COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

1 (Pages 1 to 4)

## Page 1

```
1           IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                   CORPUS CHRISTI DIVISION
3  MARC VEASEY, et al.,          )
                                 )
4        Plaintiff,              )
                                 )
5  VS.                           )  CIVIL ACTION NUMBER:
                                 )  2:13-CV-193 (NGR)
6  RICK PERRY, et al.,           )
                                 )
7        Defendants.             )
                                 )
8  _____)
   UNITED STATES OF AMERICA,     )
9                                )
         Plaintiff,              )
10                               )
   VS.                           )  CIVIL ACTION NUMBER:
11                               )  2:13-CV-263 (NGR)
   TEXAS LEAGUE OF YOUNG VOTERS  )
12 EDUCATION FUND, et al.,       )
                                 )
13   Plaintiff-Intervenors,      )
                                 )
14 TEXAS ASSOCIATION OF HISPANIC )
   COUNTY JUDGES AND COUNTY      )
15 COMMISSIONERS, et al.,        )
                                 )
16   Plaintiff-Intervenors,      )
                                 )
17 VS.                           )
                                 )
18 STATE OF TEXAS, et al.,       )
                                 )
19       Defendants.             )
                                 )
20 _____)
   TEXAS STATE CONFERENCE OF     )
21 NAACP BRANCHES, et al.,       )
                                 )
22       Plaintiffs,             )
                                 )  CIVIL ACTION NUMBER:
23 VS.                           )  2:13-CV-291(NGR)
                                 )
24 NANDITA BERRY, et al.,        )
                                 )
25       Defendants.             )
```

## Page 2

```
1  BELINDA ORTIZ, et al.,     )
                              )
2        Plaintiffs,          )
                              )
3  VS.                        )  CIVIL ACTION NUMBER:
                              )  2:13-CV-348(NGR)
4  STATE OF TEXAS, et al.,    )
                              )
5        Defendants.          )
                              )
6  _____)
7
           *************************************************
8
                        DEPOSITION OF
9
                      COBY SHORTER, III
10
                      AUGUST 12, 2014
11
           *************************************************
12
                     HIGHLY CONFIDENTIAL
13
14       ORAL DEPOSITION OF COBY SHORTER, III, produced as a
15  witness at the instance of the Plaintiff, was duly
16  sworn, was taken in the above-styled and numbered cause
17  on the AUGUST 12, 2014 from 9:05 a.m. to 2:01 p.m.,
18  before Chris Carpenter, CSR, in and for the State of
19  Texas, reported by machine shorthand, at the Office of
20  the Attorney General, 209 West 14th Street, Austin, TX
21  78701, pursuant to the Federal Rules of Civil Procedure
22  and the provisions stated on the record or attached
23  hereto.
24
25
```

## Page 3

```
1              A P P E A R A N C E S
2  FOR THE UNITED STATES OF AMERICA:
3        Jennifer Maranzano
         U.S. JUSTICE DEPARTMENT
4        CIVIL RIGHTS DIVISION
         Room 7254 NWB
5        950 Pennsylvania Avenue, N.W.
         Washington, D.C. 20530
6        (202) 514-0828
         jennifer.maranzano@usdoj.gov
7
   FOR THE NAMED DEFENDANTS AND THE WITNESS:
8
         John Scott
9        Assistant Deputy Attorney General
         ATTORNEY GENERAL OF TEXAS
10       P.O. Box 12548
         Austin, TX  78711-2548
11       (512) 475-3281
         john.scott@texasattorneygeneral.gov
12
         Rowe Jackson
13       General Counsel
         Texas Secretary of State's Office
14
15
16
17
18
19
20
21
22
23
24
25
```

## Page 4

```
1                        INDEX
2  Appearances.......................................2
3  COBY SHORTER, III
4      Examination by Ms. Maranzano...............6
5  Signature and Changes..........................192
6  Reporter's Certificate.........................193
7
                        EXHIBITS
8
9  NO. DESCRIPTION                       PAGE MARKED
10
   1   SB 362 as Introduced in the Senate      31
11
   2   Excerpt from Committee of the Whole     34
12     Transcript, March 10, 2009
   3   Excerpt from Senate Journal, March 18, 2009  35
13 4   SB 14                                   46
14 5   FAQs - Implementation of SB 14          50
15 6   January 24, 2011 e-mail                 55
16 7   Excerpt from Committee of the Whole     69
       Transcript, Jan. 25, 2011
17
18 8   E-mail chain                            75
19
   9   E-Mail, Feb. 25, 2011 and Attachments   93
20
   10  Excerpt of Texas House of Representatives  98
       Select Committee on Voter Identification and
       Voter Fraud Hearing Transcript, March 1
21     2011
22 11  E-Mail, April 8, 2011          102
23 12  E-Mail, April 20, 2011         105
24 13  Memorandum of Understanding    118
25 14  E-Mail, Oct. 16, 2013 and Attachment  128
```

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

2 (Pages 5 to 8)

|   |    |                            |     |
|---|----|----------------------------|-----|
| 1 | 15 | E-Mail 9/26/2013           | 134 |
| 2 | 16 | E-Mail, 9/27/2013          | 137 |
| 3 | 17 | E-Mail, 2/10/2014          | 143 |
| 4 | 18 | E-Mail Chain, 6/28/2013    | 150 |
| 5 | 19 | September 30, 2013 e-mail  | 150 |
| 6 | 20 | July 12, 2013 e-mail       | 156 |
| 7 | 21 | EIC Dashboard              | 164 |
| 8 | 22 | 9/18/2013 e-mail           | 185 |

**Page 7**

1   Q.  Have you talked to anyone who has been deposed
2   in this case about their deposition?
3       A.  No, ma'am.
4       Q.  Did you have any discussions about your
5   deposition with Mr. Ingram?
6       A.  Mr. Ingram in our office?  No, ma'am.
7       Q.  With Ms. McGeehan?
8       A.  No, ma'am.
9       Q.  Have you read any trial testimony from Texas V.
10  Holder?
11      A.  From who?
12      Q.  Texas versus Holder?
13      A.  No, ma'am.
14      Q.  Are you employed, Mr. Shorter?
15      A.  Yes, ma'am.
16      Q.  Where are you employed?
17      A.  I'm primarily employed at the Secretary of
18  State's Office.
19      Q.  And what's your position there?
20      A.  I am the Deputy Secretary of State.
21      Q.  And do you have other positions?
22      A.  I'm a minister.
23      Q.  Have you held other positions for the State of
24  Texas?
25      A.  Yes, ma'am.

**Page 6**

1              COBY SHORTER, III
2   having been first duly sworn to testify the truth, the
3   whole truth, and nothing but the truth, testified as
4   follows:
5              EXAMINATION
6   BY MS. MARANZANO:
7       Q.  Good morning.
8       A.  Good morning.
9       Q.  My name is Jennifer Maranzano.  I'm
10  representing the United States in this matter.  Can you
11  please state your name for the record?
12      A.  My name is Coby Shorter, III.
13      Q.  Mr. Shorter, do you understand you've been
14  placed under oath today?
15      A.  Yes, ma'am.
16      Q.  Is there any reason why you cannot testify
17  truthfully, accurately and completely today?
18      A.  No, ma'am.
19      Q.  Thank you.  Have you discussed your testimony
20  with anybody, your testimony in this deposition?
21          MR. SCOTT:  Preparation, you mean?
22      Q.  (By Ms. Maranzano)  No.  Apart from your
23  lawyers, have you discussed the fact that you are being
24  deposed with anybody?
25      A.  No, no, ma'am.

**Page 8**

1       Q.  What positions?
2       A.  Hmm, I've worked at the Department of
3   Agriculture doing economic development work.  That goes
4   back.  Let's see.  I've worked in the Office of the
5   Governor as director of agriculture and environmental
6   policy or agriculture and conservation.  That was during
7   the Bush administration.  I have worked as the Deputy
8   Director of -- Deputy Director of Governmental
9   Appointments in the Office of the Governor, Governor
10  Perry.  And I've served here as Deputy Secretary since
11  2007.
12      Q.  Is your position with the Secretary of State an
13  appointed position?
14      A.  It is appointed by the Secretary of State.
15      Q.  And which Secretary of State appointed you?
16      A.  I was initially appointed by Secretary Phil
17  Wilson, and I have served -- he was the initial
18  appointment.
19      Q.  Do you -- do you get reappointed each time
20  there's a new Secretary?
21      A.  The Secretary decides who'll be the deputy, and
22  they've -- each one since him has asked me to continue
23  to serve.
24      Q.  I see.  Prior to be appointing Deputy Secretary
25  of State, did you have any background in election

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

3 (Pages 9 to 12)

---

**9**

1  administration or election policy?
2  **A.  What do you mean specifically?**
3  Q.  Have you done any work related to elections or
4  administering elections?
5  **A.  No, ma'am.  Are you referring specifically like**
6  **to election work or -- or --**
7  Q.  Yeah, I mean -- I mean, planning elections,
8  running elections, being involved in overseeing
9  elections.
10  **A.  From a governmental perspective?**
11  Q.  From any perspective.
12  **A.  Well, I mean, I have -- I've participated in**
13  **electoral process, but in terms of working administering**
14  **elections, like I do -- well, like the Office of the**
15  **Secretary of State's Office does, no, ma'am.**
16  Q.  Okay.  Have you been involved in campaigns?
17  **A.  Yes, ma'am.**
18  Q.  Okay.  And what other -- what other work have
19  you been involved in when you say you've been involved
20  in the electoral process?
21  **A.  Well, my initial job, the one that I forgot**
22  **about since I -- before I came to Austin, I worked for**
23  **U.S. Senator Phil Gramm, and I worked on his campaign**
24  **staff.**
25  Q.  Okay.  Any other --

---

**10**

1  **A.  That was prior to coming to -- that was prior**
2  **to coming to Austin.  I had forgotten about that.**
3  Q.  Okay.
4  **A.  That was between my first job, and that was my**
5  **second job.**
6  Q.  Have you worked on any other campaigns?
7  **A.  Worked?  When you say worked, like?**
8  Q.  Worked in any capacity, volunteered, been
9  involved in?
10  **A.  Well, I volunteered.**
11  Q.  And what campaigns are those?
12  **A.  I volunteered for the Governor when he was**
13  **running for agriculture commissioner and -- and --**
14  **Governor.**
15  Q.  Have you ever served as a poll worker?
16  **A.  No, ma'am.**
17  Q.  Can you briefly describe your educational
18  background?
19  **A.  Yes, ma'am.  I have a bachelor's of science**
20  **from Texas A&M University.  I graduated in 1989, and I**
21  **have a master's of art from and Christian leadership**
22  **studies from Liberty University Seminary.**
23  Q.  Do you have any coursework or experience in IT
24  issues?
25  **A.  No more than probably a computer science course**

---

**11**

1  somewhere down the road.  I can't specifically remember
2  a specific active course, no, ma'am.
3  Q.  A computer science course somewhere in your
4  education --
5  **A.  Going to high school or something like that.  I**
6  **don't -- as an ag economics major, I don't recall -- and**
7  **it's been 20-plus years ago, I don't recall a specific**
8  **computer IT course.  I don't have an IT background.**
9  Q.  Okay.  I understand.  The Secretary of State is
10  the chief elections officer for the state, correct?
11  **A.  That is correct.**
12  Q.  And you're the second in charge after the
13  Secretary of State?
14  **A.  I'm -- yes, I am.**
15  Q.  What are your specific responsibilities with
16  regard to elections in Texas?
17  **A.  Well, my specific responsibilities are to make**
18  **sure that the elections director and the division have**
19  **the resources that they need to do their job.**
20  Q.  Do you -- do you mean monetary resources?
21  **A.  Monetary resources, computers, make sure --**
22  **office space, personnel.  I do operations, mainly**
23  **operations work within the agency.**
24  Q.  Do you primarily with regard to elections
25  oversee the director of elections?

---

**12**

1  **A.  What do you mean by primarily?**
2  Q.  Well, you said your -- I think you said your
3  main job with regard to elections was making sure the
4  director of elections had appropriate resources.  So are
5  you involved mostly at the level of overseeing the
6  director of elections?
7  **A.  Yes.**
8  Q.  Okay.  How closely do you work with the
9  Secretary of State on his responsibilities?
10  **A.  Well, I'm -- I work very closely with the**
11  **Secretary of State.  The Secretary of State does not**
12  **work exclusively with me.  The Secretary does have**
13  **access to visit with the division directors his or**
14  **herself.**
15  Q.  And does the director of elections report
16  directly to you?
17  **A.  Yes.**
18  Q.  Does the elections director administer any
19  programs directly related to voters?
20  **A.  Well, the Secretary -- the director of**
21  **elections, the elections division within our agency is**
22  **the one that works with the counties to uniformly apply**
23  **elections in the state of Texas.**
24  Q.  Does the elections director do any work like
25  voter registration drives or outreach to military and

---

Page 13

1  oversees voters or other programs that are directly
2  working with voters in the state?
3      A.  Well, when you -- I'm -- I'm really not
4  understanding your -- your question.  Could you ask me
5  again?
6      Q.  Sure.  Sure.  Let me see if I can clarify.  Are
7  there programs that the elections director works on that
8  are -- that are geared towards working directly with the
9  Texas voters such as conducting voter registration
10  drives or other activities like that?
11      A.  Well, the elections director himself does not
12  put those type of activities on.  We are, as an agency,
13  we are aware of those type of activities that go on, but
14  in terms of the office actually putting on a voter
15  registration drive from the Secretary of State's Office,
16  I'm not aware of that happening.  Because we have such a
17  close working relationship with those individuals that
18  do those things, we are aware when those -- when those
19  type of activities happen.
20      Q.  I see, but those -- when you say you have such
21  a close relationship with the individuals who do those
22  things, those are not individuals in your office,
23  correct?
24      A.  Correct.
25      Q.  Okay.

Page 14

1      A.  Or a relationship.  I -- it's probably not -- I
2  can't say whether -- we know who those people are.
3      Q.  What steps, if any, do you take to ensure that
4  the elections programs are being run effectively in your
5  office?
6      A.  I periodically meet with the director of
7  elections, as well as other division heads, for them to
8  keep me apprised of what's going on in their respective
9  divisions.
10      Q.  And how do you measure success of
11  election-related programs?
12      A.  Well, feedback from the staff, feedback from
13  the Legislature, feedback from constituents, and making
14  sure that the overall process that is in place for
15  elections in the state of Texas is successful.  You
16  know, we get through an election cycle and everything,
17  all the votes are counted, all of the issues are
18  addressed, and we prepare for the next election, making
19  sure that the staff has the resources to do that.
20      Q.  How do you tend to get feedback from
21  constituents, legislators, staff?
22      A.  Well, what do you mean?
23      Q.  Do you -- do you have any sort of formal
24  process by which you solicit feedback or is it more
25  people might contact you and let you know and --

Page 15

1      A.  Well, most of the people that contact our
2  office about elections-related issues contact the actual
3  elections division.  If the elections division feels
4  that it's something that I need to be made aware of,
5  they share it with me, but most of the contact is
6  through the process that the elections division itself
7  has in place on how they interact with the counties and
8  different groups.
9      Q.  Okay.  So the feedback that you're getting
10  mostly comes through the elections division?
11      A.  Yes, ma'am, unless someone decides to provide
12  it individually, and that's very rare.
13      Q.  Okay.  Individually, you mean to you?
14      A.  Correct.
15      Q.  Okay.  Do you have a role in appointing others
16  in the Secretary of State's Office?
17      A.  Appointing in terms of hiring employees?
18      Q.  Uh-huh.
19      A.  Yes, ma'am.
20      Q.  And what is that role?
21      A.  Any individual who is hired within the
22  Secretary of State's Office, once the division itself
23  has made a selection, I'm the individual who signs the
24  paperwork for the executive division on that individual
25  being hired, based on the recommendation from the

Page 16

1  division.
2      Q.  And the division you're talking about, is the
3  elections division?
4      A.  The elections division or any division.
5      Q.  I see.  Okay.  Were you involved in hiring
6  Mr. Ingram or appointing Mr. Ingram to be the director
7  of elections?
8      A.  Yes, ma'am.
9      Q.  And what was your role in that?
10      A.  My role was interviewing, assisting with the
11  interviewing and providing information to the Secretary
12  so that a final decision could be made.
13      Q.  What -- what were -- well, did you ask
14  Mr. Ingram to apply for that position?
15      A.  I don't recall asking him.  I think there were
16  several people that were -- that he was -- there were
17  several people that were interested in the position.
18  It's been a while since he actually applied, but I knew
19  he had an interest in the -- in the subject area.
20      Q.  Uh-huh.
21      A.  And I can't recall if I actually asked him,
22  asked him to apply, but when he -- when he applied for
23  the -- when he expressed his interest, we made sure that
24  he was able to visit with the actual Secretary so that a
25  decision could be made.

COBY SHORTER, III                                           8/12/2014
CONFIDENTIAL TRANSCRIPT

---

**17**

1  Q.  Who made sure he was able to visit with the
2  actual Secretary?  Did you say we made sure he was able?
3  **A.  When I say we, myself.**
4  Q.  Okay.
5  **A.  The secretary who does scheduling, we made sure**
6  **that he was able to visit with the Secretary as -- as**
7  **with other candidates.**
8  Q.  Okay.  What were the qualifications about --
9  what were the qualifications that Mr. Ingram possessed
10  that led you to believe he would be a good director of
11  elections?
12  **A.  Hmm, like I say, it's been a while ago, but he**
13  **seemed to have a good understanding of -- of -- good**
14  **experience as an attorney.  We felt that, based on the**
15  **individual who had served before, having a legal**
16  **background was important.  And seemed to have a passion**
17  **for election-related ideas and activities.  Seemed to**
18  **really grasp the concepts of election law.  Not saying**
19  **that he was an expert at that time, but he understood --**
20  **he appeared to understand how to work through election**
21  **law enough to understand if I don't know it now, I know**
22  **how to -- I know how to become a quick study.  Well, he**
23  **was a quick study.**
24  Q.  Do you recall if prior to his role as director
25  of elections he had a background in election

---

**18**

1  administration or election policy or he had done
2  election-related work?
3  **A.  Well, I don't recall the specific things that**
4  **he had.**
5  Q.  Uh-huh.
6  **A.  I knew that he had an interest in election**
7  **policy.**
8  Q.  Do you recall if he had any experience or
9  education in IT?
10  **A.  I don't recall if he had experience in IT.**
11  Q.  Okay.  What, if any, is your role in the
12  development of election-related legislation?
13  **A.  My role?**
14  Q.  Uh-huh.
15  **A.  Little to none.**
16  Q.  What is the role of the Secretary of State's
17  Office?
18  **A.  We are -- the Secretary of State's Office as it**
19  **relates to legislation for Texas, for the Texas**
20  **legislation?**
21  Q.  Yes, but election-related?
22  **A.  Election-related?  We are a resource.  We are a**
23  **resource to the Legislature.**
24  Q.  Do you -- do you also suggest technical fixes
25  to the election code or to laws related to elections?

---

**19**

1  **A.  What do you mean by technical fixes?**
2  Q.  If there's something in the law that doesn't
3  quite work when you administer elections, do you suggest
4  to the Legislature that they change sort of, not a
5  substantive change, but more of a technical change?
6  **A.  I don't within the agency, but our staff works**
7  **with the Legislature on technical issues if there's a**
8  **need for a technical change.**
9  Q.  And would that staff be the direct -- the
10  people within the elections division?
11  **A.  Yes, ma'am.**
12  Q.  Primarily?
13  **A.  (Witness nods head yes.)**
14  Q.  If a legislator intends to introduce an
15  election-related bill, does that person usually confer
16  with your office?
17  **A.  At -- probably at some point, I'm not really**
18  **sure where that -- where in the process, because they**
19  **don't deal directly with me.**
20  Q.  Do they do that primarily with the director of
21  elections?
22  **A.  I would say primarily and with our legal**
23  **counsel in our office.**
24  Q.  Do you -- do you know what that conferring is
25  generally about?  I know you just said you don't usually

---

**20**

1  do it yourself.  Do you have conversations as to what
2  usually happens during that conferral, like with whether
3  it's about implementing the bill, if the bill -- well,
4  let me just ask you first:  Do you -- do you have any
5  knowledge of what happens substantively during those
6  conferrals?
7  **A.  No, ma'am, unless the staff comes and shares it**
8  **with me.  I mean, they meet.  I have the confidence in**
9  **the staff that they have been doing this for a long**
10  **time, and if it's something that rises to the level that**
11  **the Secretary needs to know about it, they'll share it**
12  **with me.  But you know, technical issues and other**
13  **things, they -- they are professional enough, and we**
14  **have that type of confidence in them as a staff that**
15  **they can deal with the Legislature on those issues.**
16  Q.  I guess what I'm wondering is do legislators
17  often confer with the -- with the Office of the
18  Secretary of State about how to implement a bill, would
19  that be one of the things that they're conferring about,
20  an elections-related bill?
21  **A.  When you say how to implement?**
22  Q.  In terms of after the bill is passed, how the
23  Secretary of State would go about implementing it,
24  putting it into action?
25  **A.  I'm quite sure those -- those conversations are**

---

COBY SHORTER, III                                        8/12/2014
CONFIDENTIAL TRANSCRIPT

---

### Page 21

1  had.

2      Q.  Do legislators also talk to the Office of the
3  Secretary of State about whether the bill conflicts with
4  any other election regulations or election laws?
5          MR. SCOTT:  Objection, form, speculation,
6  vague.  You can answer.
7      Q.  (By Ms. Maranzano)  You can answer if you know.
8      A.  I don't know.
9      Q.  Okay.  Is there one Senate committee that --
10  that your office works closely with on election-related
11  bills?
12      A.  I think most of the -- on the Senate side?
13      Q.  Uh-huh.
14      A.  I think most of the Senate bills go through
15  State Affairs.
16      Q.  Do you know who on that committee you usually
17  interact with?
18      A.  Who I interact with?
19          MR. SCOTT:  Objection, form, vague,
20  time.  You can answer.
21      Q.  (By Ms. Maranzano)  The name of the committee
22  staff.
23      A.  I don't know.
24      Q.  You don't have interactions yourself?
25      A.  No, ma'am.

---

### Page 22

1      Q.  Is there a committee on the House that your
2  office usually works with on election-related bills?
3      A.  House elections.
4      Q.  Does the Secretary of State's Office ever
5  conduct research on proposed legislation related to
6  elections on its own initiative?
7      A.  What type of research?
8      Q.  Any type of research?
9          MR. SCOTT:  Objection, form.
10      A.  I would have to defer to the elections director
11  on what type of research he does.
12      Q.  (By Ms. Maranzano)  Is it your understanding
13  that at times there is research done on proposed
14  legislation of the Secretary of State's own initiative,
15  not in response to a request but --
16      A.  Well, our elections staff worked to be informed
17  on the issues.
18      Q.  And would that research be shared with anybody?
19      A.  I guess if they deem a need for it to be
20  shared.
21      Q.  How would you determine if it needed to be
22  shared?
23      A.  How would I determine?
24      Q.  Uh-huh.
25      A.  It wouldn't be a determination that I would

---

### Page 23

1  make.  It would be a determination that the ones doing
2  this whatever research would, whether or not what they
3  found needed to be shared with someone.
4      Q.  And in terms of since we're talking about
5  legislation, would this be if the Secretary of State's
6  Office conducted research on proposed legislation, would
7  they share it with the Legislature?
8          MR. SCOTT:  Objection, form, vague.
9      A.  I mean, I --
10      Q.  (By Ms. Maranzano)  Do you not have personal
11  knowledge of what I'm asking?
12      A.  Not -- not extensively, no, ma'am.  I'm really
13  not understanding --
14      Q.  Okay.
15      A.  -- what you're asking.
16      Q.  Okay.  Do you monitor the Legislature's
17  deliberation on -- deliberations on election-related
18  laws?
19      A.  No, ma'am.
20      Q.  Do you testify on some of the election-related
21  bills?
22      A.  I have had to testify only one time.
23      Q.  And what were the circumstances of that time?
24      A.  The circumstances were, I think it was back in
25  2009, there was a Senate Committee of the Whole, which

---

### Page 24

1  all the Senators were there, and the request was for the
2  Secretary to testify, and the Secretary was not
3  available to serve as the resource witness, so in the
4  Secretary's absence, I had to serve as the resource
5  witness.
6      Q.  When your office testifies, either you or the
7  director of elections or the Secretary, do you always
8  testify as resource witnesses?
9          MR. SCOTT:  Objection, form.
10      A.  Yes.
11      Q.  (By Ms. Maranzano)  What is a resource witness?
12      A.  We provide -- we provide information as asked.
13      Q.  Do you -- do you believe it's important for the
14  public to have information about the impact of a bill
15  when that bill is pending?
16          MR. SCOTT:  Objection, form, vague.
17      Q.  (By Ms. Maranzano)  Do you understand?
18      A.  Not really.  I mean --
19      Q.  If a -- if a piece of legislation is pending in
20  the Legislature, do you think it's important for the
21  public to have information about the possible impact of
22  that bill?
23          MR. SCOTT:  Objection, form.  I think it's
24  argumentative.  It assumes facts -- assumes facts and
25  vague.  You can answer if you can.

25

1   A.  Whatever the -- I think an agency should give
2   the best information they can.
3   Q.  (By Ms. Maranzano)  Do you believe that the
4   best available analysis of the impact of legislation
5   should be made public?
6       MR. SCOTT:  Objection, form, assumes
7   facts, vague and argumentative.  Go ahead.
8   A.  Say it again.
9   Q.  (By Ms. Maranzano)  Do you believe that the
10  best available analysis of the impact of legislation
11  should be made public?
12      MR. SCOTT:  Same objection.  Plus
13  speculation.
14  A.  I mean, I -- if you have -- I -- that's what
15  we've always tried to do.
16  Q.  (By Ms. Maranzano)  Before Texas started to
17  enforce SB 14, was there a method for determining a
18  voter's identity at the polls?
19  A.  Well, you had your voter registration card or
20  if you didn't use it, you could use your -- your -- I
21  mean, your other forms of ID like your driver's license
22  to actually vote.
23  Q.  And before Texas started to enforce SB 14, if a
24  voter appeared without a voter registration card or one
25  of the other forms of ID, could the voter nevertheless

26

1   cast a ballot?
2   A.  Probably provisionally.
3   Q.  Do you know what -- in what circumstances that
4   provisional ballot would be counted?
5   A.  Ma'am, I would have to defer to the elections
6   staff to tell you that.
7   Q.  Okay.  Are you aware of any problems with that
8   system prior to the enforcement of SB 14?
9   A.  I would have to --
10      MR. SCOTT:  Objection, form, overly broad.
11  A.  Election staff would have to share that with
12  you.
13  Q.  (By Ms. Maranzano)  Does the Secretary of State
14  run a voter hotline?
15  A.  We have -- I wouldn't actually call it a -- I
16  don't know if you call it a hotline.  We have an 800
17  number where voters can call to get questions answered.
18  Q.  Did you -- did you run that hotline during the
19  2013 election?
20      MR. SCOTT:  Objection, form, vague.
21  A.  The -- what do you mean, did I personally run
22  it?
23  Q.  (By Ms. Maranzano)  No, I'm sorry, your office.
24  A.  Well, the 800 number has been available.
25  Q.  So the 800 number is available regularly; is

27

1   that true?
2   A.  Yes.
3   Q.  Is there any particular hotline that gets run
4   on election days if voters are having a problem?
5   A.  Well, it's that same 800 number, if I
6   understand -- if I remember correctly, but there are --
7   it's manned by multiple individuals.
8   Q.  Do you know how many calls or approximately how
9   many calls came in during the 2013 election?
10  A.  No, ma'am, I don't.
11  Q.  Have you had any discussions with counties
12  about whether or not they run voter hotlines on election
13  days?
14  A.  None that I can recall.
15  Q.  Do you have any awareness of whether counties
16  run hotlines on election days?
17  A.  Well, the counties -- counties do share with
18  our office various issues that come up on election
19  days.  The actual systems that the counties have in
20  place, I'm not personally aware of them, but there is --
21  there is some type of mechanism.  I don't know
22  specifically what it is.
23  Q.  When voters have -- have problems or run into
24  issues on election day, are they most likely to usually
25  contact their county election official?

28

1   A.  I -- I don't know.
2   Q.  It's certainly possible that voters have
3   problems on election day and don't contact the office of
4   the Secretary of State, right?
5   A.  I don't know that either, ma'am.
6   Q.  Are you familiar with the concept of a Spanish
7   surname analysis?
8   A.  Yes, ma'am.
9   Q.  What is that?
10  A.  It's data that's provided to our office that
11  gives names by the Hispanic surnames.
12  Q.  And is that data compiled by the -- the U.S.
13  census bureau?
14  A.  I can't remember the exact agency that provides
15  it to us, but it is provided to us by some outside
16  agency.
17  Q.  Okay.  And have you ever used that list and
18  compared it against the list of registered voters as a
19  proxy for determining the number of registered voters
20  who are Hispanic?
21  A.  Well, I know our office has looked and that,
22  but we also looked at the fact that the Hispanic surname
23  in itself is not a good indicator of -- of an ethnicity.
24  Q.  And why is it not a good indicator of
25  ethnicity?

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

8 (Pages 29 to 32)

29

1    A.  There are cases in the state of Texas where
2  individuals have Hispanic surnames and they're not
3  actually Hispanic.
4    Q.  Are you familiar with a list of omission and a
5  list of commission that goes along with the list of
6  Spanish surnames?
7    A.  No, ma'am.
8    Q.  So you -- you haven't used the omission and
9  commission rates when you've done the --
10   A.  I don't know what the process has been itself
11  within our office.
12   Q.  Okay.
13   A.  Directly.
14   Q.  How often has the office of the Secretary of
15  State conducted a Spanish surname analysis, by which I
16  mean what we talked about?
17   A.  I would have to ask the elections division to
18  give that.
19   Q.  Do you think it's fair to say that they do it
20  regularly?
21   A.  I would say that it's done every time that the
22  data is provided to the office.
23   Q.  Do you have any sense of how often you get the
24  data?
25   A.  Right offhand, ma'am, I -- I don't know

30

1  specifically without --
2    Q.  Do you know --
3    A.  -- without looking at the information.
4    Q.  Do you know -- well, strike that.
5        Have you done Spanish surname analysis --
6  analyses for preclearance submissions?
7    A.  I would defer that to our director of elections
8  as to what -- what they've -- what the division has
9  actually done.
10   Q.  You don't know if they've done those for
11  redistricting commissions, for example?
12   A.  Personally, I don't know.
13   Q.  Okay.  Did you -- did you discuss the
14  preclearance submissions with the director of elections
15  when those would get submitted to the Department of
16  Justice?
17       MR. SCOTT:  Objection, form, vague.
18   A.  I'm quite sure they made me aware of them, but
19  the specifics, what they were doing with a specific
20  deal, they wouldn't necessarily go into great detail
21  with me.
22   Q.  (By Ms. Maranzano)  You do -- do you consider
23  your IT department to be knowledgeable on how to deal
24  with one of these Spanish surname analysis?
25   A.  As knowledgeable as -- as they possibly could

31

1  be.
2    Q.  Do you consider Spanish surname analyses to be
3  a routine method of analysis in your office?
4        MR. SCOTT:  Objection, form, vague.
5    A.  I -- I don't know how routinely it is done.
6    Q.  (By Ms. Maranzano)  You don't have any sense?
7    A.  As I said before, when it's provided to -- when
8  the data is provided to the office, I know that our
9  office does it as they are required to do it.
10   Q.  If the Secretary of State's Office needed
11  information about the racial and ethnic demographics of
12  registered voters, is the Spanish surname analysis the
13  best method to determine that?
14   A.  I'm not the person that would be able to tell
15  you this.
16   Q.  Who would be able to answer that?
17   A.  I don't know.
18   Q.  Okay.  Are you familiar with SB 362 that was
19  introduced by Senator Fraser in 2009?
20   A.  Are you referring to the Voter ID bill --
21   Q.  Yes.
22   A.  -- of 2009?  If that's the one that I was -- I
23  testified on, I'm vaguely familiar with it.
24   Q.  Okay.
25       (Exhibit 1 marked for identification.)

32

1    Q.  (By Ms. Maranzano)  Mr. Shorter, I'm showing
2  you what we've marked as Deposition Exhibit 1.
3    A.  Okay.
4    Q.  Do you recognize this?
5    A.  I -- I recognize that it's a bill, but
6  recognizing its specific content --
7    Q.  I'll represent to you that this is a copy of SB
8  362 as it was introduced in the Senate.  Is this the
9  bill that you testified on in the Senate?
10   A.  It appears to be, ma'am.
11   Q.  Did you have any role in the development of
12  this bill?
13   A.  No, ma'am.
14   Q.  Did you -- did you testify once on this bill or
15  more than once?
16   A.  One time.
17   Q.  Do you recall the date?
18   A.  It was around March the 10th or 11th.
19   Q.  And I believe you testified earlier that you
20  were -- you testified as a resource witness?
21   A.  Yes.
22   Q.  Did you prepare prior to serving as a resource
23  witness?
24   A.  I had staff available to -- to give me
25  information that I would potentially need to possibly

COBY SHORTER, III                                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

9 (Pages 33 to 36)

---

**33**

1   answer some of the questions, you know, but extensive
2   preparation, I didn't, you know -- I found about my --
3   the desire for the committee to have me or the Secretary
4   to testify the day before or probably the 8th or 9th or
5   somewhere around there, of March, and staff -- staff
6   gave me information that I would potentially need to
7   answer potential questions that would -- that may come
8   up.
9       Q.  Did you talk to any legislators before you
10  testified about 362, SB 362?
11      A.  No more than the bill sponsor asking, when I
12  got there, asking me to represent the Secretary of
13  State's Office.
14      Q.  Did the bill sponsor, was he the person who
15  invited the Secretary of State to testify?
16      A.  I don't remember who actually made the
17  invitation.
18      Q.  Okay.  And when you were testifying on SB 362,
19  did you take the position for or against the bill?
20      A.  No, ma'am.
21      Q.  Did several senators ask you questions about SB
22  362 during your testimony?
23      A.  It's been so long ago.  I remember them asking
24  some hypothetical issues that could potentially come
25  up.  Even though I stayed there for a while, I didn't --

---

**34**

1   I didn't testify long.
2           (Exhibit 2 marked for identification.)
3       Q.  (By Ms. Maranzano) I'm showing you what we've
4   marked as Deposition Exhibit Number 2.
5       A.  Uh-huh.
6       Q.  This I'll represent to you is an excerpt from
7   the Committee of the Whole transcript from March 10,
8   2009.  Can you look at page -- and there's a bunch of
9   different numbers at the bottom, but I'm looking at the
10  JA number, JA 003998.
11      A.  3998.
12      Q.  Yes.
13      A.  Okay.
14      Q.  And if you can just take a look at that page.
15  Do you see that Senator Van de Putte is asking you some
16  questions there?
17      A.  Uh-huh.
18      Q.  And do you see that -- that you say there's no
19  mechanisms to track race or ethnicity, and she expresses
20  some concern about gathering this information for a DOJ
21  submission.  Do you see that?
22      A.  Well, let me look.
23      Q.  Yes.
24      A.  Let's see.  Okay.  I read this, so.
25      Q.  And do you recall, do you see that you say

---

**35**

1   you'll follow up with her?
2       A.  Uh-huh.
3       Q.  Do you recall that you sent her a letter
4   following up on this inquiry?
5       A.  I recall that our staff prepared a letter for
6   my signature.
7       Q.  All right.
8           MS. MARANZANO:  If you'll mark this.
9           (Exhibit 3 marked for identification.)
10      A.  Okay.
11      Q.  (By Ms. Maranzano) I'm showing you what we've
12  marked as Exhibit 3.
13      A.  Okay.
14      Q.  If you could take a look at sort of the second
15  and then on to the third and fourth page?
16      A.  Okay.
17      Q.  Do you see there's a letter there?
18      A.  Uh-huh.
19      Q.  Do you recognize this letter?
20      A.  Like I said, it's been a long time.  I
21  remember -- I would probably recognize it even more if
22  it were in its original form from our office.  But if
23  this is the letter that is the same as our office, this
24  was the letter that was prepared by our staff to respond
25  to the questions that Senator Van de Putte had.

---

**36**

1       Q.  And can you look at the page that has the 591
2   on the top right?
3       A.  Uh-huh.
4       Q.  And there's a question about does the Secretary
5   of State track the racial status of registered voters?
6       A.  Uh-huh.
7       Q.  And then do you see that you say that
8   information on voters with Hispanic surname is
9   inconclusive?
10      A.  Hold on.  I haven't gotten there yet.
11      Q.  Okay.
12      A.  Let me see, where is it?
13      Q.  That part is towards the end of the first
14  paragraph.
15      A.  Okay.
16      Q.  Now, is your basis for -- well, what is your
17  basis for characterizing it as inconclusive?  Is it what
18  we discussed earlier?
19      A.  I think clearly is what it states here.
20      Q.  So when you said, "We do not have" -- "we do
21  have data on the number of registered voters with
22  Hispanic surnames, but the data is inconclusive," what
23  is your basis for saying it's inclusive?
24      A.  Because of what it says here, the rest of that
25  sentence.  It simply matches the surname against the

---

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

10 (Pages 37 to 40)

---

**37**

1  identified Hispanic surnames.
2      Q.  And in 2009, did you have any other way of
3  determining if a voter was Hispanic?
4      A.  Not to my knowledge.
5      Q.  So would you think that a Hispanic surname
6  analysis would be the best available way to determine if
7  the voter was Hispanic?
8          MR. SCOTT:  Objection, form.
9      A.  I think based on what we said here it's
10 inconclusive.
11     Q.  (By Ms. Maranzano)  Do you see in the next
12 paragraph, you talk about submissions to the Department
13 of Justice, and then in the second sentence you say,
14 "For instance," and can you read that sentence.  "The
15 Texas Legislative Council assisted with the compilation
16 of data on race and ethnicity on redistricting bills."
17 Do you know what the Texas Legislative Council did to
18 compile all the data on race and ethnicity for
19 redistricting bills?
20     A.  Personally, I don't know, ma'am.
21     Q.  Do you know when you wrote this letter or sent
22 this letter?
23     A.  As I -- as I stated, this letter was an effort
24 of our office to answer the Senator.  So our staff
25 drafted the letter, who -- those are the individuals who

---

**38**

1  are the experts in this area.  Since I was the
2  individual who had been asked by the Senator, the letter
3  was -- we responded to her under my authority.
4      Q.  So as you sit here today, you don't know what
5  the Texas Legislature did; is that correct -- or I'm
6  sorry, the Texas Legislative Council did for that
7  analysis?
8      A.  I don't recall back to 2009.
9      Q.  Okay.  And then do you see that the next
10 sentence says, "A similar effort to obtain such
11 demographics may have required for a voter
12 identification bill"?  Is it fair to say that in March
13 of 2009, that you were aware of the potential need to
14 identify the racial demographics of registered voters
15 when you submitted the Voter ID bill to the Department
16 of Justice?
17     A.  I don't know, ma'am.
18     Q.  Well, what -- what -- what do you mean by that
19 sentence?
20     A.  As I said, back in 2009, I -- I don't -- other
21 than what it says, I don't know.
22     Q.  And in March of 2009, is it fair to say that
23 you knew the Legislature was interested in the
24 demographics of registered voters based on your
25 testimony as a resource witness?

---

**39**

1          MR. SCOTT:  Objection, form, vague.
2      Q.  (By Ms. Maranzano)  That -- wasn't that the
3  question that we looked at for Senator Van de Putte
4  where she was interested in asking about the
5  demographics of registered voters?
6      A.  I thought Senator Van de Putte was asking about
7  Hispanic surnames.  Without looking at the whole thing,
8  I thought that was what we were talking about.
9      Q.  As you see on page 3998, Senator Van de Putte
10 says --
11     A.  Hold on, hold on, 3 what?
12     Q.  3998.
13     A.  3998.
14     Q.  JA 00.
15     A.  Okay.
16     Q.  And Senator Van de Putte says, "So how would be
17 able if we don't know" --
18     A.  Where are you, ma'am?
19     Q.  In the middle of the page, Line 10.
20     A.  Okay.
21     Q.  And there's a comment by Senator Van de Putte
22 where she talks about the data, and she's asking about
23 registered voters who are African American or Latino.
24 Do you see that?
25     A.  Uh-huh.

---

**40**

1      Q.  So at least one legislator was interested in
2  knowing that, correct?
3      A.  I would presume that she has an interest in it.
4      Q.  And can you -- can you turn back to this letter
5  and look at the very first question here that's on page
6  590?
7      A.  Uh-huh.
8      Q.  And do you see that it's asking about the
9  difference between a citizenship certificate and
10 citizenship papers?
11     A.  Uh-huh.
12     Q.  And if you could take a look at SB 362, Section
13 63.0101.
14     A.  Wait a minute.  Where are you now?  Hold on,
15 because you --
16     Q.  I'll find the page number.
17     A.  -- you're taking it too fast here.
18     Q.  It's on Page 5 or JA 3244.
19     A.  Wait a minute.  Which document?  You've given
20 me two documents.  Which document are you talking about?
21 Are you talking about this one or are you talking about
22 this one?
23     Q.  The SB 362.
24     A.  All right.
25     Q.  Yeah.

---

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

11 (Pages 41 to 44)

41

1   A.  Now where do you want me to go in this?
2   Q.  Page 5.
3   A.  Page 5.
4   Q.  Which has a JA 3244?
5   A.  JA.  Okay.
6   Q.  And then if you look at Section 63.0101, which
7   is at Line 11.
8   A.  Line 11, okay.
9   Q.  Okay.  And then I want you to take a look at
10  this section.  There's a Section A and a Section B in
11  63.0101.
12  A.  Okay.
13  Q.  And just let me know when you're ready.
14  A.  What else do you want me to look at?
15  Q.  Section A and B.  Did you look at that?
16  A.  Section A.  Okay.
17  Q.  Do you see Section A has language about a
18  United States citizenship certificate, correct?
19  A.  Uh-huh.
20  Q.  And Section B has language about a United
21  States -- or United States citizenship papers.  Do you
22  see that?
23  A.  Now where is Section B?  Okay.  I see papers
24  here.  Certificate here.  Okay.
25  Q.  And then in this letter, you're answering the

42

1   question of explaining the difference between a
2   citizenship certificate and citizenship papers.  Do you
3   see that?
4   A.  Okay.
5   Q.  Okay.  Now, in the second paragraph of the
6   letter, there's discussion of citizenship papers.  And
7   it states that the passport -- a U.S. passport and
8   certificate of citizenship would satisfy Section 63.0101
9   A and B.  And then it separately discusses birth
10  certificates and certificates of naturalization.  So my
11  question is:  Was it your position in 2009 that a
12  certificate of naturalization was intended to be
13  accepted under 63.0101 A?
14  A.  My personal position?
15  Q.  The position -- yeah, your personal position?
16  A.  My personal position, I didn't have a position.
17  Q.  What about the position of your office?
18  A.  All of this?
19  Q.  Uh-huh.
20  A.  A lawyer would have to tell me what this means.
21  I'm not a lawyer.  So I would have to defer to the
22  elections staff to tell me, okay, this was the response.
23  They verified that this needed to be in there.  I was
24  responding on behalf of the agency because I was the --
25  the witness that was up there.  But the staff was able

43

1   to -- had to draft the language to satisfy the question
2   that had been asked.  Without a staff here to walk me
3   through it again after five years, I don't remember.
4   Q.  Okay.  So sitting here today, you don't know
5   the answer to that?
6   A.  The answer to what?
7   Q.  To whether the certificate of naturalization
8   was, in 2009, whether your office thought that that was
9   part of 63.0101 A?
10  A.  I feel comfortable that what our staff put in
11  this letter was the most accurate information they had.
12  Q.  Okay.  Now, this letter is dated March 11,
13  correct?
14  A.  Yes, it appears to, yes, ma'am.
15  Q.  And you testified on March 10th, although I
16  believe the testimony went into the next day; is that
17  correct?
18  A.  Ma'am, I don't remember.  It's -- it -- I -- I
19  started -- I sat there starting the evening of the
20  9th.  I went through the 10th.  And I testified in the
21  wee hours of the morning of the 11th, somewhere like
22  5-ish or so in the morning.  I don't -- it was early.
23  Q.  Uh-huh.
24  A.  Most people weren't working about that time.
25  And upon -- upon getting through, I went back to our

44

1   staff and said we have these questions.  The staff
2   members that were there were able to write down the
3   questions.  We need to respond to the Senator.
4   Q.  And you responded that same day, these are in
5   the day, correct?
6   A.  If that's what this letter says.  Now, my dates
7   may be off on when I actually testified.  I just
8   remember it was early in the morning.
9   Q.  Now, when you -- when you serve as a resource
10  witness or when you served as the resource witness, the
11  one time, did you think it was important to respond to
12  all the questions that the legislators asked you?
13  A.  I thought it was important to answer the
14  questions that asked me.
15  Q.  And would you try to respond such as in this
16  case even if you had to go back and get more information
17  and bring it back to them?
18  A.  If that had been the case.
19  Q.  Does the Legislature's funding of your office
20  motivate you to respond to their requests?
21  A.  The Legislature motivates me to respond to
22  their requests.
23  Q.  Do you believe that you're equally responsive
24  to members of the majority political party and the
25  minority political party?

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

---

45

1    A.  We're responsive to anyone that asks the
2  question.
3      Q.  Are there any circumstances, and this can be
4  even broader than just when you testified, in which you
5  have not responded to a legislator's question or request
6  for information?
7          MR. SCOTT:  Objection, vague and
8  ambiguous.
9      A.  What do you mean?
10     Q.  (By Ms. Maranzano)  As you sit here today, can
11 you recall any times when a legislator has asked you a
12 question or asked for information and you haven't
13 responded?
14         MR. SCOTT:  Objection, vague and
15 ambiguous.  You can answer.
16     A.  I -- ma'am, not that I -- I don't know of
17 any.  I mean, I can't recall any.
18     Q.  (By Ms. Maranzano)  Do you -- do you recall if
19 you got a response to your letter to Senator
20 Van de Putte?
21     A.  I don't recall.
22     Q.  Did you have communications about the substance
23 of the letter with any other Senators?
24     A.  No, not that I can recall.
25     Q.  With the Lieutenant Governor's Office?

---

46

1      A.  Not that I can recall, ma'am.
2      Q.  With any members of the House?
3      A.  No, ma'am, not that I can -- none that I can
4  recall.
5          (Exhibit 4 marked for identification.)
6      Q.  (By Ms. Maranzano)  I'm handing you what we've
7  marked as Exhibit 4.  Do you recognize this document?
8      A.  I see two exhibit numbers on here.
9      Q.  Oh, yeah, that's --
10     A.  One says that 5 and one that says 4.
11     Q.  Well, 5 is because it's a previously used
12 exhibit.
13     A.  Oh, okay, all right.  So this would be Senate
14 Bill 14?
15     Q.  Did you have any role in the development of
16 Senate Bill 14?
17     A.  Direct -- direct development?
18     Q.  Yes.
19     A.  No, ma'am.
20     Q.  How about indirect development?
21     A.  Well, I supervised our elections staff.
22     Q.  Did they have -- did they have a role in the
23 development of the bill?
24     A.  I'm quite sure they answered questions from the
25 Legislature if they had them.

---

47

1      Q.  Do you know -- do you know who they had
2  conversations with?
3      A.  Absolutely -- no, ma'am, I --
4      Q.  But you didn't have any conversations with
5  legislators about the bill?
6      A.  No, ma'am.
7      Q.  Do you know if Senator Fraser consulted with
8  anyone in the elections division to ensure that the bill
9  did not create any conflict with the election code?
10     A.  I have no idea, ma'am.  You're talking about
11 this bill, Senate Bill 14?
12     Q.  Senate Bill 14.  Does your office receive
13 notification of allegations of in-person voter
14 impersonations?
15     A.  If our elections department would -- would
16 receive those, elections division, rather.
17     Q.  And are those something Mr. Ingram or whoever
18 the director of elections is discusses with you?
19     A.  Not in great detail, no more than if there's
20 one, we have one and they were following their
21 procedures for passing it on.
22     Q.  So you would know that there was an allegation
23 but you wouldn't know the details; is that correct?
24     A.  Quite possibly, yes, ma'am, I --
25     Q.  Prior to the passage of SB 14, were you aware

---

48

1  of any allegations of in-person voter impersonation in
2  Texas?
3      A.  I -- I don't -- you know, when you've been
4  around seven years, a lot of things happen at different
5  times.  I don't know if they happened before the bill or
6  after.
7      Q.  Well, as you sit here today, what allegations
8  of in-person voter impersonation are you aware of?
9      A.  I can't remember any specific ones.
10     Q.  Okay.
11     A.  Because they weren't -- they were passed on to
12 the appropriate authorities.
13     Q.  Do you know whether it's the Secretary of
14 State's position that under SB 14, a citizenship
15 certificate includes certificates of naturalization?
16     A.  What do you mean?
17     Q.  Well, can you take a look at -- let me find the
18 right page for you.
19     A.  Are you talking about the types of --
20     Q.  Yes.
21     A.  -- identification?
22     Q.  Yes.
23     A.  I know the different forms, but I would have to
24 have staff tell me which specific forms fall into what
25 categories.

---

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

13 (Pages 49 to 52)

---

**49**

1    Q.  Okay.  Are you aware of whether a certificate
2   of naturalization is accepted as a form of ID under SB
3   14?
4       **A.  Are you considering that a certificate of**
5   **citizenship?**
6       Q.  That's what I'm asking you.
7       **A.  I mean, is that what you were asking about?**
8       Q.  Yes, exactly.
9       **A.  I think it is one of the forms.  I had to go**
10  **back and think about that.  Citizenship is a -- should**
11  **be a form.**
12      Q.  And do you know who made that decision?
13      **A.  Who in terms of the bill?**
14      Q.  Well, if you look at the bill -- let's just
15  look at the bill for a moment.
16      **A.  So what page are you going to?**
17      Q.  Page 9 or Page 424 or DE --
18      **A.  My 424 says Page 7.**
19      Q.  DE 4188, do you see that?
20      **A.  Okay.  4188.**
21      Q.  And then Section 14 of the bill.
22      **A.  Okay.**
23      Q.  That's probably the easiest way to do it.  And
24  then do you see -- if you could just take a look at the
25  forms of ID that are --

---

**50**

1       **A.  All right.**
2       Q.  -- here.
3       **A.  Okay.**
4       Q.  Okay.  Now, let's take a look at this.
5       **A.  Okay.**
6          MS. MARANZANO:  We are marking this
7   Deposition Exhibit 6 -- 5.
8          (Exhibit 5 marked for identification.)
9       **A.  This is 4.  Okay, I got it.**
10      Q.  (By Ms. Maranzano)  Okay.  And I believe this
11  is on the second page.  It's on Page 463240.
12      **A.  463 what?**
13      Q.  Which is Page 4 at the top and the letter G.
14      **A.  Uh-huh.**
15      Q.  And do you see that according to the Secretary
16  of State frequently -- well, do you recognize this
17  document, what's been marked as Deposition Exhibit 5?
18      **A.  I recognize that it's a FAQ document.**
19      Q.  And do you see that under Section G, it says
20  the Secretary of State has determined -- researched the
21  legislative intent.  And do you see that the
22  determination has been made that citizenship
23  certificates includes certificates of naturalization?
24      **A.  Wait a minute.  Where are you?**
25      Q.  Under letter G.

---

**51**

1       **A.  G.  Okay.**
2       Q.  Okay.  So certificate of citizenship --
3   certificate of naturalization, that's not written
4   explicitly in the part of the bill that we just looked
5   at, right?
6          MR. SCOTT:  Objection, form, vague.
7   Mischaracterizes the bill and the document -- the bill,
8   SB 14, speaks for itself.  Go ahead.
9       Q.  (By Ms. Maranzano)  Did you see when you looked
10  at 63.0101, did you see certificate of naturalization
11  written in?
12      **A.  I have to go back and look.  I've seen so much**
13  **today.  Which one?**
14      Q.  That one that you have open.
15      **A.  And what am I looking at?**
16      Q.  63.0101?
17      **A.  63.1010.**
18      Q.  SB 14.
19      **A.  Okay.  And where am I looking?  Where do you**
20  **want me to look?**
21      Q.  I'm just asking you if you see certificate of
22  naturalization listed there.
23          MR. SCOTT:  Objection, form.  The document
24  4189 speaks for itself.
25      **A.  I see what the bill says.**

---

**52**

1       Q.  (By Ms. Maranzano)  So I'm wondering who made
2   the decision to include certificate of naturalization as
3   a form of ID that was allowed in -- under SB 14?
4          MR. SCOTT:  Objection, form.  I think this
5   is getting awful close to the deliberative process
6   privilege that the agency goes through.  And so I think
7   other than what the documents say on their surface, I
8   would --
9          Well, first of all, do you know?  I mean,
10  if you don't know, that may be the easiest way.  If you
11  don't know, just let her know.  But if you do know, then
12  I've got to follow up.
13      **A.  I don't know other than it would happen in the**
14  **elections division.**
15      Q.  (By Ms. Maranzano)  Okay.  Do you know what the
16  basis was of that decision?
17      **A.  No, ma'am.**
18      Q.  Do you know if that decision is memorialized in
19  a regulation?
20      **A.  What do you mean by memorialized?**
21      Q.  Is there a regulation -- is there anything in
22  writing other than these frequently asked questions that
23  says certificate of naturalization should be included?
24      **A.  I'm not aware.**
25      Q.  Okay.  Is this the case that the Secretary of

---

53

1 State has regulatory authority with regard to the forms
2 of ID allowed under SB 14?
3    **A. I think Secretary of State's Office is not a**
4 **regulatory agency.**
5    Q. Do you think that the decision to allow a
6 certificate of naturalization as one of the allowable
7 forms of ID under SB 14 is the decision that could be
8 reversed by a future administration?
9    MR. SCOTT: Objection, form, speculation.
10 Objection, form, foundation. You can answer.
11    **A. I have no clue, ma'am.**
12    Q. (By Ms. Maranzano) Did you have any
13 conversations -- you can put that document away.
14    **A. This one? I can put this away?**
15    Q. Yes.
16    **A. Okay.**
17    Q. Did you have any conversations with any
18 legislators about SB 14 while it was being considered?
19    **A. Ma'am, none that I can recall.**
20    Q. Did you have any conversations with anyone in
21 the Governor's office about SB 14?
22    **A. None of -- none of any great substance.**
23    Q. Did the Governor designate SB 14 as a
24 legislative emergency?
25    **A. I don't -- I don't remember.**

54

1    Q. Do you know why SB 14 would have been
2 designated as a legislative emergency?
3    **A. No, ma'am.**
4    Q. Was there any factual basis that necessitated
5 the Legislature to consider Voter ID bills in the first
6 60 days of the session?
7    MR. SCOTT: Objection.
8    **A. I have no idea.**
9    Q. (By Ms. Maranzano) Was there any spike in
10 in-person voter impersonation that had occurred?
11    **A. I don't know.**
12    Q. Are you aware of any particular decline in
13 voter confidence that has occurred?
14    **A. I'm not aware of any.**
15    Q. Did you provide any input into the decision to
16 make SB 14 a legislative emergency?
17    **A. No, ma'am.**
18    Q. Did the Secretary of State?
19    **A. I'm not aware of -- of that.**
20    Q. Wouldn't the Secretary of State be in the best
21 position to know whether there was an election-related
22 issue that needed to be addressed in the first 60 days
23 of the legislative session?
24    MR. SCOTT: Objection, form, foundation,
25 speculation.

55

1    **A. I mean, bills don't start with the Secretary of**
2 **State's Office.**
3    Q. (By Ms. Maranzano) But the Secretary of State
4 is the chief election official, correct?
5    **A. We're the chief resource.**
6    Q. Now, you said I believe earlier that you
7 usually work with committees, the Senate Committee on
8 State Affairs for election bills.
9    **A. I don't.**
10    Q. Your office does, correct?
11    **A. Yes.**
12    Q. And are you aware that SB 14 was referred
13 directly to the Committee of the Whole?
14    **A. Ma'am, I don't -- I don't know the history of**
15 **the legislative process on the bill.**
16    Q. Okay. Fair enough.
17    MS. MARANZANO: Can you mark this?
18    (Exhibit 6 marked for identification.)
19    MS. MARANZANO: Okay. At this point,
20 before we go further, I just want to note for the record
21 that this is a Highly Confidential document, so we're
22 going to designate this part of the transcript as highly
23 confidential.
24    MR. SCOTT: We have run into this issue
25 with our wonderful court reporter before.

56

1    MS. MARANZANO: Yes.
2    MR. SCOTT: And from his standpoint, we
3 have had the following agreement on previous
4 depositions. We want to see if we can get the same one
5 on this one so we make his life as easy as possible.
6 Which is that we put the whole deposition in some sealed
7 content, but the only time anybody needs to do anything
8 special is when we get to that portion of the depo that
9 deals with the highly confidential. So we treat it as
10 though it's, from an administrative process, he's
11 allowed to serve it upon us in a sealed manner, and it
12 just puts everybody on alert that they need to --
13 there's something in that deposition that's highly
14 confidential.
15    MS. MARANZANO: I see. So we'll --
16    MR. SCOTT: So the whole depo --
17    MS. MARANZANO: -- mark the whole
18 transcript as Highly Confidence, but we'll note on the
19 record when we're --
20    MR. SCOTT: Yes.
21    MS. MARANZANO: -- using a document that's
22 --
23    MR. SCOTT: Yes. That's way --
24    MS. MARANZANO: Yeah.
25    MR. SCOTT: -- nobody needs any special

57

1 permission to do anything except when we get to that
2 highly confidential section.
3          MS. MARANZANO:  That's fine as long as we
4 can agree that, you know, we're doing it as an
5 administrative convenience --
6          MR. SCOTT:  Absolutely, yes.
7          MS. MARANZANO:  -- but we're not agreeing
8 that the whole transcript is confidential.
9          MR. SCOTT:  Yes, yes, absolutely.
10         MS. MARANZANO:  All right.  But just so
11 I'm clear, will we continue to note on the record when
12 we're using highly confidential?
13         MR. SCOTT:  Absolutely.
14         MS. MARANZANO:  Okay.
15         MR. SCOTT:  And so we're just dealing with
16 it, it just kind of -- placing that burden -- I mean,
17 that removes the burden on him to break out any
18 subparts, and it just alerts somebody that there's
19 something in that document that's highly confidential.
20         MS. MARANZANO:  I see.  That makes sense.
21         MR. SCOTT:  And we only deal with the
22 subpart as being highly confidential.  The rest remains
23 un --
24         MS. MARANZANO:  Okay.
25         MR. SCOTT:  -- sharable with anybody you

58

1 want.
2          MS. MARANZANO:  Okay.  That sounds good.
3          MR. SCOTT:  Thank you.
4     Q.  (By Ms. Maranzano)  Mr. Shorter?
5     A.  Uh-huh.
6     Q.  I am showing you what we've marked as
7 Deposition Exhibit 6.  Do you recognize this document?
8     A.  No, ma'am.
9     Q.  Have you ever seen it before?
10    A.  No, ma'am.
11    Q.  Do you know who Jennifer Fagan is?
12    A.  Yes, ma'am.
13    Q.  And who is she?
14    A.  She works for Senate Committee on State
15 Affairs, or she used to.  I don't know if she's still
16 there or not.
17    Q.  And in 2011, she -- she worked for the Senate
18 Committee on State Affairs, correct?
19    A.  I think she did, yes.
20    Q.  In 2011?  And Senator Duncan chaired the
21 committee on State Affairs, correct?
22    A.  Yes, ma'am.
23    Q.  And did he preside over the debate on SB 14?
24    A.  I was not at that hearing.
25    Q.  Now, do you see in this document, Ms. Fagan is

59

1 asking Ms. McGeehan whether the Secretary of State or
2 any other local election officials collect ethnicity
3 information on voters?
4     A.  Uh-huh.
5     Q.  Who is Ms. McGeehan?
6     A.  Ms. McGeehan is the former director of
7 elections.
8     Q.  And when she sent this e-mail to Ms. McGeehan,
9 at that time, was Ms. McGeehan the director of
10 elections?
11    A.  It appears she was based on the e-mail here.
12    Q.  And Ms. McGeehan responded and talked about the
13 availability of the Hispanic surname analysis, correct?
14    A.  That appears to be correct.
15    Q.  Now, this e-mail was sent on January 24th,
16 right?
17    A.  That's what it -- yes, ma'am, according to this
18 document.
19    Q.  And is that the day before the Senate Committee
20 of the Whole took up SB 14?
21    A.  I have no idea.
22    Q.  Did Ms. McGeehan inform you that she's been
23 asked by Senator Duncan's staff to provide information
24 about the ethnicity of voters?
25    A.  I don't recall.

60

1     Q.  Are you aware of whether she made any response
2 to Ms. Fagan or to Senator Duncan's staff?
3     A.  I'm not aware.
4     Q.  Okay.  So --
5     A.  Other than what you've shown me here.
6     Q.  Okay.  Those are all the questions I have about
7 this document.
8     A.  Okay.  I can turn this one down?
9     Q.  Yes.
10    A.  Who do I give this one to?
11         MR. SCOTT:  Same pile.
12         MS. MARANZANO:  You can just put them in
13 the pile.
14    A.  Okay.
15    Q.  (By Ms. Maranzano)  Are you aware of whether
16 the division, the elections division at this time,
17 around January 24th, had prepared a monthly report of
18 Hispanic surname voters by household and county?
19    A.  Ma'am, I'm not aware.
20    Q.  Would it surprise you to learn that Mr. Ingram
21 testified that that's the case?
22    A.  No, it wouldn't surprise me.  I'm just -- I
23 mean -- I don't -- what -- what do you mean?
24    Q.  Would -- are you aware of whether the elections
25 division prepared a report of Hispanic surname voters

COBY SHORTER, III                                        8/12/2014
CONFIDENTIAL TRANSCRIPT

16 (Pages 61 to 64)

---

**61**

1  each month?
2      A.  I don't know exactly how often, how frequent it
3  is prepared.
4      Q.  Okay.
5      A.  I know it is prepared.
6      Q.  Okay.
7      A.  The frequency of it is not something that they
8  put on my desk every month.
9      Q.  Okay.  So that's what you were referring to
10 earlier when you said you know the list was prepared.
11     A.  I know it's prepared.  I know they follow
12 whatever procedures, but how -- how often is it done, I
13 can't give you without them telling me, without me
14 asking them, I can't give you a specific answer.
15     Q.  Do you -- do you know how the report is
16 prepared?
17     A.  What do you mean by how it's prepared?
18     Q.  Do you know what information is contained in
19 that report?
20     A.  It's been a while since I've seen one.  I would
21 have to see one to refresh my memory on it.
22     Q.  Do you know what the purpose of the report is?
23     A.  Not in great detail.
24     Q.  Do you give that report out to people who ask
25 for information about the ethnicity of voters?

---

**62**

1      A.  Where all the -- where all the staff provides
2  that particular list and who all they provide it to, I
3  don't know specifically.  Whoever the -- whoever asks
4  for it is more than likely capable of getting it.
5      Q.  So although you testified earlier that you
6  don't believe that the Spanish surname analysis is a
7  completely accurate --
8      A.  Uh-huh.
9      Q.  -- method, the Secretary of State's Office has
10 disseminated information using that form of analysis,
11 correct?
12     A.  That's the only information we have.
13     Q.  Do you know if you've ever disseminated that
14 information to the State Affairs Committee?
15     A.  Ma'am, I -- I specifically, I don't -- I
16 don't know.  I mean, I can't give you a -- if it was
17 requested by the committee, I'm sure sure our staff did
18 the best of their ability to provide it.
19     Q.  Do you recall that Ms. McGeehan testified
20 during the Committee of the Whole proceedings on the
21 Senate Bill 14?
22     A.  I remember her testifying.
23     Q.  Now, why did she testify in this case in SB 14
24 when --
25     A.  I have no clue.

---

**63**

1      Q.  Okay.
2      A.  It was not my decision.
3      Q.  Was it -- whose decision was it?
4      A.  I would presume it's the decision of the
5  committee.
6      Q.  Did you accompany Ms. McGeehan when she
7  testified as a resource witness?
8      A.  I was in the room.
9      Q.  And in the room, you mean you went to the --
10     A.  To the Senate floor.
11     Q.  Okay.  And you -- did you stay during the
12 committee's debate?
13     A.  Some of it.  I can't remember if I stayed for
14 the whole thing, ma'am.
15     Q.  Was that a common practice for you to accompany
16 other people when they went to the Legislature to
17 testify?
18     A.  It wasn't necessarily common practice, but in
19 that it was the Senate of the Whole, again, we didn't
20 know what to expect.  Ms. McGeehan wanted -- because I
21 had been there, I had been the witness before,
22 Ms. McGeehan as the elections director before the
23 Committee of the Whole just wanted me there, if nothing
24 more, for moral support.
25     Q.  And prior to the hearing on January 25, 2011

---

**64**

1  where Ms. McGeehan testified --
2      A.  Uh-huh.
3      Q.  -- the division had updated its analysis of
4  voters who had not supplied a driver's license number or
5  Social Security number with their voter registration
6  applications, correct?
7      A.  I don't remember.
8      Q.  Do you -- do you know how an analysis like that
9  would be derived?
10         MR. SCOTT:  Objection, form, foundation.
11     A.  What type of analysis?
12     Q.  (By Ms. Maranzano)  A list of voters who did
13 not supply a driver's license number or a Social
14 Security number, would that analysis be done by only
15 looking at the TEAM database?
16     A.  Ask the question -- ask me the question again,
17 please.  I didn't quite understand what you were asking.
18     Q.  Sure.  When the Secretary of State's Office
19 gives out information about voters who have not supplied
20 a driver's license number or a Social Security number on
21 a voter registration application, are they getting that
22 information from the TEAM database?
23     A.  Well, I mean, it would depend on what type of
24 request it is.
25     Q.  What do you mean by that?

---

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

17 (Pages 65 to 68)

65

1    A.  Just what I said, it depends on, you know, the
2  nature of -- of who's asking the question.  I mean,
3  what -- what is it that you're trying to -- to figure
4  out?  I mean, is it can the data be -- can the question
5  be answered simply by looking at TEAM data, or is there
6  another set of data that needs to be looked at as well.
7  I'm can't be -- I'm not the one that could tell you
8  that.  The election staff would be able to answer that
9  question as to whether or not the answers for a
10  particular query can be determined only by data that we
11  have in TEAM.
12    Q.  Okay.  I think maybe I'm not being clear.  When
13  -- when the elections division is supplying a list that
14  has the number of voters who didn't write their driver's
15  license number or their Social Security number on their
16  voter registration application, would that be -- that
17  information, would that come just from TEAM?
18    A.  Well, I think I've answered it as best I could.
19  It depends on, you know, are you just looking at the --
20  all of the data that's in TEAM?  I can't remember every
21  piece of information in TEAM.  Or are you having to look
22  at outside data to make comparisons with?
23    Q.  The information that would be supplied on the
24  voter registration application, what other database
25  would contain that?

66

1    A.  Well, not all voter applications have driver's
2  license.
3    Q.  Right, so -- so, but in terms of where you
4  would get that -- that information for the voter
5  registration applications that did have driver's license
6  numbers or that did have another number written on it,
7  that information comes from TEAM, right?
8    A.  I would presume.
9    Q.  Okay.  And as I think you just said, not every
10  voter registration application has a driver's license
11  number or a Social Security number, correct?
12    A.  That's what I've been told by staff.
13    Q.  And in fact, voters weren't required to supply
14  those numbers until 2006, correct?
15    A.  I don't know the exact date, was it 2006, but
16  I've been told that that was not a nonrequirement.
17    Q.  So information about voters who wrote or didn't
18  write a driver's license number or Social Security
19  number on a voter registration application, that
20  information is of limited use if you're trying to
21  determine who has a driver's license, correct?
22    MR. SCOTT:  Objection, form, foundation,
23  speculation.
24    A.  I'm not a technical person.  I wouldn't know.
25    Q.  (By Ms. Maranzano)  Now, besides updating the

67

1  list of voters who had driver's -- or wrote a driver's
2  license number on their voter registration application,
3  did the division, to your knowledge, conduct any other
4  research related to SB 14 before Ms. McGeehan testified?
5    A.  I can't remember.  There were some matching
6  exercises with -- with outside databases, but our staff
7  could never conclusively provide answers with any
8  confidence.
9    Q.  And I think -- I want to talk a little bit more
10  about that in a second.  But is it the case that the
11  Secretary of State's Office had a jury wheel from DPS
12  since about October 2010?  Does that sound correct to
13  you?
14    A.  I don't know the exact date, but we do have a
15  jury wheel.
16    Q.  And is it possible to match that jury wheel
17  with -- against TEAM?
18    A.  There's a process that the jury wheel goes
19  through, ma'am, not being a technical person, there is
20  some type of interaction.  I can't specifically speak to
21  how those two match together.
22    Q.  Okay.  I understand.  Did you anticipate when
23  you went over to the Committee of the Whole with
24  Ms. McGeehan that she was going to be asked for
25  information about the number of voters who didn't have a

68

1  driver's license or ID card?
2    A.  I had no -- I made no anticipation whatsoever.
3    Q.  Did you recall that that had come up in 2009?
4    A.  Ma'am, I don't even remember 2009 much, and I
5  don't remember much of what happened that day.
6    Q.  Do you think that a match against -- of DPS
7  jury pool and TEAM would have been a more accurate way
8  to get the number of individuals who might not have a
9  driver's license than using the number of individuals
10  who wrote or didn't write a driver's license number on
11  their voter registration card?
12    MR. SCOTT:  Objection, form, calls for
13  speculation.
14    A.  I don't know.
15    Q.  (By Ms. Maranzano)  When you were at -- at the
16  Capitol building on January 25th with Ms. McGeehan, did
17  you speak to legislators about SB 14 prior to her
18  testimony?
19    MR. SCOTT:  Objection, form, vague.  I
20  mean he goes to the Capitol every day.  Their office is
21  over there.
22    Q.  (By Ms. Maranzano)  When you were there with
23  Ms. McGeehan prior to her testimony?
24    A.  Not that I recall.
25    Q.  You don't recall a conversation with Senator

69

1  Williams?
2    A.  No, ma'am, I don't recall one.  I -- I just
3  don't recall.
4        MS. MARANZANO:  Can you please mark this?
5        (Exhibit 7 marked for identification.)
6    A.  When was this?
7    Q.  (By Ms. Maranzano)  I'm showing you what we've
8  marked as Deposition Exhibit 7.
9    A.  Okay.
10   Q.  This is an excerpt only, it's not the whole
11  transcript, from the January 25th, 2011 Committee of the
12  Whole proceeding.
13   A.  Okay.
14   Q.  On SB 14.  Can you turn to Page 460?
15   A.  460, okay.
16   Q.  Do you see that --
17   A.  Hold on.  460, okay.
18        MR. SCOTT:  And for the record, that's
19  Bates Number TX 816.
20        MS. MARANZANO:  Thank you.
21   Q.  (By Ms. Maranzano)  On Line 7, do you see that
22  Senator Davis is asking a question of Ms. McGeehan about
23  the number of voters who wrote down their driver's
24  license on their voter registration application?
25   A.  Are you talking about Line 7 through 11?

70

1    Q.  Yes.
2    A.  Okay.
3    Q.  And then do you see Ms. McGeehan talks about --
4  can you just take a look at Ms. McGeehan's response?
5    A.  All right.  Okay.
6    Q.  And do you see Ms. McGeehan, when she responds,
7  she references the Hispanic surname, correct, on the
8  bottom of the page?
9    A.  Okay.
10   Q.  And then Senator Davis talks about how she
11  thinks this is an important issue, correct, on the next
12  page, in terms of the implementation of this law and its
13  impact?
14   A.  Okay.
15   Q.  Are you aware of whether the Secretary of
16  State's Office had any follow-up with Senator Davis
17  after this exchange?
18   A.  Ma'am, I don't -- I don't recall.
19   Q.  Is it fair to say that Senator Davis was
20  interested in the demographics of registered voters?
21        MR. SCOTT:  Objection, form,
22  speculation.  Document speaks for itself.
23   Q.  (By Ms. Maranzano)  Based on her questions?
24   A.  I don't know, I mean, I don't know what -- it
25  is what it says.

71

1    Q.  Well, she says that it's an important issue to
2  try to understand, correct?
3    A.  I'd have to go back and read it.  I see it
4  appears to me she asks, is there an intent to track it
5  going forward.
6    Q.  And on Page 460, she actually asks if there is
7  -- if the Secretary of State already breaks down that
8  information.
9    A.  Ma'am, I don't know why she's asking these
10  questions.
11   Q.  Okay.  Do you know what Senator Davis's
12  position on SB 14 was?
13        MR. SCOTT:  Objection, form, vague.
14   Q.  (By Ms. Maranzano)  Do you know how she voted
15  on SB 14?
16   A.  No, ma'am, I wasn't there when all the voting
17  was going on.
18   Q.  Can you turn to page 489?
19   A.  489, okay.
20   Q.  And if you can look at Senator Williams'
21  comment which starts at Line 14.
22   A.  14, okay.
23   Q.  Yeah.  I want to focus your attention on what
24  he says towards the bottom and then it goes on to the
25  next page.

72

1    A.  Okay.
2    Q.  And do you see he's referencing that he talked
3  to Ms. McGeehan about a project to cross-reference the
4  driver's license and voter registration?
5    A.  Uh-huh.
6    Q.  And then do you see Ms. McGeehan talks about
7  timing for that when she says she hopes to get a
8  response to him by the end of the week?
9    A.  Uh-huh.
10   Q.  Were you there during that testimony?
11   A.  Ma'am, I don't remember.  I may have been in
12  the room.
13   Q.  Okay.
14   A.  I may not have been.
15   Q.  Do you recall this request that was made by
16  Senator Williams?
17   A.  I don't recall a specific request.  I do recall
18  our office attempting to cross-reference driver's
19  license and voter registration.
20   Q.  Okay.  Did you think that -- all right.  And
21  prior to Senator Williams' request on January 25th, are
22  you aware of any other such request for this
23  information?
24   A.  Like I said, I'm not aware of a specific
25  request.  I'm just aware of the exercise that -- the

73

1  exercises in trying to do cross-references between the
2  driver's license list and the voter registration list.
3  I'm not aware of how they all got started.
4      Q.  Can you look at the bottom of Page 490, at
5  Senator Williams' comment?
6      A.  490?
7      Q.  Uh-huh.  Where he's --
8      A.  490, okay.
9      Q.  -- he's still in the same exchange that he's
10 having with Ms. McGeehan?
11     A.  Okay.
12     Q.  And do you see that he talks about -- he
13 suggests that they could make -- if we gave legislative
14 intent as part of the bill tomorrow, do you see that?
15 It's right at the very bottom?
16     A.  Okay.
17     Q.  He's talking about legislative intent for you
18 all.  And then on the next page, and the Secretary of
19 State's Office to take that direction.  Are you aware of
20 whether that legislative intent was ever included in SB
21 14?
22     A.  Ma'am, I have no clue.
23     Q.  And what he's saying is -- it looks like he's
24 talking about training plans and voter education plans,
25 correct, on Page 491?

74

1      A.  He says if it's something you wanted to have
2  done in your training plans and voter education plans,
3  but I'm not sure really what he's referencing.
4      Q.  Well, you can read the whole statement.  And do
5  you see he says -- this is after he had asked
6  Ms. McGeehan about the -- the data matching.  And then
7  he asks if she needs further direction.  And then he
8  says, "For instance, if we wanted to target that
9  universe of people that we know are out there and maybe
10 make a little extra effort to make sure that they
11 understood they were going to have a new requirement
12 when they went to vote as far as getting a photo ID."
13     A.  Uh-huh.
14     Q.  Do you know if any legislative intent was put
15 into the bill?
16     A.  Ma'am, I don't know.
17     Q.  Do you know what Senator Williams' position on
18 SB 14 was?
19         MR. SCOTT:  Object.  If you know.
20     A.  I -- this is with -- I can't tell you how the
21 actual senators voted on this bill.
22     Q.  (By Ms. Maranzano)  Okay.  Now, I believe you
23 said that you're aware that a match was done between the
24 DPS database and the voter registration database?
25     A.  I'm aware that our office made several attempts

75

1  to try to -- try to make a match.  I'm also aware that
2  we were not very successful at it.
3         (Exhibit 8 marked for identification.)
4      Q.  (By Ms. Maranzano)  I'm showing you what we've
5  marked as Deposition Exhibit 8.
6      A.  Okay.
7      Q.  If you'll look at this, the whole thing.
8      A.  Okay.  Let's see here.  Okay.
9      Q.  Have you seen this document before?
10     A.  Ma'am, if I have, it's been so long ago, I
11 don't -- I don't remember the specifics of the document.
12 I remember the process.
13     Q.  Can you look at the third page where there's a
14 question at the top and a discussion.
15     A.  Uh-huh.
16     Q.  Do you know if you've seen the content on this
17 page before?
18     A.  I don't recall if I have.
19     Q.  When you talked about the -- the attempt to do
20 a match --
21     A.  Uh-huh.
22     Q.  -- is this write-up a write-up of that attempt
23 as far as you can tell?
24     A.  Ma'am, I don't remember the actual numbers.  I
25 just remember there were several attempts to do it, and

76

1  we got several different kind of answers.
2      Q.  And who oversaw that process of matching the
3  databases?
4      A.  That would have been a mixture of the elections
5  division and the IT division, but probably spearheaded
6  by the elections division.
7      Q.  And would that have been then spearheaded by
8  Ann McGeehan?
9      A.  Ann McGeehan or Karen Richards, I guess.
10     Q.  Do you know who analyzed the results of the
11 match?
12     A.  No, ma'am, I'm would presume their staff, but I
13 don't know specifically.
14     Q.  Can you look at this at the first page?
15     A.  Uh-huh.
16     Q.  And do you see at the very top?
17     A.  Uh-huh.
18     Q.  There's a message from Ann McGeehan, and in
19 that message she says, "Attached is a draft summary that
20 I will send to Coby and John" --
21     A.  Uh-huh.
22     Q.  -- "so they can distribute to legislative
23 folks."
24     A.  Uh-huh.
25     Q.  Does that refresh your recollection at all that

COBY SHORTER, III                                        8/12/2014
CONFIDENTIAL TRANSCRIPT

20 (Pages 77 to 80)

---

77

1  this may have been sent to you?
2      A.  Nuh-uh.
3      Q.  Do you believe that she meant Coby -- she meant
4  you by that?
5          MR. SCOTT:  Objection, form, speculation.
6      A.  It would not -- John -- John -- I presume
7  that's John that would have been our general counsel.  I
8  would not have distributed it to anyone.
9      Q.  (By Ms. Maranzano)  Who would have distributed
10  it to legislative folks?
11      A.  It would have either been Ann or her staff or
12  John, who was dealing directly with the legislative
13  affairs.
14      Q.  Would it surprise you to learn that
15  Ms. McGeehan testified that she sent this to you and
16  that she discussed it with you?
17      A.  It may have been discussed with me.  I mean,
18  the matching exercises, I remember visiting with our
19  staff about the matching exercises.  And I remember the
20  staff consistently telling me that we were trying to
21  match apples and oranges, and it wasn't giving
22  information that the staff was comfortable with or had
23  confidence in.
24      Q.  Okay.  Who told you that specifically?
25      A.  Ma'am, I don't remember exactly who it was.

---

78

1      Q.  Was it IT individuals?
2      A.  Ma'am, I don't remember exactly who it was.  I
3  mean, there were so many different people working on
4  these exercises, the IT people and the -- and I don't
5  recall these exercises being solely related to this
6  particular issue.  I'm -- I'm talking about matching
7  exercises where you're trying to take DPS and our
8  database and match them together.  And IT, Ann, all of
9  them, when they would bring the information, there was
10  always a different number.  There was never a number
11  that you could have confidence in.
12      Q.  Okay.  Well, with regard to this matching
13  exercise, in particular, with TEAM and the DPS database,
14  who did you talk to who said they didn't have confidence
15  in?
16      A.  As I said, I don't remember specifically.
17  Other than the staff.  It could have been Ann.  It could
18  have been the IT staff.  It could have been our -- the
19  elections division staff.  It was staff.  I don't recall
20  every -- every meeting that came into my office.  I just
21  know that staff shared with me.  It could have very well
22  been Ann.  It could have very well been our IT director.
23  That the information, every time they matched it
24  together, you always got a different answer.  The
25  matching -- the matching exercises did not appear to be

---

79

1  successful or something that we could have confidence in
2  the data that was being provided.
3      Q.  Were you aware when you discussed that with
4  them that they were doing this to respond to legislative
5  requests?
6      A.  Ma'am, I don't remember why they were doing
7  this.  This is 2011.  I don't -- I didn't know if they
8  were doing it for -- I don't recall if they were doing
9  it for -- I guess -- by looking at the -- this was
10  February, they were trying to answer somebody's
11  questions.  You know, we had several things going on at
12  the same time.  We had the Legislature, you got -- I
13  don't know what -- I don't know what specific questions
14  they were trying to answer.  All I know is that there
15  was a process going and they couldn't get an answer that
16  anybody was confident of.
17      Q.  But you were aware that legislators had asked
18  for this information, correct?
19      A.  Ma'am, I don't remember.
20      Q.  What was your reaction to the conclusion, which
21  is on the third page, that 600 -- somewhere between
22  678 -- 678,560 and 844,713 voters may not have been
23  issued a Texas driver's license or ID?
24          MR. SCOTT:  Objection, form, foundation,
25  and calls for speculation based upon his prior answer.

---

80

1  Go ahead if you can.
2      A.  I don't think I understood your question.
3      Q.  (By Ms. Maranzano)  Well, do you see the
4  conclusion at the bottom of that page?
5      A.  Uh-huh.
6      Q.  What was your reaction to that conclusion?
7          MR. SCOTT:  Objection, form, foundation.
8  The prior testimony was he didn't recall this document.
9  Subject to that objection, you can answer.
10      Q.  (By Ms. Maranzano)  You can answer.
11      A.  I mean, as I previously said, these exercises
12  were not -- there was -- there was no one in our -- no
13  one shared with me in our office that they had any
14  confidence in these numbers.  When the matching
15  exercises were done, I was even told my name was on
16  there.  I know I have an ID.
17      Q.  So my question, though, is just about the
18  numbers that you saw as part of this matching exercise.
19      A.  I don't remember the numbers that I saw.  I
20  just remember -- I remember staff consistently telling
21  me we are comparing apples to oranges, and every time we
22  do this, we come up with different answers.
23      Q.  And did you try to find out from the staff if
24  there was a way to conduct the match in a more effective
25  manner?

---

81

1   A.  Well, I -- I directives -- I mean, I didn't
2   direct -- I asked the staff to continue to work on it to
3   the best of their ability.
4       Q.  Was there any other way to determine how many
5   registered voters might have a driver's license or ID?
6       A.  I wouldn't know.
7       Q.  Was that something you asked staff?
8       A.  I don't recall having -- I don't recall that
9   conversation, as I consistently say, I just remember
10  staff working on this consistently and not being able to
11  come up with a definitive answer.
12      Q.  So when -- when you were working on the
13  matching exercise, did you distribute the results that
14  you found to anybody?
15          MR. SCOTT:  Objection, form,
16  mischaracterizes the evidence, misstates his
17  evidence.  Also, assumes facts not in evidence.  You can
18  answer if you can.
19      A.  Did I give somebody something?
20      Q.  (By Ms. Maranzano)  Did you distribute the --
21  the results from the matching exercises to anybody?
22      A.  Not that I can recall ever doing.
23      Q.  Did anybody in your office?
24      A.  Ma'am, I don't know.
25      Q.  Did you discuss the content of the matching

82

1   with anybody?
2       A.  Not that I can recall.
3       Q.  Did you discuss the conclusions with anybody?
4       A.  I don't -- the only conclusions I discussed was
5   with my staff, that I can recall, was you don't have a
6   conclusive answer.
7       Q.  Did you talk to Ms. McGeehan about whether or
8   not she should distribute the information to anybody?
9       A.  I don't remember.  I mean, I think -- I don't
10  think we ever got to a point where we got a conclusive
11  answer.
12      Q.  Did -- did you talk to -- is this John referred
13  to in the e-mail, John Sepehri?  Is he who you referred
14  to when --
15          MR. SCOTT:  Objection, form, calls for
16  speculation.
17      A.  I don't know if it's John Sepehri or if it's
18  John Mendoza.
19      Q.  (By Ms. Maranzano)  I believe that you
20  previously said that you thought that was the general
21  counsel?
22      A.  It -- it -- back in 2011, I got to go back and
23  think who was general counsel then.  It probably would
24  have been John Sepehri as our general counsel then.
25      Q.  Do you recall if you had any conversations with

83

1   Mr. Sepehri about whether or not to distribute
2   information from the matches to anybody?
3       A.  Ma'am, I don't recall.  Like I said, I recall
4   the information not being conclusive.  And I recall them
5   continuing to work on it.
6       Q.  So to the best of your knowledge, nobody ever
7   responded to Senator Williams' request?
8       A.  I don't know if they did or if they didn't.
9       Q.  And that's not something that would you have
10  followed up on yourself?
11      A.  No, because I wasn't -- there wouldn't have
12  been a reason for me to follow up on it, because as I've
13  said before, the elections division and the people that
14  handle legislative affairs are the individuals in our
15  office that deal directly with the Legislature.
16      Q.  Do you -- do you recall Ms. McGeehan seeking
17  approval to distribute the results of this matching
18  analysis to anybody?
19      A.  She may have.
20      Q.  And she would have got that from you, correct?
21      A.  Not -- not necessarily directly to me.  She
22  could have also talked to the Secretary.  She could have
23  talked to the general counsel.
24      Q.  Do you recall her asking you --
25      A.  Ma'am, I don't --

84

1       Q.  -- for approval?
2       A.  -- I don't -- I remember -- I remember them
3   working through the exercise.  I really don't remember
4   what all they were doing with it.  I just remember they
5   were working through an exercise of doing matches.
6       Q.  If Ms. McGeehan had presented this to you,
7   being the matching exercise, do you think she would have
8   believed she needed your approval before she could
9   distribute it?
10          MR. SCOTT:  Objection, form, calls for
11  speculation.
12      A.  Not -- I don't know.
13      Q.  (By Ms. Maranzano)  You don't recall your
14  conversation with Ms. McGeehan about the matching
15  exercise?
16      A.  As specific as I recall them going through
17  several chances or several tries to get an answer, I
18  don't recall them ever getting a conclusive answer that
19  anyone had confidence in.
20      Q.  Would it surprise you to learn that the
21  Lieutenant Governor testified that he was briefed on the
22  information contained in this document?
23      A.  I -- I have no idea if he was or not.
24      Q.  Did you have any concerns that the Legislature
25  had requested information and your office wasn't

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

22 (Pages 85 to 88)

85

1  responding to it?
2         MR. SCOTT:  Objection, form,
3  mischaracterizes his evidence, asked and answered.  And
4  he's previously testified that he doesn't recall what
5  happened and what information was requested by the
6  Legislature.
7     Q.  (By Ms. Maranzano)  You can answer.
8     A.  Well, I mean, I don't -- I don't -- I don't
9  recall.
10    Q.  When you say that -- that comparing the
11 databases was comparing apples and oranges -- actually,
12 strike that.
13        Would it have been possible to release the
14 information that you found from doing this database
15 matching analysis with a disclaimer about the accuracy?
16        MR. SCOTT:  Objection, form, speculation.
17    A.  I don't know.
18    Q.  (By Ms. Maranzano)  You don't know if you could
19 have done that?
20    A.  I mean, I would have to defer to staff to tell
21 me.
22    Q.  What staff would you defer to, to tell you
23 whether or not you could do that?
24    A.  Those involved in the process, elections,
25 staff, or counsel in our office.  I --

86

1     Q.  But aren't these people who directly report to
2  you?
3     A.  Ann.
4     Q.  I'm sorry, what?
5     A.  Ann.
6     Q.  Are these people who --
7     A.  Meaning --
8     Q.  -- who report to you as a general matter?
9  Or --
10    A.  They report to me, but they also are experts in
11 their field.  I'm not -- I'm not the expert.  I'm the
12 manager of the experts.  And they will be able to tell
13 me what they can and can't do.  The particular scenario
14 that you just outlined, I don't recall that ever being
15 presented to me as an option.
16    Q.  So you never discussed that?
17    A.  I don't recall discussing that.
18    Q.  And isn't it fair to say that you could also
19 present ideas to your staff?
20    A.  It is fair to say that, but when they are the
21 experts in the area and they have more experience than I
22 do dealing with the Legislature, because they've done
23 that for years and years, I would rely on them to tell
24 me what's the best approach to take.
25    Q.  Did you have the impression that your staff

87

1  wanted to get this information to a state where they
2  could distribute it?
3     A.  I felt our staff was trying to the best of
4  their ability to get something that they could rely on
5  and that was good data.  But through this process, and
6  this is not a -- you're isolating it to a particular
7  time that I can't -- can't pinpoint.  This process of
8  matching throughout the time that I've seen it at the
9  agency, the answer -- the situation has always been the
10 same, you can't do it.  It doesn't -- it doesn't work.
11 And the staff -- the issue of my saying apples and
12 oranges, that is language that has been given to me by
13 the staff.  It's not my language.  It's -- it's like
14 comparing apples and oranges.  We can't get conclusive
15 evidence -- I mean, conclusive -- a conclusive answer.
16    Q.  And was the -- was the voter registration
17 database compared to DPS for other reasons?  I'm sorry,
18 let me just rephrase, because I'm realizing that was not
19 clear.
20        Do you match the voter registration
21 database to the DPS database for any other reasons apart
22 from this exercise?
23    A.  Specifically, ma'am, I can't tell you
24 specifically how our staff uses it and what they match
25 it to without them specifically coming in and -- and

88

1  telling me what they matched it to.
2         MS. MARANZANO:  Why don't we take about 10
3  minutes?
4         THE WITNESS:  That's fine.
5         (Recess from 10:59 to 11:16 a.m.)
6     Q.  (By Ms. Maranzano) Okay.  Before the break we
7  were talking about a matching exercise.
8     A.  Uh-huh.
9     Q.  And you testified that you had some concerns
10 about the accuracy of the results from the matching
11 exercise, correct?
12    A.  Yes, for all the matching exercises.
13    Q.  Do you -- did you ever memorialize those
14 concerns in any writing?
15    A.  I don't -- I don't recall.  I mean, I think we
16 -- ultimately, we had to provide some numbers to -- I
17 think to your office as a result of some -- some
18 litigation later on, and we shared that we went through
19 this process but we had no confidence in those numbers
20 that we were providing them as well.
21    Q.  Are you referring to the preclearance
22 submission?
23    A.  I don't recall exactly what that document was
24 attached to.
25    Q.  Okay.  Any other instances that you wrote down

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

23 (Pages 89 to 92)

89

1  your concerns or had written communications about your
2  concerns about the accuracy of this matching?
3      A.  It could possibly have happened, ma'am.  I
4  don't remember any.
5      Q.  Okay.
6      A.  It could possibly have.
7      Q.  Did you think that -- that the results of the
8  matching would have been less reliable to look at than
9  say the number of individuals who hadn't written their
10  driver's license number on their voter registration
11  application?
12      A.  I don't know.  This whole exercise -- my
13  apprehension about any of these exercises was driven by
14  the apprehension that staff had.  If staff had concerns
15  about it, I had concerns about it.  I wouldn't know how
16  to have concerns or not have concerns if staff wasn't.
17      Q.  But I guess what I'm trying figure out is, how
18  did you weigh those concerns against the -- against the
19  fact that -- that there were requests for this
20  information?  So you were trying to balance the concerns
21  about the accuracy with the fact that this information
22  had been requested?
23      A.  I mean, I don't think I specifically, on my
24  own, was trying to balance anything.  I think there was
25  a general consensus of everybody -- there appeared to be

90

1  a general consensus of everybody involved, staff -- and
2  what they were doing with it, because I wasn't on
3  day-to-day involved with what was happening in the
4  Legislature -- that's not my job -- there was just an
5  overall concern that this is not working.
6      Q.  So your recollection as you sit here is that
7  there was a general consensus among everybody involved
8  in the matching exercise that this was so inaccurate,
9  that it shouldn't be distributed?
10      A.  Well, it was just so inaccurate.
11      Q.  Okay.  And that includes IT staff and elections
12  division staff?
13      A.  As far as I remember.
14      Q.  Can you think of anybody else that was
15  involved?
16      A.  No, ma'am.  I don't remember anything.
17      Q.  Did Ms. McGeehan ever express any concerns to
18  you that not releasing this information would damage her
19  relationship with Senator Williams?
20      A.  I don't recall anything like that.
21      Q.  Were there any concerns raised to you that the
22  political ramifications of releasing the numbers
23  involved in the match would have been difficult given
24  that the bill was still under consideration?
25      A.  I don't recall any type of conversations like

91

1  that.
2      Q.  Now if Senator Williams had included language,
3  legislative language, as he suggested during the debate,
4  would your office have released these numbers even if
5  they thought they weren't totally accurate?
6      A.  I don't know.  I -- I don't -- I don't know
7  what he was trying do.  When you showed me this
8  document, I don't know what he was trying to accomplish.
9      Q.  Did you ever discuss the matching exercises
10  with the Secretary of State?
11      A.  I'm quite sure I did.
12      Q.  And do you recall what her position was?
13      A.  The same as mine:  Allow the staff to continue
14  to work on it.
15      Q.  And did the staff continue to work on the
16  matching exercise?
17      A.  Ma'am, I presume they may have.  I'm not really
18  sure how long they continued with it.  During the
19  legislative session elections is not the only issue that
20  I'm concerned with, so.  You know, where it -- where it
21  -- I just know we were dealing with the matching
22  exercises long after the Legislature was gone.  We were
23  still dealing with it.
24      Q.  And why were you dealing with the matching
25  exercises after the Legislature was gone?

92

1      A.  Because as I've repeatedly said, no one could
2  get to a conclusive answer.  And then there were other
3  requests that came in later from some legal processes
4  and there were requests that were made by the Department
5  of Justice, I believe, for this information, and we were
6  still going through the process of those apples and
7  oranges.
8      Q.  I see.  Do you recall if you discussed the
9  matching process with anyone in the Governor's Office?
10      A.  I probably did discuss it probably some of the
11  staffers but it wouldn't have been in terms of -- this
12  is over the length of the process, not in terms of
13  legislation.  I think my contact with the Governor's
14  Office or any other outside office on matching exercises
15  was probably after the -- after the Legislature had --
16  what do you call it -- had finished up.
17      Q.  So you're conversation with the Governor's
18  Office about the matching would have been more of
19  subsequent issues that you were just being talking about?
20      A.  Correct.
21      Q.  Okay.  And do you recall what the substance of
22  that conversation was?
23      A.  The same as I've said before.
24      Q.  Okay.
25      A.  Nobody -- nobody could figure out to accurately

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

93

1   do it.
2       Q.  And did you ever consult with any IT specialist
3   outside of the Secretary of State about this process?
4       A.  I don't recall if I did.  Some of our IT staff
5   have.
6       Q.  Was that anything you discussed with them or
7   suggested to them that they might want to do?
8       A.  Ma'am, I -- I don't remember.  I think, you
9   know, there were so many different IT specialists and
10  outside consultants that are in our office from time to
11  time doing different things, they may have asked someone
12  else how to do it.  But the end sum is, nobody figured
13  out how to do it.
14      Q.  Do you recall that when SB 14 -- well, do you
15  recall what committee SB 14 was referred to in the
16  House?
17      A.  No, ma'am, as I said, I was not that directly
18  involved.
19      Q.  Okay.
20          (Exhibit 9 marked for identification.)
21          MS. MARANZANO:  Okay.  For the record,
22  this also a highly confidential document and it is
23  marked Exhibit 9.
24      Q.  (By Ms. Maranzano) Can you take a look at this
25  document.

94

1       A.  Uh-huh.
2       Q.  Have you ever seen this before?
3       A.  Not that I can recall, ma'am.
4       Q.  Can you look at the second to last paragraph on
5   the first page.
6       A.  Second to the last?
7       Q.  Yeah.
8       A.  Okay.
9       Q.  Do you see Ms. McGeehan is talking about the
10  numbers of voters who have not been issued Texas
11  driver's license or personal ID cards?
12      A.  Okay.
13      Q.  Do you see she says that they're still working
14  with the IT department to analyze that data?
15      A.  Uh-huh.
16      Q.  As of February 25, would you say that was an
17  accurate assessment?
18      A.  What was?  What --
19      Q.  That she was -- that they were still working
20  with the IT department to analyze the data about who had
21  not had a Texas driver's license or personal ID card
22  issued by DPS?
23      A.  It appeared to be an ongoing process.
24      Q.  And this e-mail, it says at top, was sent on
25  Friday, February 25th, right?

95

1       A.  That's what it says.
2       Q.  And in this e-mail, she says she hopes to have
3   an analysis by Monday.  Was there anything that occurred
4   around February 25th that would lead Ms. McGeehan to
5   believe that the analysis would have been released by
6   Monday?
7       A.  Ma'am, I don't know.
8       Q.  You have no awareness of that?
9       A.  I have no what?
10      Q.  No awareness of this --
11      A.  I mean, I only based it on what she has written
12  here.
13      Q.  But if she was going to send such an analysis
14  to a -- to Representative Harless, would she have run
15  that by you, do you think?
16      A.  She could have.  But if she were going to run
17  it by me, it would have been given to others in our
18  executive office before it would have been given to me.
19      Q.  Such as?
20      A.  Our general counsel.
21      Q.  And is your general counsel -- it looks like he
22  was cc'd on this e-mail, right?
23      A.  He is.
24      Q.  So in February -- on February 25th, is there
25  anything that you recall that -- do you recall that you

96

1   -- that your office was feeling comfortable enough with
2   the match they were going to release it?
3       A.  No, ma'am, I don't recall.
4       Q.  Okay.  Do you recall that Ms. McGeehan
5   testified before the House Select Committee on Voter
6   Identification and Voter Fraud on March 1st, 2011?
7       A.  Ma'am, I don't know when she testified.
8       Q.  Okay.  Do you recall that she did testify
9   there?
10      A.  Testified where?
11      Q.  Before the House Select Committee on Voter
12  Identification and Voter Fraud?
13      A.  Would that be the -- are you talking about the
14  Committee of the Whole or?
15      Q.  No, I'm talking about a specific committee in
16  the House of Representatives.
17      A.  Where she specifically testified, I did not
18  keep a record of where staff went and who they testified
19  before.
20      Q.  Okay.
21      A.  She very well could have.
22      Q.  Okay, okay.  Did you talk to her before she
23  went and testified in the House of Representatives on SB
24  14?
25      A.  If I did, it was for her to potentially update

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

25 (Pages 97 to 100)

---

97

1   me on what was going on.
2   Q.   Did she seek authorization from you to release
3   this data?
4   A.   Ma'am, I don't remember.  As I said, I remember
5   them consistently working on the product.
6   Q.   So you don't recall as to whether or not you
7   all discussed how she should respond if she was asked
8   about the number of individuals without Texas driver's
9   license or ID?
10   A.   No, ma'am.
11   Q.   And would you say on March 1st, it would have
12   been accurate to say that the IT department was working
13   on that analysis?
14          MR. SCOTT:  Objection, form.
15   A.   I don't know.
16   Q.   (By Ms. Maranzano) Is that your understanding
17   of where the data matching process was at on March 1st?
18   A.   My understanding of the process is that it was
19   an ongoing process.  It was never conclusively completed
20   or finished at a point where -- when I say completed,
21   completed upon where there was any confidence that it
22   was accurate.  Every time they did it, they got a
23   different answer.
24   Q.   So would you say on March 1st, an accurate
25   response to a question about who had a Texas driver's

---

98

1   license or ID would have been that an analysis had been
2   done but it wasn't at a point yet to be released?
3          MR. SCOTT:  Objection, form, speculation.
4   A.   I don't know what I would have said on March
5   the -- March 1.  Or what the answer should have been on
6   March 1 or not.
7          MS. MARANZANO:  Can we mark this.
8          (Exhibit 10 marked for identification.)
9   A.   So are we through with this one?
10   Q.   (By Ms. Maranzano) Okay.  I'm showing you what
11   we marked as Exhibit 10.
12   A.   Okay.
13   Q.   If you could turn to Page 290.
14   A.   290.
15   Q.   On Line 9, there's a question and then there's
16   Ms. McGeehan response.  If you could look at and let me
17   know when you're ready.
18   A.   Okay.
19          MR. SCOTT:  What page again?
20          MS. MARANZANO:  290.
21   A.   Okay.
22   Q.   (By Ms. Maranzano) Now does this -- to start
23   with, does this look like its Ms. McGeehan's testimony
24   to the House Select Committee on Voter Identification
25   and Voter Fraud from March 1st, 2011?

---

99

1   A.   That's what it says.
2   Q.   Do you see that she was asked about whether or
3   not a match had been done with the driver's license file
4   to determine who had a -- which registered voters had a
5   driver's license?
6   A.   Yes.
7   Q.   And she responds that the IT that her -- IT --
8   or, "Our IT department is looking at that"?
9   A.   Uh-huh.
10   Q.   Do you believe that's an accurate statement of
11   what was occurring on March 1, 2011?
12          MR. SCOTT:  Objection, speculation.
13   A.   I can only go by what Ms. McGeehan is saying
14   here.
15   Q.   (By Ms. Maranzano) But at that point, she had
16   already -- there had already been a database matching
17   exercise, correct?
18   A.   I -- I can't remember the times when all of
19   these things were being done.
20   Q.   Well, if you look at Exhibit 8, that has the
21   date February 1st at the top.
22   A.   Okay.  Okay.
23   Q.   So as of February 1st, there had been already
24   been some analysis conducted, correct?
25   A.   There had been some attempts to match that were

---

100

1   -- that staff could not be conclusive about.
2   Q.   So I -- I guess what I'm wondering is why
3   Ms. McGeehan didn't respond during committee that there
4   had already been an attempt to match conducted.
5          MR. SCOTT:  Objection, form.
6   A.   Ma'am, I wasn't there.
7          MR. SCOTT:  Wait.  She didn't ask a
8   question.
9   Q.   (By Ms. Maranzano) Do you have any concerns
10   that Ms. McGeehan misled the House Select Committee on
11   Voter Identification and Voter Fraud?
12          MR. SCOTT:  Objection, form.  The record
13   speaks for itself.
14   A.   I mean, she says what she says.  I don't feel
15   she would have misled anyone.
16   Q.   (By Ms. Maranzano) And to the best of your
17   knowledge, between January 25, 2011, and May 27, 2011,
18   when SB 14 was signed into law, was anyone other than
19   the Lieutenant Governor provided with the matching
20   results?
21   A.   I'm not aware of the Lieutenant Governor -- I'm
22   personally not aware of the Lieutenant Governor being
23   given information.  I can't recall him getting it.  So I
24   don't know --
25   Q.   Anybody else, anybody outside the Secretary of

---

COBY SHORTER, III                                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

26 (Pages 101 to 104)

101

State's Office?
    A.  I don't know -- I don't recall anyone.
    Q.  Okay.
    A.  I don't remember.
    Q.  And did you have any conversations with Senator
Williams, did he follow up at all with you, personally,
about the --
    A.  None that I can recall.
    Q.  And did anybody in your office tell you that he
followed up with them about the status of his request?
    A.  None that I can -- no, none that I can recall
at all.
    Q.  Can you identify any other occasion on which
the Secretary of State's Office completed an analysis
based on a legislator's request and they did not provide
the analysis to the legislator?
        MR. SCOTT:  Objection, form,
mischaracterizes the evidence, misstates the evidence
and it's argumentative based on the form of the
question.
            You may answer if you can.
    A.  I don't recall anything like that.
    Q.  (By Ms. Maranzano) You don't recall that that
happened?
    A.  I don't recall what happened?

102

    Q.  That -- that you completed analysis --
    A.  Ma'am, as I keep telling you --
        MR. SCOTT:  Let her finish the question.
    Q.  (By Ms. Maranzano) -- based on a legislator's
request and then didn't provide that analysis of the
request?
        MR. SCOTT:  Same objection.
    A.  I mean, I don't recall what all went into --
what all happened to it other than it didn't work.
    Q.  (By Ms. Maranzano) Did you -- did you monitor
the amendments at all to SB 14?
    A.  No, ma'am.  It's not my role.
        (Exhibit 11 marked for identification.)
    Q.  (By Ms. Maranzano) I'm showing you what we've
marked as Deposition Exhibit 11.
        MS. MARANZANO:  For the record, this is
also a highly confidential document.
    Q.  (By Ms. Maranzano) Have you ever seen this
e-mail before?
    A.  No, ma'am.
    Q.  Can you -- can you look at the first sentence
of the e-mail.  Well, do you see this is an e-mail from
Mr. Beuck to Representative Harless?
    A.  I see that it's a -- yeah, a gentleman, and to
Representative Harless, okay.

103

    Q.  Do you know who Mr. Beuck is?
    A.  No, ma'am, I do not.
    Q.  Do you know if Representative Harless was on
the Conference Committee for SB 14?
    A.  I -- I don't recall who was on the Conference
Committee.
    Q.  Was Representative Harless the House sponsor of
SB 14?
    A.  I don't recall because I wasn't involved.
    Q.  Do you see that Mr. Beuck says that he's
waiting to hear from OAG and SOS on Monday morning about
these amendments?
    A.  I see where he says he's "Waiting to hear from
OAG and SOS Monday morning."
    Q.  Are you aware of whether anyone in your office
reviewed these amendments?
        MR. SCOTT:  Objection, form, vague.
    A.  I'm not aware.
    Q.  (By Ms. Maranzano) You didn't review either of
these amendments --
    A.  No, ma'am.
    Q.  -- correct?
        Why would the Secretary of State's Office
have been giving input on amendments to a bill?
    A.  We would only answer -- our staff would only

104

answer questions that a legislator had.
    Q.  How many times during your tenure has your
office responded to questions about amendments on a
bill?
    A.  I have no idea.  I don't keep account of that.
    Q.  Okay.  Do you have an approximation --
    A.  No, ma'am.
    Q.  -- is that a common occurrence?
    A.  Legislators call election staff, legislators
call other members, other staff, as do other agencies,
wanting to know various questions about various
things.  To qualify or -- I mean to quantify in terms of
a number, I don't have a clue.
    Q.  Okay.  Can you take a look at the -- the second
amendment that's discussed in this e-mail.
    A.  Okay.  Which one's the first one?
    Q.  It is Gonzales Amendment FA 26.
    A.  Okay.  Okay.
    Q.  And it's talking about affidavits being
executed on provisional ballots, correct?
    A.  I'm not really sure what it's talking about.
    Q.  Do you see it says, talking about "Amendment
applies to affidavits executed when people are claiming
the indigent/religous exemption"?
    A.  Okay.

COBY SHORTER, III                                        8/12/2014
CONFIDENTIAL TRANSCRIPT

---

105

1    Q.  "Under the amendment, someone could sign an
2    affidavit statement at the polling place the day of
3    election stating that they don't have ID because -- "
4    well, " -- be because indigent/religous objections, then
5    vote provisionally."
6        A.  Okay.
7        Q.  Now, is there any reason why SB 14 could not
8    have provided that an individual without an ID could
9    sign an affidavit?
10       A.  I wouldn't know.
11           MR. SCOTT:  Object, form, speculation.
12       Q.  (By Ms. Maranzano) Do you know if prior to SB
13   14, provisional ballot was counted based on a signature
14   match?
15       A.  You would have to ask our elections staff.  I
16   wouldn't know.
17       Q.  Okay.  Do you know how it's determined whether
18   absentee ballots are counted or not?
19       A.  Not specifically, no, ma'am.
20           (Exhibit 12 marked for identification.)
21       A.  Which one was this?  11.  Okay.  Okay.
22       Q.  (By Ms. Maranzano) Okay.  I'm showing you what
23   we marked as Deposition Exhibit 12.
24           MS. MARANZANO:  For the record, this is
25   also a highly confidential document.

---

106

1        Q.  (By Ms. Maranzano) If you can take a look at
2    that for a moment.
3        A.  Okay.
4        Q.  Okay.  Does this appear to you to be another
5    e-mail from Mr. Beuck to Representative Harless?
6        A.  It appears to be.
7        Q.  Do you see in that second paragraph, there's a
8    discussion of the Conference Committee removing a
9    requirement that the SOS education efforts be targeted
10   at low income and minority voters?
11       A.  I see that.
12       Q.  And then there's a comment that says, "OAG/SOS
13   concerns."  Are you aware of whether the Secretary of
14   State's Office expressed concerns about an amendment to
15   target education efforts of low income and minority
16   voters?
17       A.  I'm not aware.
18       Q.  If concerns had been expressed about that,
19   would that have been something that was approved by you
20   or authorized by you?
21       A.  It depends on what the concerns were.  I'm not
22   aware of having conversation on a -- a Conference
23   Committee report about anything related to Senate Bill
24   14.
25       Q.  Okay.  Are you aware of whether provisions such

---

107

1    as that was included in the final version of SB 14?
2        A.  Ma'am, I don't know.
3        Q.  Okay.  Other than the two amendments that we
4    just discussed, are you aware of whether the Secretary
5    of State expressed an opinion on any other legislative
6    amendments to SB 14?
7        A.  None that I'm aware of.
8        Q.  Did you -- you were ever informed of an
9    amendment offered by Senator Ellis that would have
10   required the Secretary of State to study the impact of
11   SB 14 on particular populations?
12       A.  If I was informed, I don't remember.
13       Q.  You didn't provide any impact --
14       A.  No, ma'am.
15       Q.  -- input on that amendment?
16           Just a reminder that we should try not to
17   talk over each other.
18           MR. SCOTT:  She's making sure that you
19   understand that I have a chance to get an objection in.
20   If you don't -- if you say it too quick, I don't get
21   that objection in.
22       Q.  (By Ms. Maranzano) Okay.  And also so the court
23   reporter can get an accurate transcript.
24           MR. SCOTT:  What?
25           (Laughter.)

---

108

1        A.  Did I talk over you?  I'm sorry.  Please
2    forgive me.
3        Q.  (By Ms. Maranzano) No, no, absolutely.  I
4    think that you're anticipating the end of my question,
5    but.
6        A.  No, I'm not, I'm just -- I know what I know,
7    and...
8        Q.  If the Legislature had passed an amendment that
9    would have required the Secretary of State to study the
10   impact of SB 14 to determine if racial and ethic
11   minorities suffered a disparate impact pursuant to the
12   amendments Senator Ellis offered, would you have been
13   able to do that?
14           MR. SCOTT:  Objection, form, speculation.
15           You can go ahead.
16       A.  I don't know who would have.  We do what -- you
17   know, if the Legislature passes a bill, we try to the
18   best of our ability to do what they ask us to do.  How
19   it would get done, I don't know.
20       Q.  (By Ms. Maranzano) Do you believe that you have
21   any responsibility to determine the effect of SB 14 on
22   minority voters?
23       A.  I think we have a -- we have a responsibility
24   to determine the effect on all voters.
25           THE COURT REPORTER:  I'm sorry?

---

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

28 (Pages 109 to 112)

109

1    A.  On all voters.
2    Q.  (By Ms. Maranzano) And are you taking steps to
3    try to determine the effect of SB 14 on all voters?
4    A.  Well, we're trying to the best of our ability
5    to implement the bill as the Legislature has passed it,
6    and then share with the Legislature -- if there are any
7    concerns, share with the Legislature those concerns as
8    they come forward.  I don't -- I haven't been apprised
9    of any major concerns that have been brought forward on
10   SB 14.  We just try to implement what the Legislature
11   passed.
12   Q.  And when you said you haven't been apprised of
13   any major concerns that have come forward, do you mean
14   like major concerns on the elections that the State has
15   held, or what are -- what are you referring to?
16   A.  Well, we haven't -- it hasn't -- we have where
17   there have been isolated incidents of individuals having
18   -- that we've heard of in the media, but they have been
19   corrected.  We haven't seen any problems.
20   Q.  What sort of isolated incidents are you talking
21   about?
22   A.  Well, you hear of people going to get an ID and
23   they didn't have the proper documentation.  However, the
24   situation was remedied because once they were able to
25   get the proper documentation, they were able to get an

110

1    ID.
2    Q.  Okay.  So you've heard of isolated incidents of
3    individuals having issues getting ID.  But as you sit
4    here today, you're not aware of any other problems with
5    the effect of SB 14 on voters?
6    A.  No, ma'am.
7    Q.  Okay.
8    A.  I'm not aware.
9    Q.  Were you involved at all in the submission of
10   SB 14 to the Department of Justice under Section 5 for
11   preclearance?
12   A.  Our staff would have done that.  My involvement
13   would have been like on other preclearance, them letting
14   me know that they were doing it.
15   Q.  And did they submit to the department -- I
16   believe you referenced that they might have, but did
17   they submit a -- one of the results from one of the
18   matching exercises?
19   A.  I'm not sure if that was a part of preclearance
20   or if it were a part of some other pending litigation.
21   Q.  And when that was submitted to the department,
22   did you have any reason to believe that wasn't the best
23   available information that you could provide?
24   A.  Yes.  And we shared -- when we submitted that
25   information -- and I don't know exercise -- I can't

111

1    recall what exercise it was specifically related to, but
2    I do recall our office sharing with -- with the
3    requesting entity that this is not reliable information.
4    Q.  Okay.  Okay.  But I -- I think my question is
5    slightly different than that.  I'm wondering if you have
6    any reason to believe it wasn't the best available
7    information you could provide, not whether it was a
8    hundred percent accurate?
9    A.  What do you mean -- what do you mean by best
10   available?
11   Q.  I mean, was there any other information
12   available to you that you could provide to get this
13   information of potentially the number of people who had
14   driver's licenses?
15   A.  As far as -- as far as I know, we gave you all
16   what we had.  As far as I knew.
17   Q.  Do you know whether a Spanish surname analysis was
18   conducted when you submitted that information?
19   A.  I can't remember, ma'am.
20   Q.  Are you aware of any problems with in-person
21   voter fraud in the November 2012 election?
22   A.  That would -- I would have to defer to our
23   elections division.  I don't remember the specific --
24   there are -- the specific issues that came up, I don't
25   remember specifically what they were.

112

1    Q.  Do you -- you don't remember specifically what
2    they were, what incidents came up?
3    A.  I don't remember the specifics of the incidents
4    that came up.  I don't know -- for instance, the
5    election staff, if they received those, they forwarded
6    it to the appropriate agencies.
7    Q.  As you sit here today, are you aware of any
8    allegations of in-person voter impersonation in the
9    November 2012 election?
10   A.  I can't remember.  I mean, I --
11   Q.  Okay.  Did any legislator ask you or your
12   office for information about in-person voter fraud in
13   November 2012, in the November 2012 election?
14   A.  I don't remember if they did or not.
15   Q.  Are you aware of any facts that indicate that
16   the system wasn't working in the November 2012 election?
17   A.  What system?
18   Q.  The system in place to verify a voter's
19   identify.
20   A.  Ask the question again.
21   Q.  Are you aware of any facts that indicate that
22   the system to verify a voter's identity, in place in the
23   November 2012 election, was not working?
24   A.  The November 2012.  Was that pre-Voter ID or
25   post-Voter ID?

COBY SHORTER, III                                                        8/12/2014
CONFIDENTIAL TRANSCRIPT

29 (Pages 113 to 116)

---

113

1    Q.  In November 2012, I'll represent to you that
2    the Voter ID bill had not been implemented yet.
3        A.  So what I'm -- I don't understand what you're
4    asking.  Are you asking me --
5        Q.  If there are any facts that came out of that
6    election that indicate to you that --
7        A.  I don't know.
8        Q.  Okay.  What has your role been in implementing
9    SB 14?
10       A.  My role has been making sure that our staff has
11   the resources available to implement the parts of the
12   bill that apply to the Secretary of State's Office.
13       Q.  And what parts are those?
14       A.  Off the top of my head, I cannot give you an
15   exhaustive list, but after a bill is passed, there are
16   certain duties that are given to the different
17   agencies.  We have a role in voter education and we have
18   a role in making sure that -- educating the counties,
19   educating the election workers statewide as to what the
20   new changes have been in -- since the last legislative
21   session, and getting ready for the next election
22   cycle.  My role is to make sure that the staff has the
23   resources, the computers, the -- you know, the tangible,
24   physical things they need to do their jobs on a daily
25   basis.

---

114

1        Q.  Have -- has your office had a role in the EIC
2    program?
3        A.  Yes, we have.
4        Q.  And what role has that been?
5        A.  To assist the DPS in development of -- excuse
6    me, of that program.
7        Q.  How have you assisted DPS?
8        A.  Well, collaboratively working with them to
9    develop partnerships between them and the counties so
10   that they can -- we have those relationships with county
11   elections administrators, and we've been able to work
12   those counties statewide to help them in determining
13   additional places where they could have their EIC
14   locations.
15       Q.  Has the Governor's Office had any role in the
16   EIC program?
17       A.  The role of no more than keeping them informed
18   as to what we were doing.
19       Q.  Has the Lieutenant Governor's Office had any
20   role in --
21       A.  Just in us keeping them informed with what
22   we're doing.
23       Q.  Has -- where did the authority that the
24   Secretary of State's Office has with regard to the EIC
25   program come from?

---

115

1        A.  Well, it's not our program, it's the DPS
2    program.  We just -- we're helping them to get the word
3    out, here's what's happening, and helping them to
4    establish their program.
5        Q.  So is there any guideline or procedure for that
6    responsibility or is that something that your office is
7    just taking on?
8        A.  What do you mean by guideline, procedure?
9        Q.  I'm wondering how -- how the responsibilities
10   in the EIC program are split up, how that -- who decides
11   who has what authority, is that a regulation, a
12   guideline, a procedure?
13       A.  Well, it's not really a regulatory --
14           MR. SCOTT:  Excuse me.  Let me object to
15   form.
16           But go ahead.
17       A.  I don't understand it as being a regulatory
18   function.  It's a -- our office uses it as a marketing
19   opportunity to get the word out.
20       Q.  (By Ms. Maranzano) So is --
21       A.  We don't have a statutory obligation on -- on
22   EIC.
23       Q.  Okay.  Has -- what are the steps the Secretary
24   of State has taken to ensure that individuals who seek
25   an EIC can obtain one?

---

116

1        A.  Well, we have a marketing -- a marketing
2    campaign that is seeking to inform Texas voters of what
3    the requirements are.  We -- so that's a campaign that's
4    ongoing right now.  We've worked with DPS to market EICs
5    and help them get the word out on EICs.  And we are
6    educating county officials and elections officials on --
7    based on what Senate Bill 14 says.  "Here's how you are
8    to operate your local elections with these new
9    requirements."
10       Q.  Did you work with DPS on the implementation of
11   mobile EIC units?
12       A.  Yes, I did.
13       Q.  Did you work with DPS on the instigation of
14   some hours on Saturdays where DPS would issue EICs?
15       A.  Well, when you say work with them, we -- that
16   was a part of the whole -- that whole strategy of making
17   time available.
18       Q.  That was DPS's -- part of DPS's strategy?
19       A.  Uh-huh.
20       Q.  And that was -- again, that was suggested to
21   them by the Secretary of State's Office?
22       A.  I think when we started working with them, they
23   already had that idea themselves, if I recall correctly.
24       Q.  Did you consider -- well, are there any other
25   efforts that you're working on with regard to the EIC

---

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

30 (Pages 117 to 120)

---

117

1  program?
2      A.  No.  None other than this, what we're currently
3  doing.
4      Q.  And did you consider other options in terms of
5  ensuring people could get EICs that you didn't end up
6  implementing?
7      A.  None that I can remember.  Just trying to get
8  these that we were doing off the ground.
9      Q.  Do you believe that the Secretary of State's
10 Office has the responsibility to ensure that individuals
11 who are eligible for an EIC are able to obtain one?
12     A.  What do you mean?
13     Q.  Do you believe that it's part of your office's
14 responsibility to ensure that somebody who is eligible
15 to get an EIC is actually able to do so?
16     A.  I think our role is to inform the individuals.
17 The role on issuing EIC is not a function of the
18 Secretary of State's Office, it's a function of our
19 sister agency, Department of Public Safety.  What we
20 were doing in this effort is casting a broad net, and as
21 we educate people on the upcoming cycle, allow them to
22 know that you have a -- you have this Election
23 Identification Certificate available to you if you don't
24 have one of these other forms of identification.
25     Q.  So you view the Secretary of State's role as

---

118

1  more of the education and outreach role?
2      A.  That's what we were statutory designated to do.
3      Q.  Okay.  Did -- did the Department of Public
4  Safety and the Secretary of State's Office enter a
5  memorandum of understanding regarding DPS-operated
6  mobile units?
7      A.  I believe we did, yes.
8         (Exhibit 13 marked for identification.)
9      A.  Okay.
10     Q.  (By Ms. Maranzano) I'm showing you what we
11 marked as Deposition Exhibit 13.
12     A.  Yes, ma'am.
13     Q.  Do you recognize that?
14     A.  This was the Memorandum of Understanding
15 between our agency and DPS.
16     Q.  Is it your understanding that either agency can
17 terminate this agreement at any time?
18     A.  Oh, I've got to look back and see what we
19 specifically say, but let's see.
20     Q.  If you want to look at Page 4.
21     A.  Page 4.  Okay.
22     Q.  At the top.
23     A.  Okay.  (Reading to himself.)
24     Q.  So is it your understanding that either party
25 can terminate this agreement at any time?

---

119

1      A.  You know, I guess when we entered it, we didn't
2  enter it to terminate it.
3      Q.  Is there any legal requirement that the
4  Secretary of State's Office and the DPS offer mobile EIC
5  centers to voters for future elections?
6      A.  There's none that I'm aware of.
7      Q.  Would you say that the mobile EIC program is
8  under discretion of the Secretary of State and DPS?
9      A.  I would -- I would say it's under the -- it's
10 really a discretion more of the DPS and how they want us
11 to continue to help them.
12     Q.  How were the locations for the mobile units
13 selected?
14     A.  I can't give you -- we looked at different
15 parts of the state.  You know, we didn't have -- we
16 looked at population areas, we looked at -- you know, we
17 had this kind of non-matches but didn't really
18 know what that meant, and so you started looking on zip
19 codes and where are the potential non-matches and you --
20 and then we visited with local county elections
21 administrators to initially decide who wanted to help in
22 this effort initially and how we could work with them.
23 Most of them were excited about the possible idea
24 because we felt like -- everybody felt like we were
25 dealing with the unknown.  And they helped us determine

---

120

1  potential locations.  They, the counties, worked with us
2  to determine potential locations within their counties.
3      Q.  What was the potential no-match list?
4      A.  Excuse me?
5      Q.  Didn't you say you had a potential no-match
6  list?
7      A.  It's one of those that we provided to you all
8  earlier, the 7-800,000 number.
9      Q.  So I'm loosing you a little bit.  Do you mean
10 it was something that you had provided to the Department
11 of Justice?
12     A.  I don't know.  I thought we provided it to you.
13 It was a list of -- it was one of those bump-ups that we
14 bumped up and it was like, okay, we have this, we don't
15 know if these people have IDs or not because it's not
16 conclusive.  But you've got an XYZ in XYZ county, and
17 XYZ zip code, you've got X number of people who are not
18 a match.  We don't know what those are, we don't know
19 why they don't match, we don't know if they have an ID
20 or not, but we have this number here.
21         So we could potentially look at that.
22 It's not the sole factor, but that in some areas, in
23 some of your major metropolitan areas, that kind of
24 helps you to figure out where do we need to be.  And
25 likewise, you know, DPS, long-term, looked at whether or

---

121

1  not there were DPS offices even in those counties.
2      Q.   So the no-match list was some -- was a list
3  from one of the matching exercises that you previously
4  testified about, correct?
5      A.   It wasn't one, it was "the" list.  It was not
6  something that came out of it, it was -- it was the
7  list.
8      Q.   From a matching exercise between the DPS
9  database?
10     A.   The only thing I know how to refer those to
11  are, "no matches," I call them.  That's my personal list
12  of what I called it.
13     Q.   And did that list contain information about --
14  what information was included on that list?
15     A.   Ma'am, I don't remember exactly.  All I
16  remember was, there was a number of potential no
17  match -- no matches.
18     Q.   Do you recall whether there was any information
19  on who on that list had voted in the past?
20     A.   I don't recall that, ma'am.
21     Q.   Do you recall if there's any information about
22  the individual's race on that list?
23     A.   I don't -- I would think there wouldn't be
24  because we don't have any racial information.
25     Q.   You don't collect racial information on your

122

1  driver's license -- driver's licenses?
2      A.   I mean, without looking at it --
3      Q.   Okay.
4      A.   -- I don't know.  I don't think we do.
5      Q.   And did you use that no-match list to also do
6  PR or community education about the mobile units?
7      A.   What do you mean?
8      Q.   Did you use that no-match list to do any
9  community education?
10     A.   When we -- when we went to a county and said
11  we're going to be in Travis County, we, our staff worked
12  with the County and our staff had to put out press
13  releases that there was going to be a mobile unit at X
14  location for X amount of time.
15     Q.   And did your staff do any other PR or was that
16  left up to the county?
17     A.   I'm sorry?
18     Q.   Did you staff do any other publicity besides a
19  press release or was that left to the county?
20     A.   Well, the county did their own and we put out
21  press releases as well.
22     Q.   Okay.  And was there any other publicity that
23  your office did about the mobile units?
24     A.   Well, when it was initially announced, there
25  was a major press effort -- press event -- press

123

1  conference announcing it.  I don't recall if there was
2  -- the press showed up at any of the other locations or
3  not.
4      Q.   Any other publicities that you can think of
5  your office did with regard to mobile units?
6      A.   We did press releases.  We did, you know, press
7  releases, press announcements to let people know that
8  this was going to happen.  And we would also put up on
9  our website --
10     Q.   Uh-huh.
11     A.   -- that these were the locations that it would
12  happen.  And really the counties did their -- who have
13  those relationships with their local papers, they
14  publicized it as well.
15     Q.   Okay.  And are you planning to use mobile units
16  in the future?
17         MR. SCOTT:  Objection, form,
18  mischaracterizes SOS's role, previous testimony.
19         You can answer.
20     A.   That's a function of DPS.
21     Q.   (By Ms. Maranzano) Are mobile units being --
22  are mobile units in operation currently?
23     A.   I'm not aware of any being in operation right
24  now.
25         MR. SCOTT:  Object to form.

124

1      Q.   (By Ms. Maranzano) Do you have any plans to use
2  mobile units in advance of the November 2014 election?
3      A.   If DPS -- that's a call of DPS, if they're --
4      Q.   Has there been discussion of rerunning the
5  no-match list to determine locations for mobile units?
6      A.   Not that I'm aware of.
7      Q.   And did the Secretary of State's Office provide
8  the notice to the counties about the mobile units that
9  you were -- that mobile units were coming to their
10  counties?
11     A.   Well, we did it in conjunction with DPS.
12     Q.   Did you -- did you consider how much advance
13  notice a county would need in order to do effective
14  publicity about the mobile units?
15     A.   Well, we worked with those counties to see if
16  they -- if they had the time and the resources to be
17  able to help us with the effort.  And those counties who
18  were able to do it were the counties that, you know, we
19  were able to work with.  We didn't -- and those counties
20  felt like they had the appropriate amount of time to do
21  it.
22     Q.   Did any county officials express to you that
23  they felt they didn't have enough notice to
24  appropriately publicize a mobile unit coming to their
25  county?

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

32 (Pages 125 to 128)

---

**125**

1    A.  You know, I think I remember Travis County
2  saying something, but they had just as much time as
3  everybody else.
4    Q.  Do you recall what your response was to Travis
5  County?
6    A.  I think we worked with them on some dates that
7  were more accommodating for them, and they accepted.  We
8  --
9    Q.  And have -- oh, I'm sorry.
10   A.  We didn't force a unit on anybody.  We asked
11  them, "Can you do this?  Do you want to do this?  And if
12  you don't want to do it, we'll go to a county that can."
13  So, anybody that took it, they accepted knowing what the
14  responsibilities were.
15   Q.  How -- how much --
16   A.  It may have been Travis, I don't know.
17   Q.  How much notice were you generally able to
18  provide to people?
19   A.  Because I wasn't doing it on a day-to-day
20  basis, I wasn't the one doing it, I don't know the time
21  frame associated.
22   Q.  Do you have a sense of if it was a couple of
23  days or if it was a week or it was?
24   A.  It was probably more than a couple of days
25  because it takes more than that to actually deploy the

---

**126**

1  equipment to the actual area.  It could have been some
2  weeks.  I don't know the exact amount of time.
3    Q.  Did the Secretary of State have any role on the
4  hours that mobile units were in operation?
5    A.  That was a function of DPS working with the
6  individual counties to determine what the hours were to
7  be.
8    Q.  Do you know if any mobile units operate -- or
9  operated outside of regular business hours?
10   A.  Ooh, I don't remember exactly the hours that
11  were associated with some of them.
12   Q.  You don't recall.
13   A.  I mean, I -- they could have.  I mean, I don't
14  know.  I think there were a couple that may have
15  operated on a Saturday.  I don't know the specifics on
16  which one -- what the hours specifically were on all of
17  them, because there were -- there were 25 different
18  units going different places.  And then you had the
19  counties that didn't have -- EIC that had -- it was --
20  it was the counties that didn't have DPS offices that
21  had units, and it was more or less a function of the
22  personnel that DPS could provide and what they could
23  work out with that individual county as to how much time
24  they had and when they wanted to do it.
25   Q.  So DPS made the sort of final decision about

---

**127**

1  the hours of the mobile units?
2    A.  I don't know if it was DPS or I don't know if
3  it was the individual county.
4    Q.  Okay.  Do you know who was staffing the mobile
5  units?
6    A.  Initially, it would have been DPS employees and
7  some of the county employees.  The last round, there
8  were some staff members from our office which were
9  trained by DPS and certified by them to work as well, so
10  they went out and helped DPS and county employees as
11  well on staffing them.
12   Q.  And for -- for units that were staffed by, say,
13  your office, would the hours still be determined by DPS
14  or a county?
15   A.  Yes, ma'am.
16   Q.  Okay.
17   A.  As far as I -- we just assisted DPS in those
18  counties.  We were never out there ourself alone.  We
19  were out there with DPS --
20   Q.  I see.
21   A.  -- or with the county.
22   Q.  There were no units that were staffed solely by
23  Secretary of State's office?
24   A.  None that I can recall.  I would have to go
25  back and look at that to see if there were, but I --

---

**128**

1  there were generally at least two people, and I don't
2  recall us sending two of our staff members to go to one
3  place.  I don't recall that.
4    Q.  Was that -- why did you decide to help staff
5  these units?
6    A.  To help out.
7    Q.  Uh-huh.
8    A.  To help out.
9    Q.  Did DPS have any resource issues in terms of
10  staffing the mobile units?
11   A.  Well, DPS is a large agency, but they --
12  they're a busy agency, and when you start asking, you
13  know, individuals to travel three and four days a week,
14  it becomes a challenge, and it would become a challenge
15  to our agency.  But we have individuals in elections and
16  our field staff that were in some of these geographical
17  locations and it just made sense if they had a little
18  time, they could help out so that we could all spread --
19  spread the wealth.
20        MS. MARANZANO:  Mark that.
21        (Exhibit 14 marked for identification.)
22   A.  Whew, got another one.  All right.
23   Q.  (By Ms. Maranzano) I'm showing you what we
24  marked as Deposition Exhibit 14.
25   A.  Uh-huh.

---

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

33 (Pages 129 to 132)

---

129

1    Q.  Do you recognize this?
2    A.  I don't recognize the actual document.  I
3  probably have seen it.  I don't -- I know who the
4  individual is.
5    Q.  Did you receive a copy of this letter?
6    A.  I probably did, ma'am.
7    Q.  And can you take a look at it and -- well, who
8  is Bruce Elfant?
9    A.  He's the Travis County Tax Assessor/Collector.
10   Q.  And what -- what concerns is he raising in this
11 letter about the EIC mobile units?
12          MR. SCOTT:  Objection, form,
13 speculation.  The document speaks for itself.
14   A.  I guess he's giving his opinion.
15   Q.  (By Ms. Maranzano) Do you see that he raises a
16 concern about the hours of operation of the mobile
17 units?
18   A.  Okay.
19   Q.  Do you see that?
20   A.  Yes, ma'am.
21   Q.  And do you see that he raises a concern about
22 notice?
23   A.  What do you mean by notice?
24   Q.  About the notice that was provided to him.
25   A.  I see it -- no, wait a minute, are you talking

---

130

1  about --
2    Q.  In his letter.
3    A.  What specific statement are you talking about?
4    Q.  He says, "In a week and a half that we had to
5  prepare for the outreach locations..."
6    A.  Uh-huh.
7    Q.  And he -- and then he raises concern there
8  weren't weekend hours, correct?
9    A.  Uh-huh.
10   Q.  Was there a response made to Mr. Elfant, to the
11 best of your knowledge?
12   A.  I don't know if there was a response from
13 Mr. Ingram, but I know that we helped Travis County with
14 their effort.
15   Q.  You did?  In what ways?
16   A.  Well, we helped them to -- initially, he didn't
17 want to participate.  And we encouraged him, hey, to
18 participate in the effort.  "If you help -- if you get
19 the locations, we'll help you publicize, DPS will
20 provide the places for you, and they'll provide" -- I
21 mean, "DPS will provide the staffing for you, and we can
22 move forward."
23   Q.  So initially, was -- initially, when he voiced
24 concerns, that predates this letter, right, because this
25 looks like --

---

131

1    A.  Correct.
2    Q.  Okay.  And so after --
3    A.  I think.  I think.  I said correct.  I don't
4  know if this letter came before, but -- but or -- before
5  he voiced his concerns or after.
6    Q.  Well, this letter is about his experience with
7  working with the mobile EIC units, right?
8    A.  So I presume this is a letter that he provided
9  after it was over?  (Reading.)
10          Okay.  It appears that that's what it is.
11   Q.  So did you -- did you take any steps to respond
12 to his concerns that he raised in this letter?
13   A.  I didn't personally.  I don't know if
14 Mr. Ingram did or not.
15   Q.  Did you all take into consideration his
16 concerns as you went forward with the EIC mobile units
17 program?
18   A.  Any feedback that any county can give on how to
19 do it better, it was considered.  I don't -- you know,
20 when you're starting a new program and you're doing it
21 for the first time, you've got to figure out what works
22 and what doesn't work.
23   Q.  Did you encourage counties to try to have EIC
24 on mobile unit operation -- mobile units operate outside
25 of regular business hours or on the weekends?

---

132

1    A.  That -- that was not our role.  Our role was to
2  get them to -- our role was to encourage them to work
3  with DPS and even participate in the program.  What they
4  worked out with DPS was the function of the county and
5  DPS.
6    Q.  So your role primary was just to try to get --
7    A.  To make the introduction.
8    Q.  I see.
9    A.  DPS doesn't know elections -- or didn't know at
10 the time, elections, administrators or election
11 workers.  Our staff knows those individuals.
12   Q.  Uh-huh.
13   A.  We made the introductions, so they could work
14 out their relationships and help where needed.
15   Q.  Now did counties enter into a -- enter a local
16 cooperation contract with DPS when they -- when they
17 would start to issue EICs?
18   A.  Ma'am, I have no idea.
19   Q.  You have no idea.  Were you involved at all
20 in the agreements that were made between the county
21 offices and DPS?
22   A.  I don't think I was.
23   Q.  Okay.  Do you know if counties -- well, some
24 counties have been trained to issue EICs, correct?
25          MR. SCOTT:  Object to form, speculation.

---

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

34 (Pages 133 to 136)

---

**133**

1    A.  I -- that wasn't what our office did, so I
2  don't know of -- I don't know what kind of training --
3  there was contact with DPS and the counties.  What they
4  trained them on, I don't know.
5    Q.  (By Ms. Maranzano) So, your office had been
6  involved with the mobile units staffed by DPS?
7    A.  Correct.
8    Q.  Had your office been involved at all in helping
9  DPS with programs where they partner with county offices
10  and they train county staff issue EICs?
11    A.  On those counties where -- where they
12  potentially were working with county elections
13  administrators in those counties, we probably did help
14  them get an introduction.
15    Q.  Okay.  And that was about as far as your role
16  went?
17    A.  I don't know because there were other staff
18  members that were actually working day-to-day with DPS
19  on getting all of this set up.
20    Q.  Okay.  Which staff members were working on
21  that?
22    A.  The elections division.
23    Q.  Do you know who in the elections division?
24    A.  Oh, man, this was a situation where it was all
25  hands on deck.

---

**134**

1    Q.  Do you know if counties have received any extra
2  resources for working on the EIC program?
3    A.  I don't know.
4    Q.  Has DPS received any extra resources for
5  working on the EIC program?
6    A.  When you say resources?
7    Q.  Appropriations?
8    A.  I don't know if they received appropriations.
9  Some of the information -- we provided some assistance
10  with helping them get started with some of their
11  equipment.
12    Q.  Has the Secretary of State's Office received
13  any additional resources for the EIC program
14  specifically?
15    A.  No, ma'am.
16    Q.  Have you heard from any counties, any concerns
17  that they don't have the resources to work on the EIC
18  program?
19    A.  I haven't personally heard that.  I do not know
20  if our election division has or not.
21         (Exhibit 15 marked for identification.)
22    Q.  (By Ms. Maranzano) Okay.  I'm showing you what
23  we've marked as Exhibit 15.
24    A.  Uh-huh.
25    Q.  Do you recognize this?

---

**135**

1    A.  I recognize it as being an e-mail.
2    Q.  Do you recall seeing this e-mail?
3    A.  I'm quite sure I did see it.
4    Q.  Do you know what this e-mail is about?
5    A.  It seems to be about counties that had
6  difficulty -- or either "declined based on lack of
7  facility, staffing, population or some combination of
8  the three."
9    Q.  And was this about -- well, the subject line --
10  or the attachment says "Copy of EIC County Judges."  Do
11  you know if this was about -- related to the EIC
12  program?
13    A.  I'm quite sure it was.
14    Q.  And do you know what -- what these counties
15  were declining?
16    A.  Well, they declined to -- at the point of this
17  e-mail, they declined to participate in the mobile EIC
18  units at this particular point.  However, this is not to
19  say that they didn't ultimately end up participating.
20    Q.  I understand that.  But --
21    A.  This was a snapshot in time.
22    Q.  Right, right.  What I'm wondering though is,
23  what -- what's your understanding of why they were
24  declining.  I mean, I see that it says "lack of
25  facility, staffing, population or some combination of

---

**136**

1  those three."  What was your understanding of what that
2  meant?
3    A.  Just what it says.
4    Q.  What does it mean to lack population?  That --
5  are they so small that --
6    A.  Some of these areas have very, very small
7  voting populations.
8    Q.  Like can you give me a sense of how --
9    A.  I can't give you an exact number as to how --
10  but extremely small.
11    Q.  So were they saying that the voting population
12  was so small it wasn't worth the effort?
13    A.  I don't know what they were saying in terms --
14  I don't know.  I just know that there are some counties
15  that have small populations of voters.
16    Q.  So which -- on this list which would you
17  consider those counties to be?
18    A.  Right of the top of my head, without having an
19  atlas to be able to tell me what the populations are, I
20  don't know.  I do know that there are counties in Texas
21  that have small voting populations.  I don't know the
22  exact number, but.
23    Q.  Were these counties declining to have the
24  mobile unit come to their county or were they declining
25  to issue the EICs themselves or do you know?

---

137

1   A. I don't know but I would -- I don't know, okay?
2   Let me look at their e-mail and read it.
3           This appears to be related to mobile. And
4   the reason I say that is because if it's dealing with
5   our Office, it's dealing with mobile EICs.
6   Q. Okay.
7           (Exhibit 16 marked for identification.)
8   A. A lot of exhibits.
9   Q. (By Ms. Maranzano) Yeah.
10  A. All right. Okay.
11  Q. I'm showing you what we marked as Deposition
12  Exhibit 16. Can you look at this and see if you
13  recognize this?
14          MR. SCOTT: Before you answer, let me take
15  a peek at it since my name is on it.
16  A. Okay.
17  Q. (By Ms. Maranzano) Okay. Do you recognize this
18  document?
19  A. I recognize what's in it. You know, I'm not an
20  e-mail person, just so you know.
21  Q. Uh-huh.
22  A. So I recognize what the -- you know, thousands
23  of e-mails come across -- or hundreds of e-mails come
24  across my desk. My staff knows if you want to talk to
25  me about an issue, you come talk to me.

138

1           I recognize the people involved. I
2   recognize what the issue is about.
3   Q. Okay. Do you see towards the bottom of the
4   page where it talks about -- it's the third paragraph
5   from the bottom.
6   A. Uh-huh.
7   Q. And it talks about counties being nervous about
8   the increased responsibility and that they're -- it
9   refers to their staff as "their already overburdened
10  staff."
11  A. Uh-huh.
12  Q. Do you recall that concern being raised?
13  A. Uh-huh.
14  Q. And how did you respond to that?
15  A. Well, the response was, "Let's educate the
16  counties on really what's involved." Any time the State
17  or the Federal Government tells another body, "We'd like
18  you to do something," there are concerns. What we had
19  to do was just sit down with the counties and explain to
20  them what's all involved in this process. And most of
21  them, if I recall correctly, once they actually found
22  out that they weren't having to buy any equipment, they
23  weren't having to -- it wasn't going to, you know, cost
24  them anything, a great deal, there weren't going to be,
25  you know -- it wasn't anticipated that you're going to

139

1   have 5,000 people standing in line waiting for one of
2   these. When they understood -- once the counties
3   understood what was involved, that it was something that
4   may happen occasionally and we wanted to make sure there
5   was that access, they became more comfortable with it.
6   Q. And did you usually tell counties this would
7   only come up occasionally?
8   A. No, only -- I mean, it's -- that's my
9   characterization -- of -- of what would happen. What the
10  actual staff members shared with them, I don't know the
11  specifics of it but it was -- it was what we had seen
12  based on what has happened in other counties --
13  Q. Uh-huh.
14  A. -- that continue to do this, is not going to be
15  a difficult challenge for you.
16  Q. If a county expressed concerns such as that
17  their staff was overburdened, did you monitor those
18  counties at all, sort of see how the implementation was
19  going?
20  A. We monitored every place that a -- when I say
21  "we," not me personally, but the -- all of the counties
22  where all the units were, and all the units were
23  monitored by DPS staff. That information was shared
24  with our election staff.
25  Q. Okay. And who on your election staff received

140

1   that information?
2   A. I would say Mr. Ingram and anyone he would
3   share it with.
4   Q. Did you -- did you consider that staff who --
5   who were, you know, self-identifying as overburdened,
6   might -- might try to avoid additional work?
7           MR. SCOTT: Objection, form, speculation.
8   A. What do you mean?
9   Q. (By Ms. Maranzano) I mean, I'm wondering if
10  they have -- if staff that's already overburdened is
11  given an additional responsibility, if they'll actually
12  implement it effectively. Is that something that the
13  Secretary of State's Office considered when they heard
14  things from counties about county staff being
15  overburdened?
16  A. We work with counties to resolve their
17  issues. I mean, whatever reasons a county gave, we
18  tried to work with them to make them feel comfortable.
19  I can't address an individual county's employee's, you
20  know, concerns about -- I mean, I don't know what -- I
21  don't know what the employees that they would have
22  working on this, what else they're doing --
23  Q. Uh-huh.
24  A. -- so we just -- our effort was to make
25  counties comfortable.

141

1  Q.  Okay.  And that's in the manner that you've
2  already testified about in terms of the education effort
3  to the counties.  Okay.
4  A.  That is correct.
5  Q.  Did you consider that counties may have a
6  different incentive to participate in the EIC program
7  because of the additional work without additional
8  resources?
9  A.  What do you mean additional work without
10 additional resources?
11 Q.  Well, if they participate in the EIC, it's
12 another task that they're given in addition to
13 everything they've already had to be doing, correct?
14 A.  Well, I mean, most of the counties are not --
15 you know, 99 percent of them were excited about
16 participating, except for, you know, the few that
17 expressed concerns.  And then once you walked them
18 through and educated them on what was actually involved,
19 they're like, "Okay."
20 Q.  And when you said you're monitoring the EIC --
21 or your office is monitoring the --
22 A.  DPS is monitoring, and they're sharing
23 information with us.
24 Q.  Okay.  And has there been analysis done as to
25 whether counties are effectively implementing the EIC

142

1  program?
2  A.  There's been -- DPS has been doing some
3  tracking of what has been going on with it, how many
4  they've issued and so forth.  I don't know that number
5  off the top of my head, and I don't know the extent of
6  what else they're doing with the analysis.  I've seen
7  some analysis but I'm not the holder of it.  They've
8  kind of showed it to me.  Okay.  We're in the infancy of
9  this, you know, so I think it's kind of premature for us
10 to say we have all-inclusive analysis.  And we haven't
11 had a -- haven't had our major election, which is coming
12 up in November, yet.
13 Q.  Okay.  I want to come back to that analysis in
14 a minute.  But with regard to the counties -- the
15 counties that are participating, do you have any
16 knowledge, I think you said you don't work with counties
17 who are issuing EICs themselves, right?  That you're --
18 A.  No, that's not what I said.
19 Q.  Apart from the mobile units, have you been
20 involved in the counties that are issuing EICs out of
21 county offices?
22 MR. SCOTT:  Objection, form, vague.
23 A.  Yeah, I don't -- I don't know how to answer
24 that.  I mean, DPS, we've been assisting them.  There
25 may be a county -- and I don't know, there may have been

143

1  a county that needed our assistance, we may have
2  provided, without looking at data.
3  Q.  (By Ms. Maranzano) Okay.  Well, are you aware
4  of the hours of operations for counties that are issuing
5  EICs?
6  A.  No, ma'am not specifically.
7  Q.  Okay.
8  A.  It's probably been shared with me but I don't
9  remember.
10 Q.  Okay.  Do you know if any of them are outside
11 of regular business hours?
12 A.  I don't know.
13 Q.  Are you aware of any that are open on
14 Saturdays?
15 A.  I don't know.
16     (Exhibit 17 marked for identification.)
17 Q.  (By Ms. Maranzano) All right.  I'm showing you
18 what we've marked as Deposition Exhibit 17.  Do you
19 recognize this document?
20 A.  Like I said, I don't remember the specific
21 document, but I recognize the participants in the
22 document.  I need to read it.  (Reading.)
23     Okay.
24 Q.  Okay.  Can you look at the first paragraph.
25 A.  Uh-huh.

144

1  Q.  And it says, in the second line, "which now
2  gets us down to 31 counties that DPS will staff."  Was
3  there an effort to decrease the number of counties that
4  DPS would be staffing?
5     MR. SCOTT:  Objection, form, calls for
6  speculation.
7  Q.  What does that mean?  I mean, you were cc'd on
8  this e-mail, correct?
9     MR. SCOTT:  Objection, form, speculation.
10 The document speaks for itself.
11 A.  Well, you know, it kind depends on how you
12 interpret the word "down."  To me -- on this particular
13 document, to me, it means we're up to -- the same as up
14 to.
15 Q.  (By Ms. Maranzano) So, how did you -- when you
16 read this, you interpreted that to be the same as which
17 now gets us up to 31 counties?
18 A.  I don't know.
19 Q.  Are you aware of whether DPS was trying to
20 reduce the mobile units that it staffed?
21 A.  I'm aware that DPS was trying to get those --
22 those counties covered.  If county staff was available,
23 okay.  If DPS staff was available, okay.  The objective
24 here was, let's get these counties covered.
25 Q.  Did DPS have any resource issues staffing the

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

37 (Pages 145 to 148)

---

145

1  number of counties it needed to cover?
2      A.  I'm not --
3      Q.  You're not aware of that?
4      A.  You know, I -- I don't know what their resource
5  level was in terms of staffing.
6      Q.  That was never a concern that was shared with
7  you?
8      A.  Well, it was a concern of staff, who's going to
9  do what, can we get as many people to help us as
10 possible?  And as I said, it was all hands on deck.
11 Sure, these staff members have other responsibilities,
12 but what do we need to do to work together?
13     Q.  Did you ever believe that you were stretching
14 DPS's resources by -- well, strike that.
15         When DPS started running the EIC program,
16 do you know if it hired any additional staff solely for
17 the EICs?
18     A.  I have no idea, ma'am.
19     Q.  Can you see the bottom of this e-mail --
20     A.  Uh-huh.
21     Q.  -- it talks about meeting with James Bass?
22     A.  Uh-huh.
23     Q.  Why you were meeting with James Bass?
24     A.  He was the interim director of the Texas
25 Department of Transportation, and at that particular

---

146

1  time, we were seeing what other agencies, State
2  agencies, that had facilities in all counties could
3  potentially help.
4      Q.  And so you were looking to -- where it says "to
5  discuss EIC assistance from his agency" --
6      A.  Uh-huh.
7      Q.  -- were you hoping to use his facilities?
8      A.  Hoping to use his facilities or maybe even some
9  of his staff if he had them in some of those areas.  But
10 it was determined that some of the areas we were looking
11 at -- and I don't remember the exact areas -- but there
12 were not -- there was not staff at those facilities 8
13 hours a day, 5 days a week.
14     Q.  So was he able to offer assistance to the EIC
15 -- EIC assistance?
16     A.  I don't recall.  I don't think he was, based on
17 the counties that we were looking at, at that particular
18 time.  The counties that we were looking at did not have
19 full-time staff at the locations in those counties.
20     Q.  Okay.  And in the third paragraph, do you see
21 there's a reference to Secretary of State personnel --
22     A.  Uh-huh.
23     Q.  -- assisting in the special mobile EIC effort?
24     A.  Uh-huh.
25     Q.  Is that what you previously testified about

---

147

1  with Secretary of State personnel being trained to work
2  in some of these mobile units?
3      A.  Yes, ma'am.
4      Q.  And in terms of this phrase, "special mobile
5  EIC effort," what does that mean?
6      A.  I have no clue.  It's just -- I think it's a
7  term probably that they picked up.  It was -- they were
8  -- they were special because they were mobile.
9      Q.  I see.  So there's not any subset of the
10 mobile?
11     A.  No.  They were different from the other ones.
12     Q.  Okay.  Now I believe you testified earlier that
13 you weren't necessarily involved in the decision for DPS
14 to be opened on Saturdays?
15     A.  Correct.
16     Q.  Do you know anything about that program in
17 which DPS offices are open on Saturdays?
18     A.  I just know that there were some locations that
19 they agreed to keep open on Saturdays to make available
20 for people to get EICs only.
21     Q.  And is it your understanding that DPS chose
22 those locations or that the Secretary of State's Office
23 suggested the locations for DPS?
24     A.  Those were DPS choices.
25     Q.  And is it your understanding that the DPS has

---

148

1  the discretion to discontinue that program at any time?
2          MR. SCOTT:  Objection, form, speculation.
3      A.  I don't have an understanding and I don't know
4  what they -- what they did to come up with -- how they
5  developed their program.
6      Q.  (By Ms. Maranzano) Do you -- do you know how
7  many offices are open on Saturdays?
8      A.  No, ma'am.
9      Q.  Are you aware that prior to the implementation
10 of SB 14, DPS was the source of frequent citizen
11 complaints?
12         MR. SCOTT:  Objection, form.
13     A.  No, ma'am.
14     Q.  (By Ms. Maranzano) You never heard that?
15         MR. SCOTT:  Speculation, foundation.
16     A.  Speculate.  They were -- they were what now?
17     Q.  (By Ms. Maranzano) They were the source of many
18 citizen complaints?
19         MR. SCOTT:  Objection form, speculation,
20 foundation, assumes facts not in evidence.
21         Go ahead.
22     A.  Citizen complaints about what?
23     Q.  (By Ms. Maranzano) About DPS.  You never heard
24 from your constituents any concerns about long lines at
25 DPS or inadequate service at DPS?

---

149

1    A.  I mean, you hear things in the media, but no
2  questions directed to me.
3    Q.  But you had heard that that was an issue?
4    A.  Media accounts.
5    Q.  Did you consider that fact when you were
6  planning the EIC program and working with DPS to
7  implement the EIC?
8    A.  Consider what fact?
9    Q.  The fact that you the heard that there are
10  issues with long lines or service from the DPS?
11    A.  That wasn't a deciding factor on why we did
12  this.
13    Q.  Was that at all a factor in how to go about
14  implementing the EIC program?
15    A.  Not that I can recall.
16    Q.  Has the Secretary of State's Office requested
17  any additional resources from the Legislature for the
18  EIC program?
19    A.  No, ma'am.
20    Q.  Is that because you believe you have sufficient
21  resources to run the EIC program?
22       MR. SCOTT:  Objection, form, assumes facts
23  not in evidence, misstates testimony.
24    A.  It's not our program.
25    Q.  (By Ms. Maranzano) Okay.  So do you have any

150

1  plans to ask for resources for EIC -- for EIC-related
2  tasks?
3    A.  We're doing fine the way we are.  I mean, it's
4  a project that we're looking in it's infancy.  Before
5  we're able to make any determinations on what else is
6  needed, we need to complete a full election cycle, and
7  that won't be until November.
8    Q.  So is there a plan to assess the EIC program
9  after November?
10    A.  You'd have to ask -- I'm quite sure there will
11  be but that will led by DPS.
12    Q.  And will the SOS be involved in that?
13    A.  If they choose to allow us to be involved.
14       (Exhibit 18 marked for identification.)
15       MS. MARANZANO:  Do you want a break now?
16       THE COURT REPORTER:  Okay.  I could use
17  it.
18       (Recess 12:47 p.m. to 1:03 p.m.)
19       (Exhibit 19 marked for identification.)
20    Q.  (By Ms. Maranzano)  Okay.  I am showing you
21  what we're marking as Deposition Exhibit --
22    A.  Uh-huh.
23    Q.  -- 19.
24    A.  Uh-huh.
25    Q.  Can you take a look at that?

151

1    A.  Yes, ma'am, I have.
2    Q.  Do you recognize it or the content of it?
3    A.  I recognize the content.  I don't remember the
4  specific -- I don't remember receiving it, but I'm quite
5  sure -- I know the issue here.
6    Q.  Okay.  And did you have any follow-up
7  conversations about the issue in this e-mail?
8    A.  No, ma'am, I didn't.  I don't recall having
9  any.
10    Q.  Did you respond to anybody about this e-mail?
11    A.  Not that I recall.
12    Q.  And when you saw that applicants -- this
13  information in the e-mail about applicants arriving
14  without the necessary underlying documents, did you take
15  any steps to ensure that there was appropriate publicity
16  or education about the necessary underlying documents
17  required to get an EIC?
18    A.  Based on this particular e-mail?
19    Q.  Yes.
20    A.  I don't recall doing anything, other than I
21  know my mode of operandi would be to make sure that it
22  had been publicized.
23    Q.  So you don't recall taking any actions in
24  response to this e-mail, but your general -- your
25  general strategy was to try to make sure that

152

1  information was publicized?
2    A.  Well if you look at this e-mail, it says that
3  person who did not have a document said that they would
4  come to a different site the next day.
5    Q.  Uh-huh.
6    A.  And the other person really didn't want an EIC,
7  they wanted a state ID.
8    Q.  But were you at all concerned that a person
9  didn't know what the underlying documentation was --
10  that was required?
11    A.  I don't know if the person didn't know or I
12  don't know if the person actually forgot the document.
13  I don't know why they didn't have a birth certificate.
14    Q.  And so you didn't you take any actions in
15  response to this e-mail?
16    A.  Well, it wouldn't have been necessary when the
17  person, according to the -- the feedback that we
18  received from the county administrator, the person said
19  they were coming back the next day.
20    Q.  And did you -- did you get other e-mails like
21  this, to the best of your recollection?
22    A.  I probably could have gotten those from
23  Mr. Ingram.  But as I shared with you earlier, I'm not a
24  creature of e-mails.
25    Q.  Uh-huh.  Did you -- did you make an effort to

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

39 (Pages 153 to 156)

153

1  keep apprised of the EIC program and how many EICs were
2  being issued?
3      A.  I kept up with what was going on with the
4  program.  Without actually looking at the data, I can't
5  give you a specific number as to how many were issued on
6  XY date, but I kept -- I was briefed by staff, DPS.
7      Q.  Okay.  Can we -- can you look at now what we
8  marked as Exhibit 18 --
9      A.  Yes, ma'am.
10     Q.  -- previously?  I apologize for going out of
11 order.
12     A.  That's okay.
13     Q.  Does this e-mail or the content in it look
14 familiar to you?  And there's also a back of the page.
15     A.  It looks like it could have come to me, yes.
16     Q.  Did you see reports like this that categorized
17 the issuance and inquiries of EICs; did you see things
18 like this regularly?
19     A.  I think I did, yes.
20     Q.  Do you know about how often you would see these
21 updates?
22     A.  Ma'am, when we were doing this, we could have
23 had updates daily.  I mean, our staffs were talking
24 daily, so it would not have been uncommon for this type
25 of document to have been provided on a weekly or daily

154

1  basis.
2      Q.  And did those -- did those go to you on a
3  weekly or daily basis?
4      A.  Not necessarily.  I could have been cc'd, or
5  they do have given it to the staff members, election
6  staff members that were -- were directly -- that
7  directly were working in that area.
8      Q.  Would they have gone to Mr. Ingram --
9          MR. SCOTT:  Objection, form, speculation.
10     Q.  (By Ms. Maranzano) -- on a daily or weekly
11 basis?
12     A.  I don't know.
13     Q.  Which staff?  You said they would have gone to
14 the staff working in that area.  Which staff were you
15 referring to?
16     A.  When I say staff, it could have gone to some
17 other individuals in Exec.  It could have gone to our
18 counsel.  It could have gone to our communications
19 staff.  It probably did come to me.  It could have gone
20 to Keith Ingram or anyone that he had designated on his
21 staff.  I didn't -- I don't know who all was put on the
22 e-mail chain.
23     Q.  Okay.  All right.  Do you recall what you would
24 do when you received e-mails like this?
25     A.  What do you mean?

155

1      Q.  What did you do with this information?
2      A.  Read it.
3      Q.  And that's it?
4      A.  Passed it on to someone if it needed to be.
5      Q.  Like who?
6      A.  Could have been other executive staff.  Could
7  have been the Secretary himself.
8      Q.  What would prompt you?  What do you mean if it
9  needed to be, like what would prompt you to pass it on
10 to somebody?
11     A.  Someone would ask, we would look at where we
12 were in the program, how many had been issued.
13     Q.  So you looked at how many EICs were issued.
14 What were other pieces of information you were looking
15 at?
16     A.  That was pretty much it, how many had been
17 issued.
18     Q.  Did you look at how many inquiries had been
19 made?
20     A.  Well, when I say issued, I'm looking at issued
21 and inquiries.
22     Q.  Okay.
23     A.  What activity -- what activity were they
24 relating?  What activity was there related to mobile
25 EICs?  Were questions asked?  Or were cards actually

156

1  issued?
2      Q.  And did you look at where the different regions
3  around the state that that was occurring in?
4      A.  I saw it based on this.  I don't know what
5  these regions are without looking at a map.  Or -- when
6  I say a map, a TxDOT -- not TxDOT -- a DPS map, for
7  instance.  I don't know what 1A, 1B is without them
8  having the actual document that would tell me what 1 --
9  where 1A is.
10     Q.  Did the EIC information that you would get
11 would be DPS-compiled information, so was it compiled
12 generally according to DPS regions?
13     A.  This -- this information -- anything that we
14 get came to -- came to us from DPS.  We -- I guess we --
15 we work with them to figure out what it was, based on
16 their regions that they had, they would tell us it was
17 in this area, this region, we accepted that.
18     Q.  Uh-huh.  Okay.
19         (Exhibit 20 marked for identification.)
20     Q.  (By Ms. Maranzano)  Do you recognize this?  I'm
21 showing what we've marked as Deposition Exhibit 20.
22     A.  Uh-huh.
23     Q.  Do you recognize this document or the content
24 within it?
25     A.  I recognize -- like I said, I recognize -- this

COBY SHORTER, III                                                        8/12/2014
CONFIDENTIAL TRANSCRIPT

40 (Pages 157 to 160)

157

1  appears to be a staff's report that was forwarded to me,
2  and I forwarded it to our counsel.
3      Q.   And so this was -- was this a similar document
4  that was a status report sent by DPS to you about the
5  EIC issuances and inquiries?
6      A.   It appears.  I mean, you know, sometimes it
7  would look like this and sometimes it would like this.
8      Q.   So it took the format that was either what's in
9  --
10      A.   It took the format of whatever way DPS wanted
11  to submit it to us.
12      Q.   Okay.  And when -- when you were getting
13  e-mails like what you looked at in Exhibit 18 or Exhibit
14  20, did you -- did you use the information in these
15  e-mails to target where mobile units should go?
16      A.   No.  I took this information, forwarded it to
17  our general counsel, so that he could give it to the
18  election staff, and the election staff would look at it
19  and make any determinations.  But this was -- it appears
20  that this was information that was provided based on
21  sites that had already been selected.
22      Q.   But the information contained, was that used to
23  evaluate where a good location might be to issue EICs or
24  mobile units or for providing information or education?
25  If you know?

158

1      A.   Well, it just provided information on
2  inquiries.  It provided information on -- it appears to
3  be a report of just what happened during that inquiry.
4      Q.   Are you aware of any changes that were made to
5  the EIC program based on information contained in the --
6  in the reports that you received from DPS, such as what
7  we've seen in Exhibit 18 or Exhibit 20?
8      A.   No.  As I stated previously, this is an
9  evolving process, so any information you'd get would
10  help you to tweak the program for what works and what
11  doesn't work.  I'm quite -- I feel comfortable that our
12  staff, if they saw something in one of these e-mails
13  that needed to be changed or tweaked, they changed or
14  adjusted, they shared that with DPS so that they could,
15  DPS could make the changes.  But since -- you know,
16  we're -- significant changes in what needs to be done,
17  if the changes need to be made, we're not -- we're not
18  at that point in the process.
19      Q.   Are you aware of any tweaks that were made by
20  your staff or recommended by your staff in the EIC
21  program?
22      A.   I can't -- well, the changes were made -- we're
23  now allowing non-DPS staff, like our staff, to work with
24  DPS.  That frees up a little more time.  But we're -- if
25  there have been technical -- or if there had been

159

1  changes in procedure on what has happened, the end
2  result for me is, when it gets to me, it's we're going
3  to be in XYZ, Texas on this date at this particular
4  time.  The election staff that's working the program
5  now, working the program with Mr. Ingram, if there are
6  technical issues, they're resolving those issues at that
7  level.
8      Q.   Okay.
9      A.   And I have not seen any that have risen to the
10  point, that I can recall off the top of my head, that
11  needed to be addressed by me.
12      Q.   Okay.  And when you say that you're not at the
13  point right now to sort of make changes to the EIC
14  program --
15      A.   Uh-huh.
16      Q.   -- can you just describe to me what you mean by
17  that?
18      A.   Well, generally, when new initiatives are taken
19  up by an agency between the time that the legislature is
20  in session and they come back, we will be at a point
21  after this particular election to present findings on
22  here's what happened.  We'll be at a point where we can
23  give complete analysis of what worked and what did not
24  work.  And at that point -- it would be premature for us
25  to make substantive big major changes when the biggest

160

1  election that we have in this cycle is yet to come.  So
2  our hope is let's allow -- let's continue to tweak,
3  let's continue -- if there need to be minor adjustments,
4  let's -- nothing has -- nothing has occurred that I'm
5  aware of or can recall right now that would -- that
6  would seem to be a need for a major change right now.
7  We have an upcoming election.  Once we complete that,
8  we'll be able to see, like, let's take the total concept
9  of primaries, major election -- general election,
10  constitutional election, you have them all that you've
11  had, now we can see in the whole total picture what's
12  worked and what hasn't worked.
13      Q.   So --
14      A.   Because if something happens one time, it might
15  just be an accident or a fluke.  But if there's a
16  consistent pattern of something happening, which I'm not
17  saying that there is, because it hasn't -- it hasn't
18  been reported, but once you have every type of a
19  potential election that you can have and you've gone
20  through it, then you present it to the Legislature and
21  see what the Legislature wants to do with it.
22      Q.   Now, I guess -- okay.  I guess what I'm
23  wondering, though, is that -- I mean, the EIC program is
24  -- it's largely within the discretion of DPS, correct?
25          MR. SCOTT:  Objection, form.

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

41 (Pages 161 to 164)

161

1  Q.  (By Ms. Maranzano)  I mean -- okay.  Let me
2  back up.  The particulars of the EIC program are not
3  spelled out in SB 14, right?
4        MR. SCOTT:  Objection, form.
5  Q.  (By Ms. Maranzano)  You can -- you can -- if
6  you need to refer back to the exhibit, I can -- I can
7  find it for you.
8  A.  Are you saying -- what are you asking me about
9  the EIC in Senate Bill 14?  Is it in it?
10  Q.  No, that's not what I'm asking.  I'm asking
11  about the way that the EIC program is implemented is not
12  written into SB 14, right?
13  A.  I'm not aware of it being.
14  Q.  So -- so I guess I'm -- I'm a little unclear on
15  why you would wait for the Legislature to go back into
16  session to make changes to the EIC program.
17  A.  Now that's not what I said.
18  Q.  Okay.  Then maybe you can clarify.
19  A.  What I said was we have a major election coming
20  up in November.
21  Q.  Uh-huh.
22  A.  At the end of November, we will have a total
23  picture of every type of election that you can have.
24  You would have had primaries, you would have had a
25  smaller constitutional election, you would have had a

162

1  major general election.  At that particular point, when
2  you -- when you analyze all of that data, then you can
3  better -- in my opinion as a manager -- determine what
4  has worked and what has not worked.
5  Q.  Okay.
6  A.  When you do that -- November, it takes you a
7  while to get it done -- when you finish that analysis, I
8  guess what, the Texas Legislature is in session.  If
9  there is a need for something legislatively to occur for
10  this to continue, we will know that.  Otherwise, we will
11  be able to keep doing what we're doing.
12  Q.  In terms of a evaluating the EIC program, have
13  you considered whether it might be -- it might -- you
14  might want to evaluate it prior to the November 2014
15  election so that you can make sure you're implementing
16  the program effectively before a major federal election?
17  A.  Well, based on what we have done so far, we
18  feel pretty comfortable with how we're implementing it.
19  Q.  Okay.  And what are you referring to when you
20  say based on what you've done so far?
21  A.  Based on -- based on how the program is
22  operating now.  We feel comfortable that that's the way
23  we should continue to do it as we approach the general
24  election.
25  Q.  Okay.  And I'm just -- I'm just moving you a

163

1  little bit on -- based on what we're doing now.  I mean,
2  are you saying based on just the steps you're taking to
3  make EICs available?  Or are you -- what are you looking
4  at to measure that this is how you should keep
5  implementing it?
6  A.  Are you referring to the mobile units?  Or --
7  Q.  No, no, I'm referring to the EIC
8  program generally.
9  A.  Okay.  The EIC program overall is not a
10  function of the Secretary of State's Office.
11  Q.  Uh-huh.
12  A.  I'm referring specifically to these mobile
13  units that we're helping DPS with.
14  Q.  Okay.
15  A.  And when I -- so when I refer to EICs, I'm not
16  talking about EICs for the whole state of Texas.  That's
17  DPS.  I'm talking about the effort that we're helping to
18  market these mobile units and do -- because the mobile
19  unit is more of a marketing issue than a regulatory
20  function, statutory function, that has been given to
21  DPS, not to us.
22  Q.  Now, do you -- do you consider the SOS
23  involvement in the EIC program to be limited to the
24  mobile units?
25  A.  As educating people about limited to the mobile

164

1  units and educating people about what the requirements
2  are for voting.
3  Q.  Okay.  But have you used the information that
4  you've received from DPS to -- to change or refocus your
5  education at all?
6  A.  Well, what do you mean?
7  Q.  Well, when you get information from DPS that
8  has different inquiries that are made, have you used
9  that at all to evaluate your education program or to
10  change your education program?
11  A.  Well, the information that you've shown me
12  today in terms of their inquiries, and I can't remember
13  the others without looking at them, doesn't indicate to
14  me that our effort to educate individuals has not been
15  successful.
16  Q.  But as you sit here today, I'm just wondering
17  if you've received any information from DPS that has led
18  you to evaluate or make any changes to either your
19  education program or your mobile units?
20  A.  No, I don't think we've received information
21  that warrant those types of changes as of yet.
22        (Exhibit 21 marked for identification.)
23  Q.  (By Ms. Maranzano)  I'm showing you what we've
24  marked as Deposition Exhibit 21.
25  A.  Right.

---

165

1    Q.  Have you ever seen this or contents similar to
2  this?
3       A.  You know, ma'am, I have seen some data
4  language, but it was not in this -- it was in a -- it
5  wasn't -- it didn't -- it was not packaged like this.
6       Q.  Okay.  Where have you seen data similar to
7  this?
8       A.  Well, DPS showed it to me.
9       Q.  Have you heard of DPS's SharePoint site?
10      A.  Personally, I haven't.
11      Q.  Okay.  Are you familiar with how DPS is
12  maintaining information about the EICs?
13      A.  I just know that they provided information to
14  us.  How they're doing it, I don't know.
15      Q.  When did they provide information that was
16  similar to this?
17      A.  Well, they provided it to us when they sat down
18  with us and met with us about next steps after we had
19  had our -- I don't remember the exact day, but after our
20  constitutional amendment election that we had.
21      Q.  And what happened in that meeting about next
22  steps?
23      A.  Well, we just kind of -- we talked about what
24  happen -- I mean, they talked to tell us where things
25  had happened.  And we talked about how we could

---

166

1  potentially get SOS employees trained and other agency
2  staff trained.
3       Q.  Was that the only change to the program that
4  was discussed at that meeting?
5       A.  I think so.
6       Q.  Was --
7       A.  I don't --
8       Q.  I'm sorry.
9       A.  I think DPS has procedures on how they do
10  things.  And I think by the time they had this meeting,
11  they had their internal procedures set up for how they
12  were going to operate the next time.  What those
13  procedures were, I don't know.  All I wanted to be able
14  to do was tell me -- tell me and my staff where to show
15  up so we can be trained.  Because just the size of our
16  agencies cause us to do things differently.
17      Q.  Was it the Secretary of State's Office or DPS
18  who suggested that SOS staff be trained?
19      A.  Well, we just kind of asked.  We were just, as
20  we sitting around the table, "Is this something I can
21  train?  We -- our staff members are elections
22  inspectors, and there's a training process, and I just
23  got to ask can we potentially train some of our staff
24  members who are good at elections inspecting, understand
25  the elections process, can we possibly train some of

---

167

1  them to do this?"  And they looked and said, "Yes, we
2  can."
3       Q.  Okay.  But it was -- it was the suggestion of
4  someone from the Secretary of State's Office, can we be
5  trained?
6       A.  It was probably my suggestion.
7       Q.  Okay.  Now, do you see --
8       A.  Actually, I think it was mine.
9       Q.  Do you see as of the date that this was printed
10  out or issued --
11      A.  Where is that?
12      Q.  Well, there's not a date on here, but you can
13  look -- if you look at the various dates, it's certainly
14  at least late May 2014.
15      A.  Oh, Lord.
16      Q.  Now, on the very first page, do you see at that
17  time there is -- the EICs approved and issued, it says
18  those are 266?
19      A.  Uh-huh, yes, ma'am.
20      Q.  Does that sound about right to your
21  recollection that as of late May 2014?
22      A.  It -- if this is a document that -- that they
23  showed us, it sounds right.
24      Q.  Do you have a reaction to that number?
25      A.  No.

---

168

1       Q.  No reaction?
2       A.  What type of reaction are you looking for?
3       Q.  Does it seem small?  Does it seem large?  Does
4  it seem about what you would expect?
5       A.  My reaction is there were voters that needed a
6  card, we provided a service, and if it had been one, one
7  more voter has that opportunity to have the data they
8  need.  I mean, I -- I'm not quite sure how you want me
9  to evaluate it.
10      Q.  Do you believe that most voters in Texas
11  already have forms of ID that are required by SB 14?
12          MR. SCOTT:  Objection, form, foundation.
13      A.  I don't know.
14      Q.  (By Ms. Maranzano)  When you see -- when you
15  see the number 266 EICs issued -- and this was probably
16  late May of 2014.  Do you recall when you started
17  running the EIC program?
18          MR. SCOTT:  Objection, form,
19  mischaracterizes his testimony.
20      Q.  (By Ms. Maranzano)  I'm sorry.  Let me just
21  rephrase.
22          Do you recall when the State started to
23  issue EICs?
24      A.  Ma'am, I can't remember the exact date.  It was
25  sometime in -- wait.  Wait.  Ask me the question again.

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT
8/12/2014

43 (Pages 169 to 172)

---

**169**

1  Q.  When did EICs start to be issued?

2  A.  The first one, I have to go back and look.  I
3  don't have a firm date as to when DPS started doing
4  that.

5  Q.  Do you think that -- have you considered
6  whether the EIC program could be doing a better job?

7  A.  That's not my role to do.

8  Q.  You don't consider that your role?

9  A.  No, because we're not -- are you talking about
10  mobile EICs?  Are you talking about EICs --

11  Q.  We're talking about the overall program.

12  A.  Your question again?

13  Q.  Have you considered whether the EIC program
14  could be improved?

15  A.  That's not my role to consider.

16  Q.  Do you think if you made suggestions to DPS
17  about ways to improve the EIC program, they would listen
18  to those suggestions?

19  A.  I think DPS would listen to anyone that gave
20  them constructive positive advice that would help them.

21  Q.  Are you aware that DPS has actually changed
22  items in the EIC program at the suggestion of the
23  Secretary of State's Office?

24  A.  That could have happened.  Specifically what
25  those changes are, without someone recalling them for

---

**170**

1  me, I can't name them.

2  Q.  Do you recall that initially DPS was taking
3  fingerprints of EIC applicants?

4  A.  I don't know if I remember.  Ma'am, I can't
5  recall if they were or not.

6  Q.  Okay.  So you wouldn't be aware that --

7  A.  I may have been aware at one time, but I don't
8  remember specifically if they were doing it, but I -- I
9  just can't recall.

10  Q.  Do you know if anyone from the Secretary of
11  State's Office suggested to them that they should stop
12  doing that practice?

13  A.  Like I said, I don't remember.  I don't
14  remember specifically what they were doing.  If they
15  were doing that, that could have been a conversation
16  that someone in our office did have with me.

17  Q.  And you don't know if that occurred?

18  A.  I don't remember -- I don't remember
19  specifically fingerprinting.

20  Q.  Do you recall any other parts of the EIC
21  program that were changed at the suggestion of the
22  Secretary of State?

23  A.  Not without staff coming to me and refreshing
24  my memory.

25  Q.  Have you or your office made any effort to

---

**171**

1  determine if eligible individuals are actually able to
2  obtain EICs?

3  A.  What do you mean?

4  Q.  Have you made any effort to determine whether
5  individuals who are eligible for an EIC are actually
6  getting through the process and getting an EIC issued to
7  them?

8  A.  How would we know who those people are?

9  Q.  Well, I'm asking you if you've made any efforts
10  to look into this.

11  A.  I don't know how we would determine who those
12  people are.

13  Q.  You don't know how you would determine who the
14  people are who are getting EICs?

15  A.  No.  I thought your question was are we -- I
16  understood your question to me to be:  Are we aware or
17  are we working with individuals who were trying to get
18  EICs.  Is that your question?

19  Q.  My question is:  Are you making any effort to
20  look into the process of getting an EIC and whether
21  people who are eligible for an EIC are actually getting
22  EICs?

23  A.  That's not our role.

24  Q.  So have you done that?  I take it that's a no,
25  but I just want to be clear.

---

**172**

1  A.  No, I mean, I don't -- I really don't know what
2  you're looking for, to be able to answer your question.
3  Statutorily how that program works on EICs is not a
4  function of our office.  We're only responsible for
5  educating people as to here are the requirements for
6  voting.  Analysis of EICs, what works and what doesn't
7  work, is not a function of the Secretary of State's
8  Office.  That's a function of DPS and whoever else the
9  Legislature deems should do that.  And they've not
10  deemed that the Secretary of State's Office should do
11  that at this point.

12  Q.  Do you think that the Secretary of State's
13  Office could fulfill its implementation responsibilities
14  more effectively if it had more regulatory authority
15  under SB 14?

16  A.  I think we're very effective in what we're
17  doing right now.

18  Q.  Can you look back at Exhibit 21 and look at the
19  third page for me?

20  A.  Uh-huh.

21  Q.  And do you see on this page, it actually breaks
22  down the number of EICs that are issued at mobile units
23  and driver's license offices and county offices.

24  A.  Are you talking about this fourth column over
25  here?

---

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

44 (Pages 173 to 176)

173

1    Q.  Yes, exactly.
2    A.  Okay.  Okay.
3    Q.  Now, did you use this information to assess the
4  mobile unit program at all?
5    A.  I didn't personally.  I don't know if our staff
6  did.
7    Q.  Did you talk to any staff about that?
8    A.  About this particular document?
9    Q.  Uh-huh.
10    A.  I don't recall having a conversation with staff
11  about this document.
12    Q.  Did you have conversations with staff about the
13  fact that DPS was gathering this information and they
14  could use it as a way to assess the mobile unit program?
15    A.  I didn't have a discussion with them about
16  assessing the mobile unit based on this information, but
17  staff was available and staff was in the meeting where
18  DPS provided this information.
19    Q.  So are you aware of whether your staff used
20  this information to make any assessment or changes to
21  the EIC mobile unit program?
22    A.  I'm not aware of how you would use this data,
23  because right now it's just numbers.  When you have 25
24  mobile units and you got 254 counties, it's kind of safe
25  to say that you probably won't be in the same place you

174

1  were last time the next time you do it.
2    Q.  Have you used the number of EICs issued from
3  mobile units to --
4    A.  To do what?
5    Q.  To make any changes to your mobile unit
6  program.
7    A.  As I've consistently said, it's too early in
8  the game to make holistic changes in the mobile EIC
9  program because the biggest election and the biggest
10  election cycle is yet to come.
11    Q.  And can you look on -- on the seventh page of
12  this document?
13    A.  One, two, three, four, five, six, seven.  Are
14  we on the same page?
15    Q.  Does it have a list of counties?
16    A.  Did I count wrong?
17    Q.  Maybe I counted wrong.
18    A.  One, two, three, four, five, six -- I counted
19  wrong.  Forgive me, seven, yes, ma'am.
20    Q.  Have you used this information about the EICs
21  issued in different counties and different zip codes to
22  -- to target your education at all, your voter
23  education?
24    A.  Have we done what now?
25    Q.  Well, do you see that there's information about

175

1  how many EICs are issued by county and zip code?
2    A.  Uh-huh.
3    Q.  Have you used this information at all when
4  you're planning on your voter education program?
5    A.  No.  Our voter education program is -- uses
6  different analysis to target where we go, where --
7  target the state, the entire state.
8    Q.  What analysis does your voter education program
9  use?
10    A.  We have an outside vendor we hired.  They do
11  market analysis.  And based on that market analysis, it
12  teaches us, that teaches us how to effectively cover the
13  entire state of Texas during our marketing campaign.
14    Q.  Can you -- can you take a look two pages back
15  on page 5?
16    A.  Two pages back from here?
17    Q.  Yes.
18    A.  All right.  I can't even see this.
19    Q.  Do you see there's information about different
20  demographics of EIC applicants?
21    A.  Okay.
22    Q.  Was there any analysis that you or your office
23  conducted related to the race of the -- the applicants?
24    A.  Ma'am, as I said before, we have not done any
25  analysis at this point because too early in the game.

176

1    Q.  And have you considered the racial breakdown of
2  EIC applicants --
3    A.  We've not --
4        MR. SCOTT:  Let her finish.
5    Q.  (By Ms. Maranzano)  -- as you plan for future
6  EIC mobile outreach or voter education outreach.
7    A.  We've not made any considerations at this
8  particular point.  It is too early in the game.
9    Q.  Have you instructed DPS or had any discussions
10  with DPS about the information they contained -- they
11  gathered and how to evaluate the program based on it?
12    A.  Not at this point.
13    Q.  What -- what is the purpose of gathering all
14  this information now?
15    A.  You would have to ask DPS that.  This is their
16  information.
17    Q.  Are you aware of the number of individuals who
18  have received the disability exemption under SB 14?
19    A.  No, ma'am.
20    Q.  If I told you that as of January 15, 2014, 18
21  individuals have received the disability exemption, what
22  would be your reaction to that number?
23    A.  I don't have a way to react to it because I
24  don't know what the circumstances are.
25    Q.  You don't think it's a -- you have no reaction

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

45 (Pages 177 to 180)

---

177

1  to knowing the number of registered voters in the state
2  of Texas, which I assume you know, do you have any
3  reaction to the fact that 18 people have received the
4  disability exemption?
5      A.  I don't know the circumstances --
6          MR. SCOTT:  Objection, form.
7      A.  I don't know the circumstances behind that
8  number.
9      Q.  (By Ms. Maranzano)  What do you mean by the
10 circumstances?
11     A.  I don't know what -- I don't know anything
12 about that particular number.  I don't know.
13     Q.  Okay.  Have you done any outreach with
14 disability groups to ensure that they're aware of the
15 disability exemption?
16     A.  Our office has -- with this particular
17 campaign, our office works with all groups and our
18 office interacts with advocates for disabilities to make
19 sure that their issues are addressed.
20     Q.  What do you mean by this particular campaign?
21 Did you say with regard to --
22     A.  Well, with any particular campaign.
23     Q.  Okay.
24     A.  Any particular election, our office -- campaign
25 is the incorrect word.  Election, election cycle.  We

---

178

1  frequently work, we being our election staff, we're
2  doing work with the advocates of -- of those with
3  disabilities to make sure that their issues are
4  addressed.
5      Q.  And have you worked with them specifically on
6  education about the disability exemption contained in SB
7  14, to the best of your knowledge?
8      A.  I would hope that our staff has been
9  interacting with them as they've have been directed to
10 interact with several different individuals and groups
11 as it relates to Senate Bill 14.  We're -- if there's an
12 issue, we want to address it with our constituent group.
13     Q.  Do you know what other advocacy groups your
14 office is working with?
15     A.  Ma'am, off the top of my head, I -- I can't --
16 Elections would have to tell me exactly who, because
17 they've been working with them.  Nothing at this
18 particular point has risen to the -- to the role where
19 these could be addressed by me, and it's been
20 effectively handled by our election staff.
21     Q.  Has the Secretary of State's Office done any
22 analysis of how many individuals have voted
23 provisionally because they lacked photo ID?
24     A.  I don't know.
25     Q.  You don't know of any analysis?

---

179

1      A.  I mean, I don't know if they're considering it
2  or if it's being done.  I don't know.  I mean, we're --
3  I would have to ask my elections staff have they done
4  that yet or is that something that is going to be done.
5  I personally don't know.
6      Q.  Okay.  Do you know if there's been any request
7  to the counties to do any such analysis?
8      A.  I'm -- I'm -- I don't know.
9      Q.  Are you aware of any errors by a county in
10 counting the provisional ballot that was cast by
11 somebody without an ID?
12     A.  Me personally?
13     Q.  Uh-huh.
14     A.  I'm not aware.  I'm not saying it didn't
15 happen.
16     Q.  I was just about to ask you:  Would you be
17 aware, if that was something that had happened, do you
18 believe you would be aware of it?
19     A.  If it were shared with our staff, I hope
20 someone would have shared it with me.
21     Q.  Has the Secretary of State's Office done any
22 analysis on what populations are more likely to vote by
23 mail?
24     A.  What do you mean by populations?
25     Q.  The demographics of people who are more likely

---

180

1  to vote by mail.
2      A.  I can't say specifically that has been done or
3  not.
4      Q.  Do you have any knowledge, as you sit here
5  today, about the demographics of people more likely to
6  vote by mail?
7      A.  Personally, probably not.
8      Q.  Would you agree that in many African American
9  communities there's a tradition of voting in person?
10     A.  Versus what?
11     Q.  Voting by mail.
12     A.  If -- I don't know.  If that's what the -- I
13 don't know what the statistics say.
14     Q.  You have no knowledge as you sit here today?
15     A.  I know how I vote.
16     Q.  But I'm asking about African American
17 communities in general.  Do you have any knowledge?
18     A.  Statistically?
19     Q.  Statistically or any other way.
20     A.  Why would I?
21     Q.  I'm just wondering would you agree --
22     A.  I can't agree with -- I cannot agree based on
23 the fact that I've not studied it.
24     Q.  Okay.  Has the Secretary of State's Office done
25 any analysis of voter turnout since SB 14 has been

---

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

46 (Pages 181 to 184)

---

181

1  implemented?
2      A.  I think we -- we know voter totals for the
3  constitutional amendment elections that we've had.  I
4  can't give you specifics, but I do know that the total
5  number of voters was up.
6      Q.  And --
7      A.  Or increased.
8      Q.  Would you say that there's a number of
9  different factors that impact voter turnout on any given
10  election?
11      A.  I guess that could be said about any election.
12      Q.  Do you know what some of those factors are?
13      A.  You know, it could be a number of things.  It
14  could be the issues.  It could be the candidates.  There
15  are a plethora of different issues that affect why a
16  person decides they want to go to the polls, and there's
17  nobody that has a silver-bullet answer as to if people
18  are going to turn out or not.
19      Q.  Have you ever heard that the weather can be a
20  factor in voter turnout?
21      A.  I've heard the press say that.
22      Q.  When you -- when you look at election turnout,
23  do you factor -- do you try to factor in these different
24  -- these different issues that can impact voter turnout?
25      A.  Me personally?

---

182

1      Q.  Yes.
2      A.  I look at the numbers.
3      Q.  You just look at the numbers?
4      A.  Uh-huh.
5      Q.  Do you think about the other things that might
6  -- do you think about all the different --
7      A.  I look at the numbers and I look at what they
8  were this year versus what they were last year.  And
9  what they are this year since Senate Bill 14 has been
10  enacted is they're up.
11      Q.  Uh-huh.  And do you correlate that with Senate
12  Bill 14?
13      A.  I haven't made a correlation at this point.
14      Q.  Okay.  Do you consider the EIC program to be a
15  success?
16      A.  It's not for me to determine whether it's
17  successful or not.
18      Q.  Are you familiar with the legislative study
19  that's occurring on the implementation of SB 14?
20      A.  A current one?
21      Q.  Yes.
22      A.  I know that there are interim studies looking
23  at different things.  Have I been specifically involved
24  in any of that?  No, I haven't.
25      Q.  Do you know if Mr. Ingram is involved in any of

---

183

1  that?
2      A.  Like I said, I don't know the specifics of it.
3  I would -- if -- I don't know.  If it's election-related
4  and if he's been asked, I'm quite sure he probably would
5  be involved.
6      Q.  So do you know any of the details of what this
7  study is looking at?
8      A.  Not at this point.
9      Q.  Okay.  Do you believe DPS is the appropriate
10  agency to be issuing EICs?
11      A.  That's not for me to determine.
12      Q.  Apart from this responsibility of issuing EICs,
13  DPS doesn't have any other election-related functions,
14  correct?
15      A.  Well, I mean, they -- other than providing
16  their data, I mean, their list to us.
17      Q.  Their list?
18      A.  Of voters for like voter jury wheel and stuff
19  like that.
20      Q.  I see.  So it provides the jury wheel to you to
21  use --
22      A.  We get DPS data from DPS.
23      Q.  I see.  And apart from that, which is mostly
24  just providing you with data, it doesn't have any other
25  election-related responsibilities, correct?

---

184

1      A.  When you -- what type of election-related
2  responsibilities are you potentially referring to?
3      Q.  Any election-related responsibilities.
4      A.  Well, I mean, none, other than they are --
5  they're -- I mean, if there are law enforcement issues,
6  I mean, I guess they would, I mean, potentially be
7  involved.  No, I guess that would be the local folks.
8      Q.  Is DPS primarily a law enforcement agency?
9      A.  Well, it's a law enforcement agency, and it's
10  an issue -- they're the agency that in the state of
11  Texas that issues identification.
12      Q.  Do you know if state troopers are often present
13  at driver's license offices?
14      A.  Driver's license offices where?  Across Texas?
15      Q.  Uh-huh.
16      A.  Ma'am, it's been so long since I've been into
17  one, I don't know.
18      Q.  Do you know if any law enforcement tends to be
19  present in driver's license offices?
20      A.  Like I said --
21      Q.  No, you don't know?
22      A.  It's been so long since I've been in one.  I've
23  been out to the state headquarters, and they have law
24  enforcement there.  I've been to the one in my local
25  area out in Pflugerville, and I have no idea if there

---

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

---

185

1  was a law enforcement agent there or not.  I went in and
2  asked my specific question and I left, so.
3      Q.  Do you know if DPS runs warrant checks on EIC
4  applicants?
5      A.  I don't -- for EICs, I don't know what they do.
6  At least, I can't remember what they do.
7      Q.  What?
8      A.  I said that I don't know.  I can't necessarily
9  remember.  They might.
10         MS. MARANZANO:  Will you mark this?
11         (Exhibit 22 marked for identification.)
12     A.  Without looking at something to refresh my
13  memory, I don't know if they do or not.
14     Q.  (By Ms. Maranzano)  Okay.  I'm showing you what
15  we've marked as Deposition Exhibit 22.  Do you recognize
16  this or the contents within it?
17     A.  You know, I remember the issue of -- now that
18  I've seen this --
19     Q.  Uh-huh.
20     A.  -- that there was something they could do with
21  warrants.  I don't remember what it was.  But on the
22  mobile units, whatever it was, it was not done.
23     Q.  It was not done?  So in September of 2013, is
24  it fair to say that DPS was considering running warrant
25  checks on --

---

186

1      A.  I don't know what they were considering doing.
2      Q.  Okay.  Well, it looks like --
3      A.  Because --
4      Q.  Yeah.
5      A.  They say they have the ability to run them.  It
6  doesn't say they were going to do it.
7      Q.  Okay.  So was there any discussion in response
8  to this e-mail about whether or not it made sense for
9  them to do warrant checks?
10     A.  I think there was a clarification on our office
11  as far as are you going to do this or are you not, and
12  they more or less said they were not going to do it.
13     Q.  Okay.  And was that the extent of the
14  communication that you had with them about --
15     A.  As far as I remember.
16     Q.  And do you know if they did warrant checks on
17  EIC applicants in any other context?
18     A.  I don't know, ma'am.
19     Q.  Do you think applicants might be deterred from
20  applying for an EIC at an agency that they associate
21  with law enforcement?
22         MR. SCOTT:  Objection, form,
23  specialization.
24     A.  I don't know.
25     Q.  (By Ms. Maranzano)  You don't know?

---

187

1      A.  No.
2      Q.  How would you describe the relationship between
3  the office of the Secretary of State and DPS related to
4  the EIC program?
5      A.  Great.
6      Q.  Do you think each agency is similarly motivated
7  with respect to the EIC program?
8      A.  I can't speak to the motivation of other
9  agencies.  I can only speak to the motivation of the
10  Secretary of State's Office.
11     Q.  At any time since DPS has begun issuing EICs,
12  have you had any concerns about tasking DPS with
13  additional work?
14     A.  What do you mean by tasking them with
15  additional work?
16     Q.  Have you had any concerns about the workload
17  that DPS has in terms of the EIC program?
18     A.  I haven't had any concerns.
19     Q.  Have you considered whether DPS has sufficient
20  resources to effectively implement the EIC program?
21     A.  The EIC program?
22     Q.  Uh-huh.
23     A.  I'm not understanding why I would.
24     Q.  Have you heard from anybody at DPS that they
25  don't think they have sufficient resources to

---

188

1  effectively implement the EIC program?
2      A.  I haven't heard from them on the EIC program.
3  I mean, they -- we were able -- when we started talking
4  about mobile EICs, we were able to provide them some
5  assistance because they hadn't budgeted for that
6  particular effort, but what they're doing with the EICs,
7  separate from these mobile units, is their business and
8  their function and their budget.  Don't have anything to
9  do with it.  So the idea that we came up with jointly,
10  we didn't just say we have this idea of mobile EICs, you
11  all go do it.  We said we have this idea of mobile EICs,
12  we will help you get it done.
13     Q.  Were there any other ideas that you came up
14  with that you suggested to DPS --
15     A.  No.
16     Q.  -- about the EIC program?
17     A.  At this point, just trying to get this one to
18  work.
19         MS. MARANZANO:  Can we go off the record
20  for about two minutes?  I think I'm just about finished.
21         (Recess from 1:58 to 1:59 p.m.)
22     Q.  (By Ms. Maranzano)  Are you aware of any
23  allegations of noncitizen voting?
24     A.  No more than what you hear on the news
25  accounts.

---

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

48 (Pages 189 to 192)

---

**189**

1    Q.  You don't have any personal knowledge of any
2    allegations as you sit here today?
3        A.  Not that I -- not that I can remember.
4        Q.  Okay.  Would you -- is it fair to say that
5    Ms. McGeehan was a knowledgeable employee?
6        A.  It's a fair statement.
7        Q.  Trustworthy employee?
8        A.  I would think so.
9        Q.  And she reported directly to you, correct?
10       A.  While she was -- while she was -- while -- for
11   the time that she was there while I was there, yes.
12       Q.  Okay.  While she was the Director of
13   Elections --
14       A.  Right.
15       Q.  -- and while you were the Deputy --
16       A.  Right.
17       Q.  -- Secretary of State?
18       A.  Right.  Now, what was that question you asked
19   again about noncitizens?
20       Q.  If you were aware of any allegations of
21   noncitizen voting.
22       A.  You hear these things all the time, and you
23   don't know.  I can't qualify where those statements came
24   from.
25       Q.  Okay.  When you hear people talking about

---

**190**

1    illegal immigrants in Texas, what population do you
2    usually take them to be referring to?
3        A.  I don't take them to -- any -- I mean, someone
4    who is not here legally can be from anywhere.
5        Q.  Do you -- where is the largest immigrant
6    population in Texas, do you know?
7        A.  Without somebody specifically telling me where
8    they're from.
9        Q.  You don't know?
10       A.  I wouldn't speculate on this because I may be
11   totally wrong.
12       Q.  Okay.
13           MS. MARANZANO:  I don't have any further
14   questions.  Thank you for your time.
15           THE WITNESS:  Well, thank you.
16           MR. SCOTT:  We reserve ours.
17
18
19
20
21
22
23
24
25

---

**191**

1    CHANGES AND SIGNATURE
2        RE: VEASEY, ET AL. VS. PERRY, ET AL.
3    PAGE  LINE  CHANGE          REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20       I, COBY SHORTER, III, have read the foregoing
21   deposition and hereby affix my signature that same is
22   true and correct, except as noted above.
23
24       _____
25       COBY SHORTER, III

---

**192**

1        IN THE UNITED STATES DISTRICT COURT
2        FOR THE SOUTHERN DISTRICT OF TEXAS
         CORPUS CHRISTI DIVISION
3    MARC VEASEY, et al.,    )
4        Plaintiff,          )
5    VS.                     ) CIVIL ACTION NUMBER:
                             ) 2:13-CV-193 (NGR)
6    RICK PERRY, et al.,     )
7        Defendants.         )
     _____)
8                            )
     UNITED STATES OF AMERICA,  )
9        Plaintiff,          )
10   VS.                     ) CIVIL ACTION NUMBER:
                             ) 2:13-CV-263 (NGR)
11   TEXAS LEAGUE OF YOUNG VOTERS )
12   EDUCATION FUND, et al.,  )
13       Plaintiff-Intervenors,  )
14   TEXAS ASSOCIATION OF HISPANIC )
     COUNTY JUDGES AND COUNTY )
15   COMMISSIONERS, et al.,   )
16       Plaintiff-Intervenors,  )
17   VS.                     )
18   STATE OF TEXAS, et al.,  )
19       Defendants.         )
     _____)
20                           )
21   TEXAS STATE CONFERENCE OF )
     NAACP BRANCHES, et al.,  )
22       Plaintiffs,         )
23   VS.                     ) CIVIL ACTION NUMBER:
                             ) 2:13-CV-291(NGR)
24   NANDITA BERRY, et al.,   )
25       Defendants.         )

---

STAN STANART - June 17, 2014

```
 1              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION
 3   MARC VEASEY, JANE HAMILTON,     )
     SERGIO DELEON, FLOYD J. CARRIER,)
 4   ANNA BURNS, MICHAEL MONTEZ,     )
     PENNY POPE, OSCAR ORTIZ, KOBY   )
 5   OZIAS, JOHN MELLOR-CRUMMEY,     )
     JANE DOE, JOHN DOE, LEAGUE OF   )   CIVIL ACTION NO.
 6   UNITED LATIN AMERICAN CITIZENS  )   2:13-CV-193 (NGR)
     (LULAC), AND DALLAS COUNTY,     )   (lead case)
 7   TEXAS                           )
                                     )
 8   VS.                             )
                                     )
 9   RICK PERRY, Governor of Texas,  )
     and JOHN STEEN, Texas Secretary )
10   of State,                       )
     _____)
11                                   )
     UNITED STATES OF AMERICA,       )
12                                   )
     V.                              )
13                                   )
     STATE OF TEXAS, JOHN STEEN, in  )   CIVIL ACTION NO.
14   his official capacity as Texas  )    2:13-CV-263 (NGR)
     Secretary of State, and STEVE   )   (consolidated case)
15   MCCRAW, in his official capacity)
     as Director of the Texas        )
16   Department of Public Safety,    )
     _____)
17                                   )
     TEXAS STATE CONFERENCE OF NACCP )
18   BRANCHES, AND THE MEXICAN       )
     AMERICAN LEGISLATIVE CAUCUS OF  )
19   THE TEXAS HOUSE OF              )
     REPRESENTATIVES,                )
20                                   )
     V.                              )   CIVIL ACTION NO.
21                                   )   2:13-CV-291 (NGR)
     JOHN STEEN, in his official     )   (consolidated case)
22   capacity as Texas Secretary of  )
     State, and STEVE MCCRAW, in his )
23   official capacity as Director of)
     the Texas Department of Public  )
24   Safety                          )
25
```

ADVANTAGE REPORTING SERVICE - 281.376.9303

1  ****************************************************

2                    ORAL DEPOSITION OF

3                       STAN STANART

4                      JUNE 17, 2014

5  ****************************************************

6

7           ORAL DEPOSITION of STAN STANART, produced as a

8  witness at the instance of the Plaintiffs, was taken in

9  the above-styled and numbered cause on JUNE 17, 2014,

10  from 10:01 a.m. to 1:46 p.m., before Cynthia C. Miller,

11  CSR in and for the State of Texas, reported by machine

12  shorthand, at the Office of Vince Ryan, County Attorney,

13  1019 Congress, 15th Floor, Houston, Texas, pursuant to

14  the Federal Rules of Civil Procedure and the following

15  stipulation and waiver of counsel:

16           IT WAS STIPULATED AND AGREED by and between

17  counsel that if the original of said deposition is not

18  signed or available at the time of trial or any hearing,

19  an unsigned copy may be used in lieu thereof.

20

21

22

23

24

25

STAN STANART - June 17, 2014

1      Q.    All right.   So Senate Bill 14 that's the

2  subject law in this case was passed in 2011, is that

3  your recollection?

4      A.    Correct.

5      Q.    Okay.   And because of the -- I'm just trying

6  to save us some time here, because of the Section 5

7  case, it was delayed in implementation, would you agree,

8  the pre-clearance issue delayed Senate Bill 14

9  implementation in your office?

10     A.    Yes, it was delayed, yes.

11     Q.    Okay.   And then in June of 2013, the U.S.

12  Supreme Court issued the Shelby County vs. Holder

13  opinion.

14     A.    Right.

15     Q.    And shortly thereafter, the State Attorney

16  General's office cleared the implementation of Senate

17  Bill 14, is that your recollection of events?

18                  MR. SCOTT:   Objection; form.

19     A.    Yes.

20     Q.    (By Mr. Dunn)  When is it, if you know, that

21  your office first began to take steps to implement

22  Senate Bill 14?

23     A.    I think because we knew the potential of it

24  being there, we had discussions of, you know, the

25  logistics of implementing it, you know, and that would

STAN STANART - June 17, 2014

1    be forms because, you know, kind of work if this

2    changes -- I think we heard that the state would want to

3    implement it the next election.

4                    And as a result, we're so large that, you

5    know, for us to put all of our implementation things in

6    place, we would have to get a jump on it.

7                    So mostly all dealing around the

8    different forms we needed, you know, kind of the

9    what-ifs discussions that we had.

10       Q.    All right.

11       A.    I wouldn't call it extensive.

12       Q.    Even while implementation of S.B. 14 was being

13   held up, your office was working on getting ready for

14   implementation, if it ever happened.  Is that what I

15   understand you to say?

16       A.    I think it was closer to the time when we

17   thought the Supreme Court would rule.

18       Q.    I see.

19       A.    In looking forward, "Oh, this could change,

20   this could happen.  So, therefore, let's try to get a

21   little ahead of it."

22       Q.    Do you know what month that you started that

23   work in earnest?

24       A.    I have no idea.  It was -- I don't know.  A

25   whole season, I guess.  Three or four months before that

STAN STANART - June 17, 2014

1    ruling maybe, but I don't remember exactly.

2         Q.    Okay.   Do you -- who on your staff was

3    principally responsible for implementation of S.B. 14?

4         A.    Well, we would take direction from the

5    Secretary of State on any implementation of things, but

6    we also knew that there would be forms that we would

7    need to have planning for budget, if we had to, you

8    know, get new forms.

9              Just looking at do we have the means,

10   what are our roadblocks we would have, if this came out

11   this way.

12        Q.    Okay.   But you -- I guess what I'm trying to

13   find out, did you say, "All right, look, Jane, you're

14   going to be the go-to lead in the office for

15   coordinating with the Secretary of State on

16   implementation of S.B. 14"?

17             Did you have somebody that was kind of

18   ramrodding that implementation?

19        A.    John German at that time was the administrator

20   of elections.   We were just more knowledgeable of what's

21   going on.   I mean, it was a small group.   I don't know

22   that there was any one point person.

23             We basically were going to have to

24   respond -- we were going to be in a position of

25   responding to when will the Secretary of State say,

STAN STANART - June 17, 2014

1    "Okay, we're going to do this, so therefore, you know,

2    do this."

3         Q.    So just for our record, could you spell

4    Mr. German's first and last name?

5         A.    John German.

6         Q.    Is it --

7         A.    John, just J-O-H-N.  And German, like the

8    country.

9         Q.    Now, you mentioned some of the things, you

10   coordinating with the director -- with direction of the

11   Secretary of State, and you had to work on forms and you

12   were planning for the budget issues.  These are things I

13   wrote down that you just mentioned.

14        A.    I'm not sure how much coordination.  There

15   wasn't really coordination.  It was just probably in

16   brief discussions that this could likely happen, that we

17   would be prepared.

18              It wasn't any meetings or anything of

19   that nature, other than people, you know, Secretary of

20   State conferences, the normal course of business type of

21   items.

22        Q.    So there wasn't any special --

23        A.    Not really.

24        Q.    -- coordination of events?

25        A.    No.

STAN STANART - June 17, 2014

1        Q.    So to the extent there was direction from the
2    Secretary of State, that came to you in the regular
3    course as other direction from the Secretary of State
4    comes?
5        A.    Pretty much so, yeah.
6        Q.    Okay.  So with regard to these forms and the
7    budget planning you had to do, were there any resources
8    available to you from the state to implement Bill 14?
9        A.    I don't -- I don't recall that there was, but
10   I'm not -- I don't really remember that there was money
11   from the state to implement.
12              I mean, we had money in our budget to do
13   it, and I do have some discretionary money in my office
14   that I can use for projects that are deemed -- that fall
15   under the keeping control of my records essentially.
16       Q.    So -- and I'd like to ask you a little bit
17   more about that, but to the best of your recollection,
18   there wasn't any funds that came from the state
19   earmarked for implementation to Senate Bill 14 in Harris
20   County?
21       A.    Not direct funds, no.  I believe they did
22   advertising in helping getting the word out.
23       Q.    But those were activities that the state paid
24   for and directed, not you?
25       A.    Correct.

STAN STANART - June 17, 2014

1        Q.    Okay.   And I'm not trying to, you know, drill

2   this down to too fine of a point, but all I'm trying to

3   find out:   Was there a wire transfer or check sent to

4   the state to Harris County to help in any way with

5   Senate Bill 14?

6        A.    I don't recall any, no.

7        Q.    Okay.   So you mentioned that you have some

8   discretionary funds.

9        A.    Yes.

10        Q.    And so did you use any of your discretionary

11   funds on Senate Bill 14 implementation?

12        A.    We did things to get the word out.   I mean, we

13   did billboards around the county, you know, reminding

14   people to bring your photo ID to the polls.

15              We did, you know, lots of brochures, lots

16   of posters, lots of fliers, that we really contacted

17   just about anybody, any government agency, schools, your

18   ISDs, your colleges, the city, libraries, everywhere we

19   could think of, we mass-distributed those type of

20   information getting the word out about photo ID being

21   required at the poll to vote.

22        Q.    These things that you just described, they

23   cost money, I assume.

24        A.    Most of it doesn't.   I mean, most of the

25   print, extra cost, but I don't think any cost of extra

STAN STANART - June 17, 2014

1  brochures, extra printing, anything, it wasn't anything

2  I couldn't handle on the budget.

3     Q.   Okay.  It was things you had to spend money

4  on, but you could handle it with your regular budget?

5     A.   Yeah, but even the billboards was covered by

6  the budget.

7     Q.   So did you at any point go to commissioners'

8  court --

9     A.   No.

10    Q.   Let me finish my question.

11    A.   I'm sorry.

12    Q.   You probably know where I'm going.  Did you at

13  any point go to commissioners' court and ask for

14  supplemental budget monies to implement S.B. 14?

15    A.   No.

16    Q.   Other than the advertisements that you've

17  described, the pamphlets, the posters, the billboards,

18  was there any other expenditure your office had to occur

19  in order to implement Senate Bill 14?

20    A.   Well, we had to design some new forms, but,

21  you know, we have printing costs associated with forms

22  anyway.

23         So, yeah, we probably had to -- we

24  haven't really scrapped them, we're probably not using

25  the old forms as a result.  We kept them on hand just in

STAN STANART - June 17, 2014

1    case things went back the other way.

2        Q.    From my standpoint, hopefully that's a smart

3    move on your part.

4        A.    We just keep them, you know, we're trying to

5    save the taxpayer dollars, and I have got a nice big

6    warehouse that allows me to keep them.

7        Q.    All right.  So other than the printing and

8    design of those forms, there is no other money that your

9    office spent that it wouldn't have to spend if S.B. 14

10   had never come along?

11       A.    I probably went out a little bit more.  We

12   made the best effort, I mean, have a photo outreach

13   department, and they went to more -- probably more

14   locations.

15              And then I told them to do the maximum

16   push to get this word out, so all the community

17   organizations they would go to.

18              I just did -- I probably did more than

19   what they would normally do.  In other words, we worked

20   them very hard to get the word out.  So, yeah, they had

21   more -- more things to do.

22              We had more brochures, more fliers got

23   handed out than normal.  But, yeah, there wasn't any big

24   expense, I think, in the big picture when we look at our

25   whole budget.

STAN STANART - June 17, 2014

1        Q.     Okay.   Now, at one point in time, some

2  counties, for example, Dallas County, my client, took

3  the Secretary of State on its offer to pay an outside

4  vendor to match the state-wide TEAM database with the

5  state driver's license database and get a list of folks

6  in Dallas County who didn't match.

7        A.     Right.

8        Q.     And then send notifications to.  Is that

9  something, to your knowledge, that Harris County did?

10       A.     Yes, we did the -- we did that internally

11  here.  We actually -- we don't pay a vendor to do it.

12       Q.     Okay.

13       A.     We actually did a hard match of the DPS

14  database to the voter registration roll, and everybody

15  that, you know, wasn't on suspense we mailed a letter

16  to.

17              But yes, that was an extra cost, but here

18  again, my budget was able to do that.  It was over

19  90,000 mailings that we did, to people who -- like I

20  said, if you were on suspense, in other words, your

21  voter registration card had been returned, so we weren't

22  going to waste money sending it to those that would be

23  returned.

24              So everybody that was not a hard match, I

25  mean, it could be a soft match, we would still send them

STAN STANART - June 17, 2014

1   a letter.

2       Q.    And who in your office performed that match

3   for you?

4       A.    Myself, and some of my IT staff did that.

5       Q.    Okay.  And not to be too picky, so you're

6   saying you, Mr. Stanart, sat at the computer and hit the

7   keys and made it happen?

8       A.    I'm an engineer, I'm a software engineer.

9       Q.    Okay.  All right.

10      A.    I did some of that, yes.

11      Q.    So the list or output you got from such a

12  match, is that contained in the documents that were

13  produced?

14      A.    Should be.  I believe so, isn't it?  The

15  matched?

16      Q.    I saw some lists in there, but I didn't know

17  exactly what they were.  So that's why I'm asking.

18      A.    Right.  We can provide that if we -- if, for

19  some reason, it's not in there.

20      Q.    Okay.  And do you recall essentially how many

21  people came up on that match?

22      A.    It's over 1.8 million.  I don't remember the

23  exact number, but the -- like I said, after taking out

24  the ones that are in suspense, it was a little over

25  90,000 that we actually mailed the letters to.

STAN STANART - June 17, 2014

1          Q.    Oh, I'm sorry.   I thought it was $90,000 in
2    mailings.
3          A.    No.
4          Q.    You're say there's 90,000 people you mailed
5    to?
6          A.    Yes, over 90,000 people that we actually
7    mailed those letters.   And the samples of the letter are
8    in there.   There was -- and the letter was refreshed
9    also for the primaries.
10                    So anybody who got newly registered that
11   we could not match, and had not previously gotten a
12   letter, we actually did, we sent that mailing was much
13   smaller.   I forget the numbers.
14         Q.    And I'm not going to try to hold you, is that
15   like a thousand, or 5,000, or 10,000?
16         A.    Yeah, yeah.   It's not a large number.
17         Q.    Okay.   And are those the only two mailings you
18   did that were sort of S.B. 14-related?
19         A.    Yes.   I don't think we did one for the runoff
20   just because it's the same people that voted in the
21   primary, we would expect them to show up.   We'll do it
22   again in November is our plan.
23         Q.    Was there any direction from the state for you
24   to do that?   I mean, did somebody, in other words, tell
25   you you should do this, and that's why you did it, or

ADVANTAGE REPORTING SERVICE - 281.376.9303

STAN STANART - June 17, 2014

1    you came up with it on your own?

2         A.    We came up with it on our own.   After Dallas

3    had done it, we had other elected officials, you know,

4    asked us to do the same, but it was also in our mind.

5         Q.    I see.   Do you know any other counties that

6    have done it, other than Dallas County?

7         A.    No, I don't personally know of others.

8         Q.    Okay.   Do you have some kind of a system, I

9    don't know if it's a LISTSERV, or conference, or

10   telephone -- regular telephone calls, where you

11   communicate with other county election officers?

12        A.    There is a LISTSERV of -- you know, county

13   clerks, and one for people that do elections.   I don't

14   read it very often.

15        Q.    Okay.

16        A.    There's a lot of e-mails that pop across

17   there.

18        Q.    If it's anything like the LISTSERVs I'm on, it

19   fills your inbox.

20        A.    Yeah.   I actually hit -- automatically pull it

21   off into another archive folder.   I don't even -- it

22   doesn't come into my inbox.

23        Q.    Do you know the name of this LISTSERV?

24        A.    It's the Texas Association of Counties.

25   There's an election LISTSERV.

STAN STANART - June 17, 2014

1      Q.    I see.

2      A.    And, of course, the county clerk one, too.

3  Most everything you do in the election should be on the

4  election Web site.  If it's not inconceivably it's not

5  there.

6      Q.    So these two lists, they are both administered

7  by the Texas Association of Counties --

8      A.    Yes, yes.

9      Q.    Do a little bit better at letting me finish my

10  question, keep our record a little straighter.

11      A.    Okay.

12      Q.    All right.  So I just want to make sure I

13  understand all the things you spent money on.  You made

14  some forms, and billboards and advertisements, you did

15  the approximately 90,000 piece mailing.  Then later in

16  the primary, you did a smaller mailing.  Is that all?

17      A.    We did, you know, radio interviews, TV

18  interviews.  Of course, we did -- went to the -- as much

19  as possible, get as much free media as possible.

20      Q.    Okay.

21      A.    We did lots of press releases, extra press

22  releases.  Our motivation was to get the press on board.

23  I think they did a pretty good job of actually getting

24  the word out.

25                  Of course, we did, like I said, a lot of

STAN STANART - June 17, 2014

1    press releases.  I had my staff recall -- follow up with

2    the press releases after we had sent them out, just

3    did -- just to get the interest up.

4                  We wanted the word to get out to every

5    voter in Harris County that you need to bring a photo

6    ID.  We didn't want anybody to not know, even though

7    there is always somebody who hides under a rock that

8    doesn't, but we did our very best to get that out.

9        Q.    So other than those things, you can't think of

10   anything else that you spent money to implement?

11       A.    No.

12       Q.    One more question about the LISTSERV.  You

13   said that, you know, you have to output that to another

14   device because it's so voluminous, I guess.  Do you

15   still have any of the LISTSERV postings?

16       A.    Yeah, yeah.

17       Q.    And do you know whether in response to the

18   document requests your staff went through and just --

19   produced which of those were related to S.B. 14?

20       A.    I don't know if we did -- they did or not.  I

21   mean, we just gave it to the IT to pull the e-mails off

22   of the -- you know, the list of keywords.

23       Q.    Okay.

24       A.    I don't know if that one would have got picked

25   up or not, but we can do that, if you wish.

STAN STANART - June 17, 2014

```
 1   in charge of administering the rest of the election; is
 2   that right?
 3        A.    Right.
 4        Q.    All right.  Now, I assume in addition to the
 5   things you've mentioned, in order to implement S.B. 14,
 6   you had to train some staff and volunteers, election
 7   workers.
 8        A.    Oh, yes, yes.
 9        Q.    Okay.  And when do you think the first such
10   training occurred?
11        A.    Well, it was shortly after it was told to be
12   implemented.
13        Q.    Okay.
14        A.    All of our clerks got multiple points of
15   training.  Whether that be in e-mails, through the
16   in-person requirement we had for them to come get
17   trained.  The videos that we put on our Web site for
18   them, for training.  The Power Points.
19              Just, you know, we tried our very best to
20   do the most excellent job possible to get to them, "This
21   is what it takes for you to implement voter ID."
22        Q.    And so -- but it is the case you didn't do any
23   of these trainings prior to the Shelby County decision?
24        A.    No, because it wasn't -- it wasn't there.
25        Q.    Right.
```

STAN STANART - June 17, 2014

1       A.      We didn't want to confuse our workers until --
2  you know, two different directions.
3       Q.      How many election clerks, you know,
4  roundabout, does Harris County have?
5       A.      Clerks, I mean, we have a lot.   We have 5,000
6  clerks on a big election.   I mean, it's -- and judges.
7  I mean, it's just a lot of people that it takes to run
8  our elections.
9       Q.      Do you know about how many election judges
10 Harris County has?
11      A.      We had, I think, last November 776 polling
12 locations, I believe.   It's really close to that number.
13 Because it changes according on what's available.
14      Q.      Would that number -- and I understand,
15 somewhere around 770.
16      A.      Yes, right.
17      Q.      I'm not trying to nail you down to exactly,
18 but would that number be more or less the same as in a
19 presidential election?
20      A.      Yes, it does not -- it depends.   You know, if
21 we -- redistricting drives how many precincts we have,
22 but then the reality is you can't have -- you don't have
23 dinky precinct.
24              We have zero population precincts because
25 of how the lines get drawn, but we usually combo them up

STAN STANART - June 17, 2014

1   very similar, even with redistricting.

2        Q.   Okay.  So if I understand it, in terms of your

3   office training election workers in Harris County about

4   S.B. 14, you've got somewhere in the neighborhood of

5   seven to 800 election judges that need to be trained.

6        A.   Yes.

7        Q.   And you've got somewhere in the neighborhood

8   of 5,000 election clerks that need to be trained; is

9   that right?

10        A.   Well, we give training to the judges and

11   alternate judges most extensive because the judge is

12   responsible for, you know, hiring the clerks.

13        Q.   Okay.

14        A.   And so when they do those last-minute hirings,

15   the best training they can get is to go to the -- our

16   Web site, the local videos, and they are requested that

17   they do that.

18              But as long as the judges and the

19   alternate judges that are actually running the polls are

20   getting trained, then we're confident that things should

21   work correctly, as best as possible, at the polls.

22        Q.   Okay.  So is another way of saying what you

23   just said is your office makes sure the judges and

24   alternate judges are trained, and then it's the job of

25   the judges and alternate judges to get the clerks

STAN STANART - June 17, 2014

```
 1   trained?
 2        A.    Well, we actually -- yeah, we ask them to do
 3   that.   We provide training to anybody, any clerks --
 4        Q.    I see.
 5        A.    -- that will come.   It's not like we're
 6   restricted.
 7        Q.    Okay.
 8        A.    But the requirement is that we get the judge
 9   and alternate judge training.
10        Q.    Okay.   So some of the clerks come to the
11   training.
12        A.    Yes.
13        Q.    And other clerks will get the training from
14   their election judge or alternate judge?
15        A.    Correct.   And also we tell them to do the
16   video on-line.   I think everybody is required on-line to
17   take an hour of that.
18        Q.    And when you say they were required to take
19   this video, did they click some box on a computer?
20        A.    Yes.   They go to harrisvotes.com and there's a
21   training module.
22        Q.    And then they would certify in some way
23   electronically that they watched it; is that it?
24        A.    No, we did not have that.
25        Q.    Okay.
```

STAN STANART - June 17, 2014

1          A.    But the in-person was for the judge and the

2    alternate judge.

3          Q.    Can anybody, other than the election -- an

4    election clerk -- I mean, could I go on the Web site

5    right now and watch this video?

6          A.    Yes, go to harrisvotes.  I think it's still up

7    there.  Right?  Yes.

8          Q.    All right.  Are there any other aspects of the

9    training that I've missed out on, that we haven't talked

10   about?

11         A.    We went around the county to, you know, the

12   election law that Sonya pretty much does.  We go to

13   different locations around the county to make it easier

14   for the judges to get there, have multiple, many, many

15   sessions available.

16               So we -- like I said, we tried to manage

17   to get everybody trained as much as possible.

18         Q.    And you feel like you were successful in that

19   regard?

20         A.    Yes.

21         Q.    Do you feel like you were successful in

22   getting out the word to voters?

23         A.    Yes.

24         Q.    And what matrix, if any, do you use to

25   determine whether you were successful on either or both

STAN STANART - June 17, 2014

1  of those things?

2      A.    Well, I think two major matrix is voter

3  turnout, okay?  And then the other item would be the

4  number of people who voted provisionally due to not

5  having an ID.

6      Q.    Now, as far as your office is concerned, you

7  obviously administer federal, statewide, countywide

8  elections.

9      A.    Right.

10     Q.    And you're also responsible, I assume, for

11  some smaller units, like some school districts and

12  things of that nature?

13     A.    We do some of their elections, but we are not

14  responsible for them.

15     Q.    Okay.

16     A.    It's only when there is an election

17  administrator, that they have to run all the elections.

18  The clerk does not.

19     Q.    So what elections, since June of 2013 when

20  Shelby County came out from the Supreme Court, have you

21  administered under Senate Bill 14?

22     A.    Well, we did the -- it seems like it was a

23  real small entity -- we did, of course, the November '13

24  election.  But it seems like there was a -- something

25  small we did.  Like a -- I don't even recall.

STAN STANART - June 17, 2014

1        Q.    Okay.   So the November 2013 election.

2        A.    Right.

3        Q.    And the primary and primary runoff that

4    happened in 2014.

5        A.    Right.

6        Q.    And there might have been a city, but you

7    don't, for example, recall administering an election for

8    Lone Star College?

9        A.    No, we did that in May of 2013, so that was

10   pre-Shelby.

11       Q.    All right.   Now, you said that the matrix that

12   you would use, did voter turnout, and then -- well,

13   let's talk about that first.

14              Have you sat down and looked at the voter

15   turnout in November of 2013, or in this recent primary,

16   and compared it in Harris County to a similar election

17   in the past?

18       A.    Yes.  Yeah.

19       Q.    And what did you determine about voter

20   turnout, say, compared to the November -- I guess it

21   would be 2011 election and the November 2013 election?

22       A.    It was -- they were higher.  I mean, they were

23   higher than the previous ones.  I looked back two or

24   three others.  They were higher.  I forget how

25   significantly higher, but they were higher than those.

STAN STANART - June 17, 2014

1              The primary was -- other than the last --
2      the two years when Ted Cruz was on the ballot for the
3      primary, for Republicans it was higher, the Democrat
4      County wasn't as high, just because.
5          Q.    Okay.  So other than looking at, you know, the
6      gross figure of voters, there was 10,000 in this
7      election?
8          A.    Right.
9          Q.    In this one there was 12,000.  Did you do any
10     sub-analysis of those?
11         A.    No, I don't think so.
12         Q.    In other words --
13         A.    We look at countywide.
14         Q.    Just a countywide gross analysis?
15         A.    Correct.
16         Q.    Okay.  I'm just trying to find out:  Did you
17     go in and say, "Well, identify a certain subset of
18     voters that showed up in one election and see if they
19     came back on the next"?
20         A.    No.
21         Q.    The other thing you mentioned was the number
22     of provisional ballots.
23         A.    Yes.
24         Q.    So did you review the number of provisional
25     ballots in a pre-Senate Bill 14 election and then

STAN STANART - June 17, 2014

1    compare it to the like election after Senate Bill 14?

2         A.    I don't recall that I personally did that.

3         Q.    Okay.

4         A.    I don't know the exact numbers.  I do know the

5    numbers of the November election that had photo ID.

6         Q.    So what was -- I guess how is it that you

7    analyzed the number of provisional ballots to come to

8    the conclusion that you had successfully gotten the word

9    out and adequately trained your staff on Senate Bill 14?

10        A.    Well, the provisional ballots that were photo

11   ID, were 105.  Of those, six were not even registered.

12   So we had the nine left.  And of those numbers, you

13   know, eight people came back in cure.

14               We did -- and I don't remember the exact

15   when we did it.  We did some cursory match back to the

16   DPS database.

17               And if I recall, there was about

18   two-thirds of them that we could say those people have

19   photo IDs, they left them at home, or whatever, I mean,

20   so...

21        Q.    And was there any, you know, paperwork, or a

22   report, or something generated?

23        A.    No, I don't think so.  I think it was just a

24   general query.

25        Q.    Okay.  Those figures are helpful for November.

STAN STANART - June 17, 2014

1    Do you have them also for the runoff?  I'm sorry, for

2    the primary?

3         A.   For the primary?

4         Q.   Yeah.

5         A.   I don't know.  I think I've been given

6    something.  I mean, we can look at it and see.

7         Q.   Sure.  If you have something handy.

8         A.   I think I have an e-mail to that effect.

9    Let's see here.  Yes.  The runoff election we also had

10   for the City of Houston election last November, that was

11   in 2014.  I forgot to mention that.

12        Q.   Okay.

13        A.   And we had five IDs there, and none of them

14   came back and cured.

15        Q.   None of them did?  I'm sorry.  I didn't hear.

16        A.   Yes, none came back and cured.  November the

17   5th we had eight that came back and cured.  We had --

18   let's see.  In the Democrat primary, we had nine --

19   well, we had a total of ten, one that was cured.

20             And in the Republicans, we had 25 that

21   were ID, and four of those came back and cured.  So it

22   was ten and 25, Democrat and Republican.

23        Q.   Now, other than your own analysis of this for

24   your own purposes as an elected officer running

25   elections here in Harris County, have you shared these

STAN STANART - June 17, 2014

1  figures with anyone else prior to now?

2      A.   I think last November I think I shared it with

3  the media, you know, that the numbers were there, that's

4  out there, yes.

5      Q.   What about the state or the United States

6  Department of Justice?

7      A.   To my knowledge, I don't think we have.  I

8  mean, I know we put out -- I think I put these numbers

9  out last November in a press release, for the runoff, or

10 somewhere in there.  It should be in your packet of

11 information there.

12     Q.   Okay.  And with respect to this group of

13 people who appeared with no ID and didn't cure --

14     A.   Correct.

15     Q.   -- did your office do anything to reach out

16 for them, or otherwise work on their situation for

17 future elections?

18     A.   I'm thinking there's some letter that goes out

19 to them, but I don't recall what the specifics of them

20 are.

21     Q.   There may be a letter, but I guess what I'm

22 asking is:  Was there somebody on your staff that was

23 sort of tasked to say, "All right, make contact, to the

24 extent you can, with these folks that fill out the

25 provisional afterwards and see if we can help them get

STAN STANART - June 17, 2014

1    an ID"?

2         A.    Like I said, most of them do have IDs.

3         Q.    Okay.

4         A.    So the letter to them saying, you know, "You

5    must have an ID is why your vote is being rejected,"

6    well, everybody who gets provisional, is rejected, they

7    get a letter, so I would think that would be included in

8    there.  That is our reach out to them.  Did we do more

9    than that, I don't know.

10        Q.    Okay.  Did you, at any time, do an analysis or

11   consider the number of people, if any, who didn't show

12   up because they didn't think they could meet the ID

13   requirement, or were worried that they couldn't?

14        A.    No.  I mean, how would I know that?

15        Q.    And I'm not suggesting you could.

16        A.    Yeah.

17        Q.    Now, is your -- you know, one of the IDs

18   that's permitted under Senate Bill 14 is called an EIC,

19   an election identification certificate.

20        A.    Yes.

21        Q.    Do you know what I'm talking about when I say

22   EIC?

23        A.    Yes, definitely.

24        Q.    Does your office have the ability to issue

25   EIC?

STAN STANART - June 17, 2014

 1      A.   No, DPS is the one who issues those.  We did

 2 assist DPS and the Secretary of State in finding some

 3 temporary locations.

 4           In fact, they used one of my offices in

 5 the county.  Initially, it was four temporary locations

 6 in addition to the 12 DPS locations in the county.  We

 7 assisted them in locating some of those locations.

 8      Q.   Locating some of the four temporary ones?

 9      A.   Yes, yes, yes.

10      Q.   Okay.  And I want to talk about that, that's

11 important, but for right now, I want to focus on your

12 office's ability to issue an S.B. 14-approved ID.  And,

13 as I understand it, you lack that authority; is that

14 right?

15      A.   That's correct, yes.

16      Q.   Okay.  Is that something you've ever asked for

17 or inquired if you could be given the authority or the

18 opportunity to meet that need, if any?

19      A.   There might have been a discussion, but I

20 don't think so.

21      Q.   Okay.

22      A.   Our job really was to implement the law as

23 it's written right now.

24      Q.   Well, did you ever testify before the

25 legislature as it related to changing the law for photo

STAN STANART - June 17, 2014

1    is that right?

2         A.    Right.

3         Q.    Do you know if there are any DPS offices in --

4    inside Loop 610 in Houston?

5         A.    I believe there are, yes.

6         Q.    Where are they?

7         A.    I'd have to go look.  One time I looked at the

8    map.

9         Q.    Okay.

10        A.    But I don't remember.

11        Q.    And that's fine, when you don't know

12   something, just tell me you don't know it.

13        A.    Right, yes.

14        Q.    Can you recall for us where the four temporary

15   locations are?

16        A.    One of them was a church here within the Loop.

17   I think that one is actually one the Secretary of State

18   identified.  I've been there, I forget the name of the

19   place, okay?  Down here close to Rice University.

20                    Another one was down in Pasadena at --

21   where I have one of my offices.  Another one was at a

22   City of Houston facility in the north -- I mean, north

23   of the Loop.

24                    It might be within the Loop, but it's not

25   very far away, or maybe just north.  And then another

STAN STANART - June 17, 2014

1    one, I believe, was at Lone Star College-Victory.

2         Q.    So that got me to five locations.

3         A.    It's four.

4         Q.    Well, you said there was a church that you

5    couldn't remember where.

6         A.    Right.

7         Q.    One near Rice University.

8         A.    No, that's the same one.

9         Q.    Oh, same one?

10        A.    Yeah, the church is the same one.

11        Q.    Oh, okay.  I got it.  And which of those did

12   you help locate?

13        A.    All except for the church.

14        Q.    Okay.

15        A.    They called -- the secretary of state's office

16   called and said, "Hey, can you help us find something

17   for locations," so with these temporary ones, one that

18   made strategic sense.  And we looked where we knew the

19   populations might be best served and we had those

20   locations.

21        Q.    And did your office staff any of those

22   locations at all?

23        A.    No, that was all done by DPS.  They had, I

24   believe, two workers at each of those locations.

25        Q.    Do you know whether any EICs were issued?

STAN STANART - June 17, 2014

1      A.    No, I don't know what they did.

2      Q.    I mean, in other words, you weren't given any

3  kind of report that said --

4      A.    There was some verbal, initially.

5      Q.    Okay.

6      A.    And I heard it was small numbers that were

7  done, but I don't know the specifics of those.  The

8  Secretary of State or DPS would have the exact numbers.

9      Q.    What was the time period these four temporary

10  locations were opened?

11      A.    It was during that period before the election.

12  Now, I believe two of them actually, because of low

13  service, they moved them to two other -- to other

14  locations in the state, to better utilize the resources.

15  So for a while, they had four.  Then they had just two.

16      Q.    Do you know the two that were closed and moved

17  someplace else?

18      A.    The church was kept as one.  I don't -- I'm

19  not positive, but I suspect it was Victory, but -- Lone

20  Star College-Victory, but I don't remember.

21      Q.    Okay.  All right.  And you said these were

22  open around the election, but which election?

23      A.    The November election.

24      Q.    Okay.

25      A.    The November election.

STAN STANART - June 17, 2014

1      Q.    Were there any mobile units in the recent

2   primary election?

3      A.    I believe there was talk about it, and I don't

4   really -- we weren't involved in that, so I don't know

5   for sure --

6      Q.    Okay.

7      A.    -- how many there was or if there was some in

8   Harris County.

9      Q.    And there's also some discussion in this case

10  about mobile EIC.

11     A.    That's the same thing.

12     Q.    Okay.

13     A.    Temporary is mobile.  I mean, some laptops on

14  a table in a building.

15     Q.    Okay.

16     A.    It's not like it's anything other than, you

17  know.

18     Q.    Yeah.  I just wanted to make sure I wasn't

19  missing, you know, there wasn't these four, and then

20  there was roaming units or some things.

21     A.    No, that's the same thing, the temporary.

22     Q.    Okay.  One of the reports that we had received

23  is that there was advertisement for a mobile EIC unit,

24  and the voter went there and it wasn't there at the

25  location that was advertised.

STAN STANART - June 17, 2014

1       A.    Right.

2       Q.    Again, I don't know if any of this is true.

3  It's just a report I got.

4       A.    Right.

5       Q.    And they ultimately found the location about a

6  block away.

7       A.    A block away?

8       Q.    And included at the EIC mobile unit location

9  was a desk for King Street Patriot staff.

10      A.    Okay.

11      Q.    Are you aware of King Street Patriot staff

12 being involved in any of the mobile stations?

13      A.    Not to my knowledge, no.

14      Q.    Do you know whether poll watchers are

15 permitted to work EIC-issuing locations?

16      A.    It's not -- poll watchers is what I do for

17 elections.  EIC is not something that I run.

18      Q.    Okay.  So you don't know is the answer?

19      A.    No, I don't know.

20      Q.    All right.

21      A.    Yeah.  It doesn't make sense to me.

22      Q.    Has anybody with King Street Patriots assisted

23 your office in implementing Senate Bill 14?

24      A.    No.  Why would they?

25      Q.    Other than the effort by the state to set up

STAN STANART - June 17, 2014

1    the mobile EIC units, are you aware of any other

2    outreach in Harris County to issue S.B. 14-eligible IDs?

3         A.    Yes.   I actually did a -- I guess it was TV

4    interview with the League of Women Voters where they

5    said their emphasis, and also my personal emphasis, was

6    recommending people get a personal ID over the EIC ID

7    because if you can afford the -- I think if you're over

8    62, 65, you can get it for only $6.

9              And my understanding, they and other --

10   League of Women Voters, other organizations were

11   actually encouraging people to get a personal ID because

12   they have much more functionality than just the EIC.

13             The EIC, of course, is only voting.   And

14   personal ID can be used for cashing checks, going to the

15   airport, et cetera, et cetera.

16        Q.    And I understand there was, I'm sure,

17   community advertisement.

18        A.    Yes, sir.

19        Q.    But do you know, was there other sort of

20   offices set up, or special hours, or special something

21   that happened to make it easier to get an S.B.

22   14-eligible ID in Harris County?

23        A.    By government?

24        Q.    Yes.

25        A.    The DPS locations I understood were opened on

STAN STANART - June 17, 2014

1   Saturdays before the election, and we put that on our
2   advise to media also.
3                Other than that, yeah, there was some
4   Saturdays.  I don't recall how much -- I don't recall
5   Saturdays, but I don't remember how many Saturdays to
6   provide that access.
7        Q.   And you would put that out in any kind of
8   media that you would send out?
9        A.   If I knew about it, yes, yes.
10                (Recess from 10:53 a.m. to 10:58 a.m.)
11        Q.   (By Mr. Dunn)  Mr. Stanart, during the break,
12   we discovered that you had been sent a letter from the
13   Department of Justice --
14        A.   Yes.
15        Q.   -- asking for the provisional ballot
16   information --
17        A.   Right.
18        Q.   -- a few weeks ago, and your office responded
19   and provided that; is that right?
20        A.   I just saw the letters.  I'm not positive we
21   responded.  I'm assuming we do.
22        Q.   Okay.
23        A.   And then also, of course, I think some of the
24   documents we had I think the Department of Justice has
25   asked for them, I think it's similar to the same

STAN STANART - June 17, 2014

```
 1          Q.    Was this a letter?

 2          A.    Yes.

 3          Q.    Written by you, or signed by you at least?

 4          A.    Yes, yes.

 5          Q.    Okay.  Is that in the materials that were

 6   produced?

 7          A.    I think, but I'm not positive.

 8          Q.    All right.  Well, we'll follow up.  And so the

 9   letter that was sent to the secretary of state, was it

10   just copied to the district attorney, or was there a

11   separate one sent to the district attorney?

12          A.    I don't recall.  There could have been

13   separate, or it might have been a cc.  I'm not sure.

14          Q.    What, if anything, has come from that

15   referral?

16          A.    I understand there's some investigation going

17   on.

18          Q.    Okay.

19          A.    Other than that, I don't know any details.

20          Q.    Do you know if a grand jury --

21          A.    No, I don't know of anything.

22          Q.    You don't know if a grand jury has taken

23   testimony on that?

24          A.    No, not to my knowledge.

25          Q.    Okay.  All right.  So other than people voting
```

STAN STANART - June 17, 2014

1    twice and the situation you just described with

2    Ms. Moffet, are you aware of any other voter fraud in

3    Harris County?

4         A.    I mean, every election, if we find something

5    that doesn't look right, we will send that over to the

6    DA.

7              We do have, you know, where we see people

8    who are signing ballots for more than one person.

9    That's happened here.

10        Q.    Mail ballots?

11        A.    Yes, yeah.  We'll send items over to them to

12   investigate, for investigation.  I don't recall every

13   type of things that we've seen because usually, yes, a

14   lot of it's associated around mail ballots.

15             You know, we've heard of -- I know there

16   has been some investigation the county attorney's office

17   has done on mail ballots that was obviously canvassed

18   from the same street type thing, you know.

19        Q.    Are you aware of any incident in Harris County

20   that Senate Bill 14 would have prevented?

21        A.    I believe that because those people, like I

22   said, who used multiple voter registration cards, that

23   having photo ID has -- would make that more difficult

24   for someone to go down that path and vote for multiple

25   people.

STAN STANART - June 17, 2014

1      Q.    Well, prior to Senate Bill 14's

2   implementation, are you aware of any time where somebody

3   actually did vote in Harris County, and if there had

4   been an ID requirement, it would have prevented them

5   from violating the law?

6      A.    Other than poll watcher feedback or something

7   like that, no, I don't have the specifics.

8      Q.    Okay.   And somebody who has multiple

9   registration cards, that -- the registration cards could

10  all have the same or very similar names on them with

11  different addresses; is that right?

12     A.    It's possible, yes.

13     Q.    I mean, you know, so when you say you're

14  getting feedback that somebody has gone to a polling

15  location, they have multiple voter registration cards,

16  that doesn't mean they have voter registration cards for

17  different people they're trying to vote, necessarily.

18  It just means that somebody may have registered multiple

19  times?

20              MR. SCOTT:   Objection; form.

21     A.    That could be speculated.

22     Q.    (By Mr. Dunn)   Well, or you could speculate

23  that they were trying to vote for somebody else.

24     A.    Right.

25     Q.    But either way, it's speculation; is that

STAN STANART - June 17, 2014

1   right?

2        A.    Right.

3        Q.    Okay.   Now, I know it's not your job to run

4   the voter roll.

5        A.    Right.

6        Q.    And, you know, so we're going to investigate

7   that, obviously, separately.   But have you ever looked

8   at the Harris County voter roll and analyzed, you know,

9   the extent of people with similar names being on there

10  multiple times?

11       A.    Not in recent days, but I have done a little

12  bit of that, yes.

13       Q.    I mean, are you able to confirm for us that

14  there are a number of entries for people with either the

15  same or very similar names at different addresses in the

16  county?

17       A.    Yes, I do believe there are some of those in

18  there, yes.

19       Q.    For example, if somebody had their home

20  residence, and then they had a couple of rental

21  properties, and maybe they lived at some point in time

22  at each of those rental properties, they could end up

23  getting a voter registration card at each of the three

24  properties.

25       A.    Yes.

STAN STANART - June 17, 2014

1      Q.      Okay.

2      A.      They should be returning them or doing

3 something, but yes.

4      Q.      And then if they showed up at the -- at each

5 of those three polling locations with their card and

6 with an ID, with a name that matched that card, they

7 could vote three times, even after S.B. 14, couldn't

8 they?

9              MR. SCOTT:   Objection; form.

10     A.      That's likely, but we're going to be looking

11 for them.

12     Q.      (By Mr. Dunn)  Okay.  I hope you are.  I mean,

13 nobody should get to vote more than once.

14     A.      Exactly, exactly.

15     Q.      Are you aware of any prosecutions in Harris

16 County of voter fraud, you know, whether it developed

17 before you were elected or since?

18     A.      I believe, yes, I know of at least one, but I

19 don't recall the specifics.

20     Q.      I mean --

21     A.      There has been prosecutions, I just don't know

22 the details.

23     Q.      The one you remember, I'm sure you don't know

24 the name, but do you remember what the issue was, or

25 what they had done?

STAN STANART - June 17, 2014

1              So not only did every judge get the

2   personal training, but each clerk was supposed to have

3   signed the information about photo ID at the polls where

4   they worked.  So every clerk had that information.

5        Q.   On the training portion of it, what kind of

6   assistance, if any, did you get from the secretary of

7   State's office?

8        A.   They provided the -- they provided videos

9   themselves.  They provided, you know, tons of

10  information on the how-tos, you know.  We just tried to

11  make the same information to pass through in friendlier,

12  more fun ways, so they would pay attention.

13       Q.   Okay.  So the video you use on your Web site,

14  did you produce that, or was it from the secretary of

15  state?

16       A.   No, I think actually we produced it ourselves,

17  here.

18       Q.   Okay.

19       A.   But it's got the same content as what they

20  had.

21       Q.   So it's something the county would have spent

22  money on?

23       A.   Well, we had IT guys that took the cameras we

24  already had here.

25       Q.   Okay.

ADVANTAGE REPORTING SERVICE - 281.376.9303

STAN STANART - June 17, 2014

1        A.   We did the videos out at the warehouse, or
2   around the office, so, you know, we didn't hire anybody.
3        Q.   Okay.
4        A.   It wasn't like it was any additional cost.
5        Q.   So why not use the video that the secretary of
6   state provided?
7        A.   I think ours is more --
8        Q.   More better?
9        A.   More better.
10       Q.   Okay.  Did you have any information
11   technology, like computers that you had to acquire to
12   implement S.B. 14?
13       A.   No, not the specific -- nothing that we
14   weren't already using.
15       Q.   Was there anything else involved in the
16   training of workers on S.B. 14 that your office did that
17   we haven't talked about?
18       A.   There probably is because, like I said, I
19   don't know every detail of all the how-to training.
20       Q.   Okay.
21       A.   I've gone to, you know, several of them, but I
22   know the -- when we get new clerks in, that they
23   actually get, you know, e-slate-type training on the
24   mechanics.
25                 And I know at each of those mechanic

STAN STANART - June 17, 2014

1        Q.    So in your office, in the main Harris County

2  attorney's office -- Harris County clerk's office --

3        A.    Yes.

4        Q.    -- made a match and made an initial

5  determination of whether there was a match between ID

6  and registrants; is that right?

7        A.    Yes.  So clerks wouldn't have to think on

8  those issues.

9        Q.    All right.  And you did that all the way back

10  to the first election under S.B. 14?

11        A.    No, we did not have -- in early voting, we did

12  not have that at the earliest elections.  We just have

13  it now.  We did it just recently on early voting.

14        Q.    Okay.  So you implemented this for the first

15  time on early voting for the primary in 2014?

16        A.    The primary runoff.

17        Q.    For the primary runoff?

18        A.    Yes.

19        Q.    So is it fair to say that the system that

20  we're going through and describing now has only been

21  used in one election in Harris County so far?

22        A.    Yes.  Where we print the actual matched name

23  during early voting.

24        Q.    When did you first in your office start doing

25  a preliminary match and providing it to election workers

STAN STANART - June 17, 2014

1    in any form?

2         A.    We did that for the November 5th election, but

3    we only had it on the election day in the printed paper

4    poll books.  We didn't have the electronic system

5    updated to handle the matched name ID.

6         Q.    So if we focus on the November election during

7    the early voting period in the November 2013 election --

8         A.    Yes.

9         Q.    -- poll workers did not have this pre-match

10   run by your office?

11        A.    Correct.  They were actually having to do the

12   matching.  But the computer, when they would look

13   someone up, they would be at the end of the potential

14   people that would match.  I mean, while a hard match is

15   just this is the one, we're 99.99 percent sure this is

16   the one.

17             While you might have two or three listed,

18   for the worker then would have to use their knowledge to

19   say, "Oh, it's this one or not."

20        Q.    Okay.

21        A.    They would ask the voter, "Are you this

22   person?"

23        Q.    But starting in the general election, in

24   November of 2013, your office provided in paper form a

25   pre-match; is that right?

STAN STANART - June 17, 2014

1      A.    For the poll books on election day, yes.

2      Q.    Okay.   And what did you do on this subject in

3    the 2014 primary election in March?

4      A.    It's the same.   It was the same.

5      Q.    It was in paper?

6      A.    It was the same.   The early voting was the

7    electronic, where the early voting clerks had to do the

8    matching on similar names themselves.   Just like it was

9    in November.

10     Q.    Okay.

11     A.    And then the paper on election day both times

12   was pre-matched.

13     Q.    I see, okay.   And then when it came time for

14   the runoff in 2014, what did you do?

15     A.    That's when we had implemented the match.

16     Q.    Okay.

17     A.    And it might have only been on election day.

18   I really forget.   I mean, I can ask her if we had it in

19   early voting or it.

20     Q.    Well, let's find this out, if you don't mind.

21     A.    Did we have that in early voting, too?   We

22   did, didn't we?

23          MS. ASTON:   I believe we did, yes.

24     A.    For the runoff, yes, yes, we did.   We would

25   have.

STAN STANART - June 17, 2014

```
 1        Q.    (By Mr. Dunn)  So you had it for -- your best
 2   recollection is you had it for early voting and on
 3   election day --
 4        A.    For the runoff --
 5        Q.    -- in 2014?
 6        A.    Yes, when we used the electronic poll books.
 7        Q.    Yes.  We have to do a better job of not
 8   talking over one another.  All right?  And I'm doing as
 9   bad a job as you.
10        A.    All right.
11        Q.    So just to make sure that's clear in our
12   record, in the primary runoff election in 2014, both in
13   early voting and election day, there was a pre-match
14   performed by your office and provided to the workers; is
15   that right?
16        A.    Restate that, please.
17        Q.    In the primary runoff in 2014 --
18        A.    Yes.
19        Q.    -- there was a pre-match --
20        A.    Yes.
21        Q.    -- that your office performed and provided to
22   election workers both for early vote and election?
23        A.    Correct, yes.
24        Q.    Was that all done by laptop, or were any of
25   those in paper?
```

STAN STANART - June 17, 2014

1         A.     On election day, some of it was paper and some
2    was by laptop.
3         Q.     Okay.
4         A.     We have a lot less polling locations, we have
5    a limited number of electronic poll books.  We couldn't
6    support a normal election day.  There's lot of
7    consolidation in the runoff, so we couldn't support half
8    of it.
9         Q.     And when you say electronic poll books, is
10    that the same thing as this laptop you mentioned
11    earlier?
12        A.     Yes.
13        Q.     Did you acquire any of these laptops for this
14    purpose?
15        A.     No, we've had them for years.
16        Q.     So this match process that you've been
17    describing, there was no fiscal impact, as far as you
18    know, for the county?
19        A.     We had our vendor implement it in their
20    product, but under the normal service maintenance
21    agreement that we have with them.  Generally, no
22    additional cost.
23        Q.     So let me back up.  You know, you said that
24    when the first voting started under S.B. 14, you didn't
25    yet have the pre-matched, election workers had to make

STAN STANART - June 17, 2014

1    the decision in the field; is that right?

2         A.    In early voting.

3         Q.    In early voting?

4         A.    Yes.

5         Q.    So why didn't you have it?  You hadn't thought

6    of it yet?

7         A.    We didn't have time.  The vendor couldn't get

8    it.  They couldn't get it done in the time frame we

9    wanted them to.

10              Because as soon as we -- now, you know,

11   when we came up with the concept of doing it, you know,

12   by the time we got to them to try to get it done, they

13   just couldn't pull it off.

14        Q.    What's the name of this vendor?

15        A.    It's VoTech Corporation.

16        Q.    And so from your standpoint, it wasn't like

17   something came up during that initial early voting

18   period where the election workers were doing it on their

19   own, that made you want to implement the system --

20        A.    No, no, we wanted to do it initially.

21        Q.    Okay.

22        A.    They just -- they couldn't get it done in a

23   time frame that we wanted them to get it done in.

24        Q.    Now, this process of pre-matching and sending

25   to the election workers, do you know if any other county

STAN STANART - June 17, 2014

1    does that?

2        A.    I know pre-matching, Dallas County did it for

3    purposes of mailing.   I don't know if they've been doing

4    more than that.

5        Q.    Okay.

6        A.    I don't know if any other counties are doing

7    this.

8        Q.    Okay.

9        A.    I think -- I think just in passing VoTech said

10   that Dallas was interested.   I don't know where they are

11   at on that.

12       Q.    You didn't have to pay, you, as Harris County,

13   didn't have to pay VoTech anything extra to do that?

14       A.    No, it was under our normal maintenance

15   agreement.

16       Q.    Okay.   For the voter roll?

17       A.    Well --

18       Q.    Why does the county -- let me back up.   Why

19   does the county have an agreement with VoTech, to begin

20   with?

21       A.    They are our database that we use our -- for

22   the voter reg uses it.   They have their own server, and

23   then we use it also in -- we have a server on my side of

24   the house in the county clerk's office where we run the

25   elections out of.

STAN STANART - June 17, 2014

```
1              The election programming is done on that
2    product.  That's where we copy the voter roll from the
3    voter registrar also.
4         Q.   So where did this idea come from to do the
5    pre-match?
6         A.   I think they came from my office.
7         Q.   Okay.  And, I mean, can you -- are you able to
8    identify the person who had this idea?
9         A.   Maybe me, I think, if I was going to guess.
10        Q.   All right.
11        A.   Probably, I think.  But I'm not positive of
12   that.
13        Q.   Okay.
14        A.   I'm a technical guy, okay?  Engineers do these
15   kind of things.
16        Q.   So at any point did you express to the
17   secretary of state's office either, A, you had this
18   idea, or B, you were going to do it?
19        A.   Yes.  We had to get clearance on the forms
20   because we modified the forms, to accept the label to do
21   it this way.  So any time they change any form, they
22   have to review and approve.
23        Q.   "They" being the Texas Secretary of State?
24        A.   Yes.
25        Q.   Who was it over there that you would deal with
```

STAN STANART - June 17, 2014

1   on those issues?

2        A.    On forms, I'm not positive, but Keith Ingram

3   is the one who was involved in this process.   But

4   somebody in his legal department, I think, does the

5   forms.   Ashley maybe.   I don't know.

6        Q.    But if you call the secretary of state's

7   office to talk about S.B. 14 implementation, is it Keith

8   Ingram you contact?

9        A.    Usually Sonya does most of the contacting.

10        Q.    Okay.

11        A.    But, you know, I see Keith, you know, at

12   conferences and whatnot, and I'll see him --

13   occasionally, I'll contact him.   Not very often.

14        Q.    So back to this pre-match process, as I

15   understand it, the pre-match is a comparison of the

16   Harris County voter registration database to the Harris

17   County portion of the state driver's license database.

18        A.    Correct.

19        Q.    Okay.   And I assume because it's not available

20   to you, there is no similar match done, say, to the

21   passport database --

22        A.    Yes.

23        Q.    -- or the concealed handgun database, or any

24   of these others?

25        A.    Correct.

STAN STANART - June 17, 2014

1       Q.      So if a voter presents themselves at a polling
2   location, and let's say they have been pre-matched to
3   their driver's license, but they present their passport
4   or their concealed handgun license --
5       A.      Correct.
6       Q.      -- are they still going to be allowed to vote?
7       A.      Of course.
8       Q.      Okay.  Just because you're pre-matched in the
9   software doesn't mean you're now going to be restricted
10  to using that ID?
11      A.      Correct, yeah.
12      Q.      On the same token, just because you're
13  pre-matched doesn't mean if a voter shows up and they
14  have forgotten ID at home that it's going to be forgiven
15  because they've already been matched; right?
16      A.      Right.
17      Q.      They are not going to be allowed to do that?
18      A.      They have to have a photo ID, yes.
19      Q.      All right.  Now, you mentioned the issue of
20  hard and soft matches.
21      A.      Correct.
22      Q.      And who came up with what is a hard and soft
23  match, as far as your office is concerned?
24      A.      Me, and my IT team.
25      Q.      Okay.

STAN STANART - June 17, 2014

1       A.    We kind of -- multiple criteria.  You've got

2   Social Security numbers, for some people, the last four

3   digits in the voter registration database.  You have

4   driver's license number, about half the people.  You

5   have addresses, you have first names, you have last

6   names.

7               So what you look at is preponderance of

8   the data.  You don't have to have the same last name for

9   me to get a match on you if you've gotten married.

10      Q.    Okay.

11      A.    Because I have got enough data points there

12  that I can say that's you.

13      Q.    All right.

14      A.    But then you get down to the soft matches are

15  the ones that say, "I can't say that's you or that's

16  you," so that to me is a soft match when it's your --

17  when it's more than one person that is a potential

18  match, then that's not a match for me.

19      Q.    So in the first early voting period, in the

20  November 2013 election, when you were leaving it to poll

21  workers because you didn't have the pre-match system in

22  place yet --

23      A.    Right.

24      Q.    -- did you do a training on what was a hard

25  match and soft match and what was acceptable?

ADVANTAGE REPORTING SERVICE - 281.376.9303

STAN STANART - June 17, 2014

1      A.    We did training on similar names.

2      Q.    Okay.

3      A.    On what's -- in fact, I think we have a video

4    on similar names.  We, you know -- and we -- because the

5    clerks that run early voting are actually our temporary

6    employees of the county clerk's office, they have been

7    there longer, they know how to use things, we can give

8    them better training, they are more of our A-team on

9    running our polls.

10                So they were able to -- we showed them

11   what similar name required and the criteria to go

12   through it.  And the end result is I don't know anybody

13   that didn't get to vote because it was a similar name

14   issue in Harris County.

15     Q.    All right.  So when you were doing that early

16   vote period in 2013, you didn't -- you didn't use the

17   sort of hard match/soft match matrix of using multiple

18   data points, instead it was just comparing names?

19     A.    The clerk is looking at the names, they are

20   looking up the person.

21     Q.    Right.

22     A.    Remember, the first thing when they swipe the

23   electronic system is going to do is try to match the

24   driver's license.  If there is a driver's license name,

25   they will present the names that will match the driver's

STAN STANART - June 17, 2014

1    license, it will always be one person.  So it makes it

2    easy right there.

3              But otherwise, it's going to start

4    looking at the -- if there's not a DPS ID in the voter

5    registration database, it's going to start looking at

6    address, last name type things, and present, you know, a

7    potential match to the clerk there.

8              So it makes it a short list.  The clerk

9    can always ask -- if the addresses match, it's a pretty

10   easy match for the clerk then because they are presented

11   with a short list.  Or then they can always ask the

12   voter, "Are you this person or this person?"

13        Q.    So what if the person comes in with a

14   passport?

15        A.    Same, same way.  They are looking up by last

16   name.  Usually they will just do a name search.

17        Q.    And when they are looking up -- are they

18   looking up in the voter registration file, or the DPS

19   file?

20        A.    The voter registration file was all that we

21   had at that time.  You can't even look up the straight

22   DPS on our system, I don't think.  Other than when you

23   swipe, it does the automatic match.

24        Q.    Okay.

25        A.    Otherwise, you're actually going to put in

ADVANTAGE REPORTING SERVICE - 281.376.9303

STAN STANART - June 17, 2014

1   the database, first this way, then you exclude all those

2   people, and then you run ones that are left.  So it's --

3   makes it easier as the pile gets smaller, the one you

4   unmatched, you're only looking at the unmatched ones.

5        Q.   I assume you would be able to provide us this

6   query.

7        A.   Yes, the series of queries that we used, yes.

8        Q.   Okay.  Did you at any time take your -- I'm

9   just going to call it a query because I don't know what

10  else to refer to it as.

11       A.   Yeah, right.

12       Q.   Did you at any time take the query and run it

13  by the secretary of state's office?

14       A.   I don't know that we did.  I don't know if we

15  did.

16       Q.   I'm just trying to find out, you know, who, in

17  addition to you, helped develop that query system.

18       A.   It's just -- it's basically logic.  I mean,

19  what engineers do.

20       Q.   Okay.  All right.  So the answer is outside of

21  your office, you're not aware of anybody else having a

22  hand in doing that?

23       A.   No, no idea.

24       Q.   Okay.  On the election workers that you

25  utilized, I think you mentioned earlier that the

STAN STANART - June 17, 2014

1  read and, you know, help -- be able to read the

2  instructions themselves to help the clerk.

3      Q.   Let me come at it from a different angle.  So

4  when an election judge locates election workers to work

5  in her precinct, is it pretty much up to her discretion

6  who she hires, subject to them being a lawful citizen

7  and meeting the legal requirements for the position?

8      A.   Pretty much, yeah.  I mean, we -- I think we

9  do tell them, you know, we have a list of our

10  instructions that, you know, guidelines, but no hard

11  laws.  The only laws are what's in the -- what's in the

12  statutes.

13      Q.   I didn't know if there was a situation, for

14  example, where an election judge would identify a few

15  election workers that they thought were good candidates,

16  and then those candidates would have to be vetted by

17  somebody in your office to make sure they were.

18      A.   No.

19      Q.   So it's up to the election judge essentially,

20  in compliance with the applicable law.

21      A.   Yeah, whatever the law is, yes, right.

22      Q.   All right.  Is there any kind of testing or

23  analysis of the degree to which training has been

24  successful in an election worker?

25      A.   We do track complaints and other things, so we

STAN STANART - June 17, 2014

```
1              Oh, yes, there is testing.  When they do
2   e-slate training, they are tested on the results of
3   the -- can they, you know, how to hook things together,
4   how to assemble the voting machines, how to, you know,
5   select the ballot style for the voter.
6              In other words, how to run the machine.
7   There is some testing that let's us know whether they
8   need training or not.  Or like I said, recommendation
9   back to the parties that this person is not the best
10  candidate.
11      Q.   Okay.  So -- but there is no testing about,
12  you know, for example, here is a list of 14 IDs, which
13  of these are acceptable under Senate Bill 14, and then
14  election workers are expected to do it?
15      A.   They're presented with a list that they have
16  right there with them at the polls of acceptable IDs,
17  they are shown those.  They have the video training that
18  every one of them was supposed to watch this last time
19  on acceptable photo IDs, that are acceptable.
20              So they should have fairly good knowledge
21  and testing on -- not testing, but pretty well
22  information presented to them if they have actually paid
23  any attention to what the acceptable photo IDs are.
24      Q.   Okay.  But they don't have an exam that they
25  have to take before they are approved for work?
```

ADVANTAGE REPORTING SERVICE - 281.376.9303

STAN STANART - June 17, 2014

1        A.    No, I don't think there's a multiple choice.

2        Q.    All right.  On the substantially similar

3   issues, I have a few examples here I want to ask you and

4   see how it would come out in your match.  Okay?

5        A.    Okay.

6              MR. DUNN:  I don't have extra copies of

7   them.  There are four or five of them here.  Do you want

8   to make a copy?  Does it matter?

9              MR. SCOTT:  I'll come look.

10             MR. DUNN:  Sure.

11             MR. SCOTT:  Is that all right?

12             MR. DUNN:  Sure.  I guess I'll just mark

13  this set as Exhibit 1.  Actually, I'm going to number

14  the pages.  Here we go.  I do actually have an extra set

15  for you.  To save us some time, I took out a few

16  examples.  There you go.

17             MR. SCOTT:  Thank you.

18             (Stanart Deposition Exhibit No. 1 was

19  marked and is made a part of this deposition.)

20        Q.    (By Mr. Dunn)  All right.  I've handed you

21  Exhibit 1 which contains six pages which I have now

22  numbered.

23        A.    Uh-huh.

24        Q.    So starting with Page 1, if you take a look at

25  this example, it gives you the information on a poll

STAN STANART - June 17, 2014

1    Q.    Okay.

2    A.    You would need more information than just

3 this.

4    Q.    So from your viewpoint, this is a voter that

5 would either be rejected or given a provisional

6 affidavit?

7    A.    The potentiality would be there, yes.

8    Q.    Okay.  Well, and I guess you use the word

9 "potential."  And that's a good point.  Does that mean

10 that some election workers may look at this and say, "I

11 think this is the same person, so I'm going to let them

12 vote," other election workers would say it's not?

13    A.    There could be more -- if more information was

14 provided than just this, then the election worker might

15 accept.  But with just this only, I would think that

16 they would ask this person to vote provisionally.

17    Q.    Okay.  But it's possible that an election

18 worker might not?

19    A.    Like I said, I don't know of anybody that was

20 turned away from voting in our elections in Harris

21 County due to a similar name issue.

22    Q.    Okay.  And I appreciate that.

23    A.    Yeah.

24    Q.    You told me that.

25    A.    Yeah.

STAN STANART - June 17, 2014

1      Q.    I thank you for that.

2      A.    Yeah.

3      Q.    But focusing on this example, is it possible

4  that if this person appeared in Harris County, for one

5  election worker they would be permitted to vote a full

6  ballot, and another election worker would give them a

7  provisional ballot, or reject it?

8      A.    I would suspect if this was the only

9  information given, that they would be asked to vote

10  provisionally.

11      Q.    Okay.  If you could go with me to Page 2.  On

12  Page 2, we have the same first name, a different last

13  name, female individual, at least if Elizabeth is a

14  female name.  Date of birth is the same.  And then the

15  address is different.  Do you agree that's a summary of

16  the information on Page 2?

17      A.    Correct.

18      Q.    Okay.  So what -- how would this person be

19  handled in a Harris County voting location, if that's

20  all the information you have for them?

21      A.    Once again, I would think that is insufficient

22  to say it is the same person.

23      Q.    Okay.

24      A.    Once again, like I said, our database has more

25  information, and we likely would have -- if it is the

ADVANTAGE REPORTING SERVICE - 281.376.9303

STAN STANART - June 17, 2014

1   same person, we likely would have matched them.

2       Q.   And do you recognize that -- again, focusing

3   on only the information.

4       A.   Right.

5       Q.   The only information you have, do you

6   recognize a different poll worker would come to a

7   different conclusion than you just came to?

8       A.   That they would let them vote?

9       Q.   Yes.

10      A.   That's not how we trained them.

11      Q.   Okay.  So in your view, as long as your

12  training has been successful, a hundred out of a hundred

13  times this person presents themselves to different

14  people, they're going to get rejected from voting?

15      A.   They're going to be allowed to vote

16  provisionally.

17      Q.   Okay.

18      A.   Every person gets to vote provisionally.  And

19  so they have the opportunity then to provide, you know,

20  proof of that they are the matching -- same matching

21  person --

22      Q.   Okay.

23      A.   -- to the authorities.  Yeah, to the

24  authorities, to be counted.

25      Q.   Now, on Page 3, in this example, the U.S.

STAN STANART - June 17, 2014

```
 1   passport doesn't have an address on it.
 2        A.   Correct.
 3        Q.   Okay.  So the passport has a date of birth and
 4   a name, again, in this case a woman.  And their poll
 5   book has the same first name, different last name, same
 6   date of birth.  And, of course, the poll book also has
 7   an address.
 8             How would this person be dealt with by
 9   one of your election workers who's properly responding
10   to their training?
11        A.   My suspicion is that they might let them vote
12   if they asked if they still lived at such-and-such
13   address.
14        Q.   Is that the correct judgment, in your view?
15        A.   They would ask for more information, they
16   probably would ask, "Do you have something else other
17   than just the passport?"
18        Q.   And assuming the voter says, "This is what I
19   got, this is all I have."
20        A.   They would make a call downtown, they might
21   end up talking to Doug Ray here.
22        Q.   Okay.
23        A.   "Doug, what's your best opinion on this one?"
24   Because our goal is let everybody vote.
25        Q.   Okay.  Obviously, that's easy you could just
```

STAN STANART - June 17, 2014

1    do that, but then you're not really complying with

2    S.B. 14.

3         A.    No, I understand.   They would probably end up

4    voting provisionally.

5         Q.    If you were making the decision, that's your

6    judgment?

7         A.    Yes, that would -- if that is all that's

8    there.

9         Q.    Okay.

10        A.    Then that's probably the right answer.

11        Q.    All right.   I've just got a few more of these.

12        A.    Okay.

13        Q.    Page 4 now.

14        A.    All right.

15        Q.    We have a Christopher Johnson, in the poll

16   book, it's Chris Johnson.   In the driver's license

17   database, it could be a male or female, I assume.

18        A.    Right.

19        Q.    And the date of birth is different.

20        A.    Right.

21        Q.    But the address is the same.

22        A.    Yeah, but the first part of the name is the

23   same, too.   That's part of our criteria, we will look at

24   pieces of the name.

25                   In fact, we will look at the pieces of

STAN STANART - June 17, 2014

1    the name, first, middle, too, to help us identify

2    because that's very common that people go by a middle

3    name.

4           Q.    Sure.

5           A.    Or go by something different.  But yes, that

6    would be a pretty obvious match.  We would actually

7    have -- if there is not another obvious other Chris

8    Johnson at the same address -- wait a second.  These are

9    different dates of birth.

10                   That would -- that's probably a father

11    and a son.  So we would probably -- what's going to

12    happen is more than likely is we're going to match it to

13    the right one, though.

14                   Because you're going to be presenting me

15    with this here, but if there's another registered voter,

16    we're probably going to capture the right birthday date.

17    We would probably have pre-caught this because of the

18    birthday match.

19           Q.    So your poll worker would look at it and say,

20    "This guy obviously wasn't born in 1911, so it must be

21    the other one"?

22           A.    No, no.  We would do a match -- the date of

23    births here are so far off, that this -- we would have

24    matched to the correct one with the correct birthday,

25    probably be pre-matched.

STAN STANART - June 17, 2014

1                    So our election worker wouldn't probably
2     have to do anything, in this example.
3          Q.   So which one of these would you work off?
4          A.   You wouldn't work with either one, because
5     that's not a match.
6          Q.   Okay.  But when the voter comes in --
7          A.   The voter will more than likely -- Christopher
8     Senior here, okay, the one that's born in 1911, he's
9     going to be obviously that he's born in 1911.  He's over
10    100 years old.
11         Q.   Okay.
12         A.   In fact, more than likely, this person is
13    voting by mail and not showing up.
14         Q.   Or maybe even dead.
15         A.   Or even dead, correct.  Probably the younger
16    one, if -- this is a different person because of the
17    date of birth.  One is a senior, one is a junior.
18                    I would think that we would not have
19    pre-matched this.  Then it would come down to the date
20    of birth would be the criteria that would say probably
21    don't -- you would vote provisionally if you would let
22    this person vote at all.
23         Q.   All right.  Well, we know the voter comes in
24    with an ID that has their picture on it.
25         A.   Correct.

STAN STANART - June 17, 2014

1      Q.    That they are Chris Johnson born on

2  August 2nd, 1994.

3      A.    Correct.

4      Q.    And he says he was registered to vote.

5      A.    Uh-huh.

6      Q.    When you look it up in the database, though,

7  the only entry you see is this other Chris Johnson.

8      A.    If that's the only one -- like I said, when we

9  do our matching, we'll look at all of them, and we're

10  going to try to match the one that they think matches.

11      Q.    Okay.

12      A.    We would not pre-match to the wrong one.  So,

13  yes, in this case, to me that's a different date of

14  birth.

15      Q.    So any time you see a different date of birth,

16  you would consider that a not match?

17      A.    No.  Here is what we would do, and our process

18  is we would call voter registration would get involved

19  in this, and they would actually pull up the

20  application, the actual image of the physical card, and

21  they would be able to look if that's the date on that

22  card.

23          Then the date that we have in our

24  database would be legit and, therefore, they would say

25  that's the same person.

STAN STANART - June 17, 2014

1      Q.    You're saying the poll worker would get

2   somebody on the phone and work this problem?

3      A.    Yes, yes.

4      Q.    In the meantime, there's a line backing up, I

5   would assume, because that's one worker --

6      A.    No, we got more than -- early voting, we got

7   multiple workers.  Like I said, we pre-matched on

8   election day.

9            And also on election day, if the worker

10  sees it's a different birth date, it's a different

11  person, it's a senior.  So I would think that if they

12  are not able to get ahold of someone that could verify

13  the image, which more than likely that's what they would

14  do, they would probably make them vote provisionally.

15     Q.    So there is this variable where the election

16  worker says, "I'm going to investigate this further," I

17  mean, some, as you've already recognized might say,

18  "Look, it's a different date of birth, it's a

19  provisional ballot," that's the end of the query, would

20  you agree?

21     A.    If the voter complains, they would call the

22  office.

23     Q.    Okay.  So if a voter would get angry or maybe

24  push back, then you would expect the voter to contact

25  your office, and as you suggest, maybe the tax office

STAN STANART - June 17, 2014

1  would pull up the original voter registration card --

2       A.   Right.

3       Q.   -- and see if maybe this date of birth on the

4  poll book it was entered incorrectly?

5       A.   Incorrectly entered in the databases, yes.

6       Q.   And through that process, who would be the

7  decision-maker?  Once the decision was made to call the

8  county office on this voter, now who is going to decide

9  whether they get to vote a full ballot?

10       A.   When the voter reg tells them it's a typo in

11  the database, they go ahead and let them vote a regular

12  ballot.

13       Q.   Would your office be involved in this call at

14  all, other than the election worker works for you?

15       A.   I don't think so.  At this point in time, no.

16       Q.   Okay.

17       A.   We have a good working relationship on

18  election day with them.  They have their phone bank down

19  there, and that's how they're -- we're going to the

20  source for these kind of informations, so we let them be

21  the authority on looking back at the regs.

22            And that's the best thing, go back and

23  look at the original image of the voter registration

24  base, make sure there wasn't a typo in the database so

25  the issue can be resolved.

STAN STANART - June 17, 2014

1              And if it was a typo, then the voter

2    would vote regularly.  If it's different, then the voter

3    can only vote provisionally.

4         Q.    All right.

5         A.    For all purposes, it's a different person.

6         Q.    Now, if you go with me to No. 5, this person

7    shows up with a military ID.  So he didn't have a date

8    of birth or an address on it.

9         A.    Right.

10        Q.    It's just got their name.  But they are in the

11   poll book.

12        A.    Right.

13        Q.    They have a date of birth there.

14        A.    Right.

15        Q.    A date of an address.  Is this person going to

16   be allowed to vote?

17        A.    To my knowledge, everybody who came with a

18   military ID that had a matching name, they accepted them

19   to vote.

20        Q.    So somebody uses a military ID because it has

21   less data on it, just naturally has a better chance of

22   getting accepted to vote than somebody who brings in,

23   say, a driver's license which has an address and date of

24   birth that might not match, would you agree?

25        A.    No, because nobody was denied the vote

STAN STANART - June 17, 2014

1   because -- that I know of, in Harris County, because of

2   an ID issue.

3        Q.   All right.  I keep hearing you say that.

4        A.   Yeah.

5        Q.   I don't have any reason to disagree with that.

6        A.   Yeah.

7        Q.   Instead, I'm going about a very specific

8   situation, and all I'm asking you is:  Since a military

9   ID doesn't have a address and date of birth, it's going

10  to necessarily be easier to vote and get a match with

11  than a driver's license which has a date of birth and an

12  address.

13             MR. SCOTT:   Objection; form.

14       Q.   (By Mr. Dunn)  Or do you know?

15       A.   My suspicion is, once again, the clerk would

16  probably ask for more information if they have it, if

17  the voter has it.  If they didn't, more than likely,

18  yes, they would be allowed to vote.

19       Q.   All right.  And if the clerk did ask the

20  citizen for more information, at that point they would

21  just be taking the citizen's word for it; right?

22             In other words, if they said,

23  "Ms. Johnson, what's your date of birth:  And she says,

24  "November 4, 1994," then you could say that's a good

25  match?

STAN STANART - June 17, 2014

1        A.     Usually a voter would pull out a photo ID or a
2   driver's license, something of that nature.
3        Q.     Okay.
4        A.     That's the practice.
5        Q.     Usually.
6        A.     Usually, I would not say exclusively, yes.
7        Q.     And then the last example, No. 6, again this
8   is a --
9        A.     That would be a hard one, yes.  I would think
10   with that information, that information only, and that's
11   all the voter had, it would be difficult to allow that
12   person to vote, other than provisionally.
13        Q.     Okay.  Again, we're on Page 6 of Exhibit 1.
14   Here it's Elizabeth Smith in the poll book.  There's a
15   date of birth, there's an address, but she presents a
16   military ID that only has a name on it and it's
17   Elizabeth Johnson.
18        A.     Yes.  Without her providing more information,
19   I would suspect the clerk would ask her to vote
20   provisionally.  But, here again, I don't know of anyone
21   in Harris County that went down this path.
22        Q.     Okay.  Has your office at any point compiled a
23   list of nicknames?
24        A.     I don't think -- I don't think we did any
25   matching with nicknames.  Other than like I said,

STAN STANART - June 17, 2014

1    looking at middle names as a possible match to a first

2    name, we did that kind of stuff.  But not necessarily a

3    Richard/William type nickname list.

4        Q.    How about any investigation of Hispanic

5    nicknames and Hispanic names that match other similar

6    names?

7        A.    I don't believe not in our matching that we

8    did, I don't think we did any of that.

9        Q.    Okay.

10       A.    I think now for statistics basis, maybe some

11   of the people have done that, but not for actual

12   voting-type issues.

13       Q.    So, you know, I consider myself 99.9 percent

14   ignorant in being able to match Hispanic names with

15   Hispanic nicknames, but I am told that Kiko and Nacho

16   are nicknames or full names that people use for other

17   names.

18       A.    Right.

19       Q.    So when you perform your hard and soft match

20   that you provide to the poll workers, how do you make

21   sure, if at all, that you're catching those?

22       A.    We didn't.

23       Q.    Okay.

24       A.    I mean, that's -- I can't make that

25   assumption, so that would not -- that's -- if I don't

STAN STANART - June 17, 2014

1   have enough other data points that would help me match,

2   that would not be a criteria to match, the nicknames

3   stuff.

4        Q.    Would it be the same, say, for example, for

5   Chuck and Charles?

6        A.    Like I said, if we look at the three, maybe

7   first three letters, but you're going to look at other

8   data points, too.

9        Q.    Okay.

10        A.    We don't go -- we didn't go down the path of

11   nicknames.  I imagine you could probably match some

12   people on that, but that's work.

13        Q.    Okay.

14        A.    I mean, to me that's not as straightforward,

15   so we left that into those that aren't our hard match,

16   we will give that on discretion of the election worker.

17              Remember, we've got Spanish translators

18   at just about the majority of our posts, too, so they

19   would know that information, so they could use their

20   knowledge to help identify a similar name if we did not

21   have it hard matched on all the other data elements.

22        Q.    You said something there I want to make sure I

23   understand.  Is it the case when you did the query

24   electronically, you would just match the first three

25   characters, is that what I head you say?

STAN STANART - June 17, 2014

1        A.    Sometimes, along with other data points.

2        Q.    Okay.

3        A.    Like I said, I can show you the breakdown of

4   how we would match.

5        Q.    So sometimes in your query that you would run,

6   you would be looking for a full match on the name, and

7   sometimes you would say, "Well, if we had the first

8   three letters of a name or each name," and then this

9   other factor was the same, we would consider that a

10  match; is that right?

11       A.    I would have to go back and look at the

12  specifics.

13       Q.    All this would be in the query you ran?

14       A.    Yes.  Like I said, if it's not -- we had more

15  criteria we did we found that wasn't perfect.  Like I

16  said, if I couldn't get a 99.99 percent match, I didn't

17  want to use it.

18              Even though there was a lot of what I

19  call close matches or, you know, suspected matches,

20  there wasn't enough data points there for us to say,

21  yeah, that's the same person.

22       Q.    All right.  So when you have a close match, as

23  you just described it, in that case you give that person

24  a provisional ballot?

25       A.    No, I leave it up to the election judge at the

STAN STANART - June 17, 2014

1  location to determine whether it's the similar name as

2  the same person.

3       Q.    I see.  So this pre-match that you're

4  performing is advisory?

5       A.    Pretty much, so, yes.

6       Q.    Okay.

7       A.    We're pretty confident in the advice we're

8  giving them, but if they find out -- I haven't heard of

9  anywhere it's incorrect, okay?

10      Q.    Okay.

11      A.    Feedback, it was incorrect.  But, of course,

12 the ones that we don't match, then it's up to the clerk

13 to determine if that person does show up, you know,

14 which one is the ones in the poll book is this person.

15 They are going to ask them, to some degree in their

16 judgment like they have always done.  Some they know the

17 person, too.

18      Q.    Right.  So if they know the person and they

19 otherwise see something there on the ground --

20      A.    Right.

21      Q.    -- that is inconsistent with whatever maybe

22 match your office has performed, they are trained, go

23 with what you're seeing, use your judgment there in the

24 field?

25      A.    Yes.  A similar name would not work without

STAN STANART - June 17, 2014

1    <mark>them being able to do that</mark>.

2         Q.    Okay.   You've mentioned several times that

3    there was nobody that was rejected for a name mismatch;

4    is that right?

5         A.    To my knowledge, yes, yes.

6         Q.    Okay.   And so of those people that you

7    itemized for us earlier that had cast provisional

8    ballots related to ID, none of those were name

9    mismatches?

10        A.    Yes.   They came in with ID, they showed up

11   with no ID.   Some of them forgot them at home, or

12   whatever.

13        Q.    Okay.

14        A.    They somehow got to the poll and it was

15   someone else, and had gotten it and decided, "Well, I'll

16   just go ahead and vote now provisionally."   And after

17   the election results was seen, they probably didn't

18   bother to come cure it because it wouldn't have made any

19   difference.

20        Q.    Did anybody tell you that that's what they

21   did, or that's just your belief?

22        A.    That's just my belief.

23        Q.    Okay.

24        A.    Knowing that people do have IDs, that I would

25   be able to see, like two-thirds of them did, that didn't

STAN STANART - June 17, 2014

1  by phone, or mail, or e-mail, or all three?

2          A.    I've got -- probably got a few e-mails and a

3  few by phone, but like I said, pretty small numbers.

4          Q.    The ballot board, did the Harris County ballot

5  board refuse to tabulate professional ballots from

6  voters who didn't come and cure?

7          A.    Not to my knowledge.

8          Q.    So it's your belief that the cured ballots

9  were tabulated and included in the official results,

10 even if the citizen didn't come and cure?

11         A.    Oh, no, no.  I'm sorry, no, only the ones that

12 cured actually would be the ones that count.  The ones

13 they did not cure, no, they did not get counted.

14         Q.    Okay.  Do you know what the cost is?  And this

15 may be outside your wheelhouse, but do you know what the

16 cost is to get a marriage certificate in Harris County?

17         A.    Seventy-two bucks, I believe.

18         Q.    Seventy-two?

19         A.    Yes.

20         Q.    Okay.

21         A.    Seventy-one or 72.

22         Q.    Okay.

23         A.    Make it 72.

24         Q.    And I should have been more clear, not

25 somebody who is --

STAN STANART - June 17, 2014

1      A.    And you are saying a certificate or license,

2   okay, that's a license.

3      Q.    Right.

4      A.    Okay.  You want a certificate.  It seems like

5   it's 22, but don't hold me to that.

6      Q.    Okay.  Like I said, some of these things you

7   may not know anything about.

8      A.    Since my office does that, I do know about it.

9      Q.    Does your office, when you're doing a

10  pre-match during an election, the poll worker, have the

11  ability to look up marriage activity in any other

12  county?

13     A.    No.

14     Q.    In other words, if Elizabeth Johnson came in

15  and one of her records showed Elizabeth Shaw and she

16  said, "Well, I got married, and that's why it's

17  different," your office wouldn't have any way to figure

18  that out unless it happened in Harris County?

19     A.    We do have -- I mean, we do have access to the

20  whole voter roll in the whole State of Texas and the

21  whole DPS for the whole State of Texas.  So maybe we

22  could figure out some of that stuff, but that's not a

23  focus.  That's not something we normally do.

24     Q.    Okay.  So in that example with Elizabeth

25  Johnson shows up with an ID says this and Elizabeth Shaw

STAN STANART - June 17, 2014

1    for the clerk to accept that person as with the passport

2    for as the same person.

3         Q.    If they have a passport but they don't have a

4    driver's license, and it was never issued to them --

5         A.    Oh, okay.  Well, then I couldn't do that, of

6    course.  Got it.

7         Q.    Then you'll just have Elizabeth Johnson on the

8    passport with a date of birth, Elizabeth Shaw with a

9    date of birth on the data roll, and an address.

10        A.    Correct.  That wouldn't be enough data points.

11        Q.    They would be provided a provisional ballot?

12        A.    Unless the voter provided some other

13   information that had an address on it for us.

14        Q.    Oh, so could they bring their light bill?

15        A.    They are not supposed to, but I would suspect

16   if they did, that might be something that you would

17   convince a clerk to do.

18              Even though the training says otherwise,

19   or they know the person, or something like that.

20        Q.    Okay.

21        A.    Yeah.  The idea is to get as many people

22   voting as possible that should be voting.

23        Q.    Do you know who in Harris County, you know,

24   what jurisdictions have the authority ability to issue

25   birth certificates?

STAN STANART - June 17, 2014

1      A.    My office does.

2      Q.    I can go buy a birth certificate from the

3  Harris County Clerk?

4      A.    Yes, we can get it for the whole State of

5  Texas, you know, a registered copy at my main office

6  here, or the nine branches around the county.

7      Q.    Do you know what that costs?

8      A.    I think it's around 22 bucks, but I'm not

9  positive.

10      Q.    Do you know what other -- or even how many

11  other jurisdictions in the county are able to issue

12  birth certificates?

13      A.    I think we're the only one.

14      Q.    Okay.  There has been some discussion in this

15  case about the cost of birth certificates being waived

16  for some set of circumstances.  Are you familiar with

17  those requirements?

18      A.    Vaguely.  I think I've heard that, yes.  Yes,

19  in fact, yeah, they waive most of the fees, I think, for

20  that.

21          In fact, I think all except for $2 or

22  something is waived.  And I didn't advertise this to the

23  public, but I did tell my staff, if that is an issue for

24  someone who wants one, I would personally pay that out

25  of my pocket.  Don't advertise that to the world.

STAN STANART - June 17, 2014

1        Q.    Okay.   So did your -- I understand you didn't

2   advertise that.

3        A.    Yes.

4        Q.    Okay.   But did your office advertise that the

5   fees would be forgiven for birth certificates if

6   somebody couldn't afford one?

7        A.    I don't recall that we did.

8        Q.    Do you know whether your office ever did

9   actually forgive the fees?

10       A.    I don't think we had anybody ask.

11       Q.    Okay.   I guess that's a good point.

12       A.    Yeah.

13       Q.    So if I walked into the Harris County Clerk's

14   office and everything is working according to the

15   training -- all right?

16       A.    Yes.

17       Q.    And I ask for an ID, am I told, if you can't

18   afford it --

19       A.    Let me take that back.

20       Q.    Okay.

21       A.    I think it did happen.   And I just don't know

22   how much it happened, but it seems like I remember the

23   discussion.   That's why I came up with the discussion

24   about the extra $2, and I said, "Well, if they make an

25   issue of that, I'll pay that."

STAN STANART - June 17, 2014

1                But I just don't know how much it

2   happened.  But yeah.  Did we overly advertise it, I

3   don't think we did.  But if it was an issue for the

4   person, then, of course, the waiver of the fee, I think,

5   would come into play.

6        Q.    So if a person walks up to the desk and says,

7   "I want a birth certificate," they're going to be told,

8   "Okay, it's $22," and they say, "Oh, okay, thanks

9   anyway," and leave.

10       A.    Okay.

11       Q.    Then they are not volunteered and told, "Oh,

12  wait a minute, if you can't afford one, we can pay it

13  for you"?

14       A.    I don't know.

15       Q.    Okay.

16       A.    I don't know the answer.  We would have to ask

17  the people that work in those departments.  Whatever

18  guidance was given to them, from the state, is what they

19  followed, is my assumption.

20       Q.    What is the name of the sub-unit of your

21  department?

22       A.    Vital statistics.

23       Q.    Vital statistics?

24       A.    Or personal records, I guess.  Personal

25  records department.

STAN STANART - June 17, 2014

1   their Web site that let's people see some things.   I

2   don't know how much it let's them see.

3        Q.   Okay.

4        A.   I've never personally done it.   My staff might

5   use it, might not use it, I don't know.

6        Q.   So if a voter were to report to vote at one of

7   your voter registration, and their ID doesn't match the

8   voter registration records, and they say, "I've got a

9   court order changing my name," what, if anything, is

10  required to let them vote a full ballot?

11       A.   Hopefully, we've pre-matched that person so

12  that wouldn't be an issue for the clerks.

13       Q.   Okay.

14       A.   Here again, they can call downtown, and

15  potentially we can look that up ourselves.   But like I

16  said, I don't know of anybody on a similar name issue

17  that was denied the right to vote in Harris County.

18       Q.   So when somebody comes, and if they had a

19  certified copy of their record or their name change, is

20  that something that the poll worker is trained to

21  accept?

22       A.   No, they are not trained to accept that, no.

23       Q.   Okay.

24       A.   Like I said, though, nobody, to my knowledge,

25  was refused so somehow or another --

STAN STANART - June 17, 2014

1   location that we know about that we could be -- a place

2   to use.  So we used some intelligence behind it.

3       Q.   Good.  Is this geocode map in the documents

4   produced?

5               MS. ASTON:  Probably.

6       A.   I don't know.  It might have one of those

7   created and thrown away at the time, though, too.

8       Q.   (By Mr. Dunn)  I didn't see it, but it's a lot

9   of stuff.  I could have missed it.

10      A.   I mean, we could have someone redo that.  It's

11  probably in a Web shot, create, thrown away after use.

12      Q.   I see.  Okay.  Did you attempt to analyze the

13  racial characteristics of the Zip codes --

14      A.   No.

15      Q.   -- that had a large number of non-matches?

16      A.   No, no.  It's just the ones that we don't

17  match.

18      Q.   All right.  Now, I want to talk about the

19  disability exemption.  Do you know of anybody in Harris

20  County in these past elections where S.B. 14 has been in

21  effect obtained a disability exemption?

22      A.   I believe there was a few, at least one, two,

23  something.  The tax office would have a better idea of

24  that than I would, but I would believe there was.

25      Q.   Okay.

STAN STANART - June 17, 2014

1      A.   I don't know the exact number.  Very small.
2      Q.   Did you -- when S.B. 14 was being crafted, did
3  you have any input in the bill?
4      A.   No, not really.  I mean, other than mechanics.
5  That's a good -- don't do that because it might break.
6  But, you know, there was always -- I mean, we get asked
7  things because we're so large.
8      Q.   Who was it that you consulted with on the bill
9  in the legislature?
10      A.   I don't recall.  I mean, it was usually the --
11  information from maybe the secretary of state, don't
12  break this.  But it wasn't -- we weren't very involved
13  in it, let's put it that way.
14      Q.   Okay.  And I guess that's what I'm trying to
15  find out --
16      A.   Yeah.
17      Q.   You know, if you were on the -- I believe one
18  of the sponsors, for example, was
19  Representative Harless, a Houston state representative.
20      A.   Yes, yes.
21      Q.   You were on the phone with her in her office.
22  Or Senator Fraser.
23      A.   Very little on the phone.  Even though she was
24  my state rep, I was on there very little, very little
25  discussions with her.

STAN STANART - June 17, 2014

```
 1    a minute.  I'm pretty close to finished, and so we'll
 2    come back in about five, ten minutes.
 3         A.    Okay.  Sounds great.
 4                   (Recess from 12:15 p.m. to 12:21 p.m.)
 5         Q.    (By Mr. Dunn)  So just to clarify, while we
 6    were on break, you learned that after the election, an
 7    e-mail from your office was sent out to election
 8    judges --
 9         A.    Uh-huh.
10         Q.    -- to give any feedback about issues that
11    arose.
12         A.    Yeah, positive or negative.  Usually we
13    emphasize the positives.
14         Q.    Okay.
15         A.    But it's nice to get some of the good things
16    that went on on election day.
17         Q.    Did you get any S.B. 14-related feedback?
18         A.    We might have.  I don't know.  We would have
19    to double-check with that.  And I'm sure it would be
20    captured in the e-mails if it was.
21         Q.    Did you at any point purchase something or pay
22    money to the Secretary of State for materials or
23    information you used to implement S.B. 14?
24         A.    I don't know of anything.  I don't think so.
25         Q.    Okay.
```

STAN STANART - June 17, 2014

```
 1    Department of Justice, representing the United States --
 2    one of the attorneys representing the United States.
 3                    And, Mr. Stanart, I, to, will attempt not
 4    to talk over you.  And all the rules of the road that
 5    Mr. Dunn laid out at the outset for depositions are
 6    still -- still apply.
 7                    I'm going to keep this relatively brief
 8    because he covered most of the areas I was interested in
 9    covering, quite frankly.  But just a few follow-up
10    questions.
11                    You had discussed at one point the effort
12    to publicize the new ID requirement.  And among other
13    things, you mentioned billboards that have gone up.
14         A.    Yes, sir.
15         Q.    Is that right?
16         A.    Yes, sir.
17         Q.    And where were you -- what decision did you
18    make about where to put up those billboards?  How did
19    you decide which parts of the county to put those
20    billboards up?
21         A.    Well, the space was actually donated by Clear
22    Channel.
23         Q.    Okay.
24         A.    And so they pretty much kind of selected the
25    locations based upon their availability, because we
```

STAN STANART - June 17, 2014

1   basically only had to pay for the vinyl.  And so it was

2   kind of a partnership with them.

3              So that they used, you know, free space

4   they had, and they did kind of -- but, you know, they

5   kind of picked, you know, so we would get the most

6   exposure.

7              But also they were restricted by what was

8   available that they wouldn't sell to a paying customer.

9       Q.   I see.  So do you know how many billboards you

10  put up for on this issue?  Let's say in the lead up to

11  the November election.

12      A.   I believe it was 40.

13      Q.   Forty?

14      A.   Yes, sir.

15      Q.   Do you have a sense where in the county those

16  billboards went up?

17      A.   They were just all over the county.  Like I

18  said, it was driven by what was available by Clear

19  Channel that they didn't have a paying customer paying

20  for at that time.

21      Q.   Okay.  So you have no sense as to where -- if

22  all the billboards were in one part of the county, you

23  wouldn't know, or generally, what's your sense of it?

24      A.   No, they were distributed through all

25  population centers, and we actually did have some of the

STAN STANART - June 17, 2014

1    billboards in Spanish, as well as Vietnamese and

2    Chinese, and those were targeted other language than

3    English was actually trying to target into the high

4    population centers of that language.

5              And Clear Channel, they know their

6    customers, and they know where they would position those

7    to have the most impact.

8         Q.    Okay.  And did you -- in the documents you

9    provided us in discovery, did you -- is that -- does

10   that include information about where those billboards

11   went up?

12        A.    I don't know.  I mean, it might.

13        Q.    Okay.

14        A.    I think it does include the examples of the

15   billboards in the four languages.

16        Q.    Okay.  But you could provide that to us?

17        A.    I think we could probably get that from Clear

18   Channel.

19        Q.    And what can you tell us, generally, about the

20   type of information that was on those billboards?

21        A.    It was real simple.  It had a picture of a

22   photo ID on it, and the message was, "Bring your photo

23   ID to the polls."  And then we had a link to our Web

24   site, harrisvotes.com.  And then I think we had, you

25   know, my name, County Clerk, Stan Stanart.

STAN STANART - June 17, 2014

1        Q.    Okay.

2        A.    And it had my title, too, to know who's

3   sending the message out.

4        Q.    Okay.   Great.

5        A.    You know, as few words as possible to get the

6   most impact.

7        Q.    Okay.   Good.   And the image that was used in

8   that billboard, was that included in the information you

9   provided us?

10       A.    Yes, I believe so, yes.

11       Q.    Okay.   And what, if anything, did that

12  billboard advertise and say about the ability to obtain

13  an EIC or another type of ID?

14       A.    Well, it didn't because, you know, billboards,

15  you've got just a quick snapshot of the message, but it

16  did have harrisvotes.com on there, in there in white on

17  a black bar that ran across two-thirds of the way down.

18            And on harrisvotes.com, we talked

19  about -- we had a link on the main page, you know "photo

20  ID required."   And on that page, we talked about photo

21  IDs, and we had a page on EICs as well.

22       Q.    So just to clarify, you're not talking about

23  what the text is on the Harris County link, but in terms

24  of the advertisements, on the billboard, what did that

25  advertisement say about getting, if anything, about

STAN STANART - June 17, 2014

1    getting an ID?

2         A.    All it said was --

3         Q.    How to get an EIC ID?

4         A.    No, it did not address that.  It said, "bring

5    your photo ID to the polls," and it had the Web site

6    link.

7         Q.    Okay.  And you also, I believe, discussed

8    brochures that your office has produced on getting the

9    word out on the ID requirement; is that right?

10        A.    Correct.

11        Q.    Okay.  And is that also a document that's been

12   provided in the course of discovery?

13        A.    Yes, it is.  And like I said, it's also in all

14   four languages.

15        Q.    Okay.  And what does that document say about

16   getting an EIC, if anything?

17        A.    I don't have one in front of me to look at.

18        Q.    Okay.  To your knowledge, do you know if it

19   says anything about how to obtain an EIC?

20        A.    I'm not positive.  I suspect it does.  I do

21   know we did press releases that talked about the EICs

22   and the locations where people could obtain the EICs.

23        Q.    Okay.

24        A.    And we did get a lot of media from the

25   billboards.  We actually made the front page of the

STAN STANART - June 17, 2014

1    press releases for more details.

2        Q.    Okay.   But I understand that you identify the

3    Web site, but in terms of the routine, sort of press

4    release relating to elections that also discuss the ID

5    requirement, what do they say about how to get an EIC,

6    if anything?   Do they say anything?

7        A.    Some of the press releases did.   But like I

8    said, it was more appropriate right before the November

9    election, and before the primary, but you have the --

10   you should have all the press releases in the documents

11   that's been provided to you.

12       Q.    Okay.   Thank you.   Now, with regard to the --

13   to concerns about whether there are residents in the

14   county who are otherwise eligible to vote who don't have

15   photo IDs, is that a concern that has been brought to

16   the attention of your office since the passage of

17   S.B. 14?

18       A.    Most of the community organizations that I

19   know of that I've worked with, in talking to the League

20   of Women Voters, have all told me they are all trying to

21   get people to use the personal IDs instead of the EICs

22   because it has much more use as an identification

23   document.   It can be used to cash checks, and to go to

24   the airport, to go to city hall, other things.

25                   And if you're over, I believe, 62, it

STAN STANART - June 17, 2014

1   we received around ID issues has been insignificant.

2   And the number of people who actually cured and have

3   dealt -- trying to get an EIC has been very, very small.

4          Q.    Now, has the secretary of state's office

5   provided you with any information about whether there

6   might be residents in your county without IDs, without

7   picture IDs?

8          A.    No, I don't think there's very many out there

9   because they can't get any government services without

10  having a picture ID these days.

11         Q.    Have you determined whether there are certain

12  areas in the county where this may be more of an issue

13  than in other areas?

14         A.    No.   Like I said, I don't know of any -- I

15  know of -- I don't know of anybody who is in this

16  category that's -- almost hypothetical category because

17  you can't -- there is here no government services you

18  can have without a photo ID.

19               You can't go to the -- you can't cash a

20  check, you can't do anything a normal person would do

21  without having a photo ID.

22         Q.    Now, you were -- you mentioned, I think, the

23  total of provisional ballots that were cast, I believe

24  in the 2013 election because of the ID requirement.  I

25  believe you said it was 105; was that right?

STAN STANART - June 17, 2014

1   district in the county, to every principal.  We

2   communicated to the high schools.  Of course, you can't

3   vote the other ones.

4              But we communicated to them that they

5   needed to have a photo ID to vote.  And gave them

6   information about, you know, going to our Web site for

7   more details.

8              We had these posters put out that we

9   distributed to them about this information.  We did our

10  darnedest to get the word out.

11             We got the media involved because they

12  had the big bullhorns, whether through the radio, or

13  through the TVs, or the printed press, and also in every

14  language.

15             We got the word out to them about the

16  need.  And then there was -- so there was many, many

17  columns written, tons of information put out to the

18  voters that, you know, you need a photo ID to vote.  And

19  the end result, I believe, show that we did a good job

20  in getting the word out.

21       Q.   Okay.  And I'm not sure I fully followed the

22  comparison that you said you did between your voter

23  registration list and the DPS database.

24             I think you said that there was

25  discrepancies that resulted in 93 -- 90,000?

STAN STANART - June 17, 2014

1        A.    90,000 that -- a little over 90,000 that did

2  not have a hard match.

3        Q.    90,000 that didn't have a hard match.

4        A.    In other words, I wasn't confident that it was

5  the same person.

6        Q.    Okay.

7        A.    So if we didn't have a 99.99 percent

8  confidence that it was the same person then we didn't --

9  even though we might know it's one of these two people,

10  it was not -- it didn't meet my criteria.

11        Q.    Okay.  So this is my point of confusion.  So

12  part of this is whether there's a discrepancy between

13  the names and there's not an exact match.

14        A.    Correct.

15        Q.    But then there is also -- is there also

16  another -- does that 90,000 also include all those

17  individuals for whom they are only on the registration

18  list, and you cannot find any photo ID for them in the

19  DPS database, is that --

20        A.    Well, no.  It's also I can't give a hard

21  match.  It's like, you might match two or three people,

22  but there's not enough data points there for me to say

23  which one of those three people you are.

24            In other words, there is insufficient

25  data in the voter database -- voter registration

STAN STANART - June 17, 2014

1   database to actually hard match.

2                     If we had a driver's license in the voter

3   registration address for every one of them, then we

4   would -- it would make it pretty easy on us, but we

5   don't.   We've only got it for about half of them.

6        Q.   I see.   So -- I'm sorry I'm being obtuse.   So

7   at the end of the day, can you tell what percentage of

8   those -- of the 90,000 is coming from discrepancies

9   between the -- let's say the driver's license and the

10  registration, and what percentage just don't have a

11  driver's license?

12       A.   I have no way of knowing that they don't have

13  a driver's license, or a personal ID.   Remember, the DPS

14  database includes people who have personal IDs.

15       Q.   Right, right.

16       A.   And that's over 200,000 people of our

17  registered voters, if I remember right.   It's a huge

18  number.

19       Q.   Right.   Okay.   Thank you.   That's helpful.

20  One moment, please.

21       A.   Okay.

22       Q.   Now, going back to this issue of the

23  provisional ballots that were cast.   To what extent do

24  you have any information indicating that the voters who

25  cast provisional ballots because of the ID requirement

STAN STANART - June 17, 2014

1   would be unqualified to vote, or otherwise ineligible to

2   vote were it not for the photo requirement?  Do you have

3   any such information?

4        A.    No, I don't think there's any way to come to

5   that conclusion.  We went to great lengths to help the

6   voters deal with the cure process.  The tax office is,

7   you know, two floors -- two floors below us.

8             And we actually brought in DPS to do the

9   cure here in my offices, too.  So we had a one-stop shop

10  for the voters.

11            So they -- you know, I just don't see

12  where there's any evidence that those that didn't come

13  cure didn't have IDs, because there wasn't any close

14  races.

15            If there had been close races, you might

16  have drug some more people to say, "Hey, my vote would

17  make a difference."  But when you have things so largely

18  different, I suspect most of the people stayed home

19  because it doesn't matter.

20       Q.    What's your -- what's your perception as to

21  whether any of those ballots, those provisional ballots,

22  were cast by individuals who were not qualified to vote?

23            Do you have reason that any of those

24  individuals were, let's say, felons, or in any way

25  undocumented, or do you have any reason to suspect that?

STAN STANART - June 17, 2014

1       A.    Well, of the 105, six of them were not even

2   registered.  So that -- there's one reason why they

3   wouldn't even be qualified anyway, regardless of having

4   an ID issue or not.

5             The others, I'm not sure there's been an

6   analysis.  And if there has, I don't believe I've been

7   shown that information.

8       Q.    Did your office have any interest in

9   investigating whether any of those individuals were, in

10  fact, eligible to vote?

11      A.    I mean, it seems like that's more of a voter

12  registration issue.  But remember, everyone that did

13  not -- that did not -- whose ballot we did not count, we

14  sent them a letter telling them why it was not counted.

15            So if it was for an ID issue, you know,

16  then they were noted that they need to go get an ID,

17  whether that be an EIC, or a personal ID, or a driver's

18  license, or bring one of the other acceptable forms of

19  IDs to vote.

20      Q.    Okay.  Now, you mentioned that there were, I

21  believe -- was it four DPS offices in Harris County?

22  Did I get that right?

23      A.    No.  There's 12 permanent and four what we

24  call mobile.

25      Q.    I see.

STAN STANART - June 17, 2014

1          A.    Or temporary ones that was provided for the --
2    to support the November election.
3          Q.    Do you have any sense as to whether any of
4    those offices are accessible to public transport, and
5    which of those offices are accessible to public
6    transport?
7          A.    I don't know positive, but I'm certain that
8    they probably all do.   But off the top of my head, three
9    of them.   And I would suspect the fourth one does
10   because you basically -- other than that church, they're
11   public locations.
12               You know, like community centers, or a
13   college, or another one was a community center, I think,
14   for the city.   They should have.   I mean, there are
15   enough buses around Harris County that go by these
16   general areas that I can't imagine that they don't.   But
17   I don't know for positive.
18        Q.    And you said that when a person's applying for
19   an EIC who doesn't have a birth certificate, you can get
20   a birth certificate from your office; is that right?
21        A.    That's correct.   I mean, my downtown branch or
22   any of my nine satellite offices around the county.
23        Q.    Okay.   And you described -- and I don't think
24   I fully understand which circumstances of the cost being
25   defrayed.   Are you aware of the circumstances that that

STAN STANART - June 17, 2014

1    want a birth certificate because I need one to get my

2    EIC"?

3                      What would a person -- what would the

4    policy be in terms of how that person is charged?

5          A.    They were told that the state is waiving its

6    fee.  And, to the best of my knowledge, they are

7    probably told it's an additional $2 fee.  And if they

8    made an issue of that, we would waive that, and I would

9    personally pay it.

10         Q.    So it's your understanding that in every

11   instance whenever an individual has mentioned that he's

12   getting an EIC and needs a birth certificate, that your

13   office has defrayed the cost?

14         A.    The state, I think, waives their portion of

15   it, all except for $2.  But there's been very, very few

16   EICs issued in Harris County, it's my understanding.

17   Maybe a couple dozen or so.

18                      I mean, it's not very many.  So it's not

19   really -- this is not what you call an everyday issue,

20   by any means, in my office.

21         Q.    Okay.  And the individuals who work in your

22   office who are providing these birth certificates, have

23   they been trained on this policy?  And when?

24         A.    Well, the people that are in charge, they are

25   aware of it.  And this, I mean, this happened back

STAN STANART - June 17, 2014

```
1          A.    No.

2          Q.    Would that be a concern to you if they were?

3          A.    I'd have to look at the circumstances why and

4    what they're doing there.  But it depends on the

5    circumstances.  We've got some -- one, a criminal,

6    No. 1, is nice to know, he's there.

7          Q.    Almost done.  You had explained the disability

8    exemption previously, but I didn't quite follow that

9    explanation.  What documents -- well, let me back up.

10               What needs to be presented in order to

11   qualify for that exemption?

12         A.    Well, you actually -- believe it or not, you

13   deal with the voter registrar with this issue.  They're

14   the ones who deal with this.

15               It might actually be more appropriate

16   that you ask them this afternoon.  I mean, I just don't

17   know the details.  They do.

18         Q.    So you don't know the detail of the process by

19   which voters obtain a disability exemption?

20         A.    No, because it's voter registration and they

21   administer that end of the process.

22         Q.    And do you maintain the records of who gets

23   it?

24         A.    Yes.  It gets flagged in our system, so that

25   we do know that.  We print it in the poll books so that
```

STAN STANART - June 17, 2014

1    our election workers know that they have been -- they

2    got a disability waiver on the photo ID issue, but

3    that's the extent of our training.   The actual how it's

4    done is actually done through voter registration.

5         Q.    Okay.   And I think you had mentioned that

6    there were very few waivers up to this point.

7         A.    To the best of my knowledge, it's very few,

8    yes.

9         Q.    Do you have a number, or can you provide us

10   with a number?

11        A.    I don't have a number, but I'm sure we can get

12   a number.

13              MR. SHAPIRO:   Thank you.   I think that's

14   all I have.   Thank you.

15              THE WITNESS:   You're welcome.

16                      EXAMINATION

17   BY MR. SCOTT:

18        Q.    Mr. Stanart, my name is John Scott.   I

19   represent the defendants in the case.

20        A.    All right.

21        Q.    If, for any reason, during my questions you

22   don't understand one of them, please let me know, and

23   we'll reask it until we get on the same wavelength.   All

24   right?

25        A.    All right.

STAN STANART - June 17, 2014

1     Q.    All right.   What's the most populus county in

2  the State of Texas?

3     A.    Harris County.

4     Q.    Okay.   How many, approximately, registered

5  voters are in Harris County, as we sit here today?

6     A.    We're real close to two million.

7     Q.    And to your knowledge, over the past three

8  major elections that have been conducted in Harris

9  County using voter ID, how many people have been

10  prevented from voting as a result of not having proper

11  ID?

12     A.    It's a small number.   It's what, 150

13  approximately -- what's that number I just read out?

14  Yes.

15               MR. RAY:   Listen to the question.

16     Q.    (By Mr. Scott)   And of those, let's break it

17  back down by the election.   We know in the primary

18  elections which were held back in March of this year,

19  the Republican primary, there were approximately 25

20  people who presented without proper ID and were asked to

21  cast a provisional ballot; correct?

22     A.    That is correct, yes.

23     Q.    And of those, at least none of those people --

24  I'm sorry, four of those people came back and provided

25  adequate identification.

STAN STANART - June 17, 2014

1       A.     Yes.

2       Q.     And those four ballots were then counted; is

3  that correct?

4       A.     Correct.

5       Q.     The other 21 were not?

6       A.     Correct.

7       Q.     Okay.  On the Democratic side of the primary,

8  there were ten ballots cast --

9       A.     Yes.

10      Q.     -- provisionally, because they did not present

11  proper photo ID.

12      A.     Right.

13      Q.     One of those people came back and presented

14  proper photo ID, and that ballot was, in fact, counted?

15      A.     Correct.

16      Q.     Then back in November of 2013, I think you

17  said there was 105 provisional ballots that were cast

18  because the person did not have proper photo ID.

19      A.     Right.

20      Q.     Of those, six of them did not have -- were not

21  even registered to vote.

22      A.     Correct.

23      Q.     And then when y'all did a data research, or a

24  further analysis, you found that about two-thirds, or 66

25  of the remaining 99 people actually did, in fact, have

STAN STANART - June 17, 2014

1    photo ID through the Department of Public Service.

2         A.    Yes.   And eight of them actually came in and

3    cured.

4         Q.    Okay.   So eight out of that 99 actually came

5    and cured and their ballots were, in fact, counted?

6         A.    Correct.

7         Q.    Had the other, I guess, 90 -- I'm sorry,

8    60 -- what is that?  So 58 people come forward and

9    brought their IDs that they, in fact, had from the

10   Department of Public Service, and done it within the

11   six-day cure period --

12        A.    Yes.

13        Q.    -- would your county have counted those

14   ballots?

15        A.    Well, yes.   Yes.

16        Q.    Okay.

17        A.    And more of them potentially have IDs.  I'm

18   just saying those are the ones I could hard match.

19        Q.    So have you -- do you still have the ability

20   to capture and turn over the identification of those 105

21   people from the November election --

22        A.    Yes.

23        Q.    -- that cast the provisional ballots?

24        A.    Yes.

25

STAN STANART - June 17, 2014

1        A.    To best of my knowledge, yes.

2        Q.    Your department has done an enormous amount of

3   outreach to the community --

4        A.    Yes.

5        Q.    -- to let the folks know out in Harris County,

6   the voters, what they needed to do for an election as a

7   result of S.B. 14, and generally, just to advertise

8   elections; correct?

9        A.    Yes.   But we did a lot of extra effort on

10  photo ID.

11       Q.    And tried to make sure that accurate

12  information was put out there to the neighbors.

13       A.    Correct, yes.

14       Q.    Are you aware of any politicians who have put

15  out information that was -- you would been able to

16  determine was not correct, or misinformation about photo

17  ID, voter ID, or similar names?

18       A.    I think we've seen some information to that

19  effect, yes.

20       Q.    Tell me what you've seen.

21       A.    I mean, I don't have a document in front of

22  me, but there were people soliciting for information --

23  have we got examples of that?

24             MS. ASTON:   I can't remember.

25       A.    I think we've seen some information that we

STAN STANART - June 17, 2014

1   gotten captured.

2        Q.    Now, early on in your deposition, Mr. Dunn

3   asked you to identify whether you were Caucasian or not.

4        A.    Yes, sir.

5        Q.    Is that -- does your race play any role in the

6   ability of you to do your job?

7        A.    Not at all.

8        Q.    Okay.  And does it play any role in the

9   decisions you make as the chief election officer for

10  Harris County?

11       A.    Not at all.

12       Q.    Has it at any time during the time you've been

13  the chief election officer?

14       A.    No way.

15       Q.    Approximately how long have you been dealing

16  with elections, including your time as the chief

17  election officer, election judge, election clerk, and as

18  a precinct chair, total number of years?

19       A.    About nine years.

20       Q.    Elections in Texas are implemented at the

21  county level; is that correct?

22       A.    Correct.

23       Q.    Would you go back through a little bit of the

24  training that you provide as the chief election officer

25  for Harris County to the election judges, and then for

STAN STANART - June 17, 2014

1    their election clerks before elections, such as the one

2    back in November of 2014 -- I mean, 2013, I'm sorry?

3         A.    We did extensive training for everyone.

4    No. 1, we let them all know that, you know, photo ID is

5    here, and you have to get special training, so make sure

6    you participate in the training.

7                    Every judge and every alternate judge was

8    required to get the election law training, and it

9    specifically dealt with photo ID.  Also every polling

10   place was supposed to have trained people that could

11   operate the equipment.

12                   And we supplemented photo ID training in

13   that training as well.  Every clerk, you know, was

14   provided on election day at their polling locations

15   supplemental information about photo ID, which they had

16   to sign acknowledging that they had read and obtained

17   the material.

18                   We had on our Web site photo ID training.

19   We did, with the county attorney's office, a phone call

20   before the elections with our election judges giving

21   them the opportunity to ask any questions about

22   implementation of photo ID, and any laws, any legal

23   issues, questions they had, implementation issues.

24                   Like I said, our Web site had the

25   extensive training.  We just -- we went as much as

STAN STANART - June 17, 2014

1  possible to make sure that that our clerks knew how to

2  implement all the laws associated with S.B. 14.

3                 Also, we worked hard to get the word out

4  that our voters would know how to deal with photo ID

5  when they showed up at the polls.

6      Q.   We have an election coming up in November of

7  2014.

8      A.   Correct.

9      Q.   Will your office undertake to do the same

10  steps that you did back in 2013 --

11      A.   Yes.

12      Q.   -- again, for this November 2014 election?

13      A.   Correct.  We will actually -- we are already

14  talked about doing billboards again, talking to our

15  billboard -- Clear Channel again.

16                 We were already going to plan on doing

17  the letters again to anybody who we couldn't do a hard

18  match to, we will send a letter saying -- letting them

19  know they must have photo ID.  Not that they don't

20  already have an ID, but we can't do a hard match on

21  those people.

22      Q.   Do y'all ever try and estimate all the hours

23  that are extended on the training and education that are

24  put forth in preparing for an election like 2014, that's

25  coming up or the one that was performed back in November

STAN STANART - June 17, 2014

1  of 2013?

2       A.   Well, it's a big deal, I mean, the amount of

3  hours it takes.  I mean, I have -- we have -- running

4  elections, I think I have about 35 full-time employees,

5  but then I have 500 temporary employees.

6            And then, of course, on election day, we

7  might have 5,000 or more people who actually work at the

8  polls, or assist in the elections somewhere or another

9  in Harris County.  So we have a big budget.

10      Q.   And every one of those individuals is expected

11 to be trained, properly trained and educated on what the

12 current law is at the time of the election; is that

13 correct?

14      A.   To the best of our ability.  We're not

15 perfect.  We try to get as close as we can.

16      Q.   Now, part of that -- I mean, part of the

17 election doesn't just start on whenever election day is

18 in November; right?

19      A.   No way.

20      Q.   In fact, y'all will begin mailing ballots out

21 for the 2014 November election on September 5th of 2014;

22 correct?

23      A.   That sounds about right, 45 days before the

24 election, yes.

25      Q.   And that will include -- starting that day

STAN STANART - June 17, 2014

1  will start a number of different deadlines and for
2  requesting of ballots.
3       A.   Oh, yeah.
4       Q.   Some of which will include the requirement of
5  photo ID with those ballots for the people that are
6  casting those ballots; correct?
7       A.   People casting personally.  Ballot by mail
8  does not require a photo ID, yes.
9       Q.   Well, it's my understanding that there are
10 some ballots that will require photo ID, that are
11 mail-in.
12      A.   Well, that was there beforehand, you had to
13 provide proof of ID for the first-time voter, yes, yes.
14      Q.   Okay.
15      A.   They had to make a xeroxed copy.
16      Q.   For instance, a military or overseas ballot
17 that's a first-time voter, those folks will need to send
18 in a copy of their ID with their ballot; correct?
19      A.   Yes.
20      Q.   And those ballots will go out September 20th
21 to the military and overseas ballots; is that correct,
22 does that sound about right?
23      A.   It's 45 days before.
24      Q.   Got it.  The information you've received --
25 earlier you testified that you take direction from the

STAN STANART - June 17, 2014

1    secretary of state for the implementation of Senate

2    Bill 14.

3        A.    Correct.

4        Q.    Did you find that that information was

5    correct, that you were provided from the secretary of

6    state?

7        A.    Yeah, they do a good job.

8        Q.    On the no-match list that you developed, I

9    think you said it was approximately 90,000 people that

10   you came up with early on that were soft matches or no

11   matches.

12       A.    Remember, it's more than that because we take

13   out the people who, you know, voter registration cards

14   have been returned.

15       Q.    Yes.

16       A.    So we didn't mail to those people because they

17   don't live there.  It's just going to get returned, so,

18   yes.

19       Q.    And how do you know when a person's

20   registration is mailed back to you?  They are placed in

21   a suspense file; correct, or y'all are supposed to?

22       A.    Yeah.

23       Q.    If you receive a voter registration back, it

24   is supposed to be placed -- the voter is supposed to

25   place into suspense; correct?

STAN STANART - June 17, 2014

1    put in that status.

2                Okay.  They are going to still be in that

3    status until the next time the voter registrar sends

4    them a card, then it will probably get returned.  And

5    then that's when they will be put on the suspense.

6         Q.   Was that list of approximately 91,000 voters

7    that were sent those letter, was that part of the

8    materials that were turned over?

9         A.   Yes.  You got copies of letters, and it was

10   updated again for the primaries.

11        Q.   Okay.

12        A.   Just basically, the dates that were changed.

13        Q.   Did the number stay about the same, 91,000?

14        A.   No, we didn't re-mail again.  We only mailed

15   them once.  We only mailed the new people that had

16   gotten registered since then that no longer matched.

17                If they had gotten a letter the first

18   time, we didn't send another letter the second time.  We

19   didn't think it was prudent to use the taxpayers' money

20   the second time.

21        Q.   Now, you mentioned that the State of Texas or

22   the secretary of state's office offered to help on this

23   process that y'all undertook regarding the no matches or

24   the soft matches.

25        A.   I don't know how much --

STAN STANART - June 17, 2014

1      Q.    It's a job you took on your own?

2      A.    We pretty much took it on our own, but we let

3   them know what we were doing.

4      Q.    But the state did reach out to you originally?

5           MR. DUNN:   Objection; form.

6      Q.    (By Mr. Scott)  Is that correct?  Maybe not.

7      A.    I don't know.  I forget how much.  There was

8   probably some discussion about how we could do things,

9   and I think we came up with this in -- our idea.

10          But it's not like they didn't reach out

11   to us, but at the same time, I don't remember

12   specifically on this issue.

13     Q.    How long were you a software engineer?

14     A.    A long time.

15     Q.    How many years?

16     A.    I don't know.  25 years.  I mean, I'm 58.  I

17   came out of college, you know, at 22, working as a

18   hardware software engineer.  I mean --

19     Q.    So coming up with a software program that

20   would identify no matches, soft matches is something

21   you -- is just another software engineering problem that

22   was there to be solved by you?

23     A.    Yes.  Yeah.  It's a problem to solve that

24   engineers do, yes.

25     Q.    I think Mr. Dunn was asking you about this

STAN STANART - June 17, 2014

1  people vote provisionally, and I don't know if it was in

2  this election, where they were letting people vote, when

3  they were not registered to vote.

4           In other words, not where their polling

5  place was for that election day.  We had a judge let

6  people vote from other precincts, like it was their

7  early voting.  I do know we had that, so we had a lot of

8  provisionals go on.

9      Q.   So let me make sure I understand that.  So

10 there was a -- one of the elections, one of the four

11 elections --

12     A.   I don't know if it was one of those four, I

13 don't recall which election it was.  Maybe I'm adding

14 confusion by bringing this up.

15     Q.   No, no, I want to make sure I understand for

16 this issue.

17     A.   Yeah.

18     Q.   There was an election, which one we don't

19 know.

20     A.   Right.

21     Q.   But during that election, there were a high

22 number of provisional ballots that were cast, or allowed

23 to be cast --

24     A.   Yes.

25     Q.   -- in one of -- one of the polling places --

ADVANTAGE REPORTING SERVICE - 281.376.9303

STAN STANART - June 17, 2014

1      A.     Yes.

2      Q.     -- as a result of the decision by the election

3   judge.

4      A.     Yes, not following the law.

5      Q.     That they would allow provisional ballots to

6   be cast at that precinct, or that polling place, even

7   though it was the wrong polling place for the voter to

8   cast their vote?

9      A.     Correct.

10      Q.     Is that a correct summary?

11      A.     Yes, but that's not a photo ID issue.

12      Q.     But from a practical standpoint, that is an

13   issue with regard to the number of provisional ballots.

14      A.     Yes.

15      Q.     And would also be a reason that you would have

16   to really dig down deep and understand what's going on

17   with any of the provisional ballots to say, "This is an

18   issue with provisional ballots"; correct?

19      A.     Exactly.  Every one of them has its own issue.

20   Every provisional ballot you've got to go and look at

21   what really is going on here to understand what the

22   issue is.

23      Q.     In the November 2013 election -- just one more

24   follow-up on that, if I could.  With regard to the

25   two-thirds of the individuals who had photo ID but

STAN STANART - June 17, 2014

 1   appeared at the polling place without photo ID and were
 2   allowed to cast provisional ballots.
 3        A.    That's how many, in hindsight, that we looked
 4   at we matched against the voter -- I mean, the DPS ID,
 5   database to say that they did have IDs, yes.
 6        Q.    Did you do any further follow-up on any of
 7   those folks that y'all identified?
 8        A.    Other than the fact that everyone whose ballot
 9   was not counted because of ID issues, they got a letter.
10   As a result of that, no, there was no follow-up on that.
11   At least I don't know of any.
12        Q.    With regard to documents that your office
13   produced in response to the subpoena that the Department
14   of Justice, I guess, served upon y'all --
15        A.    Yes.
16        Q.    I don't know if they courtesy copied anyone
17   else with that.  And so do you have the ability to
18   recreate or get a copy of all those documents that were
19   produced to the Department of Justice?
20        A.    I believe so, yes.
21        Q.    Okay.
22        A.    It's a very similar list.  It's like the same
23   list was shared between the two parties.
24        Q.    Okay.
25        A.    So it's very similar, if I remember right.

STAN STANART - June 17, 2014

1  identification or photo impersonation fraud, but photo

2  fraud in general, do you believe it's helped to tamp

3  that down?

4        A.   I think the one thing I've seen back from the

5  voters is higher confidence in the election process

6  because we do have photo IDs.

7              Yeah.  Whether -- how much it does tamp

8  down fraud, which I would suspect it does to some

9  degree, I don't think that's the big issue.  I think

10 it's the confidence that it gives to the voters as a

11 whole body in the whole process is more secure because

12 of accepting photo ID.

13       Q.   Have you seen voter participation in Harris

14 County increase, decrease, or stay about the same as a

15 percentage of prior elections before voter ID?

16       A.   Actually, last November it increased it.

17 Well, you don't know if it increased it, but there was a

18 significant increase last November over the previous

19 two-year cycles in Harris County.

20       Q.   Percentage-wise, how big of an increase?

21       A.   I wish I had the number in front of me, I'd

22 tell you.

23       Q.   Okay.

24       A.   But it was significant.  And in the primaries,

25 other than the last primary, the turnout was much higher

STAN STANART - June 17, 2014

1   for the Republican party anyway, going back.  Other than

2   the previous one, like I said, when Ted Cruz was in it.

3   We were probably, oh, 50, 60 percent higher than the

4   previous two cycles before that.

5        Q.   And the Republican primary had 25, I think,

6   provisional ballots cast; is that correct?

7        A.   Yes.

8        Q.   As a result of no photo ID?

9        A.   Yes, they had two-and-a-half times the number

10  of provisional ballots because of ID issues that the

11  Democratic party did.

12       Q.   Would they probably have had about

13  two-and-a-half times the turnout?

14       A.   Yes, it was very similar.  It hits both

15  parties, apparently.

16       Q.   You've got a lot of different polling places

17  with a lot of different judges, and so I'm assuming, but

18  I want your answer, that there are more efficient judges

19  who operate the polling places.

20       A.   Yes.  There are some better than others, yes.

21       Q.   And with regard to the delays that someone

22  might -- a voter might encounter at a polling place.

23       A.   Yes.

24       Q.   Absent having a camera in there, is there any

25  way to know what the cause of those delays are?

STAN STANART - June 17, 2014

1        A.    Some election judges will tell us what it is.

2    I mean, or an alternate judge will tell us, but I don't

3    see where the photo ID actually added any delay.

4              In fact, we have -- we find that in early

5    voting where we've been doing the electronic poll books,

6    the majority of the people were already using driver's

7    license as a check-in process.

8              And we find it's a faster check-in

9    process as a result of just swiping their ID than it is

10   to actually sit there and either manually look it up, or

11   the old days of paper, you would have the whole county

12   there, you would take forever to go find the book that

13   has the two millionth name in it or something.

14       Q.    Now, earlier, you testified that the birth

15   certificate is issued by the vital statistics portion of

16   your office.

17       A.    Yeah.  Personal records I think is what it's

18   actually called.

19       Q.    Okay.  So someone can come to the downtown

20   location, or I think you said you had nine satellite

21   areas.

22       A.    Yes, yes.

23       Q.    And in all those locations, an individual who

24   wanted a birth certificate for purposes of obtaining an

25   election ID card --

STAN STANART - June 17, 2014

1      A.    Yes.

2      Q.    -- would have to fill out a specific form for

3  that type of birth certificate, is my understanding; is

4  that correct?

5      A.    You know, I don't really know, but it makes

6  sense it probably is still.

7      Q.    Okay.  Do y'all have a triage person at

8  y'all's locations that when someone comes in, they

9  direct them on where they need to go, or do they just

10 get in line in the que, and when they get up there, they

11 ask?

12     A.    Well, the downtown location is fairly large,

13 okay?  But the branches, a lot of the branches only have

14 two or three clerks in them, so they do basically

15 everything.

16     Q.    Do you track time when someone walks into the

17 office, for instance, in any of the satellite offices,

18 before they receive service?

19     A.    No, I don't think so.  Whether it's a busy

20 location or not a busy location, they know how to deal

21 with it out there.

22     Q.    And if you hear of a complaint about waits,

23 you, as the head election official, or the head of the

24 -- Harris County clerk, you will implement steps to fix

25 that; correct?

STAN STANART - June 17, 2014

1        A.    Oh, yes, most definitely, yes.

2        Q.    Customer service?

3        A.    Customer service.  Yeah, hey, I'm on the

4   ballot, I want these people happy.

5                MR. SCOTT:  Okay.  I thank you for your

6   you courtesy.  Pass the witness.

7                THE WITNESS:  You're welcome.

8                     FURTHER EXAMINATION

9   BY MR. DUNN:

10        Q.    Mr. Scott asked you about the effect of

11   S.B. 14, and you stated the opinion it had the effect of

12   buoying voter confidence, or something to that effect;

13   is that right?

14        A.    Yes.

15        Q.    So is it the case then, in your experience, in

16   election judges, that you've noticed that voter

17   confidence has been on the decline?

18        A.    I don't know if I could say "yes" or "no" to

19   that question.  It's not something I looked at.  I've

20   just gotten feedback from multiple people that, "I have

21   more confidence in the system as a result of having

22   photo ID."

23        Q.    Did you have -- when you would hear that back

24   from people, would you have conversation with them about

25   how it is that their confidence got questioned to begin

STAN STANART - June 17, 2014

```
 1  with?
 2      A.    No, I didn't have that discussion.
 3      Q.    Okay.  You're aware that the attorney
 4  general's office went around for several years, in both
 5  public events and private investigations, spending a
 6  great deal of tax dollars looking for voter fraud?  Are
 7  you familiar with this investigation?
 8               MR. SCOTT:  Objection; form.
 9      A.    No, not really, no.
10      Q.    (By Mr. Dunn)  You have no idea that the
11  attorney general himself, for example, was doing media
12  events talking about rampant voter fraud that he was
13  doing that he was investigating or attempting to
14  discover?
15               MR. SCOTT:  Objection; form.
16      A.    No.
17               MR. DUNN:  Nothing further.  Thank you,
18  sir.
19               MR. RAY:  Mr. Shapiro, have you got
20  anything?
21               MR. SHAPIRO:  Nothing further.  Thank
22  you.
23               MR. RAY:  Okay.  I guess we're done.
24
25
```

```
                                                               1

              IN THE UNITED STATES DISTRICT COURT
               FOR THE SOUTHERN DISTRICT OF TEXAS
                    CORPUS CHRISTI DIVISION


MARC VEASEY, et al.,              )
          Plaintiffs,             )
                                  )
v.                                ) Civil Action
                                  ) No. 2:13-cv-193(NGR)
RICK PERRY, et al.,               )
          Defendants.             )
——————————————————————————————    )
                                  )
UNITED STATES OF AMERICA,         )
          Plaintiff,              )
                                  )
TEXAS LEAGUE OF YOUNG             )
VOTERS EDUCATION FUND,            )
et al.,                           )
          Plaintiff-              )
          Intervenors,            )
                                  ) Civil Action
TEXAS ASSOCIATION OF              ) No. 2:13-cv-263(NGR)
HISPANIC COUNTY JUDGES AND        )
COUNTY COMMISSIONERS,             )
et al.,                           )
          Plaintiff-              )
          Intervenors,            )
                                  )
v.                                )
                                  )
STATE OF TEXAS, et al.,           )
          Defendants.             )
——————————————————————————————    )


                 ORAL DEPOSITION OF
                     JOE STRAUS
                   JUNE 23, 2014


                 HIGHLY CONFIDENTIAL

     ORAL DEPOSITION OF JOE STRAUS, produced as a
witness at the instance of the Plaintiff United States
```

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

15

1  judiciary and civil -- or what was it called then?

2  Civil juris prudence -- judiciary and civil juris

3  prudence, I think.

4           And then later I served on pensions and

5  investments and a committee we no longer have called

6  regulated industries.  Maybe I've got the order mixed

7  up, but I remember those comments.

8       Q.  Was there a particular area of policy that you

9  developed an expertise in or spent a great deal of time

10 on?

11      A.  Some from the regulated industries committee

12 having to do with -- with energy efficiency and some --

13 eliminating obsolete tax.

14      Q.  So it sounds like --

15      A.  Telecommunications.

16      Q.  And I'm not trying to undermine your experience

17 at all, but it doesn't sound like election-related

18 issues with something that you really spent a lot of

19 time on.

20      A.  No.

21      Q.  Is that true?

22      A.  That's right.

23      Q.  Okay.  Now, you ran in the special course in

24 2005 and then in each even-numbered-year election since,

25 I'd assume?

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

16

1        A.   Yes.

2        Q.   In any of your campaigns have you encountered

3   experience of voter fraud?

4        A.   Not that I'm aware of, no.

5        Q.   Other than the open campaign that you had in

6   2005, have you had other reelections that you would

7   consider were tightly contested?

8        A.   Tightly?

9        Q.   Yes, sir.

10       A.   Strenuously.

11       Q.   Okay.  What years were those?

12       A.   The last two primaries.

13       Q.   That's in 2012 and '14?

14       A.   That's correct.

15       Q.   Do you have a regular set of campaign

16  consultants, campaign managers or somebody that advises

17  you in that regard?

18       A.   I've had different campaign managers each

19  cycle.

20       Q.   Okay.  So it's not the case that you have sort

21  of a standard team that you've relied upon?

22       A.   For campaign -- you know, not on the ground in

23  the district campaign, no.

24       Q.   So returning to your legislative work, have you

25  publicly called for a tightening of any requirements as

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                            17

1  it comes to elections?

2      A.   I don't recall.

3      Q.   Okay.  And I understand, you know, everybody

4  gives a lot of --

5      A.   Yeah, not in a great -- not in a great deal of

6  specificity, no.

7      Q.   That wasn't sort of a pet issue of yours is

8  really what I'm getting at.

9      A.   That's correct.

10     Q.   Okay.  When is it that you first, if you ever

11 did, really get into a proposal in the legislature as it

12 pertains to photo identification for voting?

13     A.   Did I get into it?

14     Q.   Yeah, study the issue, read a bill, look at it.

15          MR. D'ANDREA:   The witness is going to

16 assert legislative privilege, but we -- I'm going to

17 allow him to answer under seal with the understanding

18 that we'll preserve the privilege.

19          MR. SCOTT:   And Chad --

20          Mr. Speaker, before you answer --

21          Chad, this brings up an issue that came up

22 in the last deposition, how we handled the housekeeping

23 of the actual deposition.

24          What we agreed to in the last deposition

25 was to go ahead and put -- keep -- treat the whole

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

19

1      Q.  (BY MR. DUNN)  All right.  So according to my

2  investigation, there have been identification

3  requirements for voting, you know, for some time,

4  decades, of course, you might imagine.  And I don't want

5  to try to sit here and quiz you and waste your time

6  today, but do you have some general description of what

7  the identification requirements were before Senate Bill

8  14?

9      A.  I don't recall specifically what they were.

10     Q.  And that's fair.  When you don't know

11  something, then, you know, obviously, just let us know

12  that.

13          Do you understand what IDs are permitted

14  under Senate Bill 14?

15     A.  Oh, gosh.  I don't recall anymore.  It's been a

16  while since I've paid any attention to it.  I know that

17  I take my driver's license with me and my voter

18  registration card.

19     Q.  Okay.  I think this is fairly clear for the

20  record, but I just want to put a fine point on it.

21  Prior to your election of speaker, did you carry any

22  bills that adjusted the photo -- or the identification

23  requirements for voting?

24     A.  No, I did not.

25     Q.  Can you recall if you sponsored or cosponsored

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

20

1  any?

2       A.  I don't recall.  I know that various bills came

3  up in sessions before I served as speaker, and I'm sure

4  I voted on them, but I don't remember whether I signed

5  onto them or not.  I could have.

6       Q.  None of them particularly come to mind?

7       A.  No.

8       Q.  So in 2011, the legislature passed Senate Bill

9  14, which I'm sure you gathered from the title, started

10 over in the Senate.  First I want to understand if you

11 recall what committee that was assigned to in the House.

12      A.  I believe we had a select committee for

13 voter -- voting -- voter identification and voter

14 security related bills.

15      Q.  And what is your authority as speaker of the

16 House as it pertains to committees?

17      A.  Well, I -- the speaker makes appointments to

18 committees and appoints chairmen.  Some of the

19 committee -- some of the committee slots are filled,

20 roughly half of them, I think, by seniority.  And then

21 others are at the discretion of the speaker.

22      Q.  What about the existence of the committee at

23 all, I mean, whether it's necessary --

24      A.  The House makes that decision, but the speaker

25 has recommendations he makes.

22

1  begins before the legislature convenes?

2      A.  There are members who get together and discuss

3  proposed rules changes and talk about how rules are

4  working, yes.

5      Q.  And then once the session is underway, a draft

6  set of rules, I assume, comes out for members to review?

7      A.  I assume so.  I don't recall.

8      Q.  So do you recall where it is the idea

9  originated to -- in 2011 to have a select committee as

10  it pertains to voter identification requirements?

11          MR. D'ANDREA:  I'm going to assert

12  privilege and allow the witness to answer under seal.

13      A.  I don't remember how it came up.  I knew --

14  everyone knew that voter security and voter

15  identification legislation was likely to be a very hot

16  topic for the legislature to consider just in -- just

17  based on discussion leading up to the session.  I don't

18  recall specifically how the decision was made to create

19  a committee for voter security and voter ID bills.

20      Q.  (BY MR. DUNN)  Was this an idea of yours to

21  create this committee?

22      A.  I don't -- I don't recall.

23      Q.  Was it -- was the idea to appoint this

24  committee something that was coming from members?

25      A.  Again, I really don't remember.

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                        24

1        You may answer under seal.

2     A.  No, I don't.

3     Q.  (BY MR. DUNN)  If this committee had not been

4  created in 2011, then what committees in the House would

5  normally have seen legislation relating to voter

6  identification?

7     A.  I assume the -- the elections committee

8  could -- some could, I suppose, go to state affairs

9  committee.  I'm not sure of others.

10     Q.  And so just before I move on, to make sure I've

11  got all this, is there anything else that you remember

12  about the creation of the special committee in 2011 that

13  handled Senate Bill 14 that we haven't talked about?

14     A.  No.

15     Q.  Was the special committee in 2011 that handled

16  Senate Bill 14 created because similar pieces of

17  legislation and past legislative cycles had been held up

18  in either the elections or state affairs committee?

19          MR. D'ANDREA:  Legislative privilege.

20          You may answer under seal.

21     A.  I don't recall that -- I don't recall the

22  process of -- or the timelines of certain bills in the

23  past, so I can't say that that's the reason.

24     Q.  (BY MR. DUNN)  So as you sit here today, is it

25  then the case that you can't tell us why there was a

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

25

1  special committee in 2011 for identification --

2       A.  Other than from time to time we -- we create

3  select committees, these types of special committees,

4  just to -- just to move a particular issue off to the

5  side so that the normal operating committee -- like the

6  elections committee in this case, probably -- would --

7  would go about dealing with the other type of issues

8  that they -- other bills that they have without being

9  distracted by something that everyone knew would be a

10 high-profile, much-debated issue.

11      Q.  Do you recall whether senior members of the

12 elections committee had, prior to 2011, either opposed

13 or otherwise wanted to loosen some of the requirements

14 and proposed photo identification bills?

15      A.  I can't remember who -- who served on the

16 previous committees.

17      Q.  Now, again, I'm sure something that is

18 elementary to you, but could you just kind of walk us

19 through, walk the court through, when a bill comes from

20 the Senate over to the House, how it's processed by the

21 House?

22           Again, sort of tracking when there's a

23 special-committee-type situation.  So what happens as

24 far as when the bill comes over from the Senate?  Comes

25 to you, I assume.

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                        26

1        A.  Well, it comes to the House.  And it's -- it's

2   referred.  It goes through the referral process that all

3   bills go through.

4        Q.  And what is the referral process?

5        A.  It would be referred to a committee.

6        Q.  And who makes that decision?

7        A.  You know, typically it's the -- the

8   parliamentarian's office.

9        Q.  Do you have input or influence in that process?

10       A.  From time to time, I might be consulted about

11  certain referrals, but I try not to be too engaged in

12  that.

13       Q.  Are there times when you've gone to the

14  parliamentarian and said, "I want this bill to go to

15  that committee"?

16       A.  I think all members talk to the parliamentarian

17  about that.

18       Q.  Okay.  I would think that the parliamentarian

19  might be a little more responsive to the speaker than

20  other members.  Is that the case?

21       A.  You don't know our parliamentarian.

22       Q.  Okay.  Well, in 2011, who was the

23  parliamentarian?

24       A.  Chris Griesel in '11.

25       Q.  Is that the parliamentarian today?

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

28

1       A.   I would think that's correct.

2       Q.   All right.   Once in committee, what happens?

3       A.   Then the committee chairman decides -- decides

4   whether or not to take up the matter.

5       Q.   Can you recall who the committee chairman was

6   on Senate Bill 14 in 2011?

7       A.   I believe it was Representative Bonnen.

8       Q.   Did you have any discussions with

9   Representative Bonnen about the progress or dealings

10  with Senate Bill 14?

11      A.   Oh --

12                MR. D'ANDREA:   Legislative privilege.

13                You may answer under seal.

14      A.   I imagine I did.   I talk to all the committee

15  chairmen.   But I don't recall specifically.   I'm sure I

16  did.

17      Q.   (BY MR. DUNN)   There's no discussion that you

18  recall with Representative Bonnen as it relates to

19  Senate Bill 14 in 2011.   Is that right?

20      A.   The question again?

21      Q.   I just want to confirm that there's no

22  discussion that you ever had in 2011 with Representative

23  Bonnen pertaining to Senate Bill 14 that you can relate

24  to us.

25      A.   Not in any kind of detail.   I'm sure I did talk

JOE STRAUS                                           6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                         29

1  to him.  But I don't recall a specific conversation with

2  him on the bill, but I'm sure we did talk.

3       Q.  And -- and I can tell you're confused by some

4  of these questions, so let me see if I can -- a lot of

5  times -- all I'm really trying to do is find out what

6  you might testify to in trial in this case.  This is our

7  only chance to visit with you before the case is tried.

8  So --

9       A.  Yeah.

10      Q.  -- if you're going to show up and say, "I met

11 with Representative Bonnen on this day and we talked

12 about the bill," that's all I want to find out.

13      A.  No, I can't -- I can't recall a specific

14 conversation.

15      Q.  Did you propose to Representative Bonnen, or

16 anyone else, a timeline on which the committee ought to

17 deal with the bill or report it out of committee, if at

18 all?

19                  MR. D'ANDREA:  Legislative privilege.

20                  You may answer under seal.

21      A.  Not to my recollection.

22      Q.  (BY MR. DUNN)  Is it fair to describe your

23 involvement with Senate Bill 14 as hands off?

24      A.  Generally.  I mean, I think that would be

25 fairly close to accurate.

                U.S. LEGAL SUPPORT - AUSTIN, TEXAS
                         512-292-4249

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                              30

1        Q.   Did you direct the committee in terms of the

2   type of opportunities they would provide for public

3   input?

4        A.   Did I -- did I do what?

5        Q.   Direct the special committee in terms of how

6   many opportunities for public input.

7        A.   No, I didn't.

8        Q.   Was it fair to say that that was left to

9   Representative Bonnen?

10       A.   Yes.

11       Q.   Well, obviously the legislative record shows

12  that Senate Bill 14 was reported favorably by the

13  committee.  Again, what happens to the bill after that?

14       A.   I suppose it went to the calendars committee.

15       Q.   And do you recall who the chair of the

16  calendars committee was in 2011?

17       A.   I'm trying to remember.  Don't tell him I can't

18  remember.  I think it was -- I think it was -- I think

19  it was Todd Hunter.

20       Q.   That's a pretty plum position, is it not?

21       A.   Yeah.  I'm just trying to get the sessions

22  straight.

23       Q.   No, I understand.

24       A.   I know it was Brian McCall in 2009.  In '11 --

25  I think Hunter's been chairman two sessions.

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

32

 1  to slow a bill down if they'd like, but I'm not sure how

 2  it works specifically or -- I'm not -- I don't know.

 3       Q.  Have you ever contacted, whether it's the chair

 4  or a member of the calendars committee, and asked them

 5  to hold up a bill?

 6            MR. D'ANDREA:  Legislative privilege.

 7            You may answer under seal.

 8       A.  If I have, it's been very rare.

 9       Q.  (BY MR. DUNN)  And have you ever done so on an

10  election-related measure?

11       A.  Not that I recall.

12       Q.  Had you -- well, strike that.

13            Can you recall what part -- you know, at

14  the beginning, middle or towards the end of the 2011

15  session that Senate Bill 14 was considered by the floor?

16       A.  I don't recall.

17       Q.  And can you recall whether you played any role

18  as to the timing of the floor debate?

19       A.  I don't.  I don't believe I did.

20       Q.  And when the bill passed the House, did you

21  vote on it?

22       A.  I've rarely voted as speaker, and I don't -- I

23  don't recall.  I don't think so.

24       Q.  What are the rules or the tradition of the

25  House as it pertains to the speaker voting on a measure?

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                          33

1        A.   You know, I don't know before -- before my

2   tenure.  But since I've been there, I very rarely have

3   voted other than on -- very rare occasions.

4   Typically -- typically I've voted with members who had

5   to make tough calls on budget issues, maybe a couple of

6   other things, but I can't remember what they are at the

7   moment.

8        Q.   But you don't recall voting on Senate Bill 14?

9        A.   I don't remember voting on it.  I don't think I

10  did.

11       Q.   Was there a conference committee on Senate Bill

12  14?

13       A.   I don't remember.

14       Q.   Okay.  So let me just see if I can recap.

15       A.   I would imagine there was, but I don't recall.

16       Q.   You don't recall what the rationale was behind

17  having a special committee on voter identification.  Is

18  that right?

19       A.   Other than just knowing that it was going to be

20  a, you know, high-profile issue that a number of members

21  had worked on previously.  It's not an unusual thing to

22  have select committees for certain types of -- of

23  issues.

24       Q.   You don't recall any particular strategy to the

25  timing of the debate of Senate Bill 14 in the House?

JOE STRAUS                                                  6/23/2014
CONFIDENTIAL TRANSCRIPT

34

1          A.   I don't.

2          Q.   You don't recall having any conversations with

3    members of the elections committee or calendars

4    committee as it pertains to the bill.   Is that right?

5          A.   Not specifically, no.   I'm sure I did, but I

6    don't recall specifically.

7          Q.   You don't remember making any speeches on the

8    floor as it pertains to the bill?

9          A.   Me?

10         Q.   Yes.

11         A.   Oh, no.

12         Q.   Do you recall having any communications with

13   the governor's office as it pertains to Senate Bill 14?

14         A.   I do not.

15         Q.   Do you recall having any communications with

16   the Lieutenant Governor or the Lieutenant Governor's

17   office as it pertains to the Senate bill?

18              MR. D'ANDREA:   Legislative privilege.

19              You may answer under seal.

20         A.   I don't recall specifically.   I'm sure, as a

21   high-profile issue, it must have come up in our routine

22   meetings, but I don't recall a specific conversation.

23         Q.   (BY MR. DUNN)  Do you recall any communications

24   with the attorney general or the attorney general's

25   office?

JOE STRAUS                                        6/23/2014
CONFIDENTIAL TRANSCRIPT

35

1        A.   I don't.

2        Q.   Did you attend any of the select committee --

3   the House select committee meetings as it pertained to

4   Senate Bill 14?

5        A.   I don't think so.

6        Q.   Did you, in 2011, have staff that you assigned

7   to each of the committees?

8        A.   Oh, yes.   A staff's assigned to all the

9   committees.

10        Q.   And do you -- did each staff member have

11   certain committee assignments?

12        A.   Yes.

13        Q.   Do you remember who was assigned the select

14   committee on photo identification, voter fraud?

15        A.   I'm assuming it was Meredith Fowler, who has

16   been on my staff since I began as speaker.   There may

17   have been more than her too, but I would assume that she

18   would have been watching most closely.

19        Q.   Is Ms. Fowler an attorney?

20        A.   Yes.

21        Q.   Does she have election-related experience

22   outside of working for your staff?

23        A.   I don't know.

24        Q.   Did you have any communication with the

25   Secretary of State's office as it pertains to Senate

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                                    36

1   Bill 14?

2        A.   I don't believe I did personally.

3        Q.   Do you -- do you recall having any

4   communications with individual county election officers

5   as it pertains to Senate Bill 14?

6        A.   Don't believe so.  Somebody may have contacted

7   me, but I don't remember.

8        Q.   You may not be able to answer this, and if you

9   can't, that's fine.  But would you have supported Senate

10  Bill 14 by a vote if it had been appropriate, if you had

11  been a House member?

12               MR. D'ANDREA:  Legislate privilege.

13               You may answer under seal.

14       A.   I voted -- I'm sure these types of bills came

15  up before I was speaker in '05 and '07, and I voted for

16  voter -- voter-ID-related legislation.  This one

17  specifically, I'm sure I would have voted for it.

18       Q.   (BY MR. DUNN)  And when you have supported

19  measures on voter identification requirements, what was

20  your rationale for doing so?

21               MR. D'ANDREA:  Legislative privilege.

22               You may answer under seal.

23       A.   Just generally the -- support the policy of

24  voter -- voter security, valid integrity and -- you

25  know, generally I don't . . . you know, I just have -- I

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

37

1  had a record of supporting voter ballot security and

2  voter ID legislation.

3       Q.   (BY MR. DUNN)   There were a number of bills

4  proposed both in 2011 and prior sessions on voter

5  identification requirements.   And some of them could be

6  described as more stringent and some of them could be

7  described as more stringent than the current law but not

8  as stringent as other proposals.   Did you have a line

9  that you drew in terms of supporting such measures?

10      A.   No.

11      Q.   Was it your view that there was no

12 identification requirement too stringent?

13           MR. D'ANDREA:   Legislative privilege.

14           You may answer under seal.

15      A.   Ask the question again.

16      Q.   (BY MR. DUNN)   I'm just trying to determine if

17 there was a line where you said, "Okay, now the

18 identification requirements are too tight, too difficult

19 that I can't support any longer," or was it just any

20 additional requirements?

21      A.   No, as the -- as the presiding officer, I

22 really didn't draw any lines in the sand or take a

23 position on whether a bill was too strong or not strong

24 enough or any of that.   I leave the details of the

25 debate and the amending of legislation up to the

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

38

1   members.

2        Q.   So from your standpoint in 2011, if the House

3   had chosen to pass a photo identification measure,

4   that's fine; if the House had chosen not to pass one,

5   that would have been fine with you?

6        A.   House passes things that don't please me

7   100 percent routinely.  And they fail to pass things

8   that I would love to see happen routinely.  So, no, I'm

9   not really micromanaging bills and legislation to my

10  desires.

11       Q.   What if a measure -- you know, outside of the

12  election-related requirement, what if a measure, in your

13  view, was going to violate federal law?  Would you still

14  permit the House to pass it?

15       A.   I would hope that we would have a long

16  discussion about what we were getting into.  And we try

17  very hard not to do that.

18       Q.   And you have some persuasive ability as a

19  speaker, I would assume, to change --

20       A.   I hope so.

21       Q.   All right.

22       A.   Probably because I don't overuse it.

23       Q.   So have you had an occasion where you thought a

24  measure on any subject might cross purposes with federal

25  law?

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

39

1              MR. D'ANDREA:   Legislate privilege.

2              You may answer under seal.

3      A.   I remember the -- one instance of the -- there

4  was this whole thing with the TSA and invasive pat downs

5  in security -- of security officials at airports that I

6  did try to persuade the House to be very careful about.

7      Q.   (BY MR. DUNN)   As it relates to Senate Bill 14,

8  do you remember receiving or making any analysis of its

9  compliance with federal law?

10     A.   I don't.

11     Q.   Do you recall at any time considering a

12  comparison of other states' ID requirements with Texas?

13     A.   I believe that was done, but I don't recall

14  specifically or that I was involved in it.

15     Q.   Did you request any information, whether from

16  the Secretary of State or some other source, about the

17  folks who might be impacted by Senate Bill 14?

18     A.   I did not.

19     Q.   Is that the sort of thing that you would have

20  expected members to do?

21     A.   Yes.   If that were to be -- if that were

22  appropriate to be done, I would imagine the members

23  working on a particular bill for or against would be

24  requesting that.

25     Q.   You understand that one of the allegations in

41

1  number of people that have been prevented from voting or

2  who were forced to cast a provisional ballot as a result

3  of Senate Bill 14?

4       A.  I believe there's been news coverage of it, but

5  I don't recall specifically beyond just not being

6  alarmed at a large number of those cases.

7       Q.  Outside of the news coverage, you've had no

8  official reporting of this information?

9       A.  Not that I'm aware of.

10      Q.  So returning back, though, to the legislative

11 process, you, as speaker, and other members, I would

12 assume, have the authority to go to state agencies and

13 ask for reports and information on considered measures.

14 Is that right?

15      A.  Yes.

16      Q.  Do you know whether it had ever been requested,

17 on Senate Bill 14, the number of people in the state who

18 lack one of the acceptable forms of ID under Senate Bill

19 14?

20      A.  I don't know.

21      Q.  And then I assume similarly you wouldn't know,

22 then, whether information had been requested from a

23 government source as to the racial makeup of people who

24 didn't posses one of the IDs acceptable under Senate

25 Bill 14?

JOE STRAUS                                      6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                      42

1        A.   I don't know.   Again, I think that might have

2   been covered in some news stories, but I'm not aware of

3   any government reporting or agency reporting.

4        Q.   Is that the type of information, though, as

5   speaker of the House, you would have hoped and expected

6   somebody to obtain and review?

7        A.   Yes.

8        Q.   From your standpoint as speaker, had such

9   information been obtained and had it shown a disparate

10  impact on minority citizens, would that have changed

11  your support for the bill?

12                 MR. D'ANDREA:   Legislative privilege.

13                 You may answer under seal.

14       A.   Ask the question again.

15       Q.   (BY MR. DUNN)   Sure.   You know, from your

16  standpoint as speaker, had you received such data and

17  had such data shown Senate Bill 14 would have a

18  disparate impact on minority citizens, would that have

19  changed your support for the bill?

20       A.   Before we passed it in 2011?

21       Q.   Yes, sir.

22       A.   I would think that the members would have had a

23  discussion about that, yes.

24       Q.   You don't recall being a part of any such

25  discussion?

JOE STRAUS                                           6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                          43

1       A.  I don't.

2       Q.  And we've had some discussion about what data

3  you've received since Senate Bill 14's implementation.

4  I just want to make sure I have it clear.

5       A.  Okay.

6       Q.  You've had no official briefing or debriefing

7  from any government sources to the effect of Senate Bill

8  14; the only information you have is from reading

9  newspapers.  Is that right?

10      A.  As I recall, yes.  I mean, my staff may have,

11  from time to time, mentioned something to me, but no --

12  not any -- no formal meetings or any kind of alarming-

13  type briefing, no.

14      Q.  I'm not asking what was discussed at this

15  point, before Mr. Scott gets too excited.  I just want

16  to know, have you had any briefing with the attorney

17  general's office as it pertains to this lawsuit?

18      A.  Only yesterday, just letting me -- just going

19  over --

20          MR. D'ANDREA:  I'd instruct you not to

21  answer to the extent you divulge attorney/client

22  privilege, but you may talk about the existence of --

23      A.  Yeah, I visited with him about what to expect

24  this morning.

25      Q.  (BY MR. DUNN)  All right.  And really all I'm

JOE STRAUS                                           6/23/2014
CONFIDENTIAL TRANSCRIPT

44

1  trying to determine is if -- prior to whatever

2  discussions you've had to prepare for this deposition,

3  if you'd had any briefings from the attorney general's

4  office from the date of passage of Senate Bill 14 until

5  the present about its legality implementation, et

6  cetera.

7       A.   No.

8       Q.   Have you requested any such communications?

9       A.   Don't believe so, no.

10      Q.   The -- the State, I'm sure, is involved in an

11  amount of litigation at any given time on any given

12  subjects.  We know about redistricting, for example.

13           Do you, as speaker of the House, receive

14  legal briefings about pending litigation involving the

15  State?

16      A.   I would think very rarely.

17      Q.   I mean, is there --

18      A.   I'm not a lawyer, and so my staff probably

19  knows I'm not, you know, into -- I wouldn't be

20  particularly interested in following every -- every

21  moment of every legal case.

22      Q.   All right.

23      A.   Only as certain legal cases impact the work of

24  the legislature or an upcoming session of legislature.

25      Q.   Now, before a measure is considered by the

JOE STRAUS                                           6/23/2014
CONFIDENTIAL TRANSCRIPT

45

1  House, it will be reviewed and a bill analysis will be

2  prepared.  Is that right?

3      A.  Yes.

4      Q.  Was it the agency that would have done that on

5  Senate Bill 14?

6      A.  Who would have done it?

7      Q.  Well, right.  I mean, sometime -- I'm fairly

8  familiar with the process too.  I know sometimes when

9  Senate bills come over, the House will just rely on the

10 Senate research's bill analysis; sometimes they prepare

11 their own.  And you may not know in this case.

12     A.  I don't know who did the analysis.

13     Q.  All right.  Did you influence at all who would

14 be involved in the preparation of the analysis?

15     A.  No.

16     Q.  Who would have made that decision?

17     A.  I don't know.

18     Q.  Did you attend a bill signing for Senate Bill

19 14?

20     A.  I don't recall.  I don't think so.  I might

21 have.  I really don't remember.

22     Q.  Again, focusing on your past support for voter

23 identification measures, have you -- do you recognize

24 that there are some set of barriers that the government

25 can erect of voting that would be -- whether illegal,

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

46

1  ill-advised?

2       A.   Yes.

3       Q.   I mean, in other words, if you had to show up

4  at three different locations in a row to secure your

5  vote, at some point, it can be come burdensome?

6       A.   Yes.

7       Q.   Okay.   And I assume as a public officer that's

8  not something you support?

9       A.   That's correct.

10      Q.   I asked you earlier what -- the various

11  identifications that were permitted under Senate Bill

12  14, and I think you said you didn't recall.   And I want

13  to go through some, though, that aren't included.   For

14  example, federal employee IDs are not included in Senate

15  Bill 14.   Is that something that you see erects an

16  unreasonable burden?

17      A.   That a federal ID cannot be used?

18      Q.   Yes, sir.

19      A.   I haven't really thought about it.   I don't

20  know why there wouldn't be.

21      Q.   How about a state government-issued ID for

22  employees?

23      A.   I don't know why they wouldn't be allowed.

24      Q.   And also student IDs issued by state of Texas

25  higher educational institutions?

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

47

1      A.   The question is?

2      Q.   Whether you think that those IDs ought to be

3   accepted in voting.

4      A.   I wouldn't have a problem with that.

5      Q.   Do you know why it is Senate Bill 14 doesn't

6   include those IDs?

7      A.   I don't know.

8      Q.   Do you know whether an analysis had been

9   performed as to the makeup or the availability of

10  various IDs to different racial groups?

11           MR. D'ANDREA:  Legislative privilege.

12           You many answer under seal.

13      A.   The question again?

14      Q.   (BY MR. DUNN)  Do you know whether an analysis

15  was performed during the consideration of Senate Bill 14

16  as to the availability of certain ideas -- IDs by

17  various racial groups?

18      A.   I don't recall.

19      Q.   In the debates over Senate Bill 14 that you

20  witnessed --

21      A.   Uh-huh.

22      Q.   -- did you hear any comments by members of the

23  legislature that had racial undertones?

24           MR. D'ANDREA:  Legislative privilege.

25           You may answer under seal.

JOE STRAUS                                         6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                         49

1       A.  No, I don't recall.

2       Q.  (BY MR. DUNN)  One of the issues that will

3   obviously be decided in this case is what the

4   legislative intent behind Senate Bill 14 was.  And I

5   understand from your testimony that you didn't vote on

6   it.  Are you able to tell us or testify what the

7   legislative intent for Senate Bill 14 was?

8               MR. D'ANDREA:  Objection; calls for

9   speculation.

10      A.  Just --

11              THE WITNESS:  Am I to answer?

12              MR. D'ANDREA:  Yes.  Oh, I'm sorry, yes.

13      A.  I think just general voter ballot security just

14  to be certain that those who were casting votes were

15  doing so legitimately.

16      Q.  (BY MR. DUNN)  Any other legislative purpose

17  that you're aware of?

18      A.  Not that I'm aware of, no.

19      Q.  Now, on the ballot security issue, were you

20  aware of incidents of voter-related activity that was

21  illegal or could have been illegal that Senate Bill 14

22  was designed to prevent?

23      A.  No, I'm not.

24      Q.  And so you've previously testified that ballot

25  security was an issue that you supported.  Why was it

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                          50

1  that you saw additional measures were required for

2  ballot security, despite having not seen any evidence of

3  such voter fraud that would be prevented by that

4  measure?

5               MR. D'ANDREA:  Objection; assumes facts not

6  in evidence.

7               THE WITNESS:  What did you say?

8               MR. D'ANDREA:  You may answer if you can.

9               THE WITNESS:  All right.

10      A.  Again, I just had a -- I have a record of

11  voting for measures that -- that called for

12  identification at the polling place, but it wasn't --

13  wasn't in relation to any specific incident that I was

14  aware of.

15      Q.  (BY MR. DUNN)  Well, you know, I'm sure you've

16  heard of that Texas or southern saying, "If it ain't

17  broke, don't fix it."

18      A.  Uh-huh.

19      Q.  So what was it about the system that you

20  thought was broken that you were trying to fix when you

21  supported such measures?

22      A.  I didn't have a -- I -- I didn't -- my -- my

23  support for it could just as easily be considered that I

24  wouldn't oppose it because I didn't think opposing it

25  was appropriate.  I saw no problem with presenting a

51

1   photo ID to vote just as you do to cash a check or --

2   you know, at the airport or the bank or wherever.

3        Q.   So another way, then, to restate that is, from

4   your standpoint there was no harm --

5        A.   Right.

6        Q.   -- in Senate Bill 14?

7        A.   Yeah.

8        Q.   And there might be some benefit, so it was

9   worth supporting.  Is that about right?

10       A.   Yeah.  I mean, again, it wasn't my bill.  But

11  when these issues came up in previous legislatures

12  before I was serving as presiding officer, I supported

13  them.

14       Q.   Now, also around 2011, the Texas Department of

15  Public Safety began requiring citizenship requirement --

16  or citizenship documents to issue driver's license or

17  identifications.  Are you aware of that?

18       A.   I remember that, yes.

19       Q.   Initially that change in policy was done on --

20  by the agency, not by the legislature.  Are you aware of

21  that?

22       A.   I vaguely recall that.

23       Q.   Were you at all involved in DPS's decision to

24  start requiring citizenship to issue --

25       A.   No --

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

53

1  interested in this issue.

2       Q.   Later the legislature gave DPS the authority to

3  require citizenship documents by statute.   Is that

4  right?

5       A.   I don't recall how we resolved it.   I think

6  that's right.

7       Q.   Is -- again, if you don't know, just tell us

8  that.   But is one of the legislative purposes behind

9  Senate Bill 14 to determine and ensure that folks who

10 receive a ballot are U.S. citizens?

11                MR. D'ANDREA:   Legislative privilege.

12                You may answer under seal.

13                And objection; calls for speculation.

14      A.   I assume so.

15      Q.   (BY MR. DUNN)   Do you know whether any of the

16 identifications permitted under Senate Bill 14 can be

17 obtained without proving one is a citizen?

18      A.   I don't know.

19      Q.   Back to the DPS issue, though, for a moment, it

20 sounds like it was not the case that you directed or

21 otherwise suggested to DPS to begin requiring

22 citizenship documents to issue IDs.

23      A.   Oh, no.

24      Q.   Have you been briefed on or otherwise looked

25 into difficulties that some citizens may have,

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                                    54

1  especially elderly citizens, in obtaining documentation

2  to show they were born in the United States, for

3  example?

4              MR. D'ANDREA:  Legislative privilege.

5              You may answer under seal.

6      A.  I know that it's been a matter that's been

7  reviewed and discussed, but I don't -- I think there

8  were provisions made, weren't there, in the bill for

9  elderly and for -- I've forgotten what it was.

10  65-year-olds or something.  I think some of these -- I

11  think some of these matters were considered in the

12  legislation, if I'm not mistaken.

13      Q.  (BY MR. DUNN)  There is a provision in the bill

14  for people over the age of 65 to vote by mail.  Is that

15  what you're referring to?

16      A.  I think so.

17      Q.  And they can vote by mail without showing such

18  identification?

19      A.  That's correct.

20      Q.  Is it your recollection that the reason such

21  provision was included in the bill was a recognition

22  that many of the elderly citizens would be unable to

23  obtain citizenship documentation?

24      A.  I don't recall.

25      Q.  So when it comes to the various IDs that are

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                                      55

 1  permitted, it's your belief that each of those IDs, a

 2  citizen would have to prove their citizenship in order

 3  to obtain.  Is that right?

 4              MR. D'ANDREA:  Asked and answered.

 5       A.  I don't recall exactly what the ID requirements

 6  are.

 7       Q.  (BY MR. DUNN)  So is that a "I don't know"?

 8       A.  I don't know.

 9       Q.  All right.

10       A.  Yeah.

11       Q.  You mentioned earlier -- I'm going to kind of

12  shift gears on you and talk about your voting.  I assume

13  that you vote somewhat regularly as a public official?

14       A.  Oh, voting like on election day?

15       Q.  Yes, sir.

16       A.  Yes.

17       Q.  Not voting in the House, but voting for elected

18  officers --

19       A.  Yes.

20       Q.  -- and measures.

21              Do you vote in person or by mail?

22       A.  I vote in person.

23       Q.  And why do you do it by in person rather than

24  mail?

25       A.  Habit.  Try to be home around elections.  And

JOE STRAUS                                                  6/23/2014
CONFIDENTIAL TRANSCRIPT

56

1  early voting lasts so long, there's generally an

2  opportunity for me to vote in person.

3       Q.  And when you vote in person, is it -- is it on

4  election day or early voting or a mixture?

5       A.  Almost always, I vote early.

6       Q.  Do you see the decision as to when to vote,

7  whether early or on election day, is a valuable choice

8  that you treasure?

9            MR. SCOTT:  Objection; form, relevance.

10      A.  What was the question again?

11      Q.  (BY MR. DUNN)  Do you see the decision -- or

12  the choice, the opportunity that you have to vote early

13  or on election day, as a valuable choice?

14      A.  Yes.

15      Q.  I mean, there -- have there been occasions, for

16  example, where you said, "Well, I think I'm going to

17  wait to vote till election day because there's some hot

18  issues in this race I want to see flesh out"?

19      A.  No, that hasn't really been a consideration for

20  me.

21      Q.  So from your standpoint, is the driving factor

22  when you vote the convenience, when you're able to --

23      A.  Travel schedule and convenience, yes.

24      Q.  All right.  You mentioned that when you vote,

25  you take your voter registration card and your driver's

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

57

1  license.  Is that right?

2      A.  Yes.

3      Q.  And has that been true even prior to Senate

4  Bill 14?

5      A.  For me, yes.

6      Q.  Can you tell me when your Texas driver's

7  license expires?

8      A.  No, I can't.

9      Q.  Is it something you have on you, you could look

10 at?

11     A.  Uh-huh.

12     Q.  Would you mind doing that for me?

13     A.  No.  Sure hope it hasn't expired.

14         9-1-2017.

15     Q.  Can you recall when -- thank you very much.

16 Can you recall when you last renewed it?

17     A.  I do remember.

18     Q.  When was that?

19     A.  It was when my youngest daughter turned 18, I

20 think, and she wanted a new license, so I went with her.

21 And it was the first day of hunting season.  It was my

22 birthday, September 1st, almost three years ago, I

23 think.

24     Q.  So that would be September 1st, 2011?

25     A.  I think that's right.

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

58

1       Q.   Can you recall when you went and renewed your
2  driver's license, whether you had to bring documentation
3  showing you were a U.S. citizen?
4       A.   I don't remember.
5       Q.   Can you recall whether your daughter was
6  required to do the same?
7       A.   Again, I don't remember.
8       Q.   Do you know --
9       A.   I think, as I recall, I could have done it
10  online, maybe.   I don't think I needed to go in person
11  at all, but since she was going, I just wanted to see
12  what the experience was like --
13      Q.   Okay.
14      A.   -- after spending a lot of money upgrading the
15  driver's license offices.
16      Q.   That's something I want to talk about,
17  obviously, later today.   Before -- before we get to
18  that, you were suggesting that you thought you could
19  renew your license online?
20      A.   I thought so.
21      Q.   Is it your understanding you can renew your
22  license on unlimited occasions online or just a few or
23  one?
24      A.   I don't know.
25      Q.   You got something in the mail, I assume, that

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

59

1  gave you your options?

2       A.  I don't remember.  I think maybe I just went

3  because my daughter was going and I said, "Well, maybe

4  I'll just do it now."  I really don't recall.

5       Q.  So are you aware whether or not there are many

6  Texans who posses a state-issued driver's license who

7  didn't have to prove identification?

8       A.  I'm not aware.

9       Q.  When you went with your daughter to renew your

10 license, and hers it sounds like, what location did you

11 go to?

12      A.  We went to one on the southeast side of San

13 Antonio.

14      Q.  What time of day did you go there?

15      A.  I want to say it was mid -- no, it was -- it

16 was in the afternoon, mid -- mid to late afternoon.

17      Q.  Did you go with anyone else other than you and

18 your daughter?

19      A.  Just the two of us.

20      Q.  How long were you there?

21      A.  Longer than I wanted to be.  I wanted to go

22 shoot doves that afternoon.

23      Q.  Was it opening day of dove season?

24      A.  Uh-huh.

25      Q.  Oh, I see.

JOE STRAUS                                         6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                        60

1        A.   Yeah.

2        Q.   Were you there 30 minutes? an hour? two hours?

3        A.   We were there a good -- over an hour.

4        Q.   There used to be a DPS office here near the

5   capitol that folks could avail themselves of.  Is that

6   right?

7        A.   I heard about it.  I never went.

8        Q.   All right.  So I assume you couldn't tell us

9   anything about that?

10       A.   Couldn't tell you anything about it.  Is it not

11   still here?

12       Q.   It might be.  I don't know.  Back when I worked

13   here, it was one of my favorite things of working in the

14   legislature.  Walk over there, there wasn't anybody else

15   there.  It was like the Maytag repairman in there.

16            Anyway, did you consider the wait that you

17   had at the DPS office to be unreasonable?

18       A.   It was longer than it should have been.

19       Q.   Did you follow up with any agency official

20   about that?

21       A.   I did.  I did talk to my staff about it, yes.

22       Q.   Who on your staff did you speak with?

23       A.   I don't recall.  Probably my chief of staff.

24       Q.   Did you go directly to the agency and speak

25   with anyone?

JOE STRAUS                                                     6/23/2014
CONFIDENTIAL TRANSCRIPT

61

1        A.   I don't think so.

2        Q.   Did you direct your staff to do so?

3             MR. D'ANDREA:   Legislative privilege.

4             You may answer under seal.

5        A.   I don't remember specifically.   I just remember

6    expressing myself that we should be doing better in

7    terms of wait times at driver's license offices,

8    especially in view of an appropriation that was made to

9    make them more efficient, to upgrade their technology.

10       Q.   (BY MR. DUNN)   And did you have any follow-up

11   from that conversation with your staff about your

12   experience?

13       A.   I have heard over time that there have been

14   improvements, but I'm not -- not aware.

15       Q.   And I appreciate that.   Thank you for that

16   answer.   But did your staff come back to you and say,

17   "We met with this agency, and here's what's happening"

18   to respond --

19       A.   I think --

20             MR. D'ANDREA:   Legislative privilege.

21             You may answer under seal.

22       A.   I think they have talked to the agency about

23   it.

24       Q.   (BY MR. DUNN)   And then your staff would report

25   back to you?

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                              63

1      Q.  Was that something driven by the appropriations

2 committee and the appropriations chair?

3      A.  It was driven -- as I recall, Senator Williams,

4 I think, was mainly involved with that.

5      Q.  I mean, it wasn't the case that the agency came

6 to you and you told appropriations, "Look, this is

7 something we need to find" --

8      A.  No, I did not.

9      Q.  Again, is this a process that, other than

10 presiding over the House generally, you weren't really

11 involved in?

12      A.  Not in a specific way, no.

13      Q.  Do you recall any conversations to the effect

14 of, you know, "We need to try to do something about

15 these lines at DPS because of the photo identification

16 requirement"?

17              MR. D'ANDREA:  Legislative privilege.

18              You many answer under seal.

19      A.  No, it was more a modernization of something

20 that had -- didn't look like it was keeping up with

21 current acceptable customer service metrics.

22      Q.  (BY MR. DUNN)  So from your point of view, were

23 the issues unrelated in terms of the DPS modernization

24 and the photo identification bill?

25              MR. D'ANDREA:  Legislative privilege.

                U.S. LEGAL SUPPORT - AUSTIN, TEXAS
                          512-292-4249

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

64

1                   You may answer under seal.

2          A.   Yeah, I hadn't really tied the two together.   I

3    just thought the driver's license offices ought to be

4    working more efficiently generally.

5          Q.   (BY MR. DUNN)  You mentioned metrics.  Had you

6    seen some data or metrics or measurements as to wait

7    times or which offices were more efficient, et cetera?

8          A.   I don't recall.  There was some talk about it,

9    but I don't remember what they were.

10         Q.   Was that information, to your knowledge, that

11   the legislature had requested either by resolution or

12   bill in the past?

13         A.   I don't remember.

14         Q.   And so I would assume it's also your answer you

15   don't know if such information exists?

16         A.   I -- I don't know, but I -- I can't -- it seems

17   to me that there was something developed.  Whether it

18   was before '11 or after '11, I'm not sure.

19         Q.   For example, with your experience in the south

20   side of San Antonio office, did you ask for, obtain or

21   receive metrics about that office's wait times?

22         A.   I did not.

23         Q.   And do you know whether the Department of

24   Public Safety was provided any additional funding to

25   deal with issues that relate to Senate Bill 14?

JOE STRAUS                                                6/23/2014
CONFIDENTIAL TRANSCRIPT

69

1      A.  Generally.

2      Q.  All right.  Did you ever read the Shelby County

3  opinion?

4      A.  Did not.

5      Q.  So just to make sure I'm clear and I've got

6  this in the record without objection, you haven't read

7  the district court's ruling on preclearance for Senate

8  Bill 14?

9      A.  That's correct.

10     Q.  And you also haven't read the Shelby County

11 opinion?

12     A.  That's correct.

13     Q.  The Texas attorney general took the position

14 that once the Shelby County opinion was issued, that

15 Senate Bill 14 could be implemented, and he announced as

16 such.  Do you recall that happening?

17     A.  Yes.

18     Q.  Were you consulted at all before that decision?

19     A.  No.

20          MR. SCOTT:  Objection; form.

21     Q.  (BY MR. DUNN)  Was there, in other words, any

22 contact with your office about "Preclearance is no

23 longer required.  We can implement Senate Bill 14 if we

24 want to"?

25     A.  I'm sure there was contact with my office,

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

JOE STRAUS                                                        6/23/2014
CONFIDENTIAL TRANSCRIPT

70

1    yeah.

2       Q.  Can you relay any of that to us?

3       A.  No.

4       Q.  Do you know what consideration, if any, was

5    made of the factual findings that the United States

6    District Court in D.C. found in the preclearance case

7    before implementation?

8       A.  No.

9       Q.  Do you know whether the district court opinion

10   on preclearance found that Senate Bill 14 would have a

11   disparate impact on minority citizens?

12          MR. D'ANDREA:  Objection; assumes facts not

13   in evidence.  Those findings have been vacated.

14      A.  What was the question?

15      Q.  (BY MR. DUNN)  Do you know whether the district

16   court opinion in the preclearance action found that

17   Senate Bill 14 would have a disparate impact on minority

18   citizens?

19      A.  I don't know.

20          MR. SCOTT:  Same objection.

21      Q.  (BY MR. DUNN)  Do you know whether Senate

22   Bill -- or do you know whether the preclearance decision

23   in D.C., what it found as it pertains to the State's

24   ability to prove Senate Bill 14 was not passed with a

25   discriminatory intent?

JOE STRAUS                                               6/23/2014
CONFIDENTIAL TRANSCRIPT

71

1        A.   I don't.

2        Q.   I just want to ask you a little bit about

3   voting behavior.  I assume you've done some analysis of

4   voter behavior in your district.

5        A.   Like what?

6        Q.   All right.  Well, let's start with this.  Do

7   you know the general racial makeup of the citizens in

8   your district?

9        A.   Not exactly, no.

10       Q.   Do you have some sense of it?

11       A.   Not -- not -- not that I would -- if you -- if

12   you gave it to me, I could say that it wouldn't surprise

13   me.

14       Q.   Okay.  I don't have it with me --

15       A.   I don't have it with me either.

16       Q.   And I'm not trying to quiz you on it, but I

17   know that some members, for example, can say, "My

18   district's" --

19       A.   No, I don't know.

20       Q.   -- "80 percent Anglo, about, or 20 percent"

21   this.

22       A.   No, I don't know.

23       Q.   Okay.  Have you ever analyzed whether the --

24       A.   I have known.  I just don't recall what it is.

25       Q.   Sure.  I mean, that's information you've looked

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

72

1   at in the past?

2        A.  Yes.

3        Q.  Have you ever looked at whether voting behavior

4   in your district is racially polarized?

5        A.  No, I haven't looked.

6        Q.  Have you looked at such information on voters

7   statewide?

8        A.  I'm sure I've read about it in articles.

9        Q.  What do you recall reading in articles?

10       A.  Generally it's the -- it's the coverage of the

11  percentage of minority votes for certain candidates.

12       Q.  And what's your sense of that coverage?

13       A.  How -- how well or not well certain Republicans

14  are doing in a certain cycle with minority voters.  But

15  I don't -- I don't remember what those numbers are

16  either, frankly.

17       Q.  Well, and not focusing on exact numbers, but is

18  it your recollection that voters in Texas are racially

19  polarized, that, for example, blacks and Hispanics vote

20  for one party's nominee and a large number of Anglos

21  vote for another party's nominee, or is that something

22  you just don't know?

23       A.  I mean, I seem to have read about it, yeah.  I

24  mean, I think that has been the case recently.

25       Q.  All right.

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                              73

1        A.   I think everybody's polarized.

2        Q.   On everything?

3        A.   Yeah.

4        Q.   All right.  What did you do to prepare for your

5   deposition today?  You told me you spoke with some

6   lawyers at the attorney general's office.  I don't want

7   you to get into that, okay?  But other than that, did

8   you speak with anybody else?

9        A.   No.

10        Q.   Did you review any documents?

11        A.   Only maybe a couple things that these gentlemen

12   may have shown me from -- I don't remember what they --

13   you know, nothing -- nothing -- "review" would be too

14   strong of a word.

15        Q.   Okay.  Can you recall any document that you

16   looked at?

17        A.   No.

18        Q.   Even what it was?

19        A.   Give me a minute, I'll -- I'll remember

20   something they showed me, but I don't remember what they

21   were.  Nothing that caught my attention.

22        Q.   Did you --

23             THE WITNESS:  Sorry, guys.

24        Q.   (BY MR. DUNN)  Did you review the text of

25   Senate Bill 14?

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

74

1        A.  I did not.

2        Q.  And I assume you didn't review the earlier

3   court decision that pertains to Senate Bill 14?

4        A.  No, I did not.

5        Q.  Did you review any of the rulings that the

6   judge presiding over this case has issued?

7        A.  No.

8        Q.  All right.  Have I been courteous to you today?

9        A.  Let me fill out your card.  I'll give you a 10.

10       Q.  Okay.  Out of 100?

11            Thank you, Mr. Speaker.  I appreciate your

12   time.

13       A.  You bet.

14                     EXAMINATION

15   BY MR. GEAR:

16       Q.  Sir, my name is Bruce Gear.  I'm with the

17   Department of Justice.  I'm one of the attorneys

18   representing the United States.  And just to start off,

19   I'd like to just go back over quickly the ground

20   rules --

21       A.  Okay.

22       Q.  -- of the deposition.

23       A.  Uh-huh.

24       Q.  I'll be asking the questions.  You're going to

25   answer, and you've been answering using verbal

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

77

1    implementation.

2         A.   Not to me directly, no.

3         Q.   Are you aware who, if anyone, would have

4    received such updates in the House?

5         A.   No, I don't know.

6         Q.   Are you aware of whether or not the Secretary

7    of State's office engaged in any analysis regarding the

8    impact of SB14 on minority voters since the

9    implementation of SB14?

10        A.   I'm not aware.

11        Q.   Are you aware of whether the legislators who

12   supported SB14 have made any attempt to assess the

13   impact of SB14 on minority voters?

14        A.   I don't know.

15        Q.   Are you aware of any agency in the -- in the

16   state that has attempted to assess the impact of SB14 on

17   minority voters?

18        A.   I'm not aware.

19        Q.   All right.   And just to round that circle, are

20   you aware of any analysis whatsoever since the

21   implementation of SB14 to determine the impact of SB14

22   on voters generally?

23        A.   I don't know.

24        Q.   Do you know any -- whether there are any state

25   agencies that have attempted to determine the number of

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

79

1        A.  Describe it?

2        Q.  The title, the date.

3        A.  Oh, yeah.  San Antonio Express News, June 7,

4   2009.

5        Q.  And directing your attention to page 1, the

6   fourth paragraph, I believe, do you see where it says,

7   "The issue of ballot security is important, but the way

8   the Senate behaved at the first opportunity did nothing

9   to help the House pass a responsible anti-voter fraud

10  bill"?

11              Do you see that?

12       A.  I see that, yes.

13       Q.  Can you explain to me what you -- and based on

14  your prior testimony --

15       A.  Uh-huh.

16       Q.  -- I believe you described that as an accurate

17  quote, correct?

18       A.  I don't always say that about the media --

19  about the press, but, yeah, I think probably it probably

20  was.

21       Q.  So based on your statement, can you explain to

22  me what you meant by "the way the Senate behaved at the

23  first opportunity"?

24              MR. D'ANDREA:  Legislative privilege.

25              You may answer under seal.

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

80

1        A.   I mean, I'm having a hard time remembering that
2   long ago now, but I think in 2009, there was some change
3   in the regular order of business of the Senate to bring
4   this bill up, and I think it -- it was -- I felt that it
5   was -- this comment was really related to the measures
6   taken in the Senate and timing related to other business
7   of the House.

8        Q.   (BY MR. GEAR)  So let's see if we can put some
9   context to the -- the time period.  You said "to bring
10  this bill up."  Are you referring to Senator Fraser's
11  bill?

12       A.   I'm trying to remember.  I don't remember whose
13  bill it was or what it was.  I think what I was probably
14  referring to was that the 140 days we have in the
15  legislature and when bills move and so forth, and I
16  think it was just the whole atmospherics of House and
17  Senate.

18       Q.   Is it fair to say that in 2009, the Senate
19  introduced a voter photo identification legislation?

20       A.   Did they?

21       Q.   Did they?

22       A.   Yes.

23       Q.   And do you recall if -- do you recall the
24  number of that particular piece of legislation?

25       A.   I don't.

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                              81

1        Q.   If I was to represent to you that it was Senate
2    Bill 362, would that help refresh your recollection?
3        A.   No.
4        Q.   Do you recall who the author of that bill was?
5        A.   You mentioned Fraser, so I guess I vaguely
6    remember he was the author.
7        Q.   Am I correct or do you recall that the Senate
8    modified the two-thirds-of-consent requirement to bring
9    Senator Fraser's bill to the Senate forum?
10            MR. D'ANDREA:   Objection; that
11   mischaracterizes the rule.
12       Q.   (BY MR. GEAR)   You can answer.
13            MR. D'ANDREA:   Yes, please.
14       A.   Yeah, I vaguely recall that, yeah.
15       Q.   And that change was in -- made in 2009.   Am I
16   correct?
17       A.   I -- yeah.   Yes.
18       Q.   And do you recall if the change to the
19   two-thirds rule was a subject matter specific to Senator
20   Fraser's bill?
21       A.   I assume so, yes.   As I remember at this point,
22   yes.
23       Q.   So, now, turning back to what's now been marked
24   as Exhibit 1 --
25       A.   Uh-huh.

JOE STRAUS                                                6/23/2014
CONFIDENTIAL TRANSCRIPT

82

1       Q.  -- the news article, "The issue of ballot
2  security is important, but the way the Senate behaved at
3  the first opportunity," did our discussion at all help
4  refresh your recollection as to what was going on during
5  that time period?
6                    MR. D'ANDREA:  Legislative privilege.
7                    You may answer under seal.
8       A.  Yeah, a little bit.  I think it was -- as I
9  recall, my comments were really regarding the ability of
10 the House to pass legislation, and I think the House and
11 the Senate, as is not unusual, had different views about
12 which body should act and when and how we relate to one
13 another.
14      Q.  (BY MR. GEAR)  You also indicate in your -- in
15 your quote that they did nothing to help pass a
16 responsible antifraud -- anti-voter fraud bill.  Can you
17 explain what you meant by that?
18                    MR. D'ANDREA:  Legislative privilege.
19                    You may answer under seal.
20      A.  Yeah, I don't remember exactly at this point,
21 but -- I don't remember exactly what it was.
22      Q.  (BY MR. GEAR)  Was there some type of
23 disagreement between the House and the Senate as to what
24 type of voter photo identification legislation should be
25 advanced?

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

83

1            MR. D'ANDREA:  Also privileged.

2      A.  Well, I don't know that we were that

3  coordinated, but I did -- I do recall that -- that the

4  House, in 2009, was a very closely divided House with --

5  on a partisan basis.

6                And as I remember, the Senate was acting on

7  its own and on its own time frame, and the House was

8  a -- was a, you know, difficult, close body to manage.

9  And I think that's what these comments were related to.

10     Q.  (BY MR. GEAR)  And to finish this quote, you

11 ended with, "It's become all politics."  Can you explain

12 that?

13            MR. D'ANDREA:  Also privileged.

14     A.  No, I can't.

15     Q.  (BY MR. GEAR)  Turning your attention to

16 page 2, the third paragraph, you're also quoted as

17 saying, "Everything would have been wonderful, but it

18 wasn't my choice to deal with it this way . . . we

19 had" -- strike that -- "but it wasn't my choice to deal

20 with it the way we had to with the temperature turned up

21 as much as it was.  That was the Lieutenant Governor

22 David Dewhurst's decision."

23                Do you see where it says that?

24     A.  I see that, yes.

25     Q.  What decision did the lieutenant governor make

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

84

1  regarding voter photo ID legislation?

2              MR. D'ANDREA:   Legislative privilege.

3              You may answer under seal.

4       A.   I don't recall what it was.

5       Q.   (BY MR. GEAR)   Does the lieutenant governor
6  control the legislative calendar?

7       A.   Yes.

8       Q.   Do you recall if he made a decision regarding
9  the legislative calendar in 2009 as it relates to voter
10 photo identification?

11      A.   I recall that -- I don't remember the
12 specifics, but I do think they -- that they brought --
13 yes, I think he -- I think what I was talking about was,
14 this was not making -- some of their procedures over
15 there was not making it easier for a closely divided
16 House to deal with matters such as this.

17      Q.   And "the procedures over there," you're
18 referring to the Senate?

19      A.   (Nodding head affirmatively.)

20      Q.   And what procedures specifically were you
21 concerned with?

22      A.   I don't remember.  I don't remember anymore.

23      Q.   Is it fair to say that the procedures that you
24 were concerned about were deviations from the normal
25 procedures that are followed in the Senate?

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

85

1        A.   I don't -- I really don't recall.

2        Q.   You go on to be quoted as saying, "While I'm
3    supportive of voter ID and ballot security, I thought it
4    was unwise for him to take the extraordinary measure
5    that he did to get it to this place."

6             Did I read that correctly?

7        A.   I suppose so, yes.   I mean, you read the
8    article correctly, yes.

9        Q.   And do you believe that this is an accurate
10   quote?

11       A.   I believe it is.   This was what was to be an
12   off-the-record discussion with the reporter.

13       Q.   That turned into --

14       A.   Turned out not to be, yes.

15       Q.   When you say "unwise for him," are you

16   referring to David Dewhurst?

17       A.   I suppose --

18             MR. D'ANDREA:   Legislative privilege.

19             You can answer under seal.

20       A.   I suppose so.

21       Q.   (BY MR. GEAR)   And when you're referring to
22   "the extraordinary measure that he did to get it to this
23   place," you're referring to voter photo ID legislation?

24             MR. D'ANDREA:   Also privileged.

25       A.   I suppose so.

JOE STRAUS                                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                                          87

1          A.   I don't -- I don't recall anymore.

2          Q.   (BY MR. GEAR)   Near the bottom of page 2, I

3    think it's the third paragraph up, it says, "Both sides

4    are taking a really hard position and exaggerating it

5    when you indicate both sides are taking a hard

6    position."

7                    Can you tell me what sides you were

8    referring to?

9                    MR. D'ANDREA:   Legislative privilege.

10                   You may answer under seal.

11         A.   I guess it was the -- the arguments that they

12   were making and the debate over the bill.

13         Q.   (BY MR. GEAR)   And when you say "the arguments

14   that they were making," the quote goes on to say that

15   "Democrats exaggerate the danger of a more modest bill,

16   and Republicans exaggerate the depth of the problem that

17   needs to be addressed."

18                   Do you see that?

19         A.   I see that, yes.

20         Q.   And do you -- again, do you believe that that's

21   an accurate quote?

22         A.   I suppose so.   It was a long time ago and, I

23   thought, off the record, so I don't even remember making

24   it, but I don't have reason to believe it wasn't.

25         Q.   So starting with the beginning of this quote,

88

1  what positions -- what hard positions do you believe

2  were being exaggerated when it came to Senator Fraser's

3  photo ID legislation?

4              MR. D'ANDREA:  Also privileged.

5       A.  I do not recall.

6       Q.  (BY MR. GEAR)  Do you recall what positions the

7  Democrats, as -- as it relates to your quote, what

8  positions they were taking and possibly exaggerating?

9       A.  I don't.

10      Q.  Do you recall what positions the Republicans

11 were exaggerating as it relates to photo ID legislation?

12      A.  I don't.

13      Q.  And more specifically, it indicates that

14 Republicans were exaggerating the depth of the problem

15 that needs to be addressed.  What problem needed to be

16 addressed with photo ID legislation, as you understand

17 it?

18      A.  The issue of voter fraud.

19      Q.  And specifically, is -- was that limited to

20 in-person voter fraud at the polling place?

21      A.  Yes.

22      Q.  And are you aware of whether -- and I'm going

23 to change the time period.  SB14, did that deal with

24 by-mail ballot fraud in any form or fashion?

25      A.  I don't know.

JOE STRAUS                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

91

1      A.  I don't know that I see every one of them.

2      Q.  But do you make a habit of approving draft

3  letters that are sent out to constituents?

4      A.  I try to.

5      Q.  All right.  And specifically, I just want to

6  turn your attention to paragraph 2.

7      A.  Uh-huh.

8      Q.  "The 82nd Legislature convened on January 11,

9  2011.  To date, there has been no legislation filed to

10  address potential fraud related to mail-in ballots."

11          Do you see that?

12      A.  I see that, yes.

13      Q.  And is it fair to say that SB14 did not address

14  fraud related to mail-in ballots?

15      A.  I don't recall what was in the bill.

16      Q.  All right.  But based upon your letter, does it

17  appear to represent that SB14 does not address potential

18  fraud related to mail-in ballots?

19      A.  Based on this letter, yes.

20      Q.  Now, staying along the -- along the line of

21  your discussions with constituents, did you communicate

22  with constituents during the consideration of SB14?

23      A.  I don't remember.

24      Q.  You certainly communicated with constituents

25  regarding SB14 and --

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                          92

1        A.   Yes.

2        Q.   -- and the issue of by-mail ballot fraud,

3   correct?

4        A.   Yes.

5        Q.   Do you recall communicating with constituents

6   regarding concerns of noncitizens voting?

7        A.   I don't recall.

8             (Straus Exhibit No. 3 was marked.)

9             MR. GEAR:   Again, I would represent for the

10  record that this is a highly confidential document, that

11  it appears to have come from the legislative files of

12  Speaker Straus.

13       Q.   (BY MR. GEAR)   And I'll just give you a chance

14  to look at this.

15       A.   (Examines document.)   Okay.

16       Q.   Does this help refresh your recollection as to

17  whether or not you communicated with your constituents

18  regarding noncitizens voting at the polls?

19       A.   It appears I did, yes.

20       Q.   And I'd direct your attention to -- actually,

21  strike that.

22             At the bottom of Exhibit No. 2 [sic], it

23  has a series of -- it has a file address.  Do you see

24  that?

25       A.   Down in the corner, right corner?

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                          93

1        Q.  At the very bottom.

2        A.  Yeah.

3        Q.  And it's the -- capitol/texas.  And it shows,

4   reading through it, CMS/Email/2009-02-11.

5             MR. D'ANDREA:  I'm sorry, counsel.

6        A.  Oh, here.

7             MR. D'ANDREA:  I thought you said

8   Exhibit 2.  I'm sorry.

9        A.  Okay.

10       Q.  (BY MR. GEAR)  Do you recognize this as coming

11  from your files?

12       A.  I don't know.

13       Q.  Can you tell me specifically what this document

14  is, referring to the first page?

15       A.  It's a response to someone who wrote about

16  voter ID and voter fraud.

17       Q.  And it's prepared for your signature, correct?

18       A.  Either that or it's an e-mail response.

19       Q.  Okay.  So directing your attention to

20  paragraph 2 --

21       A.  Uh-huh.

22       Q.  -- it says, "As you are aware, state and

23  federal law both require all voters to be citizens, but

24  current law requires no photo identification or proof of

25  citizenship when registering to vote or when voting.  I

JOE STRAUS                                                  6/23/2014
CONFIDENTIAL TRANSCRIPT

94

1  agree that we need to revise our current Texas voting

2  laws to ensure that only U.S. citizens who are Texas

3  residents are voting in our Texas elections."

4              Do you see that?

5       A.  I do, yes.

6       Q.  Is it fair to say that you received

7  communication from your constituents regarding concerns

8  that noncitizens were voting at the polls?

9              MR. D'ANDREA:  Legislative privilege.

10             You may answer under seal.

11      A.  I don't recall what the communication was that

12  they were writing about, but I would assume that was --

13  I would assume that's correct.

14      Q.  (BY MR. GEAR)  And when you say you "agree that

15  we need to revise our current Texas voting laws to

16  ensure that only U.S. citizens who are Texas residents

17  are voting in our Texas elections," what are you basing

18  that -- that position on?

19      A.  I'm guessing that it was the no photo

20  identification.

21      Q.  Did you have any research or analysis that

22  would suggest that noncitizens were actually voting at

23  the polls in Texas?

24      A.  Not that I recall.

25      Q.  Did you convene any committees to determine if

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

95

1  noncitizens were voting at the polls in Texas?

2      A.  That may have been -- that may have been

3  subject to a hearing of a committee, but I don't recall.

4      Q.  Do you recall what the results or the findings

5  of that committee may have been?

6      A.  No.

7      Q.  Do you recall if -- during the course of

8  consideration for voter photo ID legislation, that the

9  topic of noncitizens voting came up during public

10 debate?

11     A.  I imagine it did.  I don't recall specifically.

12     Q.  Do you recall if legislators who supported the

13 bill raised the concern that noncitizens may be voting

14 at the polls?

15             MR. D'ANDREA:  Legislative privilege.

16             You may answer under seal.

17     A.  I vaguely recall that, sure.  I think it's been

18 part of the debate.

19     Q.  (BY MR. GEAR)  And do you recall if there was

20 also private discussion regarding noncitizens possibly

21 voting at the polls?

22             MR. D'ANDREA:  Also privileged.

23     A.  I don't recall.

24             (Straus Exhibit No. 4 was marked.)

25     Q.  (BY MR. GEAR)  I'm showing you what's been

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                            96

1  marked as Exhibit No. 3, I believe.  And I'll give you a

2  chance to --

3               THE REPORTER:  4.

4       Q.  (BY MR. GEAR)  4.  And I'll give you a chance

5  to look at that.

6               MR. GEAR:  Thank you.

7       A.  (Examines document.)

8       Q.  (BY MR. GEAR)  Just let me know when you've had

9  a chance to review it.

10      A.  (Examines document.)  Okay.

11      Q.  Can you identify what this document is for me,

12 please?

13      A.  It looks like a press release from Senator

14 Fraser.

15      Q.  And do you recognize this to be an official

16 press release from his office?

17      A.  It appears to be, yes.

18      Q.  And directing your attention to paragraph 4

19 where it indicates, "I want to ensure that illegal

20 aliens, noncitizens" and other -- "and people otherwise

21 not qualified do not dilute the legitimate votes cast by

22 citizens."

23               Do you see where it says that?

24      A.  Yes, I do.

25      Q.  And not to ask you for the truth of the matter

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

97

1  asserted, but do you recall discussions similar to this

2  taking place during debate regarding photo ID

3  legislation?

4       A.  Not specifically, but I would imagine they did.

5       Q.  Do you recall ever responding to allegations

6  that noncitizens may be voting at the polls?

7                 MR. D'ANDREA:  Legislative privilege.

8                 You may answer under seal.

9       A.  No, I don't recall.

10      Q.  (BY MR. GEAR)  Do you have an opinion as to

11 whether or not noncitizens may have been voting at the

12 polls?

13      A.  An opinion?

14      Q.  An opinion, yes.

15      A.  No.

16      Q.  And are you aware of any -- other than the

17 committee that may have convened to look at the issue,

18 are you aware of any other communications with any of

19 the other legislators regarding this issue of

20 noncitizens voting at the polls?

21                 MR. D'ANDREA:  Also privileged.

22      A.  No.

23      Q.  (BY MR. GEAR)  You may have been asked this

24 previously by Attorney Dunn.  Do you recall one of the

25 issues being raised during the public debate that photo

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

98

1  ID legislation may result in the disenfranchisement of

2  minority voters?

3      A.  Yes.

4      Q.  And did you publicly respond to that concern in

5  any way?

6      A.  I don't recall.

7      Q.  Did you convene any committees that would have

8  reviewed that issue in any detail?

9      A.  Not that I remember, no.

10      Q.  Are you aware of any committees being convened

11  that did, in fact, look at the issue of whether or not

12  voter photo identification would -- requirements would

13  result in the disenfranchisement of minority voters?

14      A.  No.

15      Q.  Do you recall receiving communications from

16  constituents regarding their concern that photo ID

17  legislation would result in the disenfranchisement of

18  minority voters?

19                MR. D'ANDREA:  Legislative privilege.

20                You may answer under seal.

21      A.  I don't recall.

22      Q.  (BY MR. GEAR)  And so as you sit here today,

23  are you aware of any analysis that was conducted in the

24  House that reviewed the issue of voter photo ID

25  legislation and its impact on minority voters?

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

99

1       A.   I'm not aware.

2       Q.   You talked a bit about the process how a bill

3  comes from the Senate to the -- to the House.  I don't

4  completely understand that process.  But other than the

5  bill itself, is there any other material that comes

6  along with the -- the transfer of -- of the bill?  Does

7  that make sense?

8       A.   It makes sense, but I'm not sure.  I'm not sure

9  what comes with a -- with a bill.  I don't see anything.

10      Q.   So is the bill actually transferred

11 electronically?  Is it --

12      A.   I don't know.

13      Q.   -- walked across to the House?  I mean, I don't

14 know.  Generally.

15      A.   I believe so, yeah.  They're -- they're brought

16 to us.

17      Q.   Physically?  Okay.

18      A.   I think so.

19      Q.   Regarding SB14 specifically, when you receive

20 the bill in the House, does that also include the

21 analysis that may have been conducted?

22      A.   When we receive it?  I really don't know.  I

23 never -- I never look at the physical bills when they

24 come.  You'd have to ask the clerk or others that handle

25 that.  I don't know.

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                         100

 1       Q.   Based on your knowledge --

 2       A.   Uh-huh.

 3       Q.   -- are you aware of whether any analysis

 4  related to SB14 was -- was sent from the Senate to the

 5  House along with the bill?

 6       A.   I don't know.

 7       Q.   And as you sit here today, do you recall

 8  reviewing any analysis that was conducted at the Senate

 9  level regarding SB14?

10       A.   I don't recall.

11       Q.   Who is Meredith Fowler?

12       A.   She's a member of the Speaker staff.

13       Q.   Your staff?

14       A.   Yes.

15       Q.   Okay.  And did she assist you in -- in

16  reviewing SB14 during your consideration of the bill?

17       A.   I imagine she did, yes.

18       Q.   What --

19       A.   It would have been in her portfolio.

20       Q.   I'm sorry.  I missed the last part.

21       A.   I said it would have been an issue in her

22  portfolio, yes.

23       Q.   And if you recall, do you ask -- do you recall

24  asking her to conduct any particular tasks regarding

25  analyzing SB14?

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

101

1        A.   No.

2        Q.   Do you recall receiving any written analysis

3   from Ms. Fowler regarding SB14?

4                MR. D'ANDREA:  Legislative privilege.

5                You may answer under seal.

6                I'd also like to caution that Ms. Fowler's

7   a lawyer.  So to the extent that this is -- to the

8   extent her portfolio involves policy discussions, you

9   may answer that under seal subject to the legislative

10  privilege.  But to the extent she's giving you legal

11  advice, that's attorney/client protected.  It sounds

12  like we're still in policy land.  So I think you can

13  answer this under seal.

14       A.   The question?

15       Q.   (BY MR. GEAR)  Do you recall receiving any

16  analysis from Attorney Fowler regarding --

17       A.   I don't.

18       Q.   -- SB14?

19       A.   I do not.

20               (Straus Exhibit No. 5 was marked.)

21       Q.   (BY MR. GEAR)  I'm handing you what's been

22  marked as Exhibit No. 5.

23               MR. GEAR:  And I will, again, represent

24  that this is identified as a highly confidential

25  document which appears to have come from the legislative

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                         102

 1 files of Speaker Straus.

 2      A.  Uh-huh.

 3      Q.  (BY MR. GEAR)  And I'd direct your attention to

 4 page 2 --

 5                MR. GEAR:  You can have a copy.

 6                MR. SCOTT:  Thanks, Bruce.

 7      Q.  (BY MR. GEAR)  -- at the bottom.  And before we

 8 get into this document, have you seen this document

 9 before?

10      A.  I don't recall, but I could -- could well have,

11 probably did.

12      Q.  Do you see where it says, "as described

13 above" -- sorry.  Strike that.

14                It's titled Elections.  "Voter ID" --

15      A.  Uh-huh.

16      Q.  -- "as described above will be a big issue.

17 However, with Republicans' super majority, I anticipate

18 legislation passing this time."

19                Do you see that?

20      A.  Yes, I do see it.

21      Q.  And this is referring to voter photo ID

22 legislation?

23      A.  Yes.

24      Q.  "I think a straight photo ID requirement is the

25 likely type of legislation that will pass this session."

103

1          Do you recall the discussions with your

2   staff regarding the type of photo ID legislation that

3   was likely to pass in 2011?

4               MR. D'ANDREA:  Legislative privilege.

5               You may answer under seal.

6        A.   I don't recall.

7        Q.   (BY MR. GEAR)  Can you -- can you tell me, if

8   you recall, why there was an opinion that a straight

9   photo ID requirement would likely pass during the -- a

10  straight photo ID legislation would likely pass?

11              MR. D'ANDREA:  Privileged and calls for

12  speculation.

13       A.   I don't -- I don't know.  And I'm not even sure

14  I know what a straight photo ID -- I don't know what

15  that means.

16       Q.   (BY MR. GEAR)  Would you consider SB14 a

17  straight photo ID legislation?

18       A.   It's a photo ID, yes.  I'm not sure what the --

19  yeah.  Okay, yes.

20       Q.   So on the flip side, would you consider Senator

21  Fraser's previous 2009 bill as a non -- strike that.

22              Senator Fraser's photo ID bill allowed both

23  photo and non-photo ID, correct?

24       A.   I think so.

25       Q.   And would you have considered that to be a

JOE STRAUS                                      6/23/2014
CONFIDENTIAL TRANSCRIPT

104

1  moderate bill?

2       A.   Compared to this, to one that requires only a

3  photo ID?

4       Q.   Yes.

5       A.   Yes.

6       Q.   So would you agree that SB14, as passed, was

7  more stringent than prior photo ID legislation that was

8  proposed in both the Senate and the House?

9       A.   I think that's correct.

10      Q.   Have you ever heard discussion that SB14, as

11 passed, was one of the most stringent bills in the

12 country?

13      A.   I've heard it described that way, yes.

14      Q.   And do you agree with that position?

15      A.   I -- I don't know.

16      Q.   And when you say you heard it described, you've

17 heard it described by the legislators?

18           MR. D'ANDREA:   Privileged.

19           You may answer under seal.

20      A.   It seems that I have.   I mean, I've seen it

21 written about that way.

22      Q.   (BY MR. GEAR)  Do you -- do you know why --

23 from the 2009 bill to SB14, what -- the reason for

24 reducing the types of allowable ID?   Do you know the

25 reason for that?

JOE STRAUS                                            6/23/2014
CONFIDENTIAL TRANSCRIPT

106

1      Q.  (BY MR. GEAR)  Do you recall during the

2  consideration of SB14 that certain types of ID would not

3  be allowed because they may be in the possession of

4  noncitizens who may --

5      A.  No.

6      Q.  -- be voting at the polls?

7      A.  No, I don't recall.

8      Q.  Was there an intent in the legislature to make

9  SB14 more stringent than other photo ID legislation that

10 was proposed previously?

11              MR. D'ANDREA:  Privileged and calls for

12 speculation that the legislature is a they, not an it.

13     Q.  (BY MR. GEAR)  Well, it or they.  You can

14 answer.

15     A.  You'd have to talk to the bill author.  I don't

16 know.

17     Q.  When reviewing Exhibit No. 5 --

18     A.  Uh-huh.

19     Q.  -- and looking at the language "straight photo

20 ID requirement" --

21     A.  Uh-huh.

22     Q.  -- what do you think that meant?

23     A.  I guess after our discussion here, in comparing

24 it to other bills, it's -- it's a voter -- it's an ID

25 requirement for a photo ID.

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

111

1       Q.   Do you see at the top where it says, "SB14
2    would give Texas arguably the strictest photo ID law in
3    the country"?
4       A.   I do.
5       Q.   And again, is it your understanding that SB14
6    was arguably the strictest photo ID law in the country?
7       A.   Is it my understanding?   Yes.
8       Q.   And just running through the middle of the page
9    quickly, Substantive Provisions, "A voter must present
10   an acceptable photo ID on election day."
11              Do you see where it says that?
12      A.   No.   Where is it?
13      Q.   The middle of the page --
14      A.   Oh, yes.
15      Q.   -- the first page.
16      A.   Yes, uh-huh.   Yep.
17      Q.   Is it your understanding that SB14, under the
18   provisions of SB14, a Texas driver's license cannot be
19   expired more than 60 days?
20      A.   Yes.
21      Q.   And that an ID card issued by DPS cannot be
22   expired more than 60 days?
23      A.   Yes.
24      Q.   Do you have any understanding of what type of
25   military IDs are allowed under SB14?

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                        115

1  whether state employee IDs should be used, you responded

2  you're not sure why it would not be allowed.

3                Can you elaborate on why you think state

4  employee IDs should not be prohibited from being used to

5  confirm identification at the pole?

6       A.  Just my personal opinion.  I don't know why a

7  government ID would not be sufficient.

8       Q.  Is it fair to say that you think that Texas

9  agencies, for example, the Texas attorney general's

10 office, has sufficient procedures in place to ensure

11 that an ID is only given to a person whose picture is on

12 it?

13      A.  I would think so.

14      Q.  So you would have no problem if somebody from,

15 say, the Texas Department of Agriculture, went to a

16 pole, showed their state ID; that should be allowed for

17 an individual to prove their -- who they are?

18      A.  I would have no problem with that.

19      Q.  You also said you -- I believe you would have

20 no problem with a federal employee identification card

21 being used by an individual at the pole.  Is that

22 correct?

23      A.  I think I said that, yes.

24      Q.  So if, for instance, a U.S. attorney based here

25 in Austin or in Houston wanted to go vote and they used

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

116

1  their federal employee identification, that should be

2  sufficient for proving their identification at the pole?

3       A.   In my personal opinion.

4       Q.   Do you know why state employee IDs and federal

5  employ IDs are not allowed under SB14?

6            MR. D'ANDREA:   Objection; calls for

7  speculation.

8       A.   I do not know.

9       Q.   (BY MR. SHORDT)  Did you have any conversations

10 with any senators or representatives during the debate

11 over SB14 as to why federal or state employee IDs are

12 not allowed to be -- or are not included in SB14?

13           MR. D'ANDREA:   Legislative privilege.   The

14 witness may answer under seal.

15      A.   No, I did not.

16           MR. SHORDT:   I take exception to the

17 question of whether -- or whether he has waived or not

18 waived that privilege.   He answered the questions

19 earlier, I thought, with respect to conversations.

20           MR. D'ANDREA:   The record will . . .

21      Q.   (BY MR. SHORDT)  Now, you said also you would

22 not have a problem with student IDs with photos on it

23 from Texas universities or colleges being sufficient

24 identification for SB14 purposes.   Is that correct?

25      A.   I'm not an expert in ID accuracy or

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

117

1   verification, but I wouldn't see a problem.  I don't

2   know of a problem with that.

3        Q.  So you don't know of student IDs ever being

4   used for fraudulent purposes for voting in any election

5   in Texas?

6        A.  I'm not aware of that.

7        Q.  Do you -- are you aware of any analysis that

8   has ever been undertaken to that effect?

9        A.  I'm not.

10       Q.  Are you aware that this was a talking point

11   used during debate on SB14 that student IDs could be

12   forged?  Do you recall any discussions on that point?

13       A.  I don't recall that.

14            (Straus Exhibit No. 7 was marked.)

15            MR. SHORDT:  Is that Exhibit 7?

16            THE REPORTER:  7, yes.

17            MR. D'ANDREA:  I'd like to note for the

18   record this is marked highly confidential.

19       Q.  (BY MR. SHORDT)  Can you please tell me -- have

20   you seen what has been marked as Exhibit 7?  And it is

21   highly confidential, as identified by Mr. D'Andrea.

22       A.  It doesn't look familiar.  They may have shown

23   it to me, but I didn't read it.

24       Q.  Do you know who prepared it?

25       A.  No, I don't know.  Meredith, I assume.  But I

JOE STRAUS                                           6/23/2014
CONFIDENTIAL TRANSCRIPT

118

1  don't recognize the writing.

2      Q.  Can you read the top line for me, please?

3      A.  "New," and then in parentheses, "for Dem

4  support."

5      Q.  You see Item No. 2 listed?

6      A.  Uh-huh.

7      Q.  It says "63.0101(a)(6)" --

8      A.  Yes.

9      Q.  -- "allows public or private," underlined,

10  "college ID cards"?

11     A.  Yes.

12     Q.  Did you have any conversations with democratic

13  representatives or senators who are seeking to gain

14  support for voter ID legislation by returning IDs that

15  are acceptable photo IDs for voting?

16             MR. D'ANDREA:  Privileged.

17             You may answer under seal.

18     A.  No.

19     Q.  (BY MR. SHORDT)  Do you know which Republicans

20  in the House or Senate may have floated the idea to

21  include public or private college ID cards to attract

22  democratic support --

23             THE REPORTER:  I'm sorry.

24             MR. SHORDT:  Sorry.

25             THE REPORTER:  The end of the question,

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                        121

1        Q.   (BY MR. SHORDT)  Do you see where it states

2   that -- and this will be line -- sorry, the third

3   bullet -- "There is no assurance to the State that the

4   persons who process student IDs are capable of providing

5   the same type of security in issuing those IDs as the

6   state or federal government would be in the types

7   discussed in SB14"?

8        A.   I see that, yes.

9        Q.   Do you agree with that statement?

10       A.   I don't know enough to agree or disagree.

11       Q.   Earlier didn't you say, though, that you had no

12   problem with including student IDs?

13       A.   Yeah, but also, I'm not an expert in security

14   of ID production.

15       Q.   Did anybody -- or strike that.

16            Was there any discussion during SB14

17   debate, any analysis provided, any report provided

18   addressing the sufficiency of student ID preparation at

19   Texas colleges and universities?

20       A.   I don't know.

21       Q.   Did you ask for that?

22            MR. D'ANDREA:   Privileged.

23       A.   I did not ask for it, no.

24       Q.   (BY MR. SHORDT)  If you could look at bullet

25   No. 1.  Do you see where it says, "There is no

JOE STRAUS                                      6/23/2014
CONFIDENTIAL TRANSCRIPT

122

1  uniformity amongst Texas institutions of higher
2  education for making student IDs"?   Second bullet --
3  sub-bullet, I'm sorry, "Some do not have expiration
4  dates"?
5      A.   Okay.   I see it, yes.
6      Q.   Do you know why an expiration date of an ID
7  would prove or disprove that an individual in the
8  picture was not the person whose name was on the ID?
9      A.   No.
10     Q.   Do you know why -- why an individual -- do you
11 know why photo IDs, under SB14, must have an expiration
12 date?
13     A.   I don't.
14     Q.   If I can direct your attention to the fifth
15 bullet, blocked bullet.   It says, "Ease of forging
16 student IDs."   Are you aware of any analysis conducted
17 or reports provided on whether -- or on forging of
18 student IDs in Texas?
19     A.   No.   I only have two daughters.   No, I don't --
20 I don't know.
21     Q.   Hopefully they're not forging student IDs.
22     A.   I hope not.
23     Q.   Or any other IDs.
24     A.   I hope not.
25     Q.   Are you aware of any analysis or reports of

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

126

1   workers may see in any given election?

2        A.  I don't.

3        Q.  Do you know how many types of -- different

4   types of military IDs there are?

5        A.  How many types of --

6        Q.  Different types of military IDs that are --

7        A.  No, I don't -- I don't know.

8        Q.  Do you know how many Texas universities and

9   colleges there are?

10       A.  I should, but I don't.

11       Q.  To your knowledge, is there any evidence that

12  suggests that student IDs have ever been used to commit

13  voter fraud in any election in Texas?

14       A.  I'm not aware.

15       Q.  Have you ever asked for that information?

16       A.  No.

17       Q.  Have you ever had conversations with other

18  members or senators who have discussed that?

19              MR. D'ANDREA:  Privileged.

20       A.  No, I haven't.

21              (Straus Exhibit No. 9 was marked.)

22       Q.  (BY MR. SHORDT)  I'm showing you what's been

23  marked as Exhibit No. 9.  And I will represent it is an

24  excerpt of the House Journal from the 82nd Texas

25  legislature regular session proceedings that occurred on

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

128

1       A.   That -- that's what I would think it says, yes.

2       Q.   And earlier I believe you said -- you testified

3  that an election identification certificate was created

4  in SB14 so an individual could get, free of charge, a

5  photo ID to vote pursuant to SB14.   Is that correct?

6       A.   I thought so.

7       Q.   Do you understand that this amendment would

8  allow an individual seeking to get a birth certificate

9  or another identification -- another form of

10 identification's underlying document needed in order to

11 obtain an election identification certificate?

12      A.   I assume that's what it says, yeah.

13      Q.   Do you recall just -- do you recall any debate

14 on Amendment No. 15 when SB14 -- I'm sorry --

15      A.   Not specifically, but I'm sure there was.

16           THE REPORTER:   Can you ask the question

17 again?

18      Q.   (BY MR. SHORDT)   Do you recall debate on

19 Amendment No. 15 when SB14 was debated?

20      A.   I don't.

21      Q.   And does the record reflect here that this

22 amendment was tabled?

23      A.   Yes.

24      Q.   And does "tabled" mean that it did not pass?

25      A.   That's correct.

JOE STRAUS                                                6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                              129

1       Q.  So is it fair to say that this amendment did

2   not pass and, as a result, individuals still are

3   required to pay fees in order to obtain documents that

4   they may need to obtain an election identification

5   certificate?

6               MR. D'ANDREA:  Objection; misstates the

7   evidence in the record.

8               MR. SCOTT:  Objection; form,

9   mischaracterization of the evidence.

10      Q.  (BY MR. SHORDT)  You can answer.

11      A.  Well, it says that this amendment failed.

12      Q.  I'll re-ask the question.  "This amendment

13  failed" means that -- strike that.

14              Was there any amendment that passed, any

15  amendment to SB14 that passed that permitted a waiver of

16  fees for obtaining documents necessary to get an

17  election identification certificate?

18      A.  I don't know.

19      Q.  If an election identification certificate being

20  free is a reason that SB14 is compliant with the Voting

21  Rights Act, why should the underlying documents not be

22  free?

23              MR. SCOTT:  Objection; form, vague.

24              You can answer, if you can.

25      A.  I don't -- I don't know why they shouldn't be.

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                                  130

1        Q.  (BY MR. SHORDT)  Do you think they should be?

2             MR. SCOTT:  Objection; form.

3        A.  To be in compliance with the Voting Rights Act?

4        Q.  (BY MR. SHORDT)  In general, do you think that

5   if an individual wants to obtain an EIC and they do not

6   posses, for example, a birth certificate, should that

7   person have to pay for a birth certificate in order to

8   get a free election identification certificate to vote

9   under SB14?

10       A.  I really don't know.  I don't know -- I don't

11  know what a -- what the cost of a birth certificate is.

12       Q.  At the time, I can represent to you I believe

13  the cost of a birth certificate was $22 when SB14 was

14  passed.

15            Would an individual who did not have the

16  requisite photo identification to vote under SB14 have

17  to pay $22 to get a birth certificate in order to then

18  get what is deemed to be a free election identification

19  certificate in order to vote?

20            MR. SCOTT:  Objection; form, foundation.

21       Q.  (BY MR. SHORDT)  You can answer.

22       A.  I guess a matter of opinion.  I don't -- is

23  this for a replacement birth certificate or somebody

24  that doesn't have one?

25       Q.  For either.

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

131

1              MR. SCOTT:   Objection; form, foundation.

2         Q.  (BY MR. SHORDT)   If you think there's a

3    distinction, then you can --

4         A.  I do.   I think there's a distinction,

5    personally.   It's just my opinion.

6         Q.  Okay, for replacement?

7         A.  I think for replacement, I think -- I don't

8    think you should have -- I think you should have to pay

9    for it.

10        Q.  And if they did not have a birth certificate?

11        A.  Then that may be a different matter.   But I

12   don't know who doesn't have one.

13        Q.  Do you believe that everybody in Texas has a

14   birth certificate?

15             MR. SCOTT:   Objection; form, foundation.

16        A.  I don't -- I don't know how -- I don't know how

17   other states deal with birth certificates or how that

18   works.

19        Q.  (BY MR. SHORDT)   Do you believe that every

20   person born in the state of Texas was issued a birth

21   certificate when they were born?

22        A.  I would doubt that everyone, no.   But I don't

23   know.   I don't know how that works.

24        Q.  Do you -- one second.

25             So just to be clear, I want to make sure I

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                         132

1  understand your answer.  You don't know if every person

2  born in the state of Texas -- is it your --

3                MR. D'ANDREA:  Objection; asked and

4  answered.

5                MR. SCOTT:  I thought you were finished

6  with the question.

7       Q.  (BY MR. SHORDT)  I will restate the question.

8            Is it your testimony that you do not know

9  if an individual born in Texas is issued a birth

10 certificate?

11      A.  I would assume they should be.

12      Q.  Do you have any reason to believe that there

13 are individuals in Texas --

14      A.  I don't.

15      Q.  -- who do not have birth certificates?

16      A.  I don't.  I don't know anything about it.

17      Q.  You don't know anything about it?

18      A.  I don't know how birth certificates are -- are

19 issued.

20      Q.  Do you know what the unemployment rate in Texas

21 was when SB14 was debated in 2011?

22      A.  No, I don't.

23      Q.  Do you know what the average poverty level was

24 in Texas in 2011?

25      A.  I don't.

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

133

1        Q.   Do you know what the minimum wage was in Texas
2   in 2011 when SB14 was debated?
3        A.   I don't recall.
4        Q.   Do you understand that -- let me ask this.
5             You said earlier you had not read or
6   analyzed any of the -- the opinions issued with respect
7   to Texas vs. Holder.  Is that right?
8        A.   That's correct.
9        Q.   Did you read or review any -- the Crawford vs.
10  Marion County Supreme Court opinion?
11       A.   No.
12       Q.   Are you aware that that Supreme Court case
13  requires states to undertake a burden analysis when
14  passing photo identification laws to vote?
15             MR. SCOTT:  Objection; form, foundation,
16  mischaracterization.
17       Q.   (BY MR. SHORDT)  You can answer.
18       A.   No.
19       Q.   What do you think -- how would you define a
20  burden, economic burden, on an individual to vote in
21  Texas?
22       A.   I wouldn't know how to define it.
23       Q.   Do you think that requiring an individual to
24  pay $22 to get a birth certificate in order to get a
25  free election identification certificate constitutes a

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                            134

1  burden on their right to vote?

2              MR. SCOTT:   Objection; form,

3  mischaracterization of the evidence.

4      A.   It could be.

5      Q.   (BY MR. SHORDT)   Can you elaborate?   What do

6  you mean "it could be"?

7      A.   Well, could it be a burden, yes, it could be a

8  burden.

9      Q.   In what way?

10     A.   To pay money.

11     Q.   Do you know -- do you know how many Texans use

12  public transportation?

13     A.   I don't.

14     Q.   I assume the answer is true, isn't that in 2011

15  when SB14 was debated?

16              THE REPORTER:   I'm sorry.   Can you

17  repeat it again?

18     A.   I don't -- I don't know the answer.

19              THE REPORTER:   Can you repeat the question

20  again?

21     Q.   (BY MR. SHORDT)   I assume that that is the same

22  answer as to when SB14 was debated in 2011.

23              THE REPORTER:   And your answer?

24     A.   I don't know.

25     Q.   (BY MR. SHORDT)   How far is your polling

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

135

1   location from your House?

2        A.   The early voting or the same day -- or the

3   election-day voting.

4        Q.   We'll start with early voting.

5        A.   Closest one is probably, I'd guess, within

6   2 miles, within 3 miles.

7        Q.   And what about same day?

8        A.   Oh, it's within -- within a mile and a half.

9        Q.   And I apologize if you asked -- if Mr. Dunn

10  asked this question earlier, but how far is the driver's

11  license bureau from your home?

12       A.   Well, I don't know where the closest one is

13  anymore.  I'd say probably, I'm guessing, 6 or 7 miles

14  maybe.

15       Q.   Do you drive when you go to get -- to get your

16  driver's license renewed?

17       A.   Yes.

18       Q.   Are there counties in Texas where the driver's

19  license office might be more than 50 miles from where an

20  individual lives?

21       A.   I would assume so, yes.

22       Q.   Do you know what the average gallon of gas

23  costs right about now?

24       A.   Average?

25       Q.   Yeah.

JOE STRAUS                                                6/23/2014
CONFIDENTIAL TRANSCRIPT

136

1       A.   Well over $3.

2       Q.   So if you were to drive 100 miles round-trip

3   from your home to the driver's license bureau, get an ID

4   and return, that would cost 10 or 15 dollars, probably?

5            MR. SCOTT:   Objection; form, relevance.

6       Q.   (BY MR. SHORDT)   You can answer.

7       A.   How many miles?

8       Q.   Say 100 miles round-trip.

9       A.   Wouldn't cost me that much.   But it depends on

10  the car you drive, I suppose.

11      Q.   Would it cost more than $5?

12      A.   Oh, yeah.

13      Q.   When -- do you think that it's a burden -- you

14  mentioned earlier that you waited longer than you wanted

15  to in the driver's license line, about an hour, to get a

16  driver's license.

17            Are you aware of any studies that have

18  analyzed driver's license bureau wait times?

19      A.   I vaguely recall there were some done, but I

20  don't -- I don't remember them.

21      Q.   You don't remember specifics of what the wait

22  time might be?

23      A.   I don't.

24      Q.   How long do you think a wait time at a -- to

25  get your driver's license should be?   What's reasonable?

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

137

1  Certainly less than an hour.  Would two hours be

2  unreasonable?

3              MR. SCOTT:  Objection; form, foundation.

4       Q.  (BY MR. SHORDT)  You can answer.

5       A.  Two hours be unreasonable?

6       Q.  Correct.

7       A.  It would be unfortunate, yes.

8       Q.  Would it be unreasonable?

9              MR. SCOTT:  Objection; form, foundation.

10      A.  I think it's unnecessary.

11      Q.  (BY MR. SHORDT)  Do you think that -- if an

12  individual had to pay for a 100-mile round-trip drive to

13  the driver's license bureau after having paid up to $22

14  for a birth certificate to get what is a free election

15  identification certificate, would you consider that to

16  be a burden?

17              MR. D'ANDREA:  Objection; mischaracterizes

18  the record.

19              MR. SCOTT:  Objection; form, foundation.

20      Q.  (BY MR. SHORDT)  You can answer.

21      A.  Would it be a burden?

22      Q.  Earlier you testified --

23      A.  It would be an expense, yes.  It would be

24  expensive --

25      Q.  Earlier you testified -- sorry to cut you off.

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

138

1          Earlier you testified that there could be

2   different burdens on an individual.  If a person was

3   below the poverty line, would paying for gas for that

4   round-trip and would paying for an underlying document

5   for an election identification certificate constitute a

6   burden, in your mind?

7               MR. SCOTT:  Objection; form, asked and

8   answered.

9        A.  Yes.

10       Q.  (BY MR. SHORDT)  Do you know how long the lines

11  are to -- strike that.

12               Are you aware of any analysis or reports

13  addressing wait times at polling locations in Texas?

14       A.  No.

15       Q.  Do you understand -- or are you aware of any

16  instances where individuals will have to wait in excess

17  of one hour to vote?

18       A.  Heard of that, yes.

19       Q.  Can you tell me where -- when you heard about

20  that?

21       A.  No.  Just news reports.  I haven't had to wait

22  an hour.

23       Q.  Would those have been recent elections?

24       A.  I don't remember.

25       Q.  Do you know if there were waits at poles in

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                              139

1  excess of two hours?

2       A.  I don't know.

3       Q.  But you have heard of waiting at an election --

4  or waiting in line in order to vote at election time?

5       A.  Yes.

6       Q.  Do you think that it's a burden for an

7  individual who might -- do you think it's a burden for

8  an individual to have to wait longer than one hour to

9  vote?

10              MR. SCOTT:  Objection; form, foundation,

11  vague.

12       A.  Yes.

13       Q.  (BY MR. SHORDT)  Are you aware or do you know

14  if minorities in Texas constitute the majority of

15  individuals who live at or below the poverty line?

16       A.  I think that's probably correct.

17       Q.  What's the basis of your understanding?

18       A.  Just recollection of seeing that information.

19       Q.  Do you recall if -- if the relative poverty

20  level of minorities in Texas was addressed during the

21  SB14 debate?

22       A.  I don't recall.

23       Q.  Have you ever asked for that information?

24       A.  No.

25       Q.  Have you discussed that with other members or

JOE STRAUS                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                    140

1  senators?

2           MR. D'ANDREA:  Privileged.

3      A.  I don't recall discussing it, no.

4      Q.  (BY MR. SHORDT)  So do you recall -- strike

5  that.

6           Your testimony is that you do not recall,

7  during SB14, whether the poverty -- whether the poverty

8  level of minorities in Texas of Texas voters was

9  discussed?

10          MR. D'ANDREA:  Privileged.

11          MR. SCOTT:  Objection; asked and answered.

12     A.  I imagine it has -- it was.

13     Q.  (BY MR. SHORDT)  As -- at the time SB14 was

14 debated in 2011, were you aware of any specific

15 incidents of in-person voter fraud?

16     A.  No.

17     Q.  In Texas?

18     A.  No.

19     Q.  Anywhere in the United States?

20     A.  I'm not aware.

21     Q.  And so I understand your testimony, you are not

22 aware of a single instance of voter fraud that's ever

23 occurred in Texas involving the use of a student

24 identification card?

25     A.  Not aware, no.

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

141

                        EXAMINATION

1
2   BY MR. SCOTT:

3       Q.   Mr. Speaker --

4               MR. SCOTT:  Are y'all --

5               MR. SHORDT:  I have no more questions.

6               MR. SCOTT:  May I clear something up?

7               MR. SHORDT:  Yeah.

8       Q.   (BY MR. SCOTT)  Let me hand you what's been

9   marked as Exhibit 7 to your deposition.  What we know

10  is, that document didn't come from the 2011 session,

11  correct?  Make sure.

12      A.   2011 instead of 2010.

13      Q.   So unless somebody had a time machine, this

14  wouldn't have been something somebody was able to

15  consider during the 2011 consideration of SB14 as far as

16  talking points for getting democratic support for the

17  bill, correct?

18      A.   Yeah.  It says 2011 instead of 2010, so it

19  had -- it had to be later.

20      Q.   It had to have been before 2011 session, which

21  would have been the 82nd session, correct?

22      A.   I would assume so, yes.

23      Q.   Okay.  With regards to rules, early on in your

24  deposition you and Mr. Dunn spoke a little bit about

25  legislative rules.

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

                                                                    143

1      A.   I don't remember seeing it.

2      Q.   And you don't know who prepared it?

3      A.   Don't.

4      Q.   So you have absolutely no idea what year this

5  is from?

6      A.   I don't know anything about it.

7               MR. SHORDT:   Thank you.   That's all.

8               MR. DUNN:   Nothing further from me.

9               MR. GEAR:   Actually I have one follow-up

10  question.

11               THE WITNESS:   Yeah.

12                    FURTHER EXAMINATION

13  BY MR. GEAR:

14      Q.   Regarding the rules, isn't it true that there

15  are some time-honored rules that are revisited every

16  session?

17      A.   Yeah.   I mean, the rules -- the rules don't

18  drastically change necessarily from session to session.

19      Q.   And isn't it also true that the two-thirds rule

20  was considered a time-honored rule until 2009?

21               MR. D'ANDREA:   Objection; mischaracterizes

22  the record.

23      A.   That's a Senate rule, and I -- I don't --

24  that's their business.

25               MR. SCOTT:   Nothing further.