

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

| | | |
|---|---|---|
| MARC VEASEY, ET AL | * | |
|     PLAINTIFFS | * | CIVIL ACTION NO. |
| VS. | * | 2:13-CV-193 (NGR) |
| RICK PERRY, ET AL | * | [Lead case] |
|     DEFENDANTS | * | |
| | * | |
| | * | |
| UNITED STATES OF AMERICA, | * | |
|     PLAINTIFFS | * | |
| TEXAS LEAGUE OF YOUNG VOTERS | * | |
| EDUCATION FUND, ET AL | * | |
|     PLAINTIFF-INTERVENORS | * | CIVIL ACTION NO. |
| TEXAS ASSOCIATION OF HISPANIC COUNTY | * | 2:13-CV-263 (NGR) |
| JUDGES AND COUNTY COMMISSIONERS, | * | [Consolidated case] |
| ET AL | * | |
|     PLAINTIFF-INTERVENORS | * | |
| VS. | * | |
| STATE OF TEXAS, ET AL | * | |
|     DEFENDANTS | * | |
| | * | |
| | * | |
| TEXAS STATE CONFERENCE OF NAACP | * | |
| BRANCHES, ET AL | * | CIVIL ACTION NO. |
|     PLAINTIFFS | * | 2:13-CV-291 (NGR) |
| VS. | * | [Consolidated case] |
| JOHN STEEN, ET AL | * | |
|     DEFENDANTS | * | |
| | * | |
| | * | |
| BELINDA ORTIZ, ET AL | * | |
|     PLAINTIFFS | * | CIVIL ACTION NO. |
| VS. | * | 2:13-CV-348 (NGR) |
| JOHN STEEN, ET AL | * | [Consolidated case] |
|     DEFENDANTS | * | |
| | * | |

**ORAL DEPOSITION OF JUANITA VALDEZ-COX**

**JUNE 25, 2014**

ORIGINAL

SYLVIA KERR, CSR                                          SAN JUAN, TEXAS

**Austin**
tel |512|320 8690
fax |512|320 8692

**Dallas**
tel |972|364 9777
fax |972|364 9778

**Houston**
tel |281|471 8500
fax |281|471 8504

**San Antonio**
tel |210|277 6200
fax |210|277 6232

3100 West Slaughter Lane  |  Suite 101  |  Austin, Texas 78748  |  toll free 877 720 8690  |  toll free fax 866 720 8692  |  www.integrity-texas.com

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

```
------------------------  )
MARC VEASEY, JANE HAMILTON,   )
SERGIO DELEON, FLOYD J.       )
CARRIER, ANNA BURNS, MICHAEL  )
MONTEZ, PENNY POPE, OSCAR     )
ORTIZ, KOBY OZIAS, JOHN       )
MELLOR-CRUMLEY, PEGGY         )
HERMAN, EVELYN BRICKNER,      )
GORDON BENJAMIN, KEN GANDY,   )
LEAGUE OF UNITED LATIN        )   CIVIL ACTION NO.
AMERICAN CITIZENS (LULAC),    )   2:13-CV-193 (NGR)
AND DALLAS COUNTY, TEXAS      )   [Lead case]
            Plaintiffs        )
                              )
VS.                           )
                              )
RICK PERRY, Governor of       )
Texas; and JOHN STEEN, Texas  )
Secretary of State,           )
            Defendants         )
------------------------  )
UNITED STATES OF AMERICA,     )
            Plaintiffs        )
                              )
TEXAS LEAGUE OF YOUNG VOTERS  )
EDUCATION FUND, IMANI CLARK,  )
AND MICHELLE BESSIAKE,        )
     Plaintiff-Intervenors    )
                              )
TEXAS ASSOCIATION OF          )
HISPANIC COUNTY JUDGES AND    )
COUNTY COMMISSIONERS; and     )
HIDALGO COUNTY,               )
     Plaintiff-Intervenors    )   CIVIL ACTION NO.
                              )   2:13-CV-263 (NGR)
VS.                           )   [Consolidated case]
                              )
STATE OF TEXAS, JOHN STEEN,   )
in his official capacity as   )
Texas Secretary of State;     )
and STEVE McCRAW, in his      )
official capacity as          )
Director of the Texas         )
Department of Public Safety,  )
            Defendants.       )
------------------------  )
```



```
 1  ------------------------------
    TEXAS STATE CONFERENCE OF        )
 2  NAACP BRANCHES; and the          )
    MEXICAN AMERICAN LEGISLATIVE     )
 3  CAUCUS OF THE TEXAS HOUSE OF     )
    REPRESENTATIVES,                 )
 4          Plaintiffs               )    CIVIL ACTION NO.
                                     )    2:13-CV-291 (NGR)
 5  VS.                              )    [Consolidated case]
                                     )
 6  JOHN STEEN, in his official      )
    capacity as Secretary of         )
 7  State of Texas; and STEVE        )
    McCRAW, in his official          )
 8  capacity as Director of the      )
    Texas Department of Public       )
 9  Safety,                          )
            Defendants               )
10  ------------------------------   )
    BELINDA ORTIZ, LENARD            )
11  TAYLOR, EULALIO MENDEZ JR.,      )
    LIONEL ESTRADA; ESTELA           )
12  GARCIA ESPINOSA, LYDIA LARA,     )
    MARGARITO MARTINEZ LARA,         )
13  MAXIMINA MARTINEZ LARA, AND      )
    LA UNION DEL PUEBLO ENTERO,      )    CIVIL ACTION NO.
14  INC.,                            )    2:13-CV-348 (NGR)
            Plaintiffs               )    [Consolidated case]
15  VS.                              )
                                     )
16                                   )
    STATE OF TEXAS, JOHN STEEN,      )
17  in his official capacity as      )
    Texas Secretary of State;        )
18  and STEVE McCRAW, in his         )
    official capacity as             )
19  Director of the Texas            )
    Department of Public Safety,     )
20          Defendants.              )
    ------------------------------   )
21  * * * * * * * * * * * * * * * * * * * * * * * * * *

22              ORAL DEPOSITION OF

23             JUANITA VALDEZ-COX

24            TAKEN ON JUNE 25, 2014

25  * * * * * * * * * * * * * * * * * * * * * * * *
```

3

1        ORAL DEPOSITION of JUANITA VALDEZ-COX, produced as a

2   witness at the instance of the Defendants, and duly

3   sworn, was taken in the above-styled and numbered cause

4   on the 25th day of June, 2014, from 9:41 a.m. to 2:09

5   p.m., before SYLVIA KERR, CSR, RPR, CRR in and for the

6   State of Texas, reported by machine shorthand, at the

7   offices of La Union del Pueblo Entero, Inc., 1601 U.S.

8   83 Business, San Juan, Hidalgo County, Texas, pursuant

9   to the Federal Rules of Civil Procedure and the

10  provisions attached hereto.

11                  A P P E A R A N C E S

12  COUNSEL FOR THE PLAINTIFFS LA UNION DEL PUEBLO ENTERO,
    INC.:
13       MS. MARINDA VAN DALEN
         MS. PRISCILLA NORIEGA
14       Texas Rio Grande Legal Aid, Inc.
         531 East St. Francis Street
15       Brownsville, Texas 78529-5354
         (956) 982-5540
16

17  COUNSEL FOR THE PLAINTIFF UNITED STATES OF AMERICA:
         MS. ANGELA MILLER   (via telephone)
18       MR. RYAN KING   (via telephone)
         U.S. Department of Justice
19       950 Pennsylvania Avenue NW
         NWB #7266
20       Washington, D.C. 20530
         (202) 305-4143

21  COUNSEL FOR THE DEFENDANTS STATE OF TEXAS, RICK PERRY,
    JOHN STEEN and STEVE McCRAW:
22       MR. G. DAVID WHITLEY
         Assistant Deputy Attorney General
23       P.O. Box 12548
         Austin, Texas 78711
24       (512) 475-3281

25

5

```
 1              COURT REPORTER:  At this time the
 2   deposition of Juanita Valdez-Cox is being taken in Cause
 3   No. 2:13-CV-291, styled Texas State Conference of NAACP
 4   Branches versus John Steen, et al, commencing at 9:41
 5   a.m. on Wednesday, the 25th day of June, 2014 at the
 6   offices of LUPE located at 1601 U.S. Expressway 83 in
 7   the city of San Juan, Texas.  The court reporter is
 8   Sylvia Kerr, affiliated with Integrity Reporting.  Will
 9   counsel please state their appearances for the record.
10              MR. WHITLEY:  My name is David Whitley,
11   and I represent the Defendants in this litigation.  And
12   if all the attorneys want to introduce themselves before
13   we get started.
14              MS. VAN DALEN:  Marinda van Dalen, Texas
15   Rio Grande Legal Aid representing LUPE at this
16   deposition.  Beside me is my colleague, Priscilla
17   Noriega.
18              MS. MILLER:  And I'm Angela Miller from
19   the Department of Justice representing the United
20   States.
21              THE WITNESS:  I was going to say that the
22   address is not an Expressway, but Business 83.
23              JUANITA VALDEZ-COX,
24   having been first duly sworn, testified as follows:
25
```

EXAMINATION

BY MR. WHITLEY:

Q.    Ms. Cox, will you please state your full name and spell it for the record, please.

A.    Juanita, J-u-a-n-i-t-a, Valdez, V-a-l-d-e-z, hyphenate Cox, C-o-x.

Q.    Thank you.   And where do you reside?

A.    In Donna, Texas.

Q.    And are you represented by a lawyer today?

A.    Yes.

Q.    And who would that be?

A.    Marinda.

Q.    And she's sitting right next to you?

A.    Yes.

Q.    Have you ever been deposed before?

A.    Yes, once.

Q.    In what case was that?

A.    It was, I think, redistricting and voter ID.

Q.    So two times previously?

A.    No, no, it was combined.

Q.    It was one case?

A.    It was one case.

Q.    Do you remember which one -- those were separate cases, so do you remember if it was in the voter ID or redistricting?

 1     Q.    Did you guys meet here?  Or where did you-all

 2  meet when you-all spoke in person?  Or was it over the

 3  phone?

 4     A.    Here.

 5     Q.    It was here?

 6     A.    Uh-huh.

 7     Q.    How long was the meeting?

 8     A.    Maybe an hour, hour and a half.  Probably it

 9  was about an hour, hour and a half.

10     Q.    Was anyone else present?

11     A.    No.

12     Q.    Did you review any documents yesterday?

13     A.    Did I review any documents?  Yes, we did.

14     Q.    Which ones were those?

15     A.    A flyer.  A flyer that we had used to inform

16  about the voter ID.  We -- what else did we talk about?

17              MS. VAN DALEN:  I'm going to tell you not

18  to discuss anything we talked about, just any documents

19  that you looked at in preparing for the deposition.

20     A.    Okay.  The flyer, a press release that we had

21  sent out about -- what else?  The flyer, the press

22  release, the lawsuit.  You know, she showed that to me.

23  And the -- I think something -- it was like the

24  responses that they -- that apparently you sent some

25  questions and they responded to you.

1 Q. Understood.

2 A. Yeah.

3 Q. Ms. Cox, what is your educational background?

4 A. I went to school here in Donna and I am --

5 Q. Was that high school?

6 A. To the tenth grade because I am a former

7 migrant farm worker.  So then I went back and got my

8 G.E.D. and then I went back and got my associate degree

9 at the local university.

10 Q. What university is that?

11 A. Here at UTPA, Pan American.

12 Q. And aside from your associate's degree, do you

13 have any other professional qualifications, any kind of

14 certifications at all other than your degree?

15 A. No, not certifications or anything.  I can -- I

16 can teach people how to harvest a lot of different crops

17 because that's what we did, but there's no certification

18 for that.

19 Q. Understood.  Are you currently employed?

20 A. Yes.

21 Q. Where?

22 A. Here at this organization, La Union del Pueblo

23 Entero.

24 Q. And that's LUPE?

25 A. Yes, uh-huh.

1    Q.    Are you employed by anyone else?

2    A.    No.

3    Q.    Do you receive income from any other source?

4    A.    Nuh-huh.   No, this is it.

5    Q.    What is your role at LUPE?

6    A.    I am the executive director of this

7    organization.

8    Q.    How long have you held that position?

9    A.    As executive director, since 2000 and -- I

10   believe it's 2003, if I recall correctly.   Yeah.

11   Q.    And, again, that is a paid position --

12   A.    Yes.

13   Q.    -- as executive director?

14   A.    Yes, uh-huh.

15   Q.    What are your official duties and

16   responsibilities?

17   A.    There's a lot of different ones.   We have -- we

18   have a staff of, I think, 25 or 26.   And we have to -- I

19   have to be in charge of, you know, the different

20   programs that we offer here at LUPE, make sure that our

21   yearly operational goals are met by the -- by the staff

22   and the services that we provide.   It's making sure that

23   the funding we get goes to the growth of the

24   organization, which is really important to growing the

25   base.   This is an organization where people pay a fee to

1   belong and pay for their services.  And so need to make

2   sure that that funding is used in the best way possible

3   to continue with the programs.

4            Servicing the needs of the community.  And that

5   is -- that is really, really an important goal that we

6   have.  Also, the -- making sure that those members that

7   live in the colonias, they're low income areas are out

8   in the community that have certain needs, that realize

9   that they also have the power to make change in those

10  needs, that they can, you know, work together.  And if

11  it's a lack of street lights in the colonia or lack of

12  water or whatever services or needs that they have that

13  they can address them, that through our community

14  organizing, training, leadership development that we can

15  all -- that it is our responsibility.

16           At the end of the day we are the ones that have

17  to live if we don't have water or street lights or

18  things like that.  And so that's one of the -- one of

19  our main -- my main goals here that I have to keep an

20  eye on, that that is always being achieved.

21       Q.    How many hours a week do you spend working at

22  LUPE?

23       A.    Well, my weekly hours are -- well, it should be

24  40, but it's never 40.

25       Q.    Is it usually more?

1      A.   Of course.   With all that we have to do, it's a

2   lot more.   It's a lot more.   And then sometimes it

3   includes like weekends, right, but that's -- that's just

4   part of the -- part of the work that we do.

5      Q.   Is all of the work that you do for LUPE done

6   here at this building?   Or do you work --

7      A.   We have other offices, so it may be here or I

8   may travel to one of the other offices that we have.

9      Q.   How many other offices are there?

10     A.   Besides this one, there's four more.

11     Q.   All in Texas?

12     A.   All in Texas, all in this county for now,

13   uh-huh.

14     Q.   Do you -- and forgive me, I may have already

15   asked this question.   Do you have a commute to and from

16   the office at all?

17     A.   Do I have what?

18     Q.   How long does it take you to get to the office?

19     A.   Oh, not long at all.   We live in Donna and

20   it's, I would say, maybe ten -- today it takes a little

21   bit longer because on Wednesdays there's a flea market

22   and there's a whole lot of, you know, cars and people

23   going to the flea market and I drive right through

24   there, so only Wednesdays are a little longer.   Other

25   than that, actually it's not far at all.   It's very,

 1  very convenient, very close.

 2      Q.   **Did you have any previous jobs before you**

 3  **started here at LUPE?**

 4      A.   Oh, yes, uh-huh.

 5      Q.   **What were those?**

 6      A.   How far do you want to go?

 7      Q.   **We can start with the ones that you remember**

 8  **right before you started with LUPE and then I can tell**

 9  **you to stop.**

10      A.   I was -- first I was a Head Start director here

11  in this county also.  And then I was --

12      Q.   **When was that?**

13      A.   I have no idea.  Many years ago.  Maybe -- I

14  don't have -- it was a long time ago.  And then -- and

15  then I volunteered here at the union in around -- around

16  the mid '80s.

17      Q.   **When you say "the union," do you mean LUPE?**

18      A.   No.  I mean, the United Farm Workers.

19      Q.   **Okay.**

20      A.   LUPE wasn't until 2003.  That's when we brought

21  LUPE to Texas.  So before then, we were the United Farm

22  Workers.  And I started as a social service provider

23  offering services up front to the members.  And then I

24  became a community organizer for the union, and then I

25  became the coordinator for the different programs, and

1    then I became the executive director.

2        Q.    So when you started with LUPE, it was in a

3    volunteer capacity?

4        A.    For many years.  With the United Farm Workers,

5    that's how it was.  Everybody was volunteering.  And I

6    volunteered.  Well, they would give us $25 a week for

7    childcare, but everybody was volunteering.  That's how

8    we were for, oh, I would say a good maybe ten or 12

9    years.

10       Q.    And then did LUPE start in 2003?

11       A.    Yes.

12       Q.    And that's --

13       A.    No.  In Texas it did.

14       Q.    Okay.

15       A.    Yeah.

16       Q.    And then that's when you became the executive

17   director?

18       A.    The director and then executive director,

19   uh-huh.

20       Q.    How long were you director before you became an

21   executive director?

22       A.    I think it was -- it wasn't too long.  Maybe

23   three or four years and then --

24       Q.    How are those positions different?

25       A.    As just director, I was in charge of this

1   office here -- of this office here and then we had

2   people based in the different offices like just office

3   managers.  And then our board just decided that that

4   wasn't working out too well, so we wanted to put

5   everything under one, which was me, you know, as

6   executive director.

7        Q.    So this is the main office for all of the other

8   locations in South Texas?

9        A.    Oh, yes, this is like the oldest office, yeah,

10  uh-huh.  This has been here the longest.

11       Q.    Who do you report to?

12       A.    We have an advisory board of LUPE members and

13  then obviously the executive board.

14       Q.    What is the difference between the advisory

15  board of LUPE members and the executive board?

16       A.    Well, the advisory board advises on certain

17  questions, you know, that I may have, certain programs.

18  And obviously the executive board, well, they make

19  policy and the policies and approve the yearly

20  operational plan, you know, approve our budget.  That's

21  the business of the executive board.

22       Q.    Who makes up the advisory board?  You mentioned

23  LUPE members.

24       A.    Yes, it's LUPE members.

25       Q.    Are they elected to serve?  Do they --

1    A.    They're elected by the membership of the
2    organization.
3        Q.    To serve on the advisory board?
4        A.    To be on the advisory board.  And then from the
5    advisory board, after they serve a few years, then they
6    can move up to the executive board.
7        Q.    How are the members of the executive board
8    chosen?
9        A.    Elected.
10       Q.    From the -- by the members of LUPE?
11       A.    No, by the board members.  By the -- they're
12    recommended and then they're chosen by the board
13    themselves.  You know, the other board members.
14       Q.    So the executive board votes as to whether or
15    not they want somebody on their executive board?
16       A.    Right.  For example, from the advisory board,
17    if a member has been on the advisory board, let's say,
18    two years and then I will write up a bio on that person
19    and I will recommend that to the executive board and
20    then they vote whether to vote that person -- to have
21    that person on the board.
22       Q.    Does that occur when there's an open spot on
23    the executive board?  Or does it grow continuously?
24       A.    It has to -- we have to name one community
25    member to the executive board every year.

1      A.    Right, uh-huh.  He's the grants writer and the

2  budget person for LUPE locally.

3      Q.    **Okay.**

4      A.    Not the grants -- the grants and the budget

5  person.

6      Q.    **What makes up the biggest chunk of your budget?**

7      A.    What do you mean?  I don't understand.

8      Q.    **Is your budget calculated yearly?**

9      A.    Yes.

10     Q.    **Every year do you come up with a new budget?**

11     A.    **Yes.**

12     Q.    **And the executive board votes on it?**

13     A.    Exactly.

14     Q.    **And approves it or --**

15     A.    Right.

16     Q.    **Maybe if they have changes, you guys will**

17  **change something?**

18     A.    They will.  Right, they will make changes,

19  uh-huh.

20     Q.    **When you present that budget, what line item**

21  **costs the most money as you're estimating what you're**

22  **going to spend money on?**

23     A.    Salaries.

24     Q.    **Salaries?**

25     A.    Uh-huh.

1      Q.    Do you know about what percentage?

2      A.    No, I don't.

3      Q.    What --

4      A.    But it is the biggest chunk.

5      Q.    What other items make up a big chunk of that

6  budget?

7      A.    Probably benefits.  We have really excellent

8  benefits for the staff.  And then -- I think that's the

9  next one.

10      Q.    And how much of a chunk does LUPE's programming

11  and voter outreach make up of the budget?

12      A.    Well, that falls under organizing, and we have

13  a budget for our community organizers that are the

14  people that work out in the communities.  I don't know

15  how much of it is for that.  But we have the social

16  services and the organizing.  So between those two, it's

17  a big chunk of our budget.

18      Q.    How many organizers do you guys have?

19      A.    We have -- we have -- I think it's four and one

20  coordinator, so five total.

21      Q.    Are they paid?

22      A.    Oh, yes, uh-huh.

23      Q.    Are they salaried employees of LUPE?

24      A.    Uh-huh, yes.

25      Q.    And how many people do you have on the social

1    services team?

2        A.    Oh, that's a lot because we have -- we have

3    three or four in each office.  And here we have maybe

4    five or six.  I can't -- I don't --

5        Q.    Would it be fair to say somewhere between 15

6    and 20?

7        A.    Yes, uh-huh.  Well, maybe -- maybe 12 to 15,

8    yeah.

9        Q.    Okay.

10       A.    Because we have other staff also.

11       Q.    So the organizers and those that help out with

12   social services are who performs the voter outreach for

13   LUPE?

14       A.    The social service providers and the

15   organizers, yes.

16       Q.    Is there any overlap between those two groups?

17   Is there anybody --

18       A.    I have no idea.  I don't know how I could tell

19   that.

20       Q.    I guess what I'm asking is:  Is anybody who is

21   an organizer and gets paid by LUPE --

22       A.    Right.

23       Q.    -- also on the social services team?

24       A.    Oh, no, nuh-huh, no.

25       Q.    What other activities do the organizers perform

1  **other than voter outreach?**

2      A.   Well, that's included in their -- in their

3  community organizing, which is -- includes -- the voter

4  outreach includes the -- you know, the GOTV, the

5  different events with potential candidates that are

6  running for office, you know, like candidates forms.

7  They have media events to announce to the community

8  what's coming down that might have an impact on the

9  community.

10          They have -- they organize marches, you know,

11  different kinds of protests that need to happen against,

12  you know, different issues that we're working on.  They

13  have a lot of meetings with what we call house meetings,

14  which are small meetings in the communities in a home of

15  a family that wants to discuss certain issues.  And, of

16  course, a really important job is also the enrollment of

17  members into the organization.

18      Q.   **What sort of events do the organizers announce**

19  **to the community?**

20      A.   For example, the whole issue on health, you

21  know, that was coming down and then Governor Perry

22  denied the Medicaid, so they tell folks how that might

23  have an impact on them.  When the immigration reform,

24  you know, that we're still working on, that hasn't

25  happened.  They educate them on that.  You know, tell

1  them about, you know, how they can have an impact or how
2  they can get involved in that issue.  Right now we're
3  working on the street lights.  That's a huge issue.
4          So we have federal issues that we work on, we
5  have state issues, and we have very local issues also
6  that they work on.  So they're involved in all of those
7  three areas.
8      Q.   And how is what the organizers do different
9  than what the social services people do?
10     A.   The social services, they are not out in the
11 community unless an organizer invites them to go present
12 information on the work that they do.  For example, LUPE
13 also does -- teaches English, ESL, and it also teaches
14 the history and the government of the United States to
15 the people in the community that want to become
16 citizens.
17          And so if an organizer is going to go to a
18 community and the organizer doesn't know all the details
19 about that program, then a service provider will
20 accompany the organizer so that the social service
21 provider can explain the details of that program.  So
22 they do sometimes go together.  Or on Sundays if the
23 organizer is going to talk at a church about the issues
24 of the community, whether it's the impact on the voter
25 ID or the healthcare, any of those, if they go explain

1   at the church, they might take a service provider with

2   them to explain that, too.   The service providers are

3   very skilled at the issues like of immigration and

4   income tax and they support the organizers in their work

5   and vice versa, the organizers with service.

6        Q.   **Explain to me what LUPE does for its members**

7   **regarding income tax.   You mentioned that earlier.**

8        A.   Oh, we -- for many years LUPE has offered the

9   service of income tax to its membership at lower cost

10  than at others because they're members of the

11  organization.   And we fill out the income tax papers,

12  you know, your tax returns, the tax returns for our

13  membership.

14                 MS. VAN DALEN:   Can we go off the record.

15                 (A recess was taken.)

16                 (Exhibit No. 1 was marked.)

17       **Q.   (By Mr. Whitley)   You've been handed what's**

18  **been marked as Exhibit 1.   And do you recognize that**

19  **document?**

20       A.   Yes, uh-huh.

21       **Q.   Can you tell me what it is, for the record,**

22  **please?**

23       A.   This is -- I think that this is our -- this is

24  part of the -- you know, the filing of the lawsuit.   It

25  looks like it's -- it says Oral Deposition of La Union

1    Q.   Events related to this lawsuit.

2    A.   Events related in the Internet?  We may have.

3  We have -- our communications director probably put

4  something on Facebook or on our website.  He may have.

5  I'm not 100 percent sure.

6    Q.   Does the communications director report to you?

7    A.   Yes, he does.

8    Q.   Does he receive or seek your approval before

9  submitting statements of LUPE on the Internet?

10    A.   Yes, he does, but I don't usually get on

11  Facebook to see them, right.

12    Q.   So how does that usually work?

13    A.   He -- he sends them to me via e-mail, yeah.

14    Q.   And then once you approve it, he'll go ahead

15  and post it?

16    A.   Then he'll just do his job, right.

17    Q.   Does LUPE have a Twitter account?

18    A.   Not -- I think we do.  I'm not too -- you know,

19  I think we do.  I'm not 100 percent sure.  I know

20  Facebook he does and I know he sometimes does like what

21  he calls like a blog and then our website.

22    Q.   Who's your communications director?

23    A.   John Michael Torres.

24    Q.   And do you know what his duties are other than

25  posting information on you-all's website and his blog

1  **and Facebook and --**

2      A.    Actually, he -- he reads a lot of the news that

3  come out.  And anything that has an impact on the LUPE

4  membership or our community, he will -- he will write

5  the press releases or he will write them and then I will

6  approve them or not.  And then he also helps with the

7  leadership development of our memberships -- of our

8  membership so that he does a lot of training with the

9  members so that they can tell their own story and how

10  certain issues are going to impact them.

11          That's part of his work also.  And then he also

12  covers, you know, different meetings.  Like yesterday he

13  was at a meeting for the issue on the unaccompanied

14  minors and then he'll write, you know, on that, too.

15      **Q.    How much do you -- does LUPE rely on John**

16  **Michael Torres, the communications director, to post its**

17  **business or what it considers to be important on its**

18  **website or Facebook or issue a press release?  Is that**

19  **every issue that comes up he will do that?  Or how do**

20  **you guys choose?**

21      A.    Not every issue, but issues that have been

22  identified by our membership that are important to them

23  that will have a negative impact on them somehow, he

24  does that.

25      **Q.    How does the membership identify that to you?**

1      A.    At the -- remember earlier I told you about the

2    house meetings that the organizers have?

3      Q.    Yes.

4      A.    That's where the issues are discussed and

5    prioritized and that's where the -- from that, we decide

6    what actions to take.

7      Q.    So has there ever been an instance in which the

8    communications director posted something on the Internet

9    or Facebook or -- and I believe you mentioned there was

10   a Twitter account?

11     A.    I said I thought there was.  Not 100 percent

12   sure.

13     Q.    Without your approval?

14     A.    Nuh-huh, no.  Nuh-huh.  In all the years he's

15   been with us, I haven't found that to be the case, not

16   that I know of.

17     Q.    Can you tell me what you understand this case

18   to be about?

19     A.    The voter ID, the SB 14?

20     Q.    Yes, ma'am.

21     A.    My understanding of it is that the voter ID was

22   created or was passed to have -- that it has a negative

23   impact on the people that we work with, with the

24   community that we work with.  That it -- that it placed

25   unneeded obstacles to people that already have -- that

1   are living in very difficult situations.   It just added

2   more difficulties to deny them the right to vote.

3       Q.    And what do you understand this case to be

4   addressing?

5       A.    That's what -- that's what it is.   This case,

6   we're trying to put a stop to the denying of voters

7   rights to vote.

8       Q.    And when did you learn that the voter ID law

9   had taken effect?

10      A.    I don't recall the date when that was.

11  Maybe -- I don't recall.   Two years ago or last year.   I

12  don't remember the date.   I just know it was passed in

13  the last legislative session and then I think --

14              MR. WHITLEY:   We can go off the record.

15              (Off the record.)

16      Q.    (By Mr. Whitley)   We were discussing earlier

17  whether or not you remembered --

18      A.    The date.

19      Q.    -- when you learned that the voter ID law had

20  gone into effect?

21      A.    Uh-huh.

22      Q.    I am on Twitter on my phone.

23      A.    Okay.

24      Q.    And this is LUPE's Twitter account.

25      A.    Oh, good.

1    Q.    And I'm going to show you a tweet --

2    A.    Okay.

3    Q.    -- that the LUPE Twitter account sent out and I

4    want you to look at it.  I'm going to hand you my phone

5    and see if you recognize this post.

6    A.    Okay.

7              MS. VAN DALEN:  Can I see it first?

8              MR. WHITLEY:  Sure.

9    Q.    (By Mr. Whitley)  Can you see the date on

10   there, first of all?

11   A.    6/26.  Actually, almost a year ago.  '13.

12   6/26/13.

13   Q.    And does that tweet look familiar?

14   A.    Yes.

15   Q.    You can read it into the record.

16   A.    "Two hours after Supreme Court gets Voting

17   Rights Act, Texas AG suppresses minority votes."

18   Q.    And is that --

19   A.    "Voters."  Excuse me.

20   Q.    I'm sorry for interrupting you.

21   A.    Voters.  I don't -- you know, I don't get on

22   the Twitter, but it's something that we would have put

23   out.

24   Q.    And would that have been put out by the

25   communications director?

41

1      A.   Yes, he does all that.

2      Q.   **And so it would be fair to say that you learned**

3   **about voter ID going into effect some time around when**

4   **this tweet got sent?**

5      A.   I couldn't say that.  You know, I don't know.

6   I just know that it hit us hard and that we probably did

7   that, put out that tweet.

8      Q.   **Do you remember how you found out or who**

9   **informed you?  Let's start with how you found out.**

10     A.   Probably the news.  Probably the news.

11     Q.   **In the news?**

12     A.   Yeah.

13     Q.   **And have you continued to keep track of news**

14  **articles or news stories about voter ID?**

15     A.   As much as possible.

16     Q.   **Were you interested in whether or not voter ID**

17  **had taken effect in Texas?**

18     A.   Was I interested?  Was I interested in -- we

19  didn't want it to, right.

20     Q.   **So yes or no?**

21     A.   We didn't want it to take effect.

22     Q.   **If you didn't want it to take effect** --

23     A.   Right.

24     Q.   -- would that mean that you were interested in

25  whether or not it took effect?

46

A.   No.   We approached -- when it's an issue that
impacts our community, I try to find, you know,
attorneys that can help us file a lawsuit.   If I -- if
the membership is hurting and is discussing something
that's going to have a negative impact, that's part of
my job, to find somebody that can help us with that.

Q.   **How did LUPE, as an organization, decide that**
**it wanted to get involved in this lawsuit?**

A.   Well, we decided, again, because of the -- you
know, the meetings that the community organizers have.
You know, the GOTV vote that we do when we're knocking
on doors and you listen to what the issues are.   The
services -- the service providers, when we have people
that come in for services, if it's an issue that they're
discussing, right?

And I talk to the organizers, to the
coordinator and I say, look, this is what we're hearing
out in the -- this is what I'm getting that's going on
out in the community, is this something?   And then
they'll say, yeah, you know, all the organizers, or say,
no, it was only in this area or -- you know, and that's
how we -- and then -- and then we look at is it going to
have an impact on the membership.

And if it is, then we say, you know what, we
need to file a lawsuit, but also we need to do training,

47

 1   we need to do educating.  Because the lawsuit is only

 2   one piece of it, right?  There's a whole other thing in

 3   educating that needs to happen so that the impact is

 4   felt less.

 5        Q.    Do you remember specifically about this lawsuit

 6   how LUPE decided to get involved?

 7        A.    We -- through -- through the avenues that I

 8   have discussed.  And then we also belong to a coalition

 9   of different non-profit organizations.  It was an issue

10   that came up again.  We have a group that is made up

11   just of executive directors and we discussed this issue

12   and everybody was of the same feeling, that it would

13   have a negative impact, and then we decided, you know.

14   Not that I needed for them to decide, I decided for our

15   membership based on conversations.

16        Q.    What is that coalition of --

17        A.    Right.

18        Q.    -- executive directors called?

19        A.    It's called Voces Unidas, Equal Voice Network.

20        Q.    And which executive director -- so that's made

21   up of executive directors from different organizations?

22        A.    Of many different organizations.

23        Q.    Do you know which organizations?

24        A.    Yeah, there's different ones.  I think there's

25   like ten or 12 different organizations.  Some are

1   housing, some are health, others are immigration, others

2   are education, you know, wage.  There's different kinds

3   of non-profits that deal with different issues and their

4   executive directors belong to this organization.

5       Q.   And you mentioned earlier that you made the

6   decision to get involved?

7       A.   Yes.

8       Q.   Based on something that you had learned from

9   somebody you had in the field?

10      A.   From the meetings that the organizers have and

11  from the clients that come here, from reading the news,

12  from -- you know, it's not just one thing, of course.

13  You know, this is a decision where you want to spend

14  your limited time that's very busy, you know, on a

15  lawsuit or in depositions, right.  So it's not an easy

16  decision.

17           So it's looking at the impact that it's going

18  to have on a community; the community where I live, the

19  community that I represent in my role as an executive

20  director, a community that I know very well.  And so

21  through all of those different things, I decided, right,

22  with some of the staff that this is what we should do.

23      Q.   You mentioned you had been deposed in the

24  previous voter ID lawsuit?

25      A.   Yes, uh-huh, I did.

1 being during the session because I don't remember it

2 being very public information during the session. But

3 what I am saying is if it -- afterwards when they

4 announced it that it had passed, it would not be rare

5 for me to call them and say, you know, what is this and

6 how disappointed and why -- and what can we do.

7     **Q. I just want to get clear for the record. There**

8 **have been two lawsuits --**

9     A. Yes.

10     **Q. -- on one bill.**

11     A. Okay.

12     **Q. So this is just one bill. And I know it's easy**

13 **to confuse. And I get confused, too.**

14     A. Oh, I thought it was two different bills.

15     **Q. So SB 14 is just one bill. There have been two**

16 **different lawsuits. This is the second one.**

17     A. Okay.

18     **Q. And I also want to get clear for the record,**

19 **did you contact your state senator or state**

20 **representative, either before SB 14 was passed or after**

21 **it was passed regarding SB 14?**

22               MS. VAN DALEN: And I'm going to object

23 that she's answered -- you've asked and she's answered

24 that question, but you can try again.

25     A. Well, I don't remember, like I said, if it was

1  before because it wasn't too public.  But if -- if I

2  did, it would have been after -- after.  I wish I had

3  found out about it before and I probably would have.

4      Q.   Do you remember any other voting rights bills

5  that you contacted your state senator or state rep about

6  other than SB 14?

7      A.   There's been others, other type of voting ID

8  that hasn't passed, legislation that has been introduced

9  and where they have tried to make it more difficult for

10 people to vote, but that didn't pass.  But I do remember

11 that there have been other intents and I would have

12 called them about that.

13     Q.   Do you remember specifically whether or not you

14 did?

15     A.   I don't remember specifically because I don't

16 remember how long ago it was and what session it was,

17 but I do -- I do vaguely remember that there was another

18 intent to put some obstacles on voting, but I don't --

19 but I do know that it didn't pass because we're arguing

20 about this one now, right?  So this is probably the only

21 one that passed.  But there were others that were

22 introduced or talked about in the legislature.

23     Q.   So other than bills that were about voter ID,

24 are there any other voting rights bills that you've

25 discussed with your state senator or state

1   **representative?**

2       A.   Not that I can recall right now.

3               MS. VAN DALEN:   An example of a voting

4   rights bill would be like redistricting or changes to

5   voter registration practices.

6       A.   Oh, yeah.  Oh, yes, yes.  Yeah, there was.

7       Q.   **I apologize for not clarifying that.**

8       A.   Oh, yes, definitely we were involved in that,

9   uh-huh.

10      Q.   **And so let's bring up redistricting as an**

11  **example.  Did you contact your state senator or state**

12  **rep regarding redistricting?**

13      A.   And my congressman.  And actually, I testified

14  in that one, too.

15      Q.   **Did you testify in Austin?**

16      A.   Yes.

17      Q.   **Did you testify in Washington, D.C.?**

18      A.   No.

19      Q.   **When you testified in Austin, was that**

20  **regarding the redistricting bill?**

21      A.   Yes.

22      Q.   **Do you remember when that was?**

23      A.   No.  Maybe they started this redistricting

24  when, maybe six or eight years ago.  It's been a while.

25  I don't recall the year, but it was -- it hasn't been in

1  the last four years, that I'm sure of.  So it was

2  further back.

3      Q.   Okay.

4      A.   It was the one with the -- it was a

5  congressional because it was our congressman that I was

6  working with.

7      Q.   And what congressman is that?

8      A.   Ours was -- well, they redistrict it again so

9  maybe there is another one.  That one I didn't testify

10 in.  It was Ruben Hinojosa.  But now -- when they

11 redistricted it again, now it's Filemon Vela.

12     Q.   And I asked you before about your state senator

13 or your state representative.  Now I'm going to ask

14 broadly --

15     A.   Okay.

16     Q.   -- whether or not you discussed SB 14, this

17 voter ID bill, with any state senator or any state

18 representative.

19     A.   With our state senator.

20     Q.   With --

21     A.   About this one, SB 14?

22     Q.   Yes.

23     A.   Again, if I did, it would have been after the

24 fact because I didn't hear about it until at the end.

25     Q.   Who is your state senator?

1      A.    Juan "Chuy" Hinojosa.

2      Q.    Will you be seeking any attorneys' fees in this

3  lawsuit?

4      A.    No.  In all of our lawsuits, that has never

5  been the case.

6      Q.    And you mentioned earlier that you made the

7  decision that LUPE would become a plaintiff --

8      A.    Uh-huh.

9      Q.    -- in this case.

10              MS. VAN DALEN:  I'm just going to -- just

11  backing up.  There has been a claim for attorneys' fees

12  made in this case.

13              THE WITNESS:  But he's asking for LUPE.

14              MS. VAN DALEN:  But to clarify, they would

15  not go to the organization, they would go to . . .

16              THE WITNESS:  Okay.

17              MR. WHITLEY:  So in their complaint they

18  requested --

19              MS. VAN DALEN:  There's a fees claim,

20  yeah.

21              MR. WHITLEY:  When I say "their," I mean

22  LUPE.

23      Q.    (By Mr. Whitley)  When -- after you made the

24  decision that LUPE would become a plaintiff in this

25  case, when did you hire your attorney?

1    A.   No.  It wasn't like months ago.  I mean, it

2  was -- it was during this time, maybe -- maybe last

3  month.

4    **Q.   Do you know how many occasions you've spoken**

5  **with your lawyers on the phone, or any one lawyer in**

6  **this lawsuit?**

7    A.   Maybe once.

8         MS. VAN DALEN:  David, I appreciate you

9  not asking about the actual communications, but

10 nonetheless, I think this is borderline harassment.  I

11 mean, we haven't waived any privilege, nobody else has

12 been present during these communications, we're trying

13 to meet with our clients who participate and help

14 facilitate responding to discovery, etcetera, so if you

15 can move on.

16        MR. WHITLEY:  I certainly don't intend to

17 harass, and I'm certainly not asking for any privileged

18 information.

19   **Q.   (By Mr. Whitley)  What is your date of birth?**

20   A.   What is my date of birth?

21   **Q.   Yes, ma'am.**

22   A.   March 22nd, 1947.

23   **Q.   And where did you grow up?**

24   A.   Here in the Valley.

25   **Q.   And your current home address is in Donna, you**

1  mentioned?

2      A.   Yes, uh-huh.

3      Q.   **Do you know where the closest Department of**

4  **Public Safety driver's license office is?**

5      A.   In -- from here, from San Juan, I think the

6  closest one would be, I think, Edinburg.

7      Q.   **Edinburg?**

8      A.   I think so.

9      Q.   **Does the regional office that's between here**

10 **and Harlingen issue driver's licenses?**

11     A.   I don't know.  I don't know if there's a

12 regional office here.

13     Q.   **I saw a sign on my drive on the way.**

14     A.   Oh, I don't know.  I know there's one in

15 Edinburg, uh-huh.

16     Q.   **How far away is Edinburg?**

17     A.   Maybe 25 minutes or so.

18     Q.   **Do you know what forms of identification you**

19 **need to show in order to be able to vote under SB 14?**

20     A.   Under SB 14, well, there's a list.  There's a

21 list of them.  I know one is a driver's license, a birth

22 certificate.  And I remember one because I couldn't

23 believe that they didn't accept the student ID, but they

24 would accept a gun ID or a gun permit or something like

25 that, which I thought was absolutely awful.  But anyway,

1    that's one of them.  I don't remember the others.

2         Q.    So you mentioned a driver's license?

3         A.    Right, yeah.

4         Q.    And a concealed handgun license?

5         A.    Is that what that one is?  Yes, uh-huh.

6         Q.    Are you aware that a Texas personal

7    identification card is acceptable on election date to

8    vote?

9         A.    I think that's on the list, too.

10        Q.    Are you aware that a U.S. passbook --

11        A.    Yes, I saw that on the list, too.

12        Q.    I mispronounced that.

13        A.    Passport.  Yes.

14        Q.    Passport book or card is acceptable on election

15   day to vote?

16        A.    I don't know if it says book; it says a U.S.

17   passport.

18        Q.    Are you aware that a U.S. military ID with a

19   photo is acceptable on election day to prove your

20   identity?

21        A.    I don't remember that one.

22        Q.    And are you aware that a U.S. citizenship

23   certificate or certificate of naturalization with a

24   photo is acceptable?

25        A.    I think I saw that one, yes.

74

```
 1      Q.    Were you made aware of these during the

 2 previous litigation?

 3      A.    I saw them on the -- I saw them on the

 4 information that went out, you know, when the -- when

 5 the bill passed.  The State, I think it was, sent out

 6 information as to what was going to be required.  And it

 7 had that list on there.

 8      Q.    Has anyone from LUPE offered to tell anyone

 9 what forms of identification are needed to be able to

10 vote in Texas?

11      A.    Has anyone from LUPE offered to -- yeah.

12      Q.    And who would LUPE have given this information

13 to?

14      A.    To the community.  And that's a lot of staff at

15 LUPE, not just one staff.  Because remember I said we

16 have five organizers that work out in the community,

17 plus the social service providers.

18      Q.    I do remember that.

19      A.    Okay.  So that -- so it's those people.

20      Q.    So --

21      A.    That staff, I mean.

22      Q.    Through those two groups of people, the

23 requirements to vote on election day are communicated to

24 LUPE's members and the general community?

25      A.    Yeah, because we want to make sure that they --
```

 1   that they vote, right.  And we communicated that.  And

 2   that's when we found out that it would have a negative

 3   impact because many of them didn't have that.

 4       Q.   And are there specific pieces of information

 5   that LUPE uses to get that message across when those two

 6   groups of LUPE agents are out in the field?

 7       A.   Yeah, like a flyer.  We put it on paper and

 8   hand it out.

 9       Q.   Is that the voter ID flyer that we mentioned

10   earlier in the deposition that's already been produced?

11       A.   Yes, we have a flyer that we give out -- we

12   gave out.

13       Q.   And you can confirm that it's already been

14   produced to us in the litigation?

15       A.   Yes, I turned it over.

16       Q.   Okay.  Has anyone from LUPE offered to take

17   anyone to get one of the forms of identification to be

18   able to vote in Texas?

19       A.   No, we can't.  We're really very busy.  And

20   when you go to the -- like when I go to renew my

21   license, it's like an all day thing.  There's lines.

22   There's always lines.  Right.  And so it takes a long

23   time.  So we don't have the staff or the resources to be

24   able to do that.  It would be good, but we just can't.

25       Q.   Do you know whether a free ID is available to

1   people who need to obtain one of the forms of

2   identification needed to vote under --

3       A.      Do I know if it's available?

4       Q.      Uh-huh.   Under SB 14?

5       A.      No.   Do I know if it's available for free?   I

6   think I heard something -- something about that it --

7   later, I think, it was that it was free, that they could

8   be provided for free, yes.

9       Q.      Do you know what the free ID is called?

10      A.      Isn't it the Texas ID?

11      Q.      It's a -- the free one is the election

12  identification certificate.

13      A.      The one we have now, the voter card?

14      Q.      So you've got your driver's license?

15      A.      Yes.

16      Q.      So you don't need an election identification

17  certificate.

18      A.      Okay.

19              MS. VAN DALEN:   It's a photo ID that can

20  be used only for voting.

21      A.      I haven't seen one of those.

22      Q.      Were you aware that it existed?

23      A.      Vaguely I remember somebody saying that it

24  existed.

25      Q.      Do you know that there's no expiration date for

1    Q.    So those are the supporting identifications I'm

2    going through.

3    A.    Okay.

4    Q.    The supporting identification is what you use

5    to get one of those EICs.

6    A.    Okay.

7    Q.    And I can continue through the list, but it's

8    really long.

9    A.    Okay.

10    Q.    And --

11    A.    I don't think --

12    Q.    Based on your attorney's previous objections --

13    and I'm not here to harass you.

14    A.    Right.

15    Q.    I do want to just kind of move along in the

16    deposition by being able to cover these categories of

17    supporting identification so you can confirm whether or

18    not you know that somebody can use that to get an EIC.

19    A.    Well, you know, you can go through the list if

20    you want, but that's not the only objection we have to

21    the voter ID or the ability to get -- to be able to

22    vote.  You know, the transportation issue, the very

23    remote area where colonias are at.  You know, the

24    elderly, you know, that might do this.  And in the --

25    then the bottom line is I just don't -- I just don't

1    understand -- I don't understand and I don't see any

2    reason why you need to go -- why this list was

3    established in the first place, you know.  So I -- I

4    just don't understand why we need this list of things

5    when we could vote with a simple -- our voter card.

6        Q.    Let me go through some of the other categories.

7            MS. VAN DALEN:  Can I suggest -- can you

8    just ask her if she knows what supporting documents are

9    necessary in order to get an EIC and she can give her

10   answer?

11       Q.    (By Mr. Whitley)  Yeah.  Do you know what

12   supporting documents are needed to get an EIC?

13       A.    No.

14       Q.    Okay.  Let's go into --

15       A.    But can I say -- can I again tell you why I

16   don't think -- see, because to me --

17       Q.    Of course you can.

18       A.    It's just that I don't understand the reason

19   why that has -- that is -- that was done, right?  And so

20   there's no -- there was -- it was fine the way it was

21   where we were voting with our card.  So, you know, we

22   thank the State for trying to do this, but we don't get

23   it, why it had to change.

24       Q.    So can you describe the purpose and mission of

25   LUPE?

```
 1      A.    Well, the purpose is to -- or the mission is
 2   to, you know, to help -- to help create a more just
 3   society and to -- just to create a more just society
 4   that respects the rights of human beings.
 5      Q.    Is there a -- is there a stated mission of LUPE
 6   somewhere?
 7      A.    Yes, uh-huh.
 8      Q.    Is it on the website?  Or is it in your --
 9      A.    It is, uh-huh.  And our core values also.
10      Q.    The core values are on your website?
11      A.    Yes, uh-huh.
12      Q.    And I think you mentioned earlier that LUPE has
13   been in existence since 2003?
14      A.    Here in Texas, uh-huh.
15      Q.    Where did it exist before that?
16      A.    In California.
17      Q.    It's just California and Texas?
18      A.    No, and Arizona.
19      Q.    It started in California?
20      A.    Yes, uh-huh.
21      Q.    And how was it formed?
22      A.    It was formed by Cesar Chavez and Dolores
23   Huerta in 1989 to -- because they already had the United
24   Farm Workers that was dealing with grievances in the
25   fields for farm workers, but they needed a non-profit
```

1  organization to deal with some of the issues in the

2  community like education or, you know, health, housing,

3  immigration, those community issues, and that's why they

4  created LUPE.

5      Q.   And does LUPE here that you're in charge of,

6  does it have regular meetings of the membership?

7      A.   Oh, yes, uh-huh.

8      Q.   How often?

9      A.   Every first Friday of the month.

10      Q.   Where do they meet?

11      A.   Here.  Not -- here in the hall, in the union

12  hall back here.

13      Q.   Every first Friday of the month, you say?

14      A.   Every first Friday of the month.

15               MS. VAN DALEN:  I think five people is

16  about the capacity of this office here.

17      Q.   (By Mr. Whitley)  I was about to say certainly

18  not in this office?

19      A.   No, not in this office.  We have a nice union

20  hall back here that accommodates the meetings.

21      Q.   How many people attend those meetings, just

22  in --

23      A.   Oh, it varies.  It varies.  I think the -- I

24  think the fewest that we have had range from maybe 80 to

25  100 and then it's on up.

1    Q.   What is the upper limit?  So on --

2    A.   Well, what fits.  Because once we had a meeting

3 where we didn't fit.  It fits like -- it fits like 200.

4 And then -- but sometimes they -- we have -- you know,

5 we have to open the doors and it spills out outside.  So

6 we've had 500, 800.  When we have the annual Cesar

7 Chavez march, it's over 2,000.  It's -- excuse me, over

8 1,000.

9    Q.   So over 1,000 here in the union hall?

10    A.   No, in and out.  They don't fit inside.  Inside

11 and outside.

12         MS. VAN DALEN:  Off the record for a

13 second.

14         (Off the record.)

15         MR. WHITLEY:  Back on the record.

16         (Exhibit No. 3 was marked.)

17    Q.   (By Mr. Whitley)  I have handed you what's been

18 marked as Exhibit 3, I believe.

19    A.   Uh-huh.

20    Q.   And this is a page from LUPE's website --

21    A.   Oh, how nice.

22    Q.   -- that lays out your members.

23    A.   Yes.

24    Q.   What the description of your members, the

25 membership, the following services and other free and

 1   discounted benefits.

 2       A.   Yes.

 3       Q.   And you can see the URL, the website address

 4   there at the bottom.  And this was pulled yesterday.

 5       A.   Yes.

 6       Q.   So how many members does LUPE have?

 7       A.   7,000 plus.

 8       Q.   And the cost for membership is $40 a person?

 9       A.   $40 per person, $60 for a married couple and

10   the students are $20.

11       Q.   And so do you renew -- does a member renew that

12   membership every year?

13       A.   We sure love that.  Some don't.  Some do and

14   some don't, but we do try to have them to renew, try to

15   get them to renew.

16       Q.   How does one become a member?

17       A.   You just walk into the front and you get -- and

18   you get like an application and you fill out the

19   application and you present -- and you pay $40 and you

20   present something to identify you.

21       Q.   What kind of documentation is provided that

22   identifies the people that want to become members?

23       A.   There's different kinds.  You know, there's a

24   number of different kinds of documents that you can

25   bring.

1  count people that haven't renewed.

2      Q.   Oh, okay.

3      A.   It's an up-to-date database.

4      Q.   So on any given year you can count on 7,000

5  members?

6      A.   6,000, 7,000, 8,000, yeah.

7      Q.   So assuming each of those -- let's call it

8  7,000.

9      A.   Yeah, the only issue with that is that we

10  wouldn't know how many are students --

11      Q.   Right.

12      A.   -- or how many are couples, you know.  That

13  would be --

14      Q.   Or how many are renewing.  Is it true that when

15  you renew, do you get a discount?

16      A.   Yes.  Wow, you do know.  Did you just read

17  this?

18      Q.   I'm looking at it with you.

19      A.   Does it say that, that you get a discount?  Oh,

20  there it is.  Yes, they do get.

21      Q.   Okay.

22      A.   Yes, I see it.

23      Q.   So assuming all of the 7,000 were first time

24  members.

25      A.   Right.

1    Q.    And they all paid $40.

2    A.    Okay.

3    Q.    And they weren't married and they weren't

4    students.

5    A.    Okay.

6    Q.    That would be about $280,000?

7    A.    I guess.

8    Q.    So would it be safe to assume that LUPE gets

9    somewhere less than that every year from dues?

10              MS. VAN DALEN:   I'm going to object,

11   assumes facts not in evidence.   You can try to answer.

12   A.    I think it's about that amount.

13   Q.    Okay.   And are there different levels of

14   membership based on how people become a member at all?

15   Or is it just you're a member of LUPE and that's it?

16   A.    Yes.   Well, you're a member -- wait.   What they

17   pay, you're saying?   What they pay as fees?

18   Q.    Not necessarily.   That could be one of the

19   categories.   But what I'm asking is more generally.   Out

20   of all the 7,000 members, are there different categories

21   of members or --

22   A.    The student and the married couple and -- yeah.

23   Q.    Those are the only categories?

24   A.    Uh-huh.

25   Q.    Okay.

1    A.    Yeah.

2    Q.    Is LUPE a partisan organization?

3    A.    We are 501(c)(3).

4    Q.    Do you represent any given party, Republican or

5    Democrat?

6    A.    As a 501(c)(3), you can't.

7    Q.    Okay.  Does LUPE accept African American

8    members?

9    A.    Yes, of course.

10   Q.    Are there any African American members of LUPE

11   currently?

12   A.    I don't think so.  We don't have a very large

13   African American community here in the Valley.  I think

14   it's -- I don't think we have very many.  It's mainly

15   Mexican.

16   Q.    Does LUPE accept white members?

17   A.    Definitely.

18   Q.    Does LUPE currently have any white members?

19   A.    We do, actually.  Not, of course -- not very

20   many because, again, the Valley is mainly predominantly

21   Mexican American, but we do.

22   Q.    Does LUPE accept -- would it be fair to say

23   that LUPE accepts all other ethnicities if somebody

24   wants to become a member of LUPE?

25   A.    All other ethnicities and also whatever

1   profession you're in.  You know, accepts lawyers.

2                  MS. VAN DALEN:  She's giving you the sale

3   right now.

4                  THE WITNESS:  You know, teachers.

5                  MR. WHITLEY:  Sales pitch.  I don't even

6   know if I have $40 with me.

7      A.   We take credit -- we take your card, too.

8   Somebody from the State, I think we can trust your card,

9   right?

10     Q.   I don't know.

11     A.   We're in trouble.

12     Q.   Are there -- so are there any -- to your

13  knowledge, are there currently any members of LUPE of

14  any other ethnicity besides African American, white or

15  Latino?

16     A.   Well, we have -- Latino includes like Central

17  America and South America countries.  If that's included

18  in that description, we do.

19     Q.   Is that what your description of Latino

20  includes for LUPE's purposes?

21     A.   Latinos are Hispanics, uh-huh.

22     Q.   What's the difference between that, between

23  Latino and Hispanic to LUPE?

24     A.   I think Latinos is like it includes more, like

25  people from not only Mexico, but Central American

1   countries or South American countries and Hispanic -- I

2   don't know if this is the way it is.  That's how I just

3   understand it is mainly --

4       Q.   Sure.  And that's all I'm asking.

5       A.   -- Mexican American, Mexican people.

6       Q.   So besides how you would define Hispanics or

7   Latinos, besides those two, white, African Americans,

8   are there any members of any other ethnicity of LUPE

9   right now?

10      A.   Maybe some Native Americans.

11      Q.   Do you know if there have ever been any other

12  members from any other ethnicity of LUPE?

13      A.   Like what?  Like which ones?  Do you know of

14  any more?  I can't think of them.  Do you know of some?

15           MS. VAN DALEN:  Southeast Asia.

16      Q.   (By Mr. Whitley)  Sure.  Asian?

17      A.   Probably not.

18      Q.   And I think you mentioned earlier when we were

19  talking about your position, but remind me again, how

20  many employees or staff does LUPE --

21      A.   It's like 25 or -- between 25 and 27, uh-huh.

22      Q.   And that's in all of the offices in South

23  Texas?

24      A.   Yes, uh-huh, yes.

25      Q.   And of those 25 or 27, some of those are

1   organizers and the social services people?

2       A.   And communications and fund developments and

3   program managers.  You know, there's others also.

4       Q.   And how would you describe who LUPE serves?

5       A.   We service the needs of the community, and that

6   depends on what those needs are.  In one community it

7   could be the lack of transportation, the other one could

8   be, you know, health issues.  Immigration --

9               MS. VAN DALEN:   The question is who -- who

10  you serve, not . . .

11      A.   What we serve.

12      Q.   Who?

13      A.   Who?  Who do we serve?  Well, we just went

14  through the whole list of -- it's mainly the people that

15  we have identified, low income and predominantly Mexican

16  American, but there's others also.

17      Q.   Do you have to be a member of LUPE for LUPE to

18  be able to serve you?

19      A.   No, you don't have to be a member of LUPE.  We

20  have -- we have folks that are not members, but they

21  still need the services.

22      Q.   And so people who are not members of LUPE are

23  able to get some of these services here on Exhibit 3?

24      A.   Exhibit 3?

25      Q.   Where it says --

1      A.   Where it says "other free and discount"?

2      Q.   Let's go -- so members receive the following

3   services?

4      A.   Yes, they receive that.

5      Q.   And are there non-members of LUPE that receive

6   those services?

7      A.   Yes.

8      Q.   Does LUPE maintain an active list of its

9   members?

10     A.   An active?  Yes, we try, uh-huh.

11     Q.   And you mentioned before that LUPE is a

12  501(c)(3)?

13     A.   That is correct.

14     Q.   Which means that LUPE is a non-profit?

15     A.   Yes, we are a non-profit organization.

16     Q.   From where does LUPE receive funding?  We've

17  discussed earlier --

18     A.   The members.

19     Q.   -- the member fees?

20     A.   Uh-huh, yes.

21     Q.   Does LUPE receive donations?

22     A.   Yes, uh-huh.

23     Q.   Individual -- from individuals?

24     A.   Yes.

25     Q.   From corporations?

1     A.    No.

2     Q.    Does it receive sponsorships?  Do people

3   sponsor events that LUPE puts on?

4     A.    Yes.

5     Q.    And LUPE engages in some fund-raising, you

6   mentioned before?

7     A.    A little bit, yeah, we're just starting that,

8   uh-huh.

9     Q.    And the only dues that LUPE has are the $40 a

10  year dues?

11    A.    Or 60 or, yeah, or 20, uh-huh.

12    Q.    Depending on who you are?

13    A.    Right.

14    Q.    And that's represented on the website --

15    A.    Right.

16    Q.    -- as depicted in Exhibit 3?

17    A.    Uh-huh.

18    Q.    Do you know generally how those funds are

19  allocated?

20    A.    How they are allocated?  In our budget?  No, I

21  can't -- the money that comes in -- you asked earlier,

22  you know, about the money that comes in and how we use

23  it, is that -- I said for salaries and benefits.

24    Q.    Sure.

25    A.    And then the programs.

1    personally communicated with members of other state

2    legislatures regarding any voter ID legislation?

3         A.    No, nuh-huh.

4         Q.    And have you exchanged documents or any

5    materials about such legislation with other state's

6    legislatures?

7         A.    No, nuh-huh.

8         Q.    Let's talk some more about voter outreach and

9    voter education.

10        A.    Uh-huh.

11        Q.    You mentioned earlier that the organizers

12   and -- remind me again the other category of people?

13        A.    Service providers.

14        Q.    And service providers educate the public about

15   voter ID?

16        A.    Yes, uh-huh.

17        Q.    And you mentioned that they used a flyer.  Do

18   you know if there are any other resources used to

19   educate the public on voter ID?

20                    MS. VAN DALEN:  I'm going to object.  I

21   think that's a vague question.

22                    MR. WHITLEY:  Okay.

23                    MS. VAN DALEN:  You can answer.

24        Q.    (By Mr. Whitley)  To the extent you know, you

25   can answer.

1      A.    Through the meetings.   You know, we have

2  meetings in the community and meetings here.

3      Q.    So let me try to clarify it.

4      A.    Okay.

5      Q.    There's a flyer that the organizers and the

6  support -- the services people use?

7      A.    Uh-huh.

8      Q.    Do you know what that flyer contains?   What

9  information that flyer contains?

10      A.    It has what to expect from the voter ID, like

11  what -- what is it and how is it going to -- how could

12  you get ready for it?   What did you need to have.

13      Q.    Specifically in the same way that that flyer is

14  used, are any other flyers or specific printed

15  information used by organizers or services?

16      A.    Actually, we put together a booklet on it, too,

17  with many pages on -- not just on that, but voter ID was

18  one of the issues.   We had a big -- a big candidates

19  forum and we gave those out to educate the people and we

20  asked the candidates about their -- we asked them a

21  question on the voter ID.   I don't remember the question

22  exactly, but we did ask them about voter ID.   And that

23  was a huge event that we had here in McAllen.

24      Q.    Do you know if that packet has been produced?

25      A.    I don't remember.   Oh, yes.   Yes, uh-huh, it

1  was.  Yeah, I remember that event.  And it was very

2  expensive because at that place that we had it, even the

3  water was very expensive.  Yeah, we went to get a bottle

4  of water and it was like $1.50 or $2, something like

5  that.

6      Q.   That's less than what I paid for my water at

7  the airport.

8      A.   I know, they really --

9      Q.   The airport gets you.

10     A.   So it was expensive there.

11     Q.   Does LUPE engage in any activities related to

12  assisting voters during elections?

13     A.   Assisting meaning like there's many ways.

14     Q.   Let's go in terms of helping them to the polls.

15     A.   Very, very, very, very few.  And like very --

16  for example, we usually have a number that we give them

17  to call the elections office, you know, but we don't do

18  that.  That would take a lot of -- we do some, but not

19  very many.

20     Q.   The number that you give them to call is of the

21  county elections office?

22     A.   Yes, uh-huh.  Yvonne, Yvonne Ramon, uh-huh.

23     Q.   And is she the Hidalgo County elections

24  administrator?

25     A.   Yes, uh-huh, yes.

Q.   And that number is for a ride to the polls?

A.   Well, that number is for any questions, actually, that they may have.  And if anybody knows who can give rides, I would think, and any questions, it would be -- she's in charge of that.

Q.   So you said very few times has LUPE given rides?

A.   Yes, uh-huh.  Yeah.

Q.   Do you remember the last time that it happened?

A.   Probably the last -- probably the last election again.  Probably in March.

Q.   March of 2014?

A.   Uh-huh, yes.

Q.   How about voter registration, does LUPE help people register to vote?

A.   Yes, that's very, very important.  We do that a lot.  Yes, uh-huh.

Q.   How often?

A.   All the time.  We have stacks of voter registration cards.  So if you're not registered, we can do it for you like really quick.  We do that a lot in all of the offices, inside, outside with the organizers, year-round, yeah.  That's very important to us.

MR. WHITLEY:  And I think it's noon.

MS. VAN DALEN:  We can go off the record.

1    It should be on page 3.

2        A.    Yes.

3        Q.    Do you understand that this complaint is filed

4    by your attorneys on your behalf in this lawsuit?

5        A.    Yes.

6        Q.    If you would, read me the second sentence of

7    number 13, starting with "LUPE was founded."

8        A.    "LUPE was founded by Cesar Chavez to help meet

9    the advocacy and organizing needs of low-wage workers

10   and their families."

11       Q.    And, again, just for the record, that was

12   founded by Cesar Chavez in what year?

13       A.    1989 in California.

14       Q.    And then will you start with the next sentence

15   that starts "LUPE has operated."

16       A.    "LUPE has operated an office in San Juan,

17   Hidalgo County, Texas, for over ten years and also has

18   offices in the cities of Alton, Las Milpas, Mercedes and

19   Edcouch, Texas.

20       Q.    And that includes all of the LUPE offices in

21   Texas?

22       A.    Yes, uh-huh.

23       Q.    What about -- so it started in California and

24   then it moved to Texas; is that correct?

25       A.    Well, actually, it moved to Arizona first and

1    then to Texas.

2              MS. VAN DALEN:  It moved or expanded?

3        A.    It expanded.  You're right, yes.

4        Q.    So it still exists in California?

5        A.    It existed at that time; it doesn't now.  At

6    one point it existed in California and Arizona, and then

7    now it's just in Texas.

8        Q.    So is there a part of LUPE that still runs in

9    California at this moment?

10       A.    No, nuh-huh.

11       Q.    When did the California version of LUPE cease

12   operations?

13       A.    I don't recall the date exactly, but it -- but

14   maybe around -- maybe, what, maybe around 2000 --

15   somewhere around 2001.  Between 2001 and 2004, around

16   that time.

17       Q.    Okay.

18       A.    Well, that's what I remember.

19       Q.    And then so the next sentence in that complaint

20   starts with "the organization has more than"?

21       A.    Yes, more than 7,000 members.

22       Q.    Is that just in Texas?

23       A.    Yes, uh-huh.

24       Q.    And then let's go to two sentences later that

25   starts with "in response to."

1      A.    "In response to passage of the Texas voter

2   identification law, LUPE staff diverted significant

3   resources to educating their members and the larger

4   public on the new laws requirements."

5      Q.    Is that true?

6      A.    Yes, uh-huh.

7      Q.    In what way were significant resources

8   diverted?

9      A.    In -- in how -- in the discussions we had

10   earlier when I -- when I talked about the organizers

11   that do the work out there, and then I talked about the

12   social services, and I told you about like John Michael,

13   you know, with us.  So it's --

14      Q.    Is John Michael -- I'm sorry for interrupting.

15      A.    -- the involvement of the staff.

16      Q.    Is John Michael the communications director?

17      A.    Yes, he is.

18      Q.    Do you know what portion of the budget

19   financial resources were diverted by LUPE?

20      A.    A percentage?  No, I don't know.

21      Q.    Okay.  The next sentence starts with "these

22   efforts were undertaken."  Will you read that one for

23   me, please?

24      A.    "These efforts were undertaken to minimize the

25   number of otherwise eligible voters who would be unable

1   to vote."

2       Q.   Has LUPE had any success in those efforts?

3       A.   Have we had what again, please?

4       Q.   Any success in those efforts?

5       A.   I hope so.  To -- to -- you mean for them to be

6   able to get the documents required so they can vote?

7       Q.   Yes, ma'am.

8       A.   I don't know how -- I hope so.

9       Q.   Do you know --

10      A.   Slowly it's going to get into.

11      Q.   -- specifically whether or not LUPE has had any

12  success in minimizing the number of otherwise eligible

13  voters who would be unable to vote?

14      A.   Let me read it again.  I think -- I think that

15  we did some.

16      Q.   Do you remember any specific instances?

17      A.   Well, no, because you rely on that -- you know,

18  that folks actually read the flyer that you give them

19  and that can come up with the documents to do that, to

20  be able to go and get their ID.  But we don't know that,

21  that that is the -- that is the case for sure.  We don't

22  know.  We don't have ways of tracking that.

23      Q.   And we talked about the flyer before.

24      A.   Right.

25      Q.   Other than the flyer, was any other publication

1    involved in those efforts to minimize --

2        A.    Yeah, remember I told you about the -- I'm

3    sorry.

4        Q.    No, go ahead.

5        A.    I told you about the booklet and about the form

6    and about the meetings, the community meetings, and the

7    services.

8        Q.    Written material would just be the booklet and

9    a flyer?

10       A.    And the -- no.   And the -- and the press

11   release that we talked about, the press release.

12       Q.    And I was a little unclear on the press

13   release.   Do you remember when that was issued?

14       A.    No, but we have a copy of that.   They have a

15   copy of it.   You have a copy.

16              MR. WHITLEY:   And we can put this into the

17   record as well.

18              (Exhibit No. 4 was marked.)

19       Q.    (By Mr. Whitley)   So that's Exhibit 4.   Is that

20   the press release you were referring to earlier?

21       A.    Yes.

22       Q.    Can you read me the date on the press release?

23       A.    This one was August 30th, 2012.

24       Q.    Around do you remember earlier when we were

25   discussing when voter ID was put into effect?

1    A.   Uh-huh.

2    Q.   The tweet that I showed you from LUPE's --

3    A.   Right.

4    Q.   -- Twitter feed, do you remember the date of

5    that?

6    A.   I know it was in 2013.

7    Q.   It was June of 2013.

8    A.   Okay.  Actually, yes, it was June the 26th of

9    2013.

10   Q.   So since June of 2013, has LUPE issued any

11   press releases regarding voter ID?

12   A.   After June 2013?

13   Q.   Uh-huh, yes, ma'am.

14   A.   Other press releases?  I'm not sure.  I'm not

15   sure.  We might have, but I'm not sure.  I just don't

16   see how this could be the only one, but I don't remember

17   exactly.  We may have.

18   Q.   Okay.

19   A.   This was a very important issue, so I think

20   that we may have.

21   Q.   But you can't remember for sure?

22   A.   No.

23   Q.   And back to Exhibit 2, if you would, the

24   complaint that we were looking at earlier.

25   A.   Okay.

1    Q.    If you would, turn to page -- it should be page
2    17.   And I'm looking for paragraph 90.
3    A.    Okay.  17.  Okay.  I got it.
4    Q.    Will you read the first sentence in paragraph
5    90?
6    A.    "Plaintiff La Union del Pueblo Entero has
7    citizen members who lack the necessary identification to
8    vote under the requirement of SB 14 and who are unable
9    to -- and who are unable to make the financial
10   sacrifices required to obtain or correct or correct such
11   identification documents."
12   Q.    What would LUPE define as a financial
13   sacrifice?
14   A.    That our membership -- many of our 7,000
15   members are very, very low income people.  And any --
16   any kind of this requirement would place an extra burden
17   on their family.  You know, on very, very low income
18   people.
19   Q.    Can you read the next sentence starting with
20   "further LUPE?
21   A.    "Further, LUPE has had to divert its limited
22   resources to provide voter education services to low
23   income Mexican Americans in the Rio Grande Valley
24   regarding the SB 14 requirements about how its members
25   must comply with the new law."

1    Q.    Is that true?

2    A.    Yes, the voter -- yes, uh-huh.

3    Q.    And again, just to be clear, do you know

4  specifically what the amount of resources -- financial

5  resources LUPE has had to divert for this purpose?

6    A.    I don't know the amount, but I know that we --

7  we all put a lot of time into it because, again, as I

8  have stated earlier, it's a very important issue to our

9  membership, to have the right to vote.

10    Q.    Are you aware that one of the forms of

11  supporting documentation to get an EIC is a birth

12  certificate?

13    A.    You said that earlier.  Yes, uh-huh.

14    Q.    And are you aware that if somebody needs a

15  birth certificate for the purposes of getting an EIC,

16  that that person can get it for $2 or $3?

17    A.    No.  I thought earlier you said it was free.

18  That's what I had said that I didn't know it was free.

19    Q.    The election identification certificate is

20  free.

21    A.    Oh, okay.

22    Q.    To get -- are you aware that to get a birth

23  certificate for the purposes of showing it to DPS to get

24  an EIC, which is the election certificate, the birth

25  certificate is $2 or $3?

1    A.    No, it's not.

2              MS. VAN DALEN:    I'm going to object to the

3    question as putting facts in evidence.    And let the

4    witness answer.

5    A.    It's -- no.    Remember earlier we also talked

6    about immigration services?    And the birth certificates

7    are much more expensive than that.    I think they run

8    around $26 or $28.

9    Q.    And --

10   A.    That's the information -- you know, that's the

11   work that we do here.    That's how much the birth

12   certificates are when you -- when you send one off to

13   get to the state.    That's the amount that the money

14   order -- more or less that's what they ask for.

15   Q.    I'll represent to you here that if somebody

16   needs a birth certificate for the purposes of getting an

17   election identification certificate, that birth

18   certificate is $2 or $3 maximum.

19             MS. VAN DALEN:    And I'm going to object

20   and dispute that representation.    You can answer the

21   question.    Actually, I don't think there was a question.

22   Go ahead.

23             MR. WHITLEY:    There wasn't.

24   Q.    (By Mr. Whitley)    Did LUPE urge the Department

25   of Justice to sue the State of Texas over SB 14?

Juanita Valdez-Cox - 6/25/2014

116

```
 1      A.    No.
 2                  MS. VAN DALEN:  I'm going to object to the
 3      question insofar as it asks for communications protected
 4      by the attorney/client privilege.
 5      Q.    (By Mr. Whitley)  You can answer.
 6                  THE WITNESS:  I can answer?
 7                  MS. VAN DALEN:  Yes.
 8      A.    No, no.
 9      Q.    Did LUPE draft any amendments to SB 14 while it
10      was being considered?
11      A.    No, nuh-huh.
12      Q.    Did LUPE write any articles or opinion pieces
13      about SB 14 when it was being considered?
14      A.    Not that I recall.
15      Q.    Does LUPE possess any studies on the effect of
16      SB 14 on minority voters?
17      A.    Do we have -- do we possess studies?
18      Q.    Uh-huh.
19      A.    Studies?  Except what we know from our work.
20      You know, our experiences, our history of our
21      communities here and the discrimination upon communities
22      and, you know, the low income that they are, the high
23      unemployment.  Based on that, we know that it would
24      be -- that it is -- it's not a study, an official study,
25      but that's -- that's what we use, right, to know that it
```

 1  would have a negative impact.

 2      Q.   So any data that would have been received from

 3  the community has not been compiled into a study?

 4      A.   No.

 5      Q.   How about reports?

 6      A.   That we have done?

 7      Q.   Yes, ma'am.

 8      A.   LUPE has done?  No, we have not done them.

 9      Q.   Is LUPE aware of any reports on the effect of

10  SB 14 on minority voters?

11      A.   I think that I've seen somewhere that -- I

12  remember seeing some numbers that -- on -- I don't know

13  if it was an opinion or an article in the newspaper of

14  how there had been a study done and that it was -- it

15  was having -- they were large numbers.  They talked

16  about thousands of people that were going to be denied

17  the right to vote because of it.

18      Q.   Has LUPE done any reports as an organization on

19  the effect of SB 14 on minority voters?

20      A.   LUPE, we haven't, except our communication with

21  the communities.

22      Q.   Has LUPE estimated the effect of SB 14 on

23  minority voters?

24           MS. VAN DALEN:  I'm going to object to the

25  question being vague.  You can try to answer.

1    Q.    Does LUPE contend that SB 14 was enacted with a

2    discriminatory purpose?

3    A.    We do.  I do.

4    Q.    What is that based on?

5    A.    Again, it's based on our -- the history of

6    Mexican Americans in South Texas, of minorities in South

7    Texas.  It's based on, for example, my dad had to pay

8    for a poll tax when that made it difficult and harder

9    for him to vote.  I think that, you know, the

10   difficulties of the situation in South Texas with the

11   members that we -- that we represent, I think that it

12   does -- it does deny them -- it does deny them the right

13   to vote.  And because they're all Mexican American, I

14   think that it is discriminatory.

15          And, again, there was no basis, in LUPE's

16   opinion, our opinion, for the change in the law.  There

17   was no basis for obstacles to be placed on people to

18   vote.  And, you know, just the many obstacles that this

19   law places on them, it discriminates their right to

20   vote.

21   Q.    Is it LUPE's position that SB 14 is a poll tax?

22   A.    It's very -- it's -- it's an obstacle like the

23   poll tax was.  And it's -- and it's something that like

24   the poll tax was done to keep low income people to

25   make -- well, actually, to make it harder for them to

1  vote because you shouldn't have to pay to vote.

2      Q.    Does LUPE contend that the legislature acted

3  outside normal procedures in enacting SB 14?

4      A.    I don't know what normal procedures you mean,

5  what -- I don't know what that means.

6      Q.    Whatever you would determine.  Whatever your

7  opinion of normal procedures would be in a legislature?

8              MS. VAN DALEN:  And I'll object that the

9  question is vague.  You can answer if you can.

10     A.    I don't know what normal -- no, I don't know

11  what that is.

12     Q.    Okay.  Does LUPE contend that the legislature

13  acted outside its authority in making rule changes?

14     A.    Do they have the authority to do that?  I don't

15  think that anybody should have the authority to take out

16  your right to vote.

17     Q.    Does LUPE contend that SB 14 specifically

18  prevents people from voting?

19     A.    Yes.

20     Q.    In what way?

21     A.    We do.

22     Q.    In what ways?

23     A.    In that it's made it more difficult to vote in

24  that -- in that for years and years and years we've been

25  able to vote with our voter card and now why -- why add

1    to that?  In our opinion, there was no reason to make it

2    more difficult.  If anything, the state should

3    concentrate on making it easier for people to vote,

4    right, on doing more to get people to the polls instead

5    of -- instead of what they're doing and making it more

6    difficult.

7         Q.    Does LUPE contend that any legislator who voted

8    for SB 14 did so with discriminatory intent?

9         A.    I think that by -- by voting on the bill in --

10   well, by voting in favor of the bill, I think that

11   that's what they did.

12        Q.    Does LUPE contend that the legislature intended

13   to harm any minority group by enacting SB 14?

14        A.    That's what they did.  That is what -- that is

15   what has happened.  That is what they did.

16        Q.    In what way?

17        A.    By making it more difficult for people to

18   exercise, you know, their right to vote, by placing

19   obstacles on a person's right to vote for no reason at

20   all.  There was no -- no -- there was nothing that was

21   happening that they should -- it was -- it was -- the

22   voting and the voter card, everything was working fine.

23   There was no reason to add anything to that.

24        Q.    Does LUPE believe that it was not given the

25   opportunity to voice its opposition to SB 14 in front of

1  **the legislature?**

2      A.    It was not -- they didn't give us the

3  opportunity?  Again, because -- again, I say that it was

4  kept sort of secret and there was -- it wasn't too

5  public.  We didn't get a lot of notice of what was going

6  on in the legislature.  So I don't know.

7          Maybe they were dealing with it in a -- in

8  secrecy so that we didn't find out until it was already

9  passed and then we had to deal with it.  But if we had

10 been given the opportunity, we would have been there to

11 oppose it.

12     **Q.    Does LUPE support the idea that only registered**

13 **voters should be allowed to vote?**

14     A.    Yes, that's -- that's the way it's done.

15     Q.    Does LUPE believe that Texas should make sure

16 that people attempting to vote are registered voters?

17     A.    Do we support the idea that registered

18 voters -- can you repeat that, please?

19     Q.    Absolutely.  Does LUPE believe that Texas

20 should make sure that people attempting to vote are

21 registered voters?

22     A.    Well, that's -- I don't know about the state

23 because that's why you have people at the polls, the

24 judges and everybody else.  They know -- they know the

25 rules and the laws.  And so if you go -- if I go vote

1  question as calling for speculation and posing a

2  hypothetical.

3      Q.   (By Mr. Whitley)   You can answer.

4      A.   You know, it doesn't happen.  You know, how can

5  you vote in the name of another person?  You have your

6  voter -- your voter -- your voter card.

7      Q.   Does LUPE acknowledge that voter fraud exists?

8      A.   Does LUPE acknowledge -- LUPE acknowledges that

9  it doesn't exist.

10     Q.   Does LUPE acknowledge that voter fraud exists?

11     A.   No.

12     Q.   So it's the position of LUPE that voter fraud

13  never takes place?

14              MS. VAN DALEN:   The question has been

15  asked and answered.  You can answer again.

16     A.   I'm saying that in my years of working in this

17  community and, you know, the work that we're involved in

18  with civic engagement and stuff, I don't think that that

19  is something that happens to the point of where the

20  state has to impose these obstacles upon its community.

21     Q.   So it's LUPE's position that voter fraud

22  doesn't exist in Texas or anywhere else?

23     A.   I can't say.  I can't say that that it doesn't

24  exist anywhere else.  I'm saying in our community in

25  South Texas, you know, that I know --

1    Q.    So you're saying -- I'm sorry.

2    A.    What I'm saying is I don't think it exists to

3    where it creates an issue for the state to take -- to

4    develop laws that they may be thinking that they are

5    righting -- making right something that is wrong, but

6    they are -- they're making something that is right

7    wrong.

8    Q.    Does voter fraud exist or not?

9    A.    Somewhere in the world probably.

10            MS. VAN DALEN:  I'm going to object to the

11   question as overly broad, vague, ambiguous.

12   Q.    (By Mr. Whitley)  You can answer.  Go ahead.

13   A.    Somewhere probably in the world.

14   Q.    Do you think that SB 14 prevents someone from

15   casting the vote of someone else?

16   A.    Again, these questions seem to be based on

17   something that I can't relate to because that's not

18   something that in my experience happens, and so I just

19   don't think that they are questions that I'd want to

20   address or answer because that's not what I believe

21   happens.  And it's the same thing over and over again

22   that I keep telling you, is that I don't see those as

23   the reasons why you have SB 14.

24   Q.    Has any member or -- strike that.

25            Has any member of LUPE ever expressed support

 1  for SB 14?

 2       A.   No.

 3            MS. VAN DALEN:  That you -- I mean,

 4  object, it calls for speculation.

 5       Q.   (By Mr. Whitley)  Has any member of LUPE ever

 6  expressed support for any other voter ID law?

 7       A.   No.

 8            MS. VAN DALEN:  I'm going to object, it

 9  calls for speculation.

10       Q.   (By Mr. Whitley)  You can answer.

11       A.   No, we do not -- I don't think that that

12  would -- that that would happen.  Why -- why would a

13  group that has been discriminated against and that has

14  struggled so long to get that right, why would they --

15  why would they support SB 14?

16       Q.   Does LUPE believe that voter ID requirements

17  were not popular among Texans when SB 14 was being

18  considered?

19            MS. VAN DALEN:  Object, calls for

20  speculation.

21       Q.   (By Mr. Whitley)  You can answer.  I can repeat

22  it.

23       A.   I don't know about the rest of Texas.  I know

24  that it was not popular with the community that we

25  represent and the low income community.  And so I'm sure

1    any idea, but I do agree with your second statement.

2              THE WITNESS:  Oh, okay.

3        Q.    (By Mr. Whitley)   You stated earlier that LUPE

4    believes that SB 14 denies or abridges the right to vote

5    of its members, correct?

6        A.    Correct.

7        Q.    And you stated that LUPE didn't have any

8    studies or data that were conducted by LUPE or anybody

9    else?

10             MS. VAN DALEN:  I can --

11       A.    I said by LUPE.

12       Q.    In written form that would confirm that?

13       A.    Not by LUPE.

14       Q.    Are you familiar with the provisional ballot

15   process established by SB 14?

16       A.    No.

17       Q.    Has LUPE, either on its own or through counsel,

18   submitted public records requests to various counties

19   seeking information regarding provisional ballots cast

20   during the most recent election cycle?

21       A.    Provisional ballot is like for people that are

22   abroad or that they can vote?  I don't understand

23   provisional ballot.

24       Q.    Provisional ballot is on election day at the

25   polling place.  If you --

```
 1                   MS. VAN DALEN:  And for the record, to
 2   clarify, as you know, an open records request has been
 3   made to counties for provisional ballots and have
 4   actually been produced to the state by TRLA on behalf of
 5   its clients in this litigation.
 6                   MR. WHITLEY:  So is it on behalf of LUPE
 7   as well?
 8                   MS. VAN DALEN:  Yes.
 9                   MR. WHITLEY:  Fair enough.
10        Q.   (By Mr. Whitley)  Were those requests to the
11   counties based on any studies that were conducted by
12   LUPE?
13                   MS. VAN DALEN:  She's already testified
14   she didn't even know about the requests.
15        Q.   (By Mr. Whitley)  Does LUPE contend that a
16   significant portion of its members lack any of the
17   acceptable forms of ID under SB 14?
18        A.   We contend that they do lack them.
19        Q.   Do you know what portion?
20        A.   A percentage, you're saying?
21        Q.   Sure.
22        A.   No.
23        Q.   Do you know how many specifically?
24        A.   Out of 7,000, no, I don't know.
25        Q.   Can you identify one member of LUPE that does
```

1   not have any of the acceptable forms of ID under SB 14?

2        A.   I know -- I know of them, but I don't think I

3   can give you that information.

4        Q.   But you can identify one member?

5        A.   Yes, uh-huh.

6        Q.   Do you know how many of your members do not

7   have a driver's license?

8        A.   That don't have a driver's license?   I don't

9   know how many, but it's -- it's -- I don't know how I

10  could say how many, but there are many that don't have a

11  driver's license.

12       Q.   Do you know how many of your members do not

13  have a state-issued photo ID?

14       A.   I don't know how many.   I know that a lot of

15  our members don't have a voter ID.

16       Q.   I'm just talking about a state-issued photo ID.

17       A.   Right.   Yeah.   No, we don't.

18       Q.   Which could be a driver's license, a concealed

19  handgun license.

20       A.   Yes.   No.

21       Q.   A personal identification card?

22       A.   I don't know how many don't.

23       Q.   Do you know how many of your members do not

24  have a passport?

25       A.   I don't know how many.   I know that they -- a

1  lot of them don't, but I don't know the number.

2      Q.    Do you know how many of your members do not

3  have a military ID card with a photo?

4      A.    I do not know.

5      Q.    Do you know how many of your members do not

6  have a citizenship certificate?

7      A.    I can't give you a number of the 7,000.

8      Q.    Can you identify one member that does not have

9  any of the documents necessary to get an EIC?  When I

10 say EIC, I mean the election identification certificate.

11     A.    Right.  She's not a member now, but I do know

12 of somebody that doesn't have anything.

13     Q.    When did she cease to become a member?

14     A.    Oh, maybe -- it's been a while.  It's been a

15 number of years.

16     Q.    How many years?

17     A.    Oh, maybe -- let me think.  Maybe five or six.

18     Q.    Do you know how many of your members have

19 attempted to get an EIC?

20     A.    No, I don't.

21     Q.    Do you know of anybody who has attempted to get

22 an EIC?

23     A.    That's the same question.

24     Q.    Well, the first one was do you know how many,

25 and you said you didn't know how many.  But do you know

1   of anybody at all of your members who have attempted to

2   get an EIC?

3        A.   I don't know.  I don't know how many, but I do

4   remember a conversation from the organizers about some

5   of the people in their meetings that had tried, but they

6   were -- I really don't know what the issue was, why they

7   couldn't, whether they lacked how many pieces of

8   documents they needed or if they weren't accepted or

9   what had happened.

10       Q.   So you're not sure what the issue was?

11       A.   I know that they couldn't get it, but I don't

12  know like specifically based on if it was that they

13  didn't have -- they didn't have the -- all of the

14  documents that are required or the ones that they had

15  were outdated or they -- you know, I don't know what the

16  issue was.

17       Q.   Did anyone from LUPE follow-up with that

18  person?

19       A.   We tried to, and she -- and she hasn't

20  responded, but we'll keep trying.

21       Q.   Is LUPE able to identify any Texas registered

22  voter who, as of the filing of your complaint, which is

23  November 5th --

24       A.   Of 2013?

25       Q.   -- 2013 had been unable to vote on account of

1  his or her inability to obtain an acceptable form of ID
2  under SB 14?
3      A.   They have not -- that they have not been able
4  to vote?
5      Q.   On account of inability to obtain one of the
6  acceptable forms of ID under SB 14?
7      A.   We've heard -- we've heard that they were not
8  going to be able to vote.  Like when we were knocking on
9  doors to get them out to vote, some were saying that
10  they didn't have any documentation, so they didn't --
11  they probably were not going to go vote.  They didn't
12  have the documentation that was required to get the
13  photo ID, and so they were not going to go vote.
14      Q.   Are you able to identify somebody specifically?
15      A.   If we look at the precincts that we worked this
16  last election, maybe the organizers could.
17      Q.   Can you?
18      A.   No, myself, I can't, but I could ask.
19      Q.   Was that person or people who are identified,
20  were they members of LUPE?
21      A.   One -- some were; others were not.
22      Q.   So that was in November?
23      A.   No.  In March.
24      Q.   Okay.  So --
25      A.   I don't remember about November.  I'm not sure

1  exactly the date.  I don't remember if it was March, the

2  last one.  I don't remember if it was March of this year

3  or if it was -- well -- or November of last year.  I

4  don't remember.

5      Q.    Is LUPE able to identify any member who is

6  currently at present or has been unable to vote because

7  of her inability to obtain acceptable form of ID under

8  SB 14?  So that fast forwards it to the present.

9      A.    Right now you're saying?  In the last election?

10      Q.    So the example you have is from the last

11  election?

12      A.    Uh-huh.

13      Q.    And that is the March 2014 primary?

14      A.    Uh-huh.  That went to vote and they were not

15  allowed to vote?  Or what was it?  Can you read it

16  again?

17      Q.    Sure.  Is LUPE able to identify any LUPE member

18  who at present is unable to vote because of his or her

19  inability to obtain an acceptable form of ID under SB

20  14?

21      A.    Probably -- I'm trying to -- I'm trying to

22  remember whether the ones I remember have renewed their

23  membership or not.  I don't think they're LUPE members

24  right now.

25      Q.    Is LUPE able to identify any Texas registered

1 voter who is at present unable to vote because of his or

2 her inability to obtain acceptable forms of ID under SB

3 14, an acceptable form?

4      A.    Right.   Yes.

5      Q.    And is that registered voter a member of LUPE?

6      A.    No.   I mean, they haven't renewed.

7      Q.    Is LUPE able to identify a specific instance in

8 which a LUPE member attempted to obtain an acceptable

9 form of ID under SB 14 but was unable to?

10      A.    I don't know personally.

11      Q.    Is LUPE able to identify a specific instance in

12 which a Texas registered voter attempted to obtain an

13 acceptable form of ID under SB 14 but was unable to?

14      A.    I've read of some cases where they weren't, but

15 they're not LUPE members.

16      Q.    What cases did you read?

17      A.    In other parts of the State of Texas there

18 were -- I think it was an African American and also a

19 Mexican American that stated that they were not able

20 to -- that they had not -- their issue was more, I think

21 it was like transportation or some other issue that they

22 couldn't get because they were living in a very remote

23 area or far away area from DPS and they couldn't get

24 there to get their form of ID.  Do you remember that

25 one?  It was in -- it was in the --

1    Q.    Do you remember where those stories came from?

2    A.    From the newspaper.

3    Q.    Do you remember the location of the registered

4    voter that was having problems that was identified in

5    the news story?

6    A.    I think it was -- I don't know why -- East

7    Texas or West Texas.

8    Q.    Texas is a big place.

9    A.    Yeah, but I'm thinking because --

10   Q.    It was either far east or far west?

11   A.    Right.  And I don't remember where.

12   Q.    Okay.  Does LUPE contend that SB 14 makes it

13   impossible for anyone to vote?

14              MS. VAN DALEN:  I'm going to object to the

15   question as vague.  You can answer.

16   A.    Can you read it again?

17   Q.    Sure.  Does LUPE contend that SB 14 makes it

18   impossible for anyone to vote?

19   A.    I don't know.  Impossible is like -- I don't

20   know totally impossible, but it does make it -- if you

21   place obstacles on people that want to vote, then it's

22   our belief that they're more likely to get discouraged

23   and not vote.  But it just -- you know, I just believe

24   that it makes it -- it makes it difficult.  And if

25   obstacles are placed in there and you can't vote, I

1    guess it does make it impossible, right?  Yes.

2        Q.    Compared to previous elections, do you know if

3    more or less LUPE members voted in any election since SB

4    14 was implemented?

5        A.    No, I don't know.

6        Q.    Do you know if any LUPE members chose not to

7    vote in an election because of SB 14?

8                MS. VAN DALEN:  I'm going to object to the

9    question as ambiguous.  You can answer.

10       Q.    (By Mr. Whitley)  You can answer.

11       A.    I don't know.

12       Q.    Is LUPE able to identify a LUPE member who has

13   suffered harm at any point because of SB 14?

14       A.    There are many.  There are many within LUPE

15   that were hurt by SB 14.

16       Q.    Are you able to identify a specific member?

17       A.    That were harmed by this bill?

18       Q.    Uh-huh.

19       A.    Yes.

20       Q.    Has LUPE seen its donations or sponsorships

21   increase as a result of its work related to SB 14?

22       A.    Our funds increased because of it?

23       Q.    Sponsorships or donations?

24       A.    No.

25       Q.    How about membership?

150

1      A.    It's because of our -- no, I don't attribute it

2  just to SB 14.  I couldn't tell really if it could be

3  because of the advertising by -- you know, the educating

4  that went on when the organizers were talking about it.

5  Maybe more people did join, but I don't have like data

6  to show that that happened.

7      **Q.    So has LUPE seen its donations or sponsorships**

8  **increase in general over the last year?**

9      A.    I don't know how we could do that -- how we

10 can -- how I could tell that.

11     **Q.    Do you get -- is more money coming in from**

12 **sponsorships or donations as compared to last year?**

13     A.    Money donations?  Not because of SB 14.

14     **Q.    In general?**

15     A.    Oh, in general?  I think it's more than last

16 year because we -- we started new programs and now we

17 increased -- not increased programs, but we added new

18 programs.

19           MS. VAN DALEN:  Can we go off the record

20 for a second?

21           (A recess was taken.)

22           MR. WHITLEY:  Back on the record.

23     **Q.    (By Mr. Whitley)  Does LUPE contend that any of**

24 **its SB 14 related activities fall outside the scope of**

25 **its organizational mission or goals?**

151

1      A.    Outside of it?

2      Q.    Uh-huh.

3      A.    We didn't expect it to be -- to be spending

4  time on something like this, so it wasn't like we put it

5  in a specific line item in -- like in the budget, right.

6  It was something that came out that has an impact on the

7  community that we felt that we had to -- we had to deal

8  with it.   We had to work on it.

9      Q.    So SB 14 is not a line item in the budget?

10     A.    No.   It's part of the expenses from the budget,

11 but not a line item.

12     Q.    And does LUPE contend that it is unable to

13 fulfill its mission because of SB 14?

14     A.    Oh, no, our mission includes -- it's broad and

15 it's not specifically -- our mission is not just on

16 voter ID, on voter registration or -- it's more than

17 just on voter -- on voting, right, but it's part of it.

18 LUPE's mission to help -- to have a fair and just

19 society includes that, but there's others.

20     Q.    So because of SB 14, is LUPE -- even though SB

21 14 is in place, is LUPE still able to fulfill its

22 mission?

23     A.    Not completely because if it continues this

24 way, then it's not creating a more fair, just society.

25            MR. WHITLEY:   I'll mark this.   And I

 1    answer them.   Have I been courteous to you?

 2         A.    Those are the questions?

 3         Q.    That's my first question.

 4         A.    Yes, you have.   Sorry.

 5         Q.    Have I treated you in what you would consider

 6    to be a professional manner?

 7         A.    Yes.

 8         Q.    Has there been anything about my conduct or

 9    demeanor that has caused you to answer in any other way

10    but the truth?

11         A.    No.

12         Q.    Did you have an opportunity to answer all

13    questions fully?

14         A.    The ones that I was able to.

15         Q.    And we've been going since 9:30.   But are there

16    any answers you want to retract, add to, change, amend,

17    or modify in any way?   And I can give you as much time

18    as you want to think about that.

19         A.    To add to it?

20         Q.    Change your answers in any way?

21         A.    Oh, change them?   No.

22         Q.    You can add to them, you can subtract from

23    them, you can change them.

24         A.    No.   I just -- I think when I was answering,

25    I -- I want to be able to convey very honestly -- you

1   know, and maybe it's not for you to believe or for

2   anybody in this room to believe, but I do want to convey

3   the -- how critical this situation is for us and for our

4   membership and for low income people.  You know, how

5   serious we take the right to vote, how hard we work to

6   get the right to vote.  And how offensive it is for the

7   state to come in and impose these obstacles on our

8   membership and our community on minorities.

9           And through the questioning, I didn't feel like

10  I was -- I was -- because the questions have to be -- I

11  have to just respond to your questions, I wasn't given

12  the opportunity to say these things of how -- how

13  serious we take this and how honestly I reported to you

14  the community that I know and the history of this

15  community and how it has suffered because of many unfair

16  and unjust laws.  And that we consider this one one of

17  those.  And that to the best of my ability, I want -- I

18  want to convey that.

19          I want that to be -- to be very clear.  We take

20  the membership dues from the lowest in the community

21  that pay to us to do a good job of representing them,

22  and I think that that's -- you know, that's what we try

23  to do.  I just want to make sure that that was -- that

24  that was conveyed in my responses to you.

25      Q.   I appreciate you taking the time to do so.

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

1 (Pages 1 to 4)

---

**1**

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                    CORPUS CHRISTI DIVISION
MARC VEASEY, et al.,          )
        Plaintiffs,           )
                              )
v.                            ) Civil Action
                              ) No. 2:13-cv-193(NGR)
RICK PERRY, et al.,           )
        Defendants.           )

          <<<<<<HIGHLY CONFIDENTIAL>>>>>
*******************************************************
              ORAL DEPOSITION OF
                 TOMMY WILLIAMS
                  JULY 29, 2014
*******************************************************

        ORAL DEPOSITION OF TOMMY WILLIAMS, produced
as a witness at the instance of the Plaintiffs Texas
State Conference of NAACP Branches, Mexican American
Legislative Caucus of the Texas House of
Representatives, and duly sworn, was taken in the
above-styled and numbered cause on July 29, 2014, from
9:39 a.m. to 6:45 p.m., before Denyce M. Sanders, CSR,
RPR, CRR, TCRR, in and for the State of Texas,
recorded by machine shorthand, at OFFICE OF THE
ATTORNEY GENERAL OF TEXAS, Consumer Protection
Division, 808 Travis, Suite 1520, Houston, Texas,
pursuant to the Federal Rules of Civil Procedure and
the provisions stated on the record or attached
hereto; signature having been waived.
```

---

**3**

```
FOR THE DEFENDANTS:
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    Consumer Protection Division
    808 Travis, Suite 1520
    Houston, Texas  77002
    Ms. Rosemarie Donnelly
    713.225.8919
    rosemarie.donnelly@texasattorneygeneral.gov

FOR THE DEFENDANTS RICK PERRY, STATE OF TEXAS, NANDITA
BERRY, AND THE DEPARTMENT OF PUBLIC SAFETY:

    OFFICE OF THE ATTORNEY GENERAL
    TORT LITIGATION DIVISION
    P.O. Box 12548, Capitol Station
    Austin, Texas  78711
    Mr. S. Ronald Keister
    512.463.2197
    ronny.keister@oag.state.tx.us

ALSO PRESENT:
    Leah Buenik - intern
    James Graham - intern
```

---

**2**

```
              A P P E A R A N C E S

FOR THE PLAINTIFF UNITED STATES OF AMERICA:

    U.S. DEPARTMENT OF JUSTICE
    Civil Rights Division
    950 Pennsylvania Avenue, NW - NWB Room 7254
    Washington, D.C.  20530
    Ms. Jennifer Maranzano
    800.258.3931
    jennifer.maranzano@usdoj.gov

FOR THE PLAINTIFFS TEXAS STATE CONFERENCE OF NAACP
BRANCHES, MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE
TEXAS HOUSE OF REPRESENTATIVES:
    DECHERT LLP
    633 West 5th Street, 37th Floor
    Los Angeles, California  90071
    Ms. Amy L. Rudd
    213.808.5700
    amy.rudd@dechert.com

FOR THE VEASEY PLAINTIFFS:
    BRAZIL & DUNN, LLP
    4201 Cypress Creek Parkway, Suite 530
    Houston, Texas  77068
    Mr. K. Scott Brazil
    281.380.6310
    scott@brazilanddunn.com

FOR THE DEFENDANT TEXAS LEAGUE OF YOUNG VOTERS
PLAINTIFF-INTERVENORS:

    WILMER CUTLER PICKERING HALE AND DOOR, LLP
    1875 Pennsylvania Avenue, NW
    Washington, D.C.  20006
    Mr. Richard Shordt
    202.663.6262
    richard.shordt@wilmerhale.com

                  -CONTINUED-
```

---

**4**

```
                      INDEX
               ORAL DEPOSITION OF
            TOMMY WILLIAMS, JULY 29, 2014
                                           Page
APPEARANCES............................  2
BY MS. RUDD.............................  9
BY MR. BRAZIL...........................  188
BY MS. MARANZANO........................  206
BY MR. SHORDT...........................  279


REPORTER CERTIFICATION..................  308
```

TOMMY WILLIAMS                                            7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

9 (Pages 33 to 36)

33

1  deposition in the Section 5 case and trial, that your
2  recollection improved?
3      MS. DONNELLY: Objection. Form. It's
4  confusing and vague.
5      Do you understand the question?
6      THE WITNESS: No.
7  Q. (BY MS. RUDD) Okay. Well, here's what I'm
8  getting at. There were a lot of answers in your prior
9  deposition about you not recalling the specifics of
10 House Bill 218. Then, when you were asked questions
11 during the trial on Section 5, you gave specific
12 information about House Bill 218.
13     I'm asking, what changed between your
14 deposition and trial?
15     MS. DONNELLY: Objection. Form.
16     Counsel, if you want to show him his
17 testimony and ask him specifics, that's -- it's vague
18 and confusing.
19     MS. RUDD: I'm just asking general
20 questions now.
21     MR. KEISTER: Objection. Form.
22 Misstates facts not in evidence.
23 Q. (BY MS. RUDD) Did you understand the
24 question?
25 A. No. Not really. If you have something

34

1  specific you want to ask me, I'm glad to try to answer
2  it.
3  Q. We'll have to go through your testimony, I
4  guess.
5      House Bill 218 in the 2007 session was a bill
6  designed to combat in-person voter fraud; is that
7  correct?
8  A. Yes.
9  Q. Do you recall House Bill 218 generally?
10 A. Only that it was a voter ID bill.
11 Q. Do you recall who sponsored it on the Senate
12 side?
13 A. I don't know.
14 Q. If I told you that Troy Fraser sponsored that
15 bill, would that sound right to you?
16 A. He was very involved in the issue, yes.
17 Q. When did you become very involved in the
18 issue --
19     MS. DONNELLY: Objection. Form.
20 Q. (BY MS. RUDD) -- to your recollection?
21     MS. DONNELLY: Objection. Form.
22     You can answer.
23 A. You know, I don't have a specific
24 recollection about when I became involved in it. It's
25 a -- it was an issue that was important to a lot of

35

1  people and a lot of my constituents during my
2  legislative career.
3      You know, I cast about 5,000 record votes
4  every session, and I don't remember every detail of
5  every bill. It's just -- you've been swimming in this
6  river the last few months, and I have not been, so I
7  don't -- you know, there's a lot that I don't
8  remember.
9  Q. (BY MS. RUDD) Okay. But to be fair, voter ID
10 legislation was fairly controversial legislation for
11 several sessions, correct?
12     MS. DONNELLY: Objection. Form.
13 A. I don't think it was controversial. There
14 was a lot of opposition to it on one side, but I
15 wouldn't say it was controversial. It was widely
16 perceived by the public as something that was a good
17 thing.
18 Q. (BY MS. RUDD) Okay. But there was
19 significant opposition to voter ID legislation each
20 year that it was proposed, from 2007 onward, correct?
21 A. Yes.
22 Q. And it was something -- voter ID legislation
23 was an issue that you personally had a lot of
24 involvement with over the years, correct?
25     MS. DONNELLY: Objection. Form.

36

1  A. I was involved in -- when it passed, and I
2  was a joint author or a co-author of the bills; but I
3  wasn't involved in drafting any of the legislation.
4  Q. (BY MS. RUDD) Okay. So when you say you were
5  a joint author or co-author, you mean more that you
6  were a sponsor of the legislation?
7  A. Someone else was the author, and I had
8  registered my support by being a joint or co-author of
9  the legislation.
10 Q. Okay. Which -- were you a joint or co-author
11 of Senate Bill 14?
12 A. I don't recall.
13 Q. Do you recall any other particular voter ID
14 legislation that you were registered as a joint or
15 co-author on?
16 A. Not as we sit here today.
17     (Williams Exhibit 1 marked/introduced.)
18 Q. (BY MS. RUDD) Do you recognize Exhibit 1?
19 A. This looks like it is the filed version of
20 House Bill 218, as it was filed in the House.
21 Q. Okay. And that was the voter ID legislation
22 filed during the 2007 legislative session, correct?
23 A. Yeah. It looks like it was prefiled in
24 November of 2006, so it would have been for the 80th
25 regular session, it says.

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

10 (Pages 37 to 40)

37

1    Q.  And the purpose of this legislation was to
2   combat in-person voter ID fraud, correct?
3    A.  I think that was the intent of the author,
4   yeah.
5    Q.  As opposed to absentee ballot fraud or some
6   other form of voter fraud, right?
7    A.  Well, let me read it and see.
8       It would appear that this only addresses
9   identification for people who are voting in person.
10   Q.  Okay.  Prior to -- let me back up.
11      You were sitting on the State Affairs
12  Committee in 2007, correct?
13   A.  If that's what the records say, I wouldn't
14  dispute that.  I could have been.  There were some
15  sessions where I didn't -- where I wasn't on the
16  committee.
17   Q.  Okay.  Do you recall that this bill was
18  referred to the Senate State Affairs Committee for
19  consideration?
20   A.  I do not have a specific recollection.  It
21  would have been under the -- you know, the procedures
22  that we followed in the Senate.  It would have been in
23  the usual course of business that it would have come
24  to the State Affairs Committee.
25   Q.  So as a member of the State Affairs

38

1   Committee, you would have considered this legislation
2   in committee; is that right?
3    A.  If it passed the House.  I can't tell by
4   looking at this that it did.  It just says here that
5   this is the filed version.  It doesn't show that it
6   was the enrolled version.  It's not -- you know, I
7   don't know what the progress of this bill was, by what
8   you gave me.
9       (Williams Exhibit 2 marked/introduced.)
10   Q.  (BY MS. RUDD)  Exhibit 2 is the Senate
11  Journal from April 26, 2007, correct?
12   A.  It would appear to be.
13   Q.  If you turn to page -- and I'm looking at the
14  page numbers on the upper left-hand corner -- 1372 of
15  that document.
16   A.  Uh-huh.
17   Q.  The bottom half of that page has a section
18  titled, "HOUSE BILLS AND RESOLUTIONS ON FIRST
19  READING."
20      Do you see that?
21   A.  I do.
22   Q.  And it says:  "The following bills and
23  resolutions received from the House were read first
24  time and referred to the committees indicated."
25      Do you see that?

39

1    A.  I do.
2    Q.  And in that list is "HB 218 to Committee on
3   State Affairs," correct?
4    A.  That's correct.
5    Q.  Does that tell you that HB 218 was referred
6   to the State Affairs Committee?
7    A.  It does, but it doesn't tell me that this
8   bill that you've put before me was the bill that was
9   referred.  This is the introduced version of the bill.
10  I don't know whether this bill was amended on the
11  House floor or not.
12   Q.  That's fair distinction.
13      Do you recall considering this bill on the
14  State Affairs --
15   A.  No.
16   Q.  -- Committee in 2007?
17      (Williams Exhibit 3 marked/introduced.)
18   Q.  (BY MS. RUDD)  Exhibit 3 is a transcript of
19  the bench trial in the Section 5 case.  And if you
20  turn to page 69 of that exhibit, the bottom of that
21  page is the beginning of your testimony.
22      Do you see that?
23   A.  On line 24?
24   Q.  Yes.
25   A.  I see that.

40

1    Q.  And if you'll turn to page 71, at line 22 of
2   71, you're asked:  "Moving up to 2007, did the Texas
3   House pass voter ID legislation again in 2007?"
4       You say:  "Yes."
5       Question is:  "And was that House Bill 218?"
6       You say:  "Yes."
7       Do you see that?
8    A.  I do see that.
9    Q.  Okay.  And then the next couple of pages go
10  on to discuss House Bill 218.
11   A.  Yeah, I see that.  But that still does not
12  address that this is the introduced version, not the
13  enrolled version of the bill.  So this is not
14  necessarily the bill that was before the Senate.
15   Q.  I understand that.
16   A.  Okay.
17   Q.  If you go ahead and just read through your
18  testimony on page 72, I just want to know if that
19  refreshes your collection of what happened --
20  recollection of what happened with this Senate Bill
21  218.
22      MS. DONNELLY:  Objection.  Form.
23   Q.  (BY MS. RUDD)  Sorry.  House Bill 218.
24      MS. DONNELLY:  To the extent that you
25  need to read all of the testimony to refresh your

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

11 (Pages 41 to 44)

41

1  recollection, feel free to do so.
2          THE WITNESS:  Okay.
3      Q.  (BY MS. RUDD)  If it will make this process go
4  faster, I'll give you the opportunity to read further
5  into your transcript.  I just want to talk about 2007
6  now.
7      A.  Oh, okay.
8      Q.  So having now read your trial testimony, do
9  you recall that HB 218 passed out of the State Affairs
10  Committee?
11      A.  Yes, it did.
12      Q.  And you voted to pass that out of committee,
13  correct?
14      A.  I did.
15      Q.  Do you recall that that vote was strictly
16  along party lines?
17      A.  It wouldn't surprise me if it was.  I don't
18  recall the vote.
19      Q.  At the time that you voted to pass HB 218 out
20  of committee, did you think it was a good bill?
21      A.  I did.
22      Q.  It was acceptable to you, and that's why you
23  voted for it?
24      A.  It was the bill that was before us, it was
25  the best opportunity we had at that time.

42

1      Q.  Okay.  Let's go through, if we can, for a
2  second -- and I understand your qualification about
3  whether the bill that was considered in committee is
4  the bill that I have a copy of, which is Exhibit 1.
5      A.  This is not the bill that was considered in
6  committee.  This is the filed version.
7      Q.  Okay.  And fair enough.
8          Do you know, off the top of your head, what
9  differences there might have been between this version
10  and the version that was considered in committee?
11      A.  Oh, good Lord, no.
12      Q.  Okay.  If you'll turn with me to page 3 of
13  Exhibit 1.
14          First, let me ask you this general question:
15  Do you recall that HB 218 permitted a voter to either
16  show a photo ID or two forms of nonphoto ID at the
17  polls?
18          MS. DONNELLY:  Based upon Exhibit 1?
19          MS. RUDD:  Correct.
20      A.  It would appear that that was true of the --
21  if this is the legislation that we considered in
22  committee.
23      Q.  (BY MS. RUDD)  Okay.  And on page 3 of that
24  document, Subsection -- Section 63.0101(a) lists
25  documentation that was acceptable for a form of photo

43

1  ID, correct?
2      A.  Let's see.  Yes.
3      Q.  Number 1 is a driver's license or personal ID
4  card not expired more than two years, correct?
5      A.  No.  It says that it would be a driver's
6  license or personal ID card issued by the Department
7  of Public Safety that is not expired or that is
8  expired no earlier than two years before the date of
9  the -- of presentation.
10      Q.  Right.  So a driver's license or personal ID
11  card that was expired more than two years would not
12  have been accep- -- unacceptable under this version of
13  HB 218; is that right?
14          MS. DONNELLY:  Objection.  Form.
15      A.  I believe that's correct.
16      Q.  (BY MS. RUDD)  Number 2 is a United States
17  military identification card with a photo, correct?
18      A.  Uh-huh.  Person's photograph.
19      Q.  Right.
20          Number 3 is a valid employee identification
21  card with a person's photograph and issued by an
22  employer of the person in the ordinary course of
23  business, correct?
24      A.  That's Item Number 3.
25      Q.  Do you recall why that item was included in

44

1  this legislation?
2      A.  No.  You'd have to ask Betty Brown.
3      Q.  Do you recall discussing that particular form
4  of ID in committee?
5      A.  I do not.
6      Q.  Number 4 is a United States citizenship
7  certificate with a photograph, correct?
8      A.  Yes.
9      Q.  5 is a passport.
10          6 is a student identification card issued by
11  a public or a private institution on behalf of higher
12  education; is that correct?
13      A.  Correct.
14      Q.  Do you recall discussion in committee about
15  the use of a student identification card as a form of
16  photo ID?
17      A.  I do not.
18      Q.  At the time that HB 218 was being considered
19  in committee, did you consider a student
20  identification card an acceptable form of photographic
21  identification at the polls?
22      A.  I -- would you repeat the question?
23      Q.  Sure.  At the time that HB 218 was being
24  considered by you in committee, did you consider a
25  student identification card to be an acceptable form

TOMMY WILLIAMS                                           7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

12 (Pages 45 to 48)

45

1  of photo ID?
2      A.  I don't recall that I cared for this
3  provision.  It was a part of the bill, but I'm not
4  sure that I -- I don't necessarily agree with every
5  provision of every bill, so...
6      Q.  Fair enough.
7          Can you tell me why you might not have agreed
8  with this particular provision.
9      A.  I think, you know, it makes it a lot more
10  difficult for the people who are working at the polls
11  to identify -- to know whether it's a valid ID or not,
12  because we have 38 general academic institutions in
13  this state and we have a bunch of health science
14  centers and a lot of people that are issuing student
15  ID cards, including all of our community colleges; and
16  so I think it becomes very difficult for someone at
17  the poll to know whether that's actually a valid ID or
18  not.
19      Q.  Would the -- would you have the same opinion
20  of the ID listed in Number 3 there, a valid employee
21  identification card?
22      A.  Yeah.
23      Q.  Number 7 is a license to carry a concealed
24  handgun, correct?
25      A.  Correct.

46

1      Q.  So there are seven different forms of
2  photographic identification that were acceptable under
3  HB 218 in this version, correct?
4      A.  Correct.
5      Q.  And then if you look at Subsection (b), there
6  are 11 different forms of nonphoto ID that were
7  acceptable under this version of the legislation,
8  correct?
9      A.  I have to read it.
10      Q.  Sure.
11      A.  Actually, I -- let's see.  Yeah, there are
12  11.  That's correct.
13      Q.  And do you recall discussing in committee any
14  of these forms of nonphoto identification?
15      A.  I don't have a specific recollection, no.
16      Q.  Is there any reason that these forms of photo
17  identification would not have been acceptable?
18      A.  I don't think they're particularly good forms
19  of identification.
20      Q.  And is it your opinion that any one form of
21  identification that can truly identify or verify who a
22  person is is a photo identification?
23      A.  I think that the way it was listed in Senate
24  Bill 1 was -- excuse me, Senate Bill 14 was, there
25  were primary forms of identification and secondary

47

1  forms of identification; and I think that was a much
2  more reasonable way to determine whether the person
3  before you is really the person they said they were,
4  so...
5      Q.  Okay.  But in Senate Bill 14, the secondary
6  forms of identification are only used in order to --
7  to obtain an ID that has a photo on it --
8      A.  Right.
9      Q.  -- for purposes of voting, correct?
10      A.  That's correct.
11      Q.  Whereas in Senate Bill -- or House Bill 218,
12  you could actually present at the poll a form of
13  nonphotographic identification, correct?
14      A.  Under this bill, that would be true, House
15  Bill 18 [sic].
16      Q.  And can you tell me why it is that you don't
17  think any of these forms, these 11 forms of nonphoto
18  ID listed in this version of HB 218, would be
19  sufficient to identify or verify a person's identity.
20      A.  Primarily, it makes it very difficult for the
21  person who's working at the polls -- they have so many
22  things that they have to look at -- and they don't
23  know whether it's a valid document or not.
24      Q.  Do poll workers have a way to determine
25  whether a particular license is a valid license?

48

1          MS. DONNELLY:  Objection.  Form.
2      A.  I don't know.
3      Q.  (BY MS. RUDD)  Do poll workers have a way to
4  verify whether a particular Texas ID card is actually
5  what it purports to be?
6          MS. DONNELLY:  Objection.  Form.
7      A.  I don't know the answer to that.
8      Q.  (BY MS. RUDD)  HB 218 ultimately didn't get
9  considered on the floor of the Senate; is that
10  correct?
11      A.  That's correct.
12      Q.  Senator Fraser made a motion to consider
13  HB 218 outside the regular course of business,
14  correct?
15      A.  I believe he made a motion to suspend the
16  regular order of business to take up and consider
17  House Bill 218.
18      Q.  And when you say "the regular order of
19  business," that's the sort of default calendar in the
20  Senate, correct?
21      A.  The regular order of business is the order of
22  the bill -- the order that bills came out of committee
23  numerically and by time, when they were voted out of
24  committee.  That's the regular order of business out
25  of the Substantive Committee.

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

13 (Pages 49 to 52)

49

1      Q.  And in the regular order of business, bills
2   are considered in the order that they come out of
3   committee, correct?
4      A.  Under the regular order of business.
5      Q.  And if you want a bill to be considered
6   outside the regular order, you have to suspend the
7   regular order of business; is that right?
8      A.  That's correct.
9      Q.  And typically, to suspend the regular order
10  of business, you need a two-thirds vote of Senate
11  members present at the time?
12     A.  That's true of the Senate and the House.
13     Q.  Okay.  Initially, when Senator Fraser made
14  his motion to consider House Bill 218 outside the
15  regular order of business, there were some Democratic
16  senators missing from the Senate floor; is that
17  correct?
18     A.  I believe there were two who were not on the
19  floor.
20     Q.  And that was Senator John Whitmire?
21     A.  He had been counted present, but he was not
22  on the floor.
23     Q.  Okay.  And the other one was Senator Carlos
24  Uresti; is that correct?
25     A.  Correct.

50

1      Q.  And so the initial vote on Senator Fraser's
2   motion passed without those two members on the floor,
3   correct?
4      A.  The motion to suspend the regular order of
5   business was passed with two-thirds of the members
6   present voting.
7      Q.  And then -- and I'm probably going to butcher
8   this name -- Senator Shapleigh, is that the way to
9   pronounce that?
10     A.  Shapleigh?
11     Q.  Yes.
12     A.  I think that's correct.
13     Q.  Okay.  Senator Shapleigh called for a
14  verification of that vote on suspending the regular
15  order of business, correct?
16     A.  I'm not sure without looking, but he could
17  have.  Any member could have asked for a verification
18  of the vote.
19     Q.  Okay.  And a verification of the vote
20  required a roll call of the senators present, correct?
21     A.  Correct.
22     Q.  And by the time that verification occurred on
23  the motion to consider HB 218 outside the regular
24  course of business, Senators Whitmire and Uresti were
25  back on the Senate floor; is that right?

51

1      A.  That's not my recollection, but I know that
2   ultimately there was a second vote and that there --
3   there were -- they were present.
4      Q.  Okay.  When you say that's not my
5   recollection, do you have a different recollection of
6   what happened?
7      A.  I don't -- I don't recall that Senator
8   Shapleigh called for a verification vote.  I don't
9   know whether he did or he didn't, and so I can't -- I
10  don't know what you're saying is correct or not.
11         MS. DONNELLY:  Counsel, we've been going
12  about an hour.  Good time for a break?
13         MS. RUDD:  Let me do this one last thing
14  and then we can take a break.
15         (Williams Exhibit 4 marked/introduced.)
16     Q.  (BY MS. RUDD)  Exhibit 4 is a copy of the
17  Senate Journal from May 15, 2007; is that right?
18     A.  It would appear to be.
19     Q.  And if you look at the second page of that
20  document, at the bottom of the page, there's a portion
21  titled, "COMMITTEE SUBSTITUTE HOUSE BILL 218 ON SECOND
22  READING."
23         Do you see that?
24     A.  I do.
25     Q.  And there, it says that Senator Fraser moved

52

1   to suspend the regular order of business to consider
2   CSHB 218, correct?
3      A.  Would you repeat the question?
4      Q.  Sure.  Just -- I'm just verifying that that
5   says that Senator Fraser moved to suspend the regular
6   order of business to take up consideration of CSHB
7   218.
8      A.  Correct.
9      Q.  And then if you sort of read along, it looks
10  like the motion prevailed, and then it lists the yeas
11  and nays on the vote.
12         Do you see that?
13     A.  Uh-huh.
14     Q.  You have to say "yes" or "no" --
15     A.  Yes.
16     Q.  -- for the record.
17         And then it says absent was may Hegar, Uresti
18  and Whitmire, correct?
19     A.  Correct.
20     Q.  And then at the very bottom, it says that
21  Senator Shapleigh called for a verification of the
22  vote?
23     A.  I see that.
24     Q.  Okay.  So -- and you have no reason to
25  question whether that recording in the Senate Journal

TOMMY WILLIAMS                                                  7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

14 (Pages 53 to 56)

53

1   is accurate, correct?
2       A.  I believe that it's accurate.
3       Q.  Okay.  And then there was a roll call
4   performed, correct?
5       A.  Yes.
6       Q.  And this time, Senators Whitmire and Uresti
7   voted against considering CSHB 218 outside the regular
8   course of business, correct?
9       A.  Correct.  The motion failed 20 to 11.
10      Q.  And so no voter ID after that -- no voter ID
11  legislation passed out of the Senate in the 2007
12  session; is that right?
13      A.  I don't believe so.
14          MS. RUDD:  We can take a break.
15          (Break.)
16      Q.  (BY MS. RUDD)  Okay.  Prior to the break, we
17  were talking about the voter ID legislation and what
18  happened to that legislation in the 2007 session, and
19  now I want to move forward to the 2009 session.
20          In 2009 there was a voter ID bill introduced
21  in the Senate, correct?
22      A.  I don't recall without going back and
23  looking, so...
24      Q.  Okay.  Do you recall Senate Bill 362 at all?
25      A.  Not as we sit here today.

54

1           (Williams Exhibit 5 marked/introduced.)
2       Q.  (BY MS. RUDD)  Exhibit 5 is a -- I'm going to
3   represent to you, is the engrossed version of Senate
4   Bill 362.  Feel free to look through it.  I have
5   several questions about it.
6       A.  Well, it is a version of Senate Bill 362.  I
7   can't tell you from looking at this that it's the
8   engrossed version, but...
9       Q.  Right.  And I'm making that representation.
10  I pulled it off of the Texas Legislature's website.
11          Do you recall this legislation, now that
12  you've looked through it?
13      A.  Not every detail, but I remember that we had
14  a bill that session --
15      Q.  And --
16      A.  -- about it.
17      Q.  And this legislation was sponsored by
18  Senators Fraser, Estes, Nelson and Nichols, correct?
19      A.  It would appear that they were the joint
20  authors.  They don't list everybody on there always.
21      Q.  Do you know whether there were any other
22  authors --
23      A.  There could have been some coauthors.  I
24  can't tell by looking at this whether there were or
25  there were not.

55

1       Q.  And do you know whether you were?
2       A.  I don't recall.
3       Q.  Everybody listed as an author on this bill is
4   a Republican, correct?
5       A.  Everybody -- yes.
6       Q.  Okay.  Let's go briefly through the ID
7   requirements listed in this bill.  If you turn to
8   page 3, I'm looking at Section 6.
9           Okay.  On page 3, Section 6, it says -- if
10  you look at Section (b) right there -- "On offering to
11  vote, a voter must present to an election officer at
12  the polling place either:  one form of identification
13  listed in Section 63.0101(a); or two different forms
14  of identification listed in Section 63.0101(b)."
15          Do you see that?
16      A.  I see it.
17      Q.  If you turn to page 5 with me, I'm going to
18  look at the bottom of that page, Section 63.0101(a).
19          And this section lists the forms of photo
20  identification that a voter could show at the polls in
21  order to vote, correct?
22      A.  Would you repeat the question?
23      Q.  Sure.  Section 63.0101(a) lists the forms of
24  photo identification that a voter could show in order
25  to vote at the polls, correct?

56

1       A.  I think what 63.010- -- I think -- excuse me.
2   Correct, 63.0101(a) shows the forms of identification
3   that would be acceptable.  Only one form of
4   identification would be acceptable.  That's -- that's
5   the way the legislation reads.
6       Q.  Okay.  And -- but all of the forms of
7   identification listed in that section are forms of
8   photo identification, correct?
9       A.  Every form listed under Section 63.0101(a),
10  there's a requirement that that document also have the
11  person's photograph.
12      Q.  All right.  And there are six different forms
13  of photographic identification listed in that section,
14  correct?
15      A.  Well, let me count them.  Well, there's six
16  or seven, depending on whether you count the --
17  there's two subsections under 6(a) and (b), so it's an
18  either -- it's an "or" thing.  So I guess it -- you
19  know, it depends on how you count it out.
20          It could be a valid identification card
21  containing the person's photograph issued by an agency
22  or institution of the federal government or an agency
23  or institution or political subdivision of the State.
24          So there are six list -- subsections; but the
25  six has two forms, and either -- and either would --

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

16 (Pages 61 to 64)

61

1    Q. (BY MS. RUDD) But one of the things that we
2  just discussed is that in terms of the photographic
3  identification listed in Subsection (a) of Section
4  63.0101, student IDs were eliminated from Senate Bill
5  362, correct?
6    A. They're not included on the list.
7    Q. Right. And -- and employee ID cards issued
8  in the ordinary course of business were eliminated
9  from the list?
10    A. They're not included in Senate Bill 362.
11    Q. In your opinion, did those eliminations make
12  this a better voter ID bill?
13        MS. DONNELLY: Objection. Form.
14        Go ahead.
15    A. I think I've already stated on the record
16  that I thought those were weak forms of
17  identification. I can't tell you what I thought at
18  the time. I don't have any specific recollection
19  about the consideration of this bill.
20    Q. (BY MS. RUDD) Okay. One of the things that
21  happened in the 2009 session is that you proposed a
22  rule change, a change to Senate rules; is that -- do
23  you recall that?
24    A. I recall that I proposed a rule change. It
25  could have been in 2009. I don't recall the exact

62

1  session.
2    Q. The rule change that I'm referencing is a
3  change that would allow any bill relating to voter
4  identification requirements to be set as a special
5  order and considered by the Senate on a majority vote.
6        Do you recall that rule change?
7    A. Yes, I proposed a rule change. I don't
8  recall which session it was, off the top of my head.
9  If you have something that could refresh my memory,
10  I'll be glad to take a look at it.
11        (Williams Exhibit 6 marked/introduced.)
12    Q. (BY MS. RUDD) Exhibit 6 is a copy of the
13  Senate Journal dated January 14, 2009, correct?
14    A. It would appear to be.
15    Q. And if you look at the third -- the second
16  line [sic] down, the secretary is recorded as saying:
17  "Senate Resolution 14 adopting the Rules of the Senate
18  of the 80th Legislature as the permanent Rules of the
19  Senate of the 81st Legislature with the following
20  modifications, by Williams."
21        Do you see that?
22    A. I see that.
23    Q. Does that refresh your recollection that you
24  proposed a rule change to the rules of the Senate in
25  the 2009 legislative session?

63

1    A. Yes.
2    Q. And that was the rule change we just
3  mentioned, correct?
4    A. My recollection would be that there were two
5  rule changes that were proposed then: One related to
6  special orders, the other was related to another
7  matter on constitutional amendments by Senator Carona.
8  I don't remember the exact nature of that change.
9    Q. Was the proposed rule change on
10  constitutional amendments a controversial rule change
11  that session?
12    A. I don't recall that it was or that there was
13  any debate. But I don't have a -- you know, I'd have
14  to take a look at it and see. I don't recall that
15  there was any controversy about it.
16    Q. Am I right that typically the rules for the
17  Senate at the beginning of each session are laid out
18  by the dean of the Senate, typically?
19    A. I don't think that's necessarily true.
20    Q. Was that true during the time that Senator
21  Whitmire was the dean of the Senate?
22    A. I don't recall. Could have been.
23    Q. Am I right that a simple majority vote is
24  required to adopt the Senate rules each session?
25    A. That's correct. If it's done at the

64

1  beginning of the session.
2    Q. Am I correct that in this session, the 2009
3  session, the only proposed change to the rules --
4  strike that.
5        Am I correct that voter ID legislation was
6  the only substantive issues that was -- that could be
7  set by special order under the proposed rule change
8  that you laid out?
9    A. I don't recall without reading the
10  resolution. It dealt with special orders. I don't
11  recall the exact, without taking a look at the
12  resolution.
13        (Williams Exhibit 7 marked/introduced.)
14        MS. DONNELLY: Okay. The witness has
15  just pointed out that this is a confidential document.
16        This is all under seal, correct?
17        MS. RUDD: Correct. Although I -- it
18  was my understanding that -- is it all confidential
19  documents that are under seal or is it highly
20  confidential?
21        MS. MARANZANO: I believe it's highly
22  confidential.
23        MS. RUDD: I believe so, too.
24        MS. DONNELLY: This deposition is all
25  under seal, though, right? So I guess it doesn't make

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

18 (Pages 69 to 72)

69

1  vote. It wasn't a roll call vote. They're different.
2      Q.  Okay.  And by that time, Senators Whitmire
3  and Uresti were on the floor, and the motion failed,
4  correct?
5      A.  That's correct.
6      Q.  Okay.  And one of the things that would have
7  been required for that motion to pass was a two-thirds
8  vote of the present senators on the floor, correct?
9      A.  That's correct.
10     Q.  And one of the differences between that
11  motion and what happened in 2009, is that in 2009, to
12  pass the Senate rules, you only needed a majority
13  vote, correct?
14     A.  They're -- you're -- I'm not sure what you're
15  asking me, because they're not related.
16     Q.  Why didn't you, in 2009, make a motion to
17  consider voter ID legislation outside the ordinary --
18  or the regular order of business?
19     A.  My recollection in 2009, is, it was
20  considered under a special order in 2009.
21     Q.  Okay.  And that's -- that's a little bit
22  different answer than what I asked.
23         Why didn't you, instead of doing what you did
24  with the rule change here, just make a motion to
25  consider Senate Bill 362 outside the regular order of

70

1  business?
2         MS. DONNELLY:  Objection.  Form.
3      A.  I don't understand your question.
4         MS. DONNELLY:  Note my objection.
5      Q.  (BY MS. RUDD) One of the things you could
6  have done in 2009 is make a motion like Senator Fraser
7  did in 2007 to consider Senate Bill 362 out of the
8  regular order of business, correct?
9      A.  I wasn't the author of that legislation in
10  '07 or '09, and I wouldn't have been recognized to
11  make that motion.
12     Q.  Okay.  One of the things that the authors of
13  the legislation could have done in 2009 is move to
14  consider it out of the regular order of business,
15  correct?
16     A.  Yes.
17     Q.  But they didn't do that because, what had
18  happened instead, is at the beginning of session, you
19  proposed a rule change to the Senate rules that
20  allowed it to be considered upon a majority vote of
21  senators?
22         MS. DONNELLY:  I think we're walking up
23  to -- very close to what other legislators thought,
24  their motives, why they did certain things.
25         And I would instruct the witness, please

71

1  do not discuss what you think, or what someone else
2  may have done, or what their motives were.  The
3  legislative privilege is to be waived by them and not
4  by another person.
5         THE WITNESS:  Okay.  Thank you.  I
6  understand.
7      A.  So what's your question?
8      Q.  (BY MS. RUDD) I don't remember now.
9         MS. DONNELLY:  I'm sorry.  I just want
10  to make that clear, that -- because we're getting into
11  what others may have thought or done or why they did
12  it; and I just want to make that clear to the witness
13  that he shouldn't go there.
14         MS. RUDD:  Thanks.  I'm trying to be
15  pretty careful.
16         MS. DONNELLY:  Okay.
17     Q.  (BY MS. RUDD) A motion by one of the authors
18  of Senate Bill 362 to consider that legislation out of
19  the regular order of business wasn't necessary in the
20  2009 session because there was this rule change put in
21  place at the beginning of session to allow voter
22  identification requirement bills to be considered upon
23  a vote of the majority of the Senate, correct?
24     A.  I don't think that's entirely correct.
25     Q.  Okay.  Correct me.

72

1      A.  I don't think that's my job.  It's not -- I'm
2  not here to correct you or teach you parliamentary
3  procedure.
4      Q.  Well, one of the things -- but you are here
5  to answer my questions.
6         So one of the things that the rule change at
7  the beginning of the 2009 session allowed you to do
8  as -- as the Senate, is to consider voter
9  identification bills as a special order of business;
10  is that correct?
11     A.  This -- the rule amendment that I offered in
12  the 2009 session allowed voter identification
13  legislation to be considered under a special order.
14         My recollection is that it had to be passed
15  out of the Committee of the Whole by a majority vote
16  to be able -- to be eligible to be considered under
17  the special order provision.
18     Q.  Okay.
19     A.  That's my recollection.
20     Q.  So adopting your proposed rule change took a
21  majority vote of senators, correct?
22     A.  That's true every session.
23     Q.  Fair.  And then considering voter ID
24  legislation as a special order also took a majority
25  vote of senators out of the Committee of the Whole,

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                            19 (Pages 73 to 76)

73

1  correct?
2      A.  No.
3      Q.  Okay.  What's wrong with what I said?
4      A.  Could you rephrase the question, restate the
5  question?
6      Q.  Sure.  It took a majority vote of senators to
7  consider voter ID legislation in 2009 as a special
8  order, correct?
9      A.  No.
10      Q.  What's wrong with what I said?
11      A.  I think that the voter ID legislation was
12  required to be considered by the Committee of the
13  Whole.  It had to pass out of committee under the
14  regular committee rules, which would have been a
15  majority vote, and then it could be brought to the
16  floor under a special order that would only require a
17  majority vote.
18      Q.  Right.  Without your rule change, considering
19  voter ID legislation as a special order, after it
20  passed out of committee, would have required a
21  two-thirds vote of senators present, correct?
22      A.  If you were going to consider it out of the
23  regular order of business, it would be true.
24      Q.  Right.  So what I'm -- what -- without your
25  rule change, it would have required, to consider it

74

1  outside the regular order of business after it passed
2  out of committee, a two-thirds vote of senators
3  present, correct?
4      A.  If it were being considered out of the
5  regular order of business.
6      Q.  Right.  Which is exactly what I just said.
7  So I'm correct?
8      A.  Is that a question?
9      Q.  Yes.
10      A.  I think you are.
11      Q.  Thank you.
12      And your rule change enabled the Senate to
13  consider voter ID legislation outside the regular
14  order of business by a simple majority vote, correct?
15      A.  No.
16      Q.  Okay.  What's wrong with what I said?
17      A.  I think that what this rule change -- it
18  became a part of the regular order of business when
19  this rule change was enacted.
20      Q.  Okay.  Is it the only -- was voter ID
21  legislation the only substantive piece of legislation
22  that was made a regular order of business by a
23  majority vote under the rule change?
24      A.  I think that it -- I don't know.  You're
25  going to have to restate your question.  Let me look

75

1  at this and see.
2      Yeah, I'd have to have a complete copy of the
3  Senate rules to answer your question, because all I
4  really have before me are the amendments.
5      And so what you're asking me are
6  some -- whether you're intending to or not -- are some
7  fairly technical parliamentary procedures, and I can't
8  do that unless I have a complete copy of the Senate
9  rules before me.
10      Q.  Okay.  We'll come back to it.  Let me ask you
11  this question instead:  How long before, if you
12  recall, the 2009 session, did you start working on
13  this particular rule change?
14      A.  I don't recall.  Sometime before the '09
15  session started, but I don't recall the date.
16      Q.  Okay.  One of the things you did is, you went
17  back and you researched whether there had been
18  instances in the history of the Senate where similar
19  rule changes had been proposed at the outset of
20  session; is that right?
21      A.  I think that I've testified in the D.C. Court
22  of Appeals and on the Senate floor about that matter,
23  and I'd refer you to that testimony.  I don't have a
24  specific recollection of -- about that at this time --
25      Q.  So I'm right --

76

1      A.  -- without having that right in front of me.
2      Q.  Okay.  And I'm not asking you to recall the
3  specifics of that particular testimony.
4      I'm just asking you whether you performed
5  research to determine whether similar rule changes had
6  been proposed in the history of the Senate prior to
7  proposing this rule change in 2009?
8      A.  Yes.
9      Q.  Do you recall, generally speaking, how long
10  that research took?
11      A.  No.
12      Q.  Did you enlist anybody else to help you with
13  that research?
14      MS. DONNELLY:  I would caution the
15  witness that, to the extent that this invades the
16  legislative privilege, please do not discuss it.
17      A.  I -- I'm going to assert legislative
18  privilege about that.  I don't think I'm going to
19  answer the question, so...
20      MS. RUDD:  I think the fact of whether
21  he enlisted others to help him in that research is
22  not, itself, legislative privilege.  I'm not asking
23  him to go into the details of what he discussed with
24  other people.
25      MS. DONNELLY:  That limited question, go

TOMMY WILLIAMS                                              7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

21 (Pages 81 to 84)

81

1    Q.  Okay.  Earlier, I asked you whether you
2  worked with anyone from the office of the lieutenant
3  governor on the proposed rule change.
4       Did you work with any of the lieutenant
5  governor's staff on the proposed rule change?
6    **A.  No.**
7    Q.  Prior to introducing this proposed rule
8  change, you spoke to Lieutenant Governor Dewhurst
9  about it, correct?
10   **A.  Would you ask the question again?**
11   Q.  Sure.  Prior to introducing this proposed
12 rule change at the outset of session in 2009, you
13 spoke to Lieutenant Governor Dewhurst about it,
14 correct?
15      MS. DONNELLY:  I would instruct the
16 witness, any private conversations you had, please
17 don't -- please don't go into them.  They're protected
18 by legislative privilege of the other legislators.
19      With that instruction, you can answer
20 the question.
21   **A.  Yes, I talked to the lieutenant governor and
22 informed him of my intentions.**
23   Q.  (BY MS. RUDD)  Okay.  Other than a
24 conversation when you informed the lieutenant governor
25 of your intentions, did you have any other discussions

82

1  with Lieutenant Governor Dewhurst about this
2  particular proposed rule change?
3    **A.  No.**
4    Q.  Did you have any other discussions with any
5  members of Lieutenant Governor Dewhurst's staff about
6  the proposed rule change prior to introducing it?
7    **A.  I might have.  I don't recall.**
8    Q.  Do you recall speaking to Bryan Hebert about
9  the proposed rule change?
10   **A.  I might have.  I don't have a specific
11 recollection.**
12   Q.  Would Mr. Hebert be someone you typically
13 worked with on -- on matters of importance to you
14 during the legislative session?
15   **A.  I worked with him on a lot of different
16 stuff.  I don't recall whether he was on the
17 lieutenant governor's staff or whether the lieutenant
18 governor asked him to look at what I was doing.  I
19 mean, honestly, I don't remember.**
20   Q.  Did you need the lieutenant governor's
21 approval to propose this rule change in 2009?
22   **A.  No.  The rules are the rules of the Senate.**
23   Q.  Did you tell any of the Democratic senators
24 about your proposed rule change prior to introducing
25 it in 2009?

83

1    **A.  Yes.**
2    Q.  Who did you speak to about it?
3    **A.  I don't recall.**
4    Q.  Do you recall how far in advance of
5  introducing this proposed rule change you spoke to any
6  of the Democratic senators about it?
7    **A.  I don't recall the exact time frame.  I know
8  that I discussed it with two or three members of the
9  Democratic caucus prior to the time that I introduced
10 it.**
11   Q.  Would --
12   **A.  I would suspect that it would have been --
13 probably Senator Whitmire would have been one of them.
14 He was the Dean of the Senate.  And I might have
15 talked to Senator Van de Putte and Senator West.  I
16 know that we had discussions.  It could have been
17 after I introduced it or it could have been right
18 before.  I don't remember.**
19   Q.  Do you recall how much advance notice you
20 gave those particular senators --
21   **A.  Not exactly.**
22   Q.  Okay.  Was it the day before it was
23 introduced that you told them?
24   **A.  I don't recall.**
25   Q.  One of the things we were discussing before

84

1  was that, at least in Senator Whitmire's tenure as
2  Dean of the Senate, prior to 2009, he typically laid
3  out the rules of the Senate; is that consistent with
4  your recollection?
5    **A.  I can't speak to that, how it was done prior
6  to 2009.  From the '03, the '05, and the '07 session,
7  he laid out the rules, but I can't speak to prior to
8  that.  I don't know before '03.**
9    Q.  Okay.  But in your tenure as a Senator,
10 while -- up until 2009 Senator Whitmire laid out the
11 rules of the Senate?
12   **A.  He did in the '03 session, the '05 session,
13 and the '07 session.**
14   Q.  And the reason that he didn't do so in the
15 2009 session is because he was opposed to this
16 proposed rule change; is that correct?
17   **A.  He was opposed to this, that's correct.**
18   Q.  And as a result, he didn't want to lay out
19 the rules for the Senate in that particular session;
20 is that right?
21   **A.  You'd have to ask him about that.**
22   Q.  Well, it's part of public record.
23      Do you recall that Senator Whitmire did not
24 want to lay out the rules for the 2009 session because
25 he was opposed to the rule change?

TOMMY WILLIAMS                                        7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

85

1      A.  If it's a matter of public record, I'm not
2  sure why you're asking me.
3      Q.  I'm asking your recollection.
4      A.  Honestly, I don't remember all the details
5  about that.
6      Q.  You do recall that the proposed rule change
7  in 2009 was relatively controversial in the Senate,
8  don't you?
9          MS. DONNELLY:  Objection.  Form.
10     A.  There was a lot of opposition and there was a
11  lot of debate about the rule change.
12     Q.  (BY MS. RUDD)  I think you previously
13  testified that there were about six hours of debate on
14  the proposed rule change?
15     A.  About six, six and a half hours, yeah.
16     Q.  And all of the Democratic senators were
17  opposed to the rule change; is that right?
18     A.  That's correct.
19     Q.  Let's talk about your research prior to
20  introducing this proposed rule change.
21         One of the things that you said in the debate
22  about this particular rule change was that the --
23  similar rule changes had been made in history; is that
24  correct?
25     A.  I don't have a specific recollection.  If you

86

1  have something you'd like for me to look at, I'd be
2  glad to look at it.
3         But I -- I do know, as a general matter, that
4  special orders have been used before and bills had
5  been considered in the regular order of business a
6  number of times during the history of the Senate.
7         And my recollection is that there were some
8  very significant pieces of legislation that were
9  passed without suspending the regular order of
10  business.  I was surprised to find that when I did my
11  research.
12     Q.  Okay.  So one of the things that you just
13  said is that legislation is -- you know, has often
14  been considered in the regular order of business in
15  the Senate history; is that correct?  Controversial or
16  major legislation?
17     A.  I didn't -- no, I don't think that's what I
18  said.
19     Q.  Okay.
20         THE WITNESS:  Would you want to read
21  back what I said?  She doesn't remember.
22     Q.  (BY MS. RUDD)  Let me just start over.
23     A.  All right.
24     Q.  The regular order of business is the way
25  things are usually considered.  When they're passed

87

1  out of committee, they're -- they're considered on the
2  Senate floor as they're passed out of committee, in
3  that particular order; is that right?
4      A.  That is called the regular order of business.
5  It's not the way all legislation is considered in the
6  Senate.
7      Q.  I understand that.
8         And then sometimes things are considered
9  under a special order, so there's a vote to consider a
10  piece of legislation outside the regular order of
11  business; is that correct?
12     A.  That has happened in the past.  It's not as
13  frequent.
14     Q.  And the typical rule, when something is
15  considered as a special order, is that you have to
16  vote on something to be considered a special order by
17  two-thirds vote of senators present, correct?
18     A.  I think you've confused a special order and
19  suspending the regular order of business.  They're two
20  different things.
21     Q.  Okay.  That's a subtle distinction, but I
22  appreciate that, because you're much more familiar
23  with the parliamentary rules than I am.
24         So considering something outside the regular
25  order of business typically, in the Senate, required a

88

1  two-thirds vote of senators present; is that correct?
2      A.  That's correct.
3      Q.  And then tell me how something would be
4  considered a special order instead of -- in the
5  regular order of business.  How did something end up
6  being a special order?
7      A.  Well, the rules define what can be considered
8  under a special order, and a special order takes
9  precedent over all other -- it is above the regular
10  order of business.
11     Q.  Okay.  And -- and are there things that, from
12  session to session, always come under that category of
13  special order?
14         MS. DONNELLY:  Objection.  Form.
15     A.  No.  Not every session.
16     Q.  (BY MS. RUDD)  Okay.  Well, are there things
17  that are typically considered special orders as part
18  of the Senate business?
19     A.  I couldn't answer that without having a copy
20  of the Senate rules in front of me.
21     Q.  Okay.  So if we went through the Senate rules
22  for 2003, 2005, 2007, and 2009, and so forth, for all
23  the years that you were in the Senate, you could look
24  at those and tell me what things were typically
25  considered special orders?

TOMMY WILLIAMS                                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

23 (Pages 89 to 92)

89

1    A.  Well, no, that's not true.
2    Q.  Okay.  Why is that not true?
3    A.  Well, you'd have to have the Senate Journals
4    and the Senate rules to know what was considered under
5    a special order.
6    Q.  Okay.  So there are some things that aren't
7    laid out in the Senate rules that are, nonetheless,
8    considered a special order; is that right?
9    A.  I'm not sure what you're asking.
10        What I can tell you is that I don't -- I
11   don't recall in '03, '05, or '07, any legislation
12   being considered under a special order.
13        There was legislative -- most legislation was
14   passed out of the regular order of business from the
15   Senate, and there was a lot of legislation that was
16   passed in the regular order of business without
17   suspending the regular order of business.
18   Q.  And then in 2009, was the only piece of
19   legislation that -- well, strike that.  Let me ask you
20   the question.
21        In 2009, was there anything considered by the
22   Senate that was a special order?
23   A.  The only thing I recall in the '09 session
24   being considered a special order was the voter ID
25   legislation.

90

1    Q.  And is the same thing true for the 2011
2    session?
3    A.  No.
4    Q.  Okay.  What else was considered a special
5    order in the 2011 special session?
6    A.  I don't recall any legislation being
7    considered under the special order of business in the
8    2011 session.
9    Q.  Okay.  So voter ID legislation wasn't
10   considered in the special order of business in the
11   2011 session?
12   A.  Not to the best of my recollection.
13   Q.  Voter ID in the 2011 session was declared an
14   emergency item by the governor, correct?
15   A.  I believe that's correct.
16   Q.  And that permitted legislation relating to
17   voter identification requirements to be considered in
18   the first 30 days of the session; is that correct?
19   A.  Emergency items can be considered during
20   the -- there's two prohibitions under the
21   Constitution:  the first 30 days is for reading and
22   reference to committee, and the second 30 days is
23   for -- so normally, you wouldn't consider any bills on
24   the floor during the first 60 days of the session, and
25   so -- but if it's declared an emergency item, it can

91

1    be considered.
2    Q.  Okay.  Going back to 2009, as we just
3    discussed, there was a lot of debate on the proposed
4    rule change in 2009, correct?
5    A.  Yes.
6    Q.  And there were a number of amendments offered
7    by various Democratic senators to that proposed rule
8    change, correct?
9    A.  There were.
10   Q.  And each time that an amendment was proposed,
11   you moved to table the amendment; is that right?
12   A.  I don't recall specifically if -- I don't
13   recall that I took any amendments, but I don't recall
14   that I moved to table every amendment.
15   Q.  You didn't take any amendments, did you?
16   A.  I don't recall that I did.  But I might not
17   have moved to table every amendment.  I might have
18   just voted on a straight up or down so I could either
19   move to table or we could just have a straight up and
20   down vote.  And I don't recall every amendment from
21   that early part of 2009, and what motions I made,
22   without looking at the Senate Journal.
23   Q.  Moving to table an amendment has the effect
24   of -- if the motion to table carries, has the effect
25   of killing the amendment, correct?

92

1    A.  It can't be considered again during that
2    session.
3    Q.  Right.  So it has the effect of killing the
4    amendment for that session; am I right about that?
5    A.  Yes.
6    Q.  Thanks.  Every single vote during the debate
7    on your proposed rule change in 2009 split along party
8    lines; is that right?
9    A.  I don't -- I don't recall.  It was either
10   party line or very close to party-line vote.
11   Q.  You would stand by whatever appears in the
12   Senate Journal on that debate?
13   A.  I think that the Senate Journal accurately
14   reflects what happened.  Senator Carona had an
15   objection to it, and I'm not sure how he voted on
16   every single one of those amendments.
17   Q.  Ultimately, your proposed rule change in 2009
18   passed; is that correct?
19   A.  It did.
20   Q.  And all eight senators who were ethnic
21   minorities voted against that rule change; is that
22   correct?
23   A.  I know that all the Democrats voted against
24   it.  I can't tell you that every ethnic minority voted
25   against it.  I don't know that.

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

24 (Pages 93 to 96)

93

1          (Williams Exhibit 8 marked/introduced.)
2       Q.  (BY MS. RUDD)  Exhibit 8 is a copy of the
3    Senate Journal from March 18, 2009; is that correct?
4       A.  It would appear so.
5       Q.  If you turn with me to page 591 of that
6    exhibit, I want to look at the bottom half of that
7    page.
8       A.  Uh-huh.
9       Q.  If you -- the title of this section is,
10   "STATEMENT REGARDING VOTES CAST ON SENATE BILL 362."
11         Do you see that?
12      A.  I do.
13      Q.  And it looks like Senator West offered the
14   following -- a number of statements on votes cast on
15   Senate Bill 362, continuing on to page 592.
16         Do you see that?
17      A.  I do.
18      Q.  Number 1 is that, "The Senate is comprised of
19   31 members, 8 of whom are ethnic minorities," and then
20   it lists the ethnic minorities at this time; is that
21   correct?
22      A.  Are you talking about Point No. 1, under the,
23   "STATEMENT REGARDING VOTES CAST ON SENATE BILL 362"?
24      Q.  Yes, sir.
25      A.  It lists eight people who are ethnic

94

1    minorities there.  I don't know that Senator Zaffirini
2    is an ethnic minority.  She may be.  And I don't know
3    if there are any other members of the legislature who
4    might be ethnic minorities.  I don't know.
5       Q.  Okay.  Well, right here --
6       A.  These people are asserting that they are.
7       Q.  Okay.  Fair enough.
8          If you look at Item No. 2, that discusses
9    your motion to amend the rules of the Senate that
10   we've been discussing.
11         Do you see that?
12      A.  I do.
13      Q.  And if you look at the last two lines of Item
14   No. 2 there, it says the motion to amend the previous
15   rules of the Senate prevailed by a vote of 18 to 13,
16   correct?
17      A.  Yes.
18      Q.  And all eight senators who were ethnic
19   minorities voted against the motion; is that right?
20         MS. DONNELLY:  Well, you're just asking
21   what it says, right?
22      A.  That's what it says.
23      Q.  (BY MS. RUDD)  Do you have any reason to
24   dispute what it says here?
25      A.  No.

95

1       Q.  Senate Bill 362 was ultimately considered by
2    the Committee of the Whole, correct?
3       A.  I believe that's true.
4       Q.  And the Committee of the Whole is just the
5    entire body of senators making up the Senate; is that
6    right?
7       A.  That's correct.
8       Q.  And eventually, the Senate -- the Committee
9    of the Whole voted to pass Senate Bill 362 out of
10   committee, correct?
11      A.  I believe that's correct.
12      Q.  And you voted to pass Senate Bill 362 out of
13   committee, correct?
14      A.  I did.
15      Q.  And all of the senators who were ethnic
16   minorities voted against passing Senate Bill 362 out
17   of the Committee of the Whole; is that right?
18      A.  You know, I don't have a specific
19   recollection, but I know that it -- it -- it went
20   against party lines, and the eight people who are
21   listed here all voted against it.
22      Q.  Are you aware of any ethnic minority who
23   voted for passing Senate Bill 362 out of the Committee
24   of the Whole?
25      A.  No, I can't -- I don't know.  I don't know

96

1    who's an ethnic minority, who else might be.
2       Q.  But you have no reason to dispute Senator
3    West's statement in this particular Senate Journal?
4       A.  No.
5       Q.  After Senate Bill 362 was voted out of the
6    Committee of the Whole, it was set as a special order;
7    is that right?
8       A.  You know, I believe it was.  I don't -- I
9    don't have a specific recollection of that.  I'm sure
10   it's in the Senate Journal.  Whatever's reflected in
11   the Senate Journal is accurate.
12      Q.  Okay.  Well, let's look at page 592 of the
13   Senate Journal, Item 4.
14      A.  Uh-huh.  I see it.
15      Q.  Does that refresh your recollection that
16   Senate Bill 362 was set as a special order --
17      A.  The Journal says that, "On March 11, 2009,
18   the Senate voted to set Senate Bill 362, and no other
19   bill, for special order.  The vote on this special
20   order was 19-12."
21      Q.  And that's consistent with your recollection;
22   yes?
23      A.  I have no reason to believe that's not true.
24      Q.  Okay.  And again, all eight ethnic minorities
25   listed here in the Senate Journal voted against

TOMMY WILLIAMS                                              7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

25 (Pages 97 to 100)

97

1  sending Senate Bill 362 as a special order; is that
2  right?
3      A.   That's my recollection.  And that's what it
4  says here in the Senate Journal.
5      Q.   Okay.  And then ultimately, Senate Bill 362
6  passed on the third reading; is that right?  It passed
7  out of the Senate?
8      A.   It was passed out of the Senate and it was
9  sent to the House.
10     Q.   And again, the vote to pass Senate Bill 362
11 out of the Senate was split along party lines, right?
12     A.   Yes.
13     Q.   With everybody who is self-identified as an
14 ethnic minority voting against passing it out of the
15 Senate, correct?
16     A.   To the best of my knowledge, yes.
17     Q.   And then, ultimately what happened, is that
18 Senate Bill 362 didn't pass the House in that
19 particular legislative session; is that right?
20     A.   That's my recollection.
21     Q.   And so voter ID legislation didn't become law
22 in the 2009 session, right?
23     A.   That's correct.
24     Q.   Do you recall a piece of legislation that you
25 conceived of called the Smile and Vote Legislation?

98

1            MS. DONNELLY:  Counsel, are you about to
2  shift to another line of questioning?  Our food's
3  here.
4            MS. RUDD:  Oh, then let's go off record,
5  because, yes, I'm totally about to shift.
6            MS. DONNELLY:  You're totally about the
7  food.  Yeah, and I am, too.  I think everybody's
8  hungry.
9            (Lunch break.)
10     Q.   (BY MS. RUDD)  Before the break, we were
11 talking about another piece of legislation that you
12 conceived of in 2009 called the Smile and Vote
13 Legislation.
14          Do you recall that?
15     A.   Vaguely.  I don't recall the specifics of it.
16 And, frankly, I'm not even sure if I introduced the
17 bill, so...
18     Q.   Well, that was going to be one of my
19 questions.
20          Do you know whether you ever introduced that
21 particular bill?
22     A.   I don't recall.
23     Q.   Do you recall that that piece of legislation
24 would have required people who showed up at the polls
25 without a voter ID to have their picture taken in

99

1  order to vote?
2      A.   That's my recollection of what the essence of
3  the bill was.  I don't know that there was ever a bill
4  drafted.  There may have been.  I just honestly -- I
5  don't remember.
6          Which session are we talking about?
7      Q.   2009.
8          (Williams Exhibit 9 marked/introduced.)
9      Q.   (BY MS. RUDD)  Exhibit 9 is a press release
10 issued from your office on June 8, 2009, correct?
11     A.   Uh-huh.
12     Q.   And --
13     A.   It would appear so.
14     Q.   And the subject line of that press release
15 is: "State Senator Williams Proposes 'Smile & Vote,'
16 Legislation," correct?
17     A.   Yes.
18     Q.   Was it your practice to send out press
19 releases about legislation before drafting any
20 legislation?
21     A.   Sometimes we would send out a press release
22 before the legislation was drafted, before it was
23 actually -- I mean, if you had the idea and it was
24 being drafted, you might send a press release out
25 about it --

100

1      Q.   Okay.
2      A.   -- what you intended to do.
3      Q.   And what was the purpose of those type of
4  press releases?
5      A.   To tell people what you were working on, get
6  feedback.
7      Q.   Okay.  Did you get any feedback from your
8  constituents about this particular piece of
9  legislation?
10     A.   I don't recall.
11     Q.   One of the things that this would have
12 required, according to your press release, is for
13 polling locations to be equipped with either digital
14 cameras or laptop computers with cameras; is that
15 right?  I'm looking at the last paragraph of that
16 release.
17     A.   Uh-huh.  Yes, that's what it says.
18     Q.   And then the legislation also would have
19 required digital photos to be held by the respective
20 county voter registration clerk for six years,
21 correct?
22     A.   That's what it says.
23     Q.   Do you recall what the purpose was of that
24 requirement?
25     A.   I think it says it here.  I mean, they would

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

26 (Pages 101 to 104)

101

1    be required to either show photo proof of ID or have
2    their photograph made.  I don't know what else I can
3    add to that.
4        Q.  Do you have any -- do you know why holding on
5    to those photographs for six years would have been
6    important?
7        A.  Well, if someone came in with their voter
8    registration card and -- with a voter registration
9    card and they weren't that person, it might be a good
10   idea to hang on to the photograph for a while and see
11   if it was ever disputed.  It might take a while.
12       Q.  Under Senate Bill 14, poll workers aren't
13   required to hold on to people's driver's licenses or a
14   copy of people's driver's licenses for any amount of
15   time, correct?
16       A.  I don't believe so.
17       Q.  By taking someone's photograph at the polls,
18   how does that verify who they are?
19       A.  Well, I -- I think what it says here is that
20   if they didn't have a photo ID, all they had was a
21   voter registration, you could take their picture; and
22   then, if it was ever disputed that that was the
23   person, you'd at least have a photograph of who they
24   were.
25           I think the idea here is that if you don't

102

1    require a photo ID before someone goes to vote, you
2    can't ever prove voter -- in-person voter fraud.
3    That's one of the fundamental things.  It's very
4    difficult to do if you don't require a photo ID.
5        Q.  Is it possible to obtain a photo ID under
6    someone else's name in Texas?
7            MS. DONNELLY:  Objection.  Form.
8        A.  I guess it could be, if you committed fraud.
9        Q.  (BY MS. RUDD)  Is there any way for poll
10   workers, today, to determine whether someone
11   legitimately obtained a particular form of photo ID
12   that they're showing at the polls?
13           MS. DONNELLY:  Objection.  Form.
14       A.  If someone presents the required form of
15   identification that they have, I think the poll worker
16   can be fairly certain that that is who they say it
17   was --
18       Q.  (BY MS. RUDD)  Are you --
19       A.  -- under today's law.
20       Q.  Are you aware that there have been relatively
21   massive problems in recent history of identity fraud
22   in the United States?
23           MS. DONNELLY:  Objection.  Form.
24       A.  I know there have been problems.
25       Q.  (BY MS. RUDD)  Do you recall a problem with a

103

1    bunch of people who shopped at Target having their
2    identities stolen?
3            MS. DONNELLY:  Objection.  Form.
4        A.  I remember hearing the news accounts.  It
5    involved their credit cards, though, not their photo
6    identification.
7        Q.  (BY MS. RUDD)  It's possible, though, isn't
8    it, if you're a person who's acting fraudulently, to
9    go and obtain someone's ID or go obtain an ID under
10   someone else's name?
11           MR. KEISTER:  Object to form.
12           MS. DONNELLY:  Object to form.
13       A.  I -- I wouldn't have any idea about that.
14       Q.  (BY MS. RUDD)  And there's no record kept of
15   the photo ID that's shown at the polls today so that
16   if someone else challenges that voter's identity
17   later, there's any way to verify it, is there?
18       A.  Would you repeat the question?
19       Q.  Sure.  That was a jumbled question.
20           One of the things about this Smile and Vote
21   Legislation was that it would have required a
22   photograph to remain on file for some period of time
23   so that if anyone ever challenged the voter's
24   identity, there was at least a photograph to go
25   reference to determine if the voter was who they say

104

1    they were, right?
2        A.  I think the idea was that if they only
3    presented a voter registration card and no other form
4    of ID, that if someone different was coming to use
5    that same one, you'd be able to determine that that
6    voter registration card was being used by different
7    people.
8        Q.  Okay.  Do you --
9        A.  You see what I'm saying?
10       Q.  I do see what you're saying.
11           Do you have the same ability, under the
12   current law, to go back and look at what picture
13   someone showed at the polls to determine whether that
14   person was who they say they were if there's a
15   challenge to that voter's identity later?
16           MS. DONNELLY:  Objection.  Form.
17           Go ahead.
18       A.  I think that the legislation that was passed,
19   the Senate Bill 14 legislation, is a lot better than
20   this idea would have been.
21           And the reason I say that is, it's a very
22   specific form of ID, it's fairly easy for the person
23   who's working at the polls to understand and identify
24   whether that -- if you handle a lot of driver's
25   licenses, you're going to know the ones that aren't

TOMMY WILLIAMS                                           7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

28 (Pages 109 to 112)

109

1   ask anyone at the DPS to educate you on what
2   might -- what documentation a person might have to
3   show in order to obtain photographic identification
4   from the DPS?
5        **A. I'm sure I made an inquiry, but I don't have**
6   **a specific recollection.**
7        Q.  Do you know what a person has to show in
8   order to obtain a Texas driver's license in the state
9   of Texas, what documentation?
10       **A.  Are you talking about now or in 2011?**
11       Q.  Let's start with 2011.
12       **A.  I can't recall specifically.  I know that the**
13   **information is available on their website.  And I**
14   **think, generally, it would be a -- if you had a**
15   **passport, a concealed carry permit, you know, a**
16   **certified copy of your birth certificate, it would be**
17   **things like that.**
18       **And there's categories where one is**
19   **called prime -- one category's called primary, the**
20   **other's called secondary.  And, you know, it takes two**
21   **of these and only one of these.**
22       **Like, you'd -- if you just had your passport,**
23   **that would be good enough.  But if you were using**
24   **something else that wasn't quite as solid as a**
25   **passport, then it might take two forms, so...**

110

1        Q.  In 2011, was a person who wanted to obtain a
2   Texas driver's license required to bring documentation
3   showing proof of their citizenship?
4        **A.  I believe they were by rule, not by law.**
5        Q.  Do you think that was the rule in 2011?
6        **A.  I believe that DPS had adopted that as a rule**
7   **prior to 2011.**
8        Q.  Why did DPS adopt that rule, if you know?
9        MS. DONNELLY:  Objection.  Form.
10       **A.  You'd have to ask them.  I think what they**
11   **wanted to do was, they wanted to know who they were**
12   **issuing the driver's license to.  And so I think that**
13   **prior to the adoption of that rule, there was some**
14   **concern that people might have been fraudulently**
15   **obtaining driver's licenses.**
16       **So the commission adopted it by rule.  I**
17   **don't remember the year.  Sometime prior to 2011.  And**
18   **I think in 2011 or 2013, I carried legislation that**
19   **codified the rule.**
20       Q.  (BY MS. RUDD)  So -- well, that's an important
21   distinction.  Was it before or after SB 14 that you
22   carried that legislation?
23       **A.  I don't -- I don't know.**
24       Q.  Let's talk about election identification
25   certificates under Senate Bill 14.

111

1        Are you familiar with what an election
2   identification certificate is?
3        **A.  Generally.**
4        Q.  And that is the so-called free ID that a
5   person can obtain from the DPS if they don't have one
6   of the other forms of photographic identification
7   required under SB 14, right?
8        MS. DONNELLY:  Objection.  Form.
9        Go ahead.
10       **A.  I believe that's correct.**
11       Q.  (BY MS. RUDD)  What is required under SB 14
12   for a person to obtain an election identification
13   certificate, if you know?
14       **A.  You know, I can't recite it to you.  It's a**
15   **matter of public record.  And whatever is in the**
16   **record, I'm sure is accurate.  I mean, you could take**
17   **a look at that.  I can't tell you, off the top of my**
18   **head.**
19       Q.  Well, I don't want this to be a memory
20   contest, so I'm just going to show you the
21   legislation, if that will help this along.
22       (Williams Exhibit 10 marked/introduced.)
23       Q.  (BY MS. RUDD)  Exhibit 10 is a copy of the
24   signed version of Senate Bill 14, correct, sir?
25       **A.  So what's your question?  I'm finished**

112

1   looking at it now.
2        Q.  My question was just -- I just wanted you to
3   identify the exhibit.
4        **A.  Looks like it's the final version of Senate**
5   **Bill 14 that was finally adopted and signed by the**
6   **governor.**
7        Q.  Okay.  And then my prior question was:  What
8   is required under this piece of legislation for a
9   person to obtain an election identification
10  certificate?
11       **A.  I'd have to look at it.  It's in here.  Do**
12  **you want me to look and see?**
13       Q.  I was actually looking myself to see, too.
14       "ELECTION IDENTIFICATION CERTIFICATE," that
15  section starts on page 13.
16       MS. DONNELLY:  Are you asking him just
17  to read it?
18       MS. RUDD:  Yeah, let's start with that.
19       Q.  (BY MS. RUDD)  So you familiarize yourself
20  with the provisions, and then I have just a couple of
21  questions.
22       **A.  Okay.  I've looked over that part of the**
23  **bill.**
24       Q.  Okay.
25       **A.  Section 20, Subtitle B, Title 7 of the**

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

29 (Pages 113 to 116)

---

**113**

1  **521A.001?  Is that the section that you're referring**
2  **to?**
3  Q.  Yes, sir.
4  A.  **On line 20 --**
5  Q.  Yes, sir.  Let's just look at --
6  A.  **-- on page 13?**
7  Q.  Let's just look at Subsection (a) on page 13
8  first.  That subsection requires the DPS to issue an
9  election identification certificate to a person who
10  states that they're obtaining the certificate for
11  purposes of satisfying the ID requirements of this
12  legislation and does not have another form of
13  identification and then who presents one of two items;
14  is that correct?
15  A.  **It says they either have to be a registered**
16  **voter or, it looks like, complete a voter registration**
17  **form.**
18  Q.  Okay.  So there's nothing in this provision
19  of Senate Bill 14 that requires a person to bring
20  documentation showing proof of citizenship in order to
21  obtain an election identification certificate; is that
22  right?
23  A.  **That would -- yes, I believe that's true.**
24  Q.  Do you know whether, today, a person can
25  obtain an election identification certificate without

---

**114**

1  showing proof of citizenship?
2  A.  **I don't know without looking at the DPS rules**
3  **that were adopted to enact this.  But if you're -- I**
4  **don't believe you can register to vote in Texas if**
5  **you're not a citizen of the state.**
6  Q.  Can you obtain a voter registration card in
7  Texas without presenting proof of citizenship in the
8  form of a document showing --
9  A.  **I'm not sure.**
10  Q.  In order to obtain a voter registration card
11  in Texas, can't you just attest that you're a United
12  States citizen?
13  A.  **I don't know.**
14  Q.  Have you ever showed up anywhere and showed a
15  document giving -- showing your proof of citizenship
16  to obtain a voter registration card?
17  A.  **I don't know.  I've had it so long, I don't**
18  **remember.**
19  Q.  Okay.  Does anything in this section of
20  Senate Bill 14 give the DPS discretion to require
21  documentation of proof of citizenship?
22  A.  **Well, it's hard for me to say.  If you look**
23  **on page 14, on line 9, Subsection (f), it says:  "The**
24  **department may require each applicant for an original**
25  **or renewal election identification certificate to**

---

**115**

1  **furnish to the department the information required by**
2  **Section 521.142."**
3  **And I don't think I have that information.**
4  **It is not -- I'm not sure that it's a part of this**
5  **bill.  If it is, if you can show it to me, I could**
6  **determine; but I don't know what 521.421 does.**
7  **Presumably, that's the delegation of**
8  **authority to that section, but it's hard for me to**
9  **determine by looking at the bill.**
10  Q.  Okay.  Well, we can look at the DPS
11  regulations in just a second.
12  Was one of the purposes of Senate Bill 14 to
13  ensure that people who show up to the polls to vote
14  are United States citizens?
15  A.  **I think that would have been -- I don't**
16  **remember that as a primary objective, but I think the**
17  **objective was that they were registered and legal to**
18  **vote, and that would be one of the things.**
19  **I don't remember that being -- I think the**
20  **purpose of the bill was to prevent in-person voter**
21  **fraud.  That would include people who weren't citizens**
22  **of the United States who tried to vote, but I don't**
23  **think that was the only thing.**
24  (Williams Exhibit 11 marked/introduced.)
25  Q.  (BY MS. RUDD)  Exhibit 11 is Subchapter A of

---

**116**

1  Title 7 of the Transportation Code, and I've only
2  included certain portions of that here, because it's
3  really long.  And I want to look at the second page of
4  this document, page 56.
5  At the bottom of that page is Section
6  521.1425, and it's titled, "Information Required to be
7  Furnished to Department."
8  Do you see that?
9  A.  I do.
10  Q.  If you can read through that for me, I have
11  just a couple of questions about that.
12  A.  (Witness complies.)  Okay.
13  Q.  If you look at page 57, at the very end of
14  that section --
15  A.  The very end of what section?
16  Q.  Sorry.  I'm looking in the middle of the
17  page, end of Section 521.1425.
18  A.  Okay.
19  Q.  Well, first, let me ask this question:  Did
20  you carry the legislation that added this regulation
21  to the Transportation Code?
22  A.  No, I can't tell you specifically without
23  looking at the bill.  But I will tell you that I
24  carried legislation that required people to prove that
25  they were either a United States citizen or that they

---

TOMMY WILLIAMS                                              7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                           30 (Pages 117 to 120)

117

1   were in this country legally, to obtain a driver's
2   license.
3       Q.  And why was -- why did you carry that
4   legislation?
5       A.  Well, there were a number of reasons.  Chief
6   among them were, that if we didn't pass that
7   provision, you would no longer be able to use your
8   Texas driver's license to board an aircraft without
9   this provision as a part of the law.  Texas was one of
10  the very last states in the country to put these
11  provisions in.
12      Q.  Okay.  So your testimony is that without
13  these provisions, if I showed up at Austin-Bergstrom
14  International Airport, which is the airport I use most
15  frequently, and flashed my driver's license, I
16  wouldn't be able to get on a plane?
17      A.  Under federal law, that's true.
18      Q.  Okay.  Did you have any other reasons for
19  wanting to amend the Transportation Code to require
20  someone to show proof of citizenship in order to
21  obtain a driver's license?
22      A.  It's not just proof of citizenship, it was
23  proof that you were in the country legally.
24      Q.  Was there any other reasons for you wanting
25  to carry that particular piece of legislation?

118

1       A.  No.  I mean, I think that was the principal
2   reason, as I recall, and I think there was a lot of
3   debate about these provisions and whatever -- you
4   know, it -- I'd point you to the record on that.  It
5   was debated extensively on the floor of the Senate and
6   the House.
7       Q.  Did you -- so just so we're clear on when
8   this particular change in the regulations occurred, if
9   you look at the end of that particular section on page
10  57, there's a reference to the 82nd Legislative
11  Session and an effective date of September 28, 2011.
12          Is that consistent with your recollection
13  that this particular change in the regulation happened
14  in the 2011 legislative session?
15      A.  Well, it says, actually, that it occurred in
16  the first called session.
17      Q.  Okay.  It became effective on September 28,
18  2011; is that correct?
19      A.  That's what it says.
20      Q.  So this became effective after Senate Bill 14
21  became effective in May of 2011; is that correct?
22      A.  Without looking at -- I don't remember the
23  effective date of Senate Bill 14, but it's -- the law
24  clearly passed after Senate Bill 14 did.  I don't know
25  what the effective date of 14 was.

119

1       Q.  Was one of --
2       A.  It could have been earlier or later.
3       Q.  Was one of your reasons for wanting this
4   regulation, this amendment to the Transportation Code
5   so that people who applied for election identification
6   certificates would be required to show proof of
7   citizenship to obtain that particular form of ID?
8       A.  No.  That's not my recollection as I sit here
9   today.
10      Q.  Okay.  And this was a regular --
11      A.  I think it would have done that, it would
12  have had that effect, but I don't think that was the
13  primary reason.
14      Q.  Well, was it something that you considered
15  prior to supporting this particular change to the
16  regulations?
17      A.  I can't tell you.
18      Q.  You don't recall?
19      A.  Huh-uh, I don't recall.
20      Q.  There's nothing in this particular regulation
21  or this section that references electronic [sic]
22  identification certificates; is that correct?
23          MS. DONNELLY:  Objection.  Form.
24      A.  I don't believe there is, but I don't know.
25  I'd have to look at Senate Bill 1.

120

1       Q.  (BY MS. RUDD)  That would be the budget bill?
2       A.  No.  Senate Bill 1 would be the budget bill
3   for the 2013 session.  House Bill 1 would have been
4   the budget in the 2011 session.  And this would have
5   been Senate Bill 1 in the first-called session of the
6   82nd Legislature, which was a special session.
7       Q.  And this regulation was passed as part of --
8   was this regulation appended as a rider to SB 1?
9       A.  No.  I don't believe so.
10      Q.  Do you recall that in 2011 DPS -- I'm done
11  with that document.
12          Do you recall that in 2011 the DPS was facing
13  a lot of organizational challenges?  I mean, I can be
14  more specific if that helps you.  Or the chair of the
15  Transportation and Homeland Security --
16      A.  You'd have to be a lot more specific.
17      Q.  Well, are you aware of any issues the DPS was
18  facing as an organization in 2011?
19          MS. DONNELLY:  Objection.  Form.
20      A.  I don't have a specific recollection.  If
21  there's something that you want me to speak to, if
22  you'll be more specific, I'll be glad to try to answer
23  the question.
24      Q.  (BY MS. RUDD)  Was the DPS's budget cut before
25  the 2011 session?

TOMMY WILLIAMS
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

7/29/2014

34 (Pages 133 to 136)

---

**133**

1 pieces of legislation have been passed so you know
2 what needs to have a budget attached to it.
3     Am I characterizing that roughly correctly?
4     A. I think what I said is: It's a
5 contemporaneous process, that there are things that
6 affect the budget as we go through. So I wouldn't say
7 it exactly the way you did, but...
8     Q. Is it fair to say that unless a fiscal note
9 is attached to something, you don't know what dollars
10 are going to be going to any particular piece of
11 legislation until the entire budget is put together at
12 the end of session?
13     A. No. That's not true. There are a lot of
14 things that go into the budget that don't have a
15 fiscal note on them. It's not --
16     Q. Okay. Fair enough.
17     When is the budget for things that don't have
18 a fiscal note sort of set? Does that not happen until
19 the end of session, or can it happen along the way?
20     A. Well, actually, starting, for instance, right
21 now, for the next session is when it would start. So
22 it's about a -- it's not quite a one-year process, but
23 about 10 months, probably, that it takes to put the
24 state budget together.
25     Q. And the budget doesn't become final until the

---

**134**

1 end of session?
2     A. That's true. It could. But it typically is
3 the very end of the session before you know what the
4 budget is exactly.
5     Q. Senate Bill 14, as you know, was passed very
6 early in the session in 2011, right?
7     A. I do.
8     Q. And it was -- so it was passed by the Senate
9 on January 25, 2011, does that --
10     A. Yeah.
11     Q. -- sound familiar?
12     A. Yeah.
13     Q. That was well before the budget came together
14 in 2011, correct?
15     A. Well, there was -- there was a draft budget
16 that the Finance Committee would be considering, but
17 the final budget wasn't done.
18     Q. Did you know, on January 25, 2011, when SB 14
19 was passed out of the Senate, whether there would be
20 enough budgetary dollars to go to the things that
21 would be required by SB 14?
22     A. Yes.
23     Q. How did you know that?
24     A. I'm a member of the Senate Finance Committee,
25 and I discussed it with the chairman of the Senate

---

**135**

1 Finance Committee and the lieutenant governor, the
2 other members of the Senate Finance Committee; and we
3 were committed to making sure there was enough money
4 in the budget to address whatever issues that were
5 related to this.
6     Q. Did you ever put together an analysis of what
7 amount of money would be required to ensure that
8 people who needed photo ID in any form would be able
9 to get it before the 2012 election cycle?
10     A. I think that we -- I might have asked the
11 Department of Public Safety to tell us what they would
12 need to implement the provisions of Senate Bill 14
13 in a timely and efficient manner.
14     Q. One of the things that you didn't know was
15 how many people in Texas would require an election
16 identification certificate, right?
17     A. I don't know. We may have had an estimate.
18 I don't recall.
19     Q. Did you ever perform an analysis or ask the
20 DPS to perform an analysis of how many people in Texas
21 who are registered -- who would be able to vote lacked one
22 of the other forms of photo identification listed in
23 SB 14?
24     A. You know, I don't think it would have been
25 just the Department of Public Safety. I know that

---

**136**

1 there were discussions with the Secretary of State and
2 the Department of Public Safety, and there were some
3 estimate. I have no recollection of what that is.
4     My recollection is that the department was
5 comfortable that they would not require an additional
6 appropriation to be able to issue the election
7 identification certificates.
8     Q. But what did the --
9     A. They felt like, that it would have an
10 insignificant impact on their workload if we were able
11 to address these other issues that they had, which I
12 was committed to doing.
13     Q. Okay. And for those other issues -- and I'm
14 just using your words because it's easiest -- in terms
15 of modernizing and streamlining the issuance of
16 driver's licenses and electronic [sic] identification
17 certificates, that required quite a bit of money,
18 going forward, to be able to do, right?
19     A. Well, that's a relative term. It was really
20 not even one-half of one percent of the state budget.
21 I mean, it was a very insignificant -- yes, is it a
22 lot of money to you or me. If it was $66 million,
23 that would be a lot of money to me. If it was $100
24 million, if it was $5 million, it would be a lot to
25 me. But in the context of a $120 billion budget, it

---

TOMMY WILLIAMS                                           7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                          35 (Pages 137 to 140)

---

137

1   wasn't a lot of money.
2       Q.   But nevertheless, the DPS requires tens of
3   millions of dollars after 2011 to start modernizing
4   their systems and -- and request even more money in
5   the 2013 session; is that right?
6       A.   I don't know the exact amounts, but I think
7   that's probably a fair characterization.
8       Q.   Okay.  Now let's turn to this other tiny
9   subtopic of education and outreach.
10       One of the things that SB did was, it
11   required the Secretary of State's office to engage in
12   some kind of education and outreach effort to educate
13   voters on the new requirements of the voter ID law,
14   correct?
15       A.   It did.
16       Q.   But SB 14 didn't specify what those education
17   and outreach efforts had to look like, right?
18       A.   I don't recall that it does.  I would be
19   surprised if we didn't have prescriptive.
20       Q.   So the Secretary of State's office,
21   essentially, under SB 14, is given discretion to
22   determine what -- what makes sense, in terms of
23   education and outreach for voters in Texas; is that
24   right?
25       A.   That's their job, the Secretary of State's

---

138

1   office, is, they run the elections and that sort of
2   thing, so we would have delegated that to them in the
3   bill.
4       Q.   Did you do any analysis of what kind of
5   dollars might be required for the Secretary of State's
6   office to ensure that everyone in Texas who is capable
7   of voting knew about the new ID requirements?
8       A.   I believe that the Secretary of State was
9   asked to provide that information, or we asked if they
10   needed any money.
11       My recollection was that there was money in
12   their budget that was available to do that, but
13   it's -- I don't have a specific recollection.
14       So there were some unexpended funds in their
15   budget that I think may have been used to help address
16   that problem.  There may have been some additional
17   money appropriated.  I honestly don't remember.
18       Q.   Do you have any knowledge of whether the
19   Secretary of State's office, now, in hindsight, has
20   had sufficient money to educate Texas voters about the
21   new ID requirements?
22       A.   To my knowledge, it hasn't been a problem, so
23   I would say, yes, they had sufficient resources to do
24   it.  And I don't recall ever having the Secretary of
25   State come to me when I was chair of finance or chair

---

139

1   of transportation in Homeland Security, saying, "We
2   needed more money for voter education."
3       Q.   Do you know what kind of education and
4   outreach the Secretary of State's office has done to
5   educate Texas voters --
6       A.   Not specifically.
7       Q.   I want to just briefly run through the
8   consideration of SB 14, just to back us up a little
9   bit.
10       I think, as we talked about earlier, Governor
11   Perry designated that legislation an emergency item
12   that year; is that right?
13           MR. KEISTER:  Object to form.
14       Q.   (BY MS. RUDD)  Designated --
15           MS. RUDD:  You're right.  I'll correct
16   myself.
17       Q.   (BY MS. RUDD)  Governor Perry designated voter
18   identification legislation an emergency item in 2011;
19   is that correct?
20       A.   That is correct.
21       Q.   And as part of that, SB 14 was able to be
22   considered in the first 30 days of session as a result
23   of that emergency designation; is that right?
24       A.   Yes, it was considered in the regular order
25   of business at the beginning of the session.

---

140

1       Q.   Okay.  And so you've anticipated my next
2   question.
3       There was no need to move to suspend the
4   regular order of business to consider SB 14, because
5   there was nothing scheduled to be heard ahead of it at
6   that time; is that right?
7       A.   That's my recollection.
8       Q.   And SB 14 eliminated all of the forms of
9   nonphoto ID that were contained in SB 362 from 2009
10   and HB 218 from 2007?
11           MS. DONNELLY:  Object to the form.
12       You can answer.
13       A.   I think that you're mischaracterizing.  None
14   of those other provisions, as you have noted, were
15   ever enacted, so I wouldn't characterize it as saying
16   that it eliminated those.
17       What I would say is that those provisions
18   were not included in this version of the bill; but it
19   didn't eliminate anything, because none of those had
20   ever been enacted.
21       Q.   (BY MS. RUDD)  Okay.  But for two sessions, in
22   2007 and 2009, what the Senate in Texas considered was
23   legislation that would have allowed voters to present
24   one form of photographic identification or two forms
25   of other secondary identification, correct?

---

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

36 (Pages 141 to 144)

141

1     **A.  I think, generally speaking, that's true.**
2     Q.  And then moving forward to 2011, the
3   legislation -- the voter identification legislation
4   that the Senate considered, only permitted voters to
5   present a form of photo identification in order to
6   vote; is that correct?
7             MS. DONNELLY:  Object to the form.
8     **A.  I think that you had -- under the provisions**
9   **of Senate Bill 14, you had to have either a valid**
10  **Texas driver's license or an election identification**
11  **certificate, and there were maybe a couple of other**
12  **things that you could have used.  So there were -- you**
13  **know, they all had a photo on them, so...**
14    Q.  (BY MS. RUDD)  All of them were photographic
15  identification, right?
16    **A.  I think that's right.**
17    Q.  Do you know why, in 2011, the legislation
18  that was put forward eliminated a voter's ability to
19  present secondary forms of identification?
20            MS. DONNELLY:  Objection to the form.
21    **A.  I think that you're mischaracterizing what**
22  **the legislation did.  I think what it did was, it**
23  **provided for a form of photo identification that was**
24  **free of charge; and many of those things that were**
25  **secondary forms of identification in the previous**

142

1   **bills could be used to obtain an election**
2   **identification certificate.  So I think the way you**
3   **phrased it mischaracterized what the bill did.**
4             **What the bill did was, it said, you know,**
5   **you're going to have really basically one of these two**
6   **forms of photo identification, and a lot of the**
7   **alternative forms were incorporated into what it took**
8   **to get the election identification certificate.  Not**
9   **completely, but in general.**
10    Q.  (BY MS. RUDD)  Okay.  But in 2007 and 2009,
11  voter identification legislation would have allowed
12  voters to present one of those secondary forms -- or
13  two forms of those secondary forms of identification
14  at the polls in order to vote, correct?
15    **A.  They weren't ever enacted, so I think it's**
16  **kind of a moot point, I mean.**
17    Q.  I understand.
18            But had they been enacted, that's what they
19  would have allowed, right?
20    **A.  You know what?  My grandfather always told**
21  **me, "If 'ifs' and 'buts' were candy and nuts, we'd all**
22  **have a Merry Christmas."**
23    Q.  That's a good saying.
24            In 2011, what the legislation did was, it
25  required voters who didn't have one of the primary

143

1   forms of photo identification to take an extra step
2   and take their secondary forms of ID and go and get an
3   electronic [sic] identification certificate, right?
4             MS. DONNELLY:  Object to the form.
5     **A.  You're going to have to rephrase the**
6   **question.  I'm not following you.**
7     Q.  (BY MS. RUDD)  So in 2007 and 2009, that
8   legislation that was proposed allowed voters to go to
9   the polls with two forms of secondary identification
10  to identify themselves, right?
11    **A.  Had it been enacted that would have been**
12  **true.**
13    Q.  And in 2011, the legislation, SB 14, didn't
14  allow voters to preset those forms of secondary
15  identification at the polls to identify themselves,
16  right?
17    **A.  That's correct.**
18    Q.  Instead, what SB 14 does, is it requires
19  anybody who can't get one of the forms of primary
20  photographic identification to take their secondary
21  forms of ID to the DPS to get an electronic [sic]
22  identification certificate; is that right?
23    **A.  Election.**
24    Q.  I'm sorry, an election identification
25  certificate.

144

1     **A.  That's correct.**
2     Q.  Can you tell me why it is, in 2011, you made
3   the decision to exclude -- well, strike that.
4             Why, in 2011, was the legislation that was
5   proposed for voter identification limited to
6   presenting photo ID at the polls?
7             MS. DONNELLY:  Object to the form.
8             You can answer.
9     **A.  I think that's really a question that would**
10  **be better directed to Senator Fraser, who was the**
11  **primary author of the bill.  He could tell you better.**
12  **In both -- in all the instances, he was either the**
13  **Senate sponsor or the primary Senate author.  So you'd**
14  **probably be better off asking him.**
15            **I do seem to recall that other states had**
16  **enacted voter identification legislation that had**
17  **worked its way either all the way through the courts**
18  **or partially through the courts, so there was better**
19  **understanding of how the courts might view some of**
20  **those things.**
21    Q.  (BY MS. RUDD)  Was it your opinion, when you
22  were considering SB 14, that a more restrictive bill
23  that only allowed voters to present photo
24  identification at the polls, was a better form of
25  voter ID legislation?

TOMMY WILLIAMS                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

37 (Pages 145 to 148)

145

1    A. I wouldn't characterize it that way.
2    Q. How would you characterize it?
3    A. I think SB 14 was a better bill than the
4  bills that had been considered in the previous two
5  sessions, because it required a more secure form of
6  identification and it would be easier for the people
7  who were working at the polls to determine if they
8  were being presented with a valid form of ID or not.
9    Q. One of the things we talked about earlier was
10 this notion of student IDs being an allowed form of
11 photographic identification at the polls.
12      Was there any debate in the consideration of
13 SB 14 about allowing student IDs?
14   A. If there was, it's a matter of public record.
15   Q. You don't have any specific recollection of
16 that?
17   A. I don't.
18      Have you read the Journal or looked at the
19 tapes?
20   Q. I've read a lot of it, but it's pretty
21 voluminous.
22      You were against student ID as a form of
23 photographic identification at the polls; is that
24 right?
25   A. I wouldn't say that. I don't think it was --

146

1  I don't think it was necessary to include that, but I
2  think I voted for it in one of those bills. It was
3  included in one of the bills.
4      So it was an improvement over what we had,
5  but it wouldn't be the way that I would prefer. I
6  think student ID was included in the '07 session. I'm
7  not sure about '09.
8    Q. And to be fair, you voted to send HB 218 in
9  the 2007 session out of committee, right?
10   A. Yes.
11   Q. And that legislation, had it been considered
12 by the Senate, would have allowed voters to present a
13 form of student ID, correct?
14   A. If it had not been amended. Of course, any
15 piece of legislation, a lot of times there are bills
16 that come out of committee that I might vote for that
17 I thought would need improvement, but that improvement
18 could be debated on the floor of the Senate in the
19 form of an amendment to the legislation, so...
20   Q. Did you form an opinion at some point between
21 2010 and 2011 that student IDs shouldn't be allowed as
22 a form of photographic identification at the polls?
23   A. No, I don't recall. I think I've testified
24 previously that I thought that having student IDs was
25 not a good idea.

147

1    Q. And that's because poll workers aren't able
2  to determine whether a particular ID is authentic?
3        MS. DONNELLY: Objection. Form.
4    A. I think I've already answered the question.
5    Q. (BY MS. RUDD) Well, remind me.
6    A. I think that a student ID is not a very
7  secure form of identification and that it's very -- I
8  think we have 38 general academic institutions. I
9  think we have somewhere in the neighborhood of about
10 30 community colleges.
11      They're all issuing student IDs, and how
12 would the poll worker know whether that was a valid ID
13 or not? They might not even know that there was, for
14 instance, a Ranger College. I mean, it's a state
15 institution that issues ID cards. How would they know
16 that.
17   Q. Okay. But most people vote in the
18 communities where they live; isn't that right? When
19 they go to the polls, you're voting someplace that's
20 close to your home address?
21   A. Students vote -- in my experience, students
22 vote either at home or at school. And also, in my
23 experience, some of them voted both places.
24   Q. A student who shows up to the polls near
25 their university and shows their university ID, the

148

1  poll worker who lives there is probably familiar with
2  that ID as well, right?
3        MS. DONNELLY: Objection. Form.
4    A. They may or may not be.
5    Q. (BY MS. RUDD) In any event, that got
6  eliminated along the way, and Senate Bill 14 doesn't
7  contain any student ID as one of the forms of ID that
8  can be presented at the polls, right?
9    A. I believe that's correct.
10   Q. One of the other things that Senate Bill 14
11 does not include is a state-issued ID. Is there a
12 reason that that's not a form of secure ID, as you
13 say?
14   A. You know, I don't -- I don't recall the
15 specific issue about that. I think the issue is that
16 that's a -- I'm not sure we knew what a state-issued
17 ID was. I mean, what is that?
18      Is that your ID that you have from the AG's
19 office? Was it the ID that I had as a member of the
20 Senate? If I'm a resident of a mental health facility
21 that's run by the state, is it the ID -- I mean, I
22 don't know what that is exactly, so I think it was a
23 vague -- vaguely defined form of identification.
24   Q. Would you say an identification issued by the
25 AG's office isn't a secure form of identification for

TOMMY WILLIAMS                                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

38 (Pages 149 to 152)

149

1  voting purposes?
2           MS. DONNELLY: Objection. Form.
3       A.  Yeah, I don't have any basis to know what the
4  AG's office does to vet an employee before they issue
5  an ID. I would hope they're doing a pretty good job,
6  but I don't have a specific knowledge of that.
7       Q.  (BY MS. RUDD) One of the major concerns
8  raised in connection with Senate Bill 14 was that
9  there wasn't sufficient evidence of in-person voter
10  fraud in Texas to justify strict photo ID law.
11          Do you recall that?
12      A.  That was asserted by the opponents of the
13  bill.
14      Q.  Okay. What did you do prior to the passage
15  of SB 14 to research in-person voter fraud in Texas?
16      A.  I think the primary information that we
17  received about this was from the testimony that we
18  received either in the State Affairs Committee or in
19  the Committee as a Whole.
20      Q.  Okay. Other than the testimony about
21  in-person voter fraud that was received in those two
22  committees, is there any other evidence of in-person
23  voter fraud that you collected in connection with your
24  consideration of SB 14?
25      A.  I don't know what you mean by that, evidence

150

1  that I collected. How would you know if someone was
2  committing in-person voter fraud if you didn't require
3  them to have an ID? Can you tell me.
4       Q.  Well, in-person voter fraud is a prosecutable
5  offense in Texas, correct?
6       A.  It is.
7       Q.  It's subject to criminal penalties, correct?
8       A.  It is.
9       Q.  It was subject to criminal penalties prior to
10  the passage of SB 14, correct?
11      A.  Yes.
12      Q.  And prior to the passage of SB 14, there were
13  convictions for voter fraud in Texas; are you aware of
14  that?
15      A.  Yes.
16      Q.  So how were those -- how were those instances
17  of voter fraud detected when there was no photo ID
18  law?
19      A.  I have no specific recollection of how they
20  were prosecuted. I know that they were fairly rare.
21      Q.  Okay. You anticipated another question.
22          Prior to passing SB 14, did you have any
23  statistical evidence showing you how many -- how many
24  times someone in Texas had been charged for in-person
25  voter fraud?

151

1       A.  The information existed, but I can't tell you
2  what it was, so...
3       Q.  Did you determine what that information or
4  what those statistics were prior to voting for SB 14?
5       A.  I was aware of it before I voted for it, yes.
6       Q.  Is it true that there are relatively few
7  instances of prosecuted in-person voter fraud in Texas
8  that have been reported?
9       A.  In relation to number of people voting, it's
10  not very high; but I don't think that that means it
11  couldn't influence the outcome of an election. There
12  are a lot of elections that are decided by a handful
13  of votes.
14      Q.  Just because an election is a close election
15  doesn't mean that there's voter fraud at work, right?
16      A.  I didn't say that.
17      Q.  Okay.
18      A.  The point that I'm making is, that in a close
19  election even a small amount of voter fraud can make a
20  difference in the outcome of the election.
21      Q.  One of the other major issues that was raised
22  during the debate of SB 14 was that the legislation
23  would disproportionately affect certain populations in
24  Texas, including the minority community in Texas.
25          Do you recall that?

152

1       A.  I know that that was an assertion of the
2  opponents.
3       Q.  What did you do prior to voting for SB 14 to
4  satisfy yourself that there would not be a
5  disproportionate impact on the minority voting
6  community in Texas?
7       A.  Well, we took extensive testimony in the
8  State Affairs Committee over a couple of different
9  sessions. And while I don't have a specific
10  recollection, I'm sure that this issue was brought up,
11  because Senator Ellis and Senator Van de Putte had
12  both voted against the bills, were members of that
13  committee, and they would have raised those issues.
14          So I know it was discussed, and -- I'm
15  certain it was discussed in -- in committee. And
16  that's the purpose of having a bill heard before it
17  comes to the floor, is to get those kind of things
18  vetted.
19      Q.  One of the things that happened is that a lot
20  of interest groups representing the minority community
21  in Texas testified against SB 14.
22          Do you recall that?
23      A.  I do.
24      Q.  The Texas NAACP offered testimony against
25  SB 14.

TOMMY WILLIAMS                                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                    39 (Pages 153 to 156)

153

1       Do you recall that?
2   A.  I do.
3   Q.  The Mexican American Legislative Caucus had
4   representatives testify against SB 14.
5       Do you recall that?
6   A.  I do.
7   Q.  And then a number of Democratic senators also
8   offered amendments to SB 14 that addressed some of the
9   concerns of the minority constituents in Texas.
10      Do you recall that?
11  A.  I know that there were a lot of Democratic
12  senators who offered amendments, yeah.
13  Q.  Were any of those amendments, to your
14  recollection, adopted?
15  A.  You know, I don't recall.  Most of them went
16  up or down on a party-line vote, so -- but I don't
17  have a -- I don't know about the number.  Some may
18  have been, some may not have been.
19  Q.  Ultimately, SB 14 was passed out of the
20  Committee of the Whole, correct?
21  A.  Yes.
22  Q.  And you voted to pass that bill out of
23  committee?
24  A.  I did.
25  Q.  And that vote was, again, along strict party

154

1   lines, correct?
2   A.  I believe that it was.
3   Q.  And are you aware of whether any ethnic
4   minorities in the Senate voted to pass SB 14 out of
5   committee?
6   A.  I'm not aware.
7   Q.  And then, ultimately, Senate Bill 14 went
8   into Conference Committee to resolve differences
9   between the Senate bill and the House bill; is that
10  right?
11  A.  That would be the usual procedure.
12  Q.  Okay.  And that Conference Committee was
13  appointed by Lieutenant Governor Dewhurst, correct?
14  A.  For the Senate, it would have been.
15  Q.  And let me just make sure I'm getting this
16  right.
17      On that committee for SB 14 was Senator
18  Fraser, yourself, Senator Huffman, Senator Birdwell
19  and Senator Van de Putte.
20      Does that sound correct?
21  A.  I don't recall who was on the Conference
22  Committee, but if that's what's in the Journal, I'm
23  sure that's correct.
24  Q.  Okay.  And of that list, Senator Van de Putte
25  was the only Democrat on the Conference Committee,

155

1   correct?
2   A.  Of the people you just named, she would have
3   been the only Democrat.
4   Q.  And it wasn't until a Conference Committee
5   that this concept of electronic [sic] identification
6   certificates was determined; is that right?
7       MS. DONNELLY:  Object to the form.
8   A.  I don't know what you mean by "electronic
9   identification certificates."
10  Q.  (BY MS. RUDD)  Sorry.  I keep using that word.
11  Election identification certificates.
12      Election identification certificates were a
13  product of the Conference Committee; is that right?
14      MS. DONNELLY:  Objection.  Form.
15      Go ahead.
16  A.  I don't remember.  Could have been.
17  Q.  (BY MS. RUDD)  Okay.  Would you stand by the
18  record of the consideration of SB 14 in that regard?
19  A.  Whatever the record says, yeah.
20  Q.  Okay.  And then, ultimately, Senate Bill 14
21  passed out of the Senate on January 25, 2011, correct?
22  A.  Whatever the record says.
23  Q.  And again, that vote was along strict party
24  lines, right?
25  A.  That's my recollection.

156

1   Q.  And there were no ethnic minorities in the
2   Senate who voted for SB 14, right?
3   A.  I'm not aware.
4   Q.  Okay.  Would you agree with me that there is
5   a history of voting-related discrimination in Texas?
6       MS. DONNELLY:  Objection.  Form.
7       MR. KEISTER:  Objection.  Form.
8   A.  You know, I'm not sure I can agree with that
9   or disagree with it.  I don't know that I'm in a
10  position to do that.
11  Q.  (BY MS. RUDD)  Well, one of the reasons that
12  prior to the invalidation of Section 5 of the Voting
13  Rights Act, that Texas was subject to Section 5, is
14  because it's a state that has historically had
15  discriminatory practices at the polls; isn't that
16  right?
17      MR. KEISTER:  Object to form.
18      MS. DONNELLY:  Object to form.
19  A.  I don't know that I agree with what you're
20  asserting.  I think that that was the premise of
21  Section 5.  I'm not sure I completely agree with it.
22      I do believe that there had been
23  discrimination in the past, but I don't think there's
24  any -- there was a lot of manufactured litigation
25  about this as a result of Section 5.  A lot of

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                41 (Pages 161 to 164)

161

1    A. I've heard it before.
2    Q. What do you understand that phrase to mean?
3    A. That people vote as a block based on their
4  race.
5    Q. Are you aware that there has been a history
6  of racially polarized voting in certain districts in
7  Texas?
8         MR. KEISTER: Object to form.
9    A. Yeah, I couldn't tell you specifically. But
10  I know that I've heard that assertion. I don't know
11  that it's true.
12    Q. (BY MS. RUDD) You've never done anything to
13  investigate that assertion?
14    A. I'm not saying that.
15    Q. Have you done anything to find out whether --
16    A. I don't -- I don't have any recollection of
17  spending any time on it. I may have, but I may not
18  have, so... I don't have a specific recollection.
19    Q. Would you have any reason to dispute the
20  United States Supreme Court's finding that there has
21  been a history of racially polarized voting in certain
22  districts of Texas?
23         MS. DONNELLY: Objection. Form.
24         MR. KEISTER: Object to form.
25    A. Yeah, I'm not familiar with what you're

163

1    A. It might have been. I don't know.
2    Q. Were you ever prompted to make any inquiries
3  about the existence of racially polarized voting in
4  Texas during the consideration of voter identification
5  legislation?
6    A. Would you repeat the question?
7    Q. Sure. Did anything ever prompt you to make
8  inquiries about the existence of racially polarized
9  voting in Texas as a result of the debates on voter
10  identification legislation?
11    A. I know the issue was debated. I'm not sure
12  what you're asking me beyond that.
13    Q. Was it an issue that worried you at all?
14    A. That worried me? We debated it. I think it
15  was decided. I voted for the bill.
16    Q. Right. Well, my question was slightly
17  different than that.
18         Was that a concern for you when you were
19  debating the bill?
20    A. I don't recall.
21    Q. You don't recall one way or the other?
22    A. No, I do not.
23    Q. Would you agree with me that, as populations,
24  African-Americans and Hispanics tend to be more
25  economically disadvantaged than Anglos in Texas?

162

1  asserting; and, you know, I'm not an attorney, so I
2  don't know.
3    Q. (BY MS. RUDD) You, yourself, haven't done any
4  analysis of voting patterns in Texas to determine
5  whether there's been racially polarized voting in
6  Texas --
7         MS. DONNELLY: Objection. Form.
8    Q. (BY MS. RUDD) -- since you've been in office?
9         MS. DONNELLY: Objection. Form. Asked
10  and answered.
11         MS. RUDD: I don't think so.
12    A. Is there a question in there?
13    Q. (BY MS. RUDD) Right. Have you done anything
14  independently to research whether there's been a
15  history of racially polarized voting in Texas?
16    A. Independent of what?
17    Q. On your own. Have you looked into it?
18    A. No.
19         MS. DONNELLY: You answered it before.
20  Just answer the same.
21    A. No.
22    Q. (BY MS. RUDD) Do you recall whether the issue
23  of racially polarized voting was raised in connection
24  with a debate on voter identification legislation
25  during your tenure as a Senator?

164

1         MR. KEISTER: Object to form.
2         MS. DONNELLY: Object to form.
3    A. You know, I'm not sure that I would agree or
4  disagree with that. I don't have anything in front of
5  me that would indicate it one way or the other.
6    Q. (BY MS. RUDD) Have you ever done any research
7  into that?
8    A. Not that I can recall at this time.
9    Q. Do you recall testimony during the debate on
10  Senate Bill 14 that African-Americans are less likely
11  to own cars than whites?
12    A. That might have been discussed, but I don't
13  have a specific recollection.
14    Q. Did you ever do anything, independently, to
15  look into whether African-Americans disproportionately
16  lack access to motor vehicles in Texas?
17    A. Repeat the question.
18    Q. Sure. During the debates on Senate Bill 14,
19  did you do anything to look into the claim that
20  African-Americans disproportionately lack access to
21  motor vehicles in Texas?
22    A. It may have been debated, but I don't -- I
23  don't recall any specific details or anything I might
24  have done related to that.
25    Q. Do you recall hearing testimony that the

TOMMY WILLIAMS
7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

42 (Pages 165 to 168)

165

1  minority populations in Texas -- and by "minority,"
2  I'm primarily referring to language and ethnic
3  minorities in Texas -- have lower literacy rates than
4  whites?
5      A.  That may have been asserted, but I don't have
6  a specific recollection.
7      Q.  Did you personally look into whether language
8  and ethic minorities in Texas tend to have lower
9  literacy rates than whites during your consideration
10 of SB 14?
11     A.  If it was the subject of the debate, I would
12 have considered it during the debate, but I don't have
13 a specific recollection of whether the issue was
14 brought up or not.
15     Q.  Is it concerning to you at all or was it
16 concerning to you at all during the debates on SB 14
17 that language and ethnic minorities in Texas might
18 have lower literacy rates than Anglos?
19     A.  I don't recall that that was an issue.  It
20 may have been, but I don't have a specific
21 recollection.
22     Q.  Was it concerning to you at all that language
23 and ethnic minorities in Texas might have less access
24 to motor vehicles than whites?
25     A.  I don't have a specific recollection of that

166

1  subject coming up.
2      Q.  You do recall testimony from various interest
3  groups that African-Americans and Hispanics would have
4  disproportionate burdens as a result of SB 14, didn't
5  you?
6      A.  That was asserted by some groups.
7      Q.  Did you do anything to look into those
8  assertions or satisfy yourself about whether those
9  assertions were accurate?
10     A.  Yes.  That was a part of the debate.  That
11 would have been when I considered it.
12     Q.  Okay.  And I understand it was part of the
13 debate.
14         What I'm asking is slightly different, and
15 that's whether you did anything to determine whether
16 the assertions by those groups about the
17 disproportionate burdens on the minority community
18 were true.
19     A.  Yes, that would have been part of what I
20 considered during the debate, both in committee and on
21 the floor.
22     Q.  Okay.  And I understand -- I understand that
23 as a result of considering legislation, you hear
24 testimony and you have to think about the testimony.
25         Did you do any research to determine whether

167

1  the claims of the minority community that this
2  legislation would have a disproportionate impact on
3  their constituents was accurate?
4          MR. KEISTER:  Object to form.
5      A.  I -- I don't have a specific recollection.
6  My staff might have done some work on that, but, you
7  know, I can't -- I can't sit here and tell you that I
8  did or I didn't.
9      Q.  (BY MS. RUDD)  Would you agree with me that
10 there are fewer Hispanics and African-Americans in the
11 Texas legislature -- serving in the Texas legislature
12 than whites or Anglos?
13     A.  I think that's true today and it was true in
14 2011.
15     Q.  Would you agree with me that the Hispanic
16 population in Texas is continuing to grow?
17     A.  I believe that's true.
18     Q.  Do you know, generally, what the --
19 percentage of the Texas population is made up of
20 Hispanics?
21     A.  I do not.
22     Q.  Did you know that information in 2011?
23     A.  I probably did.
24         (Williams Exhibit 12 marked/introduced.)
25     Q.  (BY MS. RUDD)  Exhibit 12 is a letter from the

168

1  Brennan Center for Justice to Christian Herren in the
2  voting section of the Civil Rights Division of the
3  Department of Justice, dated September 14, 2011; am I
4  correct about that?
5      A.  Well, that's what this piece of paper says
6  that you've just handed out here.  I'm not familiar
7  with it, but, you know.
8      Q.  I understand that.
9          Okay.  If you'll turn with me to page 5.  If
10 you'll look in the -- there's a Section 2 there, and
11 then I'm looking two paragraphs into that section to
12 the paragraph that says:  "As the Texas Department of
13 Public Safety has recently noted..."
14         Do you see that?
15     A.  Uh-huh.
16     Q.  Feel free to read that --
17     A.  Yeah.
18     Q.  -- whole paragraph.  I have just a couple of
19 questions.
20     A.  (Witness complies.)  Okay.
21     Q.  Did you do any research, when you were
22 debating SB 14, about what percentage of
23 African-Americans own concealed handgun licenses in
24 Texas?
25     A.  I don't have a recollection that I did or I

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

43 (Pages 169 to 172)

169

1  didn't.
2     Q.  Was any statistical information about that
3  available to you when you voted on Senate Bill 14, to
4  your knowledge?
5     A.  It may have been.  I don't recall.
6     Q.  Would that information have been important to
7  you in determining whether to vote for the bill?
8     A.  Probably not.
9     Q.  Okay.  Turn to page 6, please.  And here, I'm
10  looking at the paragraph under the bold heading number
11  1, and feel free to read that.
12     A.  The paragraph that begins, "With over 4
13  million people..."?
14     Q.  Yes, sir.
15     A.  (Witness complies.)  Okay.
16     Q.  Prior to -- are you generally aware that the
17  poor population in Texas is disproportionately made up
18  of African-Americans and Latinos?
19        MR. KEISTER:  Object to form.
20     A.  No, I can't say that I would know that or not
21  know that.  I mean, I know that we have a lot of
22  people that live below the poverty line in Texas, but
23  I couldn't tell you the ethnic makeup of those people.
24     Q.  (BY MS. RUDD)  Okay.  Did you look into the
25  ethnic makeup of people living below the poverty line

170

1  in connection with your debate about voter ID
2  legislation in 2011?
3     A.  I do not recall at this time.
4     Q.  Would knowing that African-Americans and
5  Hispanics disproportionately make up those living
6  below the poverty line in Texas have made a difference
7  to you in your consideration of SB 14?
8        MS. DONNELLY:  Objection.  Form.
9        MR. KEISTER:  Object to form.
10     A.  You know, the provisions of Senate Bill 14
11  were that you could get this election identification
12  certificate at no cost, and so I don't think that that
13  was really an issue that I would have given a lot of
14  consideration to.
15     Q.  (BY MS. RUDD)  Okay.
16     A.  We wanted it to be accessible to as many
17  people as possible.
18     Q.  Well, let's talk about the EIC and cost.
19        The underlying documentation that's required
20  to obtain an EIC does cost money, correct?
21        MS. DONNELLY:  Objection.  Form.
22     A.  Some of it might cost money, some of it might
23  not.
24     Q.  (BY MS. RUDD)  Would you agree with me that it
25  takes time to go to a DPS office to obtain an EIC?

171

1     A.  It does.
2     Q.  Would you agree that it takes more time for
3  someone to go to a DPS office to obtain an EIC if
4  there's no DPS office in their county?
5     A.  It could or it might not.
6     Q.  Would you agree with me that for some people,
7  they would have to take off work to go obtain an EIC?
8     A.  Some people might have to do that.
9     Q.  Do you consider taking off of work a cost to
10  obtaining an EIC?
11     A.  You know, I guess it would be.  I'm not sure.
12  I mean, it's -- if you -- if you need a -- an election
13  identification certificate or if you need a driver's
14  license, whatever it is, you're going to have to go
15  get that from the State.  Everybody has to do that.
16     Q.  Right.  But prior to Senate Bill 14 being
17  passed, you didn't have to go to the DPS office to get
18  anything in order to vote in Texas, right?
19        MS. DONNELLY:  Objection.  Form.
20  Argumentative.
21     A.  That may be true.  Some people may have
22  registered to vote in a DPS office.  It was possible
23  to do that.
24     Q.  (BY MS. RUDD)  You could also register to vote
25  online, though, right?

172

1     A.  You could, if you had access to a computer.
2     Q.  You could also register to vote by mail,
3  right?
4     A.  If you had access to a post office.
5     Q.  Or access to a mailbox in the front yard,
6  right?
7     A.  (No verbal response.)
8     Q.  Would you agree with me that having to spend
9  money on gas for your car or to get onto public
10  transportation to go to a DPS office to get an EIC
11  represents a cost?
12        MR. KEISTER:  Object to the form.
13        MS. DONNELLY:  Object to the form.
14     A.  Clearly, if you're going to have to go
15  somewhere, it's going to -- that's part of the cost of
16  life, is having to get around to get your certificates
17  and licenses and all those kinds of things.
18     Q.  (BY MS. RUDD)  Would you turn with me to page
19  7 of Exhibit 12.  I'm looking at the second paragraph
20  under Subparagraph -- or the Section 2 there, starts:
21  "The latest census data..."
22        Do you see that?
23     A.  I do.
24     Q.  Read that to yourself.  I have a couple of
25  questions about that.

TOMMY WILLIAMS                                                  7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

44 (Pages 173 to 176)

173

1    A. (Witness complies.) Okay.
2    Q. Prior to voting on Senate Bill 14, did you
3  look into this issue of whether African-Americans and
4  Latino citizens in Texas disproportionately lacked
5  access to motor vehicles?
6         MS. DONNELLY: Objection. Form.
7         You can answer.
8    A. First of all, I would say that with respect
9  to this entire document that I have before me, I have
10 no idea whether these assertions are true.  This is a
11 viewpoint of an advocacy group.
12      The second thing I would say, is that -- with
13 respect to your specific question, is, that that would
14 have been something that we considered both in
15 committee, in the State Affairs Committee, in the
16 Committee of the Whole, and it would have been the
17 subject of floor debate.
18      So if you're asking me if I considered these
19 things -- I listened carefully to everybody's
20 viewpoint; I may not always agree with it -- but, yes,
21 this would have been something that we would have
22 considered during the process.
23   Q. (BY MS. RUDD) Did it concern you, in voting
24 on SB 14, that African-Americans and Latinos might
25 disproportionately lack access to a motor vehicle?

174

1         MR. KEISTER: Object to the form.
2         MS. DONNELLY: Objection. Form.
3    A. I voted for the bill.  And I don't believe
4  that there was anything in the bill that has prevented
5  any African-American from being able to obtain an
6  election identification certificate if they needed one
7  to vote, if they didn't already have a driver's
8  license.
9    Q. (BY MS. RUDD) Did you do anything -- was
10 there anything in SB 14 that ameliorates the cost to
11 obtaining an EIC for indigents, people who are
12 indigent in Texas?
13   A. It was free.  If you -- if you didn't have
14 one of the other forms of ID, the document -- the
15 election identification certificate was free.
16   Q. Okay.  But one of the things we discussed is,
17 you'd have to actually get to a DPS office to get an
18 EIC, right?
19        MR. KEISTER: Object to the form.
20   A. I believe that's correct.
21   Q. (BY MS. RUDD) And there are people in Texas
22 who don't have cars, right?
23        MS. DONNELLY: Objection. Form.
24   A. I presume there are, yeah.
25   Q. (BY MS. RUDD) And there are many people in

175

1  Texas who can't afford public transportation, right?
2    A. There could be.
3    Q. Did you consider including in SB 14 an
4  exception for -- to the photo identification
5  requirement, for people who are indigent?
6    A. If it was brought up in -- either in
7  committee -- in the State Affairs Committee or in the
8  Committee of the Whole, in the case of Senate Bill 14;
9  or if it was brought up in the floor debate -- I would
10 have considered it.
11   Q. And --
12   A. I don't have a specific recollection as we
13 sit here today, all these years later.
14   Q. In any event, there is no exception in SB 14
15 for people who are indigent in Texas, correct?
16   A. I think the election identification
17 certificate is free of charge.  That is the exception.
18   Q. Sorry.  I misspoke.
19      There's no exception to the photo ID
20 requirement for people who are indigent; is that
21 right?
22   A. No.  The certificate is free.
23   Q. Except for all the other costs we've
24 discussed, right?
25        MS. DONNELLY: Object. Argumentative.

176

1         MR. KEISTER: Form.
2    Q. (BY MS. RUDD) I understand that the
3  certificate itself isn't free, but we've discussed a
4  number of things that would represent a cost to
5  certain people in Texas, right?
6         MS. DONNELLY: Object. Form.
7  Argumentative.
8    A. You have discussed them.  You've asserted
9  that.  I've said I'm not sure that what's in this
10 letter -- I'm not accepting this at face value.  I
11 don't know whether it's true or not.  If it was
12 debated in the committee, I would have considered it.
13   Q. (BY MS. RUDD) I understand that, which is why
14 I'm not asking you to affirm or deny anything that's
15 contained in this letter.  I'm just using it as a
16 reference point, mostly for me.
17      But you -- you agreed with me earlier, right,
18 that getting in a car and driving to a DPS office and
19 paying for the gas that goes in that car represents a
20 cost, right?
21        MR. KEISTER: Object to the form.
22        MS. DONNELLY: Object to the form.
23   A. Yeah, I believe that I did.  And I think, you
24 know, it's part of the cost of life that we all bear.
25   Q. (BY MS. RUDD) And if you have to travel 100

TOMMY WILLIAMS                                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

45 (Pages 177 to 180)

177

1  miles to get to a DPS office, that's going to
2  represent a cost to you, correct?
3         MS. DONNELLY: Object to the form.
4     A.  If you have to travel for what?
5     Q.  (BY MS. RUDD) To get an EIC.
6     A.  Yeah, that would be something that you'd have
7  to pay for.
8     Q.  And so even though an EIC is itself free,
9  there are certain costs that are implicit in obtaining
10 an EIC, would you agree with me on that?
11        MR. KEISTER: Object to form.
12        MS. DONNELLY: Object to form.
13    A.  I'm not sure I would.
14    Q.  (BY MS. RUDD) Why aren't you sure?
15    A.  Well, because there's a lot of opportunities
16 that people could have; where they could ride with a
17 neighbor, there's free transportation, there's -- they
18 might not be able to walk to get one.  There's a lot
19 of exceptions.  So you're making a pretty broad
20 statement there, so...
21    Q.  Did you talk to anyone in your consideration
22 of SB 14 that felt they weren't going to be able to
23 get an EIC?
24    A.  Yes, I'm sure that we did.  I don't have a
25 specific recollection.  But there was -- no doubt,

178

1  somebody testified in committee about it.  But I don't
2  have a specific recollection of it.  I suspect that
3  there probably was.
4         I do recall that there was a young woman who
5  testified in the federal district court in Washington,
6  D.C. that she couldn't get an EIC, or any other form
7  of identification, but she was able to obtain an
8  airline ticket and get on the airplane.  If she had
9  done that, she would have had what was necessary to
10 vote.  That's my recollection.
11    Q.  Are you aware that there are ways you can get
12 onto an airplane without a form of photo
13 identification, by answering questions at the airport?
14    A.  I am aware of that.
15    Q.  If you'll turn with me to page 8 of Exhibit
16 12, I only have one more thing to ask you about on
17 this exhibit, and then we'll be done.
18        If you'll look at the bottom of page 8, the
19 paragraph under that Section 3, starting, "Not only do
20 Texas's minority citizens..."
21        Do you see that?
22    A.  Uh-huh.
23    Q.  If you could read that paragraph, that would
24 be great.  I just have two questions.
25    A.  (Witness complies.)  Okay.

179

1     Q.  Do you recall testimony during your
2  consideration of SB 14 that certain minority citizens
3  in Texas, including specifically the Latino community
4  in Texas, would have to travel proportionately greater
5  distances to get to DPS offices?
6     A.  I don't have a specific recollection.  It may
7  have been part of the debate.  I'm -- I'm sure that it
8  probably was, but I don't have a specific
9  recollection.
10    Q.  Did you do anything, or anyone in your
11 office, do anything to independently research or
12 investigate that claim?
13    A.  Once again, the committee process and the
14 whole debate is where we consider the effects of
15 legislation, and that's what I did.
16    Q.  Okay.  And I understand that.
17        I'm just asking if you took any additional
18 steps to go out and satisfy yourself about what access
19 certain communities in the --
20    A.  I can't recall.
21    Q.  Okay.  And was it concerning to you, when you
22 were voting on SB 14, that the Latino population in
23 Texas might live disproportionately further from DPS
24 offices?
25        MR. KEISTER: Object to form.

180

1         MS. DONNELLY: Object to form.
2     A.  I am not sure that it was something that I
3  was worried about when I voted for it.  I think my
4  concerns had been satisfied.
5     Q.  (BY MS. RUDD) One of the things that the
6  minor -- or the Democratic opposition, I should say,
7  was pretty vocal about, in the debates about Senate
8  Bill 14, is that there was really no significant
9  in-person voter fraud in Texas, right?
10    A.  I'm not sure.  They may have asserted that,
11 but I'm not sure that I agree that that's true.
12    Q.  I understand that.  I just -- my only point
13 is that that was part of what opposition was lodged
14 against this legislation, is that it didn't -- there
15 was no real in-person voter fraud to combat.
16        Do you recall that?
17    A.  Well, you know, once again, what I would say
18 is that voter fraud is very difficult to detect if you
19 don't require an ID when someone votes.  How are you
20 going to know if they're committing fraud if you don't
21 ask them for an ID?  So it's very difficult to detect
22 unless you require some form of identification.
23        Now, I have a lot of anecdotal
24 evidence that it happens.  My grandfather voted for 62
25 years in the Democratic primary after he died.

TOMMY WILLIAMS                                              7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

193

1    Q.  Okay.
2    A.  Because all your voter registration
3  information is over at the Secretary of State's
4  office.
5    Q.  Do you recall what databases the DPS
6  maintained at that time and what databases the
7  Secretary of State maintained at that time?
8    A.  No, not specifically.
9    Q.  Do you know whether or not those two were
10  ever matched by those agencies to determine any
11  information that would be --
12    A.  I don't have a specific recollection.  Like I
13  said, I think they would have analyzed that, and it
14  very well could have been a part of it, but I don't
15  have a specific recollection.
16    Q.  At some point the DPS was taking fingerprints
17  from individuals who were applying for an EIC, are you
18  aware of that?
19    A.  No.
20    Q.  You're not aware of that one way or the
21  other?
22    A.  Huh-uh.
23    Q.  Okay.  Do you know whether or not they
24  continue, today, to request --
25    A.  I don't know.

194

1    Q.  -- fingerprints for someone applying for an
2  EIC?
3    A.  I have no idea.
4    Q.  How was it determined, whether it's in your
5  office or your committee, or just by you, how was it
6  determined what duties would be given to the Secretary
7  of State and what duties would be given to, say, the
8  DPS, with regard to Senate Bill 14?  How was that
9  determined?
10    A.  Can you be more specific?
11    Q.  Sure.  The Secretary of State's office
12  historically has been in charge of elections, keeping
13  the databases, the information.
14          Why not -- for example, why not just give
15  them the authority and the responsibility of SB 14 --
16  whether it be identification documents, whether it be
17  photo identification, EICs, et cetera -- versus giving
18  some of those authority -- or some of that authority
19  to the DPS?
20    A.  I'd have to look at the bill.  If we have a
21  copy of the bill, I could -- I'd have to look at it
22  and see what the bill says.  But I think the bill
23  requires the department to issue the election
24  identification certificates.
25    Q.  And that's my question, why the DPS versus

195

1  the Secretary of State, or the individual counties,
2  where you get your voter registration certificate
3  from?
4    A.  I don't recall how it was determined.
5    Q.  Do you ever recall that being debated;
6  meaning, the division of duties or responsibilities?
7    A.  You'd have to look at the record.  I'm sure
8  somebody's testified to that before, with all the
9  stuff that's been done here, so -- but I don't have a
10  specific recollection about it.
11    Q.  For example, we know that more than 50
12  counties in Texas do not have a DPS office.  Just
13  assume with me that's correct, at least 50 or more do
14  not have a DPS office.
15          With that in mind, why not give the
16  responsibilities to each county for issuing the
17  identification -- whether it be photo identification,
18  registration, EICs -- versus give it to the DPS who
19  don't have offices in all 200 counties?
20    A.  Did you ask Senator Fraser that?
21    Q.  Did I?
22    A.  (Nods head.)
23    Q.  No.
24    A.  That's who you need to ask.
25    Q.  I wasn't at his deposition.

196

1    A.  Okay.  Let me know what you find out.
2    Q.  Okay.  So your answer is, you don't know?
3    A.  That's what I've been telling you.
4    Q.  Do you recall any debate regarding that
5  issue, whether or not --
6    A.  It may have been debated.  I mean, I'd have
7  to refer you to the record.  I don't have -- as I'm
8  sitting here today, all these many years later, I
9  couldn't tell you whether it was debated as I'm
10    Q.  Do you have an opinion as to why the
11  individual counties were not given that
12  responsibility --
13    A.  I do not.
14    Q.  -- versus DPS?
15    A.  No.
16    Q.  Was there ever any discussion regarding the
17  budget or budgetary issues with regard to giving the
18  counties that responsibility versus DPS, whether it
19  cost more or less?
20    A.  You know, as I told you, I don't have a
21  specific recollection.  But what I would say is that
22  in 2011, 2009, and 2007, there had been a tremendous
23  pushback from the counties about the State giving them
24  unfunded mandates and requiring them to do things and
25  not giving them the money to do it.

TOMMY WILLIAMS                                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

50 (Pages 197 to 200)

197

1    And so, that probably would have been one of
2  the reasons that, you know, you would have used a
3  state agency who said, "We can do this, and it's not
4  going to cost you any more money than you've already
5  got to spend," versus giving it to the counties who
6  probably didn't have that photographic equipment,
7  so -- but I don't have a specific recollection.
8    Now, there's always a big pushback about
9  everything that we require counties to do at the state
10 level, you know, that we're making an unfunded
11 mandate.  We require them to do this, and they -- and
12 we don't give them the money.
13    Q.  Was there any pushback on your idea of the
14 vote and smile campaign?
15    A.  You know, I don't know if that bill was ever
16 considered or even filed.  It was a Constitutional
17 amendment, so it would have been in the form of a
18 resolution.  Honestly, I don't remember.
19    Do you know?  Have you looked at the record?
20    Q.  Yes.
21    A.  And what is it?  Did I file a bill?  Did I
22 file a resolution?
23    Q.  You filed a resolution, my memory is.  I may
24 be wrong on that.
25    A.  Okay.

198

1    Q.  I'll publicly state I may be wrong, but you
2  had a resolution in that regard.
3    Did any of your fellow senators have any
4  pushback, or anybody in the House, say, "Wait a
5  minute, Senator, if you introduce that, it's going to
6  cost the counties X dollars or we're going to have to
7  have all these cameras at polling places"?
8    Do you recall any pushback on that?
9    A.  I don't recall -- I don't recall that we ever
10 had a hearing on the bill.
11    Q.  Do you recall any complaints, whether you had
12 a hearing or not, from just people that said no?
13    A.  I couldn't have told you whether I even filed
14 the bill or not.  I know that we talked about it.
15    Q.  Do you know how you came up with the idea to
16 take someone's photograph if they didn't have proper
17 identification?
18    A.  It was suggested to me by somebody, so I
19 just -- you know, most good legislative ideas don't
20 come from legislators, they're things that other
21 people bring to you.
22    Q.  Do you know whether or not any other state
23 used that form of voting and that's where you got the
24 idea?
25    A.  No.

199

1    Q.  Was the idea of putting cameras -- giving the
2  cameras to the individual counties, ever debated or
3  discussed?
4    MS. DONNELLY:  Sorry, what counties?
5  What do you mean?
6    A.  What are we talking about here?
7    MS. DONNELLY:  Objection.  Form.
8    Q.  (BY MR. BRAZIL)  Giving the counties cameras
9  like were given to the DPS, or used by the DPS, in
10 their mobile units to issue EICs, or to issue the
11 photo identification documents, was that ever
12 discussed?
13    A.  I'm confused, because now you're mixing the
14 Department of Public Safety and the counties.  I'm not
15 sure.  I think what -- I don't remember.  As I told
16 you, I don't even recall whether I actually filed a
17 resolution or not.  I'm taking your word that I did.
18 The specific -- there was no enabling legislation that
19 I recall that was filed with that.  I mean, the answer
20 is, I don't know.
21    Q.  I understand that.
22    But I'm asking now, if we take the camera
23 idea, and rather than have the cameras in the mobile
24 units to the DPS, if you just gave those to the
25 individual counties, all 254, and put them in charge

200

1  of issuing the identification, was that ever discussed
2  or debated, to your memory?
3    A.  I don't know.  I mean, honestly, I don't
4  know.
5    Q.  Was -- was the issue of the cost of that ever
6  discussed?
7    A.  I don't know.
8    Q.  Was there any pushback from the counties,
9  "Don't give us that job, don't give us that duty or
10 responsibility"?
11    A.  I have no idea.
12    Q.  You don't recall one way or the other?
13    A.  No.
14    Q.  Was there ever an issue of what people would
15 do, how they would vote if their driver's license was
16 confiscated by local law enforcement?
17    A.  There may have been.  I don't recall.
18    Q.  Do you recall any other senator bringing up
19 an issue of how many were being confiscated every year
20 by local law enforcement agencies?
21    A.  I'd refer you to the record.  And whatever
22 the record says, I'm sure that's correct.
23    Q.  We've had several elections since SB 14 went
24 into effect, have we not?
25    A.  I think that's right.  Yeah.

TOMMY WILLIAMS                                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

51 (Pages 201 to 204)

201

1    Q.  Has there been any report of people faking
2  their photo identification in order to vote?
3    A.  You know, I'd answer it this way:  I haven't
4  had a single complaint about Senate Bill 14 since the
5  bill was passed.
6      I don't know whether there have been any
7  reports of people who were trying to vote or if they
8  were just kept away by the knowledge that they would
9  have to produce an ID, but I am unaware of a single
10  person in the entire state of Texas who was denied the
11  right to vote because of Senate Bill 14.  I'm not
12  saying it doesn't exist, but if it does, I am
13  completely unaware of it.
14    Q.  Are you aware of anybody trying to vote with
15  a fake ID since Senate Bill 14 was implemented?
16    A.  I don't know how I would know that.
17    Q.  Did you believe there was a lot of support
18  for SB 14, a lot of public support?
19    A.  There was a lot of bipartisan support for it
20  in the public.  Not in the legislature.
21    Q.  That brings up my next question.
22      If there was so much support for it, without
23  getting into the semantics with you about rule
24  changes, then why not just let the legislation come up
25  in its normal course and work its way through the

202

1  process, work its way through Austin, versus change
2  the rules?
3      MR. KEISTER:  Object to form.
4    A.  I think that there's an extensive record
5  about my feelings on that subject, that it was reduced
6  to writing in the Senate Journal during the six-and-a-
7  half-hour debate on the rule change; and respectfully,
8  I would refer you to that.  And I think that
9  completely covers my thoughts about that.  I don't
10  have anything beyond what I said publicly, to say
11  about that.
12      Have you read it?
13    Q.  (BY MR. BRAZIL)  Yes.
14    A.  Okay.  So you know how I feel, then.  It's a
15  rhetorical question you're asking.
16    Q.  Well, no.  I still have to take your
17  deposition, I still have to get --
18    A.  Yeah.
19    Q.  -- your testimony.
20    A.  I refer you back to my previous testimony
21  when I was deposed, to my testimony on the witness
22  stand in the D.C. Court of Appeals and to my -- you
23  know, to the debate we had.  There's some extensive
24  public record about this.  I don't have anything to
25  say beyond that.

203

1    Q.  But what you did not say in that testimony
2  was a specific answer to my question, which is -- I
3  don't want to get into semantics of a rule change.
4      I just want to know, from your standpoint,
5  your opinion, as to why you did not let this bill just
6  work its way through the normal legislative process as
7  it had in previous sessions and as thousands of other
8  bills had in previous sessions?
9      MS. DONNELLY:  Objection.  Form.
10      You can answer.
11      MR. KEISTER:  Object.  Form.
12    A.  And what I would say to you is that you
13  overlooked that in the testimony, because it was
14  discussed extensively in my testimony, and I would
15  respectfully refer you back to that.
16    Q.  (BY MR. BRAZIL)  You can't give me a
17  two-minute summary?
18    A.  I'm not going to, no.  I would just refer you
19  back to the testimony that I gave previously, and I
20  stand by that.
21    Q.  Okay.  And this is the testimony you gave --
22    A.  In the floor debate.  This was debated
23  extensively on the floor.  I can't believe that you
24  read the transcript of the floor debate and you don't
25  know the answer to that question.

204

1    Q.  Well, whether or not I know the answer is a
2  different issue than what we're here about today.  If
3  you're not going to answer my question, just say "I'm
4  not going to answer it," and I'll move on.
5    A.  I'm referring you back to my floor debate and
6  to the testimony that I've given in depositions and in
7  courts, and I'm respectfully telling you that's really
8  all there is to it.  And I think there was a
9  six-and-a-half-hour debate on that very topic on the
10  floor of the Senate that was reduced to writing and
11  put in the Senate Journal.  That's all I have to say
12  about it.
13    Q.  So we can take that testimony and use it in
14  this trial and you would have no problem --
15    A.  Of course you could.
16    Q.  -- with that?
17    A.  Of course you could.  It's out there.  It's
18  part of the public record.
19    Q.  Well, what do you think the lawyers for the
20  State's position would be on that?
21      MS. DONNELLY:  Objection.  Form.
22    A.  I don't have any idea.
23    Q.  (BY MR. BRAZIL)  Do you know whether or not
24  you have to show proof of citizenship to obtain a
25  Texas concealed handgun license?

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

52 (Pages 205 to 208)

205

1    A.  I'm not positive.  I think that you would
2  have to show proof that you were in the country
3  legally, but I don't think you'd have to show proof of
4  citizenship.
5    Q.  Do you --
6    A.  But I don't know that definitely.
7    Q.  Do you know whether or not you have to be a
8  Texas resident to hold a Texas concealed handgun
9  license?
10   A.  I'm not sure.
11   Q.  Do you know whether or not you have to be a
12  United States citizen to hold a United States Military
13  identification card?
14   A.  I don't have a specific knowledge of that,
15  but there are noncitizens who serve in our military;
16  and I would presume, based on that knowledge, that you
17  wouldn't have to be a citizen.
18      What I would say is that if you're going to
19  vote, you have to be registered to vote and have one
20  of those IDs.  So, I mean, that was -- it was part of
21  what we were looking for.
22      So, it doesn't mean you'd be able to vote.
23  It just means that we would know who you were.  You
24  couldn't just take the military ID and go vote.  You'd
25  have to also be registered to vote, on the rolls, to

206

1  vote.
2    Q.  Do you know whether or not everyone who
3  holds -- currently holds a Texas driver's license has
4  shown proof of U.S. citizenship?
5    A.  What I know is that they have either shown it
6  previously or they will be required to show it when
7  their license is renewed, and so that's a process that
8  would take a few years, because I think your license
9  is good for about six years, so...
10   Q.  Do you know how many people currently hold a
11  Texas driver's license who have not shown proof of
12  U.S. citizenship?
13   A.  You could get that from DPS, but I don't know
14  that number.
15      MR. BRAZIL:  I'll pass the witness.
16      MS. MARANZANO:  Can we go off the record
17  for a second?
18      (Off the record.)
19      (Mr. Brazil exits the deposition room.)
20      E X A M I N A T I O N
21  BY MS. MARANZANO:
22   Q.  Good afternoon, Senator Williams.  I'm
23  Jennifer Maranzano.  I'm representing the United
24  States.
25   A.  Okay.  So you're with the U.S. Attorney's

207

1  Office?
2    Q.  I'm with the Department of Justice.
3    A.  Department of Justice.  Okay.
4    Q.  Yes.  Exactly.
5      MS. MARANZANO:  Can I have this marked,
6  please.
7      (Williams Exhibit 13 marked/introduced.)
8    Q.  (BY MS. MARANZANO)  Senator, I'm showing you
9  what was marked as Exhibit 13.
10     Can you take a look at this and tell me if you
11  recognize it.
12   A.  This looks like a state auditor's office
13  report for November of 2007 on the voter registration
14  system at the Texas Secretary of State's office.
15   Q.  Did you serve on the Legislative Audit
16  Committee?
17   A.  I did.  I would have been on the committee at
18  that point.
19   Q.  You would have been?
20   A.  I think so, yeah.
21   Q.  How did this audit arise?
22   A.  I think -- I don't recall.  They do -- they
23  routinely go through and audit state agencies.  So I
24  have no idea whether this was a special -- it wasn't a
25  request that I made.  I can't tell you that it wasn't

208

1  a special request, and I can't tell you that it wasn't
2  just part of the routine work that was done, so I
3  don't know.
4    Q.  Okay.  Do you recall what the purpose of this
5  audit was?
6    A.  No.  I mean, it's probably in the report.
7    Q.  Can you look at page Roman Numeral IV at the
8  bottom?
9    A.  Okay.
10   Q.  And do you see that part of the purpose was
11  to determine whether the records in the statewide
12  voter registration database were accurate in
13  accordance with the Help America Vote Act?
14   A.  Yeah, I see that.
15   Q.  What -- what is TEAM?
16   A.  What is what?
17   Q.  TEAM.  Do you see that TEAM is referenced on
18  this page, T-E-A-M, in all capital letters?
19   A.  I see it, but I don't know.  I guess it's
20  defined in here.
21   Q.  What -- does it sound correct if I told you
22  that that is the Texas Election Administration
23  Management System?
24   A.  Yeah, it could be.
25   Q.  And is it your understanding that TEAM is the

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

53 (Pages 209 to 212)

209

1    system in which registered voters' records are stored?
2        **A.  You know, I don't have a recollection of it.**
3    **If that's what it says in this report, I'm sure it's**
4    **true.**
5        Q.  Okay.  Did the auditor find that TEAM may
6    have included potentially ineligible voters?
7        **A.  I don't know what the findings of this audit**
8    **were.  I don't recall.**
9        Q.  Do you want to take a moment and look at the
10   report?
11       **A.  I can.**
12           MS. DONNELLY:  The whole thing?
13           THE WITNESS:  Are we on the clock while
14   I'm looking at it?
15           THE REPORTER:  (Nods head.)
16           THE WITNESS:  Okay.  I'll read it very
17   carefully.
18       Q.  (BY MS. MARANZANO)  Actually, before you take
19   too much time reading it, let me ask you this:  Do you
20   remember, as you sit here today, if the legislature
21   took any steps to address the findings in this report?
22       **A.  I do not.**
23       Q.  You have no recollection?
24       **A.  I have none, no.**
25       Q.  Okay.  All right.  Then you can go ahead and

210

1    put this document aside.
2            I'd like to ask you some questions about the
3    2009 rules debate.
4            Can you -- can you find Exhibit 6 in that
5    pile for me?
6        **A.  Maybe.  Okay.  I have the document that's**
7    **marked as Exhibit 6 in front of me.**
8        Q.  Okay.  Terrific.
9            And do you recall you earlier, I believe,
10   referenced that this is from the Senate Journal
11   when -- when the Senate was debating the rules
12   resolution in 2009; is that correct?
13       **A.  It would appear that's what it is.**
14       Q.  Can you turn to page A-75, which is towards
15   the end.  And do you see that you have a statement
16   that starts on A-74 and continues on to A-75?
17       **A.  I do.**
18       Q.  In -- in your statement on page A-75, about
19   halfway through, there's a sentence that reads:  "In
20   recent times majority vote rules have been invoked in
21   regular and special sessions under Democrats' State
22   Senate majorities in 1971, 1972, 1973, 1975, 1977,
23   1978, 1981, 1984, 1985, 1986, 1987, 1989, 1990, and
24   1992.  And a majority vote requirement was invoked
25   under a Republican majority in the 2003, third-called

211

1    special session..."
2            Did I read that correctly?
3        **A.  Yes.  It reflects what's in the Journal.**
4        Q.  Now, on the even-numbered years that you
5    reference in this -- in this remark, were those
6    special sessions?
7        **A.  Probably would have been, yeah.**
8        Q.  And in special sessions, what -- what rules
9    are applied?
10       **A.  Well, it depends on what rules are adopted**
11   **for the special session.**
12       Q.  So rules are adopted independently for
13   special sessions than from regular sessions?
14       **A.  Not always.**
15       Q.  Sometimes, in special sessions, are they
16   carried over from regular session?
17       **A.  Sometimes they are, sometimes they are not.**
18       Q.  Okay.  And in special sessions, you would --
19   the legislature's addressing a limited number of
20   subjects; is that correct?
21       **A.  Whatever the governor puts on the call are**
22   **the only things that the legislature can debate during**
23   **a special session.**
24       Q.  Okay.  So do you have special orders arise
25   during special sessions?

212

1        **A.  You know, I -- not during my time in the**
2    **Senate.  I can't tell you definitively that there**
3    **never were any special orders during a special**
4    **session.  I just don't know that as we sit here today.**
5        Q.  Okay.
6        **A.  But during my roughly 11 years -- 10 years --**
7    **10-plus years, I can't -- I don't recall that there**
8    **were special orders used in a special session.**
9        Q.  Do you recall the legislation for each of
10   these sessions, the legislation that was -- that was
11   passed by special order?
12       **A.  I'm not sure what you're asking me.**
13       Q.  Well, you -- the record states that in recent
14   times, majority vote rules have been invoked in these
15   sessions, and I'm asking you if you recall for what
16   issue in each of these sessions the majority vote rule
17   was --
18       **A.  But that's not the way you asked it.  And so**
19   **what I would say is, it says majority vote rules have**
20   **been invoked.  It doesn't mean that it was a special**
21   **order.  That's what you asserted.  It could have just**
22   **been in the regular order of business, and it would**
23   **have only required a simple majority.**
24       Q.  Okay.  Fair point.
25           So do you recall -- let me ask you this:  You

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

54 (Pages 213 to 216)

213

1   were comparing these sessions to the rule that you
2   were introducing; is that correct?  In 2009?
3       A.  I was giving a historical perspective for the
4   body.  I don't recall every piece of legislation.
5           What I do recall is that there was some
6   fairly major legislation.  My recollection is that
7   the -- the Peveto tax bill, which is -- was a major
8   overhaul of the property tax system, was passed in the
9   regular order of business.  That is still, more or
10  less, the system that we operate under today, and it
11  was probably the biggest single tax reform bill in the
12  20th Century for state government.
13          There was a workers' comp bill that was
14  passed in the regular order of business.
15          Those are the only two I recall.  There were
16  several -- you know, there were a lot of others, you
17  know, we -- I was surprised, frankly, when we went
18  through and looked at this, how many times this had
19  actually happened.
20      Q.  I believe, in the record, you also refer to a
21  redistricting bill in 1981.
22          Do you recall that?
23      A.  Could have been, yeah, but I don't have a
24  specific recollection.  I know that redistricting
25  bills under Democrats and Republicans had been passed

214

1   in the regular order of business.  That's different
2   than a special order.
3       Q.  Were any of the bills that you looked at or
4   any of these sessions that you refer to, was there an
5   exception written into the rules for a special order
6   similar to the one that you were proposing in 2009?
7       A.  I can't tell you.  I know that special orders
8   have been used before, but I can't tell you definitely
9   that there was or was not, as we sit here today.
10      Q.  What -- when you were conducting the research
11  that led you to this conclusion about these
12  legislative sessions, what sources did you look at?
13      A.  Well, they would have been multiple sources.
14  I had someone do the research for me.  I didn't
15  conduct it myself.  And it was -- it would have been
16  newspaper accounts and Journals.
17      Q.  Newspaper accounts and Senate Journals?
18      A.  Senate Journals, correct.
19      Q.  Did you talk to any -- any other senators --
20      A.  No.
21      Q.  -- who had served in any of these sessions?
22      A.  Huh-uh.
23      Q.  Did you talk to any other administrative --
24  state officials who may have been presiding during
25  these sessions?

215

1       A.  No.
2       Q.  Now, you mentioned -- Peveto?
3       A.  Peveto.
4       Q.  -- Peveto and a workers' comp issue.  And I
5   believe you said, for Peveto, it was passed as a
6   regular order of business; is that correct?
7       A.  It could have been a regular or special
8   order.  I'm not sure.  I think it was in the regular
9   order of business, but I'm not positive.
10      Q.  And do you recall whether the workers' comp
11  issue was passed in the regular order of business?
12      A.  I think it was in the regular order of
13  business.
14      Q.  In your mind, is that -- is passing a bill in
15  the regular order of business different than accepting
16  that rule from a special order?
17      A.  When you have a special order rule, the
18  regular order of business becomes whatever the subject
19  of that special order is.
20      Q.  So the effect is similar?
21      A.  It becomes a part of the regular order of
22  business.
23      Q.  Okay.  Okay.  And you don't recall, as you
24  sit here today, whether in any of these legislative
25  sessions there was an exception written into the

216

1   Senate rules that an issue could be taken up as a
2   special order by a majority vote?
3       A.  No, there were -- there was one other example
4   of that, as I recall, but I can't tell you exactly
5   when it was or what it was.  There was one or two.  At
6   least one.
7       Q.  Do you recall if it was in a regular session?
8       A.  I don't recall.
9           Have you gone back and looked?
10      Q.  Well, let's look.
11          MS. MARANZANO:  Can we mark this.
12          (Williams Exhibit 14 marked/introduced.)
13      Q.  (BY MS. MARANZANO)  I'm showing you what we've
14  marked as Exhibit 14.
15          Do you recognize this?
16      A.  No.
17      Q.  Does it look like the rules of the Senate or
18  an excerpt of the rules of the Senate?
19      A.  It's a portion of the rules of the Senate
20  from 1971, it would appear to be.
21      Q.  Can you look at the second page of the
22  document, which has a 10 at the bottom.
23          Do you see the rule on special orders?
24      A.  I do.
25      Q.  And is there any exception -- subject matter

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

55 (Pages 217 to 220)

217

1   exception that's written into this rule?
2       A.   No.
3       Q.   You can put it aside.
4       A.   Let me finish reading it.
5       Q.   Sure.
6            (Williams Exhibit 15 marked/introduced.)
7       Q.   (BY MS. MARANZANO)  Are you ready?
8       A.   I guess.  What's your question?
9       Q.   That was my question.
10      A.   What is it?
11      Q.   Whether there was a subject matter exception
12   written into it, and you already answered it.
13      A.   It would appear not in 1971.
14      Q.   Okay.  I'm showing you what we've marked as
15   Exhibit 15 for the record.  Can you take a look at
16   this and let me know if you recognize it.
17      A.   I do not.
18      Do you want to tell me what you think it is.
19      Q.   Does it appear to be the rules of the Senate?
20   An excerpt -- I'm sorry, an excerpt from the rules of
21   the Senate --
22      A.   It does.
23      Q.   -- in 1973?
24      A.   It does.  From '73.
25      Q.   And can you look at the second page, which

218

1   has a 10 at the bottom, and look at the rule on
2   special orders and tell me if you see any subject
3   matter that's carved out from the rule on special
4   orders in 1973.
5       A.   No.  There's not one that I can see there.
6       Q.   Thank you.  You can put that aside.
7            (Williams Exhibit 16 marked/introduced.)
8       Q.   (BY MS. MARANZANO)  I'm showing you what we've
9   marked as Deposition Exhibit 16.
10      Do you recognize this document?
11      A.   No.
12      You want to tell me what it is.
13      Q.   Does it appear to be an excerpt from the
14   rules of the Senate from 1975?
15      A.   It would appear to be.
16      Q.   Can you look at the second page, which has a
17   10 at the bottom and a rule on special orders.
18      Do you see any subject matter legislation
19   carved out of the rule on special orders in 1975?
20      A.   No.
21           (Williams Exhibit 17 marked/introduced.)
22      Q.   (BY MS. MARANZANO)  I'm showing you what we've
23   marked as Deposition Exhibit 17.
24      A.   Uh-huh.
25      Q.   Do you recognize this document?

219

1       A.   No.
2       Q.   Does it appear to be an excerpt from the
3   Senate rules from 1977?
4       A.   It does.
5       Q.   Can you look at the second page, which has a
6   9 on the bottom.
7       Is there any subject matter legislation
8   that's carved out of the rule on special orders?
9       A.   No, not that I see.  Wait.  Let me finish.  I
10   answered that too quickly.
11      Okay.  No, I don't see an exception.
12           (Williams Exhibit 18 marked/introduced.)
13      Q.   (BY MS. MARANZANO)  Senator, I'm showing you
14   what we've marked as Deposition Exhibit 18 for the
15   record.
16      Do you recognize this document?
17      A.   No.
18      Q.   Does it appear to be an excerpt from the
19   rules of the Senate from 1981?
20      A.   It would appear to be.
21      Q.   Can you look at the page which has a 12 on
22   the bottom and also the page that has a 13 on the
23   bottom and see if, in the rule on special orders, you
24   see any subject matter legislation that's carved out
25   of that rule?

220

1       A.   It doesn't appear that there's any.
2            (Williams Exhibit 19 marked/introduced.)
3       Q.   (BY MS. MARANZANO)  Senator, I'm showing you
4   what we've marked as Deposition Exhibit 19.
5       Do you recognize this document?
6       A.   I do not.
7       Q.   Does it appear to be a resolution adopting
8   the rules in 1985?
9       A.   No.  It appears to be a Journal excerpt from
10   the resolution that includes the resolution, but it's
11   not the resolution itself.
12      Q.   Fair point.  Fair point.
13      And do you see that in this resolution, they
14   adopted, in the 68th Legislature, the rules from the
15   67th Legislature?
16      A.   It would appear that's what they're doing.
17      Q.   And -- and those are the rules that we just
18   looked at; is that right?  From 1983; is that correct?
19      A.   It would appear so.
20      Q.   I'm sorry, I said that wrong.
21      This is from 1983, and they adopted the rules
22   from 1981; is that correct?
23      A.   That's what it would appear to be.
24      Q.   Thank you.
25           (Williams Exhibit 20 marked/introduced.)

TOMMY WILLIAMS                                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                              56 (Pages 221 to 224)

221

1    Q.  (BY MS. MARANZANO)  Senator, I'm showing you
2  what we've marked as Exhibit 20.
3         Can you take a look at this and tell me --
4    A.  Sure.  I will.  Give me a second.
5    Q.  Sure.  Are you ready?
6    A.  No.
7    Q.  Do you recognize Exhibit 20?
8    A.  I do not.
9    Q.  Does it appear to be an excerpt from the
10  rules of the Senate from 1985?
11   A.  It would appear so.
12   Q.  Can you look at the page that has a 7 on the
13  bottom.  Do you see the rule on special orders?
14   A.  I do.
15   Q.  Is there any subject matter legislation
16  that's carved out of this rule?
17   A.  It would appear not.
18        (Williams Exhibit 21 marked/introduced.)
19   Q.  (BY MS. MARANZANO)  Senator, I'm showing you
20  what we've marked as Exhibit 21.  Can you take a look
21  and tell me if you recognize this document.
22   A.  I do not.
23   Q.  Does it appear to be an excerpt from the
24  rules of the Senate from 1987?
25   A.  It would appear so.

222

1    Q.  Can you look at the page that has a 7 on the
2  bottom.  Do you see the rule on special orders?
3    A.  I do.
4    Q.  Is there any subject matter legislation that
5  is explicitly carved out of --
6    A.  No.
7    Q.  -- the special orders?
8         (Williams Exhibit 22 marked/introduced.)
9    Q.  (BY MS. MARANZANO)  Senator, I'm showing you
10  what we've marked as Exhibit 22, for the record.
11        Do you recognize this document?
12   A.  No.
13   Q.  Does it appear to be an excerpt from the
14  rules of the Senate from 1989?
15   A.  It would appear so.
16   Q.  Can you look at the page that has a 17 on the
17  bottom.  Do you see the rule on special orders?
18   A.  I do.
19   Q.  Do you see any subject matter legislation
20  carved out of that rule?
21   A.  No.
22        (Williams Exhibit 23 marked/introduced.)
23   Q.  (BY MS. MARANZANO)  Senator, I'm showing you
24  what we've marked as Exhibit 23.
25        Do you recognize this document?

223

1    A.  This would appear to be a copy of the rules
2  from the 2009 session.
3    Q.  Can you turn to page 24 for me?
4    A.  Uh-huh.
5    Q.  Do you see the rule on special orders?
6    A.  I do.
7    Q.  And Subsection (d), does that specifically
8  carve out a bill of resolution relating to voter
9  identification requirements?
10   A.  It does, if it's favorably reported from the
11  Committee of the Whole.  And it also requires 24 hours
12  after the motion's adopted by a majority of the
13  members of the Senate.
14   Q.  So is it fair to say that of the legislative
15  sessions you cited during the rules debate on January
16  14, of those regular sessions there were no exceptions
17  carved out explicitly in the rules similar to the way
18  the special order was handled in 2009, correct?
19        MS. DONNELLY:  Objection.  Form.
20   A.  Could you ask the question again?
21   Q.  (BY MS. MARANZANO)  Of the legislative
22  sessions that you cited in the record for the regular
23  sessions that you cited there on the odd-number years,
24  there's no subject matter legislation carved out
25  explicitly in the special orders rule in the same way

224

1  that voter ID is carved out in 2009, correct?
2        MS. DONNELLY:  Objection.  Form.
3    A.  Here's what I think the record says:  It says
4  that, "Historical precedent for allowing majority vote
5  on issues that do not require two-thirds support for
6  debate have deep historical roots in the traditions of
7  the Texas Senate.  In recent times majority vote rules
8  have been invoked in regular and special sessions
9  under Democrats' State Senate majorities in 1971,
10  1972, 1973, 1975, 1977, 1978, 1981, 1984, 1985, 1986,
11  1987, 1989, 1990, and 1992.  And a majority vote
12  requirement was invoked under a Republican majority in
13  the 2003, third called special session after we had
14  spent all summer trying to resolve the issue of
15  Congressional redistricting."
16        I don't believe that in my statement that is
17  in the Journal I asserted that the special order
18  exception was used in any of those sessions, only that
19  a majority vote had been used.
20   Q.  (BY MS. MARANZANO)  Okay.  Thank you.  And I
21  didn't -- I didn't mean to imply that you had asserted
22  that in the record.
23        I just -- when I asked you if the exception
24  was written into the rules, you didn't recall; and,
25  didn't we just look at the rules for the regular

TOMMY WILLIAMS                                      7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

57 (Pages 225 to 228)

225

1  sessions for these years that you've cited?  Correct?
2      A.  Yes.  But we didn't look at the special
3  sessions and -- or the sessions that -- you know,
4  which would have occurred.  I don't know.  Like I told
5  you, I don't recall whether they were used.  I know
6  that special orders had been used in the past.
7      Q.  Right.  But we looked at the rules for the
8  regular sessions, and they're not -- there is no
9  written exception in any of the special order rules in
10  the regular sessions, correct?
11      A.  That's true.  And the Senate adopts the rules
12  at the beginning of every session, and we can make the
13  rules whatever we want them to be at the beginning of
14  the session so long as a majority of the members of
15  the Senate agree on that, the rules that are proposed.
16      Q.  Okay.  Can you look at page A-9 of this
17  Senate Journal, Exhibit 6, for me?
18      A.  A-9?
19      Q.  Yes.  And if you can look at the bottom of
20  that page, with the sentence that starts:  "My
21  research further indicated..."
22          And if you could read that and see if that
23  refreshes your recollection at all about --
24      A.  Okay.  Let me -- I want to read it in context
25  here.  Hang on just a second.

226

1          Okay.  I've read it.
2      Q.  Okay.  Does that refresh your recollection at
3  all about the 1981 restricting plan?
4      A.  You know, I see -- I stand by what I said in
5  the record here.  I don't have a specific recollection
6  as we sit here today.  I know that we had researched
7  this and that I was surprised to find how this had
8  been used.  And so -- and I know that Governor Hobby
9  disputed it.  What I'd say is, that's why we have
10  Journals and records and, you know, I think the record
11  supported what I said here.
12      Q.  Do you recall if the redistricting plan that
13  was passed by a majority vote in the Senate in 1981
14  was actually implemented?
15      A.  I don't know.
16      Q.  Is that something you researched at the time?
17      A.  It could have been.  I have no idea.
18      Q.  Do you -- do you see, on page A-11, there is
19  a statement by Senator Whitmire that references an
20  action when Governor Bullock -- under Lieutenant
21  Governor Bullock?  Do you see that?
22      A.  Where are we?
23      Q.  In the middle of the page on A-11, in the
24  statement by Senator Whitmire.  He says:  "And I know
25  for a fact, when Governor Bullock did it, we were

227

1  following a court order..."
2          Are you familiar?  Do you see that sentence?
3      A.  Uh-huh.
4      Q.  Are you aware of what he's referring to?
5      A.  No.
6      Q.  Is that something you researched when you --
7      A.  Probably was, but I don't recall as we're
8  sitting here today.
9      Q.  Okay.  And when you were conducting this
10  research, did you look into the partisan breakdown of
11  these various Senate sessions when things were voted
12  on by majority -- by a majority?
13      A.  I'm sorry, would you ask your question again?
14      Q.  Yes.
15          When you were -- when you were conducting
16  research on the past Senate legislative sessions that
17  passed certain bills by majority vote, did you look at
18  the partisan breakdowns of the Senate?
19      A.  No.  The Senate was almost exclusively a
20  Democratic body.  The state was.  There was no
21  effective Republican majority for many, many years, so
22  I don't know specifically when that changed, but --
23      Q.  So are you saying you didn't research that
24  particularly because you had a general awareness of
25  the...

228

1      A.  I don't recall that I looked at the partisan
2  breakdown or anything.
3          The issues -- I don't know about the
4  redistricting issue, but the other issues that we
5  brought up, those didn't break down along partisan
6  lines.  The Peveto bill and the workers' comp bill,
7  those didn't break down along partisan lines.
8      Q.  Are rules resolutions -- in your tenure, have
9  rules resolutions ever been referred to standing
10  committees?
11      A.  They have been, and they can be.  It's the
12  discretion of the presiding officer.
13      Q.  When -- when -- when are they usually
14  referred to a Standing Committee versus the Committee
15  of the Whole?
16      A.  I couldn't tell you.  I don't know.
17      Q.  Do you recall that Senator Shapleigh raised a
18  point of order about this rules resolution not being
19  referred to a Standing Committee?
20      A.  I don't.
21      Q.  Do you -- do you want to refresh your
22  recollection by looking at page A-6?  Do you see that
23  Senator Shapleigh raised a point of order?  And do you
24  see that maybe about a little bit before halfway down
25  the page, the president overrules that point of order?

U.S. LEGAL SUPPORT
(800) 567-8757

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

58 (Pages 229 to 232)

229

1    A.  Okay.  Now, ask me your question.  What's
2  your question?
3    Q.  Did you consider whether this resolution
4  should have been referred to a Standing Committee?
5    A.  It wasn't my prerogative.  That's the
6  prerogative of the lieutenant governor.
7    Q.  So you introduced the rules resolution, and
8  then the lieutenant governor refers it to whatever
9  committee he sees fit; is that correct?
10    A.  He -- it would be his prerogative, whether to
11  recognize me to bring the resolution up, or to -- for
12  him to refer it to a committee --
13    Q.  I see.
14    A.  -- it would be his prerogative.
15    Q.  How many times during your tenure was a rules
16  resolution referred to a Standing Committee?
17    A.  I don't recall.  I don't recall that it ever
18  was referred to a Standing Committee.  It may have
19  been, but I don't recall that it was.
20        Most of the time, the rules resolution was
21  adopted -- this was the most controversy there ever
22  was over a rules resolution during my time in the
23  Senate.
24    Q.  Would you say that this was the most
25  substantive change to the rules made during your time

230

1  in the Senate?
2    A.  I don't know.  It may have been.
3    Q.  Do you think it's a reasonable request that,
4  given the substantive nature of the change, this
5  resolution be referred to a Standing Committee?
6    A.  No, not necessarily.
7    Q.  Why not?
8    A.  There were six-and-a-half hours of debate on
9  the resolution.  I think that we all had a chance --
10  and it was discussed prior to the floor debate, too,
11  so...
12    Q.  When was it discussed prior to the floor
13  debate?
14    A.  It may have been discussed in the caucus, and
15  I know it was discussed with individual members.  I
16  know I went to Dean Whitmire before I introduced the
17  resolution, out of deference to him, and let him know
18  what my plans were.
19    Q.  Do you recall when you went to Dean Whitmire?
20    A.  No, not exactly.
21    Q.  Can you look at page A-12.
22        And do you see, about halfway down the page,
23  a little -- a little above halfway, Senator Whitmire
24  says that, "...the first time we heard of this issue
25  was yesterday morning in our caucus..."?  Does that

231

1  sound about right that you --
2    A.  I don't see where he says that.
3    Q.  It's the first comment by Senator Whitmire on
4  page A-12.  I'm sorry, Senator, A-12.
5    A.  Oh, I'm sorry.  I'm on the wrong page.  No
6  wonder I couldn't find it.
7    Q.  It's in that first comment by Senator
8  Whitmire.
9    A.  Okay.  I think that spells it out.  It says I
10  talked to him before -- the record reflects that I
11  said I talked to him before we went into a caucus
12  meeting, and that's when I would have -- that's what I
13  would have done.  I wouldn't have said that if it
14  hadn't been true.
15    Q.  And that says the caucus meeting was
16  yesterday, correct?
17    A.  Well, the previous day, yeah.
18    Q.  So Senator Whitmire, at least, had about 24
19  hours of notice, correct?
20    A.  Sounds about right.
21    Q.  Do you recall that senators voiced concern
22  that they hadn't had more notice than 24 hours?
23    A.  They may have.  I don't recall.
24    Q.  Do you think it's a reasonable request for
25  senators to want some time to do their own research on

232

1  this rules resolution?
2    A.  I think that what I proposed was a -- the way
3  this was handled, it was handled in a reasonable way;
4  the rules resolution was laid out, and I -- we had a
5  vote on it.  And, I mean, I think it's a very
6  reasonable way that it happened.
7        I don't think there was anything out of the
8  ordinary about it.  That's the way the procedure
9  works.  There were a lot of people who didn't like it,
10  but it wasn't out of the ordinary.
11    Q.  Was there -- was there any reason why you
12  couldn't have given them more notice?
13    A.  You know, it was just one of those things
14  that I told them, as soon as I thought it was relevant
15  to do that, and as soon as I was ready, to go.
16    Q.  Okay.  Can you look at page A-16 for me.
17    A.  I guess what I would say, before we go on to
18  another subject, it's a pretty simple change.  Either
19  you're for it or against it.  I'm not sure how much
20  research you needed to do.
21    Q.  Well, you testified that you did research,
22  correct?
23    A.  I did.
24    Q.  So I guess my question is whether it might be
25  reasonable for other members to want to do their own

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                              59 (Pages 233 to 236)

233

1  research, too.
2      A.  I don't think their objections were about the
3  history.  It was about having the bill come to the
4  floor.  And so I think I've stated, throughout here,
5  that my goal was to go ahead and get this issue before
6  the body so that we could vote on the issue.
7         And I strongly felt, and I still do, that
8  we -- I think the tradition that the Senate had, of
9  having a two-thirds vote to bring a bill to the floor,
10 out of the regular order of business and the way we
11 handled that, was an important tradition; and, that my
12 action here saved that rule for the Senate; that
13 if this hadn't happened, it very likely would have
14 been done away with completely.
15     Q.  And why do you say that?
16     A.  There was -- there were a lot of members who
17 wanted to do away with it.
18     Q.  And how did this save the vote -- save the --
19     A.  This was an issue that they could point to
20 about why we needed to get rid of it.
21     Q.  I see.
22     A.  And so I -- and I think I said that in here,
23 too.  I think, if you read the testimony, I think I
24 said that, and I think it's important and that it be
25 preserved, and I think this had a lot to do with it

234

1  still being in place.
2      Q.  I just want to ask you a question about
3  something you just said about -- a couple minutes ago.
4         I think you said you don't think that the
5  opposition was to the history, but didn't you say
6  earlier that you think Lieutenant Governor Hobby
7  didn't quite agree with -- with your position?
8      A.  It was the former lieutenant governor, and,
9  you know, I heard that he didn't; and frankly, I don't
10 really care whether he agreed with me or not.  I
11 believe my research was correct.
12        On the matter that was before the body, the
13 rule change itself is a very simple change.  And it
14 doesn't necessarily have to do with whether you use a
15 special order or not; it's whether you allow a simple
16 majority.
17        And so there were a couple of ways that you
18 could approach that.  You could completely do away
19 with the rule where everything came, or you could make
20 one exception where this issue came.  And, to me, that
21 was a better way to resolve this issue, if it resulted
22 in the preservation of this rule.
23     Q.  Do you recall that initially, you -- you had
24 a rules resolution that exempted both voter ID and
25 redistricting from the special order?

235

1      A.  Yeah, now that you mention it, I do.
2      Q.  And why did you -- why did you end up
3  removing redistricting?
4      A.  You know, I don't recall.
5      Q.  Do you recall if somebody asked you to remove
6  redistricting?
7      A.  I don't -- I really don't remember.
8      Q.  How long did your staff spend researching the
9  rules resolution?
10     A.  I have no idea.
11     Q.  Do you have an approximation?
12     A.  Huh-uh.  I don't really.
13     Q.  Can you look at page A-31 for me?
14     A.  Uh-huh.
15     Q.  Do you see your statement about halfway down
16 the page, there's a sentence that says:  "And I think
17 that what my sense is, that there is enormous
18 willingness on the Republican side to accommodate the
19 concerns that have been expressed by Democrats about
20 the potential of disenfranchising people in our
21 state."
22        Did I read that correctly?
23     A.  I'm not sure where I see that.  Are we on 31?
24     Q.  31.
25     A.  Oh, okay.  Yeah, I've got it now.

236

1      Q.  Yeah.  Do you believe that the Republicans
2  did accommodate the Democrats about the potential of
3  disenfranchising people in the state?
4      A.  I don't believe that -- and again, this
5  debate was about the rules, not about the bill.  I
6  want to be clear about that.  What we're reading from
7  is a debate about the rule change.
8         Now, if you're asking me about the bill that
9  passed that session, which was not Senate Bill 14, it
10 was the one before that, I think that that bill did
11 not disenfranchise people, voters.  I don't believe
12 that that was the effect of any of the bills that I
13 voted for.  That wasn't my goal, and I don't think it
14 was the goal of anybody.
15     Q.  So --
16     A.  It was not that I was aware of, anyway, that
17 anybody wanted to disenfranchise people.  So I
18 don't -- whether we took everything they wanted to do
19 or not, is another issue.  But whether it
20 disenfranchised people, I would say it did not.
21     Q.  Well, let me ask you this:  What did you mean
22 by this sentence here?  Were you talking about the
23 voter ID bill?
24     A.  I think it means what it says.  I said, "I
25 think that my sense is, there's an enormous

TOMMY WILLIAMS                                              7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

60 (Pages 237 to 240)

237

1  willingness on the Republican side to accommodate the
2  concerns that have been expressed by Democrats about
3  the potential of disenfranchising people in our
4  state."
5         I think there's -- I mean, I don't know what
6  else I could say to that.  I mean, it's pretty clear
7  on the face of it, don't you think?
8     Q.  Well, I guess what I was wondering -- because
9  then you just -- in your last answer, you said there's
10  a voter ID bill, and then there's the rules
11  resolution.
12    A.  This is about the rules resolution.  The --
13  that's what this reflects, the debate on that.  I
14  think there was a lot of debate about the bill that
15  went, you know, on -- maybe on both sides; but
16  certainly, from the Democrats, when they're talking
17  about what was in the bill, and I really -- that was
18  before the body.
19    Q.  Okay.  And so were you saying, essentially,
20  "If we pass this rule, we're going to work with you on
21  the underlying bill"?  Is that what you intended to
22  convey?
23    A.  I think it says what it says here.
24    Q.  Okay.
25    A.  And there's nothing else that I can add to

238

1  that.
2     Q.  Okay.  And so your position, if -- I want to
3  make sure I'm understanding correctly -- is that the
4  bill didn't disenfranchise anybody, so there was
5  really no accommodation that needed to happen?
6     A.  I didn't say that.
7         MS. DONNELLY:  Objection.  Form.
8     Q.  (BY MS. MARANZANO) Can you -- can you then
9  just let me know what you meant?
10    A.  I meant exactly what these plain spoken words
11  said on the page right here.
12    Q.  Okay.
13    A.  There's nothing that I can add to that.  I'm
14  not going to allow you to put words in my mouth.
15    Q.  I'm just trying to understand your answer,
16  that's all.
17         "There is enormous willingness on the
18  Republican side to accommodate the concerns that have
19  been expressed by Democrats..."
20         What concerns were you referring to?
21    A.  Concerns that have been expressed by the
22  Democrats about the potential of disenfranchising
23  people in our state.  That's specifically what I was
24  referring to.  That's just exactly what it says.
25    Q.  And the concerns expressed by Democrats were

239

1  about people being disenfranchised by the voter ID
2  bill?
3     A.  I think what I said is:  We will get this
4  issue before the body as a whole; and we can make a
5  decision, together, whether we want to vote that out
6  by simple majority or whether we want to require
7  two-thirds and the rules won't require it.  But we
8  still have the option of deciding that.
9         And I think that what my sense is, that
10  there's an enormous willingness on the Republican side
11  to accommodate the concerns that have been expressed
12  by the Democrats about the potential of
13  disenfranchising the people in our state -- and so I
14  hope that we will come out of this with, maybe not
15  singing Kumbaya, but having known that we debated the
16  issue, we dealt with it, and we disposed of the
17  matter, and that we did it in a way that everybody had
18  input and concern.  And I hope -- and I hope that it's
19  not a party-line vote.  Unfortunately, it was a
20  party-line vote.
21         But I think that the issue, you had the --
22  the bill, in previous sessions, had never actually
23  come to the floor and been debated.  And so it was my
24  intention that we -- there were -- there were a lot of
25  misconceptions about what the bill did and didn't do,

240

1  and so I felt like it was important that we get the
2  issue before the body and debate it.
3     Q.  And your position is that SB 362 wouldn't
4  have disenfranchised anybody, correct?
5     A.  I don't believe it would have.
6     Q.  And what is that based on?
7     A.  The debate and the committee hearings that we
8  had and everything that went around that.
9     Q.  And when you said your intention was to get
10  the bill in front of the whole body, even apart from
11  this rules resolution, that could have happened,
12  right?  Could the lieutenant governor have referred a
13  bill to the Committee of the Whole even if you hadn't
14  introduced this rules resolution?
15    A.  I presume it could have.  I'm not sure.
16  Probably so.  Yeah, I think you probably could have.
17         MS. DONNELLY:  Counsel, you about to
18  shift?
19         MS. MARANZANO:  Yeah.  Do you want to
20  take a break?
21         MS. DONNELLY:  Take a break.
22         MS. MARANZANO:  Sure.
23         (Break.)
24         MS. MARANZANO:  Can I have this marked.
25         (Williams Exhibit 24 marked/introduced.)

TOMMY WILLIAMS                                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

61 (Pages 241 to 244)

241

1     Q.  (BY MS. MARANZANO)  Senator, I'm showing you
2  what we've marked as Deposition Exhibit 24.
3        Do you recognize this document?
4     A.  Let me look at it.
5        Okay.  It would appear that this is an e-mail
6  from Libby Nezda, who worked on my Transportation
7  Committee, to Amanda Montagne, who -- and Jason Baxter
8  and Ryan LaRue, who were also staff members for me.
9  So...
10    Q.  Have you ever seen this e-mail before?
11    A.  I don't recall.  It wasn't addressed to me.
12  I might have seen it, but you know...
13    Q.  Do you see that in this e-mail, Ms. Nezda is
14  including a link for voter registration for each
15  county and suggesting that it might be useful to
16  cross-reference it with counties that don't have
17  driver's license offices?  Do you -- is that correct?
18    A.  That's what she says, yeah.
19    Q.  Do you know if your staff actually did an
20  analysis like that?
21    A.  You know, I don't know at this point whether
22  they did or not.
23    Q.  Did you ever see an analysis like that that
24  your staff had conducted?
25    A.  You know, if they had brought it to me, I

242

1  would have told them that the Secretary of State's
2  office and the Department of Public Safety should do
3  that analysis, not my staff, because I don't believe
4  they would have had access to enough information to
5  accurately do a comparison.
6     Q.  So you don't recall discussing this analysis
7  with your staff?
8     A.  I don't at this point.  I'm not saying I did
9  or I didn't, but, I mean, it was -- you know, this was
10  into 2011.  It's a long time ago.
11    Q.  Do you see that Ms. Nezda suggests that doing
12  this analysis might be useful as far as determining
13  what areas are actually underserved?  Do you see that
14  clause?
15    A.  Yes.
16    Q.  Do you agree with that assessment that
17  determining voter registration for counties that don't
18  have driver's licenses would be a useful -- now, I
19  understand that you think SOS and DPS would be better
20  entities to do it, but just for the analysis -- would
21  be useful in determining areas that are actually
22  underserved?
23        MR. KEISTER:  Objection.  Form.
24    A.  Not necessarily.
25    Q.  (BY MS. MARANZANO)  No?  And why not?

243

1     A.  Because, you know, the areas that don't have
2  a driver's license office are going to be
3  predominantly rural areas.  And those people, they've
4  got to get in the car -- I mean, I just spent the
5  best -- I just got off a 2900 -- 2,920-mile road trip,
6  and a large part of it was through the Texas
7  panhandle, and those people drive everywhere for long,
8  long distances.
9        Even if they want to go vote, they have to
10  either get in their car or find somebody to take them.
11  And so, this is part of what you have to deal with
12  when you live in a rural area.  So I'm not sure I
13  would characterize it as "being underserved."
14        Although, having said that, I went to a lot
15  of -- I put a lot of work in during this session to
16  make sure that we made our driver's license offices
17  more efficient, that we were serving the public
18  better, and that we were trying to increase the
19  availability in all areas of the state to -- for
20  people to be able to get either a driver's license or
21  an election identification certificate.
22        If they -- if they had business at the DPS
23  office, we wanted to make it easier for them to do
24  that.
25        But what you're trying to imply from what

244

1  she's said here, I think that that's something that,
2  you know, you're kind of turning a blind eye to,
3  maybe.  And I don't know where you live, if it's in
4  Washington, D.C., so you don't own a car.  I mean,
5  there's a lot of parts of Texas you just couldn't live
6  in.
7     Q.  And when you talk about rural areas and
8  people having cars in rural areas, is this knowledge
9  based on -- well, what is this knowledge based on?
10    A.  Life.  I've lived in Texas all my life.
11    Q.  So your experience living in Texas is what
12  you're basing your knowledge on?
13    A.  Yeah.
14    Q.  Anything else?
15    A.  Well, I mean, the information that I gathered
16  as a legislator.
17    Q.  And what information is that?
18    A.  Just -- I served in the legislature for 16
19  years, 10 months and 18 days.  You learn a lot when
20  you do that.
21    Q.  Did you have any information specifically
22  about vehicle ownership in Texas during your time in
23  the legislature?
24    A.  I might have.  I can't tell you as I'm
25  sitting here today.

245

1  Q.  But as you sit here today, you don't recall
2  anything specific about that?
3      A.  Well, what -- my point is not about vehicle
4  ownership.  The point is, that whether you own a
5  vehicle or not, if you live in a remote area of the
6  state, if you want to go vote, if you want to -- if
7  you want to in-person vote, you have to find a way to
8  get there.  And that's no greater burden than going to
9  get the election identification certificate.
10     Q.  Are there any counties, that you're aware of,
11 that don't have polling places in them?
12     A.  I don't know.  There may be.  I don't know.
13 We have one county, I think, that has less than 30
14 people in it.  I guess they have a polling place
15 there.  I mean, they probably don't have multiple
16 polling places.
17     Q.  But your testimony about what's a burden for
18 people is based on your experience living in Texas; is
19 that right?
20     A.  My experience as a legislator and my
21 experience of living here.
22     Q.  Okay.
23         MS. DONNELLY:  Counsel, if you're ready
24 to move on from this exhibit, I just want to confirm,
25 for the record, this Exhibit 24 is marked "HIGHLY

246

1  CONFIDENTIAL."
2          The entire deposition is under seal,
3  including any testimony about Exhibit 24; is that
4  right?
5          MS. MARANZANO:  Yes, that's right.
6          MS. DONNELLY:  Thank you.
7          (Williams Exhibit 25 marked/introduced.)
8      Q.  (BY MS. MARANZANO)  Senator, I'm showing you,
9  for the record, what we're marking as Deposition
10 Exhibit 25.  This is an excerpt from the transcript of
11 the Committee of the Whole proceeding on SB 14.  It's
12 not the entire transcript.
13         You were asked earlier on a couple of
14 different times, I believe, about whether there was
15 any analysis that was conducted by the Secretary of
16 State's office or DPS.
17         Do you remember those questions?
18     A.  I know that you've asked me several times,
19 and I think my response has been that I don't know.
20 That's -- I don't have a recollection.
21     Q.  Well, I don't believe I've asked you, but --
22     A.  Somebody asked me.  It's a blur.
23     Q.  But this is an excerpt of the transcript, and
24 I wanted you to take a look at what it has at the
25 bottom, JA_000119.  I'm sorry, JA_00 -- there's a

247

1  bunch of different numbers, but it's the JA number,
2  and it's 000119.  And if you could look at the block
3  on the top right-hand side of the page that has a
4  little 255.
5      A.  Uh-huh.
6      Q.  And do you see -- if you start on 254, you
7  can see that that's a statement by you.  And on 255,
8  do you see that it says:  "In fact, Senator Fraser, I
9  spoke last night with the Department of Public Safety
10 and today with the Secretary of State and just asked
11 them if it would be possible for us to target those
12 voters who are below age 65 and have -- don't have an
13 ID card, a driver's license, or an ID card issued by
14 the state; and they said, yes, it would be possible
15 for us to direct our voter education to those people
16 specifically so that we could step it up and let them
17 know before your bill takes effect."
18         Do you see that?
19     A.  I see it, yeah.
20     Q.  And then can you look at what's labeled
21 JA_000801.
22         And do you see there's testimony from
23 Ms. McGeehan at the bottom of the page, and she says
24 "Senator Williams had approached us earlier today to
25 see if we could do some comparisons to try and further

248

1  focus in on who those registered voters are that don't
2  have -- or have not been issued a driver's license or
3  a personal ID number.  So we're trying to run some of
4  those numbers right now."
5          Do you see that?
6      A.  I see that.
7      Q.  Did I read that correctly?
8      A.  Yes.
9      Q.  And can you look at JA_000844.
10         And do you see there's a statement by you,
11 and at the very bottom, going up to the next page, it
12 says:  "And then finally I wanted to ask you, we had
13 talked earlier about the project that I asked you to
14 do, to cross-reference the driver's licenses and the
15 voter registration.  How is that coming along?  I know
16 I only asked today..."
17         And Ms. McGeehan says:  "Yes."
18         Do you see that?
19     A.  I see it.
20     Q.  Does this refresh your recollection that you
21 asked for an analysis from DPS and SOS about
22 registered voters who didn't have a driver's license
23 or a Texas ID?
24     A.  Yeah.  What I don't know, by looking at this,
25 is whether it would appear -- but I'm not sure, and

TOMMY WILLIAMS                                      7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

63 (Pages 249 to 252)

249

1   I'd like to clarify, for the record, that this was
2   the -- if this was the Committee of the Whole.  It
3   looks like it was.
4       Q.  This was the Committee of the Whole, yes.
5       A.  Okay.  So this was a committee hearing, and
6   this would have been the appropriate place for me to
7   ask such a thing.
8       Q.  And do you recall asking Ms. McGeehan?
9       A.  Now that you showed me this, I do.
10      Q.  And do you recall that when you initially
11  talked to Ms. McGeehan, do you recall if anybody else
12  was present from the Secretary of State's office?
13      A.  You know, I don't know.
14      Q.  You don't recall if Mr. Shorter was with her?
15      A.  He may have been.  I don't know.
16      Q.  Do you have a general point of contact for
17  election-related matters in the SOS office?
18      A.  No.  It depends on who's in there.  There
19  have been several secretaries of state during my
20  tenure in the legislature, and I think Ms. McGeehan's
21  been there a long time.  I've talked to her on a
22  number of things.  But I wouldn't say I have one point
23  of contact.
24      Q.  Why -- why did you want this analysis?
25      A.  Let me see what the -- I don't know.

250

1           It would appear from the transcript that I
2   wanted to know if we could focus our education efforts
3   on the people that were registered voters who didn't
4   have a driver's license or a state-issued ID already.
5       Q.  And is that the only reason why you wanted
6   this analysis?
7       A.  I don't know of any other reason right now.
8   I mean...
9       Q.  Did you consider targeting any additional
10  outreach to voters besides educational efforts?
11      A.  I'm not sure what you're asking me.  Your
12  question is vague.
13      Q.  Didn't you say that you wanted to -- you
14  wanted this analysis for voter education; is that
15  right?
16      A.  It would appear from the transcript.  I'd
17  like to take another look at it and see, so...
18          It looks like what we were trying to do is --
19  Ms. McGeehan says I approached her earlier today to do
20  some comparisons to try to further focus in on those
21  who are registered voters that don't have or have not
22  been issued a driver's license or personal ID, so
23  we're trying to run some of those numbers.
24          So I think what I was trying to do was just
25  see who those people were, how many there were, and if

251

1   we could focus the education efforts on making sure
2   that they knew what they needed to do to be able to
3   vote the next time.
4       Q.  And my question is:  Were you looking to
5   focus any efforts other than education, any additional
6   outreach other than voter education to these voters?
7       A.  You know, that would have been under the
8   purview of the Secretary of State, not me.
9       Q.  Okay.  So you wanted to get these numbers so
10  that you could focus voter education in the bill,
11  correct?
12      A.  No.
13      Q.  Okay.  What -- when you say so that you could
14  focus voter education on these voters, can you tell me
15  what you mean by that.
16      A.  I wanted to be sure that we understood how
17  big the problem was.  I think, you know, we needed --
18  if there was a problem.  And so I think it was up to
19  the Secretary of State's office.
20          But I wanted to know -- I wanted them -- if
21  that analysis had been done, then we would have known
22  whether or not they could address the problem.  And so
23  I felt like it was important that we ask that
24  question.
25      Q.  And when you say you wanted to make sure "we"

252

1   understood how big the problem was, "we" means the
2   legislature?
3       A.  Yeah.
4       Q.  And you wanted to know to make sure that you
5   could address that issue?
6       A.  Make sure it was being addressed.
7       Q.  I see.  So you didn't necessarily intend the
8   legislature to take an action to address the problem?
9       A.  I don't think it would be -- I think it would
10  not have been necessary for anything to happen in this
11  bill.  But it would have given us, in the Senate
12  Finance Committee, an idea whether they had adequate
13  resources or not.  So it was a question to make sure
14  the agency was considering what they needed to do.
15      Q.  And when you made this request of
16  Ms. McGeehan and DPS, do you recall what information
17  you asked for?
18      A.  No.
19      Q.  Do you know if you asked for more than just a
20  number of people?
21      A.  No.  I don't remember.  I mean, this was a
22  long time ago.  I voted on 5,000 bills that session.
23      Q.  Fair enough.  Would you consider this a
24  time-sensitive request?
25      A.  I think it was something that we needed to --

TOMMY WILLIAMS                                           7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

64 (Pages 253 to 256)

253

1  not "sensitive" in the sense that it was necessarily
2  something that needed to be done in Senate Bill 14,
3  but it was something that needed to be done before the
4  session was over.  It's more of a budget issue than a
5  Senate Bill 14 issue.
6       Q.  Do you recall if you got a response to your
7  request?
8       A.  I don't.
9       Q.  Is there anything that would refresh your
10  recollection as to whether you got a response?
11       A.  Well, if you had something that said there
12  was or wasn't, I mean...
13       Q.  What would you have done with the information
14  if you had gotten a response?
15       A.  I don't know.  I couldn't even tell you
16  before you showed me this, that I'd asked for it.
17       Q.  Do you think, if you'd gotten a response, you
18  would have shared it with anybody?
19       A.  I'm not going to speculate.  I mean, this was
20  part of the public record.  Of course I would have.
21  Everybody knew that we were asking for that.
22       Q.  And it's fair to say other legislators were
23  interested in that information, correct?
24       A.  They may have been or may not have been.
25       Q.  You don't recall, off the top of your head,

254

1  whether they were interested in that information,
2  whether opponents of the bills brought up, multiple
3  times, who was going to be impacted by this bill?
4       A.  I think it's a matter of the public record.
5  I can't tell you as I sit here today.
6       Q.  If you hadn't have gotten a response, would
7  you have followed up with Ms. McGeehan?
8       A.  I don't even remember asking Ms. McGeehan.
9  You're asking me to speculate about something that I
10  didn't even recall until you showed me this.  So it's
11  that same, "If 'ifs' and 'buts' were candy, we'd all
12  have a Merry Christmas."  I mean, I don't know is the
13  answer.
14       Q.  Well, I mean, you brought it up three times
15  during the Committee of the Whole, correct?
16       A.  You've shown me three times.  I might have
17  brought it up more.
18       Q.  You certainly --
19       A.  Certainly no less.
20       Q.  -- didn't bring it up less?
21       A.  Yeah.  At least three times.
22       Q.  At least three times.
23       A.  It was brought up.  I'm not sure I brought it
24  up every time.
25       Q.  That's a good point.  Ms. McGeehan actually

255

1  brought it up once.  You brought it up at least two
2  times during the Committee of the Whole debates?
3       A.  Once our twice, yes.
4       Q.  So it was on your mind when the Committee of
5  the Whole was debating this bill?
6       A.  Other members were asking about it, too, I
7  guess.
8       Q.  So it was something the legislature was
9  interested in, correct?
10          MS. DONNELLY:  Object.  Form.
11       A.  I can't speak to what I remember the
12  legislature was interested in or not.
13       Q.  (BY MS. MARANZANO)  But people were asking
14  about it?
15       A.  Yeah.  It was the subject of the debate in
16  the committee, which is the appropriate place to bring
17  something like that up.
18       Q.  And if you hadn't have gotten a response,
19  isn't it fair to say that there would have been some
20  follow-up from somebody?
21          MS. DONNELLY:  Object.  Form.
22       A.  You know, I can't tell you whether I got a
23  response or whether I didn't get a response.  I don't
24  know what the answer was.
25       Q.  (BY MS. MARANZANO)  Have you ever previously

256

1  been told by a resource witness that they're going to
2  get you information later?  Does that happen
3  routinely?
4       A.  In the legislature?
5       Q.  Uh-huh.
6       A.  Yes.
7       Q.  And have they ever not given you that
8  information that they have said they will get to you
9  later?
10       A.  Sometimes, I'm sure that's happened.  I mean,
11  you don't always get it unless you -- I mean, you
12  know, it doesn't -- and sometimes I ask and I get a
13  response and I don't even remember that I asked the
14  question.
15       Q.  So it's not your practice, generally, to
16  follow up with resource witnesses when you ask for
17  information?
18       A.  My staff would, but I might not.
19       Q.  But your staff would, generally?
20       A.  Generally speaking.
21       Q.  Who was your staff that was handling SB 14?
22       A.  Well, I think Ryan LaRue was involved in it,
23  and Amanda Montagne and Jason Baxter, I think are the
24  three primary people that I remember.
25          And it would appear from that e-mail, that

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

65 (Pages 257 to 260)

257

1  highly confidential e-mail that we talked about
2  earlier, that they had asked Libby Nezda to look into
3  something.
4      Q.  Would you say it's your staff's practice to
5  generally ensure that your requests get responded to?
6      A.  I think, as a general statement, that's true.
7      Q.  And --
8      A.  And I think, as a general statement, the
9  state agency that I might ask about that would
10  generally be very responsive during the time that I
11  was a member of the Senate Finance Committee
12  especially.
13          MS. MARANZANO:  Can I have this marked.
14          (Williams Exhibit 26 marked/introduced.)
15      Q.  (BY MS. MARANZANO)  I'm showing you what we've
16  marked as Deposition Exhibit No. 26.
17          Do you recognize this document?
18      A.  No.  But I'll take a look at it.
19      Q.  Okay.  Have you looked it over?
20      A.  I'm looking at it now.
21      Q.  Do you recall if you've ever seen this
22  document before?
23      A.  I don't recall that I have.  I may have.  But
24  I don't -- I don't have any -- it's the first time
25  I've seen it, to my recollection.  I may have seen it

258

1  way back there when we were considering all this.
2      Q.  Do you recall if you've ever seen the
3  analysis on page 3 before?
4      A.  This written analysis?
5      Q.  Yes.
6      A.  No, I don't recall.
7      Q.  Do you see, at the bottom of page 3, the
8  conclusion, it says:  "We can estimate between 844,713
9  to 678,560 registered voters may not have been issued
10  a" Texas driver's license -- well, "TDL/ID by the
11  DPS"?
12      A.  I see that.
13      Q.  Have you ever seen a conclusion like that
14  before?
15      A.  No.
16      Q.  Did you ever hear from the Office of the
17  Secretary of State that this was a number that they
18  had reached when they did the analysis that you
19  requested?
20      A.  Not to my recollection.  They may have told
21  me that, but I don't know.
22      Q.  Did you ever hear from the Office of the
23  Secretary of State that they couldn't respond to your
24  request because they weren't able to conduct the
25  analysis?

259

1      A.  I don't recall.
2      Q.  Or did you ever hear from the Office of the
3  Secretary of State any concerns about the accuracy of
4  such an analysis?
5      A.  I did not.  But as I look this over, what I
6  would say is that I'm not sure I agree with the
7  conclusion here, if I understand the data on the last
8  page, because it would appear to me that of the
9  844,713 voters at the upper end of the limit, 519,514
10  of those voters would be eligible to vote by mail, and
11  they would not need an ID to do that.
12          So of the 7 percent, it would appear to me
13  that about two-thirds of that 7 percent -- well, to be
14  precise, it would be 4/7ths -- no, that's not right.
15  It would be -- at 4 percent of the total, the 519
16  represents a pretty large percentage of the 844 --
17  let's see what that is.
18      Q.  Senator Williams, right now, I actually just
19  want to focus on whether or not you've received this
20  document.
21      A.  Yeah.  Well, that's fine.  If that's what you
22  want to focus on.  That's not what I want to talk
23  about, so we'll just get somewhere in the middle of
24  that.  So I don't remember --
25          MR. SHORDT:  Objection.  Nonresponsive.

260

1      A.  -- ever seeing it.
2          It would appear to me that 61-and-a-half
3  percent of the people at the upper end of the range
4  would have been able to vote by mail --
5          MR. SHORDT:  Same objection.
6  Nonresponsive.
7      A.  -- and would not need a photo ID.
8      Q.  (BY MS. MARANZANO)  Senator Williams, would
9  you --
10      A.  So I'm not sure I can agree with the
11  conclusion that's on here.
12      Q.  And if you had received this document, do you
13  think there would have been some back and forth
14  between you and the Secretary of State's office?
15      A.  There might have been.  And I might have
16  received it and had some back and forth with them.
17      Q.  And would that have been in writing?
18      A.  Probably not.
19      Q.  Do you think, if they were going to respond
20  to your request that you made during the Committee of
21  the Whole, that would have been in writing?
22      A.  They would have responded in writing.  I
23  probably would not have.
24      Q.  Do you think their response would have gone
25  to you directly or to your staff?

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

66 (Pages 261 to 264)

261

1       A.  To my staff.
2       Q.  Who on your staff would it have gone to?
3       A.  It could have gone to my chief of staff, it
4   could have gone to my legislative director, it could
5   have gone to Jason Baxter, or it could have gone to
6   Ryan LaRue.  So it would have been Janet Stieben,
7   Amanda Montagne, Jason Baxter or Ryan LaRue.  Any of
8   those people might have received a response.
9       Q.  And as you sit here today, you have no
10  recollection of whether you received this analysis or
11  not?
12      A.  I have no idea.
13          MR. KEISTER:  Objection.  Asked and
14  answered.
15      Q.  (BY MS. MARANZANO)  Senator Williams, can
16  anybody vote by absentee ballot or vote by mail in
17  Texas?
18      A.  I don't think so.  I think there's an age.  I
19  mean, you have to file an application to vote by mail
20  to receive your ballot.  You have to send in an
21  application.
22          You have to be over 65, or disabled, to be
23  able to vote by mail; or, if you're in the military,
24  you can vote by mail; or, if you're going to have an
25  actual absence from your home county during the

262

1   election and the entire early voting period, you also
2   may be eligible to vote by mail.
3          That's the best of my recollection.  But it's
4   probably pretty imprecise.  There may be some other
5   parameters on that.
6       Q.  Is it fair to say that some people who are
7   eligible to vote by mail still vote in person?
8       A.  They may.
9       Q.  Are you aware of some people who prefer to
10  vote in person even if they're eligible to vote by
11  mail?
12      A.  I am not.
13      Q.  Are you aware that in some communities, it's
14  more people prefer to vote in person even if they're
15  eligible to vote by mail?
16      A.  You know, I'll take your word for it.
17      Q.  Can you turn to Exhibit 25 for a moment.  Can
18  you look at the bottom of --
19      A.  Which one are we on?
20      Q.  -- Exhibit 25, which is the transcript, the
21  excerpt from the transcript.  If you can look at
22  JA_00066, at the very bottom of the page, there's a
23  comment by -- there's question by Senator
24  Van de Putte.
25          It says:  To your knowledge, have any studies

263

1   been done to determine if there has been under current
2   Texas voter laws any impact that it would have
3   affected -- it would have on affected class of Latino
4   and African-American voters.
5          Do you see that?
6       A.  No, I'm sorry.  I'm looking.  Where -- or
7   what, is it marked for it?  What's the small number,
8   the page number?
9       Q.  44.  At the very bottom of 44, and it goes on
10  to the next page.
11      A.  Okay.
12      Q.  Do you see Senator Van de Putte's question?
13  And if you can read Senator Fraser's response.
14          MS. DONNELLY:  Wait.  You're saying it
15  starts at 44?
16          THE WITNESS:  Yeah, I don't have 45.
17          MS. MARANZANO:  You don't have 45?
18          MS. DONNELLY:  No.
19          THE WITNESS:  No.
20          MS. MARANZANO:  On the back?
21          THE WITNESS:  No.  It goes from --
22          MS. DONNELLY:  It goes from 44 to 161.
23          MR. KEISTER:  I'm going to object to
24  having the witness read from documents at this late
25  hour.  The documents speak for themselves.

264

1          MS. MARANZANO:  I have a question, but
2   we need to find the right transcript.
3          MR. KEISTER:  You asked him to read it.
4          MS. MARANZANO:  Okay.  We'll put that
5   exhibit aside.
6          THE WITNESS:  I need to take a break
7   here to communicate with some folks that are trying to
8   reach me.
9          MS. MARANZANO:  Okay.  Let's go off the
10  record.
11          (Break.)
12          MS. MARANZANO:  Can I have this marked.
13          (Williams Exhibit 27 marked/introduced.)
14      Q.  (BY MS. MARANZANO)  Senator Williams, I'm
15  showing you what we've marked as Deposition Exhibit
16  27.
17          Do you recognize this document?
18      A.  I do not, but I will look at it.
19          This looks like an excerpt from the Senate
20  Journal the day that I had my friends from the Jewish
21  Federation of Houston on the floor of the Senate.
22      Q.  And an excerpt from the Senate Journal on
23  January 26, 2011; is that correct?
24      A.  Yes.
25      Q.  And can you look at the page that is labeled

TOMMY WILLIAMS                                           7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

67 (Pages 265 to 268)

265

1   at the bottom JA_001243?
2       A. 1243?
3       Q. Yup.
4       A. Okay.
5       Q. Do you see that Senator Davis offered an
6   amendment to SB 14 Floor Amendment No. 12, that would
7   have prohibited fees for documents that were either to
8   be used as proof of identification or to obtain a
9   document that may be used as proof of identification?
10  Do you see that amendment?
11      A. I do.
12      Q. And do you see that Senator Fraser moved to
13  table that amendment?
14      A. Yes.
15      Q. And you voted to table that amendment; is
16  that correct?
17      A. I did.
18      Q. Can you tell me why.
19      A. Looks like it was an unfunded mandate, on our
20  local government units.
21      Q. And did you talk to any of the local
22  government units to determine whether they had
23  concerns about that unfunded mandate?
24      A. No, I didn't know about the amendment until
25  Senator Davis offered it on the floor that day.

266

1       Q. So this amendment would have essentially
2   shifted costs from voters to counties; is that
3   correct?
4       A. It would appear so. Political subdivisions
5   of the State.
6       Q. And do you support the concept that the
7   voters and not the county should bear the cost of
8   obtaining an ID?
9       A. I think that we didn't want to put any
10  additional burdens, unfunded mandates on our local
11  government units. Ultimately, this is the taxpayers
12  that are paying for that.
13      Q. Would allowing these documents to be issued
14  free of charge in any way prevent Texas from verifying
15  that a voter is who they say they are at the polls?
16      A. Would you ask the question again?
17      Q. Sure. Would allowing these documents to be
18  issued free of charge in any way prevent Texas from
19  verifying a voter is who they say they are at the
20  polls?
21      A. I don't think so.
22      Q. Are you aware of whether the Indiana law
23  provides that indigent persons can obtain underlying
24  documents to obtain a necessary photo ID free of
25  charge?

267

1       A. I don't recall.
2       Q. Do you recall that during the debate on the
3   Committee of the Whole, supporters of SB 14 frequently
4   referenced the Indiana voter ID law?
5       A. That's -- I recall that it was frequently
6   referenced. I don't recall any of the particulars of
7   the Indiana law.
8       Q. Okay. Was this amendment tabled on a
9   party-line vote?
10      A. It would appear that it was.
11      Q. Will you look at JA_001245?
12      A. Okay.
13      Q. Do you see that Senator Davis also offered a
14  Floor Amendment No. 15, which would have allowed for
15  the use of IDs that had expired since the last general
16  election and up to two years?
17      A. What's your question?
18      Q. Do you see that amendment that I'm referring
19  to?
20      A. Yeah.
21      Q. I assume, based on your last answer, that you
22  are not aware of whether the Indiana voter ID law
23  contains a similar provision?
24          MS. DONNELLY: Objection. Form.
25      A. I don't know whether it does or not.

268

1       Q. (BY MS. MARANZANO) Do you see that Senator
2   Fraser moved to table this motion?
3       A. Looks like he withdrew the amendment, to me.
4   On JA_001245, it says she temporarily withdrew her
5   amendment.
6       Q. Can you look at JA_001263? And do you see
7   that she brought up -- that Senator Davis brought up
8   Floor Amendment No. 15, on that page?
9       A. I see that she brought up Floor Amendment
10  No. 15 again. I don't know if it's the same amendment
11  that she offered earlier or not. I'd have to take
12  some time --
13      Q. Well, do you see that Floor Amendment 15, as
14  reflected on JA_001263, allows for the use of
15  identification that has expired after the date of the
16  most recent general election?
17      A. Yes, I see that.
18      Q. And do you see that Senator Fraser moved to
19  table this bill?
20      A. He moved to table the amendment.
21      Q. Thank you. The amendment.
22          And you voted in favor of tabling the
23  amendment, correct?
24      A. I did.
25      Q. Why did you vote that way?

TOMMY WILLIAMS                                           7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

68 (Pages 269 to 272)

269

1    A.  I think, if we're giving out free IDs,
2  there's no reason for people to be running around with
3  expired IDs to use in an election.  So that's about
4  all I can tell you about it.
5    Q.  Did you think an expired ID was less secure
6  than a nonexpired ID?
7    A.  Yes.
8    Q.  And why is that?
9    A.  Because the person had to go in -- would have
10 to go in and get their identification verified, and
11 you don't know if they -- if it's an expired ID,
12 whether it's the same person or not.  I mean, you
13 know, it just seems like it would be more secure, to
14 me.
15   Q.  Did you have any evidence that using an ID
16 that had been expired for two years was less secure
17 than using an ID that hadn't?
18   A.  I don't recall.
19   Q.  Was this amendment tabled on a party-line
20 vote?
21   A.  Let's see.  Yes, it would appear that it was.
22   Q.  Can you look at the page that's labeled
23 JA_001251?  And I'd like to direct your attention to
24 Floor Amendment 24.
25       Do you see that Senator Hinojosa offered an

270

1  amendment that would have allowed for county
2  commissioners to authorize county election officials
3  to issue a voter registration with a photo ID?
4    A.  I don't know what all his amendment did,
5  because if I -- without having the bill in front of
6  me.  There's three sections -- there then there's the
7  amending Section 12 of the bill by striking the word
8  "photo," inserting the word "or," and, following
9  "expired," inserting another phrase.
10       And then it says, Section blank, Subchapter A
11 of the election code is amended by adding Section
12 15.0025 to read as follows.  And then there's the
13 language that you refer to, which -- so that language
14 is in there, but I don't know the effect of these
15 other changes without having a copy of the bill in
16 front of me.
17   Q.  Do you want to refer to the bill?  I believe
18 it was --
19   A.  If you have a copy of the bill that we were
20 considering, I'd be glad to take a look at it, but I
21 don't know that you do.  I mean, I think you had an
22 engrossed version of the bill.  So it would have
23 included the amendments already.
24   Q.  I see.  So the bill that has already been
25 introduced --

271

1    A.  Yeah.  I mean, I don't know.  I can go back
2  and see.  It's hard for me to tell, just looking here.
3  I'd have to get your --
4    Q.  Well, let me ask you this --
5    A.  And the line numbers change, and, you know.
6    Q.  With regard to this concept of a county
7  election official being authorized to take a
8  photograph of somebody and put it on a voter
9  registration certificate, is that a concept that you
10 support or that you would be opposed to?
11   A.  Well, I think I voted against it, so I was
12 opposed to it.
13   Q.  You voted in favor of the motion to table; is
14 that correct?
15   A.  Yes, that's correct, I was opposed to his
16 amendment.
17   Q.  And why were you opposed to this amendment?
18   A.  I don't recall.  I don't -- like I said, I
19 don't know, without having a copy of the bill that we
20 were considering on the floor, and all these other
21 changes.  I'm -- I'm reticent to say, because I don't
22 know what else might have been affected by these other
23 sections.
24   Q.  How is this --
25   A.  I can't tell by reading the amendment.

272

1    Q.  Does it strike you as similar in concept to
2  the idea of your smile and vote proposal?
3    A.  No.
4    Q.  And what are the differences?
5    A.  The difference is that the county election
6  administrator would be issuing a registration
7  certificate with a photo ID, as opposed to taking a
8  photo and retaining it to see if it was the same
9  person or not.  So it's -- there's some similarities,
10 but it's not the same.
11   Q.  And do you believe --
12   A.  And like I said, I don't know what these
13 other things, these other sections, did either.
14   Q.  Do you believe that if county election
15 officials had been permitted to take photos of people
16 and put it on a voter registration certificate, would
17 that have -- and then they were allowed to use that ID
18 to vote, would that have interfered with the purpose
19 of verifying that a voter is who they say they are?
20   A.  Yes, I think it would have.
21   Q.  How would it have interfered with that
22 purpose?
23   A.  I don't believe that the elections
24 administration people -- we would have been putting an
25 unfunded mandate on them, to start with, to do this.

TOMMY WILLIAMS                                                7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

69 (Pages 273 to 276)

273

1      And at least, a portion of the amendment that
2   I see here, it's not a requirement, it's an option, so
3   it doesn't serve -- it doesn't really solve the
4   problem.  It just says the county may do it.  It
5   doesn't say they have to do it.
6           So you would have had a hodgepodge of 254
7   counties, one county -- maybe one county chooses to
8   issue them and the other county chooses not to.  So
9   it's not solving the statewide -- it's not solving the
10  problem on the statewide issue.  There's no
11  requirement that the county do that here.
12     Q.  So -- and that concerns -- I'm confused about
13  why that's a concern for you.  Can you explain that to
14  me?
15     A.  Well, Harris County might say, "Yes, we're
16  going to do it."  But Grimes County might say, "No,
17  we're not going to do it."  And so then you would have
18  photo voter identification in Harris County but not in
19  Grimes County.
20     Q.  And why is that a problem, that one county
21  might do it and another county might not?  What --
22     A.  I think that you would want to have uniform
23  laws.  I think we -- you know, I think our election
24  laws apply to the entire state.  They're not done on a
25  county-by-county basis.

274

1      Q.  So it would concern you because voters in
2   certain counties wouldn't have the same access to this
3   ID than another?
4      A.  Some would, and some wouldn't, and it
5   wouldn't be uniformly -- people wouldn't be treated
6   uniformly across the state if you're just doing it on
7   a "may authorize" basis.
8      Q.  And in terms of the unfunded mandate --
9      A.  I guess it really wouldn't be an unfunded
10  mandate.  You're just telling them you can do it, but
11  you don't have to; and so there's no assurance that
12  they would or they wouldn't.  So it really -- I
13  probably misspoke.  It wouldn't be an unfunded mandate
14  if it's passive.
15     Q.  Do you recall why you voted to table this?
16     A.  No.
17     Q.  But you have concerns, as you sit here today,
18  about the inconsistency that this amendment --
19     A.  Just looking at that one section.  And I
20  don't know what these other portions do.  Because what
21  we were trying to do was solve the problem on a
22  statewide basis.
23          There's 254 counties in the state.  You can't
24  have every county doing this a different way.  That
25  would lead to a lot of confusion.

275

1      Q.  What do you mean by, you were trying to solve
2   the problem on a statewide basis?
3      A.  The problem of in-person voter fraud needed
4   to be addressed on a statewide basis, not on a
5   county-by-county basis, which is what it would appear
6   to me that this amendment does.
7      Q.  Were you concerned that it would be confusing
8   for poll workers to have some counties be issuing
9   these and some counties not be issuing these?
10     A.  No, because you vote in your home county.
11  You wouldn't take your ID and go to another county and
12  vote.
13     Q.  So your concern is just, as a general matter,
14  the inconsistency of the implementation?
15     A.  Yes.  That's what I've said, I think, two or
16  three times.
17     Q.  Okay.  I just wanted to be clear.
18          Was this amendment tabled on a party-line
19  vote?
20     A.  It would appear so.
21     Q.  Can you look at JA_001254.  Do you see that
22  Senator Gallegos introduced Floor Amendment 29, which
23  would have allowed for DPS to extend their hours until
24  7:00 p.m., and to be open on Saturdays?  Do you see
25  that amendment?

276

1      A.  And I'm sorry, it would not have allowed it,
2   it would have required.
3          I see the amendment, yes.
4      Q.  And you see that Senator Fraser moved to
5   table that amendment?
6      A.  Yes.
7      Q.  And you voted in favor of tabling that
8   amendment, correct?
9      A.  Correct.
10     Q.  And why did you vote in favor of tabling that
11  amendment?
12     A.  I think, like many things that Senator
13  Gallegos did, it was ill-considered, God rest his
14  soul.
15     Q.  What was ill-considered about it?
16     A.  I'm not sure that we had any evidence that
17  requiring them to be open until 7:00 p.m. during the
18  weekdays, or four hours on two Saturdays each month,
19  really was necessary.
20          And it was -- it's overly prescriptive for
21  the legislature to put this kind of language in a
22  statute for a statewide agency.  So you'd have the
23  offices all over the state that would be required to
24  be open, whether it was necessary for them to be or
25  not.

TOMMY WILLIAMS                                              7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

70 (Pages 277 to 280)

277

1        And my recollection is that the department --
2   if you look back at my press release, I think that
3   they did this as an accommodation -- something similar
4   to this, as an accommodation, to make the offices more
5   available.  They were open on Saturdays for election
6   identification certificates only.
7        In other words, they would not process
8   driver's license requests then, just the EIN [sic].
9   So sometime prior to -- after the effective date of
10  the legislation, and before the election, the
11  department did this.
12       So it's usually a lot better to try to work
13  with a department and let them help you come up with a
14  way to solve the problem than it is to put this in
15  statute where, you know, you're prescribing that they
16  do it this way and it might not actually be addressing
17  the problem.
18   Q.  The department isn't required to be open on
19  Saturday, pursuant to SB 14, right?
20   A.  No.  It would have been with this amendment.
21   Q.  And did the legislature at any time consider
22  whether individuals who worked an hourly wage would
23  have trouble going to DPS during business hours?
24   A.  Yes.  That was discussed.
25   Q.  And what was the conclusion?

278

1    A.  The conclusion was that it wasn't overly
2   burdensome, it wasn't any more burdensome than getting
3   a driver's license.  And I think, you know, my
4   recollection is, it met the test that was outlined by
5   the Supreme Court in the Indiana case when it was
6   heard.  That was part of what we looked at.
7        So I'm not a lawyer, I can't tell you, but I
8   know they set out some standards for what was too
9   burdensome and what wasn't; and the feeling was, this
10  wasn't too burdensome.
11       And in the end, the department, you know,
12  opened their offices and had some extended hours so
13  that they could address this problem, and I
14  think -- address this issue, I should say, and I think
15  that their mega centers have extended operating hours
16  now.
17       So the problem was solved without having this
18  heavy-handed way of saying, "Well, all these offices
19  need to be open," and you'd have people sitting around
20  at a desk with nothing to do.
21   Q.  Would this amendment in any way have
22  interfered with the ability to verify that a voter is
23  who they say they are?
24   A.  No, but it could have added a lot of
25  additional cost to the department that wouldn't have

279

1   necessarily solved the problem that Senator Gallegos
2   was trying to solve.
3    Q.  And this amendment was tabled on a party-line
4   vote; is that correct?
5    A.  It would appear so.
6        MS. MARANZANO:  Okay.  Let's go off the
7   record.  I think, at this point, I'll pass it to Rich.
8        (Off the record.)
9              E X A M I N A T I O N
10  BY MR. SHORDT:
11   Q.  Senator, my name is Richard Shordt.  I'm with
12  the Texas League of Young Voters Education Fund and
13  Imani Clark.  The same ground rules apply that applied
14  all day.
15       I want to go back and talk a little bit about
16  the issue of student IDs.  And I believe you testified
17  earlier that the reason you did not support student
18  IDs as a document to prove identification at the polls
19  is primarily because you didn't think that poll
20  workers would be able to necessarily distinguish
21  between the different student IDs.
22       Is that a correct summary of what you
23  previously testified to?
24   A.  I think what I testified to, that it would be
25  confusing for the poll workers to know whether it was

280

1   a valid ID or not.  And I'm not sure how secure they
2   are, as far as what the schools actually do to verify
3   to know that that is the person.  They probably ask
4   for your driver's license before they'll issue you a
5   student ID.  That would be my guess.
6        Have you checked on that?
7    Q.  Well, you said there's a lot of universities
8   here in Texas.
9    A.  Yeah, okay.  You should probably check that.
10  They probably require a driver's license before
11  they'll issue a student ID.
12   Q.  That's probably true that not every student,
13  college student in Texas, has a driver's license; is
14  that right?
15   A.  I don't know.
16   Q.  And do you know if every student at Texas A&M
17  has a driver's license?
18   A.  I have no idea.
19   Q.  Are there any other reasons, other than
20  confusion -- potential confusion among poll workers
21  and not understanding how universities and colleges
22  will issue student IDs -- or any other reasons that
23  you can recall at the time SB 14 was debated?
24   A.  Not that I recall at this time.
25       (Williams Exhibit 28 marked/introduced.)

TOMMY WILLIAMS                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

71 (Pages 281 to 284)

281

1  Q. (BY MR. SHORDT) I'm handing you what's been
2  marked as Exhibit No. 28. Please look it over and let
3  me know if you recognize this document.
4      Does that look familiar to you, Senator?
5  A. No.
6  Q. I will represent that this was produced in
7  this litigation, and you are listed as the custodian.
8      So is it fair to assume that this came out of
9  your office if you're listed as the custodian?
10     MS. DONNELLY: You're sure about that?
11     MR. SHORDT: Yeah, I'm -- I'm sure that
12 Senator Williams was listed as the custodian of this
13 document, LEG0000795.
14 A. I'm not familiar with it. I'm not saying
15 that my office didn't have it, but I don't remember
16 it.
17 Q. (BY MR. SHORDT) Okay. Do you -- I just want
18 to walk through this document. You're not familiar
19 with it, I understand. But I still want to walk
20 through it and ask you a few questions about it.
21     The first -- under Sub-bullet 1 -- sorry,
22 Bullet 1 states: "There is no uniformity amongst
23 Texas institutions of higher education for making
24 student IDs," and the first sub-bullet is: "Some do
25 not have expiration dates."

282

1      How would an expiration date on an ID prove or
2  disprove that the individual in the picture is not the
3  person whose name is on the identification?
4  A. I'm not advised.
5  Q. And what do you mean when you say, "I'm not
6  advised"?
7  A. I don't know. I've never seen this before,
8  so -- or I have no recollection of ever seeing it
9  before.
10 Q. Do you think that not having an expiration
11 date on a student identification would make it
12 disqualifying as an ID to use to represent a student
13 identity at the polls to vote?
14 A. I don't have an opinion about it.
15 Q. Okay. And the next bullet says: "Even after
16 having SOS" -- I believe that's Secretary of State --
17 "prescribe uniform requirements for student ID's,
18 there is no guarantee that colleges and universities
19 would comply."
20     Do you think it's correct to say that a -- or
21 do you believe this to be accurate, that there's no
22 guarantee a college or university would comply with a
23 uniform requirement for student IDs?
24     MS. DONNELLY: Objection. Form.
25 A. I have no idea. And they're both public and

283

1  private universities, and some private universities
2  might feel that they're not compelled to follow that.
3  I mean, I don't know.
4  Q. (BY MR. SHORDT) Would --
5  A. This isn't something that I produced, so
6  you're asking me to speculate about somebody else's
7  idea here.
8  Q. Well, let me ask it this way: In your role
9  as the vice chancellor at Texas A&M, if the Secretary
10 of State's office issued a -- issued a requirement
11 that all public universities in Texas had to issue a
12 standardized student ID, would Texas A&M comply with
13 that?
14     MS. DONNELLY: Objection. Form.
15     MR. KEISTER: Object to form.
16 A. I don't know the answer to that. That would
17 be something that you need to direct to the Office of
18 the General Counsel, not to me. I'm the vice
19 chancellor of federal and state relations, so I don't
20 know, and I don't know that the Secretary of State has
21 the authority to do that.
22 Q. (BY MR. SHORDT) Okay.
23 A. So, I mean, I just don't know is the answer.
24 Q. Okay. And the second main bullet point
25 states: "Students are still eligible to vote absentee

284

1  in their home precinct."
2      And I understand that you haven't seen this,
3  but is it accurate to say that a student could vote
4  absentee in their home district if that home district
5  is the county where the university is located?
6      MS. DONNELLY: Objection. Form.
7  A. What are you asking me?
8  Q. (BY MR. SHORDT) So let me ask it this way:
9  Let's say, for example, a student at Texas A&M grew
10 up -- their home is listed as College Station, and
11 they are attending class in College Station, which I
12 believe is in Brazos County, on election day.
13     Could that student vote absentee if they were
14 in the county on election day?
15 A. I'm not sure I can answer the question the
16 way you phrased it. The -- if they're a resident of
17 Brazos County, and that's their home county, and
18 that's also where they're attending school, they
19 wouldn't qualify for an absent -- a vote by mail or
20 absentee ballot because of their residence and their
21 school being the same.
22     But they might still be able to qualify for
23 an absentee ballot if they were over 65, if they had a
24 disability, or if they had an expected actual physical
25 absence from the county during the time that the

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

72 (Pages 285 to 288)

285

1   election was to be held.
2        For an example, the primaries, until
3   recently, frequently occurred during spring break, and
4   maybe that student expected to be on a ski trip in
5   Colorado during the time that early voting was going
6   on, they would then qualify.
7        So there's a lot -- there's probably other
8   exceptions that I don't know of.  So I think you had a
9   poorly worded question.
10   Q.  Well, my question actually is specifically --
11   my hypothetical specifically said if a student was in
12   the county on the day of the election.
13   A.  You mean physically present?
14   Q.  Physically present.
15   A.  If they're physically present, I don't think
16   they'd qualify.
17   Q.  Do you -- do you know that there are probably
18   thousands of Texas college students from the same
19   county where their college or university is located?
20        MS. DONNELLY:  Objection.  Form.
21   A.  I don't know that.  I don't -- I don't have
22   any idea.  I know there are students that attend in
23   their home county and there are students who travel
24   and live outside -- go to school outside their county.
25   I mean, I don't know what the numbers are.  I have no

286

1   idea.
2   Q.  (BY MR. SHORDT)  Do you know how many Texas
3   A&M students are from Brazos County?
4   A.  No.  No, I have no idea.  I work at the
5   system office.  There are 132,000 students in the
6   Texas A&M University system.  Roughly one out of every
7   five college students goes to an A&M school.  So how
8   would I know that?
9   Q.  I asked if you knew it, and you answered the
10   question.
11        Do you see where this states, quote, "There
12   is no assurance to the State that the persons who
13   process student IDs are capable of providing the same
14   type of security in issuing those ID's as the state or
15   federal government would be in the types discussed in
16   SB 14"?
17   A.  I see that.
18   Q.  Do you recall any testimony received during
19   SB 14, or the two previous voter ID bills that you've
20   testified to today, regarding how Texas universities
21   prepare, secure or issue a student ID, at a Texas
22   college or university?
23   A.  I'm not advised.
24   Q.  And by you're "not advised," do you mean you
25   don't know the answer?

287

1   A.  That's right.
2   Q.  And did the legislature, during the
3   consideration of SB 14, give any consideration to the
4   ways of making student IDs more secure, at least for
5   the state's public institutions of higher education?
6   A.  I don't recall.
7   Q.  Do you recall if the legislature gave any
8   consideration to options such as requiring the
9   expiration date be put on student IDs?
10   A.  I don't recall.
11   Q.  Do you see where it says, "Ease of forging
12   student ID's" on this document, Senator?
13   A.  I do.
14   Q.  Do you recall any evidence presented or
15   testimony given during the discussion of SB 14 --
16   during the consideration of SB 14, that suggests it's
17   easier to forge student IDs at Texas colleges or
18   universities?
19   A.  I don't recall.
20   Q.  Do you recall any testimony given as to
21   whether it's easy to forge IDs at any college or
22   university nationwide?
23   A.  I don't recall.
24   Q.  Do you recall any evidence or testimony given
25   that shows if it's easier or harder to forge a student

288

1   ID than it is a Texas driver's license or a Texas
2   personal identification card?
3   A.  I don't recall.
4   Q.  And do you see where, on this document, it
5   says:  "Students should have the types of documents
6   needed to procure a driver's license or ID card for
7   attending their institution"?
8   A.  I do see that.
9   Q.  Do you recall any evidence or testimony
10   received during the consideration of SB 14 that
11   provided a factual basis for that statement?
12   A.  I don't recall.
13   Q.  Do you know if every student at a Texas
14   university has one of the required documents, one of
15   the SB 14 required documents to vote?
16   A.  I don't know.
17   Q.  And the last bullet states:  "Allowing this
18   type of identification would only cause confuse" -- I
19   think that's probably a typo -- "to poll workers
20   because there are so many types."
21        And I know you've previously testified that
22   that was one of your primary concerns.
23        Do you know if military IDs are permitted by
24   SB 14?
25        Strike that.

TOMMY WILLIAMS                                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

                                                73 (Pages 289 to 292)

289

1       We've discussed this earlier.  You agree that
2  military IDs are an SB 14-permitted identification; is
3  that correct?
4       A.  I believe they are.
5       Q.  Do you know how many types of military IDs
6  there are?
7       A.  I do not.
8       Q.  Would it surprise you to hear that there are
9  at least 10 different types of U.S. military IDs?
10      A.  No.
11      Q.  Do you know if poll workers in Texas are
12 trained to distinguish between different types of
13 military IDs?
14      A.  I don't know.
15      Q.  Do you know -- did you have any concern when
16 SB 14 was debated that, just like poll workers may
17 have confusion distinguishing between student IDs,
18 they may have confusion or may not understand how to
19 distinguish between different military IDs?
20      A.  Not that I recall.  As you say, there are 10
21 of these.  As I've said previously in my testimony, I
22 believe there are 38 general academic institutions in
23 this state.  In addition, there's seven or eight
24 health science centers, and there's somewhere around
25 30 community colleges.  So there's a lot more academic

290

1  institutions issuing state IDs than there are military
2  institutions.
3       Q.  So is it fair to say that 10 or 11 types of a
4  particular ID is easier to understand, as a poll
5  worker, than several dozen student IDs?  Is that your
6  testimony?
7            MS. DONNELLY:  Objection to the form.
8            Go ahead.
9       A.  I think what I'm saying, it would be easier
10 if there were 10 instead of over two dozen.
11      Q.  (BY MR. SHORDT)  For poll workers to decipher
12 and --
13      A.  Over three dozen.  Over four dozen, probably.
14 A lot, yeah.
15      Q.  Do you recall any testimony received during
16 the consideration of SB 14 addressing how many
17 students in Texas do not possess an SB 14 valid
18 identification?
19      A.  I do not.
20      Q.  Do you recall if there was any testimony as
21 to the effect of excluding student IDs on voting at
22 historically black colleges or universities?
23      A.  Say what, now?
24      Q.  Do you recall if there was any testimony
25 received during the consideration of SB 14 with

291

1  that -- as to the effect of excluding student IDs and
2  voting at historically black colleges or universities
3  in Texas?
4       A.  I don't recall.
5       Q.  Can you please refer back to --
6            MR. SHORDT:  Go off the record for just
7  one second.
8            (Off the record.)
9       Q.  (BY MR. SHORDT)  Senator, can you please turn
10 to Exhibit 27, which we just looked at a few minutes
11 ago with Ms. Maranzano.
12      A.  All right.
13      Q.  Do you recall an amendment -- sorry, I'll
14 direct your attention to page 123 at the top
15 right-hand side of the Senate Journal.
16      Do you recall an amendment offered by Senator
17 Ellis that would allow as an acceptable form of ID a
18 student identification card from a public university
19 in Texas that contains the person's photograph and has
20 not expired?
21      A.  No, and I don't see.  You're going to have to
22 give me --
23      Q.  If you look at page 123 -- it would be in the
24 top right-hand -- page 123 of the Journal.
25            MR. KEISTER:  Are we looking at the same

292

1  document?
2            MR. SHORDT:  I thought we were.
3            MS. DONNELLY:  Go by the JA.
4       A.  JA_001248?
5            MS. DONNELLY:  Yeah.
6       A.  Is that the same page?
7       Q.  (BY MR. SHORDT)  I'm using a different
8  version, but is Floor Amendment No. 19 on that?
9            MS. DONNELLY:  Yes.
10      A.  Yes, it is.
11      Q.  (BY MR. SHORDT)  And Floor Amendment No. 19,
12 as you look at Section 5, it states:  "for a person
13 who is a student at an accredited public university
14 located in the state of Texas, a student
15 identification card that contains the person's
16 photograph that has not expired issued to the person
17 by the institution of higher education."
18      Now, this amendment would not have permitted
19 student IDs from other states; is that correct?
20      A.  I can't tell without having a copy of the
21 bill that we were considering, because there's some
22 other portions besides the language that's being
23 added.  And I'm not sure what the effect of striking
24 "or" and following "expired" -- I don't know what the
25 effect of that was.

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

74 (Pages 293 to 296)

293

1      Now, with respect to that Subsection 5, it
2  says: "for a person who is a student at an accredited
3  public university located in the state of Texas, a
4  student identification card that contains the person's
5  photograph that has not expired issued to the person
6  by the institution of higher education."
7      That's all I can tell. I don't know, without
8  having the bill in front of me, when you insert that
9  language in, what the effect of it would be; because
10  I'm not sure where it's going, from what I see -- from
11  what -- the document that I have before me.
12  Q. And Senator Fraser moved to table this
13  amendment; is that right?
14  A. That's what it says.
15  Q. And you voted in favor of tabling?
16  A. That's what it says.
17  Q. I want to turn to a different issue, and I'm
18  going to show you -- well, let me start by asking,
19  during consideration of voter ID bills between 2009
20  and 2011, do you recall that bill supporters cited the
21  results of certain polls -- public opinion polls that
22  show Texas feelings about voter ID?
23  A. What are you asking me?
24  Q. Do you recall, during the consideration of
25  SB 14 or SB 362, that bill supporters often cited or

294

1  referred to public opinion polls that showed Texans'
2  views about the voter ID issue?
3  A. Yes. I know that there were a lot of polls
4  that were done that showed it was widely popular among
5  all ethnic groups and all groups along party lines.
6  It was -- it was an overwhelmingly popular
7  thing, and we polled it in my Senate district and
8  found similar results.
9  Q. Okay.
10  A. At some point, I'm not sure where, you know,
11  in --
12  Q. Right.
13  A. -- the consideration of those bills, but I
14  know it would have been something that we had looked
15  at.
16  Q. Okay. I'd like to show you -- we'll start --
17  because you mentioned in your district, and I think
18  you may have cited one poll, so...
19      (Williams Exhibit 29 marked/introduced.)
20  Q. (BY MR. SHORDT) Senator, I've shown you
21  what's marked as Exhibit 29.
22      Do you recognize this -- this poll?
23  A. No.
24  Q. Okay.
25      (Williams Exhibit 30 marked/introduced.)

295

1  Q. (BY MR. SHORDT) And I'm going to -- I'm going
2  to just give you three documents, because I want to
3  talk about them in tandem, so I think it would be
4  easier to cross-reference.
5      MR. SHORDT: Can you mark that one,
6  please.
7      (Williams Exhibit 31 marked/introduced.)
8      MS. DONNELLY: Counsel, 29 is marked as
9  "HIGHLY CONFIDENTIAL". I realize the entire
10  deposition is under seal, which is, for the record,
11  any questions and answers about 29 are covered by the
12  "highly confidential" designation.
13      Is that an agreement?
14      MR. SHORDT: Yes.
15      MS. DONNELLY: Thank you.
16      MR. SHORDT: But Exhibits 30 and 31 are
17  not marked "highly confidential."
18      MS. DONNELLY: Understood.
19  A. Do I have 30?
20  Q. (BY MR. SHORDT) Yes, sir.
21      So let's go in reverse order, Senator. If you
22  could look at Exhibit 31, what's been marked as
23  Exhibit 31?
24      Is this -- fair to say, it's a constituent
25  newsletter that you released --

296

1  A. It would appear that it is.
2  Q. -- fall of 2009?
3  I want to direct your attention to page --
4  page 3, which is, at the bottom, Bates labeled
5  LEG00000801.
6  In the middle, halfway down on the right-hand
7  side, there's a section labeled "Fighting Voter
8  Fraud."
9  A. Uh-huh.
10  Q. And it states: "Tommy fought long and hard
11  to get a Photo Voter ID bill passed in the Texas
12  Senate."
13  And then the next line is: "70 percent of
14  Texans agree with requiring voters to present photo
15  voter identification." And the source is June 2009,
16  University of Texas Government Department Statewide
17  Survey of Texas Public Opinion.
18  Senator, is it fair to say that you approved
19  this newsletter going out --
20  A. Yes.
21  Q. -- to your constituents?
22  And do you recall specifically discussing
23  this section with, I presume, the staffer who drafted
24  it on your behalf?
25  A. I do not.

TOMMY WILLIAMS                                          7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

75 (Pages 297 to 300)

297

1     Q.  But -- but this wouldn't have gone out to
2  your constituents unless you approved --
3     A.  That is correct.
4     Q.  Okay.  So I'd like to turn now to Exhibit 30,
5  which -- do you recognize the poll in Exhibit 30?
6     A.  I do not.
7     Q.  Do you see where, at the top, it says:
8  "Texas Politics Views on Proposed Voter ID Requirement
9  (June 2009)"?
10    A.  Yes, I see it now.
11    Q.  Do you think that it's fair to say that this
12 is the poll that is referenced in your constituent
13 newsletter?
14         MS. DONNELLY:  Objection.  Form.
15    A.  I don't know.  It could be.
16    Q.  (BY MR. SHORDT)  On the first page of this
17 poll, it says:  "Views on Proposed Voter ID
18 Requirement (June 2009)," percentages and a bar graph,
19 and 69 percent agree, 17 percent disagree.  Is
20 that -- is that accurate?
21    A.  I see -- what are you talking about, Exhibit
22 30?
23    Q.  Exhibit 30, yes, sir.
24    A.  Uh-huh.
25    Q.  So I will represent to you that page 4 -- if

298

1  you can turn to page 4?
2     A.  On what exhibit?
3     Q.  Sorry.  Exhibit 30.  I will represent -- and
4  I pulled this off of the Texas Politics website --
5  that this is the question that was asked for
6  respondents of this poll.  And if you can take a
7  second just to look over this short page, I have a
8  couple questions for you.
9     A.  Okay.  I've read it.
10    Q.  At the end -- well, sorry -- respondents were
11 asked -- and then it quotes the question, what was
12 read to the respondents, and the last sentence reads:
13 "Do you agree or disagree with the idea that
14 registered voters should be required to present a
15 government issued photo ID at the polls before they
16 can be allowed to vote?"  They were given three
17 choices:  "Agree," "Disagree," "Don't Know."
18 This question doesn't -- sorry.
19         Well, this question states a
20 government-issued photo ID was used; is that correct?
21    A.  That's what it says.
22    Q.  And it doesn't define or limit the term
23 "government-issued photo ID"; is that right?
24    A.  That's correct.
25    Q.  And SB 14 does not include all forms of

299

1  government-issued photo identification; is that right?
2     A.  Aha.
3     Q.  Is that enthusiastic "aha," a "yes," Senator?
4     A.  I can't believe we're sitting here at 6:30,
5  to have these kinds of inane questions asked of me, is
6  what I think.
7         Did you really go to law school?  This is
8  ridiculous.
9         MR. SHORDT:  Objection.  Nonresponsive.
10        Will you please answer the question?
11        MS. DONNELLY:  Can you rephrase, repeat
12 the question?
13        MR. SHORDT:  Can you please repeat the
14 question that I asked the Senator.
15        THE REPORTER:  "And SB 14 does not
16 include all forms of government-issued photo
17 identification; is that right?"
18    A.  That is -- that would appear to be correct.
19    Q.  (BY MR. SHORDT)  And there are more
20 government-issued IDs that are included in SB 14; is
21 that correct?
22    A.  That's true.
23    Q.  Is it fair to say that you don't know how any
24 single respondent to this poll interpreted, quote,
25 "government-issued photo ID"; is that correct?

300

1     A.  I think it speaks for itself.
2     Q.  That wasn't quite my question.
3         I asked if you know how any individual
4  interpreted the phrase "government-issued photo ID."
5     A.  I think -- I didn't write the question for
6  the poll.  It would appear to me that it has broad
7  support.  The legislature decided what that would
8  mean, not the pollster.
9         MR. SHORDT:  Okay.  I'll strike as
10 nonresponsive.
11    Q.  (BY MR. SHORDT)  Do you know how any
12 individual respondent to this poll interpreted the
13 phrase "government-issued photo ID"?
14    A.  No.
15    Q.  Do you know if a respondent understood
16 "government-issued photo ID" to mean a state
17 university ID?
18        MS. DONNELLY:  Objection.  Form.
19    A.  I don't know.
20    Q.  (BY MR. SHORDT)  Do you know if a respondent
21 understood the term "government-issued photo ID" to
22 mean a Medicare card issued by the United States
23 Government?
24    A.  I don't know.
25    Q.  Do you know if the term -- if a respondent

TOMMY WILLIAMS                                                    7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

76 (Pages 301 to 304)

301

1  understood the term "government-issued photo ID" to
2  mean a Texas state employee ID?
3       A.  I don't know.
4       Q.  I guess one of my questions is:  If the
5  polling suggested that the public supports use of a
6  government-issued photo ID, then why doesn't SB 14
7  include all government-issued photo IDs?
8            MR. KEISTER:  Object to form.
9            MS. DONNELLY:  Object to form.
10      A.  I don't think that -- I don't know how to
11  answer your question.  There was an extensive debate
12  about this, and it was decided.  My views on it, I've
13  made as clear as I possibly know how to make.  I
14  didn't decide whether I supported Senate Bill 14 or
15  not based on a poll that the University of Texas did.
16      Q.  (BY MR. SHORDT)  Do you recall other senators
17  using this poll and similar polls as justifying
18  support for SB 14?
19      A.  Some may have.  I do recall that --
20            MS. DONNELLY:  Please don't talk about
21  what other legislators relied upon, what they thought.
22  Please don't speculate.
23      A.  I don't know what they said.  But I think, if
24  you -- I think it would be relevant to go back and
25  look at my closing remarks in the Senate Journal on

302

1  the debate about the rule change.  It's relevant, and
2  I think I clearly said that I wasn't proposing a rule
3  change because of polling.  I think that it was
4  important to get the issue before the body, so...
5       Q.  (BY MR. SHORDT)  Then -- well, let me ask
6  this:  Why did you include the poll in your
7  constituent newsletter?
8       A.  I don't know.
9       Q.  You don't know why you included reference to
10  this poll in your constituent newsletter?
11      A.  No.  I mean, somebody wrote this for me, and
12  I would have said, "Is this true?"  They would have
13  shown me where it was true or not true, and I would
14  have said, "Okay.  This is fine."
15            (Williams Exhibits 32 and 33
16  marked/introduced.)
17      Q.  (BY MR. SHORDT)  Senator, you've been
18  handed --
19            MR. SHORDT:  Does everybody have a copy?
20            MR. KEISTER:  I don't, if you have an
21  extra.  If you don't, I will survive.
22      Q.  (BY MR. SHORDT)  Sir, you've been handed what
23  have been marked as Exhibits 32 and 33.
24      A.  No, I have an Exhibit 32 here.
25      Q.  Sorry.  Exhibit 33 is right there.

303

1       Have you seen either of those polls, Senator?
2            MR. SHORDT:  And for the record, Exhibit
3  32 is a Texas Politics Voter ID Law Support for
4  October 2012, and Exhibit 33 is Texas Politics Voter
5  Identification February 2011.
6       A.  I don't recall whether I've seen them before
7  or not.
8       Q.  (BY MR. SHORDT)  I will represent that the
9  question asked of the poll respondents is the exact
10  same for both polls.  It states:  "Do you agree or
11  disagree with the idea that registered voters should
12  be required to present a government-issued photo ID at
13  the polls before they can be allowed to vote?"
14       And I will also represent that is the exact
15  same question that was asked in the previous poll that
16  we discussed.
17       You earlier cited that this has been used to
18  support broad support among Texans across all minority
19  groups; is that -- is that fair?
20      A.  I think what I said is that it had broad
21  bipartisan support and was supported across ethnic
22  lines.
23      Q.  Would it surprise you to know that between
24  July 2008 and October 2012, the percentage of
25  African-American respondents to these polls agreeing

304

1  that registered voters should be required to present a
2  government-issued photo ID at the polls before they
3  can be allowed to vote dropped from 68 percent to 33
4  percent?
5       A.  I have no idea.  I don't know whether that's
6  true or not.
7       Q.  Do these polls -- if you can take a second to
8  look at them, is that what these polls represent or
9  reflect?
10            MS. DONNELLY:  Objection to the form of
11  the question.  It's confusing and vague.
12      Q.  (BY MR. SHORDT)  I'll point you to page -- on
13  Exhibit 32, page 4 shows the support among whites,
14  African-Americans and Hispanics.
15       And is it fair that -- is it true on Exhibit
16  32 that the support among African-Americans is
17  identified as 33 percent?
18            MR. KEISTER:  Object to form.
19       Is there some evidence this is what was
20  relied upon by the legislators?  If not, I'll object
21  it states facts not in evidence.
22       And, Counsel, my time shows that we're
23  at 7 hours.
24            MR. SHORDT:  There's a question pending.
25            MS. DONNELLY:  What is the question?

TOMMY WILLIAMS                                               7/29/2014
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

77 (Pages 305 to 308)

305

1          MR. SHORDT:  Can you read back the
2   question I asked, please.
3          THE REPORTER:  "I'll point you to
4   page -- on Exhibit 32, page 4 shows the support among
5   whites, African-Americans and Hispanics.
6          And is it fair that -- is it true on
7   Exhibit 32 that the support among African-Americans is
8   identified as 33 percent?"
9          MS. DONNELLY:  The document speaks for
10  itself.
11      A.  Yeah, I've never seen it before.  It says
12  that African-American -- it would appear -- and the
13  coloring of it is difficult for me to follow, the --
14  the color code on the bar charts -- that it would
15  appear that the African-American support was 33
16  percent, the Hispanic support was 75 percent, and the
17  Anglo support was 70 -- or white, as they say, is 71
18  percent.  In the previous poll, it was 80, 63 and 68.
19      Q.  (BY MR. SHORDT)  So is it fair to say that
20  African-American support dropped by 30 percent
21  between --
22          MS. DONNELLY:  No.
23          MR. KEISTER:  Object to form.
24          MS. DONNELLY:  Objection to the form of
25  the question.

306

1          MR. SHORDT:  Please don't testify for
2   your witness.
3          MS. DONNELLY:  I objected to the form of
4   the question.
5          MR. SHORDT:  You said "no."
6      A.  I don't know what it shows.  I mean, we
7   passed the law.  The poll had nothing to do with
8   whether the law was passed or not.  I mean...
9      Q.  (BY MR. SHORDT)  What do you mean, "the poll
10  had nothing to do with whether the law was passed or
11  not"?
12      A.  I -- I voted on this -- on the Senate Bill
13  14, because I thought it was good public policy.  It
14  was popular with voters, but it was good public
15  policy.
16          There are a lot of things that are popular
17  with voters that aren't necessarily good public
18  policy; and, you know, that's my job as a legislator,
19  to discern between the two of those things.
20          And I don't know what you're trying to prove
21  here, but I think the document speaks for itself.
22  It's not anything that I've ever seen before.  So I
23  don't know the veracity of what you're showing me.
24      Q.  So you never saw the June 2009 poll that was
25  cited in your constituent --

307

1      A.  No, I don't recall.
2          MS. DONNELLY:  Objection.  Asked and
3   answered.
4      A.  I've already answered that.  I don't know
5   whether I saw it or not.
6          MR. SHORDT:  Okay.  I have no further
7   questions.
8          MS. DONNELLY:  Thank you very much.
9          MR. KEISTER:  I'll reserve.
10         (Deposition concluded at 6:45 p.m.)

308

1              REPORTER CERTIFICATION
2   THE STATE OF TEXAS :
    COUNTY  OF HARRIS :
3
4       I, DENYCE SANDERS, a Certified Shorthand
    Reporter and Notary Public in and for the State of
5   Texas, do hereby certify that the facts as stated by
    me in the caption hereto are true; that the above and
6   foregoing answers of the witness, TOMMY WILLIAMS, to
    the interrogatories as indicated were made before me
7   by the said witness after being first duly sworn to
    testify the truth, and same were reduced to
8   typewriting under my direction; that the above and
    foregoing deposition as set forth in typewriting is a
9   full, true, and correct transcript of the proceedings
    had at the time of taking of said deposition.
10      I further certify that I am not, in any
    capacity, a regular employee of the party in whose
11  behalf this deposition is taken, nor in the regular
    employ of his attorney; and I certify that I am not
12  interested in the cause, nor of kin or counsel to
    either of the parties;
13
        That the amount of time used by each party at
14  the deposition is as follows:
15      MS. RUDD - 04:11:07
        MR. BRAZIL - 00:23:48
16      MR. SHORDT - 00:39:08
        MS. MARANZANO - 01:51:59
17
        GIVEN UNDER MY HAND AND SEAL OF OFFICE
18  this, the 31st day of July, 2014.
19
20      _____
        DENYCE SANDERS, CSR, RPR, CRR, TCRR
21      Notary Public in and for
        Harris County, T E X A S
22
    My Commission Expires:  4-14-17
23  Certification No.:  4038
    Expiration Date:  12-31-15
24  U.S. LEGAL Support, Inc./Firm No. 122
    363 N. Sam Houston Parkway, 12th Floor,
25  Houston, Texas  77060; 713.653.7100

SHERRI ZGABAY                                                    6/9/2014

1 (Pages 1 to 4)

---

**Page 1**

```
1              IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                  CORPUS CHRISTI DIVISION
3   MARC VEASEY, et al.,         )
              Plaintiffs,        )
4                                )
    v.                           ) Civil Action
5                                ) No. 2:13-cv-193(NGR)
    RICK PERRY, et al.,          )
6              Defendants.       )
    _____)
7                                )
    UNITED STATES OF AMERICA,    )
8              Plaintiff,        )
                                 )
9   TEXAS LEAGUE OF YOUNG        )
    VOTERS EDUCATION FUND,       )
10  et al.,                      )
                                 )
11             Plaintiff-        ) Civil Action
               Intervenors,      ) No. 2:13-cv-263(NGR)
12                               )
    TEXAS ASSOCIATION OF         )
13  HISPANIC COUNTY JUDGES AND   )
    COUNTY COMMISSIONERS,        )
14  et al.,                      )
               Plaintiff-        )
15             Intervenors,      )
                                 )
16  v.                           )
                                 )
17  STATE OF TEXAS, et al.,      )
               Defendants.       )
18  _____)
19
20  *********************************************
21              ORAL DEPOSITION OF
22               SHERRI ZGABAY
23                JUNE 9, 2014
24  *********************************************
25      ORAL DEPOSITION OF SHERRI ZGABAY, produced as a
```

---

**Page 2**

1   witness at the instance of Plaintiffs, and duly sworn,

2   was taken in the above-styled and numbered cause on

3   June 9, 2014, from 1:03 p.m. to 2:21 p.m. before

4   Kim Seibert, CSR in and for the State of Texas,

5   reported by machine shorthand, at the law offices of

6   DECHERT LLP, 300 West Sixth Street, Suite 2010, Austin,

7   Texas, pursuant to the Federal Rules of Civil Procedure

8   and/or the provisions stated on the record or attached

9   hereto.

---

**Page 3**

```
1                    A P P E A R A N C E S
2
3   FOR PLAINTIFF UNITED STATES OF AMERICA:
      Ms. Jennifer L. Maranzano (By Telephone)
4     U.S. DEPARTMENT OF JUSTICE
      Civil Rights Division
5     950 Pennsylvania Avenue, NW
      NWB Room 7254
6     Washington, DC  20530
      (202) 305-4355
7     jennifer.maranzano@usdoj.gov
8
    FOR THE VEASEY PLAINTIFFS:
9     Mr. K. Scott Brazil
      BRAZIL & DUNN, LLP
10    4201 Cypress Creek Parkway
      Suite 530
11    Houston, Texas  77068
      (281) 380-6310
12    scott@brazilanddunn.com
13
    FOR THE DEFENDANTS:
14    Mr. S. Ronald Keister
      OFFICE OF THE ATTORNEY GENERAL OF TEXAS
15    P.O. Box 12548
      Austin, Texas  78711
16    (512) 463-2197
      ronny.keister@oag.state.tx.us
17
18  ALSO PRESENT:
      Ms. Kathleen T. Murphy-Darveau
19    TEXAS DEPARTMENT OF PUBLIC SAFETY
      5805 North Lamar Boulevard
20    Austin, Texas  78752
      (512) 424-2420
21    kathleen.murphy@dps.texas.gov
22
    REPORTED BY:
23    Kim Seibert, CSR, RPR
      U.S. Legal Support, Inc.
24    Austin Centre
      701 Brazos, Suite 380
25    Austin, Texas  78701
```

---

**Page 4**

```
1                        INDEX
2   Appearances................................
3
4   SHERRI ZGABAY
5   Examination by Mr. Brazil.................    5
    Examination by Ms. Maranzano.............   43
6   Witness' Signature Page..................   55
    Reporter's Certificate...................   57
7
8
9                      EXHIBITS
10
    NUMBER        DESCRIPTION              PAGE
11  Exhibit 142   ...................   33
                  Fee Table
12  Exhibit 143   ...................   34
                  First Page of On-Line
13  Exhibit 144   ...................   36      Application
                  Continuation of Introduction for
14                On-Line Application
                  Process
15  Exhibit 145   ...................   42
                  Application from Website
16  Exhibit 146   ...................   37
                  Instructions for Law Enforcement
17                Officer Submitting
                  Documentation Asking to
18                Initiate Revocation
                  Action Because
19                Individual No Longer
                  Meets the Criteria to
20                Hold a Concealed
                  Handgun License
21  Exhibit 147   ...................   40
                  House Bill 698
22
23
24
25
```

---

SHERRI ZGABAY                                                        6/9/2014

---

5

1      (Exhibit Nos. 142 through 147 marked.)
2              SHERRI ZGABAY,
3      having been first duly sworn, testified as follows:
4              EXAMINATION
5  BY MR. BRAZIL:
6      Q.  Good afternoon.
7      A.  Hello.
8      Q.  Would you state you full name, please.
9      A.  My name is Sherri Zgabay.
10     Q.  Would you spell your last name?
11     A.  Z-g-a-b-a-y.
12     Q.  Have you ever given your deposition before?
13     A.  I have given one deposition in my lifetime.
14     Q.  So you understand the nature of this
15  proceeding?
16     A.  Yes, I do.
17     Q.  All right.  Just a couple of rules.  I'll
18  remind you throughout the process if -- let me finish
19  my question before you give an answer.  That way the
20  court reporter can take down a full question and a full
21  answer.  And say "yes" or "no" or give verbal responses
22  rather than a nod of the head.  Fair enough?
23     A.  Fair enough.
24     Q.  If you do not understand one of my questions
25  for any reason, just say, "Scott, stop, back up,

---

6

1  rephrase," whatever.  Fair enough?
2      A.  Fair enough.
3      Q.  How are you currently employed?
4      A.  I am the manager with the licensing and
5  registration service with the Texas Department of
6  Public Safety.
7      Q.  How long have you held that position?
8      A.  I have been in this particular position since
9  August of 2010 -- July of 2010.  Excuse me.
10     Q.  And before that, how were you employed?
11     A.  I began working at the Department of Public
12  Safety in July of 1987.
13     Q.  Have you always been in that area or that
14  division?
15     A.  No, sir.  I've worked in a number of different
16  positions within the department.
17     Q.  Okay.  What do you currently do in your
18  current position?
19     A.  In my current position, I am the manager for
20  the licensing area.  Our responsibilities are to
21  process all incoming applications for various different
22  types of licensure that the department regulates.
23     Q.  Such as?  What are some of those?
24     A.  Concealed handgun is one, private security,
25  ignition interlock.

---

7

1      Q.  I'm sorry?
2      A.  Ignition interlock.  We also have controlled
3  substances, capitol access pass, metals registration.
4      Q.  What was the last one?
5      A.  Metals registration.
6      Q.  Metal?
7      A.  Metals.
8      Q.  You have to explain that one.
9      A.  Metals registration are companies that
10  purchase recycled metal, and they must be licensed by
11  the State of Texas to do so.
12     Q.  Okay.  And capitol access, I assume you mean
13  access to the capitol?
14     A.  Yes, sir.
15     Q.  Certain restricted areas?
16     A.  It's not a restricted area.  Capitol access is
17  a program specifically designated by statute that
18  allows individuals to go through a particular line at
19  the capitol.  They have the same access that any other
20  customer has; they just have a different entrance line.
21     Q.  And why would they apply for that type of
22  license?  What benefit do they receive?
23     A.  The benefit is, you do not have to go through
24  the same longer lines that have metal detectors.
25     Q.  You skip some of the security?

---

8

1      A.  Well, your security is done in advance.
2      Q.  Okay.  Controlled substance license, that's
3  someone who handles controlled substances, --
4      A.  Those are --
5      Q.  -- like a pharmacy?
6      A.  Yes, sir.  Pharmacies, physicians,
7  veterinarians, anyone that is going to dispense,
8  distribute, manufacture, or write prescriptions for
9  controlled substances.
10     Q.  Ignition interlock?
11     A.  Ignition --
12     Q.  Why someone need a license for one of
13  those?
14     A.  Well, our role is to actually certify or
15  authorize the service center or the vendor that
16  installs the ignition interlock device.
17     Q.  So if a court orders someone to have that
18  installed on their car as a result of a DWI, DPS
19  licenses the company that would install that device?
20     A.  We license the vendor that would install that
21  device, the facility.
22     Q.  Okay.  And private security would be -- is
23  that the same as a private investigator's license?
24     A.  It would include private investigator,
25  commissioned/noncommissioned guards, alarm installers,

---

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
(800) 734-4995

SHERRI ZGABAY                                                    6/9/2014

---

**9**

1    locksmiths.  There's a myriad of professionals in that
2    particular industry that must be licensed.
3        Q.  Okay.  And then the other area was, obviously,
4    concealed handgun?
5        A.  Yes, sir.
6        Q.  All right.  Do the other areas that we just
7    spoke of, capitol access and metal -- metal regulation,
8    do they -- does the DPS issue photo IDs to those
9    entities or those persons?
10       A.  The other programs that I mentioned do not
11   have photo identification cards of any sort issued.
12   They're issued a certificate, say, paper form without a
13   photo to conduct business, with the exception of
14   private security.
15       Q.  Okay.  I was just about -- and the private
16   security area, they do receive a photo -- photo
17   identification type card?
18       A.  They receive a card.  It's referenced as a
19   pocket card, and it is used in a limited capacity.  It
20   does have the photo on it, produced on the actual
21   laminated card.
22       Q.  To your knowledge, can they use that as a
23   photo ID to vote?
24       A.  I am not aware that that can be used as an
25   identification document for voting.

---

**10**

1        Q.  Can they board a plane using that ID?
2        A.  I do not know if they can use that to board a
3    plane.
4        Q.  Okay.  All right.  Let's talk about the
5    concealed handgun process in Texas.  What is, just
6    generally, the application process to obtain a
7    concealed handgun license in Texas?
8        A.  The application process allows individuals to
9    submit an application either on-line or a paper
10   application that can be mailed or delivered to the
11   department headquarters in Austin.  There is a fee
12   associated with the application.  Each individual must
13   provide different forms of documents depending on their
14   particular situation or scenario.  And in some cases
15   they are required to provide proof that they have
16   attended a training class.
17       Q.  Okay.  Are fingerprints required?
18       A.  Yes, sir.  That is additionally part of the
19   application process.  The department -- upon receipt of
20   the application, we will conduct a full background
21   check on the individuals.  They must submit electronic
22   fingerprints as a condition or part of the application
23   process.
24       Q.  Do you have to be a Texas resident to receive
25   a Texas CHL?

---

**11**

1        A.  No, sir.
2        Q.  If I'm a resident of Louisiana, what would the
3    application process be like for me?  What additional
4    information would be required?
5        A.  The application process for a -- an
6    out-of-state resident is very similar to the
7    application process for a resident of Texas.
8    Out-of-state applicants will be asked to provide a copy
9    of their out-of-state DAR license or identification as
10   well as two passport-style photos to use for the
11   production of the actual card.
12       Q.  Okay.  And they will also be required to
13   submit fingerprints?
14       A.  Yes, sir.  They must still submit the
15   fingerprints, applicable fees, and any applicable
16   supporting documents.
17       Q.  And those -- and they will undergo a
18   background check as well?
19       A.  Correct, yes, sir.
20       Q.  Okay.  Does Texas have a reciprocity with
21   other states?
22       A.  We do have reciprocity with other states.
23       Q.  If I -- can you just name one state that we
24   do?
25       A.  Certainly.  New Mexico.

---

**12**

1        Q.  Okay.  If I hold a CHL from New Mexico, can I
2    also apply for a CHL in Texas?
3        A.  Yes.
4        Q.  And is there any difference in the application
5    process since I already hold one from a -- from
6    New Mexico?
7        A.  No, sir, there is no difference in the
8    application process based on whether or not the
9    individual currently holds a concealed handgun license
10   from another state.
11       Q.  All right.  So it's the same?
12       A.  Exactly the same.
13       Q.  Okay.  But the reciprocity just allows me to
14   carry a concealed handgun in Texas using the New Mexico
15   concealed handgun license?
16       A.  Yes.
17       Q.  Okay.  Do I have to do a -- go through a
18   registration process in Texas?  If I -- if I move to
19   Texas from New Mexico and I have the CHL from
20   New Mexico, do I need to do something to transfer that
21   to Texas?
22       A.  No, sir.
23       Q.  Okay.  So when it expires in New Mexico, then
24   it expires period?
25       A.  Correct.

---

SHERRI ZGABAY                                                          6/9/2014

4 (Pages 13 to 16)

---

13

1      Q.   Okay.  Do you have to be a US citizen to get a
2   concealed handgun license in Texas?
3      A.   No, sir, you do not.
4      Q.   So there's no requirement that I submit proof
5   of US citizenship to get a CHL?
6      A.   We do require the individual to provide either
7   proof of citizenship or proof that the individual is
8   legally in this country.
9      Q.   Okay.  So you either have to be a US citizen
10   or you have to be here legally to obtain a CHL in
11   Texas?
12      A.   That is correct.
13      Q.   Okay.  And what proof or documents would I
14   need to show the DPS to meet those requirements or to
15   meet that requirement?
16      A.   The application asks that the individual
17   provide us with information about their country of
18   birth.  And if the individual indicates that they were
19   born -- a US-born citizen we do not ask for any
20   additional documentation.
21      Q.   Okay.  So if I complete a CHL today in June
22   of 2014, a CHL application, and I check that I am a
23   US-born citizen, no additional information is required?
24      A.   If you indicate that you were born in the
25   United States by listing your place of birth as being

---

15

1   background information is generally obtained -- or not
2   generally.  It is obtained from various sources.  So it
3   would be dependent upon those sources, including some
4   of the FBI records.  And I can't really speak to what
5   specifically would be contained in those.
6      Q.   Okay.  That was my next question.  Generally,
7   what sources do -- does the DPS obtain their background
8   check information?
9      A.   We have two primary sources, several
10   secondary.  But the two primary are the criminal
11   history in Texas and the federal or FBI background
12   check, which includes criminal history and other
13   relevant information for the purchase, sale, possession
14   of a firearm or ammunition under the Brady Act.
15      Q.   And you said there were some secondary
16   sources?
17      A.   Well, the secondary sources would -- an
18   example of that would be an individual in Texas must
19   be -- cannot be delinquent -- finally delinquent in
20   payment of child support.  So that isn't a criminal act
21   necessarily as far as a conviction, but there are some
22   other types of things that we're required to conduct
23   activities specifically that we're required to conduct
24   background check on.
25      Q.   Okay.  Other than child support, can you think

---

14

1   in the US.  We don't have a specific question asking if
2   the individual is a US-born citizen.  We are able to
3   determine that by the place of birth.
4      Q.   Okay.  So if I indicate a place of birth that
5   indicates I'm a US citizen, no other information is
6   required by DPS?
7      A.   That is correct.
8      Q.   What if I misrepresent that; I checked I was
9   born in Boston or, you know, in Fayetteville, Arkansas?
10   Do you do anything to verify that?
11      A.   Well, we conduct a complete background check,
12   including a federal background check, and any
13   misrepresentation or information that we determine on
14   an applicant is fraudulent would be grounds for denial
15   of that application.
16      Q.   Okay.  So you do check to see if, in fact,
17   that applicant is a US citizen by doing the background
18   check?
19      A.   The background check may contain information
20   that would indicate if the person is a US citizen or
21   not.
22      Q.   Okay.  Could the background check not indicate
23   either way?
24      A.   I would have to think about that.  I'm not
25   certain that I can really answer that, because the

---

16

1   of any others?
2      A.   Yes.  Actually, individuals also must be
3   qualified to safely possess or handle a firearm.  And
4   there are some specific psychiatric requirements,
5   medical, those types of things.
6      Q.   Okay.  Child support, medical.  Any others
7   that are noncriminal that you can think of?
8      A.   I can't think of any off the top of my head.
9      Q.   Fair enough.  And the criminal history check
10   for Texas, that's -- that's maintained by DPS?
11      A.   Yes, sir, it is.
12      Q.   Okay.  And then you said there was a federal
13   or the FBI criminal database?
14      A.   Correct.
15      Q.   Okay.  If someone were, let's say -- well,
16   first of all, how old do you have to be in Texas to
17   obtain a CHL?
18      A.   The law requires an individual to be at least
19   21 years of age unless the individual meets the
20   exceptions under military, which is 18.
21      Q.   Okay.  Let's say someone applies at age 21 for
22   a CHL in Texas and has never been in trouble in any
23   state and you do a background check, would it indicate
24   to you where that person was born, or do you know?  If
25   you don't know, just say you don't know.

---

SHERRI ZGABAY                                                    6/9/2014

5 (Pages 17 to 20)

---

**17**

1    A.  I don't know.
2    Q.  Okay.
3    A.  In thinking about it, I don't know.
4    Q.  Okay.  So I -- you do not need a Texas
5    driver's license to apply for a Texas CHL?
6    A.  That is correct.
7    Q.  Okay.  And there is no specific requirement
8    that I or that someone applying for a CHL provide a
9    birth -- certified copy of their birth certificate or
10   passport, anything of that sort?
11   A.  I'm sorry.  Restate that question one more
12   time, please.
13   Q.  Sure.  When someone applies for a CHL in
14   Texas, there's no requirement by DPS that they provide
15   a certified copy of their birth certificate or a copy
16   of their passport, anything of that sort?
17   A.  There are circumstances where we would ask for
18   those types of documents.  It is truly specific to each
19   individual and what types of information they provided
20   on the application.  And in the course of the
21   background check we may be required -- it may be
22   necessary to obtain additional information.  So I can't
23   say absolutely, no, we would never ask for those
24   things.  But those are not items that we would ask for
25   in the normal course of an application.

---

**18**

1    Q.  All right.  If I am a temporary resident, like
2    I'm a student here on a student visa or something, can
3    I obtain a CHL?
4    A.  The individual may obtain a CHL if they are a
5    temporary -- as you stated, such as a student, provided
6    that they meet the qualifications to possess a firearm.
7    They must be federally qualified to possess a firearm.
8    Q.  If I am a nonresident, noncitizen, can I apply
9    for a CHL?
10   A.  Let me say this.  Nonresident, noncitizen?
11   Q.  Right.  I'm not a resident of Texas.  I'm not
12   a US citizen.  Can I apply for a CHL?
13   A.  Yes, provided that the person meets all of the
14   background requirements, including federally qualified
15   to possess a firearm.
16   Q.  But what if I'm not born in the United States?
17   Can I still possess a -- or obtain a CHL?
18   A.  Yes, provided they meet the requirements for
19   possessing a firearm.  You must be federally qualified
20   to possess the firearm.
21   Q.  Okay.  And being federally qualified means I
22   have to be a US citizen or a legal resident?
23   A.  No.
24   Q.  Okay.  So just so I'm clear -- I want to move
25   on.

---

**19**

1    A.  Sure.
2    Q.  So in Texas you can obtain a CHL without being
3    a US citizen and without being a legal resident?
4    A.  You do not have to be a legal resident.  You
5    just must be legally in this country.  You could be a
6    legal visitor.
7    Q.  Of some sort?
8    A.  Of -- correct.
9    Q.  Okay.  And how long is a CHL?  What's the
10   term, four years?
11   A.  It is four years for the initial CHL, and then
12   it becomes a five-year renewal cycle after that.
13   Q.  Okay.  Is the renewal -- can that be done
14   on-line?
15   A.  Yes, sir.
16   Q.  Is there a time period or a renewal that has
17   to be done in person?
18   A.  There is no renewal that has to be conducted
19   in person.  The first part of your question, I believe,
20   was a timeframe?
21   Q.  Yes.  For example, for a driver's license you
22   have to go in every so many renewals.  I don't remember
23   how many.  Is it the same for CHL, or can you just
24   continue to renew on-line?
25   A.  No, you can continue to renew on-line.

---

**20**

1    Q.  When you first obtain a CHL, it's four years;
2    after that, it's five-year renewals?
3    A.  Yes, sir.
4    Q.  Okay.  Is there only one type of CHL for the
5    public?
6    A.  You may have to clarify.  What do you mean by
7    that?
8    Q.  Well, I understand you can qualify with an
9    automatic or with a revolver.  But other than that, is
10   a CHL for a member of the public -- there's just one
11   type?
12   A.  There is only one type of concealed handgun
13   license.
14   Q.  All right.  Is the one that's issued for the
15   private investigators and the private security, is it
16   the same as the CHL that a member of the public would
17   carry?
18   A.  No.  No.
19   Q.  All right.  Because their -- their license
20   allows them to display the weapon, I assume?
21   A.  Under the Private Security Act versus
22   concealed handgun, there are some commissioned -- as
23   defined in statute, commissioned private security
24   pocket cards or registrations, as you would call them.
25   And those allow those individuals to carry some

---

SHERRI ZGABAY                                                    6/9/2014

6 (Pages 21 to 24)

---

21

1 concealed, some not concealed, but in a different
2 manner and completely different laws for those
3 individuals versus the laws specific for concealed
4 carry.
5    Q.  Okay.  But the member of the public that
6 receives a concealed handgun license, the only
7 difference would be either revolver or -- I forget how
8 it's designated; all types.  I don't remember.
9    A.  Well, that used to be the case, yes, sir.
10 But --
11    Q.  Has that changed?
12    A.  That did change in June of 2013.  New
13 legislation passed that category or weapon type is --
14 you're referring to semi-auto or non-semi-auto, also
15 known as revolver, is no longer applicable.
16    Q.  So once you qualify, you qualify?
17    A.  That is correct.
18    Q.  Okay.  So before that, you had to -- if you
19 qualified with a revolver, that's all you could carry.
20 You're saying now you can qualify with either an
21 automatic or a semiautomatic or a revolver and carry
22 either?
23    A.  That's correct.
24    Q.  Who maintains the database for all the CHLs in
25 Texas?  Is that DPS?

---

22

1    A.  The department maintains that database, yes,
2 sir.
3    Q.  Is that a separate database, separate and
4 apart from the driver's license database?
5    A.  Yes, it is.
6    Q.  Okay.  And do you currently know approximately
7 how many individuals hold a Texas CHL?
8    A.  There are just over 750,000 active.  I don't
9 have the specific number off the top of my head, but
10 it's been just over 756,000, I believe, and some change
11 in the last couple of weeks.
12    Q.  Okay.  And how many of those approximately
13 750,000 individuals hold a Texas driver's license?
14    A.  I do not know those numbers.
15    Q.  How many of them are non-Texas residents?
16    A.  I also do not know how many are non-Texas
17 residents.
18    Q.  How many of them are here in the United States
19 legally?
20    A.  I'm sorry.  Repeat that one more time.
21    Q.  How many of those or what percentage of those
22 are here in the United States under some kind of, you
23 know, work visa or student visa, something like that;
24 do you know?
25    A.  I don't have those, no, sir.

---

23

1    Q.  Is that database searchable?
2    A.  The database is searchable for certain
3 criteria for some things.
4    Q.  Can you search it by age, race?  What are the
5 categories or what are the search areas?
6    A.  There are a few that are statutorily mandated,
7 such as those that you spoke to.  There are statistical
8 reports available that we produce as part of a
9 statutory requirement.  Age, county, zip code, sex,
10 and, I believe, race.  There are four reports to --
11 four different reports that we produce and one of them
12 a dual category.
13    Q.  And who is that report -- or who are those
14 reports produced for or to?
15    A.  They're made available for the general public
16 on-line.
17    Q.  What are the circumstances under which a CHL
18 will be suspended or revoked?
19    A.  Certainly.  There are a number of different
20 circumstances that could apply for suspension or
21 revocation.  Suspension is generally the first type of
22 enforcement action -- administrative enforcement action
23 the department would take.  And those are based upon
24 notification that the individual meets a specific
25 criteria outlined by statute that meets the

---

24

1 qualification or the criteria to be suspended.
2       An example of that would be DWI.  If a
3 person were arrested and charged with a Class B
4 misdemeanor such as a DWI, then that would --
5 individual would be subject for a suspension of their
6 concealed handgun license.
7    Q.  They would -- would they be sent a letter that
8 says your license is suspended or will be suspended in
9 X number of days?
10    A.  Yes, sir.  Standard rules, civil practice, I
11 believe, is the reference to it, are applied.  We are
12 required statutorily to submit written notice to the
13 individual advising that suspension action is being
14 initiated.  The individual has the opportunity to
15 request an administrative hearing within, of course, a
16 certain timeframe.  And those hearings are held before
17 a justice of the peace court in the county where the
18 person resides.
19    Q.  And that's under the suspension category?
20    A.  Correct.
21    Q.  What other types of activities would result in
22 a suspension?
23    A.  Suspension -- to be quite honest, off the top
24 of my head, the ones that come to mind the most are
25 those that charged with a particular offense.

---

25

1  There are a few others. I cannot call them off the top
2  of my head specifically of the exact reasons.
3       Q. What about delinquent child support?
4       A. Delinquent child support would fall, I
5  believe, more in the category of revocation. The
6  suspension and revocation are very close to the same,
7  so -- I don't want to speak out of turn without the
8  statute in front of me to refresh my memory on which
9  specific one falls in which category. The difference
10 between the two are generally the suspension has a
11 specific timeframe, and the revocation may not,
12 depending on how long that -- or I have it backwards.
13 Excuse me.
14       The revocation has a specific timeframe
15 and the suspension is generally, for example, pending
16 the outcome of a disposition.
17       Q. So if they get a notice of revocation, that
18 means their license has been revoked?
19       A. The procedure is the same for a notice of
20 revocation. The individual is notified by certified
21 mail that the department is initiating a revocation
22 action. The person also has the opportunity to request
23 an administrative hearing. The procedure is very
24 similar, just the elements of the case may be slightly
25 different.

26

1       Q. Okay. When would the -- or strike that.
2            What -- what circumstances would result
3  in a law enforcement officer confiscating a CHL, taking
4  physical possession of a CHL?
5       A. Repeat the question one more time.
6       Q. Sure. Is there a time when you're stopped for
7  a traffic violation, you go into a DPS office, that
8  you -- any time you've used or show your CHL, is there
9  a time when the officer, whether it be a trooper or
10 local law enforcement officer, would confiscate or take
11 possession of that CHL?
12       A. In the situation of a traffic stop, the
13 officer may have the CHL in his or her possession. I
14 believe the statute specifically says that the officer
15 may ask for the individual to surrender the CHL in
16 limited circumstances, specifically when that person is
17 being arrested.
18       Q. Okay. Is there a time when a traffic citation
19 is issued and the officer would take possession of the
20 CHL because it's -- had been revoked or had -- was in
21 suspension, or do you know?
22       A. I do not know.
23       Q. Okay.
24       A. Probably be more appropriate to the specific
25 law enforcement agency that makes that stop.

27

1       Q. Does DPS ever send out a letter either as a
2  suspension or a revocation matter and request that the
3  CHL be returned to DPS?
4       A. Yes.
5       Q. Okay. So that is part of the process, is that
6  you request that they return that CHL?
7       A. Once the -- the final action is taken and the
8  suspension or revocation goes into effect, the
9  individual is instructed in that written correspondence
10 to return the license to the department.
11      Q. What happens if that individual does not
12 return the CHL?
13      A. The statute provides the department with some
14 guidance, authority, to take additional enforcement
15 action against the individual. And that's -- that's
16 the only one that I can recall off the top of my head.
17      Q. Okay. Does that mean there's a criminal
18 penalty associated with not returning the CHL?
19      A. I'm not familiar whether there is a criminal
20 penalty attached to that or not.
21      Q. Okay. And that request to return the CHL is
22 only after a final action has occurred? I mean, while
23 the license is in suspension, I assume they keep
24 possession of it?
25      A. Say that one more time.

28

1       Q. Sure. The only time that it's asked -- the
2  only time that DPS asks someone to return the CHL is
3  when there's a final disposition of the CHL?
4       A. We ask the individual to return the CHL or
5  surrender the concealed handgun license when we are
6  initiating action. If the person requests a hearing
7  that stays the action pending the outcome of the
8  administrative hearing, then the individual is not
9  required to return the license or to surrender it until
10 the disposition of that administrative hearing.
11      Q. If they do not require -- strike that.
12           If they do not request a hearing when
13 they get a suspension letter, then when that becomes
14 final DPS requests it back?
15      A. The -- it's included all in the same letter.
16      Q. Okay. So if it's --
17      A. If you choose not to request a hearing, please
18 surrender your license within -- and it gives a
19 specific timeframe.
20      Q. Okay. Do you know if during a traffic stop
21 when the officer takes your license and runs it through
22 whatever database, does it show whether or not that
23 person carries a concealed handgun or has a CHL by just
24 using my driver's license?
25      A. Yes. When the officer conducts the traffic

SHERRI ZGABAY                                                            6/9/2014

---

29

1    stop in that scenario you've given, then, yes, the
2    officer will be -- receive in the return as you spoke
3    to whether or not the person is a licensed concealed
4    holder in Texas.
5        Q.  Just by virtue of my driver's license?
6        A.  I can't say by virtue of your driver license,
7    because --
8        Q.  You know, they go back to their computer and
9    they type --
10       A.  Right.
11       Q.  -- in your driver's license number --
12       A.  But sometimes that's not by license number;
13   it's by your name.
14       Q.  Okay.  They put in my name, they put in my
15   driver's license name.  Does it come up on their screen
16   that I have a CHL?
17       A.  When the officer can -- I guess, more
18   appropriately, when the officer conducts the -- the
19   traffic stop and runs the person's information, whether
20   it be their driver license number, whether it be their
21   name and date of birth for somebody who may not have
22   their driver license on them at the time, based on the
23   information provided by the person who has been
24   stopped, the officer will be provided information as to
25   whether or not that individual has a concealed handgun

---

30

1    license in Texas.
2        Q.  Okay.  Even though they have separate numbers
3    and they're separate cards?
4        A.  Yes, sir.
5        Q.  Okay.  Is there a process in the future where
6    those are going to be combined?
7        A.  I'm not aware of a process in the future where
8    those would be combined.
9        Q.  Do you know why they're not combined?
10       A.  I do know the reason they're not combined.
11   It's because the statute doesn't provide for that.  It
12   specifically provides for -- in my case in concealed
13   handguns, specifically a card to be issued for
14   concealed handgun.
15       Q.  Is it because they're getting a driver's
16   license and getting a concealed handgun license require
17   different types of documentation and information, or do
18   you know?
19       A.  I do not know why the statute was crafted in
20   the manner that it was.
21       Q.  How long does it take once the application is
22   received by DPS to issue a CHL?
23       A.  The timeframe can vary based on the applicant
24   and the -- any additional information that might be
25   required from the background investigation.  But the

---

31

1    statute does require that if no additional background
2    review is required, the department must issue the
3    original license within 60 days and renewals within
4    45 days.  And we are currently meeting those statutory
5    requirements.
6        Q.  If additional information is required, does
7    that extend that time period?
8        A.  Yes, sir.  The statute provides for an
9    additional 180 days.
10       Q.  Is the person notified of the problem that
11   is -- or the reason there's a delay?
12       A.  Yes.
13       Q.  Okay.  Can you use a Texas personal
14   identification card to obtain a CHL?
15       A.  Yes.
16       Q.  The CHL database, is it merged at any point or
17   compared with the driver's license database?
18       A.  No, sir.
19       Q.  But the CHL database would indicate how many
20   CHL holders are also holders of Texas driver's license?
21       A.  No, sir, not necessarily.
22       Q.  Okay.  I thought you said earlier when I was
23   going through the categories that it would tell me how
24   many of those 750,000 held Texas driver's licenses.
25       A.  It tells you their age, their race, their sex,

---

32

1    the county of residence or the ZIP code of the county
2    of residence or the ZIP code of where the individual
3    lives, but it doesn't contain specific reports that we
4    produce that give you individuals with a Texas driver
5    license versus the out-of-state driver license.  Those
6    are not reports that we specifically produce, if I'm
7    understanding your question correctly.
8        Q.  Yes and no.
9        A.  Okay.
10       Q.  I understand your answer.  My question is, can
11   you run a search to determine how many of the
12   approximately 750,000 CHL holders also have a Texas
13   driver's license?
14       A.  I can -- I know that we can query the system
15   to determine how many of the concealed handgun licenses
16   contain a Texas driver license number or Texas ID card
17   number or an out-of-state number, but I cannot tell you
18   how many of those are valid numbers at any given time
19   because we don't -- the two databases do not interface.
20       Q.  And when you say "valid," do you mean you
21   would not know if the Texas driver's license for some
22   of the 750,000 had expired?
23       A.  That would be correct.
24       Q.  Because you don't merge the two?
25       A.  Correct.

---

SHERRI ZGABAY                                                6/9/2014

---

**33**

1      Q.  Okay.
2          MR. BRAZIL:  What's the next one, 140 --
3   let's see here.
4          THE REPORTER:  142.
5          MR. BRAZIL:  Huh?
6          THE REPORTER:  142.
7          MR. BRAZIL:  142 sounds good to me.
8          THE REPORTER:  Didn't you already mark
9   it?
10         MR. BRAZIL:  Okay.
11     Q.  (BY MR. BRAZIL)  I show you what has been
12  marked as 142 --
13     A.  Okay.
14     Q.  -- and ask you to identify that, please.  It's
15  right there.
16     A.  This particular document is the fee table,
17  sometimes referenced as fee chart.  It is a document
18  that we have available for customers on our on-line --
19  on our website.
20     Q.  This is the different types of fees for the
21  different types of concealed handgun licenses?
22     A.  There's -- there's only one type of license,
23  but each of these represents different discounts that a
24  customer might receive when they apply for their
25  concealed handgun license.

---

**34**

1      Q.  Okay.  And this is from the website and also,
2   I assume, available in paper form?
3      A.  Yes.
4      Q.  Okay.  Is there any waiver of any of these
5   fees for someone who is below a certain income level or
6   at a certain poverty level?
7      A.  Yes.  One of the specific conditions -- these
8   are often referenced as a special condition either by
9   rule or statute.  One of them is indigence,
10  specifically listed in the statute as a reduced cost, a
11  reduced fee to the individual if they fall below or
12  they're at the poverty level set forth in the federal
13  guidelines.
14     Q.  Okay.  Let me show you 143.
15     A.  Yes, sir.
16     Q.  And 143 is from the website?
17     A.  Yes, sir.
18     Q.  And this is -- what would you call this, the
19  face page or the introductory page?
20     A.  This is the first page an applicant will see
21  when they are beginning the process for an on-line
22  application.
23     Q.  Okay.  And just so Jennifer will know -- she's
24  on the phone here.  This is Page 1 of 1 at the bottom;
25  is that correct?

---

**35**

1          MS. MARANZANO:  Okay.
2      Q.  (BY MR. BRAZIL)  Is that correct?  I need a
3   yes from you.
4      A.  Yes.
5      Q.  Okay.
6      A.  Yes.
7      Q.  All right.
8      A.  I'm sorry.
9      Q.  And it says at the top the first requirement
10  is a valid driver's license or identification card; is
11  that correct?
12     A.  It says, "Please provide the following
13  information."  Those are data fields that the customer
14  will be asked to provide information for as they
15  navigate through the on-line application page.
16     Q.  So they will need a valid driver's license
17  from some state?
18     A.  We do ask for that information on the on-line
19  application, yes, sir.
20     Q.  What if it's a valid driver's license from
21  Canada?
22     A.  We'll accept valid license from anywhere.
23     Q.  Okay.  Mexico?
24     A.  (Nods head affirmatively.)
25     Q.  Is that a yes?

---

**36**

1      A.  Yes.  I'm sorry.  I forget.  Don't shake my
2   head.
3      Q.  An identification card, what is meant by that?
4      A.  Those are any type of state -- state-issued
5   identification card.  And I say "state-issued."  On a
6   rare occasion we might have one issued from a foreign
7   country.  But, generally speaking, those are
8   state-issued identification cards.
9      Q.  Not just from Texas?
10     A.  That's correct.
11     Q.  Okay.  Okay.  Exhibit 144 is another snapshot
12  from the DPS website, is it not?
13     A.  Yes, it is.
14     Q.  And this is Page -- it's two pages.  Pages 1
15  of 2 and 2 of 2, correct?
16     A.  That is correct.
17     Q.  And what do you call this page?
18     A.  Let me take a quick --
19     Q.  How would you designate this page?
20     A.  -- look at this one.  This is the next -- the
21  correct terminology for this page.  This is a
22  continuation of the introduction for the on-line
23  application process.
24     Q.  Okay.  And if you have a Texas ID or a Texas
25  driver's license, you continue here.  If you hold a

---

37

1 driver's license from another state, you go to a
2 different window or a different page?
3     A. Correct. You click on a separate area of the
4 web page and it takes you to a different window to
5 provide the out-of-state information.
6     Q. Okay. What is a CHL 88 revocation affidavit?
7     A. I would have to see one off the top -- that
8 number is --
9     Q. Now, for some reason, I only have one copy of
10 this. I don't know why. But what is that?
11     A. I'm not familiar -- oh, I'm sorry. This
12 Exhibit 146 is the instructions for the law enforcement
13 officer who may be submitting documentation to the
14 department asking that we initiate revocation action
15 because the officer has come into contact with an
16 individual that they believe no longer meets the
17 criteria to hold a concealed handgun license.
18     Q. So that's something that a law enforcement
19 individual or agency would execute?
20     A. Correct. There's actually another form. I
21 can't call the number off the top of my head. But this
22 is the instruction form. There is an actual
23 affidavit -- revocation affidavit that the -- is made
24 available on our website. It's a downloadable form.
25 And the officer can fill that form out and submit it to

38

1 the department for us to potentially initiate
2 revocation action.
3     Q. All right. Does the DPS send information to
4 the counties on individuals whose CHL has been revoked
5 or suspended?
6     A. No.
7     Q. Okay. Do the law enforcement agencies outside
8 DPS receive that kind of information?
9     A. No, sir.
10     Q. So if you're stopped by Harris County
11 Sheriff's Department, they will not know that a CHL has
12 been suspended or revoked?
13     A. No, we do not send the information to them
14 specifically. But in the course of a contact with an
15 individual, the law enforcement has the ability to
16 check the status of the concealed handgun license.
17     Q. Okay. Bad question on my part.
18     A. That's okay.
19     Q. I mean, other agencies have access to that
20 information?
21     A. They have limited access based on some
22 statutory guidelines, yes, sir.
23     Q. Okay. If -- but the DPS does not provide
24 information to counties on a regular basis about CHLs,
25 do they?

39

1     A. We do not.
2     Q. Okay. Now, I understand that some counties
3 and some private entities can get information from DPS
4 through the driver's license database. Can they do
5 that through the CHL database?
6     A. No, sir.
7     Q. All right. So that information is -- I don't
8 know -- private? I don't know -- however term you
9 might -- might want to use; is that correct?
10     A. That is correct. I would believe private is
11 the correct terminology.
12     Q. Do any other -- other than law enforcement
13 agencies or entities, do any private organizations have
14 access or can they get access to the CHL?
15     A. Not through general means. The statute
16 specifically says that limited information may be
17 provided to a criminal justice agency/entity, and all
18 other concealed handgun license information is
19 specifically not subject to the open records privacy
20 information; however, some of the information may be
21 subpoenaed. It would require some form of other legal
22 action, but it is not information that is just made
23 readily available to anyone in the general public.
24     Q. For example, a county's election official or
25 voter registrar's office or someone conducting

40

1 elections would not normally have access to the CHL
2 database?
3     A. That is correct.
4     Q. Would there be any way for some -- for someone
5 to know when you went to a poling place and you have a
6 CHL, would they -- would anybody at that poling
7 location know whether or not my CHL was valid, revoked,
8 or suspended?
9     A. I am not aware of the process, to be quite
10 honest, of what the individuals at the poling places
11 would have available in front of them.
12     Q. If I went down to register to vote and I
13 wanted to use my CHL, would the county official know
14 one way or the other status of my CHL?
15     A. I am not aware of any method that they would
16 know those statuses, not based on any information
17 provided by the department.
18     Q. Okay. Let me hand you what is marked as 147.
19     A. Okay.
20     Q. And that is a copy of House Bill 698, which I
21 believe became effective in September of last year.
22 Are you familiar with that?
23     A. I am familiar with House Bill 698, yes.
24     Q. What exactly does -- did that amendment do?
25     A. The -- what House Bill 698 did is it amended

SHERRI ZGABAY                                          6/9/2014

11 (Pages 41 to 44)

41

1   the government code, obviously, to allow individuals
2   the opportunity to submit fingerprints in an
3   alternative manner other than the electronic
4   submission.
5       Q.   Okay.  When you say "electronic submission,"
6   currently there's a requirement for most counties or
7   most people to use electronic submission of
8   fingerprints?
9       A.   Currently, the administrative rules and
10  requirements for submission of fingerprints is to
11  utilize the Fingerprint Application Services of Texas,
12  also known as FAST, for submission of fingerprints.
13  Individuals make an appointment, they visit a FAST
14  location, and their fingerprints are taken at that
15  point and then submitted electronically to the
16  department as opposed to what most would recognize as
17  the ink rolled card.  This particular amendment to the
18  statute in House Bill 698 allows for certain
19  individuals who meet the criteria outlined in the bill
20  to request waiver of the electronic application --
21  electronic submission of fingerprints and allows those
22  individuals to have their fingerprints submitted on an
23  actual card to the department.
24      Q.   Okay.  So this change allows certain
25  individuals to submit it the old-fashioned way?

42

1       A.   Yes.  That would be a good explanation, yes,
2   sir.
3       Q.   Okay.  Because originally when the CHL law
4   passed, fingerprints were submitted by paper, or the
5   old-fashioned way?
6       A.   Correct, two fingerprint cards ink rolled.
7       Q.   Okay.  Let me show what is marked as 145,
8   which, I believe, is the application from the website,
9   correct?
10      A.   That is -- that's correct.  This is the -- one
11  of the portions of the application, yes.
12      Q.   Okay.  And we've already talked about driver's
13  license, ID card, issuing state, things of that nature.
14      A.   Yes, sir.
15      Q.   I noticed under "Personal Identifiers" --
16      A.   Yes.
17      Q.   -- that -- first of all, is this Exhibit
18  Number --
19      A.   This is Exhibit No. 145, also noted as the
20  CHL 78-A in the bottom left of the form.
21      Q.   Is this the current application form, CHL?
22      A.   I believe this is the current application
23  form, yes, sir.
24      Q.   So the only categories of race for a CHL are
25  those noted under "Personal Identifiers"?

43

1       A.   Yes, sir.
2       Q.   And so White and Hispanic are one category?
3       A.   That's correct.
4       Q.   Then we have Asian, Pacific Islander, American
5   Indian, Alaskan Native, Black, Other, and Unknown?
6       A.   That is correct.
7       Q.   Okay.  And then White/Hispanic?
8       A.   Correct.
9       Q.   Do you know why the White and Hispanics are
10  one category?
11      A.   I do not know.
12      Q.   Do you know what other DPS applications
13  combine those two races?
14      A.   I'm not familiar with the other applications
15  in that specific -- in the race category, no, sir.
16          MR. BRAZIL:  Let's take a short break.
17  I'm almost finished before I pass the witness.
18          MR. KEISTER:  Okay.  No problem.
19          (Recess from 1:55 p.m. to 2:05 p.m.)
20          MR. BRAZIL:  Thank you.  I'll pass the
21  witness.
22          EXAMINATION
23  BY MS. MARANZANO:
24      Q.   Hi.  This is Jennifer Maranzano.  I represent
25  the United States in this case.  I have a few

44

1   additional questions for you.  Can you hear me okay?
2       A.   Yes, ma'am.
3       Q.   Okay.  Great.  I believe that you testified
4   earlier that a person can apply for a concealed handgun
5   license in person, on-line or by mail; is that correct?
6       A.   No, ma'am.  The -- the person can apply
7   on-line, by mail, or they may deliver an application to
8   a drop box, but it isn't an actual in-person process.
9   And the individual is not required to submit it by
10  mail.  They can drop off the application, but it isn't
11  an in-person, per se, where they approach a counter and
12  visit with an individual or, you know, submit paperwork
13  speaking to an individual.  We just provide physically
14  a drop box that the individual can place their
15  documentation in.
16      Q.   I see.  Okay.  Thank you for that
17  clarification.
18      A.   Yes, ma'am.
19      Q.   And is there a requirement about how current
20  the photographs that the applicant submits has to be?
21      A.   There are really kind of two parts to that,
22  because currently the applicant who holds a Texas
23  driver license or identification card is not required
24  nor are they allowed to submit photographs.  We
25  actually utilize the photo that is maintained through

45

1    driver license.  So we utilize the exact same
2    photograph that is on their Texas DL or ID card for
3    those who hold a Texas DL or ID.
4           For those who have an out-of-state driver
5    license or identification card, we do ask for the
6    two passport-style photos.  And we have a comparison,
7    you know, visually compare the photos submitted by the
8    person to the photo that is on their driver license or
9    ID card from the other state to ensure that they are a
10   good likeness or representation of the individual.  It
11   is not a date-specific photo requirement, but we do
12   require that the photo that is being submitted in the
13   passport-style photo must be a good likeness image of
14   the photograph that appears on their identification
15   card or driver license issued by another state.
16      Q.  Who at DPS does that comparison to determine
17   if it's a good likeness between the two photographs?
18      A.  Those are individuals that work under my
19   direction.  We have a staff of individuals that
20   specifically data enter the information, conduct
21   background checks, and that would include the
22   photograph process.
23      Q.  And do they get specific training on how to
24   compare photographs?
25      A.  Well, the visual photograph -- yes, they do

46

1    receive training, but the visual photograph comparison
2    is not highly technological.  We just do some general
3    visual comparison to see that we can identify that the
4    two individuals have the same likeness.  And if there
5    is anything in question we will ask for additional
6    clarification or additional information from the
7    individual.
8       Q.  And if -- if an individual holds a Texas
9    driver's license or a Texas personal ID and DPS is
10   utilizing the photograph from those identifications,
11   does that photo continue to get updated as the driver's
12   license and ID photo is updated?
13      A.  We are updating photograph information.  The
14   use of the Texas DL or ID, the technology that allow us
15   to do that is fairly new.  So we are in the process of
16   updating the photographs as the individuals renew their
17   concealed handgun licenses.
18      Q.  Okay.  So -- so just to make sure -- I think
19   my question was a little confusing.  I guess what I'm
20   asking is, so when an individual renews their concealed
21   handgun license, there would be some kind of check to
22   determine if there had been an updated photo on their
23   Texas driver's license or personal ID, and if there was
24   that updated photo would be utilized; is that correct?
25      A.  Correct.  We are -- we are updating the

47

1    photographs, yes, ma'am, as the person goes through the
2    renewal process.
3       Q.  Okay.  Is the fingerprinting part -- is the
4    fingerprinting part of the fee that you're charging or
5    do applicants have to pay for fingerprinting separate
6    and apart from the concealed handgun license fee?
7       A.  They are separate and apart from the concealed
8    handgun license fee.
9       Q.  Okay.  When we were -- when you were
10   discussing Exhibit 142, which is the fee table --
11      A.  Yes, ma'am.
12      Q.  -- you referenced that there was a -- that
13   these -- there were some reduced fees.  And I think the
14   fee table reflects some of those reduced fees; is that
15   correct?
16      A.  Yes, ma'am.
17      Q.  Are there any additional circumstances under
18   which an individual would be able to pay a reduced fee
19   that are not reflected on this document?
20      A.  No, ma'am.  This is the most updated
21   compilation of fees for a concealed handgun license.
22      Q.  And did you say that the -- the reduced fee
23   for those who are indigent was set by statute?
24      A.  The statute, yes.  It's not a literal --
25   literally set by statute.  If I recall correctly, I

48

1    believe the statute says that the department may -- may
2    charge a fee that is half of the standard.  So it -- I
3    don't believe it specifically says $70.  It says "half
4    of the standard," which is $140.  That's how we arrive
5    at the $70.
6       Q.  Okay.  And the -- the fee -- the regular
7    standard fee of $140, is that -- that's set by statute
8    also, correct?
9       A.  Yes, ma'am.  The $140 standard fee is set
10   through statute.
11      Q.  Do you know when the statute that allowed for
12   people who are indigent to pay half of the standard
13   fee, when that was passed?
14      A.  No, ma'am.  I don't have that information
15   readily available off the top of my head.
16      Q.  Okay.  Has that been in place for the whole
17   time you've been working with the concealed handgun
18   licenses?
19      A.  Yes, ma'am.
20      Q.  Is it correct that there's a -- there's a
21   required class that applicants for a CHL have to take
22   before they can obtain a license?
23      A.  There is a required class that some concealed
24   handgun applicants must complete prior to the initial
25   issuance of a concealed handgun license.  There are a

SHERRI ZGABAY                                                  6/9/2014

49

1   few exceptions, and those are specifically designated
2   by statute.
3       Q.  And the class -- is the class run by DPS?
4       A.  No, ma'am.  The class is taught by concealed
5   handgun instructors that are certified to provide the
6   course.  They are certified by the Department of Public
7   Safety.
8       Q.  Do you know how much these -- these courses
9   cost?
10      A.  I know the fees are not regulated by the
11  department, and they range at various different costs.
12  I don't have specific, you know, numbers because the
13  department doesn't regulate the fee.  It is not
14  regulated by statute nor by rule.
15      Q.  Are they ever offered in languages other than
16  English?
17      A.  Yes.
18      Q.  What languages?
19      A.  I don't know specifically.  I do know that the
20  instructors -- because they are also certified through
21  a process under the area I'm responsible for,
22  instructors do tell us if they offer the classes in
23  different languages, but I couldn't tell you
24  specifically which languages those are.
25      Q.  Okay.  When an individual applies or --

51

1   make any distinction or indicate in any way whether the
2   individual is a citizen or not a citizen?
3       A.  No, ma'am.
4       Q.  Can you look at Exhibit 148?
5       THE REPORTER:  We don't have an
6   Exhibit 148.
7       MS. MARANZANO:  Oh, the HC 698, was that
8   Exhibit 148?
9       MR. KEISTER:  That's 147.
10      MS. MARANZANO:  I'm sorry.  147.
11      THE WITNESS:  Okay.  Yes, ma'am, I have
12  that in front of me.
13      Q.  (BY MS. MARANZANO)  Okay.  And when we were
14  talking about this earlier, you mentioned that
15  individuals -- certain individuals were eligible for
16  this alternative procedure to submit fingerprints; is
17  that correct?
18      A.  Yes, ma'am.
19      Q.  And is it -- is it correct, looking at the
20  bill, that the individuals who would be eligible for
21  this procedure are those that reside in a county having
22  a population of 46,000 or less and do not reside within
23  a 25-mile radius of a facility with the capacity to
24  process digital or electronic fingerprints?
25      A.  Yes, ma'am, that's correct.

50

1   applies to renew their -- their concealed handgun
2   license, is there -- does CPS rerun checks on their
3   fingerprints?
4       A.  Can you restate that question one more time?
5       Q.  Yes.  When an individual attempts to renew
6   their concealed handgun license, does DPS run any --
7   any checks on their fingerprints at that time, at the
8   renewal time?
9       A.  Yes, ma'am.  We complete a -- we conduct
10  another complete fingerprint-based background check in
11  the -- the same manner that we did for an original
12  application.
13      Q.  So DPS does an entire background check for a
14  renewal as well as for an initial application?
15      A.  Yes, ma'am, that's correct.
16      Q.  And the background check is the same for
17  each -- for the initial application and for the
18  renewal?
19      A.  Yes, ma'am.
20      Q.  If you -- I believe you testified earlier that
21  an individual who was lawfully in the United States
22  could get a concealed handgun license even if they
23  weren't a US citizen; is that correct?
24      A.  That is correct.
25      Q.  Does the face of the concealed handgun license

52

1       Q.  Were you involved in the development of this
2   legislation?
3       A.  No, ma'am.  I was a resource witness, resource
4   for analysis and testimony of the bill.
5       Q.  And when you say you were a resource witness,
6   can you tell me what that means?
7       A.  Well, resource witness means that I didn't
8   specifically help develop the bill or design the bill,
9   but I was responsible for analyzing the impact that it
10  would have for my specific area that I'm responsible
11  for in licensing and ultimately was responsible for
12  putting together fiscal analysis, that type of
13  information as a resource.
14      Q.  I see.  And -- and what impact did you
15  determine it would have?
16      A.  If -- now, to be honest, I don't have my notes
17  in front of me, but I -- I believe the -- excuse me.
18  Let me rephrase that.  The official impact as far as --
19  are you talking about for cost or are you talking about
20  for procedural?
21      Q.  I thought that you said that one of your roles
22  as a resource witness was to analyze the impact --
23      A.  Correct.
24      Q.  -- is that right?  So I'm just wondering sort
25  of what you determined the impact to be.

SHERRI ZGABAY                                    6/9/2014

14 (Pages 53 to 56)

53

1      A.  The impact.  Okay.  I apologize.  We -- we
2   analyze them in two different -- one is for fiscal
3   impact and one is for procedural or whether or not, you
4   know, it would require us to change our -- our
5   procedures as far as the issuance of the concealed
6   handgun.
7      The impact that -- for fiscal impact,
8   none.  For the procedural impact, it required us to
9   develop updates to our website, a specific form that
10  customers must sign in order for those to be able to
11  submit their fingerprint cards as opposed to submitting
12  fingerprints electronically.  So there are some minimal
13  operational impact that we experienced.
14     Q.  Did -- did anybody, any legislators, express a
15  concern that requiring an individual to travel more
16  than 25 miles to get -- to -- to get to a facility that
17  has the capacity to process the digital or electronic
18  fingerprints would be a burden for those individuals?
19     A.  Not to me specifically.  I don't recall having
20  any conversation with a specific legislator about that,
21  but I do believe that was some of the information in
22  the testimony for the hearings that we attended.
23     Q.  Do you know what prompted the development of
24  HB 698?
25     A.  I was advised that this was prompted because

54

1   of concern by constituents in specific areas, specific
2   rural areas that the locations for fingerprinting were
3   not readily available.
4      Q.  Do you know if anybody at DPS was involved in
5   the development of this legislation?
6      A.  I would honestly have to defer that to our
7   government relations because they coordinate all
8   legislative responses.
9      Q.  Okay.  I don't think I have anything further.
10     A.  Okay.
11     Q.  Thank you so much for your time.
12     A.  Yes, ma'am.
13        MR. BRAZIL:  Neither do I.  Thank you.
14        THE WITNESS:  Okay.
15        MR. KEISTER:  Okay.  We'll reserve until
16  time of trial and the witness will read and sign.
17        THE REPORTER:  Off the record.
18        (Proceedings concluded at 2:21 p.m.)
19
20
21
22
23
24
25

55

WITNESS CORRECTIONS AND SIGNATURE
2   Please indicate changes on this sheet of paper,
    giving the change, page number, line number, and reason
    for the change.  Please sign each page of changes.
4   PAGE/LINE     CORRECTION     REASON FOR CHANGE
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24
               _____
25                SHERRI ZGABAY

56

1      S I G N A T U R E   O F   W I T N E S S
2
3      I, SHERRI ZGABAY, solemnly swear or affirm
4   under the pains and penalties of perjury that the
5   foregoing pages contain a true and correct transcript
6   of the testimony given by me at the time and place
7   stated, with the corrections, if any, and the reasons
8   therefor noted on the foregoing correction pages(s).
9
10
11
12              _____
                 SHERRI ZGABAY
13
14  Job No. 4-AUSTIN-162600 KS
15
16
17
18
19
20
21
22
23
24
25