```
              IN THE UNITED STATES DISTRICT COURT FOR THE
                      SOUTHERN DISTRICT OF TEXAS
                       CORPUS CHRISTI DIVISION

MARK VEASEY, JANE              )   CIVIL ACTION
HAMILTON, SERGIO DELEON,       )
FLOYD J. CARRIER, ANNA         )   NO. 2:13-CV-193 (NGR)
BURNS, MICHAEL MONTEZ,         )   [Lead case]
PENNY POPE, OSCAR ORTIZ, KOBY  )
OZIAS, JOHN MELLOR-CRUMLEY,    )
PEGGY HERMAN, EVELYN           )
BRICKNER, GORDON BENJAMIN,     )
KEN GANDY, LEAGUE OF UNITED    )
LATIN AMERICAN CITIZENS        )
(LULAC), AND DALLAS COUNTY,    )
TEXAS,                         )
                               )
        Plaintiffs,            )
                               )
V.                             )
                               )
RICK PERRY, GOVERNOR OF TEXAS  )
AND JOHN STEEN, TEXAS          )
SECRETARY OF STATE,            )
                               )
        Defendants.            )
```

Martin Golando - 6/24/2014

---

**Page 2**

```
 1  UNITED STATES OF AMERICA,    )
                                 ) CIVIL ACTION
 2       Plaintiffs,             )
                                 ) NO. 2:13-CV-263 (NGR)
 3  TEXAS LEAGUE OF YOUNG VOTERS )  [Consolidated case]
    EDUCATION FUND, IMANI CLARK, )
 4  AND MICHELLE BESSIAKE,       )
                                 )
 5       Plaintiff-Intervenors,  )
                                 )
 6  TEXAS ASSOCIATION OF HISPANIC )
    COUNTY JUDGES AND COUNTY     )
 7  COMMISSIONERS, HIDALGO       )
    COUNTY, AND MARIA LONGORIA   )
 8  BENAVIDES,                   )
                                 )
 9       Plaintiff-Intervenors,  )
                                 )
10  V.                           )
                                 )
11  STATE OF TEXAS, JOHN STEEN,  )
    in his official capacity as  )
12  Texas Secretary of State; and )
    STEVE McCRAW, in his official )
13  capacity as Director of the  )
    Texas Department of Public   )
14  Safety,                      )
                                 )
15       Defendants.             )
16
17
18
19
20
21
22
23
24
25
```

---

**Page 3**

```
 1  TEXAS STATE CONFERENCE OF    )
    NAACP BRANCHES; and the      ) CIVIL ACTION
 2  MEXICAN AMERICAN LEGISLATIVE )
    CAUCUS OF THE TEXAS HOUSE OF ) NO. 2:13-CV-291 (NGR)
 3  REPRESENTATIVES,             )  [Consolidated case]
                                 )
 4       Plaintiffs,             )
                                 )
 5  V.                           )
                                 )
 6  JOHN STEEN, in his official  )
    capacity as Secretary of     )
 7  State of Texas; and STEVE    )
    McCRAW, in his official      )
 8  capacity as Director of the  )
    Texas Department of Public   )
 9  Safety,                      )
                                 )
10       Defendants.             )
11  BELINDA ORTIZ, LENARD TAYLOR, ) CIVIL ACTION
    EULALIO MENDEZ JR., LIONEL   )
12  ESTRADA; ESTELA GARCIA       ) NO. 2:13-CV-348 (NGR)
    ESPINOSA, LYDIA LARA,        )  [Consolidated case]
13  MARGARITO MARTINEZ LARA,     )
    MAXIMINA MARTINEZ LARA, and  )
14  LA UNION DEL PUEBLO ENTERO,  )
    INC.,                        )
15                               )
         Plaintiffs,             )
16                               )
    V.                           )
17                               )
    STATE OF TEXAS; JOHN STEEN,  )
18  in his official capacity as  )
    Texas Secretary of State; and )
19  STEVE McCRAW, in his official )
    capacity as Director of the  )
20  Texas Department of Public   )
    Safety,                      )
21                               )
         Defendants.             )
22
23
24
25
```

---

**Page 4**

```
 1  *********************************************
 2       ORAL REALTIME DEPOSITION OF
 3       THE MALC 30(B)(6) WITNESS
 4            MARTIN GOLANDO
 5             JUNE 24, 2014
 6  *********************************************
 7       ORAL REALTIME DEPOSITION OF MARTIN GOLANDO,
 8  produced as a witness at the instance of the DEFENDANTS,
 9  and duly sworn, was taken in the above-styled and
10  numbered cause on the 24th day of June, 2014, from
11  9:34 a.m. to 2:09 p.m., before STEVEN STOGEL, CSR in and
12  for the State of Texas, reported by machine shorthand,
13  at the Offices of the Texas Attorney General, 209 West
14  14th Street, Austin, Texas, pursuant to the Federal
15  Rules of Civil Procedure and the provisions stated on
16  the record or attached hereto.
17
18
19
20
21
22
23
24
25
```

---

**Page 5**

```
 1            A P P E A R A N C E S
 2  FOR THE PLAINTIFF TEXAS STATE CONFERENCE OF NAACP
    BRANCHES:
 3
       MS. AMY L. RUDD
 4     DECHERT LLP
       US Bank Tower
 5     633 West 5th Street, 37th Floor
       Los Angeles, California 90071-2013
 6     213.808.5700
       amy.rudd@dechert.com
 7
 8  FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 9     MS. ANGELA J. MILLER
       (Appearing via speaker phone)
10     Trial Attorney
       Voting Section
11     Civil Rights Division
       U.S. Department of Justice
12     202.514.2919
       angela.miller5@usdoj.gov
13
14  FOR THE DEFENDANTS THE STATE OF TEXAS, RICK PERRY, JOHN
    STEEN AND STEVEN McCRAW:
15     MR. STEPHEN L. TATUM, JR.
        - and -
16     MR. G. DAVID WHITLEY
       Assistant Attorney General
17     Opinion Committee
       P.O. Box 12548
18     Austin, Texas 78711-2548
       512.463.2110
19     stephen.tatum@texasattorneygeneral.gov
       david.whitley@texasattorneygeneral.gov
20
21  ALSO PRESENT:
22     Mr. Steven Stogel, Court Reporter
23
24
25
```

Martin Golando - 6/24/2014

6

1                I N D E X
2                                    PAGE
3  Appearances.....................    5
4
5  MARTIN GOLANDO
6     Examination by Mr. Tatum...................    8
7  Reporter's Certificate........................  168
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

7

1              EXHIBIT INDEX
2                                   PAGE
3  Exhibit No. 1....................................    19
        Notice of Deposition
4
   Exhibit No. 2....................................    61
5       Preliminary Statement Filed by the
        Texas State Conference of NAACP Branches
6       and the Mexican American Legislative
        Caucus
7
   Exhibit No. 3....................................  119
8       February 2011 Poll
9  Exhibit No. 4....................................  120
        February 2011 Poll
10
   Exhibit No. 5....................................  121
11      February 2011 Poll
12 Exhibit No. 6....................................  124
        October 2012 Poll
13
   Exhibit No. 7....................................  141
14      12/5/13 Public Records Request
15 Exhibit No. 8....................................  143
        List of Names
16
17
18
19
20
21
22
23
24
25

8

1        MR. TATUM:  Good morning.  My name is
2  Stephen Tatum.  I'm an Assistant Attorney General
3  representing the State of Texas in this litigation.  It
4  is June 24th.  The time is 9:30, and we are here at the
5  Price Daniel building, the Attorney General's offices in
6  Austin, Texas.
7            MARTIN A. GOLANDO,
8  having been first duly sworn, testified as follows:
9            EXAMINATION
10 BY MR. TATUM:
11     Q.  Would you state and spell your full name for
12 the record, please?
13     A.  Martin Anthony Golando, M-A-R-T-I-N, Anthony,
14 A-N-T-H-O-N-Y, Golando, G-O-L-A-N-D-O.
15     Q.  Mr. Golando, where do you reside?
16     A.  San Antonio, Texas.
17     Q.  Are you represented by counsel today?
18     A.  I am.
19     Q.  And who is that?
20     A.  Ms. Rudd.
21        MR. TATUM:  And while we're there, let's
22 go ahead and make introductions.  I don't think we've
23 done that on the record yet.  I've said who I am.
24 Mr. Golando, you've introduced yourself.
25        MS. RUDD:  Amy Rudd for the Texas State

9

1  Conference of the NAACP and MALC and the witness today.
2        MS. MILLER:  And I'm Angela Miller for
3  the U.S. Department of Justice on the phone.
4        MR. WHITLEY:  And I'm David Whitley for
5  the defendants.  I can give you a card.
6     Q.  (By Mr. Tatum)  Mr. Golando, have you ever
7  been deposed before?
8     A.  No, sir.
9     Q.  So this is your first time being the subject
10 of a deposition?
11     A.  Being the subject, that's correct.
12     Q.  Okay.  Let me first go over some ground rules
13 that will control for this deposition.  I'm going to be
14 asking you questions, and I need you to give me audible
15 answers.  This means you need to say "yes" instead of
16 nodding your head, and you need to say "no" instead of
17 shaking your head.  And try to avoid saying "uh-huh" or
18 "hmm hmm," things like that.  We need to have audible
19 answers so the court reporter can get a clean record of
20 what's said here today.  Do you understand?
21     A.  I do.
22     Q.  And on that note, I ask that you please wait
23 until I finish asking my question before you begin to
24 answer, and I'll try to do the same for you.  This is
25 easier said than done.  I just ask that we try to let

Martin Golando - 6/24/2014

10

1 each other talk, again so that we get a clean record of
2 what's said here today. Do you understand?
3    A.  Yes, sir.
4    Q.  Okay. If you don't understand a question that
5 I ask or you need me to repeat it or clarify it in any
6 way, please say so. I'm happy to do so. Anything I can
7 do to make you understand what I'm asking you. Do you
8 understand?
9    A.  Yes, sir.
10    Q.  Okay. There may be times when your attorney
11 may object to a question that I ask, in which case
12 you're still required to answer the question unless your
13 attorney specifically instructs you not to. Do you
14 understand?
15    A.  Yes.
16    Q.  Do you understand that you are under oath,
17 which means you must tell the truth, and you're subject
18 to the penalty of perjury if you do not?
19    A.  Yes.
20    Q.  Mr. Golando, how are you feeling today?
21    A.  I'm fine. Thank you for asking.
22    Q.  Are you suffering from any illnesses that
23 would prevent you from answering my questions truthfully
24 and accurately?
25    A.  No, sir.

11

1    Q.  Are you taking any medications today that
2 might prevent you from answering my questions truthfully
3 and accurately?
4    A.  No, sir.
5    Q.  Is there anything else that might prevent you
6 from answering my questions truthfully and accurately?
7    A.  No, sir.
8    Q.  What did you do to prepare for this deposition
9 today?
10    A.  I met with counsel, and I reviewed some
11 documents.
12    Q.  When you say "counsel," is that Ms. Rudd?
13    A.  That's correct, and Ms. Cohan, I guess is her
14 name. She used to be Ms. Stelcen, but now she's
15 Ms. Cohan.
16    Q.  Is that Lindsey Cohan?
17    A.  That's correct.
18    Q.  And when did you meet with them?
19    A.  Yesterday about 2:30, I believe.
20    Q.  And for how long did y'all meet?
21    A.  It was about an hour and ten minutes, I
22 believe.
23    Q.  Was that the only time y'all met in
24 preparation for this deposition?
25    A.  I think that's right. That's right. Met in

12

1 person, yeah.
2    Q.  Okay. Was anyone else present at that
3 meeting?
4    A.  No, sir.
5    Q.  So it was just you and the two lawyers?
6    A.  Correct.
7    Q.  Okay. Did you review any documents in
8 preparation for this deposition?
9    A.  Yes. I read the complaint again, and I read a
10 Brennan Center exhibit that I think was attached to the
11 complaint, and I read Mr. Yannis Banks' deposition -- or
12 most of it. I didn't read the entire thing. I read
13 about three-quarters of it.
14    Q.  How much time did you spend reviewing those
15 documents?
16    A.  I got home last night about 8:30, and I spent
17 the balance of the evening until about 11:00 reviewing
18 those documents.
19    Q.  So more or less three hours reviewing those
20 documents?
21    A.  Oh, it would have been about midnight. So
22 about three and a half -- or two and a half, I guess,
23 whatever that is.
24    Q.  Did you bring any documents with you today?
25    A.  No, sir, I did not.

13

1    Q.  Is there anything else you did to prepare for
2 this deposition that you did not already mention?
3    A.  I dreamt about the deposition a couple of
4 times. I'm not sure you can count that. But, yeah, I
5 guess that's preparation. Other than that, I can't
6 think of anything right offhand.
7    Q.  All right. Mr. Golando, I want to ask you a
8 few questions regarding your background.
9    A.  Okay.
10    Q.  Can you state the date and place of your
11 birth?
12    A.  I was born November 11th, 1977, and I was born
13 in Kirksville, Missouri, in Adair County, Missouri.
14    Q.  Can you describe your educational background?
15    A.  I went to Chesterton High School in
16 Chesterton, Indiana, class of '96, and I briefly went to
17 the University of Chicago before I was kicked out. I
18 tooled around Chicago a bit, and then I ended up at
19 UTSA. Graduated at UTSA in 2003, and then I went to UT
20 Law and graduated in 2007.
21    Q.  So you were born in Tennessee, went --
22    A.  No, no. Missouri.
23    Q.  I'm sorry.
24    A.  I apologize. I didn't mean to interrupt you.
25 I apologize.

Martin Golando - 6/24/2014

14

1  Q.  You were born in Missouri?
2  A.  Correct.
3  Q.  Had some schooling in Indiana, made your way
4  to Chicago, and eventually Texas.  Is that correct?
5  A.  There's lots of -- there's many more states in
6  between there, but, yes, that's generally correct.
7  Q.  Okay.
8  A.  Yeah.
9  Q.  And what year did you graduate from law
10 school?
11 A.  2007.
12 Q.  Aside from a law degree, do you have any other
13 professional qualifications?
14 A.  By which you mean certifications?
15 Q.  Sure.
16 A.  No.
17 Q.  Are you currently licensed to practice law?
18 A.  Currently, and in good standing.
19 Q.  In the state of Texas?
20 A.  Correct.
21 Q.  In what areas of practice do you have
22 experience?
23 A.  I'm an election law attorney, largely.  I've
24 done several election contests, and I represent elected
25 officials in helping them comply with their ethical

15

1  compliance rules.  I'm a voting rights attorney.  I have
2  some background in voting rights.  Anything I can get
3  paid for, frankly.  So if you need something, let me
4  know.
5  Q.  Mr. Golando, are you currently employed?
6  A.  I'm self-employed.
7  Q.  Does that mean you have a solo practice?
8  A.  I do.  I have a couple of different business
9  enterprises.  One is a solo practice.
10 Q.  Do you office here in Austin?
11 A.  No, not currently.  I will soon, hopefully,
12 but mostly in San Antonio.
13 Q.  Mr. Golando, what is your role at MALC?  And
14 before you answer that question, let me just go ahead
15 and say here, when I say "MALC," I mean the Mexican
16 American Legislative Caucus.  And throughout this
17 deposition, I might say "MALC" or "you" or "your," and
18 when I say that, I mean MALC unless I specifically
19 indicate otherwise.  Do you understand?
20 A.  I do.
21 Q.  Okay.  So getting back to my question, what is
22 your role at MALC?
23 A.  I am the general counsel of MALC.  That's my
24 title.
25 Q.  And how long have you held that position?

16

1  A.  Since May 1st.
2  Q.  Of this year?
3  A.  Correct.
4  Q.  Did you have any role at MALC before you
5  became general counsel?
6  A.  Yes.  It was basically the same job without
7  the title.  I weighed in on the legal consequences of
8  actions.  I weighed in on the day-to-day operations.  I
9  worked very closely with the executive director.  It's
10 essentially the same job with the title, so...
11 Q.  Is your current role as general counsel -- is
12 that a paid position?
13 A.  Yes.
14 Q.  Is that a full-time position?
15 A.  By full time, do you mean do I get a W-2 from
16 MALC?  I never have got a W-2 from MALC.  I get a --
17 they 1099 me, or whatever.  I'm a vendor, essentially.
18 Q.  So prior to becoming general counsel, you were
19 employed in a general counsel-type role at MALC.  It
20 just wasn't called general counsel.  Correct?
21 A.  Right.  I think it's listed in the C&E as a
22 consulting, but it's -- I do the same general things I
23 did before.
24 Q.  Okay.  As general counsel, what are your
25 official duties and responsibilities?

17

1  A.  I make sure that we comply with all ethical
2  laws that caucuses have to do for reporting.  I weigh in
3  on the legal consequences of certain actions we might
4  take.  I'm a strategic and tactical thinker for MALC on
5  our policy positions.  I do policy development.  I weigh
6  in on employment practices and how to train employees,
7  and I do -- and I work very closely with the Executive
8  Director to try to make sure we accomplish our
9  objectives.
10 Q.  And who is the Executive Director?
11 A.  Summer Luciano.
12 Q.  So would you say that you wear -- in a legal
13 capacity, you wear many different hats at MALC?
14 A.  Surely.  I think that's fair.
15 Q.  Who do you report to?
16 A.  The chairman, Martinez Fischer.
17 Q.  Do you manage anyone?
18 A.  I used to manage people as his chief of staff,
19 but I stopped being his chief of staff on May 1st, and
20 now I basically -- I don't think I'm directly managing
21 anybody currently, so...
22 Q.  So you were formerly the chief of staff for
23 Representative Trey Martinez Fischer.  Correct?
24 A.  That is correct.
25 Q.  And how long did you hold that position?

Martin Golando - 6/24/2014

18

1    A.   That position?  I think I -- I got that
2  position in August or September of 2008.  I think that's
3  correct.  And so I held it until May 1st of this year.
4  So six years, five and a half years, five and
5  three-quarters, something like that.
6    Q.   So you are no longer his chief of staff?
7    A.   No, I'm not.  It's strange, frankly, but --
8    Q.   What were your official duties and
9  responsibilities as chief of staff for Representative
10 Martinez Fischer?
11   A.   In short, I was responsible for everything
12 that the office did.
13   Q.   Outside of a legal capacity, is there any
14 other -- do you have any other involvement -- let me
15 restate the question.
16        Do you have any other involvement with
17 MALC outside of a legal capacity?
18   A.   I'm not sure I understand your question.
19 Could you give me an example of what you mean, and maybe
20 I can --
21   Q.   Sure.  Do you -- are you involved in any kind
22 of budgetary matters at MALC?
23   A.   Sure.
24   Q.   Are you involved in programming or activities
25 that MALC conducts?

19

1    A.   Surely.
2    Q.   Are you involved in PR at MALC?
3    A.   Yes, generally; although, it's certainly not
4  my strong suit.  You wouldn't want me to do that for
5  you, trust me.
6    Q.   Have you been providing legal representation
7  to MALC during this litigation?
8    A.   Yes.
9    Q.   And what has that legal representation
10 entailed generally?
11   A.   Generally, advice on the scope of the law and
12 how it might impact MALC members and the MALC staff.
13   Q.   Have you assisted with drafting pleadings or
14 motions?
15   A.   No, not really.  Not for this litigation.
16        (Exhibit No. 1 marked)
17   Q.   (By Mr. Tatum)  Mr. Golando, I'm handing you
18 what's been marked as Exhibit 1.  If you would, please
19 take a minute to review this document.  Are you
20 finished?
21   A.   (Witness nods head).
22   Q.   Having reviewed this document, Mr. Golando, do
23 you recognize what this document is?
24   A.   Yes.  This is the notice of deposition for the
25 MALC representative.

20

1    Q.   Did you review this document in preparation
2  for this deposition today?
3    A.   Yes, I think I remember seeing it.
4    Q.   Is it your understanding that you've been
5  designated by MALC to testify and give truthful and
6  binding answers on its behalf today?
7    A.   Yes.
8    Q.   Okay.  Now, with that document, if you would,
9  please, turn to Page 5.  Are you there?
10   A.   Yes, sir.
11   Q.   Okay.  Under the heading at the bottom of the
12 page there titled "Matters," there is a series of
13 numbered paragraphs from 1 to 26.  Do you see those
14 numbered paragraphs?
15   A.   Yes, sir.
16   Q.   Okay.  Now, if we can, quickly I'd like to go
17 through some of these and ask you some very brief
18 questions about them.
19        Topic 1 says, "The factual basis of your
20 claims or defenses in this lawsuit, including any
21 contention that SB 14, as enacted by the State of Texas'
22 82nd Legislature, was (1) enacted with a discriminatory
23 purpose and intent, and (2) results in denying and
24 abridging the right to vote on account of race and
25 language minority status."

21

1        Have you been designated to testify to
2  Topic 1 today?
3    A.   Yes.
4    Q.   And have you prepared to testify on Topic 1?
5    A.   Yes.
6    Q.   Topic 2 says, "Any interest you have in the
7  above-captioned litigation that is not adequately
8  represented by the Plaintiff United States of America."
9        Have you been designated to testify to
10 Topic 2?
11   A.   Yes.
12   Q.   And have you prepared to testify to Topic 2?
13   A.   Yes.
14   Q.   Topic 3 says, "The identity of your members on
15 September 17th, 2013."
16        Have you been designated to testify to
17 Topic 3 today?
18   A.   Yes.
19   Q.   And are you prepared to testify to Topic 3?
20   A.   Yes.
21   Q.   Topic 4 says, "The identity of your members at
22 present."
23        Have you been designated to testify to
24 Topic 4?
25   A.   Yes.

Martin Golando - 6/24/2014

22

1    Q.   And are you prepared to testify to Topic 4?
2    A.   Yes.
3    Q.   Topic 5 says, "Your activities related to
4  voter identification legislation proposed or enacted in
5  Texas since 2004."
6         Have you been designated to testify to
7  Topic 5?
8    A.   Yes.
9    Q.   Are you prepared to testify to Topic 5?
10   A.   Yes.
11   Q.   Topic 6 says, "All bills and amendments
12 drafted, researched, proposed or requested by you
13 regarding SB 14."
14        Let me just stop here and say:  When I
15 say "SB 14," I mean Senate Bill 14 that was enacted
16 during the 2011 Legislature.  Do you understand?
17   A.   Yes.
18   Q.   Okay.  Have you been designated to testify to
19 Topic 6?
20   A.   Yes.
21   Q.   Are you prepared to testify to Topic 6?
22   A.   Yes.
23   Q.   Topic 7 says, "All communications to or from
24 constituents of your members in your possession,
25 custody, or control regarding SB 14."

23

1         Have you been designated to testify to
2  Topic 7?
3    A.   Yes.
4    Q.   And are you prepared to testify to Topic 7?
5    A.   Yes.
6    Q.   Topic 8 says, "Your activities relating to
7  voter identification legislation proposed or enacted by
8  any other United States state that is not Texas, any
9  United States territory or outlying possession, or the
10 District of Columbia since 2004."
11        Have you been designated to testify to
12 Topic 8?
13   A.   Yes.
14   Q.   Are you prepared to testify to Topic 8?
15   A.   To the best of my ability.
16        MS. RUDD:  This may be a good time for me
17 to just interpose an objection.  You know, we've lodged
18 written objections to all of these topics and -- or many
19 of these topics, and to the extent that we've objected
20 on the grounds of relevance, we haven't gone out of our
21 way to prepare Mr. Golando to testify on those topics.
22 He does know something about Topic 8 and will testify to
23 the best of his ability, as with all of the topics that
24 we've lodged objections to.
25        MR. TATUM:  Okay.  Thank you.

24

1    Q.   (By Mr. Tatum)  Mr. Golando, Topic 9 says,
2  "Any policymaking or advocacy-related work performed by
3  you or on your behalf regarding voter identification
4  since 2004."
5         Have you been designated to testify to
6  Topic 9?
7    A.   Yes.
8    Q.   Are you prepared to testify to Topic 9?
9    A.   Yes.
10   Q.   Topic 10 says, "Your activities relating to
11 voter registration since 2004."
12        Have you been designated to testify to
13 Topic 10?
14   A.   Yes.
15   Q.   Are you prepared to testify on Topic 10?
16   A.   Yes.
17   Q.   Topic 11 says, "Your activities relating to
18 voter education since 2004."
19        Have you been designated to testify to
20 Topic 11?
21   A.   Yes.
22   Q.   Are you prepared to testify to Topic 11?
23   A.   Yes.
24   Q.   Topic 12 says, "Your activities relating to
25 assisting voters during elections since 2004."

25

1         Have you been designated to testify to
2  Topic 12?
3    A.   Yes.
4    Q.   Are you prepared to testify to Topic 12?
5    A.   Yes.
6    Q.   Topics 13 says, "Any activities by you or on
7  your behalf regarding SB 14."
8         Have you been designated to testify to
9  Topic 13?
10   A.   Yes.  And we agree that this is inclusive of
11 everything you just said, I imagine.  Right?  Matter 13
12 is inclusive of everything previous, every other matter
13 before that.  But, yes, I've been designated.
14   Q.   I'm just talking about the language in
15 Topic 13.
16   A.   That's fair.
17   Q.   Okay.  Are you prepared to testify regarding
18 Topic 13?
19   A.   Certainly.
20   Q.   Topic 14 says, "All written testimony, talking
21 points, or public statements made by you regarding
22 SB 14."
23        Have you been designated to testify to
24 Topic 14?
25   A.   Yes, sir.

Martin Golando - 6/24/2014

26

1    Q.   And are you prepared to testify to Topic 14?
2    A.   Yes.
3    Q.   Topic 15 says, "Any calculations, reports,
4    audits, estimates, projections, or other analyses
5    related to the effect of SB 14 on minority voters or on
6    voters who are members of a language minority group from
7    2005 to the present."
8         Have you been designated to testify to
9    Topic 15?
10   A.   Yes, sir.
11   Q.   And are you prepared to testify to Topic 15?
12   A.   Yes.
13   Q.   Topic 16 says, "The identity of each
14   registered voter known to you on September 17th, 2013,
15   who you contend has been unable to vote on account of
16   his or her inability to obtain photographic
17   identification specified by SB 14 as enacted by the
18   State of Texas' 82nd Legislature."
19        Have you been designated to testify to
20   Topic 16?
21   A.   Yes.
22   Q.   Are you prepared to testify to Topic 16?
23   A.   Yes.
24   Q.   Only 10 more.  Topic 17 says, "The identity of
25   each registered voter known to you at present, who you

27

1    contend has been unable to vote on account of his or her
2    inability to obtain photographic identification
3    specified by SB 14 as enacted by the State of Texas'
4    82nd Legislature."
5         Have you been designated to testify to
6    Topic 17?
7    A.   Yes.
8    Q.   Are you prepared to testify to Topic 17?
9    A.   Yes.
10   Q.   Topic 18 says, "Attempts made from 2011 to the
11   present by each registered voter known to you on
12   September 17th, 2013, who you contend has been unable to
13   vote on account of his or her inability to obtain
14   photographic identification specified by SB 14 as
15   enacted by the State of Texas' 82nd Legislature to
16   obtain such a form of photographic identification."
17        Have you been designated to testify to
18   Topic 18?
19   A.   Yes.
20   Q.   Are you prepared to testify to Topic 18?
21   A.   Yes.
22   Q.   Topic 19 says, "Attempt made from 2011 to the
23   present by each registered voter known to you at the
24   present who you contend has been unable to vote on
25   account of his or her inability to obtain photographic

28

1    identification specified by SB 14 as enacted by the
2    State of Texas' 82nd Legislature to obtain such a form
3    of photographic identification."
4         Have you been designated to testify to
5    Topic 19?
6    A.   Yes.
7    Q.   Are you prepared to testify on Topic 19?
8    A.   Yes.
9         MR. TATUM:  With regard to Topic 20, I
10   believe y'all have objected to this topic on grounds
11   that -- stating that MALC does not maintain lists by
12   name or by number of its members who have participated
13   in elections and cannot produce a witness to testify to
14   this topic.  Is that correct?
15        MS. RUDD:  That is correct.
16        MR. TATUM:  Okay.
17        MS. RUDD:  So that is the only topic in
18   this list that we -- we are not prepared to offer
19   Mr. Golando up to testify about.
20        MR. TATUM:  Okay.
21   Q.   (By Mr. Tatum)  Topic 21 states, "The
22   allegation in Paragraph 4(c) of your Federal Complaint
23   that SB 14 is causing and will continue to cause MALC to
24   divert a portion of its financial and other
25   organizational resources to educate Texas citizens about

29

1    the photo ID requirements of SB 14, and assisting voters
2    in casting in-person ballots in compliance with SB 14."
3         Have you been designated to testify to
4    Topic 21?
5    A.   Yes.
6    Q.   Are you prepared to testify to Topic 21?
7    A.   Yes.
8    Q.   Topic 22 states, "The allegation in
9    Paragraph 4(c) of you Federal Complaint that MALC is
10   limited and will continue to be limited to devoting
11   fewer resources to its other organizational activities."
12        Have you been designated to testify to
13   Topic 22?
14   A.   Yes.
15   Q.   Are you prepared to testify to Topic 22?
16   A.   Yes.
17   Q.   Topic 23 states, "Any allegations, whether
18   substantiated or unsubstantiated, or concerns relating
19   to election crimes raised by your members or their
20   constituents or which were communicated to you from 2004
21   to the present."
22   A.   Yes.
23   Q.   Have you been designated to testify to
24   Topic 23?
25   A.   I apologize.  Yes.

30

1    Q.   Are you prepared to testify to Topic 23?
2    A.   Yes, sir.
3    Q.   Last page.  Topic 24 states, "Any allegations,
4    whether substantiated or unsubstantiated or concerns
5    relating to voter fraud raised by your members or their
6    constituents or which were communicated to you from 2004
7    to the present."
8            Have you been designated to testify to
9    Topic 24?
10   A.   Yes.
11   Q.   Are you prepared to testify to Topic 24?
12   A.   Yes.
13   Q.   Topic 25 states, "Any calculations, reports,
14   audits, estimates, projections, or other analyses done
15   by you, commissioned by you, or in your possession,
16   custody, or control relating to voter fraud from 2004 to
17   the present."
18           Have you been designated to testify to
19   Topic 25?
20   A.   Yes.
21   Q.   Are you prepared to testify to Topic 25?
22   A.   Yes.
23   Q.   Finally, Topic 26 states, "Any calculations,
24   reports, audits, estimates, projections, or other
25   analyses done by you, commissioned by you, or in your

31

1    possession, custody, or control, relating to election
2    crimes from 2004 to the present."
3            Have you been designated to testify to
4    Topic 26?
5    A.   Yes.
6    Q.   Are you prepared to testify to Topic 26?
7    A.   Yes.
8    Q.   Okay.  Mr. Golando, I'd like to ask you a few
9    questions regarding MALC generally.
10           Can you describe the purpose and mission
11   of MALC?
12   A.   The purpose of MALC is to assist the members
13   of MALC and their staffs in being prepared to be a voice
14   for the Mexican Americans of Texas.  That's the purpose.
15   It's also listed in their bylaws, so...
16   Q.   So that's a stated mission that's in your
17   bylaws?
18   A.   Correct.
19   Q.   How long has MALC been in existence?
20   A.   Since 1973.  So 40 years -- 40-plus years.
21   Q.   And how was it formed?
22   A.   It was a caucus.  There's rumors about how it
23   was formed, in the back of a closet, but just members
24   of -- Mexican American members of the Legislature at
25   that time formed together a group.  And I think at the

32

1    beginning it was both the House and Senate, and at some
2    point there was a bifurcation between the two, so...
3    Q.   Does MALC have -- as a result of that
4    bifurcation, does it have an equivalent organization in
5    the Senate?
6    A.   Yeah.  There's a Hispanic caucus.  The chair,
7    I think, is Jose Rodriguez.
8    Q.   Do y'all regularly work with the Senate
9    Hispanic caucus?
10   A.   Define "regularly."
11   Q.   Are y'all involved organizationally with the
12   Senate Hispanic caucus?
13   A.   Yes.  I know Luis very well.  Luis Figueroa is
14   the liaison, I guess, for the Senate Hispanic caucus,
15   and I've worked with him for many years.
16   Q.   But is MALC a separate entity unto itself from
17   the Senate Hispanic caucus?
18   A.   Absolutely.
19   Q.   Okay.  How is MALC organized?
20   A.   We are a (c)3 and a (c)6 and a legislative
21   caucus.
22   Q.   Describe what it means to be a legislative
23   caucus.
24   A.   It's organized under the House housekeeping
25   resolution.  There's a portion dedicated to the creation

33

1    of legislative caucuses, which are groups of legislators
2    for various purposes.  So it's organized under that
3    statute.  And legislative caucuses also have certain
4    reporting requirements under the -- the C&E reports for
5    the Ethics Commission.  I think that covers it, so...
6    Q.   How was MALC organized internally?
7    A.   There is an executive committee made up of the
8    chair, the vice chair, the legal counsel, the treasurer,
9    and the secretary.  So it's five legislators who run for
10   leadership posts within MALC, and they make most of the
11   executive decisions.  By "internally," do you also mean
12   staff?
13   Q.   Sure.
14   A.   There's Executive Director Summer, and general
15   counsel, me, and then there are two policy analysts,
16   part time and full time, roughly.
17   Q.   So everyone on the Executive Committee is also
18   a legislator?
19   A.   Correct.  MALC is made up of legislators.
20   It's a group of legislators.
21   Q.   Do you work under the legal counsel?
22   A.   No.  I report to their chairman,
23   Representative Martinez Fischer.
24   Q.   Okay.  And is the Executive Committee elected
25   by the membership of MALC?

Martin Golando - 6/24/2014

---

34

1    A.   Correct.
2    Q.   And how long do they serve on the Executive
3  Committee?
4    A.   Roughly two years, and then there's elections
5  either during the session or just before the session,
6  right after the election, so...
7    Q.   And this is all in the bylaws, everything
8  you've told me so far?
9    A.   Yes, sir, that's correct.
10   Q.   Do you know how many members MALC has?
11   A.   41, I believe.
12   Q.   Does that stay the same over the years, or
13  does that fluctuate?
14   A.   It fluctuates.  In 2011, I think we had 39.
15  In 2013, we had 40, I believe.  And now we have 41
16  because Celia Israel just won a special election, and
17  she's decided to be a MALC member.
18   Q.   That leads me to my next question.  You stated
19  that she's decided to be a MALC member.  How does one
20  become a MALC member?
21   A.   There are two ways.  I think if you're
22  Mexican-American, you're entitled to automatic
23  admittance if you accept and -- or if you're a Latino.
24  But if you're not Latino but represent a majority Latino
25  district, you can get in through a committee process.

---

35

1  It's all listed in the bylaws, so...
2    Q.   Are there fees or dues involved with being a
3  member of MALC?
4    A.   There are.
5    Q.   Do you know how much those dues are?
6    A.   I think it's $300 for a two-year cycle.  I
7  think that's right.  It may be $300 a year.  I can't
8  recall exactly.  It's nominal.
9    Q.   Are there different levels of membership, or
10  is it you're a member of MALC and that's what everyone
11  is?
12   A.   I think you're a member of MALC and that's
13  what everyone is.
14   Q.   Okay.  Is MALC a partisan organization?
15   A.   No.
16   Q.   So the membership of MALC is comprised of both
17  Republicans and Democrats.  Is that --
18   A.   Correct.
19   Q.   -- correct?
20   A.   Correct.  I'm sorry.  I didn't mean to cut you
21  off.
22   Q.   No problem.  What kind of privileges or
23  benefits come with being a member of MALC?
24   A.   I think you get to speak as a unified voice on
25  matters of importance to the Mexican-American community.

---

36

1  You get the normal provisions that come with being part
2  of a legislator group, where you can work together to
3  form coalitions with other groups to pass legislation.
4  You get information.
5           So MALC members will call MALC staff to
6  help us -- help them research ideas.  We do some measure
7  of policy development, and we'll do anything we can for
8  members to help pass their bills or help them with an
9  initiative they have.
10          In addition, we have space, and sometimes
11  our space is used for events.  There's other things that
12  we can offer.  We do basically everything we can for our
13  members.
14   Q.   You mentioned that space.  Where is that
15  space?
16   A.   202 West 13th Street, which is about a block
17  away from here.  And we have space 204, which is
18  essentially a meeting space for caucus meetings or
19  for -- if MALC members want to meet with their
20  constituents there, it's our privilege to have them
21  there, so...
22   Q.   If you're a member of MALC, are you authorized
23  to speak on MALC's behalf?
24   A.   No.
25   Q.   Who is authorized to speak on MALC's behalf?

---

37

1    A.   The chairman.
2    Q.   Only the chairman?
3    A.   I believe that's true in the bylaws, that he
4  has a specific bylaw that says the chairman is
5  authorized to make executive decisions and speak on
6  MALC's behalf.  In practice, though, it rarely ever
7  comes up.  There may be some certain designees by the
8  chairman, "You can speak on this matter for us.  You can
9  speak on public education for us," but that's usually by
10  designation.
11          But I think as a matter of bylaw, I think
12  only the chairman has the authority to speak on behalf
13  of MALC.
14   Q.   So if someone seeks the official position of
15  MALC, they will seek that from the chairman,
16  Representative Martinez Fischer?
17   A.   That's right.  Yes, sir.
18   Q.   You mentioned employees and staff of which
19  you're a part.  Do you know how many, roughly, employees
20  or staff that MALC employees?
21   A.   It fluctuates.  During the session, there's
22  obviously more.  And there's also the MALLF fellows
23  program.  So they're paid for by the MALLF foundation,
24  but they are in the staff of certain representatives who
25  request and want MALLF fellows.  Currently we have four

---

---

**38**

1 employees, and some -- I think we have two interns.
2 Q. I'm sorry. You said MALC has four employees?
3 A. Currently. And if you count me as an
4 employee, and I think you should, even though I'm
5 technically a vendor. It's kind of a strange
6 difference, right, but --
7 Q. So when you say you're a vendor, does that
8 mean you kind of operate on a contract basis?
9 A. That's correct, a month-to-month,
10 nonrefundable retainer, thankfully, so...
11 Q. You were just mentioning MALLF, I believe?
12 A. Yes.
13 Q. M-A-L-F?
14 A. There's two Ls, I believe. Mexican American
15 Legislative Leadership Foundation. That's the (c)3.
16 Q. Okay. So that is a -- MALLF falls under the
17 umbrella of MALC?
18 A. Correct.
19 Q. And what is the purpose of MALLF?
20 A. To fund fellowships for college students and
21 graduates to get a stipend to work in MALC member
22 offices so they can learn about the Legislature.
23 Q. Okay.
24 A. It's the Moreno/Rangel program.
25 Q. Aside from the benefits and privileges that

---

**39**

1 come with being a member of MALC, which you just
2 described, who does MALC serve other than its members?
3 A. We serve our members and, by extrapolation,
4 their constituents.
5 Q. Does MALC maintain active communications with
6 the constituents of its members?
7 A. We get some contact from the constituents of
8 members, some people at large will call us, contact us
9 about voter ID issues or redistricting issues or other
10 issues that we're at the forefront of. It happens
11 occasionally, yes.
12 Q. So when a constituent calls you, as you said,
13 are they calling to communicate with MALC as an
14 organization or to communicate with one of its
15 individual members?
16 A. The former, MALC as an organization, so...
17 Q. Now, you stated that MALC is a nonprofit
18 organization. Correct?
19 A. That's correct.
20 Q. From where does MALC receive funding?
21 A. It's listed in our C&E reports. So lots of
22 PACs give to us --
23 Q. I'm sorry. Your --
24 A. I'm sorry. C&E reports, contribution and
25 expenditure reports. So it's a matter of public record.

---

**40**

1 Lots of people give MALC money. Some individuals, some
2 corporations, I believe, and some PACs do. Members give
3 us money, too, through their dues, so...
4 Q. So y'all receive funding through individual
5 donations?
6 A. Occasionally. It's rare, but yes.
7 Q. Do y'all receive funding through corporate
8 donations?
9 A. I believe that's true. I'd have to check our
10 C&E. I'm not sure to what degree we get corporate
11 funding or not, but --
12 Q. So the C&E reports, which you said are
13 publically available, they detail the sources and
14 amounts of the funding that MALC receives?
15 A. That is absolutely correct. I think we are
16 one of the few legislative caucuses that detail every
17 one of our contributions and expenditures.
18 Q. Do y'all receive funding from sponsorships?
19 A. What does that mean?
20 Q. Do y'all hold any events that are sponsored by
21 corporations or other entities?
22 A. Truly.
23 Q. What kind of events do y'all -- what kind of
24 such events do y'all hold?
25 A. Annually we have a MALC golf tournament, which

---

**41**

1 will be October 2nd this year if you guys want to come
2 in. And as part of that, there's, you know, various
3 events that are individually sponsored or sponsored by
4 people who give money to legislators, essentially.
5 We also have policy convenings that are
6 rare now because we've had a tremendous diversion of
7 resources because of these voting rights issues, but --
8 you know, there are other sponsored events, too. We did
9 a Diez y Seis event at the Capitol.
10 Q. I'm sorry. Could you say that again?
11 A. Diez y Seis event at the Capitol. September
12 16th is the Mexican-American independence, and there was
13 grito at the Capitol. It was a big event with -- I
14 think we partnered with some Latino television shows.
15 It was a great event. I was not present, unfortunately,
16 but I heard it was great. And during the session --
17 which is not a sponsored event, but we had a huge
18 concert for Mexican-Americans. I don't know if you
19 recall. It was toward the end of the session. We had
20 8,000 people come from Austin to hear our MALC members
21 and a Latino musician come play at the Capitol. It was
22 a great event.
23 Q. Was that a fundraising event?
24 A. No. We can't -- we're subject to the
25 moratorium. We don't fundraise during session.

42

```
1    Q.   Do you fundraise outside of session?
2    A.   Yeah, you have to, you know, unless you have a
3  money tree.  It would be great if you can plant one of
4  those, but --
5    Q.   You mentioned policy convenings?
6    A.   Correct.
7    Q.   Could you describe those a little more?
8    A.   I think three years ago we had an energy
9  convening where we had MALC members and important
10 decision-makers and other policy decision-makers come
11 together and talk about energy policy in Texas.  It was
12 an amazing event.  As a policy professional, I saw
13 honest bilateral dialogue on important matters that I
14 believe became an idea nursery for several of the
15 session's best ideas.  Anyway, we have some of that, but
16 less than we used to because of the diversion of
17 resources.
18   Q.   How many resources are required to put on one
19 of these policy convenings?
20   A.   It depends.  It's variable.
21   Q.   Does MALC organize and execute these policy
22 convenings by itself?
23   A.   Yes, largely.  I'm not sure what you mean by
24 yourself.  Maybe you can explain a little bit better.
25   Q.   Are these policy convenings -- are they put on
```

43

```
1  by MALC in conjunction with some other organization that
2  helps split the cost of running such a meeting?
3    A.   No.  It's run by MALC.
4    Q.   Okay.
5    A.   I mean, we'll have sponsorships sometimes, but
6  mostly MALC staff, MALC funded.
7    Q.   And how often are those typically held?
8    A.   You know, when I first began working for
9  Trey -- when Trey first began at MALC, which was
10 December of 2008, we had several MALC meetings during
11 the session and we had -- I think we had a MALC
12 convening at the golf tournament, so a couple times a
13 year.  And now I think we're down to one every two
14 years, roughly, so...
15   Q.   What would you say is MALC's largest source of
16 funding?
17   A.   You know, I don't know.  I'm sorry.  It may be
18 EFH or AT&T.  But it's listed in our C&E reports, so I
19 think that's probably the best descriptor of where we
20 get our money from.
21   Q.   What is EFH?
22   A.   Energy Future Holdings.  It's an energy
23 company that was part of the TXU private buy-out.
24   Q.   So would you say your largest source of
25 funding comes from corporate donations?
```

44

```
1    A.   I don't know.  Again, I think the best source
2  of that is to review -- you can do a spreadsheet, and I
3  could do that for you if you'd like.  But it's probably
4  from PACs, frankly, and not from corporations
5  themselves.
6    Q.   But again, that information would be in the
7  C&E report --
8    A.   Correct.
9    Q.   -- that you mentioned?
10   A.   Yes, sir.
11   Q.   Do you know if any of those C&E reports have
12 been produced to the defendants in this litigation?
13   A.   You know, I think they have been, but I -- I
14 know that we -- we've done a lot of document production,
15 so -- thousands of documents, I believe.  I'm not sure
16 exactly what's in there.  I know that if they were in my
17 computer, then you guys received them.  But they are
18 also public documents that you can download, so...
19   Q.   Where can they be downloaded from?
20   A.   The Texas Ethics Commission.  It's
21 www.tec.state.tx.us.  And there's a prompt on the
22 left-hand side where you can do an advanced search.  You
23 can look at all of MALC's and MALLF's, both their caucus
24 C&E reports.
25   Q.   Does MALC prepare an annual budget?
```

45

```
1    A.   Yes.
2    Q.   And who has the ultimate authority over that
3  budget?
4    A.   The chairman.
5    Q.   So can the chairman decide to make last-minute
6  unilateral changes to that budget?
7    A.   Surely.  It rarely happens, but yes.
8    Q.   Are the annual budgets of MALC publicly
9  available?
10   A.   No.
11   Q.   Does MALC budget or reserve space in its
12 annual budget for set dedicated operating funds?
13   A.   I don't know what you mean by that.  We have
14 budget categories.  You know, there's a certain amount
15 for staff or for staff positions.  There's a certain
16 amount for rent.  Rent is very expensive.  There's a
17 certain amount for, you know, our other policy
18 focuses -- foci.  And large portions of that have been
19 dedicated for the last four years to voting rights,
20 so...
21   Q.   Does MALC reserve any space in its annual
22 budget for funds that can be allocated on an as-needed
23 basis?
24   A.   I don't know.  I don't think so.  I -- it's --
25 budgets are always documents of priorities, right, and
```

Martin Golando - 6/24/2014

46

1 they're also highly variable, depending on how much you
2 take in in terms of how much you raise.  Right?
3           We try to keep a corpus of a certain
4 amount of money that we won't go below, and I think
5 we've gone below that.  We are currently in the worst
6 budget situation that we've ever had since I've been
7 here, and it's almost entirely because of our -- the
8 last four years of voting rights litigation and advocacy
9 on behalf of MALC.
10     Q.   Can you approximate a percentage of your
11 annual budget that's been dedicated towards voting
12 rights litigation?
13     A.   I can't, but I can approximate a current
14 budget, my time.  I get paid a certain amount, and 80 to
15 90 percent of my time is dedicated to voting rights
16 litigation.  So voting rights takes up 80 percent of my
17 time with MALC.  So that's less time for me to do policy
18 development.  It's less time for me to work with members
19 about their own bills.  It's less time for us to focus
20 on our core mission.
21     Q.   You mentioned the core mission of MALC.  Can
22 you describe generally the kinds of activities that MALC
23 regularly engages in in furtherance of its core mission?
24     A.   We try to develop policies to advance that
25 core mission.  We work with our members with their own

47

1 bills.  We try to pass their agenda.  We work with their
2 staffs to make sure that their staffs are the best
3 prepared that they can be.  We try to speak with
4 unanimity on issues of importance with the
5 Mexican-American community, and generally do everything
6 you can to try to speak with one voice about matters of
7 importance to the community as a whole, which includes
8 things like, you know, press releases, policy agendas,
9 and every other public kind of statements you can make,
10 so...
11     Q.   And what kinds of resources are devoted to
12 these core activities?
13     A.   Financial resources, staff resources, and
14 time.
15     Q.   So you said you started with MALC in 2008.  Is
16 that correct?
17     A.   That's when Trey began as chairman.  I was his
18 chief of staff then.
19     Q.   Okay.
20     A.   It was my job to act as a liaison and to some
21 measure deliver his message to MALC staff at the time.
22 So I guess the MALC staff, in some way, were managed by
23 me.  He was elected in December of 2008.
24           I'm sorry.  I apologize.  It was December
25 of 2010.  I'm off by two years.  I've worked for a long

48

1 time.  They kind of get jammed together.
2     Q.   So it was December 2010 is when your
3 involvement with MALC began?
4     A.   One second.  I'm sorry.  I'm trying to
5 remember.  It was 2009, because Pete was in the
6 legislature.  He was the chairman right before Trey.
7     Q.   When you say "Pete" --
8     A.   Pete Gallego.  I'm sorry.  Representative
9 Gallego at the time.  But Trey was chairman for one
10 session when Pete wasn't.  So that's why it was 2000 --
11 so I was right.  It was December 2008.  I'm losing my
12 mind a little bit, so...
13     Q.   Would this be a good time to take a short
14 break?
15     A.   No.  I'm square.  I'm good.
16     Q.   If you ever need to take a short break, please
17 just let me know.
18     A.   I'll just leave, so I'll be fine.
19     Q.   I'd appreciate it if you'd tell me before you
20 just leave.
21     A.   I'm just teasing.
22     Q.   Okay.  Since you've been with MALC -- and
23 let's call that since 2008.
24     A.   December, yes, sir.
25     Q.   December 2008.  What has MALC done to track

49

1 and follow voter ID legislation since then?
2     A.   We help develop amendments.  We certainly did
3 track the various voter ID bills that were filed at the
4 time.  We helped develop procedural points of order and
5 questions of order.  We developed Q and As for our
6 members and for the chairman to ask between the speaker
7 and he.  We developed a strategy dealing generally with
8 all that, and we worked to try to prevent its passage.
9     Q.   Does MALC consider the tracking of voter ID
10 legislation and the work you just described as part of
11 its core mission?
12     A.   Yes.  I think that's part of what we do, is --
13 as a legislative organization, is to track legislation.
14     Q.   Does MALC monitor voter ID legislation being
15 proposed or enacted in other states?
16     A.   Generally.  I think Texas is unique in many
17 ways, so the laws of Wisconsin or Pennsylvania or South
18 Carolina or Indiana or Georgia have tangential relevance
19 to what we do here.  But as part of investigating any of
20 these things, you should know what they're doing in the
21 states.  And so I know generally what they did, so...
22     Q.   Do you recall any specific voter ID laws in
23 other states that MALC has specifically spent resources
24 tracking or following?
25     A.   You know, I don't know the state, but I

Martin Golando - 6/24/2014

50

1  remember one had a photo ID requirement with a waiver --
2  an affidavit pass.  So you could sign a waiver saying
3  who you were.  And there were less restrictive policies
4  considered in all states compared to Texas.  And I'm
5  much more familiar with kind of the evolution of the
6  voter ID policy here, obviously.  By my estimation, we
7  have the most stringent voter qualification law in the
8  states, but that's maybe a limited opinion, so...
9      Q.   Does MALC communicate with members of other
10 state legislatures regarding these proposed voter ID
11 legislations in other states?
12     A.   Not regarding voter ID.  There are some
13 inter-caucus relationships through the Board of Hispanic
14 Caucus Chairs, and there was a legislator in -- a
15 Republican legislator in Florida who is very close with
16 my boss and Representative Anchia.  So they may have
17 spoken about voter ID, but nothing formally between the
18 two caucuses.
19     Q.   Do you remember who that legislator in Florida
20 was?
21     A.   He's a really nice guy.  I forget his name.  I
22 can look it up and make my answer more full.  I would
23 know him if I saw him.  I apologize.  I don't remember
24 his name.  Nice guy, though.  Smart guy.
25     Q.   At the end of the deposition, I'll give you an

51

1  opportunity to clarify or amend any kind of answers, so
2  if you think about it between now and then --
3      A.   Surely.
4      Q.   -- you will have an opportunity to state it at
5  the end.
6      A.   Surely.
7      Q.   So sorry.  Just to get back to voter ID being
8  proposed in other states and communications with members
9  of other state legislatures about voter ID legislation.
10         Did you testify that MALC does not
11 communicate with other states regarding voter ID laws?
12     A.   That's correct.  I think that we've sent some
13 letters -- I remember a letter before Trey was
14 chairman -- I think Pete sent a letter to the Illinois
15 legislature.  And there was a time in which the Delaware
16 legislature wanted to form its own Latino caucus, and I
17 think that Representative Gallegos, now Congressman
18 Gallegos, had discussed the bylaws.  And I think that
19 MALC is a model for these various legislative groups.
20 That's what I know.  There was nothing formal there,
21 but there has been some inter-caucus communications, but
22 I can't speak to the depth of it for voter ID.
23     Q.   So if there were a legislative caucus in
24 another state that was dealing with or opposing a voter
25 ID legislation, would they ever reach out or contact

52

1  MALC regarding its stances or positions in regards to
2  voter ID legislation in Texas?
3      A.   They haven't.  I hope that they would, because
4  several of our members are very -- have a deep knowledge
5  of this area and how it affects the Latino community.
6  And I think that however it affects the Latinos here in
7  Texas, it probably affects them in Nevada the same way
8  or California or New Mexico, Arizona, all throughout the
9  American Southwest.  I would hope we could be a model
10 for them.
11     Q.   So y'all don't have any direct communication
12 with members of other state legislatures regarding voter
13 ID legislation.  Do y'all exchange documents or
14 materials with other members of other state legislatures
15 regarding voter ID legislation?
16     A.   No, not to my knowledge.  We haven't yet.
17     Q.   Does MALC engage in any kind of activities
18 related to voter registration?
19     A.   Only through our membership, but nothing
20 directly by the caucus itself.  I think it would be
21 inappropriate for MALC to do that.
22     Q.   When you say only through your membership,
23 what does that mean?
24     A.   If the legislators themselves do a voter
25 registration drive -- they're members of MALC, but

53

1  they're doing a voter registration drive for whatever
2  reason.  So through our members they register voters,
3  but nothing directed because of the caucus actions.
4      Q.   So if a member of MALC engages in any kind of
5  activity related to voter registration, are they doing
6  so in their individual capacity as a legislator and not
7  as a member of MALC?
8      A.   I think that's correct.
9      Q.   So is it correct to say that MALC does not
10 expend any resources towards voter registration
11 activities?
12     A.   Voter registration?
13     Q.   Yes.
14     A.   No.
15     Q.   Does MALC engage in any kind of activities
16 related to voter education?
17     A.   Absolutely.
18     Q.   Could you describe those activities?
19     A.   We are an information hub about the law, and
20 so our duty is to inform our members so they can inform
21 the constituents how various laws might affect them,
22 specifically SB 14.  Over the last -- since SB 14 began
23 to be enacted last year, we have received lots of
24 requests by legislators about what the law means and how
25 they can talk to the constituents about the law, what

54

1 their requirements are. And so MALC has been a resource
2 for voter education for the members themselves.
3         And there's also been members of the
4 community who would call up and ask what does the law
5 mean, and we would tell them to the best of our
6 knowledge, to give them resources as best we can.
7         We have an electronic newsletter that we
8 send out every week called The Caucus, and voter ID
9 has -- and SB 14 and its requirement have been a central
10 part of each of those, which I think we gave to you in
11 our document productions. Also our public statements,
12 where we try to educate voters about the effects of
13 voter ID and what the requirements are in order to
14 educate them for their vote, have been prominent. We've
15 also given you those things, too.
16         So it's my experience that we've devoted
17 a lot of resources to be an information hub to voter
18 educate on this issue, so...
19   Q.   So do y'all expend or commit resources to
20 educate both members of MALC about voter ID laws and
21 constituents of members of MALC about voter ID laws?
22   A.   I think that's right. I think that The Caucus
23 doesn't just go out to members. And our public
24 statements obviously travel wherever they go. And so I
25 think that it's for the public and for the members

55

1 themselves.
2   Q.   Can you tell me what kinds of resources are
3 committed towards voter education activities?
4   A.   First you have to understand the law in order
5 to talk about it. So much of my job is to suss out the
6 law and understand it. So some portion of my salary is
7 dedicated to that.
8         Our public statements via press releases,
9 Facebook responses, or through our caucus, are written
10 by staff. There is staff time devoted to that. It
11 costs money to do those things. The cost of contact --
12 I think we actually use a different email platform that
13 costs money each month to -- you have to develop the
14 words for this. There's editing involved in that.
15         Anyways, long story short, I think that
16 lots of staff time is diverted from our core purpose,
17 which is policy development and member relations, to
18 educating on this topic, so --
19   Q.   Did MALC commit resources towards voter
20 education purposes prior to SB 14?
21   A.   Not to my knowledge. There may have been some
22 resources committed to talk about the law generally, but
23 there's been a radical uptick -- a logarithmic increase
24 in the amount of money, time, staff that we spent
25 educating our members and the public at large about

56

1 SB 14.
2   Q.   When you say "a radical uptick," can you
3 exemplify that by a certain percentage?
4   A.   I think it's very difficult to empirically say
5 X amount of time or money was spent on this issue
6 because there's lots of indirect costs that you may not
7 be aware or you might miss.
8         I will just say this: When we began
9 working as a chairman, Trey had a vision for MALC to
10 have a broad, comprehensive policy horizon that changed
11 the way which MALC and Latino issues were talked about.
12 We've done some part of that, but his goal for MALC was
13 to be able to talk about roads, transportation, energy,
14 and to devote staffers to those core concepts. We've
15 been unable to do that because of the last four years
16 with the diversion of resources in order to answer the
17 clarion call to combat this bill and its law.
18   Q.   But when you say "a radical uptick in
19 resources," what is that based on?
20   A.   My prior knowledge of the budget. I just know
21 that we had a vision to hire policy analysts for complex
22 financial transactions. We had a vision to talk about
23 transportation and water policy and a more complex and
24 fundamental way to kind of change the way in which
25 people thought about Latino policy, and we've been

57

1 fundamentally unable to do those things because of our
2 diverted focus to voting rights issues. And I guess I
3 could -- I'm not sure how I could empirically show it to
4 you, but I just know it's true, so...
5   Q.   Does MALC engage in any kind of activities
6 related to assisting voters during elections?
7   A.   Only through voter education. I assume by
8 assisting voters you mean helping them to the polls or
9 GOTV effort. That would be inappropriate for a (c)3 or
10 a (c)6.
11   Q.   When you say "GOTV," is that get out the vote?
12   A.   That's correct. We don't do that. We just --
13 we voter educate as much as we possibly can.
14   Q.   Do you have any knowledge of MALC's policy or
15 advocacy-related work with regard to voter ID
16 legislation prior to December 2008?
17   A.   Surely.
18   Q.   Could you describe MALC's policy or advocacy
19 working prior to 2008 with regard to voter ID
20 legislation?
21   A.   Yes. It's the same general thing. We did
22 lots of amendments, lots of Q and A, lots of points of
23 order by and through our membership and their staffs to
24 try to defeat the bill in 2005, 2007, 2009. If you look
25 back at the chubathon, lots of those people doing the

58

1  chubathon were MALC members.  Representative Raymond, I
2  think, had almost a whole day to himself where he talked
3  off a whole bunch of bills.  So I think that MALC
4  members have played a central role in advocating against
5  the bill in its various forms.
6       Q.   When you say "chubathon," is that in reference
7  to the practice known as chubbing?
8       A.   Yes, sir.
9       Q.   And what is chubbing?
10      A.   It's where you elongate the time on a bill,
11  longer than it normally would take, either through Q and
12  A or just long talking.
13      Q.   Is that a procedural tactic that MALC
14  regularly employs?
15      A.   Not regularly, but it happens -- legislators
16  employ it.  I think it happens once a session; although,
17  I can't point to a time this last session when it
18  happened.  Toward the end of any deadline, I think
19  there's always kind of a legislative desire to start
20  hitting the bricks.  This was much different.  This was
21  a concerted caucus-wide effort to defeat a bill by
22  literally talking off 150 bills off the calendar.  It
23  was amazing.
24      Q.   Do you remember what bill was defeated in that
25  instance?

59

1       A.   It was the Troy Fraser bill.  I think it was
2  SB 362, if I recall correctly.  But again, the numbers
3  kind of come together in my -- it wasn't necessarily
4  his bill that was talked off.  His bill was on the
5  calendar, and there was an intervening local calendar.
6  And so the local calendar took six days to get through,
7  five or six days, which it would normally take four or
8  five hours.
9       Q.   Was that in 2009?
10      A.   Correct.
11      Q.   Has MALC ever taken a public position in
12  support for or in opposition of a voter ID-related bill?
13      A.   I think so.  I think that we had some press
14  releases against the bill.  I think Trey's public
15  statements as MALC chairman were against the bill.  I
16  think that we provided those to you as much as we had
17  them in our custody.
18      Q.   When you say "the bill," do you mean SB 14?
19      A.   That's correct.  All the bills.  I'm trying to
20  remember -- I don't remember, in 2005, if there was a
21  concerted press release issued by Chairman Gallego at
22  the time, and I don't remember in '07 and '09 directly,
23  but I know that Trey has made various statements, and
24  certainly in '09 and '11 against the bill, so...
25      Q.   Could you describe all the ways that MALC

60

1  would publicize its support or opposition to a voter ID
2  bill?
3       A.   By and through its members and public
4  statements issued by the caucus itself, public
5  statements issued by members of the Executive Committee
6  or the chairman.  I don't know if we ever did a policy
7  paper on it, but we may have.  Representative Anchia had
8  several statements.  He's a member of MALC.  I think
9  that's exhaustive.  There may be some things I'm missing
10  like social media, but I don't think our social media
11  really began until a little bit later, so...
12      Q.   Does MALC have a Twitter account?
13      A.   You know, I think we do.  I don't think it's
14  operational.  Usually Trey's Twitter account is kind of
15  the central point for public statements, either as Trey
16  or as MALC chairman.
17      Q.   But MALC employs various modes of social media
18  to communicate with its members and the constituents of
19  its members.  Is that correct?
20      A.   Yes, sir.  And the public at large.  Right.
21      Q.   Sure.
22      A.   I don't think I can --
23      Q.   So has MALC been engaging in voter education
24  activities related to various voter ID bills since 2004?
25      A.   I can't speak to 2004, 2005.  I can only speak

61

1  to the recent uptick since the bill has been passed.
2  Voter education is probably not necessary if there is --
3  the bill hasn't been passed or implemented.  Right?
4            Although, sometimes I think members
5  receive questions or MALC receives questions saying, "Do
6  I have to bring my ID or not?"  Right?  That's a form of
7  voter education.  But before the passage we would say,
8  "No," and after the passage we would say, "Yes."
9            I would just say generally there has been
10  a tremendous increase in the amount of information
11  requested and provided by MALC on this issue, so...
12      Q.   And when you say "this issue," you mean SB 14?
13      A.   Correct, the implementation of SB 14.
14           MR. TATUM:  Can we take a quick break for
15  a few minutes?
16           MS. RUDD:  That would be great.
17           THE WITNESS:  Surely.
18           MR. TATUM:  We'll go off the record.
19           (Recess from 10:41 a.m. to 10:49 a.m.)
20           (Exhibit No. 2 marked)
21      Q.   (By Mr. Tatum)  Mr. Golando, I'm handing you
22  what's been marked as Exhibit 2.  And I believe you
23  stated that you reviewed this document, but just to make
24  sure:  Do you recognize what this document is?
25      A.   I believe this is what I reviewed.

62

```
1      Q.   And what is this document?
2      A.   It's our intervention, I believe, or our
3   complaint.  I get confused between the two.
4      Q.   I'll represent to you that this is the
5   complaint that initiated MALC's involvement in this
6   lawsuit.  Did you assist with the preparation of this
7   document?
8      A.   No.  Sadly.
9      Q.   Is it true that MALC does not claim that SB 14
10  causes injury to any of its members?
11     A.   I believe that's true in the following way.
12  I've thought about this deeply for a while, and I think
13  that the passage of the bill did harm our members.  I
14  think it's harmful whenever the State of Texas passes a
15  racist law, and in that sense it harms members of the
16  minority community and their representatives very
17  gravely.
18          So I think that -- I'm not sure what's
19  said in the complaint on that score, but I believe that
20  there has been an immeasurable but serious harm to my --
21  the members of my organization.
22     Q.   Mr. Golando, I ask that question because I
23  have an email from one your counsel, Ms. Lindsey Cohan,
24  stating that MALC is not asserting individual injury to
25  any of its members.
```

63

```
1           MS. RUDD:  Okay.  Let me just clarify
2   that.  I believe our position is that MALC is not
3   asserting individual injury to any of its members for
4   purposes of proving standing in this case.  I think
5   that's a separate question from whether or not as an
6   esoteric matter SB 14 and voter ID legislation has some
7   form of harm or creates some sort of injury for members
8   generally speaking.  But that's certainly true for
9   purposes of standing, Stephen.
10          MR. TATUM:  Okay.
11     Q.   (By Mr. Tatum)  Okay.  So, Mr. Golando, do you
12  agree that for purposes of standing, MALC is not
13  asserting individual injury to any of its members
14  because of SB 14?
15          MS. RUDD:  And I'm just going to object
16  to the extent that that calls for a legal conclusion.
17     A.   I guess that's true.  I would say that none of
18  the members are probably going to be directly affected
19  by voter ID.  None of them are going to be prevented
20  from voting.  But again, I reassert that there is
21  immeasurable harm when a racist law is passed and harms
22  members of the minority community the most.
23     Q.   (By Mr. Tatum)  So is MALC asserting the
24  rights of its members in this lawsuit?
25          MS. RUDD:  Objection; calls for a legal
```

64

```
1   conclusion.
2      A.   Yes, organizationally, I think that's right.
3      Q.   (By Mr. Tatum)  Is MALC asserting the rights
4   of the constituents of its members in this lawsuit?
5      A.   To the degree that we represent the
6   Mexican-American community, of course.
7      Q.   Is that because MALC believes that SB 14
8   denies or abridges the right to vote of constituents of
9   MALC members?
10     A.   Correct.
11     Q.   Do members of MALC believe that SB 14 will
12  affect their constituents' ability to elect or reelect
13  them?
14     A.   Yes.
15     Q.   With regard to standing, is it MALC's position
16  that it is only representing the interests of itself as
17  an organization in joining this lawsuit?
18          MS. RUDD:  Wait.  Can you repeat that,
19  Stephen?
20          MR. TATUM:  Sure.
21     Q.   (By Mr. Tatum)  On the issue of standing, is
22  it MALC's position that it is only representing the
23  interests of itself as an organization in joining this
24  lawsuit?
25          MS. RUDD:  Objection; calls for a legal
```

65

```
1   conclusion.
2      A.   I don't really know the parameters of
3   standing.  I mean, I do, because I'm an attorney, but
4   I -- what I will say is that MALC sought this because --
5   in the interest of its members in the community and as
6   an organization.  So I'm not sure that answers your
7   question, but maybe if you say it again, I'll try to do
8   it.
9      Q.   (By Mr. Tatum)  Well, let me just ask:  Why
10  did MALC join this lawsuit?
11     A.   Because we believe that members of our
12  community and the legislators themselves will be deeply
13  harmed by its passage and have been.
14     Q.   When did MALC first learn of this lawsuit?
15     A.   This one -- the Section 2 one?
16     Q.   Yes.
17     A.   In the fall of 2013.
18     Q.   And how was it decided that MALC would join
19  this lawsuit?
20          MS. RUDD:  Okay.  I'm going to object to
21  the extent that calls for you to reveal any
22  communications, Marty, that were had between you and the
23  organization in your capacity as an attorney or with
24  other attorneys for MALC in determining what to do in
25  this lawsuit.
```

Martin Golando - 6/24/2014

66

1    A.   On the advice of counsel, I think I can't -- I
2   don't think I can discuss that without going into the AC
3   privilege.
4    Q.   (By Mr. Tatum)  Okay.  Mr. Golando, were there
5   meetings held to discuss the possibility of joining this
6   lawsuit?
7    A.   There was not a formal MALC meeting.
8    Q.   Were there informal MALC meetings held?
9    A.   I don't know if Trey talked to other members
10  or not generally.  I'm sure that he did informally, and
11  I'm sure that this came up, voter ID generally, its
12  implementation and whether or not we would join or
13  intervene, but I don't know for sure.
14   Q.   Who within MALC made the ultimate decision to
15  join this lawsuit?
16   A.   The chairman.
17   Q.   Representative Martinez Fischer?
18   A.   Correct.
19   Q.   Was that a unilateral decision?
20       MS. RUDD:  Objection; vague.
21   A.   And again, I don't have any specific knowledge
22  of his conversations with other representatives, so I
23  don't know if it was unilateral in the sense that he
24  decided it solely.  I think it was probably a consensus
25  decision between he and other members.  But again, I

67

1   have no specific knowledge of any direct conversation he
2   had with another representative.
3    Q.   (By Mr. Tatum)  Based on what you do know
4   about MALC, would the decision -- would the action taken
5   to join this lawsuit be the result of a vote amongst the
6   Executive Committee?
7    A.   Not likely.
8    Q.   Is it likely that the decision to join this
9   lawsuit was made solely by the chairman of MALC?
10   A.   By and through his discretion given to him by
11  the bylaws, likely, but I don't know, again.  There may
12  have been informal talks or not.
13   Q.   Do you know if any representatives of MALC met
14  with any other parties in this suit to discuss the
15  possibility of joining this suit?
16   A.   I don't know.
17   Q.   Did MALC publicize that it was considering
18  joining this suit?
19   A.   By "publicize," do you mean to the public at
20  large?
21   Q.   Yes.
22   A.   I don't think so; although, we had been
23  involved in the Section 5 suit.  I think it would be a
24  natural assumption on behalf of people in the know that
25  we would seek Section 2 relief possibly.  So I don't

68

1   know what general inferences the public made from that.
2    Q.   Did MALC consider the input of its members or
3   constituents leading up to its decision to join this
4   suit?
5    A.   Certainly.
6    Q.   And how was that input sought?
7    A.   Through the public statements of members
8   themselves.  And I'm sure that representatives had
9   conversations about the implementation of SB 14 and how
10  it would affect other members and their constituents.
11  I'm sure he is privy to conversations that I wasn't
12  privy to.
13   Q.   Did you provide any legal advice to the
14  chairman regarding the decision to join this suit?
15   A.   Yes.
16   Q.   Did the chairman receive legal advice from
17  attorneys other than yourself leading up to the decision
18  to join this suit?
19   A.   Yes.
20   Q.   Do you know if the chairman received legal
21  advice from members of other organizations such as the
22  NAACP or Texas League of Young Voters leading up to the
23  decision to join this suit?
24   A.   I don't think so.  I don't think he had any
25  contact with Mr. Bledsoe or Mr. Notzon, other than

69

1   redistricting.  They would have talked about
2   redistricting probably.  And Texas League of Young
3   Voters, I know the attorney's -- I can see his face.  I
4   just don't know his name.  I'm sure that Trey would
5   never -- has never spoken to him, so...
6    Q.   Are you aware that the United States is a
7   party to this lawsuit represented by the Department of
8   Justice?
9    A.   Yes, sir.
10   Q.   At any time did MALC urge the Department of
11  Justice to sue the State of Texas over SB 14?
12       MS. RUDD:  And I -- I mean, I guess you
13  can answer the question.
14   A.   I'm trying to think if we --
15       MS. RUDD:  I just want you to be careful
16  about the attorney-client privilege to the extent there
17  are any communications prior to the filing of the
18  lawsuit that were attorney-related communications or any
19  legal advice.
20   A.   And just to be clear, what you mean by this
21  lawsuit, you mean the Section 2 lawsuit, not the
22  Section 5 matters --
23   Q.   (By Mr. Tatum)  Yes.  I'm referring to the
24  litigation that brings us here today.
25   A.   I don't think so.  I don't think any MALC

70

1  members to my knowledge or MALC as an organization sent
2  a letter to the DOJ saying, "Please sue." I don't think
3  that happened. I think if there was advocacy, it was
4  limited to just, "We think this is a bad law. Something
5  should be done," and it was probably mostly done in
6  relation to Section 5 and not Section 2.
7      Q.  Does MALC feel that its interests are not
8  adequately represented by the United States of America
9  in this lawsuit?
10     A.  Yes.
11     Q.  And why is that?
12     A.  I think that there are unique requirements for
13 Latino-elected officials and their constituents that
14 aren't necessarily represented by the DOJ. I say that
15 with all respect to the DOJ, so...
16     Q.  Is MALC as an organization harmed by SB 14?
17     A.  Yes.
18     Q.  In what ways is MALC harmed by SB 14?
19     A.  For the last four years, roughly, we have
20 diverted a tremendous amount of financial resources and
21 staff time and other resources to educate the public
22 about its effects and to combat its implementation.
23     Q.  Can you tell me what portion of MALC's annual
24 budget is diverted towards educating Texans specifically
25 about SB 14?

71

1      A.  The portion -- about 80 percent of my salary
2  is devoted to voting rights -- 80 percent of my time and
3  therefore 80 percent of my salary, whatever it is, has
4  been devoted to voting rights issues in Texas generally.
5          I think that whatever space that we have
6  in our electronic correspondence, our weekly newsletter,
7  its cost -- and usually one-third of the copy is devoted
8  to SB 14 or voter ID or status update on litigation. So
9  whatever the monthly cost of that is.
10         Plus the staff time itself. We're not
11 hourly. We're flat rate, and so it's hard to determine
12 what percentage, but a significant percentage. It's
13 prevented us from having lots of policy convenings that
14 we might want. And most recently I think that a good
15 example is that we have a border crisis right now for
16 UACs, unaccompanied children, and it would be a
17 traditional role of MALC to play a bigger role, have a
18 convening, talk about what the needs are for border
19 protection and how we can ameliorate this immediate
20 situation, and we haven't been able to focus on it
21 because of the diversion of staff time and focus and
22 financial resources, unfortunately.
23     Q.  Does MALC contend that it is unable to fulfill
24 its mission because of SB 14?
25     A.  Yes, in part.

72

1      Q.  In what way has MALC been unable to fulfill
2  its mission because of SB 14?
3      A.  The mission of MALC is to have a comprehensive
4  voice about all matters of importance to the
5  Mexican-American community, to provide assistance to our
6  member legislators and their staffs in order to further
7  that goal. The comprehensive goal is not just related
8  to the traditional civil rights issue.
9          Like I said before, Trey's goal for the
10 caucus was to have a diverse and new policy horizon for
11 MALC members and Latino policy. That current goal is
12 under serious constraints because of our diversion of
13 resources. It's sad, but it's true.
14     Q.  Does MALC consider its SB 14-related
15 activities as outside the scope of its mission?
16     A.  The voter education portion -- I wouldn't say
17 it's necessarily outside the scope of the mission, but
18 it certainly has taken away from the core mission which
19 is a comprehensive policy voice. Comprehensive means
20 more than just one thing. Right? If we wanted to talk
21 about water or transportation, complex financial
22 transactions, other issues that aren't considered Latino
23 issues, we wanted to change that, and we have been
24 unable to do so because of the devotion of the time and
25 resources to this issue, so...

73

1      Q.  Do you know what percentage of MALC's
2  financial resources have been diverted towards the
3  litigation of this lawsuit?
4      A.  This lawsuit, we've been lucky enough to have
5  little litigation expenses associated with this. We had
6  a lot more travel during the Section 5 trial. Mr.
7  Garza's salary, some part of it has been devoted to
8  this. And obviously, some portion of my salary is
9  devoted to this; although, I'm not involved with the
10 litigation, more the voter education policy development
11 side of it. I guess it's a mixed bag. I couldn't say
12 specifically, but there has been some resources -- some
13 significant financial resources devoted -- I guess -- a
14 bunch, I guess.
15     Q.  Who is Mr. Garza?
16     A.  He is my co-counsel in the redistricting
17 matter. He's also lead counsel for some of the
18 individual intervenors in this case, and he advises the
19 representative on voting rights matters.
20     Q.  And redistricting matters?
21     A.  Yes, he's the counsel on redistricting. But
22 to be clear, some portion of his salary throughout the
23 last three years has been dedicated to voter ID.
24     Q.  Has MALC publicized its participation in this
25 lawsuit?

Martin Golando - 6/24/2014

74

1    A.  Yes, I believe so.
2    Q.  In what ways?
3    A.  Press releases.  I think we did a press call
4  when we intervened.  Trey talks about the litigation
5  generally.  We do less talking about it and more voter
6  education now than we used to.  But, yes, we certainly
7  talk about it publicly.
8    Q.  In the course of publicizing its involvement
9  in this lawsuit, has MALC sought donations or
10  contributions from its normal sources of funding?
11    A.  Do you mean is voter ID something we
12  fundraised off of?  Is that your question?
13    Q.  Yes.
14    A.  No.  You can't fundraise off of voter ID.
15    Q.  Why not?
16    A.  It's deeply controversial.  So our traditional
17  sources of funding are from institutional givers to
18  legislators.  Right?  Those legislators have a
19  multifaceted business, and they don't want to give
20  to controversial groups.  In fact, our fundraising
21  levels have slowly decreased over time, in part because
22  of our intervention and complaint in this lawsuit.  You
23  can't fundraise off this issue.  You just can't.  It may
24  give you cachet because you're a voting rights leader,
25  and that means something in the Latino community, but

75

1  there's no way you can fundraise off it meaningfully.
2    Q.  Has MALC attempted to fundraise off of SB 14?
3    A.  No, sir.
4    Q.  Does it have any plans to attempt to fundraise
5  off of SB 14?
6    A.  No, sir.
7    Q.  Is that because it believes it's just not
8  possible to do so?
9    A.  Not meaningfully possible.  I don't think
10  that's -- I don't think I can go to our institutional
11  givers and say, "Hey, fund this lawsuit.  And by the
12  way, give us more money."  That's not the way it works,
13  so...
14    Q.  Do you think that some of your organizational
15  givers might agree with your involvement in this
16  lawsuit?
17    A.  They may individually, but certainly the
18  organizations that they represent probably would not;
19  although, some of them may.  A very small percentage
20  may.
21    Q.  Have any of these organizations expressed
22  support for MALC's involvement in this lawsuit?
23    A.  I'm trying to think.  I believe that -- in
24  this lawsuit?  That's more true for redistricting,
25  because if you represent a PAC that's a labor union, you

76

1  may be more supportive of redistricting efforts that
2  MALC has been under, but it's less true for voter ID.
3    But I don't know for certain if any of
4  the statements -- any of the money we receive from
5  certain PACs, if those PACs themselves have said, "We
6  support voter ID or your efforts."
7    I don't recall, so -- but it would
8  be -- if it did, it would be a very small percentage of
9  the financial undertaking, so...
10    Q.  So is it your testimony that MALC has seen its
11  donations and or sponsorships decrease as a result of
12  its involvement with this lawsuit?
13    A.  This and other lawsuits, yes, I think that
14  that's empirically true.  And our costs have
15  skyrocketed.
16    Q.  You mentioned that costs have skyrocketed, but
17  I believe it was your testimony that you had minimal
18  costs related to this litigation.  Is that --
19    A.  I thought you meant litigation.  Other costs
20  have skyrocketed, like voter education and other
21  efforts.  That's how I understood your question, so...
22    Q.  Again, I don't want to mischaracterize your
23  testimony.  How would you describe the resources of MALC
24  that have been devoted to the litigation of this
25  lawsuit?

77

1    A.  Some portion of my salary, some portion of
2  Mr. Garza's salary.  Salary is kind of a loose term
3  here.  It's just what MALC pays them.  Some portion of
4  the -- our public statements, whatever they cost to
5  generate by staff or by the Executive Director, some
6  portion of our fixed costs associated with electronic
7  distribution there, some portion of our administrative
8  costs devoted to dealing with staff and paper,
9  et cetera, some portion of our rent, right, because
10  we've had some legal meetings about this litigation
11  between me and Mr. Garza and the representative there.
12    I mean, there's lots of indirect costs
13  that you could add up, but it adds up to a pretty big
14  number, I imagine, in terms of constraints.  Our travel
15  costs during the Section 5 trial.
16    Q.  Would the allocation of resources towards the
17  litigation of this lawsuit, would -- those be evident in
18  the C&E documents that you referenced earlier?
19    A.  They would largely be evident.  The travel
20  would be apparent, because it would have been during the
21  Section 5 trial.  You would see a plane ticket for me or
22  Mr. Garza, and the costs for lodging.  So that would be
23  during -- I guess that was July of 2012.
24    You would see my salary.  As I said, some
25  portion of my salary is dedicated to this litigation and

Martin Golando - 6/24/2014

78

1   to voter education generally.
2           Mr. Garza is less apparent because he's
3   more of a mixed bag.  He gets paid more for
4   redistricting than I do, but some portion is for voter
5   ID.  And I couldn't tell you -- month to month it
6   changes, so -- and so you'd figure some portion of the
7   amount of money we spent to distribute our electronic
8   newsletter, some portion of Lindsey's salary, because
9   she's the one who helps generate that content.
10      Q.   I'm sorry.  Who?
11      A.   Lindsey Rodriguez.  She's one of the policy
12  analysts we talked about before.  Some portion of
13  Summer's salary who runs the caucus, because we had to
14  devote time to preparing for all the stuff.
15          I guess my point is that the costs may be
16  nominal compared to redistricting, but they are
17  certainly larger than they normally would be, and they
18  are daunting to my caucus, so...
19      Q.   Mr. Golando, I just want to be clear that when
20  I'm asking you about costs associated with this
21  litigation, I mean the Section 2 litigation.
22      A.   Okay.  I'm sorry.
23      Q.   I'm not referring -- I'm not talking about
24  redistricting.  I'm not talking about Section 5
25  preclearance.  I'm talking about the Section 2 case that

79

1   we're currently involved in.
2       A.   I apologize.  So there's no travel, then.  But
3   some portion of Mr. Garza's salary since fall has been
4   devoted to voter ID.  Some portion of my salary has
5   been.  Again, the others would stay the same, generally,
6   so...
7       Q.   When you say a portion of your salary, does
8   that mean a portion of your already set salary, or has
9   your salary been increased because of your work with
10  this case?
11      A.   Recently it's been increased.  I used to get
12  about $1,000 from MALC a month, and now I get $1,600
13  roughly a month, and it's been increased in part because
14  of our increased needs for voting rights.  Not a lot of
15  money, but it's a lot of money to me, so --
16      Q.   Not making a judgment on any of that.
17          Do you know specifically what portion of
18  the kind of set costs that you referenced earlier have
19  had to have been diverted towards SB 14-related
20  activities?
21      A.   Again, it's very difficult to say.  So our set
22  costs are salary costs, rent, and other things like what
23  you pay for your newsletter distribution, what you pay
24  for your list, what you pay for your copier, et cetera,
25  what you pay for paper, what you pay for -- those are

80

1   set costs.  Right?
2           Obviously my salary is devoted largely to
3   voting rights.  Summer's salary in part is for handing
4   logistical issues and running litigation and SB 14
5   generally.  Lindsey, lots of our public statements are
6   about voter ID, so lots of her content is about voter
7   ID.  Nathan does video, so I think we had some videos
8   related to voting rights generally, so some part of his
9   stipend.  I can't estimate the paper.  Rent, obviously
10  some portion of their salaries is devoted to that, and
11  we've had meetings about voter ID at MALC.  Obviously
12  it's related in some way.
13          It's very difficult to say.  I just know
14  that we've devoted more resources than I can currently
15  measure for you, and it's been tremendously daunting for
16  my caucus.
17      Q.   So MALC does not have any kind of discernible
18  or tangible measure for the exact percentage of its
19  resources that have been diverted towards SB 14-related
20  activities.  Is that right?
21      A.   I don't think that's fair.  I think that it's
22  really difficult to untwine employment.  Right?  I do a
23  lot of things for MALC.  So does Summer.  And there are
24  hills and valleys in terms of what you're focusing on.
25          What I can speak to is that the last --

81

1   since fall of 2011, and since the implementation of
2   SB 14, I guess last year, since the vacation -- I guess
3   that would be 2012 -- no.  2013.  I'm sorry -- there's
4   been a tremendous amount of focus, time, and some money
5   devoted to educating our members, their constituents
6   about this issue.  Just because I can't give you a
7   percentage today like 65 percent, what would that mean
8   other than what you can measure?  I mean, how do you
9   measure staff time?
10      Q.   Let me ask you more broadly.
11      A.   Please.
12      Q.   Let's picture a pie chart.  A circle graph
13  that's divided up, and this graph depicts, you know, how
14  much -- how many resources are devoted to X activity,
15  how many resources are devoted towards Y activity,
16  et cetera.
17          If we were looking at this pie chart for
18  the resources of MALC, how big would the slice be that's
19  devoted towards SB 14-related activities?  Without
20  putting a specific percentage on it, just roughly how
21  big would it be?
22          MS. RUDD:  Objection; calls for
23  speculation.
24      A.   Probably a third, maybe more, maybe less.
25  It's larger for voting rights generally.  It's probably

**Page 82**

1 two-thirds, maybe 75 percent for voting rights
2 generally.  And they're all related in my mind.
3         Again, I don't know what -- how good a
4 predictor it is, but -- or a pie chart would be, but
5 some portion of my salary of the last month has been
6 dedicated to talking to legislators about legislative
7 privilege and what documents they have to turn over.
8 That's been really intense the last four weeks, lots of
9 questions, lots of concern on the staff.  So recently
10 there has been, you know, a real big hill.  There may
11 have been a valley sometime after our intervention.  I
12 guess it's really hard to say.
13     Q.   (By Mr. Tatum)  What did that hill look like
14 when MALC filed its complaint on September 17th, 2013?
15         MS. RUDD:  Objection; calls for
16 speculation.
17     A.   We spent a lot of time preparing for the
18 intervention, about our public statements.  Trey takes
19 his public statements on MALC very seriously.  We spent
20 some time talking about what kind of travel it might
21 require to go to Corpus.  We spent some time talking
22 about what Mr. Garza's role would be and what my role
23 would be and devoted salary to that goal -- or money,
24 frankly.
25         So not quite the hill it's been the last

**Page 83**

1 four weeks in terms of document production, but -- in
2 terms of max effort, but it was a moderate hill,
3 certainly, right, so...
4     Q.   (By Mr. Tatum)  Can you specify what
5 particular activities that fall under the core mission
6 of MALC have had to be set aside because of MALC's
7 devoted attention to SB 14-related activities?
8     A.   Ideas aren't one to one.  It's a zero sum
9 game, largely.  But I can say that specifically our
10 focus the last four weeks in trying to get these
11 documents out and trying to prepare for litigations,
12 generally, has prevented us from taking a more -- a
13 deeper policy look at this UAC problem on the border.  I
14 discussed before how voter education efforts have taken
15 away from Trey's vision for MALC, which is to have a
16 more comprehensive and meaningful Latino policy in all
17 sectors.
18         Our goal was to have no issue be
19 considered a non-Latino issue.  Every issue should have
20 a Latino focus or Latino facet to it.  And so our policy
21 development operation has been relatively sapped because
22 of our entry in this lawsuit.
23         We've lost a lot of staff because we
24 couldn't afford to pay them because of our voter
25 education efforts and our litigations, generally.  We

**Page 84**

1 lost a staffer to the TDP last fall in part because we
2 couldn't pay him what he was worth.
3         I left state employment in part because I
4 wanted to create budgetary space for us to not lose
5 people.  That's part of the reason I left, because you
6 can kind of have a hybrid employment between the caucus
7 and trades a capital staff.  Right?
8         And so I think that our financial
9 troubles have been exacerbated by our voter education
10 efforts and our efforts involving SB 14.
11     Q.   I think you mentioned earlier that MALC has
12 four staff employees.  Is that correct?
13     A.   Counting myself, and I'm not sure you can call
14 me an employee, necessarily, because I don't get a W-2
15 from them, but I think that's right.
16     Q.   Okay.
17     A.   We have one part-time employee, one -- and two
18 full-timers, and me, and then I think we have -- I think
19 they're actually interns, whom I haven't met yet, but
20 we've got some interns.
21     Q.   So that's current number of employees?
22     A.   Current.  Current.
23     Q.   How many employees did MALC have before they
24 joined this lawsuit?
25     A.   Five plus an intern right before -- you mean

**Page 85**

1 like September of 2013.  Right?
2     Q.   Yes.
3     A.   Five.
4     Q.   And now you have four?
5     A.   Correct.  We lost somebody who was deeply
6 talented, a tremendous asset.  I miss him every day.
7     Q.   When you say you left state employment to
8 create budgetary space --
9     A.   In part.
10     Q.   In part.
11     A.   Yeah.
12     Q.   Does your salary attributable to your work as
13 a state employee -- does that come out of MALC's budget?
14     A.   No.  It comes from -- I'm not a state employee
15 anymore, but when I was a state employee, the salary
16 came from the state, so...
17     Q.   And was it not your testimony that you left or
18 you reduced your role with the state to create budgetary
19 space for MALC?
20     A.   Yes.  The Housekeeping Resolution considers
21 dual employment -- state employees can serve outside of
22 state employment with the permission of the member,
23 which includes caucus employment.  And the Housekeeping
24 Resolution also says you can use caucus equipment -- or
25 state equipment for caucus-related activities, as long

Martin Golando - 6/24/2014

86

1  as -- under certain parameters.  So it contemplates dual
2  employment with a legislative caucus.  Right?  There was
3  a time when that wasn't true, but that changed in I
4  guess '07, I believe.
5          Anyways, my goal was to in part leave
6  state employment to create space that we could -- you
7  know, I made about $4,200 a month from the state, and if
8  we could somehow shift my salary to Summer, that would
9  create $4,000 roughly for MALC to have more money to
10  make ends meet.  Like I said -- and I would appreciate
11  it if this wasn't publicized, but we have tremendous
12  budgetary constraints right now because of this effort.
13      Q.  You mentioned the chairman's goal or vision
14  for MALC which he kind of formulated when he came on in
15  2008?
16      A.  Correct.
17      Q.  Do you think it's still possible for MALC to
18  achieve that goal or vision?
19      A.  God, I hope so.  I really do hope that we can
20  do that.  I hope that we can put this stuff behind us
21  and reach finality, enjoin this lawsuit, get the Texas
22  bill done appropriately, because of their actions, and
23  then focus on the session and try to make things better.
24  I hope we can do that.
25      Q.  Does MALC believe that SB 14 makes it

87

1  impossible for MALC to fulfill its goal and mission?
2      A.  It's been very difficult.  Impossible, I
3  think is -- I think that's an extraordinary standard,
4  because there's -- it's been my experience that Summer
5  Luciano and my boss can do anything, and I mean that
6  without hyperbole, but -- and the members of MALC are
7  deeply talented people, and I think the world of their
8  efforts, all of our members.  But it's been my
9  experience that we can't do what Trey wanted to do
10  because of this litigation, and that's problematic to
11  me.
12      Q.  Does MALC contend that SB 14 was enacted with
13  a discriminary purpose?
14      A.  Absolutely.
15      Q.  What is that based on?
16      A.  Our belief is that the sum of the legislators
17  who sought the enactment did so with an impermissible
18  purpose.  It's based on our knowledge of legislative
19  procedure.  There were many deviations from normal
20  procedure in the enactment of the law.  There are also
21  straight comments from people advocating for the law and
22  straight comments from legislators throughout the course
23  of it that were -- I think belied an impermissible
24  purpose.  I think that they were -- either the
25  legislators were completely irrational or they voted

88

1  with an impermissible purpose.  I think the obvious
2  choice is that they enacted this lawsuit with a
3  discriminary purpose.
4      Q.  Does MALC contend that the legislature
5  intended to harm any minority group by enacting SB 14?
6      A.  Yes.
7      Q.  Has MALC conducted any studies, reports,
8  audits, estimates, projections or anything like that on
9  the effect of SB 14 on minority voters or on voters who
10  are members of a language minority group?
11      MS. RUDD:  Objection; compound.
12      A.  I think that Representative Anchia did
13  something like that as a MALC member, and that would
14  have been given to you guys in our first tranche of
15  documents.  And I think that during the Section 5 trial,
16  I think we had an expert report -- I think that's true.
17  But that's the sum total, I think, of our expert
18  analysis on this point, so...
19      Q.  (By Mr. Tatum)  Does MALC contend that any
20  legislator who voted for SB 14 did so with a
21  discriminary purpose?
22      A.  Yes.
23      Q.  Can MALC identify any specific legislators who
24  voted for SB 14 who did so with a discriminary
25  purpose?

89

1      A.  I think that's a difficult -- more difficult
2  question, because legislative intent is I think a
3  multifaceted kind of deal.  Arlington Heights talks
4  about the ways in which you can infer legislative
5  intent.  And I think it's important to know that because
6  legislative intent includes not only the intent of
7  legislators but their staffs and maybe their
8  constituents whom they're advocating on behalf for.
9  It's a much more deep proposition than a binary is this
10  person a racist or not.
11      I can't point to anybody who I think did
12  so impermissibly, but I do believe that they did so
13  because it's -- either they acted irrationally or they
14  had an impermissible purpose, which I think is far more
15  likely.
16      Q.  Did any members of MALC vote for SB 14?
17      A.  Yes.
18      Q.  Do you know which ones?
19      A.  Joe Pickett did, I think.  I think that Jose
20  Aliseda did when he was a member.  John Garza did.
21  Larry Gonzalez did.  I don't think Aaron Pena did.  I
22  could be wrong, though.  He may have, but I don't think
23  so.
24      Q.  Does MALC contend that any of its members who
25  voted for SB 14 did so with discriminary intent?

Martin Golando - 6/24/2014

90

1  A.  I don't know.  Like I said, I couldn't point
2  to a specific member and how they felt, what they
3  felt internally.  I just know -- I know there's
4  been generally -- Raul Torres I think voted for voter ID
5  as well.  I know them generally as good people.  Larry
6  Gonzalez is an exceptional person.  He was a great
7  staffer.  Raul Torres was one of the kindest people I've
8  ever met in the Legislature.  John Garza is a very nice
9  man.  I actually hit his car with my car once, and he
10  was very kind about it, like super kind.  Jose Aliseda
11  is super cool.  He's a pilot and he has a scuba license,
12  which is really neat.
13        Anyways, my point is I know these guys
14  personally, and I can't believe that they would, but I
15  also don't know what's in their hearts, and I don't
16  think it's also the point of legislative intent.  It's
17  not that they're -- it could be that they're deeply held
18  racists and they voted for it because they're racist.
19  That's possible.  I don't think so.  But it's also
20  possible that they did so with a still impermissible
21  purpose because they were advocating on behalf of
22  racists or they sought a racist law because they thought
23  it made sense pragmatically.  Anyways, I guess what I'm
24  saying is I don't know what's in their heart, but it's
25  possible, but I doubt it.

91

1  Q.  You mentioned that the -- or you testified
2  earlier that the Legislature acted outside of normal
3  legislative procedures in enacting SB 14.  Is that
4  correct?
5  A.  Yes, sir.
6  Q.  In what ways did the Legislature act outside
7  of its normal legislative procedures in enacting SB 14?
8  A.  It's a long answer, so I'll have to be fairly
9  narrative in this.
10  Q.  Just give me specific examples.
11  A.  Okay.  In 2005, the first bill came up that I
12  recall -- it was my first session in the Legislature --
13  and it passed the House with some consternation, and
14  then it died in the Senate on a two-thirds vote.  12
15  Senators or 11 Senators got together saying, "We will
16  not vote for this bill," and it died.
17        And then in 2007, a similar bill came up,
18  more restrictive.  It was the Betty Brown Bill, if I
19  recall correctly.  And Betty Brown said in committee --
20  I think something that I think is at least bigoted,
21  possibly prejudicial, maybe racist to Asian-Americans in
22  the course of considering this bill.  And then that bill
23  got passed by the House, and then died in a two-thirds
24  vote in the Senate again.
25        In the 2009 session, the Senate changed

92

1  the rules to have a specific carve-out for voter ID.  So
2  that's one full change right there.  And so it left the
3  Senate finally -- there was a Senate bill that came
4  over -- and the House members used their procedural
5  tactics to kill the bill.  That was the chubathon we
6  talked about earlier.
7        Fast-forward to 2011, there was a new
8  rule dealing with extended debate on the local calendar.
9  There was a new rule about -- or the same rule about the
10  two-thirds rule.  So two deviations from normal
11  procedure, and there was a creation of a fast-track
12  committee in the House and a committee as a whole in the
13  Senate.  All of those things are deviations from normal
14  procedure for bills like this.
15        I think it would be a deviation from
16  normal procedure to not listen to minority advocates.  I
17  can only look at my time in the leg when I've tried to
18  help pass a bill that I thought they were rational
19  bills, and when someone -- when my boss presents a bill
20  in committee and someone comes up and says, "We don't
21  think this bill is a good idea," that bill doesn't go
22  anywhere.  Right?  It gets stymied.  It gets absolutely
23  stopped until we solve that issue.
24        The legislative process is a process in
25  answering objections.  And every objection that was --

93

1  even small objections were virtually denied and moved
2  forward, because the bill had to get passed and passed
3  quickly.
4        All those things I think are deviations
5  from normal procedure.  There are others I could
6  probably think of.  There is a constitutional problem
7  with the bill.  The bill was stolen from the Texas
8  Mobility Fund to pay for TIC, that way it had a free ID.
9  And Trey brought a point of order saying that was
10  unconstitutional.  That was an A priority jurisdictional
11  issue.  The bill shouldn't be allowed to move forward
12  until it was solved.  They went forward anyway, passed
13  the bill, and it was solved in conference committee
14  through an outside the bounds resolution, which is
15  atypical I would say of a deviation from normal
16  procedure for a bill of this type.
17        I mean, the one thing I love about the
18  Texas Legislature is that there's a lot of bipartisan
19  cooperation, and this bill had none of that.  And there
20  was no listening to minorities or even, you know, just
21  rational objections to the bill.  That's outside the --
22  deviation from normal procedure.  And I'm trying to
23  think if there's any others I can think of right
24  offhand.
25  Q.  Let's deal with what you've testified to at

94

```
1   this point.
2       A.   Sure.  Go ahead.
3       Q.   With regard to the rule changes that you
4   mentioned, with regard to the outside the bounds
5   resolution, and with regard to any other ways that the
6   Legislature deviated from normal procedures as you've
7   testified to, is it MALC's position that the Legislature
8   acted outside the bounds of its authority in making any
9   of these rule changes?
10      A.   I think that if it had enacted the bill as
11  written in the House version of the bill it would have
12  been outside the authority.  And it's a small point.
13  The Texas Mobility Fund says you can't rob from it
14  unless you ruin the full faith and credit of -- it's a
15  Texas Constitutional dictate.  Arguably the Legislature
16  can't pass something that's unconstitutional, arguably,
17  and so in that sense it's possible that that was outside
18  the authority.
19           Other than that, the legislative
20  authority is prescribed by the House rules, so anything
21  that was outside of the rules I think was probably
22  outside the authority of the House.  But I have a
23  restrictive view of the rules, frankly.  And the Texas
24  Constitution outlines what the authority and the duty of
25  the House is.
```

95

```
1            I don't think that the bill violated the
2   presentment clause, if that's what you're asking, so...
3       Q.   It's part of what I'm asking.
4       A.   Yes, sir.
5       Q.   So, for instance, take the rule changes with
6   regards to the two-thirds vote that you testified
7   earlier to.  Correct?
8       A.   Yes, sir.
9       Q.   Was that rule change duly made by the
10  Legislature?
11      A.   By the Senate, yes, sir.
12      Q.   Have rule changes like that happened before?
13      A.   Yes.  I think there was a carve-out for
14  redistricting in the '90s that got kind of grandfathered
15  in, I believe, but it's rare.  And certainly a deviation
16  from normal procedure.
17      Q.   Have members of MALC ever employed similar
18  procedures to assist in pushing any of their bills
19  through the House?
20      A.   Specific to a Senatorial carve-out, I don't
21  think so.
22      Q.   Well, not Senatorial carve-outs for House
23  bills, but --
24      A.   Right.  Right.
25      Q.   Have members of MALC ever employed similar
```

96

```
1   procedures that the Senate employed with regard to SB 14
2   in pushing any of their bills through the House?
3       A.   So I just want to make sure I understand the
4   question.
5       Q.   Sure.
6       A.   This is actually -- this is what I do for a
7   living, so I'm picayune about certain things.  There are
8   provisions in the House rules to have a committee as a
9   whole -- it's very rare.  MALC has never done that to
10  pass a bill.
11           There is something called a special order
12  under Rule 8 where you can, under certain parameters, do
13  a special order to bring a bill out of calendars, bring
14  a bill out of committee.  I can't recall if that's ever
15  happened.  I think Chairman Gallego did a special order
16  on a Betty Brown Bill in 2007, if I recall correctly.
17  That was a bill that died on local calendar but had been
18  brought up by order to pass it essentially in the spirit
19  of comity.  But I think that's substantially different
20  than -- that's a specific rule provision.  There's no
21  carve-out for the rules, no back door for any MALC
22  member policy, I don't think.
23      Q.   So does MALC believe that any of the
24  Legislature's alleged deviations from normal
25  procedures -- does MALC contend that any of those
```

97

```
1   deviations were made illegally?
2       A.   And by "illegal," you mean outside the bounds
3   of the Texas Constitution?
4       Q.   In violation of the Texas Constitution or any
5   statute or any rule governing the Legislature.
6       A.   I'm trying to think.  If I recall correctly --
7   and this may not have been the voter ID bill, but there
8   was a bill that had a formal meeting, which was -- it's
9   a public meeting, but it's just -- you don't consider
10  public testimony, and it's basically used to vote out
11  bills.  And there was a time in which it was used that
12  was at 10:00 p.m., it was on the House floor and the
13  House had shut down, so people couldn't go to the public
14  meeting -- and it may have been on the redistricting
15  wasn't.  Maybe it was on the redistricting bill.
16  Anyways, that is an inspirit violation of the House
17  rules.  Right?  But is it an actual violation?  I doubt
18  it.
19           I guess when you say "illegal" --
20  deviations from normal procedure don't imply illegality
21  to me.  There are deviations from the way things
22  normally go.  And big bills have a certain prescribed
23  kind of trope by which they go through, and this bill
24  didn't do that.  This bill hit the gas pedal from the
25  very beginning and was in and out of the House very
```

98

1  quickly.  It came over from the Senate before we had
2  even formed committees.  That's how quick it got here.
3  And it was done that -- that was done so that there
4  could be no procedural tactics to delay the bill in
5  trying to prevent its passage.  I mean, that's obvious.
6      Q.   Is your contention that those deviations --
7  let me retract that.
8           Did MALC as an organization oppose SB 14?
9      A.   I think so.  And by -- I don't mean to -- I
10 don't mean to kind of be wishy-washy about it.  I think
11 that we had a public statement about it.  I think Trey
12 had public statements about it.  So I think as an
13 organization we were against it, which was rare, by the
14 way, to say we're against a bill.  So I think we did
15 based on my recollection, but I'm not exactly 100
16 percent certain that we had one, so...
17     Q.   Did MALC as an organization provide testimony
18 during the consideration of SB 14?
19     A.   Members can't provide testimony.  When MALC
20 has offered testimony it's been through Mr. Garza, and
21 Mr. Garza at that time, in 2011, was not hired to advise
22 us on voter ID.
23     Q.   So what was Mr. Garza's capacity with MALC in
24 2011?
25     A.   He had been hired for redistricting counsel,

99

1  so...
2      Q.   Did MALC provide written talking points to its
3  members or staff regarding SB 14 during its
4  consideration in the legislature?
5      A.   For some members, I believe so.  I think that
6  the informal process as you formulate amendments and
7  write talking points for those amendments for members,
8  and then they kind of get distributed in certain ways.
9  It's been three years now, so I can't remember whom
10 besides my boss did I write talking points for, but I'm
11 sure that I did.  I'm sure that we did help many members
12 with their amendments, but I can't recall the actual
13 specifics.  So generally, yes, but specifically I'm not
14 sure.
15     Q.   Would it have been your job to draft those
16 talking points?
17     A.   In part.  Me and Manny.
18     Q.   But you don't recall drafting any specific
19 ones?
20     A.   I did.  I certainly drafted some for Trey.
21 That's certainly true.  Whether or not he gave an
22 amendment to someone on the floor with my talking
23 points, I can't remember, so...
24     Q.   Do you know if those documents containing
25 those talking points have been produced in this

100

1  litigation?
2      A.   I think they have.  If they haven't,
3  I'll -- if I have them, I'll give them to you.  I mean,
4  it's probably work product, but I'll do what I can for
5  you.
6      Q.   Did MALC write or draft any articles or
7  opinion pieces regarding its opposition to SB 14?
8      A.   Trey has done several op-eds about voting
9  rights generally, mostly focused on redistricting.  I
10 think those have been given to you, I think.  And so if
11 they had mentioned voter ID, and they probably did, at
12 least a sentence or two in each of them.  So the answer
13 is yes, generally, but I can't remember one solely
14 dedicated to voter ID, although there may have been one,
15 so -- but they would have come through his voice as
16 chairman of MALC, attributed to him.
17     Q.   Did MALC meet with any other organizations to
18 organize an opposition to SB 14?
19     A.   During what time period?
20     Q.   During -- while SB 14 was being considered?
21     A.   Manny may have met with LULAC or members of
22 LULAC.
23     Q.   I'm sorry.  Who is Manny?
24     A.   He's the guy who left in December.  He's my
25 former employee and coworker.

101

1      Q.   What's his full name?
2      A.   Emmanuel Garcia.  And he may have met with
3  MALDEF, or I may have spoken to MALDEF, too.  But these
4  were three years ago.  Sometimes Latino organizations
5  will call MALC up and ask about it, and so Manny may
6  have met with them.  And I'm certain I talked to Luis
7  about it when he was at MALDEF, so I'm sure I spoke with
8  Luis about it.  So in that sense, MALC met with MALDEF
9  during the consideration thereof.  That's all I can
10 recall at this time.
11     Q.   Were any materials or documents of any kind
12 produced as a result of these meetings?
13     A.   Possibly.  It would be uncommon for us to
14 write up notes from a meeting.  I don't do that as part
15 of my practice, but they may have handed me a one-pager.
16 And if we have it in our possession, if it survived the
17 session, it would have been given to you in the
18 Section 5 trial and this one if we had it, so...
19     Q.   Did MALC conduct voter ID status conferences
20 during the 2011 Legislature regarding the consideration
21 of SB 14?
22     A.   What do you mean by status conference, just so
23 I'm clear?
24     Q.   I believe it was mentioned in one of the
25 documents that was produced -- it referenced a voter ID

Martin Golando - 6/24/2014

102

1 status conference, which I can only assume means some
2 kind of regular meeting to discuss voter ID bills.
3    A.  It is possible that there was a MALC meeting.
4 2011, again, was three years ago.  I'm trying to
5 remember.  We had two or three or four MALC meetings,
6 some of which were related, one of which may have been
7 voter ID related -- one.  But I don't recall specifics.
8         A status conference, to me, sounds like a
9 conference with the Court, frankly, and I don't think
10 that's -- I don't recall talking to our members about
11 that, you know, so...
12    Q.  Did MALC draft or propose or research or
13 request any amendments to SB 14 while it was being
14 considered?
15    A.  Surely.
16    Q.  Who would be in charge of drafting such
17 amendments?
18    A.  TLC.  I'd call them up and say, "I would like
19 these amendments for my boss or for my caucus."
20    Q.  And how would MALC decide on what amendments
21 it wanted to make?
22    A.  You know, it's a really informal process,
23 generally, because you're very time-constrained, and
24 there were significant time constraints with this bill.
25 And so you kind of go back to what you used to do and

104

1 member who proposed a bill proposed something or voted
2 for something, and there was lots of amendments we think
3 would ameliorate -- you look back in hindsight, could I
4 have done a different amendment that would make a better
5 argument.  I could probably think of several that I
6 would want to do now.  But at the time, I think I
7 remember being satisfied that we had fought a good
8 fight, so...
9    Q.  Do any members of MALC believe that they were
10 not given ample opportunity -- sorry.  Let me back up.
11        Do any members of MALC who opposed SB 14
12 believe that they were not given ample opportunity to
13 voice their opposition to the bill while it was being
14 considered?
15    A.  I think that's probably true in the sense that
16 the committee hearing itself lasted -- I think it was 20
17 hours.  It was kind of a marathon committee hearing,
18 which is not always the case, but sometimes the case.
19 And it was a real perfunctory meeting in the sense that
20 it was like witness, witness, witness.  It was just kind
21 of going through the motions.
22        Rolando Gutierrez is a close friend of
23 mine and a close friend of the representatives was on
24 that committee, and he described it as a sham process.
25 And so in that sense, I think that no amount of time

103

1 try to think about it.  You brainstorm a little bit.
2 And if you get any idea on a bill like this, you kind of
3 throw it into TLC to have them draft it so you can get a
4 picture of it.  Because your bosses won't respond until
5 they can read it, honestly.  That's how legislators
6 work.  And so you just overdraft, draft as many as you
7 could, and see if you can't get authors for them, your
8 boss or have your boss do it.
9        And so informally is the answer to your
10 question.
11    Q.  So is that process of proposing amendments --
12 is that typically a pretty rushed procedure or pretty
13 fast-paced procedure?
14    A.  Largely, especially on this bill.  We had to
15 reset with this bill, because I think Armando Martinez
16 appointed it on a Rule 4, Section 32(c).  So there was,
17 like, a two-day reset.  So there was some lag time where
18 you can kind of catch your breath between the two days,
19 but there was still a lot of time, and there was a lot
20 of pressure to pass the bill, a lot of pressure to
21 defeat the bill, you know.
22    Q.  Did MALC feel like it was able to present all
23 the amendments that it wanted to with regard to SB 14?
24    A.  You know, I can't speak specifically to each
25 MALC member, but I think that every -- almost every MALC

105

1 that was allotted could have, you know, represented the
2 complete opposition of the bill.  So the answer to your
3 question is probably yes, so...
4    Q.  Did MALC as an organization undertake any
5 efforts to prevent SB 14 from being passed?
6    A.  Yes.
7    Q.  And what were those efforts?
8    A.  Questions of order, trying to get people to
9 vote no, forming coalitions with other legislators to
10 try to get them to vote no, trying to get people to
11 voice their opposition, you know, getting quality
12 testimony to try to, you know, figure that out.
13    Q.  Did MALC employ tactics that were meant to
14 slow down or delay consideration of the bill?
15    A.  During which session?
16    Q.  2011.
17    A.  I'm sorry.
18    Q.  All these questions I'm asking you right now
19 are within the timeframe of the 2011 Legislature during
20 which SB 14 was being considered.
21    A.  I don't think that they had those options
22 available to them in 2011 because of the rule change,
23 and the -- I mean, Representative Martinez -- Mando
24 Martinez pointed the bill, so in that sense that delayed
25 it for I think 48 hours, roughly.  So in a sense,

106

1 literally the answer is yes, but I don't know -- the
2 same panoply of tactical options was not available to
3 MALC members in 2011 that were available for them in
4 2009. So generally the answer would be no.
5    Q.    Did MALC use all tactics at its disposal to
6 delay or defeat SB 14?
7    A.    No. I mean, quorum-busting is always an
8 option. In 2011, probably not. But you could have
9 tried to do it. You could have had an informal or
10 formal quorum bust, and that would delay the passage of
11 all bills theoretically. I don't think it was a real
12 tactical option at the time because of the time in
13 session in which the bill had come up. But we didn't do
14 everything we could have done. Theoretically, we could
15 have had a suicidal quorum bust, but --
16          MR. TATUM:  How are we doing?
17          THE WITNESS:  I'm square. Mr. Whitley?
18          MR. WHITLEY:  Oh, I'm fine.
19    Q.    (By Mr. Tatum)  Do you recall Senate Bill 362
20 proposed during the 2009 Legislature?
21    A.    Mr. Fraser, yes, I remember the bill.
22    Q.    What was that bill about?
23    A.    It was a voter identification bill.
24    Q.    Did MALC oppose that bill?
25    A.    I believe so. Members of MALC certainly did.

107

1 I don't remember if MALC itself had a statement at the
2 time in 2009, but most members did oppose the bill.
3    Q.    I'm sorry. You don't believe that MALC had a
4 statement?
5    A.    You said when MALC had a -- had a public
6 statement saying, "We oppose SB 362." I can't recall if
7 we had done that then, but most members opposed that
8 bill.
9    Q.    Did MALC engage in the same kind of tactical
10 efforts during the consideration of SB 362 that it did
11 with regard to SB 14?
12    A.    SB 362 never reached the House floor because
13 of the chubathon, so it wasn't the same tactical
14 efforts. We didn't have amendments to SB 362. We
15 didn't have points of order or questions. It was just
16 delayed from consideration because of the extenuation of
17 the local calendar.
18    Q.    So it didn't have to engage in the same kind
19 of activities with regard to SB 362 that it did with
20 SB 14 because it successfully defeated the bill through
21 the chubathon?
22    A.    Correct.
23    Q.    Is that what it's called, the chubathon?
24    A.    Lots of people have different words for it. I
25 think that's the most descriptive, so...

108

1    Q.    It's quite descriptive.
2    A.    Yeah.
3    Q.    Do you know if MALC expended more or less
4 resources opposing SB 362 than it did opposing SB 14?
5    A.    Less, because SB 14 has extenuated for years
6 now. Right?  362 was limited just to the session.
7 SB 14 has been an ongoing problem since 2011.
8    Q.    Does MALC support the idea that only
9 registered voters should be allowed to vote?
10    A.    I think so. And I don't mean to equivocate.
11 I think there's a reason -- I think registration --
12 there's been several bills that have been filed by MALC
13 members I think over the years to reconsider how we
14 register voters. So generally, yes, but specifically
15 they eat away at what registration actually means. So I
16 don't mean to be picayune. I just want to be clear.
17    Q.    So does MALC believe that a nonregistered
18 voter should be allowed to vote?
19    A.    No, I don't think so. But again, the notion
20 of registration itself is something that's open to
21 legislative amendment and change. Right?  There are
22 some MALC members who wanted to get rid of -- I think
23 that there may be some MALC members who would be willing
24 to get rid of registration if it -- and use some other
25 form of proving up whether this person should be allowed

109

1 to vote. That may be an idea that could kind of get
2 some hold among MALC members, but I would say that
3 MALC's position is we support voter registration,
4 generally. And there may be better ways to do
5 registration, too. Right?  You could do it online. You
6 could do it lots of different ways. Which kind of
7 changes the question a little bit, but I know what
8 you're saying, so...
9    Q.    Let's just frame it this way. Under the
10 current statutory scheme regarding voter registration,
11 does MALC believe that only registered voters should be
12 allowed to vote?
13    A.    We should follow the law as it stands.
14    Q.    Does MALC believe that Texas should make sure
15 that people attempting to vote are registered voters?
16    A.    Yes.
17    Q.    Does MALC believe that Texas should make sure
18 that people do not vote or attempt to vote in the name
19 of another person?
20    A.    Yes.
21    Q.    Does MALC acknowledge that voter fraud exists?
22    A.    Voter fraud generally?
23    Q.    Yes.
24    A.    Yes.
25    Q.    Does MALC acknowledge that voter fraud exists

110

1  in Texas?
2      A.   Yes.
3      Q.   Has any member of MALC ever communicated any
4  allegation or concern to MALC relating to voter fraud?
5      A.   To MALC?  I'm trying to think.  Representative
6  Pena and Representative Aliseda talked about voter fraud
7  a great deal in 2011.  They may have made -- they never
8  sent us a letter or anything.  I don't know if they
9  talked to Trey about it.  But I'm aware of those MALC
10  member concerns about voter fraud.  And Representative
11  Pena was deeply concerned about mail-in ballot fraud
12  specifically, and I think that's a real problem is
13  mail-in ballot fraud.
14      Q.   When --
15      A.   One --
16      Q.   Sorry.
17      A.   I'm sorry.  One not solved by SB 14,
18  incidentally, so...
19      Q.   Did any of those members express any concerns
20  related to in-person voter fraud?
21      A.   I think Jose Aliseda may have.  He and my boss
22  had an interview in which they talked about SB 14 for
23  the -- I believe it was the Tribune at the time, and he
24  may have communicated those concerns, certainly in the
25  interview and elsewhere, so...

111

1      Q.   And what were those concerns?
2      A.   I think he believed that in-person
3  impersonation was a larger problem than it actually was.
4  He may have said that if I recall correctly.  Again,
5  it's been three years, and it was a stray interview that
6  I barely recall, but --
7      Q.   Has any member of MALC ever communicated any
8  allegation or concern to MALC relating to election
9  crimes?
10      A.   Surely.
11      Q.   Can you identify any member of MALC who has
12  communicated an allegation or concern related to
13  election crimes?
14          MS. RUDD:  Just let me -- I want to
15  clarify just for the record, Stephen, that when you
16  refer to voter fraud and election crimes, you're
17  referring to those notions as defined in your notice of
18  deposition.  Is that correct?
19          MR. TATUM:  That's correct.
20          MR. RUDD:  Okay.
21      A.   Does that include other crimes other than
22  in-person voter --
23      Q.   (By Mr. Tatum)  If you would like to take a
24  minute and review the definitions.
25          MS. RUDD:  I would say yes.  I would say

112

1  it's broad enough to incorporate things that are outside
2  of the realm of in-person voter fraud.
3          THE WITNESS:  It would have to be
4  because --
5          MS. RUDD:  So it's Exhibit 1.
6      Q.   Okay.
7      Q.   (By Mr. Tatum)  It's on Page 5 there.  Please
8  take a minute and review the terms "election crimes" and
9  "voter fraud."
10      A.   That's how I understood it.  I mean, that's a
11  general term.  That is not just in-person voter
12  impersonation.  That includes mail-in ballot fraud,
13  other kinds of more prevalent -- possible electronic
14  fraud that was included in that.  That's a broader
15  category than just in-person voter fraud.
16      Q.   Okay.  So I'll ask again:  Has any member of
17  MALC ever communicated any allegation or concern to MALC
18  related to voter fraud?
19      A.   Surely.  I'm trying to think.  Aaron Pena
20  talked about mail-in ballot fraud a great deal, and he
21  was on the elections committee.  I think other people
22  have talked about the changes we made to voter
23  registration in 2011 and how that has caused certain of
24  their constituents to be in trouble.  I can't remember
25  the names of the constituents or the member, but I know

113

1  that I remember them talking about that.
2          I have personal knowledge in my past days
3  as an election lawyer about certain election crimes in
4  the cases that I've been involved in -- or what I
5  thought were election crimes at the time.  So, yes,
6  generally.
7      Q.   Do you have any experience in your time as an
8  election lawyer with in-person voter fraud?
9      A.   None.
10      Q.   None whatsoever?
11      A.   None whatsoever.  It's all been voter fraud in
12  the sense that mail-in ballot fraud or alleged massive
13  internal electronic corruption from one of the election
14  officials themselves.
15      Q.   Has any member of MALC ever communicated any
16  allegation or concern to MALC relating to in-person
17  voter fraud?
18      A.   Other than Mr. Aliseda?
19      Q.   Yes.
20      A.   I don't believe so.
21      Q.   Is it true that MALC has never conducted any
22  calculation, report, audit, estimate, projection, or
23  other analysis relating to voter fraud?
24          MS. RUDD:  Objection; compound, vague.
25      Q.   (By Mr. Tatum)  And just for reference, I'm

114

1  referring to MALC's objections to the rule 30(b)(6)
2  notice, and this question is based on those objections.
3      A.  Okay.
4      Q.  Specifically to topics, I believe, 25 and 26.
5      A.  I'm trying to think.  Could you say it again?
6      Q.  Sure.
7      A.  I lost it.
8      Q.  Sure.  Is it true that MALC has never
9  conducted any calculation, report, audit, estimate,
10 projection, or other analyses relating to voter fraud?
11         MS. RUDD:  Same objection.
12     A.  I don't think that's true.  I think that
13 Trey -- there was a time in which during the Section 5
14 trial Mr. Rosenberg questioned the -- the -- or
15 Mr. Forest, I think is his name.  He's a Texas Ranger,
16 inspector for y'all -- about voter fraud in person, and
17 he went through the -- I guess the five known cases of
18 in-person voter impersonation and went through how there
19 were indictments for several of them and how SB 14 may
20 not have been able to prevent those things.  So in that
21 sense -- and Trey has repeated that line and repeated
22 that analysis.  So now, since we've done a -- a surface
23 analysis of in-person voter fraud from the trial -- so
24 that's my answer, I think.
25     Q.  (By Mr. Tatum)  Has MALC ever commissioned or

115

1  possessed any calculation, report, audit, estimate,
2  projection, or other analyses related to voter fraud?
3      A.  Every month the AG -- or every other month --
4  periodically, the AG will have -- will give
5  Representative Anchia, I guess, a table of current
6  investigations -- whatever ones of those we have in our
7  possession we gave to you already.  And I had asked
8  Mr. Dire for the periodic updates, and I don't think --
9  I think I received one or two -- I think that I did.  I
10 don't recall receiving more than that.  I think I turned
11 those over.  But that's all I can think that's
12 responsive to that question, so...
13     Q.  Is it true that MALC has never conducted any
14 calculation, report, audit, estimate, projection, or
15 other analysis related to election crimes?
16     A.  Again, I think that same answer as before.
17 The voter fraud table is not limited to voter
18 impersonation.  It listed all election crimes I believe
19 that were being investigated by Mr. Forrest and the AGs
20 at the time through the referral service.  And so I
21 think that that's inclusive of that answer.
22     Q.  But MALC has never conducted any kind of
23 report on its own?  That's what I'm asking.
24     A.  You know, I don't think so.  I think other
25 than just to review the table and see how much was voter

116

1  impersonation and how much was election worker error or
2  malfeasance, how much was mail-in ballot fraud, how much
3  was just crazy people, you know, so...
4      Q.  Does MALC believe that voter fraud should be
5  illegal?
6      A.  Yes.
7      Q.  Do you think -- does MALC believe that SB 14
8  deters voter fraud?
9      A.  No.
10     Q.  Why not?
11     A.  In-person voter impersonation is so rare that
12 in the known cases that we know about, I think SB 14
13 would have prevented only one of them.
14         And so if you go back to the cases and
15 the number of votes over time that -- so in 2010 and
16 2012, there were something like 13 million votes cast in
17 various elections.  Right?  And over that same time
18 period, there was only four known voter impersonation
19 attempts and only -- I think only one indictment, I
20 think.  I may be getting the numbers slightly wrong.
21 And in that one, I think it was a father voting for his
22 son in Fort Worth.  And they had the same name, and I'm
23 not sure the ID would have caught that unless the
24 election worker looked at the date of birth, which maybe
25 they wouldn't have -- anyway, my point is that if SB 14

117

1  was targeted at that kind of crime, rare though it was,
2  in that one instance when it may have mattered, it may
3  not have mattered.  It may not have been able to prevent
4  that.  So in that sense, that justification is totally
5  irrational to me.
6      Q.  Does MALC believe that SB 14 would prevent
7  someone from casting the vote of someone else?
8          MS. RUDD:  Objection; vague.
9      A.  Generally, it's possible.  I think it's
10 unlikely.
11     Q.  (By Mr. Tatum)  Why is it unlikely?
12     A.  Most people who vote in person are voting for
13 their dead dad or that they're crazy.  It happened in
14 Bexar County once.  This woman had, like, 13 forms of
15 ID, all with different names, and she tried to vote with
16 some of those.  She had no mens rea.  Right?  You
17 couldn't indict her for that, because she was just
18 crazy.  Right?  And the known examples of in-person
19 voter impersonation that we're aware of, I don't think
20 SB 14 would have -- may not have prevented any of them.
21 So in that sense, empirically, it's not likely.
22          I also think that it's much more likely
23 to disenfranchise people far more quickly and horribly
24 than it is to prevent someone from illegally voting.
25     Q.  Has any member or constituent of MALC -- let

118

```
1   me say:  Has any member or constituent of a member of
2   MALC ever expressed support for voter ID laws?
3        A.   Surely.  Mr. Pickett voted for it, I believe.
4   Mr. Aliseda voted for it.  Mr. Gonzalez and Mr. Torres
5   and Mr. Garza did.  I can't remember if Mr. Pena did or
6   not.  I don't think that he did.  I think he had -- I
7   think he remained consistent with his previous position.
8        Q.   Has MALC as an organization ever supported a
9   voter ID bill?
10       A.   I'm trying to think.  I don't think so.  There
11  may have been some members who might seek a compromise
12  that would in that sense be a voter ID bill.  I think
13  that there are certain versions of a voter ID that MALC
14  could support or at least acquiesce to.  No version of
15  that has ever gone to the House floor, so...
16       Q.   Would MALC ever support a bill requiring a
17  photo ID to vote?
18       A.   Certainly.
19            MS. RUDD:  Objection; calls for
20  speculation.
21            THE WITNESS:  I apologize.  I didn't mean
22  to overstep.
23       A.   But certainly I think we could absolutely
24  consider it if it had -- if we didn't believe it
25  disfranchised people, and if we thought it had
```

119

```
1   sufficient protections for people who were harmed, I
2   think it's something that every member could think about
3   getting behind.
4            It is unlikely given the current climate
5   of I think deeply racist beliefs, but we'll -- you know,
6   I remain hopeful that we can reach some sort of accord.
7        Q.   (By Mr. Tatum)  Does MALC believe that voter
8   ID requirements were not popular amongst Texans when
9   SB 14 was being considered in 2011?
10       A.   They were enormously popular, as was slavery
11  back in 1860, so...
12       Q.   Does MALC equate SB 14 with slavery?
13       A.   No.  I'm just saying that sometimes popular
14  ideas aren't great ideas.
15            MR. TATUM:  I have a few more questions
16  and then we can break for lunch.
17            MS. RUDD:  Perfect.
18            (Exhibit No. 3 marked)
19       Q.   (By Mr. Tatum)  Mr. Golando, I'm handing you
20  what's been marked as Exhibit 3.
21            Are you aware that according to a poll
22  conducted by the Texas Tribune and University of Texas
23  in February 2011, while SB 14 was being considered, that
24  75 percent of registered voters agreed with the
25  proposition that voters should have to present a
```

120

```
1   government-issued photo ID before they can be allowed to
2   vote?
3        A.   That's what it says here on this exhibit.  I
4   think that I recall a poll -- references to the poll
5   during the debate.  So I think that's right.
6        Q.   Okay.  Well, I represent to you that this is a
7   graphical depiction of the results of that poll that can
8   be found online.
9            (Exhibit No. 4 marked)
10       Q.   (By Mr. Tatum)  I'm handing you what's been
11  marked as Exhibit 4.
12       A.   Thank you, sir.
13       Q.   I'll represent to you this is another
14  graphical depiction of the results of that poll, this
15  one broken down by political party.  Could you tell me,
16  looking on the left of this poll, please, what
17  percentage of Democrats agreed with the proposition that
18  voters should be required to present a government-issued
19  photo ID before they can be allowed to vote?
20            MS. RUDD:  I'm just going to object to
21  the question to the extent that it characterizes this
22  poll as representing what Democrats believe generally.
23  But you're welcome to interpret this graph to the extent
24  you can.
25       A.   It says 58 percent on your graph.
```

121

```
1        Q.   (By Mr. Tatum)  Can you tell me what
2   percentage of Independents agreed with that proposition?
3            MS. RUDD:  Same objection.
4        A.   70 percent.
5        Q.   (By Mr. Tatum)  So would you agree that
6   according to the results depicted by this graph, that a
7   majority of Democrats and Independents supported voter
8   ID requirements in 2011?
9        A.   Again, I have certain caveats, because I'm a
10  social sciences person.  I haven't read the poll.  I
11  don't know how they conducted it.  But with those
12  caveats, what you've graphically represented to me is
13  representative of that notion, sure.
14            (Exhibit No. 5 marked)
15       Q.   (By Mr. Tatum)  I'm handing you what's been
16  marked as Exhibit 5.  Mr. Golando, I represent to you
17  that this is another graphical depiction of the Texas
18  Tribune and University of Texas poll that I referenced
19  earlier.
20            Could you tell me by looking at this
21  graph what percentage of African-Americans agree with
22  the proposition that registered voters should be
23  required to present a government-issued photo ID before
24  they can be allowed to vote?
25            MS. RUDD:  Again, objection, calls for
```

122

1  speculation.  To the extent you want to testify about
2  what the graph contains, that's perfectly fine.
3      A.  I think it's 63 percent; although, the
4  gradation between the green is kind of difficult for me
5  to determine, frankly, but I think it's 63 percent.
6      Q.  (By Mr. Tatum)  I can relate.  I'm kind of
7  color blind myself.  But we're looking at the middle
8  column.
9      A.  Oh, the middle column.  I see.  Okay.
10     Q.  Okay.  Looking at the right-hand column of
11 that left grouping, can you tell me what percentage of
12 Latino registered voters agreed with the proposition --
13 or sorry -- what percentage of Latino respondents to the
14 poll agreed with the proposition that registered voters
15 should be required to present a government-issued photo
16 ID before they can be allowed to vote?
17     A.  Latinos?
18     Q.  Yes.
19     A.  And when you say "agree," you mean this
20 grouping right here?  I just want to make sure we're --
21     Q.  Correct.
22     A.  68 percent according to your graphical
23 representation of the people responding.
24     Q.  So 68 percent of Latinos who responded to this
25 poll agreed with the proposition.  Is that correct?

123

1      A.  That's what your -- if that's accurately
2  represented in this graph, I can agree to that, so...
3      Q.  Okay.  So based on the information that's in
4  this graph, would you agree that the graph depicts that
5  a majority of African-Americans and Latinos who
6  responded to the poll supported voter ID requirements in
7  2011?
8      A.  I guess, such that it is.  I mean, again, with
9  many caveats, but such that it is.
10     Q.  Does MALC believe that members of the Texas
11 Legislature have a duty to represent the interests of
12 their constituents?
13     A.  Absolutely.
14     Q.  Okay.  Assuming that the data in these polls
15 is accurate, do you think it's possible, then, that
16 SB 14 was enacted according to the wishes of Texas
17 citizens rather than some discriminatory or racist
18 intent held by the legislators that enacted it?
19         MS. RUDD:  Objection; compound, calls for
20 speculation, form.
21     A.  I think it's unlikely that that's true.
22     Q.  (By Mr. Tatum)  But do you think it's
23 possible?
24         MS. RUDD:  Same objection.
25     A.  Again, I would say anything is possible, but I

124

1  think that my knowledge of Legislative procedure and of
2  legislators generally, when people have a shifting
3  justification for their bill and when they deviate from
4  normal procedure and try everything they can do to pass
5  a bill over the strong objections and advocates and
6  leaders in the minority community, that's usually
7  because they can't see the purpose behind what they're
8  doing, and it's usually an impermissible purpose.  So
9  it's very unlikely, but yet possible.
10         (Exhibit No. 6 marked)
11     Q.  (By Mr. Tatum)  I'm handing you what's been
12 marked as Exhibit 6.  Mr. Golando, I'll represent to you
13 that these are the results of a similar poll also
14 conducted by the Texas Tribune and the University of
15 Texas, but this time conducted in October of 2012.
16         Now, if you would, please look at the in
17 conjunction with Exhibit 5 that I just handed you.
18         Okay.  So looking at Exhibit 5, we
19 established earlier that 68 -- in 2011, 68 percent of
20 Latinos agreed with the proposition that registered
21 voters should be required to present a government-issued
22 photo ID before they can be allowed to vote.  Is that
23 correct?
24         MS. RUDD:  According to this poll.
25         MR. TATUM:  Correct.

125

1      A.  Yes, sir.
2      Q.  (By Mr. Tatum)  Okay.  Looking at Exhibit 6,
3  again conducted in 2012, can you tell me what percentage
4  of Hispanic respondents to this poll agreed with the
5  proposition that registered voters should be required to
6  present a government-issued photo ID at the polls before
7  they can be allowed to vote?
8      A.  The graph says 75 percent.
9      Q.  Okay.  So would you agree that between the
10 2011 poll and the October 2012 poll, the percentage of
11 Latino or Hispanic respondents who responded to this
12 poll and who agreed with the proposition increased from
13 68 percent to 75 percent?
14     A.  I think that's true; although, I would say
15 that margins of error for subgroupings of demographic
16 groups in polling depends largely on the number of
17 people polled.  I don't know if that's a blip that's
18 within the margin of error or not, but, yes, if
19 that's -- all factors being equal, that could be true.
20     Q.  Okay.  Assuming that margins of error have
21 been accounted for and every other possible anomaly or
22 variable has been controlled for with these polls, do
23 you think -- can you explain why the percentage of
24 respondents who agreed with this proposition --
25 percentage of Hispanic or Latino respondents who agree

Martin Golando - 6/24/2014

126

1  with this proposition, can you explain why that
2  percentage increased between February 2011 and October
3  2012?
4          MS. RUDD:  Objection; calls for
5  speculation.
6          A.  I think that it could be statistical noise
7  within the poll instrument itself.  That's certainly a
8  possibility, that it's within the blip.  Margin of error
9  can be more than 3.5 percent on either side.  It can be
10  far greater.  So that's one possibility.
11          Another possibility is that there's been
12  a small incremental shift in Latino opinion about voter
13  ID, at least in response to this poll over that time
14  period.  And I guess over that time period, that would
15  include the 2012 elections, at least the primaries.
16  This was October 2012.  Right?  And so there had been
17  lots of publicizing of voter ID problems throughout the
18  nation, and maybe Latinos didn't -- the Latinos who were
19  polled didn't think it was a problem.  I don't know.
20          It's possible that the people who
21  answered their phone for polling firms are
22  representatives of Latinos generally, or that these two
23  universes of people who are responding to these polls
24  are substantially different.
25          Also, the way in which you ask the

127

1  question, the polling instrument itself, the order of
2  the questioning determines certain blips.  It's
3  certainly possible, all those things could be possible,
4  so...
5          MR. TATUM:  That's all I have right now.
6  Would y'all like to take a break?  It's ten after 12:00.
7          MS. RUDD:  Yeah.  That's great.
8          (Recess from 12:13 p.m. to 1:19 p.m.)
9          Q.  (By Mr. Tatum)  Okay.  Mr. Golando, you stated
10  earlier that MALC believes that SB 14 denies or abridges
11  the right to vote of constituents of MALC members.  Is
12  that correct?
13          A.  Yes, sir.
14          Q.  Does MALC contend that a significant portion
15  of its constituency -- by that, I mean the constituency
16  of its members -- lack any of the acceptable forms of ID
17  under SB 14?
18          MS. RUDD:  Objection; vague.
19          A.  What do you mean by "significant"?
20          Q.  (By Mr. Tatum)  Let me rephrase.  Does MALC
21  contend that any portion of its constituency -- by that
22  I mean the constituency of its members -- lack any of
23  the acceptable forms of ID under SB 14?
24          A.  Again, I'm sorry.  "The constituency of its
25  members," do you mean the members themselves lacking ID

128

1  or the people that they represent?
2          Q.  The people that they represent.
3          A.  Absolutely.
4          Q.  Okay.  Do you know how many constituents of
5  the members of MALC lack any of the acceptable forms of
6  ID under SB 14?
7          A.  I recall from the Section 5 trial that there
8  was a number that was deeply contested.  The State had
9  proffered some evidence that as many as 795,000 might
10  not have access that's based off registration rules,
11  people that didn't have driver's license, didn't
12  register with Social Security cards.  And so I think
13  that was 795, and I think that our expert -- or the
14  DOJ's expert at trial in Section 5 came up with as many
15  as 1.8 million that didn't match the databases that he
16  had access to.
17          And then Dr. Shaw did a poll of that
18  universe and got a -- it was a very poor poll.  There
19  was a very low response rate.  But he determined that
20  some portion -- I think it was like 10 or 20 percent of
21  the 1.8 million would be affected.  And so I would say a
22  range of somewhere between 200,000 to 1.8 million Texans
23  might be affected and some portion of Texas MALC
24  members -- probably a higher portion than other members
25  of the state.  Because MALC members range from --

129

1  they're from all over.  And we have a lot of the
2  counties and a lot of the population.
3          Q.  Is MALC able to identify one constituent of a
4  member of MALC that does not have any of the acceptable
5  forms of ID under SB 14?
6          A.  The intervenors that are represented by
7  Mr. Garza, several of them are affected people.  I
8  believe that some of them are from Nueces County, and I
9  think they're represented by Able Herrero if I
10  recall correctly.
11          Q.  And is Mr. Guerrero a member of MALC?
12          A.  Mr. Herrero?  Yes.
13          Q.  Whoever you just --
14          A.  I'm sorry.  Yeah, Mr. Herrero is a member of
15  MALC.
16          Q.  Okay.
17          A.  He's former vice chairman.  He's current
18  chairman of the Criminal Justice Committee in the House.
19          Q.  Is MALC able to identify any constituents of
20  its members who do not have a driver's license?
21          A.  Undoubtedly they do, but I can't give you a
22  list of names of people without a TXDL.
23          Q.  Is MALC able to identify any constituents of
24  its members who do not have a state-issued photo ID?
25          A.  Again, undoubtedly they do because of the --

Martin Golando - 6/24/2014

130

1  what we know about the ID rates among Latinos,
2  African-Americans, and the indigent, but I can't give
3  you specific names.
4      Q.   Is MALC able to identify any constituents of
5  its members who do not have a concealed handgun license?
6      A.   That's a much smaller universe of people.  I
7  think there must be -- I think there's 18,000 people in
8  the CHL database, I think.  There may be more than that.
9  I may be off by an order of magnitude, but I can't give
10  you a specific name of people who don't have a CHL;
11  although, large portions of MALC members probably --
12  constituents don't have a CHL.  It's a very small
13  universe of people.
14      Q.   Is MALC able to identify any constituents of
15  its members who do not have a U.S. passport?
16      A.   No, I'm not privy to that information.
17      Q.   Is MALC able to identify any constituents of
18  its members who do not have a military ID card with a
19  photo?
20      A.   I'm not privy.
21      Q.   When you say you're not privy to that
22  information --
23      A.   I don't know.  I don't know.
24      Q.   Is MALC able to identify any constituents of
25  its members who do not have a citizenship certificate?

131

1      A.   The only person I knew who ever had one was
2  Jose Aliseda, and he kept it with him.  He showed it to
3  me once in a deposition, and it was -- he talked about
4  how hard it was to get it and what it took for his
5  family to get it and for his brother to get it.
6          So the answer to your question is no, but
7  I know that that's a small number, and I can't imagine
8  showing that at the polls, how hard it was for him to
9  get that.
10      Q.   Is MALC able to identify any constituents of
11  its members who do not have an EIC?
12      A.   I think there have been 12 EICs issued, or
13  something like that.  Some small number of EICs.  And I
14  don't know the names of the people who have been issued
15  EICs, but I think we're talking dozens of EICs at this
16  point have been issued.
17      Q.   To constituents of MALC members?
18      A.   No.  It's the people in Texas generally.  And
19  I could be wrong with that number, but I remember at
20  some point it had been like only a few dozen had been
21  issued in 20 -- last year.  Anyways, I don't have that
22  information, but it's a low number of folks who qualify
23  for that.
24      Q.   Is MALC able to identify any of its members
25  who do not have any of the documents necessary to get an

132

1  EIC?
2      A.   Any of its members or --
3      Q.   Sorry.  Is MALC able to identify any
4  constituents of its members who do not have any of the
5  documents necessary to get an EIC?
6      A.   I think some of the intervenors that are
7  represented by Mr. Garza don't have the documents
8  necessary to get an EIC.  I think that's correct.
9      Q.   Can you identify one of them?
10      A.   You know, I don't know them by name.  I'm
11  sorry.  I know that there's a man in Nueces County -- or
12  maybe it was actually -- it was Hidalgo County.  That's
13  where it was, Hidalgo County -- who can't get a birth
14  certificate because he was born, I think, by a midwife.
15  It was very hard for him to get an actual birth
16  certificate.  And that was the only kind of document he
17  could get to go get an EIC.  I think that's correct,
18  so...
19      Q.   Do you know how many constituents of your
20  members have attempted to get an EIC?
21      A.   No.  I don't know.  I have no knowledge.
22      Q.   Do you know if any constituents of your
23  members have attempted to get an EIC?
24      A.   I presume it's likely, though it's -- EICs are
25  very rare, apparently, but I don't know.

133

1      Q.   So MALC filed its complaint on September 17th,
2  2013.  Can you identify any constituent of a MALC member
3  who at that time had been unable to vote on account of
4  his or her inability to obtain an acceptable form of ID
5  under SB 14?
6      A.   Just the affected parties that Mr. Garza
7  represents.  Those are the ones I'm aware of.  I know
8  that there's been several provisional ballots cast
9  throughout the counties, but I do not know their VUIDs.
10  I don't know their names.  But the affected people who
11  Mr. Garza represents, I think that's a good source of
12  that information.
13      Q.   But right now as we sit here, is MALC able to
14  identify any constituent of a MALC member who on
15  September 17th, 2013, the date that MALC filed its
16  complaint in this case, had been unable to vote on
17  account of his or her inability to obtain an acceptable
18  form of ID under SB 14?
19      A.   Again, I think the affected people are
20  certainly represented by MALC folks.  And to the extent
21  they couldn't vote on that day, then that's my answer.
22      Q.   So you're unable to identify any one of them?
23      A.   I can't identify them by name, but I can give
24  you the category of folks that's known to you because
25  their intervenors.  I don't know their names.  I'm

Martin Golando - 6/24/2014

134

1  sorry.  But I do know that there are affected people,
2  and those people are likely represented by MALC members.
3      Q.   Okay.
4      A.   That's the best information I have for you.
5      Q.   To be clear, I'm not asking for a category of
6  people.  I'm asking for identities.
7      A.   Well, you know, I guess I could take a break
8  and Google the intervention papers and get the names for
9  you.  I could do that.
10      Q.   But as we sit here right now, you're unable to
11  identify one?
12      A.   Sure.  I did identify the people.  I mean,
13  it's not a category of people.  I misspoke.  These are
14  actual people that have been affected.  They certainly
15  are represented by MALC members and they're in this
16  litigation, so...
17      Q.   Is MALC able to identify any Texas registered
18  voter who on September 17th, 2013, had been unable to
19  vote on account of his or her inability to obtain an
20  acceptable form of ID under SB 14?
21      A.   I believe those folks are registered, if I'm
22  not mistaken.
23      Q.   The ones you just previously mentioned?
24      A.   Yes, sir.
25      Q.   Is MALC able to identify a specific instance

135

1  in which a constituent of a MALC member attempted to
2  obtain an acceptable form of ID under SB 14 but was
3  unable to?
4      A.   There were immediate reports from -- in 2012,
5  I recall correctly, about long wait times at DPS to get
6  IDs, and we -- Representative Martinez Fischer -- the
7  DPS office that issues IDs is in his district, and so I
8  think we got some people -- some constituents had called
9  about that -- called, not written, but called -- I'm
10  trying to recall their name.  I can't.
11      Anyways, it's likely that those people
12  who gave up on those days didn't get an ID that day.
13  Right?  So it's possible that there's indeed likely that
14  people who during the glut of trying to get an ID
15  couldn't do so because the DPS office was so packed.
16      Q.   Does MALC contend that SB 14 makes it
17  impossible for anyone to vote?
18      A.   Impossible?
19      Q.   Yes.
20      A.   I think there's probably a few people -- maybe
21  it's thousands of people who it makes it impossible for,
22  surely.  If you are -- if you are a voting person and
23  don't have access to transportation and you don't have
24  an ID but you're a registered voter and you've been
25  voting for years, and you can't change that situation

136

1  because there's not a DPS office close to you, and you
2  can't get a car to go there, and you can't get money to
3  get a birth certificate because you were born by a
4  midwife, I think it's certainly possible that thousands
5  of Texans are left out, that it's impossible to get an
6  ID.
7      Q.   Is MALC able to identify any constituents of
8  its members who have not been able to vote in an
9  election because of SB 14?
10      A.   You know, I don't think so.  I don't
11  think the -- I'm not sure that the people who -- the
12  affected parties who are intervenors who are represented
13  by MALC people have actually tried yet to vote.  I could
14  be wrong.  Whatever is in their intervention papers, I
15  would stipulate to, so...
16      Q.   You would defer to the intervention papers?
17      A.   I would.  I would.  I mean, I don't know them
18  personally, you know, although I think it takes
19  incredible courage to do what they did, so...
20      Q.   When you say, "courage to do what they did,"
21  what are you referring to?
22      A.   It takes a lot of courage to fight the State
23  of Texas.  It's easier for MALC because we have MALC
24  members, and we have access to a budget to some degree.
25  And we do have -- on a session basis, it's our job to

137

1  fight for policies.  Right?
2      But to put your name out there and say,
3  "This law affects me," when people don't understand
4  that -- the position of the voter -- you know, lots of
5  people don't understand why you can't get ID.  I mean,
6  I've had ID problems all my life, so I'm sympathetic, I
7  guess.  I think it takes a lot of gumption to say, "This
8  law is wrong," so...
9      Q.   You said you've had ID problems in your life?
10      A.   Sure.
11      Q.   Can you elaborate on that?
12      A.   When I first moved here, I had a suspended
13  driver's license from Indiana because I failed to pay a
14  speeding ticket that I got outside Muncie.  And I didn't
15  need a driver's -- I wasn't driving.  I didn't have a
16  car, and I didn't have a job, really.  When I did get a
17  job, I had somebody take me there, ferry me about.  So
18  I never really got a driver's license.  And I didn't get
19  a Texas driver's license until I think the year 2000,
20  after I had moved here in the fall of '98.  So, like,
21  for two years I didn't have a Texas driver's license.
22  And it may have even been after 2000, because I don't
23  think I had a driver's license until after 9/11.  I had
24  a state-issued ID because I needed to get one because I
25  needed to travel for debate.  I was on the college

138

```
1  debate team.
2          Anyways, I know what it's like to have to
3  try to prove you are who you think you are.  And it was
4  hard for me to get a birth certificate because I lost my
5  original -- we had lots of meanderings, my mom and I,
6  throughout the whole nation.  Anyways, it was more
7  difficult than I had imagined.
8      Q.   Have you ever been unable to vote when you
9  wanted to?
10     A.   No, sir.
11     Q.   Are you currently registered to vote?
12     A.   Yes, sir.
13     Q.   Do you know if any constituents of MALC
14  members chose not to vote in an election because of
15  SB 14?
16     A.   I think it's likely that they didn't.  I don't
17  know their names, but I know there's kind of categories
18  of apathies, what I would call it.  There's lots of
19  people who don't vote because they don't believe that it
20  matters.  I think that's probably the largest source.
21  And matters could be like, "I don't think it matters
22  because the government doesn't respond to my needs.  I
23  don't think it matters because I don't think my vote
24  counts.  I don't think it matters because it's
25  irrational to vote."  My Libertarian friends tell me how
```

139

```
1  irrational voting is all the time.
2          So I think it's likely that people think
3  that voter ID was passed with such a discriminatory
4  intent and that it affected their belief of civil
5  society, that it rendered what they believed to be true
6  about Texas wrong.  Right?  I think that it cheapened
7  what it meant to be a voter.  And so those people who
8  believed that to be true, it probably affected their
9  vote.  I can't measure that.  I don't have a polling
10  instrument that says that.  Even if I did, I don't think
11  it's -- it's probably not measurable.  But I know it to
12  be true that people lose faith in voting just like they
13  lose faith in other things, and this law didn't help
14  that.
15     Q.   Can you identify -- or do you know if any
16  constituents of MALC members chose not to vote in an
17  election because of the requirements of SB 14?
18     A.   I think it's likely.  Again, I don't know
19  specific names.  After 2011, there were lots of election
20  law changes.  One of them was a registration change.
21  You couldn't register -- there's certain parameters.
22  You had to be from Texas to register people.  You
23  couldn't be deputized to register unless you took a
24  class.  If you were deputized to register people, you
25  could only do it under certain parameters.  Also, it was
```

140

```
1  like a real crime.  And there was some enforcement of
2  that new provision and law in Nueces County.  And the
3  people who were affected by that and the families of
4  those people decided not to vote because of that
5  enforcement, but also they mentioned voter ID.
6          And this is a story I heard from
7  Representative Herrero.  I think it's in his deposition
8  he talked about it for the redistricting matter.  You
9  can refer to that.  Anyways, the point is that I
10  think those people decided not to vote in large measure
11  because of voter ID and because of the enforcement of
12  these laws, so...
13     Q.   Are you familiar with the provisional ballot
14  process established by SB 14?
15     A.   A little it.
16     Q.   Can you tell me a little bit about it?
17     A.   If you cast a provisional on election day, you
18  have six days to go back to the ballot poll to prove it
19  up.  I think there's a couple different affidavits you
20  can sign.  You could just either give them the ID that
21  you should have had on election day, or you can sign an
22  affidavit saying that you have a religious objection to
23  having your photograph taken.  And I'm not sure if
24  disability works there yet.  I think there's a carve out
25  for 100 percent disabled folks, I think.  That's my
```

141

```
1  understanding of it generally.
2      Q.   Does MALC take issue with the six day
3  requirement to cure a provisional ballot?
4      A.   I don't know so.  I think that that was
5  respondent to some of -- I don't know if -- respondent
6  is the wrong word.  I think that that makes it slightly
7  more acceptable because there's a cure period.  But the
8  truth of the matter is most provisional ballots are
9  never counted, and that's problematic to all MALC
10  members, regardless of party or where they live, where
11  they're from.
12     Q.   On that note, has MALC either on its own or
13  through counsel submitted public record requests to
14  various counties seeking information regarding
15  provisional ballots cast during the most recent
16  selection cycle?
17     A.   Not through its counsel.  I certainly looked
18  at provisional ballots as part of my election law
19  practice, but not for MALC.  It was for proposed
20  election contests that didn't come through, so...
21          (Exhibit No. 7 marked)
22     Q.   (By Mr. Tatum)  Okay.  I'm handing you what's
23  been marked as Exhibit 7.
24          Mr. Golando, have you seen this document
25  or a document like it before?
```

142

1    A.  No, I haven't.  I'm sorry.
2    Q.  Okay.  Can you describe to me what this
3  document is from looking at it?
4        MS. RUDD:  Objection; calls for
5  speculation.
6    A.  It's a document dated December 5th, 2013.
7  It's a public information -- it's an open records
8  request for provisional ballots that were cast, and some
9  other categories.
10   Q.  (By Mr. Tatum)  I'll represent to you that
11 this document has been produced to the defendants in
12 this litigation, and there were a number of documents
13 just like this produced to us, documents that were
14 addressed -- this one is addressed to El Paso County.
15 There were many others addressed to various other
16 counties.
17        In your work at MALC, are you familiar
18 with these public records requests, or do you recall
19 MALC asking for counsel to submit these on its behalf?
20        MS. RUDD:  And objection to the extent
21 that that would require you to reveal any communications
22 in the pursuit of legal advice between MALC and any of
23 the attorneys for MALC in this litigation.
24   A.  No.
25   Q.  (By Mr. Tatum)  Have you seen any of the

143

1  responses from the counties to a request like this?
2    A.  No.
3    Q.  So you don't know how many public records
4  requests like this were submitted on behalf of MALC?
5    A.  No.
6    Q.  Okay.
7        (Exhibit No. 8 marked)
8    Q.  (By Mr. Tatum)  I'm now handing you what's
9  been marked as Exhibit 8.  If you wouldn't mind just
10 pressing down on that sticker.  I don't think I got it
11 on there all the way.  Thanks.
12        MS. RUDD:  All right.
13   Q.  (By Mr. Tatum)  I'll represent to you that
14 this has been produced to the defendants in this
15 litigation, and it was produced in native format, so I
16 wasn't able to print it with a Bates number on it, but I
17 represent to you for future reference that the Bates
18 number for this document is MALC 00003780.
19        Do you recognize this document?
20   A.  We turned over lots of documents.  I don't
21 recognize this one, unfortunately.
22   Q.  So you don't know what the names on this
23 document represent?
24   A.  Well, I guess I could infer.
25        MS. RUDD:  Don't infer.

144

1        THE WITNESS:  Okay.
2        MS. RUDD:  If you don't know, don't
3  speculate.
4    A.  I don't know.
5    Q.  (By Mr. Tatum)  Let me ask you:  What is this
6  document?  What does it look like?
7        MS. RUDD:  Objection; calls for
8  speculation.
9    A.  I don't know.  Possibly a list of voters,
10 possibly.
11   Q.  (By Mr. Tatum)  Okay.  But you've never seen
12 this document before?
13   A.  You know, I don't think that I have.  At least
14 I don't remember seeing it.  I apologize.
15   Q.  I'm not going to ask you any more questions
16 about that document, so you can -- unless you want to
17 keep looking at it.
18   A.  No, I -- I may, actually.
19   Q.  Okay.
20   A.  But go ahead.  I'm listening.
21   Q.  Okay.  Does MALC contend that SB 14 amounts to
22 a poll tax?
23   A.  Yes, in part.
24   Q.  And why is that?
25   A.  Because it takes ID to get ID, and some people

145

1  without ID have to buy ID to get it.  And as a
2  consequence of that, it's, I guess, a literal poll tax.
3    Q.  Is MALC aware that an EIC is an acceptable
4  form of ID to vote under SB 14?
5    A.  It is.
6    Q.  Is MALC aware that an EIC is obtainable free
7  of charge?
8    A.  But if you don't have the foundational
9  documents to get an EIC, it's the same problem.  Right?
10 And an EIC also takes time to get.  Right?  You have to
11 go to DPS to do it.  You have to sign like these
12 different waivers that says, "I'm not going to use this
13 for ID purposes.  I need this for voting."  I mean, it's
14 a strange ID in that request.  Have you ever had to sign
15 something like that to get an ID?  It's very strange.
16        Anyways, my point is that you got to have
17 an ID to get an ID, and that includes the EIC, so...
18   Q.  But MALC is aware that the actual EIC is
19 issued free of charge?
20   A.  And I know why it's free of charge, and I know
21 how it came about, because my boss brought a point of
22 order on the bill considering the Texas Mobility Fund as
23 we discussed earlier, that was rejected.  But it turned
24 out that you couldn't rob the Texas Mobility Fund of
25 these license fees, because they would put the full

Martin Golando - 6/24/2014

146

1  faith and credit of Texas on the line.  You couldn't do
2  that constitutionally.
3          And so they went into conference and they
4  decided to create a whole new ID that was outside of the
5  Texas Mobility Fund in order to solve this
6  constitutional problem.  And in order to do that, they
7  had to go outside the bounds because it's outside the
8  scope of the House rules to do this.  So, yes, I'm aware
9  of the EIC.
10      Q.   Are you aware that the EIC is issued free of
11  charge?
12      A.   Yes, sir.
13      Q.   Okay.  I want to ask you a couple more
14  questions regarding -- and I'm going back to our
15  discussion about legislative activities or procedures
16  that the Legislature used during the enactment of SB 14,
17  if I may.  Specifically I want to talk about the
18  practice that you called chubbing and the chubathon --
19  is that what it was called?
20      A.   Probably.  That's what I call it.
21      Q.   Okay.  I think I remember you calling it a
22  chubathon back in 2009.  And without going back in the
23  transcript, would you mind explaining again what
24  chubbing -- the practice of chubbing entails?
25      A.   Generally chubbing is the elongation of debate

147

1  on a bill in order to prevent the consideration of bills
2  south of it on the calendar.
3          In this case, it was a systematic effort,
4  that was a caucus-wide effort, to elongate the local
5  calendars for days to essentially force consideration of
6  House bills -- certain House bills on the calendar off.
7  Usually the local calendar is handled within one day,
8  and four to five hours at a time.  Right?  So a local
9  calendar usually has about 200 bills on it, and you read
10  through them real quickly, and then you pass them a
11  third time.  So the second and third reading are on top
12  of each other, and in between you have a legislative
13  day.  It's kind of hyper technical.  But usually it
14  takes about two to three hours.
15          This time we forced -- we -- the members
16  forced the authors of the bill to explain their bill for
17  a full ten minutes, and then there was ten minutes of
18  questioning on each bill.  So what usually would have
19  taken four hours, took I think five or six days,
20  essentially forcing the legislative calendar out.
21      Q.   And when you say "forcing the legislative
22  calendar out," does that mean forcing the bills that
23  were south of -- I believe in this instance it was
24  SB 362?
25      A.   Yes, I think that's correct.  Yes, sir.

148

1      Q.   So when you say forced the calendar out, does
2  that mean they forced all those bills that were south of
3  SB 362 on the calendar out?
4      A.   So there was a legislative deadline to get
5  Senate bills out, so the final consideration of Senate
6  bills.  I think it was -- it's usually the middle of
7  May, May 17th or May 20th, something like that.  And the
8  last day had on the local calendar was the day before,
9  something like that -- or a couple days before.  So over
10  the weekend, all -- the local calendar never finished in
11  time to consider these bills.  And then the last day, I
12  think it was a Sunday if I recall correctly, there
13  was -- there were all these calendars that had kind of
14  jammed up, and so there was about -- I think there was
15  about 110 substantive bills between the bill that was
16  first up and 362.  I think that's right.
17          Anyways, lots of bills to add that day
18  because of the tactic.  It was unfortunate.
19      Q.   So lots of bills died that day because of the
20  tactic employed by MALC in that instance?
21      A.   Many MALC members.  I mean, MALC is --
22      Q.   Sorry.
23      A.   Yeah.
24      Q.   Were any of those bills that died because of
25  the chubbing tactic employed by MALC members, were those

149

1  bills authored by MALC members?
2      A.   I think some of them were.  I'm sure that
3  my -- I'm trying to remember if my boss had one on the
4  calendar in 2009.  I think we did.  We usually get
5  considered pretty late in the session.  If we're lucky
6  to get calendar, it's a pretty late calendar.  I'm
7  trying to think what we had there.  It's probably one of
8  our VIA bills, I think.  I forget.  I think we had one
9  on the calendar.
10      Q.   One of your what bills?
11      A.   VIA bills.  San Antonio VIA is the bus place
12  for San Antonio.  I could be wrong about the actual
13  bill, but I think we had a bill on the calendar, and I
14  think it died because of it, which is how it goes.
15      Q.   Was the chubbing tactic employed on that day
16  during the, quote, unquote, chubathon, was that agreed
17  to by all the members of MALC?
18      A.   I don't know.  I think it was probably agreed
19  to by most members.  Because all that would have to have
20  happened in the chubathon for the record is to have five
21  members talk off every bill.
22          In the local calendar, you can either
23  talk off a bill by speaking for more than ten minutes,
24  or if you have four friends who can go to a bill and
25  say, "We want to talk off each of these bills," that's

Martin Golando - 6/24/2014

150

1 the way to do it.
2        And no one did that.  Republicans or
3 Democrats did that.  Every one of them could have ended
4 the chubathon right there and then if they had just
5 signed a card -- had four members or five members sign a
6 card against all the bills being considered, and then we
7 would have had to have gone on with the daily calendar
8 business.  Right?
9        That didn't happen.  So I assume that the
10 MALC members who could have done that didn't do that.  I
11 think the inference is quite clear that they supported
12 the chubathon, so --
13    Q.   You testified that you're sure that some of
14 the bills that died that day were bills authored by
15 members of MALC.  Correct?
16    A.   It's certainly likely; although, I don't have
17 an exhaustive knowledge of bills that died on the
18 calendar.  I think we had one, I think, but again, it's
19 been -- since 2009, it's been a very long time for me.
20    Q.   When you say "we," do you mean --
21    A.   Me and Trey.  I'm sorry.
22    Q.   So is it safe to say that members of MALC were
23 willing to kill their own bills that may or may not have
24 been supported by their own constituents in order to
25 defeat a voter ID bill through the use of chubbing?

151

1        MS. RUDD:  Objection; calls for
2 speculation, mischaracterizes testimony.
3    A.   Fair?  I don't know.  I think legislative
4 intent is fairly complex, as we've discussed.
5        I think that what's fair to say is that
6 MALC members thought the bill was so horrible and
7 deleterious to its people, that they would do this
8 extraordinary action to prevent its passage.  I think
9 that's the fairest thing I could say.
10    Q.   (By Mr. Tatum)  Even at the sacrifice of their
11 own bills?
12    A.   Yeah, I think that's the implication about the
13 tactic.  That's how horrible they thought this bill was.
14 I think they were right.
15    Q.   So it was worth more to kill that bill than to
16 pass bills that they, themselves, had authored?
17        MS. RUDD:  Objection; calls for
18 speculation, argumentative.
19    A.   Again, legislative intent is very complex.  If
20 I recall correctly, the Senate version of that bill
21 required you to have both your Texas registration card
22 and your driver's license or else you had to cast a
23 provisional.  That's how bad that bill was, I think.
24 And I could be mistaken.  Again, it's been many
25 different versions of the same bill.

152

1        But I think that -- like I said before --
2 and I don't think I can add more than this -- is that
3 MALC members and the members who employed this tactic
4 were certain that this bill was wrong --
5 constitutionally wrong.  It was almost, probably
6 racist, and they didn't want to ratify that.
7    Q.   (By Mr. Tatum)  On what basis does -- let me
8 retract that.
9        At that point of the chubathon, had
10 members of MALC employed the chubbing tactic before?
11    A.   Sure.  Not to kill a specific bill.  I think
12 that toward the end of session -- not in that way.  I
13 don't think chubbing the local calendar had ever been
14 done.  So that was something completely new.  It was a
15 new tactic for a specific calendar.  Right?
16        At the end of the session, there's always
17 those deadlines.  Deadlines to get a House bill out, a
18 deadline to consider a conference committee report, a
19 deadline to get a Senate bill passed by the House.  And
20 at the end of those deadlines, usually sometime between
21 10:30 p.m. to midnight, there is kind of elongated
22 consideration by people because they want to kind of hit
23 the brakes on passage of bills.  It happens every
24 session, bills start hitting the brakes.
25        And then there's a mad dash toward the

153

1 end.  When there's, like, ten minutes left, they start
2 going through bills that are -- you know, at a rapid
3 pace.  Anyways, it's a strange phenomenon, but it
4 happens every time.
5    Q.   So chubbing -- and if there's a better term
6 for it than "chubbing," please let me know.
7    A.   I wish -- I guess there's --
8    Q.   Okay.
9    A.   I don't know.  I don't know.
10    Q.   We'll just call it chubbing.
11    A.   Yeah.
12    Q.   So you testified that the tactic of chubbing
13 had never been used before the chubathon to that degree.
14 Is that correct?
15    A.   On the local calendar.  I want to be very
16 clear.  There are five or six different calendars that
17 exist in the House rules.  The local and consent
18 calendar is one of those calendars.  It has special
19 rules associated with it.  It has a special calendars
20 committee that nominates bills for this calendar.
21        And I don't think -- again, my -- I know
22 a lot about this, but not -- I don't have, you know,
23 exhaustive knowledge of it, or complete knowledge.  I
24 don't think the chubbing had ever been done on the local
25 before, and certainly not to this degree where it was

Martin Golando - 6/24/2014

154

```
1  days of consideration on the local calendar.
2         Q.   So would you say that it -- in executing the
3  chubathon, that MALC employed a tactic in a way that
4  diverted from normal legislative procedures?
5              MS. RUDD:  Objection; mischaracterizes
6  the testimony.
7         A.   I don't think so.  I think that it was a
8  unique tactical choice.  It was certainly -- I think
9  everything that's unique is somewhat a deviation from
10 normalcy.  So in that sense, partially.  But chubbing
11 itself had existed a long time before that for the
12 record.  Right?  It just hadn't been used to this degree
13 and on this calendar, so...
14        Q.   (By Mr. Tatum)  Has MALC or members of MALC
15 employed the tactic of chubbing since the chubathon?
16        A.   I think so.  I think chubbing -- again,
17 generally we're talking about.  Right?  In 2013, there
18 was -- towards the end of the debate on when you could
19 get House bills out, I think there was some slowing down
20 generally.  That's what generally happens.  It may have
21 been by MALC members or not.  I can't recall exactly.
22 But chubbing exists for a reason.
23             Sometimes you just want to hit the brakes
24 because you're tired.  Sometimes you want to hit the
25 brakes because you want to hit the brakes to prevent a
```

155

```
1  bill from passing.
2              I can't recall the specific bill -- or a
3  specific bill from this session that may have been a
4  victim of chubbing.  And sometimes it's just kind of the
5  nature of the calendar itself.  There's just not enough
6  time to consider all the bills on the calendar.
7         Q.   In your legislative experience, have you found
8  that chubbing exists more on less often than an outside
9  the bounds resolution?
10        A.   Outside the bounds resolutions are common for
11 the appropriations bill.  That happens all the time for
12 appropriations.  And then for non-appropriations bills
13 or non-budget related bills, outside the bounds
14 resolutions occur at a much slower rate.  And you can
15 check by work, because it requires a House resolution to
16 do it, and it's just -- I think it requires an HCR or an
17 SCR, depending on what the origin of the bill is.  And I
18 think that those are rarer than you might imagine, maybe
19 20 or 30 -- fewer than that, probably -- per session.
20 And chubbing is probably a one-day event or a one-hour
21 event, so I'm not sure how you would magnify -- or how
22 you would make that determination.
23             Why I say that the voter ID bill was out
24 of bounds and why that's a deviation from normal
25 procedure is that most out of bounds resolutions are for
```

156

```
1  either non-substantive changes or for the budget to
2  adjust a category.  We want to give 5 million to a
3  budget category, not 4 million.  Right?
4              And there's a small category for
5  substantive changes, but this was an entirely new
6  provision in the bill, a creation of a whole new ID done
7  by an outside the bounds resolution in a conference
8  committee.
9              So something horribly substantive that,
10 you know, was responsive to both my bosses and other
11 MALC member concerns was decided outside of their
12 ability to influence that dialogue by the members of the
13 conference committee.  And they were -- and you don't
14 get a lot of notice on an outside the bounds resolution.
15 You wake up in the morning, and there's a resolution on
16 your table saying, "You have to agree to this," and you
17 can't amend it.  Right?
18             So it's one of those things where a
19 legitimate concern was taken, and then a smaller group
20 of legislators made a decision, and there was little
21 notice and little ability to change the outcome, so...
22        Q.   Is MALC able to identify a constituent of a
23 MALC member who has suffered harm at any point because
24 of SB 14?
25        A.   And this may be where I differ from my
```

157

```
1  attorney in the sense that on our discussion of harm --
2  because I believe that every one of our constituents
3  have been harmed by the bill.  And I don't mean this --
4  I really don't mean this esoterically.  It sounds like
5  I'm just preaching platitudes.  I'm really not trying to
6  do that.
7              I think every person in Texas is harmed
8  by the bill.  When Texas passes laws that are focused on
9  what I believe is a disfranchising intent that have a --
10 that were passed with an impermissible purpose, that
11 cheapens what it means to be a Texan.  And I'm saying
12 this as someone who is an adopted Texan.  I'm not even
13 from here, really.  But this is a great state, and it is
14 made a worse place because of bills like this, in my
15 opinion.
16             And so the honest answer to your question
17 is that I think everyone has been harmed by it; everyone
18 in this room, everyone in this state.
19        Q.   Can you elaborate on what you mean by
20 "impermissible purpose"?
21        A.   I think that -- impermissible generally means
22 an unlawful purpose.  In this instance, I mean a racist
23 purpose.  I think that this bill is -- it seeks to
24 abridge the voting rights of minorities on account of
25 their race.  That's what I mean.
```

Martin Golando – 6/24/2014

158

1    And I think that it also unequally
2   enforces the laws. I think that there are several
3   provisions like that in this bill that do that. So I
4   think that those are two impermissible motives on behalf
5   of policy and decision makers that enacted this bill.
6       Q.   Does MALC believe that anyone who supports
7   SB 14 is a racist?
8       A.   No, unless they're a racist and they support
9   it. I mean, I'm certain that racists do support it, to
10  be clear. I'm certain that there are prejudiced and
11  bigoted people who do support it, but I don't think it
12  makes you a racist just to support it.
13      Q.   What makes you certain that racists do support
14  SB 14?
15           MS. RUDD:  Objection; mischaracterizes
16  testimony.
17      A.   I'm not sure if this has been produced or not,
18  but there's been some -- I've gotten some emails from
19  people who support the bill and who have taken what I
20  think to be a racist tone with me. And maybe it was
21  some emails that predate the litigation. I have some
22  knowledge or some -- I have some memory of
23  correspondence with people who I think used racist terms
24  in their emails with me.
25           I've had conversations with people who I

159

1   thought -- that I thought were racist conversations who
2   told me they would support the bill. But I think you're
3   asking me for something deeper than that, whether I
4   think that racists support the bill.
5       Q.   (By Mr. Tatum) Well, let me stick to what you
6   just testified to.
7       A.   Sure.
8       Q.   You mentioned conversations with people who
9   you thought were racist who told you they support the
10  bill.
11      A.   Yes.
12      Q.   I'm reading that from the transcript here. Do
13  you recall who those people were?
14      A.   There's a -- well, I can't recall his name.
15  I'm sorry. There's a constituent who calls Trey's
16  office when I was working there fairly frequently, about
17  once a quarter, and we have very long conversations
18  about ethnicity and identity. And he's very much
19  against hyphenation Americans, is what he calls them --
20  so Mexican-Americans, Italian-Americans -- and I always
21  try to defend multiculturalism.
22           He's never said a racist epithet to me,
23  but it's been my experience that people who espouse the
24  kind of rhetoric that he espouses probably have a racist
25  belief. And he uses words like "takers" or "Latino

160

1   immigration is an infectious disease." That's racist to
2   me.
3       And while he's a very nice man to me and
4   we have very deep conversations about this issue, I have
5   to tell you that I think that's a racist purpose -- or
6   that's a racist rhetoric. And when -- it's not
7   surprising to me that he supports this bill, so...
8       Q.   Have you ever personally encountered rhetoric
9   like that from a legislator who supported SB 14?
10      A.   Personally, no. But during the 2007 session,
11  I think Betty Brown pulled Ramey Ko -- and this is well
12  known; I'm sure you know it -- Ramey Ko aside and said,
13  "You guys should consider changing your names," meaning
14  Asian-Americans, "so people can understand you better."
15           And I think it's a well-intentioned thing
16  to say. I don't know Betty Brown very well. She and my
17  boss had a falling out about something personal, and I
18  couldn't say that I thought very highly of her. But
19  when she said that, that took me aback that someone
20  would say that, that someone should change their name.
21           And it actually dovetails with the
22  Italian-American experience. I'm Italian-American. My
23  family came over here on a boat, and I think that we
24  were the Anglos' first Latinos, and my name was changed
25  when I got here. Anyway, my point is, is that the

161

1   rhetoric used during that time period was rough. And
2   during 2011, it was -- the rhetoric was pretty bad, too.
3           And it wasn't just from House members.
4   There were -- Rebecca Forest, I think, has a group
5   called Women Against the Wall, or something like that,
6   and they had a meeting at the Capitol -- on the Capitol
7   during the session, and she said the reason we can't
8   pass immigration reform is because there were too many
9   Latino legislators. And I don't know what that means,
10  but it certainly sounds racial to me.
11           Anyway, to the degree that -- I know you
12  can't have a group on the Capitol stage without someone
13  greasing the skids for you with House administration, so
14  some member helped that person out. And I don't know if
15  they support that person or not, but I've got to tell
16  you that that's change to me, that that happened.
17           And there were other things, too. I
18  mean, the registering bill, I think, was a racist bill.
19  There were immigration bills that were considered that I
20  thought were racist in nature. So it was kind of a part
21  and parcel throughout the whole session, kind of a hyper
22  racially charged session in 2011, so...
23      Q.   So in your opinion, SB 14 was not the only
24  bill passed during 2011 that may have had racial or
25  discriminatory intent?

Martin Golando - 6/24/2014

162

1    A.  Sadly, no.  I think that, obviously, the 2011
2  registering plan is a hyper discriminatory bill and was
3  intended to be discriminatory.
4    Q.  Mr. Golando, do you know if MALC has produced
5  any and all documents responsive to the various requests
6  for production that defendants have submitted?
7    A.  To my knowledge.  If I find more, I will
8  certainly make a more fulsome -- and it's certainly not
9  my intent to withhold anything.  We have nothing to
10  hide.  I think we've been particularly above board.
11  I've given you everything that's in MALC's control,
12  that's for sure.
13      There may be -- I know that there have
14  been a lot of third-party subpoenas issued, which I,
15  frankly, disagree with tactically, but -- in fact, we
16  received one and will be complying with that as soon as
17  I get all my documents in a row, so...
18    Q.  Why do you disagree with those subpoenas
19  tactically?
20    A.  I think --
21      MS. RUDD:  Okay.  Wait.  I don't know if
22  you're disagreeing with them as an attorney for MALC.  I
23  just don't want you to reveal any of your mental
24  impressions as an attorney.
25      THE WITNESS:  Fair enough.

163

1    A.  This is not from my attorney -- this is from
2  my legislative background.  It's uncommon for
3  legislators to get subpoenaed.  And I can't imagine that
4  Jay Dyer would want you to use a third-party subpoena
5  company to subpoena legislators, and that when members
6  look at the name of the subpoena deliverer and it was
7  associated with debt collection, it was a surprise to my
8  members that they were getting subpoenaed, generally,
9  and they were subpoenaed in this way, and so -- that's
10  why I disagree with it.
11    Q.  (By Mr. Tatum)  Okay.  Mr. Golando, if MALC is
12  successful in this litigation, do you intend to seek
13  attorney's fees for your services?
14    A.  For mine?
15    Q.  Yes.
16    A.  Like I said before, my litigation part of this
17  has been minimal.  It's been limited to just kind of
18  doing -- getting documents together.  I routinely
19  collect my hours, just because I try to monitor my own
20  time, but I do not intend to seek fees in this
21  litigation.  In this one.
22    Q.  Mr. Golando, I don't have any more questions
23  for you right now at this point.
24      Before I pass the witness, is there
25  anything you'd like to clarify with regard to any of

164

1  your answers, or is there anything you'd like to add
2  with regard to any of the answers you've given here
3  today?
4    A.  I meant to look up the name of the Florida
5  State Representative who is friends with my boss and
6  Representative Anchia.
7    Q.  Oh, that's right.
8    A.  I meant to do that.  I think it's Juan Zapata,
9  I think, but I'll have to -- I'm not certain.  He's a
10  nice guy.
11    Q.  You think that that might be the Florida
12  legislator --
13    A.  Correct, who is friends with Representative
14  Anchia and my boss.  And I'm not -- again, I am not
15  clear if they've ever discussed -- I imagine that they
16  haven't, but you asked me about inter-caucus
17  communications, so...
18    Q.  Right.
19    A.  I think that everything else will have to wait
20  until I review the transcript.
21      MR. TATUM:  I pass the witness.
22      MS. RUDD:  We have no questions at this
23  time.
24      Angela, do you have any questions for
25  Marty?

165

1      MS. MILLER:  No questions from the United
2  States.
3      MS. RUDD:  All right.
4      MR. TATUM:  Okay.
5      (Deposition concluded at 2:09 p.m.)
6      (Signature requested.)
7          * * * * *
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Martin Golando - 6/24/2014

166

1          CHANGES AND SIGNATURE
2  WITNESS NAME:  MARTIN GOLANDO
3  DATE OF DEPOSITION:  JUNE 24, 2014
4  PAGE/LINE          CHANGE                    REASON
5  _____
   __
6  _____
   __
7  _____
   __
8  _____
   __
9  _____
   __
10 _____
   __
11 _____
   __
12 _____
   __
13 _____
   __
14 _____
   __
15 _____
   __
16 _____
   __

167

1        I, MARTIN GOLANDO, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5                    _____
                     MARTIN GOLANDO
6
7  THE STATE OF _____)
8  COUNTY OF _____)
9
10       Before me, _____, on this day
11 personally appeared MARTIN GOLANDO, known to me (or
12 proved to me under oath or through _____)
13 (description of identity card or other document) to be
14 the person whose name is subscribed to the foregoing
15 instrument and acknowledged to me that they executed the
16 same for the purposes and consideration therein
17 expressed.
18       Given under my hand and seal of office this the
19 _____ day of _____, 2014.
20
21
                     _____
22                   NOTARY PUBLIC IN AND FOR
                     THE STATE OF _____
23
24
25

168

1  THE STATE OF TEXAS:
   COUNTY OF TRAVIS:
2
3      I, Steven Stogel, a Certified Shorthand Reporter in
   and for the State of Texas, do hereby certify that the
   facts as stated by me in the caption hereto are true;
4  that the above and foregoing answers of the witness,
   MARTIN GOLANDO, to the interrogatories as indicated were
5  made before me by the said witness after being first
   duly sworn to testify the truth, and same were reduced
6  to typewriting under my direction; that the above and
   foregoing deposition as set forth in typewriting is a
7  full, true, and correct transcript of the proceedings
   had at the time of taking of said deposition.
8
9      I further certify that I am not, in any capacity, a
   regular employee of the party in whose behalf this
   deposition is taken, nor in the regular employ of his
10 attorney; and I certify that I am not interested in the
   cause, nor of kin or counsel to either of the parties.
11 filed with the Clerk.
12     GIVEN UNDER MY HAND AND SEAL OF OFFICE, on this,
13 the _____ day of June, 2014.
14
15
16
17
                     _____
18                   Steven Stogel, CSR 6174
                     Expiration Date:  December 31, 2014
19                   Integrity Legal Support Solutions
                     Firm Registration No. 528
20                   3100 W. Slaughter Lane, Suite A-101
                     Austin, Texas 78748
21                   (512) 320-8690
22
23
24
25

**$**

**$1,000** 79:12

**$1,600** 79:12

**$300** 35:6,7

**$4,000** 86:9

**$4,200** 86:7

**0**

**00003780** 143:18

**07** 59:22 86:4

**09** 59:22,24

**1**

**1** 7:3 19:16,18
20:13,19,22 21:2,4
112:5

**1.8** 128:15,21,22

**1:19** 127:8

**10** 24:10,13,15 26:24
128:20

**10:00** 97:12

**10:30** 152:21

**10:41** 61:19

**10:49** 61:19

**100** 98:15 140:25

**1099** 16:17

**11** 24:17,20,22 59:24
91:15

**11:00** 12:17

**110** 148:15

**119** 7:7

**11th** 13:12

**12** 24:24 25:2,4 91:14
131:12

**12/5/13** 7:14

**12:00** 127:6

**12:13** 127:8

**120** 7:9

**121** 7:10

**124** 7:12

**12548** 5:18

**13** 25:6,9,11,15,18
116:16 117:14

**13th** 36:16

**14** 20:21 22:13,15,25
25:7,20,22,24
26:1,5,17 27:3,14
28:1,23 29:1,2 53:22
54:9 55:20 56:1
59:18 61:12,13 62:9
63:6,14 64:7,11 68:9
69:11 70:16,18,25
71:8,24 72:2 75:2,5
80:4 81:2 84:10
86:25 87:12
88:5,9,20,24
89:16,25 91:3,7 96:1
98:8,18 99:3
100:7,18,20 101:21
102:13 103:23 104:11
105:5,20 106:6
107:11,20 108:4,5,7
110:17,22 114:19
116:7,12,25 117:6,20
119:9,12,23 123:16
127:10,17,23 128:6
129:5 133:5,18
134:20 135:2,16
136:9 138:15 139:17
140:14 144:21 145:4
146:16 156:24
158:7,14 160:9
161:23

**141** 7:13

**143** 7:15

**14-related** 72:14
79:19 80:19 81:19
83:7

**14th** 4:14

**15** 26:3,9,11

**150** 58:22

**16** 26:13,20,22

**168** 6:7

**16th** 41:12

**17** 26:24 27:6,8

**17th** 21:15 26:14
27:12 82:14 133:1,15
134:18 148:7

**18** 27:10,18,20

**18,000** 130:7

**1860** 119:11

**19** 7:3 27:22 28:5,7

**1973** 31:20

**1977** 13:12

**1st** 16:1 17:19 18:3

**2**

**2** 7:4 20:23
21:6,10,12 61:20,22
65:15 67:25 69:21
70:6 78:21,25

**2:09** 4:11 165:5

**2:13-CV-193** 1:4

**2:13-CV-263** 2:2

**2:13-CV-291** 3:2

**2:13-CV-348** 3:12

**2:30** 11:19

**20** 28:9 104:16 128:20
131:21 155:19

**200** 147:9

**200,000** 128:22

**2000** 48:10 137:19,22

**2003** 13:19

**2004** 22:5 23:10
24:4,11,18,25 29:20
30:6,16 31:2
60:24,25

**2005** 26:7 57:24 59:20
60:25 91:11

**2007** 13:20 14:11
57:24 91:17 96:16

160:10

**2008** 18:2 43:10
47:15,23 48:11,23,25
57:16,19 86:15

**2009** 48:5 57:24 59:9
91:25 106:4,20 107:2
146:22 149:4 150:19

**2010** 47:25 48:2
116:15

**2011** 7:8,9,11 22:16
27:10,22 34:14 81:1
92:7 98:21,24 101:20
102:4 105:16,19,22
106:3,8 108:7 110:7
112:23 119:9,23
121:8 123:7 124:19
125:10 126:2 139:19
161:2,22,24 162:1

**2012** 7:12 77:23 81:3
116:16 124:15
125:3,10 126:3,15,16
135:4

**2013** 21:15 26:14
27:12 34:15 65:17
81:3 82:14 85:1
133:2,15 134:18
142:6 154:17

**2014** 4:5,10 166:3
167:19 168:13,18

**202** 36:16

**202.514.2919** 5:12

**204** 36:17

**209** 4:13

**20th** 148:7

**21** 28:21 29:4,6

**213.808.5700** 5:6

**22** 29:8,13,15

**23** 29:17,24 30:1

**24** 4:5 30:3,9,11
166:3

**24th** 4:10 8:4

**25** 30:13,19,21 114:4

**26** 20:13 30:23 31:4,6
114:4

**2nd** 41:1

---

3

**3** 7:7 21:14,17,19
119:18,20

**3.5** 126:9

**30** 155:19

**30(b)(6** 4:3 114:1

**31** 168:18

**3100** 168:19

**32(c** 103:16

**320-8690** 168:20

**362** 59:2 106:19
107:6,10,12,14,19
108:4,6 147:24
148:3,16

**37th** 5:5

**39** 34:14

---

4

**4** 7:9 21:21,24 22:1
103:16 120:9,11
156:3

**4(c** 28:22 29:9

**40** 31:20 34:15

**40-plus** 31:20

**41** 34:11,15

**48** 105:25

---

5

**5** 6:3 7:10 20:9
22:3,7,9 67:23 69:22
70:6 73:6 77:15,21
78:24 88:15 101:18
112:7 114:13
121:14,16 124:17,18
128:7,14 156:2

**512** 168:20

**512.463.2110** 5:19

**528** 168:19

**58** 120:25

**5th** 5:5 142:6

---

6

**6** 7:12 22:11,19,21
124:10,12 125:2

**61** 7:4

**6174** 168:17

**63** 122:3,5

**633** 5:5

**65** 81:7

**68** 122:22,24 124:19
125:13

---

7

**7** 7:13 22:23 23:2,4
141:21,23

**70** 121:4

**75** 82:1 119:24
125:8,13

**78711-2548** 5:18

**78748** 168:20

**795** 128:13

**795,000** 128:9

---

8

**8** 6:6 7:15
23:6,12,14,22 96:12
143:7,9

**8,000** 41:20

**8:30** 12:16

**80** 46:14,16 71:1,2,3

**82nd** 20:22 26:18
27:4,15 28:2

---

9

**9** 24:1,6,8

**9/11** 137:23

**9:30** 8:4

**9:34** 4:11

**90** 46:15

**90071-2013** 5:5

**90s** 95:14

**96** 13:16

**98** 137:20

---

A

**a.m** 4:11 61:19

**A-101** 168:19

**Aaron** 89:21 112:19

**aback** 160:19

**ability** 23:15,23
 64:12 156:12,21

**able** 56:13 71:20
 103:22 114:20 117:3
 129:3,9,19,23
 130:4,14,17,24
 131:10,24 132:3
 133:13 134:17,25
 136:7,8 143:16
 156:22

**above-captioned** 21:7

**above-styled** 4:9

**abridge** 157:24

**abridges** 64:8 127:10

**abridging** 20:24

**absolutely** 32:18
 40:15 53:17 87:14
 92:22 118:23 123:13
 128:3

**AC** 66:2

**accept** 34:23

**acceptable** 127:16,23
 128:5 129:4 133:4,17
 134:20 135:2 141:7
 145:3

**access** 128:10,16
 135:23 136:24

**accomplish** 17:8

**accord** 119:6

**according** 119:21
 121:6 122:22 123:16
 124:24

**account** 20:24 26:15
 27:1,13,25 60:12,14
 133:3,17 134:19
 157:24

**accounted** 125:21

**accurate** 123:15

**accurately** 10:24
 11:3,6 123:1

**achieve** 86:18

**acknowledge** 109:21,25

**acknowledged** 167:15

**acquiesce** 118:14

**act** 47:20 91:6

**acted** 89:13 91:2 94:8

**action** 1:3 2:1 3:1,11
 67:4 151:8

**actions** 16:8 17:3
 53:3 86:22

**active** 39:5

**activities** 18:24 22:3
 23:6 24:10,17,24
 25:6 29:11 46:22
 47:12 52:17
 53:11,15,18 55:3
 57:5 60:24 72:15
 79:20 80:20 81:19
 83:5,7 85:25 107:19
 146:15

**activity** 53:5
 81:14,15

**actual** 97:17 99:12
 132:15 134:14 145:18
 149:12

**actually** 55:12 84:19
 90:9 96:6 108:15
 111:3 132:12 136:13
 144:18 160:21

**Adair** 13:13

**add** 77:13 148:17
 152:2 164:1

**addition** 36:10

**addressed** 142:14,15

**adds** 77:13

**adequately** 21:7 70:8

**adjust** 156:2

**administration** 161:13

**administrative** 77:7

**admittance** 34:23

**adopted** 157:12

**advance** 46:24

**advanced** 44:22

**advice** 19:11 66:1
 68:13,16,21 69:19
 142:22

**advise** 98:21

**advises** 73:18

**advocacy** 46:8 57:18
 70:3

**advocacy-related** 24:2
 57:15

**advocates** 92:16 124:5

**advocating** 58:4 87:21
 89:8 90:21

**affect** 53:21 64:12
 68:10

**affected** 63:18
 128:21,23 129:7
 133:6,10,19 134:1,14
 136:12 139:4,8 140:3

**affects** 52:5,6,7
 137:3

**affidavit** 50:2 140:22

**affidavits** 140:19

**affix** 167:2

**afford** 83:24

**African-Americans**
 121:21 123:5 130:2

**AG** 115:3,4

**against** 58:4
  59:14,15,24 98:13,14
  150:6 159:19 161:5

**agenda** 47:1

**agendas** 47:8

**ago** 42:8 101:4 102:4

**agreed** 119:24 120:17
  121:2 122:12,14,25
  124:20 125:4,12,24
  149:16,18

**AGs** 115:19

**ahead** 8:22 15:14 94:2
  144:20

**Aliseda** 89:20 90:10
  110:6,21 113:18
  118:4 131:2

**allegation** 28:22 29:8
  110:4 111:8,12
  112:17 113:16

**allegations** 29:17
  30:3

**alleged** 96:24 113:12

**allocated** 45:22

**allocation** 77:16

**allotted** 105:1

**allowed** 93:11
  108:9,18,25 109:12
  120:1,19 121:24
  122:16 124:22 125:7

**already** 13:2 79:8
  115:7

**am** 8:18,23 15:23
  164:14 168:8,10

**amazing** 42:12 58:23

**ameliorate** 71:19
  104:3

**amend** 51:1 156:17

**amendment** 99:22 104:4
  108:21

**amendments** 22:11 49:2

---

57:22 99:6,7,12
  102:13,17,19,20
  103:11,23 104:2
  107:14

**America** 2:1 5:8 21:8
  70:8

**American** 1:7 3:2 7:6
  15:16 31:24 38:14
  52:9

**Americans** 31:14
  159:19

**among** 109:2 130:1

**amongst** 67:5 119:8

**amount** 45:14,16,17
  46:4,14 55:24 56:5
  61:10 70:20 78:7
  81:4 104:25

**amounts** 40:14 144:21

**ample** 104:10,12

**Amy** 5:3 8:25

**amy.rudd@dechert.com**
  5:6

**analyses** 26:4
  30:14,25 114:10
  115:2

**analysis** 88:18 113:23
  114:22,23 115:15

**analysts** 33:15 56:21
  78:12

**Anchia** 50:16 60:7
  88:12 115:5 164:6,14

**Angela** 5:9 9:2 164:24

**angela.miller5@usdoj.**
  **gov** 5:12

**Angeles** 5:5

**Anglos** 160:24

**ANNA** 1:4

**annual** 44:25
  45:8,12,21 46:11
  70:23

**Annually** 40:25

---

**anomaly** 125:21

**answer** 9:24 10:12
  15:14 50:22 56:16
  69:13 91:8 100:12
  103:9 105:2 106:1,4
  114:24 115:16,21
  131:6 133:21 157:16

**answered** 126:21

**answering** 10:23
  11:2,6 92:25

**answers** 9:15,19 20:6
  51:1 65:6 164:1,2
  168:4

**Anthony** 8:13

**A-N-T-H-O-N-Y** 8:14

**Antonio** 8:16 15:12
  149:11,12

**anybody** 17:21 89:11

**anymore** 85:15

**anyone** 12:2 17:17
  135:17 158:6

**anything** 10:6 11:5
  13:1,6 15:2 36:7
  87:5 88:8 94:20
  110:8 123:25 162:9
  163:25 164:1

**anyway** 42:15 93:12
  116:25 160:25 161:11

**Anyways** 55:15 86:5
  90:13,23 97:16
  131:21 135:11
  138:2,6 140:9 145:16
  148:17 153:3

**anywhere** 92:22

**apathies** 138:18

**apologize** 13:24,25
  29:25 47:24 50:23
  79:2 118:21 144:14

**apparent** 77:20 78:2

**apparently** 132:25

**Appearances** 6:3

appeared 167:11

Appearing 5:9

appointed 103:16

appreciate 48:19
86:10

appropriately 86:22

appropriations
155:11,12

approximate 46:10,13

area 52:5

areas 14:21

aren't 70:14 72:22
83:8 119:14

arguably 94:15,16

argument 104:5

argumentative 151:18

Arizona 52:8

Arlington 89:3

Armando 103:15

articles 100:6

Asian-Americans 91:21
160:14

aside 14:12 38:25
83:6 160:12

as-needed 45:22

asserting 62:24
63:3,13,23 64:3

asset 85:6

assist 31:12 62:6
95:18

assistance 72:5

Assistant 5:17 8:2

assisted 19:13

assisting 24:25 29:1
57:6,8

associated 73:5 77:6
78:20 153:19 163:7

ASSOCIATION 2:6

assume 57:7 102:1
150:9

Assuming 123:14
125:20

assumption 67:24

AT&T 43:18

attached 4:16 12:10

attempt 27:22 75:4
109:18

attempted 75:2
132:20,23 135:1

attempting 109:15

attempts 27:10 116:19

attention 83:7

attorney 4:13 5:10,17
8:2,5 10:10,13 14:23
15:1 65:3,23 157:1
162:22,24 163:1
168:10

attorney-client 69:16

attorney-related
69:18

attorneys 65:24 68:17
142:23

attorney's 69:3
163:13

attributable 85:12

attributed 100:16

atypical 93:15

audible 9:14,18

audit 113:22 114:9
115:1,14

audits 26:4 30:14,24
88:8

August 18:2

Austin 4:14 5:18 8:6
15:10 41:20 168:20

authored 149:1 150:14
151:16

authority 37:12 45:2

94:8,12,18,20,22,24

authorized 36:22,25
37:5

authors 103:7 147:16

automatic 34:22

available 40:13 45:9
105:22 106:2,3

avoid 9:17

aware 56:7 69:6 110:9
117:19 119:21 133:7
145:3,6,18 146:8,10

away 36:17 72:18
83:15 108:15

---

B

background 13:8,14
15:2 163:2

bad 70:4 151:23 161:2

bag 73:11 78:3

balance 12:17

ballot 110:11,13
112:12,20 113:12
116:2 140:13,18
141:3

ballots 29:2 133:8
141:8,15,18 142:8

Bank 5:4

Banks 12:11

barely 111:6

based 56:19 67:3
87:15,18 98:15 114:2
123:3 128:10

basically 16:6 17:20
36:12 97:10

basis 20:19 38:8
45:23 136:25 152:7

Bates 143:16,17

became 16:5 42:14

become 34:20

becoming 16:18

begin 9:23

beginning 32:1 97:25

behalf 20:6 24:3 25:7
36:23,25 37:6,12
46:9 67:24 89:8
90:21 142:19 143:4
158:4 168:9

behind 86:20 119:3
124:7

belied 87:23

belief 87:16 139:4
159:25

beliefs 119:5

believe 11:19,22
28:10 34:11,15 37:3
38:11,14 40:2,9
42:14 44:15 61:22,25
62:2,11,19 63:2
64:11 65:11 74:1
75:23 76:17 86:4,25
89:12 90:14 95:15
96:23 99:5 101:24
104:9,12 106:25
107:3 108:17
109:11,14,17 110:23
113:20 114:4 115:18
116:4,7 117:6
118:3,24 119:7
120:22 123:10 129:8
134:21 138:19 147:23
157:2,9 158:6

believed 111:2
139:5,8

believes 64:7 75:7
127:10

BELINDA 3:11

BENAVIDES 2:8

benefits 35:23 38:25

BENJAMIN 1:6

besides 99:10

BESSIAKE 2:4

best 23:15,23 42:15
43:19 44:1 47:2

54:5,6 134:4

better 42:24 86:23
104:4 109:4 153:5
160:14

Betty 91:18,19 96:16
160:11,16

Bexar 117:14

bifurcation 32:2,4

bigger 71:17

bigoted 91:20 158:11

bilateral 42:13

bill 22:15 56:17
57:24 58:5,10,21,24
59:1,4,12,14,15,18,2
4 60:2 61:1,3 62:13
86:22
91:11,16,17,18,22
92:3,5,18,19,21
93:2,7,11,13,16,19,2
1 94:10,11 95:1
96:10,13,14,16,17
97:7,8,14,15,23,24
98:4,14 102:24
103:2,14,15,20,21
104:1,13 105:2,14,24
106:13,19,21,22,23,2
4 107:2,8,20
118:9,12,16 124:3,5
145:22 147:1,16,18
148:15
149:13,21,23,24
150:25
151:6,13,15,20,23,25
152:4,11,17,19
155:1,2,3,11,17,23
156:6 157:3,8,23
158:3,5,19
159:2,4,10 160:7
161:18,24 162:2

bills 22:11 36:8
46:19 47:1 49:3
58:3,22 59:19 60:24
92:14,19 95:18,23
96:2 97:11,22 102:2
106:11 108:12
147:1,6,9,22

148:2,5,6,11,15,17,1
9,24
149:1,8,10,11,25
150:6,14,17,23
151:11,16 152:23,24
153:2,20 154:19
155:6,12,13 157:14
161:19

binary 89:9

binding 20:6

bipartisan 93:18

birth 13:11 116:24
132:13,15 136:3
138:4

bit 13:18 42:24 48:12
60:11 103:1 109:7
140:16

Bledsoe 68:25

blind 122:7

blip 125:17 126:8

blips 127:2

block 36:16

board 50:13 162:10

boat 160:23

border 71:15,18 83:13

born 13:12,21 14:1
132:14 136:3

boss 50:16 87:5 92:19
99:10 102:19 103:8
110:21 145:21 149:3
160:17 164:5,14

bosses 103:4 156:10

bottom 20:11

bounds 93:14 94:4,8
97:2 146:7
155:9,10,13,24,25
156:7,14

Box 5:18

brainstorm 103:1

brakes 152:23,24
154:23,25

Branches 3:1 5:2 7:5

break 48:14,16 61:14
119:16 127:6 134:7

breath 103:18

Brennan 12:10

BRICKNER 1:6

bricks 58:20

brief 20:17

briefly 13:16

bring 12:24 61:6
96:13

brings 69:24

broad 56:10 112:1

broader 112:14

broadly 81:10

broken 120:15

brother 131:5

brought 93:9 96:18
145:21

Brown 91:18,19 96:16
160:11,16

budget 44:25
45:3,6,11,12,14,22
46:6,11,14 56:20
70:24 85:13 136:24
156:1,3

budgetary 18:22 84:4
85:8,18 86:12

budgets 45:8,25

building 8:5

bunch 58:3 73:14

BURNS 1:4

bus 149:11

business 15:8 74:19
150:8

bust 106:10,15

buy 145:1

buy-out 43:23

bylaw 37:4,11

bylaws 31:15,17 34:7
35:1 37:3 51:18
67:11

---
C
---

C&E 16:21 33:4
39:21,24 40:10,12
43:18 44:7,11,24
77:18

c)3 32:20 38:15 57:9

c)6 32:20 57:10

cachet 74:24

calculation 113:22
114:9 115:1,14

calculations 26:3
30:13,23

calendar 58:22 59:5,6
92:8 96:17 107:17
147:2,6,7,9,20,22
148:1,3,8,10
149:4,6,9,13,22
150:7,18 152:13,15
153:15,18,20
154:1,13 155:5,6

calendars 96:13 147:5
148:13 153:16,18,19

California 5:5 52:8

capacity 2:11,13
3:6,8,18,19 17:13
18:13,17 53:6 65:23
98:23 168:8

capital 84:7

Capitol 41:9,11,13,21
161:6,12

caption 168:3

car 90:9 136:2 137:16

card 9:5 130:18
150:5,6 151:21
167:13

cards 128:12

careful 69:15

Carolina 49:18

CARRIER 1:4

carve 140:24

carve-out 92:1
95:13,20 96:21

carve-outs 95:22

case 1:4 2:3 3:3,12
10:11 63:4 73:18
78:25 79:10 104:18
133:16 147:3

cases 113:4 114:17
116:12,14

cast 116:16 133:8
140:17 141:15 142:8
151:22

casting 29:2 117:7

catch 103:18

categories 45:14
138:17 142:9

category 112:15
133:24 134:5,13
156:2,3,4

caucus 3:2 7:6 15:16
31:22
32:6,9,12,14,17,21,2
3 36:18 44:23 50:14
51:16,23 52:20 53:3
54:8,22 55:9 60:4
72:10 78:13,18 80:16
84:6 85:23,24 86:2
102:19

caucuses 17:2 33:1,3
40:16 50:18

caucus-related 85:25

caucus-wide 58:21
147:4

caught 116:23

cause 4:10 28:23
168:10

caused 112:23

causes 62:10

causing 28:23

caveats 121:9,12
  123:9

Celia 34:16

Center 12:10

central 54:9 58:4
  60:15

certain 17:3 33:3
  37:7,24 45:14,15,17
  46:3,14 56:3 76:3,5
  86:1 96:7,12 97:22
  98:16 99:8 101:6
  112:23 113:3 118:13
  121:9 127:2
  139:21,25 147:6
  152:4 158:9,10,13
  164:9

certainly 19:3 25:19
  49:2 59:24 63:8 68:5
  72:18 74:6 75:17
  78:17 83:3 95:15
  99:20,21 106:25
  110:24 118:18,23
  126:7 127:3 133:20
  134:14 136:4 141:17
  150:16 153:25 154:8
  161:10 162:8

certificate 6:7
  130:25 132:14,16
  136:3 138:4

certifications 14:14

Certified 168:2

certify 168:3,8,10

cetera 77:9 79:24
  81:16

chair 32:6 33:8

chairman 17:16 33:22
  37:1,2,4,8,12,15
  45:4,5 47:17 48:6,9
  49:6 51:14 56:9
  59:15,21 60:6,16
  66:16 67:9
  68:14,16,20 96:15
  100:16 129:17,18

chairman's 86:13

Chairs 50:14

change 56:24 72:23
  92:2 95:9 105:22
  108:21 135:25 139:20
  156:21 160:20 161:16
  166:4

changed 56:10 86:3
  91:25 160:24

changes 45:6 78:6
  94:3,9 95:5,12 109:7
  112:22 139:20
  156:1,5 166:1

changing 160:13

characterizes 120:21

charge 102:16
  145:7,19,20 146:11

charged 161:22

chart 81:12,17 82:4

cheapened 139:6

cheapens 157:11

check 40:9 155:15

Chesterton 13:15,16

Chicago 13:17,18 14:4

chief 17:18,19,22
  18:6,9 47:18

children 71:16

CHL 130:8,10,12

choice 88:2 154:8

chose 138:14 139:16

CHRISTI 1:2

chubathon 57:25
  58:1,6 92:5
  107:13,21,23
  146:18,22 149:16,20
  150:4,12 152:9
  153:13 154:3,15

chubbing 58:7,9
  146:18,24,25 148:25
  149:15 150:25
  152:10,13

153:5,6,10,12,24
  154:10,15,16,22
  155:4,8,20

circle 81:12

citizens 1:7 28:25
  123:17

citizenship 130:25

civil 1:3 2:1 3:1,11
  4:15 5:11 72:8 139:4

claim 62:9

claims 20:20

clarify 10:5 51:1
  63:1 111:15 163:25

clarion 56:17

CLARK 2:3

class 13:16 139:24

clause 95:2

clean 9:19 10:1

clear 69:20 73:22
  78:19 101:23 108:16
  134:5 150:11 153:16
  158:10 164:15

Clerk 168:11

climate 119:4

close 50:15 104:22,23
  136:1

closely 16:9 17:7

closet 31:23

coalitions 36:3 105:9

co-counsel 73:16

Cohan 11:13,15,16
  62:23

collect 163:19

collection 163:7

college 38:20 137:25

color 122:7

Columbia 23:10

column 122:8,9,10

combat 56:17 70:22

comes 37:7 43:25
85:14 92:20

comity 96:19

comments 87:21,22

Commission 33:5 44:20

commissioned 30:15,25
114:25

COMMISSIONERS 2:7

commit 54:19 55:19

committed 55:3,22

committee 5:17
33:7,17,24 34:3,25
60:5 67:6 91:19
92:12,20 93:13
96:8,14 104:16,17,24
112:21 129:18 152:18
153:20 156:8,13

committees 98:2

common 155:10

communicate 39:13,14
50:9 51:11 60:18

communicated 29:20
30:6 110:3,24
111:7,12 112:17
113:15

communication 52:11

communications 22:23
39:5 51:8,21 65:22
69:17,18 142:21
164:17

community 35:25
47:5,7 52:5 54:4
62:16 63:22 64:6
65:5,12 72:5 74:25
124:6

company 43:23 163:5

compared 50:4 78:16

complaint 12:9,11
28:22 29:9 62:3,5,19
74:22 82:14 133:1,16

complete 105:2 153:23

completely 87:25
152:14

complex 56:21,23
72:21 151:4,19

compliance 15:1 29:2

comply 14:25 17:1

complying 162:16

compound 88:11 113:24
123:19

comprehensive 56:10
72:3,7,19 83:16

comprised 35:16

compromise 118:11

computer 44:17

concealed 130:5

concepts 56:14

concern 82:9 110:4
111:8,12 112:17
113:16 156:19

concerned 110:11

concerns 29:18 30:4
110:10,19,24 111:1
156:11

concert 41:18

concerted 58:21 59:21

concluded 165:5

conclusion 63:16 64:1
65:1

conduct 101:19

conducted 88:7 113:21
114:9 115:13,22
119:22 121:11
124:14,15 125:3

conducts 18:25

conference 3:1 5:2
7:5 9:1 93:13 101:22
102:1,8,9 146:3
152:18 156:7,13

conferences 101:19

confused 62:3

Congressman 51:17

conjunction 43:1
124:17

consensus 66:24

consent 153:17

consequence 145:2

consequences 16:7
17:3

consider 49:9 68:2
72:14 97:9 118:24
148:11 152:18 155:6
160:13

consideration 98:18
99:4 101:9,20 105:14
107:10,16 147:1,5
148:5 152:22 154:1
167:16

considered 50:4 72:22
83:19 100:20 102:14
104:14 105:20
119:9,23 149:5 150:6
161:19

considering 67:17
91:22 145:22

considers 85:20

consistent 118:7

Consolidated 2:3
3:3,12

consternation 91:13

constituency
127:15,21,22,24

constituent 39:12
117:25 118:1 129:3
133:2,14 135:1
156:22 159:15

constituents 22:24
29:20 30:6 36:20
39:4,6,7 53:21,25
54:21 60:18
64:4,8,12 68:3,10
70:13 81:5 89:8
112:24,25 123:12

127:11 128:4
129:19,23
130:4,12,14,17,24
131:10,17
132:4,19,22 135:8
136:7 138:13 139:16
150:24 157:2
**Constitution** 94:24
97:3,4
**constitutional** 93:6
94:15 146:6
**constitutionally**
146:2 152:5
**constraints** 72:12
77:14 86:12 102:24
**consulting** 16:22
**contact** 39:7,8 51:25
55:11 68:25
**containing** 99:24
**contains** 122:2
**contemplates** 86:1
**contend** 26:15
27:1,12,24 71:23
87:12 88:4,19 89:24
96:25 127:14,21
135:16 144:21
**content** 78:9 80:6
**contention** 20:21 98:6
**contested** 128:8
**contests** 14:24 141:20
**continue** 28:23 29:10
**contract** 38:8
**contribution** 39:24
**contributions** 40:17
74:10
**control** 9:13 22:25
30:16 31:1 162:11
**controlled** 125:22
**controversial**
74:16,20
**convening** 42:9 43:12

71:18
**convenings** 41:5
42:5,19,22,25 71:13
**conversation** 67:1
**conversations** 66:22
68:9,11 158:25
159:1,8,17 160:4
**cool** 90:11
**cooperation** 93:19
**copier** 79:24
**copy** 71:7
**core** 46:20,21,23,25
47:12 49:11 55:16
56:14 72:18 83:5
**corporate** 40:7,10
43:25
**corporations** 40:2,21
44:4
**corpus** 1:2 46:3 82:21
**correct** 9:11 11:13,17
12:6 14:2,4,6,20
16:3,20 17:23,24
18:3 28:14,15 31:18
33:19 34:1,9
35:18,19,20 38:9,18
39:18,19 40:15 42:6
44:8 47:16 51:12
53:8,9 57:12
59:10,19 60:19 61:13
64:10 66:18 84:12
85:5 86:16 91:4 95:7
107:22 111:18,19
122:21,25 124:23,25
127:12 132:8,17
147:25 150:15 153:14
164:13 167:3 168:7
**correctly** 59:2 91:19
96:16 97:6 111:4
129:10 135:5 148:12
151:20
**correspondence** 71:6
158:23
**corruption** 113:13

**cost** 43:2 55:11
71:7,9 77:4
**costs** 55:11,13 56:6
76:14,16,18,19
77:6,8,12,15,22
78:15,20 79:18,22
80:1
**counsel** 8:17 11:10,12
15:23
16:5,11,18,20,24
33:8,15,21 62:23
66:1 73:17,21 98:25
141:13,17 142:19
168:10
**counsel-type** 16:19
**count** 13:4 38:3
**counted** 141:9
**counties** 129:2 133:9
141:14 142:16 143:1
**Counting** 84:13
**counts** 138:24
**County** 1:8 2:6,7
13:13 117:14 129:8
132:11,12,13 140:2
142:14 167:8 168:1
**couple** 13:3 15:8
43:12 140:19 146:13
148:9
**courage** 136:19,20,22
**course** 64:6 74:8
87:22 91:22
**court** 1:1 5:22 9:19
102:9
**covers** 33:5
**coworker** 100:25
**crazy** 116:3 117:13,18
**create** 84:4 85:8,18
86:6,9 146:4
**creates** 63:7
**creation** 32:25 92:11
156:6

**credit** 94:14 146:1

**crime** 117:1 140:1

**crimes** 29:19 31:2
  111:9,13,16,21 112:8
  113:3,5 115:15,18

**Criminal** 129:18

**crisis** 71:15

**CSR** 4:11 168:17

**cure** 141:3,7

**current** 16:11 46:13
  72:11 84:21,22
  109:10 115:5 119:4
  129:17

**currently** 14:17,18
  15:5,11 17:21 37:25
  38:3 46:5 79:1 80:14
  138:11

**custody** 22:25 30:16
  31:1 59:17

**cut** 35:20

**cycle** 35:6 141:16

---
D
**dad** 117:13

**daily** 150:7

**DALLAS** 1:8

**Daniel** 8:5

**dash** 152:25

**data** 123:14

**database** 130:8

**databases** 128:15

**date** 13:10 116:24
  133:15 166:3 168:18

**dated** 142:6

**daunting** 78:18 80:15

**David** 5:16 9:4

**david.whitley@texasat
  torneygeneral.gov**
  5:20

**day** 4:10 58:2 85:6

---

133:21 135:12
140:17,21 141:2
147:7,13
148:8,11,17,19
149:15 150:14
167:10,19 168:13

**days** 59:6,7 103:18
  113:2 135:12 140:18
  147:5,19 148:9 154:1

**day-to-day** 16:8

**dead** 117:13

**deadline** 58:18 148:4
  152:18,19

**deadlines** 152:17,20

**deal** 89:3 93:25 110:7
  112:20

**dealing** 49:7 51:24
  77:8 92:8

**debate** 92:8 120:5
  137:25 138:1 146:25
  154:18

**debt** 163:7

**December** 43:10
  47:23,24
  48:2,11,24,25 57:16
  100:24 142:6 168:18

**DECHERT** 5:4

**decide** 45:5 102:20

**decided** 34:17,19
  65:18 66:24 140:4,10
  146:4 156:11

**decision** 66:14,19,25
  67:4,8 68:3,14,17,23
  156:20 158:5

**decision-makers** 42:10

**decisions** 33:11 37:5

**decrease** 76:11

**decreased** 74:21

**dedicated** 32:25
  45:12,19 46:11,15
  55:7 73:23 77:25
  82:6 100:14

---

**deep** 52:4 89:9 160:4

**deeper** 83:13 159:3

**deeply** 62:12 65:12
  74:16 85:5 87:7
  90:17 110:11 119:5
  128:8

**defeat** 57:24 58:21
  103:21 106:6 150:25

**defeated** 58:24 107:20

**defend** 159:21

**defendants** 1:13 2:15
  3:10,21 4:8 5:14 9:5
  44:12 142:11 143:14
  162:6

**defenses** 20:20

**defer** 136:16

**Define** 32:10

**defined** 111:17

**definitions** 111:24

**degree** 14:12 40:10
  64:5 136:24
  153:13,25 154:12
  161:11

**DEL** 3:14

**Delaware** 51:15

**delay** 98:4 105:14
  106:6,10

**delayed** 105:24 107:16

**DELEON** 1:3

**deleterious** 151:7

**deliver** 47:21

**deliverer** 163:6

**Democrats** 35:17
  120:17,22 121:7
  150:3

**demographic** 125:15

**denied** 93:1

**denies** 64:8 127:10

**denying** 20:23

**Department** 2:13
3:8,20 5:11 9:3
69:7,10

**depending** 46:1 155:17

**depends** 42:20 125:16

**depicted** 121:6

**depiction** 120:7,14
121:17

**depicts** 81:13 123:4

**deposed** 9:7

**deposition** 4:2,7 7:3
9:10,13 11:8,24
12:8,11 13:2,3 15:17
19:24 20:2 50:25
111:18 131:3 140:7
165:5 166:3 167:2
168:6,7,9

**depth** 51:22

**deputized** 139:23,24

**describe** 13:14 31:10
32:22 42:7 46:22
53:18 57:18 59:25
76:23 142:2

**described** 39:2 49:10
104:24

**description** 167:13

**descriptive** 107:25
108:1

**descriptor** 43:19

**designated** 20:5
21:1,9,16,23 22:6,18
23:1,11 24:5,12,19
25:1,8,13,23 26:8,19
27:5,17 28:4
29:3,12,23 30:8,18
31:3

**designation** 37:10

**designees** 37:7

**desire** 58:19

**detail** 40:13,16

**determination** 155:22

**determine** 71:11 122:5

**determined** 128:19

**determines** 127:2

**determining** 65:24

**deters** 116:8

**develop** 46:24 49:2,4
55:13

**developed** 49:5,7

**development** 17:5 36:7
46:18 55:17 73:10
83:21

**deviate** 124:3

**deviated** 94:6

**deviation** 92:15
93:15,22 95:15 154:9
155:24

**deviations** 87:19
92:10,13 93:4 96:24
97:1,20,21 98:6

**devote** 56:14 78:14

**devoted** 47:11 54:16
55:10 71:2,4,7
73:7,9,13 76:24 77:8
79:4 80:2,10,14
81:5,14,15,19 82:23
83:7

**devoting** 29:10

**devotion** 72:24

**dialogue** 42:13 156:12

**dictate** 94:15

**died** 91:14,16,23
96:17 148:19,24
149:14 150:14,17

**Diez** 41:9,11

**differ** 156:25

**difference** 38:6

**different** 15:8 17:13
35:9 55:12 58:20
96:19 104:4 107:24
109:6 117:15 126:24
140:19 145:12 151:25

153:16

**difficult** 56:4 79:21
80:13,22 87:2 89:1
122:4 138:7

**Dire** 115:8

**direct** 52:11 67:1

**directed** 53:3

**direction** 168:6

**directly** 17:20 52:20
59:22 63:18

**director** 2:13 3:8,19
16:9 17:8,10 33:14
77:5

**disability** 140:24

**disabled** 140:25

**disagree** 162:15,18
163:10

**disagreeing** 162:22

**discernible** 80:17

**discretion** 67:10

**discriminatory** 20:22
87:13 88:3,21,24
89:25 123:17 139:3
161:25 162:2,3

**discuss** 66:2,5 67:14
102:2

**discussed** 51:18 83:14
145:23 151:4 164:15

**discussion** 146:15
157:1

**disease** 160:1

**disenfranchise** 117:23

**disfranchised** 118:25

**disfranchising** 157:9

**disposal** 106:5

**distribute** 78:7

**distributed** 99:8

**distribution** 77:7
79:23

district 1:1 23:10
  34:25 135:7

diverse 72:10

diversion 41:6 42:16
  56:16 71:21 72:12

divert 28:24

diverted 55:16 57:2
  70:20,24 73:2 79:19
  80:19 154:4

divided 81:13

Division 1:2 5:11

document 19:19,22,23
  20:1,8 44:14 54:11
  61:23,24 62:1,7 83:1
  132:16 141:24,25
  142:3,6,11
  143:18,19,23
  144:6,12,16 167:13

documents 11:11
  12:7,15,18,20,24
  44:15,18 45:25 52:13
  77:18 82:7 83:11
  88:15 99:24
  101:11,25 131:25
  132:5,7 142:12,13
  143:20 145:9
  162:5,17 163:18

DOJ 70:2,14,15

DOJ's 128:14

donations 40:5,8
  43:25 74:9 76:11

done 8:23 9:25 14:24
  30:14,25 44:14 48:25
  56:12 70:5 86:22
  96:9 98:3 100:8
  104:4 106:14 107:7
  114:22 150:10 152:14
  153:24 156:6

door 96:21

doubt 90:25 97:17

dovetails 160:21

download 44:18

downloaded 44:19

dozen 131:20

dozens 131:15

DPS 135:5,7,15 136:1
  145:11

Dr 128:17

draft 99:15 100:6
  102:12 103:3,6

drafted 22:12 99:20

drafting 19:13 99:18
  102:16

dreamt 13:3

drive 52:25 53:1

driver's 128:11
  129:20
  137:13,15,18,19,21,2
  3 151:22

driving 137:15

dual 85:21 86:1

dues 35:2,5 40:3

duly 4:9 8:8 95:9
  168:5

during 19:7 22:16
  24:25 34:5 37:21
  41:16,25 43:10 57:6
  73:6 77:15,20,23
  88:15 98:18 99:3
  100:19,20 101:9,20
  105:15,19 106:20
  107:10 114:13 120:5
  135:14 141:15 146:16
  149:16 160:10
  161:1,2,7,24

duties 16:25 18:8

duty 53:20 94:24
  123:11

Dyer 163:4

---
E
---

earlier 77:18 79:18
  84:11 91:2 92:6 95:7
  121:19 124:19 127:10

145:23

easier 9:25 136:23

eat 108:15

editing 55:14

educate 28:25
  54:12,14,18,20 57:13
  70:21

educating 55:18,25
  70:24 81:5

education 2:3 24:18
  37:9 53:16 54:2
  55:3,20 57:7 60:23
  61:2,7 72:16 73:10
  74:6 76:20 78:1
  83:14,25 84:9

educational 13:14

effect 26:5 88:9

effects 54:12 70:22

effort 57:9 58:21
  83:2 86:12 147:3,4

efforts 76:1,6,21
  83:14,25 84:10 87:8
  105:5,7 107:10,14

EFH 43:18,21

EIC 131:11
  132:1,5,8,17,20,23
  145:3,6,9,10,17,18
  146:9,10

EICs 131:12,13,15
  132:24

either 34:5 58:11
  60:15 87:24 89:13
  126:9 140:20 141:12
  149:22 156:1 168:10

El 142:14

elaborate 137:11
  157:19

elect 64:12

elected 14:24 33:24
  47:23

election 14:23,24
  29:19 31:1 34:6,16

111:8,13,16 112:8
113:3,5,8,13
115:15,18 116:1,24
136:9 138:14
139:17,19 140:17,21
141:18,20

**elections** 24:25 28:13
34:4 57:6 112:21
116:17 126:15

**electronic** 54:7 71:6
77:6 78:7 112:13
113:13

**elongate** 58:10 147:4

**elongated** 152:21

**elongation** 146:25

**else** 11:5 12:2 13:1
117:7 151:22 164:19

**elsewhere** 110:25

**email** 55:12 62:23

**emails** 158:18,21,24

**Emmanuel** 101:2

**empirically** 56:4 57:3
76:14 117:21

**employ** 58:16 105:13
168:9

**employed** 15:5 16:19
95:17,25 96:1
148:20,25 149:15
152:3,10 154:3,15

**employee** 38:4
84:14,17 85:13,14,15
100:25 168:9

**employees** 17:6
37:18,19,20 38:1,2
84:12,21,23 85:21

**employment** 17:6 80:22
84:3,6 85:7,21,22,23
86:2,6

**employs** 58:14 60:17

**enacted** 20:21,22
22:4,15 23:7 26:17
27:3,15 28:1 49:15

53:23 87:12 88:2
94:10 123:16,18
158:5

**enacting** 88:5 91:3,7

**enactment** 87:17,20
146:16

**encountered** 160:8

**energy** 42:8,11 43:22
56:13

**enforcement**
140:1,5,11

**enforces** 158:2

**engage** 52:17 53:15
57:5 107:9,18

**engages** 46:23 53:4

**engaging** 60:23

**enjoin** 86:21

**enormously** 119:10

**entailed** 19:10

**entails** 146:24

**ENTERO** 3:14

**enterprises** 15:9

**entire** 12:12

**entirely** 46:7 156:5

**entities** 40:21

**entitled** 34:22

**entity** 32:16

**entry** 83:22

**epithet** 159:22

**equal** 125:19

**equate** 119:12

**equipment** 85:24,25

**equivalent** 32:4

**equivocate** 108:10

**error** 116:1
125:15,18,20 126:8

**esoteric** 63:6

**esoterically** 157:4

**especially** 103:14

**ESPINOSA** 3:12

**espouse** 159:23

**espouses** 159:24

**essentially** 16:10,17
36:18 41:4 96:18
147:5,20

**established** 124:19
140:14

**ESTELA** 3:12

**estimate** 80:9 113:22
114:9 115:1,14

**estimates** 26:4
30:14,24 88:8

**estimation** 50:6

**ESTRADA** 3:12

**et** 77:9 79:24 81:16

**ethical** 14:25 17:1

**Ethics** 33:5 44:20

**ethnicity** 159:18

**EULALIO** 3:11

**EVELYN** 1:6

**evening** 12:17

**event**
41:9,11,13,15,17,22,
23 42:12 155:20,21

**events** 36:11
40:20,23,24 41:3,8

**eventually** 14:4

**everyone** 33:17
35:10,13 157:17,18

**everything** 18:11
25:11,12 34:7 36:12
47:5 106:14 124:4
154:9 162:11 164:19

**evidence** 128:9

**evident** 77:17,19

**evolution** 50:5

**exacerbated** 84:9

**exact** 80:18

**exactly** 35:8 44:16
 98:15 154:21

**Examination** 6:6 8:9

**example** 18:19 71:15

**examples** 91:10 117:18

**except** 167:3

**exceptional** 90:6

**exchange** 52:13

**execute** 42:21

**executed** 167:15

**executing** 154:2

**executive** 16:9
 17:7,10
 33:7,11,14,17,24
 34:2 37:5 60:5 67:6
 77:5

**exemplify** 56:3

**exhaustive** 60:9
 150:17 153:23

**exhibit**
 7:1,3,4,7,9,10,12,13
 ,15 12:10 19:16,18
 61:20,22 112:5
 119:18,20 120:3,9,11
 121:14,16
 124:10,12,17,18
 125:2 141:21,23
 143:7,9

**exist** 153:17

**existed** 154:11

**existence** 31:19

**exists** 109:21,25
 154:22 155:8

**expend** 53:10 54:19

**expended** 108:3

**expenditure** 39:25

**expenditures** 40:17

**expenses** 73:5

**expensive** 45:16

**experience** 14:22
 54:16 87:4,9 113:7
 155:7 159:23 160:22

**expert** 88:16,17
 128:13,14

**Expiration** 168:18

**explain** 42:24 125:23
 126:1 147:16

**explaining** 146:23

**express** 110:19

**expressed** 75:21 118:2
 167:17

**extended** 92:8

**extent** 23:19 63:16
 65:21 69:16
 120:21,23 122:1
 133:20 142:20

**extenuated** 108:5

**extenuation** 107:16

**extraordinary** 87:3
 151:8

**extrapolation** 39:3

---

**F**

**face** 69:3

**Facebook** 55:9

**facet** 83:20

**fact** 74:20 162:15

**factors** 125:19

**facts** 168:3

**factual** 20:19

**failed** 137:13

**fair** 17:14 25:16
 80:21 151:3,5 162:25

**fairest** 151:9

**fairly** 91:8 151:4
 159:16

**faith** 94:14 139:12,13

146:1

**fall** 65:17 79:3 81:1
 83:5 84:1 137:20

**falling** 160:17

**falls** 38:16

**familiar** 50:5 140:13
 142:17

**families** 140:3

**family** 131:5 160:23

**Fast-forward** 92:7

**fast-paced** 103:13

**fast-track** 92:11

**father** 116:21

**February** 7:8,9,11
 119:23 126:2

**Federal** 4:14 28:22
 29:9

**feel** 70:7 103:22

**feeling** 10:20

**fees** 35:2 145:25
 163:13,20

**fellows** 37:22,25

**fellowships** 38:20

**felt** 90:2,3

**ferry** 137:17

**fewer** 29:11 155:19

**fight** 104:8 136:22
 137:1

**Figueroa** 32:13

**figure** 78:6 105:12

**filed** 7:5 49:3 82:14
 108:12 133:1,15
 168:11

**filing** 69:17

**final** 148:5

**finality** 86:21

**finally** 30:23 92:3

**financial** 28:24 47:13

56:22 70:20 71:22
72:21 73:2,13 76:9
84:8

**fine** 10:21 48:18
106:18 122:2

**finish** 9:23

**finished** 19:20 148:10

**Firm** 168:19

**firms** 126:21

**first** 8:8 9:9,12
43:8,9 55:4 65:14
88:14 91:11,12
137:12 148:16 160:24
168:5

**Fischer** 17:16,23
18:10 33:23 37:16
66:17 135:6

**five** 18:4 33:9 59:7,8
84:25 85:3 114:17
147:8,19 149:20
150:5 153:16

**fixed** 77:6

**flat** 71:11

**floor** 5:5 97:12 99:22
107:12 118:15

**Florida** 50:15,19
164:4,11

**FLOYD** 1:4

**fluctuate** 34:13

**fluctuates** 34:14
37:21

**foci** 45:18

**focus** 46:19 57:2
71:20,21 81:4
83:10,20 86:23

**focused** 100:9 157:8

**focuses** 45:18

**focusing** 80:24

**folks** 131:22
133:20,24 134:21
140:25

**force** 147:5

**forced** 147:15,16
148:1,2

**forcing** 147:20,21,22

**forefront** 39:10

**foregoing** 167:1,14
168:4,6

**Forest** 114:15 161:4

**forget** 50:21 149:8

**form** 27:16 28:2 36:3
51:16 61:6 63:7
108:25 123:20
133:4,18 134:20
135:2 145:4

**formal** 51:20 66:7
97:8 106:10

**formally** 50:17

**format** 143:15

**formed** 31:21,23,25
98:2

**former** 39:16 100:25
129:17

**formerly** 17:22

**forming** 105:9

**forms** 58:5 117:14
127:16,23 128:5
129:5

**formulate** 99:6

**formulated** 86:14

**Forrest** 115:19

**Fort** 116:22

**forth** 168:6

**forward** 93:2,11,12

**fought** 104:7

**foundation** 37:23
38:15

**foundational** 145:8

**frame** 109:9

**frankly** 15:3 18:7

44:4 82:24 94:23
102:9 122:5 162:15

**Fraser** 59:1 106:21

**fraud** 30:5,16
109:21,22,25
110:4,6,10,11,13,20
111:16
112:2,9,12,14,15,18,
20 113:8,11,12,17,23
114:10,16,23
115:2,17 116:2,4,8

**free** 93:8 145:6,19,20
146:10

**frequently** 159:16

**friend** 104:22,23

**friends** 138:25 149:24
164:5,13

**fulfill** 71:23 72:1
87:1

**full** 8:11 16:15 33:16
50:22 92:2 94:14
101:1 145:25 147:17
168:7

**full-time** 16:14

**full-timers** 84:18

**fulsome** 162:8

**fund** 2:3 38:20 75:11
93:8 94:13 145:22,24
146:5

**fundamental** 56:24

**fundamentally** 57:1

**funded** 43:6

**funding** 39:20
40:4,7,11,14,18
43:16,25 74:10,17

**fundraise** 41:25 42:1
74:14,23 75:1,2,4

**fundraised** 74:12

**fundraising** 41:23
74:20

**funds** 45:12,22

furtherance 46:23

future 43:22 143:17

---

G

Gallego 48:8,9 59:21
96:15

Gallegos 51:17,18

game 83:9

GANDY 1:7

Garcia 3:12 101:2

Garza 73:15 77:11,22
78:2 89:20 90:8
98:20,21 118:5 129:7
132:7 133:6,11

Garza's 73:7 77:2
79:3 82:22 98:23

gas 97:24

general 4:13 5:17 8:2
15:23
16:5,11,18,19,20,22,
24 33:14 57:21 68:1
112:11

generally 14:6
19:3,10,11 31:9
46:22 47:5
49:7,16,21 55:22
61:9 63:8 66:10,11
71:4 74:5 78:1 79:5
80:5,8 81:25 82:2
83:12,25 90:4,5
99:13 100:9,13
102:23 106:4 108:14
109:4,22 113:6 117:9
120:22 124:2 126:22
131:18 141:1 146:25
154:17,20 157:21
163:8

General's 8:5

generate 77:5 78:9

Georgia 49:18

gets 78:3 92:22

getting 15:21 105:11
116:20 119:3

163:8,18

given 54:15 67:10
88:14 100:10 101:17
104:10,12 119:4
162:11 164:2 167:18
168:12

givers 74:17 75:11,15

glut 135:14

goal 56:12 72:7,9,11
82:23 83:18
86:5,13,18 87:1

God 86:19

Golando 4:4,7 6:5
8:7,13,14,15,24 9:6
10:20 13:7 15:5,13
19:17,22 23:21 24:1
28:19 31:8 61:21
62:22 63:11 66:4
78:19 119:19 121:16
124:12 127:9 141:24
162:4 163:11,22
166:2 167:1,5,11
168:4

G-O-L-A-N-D-O 8:14

golf 40:25 43:12

gone 23:20 46:5
118:15 150:7

Gonzalez 89:21 90:6
118:4

Google 134:8

GORDON 1:6

gotten 158:18

GOTV 57:9,11

governing 97:5

government 138:22

government-issued
120:1,18 121:23
122:15 124:21 125:6

GOVERNOR 1:11

gradation 122:4

graduate 14:9

graduated 13:19,20

graduates 38:21

grandfathered 95:14

graph 81:12,13
120:23,25 121:6,21
122:2 123:2,4 125:8

graphical 120:7,14
121:17 122:22

graphically 121:12

gravely 62:17

greasing 161:13

great 41:15,16,22
42:3 61:16 90:6
110:7 112:20 119:14
127:7 157:13

greater 126:10

green 122:4

grito 41:13

ground 9:12

grounds 23:20 28:10

group 26:6 31:25
33:20 36:2 88:5,10
156:19 161:4,12

grouping 122:11,20

groups 33:1 36:3
51:19 74:20 125:16

Guerrero 129:11

guess 11:13 12:22
13:5 32:14 47:22
57:2 63:17 69:12
73:11,13,14 77:23
78:15 81:2 82:12
86:4 90:23 97:19
114:17 115:5 123:8
126:14 134:7 137:7
143:24 145:2 153:7

gumption 137:7

Gutierrez 104:22

guy 50:21,24 100:24
164:10

guys 41:1 44:17 88:14

90:13 160:13

---

**H**

**half** 12:22 18:4

**HAMILTON** 1:3

**hand** 167:18 168:12

**handed** 101:15 124:17

**handgun** 130:5

**handing** 19:17 61:21
  80:3 119:19 120:10
  121:15 124:11 141:22
  143:8

**handled** 147:7

**happen** 150:9

**happened** 58:18 70:3
  95:12 96:15 117:13
  149:20 161:16

**happens** 39:10 45:7
  58:15,16 152:23
  153:4 154:20 155:11

**happy** 10:6

**hard** 71:11 82:12
  131:4,8 132:15 138:4

**harm** 62:13,20 63:7,21
  88:5 156:23 157:1

**harmed** 65:13 70:16,18
  119:1 157:3,7,17

**harmful** 62:14

**harms** 62:15 63:21

**hats** 17:13

**haven't** 23:20 52:3,16
  71:20 84:19 100:2
  121:10 142:1 164:16

**having** 8:8 19:22
  71:13 140:23

**HCR** 155:16

**head** 9:16,17 19:21

**heading** 20:11

**hear** 41:20

**heard** 41:16 140:6

**hearing** 104:16,17

**heart** 90:24

**hearts** 90:15

**Heights** 89:3

**held** 15:25 18:3 43:7
  66:5,8 90:17 123:18

**help** 36:6,8 49:2
  92:18 99:11 139:13

**helped** 49:4 161:14

**helping** 14:25 57:8

**helps** 43:2 78:9

**hereby** 167:2 168:3

**hereto** 4:16 168:3

**HERMAN** 1:6

**Herrero** 129:9,12,14
  140:7

**he's** 50:21 60:8
  73:17,21 78:2 90:11
  100:24 114:15 129:17
  159:18,22 160:3
  164:9

**Hey** 75:11

**Hidalgo** 2:7 132:12,13

**hide** 162:10

**High** 13:15

**higher** 128:24

**highly** 46:1 160:18

**hill** 82:10,13,25 83:2

**hills** 80:24

**hindsight** 104:3

**hire** 56:21

**hired** 98:21,25

**Hispanic** 2:6
  32:6,9,12,14,17
  50:13 125:4,11,25

**hit** 90:9 97:24 152:22
  154:23,24,25

**hitting** 58:20 152:24

**hmm** 9:18

**hold** 17:25 40:20,24
  109:2

**Holdings** 43:22

**home** 12:16

**honest** 42:13 157:16

**honestly** 103:5

**hope** 52:3,9
  86:19,20,24

**hopeful** 119:6

**hopefully** 15:11

**horizon** 56:10 72:10

**horrible** 151:6,13

**horribly** 117:23 156:9

**hour** 11:21

**hourly** 71:11

**hours** 12:19 59:8
  104:17 105:25
  147:8,14,19 163:19

**House** 3:2 32:1,24
  91:13,23 92:4,12
  94:11,20,22,25
  95:19,22 96:2,8
  97:12,13,16,25
  107:12 118:15 129:18
  146:8 147:6
  152:17,19 153:17
  154:19 155:15
  161:3,13

**housekeeping** 32:24
  85:20,23

**hub** 53:19 54:17

**huge** 41:17

**hybrid** 84:6

**hyper** 147:13 161:21
  162:2

**hyperbole** 87:6

**hyphenation** 159:19

---

**I**

**I'd** 20:16 31:8 40:9
48:19 102:18

**ID** 29:1 39:9
49:1,3,9,14,22
50:1,6,10,12,17
51:7,9,11,22,25
52:2,13,15
54:8,13,20,21
57:15,19 60:1,24
61:6 63:6,19 66:11
71:8 73:23 74:11,14
76:2,6 78:5 79:4
80:6,7,11 90:4 92:1
93:8 97:7 98:22
100:11,14 101:19,25
102:2,7 116:23
117:15
118:2,9,12,13,17
119:8 120:1,19
121:8,23 122:16
123:6 124:22 125:6
126:13,17
127:16,23,25 128:6
129:5,24 130:1,18
133:4,18 134:20
135:2,12,14,24 136:6
137:5,6,9,24 139:3
140:5,11,20 144:25
145:1,4,13,14,15,17
146:4 150:25 155:23
156:6

**idea** 42:14 92:21
103:2 108:8 109:1

**ideas** 36:6 42:15 83:8
119:14

**identification** 22:4
23:7 24:3 26:17
27:2,14,16 28:1,3
106:23

**identify** 88:23 111:11
129:3,19,23
130:4,14,17,24
131:10,24 132:3,9
133:2,14,22,23
134:11,12,17,25
136:7 139:15 156:22

**identities** 134:6

**identity** 21:14,21
26:13,24 159:18
167:13

**ID-related** 59:12

**IDs** 135:6,7

**I'll** 9:24 48:18 50:25
62:4 65:7 91:8
100:3,4 112:16
120:13 124:12 142:10
143:13 164:9

**illegal** 97:2,19 116:5

**illegality** 97:20

**illegally** 97:1 117:24

**Illinois** 51:14

**illnesses** 10:22

**I'm** 8:2 9:2,4,13
10:6,7,21 13:4,23
14:23 15:1,6 16:17
17:4,20 18:7,18
19:17 25:14 35:20
38:2,4 39:23,24
40:10 41:10 42:23
43:17 44:15 47:24,25
48:4,8,11,15,21 50:4
57:3 59:19 60:9
61:21 62:18 63:15
65:3,6,20 66:10,11
68:8,11 69:4,14,23
73:9 75:23
78:10,20,22,23,24,25
81:3 84:13 85:14
90:23 93:22 95:3
96:7 97:6 98:15
99:10,11,13 100:23
101:6,7,23 102:4
105:17,18 106:17,18
107:3 110:5,9,17
112:19 113:25 114:5
115:23 116:22 118:10
119:13,19 120:10,20
121:9,15 122:6
124:11 127:24 129:14
130:16,20 132:10
133:7,25 134:5,6,21
135:9 136:11 137:6
140:23 141:22 142:1

143:8 144:15,20
145:12 146:8,14
149:2,3,6 150:21
155:21 157:5,11,12
158:9,10,17
159:12,15 160:12,22
164:9,14

**imagine** 25:11 77:14
131:7 155:18 163:3
164:15

**imagined** 138:7

**IMANI** 2:3

**immeasurable** 62:20
63:21

**immediate** 71:19 135:4

**immigration** 160:1
161:8,19

**immoral** 152:5

**impact** 19:12

**impermissible**
87:17,23 88:1 89:14
90:20 124:8
157:10,20,21 158:4

**impermissibly** 89:12

**impersonation** 111:3
112:12 114:18 115:18
116:1,11,18 117:19

**implementation** 61:13
66:12 68:9 70:22
81:1

**implemented** 61:3

**implication** 151:12

**imply** 97:20

**importance** 35:25
47:4,7 72:4

**important** 42:9,13
89:5

**impossible** 87:1,2
135:17,18,21 136:5

**impressions** 162:24

**inability** 26:16
27:2,13,25 133:4,17

134:19

**inappropriate** 52:21
57:9

**INC** 3:14

**incidentally** 110:18

**include** 111:21 126:15

**included** 112:14

**includes** 47:7 85:23
89:6 112:12 145:17

**including** 20:20

**inclusive** 25:10,12
115:21

**incorporate** 112:1

**increase** 55:23 61:10

**increased**
79:9,11,13,14 125:12
126:2

**incredible** 136:19

**incremental** 126:12

**indeed** 135:13

**independence** 41:12

**Independents** 121:2,7

**INDEX** 7:1

**Indiana** 13:16 14:3
49:18 137:13

**indicate** 15:19

**indicated** 168:4

**indict** 117:17

**indictment** 116:19

**indictments** 114:19

**indigent** 130:2

**indirect** 56:6 77:12

**individual** 39:15 40:4
53:6 62:24 63:3,13
73:18

**individually** 41:3
75:17

**individuals** 40:1

**infectious** 160:1

**infer** 89:4 143:24,25

**inference** 150:11

**inferences** 68:1

**influence** 156:12

**inform** 53:20

**informal** 66:8 67:12
99:6 102:22 106:9

**informally** 66:10
103:9

**information** 36:4 44:6
53:19 54:17 61:10
123:3 130:16,22
131:22 133:12 134:4
141:14 142:7

**initiated** 62:5

**initiative** 36:9

**injury** 62:10,24
63:3,7,13

**in-person** 29:2 110:20
111:2,22 112:2,11,15
113:8,16 114:18,23
116:11 117:18

**input** 68:2,6

**inspector** 114:16

**inspirit** 97:16

**instance** 4:8 58:25
95:5 117:2 134:25
147:23 148:20 157:22

**instead** 9:15,16

**institutional** 74:17
75:10

**instructs** 10:13

**instrument** 126:7
127:1 139:10 167:15

**Integrity** 168:18

**intend** 163:12,20

**intended** 88:5 162:3

**intense** 82:8

**intent** 20:23

89:2,5,6,25 90:16
123:18 139:4
151:4,19 157:9
161:25 162:9

**inter-caucus** 50:13
51:21 164:16

**interest** 21:6 65:5

**interested** 168:10

**interests** 64:16,23
70:7 123:11

**intern** 84:25

**internal** 113:13

**internally** 33:6,11
90:3

**interns** 38:1 84:19,20

**interpose** 23:17

**interpret** 120:23

**interrogatories** 168:4

**interrupt** 13:24

**intervene** 66:13

**intervened** 74:4

**intervening** 59:5

**intervenors** 73:18
129:6 132:6 133:25
136:12

**intervention** 62:2
74:22 82:11,18 134:8
136:14,16

**interview** 110:22,25
111:5

**introduced** 8:24

**introductions** 8:22

**investigated** 115:19

**investigating** 49:19

**investigations** 115:6

**involved** 18:21,24
19:2 32:11 35:2
55:14 67:23 73:9
79:1 113:4

**involvement** 18:14,16

48:3 62:5 74:8
75:15,22 76:12

**involving** 84:10

**irrational** 87:25
117:5 138:25 139:1

**irrationally** 89:13

**Israel** 34:16

**issue** 54:18 56:5
61:11,12 64:21
72:8,25 74:23 81:6
83:18,19 92:23 93:11
141:2 160:4

**issued** 59:21 60:4,5
131:12,14,16,21
145:19 146:10 162:14

**issues** 39:9,10 41:7
47:4 56:11 57:2 71:4
72:22,23 80:4 135:7

**Italian-American**
160:22

**Italian-Americans**
159:20

**it's** 16:9,21,22 18:7
19:3 31:15 32:24
33:2,9,20 35:1,6,8
36:20 38:5,24
39:21,25 40:6 42:20
43:3,18,22 44:3,20
45:24 46:7,18,19
54:16,25 56:4
57:4,21 58:10 60:13
62:2,14 71:11,12
72:13,17 73:11 74:16
75:7 76:2 77:3
79:11,13,15,21
80:12,13,15,21 81:25
82:12,25 83:8 86:17
87:2,4,8,18
89:5,9,13
90:16,19,24 91:8
94:12,14,17 95:3,15
96:9 97:8,9,10 98:20
99:9 100:4 102:22
107:23 108:1 111:5
112:1,5,7 113:11

117:9,21,22 119:2
122:3,5 123:15,21,22
124:8,9 126:8,20
127:2,6 130:12
131:18,22 132:24
134:13 135:11,13,21
136:4,5,23,25
138:2,16,24
139:2,11,18 140:7
142:6,7
145:2,9,13,15,20
146:7 147:13 148:6
149:6,7 150:16,18,19
151:24 153:3
155:4,16 156:18
159:23 160:6,15
162:8 163:2,17 164:8

**I've** 8:23 14:23 25:13
32:15 46:6 47:25
62:12 90:7 92:17
113:4 137:6
158:18,25 161:15
162:11

---
J
---

**jammed** 48:1 148:14

**JANE** 1:3

**Jay** 163:4

**job** 16:6,10 47:20
55:5 99:15 136:25
137:16,17

**Joe** 89:19

**John** 1:5,12 2:11
3:6,17 5:14 89:20
90:8

**join** 65:10,18
66:12,15 67:5,8
68:3,14,18,23

**joined** 84:24

**joining** 64:17,23 66:5
67:15,18

**Jose** 32:7 89:19 90:10
110:21 131:2

**JR** 3:11 5:15

**Juan** 164:8

**JUDGES** 2:6

**judgment** 79:16

**July** 77:23

**June** 4:5,10 8:4 166:3
168:13

**jurisdictional** 93:10

**Justice** 5:11 9:3
69:8,11 129:18

**justification** 117:4
124:3

---
K
---

**KEN** 1:7

**kicked** 13:17

**kill** 92:5 150:23
151:15 152:11

**kin** 168:10

**kindest** 90:7

**kinds** 46:22 47:11
55:2 112:13

**Kirksville** 13:13

**knew** 131:1

**knowledge** 52:4,16
54:6 55:21 56:20
57:14 66:21 67:1
70:1 87:18 113:2
124:1 132:21 150:17
153:23 158:22 162:7

**known** 26:14,25
27:11,23 58:7 114:17
116:12,18 117:18
133:24 160:12 167:11

**Ko** 160:11,12

**KOBY** 1:5

---
L
---

**LA** 3:14

**labor** 75:25

**lack** 127:16,22 128:5

**lacking** 127:25

**lag** 103:17

**Lane** 168:19

**language** 20:25 25:14
26:6 88:10

**LARA** 3:12,13

**large** 39:8 45:18
55:25 60:20 67:20
130:11 140:10

**largely** 14:23 42:23
77:19 80:2 83:9
103:14 125:16

**larger** 78:17 81:25
111:3

**largest** 43:15,24
138:20

**Larry** 89:21 90:5

**last** 12:16 30:3 45:19
46:8 53:22,23 56:15
58:17 70:19 73:23
80:25 81:2 82:5,8,25
83:10 84:1 131:21
148:8,11

**lasted** 104:16

**last-minute** 45:5

**late** 149:5,6

**later** 60:11

**LATIN** 1:7

**Latino** 34:23,24
41:14,21 51:16 52:5
56:11,25 72:11,22
74:25 83:16,20 101:4
122:12,13 125:11,25
126:12 159:25 161:9

**Latino-elected** 70:13

**Latinos** 52:6
122:17,24 123:5
124:20 126:18,22
130:1 160:24

**law** 13:20
14:9,12,17,23 19:11
50:7 53:19,24,25

54:4 55:4,6,22 56:17
62:15 63:21 70:4
87:20,21 90:22
109:13 137:3,8
139:13,20 140:2
141:18

**laws** 17:2 49:17,22
51:11 53:21 54:20,21
118:2 140:12 157:8
158:2

**lawsuit** 20:20 62:6
63:24 64:4,17,24
65:10,14,19,25
66:6,15 67:5,9
69:7,18,21 70:9
73:3,4,25 74:9,22
75:11,16,22,24
76:12,25 77:17 83:22
84:24 86:21 88:2

**lawsuits** 76:13

**lawyer** 113:3,8

**lawyers** 12:5

**lead** 1:4 73:17

**leader** 74:24

**leaders** 124:6

**leadership** 33:10
38:15

**leading** 68:3,17,22

**leads** 34:18

**League** 1:7 2:3 68:22
69:2

**learn** 38:22 65:14

**least** 91:20 100:12
118:14 126:13,15
144:13

**leave** 48:18,20 86:5

**left-hand** 44:22

**leg** 92:17

**legal** 16:7 17:3,12
18:13,17 19:6,9
33:8,21 63:16,25
64:25 68:13,16,20

69:19 77:10 142:22
168:18

**legislation** 22:4 23:7
36:3 49:1,10,13,14
51:9,25 52:2,13,15
57:16,20 63:6

**legislations** 50:11

**legislative** 3:2 7:6
15:16 32:20,22
33:1,3 38:15 40:16
49:13 51:19,23 58:19
82:6 86:2 87:18
89:2,4,6 90:16
91:3,7 92:24 94:19
108:21 124:1 146:15
147:12,20,21 148:4
151:3,19 154:4 155:7
163:2

**legislator** 33:18 36:2
50:14,15,19 53:6
88:20 160:9 164:12

**legislators**
33:1,9,19,20 41:4
52:24 53:24 58:15
65:12 72:6 74:18
82:6 87:16,22,25
88:23 89:7 103:5
105:9 123:18 124:2
156:20 161:9 163:3,5

**legislature** 20:22
22:16 26:18 27:4,15
28:2 31:24 38:22
48:6 51:15,16 88:4
90:8 91:2,6,12 93:18
94:6,7,15 95:10 97:5
99:4 101:20 105:19
106:20 123:11 146:16

**legislatures** 50:10
51:9 52:12,14

**Legislature's** 96:24

**legitimate** 156:19

**LENARD** 3:11

**less** 12:19 42:16
46:17,18,19 50:3
74:5 76:2 78:2 81:24

108:3,5 155:8

**let's** 8:21 48:23
81:12 93:25 109:9

**letter** 51:13,14 70:2
110:8

**letters** 51:13

**levels** 35:9 74:21

**liaison** 32:14 47:20

**Libertarian** 138:25

**license** 90:11 128:11
129:20 130:5
137:13,18,19,21,23
145:25 151:22

**licensed** 14:17

**life** 137:6,9

**likely** 67:7,8,11
89:15 117:21,22
132:24 134:2
135:11,13 138:16
139:2,18 150:16

**limited** 29:10 50:8
70:4 108:6 115:17
163:17

**Lindsey** 11:16 62:23
78:11 80:5

**Lindsey's** 78:8

**line** 114:21 146:1

**LIONEL** 3:11

**list** 7:15 28:18 79:24
129:22 144:9

**listed** 16:21 31:15
35:1 39:21 43:18
115:18

**listen** 92:16

**listening** 93:20
144:20

**lists** 28:11

**literal** 145:2

**literally** 58:22 106:1

**litigation** 8:3

19:7,15 21:7 44:12
46:8,12,16 69:24
71:8 73:3,5,10 74:4
76:18,19,24
77:10,17,25 78:21
80:4 87:10 100:1
134:16 142:12,23
143:15 158:21
163:12,16,21

**litigations** 83:11,25

**little** 42:7,24 48:12
60:11 73:5 103:1
109:7 140:15,16
156:20,21

**live** 141:10

**living** 96:7

**LLP** 5:4

**local** 59:5,6 92:8
96:17 107:17
147:4,7,8 148:8,10
149:22 152:13
153:15,17,24 154:1

**lodged** 23:17,24

**lodging** 77:22

**logarithmic** 55:23

**logistical** 80:4

**long** 11:20 15:25
17:25 31:19 34:2
47:25 55:15 58:12
85:25 91:8 135:5
150:19 154:11 159:17

**longer** 18:6 58:11

**LONGORIA** 2:7

**loose** 77:2

**Los** 5:5

**lose** 84:4 139:12,13

**losing** 48:11

**lost** 83:23 84:1 85:5
114:7 138:4

**lot** 44:14 54:17 73:6
79:14,15 80:23 82:17
83:23 93:18

103:19,20 129:1,2
136:22 137:7 153:22
156:14 162:14

**lots** 14:5 39:21 40:1
53:23 55:16 56:6
57:22,25 71:13 77:12
80:5,6 82:8,9 104:2
107:24 109:6 126:17
137:4 138:5,18
139:19 143:20
148:17,19

**love** 93:17

**low** 128:19 131:22

**Ls** 38:14

**Luciano** 17:11 87:5

**lucky** 73:4 149:5

**Luis** 32:13 101:6,8

**LULAC** 1:8 100:21,22

**lunch** 119:16

**LYDIA** 3:12

---

M

**machine** 4:12

**mad** 152:25

**magnify** 155:21

**magnitude** 130:9

**mail-in** 110:11,13
112:12,20 113:12
116:2

**maintain** 28:11 39:5

**majority** 34:24 121:7
123:5

**makers** 158:5

**MALC** 4:3 9:1
15:13,15,17,18,22,23
16:4,16,19 17:4,13
18:17,22,25
19:2,7,12,25 20:5
28:11,23 29:9
31:9,11,12,13,19
32:3,16,19
33:6,10,19,25

34:10,17,19,20
35:3,10,12,14,16,23
36:5,19,22
37:13,15,20
38:2,17,21
39:1,2,5,13,16,17,20
40:1,14,25 41:20
42:9,21
43:1,3,6,9,10,11
44:25 45:8,11,21
46:9,17,21,22
47:15,21,22
48:3,22,25
49:9,14,23 50:9
51:10,19
52:1,17,21,25
53:4,7,9,15
54:1,20,21 55:19
56:9,11,12 57:5
58:1,3,13
59:11,15,25
60:8,12,16,17,23
61:5,11 62:9,24
63:2,12,23
64:3,7,9,11
65:4,10,14,18,24
66:7,8,14
67:4,9,13,17 68:2
69:10,25
70:1,7,16,18
71:17,23
72:1,3,11,14 73:24
74:9 75:2 76:2,10,23
77:3 79:12
80:11,17,23 81:18
82:14,19 83:6,15
84:11,23 85:19
86:9,14,17,25
87:1,6,12
88:4,7,13,19,23
89:16,24 95:17,25
96:9,21,23,25
98:8,17,19,23 99:2
100:6,16,17
101:5,8,19
102:3,5,12,20
103:22,25 104:9,11
105:4,13
106:3,5,24,25

107:1,3,5,9
108:3,8,12,17,22,23
109:2,11,14,17,21,25
110:3,4,5,9
111:7,8,11 112:17
113:15,16,21
114:8,25 115:13,22
116:4,7 117:6,25
118:2,8,13,16
119:7,12 123:10
127:10,11,14,20
128:5,23,25
129:3,4,11,15,19,23
130:4,11,14,17,24
131:10,17,24 132:3
133:1,2,13,14,15,20
134:2,15,17,25
135:1,16 136:7,13,23
138:13 139:16
141:2,9,12,19
142:17,19,22,23
143:4,18 144:21
145:3,6,18
148:20,21,25
149:1,17
150:10,15,22 151:6
152:3,10 154:3,14,21
156:11,22,23 158:6
162:4,22 163:11

**MALC's** 36:23,25 37:6
43:15 44:23 57:14,18
62:5 64:15,22 70:23
73:1 75:22 83:6
85:13 94:7 109:3
114:1 162:11

**MALDEF** 101:3,7,8

**M-A-L-F** 38:13

**malfeasance** 116:2

**MALLF** 37:22,23,25
38:11,16,19

**MALLF's** 44:23

**man** 90:9 132:11 160:3

**manage** 17:17,18

**managed** 47:22

**managing** 17:20

**Mando** 105:23

**Manny** 99:17 100:21,23
101:5

**marathon** 104:17

**MARGARITO** 3:13

**margin** 125:18 126:8

**margins** 125:15,20

**MARIA** 2:7

**MARK** 1:3

**marked** 19:16,18
61:20,22 119:18,20
120:9,11 121:14,16
124:10,12 141:21,23
143:7,9

**Martin** 4:4,7 6:5
8:7,13 166:2
167:1,5,11 168:4

**M-A-R-T-I-N** 8:13

**Martinez** 3:13
17:16,23 18:10 33:23
37:16 66:17 103:15
105:23,24 135:6

**Marty** 65:22 164:25

**massive** 113:12

**match** 128:15

**materials** 52:14
101:11

**matter** 25:11,12
37:8,11 39:25 63:6
73:17 140:8 141:8

**mattered** 117:2,3

**matters** 18:22 20:12
35:25 42:13 47:6
69:22 72:4 73:19,20
138:20,21,23,24

**max** 83:2

**MAXIMINA** 3:13

**may** 10:10,11 16:1
17:19 18:3 23:16
35:7 37:7 43:17
50:16 55:21 56:6

60:7,9 67:11 74:23
75:17,19,20 76:1
78:15 82:10 89:22
97:7,14 100:14,21
101:2,3,5,15 102:6
108:23 109:1,4
110:7,21,24 111:4
114:19 116:20
117:2,3,20 118:11
130:8,9 137:22
144:18 146:17 148:7
150:23 154:20 155:3
156:25 161:24 162:13

**maybe** 18:19 42:24
50:8 65:7 81:24 82:1
89:7 91:21 97:14,15
116:24 126:18 132:12
135:20 155:18 158:20

**McCRAW** 2:12 3:7,19
5:14

**mean** 13:24 14:14
15:7,15,18 16:15
18:19 22:15 33:11
35:20 38:8 40:19
42:23 43:5 45:13
52:23 54:5 57:8
59:18 61:12 65:3
67:19 69:12,20,21
74:11 77:12 78:21
79:8 81:7,8 84:25
87:5 93:17 97:2
98:5,9,10 100:3
101:22 105:23 106:7
108:10,16 112:10
118:21 122:19 123:8
127:15,19,22,25
134:12 136:17 137:5
145:13 147:22
148:2,21 150:20
157:3,4,19,22,25
158:9 161:18

**meanderings** 138:5

**meaning** 160:13

**meaningful** 83:16

**meaningfully** 75:1,9

**means** 9:15 10:17

32:22 53:24 72:19
74:25 102:1 108:15
157:11,21 161:9

**meant** 51:20 76:19
105:13 139:7 164:4,8

**measurable** 139:11

**measure** 36:6 47:21
80:15,18 81:8,9
139:9 140:10

**media** 60:10,17

**medications** 11:1

**meet** 11:18,20 36:19
86:10 100:17

**meeting** 12:3 36:18
43:2 66:7 97:8,9,14
101:14 102:2,3
104:19 161:6

**meetings** 36:18 43:10
66:5,8 77:10 80:11
101:12 102:5

**MELLOR-CRUMLEY** 1:5

**member** 34:17,19,20
35:3,10,12,23 36:22
38:21 39:1 53:4,7
55:17 60:8 72:6
85:22 88:13 89:20
90:2 96:22 103:25
104:1 110:3,10
111:7,11 112:16,25
113:15 117:25 118:1
119:2 129:4,11,14
133:2,14 135:1
156:11,23 161:14

**members** 19:12
21:14,21 22:24 26:6
28:12 29:19 30:5
31:12,23,24 34:10
36:5,8,13,19
39:2,3,6,8,15 40:2
41:20 42:9 46:18,25
49:6 50:9 51:8
52:4,12,14,25
53:2,20
54:2,3,20,21,23,25
55:25 58:1,4

60:3,5,18,19 61:4
62:10,13,15,21,25
63:3,7,13,18,22,24
64:4,9,11 65:5,11
66:9,25 68:2,7,10,21
70:1 72:11 81:5
87:6,8 88:10
89:16,24 92:4
95:17,25 98:19
99:3,5,7,11 100:21
102:10 104:9,11
106:3,25 107:2,7
108:13,22,23 109:2
110:19 118:11 123:10
127:11,16,22,25
128:5,24,25
129:20,24
130:5,11,15,18,25
131:11,17,24
132:2,4,20,23
134:2,15 136:8,24
138:14 139:16 141:10
147:15 148:21,25
149:1,17,19,21
150:5,10,15,22 151:6
152:3,10 154:14,21
156:12 161:3 163:5,8

**membership** 33:25
35:9,16 52:19,22
57:23

**memory** 158:22

**MENDEZ** 3:11

**mens** 117:16

**mental** 162:23

**mention** 13:2

**mentioned** 36:14 37:18
42:5 44:9 46:21
76:16 84:11 86:13
91:1 94:4 100:11
101:24 134:23 140:5
159:8

**mentioning** 38:11

**message** 47:21

**met** 11:10,23,25 67:13
84:19 90:8 100:21

101:2,6,8

**Mexican** 3:2 7:6 15:15
31:14,24 38:14

**Mexican-American**
34:22 35:25 41:12
47:5 64:6 72:5

**Mexican-Americans**
41:18 159:20

**Mexico** 52:8

**MICHAEL** 1:4

**MICHELLE** 2:4

**middle** 122:7,9 148:6

**midnight** 12:21 152:21

**midwife** 132:14 136:4

**military** 130:18

**Miller** 5:9 9:2 165:1

**million** 116:16
128:15,21,22 156:2,3

**mind** 48:12 82:2 143:9
146:23

**mine** 104:23 163:14

**minimal** 76:17 163:17

**minorities** 93:20
157:24

**minority** 20:25 26:5,6
62:16 63:22
88:5,9,10 92:16
124:6

**minute** 19:19 111:24
112:8

**minutes** 11:21 61:15
147:17 149:23 153:1

**mischaracterize** 76:22

**mischaracterizes**
151:2 154:5 158:15

**miss** 56:7 85:6

**missing** 60:9

**mission** 31:10,16
46:20,21,23,25 49:11
71:24

72:2,3,15,17,18 83:5
87:1

**Missouri** 13:13,22
14:1

**misspoke** 134:13

**mistaken** 134:22
151:24

**mixed** 73:11 78:3

**Mobility** 93:8 94:13
145:22,24 146:5

**model** 51:19 52:9

**moderate** 83:2

**modes** 60:17

**mom** 138:5

**money** 40:1,3 41:4
42:3 43:20 46:4
55:11,13,24 56:5
75:12 76:4 78:7
79:15 81:4 82:23
86:9 136:2

**monitor** 49:14 163:19

**MONTEZ** 1:4

**month** 55:13 78:5
79:12,13 82:5 86:7
115:3

**monthly** 71:9

**month-to-month** 38:9

**moratorium** 41:25

**Moreno/Rangel** 38:24

**morning** 8:1 156:15

**mostly** 15:12 43:6
70:5 100:9

**motions** 19:14 104:21

**motives** 158:4

**move** 93:11

**moved** 93:1 137:12,20

**multiculturalism**
159:21

**multifaceted** 74:19

89:3

**Muncie** 137:14

**musician** 41:21

**myself** 84:13 122:7

---

N

**NAACP** 3:1 5:2 7:5 9:1
68:22

**narrative** 91:9

**Nathan** 80:7

**nation** 126:18 138:6

**native** 143:15

**natural** 67:24

**nature** 155:5 161:20

**neat** 90:12

**necessarily** 59:3
70:14 72:17 84:14

**necessary** 61:2 131:25
132:5,8

**Nevada** 52:7

**newsletter** 54:7 71:6
78:8 79:23

**NGR** 1:4 2:2 3:2,12

**nice** 50:21,24 90:8
160:3 164:10

**night** 12:16

**nodding** 9:16

**nods** 19:21

**noise** 126:6

**nominal** 35:8 78:16

**nominates** 153:20

**non-appropriations**
155:12

**non-budget** 155:13

**none** 63:17,19 93:19
113:9,10,11

**non-Latino** 83:19

**nonprofit** 39:17

nonrefundable 38:10

nonregistered 108:17

non-substantive 156:1

nor 168:9,10

normal 36:1 74:10
  87:19 91:2,7
  92:10,13,16
  93:5,15,22 94:6
  95:16 96:24 97:20
  124:4 154:4 155:24

normalcy 154:10

normally 58:11 59:7
  78:17 97:22

NOTARY 167:22

note 9:22 141:12

noted 167:3

notes 101:14

nothing 50:17 51:20
  52:19 53:3 162:9

notice 7:3 19:24
  111:17 114:2
  156:14,21

notion 108:19 121:13

notions 111:17

Notzon 68:25

November 13:12

Nueces 129:8 132:11
  140:2

nursery 42:14

—————————
O
—————————

oath 10:16 167:12

object 10:11 63:15
  65:20 120:20

objected 23:19 28:10

objection 23:17 63:25
  64:25 66:20 81:22
  82:15 88:11 92:25
  113:24 114:11 117:8
  118:19 121:3,25
  123:19,24 126:4

127:18 140:22
  142:4,20 144:7
  151:1,17 154:5
  158:15

objections 23:18,24
  92:25 93:1,21
  114:1,2 124:5

objectives 17:9

obtain 26:16
  27:2,13,16,25 28:2
  133:4,17 134:19
  135:2

obtainable 145:6

obvious 88:1 98:5

obviously 37:22 50:6
  54:24 73:8 80:2,9,11
  162:1

occasionally 39:11
  40:6

occur 155:14

October 7:12 41:1
  124:15 125:10
  126:2,16

offer 28:18 36:12

offered 98:20

offhand 13:6 93:24

office 15:10 18:12
  135:7,15 136:1
  159:16 167:18 168:12

offices 4:13 8:5
  38:22

official 2:11,12
  3:6,7,18,19 16:25
  18:8 37:14

officials 14:25 70:13
  113:14

Oh 12:21 106:18 122:9
  164:7

Okay 9:12 10:4,10
  12:2,7 13:9 14:7
  15:21 16:24
  20:8,11,16 22:18

23:25 25:17 28:16,20
  31:8 32:19 33:24
  35:14 38:16,23 43:4
  47:19 48:22
  63:1,10,11 65:20
  66:4 78:22 84:16
  91:11 111:20
  112:6,16 114:3 120:6
  122:9,10 123:3,14
  124:18 125:2,9,20
  127:9 128:4 129:16
  134:3 141:22 142:2
  143:6 144:1,11,19,21
  146:13,21 153:8
  162:21 163:11 165:4

one-day 155:20

one-hour 155:20

one-pager 101:15

ones 89:18 99:19
  115:6 133:7 134:23

one-third 71:7

ongoing 108:7

online 109:5 120:8

op-eds 100:8

open 108:20 142:7

operate 38:8

operating 45:12

operation 83:21

operational 60:14

operations 16:8

opinion 5:17 50:8
  100:7 126:12 157:15
  161:23

opportunity 51:1,4
  104:10,12

oppose 98:8 106:24
  107:2,6

opposed 104:11 107:7

opposing 51:24 108:4

opposition 59:12 60:1
  100:7,18 104:13

105:2,11

**option** 106:8,12

**options** 105:21 106:2

**ORAL** 4:2,7

**order** 49:4,5 54:13
55:4 56:16 57:23
72:6 93:9
96:11,13,15,18 105:8
107:15 127:1 130:9
145:22 146:5,6 147:1
150:24

**organization** 32:4
35:14 39:14,16,18
43:1 49:13 62:21
64:17,23 65:6,23
70:1,16 98:8,13,17
105:4 118:8

**organizational** 28:25
29:11 75:14

**organizationally**
32:11 64:2

**organizations** 68:21
75:18,21 100:17
101:4

**organize** 42:21 100:18

**organized** 32:19,24
33:2,6

**origin** 155:17

**original** 138:5

**ORTIZ** 1:5 3:11

**OSCAR** 1:5

**others** 79:5 93:5,23
142:15

**otherwise** 15:19

**outcome** 156:21

**outlines** 94:24

**outlying** 23:9

**outside** 18:13,17 42:1
72:15,17 85:21
91:2,6 93:14,21
94:4,8,12,17,21,22
97:2 112:1 137:14

146:4,7 155:8,10,13
156:7,11,14

**overdraft** 103:6

**overstep** 118:22

**OZIAS** 1:5

---

P

**p.m** 4:11 97:12 127:8
152:21 165:5

**P.O** 5:18

**PAC** 75:25

**pace** 153:3

**packed** 135:15

**PACs** 39:22 40:2 44:4
76:5

**page** 6:2 7:2 20:9,12
30:3 112:7

**PAGE/LINE** 166:4

**paid** 15:3 16:12 37:23
46:14 78:3

**panoply** 106:2

**paper** 60:7 77:8 79:25
80:9

**papers** 134:8
136:14,16

**Paragraph** 28:22 29:9

**paragraphs** 20:13,14

**parameters** 65:2 86:1
96:12 139:21,25

**parcel** 161:21

**partially** 154:10

**participated** 28:12

**participation** 73:24

**particular** 83:5

**particularly** 162:10

**parties** 67:14 133:6
136:12 168:10

**partisan** 35:14

**partnered** 41:14

**part-time** 84:17

**party** 69:7 120:15
141:10 168:9

**Paso** 142:14

**pass** 36:3,8 47:1 50:2
92:18 94:16 96:10,18
103:20 124:4 147:10
151:16 161:8 163:24
164:21

**passage** 49:8 61:7,8
62:13 65:13 98:5
106:10 151:8 152:23

**passed** 61:1,3 63:21
91:13,23 93:2,12
105:5 139:3 152:19
157:10 161:24

**passes** 62:14 157:8

**passing** 155:1

**passport** 130:15

**past** 113:2

**pay** 79:23,24,25 83:24
84:2 93:8 137:13

**pays** 77:3

**pedal** 97:24

**PEGGY** 1:6

**Pena** 89:21 110:6,11
112:19 118:5

**penalty** 10:18

**Pennsylvania** 49:17

**PENNY** 1:5

**people** 17:18 39:8
40:1 41:4,20 56:25
57:25 67:24 84:5
87:7,21 90:5,7 97:13
105:8,10 107:24
109:15,18 112:21
116:3 117:12,23
118:25 119:1 122:23
124:2 125:17
126:20,23 128:1,2,11
129:7,22
130:6,7,10,13

131:14,18 133:10,19
134:1,2,6,12,13,14
135:8,11,14,20,21
136:11,13 137:3,5
138:19
139:2,7,12,22,24
140:3,4,10 144:25
151:7 152:22
158:11,19,23,25
159:8,13,23 160:14

**per** 155:19

**percent** 46:15,16
71:1,2,3 81:7 82:1
98:16 119:24 120:25
121:4 122:3,5,22,24
124:19 125:8,13
126:9 128:20 140:25

**percentage** 46:10 56:3
71:12 73:1 75:19
76:8 80:18 81:7,20
120:17 121:2,21
122:11,13
125:3,10,23,25 126:2

**Perfect** 119:17

**perfectly** 122:2

**performed** 24:2

**perfunctory** 104:19

**period** 100:19 116:18
126:14 141:7 161:1

**periodic** 115:8

**periodically** 115:4

**perjury** 10:18

**permission** 85:22

**PERRY** 1:11 5:14

**person** 12:1 89:10
90:6 108:25 109:19
114:16 117:12 121:10
131:1 135:22 157:7
161:14,15 167:14

**personal** 113:2 160:17

**personally** 90:14
136:18 160:8,10
167:11

**Pete** 48:5,7,8,10
51:14

**phenomenon** 153:3

**phone** 5:9 9:3 126:21

**photo** 29:1 50:1
118:17 120:1,19
121:23 122:15 124:22
125:6 129:24 130:19

**photograph** 140:23

**photographic** 26:16
27:2,14,16,25 28:3

**picayune** 96:7 108:16

**Pickett** 89:19 118:3

**picture** 81:12 103:4

**pie** 81:12,17 82:4

**pieces** 100:7

**pilot** 90:11

**Plaintiff** 5:2,8 21:8

**Plaintiff-Intervenors**
2:5,9

**Plaintiffs** 1:9 2:2
3:4,15

**plan** 162:2

**plane** 77:21

**plans** 75:4

**plant** 42:3

**platform** 55:12

**platitudes** 157:5

**play** 41:21 71:17

**played** 58:4

**pleadings** 19:13

**please** 8:12 9:22 10:6
19:18 20:9 48:16
70:2 81:11 112:7
120:16 124:16 153:6

**plus** 71:10 84:25

**point** 32:2 58:17
60:15 78:15 88:18
89:11 90:1,13,16

93:9 94:1,12 116:25
131:16,20 140:9
145:16,21 152:9
156:23 160:25 163:23

**pointed** 105:24

**points** 25:21 49:4
57:22
99:2,7,10,16,23,25
107:15

**policies** 46:24 50:3
137:1

**policy** 17:5 33:15
36:7 41:5
42:5,10,11,12,19,21,
25 45:17 46:17 47:8
50:6 55:17
56:10,21,23,25
57:14,18 60:6 71:13
72:10,11,19 73:10
78:11 83:13,16,20
96:22 158:5

**policymaking** 24:2

**political** 120:15

**poll** 7:8,9,11,12
119:21
120:4,7,14,16,22
121:10,18 122:14,25
123:6 124:13,24
125:4,10,12 126:7,13
128:17,18 140:18
144:22 145:2

**polled** 125:17 126:19

**polling** 125:16 126:21
127:1 139:9

**polls** 57:8 123:14
125:6,22 126:23
131:8

**poor** 128:18

**POPE** 1:5

**popular** 119:8,10,13

**population** 129:2

**portion** 28:24 32:25
55:6 70:23 71:1

72:16 73:8,22
77:1,3,6,7,9,25
78:4,6,8,12
79:3,4,7,8,17 80:10
82:5 127:14,21
128:20,23,24

**portions** 45:18 130:11

**position** 15:25
16:12,14 17:25
18:1,2 37:14 59:11
63:2 64:15,22 94:7
109:3 118:7 137:4

**positions** 17:5 45:15
52:1

**possessed** 115:1

**possession** 22:24 23:9
30:15 31:1 101:16
115:7

**possibility** 66:5
67:15 126:8,10,11

**possible** 75:8,9 86:17
90:19,20,25 94:17
102:3 112:13 117:9
123:15,23,25 124:9
125:21 126:20 127:3
135:13 136:4

**possibly** 57:13 67:25
91:21 101:13
144:9,10

**posts** 33:10

**PR** 19:2

**practice** 14:17,21
15:7,9 37:6 58:7
101:15 141:19
146:18,24

**practices** 17:6

**pragmatically** 90:23

**preaching** 157:5

**preclearance** 78:25

**predate** 158:21

**predictor** 82:4

**prejudiced** 158:10

**prejudicial** 91:21

**Preliminary** 7:5

**preparation** 11:24
12:8 13:5 20:1 62:6

**prepare** 11:8 13:1
23:21 44:25 83:11

**prepared** 21:4,12,19
22:1,9,21 23:4,14
24:8,15,22 25:4,17
26:1,11,22 27:8,20
28:7,18 29:6,15
30:1,11,21 31:6,13
47:3

**preparing** 78:14 82:17

**prescribed** 94:20
97:22

**present** 5:21 12:2
21:22 26:7,25
27:11,23,24 29:21
30:7,17 31:2 41:15
103:22 119:25 120:18
121:23 122:15 124:21
125:6

**presentment** 95:2

**presents** 92:19

**press** 47:8 55:8
59:13,21 74:3

**pressing** 143:10

**pressure** 103:20

**presume** 132:24

**pretty** 77:13 103:12
149:5,6 161:2

**prevalent** 112:13

**prevent** 10:23 11:2,5
49:8 98:5 105:5
114:20 117:3,6,24
147:1 151:8 154:25

**prevented** 63:19 71:13
83:12 116:13 117:20

**previous** 25:12 118:7

**previously** 134:23

**Price** 8:5

**primaries** 126:15

**print** 143:16

**prior** 16:18 55:20
56:20 57:16,19 69:17

**priorities** 45:25

**priority** 93:10

**private** 43:23

**privilege** 36:20 66:3
69:16 82:7

**privileges** 35:22
38:25

**privy** 68:11,12
130:16,20,21

**probably** 43:19 44:3
52:7 61:2 63:18
66:24 69:2 70:5
75:18 81:24,25 93:6
94:21 100:4,11
104:5,15 105:3 106:8
128:24 130:11 135:20
138:20 139:8,11
146:20 149:7,18
152:5 155:19,20
159:24

**problem** 35:22 83:13
93:6 108:7 110:12
111:3 126:19 145:9
146:6

**problematic** 87:10
141:9

**problems** 126:17
137:6,9

**procedural** 49:4 58:13
92:4 98:4

**procedure** 4:15
87:19,20 92:11,14,16
93:5,16,22 95:16
97:20 103:12,13
124:1,4 155:25

**procedures** 91:3,7
94:6 95:18 96:1,25
146:15 154:4

proceedings 168:7

process 34:25 92:24
99:6 102:22 103:11
104:24 140:14

produce 28:13

produced 4:8 44:12
99:25 101:12,25
142:11,13 143:14,15
158:17 162:4

product 100:4

production 44:14 83:1
162:6

productions 54:11

professional 14:13
42:12

proffered 128:9

program 37:23 38:24

programming 18:24

projection 113:22
114:10 115:2,14

projections 26:4
30:14,24 88:8

prominent 54:14

prompt 44:21

propose 102:12

proposed 22:4,12 23:7
49:15 50:10 51:8
104:1 106:20 141:19

proposing 103:11

proposition 89:9
119:25 120:17
121:2,22
122:12,14,25 124:20
125:5,12,24 126:1

protection 71:19

protections 119:1

prove 138:3 140:18

proved 167:12

provide 68:13 72:5
98:17,19 99:2

provided 59:16 61:11

providing 19:6

proving 63:4 108:25

provision 96:20 140:2
156:6

provisional 133:8
140:13,17
141:3,8,15,18 142:8
151:23

provisions 4:15 36:1
96:8 158:3

public 2:13 3:8,20
7:14 25:21 37:9
39:25 44:18 47:9
54:11,23,25 55:8,25
59:11,14
60:3,4,15,20 67:19
68:1,7 70:21 77:4
80:5 82:18,19
97:9,10,13 98:11,12
107:5 141:13
142:7,18 143:3
167:22

publically 40:13

publicize 60:1
67:17,19

publicized 73:24
86:11

publicizing 74:8
126:17

publicly 45:8 74:7

PUEBLO 3:14

pulled 160:11

purpose 20:23
31:10,12,14 38:19
55:16 87:13,18,24
88:1,3,21,25 89:14
90:21 124:7,8
157:10,20,22,23
160:5

purposes 33:2 55:20
63:4,9,12 145:13
167:16

pursuant 4:14

pursuit 142:22

pushing 95:18 96:2

putting 81:20

_____

Q

qualification 50:7

qualifications 14:13

qualify 131:22

quality 105:11

quarter 159:17

question 9:23
10:4,11,12 15:14,21
18:15,18 34:18 62:22
63:5 65:7 69:13
74:12 76:21 89:2
96:4 103:10 105:3
109:7 114:2 115:12
120:21 127:1 131:6
157:16

questioned 114:14

questioning 127:2
147:18

questions 9:14 10:23
11:2,6 13:8 20:18
31:9 49:5 61:5 82:9
105:8,18 107:15
119:15 144:15 146:14
163:22 164:22,24
165:1

quick 61:14 98:2

quickly 20:16 93:3
98:1 117:23 147:10

quite 82:25 108:1
150:11

quorum 106:10,15

quorum-busting 106:7

quote 149:16

_____

R

race 20:24 157:25

**racial** 161:10,24

**racially** 161:22

**racist** 62:15 63:21
  89:10 90:18,22 91:21
  119:5 123:17 152:6
  157:22
  158:7,8,12,20,23
  159:1,9,22,24
  160:1,5,6 161:18,20

**racists** 90:18,22
  158:9,13 159:4

**radical** 55:23 56:2,18

**raise** 46:2

**raised** 29:19 30:5

**Ramey** 160:11,12

**range** 128:22,25

**Ranger** 114:15

**rapid** 153:2

**rare** 40:6 41:6 95:15
  96:9 98:13 116:11
  117:1 132:25

**rarely** 37:6 45:7

**rarer** 155:18

**rate** 71:11 128:19
  155:14

**rates** 130:1

**rather** 123:17

**ratify** 152:6

**rational** 92:18 93:21

**Raul** 90:4,7

**Raymond** 58:1

**rea** 117:16

**reach** 51:25 86:21
  119:6

**reached** 107:12

**reading** 147:11 159:12

**real** 82:10 104:19
  106:11 110:12 140:1
  147:10

**really** 19:15 50:21
  60:11 65:2 80:22
  82:8,12 86:19 90:12
  102:22 137:16,18
  157:4,5,13

**realm** 112:2

**REALTIME** 4:2,7

**reason** 53:2 84:5
  108:11 154:22 161:7
  166:4

**reassert** 63:20

**Rebecca** 161:4

**recall** 35:8 41:19
  49:22 59:2 76:7
  91:12,19 96:14,16
  97:6 99:12,18 101:10
  102:7,10 106:19
  107:6 111:4,6 115:10
  120:4 128:7 129:10
  135:5,10 142:18
  148:12 151:20 154:21
  155:2 159:13,14

**receive** 39:20
  40:4,7,18 61:5 68:16
  76:4

**received** 44:17 53:23
  68:20 115:9 162:16

**receives** 40:14 61:5

**receiving** 115:10

**recent** 61:1 141:15

**recently** 71:14 79:11
  82:9

**Recess** 61:19 127:8

**recognize** 19:23 61:24
  143:19,21

**recollection** 98:15

**reconsider** 108:13

**record** 4:16 8:12,23
  9:19 10:1 39:25
  61:18 111:15 141:13
  149:20 154:12

**records** 7:14 142:7,18

143:3

**redistricting** 39:9
  69:1,2 73:16,20,21
  75:24 76:1
  78:4,16,24 95:14
  97:15 98:25 100:9
  140:8

**reduced** 85:18 168:5

**reelect** 64:12

**refer** 111:16 140:9

**reference** 58:6 113:25
  143:17

**referenced** 77:18
  79:18 101:25 121:18

**references** 120:4

**referral** 115:20

**referring** 69:23 78:23
  111:17 114:1 136:21

**reform** 161:8

**regard** 28:9 57:15,19
  64:15 94:3,4,5 96:1
  103:23 107:11,19
  163:25 164:2

**regarding** 13:8
  22:13,25 24:3
  25:7,17,21 31:9
  50:10,12 51:11
  52:1,12,15 68:14
  99:3 100:7 101:20
  109:10 141:14 146:14

**regardless** 141:10

**regards** 52:1 95:6

**register** 53:2 108:14
  128:12
  139:21,22,23,24

**registered** 26:14,25
  27:11,23 108:9
  109:11,15 119:24
  121:22 122:12,14
  124:20 125:5
  134:17,21 135:24
  138:11

**registering** 161:18

162:2

**registration** 24:11
52:18,25
53:1,5,10,12
108:11,15,20,24
109:3,5,10 112:23
128:10 139:20 151:21
168:19

**regular** 102:2 168:9

**regularly** 32:8,10
46:23 58:14,15

**rejected** 145:23

**relate** 122:6

**related** 22:3 26:5
52:18 53:5,16 57:6
60:24 72:7 76:18
80:8,12 82:2 102:6,7
110:20 111:12 112:18
115:2,15 155:13

**relating** 23:6
24:10,17,24 29:18
30:5,16 31:1 110:4
111:8 113:16,23
114:10

**relation** 70:6

**relations** 55:17

**relationships** 50:13

**relatively** 83:21

**release** 59:21

**releases** 47:8 55:8
59:14 74:3

**relevance** 23:20 49:18

**relief** 67:25

**religious** 140:22

**remain** 119:6

**remained** 118:7

**remember** 20:3 48:5
50:1,19,23 51:13
58:24 59:20,22
99:9,23 100:13 102:5
104:7 106:21 107:1
112:24 113:1 118:5

131:19 144:14 146:21
149:3

**rendered** 139:5

**rent** 45:16 77:9 79:22
80:9

**repeat** 10:5 64:18

**repeated** 114:21

**rephrase** 127:20

**report** 17:15 33:22
44:7 88:16 113:22
114:9 115:1,14,23
152:18

**reported** 4:12

**reporter** 5:22 9:19
168:2

**Reporter's** 6:7

**reporting** 17:2 33:4

**reports** 26:3 30:13,24
33:4 39:21,24,25
40:12 43:18 44:11,24
88:7 135:4

**represent** 14:24 34:24
62:4 64:5 75:18,25
120:6,13 121:16
123:11 124:12
128:1,2 142:10
143:13,17,23

**representation** 19:6,9
122:23

**representative** 17:23
18:9 19:25 33:23
37:16 48:8 50:16
51:17 58:1 60:7
66:17 67:2 73:19
77:11 88:12 105:23
110:5,6,10 115:5
121:13 135:6 140:7
164:5,6,13

**representatives** 3:3
37:24 62:16 66:22
67:13 68:8 104:23
126:22

**represented** 8:17 21:8

69:7 70:8,14 105:1
121:12 123:2 129:6,9
132:7 133:20
134:2,15 136:12

**representing** 8:3
64:16,22 120:22

**represents** 133:7,11

**Republican** 50:15

**Republicans** 35:17
150:2

**request** 7:14 37:25
102:13 142:8 143:1
145:14

**requested** 22:12 61:11
165:6

**requests** 53:24 141:13
142:18 143:4 162:5

**require** 82:21 142:21

**required** 10:12 42:18
120:18 121:23 122:15
124:21 125:5 151:21

**requirement** 50:1 54:9
141:3

**requirements** 29:1
33:4 54:1,13 70:12
119:8 121:8 123:6
139:17

**requires** 155:15,16

**requiring** 118:16

**research** 36:6 102:12

**researched** 22:12

**reserve** 45:11,21

**reset** 103:15,17

**reside** 8:15

**resolution** 32:25
85:20,24 93:14 94:5
155:9,15 156:7,14,15

**resolutions**
155:10,14,25

**resource** 54:1

**resources** 28:25 29:11

41:7 42:17,18
47:11,13 49:23 53:10
54:6,17,19
55:2,19,22 56:16,19
70:20,21 71:22
72:13,25 73:2,12,13
76:23 77:16 80:14,19
81:14,15,18 108:4

**respect** 70:15

**respond** 103:4 138:22

**responded** 122:24
123:6 125:11

**respondent** 141:5

**respondents** 122:13
125:4,11,24,25

**responding** 122:23
126:23

**response** 126:13
128:19

**responses** 55:9 143:1

**responsibilities**
16:25 18:9

**responsible** 18:11

**responsive** 115:12
156:10 162:5

**restate** 18:15

**restrictive** 50:3
91:18 94:23

**result** 32:3 67:5
76:11 101:12

**results** 20:23
120:7,14 121:6
124:13

**retainer** 38:10

**retract** 98:7 152:8

**reveal** 65:21 142:21
162:23

**review** 12:7 19:19
20:1 44:2 111:24
112:8 115:25 164:20

**reviewed** 11:10 19:22

61:23,25

**reviewing** 12:14,17,19

**rhetoric** 159:24
160:6,8 161:1,2

**RICK** 1:11 5:14

**rid** 108:22,24

**right-hand** 122:10

**rights** 5:11 15:1,2
41:7 45:19
46:8,12,15,16 57:2
63:24 64:3 71:2,4
72:8 73:19 74:24
79:14 80:3,8 81:25
82:1 100:9 157:24

**roads** 56:13

**rob** 94:13 145:24

**Rodriguez** 32:7 78:11

**Rolando** 104:22

**role** 15:13,22
16:4,11,19 58:4
71:17 82:22 85:18

**room** 157:18

**Rosenberg** 114:14

**rough** 161:1

**roughly** 33:16 34:4
37:19 43:14 70:19
79:13 81:20 86:9
105:25

**routinely** 163:18

**row** 162:17

**Rudd** 5:3 8:20,25
11:12 23:16 28:15,17
61:16 63:1,15,25
64:18,25 65:20 66:20
69:12,15 81:22 82:15
88:11 111:14,20,25
112:5 113:24 114:11
117:8 118:19 119:17
120:20 121:3,25
123:19,24 124:24
126:4 127:7,18
142:4,20 143:12,25

144:2,7 151:1,17
154:5 158:15 162:21
164:22 165:3

**ruin** 94:14

**rule** 92:8,9,10 94:3,9
95:5,9,12 96:12,20
97:5 103:16 105:22
114:1

**rules** 4:15 9:12 15:1
92:1 94:20,21,23
96:8,21 97:17 128:10
146:8 153:17,19

**rumors** 31:22

**run** 33:9 43:3

**running** 43:2 80:4

**runs** 78:13

**rushed** 103:12

_____

S

**sacrifice** 151:10

**sad** 72:13

**Sadly** 62:8 162:1

**safe** 150:22

**Safety** 2:14 3:9,20

**salaries** 80:10

**salary** 55:6 71:1,3
73:7,8,22
77:1,2,24,25 78:8,13
79:3,4,7,8,9,22
80:2,3 82:5,23
85:12,15 86:8

**San** 8:16 15:12
149:11,12

**sapped** 83:21

**satisfied** 104:7

**saw** 42:12 50:23

**SB** 20:21 22:13,15,25
25:7,22 26:5,17
27:3,14 28:1,23
29:1,2 53:22 54:9
55:20 56:1 59:2,18
61:12,13 62:9

63:6,14 64:7,11 68:9
69:11 70:16,18,25
71:8,24 72:2,14
75:2,5 79:19 80:4,19
81:2,19 83:7 84:10
86:25 87:12
88:5,9,20,24
89:16,25 91:3,7 96:1
98:8,18 99:3
100:7,18,20 101:21
102:13 103:23 104:11
105:5,20 106:6
107:6,10,11,12,14,19
,20 108:4,5,7
110:17,22 114:19
116:7,12,25 117:6,20
119:9,12,23 123:16
127:10,17,23 128:6
129:5 133:5,18
134:20 135:2,16
136:9 138:15 139:17
140:14 144:21 145:4
146:16 147:24 148:3
156:24 158:7,14
160:9 161:23

**scheme** 109:10

**school** 13:15 14:10

**schooling** 14:3

**sciences** 121:10

**scope** 19:11 72:15,17
146:8

**score** 62:19

**SCR** 155:17

**scuba** 90:11

**seal** 167:18 168:12

**search** 44:22

**second** 48:4 147:11

**secretary** 1:12 2:12
3:6,18 33:9

**Section** 5:10 65:15
67:23,25 69:21,22
70:6 73:6 77:15,21
78:21,24,25 88:15
101:18 103:16 114:13

128:7,14

**sectors** 83:17

**Security** 128:12

**seeing** 20:3 144:14

**seek** 37:15 67:25
118:11 163:12,20

**seeking** 141:14

**seeks** 37:14 157:23

**seen** 76:10 141:24
142:25 144:11

**Seis** 41:9,11

**selection** 141:16

**self-employed** 15:6

**Senate** 22:15
32:1,5,8,12,14,17
91:14,24,25 92:3,13
95:11 96:1 98:1
106:19 148:5 151:20
152:19

**Senatorial** 95:20,22

**Senators** 91:15

**send** 54:8

**sense** 62:15 66:23
90:23 94:17 101:8
104:15,19,25
105:24,25 113:12
114:21 117:4,21
118:12 154:10 157:1

**sent** 51:12,14 70:1
110:8

**sentence** 100:12

**separate** 32:16 63:5

**September** 18:2 21:15
26:14 27:12 41:11
82:14 85:1 133:1,15
134:18

**SERGIO** 1:3

**series** 20:12

**serious** 62:20 72:12

**seriously** 82:19

**serve** 34:2 39:2,3
85:21

**service** 115:20

**services** 163:13

**session** 34:5 37:21
41:16,19,25 42:1
43:11 48:10 58:16,17
86:23 91:12,25
101:17 105:15 106:13
108:6 136:25 149:5
152:12,16,24
155:3,19 160:10
161:7,21,22

**session's** 42:15

**several** 14:24 42:14
43:10 52:4 60:8
100:8 104:5 108:12
114:19 129:7 133:8
158:2

**shaking** 9:17

**sham** 104:24

**Shaw** 128:17

**she's** 11:14 34:17,19
78:9,11

**shift** 86:8 126:12

**shifting** 124:2

**short** 18:11 48:13,16
55:15

**shorthand** 4:12 168:2

**showed** 131:2

**showing** 131:8

**shows** 41:14

**shut** 97:13

**sign** 50:2 140:20,21
145:11,14 150:5

**signature** 165:6 166:1
167:2

**signed** 150:5

**significant** 71:12
73:13 102:24
127:14,19

similar 91:17
  95:17,25 124:13

sir 9:8 10:3,9,25
  11:4,7 12:4,25
  20:10,15 25:25 26:10
  30:2 34:9 37:17
  44:10 48:24 58:8
  60:20 69:9 75:3,6
  91:5 95:4,8,11
  120:12 125:1 127:13
  134:24 138:10,12
  146:12 147:25

sit 133:13 134:10

situation 46:6 71:20
  135:25

six 18:4 59:6,7
  140:18 141:2 147:19
  153:16

skids 161:13

skyrocketed
  76:15,16,20

Slaughter 168:19

slavery 119:10,12

slice 81:18

slightly 116:20 141:6

slow 105:14

slower 155:14

slowing 154:19

slowly 74:21

small 75:19 76:8 93:1
  94:12 126:12 130:12
  131:7,13 156:4

smaller 130:6 156:19

Smart 50:24

social 60:10,17
  121:10 128:12

society 139:5

solely 66:24 67:9
  100:13

solo 15:7,9

Solutions 168:18

solve 92:23 146:5

solved 93:12,13
  110:17

somebody 85:5 137:17

somehow 86:8

someone 37:14
  92:19,20 99:22
  117:7,24 157:12
  160:19,20 161:12

sometime 82:11 152:20

somewhat 154:9

somewhere 128:22

son 116:22

sorry 13:23 35:20
  38:2 39:23,24 41:10
  43:17 47:24 48:4,8
  51:7 78:10,22 81:3
  100:23 104:10 105:17
  107:3 110:16,17
  122:13 127:24 129:14
  132:3,11 134:1 142:1
  148:22 150:21 159:15

sort 63:7 119:6

sought 65:4 68:6 74:9
  87:17 90:22

sounds 102:8 157:4
  161:10

source 43:15,24 44:1
  133:11 138:20

sources 40:13
  74:10,17

south 49:17 147:2,23
  148:2

SOUTHERN 1:1

Southwest 52:9

space
  36:10,11,14,15,17,18
  45:11,21 71:5 84:4
  85:8,19 86:6

speak 35:24 36:23,25

37:5,8,9,12 47:3,6
  51:22 60:25 80:25
  103:24

speaker 5:9 49:6

speaking 63:8 149:23

special 34:16
  96:11,13,15
  153:18,19

specific 37:4 49:22
  66:21 67:1 81:20
  88:23 90:2 91:10
  92:1 95:20 96:20
  99:18 130:3,10
  134:25 139:19
  152:11,15 155:2,3

specifically 10:13
  15:18 49:23 53:22
  70:24 73:12 79:17
  83:9 99:13 103:24
  108:14 110:12 114:4
  146:17

specifics 99:13 102:7

specified 26:17
  27:3,14 28:1

specify 83:4

speculate 144:3

speculation 81:23
  82:16 118:20 122:1
  123:20 126:5 142:5
  144:8 151:2,18

speeding 137:14

spell 8:11

spend 12:14

spent 12:16 49:23
  55:24 56:5 78:7
  82:17,19,21

spirit 96:18

split 43:2

spoke 101:7

spoken 50:17 69:5
  101:3

sponsored 40:20

41:3,8,17

**sponsorships** 40:18
43:5 76:11

**spreadsheet** 44:2

**square** 48:15 106:17

**staff** 17:18,19,22
18:6,9 19:12 33:12
36:5 37:18,20,24
43:6 45:15
47:13,18,21,22
55:10,16,24 70:21
71:10,21 77:5,8 81:9
82:9 83:23 84:7,12
99:3

**staffer** 84:1 90:7

**staffers** 56:14

**staffs** 31:13 47:2
57:23 72:6 89:7

**stage** 161:12

**stances** 52:1

**standard** 87:3

**standing** 14:18
63:4,9,12 64:15,21
65:3

**stands** 109:13

**start** 58:19 152:24
153:1

**started** 47:15

**state** 1:12 2:11,12
3:1,7,17,18 4:12
5:2,14 7:5 8:3,11,25
13:10 14:19 20:21
23:8 26:18 27:3,15
28:2 49:25 50:10
51:4,9,24 52:12,14
62:14 69:11 84:3
85:7,13,14,15,16,18,
21,22,25 86:6,7
128:8,25 136:22
157:13,18 164:5
167:7,22 168:1,3

**stated** 4:15 31:16
34:18 39:17 61:23

127:9 168:3

**state-issued** 129:24
137:24

**statement** 7:5 98:11
107:1,4,6

**statements** 25:21 47:9
54:11,24 55:8
59:15,23 60:4,5,8,15
68:7 76:4 77:4 80:5
82:18,19 98:12

**states** 1:1 2:1 5:8
14:5 21:8 23:8,9
28:21 29:8,17
30:3,13,23
49:15,21,23
50:4,8,11 51:8,11
69:6 70:8 165:2

**stating** 28:11 62:24

**statistical** 126:6

**status** 20:25 71:8
101:19,22 102:1,8

**statute** 33:3 97:5

**statutory** 109:10

**stay** 34:12 79:5

**STEEN** 1:12 2:11
3:6,17 5:14

**Stelcen** 11:14

**Stephen** 5:15 8:2 63:9
64:19 111:15

**stephen.tatum@texasat
torneygeneral.gov**
5:19

**STEVE** 2:12 3:7,19

**Steven** 4:11 5:14,22
168:2,17

**stick** 159:5

**sticker** 143:10

**stipend** 38:21 80:9

**stipulate** 136:15

**Stogel** 4:11 5:22
168:2,17

**stolen** 93:7

**stop** 22:14

**stopped** 17:19 92:23

**story** 55:15 140:6

**straight** 87:21,22

**strange** 18:7 38:5
145:14,15 153:3

**strategic** 17:4

**strategy** 49:7

**stray** 111:5

**Street** 4:14 5:5 36:16

**stringent** 50:7

**strong** 19:4 124:5

**students** 38:20

**studies** 88:7

**stuff** 78:14 86:20

**stymied** 92:22

**subgroupings** 125:15

**subject** 9:9,11 10:17
41:24

**submit** 142:19

**submitted** 141:13
143:4 162:6

**subpoena** 163:4,5,6

**subpoenaed** 163:3,8,9

**subpoenas** 162:14,18

**subscribed** 167:14

**substantially** 96:19
126:24

**substantiated** 29:18
30:4

**substantive** 148:15
156:5,9

**successful** 163:12

**successfully** 107:20

**sue** 69:11 70:2

**suffered** 156:23

**suffering** 10:22

**sufficient** 119:1

**suicidal** 106:15

**suit** 19:4
67:14,15,18,23
68:4,14,18,23

**Suite** 168:19

**sum** 83:8 87:16 88:17

**Summer** 17:11 33:14
80:23 86:8 87:4

**Summer's** 78:13 80:3

**Sunday** 148:12

**super** 90:10,11

**support** 59:12 60:1
75:22 76:6 108:8
109:3 118:2,14,16
158:8,9,11,12,13,19
159:2,4,9 161:15
168:18

**supported** 118:8 121:7
123:6 150:11,24
160:9

**supportive** 76:1

**supports** 158:6 160:7

**sure** 13:4 14:15
17:1,8 18:18,21,23
33:13 40:10 42:23
44:15 47:2 57:3
60:21 61:24 62:18
64:20 65:6
66:10,11,13 68:8,11
69:4 84:13 94:2
96:3,5 99:11,14
101:7 109:14,17
114:6,8 116:23
121:13 122:20 134:12
136:11 137:10 140:23
149:2 150:13 152:11
155:21 158:17 159:7
160:12 162:12

**surely** 17:14 19:1
45:7 51:3,6 57:17
61:17 102:15 111:10

112:19 118:3 135:22

**surface** 114:22

**surprise** 163:7

**surprising** 160:7

**survived** 101:16

**suspended** 137:12

**suss** 55:5

**sworn** 4:9 8:8 168:5

**sympathetic** 137:6

**systematic** 147:3

---

**T**

**table** 115:5,17,25
156:16

**tactic** 58:13
148:18,20,25 149:15
151:13 152:3,10,15
153:12 154:3,15

**tactical** 17:4
106:2,12 107:9,13
154:8

**tactically** 162:15,19

**tactics** 92:5 98:4
105:13 106:5

**takers** 159:25

**taking** 11:1 83:12
168:7

**talented** 85:6 87:7

**talk** 10:1 42:11 53:25
55:5,22 56:13,22
71:18 72:20 74:7
146:17 149:21,23,25

**talked** 56:11 58:2
59:4 66:9 69:1 78:12
92:6 101:6
110:6,9,22 112:20,22
131:3 140:8

**talking** 25:14,20
58:12,22 74:5
78:23,24,25
82:6,20,21
99:2,7,10,16,22,25

102:10 113:1 131:15
154:17

**talks** 67:12 74:4 89:3

**tangential** 49:18

**tangible** 80:18

**targeted** 117:1

**Tatum** 5:15 6:6
8:1,2,10,21 9:6
19:17 23:25 24:1
28:9,16,20,21
61:14,18,21
63:10,11,23
64:3,20,21 65:9 66:4
67:3 69:23 82:13
83:4 88:19 106:16,19
111:19,23 112:7
113:25 114:25 117:11
119:7,15,19 120:10
121:1,5,15 122:6
123:22 124:11,25
125:2 127:5,9,20
141:22 142:10,25
143:8,13 144:5,11
151:10 152:7 154:14
159:5 163:11 164:21
165:4

**tax** 144:22 145:2

**TAYLOR** 3:11

**TDP** 84:1

**team** 138:1

**teasing** 48:21

**technical** 147:13

**technically** 38:5

**television** 41:14

**ten** 11:21 127:6
147:17 149:23 153:1

**Tennessee** 13:21

**term** 77:2 112:11
153:5

**terms** 46:2 77:14
80:24 83:1,2 112:8
158:23

**territory** 23:9

**testified** 8:8 91:1
  93:25 94:7 95:6
  150:13 153:12 159:6

**testify** 20:5
  21:1,4,9,12,16,19,23
  22:1,6,9,18,21
  23:1,4,11,14,21,22
  24:5,8,12,15,19,22
  25:1,4,8,17,23
  26:1,8,11,19,22
  27:5,8,17,20
  28:4,7,13,19
  29:3,6,12,15,23
  30:1,8,11,18,21
  31:3,6 51:10 122:1
  168:5

**testimony** 25:20
  76:10,17,23 85:17
  97:10 98:17,19,20
  105:12 151:2 154:6
  158:16

**Texan** 157:11,12

**Texans** 70:24 119:8
  128:22 136:5

**Texas** 1:1,8,11,12
  2:3,6,11,12,13
  3:1,2,7,8,17,18,20
  4:12,13,14 5:2,14,18
  7:5 8:3,6,16,25
  14:4,19 20:21 22:5
  23:8 26:18 27:3,15
  28:2,25 31:14 42:11
  44:20 49:16 50:4
  52:2,7 62:14 68:22
  69:2,11 71:4 86:21
  93:7,18 94:13,15,23
  97:3,4 109:14,17
  110:1 114:15 119:22
  121:17,18 123:10,16
  124:14,15 128:23
  131:18 134:17 136:23
  137:19,21 139:6,22
  145:22,24 146:1,5
  151:21 157:7,8
  168:1,3,20

**Thank** 10:21 23:25
  120:12

**thankfully** 38:10

**Thanks** 143:11

**that's** 9:11
  11:13,17,25 13:5
  14:6 15:23 17:14
  18:2 25:16 31:14,16
  34:9 35:7,10,12
  37:3,9,17 38:9,15
  39:19 40:9 43:19
  46:11,17 47:17 48:10
  49:12 50:8 51:12,20
  53:8 54:22 57:12
  59:19 60:9 61:6
  62:11 63:5,8,17 64:2
  75:10,12,24,25
  76:14,21 80:21
  81:13,18 82:8
  84:5,15,21 87:3,10
  88:16,17 89:1 90:19
  92:2 93:21 94:16
  95:2 96:14,19,20
  98:2,5 99:21 101:9
  102:10 103:5 104:15
  107:25 108:20 110:12
  111:19 112:10,14
  114:12,24
  115:11,21,23 120:3,5
  122:2 123:1,3,21
  124:6 125:14,17,19
  126:7,10 127:5,7
  128:10 130:6 131:7
  132:8,12,17
  133:11,21,24 134:4
  138:20 140:25 141:9
  146:20 147:25 148:16
  149:25
  151:9,12,13,23
  154:9,20 155:24
  157:25 160:1,5,6
  161:16 162:11,12
  163:9 164:7

**themselves** 44:5 52:24
  54:2 55:1 65:12 68:8
  76:5 113:14 127:25
  151:16

**theoretically**
  106:11,14

**therefore** 71:3

**therein** 167:16

**thereof** 101:9

**there's** 14:5 31:22
  32:6,25 33:14 34:4
  36:11 37:21,22 38:14
  41:2 44:21
  45:14,15,16 54:3
  55:14,23 56:6 58:19
  75:1 77:12 79:2 81:3
  87:4 90:3 93:18,23
  96:20 108:11,12
  126:11 130:7 132:11
  133:8 135:13,20
  136:1 138:17,18
  139:21 140:19,24
  141:7 152:16,25
  153:1,5,7 155:5
  156:4,15 158:18
  159:14,15

**they're** 37:23 46:1
  49:20 52:25 53:1
  82:2 84:19 89:8
  90:17,18 117:13
  124:7 129:1,9 134:15
  141:11 158:8

**they've** 164:15

**thinker** 17:4

**third** 81:24 147:11

**third-party** 162:14
  163:4

**thousands** 44:15
  135:21 136:4

**three-quarters** 12:13
  18:5

**throughout** 15:16 52:8
  73:22 87:22 126:17
  133:9 138:6 161:21

**throw** 103:3

**TIC** 93:8

**ticket** 77:21 137:14

time-constrained
   102:23

timeframe 105:19

tired 154:24

title 15:24 16:7,10

titled 20:12

TLC 102:18 103:3

today 8:17 9:1,20
   10:2,20 11:1,9 12:24
   20:2,6 21:2,17 69:24
   81:7 164:3

tone 158:20

tooled 13:18

top 147:11

topic 20:19
   21:2,4,6,10,12,14,17
   ,19,21,24
   22:1,3,7,9,11,19,21,
   23 23:2,4,6,12,14,22
   24:1,6,8,10,13,15,17
   ,20,22,24
   25:2,4,9,15,18,20,24
   26:1,3,9,11,13,20,22
   ,24
   27:6,8,10,18,20,22
   28:5,7,9,10,14,17,21
   29:4,6,8,13,15,17,24
   30:1,3,9,11,13,19,21
   ,23 31:4,6 55:18

topics 23:18,19,21,23
   25:6 114:4

Torres 90:4,7 118:4

total 88:17

totally 117:4

tournament 40:25
   43:12

toward 41:19 58:18
   152:12,25

towards 46:11 53:10
   55:3,19 70:24 73:2
   77:16 79:19 80:19
   81:15,19 154:18

Tower 5:4

track 48:25 49:3,13

tracking 49:9,24

trades 84:7

traditional 71:17
   72:8 74:16

train 17:6

tranche 88:14

transactions 56:22
   72:22

transcript 146:23
   159:12 164:20 168:7

transportation
   56:13,23 72:21
   135:23

travel 54:24 73:6
   77:14,19 79:2 82:20
   137:25

TRAVIS 168:1

treasurer 33:8

tree 42:3

tremendous 41:6 61:10
   70:20 81:4 85:6
   86:11

tremendously 80:15

Trey 17:23 43:9 47:17
   48:6,9 51:13 56:9
   59:23 60:15 66:9
   69:4 74:4 82:18 87:9
   93:9 98:11 99:20
   100:8 110:9
   114:13,21 150:21

Trey's 59:14 60:14
   72:9 83:15 159:15

trial 5:10 73:6
   77:15,21 88:15
   101:18 114:14,23
   128:7,14

Tribune 110:23 119:22
   121:18 124:14

tried 92:17 106:9

117:15 136:13

trope 97:23

trouble 112:24

troubles 84:9

Troy 59:1

true 37:3 40:9 57:4
   62:9,11 63:8,17
   72:13 75:24 76:2,14
   86:3 88:16 99:21
   104:15 113:21
   114:8,12 115:13
   123:21 125:14,19
   139:5,8,12 167:3
   168:3,7

Truly 40:22

trust 19:5

truth 10:17 141:8
   168:5

truthful 20:5

truthfully 10:23
   11:2,6

try 9:17,24,25 17:8
   46:3,24 47:1,3,6
   49:8 54:12 57:24
   65:7 86:23 103:1
   105:10,12 124:4
   138:3 159:21 163:19

trying 48:4 59:19
   69:14 75:23 83:10,11
   93:22 97:6 98:5
   102:4 105:8,10 110:5
   112:19 114:5 118:10
   135:10,14 149:3,7
   157:5

turn 20:9 82:7

turned 115:10 143:20
   145:23

Twitter 60:12,14

two-day 103:17

two-thirds 82:1
   91:14,23 92:10 95:6

two-year 35:6

**TXDL** 129:22

**TXU** 43:23

**type** 93:16

**typewriting** 168:6

**typically** 43:7 103:12

---
U
---

**U.S** 5:11 9:3 130:15

**UAC** 83:13

**UACs** 71:16

**uh-huh** 9:17

**ultimate** 45:2 66:14

**umbrella** 38:17

**unable** 26:15
27:1,12,24 56:15
57:1 71:23 72:1,24
133:3,16,22
134:10,18 135:3
138:8

**unaccompanied** 71:16

**unanimity** 47:4

**uncommon** 101:13 163:2

**unconstitutional**
93:10 94:16

**understand** 9:20
10:2,4,7,8,14,16
15:19 18:18 22:16
55:4,6 96:3 137:3,5
160:14

**understanding** 20:4
141:1

**understood** 76:21
112:10

**undertake** 105:4

**undertaking** 76:9

**undoubtedly** 129:21,25

**unequally** 158:1

**unfortunate** 148:18

**unfortunately** 41:15
71:22 143:21

**unified** 35:24

**unilateral** 45:6
66:19,23

**union** 3:14 75:25

**unique** 49:16 70:12
154:8,9

**United** 1:1,7 2:1 5:8
21:8 23:8,9 69:6
70:8 165:1

**universe** 128:18
130:6,13

**universes** 126:23

**University** 13:17
119:22 121:18 124:14

**unlawful** 157:22

**unless** 10:12 15:18
42:2 94:14 116:23
139:23 144:16 158:8

**unlikely** 117:10,11
119:4 123:21 124:9

**unquote** 149:16

**unsubstantiated** 29:18
30:4

**unto** 32:16

**untwine** 80:22

**update** 71:8

**updates** 115:8

**uptick** 55:23 56:2,18
61:1

**urge** 69:10

**usually** 37:9 60:14
71:7 124:6,8
147:7,9,13,18 148:6
149:4 152:20

**UT** 13:19

**UTSA** 13:19

---
V
---

**vacation** 81:2

**vague** 66:20 113:24

117:8 127:18

**valley** 82:11

**valleys** 80:24

**variable** 42:20 46:1
125:22

**various** 33:2 41:2
49:3 51:19 53:21
58:5 59:23 60:17,24
116:17 141:14 142:15
162:5

**VEASEY** 1:3

**vendor** 16:17 38:5,7

**version** 94:11 118:14
151:20

**versions** 118:13
151:25

**via** 5:9 55:8 149:8,11

**vice** 33:8 129:17

**victim** 155:4

**video** 80:7

**videos** 80:7

**view** 94:23

**violated** 95:1

**violation** 97:4,16,17

**virtually** 93:1

**vision** 56:9,21,22
83:15 86:13,18

**voice** 31:13 35:24
47:6 72:4,19 100:15
104:13 105:11

**vote** 20:24 26:15
27:1,13,24 54:14
57:11 64:8 67:5
89:16 91:14,16,24
95:6 97:10 105:9,10
108:9,18
109:1,12,15,18
117:7,12,15 118:17
120:2,19 121:24
122:16 124:22 125:7
127:11 133:3,16,21
134:19 135:17

136:8,13
138:8,11,14,19,23,25
139:9,16 140:4,10
145:4

**voted** 87:25 88:20,24
89:25 90:4,18 104:1
118:3,4

**voter** 22:4 23:7
24:3,11,18 26:14,25
27:11,23 30:5,16
39:9 49:1,3,9,14,22
50:6,7,10,12,17
51:7,9,11,22,24
52:2,12,15,18,24
53:1,5,10,12,16
54:2,8,13,17,20,21
55:3,19
57:7,13,15,19 59:12
60:1,23,24 61:2,7
63:6,19 66:11 71:8
72:16 73:10,23
74:5,11,14 76:2,6,20
78:1,4 79:4 80:6,11
83:14,24 84:9 90:4
92:1 97:7 98:22
100:11,14 101:19,25
102:2,7 106:23
108:18
109:3,10,21,22,25
110:4,6,10,20
111:16,22
112:2,9,11,15,18,22
113:8,11,17,23
114:10,16,18,23
115:2,17,25
116:4,8,11,18 117:19
118:2,9,12,13 119:7
121:7 123:6
126:12,17 134:18
135:24 137:4 139:3,7
140:5,11 150:25
155:23

**voters** 2:3 24:25
26:5,6 29:1 53:2
54:12 57:6,8 68:22
69:3 88:9 108:9,14
109:11,15 119:24,25
120:18 121:22

122:12,14 124:21
125:5 144:9

**votes** 116:15,16

**voting** 5:10 15:1,2
41:7 45:19
46:8,11,15,16 57:2
63:20 71:2,4 73:19
74:24 79:14 80:3,8
81:25 82:1 100:8
116:21 117:12,24
135:22,25 139:1,12
145:13 157:24

**VUIDs** 133:9

---
W
---

**W-2** 16:15,16 84:14

**wait** 9:22 64:18 135:5
162:21 164:19

**waiver** 50:1,2

**waivers** 145:12

**wake** 156:15

**Wall** 161:5

**wasn't** 16:20 48:10
59:3 68:11 86:3,11
97:15 107:13 137:15
143:16 161:3

**water** 56:23 72:21

**ways** 34:21 49:17
59:25 70:18 74:2
89:4 91:6 94:5 99:8
109:4,6

**wear** 17:12,13

**week** 54:8

**weekend** 148:10

**weekly** 71:6

**weeks** 82:8 83:1,10

**weigh** 17:2,5

**weighed** 16:7,8

**welcome** 120:23

**we'll** 36:7 43:5 61:18
119:5 153:10

**well-intentioned**
160:15

**we're** 8:21 39:10
41:24 43:13 71:10,11
79:1 98:14 117:19
122:7,20 131:15
149:5 154:17

**West** 4:13 5:5 36:16

**we've** 8:22
23:17,19,24 41:6
44:14 46:5,6 51:12
54:14,16 56:12,14,25
73:4 77:10 80:11,14
83:23 84:20 114:22
151:4 162:10

**whatever** 12:23 16:17
53:1 71:3,5,9 77:4
115:6 136:14

**whatsoever** 113:10,11

**whenever** 62:14

**wherever** 54:24

**whether** 29:17 30:4
63:5 66:12 99:21
108:25 159:3

**Whitley** 5:16 9:4
106:17,18

**Whoever** 129:13

**whole** 47:7 58:2,3
92:12 96:9 138:6
146:4 156:6 161:21

**whom** 84:19 89:8 99:9

**whose** 167:14 168:9

**willing** 108:23 150:23

**Wisconsin** 49:17

**wish** 153:7

**wishes** 123:16

**wishy-washy** 98:10

**withhold** 162:9

**witness** 4:3,8 9:1
19:21 28:13 61:17
104:20 106:17 112:3

118:21 144:1 162:25
163:24 164:21 166:2
168:4,5

**woman** 117:14

**Women** 161:5

**won** 34:16

**work** 17:7 24:2 32:8
33:21 36:2 38:21
46:18,25 47:1 49:10
57:15 79:9 85:12
100:4 103:6 142:17
155:15

**worked** 16:9 32:15
47:25 49:8

**worker** 116:1,24

**working** 43:8 56:9
57:19 159:16

**works** 75:12 140:24

**world** 87:7

**worse** 157:14

**worst** 46:5

**worth** 84:2 116:22
151:15

**write** 99:7,10 100:6
101:14

**written** 23:18 25:20
55:9 94:11 99:2
135:9

**wrong** 89:22 116:20
131:19 136:14 137:8
139:6 141:6 149:12
152:4,5

**www.tec.state.tx.us**
44:21

―――――――――
                Y
―――――――――
**y'all** 11:20,23 28:10
32:8,11
40:4,7,18,20,23,24
52:11,13 54:19
114:16 127:6

**Yannis** 12:11

**Yesterday** 11:19

**yet** 8:23 52:16 84:19
124:9 136:13 140:24

**Young** 2:3 68:22 69:2

**yourself** 8:24 42:24
68:17

**you've** 8:24 20:4 34:8
48:22 93:25 94:6
121:12 135:24 137:9
144:11 164:2

―――――――――
                Z
―――――――――
**Zapata** 164:8

**zero** 83:8