IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

|  |  |
|---|---|
| MARC VEASEY, JANE HAMILTON, SERGIO DELEON, FLOYD J. CARRIER, ANNA BURNS, MICHAEL MONTEZ, PENNY POPE, OSCAR ORTIZ, KOBY OZIAS, JOHN MELLOR-CRUMLEY, PEGGY HERMAN, EVELYN BRICKNER, GORDON BENJAMIN, KEN GANDY, LEAGUE OF UNITED LATIN AMERICAN CITIZENS (LULAC), AND DALLAS COUNTY, TEXAS, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) CIVIL ACTION NO. 2:13-CV-193 (NGR) [Lead case] |
| Plaintiffs, | ) ) |
| V. | ) ) |
| RICK PERRY, GOVERNOR OF TEXAS AND JOHN STEEN, TEXAS SECRETARY OF STATE, | ) ) ) ) |
| Defendants. | ) |

**Page 2**

```
 1  UNITED STATES OF AMERICA,  )
                               )  CIVIL ACTION
 2     Plaintiffs,             )
                               )  NO. 2:13-CV-263 (NGR)
 3  TEXAS LEAGUE OF YOUNG      )  [Consolidated case]
    VOTERS EDUCATION FUND,     )
 4  IMANI CLARK, AURICA        )
    WASHINGTON, CRYSTAL        )
 5  OWENS, AND MICHELLE        )
    BESSIAKE,                  )
 6                             )
       Plaintiff-Intervenors,  )
 7                             )
    TEXAS ASSOCIATION OF       )
 8  HISPANIC COUNTY JUDGES     )
    AND COUNTY COMMISSIONERS,  )
 9  HIDALGO COUNTY, AND MARIA  )
    LONGORIA BENAVIDES,        )
10                             )
       Plaintiff-Intervenors,  )
11                             )
       V.                      )
12                             )
    STATE OF TEXAS, JOHN       )
13  STEEN, IN HIS OFFICIAL     )
    CAPACITY AS TEXAS          )
14  SECRETARY OF STATE; AND    )
    STEVE McCRAW, IN HIS       )
15  OFFICIAL CAPACITY AS       )
    DIRECTOR OF THE TEXAS      )
16  DEPARTMENT OF PUBLIC       )
    SAFETY,                    )
17                             )
       Defendants.             )
18
19
20
21
22
23
24
25
```

**Page 3**

```
 1  TEXAS STATE CONFERENCE OF   )
    NAACP BRANCHES; AND THE     )  CIVIL ACTION
 2  MEXICAN AMERICAN            )
    LEGISLATIVE CAUCUS OF THE   )  NO. 2:13-CV-291 (NGR)
 3  TEXAS HOUSE OF              )  [Consolidated case]
    REPRESENTATIVES,            )
 4                              )
       Plaintiffs,              )
 5                              )
       V.                       )
 6                              )
    JOHN STEEN, IN HIS          )
 7  OFFICIAL CAPACITY AS        )
    TEXAS SECRETARY OF STATE;   )
 8  AND STEVE McCRAW, IN HIS    )
    OFFICIAL CAPACITY AS        )
 9  DIRECTOR OF THE TEXAS       )
    DEPARTMENT OF PUBLIC        )
10  SAFETY,                     )
                                )
11     Defendants.              )
                                )
12  BELINDA ORTIZ, LENARD       )  CIVIL ACTION
    TAYLOR, EULALIO MENDEZ      )
13  JR., LIONEL ESTRADA;        )  NO. 2:13-CV-348 (NGR)
    ESTELA GARCIA ESPINOSA,     )  [Consolidated case]
14  ROXANNE HERNANDEZ, LYDIA    )
    LARA, MARGARITO MARTINEZ    )
15  LARA, MAXIMINA MARTINEZ     )
    LARA, AND LA UNION DEL      )
16  PUEBLO ENTERO, INC.         )
                                )
17     Plaintiffs,              )
                                )
18     V.                       )
                                )
19  JOHN STEEN, IN HIS          )
    OFFICIAL CAPACITY AS        )
20  TEXAS SECRETARY OF STATE;   )
    AND STEVE McCRAW, IN HIS    )
21  OFFICIAL CAPACITY AS        )
    DIRECTOR OF THE TEXAS       )
22  DEPARTMENT OF PUBLIC        )
    SAFETY                      )
23                              )
       Defendants.              )
24
25
```

**Page 4**

```
 1  ********************************************

 2              ORAL REALTIME DEPOSITION OF

 3                    BLAKE EARL GREEN

 4                      JUNE 18, 2014

 5  ********************************************

 6      ORAL REALTIME DEPOSITION OF BLAKE EARL GREEN,

 7  produced as a witness at the instance of the

 8  DEFENDANTS, and duly sworn, was taken in the

 9  above-styled and numbered cause on the 18th of May,

10  2014, from 10:03 a.m. to 3:46 p.m., before Tamara

11  Vinson, CSR in and for the State of Texas, reported by

12  machine shorthand, at the Texas Southern University,

13  3100 Cleburne Street, Dean's Conference Room, Houston,

14  Texas, 77004, pursuant to the Federal Rules of Civil

15  Procedure and the provisions stated on the record or

16  attached hereto.

17
18
19
20
21
22
23
24
25
```

**Page 5**

```
 1              A P P E A R A N C E S
```
```
 2
    FOR THE PLAINTIFF-INTERVENORS TEXAS LEAGUE OF YOUNG
 3  VOTERS EDUCATION FUND, IMANI CLARK, AURICA WASHINGTON,
    CRYSTAL OWENS, AND MICHELLE BESSIAKE:

 4      MS. DANIELLE Y. CONLEY
 5      WilmerHale
        1875 Pennsylvania Avenue, NW
 6      Washington, DC  20006
        202.663.6006 Fax 202.663.6363
 7      danielle.conley@wilmerhale.com
        - and -
 8      MR. RYAN P. HAYGOOD
 9      MS. NATASHA M. KORGAONKAR
        NAACP
10      40 Rector Street, 5th Floor
        New York, New York  10006-1738
11      212.965.7712 Fax 212.226.7592
        rhaygood@naacpldf.org
12      nkorgaonkar@naacpldf.org
13
    FOR THE PLAINTIFF UNITED STATES OF AMERICA
14      MS. ANGELA J. MILLER
        (Appearing via speaker phone)
15      Trial Attorney
        Voting Section
16      Civil Rights Division
        U.S. Department of Justice
17      202.514.2919 Fax 202.307.3961
        angela.miller5@usdoj.gov
18
19
    FOR THE DEFENDANTS THE STATE OF TEXAS, RICK PERRY,
20  JOHN STEEN AND STEVEN McCRAW:
21
        MR. STEPHEN L. TATUM, JR.
22      Assistant Attorney General
        Opinion Committee
23      P.O. Box 12548
        Austin, Texas  78711-2548
24      512.463.2110 Fax 512.472.6538
        stephen.tatum@texasattorneygeneral.gov
25
```

Blake Green - 6/18/2014

**6**

1 ALSO PRESENT:
2    Ms. Tamara Vinson, Court Reporter
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**8**

1                    EXHIBIT INDEX
                                          PAGE
2
   Exhibit No. 1......................21
3    Defendants' First Amended Notice of
     Intention to Take Oral Deposition of
4    Texas League of Young Voters Education
     Fund
5
   Exhibit No. 2......................25
6    The League of Young Voters Education Fund
     Mission and Purpose
7
   Exhibit No. 3......................30
8    The League of Young Voters Education Fund
     List of constituency
9
   Exhibit No. 4......................56
10   Voter ID Project Coalition Meeting
     tonight
11
   Exhibit No. 5......................61
12   Amended Complaint in Intervention of
     Plaintiff-Intervenors The Texas League of
13   Young Voters Education Fund, Imani Clark,
     Aurica Washington, Crystal Owens, and
14   Michelle Bessiake
   Exhibit No. 6......................80
15   LDF - Comment Under Section 5 of the
     Voting Rights Act
16
17 Exhibit No. 7......................116
     Texas Politics - Voter Identification
18   February 2011
19 Exhibit No. 8......................119
     Texas Politics - Voter Identification
20   February 2011
21 Exhibit No. 9......................122
     Texas Politics - Voter Identification
22   February 2011
23 Exhibit No. 10.....................135
     Election Protection and Access to the
24   Ballot in Texas
25

**7**

1                    INDEX
2                                   PAGE
3 Appearances...............................5-6
4
5 BLAKE EARL GREEN
6
        Examination by Mr. Tatum................9
7       Examination by Ms. Korgaonkar..........156
8
   Signature requested.......................159
9
   Reporter's Certificate....................161
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**9**



1              BLAKE EARL GREEN,
2 having been first duly sworn, testified as follows:
3                  EXAMINATION
4 QUESTIONS BY MR. TATUM:
5    Q.  Mr. Green, my name is Stephen Tatum.  I'm
6 with the Texas Attorney General's office and I'm
7 representing the State of Texas in this lawsuit.
8    Would you please state and spell your full
9 name for the record, please?
10   A.  Sure.  Blake Earl Green.  That's B-L-A-K-E,
11 E-A-R-L, and last name Green, G-R-E-E-N.
12   Q.  Thank you.
13       MR. TATUM:  At this point, I think we
14 should go around the room and make introductions.
15 We've already introduced ourselves, so we can start
16 here.
17       MS. KORGAONKAR:  Okay.  This is Natasha
18 Korgaonkar from the NAACP Legal Defense Fund on behalf
19 of the Texas League of Young Voters.
20       MS. CONLEY:  Danielle Conley from
21 WilmerHale also on behalf of the Texas League of Young
22 Voters.
23       MR. HAYGOOD:  And this is Ryan Haygood
24 of the NAACP Legal Defense and Educational Fund, also
25 with the Texas League of Young Voters.

Blake Green - 6/18/2014

10

1     MS. MILLER:  And on the phone, I'm
2  Angela Miller from the U.S. Department of Justice.
3     MR. TATUM:  Thank you, everybody.
4     Q.  (By Mr. Tatum)  Mr. Green, are you
5  represented by counsel today?
6     A.  Yes.
7     Q.  And who is that?
8     A.  It's Natasha Korgaonkar with LDF, Ryan
9  Haygood with LDF, as well.  And, also, Danielle Conley
10  with WilmerHale.
11    Q.  Mr. Green, have you ever been deposed before?
12    A.  No.
13    Q.  Okay.  Well, I'm going to go over some --
14  some ground rules that will control this deposition.
15  First and foremost, I will be asking you some
16  questions.  And I ask that you give me verbal answers
17  to those questions for the court reporter, so she can
18  get a clean record.  This means, you know, please do
19  not shake your head or nod your head for
20  "yes."  Just say "yes" or "no."
21       On that note, I'll ask that you please let me
22  finish my question before you begin your answer and
23  I'll try to do the same for you.  Again, this is for
24  the court reporter, so she can get an accurate
25  transcription of everything that's said here today.

11

1       Probably easier said than done, it's possible
2  that we may talk over each other at some point, but
3  I'd just ask that we do our best to let each other
4  finish before speaking.  Do you understand?
5     A.  Yes.
6     Q.  Okay.  If you don't understand a question or
7  you didn't hear it clearly or you need it repeated,
8  please say so.  I'll rephrase it, I'll repeat it, do
9  whatever I can to make you -- make sure you understand
10  the question that I'm asking you.  Okay?
11    A.  Okay.
12    Q.  Now, there may be times today when your
13  attorney may object to a question that I ask.  At that
14  point, I'll still need you to answer the question
15  unless your attorney specifically instructs you not to
16  answer.  Do you understand?
17    A.  Yes.
18    Q.  Okay.  Now, you understand that you're under
19  oath, which means that you must answer all my
20  questions truthfully or risk the penalty of perjury.
21  Do you understand?
22    A.  Yes.
23    Q.  Okay.  Mr. Green, how are you feeling today?
24    A.  Good.
25    Q.  Are you suffering from any illness that would

12

1  prevent you from providing accurate and truthful
2  answers to my question?
3     A.  No.
4     Q.  Are you taking any medications that would
5  affect your ability to provide accurate and truthful
6  answers to my questions?
7     A.  No.
8     Q.  Is there anything else that might prevent you
9  from answering my questions truthfully and accurately
10  today?
11    A.  No.
12    Q.  Mr. Green, I want to talk about -- just get
13  some general background information from you.  Where
14  were you born?
15    A.  Here in Houston.
16    Q.  In Houston.  And when were you born?
17    A.  In 1983.
18    Q.  So that makes you thirty-one?
19    A.  It will make me thirty-one at the end of this
20  year, correct.
21    Q.  And where do you reside here in Houston?
22    A.  In terms of neighborhood?
23    Q.  Yes, sure.
24    A.  Medical Center.
25    Q.  Okay.  Do you have any brothers or sisters?

13

1       MS. KORGAONKAR:  Objection as to
2  relevance.  You can answer.
3     A.  Yes.
4     Q.  (By Mr. Tatum)  Okay.  Mr. Green, where did
5  you go to school?
6     A.  Texas Southern University.
7     Q.  And did you attend graduate school after
8  that?
9     A.  I did.
10    Q.  And where did you attend graduate school?
11    A.  Texas Southern University.
12    Q.  Okay.  And what degree did you attain in
13  graduate school?
14    A.  M.B.A., Master of Business.
15    Q.  Mr. Green, what was your first job after
16  school?
17    A.  I don't remember.  After my -- after which --
18  which degree?
19    Q.  After you received your M.B.A.
20    A.  After my M.B.A., I -- after my M.B.A. --
21  after my M.B.A., I -- after my M.B.A. -- and that was
22  back in 2008.  Correct?  Okay.
23    Q.  If you don't recall, that's okay.
24    A.  No.  I recall.  I'm trying to remember.  It's
25  -- it was -- it was here, uh-huh.

Blake Green - 6/18/2014

14

1   Q.   Here at Texas Southern University?
2   A.   Correct, uh-huh.
3   Q.   And what was that job?
4   A.   I managed their executive M.B.A. program.
5   Q.   And how long did you do that for?
6   A.   I think about -- about -- about -- about two
7   years.
8   Q.   And what did you do after your job at Texas
9   Southern University?
10   A.   I joined the League of Young Voters.
11   Q.   And what year was that?
12   A.   2010.
13   Q.   So are you employed with the Texas League of
14   Young Voters?
15   A.   Were I employed?
16   Q.   Are you currently employed with the Texas
17   League of Young Voters?
18   A.   Yes.
19   Q.   And I'll just say right now, for the rest of
20   this deposition, I'll probably just refer to the Texas
21   League, if that's okay.
22   A.   That's fine.
23   Q.   It's kind of a long name and it just can get
24   a little marble-mouthed.  So just for simplification
25   purposes, when I say the "Texas League," I'm referring

15

1   to the Texas League of Young Voters.
2   A.   Uh-huh.
3   Q.   Okay.  So you're currently employed with the
4   Texas League.  Correct?
5   A.   Correct.
6   Q.   And what is your title at the Texas League?
7   A.   Deputy state director.
8   Q.   And how long have you held that position?
9   A.   Since 2010.
10   Q.   Since 2010.  Is that a paid position?
11   A.   Yes.
12   Q.   Is that full-time position?
13   A.   Yes.
14   Q.   Are you based here in Houston?
15   A.   Yes.
16   Q.   What are your official duties and
17   responsibilities as deputy state director of the Texas
18   League?
19   A.   I assist the state director with the vision
20   and -- with the vision and goals for the organization,
21   as well as manage the operations and the -- the
22   efficiency of our programs.
23   Q.   When you say assist in the vision -- I
24   believe that's what you said -- what exactly does that
25   entail?

16

1   A.   Just looking at where the -- where the -- you
2   know -- where the organization want to go long term,
3   just looking at -- you know -- you know -- the
4   programs we want to implement and how to go about
5   doing it.
6   Q.   And who do you report to?
7   A.   Our state director.
8   Q.   And who is that?
9   A.   Christina Sanders.
10   Q.   And you report directly to her?
11   A.   Yes.
12   Q.   Do you interact with her on a daily basis?
13   A.   Yes.
14   Q.   Do you manage anyone?
15   A.   Do I manage anyone?
16   Q.   Are you in charge of managing the
17   employment of anyone below you?
18   A.   Yes.
19   Q.   And how many people do you manage?
20   A.   Three.
21   Q.   Three?
22   A.   (No verbal response.)
23   Q.   And who are those people?
24   A.   Arianna Williams, Raymonda Mack, as well as
25   Nyree Mack.

17

1   Q.   Could you spell that last name, please?
2   A.   Mack, M-A-C-K.
3   Q.   And what was the first name?
4   A.   Nyree, N-Y-R-E-E.
5   Q.   So those three people, they report directly
6   to you.  Correct?
7   A.   Correct, uh-huh.
8   Q.   Could you describe a typical day at the Texas
9   League in your role as deputy state director?
10   A.   A typical day would be meeting with staff,
11   you know, looking at what's -- what's ahead for the
12   day, and then going about making sure we do everything
13   necessary to execute the day's activities.
14   Q.   Are you involved in any kind of budgeting or
15   resource allocation decisions within the Texas League?
16   A.   In some capacity, yes.
17   Q.   Okay.  And what capacity is that?
18   A.   I mean, just as state director -- I mean, as
19   deputy state director, you know, I have some -- some
20   -- some -- some oversight of it with the state
21   director, as well.
22   Q.   Is there -- would you say that the state
23   director -- Christina Sanders.  Correct?
24   A.   Correct.
25   Q.   -- and yourself and the three people you

18

1 manage, do you all comprise some sort of -- is that
2 some sort of executive committee of the Texas League
3 or is there an executive committee of the Texas
4 League?
5    A.  Executive committee, no.
6    Q.  So how is -- who else, besides the people
7 we've already named, are involved in major decisions
8 affecting the operations of the Texas League?
9    A.  In major decisions?
10    Q.  Yes.
11    A.  Well, we have an national organization that
12 -- that we -- I mean, that we speak to in terms of our
13 -- our finances and budget.
14    Q.  And do you interact with the national
15 organization on a daily basis?
16    A.  Yes.
17    Q.  Mr. Green, do you vote?
18    A.  I do.
19    Q.  When was the last time you voted?
20       MS. KORGAONKAR:  Objection as to
21 relevance.  And I'd just like to state for the record
22 that this is a 30(b)(6), so he's here to testify on
23 behalf of the League, as opposed to himself.
24    Q.  (By Mr. Tatum)  Okay.  You may answer the
25 question.

19

1    A.  The last time I voted was in the May -- I
2 believe, the May primary.
3    Q.  Okay.  Have you ever been unable to vote?
4       MS. KORGAONKAR:  Same objection, but you
5 can answer the question.
6    A.  No, not that I'm aware of.
7    Q.  (By Mr. Tatum)  Okay.  Mr. Green, what did
8 you do to prepare for this deposition today?
9    A.  I had meetings with my counsel.
10    Q.  Are those counsel in the room here today?
11    A.  Correct.
12    Q.  And when did you met with them?
13    A.  I met with them on several occasions.
14    Q.  And when was the last time you met with them?
15    A.  The last time I met with them?
16    Q.  Yes.
17    A.  Today.
18    Q.  And for how long was that?
19    A.  For about an hour.
20    Q.  And you said several occasions.  What were
21 the previous occasions that you met with your counsel
22 here today in preparation for this deposition?
23    A.  The previous occasions, we met yesterday and
24 on several different occasions for the past, I guess,
25 couple of weeks.

20

1    Q.  So about how long did you spend preparing for
2 this deposition?
3    A.  How -- specifically how long, I don't -- I
4 don't recall.  In terms of time, I don't recall.
5    Q.  How long was your meeting with counsel
6 yesterday?
7       MS. KORGAONKAR:  Mr. Green, I'll caution
8 you to answer this question, but to not reveal the
9 contents of any conversations that you may have had
10 with any counsel in this case.  You can answer this
11 question.
12    A.  Periodically throughout the day.
13    Q.  (By Mr. Tatum)  I'm sorry?
14    A.  Periodically throughout the day.
15    Q.  That was yesterday?
16    A.  Yes.
17    Q.  Did you meet with counsel on Monday?
18    A.  On Monday?  Today is Wednesday.  Monday, I
19 don't believe so.
20    Q.  Did you meet or confer with anyone else
21 besides the counsel here in this room today in
22 preparation for this deposition?
23    A.  No.
24    Q.  Did you review any documents in preparation
25 for this deposition?

21

1    A.  In terms of a notice, I reviewed the notice.
2    Q.  Did you review any other documents?
3    A.  Any other documents?  No, not that I can
4 recall.
5    Q.  So, in preparation for this deposition, you
6 only reviewed the notice?  And by that I mean the
7 30(b)(6) notice.
8    A.  Correct.
9    Q.  Okay.  Did you bring any documents with you
10 today?
11    A.  No.
12    Q.  Is there anything else you did to prepare for
13 this deposition that you have not already mentioned?
14    A.  Not that I can recall, no.
15    Q.  Okay.
16       MR. TATUM:  I just mark one of these.
17 Right?
18       THE REPORTER:  Yes.
19       MR. TATUM:  Okay.
20       (Exhibit No. 1 marked.)
21    Q.  (By Mr. Tatum)  Mr. Green, I'm handing you
22 what's been marked as Exhibit 1.
23       MR. TATUM:  You probably already have a
24 copy of it, but here's another one.  (Tendering
25 document to Ms. Korgaonkar.)

22

1    Q.  (By Mr. Tatum)  If you would, please, take a
2  minute to skim over it.
3    A.  Uh-huh.
4    Q.  Mr. Green, do you recognize this document?
5    A.  Yes.
6    Q.  And what is this document?
7    A.  It is a deposition notice.
8    Q.  And you stated a minute ago that you reviewed
9  this notice in preparation for this deposition.
10  Correct?
11   A.  Correct.
12   Q.  If you would please turn to Page 5.
13   A.  (Complying.)
14   Q.  Are you at Page 5?
15   A.  Yes.
16   Q.  Okay.  At the bottom of that page there's a
17  heading that says Matters, and following that heading
18  there is a series of numbered paragraphs from 1 to 31.
19  Is that correct?
20   A.  That is correct.
21   Q.  Okay.  Are you aware that you've been
22  designated by the Texas League of Young Voters to
23  testify and give binding answers on its behalf
24  regarding the topics contained in these paragraphs?
25   A.  Yes.

23

1       MS. KORGAONKAR:  I'd just like to note
2  for the record that we filed objections to this
3  notice.
4       MR. TATUM:  Uh-huh.
5       MS. KORGAONKAR:  And I'm sure that
6  counsel has those objections.  I'd also like to note
7  that topics 3 through 6 pertain to the identity of
8  members and that that's been resolved by stipulation
9  through counsel.
10   Q.  (By Mr. Tatum)  And, Mr. Green, what she's
11  referring to is a statement made that the Texas League
12  of Young Voters is not a membership organization and,
13  therefore, does not have any kind of membership list.
14  Is that your understanding?
15   A.  It is.
16   Q.  Is that a correct statement?
17   A.  Yes.
18   Q.  Okay.
19       MS. KORGAONKAR:  And sorry.  Just for
20  the record, also, topic 24 is affected by that
21  stipulation, as well.
22       MR. TATUM:  Okay.
23       MS. KORGAONKAR:  It's 3 through 6 and
24  24.
25       MR. TATUM:  All right.

24

1    Q.  (By Mr. Tatum)  Just to confirm one more time
2  just so we have it on the record, Mr. Green, is it
3  your understanding that you are not prepared to
4  testify to topics 3 through 6 and topic 24 because the
5  Texas League is not a membership organization and does
6  not, therefore, contain any lists of its members?
7    A.  Correct.
8    Q.  Okay.  Mr. Green, other than those topics
9  that we just discussed, are you aware that you've been
10  designated by the Texas League to give truthful and
11  binding answers on its behalf regarding all of the
12  other topics contained in these paragraphs?
13   A.  That's correct.
14   Q.  Okay.  And are you prepared to testify about
15  those topics?
16   A.  Yes.
17   Q.  Okay.  And you kind of already said this, but
18  are there any other topics on this list that you're
19  not prepared to testify to?
20   A.  No.
21   Q.  Okay.  I want to ask you some questions, some
22  general questions about the Texas League.  How long
23  has it be in existence?
24   A.  Since 2010.
25   Q.  And just generally, how was it formed?

25

1    A.  How was it formed?
2    Q.  Yeah.  How was -- who -- who initiated the
3  process that brought the Texas League into existence?
4  Who was involved in that process?
5    A.  It was our current state director and the
6  international organization.
7    Q.  So you said it was in 2010 is when the Texas
8  League was formed?
9    A.  Correct.
10   Q.  Okay.  And it is an affiliate of the national
11  organization?
12   A.  That's correct.
13   Q.  Okay.
14       (Exhibit No. 2 marked.)
15   Q.  Mr. Green, I'm handing you what's been marked
16  as Exhibit 2.
17   A.  Uh-huh.
18   Q.  I represent to you that this document has
19  been produced to Defendants in this litigation.  Do
20  you recognize this document?
21   A.  I do.
22   Q.  And what is this document?
23   A.  It is our mission and purpose of the
24  organization.
25   Q.  So this is the stated mission of the Texas

Blake Green - 6/18/2014

26

1 League of Young Voters. Correct?
2    A.   That's correct.
3    Q.   Is this mission started by the national
4 organization?
5    A.   Correct.
6    Q.   Okay. Does the Texas League operate for
7 profit?
8    A.   For profit, no.
9    Q.   So it is a nonprofit organization?
10   A.   Correct.
11   Q.   And how is it -- where does it get its
12 funding?
13   A.   From foundations, as well as from individual
14 donors.
15   Q.   What kind of foundations provide funding to
16 the Texas League?
17         MS. KORGAONKAR: Objection as to
18 relevance.
19   A.   The kind of foundations, those that are --
20 those that are -- who are socially responsible and who
21 support the work of increasing civic participation
22 here in this country.
23   Q.   (By Mr. Tatum) Can you give examples of some
24 of the organizations that provide funding to the Texas
25 League?

27

1         MS. KORGAONKAR: Same objection, but you
2 can answer.
3    A.   In terms of names or. . .
4    Q.   (By Mr. Tatum) Yes.
5    A.   We have the Ford Foundation, Open Society
6 Institute -- well, Open Society Foundation. And those
7 are the pretty much the extent.
8    Q.   You said the other source of funding is
9 individual donations. Correct?
10   A.   Correct.
11   Q.   Are there any other sources of founding that
12 the Texas League receives?
13   A.   Other sources of funding besides -- besides
14 -- we do receive some allocation from our national
15 organization.
16   Q.   Is that funding from the national
17 organization, is that received on an annual basis?
18         MS. KORGAONKAR: Objection, again, as to
19 relevance. And I think that this whole line is
20 actually beyond the scope of the notice, but you can
21 answer this question.
22   A.   Yes.
23   Q.   (By Mr. Tatum) Do y'all conduct any kind of
24 fundraising activities?
25   A.   Fundraising activities? To a certain extent,

28

1 yes, uh-huh.
2    Q.   And what kinds of activities are those?
3    A.   Making -- really just making calls to our --
4 to donor bases.
5    Q.   Within the Texas League, who decides -- and
6 you kind of touched on this earlier -- who decides how
7 its funds are used?
8         MS. KORGAONKAR: Objection. This is
9 beyond the scope of the notice, but you can answer.
10   A.   It's pretty much a joint -- a joint -- a
11 joint decision between myself and the state director.
12   Q.   (By Mr. Tatum) It's a joint decision --
13         (Reporter interruption.)
14   Q.   (By Mr. Tatum) And I'll try to slow down, as
15 well. Now, we've already talked about how the Texas
16 League is not a membership organization. Who does the
17 Texas League serve?
18   A.   We serve a constituent -- a constituent base
19 of people who has volunteered with us, either took an
20 action or signed a -- signed a pledge -- a pledge to
21 vote card.
22   Q.   So just to kind of repeat what you said, is
23 it correct -- so you have constituents. Is that
24 correct?
25   A.   Correct.

29

1    Q.   And one becomes a constituent by -- or can
2 you explain again how one becomes a constituent of the
3 Texas League?
4    A.   Right. One becomes a constituent by either,
5 you know, volunteering with our organization, you
6 know, attending an event of some sort, you know,
7 signing a pledge card after, you know, registering
8 them to vote or if they, in particular, took a
9 specific action with our organization.
10   Q.   And what kind of specific action are you
11 talking about or can you give an example of a specific
12 action?
13   A.   Right. They may have signed a petition of
14 some sort.
15   Q.   Okay. Does the Texas League maintain any
16 kind of list of constituents that you just described?
17   A.   We do, uh-huh.
18   Q.   Does the Texas League actively recruit new
19 constituents?
20         MS. KORGAONKAR: Objection for
21 vagueness. I don't know what you mean by "recruit."
22         THE WITNESS: Right.
23   Q.   (By Mr. Tatum) Does the Texas League
24 actively try to accumulate new constituents?
25   A.   Our main target is people between the ages of

30

1  eighteen and thirty-five.  And, you know, there are
2  several opportunities in which people can become part
3  of our organization.  And those ways are those ways,
4  in particular.
5      Q.  Okay.  So you mentioned that the Texas League
6  does keep a list of constituents that is served by the
7  Texas League.  Correct?
8      A.  Correct.
9      Q.  Do you know if that list has been produced in
10  this litigation?
11      A.  It has.
12      Q.  Okay.
13          (Exhibit No. 3 marked.)
14      Q.  All right.  Mr. Green, I'm handing you what
15  has been marked as Exhibit 3.  Now, it doesn't have
16  the Bates number at the bottom, because this was
17  printed off an Excel spreadsheet, but I represent to
18  you that -- and to you, Natasha -- that this is Bates
19  No. 00000900.  I also represent to you that this is a
20  partial printout --
21      A.  Okay.
22      Q.  -- of that document because it contains over
23  7,000 names on it, I believe, and I didn't want to
24  spend that kind of paper.
25          MS. KORGAONKAR:  And Stephen, just for

31

1  the sake of the record, that's with the prefix LYV.
2  Is that right?
3          MR. TATUM:  Correct.
4          MS. KORGAONKAR:  Okay.
5      Q.  (By Mr. Tatum)  Mr. Green, do you recognize
6  this document?
7      A.  I do.
8      Q.  And, again, this was in an Excel spreadsheet,
9  so it doesn't have the grid lines or anything like
10  that.  What is this document?
11      A.  This is a list of our constituency.
12      Q.  And who compiles this list?  Is there any
13  specific person who's responsible for compiling this
14  list?
15      A.  I mean, there are several ways in which you
16  can be added to this list.  Some of them is through
17  data entry.  And then the other is through -- that's
18  -- it's pre-populated through -- through either our
19  website or any other electronic form.
20      Q.  So when various people, again, in the target
21  area that you mentioned, which was eighteen to
22  thirty-five.  Correct?
23      A.  (No verbal response.)
24      Q.  When various people volunteer for the Texas
25  League or they participate in an action of the Texas

32

1  League or any of the other ways that one becomes a
2  constituent that you already mentioned, is their name
3  then placed on this list or another list like it?
4      A.  Yes.
5      Q.  Okay.  So I mentioned that this document had
6  over 7,00 names.  I can't remember the exact number.
7  Would you say that that number represents the total
8  constituency of the Texas League?
9      A.  It represents the constituency of the Texas
10  League, in terms of those who have taken action.  But,
11  you know, we represent all young people between that
12  age range of eighteen to thirty-five here in the State
13  of Texas.
14      Q.  Does the Texas League represent the interests
15  of these constituents in joining this lawsuit?
16          MS. KORGAONKAR:  Objection.  Calls for a
17  legal conclusion.  He's not an attorney.  You can
18  answer the question.
19      A.  We represent young people statewide, you
20  know, between the -- between the age range I
21  specified.
22      Q.  (By Mr. Tatum)  So it's those people on whose
23  behalf the Texas League joined this lawsuit.  Is that
24  correct?
25          MS. KORGAONKAR:  Same objection.  That

33

1  calls for a legal conclusion.
2      Q.  (By Mr. Tatum)  I'll rephrase the question.
3  Why did the Texas League join this lawsuit?
4      A.  We joined this lawsuit because it poses a
5  burden to certain populations.  And one of those key
6  populations is young people, particularly those in
7  communities of color.  And it also puts a burden on
8  our organization as a whole, as well.
9      Q.  We'll talk about that a little bit later.  Do
10  you know if any Texas League constituents attempted to
11  intervene in this lawsuit on their own?
12          MS. KORGAONKAR:  Objection.  Calls for a
13  legal conclusion, but you can answer that.
14      A.  I don't know.
15      Q.  (By Mr. Tatum)  So is it the Texas League's
16  contention that they are not representing the
17  interests of any of its constituents in joining this
18  lawsuit?
19          MS. KORGAONKAR:  Objection.  That also
20  calls for a legal conclusion.
21      A.  Restate the question or rephrase the
22  question.
23      Q.  (By Mr. Tatum)  Sure.  Does the Texas League
24  contend that it is not representing the interests of
25  any of its constituents in joining this lawsuit?

Blake Green - 6/18/2014

34

1        MS. KORGAONKAR:  Same objection.
2        A.  We're actually representing, you know, young
3   people who are most affected by this law.
4        Q.  (By Mr. Tatum)  Are you aware that the United
5   States of America is a party to this lawsuit?
6        A.  United States of America, in terms?
7        Q.  The United States of American represented by
8   the Department of Justice, are you aware that they are
9   a party to this lawsuit?
10       A.  I am aware.
11       Q.  Okay.  Does the Texas League contend that the
12  interests of the Texas League are not adequately
13  represented by the United States in this lawsuit?
14       MS. KORGAONKAR:  Objection.  Calls for a
15  legal conclusion.  You can answer the question.
16       A.  I would say the Texas League could provide
17  more clarity in this particular space in terms of how
18  young people are affected.  And with that conclusion,
19  that information could be beneficial to the Department
20  of Justice.
21       Q.  (By Mr. Tatum)  So is it the Texas League's
22  objective in this lawsuit to provide clarity regarding
23  the issues that are central to this lawsuit?
24       A.  Well, we can provide a more so "on the
25  ground" representation on how this law has impacted

35

1   certain populations that this law affect.
2        Q.  And does the Texas League feel that it can
3   provide that representation to a better degree than
4   the United States of America represented by the
5   Department of Justice?
6        A.  I believe so.
7        Q.  And why do you believe so?
8        A.  Because we're on the ground doing the work
9   and we -- we have firsthand account on how this law,
10  you know, directly impacts people here in Texas.
11       Q.  How was the decision made to join this
12  lawsuit by the Texas League?
13       MS. KORGAONKAR:  Mr. Green, I'll just
14  caution you here that you can answer the question, but
15  not reveal the contents of any conversations that you
16  may have had with attorneys.
17       THE WITNESS:  Uh-huh.
18       MS. KORGAONKAR:  You can answer the
19  question.
20       A.  How do we make this decision?
21       Q.  (By Mr. Tatum)  Just generally describe the
22  process that led to the Texas League intervening in
23  this lawsuit without divulging any privileged
24  information.
25       A.  Our state director met with counsel.

36

1        MS. KORGAONKAR:  And I'll just caution
2   you --
3        THE WITNESS:  Uh-huh.
4        MS. KORGAONKAR:  -- that you can say
5   that, but not reveal any of the contents of
6   conversations.
7        THE WITNESS:  Uh-huh.
8        Q.  (By Mr. Tatum)  Mr. Green, I'll ask some more
9   direct questions.  So you mentioned that the state
10  director, Ms. Sanders, met with counsel.  Correct?
11       A.  Correct, uh-huh.
12       Q.  Were you present at that meeting?
13       A.  Were I present?  No.
14       Q.  Was anyone else present at that meeting?
15       A.  I don't recall.
16       Q.  Do you know if the Texas League met with any
17  other organizations to discuss the possibility of
18  joining this lawsuit?
19       A.  I don't know.  I don't think so.
20       Q.  Do you know if the Texas League met with any
21  other parties to this lawsuit to discuss the
22  possibility of joining this lawsuit?
23       A.  Parties, no.
24       Q.  Was there any kind of vote taken to determine
25  whether the Texas League would join this lawsuit?

37

1        A.  No.
2        Q.  So would you say it was a unilateral decision
3   by the state director to join this lawsuit?
4        MS. KORGAONKAR:  Objection.  That
5   mischaracterizes his testimony.
6        A.  Right.  I mean, we -- I mean, there were some
7   conversations with our national office and that's
8   pretty much it, uh-huh.
9        Q.  (By Mr. Tatum)  So who made the ultimate
10  decision for the Texas League to join in lawsuit?
11       A.  The ultimate decision was our state director.
12       Q.  Okay.  I want to go back to talking a little
13  bit about the activities of the Texas League, just
14  general activities.
15       A.  Uh-huh.
16       Q.  What -- could you describe the primary
17  general activities that the Texas League conducts?
18       A.  Sure.  We do voter registration, we do voter
19  education, we do what we call Get Out the Vote, and
20  also leadership training.
21       Q.  This just occurred to me that these might be
22  listed on the mission statement that I gave to you
23  previously.
24       A.  Uh-huh.
25       Q.  I believe on that document, if you have it --

38

1  do you have it in front of you?
2  A.  Uh-huh.
3  Q.  It says that our organizing and programming
4  model can be categorized in the following key areas:
5  Voter registration, Get Out the Vote, which you
6  mentioned, Voter Education and Issue Advocacy,
7  Election Protection, and Leadership Development.
8  Are those all activities of the Texas League?
9  A.  Correct.
10  Q.  Okay.  And in the course of carrying out
11  these activities, how does the Texas League
12  communicate with its constituents to let them know
13  about the activities or to organize them?
14  A.  I mean, we do it in a variety of ways.  One
15  of them is through -- you know -- through e-mails,
16  through text messages, social media, you know,
17  visiting campuses.
18  Q.  And how many different campuses do y'all
19  visit?
20  A.  I mean, I don't recall the number, but I
21  know, statewide, it's -- it's over -- it's over 25
22  different -- different campuses.
23  Q.  Throughout the state?
24  A.  Throughout the state, uh-huh.
25  Q.  What kinds of resources are devoted to these

39

1  activities?
2  A.  What do you mean, "kinds of resources"?
3  Q.  What kind of monetary financial resources are
4  devoted to these activities?
5  A.  I don't think I under -- I clearly don't
6  understand what you're -- what you're asking.
7  Q.  Do you have to pay -- like, what do you have
8  to pay for to carry out these activities?  Do you have
9  to pay for fliers?  Do you have to pay people's
10  salaries, pay volunteers, that kind of thing?
11  A.  Right.  We have -- we have -- we pay for
12  salaries, we pay for the cost to put on the program,
13  gas, print collateral, advertising.
14  Q.  Does the Texas League conduct any of these
15  activities in connection with any other organizations
16  in the State of Texas?
17  A.  What do you mean?  I don't understand the
18  question.  What do you mean, "in connection"?
19  Q.  Do you conduct these activities with any
20  other organization?
21  A.  We do collaborations, yes.
22  Q.  With what organizations?
23  A.  Some include the Texas Organizing Project,
24  Mi Familia Vota, Rock the Vote.  Pretty much those
25  that serve our -- our population, as well.  Well,

40

1  Texas Freedom Network.  Those who are -- who have
2  youth components that we work with, uh-huh.
3  Q.  Do y'all do any work with the Texas NAACP?
4  A.  We do -- we do some work, uh-huh.
5  Q.  And what kind of work is that?
6  A.  Pretty much around election protection.
7  Q.  And what exactly does election protection
8  entail?
9  A.  Well, election protection, I know they have a
10  1-800 number that people if people at the polls have,
11  you know, a problem or issue, they can call that
12  number.  And the NAACP will have people on the other
13  end that receives those -- or they have attorneys who
14  receive those -- that information and, I guess, try to
15  get those issues resolved.  And the only thing we do,
16  we just provide that number as a resource to our
17  constituent base if they were to have any problems at
18  the polls.
19  Q.  So what -- you kind of described what the
20  Texas NAACP does, in terms of election protection.
21  What does the Texas League of Young Voters do in
22  regards to election protection?
23  A.  Right.  We just refer them to that number.
24  Q.  You just refer them to that number?
25  A.  Uh-huh.

41

1  Q.  That's the extent of the Texas League
2  activities with regard to election protection?
3  A.  I mean, we do poll monitoring.
4  Q.  Poll monitoring?
5  A.  Uh-huh.
6  Q.  And what does that entail?
7  A.  Poll monitoring is, you know, if someone have
8  a problem at the polls, they will come to us.  And,
9  you know, we'll listen to what their issue is and, you
10  know, refer them to an agency or organization that
11  could -- that could assist with them.
12  Q.  Are there any other activities related to
13  election protection that the Texas League engages in?
14  A.  Being a voice for them and, you know, in
15  similar cases like this, you know, legal challenges,
16  but those are pretty much to the extent.
17  Q.  Does the Texas League engage in any kind of
18  policy or advocacy work with regard to legislation
19  that's being proposed during any session of the
20  legislature?
21  A.  Yes.
22  Q.  And what kind of work do they do in that
23  regard?
24  A.  Anything particularly that deals with youth
25  voting or voting rights.

Blake Green - 6/18/2014

42

1   Q.   Does the Texas League provide live or written
2   testimony during the consideration of legislation that
3   affects youth voting?
4   A.   Yes, uh-huh.
5   Q.   And who provides that testimony?
6   A.   It's generally our state director.
7   Q.   Have you ever provided such testimony?
8   A.   No.
9   Q.   Do you have any experience at the
10  legislature?
11  A.   (No verbal response.)
12  Q.   Let me clarify that.  Have you ever worked at
13  the legislature?
14  A.   I have.
15  Q.   And when was that?
16  A.   It was back in 2006, I believe.
17  Q.   So this was after your grad degree, but
18  before you joined the Texas League?
19  A.   Correct.
20  Q.   And who did you work for?
21  A.   I worked for a member of the Texas House of
22  Representatives.
23  Q.   And what member was that?
24  A.   Hubert Vo.
25  Q.   I'm sorry?

43

1   A.   Hubert, Hubert Vo.  Last name V-O.
2   Q.   Hubert Vo?
3   A.   Hubert Vo, uh-huh.
4   Q.   And he was a state representative?
5   A.   He was.
6   Q.   And how long did you work for him?
7   A.   It was an internship, so I would say -- to
8   the extent that I can recall, I would say about six
9   months.  About six months to a year.
10  Q.   And that was in 2006?
11  A.   As I can recall, yes.
12  Q.   Did that period of time that you were an
13  intern cover the 2007 legislature?
14  A.   No, I don't think so.  I think it was the
15  interim, uh-huh.
16  Q.   So you were talking about the activities that
17  the Texas League engages in with regard to legislation
18  that might affect its constituency.  You talked about
19  testimony given during the legislature.  Is there
20  anything else that the Texas League does in connection
21  with legislation that affects its constituency?
22  A.   No.  That's pretty much to the extent.
23  Q.   Do y'all conduct any polls of your own?
24  A.   No.
25  Q.   Do you conduct any studies of your own?

44

1   A.   We don't.
2   Q.   Can you describe the Texas League's
3   activities related to voter ID legislation that's been
4   proposed or enacted since 2004?
5   A.   Sure.  We joined a coalition where we
6   developed the "Got ID" campaign, which was an
7   educational campaign.
8       We visited a number of colleges and
9   universities to educate student voters on the new law,
10  as well as train student leaders.
11      We co-hosted community forums, community
12  events, in addition to host -- well, co-hosting a
13  voter ID clinic -- voter ID clinic.
14      We made phone calls, you know, to our, you
15  know, new and existing constituent base to make sure
16  that they are aware of the new law.
17      We monitored polling locations on election
18  day and during the early voting period to make sure
19  that people were aware before they stood in line that
20  they had to present some form of ID.
21      And on occasions, we did take a couple people
22  to the polls -- I mean, to the -- to obtain their --
23  to obtain an EIC.
24  Q.   So, for the more general activities that you
25  just described, has the Texas League been engaged in

45

1   those kind of activities since 2004 with regard to any
2   voter ID legislation?
3   A.   Did you say before 2004?
4   Q.   No.  Since 2004.
5   A.   Okay.  What's the question again?  I'm sorry.
6   Q.   You talked -- you mentioned a bunch of
7   activities there.  And I think some of the things you
8   mentioned were kind of more specific to SB 14.
9   A.   Uh-huh.
10  Q.   And my question was kind of generally about
11  any voter ID legislation since 2004.  And so you
12  talked about various clinics and workshops.  Is that
13  the kind of thing that the Texas League has done in
14  connection with voter ID legislation going all the way
15  back to 2004?
16      MS. KORGAONKAR:  Objection.  That's
17  compound.  I think if you maybe break it down.  It's a
18  little confusing.
19      MR. TATUM:  Sure.
20  Q.   (By Mr. Tatum)  The activities you just
21  described, are those activities that the Texas League
22  has engaged in with regard to -- generally, with
23  regard to voter ID legislation going back to 2004?
24  A.   No.
25      MS. KORGAONKAR:  Objection.  It's still

46

1  compound.
2          MR. TATUM:  Okay.
3          MS. KORGAONKAR:  I just want to make
4  sure.
5          MR. TATUM:  Yeah.
6     Q.  (By Mr. Tatum)  Okay.  Mr. Green, has the
7  Texas League conducted educational campaigns regarding
8  voter ID legislations going back to 2004?
9     A.  Prior to the enactment of SB 14?
10    Q.  Yes.
11    A.  As relates to voter ID, no.
12    Q.  Prior to the enactment of SB 14, did the
13  Texas League visit colleges and universities to
14  educate students on voter ID laws?  Again, prior to SB
15  14 and going back to 2004.
16    A.  Prior, no.
17    Q.  Prior to the enactment of SB 14, did the
18  Texas League host community forums, community events,
19  or voter ID clinics going back to 2004?
20    A.  As it relates to SB 14, no.
21    Q.  Prior to the enactment of SB 14, did the
22  Texas League make phone calls or send e-mail blasts
23  regarding voter ID legislation going back to 2004?
24          MS. KORGAONKAR:  Objection.  That's
25  compound.

47

1     Q.  (By Mr. Tatum)  I'm just reading it right off
2  your previous answer here.  You testified earlier that
3  you made phone calls to universities.
4     A.  Well, we made phone calls to voters, right,
5  not to universities.
6     Q.  Okay.  Did the Texas League, prior to the
7  enactment of SB 14, monitor polling locations on
8  election day and during the early voting period to
9  make sure that people were aware, before they stood in
10  line, that they had to present some form of ID?
11    A.  No.
12    Q.  Okay.  So prior to the enactment of SB 14,
13  what kinds of activities did the Texas League engage
14  in with regard to voter ID legislation?  That's
15  probably the question I should have asked right up
16  front.
17    A.  Before it was actually enacted?
18    Q.  Yes, prior -- between 2004 and the enactment
19  of SB 14, within that window of time, what kind of
20  activities did the Texas League engage in with regard
21  to voter ID legislations being proposed?
22    A.  Okay.  Well, I know that our -- I know we
23  participated in, you know, some coalition calls just
24  to -- coalition calls to just get an update on the
25  status of the bill.  Our state director testified on

48

1  one or two occasions on how the bill would affect
2  student voters.  That's pretty much the extent prior
3  to the enactment of the SB 14 law --
4     Q.  Okay.
5     A.  -- that I'm aware of.
6     Q.  Can you describe the Texas League's
7  activities related to voter ID legislation being
8  proposed or enacted in any other state?
9     A.  Oh, I don't -- I don't recall, no.
10    Q.  You cannot describe any of those activities?
11    A.  In terms of voter ID legislation in any other
12  state?
13    Q.  Yes.
14    A.  I can't recall.  I'm really just focused on
15  here in Texas.
16    Q.  To your knowledge, does the Texas League
17  engage in any kind of activity with regard to voter ID
18  legislation being proposed in any other state?
19    A.  No.
20    Q.  They do not?
21    A.  No.
22    Q.  There are other affiliates at the state level
23  of the League of Young Voters.  Correct?
24    A.  Correct.
25    Q.  Do you know where those affiliates are?

49

1     A.  We have Georgia, we have Wisconsin, and we
2  have Maine.
3     Q.  Does the Texas League regularly interact or
4  collaborate with those other affiliates in any way?
5     A.  Not necessarily.  I mean, we host -- I mean,
6  we do, I guess, affiliate-wide calls just to get
7  updates and share best practices.
8          MS. KORGAONKAR:  Stephen, after this
9  line of questioning, can we take a quick break?
10         MR. TATUM:  Oh, sure.  Let me just make
11  sure we don't have a ways to go and just find a good
12  stopping point.
13         MS. KORGAONKAR:  Of course.
14    Q.  (By Mr. Tatum)  Okay.  Mr. Green, does the
15  Texas League conduct any policy making or
16  advocacy-related work specifically with regard to
17  voter ID legislation?
18    A.  No.
19         MR. TATUM:  Why don't we go ahead and
20  take a break right now?
21         MS. KORGAONKAR:  Sure.
22         MR. TATUM:  Five or ten minutes?
23         MS. KORGAONKAR:  Sounds good.  I have
24  10:57.
25         (Break.)

Blake Green - 6/18/2014

50

1          MR. TATUM:  All right.  We're back on
2    the record.
3    Q.   (By Mr. Tatum)  Mr. Green, I want to go back,
4    backtrack just a little bit.  I asked you previously
5    about the activities of the Texas League related to
6    voter ID legislation proposed or enacted in any other
7    state.  Was it your testimony that you're not aware of
8    any activities that the Texas League conducts with
9    such voter ID legislation?
10   A.   You're talking about the Texas League?
11   Q.   Yes.
12   A.   The Texas League doesn't do anything outside
13   of Texas.
14   Q.   Okay.
15   A.   All right.
16   Q.   I just wanted to confirm.  Okay.  You
17   mentioned before activities of the Texas League, such
18   as registration, education, and assisting voters
19   during elections.  I want to ask you just a little bit
20   more about that.  Could you describe specifically what
21   kinds of activities the Texas League engages in with
22   regard to voter registration.
23   A.   Well, we do -- we do what we call "tabling."
24   Q.   "Tabling"?
25   A.   Tabling.  And that's where we set up a table

51

1    in a community or on a college campus to register
2    people to vote people who are -- people to vote who
3    haven't been registered.
4    Q.   Do you do that throughout the state?
5    A.   Yes.
6    Q.   And what kinds of resources are involved in
7    that activity?
8    A.   Well, we have staff, staff salaries.  We have
9    print collateral.
10   Q.   Do you engage any volunteers for such
11   activities?
12   A.   We do, uh-huh.
13   Q.   Could you describe the activities of the
14   Texas League specifically with regard to voter
15   education?
16   A.   Voter education is really particularly print
17   materials about the process of voting, educating them
18   on, you know, why -- why they vote.  And, you know, it
19   ties back into the -- you know -- the community forums
20   and, you know, the different events to just educate
21   about voting and why it's important.
22   Q.   Do you educate constituents or anyone else
23   regarding voter laws, in general?
24   A.   About voter laws in general?  Not
25   necessarily.

52

1    Q.   Do you educate constituents or anyone else
2    regarding the process of voting?
3    A.   The process of voting, yes.
4    Q.   Does that include educating constituents and
5    anyone else about the necessary steps to take to vote
6    about polling places?
7    A.   Oh, yeah.
8    Q.   On that note, could you describe the Texas
9    League's activities specifically with regard to
10   assisting voters during elections?
11   A.   Well, during elections, we make phone calls
12   to them.  We tell them -- you know -- if they have a
13   question about where their polling location is or the
14   nearest one, we identify what that poll location is
15   and provide that information to them.
16   Q.   And when you make phone calls, where do you
17   get the phone numbers?
18   A.   To make phone calls?
19   Q.   Yes.
20   A.   Through a -- through a system we have called
21   VAN.
22   Q.   Are those numbers included --
23   A.   VAN, Voter Action Network.
24   Q.   Are this Voter Action Network --
25   A.   And, also, our -- our constituency base, as

53

1    well.
2    Q.   What is the Voter Action Network?
3    A.   It's a -- just a list of registered voters
4    that's obtained from the Secretary of State's office.
5    It's just a database.
6    Q.   Is that database maintained by the Secretary
7    of State?
8    A.   No.  It's actually -- it's actually
9    maintained by a -- the organization that actually --
10   that actually, I guess, created the database, uh-huh.
11   Q.   And what organization is that?
12   A.   State Voices.
13   Q.   I'm sorry?
14   A.   State Voices.  State Voices, uh-huh.
15   Q.   Is that an independent organization or is
16   that part of some other organization?
17          MS. KORGAONKAR:  Objection.  Calls for
18   speculation and beyond the notice.
19   A.   Yeah, I don't -- I don't know.  I mean, I
20   don't know if they are an independent or --
21   Q.   (By Mr. Tatum)  Okay.  Could you describe the
22   activities of the Texas League specifically with
23   regard to SB 14?
24   A.   Well, I mean, aside from the, you know, our
25   state director making testimonies, you know, about --

54

1  about the law and how it impacts young people.  You
2  know, once it was enacted, we did do comment letter
3  that we submitted to the Department of Justice citing
4  our reason on why this law is a burden to our
5  constituency base.  And that's pretty much it.
6      Q.   With regard to SB 14, is there anything the
7  Texas League does besides issuing a comment letter?
8      A.   As it relates to SB 14?
9      Q.   Yes.
10     A.   I mean, as I said before, I mean, we've
11  educated -- you know -- our constituents about -- you
12  know -- about the law -- you know -- once it passed on
13  what's required to go to the polls and vote.
14     Q.   And what kinds of resources have been devoted
15  to SB 14-related activities?
16     A.   I mean, a lot of our resources have been
17  shifted to -- you know -- with -- with time and -- you
18  know -- printing -- you know -- print collateral
19  and -- and -- you know -- hope -- you know -- a great
20  deal of stuff to educate our -- you know -- our
21  constituent base about the new law.
22     Q.   Were more resources spent regarding the
23  education of SB 14 than were spent regarding the
24  education of previous voter ID bills?
25     A.   What do you mean, "previous voter ID bills"?

55

1      Q.   Any voter ID legislation that was proposed or
2  enacted prior to SB 14.
3      A.   Uh-huh.
4      Q.   I think you mentioned earlier that the Texas
5  League sought to educate its constituents and members
6  regarding those bills.  Is that correct?
7      A.   Prior -- prior to the passing of SB 14?
8          MS. KORGAONKAR:  I'd just object.  He's
9  testified that the League didn't exist before 2010.
10         THE WITNESS:  Yeah.
11         MR. TATUM:  Okay.  Thank you.
12     Q.   (By Mr. Tatum) So, since 2010, has the Texas
13  League spent any amount of resources on educating its
14  constituents regarding voter ID legislation, other
15  than SB 14?
16     A.   No.
17     Q.   No?
18     A.   No.
19     Q.   So is it correct to say that the resources
20  the Texas League has spent on educating its members
21  regarding SB 14 -- sorry.  Let me retract.
22         Is SB 14 the first voter ID bill that the
23  Texas League has spent resources towards educating its
24  members on?
25     A.   Yes.

56

1      Q.   Okay.
2          (Exhibit No. 4 marked.)
3      Q.   Mr. Green, I'm handing you what's been marked
4  as Exhibit 4.
5      A.   Uh-huh.
6          MR. TATUM:  I'm sorry I didn't bring
7  more.
8          MS. CONLEY:  Oh, that's okay.  No
9  worries.
10     Q.   Mr. Green, I represent to you that this
11  document was produced to Defendants in this
12  litigation.  Do you recognize these documents?
13     A.   Yes.
14     Q.   And what do these documents represent?
15     A.   About an upcoming coalition meeting that we
16  are part of, uh-huh.
17     Q.   A coalition that the Texas League is a part
18  of?
19     A.   Correct, uh-huh.
20     Q.   What is the name of that coalition?
21     A.   Well, it's part of the Got ID campaign or the
22  got ID Coalition.
23     Q.   So the coalition is the result of the Got ID
24  campaign that you mentioned earlier?
25     A.   Correct.

57

1      Q.   And was that coalition created in direct
2  response to SB 14?
3      A.   Right, it was created to, basically, educate
4  our populations about the new voter ID law, uh-huh.
5          MS. KORGAONKAR:  And, Stephen, I don't
6  want to interrupt your line of questioning, but I just
7  want to note for the records that it's two pages here,
8  but they don't appear to be consecutive --
9          MR. TATUM:  Okay.
10         MS. KORGAONKAR:  -- based on the Bates
11  stamp and don't appear to be one document.
12         THE WITNESS:  Right.
13         MR. TATUM:  That's correct.  If you'd
14  like, I can mark them as separate exhibits.
15         MS. KORGAONKAR:  I just wanted to note
16  that for the record.
17         MR. TATUM:  Okay.
18     Q.   (By Mr. Tatum) So, Mr. Green, you stated
19  that this e-mail describes an upcoming meeting.  Is
20  that correct?
21     A.   That's correct.
22     Q.   And is that the meeting described in the
23  e-mail here as occurring on Monday, October 7, 2013 at
24  the TOP headquarters?
25     A.   That's correct.

Blake Green - 6/18/2014

58

1   Q.   What is the "TOP"?
2   A.   It's one of the collaborating organizations
3   called the Texas Organizing Project.
4   Q.   Is that an independent organization?
5        MS. KORGAONKAR:  Objection.  Beyond the
6   scope of the notice and it calls for speculation.  You
7   can answer.
8   A.   I don't know if it's independent or not.
9   Q.   (By Mr. Tatum)  So what do you know about the
10  TOP?
11  A.   I know, to my knowledge, that the Texas
12  Organizing project, to my knowledge, do similar work
13  that we do.
14  Q.   Did you attend this meeting?
15  A.   On October 7th, I believe so.
16  Q.   And do you remember what was discussed at
17  that meeting?
18  A.   Pretty much -- if I can recall, pretty much
19  just looking at ways in which we could, you know,
20  develop materials and messaging on how -- you know --
21  just how to outreach to our target bases about the
22  voter ID law and what's required to vote at the polls.
23  Q.   Was this litigation discussed at that
24  meeting?
25  A.   Litigation, no, I don't -- I don't think so.

59

1   Q.   Turn to the next page.
2   A.   Uh-huh.
3   Q.   This next page references an October 15th
4   voter ID community workshop.  Is that correct?
5   A.   That's correct.
6   Q.   Okay.  Did you attend that?
7   A.   Yes.
8   Q.   And where was that held?
9   A.   If I can recall, the -- this particular one
10  was held at the S.H.A.P.E Community Center.
11  Q.   In what city?
12  A.   Here in Houston.
13  Q.   And was that community workshop put on by the
14  Texas League?
15  A.   No.  It was put on by the -- by the
16  coalition.
17  Q.   By the coalition?
18  A.   Uh-huh.
19  Q.   Do you know what other organizations are a
20  part of this coalition?
21  A.   We have -- you know -- as I said, we have the
22  Texas Organizing Project.  If I can recall, we have
23  Mi Familia Vota.  I know the NAACP has one.  The
24  Houston Area Urban League.  I mean, there may be more,
25  but I just can't recall.

60

1   Q.   Is that the only such workshop that has been
2   held by the coalition, to your knowledge?
3   A.   In terms of workshop, no.  There's been --
4   there's been -- there's been others.  There's been --
5   I know there was a voter ID clinic, as well as a --
6   there's a community education forum, as well.
7   Q.   And were these other clinics and forums that
8   you're referring to, were those directly related to
9   SB 14?
10  A.   They were relating to educating about the new
11  law and what's required to vote.
12  Q.   Were any such workshops or clinics held by
13  the coalition prior to the enactment of SB 14?
14  A.   No.
15  Q.   Sorry.  I forgot to ask.  The TOP
16  headquarters, do you remember where that was?
17  A.   It was here in Houston, uh-huh.
18  Q.   You mentioned this earlier, I just want to
19  confirm, has the Texas League conducted any kind of
20  studies or reports, audits, estimates, projections or
21  any other kind of analyses related to the effect of
22  SB 14 on minority voters or on voters who are members
23  of a language minority group?
24  A.   No.
25  Q.   No.

61

1        (Exhibit No. 5 marked.)
2   Q.   Mr. Green, I'm handing you what's been marked
3   as Exhibit 5.  Mr. Green, do you recognize this
4   document?
5   A.   This particular document, yes.
6   Q.   You've seen this document before?
7   A.   Yes, uh-huh.
8   Q.   Mr. Green, I represent to you that this is
9   the Amended Complaint in Intervention of
10  Plaintiff-Intervenors The Texas League of Young Voters
11  Education Fund, Imani Clark, Aurica Washington,
12  Crystal Owens, and Michelle Bessiake, filed on
13  November 14th, 2013.  Is that an accurate
14  representation of what this document is?
15  A.   Correct, uh-huh.
16  Q.   Okay.  So you're aware that the Texas League
17  intervened in this lawsuit along with Imani Clark,
18  Aurica Washington, Crystal Owens, and Michelle
19  Bessiake.  Correct?
20  A.   Correct.
21  Q.   And what -- with regard to those four
22  individuals that I just named, what is their
23  respective involvement with the Texas League, if any?
24  A.   (No verbal response.)
25  Q.   And if you want, I'll just -- I can ask

62

1 individually. What is the involvement of -- what is
2 Imani Clark's involvement with the Texas League?
3        MS. KORGAONKAR: Could you just clarify
4 what you mean by "involvement"?
5    A. Involvement, uh-huh.
6    Q. (By Mr. Tatum) Sure. We've established or
7 you've acknowledged that the Texas League intervened
8 in this lawsuit along with those four individuals.
9 Correct?
10   A. (No verbal response.)
11   Q. Their names appear on the same intervening
12 documents. Is that correct?
13   A. That's what I see, uh-huh.
14   Q. Okay. Is Imani Clark a constituent of the
15 Texas League?
16   A. I don't -- I'm not -- I'm not sure. I'm not
17 -- I don't -- I don't recall if -- I mean, I don't
18 recall at the moment if she is or if she isn't.
19   Q. Do you know if Imani Clark has been involved
20 with any Texas League activity?
21   A. Imani Clark, I don't recall.
22   Q. Do you know if she's ever volunteered for the
23 Texas League?
24   A. Imani Clark, I mean, I don't recall.
25   Q. Do you know if Imani Clark is involved with

63

1 the Texas League in any way?
2    A. I mean, not to my knowledge.
3    Q. Do you know if Aurica Washington is involved
4 with the Texas League in any way?
5        MS. KORGAONKAR: I just want to clarify
6 for the record that Aurica Washington is no longer a
7 Plaintiff-Intervenor in this case.
8    A. Okay. I mean, to the extent of my knowledge,
9 I don't -- I don't know.
10   Q. (By Mr. Tatum) You don't know if Aurica
11 Washington is involved with the Texas League in any
12 way?
13   A. I mean, to the extent of my knowledge, I
14 don't -- I don't know, no.
15   Q. Have you ever seen that name before?
16   A. I've seen all the names.
17   Q. Have you seen any of those names before you
18 just now saw them on this complaint?
19   A. Yes, uh-huh.
20   Q. And when did you last see those names?
21   A. I believe it was on another document that was
22 similar to this. Maybe a -- maybe another complaint
23 document, because this is the amended one.
24   Q. Okay. So with regard to any of those four
25 individuals, do you know if any of those four

64

1 individuals are involved with the Texas League in any
2 way?
3        MS. KORGAONKAR: Objection. Compound
4 and vague.
5        MR. TATUM: I can ask about them
6 individually if you want, which I will do.
7    Q. (By Mr. Tatum) Are you aware if Crystal
8 Owens is involved with the Texas League in any way?
9    A. In any way, I don't -- you know -- I don't
10 know. I don't -- I don't recall. I mean -- and
11 Michelle. . .
12   Q. Are you aware or do you know if Michelle
13 Bessiake is involved with the Texas League in any way?
14   A. Michelle, I don't -- I don't recall this
15 either, huh-uh.
16   Q. Has the Texas League actively sought to find
17 constituents or anyone else to encourage them to join
18 this lawsuit?
19        MS. KORGAONKAR: Objection for
20 vagueness. You can answer.
21        MR. TATUM: Lets me rephrase.
22   Q. (By Mr. Tatum) Has the Texas League actively
23 sought to find one of its constituents or anyone else
24 to discuss with them the possibility of joining this
25 lawsuit?

65

1    A. Actively sought, no. But in the course of
2 our work, we did come across -- or members of our
3 organization did come across some people who may have
4 been impacted about the law and the option was
5 presented to them, you know, that a lawsuit was filed,
6 uh-huh. Well, that -- that -- you know -- for them to
7 -- or for them or to be a part of our lawsuit, uh-huh.
8    Q. So is it your testimony now that the Texas
9 League was approached by one or more of its
10 constituents or anyone else that it serves about the
11 possibility of joining this lawsuit?
12        MS. KORGAONKAR: Objection. That
13 mischaracterizes his prior testimony.
14   Q. (By Mr. Tatum) Is that an accurate summary
15 of your testimony?
16   A. What do you mean by "approach"?
17   Q. You testified a minute ago, and I'm reading
18 from the transcript here, We did come across members
19 of our organization who may have been impacted about
20 the law and the option was presented to them that a
21 lawsuit was filed. Is that correct?
22   A. That's correct, uh-huh.
23   Q. Okay. So is it your testimony then that the
24 Texas League did not actively seek to find
25 constituents at the Texas League to discuss with them

66

1 the possibility of joining this lawsuit?
2    A.  I mean, I wouldn't say we -- I mean, we
3 didn't actively seek.  No, we didn't actively seek.
4 But, you know, as I said before, we did -- I mean --
5 you know -- some of them, we -- you know -- we did
6 present with the opportunity.  But for them to
7 actually join the lawsuit, that was -- you know --
8 that's pretty much their decision, but we didn't
9 actively seek, no.
10    Q.  Did you meet with any of these -- and you
11 mentioned members of your organization.  By that, I
12 assume you mean constituents.  Correct?
13    A.  When I say members, I mean staff.  Well, I
14 meant staff.
15    Q.  So you meant to say that you came across
16 staff of the Texas League who came to you to say that
17 they've been impacted by the law and you presented
18 staff with the possibility of joining this lawsuit?
19    A.  Wait.  Go back.  Now, I'm confused.
20    Q.  Okay.  I'm trying to -- we need to clarify
21 this.
22    A. Right.
23    Q.  You testified earlier, you said, We did come
24 across members of our organization who may have been
25 impacted about the law and the option was presented to

67

1 them about the lawsuit.  Correct?
2    A.  I believe I said, in the course of our work,
3 we came across -- I mean, I may have mentioned
4 members, but constituent -- constituency base or
5 people who we outreach to.
6    Q.  All right.  So when you said members, you
7 meant to say constituents, because we've established
8 that you don't have members?
9    A.  Right, correct.
10    Q.  Okay.  Did you meet with any of these
11 constituents that you referred to here?  Did you
12 personally meet with them?
13    A.  Did I personally meet with them, no.
14    Q.  Do you know who within the Texas League met
15 with these specific constituents?
16    A.  I don't recall exactly who.
17    Q.  You mentioned Arianna Williams earlier.  What
18 is her job with the Texas League?
19    A.  Well, I mean, she assists with our programs,
20 particularly voter registration and voter -- voter
21 engagement -- I mean, voter education.
22    Q.  Do you know if she was contacted by any
23 constituent about the possibility of joining this
24 lawsuit?
25    A.  I mean, I don't know personally.  I don't --

68

1 I mean, I don't know if she was contacted by any of
2 our constituents -- well, our constituents.
3    Q.  How do you know that your constituents -- let
4 me rephrase.  How do you know that the Texas League
5 came across these constituents who said they have been
6 impacted by the voter ID law?
7    A.  I mean, as I said before, in the course of
8 our work -- I mean, in the course of our work -- I
9 mean, like I say, I don't know who from the
10 organization, but I know that someone may have
11 mentioned this to them, that the opportunity is
12 available to join a lawsuit.
13    Q.  Do you know who that someone was?
14    A.  I mean, I don't recall exactly who, no.
15    Q.  Do you know if any of these constituents that
16 you came across in the course of your work, do you
17 know if any of those constituents included the four
18 individuals who are listed on the amended complaint?
19    A.  I mean, it's a possibility, but I don't know
20 for sure.
21    Q.  If you'll look at the Amended Complaint that
22 I've handed you there.
23    A.  (Complying.)
24    Q.  I'll represent to you --
25       MR. TATUM:  And, Natasha, please correct

69

1 me if I'm wrong.
2    Q.  (By Mr. Tatum)  -- that the Complaint alleges
3 that each one of the four individuals, Ms. Clark,
4 Ms. Washington, Ms. Owens, and Ms. Bessiake is and
5 will continue to be harmed by the voting laws enacted
6 by SB 14?
7       MS. KORGAONKAR:  And I just want to
8 clarify that Ms. Washing, Ms. Owens, and Ms. Bessiake
9 are no longer parties in this litigation.
10    Q.  (By Mr. Tatum)  Okay.  Mr. Green, do you know
11 -- do you have any idea why Ms. Washington, Ms. Owens,
12 or Ms. Bessiake are no longer parties to this
13 litigation?
14       MS. KORGAONKAR:  And Blake, I'll just
15 caution you that you can answer the yes for no
16 question, but not to reveal the contents of any
17 conversations that you may have had with counsel --
18       THE WITNESS:  Okay.
19       MS. KORGAONKAR:  -- about the
20 litigation.
21    A.  Right.  I mean, I don't recall exactly why
22 they are no longer on the case.
23    Q.  (By Mr. Tatum)  Have you ever interacted with
24 Ms. Washington, Ms. Owens, or Ms. Bessiake?
25    A.  No.

70

1    Q.   Okay.  Okay.  So then I'll represent to you
2   that the complaint alleges that Ms. Clark, who is
3   still a party to this litigation, is and will continue
4   to be harmed by the voting laws enacted by SB 14.  Is
5   that a correct representation of the Complaint?  In
6   fact, before you answer that, let me just find it and
7   point it out for you.
8           MS. CONLEY:  I'm sorry.  I don't think I
9   understood the question.  Can you -- do you mind
10  repeating it?
11          MR. TATUM:  Actually, I hadn't gotten to
12  the question yet.  I was --
13          MS. CONLEY:  Or --
14          MR. TATUM:  I'll start over.
15          MS. CONLEY:  Yeah.
16          MR. TATUM:  Let's re-rack.
17          MS. CONLEY:  Thank you.
18     Q.   (By Mr. Tatum)  Okay.  On Page 4 of that
19  Complaint that you have in front of you, at the top of
20  the page, Paragraph 12, the Complaint alleges that
21  Ms. Clark, Ms. Imani Clark's voting rights are impeded
22  by SB 14, as she will be prevented from voting in
23  person at the polls because of Defendants'
24  unnecessarily strict and racially discriminatory photo
25  identification law.

71

1           Is that an accurate reading of that
2   allegation?
3      A.   Correct.
4      Q.   Okay.  Do you know if the Texas League has
5   ever assisted Mrs. Clark or tried to assist Mrs. Clark
6   with registering to vote?
7      A.   I don't recall.
8      Q.   Do you know if the Texas League has ever
9   assisted or attempted to assist Mrs. Clark with regard
10  to obtaining an acceptable form of ID under SB 14?
11     A.   I don't recall.
12     Q.   Does the Texas League -- let me back up.
13          Has the Texas League ever assisted or
14  attempted to assist any of its constituents in
15  obtaining an acceptable form of ID under SB 14?
16     A.   I mean, yes.  Yes.  We've -- I mean, we've --
17  you know -- we've -- we've -- you know -- like I said,
18  we have a lot of print material where we educated them
19  on how to go about getting an -- getting an EIC.  And
20  I know on -- like I said, on one or two occasions, we
21  did take them to -- to -- you know -- a local mobile
22  DPS office to get an EIC.
23     Q.   Does the Texas League contend that SB 14
24  creates a burden for black and other voters of color
25  because those voters do not have an acceptable form of

72

1   ID under SB 14?
2      A.   Yes.
3      Q.   And what is that contention based on?
4      A.   Well, I mean, it's based on, you know, social
5   and economic status.  When you think about it, across
6   the board, African Americans and Hispanics are, you
7   know, disproportionately not able to, you know, have
8   the funds, you know, compared to, you know, white
9   people across the board to be able to afford the
10  requiring documents, especially those that are
11  underlying, to actually get an EIC.  And
12  specifically -- you know -- you know -- student IDs.
13  I mean, specifically, those out-of-state students that
14  don't have one of the forms of ID, like they had
15  before, which was a student ID, to vote.
16     Q.   Do you know what the current acceptable forms
17  of ID to vote are under SB 14?
18     A.   I do.
19     Q.   Can you list them?
20     A.   Sure.  You have your Texas Driver's License,
21  your Texas ID, you have a military ID, you have a U.S.
22  citizenship certificate with a photo, you have a U.S.
23  passport, you have a concealed handgun license, and
24  then you have your Election Identification
25  Certificate.

73

1      Q.   Also known as the "EIC"?
2      A.   EIC, correct.
3      Q.   Okay.  Now, is the contention you were just
4   discussing, is that based on any kind of study or
5   analyses?
6           MS. KORGAONKAR:  And I'll just object to
7   the extent that "contention" is a legal term and
8   Mr. Green is not a lawyer.
9      A.   Can you rephrase the question?
10     Q.   (By Mr. Tatum)  Sure.
11     A.   Uh-huh.
12     Q.   Well, let me back up if we're not going to --
13  if we don't like the use of the word "contention."
14  Does the Texas League -- does the Texas League believe
15  that SB 14 creates a burden for black and other voters
16  of colors because those voters do not have an
17  acceptable form of ID under SB 14?
18     A.   Yes.
19     Q.   Okay.  And you previously described the basis
20  for that belief.  Correct?
21     A.   Correct.
22     Q.   Okay.  Is that belief based on any kind of
23  formal study or analyses?
24     A.   I mean, I've read -- I mean, I've read
25  articles and, you know, papers and, you know, iPads

74

1  that talk about how, you know, the law has been a
2  burden.  And just from people that we've talked to in
3  the field, you know, how it -- it -- you know -- it's
4  a burden to particularly African Americans and
5  Hispanics who don't have -- you know -- you know --
6  generally the money and the resources to get one of
7  the acceptable forms of ID under this law.
8      Q.  Does the Texas League believe that SB 14
9  amounts to a poll tax?
10     A.  Yes.
11     Q.  And what is that belief based on?
12     A.  I mean, it's pretty much based on that the
13  EIC generally isn't -- I mean, isn't a free -- you
14  know -- free -- you know -- a free document.  You
15  know, for instance, you know, if you're out-of-state
16  student, number one, you have to -- you know -- go --
17  you know -- go get your -- you know -- pay for a birth
18  certificate, which is one of the forms of ID that's
19  required to prove your citizenship to actually get an
20  ID.  So you actually have to pay for that, which in
21  some instances are $22 or more in order to get your
22  EIC.  So, I mean, it can be argued that, you know,
23  getting an EIC or essentially even having -- you
24  know -- being eligible to use your eligibility to vote
25  can be referred to as a poll tax.

75

1      Q.  Does the Texas League believe that SB 14
2  denies or abridges the right to vote on account of
3  race or membership in a language minority group?
4      A.  On account of race?
5      Q.  Race or membership in a language minority
6  group.
7      A.  Yes.
8      Q.  And what is that belief based on?
9      A.  I mean -- I mean, as I said before, I mean,
10  I've been in this work for -- for -- I mean, for quite
11  some time.  And, I mean, it's -- you know -- it's --
12  it's -- it's discriminatory.  And I've said before,
13  you know, African Americans and Hispanics and, you
14  know, different minority groups -- you know -- you
15  know -- are disproportionally affected because of the
16  fact that, you know, they don't have the economic, you
17  know, resources to be able to fulfill the requirements
18  to get an EIC.  And that pretty much puts a burden on
19  the populations we serve, which are, you know,
20  minority communities, particularly African Americans
21  and Hispanics.
22     Q.  Does the Texas League believe that a
23  significant portion of its constituents lack any of
24  the acceptable forms of ID under SB 14?
25     A.  That are constituency?

76

1      Q.  Yes.
2      A.  Lacks a significant?
3          MS. CONLEY:  I'm sorry.  Can you repeat
4  the question.  I don't think he understood it.
5          MR. TATUM:  Sure.
6      Q.  (By Mr. Tatum)  Does the Texas League believe
7  that a significant portion of its constituency lacks
8  any of the acceptable forms of ID under SB 14?
9      A.  I mean, I don't know -- I mean, I don't know
10  about the, you know, significant.  But I know that the
11  people that we talk to and that who we serve -- and
12  like I said, particularly those who are out-of-state
13  students here on college campuses here in Texas who
14  don't have a Texas ID or one of the forms of ID, that
15  it -- that it affects them greatly.
16          For example, you know, in our meetings, you
17  know, some of the student organization meetings that
18  we go to -- one of them could be the California Club.
19  And we all know those students who are part of the
20  California Club are from California and don't have a
21  Texas ID or Texas Driver's License.
22          So that's a large -- well, the majority of
23  all those students most likely wouldn't have the form
24  of ID, with the exception to, you know, their student
25  ID and their out-of-state ID.

77

1      Q.  Can you identify one person who does not have
2  any of the acceptable forms of ID under SB 14?
3      A.  Can I identify one person?
4      Q.  Yes.
5      A.  Well, Imani Clark.
6      Q.  And she's a party to this lawsuit?
7      A.  Uh-huh.
8      Q.  Is there anyone else you can identify besides
9  Imani Clark?
10     A.  I mean, I don't know by names, I mean,
11  specifically, but, I mean, I do know that there are,
12  like I said, people within the California Club that
13  don't have it.  I mean, I don't know them by name, but
14  I do know there is the a large segment, such as that
15  group, that don't have the proper -- proper
16  identification.
17     Q.  Is Imani Clark part of the California Club
18  that you just mentioned?
19     A.  I don't think so, huh-uh.
20     Q.  Do you know how many of your -- do you know
21  how many Texas League constituents lack a driver's
22  license?
23     A.  I don't --
24     Q.  A Texas Driver's License?
25     A.  Oh, I don't know that information.

78

```
 1   Q.  Do you know how many Texas League
 2   constituents lack a Texas-issued photo ID?
 3   A.  A Texas-issued photo ID?  I don't have that
 4   number.  I don't know.
 5   Q.  Do you know how many Texas League
 6   constituents lack a concealed handgun license?
 7   A.  Lack a concealed handgun license?
 8   Q.  Yes.
 9   A.  I don't know.
10   Q.  Do you know how many Texas League
11   constituents do not have a passport?
12   A.  I don't know.
13   Q.  Do you know how many Texas League
14   constituents do not have a military ID card with a
15   photo on it?
16   A.  Military ID?  How many, I don't know.
17   Q.  Do you know how many Texas League
18   constituents do not have a citizenship certificate?
19   A.  I don't know.
20   Q.  Do you know how many Texas League
21   constituents do not have the necessary documents to
22   get an EIC?
23   A.  I don't know.
24   Q.  Do you know how many Texas League
25   constituents have attempted to obtain an EIC?
```

79

```
 1   A.  I don't have that number, as well.  Attempted
 2   to?
 3   Q.  Yes.
 4   A.  I don't -- I don't know that number, no.
 5   Q.  Can you identify any constituent of the Texas
 6   League that has attempted to obtain an EIC?
 7   A.  I mean, as I -- you know -- as I can recall,
 8   you know, when our staff member, took, you know, on
 9   those occasions two or three of our constituencies to
10   go get an EIC.  That was an attempt.
11   Q.  Do you recall what staff member took them?
12   A.  I can recall Arianna Williams, uh-huh.
13   Q.  Do you know where she took them to attempt to
14   obtain an EIC?
15   A.  Where?  I believe, to the Department of
16   Public Safety, to the DPS office.
17   Q.  And you said she took three people?
18        MS. KORGAONKAR:  Objection.  I don't
19   think that that was his testimony.
20   A.  Right.
21   Q.  (By Mr. Tatum)  Let me check.  I believe you
22   said two or three constituents.  It's kind of rough
23   there.  Anyway, regardless, Arianna Williams took some
24   constituents to attempt to get an EIC.  Is that
25   correct?
```

80

```
 1   A.  That's correct.
 2   Q.  Do you know if they were successful in
 3   obtaining an EIC on that trip?
 4   A.  Oh, I don't know, no.
 5   Q.  Would she -- would Arianna Williams know?
 6   A.  Oh, I don't know.  I mean, but let's -- let's
 7   just say, as an organization, we made several attempts
 8   just through our education to make sure that, you
 9   know, our constituency base and those in our target,
10   you know, audience know about the steps on how to get
11   an EIC.  Now, some of those may have actually received
12   an EIC.  Some of them probably didn't, but we don't
13   know.  But I know we, as an organization, made every
14   attempt to educate them about, you know, if they don't
15   have one of the seven forms of ID, that they -- that
16   they are educated on how to get that.
17   Q.  Has the Texas League followed up with any
18   constituent that it's educated about getting an EIC to
19   determine whether or not they were successful in
20   getting one?
21   A.  Have we followed?  I don't -- I don't recall.
22   I don't believe so.
23        (Exhibit No. 6 marked.)
24   Q.  Mr. Green, I'm handing you what's been marked
25   as Exhibit 6.  Mr. Green, I represent to you that this
```

81

```
 1   document has been produced to the Defendants in this
 2   litigation.  Have you ever seen this document before?
 3   A.  Yes.
 4   Q.  What is this document?
 5   A.  It's a comment letter that we submitted to
 6   the Department of Justice to deny preclearance,
 7   Section 5 preclearance, because we feel as though --
 8   because we believe that, you know, the law pretty much
 9   puts a burden on our key population.
10   Q.  So this comment letter was prepared by the
11   Texas League.  Correct?
12   A.  Correct.  It was jointly prepared by Texas
13   League and the Legal Defense Fund.
14   Q.  Okay.
15   A.  Uh-huh.
16   Q.  And it was submitted on September 8th, 2011.
17   It that correct?  Just going off the first page there.
18   A.  That's correct.
19   Q.  Okay.  If you wouldn't mind turning to
20   Page 5.  Let me know when you're there.
21   A.  I'm there.
22   Q.  Okay.  At the bottom of Page 5, it says, For
23   example, in explaining the hardship that the proposed
24   photo ID law would impose on them, Prairie View
25   students stated.  And following that sentence there's
```

Blake Green - 6/18/2014

82

1  a number of quotes.  Is that correct?
2      A.  That's correct.
3      Q.  And in the paragraph that immediately follows
4  those quotes, it says, The League of Young Voters
5  Education Fund took statements from dozens of students
6  along these lines, explaining that they would be
7  effectively prohibited from voting by the proposed
8  photo ID law.
9          Is that a correct reading of that sentence?
10     A.  Correct.
11     Q.  Okay.  It then says, The examples above are
12  only a sample of the hundreds of students at Prairie
13  View A&M alone who would likely be denied the
14  opportunity to vote as a result of the proposed photo
15  ID law.
16         Is that an accurate reading of that sentence?
17     A.  Correct.
18     Q.  Okay.  So this comment was submitted, again,
19  on September 8th, 2011.  Do you agree that that would
20  be after the legislative session when SB 14 was
21  enacted?
22     A.  Correct.
23     Q.  Can the Texas League identify anyone who made
24  the statements in the quoted points there that I just
25  pointed out?  That was a horribly stated question.

83

1          MS. CONLEY:  You saved us the objection.
2      Q.  (By Mr. Tatum)  Okay.  Do you see the number
3  of bullet points that contain quote -- quoted
4  statements --
5      A.  Yes.
6      Q.  -- next to them?  Okay.  Can the Texas League
7  identify anyone who made those statements?
8          MS. KORGAONKAR:  Objection for
9  vagueness.  I just don't know what you mean by
10  "identify."  Would you clarify?
11     Q.  (By Mr. Tatum)  This document does not -- it
12  represents that those statements were made by an
13  actual Prairie View A&M students.  Correct?
14     A.  Correct.
15     Q.  Okay.  Can the Texas League identify who
16  those actual students are?
17     A.  I mean, I know we -- I mean, I know we took
18  the statements, correct.
19     Q.  Do you know -- sorry.
20     A.  No.  You can go.
21     Q.  Do you know when those statements were
22  collected?
23     A.  I mean, I don't recall exactly, but I would
24  assume it would be in 2011.
25     Q.  Do you know how they were collected?

84

1      A.  I don't -- I don't -- I don't -- I don't know
2  how.  I mean, I don't know specifically how.  I mean,
3  but I know we did take -- take these statements.  I do
4  recall that occurring.
5      Q.  And this probably calls for speculation, but
6  --
7      A.  Uh-huh.
8      Q.  -- could it have been by the use of a survey
9  or a comment card or some kind of petition?
10         MS. CONLEY:  Objection.  Calls for
11  speculation.
12         MS. KORGAONKAR:  Objection.  Calls for
13  speculation, but you can answer.
14     A.  I don't know.  I don't recall.  I don't know.
15     Q.  (By Mr. Tatum)  Do you know if any one who
16  made any of these statements was unable to vote
17  because of SB 14?
18         MS. KORGAONKAR:  Objection.  That will
19  also call for speculation, but you can answer if you
20  know.
21     A.  Yeah.  I wouldn't know.
22     Q.  (By Mr. Tatum)  You wouldn't know?
23     A.  These particular people?
24         MS. KORGAONKAR:  Objection.  It stands
25  that it calls for speculation.

85

1      A.  Right.  I mean, I don't -- I mean, I don't --
2  I don't know.  I don't know.
3      Q.  (By Mr. Tatum)  Do you know who would know?
4      A.  Who would know?
5      Q.  Yes.
6      A.  If they voted?
7      Q.  Yes.
8      A.  I mean, I believe the Secretary of State
9  would know.
10     Q.  Do you know if anyone at the Texas League
11  followed up with any of the people that made these
12  statements to determine whether or not they were able
13  to vote because of SB 14?
14     A.  Followed up?  I -- I don't know.  I
15  mean, I don't know, in particular, if that occurred or
16  not.
17         MR. TATUM:  Are you y'all fine with
18  going another 20 or so minutes before taking a break?
19         MS. KORGAONKAR:  That's fine.
20         MR. TATUM:  Are you okay with that?
21         MS. CONLEY:  I'm good.
22         THE WITNESS:  I'm good.
23         MR. TATUM:  All right.
24     Q.  (By Mr. Tatum)  Mr. Green, can you identify
25  any Texas League constituent known to the Texas League

86

1  when it filed this Original Complaint on August 26,
2  2013, who, at that time, had been unable to vote on
3  account of his or her inability to obtain an
4  acceptable form of ID under SB 14?
5          MS. KORGAONKAR:  Objection.  It's
6  confusing.  If you could break that down.
7          MR. TATUM:  Sure.
8      Q.  (By Mr. Tatum)  Mr. Green, I represent to you
9  that the Texas League filed its Original Complaint in
10  this case on August 26th, 2013.  Can you identify any
11  Texas League constituent who, on that date, had been
12  unable to vote on account of his or her inability to
13  obtain an acceptable form of ID under SB 14?
14      A.  No.
15      Q.  On August 26, 2013 -- sorry.  Let me retract
16  that.
17          Can you identify any Texas-registered voter
18  who, on that date, had been unable to vote on account
19  of his or her inability to obtain an acceptable form
20  of ID under SB 14?
21      A.  Can I identify any Texas-registered voter?
22      Q.  Yes.
23      A.  Not by name, no.  Not by name.  Not
24  specifically by name, but I know that there were -- I
25  mean, just from being out in the field, I know that

87

1  there were -- you know -- you know -- some of them
2  that have been identified, yes, that didn't have one
3  of the forms of ID to vote.
4      Q.  But you can't identify them here today?
5      A.  In terms of names --
6          MS. KORGAONKAR:  Objection.
7  Mischaracterizes his testimony.  Slow down.
8      Q.  (By Mr. Tatum)  Can you identify one of them
9  here today?
10      A.  In terms of names, no.
11      Q.  Mr. Green, I represent to you that the Texas
12  League filed its Amended Complaint in this case on
13  November 14th, 2013.  Can you identify any Texas
14  League constituent who, at that time, had been unable
15  to vote on account of his or her inability to obtain
16  an acceptable form of ID under SB 14?
17      A.  Texas League constituent?  Constituent, I
18  don't -- I don't -- I don't think I could identify
19  any, no.
20      Q.  Can you identify any Texas-registered voter
21  who, at that time, had been unable to vote on account
22  of his or her inability to obtain an acceptable form
23  of ID under SB 14?
24      A.  And this is when we filed the Amended
25  Complaint?

88

1      Q.  Yes.
2          MS. CONLEY:  Can you just make sure that
3  you understand the question before you answer?
4  Because he's asking you the same question.
5          THE WITNESS:  Uh-huh.
6          MS. CONLEY:  I just want to make sure
7  you understand the question.
8          THE WITNESS:  Uh-huh.
9          MS. CONLEY:  So if you don't understand
10  the question, you should ask him for clarification.
11      Q.  (By Mr. Tatum)  And please do.  And I'm happy
12  to --
13      A.  Right.
14      Q.  -- rephrase or clarify.
15      A.  Okay.  Can you rephrase it, please?
16      Q.  Sure.  The Texas League filed its Amended
17  Complaint in this case on November 14th, 2013.
18      A.  Uh-huh.
19      Q.  Can you identify any Texas-registered voter
20  who, on that date, had been unable to vote on account
21  of his or her inability to obtain an acceptable form
22  of ID under SB 14?
23      A.  And this is as of?
24      Q.  As of November 14th, 2013.
25      A.  I just want to make sure I understand your

89

1  question.  Repeat it one more time.
2      Q.  Sure.  When the Texas League filed its
3  Amended Complaint on November 14th, 2013 -- let me
4  rephrase that.
5          Can you identify any Texas-registered voter
6  who, as of November 14th, 2013, had been unable to
7  vote on account of his or her inability to obtain an
8  acceptable form of ID under SB 14?
9      A.  Can I identify by name, no.  By specific
10  names?  Can I identify by specific names?  I don't --
11  -- by specific names, I don't know if I -- I mean, I
12  don't think so.
13      Q.  Can you identify any Texas League constituent
14  known to the Texas League at present that is or has
15  been unable to vote because of his or her inability to
16  obtain an acceptable form of ID under SB 14?  And if
17  you don't understand the question, please let me know.
18      A.  I understand that question.  Constituent
19  base?  I mean, I know there are some.  But in terms of
20  me identifying, you know the names, I don't know the
21  names.
22      Q.  Do you know how many there are?
23      A.  I don't know how many there are, no.
24      Q.  Can you identify any Texas-registered voter
25  known to the Texas League at present that is or has

Blake Green - 6/18/2014

90

1  been unable to vote because of his or her inability to
2  obtain an acceptable form of ID under SB 14?
3      A.   I mean, I don't know by name, but I know
4  there are some out there.
5      Q.   Do you know how many?
6      A.   How many?  I mean, I don't -- I mean, I don't
7  have an estimate right now.
8      Q.   Can you identify a specific instance in which
9  a Texas League constituent attempted to obtain an
10 acceptable form of ID under SB 14, but was unable to?
11     A.   A Texas League constituent?
12     Q.   Yes.
13     A.   Okay.  Repeat the question again.
14     Q.   Sure.  Can you identify a specific instance
15 in which a Texas League constituent attempted to
16 obtain an acceptable form of ID under SB 14, but was
17 unable to?
18     A.   I mean, I don't think I can recall.  I mean,
19 I don't think I can recall any attempts made by our
20 constituent base -- by our constituent.
21     Q.   Can you identify a specific instance in which
22 any Texas-registered voter attempted to obtain an
23 acceptable form of ID under SB 14, but was unable to?
24     A.   Can you repeat the question again?
25     Q.   Sure.  Can you identify a specific instance

91

1  in which a Texas-registered voter attempted to obtain
2  an acceptable form of ID under SB 14, but was unable
3  to?
4      A.   That attempted to obtain an EIC?
5      Q.   No.  Attempted to obtain any of the
6  acceptable forms of ID under SB 14.
7      A.   Attempted to, but wasn't able to?
8      Q.   Yes.
9      A.   That attempted to?  And this is any
10 Texas-registered voter?
11     Q.   Yes.
12     A.   I mean, you know, as -- you know -- as I said
13 before, I know we've educated people about it, you
14 know, through our educational materials.  Now, in
15 terms of, you know, if attempts were made possibly if
16 they got an EIC or, you know, wasn't able to vote, you
17 know, I don't -- I mean, I don't know that specific
18 information.
19         MS. KORGAONKAR:  Are you doing okay?
20         THE WITNESS:  Huh?
21         MS. KORGAONKAR:  Are you doing all
22 right?
23         THE WITNESS:  Huh?
24         MS. KORGAONKAR:  Are you doing okay?
25         THE WITNESS:  Am I doing okay?

92

1          MS. KORGAONKAR:  Yeah.
2          THE WITNESS:  Yeah.
3          MS. KORGAONKAR:  Do you need a break?
4          THE WITNESS:  No.  I'm good.
5          MS. KORGAONKAR:  Okay.
6          MR. TATUM:  I've got five or so more
7  questions.
8          MS. KORGAONKAR:  Okay.  Perfect.
9          MR. TATUM:  Then we can take a break.
10     Q.   (By Mr. Tatum)  Mr. Green, does the Texas
11 League believe that SB 14 makes it impossible for
12 anyone to vote?
13     A.   Makes it impossible?
14     Q.   Yes.
15     A.   Yes, uh-huh.
16     Q.   And why does the Texas League believe that?
17     A.   Well, I mean, if a person is registered and
18 don't have one of the forms of IDs, then -- then they
19 pretty much won't be able to vote.  They won't be able
20 to exercise their right to vote.
21     Q.   Can you recall any specific instance in which
22 SB 14 made it impossible for someone to vote?
23     A.   I mean, I can't recall specifically any
24 particular instances, but -- I mean, but I know if you
25 don't have one of the forms of ID, you know, it's

93

1  impossible form you to vote.
2      Q.   Since SB 14 became effective, do you know how
3  many election cycles we've had in the State of Texas?
4      A.   Oh, I don't know.  I mean, I don't know off
5  the top of my head, huh-uh.
6      Q.   Do you think it might be two or three?
7      A.   And this was back in -- when was it?
8          MS. KORGAONKAR:  Please clarify what you
9  mean by "effective."
10         MR. TATUM:  Sure.  And that's a --
11 that's a good point.
12     Q.   (By Mr. Tatum)  SB 14 became effective --
13 completely effective on January 1st, 2012.
14     A.   Uh-huh.
15     Q.   There was the preclearance litigation, so I
16 believe it did not become fully implemented until
17 after that litigation.  So since -- let's use that as
18 a time frame.  Since SB 14 was implemented sometime in
19 the summer of 2012, I believe, do you know if --
20     A.   Wait.  You said the summer of 2012.  I don't
21 think it was -- I don't think it was implemented in
22 the summer of 2012.
23     Q.   Do you know when it was implemented?
24     A.   I mean, I know it wasn't implemented for the
25 Presidential election that occurred in 2012.  Well,

Blake Green - 6/18/2014

94

1  when it went into effect?
2     Q.  Okay.  Let me just --
3     A.  Uh-huh.
4     Q.  Let's back up.
5     A.  Right.
6     Q.  Okay.  Since SB 14 was implemented, do you
7  know if more or less of Texas League constituents
8  voted in any election after SB 14 was implemented as
9  compared to elections prior to the implementation of
10  SB 14?  And I can rephrase that if you want.
11        MS. KORGAONKAR:  In addition, to, I
12  think, need to go rephrase it, I just want to clarify.
13  What I think you're asking about is topic 24.  And in
14  our objections, we've noted that the League doesn't
15  keep the kind of information that I think your
16  question is seeking.  And I also want to clarify that
17  it's still not clear to me what you mean by
18  "implemented."
19        MR. TATUM:  The way I understand topic
20  24 is, it talks about the number of voters who are
21  your members.  And y'all have made it clear that the
22  Texas League is not a membership organization.  And
23  I'm asking about constituents.
24        MS. KORGAONKAR:  So I understand the
25  distinction.

95

1        MR. TATUM:  Yes.
2        MS. KORGAONKAR:  I think that our
3  objections, though, note that the League doesn't keep
4  any of that type of information.
5        MR. TATUM:  Okay.
6        MS. KORGAONKAR:  Just full stop.
7        MR. TATUM:  Okay.
8     Q.  (By Mr. Tatum)  Just in light of that, can
9  you confirm, Mr. Green, that the Texas League does not
10  keep any kind of information relative to topic 24 in
11  the notice of this deposition?
12     A.  That's correct.
13        MS. CONLEY:  And why don't you take a
14  look at --
15        THE WITNESS:  Right.
16        MS. CONLEY:  -- topic 24 and read it
17  before you answer that question.
18     A.  Right, we don't keep information on if they
19  vote or not.
20     Q.  (By Mr. Tatum)  Okay.  Just to confirm, the
21  Texas League does not keep any kind of information
22  indicating whether or not its constituents have voted?
23     A.  Correct.
24     Q.  Okay.  And the last question before we take a
25  break.

96

1     A.  Okay.
2     Q.  Can you identify a Texas League constituent
3  who has suffered harm at any point because of SB 14?
4        MS. KORGAONKAR:  Objection for
5  vagueness, harm.
6     Q.  (By Mr. Tatum)  Can you identify a Texas
7  League constituent who has been negatively impact in
8  any way because of SB 14?
9     A.  What do you mean by "negatively impacted"?
10     Q.  Any Texas League constituent who has been
11  affective -- affect -- affected -- sorry.  Let me
12  re-rack.
13        Can you identify any Texas League constituent
14  who has been affected in a negative way, any kind of
15  negative way by SB 14?
16     A.  Well, I mean, I can't identify by name, but I
17  know that there -- that there are some on our list
18  that -- particularly out-of-state students that don't
19  have one of the forms of ID, uh-huh.
20     Q.  Do you know how many?
21     A.  I don't know how many.
22        MR. TATUM:  I think we can take a break.
23        THE WITNESS:  Okay.
24        (Lunch recess.)
25        MR. TATUM:  Are we back on the record?

97

1        THE REPORTER:  Yes.
2        MR. TATUM:  Okay.
3     Q.  (By Mr. Tatum)  Mr. Green, I'd like to talk
4  to you more about SB 14.  Does the Texas League
5  contend that SB 14 was enacted with a discriminatory
6  purpose?
7     A.  Yes.
8        MS. KORGAONKAR:  Object to "contend."
9  Calls for a legal conclusion.
10     Q.  (By Mr. Tatum)  Let me rephrase then.  Does
11  the Texas League believe that SB 14 was enacted with a
12  discriminatory purpose?
13     A.  Yes, uh-huh.
14     Q.  And what is that belief based on?
15     A.  It was -- it's based on it being
16  discriminatory to the fact that it -- it limits the
17  forms of ID to -- and -- and makes it harder for, you
18  know, specific burdens to -- I mean, and makes it a
19  burden for specific -- specific population.  So some
20  populations are, in fact, discriminated from. . .
21     Q.  Okay.  Does the Texas League believe that the
22  legislature that enacted SB 14 acted outside of normal
23  procedures in enacting SB 14?
24     A.  I want to make sure I understand your
25  question correctly.  Can you restate it or rephrase it

Blake Green - 6/18/2014

98

1 another way?
2    Q.  Sure.  Does the Texas League believe that the
3 legislature -- the Texas legislature acted outside of
4 normal legislative procedures when it enacted SB 14?
5    A.  Yes.
6    Q.  And what is that belief based on?
7    A.  Well, I mean, it's based on, you know, it
8 going before the DOJ and the DOJ stopping it.  And
9 then after the -- you know -- after the Shelby County
10 -- I mean, not the Shelby County.  But after the
11 Section 5 Federal Court struck it down, the -- you
12 know -- the state or the legislators still went ahead
13 and moved forward and implemented of the law.
14    Q.  I believe you're talking more about after the
15 law was actually enacted.
16    A.  Uh-huh.
17    Q.  And I'm talking -- what I'm asking about is
18 the 2011 legislature.
19    A.  Okay.
20    Q.  Perhaps I should have been more clear about
21 that.
22    A.  Okay.
23    Q.  So during the 2011 Texas Legislature, when SB
24 14 was proposed, considered, and ultimately passed,
25 does the Texas League believe that the legislature

99

1 acted outside of normal legislative procedures in
2 pushing that bill through?
3          MS. KORGAONKAR:  Maybe if you could
4 clarify "normal legislative procedures."
5          MR. TATUM:  Sure.
6    Q.  (By Mr. Tatum)  I'm sorry.  Bear with me.
7 Okay.  In your -- in the Amended Complaint filed by
8 the Texas League on Page 22 -- and this is under Claim
9 No. 1.  I'm looking at Page 22, Paragraph 10.  It
10 cites evidence -- and I'm quoting directly from the
11 Amended Complaint here.  It cites evidence
12 demonstrating that the Texas legislature departed from
13 its usual procedures when it passed SB 14.  So that's
14 where this question comes from.
15          And when I say "legislative procedures," I'm
16 talking about any kind of legislative proceeding that
17 occurs during the course of a bill's consideration.
18 So with that stated, I'll ask the question again.
19 Does the Texas League believe that the legislature
20 acted outside of normal procedures in the enactment of
21 SB 14 during the 2011 Texas League's legislature?
22          MS. CONLEY:  And I'd just like to -- can
23 we just point Mr. Green to the --
24          MR. TATUM:  Oh, sure.
25          MS. CONLEY:  -- to the top of the

100

1 question, so he can know the context of --
2          MR. TATUM:  Sure.
3          MS. KORGAONKAR:  Read it --
4          MS. CONLEY:  -- the -- you know --
5 Section 10 that you're referring to.
6          MS. KORGAONKAR:  -- if that helps you to
7 answer the question.
8          MR. TATUM:  Gotcha.
9          MS. CONLEY:  Okay.
10          MR. TATUM:  No problem.
11    Q.  (By Mr. Tatum)  So, again, I'm looking on
12 Page 22.  And in the middle of that page there's a
13 numbered paragraph.  It's No. 10.  Do you see that
14 paragraph?
15    A.  Uh-huh.
16    Q.  Would you please say "yes"?
17    A.  Oh, I'm sorry.  Yes.
18    Q.  Thank you.  That paragraph says, Evidence
19 demonstrating that the Texas Legislature departed from
20 its usual procedures when it passed SB 14.
21          Is that an accurate reading of that sentence?
22    A.  (No verbal response.)
23          MS. CONLEY:  I'm sorry.  What was the --
24 was the question just was -- is that an accurate
25 reading?

101

1          MR. TATUM:  Yes.
2          MS. CONLEY:  Okay.
3    Q.  (By Mr. Tatum)  Did I accurately read that
4 sentence there under Paragraph 10?
5    A.  Yes.
6    Q.  Okay.  Can you tell me what evidence that
7 statement that I just read is based on?
8          MS. KORGAONKAR:  And I'll object to the
9 extent that that calls for a legal conclusion that
10 that the word "evidence" carries a legal significance.
11 You can answer the question if you're able to.
12          MR. TATUM:  And if it helps, I can
13 rephrase it.
14          MS. KORGAONKAR:  You can also look at
15 the document.
16          THE WITNESS:  Right.  I'm actually
17 looking at it now.
18    A.  Well, can you just -- can you rephrase the
19 question?
20    Q.  (By Mr. Tatum)  Absolutely.  In its Amended
21 Complaint, the Texas League is alleging or citing
22 evidence demonstrating that the Texas legislature
23 departed from its usual procedures when it passed
24 SB 14.  Can you tell me on what basis the Texas League
25 believes that the Texas Legislature departed from its

Blake Green - 6/18/2014

102

1  usual procedures when it passed SB 14?
2        MS. KORGAONKAR:  I'll object just to the
3  extent that it could call for a legal conclusion, but
4  you can answer.
5     A.  Right.  I don't -- I don't know.
6     Q.  (By Mr. Tatum)  You don't know on what basis
7  the Texas League believes that the legislature
8  departed from its usual procedures when it passed
9  SB 14?
10       MS. CONLEY:  Same objection.  I just
11  want to make sure it's preserved.
12    A.  Well, I mean, one thing I can say is that --
13  I mean, I do know that there were some amendments that
14  were -- that were -- you know -- that were proposed
15  that -- that -- you know -- that the legislature did
16  strike down that would have included, you know,
17  student IDs or, you know, other forms of ID that would
18  make it more -- make the bill better.
19    Q.  (By Mr. Tatum)  Do you have anything else on
20  that question?
21       MS. CONLEY:  Object to the form.
22       MS. KORGAONKAR:  Asked and answered.
23       THE WITNESS:  Huh?
24    Q.  (By Mr. Tatum)  I'm just wondering if I can
25  ask my next question or if you have more?

103

1     A.  You can ask your next question.
2     Q.  Okay.  In this same vain, does the Texas
3  League believe that the Texas legislature acted
4  improperly in the way that it enacted SB 14?
5        MS. KORGAONKAR:  Objection for
6  vagueness.  It also calls for a legal conclusion.
7  It's not clear what "improperly" means.
8     A.  (No verbal response.)
9     Q.  Again, the Texas League has alleged in its
10  Complaint that the Texas legislature departed from its
11  usual procedures when it passed SB 14.  You've
12  testified that certain amendments that were proposed
13  were ultimately rejected.  Other than that, on what
14  basis does the Texas League believe that the Texas
15  Legislature departed from its usual procedures when it
16  passed SB 14?
17    A.  (No verbal response.)
18    Q.  Mr. Green, if you like, we can -- I'm sorry
19  if I interrupted you.
20    A.  I mean, you can go ahead.
21    Q.  If you like, we can come back to this later
22  and I can just move on, if that's all right with you.
23    A.  Yeah, that's fine.
24    Q.  Okay.  Mr. Green, does the Texas League
25  believe that any legislator who voted for SB 14 acted

104

1  with discriminatory intent?
2        MS. KORGAONKAR:  Objection to the extent
3  that "discriminatory intent" in this litigation is a
4  legal term.  You can ask the question if you're able
5  to.
6     A.  Any legislator?  I don't know.  Any
7  legislator?
8     Q.  (By Mr. Tatum)  I'll --
9        MS. KORGAONKAR:  Do you understand the
10  question?
11    A.  I mean, restate the question again to make
12  sure I understand.
13    Q.  (By Mr. Tatum)  Sure.
14    A.  Uh-huh.
15    Q.  Does the Texas League believe that any
16  legislator who voted for SB 14 acted with the intent
17  to discriminate by doing so?
18    A.  That voted for it?
19    Q.  Yes.
20    A.  Yes.
21    Q.  And what is that belief based on?
22    A.  You know, as I said before, after, you know,
23  the amendments, you know, were passed to be more
24  inclusive, you know, the way that it is now, the way
25  that they voted on it, you know, with limited -- I

105

1  guess, with the limited forms of ID, I mean, it -- it
2  -- I mean, it can be said that they clearly knew that
3  some people would be left out of the process because
4  of that fact and they still went ahead and voted on it
5  anyway.
6     Q.  Does the Texas League believe that the
7  legislature, in enacting SB 14, intended to harm any
8  specific minority group?
9        MS. KORGAONKAR:  Objection for vagueness
10  on harm.
11    A.  What do you mean by "harm"?
12    Q.  (By Mr. Tatum)  Does the Texas League believe
13  that the Texas Legislature intended to negatively
14  impact or negatively affect any minority group when it
15  enacted SB 14?
16    A.  Yes.
17    Q.  And what is that belief based on?
18    A.  Well, I mean, as I said before, one example
19  would be student -- student ID.  I mean, previously
20  student IDs were able to vote.  And that's, you know,
21  a key population.  And now, you know, those eligible
22  voters, you know, cannot use their student IDs to vote
23  under this new SB 14 law.
24    Q.  Does the Texas League believe that only
25  minority students with college IDs are impacted by --

Blake Green - 6/18/2014

106

1  in the way that you just described?
2      A.   Minority IDs, I think they would -- they
3  would be impacted more than the non-minorities.
4      Q.   And is that belief based on any kind of study
5  or analysis?
6      A.   I mean, like I said -- as I said before, you
7  know, in order to get one of the forms of ID,
8  especially for those out-of-state students, and
9  especially the ones that are, you know African
10  American and, you know, Hispanic, like I said, because
11  of their economic status across the board compared to,
12  you know, their white counterparts, it's -- it puts --
13  it puts -- it puts a burden for them, uh-huh.
14      Q.   Does the Texas League support the idea that
15  only registered voters should be allowed to vote?
16      A.   Only registered voters?
17      Q.   Yes.
18      A.   Yes, uh-huh.
19      Q.   Does the Texas League believe that Texas
20  should make sure that people attempting to vote are
21  registered voters?
22      A.   Okay.  Restate your question --
23      Q.   Sure.
24      A.   -- to make sure I understand.
25      Q.   Does the Texas League believe that the State

107

1  of Texas should make sure that people attempting to
2  vote are registered voters?
3      A.   Well, I don't know exactly what the State of
4  Texas should do, but I know that everyone who is
5  registered to vote should have the right to vote and
6  shouldn't have any barriers towards that -- towards
7  that right.
8      Q.   Does the Texas League believe that -- and
9  this might be repeating my previous question and let
10  me know if it is.  Does the Texas League believe that
11  the Texas should make -- that the State of Texas
12  should make sure that the person who is registered to
13  vote is the same person who is attempting to vote?
14      A.   One more time.
15      Q.   Does the Texas League believe that the State
16  of Texas should make sure that a person who is
17  registered to vote is the same person who is
18  attempting to vote?
19      A.   I mean, like, as before I said before, I
20  don't know, you know, what the State of Texas should
21  do, but I know currently, the way it is now does leave
22  out, you know, a significant amount of people and
23  makes it harder for them to vote.
24      Q.   Okay.  Leaving the State of Texas out of it,
25  does the Texas League believe that when someone is

108

1  casting a vote, they should be the same person who is
2  registered to vote?  In other words, does the Texas
3  League believe that voter fraud should be prevented?
4          MS. KORGAONKAR:  Objection.  That's a
5  compound question as stated.
6      Q.   (By Mr. Tatum)  Okay.  Let me rephrase.
7      A.   Uh-huh.
8      Q.   Does the Texas League believe that the person
9  who is registered to vote -- a person who is duly
10  registered to vote should be the same person that is
11  attempting to vote on election day?
12      A.   Well, I mean, we believe that everyone who
13  has the right to vote has a right to vote.
14      Q.   And does -- do you believe that when a
15  registered voter is voting, we should make sure that
16  they're the same person -- let me retract.
17          Mr. Green, do you think voter fraud should be
18  illegal?
19      A.   I mean, I don't -- I mean, I don't know about
20  -- I mean, I don't know anything about pretty much
21  voter fraud, but -- but the way that SB 14 is on the
22  books now, you know, as I said before, makes it --
23  makes it hard for certain people to actually vote.
24  And we believe that everyone who has a right to vote
25  should, in fact, have a right to vote without any --

109

1  any -- you know -- without any burdens or challenges
2  to it.
3      Q.   But do you think voter fraud should be
4  illegal?
5      A.   Like I said, I think everyone who has a right
6  to vote should have a right to vote.
7      Q.   Mr. Green, you're not answering my question.
8  I'm looking for a "yes" or "no."
9          MS. KORGAONKAR:  Maybe I'll object to
10  vagueness to the term "voter fraud."
11      Q.   (By Mr. Tatum)  Okay.  Do you have the notice
12  of this deposition in front of you in there somewhere?
13      A.   (No verbal response.)
14      Q.   Do you have the notice in front of you?
15      A.   I do, uh-huh.
16      Q.   Would you mind turning to Page 5, please?
17      A.   (Complying.)
18      Q.   When I refer to "voter fraud," I'm referring
19  to that term as it is defined in this notice and as it
20  was used in the deposition topics.  If you would,
21  please, take a moment to just review that definition
22  and let me know when you're finished.
23      A.   (Complying.)  Okay.
24      Q.   Have you had a chance to review that
25  definition?

Blake Green - 6/18/2014

110

1    A.  Uh-huh.
2    Q.  Okay.  Having reviewed what I mean when I say
3  "voter fraud," do you believe that voter fraud should
4  be illegal?
5    A.  Should be illegal?
6        MS. KORGAONKAR:  I'll just note for the
7  record that I don't know this is within any of the
8  topics in the notice.  You should answer the question
9  to the extent that you're able to.  And I'd also like
10  to note that some of the topics related -- that do
11  relate to voter fraud have been objected to.  We did,
12  however, say that we'd produce a witness, but the
13  objections are maintained.
14        MS. CONLEY:  Do you mind just repeating
15  your question to make sure that. . .
16        MR. TATUM:  You bet.
17        MS. CONLEY:  Yeah.  Thank you.
18    Q.  (By Mr. Tatum)  Mr. Green --
19    A.  Uh-huh.
20    Q.  -- having reviewed what I mean when I say
21  "voter fraud," do you believe that voter fraud should
22  be illegal?
23    A.  Well, I mean, I'm not -- I'm not a
24  legislature and I don't -- and I don't make laws, but
25  I believe everyone who has the right to vote should

111

1  have a right to vote and. . .
2    Q.  Mr. Green, do you think voter fraud should be
3  illegal?
4        MS. KORGAONKAR:  Can I -- can I just
5  make a suggestion?
6        MR. TATUM:  Sure.
7        MS. KORGAONKAR:  It might be helpful to
8  -- I appreciate that there's a definition here.  It
9  might, nonetheless, for the purposes of getting
10  through this, be more helpful if you were to break
11  down voter fraud.
12        MR. TATUM:  Okay.  I'm happy to do that.
13    Q.  (By Mr. Tatum)  Mr. Green, I represent to you
14  that the term "voter fraud" is defined as fraudulent
15  or deceptive acts committed to influence the act of
16  voting and includes both criminal and civil offenses
17  and violations.  "Voter fraud" can mean many different
18  things.
19        Mr. Green, do you believe that making or --
20  making or knowingly possessing a counterfeit -- sorry.
21        Mr. Green, do you believe that it should be
22  illegal to make or knowingly possess a counterfeit of
23  an official election ballot?
24        MS. KORGAONKAR:  Mr. Green, this is just
25  a "yes" or "no" question.

112

1        THE WITNESS:  Uh-huh.
2    A.  Right.  I mean, voter fraud is illegal.
3  Correct?
4    Q.  (By Mr. Tatum)  Mr. Green, I'm asking you a
5  question.
6    A.  Okay.
7    Q.  And I'd appreciate it if you would answer for
8  me, please.
9    A.  Okay.
10    Q.  Mr. Green, do you think it should be illegal
11  to make or knowingly process a counterfeit of an
12  official election ballot?
13    A.  Yes.
14    Q.  Do you think it should be illegal to sign a
15  name, other than one's own, to a petition proposing an
16  initiative, referendum, recall, or nomination of a
17  candidate for office?
18    A.  That it should be illegal?
19    Q.  Yes.
20    A.  Yes.
21    Q.  Mr. Green, do you think it should be illegal
22  to knowingly sign more than once for the proposition,
23  question, or candidate in one election?
24    A.  Yes.
25    Q.  Mr. Green, do you think it should be illegal

113

1  to sign a petition proposing an initiative or
2  referendum when the signer is not a qualified voter?
3    A.  Yes.
4    Q.  Mr. Green, do you think it should be illegal
5  to vote or attempt to vote in the name of another
6  person?
7    A.  More than once on a -- yes.
8    Q.  I'm sorry.  I didn't understand your answer.
9    A.  Yes.
10    Q.  Mr. Green, do you think it should be illegal
11  to vote or attempt to vote more than once during the
12  same election?
13    A.  More than once in the same election, yes.
14    Q.  Mr. Green, do you think it should be illegal
15  to intentionally make a false affidavit swearing
16  falsely -- swear falsely or falsely affirm under an
17  oath required by statute regarding one's voting
18  status?
19    A.  Yes.
20    Q.  Mr. Green, do you think it should be illegal
21  to vote or attempt to vote in an election after being
22  disqualified or when the person knows that he or she
23  is not eligible to vote?
24    A.  When the person knows that he or she is not
25  eligible to vote, yes.

114

1    Q.   Mr. Green, do you believe that it should be
2  illegal to knowingly solicit or encourage a person who
3  is not qualified to vote in an election?
4    A.   Knowingly solicit or encourage a person who
5  is not qualified to vote in an election, yes.
6    Q.   Mr. Green, without going through all of the
7  various forms of voter fraud again, does the Texas
8  League believe that SB 14 deters voter fraud?
9    A.   Does it deter voter fraud?
10   Q.   Yes.
11   A.   I mean, I can't -- I mean, I don't know.  I
12  don't know if it deters voter fraud.
13   Q.   Does the Texas League believe that it does?
14       MS. KORGAONKAR:  Okay.  That's been
15  asked and answered.  He said he didn't know.
16   Q.   (By Mr. Tatum)  Mr. Green, has any
17  constituent of the Texas League ever expressed support
18  for voter ID laws?
19   A.   Any constituent?
20   Q.   Yes.
21   A.   Voted -- I mean, expressed support, I don't
22  know.
23   Q.   Has any constituent of the Texas League ever
24  expressed support specifically for SB 14?
25   A.   Expressed support, I don't -- not to my

115

1  knowledge.  I don't know.
2    Q.   Does the Texas League contend that voter ID
3  requirements were not popular amongst the citizens of
4  Texas when SB 14 was being considered in 2011?
5        MS. KORGAONKAR:  Objection to the use of
6  "contend."  It's also compound.
7        MS. CONLEY:  And it calls for
8  speculation.
9        MR. TATUM:  I'll rephrase.
10   Q.   (By Mr. Tatum)  Mr. Green, does the Texas
11  League believe that the citizens of Texas did not
12  support voter ID requirements in 2011?
13   A.   I mean, I don't recall any -- I mean, looking
14  at any polls or statistics, but I do know that our
15  constituency base, the ones who are most impacted, and
16  we, as an organization don't support it because, you
17  know, of the burden that it has on young people and
18  people of color.
19   Q.   Mr. Green, are you aware that according to a
20  poll -- you mentioned polls -- conducted by the Texas
21  Tribune and the University of Texas in February 2011
22  -- so this was just before SB 14 was enacted -- that
23  75 percent of registered voters agreed with the
24  proposition that voters should have to present a
25  government-issued photo ID before they can be allowed

116

1  to vote?
2        MS. KORGAONKAR:  Objection.  That
3  assumes facts not the evidence.
4    A.   I mean, I wasn't aware of that poll.
5    Q.   Okay.
6        (Exhibit No. 7 marked.)
7    Q.   Mr. Green, I'm handing you what's been marked
8  as Exhibit 7.
9    A.   Uh-huh.  Okay.
10   Q.   Mr. Green, I represent to you that what I
11  just handed you is a graphical representation of the
12  poll I just referenced, the poll conducted by the
13  Texas Tribune and the University of Texas in February
14  of 2011.  Can you confirm by looking at this graph the
15  percentage of people who responded to this poll that
16  agree with the proposition that registered voters
17  should be required to present a government-issued
18  photo ID before they can be allowed to vote?
19       MS. KORGAONKAR:  And I'll object to that
20  question.  As Mr. Green just stated, he has no
21  familiarity with this document whatsoever.  I'll also
22  object to the characterization of the document as
23  we've never seen it, not being able to testify to any
24  of the contents.
25       (Speaking simultaneously.)

117

1        MS. CONLEY:  Are you just asking him to
2  read the document?
3        MR. TATUM:  Yes.
4        THE REPORTER:  Let me get her objection
5  first.
6        MS. CONLEY:  Okay.
7        THE REPORTER:  Go ahead.
8        MS. KORGAONKAR:  We don't agree with the
9  way it was represented by counsel.
10       MS. CONLEY:  I just asked the question,
11  are you just asking him to read the document?
12       MR. TATUM:  Yes.
13       MS. CONLEY:  That's --
14       MR. TATUM:  Yes.
15   Q.   (By Mr. Tatum)  And I'll represent to you
16  again that this is the graphical representation of the
17  poll that I referenced earlier conducted by the Texas
18  Tribune and the University of Texas in 2011 showing
19  the results of that poll.  I'm representing to you
20  that that's what this graph shows.
21   A.   Okay.
22   Q.   Do you understand?
23   A.   I see.
24   Q.   Okay.  Looking at this graph, do you see at
25  the top there where the question is presented and it

118

1  states, and I quote, Do you agree or disagree that
2  registered voters should be required to present a
3  government-issued photo ID before they can be allowed
4  to vote?
5        Do you see that sentence?
6    A.  You're correct, I see that sentence.
7    Q.  Okay.  Looking at the graphical
8  representation of the data, can you tell me what
9  percentage of the people who responded to this poll
10  indicated that they agree with that proposition?
11    A.  I mean, 75 percent.  But let me -- but let me
12  just -- let me just be clear.  When you say
13  government-issue photo ID, you know, for state --
14  state institutions, those are -- those are -- state
15  institutions IDs, that's government-issued ID, as
16  well.  I mean, government-issued IDs, as well.
17    Q.  Okay.  So do you think that the information
18  in this graph is inaccurate then?
19        MS. KORGAONKAR:  Objection.  That
20  mischaracterizes testimony.
21    A.  I mean, that's not what I'm saying.  What I'm
22  saying is -- I mean, this is poll -- I see this poll
23  here.  I mean, but I also believe that everyone who --
24  who is eligible to vote should have the right --
25  should have the right to vote and. . .

119

1    Q.  Okay.  Let me rephrase my question.  Would
2  you agree -- looking at the information on this graph,
3  would you agree that this graph indicates that 75
4  percent of the people who responded to this poll
5  indicated that they agree that registered voters
6  should be required to present a government-issued
7  photo ID before they can be allowed to vote?
8    A.  Correct, looking at this document, I do see
9  that.
10        (Exhibit No. 8 marked.)
11    Q.  Okay.  Mr. Green, I'm handing you what's been
12  marked as Exhibit 8.  Mr. Green, I represent to you
13  that this is another graphical representation of the
14  results of the poll that we've been discussing.  And I
15  represent to you that this graph depicts the results
16  of that poll broken down amongst different races and
17  ethnicities.
18        MS. KORGAONKAR:  We'll object here again
19  to the extent that Mr. Green is not familiar with the
20  document.
21    Q.  (By Mr. Tatum)  And I will say on the record
22  that I'm introducing this to you for the first time
23  and I understand this is the first time you've seen
24  this document.
25        MS. KORGAONKAR:  Or any of the

120

1  underlying data.
2        MR. TATUM:  Yes.
3    Q.  (By Mr. Tatum)  Again, I'm representing to
4  you that this is data compiled by the Texas Tribune
5  and the University of Texas in a poll that they
6  conducted in February 2011.  Mr. Green, looking at the
7  document I've just given you --
8    A.  Uh-huh.
9    Q.  -- can you tell me -- looking at the left
10  side of that graph, can you tell me what percentage of
11  African Americans who responded to this poll agree
12  that registered voters should be required to present a
13  government-issued photo ID before they can be allowed
14  to vote?
15        MS. CONLEY:  And just so we're clear,
16  you're not asking him whether or not that number is
17  accurate, just whether this is what the document says.
18  Right?
19        MR. TATUM:  Yes.
20    Q.  (By Mr. Tatum)  I'm asking you to, if you
21  would, please, look at this document and tell me what
22  percentage this graph depicts --
23    A.  Right.
24    Q.  -- of African Americans who responded to this
25  poll who indicated that they agree that registered

121

1  voters should be required to present a
2  government-issued photo ID before they can be allowed
3  to vote?
4    A.  I mean, this document says 63 percent.
5    Q.  And can you tell me what percentage of Latino
6  respondents to this poll indicated that they agree
7  that registered voters should be required to present a
8  government-issued photo ID before they can be allowed
9  to vote?
10    A.  The document says 68 percent.
11    Q.  Okay.  Looking at this graph, would you agree
12  the majority of African Americans and Latinos who
13  responded to this poll supported voter ID requirements
14  in 2011?
15    A.  I want to make sure I understand your
16  question.  Say it again.
17    Q.  Sure.  Based on the information contained in
18  this graph --
19    A.  Uh-huh.
20    Q.  -- would you agree that the majority of
21  African Americans and Latinos who responded to this
22  poll supported voter ID requirements in 2011?
23    A.  I mean, according to this graph, it does say
24  that.  I mean, it says 63 percent of African Americans
25  and 68 percent of Latino agree that registered voters

Blake Green - 6/18/2014

122

1  should be required to present a government-issued ID
2  before they're allowed to vote, according to this
3  graph, uh-huh.
4      Q.  All right.  I've got one more graph.  It's
5  the last one, I promise.
6      A.  Okay.
7          (Exhibit No. 9 marked.)
8      Q.  Mr. Green, I'm handing you what's been marked
9  as Exhibit 9.  Mr. Green, with knowledge that you've
10  never seen this document before --
11      A.  Uh-huh.
12      Q.  -- I represent to you that this document
13  represents the graphical results or is a graphical
14  representative of the results -- of the results of the
15  poll conducted by the Texas Tribune and the University
16  of Texas in February of 2011.
17          Mr. Green, looking at this graph, could you
18  tell me what percentage of democrats who responded to
19  this poll support the proposition that registered
20  voters should be required to present a
21  government-issued photo ID before they can be allowed
22  to vote?
23      A.  I mean, this document says 58 percent.
24      Q.  And could you tell me what percentage of
25  independents agree that registered voters should be

123

1  required to present a government-issued photo ID
2  before they can be allowed to vote?
3      A.  I mean, it states -- it states 70 percent,
4  uh-huh.
5      Q.  Okay.  Mr. Green, having worked in the
6  legislature for a short amount of time, as you stated
7  previously, would you agree that elected lawmakers
8  listen to the voices of their constituents?
9          MS. KORGAONKAR:  And I'll just object,
10  because Mr. Green is here to testify on behalf of the
11  League, not as himself, as anyone who's worked for the
12  legislature or even just as a Texan.
13          You can still answer the question.
14      A.  Restate the question.
15      Q.  (By Mr. Tatum)  Sure.  Would you agree that
16  elected lawmakers listen to the voices of their
17  constituents?
18          MS. KORGAONKAR:  And I'll just make the
19  same objection.
20      A.  That's what should happen, uh-huh.
21      Q.  (By Mr. Tatum)  Do you believe that elected
22  lawmakers listen to the concerns of their constituents
23  when drafting or considering legislation?
24          MS. KORGAONKAR:  I'll make the same
25  objection, but it would be helpful if you'd clarify

124

1  whether you're asking whether the League believes this
2  or whether he believes this.
3          MR. TATUM:  Okay.
4      Q.  (By Mr. Tatum)  Mr. Green, do you believe
5  that elected lawmakers listen to the voices and
6  concerns of their constituents when drafting or
7  considering legislation?
8          MS. KORGAONKAR:  Does he in his personal
9  capacity or does he as the League?  I want to make
10  sure the record is clear.
11          MR. TATUM:  Sure.  I'll ask both.
12      Q.  (By Mr. Tatum)  Does the Texas League believe
13  that elected lawmakers listen to the voices and
14  concerns of their constituents when drafting or
15  considering legislation?
16      A.  I mean, I can't -- I mean, they should -- I
17  mean, they should listen to their constituents.  I
18  mean, those are the folks who elected them.
19      Q.  Does the Texas League believe that they do
20  listen to the voices of their constituents?
21      A.  That they do?  You know, I can't answer that
22  question.  I mean, I would hope that they -- that they
23  would, uh-huh.
24      Q.  Okay.  Mr. Green, do you think it's at least
25  possible that, based on the results of this poll, that

125

1  SB 14 was enacted according to the wishes of Texas
2  citizens and not because of a discriminatory intent?
3          MS. KORGAONKAR:  And I'll just object
4  again that this is a 30(b)(6).  He's here to testify
5  as the League.  And I'll make, again, the underlying
6  objection that he has no familiarity, neither does the
7  League, with this poll.
8          THE WITNESS:  Uh-huh.
9          MS. KORGAONKAR:  Subject to that, you
10  can answer the question.
11      A.  Right.  I mean, I can't -- I mean, I don't
12  know -- I mean, I don't know, according to this graph,
13  if that is -- that is the case.  I don't know.
14      Q.  Notwithstanding this poll and these graphs,
15  does the Texas League believe that it's possible that
16  SB 14 was enacted according to the wishes of Texas
17  citizens and not because of a discriminatory intent
18  held by legislators?
19      A.  Okay.  Repeat it one more time.
20      Q.  Sure.
21      A.  Uh-huh.
22      Q.  Does the Texas League believe that it's at
23  least possible that SB 14 was enacted according to the
24  wishes and desires of citizens of Texas and not
25  because of a discriminatory intent held by the

Blake Green - 6/18/2014

126

1   legislators that voted for that bill?
2       A.   I mean, I don't know which particular, I
3   guess, Texas citizens you're referring to, because,
4   you know, there's a lot of citizens that -- I mean,
5   that are Texas citizens who are left out of the
6   process because of, you know, the current laws on the
7   books as it relates to SB 14.
8       Q.   Does the Texas League believe that no
9   citizens of Texas support voter ID requirements?
10      A.   That no citizens?
11      Q.   Correct.
12      A.   I mean, I would imagine some citizens support
13  it.
14      Q.   Do you have the Amended Complaint in front of
15  you?
16      A.   (No verbal response.)
17      Q.   Do you have it in front of you?
18      A.   Uh-huh.
19      Q.   Okay.  If you would please turn to Page 6.
20      A.   (Complying.)
21      Q.   Now, the question I'm about to ask is going
22  to be in reference to Paragraph 30.  Does the Texas
23  League believe that SB 14 forces the Texas League to
24  divert its limited resources, both financial and
25  otherwise, away from fulfilling its core mission of

127

1   registering and mobilizing young people of color to
2   vote, and, instead, towards helping its existing base
3   of voters secure one of the acceptable forms of ID
4   under SB 14?
5       A.   Yeah.
6       Q.   What is that belief based upon?
7       A.   Well, I mean, it's based upon our pursuit --
8   our core mission is to register voters to educate them
9   about the process, you know, and also to do, sort of,
10  what we call "leadership training."
11           Now, because of the enactment of SB 14, we've
12  been short of -- we're -- we have diverted our
13  resources to pretty much, you know, educate not only
14  -- not only our existing base of voters, but also our
15  new base of voters or constituency or population about
16  the -- about the particular SB 14 requirements under
17  the law.
18           So rather than us doing our normal function,
19  we have diverted -- we have diverted our resources to
20  pretty much educating people about, you know, how to
21  obtain one of the forms of ID.
22      Q.   Does the Texas League believe that educating
23  its constituents about voting requirements is a core
24  function of the Texas League?
25      A.   Educating them about voting requirements?

128

1       Q.   Yes.
2       A.   I mean, it's not the primary.
3       Q.   But does the Texas League believe that
4   educating its constituents regarding voting
5   requirements, and I should said voting laws, is a core
6   mission of the Texas League?
7           MS. KORGAONKAR:  Objection.  It's been
8   asked and answered.  You can answer.
9       A.   All right.  I mean, one of the things that we
10  do is, like I say, we engage in people in all respects
11  of the electoral process.  So we do -- you know -- you
12  know -- educate -- you know -- around -- you know --
13  different laws or issues that impact them directly.
14      Q.   (By Mr. Tatum)  Does the Texas League believe
15  that educating its constituents regarding the
16  requirements of SB 14 falls outside of its stated
17  mission?
18      A.   I mean, as one of our key sole
19  responsibilities, yes.
20      Q.   And how is educating its constituents
21  regarding the requirements of SB 14 different from
22  educating Texas League constituents regarding voter
23  requirements prior to SB 14?
24      A.   You know, I mean, as I said before, our --
25  our main source -- or our main -- is to educate them

129

1   about the electoral process, to educate them about how
2   issues, you know, impact them, how issues affect them.
3   But since a lot of our constituent base, particularly
4   college students are affected by this law, we want to
5   made sure that -- are affected -- I mean, the ones
6   that are affected by this law -- I mean, we want to
7   make sure that those who are eligible are eligible to
8   vote.
9           And -- you know -- you know -- we thought we
10  had our existing base secured, but, now, with the new
11  law, we have to make sure that they -- that they, who
12  voted previously, prior to SB 14, can vote again, you
13  know, after the law has been enacted.
14           So it has pretty much put a strain on you,
15  know, us being able to, you know, increase our voting
16  universe, add more people to the rolls through our
17  main focus -- one of our main focus is voter
18  registration has been deterred to actually, basically,
19  you know, make sure that our existing base of people
20  who will be registered who voted before and those who
21  are -- you know -- pretty much negative impact get the
22  requirements, so that they can vote -- that they can
23  vote again.
24           MS. KORGAONKAR:  Just slow down.
25      Q.   (By Mr. Tatum)  Mr. Green, in that allegation

Blake Green - 6/18/2014

---

130

1  that I read on Page 6 of the Complaint in Paragraph 30
2  --
3      A.  Uh-huh.
4      Q.  -- it makes a reference to limited resources,
5  financial and other.  Obviously "financial resources"
6  means money.  What does "other" refer to?
7      A.  I mean, time.
8      Q.  Anything else?
9      A.  I mean, just pretty much -- pretty much time
10  and -- and -- right, pretty much time and, you know,
11  financial resources, uh-huh.
12      Q.  So when they say limited resources, financial
13  and other, am I correct to say that you're referring
14  to financial resources and time?  Is that what you --
15  is that correct?
16      A.  I mean, people's time is a resource.
17      Q.  I agree.
18      A.  Right.
19      Q.  Are there any other kinds of resources that
20  the Texas League is referring to there?
21      A.  I mean, other, no.
22      Q.  (Indicating.)
23      A.  Oh, I said other, no.
24      Q.  I'm sorry.  I didn't hear you.
25          Of all the resources at the disposal of the

---

131

1  Texas League, what portion of those resources are you
2  having to divert towards SB 14-related activities?
3      A.  Which portion of it?  Well, all of our -- I
4  mean, pretty much a combination of all the re -- all
5  the re -- pretty much all the resources that goes
6  into, you know, our daily core mission.  So all of
7  that has been -- you know -- a portion of that has
8  really been diverted to, you know, incorporating, I
9  guess, making sure that people are educated in pretty
10  much all aspects, either it be with voter
11  registration, either it be with voter education or
12  even with leadership training.  We have to divert some
13  of the resource that was geared towards that to divert
14  to make sure that it covers, you know, incorporating
15  an SB 14 education component, as well.
16      Q.  Do you know what kind of time resources are
17  being diverted towards SB 14-related activities?
18      A.  I mean, I can say with myself and our state
19  director and even members of our -- of our staff --
20  you know -- rather than -- you know -- us -- you know
21  -- doing our essential Get Out the Vote -- you know --
22  activities -- you know -- we're now -- you know --
23  doing education -- going to do -- you know --
24  educational presentations.  I know myself and our
25  state director, we attend -- you know -- so many

---

132

1  different -- you know -- meetings to talk about -- you
2  know -- you know -- how do we better communicate this
3  all to our constituent base.  I mean, so all those are
4  examples of how -- you know -- our normal, I guess,
5  time during our core mission has been diverted to
6  combating this SB 14 law, uh-huh.
7      Q.  Mr. Green, looking at Paragraph 31 on Page 6,
8  do you see that paragraph?
9      A.  I do.
10      Q.  Okay.  Can you tell me what resources have
11  been diverted towards assessing who among the Texas
12  League constituency lacks one of the forms of required
13  photo ID under SB 14?
14      A.  As I said before, I know -- you know --
15  rather than just -- you know -- making phone calls to
16  them about getting out the vote -- you know -- we're
17  asking them -- you know -- do you have one of the
18  forms of required ID.
19          So it's -- it's taken extra time to have a
20  conversation with them about if they do have -- you
21  know -- one of the required forms of ID.  And if not,
22  we're spending extra time -- you know -- call time or
23  either in-person time telling them the specific steps
24  of how to do it.  And -- you know -- all that -- you
25  know -- all that takes -- takes time, and it takes

---

133

1  energy, and it takes more people.
2      Q.  What kind of financial resources have been
3  diverted towards assessing who among the Texas League
4  constituency lacks one of the forms of required photo
5  ID under SB 14?
6      A.  Financial resources, I know -- I know -- now,
7  this -- this --
8          MS. KORGAONKAR:  Objection as to form.
9  Sorry.
10      A.  Uh-huh.  And what do you mean by "forms"?
11      Q.  (By Mr. Tatum)  That's a question for your
12  attorney.  Were you through answering the question?
13      A.  No.  I haven't started answering the
14  question.
15      Q.  Okay.  By all means, proceed.
16      A.  Right.  I'm saying, I mean, what do you mean
17  by "forms"?
18      Q.  Oh, I'm sorry.  You're referring to forms in
19  my question, not the objection, form.
20      A.  In your question, right.
21      Q.  Sorry.  It says here in the Complaint under
22  Paragraph 31, it says, In particular, the Texas League
23  is now forced to undertake such activities as
24  assessing who among its constituency lacks one of the
25  forms of required photo IDs under SB 14.

---

Blake Green - 6/18/2014

134

1    I did not write this sentence, but I can only
2  assume it means the various documents that are
3  required to vote, the various forms of the photo ID
4  that are required to vote under SB 14, a driver's
5  licence, a concealed handgun license, state-issued
6  photo ID, et cetera.
7    A.  No.  I thought your question was forms of --
8  I think you said forms of resources or something or
9  forms of --
10   Q.  Okay.  Let's start over.
11   A.  Right.
12   Q.  Let's start over.  Can you tell me what
13  amount of financial resources have been diverted
14  towards assessing who among the Texas League
15  constituency lacks one of the forms of required photo
16  under SB 14?
17   A.  I mean, I don't know the specific amount.
18       MS. KORGAONKAR:  I'm objecting to the
19  form of the question.  You can answer it.
20   A.  I mean, I don't know the specific amount.
21   Q.  (By Mr. Tatum)  Mr. Green, can you tell me
22  what -- can you tell me how much time has been spent
23  hosting public education campaigns designed to inform
24  young voters of color that Defendants, State of Texas,
25  previously court-rejected photo ID law is now in

135

1  effect?
2    A.  Well, I mean, I can't give the exact -- the
3  exact amount, but I know we are spending more time
4  taking more trips -- well, not more -- well, actually,
5  more trips to college campuses.  I know we've been
6  called upon by a number of organizations who have use
7  as their constituency base that they've asked us,
8  because, you know, we're very familiar with the law,
9  to come to their events or to their public forums and,
10  you know, make a presentation about it.  And some of
11  those are during the weekends, some of those are after
12  hours, some of them are during the day.  But it's --
13  it's -- it's -- it's out of -- it's out of the norm
14  and we're making it so frequently.  Because one of our
15  key is, we want to make sure that -- you know --
16  particularly young people and students, we want to
17  make sure that they -- you know -- you know -- they
18  were able to vote prior to SB 14, and we want to make
19  sure that they are.  And that's one of the things that
20  we have been doing critically is ensuring that -- that
21  -- that base that voted in 2012 can vote again in 2013
22  and 2014.
23       (Exhibit No. 10 marked.)
24   Q.  Mr. Green, I'm handing you what's been marked
25  as Exhibit 10.  Mr. Green, I represent that this

136

1  document has been produced to the Defendants in the
2  litigation.  Have you seen this document before?
3    A.  Yes.
4    Q.  Now, there's a box at the top of this
5  document that's obscuring the title of it or whatever
6  is at the top there.  Do you know what's behind that
7  box?
8    A.  Oh, that's our logo.
9    Q.  That's the Texas League logo underneath that
10  box?
11   A.  Correct.
12   Q.  Okay.  Mr. Green, this document says, down
13  there in the middle, the third paragraph, it says,
14  quote, With the long history of voter
15  disenfranchisement in Texas oh the confusion of this
16  particular bill, we would have to do significant
17  election protection work for this election cycle.
18  Below are two ways in which we could make this happen.
19       Is that a correct reading of that paragraph?
20   A.  Correct.
21   Q.  Okay.  And below that it says -- it lists, 1,
22  Launch a comprehensive education campaign.  And 2, Run
23  a comprehensive election protection plan.  Is that
24  correct?
25   A.  Correct.

137

1    Q.  And below that it appears to be some
2  budgetary figures.  Is that correct?
3    A.  That's correct.
4    Q.  Do you know if the comprehensive education
5  campaign or the comprehensive protection plan
6  referenced in the document were ever executed?
7       MS. KORGAONKAR:  Objection.  Compound.
8  You can answer.
9    Q.  (By Mr. Tatum)  Let me rephrase.  This
10  document says, Below are two ways in which we could
11  make this happen.  To me, that indicates that the
12  comprehensive education campaign and comprehensive
13  election protection plan were just being proposed in
14  this document.
15   A.  Right.
16   Q.  Did the Texas League ever launch a
17  comprehensive education campaign as described in this
18  document?
19   A.  And this was back in 2012.  I think, to the
20  extent this -- I know this was just a proposal to
21  receive funding.  And I think -- back in 2012, I think
22  our education campaign pretty much focused on just Get
23  Out the Vote since, you know, the law wasn't enacted
24  at that time.
25   Q.  Did the Texas League ever run a comprehensive

Blake Green - 6/18/2014

138

1 election protection plan as described in this
2 document?
3    A.  We did run a -- a -- I mean, not to this
4 extent, not back in 2012, no.
5    Q.  All right.  So, to your knowledge, neither of
6 those activities listed there ever occurred?
7          MS. KORGAONKAR:  Objection.  That
8 mischaracterizes his testimony.
9    Q.  (By Mr. Tatum)  Do you know if either one of
10 those activities ever occurred?
11   A.  I mean, we did an education campaign, yes.
12   Q.  Okay.
13   A.  And we did an election protection campaign,
14 right, but it was just to -- but just to educate --
15 you know -- as a -- you know -- as a regular basis
16 on -- you know -- Get Out the Vote.
17   Q.  Okay.  At the bottom there under the heading
18 Budget --
19   A.  Uh-huh.
20   Q.  -- it has a number of monetary figures --
21   A.  Correct.
22   Q.  -- corresponding to certain expenses --
23   A.  Uh-huh.
24   Q.  -- it looks like.
25   A.  Uh-huh.

139

1    Q.  Does that represent the amount of financial
2 resources that would need to be spent on one of those
3 two activities?
4    A.  Yes, that was -- yes, that's what it's --
5 yeah, correct, uh-huh.
6    Q.  And is that total amount there at the bottom,
7 $25,000, is that the amount required for both
8 activities or just one?
9    A.  It would be a comprehensive -- I mean, a
10 collaboration of both activities.
11   Q.  So are you saying that to launch a
12 comprehensive education campaign, as described here,
13 and run a comprehensive election protection plan, as
14 described here, would require the budgetary expenses
15 described below?
16          MS. KORGAONKAR:  Objection.
17 Mischaracterizes.
18   Q.  (By Mr. Tatum)  I'm just asking if that's
19 what your understanding of these numbers is.
20   A.  I mean, it was a proposed budget based on our
21 specific key target market -- I mean, our target
22 precincts at that time.
23   Q.  And I'm sorry if I'm retreading ground here,
24 but you stated that a comprehensive education campaign
25 was executed with regard to SB 14.  Correct?

140

1    A.  Well, that was after -- that was after the
2 law actually was -- was -- was enacted.  That was, I
3 think, in the summer of 2013.
4    Q.  Okay.  And was a comprehensive election
5 protection plan executed after the implementation of
6 SB 14?
7    A.  Yes.
8    Q.  And do you recall if the financial resources
9 required for those activities equaled the amount
10 that's depicted below on this document?
11   A.  I don't -- I mean, I don't know.  I mean, I
12 don't know specifically.  Like I said, this was just a
13 proposal --
14   Q.  Okay.
15   A.  -- back in 2012.
16   Q.  But do you know how much it actually ended up
17 costing to run those two programs?
18   A.  Actually, I don't know.  I know we have a set
19 budget and we allocate resources as -- as things
20 happen.
21   Q.  Okay.
22   A.  But in terms of specific cost, I don't know.
23   Q.  What do you mean, "as things happen"?
24   A.  Right.  Well, I know we normally do voter
25 registration, voter education -- you know -- you know

141

1 -- our -- our normal stuff.  But then when we find out
2 or when there's, you know, something that we think
3 will impact our -- our key population, you know, we
4 have to make shifts to make sure that that is
5 incorporated, as well.  I mean, that's a key component
6 that we don't want to leave out.
7    Q.  Are there resources -- well, let me back up.
8 Does the Texas League devise or conduct an annual
9 budget?
10   A.  Right.  We do a projection.
11   Q.  A projection for that year's budget?
12   A.  Correct.
13   Q.  Does that budget include set dedicated funds
14 for specific purposes?
15   A.  We have specific allocations, yes.
16   Q.  Are there funds in the budget that are
17 reserved for things that come up, as you described it,
18 on an as-needed-type basis?
19   A.  I mean, it's very limited.  I mean, we have
20 miscellaneous funds, but it's very limited.
21   Q.  But miscellaneous funds are set aside for
22 things that come up?
23   A.  Yes.
24   Q.  And when you talk about financial resources
25 that have been diverted towards SB 14 activities, have

Blake Green - 6/18/2014

142

1 those resources come from the set dedicated funds or
2 the miscellaneous funds?
3    A.   It came from both.
4    Q.   From both?
5    A.   (Nods head affirmatively.)
6    Q.   Looking back at this document here, the
7 comprehensive education campaign and the comprehensive
8 election protection plan referenced there, were those
9 being proposed in response to SB 14?
10   A.   This was being proposed -- I guess we were
11 getting ourselves up just in case it wasn't
12 pre-cleared by the -- I mean, if -- if it went ahead
13 and was pre-cleared by the Department of Justice,
14 right.
15   Q.   So this was being proposed kind of on a
16 contingent basis if SB 14 was pre-cleared.  Is that
17 what you're saying?
18        MS. KORGAONKAR:  Objection.  I think
19 that mischaracterizes slightly.
20   Q.   (By Mr. Tatum)  Okay.  Let me rephrase.  The
21 comprehensive education campaign and the comprehensive
22 election protection plan that are being proposed in
23 this document, were those being proposed in response
24 to or because of SB 14?
25   A.   Correct.

143

1    Q.   So when it says a comprehensive education
2 campaign targeting young voters to ensure that they
3 are aware of the election laws and their rights to
4 register and vote, when it says election laws, is it
5 referring to SB 14?
6    A.   SB -- right, it's referring to SB 14 and --
7 pretty much SB 14 and what's required under that --
8 under that bill.
9    Q.   Does a comprehensive education campaign -- or
10 is -- let me start over.
11        Is launching a comprehensive education
12 campaign regarding a voter law, is that part of the
13 core mission of the Texas League of Young Voters?
14   A.   You know, as I said before, it's -- you know
15 -- one of our -- you know -- we want to make sure that
16 -- well, education is one of our core missions.  Now,
17 maybe not -- now, maybe -- right.  I mean, anything
18 that -- that would hinder our base from voting, we
19 want to make sure that they are -- that they are
20 educated on, you know, any laws or anything that would
21 hinder them from voting.
22   Q.   So by educating its constituents regarding
23 SB 14, is the Texas League not fulfilling its mission
24 to educate voters regarding voter laws?
25        MS. KORGAONKAR:  Objection.  I think

144

1 that's confusing as stated.
2    Q.   (By Mr. Tatum)  Would you like me to rephrase
3 the question?
4    A.   Yes.
5    Q.   Okay.  Is educating young voters and Texas
6 League constituents about existing voter laws, is that
7 part of the Texas League's mission?
8    A.   I mean, our mission is to register voters and
9 get them out to vote.  I mean, it's not -- I mean,
10 it's not our core mission, but, you know, like I said,
11 anything that impacts them, we want to make sure that
12 they're aware of it.  But our core mission is get
13 people registered and get them out to the polls.
14   Q.   My question was:  Is educating voters --
15   A.   Uh-huh.
16   Q.   -- about existing voting laws part of the
17 Texas League's mission?
18   A.   Is it part of our mission?
19   Q.   Yes.
20        MS. KORGAONKAR:  That's been asked and
21 answered.
22        MR. TATUM:  He didn't answer the
23 question.
24        MS. KORGAONKAR:  Can you read back,
25 please?

145

1        THE REPORTER:  What do you want me to
2 read back?
3        MS. KORGAONKAR:  The -- not this
4 question that I objected to, but the one prior in
5 response to that, please.
6        (Requested portion read.)
7    Q.   (By Mr. Tatum)  And my question was:  Is
8 educating young voters about existing voter laws, is
9 that part of the Texas League's mission, not
10 registering, but educating?
11        MS. KORGAONKAR:  I make the same
12 objection.
13   A.   Yeah, it's the same question.
14   Q.   (By Mr. Tatum)  Mr. Green, do you have the
15 document I gave you earlier that recites the Texas
16 League of Young Voters Education Fund's mission and
17 purpose?
18   A.   Yes.
19   Q.   After the sentence that says, Our organizing
20 and programming model can be categorized in the
21 following key areas, am I correct in stating that one
22 of those key areas is voter education and issue
23 advocacy?
24   A.   That's correct.
25   Q.   Okay.  So am I correct in stating that voter

Blake Green - 6/18/2014

146

1  education is part of the mission of the Texas League?
2     A.  Voter education?
3     Q.  Yes.
4     A.  Yes.
5     Q.  And does voter education include educating
6  voters about existing voter laws?
7     A.  I mean, to a certain extent.
8     Q.  Okay.
9     A.  I mean, but that's not our core -- when we --
10  when we say voter education.
11     Q.  What is your core when you say voter
12  education?
13     A.  Voter education is making sure that they know
14  their rights as a voter, you know, like when they go
15  to the polls, if they're turned away, stuff like that.
16     Q.  So educating Texas League constituents about
17  existing voter laws is not part --
18     A.  About existing voter laws?
19        MS. KORGAONKAR:  Objection.
20        MR. TATUM:  Sorry.
21        MS. KORGAONKAR:  Mischaracterizes what
22  he said.
23     Q.  (By Mr. Tatum)  Okay.  Is educating Texas
24  League constituents about existing voter laws not part
25  of the Texas League's mission?

147

1     A.  I mean, it is part to a certain extent.
2     Q.  Okay.  Would you agree that the law as
3  enacted by SB 14 is an existing voter law?
4     A.  Currently, on the books, yes.
5     Q.  Okay.  So by educating Texas League
6  constituents about the requirements of SB 14, is the
7  Texas League not fulfilling its mission to educate
8  voters about existing voter laws?
9     A.  I mean, we are for that mission, but we don't
10  want it to, you know, overshadow, you know, our
11  critical work, which is, you know, voter registration,
12  Get Out the Vote.  Now, when you start -- like us,
13  when we start getting to the point where, you know,
14  that's literally the majority of our time is educating
15  about, you know, a law that we think hinders our
16  population, then it's sort of, when you about it, a
17  deviation from, you know, our core activities.
18     Q.  Can you tell me how many time-related
19  resources of the Texas League have been diverted
20  towards providing financial assistance and
21  transportation to young voters who lack the required
22  photo IDs and/or underlying documents, so that they
23  can acquire them where possible?
24     A.  Okay.  Well, I mean, as I said before, I know
25  there were several occasions where one of our staff

148

1  member did take a couple of our, I guess, constituency
2  to attain their -- their EIC.  And as we know, gas is
3  a financial resource.  And, you know, let's -- let's
4  be very clear that, you know, we did also educate and
5  pass out print material and print collateral, and all
6  those are financial resources, as well.  You know,
7  cost of printing, you know, cost of design, all that,
8  you know, are, you know, budgetary items that are
9  needed to -- you know -- to make this happen.
10     Q.  Can you tell me what amount of financial
11  resources have been diverted towards the purposes you
12  just described?
13     A.  The amount?  I don't know the exact amount.
14     Q.  Does the Texas League believe that it has
15  been unable to fulfill its mission because of SB 14?
16     A.  It has made it hard.  I mean, it has put a
17  burden on the organization, yes.
18     Q.  But has the -- does the Texas League -- I
19  don't believe you answered my question.  Does the
20  Texas League believe -- or does it -- or does the --
21  is the Texas League taking a position -- let me start
22  over.
23        Does the Texas League take the position that
24  it has been unable to fulfill its stated mission
25  because of SB 14?

149

1     A.  Yes.
2     Q.  In what way has it been unable to fulfill its
3  stated mission because of SB 14?
4     A.  I mean, as I -- I mean, as I said before, you
5  know, one of our key components -- I mean, one of our
6  key, you know, areas is to get, you know, new people,
7  you know, registered and out to vote.
8        Like I said, now, we're basically, you know,
9  making sure that our existing base, which we thought
10  were secure, make sure that they know that -- you know
11  -- about -- about the new law.  And if it impacts
12  them, make sure that they get the necessary documents.
13        So when it gets to a point where -- you
14  know -- rather than just registering voters or getting
15  them out to vote, where we're incorporating a
16  significant amount of time and energy, you know,
17  pretty much combating and educating them and making --
18  and walking them through -- walking them through, you
19  know, hand in hand, you know, getting them the
20  necessary forms of ID, then, I mean, that's a
21  significant amount of time that we're spending just
22  on, you know, SB 14 that we didn't have to before.
23     Q.  You mentioned getting new people to register
24  to vote.
25     A.  Uh-huh.

150

1    Q.   Do you know, on average, prior to SB 14, how
2  many new registered voters the Texas League was able
3  to -- let me state that again.
4         Prior to SB 14, do you know, on average,
5  average how many voters the Texas League helped
6  register for the first time?
7    A.   I mean, I don't know the exact number, but I
8  know it's significantly higher than the amount we're
9  registering now.
10   Q.   Can you give me a ballpark percentage of how
11  much lower it is now, as opposed to before SB 14?
12   A.   I mean, I don't have that -- I mean, I don't
13  -- I can't -- I mean, I -- I don't have information
14  off the top of my head.  I would have to. . .
15   Q.   Does the Texas -- do you know how many -- or
16  does the Texas League maintain that kind of
17  information about how many new registered voters it
18  has -- about how many voters it has helped -- let me
19  start over.
20        Does the Texas League maintain information
21  indicating how many voters it has helped register for
22  the first time in a given year?
23   A.   I mean, we have some information, but it's
24  not -- I mean, it's not I mean, it's not -- I mean,
25  I would say it's not categorized as, you know, these

151

1  people we registered to vote.  Right.  Because we
2  don't -- we -- because -- you know -- we don't -- you
3  know -- possess that type of information.
4    Q.   So when you say that you haven't been able
5  to, for lack of a better word, get as many new
6  registered voters while SB 14 is in effect --
7    A.   Uh-huh.
8    Q.   -- as opposed to before it was in effect --
9    A.   Right.
10   Q.   -- what is that statement based on?
11   A.   Well, what I mean by that is that -- you
12  know -- prior to SB 14 -- you know -- we -- you know
13  -- we have the time and the resource to -- you know --
14  to attend college campuses and strictly do -- you know
15  -- voter registration now, after SB 14, you know,
16  we're spending a lot of our time -- I mean, we're
17  still doing VR, because that's -- like I say, that's
18  one of our core missions.
19        But, now, some of the time is, you know, like
20  I said, going to, you know, speak at events or, you
21  know, making presentations.  So a lot of our, I guess,
22  staff and, you know, volunteers are -- are now sort of
23  like in an educational phase, rather than just going
24  out registering to vote.
25        I mean, so I know that the number of, you

152

1  know, VR -- I guess, what I mentioned before as
2  tabling isn't as much as now, because we're now,
3  basically, just making presentations and actually, you
4  know, educating about this new law.
5    Q.   And for the record, when you say "VR"?
6    A.   Voter registration.
7    Q.   Okay.  Does the Texas League believe that any
8  of its SB 14-related activities fall outside of the
9  scope of the Texas League's mission?
10   A.   I already answered that question.
11   Q.   Okay.  I don't believe -- I've asked -- I've
12  asked you a lot of questions about the Texas League's
13  mission today, especially with regard to SB 14, but I
14  don't think I've asked this specific one.
15   A.   Okay.
16   Q.   So, if I may, I'll repeat it.
17   A.   Uh-huh.
18   Q.   Does the Texas League believe that any of its
19  SB 14-related activities fall outside of the scope of
20  its stated mission?
21   A.   Of our core mission, yes.
22   Q.   And what activities are those?
23   A.   What, our core?
24   Q.   What SB 14-related activities that the Texas
25  League engages in fall outside of the scope of its

153

1  core mission?
2    A.   Well, I mean, as I said before, our core
3  mission is voter registration and Get Out the Vote.
4  It's not solely, you know, about making phone calls to
5  ask people who we've registered and who voted last
6  time if they have the ID to register -- you know -- to
7  be able to register again.
8         I mean, our core mission is actually, you
9  know, bringing new people into the process and, you
10  know, getting them acclimated to electoral process,
11  not -- not solely -- you know -- like I said, now, we
12  are -- we have to go back to the people we registered
13  before and actually calling them and making sure.  So
14  it's sort of like double work in some sense.
15        MR. TATUM:  I think I've just got a few
16  more questions here and then we're done.
17        MS. KORGAONKAR:  Okay.
18   Q.   (By Mr. Tatum)  Mr. Green, have any Texas
19  League constituents ever raised an allegation or
20  concern relating to election crimes to the Texas
21  League?
22        MS. KORGAONKAR:  I just want to note for
23  the record that we objected to that topic in the
24  30(b)(6) notice, but you can answer the question.
25   A.   I don't know.  We don't -- I mean, that's not

Blake Green - 6/18/2014

154

1  our core mission.  We don't focus on election crimes.
2      Q.  (By Mr. Tatum)  Do y'all focus on voter
3  fraud?
4      A.  Do we focus on voter fraud?  That's not what
5  our core mission is.
6      Q.  So has the Texas League conducted any
7  calculations, reports, audits, estimates, projections,
8  or other analyses relating to election crimes or voter
9  fraud?
10     A.  No.
11     Q.  Mr. Green, to the best of your knowledge, has
12 the Texas League provided all documents responsive to
13 the Defendants request for production in this case
14 that were in the Texas League's possession, custody,
15 or control?
16     A.  To the best of my knowledge, yes.
17     Q.  Mr. Green, do you know a Mr. Yannis Banks?
18     A.  Do I know him?
19     Q.  Yes.
20     A.  I've seen his name.
21     Q.  Have you ever met or conferred with him about
22 anything?
23         MS. KORGAONKAR:  Objection.  Beyond the
24 scope, but you can answer that.
25     A.  Yannis Banks, I know who he is.  I haven't

155

1  spoken to him about anything.
2         MR. TATUM:  Okay.  Could we go off the
3  record real quick?
4         (Discussion off the record.)
5         MR. TATUM:  Okay.  Back on the record.
6      Q.  (By Mr. Tatum)  Okay.  Mr. Green, we were
7  talking about this before, but we moved on after we
8  kind of got bogged done.  I was asking you whether the
9  Texas League believes that the legislature, in
10 enacting SB 14, departed from its normal legislative
11 procedures.  That's what we were talking about.
12     So I'm going to ask again:  Does the Texas
13 League believe that the Texas Legislature departed
14 from its normal legislative practices and procedures
15 in enacting SB 14?
16     A.  I don't know.
17     Q.  Well, I don't have anything else for you,
18 Mr. Green, now that we've come to this point.
19     A.  Okay.
20     Q.  And before I pass the witness, do you have
21 any -- anything you'd like to clarify or modify with
22 regard to any of your answers given today?
23     A.  I'm trying to think.
24     Q.  And you can think about it after we break.
25 And if they ask you any questions, you can come back

156

1  to that.
2      A.  Okay.
3         MR. TATUM:  All right.  Well, I have no
4  more questions for you and I pass the witness.
5         MS. KORGAONKAR:  So we'll just take a
6  break right now and then reconvene.
7         MR. TATUM:  Sure.
8         (Break.)
9         MS. KORGAONKAR:  I'm ready to go back on
10 the record.  We just have a couple of questions for
11 redirect.
12        MS. MILLER:  Okay.
13               EXAMINATION
14 QUESTIONS BY MS. KORGAONKAR:
15     Q.  Mr. Green, earlier you testified that when
16 you used the term "constituents" today, you've meant
17 people who have taken actions with the League, signed
18 petitions or signed pledge cards.  Is that right?
19     A.  That's correct.
20     Q.  And you've also used the term "constituency
21 base."  Is that right?
22     A.  Correct.
23     Q.  And is it correct that that doesn't
24 necessarily mean people who have taken an action with
25 the League or signed a petition or anything like that?

157

1      A.  Yes, that's correct.
2      Q.  Does constituency base, the way that you've
3  used today, mean the League's target demographic?
4      A.  Right, our target population.
5      Q.  What is a target population?
6      A.  Eighteen to thirty-five-year-olds,
7  particularly young people of color.
8      Q.  I'd like to just draw your attention back to
9  Exhibit, I believe it was 3, the list.
10     A.  Oh, is this it?  (Indicating.)
11     Q.  This one, yes.
12     A.  Okay.
13     Q.  Earlier, you testified that that document is
14 a partial list of constituents.  Is that right?
15     A.  Correct.
16     Q.  Does the League represent the interests of
17 constituents in this lawsuit?
18     A.  Yes.
19         MS. KORGAONKAR:  If we could just go off
20 the record for one moment?
21         (Discussion off the record.)
22         MS. KORGAONKAR:  Okay.  Those are all
23 the questions that we have.
24         THE WITNESS:  Okay.
25         MS. KORGAONKAR:  Does DOJ have any

158

1  questions.
2          MS. MILLER:  No questions from the
3  United States.
4          MR. TATUM:  Okay.  And I have nothing
5  further.  With that, I believe we can go off record.
6  Mr. Green, thank you.
7          THE WITNESS:  Thank you.
8          MS. KORGAONKAR:  Thank you.
9          (Deposition concluded at 3:46 p.m.)
10         (Signature requested.)
11                  * * * * *
12
13
14
15
16
17
18
19
20
21
22
23
24
25

159

1          CHANGES AND SIGNATURE
2  WITNESS NAME:  BLAKE EARL GREEN
3  DATE OF DEPOSITION:  JUNE 18, 2014
4  PAGE/LINE            CHANGE            REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

160

1          I, BLAKE EARL GREEN, have read the foregoing
   deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
4
5          _____
           BLAKE EARL GREEN
6
7
   THE STATE OF _____)
8  COUNTY OF _____)
9      Before me, _____, on this
   day personally appeared BLAKE EARL GREEN, known to me
10 (or proved to me under oath or through
   _____) (description of identity
11 card or other document) to be the person whose name is
   subscribed to the foregoing instrument and
12 acknowledged to me that they executed the same for the
   purposes and consideration therein expressed.
13     Given under my hand and seal of office this
   _____ day of _____,
14 _____.
15
16
17         _____
           NOTARY PUBLIC IN AND FOR
18         THE STATE OF _____
           COMMISSION EXPIRES: _____
19
20
21
22
23
24
25

161

1  THE STATE OF TEXAS:
   COUNTY OF FT. BEND:
2
       I, Tamara Vinson, a Certified Shorthand
3  Reporter and Notary Public in and for the State of
   Texas, do hereby certify that the facts as stated by
4  me in the caption hereto are true; that the above and
   foregoing answers of the witness, BLAKE EARL GREEN, to
5  the interrogatories as indicated were made before me
   by the said witness after being first duly sworn to
6  testify the truth, and same were reduced to
   typewriting under my direction; that the above and
7  foregoing deposition as set forth in typewriting is a
   full, true, and correct transcript of the proceedings
8  had at the time of taking of said deposition.
9      I further certify that I am not, in any
   capacity, a regular employee of the party in whose
10 behalf this deposition is taken, nor in the regular
   employ of his attorney; and I certify that I am not
11 interested in the cause, nor of kin or counsel to
   either of the parties.
12
       GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
13 this, the _____ day of June, 2014.
14
15
16
17
          _____
18        Tamara Vinson
          Texas CSR No. 3015
19        Expiration Date:  12-31-2014
          Integrity Legal Support Solutions
20        Firm Registration #528
          3100 W. Slaughter Lane, Suite 101
21        Austin, Texas  78748
          (512) 320-8690
22
23
24
25

---

**$**

**$22** 74:21

**$25,000** 139:7

---

**0**

**00000900** 30:19

---

**1**

**1** 21:20,22 22:18 99:9
136:21

**1.......................
.............21** 8:2

**10** 99:9 100:5,13
101:4 135:23,25

**10...................
...........135** 8:23

**10:03** 4:10

**10:57** 49:24

**10006-1738** 5:11

**101** 161:20

**12** 70:20

**12-31-2014** 161:19

**12548** 5:23

**14** 45:8
46:9,12,15,17,20,21
47:7,12,19 48:3
53:23 54:6,8,23
55:2,7,15,21,22 57:2
60:9,13,22 69:6
70:4,22 71:10,15,23
72:1,17 73:15,17
74:8 75:1,24 76:8
77:2 82:20 84:17
85:13 86:4,13,20
87:16,23 88:22
89:8,16
90:2,10,16,23 91:2,6
92:11,22 93:2,12,18
94:6,8,10 96:3,8,15
97:4,5,11,22,23
98:4,24 99:13,21
100:20 101:24
102:1,9
103:4,11,16,25

104:16 105:7,15,23
108:21 114:8,24
115:4,22 125:1,16,23
126:7,23 127:4,11,16
128:16,21,23 129:12
131:15 132:6,13
133:5,25 134:4,16
135:18 139:25 140:6
141:25 142:9,16,24
143:5,6,7,23 147:3,6
148:15,25 149:3,22
150:1,4,11
151:6,12,15 152:13
155:10,15

**14-related** 54:15
131:2,17 152:8,19,24

**14th** 61:13 87:13
88:17,24 89:3,6

**15th** 59:3

**18** 4:4 159:3

**1-800** 40:10

**1875** 5:5

**18th** 4:9

**1983** 12:17

**1st** 93:13

---

**2**

**2** 25:14,16 136:22

**2...................
.............25** 8:5

**2:13-CV-193** 1:4

**2:13-CV-263** 2:2

**2:13-CV-291** 3:2

**2:13-CV-348** 3:13

**20** 85:18

**20006** 5:6

**2004** 44:4
45:1,3,4,11,15,23
46:8,15,19,23 47:18

**2006** 42:16 43:10

**2007** 43:13

**2008** 13:22

**2010** 14:12 15:9,10
24:24 25:7 55:9,12

**2011** 8:18,20,22 81:16
82:19 83:24 98:18,23
99:21 115:4,12,21
116:14 117:18 120:6
121:14,22 122:16

**2012**
93:13,19,20,22,25
135:21 137:19,21
138:4 140:15

**2013** 57:23 61:13
86:2,10,15 87:13
88:17,24 89:3,6
135:21 140:3

**2014** 4:4,10 135:22
159:3 161:13

**202.307.3961** 5:18

**202.514.2919** 5:18

**202.663.6006** 5:6

**202.663.6363** 5:6

**212.226.7592** 5:11

**212.965.7712** 5:11

**22** 99:8,9 100:12

**24** 23:20,24 24:4
94:13,20 95:10,16

**25** 38:21

**26** 86:1,15

**26th** 86:10

---

**3**

**3** 23:7,23 24:4
30:13,15 157:9

**3...................
.............30** 8:7

**3:46** 4:10 158:9

**30** 126:22 130:1

**30(b)(6** 18:22 21:7
125:4 153:24

**3015** 161:18

**31** 22:18 132:7 133:22

**3100** 4:13 161:20

**320-8690** 161:21

--------------------
4
**4** 56:2,4 70:18

**4.....................
..............56** 8:9

**40** 5:10

--------------------
5
**5** 8:15 22:12,14
   61:1,3 81:7,20,22
   98:11 109:16

**5.....................
..............61** 8:11

**512** 161:21

**512.463.2110** 5:24

**512.472.6538** 5:24

**528** 161:20

**58** 122:23

**5th** 5:10

--------------------
6
**6** 23:7,23 24:4
   80:23,25 126:19
   130:1 132:7

**6.....................
..............80** 8:15

**63** 121:4,24

**68** 121:10,25

--------------------
7
**7** 57:23 116:6,8

**7,00** 32:6

**7,000** 30:23

**7.....................
.............116** 8:17

**70** 123:3

**75** 115:23 118:11
   119:3

**77004** 4:14

**78711-2548** 5:24

**78748** 161:21

**7th** 58:15

--------------------
8
**8** 119:10,12

**8.....................
...........119** 8:19

**8th** 81:16 82:19

--------------------
9
**9** 122:7,9

**9.....................
............122** 8:21

--------------------
A
**A&M** 82:13 83:13

**a.m** 4:10

**ability** 12:5

**able** 72:7,9 75:17
   85:12 91:7,16 92:19
   101:11 104:4 105:20
   110:9 116:23 129:15
   135:18 150:2 151:4
   153:7

**above-styled** 4:9

**abridges** 75:2

**Absolutely** 101:20

**acceptable**
   71:10,15,25 72:16
   73:17 74:7 75:24
   76:8 77:2 86:4,13,19
   87:16,22 88:21
   89:8,16
   90:2,10,16,23 91:2,6
   127:3

**Access** 8:23

**acclimated** 153:10

**according** 115:19
   121:23 122:2
   125:1,12,16,23

**account** 35:9 75:2,4
   86:3,12,18 87:15,21
   88:20 89:7

**accumulate** 29:24

**accurate** 10:24 12:1,5
   61:13 65:14 71:1
   82:16 100:21,24
   120:17

**accurately** 12:9 101:3

**acknowledged** 62:7
   160:12

**acquire** 147:23

**across** 65:2,3,18
   66:15,24 67:3
   68:5,16 72:5,9
   106:11

**act** 8:16 111:15

**acted** 97:22 98:3
   99:1,20 103:3,25
   104:16

**action** 1:3 2:1 3:1,12
   28:20 29:9,10,12
   31:25 32:10 52:23,24
   53:2 156:24

**actions** 156:17

**actively** 29:18,24
   64:16,22 65:1,24
   66:3,9

**activities** 17:13
   27:24,25 28:2
   37:13,14,17
   38:8,11,13
   39:1,4,8,15,19
   41:2,12 43:16
   44:3,24 45:1,7,20,21
   47:13,20 48:7,10
   50:5,8,17,21
   51:11,13 52:9 53:22
   54:15 131:2,17,22
   133:23 138:6,10
   139:3,8,10 140:9

141:25 147:17
152:8,19,22,24

**activity** 48:17 51:7
62:20

**acts** 111:15

**actual** 83:13,16

**actually** 27:20 34:2
47:17 53:8,9,10 66:7
70:11 72:11 74:19,20
80:11 98:15 101:16
108:23 129:18 135:4
140:2,16,18 152:3
153:8,13

**add** 129:16

**added** 31:16

**addition** 44:12 94:11

**adequately** 34:12

**advertising** 39:13

**advocacy** 38:6 41:18
145:23

**advocacy-related**
49:16

**affect** 12:5 35:1
43:18 48:1 96:11
105:14 129:2

**affected** 23:20
34:3,18 75:15
96:11,14 129:4,5,6

**affecting** 18:8

**affective** 96:11

**affects** 42:3 43:21
76:15

**affidavit** 113:15

**affiliate** 25:10

**affiliates** 48:22,25
49:4

**affiliate-wide** 49:6

**affirm** 113:16

**affirmatively** 142:5

**affix** 160:1

**afford** 72:9

**African** 72:6 74:4
75:13,20 106:9
120:11,24
121:12,21,24

**age** 32:12,20

**agency** 41:10

**ages** 29:25

**ago** 22:8 65:17

**agreed** 115:23

**ahead** 17:11 49:19
98:12 103:20 105:4
117:7 142:12

**allegation** 71:2
129:25 153:19

**alleged** 103:9

**alleges** 69:2 70:2,20

**alleging** 101:21

**allocate** 140:19

**allocation** 17:15
27:14

**allocations** 141:15

**allowed** 106:15 115:25
116:18 118:3 119:7
120:13 121:2,8
122:2,21 123:2

**alone** 82:13

**already** 9:15 18:7
21:13,23 24:17 28:15
32:2 152:10

**am** 34:10 91:25 130:13
145:21,25 161:9,10

**amended** 8:3,12 61:9
63:23 68:18,21
87:12,24 88:16 89:3
99:7,11 101:20
126:14

**amendments** 102:13
103:12 104:23

**America** 2:1 5:14
34:5,6 35:4

**American** 1:8 3:2 34:7
106:10

**Americans** 72:6 74:4
75:13,20 120:11,24
121:12,21,24

**among** 132:11 133:3,24
134:14

**amongst** 115:3 119:16

**amount** 55:13 107:22
123:6 134:13,17,20
135:3 139:1,6,7
140:9 148:10,13
149:16,21 150:8

**amounts** 74:9

**analyses** 60:21
73:5,23 154:8

**analysis** 106:5

**and/or** 147:22

**Angela** 5:15 10:2

**angela.miller5@usdoj.**
**gov** 5:18

**ANNA** 1:4

**annual** 27:17 141:8

**answer** 10:22
11:14,16,19 13:2
18:24 19:5 20:8,10
27:2,21 28:9 32:18
33:13 34:15 35:14,18
47:2 58:7 64:20
69:15 70:6 84:13,19
88:3 95:17 100:7
101:11 102:4 110:8
112:7 113:8 123:13
124:21 125:10 128:8
134:19 137:8 144:22
153:24 154:24

**answered** 102:22
114:15 128:8 144:21
148:19 152:10

**answering** 12:9 109:7
133:12,13

**answers** 10:16 12:2,6
22:23 24:11 155:22

161:4

**anyone** 16:14,15,17
20:20 36:14 51:22
52:1,5 64:17,23
65:10 77:8 82:23
83:7 85:10 92:12
123:11

**anything** 12:8 21:12
31:9 41:24 43:20
50:12 54:6 102:19
108:20 130:8
143:17,20 144:11
154:22 155:1,17,21
156:25

**anyway** 79:23 105:5

**appear** 57:8,11 62:11

**Appearances**.........
.....................
....**5-6** 7:3

**appeared** 160:9

**Appearing** 5:15

**appears** 137:1

**appreciate** 111:8
112:7

**approach** 65:16

**approached** 65:9

**area** 31:21 59:24

**areas** 38:4 145:21,22
149:6

**argued** 74:22

**Arianna** 16:24 67:17
79:12,23 80:5

**articles** 73:25

**aside** 53:24 141:21

**as-needed-type** 141:18

**aspects** 131:10

**assessing** 132:11
133:3,24 134:14

**assist** 15:19,23 41:11
71:5,9,14

**assistance** 147:20

**Assistant** 5:22

**assisted** 71:5,9,13

**assisting** 50:18 52:10

**assists** 67:19

**ASSOCIATION** 2:7

**assume** 66:12 83:24
134:2

**assumes** 116:3

**attached** 4:16

**attain** 13:12 148:2

**attempt** 79:10,13,24
80:14 113:5,11,21

**attempted** 33:10
71:9,14 78:25 79:1,6
90:9,15,22
91:1,4,5,7,9

**attempting** 106:20
107:1,13,18 108:11

**attempts** 80:7 90:19
91:15

**attend** 13:7,10 58:14
59:6 131:25 151:14

**attending** 29:6

**attention** 157:8

**attorney** 5:16,22 9:6
11:13,15 32:17
133:12 161:10

**attorneys** 35:16 40:13

**audience** 80:10

**audits** 60:20 154:7

**August** 86:1,10,15

**Aurica** 2:4 5:3 8:13
61:11,18 63:3,6,10

**Austin** 5:24 161:21

**available** 68:12

**Avenue** 5:5

**average** 150:1,4,5

**aware** 19:6 22:21 24:9

34:4,8,10 44:16,19
47:9 48:5 50:7 61:16
64:7,12 115:19 116:4
143:3 144:12

**away** 126:25 146:15

_____

B

**background** 12:13

**backtrack** 50:4

**ballot** 8:24 111:23
112:12

**ballpark** 150:10

**Banks** 154:17,25

**barriers** 107:6

**base** 28:18 40:17
44:15 52:25 54:5,21
67:4 80:9 89:19
90:20 115:15
127:2,14,15
129:3,10,19 132:3
135:7,21 143:18
149:9 156:21 157:2

**based** 15:14 57:10
72:3,4 73:4,22
74:11,12 75:8
97:14,15 98:6,7
101:7 104:21 105:17
106:4 121:17 124:25
127:6,7 139:20
151:10

**bases** 28:4 58:21

**basically** 57:3 129:18
149:8 152:3

**basis** 16:12 18:15
27:17 73:19 101:24
102:6 103:14 138:15
141:18 142:16

**Bates** 30:16,18 57:10

**Bear** 99:6

**became** 93:2,12

**become** 30:2 93:16

**becomes** 29:1,2,4 32:1

**begin** 10:22

**behalf** 9:18,21 18:23
  22:23 24:11 32:23
  123:10 161:10

**behind** 136:6

**belief** 73:20,22 74:11
  75:8 97:14 98:6
  104:21 105:17 106:4
  127:6

**believe** 15:24 19:2
  20:19 30:23 35:6,7
  37:25 42:16 58:15
  63:21 67:2 73:14
  74:8 75:1,22 76:6
  79:15,21 80:22 81:8
  85:8 92:11,16
  93:16,19 97:11,21
  98:2,14,25 99:19
  103:3,14,25 104:15
  105:6,12,24
  106:19,25
  107:8,10,15,25
  108:3,8,12,14,24
  110:3,21,25
  111:19,21 114:1,8,13
  115:11 118:23 123:21
  124:4,12,19
  125:15,22 126:8,23
  127:22 128:3,14
  148:14,19,20
  152:7,11,18 155:13
  157:9 158:5

**believes** 101:25 102:7
  124:1,2 155:9

**BELINDA** 3:12

**BENAVIDES** 2:9

**BEND** 161:1

**beneficial** 34:19

**BENJAMIN** 1:7

**besides** 18:6 20:21
  27:13 54:7 77:8

**Bessiake** 2:5 5:3 8:14
  61:12,19 64:13
  69:4,8,12,24

**best** 11:3 49:7
  154:11,16

**bet** 110:16

**better** 35:3 102:18
  132:2 151:5

**beyond** 27:20 28:9
  53:18 58:5 154:23

**bill** 47:25 48:1 55:22
  99:2 102:18 126:1
  136:16 143:8

**bills** 54:24,25 55:6

**bill's** 99:17

**binding** 22:23 24:11

**birth** 74:17

**bit** 33:9 37:13
  50:4,19

**black** 71:24 73:15

**Blake** 4:3,6 7:5
  9:1,10 69:14 159:2
  160:1,5,9 161:4

**B-L-A-K-E** 9:10

**blasts** 46:22

**board** 72:6,9 106:11

**bogged** 155:8

**books** 108:22 126:7
  147:4

**born** 12:14,16

**bottom** 22:16 30:16
  81:22 138:17 139:6

**box** 5:23 136:4,7,10

**BRANCHES** 3:1

**break** 45:17
  49:9,20,25 85:18
  86:6 92:3,9 95:25
  96:22 111:10 155:24
  156:6,8

**BRICKNER** 1:7

**bring** 21:9 56:6

**bringing** 153:9

**broken** 119:16

**brothers** 12:25

**brought** 25:3

**budget** 18:13 138:18
  139:20 140:19
  141:9,11,13,16

**budgetary** 137:2
  139:14 148:8

**budgeting** 17:14

**bullet** 83:3

**bunch** 45:6

**burden** 33:5,7 54:4
  71:24 73:15 74:2,4
  75:18 81:9 97:19
  106:13 115:17 148:17

**burdens** 97:18 109:1

**BURNS** 1:5

**Business** 13:14

--------

C

**calculations** 154:7

**California** 76:18,20
  77:12,17

**campaign** 44:6,7
  56:21,24 136:22
  137:5,12,17,22
  138:11,13 139:12,24
  142:7,21 143:2,9,12

**campaigns** 46:7 134:23

**campus** 51:1

**campuses** 38:17,18,22
  76:13 135:5 151:14

**candidate** 112:17,23

**capacity** 2:13,15
  3:7,8,19,21 17:16,17
  124:9 161:9

**caption** 161:4

**card** 28:21 29:7 78:14
  84:9 160:11

**cards** 156:18

CARRIER 1:4

carries 101:10

carry 39:8

carrying 38:10

case 1:5 2:3 3:3,13
20:10 63:7 69:22
86:10 87:12 88:17
125:13 142:11 154:13

cases 41:15

casting 108:1

categorized 38:4
145:20 150:25

CAUCUS 3:2

cause 4:9 161:11

caution 20:7 35:14
36:1 69:15

Center 12:24 59:10

central 34:23

certain 27:25 33:5
35:1 103:12 108:23
138:22 146:7 147:1

certificate 72:22,25
74:18 78:18

Certificate..........
............161 7:9

Certified 161:2

certify 161:3,9,10

cetera 134:6

challenges 41:15
109:1

chance 109:24

CHANGE 159:4

CHANGES 159:1

characterization
116:22

charge 16:16

check 79:21

CHRISTI 1:2

Christina 16:9 17:23

cites 99:10

cities 99:11

citing 54:3 101:21

citizens 1:8 115:3,11
125:2,17,24
126:3,4,5,9,10,12

citizenship 72:22
74:19 78:18

city 59:11

civic 26:21

civil 1:3 2:1 3:1,12
4:14 5:17 111:16

Claim 99:8

clarification 88:10

clarify 42:12 62:3
63:5 66:20 69:8
83:10 88:14 93:8
94:12,16 99:4 123:25
155:21

clarity 34:17,22

Clark 2:4 5:3 8:13
61:11,17
62:14,19,21,24,25
69:3 70:2,21 71:5,9
77:5,9,17

Clark's 62:2 70:21

clean 10:18

clear 94:17,21 98:20
103:7 118:12 120:15
124:10 148:4

clearly 11:7 39:5
105:2

Cleburne 4:13

clinic 44:13 60:5

clinics 45:12 46:19
60:7,12

Club 76:18,20
77:12,17

coalition 8:10 44:5
47:23,24

56:15,17,20,22,23
57:1 59:16,17,20
60:2,13

co-hosted 44:11

co-hosting 44:12

collaborate 49:4

collaborating 58:2

collaboration 139:10

collaborations 39:21

collateral 39:13 51:9
54:18 148:5

collected 83:22,25

college 51:1 76:13
105:25 129:4 135:5
151:14

colleges 44:8 46:13

color 33:7 71:24
115:18 127:1 134:24
157:7

colors 73:16

combating 132:6
149:17

combination 131:4

comes 99:14

comment 8:15 54:2,7
81:5,10 82:18 84:9

COMMISSION 160:18

COMMISSIONERS 2:8

committed 111:15

committee 5:23
18:2,3,5

communicate 38:12
132:2

communities 33:7
75:20

community 44:11 46:18
51:1,19 59:4,10,13
60:6

compared 72:8 94:9
106:11

**compiled** 120:4

**compiles** 31:12

**compiling** 31:13

**complaint** 8:12 61:9
63:18,22 68:18,21
69:2 70:2,5,19,20
86:1,9 87:12,25
88:17 89:3 99:7,11
101:21 103:10 126:14
130:1 133:21

**completely** 93:13

**Complying** 22:13 68:23
109:17,23 126:20

**component** 131:15
141:5

**components** 40:2 149:5

**compound** 45:17
46:1,25 64:3 108:5
115:6 137:7

**comprehensive**
136:22,23
137:4,5,12,17,25
139:9,12,13,24 140:4
142:7,21 143:1,9,11

**comprise** 18:1

**concealed** 72:23
78:6,7 134:5

**concern** 153:20

**concerns** 123:22
124:6,14

**concluded** 158:9

**conclusion** 32:17
33:1,13,20 34:15,18
97:9 101:9 102:3
103:6

**conduct** 27:23
39:14,19 43:23,25
49:15 141:8

**conducted** 46:7 60:19
115:20 116:12 117:17
120:6 122:15 154:6

**conducts** 37:17 50:8

**confer** 20:20

**Conference** 3:1 4:13

**conferred** 154:21

**confirm** 24:1 50:16
60:19 95:9,20 116:14

**confused** 66:19

**confusing** 45:18 86:6
144:1

**confusion** 136:15

**Conley** 5:4 9:20 10:9
56:8 70:8,13,15,17
76:3 83:1 84:10
85:21 88:2,6,9
95:13,16 99:22,25
100:4,9,23 101:2
102:10,21 110:14,17
115:7 117:1,6,10,13
120:15

**connection** 39:15,18
43:20 45:14

**consecutive** 57:8

**consideration** 42:2
99:17 160:12

**considered** 98:24
115:4

**considering** 123:23
124:7,15

**Consolidated** 2:3
3:3,13

**constituencies** 79:9

**constituency** 8:8
31:11 32:8,9
43:18,21 52:25 54:5
67:4 75:25 76:7 80:9
115:15 127:15 132:12
133:4,24 134:15
135:7 148:1 156:20
157:2

**constituent** 28:18
29:1,2,4 32:2 40:17
44:15 54:21 62:14
67:4,23 79:5 80:18
85:25 86:11 87:14,17

89:13,18
90:9,11,15,20
96:2,7,10,13
114:17,19,23 129:3
132:3

**constituents** 28:23
29:16,19,24 30:6
32:15 33:10,17,25
38:12 51:22 52:1,4
54:11 55:5,14
64:17,23 65:10,25
66:12 67:7,11,15
68:2,3,5,15,17 71:14
75:23 77:21
78:2,6,11,14,18,21,2
5 79:22,24 94:7,23
95:22 123:8,17,22
124:6,14,17,20
127:23
128:4,15,20,22
143:22 144:6
146:16,24 147:6
153:19 156:16
157:14,17

**contacted** 67:22 68:1

**contain** 24:6 83:3

**contained** 22:24 24:12
121:17

**contains** 30:22

**contend** 33:24 34:11
71:23 97:5,8 115:2,6

**contention** 33:16 72:3
73:3,7,13

**contents** 20:9 35:15
36:5 69:16 116:24

**context** 100:1

**contingent** 142:16

**continue** 69:5 70:3

**control** 10:14 154:15

**conversation** 132:20

**conversations** 20:9
35:15 36:6 37:7
69:17

**copy** 21:24

**core** 126:25 127:8,23
   128:5 131:6 132:5
   143:13,16 144:10,12
   146:9,11 147:17
   151:18 152:21,23
   153:1,2,8 154:1,5

**CORPUS** 1:2

**correct** 12:20 13:22
   14:2 15:4,5
   17:6,7,23,24 19:11
   21:8 22:10,11,19,20
   23:16 24:7,13
   25:9,12 26:1,2,5,10
   27:9,10 28:23,24,25
   30:7,8 31:3,22 32:24
   36:10,11 38:9 42:19
   48:23,24 55:6,19
   56:19,25
   57:13,20,21,25
   59:4,5 61:15,19,20
   62:9,12 65:21,22
   66:12 67:1,9 68:25
   70:5 71:3 73:2,20,21
   79:25 80:1
   81:11,12,17,18
   82:1,2,9,10,17,22
   83:13,14,18 95:12,23
   112:3 118:6 119:8
   126:11 130:13,15
   136:11,19,20,24,25
   137:2,3 138:21
   139:5,25 141:12
   142:25 145:21,24,25
   156:19,22,23
   157:1,15 160:2 161:7

**correctly** 97:25

**corresponding** 138:22

**cost** 39:12 140:22
   148:7

**costing** 140:17

**counsel** 10:5
   19:9,10,21
   20:5,10,17,21 23:6,9
   35:25 36:10 69:17
   117:9 161:11

**counterfeit** 111:20,22
   112:11

**counterparts** 106:12

**country** 26:22

**County** 1:9 2:8,9
   98:9,10 160:8 161:1

**couple** 19:25 44:21
   148:1 156:10

**course** 38:10 49:13
   65:1 67:2 68:7,8,16
   99:17

**court** 1:1 6:2
   10:17,24 98:11

**court-rejected** 134:25

**cover** 43:13

**covers** 131:14

**created** 53:10 57:1,3

**creates** 71:24 73:15

**crimes** 153:20 154:1,8

**criminal** 111:16

**critical** 147:11

**critically** 135:20

**Crystal** 2:4 5:3 8:13
   61:12,18 64:7

**CSR** 4:11 161:18

**current** 25:5 72:16
   126:6

**currently** 14:16 15:3
   107:21 147:4

**custody** 154:14

**cycle** 136:17

**cycles** 93:3

---
**D**
---

**daily** 16:12 18:15
   131:6

**DALLAS** 1:9

**Danielle** 5:4 9:20
   10:9

**danielle.conley@wilme**
   **rhale.com** 5:7

**data** 31:17 118:8
   120:1,4

**database** 53:5,6,10

**date** 86:11,18 88:20
   159:3 161:19

**day** 17:8,10,12
   20:12,14 44:18 47:8
   108:11 135:12
   160:9,13 161:13

**day's** 17:13

**DC** 5:6

**deal** 54:20

**deals** 41:24

**Dean's** 4:13

**deceptive** 111:15

**decides** 28:5,6

**decision** 28:11,12
   35:11,20 37:2,10,11
   66:8

**decisions** 17:15
   18:7,9

**dedicated** 141:13
   142:1

**Defendants** 1:14 2:17
   3:11,23 4:8 5:20 8:3
   25:19 56:11 70:23
   81:1 134:24 136:1
   154:13

**Defense** 9:18,24 81:13

**defined** 109:19 111:14

**definition** 109:21,25
   111:8

**degree** 13:12,18 35:3
   42:17

**DEL** 3:15

**DELEON** 1:4

**democrats** 122:18

**demographic** 157:3

demonstrating 99:12
  100:19 101:22

denied 82:13

denies 75:2

deny 81:6

departed 99:12 100:19
  101:23,25 102:8
  103:10,15 155:10,13

Department 2:16
  3:9,22 5:17 10:2
  34:8,19 35:5 54:3
  79:15 81:6 142:13

depicted 140:10

depicts 119:15 120:22

deposed 10:11

deposition 4:2,6 8:3
  10:14 14:20 19:8,22
  20:2,22,25 21:5,13
  22:7,9 95:11
  109:12,20 158:9
  159:3 160:1
  161:7,8,10

deputy 15:7,17
  17:9,19

describe 17:8 35:21
  37:16 44:2 48:6,10
  50:20 51:13 52:8
  53:21

described 29:16 40:19
  44:25 45:21 57:22
  73:19 106:1 137:17
  138:1 139:12,14,15
  141:17 148:12

describes 57:19

description 160:10

design 148:7

designated 22:22
  24:10

designed 134:23

desires 125:24

deter 114:9

determine 36:24 80:19
  85:12

deterred 129:18

deters 114:8,12

develop 58:20

developed 44:6

Development 38:7

deviation 147:17

devise 141:8

devoted 38:25 39:4
  54:14

different 19:24
  38:18,22 51:20 75:14
  111:17 119:16
  128:13,21 132:1

direct 36:9 57:1

direction 161:6

directly 16:10 17:5
  35:10 60:8 99:10
  128:13

director 2:15 3:9,21
  15:7,17,19 16:7
  17:9,18,19,21,23
  25:5 28:11 35:25
  36:10 37:3,11 42:6
  47:25 53:25
  131:19,25

disagree 118:1

discriminate 104:17

discriminated 97:20

discriminatory 70:24
  75:12 97:5,12,16
  104:1,3 125:2,17,25

discuss 36:17,21
  64:24 65:25

discussed 24:9
  58:16,23

discussing 73:4
  119:14

Discussion 155:4
  157:21

disenfranchisement
  136:15

disposal 130:25

disproportionately
  72:7 75:15

disqualified 113:22

distinction 94:25

DISTRICT 1:1

divert 126:24
  131:2,12,13

diverted 127:12,19
  131:8,17 132:5,11
  133:3 134:13 141:25
  147:19 148:11

Division 1:2 5:17

divulging 35:23

document 21:25 22:4,6
  25:18,20,22 30:22
  31:6,10 32:5 37:25
  56:11 57:11
  61:4,5,6,14 63:21,23
  74:14 81:1,2,4 83:11
  101:15 116:21,22
  117:2,11 119:8,20,24
  120:7,17,21 121:4,10
  122:10,12,23
  136:1,2,5,12
  137:6,10,14,18 138:2
  140:10 142:6,23
  145:15 157:13 160:11

documents 20:24
  21:2,3,9 56:12,14
  62:12 72:10 78:21
  134:2 147:22 149:12
  154:12

DOJ 98:8 157:25

donations 27:9

done 11:1 45:13
  153:16 155:8

donor 28:4

donors 26:14

double 153:14

**dozens** 82:5

**DPS** 71:22 79:16

**drafting** 123:23
124:6,14

**draw** 157:8

**driver's** 72:20 76:21
77:21,24 134:4

**duly** 4:8 9:2 108:9
161:5

**during** 41:19 42:2
43:19 44:18 47:8
50:19 52:10,11 98:23
99:17,21 113:11
132:5 135:11,12

**duties** 15:16

---

### E

**Earl** 4:3,6 7:5 9:1,10
159:2 160:1,5,9
161:4

**E-A-R-L** 9:11

**earlier** 28:6 47:2
55:4 56:24 60:18
66:23 67:17 117:17
145:15 156:15 157:13

**early** 44:18 47:8

**easier** 11:1

**economic** 72:5 75:16
106:11

**educate** 44:9 46:14
51:20,22 52:1 54:20
55:5 57:3 80:14
127:8,13 128:12,25
129:1 138:14 143:24
147:7 148:4

**educated** 54:11 71:18
80:16,18 91:13 131:9
143:20

**educating** 51:17 52:4
55:13,20,23 60:10
127:20,22,25
128:4,15,20,22
143:22 144:5,14

145:8,10 146:5,16,23
147:5,14 149:17
152:4

**education** 2:3 5:3
8:4,6,8,13 37:19
38:6 50:18 51:15,16
54:23,24 60:6 61:11
67:21 80:8 82:5
131:11,15,23 134:23
136:22
137:4,12,17,22
138:11 139:12,24
140:25 142:7,21
143:1,9,11,16
145:16,22
146:1,2,5,10,12,13

**educational** 9:24 44:7
46:7 91:14 131:24
151:23

**effect** 60:21 94:1
135:1 151:6,8

**effective**
93:2,9,12,13

**effectively** 82:7

**efficiency** 15:22

**EIC** 44:23 71:19,22
72:11 73:1,2
74:13,22,23 75:18
78:22,25
79:6,10,14,24
80:3,11,12,18
91:4,16 148:2

**eighteen** 30:1 31:21
32:12 157:6

**either** 28:19 29:4
31:18 64:15
131:10,11 132:23
138:9 161:11

**elected** 123:7,16,21
124:5,13,18

**election** 8:23 38:7
40:6,7,9,20,22
41:2,13 44:17 47:8
72:24 93:3,25 94:8
108:11 111:23

112:12,23
113:12,13,21 114:3,5
136:17,23 137:13
138:1,13 139:13
140:4 142:8,22
143:3,4 153:20
154:1,8

**elections** 50:19
52:10,11 94:9

**electoral** 128:11
129:1 153:10

**electronic** 31:19

**eligibility** 74:24

**eligible** 74:24 105:21
113:23,25 118:24
129:7

**else** 12:8 18:6 20:20
21:12 36:14 43:20
51:22 52:1,5
64:17,23 65:10 77:8
102:19 130:8 155:17

**e-mail** 46:22 57:19,23

**e-mails** 38:15

**employ** 161:10

**employed** 14:13,15,16
15:3

**employee** 161:9

**employment** 16:17

**enacted** 44:4 47:17
48:8 50:6 54:2 55:2
69:5 70:4 82:21
97:5,11,22 98:4,15
103:4 105:15 115:22
125:1,16,23 129:13
137:23 140:2 147:3

**enacting** 97:23 105:7
155:10,15

**enactment**
46:9,12,17,21
47:7,12,18 48:3
60:13 99:20 127:11

**encourage** 64:17
114:2,4

energy 133:1 149:16

engage 41:17 47:13,20
48:17 51:10 128:10

engaged 44:25 45:22

engagement 67:21

engages 41:13 43:17
50:21 152:25

ensure 143:2

ensuring 135:20

entail 15:25 40:8
41:6

ENTERO 3:16

entry 31:17

equaled 140:9

especially 72:10
106:8,9 152:13

ESPINOSA 3:13

essential 131:21

essentially 74:23

established 62:6 67:7

ESTELA 3:13

estimate 90:7

estimates 60:20 154:7

ESTRADA 3:13

et 134:6

ethnicities 119:17

EULALIO 3:12

EVELYN 1:7

event 29:6

events 44:12 46:18
51:20 135:9 151:20

everybody 10:3

everyone 107:4
108:12,24 109:5
110:25 118:23

everything 10:25
17:12

evidence 99:10,11

100:18 101:6,10,22
116:3

exact 32:6 135:2,3
148:13 150:7

exactly 15:24 40:7
67:16 68:14 69:21
83:23 107:3

Examination 7:6,7 9:3
156:13

example 29:11 76:16
81:23 105:18

examples 26:23 82:11
132:4

Excel 30:17 31:8

except 160:2

exception 76:24

execute 17:13

executed 137:6 139:25
140:5 160:12

executive 14:4
18:2,3,5

exercise 92:20

Exhibit
8:1,2,5,7,9,11,15,17
,19,21,23 21:20,22
25:14,16 30:13,15
56:2,4 61:1,3
80:23,25 116:6,8
119:10,12 122:7,9
135:23,25 157:9

exhibits 57:14

exist 55:9

existence 24:23 25:3

existing 44:15
127:2,14 129:10,19
144:6,16 145:8
146:6,17,18,24
147:3,8 149:9

expenses 138:22
139:14

experience 42:9

Expiration 161:19

EXPIRES 160:18

explain 29:2

explaining 81:23 82:6

expressed
114:17,21,24,25
160:12

extent 27:7,25
41:1,16 43:8,22 48:2
63:8,13 73:7 101:9
102:3 104:2 110:9
119:19 137:20 138:4
146:7 147:1

extra 132:19,22

---

F

fact 70:6 75:16
97:16,20 105:4
108:25

facts 116:3 161:3

fall 152:8,19,25

falls 128:16

false 113:15

falsely 113:16

Familia 39:24 59:23

familiar 119:19 135:8

familiarity 116:21
125:6

Fax 5:6,11,18,24

February 8:18,20,22
115:21 116:13 120:6
122:16

Federal 4:14 98:11

feel 35:2 81:7

feeling 11:23

field 74:3 86:25

figures 137:2 138:20

filed 23:2 61:12
65:5,21 86:1,9
87:12,24 88:16 89:2

99:7

**finances** 18:13

**financial** 39:3 126:24
130:5,11,12,14
133:2,6 134:13 139:1
140:8 141:24 147:20
148:3,6,10

**fine** 14:22 85:17,19
103:23

**finish** 10:22 11:4

**finished** 109:22

**Firm** 161:20

**first** 8:3 9:2 10:15
13:15 17:3 55:22
81:17 117:5
119:22,23 150:6,22
161:5

**firsthand** 35:9

**five** 49:22 92:6

**fliers** 39:9

**Floor** 5:10

**FLOYD** 1:4

**focus** 129:17
154:1,2,4

**focused** 48:14 137:22

**folks** 124:18

**forced** 133:23

**forces** 126:23

**Ford** 27:5

**foregoing** 160:1,11
161:4,7

**foremost** 10:15

**forgot** 60:15

**form** 31:19 44:20
47:10 71:10,15,25
73:17 76:23
86:4,13,19 87:16,22
88:21 89:8,16
90:2,10,16,23 91:2
93:1 102:21 133:8,19

134:19

**formal** 73:23

**formed** 24:25 25:1,8

**forms** 72:14,16
74:7,18 75:24
76:8,14 77:2 80:15
87:3 91:6 92:18,25
96:19 97:17 102:17
105:1 106:7 114:7
127:3,21
132:12,18,21
133:4,10,17,18,25
134:3,7,8,9,15
149:20

**forth** 161:7

**forum** 60:6

**forums** 44:11 46:18
51:19 60:7 135:9

**forward** 98:13

**Foundation** 27:5,6

**foundations**
26:13,15,19

**founding** 27:11

**frame** 93:18

**fraud** 108:3,17,21
109:3,10,18
110:3,11,21
111:2,11,14,17 112:2
114:7,8,9,12
154:3,4,9

**fraudulent** 111:14

**free** 74:13,14

**Freedom** 40:1

**frequently** 135:14

**front** 38:1 47:16
70:19 109:12,14
126:14,17

**FT** 161:1

**fulfill** 75:17
148:15,24 149:2

**fulfilling** 126:25

143:23 147:7

**full** 9:8 95:6 161:7

**full-time** 15:12

**fully** 93:16

**function** 127:18,24

**Fund** 2:3 5:3
8:4,6,8,13 9:18,24
61:11 81:13 82:5

**funding** 26:12,15,24
27:8,13,16 137:21

**fundraising** 27:24,25

**funds** 28:7 72:8
141:13,16,20,21
142:1,2

**Fund's** 145:16

---

G

**GANDY** 1:8

**GARCIA** 3:13

**gas** 39:13 148:2

**geared** 131:13

**general** 5:22 12:13
24:22 37:14,17 44:24
51:23,24

**generally** 24:25 35:21
42:6 45:10,22
74:6,13

**General's** 9:6

**Georgia** 49:1

**gets** 149:13

**getting** 71:19 74:23
80:18,20 111:9
132:16 142:11 147:13
149:14,19,23 153:10

**given** 43:19 120:7
150:22 155:22 160:13
161:12

**goals** 15:20

**GORDON** 1:7

**Gotcha** 100:8

gotten 70:11

government-issue
  118:13

government-issued
  115:25 116:17
  118:3,15,16 119:6
  120:13 121:2,8
  122:1,21 123:1

GOVERNOR 1:12

grad 42:17

graduate 13:7,10,13

graph 116:14
  117:20,24 118:18
  119:2,3,15 120:10,22
  121:11,18,23
  122:3,4,17 125:12

graphical 116:11
  117:16 118:7 119:13
  122:13

graphs 125:14

great 54:19

greatly 76:15

Green 4:3,6 7:5
  9:1,5,10,11 10:4,11
  11:23 12:12 13:4,15
  18:17 19:7 20:7
  21:21 22:4 23:10
  24:2,8 25:15 30:14
  31:5 35:13 36:8 46:6
  49:14 50:3 56:3,10
  57:18 61:2,3,8 69:10
  73:8 80:24,25 85:24
  86:8 87:11 92:10
  95:9 97:3 99:23
  103:18,24 108:17
  109:7 110:18
  111:2,13,19,21,24
  112:4,10,21,25
  113:4,10,14,20
  114:1,6,16 115:10,19
  116:7,10,20
  119:11,12,19 120:6
  122:8,9,17 123:5,10
  124:4,24 129:25
  132:7 134:21

135:24,25 136:12
145:14 153:18
154:11,17 155:6,18
156:15 158:6 159:2
160:1,5,9 161:4

G-R-E-E-N 9:11

grid 31:9

ground 10:14 34:25
  35:8 139:23

group 60:23 75:3,6
  77:15 105:8,14

groups 75:14

guess 19:24 40:14
  49:6 53:10 105:1
  126:3 131:9 132:4
  142:10 148:1 151:21
  152:1

———————————
          H
———————————

HAMILTON 1:4

hand 149:19 160:13
  161:12

handed 68:22 116:11

handgun 72:23 78:6,7
  134:5

handing 21:21 25:15
  30:14 56:3 61:2
  80:24 116:7 119:11
  122:8 135:24

happen 123:20 136:18
  137:11 140:20,23
  148:9

happy 88:11 111:12

hard 108:23 148:16

harder 97:17 107:23

hardship 81:23

harm 96:3,5
  105:7,10,11

harmed 69:5 70:4

haven't 51:3 133:13
  151:4 154:25

having 9:2 74:23

110:2,20 123:5 131:2

Haygood 5:9 9:23 10:9

head 10:19 93:5 142:5
  150:14

heading 22:17 138:17

headquarters 57:24
  60:16

hear 11:7 130:24

held 15:8 59:8,10
  60:2,12 125:18,25

helped 150:5,18,21

helpful 111:7,10
  123:25

helping 127:2

helps 100:6 101:12

hereby 160:1 161:3

here's 21:24

hereto 4:16 161:4

HERMAN 1:7

HERNANDEZ 3:14

he's 18:22 32:17 55:8
  88:4 125:4

HIDALGO 2:9

higher 150:8

hinder 143:18,21

hinders 147:15

Hispanic 2:8 106:10

Hispanics 72:6 74:5
  75:13,21

history 136:14

hope 54:19 124:22

horribly 82:25

host 44:12 46:18 49:5

hosting 134:23

hour 19:19

hours 135:12

House 3:3 42:21

**Houston** 4:13
  12:15,16,21 15:14
  59:12,24 60:17
**Hubert** 42:24 43:1,2,3
**Huh** 91:20,23 102:23
**huh-uh** 64:15 77:19
  93:5
**hundreds** 82:12

---
I
---

**I'd** 11:3 18:21 23:1,6
  55:8 97:3 99:22
  110:9 112:7 157:8
**ID** 8:10 44:3,6,13,20
  45:2,11,14,23
  46:8,11,14,19,23
  47:10,14,21
  48:7,11,17 49:17
  50:6,9 54:24,25
  55:1,14,22
  56:21,22,23 57:4
  58:22 59:4 60:5 68:6
  71:10,15
  72:1,14,15,17,21
  73:17 74:7,18,20
  75:24
  76:8,14,21,24,25
  77:2 78:2,3,14,16
  80:15 81:24 82:8,15
  86:4,13,20
  87:3,16,23 88:22
  89:8,16
  90:2,10,16,23 91:2,6
  92:25 96:19 97:17
  102:17 105:1,19
  106:7 114:18
  115:2,12,25 116:18
  118:3,13,15 119:7
  120:13 121:2,8,13,22
  122:1,21 123:1 126:9
  127:3,21
  132:13,18,21 133:5
  134:3,6,25 149:20
  153:6
**idea** 69:11 106:14
**identification**

  8:17,19,21 70:25
  72:24 77:16
**identified** 87:2
**identify** 52:14
  77:1,3,8 79:5 82:23
  83:7,10,15 85:24
  86:10,17,21
  87:4,8,13,18,20
  88:19
  89:5,9,10,13,24
  90:8,14,21,25
  96:2,6,13,16
**identifying** 89:20
**identity** 23:7 160:10
**IDs** 72:12 92:18
  102:17 105:20,22,25
  106:2 118:15,16
  133:25 147:22
**I'll** 10:21,23 11:8,14
  14:19,20 20:7 28:14
  33:2 35:13 36:1,8
  61:25 68:24 69:14
  70:1,14 73:6 99:18
  101:8 102:2 104:8
  109:9 110:6 115:9
  116:19,21 117:15
  123:9,18,24 124:11
  125:3,5 152:16
**illegal** 108:18 109:4
  110:4,5,22 111:3,22
  112:2,10,14,18,21,25
  113:4,10,14,20 114:2
**illness** 11:25
**I'm** 9:5,6 10:1,13
  11:10 13:24 14:25
  19:6 20:13 21:21
  23:5 25:15 30:14
  42:25 45:5 47:1
  48:5,14 53:13 56:3,6
  61:2 62:16 65:17
  66:19,20 69:1 70:8
  76:3 80:24 81:21
  85:21,22 88:11 92:4
  94:23 98:17
  99:6,9,10,15
  100:11,17,23 101:16

  102:24 103:18
  109:8,18 110:23
  111:12 112:4 113:8
  116:7 117:19 118:21
  119:11,22 120:3,20
  122:8 126:21 130:24
  133:16,18 134:18
  135:24 139:18,23
  155:12,23 156:9
**imagine** 126:12
**Imani** 2:4 5:3 8:13
  61:11,17
  62:2,14,19,21,24,25
  70:21 77:5,9,17
**immediately** 82:3
**impact** 96:7 105:14
  128:13 129:2,21
  141:3
**impacted** 34:25
  65:4,19 66:17,25
  68:6 96:9 105:25
  106:3 115:15
**impacts** 35:10 54:1
  144:11 149:11
**impeded** 70:21
**implement** 16:4
**implementation** 94:9
  140:5
**implemented**
  93:16,18,21,23,24
  94:6,8,18 98:13
**important** 51:21
**impose** 81:24
**impossible**
  92:11,13,22 93:1
**improperly** 103:4,7
**inability** 86:3,12,19
  87:15,22 88:21
  89:7,15 90:1
**inaccurate** 118:18
**INC** 3:16
**include** 39:23 52:4

141:13 146:5

**included** 52:22 68:17
102:16

**includes** 111:16

**inclusive** 104:24

**incorporated** 141:5

**incorporating**
131:8,14 149:15

**increase** 129:15

**increasing** 26:21

**independent** 53:15,20
58:4,8

**independents** 122:25

**INDEX** 7:1 8:1

**indicated** 118:10
119:5 120:25 121:6
161:5

**indicates** 119:3
137:11

**indicating** 95:22
130:22 150:21 157:10

**individual** 26:13 27:9

**individually** 62:1
64:6

**individuals** 61:22
62:8 63:25 64:1
68:18 69:3

**influence** 111:15

**inform** 134:23

**information** 12:13
34:19 35:24 40:14
52:15 77:25 91:18
94:15 95:4,10,18,21
118:17 119:2 121:17
150:13,17,20,23
151:3

**initiated** 25:2

**initiative** 112:16
113:1

**in-person** 132:23

**instance** 4:7 74:15
90:8,14,21,25 92:21

**instances** 74:21 92:24

**instead** 127:2

**Institute** 27:6

**institutions**
118:14,15

**instructs** 11:15

**instrument** 160:11

**Integrity** 161:19

**intended** 105:7,13

**intent** 104:1,3,16
125:2,17,25

**Intention** 8:3

**intentionally** 113:15

**interact** 16:12 18:14
49:3

**interacted** 69:23

**interested** 161:11

**interests** 32:14
33:17,24 34:12
157:16

**interim** 43:15

**intern** 43:13

**international** 25:6

**internship** 43:7

**interrogatories** 161:5

**interrupt** 57:6

**interrupted** 103:19

**interruption** 28:13

**intervene** 33:11

**intervened** 61:17 62:7

**intervening** 35:22
62:11

**Intervention** 8:12
61:9

**introduced** 9:15

**introducing** 119:22

**introductions** 9:14

**involved** 17:14 18:7
25:4 51:6 62:19,25
63:3,11 64:1,8,13

**involvement** 61:23
62:1,2,4,5

**iPads** 73:25

**isn't** 62:18 74:13
152:2

**issue** 38:6 40:11 41:9
145:22

**issues** 34:23 40:15
128:13 129:2

**issuing** 54:7

**items** 148:8

**it's** 10:8 11:1 13:24
14:23 23:23 28:10,12
31:18 32:22 38:21
42:6 45:17,25 51:21
53:3,5,8 56:21 57:7
58:2,8 68:19 72:4
74:3,12 75:11,12
79:22 80:18 81:5
86:5 92:25 94:17
97:15 98:7 100:13
102:11 103:7 106:12
115:6 122:4 124:24
125:15,22 127:7
128:2,7 132:19
135:12,13 139:4
141:19,20 143:6,14
144:9,10 145:13
147:16
150:8,23,24,25
153:4,14

**I've** 63:16 68:22
73:24 75:10,12 92:6
120:7 122:4
152:11,14 153:15
154:20

J

**JANE** 1:3

**January** 93:13

**job** 13:15 14:3,8
   67:18
**JOHN** 1:6,13 2:12
   3:6,19 5:20
**join** 33:3 35:11 36:25
   37:3,10 64:17 66:7
   68:12
**joined** 14:10 32:23
   33:4 42:18 44:5
**joining** 32:15
   33:17,25 36:18,22
   64:24 65:11 66:1,18
   67:23
**joint** 28:10,11,12
**jointly** 81:12
**JR** 3:13 5:22
**JUDGES** 2:8
**June** 4:4 159:3 161:13
**Justice** 5:17 10:2
   34:8,20 35:5 54:3
   81:6 142:13

─────────── K ───────────

**KEN** 1:7
**key** 33:5 38:4 81:9
   105:21 128:18 135:15
   139:21 141:3,5
   145:21,22 149:5,6
**kin** 161:11
**kinds** 28:2 38:25 39:2
   47:13 50:21 51:6
   54:14 130:19
**knew** 105:2
**knowingly** 111:20,22
   112:11,22 114:2,4
**knowledge** 48:16
   58:11,12 60:2
   63:2,8,13 115:1
   122:9 138:5
   154:11,16
**known** 73:1 85:25
   89:14,25 160:9

**KOBY** 1:6
**Korgaonkar** 5:9
   9:17,18 10:8 13:1
   18:20 19:4 20:7
   21:25 23:1,5,19,23
   26:17 27:1,18 28:8
   29:20 30:25 31:4
   32:16,25 33:12,19
   34:1,14 35:13,18
   36:1,4 37:4 45:16,25
   46:3,24
   49:8,13,21,23 53:17
   55:8 57:5,10,15 58:5
   62:3 63:5 64:3,19
   65:12 69:7,14,19
   73:6 79:18 83:8
   84:12,18,24 85:19
   86:5 87:6
   91:19,21,24
   92:1,3,5,8 93:8
   94:11,24 95:2,6 96:4
   97:8 99:3 100:3,6
   101:8,14 102:2,22
   103:5 104:2,9 105:9
   108:4 109:9 110:6
   111:4,7,24 114:14
   115:5 116:2,19 117:8
   118:19 119:18,25
   123:9,18,24 124:8
   125:3,9 128:7 129:24
   133:8 134:18 137:7
   138:7 139:16 142:18
   143:25 144:20,24
   145:3,11 146:19,21
   153:17,22 154:23
   156:5,9,14
   157:19,22,25 158:8
**Korgaonkar..........
   156** 7:7

─────────── L ───────────

**LA** 3:15
**lack** 75:23 77:21
   78:2,6,7 147:21
   151:5
**lacks** 76:2,7 132:12
   133:4,24 134:15

**Lane** 161:20
**language** 60:23 75:3,5
**LARA** 3:14,15
**large** 76:22 77:14
**last** 9:11 17:1 18:19
   19:1,14,15 43:1
   63:20 95:24 122:5
   153:5
**later** 33:9 103:21
**LATIN** 1:8
**Latino** 121:5,25
**Latinos** 121:12,21
**launch** 136:22 137:16
   139:11
**launching** 143:11
**law** 34:3,25 35:1,9
   44:9,16 48:3
   54:1,4,12,21 57:4
   58:22 60:11 65:4,20
   66:17,25 68:6 70:25
   74:1,7 81:8,24
   82:8,15 98:13,15
   105:23 127:17
   129:4,6,11,13 132:6
   134:25 135:8 137:23
   140:2 143:12
   147:2,3,15 149:11
   152:4
**lawmakers** 123:7,16,22
   124:5,13
**laws** 46:14 51:23,24
   69:5 70:4 110:24
   114:18 126:6
   128:5,13
   143:3,4,20,24
   144:6,16 145:8
   146:6,17,18,24 147:8
**lawsuit** 9:7 32:15,23
   33:3,4,11,18,25
   34:5,9,13,22,23
   35:12,23
   36:18,21,22,25
   37:3,10 61:17 62:8
   64:18,25

65:5,7,11,21
66:1,7,18 67:1,24
68:12 77:6 157:17

**lawyer** 73:8

**LDF** 8:15 10:8,9

**Lead** 1:5

**leaders** 44:10

**leadership** 37:20 38:7
127:10 131:12

**League** 1:8 2:3 5:2
8:4,6,8,12
9:19,21,25
14:10,13,17,21,25
15:1,4,6,18 17:9,15
18:2,4,8,23 22:22
23:11 24:5,10,22
25:3,8 26:1,6,16,25
27:12 28:5,16,17
29:3,15,18,23 30:5,7
31:25
32:1,8,10,14,23
33:3,10,23
34:11,12,16
35:2,12,22
36:16,20,25
37:10,13,17 38:8,11
39:14 40:21
41:1,13,17 42:1,18
43:17,20 44:25
45:13,21
46:7,13,18,22
47:6,13,20 48:16,23
49:3,15
50:5,8,10,12,17,21
51:14 53:22 54:7
55:5,9,13,20,23
56:17 59:14,24 60:19
61:10,16,23
62:2,7,15,20,23
63:1,4,11
64:1,8,13,16,22
65:9,24,25 66:16
67:14,18 68:4
71:4,8,12,13,23
73:14 74:8 75:1,22
76:6 77:21
78:1,5,10,13,17,20,2

4 79:6 80:17
81:11,13 82:4,23
83:6,15 85:10,25
86:9,11 87:12,14,17
88:16 89:2,13,14,25
90:9,11,15 92:11,16
96:2,7,10,13
97:4,11,21 98:2,25
99:8,19 101:21,24
102:7 103:3,9,14,24
104:15 105:6,12,24
106:14,19,25
107:8,10,15,25
108:3,8
114:8,13,17,23
115:2,11 123:11
124:1,9,12,19
125:5,7,15,22
126:8,23 127:22,24
128:3,6,14,22 130:20
131:1 132:12
133:3,22 134:14
136:9 137:16,25
141:8 143:13,23
144:6 145:16
146:1,16,24
147:5,7,19
148:14,18,20,21,23
150:2,5,16,20
152:7,18,25
153:19,21 154:6,12
155:9,13 156:17,25
157:16

**League's** 33:15 34:21
44:2 48:6 52:9 99:21
144:7,17 145:9
146:25 152:9,12
154:14 157:3

**least** 124:24 125:23

**leave** 107:21 141:6

**Leaving** 107:24

**led** 35:22

**legal** 9:18,24 32:17
33:1,13,20 34:15
41:15 73:7 81:13
97:9 101:9,10 102:3

103:6 104:4 161:19

**legislation** 41:18
42:2 43:17,21 44:3
45:2,11,14,23 46:23
47:14 48:7,11,18
49:17 50:6,9 55:1,14
123:23 124:7,15

**legislations** 46:8
47:21

**legislative** 3:2 82:20
98:4 99:1,4,15,16
155:10,14

**legislator** 103:25
104:6,7,16

**legislators** 98:12
125:18 126:1

**legislature** 41:20
42:10,13 43:13,19
97:22 98:3,18,23,25
99:12,19,21 100:19
101:22,25 102:7,15
103:3,10,15 105:7,13
110:24 123:6,12
155:9,13

**LENARD** 3:12

**less** 94:7

**let's** 80:6 93:17
148:3

**Lets** 64:21

**Let's** 70:16 94:4
134:10,12

**letter** 54:2,7 81:5,10

**level** 48:22

**licence** 134:5

**license** 72:20,23
76:21 77:22,24
78:6,7 134:5

**light** 95:8

**likely** 76:23 82:13

**limited** 104:25 105:1
126:24 130:4,12
141:19,20

limits 97:16

line 27:19 44:19
  47:10 49:9 57:6

lines 31:9 82:6

LIONEL 3:13

list 8:8 23:13 24:18
  29:16 30:6,9
  31:11,12,14,16 32:3
  53:3 72:19 96:17
  157:9,14

listed 37:22 68:18
  138:6

listen 41:9
  123:8,16,22
  124:5,13,17,20

lists 24:6 136:21

literally 147:14

litigation 25:19
  30:10 56:12 58:23,25
  69:9,13,20 70:3 81:2
  93:15,17 104:3 136:2

little 14:24 33:9
  37:12 45:18 50:4,19

live 42:1

local 71:21

location 52:13,14

locations 44:17 47:7

logo 136:8,9

long 14:5,23 15:8
  16:2 19:18 20:1,3,5
  24:22 43:6 136:14

longer 63:6
  69:9,12,22

LONGORIA 2:9

lot 54:16 71:18 126:4
  129:3 151:16,21
  152:12

lower 150:11

LULAC 1:9

Lunch 96:24

LYDIA 3:14

LYV 31:1

_____

M

M.B.A 13:14,19,20,21
  14:4

machine 4:12

Mack 16:24,25 17:2

M-A-C-K 17:2

main 29:25 128:25
  129:17

Maine 49:2

maintain 29:15
  150:16,20

maintained 53:6,9
  110:13

major 18:7,9

majority 76:22
  121:12,20 147:14

manage 15:21
  16:14,15,19 18:1

managed 14:4

managing 16:16

marble-mouthed 14:24

MARC 1:3

MARGARITO 3:14

MARIA 2:9

mark 21:16 57:14

marked 21:20,22
  25:14,15 30:13,15
  56:2,3 61:1,2
  80:23,24 116:6,7
  119:10,12 122:7,8
  135:23,24

market 139:21

MARTINEZ 3:14,15

Master 13:14

material 71:18 148:5

materials 51:17 58:20

91:14

Matters 22:17

MAXIMINA 3:15

may 4:9 11:2,12,13
  18:24 19:1,2 20:9
  29:13 35:16 59:24
  65:3,19 66:24 67:3
  68:10 69:17 80:11
  152:16

maybe 45:17 63:22
  99:3 109:9 143:17

McCRAW 2:14 3:8,20
  5:20

mean 17:18 18:12 21:6
  29:21 31:15 37:6
  38:14,20 39:2,17,18
  41:3 44:22 49:5
  53:19,24 54:10,16,25
  59:24 62:4,17,24
  63:2,8,13 64:10
  65:16 66:2,4,12,13
  67:3,19,21,25
  68:1,7,8,9,14,19
  69:21 71:16 72:4,13
  73:24 74:12,13,22
  75:9,10,11 76:9
  77:10,11,13 79:7
  80:6 83:9,17,23 84:2
  85:1,8,15 86:25
  89:11,19 90:3,6,18
  91:12,17 92:17,23,24
  93:4,9,24 94:17
  96:9,16 97:18
  98:7,10 102:12,13
  103:20 104:11
  105:1,2,11,18,19
  106:6 107:19
  108:12,19,20
  110:2,20,23 111:17
  112:2 114:11,21
  115:13 116:4
  118:11,16,21,22,23
  121:4,23,24 122:23
  123:3
  124:16,17,18,22
  125:11,12 126:2,4,12
  127:7 128:2,9,18,24

```
129:5,6
130:7,9,16,21
131:4,18 132:3
133:10,16 134:17,20
135:2 138:3,11
139:9,20,21
140:11,23 141:5,19
142:12 143:17
144:8,9 146:7,9
147:1,9,24 148:16
149:4,5,20
150:7,12,13,23,24
151:11,16,25
153:2,8,25 156:24
157:3
```

**means** 10:18 11:19
  103:7 130:6 133:15
  134:2

**meant** 66:14,15 67:7
  156:16

**media** 38:16

**Medical** 12:24

**medications** 12:4

**meet** 20:17,20 66:10
  67:10,12,13

**meeting** 8:10 17:10
  20:5 36:12,14 56:15
  57:19,22 58:14,17,24

**meetings** 19:9
  76:16,17 132:1

**MELLOR-CRUMLEY** 1:6

**member** 42:21,23
  79:8,11 148:1

**members** 23:8 24:6
  55:5,20,24 60:22
  65:2,18 66:11,13,24
  67:4,6,8 94:21
  131:19

**membership** 23:12,13
  24:5 28:16 75:3,5
  94:22

**MENDEZ** 3:12

**mentioned** 21:13 30:5
  31:21 32:2,5 36:9

```
38:6 45:6,8 50:17
55:4 56:24 60:18
66:11 67:3,17 68:11
77:18 115:20 149:23
152:1
```

**messages** 38:16

**messaging** 58:20

**met**
  19:12,13,14,15,21,23
  35:25 36:10,16,20
  67:14 154:21

**MEXICAN** 3:2

**Mi** 39:24 59:23

**MICHAEL** 1:5

**Michelle** 2:5 5:3 8:14
  61:12,18 64:11,12,14

**middle** 100:12 136:13

**military** 72:21
  78:14,16

**Miller** 5:15 10:1,2
  156:12 158:2

**mind** 70:9 81:19
  109:16 110:14

**minority** 60:22,23
  75:3,5,14,20
  105:8,14,25 106:2

**minute** 22:2,8 65:17

**minutes** 49:22 85:18

**miscellaneous**
  141:20,21 142:2

**mischaracterizes** 37:5
  65:13 87:7 118:20
  138:8 139:17 142:19
  146:21

**mission** 8:6 25:23,25
  26:3 37:22 126:25
  127:8 128:6,17 131:6
  132:5 143:13,23
  144:7,8,10,12,17,18
  145:9,16 146:1,25
  147:7,9 148:15,24
  149:3 152:9,13,20,21

```
153:1,3,8 154:1,5
```

**missions** 143:16
  151:18

**mobile** 71:21

**mobilizing** 127:1

**model** 38:4 145:20

**modify** 155:21

**moment** 62:18 109:21
  157:20

**Monday** 20:17,18 57:23

**monetary** 39:3 138:20

**money** 74:6 130:6

**monitor** 47:7

**monitored** 44:17

**monitoring** 41:3,4,7

**MONTEZ** 1:5

**months** 43:9

**move** 103:22

**moved** 98:13 155:7

**myself** 28:11
  131:18,24

---

N

**NAACP** 3:1 5:10
  9:18,24 40:3,12,20
  59:23

**Natasha** 5:9 9:17 10:8
  30:18 68:25

**national** 18:11,14
  25:10 26:3 27:14,16
  37:7

**nearest** 52:14

**necessarily** 49:5
  51:25 156:24

**necessary** 17:13 52:5
  78:21 149:12,20

**negative** 96:14,15
  129:21

**negatively** 96:7,9

105:13,14

**neighborhood** 12:22

**neither** 125:6 138:5

**Network** 40:1 52:23,24
53:2

**NGR** 1:4 2:2 3:2,13

**nkorgaonkar@naacpldf.
org** 5:12

**nod** 10:19

**Nods** 142:5

**nomination** 112:16

**nonetheless** 111:9

**non-minorities** 106:3

**nonprofit** 26:9

**nor** 161:10,11

**norm** 135:13

**normal** 97:22 98:4
99:1,4,20 127:18
132:4 141:1
155:10,14

**normally** 140:24

**Notary** 160:17 161:3

**note** 10:21 23:1,6
52:8 57:7,15 95:3
110:6,10 153:22

**noted** 94:14 160:2

**nothing** 158:4

**notice** 8:3 21:1,6,7
22:7,9 23:3 27:20
28:9 53:18 58:6
95:11 109:11,14,19
110:8 153:24

**Notwithstanding**
125:14

**November** 61:13 87:13
88:17,24 89:3,6

**NW** 5:5

**Nyree** 16:25 17:4

**N-Y-R-E-E** 17:4

---

O

**oath** 11:19 113:17
160:10

**object** 11:13 55:8
73:6 97:8 101:8
102:2,21 109:9
116:19,22 119:18
123:9 125:3

**objected** 110:11 145:4
153:23

**objecting** 134:18

**objection** 13:1 18:20
19:4 26:17 27:1,18
28:8 29:20 32:16,25
33:12,19 34:1,14
37:4 45:16,25 46:24
53:17 58:5 64:3,19
65:12 79:18 83:1,8
84:10,12,18,24 86:5
87:6 96:4 102:10
103:5 104:2 105:9
108:4 115:5 116:2
117:4 118:19
123:19,25 125:6
128:7 133:8,19 137:7
138:7 139:16 142:18
143:25 145:12 146:19
154:23

**objections** 23:2,6
94:14 95:3 110:13

**objective** 34:22

**obscuring** 136:5

**obtain** 44:22,23 78:25
79:6,14 86:3,13,19
87:15,22 88:21
89:7,16 90:2,9,16,22
91:1,4,5 127:21

**obtained** 53:4

**obtaining** 71:10,15
80:3

**Obviously** 130:5

**occasions**
19:13,20,21,23,24
44:21 48:1 71:20

---

79:9 147:25

**occurred** 37:21 85:15
93:25 138:6,10

**occurring** 57:23 84:4

**occurs** 99:17

**October** 57:23 58:15
59:3

**offenses** 111:16

**office** 9:6 37:7 53:4
71:22 79:16 112:17
160:13 161:12

**official** 2:13,15
3:7,8,19,21 15:16
111:23 112:12

**oh** 48:9 49:10 52:7
56:8 77:25 80:4,6
93:4 99:24 100:17
130:23 133:18
136:8,15 157:10

**okay** 9:17 10:13
11:6,10,11,18,23
12:25 13:4,12,22,23
14:21 15:3 17:17
18:24 19:3,7
21:9,15,19 22:16,21
23:18,22
24:8,14,17,21
25:10,13 26:6 29:15
30:5,12,21 31:4 32:5
34:11 37:12 38:10
45:5 46:2,6
47:6,12,22 48:4
49:14 50:14,16 53:21
55:11 56:1,8 57:9,17
59:6 61:16 62:14
63:8,24 65:23 66:20
67:10 69:10,18
70:1,18 71:4
73:3,19,22
81:14,19,22 82:11,18
83:2,6,15 85:20
88:15 90:13
91:19,24,25 92:5,8
94:2,6 95:5,7,20,24
96:1,23 97:2,21
98:19,22 99:7 100:9

---

101:2,6 103:2,24
106:22 107:24 108:6
109:11,23 110:2
111:12 112:6,9
114:14 116:5,9
117:6,21,24 118:7,17
119:1,11 122:6 123:5
124:3,24 125:19
126:19 132:10 133:15
134:10 136:12,21
138:12,17
140:4,14,21 142:20
144:5 145:25
146:8,23 147:2,5,24
152:7,11,15 153:17
155:2,5,6,19
156:2,12
157:12,22,24 158:4

**ones** 106:9 115:15
129:5

**one's** 112:15 113:17

**Open** 27:5,6

**operate** 26:6

**operations** 15:21 18:8

**Opinion** 5:23

**opportunities** 30:2

**opportunity** 66:6
68:11 82:14

**opposed** 18:23 150:11
151:8

**option** 65:4,20 66:25

**Oral** 4:2,6 8:3

**order** 74:21 106:7

**organization** 15:20
16:2 18:11,15 23:12
24:5 25:6,11,24
26:4,9 27:15,17
28:16 29:5,9 30:3
33:8 39:20 41:10
53:9,11,15,16 58:4
65:3,19 66:11,24
68:10 76:17 80:7,13
94:22 115:16 148:17

**organizations** 26:24

36:17 39:15,22 58:2
59:19 135:6

**organize** 38:13

**organizing** 38:3 39:23
58:3,12 59:22 145:19

**Original** 86:1,9

**ORTIZ** 1:5 3:12

**OSCAR** 1:5

**others** 60:4

**otherwise** 126:25

**ourselves** 9:15 142:11

**out-of-state** 72:13
74:15 76:12,25 96:18
106:8

**outreach** 58:21 67:5

**outside** 50:12 97:22
98:3 99:1,20 128:16
152:8,19,25

**overshadow** 147:10

**oversight** 17:20

**Owens** 2:5 5:3 8:13
61:12,18 64:8
69:4,8,11,24

**OZIAS** 1:6

---

P

**p.m** 4:10 158:9

**P.O** 5:23

**page** 7:2 8:1
22:12,14,16 59:1,3
70:18,20 81:17,20,22
99:8,9 100:12 109:16
126:19 130:1 132:7

**PAGE/LINE** 159:4

**pages** 57:7

**paid** 15:10

**paper** 30:24

**papers** 73:25

**paragraph** 70:20 82:3
99:9 100:13,14,18

101:4 126:22 130:1
132:7,8 133:22
136:13,19

**paragraphs** 22:18,24
24:12

**partial** 30:20 157:14

**participate** 31:25

**participated** 47:23

**participation** 26:21

**particular** 29:8 30:4
34:17 59:9 61:5
84:23 85:15 92:24
126:2 127:16 133:22
136:16

**particularly** 33:6
41:24 51:16 67:20
74:4 75:20 76:12
96:18 129:3 135:16
157:7

**parties** 36:21,23
69:9,12 161:11

**party** 34:5,9 70:3
77:6 161:9

**pass** 148:5 155:20
156:4

**passed** 54:12 98:24
99:13 100:20 101:23
102:1,8 103:11,16
104:23

**passing** 55:7

**passport** 72:23 78:11

**past** 19:24

**pay** 39:7,8,9,10,11,12
74:17,20

**PEGGY** 1:6

**penalty** 11:20

**Pennsylvania** 5:5

**PENNY** 1:5

**people** 16:19,23
17:5,25 18:6 28:19
29:25 30:2 31:20,24
32:11,19,22 33:6

34:3,18 35:10
40:10,12 44:19,21
47:9 51:2 54:1 65:3
67:5 72:9 74:2 76:11
77:12 79:17 84:23
85:11 91:13 105:3
106:20 107:1,22
108:23 115:17,18
116:15 118:9 119:4
127:1,20 128:10
129:16,19 131:9
133:1 135:16 144:13
149:6,23 151:1
153:5,9,12 156:17,24
157:7

**people's** 39:9 130:16

**percent** 115:23 118:11
119:4 121:4,10,24,25
122:23 123:3

**percentage** 116:15
118:9 120:10,22
121:5 122:18,24
150:10

**Perfect** 92:8

**Perhaps** 98:20

**period** 43:12 44:18
47:8

**Periodically** 20:12,14

**perjury** 11:20

**PERRY** 1:12 5:20

**person** 31:13 70:23
77:1,3 92:17
107:12,13,16,17
108:1,8,9,10,16
113:6,22,24 114:2,4
160:11

**personal** 124:8

**personally**
67:12,13,25 160:9

**pertain** 23:7

**petition** 29:13 84:9
112:15 113:1 156:25

**petitions** 156:18

**phase** 151:23

**phone** 5:15 10:1 44:14
46:22 47:3,4
52:11,16,17,18
132:15 153:4

**photo** 70:24 72:22
78:2,3,15 81:24
82:8,14 115:25
116:18 118:3,13
119:7 120:13 121:2,8
122:21 123:1 132:13
133:4,25
134:3,6,15,25 147:22

**placed** 32:3

**places** 52:6

**PLAINTIFF** 5:14

**Plaintiff-Intervenor**
63:7

**Plaintiff-Intervenors**
2:6,10 5:2 8:12
61:10

**Plaintiffs** 1:10 2:2
3:4,17

**plan** 136:23 137:5,13
138:1 139:13 140:5
142:8,22

**please** 9:8,9 10:18,21
11:8 17:1 22:1,12
68:25 88:11,15 89:17
93:8 100:16
109:16,21 112:8
120:21 126:19 144:25
145:5

**pledge** 28:20 29:7
156:18

**point** 9:13 11:2,14
49:12 70:7 93:11
96:3 99:23 147:13
149:13 155:18

**pointed** 82:25

**points** 82:24 83:3

**policy** 41:18 49:15

**Politics** 8:17,19,21

**poll** 41:3,4,7 52:14
74:9,25 115:20
116:4,12,15
117:17,19 118:9,22
119:4,14,16
120:5,11,25
121:6,13,22
122:15,19 124:25
125:7,14

**polling** 44:17 47:7
52:6,13

**polls** 40:10,18 41:8
43:23 44:22 54:13
58:22 70:23
115:14,20 144:13
146:15

**POPE** 1:5

**popular** 115:3

**population** 39:25 81:9
97:19 105:21 127:15
141:3 147:16 157:4,5

**populations** 33:5,6
35:1 57:4 75:19
97:20

**portion** 75:23 76:7
131:1,3,7 145:6

**poses** 33:4

**position** 15:8,10,12
148:21,23

**possess** 111:22 151:3

**possessing** 111:20

**possession** 154:14

**possibility** 36:17,22
64:24 65:11 66:1,18
67:23 68:19

**possible** 11:1 124:25
125:15,23 147:23

**possibly** 91:15

**practices** 49:7 155:14

**Prairie** 81:24 82:12
83:13

**precincts** 139:22

preclearance 81:6,7
93:15

pre-cleared
142:12,13,16

prefix 31:1

preparation 19:22
20:22,24 21:5 22:9

prepare 19:8 21:12

prepared 24:3,14,19
81:10,12

preparing 20:1

pre-populated 31:18

present 6:1
36:12,13,14 44:20
47:10 66:6 89:14,25
115:24 116:17 118:2
119:6 120:12 121:1,7
122:1,20 123:1

presentation 135:10

presentations 131:24
151:21 152:3

presented 65:5,20
66:17,25 117:25

preserved 102:11

Presidential 93:25

pretty 27:7 28:10
37:8 39:24 40:6
41:16 43:22 48:2
54:5 58:18 66:8
74:12 75:18 81:8
92:19 108:20
127:13,20 129:14,21
130:9,10 131:4,5,9
137:22 143:7 149:17

prevent 12:1,8

prevented 70:22 108:3

previous 19:21,23
47:2 54:24,25 107:9

previously 37:23 50:4
73:19 105:19 123:7
129:12 134:25

primary 19:2 37:16

128:2

print 39:13 51:9,16
54:18 71:18 148:5

printed 30:17

printing 54:18 148:7

printout 30:20

prior
46:9,12,14,16,17,21
47:6,12,18 48:2
55:2,7 60:13 65:13
94:9 128:23 129:12
135:18 145:4 150:1,4
151:12

privileged 35:23

probably 11:1 14:20
21:23 47:15 80:12
84:5

problem 40:11 41:8
100:10

problems 40:17

Procedure 4:15

procedures 97:23 98:4
99:1,4,13,15,20
100:20 101:23
102:1,8 103:11,15
155:11,14

proceed 133:15

proceeding 99:16

proceedings 161:7

process 25:3,4 35:22
51:17 52:2,3 105:3
112:11 126:6 127:9
128:11 129:1
153:9,10

produce 110:12

produced 4:7 25:19
30:9 56:11 81:1
136:1

production 154:13

profit 26:7,8

program 14:4 39:12

programming 38:3
145:20

programs 15:22 16:4
67:19 140:17

prohibited 82:7

project 8:10 39:23
58:3,12 59:22

projection 141:10,11

projections 60:20
154:7

promise 122:5

proper 77:15

proposal 137:20
140:13

proposed 41:19 44:4
47:21 48:8,18 50:6
55:1 81:23 82:7,14
98:24 102:14 103:12
137:13 139:20
142:9,10,15,22,23

proposing 112:15
113:1

proposition 112:22
115:24 116:16 118:10
122:19

protection 8:23 38:7
40:6,7,9,20,22
41:2,13 136:17,23
137:5,13 138:1,13
139:13 140:5
142:8,22

prove 74:19

proved 160:10

provide 12:5 26:15,24
34:16,22,24 35:3
40:16 42:1 52:15

provided 42:7 154:12

provides 42:5

providing 12:1 147:20

provisions 4:15

public 2:16 3:9,22

79:16 134:23 135:9
160:17 161:3

**PUEBLO** 3:16

**purpose** 8:6 25:23
97:6,12 145:17

**purposes** 14:25 111:9
141:14 148:11 160:12

**pursuant** 4:14

**pursuit** 127:7

**pushing** 99:2

**puts** 33:7 75:18 81:9
106:12,13

---

Q

**qualified** 113:2
114:3,5

**question** 10:22
11:6,10,13,14 12:2
18:25 19:5 20:8,11
27:21 32:18
33:2,21,22 34:15
35:14,19 39:18
45:5,10 47:15 52:13
69:16 70:9,12 73:9
76:4 82:25
88:3,4,7,10
89:1,17,18 90:13,24
94:16 95:17,24 97:25
99:14,18 100:1,7,24
101:11,19 102:20,25
103:1 104:4,10,11
106:22 107:9 108:5
109:7 110:8,15
111:25 112:5,23
116:20 117:10,25
119:1 121:16
123:13,14 124:22
125:10 126:21
133:11,12,14,19,20
134:7,19 144:3,14,23
145:4,7,13 148:19
152:10 153:24

**questioning** 49:9 57:6

**questions** 9:4
10:16,17 11:20

12:6,9 24:21,22 36:9
92:7 152:12 153:16
155:25 156:4,10,14
157:23 158:1,2

**quick** 49:9 155:3

**quite** 75:10

**quote** 83:3 118:1
136:14

**quoted** 82:24 83:3

**quotes** 82:1,4

**quoting** 99:10

---

R

**race** 75:3,4,5

**races** 119:16

**racially** 70:24

**raised** 153:19

**range** 32:12,20

**rather** 127:18 131:20
132:15 149:14 151:23

**Raymonda** 16:24

**re** 131:4,5

**reading** 47:1 65:17
71:1 82:9,16
100:21,25 136:19

**ready** 156:9

**real** 155:3

**really** 28:3 48:14
51:16 131:8

**REALTIME** 4:2,6

**reason** 54:4 159:4

**recall** 13:23,24 20:4
21:4,14 36:15 38:20
43:8,11 48:9,14
58:18 59:9,22,25
62:17,18,21,24
64:10,14 67:16 68:14
69:21 71:7,11
79:7,11,12 80:21
83:23 84:4,14
90:18,19 92:21,23

112:16 115:13 140:8

**receive** 27:14 40:14
137:21

**received** 13:19 27:17
80:11

**receives** 27:12 40:13

**recess** 96:24

**recites** 145:15

**recognize** 22:4 25:20
31:5 56:12 61:3

**reconvene** 156:6

**record** 4:15 9:9 10:18
18:21 23:2,20 24:2
31:1 50:2 57:16 63:6
96:25 110:7 119:21
124:10 152:5 153:23
155:3,4,5 156:10
157:20,21 158:5

**records** 57:7

**recruit** 29:18,21

**Rector** 5:10

**redirect** 156:11

**reduced** 161:6

**refer** 14:20 40:23,24
41:10 109:18 130:6

**reference** 126:22
130:4

**referenced** 116:12
117:17 137:6 142:8

**references** 59:3

**referendum** 112:16
113:2

**referred** 67:11 74:25

**referring** 14:25 23:11
60:8 100:5 109:18
126:3 130:13,20
133:18 143:5,6

**regard** 41:2,18,23
43:17 45:1,22,23
47:14,20 48:17 49:16
50:22 51:14 52:9

53:23 54:6 61:21
63:24 71:9 139:25
152:13 155:22

**regarding** 22:24 24:11
34:22 46:7,23 51:23
52:2 54:22,23
55:6,14,21 113:17
128:4,15,21,22
143:12,22,24

**regardless** 79:23

**regards** 40:22

**register** 51:1 127:8
143:4 144:8 149:23
150:6,21 153:6,7

**registered** 51:3 53:3
92:17 106:15,16,21
107:2,5,12,17
108:2,9,10,15 115:23
116:16 118:2 119:5
120:12,25 121:7,25
122:19,25 129:20
144:13 149:7
150:2,17 151:1,6
153:5,12

**registering** 29:7 71:6
127:1 145:10 149:14
150:9 151:24

**registration** 37:18
38:5 50:18,22 67:20
129:18 131:11 140:25
147:11 151:15 152:6
153:3 161:20

**regular** 138:15
161:9,10

**regularly** 49:3

**rejected** 103:13

**relate** 110:11

**related** 41:12 44:3
48:7 50:5 60:8,21
110:10

**relates** 46:11,20 54:8
126:7

**relating** 60:10 153:20
154:8

**relative** 95:10

**relevance** 13:2 18:21
26:18 27:19

**remember** 13:17,24
32:6 58:16 60:16

**repeat** 11:8 28:22
76:3 89:1 90:13,24
125:19 152:16

**repeated** 11:7

**repeating** 70:10 107:9
110:14

**rephrase** 11:8 33:2,21
64:21 68:4 73:9
88:14,15 89:4
94:10,12 97:10,25
101:13,18 108:6
115:9 119:1 137:9
142:20 144:2

**report** 16:6,10 17:5

**reported** 4:11

**reporter** 6:2 10:17,24
21:18 28:13 97:1
117:4,7 145:1 161:3

**Reporter's** 7:9

**reports** 60:20 154:7

**represent** 25:18
30:17,19 32:11,14,19
56:10,14 61:8 68:24
70:1 80:25 86:8
87:11 111:13 116:10
117:15 119:12,15
122:12 135:25 139:1
157:16

**representation** 34:25
35:3 61:14 70:5
116:11 117:16 118:8
119:13

**representative** 43:4
122:14

**Representatives** 3:3
42:22

**represented** 10:5
34:7,13 35:4 117:9

**representing** 9:7
33:16,24 34:2 117:19
120:3

**represents** 32:7,9
83:12 122:13

**request** 154:13

**requested** 145:6
158:10

**requested...........
.............159**
7:8

**require** 139:14

**required** 54:13 58:22
60:11 74:19 113:17
116:17 118:2 119:6
120:12 121:1,7
122:1,20 123:1
132:12,18,21
133:4,25 134:3,4,15
139:7 140:9 143:7
147:21

**requirements** 75:17
115:3,12 121:13,22
126:9 127:16,23,25
128:5,16,21,23
129:22 147:6

**requiring** 72:10

**re-rack** 70:16 96:12

**reserved** 141:17

**reside** 12:21

**resolved** 23:8 40:15

**resource** 17:15 40:16
130:16 131:13 148:3
151:13

**resources** 38:25
39:2,3 51:6
54:14,16,22
55:13,19,23 74:6
75:17 126:24
127:13,19
130:4,5,11,12,14,19,
25 131:1,5,16 132:10
133:2,6 134:8,13
139:2 140:8,19

141:7,24 142:1
147:19 148:6,11

**respective** 61:23

**respects** 128:10

**responded** 116:15
118:9 119:4
120:11,24 121:13,21
122:18

**respondents** 121:6

**response** 16:22 31:23
42:11 57:2 61:24
62:10 100:22
103:8,17 109:13
126:16 142:9,23
145:5

**responsibilities**
15:17 128:19

**responsible** 26:20
31:13

**responsive** 154:12

**rest** 14:19

**restate** 33:21 97:25
104:11 106:22 123:14

**result** 56:23 82:14

**results** 117:19
119:14,15 122:13,14
124:25

**retract** 55:21 86:15
108:16

**retreading** 139:23

**reveal** 20:8 35:15
36:5 69:16

**review** 20:24 21:2
109:21,24

**reviewed** 21:1,6 22:8
110:2,20

**rhaygood@naacpldf.org**
5:12

**RICK** 1:12 5:20

**rights** 5:17 8:16
41:25 70:21 143:3

146:14

**risk** 11:20

**Rock** 39:24

**role** 17:9

**rolls** 129:16

**room** 4:13 9:14 19:10
20:21

**rough** 79:22

**ROXANNE** 3:14

**rules** 4:14 10:14

**run** 136:22 137:25
138:3 139:13 140:17

**Ryan** 5:9 9:23 10:8

---

S

**S.H.A.P.E** 59:10

**Safety** 2:16 3:10,22
79:16

**sake** 31:1

**salaries** 39:10,12
51:8

**sample** 82:12

**Sanders** 16:9 17:23
36:10

**saved** 83:1

**saw** 63:18

**SB** 45:8
46:9,12,14,17,20,21
47:7,12,19 48:3
53:23 54:6,8,15,23
55:2,7,15,21,22 57:2
60:9,13,22 69:6
70:4,22 71:10,15,23
72:1,17 73:15,17
74:8 75:1,24 76:8
77:2 82:20 84:17
85:13 86:4,13,20
87:16,23 88:22
89:8,16
90:2,10,16,23 91:2,6
92:11,22 93:2,12,18
94:6,8,10 96:3,8,15

97:4,5,11,22,23
98:4,23 99:13,21
100:20 101:24
102:1,9
103:4,11,16,25
104:16 105:7,15,23
108:21 114:8,24
115:4,22 125:1,16,23
126:7,23 127:4,11,16
128:16,21,23 129:12
131:2,15,17 132:6,13
133:5,25 134:4,16
135:18 139:25 140:6
141:25 142:9,16,24
143:5,6,7,23 147:3,6
148:15,25 149:3,22
150:1,4,11
151:6,12,15
152:8,13,19,24
155:10,15

**school**
13:5,7,10,13,16

**scope** 27:20 28:9 58:6
152:9,19,25 154:24

**seal** 160:13 161:12

**Secretary** 1:13 2:14
3:7,20 53:4,6 85:8

**Section** 5:16 8:15
81:7 98:11 100:5

**secure** 127:3 149:10

**secured** 129:10

**seek** 65:24 66:3,9

**seeking** 94:16

**seen** 61:6 63:15,16,17
81:2 116:23 119:23
122:10 136:2 154:20

**segment** 77:14

**send** 46:22

**sense** 153:14

**sentence** 81:25
82:9,16 100:21 101:4
118:5,6 134:1 145:19

**separate** 57:14

September 81:16 82:19

SERGIO 1:4

series 22:18

serve 28:17,18 39:25
75:19 76:11

served 30:6

serves 65:10

session 41:19 82:20

seven 80:15

several 19:13,20,24
30:2 31:15 80:7
147:25

shake 10:19

share 49:7

Shelby 98:9,10

she's 23:10 62:22
77:6

shifted 54:17

shifts 141:4

short 123:6 127:12

shorthand 4:12 161:2

showing 117:18

shows 117:20

sign 112:14,22 113:1

signature 7:8 158:10
159:1 160:1

signed 28:20 29:13
156:17,18,25

signer 113:2

significance 101:10

significant 75:23
76:2,7,10 107:22
136:16 149:16,21

significantly 150:8

signing 29:7

similar 41:15 58:12
63:22

simplification 14:24

simultaneously 116:25

sisters 12:25

six 43:8,9

skim 22:2

Slaughter 161:20

slightly 142:19

slow 28:14 87:7
129:24

social 38:16 72:4

socially 26:20

Society 27:5,6

sole 128:18

solely 153:4,11

solicit 114:2,4

Solutions 161:19

someone 41:7 68:10,13
92:22 107:25

sometime 93:18

somewhere 109:12

sorry 20:13 23:19
42:25 45:5 53:13
55:21 56:6 60:15
70:8 76:3 83:19
86:15 96:11 99:6
100:17,23 103:18
111:20 113:8 130:24
133:9,18,21 139:23
146:20

sort 18:1,2 29:6,14
127:9 147:16 151:22
153:14

sought 55:5 64:16,23
65:1

Sounds 49:23

source 27:8 128:25

sources 27:11,13

Southern 1:1 4:12
13:6,11 14:1,9

space 34:17

speak 18:12 151:20

speaker 5:15

speaking 11:4 116:25

specific 29:9,10,11
31:13 45:8 67:15
89:9,10,11
90:8,14,21,25 91:17
92:21 97:18,19 105:8
132:23 134:17,20
139:21 140:22
141:14,15 152:14

specifically 11:15
20:3 49:16 50:20
51:14 52:9 53:22
72:12,13 77:11 84:2
86:24 92:23 114:24
140:12

specified 32:21

speculation 53:18
58:6
84:5,11,13,19,25
115:8

spell 9:8 17:1

spend 20:1 30:24

spending 132:22 135:3
149:21 151:16

spent 54:22,23
55:13,20,23 134:22
139:2

spoken 155:1

spreadsheet 30:17
31:8

staff 17:10 51:8
66:13,14,16,18
79:8,11 131:19
147:25 151:22

stamp 57:11

stands 84:24

start 9:15 70:14
134:10,12 143:10
147:12,13 148:21
150:19

started 26:3 133:13

state 1:13 2:12,14
  3:1,7,20 4:11 5:20
  9:7,8 15:7,17,19
  16:7
  17:9,18,19,20,22
  18:21 25:5 28:11
  32:12 35:25 36:9
  37:3,11 38:23,24
  39:16 42:6 43:4
  47:25 48:8,12,18,22
  50:7 51:4
  53:7,12,14,25 85:8
  93:3 98:12 106:25
  107:3,11,15,20,24
  118:13,14 131:18,25
  134:24 150:3
  160:7,18 161:1,3

stated 4:15 22:8
  25:25 57:18 81:25
  82:25 99:18 108:5
  116:20 123:6 128:16
  139:24 144:1 148:24
  149:3 152:20 161:3

state-issued 134:5

statement 23:11,16
  37:22 101:7 151:10

statements 82:5,24
  83:4,7,12,18,21
  84:3,16 85:12

states 34:5,6,7,13
  35:4 118:1 123:3
  158:3

State's 53:4

STATES 1:1 2:1 5:14

statewide 32:19 38:21

stating 145:21,25

statistics 115:14

status 47:25 72:5
  106:11 113:18

statute 113:17

STEEN 1:13 2:13
  3:6,19 5:20

Stephen 5:22 9:5
  30:25 49:8 57:5

stephen.tatum@texasat
  tornygeneral.gov
  5:25

steps 52:5 80:10
  132:23

STEVE 2:14 3:8,20

STEVEN 5:20

stipulation 23:8,21

stood 44:19 47:9

stop 95:6

stopping 49:12 98:8

strain 129:14

Street 4:13 5:10

strict 70:24

strictly 151:14

strike 102:16

struck 98:11

student 44:9,10 48:2
  72:12,15 74:16
  76:17,24 102:17
  105:19,20,22

students 46:14 72:13
  76:13,19,23 81:25
  82:5,12 83:13,16
  96:18 105:25 106:8
  129:4 135:16

studies 43:25 60:20

stuff 54:20 141:1
  146:15

Subject 125:9

submitted 54:3
  81:5,16 82:18

subscribed 160:11

successful 80:2,19

suffered 96:3

suffering 11:25

suggestion 111:5

Suite 161:20

summary 65:14

summer 93:19,20,22
  140:3

support 26:21 106:14
  114:17,21,24,25
  115:12,16 122:19
  126:9,12 161:19

supported 121:13,22

sure 9:10 11:9 12:23
  17:12 23:5 33:23
  37:18 44:5,15,18
  45:19 46:4 47:9
  49:10,11,21 62:6,16
  68:20 72:20 73:10
  76:5 80:8 86:7
  88:2,6,16,25 89:2
  90:14,25 93:10 97:24
  98:2 99:5,24 100:2
  102:11 104:12,13
  106:20,23,24
  107:1,12,16 108:15
  110:15 111:6
  121:15,17 123:15
  124:10,11 125:20
  129:5,7,11,19
  131:9,14
  135:15,17,19 141:4
  143:15,19 144:11
  146:13 149:9,10,12
  153:13 156:7

survey 84:8

swear 113:16

swearing 113:15

sworn 4:8 9:2 161:5

system 52:20

___

T

table 50:25

tabling 50:23,24,25
  152:2

taking 12:4 85:18
  135:4 148:21 161:8

talk 11:2 12:12 33:9

talked 28:15 43:18
45:6,12 74:2

talking 29:11 37:12
43:16 50:10 98:14,17
99:16 155:7,11

talks 94:20

Tamara 4:10 6:2
161:2,18

target 29:25 31:20
58:21 80:9 139:21
157:3,4,5

targeting 143:2

Tatum 5:22 9:4,5,13
10:3,4 13:4 18:24
19:7 20:13
21:16,19,21,23 22:1
23:4,10,22,25 24:1
26:23 27:4,23
28:12,14 29:23
31:3,5 32:22
33:2,15,23 34:4,21
35:21 36:8 37:9
45:19,20 46:2,5,6
47:1 49:10,14,19,22
50:1,3 53:21
55:11,12 56:6
57:9,13,17,18 58:9
62:6 63:10
64:5,7,21,22 65:14
68:25 69:2,10,23
70:11,14,16,18 73:10
76:5,6 79:21 83:2,11
84:15,22
85:3,17,20,23,24
86:7,8 87:8 88:11
92:6,9,10 93:10,12
94:19 95:1,5,7,8,20
96:6,22,25 97:2,3,10
99:5,6,24
100:2,8,10,11
101:1,3,12,20
102:6,19,24 104:8,13
105:12 108:6 109:11
110:16,18
111:6,12,13 112:4

114:16 115:9,10
117:3,12,14,15
119:21 120:2,3,19,20
123:15,21
124:3,4,11,12 128:14
129:25 133:11 134:21
137:9 138:9 139:18
142:20 144:2,22
145:7,14 146:20,23
153:15,18 154:2
155:2,5,6 156:3,7
158:4

Tatum................
..9 7:6

tax 74:9,25

TAYLOR 3:12

ten 49:22

Tendering 21:24

term 16:2 73:7 104:4
109:10,19 111:14
156:16,20

terms 12:22 18:12
20:4 21:1 27:3 32:10
34:6,17 40:20 48:11
60:3 87:5,10 89:19
91:15 140:22

testified 9:2 47:2,25
55:9 65:17 66:23
103:12 156:15 157:13

testify 18:22 22:23
24:4,14,19 116:23
123:10 125:4 161:6

testimonies 53:25

testimony 37:5
42:2,5,7 43:19 50:7
65:8,13,15,23 79:19
87:7 118:20 138:8

Texan 123:12

Texas 1:1,9,13
2:3,7,12,13,15
3:1,3,7,9,20,21
4:11,12,14 5:2,20,24
8:4,12,17,19,21,24
9:6,7,19,21,25

13:6,11
14:1,8,13,16,20,25
15:1,4,6,17 17:8,15
18:2,3,8 22:22 23:11
24:5,10,22 25:3,7,25
26:6,16,24 27:12
28:5,15,17
29:3,15,18,23 30:5,7
31:24,25
32:8,9,13,14,23
33:3,10,15,23
34:11,12,16,21
35:2,10,12,22
36:16,20,25
37:10,13,17 38:8,11
39:14,16,23
40:1,3,20,21
41:1,13,17
42:1,18,21 43:17,20
44:2,25 45:13,21
46:7,13,18,22
47:6,13,20
48:6,15,16 49:3,15
50:5,8,10,12,13,17,2
1 51:14 52:8 53:22
54:7 55:4,12,20,23
56:17 58:3,11
59:14,22 60:19
61:10,16,23
62:2,7,15,20,23
63:1,4,11
64:1,8,13,16,22
65:8,24,25 66:16
67:14,18 68:4
71:4,8,12,13,23
72:20,21 73:14 74:8
75:1,22
76:6,13,14,21
77:21,24
78:1,5,10,13,17,20,2
4 79:5 80:17
81:11,12 82:23
83:6,15 85:10,25
86:9,11 87:11,13,17
88:16 89:2,13,14,25
90:9,11,15 92:10,16
93:3 94:7,22 95:9,21
96:2,6,10,13
97:4,11,21

98:2,3,23,25
99:8,12,19,21 100:19
101:21,22,24,25
102:7
103:2,3,9,10,14,24
104:15
105:6,12,13,24
106:14,19,25
107:1,4,8,10,11,15,1
6,20,24,25 108:2,8
114:7,13,17,23
115:2,4,10,11,20,21
116:13 117:17,18
120:4,5 122:15,16
124:12,19
125:1,15,16,22,24
126:3,5,8,9,22,23
127:22,24
128:3,6,14,22 130:20
131:1 132:11
133:3,22 134:14,24
136:9,15 137:16,25
141:8 143:13,23
144:5,7,17 145:9,15
146:1,16,23,25
147:5,7,19
148:14,18,20,21,23
150:2,5,15,16,20
152:7,9,12,18,24
153:18,20
154:6,12,14
155:9,12,13
161:1,3,18,21

**Texas-issued** 78:2,3

**Texas-registered**
86:17,21 87:20 88:19
89:5,24 90:22
91:1,10

**text** 38:16

**thank** 9:12 10:3 55:11
70:17 100:18 110:17
158:6,7,8

**that's** 9:10 10:25
13:23 14:21,22 15:24
23:8 24:13 25:12
26:2 31:1,17 37:7
41:1,19 43:22 44:3

45:16 46:24 47:14
48:2 50:25 53:4 54:5
56:8 57:13,21,25
59:5 62:13 65:22
66:8 74:18 76:22
80:1 81:18 82:2
85:19 93:10,11 95:12
99:13 103:22,23
105:20 108:4 114:14
117:13,20 118:15,21
123:20 133:11 135:19
136:5,8,9 137:3
139:4,18 140:10
141:5 144:1,20
145:24 146:9 147:14
149:20 151:17 153:25
154:4 155:11 156:19
157:1

**therefore** 23:13 24:6

**therein** 160:12

**there's** 22:16
60:3,4,6 81:25
100:12 111:8 126:4
136:4 141:2

**they're** 108:16 122:2
144:12 146:15

**they've** 66:17 135:7

**third** 136:13

**thirty-five** 30:1
31:22 32:12

**thirty-five-year-olds**
157:6

**thirty-one** 12:18,19

**throughout** 20:12,14
38:23,24 51:4

**ties** 51:19

**time-related** 147:18

**title** 15:6 136:5

**today** 10:5,25
11:12,23 12:10
19:8,10,17,22
20:18,21 21:10
87:4,9 152:13 155:22
156:16 157:3

**tonight** 8:10

**top** 57:24 58:1,10
60:15 70:19 93:5
99:25 117:25 136:4,6
150:14

**topic** 23:20 24:4
94:13,19 95:10,16
153:23

**topics** 22:24 23:7
24:4,8,12,15,18
109:20 110:8,10

**total** 32:7 139:6

**touched** 28:6

**towards** 55:23 107:6
127:2 131:2,13,17
132:11 133:3 134:14
141:25 147:20 148:11

**train** 44:10

**training** 37:20 127:10
131:12

**transcript** 65:18
161:7

**transcription** 10:25

**transportation** 147:21

**Trial** 5:16

**Tribune** 115:21 116:13
117:18 120:4 122:15

**tried** 71:5

**trip** 80:3

**trips** 135:4,5

**true** 160:2 161:4,7

**truth** 161:6

**truthful** 12:1,5 24:10

**truthfully** 11:20 12:9

**try** 10:23 28:14 29:24
40:14

**trying** 13:24 66:20
155:23

**turn** 22:12 59:1
126:19

**turned** 146:15

**turning** 81:19 109:16

**type** 95:4 151:3

**typewriting** 161:6,7

**typical** 17:8,10

---

U

**U.S** 5:17 10:2
72:21,22

**uh-huh** 13:25 14:2
15:2 17:7 22:3 23:4
25:17 28:1 29:17
35:17 36:3,7,11
37:8,15,24 38:2,24
40:2,4,25 41:5 42:4
43:3,15 45:9 51:12
53:10,14 55:3
56:5,16,19 57:4
59:2,18 60:17
61:7,15 62:5,13
63:19 65:6,7,22
73:11 77:7 79:12
81:15 84:7 88:5,8,18
92:15 93:14 94:3
96:19 97:13 98:16
100:15 104:14
106:13,18 108:7
109:15 110:1,19
112:1 116:9 120:8
121:19 122:3,11
123:4,20 124:23
125:8,21 126:18
130:3,11 132:6
133:10 138:19,23,25
139:5 144:15 149:25
151:7 152:17

**ultimate** 37:9,11

**ultimately** 98:24
103:13

**unable** 19:3 84:16
86:2,12,18 87:14,21
88:20 89:6,15
90:1,10,17,23 91:2
148:15,24 149:2

**underlying** 72:11

120:1 125:5 147:22

**underneath** 136:9

**understand**
11:4,6,9,16,18,21
39:6,17 88:3,7,9,25
89:17,18 94:19,24
97:24 104:9,12
106:24 113:8 117:22
119:23 121:15

**understanding** 23:14
24:3 139:19

**understood** 70:9 76:4

**undertake** 133:23

**unilateral** 37:2

**UNION** 3:15

**United** 1:1,8 2:1 5:14
34:4,6,7,13 35:4
158:3

**universe** 129:16

**universities** 44:9
46:13 47:3,5

**University** 4:12
13:6,11 14:1,9
115:21 116:13 117:18
120:5 122:15

**unless** 11:15

**unnecessarily** 70:24

**upcoming** 56:15 57:19

**update** 47:24

**updates** 49:7

**upon** 127:6,7 135:6

**Urban** 59:24

**usual** 99:13 100:20
101:23 102:1,8
103:11,15

---

V

**vague** 64:4

**vagueness** 29:21 64:20
83:9 96:5 103:6
105:9 109:10

**vain** 103:2

**VAN** 52:21,23

**variety** 38:14

**various** 31:20,24
45:12 114:7 134:2,3

**VEASEY** 1:3

**verbal** 10:16 16:22
31:23 42:11 61:24
62:10 100:22
103:8,17 109:13
126:16

**via** 5:15

**View** 81:24 82:13
83:13

**Vinson** 4:11 6:2
161:2,18

**violations** 111:17

**vision** 15:19,20,23

**visit** 38:19 46:13

**visited** 44:8

**visiting** 38:17

**Vo** 42:24 43:1,2,3

**V-O** 43:1

**voice** 41:14

**voices** 53:12,14
123:8,16 124:5,13,20

**volunteer** 31:24

**volunteered** 28:19
62:22

**volunteering** 29:5

**volunteers** 39:10
51:10 151:22

**Vota** 39:24 59:23

**vote** 18:17 19:3 28:21
29:8 36:24 37:19
38:5 39:24 51:2,18
52:5 54:13 58:22
60:11 71:6 72:15,17
74:24 75:2 82:14
84:16 85:13

86:2,12,18
87:3,15,21 88:20
89:7,15 90:1 91:16
92:12,19,20,22 93:1
95:19 105:20,22
106:15,20
107:2,5,13,17,18,23
108:1,2,9,10,11,13,2
3,24,25 109:6 110:25
111:1
113:5,11,21,23,25
114:3,5 116:1,18
118:4,24,25 119:7
120:14 121:3,9
122:2,22 123:2 127:2
129:8,12,22,23
131:21 132:16
134:3,4 135:18,21
137:23 138:16 143:4
144:9 147:12
149:7,15,24 151:1,24
153:3

**voted** 18:19 19:1 85:6
94:8 95:22 103:25
104:16,18,25 105:4
114:21 126:1
129:12,20 135:21
153:5

**voter** 8:10,17,19,21
37:18 38:5,6 44:3,13
45:2,11,14,23
46:8,11,14,19,23
47:14,21 48:7,11,17
49:17 50:6,9,22
51:14,16,23,24
52:23,24 53:2
54:24,25 55:1,14,22
57:4 58:22 59:4 60:5
67:20,21 68:6
86:17,21 87:20 88:19
89:5,24 90:22
91:1,10
108:3,15,17,21
109:3,10,18
110:3,11,21
111:2,11,14,17 112:2
113:2
114:7,8,9,12,18

115:2,12 121:13,22
126:9 128:22 129:17
131:10,11 136:14
140:24,25 143:12,24
144:6 145:8,22,25
146:2,5,6,10,11,13,1
4,17,18,24
147:3,8,11 151:15
152:6 153:3
154:2,4,8

**voters** 2:3 5:3
8:4,6,8,13
9:19,22,25
14:10,14,17 15:1
22:22 23:12 26:1
40:21 44:9 47:4
48:2,23 50:18 52:10
53:3 60:22 61:10
71:24,25 73:15,16
82:4 94:20 105:22
106:15,16,21 107:2
115:23,24 116:16
118:2 119:5 120:12
121:1,7,25 122:20,25
127:3,8,14,15 134:24
143:2,13,24
144:5,8,14 145:8,16
146:6 147:8,21
149:14
150:2,5,17,18,21
151:6

**voting** 5:16 8:16
41:25 42:3 44:18
47:8 51:17,21 52:2,3
69:5 70:4,21,22 82:7
108:15 111:16 113:17
127:23,25 128:4,5
129:15 143:18,21
144:16

**VR** 151:17 152:1,5

---

### W

**Wait** 66:19 93:20

**walking** 149:18

**Washing** 69:8

**Washington** 2:4 5:3,6
8:13 61:11,18

63:3,6,11 69:4,11,24

**wasn't** 91:7,16 93:24
116:4 137:23 142:11

**ways** 30:3 31:15 32:1
38:14 49:11 58:19
136:18 137:10

**website** 31:19

**we'd** 110:12

**Wednesday** 20:18

**weekends** 135:11

**weeks** 19:25

**we'll** 33:9 41:9
119:18 156:5

**we're** 34:2 35:8 50:1
73:12 120:15 127:12
131:22 132:16,22
135:8,14 149:8,15,21
150:8 151:16 152:2
153:16

**we've** 9:15 18:7 28:15
54:10 62:6 67:7
71:16,17 74:2 91:13
93:3 94:14 116:23
119:14 127:11 135:5
153:5 155:18

**whatever** 11:9 136:5

**whatsoever** 116:21

**whether** 36:25 80:19
85:12 95:22
120:16,17 124:1,2
155:8

**white** 72:8 106:12

**whole** 27:19 33:8

**who's** 31:13 123:11

**whose** 32:22 160:11
161:9

**Williams** 16:24 67:17
79:12,23 80:5

**WilmerHale** 5:5 9:21
10:10

**window** 47:19

**Wisconsin** 49:1

**wishes** 125:1,16,24

**witness** 4:7 29:22
  35:17 36:3,7 55:10
  57:12 69:18 85:22
  88:5,8 91:20,23,25
  92:2,4 95:15 96:23
  101:16 102:23 110:12
  112:1 125:8 155:20
  156:4 157:24 158:7
  159:2 161:4,5

**wondering** 102:24

**work** 26:21 35:8
  40:2,3,4,5 41:18,22
  42:20 43:6 49:16
  58:12 65:2 67:2
  68:8,16 75:10 136:17
  147:11 153:14

**worked** 42:12,21
  123:5,11

**workshop** 59:4,13
  60:1,3

**workshops** 45:12 60:12

**worries** 56:9

**write** 134:1

**written** 42:1

**wrong** 69:1

─────────────────
          Y
─────────────────
**y'all** 27:23 38:18
  40:3 43:23 85:17
  94:21 154:2

**Yannis** 154:17,25

**year's** 141:11

**yesterday** 19:23
  20:6,15

**yet** 70:12

**York** 5:11

**you'll** 68:21

**young** 2:3 5:2
  8:4,6,8,13
  9:19,21,25

14:10,14,17 15:1
  22:22 23:12 26:1
  32:11,19 33:6
  34:2,18 40:21 48:23
  54:1 61:10 82:4
  115:17 127:1 134:24
  135:16 143:2,13
  144:5 145:8,16
  147:21 157:7

**yourself** 17:25

**youth** 40:2 41:24 42:3

**you've** 22:21 24:9
  61:6 62:7 103:11
  119:23 122:9
  156:16,20 157:2