1 fill out. And I say that, I probably need to go through

2 the whole kit. I can look through here and see. There

3 may be a form in here. I can look.

4     Q. Are these documents, if we followed up with

5 your attorney, that we could get copies of?

6     A. Oh, yeah, absolutely.

7     Q. Excellent. So a person comes in, they have

8 got a substantially-similar name, but not an exact

9 match, they fill out a form.

10     If a person comes in and the election

11 clerk says, "You know what, this doesn't look

12 substantially similar," what happens?

13     A. Then they are allowed to vote a provisional

14 ballot.

15     Q. And does that get checked by anyone? Does the

16 election judge -- before somebody votes a provisional

17 ballot because of a substantially-similar name issue,

18 does the election judge check that work?

19     A. The election judge?

20     Q. In other words, if an election clerk looks at

21 someone's ID and says, "I don't think this is

22 substantially similar" --

23     A. Right.

24     Q. -- before they tell the voter that they have

25 to vote a provisional ballot, would the election judge

64

1  verify that that person is not eligible to cast a
2  regular ballot?
3      A.  Yeah, the election judge should sign on the
4  provisional ballot.
5      Q.  So the election judge has to sign on all the
6  provisional ballots?
7      A.  Right, absolutely.
8      Q.  Okay.  Did you give any guidance, perhaps, on
9  nicknames?  Like did you give a list of nicknames that
10 people go by for various names?
11     A.  Yeah.  I think in here they even have samples
12 of stuff like that.
13     Q.  When you say "they have examples," is that the
14 Secretary of State's training?
15     A.  Well, the Secretary of State's training.
16     Q.  But did the county produce a list of
17 nicknames, for instance, for Spanish names?
18     A.  No, not necessarily.
19     Q.  For common Hispanic names?
20     A.  Because in here, they talk about like instead
21 of William B. Clements, it may be Bill Clements, you
22 know.  Bill instead of William, and that's okay.
23 Because we know, you know, basically you would know that
24 that's the same person.
25     Q.  But aside from the examples of nicknames that

1  the Secretary of State's office included in their
2  training, the county didn't provide any additional lists
3  of nicknames that people may go by for Hispanic names,
4  for instance?
5      A.  No.
6      Q.  Okay.  Do you know if any other counties
7  provided lists of nicknames to their election workers to
8  help with their substantially-similar name analysis?
9      A.  No, I'm not aware of it.
10     Q.  Okay.  If we can go ahead and mark this as
11 Exhibit 1.  This is going to be marked as Exhibit 1.
12 It's a substantially-similar name analysis.
13          (Guidry Deposition Exhibit No. 1 was
14 marked and is made a part of this deposition.)
15     Q.  (By Ms. Simson)  So if you look at Example 1
16 on the first page, you'll see that there's a place where
17 it includes information from the poll book, and then
18 some information from the driver's license.
19          And in Example 1, there's a slightly
20 different -- or there's a different first name, a
21 different last name, same date of birth, and different
22 addresses.
23          So if you were looking at a voter who
24 appeared with this driver's license, would you consider
25 this to be substantially similar or not?

1       MR. KEISTER: Objection; form.
2    A.   Without looking at a picture, it would be hard
3  to say.
4    Q.   (By Ms. Simson) So you think it's important
5  to look at the picture before determining?
6    A.   Absolutely.
7    Q.   And is there -- okay. So even with the
8  different last name, different first name, and different
9  address, this person could still be considered
10 substantially similar?
11       MR. KEISTER: Object to form.
12   A.   Well, if she got married, and she could have
13 moved, but without seeing that person, it's hard to say.
14   Q.   (By Ms. Simson) Okay. If you could turn to
15 the second example. Actually, let's push it up to
16 Example 3. We can move a little faster.
17          So here you have information on the poll
18 book, Christine Barrow, date of birth April 8th, 1965.
19 You have an address. Then the information on the U.S.
20 passport, there's only a name and a date of birth
21 because U.S. passports don't include addresses. Would
22 that person be substantially similar or not?
23       MR. KEISTER: Objection; form.
24   A.   I'd have to see her, I'd have to see her ID,
25 I'd have to see her picture.

1  Q. (By Ms. Simson) Okay. So if somebody came in
2  with a different last name, different address, but their
3  picture looked the same, would you be able to admit them
4  to vote a regular ballot?
5  A. I would have her sign an affidavit, and then I
6  would allow her to vote.
7  Q. Okay.
8  A. If I was making that call.
9  Q. Okay. Can we turn to Example 5, on Page 5 of
10 Exhibit 1. And here you've got information on the poll
11 book, name, date of birth, address. And then on the
12 military ID card, all you have is a name.
13      Would you be able to determine whether
14 somebody had the proper ID based on this information?
15      MR. KEISTER: Object to form.
16 A. On his military ID? There's no date of birth
17 or nothing on it?
18 Q. (By Ms. Simson) No.
19 A. That's the complete military ID?
20 Q. Yes.
21 A. I'd have to look at the individual, determine
22 whether or not that's him.
23 Q. If somebody comes in with an ID and the
24 picture looks like the person, but the information
25 doesn't match the information on the poll book, they

1  have a different name, different date of birth,
2  different address, could they still be admitted for
3  voting a regular ballot?
4         MR. KEISTER: Object to form.
5     A.  If everything is different?
6     Q.  (By Ms. Simson) Yes.
7     A.  And the name and everything is different?
8     Q.  Yes.
9     A.  And it's a male?
10    Q.  In terms of the gender, yes, we can say the
11 picture matches the person.
12    A.  Well, I would, yes.
13    Q.  And their gender matches.
14    A.  I wouldn't think so. We would need to have
15 something that matches.
16    Q.  So the picture alone is also not sufficient --
17    A.  No, not the picture alone.
18    Q.  Okay.
19    A.  Something has to match.
20    Q.  Okay. And then if you turn to Example 7 on
21 the last page -- actually, one second. Actually, can we
22 turn to Example 4 on Page 4?
23         And do you see that the name on the poll
24 book is Christopher Johnson, and the name on the
25 driver's license is Chris Johnson?

1  A. Uh-huh.

2  Q. And do you see that the date of birth on the

3  poll book is November 11th, 1911, and the date of birth

4  on the driver's license is August 22nd, 1994?

5  A. Uh-huh.

6  Q. And then do you see that the addresses on the

7  two match?

8  A. Uh-huh.

9  Q. Without seeing a picture, would you think it

10 likely that someone would find this substantially

11 similar?

12        MR. KEISTER: Object to form. Calls for

13 speculation.

14 Q. (By Ms. Simson) Would you find this to be

15 substantially similar?

16        MR. KEISTER: Same objection.

17 A. I would find it to be -- no, because that's a

18 big difference in the age.

19 Q. (By Ms. Simson) So it would be the age, the

20 date of birth difference that would make this

21 potentially not substantially similar?

22        MR. KEISTER: Object to form.

23 A. You should be able to look at him and tell. I

24 mean, that's a big difference in age, 1911 to 1994.

25 Q. (By Ms. Simson) Let's say the poll book says

1  he was born in 1911 but he appears with his driver's
2  license saying he was born in 1994, and he looks about
3  30.
4            Is that something that you could -- could
5  you let him vote a regular ballot?
6            MR. KEISTER:  Objection; form.  Calls for
7  speculation.
8       A.   I would probably let him vote a provisional
9  ballot.  That's confusing there.
10      Q.   (By Ms. Simson)  That's because there's a
11 significant age difference?
12      A.   Significant.
13      Q.   All right.  So we can put those to the side, I
14 think we can go through the rest of this pretty quick.
15           So you mentioned that there was a
16 complaint about photo ID.  What was that complaint
17 about?
18      A.   Okay.  That was on the election workers, just
19 made an observation.
20      Q.   Who made the observation?
21      A.   One of my election judges, she was a new
22 judge.  She made an observation.  Let me give it to you.
23           MR. KEISTER:  Let the record reflect that
24 the witness is looking at her personal computer.  If you
25 just let us know if you actually have a document that

```
 1   matches the computer, that's what I'm concerned about.
 2            THE WITNESS:  Oh, I do.
 3            MS. KENNEDY:  All the documents here is
 4   what she's looking at.
 5            THE WITNESS:  This is what the judge
 6   said.
 7            MS. SIMSON:  We'll make copies of this.
 8       Q.   (By Ms. Simson)  Do you recall the
 9   circumstances of the complaint?
10       A.   It was just an observation that she made while
11   she was working at the polling location, that she --
12       Q.   And the observation was about an election
13   worker?
14       A.   Yes.  She said, "An elderly gentleman came to
15   vote early and brought his wife on election day.  He
16   stood with his wife when he checked in.  He then pulled
17   me aside and told me that he was never asked for ID
18   because he had his voter registration card.
19            "And he questioned it, but they never
20   took his ID.  He heard me explain to another person in
21   line that ID was now required to vote and that was
22   acceptable form."
23            So the voter was concerned because he was
24   not asked for his ID.  And he asked her, you know,
25   whether or not he was supposed to have ID or not.  So he
```

1  just brought it to her attention because he knew she was
2  a judge.
3      Q.  Okay.
4      A.  And so she reported it to us, which was the
5  proper thing for her to do.
6      Q.  So the complaint was that one of the election
7  workers was not implementing the law as it was intended?
8      A.  Right.
9      Q.  Were there any other complaints from voters in
10 Jefferson County about the photo ID law?
11     A.  None other than the one that I got from her.
12 And she had another one on there as well.  Basically the
13 same thing.
14     Q.  That somebody was not asking for ID when they
15 should have been?
16     A.  Right, right, right.
17     Q.  Do you know whether the election worker didn't
18 ask for an ID because they knew the person who was
19 voting, or was it that they just didn't ask for an ID
20 from some random person that they didn't know?
21     A.  I don't know which it was, but all we did was
22 we covered with the people at that polling location that
23 you are required to ask for a voter ID from everyone.
24     Q.  Regardless of whether you know the person?
25     A.  Regardless.

1  Q.  So if the sheriff for Jefferson County --
2  A.  I don't care.  If I come up there to vote, I
3  show voter ID, you know, so...
4  Q.  And so you have not received any other
5  complaints from constituents about this photo ID law?
6  A.  Have I received any complaints?
7  Q.  Yes.
8  A.  No.  You mean as far as going to the polling
9  locations?
10  Q.  The voters, yeah.
11  A.  No.
12  Q.  And do you know -- did you receive any
13  feedback from election workers about the implementation
14  of S.B. 14?
15  A.  No, I have not.
16  Q.  Did you request any feedback from election
17  workers about how it went, implementing the photo ID
18  law?
19  A.  No, I have not.
20  Q.  Did the Secretary of State's office contact
21  you at all about how the implementation of S.B. 14 went
22  in any of the elections?
23  A.  No, they have not.
24  Q.  And you have not contacted the Secretary of
25  State's office about how the implementation of S.B. 14

1  went in any of the elections?
2     A.  No, I have not.
3     Q.  Did the Secretary of State's office collect
4  any information from you about how the implementation of
5  S.B. 14 went?
6     A.  No, they have not.
7     Q.  Before you mentioned that the voters who were
8  found to be substantially similar had to fill out forms.
9  Do you have any sense for how many forms were filled out
10 for voters who were substantially similar?
11    A.  Oh, my. We turn those in to voter
12 registration. And, initially, we had a stack about that
13 big (indicating), and that was because the election
14 workers did not understand about the "substantially
15 similar." So they were challenging everything that was
16 not exact in the voter registration database.
17        But I think since the first election,
18 which was the constitutional amendment election, we have
19 straightened that out.
20    Q.  So that was probably a couple hundred in that
21 forms filled out?
22    A.  Yeah, I think so. And the voter registrar has
23 all of those.
24    Q.  And when you say that initially they were
25 challenging everyone who wasn't an exact match, what do

1   you mean by they were challenging them?
2      A.  I mean, if they weren't exact -- if they
3   weren't exactly the same on the voter ID as they were on
4   the voter registration database, they made them fill out
5   a form, if they weren't exactly the same.
6      Q.  Now, if they are not an exact match, what does
7   the voter have to do?
8      A.  They let them vote.  They don't have to be an
9   exact match.
10     Q.  Do they have to sign any kind of affidavit on
11  the poll book?
12     A.  No.
13     Q.  So as county clerk, does your office issue
14  certified copies of marriage licenses?
15     A.  Yes, we do.
16     Q.  And do you know if those are issued -- sorry.
17  Are those issued only in person, or can a person ask for
18  a certified copy of a marriage license by mail or
19  on-line?
20     A.  They can ask by mail or on-line.
21     Q.  And is there only one office location where a
22  person could request a certified copy of a marriage
23  license, or multiple offices in the county?
24     A.  Multiple.
25     Q.  And do you know, how many offices is that?

1   A.  I have two offices.
2   Q.  And what are the costs to get a certified copy
3   of a marriage license in Jefferson County?
4   A.  A marriage license is around $6.
5   Q.  Around $6.  And is there any sort of waiver if
6   a person says, "I need a certified copy of my marriage
7   license, but I can't afford $6"?
8   A.  No, there's not.
9   Q.  Okay.  The county also has the ability to
10  issue certified copies of birth certificates; is that
11  correct?
12  A.  That's correct.
13  Q.  And I imagine those are offered at both of
14  those locations you mentioned before?
15  A.  That's correct.
16  Q.  Okay.  And can you -- can a person request
17  that on-line or by mail from the county?
18  A.  They can, with proper ID.
19  Q.  With proper ID.
20  A.  Because those are not public forms for
21  everyone.
22  Q.  And what is the cost of getting a certified
23  copy of a birth certificate?
24  A.  I think it's $23.
25  Q.  $23.  Are you aware that fees are being waived

1   for birth certificates if they're needed to get an EIC?
2       A.   I know the fees have been lowered for birth
3   certificates to get an EIC card.
4       Q.   And what are they lowered to?
5       A.   I think they are $3, if I'm not mistaken.
6       Q.   $3.  Has anybody come in and requested one of
7   these reduced-fee birth certificates to get an EIC?
8       A.   No, but I did publish it that they were
9   available for $3.
10      Q.   And how did you publish that?
11      A.   We had published them on a Web site, and also
12  made it known -- we did the publication about the DPS
13  coming, that if they needed a birth certificate, that
14  the fee was only $3, if you needed it only for an EIC
15  card, though.
16      Q.   And does a person have to request one of these
17  reduced-fee birth certificates in person?
18      A.   Well, you have to show an ID to get a birth
19  certificate, because that's not just public records.
20      Q.   If a person showed up at a mobile EIC unit
21  without a birth certificate and said they didn't have
22  one, would they have had to come to this office to get a
23  copy of the birth certificate, or could they have gotten
24  it at the mobile EIC unit?
25      A.   They would come to the office.