## 1

```
 1              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
 2                    CORPUS CHRISTI DIVISION
 3  MARC VEASEY, et al.,      )
              Plaintiffs,     )
 4                            )
       v.                     ) Civil Action
 5                            ) No. 2:13-cv-193(NGR)
    RICK PERRY, et al.,       )
 6              Defendants.   )
    _____  )
 7                            )
    UNITED STATES OF AMERICA, )
 8       Plaintiff,           )
                              )
 9  TEXAS LEAGUE OF YOUNG     )
    VOTERS EDUCATION FUND,    )
10  et al.,                   )
                              )
11       Plaintiff-           ) Civil Action
         Intervenors,         ) No. 2:13-cv-263(NGR)
12                            )
    TEXAS ASSOCIATION OF      )
13  HISPANIC COUNTY JUDGES AND)
    COUNTY COMMISSIONERS,     )
14  et al.,                   )
         Plaintiff-           )
15       Intervenors,         )
                              )
16       v.                   )
                              )
17  STATE OF TEXAS, et al.,   )
              Defendants.     )
18  _____  )
19
              <<<<<HIGHLY CONFIDENTIAL>>>>>
20
21  ************************************************
22                 ORAL DEPOSITION OF
23         REPRESENTATIVE PATRICIA HARLESS
24                    JUNE 20, 2014
25  ************************************************
```

## 2

```
 1      ORAL DEPOSITION of REPRESENTATIVE PATRICIA
 2  HARLESS, produced as a witness at the instance of the
 3  Texas State Conference of NAACP Branches, Mexican
 4  American Legislative Caucus of the Texas House of
 5  Representatives, and duly sworn, was taken in the
 6  above-styled and numbered cause on June 20, 2014, from
 7  9:13 a.m. to 1:27 p.m., before Denyce M. Sanders, CSR,
 8  RPR, CRR, TCRR, in and for the State of Texas,
 9  recorded by machine shorthand, at the Attorney
10  General's Office, 808 Travis Street, Suite 1520,
11  Houston, Texas, pursuant to the Federal Rules of Civil
12  Procedure and the provisions stated on the record or
13  attached hereto; signature having been waived.
```

## 3

```
 1                  A P P E A R A N C E S
 2
    FOR THE PLAINTIFF UNITED STATES OF AMERICA:
 3
       U.S. DEPARTMENT OF JUSTICE
 4     Civil Rights Division
       950 Pennsylvania Avenue, NW - NWB Room 7254
 5     Washington, D.C. 20530
       Mr. Daniel J. Freeman
 6     202.305.4355
       daniel.freeman@usdoj.gov
 7
 8  FOR THE PLAINTIFFS TEXAS STATE CONFERENCE OF NAACP
    BRANCHES, MEXICAN AMERICAN LEGISLATIVE CAUCUS OF THE
 9  TEXAS HOUSE OF REPRESENTATIVES:
10     DECHERT LLP
       902 Carnegie Center, Suite 500
11     Princeton, New Jersey 08540
       Mr. Ezra D. Rosenberg
12     609.955.3200
       ezra.rosenberg@dechert.com
13
14
    FOR THE DEFENDANT TEXAS LEAGUE OF YOUNG VOTERS
15  PLAINTIFF-INTERVENORS:
16     WILMER CUTLER PICKERING HALE AND DOOR, LLP
       1875 Pennsylvania Avenue, NW
17     Washington, D.C. 20006
       Ms. Tania Faransso
18     202.663.6262
       tania.faransso@wilmerhale.com
19
20  FOR THE DEFENDANTS:
21
       OFFICE OF THE ATTORNEY GENERAL OF TEXAS
22     Consumer Protection Division
       808 Travis, Suite 1520
23     Houston, Texas 77002
       Ms. Rosemarie Donnelly
24     713.225.8919
       rosemarie.donnelly@texasattorneygeneral.gov
25
```

## 4

```
 1  FOR THE DEFENDANTS RICK PERRY, STATE OF TEXAS, NANDITA
    BERRY, AND THE DEPARTMENT OF PUBLIC SAFETY:
 2
 3     OFFICE OF THE ATTORNEY GENERAL
       TORT LITIGATION DIVISION
 4     P.O. Box 12548, Capitol Station
       Austin, Texas 78711
 5     Mr. S. Ronald Keister
       512.463.2197
 6     ronny.keister@oag.state.tx.us
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

REPRESENTATIVE PATRICIA HARLESS                                    6/20/2014
HIGHLY CONFIDENTIAL

2 (Pages 5 to 8)

---

**5**

INDEX

ORAL DEPOSITION OF

REPRESENTATIVE PATRICIA HARLESS, JUNE 20, 2014

Page

APPEARANCES................................   3

BY MR. ROSENBERG.......................   8

BY MR. FREEMAN.........................  82

BY MS. FARANSSO........................ 138

REPORTER CERTIFICATION.................. 144

---

**7**

Harless  176     3/28/12 e-mail exchange ...... 130
between Patricia Harless and
Sandra Thibodeau

---

**6**

EXHIBIT INDEX
ORAL DEPOSITION OF
REPRESENTATIVE PATRICIA HARLESS, JUNE 20, 2014
Description                Page

Harless  162     Subpoena....................  11

Harless  163     House Journal from Monday, ... 38
March 21, 2011
Harless  164     5/27/09 letter from Patricia . 48
Harless to Candace Tannous

Harless  165     OTB Resolution............  56

Harless  166     Typewritten notes............  63

Harless  167     House Journal for Wednesday, . 66
March 23, 2011
Harless  168     1/17/12 Brief.................  76
Harless  169     4/20/11 e-mail from Colby .... 93
Beuck to Patricia Harless

Harless  170     9/23/05 article from The New . 100
York Times
Harless  171     House Bill 112................ 104
Harless  172     2/25/11 e-mail from Ann ...... 115
McGeehan to Patricia
Harless, et al.
Harless  173     2/25/11 e-mail from Ann ...... 116
McGeehan to Colby Beuck

Harless  174     Excerpt from Voter Fraud ..... 119
Hearing transcript
Harless  175     2/1/11 e-mail from Ann ....... 123
McGeehan to Karen Richards,
et al.

---

**8**

REPRESENTATIVE PATRICIA HARLESS,
having been first duly sworn, testified as follows:
    MR. ROSENBERG:  Just for the record,
there is an open line for the plaintiffs, but my
understanding is that no one's on; is that correct?
    (No responses.)
    MR. ROSENBERG:  I'll take silence as
affirmation, and we may shut it down.
    E X A M I N A T I O N
BY MR. ROSENBERG:
    Q.  Good morning, Representative Harless.
    A.  Good morning.
    Q.  Nice to see you again.
    You've been deposed before; is that correct?
    A.  Yes, sir.
    Q.  Just -- have you been deposed since the last
time you were deposed in the Section 5 litigation?
    A.  No.  Not that I know of.
    Q.  Just to refresh your recollection as to the
rules, you understand that you're testifying under
oath?
    A.  (Nods head.)
    Q.  I'm going to have to give you the --
    A.  Yes.  Yes.
    Q.  -- next instruction --

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

**9**

1    A.   Yes.
2    Q.   -- earlier.
3         Because what you say, it's going to be put
4    into a transcript that might be used in this case,
5    it's important that you answer verbally.  Nods of the
6    head and shrugs of the shoulder aren't taken down by
7    the transcriber.
8         Do you understand that?
9    A.   Yes.
10   Q.   It's also important that you understand the
11   questions that I ask.  If you don't, please tell me,
12   and I'll try to clarify it for you.  Okay?
13   A.   Yes.
14   Q.   At any time, if you want a break, so long as
15   there's not a question pending, let me know, and we
16   can take a break.
17   A.   Thank you.
18   Q.   Okay.  You were deposed in the Section 5
19   litigation.  I'm not intending to go over questions
20   that you actually answered in that deposition unless
21   it's necessary to -- for clarity, so we will try to
22   speed along as expeditiously as possible.  Okay?
23   A.   Yes, sir.
24   Q.   First of all, did you meet with anyone in
25   preparation for today's deposition?

**10**

1    A.   Yes, sir.
2    Q.   And with whom did you meet?
3    A.   Rosemarie.
4    Q.   Now, is Rosemarie your lawyer representing
5    you in this deposition?
6    A.   Yes, sir.
7    Q.   How long did you meet with her?
8    A.   45 minutes, an hour.
9    Q.   And when was this?
10   A.   Yesterday afternoon.
11   Q.   Did you review any -- and was anyone else in
12   that meeting?
13   A.   No, sir.
14   Q.   Did you review any documents in preparation
15   for this deposition?
16   A.   Personally?
17   Q.   Yes.
18   A.   I looked through the transcript of my first
19   deposition in this case.
20   Q.   Okay.  And you were deposed twice in that
21   case; do you recall that?
22   A.   Yes, sir.
23   Q.   And did you review both transcripts?
24   A.   No, sir.
25   Q.   Just the first one?

**11**

1    A.   Yes, sir.
2    Q.   Did you review any other documents?
3    A.   Just read through a copy of the bill.
4    Q.   And by "the bill," do you mean SB 14?
5    A.   Yes, sir.
6         And just -- well, we'll mark that in a few
7    minutes, I think.
8         (Harless Exhibit 162 marked/introduced.)
9    Q.   (BY MR. ROSENBERG)  Let me show you a
10   document that has been premarked.  I only have one
11   copy, so you have it.  It's been premarked as Exhibit
12   162.
13        MR. ROSENBERG:  Oh, there is more
14   copies?  Oh, good.
15   Q.   (BY MR. ROSENBERG)  I'm going to ask you if
16   you've seen this document before?
17   A.   I'm not sure.
18   Q.   I will represent to you that is a subpoena to
19   produce documents that was served on you through the
20   attorney general's office.
21        Are you aware that there was a subpoena
22   asking for documents that were served on you this
23   year?
24   A.   Yes, sir.
25   Q.   Did you look at the subpoena?

**12**

1    A.   Yes, sir.
2    Q.   And when was that, do you recall?
3    A.   No, sir.
4    Q.   And have you -- what did you do in response
5    to the subpoena?
6    A.   My office produced the documents.
7    Q.   Did you review the documents before they were
8    produced?
9    A.   No, sir.
10   Q.   Who collected the documents for you in your
11   office?
12   A.   I assume my chief of staff, Julie Scott.  But
13   I don't know for sure.
14   Q.   Did you -- do you know if documents were
15   gathered from your personal e-mail accounts in
16   connection with the subpoena?
17   A.   I have none.
18   Q.   You do not have any personal e-mail accounts?
19   A.   Not since we first turned them over --
20   Q.   Back in --
21   A.   -- in the first --
22   Q.   -- 2012?
23   A.   Yes.
24   Q.   Now, you mentioned SB 14 a few moments ago.
25   And just for the record, what is SB 14?

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

4 (Pages 13 to 16)

13

1    A.  **It's the photo voter ID legislation.**
2    Q.  That was actually passed in 2012?
3    A.  **2011.**
4    Q.  2011.
5        And prior to the passage of SB 14, you're
6    aware that there were other voter identification bills
7    that were considered by the Texas legislature?
8    A.  **There were other bills filed in past**
9    **sessions, yes.**
10   Q.  And --
11   A.  **I'm aware of that.**
12   Q.  And did you support any of those bills?
13   A.  **I -- I don't know if those bills made it to**
14   **the floor to vote on.**
15   Q.  Do you recall whether any of the prior bills
16   included both photo ID and non-photo ID provisions?
17       MS. DONNELLY:  Objection.  Form.
18   A.  **I don't remember.**
19       MS. DONNELLY:  I'm going to object to
20   the form.
21   Q.  (BY MR. ROSENBERG)  I'm sorry, you don't
22   remember?
23   A.  **No, sir.**
24   Q.  Do you remember whether you ever supported a
25   voter identification bill that included nonphoto ID

14

1    provisions?
2    A.  **I -- I don't remember.  I don't know if a**
3    **bill ever made it to the floor.**
4    Q.  Let's go to SB 14.  And if you would, please
5    tell me your memory as to your first involvement with
6    SB 14.
7        MS. DONNELLY:  I'm going to object to
8    the extent the question calls for information that is
9    covered by the legislative privilege.
10       And subject to that objection, if the
11   witness would like to answer it, that answer will be
12   under seal pursuant to the Court's order.
13   Q.  (BY MR. ROSENBERG)  And I'm sure that your
14   counsel has explained this to you, Representative
15   Harless, but you do have the -- whether or not it's a
16   proper assertion of legislative privilege -- the
17   question -- but for any question as to which you feel
18   legislative privilege applies, you do have the option,
19   as Counsel said, to testify, and your answer would be
20   under seal.
21       Do you understand that?
22   A.  **Yes, sir.**
23       MR. FREEMAN:  If I can just say, if it's
24   possible for you to be clear, if you decline to answer
25   based on the legislative privilege, I would ask that

15

1    you clearly state you're doing so rather than simply
2    not providing part of a response to an answer based on
3    the privilege.
4        MS. DONNELLY:  And that's okay, with the
5    exception that please do not reveal communications
6    with other legislators since the legislative
7    privilege -- that they are entitled to is theirs to
8    decide whether they wish to waive it or not.
9        Are you with me yet?
10       THE WITNESS:  I'm not sure I'm with the
11   whole group.  So you're saying, be clear if I'm
12   asserting legislative intent --
13       MR. ROSENBERG:  Privilege.
14       THE WITNESS:  -- or privilege.  Do I
15   need to state that I want that sealed again, or --
16       MS. DONNELLY:  No.
17       And if you don't mind, I'd like to just
18   instruct the witness myself, if you don't mind.
19       When we object -- when I object to a
20   question that is covered by legislative privilege,
21   you're free to answer the question if you wish, your
22   answer will be under seal.  The lawyers will want to
23   assume that you've answered completely unless we state
24   otherwise, and that's fine.
25       THE WITNESS:  We, me, or --

16

1        MS. DONNELLY:  When the two of us states
2    that there's a portion of your answer that is not
3    being responded to because it's the legislative
4    privilege of another legislator.
5        THE WITNESS:  Okay.
6        MS. DONNELLY:  So with that exception,
7    you'll be answering completely to the best of your
8    knowledge, but your answer will be under seal.
9        THE WITNESS:  Okay.
10       MS. DONNELLY:  Does that work?
11       MR. FREEMAN:  Yeah.
12       THE WITNESS:  Okay.
13   A.  **I don't know what the question was now.**
14       MS. DONNELLY:  Well, it's just going to
15   keep coming up, so it's good to get it out on the
16   table and to proceed.
17       MR. ROSENBERG:  You know what, we'll
18   just have it read back, the question before this whole
19   colloquy.
20       THE REPORTER:  "Let's go to SB 14.  And
21   if you would, please tell me your memory as to your
22   first involvement with SB 14."
23   A.  **First involvement with SB 14, I don't know.**
24   Q.  (BY MR. ROSENBERG)  Okay.  Did there come a
25   time when you were asked to -- or someone discussed

REPRESENTATIVE PATRICIA HARLESS                6/20/2014
HIGHLY CONFIDENTIAL

17

1   with you the idea of your being the sponsor of SB 14
2   in the House?
3   **A. I don't remember. I know I filed a bill**
4   **similar to SB 14.**
5           MR. KEISTER: Can I ask you a question
6   before we get going?
7           MR. ROSENBERG: Sure.
8           MR. KEISTER: Are we doing this on a
9   question-by-question basis on the legislative
10  privilege, or are we doing a block of sealed
11  information?
12          MR. ROSENBERG: If she is willing to
13  testify while asserting the privilege -- I think we
14  have to actually have the -- an understanding as to
15  when the privilege is asserted.
16          MR. KEISTER: Right. Yeah.
17          MR. ROSENBERG: But I'd love to be able
18  to streamline this in some way.
19          MR. KEISTER: I understand.
20          MR. ROSENBERG: So that we don't have to
21  go through it each time.
22          MR. KEISTER: And that was my concern,
23  Rosemarie, if we're going to have to do a question-by-
24  question or if there can be a block, because I don't
25  want you asserting the last question but now he's

18

1   asking another question.
2           MS. DONNELLY: Yeah, if you will agree
3   to a running objection on this line of questioning
4   regarding SB 14, and then I don't have to keep
5   interrupting you.
6           MR. ROSENBERG: You know, if she's
7   then -- willing to testify under seal; but if there's
8   something she's not saying and not testifying to, then
9   we have to know that.
10          MS. DONNELLY: Yeah.
11          MR. ROSENBERG: So I think then we can
12  do it that way.
13          MS. DONNELLY: And I will be instructing
14  the witness not to answer questions regarding
15  conversations, communications with other legislators.
16          THE WITNESS: Yes, ma'am.
17          MS. DONNELLY: With that exception, your
18  answer will be under seal as we are talking about
19  SB 14.
20          Is that clear enough?
21          MR. ROSENBERG: That works for me.
22          Mr. Freeman?
23          MR. KEISTER: But I guess my question
24  is, does there become a cutoff point where we
25  suddenly --

19

1           MS. DONNELLY: Switch.
2           MR. KEISTER: -- are switching from
3   legislative privilege to non? How are we going to
4   designate that?
5           MR. FREEMAN: I mean, I think it's
6   necessary that we have an understanding of when the
7   objection -- the running objection ceases, because
8   obviously not the entire thing is --
9           MS. DONNELLY: Well, why don't we run
10  the objection, and then we can decide when the
11  objection is no longer running? How's that?
12          MR. ROSENBERG: We can try that.
13          MR. FREEMAN: That's absolutely fine.
14          Q. (BY MR. ROSENBERG) I think the question was:
15  Did there come a time when you became the sponsor of
16  SB 14 on the House floor?
17          **A. Yes.**
18          Q. And can you tell me, if you recall, what the
19  circumstances were that led to your becoming the
20  sponsor of SB 14 on the House floor.
21          MS. DONNELLY: Here we're going to start
22  a running objection that this line of questioning will
23  be covered by the legislative privilege. Your answers
24  will be under seal. Until we, at such time, say the
25  running objection is no longer applied, your answers

20

1   will be under seal. Please do not reveal
2   communications with other legislature [sic], and then
3   we can carry on.
4           **A. I don't recall.**
5           Q. (BY MR. ROSENBERG) Are you aware that there
6   was a Select Committee on Voter Identification that
7   was composed in the House?
8           **A. I vaguely remember that.**
9           Q. Were you on the committee?
10          **A. I -- I do remember that.**
11          Q. Were you involved in the formation of that
12  committee?
13          **A. No, sir.**
14          Q. Who was involved in the formation of that
15  committee?
16          **A. I don't know.**
17          Q. Were you involved in discussions as to the
18  composition of that committee?
19          **A. No.**
20          Q. Was SB 14 considered an important piece of
21  legislation by you?
22          **A. All my legislation I consider to be**
23  **important.**
24          Q. So you do not consider SB 14 to be more or
25  less important than any other piece of legislation?

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL

6/20/2014

6 (Pages 21 to 24)

---

**21**

1   A. I think all my legislation is important.

2   Q. Are they all of equal importance?

3   A. To someone.

4   Q. To you?

5       MS. DONNELLY: You don't have to change

6   your answer just because he keeps asking.

7   A. Yeah, they're all equally important.

8   Q. (BY MR. ROSENBERG) Was SB 14 given emergency

9   legislation treatment?

10  A. I think the governor put it on the emergency

11  call, but I -- I can't remember for sure. I think he

12  did. I think we had some emergency.

13  Q. Do you -- I'm sorry, were you finished with

14  your answer?

15  A. Yeah. I -- you probably know more than I do,

16  because I've gone through another session since then.

17  I've had a couple years since then, too.

18      Do you have an understanding as to why the

19  governor declared it an emergency piece of

20  legislation?

21  A. I don't.

22      MR. KEISTER: Object to the form.

23  Q. (BY MR. ROSENBERG) Did you consider there to

24  be an emergent need for SB 14?

25  A. That's not my call.

---

**22**

1   Q. Well, whether it's your call or not, did you

2   consider it to be an -- there to be an emergent need

3   for that legislation?

4   A. I don't. I don't get into what's an

5   emergency in the state or not.

6   Q. Did you have any discussions with anyone in

7   the governor's office, including Governor Perry, at

8   the time that you were dealing with SB 14?

9   A. Not that I remember.

10  Q. Did you have any discussions with Lieutenant

11  Governor Dewhurst during this time?

12      MS. DONNELLY: Don't get into that.

13  That's privileged.

14      MR. ROSENBERG: The substance of the

15  discussion may be privileged, but whether she had a

16  discussion is not privileged.

17      MS. DONNELLY: Well, but then --

18      MR. ROSENBERG: We can't even build,

19  then, a foundation for challenging the privilege if we

20  don't know whether a discussion occurred or not.

21      MS. DONNELLY: Yeah, but that's a

22  slippery slope. Did you have a conversation with

23  Lieutenant Governor Dewhurst about X?

24      MR. ROSENBERG: Well, the X is pretty

25  broad. SB 14.

---

**23**

1       MS. DONNELLY: You can answer.

2   A. No.

3   Q. (BY MR. ROSENBERG) How about with Speaker

4   Straus?

5   A. Possibly. I don't remember.

6   Q. How about with Senator Fraser?

7   A. Probably.

8   Q. Do you remember how many conversations you

9   had with Senator Fraser about SB 14?

10  A. I don't.

11  Q. Do you remember the substance of any of the

12  conversations that you had with Senator Fraser?

13  A. Just about carrying the legislation in the

14  House, picking it up.

15  Q. Anything beyond that?

16  A. I don't remember.

17  Q. During the time that you were dealing with --

18  or leading up to the enactment of SB 14, were you

19  concerned about voter fraud in Texas?

20  A. I don't remember.

21  Q. Were you concerned about voter fraud dealing

22  with absentee ballots in Texas?

23  A. I don't recall.

24  Q. Were you concerned about in-person voter

25  fraud in Texas?

---

**24**

1   A. I would say yes, or I would not have filed

2   the legislation.

3   Q. Do you recall what the basis was for your

4   concern about in-person voter fraud in Texas?

5       MS. DONNELLY: We're still under the

6   running objection, so feel free.

7       MR. ROSENBERG: Understood.

8   A. No. I'm sorry.

9   Q. (BY MR. ROSENBERG) Were you concerned during

10  this time with noncitizens voting in Texas?

11  A. No.

12  Q. Did you have any discussion with any outside

13  groups -- "outside groups" meaning not legislators --

14  concerning voter identification during this time?

15  A. Not that I recall.

16  Q. Do you recall whether you had any discussions

17  with people from the King Street Patriots?

18  A. I don't remember.

19  Q. Do you recall whether you had any discussion

20  with people from True the Vote?

21  A. I don't remember.

22  Q. Do you recall if you had any discussions with

23  people from the Texas Tea Party, either the women's

24  tea party or general tea party, if there's a

25  difference?

REPRESENTATIVE PATRICIA HARLESS                                6/20/2014
HIGHLY CONFIDENTIAL

7 (Pages 25 to 28)

---

**25**

1    A.  I don't recall.
2    Q.  Do you recall whether there were discussions
3  with constituents during this time concerning voter
4  ID?
5    A.  The time?  What time?
6    Q.  During the time leading up to the enactment
7  of SB 14.
8    A.  After filing the legislation or prior to
9  filing it?
10   Q.  Either prior to or after filing it.
11   A.  Yes, I'd had constituents come to me in the
12 past talking about the integrity of the elections.
13   Q.  Which constituents?
14   A.  I can't tell you.  I don't remember.
15   Q.  What -- how many such conversations did you
16 have?
17   A.  I don't remember.
18   Q.  When did those discussions occur?
19   A.  I don't remember.
20   Q.  What was the substance of the conversations?
21   A.  Typically, at a town hall meeting, talking
22 about why don't we have photo identification for
23 in-person voting.
24   Q.  And how many such conversations did you have?
25   A.  I don't remember.

---

**26**

1    Q.  More than two?
2    A.  Probably.  I give about five speeches a week
3  during the interim.
4    Q.  At every speech did this come up?
5    A.  No.  Probably not.
6    Q.  More than five conversations?
7    A.  It would -- it would be a guess.  I don't
8  know.
9    Q.  Do you recall whether you had any input from
10 lobbying groups that affected the drafting of SB 14?
11   A.  Not that I recall.
12   Q.  Is there anyone in your staff who would know
13 the answer better than you?
14   A.  My staff has a lot of communications I'm not
15 aware of, so they may.
16   Q.  Do you recall testifying that you thought
17 that there would be a, quote, "very, very small
18 universe," end quote, of people who did not have
19 the -- the photo ID required by SB 14?
20        MS. DONNELLY:  Objection.
21        Do you have a document?
22        MR. ROSENBERG:  I'm just first asking
23 her if she recalls.
24   A.  I don't.
25   Q.  (BY MR. ROSENBERG)  Did you, at the time that

---

**27**

1  SB -- that you were handling SB 14, believe that there
2  would be a very, very small universe of people who
3  would not have the identification required by SB 14?
4    A.  I don't remember what I believed then.
5    Q.  Sitting here today, do you believe that there
6  is a very, very small universe of people who do not
7  have the photo ID?
8        MS. DONNELLY:  Objection.  Form.
9    A.  I believe that in today's environment in
10 Texas it's difficult to do anything without a photo
11 ID.
12   Q.  (BY MR. ROSENBERG)  So you believe that
13 there's a very, very small universe of people who do
14 not have --
15   A.  I don't know.
16   Q.  Do you recall whether the Brennan Center
17 submitted a report to the legislature in connection
18 with the consideration of SB 14?
19   A.  I remember the name, the Brennan Center, but
20 I don't remember if there was a report submitted, if
21 they testified in committee or why I remember the
22 name, but I remember the name.
23   Q.  Do you recall whether you relied on the
24 Brennan Center's report in connection with your views
25 on SB 14?

---

**28**

1    A.  I don't remember.
2    Q.  Were you aware that minority legislatures
3  [sic] and minority groups spoke out against SB 14?
4        MS. DONNELLY:  Objection.  Form.
5    A.  I know there was hours of testimony and hours
6  of debate on the House floor.
7    Q.  (BY MR. ROSENBERG)  And do you recall that
8  African-American legislators and Latino legislators
9  spoke out against SB 14?
10       MS. DONNELLY:  Objection.  Form.
11   A.  I recall hours of debate on the House floor
12 with legislative members and colleagues and in
13 committee.
14   Q.  (BY MR. ROSENBERG)  And in the course of those
15 legislative debates that you remember, do you remember
16 that there were several African-American legislators
17 and Hispanic legislators that spoke out against SB 14?
18   A.  The only ones that come to mind that I
19 remember -- so I can't say several -- are Marc Veasey
20 and Rafael Anchia.
21   Q.  Do you remember that there were African-
22 American groups and Hispanic groups that also spoke
23 out against SB 14 before the legislature?
24       MS. DONNELLY:  Objection.  Form.
25       You can answer.

---

REPRESENTATIVE PATRICIA HARLESS                                6/20/2014
HIGHLY CONFIDENTIAL

8 (Pages 29 to 32)

---

29

1      A.  I don't remember.
2      Q.  (BY MR. ROSENBERG)  Are you aware of -- do you
3  have a memory of the assertions that were made by
4  Senator Veasey and Representative Anchia in connection
5  with the possible impact of SB 14 on the ability of
6  African-Americans and Hispanics to vote?
7      A.  I don't remember.
8      Q.  Do you remember whether anyone, in connection
9  with the legislature's consideration of SB 14,
10  indicated that it would impact adversely African-
11  Americans and Hispanics voting?
12      MS. DONNELLY:  Objection.  Form.
13      A.  I remember there were hours of debate.
14      Q.  (BY MR. ROSENBERG)  I understand you remember
15  there were hours of debate.
16      A.  I don't remember the substance of the debate.
17      Q.  At any time during your support of SB 14,
18  leading up to the passage of SB 14, did you undertake
19  an analysis of whether any groups of people would be
20  more or less likely to possess the identifications
21  that were listed in the bill?
22      MS. DONNELLY:  Since we're shifting, I
23  just want to make sure that the running objection that
24  we talked about earlier is still running.  Is that
25  right?

---

30

1      MR. ROSENBERG:  Understood.
2      MS. DONNELLY:  Thank you.
3      A.  One more time?
4      Q.  (BY MR. ROSENBERG)  Sure.
5      At any time during the time leading up to the
6  enactment of SB 14 did you undertake an analysis of
7  whether certain groups of people would be more or less
8  likely to possess any of the forms of identification
9  listed in SB 14?
10      A.  I don't remember what we did.
11      Q.  Do you know if you had any -- do you remember
12  whether you had any information as to whether certain
13  groups of people would be more or less likely to
14  possess certain of the identification of -- listed in
15  SB 14?
16      A.  I don't remember.
17      Q.  During that same period of time were you
18  aware whether any legislator undertook an analysis of
19  whether certain groups of people would be more or less
20  likely to possess the identification under SB 14?
21      MS. DONNELLY:  I'm going to inject
22  there, that, please do not reveal your knowledge of
23  what any other legislator did unless it's in the
24  public record.
25      A.  I do not remember.

---

31

1      Q.  (BY MR. ROSENBERG)  Do you recall whether you
2  had any information as to how many individuals had or
3  did not have the various forms of photo identification
4  listed in SB 14?
5      A.  If I had information?
6      Q.  Yes.
7      A.  I know we had testimony in committee about
8  what the Secretary of State or one of the agencies
9  thought that number may be.  But I -- I don't remember
10  the specifics of that and which agency that was.
11      Q.  During the same period of time did you have
12  any information as to the racial composition of the
13  people who may or may not have the IDs listed in
14  SB 14?
15      A.  I don't recall that.
16      Q.  During this time did you consider it
17  important as to whether racial -- different racial or
18  ethnic groups of people were more or less likely to
19  possess any of the identifications listed in SB 14?
20      A.  I think it's important to protect the
21  election process for all Texans.
22      Q.  And -- did you specifically think it was
23  important as to whether or not there would be an
24  impact on African-Americans or Hispanics as a result
25  of SB 14?

---

32

1      MS. DONNELLY:  Objection.  Form.
2      A.  I -- I don't remember what all we looked at.
3      Q.  (BY MR. ROSENBERG)  Whether or not you
4  remember what you looked at, did you think it was
5  important?
6      A.  I know that we were making sure that it was
7  protecting the integrity of the election for everyone.
8      (Off the record.)
9      Q.  (BY MR. ROSENBERG)  Representative Harless,
10  are you aware that during the legislative debates over
11  SB 14 opponents of the bill indicated that there would
12  be certain burdens on people who did not have the
13  forms of identification listed in SB 14 to get those
14  identifications?
15      A.  I remember there were hours of debate.  I
16  don't remember the content.
17      Q.  Sitting here, you don't remember that anyone
18  said that it would be difficult for people to, for
19  example, drive perhaps an hour or more to a motor
20  vehicle facility?
21      A.  I know there were hours of debate.  I don't
22  remember specifically what the content of the debate
23  was.
24      Q.  Are you aware that during the debate
25  opponents of SB 14 asserted that the burden of getting

---

REPRESENTATIVE PATRICIA HARLESS                                    6/20/2014
HIGHLY CONFIDENTIAL

9 (Pages 33 to 36)

**33**

1  the forms of identification that are listed in SB 14
2  would fall most heavily on African-Americans and
3  Hispanics?
4       MS. DONNELLY:  I'm going to object
5  there.
6       Please do not discuss any communications
7  with other legislators or information you learned from
8  other legislators that is not in the public record.
9       A.  I do not remember.
10      Q.  (BY MR. ROSENBERG)  And you do not remember
11 because you're asserting privilege or you just don't
12 remember?
13      A.  I just don't remember.  I know you've lived
14 this; but when I finish a bill, I finish a bill and I
15 move on, and I've had another session with other
16 bills, and I have limited memory space.
17      Q.  Well, that's -- let me -- that actually leads
18 me to something else.
19      You're aware that SB 14 is now the law?
20      A.  Yes.
21      Q.  Have you been following implementation of
22 SB 14?
23      A.  No, sir.
24      Q.  Do you have an interest in wanting to make
25 sure that it's implemented correctly?

**34**

1       A.  I've noticed they've done the training.
2  After I pass the legislation, it's up to the agencies
3  to do the implementation.  I have no control over
4  that.
5       Q.  Are you aware of any problems with its
6  implementation?
7       A.  Not that I've heard of.
8       Q.  Have you heard any complaints from any voters
9  or constituents as to its implementation?
10      A.  Not in my district.
11      Q.  Do you have an understanding as to whether
12 its implementation has led to a decrease in voter
13 fraud?
14      A.  I haven't -- I don't know.
15      Q.  Did you or your staff take any steps to help
16 implement SB 14?
17      A.  I did not.
18      MS. DONNELLY:  Objection.  Form.
19 Go ahead.
20      A.  I did not.
21      Q.  (BY MR. ROSENBERG)  Did you try to get out the
22 word as to SB 14?
23      A.  We sent out e-mails to our constituents about
24 the requirements, several of them.
25      Q.  When you said to your "constituents," did you

**35**

1  send it out to all of your constituents?
2       A.  We sent it out by our e-mail blast of people
3  that have signed up, and we do every time there's an
4  election.
5       Q.  So to whom would this -- I guess I'm
6  interested in who this -- who's on this database of
7  your constituents?
8       A.  Anyone who's ever called, written, or come to
9  my office for any type of assistance since I've been
10 elected.  Their e-mail addresses, if they have one, is
11 collected, and they're added to our e-mail database,
12 and we send out information relevant to the district.
13 It's nonpartisan.  It's state-related business.
14      Q.  And would that also go to contributors?
15      A.  No.
16      Q.  So --
17      A.  Let me rephrase that.
18      There could be contributors that have
19 contacted our office that are on the list, but this is
20 a constituent-driven list.
21      Q.  Do you know how many people are on that list?
22      A.  I don't.
23      Q.  Does the phrase "legislative purpose" have
24 any meaning to you?
25      A.  No, sir.

**36**

1       Q.  Does the phrase "legislative intent" have any
2  meaning to you?
3       A.  Yes, sir.
4       Q.  What's that mean?
5       A.  It means what the intent of the legislation
6  was, what was argued for the intent.
7       Q.  And when you say "what was argued for the
8  intent," what -- what are you referring to?
9       A.  Or testified in committee on the floor.
10      Q.  Are you limiting yourself to the public
11 record?
12      A.  Yes.
13      Q.  Can a legislative intent be based on things
14 outside the public record?
15      A.  I don't know.
16      Q.  Do you understand what the word
17 "discriminatory" means?
18      A.  Yes.
19      Q.  What's your understanding?
20      A.  One person or thing not treated equal to the
21 same as another person or thing.
22      Q.  Can a law have a discriminatory intent even
23 if that's not stated on the public record?
24      MR. KEISTER:  Object to form.
25      A.  I -- I don't know.

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

---

**37**

1    Q.  (BY MR. ROSENBERG)  Do you think it's
2    possible?
3            MR. KEISTER:  Object to form.
4        A.  I don't know.
5        Q.  (BY MR. ROSENBERG)  Is it your understanding
6    that there's only one intent behind the legislation?
7        A.  The stated intent.
8        Q.  Can there be unstated intent?
9            MR. KEISTER:  Object to form.
10       A.  I don't know.
11           MR. ROSENBERG:  Why don't we take a
12   break.  I think I'm going to go into some documents
13   now.
14           MS. DONNELLY:  Okay.  The running
15   objection is still running; is that right?
16           MR. ROSENBERG:  Well, you know what,
17   we'll -- sure.  But let's see what questions I ask
18   when we start again.
19           MS. DONNELLY:  Okay.
20           MR. ROSENBERG:  We might decide to --
21           MS. DONNELLY:  Since the running
22   objection was agreed upon, it has, at least to this
23   point, been running; is that right?
24           MR. ROSENBERG:  Right.
25           MS. DONNELLY:  And when we come back on

---

**38**

1    the record, we can talk about it some more.
2            MR. ROSENBERG:  Absolutely.  No problem.
3            MS. DONNELLY:  Very good.
4            (Break.)
5            (Harless Exhibit 163 marked/introduced.)
6        Q.  (BY MR. ROSENBERG)  Representative Harless,
7    I'll show you what's been premarked as Exhibit 163.
8            And ask you if you can identify this document
9    for the record.
10       A.  It looks like the House Journal from March
11   21, 2011.
12       Q.  And have you ever seen this document before?
13       A.  Not that I recall.  I may have.  I don't
14   know.
15       Q.  And do you know, looking at this document,
16   what proceedings this document records?
17       A.  It's the House Journal from March 21st, the
18   events that happened on the House floor on the 21st --
19   of 2011.
20       Q.  And looking through this document, as you
21   certainly can if you wish, does this document deal
22   with legislative consideration of SB 14?
23       A.  It looks like, on page 910, it's the second
24   reading of S -- committee substitute SB 14.
25       Q.  I'd like to direct your attention to page

---

**39**

1    910.  And you see where Representative Anchia asks, "I
2    wanted to ask you a couple questions about SB 14 and
3    voter impersonation.  You alluded to the fact that
4    this bill deals with one specific type of voter fraud,
5    correct?"
6            And that answer that is recorded:  "Yes,
7    potential voter fraud."
8            Do you see that?
9        A.  Yes, I see it.
10       Q.  And the colloquy goes on, Anchia says:  "And
11   that's voter impersonation?"
12           You answer "Yes."
13           And Anchia says:  "And how does -- describe
14   how voter impersonation works."
15           And you say:  "Someone shows up to the poll
16   with a voter registration card that may not be theirs
17   and passes a vote with that card."
18           And he then asks:  "How often does that
19   happen in the State of Texas, do you think?"
20           And you answer:  "I'm not advised."
21           Do you see that?
22       A.  Yes, sir.
23       Q.  And what -- what did you mean by "I'm not
24   advised"?
25           MS. DONNELLY:  I'm going to assert the

---

**40**

1    legislative privilege.
2            And subject to that objection, you can
3    answer under seal.
4            Do you want to continue a running
5    objection, Counsel?
6            MR. ROSENBERG:  Yes.
7            MS. DONNELLY:  Okay.  So we are back on
8    a running objection, and the running objection will
9    run until the parties agree that it is no longer
10   running.
11           Is that an agreement with all counsel?
12           MR. ROSENBERG:  That's the agreement,
13   yes.
14           MR. FREEMAN:  Yes.
15       A.  I'm not exactly sure what -- what all was
16   going on there, but typically, when I say I'm not
17   advised, meaning nobody has come up to me and given me
18   all that information.
19       Q.  (BY MR. ROSENBERG)  Was it a surprise to you
20   that this question would be asked in consideration of
21   SB 14?
22       A.  I -- I don't know.
23       Q.  Did you try to gather this information as --
24   as to -- any information as to this issue after this
25   debate?

---

41

1     A.  I don't know.
2     Q.  Further down in that page, Representative
3  Anchia says: "Did they" -- and you can read the whole
4  paragraphs that precede that so you know what the
5  "they" refers to.
6         But his question is: "Did they provide any
7  documented cases, or was it anecdotal?"
8         And your answer is: "There was information
9  from the secretary of state, but really, we don't have
10  the tools to effectively deter or detect this type of
11  voter fraud."
12        Do you see that?
13     A.  Yes, sir.
14     Q.  Do you recall having said that, by the way?
15     A.  No, sir.
16     Q.  Do you know what information you're referring
17  to when you say there was information from the
18  Secretary of State?
19     A.  No, sir.
20         MS. DONNELLY:  Would you like to read
21  through the --
22     Q.  (BY MR. ROSENBERG)  And again, you can read
23  whatever you want to read.
24         MS. DONNELLY:  The document you've been
25  handed, do you feel like you need to read this?

42

1  Because if you do, take your time to do so.
2         THE WITNESS:  Well, read it to -- to --
3  to refresh your memory or --
4         MS. DONNELLY:  I'm just saying, if
5  you're asked a question and you feel like you need to
6  read the whole thing, take the time to do it.  You're
7  not prohibited from doing it.
8         THE WITNESS:  Yeah.  Okay.
9     Q.  (BY MR. ROSENBERG)  Okay.  And I guess I -- I
10  don't remember if you answered my last question.
11     A.  I don't know either.  What's your last
12  question?
13         MS. DONNELLY:  She did.
14     Q.  (BY MR. ROSENBERG)  I think you did also.
15         Turning to page 912, the upper right-hand
16  corner, you're quoted as saying: "But when elections
17  are won or lost on two votes, we need to put every
18  check and balance we can to restore the public's
19  confidence, and not only does it restore the public's
20  confidence in the election, there's been documented
21  evidence in the two states that have passed this more
22  restrictive photo ID that voter turnout increases.
23  When people have confidence that their vote counts,
24  they are more apt to show up and vote."
25         Do you see that?

43

1     A.  Yes, sir.
2     Q.  Do you recall having said that?
3     A.  I don't recall.
4     Q.  Do you recall what states you're referring to
5  when you say there's been documented evidence in the
6  two states that have passed this?
7     A.  Georgia, Indiana, maybe.  I don't know.
8     Q.  Do you recall what the nature of the
9  documented evidence was relating to Georgia and
10  Indiana?
11     A.  I know that -- well, I think I recall that
12  prior to Texas passing photo voter ID, Indiana had
13  passed it, and it had gone to the Supreme Court and
14  been upheld, and Georgia had passed it, and it had
15  been precleared.  I think those are the two states
16  that had passed voter photo ID prior to Texas being
17  passed.
18     Q.  And my question is:  Do you have a memory of
19  what the documented evidence was that you're referring
20  to in this paragraph?
21     A.  I don't.
22     Q.  Turning your attention to page 914, upper
23  right-hand corner, Representative Anchia says: "Why
24  does it" -- referring to the bill -- "ignore mail-in
25  ballots?"

44

1         Do you see that?
2     A.  Yes.
3     Q.  And you answered:  "This bill is only
4  interested in one type of potential fraud, in-person
5  voter fraud."
6         Do you see that?
7     A.  Yes, sir.
8     Q.  And my question is:  Why was not absentee
9  ballots dealt with in SB 14?
10     A.  I think SB 14 was about in-person voting.
11     Q.  And why did you not think that it was
12  important to address absentee ballots at the same
13  time?
14         MS. DONNELLY:  Objection.  Form.
15     A.  I don't know that that was a true statement.
16  I think there was other legislation that was proposed
17  at the time about absentee ballot and stuff like that.
18  I'm -- I'm not for sure.  This was about in-person
19  voting.
20     Q.  (BY MR. ROSENBERG)  Do you have an
21  understanding -- do you have an understanding, sitting
22  here today, as to the extent of in-person voter fraud
23  at the time SB 14 was enacted?
24         MS. DONNELLY:  Objection.  Form.
25         Go ahead.

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

---

**45**

1     A.  Say that one more time.
2     Q.  (BY MR. ROSENBERG)  Sure.
3          Sitting here today, do you have an
4     understanding as to the extent of in-person voter
5     fraud in Texas at the time SB 14 was enacted?
6     A.  I don't recall.
7     Q.  Do you have an understanding as to whether or
8     not it was more or less of a problem with absentee
9     ballot fraud?
10         MS. DONNELLY:  Objection.  Form.
11         Go ahead.
12    A.  I don't recall.
13    Q.  (BY MR. ROSENBERG)  Turning your attention to
14    page 915, Representative Anchia -- there's a -- the
15    first large paragraph, the one that begins:  "Here's
16    the quandary for this body."
17         Do you see that?
18    A.  Yes, sir.
19    Q.  And the last sentence says:  "How much money
20    is in the bill for informing Texans about the change
21    in the law"?
22         And you answered:  "The fiscal note on the
23    bill is $2,024,000"?
24    A.  Yes, sir.
25    Q.  Do you know whether or not that money has

---

**46**

1     been spent?
2     A.  I don't.
3     Q.  Do you know whether there was any legislative
4     oversight over the spending of that money?
5     A.  I don't.
6     Q.  Next page, on page 916, towards the middle,
7     you're quoted as saying:  "It" -- and again, we're
8     talking about the bill -- "It will increase turnout of
9     all voters and education of all voters."
10         Do you see that?  It's just about -- a little
11    below the halfway mark.
12    A.  Yes.
13    Q.  You can read the whole page if you want.
14    A.  Yes.
15    Q.  What is it -- do you have an understanding as
16    to your basis for stating "It will increase turnout of
17    all voters"?
18    A.  I don't.
19    Q.  Turning your attention to page 918.  And
20    first, Representative Anchia, just above the middle
21    half of the page, he says:  "Have you" -- "I know
22    you've done a lot of work on this bill, a lot of
23    research.  What academic studies have you run across
24    to determine the number of minorities that lack
25    required photo identification?"

---

**47**

1          ANSWER:  "From all the testimony that
2     we've had in committee, there was no possible way to
3     determine that."
4          Do you see that?
5     A.  Yes, sir.
6     Q.  (BY MR. ROSENBERG)  And then further down,
7     Representative Anchia says:  "But, are you aware of
8     any studies?  Above and beyond the testimony?"
9          You can read what's in between that.
10         MS. DONNELLY:  Yeah, take your time to
11    read between.
12    A.  Okay.
13    Q.  (BY MR. ROSENBERG)  And in response to
14    Representative Anchia's question:  "But, are you aware
15    of any studies?  Above and beyond the testimony?"  You
16    say:  "No.  Not advised."
17         Do you see that?
18    A.  Yes, sir.
19    Q.  Is -- can you tell me what you meant by "No.
20    Not advised".
21    A.  No.
22    Q.  Is it your understanding that there were no
23    studies available to determine the number of
24    minorities that lack required photo identification?
25    A.  I don't remember that.

---

**48**

1     Q.  Did you rely on any public opinion polls in
2     connection with your support of SB 14?
3          MS. DONNELLY:  Since we're shifting
4     gears, I'm going to just make sure our running
5     objection is still running.
6          MR. ROSENBERG:  It is.  It's still
7     running.
8          MS. DONNELLY:  As to all counsel.
9     A.  I don't recall.
10         (Harless Exhibit 164 marked/introduced.)
11    Q.  (BY MR. ROSENBERG)  I'd like to show you a
12    package of documents that we've marked as Exhibit 164.
13         MS. DONNELLY:  Counsel, 164 are
14    documents produced by Representative Harless's office;
15    is that correct?
16         MR. ROSENBERG:  That's correct.  And
17    these are, just for the record, marked "Confidential,"
18    not "Highly Confidential," so this part of the
19    transcript should be -- in addition to the highly
20    confidential treatment of Representative Harless's
21    testimony about the documents, these documents
22    themselves are "Confidential" and not Highly
23    Confidential.  I'm not sure exactly how that's going
24    to work, but just for the record.
25    A.  Well, I think they're confidential on this,

---

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

                                    13 (Pages 49 to 52)

---

**49**

1  because they're considered -- this is constituent
2  personal information that's not supposed to be
3  released to the public.
4        Q.   (BY MR. ROSENBERG)  Right.  And just for the
5  record, there's a protective order in place in this
6  case that has different levels of confidentiality.
7  There's a confidential level and there's a highly
8  confidential level --
9        A.   Okay.
10       Q.   -- which is actually higher than
11 confidential.  And these have been designated by the
12 attorney general on your behalf as confidential and
13 not highly confidential.
14       A.   Okay.
15       Q.   And they'll be treated as confidential --
16       A.   Okay.
17       Q.   -- in accordance with --
18            MS. DONNELLY:  They won't go out in
19 public.
20            MR. KEISTER:  But these were produced
21 pursuant to the Court's order with respect to
22 legislative documents.
23            MR. ROSENBERG:  That's correct.
24            MR. KEISTER:  So these need to be --
25            MR. ROSENBERG:  Treated as confidential.

---

**50**

1            MR. KEISTER:  -- treated as sealed.
2            MR. ROSENBERG:  Well, quite frankly,
3  sitting here today, I don't recall how "Confidential"
4  documents are treated as opposed to "Highly
5  Confidential" documents, but they'll be treated in
6  accordance with the protective order.
7            MR. KEISTER:  Yes.  Or for the purposes
8  of this exercise, why don't we treat these as they're
9  covered by the Court's order with respect to -- I'm
10 assuming these were produced pursuant to the Court's
11 order with respect to the assertion of legislative
12 privilege, so why don't we treat these -- or not treat
13 them, they are -- treat these as being legislative
14 privileged documents and have them sealed along with
15 the testimony.  Maybe that's what you're saying.
16            MR. ROSENBERG:  No, it's not quite what
17 I'm saying.
18            MR. KEISTER:  Okay.
19            MR. ROSENBERG:  Mainly because I think
20 that communications with constituents are actually not
21 treated as being at the same level of legislative
22 privilege as other communications, but the -- the
23 protective order is going to speak for itself --
24            MR. KEISTER:  Yeah.
25            MR. ROSENBERG:  -- and covers that.

---

**51**

1            MR. KEISTER:  But with respect to the
2  Court's order on legislatively produced documents.
3  And I'm not saying that I understand it.  That's why I
4  tried to make sure.
5            MR. ROSENBERG:  I actually think that
6  these were produced specifically as "Confidential" and
7  not "Highly Confidential," but I'm certainly willing
8  to -- until we can clear this up afterwards, so
9  there's no mistaking, you can -- we will not --
10            MR. KEISTER:  Continue to have these
11 under seal --
12            MR. ROSENBERG:  Sure.
13            MR. KEISTER:  -- just like all the other
14 documents.  Okay.
15            MS. DONNELLY:  Right.  And with all
16 that, the running objection is still running, as I
17 understand it, with respect to --
18            MR. ROSENBERG:  Yeah, the testimony, I
19 understand, is highly confidential.
20            MS. DONNELLY:  -- under Exhibit 164,
21 that objection is still running as to --
22       Q.   (BY MR. ROSENBERG)  Have you seen these
23 documents before?
24       A.   Not to my knowledge.
25       Q.   Okay.  Some of them are signed by you, but I

---

**52**

1  assume that they might have been written by your
2  staff; is that -- or at least, they indicate -- an
3  indicated signature line for you?
4            MS. DONNELLY:  Well, there's a number of
5  pages here.  There's roughly 50-some-odd pages, and I
6  don't think the witness has had an opportunity to
7  review every one of them.
8            MR. ROSENBERG:  Well, I'm only going to
9  ask about a couple of them.
10       A.   Okay.
11       Q.   (BY MR. ROSENBERG)  Looking at the second
12 page, have you ever seen this document before?
13       A.   I don't know.
14       Q.   Can you identify it?
15       A.   It looks like a letter to a constituent,
16 maybe an e-mail.
17       Q.   And from your e-mail?
18       A.   From -- from the State e-mail.
19       Q.   Are you -- do people other than yourself --
20 well, first of all, do you have access to this State
21 e-mail?
22       A.   I do.
23       Q.   Does anyone other than yourself have access
24 to your --
25       A.   All my staff.

---

REPRESENTATIVE PATRICIA HARLESS                6/20/2014
HIGHLY CONFIDENTIAL

---

53

1  Q.  Let me just finish the question.
2  A.  Sorry.
3  Q.  -- to your e-mail account?
4  A.  Yes.
5  Q.  All your staff?
6  A.  Yes, sir.
7  Q.  And so you can't tell, looking at this, or
8  have no memory as to whether you actually wrote this
9  or a staff member wrote this; is that fair?
10  A.  That's fair.
11  Q.  Looking at the second paragraph in the
12  middle, it's written -- you may review this --
13  referring to "70 percent of Texans believe that there
14  should be some form of identification for voting.  You
15  may review this University of Texas poll by logging
16  onto" -- and you give a website.
17       Do you see that?
18  A.  Yes, sir.
19  Q.  Or it's given as a website.
20       Do you recall that poll?
21  A.  Do I?
22  Q.  Do you.
23  A.  Do I recall what?
24  Q.  That poll that you refer to.
25  A.  No.

---

54

1  Q.  When it's written that there should be some
2  form of identification for voting, it's not being
3  suggested here that the specific forms of
4  identification set forth in SB 14 were endorsed by
5  70 percent of Texans, is it?
6  MS. DONNELLY:  Objection.  Form.
7       You can answer.
8  A.  I don't know what the poll is or what it was
9  talking about.
10  Q.  (BY MR. ROSENBERG)  Are you aware of any poll
11  where the specific forms of identification set forth
12  in SB 14 were the subject of the poll?
13  A.  I don't recall.
14  Q.  Turning your attention to LEG 746.  You'll
15  see there's a Bates stamp on the lower right-hand
16  corner.  And I'll ask you to review that.  And it is
17  more than a one-page document.  If you want to review
18  the rest, you're welcome to.  But I'm only going to
19  ask you a question about the second paragraph.
20  A.  The second paragraph?
21  Q.  Yeah.  But first I want to ask you whether
22  you've ever seen this document before?
23  A.  I'm sure I probably have, but I don't
24  remember specifically.
25  Q.  Do you know who Duncan Parish is?

---

55

1  A.  I don't.
2  Q.  Looking at the second paragraph, it's
3  written:  "I'm not sure of the number nation wide
4  [sic].  In Texas during the May 29th primary, we had
5  239 dead people vote with 213 of those dead people
6  voting in person."
7       Do you see that?
8  A.  Yes, sir.
9  Q.  Do you recall having written that?
10  A.  No, sir.
11  Q.  Do you recall that subject matter of 239 dead
12  people voting with 213 of those voting in person?
13  A.  No, sir.
14  Q.  Do you have any idea where that information
15  came from?
16  A.  No, sir.  I don't remember.
17  Q.  Looking at page LEG 753.
18       First, I ask you whether you've seen this
19  document before?
20  A.  I don't remember.
21  Q.  Do you know who Linda Simcox is?
22  A.  Not that I know of.
23  Q.  Looking at the second paragraph, "My staff
24  contacted the Harris County Clerk's office to look
25  into this issue.  According to the County Clerk's

---

56

1  office, they have received no complaints or had any
2  problems implementing the Voter ID law.  Their poll
3  workers have been trained to check for name
4  similarities."
5       Do you see that?
6  A.  Yes, sir.
7  Q.  Do you recall this issue?
8  A.  No, sir.
9  Q.  Do you know who in your staff contacted the
10  Harris County Clerk's Office?
11  A.  No, sir.
12  Q.  Do you know the basis for your statement that
13  "Their poll workers have been trained to check for
14  name similarities"?
15  A.  No, sir.
16  Q.  Do you know what's meant by the sentence
17  "Their poll workers have been trained to check for
18  name similarities"?
19  A.  No, sir.
20       (Harless Exhibit 165 marked/introduced.)
21  Q.  (BY MR. ROSENBERG)  I'd like to show you
22  what's been marked as Exhibit 165.
23       And ask you if you can tell me what this is.
24  A.  No.
25  MS. DONNELLY:  Since we've shifted to a

---

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

57

1    new document, I do want to make clear that the running
2    objection is still running; is that correct, Counsel?
3            MR. ROSENBERG:  That's correct.  And
4    this document is a "Highly Confidential" document and
5    will be treated as such.
6            MS. DONNELLY:  Under the Court's order.
7    Thank you.
8            MR. ROSENBERG:  Yes.
9    A.   Do I know what it is?
10   Q.   (BY MR. ROSENBERG)  Yes.
11   A.   No.
12   Q.   It's -- the first two words on it are "OTB
13   Resolution."  In New York, that's off-track betting.
14   I don't think that's what it is here.
15            Can you tell me what it is.
16   A.   I would assume that OTB resolution, out of
17   bounds, out of the bounds.
18   Q.   Out of the bounds?
19   A.   Out-of-the-bounds resolution, maybe.
20   Q.   And what is an out-of-the-bounds resolution?
21   A.   Sometimes after conference -- when a bill
22   goes to conference committee, where there's
23   differences between the Senate and the House, you --
24   if you think that there's something that goes out of
25   the bounds of the original purpose of that part of the

58

1    section of the bill or the intent of that part of the
2    section of the bill, then you should do an out-of-
3    bounds resolution.  If there's something other, that
4    was added to the bill or taken away, that wasn't part
5    of the original bill.
6    Q.   And do you recall there being an out-of-the-
7    bounds resolution in connection with SB 14?
8    A.   Not until I saw this.
9    Q.   Have you ever seen this document before?
10   A.   I probably have.  It looks like it was maybe
11   my comments or -- or the -- I probably have.
12   Q.   Who -- can you identify the handwriting
13   or --
14   A.   That's my handwriting.  It's terrible.
15   Q.   And looking throughout the document, is
16   that -- wherever there's handwriting, is that your
17   handwriting?
18   A.   Yes.  One, two, three, four -- on the
19   first five pages, the writing is mine.
20   Q.   And looking at the first page where it said
21   "a D" -- it says:  "DPS my understanding & Expectation
22   that DPS" -- I guess that means "will" -- "wl put a
23   photo on Election ID certificate."
24            Is that a fair reading of that?
25   A.   I guess.

59

1    Q.   Can you tell me what you meant by that.
2    A.   No.  I don't -- I don't recall.
3    Q.   By the way, was it your expectation that DPS
4    would be administering SB 14?
5            MS. DONNELLY:  Objection.  Form.
6            Go ahead.
7    A.   I -- I don't recall.
8    Q.   (BY MR. ROSENBERG)  Was it your expectation
9    that DPS would have any discretion as to the forms of
10   identification that would be accepted by DPS for
11   purposes of issuing a driver's license?
12   A.   I don't know.
13   Q.   Would it bother you if DPS had discretion to
14   decide whether or not a person should have a driver's
15   license which would be accepted as identification for
16   SB 14?
17   A.   I don't know what the duties of DPS are.
18   Q.   Turning your attention to page 6962, that's
19   TX 6962, which is about the fourth page.
20   A.   Okay.
21   Q.   Under "Notable Provision Kept/Modified," do
22   you see that?
23   A.   Yes, sir.
24   Q.   There's a discussion about an exemption for
25   natural disasters.

60

1            Do you see that?
2    A.   Yes, sir.
3    Q.   And then it says, the second bullet point:
4    "Why kept in?  The potential to impact a large number
5    of voters."
6            Do you see that?
7    A.   Yes, sir.
8    Q.   Do you have an understanding as to what's
9    meant by that?
10   A.   No, sir.
11           MS. DONNELLY:  Objection.  Form.
12   Q.   (BY MR. ROSENBERG)  Turn to the next page,
13   6963.  There's a question in bold:  "Isn't bill now
14   more restrictive than Indiana's or Georgia law?"
15           Do you see that?
16   A.   Yes.
17   Q.   Do you have an understanding as to whether
18   SB 14 was more restrictive than Indiana's or Georgia's
19   law?
20   A.   I don't recall.
21   Q.   Now, looking at the answer to the question --
22   well, strike that.
23           This says:  "General Q & A."
24           Do you see that?
25   A.   Yes, sir.

REPRESENTATIVE PATRICIA HARLESS                 6/20/2014
HIGHLY CONFIDENTIAL

16 (Pages 61 to 64)

---

**61**

1    Q.   Was it your understanding that -- is it your
2    understanding that this document sets forth questions
3    that were expected to be asked on the floor and
4    suggested answers?
5    A.   I don't know.
6    Q.   Is that a process that you typically do?
7    A.   What do you mean?
8    Q.   Meaning, when you -- first of all, is this
9    the only bill you've ever been the sponsor of?
10   A.   No.
11   Q.   When you're a sponsor of the bill, do you
12   anticipate, in legislative debates, that there will be
13   certain questions asked from the floor and you
14   anticipate what the answers might be?
15   A.   This is -- this specifically is an out-of-
16   bounds resolution.  This is my only out-of-bounds
17   resolution that I've done in four sessions.  And after
18   you get to this point, typically you've debated the
19   bill at least three times; in committee, on the floor,
20   and then back on the floor for -- so I don't know if
21   that has to do with, because these are questions that
22   had been asked before.  I don't -- I don't know
23   what -- you know, I don't know that I -- I do that all
24   the time.
25   Q.   Do you have an understanding what the purpose

---

**62**

1    of this document was?
2    A.   This was to explain the out-of-bounds
3    resolution.  I...
4    Q.   Was this to give you guidance on the floor?
5    A.   Yes.
6    Q.   Turning your attention back to page 6963,
7    does the paragraphs that follow the question -- do the
8    paragraphs that follow the question answer the
9    question whether the bill is more restrictive than
10   Indiana's or Georgia's?
11        MS. DONNELLY:  Take your time to read it
12   if you need to.
13   A.   Seems to.
14   Q.   (BY MR. ROSENBERG)  How?
15   A.   That it's constitutional, and Indiana and
16   Georgia's laws were constitutional.  I don't think any
17   legislation is the same as the next.  I think there's
18   all different...
19   Q.   Well, would you agree that if, for example,
20   you have two pieces of legislation that were identical
21   in terms of the photo identification that was required
22   in each, except that one had an additional category
23   that was allowed, would you agree that one was more
24   restrictive than the other in terms of documentation?
25   A.   I -- I don't know.

---

**63**

1    Q.   Do you recall any differences between Indiana
2    and Georgia's law on the one hand and SB 14 on the
3    other?
4    A.   No.
5    Q.   Do you recall whether Georgia allowed expired
6    driver's licenses, for example?
7    A.   No.
8    Q.   Do you know whether SB 14 allowed expired
9    driver's licenses?
10   A.   From reading the bill last night, I think we
11   allowed ID -- expired no longer than 60 days.
12        (Harless Exhibit 166 marked/introduced.)
13   Q.   (BY MR. ROSENBERG)  I'd like to show you
14   what's been marked as 166.
15        MS. DONNELLY:  This is also "Highly
16   Confidential," Counsel?
17        MR. ROSENBERG:  It is also "Highly
18   Confidential," and I will accept your continuing
19   assertion of privilege under seal.
20        MS. DONNELLY:  Thank you.
21   Q.   (BY MR. ROSENBERG)  Can you tell me what this
22   document is.
23   A.   No.
24   Q.   Do you recall if you've ever seen it before?
25   A.   It looks vaguely familiar.

---

**64**

1    Q.   Do you know if you wrote it?
2    A.   It's typed; and, no, I don't know if I did.
3    Q.   Turning your attention to page 7026 -- and
4    just for the record -- actually, if you would please
5    go back to 7025, and if you see -- what number does it
6    say on that page, above the Bates stamp?  Does it say
7    number 3?
8    A.   Yes, sir.
9    Q.   And if you go to page 7026, do you see what
10   page number is on that?
11   A.   5.
12   Q.   Right.
13        Do you know where page 4 is of this document?
14   A.   I don't.
15   Q.   And similarly, if you look at 7027 and go to
16   7028, that goes from page 6 to 8, right?
17   A.   Yes, sir.
18   Q.   Do you know where page 7 is of this document?
19   A.   It was page 27023.  It looks like they're out
20   of page order.
21   Q.   They're out of order.  Okay.  Good.  I don't
22   know if we can find page 4.
23        Okay.  Let's turn back.
24        On page 7026, which is page 5, is that
25   handwriting yours?

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

---

Page 65

1      A.  Yes.
2      Q.  You do have bad handwriting.
3      A.  I know I do.  My son says I'm really smart,
4   though.
5      Q.  The bottom paragraph:  "How to get a voter ID
6   if you live a long distance to drive to get a TDL?"
7         And TDL, do you know what that refers to?
8      A.  Texas driver's license.
9      Q.  Right.
10        And "15 million TDL 750,000 ID's.  Very small
11  number..."
12        Do you know what is meant by "very small
13  number"?
14     A.  No, sir.
15     Q.  Turning your attention to the next page,
16  7027, where it says:  "-- plaintiffs have been unable
17  to produce a single individual who either did not have
18  an ID or could not easily find one."
19        Do you know what is meant by that?
20     A.  Where is that?
21     Q.  I'm sorry, it's under the second paragraph,
22  "Isn't this bill unconstitutional?"
23     A.  Okay.
24     Q.  "More restrictive than Indiana's Law"?
25     A.  I do not.

---

Page 66

1      Q.  And you don't know the basis for that
2   statement, then?
3      A.  No, sir.
4      Q.  Turning your attention to 7037, can you tell
5   me what that is.
6      A.  It's a floor amendment by Bonnen.
7      Q.  And do you know -- do you recall this floor
8   amendment?
9      A.  I don't.
10     Q.  Looking at it, is it -- is it accurate to say
11  that this was the amendment that deleted the exemption
12  from the requirements of SB 14 for persons 70 years of
13  age or older?
14     A.  I would need to see it in context with
15  this --
16     Q.  Do you recall there being a provision in the
17  bill at some time that exempted persons who are 70
18  yeas of age or older from the requirements of having
19  to show a photo ID in order to vote in person?
20     A.  I don't remember.
21     Q.  And I assume, then, you don't remember there
22  being an amendment that deleted that from the bill?
23     A.  I don't.
24        (Harless Exhibit 167 marked/introduced.)
25     Q.  (BY MR. ROSENBERG)  I'd like to have this

---

Page 67

1   marked as Exhibit 167 and ask you if you can identify
2   Exhibit 167 for the record.
3      A.  House Journal for Wednesday, March 23, 2011.
4      Q.  And have you ever seen this document?
5      A.  Not that I know of.
6      Q.  And feel free to look through it.
7         And could you tell me, after looking through
8   it, whether it refreshes your recollection as to
9   whether you've seen this document.
10     A.  I -- no.
11     Q.  Looking through it, does this document
12  reflect proceedings on the House floor concerning
13  SB 14?
14        MS. DONNELLY:  Can you point her to it?
15        MR. ROSENBERG:  Excuse me?
16        MS. DONNELLY:  Can you point her to it?
17        MR. ROSENBERG:  The whole document,
18  actually, from page -- those initial resolutions
19  to -- from page 952 forward, I believe.  It's even
20  before that.
21     A.  Yes.  It starts on page 951, SB 14, committee
22  substitute SB 14 on second reading.
23     Q.  (BY MR. ROSENBERG)  And were these the
24  proceedings where amendments were offered to SB 14?
25     A.  This is the House Journal of the proceedings

---

Page 68

1   of the floor on March 23rd.  I'm not sure.  But I
2   guess this was when I laid out the bill, I guess.
3      Q.  Turning your attention to page 966, and 967.
4   And we're dealing with Amendment No. 11.  And if you
5   could read that to yourself.
6      A.  966?
7      Q.  Yeah.  At the bottom, it says:  "Amendment
8   No. 11."  It begins:  "Representative Veasey offered
9   the following amendment..."
10     A.  Okay.
11     Q.  Do you recall this amendment being offered?
12     A.  No, sir.
13     Q.  Do you see where it says:  "Representative
14  Harless moved to table Amendment No. 11"?
15     A.  Yes, sir.
16     Q.  And Amendment No. 11 dealt with the execution
17  of "-- an affidavit under penalty of perjury stating
18  that the voter is the same person named on the list of
19  registered voters --"; is that correct?
20     A.  That's what it says.
21     Q.  Do you recall why you moved to table
22  Amendment No. 11?
23        MS. DONNELLY:  And once again, we're
24  still under the running objection?
25        MR. ROSENBERG:  Yes.

69

1    A.  No, sir.
2    Q.  (BY MR. ROSENBERG)  Sitting here today, do you
3  have an understanding as to why?
4    A.  No, sir.
5    Q.  Turning your attention to page 969, Amendment
6  No. 15, offered by Representative Martinez, which
7  stated that:  "Notwithstanding any other law, an
8  agency, institution, or political subdivision of this
9  state may not charge any fee for the issuance of any
10  document that may be used:  As proof of identification
11  under this chapter; or to obtain a document that may
12  be used as proof of identification under this
13  chapter."
14       Do you see that?
15    A.  Yes, sir.
16    Q.  And it says that Representative Harless moved
17  to table Amendment No. 15.
18       Do you see that?
19    A.  Yes, sir.
20    Q.  Do you recall why you moved to table
21  Amendment No. 15?
22    A.  No, sir.
23    Q.  Do you -- sitting here today, do you oppose
24  Amendment No. 15?
25    A.  I don't know what it means.

70

1    Q.  Moving to page 970, Amendment No. 16 offered
2  by Representative Raymond, which wanted to insert the
3  following -- I'll read it in part, just for the
4  record -- presents a paycheck or copy of another
5  official employment document that includes the
6  information of the voter's employer and informs the
7  election officer that:  The voter's employer does not
8  permit the voter to be absent from work for the
9  purpose of obtaining photo ID; and offices of the DPS
10  are not open for at least two consecutive hours
11  outside of the voter's working hours.
12       Do you see that?
13    A.  Yes, sir.
14    Q.  And if you turn to page 974, Representative
15  V. Taylor -- is that Van Taylor?
16    A.  I guess, yeah.
17    Q.  -- moved to table Amendment No. 16, and you
18  voted in favor of tabling it.
19       Do you see that?  Under the "yeas."
20    A.  Yes.
21    Q.  Do you recall why you voted in favor of
22  tabling the amendment?
23    A.  No, sir.
24    Q.  Do you have an understanding, today, of what
25  that amendment would do?

71

1    A.  No, sir.
2    Q.  Amendment No. 17, on page 974, wanted to
3  insert a temporary driving permit issued to the person
4  by DPS.
5       Do you see that?
6    A.  Yes, sir.
7    Q.  And then it says that you moved to table
8  Amendment No. 17.
9       Do you see that?
10    A.  Yes, sir.
11    Q.  Do you recall why you moved to table it?
12    A.  No, sir.
13    Q.  Sitting here today, do you understand what
14  Amendment No. 17 purported to do?
15    A.  No, sir.
16    Q.  If I were to suggest that Amendment No. 17
17  purported to include, as an additional form of ID, a
18  temporary driving permit issued to the person by the
19  DPS, would that make sense to you?
20    A.  Yes, sir.
21    Q.  And sitting here today, do you oppose that?
22       MS. DONNELLY:  Objection to form.
23    A.  I don't -- I don't know what a temporary
24  driving permit issued by the DPS looks like, if it has
25  a photo on it.

72

1    Q.  (BY MR. ROSENBERG)  Turning to page 975,
2  Amendment No. 18, Representative Dutton offered an
3  amendment to include -- to add Subdivision 25 to read
4  as follows:  "'Personal identification card' means a
5  personal identification voter certificate issued by
6  the Department of Public Safety," and there was a
7  motion to table that, which you moved.
8       Do you see that?
9       MS. DONNELLY:  He's just asking if you
10  moved to table it.
11    A.  Yes.
12    Q.  (BY MR. ROSENBERG)  And do you know why you
13  moved to table it?
14    A.  No.
15    Q.  Turn the page, please.  978.
16       Representative Veasey offered an amendment
17  that would add as a form of identification "a valid
18  employee identification card that contains the
19  person's photograph and is issued by an employer of
20  the person in the ordinary course of the employer's
21  business."
22       Do you see that?
23    A.  Yes.
24    Q.  And you moved to table that amendment.
25       Do you see that?

REPRESENTATIVE PATRICIA HARLESS                    6/20/2014
HIGHLY CONFIDENTIAL

73

1     **A. Yes.**
2     Q.  Do you know why you moved to table that
3   amendment?
4     **A. No, sir.**
5     Q.  Sitting here today, do you oppose that
6   amendment?
7     **A. I don't --**
8           MS. DONNELLY:  Object to the form.
9     **A. I don't know.**
10    Q.  (BY MR. ROSENBERG)  Turning to page 979,
11  Amendment No. 23, Representative Dutton offered an
12  amendment that would add to the forms of photo ID in
13  SB 14, "a student identification card issued by a
14  public or private high school or institution of higher
15  education that contains the person's photograph."
16        Do you see that?
17    **A. Yes, sir.**
18    Q.  And you voted to table that; is that correct?
19    **A. Yes, sir.**
20    Q.  Do you know why you did so?
21    **A. No, sir.**
22    Q.  Sitting here today, do you oppose that?
23          MS. DONNELLY:  Objection to form.
24    **A. I don't know.**
25    Q.  (BY MR. ROSENBERG)  Are you aware as to

74

1   whether either the Indiana or Georgia statute included
2   a student identification card with a photograph as an
3   acceptable form of ID?
4     **A. I'm not.**
5     Q.  Are you aware of whether you, yourself, have
6   in the past supported legislation that included a
7   student identification card as an acceptable form of
8   ID?
9     **A. I'm not aware.**
10    Q.  Turning to the next page, Amendment No. 24,
11  which was offered by Representative Martinez Fischer
12  and would include as an acceptable form of ID in
13  SB 14, "a valid identification card that contains the
14  person's photograph and is issued by this state."
15        Do you see that?
16    **A. Yes, sir.**
17    Q.  And that was moved to table, and you voted in
18  favor of tabling it.
19        Do you see that?
20    **A. Yes, sir.**
21    Q.  Do you know why you did so?
22    **A. No, sir.**
23    Q.  Sitting here today, do you oppose that?
24          MS. DONNELLY:  Objection. Form.
25    **A. I don't know.**

75

1     Q.  (BY MR. ROSENBERG)  Do you oppose allowing
2   individuals to use that form of ID, a valid
3   identification card that contains the person's
4   photograph and is issued by the state --
5           MS. DONNELLY:  Objection.
6     Q.  (BY MR. ROSENBERG)  -- in order to vote?
7           MS. DONNELLY:  Objection. Form.
8         You can answer.
9     **A. I don't remember what the debate was relating**
10  **to all of this at the time.**
11    Q.  (BY MR. ROSENBERG)  Sitting here today, do you
12  oppose allowing an individual to use a valid
13  identification card that contains a person's
14  photograph and is issued by the state in order to
15  vote?
16    **A. I don't know what the debate was --**
17          MS. DONNELLY:  Objection. Form.
18    **A. -- about, why it was important to use.**
19    Q.  (BY MR. ROSENBERG)  So sitting here today, you
20  don't have a position on that issue?
21    **A. That's right.**
22    Q.  And the same question as to the use of a
23  student identification card issued by a public or
24  private high school or institution of higher education
25  that contains the person's photograph:  Sitting here

76

1   today, do you oppose that form of identification being
2   used as a form of ID for a person to vote?
3           MS. DONNELLY:  Objection. Form.
4         You can answer.
5     **A. I don't recall the debate on the purpose of**
6   **the IDs chosen.**
7     Q.  (BY MR. ROSENBERG)  And therefore, sitting
8   here today, you don't have a position on it one way or
9   the other?
10    **A. Yes, sir.  I do not.**
11          **(Harless Exhibit 168 marked/introduced.)**
12    Q.  (BY MR. ROSENBERG)  I'd like to have this
13  marked as Exhibit 168, please.
14          MR. ROSENBERG:  And this is a document
15  that's also "Highly Confidential."
16    Q.  (BY MR. ROSENBERG)  And first of all, I want
17  to ask you if you -- actually, if I may, I actually
18  gave you my copy.  Is it okay if we switched these,
19  because I had marked this?
20    **A. Sure.**
21          MS. DONNELLY:  Of course.
22          THE WITNESS:  Sorry.
23          MR. ROSENBERG:  No, my fault.
24          THE WITNESS:  Am I a part-time attorney?
25          MS. DONNELLY:  You're doing fine.

REPRESENTATIVE PATRICIA HARLESS                                    6/20/2014
HIGHLY CONFIDENTIAL

---

**77**

1    Q.  (BY MR. ROSENBERG)  Have you seen this
2   document before?
3    A.  **Not that I recall.**
4    Q.  And it's entitled "Reasons for Withholding
5   Certain Information Requested by Suzanne Gamboa,
6   Associated Press, from State Representative Patricia
7   Harless."
8        Do you see that?
9    A.  **Yes, sir.**
10   Q.  Do you recall, back in January of 2012, there
11  being a Freedom of Information Act request for certain
12  documents from you?
13   A.  **No, sir.**
14   Q.  Turning your attention to the second page,
15  the paragraph --
16       MS. DONNELLY:  Counsel, the running
17  objection applies to those questions regarding Harless
18  168 as well.
19       MR. ROSENBERG:  Absolutely.
20       MS. DONNELLY:  The questions and answers
21  are sealed.  This is a continuation of the running
22  objection.
23       You can answer.
24   Q.  (BY MR. ROSENBERG)  It begins:  "There are
25  seven documents that the office seeks to withhold.

---

**78**

1   Copies of those documents are included with this brief
2   and are marked in red pencil for identification and
3   designation of the specific grounds for which the
4   council seeks to withhold each document.  Documents A,
5   B, C, D, and E are a single email chain between the
6   member and her Chief of Staff Colby Beuck containing
7   advice, opinions, and recommendations relating to a
8   speech on Senate Bill No. 14, Acts of the 82nd
9   Legislature, Regular Session, 2011 (Voter I.D. Law)
10  that the representative gave to the Cy-Fair Houston
11  Chamber of Commerce, Government Affairs Committee on
12  December 1, 2011.  Documents F and G are emails
13  between Representative Harless and her chief of staff
14  that relate to the representative's request for an
15  outline and talking points for the speech on S.B. 14.
16  Portions of documents F and G are unresponsive to the
17  request, and are marked accordingly.  Additionally,
18  documents F and G show that 'cc' copies were sent to
19  Julie Scott and Ella Edmiston" -- E-D-M-I-S-T-O-N --
20  "both of whom are employed in the representative's
21  office.  All of the documents contain confidential
22  discussions and information regarding public policy
23  and the preparation of legislation."
24       Do you see that?
25   A.  **Yes, sir.**

---

**79**

1    Q.  Does that refresh your recollection as to any
2   issue?
3    A.  **No, sir.**
4    Q.  Do you know whether these documents that
5   are -- first of all, do you recall what these
6   documents are?
7    A.  **No, sir.**
8    Q.  Do you recall having given a speech to the
9   Cy-Fair Houston Chamber of Commerce in December of
10  2011?
11   A.  **No, sir.**
12   Q.  Do you know whether the documents described
13  in this paragraph have been produced to the plaintiffs
14  in this case?
15   A.  **I do not know.**
16   Q.  Representative Harless, do you understand
17  that there has been a history of official voter-
18  related discrimination in the state of Texas?
19       MR. KEISTER:  Object to form.
20   A.  **Ask that one more time.**
21   Q.  (BY MR. ROSENBERG)  Sure.
22       Do you agree that there has been a history
23  of -- of voting-related racial discrimination in the
24  state of Texas?
25       MR. KEISTER:  Objection.  Form.

---

**80**

1        MS. DONNELLY:  And I join in that
2   objection.  Form.
3    A.  **I don't know.  We have -- we have a 1965**
4   **Voting Rights Act.**
5    Q.  (BY MR. ROSENBERG)  And since 1965, do you
6   understand whether Texas has been found to have
7   violated the Voting Rights Act because of having
8   passed discriminatory legislation?
9        MR. KEISTER:  Object to form.
10       MS. DONNELLY:  Object to form.
11   A.  **I don't know.**
12   Q.  (BY MR. ROSENBERG)  Are you unaware of there
13  being racial discrimination in Texas?
14       MS. DONNELLY:  Objection to the form.
15       MR. KEISTER:  Same.
16   A.  **Am I unaware?**
17   Q.  (BY MR. ROSENBERG)  Uh-huh.
18   A.  **Am I aware -- can you ask it a different way?**
19   Q.  Sure.
20       Are you aware of there being racial
21  discrimination in Texas?
22   A.  **No.  Not -- not that I recall.**
23   Q.  Do you agree that African-Americans have been
24  subject to discrimination in employment in the state
25  of Texas?

---

REPRESENTATIVE PATRICIA HARLESS                         6/20/2014
HIGHLY CONFIDENTIAL

---

81

1          MS. DONNELLY:  Object to form.
2          MR. KEISTER:  Objection.  Form.
3     A.  I don't know.
4     Q.  (BY MR. ROSENBERG)  How about Hispanics, do
5  you think they've been subject to racial
6  discrimination in the state of Texas?
7          MS. DONNELLY:  Objection.  Form.
8          MR. KEISTER:  Form.
9     A.  I have no information on it.
10    Q.  (BY MR. ROSENBERG)  Do you believe that
11 African-Americans or Hispanics have been subject to
12 discrimination in education in the state of Texas?
13         MS. DONNELLY:  Objection.  Form.
14    A.  I don't know.
15         MR. KEISTER:  Form.
16    Q.  (BY MR. ROSENBERG)  Do you know what the term
17 "polarized voting" means?
18    A.  No.
19    Q.  Are you aware of there ever being political
20 campaigns in the state of Texas that use subtle
21 appeals to racist sentiments?
22         MS. DONNELLY:  Objection.  Form.
23         MR. KEISTER:  Form.
24    A.  I don't know.
25         MR. ROSENBERG:  We can take a break.  I

---

82

1  might be done with my questioning, but we should take
2  a little break.
3          (Break.)
4          MR. ROSENBERG:  I will pass the witness
5  to Mr. Freeman.
6      E X A M I N A T I O N
7  BY MR. FREEMAN:
8     Q.  Thank you, Representative.  And we will do
9  our best to get you to your baseball game.
10    A.  I'll just listen to it.
11    Q.  Well, to get you to somewhere where you can
12 listen to it.
13         So first off, I just want to ask a couple
14 questions about SB 14 and -- and the importance of
15 SB 14.
16         So excluding SB 14, have you ever carried a
17 bill that was a subject that the governor had declared
18 an emergency?
19         MR. KEISTER:  Object to form.
20         MS. DONNELLY:  I second the objection.
21    A.  I -- I don't know for sure.
22    Q.  (BY MR. FREEMAN)  Can you identify any bill,
23 excluding SB 14, that was on a subject that the
24 governor had declared a legislative emergency?
25    A.  We have -- we have them, I think, most

---

83

1  sessions.  I -- I can't recall, but we have them most
2  sessions.
3     Q.  Okay.  But -- but you personally cannot
4  identify any bill other than SB 14 that was on a
5  subject -- that you sponsored that was on a subject
6  that the governor had declared a legislative
7  emergency?
8     A.  Not that I remember.
9     Q.  Okay.  And excluding SB 14, have you ever
10 carried any bill that had been subject to a multi-hour
11 debate on the floor of the House?
12         MS. DONNELLY:  Object to the form of the
13 question.
14         When you said "carried," what -- can you
15 be more specific?
16         MR. FREEMAN:  Sponsored.
17    Q.  (BY MR. FREEMAN)  Let me rephrase.
18         Excluding SB 14, have you ever sponsored a
19 bill that was subject to a multi-hour debate on the
20 floor of the House?
21    A.  As the sole sponsor, not that I recall.
22    Q.  Okay.  And excluding SB 14, have you ever
23 been the sole sponsor or lead sponsor of the bill that
24 was subject to significant, substantial news coverage?
25         MS. DONNELLY:  Objection to form.

---

84

1          You can answer.
2     A.  Not that I recall.
3     Q.  (BY MR. FREEMAN)  Would it be fair to say that
4  SB 14 is the most important bill that you have
5  sponsored in your legislative career?
6          MS. DONNELLY:  Objection.  Form.
7          MR. KEISTER:  Join.
8     A.  No.
9     Q.  (BY MR. FREEMAN)  Would it be fair to say that
10 it's the most high-profile bill that you've sponsored
11 in your legislative career?
12         MS. DONNELLY:  Objection.  Form.
13         MR. KEISTER:  Form.
14    A.  No.
15    Q.  (BY MR. FREEMAN)  And why not?
16    A.  I mean, it may be high profile to others, but
17 there are other legislation that I've carried that was
18 more high profile to my district, which is the people
19 I serve and who I pay attention to.
20    Q.  Okay.  Have you had a primary opponent since
21 SB 14 passed?
22    A.  No.
23    Q.  And, Representative, what are all of the
24 purposes of SB 14?
25         MS. DONNELLY:  Objection.  Form.  Object

---

REPRESENTATIVE PATRICIA HARLESS                                6/20/2014
HIGHLY CONFIDENTIAL

---

85

1   on the grounds that the question calls for information
2   covered by legislative privilege.
3           You may answer if you would like to
4   answer, but your answer will be under seal.
5           If Counsel would like to agree to a
6   running objection, then I don't have to keep
7   interrupting you on every question.
8           Is that an agreement that we have?
9           MR. FREEMAN:  That's fine.
10          MS. DONNELLY:  Okay.  Is that an
11  agreement among all counsel?
12          MR. ROSENBERG:  Yes, it is.
13          MS. DONNELLY:  So from now until we both
14  agree that there's no longer a running objection,
15  there's a running objection.
16          MR. ROSENBERG:  Running objection is
17  right.
18          MS. DONNELLY:  Thank you.
19          A.  I don't know the -- I can't recall the answer
20  of all the purposes of it, but mainly to provide for
21  the integrity of the in-person voting by showing a
22  photo ID.
23          Q.  (BY MR. FREEMAN)  And there might be other
24  purposes, but you are not personally aware of them?
25          A.  I don't remember them.

---

86

1           Q.  Okay.  What is your basis for believing that
2   there was, prior to SB 14, a lack of integrity?
3           A.  Can you state that one more time?
4           Q.  Well, you had just testified that the purpose
5   was to ensure the integrity of the in-person vote,
6   correct?
7           A.  One of the purposes that I remember, that I
8   recall.
9           Q.  A purpose.
10          And so my question was:  What is the basis
11  for your belief that before SB 14 was passed there was
12  a lack of integrity in the in-person vote?
13          MS. DONNELLY:  Object to the form.
14          Go ahead.
15          A.  Just, when you show up to vote, saying who
16  you are, show them proof that you are who you say you
17  are.
18          Q.  (BY MR. FREEMAN)  But what is your basis for
19  believing that, absent showing that proof, there was a
20  lack of integrity in the in-person vote?
21          A.  I don't recall.
22          Q.  Before SB 14 passed, did you believe some
23  form of in-person voter fraud was occurring?
24          A.  I don't recall.
25          Q.  And to be clear, you don't recall any other

---

87

1   purpose of SB 14 besides ensuring the integrity of the
2   in-person vote; is that correct?
3           A.  Yes.
4           Q.  Do you remember discussing the Carter-Baker
5   Commission Report during the debate on SB 14?
6           A.  No, sir.
7           Q.  Do you recall what the Carter-Baker
8   Commission Report was?
9           A.  No, sir.
10          Q.  You have no recollection of anything called
11  the Carter-Baker commission or a commission involving
12  former Secretary of State Baker and former President
13  Jimmy Carter regarding election integrity or voter ID?
14          A.  I remember something being said about Carter.
15          Q.  And do you have any recollection of what that
16  was?
17          A.  No, sir.
18          Q.  And you said that you reviewed your
19  deposition testimony previously, correct?
20          A.  I went through, like, the first 30 pages --
21          Q.  Okay.
22          A.  -- while watching the TCU baseball game.  We
23  lost, by the way.
24          Q.  I'm sorry.  We'll come back to that after a
25  break.

---

88

1           I'd like to have you go back to Exhibit 166.
2   The first page of Exhibit 166, what are these
3   statements?
4           MS. DONNELLY:  Object to the form.
5           Q.  (BY MR. FREEMAN)  What is this document?  Just
6   the first page.
7           A.  It looks like talking points.
8           Q.  And am I correct that one of these talking
9   points was:  "This bill is not about citizenship,
10  language, immigration, it is about preserving and
11  protecting the integrity of our election process by
12  showing a photo ID when voting in person"?
13          A.  Yes, sir.
14          Q.  Why was it necessary to clarify that this
15  bill was not about citizenship?
16          A.  I -- I don't recall.
17          Q.  Do you recall whether any supporters of voter
18  ID had tied the bill to issues concerning voter
19  citizenship?
20          A.  I don't recall.
21          Q.  Do you recall whether supporters of voter ID
22  had tied the issue to immigration?
23          A.  I don't recall.
24          Q.  If you turn to the page concerning "Impact on
25  Voters."  Third page, I believe, but it's labeled page

---

REPRESENTATIVE PATRICIA HARLESS                                    6/20/2014
HIGHLY CONFIDENTIAL

---

**89**

1  7.
2      **A. Okay.**
3      Q.  Do you have any other basis besides the
4  analysis that you suggest concerning Georgia and
5  Indiana and statewide turnout in those states, do you
6  have any other basis to believe that SB 14 would
7  increase minority turnout in Texas?
8          MS. DONNELLY: Objection. Form.
9          You can answer.
10     **A. I don't remember all that went into the**
11 **debate and the preparation for SB 14.**
12     Q.  (BY MR. FREEMAN) Do you remember the factual
13 basis for why you asserted that the bill will increase
14 turnout among all voters --
15         MS. DONNELLY: Objection. Form.
16     Q.  (BY MR. FREEMAN)  -- in Texas?
17         MS. DONNELLY: Objection. Form.
18     **A. No.  I don't remember.**
19     Q.  (BY MR. FREEMAN) Do you know if you relied on
20 any Texas-specific information in making that
21 statement?
22     **A. I don't remember.  And it says "I think."**
23     Q.  Okay.  Do you know when Georgia's voter ID
24 bill was enacted?
25     **A. No.  I don't remember.  I know I did then, I**

---

**90**

1  **don't know now.**
2      Q.  Is it possible that minority turnout
3  increased in Georgia because President Obama was the
4  first African-American nominated by a major party for
5  president and not because a voter ID bill had been
6  enacted?
7          MS. DONNELLY: Objection. Form.
8          You can answer.
9          MR. KEISTER: Form.
10     **A. I don't know.**
11     Q.  (BY MR. FREEMAN) If you can turn to the page
12 "About More Restrictive Bill," which is labeled page
13 1, but it is 7031, referring to the Bates number.
14     Q.  Do you see where it says: "Plus, I believe
15 that Photo ID is simpler and less confusing for the
16 voters"?
17     **A. Which paragraph is that?**
18     Q.  Second paragraph, end of the second
19 paragraph.
20     **A. Yes, I see that.**
21     Q.  Why would reducing the number of ways that a
22 voter could establish their identity reduce confusion
23 for the voters?
24         MS. DONNELLY: Objection. Form.
25     **A. I -- I don't know what went into preparing**

---

**91**

1  the statement.
2      Q.  (BY MR. FREEMAN) So --
3      **A. I don't remember.**
4      Q.  -- let's just say, logically, before SB 14, I
5  could show a photo ID or I could show my voter
6  registration card or I could show a few other nonphoto
7  documents.  After SB 14, I could only show a photo ID.
8          Why would reducing the number of documents
9  you can show make it less confusing for the voters if
10 they can't continue to show exactly what they've shown
11 before?
12     **A. I -- I don't remember.**
13     Q.  But logically now, why would you -- do you
14 continue to believe that photo ID is simpler and less
15 confusing for the voters at this time?
16     **A. I do.**
17     Q.  And why?
18     **A. I think knowing that when you show up to vote**
19 **and show your photo ID, like you rent a video or do**
20 **other things, it's in their normal course of everyday**
21 **life.**
22     Q.  Does showing your voter registration card --
23 is that idea confusing to voters?
24     **A. I -- I don't remember all the purpose in**
25 **that.  I know a photo ID is what they carry every day.**

---

**92**

1      Q.  Do you see the last paragraph where it's
2  labeled "More restrictive different bill?"
3      **A. Yes, sir.**
4      Q.  And do you see where it says that "2
5  additional years to see Photo ID working in other
6  states and 2 additional years to hear from my
7  constituents that a photo voter ID bill is something
8  they expect..."?
9      **A. Yes.**
10     Q.  What additional evidence did you rely on from
11 the last two years, from 2009 to 2011, that suggested
12 that a strict photo ID bill was working in other
13 states?
14         MS. DONNELLY: Objection. Form.
15     **A. I don't recall.**
16     Q.  (BY MR. FREEMAN) And what did you hear from
17 your constituents that suggested that they expected a
18 strict photo ID bill?
19         MS. DONNELLY: Objection. Form.
20         Go ahead.
21     **A. Just what I've said earlier to him, in town**
22 **hall meetings, meetings with constituent groups, them**
23 **asking for legislation that required for people to**
24 **show a photo ID when they voted in person.**
25     Q.  (BY MR. FREEMAN) If you could turn back to

---

93

1    page 6, which is 7027, the page labeled 6.  And do you
2    see where it says that the bill "Provides exceptions
3    for elderly, disabled, or indigent voters" in the
4    third paragraph?
5        **A.  Yes.**
6        Q.  And did you consider those to be beneficial
7    features of the bill?
8        **A.  I did.**
9        Q.  Do you recall if you voted to eliminate the
10   exemption for elderly voters?
11       **A.  I don't recall.**
12           **(Harless Exhibit 169 marked/introduced.)**
13       Q.  (BY MR. FREEMAN)  Representative, what is this
14   document?
15           MS. DONNELLY:  I'm sorry, Counsel, this
16   is a "Highly Confidential" document.
17           MR. FREEMAN:  It is.
18           MS. DONNELLY:  It's going to be treated
19   as though --
20           MR. ROSENBERG:  Highly confidential.
21           MS. DONNELLY:  All the conversation and
22   questioning on this document will be treated as highly
23   confidential; is that right?
24           MR. FREEMAN:  Yes.  And the running
25   objection is still running.

94

1            MS. DONNELLY:  And the running objection
2    is still running on the exhibits.
3            MR. FREEMAN:  Thank you.
4        **A.  It looks to be an e-mail from Colby, my chief**
5    **of staff at the time, to me.**
6        Q.  (BY MR. FREEMAN)  And what does this e-mail
7    describe?
8        **A.  It says differences between the CCR SB 14 and**
9    **House passage of SB 14.**
10       Q.  And what does CCR mean?
11       **A.  I guess the Conference Committee Report,**
12   **maybe.**
13       Q.  Okay.  So this is the bill as it came out of
14   conference, correct?
15       **A.  I -- I guess.**
16       Q.  Okay.  Do you see the second paragraph where
17   it says that the Conference Committee Report removes
18   requirement that SOS education efforts target low
19   income and minority voters?
20       **A.  I see that.**
21       Q.  And that -- that was a provision -- it says,
22   next to it, "(Miles)," correct?
23       **A.  Yes.**
24       Q.  Does that mean that was a provision added by
25   Representative Borris Miles?

95

1        **A.  I would think that that's what that would**
2    **refer to.**
3        Q.  And who is Representative Miles?
4        **A.  He was a House member -- or is a House**
5    **member.**
6        Q.  And is Representative Miles from the Houston
7    area as well?
8        **A.  Yes.**
9        Q.  And is he African-American?
10       **A.  Yes.**
11       Q.  And does he represent a predominantly
12   African-American community?
13       **A.  I don't know the percentage of his district.**
14       Q.  And that was a provision that was passed by
15   the House, correct?
16       **A.  I -- I can't tell you.  I guess it was.  I**
17   **don't know if it was the House.  I guess.**
18       Q.  Okay.  And why was this provision removed
19   from SB 14?
20       **A.  I don't recall.**
21       Q.  Do you recall what the OAG or SOS concerns
22   were?
23       **A.  No.**
24       Q.  Do you see in Paragraph 5 where it talks
25   about removing "Tribal IDs as an acceptable form of

96

1    ID"?
2        **A.  Yes.**
3        Q.  And is it your understanding that the
4    Conference Committee removed Tribal IDs as an
5    acceptable form of voter ID?
6        **A.  Yes.**
7        Q.  And it says next to it "Naomi Gonzalez,"
8    correct?
9        **A.  Yes.**
10       Q.  And so this was an amendment sponsored by
11   Representative Gonzalez?
12       **A.  Yes.  I assume that, yeah.**
13       Q.  And Representative Gonzalez, she represents a
14   district in the El Paso area, correct?
15       **A.  I think so.  I don't know.**
16       Q.  And she's Hispanic, correct?
17       **A.  She has a Hispanic surname.**
18       Q.  And do you know if there are any recognized
19   Native American tribes in the El Paso area?
20       **A.  I don't know.**
21       Q.  Do you know why this amendment was rejected?
22       **A.  I don't.**
23           MS. DONNELLY:  Objection.  Form.
24       **A.  I know what's written in the next sentence.**
25       Q.  (BY MR. FREEMAN)  Do you know how many

REPRESENTATIVE PATRICIA HARLESS                                    6/20/2014
HIGHLY CONFIDENTIAL

**97**

1   different recognized tribes there are in Texas?
2       A.  I don't.
3       Q.  Do you know how many different forms of
4   military ID exist?
5       A.  I don't.
6       Q.  Do you know if there are more or fewer
7   recognized tribes in Texas than there are forms of
8   military ID?
9       A.  I don't.
10      Q.  Put that document aside.
11          Now, at the beginning of the legislative
12  session in 2011, you filed your own voter ID bill,
13  correct?
14      A.  I think so, yes.
15      Q.  Do you know if that was HB 112?
16      A.  I don't remember the number.
17      Q.  Do you remember what substantive input you
18  provided concerning that bill?
19      A.  No.
20      Q.  When you sponsor a bill, do you generally
21  tell your staff or the TLC what you would like to be
22  included in that bill?
23      A.  My staff and I discuss what we're thinking or
24  what we've been asked to do or what we plan to do, and
25  they have those discussions.  I -- I don't know what

**98**

1   happens after that.
2       Q.  Do you sign off on the bill before it's
3   submitted under your name?
4       A.  I sign it when it's filed, after they've
5   provided a copy from leg' counsel.
6       Q.  And do you review the bill prior to signing
7   it?
8       A.  Yes.
9           MR. FREEMAN:  Before we go into the
10  substance, if we want to take a break now that it
11  seems that lunch has arrived.  I don't know if people
12  have hot meals.  I'm happy to go off the record and we
13  can take a break.
14          MS. DONNELLY:  We can do that.
15          MR. KEISTER:  Sounds good to me.
16          (Lunch break.)
17      Q.  (BY MR. FREEMAN)  If we could just jump back
18  to Exhibit 167, which is the big, fat transcript.
19  Thank you.
20          Now, we had previously discussed how an
21  exemption for elderly people was important to you,
22  correct?
23          MS. DONNELLY:  Objection.  Form.
24      A.  (Nods head.)
25      Q.  (BY MR. FREEMAN)  Is that a "yes"?  You

**99**

1   nodded.
2       A.  You asked me about the elderly and the
3   indigent and the poor and the Conference Committee
4   Report and if that was important, and I said yes.
5       Q.  If you could turn to page 961.
6       A.  Okay.
7       Q.  Do you see Amendment No. 7 at the bottom of
8   the page?
9       A.  Amendment 7, yes.
10      Q.  Can you turn to the next page and review
11  Amendment 7?
12      A.  "70 years old or older on January 1, 2012, as
13  indicated by the date of birth on the voter's voter
14  registration certificate; or..."
15      Q.  And this was an amendment to strike that
16  language, correct?
17      A.  That's what it says.
18      Q.  And so this amendment struck the exemption
19  for individuals who were 70 years of age or older on
20  January 1, 2012; is that correct?
21      A.  I guess so.
22      Q.  Do you recall whether or not you voted in
23  favor of this amendment?
24      A.  I don't recall.
25      Q.  If you could turn to page 965, Record Vote

**100**

1   110.
2       A.  Okay.
3       Q.  Do you see whether you voted in favor of the
4   amendment?
5       A.  965?
6       Q.  At the bottom of that page, Record Vote 110,
7   Amendment 7?
8       A.  Harless, yes.
9       Q.  Why did you vote in favor of that amendment?
10      A.  I don't recall.
11          (Harless Exhibit 170 marked/introduced.)
12      Q.  (BY MR. FREEMAN)  I'd like to put another
13  document in front of you.  Exhibit 170.
14          MS. DONNELLY:  Counsel, before you start
15  asking questions, this document, Harless 170, is
16  Highly Confidential and will be treated as sealed
17  pursuant to the Court's order, right?
18          MR. FREEMAN:  Yes.
19      Q.  (BY MR. FREEMAN)  Representative, have you
20  seen this document before?
21      A.  I don't remember if I have or haven't.
22      Q.  And do you recall whether you produced this
23  from your legislative file in response to the subpoena
24  you received?
25      A.  I don't know.

REPRESENTATIVE PATRICIA HARLESS                6/20/2014
HIGHLY CONFIDENTIAL

---

101

1    Q.  When you keep an op-ed or a newspaper article
2  in a legislative folder or file, why do you usually do
3  that?
4    A.  I don't know that I do that.  I don't know if
5  I do it or if my staff does it.
6    Q.  When a -- thank you.
7      When a newspaper article or an op-ed is found
8  in your legislative file, why does it usually end up
9  there, to your knowledge?
10    A.  It's related to the bill.
11    Q.  Do you know if you've read this before?
12    A.  I don't know if I have.
13    Q.  And who is the author of this op-ed?
14    A.  It says by Jimmy Carter and James A. Baker
15  III.
16    Q.  So that's President Carter and former
17  Secretary of State Baker?
18    A.  I guess it is.
19    Q.  Okay.
20    A.  It doesn't say that, but I guess it is if you
21  say it is.
22    Q.  If you could go to the seventh paragraph.  It
23  begins:  "Here's the problem we were addressing..."
24    A.  Okay.
25    Q.  Could you read that paragraph into the

---

102

1  record, please?
2    A.  "Here's the problem we were addressing:  24
3  states already require that voters prove their
4  identity at the polls - some states request driver's
5  licenses, others accept utility bills, affidavits or
6  other documents - and 12 others are considering it.
7  This includes Georgia, which just started demanding
8  that voters have a state-issued photo ID, even though
9  obtaining one can be too costly or difficult for poor
10  Georgians.  We consider Georgia's law discriminatory."
11    Q.  And so did President Carter and former
12  Secretary of State Baker state in this op-ed that they
13  considered Georgia's law discriminatory?
14      MR. KEISTER:  Objection.  Form.
15    A.  The authors wrote it, and they say that in
16  this article.
17    Q.  (BY MR. FREEMAN)  And what is the date of this
18  article?
19    A.  September 23, 2005.
20    Q.  And do you believe that Georgia's voter ID
21  law is discriminatory?
22    A.  I don't --
23      MS. DONNELLY:  Objection.  Form.
24    A.  I don't have enough information to know.  I
25  don't recall.

---

103

1    Q.  (BY MR. FREEMAN)  Okay.  So you have no basis
2  to disagree, per se?
3      MS. DONNELLY:  Objection.  Form.
4    A.  Well, I -- if I remember correctly -- and I'm
5  not sure that I do -- I think Georgia's was precleared
6  by the Department of Justice.  So that would make it
7  nondiscriminatory.
8    Q.  (BY MR. FREEMAN)  My question is whether you
9  have a factual basis to disagree with the statement
10  that Georgia's law is discriminatory?
11      MR. KEISTER:  Objection.  Asked and
12  answered.
13      MS. DONNELLY:  Join in the objection.
14    A.  I would say that Georgia's law, if I remember
15  correctly, has been precleared by the Department of
16  Justice to be held constitutional; therefore, it is
17  not discriminatory.
18    Q.  (BY MR. FREEMAN)  If you move to Paragraph 9,
19  could you read just the first sentence?
20    A.  "Yes, we are concerned about the
21  approximately 12 percent of citizens who lack a
22  driver's license."
23    Q.  Do you have any basis to disagree with this
24  statement that approximately 12 percent of citizens
25  lack a driver's license?

---

104

1      MS. DONNELLY:  Objection.  Form.
2    A.  I have no basis to agree or disagree.
3      MR. FREEMAN:  Okay.
4      (Off the record.)
5      MR. FREEMAN:  Mark this Exhibit 171.
6      (Harless Exhibit 171 marked/introduced.)
7    Q.  (BY MR. FREEMAN)  And, Representative, you
8  filed your own photograph photo ID in 2011; we
9  discussed that before the break, correct?
10    A.  Yes, sir.
11    Q.  So this is Exhibit 171, and is this the bill
12  that you introduced in 2011?
13    A.  It looks to be.
14    Q.  And do you recall whether this bill allowed
15  individuals to cast a valid, in-person ballot, showing
16  photographic ID or nonphotographic ID?
17      MS. DONNELLY:  Just confirm, Counsel,
18  the running objection is still running.
19    A.  I don't recall.
20      MR. FREEMAN:  This is a public document,
21  but the objection speaks to her testimony.
22      MS. DONNELLY:  Yes.
23    Q.  (BY MR. FREEMAN)  If you could turn to page 6
24  and on to page 7.
25    A.  Okay.

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

27 (Pages 105 to 108)

---

105

1    Q.   And do you see that documents listed as
2    acceptable as proof of identification --
3       A.   Yeah.
4       Q.   -- include a variety of nonphotographic
5    documents, correct?
6       A.   Yes.
7       Q.   Why did you include these nonphotographic
8    documents in your voter ID proposal?
9       A.   I don't know.
10      Q.   Would your ID proposal have helped fulfill
11   the purpose of SB 14 that you mentioned previously?
12      A.   I can't remember about this bill.
13      Q.   Did you think that these documents were
14   acceptable to establish a voter identity?
15      A.   I think -- I don't remember why this bill was
16   filed, unless it was just the same as the last session
17   bill.  The prior session.
18      Q.   Now, you previously testified that your
19   constituents had urged you to file a voter ID bill,
20   correct?
21      A.   Yes.
22      Q.   Had they urged you -- and after they urged
23   you, you filed this bill, correct?
24      A.   I filed this bill at the beginning of
25   session, because it's got a low number.

---

106

1       Q.   And --
2       A.   Or maybe even before session started, because
3    it's got a low number.
4       Q.   And so had your constituents urged you to
5    file anything different from this bill specifically?
6       A.   I don't recall.  I don't -- you know, if I
7    spent hours going over what happened during this 2011
8    session, I might understand more what was going on,
9    but I haven't done that.
10      Q.   As you stand now do you believe that the
11   documents listed as acceptable as proof of
12   identification are, in fact, effective ways for a
13   voter to establish their identity?
14      A.   I think the most effective way for a voter to
15   establish their identity for in-person voting is with
16   a photo ID.
17      Q.   Do you think that these are insufficient in
18   any way?
19      A.   If they don't include a photo ID, I do.
20      Q.   And why's that?
21      A.   Because a photo ID is to identify you are who
22   you say you are.
23      Q.   Do you know if HB 112 was referred to the
24   Select Committee on Voter Identification and Voter
25   Fraud?

---

107

1       A.   I don't remember.
2       Q.   Do you remember if HB 112 limited the use of
3    forms of identification to those that had been expired
4    by 60 days or fewer?
5       A.   I don't remember.
6       Q.   If you look at the bottom of page 5 and top
7    of page 6, do you see where it says:  "a driver's
8    license or personal identification card issued to the
9    person by the Department of Public Safety that has not
10   expired or that expired no earlier than two years
11   before the date of the presentation"?
12      A.   I see that.
13      Q.   Do you believe that a driver's license that
14   has expired by one year and 11 months is sufficient to
15   establish an individual's identity?
16      A.   I don't know why the two years was put in
17   this legislation.
18      Q.   But do you believe now, as we sit here, that
19   a driver's license that's been expired for 18 months
20   establishes an individual's identity, if the picture
21   matches?
22      A.   I -- I don't know why you would have an ID
23   that's been expired for two years.
24      Q.   Do some people sometimes not renew their
25   driver's license if they don't drive anymore, older

---

108

1    folks?
2       A.   I don't know.
3       Q.   Okay.  To your knowledge, did Colby Beuck,
4    your former chief of staff, provide assistance with
5    the drafting of this bill?
6       A.   I don't recall.  I know leg' counsel drafts
7    the bills.
8       Q.   Do you know if he provided any substantive
9    input to leg' counsel?
10      A.   I think we fill out forms to do it, and he
11   would have been the one who would have done that.
12      Q.   During the drafting of SB 14, do you know
13   if -- if Mr. Beuck helped provide input on the Senate
14   bill?
15      A.   I don't know.
16      Q.   Is there any circumstance in which a member
17   of your staff has worked with an individual on the
18   Senate to craft a Senate side bill?
19      A.   Not in my knowledge.
20      Q.   Okay.  Now, turning away from this bill and
21   just to SB 14, do you know why SB 14 includes military
22   ID as an acceptable form of photographic ID?
23      A.   I don't recall.
24      Q.   Do you know why it includes passports?
25      A.   No, sir.

---

---

**109**

1    Q.  Do you know why it does not include a federal
2    employee ID with a person's photograph on it?
3    **A.  I don't recall.**
4    Q.  Do you know why it doesn't include any other
5    federally-issued ID besides passports or
6    Department of Defense-issued or VA-issued ID?
7    **A.  I don't remember.**
8    Q.  Do you know why SB 14 doesn't include state
9    employee IDs?
10   **A.  I don't recall.**
11   Q.  Do you know why it doesn't include municipal
12   IDs?
13   **A.  I don't.  I don't know.**
14   Q.  Do you remember if you provided Mr. Beuck
15   with any instructions as to the substance of what you
16   wanted included in SB 14?
17   **A.  I didn't draft SB 14.**
18   Q.  Okay.  Do you remember if the Mexican
19   American Legal Defense and Education Fund, MALDEF, do
20   you remember if they took a position on SB 14?
21   **A.  I think they did.**
22   Q.  And what was that position?
23   **A.  I think they were opposed to it.  I -- I**
24   **think there was testimony that they were opposed to**
25   **it.**

---

**110**

1    Q.  Did it concern you that MALDEF was opposed to
2    SB 14?
3    **A.  There was a lot of people that were in**
4    **support and opposition to the bill.  I'm -- no, I'm --**
5    **I'm never surprised.  I'm always willing to listen.**
6    Q.  But does it concern you when a minority
7    rights group is actively opposed to a bill, does that
8    raise concerns for you specifically?
9    MS. DONNELLY:  Objection.  Form.
10   **A.  I try to listen to all concerns from every**
11   **group.**
12   Q.  (BY MR. FREEMAN)  Do you remember if the NAACP
13   took a position on SB 14?
14   **A.  I can't say for sure, but I would think they**
15   **would.**
16   Q.  And what would make you think that they
17   would?
18   **A.  Well, I think they did.  I mean, I think I**
19   **read something.**
20   Q.  Do you remember what that position was?
21   **A.  Opposed to it.**
22   Q.  And did it concern you that the NAACP was
23   opposed to it?
24   MS. DONNELLY:  Objection.  Form.
25   **A.  I'm concerned when anybody's opposed to any**

---

**111**

1    **bills, and I try to listen to their concerns.**
2    Q.  (BY MR. FREEMAN)  And why did you, in the end,
3    decide to continue to support SB 14, notwithstanding
4    the concerns that these groups raised?
5    **A.  Because I thought that the bill was a good**
6    **bill and providing integrity in the election process.**
7    Q.  Did MALDEF and the NAACP raise other concerns
8    about possible harms that SB 14 would have?
9    **A.  I don't recall what their -- what their**
10   **opposition was.**
11   Q.  Do you remember what Representative Anchia's
12   opposition was?
13   **A.  No.**
14   Q.  Do you remember what Representative Veasey's
15   opposition was?
16   **A.  No.**
17   Q.  Do you remember whether, at the Select
18   Committee on Voter Identification and Voter Fraud
19   hearing on SB 14, whether there were experts who
20   testified about the possible effects of SB 14?
21   **A.  I don't recall specifically.  I know we had**
22   **someone come in and testify, but I couldn't even tell**
23   **you who that was.**
24   Q.  Do you remember someone named Tova Wang?
25   **A.  No.**

---

**112**

1    Q.  Do you remember the term the Brennan Center?
2    **A.  I remember the term.**
3    Q.  And do you remember if anyone from the
4    Brennan Center provided testimony?
5    **A.  I don't remember.**
6    Q.  And we had previously discussed the
7    Carter-Baker Commission.
8    Do you remember someone named Toby Moore?
9    **A.  I don't remember.**
10   Q.  Do you know if he was a staff member of the
11   Carter-Baker Commission?
12   **A.  I don't know.**
13   Q.  Okay.
14   **A.  I don't remember.**
15   Q.  Do you remember whether there was any
16   testimony in the Select Committee hearing about the
17   number of people who might not have the types of IDs
18   required by SB 14 in order to cast a valid in-person
19   ballot?
20   **A.  I don't.**
21   Q.  Do you remember if there were disagreements
22   among the different experts about whether or not it
23   would be a problem, whether there would be a
24   substantial number of people who would lack ID?
25   **A.  I remember the Secretary of State testifying,**

113

1   but -- and arguments back and forth, but I can't
2   recall specifically what that was.
3        Q.  But in the end, you took the position that
4   there weren't going to be a large number of people who
5   lacked these IDs, right?
6            MS. DONNELLY:  Objection.  Form.
7        A.  I don't remember what my position was on
8   that.
9        Q.  (BY MR. FREEMAN)  Why do you think that there
10  was -- well, first -- sorry.  Strike that.
11           Would you agree that there was strong
12  opposition to SB 14 among the people who voted against
13  it?
14           MS. DONNELLY:  Objection.  Form.
15       A.  There was opposition.
16       Q.  (BY MR. FREEMAN)  Why do you think they
17  opposed SB 14?
18       A.  I don't know.
19       Q.  You have no understanding of -- of the
20  opposition to this bill?
21       A.  No.  Every bill, there's opposition, and I --
22  I never can quite understand all the workings behind
23  it.
24       Q.  Have you ever had an individual registered
25  voter tell you that they did not vote because they

114

1   were concerned about voter fraud canceling out their
2   vote?
3        A.  Not that I can recall.
4        Q.  Was there any testimony given to the Select
5   Committee on Voter Identification and Voter Fraud --
6   which I will, in the future, just call the Select
7   Committee, if that's okay.
8        A.  Okay.
9        Q.  Was there any testimony to the Select
10  Committee stating that SB 14 would have a
11  disproportionate impact on minority voters?
12       A.  I don't remember the testimony in committee.
13       Q.  Was there any testimony that minority voters
14  were less likely than Anglo voters to possess the
15  types of ID required to cast a valid in-person ballot
16  under -- or regular in-person ballot under SB 14?
17       A.  I don't remember the testimony in committee.
18       Q.  Are you aware of how many individuals had to
19  cast provisional ballots in either the November 2013
20  general election or the 2014 primary --
21       A.  No, sir.
22       Q.  -- because they arrived at a polling place
23  without the ID required by SB 14?
24       A.  No, sir.
25       Q.  So you haven't followed the implementation of

115

1   SB 14?
2        A.  No, sir.
3        Q.  As we sit here now, if it is, in fact, the
4   case that African-American and Hispanic voters lack
5   the ID required by SB 14 at a greater rate than Anglo
6   voters, do you think that SB 14 is still a worthwhile
7   law?
8            MS. DONNELLY:  Objection.  Form.
9            MR. KEISTER:  Form.
10       A.  I'm not going to speculate.
11           (Harless Exhibit 172 marked/introduced.)
12           MR. FREEMAN:  Mark the following
13  document as Exhibit 172.  And this document has been
14  designated Highly Confidential, so the document itself
15  will be placed under seal, and it is my understanding
16  that a running objection continues to run its
17  marathon.
18           MS. DONNELLY:  Thank you.
19       Q.  (BY MR. FREEMAN)  Representative, have you
20  seen this document before?
21       A.  Not that I recall.
22       Q.  What is this document?
23       A.  It looks like an e-mail from Ann McGeehan,
24  Secretary of State's office, sent to me and Colby and
25  copied a John -- I don't know how to say his last

116

1   name.
2        Q.  Sepehri?
3        A.  Sepehri.
4        Q.  Do you know who John Sepehri is?
5        A.  I don't remember.  It shows that it had some
6   attachments, and it's a letter to me.  Or an e-mail to
7   me, sorry.
8        Q.  And this is dated Friday, February 25th?
9        A.  Yes, 2011.
10       Q.  If you could just go to the third paragraph
11  of this e-mail, did Ms. McGeehan write to you that
12  "...concerning the number of voters who have not been
13  issued TDL/personal ID cards by DPS, we are still
14  working with our IT Dept to analyze that data, and
15  hope to have an analysis by Monday"?
16       A.  That's what it says.
17       Q.  Had you asked her for that analysis?
18       A.  I don't recall.
19       Q.  Did you follow up on this request?
20       A.  I don't remember.
21           (Harless Exhibit 173 marked/introduced.)
22           MR. FREEMAN:  The following document,
23  173, this has also been designated as "Highly
24  Confidential" and will be placed under seal.
25       Q.  (BY MR. FREEMAN)  Representative, what is this

REPRESENTATIVE PATRICIA HARLESS                          6/20/2014
HIGHLY CONFIDENTIAL

---

**117**

1    document?
2        A.   It is an e-mail from Ann McGeehan to Colby,
3    dated February 25, 2011, questions what -- it says:
4    Question:  What is the number of voters that do not
5    have a Texas Drivers License/Personal ID or Social
6    Security Number in the statewide database?
7        Q.   And so this was sent just a couple of hours
8    after Exhibit 172?
9        A.   Three hours and 14 minutes.
10       Q.   I appreciate your precision.
11           This isn't saying the number of people who
12   have a Texas driver's license because of matching
13   against DPS, correct?
14       A.   I don't know what it's saying.
15       Q.   If you could take a moment to review it,
16   then.
17       A.   What did you ask, is it saying?
18       Q.   So this document does not say the number of
19   individuals who have been issued Texas driver's
20   license or personal identification cards by DPS --
21           MS. DONNELLY:  Objection.
22       Q.   (BY MR. FREEMAN)  -- correct?
23           MS. DONNELLY:  Please don't speculate on
24   what somebody else meant.
25       A.   Yeah, I -- yeah, I don't -- I don't know.

---

**118**

1        Q.   (BY MR. FREEMAN)  So if you look at 172,
2    would you say that 173 is the analysis that
3    Ms. McGeehan described in the third paragraph of 172,
4    or is this something different?
5            MS. DONNELLY:  Objection.  Form.
6            Please don't speculate.
7        A.   I don't know.  She said she'd have the
8    analysis by Monday.  This is on a Friday.  I don't
9    know.
10       Q.   (BY MR. FREEMAN)  Reading 173, as you
11   understand the document, is this a description of the
12   number of voters who possess a Texas driver's license
13   or identification card?
14           MS. DONNELLY:  Objection.  Form.
15       A.   What are you asking, if it is?
16       Q.   (BY MR. FREEMAN)  Is this an analysis of the
17   number of voters in Texas who possess a Texas driver's
18   license or personal identification card issued by DPS?
19       A.   I don't know that for a fact, no.
20       Q.   Did Ms. McGeehan provide a calculation of the
21   number of voters who provided a Texas driver's license
22   or ID number when they registered to vote?
23       A.   Well, in reading the paragraph, it goes into
24   details about how their system had been updated and
25   not everything is accurate, and the first set of

---

**119**

1    numbers reflect new registration since January 2006
2    and show what identification numbers that new
3    applicants provided.
4            The second set of numbers reflect the entire
5    statewide file of registered voters and shows which
6    identification numbers were provided by the applicants
7    before or after January 2006.  But she says that they
8    did not keep that information prior to 2006.
9            So I think it's not quite an analysis.  It's,
10   in their mind, an estimation of what they think, if
11   they had to guess.
12       Q.   Okay.  That's fine.
13           (Harless Exhibit 174 marked/introduced.)
14           MR. FREEMAN:  Mark the next document as
15   Exhibit 174.  This is not marked "Highly
16   Confidential."
17       Q.   (BY MR. FREEMAN)  What is this document?
18       A.   I have no clue.
19       Q.   Do you see, at the top of it, it says "Voter
20   Fraud Hearing, March 1, 2011"?
21       A.   "Volume 2, March 1, 2011," yes.
22       Q.   Would you agree that this is a transcript of
23   the Voter Fraud Hearing?
24       A.   It looks to be a transcript from the Voter
25   Fraud Hearing on March 1, 2011.

---

**120**

1        Q.   Do you recall when the Select Committee held
2    its hearing on SB 14?
3        A.   I do not.
4        Q.   Would it have been around March 1st?
5        A.   It could have been.  I have no reason to
6    doubt that this is anything but valid.
7        Q.   Okay.  I appreciate that.
8            During the Select Committee hearing, do you
9    recall whether any members of the committee asked Ann
10   McGeehan whether the Secretary of State's office had
11   matched the voter registration file against the
12   driver's license file to determine how many voters
13   lacked DPS-issued IDs?
14       A.   I don't remember what they specifically
15   asked.
16       Q.   If you could review page 289, the first page
17   of this transcript.
18       A.   Okay.
19       Q.   And actually, the second page as well.
20       A.   How far?  All the way down?
21       Q.   Just through the second page, yes.
22       A.   Okay.
23       Q.   Having reviewed this transcript, during the
24   Select Committee hearings, did any members of the
25   committee ask Ann McGeehan whether SOS, the Secretary

---

121

1   of State's office, had matched the voter registration
2   file against the driver's license file to determine
3   how many voters lacked DPS-issued ID?
4          MS. DONNELLY:  Objection.  The record
5   speaks for itself.
6          You can answer.
7       A.  In this -- in this transcript, she says that
8   they shared information, they worked with, I guess,
9   another agency.  But since 2006, they've required
10  Social Security, and they've matched that.  And it
11  says:  "So since that time, we show 34,506 voters out
12  of almost 4 million that stated they did not have
13  I.D."
14      Q.  (BY MR. FREEMAN) Where are you reading that
15  from?
16      A.  On page 2, in the middle of the page under
17  Ann McGeehan.
18      Q.  That's page 291, so the third page of the
19  transcript?
20      A.  No.  Right here.  On the first page.  291,
21  yeah.  Page 291.  I didn't go to there.
22      Q.  I'm sorry, you have -- you have two copies of
23  the same.
24          MS. DONNELLY:  Yes, I have two copies of
25  the same as well.

122

1       Q.  (BY MR. FREEMAN) You didn't have the first
2   page.  My apologies.  My mistake.  You didn't have the
3   page at all that I asked you to read.
4       A.  Okay.
5       Q.  If you could review pages 289 and 290.
6       A.  Okay.
7       Q.  So during the Select Committee, do you agree
8   that an unidentified representative asked Ms. McGeehan
9   whether SOS had done a match to determine with the
10  driver's license file as to whether particular voters
11  have driver's licenses or not?  That's on page 290.
12      A.  290?  "Have you all done a match to determine
13  with the driver's license file as to whether these
14  folks have driver's licenses or not?"
15          "Uh-huh."
16      Q.  Do you recall who asked that question, by any
17  chance?
18      A.  I don't.
19      Q.  Okay.  And did Ms. McGeehan state that the
20  Secretary of State's IT department was still working
21  on that analysis?
22      A.  We're looking at it to make sure.
23      Q.  So the analysis that Ms. McGeehan provided to
24  Mr. Beuck on February 25th, that wasn't this matching
25  analysis, right?

123

1       A.  I don't know.  I don't know.
2       Q.  Did you follow up on the request for this
3   information any time after March 1st, as the sponsor
4   of the bill?
5       A.  I don't remember.
6       Q.  Is there any circumstance that you're aware
7   of in which you've requested information from the
8   Office of the Secretary of State about a bill that you
9   sponsored and that the Secretary of State has not
10  provided that information, even though it had it?
11      A.  Not that I recall.
12      Q.  Is there any circumstance that you're aware
13  of with regard to any legislative order in which
14  there's been a request for information the Secretary
15  of State had and the Secretary of State simply did not
16  provide it?
17          MR. KEISTER:  Object to form.
18      A.  I would only be able to ask -- answer about
19  me.
20      Q.  (BY MR. FREEMAN) Okay.
21          (Harless Exhibit 175 marked/introduced.)
22          MR. FREEMAN:  Mark the following
23  document Exhibit 175.  This document has not been
24  marked "Highly Confidential."
25      Q.  (BY MR. FREEMAN) Representative, I'll ask you

124

1   to review this document in its entirety.
2       A.  Okay.
3       Q.  Have you seen this document before?
4       A.  Not that I recall.
5       Q.  Have you seen any similar document laying out
6   the analysis that is found on pages 2 and 3?
7       A.  Not that I recall.
8       Q.  Do you know why you never received this
9   analysis?
10      A.  I don't.
11          MS. DONNELLY:  Objection.  Form.
12          MR. KEISTER:  Objection.  Form.
13      A.  I don't know if I have or haven't.
14      Q.  (BY MR. FREEMAN) To your understanding, is
15  this the analysis that was asked for during the Select
16  Committee hearing?
17          MR. KEISTER:  Object to form.
18          MS. DONNELLY:  Object to form.
19      A.  I don't know if it is or isn't.
20      Q.  (BY MR. FREEMAN) Well, reviewing it, does it
21  appear to be a matching analysis between DPS records
22  and the voter file?
23      A.  I'm not sure what it is.  I mean, I know
24  they've got their queries and matching criteria and
25  number of voters, but I don't know why there's all the

125

1   different numbers.
2           And they have several questions:  "Does it
3   include Social Securities?"  "I don't know, I'll found
4   out."  So I'm not sure what it is, what it's about,
5   what it actually means.
6       Q.  And as you continue to review the document,
7   you have no better understanding of what it would mean
8   to run a query for particular matching criteria
9   between voters --
10      A.  Right.
11      Q.  -- and DPS records?
12      A.  Right.  I don't -- you know, I -- there's not
13  enough information here to tell you what it is.
14      Q.  We can agree that, at present, there's no
15  exemption from SB 14 for voters who are 70 or older,
16  correct?
17      A.  I don't remember.
18      Q.  Well, that's because Amendment 7 that we
19  discussed earlier, right?
20      A.  "Did we not put it back in in conference?"
21  "I don't remember."
22      Q.  Do you know whether SB 14 currently contains
23  an exemption for individuals who are 70 or older?
24      A.  I don't remember.
25      Q.  Looking at page 2 of this document -- I'm

126

1   looking at Query 1, Query 3 and Query 5, the ones that
2   don't contain an exemption for voters who are 70 or
3   older.
4           Of those three, what is the lowest number of
5   voters that did not match a DPS record?
6       A.  1, 3 and 5, what is the lowest number?
7       Q.  The lowest of the estimates there for the
8   number of voters who did not match to a DPS record.
9           MS. DONNELLY:  Object to the form of the
10  question.
11          You understand the question?
12      A.  It would look like 3.
13      Q.  (BY MR. FREEMAN)  And is that 6- --
14      A.  Is that right?
15      Q.  Is that 678,560 voters?
16      A.  That's what this says.
17      Q.  If you had known, during consideration of
18  SB 14, that the Secretary of State's office was not
19  able to determine that 678,560 voters lacked -- or had
20  a DPS-issued ID, would you have still supported the
21  bill?
22          MR. KEISTER:  Objection.  Form.
23          MS. DONNELLY:  Objection.  Form.
24          MR. KEISTER:  Misstates the document.
25      A.  I don't know about the validity of all this.

127

1   I don't remember what the debate was.  I remember
2   there was some question in whether these numbers were
3   valid.  But I don't remember what that was.  That
4   numbers presented were in -- were not necessarily
5   valid.
6       Q.  (BY MR. FREEMAN)  Within the Texas population,
7   just knowing, based on your personal knowledge, would
8   you say that individuals who lacked -- or who are
9   poor, would you say they're more likely or less likely
10  to have a photo ID?
11          MS. DONNELLY:  Objection.  Form.
12          MR. KEISTER:  Form.
13      A.  I think that in this day and time, in
14  Houston, Texas, in Texas in general, that most
15  everyone has some form of photo ID.
16      Q.  (BY MR. FREEMAN)  Most everyone.  But what
17  about the people who don't?
18      A.  I have no clue who that might be.
19      Q.  I'm done with that document.
20          So you testified earlier that there was an
21  increased interest in matters related to elections in
22  your district --
23      A.  Yes.
24      Q.  -- before this term, correct?
25          Did those concerns ever focus on noncitizen

128

1   voting?
2       A.  I don't recall that.
3       Q.  Did they ever focus specifically on Hispanic
4   voters?
5       A.  I don't recall that.
6       Q.  Do you remember why your constituents
7   considered these issues important?
8       A.  They think one vote, one person, makes a
9   difference.
10      Q.  Did any of your constituents ever volunteer
11  specific information about why they found these issues
12  to be important?
13      A.  I can't recall.
14      Q.  If we could go back to Exhibit 164.  It's a
15  big packet of e-mails.  The first page has your
16  letterhead on it.  There we go.
17          If you could turn to page 711.  Actually, on
18  page 712.
19      A.  Okay.
20      Q.  And did a constituent write to you, saying,
21  "Recently, I was told of a democratic Hispanic group
22  jumping for joy saying ~"the Senate bill did nothing
23  on paper ballots...that is how we will continue doing
24  what we want to do"?  712.
25      A.  712.  Is that from the same person?  Yeah.

**129**

1      Okay.
2          Yes, I see that.
3      Q.  Did you receive many messages from
4  constituents saying that Hispanic groups were jumping
5  for joy about voter fraud?
6      A.  I don't recall.
7      Q.  And in your response, which is on page 711,
8  did you question this account at all?
9      A.  Do you want me to read my response?
10     Q.  I would, yes.
11     A.  Okay.  Okay.  What was your question?
12     Q.  Did you question this voter's account of
13  Hispanic groups "jumping for joy"?
14     A.  I didn't address it.
15     Q.  Okay.  And did you address in any way the
16  assertion that this voter's description of voter fraud
17  focused on Hispanic groups?
18     A.  I -- I don't see that I talked about that.  I
19  talked about how the ballot-by-mail process works and
20  where they can get more information on that and how
21  they handle it.
22     Q.  Okay.  Let's turn to page 744, which is
23  toward the back of the packet.
24         MS. DONNELLY:  I don't have a 744 or
25  745.

**130**

1          MR. FREEMAN:  I have a separate copy of
2  it.  I was trying to keep the number of exhibits down.
3          (Harless Exhibit 176 marked/introduced.)
4          MR. FREEMAN:  I'm going to mark this
5  document as Exhibit 176.
6      Q.  (BY MR. FREEMAN)  Representative, have you
7  seen this document before?
8      A.  Not that I recall.
9      Q.  What is this document?
10     A.  It looks like an e-mail to my state e-mail --
11  or from my state e-mail to a Sandra Thibodeau, dated
12  March 28, 2012.
13     Q.  And who is Sandra Thibodeau?
14     A.  I have no clue.
15     Q.  And do you see, in her e-mail, she said:  "So
16  why should someone who cannot produce documentation of
17  citizenship be allowed to vote in U.S. elections?"
18         MS. DONNELLY:  Why don't you take a
19  moment to read it.
20     A.  Yes.
21     Q.  (BY MR. FREEMAN)  Did you receive many
22  messages from constituents, either in person or by
23  e-mail or on the phone, arguing in favor of proof of
24  citizenship related to voter ID?
25         MS. DONNELLY:  Objection.

**131**

1      A.  Not that I recall.
2      Q.  (BY MR. FREEMAN)  And did you correct --
3  sorry.  Strike that.
4          Does SB 14 require proof of citizenship?
5      A.  I think, to register to vote, you check that
6  you are a citizen.
7      Q.  But does SB 14 require a voter who shows up
8  at the poll to provide a form of ID that establishes
9  citizenship?
10     A.  They can show a form of ID that's citizenship
11  that has their photo on it.
12     Q.  But do they have to?
13     A.  I don't think so.
14     Q.  Did you correct the voter's perception that
15  SB 14 requires proof of citizenship?
16     A.  I typically try not to correct my
17  constituents.  I try to give them relevant information
18  that will help them be more informed.
19     Q.  Would it help them be more informed to
20  explain what SB 14 does and doesn't do?
21     A.  In the real world, no.
22     Q.  And why's that?
23     A.  You know, I just think that it's best
24  sometimes to give them information to do their own due
25  diligence and not argue with them.  It's not my job to

**132**

1  change their mind.
2      Q.  But is it your job to educate them?
3      A.  I -- I do that.  I provide them information
4  where they can get more information.
5      Q.  And if we could go back to Exhibit 164, the
6  big packet.
7      A.  The e-mails?
8      Q.  Yes.
9          If you could just turn to the third page of
10  the document, which is -- which is --
11     A.  704?
12     Q.  -- 704, yes.
13         And did you write to this constituent that
14  Canada, Mexico, Germany, France, Greece, and even
15  Iraq, require photo identification to ensure that
16  there is not repetitive or deceptive voting?
17         MS. DONNELLY:  If you need to read the
18  whole document, feel free to do so.
19     A.  This is an e-mail from my state e-mail to
20  someone -- I don't know if they're a constituent or
21  not -- and I don't know if I wrote this or if my staff
22  wrote this, but it is a response to an e-mail.
23     Q.  (BY MR. FREEMAN)  When you write e-mail to
24  constituents or other individuals who write to you, do
25  you try to ensure that those statements are accurate?

REPRESENTATIVE PATRICIA HARLESS                6/20/2014
HIGHLY CONFIDENTIAL

133

1    A. My staff tries to, yes.
2    Q. Do you know if it's accurate that Canada,
3  Mexico, Germany, France, Greece, and even Iraq,
4  require photo identification in order to vote?
5    A. I don't know what they did in 2009, I don't
6  know what they do today.
7    Q. Okay. One more.
8      If you turn to page 718. If you look in the
9  first paragraph, did you -- did you write to this
10 individual: "As the bipartisan Commission on Federal
11 Election Reform concluded, ballot access should
12 have...the same degree of integrity as boarding a
13 plane or cashing a check, both of which require a
14 photo ID"?
15    A. I don't know if I wrote this. There's a
16 response to a constituent that says what you just
17 read.
18    Q. And is the bipartisan Commission on Federal
19 Election Reform, is that the Carter-Baker Commission
20 that we discussed earlier?
21    A. I don't know.
22    Q. Do you know for certain that photo ID is
23 necessary to board a plane?
24    A. I don't know.
25    Q. Do you know for certain that it's not

134

1  possible to cash a check without photo ID?
2    A. I don't know.
3    Q. When you sponsor a bill, is it important to
4  you to ensure that that bill complies with the Texas
5  Constitution?
6    A. I think it's important for legislation to
7  comply with the Constitution.
8    Q. And what steps do you take when you're
9  sponsoring a bill to ensure that the bill complies
10 with the Texas Constitution?
11    A. Legislators typically rely on leg' counsel to
12 fulfill that responsibility.
13    Q. Does leg' counsel provide a written opinion,
14 or how does that process work?
15    A. They do the research.
16    Q. And how do you know that they do -- that
17 they've done the research?
18    A. That's their job requirement.
19    Q. Is there any kind of sign-off saying, "We've
20 done the research, and we believe that this complies
21 with the Texas Constitution"?
22    A. By drafting the legislation, that's our
23 understanding.
24    Q. Does -- if leg' counsel receives a drafting
25 request, do they ever refuse to include certain

135

1  substantive provisions in a draft bill that a
2  legislator has asked them to draft because they
3  believe it would violate the Texas Constitution?
4    A. I don't know what they do with other
5  legislators.
6    Q. Have they ever done that for you?
7    A. They've sent back stuff said -- saying that
8  we couldn't do it there, or the way we wanted to do
9  it, because it wouldn't fit in that area of the
10 government code or...
11    Q. Have they ever sent something back saying
12 that it would violate the Texas Constitution?
13    A. Not that I recall.
14    Q. Have they ever sent something back saying it
15 would violate federal law?
16    A. Not that I recall.
17    Q. Have they ever sent something back saying
18 that it would violate the Voting Rights Act?
19    A. Not that I recall.
20    Q. Are there any other steps, other than relying
21 on whether or not leg' counsel sends back to you that
22 you take to ensure that a bill complies with federal
23 law?
24    A. Not that I recall.
25    Q. And are there any other steps other than

136

1  relying on bill drafters and leg' counsel to not
2  complete a bill drafting request that violates the
3  Voting Rights Act that you use to ensure that a bill
4  that you're proposing complies with the Voting Rights
5  Act?
6    A. Not that I recall.
7    Q. Are there any steps that you take when voting
8  on a bill, any additional steps, to ensure that it
9  complies with federal law or the Voting Rights Act?
10    A. Not that I recall.
11    Q. When other legislators have alleged that
12 particular legislation violates the Voting Rights Act,
13 do you take that seriously?
14    A. I rely on leg' counsel to do their due
15 diligence to make sure that that doesn't happen.
16    Q. So if a bill has been drafted and it's before
17 the House, it's made its way through leg' counsel, but
18 someone on the other side, an opponent of that bill,
19 says, "This violates the Voting Rights Act," you
20 believe that not to be true because leg' counsel has
21 drafted the bill?
22    A. I believe that, yes.
23    Q. Have any Texas laws ever been struck down
24 under the Voting Rights Act?
25    A. I don't know.

---

137

1      Q.  Are you familiar with the opinion in Texas v.
2  Holder, the litigation in DC about SB 14?
3      A.  No.
4      Q.  Do you know which way that decision came out?
5          MS. DONNELLY:  Objection.  Form.
6      A.  No.  I know there's been a lot of litigation
7  surrounding it, but I don't know -- I don't know
8  where -- where it's at, what it's done, where we're
9  here, why we're here.
10     Q.  (BY MR. FREEMAN)  Okay.  Do you know if there
11  was a Select Committee on Voter Identification and
12  Voter Fraud convened in 2013?
13     A.  Not that I recall.
14     Q.  Were you a member of the House Elections
15  Committee in 2013?
16     A.  No.
17     Q.  Do you know if there were any committee
18  hearings held in 2013 about voter ID?
19     A.  I don't know.
20     Q.  Do you know if there were any bill proposals?
21     A.  I don't know.
22     Q.  Did you raise any bill proposals about
23  modifying SB 14 in any way?
24     A.  No.
25     Q.  Are you aware of any cases of in-person voter

---

138

1  impersonation that occurred in Texas during the 2012
2  presidential election?
3          MS. DONNELLY:  Objection.  Form.  I
4  think that's been asked and answered.
5      A.  Not -- not that I recall.
6      Q.  (BY MR. FREEMAN)  Are you aware of any other
7  cases of in-person voter impersonation that occurred
8  in Texas between May 2012 and June 2013?
9          MS. DONNELLY:  Objection.  Form.
10     A.  I don't know.
11         MR. FREEMAN:  Okay.  That's all I have.
12  Pass the witness.
13         THE WITNESS:  Okay.
14         MS. DONNELLY:  Want to take a quick
15  break before we turn you over to this last lady?
16         MS. FARANSSO:  Actually, I'll be very
17  quick.
18         THE WITNESS:  I'm good.
19         E X A M I N A T I O N
20  BY MS. FARANSSO:
21     Q.  Just a couple of quick questions.
22     A.  Okay.
23     Q.  And again, Representative, my name is Tania
24  Faransso of WilmerHale, and I'm here on behalf of the
25  Texas League of Young Voters Education Fund.  I'll

---

139

1  make this very quick so you'll be able to make it to
2  your game or to watch your game.
3          If you could actually take a look at Exhibit
4  165.
5      A.  The e-mails?
6      Q.  It wasn't the e-mails, it was the OTB
7  resolution document.
8      A.  Okay.
9      Q.  And if you just turn to the page labeled 5 at
10  the bottom.
11     A.  Okay.
12     Q.  And I believe we looked at this a bit earlier
13  today.  It's one of your general Q and A questions and
14  answers.  And the question at the top of the page is:
15  "Isn't bill" -- referring to Senate Bill 14 -- "Isn't
16  bill now more restrictive than Indiana's or Georgia
17  Law?"
18         If you look at the second paragraph there, it
19  says:  "Plus, it complies with the Supreme Court
20  decision because it offsets the new requirements on
21  voters by" -- and then it provides a bullet-pointed
22  list, and the first bullet you see there reads:
23  "Providing access to free photo ID cards"?
24     A.  Yes.
25     Q.  And then do you also see the third bullet

---

140

1  that says:  "Ensuring that obtaining photo ID is no
2  more burdensome or inconvenient than the usual act of
3  voting"?
4      A.  Yes.
5      Q.  Are you -- with respect to the first bullet,
6  providing access to free photo ID cards, are you or
7  were you aware at the time during the debate on SB 14,
8  of what documentation would be required to obtain this
9  free photo ID card?
10     A.  No, I don't recall.  But I also wanted to say
11  earlier, when we were talking about this out-of-bound
12  resolution, I said this was my first one to do, I
13  don't actually draft the out-of-bound resolutions.
14     Q.  Understood.
15     A.  Since he was talking about bill drafting,
16  they're drafted by the leg' counsel, too.  But it was
17  the first time I had laid out an out-of-the-bound
18  resolution that I remember on a bill on the floor.
19     Q.  Thank you for clarifying that.  Understood.
20         Separate and apart from this out-of-bounds
21  resolution, would you have been aware at the time of
22  the documentation that would have been required to
23  obtain the free photo ID card?
24     A.  I may have, I just don't remember.
25     Q.  Were you aware of the costs in connection

141

1   with obtaining that underlying documentation to obtain
2   a free photo ID card?
3           A.   I -- I don't recall.
4       Q.   Do you recall that there was any debate or
5   quantification of the costs of obtaining such
6   documentation during the house debate on Senate Bill
7   14?
8           A.   I know we had debate on making sure that the
9   election card was free of charge, and where that money
10  would come from that it cost the Department to do
11  that.  That's...
12      Q.   But you don't recall specific debate about
13  the underlying documentation needed to obtain that
14  free ID card?
15          A.   I don't.
16      Q.   Would information about the costs for an
17  individual to obtain a free photo ID card have been
18  useful in assessing whether obtaining that photo ID
19  was burdensome or not?
20          MS. DONNELLY:  Objection to the form.
21          I think we also clarified when we
22  shifted from Mr. Freeman to -- to you, Counsel, that
23  the running objection --
24          MS. FARANSSO:  Yes.
25          MS. DONNELLY:  -- is still running at

142

1   this point.
2           MS. FARANSSO:  That's correct.  That was
3   my understanding.
4           MS. DONNELLY:  That's the understanding
5   of all counsel?
6           MR. ROSENBERG:  Yes.
7           MS. FARANSSO:  That's correct.
8       Q.   (BY MS. FARANSSO)  You can answer.
9           A.   I don't recall the question.  I'm sorry.
10      Q.   That's all right.
11          MS. FARANSSO:  Could you read back?
12          THE REPORTER:  "Would information about
13  the costs for an individual to obtain a free photo ID
14  card have been useful in assessing whether obtaining
15  that photo ID was burdensome or not?"
16          A.   I can't answer.
17      Q.   (BY MS. FARANSSO)  What would you define to be
18  a permissible burden in terms of the -- of what an
19  individual would need to do to be able to vote?
20          MS. DONNELLY:  Objection.  Form.
21          A.   I think voting is sometimes burdensome.  I
22  voted in three locations on May 27th for three
23  different elections, so, you know, it's -- it's not
24  easy, but it's our responsibility.  I take it
25  seriously.

143

1       Q.   (BY MS. FARANSSO)  Would you agree that if an
2   individual was required to obtain documentation in
3   order to even be able to vote, that that could
4   possibly impose a burden on certain individuals?
5           MS. DONNELLY:  Objection.  Form.
6           A.   I can't speculate that that person doesn't
7   already have that documentation or that ID.
8           MS. FARANSSO:  I think I have no more
9   questions, unless anyone else does.
10          MR. FREEMAN:  Why don't we break for
11  just a couple minutes to make sure.
12          (Break.)
13          MS. FARANSSO:  We pass the witness.
14          MR. KEISTER:  We'll reserve.
15          MS. DONNELLY:  And the running objection
16  has finally run its course.
17          (Deposition concluded at 1:27 p.m.)
18
19
20
21
22
23
24
25

144

1           REPORTER CERTIFICATION
2   THE STATE OF TEXAS :
    COUNTY OF HARRIS :
3
4       I, DENYCE SANDERS, a Certified Shorthand
    Reporter and Notary Public in and for the State of
5   Texas, do hereby certify that the facts as stated by
    me in the caption hereto are true; that the above and
6   foregoing answers of the witness, REPRESENTATIVE
    PATRICIA HARLESS, to the interrogatories as indicated
7   were made before me by the said witness after being
    first duly sworn to testify the truth, and same were
8   reduced to typewriting under my direction; that the
    above and foregoing deposition as set forth in
9   typewriting is a full, true, and correct transcript of
    the proceedings had at the time of taking of said
10  deposition.
11      I further certify that I am not, in any
    capacity, a regular employee of the party in whose
12  behalf this deposition is taken, nor in the regular
    employ of his attorney; and I certify that I am not
13  interested in the cause, nor of kin or counsel to
    either of the parties;
14      That the amount of time used by each party at
    the deposition is as follows:
15
        MR. ROSENBERG - 01:30:09
16      MR. FREEMAN - 01:21:56
        MS. FARANSSO - 00:05:32
17
        GIVEN UNDER MY HAND AND SEAL OF OFFICE, on
18  this, the 23rd day of June, 2014.
19
20
        DENYCE SANDERS, CSR, RPR, CRR, TCRR
21      Notary Public in and for
        Harris County, T E X A S
22
    My Commission Expires: 4-14-17
23  Certification No.: 4038
    Expiration Date: 12-31-15
24  U.S. LEGAL Support, Inc./Firm No. 122
    363 N. Sam Houston Parkway, 12th Floor,
25  Houston, Texas  77060; 713.653.7100

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL
6/20/2014

1

**A**

**$2,024,000** 45:23
**a.m** 2:7
**ability** 29:5
**able** 17:17 123:18
    126:19 139:1
    142:19 143:3
**above-styled** 2:6
**absent** 70:8 86:19
**absentee** 23:22 44:8
    44:12,17 45:8
**absolutely** 19:13 38:2
    77:19
**academic** 46:23
**accept** 63:18 102:5
**acceptable** 74:3,7,12
    95:25 96:5 105:2,14
    106:11 108:22
**accepted** 59:10,15
**access** 52:20,23
    133:11 139:23
    140:6
**account** 53:3 129:8
    129:12
**accounts** 12:15,18
**accurate** 66:10
    118:25 132:25
    133:2
**act** 77:11 80:4,7
    135:18 136:3,5,9,12
    136:19,24 140:2
**Action** 1:4,11
**actively** 110:7
**Acts** 78:8
**add** 72:3,17 73:12
**added** 35:11 58:4
    94:24
**addition** 48:19
**additional** 62:22
    71:17 92:5,6,10
    136:8
**Additionally** 78:17
**address** 44:12 129:14
    129:15
**addresses** 35:10
**addressing** 101:23

102:2
**administering** 59:4
**adversely** 29:10
**advice** 78:7
**advised** 39:20,24
    40:17 47:16,20
**Affairs** 78:11
**affidavit** 68:17
**affidavits** 102:5
**affirmation** 8:8
**African** 28:21 29:10
**African-American**
    28:8,16 90:4 95:9
    95:12 115:4
**African-Americans**
    29:6 31:24 33:2
    80:23 81:11
**afternoon** 10:10
**age** 66:13,18 99:19
**agencies** 31:8 34:2
**agency** 31:10 69:8
    121:9
**ago** 12:24
**agree** 18:2 40:9 62:19
    62:23 79:22 80:23
    85:5,14 104:2
    113:11 119:22
    122:7 125:14 143:1
**agreed** 37:22
**agreement** 40:11,12
    85:8,11
**ahead** 34:19 44:25
    45:11 59:6 86:14
    92:20
**al** 1:3,5,10,14,17 6:19
    6:24
**alleged** 136:11
**allowed** 62:23 63:5,8
    63:11 104:14
    130:17
**allowing** 75:1,12
**alluded** 39:3
**amendment** 66:6,8
    66:11,22 68:4,7,9
    68:11,14,16,22 69:5
    69:17,21,24 70:1,17

70:22,25 71:2,8,14
    71:16 72:2,3,16,24
    73:3,6,11,12 74:10
    96:10,21 99:7,9,11
    99:15,18,23 100:4,7
    100:9 125:18
**amendments** 67:24
**AMERICA** 1:7 3:2
**American** 2:4 3:8
    28:22 96:19 109:19
**Americans** 29:11
**amount** 144:14
**analysis** 29:19 30:6
    30:18 89:4 116:15
    116:17 118:2,8,16
    119:9 122:21,23,25
    124:6,9,15,21
**analyze** 116:14
**Anchia** 28:20 29:4
    39:1,10,13 41:3
    43:23 45:14 46:20
    47:7
**Anchia's** 47:14
    111:11
**anecdotal** 41:7
**Anglo** 114:14 115:5
**Ann** 6:18,20,23
    115:23 117:2 120:9
    120:25 121:17
**answer** 9:5 14:11,11
    14:19,24 15:2,21,22
    16:2,8 18:14,18
    21:6,14 23:1 26:13
    28:25 39:6,12,20
    40:3 41:8 47:1 54:7
    60:21 62:8 75:8
    76:4 77:23 84:1
    85:3,4,4,19 89:9
    90:8 121:6 123:18
    142:8,16
**answered** 9:20 15:23
    42:10 44:3 45:22
    103:12 138:4
**answering** 16:7
**answers** 19:23,25
    61:4,14 77:20

139:14 144:5
**anticipate** 61:12,14
**anybody's** 110:25
**anymore** 107:25
**apart** 140:20
**apologies** 122:2
**appeals** 81:21
**appear** 124:21
**APPEARANCES** 5:5
**applicants** 119:3,6
**applied** 19:25
**applies** 14:18 77:17
**appreciate** 117:10
    120:7
**approximately**
    103:21,24
**apt** 42:24
**area** 95:7 96:14,19
    135:9
**argue** 131:25
**argued** 36:6,7
**arguing** 130:23
**arguments** 113:1
**arrived** 98:11 114:22
**article** 6:15 101:1,7
    102:16,18
**aside** 97:10
**asked** 16:25 40:20
    42:5 61:3,13,22
    97:24 99:2 103:11
    116:17 120:9,15
    122:3,8,16 124:15
    135:2 138:4
**asking** 11:22 18:1
    21:6 26:22 72:9
    92:23 100:15
    118:15
**asks** 39:1,18
**assert** 39:25
**asserted** 17:15 32:25
    89:13
**asserting** 15:12 17:13
    17:25 33:11
**assertion** 14:16 50:11
    63:19 129:16
**assertions** 29:3

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL

6/20/2014

2

**assessing** 141:18
142:14
**assistance** 35:9 108:4
**Associated** 77:6
**ASSOCIATION**
1:12
**assume** 12:12 15:23
52:1 57:16 66:21
96:12
**assuming** 50:10
**attached** 2:13
**attachments** 116:6
**attention** 38:25 43:22
45:13 46:19 54:14
59:18 62:6 64:3
65:15 66:4 68:3
69:5 77:14 84:19
**attorney** 2:9 3:21 4:3
11:20 49:12 76:24
144:12
**Austin,Texas** 4:4
**author** 101:13
**authors** 102:15
**available** 47:23
**Avenue** 3:4,16
**aware** 11:21 13:6,11
20:5 26:15 28:2
29:2 30:18 32:10,24
33:19 34:5 47:7,14
54:10 73:25 74:5,9
80:18,20 81:19
85:24 114:18 123:6
123:12 137:25
138:6 140:7,21,25

**B**
**B** 78:5
**back** 12:20 16:18
37:25 40:7 61:20
62:6 64:5,23 77:10
87:24 88:1 92:25
98:17 113:1 125:20
128:14 129:23
132:5 135:7,11,14
135:17,21 142:11
**bad** 65:2

**Baker** 87:12 101:14
101:17 102:12
**balance** 42:18
**ballot** 44:17 45:9
104:15 112:19
114:15,16 133:11
**ballot-by-mail**
129:19
**ballots** 23:22 43:25
44:9,12 114:19
128:23
**baseball** 82:9 87:22
**based** 14:25 15:2
36:13 127:7
**basis** 17:9 24:3 46:16
56:12 66:1 86:1,10
86:18 89:3,6,13
103:1,9,23 104:2
**Bates** 54:15 64:6
90:13
**becoming** 19:19
**beginning** 97:11
105:24
**begins** 45:15 68:8
77:24 101:23
**behalf** 49:12 138:24
144:11
**belief** 86:11
**believe** 27:1,5,9,12
53:13 67:19 81:10
86:22 88:25 89:6
90:14 91:14 102:20
106:10 107:13,18
134:20 135:3
136:20,22 139:12
**believed** 27:4
**believing** 86:1,19
**beneficial** 93:6
**BERRY** 4:1
**best** 16:7 82:9 131:23
**better** 26:13 125:7
**betting** 57:13
**Beuck** 6:14,20 78:6
108:3,13 109:14
122:24
**beyond** 23:15 47:8,15

**big** 98:18 128:15
132:6
**bill** 6:17 11:3,4 13:25
14:3 17:3 29:21
32:11 33:14,14 39:4
43:24 44:3 45:20,23
46:8,22 57:21 58:1
58:2,4,5 60:13 61:9
61:11,19 62:9 63:10
65:22 66:17,22 68:2
78:8 82:17,22 83:4
83:10,19,23 84:4,10
88:9,15,18 89:13,24
90:5,12 92:2,7,12
92:18 93:2,7 94:13
97:12,18,20,22 98:2
98:6 101:10 104:11
104:14 105:12,15
105:17,19,23,24
106:5 108:5,14,18
108:20 110:4,7
111:5,6 113:20,21
123:4,8 126:21
128:22 134:3,4,9,9
135:1,22 136:1,2,3
136:8,16,18,21
137:20,22 139:15
139:15,16 140:15
140:18 141:6
**bills** 13:6,8,12,13,15
33:16 102:5 108:7
111:1
**bipartisan** 133:10,18
**birth** 99:13
**bit** 139:12
**blast** 35:2
**block** 17:10,24
**board** 133:23
**boarding** 133:12
**body** 45:16
**bold** 60:13
**Bonnen** 66:6
**Borris** 94:25
**bother** 59:13
**bottom** 65:5 68:7
99:7 100:6 107:6

139:10
**bounds** 57:17,17,18
57:25 58:3,7 61:16
**Box** 4:4
**Branches** 2:3 3:8
**break** 9:14,16 37:12
38:4 81:25 82:2,3
87:25 98:10,13,16
104:9 138:15
143:10,12
**Brennan** 27:16,19,24
112:1,4
**brief** 6:13 78:1
**broad** 22:25
**build** 22:18
**bullet** 60:3 139:22,25
140:5
**bullet-pointed**
139:21
**burden** 32:25 142:18
143:4
**burdens** 32:12
**burdensome** 140:2
141:19 142:15,21
**business** 35:13 72:21

**C**
**C** 3:1 78:5
**calculation** 118:20
**call** 21:11,25 22:1
114:6
**called** 35:8 87:10
**calls** 14:8 85:1
**campaigns** 81:20
**Canada** 132:14 133:2
**canceling** 114:1
**Candace** 6:8
**capacity** 144:11
**Capitol** 4:4
**caption** 144:5
**card** 39:16,17 72:4
72:18 73:13 74:2,7
74:13 75:3,13,23
91:6,22 107:8
118:13,18 140:9,23
141:2,9,14,17

3

142:14
**cards** 116:13 117:20
  139:23 140:6
**career** 84:5,11
**Carnegie** 3:10
**carried** 82:16 83:10
  83:14 84:17
**carry** 20:3 91:25
**carrying** 23:13
**Carter** 87:13,14
  101:14,16 102:11
**Carter-Baker** 87:4,7
  87:11 112:7,11
  133:19
**case** 9:4 10:19,21
  49:6 79:14 115:4
**cases** 41:7 137:25
  138:7
**cash** 134:1
**cashing** 133:13
**cast** 104:15 112:18
  114:15,19
**category** 62:22
**Caucus** 2:4 3:8
**cause** 2:6 144:12
**cc** 78:18
**CCR** 94:8,10
**ceases** 19:7
**Center** 3:10 27:16,19
  112:1,4
**Center's** 27:24
**certain** 30:7,12,14,19
  32:12 61:13 77:5,11
  133:22,25 134:25
  143:4
**certainly** 38:21 51:7
**certificate** 58:23 72:5
  99:14
**Certification** 5:13
  144:1,23
**Certified** 144:3
**certify** 144:4,10,12
**chain** 78:5
**challenging** 22:19
**Chamber** 78:11 79:9
**chance** 122:17

**change** 21:5 45:20
  132:1
**chapter** 69:11,13
**charge** 69:9 141:9
**check** 42:18 56:3,13
  56:17 131:5 133:13
  134:1
**chief** 12:12 78:6,13
  94:4 108:4
**chosen** 76:6
**CHRISTI** 1:2
**circumstance** 108:16
  123:6,12
**circumstances** 19:19
**citizen** 131:6
**citizens** 103:21,24
**citizenship** 88:9,15
  88:19 130:17,24
  131:4,9,10,15
**Civil** 1:4,11 2:11 3:4
**clarified** 141:21
**clarify** 9:12 88:14
**clarifying** 140:19
**clarity** 9:21
**clear** 14:24 15:11
  18:20 51:8 57:1
  86:25
**clearly** 15:1
**Clerk's** 55:24,25
  56:10
**clue** 119:18 127:18
  130:14
**code** 135:10
**Colby** 6:14,20 78:6
  94:4 108:3 115:24
  117:2
**colleagues** 28:12
**collected** 12:10 35:11
**colloquy** 16:19 39:10
**come** 16:24 19:15
  25:11 26:4 28:18
  35:8 37:25 40:17
  87:24 111:22
  141:10
**coming** 16:15
**comments** 58:11

**Commerce** 78:11
  79:9
**commission** 87:5,8
  87:11,11 112:7,11
  133:10,18,19
  144:22
**COMMISSIONERS**
  1:13
**committee** 20:6,9,12
  20:15,18 27:21
  28:13 31:7 36:9
  38:24 47:2 57:22
  61:19 67:21 78:11
  94:11,17 96:4 99:3
  106:24 111:18
  112:16 114:5,7,10
  114:12,17 120:1,8,9
  120:24,25 122:7
  124:16 137:11,15
  137:17
**communications**
  15:5 18:15 20:2
  26:14 33:6 50:20,22
**community** 95:12
**complaints** 34:8 56:1
**complete** 136:2
**completely** 15:23
  16:7
**complies** 134:4,9,20
  135:22 136:4,9
  139:19
**comply** 134:7
**composed** 20:7
**composition** 20:18
  31:12
**concern** 17:22 24:4
  110:1,6,22
**concerned** 23:19,21
  23:24 24:9 103:20
  110:25 114:1
**concerning** 24:14
  25:3 67:12 88:18,24
  89:4 97:18 116:12
**concerns** 95:21 110:8
  110:10 111:1,4,7
  127:25

**concluded** 133:11
  143:17
**conference** 2:3 3:8
  57:21,22 94:11,14
  94:17 96:4 99:3
  125:20
**confidence** 42:19,20
  42:23
**confidential** 1:19
  48:17,18,20,22,23
  48:25 49:7,8,11,12
  49:13,15,25 50:3,5
  51:6,7,19 57:4
  63:16,18 76:15
  78:21 93:16,20,23
  100:16 115:14
  116:24 119:16
  123:24
**confidentiality** 49:6
**confirm** 104:17
**confusing** 90:15 91:9
  91:15,23
**confusion** 90:22
**connection** 12:16
  27:17,24 29:4,8
  48:2 58:7 140:25
**consecutive** 70:10
**consider** 20:22,24
  21:23 22:2 31:16
  93:6 102:10
**consideration** 27:18
  29:9 38:22 40:20
  126:17
**considered** 13:7
  20:20 49:1 102:13
  128:7
**considering** 102:6
**constituent** 49:1
  52:15 92:22 128:20
  132:13,20 133:16
**constituent-driven**
  35:20
**constituents** 25:3,11
  25:13 34:9,23,25
  35:1,7 50:20 92:7
  92:17 105:19 106:4

REPRESENTATIVE PATRICIA HARLESS                                6/20/2014
HIGHLY CONFIDENTIAL

4

128:6,10 129:4
130:22 131:17
132:24
**Constitution** 134:5,7
134:10,21 135:3,12
**constitutional** 62:15
62:16 103:16
**Consumer** 3:22
**contacted** 35:19
55:24 56:9
**contain** 78:21 126:2
**containing** 78:6
**contains** 72:18 73:15
74:13 75:3,13,25
125:22
**content** 32:16,22
**context** 66:14
**continuation** 77:21
**continue** 40:4 51:10
91:10,14 111:3
125:6 128:23
**continues** 115:16
**continuing** 63:18
**contributors** 35:14
35:18
**control** 34:3
**convened** 137:12
**conversation** 22:22
93:21
**conversations** 18:15
23:8,12 25:15,20,24
26:6
**copied** 115:25
**copies** 11:14 78:1,18
121:22,24
**copy** 11:3,11 70:4
76:18 98:5 130:1
**corner** 42:16 43:23
54:16
**CORPUS** 1:2
**correct** 8:5,14 39:5
48:15,16 49:23 57:2
57:3 68:19 73:18
86:6 87:2,19 88:8
94:14,22 95:15 96:8
96:14,16 97:13

98:22 99:16,20
104:9 105:5,20,23
117:13,22 125:16
127:24 131:2,14,16
142:2,7 144:8
**correctly** 33:25 103:4
103:15
**cost** 141:10
**costly** 102:9
**costs** 140:25 141:5,16
142:13
**council** 78:4
**counsel** 14:14,19
40:5,11 48:8,13
57:2 63:16 77:16
85:5,11 93:15 98:5
100:14 104:17
108:6,9 134:11,13
134:24 135:21
136:1,14,17,20
140:16 141:22
142:5 144:12
**counts** 42:23
**County** 1:13,13
55:24,25 56:10
144:2,21
**couple** 21:17 39:2
52:9 82:13 117:7
138:21 143:11
**course** 28:14 72:20
76:21 91:20 143:16
**Court** 1:1 43:13
139:19
**Court's** 14:12 49:21
50:9,10 51:2 57:6
100:17
**coverage** 83:24
**covered** 14:9 15:20
19:23 50:9 85:2
**covers** 50:25
**craft** 108:18
**criteria** 124:24 125:8
**CRR** 2:8 144:20
**CSR** 2:7 144:20
**currently** 125:22
**CUTLER** 3:16

**cutoff** 18:24
**Cy-Fair** 78:10 79:9

───────────────
            **D**
───────────────

**D** 3:11 58:21 78:5
**D.C** 3:5,17
**Daniel** 3:5
**daniel.freeman@u...**
3:6
**data** 116:14
**database** 35:6,11
117:6
**date** 99:13 102:17
107:11 144:23
**dated** 116:8 117:3
130:11
**day** 91:25 127:13
144:18
**days** 63:11 107:4
**DC** 137:2
**dead** 55:5,5,11
**deal** 38:21
**dealing** 22:8 23:17,21
68:4
**deals** 39:4
**dealt** 44:9 68:16
**debate** 28:6,11 29:13
29:15,16 32:15,21
32:22,24 40:25 75:9
75:16 76:5 83:11,19
87:5 89:11 127:1
140:7 141:4,6,8,12
**debated** 61:18
**debates** 28:15 32:10
61:12
**December** 78:12 79:9
**deceptive** 132:16
**DECHERT** 3:10
**decide** 15:8 19:10
37:20 59:14 111:3
**decision** 137:4
139:20
**declared** 21:19 82:17
82:24 83:6
**decline** 14:24
**decrease** 34:12

**DEFENDANT** 3:14
**Defendants** 1:6,17
3:20 4:1
**Defense** 109:19
**Defense-issued** 109:6
**define** 142:17
**degree** 133:12
**deleted** 66:11,22
**demanding** 102:7
**democratic** 128:21
**Denyce** 2:7 144:3,20
**department** 3:3 4:1
72:6 103:6,15 107:9
109:6 122:20
141:10
**deposed** 8:14,16,17
9:18 10:20
**deposition** 1:22 2:1
5:2 6:2 9:20,25 10:5
10:15,19 87:19
143:17 144:8,9,11
144:14
**Dept** 116:14
**describe** 39:13 94:7
**described** 79:12
118:3
**description** 6:4
118:11 129:16
**designate** 19:4
**designated** 49:11
115:14 116:23
**designation** 78:3
**details** 118:24
**detect** 41:10
**deter** 41:10
**determine** 46:24 47:3
47:23 120:12 121:2
122:9,12 126:19
**Dewhurst** 22:11,23
**difference** 24:25
128:9
**differences** 57:23
63:1 94:8
**different** 31:17 49:6
62:18 80:18 92:2
97:1,3 106:5 112:22

REPRESENTATIVE PATRICIA HARLESS                                    6/20/2014
HIGHLY CONFIDENTIAL

5

118:4 125:1 142:23
**difficult** 27:10 32:18
  102:9
**diligence** 131:25
  136:15
**direct** 38:25
**direction** 144:7
**disabled** 93:3
**disagree** 103:2,9,23
  104:2
**disagreements**
  112:21
**disasters** 59:25
**discretion** 59:9,13
**discrimination** 79:18
  79:23 80:13,21,24
  81:6,12
**discriminatory** 36:17
  36:22 80:8 102:10
  102:13,21 103:10
  103:17
**discuss** 33:6 97:23
**discussed** 16:25
  98:20 104:9 112:6
  125:19 133:20
**discussing** 87:4
**discussion** 22:15,16
  22:20 24:12,19
  59:24
**discussions** 20:17
  22:6,10 24:16,22
  25:2,18 78:22 97:25
**disproportionate**
  114:11
**distance** 65:6
**district** 1:1,1 34:10
  35:12 84:18 95:13
  96:14 127:22
**Division** 1:2 3:4,22
  4:3
**document** 11:10,16
  26:21 38:8,12,15,16
  38:20,21 41:24
  52:12 54:17,22
  55:19 57:1,4,4 58:9
  58:15 61:2 62:1

63:22 64:13,18 67:4
  67:9,11,17 69:10,11
  70:5 76:14 77:2
  78:4 88:5 93:14,16
  93:22 97:10 100:13
  100:15,20 104:20
  115:13,13,14,20,22
  116:22 117:1,18
  118:11 119:14,17
  123:23,23 124:1,3,5
  125:6,25 126:24
  127:19 130:5,7,9
  132:10,18 139:7
**documentation** 62:24
  130:16 140:8,22
  141:1,6,13 143:2,7
**documented** 41:7
  42:20 43:5,9,19
**documents** 10:14
  11:2,19,22 12:6,7
  12:10,14 37:12
  48:12,14,21,21
  49:22 50:4,5,14
  51:2,14,23 77:12,25
  78:1,4,12,16,18,21
  79:4,6,12 91:7,8
  102:6 105:1,5,8,13
  106:11
**doing** 15:1 17:8,10
  42:7 76:25 128:23
**Donnelly** 3:23 13:17
  13:19 14:7 15:4,16
  16:1,6,10,14 18:2
  18:10,13,17 19:1,9
  19:21 21:5 22:12,17
  22:21 23:1 24:5
  26:20 27:8 28:4,10
  28:24 29:12,22 30:2
  30:21 32:1 33:4
  34:18 37:14,19,21
  37:25 38:3 39:25
  40:7 41:20,24 42:4
  42:13 44:14,24
  45:10 47:10 48:3,8
  48:13 49:18 51:15
  51:20 52:4 54:6

56:25 57:6 59:5
  60:11 62:11 63:15
  63:20 67:14,16
  68:23 71:22 72:9
  73:8,23 74:24 75:5
  75:7,17 76:3,21,25
  77:16,20 80:1,10,14
  81:1,7,13,22 82:20
  83:12,25 84:6,12,25
  85:10,13,18 86:13
  88:4 89:8,15,17
  90:7,24 92:14,19
  93:15,18,21 94:1
  96:23 98:14,23
  100:14 102:23
  103:3,13 104:1,17
  104:22 110:9,24
  113:6,14 115:8,18
  117:21,23 118:5,14
  121:4,24 124:11,18
  126:9,23 127:11
  129:24 130:18,25
  132:17 137:5 138:3
  138:9,14 141:20,25
  142:4,20 143:5,15
**DOOR** 3:16
**doubt** 120:6
**DPS** 58:21,22 59:3,9
  59:10,13,17 70:9
  71:4,19,24 116:13
  117:13,20 118:18
  124:21 125:11
  126:5,8
**DPS-issued** 120:13
  121:3 126:20
**draft** 109:17 135:1,2
  140:13
**drafted** 136:16,21
  140:16
**drafters** 136:1
**drafting** 26:10 108:5
  108:12 134:22,24
  136:2 140:15
**drafts** 108:6
**drive** 32:19 65:6
  107:25

**driver's** 59:11,14
  63:6,9 65:8 102:4
  103:22,25 107:7,13
  107:19,25 117:12
  117:19 118:12,17
  118:21 120:12
  121:2 122:10,11,13
  122:14
**Drivers** 117:5
**driving** 71:3,18,24
**due** 131:24 136:14
**duly** 2:5 8:2 144:7
**Duncan** 54:25
**duties** 59:17
**Dutton** 72:2 73:11

**E**
**E** 3:1,1 8:9 78:5 82:6
  138:19 144:21
**E-D-M-I-S-T-O-N**
  78:19
**e-mail** 6:14,18,20,23
  7:1 12:15,18 35:2
  35:10,11 52:16,17
  52:18,21 53:3 94:4
  94:6 115:23 116:6
  116:11 117:2
  130:10,10,11,15,23
  132:19,19,22,23
**e-mails** 34:23 128:15
  132:7 139:5,6
**earlier** 9:2 29:24
  92:21 107:10
  125:19 127:20
  133:20 139:12
  140:11
**easily** 65:18
**easy** 142:24
**Edmiston** 78:19
**educate** 132:2
**education** 1:9 46:9
  73:15 75:24 81:12
  94:18 109:19
  138:25
**effective** 106:12,14
**effectively** 41:10

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL

6/20/2014

6

**effects** 111:20
**efforts** 94:18
**either** 24:23 25:10
  42:11 65:17 74:1
  114:19 130:22
  144:13
**El** 96:14,19
**elderly** 93:3,10 98:21
  99:2
**elected** 35:10
**election** 31:21 32:7
  35:4 42:20 58:23
  70:7 87:13 88:11
  111:6 114:20
  133:11,19 138:2
  141:9
**elections** 25:12 42:16
  127:21 130:17
  137:14 142:23
**eliminate** 93:9
**Ella** 78:19
**email** 78:5
**emails** 78:12
**emergency** 21:8,10
  21:12,19 22:5 82:18
  82:24 83:7
**emergent** 21:24 22:2
**employ** 144:12
**employed** 78:20
**employee** 72:18
  109:2,9 144:11
**employer** 70:6,7
  72:19
**employer's** 72:20
**employment** 70:5
  80:24
**enacted** 44:23 45:5
  89:24 90:6
**enactment** 23:18
  25:6 30:6
**endorsed** 54:4
**ensure** 86:5 132:15
  132:25 134:4,9
  135:22 136:3,8
**ensuring** 87:1 140:1
**entire** 19:8 119:4

**entirety** 124:1
**entitled** 15:7 77:4
**environment** 27:9
**equal** 21:2 36:20
**equally** 21:7
**establish** 90:22
  105:14 106:13,15
  107:15
**establishes** 107:20
  131:8
**estimates** 126:7
**estimation** 119:10
**et** 1:3,5,10,14,17 6:19
  6:24
**ethnic** 31:18
**events** 38:18
**everyday** 91:20
**evidence** 42:21 43:5
  43:9,19 92:10
**exactly** 40:15 48:23
  91:10
**example** 32:19 62:19
  63:6
**exception** 15:5 16:6
  18:17
**exceptions** 93:2
**Excerpt** 6:21
**exchange** 7:1
**excluding** 82:16,23
  83:9,18,22
**Excuse** 67:15
**execution** 68:16
**exempted** 66:17
**exemption** 59:24
  66:11 93:10 98:21
  99:18 125:15,23
  126:2
**exercise** 50:8
**Exhibit** 6:1 11:8,11
  38:5,7 48:10,12
  51:20 56:20,22
  63:12 66:24 67:1,2
  76:11,13 88:1,2
  93:12 98:18 100:11
  100:13 104:5,6,11
  115:11,13 116:21

117:8 119:13,15
  123:21,23 128:14
  130:3,5 132:5 139:3
**exhibits** 94:2 130:2
**exist** 97:4
**expect** 92:8
**expectation** 58:21
  59:3,8
**expected** 61:3 92:17
**expeditiously** 9:22
**experts** 111:19
  112:22
**Expiration** 144:23
**expired** 63:5,8,11
  107:3,10,10,14,19
  107:23
**Expires** 144:22
**explain** 62:2 131:20
**explained** 14:14
**extent** 14:8 44:22
  45:4
**Ezra** 3:11
**ezra.rosenberg@d...**
  3:12

———————————
**F**

**F** 78:12,16,18
**facility** 32:20
**fact** 39:3 106:12
  115:3 118:19
**facts** 144:4
**factual** 89:12 103:9
**fair** 53:9,10 58:24
  84:3,9
**fall** 33:2
**familiar** 63:25 137:1
**far** 120:20
**Faranso** 3:17 5:8
  138:16,20,24
  141:24 142:2,7,8,11
  142:17 143:1,8,13
  144:16
**fat** 98:18
**fault** 76:23
**favor** 70:18,21 74:18
  99:23 100:3,9

130:23
**features** 93:7
**February** 116:8
  117:3 122:24
**federal** 2:11 109:1
  133:10,18 135:15
  135:22 136:9
**federally-issued**
  109:5
**fee** 69:9
**feel** 14:17 24:6 41:25
  42:5 67:6 132:18
**fewer** 97:6 107:4
**file** 100:23 101:2,8
  105:19 106:5 119:5
  120:11,12 121:2,2
  122:10,13 124:22
**filed** 13:8 17:3 24:1
  97:12 98:4 104:8
  105:16,23,24
**filing** 25:8,9,10
**fill** 108:10
**finally** 143:16
**find** 64:22 65:18
**fine** 15:24 19:13
  76:25 85:9 119:12
**finish** 33:14,14 53:1
**finished** 21:13
**Firm** 144:24
**first** 8:2 9:24 10:18
  10:25 12:19,21 14:5
  16:22,23 26:22
  45:15 46:20 52:20
  54:21 55:18 57:12
  58:19,20 61:8 76:16
  79:5 82:13 87:20
  88:2,6 90:4 103:19
  113:10 118:25
  120:16 121:20
  122:1 128:15 133:9
  139:22 140:5,12,17
  144:7
**fiscal** 45:22
**Fischer** 74:11
**fit** 135:9
**five** 26:2,6 58:19

REPRESENTATIVE PATRICIA HARLESS                                    6/20/2014
HIGHLY CONFIDENTIAL

7

**floor** 13:14 14:3
    19:16,20 28:6,11
    36:9 38:18 61:3,13
    61:19,20 62:4 66:6
    66:7 67:12 68:1
    83:11,20 140:18
    144:24
**focus** 127:25 128:3
**focused** 129:17
**folder** 101:2
**folks** 108:1 122:14
**follow** 62:7,8 116:19
    123:2
**followed** 114:25
**following** 33:21 68:9
    70:3 115:12 116:22
    123:22
**follows** 8:2 72:4
    144:14
**foregoing** 144:5,8
**form** 13:17,20 21:22
    27:8 28:4,10,24
    29:12 32:1 34:18
    36:24 37:3,9 44:14
    44:24 45:10 53:14
    54:2,6 59:5 60:11
    71:17,22 72:17 73:8
    73:23 74:3,7,12,24
    75:2,7,17 76:1,2,3
    79:19,25 80:2,9,10
    80:14 81:1,2,7,8,13
    81:15,22,23 82:19
    83:12,25 84:6,12,13
    84:25 86:13,23 88:4
    89:8,15,17 90:7,9
    90:24 92:14,19
    95:25 96:5,23 98:23
    102:14,23 103:3
    104:1 108:22 110:9
    110:24 113:6,14
    115:8,9 118:5,14
    123:17 124:11,12
    124:17,18 126:9,22
    126:23 127:11,12
    127:15 131:8,10
    137:5 138:3,9

141:20 142:20
    143:5
**formation** 20:11,14
**former** 87:12,12
    101:16 102:11
    108:4
**forms** 30:8 31:3
    32:13 33:1 54:3,11
    59:9 73:12 97:3,7
    107:3 108:10
**forth** 54:4,11 61:2
    113:1 144:8
**forward** 67:19
**found** 80:6 101:7
    124:6 125:3 128:11
**foundation** 22:19
**four** 58:18 61:17
**fourth** 59:19
**France** 132:14 133:3
**frankly** 50:2
**Fraser** 23:6,9,12
**fraud** 6:21 23:19,21
    23:25 24:4 34:13
    39:4,7 41:11 44:4,5
    44:22 45:5,9 86:23
    106:25 111:18
    114:1,5 119:20,23
    119:25 129:5,16
    137:12
**free** 15:21 24:6 67:6
    132:18 139:23
    140:6,9,23 141:2,9
    141:14,17 142:13
**Freedom** 77:11
**Freeman** 3:5 5:7
    14:23 16:11 18:22
    19:5,13 40:14 82:5
    82:7,22 83:16,17
    84:3,9,15 85:9,23
    86:18 88:5 89:12,16
    89:19 90:11 91:2
    92:16,25 93:13,17
    93:24 94:3,6 96:25
    98:9,17,25 100:12
    100:18,19 102:17
    103:1,8,18 104:3,5

104:7,20,23 110:12
    111:2 113:9,16
    115:12,19 116:22
    116:25 117:22
    118:1,10,16 119:14
    119:17 121:14
    122:1 123:20,22,25
    124:14,20 126:13
    127:6,16 130:1,4,6
    130:21 131:2
    132:23 137:10
    138:6,11 141:22
    143:10 144:16
**Friday** 116:8 118:8
**front** 100:13
**fulfill** 105:10 134:12
**full** 144:8
**Fund** 1:9 109:19
    138:25
**further** 41:2 47:6
    144:10
**future** 114:6

_____

**G**
**G** 78:12,16,18
**Gamboa** 77:5
**game** 82:9 87:22
    139:2,2
**gather** 40:23
**gathered** 12:15
**gears** 48:4
**general** 3:21 4:3
    24:24 49:12 60:23
    114:20 127:14
    139:13
**general's** 2:10 11:20
**generally** 97:20
**Georgia** 43:7,9,14
    60:14 63:5 74:1
    89:4 90:3 102:7
    139:16
**Georgia's** 60:18
    62:10,16 63:2 89:23
    102:10,13,20 103:5
    103:10,14
**Georgians** 102:10

**Germany** 132:14
    133:3
**getting** 32:25
**give** 8:23 26:2 53:16
    62:4 131:17,24
**given** 21:8 40:17
    53:19 79:8 114:4
    144:17
**go** 9:19 14:4 16:20
    17:21 34:19 35:14
    37:12 44:25 45:11
    49:18 59:6 64:5,9
    64:15 86:14 88:1
    92:20 98:9,12
    101:22 116:10
    121:21 128:14,16
    132:5
**goes** 39:10 57:22,24
    64:16 118:23
**going** 8:23 9:3 11:15
    13:19 14:7 16:14
    17:6,23 19:3,21
    30:21 33:4 37:12
    39:25 40:16 48:4,23
    50:23 52:8 54:18
    93:18 106:7,8 113:4
    115:10 130:4
**Gonzalez** 96:7,11,13
**good** 8:11,12 11:14
    16:15 38:3 64:21
    98:15 111:5 138:18
**government** 78:11
    135:10
**governor** 21:10,19
    22:7,11,23 82:17,24
    83:6
**governor's** 22:7
**greater** 115:5
**Greece** 132:14 133:3
**grounds** 78:3 85:1
**group** 15:11 110:7,11
    128:21
**groups** 24:13,13
    26:10 28:3,22,22
    29:19 30:7,13,19
    31:18 92:22 111:4

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL                                        6/20/2014

8

129:4,13,17
guess 18:23 26:7 35:5
    42:9 58:22,25 68:2
    68:2 70:16 94:11,15
    95:16,17 99:21
    101:18,20 119:11
    121:8
guidance 62:4

                H
HALE 3:16
half 46:21
halfway 46:11
hall 25:21 92:22
hand 63:2 144:17
handed 41:25
handle 129:21
handling 27:1
handwriting 58:12
    58:14,16,17 64:25
    65:2
happen 39:19 136:15
happened 38:18
    106:7
happens 98:1
happy 98:12
Harless 1:23 2:2 5:3
    6:3,5,6,8,8,9,10,11
    6:13,14,14,15,17,18
    6:19,20,21,23 7:1,1
    8:1,11 11:8 14:15
    32:9 38:5,6 48:10
    56:20 63:12 66:24
    68:14 69:16 76:11
    77:7,17 78:13 79:16
    93:12 100:8,11,15
    104:6 115:11
    116:21 119:13
    123:21 130:3 144:6
Harless's 48:14,20
harms 111:8
Harris 55:24 56:10
    144:2,21
HB 97:15 106:23
    107:2
head 8:22 9:6 98:24

hear 92:6,16
heard 34:7,8
hearing 6:22 111:19
    112:16 119:20,23
    119:25 120:2,8
    124:16
hearings 120:24
    137:18
heavily 33:2
held 103:16 120:1
    137:18
help 34:15 131:18,19
helped 105:10 108:13
hereto 2:13 144:5
high 73:14 75:24
    84:16,18
high-profile 84:10
higher 49:10 73:14
    75:24
highly 1:19 48:18,19
    48:22 49:7,13 50:4
    51:7,19 57:4 63:15
    63:17 76:15 93:16
    93:20,22 100:16
    115:14 116:23
    119:15 123:24
Hispanic 1:13 28:17
    28:22 96:16,17
    115:4 128:3,21
    129:4,13,17
Hispanics 29:6,11
    31:24 33:3 81:4,11
history 79:17,22
Holder 137:2
hope 116:15
hot 98:12
hour 10:8 32:19
hours 28:5,5,11
    29:13,15 32:15,21
    70:10,11 106:7
    117:7,9
house 2:4 3:9 6:6,11
    6:17 17:2 19:16,20
    20:7 23:14 28:6,11
    38:10,17,18 57:23
    67:3,12,25 83:11,20

94:9 95:4,4,15,17
    136:17 137:14
    141:6
Houston 2:11 3:23
    78:10 79:9 95:6
    127:14 144:24,25
How's 19:11

                I
I.D 78:9 121:13
ID 13:1,16,16,25 25:4
    26:19 27:7,11 42:22
    43:12,16 56:2 58:23
    63:11 65:5,18 66:19
    70:9 71:17 73:12
    74:3,8,12 75:2 76:2
    85:22 87:13 88:12
    88:18,21 89:23 90:5
    90:15 91:5,7,14,19
    91:25 92:5,7,12,18
    92:24 96:1,5 97:4,8
    97:12 102:8,20
    104:8,16,16 105:8
    105:10,19 106:16
    106:19,21 107:22
    108:22,22 109:2,5,6
    112:24 114:15,23
    115:5 116:13 117:5
    118:22 121:3
    126:20 127:10,15
    130:24 131:8,10
    133:14,22 134:1
    137:18 139:23
    140:1,6,9,23 141:2
    141:14,17,18
    142:13,15 143:7
ID's 65:10
idea 17:1 55:14 91:23
identical 62:20
identification 13:6,25
    20:6 24:14 25:22
    27:3 30:8,14,20
    31:3 32:13 33:1
    46:25 47:24 53:14
    54:2,4,11 59:10,15
    62:21 69:10,12 72:4

72:5,17,18 73:13
    74:2,7,13 75:3,13
    75:23 76:1 78:2
    105:2 106:12,24
    107:3,8 111:18
    114:5 117:20
    118:13,18 119:2,6
    132:15 133:4
    137:11
identifications 29:20
    31:19 32:14
identify 38:8 52:14
    58:12 67:1 82:22
    83:4 106:21
identity 90:22 102:4
    105:14 106:13,15
    107:15,20
IDs 31:13 76:6 95:25
    96:4 109:9,12
    112:17 113:5
    120:13
ignore 43:24
III 101:15
immigration 88:10
    88:22
impact 29:5,10 31:24
    60:4 88:24 114:11
impersonation 39:3
    39:11,14 138:1,7
implement 34:16
implementation
    33:21 34:3,6,9,12
    114:25
implemented 33:25
implementing 56:2
importance 21:2
    82:14
important 9:5,10
    20:20,23,25 21:1,7
    31:17,20,23 32:5
    44:12 75:18 84:4
    98:21 99:4 128:7,12
    134:3,6
impose 143:4
in-person 23:24 24:4
    25:23 44:4,10,18,22

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL

6/20/2014

9

45:4 85:21 86:5,12
86:20,23 87:2
104:15 106:15
112:18 114:15,16
137:25 138:7
**include** 71:17 72:3
74:12 105:4,7
106:19 109:1,4,8,11
125:3 134:25
**included** 13:16,25
74:1,6 78:1 97:22
109:16
**includes** 70:5 102:7
108:21,24
**including** 22:7
**income** 94:19
**inconvenient** 140:2
**increase** 46:8,16 89:7
89:13
**increased** 90:3
127:21
**increases** 42:22
**INDEX** 5:1 6:1
**Indiana** 43:7,10,12
62:15 63:1 74:1
89:5
**Indiana's** 60:14,18
62:10 65:24 139:16
**indicate** 52:2
**indicated** 29:10
32:11 52:3 99:13
144:6
**indigent** 93:3 99:3
**individual** 65:17
75:12 108:17
113:24 133:10
141:17 142:13,19
143:2
**individual's** 107:15
107:20
**individuals** 31:2 75:2
99:19 104:15
114:18 117:19
125:23 127:8
132:24 143:4
**information** 14:8

17:11 30:12 31:2,5
31:12 33:7 35:12
40:18,23,24 41:8,16
41:17 49:2 55:14
70:6 77:5,11 78:22
81:9 85:1 89:20
102:24 119:8 121:8
123:3,7,10,14
125:13 128:11
129:20 131:17,24
132:3,4 141:16
142:12
**informed** 131:18,19
**informing** 45:20
**informs** 70:6
**initial** 67:18
**inject** 30:21
**input** 26:9 97:17
108:9,13
**insert** 70:2 71:3
**instance** 2:2
**institution** 69:8 73:14
75:24
**instruct** 15:18
**instructing** 18:13
**instruction** 8:25
**instructions** 109:15
**insufficient** 106:17
**integrity** 25:12 32:7
85:21 86:2,5,12,20
87:1,13 88:11 111:6
133:12
**intending** 9:19
**intent** 15:12 36:1,5,6
36:8,13,22 37:6,7,8
58:1
**interest** 33:24 127:21
**interested** 35:6 44:4
144:12
**interim** 26:3
**interrogatories** 144:6
**interrupting** 18:5
85:7
**Intervenors** 1:11,15
**introduced** 104:12
**involved** 20:11,14,17

**involvement** 14:5
16:22,23
**involving** 87:11
**Iraq** 132:15 133:3
**issuance** 69:9
**issue** 40:24 55:25
56:7 75:20 79:2
88:22
**issued** 71:3,18,24
72:5,19 73:13 74:14
75:4,14,23 107:8
116:13 117:19
118:18
**issues** 88:18 128:7,11
**issuing** 59:11

——————————
**J**
——————————
**J** 3:5
**James** 101:14
**January** 77:10 99:12
99:20 119:1,7
**Jersey** 3:11
**Jimmy** 87:13 101:14
**job** 131:25 132:2
134:18
**John** 115:25 116:4
**join** 80:1 84:7 103:13
**Journal** 6:6,11 38:10
38:17 67:3,25
**joy** 128:22 129:5,13
**JUDGES** 1:13
**Julie** 12:12 78:19
**jump** 98:17
**jumping** 128:22
129:4,13
**June** 1:24 2:6 5:3 6:3
138:8 144:18
**Justice** 3:3 103:6,16

——————————
**K**
——————————
**Karen** 6:23
**keep** 16:15 18:4 85:6
101:1 119:8 130:2
**keeps** 21:6
**Keister** 4:5 17:5,8,16
17:19,22 18:23 19:2

21:22 36:24 37:3,9
49:20,24 50:1,7,18
50:24 51:1,10,13
79:19,25 80:9,15
81:2,8,15,23 82:19
84:7,13 90:9 98:15
102:14 103:11
115:9 123:17
124:12,17 126:22
126:24 127:12
143:14
**kept** 60:4
**Kept/Modified** 59:21
**kin** 144:12
**kind** 134:19
**King** 24:17
**know** 8:18 9:15 12:13
12:14 13:13 14:2
16:13,17,23 17:3
18:6,9 20:16 21:15
22:20 26:8,12 27:15
28:5 30:11 31:7
32:6,21 33:13 34:14
35:21 36:15,25 37:4
37:10,16 38:14,15
40:22 41:1,4,16
42:11 43:7,11 44:15
45:25 46:3,21 52:13
54:8,25 55:21,22
56:9,12,16 57:9
59:12,17 61:5,20,22
61:23,23 62:25 63:8
64:1,2,13,18,22
65:3,7,12,19 66:1,7
67:5 69:25 71:23
72:12 73:2,9,20,24
74:21,25 75:16 79:4
79:12,15 80:3,11
81:3,14,16,24 82:21
85:19 89:19,23,25
90:1,10,25 91:25
95:13,17 96:15,18
96:20,21,24,25 97:3
97:6,15,25 98:11
100:25 101:4,4,11
101:12 102:24

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL

6/20/2014

10

105:9 106:6,23
107:16,22 108:2,6,8
108:12,15,21,24
109:1,4,8,11,13
111:21 112:10,12
113:18 115:25
116:4 117:14,25
118:7,9,19 123:1,1
124:8,13,19,23,25
125:3,12,22 126:25
131:23 132:20,21
133:2,5,6,15,21,22
133:24,25 134:2,16
135:4 136:25 137:4
137:6,7,7,10,17,19
137:20,21 138:10
141:8 142:23
**knowing** 91:18 127:7
**knowledge** 16:8
30:22 51:24 101:9
108:3,19 127:7
**known** 126:17

─────────────

**L**

**labeled** 88:25 90:12
92:2 93:1 139:9
**lack** 46:24 47:24 86:2
86:12,20 103:21,25
112:24 115:4
**lacked** 113:5 120:13
121:3 126:19 127:8
**lady** 138:15
**laid** 68:2 140:17
**language** 88:10 99:16
**large** 45:15 60:4
113:4
**Latino** 28:8
**law** 33:19 36:22
45:21 56:2 60:14,19
63:2 65:24 69:7
78:9 102:10,13,21
103:10,14 115:7
135:15,23 136:9
139:17
**laws** 62:16 136:23
**lawyer** 10:4

**lawyers** 15:22
**laying** 124:5
**lead** 83:23
**leading** 23:18 25:6
29:18 30:5
**leads** 33:17
**League** 1:9 3:14
138:25
**learned** 33:7
**led** 19:19 34:12
**leg** 54:14 55:17 98:5
108:6,9 134:11,13
134:24 135:21
136:1,14,17,20
140:16
**Legal** 109:19 144:24
**legislation** 13:1 20:21
20:22,25 21:1,9,20
22:3 23:13 24:2
25:8 34:2 36:5 37:6
44:16 62:17,20 74:6
78:23 80:8 84:17
92:23 107:17 134:6
134:22 136:12
**legislative** 2:4 3:8
14:9,16,18,25 15:6
15:12,20 16:3 17:9
19:3,23 28:12,15
32:10 35:23 36:1,13
38:22 40:1 46:3
49:22 50:11,13,21
61:12 82:24 83:6
84:5,11 85:2 97:11
100:23 101:2,8
123:13
**legislatively** 51:2
**legislator** 16:4 30:18
30:23 135:2
**legislators** 15:6 18:15
24:13 28:8,8,16,17
33:7,8 134:11 135:5
136:11
**legislature** 13:7 20:2
27:17 28:23 78:9
**legislature's** 29:9
**legislatures** 28:2

**let's** 14:4 16:20 37:17
64:23 91:4 129:22
**letter** 6:8 52:15 116:6
**letterhead** 128:16
**level** 49:7,8 50:21
**levels** 49:6
**license** 59:11,15 65:8
103:22,25 107:8,13
107:19,25 117:12
117:20 118:12,18
118:21 120:12
121:2 122:10,13
**License/Personal**
117:5
**licenses** 63:6,9 102:5
122:11,14
**Lieutenant** 22:10,23
**life** 91:21
**limited** 33:16 107:2
**limiting** 36:10
**Linda** 55:21
**line** 8:4 18:3 19:22
52:3
**list** 35:19,20,21 68:18
139:22
**listed** 29:21 30:9,14
31:4,13,19 32:13
33:1 105:1 106:11
**listen** 82:10,12 110:5
110:10 111:1
**litigation** 4:3 8:17
9:19 137:2,6
**little** 46:10 82:2
**live** 65:6
**lived** 33:13
**LLP** 3:10,16
**lobbying** 26:10
**locations** 142:22
**logging** 53:15
**logically** 91:4,13
**long** 9:14 70:1 65:6
**longer** 19:11,25 40:9
63:11 85:14
**look** 11:25 55:24
64:15 67:6 107:6
118:1 126:12 133:8

139:3,18
**looked** 10:18 32:2,4
139:12
**looking** 38:15,20
52:11 53:7,11 55:2
55:17,23 58:15,20
60:21 66:10 67:7,11
122:22 125:25
126:1
**looks** 38:10,23 52:15
58:10 63:25 64:19
71:24 88:7 94:4
104:13 115:23
119:24 130:10
**lost** 42:17 87:23
**lot** 26:14 46:22,22
110:3 137:6
**love** 17:17
**low** 94:18 105:25
106:3
**lower** 54:15
**lowest** 126:4,6,7
**lunch** 98:11,16

─────────────

**M**

**M** 2:7 8:9 82:6
138:19
**ma'am** 18:16
**machine** 2:9
**mail-in** 43:24
**major** 90:4
**making** 32:6 89:20
141:8
**MALDEF** 109:19
110:1 111:7
**marathon** 115:17
**Marc** 1:3 28:19
**March** 6:7,12 38:10
38:17 67:3 68:1
119:20,21,25 120:4
123:3 130:12
**mark** 11:6 46:11
104:5 115:12
119:14 123:22
130:4
**marked** 48:12,17

56:22 63:14 67:1
76:13,19 78:2,17
119:15 123:24
**marked/introduced**
11:8 38:5 48:10
56:20 63:12 66:24
76:11 93:12 100:11
104:6 115:11
116:21 119:13
123:21 130:3
**Martinez** 69:6 74:11
**match** 122:9,12
126:5,8
**matched** 120:11
121:1,10
**matches** 107:21
**matching** 117:12
122:24 124:21,24
125:8
**matter** 55:11
**matters** 127:21
**McGeehan** 6:18,20
6:23 115:23 116:11
117:2 118:3,20
120:10,25 121:17
122:8,19,23
**meals** 98:12
**mean** 11:4 19:5 36:4
39:23 61:7 84:16
94:10,24 110:18
124:23 125:7
**meaning** 24:13 35:24
36:2 40:17 61:8
**means** 36:5,17 58:22
69:25 72:4 81:17
125:5
**meant** 47:19 56:16
59:1 60:9 65:12,19
117:24
**meet** 9:24 10:2,7
**meeting** 10:12 25:21
**meetings** 92:22,22
**member** 53:9 78:6
95:4,5 108:16
112:10 137:14
**members** 28:12

120:9,24
**memory** 14:5 16:21
29:3 33:16 42:3
43:18 53:8
**mentioned** 12:24
105:11
**messages** 129:3
130:22
**Mexican** 2:3 3:8
109:18
**Mexico** 132:14 133:3
**middle** 46:6,20 53:12
121:16
**Miles** 94:22,25 95:3,6
**military** 97:4,8
108:21
**million** 65:10 121:12
**mind** 15:17,18 28:18
119:10 132:1
**mine** 58:19
**minorities** 46:24
47:24
**minority** 28:2,3 89:7
90:2 94:19 110:6
114:11,13
**minutes** 10:8 11:7
117:9 143:11
**Misstates** 126:24
**mistake** 122:2
**mistaking** 51:9
**modifying** 137:23
**moment** 117:15
130:19
**moments** 12:24
**Monday** 6:6 116:15
118:8
**money** 45:19,25 46:4
141:9
**months** 107:14,19
**Moore** 112:8
**morning** 8:11,12
**motion** 72:7
**motor** 32:19
**move** 33:15 103:18
**moved** 68:14,21
69:16,20 70:17 71:7

71:11 72:7,10,13,24
73:2 74:17
**Moving** 70:1
**multi-hour** 83:10,19
**municipal** 109:11

## N

**N** 3:1 8:9,9 82:6,6
138:19,19 144:24
**NAACP** 2:3 3:8
110:12,22 111:7
**name** 27:19,22,22
56:3,14,18 98:3
116:1 138:23
**named** 68:18 111:24
112:8
**NANDITA** 4:1
**Naomi** 96:7
**nation** 55:3
**Native** 96:19
**natural** 59:25
**nature** 43:8
**necessarily** 127:4
**necessary** 9:21 19:6
88:14 133:23
**need** 15:15 21:24
22:2 41:25 42:5,17
49:24 62:12 66:14
132:17 142:19
**needed** 141:13
**never** 110:5 113:22
124:8
**new** 3:11 6:15 57:1
57:13 119:1,2
139:20
**news** 83:24
**newspaper** 101:1,7
**Nice** 8:13
**night** 63:10
**nodded** 99:1
**Nods** 8:22 9:5 98:24
**nominated** 90:4
**non** 19:3
**non-photo** 13:16
**noncitizen** 127:25
**noncitizens** 24:10

**nondiscriminatory**
103:7
**nonpartisan** 35:13
**nonphoto** 13:25 91:6
**nonphotographic**
104:16 105:4,7
**normal** 91:20
**Notable** 59:21
**Notary** 144:4,21
**note** 45:22
**notes** 6:10
**noticed** 34:1
**notwithstanding**
69:7 111:3
**November** 114:19
**number** 31:9 46:24
47:23 52:4 55:3
60:4 64:5,7,10
65:11,13 90:13,21
91:8 97:16 105:25
106:3 112:17,24
113:4 116:12 117:4
117:6,11,18 118:12
118:17,21,22
124:25 126:4,6,8
130:2
**numbered** 2:6
**numbers** 119:1,2,4,6
125:1 127:2,4
**NW** 3:4,16
**NWB** 3:4

## O

**O** 8:9 82:6 138:19
**OAG** 95:21
**oath** 8:21
**Obama** 90:3
**object** 13:19 14:7
15:19,19 21:22 33:4
36:24 37:3,9 73:8
79:19 80:9,10 81:1
82:19 83:12 84:25
86:13 88:4 123:17
124:17,18 126:9
**objection** 13:17
14:10 18:3 19:7,7

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL

6/20/2014

12

19:10,11,22,25 24:6
26:20 27:8 28:4,10
28:24 29:12,23 32:1
34:18 37:15,22 40:2
40:5,8,8 44:14,24
45:10 48:5 51:16,21
54:6 57:2 59:5
60:11 68:24 71:22
73:23 74:24 75:5,7
75:17 76:3 77:17,22
79:25 80:2,14 81:2
81:7,13,22 82:20
83:25 84:6,12,25
85:6,14,15,16 89:8
89:15,17 90:7,24
92:14,19 93:25 94:1
96:23 98:23 102:14
102:23 103:3,11,13
104:1,18,21 110:9
110:24 113:6,14
115:8,16 117:21
118:5,14 121:4
124:11,12 126:22
126:23 127:11
130:25 137:5 138:3
138:9 141:20,23
142:20 143:5,15
**obtain** 69:11 140:8
140:23 141:1,13,17
142:13 143:2
**obtaining** 70:9 102:9
140:1 141:1,5,18
142:14
**obviously** 19:8
**occur** 25:18
**occurred** 22:20 138:1
138:7
**occurring** 86:23
**off-track** 57:13
**offered** 67:24 68:8,11
69:6 70:1 72:2,16
73:11 74:11
**office** 2:10 3:21 4:3
11:20 12:6,11 22:7
35:9,19 48:14 55:24
56:1,10 77:25 78:21

115:24 120:10
121:1 123:8 126:18
144:17
**officer** 70:7
**offices** 70:9
**official** 70:5 79:17
**offsets** 139:20
**Oh** 11:13,14
**okay** 9:12,18,22
10:20 15:4 16:5,9
16:12,24 37:14,19
40:7 42:8,9 47:12
49:9,14,16 50:18
51:14,25 52:10
59:20 64:21,23
65:23 68:10 76:18
83:3,9,22 84:20
85:10 86:1 87:21
89:2,23 94:13,16
95:18 99:6 100:2
101:19,24 103:1
104:3,25 108:3,20
109:18 112:13
114:7,8 119:12
120:7,18,22 122:4,6
122:19 123:20
124:2 128:19 129:1
129:11,11,15,22
133:7 137:10
138:11,13,22 139:8
139:11
**old** 99:12
**older** 66:13,18 99:12
99:19 107:25
125:15,23 126:3
**once** 68:23
**one's** 8:5
**one-page** 54:17
**ones** 28:18 126:1
**op-ed** 101:1,7,13
102:12
**open** 8:4 70:10
**opinion** 48:1 134:13
137:1
**opinions** 78:7
**opponent** 84:20

136:18
**opponents** 32:11,25
**opportunity** 52:6
**oppose** 69:23 71:21
73:5,22 74:23 75:1
75:12 76:1
**opposed** 50:4 109:23
109:24 110:1,7,21
110:23,25 113:17
**opposition** 110:4
111:10,12,15
113:12,15,20,21
**option** 14:18
**ORAL** 1:22 2:1 5:2
6:2
**order** 14:12 49:5,21
50:6,9,11,23 51:2
57:6 64:20,21 66:19
75:6,14 100:17
112:18 123:13
133:4 143:3
**ordinary** 72:20
**original** 57:25 58:5
**OTB** 6:9 57:12,16
139:6
**out-of** 58:2 61:15
**out-of-bound** 140:11
140:13
**out-of-bounds** 61:16
62:2 140:20
**out-of-the** 58:6
**out-of-the-bound**
140:17
**out-of-the-bounds**
57:19,20
**outline** 78:15
**outside** 24:12,13
36:14 70:11
**oversight** 46:4

———————————
**P**
———————————
**P** 3:1,1
**p.m** 2:7 143:17
**P.O** 4:4
**package** 48:12
**packet** 128:15 129:23

132:6
**page** 5:4 6:4 38:23,25
41:2 42:15 43:22
45:14 46:6,6,13,19
46:21 52:12 55:17
58:20 59:18,19
60:12 62:6 64:3,6,9
64:10,13,16,18,19
64:20,22,24,24
65:15 67:18,19,21
68:3 69:5 70:1,14
71:2 72:1,15 73:10
74:10 77:14 88:2,6
88:24,25,25 90:11
90:12 93:1,1 99:5,8
99:10,25 100:6
104:23,24 107:6,7
120:16,16,19,21
121:16,16,18,18,20
121:21 122:2,3,11
125:25 128:15,17
128:18 129:7,22
132:9 133:8 139:9
139:14
**pages** 52:5,5 58:19
87:20 122:5 124:6
**paper** 128:23
**paragraph** 43:20
45:15 53:11 54:19
54:20 55:2,23 65:5
65:21 77:15 79:13
90:17,18,19 92:1
93:4 94:16 95:24
101:22,25 103:18
116:10 118:3,23
133:9 139:18
**paragraphs** 41:4
62:7,8
**Parish** 54:25
**Parkway** 144:24
**part** 15:2 48:18 57:25
58:1,4 70:3
**part-time** 76:24
**particular** 122:10
125:8 136:12
**parties** 40:9 144:13

**party** 24:23,24,24
90:4 144:11,14
**Paso** 96:14,19
**pass** 34:2 82:4 138:12
143:13
**passage** 13:5 29:18
94:9
**passed** 13:2 42:21
43:6,13,14,16,17
80:8 84:21 86:11,22
95:14
**passes** 39:17
**passing** 43:12
**passports** 108:24
109:5
**Patricia** 1:23 2:1 5:3
6:3,8,14,18 7:1 8:1
77:6 144:6
**Patriots** 24:17
**pay** 84:19
**paycheck** 70:4
**penalty** 68:17
**pencil** 78:2
**pending** 9:15
**Pennsylvania** 3:4,16
**people** 24:17,20,23
26:18 27:2,6,13
29:19 30:7,13,19
31:13,18 32:12,18
35:2,21 42:23 52:19
55:5,5,12 84:18
92:23 98:11,21
107:24 110:3
112:17,24 113:4,12
117:11 127:17
**percent** 53:13 54:5
103:21,24
**percentage** 95:13
**perception** 131:14
**period** 30:17 31:11
**perjury** 68:17
**permissible** 142:18
**permit** 70:8 71:3,18
71:24
**Perry** 1:5 4:1 22:7
**person** 36:20,21 55:6

55:12 59:14 66:19
68:18 71:3,18 72:20
76:2 88:12 92:24
107:9 128:8,25
130:22 143:6
**person's** 72:19 73:15
74:14 75:3,13,25
109:2
**personal** 12:15,18
49:2 72:4,5 107:8
117:20 118:18
127:7
**personally** 10:16
83:3 85:24
**persons** 66:12,17
**phone** 130:23
**photo** 13:1,16 25:22
26:19 27:7,10 31:3
42:22 43:12,16
46:25 47:24 58:23
62:21 66:19 70:9
71:25 73:12 85:22
88:12 90:15 91:5,7
91:14,19,25 92:5,7
92:12,18,24 102:8
104:8 106:16,19,21
127:10,15 131:11
132:15 133:4,14,22
134:1 139:23 140:1
140:6,9,23 141:2,17
141:18 142:13,15
**photograph** 72:19
73:15 74:2,14 75:4
75:14,25 104:8
109:2
**photographic** 104:16
108:22
**phrase** 35:23 36:1
**PICKERING** 3:16
**picking** 23:14
**picture** 107:20
**piece** 20:20,25 21:19
**pieces** 62:20
**place** 49:5 114:22
**placed** 115:15 116:24
**Plaintiff** 1:8,11,14

3:2
**PLAINTIFF-INT...**
3:15
**plaintiffs** 1:3 3:8 8:4
65:16 79:13
**plan** 97:24
**plane** 133:13,23
**please** 9:11 14:4 15:5
16:21 20:1 30:22
33:6 64:4 72:15
76:13 102:1 117:23
118:6
**Plus** 90:14 139:19
**point** 18:24 37:23
60:3 61:18 67:14,16
142:1
**points** 78:15 88:7,9
**polarized** 81:17
**policy** 78:22
**political** 69:8 81:19
**poll** 39:15 53:15,20
53:24 54:8,10,12
56:2,13,17 131:8
**polling** 114:22
**polls** 48:1 102:4
**poor** 99:3 102:9
127:9
**population** 127:6
**portion** 16:2
**Portions** 78:16
**position** 75:20 76:8
109:20,22 110:13
110:20 113:3,7
**possess** 29:20 30:8,14
30:20 31:19 114:14
118:12,17
**possible** 9:22 14:24
29:5 37:2 47:2 90:2
111:8,20 134:1
**possibly** 23:5 143:4
**potential** 39:7 44:4
60:4
**precede** 41:4
**precision** 117:10
**precleared** 43:15
103:5,15

**predominantly** 95:11
**premarked** 11:10,11
38:7
**preparation** 9:25
10:14 78:23 89:11
**preparing** 90:25
**present** 125:14
**presentation** 107:11
**presented** 127:4
**presents** 70:4
**preserving** 88:10
**president** 87:12 90:3
90:5 101:16 102:11
**presidential** 138:2
**Press** 77:6
**pretty** 22:24
**previously** 87:19
98:20 105:11,18
112:6
**primary** 55:4 84:20
114:20
**Princeton** 3:11
**prior** 13:5,15 25:8,10
43:12,16 86:2 98:6
105:17 119:8
**private** 73:14 75:24
**privilege** 14:9,16,18
14:25 15:3,7,13,14
15:20 16:4 17:10,13
17:15 19:3,23 22:19
33:11 40:1 50:12,22
63:19 85:2
**privileged** 22:13,15
22:16 50:14
**probably** 21:15 23:7
26:2,5 54:23 58:10
58:11
**problem** 38:2 45:8
101:23 102:2
112:23
**problems** 34:5 56:2
**Procedure** 2:12
**proceed** 16:16
**proceedings** 38:16
67:12,24,25 144:9
**process** 31:21 61:6

88:11 111:6 129:19
134:14
**produce** 11:19 65:17
130:16
**produced** 2:2 12:6,8
48:14 49:20 50:10
51:2,6 79:13 100:22
**profile** 84:16,18
**prohibited** 42:7
**proof** 69:10,12 86:16
86:19 105:2 106:11
130:23 131:4,15
**proper** 14:16
**proposal** 105:8,10
**proposals** 137:20,22
**proposed** 44:16
**proposing** 136:4
**protect** 31:20
**protecting** 32:7 88:11
**Protection** 3:22
**protective** 49:5 50:6
50:23
**prove** 102:3
**provide** 41:6 85:20
108:4,13 118:20
123:16 131:8 132:3
134:13
**provided** 97:18 98:5
108:8 109:14 112:4
118:21 119:3,6
122:23 123:10
**provides** 93:2 139:21
**providing** 15:2 111:6
139:23 140:6
**provision** 59:21
66:16 94:21,24
95:14,18
**provisional** 114:19
**provisions** 2:12 13:16
14:1 135:1
**public** 4:1 30:24 33:8
36:10,14,23 48:1
49:3,19 72:6 73:14
75:23 78:22 104:20
107:9 144:4,21
**public's** 42:18,19

**purported** 71:14,17
**purpose** 35:23 57:25
61:25 70:9 76:5
86:4,9 87:1 91:24
105:11
**purposes** 50:7 59:11
84:24 85:20,24 86:7
**pursuant** 2:11 14:12
49:21 50:10 100:17
**put** 9:3 21:10 42:17
58:22 97:10 100:12
107:16 125:20

— — — — — —
**Q**
**quandary** 45:16
**quantification** 141:5
**queries** 124:24
**query** 125:8 126:1,1
126:1
**question** 9:15 14:8,17
14:17 15:20,21
16:13,18 17:5,24,25
18:1,23 19:14 40:20
41:6 42:5,10,12
43:18 44:8 47:14
53:1 54:19 60:13,21
62:7,8,9 75:22
83:13 85:1,7 86:10
103:8 117:4 122:16
126:10,11 127:2
129:8,11,12 139:14
142:9
**question-by** 17:23
**question-by-questi...**
17:9
**questioning** 18:3
19:22 82:1 93:22
**questions** 9:11,19
18:14 37:17 39:2
61:2,13,21 77:17,20
82:14 100:15 117:3
125:2 138:21
139:13 143:9
**quick** 138:14,17,21
139:1
**quite** 50:2,16 113:22

119:9
**quote** 26:17,18
**quoted** 42:16 46:7

— — — — — —
**R**
**R** 3:1
**racial** 31:12,17,17
79:23 80:13,20 81:5
**racist** 81:21
**Rafael** 28:20
**raise** 110:8 111:7
137:22
**raised** 111:4
**rate** 115:5
**Raymond** 70:2
**read** 11:3 16:18 41:3
41:20,22,23,25 42:2
42:6 46:13 47:9,11
62:11 68:5 70:3
72:3 101:11,25
103:19 110:19
122:3 129:9 130:19
132:17 133:17
142:11
**reading** 38:24 58:24
63:10 67:22 118:10
118:23 121:14
**reads** 139:22
**real** 131:21
**really** 41:9 65:3
**reason** 120:5
**Reasons** 77:4
**recall** 10:21 12:2
13:15 19:18 20:4
23:23 24:3,15,16,19
24:22 25:1,2 26:9
26:11,16 27:16,23
28:7,11 31:1,15
38:13 41:14 43:2,3
43:4,8,11 45:6,12
48:9 50:3 53:20,23
54:13 55:9,11 56:7
58:6 59:2,7 60:20
63:1,5,24 66:7,16
68:11,21 69:20
70:21 71:11 72:8

76:5 77:3,10 79:5,8
80:22 83:1,21 84:2
85:19 86:8,21,24,25
87:7 88:16,17,20,21
88:23 92:15 93:9,11
95:20,21 99:22,24
100:10,22 102:25
104:14,19 106:6
108:6,23 109:3,10
111:9,21 113:2
114:3 115:21
116:18 120:1,9
122:16 123:11
124:4,7 128:2,5,13
129:6 130:8 131:1
135:13,16,19,24
136:6,10 137:13
138:5 140:10 141:3
141:4,12 142:9
**recalls** 26:23
**receive** 129:3 130:21
**received** 56:1 100:24
124:8
**receives** 134:24
**recognized** 96:18
97:1,7
**recollection** 8:19
67:8 79:1 87:10,15
**recommendations**
78:7
**record** 2:12 8:3 12:25
30:24 32:8 33:8
36:11,14,23 38:1,9
48:17,24 49:5 64:4
67:2 70:4 98:12
99:25 100:6 102:1
104:4 121:4 126:5,8
**recorded** 2:9 39:6
**records** 38:16 124:21
125:11
**red** 78:2
**reduce** 90:22
**reduced** 144:7
**reducing** 90:21 91:8
**refer** 53:24 95:2
**referred** 106:23

**referring** 36:8 41:16
43:4,19,24 53:13
90:13 139:15
**refers** 41:5 65:7
**reflect** 67:12 119:1,4
**Reform** 133:11,19
**refresh** 8:19 42:3
79:1
**refreshes** 67:8
**refuse** 134:25
**regard** 123:13
**regarding** 18:4,14
77:17 78:22 87:13
**register** 131:5
**registered** 68:19
113:24 118:22
119:5
**registration** 39:16
91:6,22 99:14 119:1
120:11 121:1
**regular** 78:9 114:16
144:11,11
**rejected** 96:21
**relate** 78:14
**related** 79:18 101:10
127:21 130:24
**relating** 43:9 75:9
78:7
**released** 49:3
**relevant** 35:12
131:17
**relied** 27:23 89:19
**rely** 48:1 92:10
134:11 136:14
**relying** 135:20 136:1
**remember** 13:18,22
13:24 14:2 17:3
20:8,10 21:11 22:9
23:5,8,11,16,20
24:18,21 25:14,17
25:19,25 27:4,19,20
27:21,22 28:1,15,15
28:19,21 29:1,7,8
29:13,14,16 30:10
30:11,16,25 31:9
32:2,4,15,16,17,22

33:9,10,12,13 42:10
47:25 54:24 55:16
55:20 66:20,21 75:9
83:8 85:25 86:7
87:4,14 89:10,12,18
89:22,25 91:3,12,24
97:16,17 100:21
103:4,14 105:12,15
107:1,2,5 109:7,14
109:18,20 110:12
110:20 111:11,14
111:17,24 112:1,2,3
112:5,8,9,14,15,21
112:25 113:7
114:12,17 116:5,20
120:14 123:5
125:17,21,24 127:1
127:1,3 128:6
140:18,24
**removed** 95:18 96:4
**removes** 94:17
**removing** 95:25
**renew** 107:24
**rent** 91:19
**repetitive** 132:16
**rephrase** 35:17 83:17
**report** 27:17,20,24
87:5,8 94:11,17
99:4
**Reporter** 5:13 16:20
142:12 144:1,4
**represent** 11:18
95:11
**representative** 1:23
2:1 5:3 6:3 8:1,11
14:14 29:4 32:9
38:6 39:1 41:2
43:23 45:14 46:20
47:7,14 48:14,20
68:8,13 69:6,16
70:2,14 72:2,14
73:11 74:11 77:6
78:10,13 79:16 82:8
84:23 93:13 94:25
95:3,6 96:11,13
100:19 104:7

111:11,14 115:19
116:25 122:8
123:25 130:6
138:23 144:5
**representative's**
78:14,20
**Representatives** 2:5
3:9
**representing** 10:4
**represents** 96:13
**request** 77:11 78:14
78:17 102:4 116:19
123:2,14 134:25
136:2
**requested** 77:5 123:7
**require** 102:3 131:4
131:7 132:15 133:4
133:13
**required** 26:19 27:3
46:25 47:24 62:21
92:23 112:18
114:15,23 115:5
121:9 140:8,22
143:2
**requirement** 94:18
134:18
**requirements** 34:24
66:12,18 139:20
**requires** 131:15
**research** 46:23
134:15,17,20
**reserve** 143:14
**resolution** 6:9 57:13
57:16,19,20 58:3,7
61:16,17 62:3 139:7
140:12,18,21
**resolutions** 67:18
140:13
**respect** 49:21 50:9,11
51:1,17 140:5
**responded** 16:3
**response** 12:4 15:2
47:13 100:23 129:7
129:9 132:22
133:16
**responses** 8:6

**responsibility** 134:12
142:24
**rest** 54:18
**restore** 42:18,19
**restrictive** 42:22
60:14,18 62:9,24
65:24 90:12 92:2
139:16
**result** 31:24
**reveal** 15:5 20:1
30:22
**review** 10:11,14,23
11:2 12:7 52:7
53:12,15 54:16,17
98:6 99:10 117:15
120:16 122:5 124:1
125:6
**reviewed** 87:18
120:23
**reviewing** 124:20
**Richards** 6:23
**RICK** 1:5 4:1
**right** 17:16 29:25
37:15,23,24 49:4
51:15 64:12,16 65:9
75:21 85:17 93:23
100:17 113:5
121:20 122:25
125:10,12,19
126:14 142:10
**right-hand** 42:15
43:23 54:15
**rights** 3:4 80:4,7
110:7 135:18 136:3
136:4,9,12,19,24
**Ronald** 4:5
**ronny.keister@oag...**
4:6
**Room** 3:4
**Rosemarie** 3:23 10:3
10:4 17:23
**rosemarie.donnell...**
3:24
**Rosenberg** 3:11 5:6
8:3,7,10 11:9,13,15
13:21 14:13 15:13

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL

6/20/2014

16

16:17,24 17:7,12,17
17:20 18:6,11,21
19:12,14 20:5 21:8
21:23 22:14,18,24
23:3 24:7,9 26:22
26:25 27:12 28:7,14
29:2,14 30:1,4 31:1
32:3,9 33:10 34:21
37:1,5,11,16,20,24
38:2,6 40:6,12,19
41:22 42:9,14 44:20
45:2,13 47:6,13
48:6,11,16 49:4,23
49:25 50:2,16,19,25
51:5,12,18,22 52:8
52:11 54:10 56:21
57:3,8,10 59:8
60:12 62:14 63:13
63:17,21 66:25
69:2 72:1,12 73:10
73:25 75:1,6,11,19
76:7,12,14,16,23
77:1,19,24 79:21
80:5,12,17 81:4,10
81:16,25 82:4 85:12
85:16 93:20 142:6
144:15
**roughly** 52:5
**RPR** 2:8 144:20
**rules** 2:11 8:20
**run** 19:9 40:9 46:23
115:16 125:8
143:16
**running** 18:3 19:7,11
19:22,25 24:6 29:23
29:24 37:14,15,21
37:23 40:4,8,8,10
48:4,5,7 51:16,16
51:21 57:1,2 68:24
77:16,21 85:6,14,15
85:16 93:24,25 94:1
94:2 104:18,18
115:16 141:23,25
143:15

**S**

**S** 3:1 4:5 38:24
144:21
**S.B** 78:15
**Safety** 4:1 72:6 107:9
**Sam** 144:24
**Sanders** 2:7 144:3,20
**Sandra** 7:2 130:11,13
**saw** 58:8
**saying** 15:11 18:8
42:4,16 46:7 50:15
50:17 51:3 86:15
117:11,14,17
128:20,22 129:4
134:19 135:7,11,14
135:17
**says** 39:10,13 41:3
43:23 45:19 46:21
47:7 58:21 60:3,23
65:3,16 68:7,13,20
69:16 71:7 89:22
90:14 92:4 93:2
94:8,17,21 96:7
99:17 101:14 107:7
116:16 117:3 119:7
119:19 121:7,11
126:16 133:16
136:19 139:19
140:1
**SB** 11:4 12:24,25
13:5 14:4,6 16:20
16:22,23 17:1,4
18:4,19 19:16,20
20:20,24 21:8,24
22:8,25 23:9,18
25:7 26:10,19 27:1
27:1,3,18,25 28:3,9
28:17,23 29:5,9,17
29:18 30:6,9,15,20
31:4,14,19,25 32:11
32:13,25 33:1,19,22
34:16,22 38:22,24
39:2 40:21 44:9,10
44:23 45:5 48:2
54:4,12 58:7 59:4
59:16 60:18 63:2,8

66:12 67:13,21,22
67:24 73:13 74:13
82:14,15,16,23 83:4
83:9,18,22 84:4,21
84:24 86:2,11,22
87:1,5 89:6,11 91:4
91:7 94:8,9 95:19
105:11 108:12,21
108:21 109:8,16,17
109:20 110:2,13
111:3,8,19,20
112:18 113:12,17
114:10,16,23 115:1
115:5,6 120:2
125:15,22 126:18
131:4,7,15,20 137:2
137:23 140:7
**school** 73:14 75:24
**Scott** 12:12 78:19
**se** 103:2
**seal** 14:12,20 15:22
16:8 18:7,18 19:24
20:1 40:3 51:11
63:19 85:4 115:15
116:24 144:17
**sealed** 15:15 17:10
50:1,14 77:21
100:16
**second** 38:23 52:11
53:11 54:19,20 55:2
55:23 60:3 65:21
67:22 77:14 82:20
90:18,18 94:16
119:4 120:19,21
139:18
**secretary** 31:8 41:9
41:18 87:12 101:17
102:12 112:25
115:24 120:10,25
122:20 123:8,9,14
123:15 126:18
**section** 8:17 9:18
58:1,2
**Securities** 125:3
**Security** 117:6
121:10

**see** 8:13 37:17 39:1,8
39:9,21 41:12 42:25
44:1,6 45:17 46:10
47:4,17 53:17 54:15
55:7 56:5 59:22
60:1,6,15,24 64:5,9
66:14 68:13 69:14
69:18 70:12,19 71:5
71:9 72:22,25 73:16
74:15,19 77:8 78:24
90:14,20 92:1,4,5
93:2 94:16,20 95:24
99:7 100:3 105:1
107:7,12 119:19
129:2,18 130:15
139:22,25
**seeks** 77:25 78:4
**seen** 11:16 38:12
51:22 52:12 54:22
55:18 58:9 63:24
67:4,9 77:1 100:20
115:20 124:3,5
130:7
**Select** 20:6 106:24
111:17 112:16
114:4,6,9 120:1,8
120:24 122:7
124:15 137:11
**Senate** 57:23 78:8
108:13,18,18
128:22 139:15
141:6
**Senator** 23:6,9,12
29:4
**send** 35:1,12
**sends** 135:21
**sense** 71:19
**sent** 34:23 35:2 78:18
115:24 117:7 135:7
135:11,14,17
**sentence** 45:19 56:16
96:24 103:19
**sentiments** 81:21
**separate** 130:1
140:20
**Sepehri** 116:2,3,4

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL

6/20/2014

17

**September** 102:19
**seriously** 136:13
    142:25
**serve** 84:19
**served** 11:19,22
**session** 21:16 33:15
    78:9 97:12 105:16
    105:17,25 106:2,8
**sessions** 13:9 61:17
    83:1,2
**set** 54:4,11 118:25
    119:4 144:8
**sets** 61:2
**seven** 77:25
**seventh** 101:22
**shared** 121:8
**she'd** 118:7
**shifted** 56:25 141:22
**shifting** 29:22 48:3
**shorthand** 2:9 144:3
**shoulder** 9:6
**show** 11:9 38:7 42:24
    48:11 56:21 63:13
    66:19 78:18 86:15
    86:16 91:5,5,6,7,9
    91:10,18,19 92:24
    119:2 121:11
    131:10
**showing** 85:21 86:19
    88:12 91:22 104:15
**shown** 91:10
**shows** 39:15 116:5
    119:5 131:7
**shrugs** 9:6
**shut** 8:8
**sic** 20:2 28:3 55:4
**side** 108:18 136:18
**sign** 98:2,4
**sign-off** 134:19
**signature** 2:13 52:3
**signed** 35:3 51:25
**significant** 83:24
**signing** 98:6
**silence** 8:7
**Simcox** 55:21
**similar** 17:4 124:5

**similarities** 56:4,14
    56:18
**similarly** 64:15
**simpler** 90:15 91:14
**simply** 15:1 123:15
**single** 65:17 78:5
**sir** 8:15 9:23 10:1,6
    10:13,22,24 11:1,5
    11:24 12:1,3,9
    13:23 14:22 20:13
    33:23 35:25 36:3
    39:22 41:13,15,19
    43:1 44:7 45:18,24
    47:5,18 53:6,18
    55:8,10,13,16 56:6
    56:8,11,15,19 59:23
    60:2,7,10,25 64:8
    64:17 65:14 66:3
    68:12,15 69:1,4,15
    69:19,22 70:13,23
    71:1,6,10,12,15,20
    73:4,17,19,21 74:16
    74:20,22 76:10 77:9
    77:13 78:25 79:3,7
    79:11 87:6,9,17
    88:13 92:3 104:10
    108:25 114:21,24
    115:2
**sit** 107:18 115:3
**sitting** 27:5 32:17
    44:21 45:3 50:3
    69:2,23 71:13,21
    73:5,22 74:23 75:11
    75:19,25 76:7
**slippery** 22:22
**slope** 22:22
**small** 26:17 27:2,6,13
    65:10,12
**smart** 65:3
**Social** 117:5 121:10
    125:3
**sole** 83:21,23
**somebody** 117:24
**son** 65:3
**sorry** 13:21 21:13
    24:8 53:2 65:21

76:22 87:24 93:15
    113:10 116:7
    121:22 131:3 142:9
**SOS** 94:18 95:21
    120:25 122:9
**Sounds** 98:15
**SOUTHERN** 1:1
**space** 33:16
**speak** 50:23
**Speaker** 23:3
**speaks** 104:21 121:5
**specific** 39:4 54:3,11
    78:3 83:15 128:11
    141:12
**specifically** 31:22
    32:22 51:6 54:24
    61:15 106:5 110:8
    111:21 113:2
    120:14 128:3
**specifics** 31:10
**speculate** 115:10
    117:23 118:6 143:6
**speech** 26:4 78:8,15
    79:8
**speeches** 26:2
**speed** 9:22
**spending** 46:4
**spent** 46:1 106:7
**spoke** 28:3,9,17,22
**sponsor** 17:1 19:15
    19:20 61:9,11 83:21
    83:23,23 97:20
    123:3 134:3
**sponsored** 83:5,16,18
    84:5,10 96:10 123:9
**sponsoring** 134:9
**staff** 12:12 26:12,14
    34:15 52:2,25 53:5
    53:9 55:23 56:9
    78:6,13 94:5 97:21
    97:23 101:5 108:4
    108:17 112:10
    132:21 133:1
**stamp** 54:15 64:6
**stand** 106:10
**start** 19:21 37:18

    100:14
**started** 102:7 106:2
**starts** 67:21
**state** 1:17 2:3,8 3:8
    4:1 15:1,15,23 22:5
    31:8 39:19 41:9,18
    52:18,20 69:9 74:14
    75:4,14 77:6 79:18
    79:24 80:24 81:6,12
    81:20 86:3 87:12
    101:17 102:12,12
    109:8 112:25
    122:19 123:8,9,15
    123:15 130:10,11
    132:19 144:2,4
**State's** 115:24 120:10
    121:1 122:20
    126:18
**state-issued** 102:8
**state-related** 35:13
**stated** 2:12 36:23
    37:7 69:7 121:12
    144:4
**statement** 44:15
    56:12 66:2 89:21
    91:1 103:9,24
**statements** 88:3
    132:25
**states** 1:1,7 3:2 16:1
    42:21 43:4,6,15
    89:5 92:6,13 102:3
    102:4
**statewide** 89:5 117:6
    119:5
**stating** 46:16 68:17
    114:10
**Station** 4:4
**statute** 74:1
**steps** 34:15 134:8
    135:20,25 136:7,8
**Straus** 23:4
**streamline** 17:18
**Street** 2:10 24:17
**strict** 92:12,18
**strike** 60:22 99:15
    113:10 131:3

**strong** 113:11
**struck** 99:18 136:23
**student** 73:13 74:2,7
    75:23
**studies** 46:23 47:8,15
    47:23
**stuff** 44:17 135:7
**subdivision** 69:8 72:3
**subject** 14:10 40:2
    54:12 55:11 80:24
    81:5,11 82:17,23
    83:5,5,10,19,24
**submitted** 27:17,20
    98:3
**subpoena** 6:5 11:18
    11:21,25 12:5,16
    100:23
**substance** 22:14
    23:11 25:20 29:16
    98:10 109:15
**substantial** 83:24
    112:24
**substantive** 97:17
    108:8 135:1
**substitute** 38:24
    67:22
**subtle** 81:20
**suddenly** 18:25
**sufficient** 107:14
**suggest** 71:16 89:4
**suggested** 54:3 61:4
    92:11,17
**Suite** 2:10 3:10,22
**support** 13:12 29:17
    48:2 110:4 111:3
    144:24
**supported** 13:24 74:6
    126:20
**supporters** 88:17,21
**supposed** 49:2
**Supreme** 43:13
    139:19
**sure** 11:17 12:13
    14:13 15:10 17:7
    21:11 29:23 30:4
    32:6 33:25 37:17

40:15 44:18 45:2
    48:4,23 51:4,12
    54:23 55:3 68:1
    76:20 79:21 80:19
    82:21 103:5 110:14
    122:22 124:23
    125:4 136:15 141:8
    143:11
**surname** 96:17
**surprise** 40:19
**surprised** 110:5
**surrounding** 137:7
**Suzanne** 77:5
**Switch** 19:1
**switched** 76:18
**switching** 19:2
**sworn** 2:5 8:2 144:7
**system** 118:24

**T**
**T** 8:9 82:6 138:19
    144:21
**table** 16:16 68:14,21
    69:17,20 70:17 71:7
    71:11 72:7,10,13,24
    73:2,18 74:17
**tabling** 70:18,22
    74:18
**take** 8:7 9:16 34:15
    37:11 42:1,6 47:10
    62:11 81:25 82:1
    98:10,13 117:15
    130:18 134:8
    135:22 136:7,13
    138:14 139:3
    142:24
**taken** 2:5 9:6 58:4
    144:11
**talk** 38:1
**talked** 29:24 129:18
    129:19
**talking** 18:18 25:12
    25:21 46:8 54:9
    78:15 88:7,8 140:11
    140:15
**talks** 95:24

**Tania** 3:17 138:23
**tania.faransso@wi...**
    3:18
**Tannous** 6:8
**target** 94:18
**Taylor** 70:15,15
**TCRR** 2:8 144:20
**TCU** 87:22
**TDL** 65:6,7,10
**TDL/personal**
    116:13
**tea** 24:23,24,24
**tell** 9:11 14:5 16:21
    19:18 25:14 47:19
    53:7 56:23 57:15
    59:1 63:21 66:4
    67:7 95:16 97:21
    111:22 113:25
    125:13
**temporary** 71:3,18
    71:23
**term** 81:16 112:1,2
    127:24
**terms** 62:21,24
    142:18
**terrible** 58:14
**testified** 8:2 27:21
    36:9 86:4 105:18
    111:20 127:20
**testify** 14:19 17:13
    18:7 111:22 144:7
**testifying** 8:20 18:8
    26:16 112:25
**testimony** 28:5 31:7
    47:1,8,15 48:21
    50:15 51:18 87:19
    104:21 109:24
    112:4,16 114:4,9,12
    114:13,17
**Texans** 31:21 45:20
    53:13 54:5
**Texas** 1:1,9,12,17 2:3
    2:4,8,11 3:8,9,14,21
    3:23 4:1 13:7 23:19
    23:22,25 24:4,10,23
    27:10 39:19 43:12

43:16 45:5 53:15
    55:4 65:8 79:18,24
    80:6,13,21,25 81:6
    81:12,20 89:7,16
    97:1,7 117:5,12,19
    118:12,17,17,21
    127:6,14,14 134:4
    134:10,21 135:3,12
    136:23 137:1 138:1
    138:8,25 144:2,4,25
**Texas-specific** 89:20
**thank** 9:17 30:2 57:7
    63:20 82:8 85:18
    94:3 98:19 101:6
    115:18 140:19
**theirs** 15:7 39:16
**Thibodeau** 7:2
    130:11,13
**thing** 19:8 36:20,21
    42:6
**things** 36:13 91:20
**think** 11:7 17:13
    18:11 19:5,14 21:1
    21:10,11,12 31:20
    31:22 32:4 37:1,12
    39:19 42:14 43:11
    43:15 44:10,11,16
    48:25 50:19 51:5
    52:6 57:14,24 62:16
    62:17 63:10 81:5
    82:25 89:22 91:18
    95:1 96:15 97:14
    103:5 105:13,15
    106:14,17 108:10
    109:21,23,24
    110:14,16,18,18
    113:9,16 115:6
    119:9,10 127:15
    128:8 131:5,13,23
    134:6 138:4 141:21
    142:21 143:8
**thinking** 97:23
**third** 88:25 93:4
    116:10 118:3
    121:18 132:9
    139:25

REPRESENTATIVE PATRICIA HARLESS                                    6/20/2014
HIGHLY CONFIDENTIAL

19

thought 26:16 31:9
    111:5
three 58:18 61:19
    117:9 126:4 142:22
    142:22
tied 88:18,22
time 8:17 9:14 16:25
    17:21 19:15,24 22:8
    22:11 23:17 24:10
    24:14 25:3,5,5,6
    26:25 29:17 30:3,5
    30:5,17 31:11,16
    35:3 42:1,6 44:13
    44:17,23 45:1,5
    47:10 61:24 62:11
    66:17 75:10 79:20
    86:3 91:15 94:5
    121:11 123:3
    127:13 140:7,17,21
    144:9,14
times 6:16 61:19
TLC 97:21
Toby 112:8
today 27:5 44:22
    45:3 50:3 69:2,23
    70:24 71:13,21 73:5
    73:22 74:23 75:11
    75:19 76:1,8 133:6
    139:13
today's 9:25 27:9
told 128:21
tools 41:10
top 107:6 119:19
    139:14
TORT 4:3
Tova 111:24
town 25:21 92:21
trained 56:3,13,17
training 34:1
transcriber 9:7
transcript 6:22 9:4
    10:18 48:19 98:18
    119:22,24 120:17
    120:23 121:7,19
    144:8
transcripts 10:23

Travis 2:10 3:22
treat 50:8,12,12,13
treated 36:20 49:15
    49:25 50:1,4,5,21
    57:5 93:18,22
    100:16
treatment 21:9 48:20
Tribal 95:25 96:4
tribes 96:19 97:1,7
tried 51:4
tries 133:1
true 24:20 44:15
    136:20 144:5,8
truth 144:7
try 9:12,21 19:12
    34:21 40:23 110:10
    111:1 131:16,17
    132:25
trying 130:2
turn 60:12 64:23
    70:14 72:15 88:24
    90:11 92:25 99:5,10
    99:25 104:23
    128:17 129:22
    132:9 133:8 138:15
    139:9
turned 12:19
turning 42:15 43:22
    45:13 46:19 54:14
    59:18 62:6 64:3
    65:15 66:4 68:3
    69:5 72:1 73:10
    74:10 77:14 108:20
turnout 42:22 46:8
    46:16 89:5,7,14
    90:2
twice 10:20
two 16:1 26:1 42:17
    42:21 43:6,15 57:12
    58:18 62:20 70:10
    92:11 107:10,16,23
    121:22,24
TX 59:19
type 35:9 39:4 41:10
    44:4
typed 64:2

types 112:17 114:15
typewriting 144:7,8
Typewritten 6:10
typically 25:21 40:16
    61:6,18 131:16
    134:11

─────────────
U

U.S 3:3 130:17
    144:24
Uh-huh 80:17 122:15
unable 65:16
unaware 80:12,16
unconstitutional
    65:22
underlying 141:1,13
understand 8:20 9:8
    9:10 14:21 17:19
    29:14 36:16 51:3,17
    51:19 71:13 79:16
    80:6 106:8 113:22
    118:11 126:11
understanding 8:5
    17:14 19:6 21:18
    34:11 36:19 37:5
    44:21,21 45:4,7
    46:15 47:22 58:21
    60:8,17 61:1,2,25
    69:3 70:24 96:3
    113:19 115:15
    124:14 125:7
    134:23 142:3,4
Understood 24:7
    30:1 140:14,19
undertake 29:18 30:6
undertook 30:18
unidentified 122:8
UNITED 1:1,7 3:2
universe 26:18 27:2,6
    27:13
University 53:15
unresponsive 78:16
unstated 37:8
updated 118:24
upheld 43:14
upper 42:15 43:22

urged 105:19,22,22
    106:4
use 75:2,12,18,22
    81:20 107:2 136:3
useful 141:18 142:14
usual 140:2
usually 101:2,8
utility 102:5

─────────────
V

v 1:4,16 70:15 137:1
VA-issued 109:6
vaguely 20:8 63:25
valid 72:17 74:13
    75:2,12 104:15
    112:18 114:15
    120:6 127:3,5
validity 126:25
Van 70:15
variety 105:4
various 31:3
Veasey 1:3 28:19
    29:4 68:8 72:16
Veasey's 111:14
vehicle 32:20
verbally 9:5
video 91:19
views 27:24
violate 135:3,12,15
    135:18
violated 80:7
violates 136:2,12,19
Volume 119:21
volunteer 128:10
vote 13:14 24:20 29:6
    39:17 42:23,24 55:5
    66:19 75:6,15 76:2
    86:5,12,15,20 87:2
    91:18 99:25 100:6,9
    113:25 114:2
    118:22 128:8
    130:17 131:5 133:4
    142:19 143:3
voted 70:18,21 73:18
    74:17 92:24 93:9
    99:22 100:3 113:12

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL
6/20/2014

20

142:22
**voter** 6:21 13:1,6,25
  20:6 23:19,21,24
  24:4,14 25:3 34:12
  39:3,4,7,11,14,16
  41:11 42:22 43:12
  43:16 44:5,22 45:4
  56:2 65:5 68:18
  70:8 72:5 78:9
  79:17 86:23 87:13
  88:17,18,21 89:23
  90:5,22 91:5,22
  92:7 96:5 97:12
  99:13 102:20 105:8
  105:14,19 106:13
  106:14,24,24
  111:18,18 113:25
  114:1,5,5 119:19,23
  119:24 120:11
  121:1 124:22 129:5
  129:16 130:24
  131:7 137:11,12,18
  137:25 138:7
**voter's** 70:6,7,11
  99:13 129:12,16
  131:14
**voters** 1:9 3:14 34:8
  46:9,9,17 60:5
  68:19 88:25 89:14
  90:16,23 91:9,15,23
  93:3,10 94:19 102:3
  102:8 114:11,13,14
  115:4,6 116:12
  117:4 118:12,17,21
  119:5 120:12 121:3
  121:11 122:10
  124:25 125:9,15
  126:2,5,8,15,19
  128:4 138:25
  139:21
**votes** 42:17
**voting** 24:10 25:23
  29:11 44:10,19
  53:14 54:2 55:6,12
  55:12 80:4,7 81:17
  85:21 88:12 106:15

128:1 132:16
  135:18 136:3,4,7,9
  136:12,19,24 140:3
  142:21
**voting-related** 79:23

**W**
**waive** 15:8
**waived** 2:13
**Wang** 111:24
**want** 9:14 15:15,22
  17:25 29:23 40:4
  41:23 46:13 54:17
  54:21 57:1 76:16
  82:13 98:10 128:24
  129:9 138:14
**wanted** 39:2 70:2
  71:2 109:16 135:8
  140:10
**wanting** 33:24
**Washington** 3:5,17
**wasn't** 58:4 122:24
  139:6
**watch** 139:2
**watching** 87:22
**way** 17:18 18:12
  41:14 47:2 59:3
  76:8 80:18 87:23
  106:14,18 120:20
  129:15 135:8
  136:17 137:4,23
**ways** 90:21 106:12
**we'll** 11:6 16:17
  37:17 87:24 143:14
**we're** 17:23 19:21
  24:5 29:22 46:7
  48:3 68:4,23 97:23
  122:22 137:8,9
**we've** 47:2 48:12
  56:25 97:24 134:19
**website** 53:16,19
**Wednesday** 6:11
  67:3
**week** 26:2
**welcome** 54:18
**went** 87:20 89:10

90:25
**weren't** 113:4
**why's** 106:20 131:22
**wide** 55:3
**willing** 17:12 18:7
  51:7 110:5
**WILMER** 3:16
**WilmerHale** 138:24
**wish** 15:8,21 38:21
**withhold** 77:25 78:4
**Withholding** 77:4
**witness** 2:2 14:11
  15:10,14,18,25 16:5
  16:9,12 18:14,16
  42:2,8 52:6 76:22
  76:24 82:4 138:12
  138:13,18 143:13
  144:5,6
**wl** 58:22
**women's** 24:23
**won** 42:17
**word** 34:22 36:16
**words** 57:12
**work** 16:10 46:22
  48:24 70:8 134:14
**worked** 108:17 121:8
**workers** 56:3,13,17
**working** 70:11 92:5
  92:12 116:14
  122:20
**workings** 113:22
**works** 18:21 39:14
  129:19
**world** 131:21
**worthwhile** 115:6
**wouldn't** 135:9
**write** 116:11 128:20
  132:13,23,24 133:9
**writing** 58:19
**written** 35:8 52:1
  53:12 54:1 55:3,9
  96:24 134:13
**wrote** 53:8,9 64:1
  102:15 132:21,22
  133:15

**X**
**X** 8:9 22:23,24 82:6
  138:19 144:21

**Y**
**yeah** 16:11 17:16
  18:2,10 21:7,15
  22:21 42:8 47:10
  50:24 51:18 54:21
  68:7 70:16 96:12
  105:3 117:25,25
  121:21 128:25
**year** 11:23 107:14
**years** 21:17 66:12
  92:5,6,11 99:12,19
  107:10,16,23
**yeas** 66:18 70:19
**Yesterday** 10:10
**York** 6:16 57:13
**Young** 1:9 3:14
  138:25

**Z**

**0**
**00:05:32** 144:16
**01:21:56** 144:16
**01:30:09** 144:15
**08540** 3:11

**1**
**1** 78:12 90:13 99:12
  99:20 119:20,21,25
  126:1,6
**1/17/12** 6:13
**1:27** 2:7 143:17
**100** 6:15
**104** 6:17
**11** 6:5 68:4,8,14,16
  68:22 107:14
**110** 100:1,6
**112** 6:17 97:15
  106:23 107:2
**115** 6:18
**116** 6:20
**119** 6:21

REPRESENTATIVE PATRICIA HARLESS
HIGHLY CONFIDENTIAL

6/20/2014

21

**12** 102:6 103:21,24
**12-31-15** 144:23
**122** 144:24
**123** 6:23
**12548** 4:4
**12th** 144:24
**130** 7:1
**138** 5:8
**14** 11:4 12:24,25 13:5
　14:4,6 16:20,22,23
　17:1,4 18:4,19
　19:16,20 20:20,24
　21:8,24 22:8,25
　23:9,18 25:7 26:10
　26:19 27:1,3,18,25
　28:3,9,17,23 29:5,9
　29:17,18 30:6,9,15
　30:20 31:4,14,19,25
　32:11,13,25 33:1,19
　33:22 34:16,22
　38:22,24 39:2 40:21
　44:9,10,23 45:5
　48:2 54:4,12 58:7
　59:4,16 60:18 63:2
　63:8 66:12 67:13,21
　67:22,24 73:13
　74:13 78:8,15 82:14
　82:15,16,23 83:4,9
　83:18,22 84:4,21,24
　86:2,11,22 87:1,5
　89:6,11 91:4,7 94:8
　94:9 95:19 105:11
　108:12,21,21 109:8
　109:16,17,20 110:2
　110:13 111:3,8,19
　111:20 112:18
　113:12,17 114:10
　114:16,23 115:1,5,6
　117:9 120:2 125:15
　125:22 126:18
　131:4,7,15,20 137:2
　137:23 139:15
　140:7 141:7
**144** 5:13
**15** 65:10 69:6,17,21
　69:24

**1520** 2:10 3:22
**16** 70:1,17
**162** 6:5 11:8,12
**163** 6:6 38:5,7
**164** 6:8 48:10,12,13
　51:20 128:14 132:5
**165** 6:9 56:20,22
　139:4
**166** 6:10 63:12,14
　88:1,2
**167** 6:11 66:24 67:1,2
　98:18
**168** 6:13 76:11,13
　77:18
**169** 6:14 93:12
**17** 71:2,8,14,16
**170** 6:15 100:11,13
　100:15
**171** 6:17 104:5,6,11
**172** 6:18 115:11,13
　117:8 118:1,3
**173** 6:20 116:21,23
　118:2,10
**174** 6:21 119:13,15
**175** 6:23 123:21,23
**176** 7:1 130:3,5
**18** 72:2 107:19
**1875** 3:16
**1965** 80:3,5
**1st** 120:4 123:3

――――――――

**2**

**2** 92:4,6 119:21
　121:16 124:6
　125:25
**2/1/11** 6:23
**2/25/11** 6:18,20
**2:13-cv-193(NGR)**
　1:5
**2:13-cv-263(NGR)**
　1:11
**20** 1:24 2:6 5:3 6:3
**20006** 3:17
**2005** 102:19
**2006** 119:1,7,8 121:9
**2009** 92:11 133:5

**2011** 6:7,12 13:3,4
　38:11,19 67:3 78:9
　78:12 79:10 92:11
　97:12 104:8,12
　106:7 116:9 117:3
　119:20,21,25
**2012** 12:22 13:2
　77:10 99:12,20
　130:12 138:1,8
**2013** 114:19 137:12
　137:15,18 138:8
**2014** 1:24 2:6 5:3 6:3
　114:20 144:18
**202.305.4355** 3:6
**202.663.6262** 3:18
**20530** 3:5
**21** 6:7 38:11
**213** 55:5,12
**21st** 38:17,18
**23** 6:12 67:3 73:11
　102:19
**239** 55:5,11
**23rd** 68:1 144:18
**24** 74:10 102:2
**25** 72:3 117:3
**25th** 116:8 122:24
**27023** 64:19
**27th** 142:22
**28** 130:12
**289** 120:16 122:5
**290** 122:5,11,12
**291** 121:18,20,21
**29th** 55:4

――――――――

**3**

**3** 5:5 64:7 124:6
　126:1,6,12
**3/28/12** 7:1
**30** 87:20
**34,506** 121:11
**363** 144:24
**38** 6:6

――――――――

**4**

**4** 64:13,22 121:12
**4-14-17** 144:22

**4/20/11** 6:14
**4038** 144:23
**45** 10:8
**48** 6:8

――――――――

**5**

**5** 8:17 9:18 64:11,24
　95:24 107:6 126:1,6
　139:9
**5/27/09** 6:8
**50-some-odd** 52:5
**500** 3:10
**512.463.2197** 4:5
**56** 6:9

――――――――

**6**

**6** 64:16 93:1,1 104:23
　107:7 126:13
**60** 63:11 107:4
**609.955.3200** 3:12
**63** 6:10
**66** 6:11
**678,560** 126:15,19
**6962** 59:18,19
**6963** 60:13 62:6

――――――――

**7**

**7** 64:18 89:1 99:7,9
　99:11 100:7 104:24
　125:18
**70** 53:13 54:5 66:12
　66:17 99:12,19
　125:15,23 126:2
**7025** 64:5
**7026** 64:3,9,24
**7027** 64:15 65:16
　93:1
**7028** 64:16
**7031** 90:13
**7037** 66:4
**704** 132:11,12
**711** 128:17 129:7
**712** 128:18,24,25
**713.225.8919** 3:24
**713.653.7100** 144:25
**718** 133:8

REPRESENTATIVE PATRICIA HARLESS                                    6/20/2014
HIGHLY CONFIDENTIAL

22

**7254** 3:4
**744** 129:22,24
**745** 129:25
**746** 54:14
**750,000** 65:10
**753** 55:17
**76** 6:13
**77002** 3:23
**77060** 144:25
**78711** 4:4

**8**

**8** 5:6 64:16
**808** 2:10 3:22
**82** 5:7
**82nd** 78:8

**9**

**9** 103:18
**9/23/05** 6:15
**9:13** 2:7
**902** 3:10
**910** 38:23 39:1
**912** 42:15
**914** 43:22
**915** 45:14
**916** 46:6
**918** 46:19
**93** 6:14
**950** 3:4
**951** 67:21
**952** 67:19
**961** 99:5
**965** 99:25 100:5
**966** 68:3,6
**967** 68:3
**969** 69:5
**970** 70:1
**974** 70:14 71:2
**975** 72:1
**978** 72:15
**979** 73:10