```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     CORPUS CHRISTI DIVISION
 3   MARC VEASEY, JANE HAMILTON,      )
     SERGIO DELEON, FLOYD J. CARRIER,)
 4   ANNA BURNS, MICHAEL MONTEZ,      )
     PENNY POPE, OSCAR ORTIZ, KOBY    )
 5   OZIAS, JOHN MELLOR-CRUMMEY,      )
     JANE DOE, JOHN DOE, LEAGUE OF    )   CIVIL ACTION NO.
 6   UNITED LATIN AMERICAN CITIZENS   )   2:13-CV-193 (NGR)
     (LULAC), AND DALLAS COUNTY,      )   (lead case)
 7   TEXAS                            )
                                      )
 8   VS.                              )
                                      )
 9   RICK PERRY, Governor of Texas,   )
     and JOHN STEEN, Texas Secretary  )
10   of State,                        )
     ─────────────────────────────────)
11                                    )
     UNITED STATES OF AMERICA,        )
12                                    )
     V.                               )
13                                    )
     STATE OF TEXAS, JOHN STEEN, in   )   CIVIL ACTION NO.
14   his official capacity as Texas   )    2:13-CV-263 (NGR)
     Secretary of State, and STEVE    )   (consolidated case)
15   MCCRAW, in his official capacity )
     as Director of the Texas         )
16   Department of Public Safety,     )
     ─────────────────────────────────)
17                                    )
     TEXAS STATE CONFERENCE OF NACCP  )
18   BRANCHES, AND THE MEXICAN        )
     AMERICAN LEGISLATIVE CAUCUS OF   )
19   THE TEXAS HOUSE OF               )
     REPRESENTATIVES,                 )
20                                    )
     V.                               )   CIVIL ACTION NO.
21                                    )   2:13-CV-291 (NGR)
     JOHN STEEN, in his official      )   (consolidated case)
22   capacity as Texas Secretary of   )
     State, and STEVE MCCRAW, in his  )
23   official capacity as Director of )
     the Texas Department of Public   )
24   Safety                           )
25
```

1    **********************************************************

2                         ORAL DEPOSITION OF

3                            J.R. HARRIS

4                           JUNE 17, 2014

5    **********************************************************

6

7              ORAL DEPOSITION of J.R. HARRIS, produced as a

8    witness at the instance of the Plaintiffs, was taken in

9    the above-styled and numbered cause on JUNE 17, 2014,

10   from 2:41 p.m. to 3:42 p.m., before Cynthia C. Miller,

11   CSR in and for the State of Texas, reported by machine

12   shorthand, at the Office of Vince Ryan, County Attorney,

13   1019 Congress, 15th Floor, Houston, Texas, pursuant to

14   the Federal Rules of Civil Procedure and the following

15   stipulation and waiver of counsel:

16             IT WAS STIPULATED AND AGREED by and between

17   counsel that if the original of said deposition is not

18   signed or available at the time of trial or any hearing,

19   an unsigned copy may be used in lieu thereof.

20

21

22

23

24

25

```
 1
 2                          APPEARANCES
 3
      FOR THE PLAINTIFFS:
 4
            Mr. Chad W. Dunn
 5          BRAZIL & DUNN
            4201 Cypress Creek Pkwy, Suite 530
 6          Houston, Texas  77068
            281-580-6310
 7          281-580-6362 (fax)
 8
 9
      FOR THE PLAINTIFF UNITED STATES OF AMERICA:
10
            Ms. Angela Miller (via telephone)
11          DEPARTMENT OF JUSTICE
            Civil Rights Division
12          950 Pennsylvania Avenue N.W. (NWB-7200)
            Washington, D.C.  20530
13          202-514-2919
            202-307-3961 (fax)
14
15
16    FOR THE DEFENDANTS STATE OF TEXAS,
      RICK PERRY, JOHN STEEN, AND STEVE McCRAW:
17
            Mr. John B. Scott
18          DEPUTY ATTORNEY GENERAL FOR LITIGATION
            Southern District of Texas No. 10418
19          209 West 14th Street
            Austin, Texas  78701
20          512-475-0131
            512-475-2994 (fax)
21
22
23
24
25
```

```
1                    APPEARANCES CONTINUED
2
     FOR THE DEPONENT:
3
          Mr. Douglas P. Ray
4         SENIOR ASSISTANT COUNTY ATTORNEY
          1019 Congress, 15th Floor
5         Houston, Texas   77002
          713-274-5463
6         713-755-8772 (fax)
7
8
          Ms. Sonya Aston
9         HARRIS COUNTY CLERK'S OFFICE
          Administrator of Elections
10        1001 Preston, 4th Floor
          Houston, Texas   77002
11        713-755-5792
          713-755-2617 (fax)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

1                              INDEX

2

3                                                      Page

4

Stipulations..........................................1

5

Appearances.........................................3/4

6

7

8

Testimony of J.R. HARRIS

9

        Examination by Mr. Dunn............................6

10

        Examination by Ms. Miller........................38

11

        Examination by Mr. Scott.........................44

12

        Further Examination by Mr. Dunn..................54

13

14

Changes and Signature.............................56/57

15

Reporter's Certificate..............................58

16

17

18

19                          NO EXHIBITS

20

21

22

23

24

25

```
 1                         J.R. HARRIS,
 2    having been first duly sworn, testified as follows:
 3                         EXAMINATION
 4    BY MR. DUNN:
 5         Q.   Please tell us your name.
 6         A.   My name is James Rice Harris.  I go by J.R.
 7         Q.   All right, Mr. Harris.  My name is Chad Dunn.
 8    We've had the occasion to meet a few times; is that
 9    right?
10         A.   Yes.
11         Q.   All right.  I represent a group of plaintiffs
12    called the Veasey/LULAC plaintiffs, also includes Dallas
13    County as plaintiffs in this case.  Do you understand
14    that?
15         A.   Yes.
16         Q.   I notice you're writing down some things, and
17    you're certainly free to do that.  Just understand, if
18    you write down something on that notebook, somebody in
19    this room might ask you to look at it, and they are
20    entitled to do so.
21         A.   Sure.
22         Q.   Have you ever given a deposition before?
23         A.   Yes.
24         Q.   Okay.  About how many occasions?
25         A.   I believe only once.
```

1     Q.   And I understand you're a lawyer; is that

2   right?

3     A.   Yes.

4     Q.   Did you take depositions at any point in your

5   career?

6     A.   I don't believe I have.

7     Q.   Okay.  What was the occasion you gave a

8   deposition?

9     A.   It was in my capacity as an assistant county

10  attorney representing the appraisal review board.

11    Q.   I see.  So I assume it had nothing to do with

12  voting.

13    A.   Nothing to do with voting.

14    Q.   Okay.  How long ago was that?

15    A.   Probably three years ago.

16    Q.   All right.  You might basically understand a

17  deposition, but it's important we don't talk over one

18  another because the court reporter can only take down

19  one voice at a time, all right?

20    A.   (Witness nodded.)

21    Q.   If you answer audibly, or shake of a head like

22  you just did, I'll ask you if that's a "yes" or "no."

23  That's because the court reporter can't take down

24  gestures.  Do you understand?

25    A.   Yes.

```
 1          Q.    You can take a break if you need to, if you

 2    have any questions, that will be fine, but I don't

 3    expect it to take an hour or so.  And then each of these

 4    other lawyers may avail themselves of the opportunity of

 5    asking you some questions.  Okay?

 6          A.    Yes.

 7          Q.    First, give us the benefit of where you were

 8    born, grew up, went to school, that sort of thing.

 9          A.    Okay.  Born and raised in Houston.  Went to

10    college at University of Texas at Austin.  Went to law

11    school at South Texas College of Law.  Graduated in

12    2005.

13                Came to work for the assistant -- the

14    county attorney's office here in Harris County.  Was

15    employed with the county attorney's office up until

16    about a year ago.  And now I'm the director of

17    compliance at the tax office.

18          Q.    Okay.  When did you start as director of

19    compliance?

20          A.    This would have been maybe April of 2013.

21          Q.    Okay.  When you were at the county attorney's

22    office, did you have any responsibilities as they

23    pertain to elections?

24          A.    No, other than occasionally helping out on

25    election day.  That was mainly Doug Ray's
```

1    responsibilities.

2         Q.   How would you help on election day?

3         A.   Answer calls, any calls that were referred to

4    the county attorney's office that day.

5         Q.   Okay.  Did somebody recruit you to go work for

6    the tax office?

7         A.   No.

8         Q.   Okay.  Was it a posting that you applied for?

9    How did you become employed over there?

10        A.   I had always thought that they needed a

11   director of compliance, and they had had one off and on.

12   Mr. Sullivan (sic) was the new tax assessor-collector.

13             Mr. Sullivan, the previous tax

14   assessor-collector, did not have an director of

15   compliance.  And I just thought it would be a good fit.

16   I wanted to be more hands-on and be able to actually be

17   more involved in the day-to-day activities.

18        Q.   You said Mr. Sullivan twice, you mean

19   Mr. Vasquez didn't have a compliance --

20        A.   Mr. Sumner.

21        Q.   Sumner.

22        A.   I may have misspoke, Mr. Sumner.

23        Q.   Okay.  Perhaps I misheard you.  So Mr. Sumner

24   didn't have a director of compliance, you thought it

25   would be a good idea if Mr. Sullivan, the current

1        officeholder, would?

2              A.   Yes.

3              Q.   And you volunteered to do that; is that right?

4              A.   Yes.

5              Q.   Okay.  And so you transferred your Harris

6        County employment from the county attorney's office to

7        the tax assessor's office?

8              A.   Yes.

9              Q.   So what does the director of compliance do on

10       a day-to-day basis?

11             A.   Okay.  Well, I am directly over the voter

12       department, so I do interact with the voter department

13       daily.  I also handle open records requests and help

14       oversee and manage our responses to the many open

15       records requests we receive.

16                  I also help deal with any litigation that

17       may be foreseeable.  If we have threats of litigation,

18       I'll step in and deal with the corresponding director of

19       property tax or auto and try to resolve the issues, try

20       to prevent any litigation, if possible.

21                  And also help work with the county

22       attorney's office if we're -- we do have some active

23       litigation.  Get them the answers they need to

24       questions.  Or any information they need.  And may

25       suggest a course of action to take in the litigation.

1      Q.   All right.  Prior to your employment at the

2  tax office, did you ever -- have you ever testified

3  before the legislature?

4      A.   No, I have not.

5      Q.   Have you ever worked for a member of the

6  legislature?

7      A.   No.

8      Q.   Have you been involved in electoral campaigns

9  at all?

10     A.   Yes.

11     Q.   Which campaigns did you work on?

12     A.   I went door-to-door for Anne Clutterbuck.

13  This was many, many years ago when she first ran for

14  City Council.

15          I may have stood out at an election poll

16  for Vince Ryan.  I think that's the extent of it.

17     Q.   Okay.

18     A.   Very nominal volunteer-type stuff.

19     Q.   Give us a sense of sort of who you report to

20  in Mr. Sullivan's office.

21     A.   Okay.

22     Q.   An organization chart type thing.

23     A.   Sure.  I report to Mr. Sullivan directly.

24     Q.   Okay.  Are you considered a supervisor of the

25  department that handles voter registration?

1       A.   I'm considered a director who oversees the

2   voter department.

3       Q.   All right.  So I guess maybe I'll just start

4   by an example.  Let's say one of the clerks who

5   processes voter registration needs to be, you know, let

6   go.  Do you make that decision or handle that?

7       A.   Yes, sure.  Ultimately, it's Mr. Sullivan who

8   would hire or terminate someone, but I would be involved

9   in that process, yes.

10       Q.   Okay.  If a clerk working on voter

11   registration applications had a question or a concern,

12   are you their next level supervisor?  Is there somebody

13   in between?

14       A.   Sure.  There is a few layers in between.

15       Q.   Okay.

16       A.   We have two assistant managers, and we have a

17   manager of voters.

18       Q.   And who are those three people?

19       A.   Albert Cheng, C-H-E-N-G, is the manager of

20   voters.  And Sue Hastings is an assistant manager.  And

21   Cosme Garcia is an assistant manager.

22       Q.   And I want to back up and do something I

23   should have done before.  Just because the court may

24   ultimately review your deposition, not see you in

25   person, can you give us your age and race?

1        A.   Sure.  I am --

2        Q.   "Ish" on the age.

3        A.   Thirty-six years old.  And I am Caucasian.

4        Q.   All right.  So now I want to talk about

5   Senate Bill 14.  And when I mention that, I'm talking

6   about the photo identification bill the legislature

7   passed in 2011 --

8        A.   Yes.

9        Q.   -- that was implemented in Texas starting in

10  June of 2013.

11       A.   Okay.

12       Q.   So do we have an understanding of what we're

13  talking about when we say Senate Bill 14?

14       A.   Yes.

15       Q.   When is it you first became involved in Senate

16  Bill 14?

17       A.   As soon as the Shelby County case came out, I

18  believe the next day or even that day, the A.G. came out

19  with a release saying that S.B. 14 would now be in

20  effect.  So from the beginning.

21       Q.   Okay.

22       A.   But not -- but I wasn't involved in the

23  original legislation or any aspect of that.

24       Q.   So when you got -- you mentioned that the A.G.

25  put out -- or the state attorney general put out a

1    release.  Was that something that you just received

2    through the media, or it was actually delivered to your

3    office?

4         A.   Oh, probably a combination.  If there was some

5    LISTSERV that I was on from the A.G.'s office, I

6    received it that way.  But also I think simultaneously,

7    I heard about it through the media.

8         Q.   Now, we've heard about earlier today a

9    LISTSERV that the Texas Association of Counties

10   administers.

11        A.   Okay.

12        Q.   Is that the LISTSERV that you're talking

13   about, or a different LISTSERV?

14        A.   This would be maybe something from the

15   secretary of state to the election administrators or

16   officials.

17        Q.   Okay.  And I'm not technically trained enough

18   to know exactly what a LISTSERV is, but, you know, I can

19   understand you have like an e-mail blast list, and then

20   there's also kind of these lists where you have a more

21   fluid conversation, you post something and everybody can

22   read it, and then they can post something.

23             So do you know whether it was an e-mail

24   you got from the secretary of state to a larger list, or

25   was it on more of these LISTSERV-type systems?

1        A.   Well, let's be clear, I don't recall if it was

2   directly from the A.G.

3        Q.   Okay.

4        A.   I may have heard about it from the media.   But

5   if it was, it would have been a one-directional type

6   e-mail, not a fluid back and forth sort of list.

7        Q.   Okay.   There's -- are you a member of any

8   election-related LISTSERVs, that you know of?

9        A.   Yes.

10       Q.   What are those?

11       A.   I cannot -- I don't know how they are

12   described, but it comes from the secretary of state.

13   Whenever they have a bulletin, I'll receive that

14   bulletin from the secretary of state.

15       Q.   Okay.   Any other kind of LISTSERVs?

16       A.   Yes.   TACA, I think is what you mentioned.

17       Q.   Texas Association of Counties?

18       A.   No, that's TAC.

19       Q.   Okay.

20       A.   There's a Texas Association -- Tax

21   Assessor-Collector Association, that's TACA.

22       Q.   Okay.

23       A.   I receive e-mails from that organization.   I

24   occasionally receive e-mails from the Texas Department

25   of Licensing and Regulation.   I receive lists -- I

1    receive commissioner court agendas, I'm on that list.

2    I'm on --

3         Q.   I'm focusing on ones that are

4    election-related.

5         A.   Sure.  Mainly from the secretary of state.

6    Whatever lists they have of who would receive bulletins,

7    I'm on that list.

8         Q.   Okay.  But are you aware of any LISTSERV

9    that's election-related, in whole or in part, where --

10   you know, it's more like I described, where you can post

11   something, and other people can see it, and then they

12   can post in response?

13        A.   No.

14        Q.   Okay.

15        A.   I don't -- and you mentioned TAC, which I

16   don't believe I'm a member of that LISTSERV.

17        Q.   And that probably would have been a better way

18   for me to ask it.  We talked to Mr. Stanart, and he said

19   he was on this LISTSERV for the Texas Association of

20   Counties.  And I asked him if anybody in the tax office

21   was, and he said he wasn't sure.  So that's what I'm

22   really trying to find out.

23        A.   I'm not on the Association of Counties

24   LISTSERV.

25        Q.   And do you know if anybody in the tax office

1    is?

2        A.   I do not know.

3        Q.   Okay.

4        A.   I would assume Mr. Sullivan was, but I just

5    don't know.

6        Q.   Now, do you know how it is that the tax

7    assessor-collector, as an officeholder, got involved in

8    doing voter registration?

9        A.   You know, I want to speak with as much

10   personal knowledge as I have, and I've never seen any

11   primary indication of this, but, yes, I'm familiar in

12   the sense that I've heard that it was based on the poll

13   tax and collecting the tax associated with voting.

14       Q.   But that's not anything you've gone back and

15   looked at sort of the legal authority behind it?

16       A.   No, but I think that would be interesting.  So

17   I can't verify that, I can't speak with any authority on

18   that.

19       Q.   Sure.

20       A.   But I think that's the consensus, if you were

21   to ask anybody as to why there's that connection.

22       Q.   All right.  So going back to S.B. 14, somehow

23   you get this notice from the state attorney general that

24   S.B. 14 is going to be implemented after Shelby County.

25   And what role, if any, did you have then going forward

1    in its implementation?

2         A.   Okay.  I oversaw how we were going to

3    implement the requirements.

4         Q.   When you say "we," are you talking about --

5         A.   The tax office, the tax voter registrar.

6         Q.   Not the county as a whole?

7         A.   Not the county as a whole.

8         Q.   Okay.

9         A.   Just the voter registrar's office.

10        Q.   And so what did you do to determine what

11   implementation steps the tax office should take?

12        A.   Okay.  Well, we identified what role we played

13   in this process, and outlined a course as to how we can

14   successfully deal with this new procedure.

15        Q.   Did you have a person or persons with the

16   county clerk that you liaisoned with?

17        A.   Yes, we would meet occasionally with Sonya

18   Aston.

19        Q.   Okay.  Anybody else?

20        A.   Occasionally, maybe Hector.  I don't know his

21   last name.

22             MR. RAY:  Deleon.

23        A.   Deleon.  Outreached with the county's office.

24        Q.   (By Mr. Dunn)  And you said "we."  Was there

25   somebody else in your department that was involved in

1   these discussions?

2        A.   Sure, it was a team effort.

3        Q.   Who were they?

4        A.   Albert Cheng, Cosme Garcia, Amanda Martin, who

5   is a project coordinator underneath me.  Sue Hastings.

6   Jack Kasserman, who does imaging within our office.

7   Jennifer Dage, who is administrative assistant within

8   the office of the voter registrar department.  Xavier

9   Herrera, who was our outreach manager.  And Justin

10  Concepcion, who is our communication manager.

11       Q.   Would you ever deal with anybody in the

12  secretary of state's office?

13       A.   Yes.  We would interact with Betsy -- last

14  name is hard to pronounce.  Maybe Shernoff or something.

15  And Keith Ingram.  And Ashley Fisher, an attorney with

16  the secretary of state's office.

17       Q.   Anybody else you can think of in the secretary

18  of state's office?

19       A.   Not by name.

20       Q.   Was Ed Johnson at all involved in this

21  process?

22       A.   Meaning the pure voter registration aspect of

23  it?

24       Q.   The S.B. 14 implementation.

25       A.   Well, involved in what?  At all?  What are you

```
 1   asking if he was involved?

 2       Q.   In the process of implementing Senate Bill 14

 3   in Harris County.

 4       A.   Within the voter registration department?

 5       Q.   Within the county at all, if you are aware.

 6       A.   Okay.  Then there was just one instance I know

 7   he was involved, and that was sending out a letter to

 8   voters that related to S.B. 14.

 9       Q.   Okay.

10       A.   But other than that, no, absolutely not.  He

11   was not involved in our implementation.

12       Q.   And within which office does Mr. Johnson work?

13       A.   The county clerk's office.

14       Q.   And what about George Hammerlein?

15       A.   I can't think of any aspect where I dealt with

16   him on any issues.  It may have bled over with whatever

17   letter Ed Johnson sent out, he may have been involved in

18   that as well.

19       Q.   Mr. Hammerlein also works for the county

20   clerk?

21       A.   Yes.

22       Q.   Okay.  All right.  So what steps did the tax

23   office need to do to change their behavior in order to

24   deal with S.B. 14?

25       A.   Well, the first step was to educate our office
```

1    on what it meant.  We did not want any misinformation

2    out there, and we certainly didn't want it coming from

3    our office.

4              So we began by training the voter

5    registration department and anyone else who would

6    possibly deal with this issue, whether it's answering

7    phones on election day, or dealing with a customer in a

8    branch.

9              So that was a key component was educating

10   our office as to what the requirements were and what our

11   role in that office was.

12             When I speak about our role, I generally

13   mean the cure process.  Where someone who voted

14   provisionally can cure their vote through a variety of

15   means.

16       Q.    So -- and maybe that's a better place to

17   start.  Other than the cure process, which you've just

18   described, what other responsibilities does the tax

19   assessor have related to the S.B. 14 responsibilities?

20             And maybe the answer is none, but I

21   assume you know more about your business than I do.

22       A.    Sure.  I mean, anything that we had to

23   implement was isolated to it being related to the cure

24   process.

25             For example, if we had to include the

1   letter "E" on a voter registration card, well, that was

2   related to the cure process, indicating that they were

3   exempt.  So almost everything was related to the cure

4   process.

5       Q.   Okay.  We've heard testimony today, earlier

6   today from Mr. Stanart about a pre-match process that he

7   would do for poll workers where he would take the DPS

8   driver's license database and match it with the voter

9   registration database and try to determine matches so

10  that poll workers could more easily facilitate receiving

11  IDs.

12            I think that's more or less the gist of

13  the subject matter of his testimony on that subject.  So

14  did you have anything to do with that on the pre-match

15  process?

16      A.   Only insofar as he was matching it to the list

17  of registered voters, which he could have obtained

18  independently through our information database.

19            Or he could have asked for it, and I just

20  don't know if we gave him a list of voters.  That would

21  be the extent of it.

22      Q.   You wouldn't facilitate at all actually doing

23  such a match?

24      A.   No, sir.

25      Q.   Okay.  Now, of course, I want to come back to

1    the cure process, but your office also processes the

2    provisional ballots affidavits after an election; is

3    that right?

4          A.   Yes.

5          Q.   And your clerks review the affidavits, and

6    then there's boxes on the form for them to check for

7    various inquiries that they make; is that right?

8          A.   Yes.

9          Q.   And we have in the records that Harris County

10   produced some provisional ballots that relate to a

11   person not having an ID, or complying with S.B. 14.

12   Have you seen any of those at any time?

13         A.   Yes, I would have seen a provisional ballot.

14   Are we talking about the November election?

15         Q.   I'm not really sure, I just saw them in the

16   box.

17         A.   Sure.  Most every election since S.B. 14, I

18   would have seen at some point.

19         Q.   Okay.  And you would have seen them in real

20   time?  In other words, when a clerk say, "Oh, this is an

21   S.B. 14," she or he was trained to go take it to you?

22         A.   No.

23         Q.   Okay.

24         A.   We have separate bins for unique problems that

25   correspond to the provisional ballot affidavit that we

```
 1    review.  So, yes, there was a bin for provisional ID,
 2    for lack of a better word, ballots.
 3                    And our job was to match up the cures
 4    with those provisionals.  So it would have been at that
 5    time when pairing the cures with those provisional
 6    ballots that I would have had some interaction with
 7    them.
 8        Q.    I see.  Okay.  And cures are when people come
 9    in and they show their ID, and now they are eligible to
10    have their provisional ballot tabulated; is that right?
11        A.    Yes.
12        Q.    Okay.  On people who come in and have to cast
13    a provisional ballot, and they don't come back and cure,
14    and the ballot affidavit references that it's an
15    ID-related issue, what does your office do with those?
16        A.    Okay.  They are held until after the cure
17    period is over.  We would not want to release them until
18    they had an opportunity to cure their vote.
19                    So those are generally going to be the
20    last provisional ballots that we send back up because we
21    have to wait until the voter has the opportunity,
22    full-time frame to cure their vote.
23        Q.    Would you -- did your office do anything to
24    sort of contact those voters and help them work out
25    their ID issue?
```

1          A.    No, sir.

2          Q.    Were those names reported to anybody, as far

3     as you know, whether it's the United States, or Texas,

4     or some private group?

5          A.    No, sir.  Not unless there was an open records

6     request, and there may have been a few, but the county

7     clerk's office received those.

8          Q.    Okay.  There is some inclination that a

9     Houston group called King Street Patriots has at times

10    been involved with your office on voter registration.

11    Have you ever experienced any of that?

12         A.    No, I have not.

13         Q.    So you don't ever interact with anybody from

14    that group?

15         A.    Honestly, no.  I don't -- I interact with

16    people through our volunteer deputy registration

17    trainings, and we may have a training out there, and I

18    may have interacted with them in that sense.

19              I've never been to their location, I

20    don't even know who the members are.  But I can't say

21    that I haven't, if I don't know.

22         Q.    Sure.  Well -- and that's fair enough.  I

23    guess, you know, I just want to --

24         A.    No one -- I've never interacted with any known

25    person from King Street Patriots --

1    Q.    Okay.

2    A.    -- in the context of voter registration.

3    Q.    When you would process these provisional

4    ballot affidavits after each of these elections in late

5    2013 and the ones that have happened this year, were

6    there any poll watchers or observers present in the tax

7    office?

8    A.    No.

9    Q.    All right.  Now, you mentioned the training

10   you did for your staff.  Were there any materials that

11   you created as part of that training?

12   A.    Yes.

13   Q.    I assume you've produced those in response to

14   the subpoena.

15   A.    I have not.

16   Q.    Okay.

17   A.    It is identical to the secretary of state's

18   training.

19   Q.    I see.  All right.  So which is going to be my

20   next question.  You didn't go out and recreate the

21   wheel, you used what the secretary of state sent?

22   A.    Yes, but we did have some additional slides

23   that dealt with procedure.  So if you want those, I can

24   produce those.

25   Q.    Slides as, like, part of a Power Point?

1      A.   Yes, sir.

2      Q.   Okay.  Yeah, I would like that.  And we're

3   going to send a letter to your counsel for those things

4   so you don't have to try to keep track of it now.

5      A.   Okay.  Yes.

6      Q.   When you would do these trainings, there was

7   like a Power Point that you went through, is that what I

8   understand?

9      A.   Yes.  It evolved.  When it first came out that

10   this would be in effect, we huddled up with voters and

11   went over the basics.  At that time, we just had basic

12   information, but statutes and administrative code

13   provisions.

14          So, you know, once there was more

15   training materials by the secretary of state, we

16   utilized those.  So it evolved.

17      Q.   And some of those items you created, some of

18   them you got from the secretary of state?

19      A.   Yes, sir.

20      Q.   Was there any items or activities that your

21   office had to spend money on in order to implement

22   S.B. 14?

23      A.   Not specifically.  Everything was included or

24   absorbed through our regular expenses.

25      Q.   Okay.  All right.  Now, I want to talk

1    briefly, I understand that there's an issue on Senate

2    Bill 14 as it relates to substantially similar names,

3    where poll workers have to determine whether an ID is

4    substantially similar to the voter registration

5    information.

6         A.   Yes.

7         Q.   And I recognize that's not your area; correct,

8    that's not something you deal with?

9         A.   Yes.

10        Q.   You're not a poll worker, in other words?

11        A.   Correct.

12        Q.   All right.  But obviously, how your office

13   enters voter registration applications could play into

14   this, so I want to ask you a little bit about that,

15   okay?

16        A.   Sure.

17        Q.   As I understand it, I'm trying to save us time

18   here, so correct me if I'm wrong.  As I understand it,

19   you get a voter registration from many sources, you have

20   a clerk there, the clerk will sit down and enter that

21   information into the system, to the extent they can read

22   the handwriting.

23        A.   Yes, sir.

24        Q.   And the information is uploaded to the state,

25   cross-referenced with the state database, and it comes

1    back, and people are either registered or sent notices.

2    Is that the basic process?

3         A.   Generally, yes.

4         Q.   Okay.  Do you know if there are limiting

5    characteristics in the computer system utilized by voter

6    registration clerks on how they can input a name?

7         A.   Limiting characteristics?

8         Q.   So I can give you an example if that doesn't

9    make sense to you.

10        A.   Go ahead.

11        Q.   Okay.  So let's say you had Jose de Santiago.

12   Does the system restrict the person to entering

13   "de Santiago" with spaces in between the "de Santiago,"

14   or keeping it together as one word?

15        A.   No, if there's a space between the D-E and the

16   Santiago, then we include that space, if that's what

17   you're asking.

18        Q.   Okay.  And when that information is sent up to

19   TEAM in the secretary of state's database, do you know

20   whether or not their software has a limiting restriction

21   as to how you would enter that name?

22        A.   I'm not aware.

23        Q.   You don't know one way or the other?

24        A.   No.

25        Q.   It could be the case, and we don't know, that

1    the state system might require there to be a space

2    there, and the county system somebody chooses to enter

3    it in adjacent letters; is that true, that could be the

4    case?

5        A.   I think -- I think they're matching it up with

6    a name that they have, so it would be dependent on how

7    the name appears and whatever record they're looking at.

8        Q.   Right.  I guess that's my point.  If there is

9    not -- if there is not a requirement in the software as

10   to how you enter your name, then different people may do

11   it different ways.

12               So "De la Cruz" might end up with two

13   spaces with somebody -- on person in your office.  A

14   different person in your office gets the same

15   application, they may have put no spaces in there; is

16   that right?

17       A.   That different people may put different names

18   on applications with a space or without a space?

19       Q.   Well, stated a little bit differently,

20   different people in your office may input the same name

21   differently.

22       A.   That's possible.

23       Q.   Okay.

24       A.   Depending on how it appears on the

25   application.

1      Q.   And similarly, whoever over at DPS, for

2   example, enrolls a name, the same name when they go get

3   their driver's license, or their EIC, may enter it in a

4   different way than the voter registration clerk entered

5   their voter registration application; is that right?

6      A.   I can't speak to that, but it's possible.

7      Q.   Okay.  So are you aware of any controls in

8   your office, or like guidelines, or things that you

9   instruct your clerks to do in terms of dealing with

10  different names?

11     A.   They input the names as it appears on the

12  application.  So if it appears as though there's a space

13  between the names in the last name, then they will

14  include a space.

15     Q.   I see.  Okay.  And if they -- do the people in

16  your office have the ability to go on the statewide

17  database and look up a name when they're enrolling a

18  voter registration application?

19     A.   Yes, they can access a DPS database.

20     Q.   Okay.

21     A.   It's limited to that.

22     Q.   And do they do that as a matter of course when

23  they're processing voter registration applications?

24     A.   Yes.

25     Q.   So, in theory, if someone is doing their job,

1   they are looking at a voter application and they will

2   see "De la Cruz" with spaces, they're supposed to go on

3   the driver's license database and make sure that's how

4   it's entered there as well?

5       A.   If they have a question as to whether there's

6   a space or not, then they should use that database and

7   say, "Okay, this person, there is a space in the DPS

8   record, let's err on the side of interpreting it as

9   there being a space."

10      Q.   Okay.  But some of them may not question it,

11  it may look clear to them.  And then what you're saying

12  is some of them may not look at the DPS database.

13      A.   It would be incumbent on their discretion to

14  access that database or not.

15      Q.   All right.  So when the report's made to do

16  the match to the secretary of state, is that done

17  nightly or weekly?

18      A.   I believe it's nightly.

19      Q.   Okay.  So when that is sent in nightly and a

20  report comes back the next day, there's going to be a

21  report of non-matches; is that right?

22      A.   Yes.

23      Q.   And what's done with that report in your

24  office, if anything?

25      A.   We have a processor review those.

1        Q.   And what does that person do?

2        A.   Well, they research the accounts, they see if

3    it was potentially a typo and data entry error on our

4    part.  And if that's the case, then we cure it, and we

5    send it back up, and it could get resolved that way.

6        Q.   So let's say "De la Cruz" comes back and it

7    was Anthony De la Cruz, and it comes back and it says,

8    "no match," it's not going to say on there, is it -- or

9    maybe it will, but we have a Tony De la Cruz with no

10   spaces in the driver's license database, maybe that's

11   what you mean?  I mean, does it make suggestions to you

12   like that in the match?

13       A.   No, it does indicate the name and information

14   as it appears in their records.  We have two separate

15   names and identifiers.

16            One that was ours that we sent, and one

17   that was theirs.  That's the only information that's on

18   those reports.

19       Q.   So then it would be up to your office -- when

20   Anthony De la Cruz comes back as a non-match, it would

21   be up to somebody in your office then to get into DPS's

22   database and maybe search "De la Cruz" with and without

23   spaces, maybe search "Tony," in order to find out if

24   there was an entry that should have been a match, the

25   computer just didn't catch it?

1          A.   Yes.

2          Q.   And does that happen?

3          A.   Do we make typo mistakes?

4          Q.   Well, do you do this review that we've just

5     described?

6          A.   Yes.  We review each and every one of them.

7     And to see what the issue is, we attempt to identify the

8     issue.  If it's something we can cure on our end, then

9     we do that.

10               If it's not, then they are sent a letter

11     that indicates they need to submit a new application.

12          Q.   So when you say if it can be cured on your

13     end, in my example, it would mean just sending it back

14     up to the state but this time without spaces?

15          A.   Yes, yes.

16          Q.   Okay.  And your office would do that?

17          A.   Yes, sir.

18          Q.   If somebody is sent in -- you know, again,

19     let's say it's Anthony De la Cruz, has submitted a voter

20     registration to the state, and it comes back as a

21     non-match, and somebody in your office works it like

22     they're supposed to, and they can't find anything else,

23     any other entry in the state database that it should

24     match, then what happens?

25          A.   They're sent a letter indicating that they

1    need to submit a new application within ten days.

2        Q.   So what if they're a new resident of the state

3    so they're not in the statewide database, and they're

4    not supposed to be yet?

5        A.   I don't think they would necessarily fail that

6    check.

7        Q.   Okay.

8        A.   Honestly, my knowledge of this process is

9    limited.

10       Q.   That's fair.

11       A.   Especially since there's that other component

12   of the state.

13       Q.   Yeah.  And if we ask you anything you don't

14   know, you know, that's completely fair.  I'm not trying

15   to get you to guess about things.

16            All right.  I assume your office doesn't

17   have anything to do with issuing Senate Bill 14 related

18   or eligible IDs.

19       A.   Issuing eligible IDs, no, we have nothing to

20   do with issuing IDs.

21       Q.   Okay.  You can't, as I understand it, even

22   issue underlying documentation for IDs, like birth

23   certificates?

24       A.   We can issue a voter registration card.  I

25   believe that's a second form of ID to get certain forms

1    of ID.

2         Q.   Okay.   Any other documents that you think are

3    underlying IDs?

4         A.   We have tax records, auto records.   There's a

5    long list of things that are secondary forms of ID, so

6    maybe a tax statement would help.

7         Q.   Are you aware of anybody coming to the tax

8    office and requesting these secondary items in order to

9    obtain an ID?

10        A.   That's a common request, requesting voter

11   registration certificates as a form of ID.

12        Q.   Okay.

13        A.   It's a common request.

14        Q.   Well, I guess what I'm asking is a little more

15   specific question.   Are you aware of a specific, you

16   know, incident or group of incidents where somebody has

17   come in and said, "I need this because I need to get an

18   EIC or driver's license so I can vote"?

19        A.   No, I can't think of any specific individual

20   that I'm aware of.   I can only -- I would just be

21   guessing whether somebody would request it for that

22   purpose or not.   We wouldn't know why they were

23   requesting it.

24             So it goes against the nature of this

25   type of request.   We can't say, "Well, why do you want

1    this?"

2        Q.   Sure.  Are you aware at your time there at the

3    tax office that -- and I understand this might be more a

4    county clerk office issue, but are you aware in the tax

5    office of anybody trying to commit voter fraud?

6        A.   Anyone trying to commit voter fraud?

7        Q.   Yes.

8        A.   I just got a request dealing with some voter

9    fraud allegations back in 2010.  So I don't have any

10   personal knowledge of that, but it seems as though back

11   in 2010, there were some allegations of fraud.

12       Q.   And what was -- from whom did this request

13   come?

14       A.   This came from a media source.

15       Q.   Okay.  And what is the incident that's

16   referenced?

17       A.   They asked for voter fraud allegations related

18   to Houston votes.  And there was some larger entity they

19   said they were part of, Houston Education, some other

20   larger entity.  I know nothing about the fraud

21   allegations.

22       Q.   Any other incidents that you're aware of?

23       A.   Voter fraud?

24       Q.   Yes.

25       A.   In terms of registration?

1        Q.    Yes.

2        A.    No.  As a matter of just routine, we issue a

3   report to the DA's office after each election, it's a

4   poll book audit.  And that is a listing of voters who,

5   you know, were not on the poll book but voted, that sort

6   of thing, that were canceled and yet still voted.  And

7   so that's the only possible potential, and that goes to

8   the DA's office.

9        Q.    Are you aware of any prosecutions by the

10   Harris County DA's office on voter fraud?

11        A.    No.  I know they do research sometimes, but

12   I'm not aware of any prosecutions.

13        Q.    I think that's my questions for today.  One of

14   these other lawyers may have some questions.  Thank you

15   for your time.

16        A.    Thanks.

17              MR. SCOTT:  Angela, you want to go?

18              MS. MILLER:  Yes, I could.  I just have a

19   couple of quick questions.

20                   EXAMINATION

21   BY MS. MILLER (via telephone):

22        Q.    So, Mr. Harris, you were talking about the

23   cure process.  How are people who cast provisional

24   ballots informed about the cure process and the cure

25   period?

1    A.    Okay.  When they vote provisionally, they're

2    given a provisional affidavit.  And on that form, it has

3    a notice to provisional voter.

4            It informs them that they have that

5    six-day period to come cure their vote.  There is a map

6    that's not only on the provisional ballot itself, but

7    there's a separate map that has all of the tax office

8    locations, and the information is all on that notice.

9    Q.    And that six days, is it clarified on that

10   notice whether that's business days or calendar days?

11   A.    I would have to look at the notice.  It's

12   prescribed by the secretary of state.

13   Q.    So the notice -- does the secretary of state

14   give you a form notice that you use?

15   A.    This is the county clerk's materials.

16   Q.    Okay.

17   A.    So at the time of voting, they're handed this

18   when they vote provisionally.  This is something that

19   every provisional voter is given.

20   Q.    But is this notice something that the county

21   developed, or is it the secretary of state giving you a

22   notice that you use?

23   A.    Yeah, they prescribe the language.

24   Q.    Okay.

25        A.    And we put it on our -- each county does it

1    differently in terms of the types of affidavits, the

2    size of the paper, the layout.  So that language would

3    have come from the secretary of state.

4         Q.   And how do they send that language to you?  Is

5    it in an e-mail, or how do you receive it?

6         A.   You know, I'm kind of speaking outside my

7    domain.  This would be between the county clerk and the

8    secretary of state's office.

9         Q.   Okay.

10        A.   And I just can't speak to that.

11        Q.   Got it, okay.  And the disability exemption

12   for folks who have a reported disability and are exempt

13   for the ID requirements of S.B. 14 --

14        A.   Yes.

15        Q.   -- does your office have any involvement in

16   implementing that disability exemption?

17        A.   Yes.  We accept the form and we process it,

18   and we would indicate on their voter registration

19   certificate they have that exemption.  And we also would

20   indicate it on the poll book, if we produced a poll book

21   for a smaller entity.

22        Q.   And did your office do any outreach to inform

23   voters that this exemption exists?

24        A.   Yes.

25        Q.   What sort of outreach have you done?

1    A.    Several press releases.  I consulted with our

2    communication director, our manager, and asked him, you

3    know, "How many media sources picked up what we've sent

4    out," and he told me that there were 44 media

5    impressions.

6              That varies from on-line, to radio, to

7    e-mail blasts by non-profits.  So through press

8    releases, I guess the normal traditional sense, social

9    media.

10             We did communicate with -- well, first,

11   we created posters that were based on the secretary of

12   state's eight-and-a-half by 11 handouts describing the

13   seven forms of ID and the exemptions.

14             So we made large posters of those and put

15   those up at all of our branches.  And we also e-mailed

16   those posters out to certain people.

17             For instance, you know, the Coalition for

18   the Homeless, and they were able to integrate that into

19   one of their newsletters, I believe.

20   Q.    Any other groups or agencies that you e-mailed

21   them to, or distributed them to?

22   A.    Well, we worked with 211, which is our local

23   call center where people who have questions can call

24   that number and get answers.

25             We anticipated maybe people would call

1    211 asking these type of questions.  We wanted them to

2    be informed and educated, so we worked with them,

3    trained 30 or 40 of their call center staff.

4         Q.   And is that 211 line, what sort of -- is that

5    a city line, or a county line?

6         A.   Yes, it's some sort of non-profit, United

7    Way/City of Houston.  I don't know exactly who owns it,

8    or how it's funded.

9         Q.   Okay.  What sort of queries are usually made

10   to 211?

11        A.   Oh, boy.

12        Q.   I mean, if people are told to call 211, what

13   for?

14        A.   People -- we never instructed anyone to call

15   211.  However, we anticipated people may call that

16   number and ask these type of questions.  I think it's

17   just -

18        Q.   How do people know to call 211 for anything?

19        A.   They have their own marketing campaigns.

20        Q.   Okay.  And do you know in those campaigns why

21   they suggest calling 211?

22        A.   Oh, again, I don't know exactly what types of

23   calls they were designed to accept, but I know that they

24   accept a wide variety of phone calls, you know, just

25   general citizen-to-government type questions.

1        Q.    Okay.

2        A.    People that need help.  And they're able to

3    direct them to the proper source, you know.  "How do I

4    get a special Metro bus to come pick me up?"  211 can

5    put them in touch with Metro, or can help put them in

6    touch with the proper -- they're kind of triage for

7    people in need of services.

8        Q.    So addition -- in addition to Coalition for

9    the Homeless and 211, were there any other agencies,

10   organizations, or kind of groups that you tried to

11   disseminate information through?

12       A.    Sure.  By nature of our vehicle registration

13   work, we work with grocery stores and other

14   subcontractors who handle voter registration.  We

15   e-mailed some materials to them and asked that they post

16   those.

17                  I don't know if they did or not, but

18   we -- in terms of outreach, we reached out to them to

19   spread the word.

20       Q.    Anything else?

21       A.    You know, I participated in a conference call

22   with the county attorney's office and the county clerk's

23   office with election workers.  That's about the extent

24   of it.

25       Q.    Did you guys try to disseminate information

1   through Social Security offices?

2        A.    No, ma'am.

3        Q.    What about DHHS or any of its sort of

4   subsidiary organizations?

5               MR. RAY:  Well, I want to point out to

6   you, I don't think Mr. Harris realized this, but 211 is

7   actually run by the Texas Health and Human Services

8   Commission.

9               MS. MILLER:  Okay.

10              MR. RAY:  So the 211 line is -- you know,

11  use of that line actually would be using the Health and

12  Human Services network of all their various services, if

13  somebody were to call that number.

14       Q.    (By Ms. Miller)  Okay.  Any other -- any other

15  outreach that you did with any subsidiary of DHHS, other

16  than the 211 line?

17       A.    No, no specific outreach.

18              MS. MILLER:  I think that's all the

19  questions I have.  Thank you.

20                    EXAMINATION

21  BY MR. SCOTT:

22       Q.    Mr. Harris, my name is John Scott.  I

23  represent the Texas defendants in this litigation.  A

24  couple of real quick housekeeping things.  Documents,

25  you didn't bring any documents with you today; is that

1   correct?

2        A.    That's correct.

3        Q.    Have you provided any documents before today,

4   either to your counsel, or to Mr. Dunn, or to the

5   Department of Justice, or anybody else associated with

6   this case?

7        A.    No, sir.

8        Q.    With regard to you mentioned requests pursuant

9   to the -- I don't know that you used this terminology,

10  but the Public Information Act?

11       A.    Yes.

12       Q.    Do you recall any document request pursuant to

13  the Public Information Act that have come into your

14  office for documents similar to those that had been --

15  were in the deposition notice that you were asked to

16  bring?  Here is a copy for you to review.

17       A.    So you're asking if the Harris County tax

18  office received any open records request associated with

19  any of these documents?

20       Q.    Yes, sir.

21       A.    The answer is yes.

22       Q.    Which categories, as you recall?

23       A.    Sure.   Dealing with the provisional ballots.

24  We received a request from some organization out west in

25  Texas, maybe El Paso or so, and they wanted, basically,

1    copies of provisional ballots.  And we directed them to

2    the county clerk's office since we're not the custodian

3    of those records.

4         Q.   Have you filed any requests from a John Powers

5    at Department of Justice?

6         A.   No.

7         Q.   Do you recall visiting with anyone else with

8    the Department of Justice on document requests?

9         A.   No, sir.

10        Q.   Okay.  How about anybody over at Rice

11   University, has anyone -- have you been in touch -- has

12   anyone from Rice University's political science

13   department been in touch with you?

14        A.   Not that I'm aware of, no.

15        Q.   Okay.  Is there -- Mr. Dunn asked you what

16   race you were.  Is there anything about your race that

17   has anything to do with how you do your job?

18        A.   No.

19        Q.   Does it come into play in any role?  Does race

20   come into play in any role in doing your job?

21        A.   No.

22        Q.   You answered some questions relating to the

23   process to cure provisional votes, and the role that you

24   play in that process.

25                   Help me understand that a little bit

1    better.  When a provisional ballot is cast at the

2    polling place by an effected voter, does -- who retains

3    custody of that ballot for the next six days during that

4    cure period?

5         A.   Once we're in possession of it, we keep it

6    until the end of the cure period.

7         Q.   Okay.  And then what do you do with it?

8         A.   We remit it back to the county clerk's office.

9         Q.   So if a -- in the case of a voter ID issue, if

10   someone cures by bringing an acceptable form of photo

11   ID --

12        A.   Yes.

13        Q.   -- and shows that, do y'all forward the copy

14   of the photo ID?  How does that process work at that

15   point in time?

16        A.   We do not -- it's similar to when the person

17   votes.  We do not make a photocopy of anything.  We

18   simply make a notation, and include that, and check the

19   box that they came in to show -- there's three ways they

20   can cure their vote.  Through a permanent exemption, a

21   temporary exemption, or by showing a valid ID.  We check

22   the appropriate box.

23                  And if it's one of those temporary

24   exemptions, we would have included the associating

25   documents.  So we simply check a box on the provisional

1    affidavit.

2        Q.    And once the correct box is checked, does that

3    end the cure period for that ballot, and so thereby, you

4    forward that immediately over to the county clerk?

5        A.    Yes, sir.  As soon as they cure their vote,

6    there is no need to retain it for the six-day period.

7        Q.    And it's forwarded on and they do with it

8    whatever they're going to do?

9        A.    Yes.

10       Q.    Okay.  You were asked some questions about

11   deputy registrar training.  First of all, what is a

12   deputy registrar?

13       A.    These are volunteer deputy registrars in the

14   State of Texas.  Anyone who qualifies can be appointed

15   by our office to accept voter registrations and turn

16   them into our office.

17       Q.    And what are the qualifications to become a

18   volunteer deputy registrar?

19       A.    Okay.  I may omit a qualification or two, but

20   generally speaking, you have to be 18 years of age,

21   cannot be convicted of an ID fraud felony.  It's very

22   nominal qualifications.  I think similar mental health

23   rules as in the ability to vote.

24                   You cannot be discharged by a court of

25   being not mentally sane, and you have to attend a

1    volunteer deputy training course.

2        Q.   Is that course put on by your office here in

3    Harris County?

4        A.   Yes, sir.

5        Q.   Or is it put on by someone else?

6        A.   We host, and we teach and train the course.

7        Q.   And do they sign off on when they complete

8    their study?  How do you keep track of who's completed

9    and who hasn't?

10       A.   Sure.

11       Q.   I guess that's a better way to ask.

12       A.   It's as simple as a sign-in sheet.

13       Q.   Okay.  And when a volunteer deputy registrar

14   goes out and signs people up, is there a way to track

15   who they have signed up through y'all's process?

16       A.   Each volunteer deputy has a unique number

17   that's associated with the form that they -- the

18   application that they submit to us.

19            So, yes, we can -- we can identify an

20   application we've received and associate it with the

21   particular volunteer that turned it in.

22       Q.   So when there's a no-match list, we talked

23   about that a little bit in your deposition, the people

24   who at least on the surface do not appear to have a

25   photo ID that's matched up to a registrar, a person

1    who's registered to vote.   So for purposes of our

2    deposition, you understand a no match to be that; is

3    that correct?

4         A.   This is -- by no match you mean that the

5    official list of registered voters has been matched with

6    DPS lists, or what?

7         Q.   Well, let's limit it at that level.

8         A.   Okay.

9         Q.   Because that's what -- a number that I think

10   the county clerk comes up with is soft matches.

11        A.   Okay.

12        Q.   People who do not match up identically between

13   the registrar roles and the DPS data.

14        A.   Okay.

15        Q.   So of those people, each one of those persons

16   will have a unique ID number attached to a deputy

17   volunteer registrar, if they were signed up by one?

18        A.   No, I think I've omitted a major, major

19   fundamental principle here.

20        Q.   Okay.

21        A.   That these volunteers are in addition to how

22   we receive applications through mail and otherwise.

23        Q.   Okay.

24        A.   So while they do turn in a substantial amount

25   of applications, not every application is associated

1   with a volunteer deputy.

2        Q.   Percentage-wise, in Harris County, as we sit

3   here today, what percent of the registered voters would

4   you estimate are the result of volunteer deputy

5   registrar activity?

6        A.   I cannot answer that for fear that I would not

7   accurately give you a picture.

8        Q.   Okay.

9        A.   I can tell you that we have over 5,000

10   volunteer deputies out there.

11        Q.   But if it came -- so if we're trying to go

12   back and track and figure out who was signed up by a

13   volunteer deputy registrar --

14        A.   Yes.

15        Q.   -- there would be a connection with that

16   voter's information, that would identify a unique number

17   and, thereby, the fact that it has a unique number it

18   would be connected to a sign-up by a volunteer deputy

19   registrar; correct?

20        A.   Yes, sir, yes.

21        Q.   Okay.  During the training of the deputy

22   registrars, the volunteer deputy registrars, are they

23   cautioned about attempting to sign people up who are

24   registered to vote in other states?

25        A.   Are they cautioned to not register people who

1    are registered in other states?

2          Q.    Sure.

3          A.    We follow a strict Power Point provided by the

4    secretary of state.  I don't believe that's specifically

5    mentioned in the Power Point.  So --

6          Q.    In order for someone to be registered to vote

7    in Texas, they have to consider themselves domiciled in

8    the State of Texas for a period of time, 30 days; is

9    that correct?

10         A.    For voting purposes?

11         Q.    Yes.

12         A.    No, I believe they have to --

13         Q.    Is it 60?

14         A.    No, sir.  I believe they have to submit an

15   application, or they attest to the fact they reside at

16   the address provided.

17         Q.    And residency requirements in order to be able

18   to register to vote in Texas, in Harris County, are

19   what?

20         A.    Oh, well, I mean, registration is effective

21   after 30 days.

22         Q.    Okay.

23         A.    So 30 days after the application, it becomes

24   effective.  So in that sense, if that's --

25         Q.    Are you aware of situations where deputy

1   volunteer -- or volunteer deputy registrars are

2   attempting to sign up people who consider themselves

3   residents of other states?

4       A.   Am I aware of any volunteer deputies who are

5   attempting to register people in other states?

6       Q.   No.  Who are registered to vote in other

7   states who consider themselves a resident of those other

8   states.

9       A.   I'm not personally aware of that.

10      Q.   The database that's used for purposes of the

11  Harris County elections, that is the one that you are in

12  charge of; correct, of registered voters?

13      A.   Yes.

14      Q.   The TEAM database is information that's

15  uploaded from Harris County to TEAM -- to the secretary

16  of state, but you don't actually use the TEAM database

17  for purposes of implementing the elections; correct?

18      A.   Correct.

19      Q.   So Mr. Dunn asked you some questions about

20  potential differences in names and spaces in the last

21  names.  Do you recall those questions?

22      A.   Yes.

23      Q.   With regard to for purposes of implementing an

24  election, for purposes of trying to determine who is not

25  a correct match, the best source of that database would

1    be your database that you use to implement the

2    elections; correct?

3         A.   Well, we are one piece of information, the

4    official list of registered voters.

5         Q.   And it is the only official list; correct?

6         A.   Correct.

7         Q.   The TEAM database simply attempts to copy that

8    database, is your understanding; correct?

9         A.   Correct.  Now, we're an off-line county.  I

10   don't know if that factors into what you're saying or

11   not.  Other counties are on-line, and I can't speak to

12   how they operate.

13        Q.   We're speaking of your county.

14        A.   Yes.

15        Q.   Harris County.

16        A.   Yes.

17             MR. SCOTT:  That's all the questions I

18   have for you.  Thank you for your time, sir.

19                    FURTHER EXAMINATION

20   BY MR. DUNN:

21        Q.   Well, just to follow up, what did you mean by

22   off-line versus on-line counties?

23        A.   Some counties, I believe, instead of using

24   their own internal database, they rely on the state.

25   They upload and enter all their information to the TEAM

1  system, and that is their database for that county.

2  Because of the volume, that's just simply not possible

3  here in Harris County.

4      Q.   So is another way of saying that, in some

5  counties, the county voter registrar's office input and

6  work directly out of TEAM, whereas in Harris County, you

7  use a different software, and then it's, you know,

8  meshed with TEAM?

9      A.   Then they may maintain their records through

10  the TEAM system, if that's -- but again, I can't speak

11  to how other counties do it.

12                 MR. DUNN:  Sure.  All right.  Thank you

13  very much.

14                 MR. RAY:  I guess we're done.

15

16

17

18

19

20

21

22

23

24

25

```
 1                    CHANGES AND SIGNATURE

              FOR THE DEPOSITION OF J.R. HARRIS

 2                    JUNE 17, 2014

 3    PAGE   LINE   CHANGE                    REASON

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

```
 1              I, J.R. HARRIS, have read the foregoing
 2   deposition and hereby affix my signature that same is
 3   true and correct, except as noted above.
 4
 5
 6
 7                    _____
                              J.R. HARRIS
 8
 9   THE STATE OF _____ )
10   COUNTY OF _____ )
11              Before me, _____, on
     this day personally appeared J.R. HARRIS, known to me or
12   proved to me under oath or through _____
     (description of identity card or other document) to be
13   the person whose name is subscribed to the foregoing
     instrument and acknowledged to me that they executed the
14   same for the purposes and consideration therein
     expressed.
15
                Given under my hand and seal of office
16   this _____ day of _____, 2014.
17
18
                     _____
19                   NOTARY PUBLIC IN AND FOR
                     THE STATE OF _____
20
21
22
23
24
25
```

```
 1                  IN THE UNITED STATES DISTRICT COURT
                   FOR THE SOUTHERN DISTRICT OF TEXAS
 2                       CORPUS CHRISTI DIVISION
 3   MARC VEASEY, JANE HAMILTON,        )
     SERGIO DELEON, FLOYD J. CARRIER,)
 4   ANNA BURNS, MICHAEL MONTEZ,        )
     PENNY POPE, OSCAR ORTIZ, KOBY     )
 5   OZIAS, JOHN MELLOR-CRUMMEY,        )
     JANE DOE, JOHN DOE, LEAGUE OF     )   CIVIL ACTION NO.
 6   UNITED LATIN AMERICAN CITIZENS    )   2:13-CV-193 (NGR)
     (LULAC), AND DALLAS COUNTY,       )   (lead case)
 7   TEXAS                             )
                                       )
 8   VS.                               )
                                       )
 9   RICK PERRY, Governor of Texas,    )
     and JOHN STEEN, Texas Secretary )
10   of State,                         )
     _____)
11                                     )
     UNITED STATES OF AMERICA,         )
12                                     )
     V.                                )
13                                     )
     STATE OF TEXAS, JOHN STEEN, in )      CIVIL ACTION NO.
14   his official capacity as Texas    )    2:13-CV-263 (NGR)
     Secretary of State, and STEVE    )   (consolidated case)
15   MCCRAW, in his official capacity)
     as Director of the Texas          )
16   Department of Public Safety,      )
     _____)
17                                     )
     TEXAS STATE CONFERENCE OF NACCP )
18   BRANCHES, AND THE MEXICAN         )
     AMERICAN LEGISLATIVE CAUCUS OF )
19   THE TEXAS HOUSE OF                )
     REPRESENTATIVES,                  )
20                                     )
     V.                                )      CIVIL ACTION NO.
21                                     )   2:13-CV-291 (NGR)
     JOHN STEEN, in his official       )   (consolidated case)
22   capacity as Texas Secretary of )
     State, and STEVE MCCRAW, in his )
23   official capacity as Director of)
     the Texas Department of Public  )
24   Safety                            )
25
```

1                REPORTER'S CERTIFICATION

                DEPOSITION OF J.R. HARRIS

2                   JUNE 17, 2014

3        I, Cynthia C. Miller, a Certified Shorthand

4   Reporter in and for the State of Texas, do hereby

5   certify that the facts as stated by me in the caption

6   hereto are true, that the above and foregoing answers of

7   the witness, J.R. HARRIS, to the questions as indicated

8   were made before me by the said witness after being

9   first duly sworn to testify to the truth, and same were

10  reduced to writing under my direction; that the above

11  and foregoing deposition as set forth in writing is a

12  full, true and correct transcript of the proceedings had

13  at the time of taking said deposition; that as requested

14  the deposition was made available for the witness to

15  read and sign.

16       I further certify that I am not, in any

17  capacity, a regular employee of the party in whose

18  behalf this deposition is taken, nor in the regular

19  employ of their attorney, and that I am not interested

20  in the cause, nor of kin or counsel to either of the

21  parties.

22

23

24

25

1
2          GIVEN under my hand and seal of office on
3    this, the 9th day of July, A. D. 2014.
4
5
6
7    _____
                CYNTHIA C. MILLER, Texas CSR 8065
8               Certification Expiration 12/31/2014
                Firm Registration No. 378
9               P.O. Box 169
                Tomball, Texas 77377
10              281.376.9303
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25