BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

1 (Pages 1 to 4)

## 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION
 3  MARC VEASEY, et al.,         )
                                 )
 4          Plaintiff,           )
                                 )
 5  VS.                          )  CIVIL ACTION NUMBER:
                                 )  2:13-CV-193 (NGR)
 6  RICK PERRY, et al.,          )
                                 )
 7          Defendants.          )
                                 )
 8  _____)
    UNITED STATES OF AMERICA,    )
 9                               )
            Plaintiff,           )
10                               )
    VS.                          )  CIVIL ACTION NUMBER:
11                               )  2:13-CV-263 (NGR)
    TEXAS LEAGUE OF YOUNG VOTERS )
12  EDUCATION FUND, et al.,      )
                                 )
13     Plaintiff-Intervenors,    )
                                 )
14  TEXAS ASSOCIATION OF HISPANIC)
    COUNTY JUDGES AND COUNTY     )
15  COMMISSIONERS, et al.,       )
                                 )
16     Plaintiff-Intervenors,    )
                                 )
17  VS.                          )
                                 )
18  STATE OF TEXAS, et al.,      )
                                 )
19          Defendants.          )
                                 )
20  _____)
    TEXAS STATE CONFERENCE OF    )
21  NAACP BRANCHES, et al.,      )
                                 )
22          Plaintiffs,          )
                                 )  CIVIL ACTION NUMBER:
23  VS.                          )  2:13-CV-291(NGR)
                                 )
24  NANDITA BERRY, et al.,       )
                                 )
25          Defendants.          )
```

## 2

```
 1  BELINDA ORTIZ, et al.,    )
                             )
 2       Plaintiffs,         )
                             )
 3  VS.                      )  CIVIL ACTION NUMBER:
                             )  2:13-CV-348(NGR)
 4  STATE OF TEXAS, et al.,  )
                             )
 5       Defendants.         )
                             )
 6  _____)
 7
    ************************************************
 8
                    DEPOSITION OF
 9
                    BRYAN HEBERT
10
                    JUNE 17, 2014
11
    ************************************************
12
                  HIGHLY CONFIDENTIAL
13
14      ORAL DEPOSITION OF BRYAN HEBERT, produced as a
15  witness at the instance of the Plaintiff, was duly
16  sworn, was taken in the above-styled and numbered cause
17  on the JUNE 17, 2014 from 9:05 a.m. to 5:51 p.m., before
18  Chris Carpenter, CSR, in and for the State of Texas,
19  reported by machine shorthand, at the Office of the
20  Attorney General, 209 West 14th Street, Austin, TX
21  78701, pursuant to the Federal Rules of Civil Procedure
22  and the provisions stated on the record or attached
23  hereto.
24
25
```

## 3

```
 1              A P P E A R A N C E S
 2  FOR THE UNITED STATES OF AMERICA:
 3      Elizabeth Westfall
        U.S. JUSTICE DEPARTMENT
 4      CIVIL RIGHTS DIVISION
        Room 7254 NWB
 5      950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530
 6      (202) 514-0828
        elizabeth.westfall@usdoj.gov
 7
    FOR THE NAMED DEFENDANTS RICK PERRY, ET AL.:
 8
        G. David Whitley
 9      Assistant Deputy Attorney General
        ATTORNEY GENERAL OF TEXAS
10      P.O. Box 12548
        Austin, TX  78711-2548
11      (512) 475-3281
        david.whitley@texasattorneygeneral.gov
12
13  FOR THE WITNESS:
14      Linda Halpern
        Manager of Complex Litigation
15      ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
16      Austin, TX  78711-2548 MC109
        (512) 475-1969
17      linda.halpern@texasattorneygeneral.gov
18      Brooke Paup
        Deputy Division Chief
19      Intergovernmental Relations Division
        ATTORNEY GENERAL OF TEXAS
20      P.O. Box 12548
        Austin, TX  78711-2548
21      (512) 936-1381
        brooke.paup@oag.state.tx.us
22  FOR TEXAS LEAGUE OF YOUNG VOTERS' EDUCATION FUND:
23      Kelly P. Dunbar
        WILMER HALE
24      1875 Pennsylvania Avenue, NW
        Washington, DC 20006
25      (202) 663-6262
```

## 4

```
 1  FOR THIRD-PARTY LEGISLATORS:
 2      Arthur D'Andrea
        Assistant Solicitor General
 3      ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
 4      Austin, TX  78711-2548
        (512) 936-2868
 5      arthur.dandrea@oag.state.tx.us
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

2 (Pages 5 to 8)

5

INDEX

1
2   Appearances........................................2
3   BRYAN HEBERT
4       Examination by Ms. Westfall................7
        Examination by Mr. Dunbar................257
5
    Signature and Changes............................290
6
    Reporter's Certificate...........................291
7
8           EXHIBITS
9   NO. DESCRIPTION                    PAGE MARKED
10  148   Deposition Subpoena              10
11  149   Subpoena to Produce Documents        11
12  150   Senate Bill 362               34
13  151   Texas Legislature Online History     34
14  152   81st Legislature Senate Rules      57
15  153   January 14, 2009 DallasNews.com article re  60
        Voter ID
16
    154   Senate Journal entry from the 23rd day of  70
17      session, March 18, 2009
18  155   TX00087007 through 87014         78
19  156   TX 00090532 through TX 00090543     103
20  157   Hebert to Noe Barrios, date 1-13-2011  109
21  158   TX0003456 Talking points         115
22  159   Press release from the Lieutenant Governor's 122
        office re Gov. Perry's emergency call
23
    160   January 20, 2011 letter to Senator Birdwell 125
24
    161   January 12, 2011 version of SB 14    128
25

7

BRYAN HEBERT,
having been first duly sworn to testify the truth, the
whole truth, and nothing but the truth, testified as
follows:
            EXAMINATION
BY MS. WESTFALL:
    Q.  Good morning, Mr. Hebert.  Could you state and
spell your name for the record, please?
    A.  Bryan Hebert, B-R-Y-A-N, H-E-B-E-R-T.
    Q.  My name is Elizabeth Westfall.  I represent the
United States in this action.  And I will let other
people at the table introduce themselves.
        MR. DUNBAR:  I'm Kelly Dunbar.  I
represent the Texas League of Young Voters' Education
Fund, Intervenors.
        MS. HALPERN:  I'm Linda Halpern.  I
represent the witness.
        MS. PAUP:  Brooke Paup, co-counsel.
        MR. WHITLEY:  David Whitley, here on
behalf of the named defendants.
        MR. D'ANDREA:  My name is Arthur D'Andrea.
I represent third-party legislators, and these are two
interns from our office who are helping out on the case.
    Q.  (By Ms. Westfall) Mr. Hebert, you were deposed
in Texas versus Holder, correct?

6

1   162   Senate Rules, 82nd Legislature, Jan. 19,  152
        2011
2
3   163   E-Mail Chain, Jan. 21, 2011       153
4   164   E-Mail Chain, Jan. 22, 2011       168
5   165   Copy of SB 14              182
6   166   E-Mail Chain, Jan 24, 2011       188
7   167   E-Mail, Jan. 24, 2011          194
8   168   E-Mail, Jan. 27, 2011          198
9   169   E-Mail Chain, Jan. 24, 2011       198
10  170   E-Mail, Jan. 24, 2011          206
11  171   Legislative History of SB 14      209
12  172   E-Mail Chain, Feb. 1, 2011       213
13  173   Defendant's Objections and Responses to  215
        Plaintiffs and Plaintiff Intervenors First
14      Set of Interrogatories
15  174   Senate Journal, Jan. 26, 2011      220
16  175   Lt. Governor Dewhurst Statement Regarding  227
        Passage of Voter ID
17  176   E-Mail, Jan. 27, 2011 and Attachment  230
18  177   E-Mail Chain, 9/16/2013         251
19
20
21
22
23
24
25

8

    A.  Correct.
    Q.  Do you remember the instructions you received
at that deposition?
    A.  It would probably be better if you'll refresh
my memory.
    Q.  Certainly.  Have you been deposed in any other
action since you were deposed in Texas versus Holder?
    A.  No.
    Q.  Have you testified in court since that
deposition?
    A.  No.
    Q.  And to rereview the rules, you understand you
must answer questions truthfully, accurately and
completely?
    A.  Yes.
    Q.  The court reporter here will prepare a
transcript of everything that is said today, correct?
    A.  Correct.
    Q.  You must respond to my questions verbally and
not shake your head in response; is that okay?
    A.  Yes.
    Q.  Please wait for me to finish my questions
before you answer, and I will try to do the same.
    A.  Okay.
    Q.  I will try to ask you clear questions, but if

BRYAN HEBERT                                      6/17/2014
CONFIDENTIAL TRANSCRIPT

9

1  you don't understand a question, please feel free to ask
2  for a clarification, okay?
3      **A.  Okay.**
4      Q.  If you wish to stop and take a break, let me
5  know.  We can take a break at any time.  But if a
6  question is pending, I would ask that you answer the
7  question first, okay?
8      **A.  Okay.**
9      Q.  If you would -- you understand that you're
10  under oath.  You've just been sworn in.  You may be
11  subject to penalty of perjury for giving false or
12  misleading; right?
13      **A.  Yes.**
14      Q.  Do you understand these instructions?
15      **A.  I do.**
16      Q.  Are you on any medication today that would
17  affect your ability to testify?
18      **A.  No.**
19      Q.  Is there any other reason why you can't testify
20  truthfully today?
21      **A.  No.**
22      Q.  I may use the terms Voter ID and Photo ID
23  interchangeably during this deposition.  I want you to
24  interpret that term as broadly to mean a requirement
25  that a voter present a form of identification, whether

10

1  it has a photo on it or otherwise, when voting in
2  person.  Do you understand?
3      **A.  Yes.**
4      Q.  I may refer to Lieutenant Governor Dewhurst,
5  Mr. Dewhurst, or the Lieutenant Governor's Office.
6  Again, I want you to construe that, those terms as
7  broadly as possible, okay?
8      **A.  Okay.**
9      Q.  And also, when I refer to the term minority
10  voters, I mean voters who are not White, non-Anglo.  Do
11  you understand?
12      **A.  Yes.**
13      Q.  When I refer to communications, I mean both
14  oral and written communications, including e-mail
15  communications.  Do you understand?
16      **A.  Yes.**
17      Q.  Are you represented by counsel today?
18      **A.  Yes.**
19      Q.  Who is that?
20      **A.  Ms. Halpern.**
21          MS. WESTFALL:  Could you mark this?
22          (Brief discussion off the record.)
23          (Exhibit 148 marked for identification.)
24      Q.  (By Ms. Westfall)  You've been handed what's
25  been marked as Exhibit 148.  Do you recognize this

11

1  document?
2          MS. HALPERN:  Do you have a copy for me,
3  Counsel?
4          MS. WESTFALL:  Yes, I do.
5          MS. HALPERN:  Thank you.
6          MS. WESTFALL:  I meant to pass that to
7  you.  My apologies.
8      Q.  (By Ms. Westfall)  Do you recognize this
9  document?
10      **A.  Yes.**
11      Q.  What is it?
12      **A.  It is a subpoena to appear at this deposition.**
13          MS. WESTFALL:  Reporter, could you please
14  mark this?
15          (Exhibit 149 marked for identification.)
16      Q.  (By Ms. Westfall)  You've been handed what's
17  been marked as Exhibit 149.  Do you recognize this
18  document?
19      **A.  Yes.**
20      Q.  What is it?
21      **A.  It's a subpoena to produce certain documents**
22  **related to Voter ID.**
23      Q.  Have you searched for these documents?
24      **A.  I have.**
25      Q.  Have you completed your search?

12

1      **A.  I have.**
2      Q.  Have you provided these documents to counsel?
3      **A.  I have.**
4      Q.  Do you conduct any official business for the
5  Lieutenant Governor through an e-mail that is not a
6  state-run or Lieutenant Governor office-run e-mail?
7      **A.  No.**
8      Q.  In other words, do you use a personal e-mail
9  account to conduct work business?
10      **A.  No.**
11      Q.  Did you ever work on any of the Lieutenant
12  Governor's campaigns?
13      **A.  No.**
14      Q.  Did you use an e-mail -- have you used an
15  e-mail to communicate with his campaigns ever?
16      **A.  No.**
17      Q.  Do you see, turning back to Exhibit 149, that
18  the subpoena requests you produce documents from e-mail
19  sent or received through official state e-mail as well
20  as e-mail addresses used to conduct other official state
21  business?
22      **A.  Could you repeat that?  I'm sorry.**
23      Q.  Certainly.  It's a bit of a confusing question.
24  Do you see that Exhibit 149, in the instructions, it
25  requires you to search both, in essence, your personal

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

13

1 e-mail and your official state or e-mail run through the
2 Lieutenant Governor's Office. Do you see that in the
3 instructions?
4       MS. HALPERN: Can you give us a number,
5 Counsel?
6       MS. WESTFALL: If you turn to Exhibit A on
7 Page 2 of Paragraph 8.
8    Q. (By Ms. Westfall) Do you see that the
9 instructions direct you to look at your personal e-mail
10 as well as your work e-mail --
11   **A. Yes.**
12   Q. -- for responsive e-mails?
13   **A. Yes.**
14   Q. Did you do that?
15   **A. Yes.**
16   Q. How does the Lieutenant Governor communicate
17 with his constituents?
18   **A. Typically, correspondence from constituents**
19 **comes into our office in the form of an e-mail or a**
20 **letter, and we reply in a similar manner.**
21   Q. Does he have an e-mail newsletter?
22   **A. I'm not sure. I don't think so.**
23   Q. Does he have a mailing list that he sends
24 letters to?
25   **A. I'm not sure.**

14

1    Q. Did you prepare for today's deposition?
2    **A. Yes.**
3    Q. How did you prepare?
4    **A. I reviewed my transcript of my deposition last**
5 **time. I met with counsel, and I just be sort of checked**
6 **to see if there were any current developments related to**
7 **implementation of Voter ID.**
8    Q. When you met with counsel, was anyone else
9 present?
10   **A. No.**
11   Q. Did you review any documents at that meeting
12 with counsel?
13   **A. Other than -- yes, copies of the bills, and my**
14 **transcript from last time.**
15   Q. Anything else?
16   **A. No.**
17   Q. Other than your attorney, have you spoken to
18 anyone about your deposition today?
19   **A. No.**
20   Q. Did you bring any notes or documents with you
21 today?
22   **A. No.**
23   Q. Are you still a member of the Texas bar?
24   **A. Yes.**
25   Q. Are you licensed to practice law in other

15

1 states?
2    **A. No.**
3    Q. And you were first hired -- I'm going to try to
4 lead you through some of your background so we can get
5 through this quickly since we've already covered that in
6 a prior deposition. You were first hired as counsel for
7 public policy for Mr. Dewhurst in 2007; is that right?
8    **A. Correct.**
9    Q. You were promoted to Deputy General Counsel in
10 2008 or 2009; is that correct?
11   **A. Correct.**
12   Q. Which year was that you were promoted?
13   **A. 2009 -- wait -- yes, I'd say 2009.**
14   Q. Did your responsibilities as Deputy General
15 Counsel include providing opinions on law to the
16 Lieutenant Governor?
17   **A. Yes.**
18   Q. What were the circumstances under which that
19 occurred?
20   **A. Analyzing legislation, reviewing open records**
21 **requests, and whatever questions he might have about any**
22 **legal matter.**
23   Q. Can you think of any other instances when you
24 provided him with legal advice?
25       MS. HALPERN: Let me caution you not to

16

1 reveal any attorney-client confidences in answering that
2 question.
3    Q. (By Ms. Westfall) And just to clarify, I'm
4 only asking for categories of communications, not the
5 substance thereof.
6    **A. I think those broad categories cover it.**
7    Q. Did your responsibilities as Deputy General
8 Counsel include providing assistance to the Lieutenant
9 Governor in any legal proceedings?
10   **A. I -- I do not recall. I do not think so.**
11   Q. Did your responsibilities as Deputy General
12 Counsel include providing professional legal services
13 unrelated to policy choices or political considerations?
14   **A. Can you just repeat that?**
15   Q. Sure. Did your responsibilities as Deputy
16 General Counsel include providing professional legal
17 services unrelated to policy or political
18 considerations?
19   **A. I mean, to the extent the Lieutenant Governor**
20 **does things like communicate with constituents or**
21 **receive open records requests or procedural matters**
22 **within the Senate, yes, but for the most part, it was**
23 **all under an umbrella of legal advice.**
24   Q. And you served as Deputy General Counsel until
25 January 2012?

BRYAN HEBERT                                            6/17/2014
CONFIDENTIAL TRANSCRIPT

5 (Pages 17 to 20)

---

**17**

1    A. Correct.
2    Q. During the five-year period that you served as
3 Mr. Dewhurst's deputy general counsel, you were the
4 point person for the Secretary of State's office; is
5 that right?
6    A. Correct.
7    Q. Fair to say you're quite familiar with the
8 Texas election code?
9    A. Correct.
10   Q. You became employed somewhere else in January
11 2012?
12   A. Yes.
13   Q. Where was that?
14   A. I was an independent political consultant, and
15 I had clients and was in the process of forming a
16 partnership.
17   Q. You served -- did you serve as the executive
18 director for the Texas Conservative Roundtable?
19   A. I did.
20   Q. Was that a client or was that a paid employment
21 position?
22   A. Client.
23   Q. While you were consulting in 2012, did you ever
24 provide any advice to a campaign candidate or political
25 party?

---

**18**

1    A. No.
2    Q. And what happened to your efforts to enter into
3 a partnership?
4    A. Before we could finish, I was given a great
5 offer to return to the capital when my boss was
6 remaining as Lieutenant Governor.
7   Q. So was there a time when Mr. Dewhurst rehired
8 you?
9   A. Yes.
10   Q. When was that?
11   A. That was in October of 2012.
12   Q. What position did he hire you for?
13   A. General counsel.
14   Q. How did that opportunity arise?
15   A. He unexpectedly was given the opportunity to
16 remain Lieutenant Governor, and his general counsel at
17 the time left to take another position. And he had an
18 opening, and his chief of staff reached out to me and
19 offered me the position.
20   Q. Who was his chief of staff at that time?
21   A. Blaine Brunson.
22   Q. What are your responsibilities? Do you
23 currently still hold that position?
24   A. I do.
25   Q. What are your responsibilities as general

---

**19**

1 counsel?
2    A. Overseeing the legal staff, providing legal
3 counsel to the Lieutenant Governor and staff, answering
4 open records requests, serving as public information
5 officer for our office, assorted other legal issues.
6   Q. Are you still the point person for the
7 Secretary of State's Office or is someone else handling
8 those responsibilities?
9   A. Someone else.
10   Q. Who is that person?
11   A. Constance Allison.
12   Q. Has that person -- how long has Constance
13 Allison been employed with Mr. Dewhurst?
14   A. I believe she started when I did, which would
15 be October or so, 2012.
16   Q. Is she involved in any way in implementation of
17 SB 14?
18   A. Not that I know of.
19   Q. Who is the point person for the Department of
20 Public Safety in your office?
21   A. I think currently that position is open, and so
22 I imagine our acting chief of -- acting chief of staff
23 would handle those requests.
24   Q. Who is that person?
25   A. John Opperman.

---

**20**

1    Q. Do you handle communications with the
2 Department of Public Safety in any way right now for the
3 Lieutenant Governor?
4   A. To the extent that DPS is involved with Voter
5 ID, I have communicated with them.
6   Q. And when have those communications occurred?
7   A. Maybe only during 2013, a couple of e-mails.
8   Q. What were the e-mails about?
9   A. They were inquiries from me about efforts to
10 implement distribution of identification.
11   Q. Were these e-mails around the fall, early fall
12 of 2013?
13   A. I can't recall.
14   Q. And what did you learn as a result of your
15 e-mail communication with DPS?
16   A. I learned that DPS -- I think I -- from this
17 e-mail, I learned that DPS was increasing their office
18 hours in certain locations. They were implementing
19 mobile unit efforts. They were pursuing an education
20 initiative. There may have been more, but I think
21 that's right.
22   Q. What prompted you to initiate these
23 conversations?
24   A. I met with some constituents who asked about
25 state efforts to implement the program.

---

BRYAN HEBERT                                            6/17/2014
CONFIDENTIAL TRANSCRIPT

6 (Pages 21 to 24)

---

**21**

1   Q.  Who were the constituents?
2   A.  I don't remember their individual names, but
3   the organization, I believe, was called True the Vote.
4   Q.  And so you were following up on -- on
5   meetings -- meetings that you had with these
6   constituents and seeking a status update from DPS as to
7   how they were implementing the EICs; is that correct?
8   A.  Correct.
9   Q.  Have you had any communications with DPS
10  subsequent to those e-mail communications in 2013?
11  A.  I don't think so.
12  Q.  Do you have any reason to know whether DPS has
13  in fact undertaken the activities you've just testified
14  to?
15  A.  I've seen news accounts to that effect, so yes.
16  Q.  Where were the news accounts?
17  A.  We at the Capitol every day, we get a list of
18  legislative and newspaper clippings from across the
19  state and across -- reading those every day, I've --
20  I've seen various accounts.
21  Q.  And the accounts said what?
22  A.  They said that -- what I mentioned earlier,
23  that there were efforts through local media to publicize
24  extended hours, the mobile units, et cetera.
25  Q.  So you have not had any communications directly

---

**22**

1   with DPS since those e-mail communications in 2013; is
2   that correct?
3   A.  I think that's correct.
4   Q.  Has anyone, to your knowledge, in your office,
5   had any communications with DPS since the fall of 2013?
6   A.  Not that I'm aware.  I assume someone has, but
7   not relating to Voter ID.
8   Q.  During the 2009 legislative session, which I
9   guess was the 81st Session, who did you report to?
10  A.  2009, I would have been deputy general counsel
11  and would have reported to Frank Battle.
12  Q.  Did Mr. Battle review drafts of --
13  A.  I'm sorry.  It was either Frank Battle or
14  Spencer Reid, whoever was the general counsel, and I'm
15  forgetting when Spencer left.
16  Q.  Did Mr. Battle or Mr. Spencer review drafts of
17  your work product before they were circulated outside of
18  your office?
19  A.  Sometimes.
20  Q.  When would those circumstances arise?
21  A.  It -- I mean, some memos, I thought Frank or
22  Spencer had, you know, some -- that they either needed
23  to see it or it would be useful for them to see it, but
24  not every memo or brief was sent through them for
25  review.

---

**23**

1   Q.  How did you in your own mind decide when you
2   would run things by Mr. Battle for review?
3   A.  I can't say, just a case-by-case basis.
4   Q.  Would you typically run draft e-mails by him
5   before you sent them to other staff for the Senate?
6   A.  I may have, but not every time.
7   Q.  And if you did a memo or talking points or
8   something more substantive, would you tend to run those
9   by Mr. Battle before you sent them out?
10  A.  Again, maybe, it would depend on the specific
11  item.
12  Q.  Were there any rules or guidelines that
13  Mr. Battle presented you with or that were understood as
14  to when you could or could not circulate written work
15  product outside of the office?
16  A.  I don't think so.
17  Q.  Did anyone else in the office beside Mr. Battle
18  review your written work product before it went out if
19  you decided to run it by somebody?
20  A.  Possibly Julia Rathgeber, our policy director
21  or legislative director, I forget her title.
22  Q.  Anybody else?
23  A.  Possibly our chief of staff, who in 2009 would
24  have been Rob Johnson.
25  Q.  Did Mr. Dewhurst ever review any of your drafts

---

**24**

1   before they went out?
2   A.  Not that I recall.
3   Q.  Never, not once?
4   A.  Not that I recall.  There, again, there may
5   have been some particular memo, and I guess it depends
6   on who the intended audience would be, but not that I'm
7   recalling now.
8   Q.  Did you ever prepare memos from Mr. Dewhurst
9   that were also -- that you also subsequently shared with
10  the staff in the Senate?
11  A.  I may have shared memos with both Lieutenant
12  Governor Dewhurst and other staff.
13  Q.  Did any of those involve photo ID?
14  A.  Probably.
15  Q.  Do you recall which ones you shared with both
16  Mr. Dewhurst and staff?
17  A.  I do not.
18  Q.  Do you recall drafting talking points about the
19  bills, any of the bills that you shared with both
20  Mr. Dewhurst and other staff?
21  A.  I probably did.  I think drafting talking
22  points and substantive sort of white papers is pretty
23  common.
24  Q.  And they would be shared with both Mr. Dewhurst
25  and other staff concurrently or sequentially?

---

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

7 (Pages 25 to 28)

25

1    A.  They may have been.
2    Q.  During the 2011 82nd Session, who did you
3  report to?
4    A.  2011, I reported to Frank Battle, the general
5  counsel.
6    Q.  And you're confident that that was the person
7  you reported to?
8    A.  It was definitely Frank.
9    Q.  Closer in time, easier to remember.  Did
10  Mr. Battle have a similar kind of review process for
11  your written work product --
12    A.  Yes.
13    Q.  -- that you just testified to in 2009?
14    A.  Yes.
15    Q.  Thank you.  And I think I asked you this before
16  a little differently but you -- were you involved in any
17  capacity in any of Mr. Dewhurst's campaigns?
18    A.  No.
19        MS. HALPERN:  Objection, asked and
20  answered.
21    Q.  (By Ms. Westfall)  Were you involved -- did you
22  have any advisory in or any informal role, unpaid role,
23  in any campaign?
24    A.  No.
25    Q.  Did the campaign staff consult with you on

26

1  anything ever?
2    A.  I'm sure -- I mean, I know people on his
3  campaign.  I'm sure I talked about the campaign and how
4  it was going, but I'm not remembering any specific
5  instance of any sort of consultation.
6    Q.  Did Texas -- did the Texas Legislature consider
7  a Voter ID bill in 2007?
8    A.  I believe yes.
9    Q.  Was that bill HB 218?
10    A.  I -- I get the numbers and the years confused.
11  If you had a copy to double-check, I could be certain.
12    Q.  And was -- rather than marking another exhibit,
13  was any Voter ID bill passed, enacted in 2007?
14    A.  I don't believe so.
15    Q.  And was there support in the Legislature for
16  advancing a Voter ID bill in the following legislative
17  session?
18    A.  In 2009?
19    Q.  Yes.
20    A.  Regular session, I believe a bill was filed,
21  and I do not believe a bill finally passed.
22    Q.  Do you recall whether any particular members
23  expressed support for advancing a Voter ID bill in 2009?
24    A.  I don't remember particular members, no.  I
25  mean, obviously, the bill sponsors, but I can't remember

27

1  individual legislators.
2    Q.  Do you recall that a bill advanced that was
3  called SB 362?
4    A.  Again, I'm not clear on the number and what was
5  in that bill.
6    Q.  Do you know where there was support in the
7  Legislature for Voter ID in 2009?
8        MS. HALPERN:  Calls for speculation.
9    A.  Probably lots of reasons.
10    Q.  (By Ms. Westfall)  Can you tell me what the
11  reasons were?
12        MS. HALPERN:  Objection, calls for
13  speculation.
14    Q.  (By Ms. Westfall)  You may answer.
15    A.  The reasons why there was support for passing
16  Voter ID?
17    Q.  In the Legislature, yes?
18    A.  I imagine that people wanted to stop voter
19  fraud and increase the security of the elections,
20  increase voter confidence.  I'm sure there are other
21  reasons and probably unique to each member that
22  supported the bill.
23    Q.  Are you aware of any facts that supported the
24  decision to push forward with Voter ID in 2009?
25        MS. HALPERN:  Objection, vague.

28

1    A.  Again, I'm not --
2    Q.  (By Ms. Westfall)  Any factual support for a
3  need for Voter ID that you're aware of?
4    A.  Meaning the existence of fraud?
5    Q.  Yes.
6    A.  I think, yes, my recollection is that there was
7  evidence of fraud in the elections in Texas as there is
8  in, I assume, elections of every jurisdiction.
9    Q.  Are you aware of any reasons for supporting
10  Voter ID in 2009 that were not in the public record?
11        MS. HALPERN:  Objection, vague, calls for
12  speculation.
13    Q.  (By Ms. Westfall)  You may answer.
14    A.  Reasons to support the bill were not in the
15  public record?  I'm not aware of any.
16    Q.  Were there any constituencies in 2009 that
17  wanted Voter ID?
18    A.  Constituencies of the public or in the
19  Legislature?
20    Q.  Of the public?
21    A.  That wanted Voter ID?  I mean, I think there
22  are public opinion polls that show a pretty large
23  majorities of the public supported the concept of Voter
24  ID.
25    Q.  Putting aside polling, are you aware of

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

8 (Pages 29 to 32)

---

29

1  constituencies in the public in 2009 that were
2  supporting and pushing the Legislature to enact Voter
3  ID?
4      **A.  I don't know that they could be grouped into**
5  **constituencies except to the extent that they are**
6  **constituents who would like voter fraud reform or**
7  **improved voting security.**
8      Q.  Were there particular groups or organizations
9  that supported that cause in 2009?
10     **A.  I don't recall specific names of groups.**
11     Q.  Were there any individuals or groups that
12 contacted Mr. Dewhurst to express their support for
13 Voter ID in 2009?
14     **A.  I would have to look at, you know, old**
15 **communications.  I don't recall the names of specific**
16 **groups.**
17     Q.  Did Mr. Dewhurst himself support advancing
18 Voter ID in 2009?
19     **A.  My memory is his public statements were, yes,**
20 **he supported Voter ID.**
21     Q.  Why did he want to advance a Voter ID bill in
22 2009?
23     **A.  Again, he probably has his own --**
24     MS. HALPERN:  Let me caution you not to
25 reveal any attorney-client confidences in answering this

---

30

1  question.  To the extent that you're able to answer the
2  question without doing so, go ahead.
3      **A.  Again, I think his public statements were --**
4  **reflected the fact that he was concerned about voter**
5  **fraud and securing Texas elections and making sure that,**
6  **you know, eligible voters were able to cast votes in**
7  **secure elections.**
8      MS. WESTFALL:  And I'll object to that
9  objection to the extent that this is asking for policy
10 communications, not legal advice.
11     Q.  (By Ms. Westfall)  So did you answer fully or
12 was any of that withheld on the basis of purported
13 attorney-client privilege?
14     MS. HALPERN:  Well, then, let me renew a
15 different objection, Counsel, on this, the deliberative
16 process objection.  This witness is testifying as to his
17 opinions and his beliefs, which you're now asking him to
18 reveal the opinions or beliefs of others in the
19 Legislature and that violates their deliberative process
20 privilege.  You may ask these questions of them, but I'm
21 going to object and direct him not to answer with
22 respect to the opinions of others.
23     MS. WESTFALL:  Well, I think with regard
24 to deliberative process, I'm asking about Mr. Dewhurst's
25 roles and responsibilities as a legislator, so I don't

---

31

1  think deliberative process applies.  I think your
2  objection is not well-founded.  I ask that you withdraw
3  it.
4      MS. HALPERN:  I'm not withdrawing it,
5  Counsel.
6      Q.  (By Ms. Westfall)  Again, why did Mr. Dewhurst
7  want to advance Voter ID in the 2009 Legislative
8  session?
9      MS. HALPERN:  You may answer as long as
10 you don't reveal any confidence or communications you
11 had with the Lieutenant Governor.  Anything that was on
12 the public record you're free to reference.
13     MS. WESTFALL:  What is the privilege
14 you're asserting on?
15     MS. HALPERN:  In this case, it is
16 Lieutenant Governor Dewhurst's deliberative process
17 privilege and his legislative privilege.
18     Q.  (By Ms. Westfall)  You can answer.
19     **A.  Again, my memory is his public statements have**
20 **been consistent that he wants secure elections, to deter**
21 **fraud, to make sure that ineligible voters are not**
22 **casting votes.**
23     Q.  To be clear, for the record, are you
24 withholding any -- any testimony on the basis of your
25 counsel's advice not to testify on the basis of

---

32

1  deliberative process or legislative privilege?
2      MS. HALPERN:  And let me add attorney-
3  client at this point, as well, since he was in the
4  position of deputy general counsel to the Lieutenant
5  Governor.
6      Q.  (By Ms. Westfall)  Are you withholding any
7  testimony on the basis of those instructions?
8      **A.  No.**
9      Q.  Were there any problems that Mr. Dewhurst was
10 trying to fix in 2009 with the Voter ID legislation?
11     **A.  Well, again, the bill was sponsored by I think**
12 **Senator Fraser, and you would have to ask him his**
13 **specific problems that he was trying to fix.  The bill**
14 **as filed, again, I think was supported by the Lieutenant**
15 **Governor and other supporters.**
16     Q.  Were there particular constituencies that
17 Mr. Dewhurst was responding to in supporting Voter ID in
18 2009?
19     **A.  Again, you would have to ask him.  I believe,**
20 **you know, again, that there was a broad range of people**
21 **who supported the bill.**
22     Q.  So in answer to my question, there were not
23 particular constituencies to --
24     **A.  I -- I'm don't --**
25     Q.  -- your knowledge that he was responding to?

---

BRYAN HEBERT                                        6/17/2014
CONFIDENTIAL TRANSCRIPT

---

33

1    A.  I'm not aware of particular constituencies.
2    Q.  Are you aware of any facts, any facts on the
3  ground that supported Mr. Dewhurst's support for Voter
4  ID in 2009?
5    A.  I recall accounts of voter fraud that were laid
6  out in various stages of the bill debate, and again, as
7  fraud exists in most elections, jurisdictions, at some
8  point, at some level.
9    Q.  And this is the -- the fraud you're referring
10  to is all within the -- in public debate in 2009; is
11  that correct?
12    A.  There was a lot of references to fraud, and I
13  should add, also, I guess, incomplete or inaccurate
14  voter roles, other problems within the election process,
15  correct.
16    Q.  Was Voter ID part of Mr. Dewhurst's legislative
17  agenda for 2009?
18    A.  I'm not sure what you mean by agenda.  I think
19  it's fair to say he supported the Voter ID bill.
20    Q.  Was the Voter ID bill filed in December 2008?
21    A.  I don't remember the date it was filed.  I know
22  that bills can be filed beginning in November before
23  each session.
24       MS. WESTFALL:  Could you mark this is as
25  150?

---

34

1       (Exhibit 150 marked for identification.)
2    Q.  (By Ms. Westfall)  You've been handed what's
3  been marked as Exhibit 150.  Do you recognize this
4  document?
5    A.  (Witness looking at document.)
6       MS. WESTFALL:  Could you mark this too?
7       (Exhibit 151 marked for identification.)
8    Q.  (By Ms. Westfall)  You've also been handed
9  Exhibit 151.
10    A.  This looks like Senate Bill 362.
11    Q.  Was this the bill you were just referring to
12  introduced by Senator Fraser?
13    A.  Senator Fraser is a sponsor.  I don't know at
14  what stage in the legislative process this version
15  reflects.
16    Q.  Who developed Senate Bill 362?
17    A.  I believe Senator Fraser and his staff with
18  input from other staff, others.
19    Q.  Were you also involved yourself?
20    A.  I -- I'm sure I was.  I can't remember to what
21  extent.  2009?  Right, I can't remember as to what
22  extent I was involved.
23    Q.  Do you recall any communications that occurred
24  before SB 362 was filed related to its development?
25    A.  I don't recall any.  There may have been, but I

---

35

1  don't recall specific communications.
2    Q.  And were you involved yourself in the
3  development of Senate Bill 362?
4    A.  Again, I know I, on behalf of my boss, was in
5  charge of sort of tracking and analyzing election
6  legislation including Voter ID.  I cannot recall
7  specific communications on the development of Senate
8  Bill 362.  That was five years ago.
9    Q.  Were you involved in the drafting itself of
10  Senate Bill 362?
11    A.  Again, I can't recall specific instances of
12  drafting language in the bill.
13    Q.  I believe you testified in your previous
14  deposition that Jennifer Fagan from the State Affairs
15  Committee was involved in drafting.  Does that sound
16  correct?
17    A.  That's probably right.
18    Q.  And Janice McCoy from Senator Fraser's was --
19  Senator Fraser's was involved in the drafting; is that
20  correct?
21    A.  That's probably right.
22    Q.  While drafting Senate Bill 362, do you recall
23  discussing any particular provisions of the bill?
24       MS. HALPERN:  Objection, assumes facts not
25  in evidence.

---

36

1    A.  So the question is while drafting?
2    Q.  (By Ms. Westfall)  While you were involved in
3  participating in the drafting process, do you recall any
4  discussions about any particular provisions of the bill?
5    A.  I don't recall particular discussions about
6  particular provisions.
7    Q.  Do you recall that Senate Bill 362 allowed the
8  use of both photo and nonphoto ID by voters?
9    A.  Looking at the bill in front of me, I can see
10  that it does.
11    Q.  Do you recall any discussions about the choice
12  to include that range of acceptable documents in the
13  bill?
14    A.  I don't recall specific conversations.
15    Q.  Do you recall any discussion about the
16  provision related to provisional ballots in Senate Bill
17  362?
18    A.  I don't recall.
19    Q.  Turning your attention back to Exhibit 150,
20  what forms, generally, of Voter ID are permitted by
21  Senate Bill 362?
22    A.  What forms of ID?
23    Q.  Of ID, yes.  And let me see if I can turn your
24  attention to page 5 and 6 of the bill.
25    A.  Senate Bill 362.  It looks like acceptable

---

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

---

37

1  forms of photo identification are a driver's license or
2  personal ID card issued by DPS, a United States military
3  ID card, a United States citizenship certificate, United
4  States passport, and a concealed handgun license issued
5  by DPS, and a valid identification card with a
6  photograph issued by the federal or state government.
7  And then there's a list of additional acceptable proof:
8  their voter registration certificate or a copy of
9  utility bill, bank statement, government check,
10 paycheck, other government documents.  Official mail
11 from the government.  Certified birth certificate, U.S.
12 citizenship papers, marriage license or divorce decree,
13 adoption, name change or sex change records.  Public
14 benefit cards, temporary driving permits, pilot license,
15 library card, hunting or fishing license.
16     Q.  So would you describe this as a very broad set
17 of IDs?
18     A.  It seems to be a broad set of IDs.
19     Q.  Do you recall that in your previous deposition
20 you testified that you had several conversations with
21 Ms. Fagan and Ms. McCoy about the forms of ID to include
22 in Senate Bill 362?
23     A.  I remember -- is the question do I recall from
24 my deposition?
25     Q.  Do you recall that you testified to that fact

---

38

1  in your deposition?
2     A.  I don't recall that specific time --
3     Q.  Do you recall that you in fact had several
4  conversations with Ms. Fagan and Ms. McCoy about the
5  forms of ID to include?
6     A.  I recall having conversations with Ms. McCoy
7  and Ms. Fagan about Voter ID, but I don't recall the
8  nature of those five years after and two years after my
9  last deposition.
10    Q.  Was Mr. Dewhurst involved in any of these
11 discussions?
12    A.  Not that I recall.
13    Q.  Was he involved in any discussion about what
14 forms of ID to include in Senate Bill 362?
15    A.  Not that I recall, and I don't know what
16 conversations he may have had with other people.
17    Q.  Yeah, I'm just asking you --
18    A.  Sure.
19    Q.  -- to talk about things in your knowledge --
20    A.  Sure.
21    Q.  -- obviously, thank you.
22        Do you know what -- what forms of ID
23 Mr. Dewhurst thought should be included in Senate Bill
24 362?
25        MS. HALPERN:  Objection, and direct the

---

39

1  witness, if this involves attorney-client
2  communications, do not reveal them.  And to the extent
3  that you are being asked about his thoughts and
4  impressions, I'm going to direct you not to answer on
5  the basis of that would waive his legislative privilege.
6  You can waive your own.  You can't waive somebody
7  else's.  You can ask those questions of him.
8        MS. WESTFALL:  I object to your objection.
9  Mr. Hebert only has legislative privilege and can assert
10 that on the basis of Mr. Dewhurst's legislative
11 privilege, which we take strong issue with in this
12 litigation, but it is not his privilege to -- it is not
13 his personal privilege, so I ask that you were withdraw
14 that objection because --
15        MS. HALPERN:  On the contrary, then he
16 can't answer your question at all.  We're trying to be
17 cooperative here, and I'm allowing you to ask him
18 questions as to his thoughts and opinions.  But you're
19 right, the privilege belongs to Lieutenant Governor
20 Dewhurst, as well, and he cannot answer questions about
21 Lieutenant Governor Dewhurst's thoughts and impressions,
22 because that would waive somebody else's -- that would
23 waive the deliberative process privilege of Lieutenant
24 Governor Dewhurst.  He's free to waive that himself, but
25 this witness is not free to waive it for him.

---

40

1        MS. WESTFALL:  Is that the sole privilege
2  you're asserting with regard to my question about
3  Mr. Dewhurst's opinions as to which forms of ID should
4  be included in this legislation?  Is it only
5  deliberative process?
6        MS. HALPERN:  Actually, that was
7  legislative privilege.
8        MS. WESTFALL:  And to be clear, you're not
9  asserting deliberative process with regard to his
10 testimony I'm seeking to elicit on views of Mr. Dewhurst
11 with regard to ID and legislation; is that correct?
12        MS. HALPERN:  It would depend whether it
13 was -- it would depend whether it was a final opinion or
14 not.  If it's an evolving opinion, then it's
15 deliberative process privilege.  If it's a final opinion
16 that was expressed in some way, then I guess the
17 decision has been reached.
18        MS. WESTFALL:  So just so the record is
19 clear, you're asserting both deliberative process and
20 legislative privilege with regard to the testimony in
21 response to the question I just asked about what forms
22 of ID the Lieutenant Governor thought should be included
23 in the bill; is that correct?
24        MS. HALPERN:  To the extent the witness
25 can answer the question with regard to public statements

---

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

---

41

1  that the Lieutenant Governor made, he's free to answer
2  it.
3      Q.  (By Ms. Westfall)  Could you answer as to
4  public statements?
5      A.  I don't recall particular public statements
6  regarding Senate Bill 362.
7      Q.  And do you recall -- I'm not asking for your
8  testimony.  You're counsel's already directed you not to
9  answer.  Do you recall private statements from
10 Mr. Dewhurst concerning his opinion on which forms of ID
11 should be included in the Senate Bill 362?
12     A.  I don't recall.
13     Q.  Are you familiar with the Crawford Voter ID
14 decision?
15     A.  Yes.
16     Q.  When was that issued?
17     A.  Oh, I can't remember the year.
18     Q.  Was it April 2008?
19     A.  That sounds right.
20     Q.  Did you read it when it was issued?
21     A.  Yes.
22     Q.  Did the Crawford decision have any impact on
23 the development of Voter ID legislation in Texas?
24     A.  Probably so.
25     Q.  Do you know how it did?

---

42

1      A.  It -- I can say for myself, it impacted my
2  understanding of permissible boundaries under the
3  constitution for voter identification legislation.
4      Q.  And what were those boundaries?
5      A.  I think, broadly speaking, the court in
6  Crawford said that the state has an interest in securing
7  elections and improving confidence in those elections
8  and deterring fraud and making sure that voter roles are
9  accurate.  That, I believe it says even if in some
10 negligible way individual voters might be adversely
11 impacted, if that does not rise to a level that
12 outweighs the good brought by enacting legislation, then
13 the law might be upheld.  In other words, there can be
14 some burden involved with photo identification or voter
15 identification legislation, and through that lens, they
16 upheld Indiana's voter identification.
17     Q.  And based on what you just said described about
18 the Crawford decision, how did that shape your view of
19 how Texas could enact Voter ID legislation?
20     A.  I think, again, generally speaking, it showed
21 that -- it confirmed that the Supreme Court will uphold
22 photo identification requirements in some circumstances.
23     Q.  And how did that apply to the Texas
24 legislature's efforts to enact Voter ID?
25         MS. HALPERN:  Objection, calls for

---

43

1  speculation as phrased.
2      Q.  (By Ms. Westfall)  You may answer.
3      A.  Yeah.  I think individual legislators or
4  sponsors of the bill might interpret their own way.  I
5  think it probably to each them said that if you enact a
6  plan that is not overly burdensome, then it will be held
7  constitutional.
8      Q.  Did the Indiana law issue, do you recall,
9  permit the use of nonphoto ID?
10     A.  I cannot recall if it was nonphoto or --
11     Q.  And I will represent to you that it did not
12 allow the use of nonphoto ID.
13     A.  Okay.
14     Q.  Why did, in light of the Indiana law and the
15 Crawford decision, SB 362 permit voters to present
16 nonphoto ID?
17     A.  I don't know.
18     Q.  Why was nonphoto ID permissible under Senate
19 Bill 362?
20         MS. HALPERN:  Objection, asked and
21 answered.
22     Q.  (By Ms. Westfall)  You may answer.
23     A.  Why was it permissible?
24     Q.  Why was it included as a form of permissible
25 ID?

---

44

1      A.  I don't know.  I mean, I can say generally in
2  the legislative process, bills change for lots of
3  reasons:  The desire of the sponsor, input from other
4  legislators, input from the public, litigation.  It
5  could be any reason or all of those reasons.
6      Q.  But do you know as to this particular issue as
7  to why nonphoto was included in Senate Bill 362?
8      A.  I do not know.
9      Q.  Are you familiar with the model Voter ID bill
10 created by the American Legislative Exchange Council
11 known as ALEC?
12     A.  I know what ALEC is, but I'm not familiar with
13 new specific model legislation.
14     Q.  And do you have any understanding as to why
15 Senate Bill 362 limited the forms of acceptable ID to
16 those listed that you just testified to on Pages 5 and 6
17 of Exhibit 150?
18     A.  I don't know why this list is this list
19 specifically.
20     Q.  Do you know how any of the IDs on that list
21 arose in terms of their inclusion in the bill?
22     A.  Some of them are current law or were current
23 law at the time and were retained.
24     Q.  And those IDs would include which ones?
25     A.  Driver license, some of the nonphoto utility

---

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

12 (Pages 45 to 48)

---

45

1  **bill, bank statement, government check, paycheck, other**
2  **government documents.**
3      Q.   Anything else?
4      **A.   That appears to be all of them that were**
5  **retained.**
6      Q.   Do you recall how provisional ballots were
7  treated under Senate Bill 362?
8      **A.   I don't recall, but I could look if you would**
9  **like.**
10     Q.   Certainly, that would be helpful.
11  Unfortunately, I don't have a page to direct you to, but
12  I'm sure you're sufficiently familiar with this to find
13  it quickly.
14     **A.   It looks like on the bottom of Page 7 on to**
15  **Page 8 is the election code section dealing with**
16  **provisional ballots, and it looks like it just changes a**
17  **cross reference, so I guess it retains the existing**
18  **provisional ballot system.**
19     Q.   What was that system?
20     **A.   As I understand it at the time, if the person**
21  **appears without appropriate identification or is**
22  **otherwise possibly not eligible to vote, they may still**
23  **cast a provisional ballot if they execute an affidavit**
24  **stating that they are indeed a registered voter and are**
25  **eligible to vote.**

---

46

1      Q.   The voter need not take any further action
2  after other casting that ballot to ensure that it will
3  be counted; is that correct?
4      **A.   They have to -- after they sign an affidavit.**
5  **So they have to cast a provisional ballot and then sign**
6  **the affidavit.**
7      Q.   And after that, the voter need not return to
8  the election office with a form of acceptable ID; is
9  that correct?
10     **A.   I think that's correct.**
11     Q.   Do you know why Senate Bill 362 permitted
12  provisional ballots cast by voters without necessary ID
13  to be counted without requiring further action on the
14  part of the voter?
15     **A.   I don't know.**
16     Q.   Do you know why it essentially maintain the
17  status quo for provisional ballots?
18     **A.   I don't know.**
19     Q.   Are you aware of how the Indiana law at issue
20  in Crawford treated provisional ballots?
21     **A.   I cannot recall.**
22     Q.   Do you recall -- well, I'll represent to you
23  that it required the voter to return to the office.
24  Does that sound familiar?
25     **A.   Okay.  I take your word for it.**

---

47

1      Q.   So is it true, fair to say, that Senate Bill
2  362 was more lenient with regard to provisional ballots
3  than the Indiana law was?
4          MS. HALPERN:  You're asking him to rely on
5  your representation in answering --
6          MS. WESTFALL:  Yes.
7          MS. HALPERN:  -- that question, Counsel?
8          MS. WESTFALL:  Yes.
9      **A.   I'm not sure I would use the word lenient.  I**
10  **think a voter allowed to return with appropriate**
11  **identification could be more certain that their**
12  **provisional ballot would be counted.  And so they are**
13  **different systems, I would allow that.**
14     Q.   (By Ms. Westfall)  But certainly under Senate
15  Bill 362, the voter was not required to return a second
16  time to a voting official to show ID, correct?  And that
17  different from Indiana; is that correct?
18     **A.   I think that's correct.**
19     Q.   Before Senate Bill 362 was filed, was there any
20  analysis of the likely impact of that bill on voters
21  that you're aware of?
22     **A.   I can't recall from 2009.**
23     Q.   Any analysis about the number of registered
24  voters without requisite ID under Senate Bill 362?
25     **A.   I don't recall.**

---

48

1      Q.   Do you recall any communications about the
2  impact of Senate Bill 362 on minority voters?
3      **A.   I don't recall specific communications.**
4      Q.   Are you aware of any analysis of the impact of
5  Senate Bill 362 on minority voters?
6      **A.   I can't recall any specific.**
7      Q.   Was there any consideration given to analyzing
8  Spanish surnamed registered voters who had Texas driver
9  license or personal ID?
10     **A.   It's possible.  I just can't recall.**
11     Q.   So you testified in your prior deposition about
12  the purpose of Senate Bill 362, in which I think you
13  alluded to earlier in this deposition, the purposes were
14  to improve the integrity of elections and instill
15  confidence in the electorate.  Do you recall that
16  testimony?
17     **A.   I don't recall the testimony, but I'm sure**
18  **that's correct.**
19     Q.   And is that still your testimony about the
20  purpose of the Senate Bill 362?
21     **A.   I think there are certain -- those are some of**
22  **the purposes, sure.**
23     Q.   Which are the other purposes?
24     **A.   Again, you'd have to ask the bill sponsors,**
25  **their purpose on sponsoring it and passing legislation.**

---

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

13 (Pages 49 to 52)

49

1   Q.  Do you recall any that you were kind of -- you
2   were kind of in the mix of the development and drafting
3   of Senate Bill 362.  Do you recall any other purposes
4   sitting here today?
5   A.  And again, I think public statements that I
6   recall are in that same vein, protecting voting
7   integrity, improving voter confidence, making sure that
8   voter fraud or inaccurate voter roles or other problems
9   did not result in inaccurate or unsecured elections.
10  Q.  And what was the -- what was the basis for the
11  understanding that there was -- that there was the lack
12  of confidence in the electorate?
13  A.  Well, I think one indication would have been
14  that public polls again showed overwhelming numbers of
15  voters -- voters supported some form of photo ID.
16  Q.  And from the polls supporting Voter ID, you
17  could infer that there was a lack of confidence in the
18  electorate, is that your testimony?
19  A.  I think if people wanted an improvement in the
20  process, that would probably be derived from a -- some
21  lack of confidence in the system.
22  Q.  And aside from those public opinion polls, is
23  there any other basis or facts you're aware of that made
24  the legislature feel there was a lack of confidence in
25  the voting system?

50

1   A.  Again, I may be forgetting some testimony
2   during that session.  I'm sure individual sponsors had
3   communications with their constituents, but I'm not
4   particularly aware of those.
5   Q.  In terms of improving the integrity of
6   elections, again, what was the need for that in 2009?
7   A.  The need to?
8   Q.  What was the factual basis for the need to
9   remedy that issue?
10  A.  Again, I can't speak for what each individual
11  bill sponsor supporter thinks.  My understanding at the
12  time is that fraud exists in the elections, and there
13  are various ways you can improve the security of those
14  elections.  And those efforts to improve the security
15  are worthwhile if they're not unduly burdensome on
16  voters.
17  Q.  And to be clear, Voter ID addresses the problem
18  of in-person voter fraud; is that correct?
19  A.  That's correct.
20  Q.  And so is it your testimony that Voter ID
21  legislation to address that type of fraud addresses
22  fraud more generally?
23         MS. HALPERN:  Objection, confusing, vague.
24  A.  I -- I think it's unclear to me exactly how
25  certain types of fraud might be deterred from this

51

1   outside of in-person voter fraud.  I mean, to the extent
2   that it shows the Legislature and local officials are
3   concerned about fraud and aware of fraud and taking
4   steps to prevent that fraud, that may indeed have an
5   impact and -- and deter other types of fraud.
6   Q.  (By Ms. Westfall)  And what particular types of
7   fraud are you -- are you describing or referring to?
8   A.  I mean, generally, in the elections, there can
9   be in-person voter fraud.  There can be mail ballot
10  fraud.  There might be undue coercion of voters or
11  manipulation of results.  I'm sure there are some others
12  that I'm forgetting.
13  Q.  Which types of fraud specifically do you
14  believe existed in 2009 that warranted Voter ID
15  legislation?
16         MS. HALPERN:  Objection, compound.
17  Q.  (By Ms. Westfall)  You may answer.
18  A.  The types of fraud that I believe existed in
19  2009 that warranted Voter ID legislation?  Again, I
20  think there's, you know, evidence in our history of each
21  of those types of fraud I just mentioned, and Voter ID
22  was certainly designed, as far as I can tell, to combat
23  one of those types of fraud.
24  Q.  And I believe you just testified that it would
25  combat the in-person voter fraud at the polls; is that

52

1   correct?
2   A.  Correct.  That was --
3   Q.  Is it also your testimony that it would address
4   these other types of fraud?
5   A.  It's my testimony that the intent of the bill,
6   as I understand it, was to address in-person voter
7   fraud, and that that attempt to address one type of
8   fraud might have the additional impact of deterring
9   other types of fraud.
10  Q.  Do you have any factual support for that
11  inference?
12  A.  No, other than, you know, common sense and
13  looking at the legislature generally.
14  Q.  How would Senate Bill 362 eliminate the lack of
15  confidence in the electorate?
16  A.  I mean, again, I think in my impression is that
17  if you make steps to eliminate fraud in elections,
18  people that do cast votes that are eligible voters can
19  be more secure that their vote will be counted and not
20  offset by an ineligible voter, and that will instill
21  confidence in that particular elector or voter, I should
22  say, and in the electorate, in general.
23  Q.  And how do you -- what's the basis for
24  inferring that?
25  A.  Again, I think just generally, any legislation,

BRYAN HEBERT                                                6/17/2014
CONFIDENTIAL TRANSCRIPT

14 (Pages 53 to 56)

---

**53**

1  any criminal law, any area where the legislature is
2  acting and taking steps, the intended impact, at least,
3  is to give the public confidence that the legislature is
4  acting on their behalf.
5      Q.  Do you have any factual basis, other than what
6  you just testified to, that drawing that conclusion that
7  the bill would have that effect?
8      A.  I don't have -- I can't -- I don't have a
9  specific example, again, other than just that's sort of
10 the whole point of the legislature is to act on behalf
11 of the public presumably to instill confidence and not
12 to instill some other feeling.
13     Q.  Are you aware whether Mr. Dewhurst tied Voter
14 ID to immigration as issues that -- in other words, put
15 differently, that Voter ID and enacting that would help
16 to stem illegal immigration?
17         MS. HALPERN:  Let me again caution you not
18 to reveal any communications while you were wearing your
19 attorney-client privilege hat, not -- not to violate the
20 deliberative process privilege to the extent it's
21 applicable to this question, and not to violate his
22 legislative privilege.
23     A.  I'm not aware of any link between immigration
24 and Voter ID.
25     Q.  (By Ms. Westfall)  And are you not -- is any of

---

**54**

1  your answer not providing testimony based on the
2  instruction of your counsel?
3      A.  No.
4      Q.  Did Senate Bill 362, to your knowledge, require
5  a voter to prove citizenship when casting a ballot?
6      A.  I'd have to look at the bill if you don't mind.
7      Q.  Sure.  Certainly.
8      A.  I think some of these forms of ID would require
9  citizenship to obtain possibly, but they're also some on
10 here that it's possible that noncitizens would be able
11 to obtain.
12     Q.  So is your testimony that it -- Senate Bill 362
13 would not require a voter to prove citizenship for that
14 reason because some of these IDs do not require proof of
15 citizenship; is that correct?
16         MS. HALPERN:  Objection, misstates the
17 testimony.
18     Q.  (By Ms. Westfall)  You may answer.
19     A.  That sounds correct.
20     Q.  Are you aware of any nonpublic unstated
21 purposes of Senate Bill 362?
22     A.  I'm not aware of any.
23     Q.  What portion of the public is least likely to
24 possess ID documents?
25     A.  What portion of the public is least likely to

---

**55**

1  possess these documents in 362?
2      Q.  Yes.
3         MS. HALPERN:  Objection, calls for
4  speculation.
5      Q.  (By Ms. Westfall)  You may answer.
6      A.  I don't know specific segments of the
7  population.  It would seem to me that -- that any
8  segment of the population would be able in some way to
9  obtain at least one of these forms.
10     Q.  But getting back to my question in terms of
11 current possession, as opposed to ability to obtain ID
12 in 362, are there any portions of the population that
13 you believe are less likely to currently possess the
14 forms of ID in 362?
15     A.  I'm not sure.
16     Q.  Are poor voters the least likely to possess ID
17 documents?
18     A.  Well, I mean, one of the forms of ID is a
19 government check or government benefits, and so those,
20 in fact, to be populations most likely to receive those.
21 Driver's licenses or personal identification cards I
22 think are necessary to obtain a lot of those benefits,
23 so maybe -- I think they seem as likely to be able to
24 obtain or to possess those documents.  So I guess I
25 would say not necessarily to your question.

---

**56**

1      Q.  Are minority voters in Texas more likely to be
2  poor than Anglos, to your knowledge?
3      A.  I would assume, I mean, I think historically,
4  poor populations have generally had higher
5  representation among minorities, that's fair.  And
6  that's probably true in Texas and every other state.
7      Q.  Did supporters of Senate Bill 362 adopt any
8  procedural mechanisms to increase the likelihood of the
9  bill's passage?
10     A.  I'm sorry, could you repeat?
11     Q.  Certainly.  Did supporters of Senate Bill 362
12 adopt any procedural mechanisms to increase the
13 likelihood of the bill's passage?
14     A.  I don't recall specific examples.  I think any
15 bill sponsored uses the rules of the House and Senate to
16 get their bill passed, whether those are unique or
17 special or any other descriptive, probably in the eye of
18 the beholder.  If they're in the rules, they're in the
19 rules, and at the disposal of the sponsor.
20     Q.  But were -- getting back to my question.  Were
21 there any procedural mechanisms you can recall that were
22 put into place by the supporters of Senate Bill 362 to
23 ensure its passage?
24     A.  I don't recall specific examples.
25     Q.  Did the Lieutenant Governor's Office play any

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

57

1  role in attempting to secure passage of 362 in the
2  Senate?
3      A.  I don't recall specific actions.  I think the
4  Lieutenant Governor supported Senate Bill 362, and he
5  probably treated it like he treated any other bill that
6  he supported.  He -- I'm sure -- again, you would have
7  to ask him or the people he talked to, but the -- you
8  know, the Lieutenant Governor speaks to senators and
9  house members and the public to garner support like any
10  elected official does.
11         MS. WESTFALL:  Could you please mark this?
12         (Exhibit 152 marked for identification.)
13     Q.  (By Ms. Westfall)  Just for the record, I'm
14  using some exhibits from your prior deposition that have
15  stamps on them just so that they can be cross-referenced
16  with your prior testimony.
17         You've been handed what's been marked in
18  this deposition in this matter, Veasey versus Perry,
19  Exhibit Number 152.  Do you know what this is?
20     A.  The first page looks like the cover of the
21  Senate rule book.  And the second page -- this is the
22  rules from 2009, and the second page appears to be Rule
23  5.11 regarding special orders.
24     Q.  Could you describe this rule, please?
25     A.  Rule 5.11 says that, "Any bill, resolution, or

58

1  other measure may be made a special order for a future
2  time by affirmative vote of two-thirds of the members
3  present.  A special order shall be considered at the
4  time for which it is set and considered from day to day
5  until disposed of, unless at the time so fixed there is
6  pending business under a special order, but it may be
7  suspended by a two-thirds vote of all the members
8  present.  If a special order is not reached or
9  considered, it shall not lose its place as a special
10  order.  And all of those orders are subject to joint
11  rules and Rule 5.10.  Upon vote of four-fifths of the
12  members, a special order may be reset to an earlier time
13  than previously scheduled.  And then notwithstanding
14  Subsection A, a bill or resolution relating to voter
15  identification requirements reported from the committee
16  of the whole may be set as a special order for a time at
17  least 24 hours after the motion is adopted by a majority
18  of the Senate."  And then there are -- there are various
19  editorial notes and notes on previous rulings.
20         MS. HALPERN:  Counsel, we've been going
21  over an hour.  Can we take a break?
22         MS. WESTFALL:  Certainly.  Let's take a
23  break.
24         (Recess from 10:09 to 10:28 a.m.)
25     Q.  (By Ms. Westfall) We were just discussing Rule

59

1  5.11 from the 2009 session, Exhibit 152, correct?
2      A.  Correct.
3      Q.  And I believe you just read Rule 5.11 in it's
4  entirety; is that right?
5      A.  Correct.
6      Q.  How did the Senate come to adopt this rule?
7      A.  The beginning of every session, the Senate
8  adopts rules for that session, and this was part of the
9  rules for that session.
10     Q.  How did it come to adopt Rule 5.11, Part D,
11  related to Voter ID requirements?
12     A.  I don't remember the specifics of the
13  conversation, but again my understanding is that the
14  rules are adopted as a whole before -- at the beginning
15  of session.
16     Q.  How did this particular provision arise, 5.11D,
17  in the 2009 rules?
18     A.  I don't know.
19     Q.  Do you recall that there was a closed-door
20  caucus of the full Senate to discussion 5.11D in the
21  2009 rules?
22     A.  I don't recall that, and that's a Senators only
23  meeting so I would haven't wouldn't have been in the
24  room.
25     Q.  So all caucus meetings are of Senators only,

60

1  not staff; is that correct?
2      A.  That is my understanding.
3      Q.  Were you ever in attendance of a full Senate
4  caucus meeting yourself?
5      A.  No.
6      Q.  Did you hear about what happened at a full
7  Senate caucus meeting in advance of the adoption of the
8  5.11D?
9      A.  No.
10         MS. WESTFALL:  Would you mark this,
11  please.
12     A.  I should -- to clarify --
13         THE COURT REPORTER:  I'm sorry.  Let me
14  mark this, please..
15         THE WITNESS:  Oh, I'm sorry.
16         (Exhibit 153 marked for identification.)
17     Q.  (By Ms. Westfall) You've been handed what's
18  been marked at 153.
19         Did you want to clarify your testimony?
20     A.  I was just going to add that my understanding
21  is that Senators can invite whomever they want into that
22  caucus meeting, but I was not invited to that caucus
23  meeting.
24     Q.  I see.  Could you turn your attention to
25  Exhibit 153.

BRYAN HEBERT                                             6/17/2014
CONFIDENTIAL TRANSCRIPT

16 (Pages 61 to 64)

---

61

1    A.  Okay.
2    Q.  Have you seen this -- could you take a look at
3  this exhibit.
4    A.  Okay.
5    Q.  What is the article about?
6    A.  It's about the beginning of the session in 2009
7  and the rules debate and Voter ID debate.
8    Q.  Do you recall having been in the closed-door
9  caucus of the full Senate meeting referred to in this
10 article?
11   A.  Again, I was not.
12   Q.  Do you recall hearing about what was said in
13 this closed-door Caucus of the full Senate?
14   A.  I did not hear anything.
15   Q.  Do you know which particular Senators supported
16 Rule 5.11D?
17   A.  I imagine the Senators that voted for the
18 adoption of the rules, and I don't know the specific
19 Senators who did.
20   Q.  Did the Senate ultimately adopt Rule 5.11D?
21   A.  My memory is, yes.
22   Q.  Is it true that only a simple majority of
23 Senators was required to enact the rules for 2009?
24   A.  My memory is that Senate rules are adopted by a
25 majority of the Senators.

---

62

1    Q.  And not of two-thirds of the Senators; is that
2  correct?
3    A.  I think that's correct but not -- not
4  parliamentarian.
5    Q.  Do you know why Rule 5.11D was adopted?
6    A.  I assume it was adopted because the Senate
7  liked it.
8    Q.  Any other reasons?
9    A.  If I could look back at the rule, 5.11D deals
10 with photo identification bills or resolutions.  I
11 assume that they wanted to make sure that those types of
12 bills or resolutions were treated as outlined in 5.11D.
13   Q.  What was the purpose of allowing -- providing
14 that Voter ID legislation could be treated as a special
15 order?
16   A.  I don't know the purpose of it.
17   Q.  What was the effect of treating it as a special
18 order?
19   A.  As I understand Senate rules, and as 5.11 lays
20 out, it would allow Voter Identification requirements to
21 be heard before the Committee of the Whole, 24 hours or
22 more after the special order was set.
23   Q.  How would a bill ordinarily be treated if this
24 5.11D were not in place?
25   A.  Bill or special order?

---

63

1    Q.  A bill.
2    A.  I mean, my understanding of the legislative
3  process is bills are introduced and referred to
4  committee and go through the committee process, and if
5  the Senator wished to bring it to the floor, it's placed
6  on an Intent Calendar, and then if the Lieutenant
7  Governor recognizes that Senator on that bill, the
8  Senate debates it.  And there are various procedures and
9  timetables in the mix there.
10   Q.  How does the 5.11D change consideration of the
11 Voter ID bill for 2009?
12   A.  It treated it -- it said that if a special
13 order relates to Voter ID, then it could be considered
14 within 24 hours.
15   Q.  And in order to do that only required a vote of
16 the majority of the Senate; is that correct?
17   A.  Correct.
18   Q.  And ordinarily to set a special order would
19 require two-thirds support from two-thirds of the
20 Senators; is that correct?
21       MS. HALPERN:  Objection, misstates the
22 testimony.
23   A.  I think -- right.  I mean 5.11A says that a
24 special order may be set with affirmative vote of
25 two-thirds.  And then D says, on Voter ID, it may be set

---

64

1  by a majority of the members of the Senate.
2    Q.  (By Ms. Westfall) So it carves out an exception
3  for Voter ID with regard to its designation as a special
4  order; is that correct?
5    A.  Yes.
6    Q.  Was Senate Bill 362 assigned to the Committee
7  of the Whole?
8    A.  My memory is, yes, it was.
9    Q.  What is the Committee of the Whole?
10   A.  Instead of being referred to committee with a
11 limited number of members that meets in a committee
12 room, typically, the Committee of the Whole consists of
13 every Senator and the Lieutenant Governor and they meet
14 on the Senate floor.
15   Q.  And ordinarily would 362, as an election bill,
16 have been assigned to the State Affairs Committee?
17   A.  Most State Affairs -- most election bills in
18 the Senate are referred to State Affairs.  My memory is
19 that some could be referred to jurisprudence and it's
20 possible some other committee.
21   Q.  Can you recall any other election bill that was
22 referred to the Committee of the Whole besides 362,
23 Senate Bill 362 and Senate Bill 14?
24   A.  I don't recall any.
25   Q.  Can you recall any other bills that the

---

**65**

1  Lieutenant Governor assigned to the Committee of the
2  Whole besides Senate Bill 362?
3      **A.  I'm sorry, what types of bills?**
4      Q.  Any bill.
5      **A.  Any bill.  My memory is that the Committee of**
6  **the Whole has met before and I cannot remember all the**
7  **specific instances except it's possible redistricting,**
8  **it's possible school finance -- and in fact, I should --**
9  **to clarify an earlier remark:  The school finance bill**
10 **from a few sessions ago may have had some election**
11 **provisions in it.  Those are the examples that come to**
12 **mind.**
13     Q.  So school financing, what session was that,
14 that it was referred to the Committee of the Whole?
15     **A.  It may have been, and again, I can't remember**
16 **if it was or not.  It may have been -- and it would have**
17 **been 2006.  But again, I cannot remember for sure if it**
18 **was the Committee of the Whole.**
19     Q.  Was school financing set as a special order by
20 a simple majority?
21     **A.  I can't recall.**
22     Q.  Other than the bills you just testified to, are
23 you aware of any other bills that Lieutenant Governor
24 has assigned to the Committee of the Whole?
25     **A.  I can't remember others.**

**66**

1      Q.  And in terms of the redistricting bill, which
2  bill was this that was referred to the Committee of the
3  Whole?
4      **A.  I can't remember specific examples.  Again, I**
5  **was just -- if the Committee of the Whole -- I remember**
6  **the Committee of the Whole has met in the last decade**
7  **that I've been around the Capitol and my memory is that**
8  **it might have been for redistricting one year, but I**
9  **can't remember a specific year example.**
10     Q.  Do you know whether Mr. Dewhurst assigned
11 Senate Bill 362 to the Committee of the Whole to
12 expedite its consideration?
13     **A.  I don't know why he did.**
14     Q.  Did it have the effect of expediting
15 consideration?
16     **A.  I can say, generally speaking, the Committee of**
17 **the Whole might expedite it, but it still I think**
18 **requires separate votes by the Committee of the Whole**
19 **and by the Senate as a sitting body.  And I also**
20 **remember, in I think it was 2009, this particular**
21 **Committee of the Whole met for better than 24 hours,**
22 **which seems like -- if that was speeding up the process,**
23 **then it didn't do a very good job, I guess.**
24     Q.  Is it correct that when bills are assigned to
25 the Committee of the Whole as opposed to State Affairs,

**67**

1  that they can immediately or within a very short period
2  of time be heard by the full Senate?
3      **A.  I'm not sure.**
4      Q.  Do Mr. Dewhurst and Senator Fraser have a
5  social relationship outside of their working
6  relationship?
7      **A.  I don't know.**
8      Q.  Do you know whether Mr. Dewhurst had dinner
9  with Senator Fraser on March -- early March 2009?
10     **A.  I don't know.**
11     Q.  Do you know when Senate Bill 362 was considered
12 by the Senate in 2009?
13     **A.  I don't remember the date.**
14     Q.  Could you refer back to -- turn your attention
15 back to Exhibit 151?
16     **A.  Yes.**
17     Q.  Could you take a look at that -- and what is
18 that?
19     **A.  Exhibit 151 is a printout from the Texas**
20 **Legislature Online.  It is the bill history for Senate**
21 **Bill 362 from the 81st regular session.**
22         **And your question is when did the Senate**
23 **consider Senate Bill 362?**
24     Q.  Yes.
25     **A.  Well, it was received by the Secretary of the**

**68**

1  **Senate in December 2008.  It was read and referred to**
2  **the Committee of the Whole on February 17.  It was**
3  **scheduled and considered for a public hearing on March**
4  **10th and then passed by the Senate on March 11.  Then**
5  **read a second time on March 17th, read a third time on**
6  **March 18th, and then reported by the Senate on March**
7  **18th.**
8      Q.  Thank you.  And the lengthy public testimony
9  you're referring to that occurred a period of 24 hours
10 occurred on March 10th; is that correct?
11     **A.  I think that must be right.  Testimony taken in**
12 **committee would likely have been March 10th.**
13     Q.  Was that testimony taken in the Committee of
14 the Whole?
15     **A.  My memory is that yes, it was.**
16     Q.  During the Committee of the Whole's
17 consideration of Senate Bill 362, there were concerns
18 that were raised by the impact of the bill on minority
19 voters, right?
20     **A.  I think that's right.**
21     Q.  Did supporters of Senate Bill 362 take any
22 steps in response to those concerns?
23     **A.  I can't recall specific steps but I do recall**
24 **that they -- I think I recall that they contested that**
25 **it would in fact have an adverse impact on minority**

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

---

**69**

1  voters, so --
2  Q. So they -- go ahead.
3  **A. All right. And so, I'm sure that would inform**
4  **whether they felt the need to take steps.**
5  Q. So is it your testimony that no changes were
6  made to the bill in the Senate as a result of those
7  concerns?
8  **A. I would have to see the different versions of**
9  **the bill through this process to know for sure.**
10  Q. Did Mr. Dewhurst, to your recollection, take
11  any actions in response to the concerns about the impact
12  of the bill on minority voters?
13  **A. Take actions?**
14  Q. Yes.
15  **A. I mean, Lieutenant Governor's powers to act on**
16  **a bill once it's before a Committee or the Senate are**
17  **relatively limited. He can't introduce amendments or --**
18  **he's not a bill sponsor. I'm certainly not aware of any**
19  **formal action he took, whether he spoke with Senators or**
20  **the public, I don't know.**
21  Q. So to your knowledge, Mr. Dewhurst did not take
22  any actions in response to these concerns, based on your
23  knowledge; is that fair?
24  **A. I'm not aware of any specific actions he took.**
25  Q. Did Senator Fraser take any actions in response

---

**70**

1  to any of these concerns raised, that you're aware of?
2  **A. I don't know.**
3  Q. And overall, were there any changes made to
4  Senate Bill 362 at any stage in the bill's history to
5  respond to concerns about minority voters?
6  **A. Again, I would have to see individual copies**
7  **from each state of the process.**
8  **(Exhibit 154 marked for identification.)**
9  Q. (By Ms. Westfall) You've been handed what's
10  been marked as Exhibit 154. Do you recognize this
11  document?
12  **A. It looks like the Senate Journal entry from the**
13  **23rd day of session, which would be March 18, 2009.**
14  Q. And I believe you just testified that was
15  the day of the final -- the final day of the Senate's
16  consideration of Senate Bill 362; is that right?
17  **A. If I could look at the timeline again. March**
18  **18th was when the Senate reported the engrossed version**
19  **of SB 362.**
20  Q. That concluded the Senate's consideration of
21  Senate Bill 362; is that right?
22  **A. It sent the bill to the House.**
23  Q. Thank you. Do you see that on Page 591 of the
24  Senate Journal, Exhibit 154, there is a letter from
25  Senator West?

---

**71**

1  **A. Yes. Statement regarding votes cast by Senator**
2  **West.**
3  Q. And do you recall generally without -- and I'm
4  not asking you to read the entire letter into the
5  record, but do you recall generally what this letter
6  concerns?
7  **A. I don't recall.**
8  Q. Do you want to take look at it and tell me when
9  you've had a chance to review it.
10  **A. Okay.**
11  Q. What does it generally pertain to?
12  **A. Senator West explains that each of the ethnic**
13  **minority Senators voted against Senate Bill 362 at each**
14  **stage of its passage.**
15  Q. Were there any responses to this letter that
16  you're aware of from supporters of Senate Bill 362?
17  **A. I'm not aware.**
18  Q. Are you aware of any responses off the record
19  in response to this letter?
20  **A. I'm not aware of any responses.**
21  Q. And that's on or off the record?
22  **A. I -- I don't recall any responses on or off the**
23  **record.**
24  Q. Are you aware of any concerns that refusal to
25  make changes to the bill, to Senate Bill 362, might

---

**72**

1  threaten its preclearance?
2  **A. Could you repeat, please?**
3  Q. Certainly. Let me withdraw that question.
4  Are you aware of any concerns that refusal
5  to make changes to Senate Bill 362 in response to
6  concerns about its impact on the minority voters might
7  threaten it's preclearance under Section 5?
8  **A. I don't recall specific concerns or efforts.**
9  Q. Did the letter from Senator West cause you any
10  concern about its likelihood of preclearance under
11  Section 5 of the Voting Rights Act?
12  **A. I can't remember my specific reactions to**
13  **Senator West's statement or that I saw the statement.**
14  **It's possible in the Senate to go back after the day and**
15  **to amend the Journal by submitting a statement. And so**
16  **I'm not sure if Senator West read this or submitted it**
17  **on the day of or submitted it later. But in any case, I**
18  **can't remember my specific reaction.**
19  Q. Do you recall when you first became aware of
20  this letter from Senator West?
21  **A. I mean, I was aware at the time who voted**
22  **against the bill. I don't know -- I can't recall when I**
23  **became aware of Senator West's statement as laid out in**
24  **the Journal.**
25  Q. Were you aware of these concerns, generally, at

---

73

1  the time Senate Bill 362 was being considered?
2      A.  My memory is that during the debate before the
3  Committee of the Whole, the Senators in opposition
4  stated something to this effect.
5      Q.  Did you have any concerns that -- that those
6  objections on the part of bill opponents would create
7  any barriers to preclearance under Section 5 of the
8  Voting Rights Act?
9      A.  It would be better if they had all voted for
10  it.  But I know it's also true that the Democrats, as a
11  block, voted against lots of bills over the years,
12  including Voter ID.  And in this case, he lays out that
13  all 12 Democratic Senators voted against the bill, and
14  yes, that includes minority Senators.  But it -- again,
15  I think Democrats voting as a block against bills is --
16  it's not unheard of.  It's not ideal in most cases, but
17  its not unheard of.
18      Q.  And you didn't see it as a problem in terms of
19  preclearance of Senate Bill 362 if that had happened, if
20  it had been enacted?
21      A.  Again, it would have been better if all the
22  Senators supported the bill.
23      Q.  So your answer is no?  It was not a hurdle?
24      A.  I don't recall my immediate impression, but I
25  don't think I would have seen it as an insurmountable

74

1  hurdle.
2      Q.  Senate Bill 362 was not passed by the House; is
3  that correct?
4      A.  I would have to check the bill history.
5      Q.  Please go ahead and feel free to do so.
6      A.  Correct.
7      Q.  Do you know what happened to Senate Bill 362 in
8  the House?
9      A.  It looks like on May 23, 2009, it would have --
10  it was placed on the major State calendar.  And my
11  memory is that there's a fair amount of opposition from
12  Democrats in the House, some would say stall tactics.
13  They talked at length on bills that normally would have
14  been passed as a matter of routine.  To delay
15  consideration of the bill on the major State calendar,
16  it was certainly, again, met with sort of stiff partisan
17  opposition in the House.  But I can't recall the
18  specific details of its demise.
19      Q.  Is there a term that is used to refer to when
20  there's a lot of talking about a bill to stop
21  consideration of other bills?
22      A.  "Chubbing" is the word or term around the
23  Capitol that's used, yes.  Again, it's -- there's no
24  filibuster allowed in the House.  They have strict rules
25  on the amount of time a person may speak, but if every

75

1  single person uses every second of time on every single
2  bill to delay consideration of other bills or other
3  actions, chubbing is the term that's often used.
4      Q.  And how did opponents of Senate Bill 362 -- how
5  did they manage to chub it to death, so to speak?
6      A.  My memory from watching it on TV, because I was
7  not in the House, is that on other calendars, the major
8  State calendars, just one calendar bill the House
9  considers is that there were other calendars for that,
10  or days before that even, wherein the Democrats -- my
11  memory is that it was all Democrats -- spoke at length
12  on those procedural or uncontroversial bills to delay
13  the consideration of the major State calendar.
14      Q.  Who -- who was the Speaker at the time that the
15  Senate Bill 362 was under consideration?
16      A.  In 2009 it would have been Joe Straus.
17      Q.  Could Speaker Straus have assigned the Senate
18  bill to a different calendar when it was received in the
19  House to ensure its passage?
20      A.  My understanding is that it's the calendar's
21  committee and the Speaker who set the calendars in the
22  House.
23      Q.  Why did he set it for a calendar where it could
24  be chubbed?
25      A.  I don't know.  I don't know why he did what he

76

1  did.
2      Q.  Were there other matters the House had to
3  attend to in 2009 that were more important than Voter
4  ID, in your view, and that's what caused the delay?
5      A.  I don't recall specific measures being
6  considered by the House in 2009.
7      Q.  If Voter ID -- if Senate Bill 362 had been
8  received by the House earlier in the session, would it
9  have increased its likelihood of passage?
10      A.  Generally in the legislature, the earlier a
11  chamber considers it, the more likely it is to pass.
12          And as to your last question about the
13  importance, I think whether a bill is important or which
14  bill is more important is decided by each member of the
15  House and Senate and varies likely from member to each
16  member.
17      Q.  But there are leaders in each chamber, to be
18  fair; isn't that correct?
19      A.  Yes.
20      Q.  Not -- not every single member of the House has
21  equal weight or say as to what is given legislative
22  priority; isn't that correct?
23      A.  That's correct.
24      Q.  Is it fair to say Speaker Straus has a fair
25  amount of sway on which bill is to be heard in the House

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

20 (Pages 77 to 80)

---

77

1  in 2009?
2      **A.  I would hope so, but I don't know for certain.**
3      Q.  And do you recall the member who sponsored
4  Senate Bill 362 in the House?
5      **A.  Senate sponsor?**
6      Q.  The House sponsor.  Or who carried in the
7  House.  I may be using the wrong term.
8      **A.  Looking at the history you provided earlier, it**
9  **looks like Representative Todd Smith was the House**
10 **sponsor.**
11     Q.  And did he have anything to do with what
12 calendar Senate Bill 362 was placed on?
13     **A.  I don't know.**
14     Q.  Do you know who else besides Mr. Straus would
15 have had any involvement in a what calendar Senate Bill
16 362 was placed on?
17     **A.  I imagine the Chair of the calendars committee.**
18 **I'm not sure who else.**
19     Q.  Thank you.
20     **A.  And I should say, the major State calendar is**
21 **the most -- generally is the most important bills on any**
22 **given legislative day.**
23     MS. WESTFALL:  I am now going to use an
24 exhibit that has been marked as highly confidential.
25 I'm going to designate this portion of the transcript as

---

78

1  highly confidential under the Consent Protective Order
2  ECF Number 105 in this action.
3      Could you mark this?
4      (Exhibit 155 marked for identification.)
5      MR. WHITLEY:  Ms. Westfall, was this
6  something that was produced in Texas v. Holder?
7      MS. WESTFALL:  No, this is was produced
8  pursuant to the judge's ruling on legislative privilege
9  in Veasey versus Perry.  And I am designating it is
10 highly confidential.  I'm designating the transcript as
11 highly confidential mand when I'm done questioning the
12 witness on this document, I will terminate that
13 designation of highly confidential.  I am proceeding
14 under the party's agreed upon procedures in the Consent
15 Protective Order ECF Number 105.
16     MR. WHITLEY:  Whether it is the position
17 of counsel for defendants that it's not clear what the
18 judge has set out for the procedure of introducing
19 something -- information like this in the
20 deposition.  So we're going to object to its
21 introduction.  I think the way that you're proceeding
22 would have to be ruled on later by the judge.  We're not
23 going to call the judge right now, but we object to
24 this.
25     MR. D'ANDREA:  And I'd like to add, I

---

79

1  agree I thought the understanding was that supporting
2  documents, produced under seal or not, before they were
3  used for any purpose, the judge was going to have to
4  rule that the Department of Justice move to compel
5  admission of the document, the judge would rule on it.
6  I guess our concern is if you elicit privileged
7  testimony using privileged documents, you're using it.
8  So we're not going to call the judge, but this wasn't
9  how I expected to proceed.
10     MS. WESTFALL:  Okay.  While I appreciate
11 hearing your objections fully stated on the record, it
12 is our understanding, based on the judge's ruling, that
13 in discovery we able to obtain these documents
14 designated as highly confidential.  We can now use
15 documents produced by this witness that were highly
16 confidential in the context of discovery, and that's --
17 the judge has deferred a ruling on admissibility of any
18 of this until a later time, but we certainly will
19 proceed under the Consent Protective Order in terms of
20 designation and certainly would not submit any testimony
21 elicited or these documents to the court unless it was
22 done under seal.  Is that acceptable?
23     MS. HALPERN:  Let me state this.  In light
24 of what I'm hearing now from defendants with respect to
25 an objection, I'm going to assert a continuing objection

---

80

1  against -- so as to not interfere with your questions,
2  I'm going assert a continuing objection to all questions
3  pertaining to this document.  And that way you can do
4  what you want and the entire piece can be carved out
5  should there be a problem.  And the court --
6      MS. WESTFALL:  Thank you.  I appreciate
7  your streamlining your objections.  And just to be
8  clear, the objection is on the basis of what privilege
9  is?
10     MS. HALPERN:  Well --
11     MS. WESTFALL:  Or is it document by
12 document?
13     MS. HALPERN:  In the case of this
14 document, it's going to be on the basis of whatever
15 privilege was asserted in the privilege log, whatever
16 caused the judge to declare in the first instance that
17 this needed to be produced and designated as highly
18 confidential.
19     MS. WESTFALL:  I see.  Thank you.
20     MS. HALPERN:  I assume that's legislative
21 privilege but I don't know.
22     MS. WESTFALL:  I think a fair summary of
23 the court's ruling is that unless they were otherwise
24 withheld on another privilege, which we were not able to
25 overcome, then it was withheld on the basis of

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

21 (Pages 81 to 84)

---

81

1  legislative privilege.  And your being -- the
2  legislators and their staff were required to produce
3  these documents, under the procedures I just described
4  earlier, which is highly confidential in discovery,
5  under seal submitted to the court, and the court will
6  rule on its admissibility at a later date.
7         MS. HALPERN:  And I will also note this
8  appears to be predecisional since it's talking points
9  and reasons to support something which would seem to be
10 leading to part of the decision-making process, so I'm
11 going to assert that as well.
12        MS. WESTFALL:  I'm not sure whether in
13 fact -- well, I don't believe, based on the logic of the
14 judge's ruling, that this document was withheld on the
15 basis of the legislative privilege and deliberative
16 process because the judge has not issued a ruling on
17 deliberative process in this litigation.
18        MS. HALPERN:  Well --
19        MS. WESTFALL:  Therefore, you can make
20 that objection.  We would take strong issue with it
21 because this document, which is document -- Exhibit
22 Number 155, TX00087007 through 87013 -- actually 87014,
23 it's a double-sided document -- pertains to Mr. Hebert's
24 activities for the Lieutenant Governor acting in his
25 capacity as leader of the Senate in a legislative

---

82

1  capacity and not in an executive capacity which would,
2  perhaps, under some circumstances, give -- give rise to
3  an ability to assert deliberative process.
4         MS. HALPERN:  That's correct.  And I mean,
5  I would even have a question about whether there was
6  attorney-client privilege here.  I don't know the bona
7  fides of this document.  I mean, the pages are stapled
8  together but whether, for example the last page, which
9  is clearly a recitation of law, has been stapled to the
10 preceding page but was it in fact part of some sort of
11 legal memorandum, I don't know.  But just looking at it
12 on the face of it, you know, as -- as his lawyer, that
13 would give me pause that in fact it actually may have
14 been attorney-client privilege.
15        MS. WESTFALL:  Well, I will -- I will
16 direct you to the Bates numbers.  I will direct you to a
17 list of the attachments on the cover e-mail, 00087007
18 that refers to these attachments.  This communication
19 was between Mr. Hebert and Janice McCoy, who is the
20 staff person for Senator Fraser, therefore, no attorney-
21 client.
22        MS. HALPERN:  Well, I would agree with
23 that assuming that -- I will agree -- I will agree with
24 you that if in fact that is the case, the attorney-
25 client privilege is -- is probably a question.  There

---

83

1  still might be an attorney work product privilege
2  though.
3         MS. WESTFALL:  Let us proceed having
4  designated this testimony as highly confidential.  We'll
5  continue to keep it highly confidential until I indicate
6  that the designation is to be terminated.
7         MS. HALPERN:  And with a running
8  objection.
9         MS. WESTFALL:  With a running objection.
10 Understood.  Thank you, Counsel.
11    Q.  (By Ms. Westfall) Turning your attention back
12 to Exhibit 155, Mr. Hebert, do you recognize this
13 document?
14    **A.  It looks like an e-mail I sent to Janice McCoy**
15 **for use -- or it says, "For your use as needed," and it**
16 **is a series of attachments relating to talking points**
17 **and arguments in support of Senate Bill 362 as well as**
18 **some overview of various election laws and processes**
19 **used.**
20    Q.  And you just described a bunch of -- several
21 attachments to the e-mail to Exhibit 155.  Did you draft
22 all those attachments yourself?
23    **A.  This looks like -- my memory is that, yes, I**
24 **drafted or at least substantially drafted these**
25 **documents.**

---

84

1     Q.  Turning your attention to the date of the
2  e-mail, what is the date of the e-mail?
3     **A.  March 4, 2009.**
4     Q.  Was this e-mail sent to Ms. McCoy shortly
5  before the Committee of the Whole's consideration of
6  Senate Bill 362?
7     **A.  I'd have to refer to the history again.  The**
8  **e-mail is from March 4th and the committee took**
9  **testimony on March 10th.  It was passed after that.  So**
10 **yes, I mean, it was before consideration by the Senate.**
11    Q.  And several days before; is that correct?
12    **A.  Correct.**
13    Q.  When did you draft the attachments to Exhibit
14 155?
15    **A.  I do not recall.**
16    Q.  Roughly around the same time as the e-mail?
17    **A.  I can't recall.  It may have been the fall**
18 **before session.  It may have been right before.  I can't**
19 **recall.**
20    Q.  Do you know why you drafted the attachments?
21    **A.  For her use as needed.  Again, I think to help**
22 **with passage of the bill by providing outlines of**
23 **relevant law and arguments to extend to opponents of the**
24 **bill.**
25    Q.  Did anyone direct you to draft these

---

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

85

1  attachments?
2     **A.  I don't recall.  I don't think so.**
3     Q.  Did Frank Battle ask you to draft these
4  attachments?
5     **A.  I don't recall.  I don't think so.**
6     Q.  Did you usually work independently and draft
7  things that you thought would be helpful or did someone
8  usually tell you to --
9     **A.  Usually I drafted --**
10       MS. HALPERN:  Objection, asked and
11 answered.
12    Q.  (By Ms. Westfall) You may answer.
13    **A.  As it was helpful, I drafted things.**
14    Q.  Did Ms. McCoy ask you for these documents?
15    **A.  I can't recall.**
16    Q.  Did anyone -- concerning all the attachments,
17 did anyone provide you with comments or revisions on the
18 documents before you sent them to Ms. McCoy?
19    **A.  I don't recall.**
20    Q.  Did you provide these attachments to
21 Mr. Dewhurst at any time during consideration of 362?
22    **A.  Possibly.  I can't be certain but possibly.**
23    Q.  Do you recall which attachments of Exhibit 155
24 you provided and shared to Mr. Dewhurst?
25       MS. HALPERN:  I'm going direct him not to

86

1  answer because that would -- that would violate the
2  deliberative process privilege to the extent that this
3  is giving advice for the forming of an opinion or the
4  taking of an action.  I think it falls squarely within
5  the deliberative process --
6       THE COURT REPORTER:  You think it's
7  falls -- I'm sorry, I'm having trouble hearing you.
8       MS. HALPERN:  I said to the extent that
9  this is giving advice for the forming of an opinion, I
10 think it falls squarely within the deliberative process
11 privilege.  And also, again, depending on the context in
12 which these would have been provided to the Lieutenant
13 Governor, I -- I think it still constitutes the
14 rendering of legal advice.
15       MS. WESTFALL:  We take issue with your
16 objections to the extent that the Lieutenant Governor
17 has both executive and legislative functions, and while
18 it may be appropriate, based on the positions that the
19 legislators have taken in this case to assert
20 legislative privilege when they want to, it would be
21 impossible to assert both privileges with regard to both
22 legislative and deliberative process with regard to
23 these sets of documents.
24       MS. HALPERN:  I'm not asserting
25 legislative, I'm asserting deliberative process.

87

1       MS. WESTFALL:  Solely?
2       MS. HALPERN:  Deliberative process and
3  potentially attorney-client.
4       MS. WESTFALL:  Okay.  Okay.  Thank you.
5     Q.  (By Ms. Westfall) Besides Ms. McCoy, did you
6  provide any of these attachments to any of other staff
7  for any other Senators?
8     **A.  I can't recall.**
9     Q.  Did you provide them to Senator Williams' staff
10 person?
11    **A.  I don't recall.  I don't remember Senator**
12 **Williams being particularly involved but I don't know**
13 **for sure.**
14    Q.  Did you provide them to Senator Duncan's staff?
15    **A.  It's possible Jennifer Fagan, as his staff**
16 **person and Chair of State Affairs, may have seen these**
17 **but I can't recall for sure.  I mean again, it's five**
18 **years ago.**
19    Q.  Turning your attention to Texas 00087008,
20 Reasons to Support Senate Bill 362 as Filed?
21    **A.  Uh-huh.**
22    Q.  Do you see that you indicate that, "Senate Bill
23 362 should be supported because that bill is not as
24 restricted as the Indiana and Georgia ID bills"?
25    **A.  That's what it says.**

88

1     Q.  And can you tell me what provisions of 362 made
2  it less restrictive than the Indiana and Georgia laws?
3     **A.  Well, I think at least the fact that there were**
4  **more acceptable forms of identification.  I'm not sure**
5  **what other specifics I might have been -- I had in mind**
6  **here.**
7     Q.  It's fair to say that 362 allowed for the use
8  of non-photo ID and the Georgia and Indiana laws did
9  not; is that correct?
10    **A.  Correct.**
11    Q.  So that would be a major difference between
12 Senate Bill 362 and those other bills; is that right?
13    **A.  Correct.**
14    Q.  And do you see that in Point Number 2 of
15 Reasons to Support Senate Bill 362 as Filed, you
16 characterize Senate Bill 362 as a compromised bill?
17    **A.  That's right.  And I should say, from looking**
18 **at these and the next page, it appears again these are**
19 **statements intended to garner support for the bill.  And**
20 **so, yes, it is characterized as a compromised bill here.**
21    Q.  How -- why is it a compromised bill?
22    **A.  Well, I would say that every bill is**
23 **compromised.  In most cases, in the fact that both photo**
24 **and non-photo ID were included is probably one example.**
25    Q.  Are there any other facets of 362 that served

**89**

1  as the basis of your argument that it was a compromise?
2      A. Not offhand. I can look at 362 if you'd
3  like. And again I say compromised bill, it's, you know,
4  my impression is that provisions, additional forms of ID
5  for example, were added to the bill in an attempt to
6  garner a compromise. But as I mentioned earlier, every
7  Democrat still voted against it.
8      Q. How did adding forms of ID constitute a
9  compromise, in your mind?
10     A. I mean, again, I'm -- looking at this, it's
11 possible that specific types of ID within the list were
12 suggested by other staff or constituents or Senators, I
13 can't recall the specifics, but it's likely related to
14 the forms of identification.
15     Q. And how -- what -- how was this a compromise
16 sort of relative to what other form of the bill it could
17 have taken?
18     A. Well, the bill, I imagine, could have taken any
19 form, and I can't recall specific early forms of the
20 bill or that it even existed in a form. It could have
21 been discussions with people around the Capitol or
22 listening to constituents or reading the newspaper or
23 reading Crawford or looking at the other state's laws.
24 I mean it could be, again, a product of lots of
25 different forms of input.

**90**

1      Q. But I guess you characterizes it as a
2  compromise. There could have been two. What were the
3  two sets of extremes that it was a compromise with?
4      A. Again, I can't recall what other forms this
5  bill existed in through the process, written or not
6  written, so I'm not sure what I was referring to here
7  five years ago.
8      Q. Do you see that in Bullet 1 you write, "There
9  is less chance of disenfranchising elderly, poor or
10 minority voters"?
11     A. Yes, it says that.
12     Q. And how did you determine that Senate Bill 362
13 would have that effect?
14     A. I don't recall specific reason for
15 that. Again, other than this document taken as whole
16 with the others are intended to be arguments in favor of
17 the bill. And, you know, any election reform has a
18 chance of disenfranchising voters, and this is evidently
19 less chance of disenfranchising voters.
20     Q. And what particular provisions in Senate Bill
21 362 made is less likely to disenfranchise these classes
22 of voters?
23     A. Again, I assume it's related to the forms of
24 identification that are acceptable.
25     Q. So is it fair to say that given that it allowed

**91**

1  for the use of non-photo ID, that would make it less
2  likely to disenfranchise these classes of voters?
3      MS. HALPERN: Objection, calls for
4  speculation.
5      Q. (By Ms. Westfall) You may answer.
6      A. It's possible. Again, looking at Crawford, you
7  know, the court allowed that forms of voter reform will
8  often disenfranchise some voters and, you know, if it's
9  some minimal number or negligible number, then that
10 might be okay if there are other benefits to the law.
11     Q. Turning your attention back to what you wrote
12 about Senate Bill 362, is it fair to say that you were
13 referring to the use of non-photo ID made it -- the bill
14 less likely that it would disenfranchise these forms of
15 -- these classes of voters?
16     A. I can't be sure. I know there are more forms
17 of ID certainly as compared to the current law, but I
18 don't know if I was specifically referring to photo or
19 non-photo. And again, it says at less than a chance.
20 It doesn't -- I don't think it acknowledges that people
21 will be disenfranchised. It acknowledges the chance of
22 disenfranchisement is some percentage less under this
23 bill.
24     Q. Is it -- were you intending to suggest there
25 was less of a chance of disenfranchising elderly, poor

**92**

1  or minority voters relative to hard-photo ID bills than
2  would only permit the use of photo ID?
3      A. I don't recall what I was drawing comparison
4  to. Different forms of bills is all I can say.
5      Q. So you, sitting here today, you can't tell sort
6  of what type of bill this was relative to that you were
7  referring to in Point 1?
8      A. Presumably it refers to a bill with fewer forms
9  of acceptable identification but I don't know the sorts
10 or I'm not sure exactly what I had in mind at the time.
11 And it may have even been that there were other bills
12 filed that session that I was referring to, and I don't
13 have those other bills.
14     I mean, I know throughout this process of
15 voter ID over the last however many years it's been,
16 there have been people who want this law to go away and
17 there have been people who think this law is not
18 restrictive enough. It may have been a reference to
19 those people -- or bills filed by those people as
20 legislators.
21     Q. Is it fair to say that without the provision
22 allowing use of non-photo ID in Senate Bill 362, that it
23 would increase the likelihood of disenfranchisement for
24 these groups?
25     MS. HALPERN: Objection, calls for

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

93

1  speculation.
2  Q.  (By Ms. Westfall) You may answer.
3  A.  It's possible.
4  Q.  And that's what you were suggesting in the
5  talking point; is that correct?
6  **A.  Again, I'm not sure what else I was comparing**
7  **it to.  I can't remember what other specific or general**
8  **alternatives I was referring to when I say less of a**
9  **chance.  It's also possible I was, you know, giving, you**
10 **know, sort of best case scenarios to the staff to help**
11 **increase passage of the bill.**
12 Q.  But is it fair to say that you had a good faith
13 basis and believed the talking points that you were
14 writing here --
15 **A.  I would never encourage someone to lie.  And**
16 **yeah, I think it's fair to say that this is my good**
17 **faith understanding of what this bill does and does not**
18 **do.  Again, I just can't remember what else might have**
19 **been in the -- before the legislature.  There may have**
20 **been, you know, bills that were a bit more restrictive**
21 **and that may have been what I was referring to.**
22 Q.  Did you believe that arguing that Senate Bill
23 362 would not disenfranchise elderly, poor or minority
24 voters would generate support for the bill?
25 **A.  Yes.  I don't think anyone in the legislature**

94

1  has an interest in disenfranchising elderly, poor or
2  minority voters.
3  Q.  Why do you think that argument needed to be
4  made?
5  **A.  I don't know.  I think it's just sort of belt**
6  **and suspenders reminding people that this bill will not**
7  **have that effect.**
8  Q.  And is fair to say that at the time you wrote
9  these reasons to support Senate Bill 362, that you were
10 aware of concerns -- there were concerns out there that
11 the bill would adversely impact these groups?
12 **A.  Oh, sure.  I mean we knew, you know, Democrats**
13 **in particular opposed this bill before they cast their**
14 **vote, that's true.**
15 Q.  Why did you write that, in Bullet 5, that
16 allowing many forms of ID would increase the chance of
17 federal preclearance?
18 **A.  I think because it was true.  I mean, the**
19 **history of preclearance cases on voter ID showed you,**
20 **you know, that the more forms of ID were -- that were**
21 **permitable, permissible, the greater the chances of**
22 **preclearance.  It doesn't mean they were necessary to**
23 **get preclearance, but I think it's fair to say they**
24 **increased the chances.**
25 Q.  And did you write that bullet point because you

95

1  believed that allowing more forms of ID would decrease
2  the bill's discriminatory impact on voters?
3  **A.  Would you repeat?**
4  Q.  Did you write this bullet about preclearance
5  because you believed that allowing more forms of ID
6  would decrease the bill's discriminatory impact on
7  voters?
8  **A.  I believe that this bill, what it says,**
9  **increases the chances of preclearance because it had --**
10 **because of the list of acceptable ID in the bill.**
11 Q.  And the preclearance standard is what?
12 **A.  It was -- under Section 5, preclearance was**
13 **that there was -- the State has the burden or the**
14 **jurisdiction has the burden of proving that there's no**
15 **discriminatory impact or effect on minority populations.**
16 Q.  And here you wrote that Senate Bill 362 is
17 something that should be supported because it increases
18 chance of federal preclearance because many forms of ID
19 are acceptable; is that right?
20 **A.  Right.  And again, I don't remember what other**
21 **alternative bills might have been proposed by other**
22 **members of the legislature.**
23 Q.  But certainly Senate Bill 362 was not as
24 restrictive as a quote, unquote, hard-photo only Voter
25 ID bill, correct?

96

1  **A.  It was not as restrictive and it was not as**
2  **secure either.**
3  Q.  But it was -- it definitely allowed a broader
4  range --
5  **A.  Yes.**
6  Q.  -- of ID including non-photo ID?
7  **A.  Yes.**
8  Q.  And in your view and you were advocating to
9  Ms. McCoy, that a reason to support it was this broad
10 set of forms of ID could increase the chances of
11 preclearance under Section 5; is that right?
12      MS. HALPERN:  Object to the form, assumes
13 facts not in evidence.
14 Q.  (By Ms. Westfall) You may answer.
15 **A.  I think the point of this document and some of**
16 **the following documents are for supporters of the bill**
17 **in speaking to opponents of the bill to give them things**
18 **to use to garner more support.**
19 Q.  You also allude to the provisional ballot
20 procedure in Bullet 5 and you write, "Provisional ballot
21 procedure is less burdensome."  What did you mean by
22 that?
23 **A.  I do not know.**
24 Q.  Is it less burdensome because the voter did
25 not, after the election, have to appear -- if the voter

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

25 (Pages 97 to 100)

97

1  cast a provisional ballot, the voter would not have to
2  go back to the election office to show ID?
3     A.  It's possible.
4     Q.  And under the Indiana and Georgia laws, the
5  voter would have to come back and show ID if casting a
6  provisional ballot; is that correct?
7     A.  I think that's correct.
8     Q.  So relative to Indiana and Georgia, Senate Bill
9  362 was less burdensome on voters as to provisional
10 ballots; is that correct?
11    A.  I think that's fair.  Again, if I could just
12 clarify again:  Yes, burdensome.  In the earlier
13 deposition you used the word "lenient."  You know, it
14 depends on the eye of the beholder, I suppose.  But yes,
15 that's generally correct.
16    Q.  Turn your attention to the talking points at
17 Texas 00087009.  In the second bullet point about
18 protecting Texas voters, was it your view that Senate
19 Bill 362 would accomplish all these goals listed?  The
20 five bullets underneath Roman II.
21    A.  I hope I believed it would, yes.  My memory is
22 that yes, it would in fact.  Yes, the threat of fraud is
23 real.  Yes, this bill protects Texas voters.  And that
24 it attempted some -- it represented some attempt at a
25 compromise.  Sure.

98

1     Q.  But you're -- you were arguing that the Senate
2  Bill 362 would accomplish the goals in Roman II; is that
3  correct?
4     A.  Yes.
5     Q.  And in other words, Senate Bill 362, which
6  allowed for the use of photo and non-photo ID, would
7  accomplish these five goals, correct, under Roman II?
8     A.  Correct.  It doesn't say that this is the only
9  bill that will protect Texas voters, but yes, it does
10 say this bill will protect Texas voters.
11    Q.  We talked a little bit about the provisional
12 ballot process under Senate Bill 362.  It would not
13 alter the status quo --
14    A.  I believe --
15    Q.  -- of provisional ballot processing, to the
16 best of your recollection?
17    A.  I believe that's correct.
18    Q.  Under Senate Bill 362, voters without
19 qualifying ID could cast a provisional ballot; isn't
20 that right?
21    A.  Yes.  As they can today.
22    Q.  And the County Ballot Board would then check
23 their records and look at the ballot envelope and
24 determine whether to count based on their own review of
25 records of that ballot; is that correct?

99

1     A.  I believe that's correct.
2     Q.  The provisional ballot voter would not be
3  required to appear at the County election office; is
4  that right?
5     A.  That's correct.
6     Q.  And under Senate Bill 14, a voter without
7  requisite ID on election day would cast a provisional
8  ballot and then need to return to the election office
9  with qualifying ID in order for their ballot to be
10 counted; is that correct?
11    A.  If the reason for the provisional ballot is
12 that they did not have acceptable ID, then yes, they
13 have the opportunity to go confirm that after the voting
14 on election day.
15    Q.  And indeed, if they did not confirm, that their
16 ballot would not be counted?
17    A.  I believe that's correct.
18    Q.  Turning your attention now to Texas 00087011.
19    A.  Okay.
20    Q.  Actually strike that.
21       Turning your attention to 00087014, the
22 last page of Exhibit 155, Process for Obtaining a Texas
23 Birth Certificate.  When Senate Bill 362 was under
24 consideration, did you consider the cost of obtaining
25 photo IDs required under that law -- bill?

100

1     A.  Looking at this page, it is clear that I
2  considered it.  Again, I was not a bill sponsor.
3     Q.  Did you -- or your office conduct research on
4  the cost of documents like birth certificates required
5  to obtain an ID?
6     A.  I don't recall.
7     Q.  Does looking at Texas 00087014 refresh your
8  recollection as to whether you undertook or someone in
9  your office undertook research on the cost of birth
10 certificates in Texas?
11    A.  It's clear from this document that birth
12 certificates were considered.  Each of the 1, 2, 3 and 4
13 on that page mention birth certificates.  I can't recall
14 if I -- I would have been the one that did it, likely,
15 and I can't remember if I looked specifically at cost or
16 if I looked at birth certificates generally.
17    Q.  Do you know why you focused on the cost of
18 birth certificates?
19    A.  I don't know that I focused on the cost of
20 birth certificates.  I think I looked at the
21 availability of birth certificates, looking at this
22 document.
23    Q.  Do you know why you looked at the availability
24 of birth certificates as opposed to other forms of
25 identification?

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

26 (Pages 101 to 104)

101

1    A.  I think likely that birth -- I mean, I think
2  birth certificates are one of the more common methods of
3  obtaining other types of identification and so I looked
4  into how one goes about getting copies of birth
5  certificates.
6    Q.  And does this document here, Process for
7  Getting Copy Of Texas Birth Certificate, indicate that
8  it will cost $22 at least to get a birth certificate?
9    A.  That's what I put as of 2009.  That was -- I
10  assume -- I hope I got that correct.
11    Q.  And that to get a birth certificate for $22 as
12  opposed to 43 or 38, the applicant would have to appear
13  in person at Vital Statistics or another site or have
14  access to the Internet?
15    A.  To pay the $22, they would have to appear in
16  person or have access to the Internet, as you could get
17  at most any library, including in 2009.
18    Q.  At the time SB 362 was under consideration, was
19  Janice McCoy also focused on the issue of the cost of
20  obtaining a birth certificate?
21    A.  I don't know what Janice was focused on.
22    Q.  Did you -- do you recall any conversations with
23  her about that?
24    A.  I don't recall, but I sent her this.  So if she
25  wasn't before, then presumably she was aware after.

102

1        MS. HALPERN:  Counsel, we've been going
2  another hour and I need a break.
3        MS. WESTFALL:  Okay.  Certainly.  Let's
4  take a break.  I'm done with the document.  Let's take a
5  break.
6        (Recess 11:26 a.m. to 11:39 a.m.)
7    Q.  (By Ms. Westfall)  Okay.  We were -- you were
8  last discussing testifying about Exhibit Number 155,
9  which had been your testimony about that document had
10  been designated as highly confidential.  I want to
11  terminate or suspend that designation now, because I
12  want to ask you questions that don't pertain to that
13  document or other documents that have been designated as
14  highly confidential.
15    A.  Okay.
16    Q.  I believe you testified that Todd Smith was the
17  house sponsor of Senate Bill 362 in 2009?
18    A.  Correct.
19    Q.  And who was the House sponsor of Senate Bill
20  14?
21    A.  I believe it was Representative Harless.  There
22  may have been additional sponsors.
23    Q.  Do you recall that Representative Debbie Riddle
24  had strong interest in voter ID?
25    A.  I know that she has always had an interest in

103

1  voter ID.
2    Q.  And has it been across several legislative
3  sessions that she's held this interest?
4    A.  I think that's correct.
5    Q.  Do you know why Ms. Riddle was not selected to
6  carry either Senate Bill 14 or Senate Bill 362 in the
7  House?
8    A.  I don't know.  That's a decision that's made in
9  the House.
10    Q.  Do you know whether it has anything to do with
11  anything that she has said publicly related to
12  immigration?
13    A.  I don't know.
14    Q.  Was Senate Bill 14 filed in November 2010 in
15  the Senate?
16    A.  I don't recall when it was filed.
17        MS. WESTFALL:  Could you mark this 156?
18        (Exhibit 156 marked for identification.)
19        MS. WESTFALL:  I'm going to designate this
20  portion of the deposition as highly confidential because
21  we are -- I'm again going to use a document that has
22  been produced that has been designated as highly
23  confidential.
24    Q.  (By Ms. Westfall)  Mr. Hebert --
25        (Brief discussion off the record.)

104

1    Q.  (By Ms. Westfall)  So you've been handed what's
2  been marked as 156.  Do you recognize this document
3  is?
4    A.  It looks like an e-mail from Janice McCoy to
5  various Senate staff with an attachment of a draft of
6  voter ID bill.
7        MS. WESTFALL:  For the record, Exhibit
8  Number 156 is Texas 00090532 through Texas 00090543.
9    Q.  (By Ms. Westfall)  Do you see that you were
10  copied on the e-mail?
11    A.  Yes.
12    Q.  Do you see the date of the e-mail?
13    A.  Well, it's two e-mails.  The first one,
14  November 8th, and the second on November 9th.
15    Q.  Did you know before you received this e-mail
16  that Senator Fraser would be filing a Voter ID bill?
17    A.  My memory is that he had -- or his staff had
18  already expressed an interest in refiling Voter ID
19  legislation.
20    Q.  Senator Fraser had been the sponsor of Senate
21  Bill 362; is that correct?
22    A.  Correct.
23    Q.  And you knew in advance of this date, November
24  2010, that he would be refiling a Voter ID bill; is that
25  right?

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

---

105

1  A. Yes.
2      MR. WHITLEY: Ms. Westfall, very quickly,
3  and I'm sorry for interrupting. Is this -- and I may
4  have misheard. Is this portion of the testimony also
5  designated --
6      MS. WESTFALL: Yes.
7      MR. WHITLEY: -- as highly confidential?
8      MS. WESTFALL: I -- I hope I designated it
9  as highly confidential.
10     MR. WHITLEY: And this is a document that
11 was produced pursuant to the protective order?
12     MS. WESTFALL: Yes.
13     MR. WHITLEY: And it was produced as
14 production from the last case pursuant to the court's
15 order to produce those documents from the last case?
16     MS. WESTFALL: Yes.
17     MR. WHITLEY: So the defendants are
18 going have the same objection about this document as we
19 did before.
20     MS. WESTFALL: Yes.
21     MR. WHITLEY: Okay.
22     MS. WESTFALL: Thank you.
23  Q. (By Ms. Westfall) So originally, as indicated
24 in the subject line, the Voter ID bill he filed in
25 November 2010 received a bill number of Senate Bill 178;

---

106

1  is that right?
2      A. I'm not sure. I guess so. According to this
3  e-mail, yes.
4      Q. And the bill number was later changed to Senate
5  Bill 14; is that correct?
6      A. Correct. Again, I'm not sure that it's the
7  exact same bill, but that might be correct.
8      Q. Assuming it is the same bill, do you know why
9  the change in numbering was made?
10     A. I don't know. Typically, low bill numbers are
11 priorities of the Lieutenant Governor and the Senate.
12     Q. Do you know whether Senator Fraser was asked to
13 refile so that he could be designated with a low bill
14 number?
15     A. I don't know.
16     Q. Do you know whether Mr. Dewhurst asked him to
17 do that?
18     A. I don't know.
19     Q. Do you see that the e-mail, the second e-mail
20 dated November 8th on Page 90532, alludes to a
21 discussion with the Lieutenant Governor's office --
22     A. Yes.
23     Q. -- in Paragraph 2?
24     A. (Witness nods head yes.)
25     Q. Were you part of that meeting?

---

107

1      A. I might have been. I cannot recall the
2  specifics of the meeting.
3      Q. Do you see -- could you review that paragraph
4  starting, "After late discussion with Lieutenant
5  Governor's office," and let me know when you're done?
6      A. Okay.
7      Q. Could you indicate in your own words what it
8  describes?
9      A. That someone, in looking at it now, it probably
10 was me, suggested that having voter registration fraud
11 provisions and a voter identification bill might present
12 a two-subject problem, which is a parliamentary --
13 or constitutional restriction that any one bill can only
14 contain one subject.
15     Q. So was it your advice and recommendation that
16 Section 18 be removed from the bill?
17     A. I assume it was my recommendation.
18     Q. Could you refer me to the constitutional
19 provision that creates the two-subject rule?
20     A. I don't know the number.
21     Q. And again, Section 18 of this previous
22 iteration of the bill would have violated the
23 two-subject rule for what reason?
24     A. It's possible that if a bill contained both
25 requirements for acceptable Voter ID voting at polls and

---

108

1  provisions relating to punishment of voter registration
2  fraud, that a House parliamentary or a Senate
3  parliamentary or a court after the fact could decide
4  that those two things were not one subject. And to, you
5  know, to avoid that concern, it was probably safer to
6  remove that provision.
7      Q. Do you know whether any other changes were made
8  to the draft besides the one you just testified to as a
9  result of your meeting with Ms. McCoy?
10     A. I don't recall.
11     Q. Turning to the bill itself --
12     A. Can I?
13     Q. Go ahead.
14     A. To clarify, I don't know that if it was even a
15 meeting. It says a discussion. It may have been a
16 phone call.
17     Q. Do you recall whether any other changes to the
18 bill occurred during that discussion?
19     A. I don't recall.
20     Q. Turning to the bill attached to Exhibit 156, it
21 appears -- if you could take a look at the bill, that
22 there was no exemption from the ID requirements for
23 voters over the age of 70; is that correct?
24     A. I do not see an exemption.
25         MS. WESTFALL: Could you mark this

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

---

**109**

1  document as Exhibit 157?
2      (Exhibit 157 marked for identification.)
3      Q.  (By Ms. Westfall)  You've been handed what's
4  been marked as Exhibit 157.  Do you recognize this
5  document?
6      A.  It's an e-mail from myself to a Senate staffer
7  relating to Voter ID bill.
8      Q.  Preliminary question:  Why did you copy
9  yourself, Bryan Hebert to Bryan Hebert, this e-mail?
10     A.  It's possible I did that just as a sort of
11 bookkeeping for myself to put it into one folder in my
12 archive system.  But you can see at the bottom it's got
13 my deputy general counsel signature, which would only
14 have come from my state account.
15     Q.  Thank you.  Who is Noe Barrios?
16     A.  Noe Barrios is I believe now chief of staff for
17 Senator Estes.  I'm not sure what his title was in 2011.
18     Q.  What is the party affiliation of Senator Estes?
19     A.  He's a Republican.
20     Q.  What were the concerns about SB 14's compliance
21 with the Voting Rights Act that are expressed by
22 Mr. Barrios?
23     A.  I don't know.  It says here that -- it looks
24 like Blaine Brunson, the chief of staff for the
25 Lieutenant Governor, had a conversation with Senator

---

**110**

1  Estes, and in that conversation concerns were raised.  I
2  don't recall the specific -- of whether Blaine relayed
3  the specifics of those concerns or whether he just said
4  Senator Estes wants to make sure this passes and is
5  precleared.
6      Q.  So you provided information about Crawford and
7  the Indiana law in response to these concerns, correct?
8      A.  That looks to be correct.
9      Q.  Why did you provide information about Indiana's
10 photo ID law in response to concerns about Senate Bill
11 14 under the Voting Rights Act?
12     A.  I think it was -- looks like it was a separate
13 point, I said, you know, the good news is that U.S.
14 Supreme Court has upheld a similar law in Indiana, and I
15 don't believe -- you know, I think the Crawford decision
16 is relevant to the discussion of whether Voter ID laws
17 will be upheld.  It's not a preclearance process, but it
18 is relevant.
19     Q.  And Crawford would be relevant to
20 constitutional challenges against Voter ID; is that
21 correct?
22     A.  Correct.
23     Q.  But Crawford is not -- doesn't -- Crawford was
24 not a statutory.
25     A.  It's not a Section 5 ruling.

---

**111**

1      Q.  So how did you believe that discussing the
2  Crawford case would be responsive to the concerns of
3  Mr. Barrios and his boss?
4      A.  I don't remember for sure today.  I would say
5  that if the Supreme Court approved an election change or
6  election program in a state, that's certainly better
7  than if they did not approve it in terms of whether it
8  would pass preclearance.
9      Q.  So in measures required to offset burdens on
10 voters, do you see that at Roman II?
11     A.  Yes.
12     Q.  You mentioned availability of provisional
13 ballots and absentee ballots, correct?
14     A.  Correct.
15     Q.  And under Senate Bill 14, if a voter casts
16 provisional ballot, that voter for -- for not -- for
17 lack of acceptable photo ID, the voter would have to
18 return with acceptable photo ID in order for that ballot
19 to be counted, correct?
20     A.  Correct.
21     Q.  So how does the availability of provisional
22 ballots under Senate Bill 14 offset burden to voters?
23     A.  Because the voter is not turned away outright.
24 If they show up at the polls with no ID, they're not
25 just told too bad.  They're allowed to cast a

---

**112**

1  provisional ballot, and they're further given an
2  opportunity to appear with acceptable ID and have that
3  the ballot counted.
4      Q.  So under -- are you familiar with the Help
5  America Vote Act?
6      A.  Yes.
7      Q.  And doesn't the Help America Vote Act require
8  that no voter, under any circumstance, can be turned
9  away from the polls and is permitted to vote a
10 provisional ballot?
11     A.  I'll take your word for it.
12     Q.  So how does -- assuming that to be the case,
13 how does Senate Bill 14 offset burden to voters if it's
14 already provided for in federal law?
15     A.  I assume by -- at least by providing a clear
16 mechanism and by ensuring that the secure measures in
17 place at the polls are continued through the provisional
18 ballot process and providing guidance through election
19 workers and election clerks on how to handle such
20 requests so that they're not mishandled.
21     Q.  And on -- where you have Roman III, measures
22 recommended to offset burdens on voters, you mention an
23 exception for certain elderly voters.  Why did you raise
24 the issue of elderly voters in response to concerns
25 about the Voting Rights Act?

---

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

---

113

1    A. I can't recall.
2    Q. And elderly voters are not the protected class
3 of voters that are at issue in the Voting Rights Act,
4 correct?
5    A. Correct. Although, again, if I'm referencing
6 constitutional law, making sure all classes of voters
7 are treated the same way would increase the chances of
8 success before a court.
9    Q. So it's more of an equal protection concern and
10 less of a Voting Rights Act concern; is that correct?
11    A. Possibly.
12    Q. Insofar as -- well, okay. Did Mr. Barrios
13 respond to your e-mail?
14    A. I don't recall.
15       MS. WESTFALL: I'm going to terminate the
16 highly confidential designation right now.
17    Q. (By Ms. Westfall) Did you hear of any other
18 concerns about Senate Bill 14's compliance with the
19 Voting Rights Act at this period in time?
20    A. In --
21       MS. HALPERN: Objection, vague.
22    A. In January of 2011, we would have been in
23 session, and I assume I did hear objections from
24 opponents of the bill.
25    Q. (By Ms. Westfall) Were there any concerns

---

114

1 about SB 14's compliance with the Voting Rights Act from
2 senators who later voted for the bill?
3    A. I don't recall. It's three years ago.
4    Q. Governor Perry designated the issue of Voter ID
5 as emergency legislation, correct?
6    A. I think that's correct.
7    Q. And you had a conversation with Janice McCoy
8 about the designation of Voter ID as emergency
9 legislation, correct?
10    A. I may have. I don't remember specific
11 conversation about that designation. Certainly after
12 the fact we would have talked about it.
13    Q. But you don't recall what was said at that
14 conversation?
15    A. I don't recall.
16    Q. Just the existence of the conversation?
17    A. I'm not even sure that we actually had that
18 conversation. I would not be surprised if we talked
19 about the emergency designation after it happened.
20    Q. I'll represent to you that in your prior
21 deposition you testified to the existence of a
22 conversation --
23    A. Okay.
24    Q. -- with Ms. McCoy about the emergency
25 designation.

---

115

1    A. Sure.
2    Q. And sitting here today, do you recall anything
3 about that conversation?
4    A. I don't. It's three years ago, two years since
5 my last deposition.
6       MS. WESTFALL: Counsel, let's go off the
7 record for a second.
8       (Brief discussion off the record.)
9       (Exhibit 158 marked for identification.)
10    Q. (By Ms. Westfall) You've been handed what's
11 been marked as Exhibit 158. It is TX0003456.
12       MS. HALPERN: Counsel, if you don't mind
13 some unsolicited advice, let me suggest that rather than
14 discussing the contents of this, which would require you
15 to make this portion of the deposition confidential,
16 without describing it, why don't you just ask him if
17 he --
18       MS. WESTFALL: Sure.
19    Q. (By Ms. Westfall) Do you know what this is?
20    A. It looks like talking points for DHD, which
21 would be David Dewhurst, Call to Members Voter ID
22 Timeline and Procedures.
23    Q. Did you draft this?
24    A. I don't think I did.
25    Q. Okay.

---

116

1    A. And I -- I don't remember drafting it for sure,
2 but just as a practical matter, the ID in the first
3 line, I would never have done it lower case.
4    Q. Fair point.
5    A. And this also seems more sort of personal in
6 nature. It's not the style I would have written in
7 either.
8    Q. Do you know whether -- putting aside document 1
9 -- the Exhibit 158, do you know whether Mr. Dewhurst
10 called all members about consideration of Senate Bill
11 14?
12    A. I don't recall. I don't -- I don't remember
13 any firsthand knowledge for sure.
14    Q. Do you have any idea who drafted this document?
15    A. I don't.
16    Q. Do you think Mr. Dewhurst himself drafted this
17 document?
18    A. I don't know.
19    Q. Would Frank Battle or Julia Rathgeber or Blaine
20 Brunson had drafted this document?
21    A. In 2011, Frank Battle would have been -- let's
22 see if I remember -- I don't know. I don't know. It
23 could have been any of them. It could have been the
24 Lieutenant Governor himself, but that seems unlikely.
25    Q. Do you know why Mr. Dewhurst would have

---

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

30 (Pages 117 to 120)

117

1  indicated to members that he wanted to move this bill,
2  that is Senate Bill 14, as expeditiously as possible?
3      A.  I don't know.  Considering that Governor Perry
4  designated it an emergency, that might be one reason.
5      Q.  Do you know why he would have wanted to get
6  consideration of Voter ID out of the way before
7  considering some of the other issues mentioned in this
8  document such as budget, imminent domain, border
9  security and, quote, "other pressing issues," end quote?
10     A.  Again --
11         MS. HALPERN:  Objection, calls for
12 speculation.
13     A.  I don't know.  Again, I would guess that since
14 the Governor considered it an emergency, that that means
15 it warranted some attention.
16     Q.  (By Ms. Westfall)  Do you see that these
17 talking points indicate at Exhibit 158 that the Senate
18 would meet the following week as long as it took to get
19 Voter ID done, in essence?
20     A.  Yes.
21     Q.  Do you know why those steps were taken with
22 regard to this bill?
23     A.  I don't know.
24     Q.  Do you know why, other than what you just
25 testified to in terms of emergency designation, it was

118

1  moved so expeditiously through the Senate?
2      A.  I don't know.  Again, I could guess that given
3  the vocal opposition from Democrats, that he expected a
4  fight.  And as I said earlier, the earlier in the
5  process you start on controversial or contentious bills,
6  the better, in terms of getting it passed.  It may have
7  been some other reason.  Maybe the Speaker requested it
8  or maybe the Governor requested it.  I don't know.
9      Q.  Are you aware of other kind of substantive
10 bills that were pushed through the first week of session
11 in the January, to your knowledge?
12     A.  I don't recall what else might have been an
13 emergency.  The Senate rules and the Legislature's rules
14 prohibit consideration of certain types of bills during
15 certain points in the Senate.  It may have been that
16 this was the only bill we could consider that early in
17 session.  I don't know.  And I don't know when this was
18 drafted exactly either.
19     Q.  Putting aside 2011, since you were in the
20 Senate working as a staff person since 2007; is that
21 correct, 2007?
22     A.  Sadly, yes.
23     Q.  Are you aware of any other substantive bills
24 that were pushed through the Senate in the first week of
25 session in January?

119

1      A.  My memory is there have been a number of
2  emergency issues over those years.  I cannot recall
3  which specific bills were passed during the first week
4  or the first month or the first 60 days of session.
5      Q.  Do you know what subject matter they were?
6      A.  You know, I can't remember.  I know -- I should
7  know, but I know there have been a number of them that
8  have been emergencies, but I can't remember.  And I
9  should also say that it's possible for the Senate to
10 vote to suspend those rules to do so, and I can't
11 remember if that has happened or not.
12     Q.  Do you know in terms of the date of this
13 document that it starts off, "Today Governor Perry
14 designated Voter ID as an emergency"?
15     A.  Yes.
16     Q.  Does that suggest to you a certain date when
17 this document was drafted?
18     A.  Probably the date that the designation was
19 made.  I don't know when this was distributed or when he
20 might have met with the senators as indicated here.
21     Q.  Do you recall that Governor Perry designated
22 Voter ID as an emergency on January 20 of 2011?
23     A.  I don't recall the date, but I assume that's
24 correct.
25     Q.  Would it be in the legislative history on

120

1  Senate Bill 14 or no?
2      A.  The emergency designation, I don't believe
3  would be.  It would be a proclamation from the
4  Governor's office and would likely have been read on the
5  floor of the Senate and therefore be in the Senate
6  Journal.
7      Q.  Do you see that on document Exhibit Number 158,
8  it indicates that it would be in the Senate's best
9  interest to complete work on Voter ID before focusing on
10 these other issues listed?
11     A.  Yes.
12     Q.  Four paragraphs down.
13     A.  It says that --
14         MS. HALPERN:  I'm sorry.  I should have
15 interposed a running objection, and I apologize.  I said
16 it was okay for you to ask him if he authored it.  He
17 says he didn't.  And now we have a whole line of
18 continuing questions about this highly confidential
19 document.  So with your indulgence, because I think
20 we're having bilateral cooperation here, I want to go
21 back and assert a running objection starting from every
22 question after he says he didn't author this.
23         MS. WESTFALL:  Certainly.  Certainly.
24     Q.  (By Ms. Westfall)  Are you aware of any facts,
25 factual support, need for such prompt and expeditious

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

31 (Pages 121 to 124)

---

121

1  consideration of Senate Bill 14 before other legislative
2  priorities?
3       **A.  I'm not sure what the Governor considered in**
4  **making the designation.**
5       Q.  But the sole -- your sole -- your testimony is
6  that it was solely -- your understanding was it was the
7  Governor's designation of this bill as an emergency is
8  the sole factual support for why it was pushed so
9  expeditiously in the Senate in January --
10          MS. HALPERN:  Objection.
11      Q.  (By Ms. Westfall)  -- is that correct?
12          MS. HALPERN:  Assumes facts not in
13  evidence.
14      Q.  (By Ms. Westfall)  You may answer.
15      **A.  I don't know is the short answer.  I know this**
16  **was a priority of Lieutenant Governor Dewhurst and of**
17  **many senators.  And it was clearly deemed an emergency**
18  **by the Governor.  And all that together seems enough to**
19  **call expeditions -- expediting the process.**
20      Q.  Other than what you just testified to, there
21  are no other facts that warranted such prompt
22  consideration of Senate Bill 14; is that right?
23      **A.  Again, the same that I mentioned earlier, the**
24  **desire to actually have it passed this time.  This was**
25  **now the third or fourth or fifth session that it had**

---

122

1  **been attempted to be passed.  And on multiple occasions,**
2  **had run out of time or procedural obstacles had been**
3  **placed in its way that stopped it.  So if nothing else,**
4  **to get it done.**
5          MS. WESTFALL:  I'm going to terminate the
6  highly confidential designation right now.
7          MS. HALPERN:  When do you plan to stop for
8  lunch?
9          MS. WESTFALL:  I'm open.
10          MS. HALPERN:  Well, I'm assuming you've
11  got hours and hours to go before you sleep?
12          MS. WESTFALL:  I have hours and hours to
13  go before I sleep.  I have -- I have a bunch of short
14  exhibits to go through, so we're going to be here all
15  day as you -- it's 12 noon.
16          MS. HALPERN:  What do you want to do?
17          MS. WESTFALL:  I'm open.
18          THE WITNESS:  Maybe another half hour and
19  then break?
20          MS. WESTFALL:  Okay.  12:30 is a good time
21  for lunch.  Okay.  I'm going to -- could you please mark
22  this?
23          (Exhibit 159 marked for identification.)
24      Q.  (By Ms. Westfall)  You've just been handed
25  what's been marked as 159.  Do you recognize this

---

123

1  document?
2       **A.  It looks like a press release from the**
3  **Lieutenant Governor's office.**
4       Q.  What is it concerning?
5       **A.  The Governor Perry emergency call.**
6       Q.  Do you see the date of the release?
7       **A.  Yes.**
8       Q.  What is the date?
9       **A.  January 20, 2010.**
10      Q.  And when was this -- what does it refer to in
11  terms of when the emergency designation was made?
12      **A.  "Today."**
13      Q.  So, therefore, the emergency designation was
14  January 20th; is that correct?
15      **A.  I assume that's true.**
16      Q.  Do you see that -- turning your attention to
17  the last paragraph of this release, do you see that it
18  refers to the need to protect one man, one vote?
19      **A.  It says, "One person, one vote," yes.**
20      Q.  One person, one vote.  Do you know what was
21  meant by that?
22      **A.  I mean, I just -- generally that each vote**
23  **shall count if cast by an eligible voter and not be**
24  **offset by a vote cast by an ineligible voter.**
25      Q.  Was there a threat to the principle of one

---

124

1  person, one vote, that Voter ID was intended to remedy?
2       **A.  Yes.**
3       Q.  Can you explain that?
4       **A.  In my judgment, as I just said, if an eligible**
5  **voter casts a vote, that vote is counted.  If an**
6  **ineligible voter casts a fraudulent vote, that has the**
7  **effect of eliminating or offsetting an eligible vote,**
8  **and therefore, is a threat to the principle of one**
9  **person, one vote.**
10      Q.  And what was the basis for the need of ensuring
11  one person, one vote through Voter ID, other than what
12  you've just testified to?
13      **A.  I think that's enough.  I think there's lots of**
14  **--**
15      Q.  Principle.
16      **A.  There are lots of ways to protect that**
17  **principle in Voter ID.  This Voter ID legislation was**
18  **one.**
19      Q.  And do you see it alludes to uphold the
20  integrity of elections?
21      **A.  Yes.**
22      Q.  Why was there a need to uphold the integrity of
23  elections through Voter ID?
24      **A.  Again, I think accounts of various types of**
25  **fraud have been well-documented in Texas and other**

---

BRYAN HEBERT                                                6/17/2014
CONFIDENTIAL TRANSCRIPT

32 (Pages 125 to 128)

125

1  jurisdictions, and this attempt to decrease that fraud
2  has the effect of upholding the integrity of our
3  elections so that you can be sure that the person who
4  got the most eligible votes is the person that was
5  elected.
6      Q.  Were there indications that existing Voter ID
7  law in Texas had failed to protect the integrity of the
8  elections?
9      A.  I'm sure there were examples that I --
10 specifics of which escape me now, but yes, like I said,
11 there's been examples of fraud throughout Texas's
12 history.  This was one -- intended to be one step
13 towards curbing that fraud and curbing fraud in general.
14     Q.  And by voter fraud, you mean voter fraud
15 generally and not limited to in-person voter
16 impersonation; is that correct?
17     A.  The bulk of this voter -- SB 14, as I saw it,
18 was intended to stop in-person voter fraud, but as I
19 discussed earlier, I think the potential impact of that
20 is much broader.
21         MS. WESTFALL:  Can you mark this?
22         (Exhibit 160 marked for identification.)
23     Q.  (By Ms. Westfall)  You've been handed what's
24 been marked as Exhibit 160.  Do you recognize this
25 document?

126

1      A.  It is a letter to Senator Birdwell, and my
2  recollection is that every senator got a similar letter
3  stating Lieutenant Governor Dewhurst's intent to
4  recognize Senator Duncan, to resolve the Senate into
5  Committee of the Whole to consider SB 14 relating to
6  Voter ID, to appoint Senator Duncan as chair of that
7  committee, and then some other time line procedural
8  issues.
9      Q.  Did you draft this letter?
10     A.  No.
11     Q.  Who drafted this letter?
12     A.  I don't know.
13     Q.  What did the initials at the bottom mean?
14     A.  DD would likely be David Dewhurst, and EG would
15 likely be Elaine Gonzalez, his assistant.
16     Q.  Why did Senator Duncan make a motion to resolve
17 the Senate to the Committee of the Whole?
18     A.  I don't know why he did what he did.
19 Procedurally, a senator has to make the motion to
20 resolve it into a Committee of the Whole.
21     Q.  And Mr. Dewhurst himself was not able to do
22 that; is that correct?
23     A.  Correct.  I'm not aware of a procedure where
24 the Lieutenant Governor can do so.
25     Q.  Was it -- was Senator Duncan selected for this

127

1  role because he was the chair of the State Affairs
2  Committee, which had jurisdiction over election-related
3  bills?
4      A.  I don't know the reason he was chosen.  I think
5  it was a good choice because in addition to his
6  experience with the election procedure, he's a
7  long-serving member of the Senate, familiar with Senate
8  rules and procedure, and just frankly, an even-handed
9  temperament and trusted by all members of the Senate.
10     Q.  Is there a reason why Senator Fraser was not
11 selected for that role?
12     A.  Likely because he was the sponsor of the bill
13 in question.
14     Q.  I see.  So he would appear as sort of a witness
15 or a resource?
16     A.  Correct.  I think -- well, the way it would
17 work is a senator would be appointed to preside, someone
18 other than Lieutenant Governor.  You would not have the
19 sponsor of the bill presiding.  Even in a regular
20 committee process, the chair of the committee would hand
21 the gavel off to the vice chair, someone else to preside
22 if a bill of the chair came before the committee.  So in
23 this case, Senator Fraser was almost certainly not
24 chosen because he was the sponsor of Senate Bill 14.
25         MS. WESTFALL:  Would you please mark this?

128

1         (Exhibit 161 marked for identification.)
2         MS. WESTFALL:  Go off the record one
3  second.
4         (Brief discussion off the record.)
5         MS. WESTFALL:  Back on the record.
6      Q.  (By Ms. Westfall)  You've been handed Exhibit
7  161.  Do you recognize this document?
8      A.  Appears to be copy of some version of SB 14.
9      Q.  Do you see the date at the bottom?
10     A.  Looks like the date January 12, 2011.
11     Q.  Can you refer yourself back to that other
12 exhibit and of the chronology of Senate Bill 14?
13     A.  Actually I don't have that.  I have the
14 chronology of 362.
15     Q.  All right.  Strike that.  We'll go back to that
16 a later time.
17         So the bill gets filed in November 2010,
18 correct?  And then are there changes to the bill between
19 its filing in November 2010 and January 2012 -- 2011?
20     A.  Well, we know there was at least -- again,
21 without knowing which versions were officially filed,
22 referring back to the earlier e-mail from Janice McCoy
23 to Senate staffers, it looks like she made one change
24 that she referenced there, deleted Section 18, and made
25 some changes -- or didn't make changes to Section 14.  I

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

33 (Pages 129 to 132)

---

129

1  don't know what changes may have been made between that
2  version and that attachment and this without looking
3  through it.  And I don't know which was filed and which
4  was not filed.
5      Q.  Is it possible that you could prefile a bill in
6  November of 2010 and then continue working on different
7  iterations and file another version in January 2011?
8      A.  Yes.  A bill can be changed by the author as
9  often as they like.
10     Q.  Do you recall that -- without looking at the
11  documents, do you recall from your memory whether
12  changes were made to the bill during that period of
13  time?
14     A.  I don't recall.
15     Q.  And you were involved in developing Senate Bill
16  14; is that right?
17     A.  I had conversations with Janice McCoy regarding
18  the bill, and I had been working on it previous
19  sessions.  Yes, I think it's fair to say I was aware,
20  and I was certainly -- and for my office's purposes, in
21  charge of analyzing and tracking the bill.
22     Q.  Was Ms. Jennifer Fagan also involved in the
23  drafting process or was it chiefly you and Ms. McCoy?
24     A.  I can't remember the extent to Jennifer Fagan
25  was involved.  And I should say the development.  The

---

130

1  drafting, I mean, for example, on this Exhibit 161,
2  there's a number at the bottom which I think indicates
3  it came from Senate Engrossing and Enrolling, which is
4  an agency within the Senate to draft bills.  So I don't
5  know how much input Jennifer Fagan or myself had on this
6  particular draft or the bill as a whole.
7      Q.  Were there other staff involved besides you,
8  Ms. McCoy and Ms. Fagan in drafting Senate Bill --
9  developing Senate Bill 14?
10     A.  I don't recall.  Again, I think given
11  Ms. McCoy's earlier e-mail, there's a list of Senate
12  staff.  I don't know to the extent to which any of those
13  people were or were not involved or whether people not
14  on that list were involved.
15     Q.  Were you involved in drafting Senate Bill 14?
16     A.  I don't recall.  I may have.  I have a
17  background of drafting bills.  It's possible that I may
18  have helped with the language, sure.
19     Q.  Do you recall what sources you consulted, if
20  any, to draft Senate Bill 14?
21         MS. HALPERN:  Objection, assumes facts not
22  in evidence.
23     A.  To the extent I did draft or help with drafting
24  language, I assume I would have looked at previous
25  versions of this bill.  I would have looked to other

---

131

1  states where Voter ID was implemented, Indiana and
2  Georgia and Louisiana.  I would have looked through
3  testimony provided during the course over the last
4  previous few sessions on this -- on this concept.  I
5  don't know what else.  I imagine I would have drawn from
6  a lot of sources.  But most importantly, if I was asked
7  to draft something, I would have just done what I was
8  asked to draft as a sort of administrative matter.
9      Q.  (By Ms. Westfall)  Kind of a technical matter?
10     A.  Correct.
11     Q.  And this would have been at the instruction of
12  Mr. Dewhurst?
13     A.  Unlikely.
14     Q.  At whose instruction?
15     A.  More likely at the instruction of Janice, whose
16  boss was the sponsor.  And as far as I know, Janice does
17  not have experience drafting bills herself, so she may
18  have asked me to help make sure the formatting was
19  correct and so forth.
20     Q.  I see.  Did you, besides the sources that you
21  just testified to, did you look at any model Voter ID
22  legislation from interest groups?
23     A.  No.  I don't recall looking at it.
24     Q.  Did you or the Lieutenant Governor exchange
25  drafts of Senate Bill 14 with anybody during this

---

132

1  period?
2      A.  I don't know what he did.  To the extent I
3  exchanged drafts or -- does that include reviewing
4  drafts?  It likely would have only have been with Janice
5  McCoy and possibly with Jennifer Fagan.  I don't recall
6  forwarding drafts to other people.  I may have, but I
7  don't recall.
8      Q.  Did you review any studies about the impact of
9  Voter ID in other states or any implications of Voter ID
10  in other states in drafting Senate Bill 14?
11     A.  To the extent I drafted portions of this bill
12  or didn't draft portions of the bill, I'm not sure.  I
13  know, generally, I was aware of studies related to voter
14  turnout and so forth in Voter ID states.
15     Q.  And by Voter ID states, you're referring to
16  Georgia and Indiana?
17     A.  Indiana and Georgia, and there seems like there
18  may have been some others in 2011, Louisiana or -- and
19  maybe some other jurisdictions.
20     Q.  Do you recall the particular studies you looked
21  at?
22     A.  I don't remember the names of the studies.  I
23  remember the gist being that turnout had not been
24  adversely impacted in the wake of Voter ID legislation.
25     Q.  How did you come upon learning about those

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

133

1  studies?
2      A.  Probably an Internet search.  Possibly from
3  testimony in prior sessions.  I think in one of our -- I
4  think in the 2009 session, one of the witnesses was an
5  Indiana elections official who would have probably
6  suggested or shown the impact in that state.
7      Q.  Did you chiefly learn about the studies of the
8  impact in Indiana and Georgia through those states'
9  election officials?
10     A.  I can't say chiefly.  I'm sure to some extent
11 it was directly from them.  To some extent it was
12 indirectly by reading reports from those agencies
13 online.  But I'm sure there were lots of other
14 independent sources I looked at.
15     Q.  When you were involved in drafting and
16 developing Senate Bill 14, did you consider other forms
17 of ID to include that were not ultimately in the bill
18 that became law?
19     A.  Did I consider them?
20     Q.  Yes.
21     A.  I think, sure.  I mean, lots of forms of ID
22 exist.  I think there was a process.  Again, I don't
23 remember making any sort of formal decisions about what
24 was and was not going to be included.  But yeah, there
25 were -- if only from other drafts of the bill in

134

1  previous -- similar bills in previous sessions, you
2  know, and opponents of the bill would certainly have
3  suggested alternative or additional methods of ID.
4      Q.  Could you --
5          MS. HALPERN:  Counsel, I'd like to confer
6  with the witness.  We're treading into deliberative
7  process privilege territory now, and I want to just
8  confer with him and see if he wants to waive it.  Can we
9  go off?
10         MS. WESTFALL:  Certainly.
11         (Recess taken from 12:20 to 12:24 p.m.)
12         MS. HALPERN:  I'm hoping that the both of
13 you counsel will confer, because the rule is seven
14 hours.  It's not seven hours for one and seven hours for
15 somebody else.  So if she uses up all your time, that's
16 a dispute you have to have with Elizabeth and not -- not
17 with this witness and not with his lawyer.
18         MS. WESTFALL:  We'll confer.
19         MS. HALPERN:  Okay.
20         MS. WESTFALL:  We're not saying we agree
21 with you.  We'll confer.
22         MS. HALPERN:  All right.
23         MS. WESTFALL:  In the interest of
24 cooperation.
25         MR. WHITLEY:  And to be clear, since we're

135

1  back on the record now, to the extent that the
2  defendants did not object to those portions of the
3  testimony that were designated as highly confidential or
4  exhibits introduced as part of that testimony, we're
5  going to assert a standing objection to those documents
6  that were produced from Texas v. Holder pursuant to
7  Judge Ramos's order that they were only legislatively
8  privileged.  So that's the same objection that we've
9  asserted previously in this deposition, and it will be
10 our standing objection to those documents that are
11 introduced as highly confidential.
12         MS. WESTFALL:  Very well.
13     Q.  (By Ms. Westfall)  Turning back to Exhibit 161,
14 Senate Bill 14, dated 1-12-2011.  We were just talking
15 about forms of ID that you considered and did not
16 include in the bill.  Do you recall any particular forms
17 of ID that you considered, you, collectively, you,
18 Ms. McCoy, Ms. Fagan, you, yourself, within your office,
19 that were not included in Senate Bill 14 ultimately?
20     A.  I'm not aware of what forms of ID Ms. McCoy or
21 others considered.  In terms of what I considered,
22 frankly, I don't recall.  But again, I'm sure I would
23 have considered, you know, forms of ID that had been
24 used in other states, that existed in the previous
25 versions of this legislation.

136

1      Q.  Did you consider allowing the use of expired
2  IDs in Senate Bill 14?
3      A.  I don't recall a specific consideration of
4  that.
5      Q.  Did you conduct during this period kind of in
6  the beginning of January or prior to that time, any
7  analyses about how many registered voters possessed the
8  required forms of ID under Senate Bill 14?
9      A.  I remember meeting with the Secretary of
10 State's office, but I can't recall -- about available
11 identification, but I cannot remember the details of
12 that meeting.
13     Q.  Was that meeting around February or late
14 January 2011?
15     A.  I don't know.
16     Q.  Was that with Ms. McGeehan?
17     A.  Yes.
18     Q.  Was Coby Shorter at that meeting?
19     A.  I cannot recall, but I don't believe so.
20     Q.  Was John Sepheri at that meeting?
21     A.  I don't recall.
22     Q.  Was Senator Williams' staff person at that
23 meeting?
24     A.  I can't recall.
25     Q.  What was the meeting about?

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

35 (Pages 137 to 140)

---

137

1    A.  My memory is that Janice and myself, possibly
2  Jennifer Fagan and possibly others, met I believe in
3  Senator Fraser's offices to discuss generally the
4  availability of IDs.  I don't recall specifics of the
5  meeting.  I know it was generally about the election
6  process.  There may have been some discussion of how
7  different steps in the legislative -- electoral process
8  work, but I can't remember specifics.
9    Q.  Was this meeting before the Senate, the
10 Committee of the Whole or the full Senate considered
11 SB 14?
12   A.  Probably, but I can't be sure.
13   Q.  And was part of that discussion about which
14 registered voters have forms of state issued ID?
15      MS. HALPERN:  I'm going to object as
16 vague.
17   A.  Yeah, I think -- go ahead, I'm sorry.
18      MS. HALPERN:  I don't understand your
19 question.
20   Q.  (By Ms. Westfall)  You may answer.
21   A.  I think in speaking to Ms. McGeehan from the
22 Secretary of State's office, I would have been
23 interested in knowing how many voters used ID when they
24 vote as opposed to using just a registration card or
25 some other ID.

---

138

1    Q.  Interesting.  So what did you learn from that
2  question?
3    A.  I can't remember.
4    Q.  Did you --
5    A.  I think I remember, frankly, that she would
6  look into it to be sure, and I can't remember the
7  outcome of that.
8    Q.  What other forms of acceptable state-issued ID
9  under Senate Bill 14?
10   A.  Under Senate Bill 14, if I can look to make
11 sure I'm correct.  It's photo IDs including --
12   Q.  And I'm just turning your attention to the
13 state IDs only.
14   A.  The state IDs under Senate Bill 14, and again,
15 all I have is this copy of Senate Bill 14.  I don't know
16 what version this is.  But my memory is it would be a
17 driver's license, a personal identification card or
18 election identification card issued by DPS.
19      MS. HALPERN:  And I'd like the record to
20 reflect that the witness is testifying from Exhibit 151,
21 which is dated January 12, 2011.
22      MS. WESTFALL:  Thank you, Counsel.
23   Q.  (By Ms. Westfall)  Would it also include
24 license to carry --
25   A.  Right.

---

139

1    Q.  -- handguns?
2    A.  Yes, it would, CHL license, CHL, yeah.
3    Q.  Was there discussion in this meeting about --
4  with Ms. McGeehan, as to which voters possessed those
5  state-issued forms of ID?
6    A.  I don't think so.  I think it was strictly at
7  that time how many voters present a driver's license or
8  some other identification.  It wasn't meant to be the
9  types of voters or how many types of ID.  I think it was
10 just who does more than present their registration card.
11 That's my memory.
12   Q.  Is it your understanding from that meeting that
13 the Secretary of State's office collects that
14 information?
15   A.  I think they might.  They are the counties know
16 who presents just a card versus presents an ID.  I think
17 that might be right.
18   Q.  Is that your understanding that that was part
19 of the statewide voter registration database?
20   A.  I don't know what database it might exist in.
21   Q.  At this time in early January-February 2011,
22 was there any analysis to determine whether minority
23 voters would be disproportionately less likely to
24 possess the state-issued forms of ID that you just
25 mentioned?

---

140

1    A.  I -- I did not conduct such research, but I
2  don't know if it existed.
3    Q.  Are you aware of any analysis that you didn't
4  conduct along those lines?
5    A.  I have to say I don't recall.  I know there was
6  testimony in the committee process about the impact on
7  various populations, and I can't remember how much of
8  that was hypothesis and how much was based on other
9  states and how much was based on formal studies.
10   Q.  What was the purpose of not allowing voters to
11 use nonphoto ID in Senate Bill 14?
12   A.  I don't know the purpose, because it's not my
13 bill.  I think there was public discussion about the
14 need to have a secure process, and nonphoto ID is less
15 secure than photo ID.
16   Q.  What is the basis for that statement?
17   A.  There -- if a document has a photo with a
18 person's face on it, especially the type of document
19 listed in Senate Bill 14, that's generally a much more
20 secure document with various seals and holograms and
21 codes on it that make it more difficult to forge, as
22 opposed to some of the older law-permissible IDs such as
23 utility bills or government checks or so forth.
24   Q.  And is it -- was it your view that those bills,
25 those forms of ID and the nonphoto ID would not

---

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

---

141

1  sufficiently prove that the voter was who she said she
2  was at the polls?
3      A.  I think my opinion is that voters who appear
4  without photo ID, there's a greater chance that that is
5  not the voter they claim to be --
6      Q.  Was there any --
7      A.  -- because it's a less secure form of
8  identification.
9      Q.  Was there any factual basis for drawing the
10 conclusion that nonphoto ID was not effective?
11     A.  Sure.  I think, for one, practice of the
12 federal government for many benefits and access at the
13 federal level, but also in Texas, you have to have a
14 photo ID.  So I guess a lot of us thought if it was good
15 enough for the feds, then it was good enough for Texas.
16     Q.  Under -- again, going back to the Help America
17 Vote Act, is it your understanding under that federal
18 law that if a voter registers and their information
19 cannot be matched against the driver license database or
20 Social Security, that they must show a form of ID when
21 they appear in person to vote; is that right?
22     A.  I'm not -- I'm not sure.
23     Q.  Okay.  Are you aware of any facts indicating
24 that a voter under Texas previous law came into the
25 polling place with a nonphoto ID and tried to him

---

142

1  impersonate another voter?
2      A.  I believe there was testimony during some of
3  the committee processes.  In fact, I think Senator
4  Williams' own brother was a victim of in-person voter
5  fraud.  He had been shown casting a vote but had, in
6  fact, not yet voted in that election.  There may have
7  been other examples that I can't specifically remember.
8      Q.  Other than the public record surrounding SB 14
9  and SB 362, are you aware of any other instances of the
10 use of nonphoto ID leading to that consequence that you
11 just described?
12     A.  Not -- no.
13         MS. HALPERN:  Counsel, lunch.
14         MS. WESTFALL:  Let's go down.  Let's go
15 off the record, because it will take a little while to
16 finish talking about this preliminary stuff.
17         (Lunch recess from 12:35 to 1:39 p.m.)
18     Q.  (By Ms. Westfall) So we were discussing before
19 lunch the Exhibit 161, the version of Senate Bill 14
20 dated January 12, 2011.
21     A.  Yes.
22     Q.  What was -- can you review the forms of ID
23 under this version of the bill, which are at pages,
24 gosh --
25     A.  Eight and nine.

---

143

1      Q.  Eight and nine.  Just take a look.  You don't
2  need to read them aloud, but if you could just take a
3  look and let me know when you've had a chance.
4      A.  Okay.
5      Q.  Do you see that this only includes photo ID?
6      A.  Yes.
7      Q.  Do you know why non-photo ID was not included?
8      A.  I don't know.
9      Q.  Do you know who made the decision not to
10 include non-photo ID in Senate Bill 14?
11     A.  I don't, but I can presume it's Senator
12 Fraser's bill.  And he decided, but I don't know that.
13         MS. HALPERN:  I ask the witness not to
14 speculate.
15     Q.  (By Ms. Westfall) Did anything occur between
16 2009 and 2011 that made two forms of non-photo ID an
17 acceptable option in 2009, but not in 2011?
18     A.  Not that I'm aware.
19     Q.  Would allowing the use of non-photo ID
20 interfere with the purposes of Senate Bill 14?
21     A.  Would allowing non-photo ID interfere with the
22 purposes?  The purposes, as I understand them, are to
23 increase the security of the elections, and so I
24 would -- in my opinion, I would say yes, non-photo is
25 less secure.  To the extent that's a purpose of the

---

144

1  bill, then it interferes with that purpose.
2      Q.  In 2009, with regard to Senate Bill 362, at
3  that time you argued in a previous exhibit we discussed
4  that non-photo ID did further the purpose of preventing
5  voter fraud, increasing voter confidence, et cetera; is
6  that correct?
7          MS. HALPERN:  Objection, misstates facts
8  not in evidence.
9      A.  I'd have to double-check and see.  I don't
10 think first that it was the purpose, and I'm not sure
11 that I argued that as you suggested.  To the extent that
12 you're referring to Exhibit 155, Reasons to Support 362
13 As Filed, I don't think it mentions -- on Number 5 on
14 00087008, one reason to support the bill is that it
15 increases the chance of the federal preclearance because
16 many forms of ID are acceptable, is that --
17         MS. WESTFALL:  Can I break in right now?
18 This needs to be designated as highly confidential, his
19 response.
20     Q.  (By Ms. Westfall) Turning your attention back
21 to Exhibit 155, did you not, with regard to the talking
22 points at Texas TX00087009, argue and present talking
23 points that at Roman II that the bill protects Texas
24 voters in five different regards?
25     A.  Yes, I did.

---

BRYAN HEBERT 6/17/2014
CONFIDENTIAL TRANSCRIPT

---

145

1    Q. And that was -- you were arguing that the bill,
2 Senate Bill 362, protects Texas voters, were you not?
3    **A. Yes. But I was not arguing it was the only way**
4 **to protect Texas voters. That's what your earlier**
5 **question was asking.**
6    Q. Are you aware of any facts at all that support
7 the decision not to include non-photo ID in Senate Bill
8 14?
9    **A. I -- again, I'm not sure why Senator Fraser**
10 **crafted this bill the way he did.**
11    Q. Are you aware that Senate Bill 362 permitted
12 the use of state and federal issued photo ID?
13    **A. Yes.**
14    Q. Do you know why Senate Bill 14 did not include
15 these forms of ID?
16    **A. I don't. Except to say it's a different bill**
17 **and a different session, but I don't know why.**
18    Q. Were you involved in any discussions about the
19 use of non-photo ID in -- about including that in Senate
20 Bill 14?
21       MS. HALPERN: Objection, asked and
22 answered. I think we covered this before lunch.
23    Q. (By Ms. Westfall) You may answer.
24    **A. I don't recall specific discussions about what**
25 **-- whether those provisions should be in the bill or**

---

146

1 **not.**
2    Q. Do you recall any discussions about whether to
3 include state and federal issued photo ID in Senate Bill
4 14?
5    **A. I don't recall.**
6    Q. Are you aware of any facts that would support
7 any decision not to include those as acceptable forms of
8 ID in Senate Bill 14?
9    **A. No. I mean, again, except to say that SB 14, I**
10 **think, provides a more secure electoral system than 362.**
11 **I don't know that that was the reason.**
12    Q. Other than what you testified to earlier today,
13 you're not aware of any other facts or rationales for
14 why those forms of ID were not included in Senate Bill
15 14?
16    **A. I don't think so.**
17    Q. Did Senate Bill 14 permit the use of employee
18 IDs?
19    **A. Senate Bill 14?**
20    Q. Yes.
21    **A. I don't believe it did.**
22    Q. Do you know why it did not allow the use of
23 employee IDs?
24    **A. I do not know.**
25    Q. Did Senate Bill 362 allow the use -- voters to

---

147

1 use employee IDs?
2    **A. I don't see employer IDs listed in this copy of**
3 **362 that I have, except to the extent they would be an**
4 **ID card issued by the federal or state government or**
5 **local government.**
6    Q. Thank you.
7       Did Senate Bill 362 allow for the use of
8 student IDs?
9    **A. Not specifically. Again, to the extent that a**
10 **student ID card us considered an ID card issued by**
11 **federal or state government, it would be covered by 362.**
12 **So I suppose some ID cards from the universities.**
13    Q. So were student IDs included under agencies or
14 institutions of the state to the extent they were state
15 universities?
16    **A. I think the argument could be made that**
17 **institution of this state includes a state university.**
18    Q. Do you know why Senate Bill 14 did not include
19 the use of student IDs?
20    **A. I don't know. I understand during the open -- the**
21 **floor debate on this bill, there were some concern that**
22 **universities might be treated differently and that it**
23 **would be confusing to allow some university IDs but not**
24 **others. And the concern was that if it was not a state**
25 **university, there would be no way of controlling the**

---

148

1 **form of those IDs, and that might be less secure.**
2    Q. Do you know how the exception for individuals
3 with disabilities came to be included in Senate Bill 14?
4    **A. My memory is that it was suggested on the floor**
5 **by Senator -- and I can't recall for sure, if that is**
6 **correct, and if so, which Senator suggested it.**
7    Q. Was it Senator Patrick?
8    **A. It may have been.**
9    Q. Do you know why that was included as an
10 exception to the bill?
11    **A. My memory is that he, on the floor at least,**
12 **said -- and I don't know personally, but my memory from**
13 **the floor debate is that he had done lots of work with**
14 **disabled populations and wanted that exception in there.**
15    Q. Do you have any other information that was not
16 in public record as to why the disability exemption was
17 included in Senate Bill 14?
18    **A. No.**
19    Q. How did the exception for first -- strike that.
20       In one or more iterations of Senate Bill
21 14, was there an exemption for voters over the age of
22 70?
23    **A. I don't remember if Senate Bill 14 had such an**
24 **exemption or not. Yet, other versions of the bill --**
25 **oh, wait, never mind. On Exhibit 161 on Page 5, yes, I**

---

BRYAN HEBERT                                         6/17/2014
CONFIDENTIAL TRANSCRIPT

149

1  see that there is an exception for people 70 years of
2  age or older as of January 1, 2012.
3      Q.  Do you know how this provision became included
4  in this version of Senate Bill 14?
5      A.  I don't know.
6      Q.  What is the purpose of that provision?
7      A.  I don't know the intended purpose, but my guess
8  is --
9          MS. HALPERN:  Let me stop you right there.
10     A.  I don't know the purpose.
11         MS. WESTFALL:  And for the record, I would
12 like to note that you can make an objection based on
13 speculation, but of course, the witness can answer it.
14 It's not a proper basis under the federal rules for
15 instructing the witness not to answer.
16     Q.  (By Ms. Westfall) Are you aware of any facts
17 that supported the need for this exemption for voters
18 over the age of 70?
19     A.  No.
20     Q.  How did the exception for individuals with
21 religious objections to being photographed arise?
22     A.  I can't recall.
23     Q.  What is the purpose of that provision?
24     A.  As I understand it, and again, I can't remember
25 who raised the issue, but there is apparently -- and I

150

1  don't know if it's from another case or another state,
2  but there's some religious sect or group that does not
3  believe in being photographed or believe that being
4  photographed somehow steals their soul or does something
5  that crosses the tenets of their religion, and
6  therefore, to be safe, that exception should be put in
7  the bill.
8      Q.  Can you think of any other purposes for that
9  exemption?
10     A.  No.
11     Q.  Did you believe that that exemption was legally
12 required as a first amendment issue?
13     A.  I don't know that I thought it was legally
14 required.
15     Q.  Did the Legislature in the course of debating,
16 amending, considering SB 14, make any changes to the
17 bills based on the concerns of the impact on racial and
18 ethnic minority voters?
19     A.  I'm not sure I can recall specific parts of the
20 bill.  I know specific amendments were suggested by
21 minority members of the Senate, but I'm not sure,
22 without walking through the bill line by line, what
23 might be characterized as you did.
24     Q.  Sitting here today, can you recall any of the
25 changes that were in the final version of the bill

151

1  signed into law that were made in responses to some of
2  those concerns?
3      A.  Again, without -- because I'm not the sponsor
4  of the bill, I don't know why each decision was made to
5  change the bill.  And alternatively, some of the bill
6  was changed by amendments on the floor, and it's hard to
7  say what the specific -- there's no one purpose for
8  every member's vote.  So I can say the bill did change,
9  I'm sure parts of the -- some of those changes were a
10 reaction to opponents who raised the issues you cited,
11 but I'm not sure I can name them off the top of my head.
12     Q.  Did the Lieutenant Governor play a role in
13 developing strategy to ensure that SB 14 would be
14 enacted?
15     A.  Strategy for it to be enacted?  Does that
16 mean --
17         MS. HALPERN:  I'm going to direct the
18 witness this sounds predecisional to me, and I think
19 we're starting to encroach on the Lieutenant Governor's
20 privilege.  So I'm going to direct you not to answer
21 that one.
22         MS. WESTFALL:  What is the privilege that
23 you're asserting here?
24         MS. HALPERN:  Predecisional.
25         MS. WESTFALL:  Deliberative process or

152

1  legislative --
2          MS. HALPERN:  Yes, deliberative process.
3          MS. WESTFALL:  Okay.  And we have a
4  standing disagreement on whether that is an appropriate
5  privilege to assert with regard to that question.
6      Q.  (By Ms. Westfall) Are you aware of any strategy
7  by the Legislature as a whole or individual legislators
8  to ensure that Senate Bill 14 would not have the same
9  fate that SB 362 did in the house?
10     A.  I'm not aware of specific discussions designed
11 to ensure passage, except to say that every decision in
12 the Legislature is designed to ensure passage.  By the
13 supporters, I should say.
14     Q.  Are you aware of any particular steps that were
15 taken by supporters of SB 14 to ensure the bill would be
16 enacted?
17     A.  By enacted, do you mean adopted by the
18 Legislature or implemented by Secretary of State?
19     Q.  Adopted by the Legislature.
20     A.  I don't -- I can't point to a specific step
21 within the legislative process, other than the ones
22 required by the constitution and the rules before a bill
23 can become law.
24         (Exhibit 162 marked for identification.)
25     Q.  (By Ms. Westfall) You've been handed what's

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

---

153

1  been marked as 162.  Do you recognize this document?
2      **A.  It looks to be a copy -- the first page is a**
3  **copy of the cover of the Senate rule book, and the**
4  **second page is a copy of Rule 5.11 regarding special**
5  **orders.**
6      Q.  Is 5.11D the same provision that was put into
7  place in the rules in 2009?
8      **A.  Let me double-check.  Yes.  Appears so.**
9      Q.  Was it adopted for the same reasons that the
10  rule was adopted in 2009?
11     **A.  I don't know.**
12     Q.  Under 5.11D from the 2011 session, it would
13  only require the support of a majority to ensure that
14  voter ID legislation was set as a special order; isn't
15  that correct?
16     **A.  Correct.**
17     Q.  And the rule itself in 2011, 5.11D was adopted
18  as part of all the rules that were adopted by a simple
19  majority of the Senate; is that right?
20     **A.  Correct.**
21         MS. WESTFALL:  Would you mark this?
22         (Exhibit 163 marked for identification.)
23         MS. WESTFALL:  And we're going to
24  designate this as highly confidential.
25     Q.  (By Ms. Westfall) You've been handed what's

---

154

1  been marked as Exhibit 163.  Do you recognize this
2  document?
3      **A.  It looks like an e-mail from myself to some**
4  **Senate staff and some people in my office with attached**
5  **documents related to compliance with the Supreme Court,**
6  **talking points on the bill, and comparisons of various**
7  **state election laws.**
8      Q.  Did you draft the cover?  And it's TX00262645
9  through TX00262649.  Did you draft all these documents,
10  including the cover e-mail?
11     **A.  I think so.**
12     Q.  Did you send this e-mail on Friday, January
13  21st, to Jason Baxter, Janice McCoy and Jonathan
14  Stinson?
15     **A.  It looks that way.**
16     Q.  And you copied your chief of staff and
17  Lieutenant Governor Blaine Brunson and Julia Rathgeber
18  as the policy director?
19     **A.  Correct.**
20     Q.  Is Jason Baxter a staff person, or was he at
21  the time, a staff person for Senator Williams?
22     **A.  Yes.**
23     Q.  And is Jonathan Stinson was Senator Huffman's
24  legislative director at the time?
25     **A.  I don't know his title, but he was with Senator**

---

155

1  **Huffman.**
2      Q.  Who did Wroe Jackson work for at this time?
3      **A.  I believe Wroe worked for Senator Huffman, but**
4  **he's now with the Secretary of State's Office.  And I**
5  **forget at what point he went from one office to the**
6  **other.**
7      Q.  Why did you circulate this e-mail?
8      **A.  I think in the e-mail itself it says there's**
9  **several documents that may prove useful in preparing for**
10  **next week's voter ID debate.**
11     Q.  And that's the reason why you sent it --
12     **A.  I think so.**
13     Q.  -- is to prepare --
14     **A.  I can't recall sending the e-mail, but if**
15  **that's what I wrote at the time, I'm sure that's the**
16  **better indication.**
17     Q.  Did you send these talking points, the summary
18  of the standard, and chart of the differences to any
19  other staff people for any other Senators?
20     **A.  I don't recall.  If none turned up in the**
21  **discovery phase, then I don't think I did, or I don't**
22  **have those copies.  As far as I know, these are the only**
23  **people.**
24     Q.  Did Mr. Brunson or Ms. Rathgeber view these
25  attachments before you sent this e-mail?

---

156

1      **A.  I can't recall.**
2      Q.  Did Mr. Dewhurst?
3      **A.  I can't recall.**
4      Q.  Do you see that in your e-mail you allude to
5  information discussed Sunday night?
6      **A.  Yes.**
7      Q.  Do you recall that discussion that you had
8  Sunday night?
9      **A.  My memory is it was -- it may have been a**
10  **briefing, but I can't remember who it was for.  These**
11  **staffers presumably, but I can't remember if it was a**
12  **staff brief or Senators or who else might have been**
13  **there.**
14     Q.  Were you doing a briefing prior to Senate
15  consideration of SB 14?
16     **A.  Probably.  Without knowing the timing, I'm not**
17  **sure if it was designed to be directly ahead of floor**
18  **debate, or if it was just a general briefing and this**
19  **was the only time people could be available.**
20     Q.  Do you know what information was discussed on
21  Sunday night that you allude to in this e-mail?
22     **A.  My memory is it was just a general overview**
23  **similar to these documents, you know, big picture stuff,**
24  **on the legality of voter ID and what other states were**
25  **doing.**

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

---

157

1    Q.  Turning your attention to the second page,
2  TX00262646, do you see it's called Ensuring Compliance
3  With the Supreme Court?
4    A.  Yes.
5    Q.  And you list five legitimate state interests
6  under column -- under Roman I?
7    A.  Yes.
8    Q.  How did you know that Senate Bill -- strike
9  that.
10       What was the basis for your argument that
11  Senate Bill 14 would deter and detect fraud?
12    A.  As I've said before, I think state efforts to
13  stop criminal acts from occurring deter those acts from
14  occurring.  So in this case, if we know election fraud
15  exists and we take steps to stop it, that would deter.
16    Q.  Okay.  Other than that sort of logic that you
17  just set forth in this deposition, were there any facts
18  that would cause you to concluded that SB 14 would deter
19  and detect fraud?
20       MS. HALPERN:  Objection, mischaracterizes
21  his answer.  Objection, compound.  Objection,
22  misleading.
23    Q.  (By Ms. Westfall) You may answer.
24    A.  Again, I think taking the whole of testimony
25  over the preceding sessions, there have been testimony

---

158

1  and research done by myself and others showing that
2  fraud exists in Texas.  And this had been implemented in
3  other states and as far as we knew was successful, and
4  therefore, it seemed reasonable to implement in Texas.
5    Q.  How did you know that voter ID was successful
6  in other states?
7    A.  When I say successful, I mean it had been
8  upheld by the courts and had not resulted in decreased
9  turnout.  As it relates to fraud, I probably should have
10  used a different word, because I'm not sure sitting here
11  that I can say successful, but...
12    Q.  It was not -- those bills -- in other words,
13  those bills were not found to be unlawful, and according
14  to studies that you saw, it did not reduce turnout in
15  those states; is that correct?
16    A.  That is correct.
17    Q.  What facts are you aware of that SB 14 would
18  improve and modernize election procedures?
19    A.  Let me look at the bill real quick.
20    Q.  Take your time.
21    A.  First, I would say improve would include make
22  more secure, so by making the elections more secure,
23  you're improving them.  Further, it provides more detail
24  for voters to -- regarding how to make sure that their
25  vote counts should they be asked to cast a provisional

---

159

1  ballot.  There are various notice requirements, and the
2  forms of ID listed here tend to be more secure.  To the
3  extent we're talking about modernization, I think most
4  of these have various seals and bar codes and things
5  that make them more secure and more useful as
6  identification documents than some of the items
7  previously admissible under law.
8    Q.  And because of the security of those particular
9  forms of ID, it modernizes election procedures in your
10  view?
11    A.  Sure.  I think a recently issued state ID is a
12  more modern form of identification than a utility bill.
13    Q.  How does that modernize election procedures?
14    A.  They're more technological, you know, features
15  of those forms of ID.  They're more secure.  In some
16  cases, they may be more recently issued.  If they can't
17  be expired or can only be recently expired, that's
18  different than -- as far as I know, the utility bill,
19  for example, requirement didn't have an expiration
20  component to it.
21    Q.  So the next two bullets are kind of similar;
22  protecting against voter fraud enabled by inaccurate
23  voter registration rolls, and counting only the eligible
24  voters to vote, right?
25    A.  Right.

---

160

1    Q.  Kind of similar?
2       What facts do you know or did you know at
3  the time when you wrote this set of -- set of talking
4  points, that would enable you to predict that SB 14
5  would have that effect?
6    A.  Again, I think the whole intent of the bill is
7  to make sure eligible, properly identified voters are
8  casting votes.  We had had testimony over the years
9  that, in fact, the registration rules were not a hundred
10  percent accurate and in, in fact, there may be registration
11  cards sent to people who are dead or felons or otherwise
12  ineligible.
13       And so accurate, up-to-date identification
14  required at the polling place seems on its face to
15  protect against fraud and be designed to count only
16  eligible voters and votes.
17    Q.  Isn't it true that some of the forms of ID
18  allowable under SB 14 could be obtained by persons who
19  are not U.S. citizens?
20    A.  Sure.  No system is perfect, but I think this
21  was a step in the right direction towards increasing the
22  security.  It didn't say make a hundred percent secure,
23  because there's no such thing.  But yes, any system
24  designed by humans can be abused by humans.
25    Q.  So what types of ineligible voters would SB 14

---

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

41 (Pages 161 to 164)

161

1  prevent from voting?
2      A.  It's a broad category, I think.  My
3  understanding of ineligible voters would be someone who
4  doesn't live in the state, someone who is dead, someone
5  who fraudulently obtains someone else's identifying
6  registration card, someone who produces false
7  documentation.  I could go on, I guess, but it's a broad
8  category.
9      Q.  Well, turning back to that first category,
10  people that don't reside in the state, those people are
11  clearly ineligible to vote in the State of Texas,
12  correct?
13      A.  Right.  Well, I should say if they're a
14  resident, but currently out of the state, they may vote.
15  But yes, generally, that's right.
16      Q.  Assuming someone moved to another state with
17  intent to remain in that other state, and they were not
18  a Texas resident, then suppose that individual came back
19  into the state with a driver's license with their former
20  Texas address and a picture, that would be a qualifying
21  ID under SB 14, correct?
22      A.  Uh-huh.
23      Q.  So under that circumstance, it would not
24  prevent an ineligible voter, who should not be on the
25  voter rolls, from participating in an election; isn't

162

1  that right?
2      A.  Right.  Like I said, there's no perfect system.
3  The universe of potential crimes or ineligible votes
4  that would be cast is larger without this bill, and it
5  is smaller with this bill, but it's not a perfect
6  system.  Of course, fraud still exists, and that's why
7  lots of other bills have been able to be introduced
8  regarding voter fraud.  There's lots of types of fraud
9  and efforts to stop that.
10      Q.  And then finally, what facts were you aware of
11  at the time that you wrote this, that SB 14 would
12  protect public confidence in elections?
13      A.  As you asked a similar question about 362, I
14  think the polling continued to show that the voters of
15  Texas supported photo ID, and that includes minority
16  voters, blacks and Hispanics, and then voters as a whole
17  overwhelmingly.  I think you could draw just from that,
18  that public confidence would increase by adopting
19  measures supported by the public.
20      Q.  Turning to measures required to offset burdens,
21  how did SB 14 accomplish and fulfill these required
22  measures?  And we'll start off with the first one, how
23  does SB 14 provide access to free photo ID cards?
24      A.  As I see it, the bill currently as implemented
25  allows -- required DPS to create election identification

163

1  cards, which are similar to driver's licenses, but for
2  the purpose of having a photo ID for elections, and
3  those were to be issued at no cost.
4      Q.  At the time that you wrote these bullet points,
5  you knew, did you not, that it cost -- there was a cost
6  associated with obtaining a birth certificate in the
7  State of Texas, correct?
8      A.  At the time of this, yes.
9      Q.  And that cost was $22 at a minimum.  Correct?
10      A.  Yes.  But it's not today, as I understand it.
11      Q.  But at the time the bill was being considered
12  when you wrote these bullet points, the cost was $22,
13  right?
14      A.  Again, yes, and this bullet point says, access
15  to free photo ID cards, the cards are free.
16      Q.  But the underlying documentation to get the
17  free card is not free, correct?
18      A.  If you already have a birth certificate, it's
19  free.
20      Q.  If you don't have a birth certificate, it's not
21  free though, right?
22      A.  It would have been 22 dollars, and now I
23  believe it's either zero, zero to 3 dollars.
24      Q.  That occurred -- the change in what it cost to
25  get a birth certificate occurred after Senate Bill 14

164

1  was enacted, did it not?
2      A.  I think that's right.
3      Q.  As to the second bullet, availability of
4  provisional ballots and absentee ballots, how did Senate
5  Bill 14 make available provisional ballots beyond what
6  was already required by the Help America Vote Act and
7  existing Texas law?
8      A.  Well, I mean, the section of the bill, I can
9  pull it out, as I said earlier, if a voter -- the intent
10  was if a voter appears without the appropriate ID, they
11  would not be turned away, they would be allowed to cast
12  a provisional ballot.  And then the bill sets out
13  provisions for a voter to provide better identification
14  to have the ballot counted.  And whether that's an
15  addition to provisions under HAVA or other statutes, I'm
16  not sure.  But it seems like this particular memo that
17  you're pointing to, in the Supreme Court decision, they
18  wanted to make sure provisional ballots were available.
19  Whether that's available because of HAVA or because of
20  state law, I don't think mattered to the court.
21      Q.  But provisional ballots aren't very meaningful
22  if you cast them and then they're not counted, right?
23  That's not really voting, right?
24      A.  It's voting, but I think again, the idea that a
25  constituent can go back and confirm that their ballot is

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

165

1  being counted was the point.  And then SB 14 voters are
2  allowed the opportunity to get the ID and make sure
3  their ballot is counted.
4     Q.  Do you think that having to go back to an
5  election official a second time is more burdensome or
6  less burdensome than voting a provisional ballot once
7  and having election officials determine whether that's
8  valid from the standpoint of the voters?
9     A.  It's all part of casting a vote.  Two trips is
10  more than one trip.  But again, in terms of the process
11  of voting, there's lots of steps.  In Texas, for
12  example, in primaries and caucuses and things, there are
13  multiple meetings and steps you have to have your voice
14  counted.  So yes, if you're asking me is two trips more
15  than one, yes, it is.  Is it more burdensome?  You know,
16  it's part of casting a vote, but I don't think it's too
17  burdensome.
18     Q.  In terms of the inconvenience of voting, are
19  you aware that to obtain an EIC, you must present a
20  document that indicates your U.S. citizenship?
21     A.  I'm not aware.  I'm aware that -- my
22  understanding is that the EIC runs parallel to driver's
23  licenses.  And obviously, the distinction being that one
24  is for voting only and one is for a broader set of
25  functions.  So I can't say that I know that to be a

166

1  fact.
2     Q.  Are you aware that Senate Bill 14 permitted DPS
3  in creating the EIC to require fingerprinting of
4  applicants?
5     A.  I'm not aware of that.  And I don't have the
6  EIC language in front of me, so I can't be a hundred
7  percent certain what the statute says.
8     Q.  And voters in registering to vote need not
9  supply fingerprints; is that correct?
10     A.  To register to vote, right, I don't think you
11  need to supply fingerprints.
12     Q.  To register to vote, you need not, in the State
13  of Texas, provide proof that you're a U.S. citizen,
14  other than signing under penalty of perjury on your
15  voter registration application; is that correct?
16     A.  Right.  I think signing that -- effectively
17  signing an affidavit is a step of assurance for the
18  State of Texas.
19     Q.  And that's a different way to prove citizenship
20  in the voter registration context than to obtain an EIC
21  assuming you have to show --
22     A.  Fingerprints and signatures are different, yes.
23     Q.  Right.  Now, strike that, because I think we
24  just got -- talked over each other.
25         Assuming that you must show documentary

167

1  proof of citizenship to obtain an EIC, that is not how
2  you prove citizenship when you register to vote; is that
3  right?
4     A.  I think that as correct.
5     Q.  Because when you register to vote, you sign an
6  application under penalty of perjury saying, I am a U.S.
7  citizen; is that correct?
8     A.  Correct.
9     Q.  And that's not the same as showing a
10  documentary proof of citizenship?
11     A.  Correct.
12     Q.  Is it true in the State of Texas that many
13  voters can walk to their precinct to vote?
14     A.  That seems accurate to me.
15     Q.  But it's not the case with regard to all driver
16  license offices, is that, that you can walk to your
17  driver license office?
18     A.  I don't know that.
19         MS. HALPERN:  Counsel, before you ask your
20  next question, I would like to confer with the witness.
21         MS. WESTFALL:  Certainly.  Do you want to
22  step out?
23         MS. HALPERN:  Yeah.
24         (Brief recess from 2:19 to 2:22 p.m. )
25         MS. HALPERN:  Back on the record.  I need

168

1  to make a late objection, Counsel, to your question
2  asking the witness if he was aware that SB 14 allowed
3  requiring fingerprints of a witness to get an EIC card.
4  I don't know if you meant to phrase it that way.
5         MS. WESTFALL:  I know what I intended.
6         MS. HALPERN:  All right.  I'm objecting to
7  that assuming facts not in evidence.
8         MS. WESTFALL:  Okay.  I guess we're
9  back -- we're still back on, so.
10         And we are continuing our designation as
11  highly confidential.  So I hope I did that for that
12  prior document, I believe I did.
13         Could you mark this?
14         (Exhibit 164 marked for identification).
15     Q.  (By Ms. Westfall) You've been handed what's
16  been marked as Exhibit 164.  Do you recognize this
17  document?
18     A.  Yes.
19     Q.  What is it?
20     A.  It is an e-mail from myself to various Senate
21  staff, cc'ing my chief of staff and policy director,
22  expressing concerns about preclearance.  And then
23  there's an attachment explaining generally the standard
24  of review by the Department of Justice.
25     Q.  Do you see that at the top -- and this is --

BRYAN HEBERT                                             6/17/2014
CONFIDENTIAL TRANSCRIPT

43 (Pages 169 to 172)

---

169

1  for the record, this is TX00262650 through TX00262650.
2       MS. HALPERN:  Counsel, this is marked
3  highly confidential.
4       MS. WESTFALL:  Yeah, we're still -- I
5  believe we're still -- we should be still on the highly
6  confidential designation.  Thank you.
7    Q.  (By Ms. Westfall) Do you see at top of Page
8  262650, that Mr. Stinson had forwarded this e-mail to
9  Wroe Jackson and another recipient?
10   A.  Yes.
11   Q.  Do you know who that recipient is,
12  jlawyer119@aol.com?
13   A.  No.  It's -- no.
14   Q.  Why did you believe that preclearance was
15  doubtful, to use your words?
16   A.  I think my reasoning was that the Obama DOJ had
17  been aggressively interpreting and enforcing the Voter
18  Rights Act through preclearance and didn't seem to
19  particularly like Texas, and so there were -- there was
20  a risk that it would not be precleared.
21   Q.  And you sent this e-mail Saturday, January 22,
22  2011; is that right?
23   A.  That's what it looks like.
24   Q.  That was prior to the floor consideration or
25  committee of the whole consideration of SB 14?

---

170

1    A.  I don't have the history of the bill passage,
2  so I think --
3    Q.  The best of your recollection.
4    A.  I can't remember the date the bill passed the
5  Senate.
6       MS. WESTFALL:  Could we go off the record
7  for one second?
8       (Brief discussion off the record.)
9    Q.  (By Ms. Westfall) Did you ever share your view
10  that preclearance was doubtful with Mr. Dewhurst?
11   A.  I can't recall.
12   Q.  Did you share with anyone else in your office
13  besides Mr. Brunson and Ms. Rathgeber?
14   A.  Probably not.
15   Q.  Did you share with other staff people besides
16  Mr. Baxter, Ms. McCoy and Mr. Stinson?
17   A.  I don't recall.
18   Q.  After you sent this e-mail, were there any
19  changes made to the bill to address any of these
20  concerns?
21   A.  Again, I don't know for sure without seeing
22  subsequent copies of the bill.  I know the bill changed
23  from January 22nd through final passage.
24   Q.  The Texas Legislature wanted Senate Bill 14 to
25  be precleared, did it not?

---

171

1    A.  Yes.
2    Q.  It wanted to enforce Senate Bill 14, did it
3  not?
4    A.  Yes.
5    Q.  Why did you make -- do you see -- strike that.
6       Do you mean that in this e-mail you made
7  the suggestion that the Legislature might consider
8  adding a longer list of acceptable photo IDs?
9    A.  Yes.  It says to increase the chances, you
10  might consider adding a list of additional IDs.
11   Q.  And you proposed using language in Georgia's
12  law, which includes ID issued by the federal government,
13  state government or local government within the state?
14   A.  That's correct.
15   Q.  And you also suggested at a minimum, you might
16  include language from Senate Bill 362 concerning valid
17  ID issued by an agency or institution of the federal
18  government or agency or institution of political
19  subdivision of the state.  Do you see that suggestion?
20   A.  Yes.
21   Q.  Why did you suggest adding these forms of ID to
22  the bill?
23   A.  Again, I think we know that Georgia law was
24  precleared, and so closer to other precleared laws, the
25  better in terms of again increasing chances.  It doesn't

---

172

1  mean it was the only way to do it, but I think it's easy
2  to argue it would increase the chances of that
3  happening.
4    Q.  Was there any other reason besides following
5  Georgia's footsteps that you thought this would assist
6  in increasing the likelihood of preclearance?
7    A.  Not that I recall.
8    Q.  Were these forms of ID added to SB 14?
9    A.  No.  This language is not in SB 14.  There are
10  other -- there is other language from the Georgia law
11  and the Texas law, but not this underlying language in
12  Exhibit 164.
13   Q.  Are these IDs that you mention in your e-mail
14  less secure than the other IDs that ultimately made it
15  into SB 14?
16   A.  In my opinion -- is the underlying text less
17  secure than the final version of SB 14, is that the
18  question?
19   Q.  The question is:  Are the IDs that you propose
20  adding to SB 14 less secure than the IDs that were
21  ultimately included in Senate Bill 14?
22   A.  I think the short answer is yes.  I think to
23  the extent you allow increasing number of
24  identifications, it increases the chance of confusion on
25  the part of the election poll workers and on the part of

---

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

44 (Pages 173 to 176)

173

1  the voters.  So to that extent, I would say yes, it is
2  somewhat less secure.
3      Q.  And it's your testimony that it's less secure
4  because they're more forms of ID which create more
5  confusion?
6      A.  That is ones reason.
7      Q.  Are there other reasons that you're aware of?
8      A.  It's more types of identification that could be
9  forged.  It's presumably a large number of local, state
10 and federal ID cards and entities that would issue those
11 cards.  You know, especially in Texas, we have 254
12 counties.  I think that would fall under political
13 subdivision of the state.
14      Some counties, frankly, barely have
15 computers, much less, you know, sophisticated
16 identification cards for their employees or to other
17 people to whom they would issue this card.  So yeah, I
18 think this is a less -- adding this language would be
19 less secure.
20      Q.  So how would a forged student ID that had a
21 picture of the student, that wasn't issued by the
22 university, that was issued by Kinko's, that voter goes
23 in to vote, how is that less secure?
24      A.  I don't understand the question.
25      Q.  Doesn't that card show the person's identity?

174

1  You can see the picture and you can see the person.
2      A.  A forged student ID with a photograph would be
3  less secure, yes.  In my opinion, it's more easily
4  forged than the types of documents or IDs permissible
5  under SB 14.
6      Q.  But the purpose of the photo ID requirement is
7  so that the voter can prove I am who I say I am, this is
8  my picture, I am me.
9      A.  Right.  On a secure, widely recognizable form
10 of ID.  And there I don't know how many colleges in
11 Texas, or in the instance of eligible voters from Texas
12 who reside in Texas, and intend to reside in Texas,
13 continue school out of state or private universities,
14 the pool of potential IDs and the ability to forge those
15 gets much easier, I think.
16      MS. HALPERN:  Counsel, did you want to
17 take a break?  Before you said you did.
18      MS. WESTFALL:  No.  Let's keep going
19 Otherwise, we'll go past -- we can keep going a little
20 way.
21      Q.  (By Ms. Westfall) So isn't the purpose of the
22 photo ID requirement so that the person can show I am
23 who I am?
24      MS. HALPERN:  Objection-
25      Q.  (By Ms. Westfall) And you're on the rolls, I am

175

1  who I am, name is there, here's my picture?
2      MS. HALPERN:  Objection, misstates prior
3  testimony, and mischaracterizes prior testimony.
4      Q.  (By Ms. Westfall) You may answer.
5      A.  Yeah.  I think the point of requiring a photo
6  ID is to increase the connection for the electoral
7  official between the ID presented and the person
8  presenting it.  And the list of acceptable forms of ID
9  narrows or expands the ability of those to be reliable
10 identification.
11      Q.  Would -- I guess turning back to the talking
12 points that you did on SB 14, to what you just
13 testified, would adding these forms of ID that you
14 suggest in this e-mail thwart or interfere with any of
15 those purposes?
16      A.  So you're referring to Exhibit 163 and
17 attachments of that, thereto?
18      MS. HALPERN:  Are you referring to --
19      MS. WESTFALL:  The e-mail that he just
20 testified to.
21      A.  So the documents described in Exhibit 164, do
22 those undermine the goals laid out in Exhibit 163?
23      Q.  (By Ms. Westfall) Correct.  Thank you.
24      A.  Well, sure, for the first one.  I mean, the
25 first legitimate state interest is deterring and

176

1  detecting fraud.  As I mentioned, I think it's safe to
2  say the more forms of ID permissible, the more potential
3  fraud.  Because the electoral officials are not familiar
4  with those forms of ID because there are fewer security
5  protections, et cetera.
6      Possibly improving and modernizing
7  election procedures, voter rolls is probably not.  And
8  protecting public confidence in the elections, again I
9  think -- I think if you have a long -- the longer the
10 list of types of IDs, potentially that would make a
11 voter less confident that they're accurate IDs or
12 acceptable IDs, but I don't know that.
13      Q.  So how would it that if you were on the voter
14 rolls and you appear in a precinct and suppose you
15 shouldn't be on the voter roll, you're ineligible now,
16 how does walking in with a fraudulent student ID, how
17 does allowing that ID to be used, interfere with the --
18 or create fraud in the system?  You're already on the
19 rolls, the purpose of the photo ID bill is to show a
20 photo of the voter and show I am who I am.
21      A.  Right.
22      Q.  I'm here on your rolls.
23      A.  Right.
24      Q.  How do any of the problems with the IDs you
25 just described remedy that or prevent that?

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

45 (Pages 177 to 180)

---

**177**

1    MS. HALPERN: Objection, compound.
2    Q. (By Ms. Westfall) You may answer.
3    **A. So the -- so I understand, so the -- again, the**
4    **underlying -- additional forms of ID described by**
5    **Exhibit 164, how does allowing those improve security?**
6    Q. How does it interfere with the ability of
7    election officials to check your ID, see who you are,
8    see that you're on the rolls and allow you to vote a
9    regular ballot?
10   **A. Again, so the question is how does it make it**
11   **less secure, and I think the answer is, as I said,**
12   **potentially the more forms of ID, especially from any**
13   **political subdivision in the state is more easily forged**
14   **or less familiar to the poll worker. So therefore, less**
15   **reliable as a form of ID.**
16   Q. Turning back now to Exhibit 164, when did you
17   draft the Standard of Review by the Department of
18   Justice at TK00262651?
19   **A. I don't recall.**
20   Q. Did you draft that before the session started
21   in 2010?
22   **A. I don't recall.**
23   Q. Why did you draft that document?
24   **A. To brief people who are unfamiliar on the**
25   **Standard of Review by the Department of Justice.**

---

**178**

1    Q. Were you directed to draft that document?
2    **A. I don't believe I was, but I can't recall for**
3    **sure.**
4    Q. Did you just do this of your own volition?
5    **A. Possibly, yes.**
6    Q. Did Mr. Dewhurst ask you to draft this?
7    **A. I don't recall that he did.**
8    Q. Under standard review under retrogressive
9    effect, did the Legislature, subsequent to your drafting
10   of this document, seek information to determine whether
11   Hispanic and African-American voters are less likely to
12   possess a photo ID?
13   **A. I'm not sure. I can't recall from the public**
14   **testimony if that was mentioned or not. I know it was**
15   **discussed at length amongst Senators in debate -- on the**
16   **house floor during the debate.**
17   Q. Is there anything not in the public discussion
18   about analysis of this question?
19   **A. Not that I'm aware of. I mean, what is not in**
20   **the public discussion is evidence of a particular people**
21   **who would have been unable to. I don't remember seeing**
22   **or hearing of any particular individuals who were unable**
23   **to obtain any ID.**
24   Q. But were there any private conversations among
25   legislators to seek information about whether Hispanic

---

**179**

1    or African-American voters possess the forms of ID in SB
2    14?
3    **A. Not that I'm personally aware of.**
4    Q. Did you or anyone talk to legislators
5    representing who were the candidates of choice of
6    minority voters about their position on SB 14?
7    **A. Did I speak to them?**
8    Q. Did you or anyone you know speak to anyone
9    about their position on SB 14?
10   MS. HALPERN: Objection, vague.
11   **A. I don't know who other people spoke to, but at**
12   **least in the public debate, there was several hours of**
13   **back and forth between members of all races and parties.**
14   Q. (By Ms. Westfall) Other than the public debate,
15   are you aware of any other conversations with members of
16   the Legislature representing voters who were minority
17   voters.
18   **A. I was not in those conversations.**
19   Q. Do you see that you discuss less retrogressive
20   alternatives in your standard of review?
21   **A. Yes.**
22   Q. Were any additional forms of ID considered to
23   address this point?
24   **A. There were lots of forms of identification**
25   **considered. Again, publicly, I don't know what all was**

---

**180**

1    considered in private or by sponsors outside of my
2    knowledge.
3    Q. Can you identify any attempts to make the bill
4    less retrogressive or as least burdensome as possible to
5    voters and still accomplish the goals of the
6    Legislature?
7    **A. Sure. There were additional forms of ID added**
8    **by amendment on the floor. There were broad exemptions**
9    **for certain class of people. There were free election**
10   **identification cards issued. I think all of those**
11   **things were designed to be less burdensome for voters.**
12   Q. What were the forms of ID that were added?
13   **A. I don't have a final copy of the bill. I know**
14   **concealed handgun license was one form. There may have**
15   **been others that I'm forgetting without the bill.**
16   Q. Are the seven forms of ID under SB 14 as
17   enacted, Texas driver license, Texas personal ID, EIC,
18   concealed handgun license, military ID, citizenship --
19   U.S. citizenship or passport, U.S. passport?
20   **A. Without -- those sound right, but without**
21   **having the final bill in front of me, I can't say a**
22   **hundred percent yes.**
23   MS. HALPERN: Counsel, I would like to
24   take a break.
25   MS. WESTFALL: Okay. Let's take a break.

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

---

181

1          (Recess from 2:41 to 2:51 p.m.)
2     Q.  (By Ms. Westfall)  We're back on the record,
3  and we were talking about Exhibit 164.
4     A.  Correct.
5     Q.  And in particular, the standard of review that
6  you had drafted at TX00262651.
7     A.  Okay.
8     Q.  Do you see that you flagged the issue of
9  whether the law includes mitigating effects?
10    A.  Yes.
11    Q.  And one of the things you list is education
12 efforts targeted at minority communities?
13    A.  Yes.
14    Q.  Do you recall whether SB 14 included any
15 targeted education efforts at minority communities as
16 signed into law?
17    A.  Without having the final version in front of
18 me, my memory is that Secretary of State was given
19 authority to implement an education program.  And the
20 need to do that and minority training I think was
21 discussed during debate over the bill.
22    Q.  But the discretion was given to the Secretary;
23 is that correct?
24    A.  I think that is correct.
25    Q.  It wasn't provided in the bill itself --

---

182

1     A.  I think --
2     Q.  -- is that correct?
3     A.  I think that is correct, although I believe
4  there was also reference requiring the Secretary of
5  State to coordinate with nonprofits and other groups in
6  developing the education efforts.
7     Q.  Do you see also that you listed programs
8  designed to provide photo ID --
9          (Noise interruption as someone enters
10 room.)
11         THE REPORTER:  I'm sorry.
12         MS. WESTFALL:  Let's go off the record for
13 one second.
14         (Brief discussion off the record.)
15         MS. WESTFALL:  Could you mark this?
16         (Exhibit 165 marked for identification.)
17    Q.  (By Ms. Westfall)  You've been handed what's
18 been marked as 165.  Do you recognize this?
19    A.  165 is a copy of SB 14.
20    Q.  This is the version that was signed into law;
21 is that correct?
22    A.  Appears so.
23    Q.  So turning your attention now to Exhibit 165,
24 are there education efforts targeted at minority
25 communities in this bill?

---

183

1     A.  Well, it requires the voter registrar of every
2  county that maintains a website to include information,
3  so that would presumably include minority majority
4  counties.
5     Q.  But to your knowledge, it's not a targeted
6  voter education program; is that correct?
7     A.  Statute -- statutory language does not have
8  specific reference to minorities.
9     Q.  In SB 14, does it include a provision about
10 providing photo IDs in isolated and impoverished areas?
11    A.  I don't see specific references, again, other
12 than the fact that those individuals would fall under
13 general directions to county officials and the Secretary
14 of State.
15    Q.  But to your knowledge, SB 14 did not have
16 targeted -- a targeted program for isolated and
17 impoverished areas; is that right?
18    A.  The statutory language did not, and I'm not
19 certain if the Secretary of State or DPS or other state
20 agencies have separate authority.
21    Q.  Does SB 14 -- any -- include any other programs
22 designed to minimize the impact on minority voters --
23 targeted on minority voters?
24    A.  I think the SB 14 has measures designed to
25 broaden access to identifications and to exempt certain

---

184

1  classes of individuals which might include minority
2  voters.
3     Q.  Who were those exempted classes of voters?
4     A.  Well, in the case of the election
5  identification cards, it would be voters who cannot
6  afford and do not have other forms of photo ID.  So to
7  the extent minority voters fall under that group of
8  people, they would be included.
9     Q.  Any other way?
10    A.  I thought there was exemptions, but I'm having
11 trouble finding them.
12         THE REPORTER:  I'm sorry?
13    A.  I thought there were other exemptions, but I'm
14 having trouble finding them.
15    Q.  (By Ms. Westfall)  Is there an exemption for
16 certain persons with disabilities who obtained
17 documentation from the Social Security Administration --
18    A.  Yeah.
19    Q.  -- or the Veterans' Affairs Department?
20    A.  Yes, I believe there is.
21    Q.  And how does that relate to your contention
22 that those are targeted to minority voters?
23    A.  It doesn't.  My contention is that minority
24 voters might be a class within these voters, the classes
25 you described, for -- for disabled voters.  For free

---

BRYAN HEBERT                                            6/17/2014
CONFIDENTIAL TRANSCRIPT

---

185

1  election identification cards, to the extent the
2  position is that minorities are more likely to be poor,
3  then I think providing free ID cards would be directly
4  targeted to them.
5      Q.  Do you see that you also list as mitigating
6  effects, photo IDs free of charge and widely available
7  on the standard of review?
8      A.  Yes.
9      Q.  At the time SB 14 was under consideration by
10  the Senate, did you consider that EICs would be as
11  implemented by DPS widely available?
12      A.  Yes.
13      Q.  What was the basis of that conclusion?
14      A.  Basis of concluding that EICs would be --
15  Would be widely available.
16      A.  -- widely available?  Because they are to be
17  administered by a state agency with jurisdiction across
18  the state.
19      Q.  Isn't it true that at the time SB 14 was under
20  consideration by the Senate and subsequent even into
21  2012, that 80 counties did not have a driver license
22  office?
23      A.  I don't know the number of counties exactly
24  without those offices, but I do know that there are
25  mobile efforts and extended hours and other provisions

---

186

1  that DPS has undertaken to implement the law.
2      Q.  Just to go back to the question that I posed to
3  you:  At the time that SB was under consideration by the
4  Senate --
5      A.  Uh-huh.
6      Q.  -- about 80 counties did not have driver
7  license offices at that time; isn't that correct?
8      A.  I don't remember the number.  I know there was
9  discussion of it during floor debate about the number
10  and whether it was accessible enough, but I don't
11  remember that number.
12      Q.  Plans to put into place mobile EIC units did
13  not get underway until long after SB 14 was signed into
14  law; isn't that correct?
15      A.  I don't know the date that those started.
16      Q.  It was after the date that SB 14 was signed
17  into law; isn't that correct?
18      A.  I don't know.
19      Q.  Do you see that it also lists, "How does this
20  compare to the law of other states, is it less
21  restrictive or more"?
22      A.  Yes.
23      Q.  Was consideration given to whether the Texas
24  voter ID law was less restrictive, equally restrictive
25  or more restrictive than the laws in Georgia and

---

187

1  Indiana?
2      A.  Was there consideration given to that?  I think
3  there probably was.  I don't remember specific debate
4  from the floor, but I would assume it was.
5          And something occurs to me regarding your
6  last question about IDs being widely available.  If you
7  point to the 80 counties' geography that you said at the
8  time did not have offices, it's still not clear to me
9  what percentage of Texans lived in those counties.  My
10  understanding is that the vast majority of Texas'
11  population lives in counties that do have those offices.
12      Q.  When did you learn that fact?
13      A.  When did I learn that?
14      Q.  Assuming that that's right, when did you learn
15  that fact?
16      A.  I believe that was discussed on the floor
17  during debate.
18      Q.  Were there any changes to the bill considered
19  as a result of your memo on the standard of review or
20  your cover e-mail at Exhibit 164?
21      A.  I -- to the extent there were changes to the
22  bill between this e-mail and the final version, I can't
23  say to what extent those changes were a result of this
24  memo.  I don't pretend that I have that much influence,
25  but there were changes to the bill.

---

188

1      Q.  Were any of these IDs that you suggested on the
2  cover e-mail of 164 added?
3      A.  No, we don't have -- and again, I think the --
4  the IDs described there, the underlined language on
5  Exhibit 164, meaning, all federal, state, local,
6  political subdivision IDs, it's considerably less secure
7  because of the reasons we mentioned.  They don't have
8  expiration dates.  They don't have bar codes.  They
9  could be, you know, produced by any -- an innumerable
10  almost number of entities in Texas, given the large
11  number of counties and local subdivisions within those
12  counties.
13          MS. WESTFALL:  I'm going to object to your
14  response as nonresponsive and ask you again.
15      Q.  (By Ms. Westfall)  Were any of the IDs that you
16  proposed in the e-mail in Exhibit 164 adopted in the
17  final version of Senate Bill 14?
18      A.  The final version of Senate Bill 14 does not
19  include this language.
20          MS. WESTFALL:  Could you mark this?
21          (Exhibit 166 marked for identification.)
22      Q.  (By Ms. Westfall)  You've been handed what's
23  been marked as Exhibit 166.  Do you recognize this
24  document?
25      A.  It looks like an e-mail, two e-mails.  One from

---

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

48 (Pages 189 to 192)

---

189

1  me to some Senate staffers.  And then, again, an
2  additional e-mail from Senator Huffman's staff or to
3  another Huffman's staffer, or I think Huffman staffer,
4  with an attachment on possible questions and amendments
5  likely to arise tomorrow, which would be and the day
6  after January 24.
7      Q.  Okay.
8      A.  And again, the attachment is Janice's notes on
9  those questions.
10     Q.  And for the record, Exhibit 166 is TX00265539
11 through TX00265543.
12         Who is Amanda Montagne?
13     A.  Amanda Montagne at the time worked for Senator
14 Williams.
15     Q.  Who is Ryan LaRue?
16     A.  I believe he also worked for Senator Williams
17 at the time.
18     Q.  Why were you sending them this e-mail?
19     A.  My memory is that Senator Williams cared about
20 this issue and intended to help defend the bill on the
21 floor.
22     Q.  By this issue, you mean?
23     A.  Voter ID bill.
24     Q.  Did you have advanced notice of the amendments
25 that were going to be offered?

---

190

1      A.  I don't think -- sometimes in the legislature
2  they prefile amendment.  The House does that a lot more
3  often than the Senate.  I can't remember if I saw
4  amendments ahead of the floor debates.  This
5  amendment -- I mean, this attachment says the amendments
6  that are likely to arise.  I don't know how she came to
7  that conclusion, but I don't recall seeing any
8  amendments ahead of time.
9      Q.  Did you speak with authors of the amendments?
10     A.  It's possible.  I mean, I speak to a lot of
11 Senate staff every day from all parties on all sides of
12 all issues so it's possible.
13     Q.  The e-mail indicates that your suggested
14 revisions are in red; is that right?
15     A.  Yes.
16     Q.  And this is a black-and-white document; is that
17 right?
18     A.  Uh-huh.
19     Q.  Do you recall what changes you made to
20 Ms. McCoy's proposed responses to amendments in her
21 Q&A's?
22     A.  I don't remember.
23     Q.  Do you see there's a strikeout on the last page
24 at 265543?
25     A.  Yes.

---

191

1      Q.  Is that your strikeout?
2      A.  I don't -- I can't say for sure.
3      Q.  Do you see on page 265540, it discuss a lower
4  elderly threshold?
5      A.  Yes.
6      Q.  Do you recall which senators requested these
7  exemptions for voters over the age of 70?
8      A.  I don't.
9      Q.  Do you recall what other compromises, besides
10 these amendments listed here, bill opponents asked of
11 bill supporters?
12     A.  Without seeing a list of the amendments and
13 without knowing the conversations between the senators,
14 I don't know for sure what they -- what opponents
15 wanted.
16     Q.  Did bill opponents ask that Senate Bill 14
17 include additional forms of ID?
18     A.  Again, without having the amendments in front
19 of me, I just can't recall specifically.  I know -- I do
20 remember -- again, CHLs were added at the requests of
21 Senator Hinojosa.
22     Q.  CHLs are?
23     A.  Concealed handgun license.  So at least for one
24 case, opponents to the bill suggested an alternative
25 form of ID, and that was acceptable.

---

192

1      Q.  Do you see at page TX00265541 through 43, it
2  appears to be questions and answers?
3      A.  Yes.
4      Q.  Were these questions that Senator Fraser
5  expected to receive on the floor from bill opponents?
6      A.  I don't know.  I didn't write the documents, so
7  I don't know for sure.
8      Q.  Do you see at 265542, it references statistics
9  and voter turnout studies that were in the possession of
10 Senator Wentworth in the middle of the page?
11     A.  Yes.  I think Senator Wentworth has some
12 information on those statistics and voter turnout
13 studies.
14     Q.  What studies did the Lieutenant Governor use to
15 satisfy himself that Senate Bill 14 would not reduce
16 turnout among minority voters?
17     A.  Well, Senator -- I mean, the Lieutenant
18 Governor Dewhurst would have been a sitting member of
19 the Committee of the Whole, so he would have reviewed
20 all of those documents presented during that debate.
21     Q.  Can you identify any studies that he reviewed
22 to satisfy himself that it would not reduce turnout
23 among minority voters?
24         MS. HALPERN:  Object to the form.  Object
25 that it calls for speculation.

---

BRYAN HEBERT                                           6/17/2014
CONFIDENTIAL TRANSCRIPT

193

1    Q.  (By Ms. Westfall)  You may answer.
2    A.  I don't remember specific names of reports or
3  studies.  I do remember generally that Senator
4  Wentworth's presentation included voter turnout in
5  states that implemented voter ID.
6    Q.  In terms of the impact at the bottom of page
7  265542, references the impact to voter ID on Hispanic,
8  Black and poor voters.  Do you see that?
9    A.  Uh-huh.
10    Q.  And do you see a reference that's data from
11  Indiana?
12    A.  Yes.
13    Q.  And is it true that there was no data at that
14  point gathered concerning Texas voters and the impact in
15  Texas of Senate Bill 14?
16    A.  I don't know that no data had been collected --
17    Q.  But you're not aware of any, sitting here
18  today, that you can recall?
19    A.  Well, it had not been implemented yet, so.
20    Q.  There wasn't any analysis while the bill was
21  pending?
22    A.  Not that I can recall.  But again, there was no
23  testimony that I recall during that debate about actual
24  individuals who would not be able to get an ID.
25        MS. WESTFALL:  I would object to that

194

1  response as nonresponsive.
2    Q.  (By Ms. Westfall)  Turning back to Texas
3  00265543, I asked you about the strikeout before, and I
4  believe you did not -- you did not make that strikeout;
5  is that correct?
6    A.  I don't recall whether I did or not.
7    Q.  Do you know who would have made that strikeout?
8    A.  No.  I mean, the e-mail says attached are
9  Janice's notes, so I presume it would be Janice or
10  someone Janice knows.  And it may have been me.  I
11  honestly can't remember.
12    Q.  Did you agree with the strikeout that's
13  identifying particular numbers of voters without ID
14  might be, quote, potentially confusing, unquote?
15    A.  I don't know.
16    Q.  Did you anticipate that legislators might want
17  to know the number of voters impacted by Senate Bill 14?
18    A.  Yes.  And again, there -- I'm sure there was
19  debate about that.  It was a big part of the debate on
20  the floor before the Committee of the Whole.
21    Q.  What did bill supporters do to respond to those
22  questions?
23    A.  I can't remember specifics, all the specifics.
24        MS. WESTFALL:  Could you mark this?
25        (Exhibit 167 marked for identification.)

195

1    Q.  (By Ms. Westfall)  You've been handed what's
2  been marked as Exhibit 167.  Do you recognize this
3  document?
4    A.  Looks like a memo, an e-mail that I wrote to
5  several Senate staffers --
6    Q.  Well -- go ahead.
7    A.  -- relating to a proposed amendment that was
8  likely to be offered allowing a person to vote without
9  the photo ID but by signing an affidavit.
10    Q.  And you opined that that would gut the bill?
11    A.  It says, yes, it basically guts the bill.
12    Q.  How would it gut the bill?
13    A.  It means photo IDs are not necessary.  And to
14  the extent that this bill requires photo IDs at the
15  poll, that amendment would say they're really not.
16    Q.  Why did you mention the DOJ loves affidavits?
17    A.  I don't recall specifically.  I assume it was
18  because they reference that language in other
19  preclearance reports.
20    Q.  Did you believe that affidavits were relevant
21  to analysis of SB 14 under Section 5 of the Voting
22  Rights Act?
23    A.  I -- I can't recall specifically.  I can say
24  that all previous preclearance opinions are relevant
25  whether future laws are going to be precleared, and that

196

1  would be true in Texas and any other state.
2    Q.  Did you consider whether an affidavit provision
3  might impact minority voters in a favorable way in
4  Texas?
5    A.  I don't think I did.  I think the consideration
6  was what I said there is that it guts the bill in the
7  sense that it turns a photo ID bill into a bill that
8  does not require photo IDs.
9    Q.  Why did you send this e-mail concerning this
10  particular amendment and not others?
11    A.  I don't recall.
12    Q.  Do you have concern -- did you have concern at
13  the time that there might be support for this amendment?
14        MS. HALPERN:  Objection, assumes facts not
15  in evidence.
16    Q.  (By Ms. Westfall)  You may answer.
17    A.  I don't think that was my concern, but I don't
18  recall specifically why this -- the proposed potential
19  amendment warranted flagging.  It could be that was the
20  only amendment I was, you know, aware of might come up.
21  I don't recall.
22    Q.  Did Texas voter registration applications
23  require the voter's signature?
24    A.  Yes, I believe they did.
25    Q.  And so county election officials have a

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

50 (Pages 197 to 200)

---

197

1  signature of a voter on file in their offices; is that
2  right?
3      **A.  I think that's probably right.**
4      Q.  What is early voting by mail?
5      **A.  A voter -- it means one of certain criteria can**
6  **request a ballot and complete that ballot and mail it**
7  **in.**
8      Q.  And it's in Texas, early voting by mail is
9  not -- no excuse, correct?
10     **A.  I'm sorry?**
11     Q.  Let me withdraw that question.
12         You need to fall within a certain set of
13  categories to vote --
14     **A.  Correct.**
15     Q.  -- early vote in Texas; is that right?
16     **A.  Correct.**
17     Q.  When a voter --
18         MR. WHITLEY:  Objection.  I think you're
19  using early vote and vote by mail synonymously, and you
20  may have misstated something, but I want to make sure
21  your question is clear.
22         THE WITNESS:  That's a good point.
23         MS. WESTFALL:  Thank you for the
24  clarification, Counsel.
25     Q.  (By Ms. Westfall)  When a voter votes early

---

198

1  by -- actually, what's the difference between voting
2  early by mail and absentee voting?
3      **A.  I believe, as far as I know, they're the same.**
4  **Absentee voting and mail-in voting are the same.  And**
5  **your -- if the question is, can only certain categories**
6  **of people cast a mail-in ballot, the answer is yes.**
7  **It's a pretty broad category of people.  Those, I think,**
8  **over 65, those with a disability, although I'm sure that**
9  **term is defined.  It think it's largely self-defined by**
10 **the voter.  And those who are residents to Texas but**
11 **temporarily out of the state.**
12     Q.  For a mail-in ballot, how does the ballot board
13  determine whether the ballot is valid?
14     **A.  I guess I'm not a hundred percent clear.  I**
15  **would imagine they compare signatures.**
16         MS. WESTFALL:  Could you also mark this
17  one?  These two, doesn't matter what order.
18         (Exhibit 168 and 169 marked for
19  identification.)
20     Q.  (By Ms. Westfall)  You've been handed what's
21  been marked as 168 and 169.
22         MS. HALPERN:  I've only been handed 169
23  apparently.
24         MS. WESTFALL:  Didn't throw it far enough.
25         MS. HALPERN:  There you go.

---

199

1      Q.  (By Ms. Westfall)  Do you recognize these
2  documents?
3      **A.  Let's see.  Exhibit 168 is an e-mail from**
4  **someone named Brent Connett.  I don't know to whom, to**
5  **himself, but then that e-mail is in the possession looks**
6  **like Jason Baxter sent it to me, and I replied to all,**
7  **to those parties.  Anyway, regarding suggested talking**
8  **points on election integrity.  And then me advising**
9  **caution.  And then 169 is the underlying e-mail, I**
10 **suppose, from Brent Connett to -- it says addressed to**
11 **Senators.  And then there's an attachment analyses and**
12 **talking points on election integrity.**
13         MS. WESTFALL:  And for the record, Exhibit
14  168 is Texas 00081510.  Exhibit 169 is Texas 00080568
15  through 80572.  Actually, '3.  Sorry.
16     Q.  (By Ms. Westfall)  Did the Texas Conservative
17  Coalition that wrote the attachment to Mr. Baxter's
18  e-mail express support for voter photo ID requirements?
19     **A.  It appears that, yes, they did.**
20     Q.  Did the coalition urge adoption of such a
21  requirement as a means of combating noncitizens from
22  registering to vote?
23     **A.  I'm not seeing that language, but it must be in**
24  **there, because in my e-mail I say that's not what the**
25  **bill is about, to avoid that language.  But I'm not**

---

200

1  **finding it in the attachment.**
2      Q.  Thank you.  Was combating noncitizen voter
3  registration one of the purposes of SB 14?
4      **A.  I think the purpose was to combat ineligible**
5  **voters.**
6      Q.  Did that include non-U.S. citizens from
7  participating in elections?
8      **A.  I think noncitizens are a subset of ineligible**
9  **voters.**
10     Q.  So the answer would be yes?
11     **A.  Yes.**
12     Q.  Do you see that at 168, you commented on the
13  talking points, and you advised or recommended to
14  Mr. Baxter and Ms. Montagne and Mr. LaRue that talk of
15  the illegals and registration, to quote you, "be
16  avoided."  Do you see that?
17     **A.  It doesn't say be avoided.  It says, "Avoid**
18  **talking about illegals and registration.  We're not**
19  **doing this to crack down on illegals but to generally**
20  **strengthen the security and integrity of the voting**
21  **process.  This is a bill about voting, not registering,**
22  **although some mention of registration fraud is useful to**
23  **show that fraud exists generally in the system."**
24     Q.  Why did you write this?
25     **A.  I think I wrote it -- I'm not familiar even**

---

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

51 (Pages 201 to 204)

---

**201**

1  today, and I don't think I was familiar with the group
2  who sent the document to Texas Conservative Coalition or
3  Mr. Brent Connett.  I don't think I directly received
4  this information.  All the people that I include on that
5  e-mail worked for Senator Williams, and so I'm not clear
6  who received it beyond Senator Williams.  But I think
7  what I say in the e-mails is what I meant and it's true
8  today, despite some efforts by some to characterize it
9  as such, it's not an anti-immigrant or anti-illegals,
10 quote/unquote, illegals bill.  It's about strengthening
11 the security and the integrity of the voting system.  So
12 to the extent I was advising Senate staff who were then
13 advising their boss, I wanted to make sure that people
14 were careful about how they couched the bill, especially
15 if they weren't the sponsor of the bill, and that they
16 used rhetoric that was responsible and accurate.
17     Q.  How do you mean that cracking down on illegals
18 and registration was not a purpose of Senate Bill 14?
19     A.  It was never -- I only know what I know from my
20 conversations with senators and staff and what I
21 witnessed publicly, and at no time did I see or witness
22 any of the above-mentioned people talk about immigration
23 or illegal or any of the other similar rhetoric as the
24 purpose of the bill.
25     Q.  Is it fair to say that there were some groups

---

**202**

1  like the Texas Conservative Coalition who believed that
2  Senate Bill 14 would further the purpose of cracking
3  down on noncitizens voting?
4      A.  I guess, yes, there's groups who interpret the
5  bill all manner of ways.
6      Q.  And you just testified that you thought a more
7  responsible way was to discuss it in terms of, as you
8  mention in the e-mail, as it relates to voting.  Why
9  would it be irresponsible to talk about Senate Bill 14
10 cracking down on illegals or noncitizens voting?
11     A.  Well, it's just inaccurate for one.  Again, I
12 think as I said here, that was not my understanding of
13 the bill's purpose or intent.  So to the extent it's
14 characterized as the intent, that's inaccurate.  And
15 again, we all know that there's inflammatory language
16 used by parties on both sides.  And certainly, the term
17 illegal and other terms used by people in and around the
18 Capitol are offensive to others.  And to the extent we
19 could avoid inflammatory rhetoric, that's always my
20 interest.
21     Q.  And why were you concerned with the possibility
22 that inflammatory rhetoric, as you called it, would be
23 used in the SB 14?
24     A.  There was inflammatory rhetoric on the floor of
25 the Senate between senators, so of course there was from

---

**203**

1  members on both sides of the issue across the states.
2      Q.  And were you concerned about quality of the
3  dialogue or any other repercussions that might come from
4  this type of rhetoric being used with regard to SB 14?
5      A.  Yeah, I think it's safe to say that I was
6  concerned about the quality of the rhetoric.  Anytime
7  you have a bill with all the Republicans on one side and
8  all the Democrats on the other, it tends to be
9  contentious, and the rhetoric in those situations can
10 escalate.  And I try to see myself as a sort of neutral
11 observer and legal advisor on these matters.  And to the
12 extent we can avoid overheated rhetoric, that's always
13 in the best interest of the Legislature, I think.
14     Q.  And beside Exhibit 169 and the cover e-mail
15 sent by Brent Connett and the attachment thereto, had
16 you heard other senators or their staff frame SB 14 as
17 something that would combat illegal voting and illegals
18 from voting and participating in elections?
19     A.  I'm sure there are instances -- what I recall
20 is statements to combat ineligible voters.  And it's
21 possible that noncitizens were listed as part of those,
22 that group, but I can't remember specific instances now.
23     Q.  If there were some supporters of SB 14 who
24 thought it would go after combating illegals and
25 noncitizens voting, and that was a faction who supported

---

**204**

1  SB 14, why wouldn't you let that message continue in the
2  public domain?
3      A.  Assuming that we're talking about people who
4  are not citizens of Texas, I think it's fair to say we
5  should not allow noncitizens of Texas to vote in Texas
6  elections.  That is part of the intent of SB 14.  But as
7  I said, the group of ineligible voters is much larger
8  than that.
9          To the extent you want to talk about
10 people from -- not -- that are not citizens of Texas
11 voting in Texas elections and that being a problem, that
12 seems totally fair to me.
13     Q.  But here in this e-mail in 168, you were
14 concerned about talk about illegals.  Who were you
15 referring to when you said illegals?
16     A.  I think I -- it appears I was quoting from the
17 document, and I'm also referring -- suggesting that
18 there's not a discussion about registration, because
19 neither of those things are the point of this bill.
20     Q.  But by illegals, were you referring to persons
21 who were not U.S. citizens?
22     A.  I don't know.  I don't know.  Again, I think my
23 impression is that I was quoting from the document, and
24 so I'm not sure what illegals referred to.  Yes,
25 generally speaking, I think people who use the term

---

BRYAN HEBERT                                                6/17/2014
CONFIDENTIAL TRANSCRIPT

52 (Pages 205 to 208)

---

205

1   refer to people who are not United States citizens.
2       Q.  Did you have any concern or was any of your
3   motivation in writing the e-mail at Exhibit 168 based on
4   concern that talk about illegals could be construed as
5   racially discriminatory?
6       A.  I don't know if that was a specific concern of
7   mine.  I think the concern, again, was that people
8   accurately framed the bill about what the bill actually
9   did and not what one line of one talking -- one, you
10  know, document of talking points from an outside group
11  said it might be about, but that it'd be based on what
12  the senators actually said and the sponsors of the bill
13  actually said.
14      Q.  And you -- so the purpose of the e-mail was to
15  bring it back to the public discussion about the
16  purposes of the bill and not as framed by groups such as
17  the Travis Conservative Coalition?
18      A.  Again, I can't specifically recall what I was
19  thinking at the time that I got this, but that sounds
20  roughly correct.
21      Q.  And what was the purpose of kind of reframing
22  the debate and keeping it on the public purposes of
23  Senate Bill 14?
24      A.  I don't know.  I mean, I just -- I was just
25  responding to the document that was sent to me.

---

206

1       MS. WESTFALL:  Could you mark this?
2       (Exhibit 170 marked for identification.)
3       Q.  (By Ms. Westfall)  You've been handed what's
4   been marked as 170, which is Texas 00081575.  Do you
5   recognize this document?
6       A.  Looks like an e-mail from myself to various
7   Senate staffers and my chief of staff and policy
8   director laying out, quote, the plan for Tuesday, which
9   I assume would have been floor debate and the Committee
10  of the Whole.  And it lays out invited witnesses,
11  certain roles different senators would play, some other
12  items.
13      Q.  Who was Katie Ogden?
14      A.  Katie Ogden worked for Senator Wentworth, I
15  believe, as chief of staff.
16      Q.  Is it fair to say that this e-mail is sort of
17  saying that plan for testimony and how consideration of
18  the bill would occur?
19      A.  To the extent you can have a plan and execute
20  it on the floor of the Senate, I suppose it is an
21  attempt to -- at best, it's an outline of how things
22  might go.
23      Q.  Were you responsible for that outline?
24      A.  I honestly can't remember if these are my ideas
25  or if this is me passing a message, but this is an

---

207

1   e-mail from me.
2       Q.  Who else would have developed this plan besides
3   you?
4       A.  Senator Fraser and his staff, any of the
5   senators listed here, perhaps Blaine Brunson or Julia
6   Rathgeber.
7       Q.  But is it more likely that it came from your
8   office given that you were the point person for the
9   elections and voting issues?
10      A.  It's unlikely I would have done all this
11  without significant input from the bill sponsor and the
12  senators listed.  It's not my place to tell senators
13  what they're going to be doing during debate of a bill.
14      Q.  But was it your role to kind of organize,
15  coordinate and communicate the plan to others?
16      A.  At least to these people, that seems fair.
17      Q.  Do you see that under "floor tasks" in the
18  parentheses, you urge senators to emphasize the
19  detection and deterrence of fraud and protect public
20  confidence in elections?
21      A.  Yes.
22      Q.  Why did you stress the need for senators to
23  emphasize those points?
24      A.  Because that goal was the goal of the bill as I
25  understood it.

---

208

1       Q.  Were you concerned that they may -- they might
2   say other things on the floor of the senate about other
3   reasons for SB 14 being considered?
4       A.  I -- even if I had concerns about a senator --
5   what a senator might say, there's no stopping a senator
6   who wants to say something.  But yeah, to the extent
7   that senators were looking for direction, I think this
8   was an attempt to remind people what the point of this
9   bill is.
10      Q.  And again, as with the previous exhibit, were
11  you concerned that there might on the Senate floor be
12  expressions of support for Senate Bill 14 as a basis of
13  cracking down on illegal non-U.S. citizens in this
14  country?
15      A.  I don't know that I was concerned about it,
16  again, because I don't recall that I had heard it from
17  many senators or their staff.  So I don't -- I don't
18  think I would say it was a concern of mine.
19      Q.  So if detecting and deterring fraud and
20  protecting public confidence was the sole purposes to
21  SB 14, why were you having to remind staffers to let
22  their bosses know that these were the purposes of the
23  bill?
24      A.  One, I would say it wasn't necessarily the sole
25  purpose, but it's in my estimation the main purpose.

---

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

53 (Pages 209 to 212)

209

But more importantly, I think senators have hundreds and hundreds and hundreds of bills that they consider, and while this is a very important bill, there were lots of very important bills and items before the senators during that session.  Plus, their day jobs, plus their family lives, there's a lot going on.  And so we do this for all sorts of bills, not just this bill, reminding senators what the bill does and how it might be discussed and so forth.

MS. WESTFALL:  We're going to stop the highly confidential designation right now.

MS. HALPERN:  How long have we been going since the last break?  I lost track of where we are.

MR. WHITLEY:  45 minutes.

MS. WESTFALL:  Okay.  Okay to proceed?  Do you want to go off the record and have him calculate it or do you want to take a break or do you want to --

MS. HALPERN:  Yeah, I'd like a five-minute break.

MS. WESTFALL:  Okay.  That's fine.

(Recess from 3:33 to 3:45 p.m.)

(Exhibit 171 marked for identification.)

Q.  (By Ms. Westfall) You've been handed what's been marked 171.  Do you recognize this document?

A.  It looks like the legislative history of Senate

210

Bill 14.

Q.  Right.  Are you aware that Senator Fraser answered "I am not advised throughout the debate on Senate Bill 14"?

A.  I remember that he gave that answer to some questions.

Q.  Did you know in advance that he was going to take that approach, in terms of answering questions, during the consideration of SB 14 in Committee of the Whole?

A.  No.

Q.  Did anyone know he was going to have those answers?

A.  I don't know.

Q.  In advance?  Was Senator Fraser instructed by anybody to answer in that manner?

MS. HALPERN:  Objection, calls for speculation.

Q.  (By Ms. Westfall) You may answer.

A.  Not that I know of.

Q.  Was SB 14 the least restrictive option to achieve the goal of preventing voter fraud?

A.  I don't know.  I mean, I suppose it could have been more or less restrictive, but I'm not sure how that would have affected the security of the elections.

211

Q.  But can you imagine, sitting here today, that there could have been a less restrictive bill that could have accomplished that same objective of SB 14?

MS. HALPERN:  Objection, relevance.

Q.  (By Ms. Westfall) You may answer.

A.  There would -- there could have been a less restrictive bill.  I am not clear that that would have been adequately secure or resulted in adequately secure elections.

Q.  Was there any discussion in the Senate of how to accomplish the goals of photo ID, generally, requirements by less restrictive means?

A.  Yes.  I think a lot of the debate in the Senate, and from what I saw at the House, there was that debate.  Certainly opponents of the bill had a lot of suggested amendments, some of which were adopted and a lot of which were not.  So yes, there was discussion about that.

Q.  Which ones were adopted to make the bill less restrictive?

A.  I'll have to look to be sure.  In the Senate?

Q.  In the Senate.

A.  Two I can think of, off the top of my head, I think the disability exception and the addition of CHLs as acceptable ID.  There may have been others.  Maybe --

212

if I could just a second look at the bill.  My memory is that the language in the bill referring to recently expired IDs was a product of a floor amendment from a minority member.  Without going through every individual amendment, those are three examples I can think of.

Q.  Are you aware of whether Mr. Dewhurst had any nonpublic conversations with other members or staff about amendments to SB 14?

A.  I'm not aware of any conversations.

Q.  Were you part of any of those conversations with Mr. Dewhurst and other members about amendments?

MS. HALPERN:  Objection, asked and answered.

A.  Yeah.  I'm not aware.

Q.  (By Ms. Westfall) You can answer.

Were you on the Senate floor when SB 14 was being considered by the Committee of the Whole?

A.  Yes.

Q.  During for consideration, did Senator Williams ask Ann McGeehan to conduct additional analysis of which registered voters did not have driver licenses?

A.  I don't recall.  I believe Senator Williams was chair of Transportation at the time, so he would likely have had an interest in issues related to DPS-issued identification, but I don't recall that specific

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

54 (Pages 213 to 216)

213

1  question.
2      Q.  Were you ever a party to conversations with the
3  Office of the Secretary of State's concerning analysis
4  of voters without a driver license?
5      A.  Again, it's possible.  I think I mentioned it
6  earlier in my deposition.  I recall a meeting with Ann
7  McGeehan.  I think it involved how people voted or
8  whether those people, voters had identification
9  typically.  But I cannot remember the specifics of that
10  conversation.
11     Q.  Do you recall whether that conversation was
12  after the Senate considered SB 14 or before?
13     A.  I don't recall.
14         MS. WESTFALL:  Could you mark this?
15         (Exhibit 172 marked for identification.)
16     Q.  (By Ms. Westfall) You've been handed what's
17  been marked as 172.  Could you take a look at this
18  document and let me know when you've had a chance to
19  review it.
20     A.  It looks like a chain of e-mails among
21  Secretary of State staff regarding the number of
22  registered voters that have not been issued a driver's
23  license or personal ID card by DPS.
24     Q.  Have you ever seen this document before today?
25     A.  I can't recall if I have or not.  I can't

214

1  recall.  It seems like it would have -- if it was a
2  public document, it would have come up in either the
3  House or Senate debate, so it's possible I heard
4  reference to it, but I can't recall if I saw it
5  specifically.
6         MS. WESTFALL:  For the record, Exhibit 172
7  is Bates number TX00 107733 through 107735.
8      Q.  (By Ms. Westfall) Have you ever seen this
9  document not in the public debate?
10     A.  I don't think so, but I can't recall.  Again,
11  it's -- I know that I met with Ann McGeehan, and I think
12  I talked about issues similar to this, I can't recall if
13  this is a response to a question I raised or a question
14  someone else raised, and I'm not a recipient anywhere on
15  here, so I don't remember seeing the document before,
16  no.
17     Q.  Do you see the date of this document, the dates
18  of these e-mails?
19     A.  The document is undated, but the e-mails are
20  January 27th, February 1st, and February 1st of 2011.
21     Q.  So is it fair to say that these e-mails were
22  drafted after the Senate consideration of Senate Bill
23  14?
24     A.  Yes.
25     Q.  Had you ever heard any of these numbers or

215

1  results prior to today, even if you hadn't seen this
2  particular set of e-mails?
3      A.  I can't recall.  Again, it's possible that Ann
4  or the Secretary of State's Office had some of these
5  numbers in previous meetings I had with them, but I
6  don't recall specific instances of that.
7      Q.  You were involved in preparation of Defendants'
8  interrogatory responses to the United States
9  interrogatory requests in this action; is that correct?
10     A.  Yes, I believe I was.
11     Q.  And as part of those responses, did you provide
12  information about occasions on which analysis of which
13  voters have state-issued forms of ID had been conducted?
14     A.  I know I assisted with the interrogatories to
15  the extent they requested documents or information from
16  my -- from the Lieutenant Governor's Office, and I can't
17  remember if what you described would have been a
18  response to that or not.
19         MS. WESTFALL:  Could you please mark this?
20         (Exhibit 173 marked for identification.)
21     Q.  (By Ms. Westfall) You have been handed what's
22  been marked as Exhibit 173.  Do you recognize this
23  document?
24     A.  It looks like a copy of the Defendants'
25  Objections and Responses to Plaintiffs and Intervenors

216

1  First Set of Interrogatories.
2      Q.  Have you seen this document before?
3      A.  I'm not sure I've seen this version or the --
4  I'm assuming this is the final version.  I think I saw
5  it, but I can't be a hundred percent sure.
6      Q.  Turning your attention to Page 6, do you see
7  you are listed?
8      A.  Yes.
9      Q.  And do you see it indicates that you provided
10  assistance with responses to interrogatories number 2,
11  17, 18, 19?
12     A.  Yes.
13     Q.  Turning your attention to Page 59, which is
14  where the response to Interrogatory 17 is located.
15     A.  Uh-huh.
16     Q.  Do you see that you contributed responses to
17  Interrogatory 17, 18 -- 17 and 18, which requests
18  information about analysis of which voters don't have
19  certain forms of ID?
20     A.  Yes.
21     Q.  Could you describe information that you
22  provided to respond to Interrogatory requests 17 and 18?
23     A.  I don't recall that I provided any information.
24  I can't remember that we had anything responsive or not.
25     Q.  Do you believe that the indication on Page 6,

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

---

217

1  that you provided information for numbers 2, 17, 18, and
2  19, was in error?
3      **A.  I don't believe that.  Let me double check.  It**
4  **says the following persons assisted generally in either**
5  **providing information or preparing responses.  I'm not**
6  **sure which one of those I fall into, but I do remember**
7  **helping with some of these.**
8      Q.  Did you do any drafting, do you recall, for the
9  responses to 17 and 18?
10     **A.  I don't recall doing any specific drafting.**
11     Q.  Did you provide information?
12     **A.  I think it's more likely I would have provided**
13  **any information I had in my -- had available to me.**
14     Q.  And as evidenced on the face of the responses
15  to 17, which requests information about analysis of
16  voters without state forms of ID, there is no
17  information disclosed about the matching analysis in
18  Exhibit 172 which you just reviewed, correct?
19     **A.  Let me see.**
20     MS. HALPERN:  Counsel, I'm going to
21  object.  I want the record to reflect that this witness
22  has not identified as having received Exhibit 172.  He's
23  neither to nor from nor cc'd.
24     MS. WESTFALL:  I'm asking about
25  interrogatory responses to which Defendants have

---

218

1  indicated he has participated in.
2      MS. HALPERN:  Well, I understand that, and
3  I think you're mischaracterizing the interrogatory as
4  well.  Certainly, this Exhibit 172 doesn't have anything
5  about demographic characteristics in it.  At best, it
6  has numbers.  And I, frankly, don't understand the
7  exhibit to the extent that the first row in each query,
8  which is labeled Number of Voters With No -- presumably,
9  that means driver's license or ID number -- that number
10  is the sum of the two rows below it, numbers that did
11  not match and numbers that did match.
12     MS. WESTFALL:  Okay.  Well, you're not
13  here to testify, but I appreciate your comments on the
14  exhibit.
15     MS. HALPERN:  Well, I just don't want you
16  mischaracterizing his role in the interrogatory
17  responses, asking about number or demographic
18  characteristics, when this aide doesn't do either.  He
19  didn't see the document.
20     MS. WESTFALL:  Well, you're not -- you're
21  not here to testify about this document, so I'm going to
22  move to strike those comments.
23     **A.  So to the extent my office was asked about**
24  **whether we possessed documents described by**
25  **interrogatory 17 and 18, I don't think we had any**

---

219

1  **documents in our possession, and I don't recall**
2  **providing any specific input otherwise to the response.**
3      Q.  (By Ms. Westfall) Do you have any information
4  about why the analysis included in Exhibit 172 was not
5  listed in this interrogatory response?
6      **A.  It doesn't appear to have been sent to any**
7  **legislator from the face of this document, this e-mail.**
8  **It looks like internal e-mails by the Secretary of**
9  **State.**
10     Q.  Do you have any information about why -- is it
11  your understanding the Secretary of State is a defendant
12  in this action?
13     **A.  I'm not sure that's correct, but I will take**
14  **your word for it.**
15     Q.  I will represent to you --
16     **A.  Thank you.**
17     Q.  -- because the caption is condensed, the
18  Secretary of State is a defendant in this action.
19     MS. HALPERN:  I'm going to object to your
20  question, Counsel, because it calls for speculation on
21  the part of this witness, since he is not a defendant
22  and obviously don't know.
23     Q.  (By Ms. Westfall) You may answer.
24     **A.  What was the question?**
25     Q.  Do you know why analysis in 172 was not

---

220

1  included in the response to the Interrogatory 17 and 18?
2      **A.  I do not know.  I know I did not provide it**
3  **because I do not possess it.**
4      MS. WESTFALL:  Could you please mark this?
5      (Exhibit 174 marked for identification.)
6      Q.  (By Ms. Westfall) You've been handed what's
7  been marked as Exhibit 174.  Do you recognize this
8  document?
9      **A.  It appears to be the Senate Journal entry**
10  **from -- or at least part of Wednesday, January 26, 2011.**
11     Q.  Did the Lieutenant Governor circulate to the
12  Republican caucus written recommendations on how to vote
13  on certain amendments?
14     **A.  Not that I'm aware.**
15     Q.  Ever?
16     **A.  Not that I'm aware.  And as a practical matter,**
17  **from my experience, generally on the floor of the**
18  **Senate, which was every day in recent sessions,**
19  **amendments are not generally known until the senator**
20  **submits it, which could be seconds before they are**
21  **considered.  So as a practical matter, I don't think**
22  **there would have been time to submit written positions**
23  **on how to vote on amendments.**
24     Q.  I direct your attention to Page 137 of this
25  Senate Journal.

---

221

1       A.  All right.
2       Q.  Do you see that it lists a floor amendment
3   offered by Senator Duncan --
4       A.  Yes.
5       Q.  -- related to indigent voters?
6       A.  Yes.
7       Q.  Would this amendment have required the counting
8   of provisional ballots of individuals, voters who attest
9   they are indigent and do not have ID?
10      A.  If the person executed an affidavit stating
11  that they were indigent or had a religious objection or
12  were not otherwise challenged, then it looks like, yes,
13  that that provisional ballot would have been counted.
14      Q.  This amendment was adopted by the Senate, was
15  it not?
16      A.  I don't have the vote on that.
17      Q.  Sir, does it indicate, on Page 138, the vote?
18      A.  I'm sorry.  Yes.
19      Q.  Was it adopted by the Senate?
20      A.  Yes.
21      Q.  Was this provision included in the final
22  version of SB 14 that's signed into law?
23      A.  I do not believe it was.
24      Q.  Had this been adopted in the final version of
25  the bill signed into law, would it have reduced the

222

1   burden on poor voters?
2       A.  I think it would -- would it have reduced the
3   burden on poor voters if this had been adopted?  It's
4   possible.
5       Q.  Are poor voters disproportionately minority?
6       A.  I don't know that to be true, but I suspect
7   that to be true.
8       Q.  May I direct your attention to Page 118 of
9   Exhibit 174.
10      A.  Okay.
11      Q.  Do you see that there's a floor amendment
12  Number 12 offered by Senator Davis to prohibit state
13  agencies from charging fees for the issuance of
14  acceptable forms of photo ID under Senate Bill 14 or for
15  underlying documentation --
16      A.  Yes.
17      Q.  -- to get those forms of ID?
18      A.  Yes.
19      Q.  Was this amendment adopted by the Senate?
20      A.  No.
21      Q.  Had this been adopted, would this have reduced
22  the burden on poor voters?
23      A.  It is possible, although, again, today, I think
24  the charge for a birth certificate is three dollars or
25  zero dollars depending on the county.

223

1       Q.  But at the time Senate Bill 14 was adopted by
2   the Legislature, that was not the case, correct?
3       A.  Correct.
4       Q.  Would adopting this floor amendment Number 12
5   have interfered with the effectiveness of the bill?
6       A.  Effectiveness is pretty broad.  It would have
7   been a costlier bill.  It would have potentially been a
8   larger burden on counties or other agencies.  I'm not
9   sure what other adverse effects might have resulted.
10  I'm not sure it would have affected the security of
11  elections, but I can't say that it wouldn't undermine
12  the effectiveness of the bill as a whole.
13      Q.  Given that you were aware of the cost of
14  obtaining a birth certificate and you circulated that
15  memo that you testified about earlier today, why did the
16  Legislature not adopt Amendment Number 12?
17      A.  I can't recall.  I don't know.
18      Q.  Turning your attention to Page 121, do you see
19  there is an amendment that was offered by Senator Van de
20  Putte?
21      A.  I do.
22      Q.  And this would have substituted -- well, if you
23  could review this amendment and let me know when you've
24  had a chance.
25      A.  (Reviewing document.) Okay.

224

1       Q.  Would this amendment, in essence, have provided
2   the same forms of ID that were part of SB 362?
3       A.  It looks to be very similar to 362.  One photo
4   or two nonphoto, which, again, was, at the time, opposed
5   by every Democrat that I recall.
6       Q.  But in answer to my question, it was very
7   similar to Senate Bill 362?
8       A.  It is similar.
9       Q.  In terms of the ID.  And this amendment was not
10  adopted by the Senate, correct?
11      A.  It was not.
12      Q.  Do you know why the Legislature didn't adopt
13  this amendment?
14      A.  I can't recall the debate, so no, I don't know.
15      Q.  Turning your attention to Page 123, which is
16  something you testified about earlier, the Floor
17  Amendment Number 18 concerning concealed handgun
18  licenses?
19      A.  Yes.
20      Q.  Do you see that amendment was adopted?
21      A.  Unanimously, yes.
22      Q.  Do you know why that was adopted?
23      A.  I can't recall, no.  I don't know.
24      Q.  And do you know whether other amendments to
25  allow the use of Medicare cards and student IDs were

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

57 (Pages 225 to 228)

---

**225**

1 also offered?

2    **A.** Do I know why?

3    **Q.** No. Do you know -- are you aware that there

4 were other amendments to include Medicare cards and

5 student ID cards that were offered on the Senate floor?

6    **A.** Yes.

7    **Q.** And were those amendments adopted by the

8 Senate?

9    **A.** No.

10    **Q.** Are you aware of any facts or basis for

11 including concealed handguns as an acceptable form of

12 ID, but not Medicare cards or student ID cards?

13    **A.** Well, from my own knowledge, I would -- I know

14 that the concealed handgun licenses are issued by DPS,

15 which also issues driver licenses and election IDs

16 and personal identification cards. I know they have

17 personal -- identifying information and expiration dates

18 on their face. Medicare cards, I'm honestly not sure

19 what those look like. I'm not sure if they include

20 expiration dates or other identifying information.

21    Students IDs, I've talked about before. I

22 think even if as in the proposed amendment in the

23 Senate, you say accredited public university in Texas,

24 that's still a very, very large pool of potential

25 identifications, which may or may not have security

---

**226**

1 elements or expiration dates or any other number of

2 identifying characteristics.

3    **Q.** Were there any forms of ID issued by DPS that

4 were -- are not acceptable photo IDs under Senate Bill

5 14?

6    **A.** I'm not aware of any.

7    **Q.** Would you turn your attention to 130. Do you

8 see that Senator Ellis offered a Floor Amendment Number

9 130?

10    **A.** Yes.

11    **Q.** Pertaining to the collection of data?

12    **A.** Yes.

13    **Q.** And requiring the Secretary of State to conduct

14 studies related to eligible voters?

15    **A.** Yes.

16    **Q.** And this amendment was rejected, correct?

17    **A.** Yes.

18    **Q.** This was not included in the final version of

19 Senate Bill 14 signed about the Governor; is that right?

20    **A.** Correct.

21    **Q.** Had Floor Amendment Number 30 been adopted,

22 would it have interfered with the effectiveness of

23 Senate Bill 14?

24    **A.** Yes, to the extent it required a large devotion

25 of resources by the Secretary of State that might be

---

**227**

1 used in other areas, looking at the text of Senator

2 Ellis's amendment, it required an annual report, which

3 would already be unusual in the legislatures, and we

4 meet every other year, and a list of seven items that

5 would have to be included in that annual report,

6 including the number of residents eligible to vote, the

7 average wait time to obtain certain types of documents.

8    So yeah, I think, assuming the Secretary

9 of State could even determine these numbers, they seem

10 like a -- it would be pretty time consuming to get all

11 seven of these items produced on an annual basis.

12    **Q.** Was there any concern that the data

13 would show a discriminatory impact of Senate Bill 14 on

14 minority voters?

15    **A.** I'm not aware of any such concern.

16    MS. WESTFALL: Could you please mark this?

17    (Exhibit 175 marked for identification.)

18    **Q.** (By Ms. Westfall) You've been handed what's

19 been marked as Exhibit 175. Did you recognize this

20 document?

21    **A.** It looks like a press release by the Lieutenant

22 Governor.

23    **Q.** Did you see a draft of this before it was

24 finalized?

25    **A.** I don't recall if I did or not.

---

**228**

1    **Q.** Did you write this?

2    **A.** No.

3    **Q.** Did you advise Mike Walz, who is listed as a

4 contact here, about the contents of this release?

5    **A.** It is possible, but I do not recall seeing this

6 or advising on this.

7    **Q.** Do you see that in the second paragraph, it

8 states, "A voter ID will ensure that only U.S. citizens

9 who are legally eligible vote in Texas elections"?

10    **A.** Yes.

11    **Q.** Why does this press release reference a need to

12 ensure only U.S. citizens are participating in

13 elections?

14    **A.** Why does it reference that? I don't know. I

15 mean, the bill does ensure that.

16    **Q.** Doesn't it seem that this message about SB 14

17 seems a bit in conflict with what you had been

18 recommending senators to say about the bill?

19    **A.** Well, Lieutenant Governor is not a senator or

20 the sponsor. I don't think it conflicts with that

21 necessarily. I think my e-mail that you referenced

22 earlier was warning about using certain types of terms.

23 They're talking about certain subjects that were not a

24 matter covered by the bill.

25    **Q.** So you see no conflict between the message

---

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

229

¹ about Voter ID in Exhibit 175 and the purposes of the
² bill as you saw them?
³     **A.   I think it's a more narrow interpretation of**
⁴ **the bill than -- it doesn't include everything the bill**
⁵ **covers, so it's more narrow than I might personally**
⁶ **characterize it.**
⁷     Q.   Why was there a need for ensuring that only
⁸ U.S. citizens vote in Texas elections?
⁹     **A.   I don't know.  I don't know why.**
¹⁰     Q.   Was there any factual basis for non-U.S.
¹¹ citizens participating in elections at the time and they
¹² need to be stamped out by the Legislature?
¹³     **A.   Again, I think non-U.S. citizens or non-Texas**
¹⁴ **citizens are a subset of a larger class of ineligible**
¹⁵ **voters who would hopefully be deterred from trying to**
¹⁶ **cast fraudulent votes.**
¹⁷     Q.   This press release references in particular
¹⁸ U.S. citizens and ensuring that only U.S. citizens are
¹⁹ participating in elections in Texas, correct?
²⁰     **A.   Correct.**
²¹     Q.   Were there any facts, that you're aware of at
²² the time, that non-U.S. citizens were participating in
²³ Texas elections?
²⁴     **A.   I can't recall specific examples.**
²⁵     Q.   And was there a lack of public confidence in

230

¹ the election process as a result of noncitizens
² participating in the elections?
³     **A.   Again, I think it was my impression -- it is my**
⁴ **impression that voters in Texas, citizens in Texas saw**
⁵ **room for improvement, specifically in the form of photo**
⁶ **ID, as evidenced by public opinion polls, among all**
⁷ **voters, minority voters, and subsets of minority voters.**
⁸     MS. WESTFALL:  I would like to designate
⁹ this now as highly confidential.
¹⁰     (Exhibit 176 marked for identification.)
¹¹     Q.   (By Ms. Westfall) You've been handed what's
¹² been marked as 176.  Do you recognize this document?
¹³     MS. HALPERN:  And just before he answers
¹⁴ that, and again, I wasn't involved in that process.  But
¹⁵ to the extent that this document has been marked as
¹⁶ highly confidential, I think it's incumbent on me to
¹⁷ enter a running objection to questions about this
¹⁸ document to the extent that whatever privileges were
¹⁹ asserted by the person who wrote this document are
²⁰ obliterated by your asking questions about it.
²¹     MS. WESTFALL:  I take strong objection to
²² the word "obliterated," Counsel.  But your objection is
²³ on the record.  And this is designated as highly
²⁴ confidential pursuant to the consent protective order
²⁵ ECF 105.

231

¹     Q.   (By Ms. Westfall) Do you recognize this
² document?
³     **A.   Yes.**
⁴     Q.   What is it?
⁵     **A.   It looks like an e-mail from myself to Senate**
⁶ **staffers, some Senate staffers, with an attached summary**
⁷ **of SB 14 as it passed the Senate.**
⁸     MS. WESTFALL:  For the record, Exhibit 176
⁹ is Texas 00034469 through Texas TX 00034471.
¹⁰     Q.   (By Ms. Westfall)  Did you draft the attachment
¹¹ to Exhibit 176?
¹²     **A.   I think I probably did.**
¹³     Q.   And the attachment is titled Voter ID Bill
¹⁴ Summary, correct?
¹⁵     **A.   Correct.**
¹⁶     Q.   Who was the intended audience of this bill
¹⁷ summary?
¹⁸     **A.   I assume the people on the e-mail that I sent**
¹⁹ **it to.**
²⁰     Q.   Was it solely for purposes of advising these
²¹ staff people, or was it intended for a broader audience?
²²     **A.   It's possible it was intended for people on the**
²³ **Lieutenant Governor's staff, as well as the recipients**
²⁴ **of this e-mail.**
²⁵     Q.   Did you circulate this summary to anybody else

232

¹ besides the recipients on the first page of Exhibit 176?
²     **A.   I don't recall whether I did or not.**
³     Q.   Was this summary reviewed and approved by
⁴ anyone in your office before it went out?
⁵     **A.   Probably not, but I can't be sure.**
⁶     Q.   Did Lieutenant Governor Dewhurst see this
⁷ summary?
⁸     **A.   I can't recall.  It's possible.**
⁹     Q.   Do you see it was dated January 27th, 2011?
¹⁰     **A.   The e-mail is dated January 27th, 2011, yes.**
¹¹     Q.   Was this e-mail drafted after the Senate had
¹² adopted Senate Bill 14?
¹³     **A.   It appears that yes, it was.**
¹⁴     Q.   Do you see that under the Bill Summary, the
¹⁵ first sentence characterizes SB 14 as the strictest
¹⁶ photo ID bill in the country?
¹⁷     **A.   Yes, arguably the strictest photo ID bill.**
¹⁸     Q.   What was your assessment based on?
¹⁹     **A.   The comparison of Texas requirements to states**
²⁰ **that had other photo ID requirements.**
²¹     Q.   What made it -- what particular facets of the
²² bill made it the strictest in the country?
²³     **A.   I assume it was related to the forms of**
²⁴ **acceptable ID.  It could also have been related to**
²⁵ **criminal penalties associated with fraudulent election**

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

59 (Pages 233 to 236)

233

1  activity.
2      Q.  Anything else?
3      A.  Without looking at it in my comparison, I'm not
4  sure offhand.
5      Q.  Do you believe it was the intent of the Texas
6  Legislature to enact the strictest photo ID law in the
7  country?
8      A.  I believe it was the intent of the Legislature
9  to enact a photo ID law that was successful in securing
10  the integrity of elections.  But I'm not sure they --
11  don't think they did it to get ahead of what other
12  states were doing or not doing.
13      Q.  Do you see that in the first paragraph, you
14  predict that it will be upheld under Section 5, Voting
15  Rights Act Review?
16      A.  I do see that.
17      Q.  Why did you in this summary, right after the
18  bill was passed by the Senate, opine that it will be
19  preclearance, having only days before expressed grave
20  doubts about its state under Section 5?
21      A.  Well, I think there's a different bill, and so
22  given the addition of additional acceptable photo IDs
23  and blanket exceptions for certain classes of voters and
24  other provisions related to availability of
25  identification -- election identification cards and

234

1  education.
2      Q.  Were election identification cards included
3  when the Senate passed the bill, or was that in
4  conference committee?
5      A.  A good question.  Let me check.  It may have
6  been in conference.  I can't remember for sure offhand
7  without having a copy of the Senate and engrossed
8  version.
9      Q.  So the basis of your opinion about the bill
10  being likely precleared is based on the exemptions for
11  disability and what other provision?
12      A.  Again, the changes made in the Senate after
13  filing included additional forms of acceptable photo ID,
14  exceptions for certain classes of people, including
15  voters over 70, disabled voters, indigent or religious
16  objectors; the fact that the name and ID must be
17  substantially similar to the name on the list as opposed
18  to exactly matching.  I can't remember what else.
19      Q.  And were those provisions -- did those
20  provisions ensure that there would not be disparate
21  impact on minority voters, or was that simply a
22  lessening of the burden on all voters?
23      A.  I think both.  Minority voters are included in
24  all voters, so in lessening the burden on all voters
25  would almost certainly reduce the burden on minority

235

1  voters.
2      Q.  In terms of what was passed in the Senate, did
3  the provision excluding voters over 70, was that
4  included in the bill signed into law?
5      A.  I do not believe it was.
6      Q.  Was the exemption for SB 14, by presenting a
7  certificate related to disability, passed into law?
8      A.  I believe it was.
9      Q.  Are you -- are you -- do you believe that it
10  was -- the voter had to obtain documentation from the
11  Social Security Administration or Veterans
12  Administration in the version that was enacted?
13      A.  For the disability exception?  I cannot
14  remember the specific documentation required.  I'd have
15  to look it up.  I can if you'd like.
16      Q.  Was the Senate -- do you recall, was the Senate
17  version -- did the Senate version have a provision where
18  a person with a disability could obtain a certificate or
19  documentation from a physician to be exempt?
20      A.  I can't recall that except by looking at this
21  summary, that I presumably prepared.  It says that a
22  voter who is disabled and has provided a physician
23  certification of that disability to the registrar may
24  get a certain type of registration card.
25      Q.  And was that provision part of the bill that

236

1  was signed into law?
2      A.  I can't remember the exact language in the
3  final bill.
4      Q.  Was something more restrictive related to just
5  the Social Security Administration and the Veterans
6  Administration signed into law?
7          MS. HALPERN:  Object to the form.
8      A.  I mean, it's possible.  I can look at the bill.
9      Q.  (By Ms. Westfall) Please.
10      A.  Yes.  There is different language.  And my
11  guess is, it was made to conform with some standardized
12  language regarding a definition of disability.
13      Q.  It had the effect of being more -- providing a
14  narrower class of persons with disabilities relief from
15  the bill, did it not?
16      A.  I can't recall now what the affect was, but I
17  do recall, now that I have the language in front of me,
18  that it was designed to make it parallel to existing
19  definitions of disability elsewhere in Texas law.
20      Q.  Fair to say it's easier to get a note from a
21  doctor than it is to get a document from the Social
22  Security Administration or Veterans Administration?
23      A.  I honestly don't know.  I mean, the language
24  here is a physician certification of the disability.
25  I'm not sure exactly what that entails, and I'm not sure

BRYAN HEBERT                                      6/17/2014
CONFIDENTIAL TRANSCRIPT

237

1 if these documents from the Social Security
2 Administration or Department of Veterans Affairs are
3 obtainable online or by mail or in the possession of
4 people receiving disability benefits anyway.
5      Q.   Did you have any knowledge about that process
6 at the time that SB 14 was enacted by -- passed by the
7 Senate?
8      A.   I'm not sure that I did.
9      Q.   In the summary, you also reference persons who
10 are indigent --
11     A.   Yes.
12     Q.   -- being exempt from the bill in certain
13 regards of being able to get a photo ID or not being
14 able to get a photo ID.  That provision was not included
15 in the bill signed into law, correct?
16     A.   Correct.  And I think the answer is because
17 voting, election identification certificates free of
18 charge were added, which removed the need to exempt
19 indigent people up front.
20     Q.   Fair to say that the bill that was signed into
21 law was stricter than the version that the Senate
22 passed?
23     A.   I'm not sure strict is the right word.  I mean,
24 there were -- there is different language.  They added
25 some things and removed some things.  But without a

238

1 side-by-side comparison, I wouldn't say strict.  And
2 even if I saw them side by side, I'm not sure strict is
3 the right word.
4      Q.   Did the Lieutenant Governor play any role in
5 the conference committee's consideration of Senate Bill
6 14?
7      A.   I don't know.
8      Q.   Did he appoint the conferee?
9      A.   He did do that.
10     Q.   Was it just the Senate conferees, or did he
11 also -- was he also involved in the House conferee side
12 of things?
13     A.   The Lieutenant Governor appoints Senate
14 conferees to conference committees, so I'm not aware of
15 any other involvement in appointees.
16     Q.   Does he appoint conferees for all bills in the
17 Senate or only certain bills?
18     A.   Any bill that goes to conference committee has
19 conferees appointed by the Lieutenant Governor.
20     Q.   During the conference committee's consideration
21 of SB 14, did the conference committee remove the
22 provision to require that voter education be targeted at
23 low income and minority voters?  Are you aware of that?
24     A.   I can't remember when that language was added
25 or taken out.

239

1      Q.   Do you know why it was taken out?
2      A.   I don't.
3      Q.   Were you involved in drafting the EIC provision
4 that was adopted during the conference?
5      A.   I believe I was.
6      Q.   How did you develop will that language?
7      A.   I believe my intent was to have it parallel
8 existing statutory or rule language for drivers'
9 licenses, after removing parts that were not relevant.
10 The goal was to have the cards and the information be
11 similar to drivers' licenses and issued by the same
12 agency.
13           MS. WESTFALL:  And I meant to suspend the
14 designation of highly confidential right before I
15 started asking about the conference committee.  I don't
16 know if it's possible to insert it at this juncture.
17     Q.   (By Ms. Westfall) Did you consider the hours of
18 operation for driver license offices when you were
19 developing the EIC provision?
20     A.   I mean, generally, the hours of operation of
21 DPS offices were debated on the floor of the Senate, so
22 I think, yes, I would have considered it.
23     Q.   Was there any response legislatively to those
24 concerns raised?
25     A.   Not within the face of this statute, but I'm

240

1 not sure what other legislative actions were taken.  And
2 again, I know as a fact that actions were taken by the
3 Department of Public Safety.
4      Q.   Was it left to DPS, when the bill was being
5 crafted, as to what the hours of the driver license
6 offices would be?
7      A.   Yes.  DPS sets the hours of their office based
8 on the whole range of factors, including population and
9 usage and so forth.
10     Q.   And Senate Bill 14 did not direct or influence
11 in any way where driver licenses offices were located;
12 is that correct?
13     A.   I'd have to check to be sure.
14           (Reviewing document.) I don't see any
15 language doing that.
16     Q.   Did the Legislature, in crafting SB 14, give
17 any consideration to the availability of driver license
18 offices via public transit?
19     A.   Again, my recollection is that it was -- that
20 may have been part of the debate on the floor, but I
21 can't remember any specific language in the face of the
22 statute addressing that.
23     Q.   During consideration of SB 14, was there any
24 analysis of cost or steps a voter would need to take to
25 obtain an EIC?

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

61 (Pages 241 to 244)

---

**241**

1    A. I can't recall.

2    Q. Is it fair to say that Hispanic and African

3 American senators asserted during the legislative

4 process that Senate Bill 14 would diminish the

5 participation of Hispanic and African American voters?

6    A. I recall that was, yes.

7    Q. Do you agree with that assessment?

8    A. No, not necessarily.

9    Q. I should say, did you at the time agree with

10 that assessment?

11    A. No.

12    Q. What was your basis, factual basis at the time

13 to have skepticism about those assertions?

14    A. I would say the entirety of testimony over the

15 course of multiple sessions; the fact that not just in

16 Texas, but in no other state, that I was aware of, had

17 even a single minority or even single plaintiff come forward

18 that was unable to obtain an ID or they already

19 possessed an ID, and that was true for minority

20 populations, poor populations, and all populations.

21        So I would guess -- I would say in part,

22 based on the experience of other states and the lack of

23 people -- even a single person identified as unable to

24 obtain identification.  And again, the fact that during

25 the multiple sessions of testimony, I was not convinced

---

**242**

1 that this would adversely impact any one class of people

2 in Texas.

3    Q. Do you think that it would be problematic if SB

4 14 made it more difficult for Hispanic and African

5 American voters to participate in elections, even if it

6 didn't wholly disenfranchise them?

7        MS. HALPERN:  Objection, calls for a legal

8 conclusion.

9    Q. (By Ms. Westfall) You may answer.

10    A. Would it be problematic if SB 14 adversely

11 impacted minority populations?

12    Q. Made it more burdensome.

13    A. Made it more burdensome.  It would depend on

14 the extent of that burden.  It would be dependant on

15 whether it was only minorities that were burdened.  It

16 would depend on whether there was an intent to burden

17 only those minorities.  So possibly, just to answer, I

18 guess.

19    Q. At any time since the passage of Senate Bill

20 14, have you come to believe that Senate Bill 14 was

21 passed with any discriminatory purpose?

22    A. Before I say yes or no, how was it phrased

23 again?  Do I believe that it was passed --

24    Q. At any time since the passage of Senate Bill

25 14, have you come to believe that it was passed with any

---

**243**

1 discriminatory purpose, in whole or in part?

2    A. I do not believe that it was passed with any

3 discriminatory purpose, in whole or in part.

4    Q. Was Senate Bill 14 enacted in part to reduce

5 the participation of Hispanic voters?

6    A. I do not believe so.

7    Q. Was SB 14 enacted in part to reduce the

8 participation of African American voters?

9    A. I do not believe so.  And, in fact, at least on

10 the House side, there were minority members, black and

11 Hispanic, who voted for the bill.

12    Q. At any time since the passage of Senate Bill

13 14, have you come to believe that Senate Bill 14 will

14 have a disproportionate effect on minority voters as

15 compared to Anglo voters?

16    A. I have not seen any evidence to convince me of

17 that.

18    Q. Are you familiar with the opinion of Texas

19 versus Holder denying judicial preclearance of Senate

20 Bill 14?

21    A. I am generally familiar.

22    Q. Did you read the opinion?

23    A. It's been a while.

24    Q. But yeah?

25    A. Yes, I have read it.

---

**244**

1    Q. Did the Lieutenant Governor have a reaction to

2 the decision?

3    A. My memory is that he was disappointed.

4    Q. How did the Senate on the whole react?

5        MS. HALPERN:  Objection, calls for

6 speculation.

7    Q. (By Ms. Westfall) You may answer.

8    A. Public reactions from individual to senators

9 varied.

10    Q. How did -- go ahead.

11    A. Some were disappointed and some were pleased, I

12 imagine.

13    Q. Did the Lieutenant Governor take any actions to

14 respond to the decision?

15    A. I can't remember any specific action.

16    Q. Did he propose any changes to Senate Bill 14?

17    A. I can't recall.

18    Q. Did he or any senator urge that amendments to

19 Senate Bill 14 be made to address any of the concerns

20 raised by the court?

21    A. I can't recall specific suggestions.

22    Q. How many times did the Legislature meet after

23 -- strike that.

24        When did the decision -- when was it

25 issued?

---

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

62 (Pages 245 to 248)

245

1   A.  I can't recall a date.
2   Q.  Is it -- was it issued around August 2012?
3   A.  That sounds right.
4   Q.  How many times did the Legislature meet after
5   August 2012?
6   A.  They would have met in regular session in the
7   spring of -- winter and spring of 2013, and one or two
8   special sessions after that.
9   Q.  Are you aware of any committee hearings held
10  related to Voter ID after Texas versus Holder was
11  issued?
12  A.  It's possible that the issue was addressed
13  during the regular legislative session, but I also know
14  that courts -- the U.S. Supreme Court's decision
15  regarding Section 5 of the Voting Rights Act impacted
16  concern over preclearance.
17  Q.  Do you know when that decision was issued?
18  A.  It was the summer.  I forget the date.
19  Q.  Was it issued June 25th, 2013?
20  A.  That sounds -- that sounds right.
21  Q.  And so for the period from the time that Texas
22  versus Holder was issued in August 2012 to June 25th,
23  2013, were there any committee hearings held related to
24  Voter ID in the Texas Legislature?
25  A.  I'm not sure on the House side, and I can't

246

1   recall on the Senate side.  But again, I think there was
2   -- I, as an observer, expected a decision soon regarding
3   the constitutionality of Section 5 of the Voting Rights
4   Act, given the animosity that arose out of Senate Bill
5   14 and the earlier versions of that; the extreme
6   partisan split on the issue that I don't think anybody
7   was in a hurry to get right back into it when there were
8   pending U.S. Supreme Court cases on the issue.
9   Q.  Were any pending -- the Shelby County case,
10  that's the case you're referring to?
11  A.  Correct.
12  Q.  And that did not -- that was not an appeal of
13  the Texas Voter ID decision, correct?
14  A.  Correct.
15  Q.  That was about the constitutionality of the
16  formula of coverage under Section IV of the Voting
17  Rights Act?
18  A.  Correct.
19  Q.  As well as Section 5 of the Voting Rights Act,
20  correct?
21  A.  By reference, yes.
22  Q.  Were any interim session committees convened
23  during this period to address the issue of Voter ID that
24  you're aware of?
25  A.  Between the period -- the end of session and --

247

1   Q.  Between August -- August 2012 and June 2013?
2   A.  Well, they wouldn't have been called right
3   before the regular session because there wasn't time.
4   And then during the regular session, as I said, I don't
5   recall what specific action or consideration committees
6   gave to it.  And then session ended late May, early
7   June, and the Shelby County decision came out late June.
8   So I think no, there was not consideration given through
9   the legislative process.
10  Q.  And after the decision in Texas versus Holder,
11  Texas held a major election, did it not?
12  A.  I think that's right.
13  Q.  A presidential federal election in November
14  2012; is that right?
15  A.  Right.
16  Q.  Were there any efforts made on the part of the
17  Legislature to hold hearings, convene task force or
18  otherwise examine the administration of the 2012
19  election?
20  A.  I'm not sure.
21  Q.  Would you be aware of those had they been?
22  A.  I might be aware of them, but be unable to
23  remember them now.  But I don't remember any specific
24  efforts by the Legislature to examine the effects.
25      I know there were various news accounts by

248

1   the media.  There were comments from county election
2   official in those media reports.  I know the Secretary
3   of State's Office was reviewing the implementation of
4   the program.
5   Q.  I just want to make sure we're testifying --
6   you're testifying about the election I'm referring to.
7       The election during November 2012, SB 14
8   was not in effect, correct?
9   A.  Correct.
10  Q.  Was there any examination of how that election
11  went by the Legislature?
12  A.  I'm not clear.
13  Q.  You don't know?
14  A.  I don't know.
15  Q.  And you would be the person who would likely
16  know for the Lieutenant Governor, would you not, because
17  you handle election issues?
18  A.  Actually, in November 2012, I had just returned
19  to the Lieutenant Governor's Office, and I was not
20  handling elections of the broad issue when I returned.
21  Q.  Who was?
22  A.  Constance Allison.
23  Q.  Are you aware of any in person voter
24  impersonation that occurred in the state of Texas during
25  the 2012 presidential election?

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

63 (Pages 249 to 252)

249

1    A.  I am not personally aware of any.
2    Q.  Who would be the best person in the state of
3  Texas to answer that question?
4    A.  Individual county law enforcement officials.
5    Q.  Who would be the best person at the state level
6  to answer that question?
7    A.  I suppose the Secretary of State, possibly the
8  Attorney General.  But those would only come to the
9  Attorney General if they forwarded by local law
10  enforcement.
11    Q.  Are you aware of any in person voter
12  impersonation that occurred in Texas during any election
13  between August 2012 and June 2013?
14    A.  I cannot recall being aware of any.
15    Q.  As of June 26th, 2013, Texas started to enforce
16  Senate Bill 14, correct?
17    A.  On what date?  I'm sorry.
18    Q.  June 26th, 2013, it started to enforce the law?
19    A.  I think that's correct.
20    Q.  After Shelby was issued; is that right?
21    A.  That's correct.
22    Q.  Have you or anyone in the Lieutenant Governor's
23  Office played any role the implementation of Senate Bill
24  14 since June 26th, 2013?
25    A.  I don't think I can say we played a role in the

250

1  implementation.
2    Q.  Have you had communications with DPS other than
3  the communications you testified about earlier this
4  morning?
5    A.  I don't believe I have.
6    Q.  Has the Lieutenant Governor attempted to assess
7  the impact of Senate Bill 14 on minority voters since
8  Texas began enforcing Senate Bill 14?
9    MS. HALPERN:  I want to remind the witness
10  that he is the general counsel for the Lieutenant
11  Governor, and in that capacity, not to reveal any
12  attorney-client confidences.
13    A.  I am not sure what efforts he has and has not
14  undertaken.
15    Q.  (By Ms. Westfall) Has the Lieutenant Governor
16  requested that the Secretary of State Office assess the
17  impact of Senate Bill 14 on minority voters?
18    A.  I'm not aware that he has.
19    Q.  Has any legislator who supported Senate Bill
20  14, to your knowledge, made any effort to assess the
21  impact of Senate Bill 14 on minority voters?
22    A.  It's possible.  Again, on my behalf, I have
23  reviewed news accounts following each of the recent
24  elections, statements from Travis County officials,
25  election officials and other -- Harris County, I

251

1  believe, other election officials saying there has not
2  be noticeable problems, and I can't remember if senators
3  may have been quoted in any of those individuals'
4  accounts.
5    Q.  Has the Lieutenant Governor or the Legislature
6  made any efforts to determine the number of voters who
7  have appeared to vote in person without a qualifying
8  photo ID?
9    A.  I'm not sure there has been a legislative
10  effort to do that.
11    Q.  So the answer is no?
12    A.  As far as I'm aware, the answer is no.
13    Q.  Has the Lieutenant Governor or the Legislature
14  made any effort to determine the number of provisional
15  ballots cast for lack of qualifying photo ID that were
16  not counted?
17    A.  I am not sure.
18    MS. WESTFALL:  I want to take a slight
19  break, and then we're nearing the end for me.
20    (Recess taken from 4:45 p.m. to 4:57 p.m.)
21    (Exhibit 177 marked for identification.)
22    Q.  (By Ms. Westfall)  I'm going to hand you what's
23  been marked as 177, and this is highly confidential
24  another highly confidential document.
25    MS. HALPERN:  We're going back to that

252

1  mode.  177.
2    Q.  (By Ms. Westfall)  Do you recognize this
3  document?  Take your time to look at it.
4    MS. WESTFALL:  It is, for the record,
5  LEG00004939 through 4941.
6    A.  It looks like e-mails between myself and
7  representatives from a group called True the Vote.
8    Q.  (By Ms. Westfall)  When did these exchanges
9  occur?
10    A.  The first e-mail is August 30, and the last one
11  is September 16, 2013.
12    Q.  Were the representatives from True the Vote
13  asking for your assistance?
14    A.  Yes.
15    Q.  What were they seeking from you?
16    A.  They were wanting updates on efforts to
17  implement voter -- voter -- getting identification to
18  voters and related matters, voter registration election
19  integrity issues.
20    Q.  Did this relate to EICs?
21    A.  I'm not sure that it related specifically to
22  EICs.  I think it was more identification in general,
23  but certainly, EIC would have been included in that.  I
24  can review to be sure.
25    Q.  Sure.  Why don't you take a moment to look and

253

¹ refresh?

² A. Yes. This e-mail on August 30 refers to EIC

³ application services, but I met with them in person, and

⁴ it was a broader discussion.

⁵ Q. What did they ask that you do with regard to

⁶ DPS?

⁷ A. I think they just wanted me to find out what

⁸ DPS was doing.

⁹ Q. Did you do that?

¹⁰ A. Yes.

¹¹ Q. Did you do that via e-mail or in -- in phone

¹² call or an in-person meeting or all of the above?

¹³ A. I think it was probably definitely a phone

¹⁴ call, and there may have been an e-mail to DPS as well.

¹⁵ Q. What did you -- who did you contact at DPS?

¹⁶ A. Candace Nolte, N-O-L-T-E. She's the government

¹⁷ relations person at DPS.

¹⁸ Q. What did you ask of Ms. Nolte?

¹⁹ A. My memory is -- if I can read my e-mail here to

²⁰ be sure. I inquired generally about access to election

²¹ identification.

²² Q. What did she tell you in response to those

²³ inquiries?

²⁴ A. Well, this e-mail says that she indicated that

²⁵ they don't have the resources now to add mobile office

254

¹ locations or new office locations, but they hope to have

² the different resources in the new year. And there was

³ also a reference -- a request to use DPS databases, let

⁴ private parties use DPS databases, and DPS is, for

⁵ obvious reasons, reluctant to allow access to their

⁶ databases.

⁷ Q. Did you have more than one conversation with

⁸ DPS on this topic?

⁹ A. I think there were probably more than one phone

¹⁰ call.

¹¹ Q. Were they a handful of phone calls?

¹² A. Yes.

¹³ Q. Was there any other information that you

¹⁴ gleaned from your phone calls besides what is

¹⁵ memorialized in this e-mail that you wrote on September

¹⁶ 16, 2013?

¹⁷ A. It seems there may have been more detail in

¹⁸ subsequent conversations about the extended hours

¹⁹ offered by DPS. I can't remember other specifics.

²⁰ Q. Did you convey the contents of that

²¹ conversation to anyone at True the Vote or other people?

²² A. Yes, and then this e-mail is to True the Vote

²³ representatives.

²⁴ Q. I guess my question is whether the sum total of

²⁵ everything you learned from DPS, was it conveyed to True

255

¹ the Vote?

² A. Yes, I believe there was a follow-up phone call

³ that I made to True the Vote.

⁴ Q. Do you see that in your e-mail you report that

⁵ DPS does not have the resources right now but they hope

⁶ to add additional resources next year for mobile

⁷ locations?

⁸ A. Right.

⁹ Q. Did you follow up to learn whether DPS in 2014

¹⁰ did have the resources to add mobile office locations or

¹¹ new office locations?

¹² A. I did not follow up. Again, I don't interact

¹³ typically with DPS at the Capitol, and I wasn't handling

¹⁴ general election issues last session.

¹⁵ Q. Why did they contact -- why did True the Vote

¹⁶ contact you?

¹⁷ A. I think they just stopped by. It's possible.

¹⁸ I think it was just a drop-in visit, and I was the one

¹⁹ who was most familiar with their issue. But it's also

²⁰ possible that -- I mean, I've done voter ID issues, and

²¹ they were referred to me. I can't remember the exact

²² nature of how I met them.

²³ Q. Did you take any steps independent of these

²⁴ communications with DPS and True the Vote to follow up

²⁵ on the lack of resources that DPS claimed was

256

¹ constraining DPS?

² A. I did not take efforts, but I'm not -- and I'm

³ not sure what efforts through the budget or other areas

⁴ may have been used to address the resource issue.

⁵ Q. Do you know whether anybody besides you took

⁶ any steps to provide DPS with additional resources?

⁷ A. No, I was not involved in DPS budget process.

⁸ Q. Are you aware of whether DPS in 2014 increased

⁹ the number of mobile locations?

¹⁰ A. I'm not aware.

¹¹ Q. Did they add any new driver license offices in

¹² 2014?

¹³ A. I'm not aware.

¹⁴ Q. Do you see that in Erin Anderson's response of

¹⁵ 9-16-2013, she alludes to -- she thanks you for your

¹⁶ efforts but then eludes to the fact that she had a made

¹⁷ an earlier flip response?

¹⁸ A. I see that reference.

¹⁹ Q. Do you know what that flip response is all

²⁰ about?

²¹ A. I can't recall what that's referring to. I

²² assume it was from something she said in our meeting,

²³ but I can't recall.

²⁴ MS. WESTFALL: I'm going to pass the

²⁵ witness.

BRYAN HEBERT                                        6/17/2014
CONFIDENTIAL TRANSCRIPT

65 (Pages 257 to 260)

257

1          MR. DUNBAR:  Thank you, Ms. Westfall.
2                    EXAMINATION
3  BY MR. DUNBAR:
4      Q.  Good afternoon, Mr. Hebert.  I'm Kelly Dunbar.
5  As I mentioned before, I represent the Texas League of
6  Young Voters' Education Fund and Imania Clark as an
7  individual.
8          THE REPORTER:  I'm sorry, why don't you
9  move down here.
10         MR. DUNBAR:  Sure.
11         (Changing seats.)
12         MS. HALPERN:  Just for clarification, I am
13 representing this witness and I'm not otherwise part of
14 this lawsuit.  Who is your client?
15         MR. DUNBAR:  The Texas League of Young
16 Voters' Education Fund.
17         MS. HALPERN:  What is that?
18         MR. DUNBAR:  It's a public interest
19 organization in Texas.  They're getting deposed tomorrow
20 by the State, so.
21         MS. HALPERN:  You represent voters like
22 under 22 or something?
23         MR. DUNBAR:  It's focused on registering
24 and issues relating to young voters in the state.
25         MS. HALPERN:  Thanks.  I appreciate that.

258

1          MR. DUNBAR:  And one individual who is a
2  student.
3          MS. HALPERN:  Okay.
4      Q.  (By Mr. Dunbar)  Mr. Hebert, good afternoon.  I
5  think my introduction is on the record.  Just to be
6  clear, I assume we will continue the deposition under
7  kind of the same ground rules and understanding that
8  Ms. Westfall provided you now early this morning.  Is
9  that acceptable to you?
10     A.  Yes.
11     Q.  Great.  And I think I'll just start.  I had a
12 few questions about some of the highly confidential
13 e-mails, so would ask that this part be designated as
14 highly confidential and that I'm hopeful we can move off
15 that and not need to worry about that with respect to
16 the rest of my questions.
17         MR. WHITLEY:  Mr. Dunbar, sorry to
18 interrupt.  Just to be clear, even though you're asking
19 the questions now, the defendants will assert the same
20 objections as to the highly confidential portions that
21 we did while Ms. Westfall was asking the questions.
22         MR. DUNBAR:  Understood.  Thank you.
23     Q.  (By Mr. Dunbar)  And I'd ask that you gather
24 Exhibit 176 and Exhibit 155.
25     A.  Can you tell me what 155 is?

259

1      Q.  Sure.  That's the March 4th, 2009 e-mail from
2  you to Janice McCoy.
3      A.  Okay.
4      Q.  And then you found 176?
5      A.  I did.
6      Q.  Okay.  And Ms. Westfall asked you some
7  questions about these, so I guess I want to start with
8  exhibit -- Exhibit 176.  And if you turn to --
9          MR. WHITLEY:  I'm sorry.  That's one of
10 the ones I didn't get.  Do you have an extra copy for
11 me?
12         MS. WESTFALL:  Which one is that?
13         MR. WHITLEY:  155.
14         THE WITNESS:  The summary of SB 14.
15         MR. DUNBAR:  I'm on 176 right now, which I
16 do not have an extra copy of.
17         MR. WHITLEY:  I've got 176.  I don't have
18 155.
19         MR. DUNBAR:  Oh, I'm sorry, 155.
20         MS. HALPERN:  What is 155?
21         MR. DUNBAR:  That's the Mr. Hebert e-mail
22 to Janice McCoy in March of 2009.
23         MS. HALPERN:  Oh, yeah.  Let me just see
24 if I can find that for you.
25         (Brief discussion off the record.)

260

1      Q.  (By Mr. Dunbar)  Okay.  And just to be clear,
2  so the record is clear on this point, this is an e-mail
3  and attachment from you on January 7, 2011, to a group
4  of Senate staffers; is that correct?
5      A.  January 27.
6      Q.  Yeah, you're correct.  Thank you for the
7  clarification.
8      A.  Uh-huh.
9      Q.  And on the first page after the cover e-mail, I
10 believe you answered this question for Ms. Westfall
11 already.  You explained that SB 14 would give Texas
12 arguably the strictest voter ID law in the country; is
13 that correct?
14     A.  That's what this says, yes.
15     Q.  And is it fair to describe this attachment as
16 advocating for the strictest photo ID law in the
17 country?
18     A.  I don't think it's advocating for the strictest
19 photo ID law in the country.  I think it's
20 characterizing it as arguably so, but then the next
21 sentence says, also, that I thought it was going to be
22 upheld under the constitution and Section 5 of the
23 Voting Rights Act.
24     Q.  Right.  So is it fair to say by January 27,
25 2011, it was the position of you or your office that

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

66 (Pages 261 to 264)

261

1    SB 14 should be adopted as it was -- as it was written?
2       **A.  Yes.  The Senate likes no changes from the**
3    **House as a general rule.**
4       Q.  But I'm asking about the position of you as a
5    representative of the office of the Lieutenant Governor
6    who were advocating enacting the bill as written; is
7    that correct?
8       **A.  I think that's fair.**
9       Q.  And again, that would be the strictest photo ID
10   law in the country, correct?
11      **A.  The bill as passed by the Senate at the time**
12   **was arguably the strictest photo ID law in the country,**
13   **yes.**
14      Q.  Okay.  No, that's helpful.  I then wanted to
15   turn to Exhibit 155, which is, again, a document that
16   we've talked about in the record.  This is an e-mail
17   from you on March 4, 2009 to Janice McCoy; is that
18   correct?
19      **A.  Yes.**
20      Q.  And on page 1 of this document, which I --
21   again, we've already discussed, you have, "Reasons to
22   Support SB 362 as Filed," is that correct?
23      **A.  Correct.**
24      Q.  And would you read into the record, if you
25   haven't already, what the first bullet is in support

262

1    that you've written?
2       **A.  The first bullet reads, "This bill improves**
3    **security in the election process but is not as**
4    **restrictive as Indiana and Georgia.  There's less chance**
5    **of disenfranchising elderly, poor or minority voters.**
6       Q.  And I believe the record already reflects in
7    answer to this question, apologies if I'm wrong, but you
8    drafted these sets of bullets; is that correct?
9       **A.  I think I did.**
10      Q.  And so I guess my question is:  What facts
11   changed from May -- or excuse me, March 2009 to January
12   2011 that led your office from advocating a least
13   restrictive version of the law to what you then
14   characterize as one of the most restrictive photo ID
15   laws in the country?
16         MS. HALPERN:  Objection, compound.
17      Q.  (By Mr. Dunbar)  You can answer.
18      **A.  I think the question, as I understand it, the**
19   **answer is these are different types of documents.  One**
20   **is talking points and essentially a sales pitch for**
21   **members to use to get support for the bill.  The other**
22   **is a summary of what is in the bill.  In 2009, this was**
23   **the bill before the Legislature, and so I believe the**
24   **Lieutenant Governor supported it.  In 2011, this was the**
25   **bill before the Legislature, and the Lieutenant Governor**

263

1    supported it.
2          MS. HALPERN:  And let the record reflect
3    that when he says in 2009, this was the bill before the
4    Legislature, the witness is referring to Exhibit 155.
5    And when he says in 2011, this was the bill before the
6    Legislature, the witness is referring to Exhibit 176.
7       **A.  And for both of those, when I say the**
8    **Lieutenant Governor supported it, that's based on his**
9    **public statements.**
10      Q.  (By Mr. Dunbar)  So would it be fair to say
11   there was no change in the position of your office from
12   2009 to 2011 with respect to how strict a photo ID law
13   should be?
14      **A.  I can't speak for the Lieutenant Governor**
15   **personally, but I can say on my own behalf, there was**
16   **support for a voter ID bill that improved the security**
17   **of elections in Texas.  And both bills did that to**
18   **varying extents.  And again, what was before the**
19   **Legislature in 2009 was supported by my office.**
20      Q.  So were there any facts that changed from 2009
21   to 2011 that in your offices, your view or your office's
22   view, justified a stricter photo ID measure than had
23   been discussed in 2009?
24      **A.  I'm not aware of facts that drove changes**
25   **between the bills, but again, I was not -- the**

264

1    **Lieutenant Governor was not a sponsor of either bill.**
2       Q.  Right.  And you've testified to that point
3    before, and I guess I just want to be clear on that.
4    That when you say he wasn't the sponsor, you mean in a
5    formal parliamentary sense, the Lieutenant Governor was
6    not the sponsor of the bill; is that correct?
7       **A.  Correct.  The Lieutenant Governor cannot file**
8    **bills.**
9       Q.  But did the Lieutenant Governor, I believe
10   you've stated, based on public statements, strongly
11   supported voter ID measures; is that correct?
12      **A.  That is correct.**
13      Q.  And that you and your office played a role in
14   drafting and implementing various iterations of the bill
15   between 2009 and 2011, correct?
16      **A.  I wouldn't use the word implemented, but yes,**
17   **we were consulted in the process.**
18      Q.  And you're not aware of any facts that change
19   from 2009 to 2011 that would have justified a stricter
20   form of a photo ID law?  Is that your testimony?
21         MS. HALPERN:  Objection, compound, calls
22   for -- misstates prior testimony.
23      Q.  (By Ms. Westfall)  You can answer.
24      **A.  I cannot recall specific factual evidence**
25   **between 2009 and 2011 as evidenced through testimony or**

---

265

1  other methods that I was aware of, but it is possible
2  there were additional examples of fraud that I'm
3  forgetting.  It's possible that there was additional
4  input from experiences of other states.  Beyond those
5  things, I'm not sure.
6      Q.  But sitting here today, you can't recall any
7  specific instances of additional fraud or examples from
8  other states; is that correct?
9      A.  I can't recall right now.
10     Q.  And I'd ask that you take a look at Exhibit
11 166, which again is also highly confidential.  And then
12 after we're done talking about this, we can probably
13 conclude the highly confidential portion.  This is the
14 January 24, 2011 e-mail chain involving Jonathan
15 Stinson, Wroe Jackson.
16     A.  Yes.
17     Q.  And if you turn to page -- I guess to Texas
18 00265541, the second bullet down, do you see the
19 question:  "Why is this bill different from the bill you
20 filed last session?"
21     A.  Yes.
22     Q.  And can you read -- can you read into the
23 record what your answer is?
24     A.  The question is:  "Why is this bill different
25 from the bill you filed last session?"

---

266

1           And the -- I think is a proposed response
2  is:  "We have had two additional years to see photo ID
3  working in other states and two additional years to see
4  that voter fraud is still a problem.  Only a true photo
5  ID bill can deter and detect fraud at the polls and can
6  protect the public's confidence in elections.  Plus, I
7  believe that photo ID is simpler and less confusing for
8  the voters."
9      Q.  And I believe your prior testimony is that you
10 did not write that response; is that correct?
11     A.  That's correct.
12     Q.  Would you agree with that response?
13     A.  Seems like a fair response.
14     Q.  And again, the response references two
15 additional years to see photo ID working in other
16 states.  What did you understand that to mean at the
17 time when you saw these bullets?
18     A.  I can't recall what I thought at the time.
19 Looking at it now, I -- it seems evident on its face
20 that states that had voter ID had not experienced
21 problems, and in fact, had seen increases in voter
22 turnout.
23     Q.  So you would interpret working in that sentence
24 to mean an actual increase in voter turnout?
25     A.  That could be one interpretation of working.

---

267

1      Q.  Okay.  And there's a second part of that
2  sentence then says that there have been two additional
3  years to see that voter fraud is still a problem,
4  correct?
5      A.  Correct.
6      Q.  And but again, I believe that you've just
7  testified that you can't recall any specific examples of
8  voter fraud between 2009 and 2011 that would justify a
9  stricter voter ID law, correct?
10     A.  I cannot recall specific examples.  I know as
11 part of my duties, tracking election legislation, in
12 general, there were constant examples in the news that
13 almost every election of some sort of fraud or another.
14     Q.  And in general, when you consider these
15 instances of fraud, did you draw distinctions between
16 the types of fraud that were at issue?
17     A.  As a legal matter or as a professional matter?
18     Q.  As a policy matter, was it relevant to you
19 whether the actual fraud that you perceived to be a
20 problem was in-person voter fraud, the type of fraud
21 that would be addressed by SB 14?
22     A.  In assessing whether fraud, in general, was a
23 problem, I didn't make distinctions.  In addressing
24 potential legislation in the future to address those
25 problems, I probably did.

---

268

1      Q.  So as long as there was, quote/unquote,
2  evidence of voter fraud, you saw that as a rationale for
3  SB 14 across the board, correct?
4      A.  I -- yeah, I do.
5      Q.  Okay.  I think that concludes the highly
6  confidential portion unless something else comes up.
7           SB 14 does include student IDs as an
8  acceptable form of ID; is that correct?
9      A.  Correct.
10     Q.  And prior to SB 14, I believe we've already
11 talked about student IDs would have been an acceptable
12 form of ID; is that correct?
13     A.  In earlier sessions, in some drafts, student
14 IDs were included, yes.
15     Q.  Sorry.  And my question -- my question, I don't
16 think was clear.  I meant prior to SB -- SB 14 going
17 into effect, setting aside prior versions of voter ID
18 legislation, a student voter in Texas could use a
19 student ID to vote; is that correct?
20     A.  I'm actually not sure if that's correct.
21 Meaning, in 2009, if a student showed up and their only
22 identification was a student ID, could they vote?
23     Q.  Right.
24     A.  I'm not sure that's true.
25     Q.  Let me take a look, then, I may be misreading

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

68 (Pages 269 to 272)

269

1  things, so you can help me out here.  This would be
2  Exhibit 150, which is not highly confidential.
3          MR. WHITLEY:  What is that?
4          MS. HALPERN:  362.
5          MR. DUNBAR:  Yeah, this is 362, right,
6  which has the strike-through of what I took to be
7  existing law.  So let me clarify that if I'm wrong.
8      A.  Got it.
9      Q.  (By Mr. Dunbar)  Found it.  If you look at page
10  6 of the document, or I guess, for the record, can you
11  tell me what Exhibit 150 is?
12      A.  Exhibit 150 is a draft of Senate Bill 362 at
13  some point in the process.
14      Q.  And you see throughout the draft underlining
15  and strike-throughs, correct?
16      A.  Correct.
17      Q.  And is it correct to say that underlining
18  represents the additional statutory text?
19      A.  The underlined is the proposed new text, and
20  the struck-through is the existing law.
21      Q.  Okay.  Then on page 6 of the bill, under the
22  first heading at the top, you see strike-through?
23      A.  Uh-huh.
24      Q.  Beginning with form of identification
25  containing -- that states, "Form of identification

270

1  containing the person's photograph that establishes the
2  person's identity," correct?
3      A.  Correct.
4      Q.  And to the extent that a student ID had a
5  photograph on it, would that have satisfied the existing
6  law there allowing someone to use a student ID to vote?
7      A.  I suppose it could have.  I'm not sure how
8  that's interpreted by election officials.
9      Q.  Okay.  So it's your testimony that in
10  considering SB 14 and whether to include student IDs or
11  not, you were not aware of whether student IDs could
12  actually historically have been used to vote?
13      A.  I can't recall if I was aware of it at the
14  time, but, so I'm not sure.
15      Q.  Okay.  And I believe you -- you answered my
16  first question which may have been unclear, which is the
17  second question I wanted to ask.  The prior versions of
18  draft or proposed photo ID legislation that were
19  considered in this relevant time frame did include
20  student IDs as an acceptable form of ID; is that
21  correct?
22      A.  That's correct.
23      Q.  And do you recall when the decision was made to
24  drop student IDs as a form of acceptable ID from the
25  bill, from the draft bill?

271

1      A.  I don't recall.  I mean, again, there was an
2  ongoing discussion amongst senators about what forms of
3  identification are actually reliable, and in the context
4  of that conversation, I believe it was removed.
5      Q.  You don't recall who first suggested that
6  students IDs not be an accepted form of voter
7  identification?
8      A.  I don't recall.
9      Q.  As you recall here today, it was not your
10  office that proposed the idea?
11      A.  Correct.
12      Q.  So it was likely proposed by someone in the
13  Legislature?
14      A.  Yes.
15      Q.  And did your office have an official position
16  on the question of whether student IDs should or should
17  not be included as an acceptable form of ID?
18      A.  I know I was -- I don't think we had an
19  official position.  I have and had concerns about
20  whether or not student IDs are secure forms of
21  identification given the problems I've discussed:  The
22  lack of expiration dates, the varying degrees of
23  security, the different types of institutions and
24  locations of institutions and technological capability
25  of institutions and et cetera.

272

1      Q.  And did you discuss -- did you have discussions
2  with legislative staff about whether to include student
3  IDs?
4      A.  It's possible.  I can't recall specific
5  conversations.
6      Q.  Would you have talked to Janice McCoy about the
7  issue?
8      A.  Probably.
9      Q.  Would you have talked to -- would there be
10  others that you likely would have talked to about the
11  subject?
12      A.  I think possibly anyone in these e-mails we've
13  covered today.  Senator -- staffers from Senator
14  Williams, Senator Duncan, Senator Huffman, senators who
15  were actively involved in supporting the legislation, as
16  well as, potentially, again, as I mentioned, I had
17  interacted with senators and their staffs daily from
18  both parties, so it's possible I talked to others about
19  it.
20      Q.  And would there be one particular legislative
21  office that you would say was the strongest proponent of
22  not including student IDs as a form of acceptable ID?
23      A.  I don't recall anyone being particularly
24  outspoken.
25      Q.  So there was no one that was really that

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

69 (Pages 273 to 276)

---

273

1  supportive of the idea?
2      **A.  Supportive of the idea of removing --**
3      Q.  Right.
4      **A.  -- student IDs?  No one senator or person**
5  **stands out to me.**
6      Q.  Okay.  And I think you've gotten -- you got
7  into this slightly before in answering a different
8  question, but what was the purpose of excluding student
9  IDs or the purposes of excluding students IDs as a form
10 of acceptable identification?
11     **A.  I don't know --**
12         MS. HALPERN:  Objection, asked and
13 answered.
14     Q.  (By Mr. Dunbar)  I hadn't asked the question
15 before so you can answer.
16     **A.  I don't know the author's intent, because I'm**
17 **not the author.  As I've said, my understanding is and**
18 **my -- my position is that those forms of ID are**
19 **inherently less secure and less reliable.**
20     Q.  And at the time that SB 14 was being
21 considered, were you aware of any facts or evidence that
22 suggested student IDs had been used for voting fraud in
23 Texas?
24     **A.  Not that I recall.**
25     Q.  Were you aware of any evidence that student IDs

---

274

1  had been used for voting fraud anywhere in the country?
2      **A.  Not that I recall.**
3      Q.  Was any analysis done of how many people used
4  students IDs historically in elections to vote?
5      **A.  Not that I recall.  I know there was debate**
6  **about the use of student IDs, and I can't remember if**
7  **there was an analysis of what percentage of voters used**
8  **those IDs.  I know the document that was presented to me**
9  **earlier estimated that something along the lines of 95**
10 **percent of voters possessed a driver's license, but I**
11 **don't know if there was similar analysis for student**
12 **IDs.**
13     Q.  So you're sitting here today, you're aware of
14 no analysis that was done on the question of the number
15 of -- the number of voters that had historically used --
16 excuse me, that had historically used students IDs to
17 vote, correct?
18     **A.  Correct.**
19     Q.  And was there any discussion about the effect
20 of excluding student IDs on voter -- on student voter
21 turnout generally?
22     **A.  Yes.  There was debate on the floor about that**
23 **issue, I recall.**
24     Q.  And what was the nature of that debate on the
25 floor?

---

275

1      **A.  Opponents of the bill were concerned that it**
2  **would make it harder for students to vote and proponents**
3  **disagreed.**
4      Q.  And was there any analysis done by proponents
5  on the question of whether those assertions were
6  correct?
7      **A.  I am not aware.**
8      Q.  Was there any discussion about the effect of
9  excluding student IDs on voting at historically Black
10 colleges or universities in the state?
11     **A.  Was there any analysis?**
12     Q.  Correct.
13     **A.  I'm not aware.**
14     Q.  So there was no assessment on the impact of
15 excluding student IDs on minority voters?
16     **A.  I'm not aware of any analysis.**
17     Q.  I believe you mentioned earlier the possibility
18 of student IDs being forged because they're less secure.
19 Was there any comparison done of the ability or the ease
20 of forging student IDs versus other forms of accepted
21 identification?
22     **A.  I don't recall of specific studies, but I have**
23 **some memory of floor debate or maybe even student IDs**
24 **were held up as an example to show that, for example,**
25 **there was no expiration date on them, that they didn't**

---

276

1  **have, you know, backing bar codes or things that might**
2  **indicate it was a formal identification.  But I can't**
3  **remember, specifically, studies that might have been**
4  **done.**
5      Q.  And did your office consider alternatives to
6  banning the use of student IDs to address some of the
7  problems that you've identified with their potential
8  use?
9      **A.  My memory is at different stages of the -- of**
10 **similar legislation over multiple sessions, did have**
11 **different forms of student ID.  I think one was all**
12 **student IDs.  One was only government-issued student IDs**
13 **in Texas.  And I certainly considered it in my head as I**
14 **was providing input on this legislation.**
15     Q.  But presumably one alternative to banning the
16 use of student IDs while also addressing the concerns
17 you've addressed would be for the state to adopt
18 guidelines or best practices with respect to
19 university's issuance of students IDs, correct?
20     **A.  That could have been done.  I'm not sure if**
21 **that would have been effective.  And again, there's lot**
22 **of potential alternatives that were not considered or**
23 **adopted.**
24     Q.  So that alternative was simply not considered?
25 Is that your testimony?

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

---

277

1    A.  I'm not aware that it was considered.
2    Q.  Were there any other specific alternatives
3  considered to address some of the concerns with the
4  secureness of student IDs that you've discussed as
5  opposed to simply an outright ban on their use?
6    A.  I don't believe so.  And for my own sake,
7  again, I think the impression was that people who had
8  student IDs also had some other form of official photo
9  ID.
10   Q.  And what was the basis for that assumption?
11   A.  The entirety of testimony over multiple
12 sessions.
13   Q.  Is there any specific testimony you can recall
14 that addressed that subject?
15   A.  I can't recall specific testimony.
16   Q.  But it's your testimony you -- you may recall
17 someone who testified that if you have a student ID,
18 you're also likely to have other forms of acceptable ID?
19   A.  Again, I think, just today, I can't remember if
20 this is jogging my memory or if it's what I've just
21 learned today, but there was an estimate that 95 percent
22 of voters have a driver's license.  So that would
23 confirm that, you know, to the extent students are
24 voters, they also have a driver's license, at least in
25 addition to whatever other CHL or passports or other

---

278

1  forms of ID are acceptable.
2    Q.  And I believe we've already established that
3  the Supreme Court's decision in Crawford was decided in
4  2008.  Does that sound about right?
5    A.  I think that's right.
6    Q.  And I believe you testified that you -- well, I
7  shouldn't characterize your testimony.  Did you pay
8  close attention to Crawford after 2008?
9    A.  Yes.
10   Q.  And the attempt was, I believe as you put it,
11 to attempt to make sure that Texas' photo voter ID law
12 would comply with the boundaries established by the
13 Supreme Court in Crawford; is that correct?
14   A.  I certainly hoped it would.
15   Q.  And would it be fair to say you did a
16 comprehensive assessment of whether Texas' proposed
17 photo ID laws complied with the Supreme Court's decision
18 in Crawford?
19       MS. HALPERN:  Objection, vague.
20   A.  Yeah, I read Crawford.  I've read the various
21 stages of the bill and made assessments of whether it
22 might be permissible under Crawford.  But obviously,
23 there's no way to know for sure until the court rules.
24   Q.  (By Mr. Dunbar)  And was your analysis of
25 Crawford an attempt to -- well, strike that.

---

279

1       With respect then to the issue of post
2  Crawford, I believe the record already establishes that
3  your office at least undertook no analysis of the number
4  of registered voters in the state without an acceptable
5  form of identification under SB 14; is that correct?
6    A.  I'm not aware of that analysis.
7    Q.  Do you think that analysis would have been
8  helpful in assessing the burden standard that Crawford
9  established?
10   A.  I think, again, for my own sake, I can't speak
11 for anyone else, that the entirety of the testimony over
12 multiple sessions showing the impact on voter turnout in
13 other states with photo ID, including Indiana, as well
14 as the absence of any individual who was unable to
15 obtain an ID and brought that claim to court, and any
16 other state with photo ID was indicative to me that it
17 was not going to be an undue burden.
18   Q.  Okay.  And in engaging in this analysis in the
19 wake of Crawford, how did you define a permissible and
20 an impermissible burden?
21   A.  I suppose, ultimately, about -- it was as an
22 official manner, can the person obtain an identification
23 and then what hurdles exist to get that identification,
24 I'm not sure I can quantify it in any specific way.
25   Q.  Okay.  Well, at several points in the

---

280

1  deposition today, I believe you said that you were
2  looking at whether there would be any individual that
3  would be unable to obtain a form of voter ID.  Does that
4  accurately summarize your testimony?
5    A.  That is one thing that I considered was the
6  success of plaintiff's in other jurisdictions with photo
7  ID requirements.
8    Q.  So the burden standard you applied in thinking
9  about voter identification legislation in the wake of
10 Crawford was whether the Texas law would leave any
11 voters unable to obtain a form of ID?
12   A.  No, that's not the only thing I considered.
13   Q.  What else did you consider?
14   A.  Again, what other hurdles might -- what burdens
15 might be put upon a person trying to obtain
16 identification or cast a vote and do the measures laid
17 out in various forms of this legislation address those
18 burdens and/or outweigh those burdens?
19   Q.  Okay.  And as a procedural matter, how did you
20 go about attempting to identify the hurdles or burdens
21 that an individual might face in attempting to get an
22 EIC?
23   A.  To get an EIC?
24   Q.  Correct.  To obtain an acceptable form of
25 identification.

---

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

---

281

1    **A.  Just looking at the requirements of the**
2    **statute --**
3           MR. WHITLEY:  I object to that question.
4    Are we talking about EICs or all the different forms of
5    identification on election day?
6           MR. DUNBAR:  Well, I'm assuming that an
7    EIC is the lowest cost option, so I ask -- but I'll
8    ask the question generally.
9       Q.  (By Mr. Dunbar)  What you -- you've testified
10   or you've just testified that, in thinking about the
11   burden that the law would impose, you thought about the
12   hurdles that an individual might have to overcome in
13   order to obtain an acceptable form of ID.  And I'm
14   asking, my question is -- and thank you for the
15   clarification.  With respect to any of the acceptable
16   forms of ID, what process did you use to identify those
17   hurdles?
18      **A.  Again, I just looked at the requirements to**
19   **obtain the forms of identification.**
20      Q.  So you did no analysis of the actual location,
21   locations in the state that a voter would have to go to
22   get -- to acquire one of the acceptable forms of
23   identification?
24      **A.  I believe there was significant discussion**
25   **during the floor debate and the Committee of the Whole**

---

282

1    about that topic.
2       Q.  But your office's analysis in the wake of
3    Crawford in analyzing the burden issue, you didn't look
4    into that issue?
5       **A.  I don't think I did a separate analysis apart**
6    **from the hours of public testimony.**
7       Q.  And so I also take it that means you did no
8    analysis of the hours of operation in the various DPS
9    locations; is that correct?
10      **A.  I did not do any independent analysis apart**
11   **from the hours of testimony, correct.**
12      Q.  And you would agree, wouldn't you, that those
13   factors would be relevant to an assessment of the burden
14   required with achieving an acceptable form of
15   identification?
16      **A.  They are relevant.  And again, I feel like they**
17   **were adequately addressed in the hours of testimony on**
18   **this bill over multiple sessions.**
19      Q.  In any of those hours of testimony, do you
20   recall any quantification that was done with respect to
21   identifying the burdens of acquiring an acceptable form
22   of identification?
23      A.  Sure.  I mean, I know there was -- and again,
24   it was presented to me in an exhibit today, there was a
25   specific number of counties that did not at the time

---

283

1    have offices located in them.  There was discussion
2    about the operating hours of those offices that do
3    exist.  There was discussion about the percentage of the
4    population that actually lives in these counties that
5    don't have offices and whether that is a significant
6    number of the population or not.  And then there was a
7    discussion about what efforts going forward the
8    Secretary of State and DPS and other agencies might
9    undertake to -- to expand the access to identification.
10      Q.  And again, though, you didn't -- in undertaking
11   this burden analysis in the wake of Crawford, you didn't
12   do an independent study or analyses of the number of
13   voters that would actually be affected by SB 14; is that
14   correct?
15      **A.  I did no independent analysis.**
16           MS. HALPERN:  Counsel, how much more do
17   you think you have?
18           MR. DUNBAR:  10 to 15 minutes probably.
19           MS. HALPERN:  How much more time does he
20   have?
21           THE REPORTER:  I have to go off the record
22   to compute.
23           (Off the record from 5:38 to 5:40 p.m.)
24           MR. DUNBAR:  Back on the record.  Can you
25   repeat the last question?

---

284

1           (Requested portion read by the court
2    reporter.)
3       Q.  (By Mr. Dunbar)  And would there be any answer
4    to that analysis that would change your view of whether
5    SB 14 imposes an undue burden on the exercise of voting
6    rights?
7           MS. HALPERN:  Objection, calls for a legal
8    conclusion.
9       Q.  (By Mr. Dunbar)  Go ahead, sir.
10      **A.  So if an analysis showed that a significant**
11   **number of students do not have one of the acceptable**
12   **forms of ID, including a driver's license, and could not**
13   **obtain one of those forms of identification, then,**
14   **possibly, that would make me second-guess my conclusion.**
15      Q.  My question was a slightly more basic one,
16   which is:  If, hypothetically, you had undertaken the
17   analysis of the number of registered voters without an
18   acceptable form of ID and it turned out to, say, be 20
19   percent of the registered voter population, would you
20   find that significant or relevant to the burden
21   analysis?
22      A.  Possibly.
23      Q.  But it wouldn't change your view of
24   permissibility of SB 14?
25      A.  It would depend on the exact nature of that

---

BRYAN HEBERT                                                           6/17/2014
CONFIDENTIAL TRANSCRIPT

---

**285**

1  finding, I suppose.
2      Q.  And would there be any level of racial
3  disparity with respect to the effect of SB 14 that would
4  have been -- that would have changed your analysis of
5  the burden imposed by the law?
6      A.  Repeat that question.
7      Q.  Sure.  Would there be any level of racial
8  disparate effect resulting from SB 14 that would have
9  changed your assessment of whether SB 14 was permissible
10  under Crawford?
11     A.  It's possible.  I'd like to think any new
12  information could change my calculation.
13     Q.  Okay.
14     A.  And again, all evidence that -- the weight of
15  the evidence that I had observed over multiple sessions
16  indicated that it would not be a particular burden to a
17  particular constituency.
18     Q.  And that was largely based on -- well, strike
19  that.
20         That was based entirely on the studies
21  you've referenced from other states suggesting there was
22  no turnout drop in the wake of the enactment of photo ID
23  laws; is that correct?
24     A.  No, it was also based on the multiple witnesses
25  by supporters and opponents of the bill over three or

---

**286**

1  four legislative sessions, as well as committee
2  testimony, as well as debate on the House floor and
3  Senate floor during that time.
4      Q.  And how did that debate or testimony convince
5  you that SB 14 would not have a racially disparate
6  impact?
7      A.  I just -- I saw no convincing argument or
8  evidence that it would.  And neither did the minority
9  members of the House that voted for the bill or anybody
10  else who voted for the bill, which passed in both
11  chambers.
12     Q.  And I believe you've mentioned a few times that
13  SB 14 was contentious and resulted in this extreme
14  partisan split; is that correct?
15     A.  Correct.
16     Q.  And --
17     A.  I don't know if I used the word extreme, but
18  there was a partisan fight, yes.
19     Q.  What would you -- how would you explain the
20  deep partisan divide over the issue?
21     A.  I don't know.  I don't know that I can.
22     Q.  You -- you're -- all of your time working on
23  photo voter identification laws, you've never heard
24  anyone suggest that such laws might help a particular
25  party?

---

**287**

1      A.  I've heard people suggest lots of things, that
2  it would help a particular party, that certain people
3  would benefit from fund raising by opposing the bill.
4  I've heard lots of things.  That doesn't mean they're
5  correct.  And I can't get in the mind of any individual
6  senator to know why they support or why their party
7  supports or opposes a bill.
8      Q.  In any private conversations that your office
9  had with Texas legislatures, was the -- a potential
10  partisan advantage from SB 14 discussed?
11     A.  The meetings I had, was a partisan advantage
12  discussed?
13     Q.  If the potential that SB 14 would benefit the
14  Republican party?
15     A.  No.
16     Q.  That was never discussed in any meeting?
17     A.  No.
18     Q.  You mentioned election identification
19  certificates and mobile EIC stations as a part of an
20  implementation effort that in your view has helped make
21  SB 14 effective; is that correct?
22     A.  Correct.
23     Q.  And this was in response to, I believe, some
24  questions from a constituency group that you discussed
25  with Ms. Westfall, you made inquiries to DPS, right?

---

**288**

1      A.  Correct.
2      Q.  And are you aware or as a part of that
3  analysis, I should say, did you ask questions about the
4  location of the mobile EIC stations or their hours of
5  operation?
6      A.  I can't recall.  And I know some of my
7  information came from news accounts on the subject, and
8  I can't recall right now where those were located or
9  directed.
10     Q.  So you did ask specific questions about the
11  hours of operations of the mobile EIC units?
12     A.  I don't know that I asked specific questions of
13  DPS.  I may have.  And again, I know I've read news
14  accounts of extended hours and so forth.
15     Q.  Would it surprise you if someone from DPS took
16  the position that it would be most convenient for those
17  needing to get election identification certificates to
18  be open only during 9 to 5 business hours?
19     A.  Would it surprise me if DPS said it's most
20  convenient to do it from 9 to 5?
21     Q.  Yes.
22     A.  I would defer to their judgment, I suppose, on
23  what hours are most effective for operating their
24  offices.
25         MR. DUNBAR:  That's all I have.

---

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

73 (Pages 289 to 292)

---

289

1      MS. WESTFALL:  Okay.  We are going to keep
2  this deposition open pending any motion to compel
3  responses to testimony for which you were ordered and
4  instructed by your counsel not to answer on the basis of
5  legislative privilege, deliberative process privilege,
6  or attorney-client privilege.
7      MS. HALPERN:  Are you planning on filing
8  such motions?
9      MS. WESTFALL:  We will certainly take that
10  under consideration.  I need to consult with my counsel.
11      MS. HALPERN:  Okay.
12      MS. WESTFALL:  Thank you for your time
13  today.
14      (Discussion off the record from 5:46 to
15  5:50 p.m., where it was agreed to designate the entire
16  transcript as highly confidential.)
17      MS. HALPERN:  I want to put on the record
18  that we are reserving the right to read and sign.  You
19  can e-mail me the original for signature.
20      (Deposition concluded at 5:51 p.m.)
21
22
23
24
25

---

290

1          CHANGES AND SIGNATURE
2      RE: VEASEY, ET AL. VS. PERRY, ET AL.
3  PAGE LINE CHANGE          REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20      I, BRYAN HEBERT, have read the foregoing deposition
21  and hereby affix my signature that same is true and
22  correct, except as noted above.
23
24          _____
25          BRYAN HEBERT

---

291

1          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
2              CORPUS CHRISTI DIVISION
3  MARC VEASEY, et al.,     )
4      Plaintiff,      )
5  VS.              ) CIVIL ACTION NUMBER:
               ) 2:13-CV-193 (NGR)
6  RICK PERRY, et al.,     )
               )
7      Defendants.      )
8  _____
  UNITED STATES OF AMERICA,   )
9      Plaintiff,      )
10  VS.              ) CIVIL ACTION NUMBER:
11              ) 2:13-CV-263 (NGR)
  TEXAS LEAGUE OF YOUNG VOTERS )
12  EDUCATION FUND, et al.,     )
13  Plaintiff-Intervenors,  )
               )
14  TEXAS ASSOCIATION OF HISPANIC )
  COUNTY JUDGES AND COUNTY    )
15  COMMISSIONERS, et al.,     )
16  Plaintiff-Intervenors,  )
17  VS.              )
               )
18  STATE OF TEXAS, et al.,     )
               )
19      Defendants.      )
20  _____
  TEXAS STATE CONFERENCE OF   )
21  NAACP BRANCHES, et al.,     )
22      Plaintiffs,      )
               ) CIVIL ACTION NUMBER:
23  VS.              ) 2:13-CV-291(NGR)
               )
24  NANDITA BERRY, et al.,     )
               )
25      Defendants.      )

---

292

1  BELINDA ORTIZ, et al.,     )
               )
2      Plaintiffs,      )
               )
3  VS.              ) CIVIL ACTION NUMBER:
               ) 2:13-CV-348(NGR)
4  STATE OF TEXAS, et al.,     )
               )
5      Defendants.      )
6  _____)
7          REPORTER'S CERTIFICATION
          DEPOSITION OF BRYAN HEBERT
8              JUNE 17, 2014
9      I, Chris Carpenter, Certified Shorthand Reporter in
10  and for the State of Texas, hereby certify to the
11  following:
12      That the witness, BRYAN HEBERT, was duly sworn by
13  the officer and that the transcript of the oral
14  deposition is a true record of the testimony given by
15  the witness;
16      That the deposition transcript was submitted on the
17  _____ day of _____, 2014, to the witness or to the
18  attorney for the witness for examination, signature and
19  return to _____,
20  by _____, 2014, and if returned,
21  the original transcript will be forwarded to Elizabeth
22  Westfall, the custodial attorney;
23      That the amount of time used by each party at the
24  deposition is as follows:
25      Ms. Westfall:  5 hours, 54 minutes

---

BRYAN HEBERT                                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

293

1    Mr. Dunbar:  42 minutes
2    I further certify that I am neither counsel for,
3  related to, nor employed by any of the parties or
4  attorneys in the action in which this proceeding was
5  taken, and further that I am not financially or
6  otherwise interested in the outcome of the action.
7    Certified to by me this 17th of June, 2014
8
9
10
     Chris Carpenter, Texas CSR 1151
11   Expiration Date:  12/31/2014
     701 Brazos, Suite 380
12   Austin, TX  78701
     (512)292-4249
13
14  Firm Registration No. 344
15
16
17
18
19
20
21
22
23
24
25

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

1

## A

**$22** 101:8,11,15
  163:9,12
**a.m** 2:17 58:24 102:6
  102:6
**ability** 9:17 55:11
  82:3 174:14 175:9
  177:6 275:19
**able** 30:1,6 54:10
  55:8,23 79:13 80:24
  126:21 162:7
  193:24 237:13,14
**above-mentioned**
  201:22
**above-styled** 2:16
**absence** 279:14
**absentee** 111:13
  164:4 198:2,4
**abused** 160:24
**acceptable** 36:12,25
  37:7 44:15 46:8
  79:22 88:4 90:24
  92:9 95:10,19 99:12
  107:25 111:17,18
  112:2 138:8 143:17
  144:16 146:7 171:8
  175:8 176:12
  191:25 211:25
  222:14 225:11
  226:4 232:24
  233:22 234:13
  258:9 268:8,11
  270:20,24 271:17
  272:22 273:10
  277:18 278:1 279:4
  280:24 281:13,15
  281:22 282:14,21
  284:11,18
**accepted** 271:6
  275:20
**access** 101:14,16
  141:12 162:23
  163:14 183:25

253:20 254:5 283:9
**accessible** 186:10
**accomplish** 97:19
  98:2,7 162:21 180:5
  211:11
**accomplished** 211:3
**account** 12:9 109:14
**accounts** 21:15,16,20
  21:21 33:5 124:24
  247:25 250:23
  251:4 288:7,14
**accredited** 225:23
**accurate** 42:9 160:10
  160:13 167:14
  176:11 201:16
**accurately** 8:13
  205:8 280:4
**achieve** 210:22
**achieving** 282:14
**acknowledges** 91:20
  91:21
**acquire** 281:22
**acquiring** 282:21
**act** 53:10 69:15 72:11
  73:8 109:21 110:11
  112:5,7,25 113:3,10
  113:19 114:1
  141:17 164:6
  169:18 195:22
  233:15 245:15
  246:4,17,19 260:23
**acting** 19:22,22 53:2
  53:4 81:24
**action** 1:5,10,22 2:3
  7:11 8:7 46:1,13
  69:19 78:2 86:4
  215:9 219:12,18
  244:15 247:5 291:5
  291:10,22 292:3
  293:4,6
**actions** 57:3 69:11,13
  69:22,24,25 75:3
  240:1,2 244:13
**actively** 272:15

**activities** 21:13 81:24
**activity** 233:1
**acts** 157:13,13
**actual** 193:23 266:24
  267:19 281:20
**add** 32:2 33:13 60:20
  78:25 253:25 255:6
  255:10 256:11
**added** 89:5 172:8
  180:7,12 188:2
  191:20 237:18,24
  238:24
**adding** 89:8 171:8,10
  171:21 172:20
  173:18 175:13
**addition** 127:5
  164:15 211:24
  233:22 277:25
**additional** 37:7 52:8
  89:4 102:22 134:3
  171:10 177:4
  179:22 180:7 189:2
  191:17 212:20
  233:22 234:13
  255:6 256:6 265:2,3
  265:7 266:2,3,15
  267:2 269:18
**address** 50:21 52:3,6
  52:7 161:20 170:19
  179:23 244:19
  246:23 256:4
  267:24 276:6 277:3
  280:17
**addressed** 199:10
  245:12 267:21
  276:17 277:14
  282:17
**addresses** 12:20
  50:17,21
**addressing** 240:22
  267:23 276:16
**adequately** 211:8,8
  282:17
**administered** 185:17

**administration**
  184:17 235:11,12
  236:5,6,22,22 237:2
  247:18
**administrative** 131:8
**admissibility** 79:17
  81:6
**admissible** 159:7
**admission** 79:5
**adopt** 56:7,12 59:6
  59:10 61:20 223:16
  224:12 276:17
**adopted** 58:17 59:14
  61:24 62:5,6 152:17
  152:19 153:9,10,17
  153:18 188:16
  211:16,19 221:14
  221:19,24 222:3,19
  222:21 223:1
  224:10,20,22 225:7
  226:21 232:12
  239:4 261:1 276:23
**adopting** 162:18
  223:4
**adoption** 37:13 60:7
  61:18 199:20
**adopts** 59:8
**advance** 29:21 31:7
  60:7 104:23 210:7
  210:15
**advanced** 27:2
  189:24
**advancing** 26:16,23
  29:17
**advantage** 287:10,11
**adverse** 68:25 223:9
**adversely** 42:10
  94:11 132:24 242:1
  242:10
**advice** 15:24 16:23
  17:24 30:10 31:25
  86:3,9,14 107:15
  115:13
**advise** 228:3

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

2

**advised** 200:13 210:3
**advising** 199:8
  201:12,13 228:6
  231:20
**advisor** 203:11
**advisory** 25:22
**advocating** 96:8
  260:16,18 261:6
  262:12
**Affairs** 35:14 64:16
  64:17,18 66:25
  87:16 127:1 184:19
  237:2
**affect** 9:17 236:16
**affidavit** 45:23 46:4,6
  166:17 195:9 196:2
  221:10
**affidavits** 195:16,20
**affiliation** 109:18
**affirmative** 58:2
  63:24
**affix** 290:21
**afford** 184:6
**African** 241:2,5
  242:4 243:8
**African-American**
  178:11 179:1
**afternoon** 257:4
  258:4
**age** 108:23 148:21
  149:2,18 191:7
**agencies** 133:12
  147:13 183:20
  222:13 223:8 283:8
**agency** 130:4 171:17
  171:18 185:17
  239:12
**agenda** 33:17,18
**aggressively** 169:17
**ago** 35:8 65:10 87:18
  90:7 114:3 115:4
**agree** 79:1 82:22,23
  82:23 134:20
  194:12 241:7,9

266:12 282:12
**agreed** 78:14 289:15
**ahead** 30:2 69:2 74:5
  108:13 137:17
  156:17 190:4,8
  195:6 233:11
  244:10 284:9
**aide** 218:18
**al** 1:3,6,12,15,18,21
  1:24 2:1,4 3:7 290:2
  290:2 291:3,6,12,15
  291:18,21,24 292:1
  292:4
**ALEC** 44:11,12
**Allison** 19:11,13
  248:22
**allow** 43:12 47:13
  62:20 146:22,25
  147:7,23 172:23
  177:8 204:5 224:25
  254:5
**allowable** 160:18
**allowed** 36:7 47:10
  74:24 88:7 90:25
  91:7 96:3 98:6
  111:25 164:11
  165:2 168:2
**allowing** 39:17 62:13
  92:22 94:16 95:1,5
  136:1 140:10
  143:19,21 176:17
  177:5 195:8 270:6
**allows** 162:25
**allude** 96:19 156:4,21
**alluded** 48:13
**alludes** 106:20
  124:19 256:15
**aloud** 143:2
**alter** 98:13
**alternative** 95:21
  134:3 191:24
  276:15,24
**alternatively** 151:5
**alternatives** 93:8

179:20 276:5,22
  277:2
**Amanda** 189:12,13
**amend** 72:15
**amending** 150:16
**amendment** 150:12
  180:8 190:2,5 195:7
  195:15 196:10,13
  196:19,20 212:3,5
  221:2,7,14 222:11
  222:19 223:4,16,19
  223:23 224:1,9,13
  224:17,20 225:22
  226:8,16,21 227:2
**amendments** 69:17
  150:20 151:6 189:4
  189:24 190:4,5,8,9
  190:20 191:10,12
  191:18 211:16
  212:8,11 220:13,19
  220:23 224:24
  225:4,7 244:18
**America** 1:8 3:2
  112:5,7 141:16
  164:6 291:8
**American** 44:10
  241:3,5 242:5 243:8
**amount** 74:11,25
  76:25 292:23
**analyses** 136:7
  199:11 283:12
**analysis** 47:20,23
  48:4 139:22 140:3
  178:18 193:20
  195:21 212:20
  213:3 215:12
  216:18 217:15,17
  219:4,25 240:24
  274:3,7,11,14 275:4
  275:11,16 278:24
  279:3,6,7,18 281:20
  282:2,5,8,10 283:11
  283:15 284:4,10,17
  284:21 285:4 288:3

**analyzing** 15:20 35:5
  48:7 129:21 282:3
**and/or** 280:18
**Anderson's** 256:14
**Anglo** 243:15
**Anglos** 56:2
**animosity** 246:4
**Ann** 212:20 213:6
  214:11 215:3
**annual** 227:2,5,11
**answer** 8:13,23 9:6
  27:14 28:13 30:1,11
  30:21 31:9,18 32:22
  39:4,16,20 40:25
  41:1,3,9 43:2,22
  51:17 54:1,18 55:5
  73:23 85:12 86:1
  91:5 93:2 96:14
  121:14,15 137:20
  145:23 149:13,15
  151:20 157:21,23
  172:22 175:4 177:2
  177:11 193:1
  196:16 198:6
  200:10 210:5,16,19
  211:5 212:15
  219:23 224:6
  237:16 242:9,17
  244:7 249:3,6
  251:11,12 262:7,17
  262:19 264:23
  265:23 273:15
  284:3 289:4
**answered** 25:20
  43:21 85:11 145:22
  210:3 212:13
  260:10 270:15
  273:13
**answering** 16:1 19:3
  29:25 47:5 210:8
  273:7
**answers** 192:2
  210:13 230:13
**anti-illegals** 201:9

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

3

**anti-immigrant**
201:9
**anticipate** 194:16
**anybody** 23:22
131:25 210:16
231:25 246:6 256:5
286:9
**Anytime** 203:6
**anyway** 199:7 237:4
**apart** 282:5,10
**apologies** 11:7 262:7
**apologize** 120:15
**apparently** 149:25
198:23
**appeal** 246:12
**appear** 11:12 96:25
99:3 101:12,15
112:2 127:14 141:3
141:21 176:14
219:6
**Appearances** 5:2
**appeared** 251:7
**appears** 45:4,21
57:22 81:8 88:18
108:21 128:8 153:8
164:10 182:22
192:2 199:19
204:16 220:9
232:13
**applicable** 53:21
**applicant** 101:12
**applicants** 166:4
**application** 166:15
167:6 253:3
**applications** 196:22
**applied** 280:8
**applies** 31:1
**apply** 42:23
**appoint** 126:6 238:8
238:16
**appointed** 127:17
238:19
**appointees** 238:15
**appoints** 238:13

**appreciate** 79:10
80:6 218:13 257:25
**approach** 210:8
**appropriate** 45:21
47:10 86:18 152:4
164:10
**approve** 111:7
**approved** 111:5
232:3
**April** 41:18
**archive** 109:12
**area** 53:1
**areas** 183:10,17
227:1 256:3
**arguably** 232:17
260:12,20 261:12
**argue** 144:22 172:2
**argued** 144:3,11
**arguing** 93:22 98:1
145:1,3
**argument** 89:1 94:3
147:16 157:10
286:7
**arguments** 83:17
84:23 90:16
**arose** 44:21 246:4
**Arthur** 4:2 7:21
**arthur.dandrea@o...**
4:5
**article** 5:15 61:5,10
**aside** 28:25 49:22
116:8 118:19
268:17
**asked** 20:24 25:15,19
39:3 40:21 43:20
85:10 106:12,16
131:6,8,18 145:21
158:25 162:13
191:10 194:3
212:12 218:23
259:6 273:12,14
288:12
**asking** 16:4 30:9,17
30:24 38:17 41:7

47:4 71:4 145:5
165:14 168:2
217:24 218:17
230:20 239:15
252:13 258:18,21
261:4 281:14
**assert** 39:9 79:25
80:2 81:11 82:3
86:19,21 120:21
135:5 152:5 258:19
**asserted** 80:15 135:9
230:19 241:3
**asserting** 31:14 40:2
40:9,19 86:24,25
151:23
**assertions** 241:13
275:5
**assess** 250:6,16,20
**assessing** 267:22
279:8
**assessment** 232:18
241:7,10 275:14
278:16 282:13
285:9
**assessments** 278:21
**assigned** 64:6,16 65:1
65:24 66:10,24
75:17
**assist** 172:5
**assistance** 16:8
216:10 252:13
**assistant** 3:9 4:2
126:15
**assisted** 215:14 217:4
**associated** 163:6
232:25
**ASSOCIATION**
1:14 291:14
**assorted** 19:5
**assume** 22:6 28:8
56:3 62:6,11 80:20
90:23 101:10
107:17 112:15
113:23 119:23

123:15 130:24
187:4 195:17 206:9
231:18 232:23
256:22 258:6
**assumes** 35:24 96:12
121:12 130:21
196:14
**assuming** 82:23
106:8 112:12
122:10 161:16
166:21,25 168:7
187:14 204:3 216:4
227:8 281:6
**assumption** 277:10
**assurance** 166:17
**attached** 2:22 108:20
154:4 194:8 231:6
**attachment** 6:17
104:5 129:2 168:23
189:4,8 190:5
199:11,17 200:1
203:15 231:10,13
260:3,15
**attachments** 82:17
82:18 83:16,21,22
84:13,20 85:1,4,16
85:20,23 87:6
155:25 175:17
**attempt** 52:7 89:5
97:24 125:1 206:21
208:8 278:10,11,25
**attempted** 97:24
122:1 250:6
**attempting** 57:1
280:20,21
**attempts** 180:3
**attend** 76:3
**attendance** 60:3
**attention** 36:19,24
60:24 67:14 83:11
84:1 87:19 91:11
97:16 99:18,21
117:15 123:16
138:12 144:20

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

4

157:1 182:23 216:6
216:13 220:24
222:8 223:18
224:15 226:7 278:8
**attest** 221:8
**attorney** 2:20 3:9,9
3:14,19 4:3 14:17
32:2 82:20,24 83:1
249:8,9 292:18,22
**attorney-client** 16:1
29:25 30:13 39:1
53:19 82:6,14 87:3
250:12 289:6
**attorneys** 293:4
**audience** 24:6 231:16
231:21
**August** 245:2,5,22
247:1,1 249:13
252:10 253:2
**Austin** 2:20 3:10,15
3:20 4:4 293:12
**author** 120:22 129:8
273:17
**author's** 273:16
**authored** 120:16
**authority** 181:19
183:20
**authors** 190:9
**availability** 100:21
100:23 111:12,21
137:4 164:3 233:24
240:17
**available** 136:10
156:19 164:5,18,19
185:6,11,15,16
187:6 217:13
**Avenue** 3:5,24
**average** 227:7
**avoid** 108:5 199:25
200:17 202:19
203:12
**avoided** 200:16,17
**aware** 22:6 27:23
28:3,9,15,25 33:1,2

46:19 47:21 48:4
49:23 50:4 51:3
53:13,23 54:20,22
65:23 69:18,24 70:1
71:16,17,18,20,24
72:4,19,21,23,25
94:10 101:25 118:9
118:23 120:24
126:23 129:19
132:13 135:20
140:3 141:23 142:9
143:18 145:6,11
146:6,13 149:16
152:6,10,14 158:17
162:10 165:19,21
165:21 166:2,5
168:2 173:7 178:19
179:3,15 193:17
196:20 210:2 212:6
212:9,14 220:14,16
223:13 225:3,10
226:6 227:15
229:21 238:14,23
241:16 245:9
246:24 247:21,22
248:23 249:1,11,14
250:18 251:12
256:8,10,13 263:24
264:18 265:1
270:11,13 273:21
273:25 274:13
275:7,13,16 277:1
279:6 288:2

**B**

**B-R-Y-A-N** 7:9
**back** 12:17 36:19
55:10 56:20 62:9
67:14,15 72:14
83:11 91:11 97:2,5
120:21 128:5,11,15
128:22 135:1,13
141:16 144:20
161:9,18 164:25

165:4 167:25 168:9
168:9 175:11
177:16 179:13
181:2 186:2 194:2
205:15 246:7
251:25 283:24
**background** 15:4
130:17
**backing** 276:1
**bad** 111:25
**ballot** 45:18,23 46:2
46:5 47:12 51:9
54:5 96:19,20 97:1
97:6 98:12,15,19,22
98:23,25 99:2,8,9
99:11,16 111:16,18
112:1,3,10,18 159:1
164:12,14,25 165:3
165:6 177:9 197:6,6
198:6,12,12,13
221:13
**ballots** 36:16 45:6,16
46:12,17,20 47:2
97:10 111:13,13,22
164:4,4,5,18,21
221:8 251:15
**ban** 277:5
**bank** 37:9 45:1
**banning** 276:6,15
**bar** 14:23 159:4
188:8 276:1
**barely** 173:14
**barriers** 73:7
**Barrios** 5:20 109:15
109:16,22 111:3
113:12
**based** 42:17 54:1
69:22 79:12 81:13
86:18 98:24 140:8,9
149:12 150:17
205:3,11 232:18
234:10 240:7
241:22 263:8
264:10 285:18,20

285:24
**basic** 284:15
**basically** 195:11
**basis** 23:3 30:12
31:24,25 32:7 39:5
39:10 49:10,23 50:8
52:23 53:5 80:8,14
80:25 81:15 89:1
93:13 124:10
140:16 141:9
149:14 157:10
185:13,14 208:12
225:10 227:11
229:10 234:9
241:12,12 277:10
289:4
**Bates** 82:16 214:7
**Battle** 22:11,12,13,16
23:2,9,13,17 25:4
25:10 85:3 116:19
116:21
**Baxter** 154:13,20
170:16 199:6
200:14
**Baxter's** 199:17
**began** 250:8
**beginning** 33:22 59:7
59:14 61:6 136:6
269:24
**behalf** 7:20 35:4 53:4
53:10 250:22
263:15
**beholder** 56:18 97:14
**beliefs** 30:17,18
**believe** 19:14 21:3
26:8,14,20,21 32:19
34:17 35:13 42:9
51:14,18,24 55:13
59:3 70:14 81:13
93:22 95:8 98:14,17
99:1,17 102:16,21
109:16 110:15
111:1 120:2 136:19
137:2 142:2 146:21

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

5

| | | | |
|---|---|---|---|
| 150:3,3,11 155:3 | 26:20,21,23,25 27:2 | 105:25 106:4,5,7,8 | 192:5,15 193:15,20 |
| 163:23 168:12 | 27:5,22 28:14 29:21 | 106:10,13 107:11 | 194:17,21 195:10 |
| 169:5,14 178:2 | 32:11,13,21 33:6,19 | 107:13,16,22,24 | 195:11,12,14 196:6 |
| 182:3 184:20 | 33:20 34:10,11,16 | 108:11,18,20,21 | 196:7,7 199:25 |
| 187:16 189:16 | 35:3,8,10,12,22,23 | 109:7 110:10 | 200:21 201:10,14 |
| 194:4 195:20 | 36:4,7,9,13,16,21 | 111:15,22 112:13 | 201:15,18,24 202:2 |
| 196:24 198:3 | 36:24,25 37:9,22 | 113:18,24 114:2 | 202:5,9 203:7 |
| 206:15 212:22 | 38:14,23 40:23 41:6 | 116:10 117:1,2,22 | 204:19 205:8,8,12 |
| 215:10 216:25 | 41:11 43:4,19 44:7 | 118:16 120:1 121:1 | 205:16,23 206:18 |
| 217:3 221:23 233:5 | 44:9,15,21 45:1,7 | 121:7,22 127:12,19 | 207:11,13,24 208:9 |
| 233:8 235:5,8,9 | 46:11 47:1,15,19,20 | 127:22,24 128:12 | 208:12,23 209:3,7,8 |
| 239:5,7 242:20,23 | 47:24 48:2,5,12,20 | 128:17,18 129:5,8 | 210:1,4 211:2,7,15 |
| 242:25 243:2,6,9,13 | 48:24 49:3 50:11 | 129:12,15,18,21 | 211:19 212:1,2 |
| 250:5 251:1 255:2 | 52:5,14 53:7 54:4,6 | 130:6,8,9,15,20,25 | 214:22 221:25 |
| 260:10 262:6,23 | 54:12,21 56:7,11,15 | 131:25 132:10,11 | 222:14 223:1,5,7,12 |
| 264:9 266:7,9 267:6 | 56:16,22 57:4,5,25 | 132:12 133:16,17 | 224:7 226:4,19,23 |
| 268:10 270:15 | 58:14 62:23,25 63:1 | 133:25 134:2 | 227:13 228:15,18 |
| 271:4 275:17 277:6 | 63:7,11 64:6,15,21 | 135:14,16,19 136:2 | 228:24 229:2,4,4 |
| 278:2,6,10 279:2 | 64:23,23 65:2,4,5,9 | 136:8 138:9,10,14 | 231:13,16 232:12 |
| 280:1 281:24 | 66:1,2,11 67:11,20 | 138:15 140:11,13 | 232:14,16,17,22 |
| 286:12 287:23 | 67:21,23 68:17,18 | 140:19 142:19,23 | 233:18,21 234:3,9 |
| **believed** 93:13 95:1,5 | 68:21 69:6,9,12,16 | 143:10,12,20 144:1 | 235:4,25 236:3,8,15 |
| 97:21 202:1 | 69:18 70:4,16,21,22 | 144:2,14,23 145:1,2 | 237:12,15,20 238:5 |
| **BELINDA** 2:1 292:1 | 71:13,16,25,25 72:5 | 145:7,10,11,14,16 | 238:18 240:4,10 |
| **belongs** 39:19 | 72:22 73:1,6,13,19 | 145:20,25 146:3,8 | 241:4 242:19,20,24 |
| **belt** 94:5 | 73:22 74:2,4,7,15 | 146:14,17,19,25 | 243:4,11,12,13,20 |
| **benefit** 37:14 287:3 | 74:20 75:2,4,8,15 | 147:7,18,21 148:3 | 244:16,19 246:4 |
| 287:13 | 75:18 76:7,13,14,25 | 148:10,17,20,23,24 | 249:16,23 250:7,8 |
| **benefits** 55:19,22 | 77:4,12,15 83:17 | 149:4 150:7,20,22 | 250:17,19,21 261:6 |
| 91:10 141:12 237:4 | 84:6,22,24 87:20,22 | 150:25 151:4,5,5,8 | 261:11 262:2,21,22 |
| **BERRY** 1:24 291:24 | 87:23 88:12,15,16 | 152:8,15,22 154:6 | 262:23,25 263:3,5 |
| **best** 93:10 98:16 | 88:16,19,20,21,22 | 157:8,11 158:19 | 263:16 264:1,6,14 |
| 120:8 170:3 203:13 | 89:3,5,16,18,20 | 159:12,18 160:6 | 265:19,19,24,25 |
| 206:21 218:5 249:2 | 90:5,12,17,20 91:12 | 162:4,5,24 163:11 | 266:5 269:12,21 |
| 249:5 276:18 | 91:13,23 92:6,8,22 | 163:25 164:5,8,12 | 270:25,25 275:1 |
| **better** 8:4 66:21 73:9 | 93:11,17,22,24 94:6 | 166:2 170:1,4,19,22 | 278:21 282:18 |
| 73:21 111:6 118:6 | 94:9,11,13 95:8,10 | 170:22,24 171:2,16 | 285:25 286:9,10 |
| 155:16 164:13 | 95:16,23,25 96:16 | 171:22 172:21 | 287:3,7 |
| 171:25 | 96:17 97:8,19,23 | 176:19 180:3,13,15 | **bill's** 56:9,13 70:4 |
| **beyond** 164:5 201:6 | 98:2,5,9,10,12,18 | 180:21 181:21,25 | 95:2,6 202:13 |
| 265:4 | 99:6,23,25 100:2 | 182:25 187:18,22 | **bills** 14:13 24:19,19 |
| **big** 156:23 194:19 | 102:17,19 103:6,6 | 187:25 188:17,18 | 33:22 44:2 62:10,12 |
| **bilateral** 120:20 | 103:14 104:6,16,21 | 189:20,23 191:10 | 63:3 64:17,25 65:3 |
| **bill** 5:12 26:7,9,13,16 | 104:24 105:24,25 | 191:11,16,16,24 | 65:22,23 66:24 |

BRYAN HEBERT                                                6/17/2014
CONFIDENTIAL TRANSCRIPT

6

73:11,15 74:13,21
75:2,12 77:21 87:24
88:12 92:1,4,11,13
92:19 93:20 95:21
118:5,10,14,23
119:3 127:3 130:4
130:17 131:17
134:1 140:23,24
150:17 158:12,13
162:7 209:2,4,7
238:16,17 263:17
263:25 264:8
**Birdwell** 5:23 126:1
**birth** 37:11 99:23
100:4,9,11,13,16,18
100:20,21,24 101:1
101:2,4,7,8,11,20
163:6,18,20,25
222:24 223:14
**bit** 12:23 93:20 98:11
228:17
**black** 193:8 243:10
275:9
**black-and-white**
190:16
**blacks** 162:16
**Blaine** 18:21 109:24
110:2 116:19
154:17 207:5
**blanket** 233:23
**block** 73:11,15
**board** 98:22 198:12
268:3
**body** 66:19
**bona** 82:6
**book** 57:21 153:3
**bookkeeping** 109:11
**border** 117:8
**boss** 18:5 35:4 111:3
131:16 201:13
**bosses** 208:22
**bottom** 45:14 109:12
126:13 128:9 130:2
193:6

**boundaries** 42:2,4
278:12
**Box** 3:10,15,19 4:3
**BRANCHES** 1:21
291:21
**Brazos** 293:11
**break** 9:4,5 58:21,23
102:2,4,5 122:19
144:17 174:17
180:24,25 209:13
209:17,19 251:19
**Brent** 199:4,10 201:3
203:15
**brief** 10:22 22:24
103:25 115:8 128:4
156:12 167:24
170:8 177:24
182:14 259:25
**briefing** 156:10,14,18
**bring** 14:20 63:5
205:15
**broad** 16:6 32:20
37:16,18 96:9 161:2
161:7 180:8 198:7
223:6 248:20
**broaden** 183:25
**broader** 96:3 125:20
165:24 231:21
253:4
**broadly** 9:24 10:7
42:5
**Brooke** 3:17 7:18
**brooke.paup@oag....**
3:21
**brother** 142:4
**brought** 42:12
279:15
**Brunson** 18:21
109:24 116:20
154:17 155:24
170:13 207:5
**Bryan** 2:9,14 5:3 7:1
7:9 109:9,9 290:20
290:25 292:7,12

**budget** 117:8 256:3,7
**bulk** 125:17
**bullet** 90:8 94:15,25
95:4 96:20 97:17
163:4,12,14 164:3
261:25 262:2
265:18
**bullets** 97:20 159:21
262:8 266:17
**bunch** 83:20 122:13
**burden** 42:14 95:13
95:14 111:22
112:13 222:1,3,22
223:8 234:22,24,25
242:14,16 279:8,17
279:20 280:8
281:11 282:3,13
283:11 284:5,20
285:5,16
**burdened** 242:15
**burdens** 111:9
112:22 162:20
280:14,18,18,20
282:21
**burdensome** 43:6
50:15 96:21,24 97:9
97:12 165:5,6,15,17
180:4,11 242:12,13
**business** 12:4,9,21
58:6 288:18

_____

**C**

**C** 3:1
**calculate** 209:16
**calculation** 285:12
**calendar** 63:6 74:10
74:15 75:8,13,18,23
77:12,15,20
**calendar's** 75:20
**calendars** 75:7,8,9,21
77:17
**call** 5:22 78:23 79:8
108:16 115:21
121:19 123:5

253:12,14 254:10
255:2
**called** 21:3 27:3
116:10 157:2
202:22 247:2 252:7
**calls** 27:8,12 28:11
42:25 55:3 91:3
92:25 117:11
192:25 210:17
219:20 242:7 244:5
254:11,14 264:21
284:7
**campaign** 17:24
25:23,25 26:3,3
**campaigns** 12:12,15
25:17
**Candace** 253:16
**candidate** 17:24
**candidates** 179:5
**capability** 271:24
**capacity** 25:17 81:25
82:1,1 250:11
**capital** 18:5
**Capitol** 21:17 66:7
74:23 89:21 202:18
255:13
**caption** 219:17
**card** 37:2,3,5,15
137:24 138:17,18
139:10,16 147:4,10
147:10 161:6
163:17 168:3
173:17,25 213:23
235:24
**cards** 37:14 55:21
147:12 160:11
162:23 163:1,15,15
173:10,11,16
180:10 184:5 185:1
185:3 224:25 225:4
225:5,12,15,16
225:18 233:25
234:2 239:10
**cared** 189:19

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

7

**careful** 201:14
**Carpenter** 2:18
   292:9 293:10
**carried** 77:6
**carry** 103:6 138:24
**carved** 80:4
**carves** 64:2
**case** 7:23 31:15 72:17
   73:12 80:13 82:24
   86:19 93:10 105:14
   105:15 111:2
   112:12 116:3
   127:23 150:1
   157:14 167:15
   184:4 191:24 223:2
   246:9,10
**case-by-case** 23:3
**cases** 73:16 88:23
   94:19 159:16 246:8
**cast** 30:6 45:23 46:5
   46:12 52:18 71:1
   94:13 97:1 98:19
   99:7 111:25 123:23
   123:24 158:25
   162:4 164:11,22
   198:6 229:16
   251:15 280:16
**casting** 31:22 46:2
   54:5 97:5 142:5
   160:8 165:9,16
**casts** 111:15 124:5,6
**categories** 16:4,6
   197:13 198:5
**category** 161:2,8,9
   198:7
**caucus** 59:20,25 60:4
   60:7,22,22 61:9,13
   220:12
**caucuses** 165:12
**cause** 2:16 29:9 72:9
   157:18
**caused** 76:4 80:16
**caution** 15:25 29:24
   53:17 199:9

**cc'd** 217:23
**cc'ing** 168:21
**certain** 11:21 20:18
   26:11 47:11 48:21
   50:25 77:2 85:22
   112:23 118:14,15
   119:16 166:7 180:9
   183:19,25 184:16
   197:5,12 198:5
   206:11 216:19
   220:13 227:7
   228:22,23 233:23
   234:14 235:24
   237:12 238:17
   287:2
**certainly** 8:6 12:23
   45:10 47:14 51:22
   54:7 56:11 58:22
   69:18 72:3 74:16
   79:18,20 91:17
   95:23 102:3 111:6
   114:11 120:23,23
   127:23 129:20
   134:2,10 167:21
   202:16 211:15
   218:4 234:25
   252:23 276:13
   278:14 289:9
**certificate** 5:6 37:3,8
   37:11 99:23 101:7,8
   101:11,20 163:6,18
   163:20,25 222:24
   223:14 235:7,18
**certificates** 100:4,10
   100:12,13,16,18,20
   100:21,24 101:2,5
   237:17 287:19
   288:17
**certification** 235:23
   236:24 292:7
**Certified** 37:11 292:9
   293:7
**certify** 292:10 293:2
**cetera** 21:24 144:5

   176:5 271:25
**chain** 6:2,3,5,8,11,18
   213:20 265:14
**chair** 77:17 87:16
   126:6 127:1,20,21
   127:22 212:23
**challenged** 221:12
**challenges** 110:20
**chamber** 76:11,17
**chambers** 286:11
**chance** 71:9 90:9,18
   90:19 91:19,21,25
   93:9 94:16 95:18
   141:4 143:3 144:15
   172:24 213:18
   223:24 262:4
**chances** 94:21,24
   95:9 96:10 113:7
   171:9,25 172:2
**change** 37:13,13 44:2
   63:10 106:9 111:5
   128:23 151:5,8
   163:24 263:11
   264:18 284:4,23
   285:12 290:3
**changed** 106:4 129:8
   151:6 170:22
   262:11 263:20
   285:4,9
**changes** 5:5 45:16
   69:5 70:3 71:25
   72:5 108:7,17
   128:18,25,25 129:1
   129:12 150:16,25
   151:9 170:19
   187:18,21,23,25
   190:19 234:12
   244:16 261:2
   263:24 290:1
**Changing** 257:11
**characteristics** 218:5
   218:18 226:2
**characterize** 88:16
   201:8 229:6 262:14

   278:7
**characterized** 88:20
   150:23 202:14
**characterizes** 90:1
   232:15
**characterizing**
   260:20
**charge** 35:5 129:21
   185:6 222:24
   237:18
**charging** 222:13
**chart** 155:18
**check** 37:9 45:1
   55:19 74:4 98:22
   177:7 217:3 234:5
   240:13
**checked** 14:5
**checks** 140:23
**chief** 3:18 18:18,20
   19:22,22 23:23
   109:16,24 154:16
   168:21 206:7,15
**chiefly** 129:23 133:7
   133:10
**CHL** 139:2,2 277:25
**CHLs** 191:20,22
   211:24
**choice** 36:11 127:5
   179:5
**choices** 16:13
**chosen** 127:4,24
**Chris** 2:18 292:9
   293:10
**CHRISTI** 1:2 291:2
**chronology** 128:12
   128:14
**chub** 75:5
**chubbed** 75:24
**chubbing** 74:22 75:3
**circulate** 23:14 155:7
   220:11 231:25
**circulated** 22:17
   223:14
**circumstance** 112:8

BRYAN HEBERT                                              6/17/2014
CONFIDENTIAL TRANSCRIPT

8

161:23
circumstances 15:18
  22:20 42:22 82:2
cited 151:10
citizen 166:13 167:7
citizens 49:15 160:19
  200:6 204:4,10,21
  205:1 208:13 228:8
  228:12 229:8,11,13
  229:14,18,18,22
  230:4
citizenship 37:3,12
  54:5,9,13,15 165:20
  166:19 167:1,2,10
  180:18,19
Civil 1:5,10,22 2:3,21
  3:4 291:5,10,22
  292:3
claim 141:5 279:15
claimed 255:25
clarification 9:2
  197:24 257:12
  260:7 281:15
clarify 16:3 60:12,19
  65:9 97:12 108:14
  269:7
Clark 257:6
class 113:2 180:9
  184:24 229:14
  236:14 242:1
classes 90:21 91:2,15
  113:6 184:1,3,24
  233:23 234:14
clear 8:25 27:4 31:23
  40:8,19 50:17 78:17
  80:8 100:1,11
  112:15 134:25
  187:8 197:21
  198:14 201:5 211:7
  248:12 258:6,18
  260:1,2 264:3
  268:16
clearly 82:9 121:17
  161:11

clerks 112:19
client 17:20,22 32:3
  82:21,25 257:14
clients 17:15
clippings 21:18
close 278:8
closed-door 59:19
  61:8,13
closer 25:9 171:24
co-counsel 7:18
coalition 199:17,20
  201:2 202:1 205:17
Coby 136:18
code 17:8 45:15
codes 140:21 159:4
  188:8 276:1
coercion 51:10
collected 193:16
collection 226:11
collectively 135:17
collects 139:13
colleges 174:10
  275:10
column 157:6
combat 51:22,25
  200:4 203:17,20
combating 199:21
  200:2 203:24
come 59:6,10 65:11
  97:5 109:14 132:25
  196:20 203:3 214:2
  241:17 242:20,25
  243:13 249:8
comes 13:19 268:6
commented 200:12
comments 85:17
  218:13,22 248:1
COMMISSIONERS
  1:15 291:15
committee 35:15
  58:15 62:21 63:4,4
  64:6,9,10,11,12,16
  64:20,22 65:1,5,14
  65:18,24 66:2,5,6

66:11,16,18,21,25
68:2,12,13,16 69:16
73:3 75:21 77:17
84:5,8 126:5,7,17
126:20 127:2,20,20
127:22 137:10
140:6 142:3 169:25
192:19 194:20
206:9 210:9 212:17
234:4 238:18,21
239:15 245:9,23
281:25 286:1
committee's 238:5,20
committees 238:14
  246:22 247:5
common 24:23 52:12
  101:2
communicate 12:15
  13:16 16:20 207:15
communicated 20:5
communication
  20:15 82:18
communications
  10:13,14,15 16:4
  20:1,6 21:9,10,25
  22:1,5 29:15 30:10
  31:10 34:23 35:1,7
  39:2 48:1,3 50:3
  53:18 250:2,3
  255:24
communities 181:12
  181:15 182:25
compare 186:20
  198:15
compared 91:17
  243:15
comparing 93:6
comparison 92:3
  232:19 233:3 238:1
  275:19
comparisons 154:6
compel 79:4 289:2
complete 120:9 197:6
completed 11:25

completely 8:14
Complex 3:14
compliance 109:20
  113:18 114:1 154:5
  157:2
complied 278:17
comply 278:12
component 159:20
compound 51:16
  157:21 177:1
  262:16 264:21
comprehensive
  278:16
compromise 89:1,6,9
  89:15 90:2,3 97:25
compromised 88:16
  88:20,21,23 89:3
compromises 191:9
compute 283:22
computers 173:15
concealed 37:4
  180:14,18 191:23
  224:17 225:11,14
concept 28:23 131:4
concern 72:10 79:6
  108:5 113:9,10
  147:21,24 196:12
  196:12,17 205:2,4,6
  205:7 208:18
  227:12,15 245:16
concerned 30:4 51:3
  202:21 203:2,6
  204:14 208:1,11,15
  275:1
concerning 41:10
  85:16 123:4 171:16
  193:14 196:9 213:3
  224:17
concerns 68:17,22
  69:7,11,22 70:1,5
  71:6,24 72:4,6,8,25
  73:5 94:10,10
  109:20 110:1,3,7,10
  111:2 112:24

BRYAN HEBERT                                      6/17/2014
CONFIDENTIAL TRANSCRIPT

113:18,25 150:17
151:2 168:22
170:20 208:4
239:24 244:19
271:19 276:16
277:3
**conclude** 265:13
**concluded** 70:20
157:18 289:20
**concludes** 268:5
**concluding** 185:14
**conclusion** 53:6
141:10 185:13
190:7 242:8 284:8
284:14
**concurrently** 24:25
**condensed** 219:17
**conduct** 12:4,9,20
100:3 136:5 140:1,4
212:20 226:13
**conducted** 215:13
**confer** 134:5,8,13,18
134:21 167:20
**conferee** 238:8,11
**conferees** 238:10,14
238:16,19
**conference** 1:20
234:4,6 238:5,14,18
238:20,21 239:4,15
291:20
**confidence** 27:20
31:10 42:7 48:15
49:7,12,17,21,24
52:15,21 53:3,11
144:5 162:12,18
176:8 207:20
208:20 229:25
266:6
**confidences** 16:1
29:25 250:12
**confident** 25:6
176:11
**confidential** 2:12
77:24 78:1,10,11,13

79:14,16 80:18 81:4
83:4,5 102:10,14
103:20,23 105:7,9
113:16 115:15
120:18 122:6 135:3
135:11 144:18
153:24 168:11
169:3,6 209:11
230:9,16,24 239:14
251:23,24 258:12
258:14,20 265:11
265:13 268:6 269:2
289:16
**confirm** 99:13,15
164:25 277:23
**confirmed** 42:21
**conflict** 228:17,25
**conflicts** 228:20
**conform** 236:11
**confused** 26:10
**confusing** 12:23
50:23 147:23
194:14 266:7
**confusion** 172:24
173:5
**connection** 175:6
**Connett** 199:4,10
201:3 203:15
**consent** 78:1,14
79:19 230:24
**consequence** 142:10
**Conservative** 17:18
199:16 201:2 202:1
205:17
**consider** 26:6 67:23
99:24 118:16 126:5
133:16,19 136:1
171:7,10 185:10
196:2 209:2 239:17
267:14 276:5
280:13
**considerably** 188:6
**consideration** 48:7
63:10 66:12,15

68:17 70:16,20
74:15,21 75:2,13,15
84:5,10 85:21 99:24
101:18 116:10
117:6 118:14 121:1
121:22 136:3
156:15 169:24,25
185:9,20 186:3,23
187:2 196:5 206:17
210:9 212:19
214:22 238:5,20
240:17,23 247:5,8
289:10
**considerations** 16:13
16:18
**considered** 58:3,4,9
63:13 67:11 68:3
73:1 76:6 100:2,12
117:14 121:3
135:15,17,21,23
137:10 147:10
163:11 179:22,25
180:1 187:18 208:3
212:17 213:12
220:21 239:22
270:19 273:21
276:13,22,24 277:1
277:3 280:5,12
**considering** 117:3,7
150:16 270:10
**considers** 75:9 76:11
**consistent** 31:20
**consists** 64:12
**Constance** 19:11,12
248:22
**constant** 267:12
**constituencies** 28:16
28:18 29:1,5 32:16
32:23 33:1
**constituency** 285:17
287:24
**constituent** 164:25
**constituents** 13:17,18
16:20 20:24 21:1,6

29:6 50:3 89:12,22
**constitute** 89:8
**constitutes** 86:13
**constitution** 42:3
152:22 260:22
**constitutional** 43:7
107:13,18 110:20
113:6
**constitutionality**
246:3,15
**constraining** 256:1
**construe** 10:6
**construed** 205:4
**consult** 25:25 289:10
**consultant** 17:14
**consultation** 26:5
**consulted** 130:19
264:17
**consulting** 17:23
**consuming** 227:10
**contact** 228:4 253:15
255:15,16
**contacted** 29:12
**contain** 107:14
**contained** 107:24
**containing** 269:25
270:1
**contention** 184:21,23
**contentious** 118:5
203:9 286:13
**contents** 115:14
228:4 254:20
**contested** 68:24
**context** 79:16 86:11
166:20 271:3
**continue** 83:5 129:6
174:13 204:1 258:6
**continued** 112:17
162:14
**continuing** 79:25
80:2 120:18 168:10
**contrary** 39:15
**contributed** 216:16
**controlling** 147:25

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

10

**controversial** 118:5
**convene** 247:17
**convened** 246:22
**convenient** 288:16,20
**conversation** 59:13
  109:25 110:1 114:7
  114:11,14,16,18,22
  115:3 213:10,11
  254:7,21 271:4
**conversations** 20:23
  36:14 37:20 38:4,6
  38:16 101:22
  129:17 178:24
  179:15,18 191:13
  201:20 212:7,9,10
  213:2 254:18 272:5
  287:8
**convey** 254:20
**conveyed** 254:25
**convince** 243:16
  286:4
**convinced** 241:25
**convincing** 286:7
**cooperation** 120:20
  134:24
**cooperative** 39:17
**coordinate** 182:5
  207:15
**copied** 104:10 154:16
**copies** 14:13 70:6
  101:4 155:22
  170:22
**copy** 6:4 11:2 26:11
  37:8 101:7 109:8
  128:8 138:15 147:2
  153:2,3,4 180:13
  182:19 215:24
  234:7 259:10,16
**CORPUS** 1:2 291:2
**correct** 7:25 8:1,17
  8:18 15:8,10,11
  17:1,6,9 21:7,8 22:2
  22:3 33:11,15 35:16
  35:20 40:11,23 46:3

46:9,10 47:16,17,18
48:18 50:18,19 52:1
52:2 54:15,19 59:1
59:2,5 60:1 62:2,3
63:16,17,20 64:4
66:24 68:10 74:3,6
76:18,22,23 82:4
84:11,12 88:9,10,13
93:5 95:25 97:6,7
97:10,15 98:3,7,8
98:17,25 99:1,5,10
99:17 101:10
102:18 103:4
104:21,22 106:5,6,7
108:23 110:7,8,21
110:22 111:13,14
111:19,20 113:4,5
113:10 114:5,6,9
118:21 119:24
121:11 123:14
125:16 126:22,23
127:16 128:18
131:10,19 138:11
144:6 148:6 153:15
153:16,20 154:19
158:15,16 161:12
161:21 163:7,9,17
166:9,15 167:4,7,8
167:11 171:14
175:23 181:4,23,24
182:2,3,21 183:6
186:7,14,17 194:5
197:9,14,16 205:20
215:9 217:18
219:13 223:2,3
224:10 226:16,20
229:19,20 231:14
231:15 237:15,16
240:12 246:11,13
246:14,18,20 248:8
248:9 249:16,19,21
260:4,6,13 261:7,10
261:18,22,23 262:8
264:6,7,11,12,15

265:8 266:10,11
267:4,5,9 268:3,8,9
268:12,19,20
269:15,16,17 270:2
270:3,21,22 271:11
274:17,18 275:6,12
276:19 278:13
279:5 280:24 282:9
282:11 283:14
285:23 286:14,15
287:5,21,22 288:1
290:22
**correspondence**
  13:18
**cost** 99:24 100:4,9,15
  100:17,19 101:8,19
  163:3,5,5,9,12,24
  223:13 240:24
  281:7
**costlier** 223:7
**couched** 201:14
**Council** 44:10
**counsel** 10:17 11:3
  12:2 13:5 14:5,8,12
  15:6,9,15 16:8,12
  16:16,24 17:3 18:13
  18:16 19:1,3 22:10
  22:14 25:5 30:15
  31:5 32:4 47:7 54:2
  58:20 78:17 83:10
  102:1 109:13 115:6
  115:12 134:5,13
  138:22 142:13
  167:19 168:1 169:2
  174:16 180:23
  197:24 217:20
  219:20 230:22
  250:10 283:16
  289:4,10 293:2
**counsel's** 31:25 41:8
**count** 98:24 123:23
  160:15
**counted** 46:3,13
  47:12 52:19 99:10

99:16 111:19 112:3
124:5 164:14,22
165:1,3,14 221:13
251:16
**counties** 139:15
  173:12,14 183:4
  185:21,23 186:6
  187:7,9,11 188:11
  188:12 223:8
  282:25 283:4
**counting** 159:23
  221:7
**country** 208:14
  232:16,22 233:7
  260:12,17,19
  261:10,12 262:15
  274:1
**counts** 158:25
**county** 1:14,14 98:22
  99:3 183:2,13
  196:25 222:25
  246:9 247:7 248:1
  249:4 250:24,25
  291:14,14
**couple** 20:7
**course** 131:3 149:13
  150:15 162:6
  202:25 241:15
**court** 1:1 8:9,16 42:5
  42:21 60:13 79:21
  80:5 81:5,5 86:6
  91:7 108:3 110:14
  111:5 113:8 154:5
  157:3 164:17,20
  244:20 246:8
  278:13,23 279:15
  284:1 291:1
**court's** 80:23 105:14
  245:14 278:3,17
**courts** 158:8 245:14
**cover** 16:6 57:20
  82:17 153:3 154:8
  154:10 187:20
  188:2 203:14 260:9

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

11

coverage 246:16
covered 15:5 145:22
    147:11 228:24
    272:13
covers 229:5
crack 200:19
cracking 201:17
    202:2,10 208:13
crafted 145:10 240:5
crafting 240:16
Crawford 41:13,22
    42:6,18 43:15 46:20
    89:23 91:6 110:6,15
    110:19,23,23 111:2
    278:3,8,13,18,20,22
    278:25 279:2,8,19
    280:10 282:3
    283:11 285:10
create 73:6 162:25
    173:4 176:18
created 44:10
creates 107:19
creating 166:3
crimes 162:3
criminal 53:1 157:13
    232:25
criteria 197:5
cross 45:17
cross-referenced
    57:15
crosses 150:5
CSR 2:18 293:10
curbing 125:13,13
current 14:6 44:22
    44:22 55:11 91:17
currently 18:23
    19:21 55:13 161:14
    162:24
custodial 292:22

                D
D 59:10 63:25
D'Andrea 4:2 7:21
    7:21 78:25

D.C 3:5
daily 272:17
DallasNews.com
    5:15
data 193:10,13,16
    226:11 227:12
database 139:19,20
    141:19
databases 254:3,4,6
date 5:20 33:21 67:13
    81:6 84:1,2 104:12
    104:23 119:12,16
    119:18,23 123:6,8
    128:9,10 170:4
    186:15,16 214:17
    245:1,18 249:17
    275:25 293:11
dated 106:20 135:14
    138:21 142:20
    232:9,10
dates 188:8 214:17
    225:17,20 226:1
    271:22
David 3:8 7:19
    115:21 126:14
david.whitley@tex...
    3:11
Davis 222:12
day 5:16 21:17,19
    58:4,4 70:13,15,15
    72:14,17 77:22 99:7
    99:14 122:15 189:5
    190:11 209:5
    220:18 281:5
    292:17
days 75:10 84:11
    119:4 233:19
DC 3:24
DD 126:14
de 223:19
dead 160:11 161:4
dealing 45:15
deals 62:9
death 75:5

debate 33:6,10 61:7,7
    73:2 147:21 148:13
    155:10 156:18
    178:15,16 179:12
    179:14 181:21
    186:9 187:3,17
    192:20 193:23
    194:19,19 205:22
    206:9 207:13 210:3
    211:13,15 214:3,9
    224:14 240:20
    274:5,22,24 275:23
    281:25 286:2,4
debated 239:21
debates 63:8 190:4
debating 150:15
Debbie 102:23
decade 66:6
December 33:20 68:1
decide 23:1 108:3
decided 23:19 76:14
    143:12 278:3
decision 27:24 40:17
    41:14,22 42:18
    43:15 103:8 110:15
    143:9 145:7 146:7
    151:4 152:11
    164:17 244:2,14,24
    245:14,17 246:2,13
    247:7,10 270:23
    278:3,17
decision-making
    81:10
decisions 133:23
declare 80:16
decrease 95:1,6
    125:1
decreased 158:8
decree 37:12
deemed 121:17
deep 286:20
defend 189:20
defendant 219:11,18
    219:21

Defendant's 6:12
defendants 1:7,19,25
    2:5 3:7 7:20 78:17
    79:24 105:17 135:2
    215:7,24 217:25
    258:19 291:7,19,25
    292:5
defer 288:22
deferred 79:17
define 279:19
defined 198:9
definitely 25:8 96:3
    253:13
definition 236:12
definitions 236:19
degrees 271:22
delay 74:14 75:2,12
    76:4
deleted 128:24
deliberative 30:15,19
    30:24 31:1,16 32:1
    39:23 40:5,9,15,19
    53:20 81:15,17 82:3
    86:2,5,10,22,25
    87:2 134:6 151:25
    152:2 289:5
demise 74:18
Democrat 89:7 224:5
Democratic 73:13
Democrats 73:10,15
    74:12 75:10,11
    94:12 118:3 203:8
demographic 218:5
    218:17
denying 243:19
Department 3:3
    19:19 20:2 79:4
    168:24 177:17,25
    184:19 237:2 240:3
depend 23:10 40:12
    40:13 242:13,16
    284:25
dependant 242:14
depending 86:11

BRYAN HEBERT                                6/17/2014
CONFIDENTIAL TRANSCRIPT

12

222:25
**depends** 24:5 97:14
**deposed** 7:24 8:6,7
  257:19
**deposition** 2:8,14
  5:10 8:3,10 9:23
  11:12 14:1,4,18
  15:6 35:14 37:19,24
  38:1,9 48:11,13
  57:14,18 78:20
  97:13 103:20
  114:21 115:5,15
  135:9 157:17 213:6
  258:6 280:1 289:2
  289:20 290:20
  292:7,14,16,24
**deputy** 3:9,18 15:9
  15:14 16:7,11,15,24
  17:3 22:10 32:4
  109:13
**derived** 49:20
**describe** 37:16 57:24
  216:21 260:15
**described** 42:17 81:3
  83:20 142:11
  175:21 176:25
  177:4 184:25 188:4
  215:17 218:24
**describes** 107:8
**describing** 51:7
  115:16
**DESCRIPTION** 5:9
**descriptive** 56:17
**designate** 77:25
  103:19 153:24
  230:8 289:15
**designated** 79:14
  80:17 83:4 102:10
  102:13 103:22
  105:5,8 106:13
  114:4 117:4 119:14
  119:21 135:3
  144:18 230:23
  258:13

**designating** 78:9,10
**designation** 64:3
  78:13 79:20 83:6
  102:11 113:16
  114:8,11,19,25
  117:25 119:18
  120:2 121:4,7 122:6
  123:11,13 168:10
  169:6 209:11
  239:14
**designed** 51:22
  152:10,12 156:17
  160:15,24 180:11
  182:8 183:22,24
  236:18
**desire** 44:3 121:24
**despite** 201:8
**detail** 158:23 254:17
**details** 74:18 136:11
**detect** 157:11,19
  266:5
**detecting** 176:1
  208:19
**detection** 207:19
**deter** 31:20 51:5
  157:11,13,15,18
  266:5
**determine** 90:12
  98:24 139:22 165:7
  178:10 198:13
  227:9 251:6,14
**deterred** 50:25
  229:15
**deterrence** 207:19
**deterring** 42:8 52:8
  175:25 208:19
**develop** 239:6
**developed** 34:16
  207:2
**developing** 129:15
  130:9 133:16
  151:13 182:6
  239:19
**development** 34:24

35:3,7 41:23 49:2
  129:25
**developments** 14:6
**devotion** 226:24
**Dewhurst** 6:15 10:4
  10:5 15:7 18:7
  19:13 23:25 24:8,12
  24:16,20,24 29:12
  29:17 31:6 32:9,17
  38:10,23 39:20,24
  40:10 41:10 53:13
  66:10 67:4,8 69:10
  69:21 85:21,24
  106:16 115:21
  116:9,16,25 121:16
  126:14,21 131:12
  156:2 170:10 178:6
  192:18 212:6,11
  232:6
**Dewhurst's** 17:3
  25:17 30:24 31:16
  33:3,16 39:10,21
  40:3 126:3
**DHD** 115:20
**dialogue** 203:3
**difference** 88:11
  198:1
**differences** 155:18
**different** 30:15 47:13
  47:17 69:8 75:18
  89:25 92:4 129:6
  137:7 144:24
  145:16,17 158:10
  159:18 166:19,22
  206:11 233:21
  236:10 237:24
  254:2 262:19
  265:19,24 271:23
  273:7 276:9,11
  281:4
**differently** 25:16
  53:15 147:22
**difficult** 140:21 242:4
**diminish** 241:4

**dinner** 67:8
**direct** 13:9 30:21
  38:25 39:4 45:11
  82:16,16 84:25
  85:25 151:17,20
  220:24 222:8
  240:10
**directed** 41:8 178:1
  288:9
**direction** 160:21
  208:7
**directions** 183:13
**directly** 21:25 133:11
  156:17 185:3 201:3
**director** 17:18 23:20
  23:21 154:18,24
  168:21 206:8
**disabilities** 148:3
  184:16 236:14
**disability** 148:16
  198:8 211:24
  234:11 235:7,13,18
  235:23 236:12,19
  236:24 237:4
**disabled** 148:14
  184:25 234:15
  235:22
**disagreed** 275:3
**disagreement** 152:4
**disappointed** 244:3
  244:11
**disclosed** 217:17
**discovery** 79:13,16
  81:4 155:21
**discretion** 181:22
**discriminatory** 95:2
  95:6,15 205:5
  227:13 242:21
  243:1,3
**discuss** 137:3 179:19
  191:3 202:7 272:1
**discussed** 125:19
  144:3 156:5,20
  178:15 181:21

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

13

187:16 209:9
261:21 263:23
271:21 277:4
287:10,12,16,24
**discussing** 35:23
58:25 102:8 111:1
115:14 142:18
**discussion** 10:22
36:15 38:13 59:20
103:25 106:21
107:4 108:15,18
110:16 115:8 128:4
137:6,13 139:3
140:13 156:7 170:8
178:17,20 182:14
186:9 204:18
205:15 211:10,17
253:4 259:25 271:2
274:19 275:8
281:24 283:1,3,7
289:14
**discussions** 36:4,5,11
38:11 89:21 145:18
145:24 146:2
152:10 272:1
**disenfranchise** 90:21
91:2,8,14 93:23
242:6
**disenfranchised**
91:21
**disenfranchisement**
91:22 92:23
**disenfranchising**
90:9,18,19 91:25
94:1 262:5
**disparate** 234:20
285:8 286:5
**disparity** 285:3
**disposal** 56:19
**disposed** 58:5
**disproportionate**
243:14
**disproportionately**
139:23 222:5

**dispute** 134:16
**distinction** 165:23
**distinctions** 267:15
267:23
**distributed** 119:19
**distribution** 20:10
**DISTRICT** 1:1,1
291:1,1
**divide** 286:20
**Division** 1:2 3:4,18
3:18 291:2
**divorce** 37:12
**doctor** 236:21
**document** 11:1,9,18
34:4,5 70:11 78:12
79:5 80:3,11,12,14
81:14,21,21,23 82:7
83:13 90:15 96:15
100:11,22 101:6
102:4,9,13 103:21
104:2 105:10,18
109:1,5 116:8,14,17
116:20 117:8
119:13,17 120:7,19
123:1 125:25 128:7
140:17,18,20 153:1
154:2 165:20
168:12,17 177:23
178:1,10 188:24
190:16 195:3 201:2
204:17,23 205:10
205:25 206:5
209:24 213:18,24
214:2,9,15,17,19
215:23 216:2
218:19,21 219:7
220:8 223:25
227:20 230:12,15
230:18,19 231:2
236:21 240:14
251:24 252:3
261:15,20 269:10
274:8
**documentary** 166:25

167:10
**documentation** 161:7
163:16 184:17
222:15 235:10,14
235:19
**documents** 5:11
11:21,23 12:2,18
14:11,20 36:12
37:10 45:2 54:24
55:1,17,24 79:2,7
79:13,15,21 81:3
83:25 85:14,18
86:23 96:16 100:4
102:13 105:15
129:11 135:5,10
154:5,9 155:9
156:23 159:6 174:4
175:21 192:6,20
199:2 215:15
218:24 219:1 227:7
237:1 262:19
**doing** 30:2 156:14,25
200:19 207:13
217:10 233:12,12
240:15 253:8
**DOJ** 169:16 195:16
**dollars** 163:22,23
222:24,25
**domain** 117:8 204:2
**double** 217:3
**double-check** 26:11
144:9 153:8
**double-sided** 81:23
**doubtful** 169:15
170:10
**doubts** 233:20
**DPS** 20:4,15,16,17
21:6,9,12 22:1,5
37:2,5 138:18
162:25 166:2
183:19 185:11
186:1 213:23
225:14 226:3
239:21 240:4,7

250:2 253:6,8,14,15
253:17 254:3,4,4,8
254:19,25 255:5,9
255:13,24,25 256:1
256:6,7,8 282:8
283:8 287:25
288:13,15,19
**DPS-issued** 212:24
**draft** 23:4 83:21
84:13,25 85:3,6
104:5 108:8 115:23
126:9 130:4,6,20,23
131:7,8 132:12
154:8,9 177:17,20
177:23 178:1,6
227:23 231:10
269:12,14 270:18
270:25
**drafted** 83:24,24
84:20 85:9,13
116:14,16,20
118:18 119:17
126:11 132:11
181:6 214:22
232:11 262:8
**drafting** 24:18,21
35:9,12,15,19,22
36:1,3 49:2 116:1
129:23 130:1,8,15
130:17,23 131:17
132:10 133:15
178:9 217:8,10
239:3 264:14
**drafts** 22:12,16 23:25
131:25 132:3,4,6
133:25 268:13
**draw** 162:17 267:15
**drawing** 53:6 92:3
141:9
**drawn** 131:5
**driver** 44:25 48:8
141:19 167:15,17
180:17 185:21
186:6 212:21 213:4

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

BRYAN HEBERT                                6/17/2014
CONFIDENTIAL TRANSCRIPT

14

225:15 239:18
240:5,11,17 256:11
**driver's** 37:1 55:21
138:17 139:7
161:19 163:1
165:22 213:22
218:9 274:10
277:22,24 284:12
**drivers** 239:8,11
**driving** 37:14
**drop** 270:24 285:22
**drop-in** 255:18
**drove** 263:24
**duly** 2:15 7:2 292:12
**Dunbar** 3:23 5:4 7:13
7:13 257:1,3,4,10
257:15,18,23 258:1
258:4,17,22,23
259:15,19,21 260:1
262:17 263:10
269:5,9 273:14
278:24 281:6,9
283:18,24 284:3,9
288:25 293:1
**Duncan** 126:4,6,16
126:25 221:3
272:14
**Duncan's** 87:14
**duties** 267:11

—————————
**E**
**E** 3:1,1
**e-mail** 6:2,3,5,6,7,8,9
6:11,17,18 10:14
12:5,6,8,14,15,18
12:19,20 13:1,1,9
13:10,19,21 20:15
20:17 21:10 22:1
82:17 83:14,21 84:2
84:2,4,8,16 104:4
104:10,12,15 106:3
106:19,19 109:6,9
113:13 128:22
130:11 154:3,10,12

155:7,8,14,25 156:4
156:21 168:20
169:8,21 170:18
171:6 172:13
175:14,19 187:20
187:22 188:2,16,25
189:2,18 190:13
194:8 195:4 196:9
199:3,5,9,18,24
201:5 202:8 203:14
204:13 205:3,14
206:6,16 207:1
219:7 228:21 231:5
231:18,24 232:10
232:11 252:10
253:2,11,14,19,24
254:15,22 255:4
259:1,21 260:2,9
261:16 265:14
289:19
**e-mails** 13:12 20:7,8
20:11 23:4 104:13
188:25 201:7
213:20 214:18,19
214:21 215:2 219:8
252:6 258:13
272:12
**earlier** 21:22 48:13
58:12 65:9 76:8,10
77:8 81:4 89:6
97:12 118:4,4
121:23 125:19
128:22 130:11
145:4 146:12 164:9
213:6 223:15
224:16 228:22
246:5 250:3 256:17
268:13 274:9
275:17
**early** 20:11 67:9
89:19 118:16
139:21 197:4,8,15
197:19,25 198:2
247:6 258:8

**ease** 275:19
**easier** 25:9 174:15
236:20
**easily** 174:3 177:13
**easy** 172:1
**ECF** 78:2,15 230:25
**editorial** 58:19
**education** 1:12 3:22
7:14 20:19 181:11
181:15,19 182:6,24
183:6 234:1 238:22
257:6,16 291:12
**effect** 21:15 53:7
62:17 66:14 73:4
90:13 94:7 95:15
124:7 125:2 160:5
178:9 236:13
243:14 248:8
268:17 274:19
275:8 285:3,8
**effective** 141:10
276:21 287:21
288:23
**effectively** 166:16
**effectiveness** 223:5,6
223:12 226:22
**effects** 181:9 185:6
223:9 247:24
**effort** 250:20 251:10
251:14 287:20
**efforts** 18:2 20:9,19
20:25 21:23 42:24
50:14 72:8 157:12
162:9 181:12,15
182:6,24 185:25
201:8 247:16,24
250:13 251:6
252:16 256:2,3,16
283:7
**EIC** 165:19,22 166:3
166:6,20 167:1
168:3 180:17
186:12 239:3,19
240:25 252:23

253:2 280:22,23
281:7 287:19 288:4
288:11
**EICs** 21:7 185:10,14
252:20,22 281:4
**Eight** 142:25 143:1
**either** 22:13,22 96:2
103:6 116:7 118:18
163:23 214:2 217:4
218:18 264:1
**Elaine** 126:15
**elderly** 90:9 91:25
93:23 94:1 112:23
112:24 113:2 191:4
262:5
**elected** 57:10 125:5
**election** 17:8 33:14
35:5 45:15 46:8
64:15,17,21 65:10
83:18 90:17 96:25
97:2 99:3,7,8,14
111:5,6 112:18,19
127:6 133:9 137:5
138:18 142:6 154:7
157:14 158:18
159:9,13 161:25
162:25 165:5,7
172:25 176:7 177:7
180:9 184:4 185:1
196:25 199:8,12
225:15 230:1
232:25 233:25
234:2 237:17
247:11,13,19 248:1
248:6,7,10,17,25
249:12 250:25
251:1 252:18
253:20 255:14
262:3 267:11,13
270:8 281:5 287:18
288:17
**election-related**
127:2
**elections** 27:19 28:7

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

15

28:8 30:5,7 31:20
33:7 42:7,7 48:14
49:9 50:6,12,14
51:8 52:17 124:20
124:23 125:3,8
133:5 143:23
158:22 162:12
163:2 176:8 200:7
203:18 204:6,11
207:9,20 210:25
211:9 223:11 228:9
228:13 229:8,11,19
229:23 230:2
233:10 242:5
248:20 250:24
263:17 266:6 274:4
elector 52:21
electoral 137:7
  146:10 175:6 176:3
electorate 48:15
  49:12,18 52:15,22
elements 226:1
elicit 40:10 79:6
elicited 79:21
eligible 30:6 45:22,25
  52:18 123:23 124:4
  124:7 125:4 159:23
  160:7,16 174:11
  226:14 227:6 228:9
eliminate 52:14,17
eliminating 124:7
Elizabeth 3:3 7:10
  134:16 292:21
elizabeth.westfall...
  3:6
Ellis 226:8
Ellis's 227:2
else's 39:7,22 161:5
eludes 256:16
emergencies 119:8
emergency 5:22
  114:5,8,19,24 117:4
  117:14,25 118:13
  119:2,14,22 120:2

121:7,17 123:5,11
  123:13
emphasize 207:18,23
employed 17:10
  19:13 293:3
employee 146:17,23
  147:1
employees 173:16
employer 147:2
employment 17:20
enable 160:4
enabled 159:22
enact 29:2 42:19,24
  43:5 61:23 233:6,9
enacted 26:13 73:20
  151:14,15 152:16
  152:17 164:1
  180:17 235:12
  237:6 243:4,7
enacting 42:12 53:15
  261:6
enactment 285:22
encourage 93:15
encroach 151:19
ended 247:6
enforce 171:2 249:15
  249:18
enforcement 249:4
  249:10
enforcing 169:17
  250:8
engaging 279:18
engrossed 70:18
  234:7
Engrossing 130:3
Enrolling 130:3
ensure 46:2 56:23
  75:19 151:13 152:8
  152:11,12,15
  153:13 228:8,12,15
  234:20
ensuring 112:16
  124:10 157:2 229:7
  229:18

entails 236:25
enter 18:2 230:17
enters 182:9
entire 71:4 80:4
  289:15
entirely 285:20
entirety 59:4 241:14
  277:11 279:11
entities 173:10
  188:10
entry 5:16 70:12
  220:9
envelope 98:23
equal 76:21 113:9
equally 186:24
Erin 256:14
error 217:2
escalate 203:10
escape 125:10
especially 140:18
  173:11 177:12
  201:14
essence 12:25 117:19
  224:1
essentially 46:16
  262:20
established 278:2,12
  279:9
establishes 270:1
  279:2
Estes 109:17,18
  110:1,4
estimate 277:21
estimated 274:9
estimation 208:25
et 1:3,6,12,15,18,21
  1:24 2:1,4 3:7 21:24
  144:5 176:5 271:25
  290:2,2 291:3,6,12
  291:15,18,21,24
  292:1,4
ethnic 71:12 150:18
even-handed 127:8
evidence 28:7 35:25

51:20 96:13 121:13
  130:22 144:8 168:7
  178:20 196:15
  243:16 264:24
  268:2 273:21,25
  285:14,15 286:8
evidenced 217:14
  230:6 264:25
evident 266:19
evidently 90:18
evolving 40:14
exact 106:7 236:2
  255:21 284:25
exactly 50:24 92:10
  118:18 185:23
  234:18 236:25
examination 5:4,4
  7:5 248:10 257:2
  292:18
examine 247:18,24
example 53:9 66:9
  82:8 88:24 89:5
  130:1 159:19
  165:12 275:24,24
examples 56:14,24
  65:11 66:4 125:9,11
  142:7 212:5 229:24
  265:2,7 267:7,10,12
exception 64:2
  112:23 148:2,10,14
  148:19 149:1,20
  150:6 211:24
  235:13
exceptions 233:23
  234:14
exchange 44:10
  131:24
exchanged 132:3
exchanges 252:8
excluding 235:3
  273:8,9 274:20
  275:9,15
excuse 197:9 262:11
  274:16

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

16

**execute** 45:23 206:19
**executed** 221:10
**executive** 17:17 82:1
  86:17
**exempt** 183:25
  235:19 237:12,18
**exempted** 184:3
**exemption** 108:22,24
  148:16,21,24
  149:17 150:9,11
  184:15 235:6
**exemptions** 180:8
  184:10,13 191:7
  234:10
**exercise** 284:5
**exhibit** 10:23,25
  11:15,17 12:17,24
  13:6 26:12 34:1,3,7
  34:9 36:19 44:17
  57:12,19 59:1 60:16
  60:25 61:3 67:15,19
  70:8,10,24 77:24
  78:4 81:21 83:12,21
  84:13 85:23 99:22
  102:8 103:18 104:7
  108:20 109:1,2,4
  115:9,11 116:9
  117:17 120:7
  122:23 125:22,24
  128:1,6,12 130:1
  135:13 138:20
  142:19 144:3,12,21
  148:25 152:24
  153:22 154:1
  168:14,16 172:12
  175:16,21,22 177:5
  177:16 181:3
  182:16,23 187:20
  188:5,16,21,23
  189:10 194:25
  195:2 198:18 199:3
  199:13,14 203:14
  205:3 206:2 208:10
  209:22 213:15

214:6 215:20,22
  217:18,22 218:4,7
  218:14 219:4 220:5
  220:7 222:9 227:17
  227:19 229:1
  230:10 231:8,11
  232:1 251:21
  258:24,24 259:8,8
  261:15 263:4,6
  265:10 269:2,11,12
  282:24
**exhibits** 5:8 57:14
  122:14 135:4
**exist** 133:22 139:20
  279:23 283:3
**existed** 51:14,18
  89:20 90:5 135:24
  140:2
**existence** 28:4 114:16
  114:21
**existing** 45:17 125:6
  164:7 236:18 239:8
  269:7,20 270:5
**exists** 33:7 50:12
  157:15 158:2 162:6
  200:23
**expand** 283:9
**expands** 175:9
**expected** 79:9 118:3
  192:5 246:2
**expedite** 66:12,17
**expediting** 66:14
  121:19
**expeditious** 120:25
  121:19
**expeditiously** 117:2
  118:1 121:9
**experience** 127:6
  131:17 220:17
  241:22
**experienced** 266:20
**experiences** 265:4
**expiration** 159:19
  188:8 225:17,20

226:1 271:22
  275:25 293:11
**expired** 136:1 159:17
  159:17 212:3
**explain** 124:3 286:19
**explained** 260:11
**explaining** 168:23
**explains** 71:12
**express** 29:12 199:18
**expressed** 26:23
  40:16 104:18
  109:21 233:19
**expressing** 168:22
**expressions** 208:12
**extend** 84:23
**extended** 21:24
  185:25 254:18
  288:14
**extent** 16:19 20:4
  29:5 30:1,9 34:21
  34:22 39:2 40:24
  51:1 53:20 86:2,8
  86:16 129:24
  130:12,23 132:2,11
  133:10,11 135:1
  143:25 144:11
  147:3,9,14 159:3
  172:23 173:1 184:7
  185:1 187:21,23
  195:14 201:12
  202:13,18 203:12
  204:9 206:19 208:6
  215:15 218:7,23
  226:24 230:15,18
  242:14 270:4
  277:23
**extents** 263:18
**extra** 259:10,16
**extreme** 246:5
  286:13,17
**extremes** 90:3
**eye** 56:17 97:14

———————————
            **F**
———————————

**face** 82:12 140:18
  160:14 217:14
  219:7 225:18
  239:25 240:21
  266:19 280:21
**facets** 88:25 232:21
**fact** 21:13 30:4 37:25
  38:3 55:20 65:8
  68:25 81:13 82:10
  82:13,24 88:3,23
  97:22 108:3 114:12
  142:3,6 160:9,10
  166:1 183:12
  187:12,15 234:16
  240:2 241:15,24
  243:9 256:16
  266:21
**faction** 203:25
**factors** 240:8 282:13
**facts** 27:23 33:2,2
  35:24 49:23 96:13
  120:24 121:12,21
  130:21 141:23
  144:7 145:6 146:6
  146:13 149:16
  157:17 158:17
  160:2 162:10 168:7
  196:14 225:10
  229:21 262:10
  263:20,24 264:18
  273:21
**factual** 28:2 50:8
  52:10 53:5 120:25
  121:8 141:9 229:10
  241:12 264:24
**Fagan** 35:14 37:21
  38:4,7 87:15 129:22
  129:24 130:5,8
  132:5 135:18 137:2
**failed** 125:7
**fair** 17:7 33:19 47:1
  56:5 69:23 74:11
  76:18,24,24 80:22
  88:7 90:25 91:12

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

17

92:21 93:12,16 94:8
94:23 97:11 116:4
129:19 201:25
204:4,12 206:16
207:16 214:21
236:20 237:20
241:2 260:15,24
261:8 263:10
266:13 278:15
**faith** 93:12,17
**fall** 20:11,11 22:5
84:17 173:12
183:12 184:7
197:12 217:6
**falls** 86:4,7,10
**false** 9:11 161:6
**familiar** 17:7 41:13
44:9,12 45:12 46:24
112:4 127:7 176:3
177:14 200:25
201:1 243:18,21
255:19
**family** 209:6
**far** 51:22 131:16
155:22 158:3
159:18 198:3,24
251:12
**fate** 152:9
**favor** 90:16
**favorable** 196:3
**features** 159:14
**Feb** 6:11
**February** 68:2
136:13 214:20,20
**federal** 2:21 37:6
94:17 95:18 112:14
141:12,13,17
144:15 145:12
146:3 147:4,11
149:14 171:12,17
173:10 188:5
247:13
**feds** 141:15
**feel** 9:1 49:24 74:5

282:16
**feeling** 53:12
**fees** 222:13
**felons** 160:11
**felt** 69:4
**fewer** 92:8 176:4
**fides** 82:7
**fifth** 121:25
**fight** 118:4 286:18
**file** 129:7 197:1 264:7
**filed** 26:20 32:14
33:20,21,22 34:24
47:19 87:20 88:15
92:12,19 103:14,16
105:24 128:17,21
129:3,4 144:13
261:22 265:20,25
**filibuster** 74:24
**filing** 104:16 128:19
234:13 289:7
**final** 40:13,15 70:15
70:15 150:25
170:23 172:17
180:13,21 181:17
187:22 188:17,18
216:4 221:21,24
226:18 236:3
**finalized** 227:24
**finally** 26:21 162:10
**finance** 65:8,9
**financially** 293:5
**financing** 65:13,19
**find** 45:12 253:7
259:24 284:20
**finding** 184:11,14
200:1 285:1
**fine** 209:20
**fingerprinting** 166:3
**fingerprints** 166:9,11
166:22 168:3
**finish** 8:22 18:4
142:16
**Firm** 293:14
**first** 6:13 7:2 9:7 15:3

15:6 57:20 72:19
80:16 104:13 116:2
118:10,24 119:3,4,4
144:10 148:19
150:12 153:2
158:21 161:9
162:22 175:24,25
216:1 218:7 232:1
232:15 233:13
252:10 260:9
261:25 262:2
269:22 270:16
271:5
**firsthand** 116:13
**fishing** 37:15
**five** 35:8 38:8 87:17
90:7 97:20 98:7
144:24 157:5
**five-minute** 209:18
**five-year** 17:2
**fix** 32:10,13
**fixed** 58:5
**flagged** 181:8
**flagging** 196:19
**flip** 256:17,19
**floor** 63:5 64:14
120:5 147:21 148:4
148:11,13 151:6
156:17 169:24
178:16 180:8 186:9
187:4,16 189:21
190:4 192:5 194:20
202:24 206:9,20
207:17 208:2,11
212:3,16 220:17
221:2 222:11 223:4
224:16 225:5 226:8
226:21 239:21
240:20 274:22,25
275:23 281:25
286:2,3
**focused** 100:17,19
101:19,21 257:23
**focusing** 120:9

**folder** 109:11
**follow** 255:9,12,24
**follow-up** 255:2
**following** 21:4 26:16
96:16 117:18 172:4
217:4 250:23
292:11
**follows** 7:4 292:24
**footsteps** 172:5
**force** 247:17
**foregoing** 290:20
**forge** 140:21 174:14
**forged** 173:9,20
174:2,4 177:13
275:18
**forget** 23:21 155:5
245:18
**forgetting** 22:15 50:1
51:12 180:15 265:3
**forging** 275:20
**form** 9:25 13:19
43:24 46:8 49:15
89:16,19,20 96:12
141:7,20 148:1
159:12 174:9
177:15 180:14
191:25 192:24
225:11 230:5 236:7
264:20 268:8,12
269:24,25 270:20
270:24 271:6,17
272:22 273:9 277:8
279:5 280:3,11,24
281:13 282:14,21
284:18
**formal** 69:19 133:23
140:9 264:5 276:2
**formatting** 131:18
**former** 161:19
**forming** 17:15 86:3,9
**forms** 36:20,22 37:1
37:21 38:5,14,22
40:3,21 41:10 44:15
54:8 55:9,14,18

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

18

88:4 89:4,8,14,19
89:25 90:4,23 91:7
91:14,19 92:4,8
94:16,20 95:1,5,18
96:10 100:24
133:16,21 135:15
135:16,20,23 136:8
137:14 138:8 139:5
139:24 140:25
142:22 143:16
144:16 145:15
146:7,14 159:2,9,15
160:17 171:21
172:8 173:4 175:8
175:13 176:2,4
177:4,12 179:1,22
179:24 180:7,12,16
184:6 191:17
215:13 216:19
217:16 222:14,17
224:2 226:3 232:23
234:13 271:2,20
273:18 275:20
276:11 277:18
278:1 280:17 281:4
281:16,19,22
284:12,13
**formula** 246:16
**forth** 131:19 132:14
140:23 157:17
179:13 209:9 240:9
288:14
**forward** 27:24
241:17 283:7
**forwarded** 169:8
249:9 292:21
**forwarding** 132:6
**found** 158:13 259:4
269:9
**four** 120:12 286:1
**four-fifths** 58:11
**fourth** 121:25
**frame** 203:16 270:19
**framed** 205:8,16

**Frank** 22:11,13,21
25:4,8 85:3 116:19
116:21
**frankly** 127:8 135:22
138:5 173:14 218:6
**Fraser** 32:12 34:12
34:13,17 67:4,9
69:25 82:20 104:16
104:20 106:12
127:10,23 145:9
192:4 207:4 210:2
210:15
**Fraser's** 35:18,19
137:3 143:12
**fraud** 27:19 28:4,7
29:6 30:5 31:21
33:5,7,9,12 42:8
49:8 50:12,18,21,22
50:25 51:1,3,3,4,5,7
51:9,10,13,18,21,23
51:25 52:4,7,8,9,17
97:22 107:10 108:2
124:25 125:1,11,13
125:13,14,14,18
142:5 144:5 157:11
157:14,19 158:2,9
159:22 160:15
162:6,8,8 176:1,3
176:18 200:22,23
207:19 208:19
210:22 265:2,7
266:4,5 267:3,8,13
267:15,16,19,20,20
267:22 268:2
273:22 274:1
**fraudulent** 124:6
176:16 229:16
232:25
**fraudulently** 161:5
**free** 9:1 31:12 39:24
39:25 41:1 74:5
162:23 163:15,15
163:17,17,19,21
180:9 184:25 185:3

185:6 237:17
**Friday** 154:12
**front** 36:9 166:6
180:21 181:17
191:18 236:17
237:19
**fulfill** 162:21
**full** 59:20 60:3,6 61:9
61:13 67:2 137:10
**fully** 30:11 79:11
**functions** 86:17
165:25
**fund** 1:12 3:22 7:15
257:6,16 287:3
291:12
**further** 46:1,13 112:1
144:4 158:23 202:2
293:2,5
**future** 58:1 195:25
267:24

─────────────────

**G**

**G** 3:8
**garner** 57:9 88:19
89:6 96:18
**gather** 258:23
**gathered** 193:14
227:12
**gavel** 127:21
**general** 2:20 3:9,9,14
3:19 4:2,3 15:9,14
16:7,11,16,24 17:3
18:13,16,25 22:10
22:14 25:4 32:4
52:22 93:7 109:13
125:13 156:18,22
183:13 249:8,9
250:10 252:22
255:14 261:3
267:12,14,22
**generally** 36:20
42:20 44:1 50:22
51:8 52:13,25 56:4
66:16 71:3,5,11

72:25 76:10 77:21
97:15 100:16
123:22 125:15
132:13 137:3,5
140:19 161:15
168:23 193:3
200:19,23 204:25
211:11 217:4
220:17,19 239:20
243:21 253:20
274:21 281:8
**generate** 93:24
**geography** 187:7
**Georgia** 87:24 88:2,8
97:4,8 131:2 132:16
132:17 133:8
171:23 172:10
186:25 262:4
**Georgia's** 171:11
172:5
**getting** 55:10 56:20
101:4,7 118:6
252:17 257:19
**gist** 132:23
**give** 13:4 53:3 82:2,2
82:13 96:17 240:16
260:11
**given** 18:4,15 48:7
76:21 77:22 90:25
112:1 118:2 130:10
181:18,22 186:23
187:2 188:10 207:8
223:13 233:22
246:4 247:8 271:21
292:14
**giving** 9:11 86:3,9
93:9
**gleaned** 254:14
**go** 30:2 63:4 69:2
72:14 74:5 92:16
97:2 99:13 108:13
115:6 120:20
122:11,13,14 128:2
128:15 134:9

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

19

137:17 142:14
161:7 164:25 165:4
170:6 174:19
182:12 186:2 195:6
198:25 203:24
206:22 209:16
244:10 280:20
281:21 283:21
284:9
**goal** 207:24 210:22
239:10
**goals** 97:19 98:2,7
175:22 180:5
211:11
**goes** 101:4 173:22
238:18
**going** 15:3 26:4 30:21
39:4 58:20 60:20
77:23,25 78:20,23
79:3,8,25 80:2,14
81:11 85:25 102:1
103:19,21 105:18
113:15 122:5,14,21
133:24 135:5
137:15 141:16
151:17,20 153:23
174:18,19 188:13
189:25 195:25
207:13 209:6,10,12
210:7,12 212:4
217:20 218:21
219:19 251:22,25
256:24 260:21
268:16 279:17
283:7 289:1
**Gonzalez** 126:15
**good** 7:7 42:12 66:23
93:12,16 110:13
122:20 127:5
141:14,15 197:22
234:5 257:4 258:4
**gosh** 142:24
**gotten** 273:6
**Gov** 5:22

**government** 37:6,9
37:10,11 45:1,2
55:19,19 140:23
141:12 147:4,5,11
171:12,13,13,18
253:16
**government-issued**
276:12
**Governor** 6:15 10:4
12:5,6 13:16 15:16
16:9,19 18:6,16
19:3 20:3 24:12
31:11,16 32:5,15
39:19,21,24 40:22
41:1 57:4,8 63:7
64:13 65:1,23 81:24
86:13,16 106:11
109:25 114:4
116:24 117:3,14
118:8 119:13,21
121:3,16,18 123:5
126:3,24 127:18
131:24 151:12
154:17 192:14,18
220:11 226:19
227:22 228:19
232:6 238:4,13,19
244:1,13 248:16
250:6,11,15 251:5
251:13 261:5
262:24,25 263:8,14
264:1,5,7,9
**Governor's** 10:5
12:12 13:2 56:25
69:15 106:21 107:5
120:4 121:7 123:3
151:19 215:16
231:23 248:19
249:22
**Governor's122** 5:22
**grave** 233:19
**great** 18:4 258:11
**greater** 94:21 141:4
**ground** 33:3 258:7

**group** 150:2 184:7
201:1 203:22 204:7
205:10 252:7 260:3
287:24
**grouped** 29:4
**groups** 29:8,10,11,16
92:24 94:11 131:22
182:5 201:25 202:4
205:16
**guess** 22:9 24:5 33:13
40:16 45:17 55:24
66:23 79:6 90:1
106:2 117:13 118:2
141:14 149:7 161:7
168:8 175:11
198:14 202:4
236:11 241:21
242:18 254:24
259:7 262:10 264:3
265:17 269:10
**guidance** 112:18
**guidelines** 23:12
276:18
**gut** 195:10,12
**guts** 195:11 196:6

**H**

**H-E-B-E-R-T** 7:9
**HALE** 3:23
**half** 122:18
**Halpern** 3:13 7:16,16
10:20 11:2,5 13:4
15:25 25:19 27:8,12
27:25 28:11 29:24
30:14 31:4,9,15
32:2 35:24 38:25
39:15 40:6,12,24
42:25 43:20 47:4,7
50:23 51:16 53:17
54:16 55:3 58:20
63:21 79:23 80:10
80:13,20 81:7,18
82:4,22 83:7 85:10
85:25 86:8,24 87:2

91:3 92:25 96:12
102:1 113:21
115:12 117:11
120:14 121:10,12
122:7,10,16 130:21
134:5,12,19,22
137:15,18 138:19
142:13 143:13
144:7 145:21 149:9
151:17,24 152:2
157:20 167:19,23
167:25 168:6 169:2
174:16,24 175:2,18
177:1 179:10
180:23 192:24
196:14 198:22,25
209:12,18 210:17
211:4 212:12
217:20 218:2,15
219:19 230:13
236:7 242:7 244:5
250:9 251:25
257:12,17,21,25
258:3 259:20,23
262:16 263:2
264:21 269:4
273:12 278:19
283:16,19 284:7
289:7,11,17
**hand** 127:20 251:22
**handed** 10:24 11:16
34:2,8 57:17 60:17
70:9 104:1 109:3
115:10 122:24
125:23 128:6
152:25 153:25
168:15 182:17
188:22 195:1
198:20,22 206:3
209:23 213:16
215:21 220:6
227:18 230:11
**handful** 254:11
**handgun** 37:4 180:14

BRYAN HEBERT                                6/17/2014
CONFIDENTIAL TRANSCRIPT

20

180:18 191:23
224:17 225:14
**handguns** 139:1
225:11
**handle** 19:23 20:1
112:19 248:17
**handling** 19:7 248:20
255:13
**happened** 18:2 60:6
73:19 74:7 114:19
119:11
**happening** 172:3
**hard** 151:6
**hard-photo** 92:1
95:24
**harder** 275:2
**Harless** 102:21
**Harris** 250:25
**hat** 53:19
**HAVA** 164:15,19
**HB** 26:9
**head** 8:20 106:24
151:11 211:23
276:13
**heading** 269:22
**hear** 60:6 61:14
113:17,23
**heard** 62:21 67:2
76:25 203:16
208:16 214:3,25
286:23 287:1,4
**hearing** 61:12 68:3
79:11,24 86:7
178:22
**hearings** 245:9,23
247:17
**Hebert** 2:9,14 5:3,20
7:1,7,9,24 39:9
82:19 83:12 103:24
109:9,9 257:4 258:4
259:21 290:20,25
292:7,12
**Hebert's** 81:23
**held** 43:6 103:3 245:9

245:23 247:11
275:24
**help** 53:15 84:21
93:10 112:4,7
130:23 131:18
141:16 164:6
189:20 269:1
286:24 287:2
**helped** 130:18 287:20
**helpful** 45:10 85:7,13
261:14 279:8
**helping** 7:23 217:7
**hereto** 2:23
**higher** 56:4
**highly** 2:12 77:24
78:1,10,11,13 79:14
79:15 80:17 81:4
83:4,5 102:10,14
103:20,22 105:7,9
113:16 120:18
122:6 135:3,11
144:18 153:24
168:11 169:3,5
209:11 230:9,16,23
239:14 251:23,24
258:12,14,20
265:11,13 268:5
269:2 289:16
**Hinojosa** 191:21
**hire** 18:12
**hired** 15:3,6
**Hispanic** 1:14 178:11
178:25 193:7 241:2
241:5 242:4 243:5
243:11 291:14
**Hispanics** 162:16
**historically** 56:3
270:12 274:4,15,16
275:9
**history** 5:13 6:10
51:20 67:20 70:4
74:4 77:8 84:7
94:19 119:25
125:12 170:1

209:25
**hold** 18:23 247:17
**Holder** 7:25 8:7 78:6
135:6 243:19
245:10,22 247:10
**holograms** 140:20
**honestly** 194:11
206:24 225:18
236:23
**hope** 77:2 97:21
101:10 105:8
168:11 254:1 255:5
**hoped** 278:14
**hopeful** 258:14
**hopefully** 229:15
**hoping** 134:12
**hour** 58:21 102:2
122:18
**hours** 20:18 21:24
58:17 62:21 63:14
66:21 68:9 122:11
122:11,12,12
134:14,14,14
179:12 185:25
239:17,20 240:5,7
254:18 282:6,8,11
282:17,19 283:2
288:4,11,14,18,23
292:25
**house** 56:15 57:9
70:22 74:2,8,12,17
74:24 75:7,8,19,22
76:2,6,8,15,20,25
77:4,6,7,9 102:17
102:19 103:7,9
108:2 152:9 178:16
190:2 211:14 214:3
238:11 243:10
245:25 261:3 286:2
286:9
**Huffman** 155:1,3
189:3 272:14
**Huffman's** 154:23
189:2,3

**humans** 160:24,24
**hundred** 160:9,22
166:6 180:22
198:14 216:5
**hundreds** 209:1,2,2
**hunting** 37:15
**hurdle** 73:23 74:1
**hurdles** 279:23
280:14,20 281:12
281:17
**hurry** 246:7
**hypothesis** 140:8
**hypothetically**
284:16

I
**ID** 5:15 6:16 9:22,22
11:22 14:7 20:5
22:7 24:13 26:7,13
26:16,23 27:7,16,24
28:3,10,17,21,24
29:3,13,18,20,21
31:7 32:10,17 33:4
33:16,19,20 35:6
36:8,20,22,23 37:2
37:3,21 38:5,7,14
38:22 40:3,11,22
41:10,13,23 42:19
42:24 43:9,12,16,18
43:25 44:9,15 46:8
46:12 47:16,24 48:9
49:15,16 50:17,20
51:14,19,21 53:14
53:15,24 54:8,24
55:11,14,16,18
59:11 61:7 62:14
63:11,13,25 64:3
73:12 76:4,7 87:24
88:8,24 89:4,8,11
91:1,13,17 92:1,2
92:15,22 94:16,19
94:20 95:1,5,10,18
95:25 96:6,6,10
97:2,5 98:6,19 99:7

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

21

99:9,12 100:5
102:24 103:1 104:6
104:16,18,24
105:24 107:25
108:22 109:7
110:10,16,20
111:17,18,24 112:2
114:4,8 115:21
116:2 117:6,19
119:14,22 120:9
124:1,11,17,17,23
125:6 126:6 131:1
131:21 132:9,9,14
132:15,24 133:17
133:21 134:3
135:15,17,20,23
136:8 137:14,23,25
138:8 139:5,9,16,24
140:11,14,15,25,25
142:10,22 143:5,7
143:10,16,19,21
144:4,16 145:7,12
145:15,19 146:3,8
146:14 147:4,10,10
147:12 153:14
155:10 156:24
158:5 159:2,9,11,15
160:17 161:21
162:15,23 163:2,15
164:10 165:2
171:12,17,21 172:8
173:4,10,20 174:2,6
174:10,22 175:6,7,8
175:13 176:2,4,16
176:17,19 177:4,7
177:12,15 178:12
178:23 179:1,22
180:7,12,16,17,18
182:8 184:6 185:3
186:24 189:23
191:17,25 193:5,7
193:24 194:13
195:9 196:7 199:18

211:11,25 213:23
215:13 216:19
217:16 218:9 221:9
222:14,17 224:2,9
225:5,12,12,15
226:3 228:8 229:1
230:6 231:13
232:16,17,20,24
233:6,9 234:13,16
237:13,14 241:18
241:19 245:10,24
246:13,23 251:8,15
255:20 260:12,16
260:19 261:9,12
262:14 263:12,16
263:22 264:11,20
266:2,5,7,15,20
267:9 268:8,12,17
268:19,22 270:4,6
270:18,20,24
271:17 272:22
273:18 276:11
277:9,17,18 278:1
278:11,17 279:13
279:15,16 280:3,7
280:11 281:13,16
284:12,18 285:22
**idea** 116:14 164:24
271:10 273:1,2
**ideal** 73:16
**ideas** 206:24
**identification** 9:25
10:23 11:15 20:10
34:1,7 37:1,5 42:3
42:14,15,16,22
45:21 47:11 55:21
57:12 58:15 60:16
62:10,20 70:8 78:4
88:4 89:14 90:24
92:9 100:25 101:3
103:18 107:11
109:2 115:9 122:23
125:22 128:1
136:11 138:17,18

139:8 141:8 152:24
153:22 159:6,12
160:13 162:25
164:13 168:14
173:8,16 175:10
179:24 180:10
182:16 184:5 185:1
188:21 194:25
198:19 206:2
209:22 212:25
213:8,15 215:20
220:5 225:16
227:17 230:10
233:25,25 234:2
237:17 241:24
251:21 252:17,22
253:21 268:22
269:24,25 271:3,7
271:21 273:10
275:21 276:2 279:5
279:22,23 280:9,16
280:25 281:5,19,23
282:15,22 283:9
284:13 286:23
287:18 288:17
**identifications**
172:24 183:25
225:25
**identified** 160:7
217:22 241:23
276:7
**identify** 180:3 192:21
280:20 281:16
**identifying** 161:5
194:13 225:17,20
226:2 282:21
**identity** 173:25 270:2
**IDs** 37:17,18 44:20
44:24 54:14 99:25
136:2 137:4 138:11
138:13,14 140:22
146:18,23 147:1,2,8
147:13,19,23 148:1
171:8,10 172:13,14

172:19,20 174:4,14
176:10,11,12,24
183:10 185:6 187:6
188:1,4,6,15 195:13
195:14 196:8 212:3
224:25 225:21
226:4 233:22 268:7
268:11,14 270:10
270:11,20,24 271:6
271:16,20 272:3,22
273:4,9,9,22,25
274:4,6,8,12,16,20
275:9,15,18,20,23
276:6,12,16,19
277:4,8
**II** 97:20 98:2,7
111:10 144:23
**III** 112:21
**illegal** 53:16 201:23
202:17 203:17
208:13
**illegals** 200:15,18,19
201:10,17 202:10
203:17,24 204:14
204:15,20,24 205:4
**imagine** 19:22 27:18
61:17 77:17 89:18
131:5 198:15 211:1
244:12
**Imania** 257:6
**immediate** 73:24
**immediately** 67:1
**immigration** 53:14
53:16,23 103:12
201:22
**imminent** 117:8
**impact** 41:22 47:20
48:2,4 51:5 52:8
53:2 68:18,25 69:11
72:6 94:11 95:2,6
95:15 125:19 132:8
133:6,8 140:6
150:17 183:22
193:6,7,14 196:3

BRYAN HEBERT                                      6/17/2014
CONFIDENTIAL TRANSCRIPT

22

227:13 234:21 242:1 250:7,17,21 275:14 279:12 286:6
**impacted** 42:1,11 132:24 194:17 242:11 245:15
**impermissible** 279:20
**impersonate** 142:1
**impersonation** 125:16 248:24 249:12
**implement** 20:10,25 158:4 181:19 186:1 252:17
**implementation** 14:7 19:16 248:3 249:23 250:1 287:20
**implemented** 131:1 152:18 158:2 162:24 185:11 193:5,19 264:16
**implementing** 20:18 21:7 264:14
**implications** 132:9
**importance** 76:13
**important** 76:3,13,14 77:21 209:3,4
**importantly** 131:6 209:1
**impose** 281:11
**imposed** 285:5
**imposes** 284:5
**impossible** 86:21
**impoverished** 183:10 183:17
**impression** 52:16 73:24 89:4 204:23 230:3,4 277:7
**impressions** 39:4,21
**improve** 48:14 50:13 50:14 158:18,21 177:5

**improved** 29:7 263:16
**improvement** 49:19 230:5
**improves** 262:2
**improving** 42:7 49:7 50:5 158:23 176:6
**in-person** 50:18 51:1 51:9,25 52:6 125:15 125:18 142:4 253:12 267:20
**inaccurate** 33:13 49:8,9 159:22 202:11,14
**include** 15:15 16:8,12 16:16 36:12 37:21 38:5,14 44:24 132:3 133:17 135:16 138:23 143:10 145:7,14 146:3,7 147:18 158:21 171:16 183:2,3,9,21 184:1 188:19 191:17 200:6 201:4 225:4,19 229:4 268:7 270:10,19 272:2
**included** 38:23 40:4 40:22 41:11 43:24 44:7 88:24 133:24 135:19 143:7 146:14 147:13 148:3,9,17 149:3 172:21 181:14 184:8 193:4 219:4 220:1 221:21 226:18 227:5 234:2 234:13,23 235:4 237:14 252:23 268:14 271:17
**includes** 73:14 143:5 147:17 162:15 171:12 181:9
**including** 10:14 35:6

73:12 96:6 101:17 138:11 145:19 154:10 225:11 227:6 234:14 240:8 272:22 279:13 284:12
**inclusion** 44:21
**income** 238:23
**incomplete** 33:13
**inconvenience** 165:18
**increase** 27:19,20 56:8,12 92:23 93:11 94:16 96:10 113:7 143:23 162:18 171:9 172:2 175:6 266:24
**increased** 76:9 94:24 256:8
**increases** 95:9,17 144:15 172:24 266:21
**increasing** 20:17 144:5 160:21 171:25 172:6,23
**incumbent** 230:16
**independent** 17:14 133:14 255:23 282:10 283:12,15
**independently** 85:6
**INDEX** 5:1
**Indiana** 43:8,14 46:19 47:3,17 87:24 88:2,8 97:4,8 110:7 110:14 131:1 132:16,17 133:5,8 187:1 193:11 262:4 279:13
**Indiana's** 42:16 110:9
**indicate** 83:5 87:22 101:7 107:7 117:17 221:17 276:2
**indicated** 105:23

117:1 119:20 218:1 253:24 285:16
**indicates** 120:8 130:2 165:20 190:13 216:9
**indicating** 141:23
**indication** 49:13 155:16 216:25
**indications** 125:6
**indicative** 279:16
**indigent** 221:5,9,11 234:15 237:10,19
**indirectly** 133:12
**individual** 21:2 27:1 42:10 43:3 50:2,10 70:6 152:7 161:18 212:4 244:8 249:4 257:7 258:1 279:14 280:2,21 281:12 287:5
**individuals** 29:1 148:2 149:20 178:22 183:12 184:1 193:24 221:8 251:3
**indulgence** 120:19
**ineligible** 31:21 52:20 123:24 124:6 160:12,25 161:3,11 161:24 162:3 176:15 200:4,8 203:20 204:7 229:14
**infer** 49:17
**inference** 52:11
**inferring** 52:24
**inflammatory** 202:15 202:19,22,24
**influence** 187:24 240:10
**inform** 69:3
**informal** 25:22
**information** 19:4 78:19 110:6,9

BRYAN HEBERT                          6/17/2014
CONFIDENTIAL TRANSCRIPT

23

139:14 141:18
148:15 156:5,20
178:10,25 183:2
192:12 201:4
215:12,15 216:18
216:21,23 217:1,5
217:11,13,15,17
219:3,10 225:17,20
239:10 254:13
285:12 288:7
**inherently** 273:19
**initials** 126:13
**initiate** 20:22
**initiative** 20:20
**innumerable** 188:9
**input** 34:18 44:3,4
89:25 130:5 207:11
219:2 265:4 276:14
**inquired** 253:20
**inquiries** 20:9 253:23
287:25
**insert** 239:16
**Insofar** 113:12
**instance** 2:15 26:5
80:16 174:11
**instances** 15:23 35:11
65:7 142:9 203:19
203:22 215:6 265:7
267:15
**instill** 48:14 52:20
53:11,12
**institution** 147:17
171:17,18
**institutions** 147:14
271:23,24,25
**instructed** 210:15
289:4
**instructing** 149:15
**instruction** 54:2
131:11,14,15
**instructions** 8:2 9:14
12:24 13:3,9 32:7
**insurmountable**
73:25

**integrity** 48:14 49:7
50:5 124:20,22
125:2,7 199:8,12
200:20 201:11
233:10 252:19
**intend** 174:12
**intended** 24:6 53:2
88:19 90:16 124:1
125:12,18 149:7
168:5 189:20
231:16,21,22
**intending** 91:24
**intent** 52:5 63:6
126:3 160:6 161:17
164:9 202:13,14
204:6 233:5,8 239:7
242:16 273:16
**interact** 255:12
**interacted** 272:17
**interchangeably** 9:23
**interest** 42:6 94:1
102:24,25 103:3
104:18 120:9
131:22 134:23
175:25 202:20
203:13 212:24
257:18
**interested** 137:23
293:6
**Interesting** 138:1
**interests** 157:5
**interfere** 80:1 143:20
143:21 175:14
176:17 177:6
**interfered** 223:5
226:22
**interferes** 144:1
**Intergovernmental**
3:18
**interim** 246:22
**internal** 219:8
**Internet** 101:14,16
133:2
**interns** 7:23

**interposed** 120:15
**interpret** 9:24 43:4
202:4 266:23
**interpretation** 229:3
266:25
**interpreted** 270:8
**interpreting** 169:17
**interrogatories** 6:13
215:14 216:1,10
**interrogatory** 215:8
215:9 216:14,17,22
217:25 218:3,16,25
219:5 220:1
**interrupt** 258:18
**interrupting** 105:3
**interruption** 182:9
**Intervenors** 6:13
7:15 215:25
**introduce** 7:12 69:17
**introduced** 34:12
63:3 135:4,11 162:7
**introducing** 78:18
**introduction** 78:21
258:5
**invite** 60:21
**invited** 60:22 206:10
**involve** 24:13
**involved** 19:16 20:4
25:16,21 34:19,22
35:2,9,15,19 36:2
38:10,13 42:14
87:12 129:15,22,25
130:7,13,14,15
133:15 145:18
213:7 215:7 230:14
238:11 239:3 256:7
272:15
**involvement** 77:15
238:15
**involves** 39:1
**involving** 265:14
**irresponsible** 202:9
**isolated** 183:10,16
**issuance** 222:13

276:19
**issue** 39:11 43:8 44:6
46:19 50:9 81:20
86:15 101:19
112:24 113:3 114:4
149:25 150:12
173:10,17 181:8
189:20,22 203:1
245:12 246:6,8,23
248:20 255:19
256:4 267:16 272:7
274:23 279:1 282:3
282:4 286:20
**issued** 37:2,4,6 41:16
41:20 81:16 137:14
138:18 145:12
146:3 147:4,10
159:11,16 163:3
171:12,17 173:21
173:22 180:10
213:22 225:14
226:3 239:11
244:25 245:2,11,17
245:19,22 249:20
**issues** 19:5 53:14
117:7,9 119:2
120:10 126:8
151:10 190:12
207:9 212:24
214:12 225:15
248:17 252:19
255:14,20 257:24
**it'd** 205:11
**item** 23:11
**items** 159:6 206:12
209:4 227:4,11
**iteration** 107:22
**iterations** 129:7
148:20 264:14
**IV** 246:16

**J**

**Jackson** 155:2 169:9
265:15

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

24

**Jan** 6:1,2,3,5,6,7,8,9
  6:14,17
**Janice** 35:18 82:19
  83:14 101:19,21
  104:4 114:7 128:22
  129:17 131:15,16
  132:4 137:1 154:13
  194:9,10 259:2,22
  261:17 272:6
**Janice's** 189:8 194:9
**January** 5:15,23,24
  16:25 17:10 113:22
  118:11,25 119:22
  121:9 123:9,14
  128:10,19 129:7
  136:6,14 138:21
  142:20 149:2
  154:12 169:21
  170:23 189:6
  214:20 220:10
  232:9,10 260:3,5,24
  262:11 265:14
**January-February**
  139:21
**Jason** 154:13,20
  199:6
**Jennifer** 35:14 87:15
  129:22,24 130:5
  132:5 137:2
**jlawyer119@aol.co...**
  169:12
**job** 66:23
**jobs** 209:5
**Joe** 75:16
**jogging** 277:20
**John** 19:25 136:20
**Johnson** 23:24
**joint** 58:10
**Jonathan** 154:13,23
  265:14
**Journal** 5:16 6:14
  70:12,24 72:15,24
  120:6 220:9,25
**judge** 78:18,22,23

79:3,5,8,17 80:16
  81:16 135:7
**judge's** 78:8 79:12
  81:14
**JUDGES** 1:14
  291:14
**judgment** 124:4
  288:22
**judicial** 243:19
**Julia** 23:20 116:19
  154:17 207:5
**juncture** 239:16
**June** 2:10,17 245:19
  245:22 247:1,7,7
  249:13,15,18,24
  292:8 293:7
**jurisdiction** 28:8
  95:14 127:2 185:17
**jurisdictions** 33:7
  125:1 132:19 280:6
**jurisprudence** 64:19
**Justice** 3:3 79:4
  168:24 177:18,25
**justified** 263:22
  264:19
**justify** 267:8

_____

**K**

**Katie** 206:13,14
**keep** 83:5 174:18,19
  289:1
**keeping** 205:22
**Kelly** 3:23 7:13 257:4
**kind** 25:10 49:1,2
  118:9 131:9 136:5
  159:21 160:1
  205:21 207:14
  258:7
**Kinko's** 173:22
**knew** 94:12 104:23
  158:3 163:5
**know** 9:5 19:18 21:12
  22:22 26:2 27:6
  29:4,14 30:6 32:20

33:21 34:13 35:4
38:15,22 41:25
43:17 44:1,6,12,18
44:20 46:11,15,16
46:18 51:20 52:12
55:6 57:8,19 59:18
61:15,18 62:5,16
66:10,13 67:7,8,10
67:11 69:9,20 70:2
72:22 73:10 74:7
75:25,25 77:2,13,14
80:21 82:6,11,12
84:20 87:12 89:3
90:17 91:7,8,16,18
92:9,14 93:9,10,20
94:5,12,20 96:23
97:13 100:17,19,23
101:21 102:25
103:5,8,10,13
104:15 106:8,10,12
106:15,16,18 107:5
107:20 108:5,7,14
109:23 110:13,15
115:19 116:8,9,18
116:22,22,25 117:3
117:5,13,21,23,24
118:2,8,17,17 119:5
119:6,6,7,7,19
121:15,15 123:20
126:12,18 127:4
128:20 129:1,3
130:5,12 131:5,16
132:2,13 134:2
135:23 136:15
137:5 138:15
139:15,20 140:2,5
140:12 143:3,7,8,9
143:12 145:14,17
146:11,22,24
147:18,20,20 148:2
148:9,12 149:3,5,7
149:10 150:1,13,20
151:4 153:11
154:25 155:22

156:20,23 157:8,14
158:5 159:14,18
160:2,2 165:15,25
167:18 168:4,5
169:11 170:21,22
171:23 173:11,15
174:10 176:12
178:14 179:8,11,25
180:13 185:23,24
186:8,15,18 188:9
190:6 191:14,19
192:6,7 193:16
194:7,15,17 196:20
198:3 199:4 201:17
201:19,19 202:15
204:22,22 205:6,10
205:24 208:15,22
210:7,12,14,20,23
213:18 214:11
215:14 219:22,25
220:2,2 222:6
223:17,23 224:12
224:14,22,23,24
225:2,3,13,16
228:14 229:9,9
236:23 238:7 239:1
239:16 240:2
245:13,17 247:25
248:2,13,14,16
256:5,19 267:10
271:18 273:11,16
274:5,8,11 276:1
277:23 278:23
282:23 286:17,21
286:21 287:6 288:6
288:12,13
**knowing** 128:21
  137:23 156:16
  191:13
**knowledge** 22:4
  32:25 38:19 54:4
  56:2 69:21,23
  116:13 118:11
  180:2 183:5,15

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

25

225:13 237:5
250:20
**known** 44:11 220:19
**knows** 194:10

**L**

**labeled** 218:8
**lack** 49:11,17,21,24
52:14 111:17
229:25 241:22
251:15 255:25
271:22
**laid** 33:5 72:23
175:22 280:16
**language** 35:12
130:18,24 166:6
171:11,16 172:9,10
172:11 173:18
183:7,18 188:4,19
195:18 199:23,25
202:15 212:2 236:2
236:10,12,17,23
237:24 238:24
239:6,8 240:15,21
**large** 28:22 173:9
188:10 225:24
226:24
**largely** 198:9 285:18
**larger** 162:4 204:7
223:8 229:14
**LaRue** 189:15 200:14
**late** 107:4 136:13
168:1 247:6,7
**law** 14:25 15:15
42:13 43:8,14 44:22
44:23 46:19 47:3
53:1 82:9 84:23
91:10,17 92:16,17
99:25 110:7,10,14
112:14 113:6 125:7
133:18 141:18,24
151:1 152:23 159:7
164:7,20 171:12,23
172:10,11 181:9,16

182:20 186:1,14,17
186:20,24 221:22
221:25 233:6,9
235:4,7 236:1,6,19
237:15,21 249:4,9
249:18 260:12,16
260:19 261:10,12
262:13 263:12
264:20 267:9 269:7
269:20 270:6
278:11 280:10
281:11 285:5
**law-permissible**
140:22
**laws** 83:18 88:2,8
89:23 97:4 110:16
154:7 171:24
186:25 195:25
262:15 278:17
285:23 286:23,24
**lawsuit** 257:14
**lawyer** 82:12 134:17
**laying** 206:8
**lays** 62:19 73:12
206:10
**lead** 15:4
**leader** 81:25
**leaders** 76:17
**leading** 81:10 142:10
**League** 1:11 3:22
7:14 257:5,15
291:11
**learn** 20:14 133:7
138:1 187:12,13,14
255:9
**learned** 20:16,17
254:25 277:21
**learning** 132:25
**leave** 280:10
**led** 262:12
**left** 18:17 22:15
240:4
**LEG00004939** 252:5
**legal** 15:22,24 16:9

16:12,16,23 19:2,2
19:5 30:10 82:11
86:14 203:11 242:7
267:17 284:7
**legality** 156:24
**legally** 150:11,13
228:9
**legislation** 15:20
32:10 35:6 40:4,11
41:23 42:3,12,15,19
44:13 48:25 50:21
51:15,19 52:25
62:14 104:19 114:5
114:9 124:17
131:22 132:24
135:25 153:14
267:11,24 268:18
270:18 272:15
276:10,14 280:9,17
**legislative** 6:10 21:18
22:8 23:21 26:16
31:7,17 32:1 33:16
34:14 39:5,9,10
40:7,20 44:2,10
53:22 63:2 76:21
77:22 78:8 80:20
81:1,15,25 86:17,20
86:22,25 103:2
119:25 121:1 137:7
152:1,21 154:24
209:25 240:1 241:3
245:13 247:9 251:9
272:2,20 286:1
289:5
**legislatively** 135:7
239:23
**legislator** 30:25
219:7 250:19
**legislators** 4:1 7:22
27:1 43:3 44:4 81:2
86:19 92:20 152:7
178:25 179:4
194:16
**legislature** 5:13,14

6:1 26:6,15 27:7,17
28:19 29:2 30:19
49:24 51:2 52:13
53:1,3,10 67:20
76:10 93:19,25
95:22 150:15 152:7
152:12,18,19
170:24 171:7 178:9
179:16 180:6 190:1
203:13 223:2,16
224:12 229:12
233:6,8 240:16
244:22 245:4,24
247:17,24 248:11
251:5,13 262:23,25
263:4,6,19 271:13
**legislature's** 42:24
118:13
**legislatures** 227:3
287:9
**legitimate** 157:5
175:25
**length** 74:13 75:11
178:15
**lengthy** 68:8
**lenient** 47:2,9 97:13
**lens** 42:15
**lessening** 234:22,24
**let's** 58:22 102:3,4
115:6 116:21
142:14,14 174:18
180:25 182:12
199:3
**letter** 5:23 13:20
70:24 71:4,5,15,19
72:9,20 126:1,2,9
126:11
**letters** 13:24
**level** 33:8 42:11
141:13 249:5 285:2
285:7
**library** 37:15 101:17
**license** 37:1,4,12,14
37:15 44:25 48:9

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

26

138:17,24 139:2,7
141:19 161:19
167:16,17 180:14
180:17,18 185:21
186:7 191:23 213:4
213:23 218:9
239:18 240:5,17
256:11 274:10
277:22,24 284:12
**licensed** 14:25
**licenses** 55:21 163:1
165:23 212:21
224:18 225:14,15
239:9,11 240:11
**lie** 93:15
**Lieutenant** 5:22 10:4
10:5 12:5,6,11 13:2
13:16 15:16 16:8,19
18:6,16 19:3 20:3
24:11 31:11,16 32:4
32:14 39:19,21,23
40:22 41:1 56:25
57:4,8 63:6 64:13
65:1,23 69:15 81:24
86:12,16 106:11,21
107:4 109:25
116:24 121:16
123:3 126:3,24
127:18 131:24
151:12,19 154:17
192:14,17 215:16
220:11 227:21
228:19 231:23
232:6 238:4,13,19
244:1,13 248:16,19
249:22 250:6,10,15
251:5,13 261:5
262:24,25 263:8,14
264:1,5,7,9
**light** 43:14 79:23
**liked** 62:7
**likelihood** 56:8,13
72:10 76:9 92:23
172:6

**likes** 261:2
**limited** 44:15 64:11
69:17 125:15
**Linda** 3:13 7:16
**linda.halpern@tex...**
3:16
**line** 105:24 116:3
120:17 126:7
150:22,22 205:9
290:3
**lines** 140:4 274:9
**link** 53:23
**list** 13:23 21:17 37:7
44:18,18,20 82:17
89:11 95:10 130:11
130:14 157:5 171:8
171:10 175:8
176:10 181:11
185:5 191:12 227:4
234:17
**listed** 44:16 97:19
120:10 140:19
147:2 159:2 182:7
191:10 203:21
207:5,12 216:7
219:5 228:3
**listening** 89:22
**lists** 186:19 221:2
**litigation** 1:13 39:12
44:4 81:17
**little** 25:16 98:11
142:15 174:19
**live** 161:4
**lived** 187:9
**lives** 187:11 209:6
283:4
**local** 21:23 51:2
147:5 171:13 173:9
188:5,11 249:9
**located** 216:14
240:11 283:1 288:8
**location** 281:20 288:4
**locations** 20:18 254:1
254:1 255:7,10,11

256:9 271:24
281:21 282:9
**log** 80:15
**logic** 81:13 157:16
**long** 19:12 31:9
117:18 176:9
186:13 209:12
268:1
**long-serving** 127:7
**longer** 171:8 176:9
**look** 13:9 29:14 45:8
54:6 61:2 62:9
67:17 70:17 71:8
89:2 98:23 108:21
131:21 138:6,10
143:1,3 158:19
211:21 212:1
213:17 225:19
235:15 236:8 252:3
252:25 265:10
268:25 269:9 282:3
**looked** 100:15,16,20
100:23 101:3
130:24,25 131:2
132:20 133:14
281:18
**looking** 34:5 36:9
52:13 77:8 82:11
88:17 89:10,23 91:6
100:1,7,21 107:9
129:2,10 131:23
208:7 227:1 233:3
235:20 266:19
280:2 281:1
**looks** 34:10 36:25
45:14,16 57:20
70:12 74:9 77:9
83:14,23 104:4
109:23 110:8,12
115:20 123:2
128:10,23 153:2
154:3,15 169:23
188:25 195:4 199:5
206:6 209:25

213:20 215:24
219:8 221:12 224:3
227:21 231:5 252:6
**lose** 58:9
**lost** 209:13
**lot** 33:12 55:22 74:20
131:6 141:14 190:2
190:10 209:6
211:13,15,17
276:21
**lots** 27:9 44:2 73:11
89:24 124:13,16
133:13,21 148:13
162:7,8 165:11
179:24 209:3 287:1
287:4
**Louisiana** 131:2
132:18
**loves** 195:16
**low** 106:10,13 238:23
**lower** 116:3 191:3
**lowest** 281:7
**Lt** 6:15
**lunch** 122:8,21
142:13,14,17,19
145:22

_____

**M**

**machine** 2:19
**mail** 37:10 51:9
197:4,6,8,19 198:2
237:3
**mail-in** 198:4,6,12
**mailing** 13:23
**main** 208:25
**maintain** 46:16
**maintains** 183:2
**major** 74:10,15 75:7
75:13 77:20 88:11
247:11
**majorities** 28:23
**majority** 58:17 61:22
61:25 63:16 64:1
65:20 153:13,19

BRYAN HEBERT                                6/17/2014
CONFIDENTIAL TRANSCRIPT

183:3 187:10
**making** 30:5 42:8
  49:7 113:6 121:4
  133:23 158:22
**man** 123:18
**manage** 75:5
**Manager** 3:14
**mand** 78:11
**manipulation** 51:11
**manner** 13:20 202:5
  210:16 279:22
**MARC** 1:3 291:3
**March** 5:11 67:9,9
  68:3,4,5,6,6,10,12
  70:13,17 84:3,8,9
  259:1,22 261:17
  262:11
**mark** 10:21 11:14
  33:24 34:6 57:11
  60:10,14 78:3
  103:17 108:25
  122:21 125:21
  127:25 153:21
  168:13 182:15
  188:20 194:24
  198:16 206:1
  213:14 215:19
  220:4 227:16
**marked** 5:9 10:23,25
  11:15,17 34:1,3,7
  57:12,17 60:16,18
  70:8,10 77:24 78:4
  103:18 104:2 109:2
  109:4 115:9,11
  122:23,25 125:22
  125:24 128:1
  152:24 153:1,22
  154:1 168:14,16
  169:2 182:16,18
  188:21,23 194:25
  195:2 198:18,21
  206:2,4 209:22,24
  213:15,17 215:20
  215:22 220:5,7

227:17,19 230:10
  230:12,15 251:21
  251:23
**marking** 26:12
**marriage** 37:12
**match** 218:11,11
**matched** 141:19
**matching** 217:17
  234:18
**matter** 15:22 57:18
  74:14 116:2 119:5
  131:8,9 198:17
  220:16,21 228:24
  267:17,17,18
  280:19
**mattered** 164:20
**matters** 16:21 76:2
  203:11 252:18
**MC109** 3:15
**McCoy** 35:18 37:21
  38:4,6 82:19 83:14
  84:4 85:14,18 87:5
  96:9 101:19 104:4
  108:9 114:7,24
  128:22 129:17,23
  130:8 132:5 135:18
  135:20 154:13
  170:16 259:2,22
  261:17 272:6
**McCoy's** 130:11
  190:20
**McGeehan** 136:16
  137:21 139:4
  212:20 213:7
  214:11
**mean** 9:24 10:10,13
  16:19 22:21 26:2,25
  28:21 33:18 44:1
  51:1,8 52:16 55:18
  56:3 63:2,23 69:15
  72:21 82:4,7 84:10
  87:17 89:10,24
  92:14 94:12,18,22
  96:21 101:1 123:22

125:14 126:13
  130:1 133:21 146:9
  151:16 152:17
  158:7 164:8 172:1
  175:24 178:19
  189:22 190:5,10
  192:17 194:8
  205:24 210:23
  228:15 236:8,23
  237:23 239:20
  255:20 264:4
  266:16,24 271:1
  282:23 287:4
**meaning** 28:4 188:5
  268:21
**meaningful** 164:21
**means** 117:14 195:13
  197:5 199:21
  211:12 218:9 282:7
**meant** 11:6 123:21
  139:8 168:4 201:7
  239:13 268:16
**measure** 58:1 263:22
**measures** 76:5 111:9
  112:16,21 162:19
  162:20,22 183:24
  264:11 280:16
**mechanism** 112:16
**mechanisms** 56:8,12
  56:21
**media** 21:23 248:1,2
**Medicare** 224:25
  225:4,12,18
**medication** 9:16
**meet** 64:13 117:18
  227:4 244:22 245:4
**meeting** 14:11 59:23
  60:4,7,22,23 61:9
  106:25 107:2 108:9
  108:15 136:9,12,13
  136:18,20,23,25
  137:5,9 139:3,12
  213:6 253:12
  256:22 287:16

**meetings** 21:5,5
  59:25 165:13 215:5
  287:11
**meets** 64:11
**member** 14:23 27:21
  76:14,15,16,20 77:3
  127:7 192:18 212:4
**member's** 151:8
**members** 26:22,24
  57:9 58:2,7,12 64:1
  64:11 95:22 115:21
  116:10 117:1 127:9
  150:21 179:13,15
  203:1 212:7,11
  243:10 262:21
  286:9
**memo** 22:24 23:7
  24:5 164:16 187:19
  187:24 195:4
  223:15
**memorandum** 82:11
**memorialized** 254:15
**memory** 8:5 29:19
  31:19 61:21,24 64:8
  64:18 65:5 66:7
  68:15 73:2 74:11
  75:6,11 83:23 97:21
  104:17 119:1
  129:11 137:1
  138:16 139:11
  148:4,11,12 156:9
  156:22 181:18
  189:19 212:1 244:3
  253:19 275:23
  276:9 277:20
**memos** 22:21 24:8,11
**mention** 100:13
  112:22 172:13
  195:16 200:22
  202:8
**mentioned** 21:22
  51:21 89:6 111:12
  117:7 121:23
  139:25 176:1

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

28

178:14 188:7 213:5
257:5 272:16
275:17 286:12
287:18
**mentions** 144:13
**message** 204:1
206:25 228:16,25
**met** 14:5,8 20:24 65:6
66:6,21 74:16
119:20 137:2
214:11 245:6 253:3
255:22
**methods** 101:2 134:3
265:1
**middle** 192:10
**Mike** 228:3
**military** 37:2 180:18
**mind** 23:1 54:6 65:12
88:5 89:9 92:10
115:12 148:25
287:5
**mine** 205:7 208:18
**minimal** 91:9
**minimize** 183:22
**minimum** 163:9
171:15
**minorities** 56:5 183:8
185:2 242:15,17
**minority** 10:9 48:2,5
56:1 68:18,25 69:12
70:5 71:13 72:6
73:14 90:10 92:1
93:23 94:2 95:15
139:22 150:18,21
162:15 179:6,16
181:12,15,20
182:24 183:3,22,23
184:1,7,22,23
192:16,23 196:3
212:4 222:5 227:14
230:7,7 234:21,23
234:25 238:23
241:17,19 242:11
243:10,14 250:7,17

250:21 262:5
275:15 286:8
**minutes** 209:14
283:18 292:25
293:1
**mischaracterizes**
157:20 175:3
**mischaracterizing**
218:3,16
**mishandled** 112:20
**misheard** 105:4
**misleading** 9:12
157:22
**misreading** 268:25
**misstated** 197:20
**misstates** 54:16 63:21
144:7 175:2 264:22
**mitigating** 181:9
185:5
**mix** 49:2 63:9
**mobile** 20:19 21:24
185:25 186:12
253:25 255:6,10
256:9 287:19 288:4
288:11
**mode** 252:1
**model** 44:9,13 131:21
**modern** 159:12
**modernization** 159:3
**modernize** 158:18
159:13
**modernizes** 159:9
**modernizing** 176:6
**moment** 252:25
**Montagne** 189:12,13
200:14
**month** 119:4
**morning** 7:7 250:4
258:8
**motion** 58:17 126:16
126:19 289:2
**motions** 289:8
**motivation** 205:3
**move** 79:4 117:1

218:22 257:9
258:14
**moved** 118:1 161:16
**multiple** 122:1
165:13 241:15,25
276:10 277:11
279:12 282:18
285:15,24

─────────
**N**
─────────
**N** 3:1
**N-O-L-T-E** 253:16
**N.W** 3:5
**NAACP** 1:21 291:21
**name** 7:8,10,21 37:13
151:11 175:1
234:16,17
**named** 3:7 7:20
199:4
**names** 21:2 29:10,15
132:22 193:2
**NANDITA** 1:24
291:24
**narrow** 229:3,5
**narrower** 236:14
**narrows** 175:9
**nature** 38:8 116:6
255:22 274:24
284:25
**nearing** 251:19
**necessarily** 55:25
208:24 228:21
241:8
**necessary** 46:12
55:22 94:22 195:13
**need** 28:3 46:1,7 50:6
50:7,8 69:4 99:8
102:2 120:25
123:18 124:10,22
140:14 143:2
149:17 166:8,11,12
167:25 181:20
197:12 207:22
228:11 229:7,12

237:18 240:24
258:15 289:10
**needed** 22:22 80:17
83:15 84:21 94:3
**needing** 288:17
**needs** 144:18
**negligible** 42:10 91:9
**neither** 204:19
217:23 286:8 293:2
**neutral** 203:10
**never** 24:3 93:15
116:3 148:25
201:19 286:23
287:16
**new** 44:13 254:1,2
255:11 256:11
269:19 285:11
**news** 21:15,16 110:13
247:25 250:23
267:12 288:7,13
**newsletter** 13:21
**newspaper** 21:18
89:22
**NGR** 1:5,11 291:5,11
**night** 156:5,8,21
**nine** 142:25 143:1
**nods** 106:24
**Noe** 5:20 109:15,16
**Noise** 182:9
**Nolte** 253:16,18
**non-Anglo** 10:10
**non-photo** 88:8,24
91:1,13,19 92:22
96:6 98:6 143:7,10
143:16,19,21,24
144:4 145:7,19
**non-Texas** 229:13
**non-U.S** 200:6
208:13 229:10,13
229:22
**noncitizen** 200:2
**noncitizens** 54:10
199:21 200:8 202:3
202:10 203:21,25

204:5 230:1
**nonphoto** 36:8 43:9
43:10,12,16,18 44:7
44:25 140:11,14,25
141:10,25 142:10
224:4
**nonprofits** 182:5
**nonpublic** 54:20
212:7
**nonresponsive**
188:14 194:1
**noon** 122:15
**normally** 74:13
**note** 81:7 149:12
236:20
**noted** 290:22
**notes** 14:20 58:19,19
189:8 194:9
**notice** 159:1 189:24
**noticeable** 251:2
**notwithstanding**
58:13
**November** 33:22
103:14 104:14,14
104:23 105:23
106:20 128:17,19
129:6 247:13 248:7
248:18
**number** 1:5,10,22 2:3
13:4 27:4 47:23
57:19 64:11 78:2,15
81:22 88:14 91:9,9
102:8 104:8 105:25
106:4,14 107:20
119:1,7 120:7 130:2
144:13 172:23
173:9 185:23 186:8
186:9,11 188:10,11
194:17 213:21
214:7 216:10 218:8
218:9,9,17 222:12
223:4,16 224:17
226:1,8,21 227:6
251:6,14 256:9

274:14,15 279:3
282:25 283:6,12
284:11,17 291:5,10
291:22 292:3
**numbered** 2:16
**numbering** 106:9
**numbers** 26:10 49:14
82:16 106:10
194:13 214:25
215:5 217:1 218:6
218:10,11 227:9
**NW** 3:24
**NWB** 3:4

---

## O

**oath** 9:10
**Obama** 169:16
**object** 30:8,21 39:8
78:20,23 96:12
135:2 137:15
188:13 192:24,24
193:25 217:21
219:19 236:7 281:3
**objecting** 168:6
**objection** 25:19
27:12,25 28:11 30:9
30:15,16 31:2 35:24
38:25 39:8,14 42:25
43:20 50:23 51:16
54:16 55:3 63:21
79:25,25 80:2,8
81:20 83:8,9 85:10
91:3 92:25 105:18
113:21 117:11
120:15,21 121:10
130:21 135:5,8,10
144:7 145:21
149:12 157:20,21
157:21 168:1
174:24 175:2 177:1
179:10 196:14
197:18 210:17
211:4 212:12
221:11 230:17,21

230:22 242:7 244:5
262:16 264:21
273:12 278:19
284:7
**objections** 6:12 73:6
79:11 80:7 86:16
113:23 149:21
215:25 258:20
**objective** 211:3
**objectors** 234:16
**obliterated** 230:20,22
**observed** 285:15
**observer** 203:11
246:2
**obstacles** 122:2
**obtain** 54:9,11 55:9
55:11,22,24 79:13
100:5 165:19
166:20 167:1
178:23 227:7
235:10,18 240:25
241:18,24 279:15
279:22 280:3,11,15
280:24 281:13,19
284:13
**obtainable** 237:3
**obtained** 160:18
184:16
**obtaining** 99:22,24
101:3,20 163:6
223:14
**obtains** 161:5
**obvious** 254:5
**obviously** 26:25
38:21 165:23
219:22 278:22
**occasions** 122:1
215:12
**occur** 143:15 206:18
252:9
**occurred** 15:19 20:6
34:23 68:9,10
108:18 163:24,25
248:24 249:12

**occurring** 157:13,14
**occurs** 187:5
**October** 18:11 19:15
**offensive** 202:18
**offer** 18:5
**offered** 18:19 189:25
195:8 221:3 222:12
223:19 225:1,5
226:8 254:19
**offhand** 89:2 233:4
234:6
**office** 2:19 5:22 7:23
10:5 13:2,19 17:4
19:5,7,20 20:17
22:4,18 23:15,17
46:8,23 56:25 97:2
99:3,8 100:3,9
106:21 107:5 120:4
123:3 135:18
136:10 137:22
139:13 154:4 155:4
155:5 167:17
170:12 185:22
207:8 213:3 215:4
215:16 218:23
232:4 240:7 248:3
248:19 249:23
250:16 253:25
254:1 255:10,11
260:25 261:5
262:12 263:11,19
264:13 271:10,15
272:21 276:5 279:3
287:8
**office's** 129:20
263:21 282:2
**office-run** 12:6
**officer** 19:5 292:13
**offices** 137:3 167:16
185:24 186:7 187:8
187:11 197:1
239:18,21 240:6,11
240:18 256:11
263:21 283:1,2,5

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

288:24
**official** 12:4,19,20
  13:1 37:10 47:16
  57:10 133:5 165:5
  175:7 248:2 271:15
  271:19 277:8
  279:22
**officially** 128:21
**officials** 51:2 133:9
  165:7 176:3 177:7
  183:13 196:25
  249:4 250:24,25
  251:1 270:8
**offset** 52:20 111:9,22
  112:13,22 123:24
  162:20
**offsetting** 124:7
**Ogden** 206:13,14
**oh** 41:17 60:15 94:12
  148:25 259:19,23
**okay** 8:20,24 9:2,3,7
  9:8 10:7,8 43:13
  46:25 61:1,4 71:10
  79:10 87:4,4 91:10
  99:19 102:3,7,15
  105:21 107:6
  113:12 114:23
  115:25 120:16
  122:20,21 134:19
  141:23 143:4 152:3
  157:16 168:8
  180:25 181:7 189:7
  209:15,15,20
  218:12 222:10
  223:25 258:3 259:3
  259:6 260:1 261:14
  267:1 268:5 269:21
  270:9,15 273:6
  279:18,25 280:19
  285:13 289:1,11
**old** 29:14
**older** 140:22 149:2
**once** 24:3 69:16
  165:6

**ones** 24:15 44:24
  152:21 173:6
  211:19 259:10
**ongoing** 271:2
**online** 5:13 67:20
  133:13 237:3
**open** 15:20 16:21
  19:4,21 122:9,17
  147:20 288:18
  289:2
**opening** 18:18
**operating** 283:2
  288:23
**operation** 239:18,20
  282:8 288:5
**operations** 288:11
**opine** 233:18
**opined** 195:10
**opinion** 28:22 40:13
  40:14,15 41:10
  49:22 86:3,9 141:3
  143:24 172:16
  174:3 230:6 234:9
  243:18,22
**opinions** 15:15 30:17
  30:18,22 39:18 40:3
  195:24
**Opperman** 19:25
**opponents** 73:6 75:4
  84:23 96:17 113:24
  134:2 151:10
  191:10,14,16,24
  192:5 211:15 275:1
  285:25
**opportunity** 18:14,15
  99:13 112:2 165:2
**opposed** 55:11 66:25
  94:13 100:24
  101:12 137:24
  140:22 224:4
  234:17 277:5
**opposes** 287:7
**opposing** 287:3
**opposition** 73:3

74:11,17 118:3
**option** 143:17 210:21
  281:7
**oral** 2:14 10:14
  292:13
**order** 58:1,3,6,8,10
  58:12,16 62:15,18
  62:22,25 63:13,15
  63:18,24 64:4 65:19
  78:1,15 79:19 99:9
  105:11,15 111:18
  135:7 153:14
  198:17 230:24
  281:13
**ordered** 289:3
**orders** 57:23 58:10
  153:5
**ordinarily** 62:23
  63:18 64:15
**organization** 21:3
  257:19
**organizations** 29:8
**organize** 207:14
**original** 289:19
  292:21
**originally** 105:23
**ORTIZ** 2:1 292:1
**outcome** 138:7 293:6
**outline** 206:21,23
**outlined** 62:12
**outlines** 84:22
**outright** 111:23
  277:5
**outside** 22:17 23:15
  51:1 67:5 180:1
  205:10
**outspoken** 272:24
**outweigh** 280:18
**outweighs** 42:12
**overall** 70:3
**overcome** 80:25
  281:12
**overheated** 203:12
**overly** 43:6

**Overseeing** 19:2
**overview** 83:18
  156:22
**overwhelming** 49:14
**overwhelmingly**
  162:17

___

**P**

**P** 3:1,1,23
**p.m** 2:17 134:11
  142:17 167:24
  181:1 209:21
  251:20,20 283:23
  289:15,20
**P.O** 3:10,15,19 4:3
**page** 5:9 13:7 36:24
  45:11,14,15 57:20
  57:21,22 70:23 82:8
  82:10 88:18 99:22
  100:1,13 106:20
  148:25 153:2,4
  157:1 169:7 190:23
  191:3 192:1,10
  193:6 216:6,13,25
  220:24 221:17
  222:8 223:18
  224:15 232:1 260:9
  261:20 265:17
  269:9,21 290:3
**pages** 44:16 82:7
  142:23
**paid** 17:20
**papers** 24:22 37:12
**paragraph** 13:7
  106:23 107:3
  123:17 228:7
  233:13
**paragraphs** 120:12
**parallel** 165:22
  236:18 239:7
**parentheses** 207:18
**parliamentarian**
  62:4
**parliamentary**

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

107:12 108:2,3
264:5
**part** 16:22 33:16
46:14 59:8,10 73:6
81:10 82:10 106:25
135:4 137:13
139:18 153:18
165:9,16 172:25,25
194:19 203:21
204:6 212:10
215:11 219:21
220:10 224:2
235:25 240:20
241:21 243:1,3,4,7
247:16 257:13
258:13 267:1,11
287:19 288:2
**participate** 242:5
**participated** 218:1
**participating** 36:3
161:25 200:7
203:18 228:12
229:11,19,22 230:2
**participation** 241:5
243:5,8
**particular** 24:5 26:22
26:24 29:8 32:16,23
33:1 35:23 36:4,5,6
41:5 44:6 51:6
52:21 59:16 61:15
66:20 90:20 94:13
130:6 132:20
135:16 152:14
159:8 164:16
178:20,22 181:5
194:13 196:10
215:2 229:17
232:21 272:20
285:16,17 286:24
287:2
**particularly** 50:4
87:12 169:19
272:23
**parties** 179:13

190:11 199:7
202:16 254:4
272:18 293:3
**partisan** 74:16 246:6
286:14,18,20
287:10,11
**partnership** 17:16
18:3
**parts** 150:19 151:9
239:9
**party** 17:25 109:18
213:2 286:25 287:2
287:6,14 292:23
**party's** 78:14
**pass** 11:6 76:11 111:8
256:24
**passage** 6:16 56:9,13
56:23 57:1 71:14
75:19 76:9 84:22
93:11 152:11,12
170:1,23 242:19,24
243:12
**passed** 26:13,21
56:16 68:4 74:2,14
84:9 118:6 119:3
121:24 122:1 170:4
231:7 233:18 234:3
235:2,7 237:6,22
242:21,23,25 243:2
261:11 286:10
**passes** 110:4
**passing** 27:15 48:25
206:25
**passport** 37:4 180:19
180:19
**passports** 277:25
**Patrick** 148:7
**Paup** 3:17 7:18,18
**pause** 82:13
**pay** 101:15 278:7
**paycheck** 37:10 45:1
**penalties** 232:25
**penalty** 9:11 166:14
167:6

**pending** 9:6 58:6
193:21 246:8,9
289:2
**Pennsylvania** 3:5,24
**people** 7:12 26:2
27:18 32:20 38:16
49:19 52:18 57:7
89:21 91:20 92:16
92:17,19,19 94:6
130:13,13 132:6
149:1 154:4 155:19
155:23 156:19
160:11 161:10,10
170:15 173:17
177:24 178:20
179:11 180:9 184:8
198:6,7 201:4,13,22
202:17 204:3,10,25
205:1,7 207:16
208:8 213:7,8
231:18,21,22
234:14 237:4,19
241:23 242:1
254:21 274:3 277:7
287:1,2
**perceived** 267:19
**percent** 160:10,22
166:7 180:22
198:14 216:5
274:10 277:21
284:19
**percentage** 91:22
187:9 274:7 283:3
**perfect** 160:20 162:2
162:5
**period** 17:2 67:1 68:9
113:19 129:12
132:1 136:5 245:21
246:23,25
**perjury** 9:11 166:14
167:6
**permissibility** 284:24
**permissible** 42:2
43:18,23,24 94:21

174:4 176:2 278:22
279:19 285:9
**permit** 43:9,15 92:2
146:17
**permitable** 94:21
**permits** 37:14
**permitted** 36:20
46:11 112:9 145:11
166:2
**Perry** 1:6 3:7 57:18
78:9 114:4 117:3
119:13,21 123:5
290:2 291:6
**Perry's** 5:22
**person** 10:2 17:4
19:6,10,12,19,24
25:6 45:20 74:25
75:1 82:20 87:10,16
101:13,16 118:20
123:19,20 124:1,9
124:11 125:3,4
136:22 141:21
154:20,21 174:1,22
175:7 195:8 207:8
221:10 230:19
235:18 241:23
248:15,23 249:2,5
249:11 251:7 253:3
253:17 273:4
279:22 280:15
**person's** 140:18
173:25 270:1,2
**personal** 12:8,25
13:9 37:2 39:13
48:9 55:21 116:5
138:17 180:17
213:23 225:16,17
**personally** 148:12
179:3 229:5 249:1
263:15
**persons** 160:18
184:16 204:20
217:4 236:14 237:9
**pertain** 71:11 102:12

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

**pertaining** 80:3
226:11
**pertains** 81:23
**phase** 155:21
**phone** 108:16 253:11
253:13 254:9,11,14
255:2
**photo** 9:22 10:1
24:13 36:8 37:1
42:14,22 49:15
62:10 88:23 91:18
92:2 98:6 99:25
110:10 111:17,18
138:11 140:15,17
141:4,14 143:5
145:12 146:3
162:15,23 163:2,15
171:8 174:6,22
175:5 176:19,20
178:12 182:8
183:10 184:6 185:6
195:9,13,14 196:7,8
199:18 211:11
222:14 224:3 226:4
230:5 232:16,17,20
233:6,9,22 234:13
237:13,14 251:8,15
260:16,19 261:9,12
262:14 263:12,22
264:20 266:2,4,7,15
270:18 277:8
278:11,17 279:13
279:16 280:6
285:22 286:23
**photograph** 37:6
174:2 270:1,5
**photographed**
149:21 150:3,4
**phrase** 168:4
**phrased** 43:1 242:22
**physician** 235:19,22
236:24
**picture** 156:23
161:20 173:21

174:1,8 175:1
**piece** 80:4
**pilot** 37:14
**pitch** 262:20
**place** 56:22 58:9
62:24 112:17
141:25 153:7
160:14 186:12
207:12
**placed** 63:5 74:10
77:12,16 122:3
**plaintiff** 1:4,9 2:15
6:13 241:17 291:4,9
**plaintiff's** 280:6
**Plaintiff-Intervenors**
1:13,16 291:13,16
**Plaintiffs** 1:22 2:2
6:13 215:25 291:22
292:2
**plan** 43:6 122:7
206:8,17,19 207:2
207:15
**planning** 289:7
**Plans** 186:12
**play** 56:25 151:12
206:11 238:4
**played** 249:23,25
264:13
**please** 7:8 8:22 9:1
11:13 57:11,24
60:11,14 72:2 74:5
122:21 127:25
215:19 220:4
227:16 236:9
**pleased** 244:11
**plus** 209:5,5 266:6
**point** 17:4 19:6,19
32:3 33:8 53:10
88:14 92:7 93:5
94:25 96:15 97:17
110:13 116:4
152:20 155:5
163:14 165:1 175:5
179:23 187:7

193:14 197:22
204:19 207:8 208:8
260:2 264:2 269:13
**pointing** 164:17
**points** 5:21 23:7
24:18,22 81:8 83:16
93:13 97:16 115:20
117:17 118:15
144:22,23 154:6
155:17 160:4 163:4
163:12 175:12
199:8,12 200:13
205:10 207:23
262:20 279:25
**policy** 15:7 16:13,17
23:20 30:9 154:18
168:21 206:7
267:18
**political** 16:13,17
17:14,24 171:18
173:12 177:13
188:6
**poll** 172:25 177:14
195:15
**polling** 28:25 141:25
160:14 162:14
**polls** 28:22 49:14,16
49:22 51:25 107:25
111:24 112:9,17
141:2 230:6 266:5
**pool** 174:14 225:24
**poor** 55:16 56:2,4
90:9 91:25 93:23
94:1 185:2 193:8
222:1,3,5,22 241:20
262:5
**population** 55:7,8,12
187:11 240:8 283:4
283:6 284:19
**populations** 55:20
56:4 95:15 140:7
148:14 241:20,20
241:20 242:11
**portion** 54:23,25

77:25 103:20 105:4
115:15 265:13
268:6 284:1
**portions** 55:12
132:11,12 135:2
258:20
**posed** 186:2
**position** 17:21 18:12
18:17,19,23 19:21
32:4 78:16 179:6,9
185:2 260:25 261:4
263:11 271:15,19
273:18 288:16
**positions** 86:18
220:22
**possess** 54:24 55:1,13
55:16,24 139:24
178:12 179:1 220:3
**possessed** 136:7
139:4 218:24
241:19 274:10
**possession** 55:11
192:9 199:5 219:1
237:3
**possibility** 202:21
275:17
**possible** 10:7 48:10
54:10 64:20 65:7,8
72:14 87:15 89:11
91:6 93:3,9 97:3
107:24 109:10
117:2 119:9 129:5
130:17 180:4 189:4
190:10,12 203:21
213:5 214:3 215:3
222:4,23 228:5
231:22 232:8 236:8
239:16 245:12
250:22 255:17,20
265:1,3 272:4,18
285:11
**possibly** 23:20,23
45:22 54:9 85:22,22
113:11 132:5 133:2

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

33

137:1,2 176:6 178:5
242:17 249:7
272:12 284:14,22
**post** 279:1
**potential** 125:19
162:3 174:14 176:2
196:18 225:24
267:24 276:7,22
287:9,13
**potentially** 87:3
176:10 177:12
194:14 223:7
272:16
**powers** 69:15
**practical** 116:2
220:16,21
**practice** 14:25
141:11
**practices** 276:18
**preceding** 82:10
157:25
**precinct** 167:13
176:14
**preclearance** 72:1,7
72:10 73:7,19 94:17
94:19,22,23 95:4,9
95:11,12,18 96:11
110:17 111:8
144:15 168:22
169:14,18 170:10
172:6 195:19,24
233:19 243:19
245:16
**precleared** 110:5
169:20 170:25
171:24,24 195:25
234:10
**predecisional** 81:8
151:18,24
**predict** 160:4 233:14
**prefile** 129:5 190:2
**preliminary** 109:8
142:16
**preparation** 215:7

**prepare** 8:16 14:1,3
24:8 155:13
**prepared** 235:21
**preparing** 155:9
217:5
**present** 9:25 14:9
43:15 58:3,8 107:11
139:7,10 144:22
165:19
**presentation** 193:4
**presented** 23:13
175:7 192:20 274:8
282:24
**presenting** 175:8
235:6
**presents** 139:16,16
**preside** 127:17,21
**presidential** 247:13
248:25
**presiding** 127:19
**press** 5:22 123:2
227:21 228:11
229:17
**pressing** 117:9
**presumably** 53:11
92:8 101:25 156:11
173:9 183:3 218:8
235:21 276:15
**presume** 143:11
194:9
**pretend** 187:24
**pretty** 24:22 28:22
198:7 223:6 227:10
**prevent** 51:4 161:1
161:24 176:25
**preventing** 144:4
210:22
**previous** 35:13 37:19
58:19 107:21
129:18 130:24
131:4 134:1,1
135:24 141:24
144:3 195:24
208:10 215:5

**previously** 58:13
135:9 159:7
**primaries** 165:12
**principle** 123:25
124:8,15,17
**printout** 67:19
**prior** 15:6 48:11
57:14,16 114:20
133:3 136:6 156:14
168:12 169:24
175:2,3 215:1
264:22 266:9
268:10,16,17
270:17
**priorities** 106:11
121:2
**priority** 76:22 121:16
**private** 41:9 174:13
178:24 180:1 254:4
287:8
**privilege** 30:13,20
31:13,17,17 32:1
39:5,9,11,12,13,19
39:23 40:1,7,15,20
53:19,20,22 78:8
80:8,15,15,21,24
81:1,15 82:6,14,25
83:1 86:2,11,20
134:7 151:20,22
152:5 289:5,5,6
**privileged** 79:6,7
135:8
**privileges** 86:21
230:18
**probably** 8:4 24:14
24:21 27:9,21 29:23
35:17,21 41:24 43:5
49:20 56:6,17 57:5
82:25 88:24 107:9
108:5 119:18 133:2
133:5 137:12
156:16 158:9
170:14 176:7 187:3
197:3 231:12 232:5

253:13 254:9
265:12 267:25
272:8 283:18
**problem** 50:17 73:18
80:5 107:12 204:11
266:4 267:3,20,23
**problematic** 242:3,10
**problems** 32:9,13
33:14 49:8 176:24
251:2 266:21
267:25 271:21
276:7
**procedural** 16:21
56:8,12,21 75:12
122:2 126:7 280:19
**Procedurally** 126:19
**procedure** 2:21 78:18
96:20,21 126:23
127:6,8
**procedures** 63:8
78:14 81:3 115:22
158:18 159:9,13
176:7
**proceed** 79:9,19 83:3
209:15
**proceeding** 78:13,21
293:4
**proceedings** 16:9
**process** 17:15 25:10
30:16,19,24 31:1,16
32:1 33:14 34:14
36:3 39:23 40:5,9
40:15,19 44:2 49:20
53:20 63:3,4 66:22
69:9 70:7 81:10,16
81:17 82:3 86:2,5
86:10,22,25 87:2
90:5 92:14 98:12
99:22 101:6 110:17
112:18 118:5
121:19 127:20
129:23 133:22
134:7 137:6,7 140:6
140:14 151:25

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

34

152:2,21 165:10 200:21 230:1,14 237:5 241:4 247:9 256:7 262:3 264:17 269:13 281:16 289:5
**processes** 83:18 142:3
**processing** 98:15
**proclamation** 120:3
**produce** 5:11 11:21 12:18 81:2 105:15
**produced** 2:14 78:6,7 79:2,15 80:17 103:22 105:11,13 135:6 188:9 227:11
**produces** 161:6
**product** 22:17 23:15 23:18 25:11 83:1 89:24 212:3
**production** 105:14
**professional** 16:12,16 267:17
**program** 20:25 111:6 181:19 183:6,16 248:4
**programs** 182:7 183:21
**prohibit** 118:14 222:12
**promoted** 15:9,12
**prompt** 120:25 121:21
**prompted** 20:22
**proof** 37:7 54:14 166:13 167:1,10
**proper** 149:14
**properly** 160:7
**proponent** 272:21
**proponents** 275:2,4
**propose** 172:19 244:16
**proposed** 95:21 171:11 188:16

190:20 195:7 196:18 225:22 266:1 269:19 270:18 271:10,12 278:16
**protect** 98:9,10 123:18 124:16 125:7 145:4 160:15 162:12 207:19 266:6
**protected** 113:2
**protecting** 49:6 97:18 159:22 176:8 208:20
**protection** 113:9
**protections** 176:5
**protective** 78:1,15 79:19 105:11 230:24
**protects** 97:23 144:23 145:2
**prove** 54:5,13 141:1 155:9 166:19 167:2 174:7
**provide** 17:24 85:17 85:20 87:6,9,14 110:9 162:23 164:13 166:13 182:8 215:11 217:11 220:2 256:6
**provided** 12:2 15:24 77:8 85:24 86:12 110:6 112:14 131:3 181:25 216:9,22,23 217:1,12 224:1 235:22 258:8
**provides** 146:10 158:23
**providing** 15:15 16:8 16:12,16 19:2 54:1 62:13 84:22 112:15 112:18 183:10 185:3 217:5 219:2 236:13 276:14

**proving** 95:14
**provision** 36:16 59:16 92:21 107:19 108:6 149:3,6,23 153:6 183:9 196:2 221:21 234:11 235:3,17,25 237:14 238:22 239:3,19
**provisional** 36:16 45:6,16,18,23 46:5 46:12,17,20 47:2,12 96:19,20 97:1,6,9 98:1,11,15,19 99:2,7 99:11 111:12,16,21 112:1,10,17 158:25 164:4,5,12,18,21 165:6 221:8,13 251:14
**provisions** 2:22 35:23 36:4,6 65:11 88:1 89:4 90:20 107:11 108:1 145:25 164:13,15 185:25 233:24 234:19,20
**public** 15:7 19:4,20 20:2 28:10,15,18,20 28:22,23 29:1,19 30:3 31:12,19 33:10 37:13 40:25 41:4,5 44:4 49:5,14,22 53:3,11 54:23,25 57:9 68:3,8 69:20 140:13 142:8 148:16 162:12,18 162:19 176:8 178:13,17,20 179:12,14 204:2 205:15,22 207:19 208:20 214:2,9 225:23 229:25 230:6 240:3,18 244:8 257:18 263:9 264:10 282:6
**public's** 266:6

**publicize** 21:23
**publicly** 103:11 179:25 201:21
**pull** 164:9
**punishment** 108:1
**purported** 30:12
**purpose** 48:12,20,25 62:13,16 79:3 140:10,12 143:25 144:1,4,10 149:6,7 149:10,23 151:7 163:2 174:6,21 176:19 200:4 201:18,24 202:2,13 205:14,21 208:25 208:25 242:21 243:1,3 273:8
**purposes** 48:13,22,23 49:3 54:21 129:20 143:20,22,22 150:8 175:15 200:3 205:16,22 208:20 208:22 229:1 231:20 273:9
**pursuant** 2:21 78:8 105:11,14 135:6 230:24
**pursuing** 20:19
**push** 27:24
**pushed** 118:10,24 121:8
**pushing** 29:2
**put** 53:14 56:22 101:9 109:11 150:6 153:6 186:12 278:10 280:15 289:17
**Putte** 223:20
**putting** 28:25 116:8 118:19

**Q**

**Q&A's** 190:21
**qualifying** 98:19 99:9

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

35

161:20 251:7,15
**quality** 203:2,6
**quantification**
 282:20
**quantify** 279:24
**query** 218:7
**question** 9:1,6,7
 12:23 16:2 30:1,2
 32:22 36:1 37:23
 39:16 40:2,21,25
 47:7 53:21 55:10,25
 56:20 67:22 72:3
 76:12 82:5,25 109:8
 120:22 127:13
 137:19 138:2 145:5
 152:5 162:13
 167:20 168:1
 172:18,19 173:24
 177:10 178:18
 186:2 187:6 197:11
 197:21 198:5 213:1
 214:13,13 219:20
 219:24 224:6 234:5
 249:3,6 254:24
 260:10 262:7,10,18
 265:19,24 268:15
 268:15 270:16,17
 271:16 273:8,14
 274:14 275:5 281:3
 281:8,14 283:25
 284:15 285:6
**questioning** 78:11
**questions** 8:13,19,22
 8:25 15:21 30:20
 39:7,18,20 80:1,2
 102:12 120:18
 189:4,9 192:2,4
 194:22 210:6,8
 230:17,20 258:12
 258:16,19,21 259:7
 287:24 288:3,10,12
**quick** 158:19
**quickly** 15:5 45:13
 105:2

**quite** 17:7
**quo** 46:17 98:13
**quote** 95:24 117:9,9
 194:14 200:15
 206:8
**quote/unquote**
 201:10 268:1
**quoted** 251:3
**quoting** 204:16,23

       **R**

**R** 3:1
**races** 179:13
**racial** 150:17 285:2,7
**racially** 205:5 286:5
**raise** 112:23
**raised** 68:18 70:1
 110:1 149:25
 151:10 214:13,14
 239:24 244:20
**raising** 287:3
**Ramos's** 135:7
**range** 32:20 36:12
 96:4 240:8
**Rathgeber** 23:20
 116:19 154:17
 155:24 170:13
 207:6
**rationale** 268:2
**rationales** 146:13
**reached** 18:18 40:17
 58:8
**react** 244:4
**reaction** 72:18
 151:10 244:1
**reactions** 72:12 244:8
**read** 41:20 59:3 68:1
 68:5,5 71:4 72:16
 120:4 143:2 243:22
 243:25 253:19
 261:24 265:22,22
 278:20,20 284:1
 288:13 289:18
 290:20

**reading** 21:19 89:22
 89:23 133:12
**reads** 262:2
**real** 97:23 158:19
**really** 164:23 195:15
 272:25
**reason** 9:19 21:12
 44:5 54:14 90:14
 96:9 99:11 107:23
 117:4 118:7 127:4
 127:10 144:14
 146:11 155:11
 172:4 173:6 290:3
**reasonable** 158:4
**reasoning** 169:16
**reasons** 27:9,11,15
 27:21 28:9,14 44:3
 44:5 62:8 81:9
 87:20 88:15 94:9
 144:12 153:9 173:7
 188:7 208:3 254:5
 261:21
**recall** 16:10 20:13
 24:2,4,15,18 26:22
 27:2 29:10,15 33:5
 34:23,25 35:1,6,11
 35:22 36:3,5,7,11
 36:14,15,18 37:19
 37:23,25 38:2,3,6,7
 38:12,15 41:5,7,9
 41:12 43:8,10 45:6
 45:8 46:21,22 47:22
 47:25 48:1,3,6,10
 48:15,17 49:1,3,6
 56:14,21,24 57:3
 59:19,22 61:8,12
 64:21,24,25 65:21
 68:23,23,24 71:3,5
 71:7,22 72:8,19,22
 73:24 74:17 76:5
 77:3 84:15,17,19
 85:2,5,15,19,23
 87:8,11,17 89:13,19
 90:4,14 92:3 100:6

100:13 101:22,24
102:23 103:16
107:1 108:10,17,19
110:2 113:1,14
114:3,13,15 115:2
116:12 118:12
119:2,21,23 129:10
129:11,14 130:10
130:16,19 131:23
132:5,7,20 135:16
135:22 136:3,10,19
136:21,24 137:4
140:5 145:24 146:2
146:5 148:5 149:22
150:19,24 155:14
155:20 156:1,3,7
170:11,17 172:7
177:19,22 178:2,7
178:13 181:14
190:7,19 191:6,9,19
193:18,22,23 194:6
195:17,23 196:11
196:18,21 203:19
205:18 208:16
212:22,25 213:6,11
213:13,25 214:1,4
214:10,12 215:3,6
216:23 217:8,10
219:1 223:17 224:5
224:14,23 227:25
228:5 229:24 232:2
232:8 235:16,20
236:16,17 241:1,6
244:17,21 245:1
246:1 247:5 249:14
256:21,23 264:24
265:6,9 266:18
267:7,10 270:13,23
271:1,5,8,9 272:4
272:23 273:24
274:2,5,23 275:22
277:13,15,16
282:20 288:6,8
**recalling** 24:7

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

36

**receive** 16:21 55:20
192:5
**received** 8:2 12:19
67:25 75:18 76:8
104:15 105:25
201:3,6 217:22
**receiving** 237:4
**recess** 58:24 102:6
134:11 142:17
167:24 181:1
209:21 251:20
**recipient** 169:9,11
214:14
**recipients** 231:23
232:1
**recitation** 82:9
**recognizable** 174:9
**recognize** 10:25 11:8
11:17 34:3 70:10
83:12 104:2 109:4
122:25 125:24
126:4 128:7 153:1
154:1 168:16
182:18 188:23
195:2 199:1 206:5
209:24 215:22
220:7 227:19
230:12 231:1 252:2
**recognizes** 63:7
**recollection** 28:6
69:10 98:16 100:8
126:2 170:3 240:19
**recommendation**
107:15,17
**recommendations**
220:12
**recommended**
112:22 200:13
**recommending**
228:18
**record** 2:22 7:8 10:22
28:10,15 31:12,23
40:18 57:13 71:5,18
71:21,23 79:11

103:25 104:7 115:7
115:8 128:2,4,5
135:1 138:19 142:8
142:15 148:16
149:11 167:25
169:1 170:6,8 181:2
182:12,14 189:10
199:13 209:16
214:6 217:21
230:23 231:8 252:4
258:5 259:25 260:2
261:16,24 262:6
263:2 265:23
269:10 279:2
283:21,23,24
289:14,17 292:14
**records** 15:20 16:21
19:4 37:13 98:23,25
**red** 190:14
**redistricting** 65:7
66:1,8
**reduce** 158:14 192:15
192:22 234:25
243:4,7
**reduced** 221:25
222:2,21
**refer** 10:4,9,13 67:14
74:19 84:7 107:18
123:10 128:11
205:1
**reference** 31:12
45:17 92:18 182:4
183:8 193:10
195:18 214:4
228:11,14 237:9
246:21 254:3
256:18
**referenced** 128:24
228:21 285:21
**references** 33:12
183:11 192:8 193:7
229:17 266:14
**referencing** 113:5
**referred** 61:9 63:3

64:10,18,19,22
65:14 66:2 68:1
204:24 255:21
**referring** 33:9 34:11
51:7 68:9 90:6
91:13,18 92:7,12
93:8,21 128:22
132:15 144:12
175:16,18 204:15
204:17,20 212:2
246:10 248:6
256:21 263:4,6
**refers** 82:18 92:8
123:18 253:2
**refile** 106:13
**refiling** 104:18,24
**reflect** 138:20 217:21
263:2
**reflected** 30:4
**reflects** 34:15 262:6
**reform** 29:6 90:17
91:7
**reframing** 205:21
**refresh** 8:4 100:7
253:1
**refusal** 71:24 72:4
**regard** 30:23 40:2,9
40:11,20,25 47:2
64:3 86:21,22
117:22 144:2,21
152:5 167:15 203:4
253:5
**regarding** 6:15 41:6
57:23 71:1 129:17
153:4 158:24 162:8
187:5 199:7 213:21
236:12 245:15
246:2
**regards** 144:24
237:13
**register** 166:10,12
167:2,5
**registered** 45:24
47:23 48:8 136:7

137:14 212:21
213:22 279:4
284:17,19
**registering** 166:8
199:22 200:21
257:23
**registers** 141:18
**registrar** 183:1
235:23
**registration** 37:8
107:10 108:1
137:24 139:10,19
159:23 160:9,10
161:6 166:15,20
196:22 200:3,15,18
200:22 201:18
204:18 235:24
252:18 293:14
**regular** 26:20 67:21
127:19 177:9 245:6
245:13 247:3,4
**rehired** 18:7
**Reid** 22:14
**rejected** 226:16
**relate** 184:21 252:20
**related** 11:22 14:6
34:24 36:16 59:11
89:13 90:23 103:11
132:13 154:5
212:24 221:5
226:14 232:23,24
233:24 235:7 236:4
245:10,23 252:18
252:21 293:3
**relates** 63:13 158:9
202:8
**relating** 22:7 58:14
83:16 108:1 109:7
126:5 195:7 257:24
**relations** 3:18 253:17
**relationship** 67:5,6
**relative** 89:16 92:1,6
97:8
**relatively** 69:17

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

relayed 110:2
release 5:22 123:2,6
  123:17 227:21
  228:4,11 229:17
relevance 211:4
relevant 84:23
  110:16,18,19
  195:20,24 239:9
  267:18 270:19
  282:13,16 284:20
reliable 175:9 177:15
  271:3 273:19
relief 236:14
religion 150:5
religious 149:21
  150:2 221:11
  234:15
reluctant 254:5
rely 47:4
remain 18:16 161:17
remaining 18:6
remark 65:9
remedy 50:9 124:1
  176:25
remember 8:2 21:2
  25:9 26:24,25 33:21
  34:20,21 37:23
  41:17 59:12 65:6,15
  65:17,25 66:4,5,9
  66:20 67:13 72:12
  72:18 87:11 93:7,18
  95:20 100:15 111:4
  114:10 116:1,12,22
  119:6,8,11 129:24
  132:22,23 133:23
  136:9,11 137:8
  138:3,5,6 140:7
  142:7 148:23
  149:24 156:10,11
  170:4 178:21 186:8
  186:11 187:3 190:3
  190:22 191:20
  193:2,3 194:11,23
  203:22 206:24

210:5 213:9 214:15
  215:17 216:24
  217:6 234:6,18
  235:14 236:2
  238:24 240:21
  244:15 247:23,23
  251:2 254:19
  255:21 274:6 276:3
  277:19
remembering 26:4
remind 208:8,21
  250:9
reminding 94:6
  209:7
remove 108:6 238:21
removed 107:16
  237:18,25 271:4
removing 239:9
  273:2
rendering 86:14
renew 30:14
repeat 12:22 16:14
  56:10 72:2 95:3
  283:25 285:6
repercussions 203:3
replied 199:6
reply 13:20
report 22:9 25:3
  227:2,5 255:4
reported 2:19 22:11
  25:4,7 58:15 68:6
  70:18
reporter 8:16 11:13
  60:13 86:6 182:11
  184:12 257:8
  283:21 284:2 292:9
Reporter's 5:6 292:7
reports 133:12 193:2
  195:19 248:2
represent 7:10,14,17
  7:22 43:11 46:22
  114:20 219:15
  257:5,21
representation 47:5

56:5
representative 77:9
  102:21,23 261:5
representatives
  252:7,12 254:23
represented 10:17
  97:24
representing 179:5
  179:16 257:13
represents 269:18
Republican 109:19
  220:12 287:14
Republicans 203:7
request 197:6 254:3
requested 118:7,8
  191:6 215:15
  250:16 284:1
requests 12:18 15:21
  16:21 19:4,23
  112:20 191:20
  215:9 216:17,22
  217:15
require 54:4,8,13,14
  63:19 112:7 115:14
  153:13 166:3 196:8
  196:23 238:22
required 46:23 47:15
  61:23 63:15 81:2
  99:3,25 100:4 111:9
  136:8 150:12,14
  152:22 160:14
  162:20,21,25 164:6
  221:7 226:24 227:2
  235:14 282:14
requirement 9:24
  159:19 174:6,22
  199:21
requirements 42:22
  58:15 59:11 62:20
  107:25 108:22
  159:1 199:18
  211:12 232:19,20
  280:7 281:1,18
requires 12:25 66:18

183:1 195:14
requiring 46:13
  168:3 175:5 182:4
  226:13
requisite 47:24 99:7
rereview 8:12
research 100:3,9
  140:1 158:1
reserving 289:18
reset 58:12
reside 161:10 174:12
  174:12
resident 161:14,18
residents 198:10
  227:6
resolution 57:25
  58:14
resolutions 62:10,12
resolve 126:4,16,20
resource 127:15
  256:4
resources 226:25
  253:25 254:2 255:5
  255:6,10,25 256:6
respect 30:22 79:24
  258:15 263:12
  276:18 279:1
  281:15 282:20
  285:9
respond 8:19 70:5
  113:13 194:21
  216:22 244:14
responding 32:17,25
  205:25
response 8:20 40:21
  68:22 69:11,22,25
  71:19 72:5 110:7,10
  112:24 144:19
  188:14 194:1
  214:13 215:18
  216:14 219:2,5
  220:1 239:23
  253:22 256:14,17
  256:19 266:1,10,12

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

38

266:13,14 287:23
**responses** 6:12 71:15
71:18,20,22 151:1
190:20 215:8,11,25
216:10,16 217:5,9
217:14,25 218:17
289:3
**responsibilities** 15:14
16:7,11,15 18:22,25
19:8 30:25
**responsible** 201:16
202:7 206:23
**responsive** 13:12
111:2 216:24
**rest** 258:16
**restricted** 87:24
**restriction** 107:13
**restrictive** 88:2 92:18
93:20 95:24 96:1
186:21,24,24,25
210:21,24 211:2,7
211:12,20 236:4
262:4,13,14
**result** 20:14 49:9
69:6 108:9 187:19
187:23 230:1
**resulted** 158:8 211:8
223:9 286:13
**resulting** 285:8
**results** 51:11 215:1
**retained** 44:23 45:5
**retains** 45:17
**retrogressive** 178:8
179:19 180:4
**return** 18:5 46:7,23
47:10,15 99:8
111:18 292:19
**returned** 248:18,20
292:20
**reveal** 16:1 29:25
30:18 31:10 39:2
53:18 250:11
**review** 14:11 22:12
22:16,25 23:2,18,25

25:10 71:9 98:24
107:3 132:8 142:22
168:24 177:17,25
178:8 179:20 181:5
185:7 187:19
213:19 223:23
233:15 252:24
**reviewed** 14:4 192:19
192:21 217:18
232:3 250:23
**reviewing** 15:20
132:3 223:25
240:14 248:3
**revisions** 85:17
190:14
**rhetoric** 201:16,23
202:19,22,24 203:4
203:6,9,12
**RICK** 1:6 3:7 291:6
**Riddle** 102:23 103:5
**right** 9:12 15:7 17:5
20:2,21 34:21 35:17
35:21 39:19 41:19
59:4 63:23 68:11,19
68:20 69:3 70:16,21
78:23 84:18 88:12
88:17 95:19,20
96:11 98:20 99:4
104:25 106:1
113:16 121:22
122:6 128:15
129:16 134:22
138:25 139:17
141:21 144:17
149:9 153:19
159:24,25 160:21
161:13,15 162:1,2
163:13,21 164:2,22
164:23 166:10,16
166:23 167:3 168:6
169:22 174:9
176:21,23 180:20
183:17 187:14
190:14,17 197:2,3

197:15 209:11
210:2 221:1 226:19
233:17 237:23
238:3 239:14 245:3
245:20 246:7 247:2
247:12,14,15
249:20 255:5,8
259:15 260:24
264:2 265:9 268:23
269:5 273:3 278:4,5
287:25 288:8
289:18
**rights** 3:4 72:11 73:8
109:21 110:11
112:25 113:3,10,19
114:1 169:18
195:22 233:15
245:15 246:3,17,19
260:23 284:6
**rise** 42:11 82:2
**risk** 169:20
**Rob** 23:24
**role** 25:22,22 57:1
127:1,11 151:12
207:14 218:16
238:4 249:23,25
264:13
**roles** 30:25 33:14
42:8 49:8 206:11
**roll** 176:15
**rolls** 159:23 161:25
174:25 176:7,14,19
176:22 177:8
**Roman** 97:20 98:2,7
111:10 112:21
144:23 157:6
**room** 3:4 59:24 64:12
182:10 230:5
**roughly** 84:16 205:20
**Roundtable** 17:18
**routine** 74:14
**row** 218:7
**rows** 218:10
**rule** 57:21,22,24,25

58:11,25 59:3,6,10
61:16,20 62:5,9
79:4,5 81:6 107:19
107:23 134:13
153:3,4,10,17 239:8
261:3
**ruled** 78:22
**rules** 2:21 5:14 6:1
8:12 23:12 56:15,18
56:19 57:22 58:11
59:8,9,14,17,21
61:7,18,23,24 62:19
74:24 118:13,13
119:10 127:8
149:14 152:22
153:7,18 160:9
258:7 278:23
**ruling** 78:8 79:12,17
80:23 81:14,16
110:25
**rulings** 58:19
**run** 13:1 23:2,4,8,19
122:2
**running** 83:7,9
120:15,21 230:17
**runs** 165:22
**Ryan** 189:15

---

**S**

**S** 3:1
**Sadly** 118:22
**safe** 150:6 176:1
203:5
**safer** 108:5
**Safety** 19:20 20:2
240:3
**sake** 277:6 279:10
**sales** 262:20
**satisfied** 270:5
**satisfy** 192:15,22
**Saturday** 169:21
**saw** 72:13 125:17
158:14 190:3
211:14 214:4 216:4

BRYAN HEBERT                                6/17/2014
CONFIDENTIAL TRANSCRIPT

39

229:2 230:4 238:2
266:17 268:2 286:7
**saying** 134:20 167:6
206:17 251:1
**says** 42:9 57:25 63:23
63:25 83:15 87:25
90:11 91:19 95:8
108:15 109:23
120:13,17,22
123:19 155:8
163:14 166:7 171:9
190:5 194:8 195:11
199:10 200:17
217:4 235:21
253:24 260:14,21
263:3,5 267:2
**SB** 5:24 6:4,10 19:17
27:3 34:24 43:15
70:19 101:18
109:20 114:1
125:17 126:5 128:8
137:11 142:8,9
146:9 150:16
151:13 152:9,15
156:15 157:18
158:17 160:4,18,25
161:21 162:11,21
162:23 165:1 168:2
169:25 172:8,9,15
172:17,20 174:5
175:12 179:1,6,9
180:16 181:14
182:19 183:9,15,21
183:24 185:9,19
186:3,13,16 195:21
200:3 202:23 203:4
203:16,23 204:1,6
208:3,21 210:9,21
211:3 212:8,16
213:12 221:22
224:2 228:16 231:7
232:15 235:6 237:6
238:21 240:16,23
242:3,10 243:7

248:7 259:14
260:11 261:1,22
267:21 268:3,7,10
268:16,16 270:10
273:20 279:5
283:13 284:5,24
285:3,8,9 286:5,13
287:10,13,21
**scenarios** 93:10
**scheduled** 58:13 68:3
**school** 65:8,9,13,19
174:13
**seal** 79:2,22 81:5
**seals** 140:20 159:4
**search** 11:25 12:25
133:2
**searched** 11:23
**seats** 257:11
**second** 47:15 57:21
57:22 68:5 75:1
97:17 104:14
106:19 115:7 128:3
153:4 157:1 164:3
165:5 170:7 182:13
212:1 228:7 265:18
267:1 270:17
**second-guess** 284:14
**seconds** 220:20
**Secretary** 17:4 19:7
67:25 136:9 137:22
139:13 152:18
155:4 181:18,22
182:4 183:13,19
213:3,21 215:4
219:8,11,18 226:13
226:25 227:8 248:2
249:7 250:16 283:8
**sect** 150:2
**section** 45:15 72:7,11
73:7 95:12 96:11
107:16,21 110:25
128:24,25 164:8
195:21 233:14,20
245:15 246:3,16,19

260:22
**secure** 30:7 31:20
52:19 57:1 96:2
112:16 140:14,15
140:20 141:7
143:25 146:10
148:1 158:22,22
159:2,5,15 160:22
172:14,17,20 173:2
173:3,19,23 174:3,9
177:11 188:6 211:8
211:8 271:20
273:19 275:18
**secureness** 277:4
**securing** 30:5 42:6
233:9
**security** 27:19 29:7
50:13,14 117:9
141:20 143:23
159:8 160:22 176:4
177:5 184:17
200:20 201:11
210:25 223:10
225:25 235:11
236:5,22 237:1
262:3 263:16
271:23
**see** 12:17,24 13:2,8
14:6 22:23,23 36:9
36:23 60:24 69:8
70:6,23 73:18 80:19
87:22 88:14 90:8
104:9,12 106:19
107:3 108:24
109:12 111:10
116:22 117:16
119:12 120:7 123:6
123:16,17 124:19
127:14 128:9
131:20 134:8 143:5
144:9 147:2 149:1
156:4 157:2 162:24
168:25 169:7 171:5
171:6,19 174:1,1

177:7,8 179:19
181:8 182:7 183:11
185:5 186:19
190:23 191:3 192:1
192:8 193:8,10
199:3 200:12,16
201:21 203:10
207:17 214:17
216:6,9,16 217:19
218:19 221:2
222:11 223:18
224:20 226:8
227:23 228:7,25
232:6,9,14 233:13
233:16 240:14
255:4 256:14,18
259:23 265:18
266:2,3,15 267:3
269:14,22
**seeing** 170:21 178:21
190:7 191:12
199:23 214:15
228:5
**seek** 178:10,25
**seeking** 21:6 40:10
252:15
**seen** 21:15,20 61:2
73:25 87:16 213:24
214:8 215:1 216:2,3
243:16 266:21
**segment** 55:8
**segments** 55:6
**selected** 103:5 126:25
127:11
**self-defined** 198:9
**senate** 5:12,14,16 6:1
6:14 16:22 23:5
24:10 34:10,16 35:3
35:7,10,22 36:7,16
36:21,25 37:22
38:14,23 41:6,11
43:18 44:7,15 45:7
46:11 47:1,14,19,24
48:2,5,12,20 49:3

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

40

52:14 54:4,12,21
56:7,11,15,22 57:2
57:4,21 58:18 59:6
59:7,20 60:3,7 61:9
61:13,20,24 62:6,19
63:8,16 64:1,6,14
64:18,23,23 65:2
66:11,19 67:2,11,12
67:20,22,23 68:1,4
68:6,17,21 69:6,16
70:4,12,16,18,21,24
71:13,16,25 72:5,14
73:1,19 74:2,7 75:4
75:15,17 76:7,15
77:4,5,12,15 81:25
83:17 84:6,10 87:20
87:22 88:12,15,16
90:12,20 91:12
92:22 93:22 94:9
95:16,23 97:8,18
98:1,5,12,18 99:6
99:23 102:17,19
103:6,6,14,15 104:5
104:20 105:25
106:4,11 108:2
109:6 110:10
111:15,22 112:13
113:18 116:10
117:2,17 118:1,13
118:15,20,24 119:9
120:1,5,5 121:1,9
121:22 126:4,17
127:7,7,9,24 128:12
128:23 129:15
130:3,4,8,9,11,15
130:20 131:25
132:10 133:16
135:14,19 136:2,8
137:9,10 138:9,10
138:14,15 140:11
140:19 142:19
143:10,20 144:2
145:2,7,11,14,19
146:3,8,14,17,19,25

147:7,18 148:3,17
148:20,23 149:4
150:21 152:8 153:3
153:19 154:4
156:14 157:8,11
163:25 164:4 166:2
168:20 170:5,24
171:2,16 172:21
185:10,20 186:4
188:17,18 189:1
190:3,11 191:16
192:15 193:15
194:17 195:5
201:12,18 202:2,9
202:25 205:23
206:7,20 208:2,11
208:12 209:25
210:4 211:10,14,21
211:22 212:16
213:12 214:3,22,22
220:9,18,25 221:14
221:19 222:14,19
223:1 224:7,10
225:5,8,23 226:4,19
226:23 227:13
231:5,6,7 232:11,12
233:18 234:3,7,12
235:2,16,16,17
237:7,21 238:5,10
238:13,17 239:21
240:10 241:4
242:19,20,24 243:4
243:12,13,19 244:4
244:16,19 246:1,4
249:16,23 250:7,8
250:17,19,21 260:4
261:2,11 269:12
286:3
**Senate's** 70:15,20
120:8
**senator** 5:23 32:12
34:12,13,17 35:18
35:19 63:5,7 64:13
67:4,9 69:25 70:25

71:1,12 72:9,13,16
72:20,23 82:20 87:9
87:11,14 104:16,20
106:12 109:17,18
109:25 110:4 126:1
126:2,4,6,16,19,25
127:10,17,23
136:22 137:3 142:3
143:11 145:9 148:5
148:6,7 154:21,23
154:25 155:3 189:2
189:13,16,19
191:21 192:4,10,11
192:17 193:3 201:5
201:6 206:14 207:4
208:4,5,5 210:2,15
212:19,22 220:19
221:3 222:12
223:19 226:8 227:1
228:19 244:18
272:13,13,14,14
273:4 287:6
**senators** 57:8 59:22
59:25 60:21 61:15
61:17,19,23,25 62:1
63:20 69:19 71:13
73:3,13,14,22 87:7
89:12 114:2 119:20
121:17 155:19
156:12 178:15
191:6,13 199:11
201:20 202:25
203:16 205:12
206:11 207:5,12,12
207:18,22 208:7,17
209:1,4,8 228:18
241:3 244:8 251:2
271:2 272:14,17
**send** 154:12 155:17
196:9
**sending** 155:14
189:18
**sends** 13:23
**sense** 52:12 196:7

264:5
**sent** 12:19 22:24 23:5
23:9 70:22 83:14
84:4 85:18 101:24
155:11,25 160:11
169:21 170:18
199:6 201:2 203:15
205:25 219:6
231:18
**sentence** 232:15
260:21 266:23
267:2
**separate** 66:18
110:12 183:20
282:5
**Sepheri** 136:20
**September** 252:11
254:15
**sequentially** 24:25
**series** 83:16
**serve** 17:17
**served** 16:24 17:2,17
88:25
**services** 16:12,17
253:3
**serving** 19:4
**session** 5:17 22:8,9
25:2 26:17,20 31:8
33:23 50:2 59:1,7,8
59:9,15 61:6 65:13
67:21 70:13 76:8
84:18 92:12 113:23
118:10,17,25 119:4
121:25 133:4
145:17 153:12
177:20 209:5 245:6
245:13 246:22,25
247:3,4,6 255:14
265:20,25
**sessions** 65:10 103:3
129:19 131:4 133:3
134:1 157:25
220:18 241:15,25
245:8 268:13

BRYAN HEBERT                                          6/17/2014
CONFIDENTIAL TRANSCRIPT

41

276:10 277:12
279:12 282:18
285:15 286:1
**set** 6:13 37:16,18
58:4,16 62:22 63:18
63:24,25 65:19
75:21,23 78:18
96:10 153:14
157:17 160:3,3
165:24 197:12
215:2 216:1
**sets** 86:23 90:3
164:12 240:7 262:8
**setting** 268:17
**seven** 134:13,14,14
180:16 227:4,11
**sex** 37:13
**shake** 8:20
**shape** 42:18
**share** 170:9,12,15
**shared** 24:9,11,15,19
24:24 85:24
**Shelby** 246:9 247:7
249:20
**short** 67:1 121:15
122:13 172:22
**Shorter** 136:18
**shorthand** 2:19 292:9
**shortly** 84:4
**show** 28:22 47:16
97:2,5 111:24
141:20 162:14
166:21,25 173:25
174:22 176:19,20
200:23 227:13
275:24
**showed** 42:20 49:14
94:19 268:21
284:10
**showing** 158:1 167:9
279:12
**shown** 133:6 142:5
**shows** 51:2
**side** 203:7 238:2,2,11

243:10 245:25
246:1
**side-by-side** 238:1
**sides** 190:11 202:16
203:1
**sign** 46:4,5 167:5
289:18
**signature** 5:5 109:13
196:23 197:1
289:19 290:1,21
292:18
**signatures** 166:22
198:15
**signed** 151:1 181:16
182:20 186:13,16
221:22,25 226:19
235:4 236:1,6
237:15,20
**significant** 207:11
281:24 283:5
284:10,20
**signing** 166:14,16,17
195:9
**similar** 13:20 25:10
110:14 126:2 134:1
156:23 159:21
160:1 162:13 163:1
201:23 214:12
224:3,7,8 234:17
239:11 274:11
276:10
**simple** 61:22 65:20
153:18
**simpler** 266:7
**simply** 234:21 276:24
277:5
**single** 75:1,1 76:20
241:17,23
**sir** 221:17 284:9
**site** 101:13
**sitting** 49:4 66:19
92:5 115:2 150:24
158:10 192:18
193:17 211:1 265:6

274:13
**situations** 203:9
**skepticism** 241:13
**sleep** 122:11,13
**slight** 251:18
**slightly** 273:7 284:15
**smaller** 162:5
**Smith** 77:9 102:16
**social** 67:5 141:20
184:17 235:11
236:5,21 237:1
**sole** 40:1 121:5,5,8
208:20,24
**solely** 87:1 121:6
231:20
**Solicitor** 4:2
**somebody** 23:19 39:6
39:22 134:15
**somewhat** 173:2
**soon** 246:2
**sophisticated** 173:15
**sorry** 12:22 22:13
56:10 60:13,15 65:3
86:7 105:3 120:14
137:17 182:11
184:12 197:10
199:15 221:18
249:17 257:8
258:17 259:9,19
268:15
**sort** 14:5 24:22 26:5
35:5 53:9 74:16
82:10 89:16 92:5
93:10 94:5 109:10
116:5 127:14 131:8
133:23 157:16
203:10 206:16
267:13
**sorts** 92:9 209:7
**soul** 150:4
**sound** 35:15 46:24
180:20 278:4
**sounds** 41:19 54:19
151:18 205:19

245:3,20,20
**sources** 130:19 131:6
131:20 133:14
**SOUTHERN** 1:1
291:1
**Spanish** 48:8
**speak** 50:10 74:25
75:5 179:7,8 190:9
190:10 263:14
279:10
**Speaker** 75:14,17,21
76:24 118:7
**speaking** 42:5,20
66:16 96:17 137:21
204:25
**speaks** 57:8
**special** 56:17 57:23
58:1,3,6,8,9,12,16
62:14,17,22,25
63:12,18,24 64:3
65:19 153:4,14
245:8
**specific** 23:10 26:4
29:10,15 32:13 35:1
35:7,11 36:14 38:2
44:13 48:3,6 53:9
55:6 56:14,24 57:3
61:18 65:7 66:4,9
68:23 69:24 72:8,12
72:18 74:18 76:5
89:11,19 90:14 93:7
110:2 114:10 119:3
136:3 145:24
150:19,20 151:7
152:10,20 183:8,11
187:3 193:2 203:22
205:6 212:25 215:6
217:10 219:2
229:24 235:14
240:21 244:15,21
247:5,23 264:24
265:7 267:7,10
272:4 275:22 277:2
277:13,15 279:24

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

42

282:25 288:10,12
**specifically** 44:19
  51:13 91:18 100:15
  142:7 147:9 191:19
  195:17,23 196:18
  205:18 214:5 230:5
  252:21 276:3
**specifics** 59:12 88:5
  89:13 107:2 110:3
  125:10 137:4,8
  194:23,23 213:9
  254:19
**speculate** 143:14
**speculation** 27:8,13
  28:12 43:1 55:4
  91:4 93:1 117:12
  149:13 192:25
  210:18 219:20
  244:6
**speeding** 66:22
**spell** 7:8
**Spencer** 22:14,15,16
  22:22
**split** 246:6 286:14
**spoke** 69:19 75:11
  179:11
**spoken** 14:17
**sponsor** 34:13 44:3
  50:11 56:19 69:18
  77:5,6,10 100:2
  102:17,19 104:20
  127:12,19,24
  131:16 151:3
  201:15 207:11
  228:20 264:1,4,6
**sponsored** 32:11
  56:15 77:3
**sponsoring** 48:25
**sponsors** 26:25 43:4
  48:24 50:2 102:22
  180:1 205:12
**spring** 245:7,7
**squarely** 86:4,10
**staff** 18:18,20 19:2,3

19:22 23:5,23 24:10
24:12,16,20,25
25:25 34:17,18 60:1
81:2 82:20 87:6,9
87:14,15 89:12
93:10 104:5,17
109:16,24 118:20
130:7,12 136:22
154:4,16,20,21
155:19 156:12
168:21,21 170:15
189:2 190:11
201:12,20 203:16
206:7,15 207:4
208:17 212:7
213:21 231:21,23
272:2
**staffer** 109:6 189:3,3
**staffers** 128:23
  156:11 189:1 195:5
  206:7 208:21 231:6
  231:6 260:4 272:13
**staffs** 272:17
**stage** 34:14 70:4
  71:14
**stages** 33:6 276:9
  278:21
**stall** 74:12
**stamped** 229:12
**stamps** 57:15
**standard** 95:11
  155:18 168:23
  177:17,25 178:8
  179:20 181:5 185:7
  187:19 279:8 280:8
**standardized** 236:11
**standing** 135:5,10
  152:4
**standpoint** 165:8
**stands** 273:5
**stapled** 82:7,9
**start** 118:5 162:22
  258:11 259:7
**started** 19:14 177:20

186:15 239:15
249:15,18
**starting** 107:4 120:21
  151:19
**starts** 119:13
**state** 1:18,20 2:4,18
  7:7 12:19,20 13:1
  20:25 21:19 35:14
  37:6 42:6 56:6
  64:16,17,18 66:25
  70:7 74:10,15 75:8
  75:13 77:20 79:23
  87:16 95:13 109:14
  111:6 127:1 133:6
  137:14 138:13,14
  145:12 146:3 147:4
  147:11,14,14,17,17
  147:24 150:1
  152:18 154:7 157:5
  157:12 159:11
  161:4,10,11,14,16
  161:17,19 163:7
  164:20 166:12,18
  167:12 171:13,13
  171:19 173:9,13
  174:13 175:25
  177:13 181:18
  182:5 183:14,19,19
  185:17,18 188:5
  196:1 198:11
  213:21 217:16
  219:9,11,18 222:12
  226:13,25 227:9
  233:20 241:16
  248:24 249:2,5,7
  250:16 257:20,24
  275:10 276:17
  279:4,16 281:21
  283:8 291:18,20
  292:4,10
**state's** 17:4 19:7
  89:23 136:10
  137:22 139:13
  155:4 213:3 215:4

248:3
**state-issued** 138:8
  139:5,24 215:13
**state-run** 12:6
**stated** 2:22 73:4
  79:11 264:10
**statement** 6:15 37:9
  45:1 71:1 72:13,13
  72:15,23 140:16
**statements** 29:19
  30:3 31:19 40:25
  41:4,5,9 49:5 88:19
  203:20 250:24
  263:9 264:10
**states** 1:1,8 3:2 7:11
  15:1 37:2,3,4 131:1
  132:9,10,14,15
  133:8 135:24 140:9
  156:24 158:3,6,15
  186:20 193:5 203:1
  205:1 215:8 228:8
  232:19 233:12
  241:22 265:4,8
  266:3,16,20 269:25
  279:13 285:21
  291:1,8
**statewide** 139:19
**stating** 45:24 126:3
  221:10
**stations** 287:19 288:4
**statistics** 101:13
  192:8,12
**status** 21:6 46:17
  98:13
**statute** 166:7 183:7
  239:25 240:22
  281:2
**statutes** 164:15
**statutory** 110:24
  183:7,18 239:8
  269:18
**steals** 150:4
**stem** 53:16
**step** 125:12 152:20

BRYAN HEBERT                                6/17/2014
CONFIDENTIAL TRANSCRIPT

43

160:21 166:17
167:22
**steps** 51:4 52:17 53:2
68:22,23 69:4
117:21 137:7
152:14 157:15
165:11,13 240:24
255:23 256:6
**stiff** 74:16
**Stinson** 154:14,23
169:8 170:16
265:15
**stop** 9:4 27:18 74:20
122:7 125:18 149:9
157:13,15 162:9
209:10
**stopped** 122:3 255:17
**stopping** 208:5
**strategy** 151:13,15
152:6
**Straus** 75:16,17
76:24 77:14
**streamlining** 80:7
**Street** 2:20
**strengthen** 200:20
**strengthening** 201:10
**stress** 207:22
**strict** 74:24 237:23
238:1,2 263:12
**stricter** 237:21
263:22 264:19
267:9
**strictest** 232:15,17,22
233:6 260:12,16,18
261:9,12
**strictly** 139:6
**strike** 99:20 128:15
148:19 157:8
166:23 171:5
218:22 244:23
278:25 285:18
**strike-through** 269:6
269:22
**strike-throughs**

269:15
**strikeout** 190:23
191:1 194:3,4,7,12
**strong** 39:11 81:20
102:24 230:21
**strongest** 272:21
**strongly** 264:10
**struck-through**
269:20
**student** 147:8,10,13
147:19 173:20,21
174:2 176:16
224:25 225:5,12
258:2 268:7,11,13
268:18,19,21,22
270:4,6,10,11,20,24
271:16,20 272:2,22
273:4,8,22,25 274:6
274:11,20,20 275:9
275:15,18,20,23
276:6,11,12,12,16
277:4,8,17
**students** 225:21
271:6 273:9 274:4
274:16 275:2
276:19 277:23
284:11
**studies** 132:8,13,20
132:22 133:1,7
140:9 158:14 192:9
192:13,14,21 193:3
226:14 275:22
276:3 285:20
**study** 283:12
**stuff** 142:16 156:23
**style** 116:6
**subdivision** 171:19
173:13 177:13
188:6
**subdivisions** 188:11
**subject** 9:11 58:10
105:24 107:14
108:4 119:5 272:11
277:14 288:7

**subjects** 228:23
**submit** 79:20 220:22
**submits** 220:20
**submitted** 72:16,17
81:5 292:16
**submitting** 72:15
**subpoena** 5:10,11
11:12,21 12:18
**Subsection** 58:14
**subsequent** 21:10
170:22 178:9
185:20 254:18
**subsequently** 24:9
**subset** 200:8 229:14
**subsets** 230:7
**substance** 16:5
**substantially** 83:24
234:17
**substantive** 23:8
24:22 118:9,23
**substituted** 223:22
**success** 113:8 280:6
**successful** 158:3,5,7
158:11 233:9
**sufficiently** 45:12
141:1
**suggest** 91:24 115:13
119:16 171:21
175:14 286:24
287:1
**suggested** 89:12
107:10 133:6 134:3
144:11 148:4,6
150:20 171:15
188:1 190:13
191:24 199:7
211:16 271:5
273:22
**suggesting** 93:4
204:17 285:21
**suggestion** 171:7,19
**suggestions** 244:21
**Suite** 293:11
**sum** 218:10 254:24

**summarize** 280:4
**summary** 80:22
155:17 231:6,14,17
231:25 232:3,7,14
233:17 235:21
237:9 259:14
262:22
**summer** 245:18
**Sunday** 156:5,8,21
**supply** 166:9,11
**support** 26:15,23
27:6,15 28:2,14
29:12,17 33:3 52:10
57:9 63:19 81:9
83:17 87:20 88:15
88:19 93:24 94:9
96:9,18 120:25
121:8 144:12,14
145:6 146:6 153:13
196:13 199:18
208:12 261:22,25
262:21 263:16
287:6
**supported** 27:22,23
28:23 29:9,20 32:14
32:21 33:3,19 49:15
57:4,6 61:15 73:22
87:23 95:17 149:17
162:15,19 203:25
250:19 262:24
263:1,8,19 264:11
**supporter** 50:11
**supporters** 32:15
56:7,11,22 68:21
71:16 96:16 152:13
152:15 191:11
194:21 203:23
285:25
**supporting** 28:9 29:2
32:17 49:16 79:1
272:15
**supportive** 273:1,2
**supports** 287:7
**suppose** 97:14 147:12

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

BRYAN HEBERT                                6/17/2014
CONFIDENTIAL TRANSCRIPT

44

161:18 176:14
199:10 206:20
210:23 249:7 270:7
279:21 285:1
288:22
**Supreme** 42:21
110:14 111:5 154:5
157:3 164:17
245:14 246:8 278:3
278:13,17
**sure** 13:22,25 16:15
26:2,3 27:20 30:5
31:21 33:18 34:20
38:18,20 42:8 45:12
47:9 48:17,22 49:7
50:2 51:11 54:7
55:15 57:6 62:11
65:17 67:3 69:3,9
72:16 77:18 81:12
87:13,17 88:4 90:6
91:16 92:10 93:6
94:12 97:25 106:2,6
109:17 110:4 111:4
113:6 114:17 115:1
115:18 116:1,13
121:3 125:3,9
130:18 131:18
132:12 133:10,13
133:21 135:22
137:12 138:6,11
141:11,22 144:10
145:9 148:5 150:19
150:21 151:9,11
155:15 156:17
158:10,24 159:11
160:7,20 164:16,18
165:2 170:21
175:24 178:3,13
180:7 191:2,14
192:7 194:18
197:20 198:8
201:13 203:19
204:24 210:24
211:21 216:3,5

217:6 219:13 223:9
223:10 225:18,19
232:5 233:4,10
234:6 236:25,25
237:8,23 238:2
240:1,13 245:25
247:20 248:5
250:13 251:9,17
252:21,24,25
253:20 256:3
257:10 259:1 265:5
268:20,24 270:7,14
276:20 278:11,23
279:24 282:23
285:7
**surnamed** 48:8
**surprise** 288:15,19
**surprised** 114:18
**surrounding** 142:8
**suspect** 222:6
**suspend** 102:11
119:10 239:13
**suspended** 58:7
**suspenders** 94:6
**sway** 76:25
**sworn** 2:16 7:2 9:10
292:12
**synonymously**
197:19
**system** 45:18,19
49:21,25 109:12
146:10 160:20,23
162:2,6 176:18
200:23 201:11
**systems** 47:13

---

**T**

**table** 7:12
**tactics** 74:12
**take** 9:4,5 18:17
39:11 46:1,25 58:21
58:22 61:2 67:17
68:21 69:4,10,13,21
69:25 71:8 81:20

86:15 102:4,4
108:21 112:11
142:15 143:1,2
157:15 158:20
174:17 180:24,25
209:17 210:8
213:17 219:13
230:21 240:24
244:13 251:18
252:3,25 255:23
256:2 265:10
268:25 282:7 289:9
**taken** 2:16 68:11,13
86:19 89:17,18
90:15 117:21
134:11 152:15
238:25 239:1 240:1
240:2 251:20 293:5
**talk** 38:19 179:4
200:14 201:22
202:9 204:9,14
205:4
**talked** 26:3 57:7
74:13 98:11 114:12
114:18 166:24
214:12 225:21
261:16 268:11
272:6,9,10,18
**talking** 5:21 23:7
24:18,21 74:20 81:8
83:16 93:5,13 97:16
115:20 117:17
135:14 142:16
144:21,22 154:6
155:17 159:3 160:3
175:11 181:3 199:7
199:12 200:13,18
204:3 205:9,10
228:23 262:20
265:12 281:4
**targeted** 181:12,15
182:24 183:5,16,16
183:23 184:22
185:4 238:22

**task** 247:17
**tasks** 207:17
**technical** 131:9
**technological** 159:14
271:24
**tell** 27:10 51:22 71:8
85:8 88:1 92:5
207:12 253:22
258:25 269:11
**temperament** 127:9
**temporarily** 198:11
**temporary** 37:14
**tend** 23:8 159:2
**tends** 203:8
**tenets** 150:5
**term** 9:24 10:9 74:19
74:22 75:3 77:7
198:9 202:16
204:25
**terminate** 78:12
102:11 113:15
122:5
**terminated** 83:6
**terms** 9:22 10:6
44:21 50:5 55:10
66:1 73:18 79:19
111:7 117:25 118:6
119:12 123:11
135:21 165:10,18
171:25 193:6 202:7
202:17 210:8 224:9
228:22 235:2
**territory** 134:7
**testified** 7:3 8:9
21:13 25:13 35:13
37:20,25 44:16
48:11 51:24 53:6
65:22 70:14 102:16
108:8 114:21
117:25 121:20
124:12 131:21
146:12 175:13,20
202:6 223:15
224:16 250:3 264:2

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

45

267:7 277:17 278:6
281:9,10
**testify** 7:2 9:17,19
31:25 218:13,21
**testifying** 30:16
102:8 138:20 248:5
248:6
**testimony** 31:24 32:7
40:10,20 41:8 48:16
48:17,19 49:18 50:1
50:20 52:3,5 54:1
54:12,17 57:16
60:19 63:22 68:8,11
68:13 69:5 79:7,20
83:4 84:9 102:9
105:4 121:5 131:3
133:3 135:3,4 140:6
142:2 157:24,25
160:8 173:3 175:3,3
178:14 193:23
206:17 241:14,25
264:20,22,25 266:9
270:9 276:25
277:11,13,15,16
278:7 279:11 280:4
282:6,11,17,19
286:2,4 289:3
292:14
**Texans** 187:9
**Texas** 1:1,11,14,18
1:20 2:4,18 3:9,14
3:19,22 4:3 5:13
7:14,25 8:7 14:23
17:8,18 26:6,6 28:7
30:5 41:23 42:19,23
48:8 56:1,6 67:19
78:6 87:19 97:17,18
97:23 98:9,10 99:18
99:22 100:7,10
101:7 104:8,8
124:25 125:7 135:6
141:13,15,24
144:22,23 145:2,4
158:2,4 161:11,18

161:20 162:15
163:7 164:7 165:11
166:13,18 167:12
169:19 170:24
172:11 173:11
174:11,11,12,12
180:17,17 186:23
187:10 188:10
193:14,15 194:2
196:1,4,22 197:8,15
198:10 199:14,14
199:16 201:2 202:1
204:4,5,5,10,11
206:4 225:23 228:9
229:8,19,23 230:4,4
231:9,9 232:19
233:5 236:19
241:16 242:2
243:18 245:10,21
245:24 246:13
247:10,11 248:24
249:3,12,15 250:8
257:5,15,19 260:11
263:17 265:17
268:18 273:23
276:13 278:11,16
280:10 287:9 291:1
291:11,14,18,20
292:4,10 293:10
**Texas's** 125:11
**text** 172:16 227:1
269:18,19
**thank** 11:5 25:15
38:21 68:8 70:23
77:19 80:6,19 83:10
87:4 105:22 109:15
138:22 147:6 169:6
175:23 197:23
200:2 219:16 257:1
258:22 260:6
281:14 289:12
**thanks** 256:15 257:25
**thereof** 16:5
**thereto** 175:17

203:15
**thing** 160:23 280:5
280:12
**things** 16:20 23:2
38:19 85:7,13 96:17
108:4 159:4 165:12
180:11 181:11
204:19 206:21
208:2 237:25,25
238:12 265:5 269:1
276:1 287:1,4
**think** 13:22 15:23
16:6,10 19:21 20:16
20:20 21:11 22:3
23:16 24:21 25:15
28:6,21 30:3,23
31:1,1 32:11,14
33:18 42:5,20 43:3
43:5 46:10 47:10,18
48:12,21 49:5,13,19
50:24 51:20 52:16
52:25 54:8 55:22,23
56:3,14 57:3 62:3
63:23 66:17,20
68:11,20,24 73:15
73:25 76:13 78:21
80:22 84:21 85:2,5
86:4,6,10,13 88:3
91:20 92:17 93:16
93:25 94:3,5,18,23
96:15 97:7,11
100:20 101:1,1
103:4 110:12,15
114:6 115:24
116:16 120:19
124:13,13,24
125:19 127:4,16
129:19 130:2,10
133:3,4,21,22
137:17,21 138:5
139:6,6,9,15,16
140:13 141:3,11
142:3 144:10,13
145:22 146:10,16

147:16 150:8
151:18 154:11
155:8,12,21 157:12
157:24 159:3,11
160:6,20 161:2
162:14,17 164:2,20
164:24 165:4,16
166:10,16,23 167:4
169:16 170:2
171:23 172:1,22,22
173:12,18 174:15
175:5 176:1,9,9
177:11 180:10
181:20,24 182:1,3
183:24 185:3 187:2
188:3 189:3 190:1
192:11 196:5,5,17
197:3,18 198:7,9
200:4,8,25 201:1,3
201:6 202:12 203:5
203:13 204:4,16,22
204:25 205:7 208:7
208:18 209:1
211:13,23,24 212:5
213:5,7 214:10,11
216:4 217:12 218:3
218:25 220:21
222:2,23 225:22
227:8 228:20,21
229:3,13 230:3,16
231:12 233:11,21
234:23 237:16
239:22 242:3 246:1
246:6 247:8,12
249:19,25 252:22
253:7,13 254:9
255:17,18 258:5,11
260:18,19 261:8
262:9,18 266:1
268:5,16 271:18
272:12 273:6
276:11 277:7,19
278:5 279:7,10
282:5 283:17

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

BRYAN HEBERT                          6/17/2014
CONFIDENTIAL TRANSCRIPT

285:11
**thinking** 205:19
  280:8 281:10
**thinks** 50:11
**third** 68:5 121:25
**third-party** 4:1 7:22
**thought** 22:21 38:23
  40:22 79:1 85:7
  141:14 150:13
  172:5 184:10,13
  202:6 203:24
  260:21 266:18
  281:11
**thoughts** 39:3,18,21
**threat** 97:22 123:25
  124:8
**threaten** 72:1,7
**three** 114:3 115:4
  212:5 222:24
  285:25
**threshold** 191:4
**throw** 198:24
**thwart** 175:14
**tied** 53:13
**time** 9:5 14:5,14 18:7
  18:17,20 23:6 25:9
  38:2 44:23 45:20
  47:16 50:12 58:2,4
  58:5,12,16 67:2
  68:5,5 72:21 73:1
  74:25 75:1,14 79:18
  84:16 85:21 92:10
  94:8 101:18 113:19
  121:24 122:2,20
  126:7 128:16
  129:13 134:15
  136:6 139:7,21
  144:3 154:21,24
  155:2,15 156:19
  158:20 160:3
  162:11 163:4,8,11
  165:5 185:9,19
  186:3,7 187:8
  189:13,17 190:8

196:13 201:21
  205:19 212:23
  220:22 223:1 224:4
  227:7,10 229:11,22
  237:6 241:9,12
  242:19,24 243:12
  245:21 247:3 252:3
  261:11 266:17,18
  270:14,19 273:20
  282:25 283:19
  286:3,22 289:12
  292:23
**timeline** 70:17
  115:22
**times** 244:22 245:4
  286:12
**timetables** 63:9
**timing** 156:16
**title** 23:21 109:17
  154:25
**titled** 231:13
**TK00262651** 177:18
**today** 8:17 9:16,20
  10:17 14:18,21 49:4
  92:5 98:21 111:4
  115:2 119:13
  123:12 146:12
  150:24 163:10
  193:18 201:1,8
  211:1 213:24 215:1
  222:23 223:15
  265:6 271:9 272:13
  274:13 277:19,21
  280:1 282:24
  289:13
**today's** 14:1
**Todd** 77:9 102:16
**told** 111:25
**tomorrow** 189:5
  257:19
**top** 151:11 168:25
  169:7 211:23
  269:22
**topic** 254:8 282:1

**total** 254:24
**totally** 204:12
**track** 209:13
**tracking** 35:5 129:21
  267:11
**training** 181:20
**transcript** 8:17 14:4
  14:14 77:25 78:10
  289:16 292:13,16
  292:21
**transit** 240:18
**Transportation**
  212:23
**Travis** 205:17 250:24
**treading** 134:6
**treated** 45:7 46:20
  57:5,5 62:12,14,23
  63:12 113:7 147:22
**treating** 62:17
**tried** 141:25
**trip** 165:10
**trips** 165:9,14
**trouble** 86:7 184:11
  184:14
**true** 21:3 47:1 56:6
  61:22 73:10 94:14
  94:18 123:15
  160:17 167:12
  185:19 193:13
  196:1 201:7 222:6,7
  241:19 252:7,12
  254:21,22,25 255:3
  255:15,24 266:4
  268:24 290:21
  292:14
**trusted** 127:9
**truth** 7:2,3,3
**truthfully** 8:13 9:20
**try** 8:23,25 15:3
  203:10
**trying** 32:10,13 39:16
  229:15 280:15
**Tuesday** 206:8
**turn** 13:6 36:23

60:24 67:14 97:16
  226:7 259:8 261:15
  265:17
**turned** 111:23 112:8
  155:20 164:11
  284:18
**turning** 12:17 36:19
  83:11 84:1 87:19
  91:11 99:18,21
  108:11,20 123:16
  135:13 138:12
  144:20 157:1 161:9
  162:20 175:11
  177:16 182:23
  194:2 216:6,13
  223:18 224:15
**turnout** 132:14,23
  158:9,14 192:9,12
  192:16,22 193:4
  266:22,24 274:21
  279:12 285:22
**turns** 196:7
**TV** 75:6
**two** 7:22 38:8 90:2,3
  104:13 108:4 115:4
  143:16 159:21
  165:9,14 188:25
  198:17 211:23
  218:10 224:4 245:7
  266:2,3,14 267:2
**two-subject** 107:12
  107:19,23
**two-thirds** 58:2,7
  62:1 63:19,19,25
**TX** 2:20 3:10,15,20
  4:4 5:19,19 231:9
  293:12
**TX00** 214:7
**TX0003456** 5:21
  115:11
**TX00087007** 5:18
  81:22
**TX00087009** 144:22
**TX00262645** 154:8

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

47

TX00262646 157:2
TX00262649 154:9
TX00262650 169:1
TX00262651 181:6
TX00262652 169:1
TX00265539 189:10
TX00265541 192:1
TX00265543 189:11
type 50:21 52:7 92:6
  140:18 203:4
  235:24 267:20
types 50:25 51:5,6,13
  51:18,21,23 52:4,9
  62:11 65:3 89:11
  101:3 118:14
  124:24 139:9,9
  160:25 162:8 173:8
  174:4 176:10 227:7
  228:22 262:19
  267:16 271:23
typically 13:18 23:4
  64:12 106:10 213:9
  255:13

U

U.S 3:3 37:11 110:13
  160:19 165:20
  166:13 167:6
  180:19,19 204:21
  228:8,12 229:8,18
  229:18 245:14
  246:8
Uh-huh 87:21 161:22
  186:5 190:18 193:9
  216:15 260:8
  269:23
ultimately 61:20
  133:17 135:19
  172:14,21 279:21
umbrella 16:23
unable 178:21,22
  241:18,23 247:22
  279:14 280:3,11
Unanimously 224:21

unclear 50:24 270:16
uncontroversial
  75:12
undated 214:19
underlined 188:4
  269:19
underlining 269:14
  269:17
underlying 163:16
  172:11,16 177:4
  199:9 222:15
undermine 175:22
  223:11
underneath 97:20
understand 8:12 9:1
  9:9,14 10:2,11,15
  45:20 52:6 62:19
  137:18 143:22
  149:24 163:10
  173:24 177:3 218:2
  218:6 262:18
  266:16
understanding 42:2
  44:14 49:11 50:11
  59:13 60:2,20 63:2
  75:20 79:1,12 93:17
  121:6 139:12,18
  141:17 161:3
  165:22 187:10
  202:12 219:11
  258:7 273:17
understood 23:13
  83:10 207:25
  258:22
undertake 283:9
undertaken 21:13
  186:1 250:14
  284:16
undertaking 283:10
undertook 100:8,9
  279:3
underway 186:13
undue 51:10 279:17
  284:5

unduly 50:15
unexpectedly 18:15
unfamiliar 177:24
Unfortunately 45:11
unheard 73:16,17
unique 27:21 56:16
unit 20:19
United 1:1,8 3:2 7:11
  37:2,3,3 205:1
  215:8 291:1,8
units 21:24 186:12
  288:11
universe 162:3
universities 147:12
  147:15,22 174:13
  275:10
university 147:17,23
  147:25 173:22
  225:23
university's 276:19
unlawful 158:13
unpaid 25:22
unquote 95:24
  194:14
unrelated 16:13,17
unsecured 49:9
unsolicited 115:13
unstated 54:20
unusual 227:3
up-to-date 160:13
update 21:6
updates 252:16
upheld 42:13,16
  110:14,17 158:8
  233:14 260:22
uphold 42:21 124:19
  124:22
upholding 125:2
urge 199:20 207:18
  244:18
usage 240:9
use 9:22 12:8,14 36:8
  43:9,12 47:9 77:23
  79:14 83:15,15

84:21 88:7 91:1,13
  92:2,22 96:18 98:6
  103:21 136:1
  140:11 142:10
  143:19 145:12,19
  146:17,22,25 147:1
  147:7,19 169:15
  192:14 204:25
  224:25 254:3,4
  262:21 264:16
  268:18 270:6 274:6
  276:6,8,16 277:5
  281:16
useful 22:23 155:9
  159:5 200:22
uses 56:15 75:1
  134:15
usually 85:6,8,9
utility 37:9 44:25
  140:23 159:12,18

V

v 78:6 135:6
vague 27:25 28:11
  50:23 113:21
  137:16 179:10
  278:19
valid 37:5 165:8
  171:16 198:13
Van 223:19
varied 244:9
varies 76:15
various 21:20 33:6
  50:13 58:18 63:8
  83:18 104:5 124:24
  140:7,20 154:6
  159:1,4 168:20
  206:6 247:25
  264:14 278:20
  280:17 282:8
varying 263:18
  271:22
vast 187:10
Veasey 1:3 57:18

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

48

78:9 290:2 291:3
**vein** 49:6
**verbally** 8:19
**version** 5:24 34:14
    70:18 128:8 129:2,7
    138:16 142:19,23
    149:4 150:25
    172:17 181:17
    182:20 187:22
    188:17,18 216:3,4
    221:22,24 226:18
    234:8 235:12,17,17
    237:21 262:13
**versions** 69:8 128:21
    130:25 135:25
    148:24 246:5
    268:17 270:17
**versus** 7:25 8:7 57:18
    78:9 139:16 243:19
    245:10,22 247:10
    275:20
**Veterans** 184:19
    235:11 236:5,22
    237:2
**vice** 127:21
**victim** 142:4
**view** 42:18 76:4 96:8
    97:18 140:24
    155:24 159:10
    170:9 263:21,22
    284:4,23 287:20
**views** 40:10
**violate** 53:19,21 86:1
**violated** 107:22
**violates** 30:19
**visit** 255:18
**Vital** 101:13
**vocal** 118:3
**voice** 165:13
**volition** 178:4
**vote** 21:3 45:22,25
    52:19 58:2,7,11
    63:15,24 94:14
    112:5,7,9 119:10

123:18,19,20,22,24
124:1,5,5,6,7,9,11
137:24 141:17,21
142:5 151:8 158:25
159:24 161:11,14
164:6 165:9,16
166:8,10,12 167:2,5
167:13 173:23
177:8 195:8 197:13
197:15,19,19
199:22 204:5
220:12,23 221:16
221:17 227:6 228:9
229:8 251:7 252:7
252:12 254:21,22
255:1,3,15,24
268:19,22 270:6,12
274:4,17 275:2
280:16
**voted** 61:17 71:13
    72:21 73:9,11,13
    89:7 114:2 142:6
    213:7 243:11 286:9
    286:10
**voter** 5:15 6:16 9:22
    9:25 11:22 14:7
    20:4 22:7 26:7,13
    26:16,23 27:7,16,18
    27:20,24 28:3,10,17
    28:21,23 29:2,6,13
    29:18,20,21 30:4
    31:7 32:10,17 33:3
    33:5,14,16,19,20
    35:6 36:20 37:8
    38:7 41:13,23 42:3
    42:8,14,16,19,24
    44:9 45:24 46:1,7
    46:14,23 47:10,15
    49:7,8,8,16 50:17
    50:18,20 51:1,9,14
    51:19,21,25 52:6,20
    52:21 53:13,15,24
    54:5,13 58:14 59:11
    61:7 62:14,20 63:11

63:13,25 64:3 73:12
76:3,7 91:7 92:15
94:19 95:24 96:24
96:25 97:1,5 99:2,6
102:24 103:1 104:6
104:16,18,24
105:24 107:10,11
107:25 108:1 109:7
110:16,20 111:15
111:16,17,23 112:8
114:4,8 115:21
117:6,19 119:14,22
120:9 123:23,24
124:1,5,6,11,17,17
124:23 125:6,14,14
125:15,17,18 126:6
131:1,21 132:9,9,13
132:14,15,24
139:19 141:1,5,18
141:24 142:1,4
144:5,5 153:14
155:10 156:24
158:5 159:22,23
161:24,25 162:8
164:9,10,13 166:15
166:20 169:17
173:22 174:7 176:7
176:11,13,15,20
183:1,6 186:24
189:23 192:9,12
193:4,5,7 196:22
197:1,5,17,25
198:10 199:18
200:2 210:22 228:8
229:1 231:13
235:10,22 238:22
240:24 245:10,24
246:13,23 248:23
249:11 252:17,17
252:18 255:20
260:12 263:16
264:11 266:4,20,21
266:24 267:3,8,9,20
268:2,17,18 271:6

274:20,20 278:11
279:12 280:3,9
281:21 284:19
286:23
**voter's** 196:23
**voters** 1:11 3:22 7:14
    10:10,10 30:6 31:21
    36:8 42:10 43:15
    46:12 47:20,24 48:2
    48:5,8 49:15 50:16
    51:10 52:18 55:16
    56:1 68:19 69:1,12
    70:5 72:6 90:10,18
    90:19,22 91:2,8,15
    92:1 93:24 94:2
    95:2,7 97:9,18,23
    98:9,10,18 108:23
    111:10,22 112:13
    112:22,23,24 113:2
    113:3,6 136:7
    137:14,23 139:4,7,9
    139:23 140:10
    141:3 144:24 145:2
    145:4 146:25
    148:21 149:17
    150:18 158:24
    159:24 160:7,16,25
    161:3 162:14,16,16
    165:1,8 166:8
    167:13 173:1
    174:11 178:11
    179:1,6,16,17 180:5
    180:11 183:22,23
    184:2,3,5,7,22,24
    184:24,25 191:7
    192:16,23 193:8,14
    194:13,17 196:3
    200:5,9 203:20
    204:7 212:21 213:4
    213:8,22 215:13
    216:18 217:16
    218:8 221:5,8 222:1
    222:3,5,22 226:14
    227:14 229:15

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

49

230:4,7,7,7 233:23
234:15,15,21,22,23
234:24,24 235:1,3
238:23 241:5 242:5
243:5,8,14,15 250:7
250:17,21 251:6
252:18 257:6,16,21
257:24 262:5 266:8
274:7,10,15 275:15
277:22,24 279:4
280:11 283:13
284:17 291:11
**votes** 30:6 31:22
52:18 66:18 71:1
125:4 160:8,16
162:3 197:25
229:16
**voting** 10:1 29:7
47:16 49:6,25 72:11
73:8,15 99:13
107:25 109:21
110:11 112:25
113:3,10,19 114:1
161:1 164:23,24
165:6,11,18,24
195:21 197:4,8
198:1,2,4,4 200:20
200:21 201:11
202:3,8,10 203:17
203:18,25 204:11
207:9 233:14
237:17 245:15
246:3,16,19 260:23
273:22 274:1 275:9
284:5
**VS** 1:5,10,17,23 2:3
290:2 291:5,10,17
291:23 292:3

―――――――――――
**W**
―――――――――――
**wait** 8:22 15:13
148:25 227:7
**waive** 39:5,6,6,22,23
39:24,25 134:8

**wake** 132:24 279:19
280:9 282:2 283:11
285:22
**walk** 167:13,16
**walking** 150:22
176:16
**Walz** 228:3
**want** 9:23 10:6 29:21
31:7 60:19,21 71:8
80:4 86:20 92:16
102:10,12 120:20
122:16 134:7
167:21 174:16
194:16 197:20
204:9 209:16,17,17
217:21 218:15
248:5 250:9 251:18
259:7 264:3 289:17
**wanted** 27:18 28:17
28:21 49:19 62:11
117:1,5 148:14
164:18 170:24
171:2 191:15
201:13 253:7
261:14 270:17
**wanting** 252:16
**wants** 31:20 110:4
134:8 208:6
**warning** 228:22
**warranted** 51:14,19
117:15 121:21
196:19
**Washington** 3:5,24
**wasn't** 79:8 101:25
139:8 173:21
181:25 193:20
208:24 230:14
247:3 255:13 264:4
**watching** 75:6
**way** 19:16 20:2 40:16
42:10 43:4 55:8
78:21 80:3 113:7
117:6 122:3 127:16
145:3,10 147:25

154:15 166:19
168:4 172:1 174:20
184:9 196:3 202:7
240:11 278:23
279:24
**ways** 50:13 124:16
202:5
**we'll** 83:4 128:15
134:18,21 162:22
174:19
**we're** 39:16 78:20,22
79:8 120:20 122:14
134:6,20,25 135:4
151:19 153:23
159:3 168:8,9 169:4
169:5 181:2 200:18
204:3 209:10 248:5
251:19,25 265:12
**we've** 15:5 58:20
102:1 135:8 261:16
261:21 268:10
272:12 278:2
**wearing** 53:18
**website** 183:2
**Wednesday** 220:10
**week** 117:18 118:10
118:24 119:3
**week's** 155:10
**weight** 76:21 285:14
**well-documented**
124:25
**well-founded** 31:2
**went** 23:18 24:1
155:5 232:4 248:11
**Wentworth** 192:10
192:11 206:14
**Wentworth's** 193:4
**weren't** 201:15
**West** 2:20 70:25 71:2
71:12 72:9,16,20
**West's** 72:13,23
**Westfall** 3:3 5:4 7:6
7:10,24 10:21,24
11:4,6,8,13,16 13:6

13:8 16:3 25:21
27:10,14 28:2,13
30:8,11,23 31:6,13
31:18 32:6 33:24
34:2,6,8 36:2 39:8
40:1,8,18 41:3 43:2
43:22 47:6,8,14
51:6,17 53:25 54:18
55:5 57:11,13 58:22
58:25 60:10,17 64:2
70:9 77:23 78:5,7
79:10 80:6,11,19,22
81:12,19 82:15 83:3
83:9,11 85:12 86:15
87:1,4,5 91:5 93:2
96:14 102:3,7
103:17,19,24 104:1
104:7,9 105:2,6,8
105:12,16,20,22,23
108:25 109:3
113:15,17,25 115:6
115:10,18,19
117:16 120:23,24
121:11,14 122:5,9
122:12,17,20,24
125:21,23 127:25
128:2,5,6 131:9
134:10,18,20,23
135:12,13 137:20
138:22,23 142:14
142:18 143:15
144:17,20 145:23
149:11,16 151:22
151:25 152:3,6,25
153:21,23,25
157:23 167:21
168:5,8,15 169:4,7
170:6,9 174:18,21
174:25 175:4,19,23
177:2 179:14
180:25 181:2
182:12,15,17
184:15 188:13,15
188:20,22 193:1,25

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

50

194:2,24 195:1
196:16 197:23,25
198:16,20,24 199:1
199:13,16 206:1,3
209:10,15,20,23
210:19 211:5
212:15 213:14,16
214:6,8 215:19,21
217:24 218:12,20
219:3,23 220:4,6
227:16,18 230:8,11
230:21 231:1,8,10
236:9 239:13,17
242:9 244:7 250:15
251:18,22 252:2,4,8
256:24 257:1 258:8
258:21 259:6,12
260:10 264:23
287:25 289:1,9,12
292:22,25
**white** 10:10 24:22
**Whitley** 3:8 7:19,19
78:5,16 105:2,7,10
105:13,17,21
134:25 197:18
209:14 258:17
259:9,13,17 269:3
281:3
**Whole's** 68:16 84:5
**wholly** 242:6
**widely** 174:9 185:6
185:11,15,16 187:6
**Williams** 87:9,12
136:22 142:4
154:21 189:14,16
189:19 201:5,6
212:19,22 272:14
**WILMER** 3:23
**winter** 245:7
**wish** 9:4
**wished** 63:5
**withdraw** 31:2 39:13
72:3 197:11
**withdrawing** 31:4

**withheld** 30:12 80:24
80:25 81:14
**withholding** 31:24
32:6
**witness** 2:15 3:12
7:17 30:16 34:5
39:1,25 40:24 60:15
78:12 79:15 106:24
122:18 127:14
134:6,17 138:20
143:13 149:13,15
151:18 167:20
168:2,3 197:22
201:21 217:21
219:21 250:9
256:25 257:13
259:14 263:4,6
292:12,15,17,18
**witnessed** 201:21
**witnesses** 133:4
206:10 285:24
**word** 46:25 47:9
74:22 97:13 112:11
158:10 219:14
230:22 237:23
238:3 264:16
286:17
**words** 12:8 42:13
53:14 98:5 107:7
158:12 169:15
**work** 12:9,11 13:10
22:17 23:14,18
25:11 83:1 85:6
120:9 127:17 137:8
148:13 155:2
**worked** 155:3 189:13
189:16 201:5
206:14
**worker** 177:14
**workers** 112:19
172:25
**working** 67:5 118:20
129:6,18 266:3,15
266:23,25 286:22

**worry** 258:15
**worthwhile** 50:15
**wouldn't** 59:23 204:1
223:11 238:1 247:2
264:16 282:12
284:23
**write** 90:8 94:15,25
95:4 96:20 192:6
200:24 228:1
266:10
**writing** 93:14 205:3
**written** 10:14 23:14
23:18 25:11 90:5,6
116:6 220:12,22
261:1,6 262:1
**Wroe** 155:2,3 169:9
265:15
**wrong** 77:7 262:7
269:7
**wrote** 91:11 94:8
95:16 155:15 160:3
162:11 163:4,12
195:4 199:17
200:25 230:19
254:15

**X**

**Y**

**yeah** 38:17 43:3
93:16 133:24
137:17 139:2
167:23 169:4
173:17 175:5
184:18 203:5 208:6
209:18 212:14
227:8 243:24
259:23 260:6 268:4
269:5 278:20
**year** 15:12 41:17
66:8,9 227:4 254:2
255:6
**years** 26:10 35:8 38:8
38:8 73:11 87:18

90:7 92:15 114:3
115:4,4 119:2 149:1
160:8 266:2,3,15
267:3
**young** 1:11 3:22 7:14
257:6,15,24 291:11

**Z**

**zero** 163:23,23
222:25

**0**

**00034469** 231:9
**00034471** 231:9
**00080568** 199:14
**00081510** 199:14
**00081575** 206:4
**00087007** 82:17
**00087008** 87:19
144:14
**00087009** 97:17
**00087011** 99:18
**00087014** 99:21
100:7
**00090532** 5:19 104:8
**00090543** 5:19 104:8
**00265541** 265:18
**00265543** 194:3

**1**

**1** 6:11 90:8 92:7
100:12 116:8 149:2
261:20
**1-12-2011** 135:14
**1-13-2011** 5:20
**1:39** 142:17
**10** 5:10 283:18
**10:09** 58:24
**10:28** 58:24
**103** 5:19
**105** 78:2,15 230:25
**107733** 214:7
**107735** 214:7
**109** 5:20

BRYAN HEBERT
CONFIDENTIAL TRANSCRIPT

6/17/2014

51

**10th** 68:4,10,12 84:9
**11** 5:11 68:4
**11:26** 102:6
**11:39** 102:6
**115** 5:21
**1151** 293:10
**118** 222:8
**12** 5:24 73:13 122:15
  128:10 138:21
  142:20 222:12
  223:4,16
**12/31/2014** 293:11
**12:20** 134:11
**12:24** 134:11
**12:30** 122:20
**12:35** 142:17
**121** 223:18
**123** 224:15
**125** 5:23
**12548** 3:10,15,19 4:3
**128** 5:24
**130** 226:7,9
**137** 220:24
**138** 221:17
**14** 5:15,24 6:4,10
  19:17 64:23 99:6
  102:20 103:6,14
  106:5 110:11
  111:15,22 112:13
  116:11 117:2 120:1
  121:1,22 125:17
  126:5 127:24 128:8
  128:12,25 129:16
  130:9,15,20 131:25
  132:10 133:16
  135:14,19 136:2,8
  137:11 138:9,10,14
  138:15 140:11,19
  142:8,19 143:10,20
  145:8,14,20 146:4,8
  146:9,15,17,19
  147:18 148:3,17,21
  148:23 149:4
  150:16 151:13

152:8,15 156:15
157:11,18 158:17
160:4,18,25 161:21
162:11,21,23
163:25 164:5 165:1
166:2 168:2 169:25
170:24 171:2 172:8
172:9,15,17,20,21
174:5 175:12 179:2
179:6,9 180:16
181:14 182:19
183:9,15,21,24
185:9,19 186:13,16
188:17,18 191:16
192:15 193:15
194:17 195:21
200:3 201:18 202:2
202:9,23 203:4,16
203:23 204:1,6
205:23 208:3,12,21
210:1,4,9,21 211:3
212:8,16 213:12
214:23 221:22
222:14 223:1 226:5
226:19,23 227:13
228:16 231:7
232:12,15 235:6
237:6 238:6,21
240:10,16,23 241:4
242:4,10,20,20,25
243:4,7,13,13,20
244:16,19 246:5
248:7 249:16,24
250:7,8,17,20,21
259:14 260:11
261:1 267:21 268:3
268:7,10,16 270:10
273:20 279:5
283:13 284:5,24
285:3,8,9 286:5,13
287:10,13,21
**14's** 109:20 113:18
  114:1
**148** 5:10 10:23,25

**149** 5:11 11:15,17
  12:17,24
**14th** 2:20
**15** 283:18
**150** 5:12 33:25 34:1,3
  36:19 44:17 269:2
  269:11,12
**151** 5:13 34:7,9 67:15
  67:19 138:20
**152** 5:14 6:1 57:12,19
  59:1
**153** 5:15 6:2 60:16,18
  60:25
**154** 5:16 70:8,10,24
**155** 5:18 78:4 81:22
  83:12,21 84:14
  85:23 99:22 102:8
  144:12,21 258:24
  258:25 259:13,18
  259:19,20 261:15
  263:4
**156** 5:19 103:17,18
  104:2,8 108:20
**157** 5:20 109:1,2,4
**158** 5:21 115:9,11
  116:9 117:17 120:7
**159** 5:22 122:23,25
**16** 252:11 254:16
**160** 5:23 125:22,24
**161** 5:24 128:1,7
  130:1 135:13
  142:19 148:25
**162** 6:1 152:24 153:1
**163** 6:2 153:22 154:1
  175:16,22
**164** 6:3 168:14,16
  172:12 175:21
  177:5,16 181:3
  187:20 188:2,5,16
**165** 6:4 182:16,18,19
  182:23
**166** 6:5 188:21,23
  189:10 265:11
**167** 6:6 194:25 195:2

**168** 6:3,7 198:18,21
  199:3,14 200:12
  204:13 205:3
**169** 6:8 198:18,21,22
  199:9,14 203:14
**17** 2:10,17 68:2
  216:11,14,17,17,22
  217:1,9,15 218:25
  220:1 292:8
**170** 6:9 206:2,4
**171** 6:10 209:22,24
**172** 6:11 213:15,17
  214:6 217:18,22
  218:4 219:4,25
**173** 6:12 215:20,22
**174** 6:14 220:5,7
  222:9
**175** 6:15 227:17,19
  229:1
**176** 6:17 230:10,12
  231:8,11 232:1
  258:24 259:4,8,15
  259:17 263:6
**177** 6:18 251:21,23
  252:1
**178** 105:25
**17th** 68:5 293:7
**18** 5:17 70:13 107:16
  107:21 128:24
  216:11,17,17,22
  217:1,9 218:25
  220:1 224:17
**182** 6:4
**1875** 3:24
**188** 6:5
**18th** 68:6,7 70:18
**19** 6:1 216:11 217:2
**194** 6:6
**198** 6:7,8
**1st** 214:20,20

---

**2**

**2** 5:2 13:7 88:14
  100:12 106:23

BRYAN HEBERT                                    6/17/2014
CONFIDENTIAL TRANSCRIPT

52

216:10 217:1
**2:13-CV-193** 1:5
  291:5
**2:13-CV-263** 1:11
  291:11
**2:13-CV-291(NGR)**
  1:23 291:23
**2:13-CV-348(NGR)**
  2:3 292:3
**2:19** 167:24
**2:22** 167:24
**2:41** 181:1
**2:51** 181:1
**20** 5:23 119:22 123:9
  284:18
**20006** 3:24
**2006** 65:17
**2007** 15:7 26:7,13
  118:20,21
**2008** 15:10 33:20
  41:18 68:1 278:4,8
**2009** 5:15,17 15:10
  15:13,13 22:8,10
  23:23 25:13 26:18
  26:23 27:7,24 28:10
  28:16 29:1,9,13,18
  29:22 31:7 32:10,18
  33:4,10,17 34:21
  47:22 50:6 51:14,19
  57:22 59:1,17,21
  61:6,23 63:11 66:20
  67:9,12 70:13 74:9
  75:16 76:3,6 77:1
  84:3 101:9,17
  102:17 133:4
  143:16,17 144:2
  153:7,10 259:1,22
  261:17 262:11,22
  263:3,12,19,20,23
  264:15,19,25 267:8
  268:21
**2010** 103:14 104:24
  105:25 123:9
  128:17,19 129:6

177:21
**2011** 5:23,24 6:1,2,3
  6:5,6,7,8,9,11,14,17
  25:2,4 109:17
  113:22 116:21
  118:19 119:22
  128:10,19 129:7
  132:18 136:14
  138:21 139:21
  142:20 143:16,17
  153:12,17 169:22
  214:20 220:10
  232:9,10 260:3,25
  262:12,24 263:5,12
  263:21 264:15,19
  264:25 265:14
  267:8
**2012** 16:25 17:11,23
  18:11 19:15 128:19
  149:2 185:21 245:2
  245:5,22 247:1,14
  247:18 248:7,18,25
  249:13
**2013** 20:7,12 21:10
  22:1,5 245:7,19,23
  247:1 249:13,15,18
  249:24 252:11
  254:16
**2014** 2:10,17 255:9
  256:8,12 292:8,17
  292:20 293:7
**202** 3:6,25
**20530** 3:5
**206** 6:9
**209** 2:20 6:10
**20th** 123:14
**21** 6:2
**213** 6:11
**215** 6:12
**218** 26:9
**21st** 154:13
**22** 6:3 163:22 169:21
  257:22
**220** 6:14

**227** 6:15
**22nd** 170:23
**23** 74:9
**230** 6:17
**23rd** 5:16 70:13
**24** 6:5,6,8,9 58:17
  62:21 63:14 66:21
  68:9 189:6 265:14
**251** 6:18
**254** 173:11
**257** 5:4
**25th** 245:19,22
**26** 6:14 220:10
**262650** 169:8
**265540** 191:3
**265542** 192:8 193:7
**265543** 190:24
**26th** 249:15,18,24
**27** 6:7,17 260:5,24
**27th** 214:20 232:9,10
**290** 5:5
**291** 5:6

---

**3**

**3** 100:12 163:23
  199:15
**3:33** 209:21
**3:45** 209:21
**30** 226:21 252:10
  253:2
**34** 5:12,13
**344** 293:14
**362** 5:12 27:3 34:10
  34:16,24 35:3,8,10
  35:22 36:7,17,21,25
  37:22 38:14,24 41:6
  41:11 43:15,19 44:7
  44:15 45:7 46:11
  47:2,15,19,24 48:2
  48:5,12,20 49:3
  52:14 54:4,12,21
  55:1,12,14 56:7,11
  56:22 57:1,4 64:6
  64:15,22,23 65:2

66:11 67:11,21,23
68:17,21 70:4,16,19
70:21 71:13,16,25
72:5 73:1,19 74:2,7
75:4,15 76:7 77:4
77:12,16 83:17 84:6
85:21 87:20,23 88:1
88:7,12,15,16,25
89:2 90:12,21 91:12
92:22 93:23 94:9
95:16,23 97:9,19
98:2,5,12,18 99:23
101:18 102:17
103:6 104:21
128:14 142:9 144:2
144:12 145:2,11
146:10,25 147:3,7
147:11 152:9
162:13 171:16
224:2,3,7 261:22
269:4,5,12
**38** 101:12
**380** 293:11

---

**4**

**4** 84:3 100:12 261:17
**4:45** 251:20
**4:57** 251:20
**42** 293:1
**43** 101:12 192:1
**45** 209:14
**475-1969** 3:16
**475-3281** 3:11
**4941** 252:5
**4th** 84:8 259:1

---

**5**

**5** 36:24 44:16 72:7,11
  73:7 94:15 95:12
  96:11,20 110:25
  144:13 148:25
  195:21 233:14,20
  245:15 246:3,19
  260:22 288:18,20

BRYAN HEBERT                                6/17/2014
CONFIDENTIAL TRANSCRIPT

53

|  |  |
|---|---|
| 292:25 | 187:7 |
| **5.10** 58:11 | **80572** 199:15 |
| **5.11** 57:23,25 59:1,3 | **81st** 5:14 22:9 67:21 |
| 59:10 62:19 153:4 | **82nd** 6:1 25:2 |
| **5.11A** 63:23 | **87013** 81:22 |
| **5.11D** 59:16,20 60:8 | **87014** 5:18 81:22 |
| 61:16,20 62:5,9,12 | **8th** 104:14 106:20 |
| 62:24 63:10 153:6 | |
| 153:12,17 | **9** |
| **5:38** 283:23 | **9** 288:18,20 |
| **5:40** 283:23 | **9-16-2013** 256:15 |
| **5:46** 289:14 | **9/16/2013** 6:18 |
| **5:50** 289:15 | **9:05** 2:17 |
| **5:51** 2:17 289:20 | **90532** 106:20 |
| **512** 3:11,16,20 4:4 | **936-1381** 3:20 |
| **512)292-4249** 293:12 | **936-2868** 4:4 |
| **514-0828** 3:6 | **95** 274:9 277:21 |
| **54** 292:25 | **950** 3:5 |
| **57** 5:14 | **9th** 104:14 |
| **59** 216:13 | |
| **591** 70:23 | |

**6**

6 36:24 44:16 216:6
  216:25 269:10,21
**60** 5:15 119:4
**65** 198:8
**663-6262** 3:25

**7**

**7** 5:4 45:14 260:3
**70** 5:16 108:23
  148:22 149:1,18
  191:7 234:15 235:3
**701** 293:11
**7254** 3:4
**78** 5:18
**78701** 2:21 293:12
**78711-2548** 3:10,15
  3:20 4:4

**8**

**8** 13:7 45:15
**80** 185:21 186:6

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249