```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                     CORPUS CHRISTI DIVISION

MARC VEASEY, JANE HAMILTON,        )
SERGIO DELEON, FLOYD J. CARRIER,   )
ANNA BURNS, MICHAEL MONTEZ,        )
PENNY POPE, OSCAR ORTIZ, KOBY      )
OZIAS, JOHN MELLOR-CRUMLEY, PEGGY  )
HERMAN, EVELYN BRICKNER, GORDON    )
BENJAMIN, KEN GANDY, LEAGUE OF     )
UNITED LATIN AMERICAN CITIZENS     )
(LULAC), AND DALLAS COUNTY,        )
TEXAS,                             )  CIVIL ACTION
     Plaintiffs,                   )  NO.
                                   )  2:13-CV-193
v.                                 )  (NGR)
                                   )  [Lead case]
RICK PERRY, Governor of Texas;     )
and JOHN STEEN, Texas Secretary    )
of State,                          )
     Defendants.                   )
_____    )
                                   )
UNITED STATES OF AMERICA,          )
     Plaintiffs,                   )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, IMANI CLARK, AND   )
MICHELLE BESSIAKE,                 )
     Plaintiff-Intervenors,        )
                                   )
TEXAS ASSOCIATION OF HISPANIC      )
COUNTY JUDGES AND COUNTY           )
COMMISSIONERS, HIDALGO COUNTY,     )
AND MARIA LONGORIA BENAVIDES,      )  CIVIL ACTION
     Plaintiff-Intervenors,        )  NO.
                                   )  2:13-CV-263
v.                                 )  (NGR)
                                   )  Consolidated
STATE OF TEXAS, JOHN STEEN, in     )  case
his official capacity as Texas     )
Secretary of State; and STEVE      )
McCRAW, in his official capacity   )
as Director of the Texas           )
Department of Public Safety,       )
     Defendants.                   )
_____    )
```



**Page 2**

```
 1  _____ )
 2  TEXAS STATE CONFERENCE OF NAACP   )
    BRANCHES; and the MEXICAN          )
 3  AMERICAN LEGISLATIVE CAUCUS OF     )
    THE TEXAS HOUSE OF                 )
 4  REPRESENTATIVES,         )CIVIL ACTION
    Plaintiffs,           )NO.
 5                         )2:13-CV-291
    v.                    )(NGR)
 6                        )Consolidated
    JOHN STEEN, in his official   )case
 7  capacity as Secretary of State of  )
    Texas; and STEVE McCRAW, in his    )
 8  official capacity as Director      )
    of the Texas Department of Public  )
 9  Safety,                            )
    Defendants.                        )
10  _____ )
11  BELINDA ORTIZ, LENARD TAYLOR,   )
    EULALIO MENDEZ JR., LIONEL         )
12  ESTRADA; ESTELA GARCIA ESPINOSA,   )
    LYDIA LARA, MARGARITO MARTINEZ     )
13  LARA, MAXIMINA MARTINEZ LARA, AND )CIVIL ACTION
    LA UNION DEL PUEBLO ENTERO, INC.   )NO.
14  Plaintiffs,           )2:13-CV-348
                          )(NGR)
15  v.                    )Consolidated
                          )case
16  STATE OF TEXAS; JOHN STEEN, in his )
    Official capacity as Texas         )
17  Secretary of State; and STEVE      )
    McCRAW, in his official capacity   )
18  As Director of the Texas           )
    Department of Public Safety,       )
19  Defendants.                        )
    _____ )
20
21  -----------------------------------
22        ORAL DEPOSITION OF
23            LINDA LYDIA
24           JUNE 6, 2014
25  -----------------------------------
```

**Page 3**

```
 1
 2
 3        ORAL DEPOSITION OF LINDA LYDIA,
 4  produced as a witness at the instance of the
 5  Defendants, and duly sworn, was taken in the
 6  above-styled and numbered cause on June 6, 2014,
 7  from 8:48 a.m. to 1:11 p.m., before Karen L. D.
 8  Schoeve, CRR, RDR, in and for the State of Texas,
 9  reported by machine shorthand, at the law offices
10  of Locke Lord, LLP, 2200 Ross Avenue, Suite 2200,
11  Dallas, Texas, pursuant to the Federal Rules of
12  Civil Procedure and the provisions stated on the
13  record or attached hereto.
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1           A P P E A R A N C E S
 2  FOR THE PLAINTIFFS:
 3    AMY L. RUDD
      DECHERT LLP
 4    633 West 5th Street, 37th Floor
      Los Angeles, CA 90071-2013
 5    T: 213.808.5700
      F: 213.808.5760
 6    amy.rudd@dechert.com
 7
    FOR THE DEFENDANTS:
 8
      STEPHEN TATUM
 9    OFFICE OF THE ATTORNEY GENERAL
      209 West 14th Street
10    Austin, Texas 78711
      T: 512.463.3133
11    D: 817.713.9492
      stephen.tatum@texasattorneygeneral.gov
12
13  FOR PLAINTIFF UNITED STATES OF AMERICA:
    (attended via teleconference)
14
      Angela J. Miller
15    Trial Attorney
      Voting Section, Civil Rights Division
16    U.S. Department of Justice
      950 Pennsylvania Ave., NW
17    NWB Room 7204
      Washington, DC 20530
18    T: (202) 514-2919
      angela.miller5@usdoj.gov
19
20  THE COURT REPORTER:
21    Karen L. D. Schoeve
      Certified Realtime Reporter
22    Registered Diplomate Reporter
      Integrity Legal Support Solutions
23    Firm Registration No. 528
      3100 W. Slaughter Lane, Suite A-101
24    Austin, Texas 78748
      (512) 320-8690
25    (512) 320-8692 (fax)
```

**Page 5**

```
 1                  INDEX
 2
                                    PAGE
 3
 4  Appearances                      4
 5
    LINDA LYDIA
 6
       Examination by Mr. Tatum      7
 7
       Examination by Ms. Rudd      ---
 8
       Examination by Ms. Miller    ---
 9
       Afternoon Session            126
10
11  Changes and Signature           163
12  Reporter's Certificate          165
13
14
15
16
17
18
19
20
21
22
23
24
25
```



Page 6

EXHIBIT INDEX
NO.   DESCRIPTION                                    PAGE
Exhibit Number 1                            13
     Defendants' Second Amended Notice of
     Intention to Take Oral Deposition of the
     Texas State Conference of NAACP Branches

Exhibit Number 2                            19
     Complaint for Declaratory and
     Injunctive Relief

Exhibit Number 3                            94
     E-mail chain
     Bates stamped TSC00006037 - 6039

Exhibit Number 4                            99
     E-mail chain
     Bates stamped TSC00006029 - 6031

Exhibit Number 5                            105
     E-mail chain
     Bates stamped TSC00006032 - 6036

Exhibit Number 6                            113
     Urgent Action Alert
     Bates stamped TSC00006061

Exhibit Number 7                            116
     Minutes of Executive Committee
     January 25, 2014 - Lufkin, Texas

Exhibit Number 8                            119
     Election Protection flyer
     Bates stamped TSC00006062 - 6063

Exhibit Number 9                            122
     Election Identification Certificate
     (EIC) Study
     TSC00006058

Page 7

1          P R O C E E D I N G S
2
3              LINDA LYDIA,
4   having been first duly sworn, testified as
5   follows:
6              EXAMINATION
7   BY MR. TATUM:
8       Q.   Good morning.
9       A.   Good morning.
10      Q.   My name is Stephen Tatum.  I'm an
11  assistant attorney general in the State of Texas,
12  and I'm representing the defendants in this
13  matter.
14          This is Case Number 2:13-CV-193 in
15  Federal District Court, Southern District of
16  Texas, and consolidated cases.
17          This is the deposition of Linda
18  Lydia.  It is about 8:48 on June 6th.  We're here
19  at the offices of Locke Lord in Dallas, Texas.
20          Ms. Lydia, would you please state
21  your full name for the record, please.
22      A.   Linda Darden Lydia.
23      Q.   And, Miss Lydia, where do you reside?
24      A.   I reside at the 1332 Bow Creek Drive,
25  Duncanville, Texas 75116.

Page 8

1       Q.   And, Miss Lydia, when were you born?
2       A.   January 3rd, 1950.
3       Q.   Okay.  Are you currently employed?
4       A.   Yes, I am.
5       Q.   Are where are you currently employed?
6       A.   Mersal Realty as a realtor and also
7   part-time doing some marketing for a retail
8   product, is what I call it.
9       Q.   Okay.  May I ask what that retail
10  product is --
11          (Telephone interruption.)
12          MS. MILLER:  Hey there.  This is
13  Angela Miller from the DOJ.
14          MS. RUDD:  Hi, Angela.  This is Amy
15  Rudd.  We just started, and your name is on the
16  record.
17          MS. MILLER:  Okay.  Great.  Sorry.
18  I thought we were starting later, so...
19          MS. RUDD:  No problem.  That's why
20  I e-mailed you.  Just one sec.
21          MR. TATUM:  That was Angela Miller
22  calling in, and I just realized I didn't allow
23  you to make an introduction, Amy, if you'd like
24  to.
25          MS. RUDD:  Amy Rudd for the Texas

Page 9

1   State Conference of the NAACP.
2          MR. TATUM:  Thank you.
3       Q.   (BY MR. TATUM)  So, Miss Lydia, you
4   were about to tell me about the product that you
5   do marketing --
6       A.   The product is a real estate product;
7   is a utility connection service for realtors.
8       Q.   Okay.  And have you ever been deposed
9   before?
10      A.   No.
11      Q.   Okay.  I'm going to ask you some
12  preliminary questions before we begin and then
13  I'm going to go over some ground rules --
14      A.   Okay.
15      Q.   -- for control of the deposition.
16          First, Miss Lydia, how are you
17  feeling today?
18      A.   Sleepy.
19      Q.   Sleepy.
20      A.   Not enough sleep.
21      Q.   Okay.  Are you suffering from any
22  illness today that would affect your ability to
23  provide accurate and truthful answers to my
24  questions?
25      A.   No, sir.

Linda Lydia - 6/6/2014

10

1    Q.   Are you taking any medications that
2  would affect your ability to provide accurate and
3  truthful answers to my questions?
4    A.   No, sir.
5    Q.   Is there anything else this morning
6  that might prevent you from accurately and
7  truthfully answering my questions?
8    A.   No.
9    Q.   That includes being sleepy.
10   A.   That's correct.
11   Q.   Okay.  You understand that you've been
12  sworn to tell the truth today.
13   A.   Yes, sir.
14   Q.   Okay.  I'm going to be asking you some
15  questions, and I need you to answer them audibly
16  for the court reporter and those joining us over
17  the phone.  Do you understand?
18   A.   Yes.
19   Q.   Okay.  If you would, please, if you're
20  going to answer yes or no to a question, please
21  say yes or no.  Don't nod your head or shake your
22  head.
23   A.   Yes.
24   Q.   And, please, if you would, wait until I
25  finish stating my question before answering and I

11

1  will try to do the same to you when you are
2  answering.
3         This is easier said than done.
4  There may be times when we accidentally speak
5  over each other.  I just ask that we try to allow
6  each other to finish before answering or asking a
7  question.
8         Do you understand?
9    A.   Yes.
10   Q.   Okay.  If you don't understand a
11  question that I ask or you need clarification of
12  a question that I ask, please say so and I will
13  gladly rephrase or repeat the question.
14   A.   Yes.
15   Q.   Okay.  And there made be times today
16  when your attorney will object to a question that
17  I ask.  In that case, you can still answer the
18  question unless your attorney specifically
19  instructs you not to.
20         Do you understand?
21   A.   Yes.
22   Q.   Okay.  And, Miss Lydia, you are
23  represented by counsel today; is that correct?
24   A.   That's correct.
25   Q.   And is that Amy Rudd sitting next to

12

1  you?
2    A.   Yes.
3    Q.   Okay.  Ms. Lydia, what did you do to
4  prepare for your deposition today?
5    A.   I read through the complaint that was
6  filed by the State Conference and beyond that
7  not -- not --
8    Q.   Did you --
9    A.   I have discussed this with Amy and
10  beyond that, not anything.
11   Q.   Did you meet with anyone else besides
12  Amy in preparation for this deposition?
13   A.   I have had a discussion with Gary
14  Bledsoe, our attorney with the State Conference.
15   Q.   Okay.  And when was that discussion?
16   A.   Probably a few days ago.  I'm not sure
17  of the exact date.
18   Q.   And how long was that discussion?
19   A.   15, 20 minutes, maybe.
20   Q.   Was anyone else a party to that
21  discussion?
22   A.   Amy was on the discussion -- was on the
23  phone because it was actually a conference call
24  and Yannis Banks, our paid staff person.
25   Q.   Were there any other meetings held in

13

1  preparation for this deposition?
2    A.   No.
3    Q.   Other than the complaint, did you
4  review any other documents in preparation for
5  this deposition?
6    A.   No.
7    Q.   Okay.  Overall how much time would you
8  say you spent review- -- preparing for this
9  deposition?
10   A.   Maybe an hour.
11   Q.   Maybe an hour?
12   A.   Yes.
13   Q.   Did you bring any documents with you
14  here today?
15   A.   I only brought the complaint and
16  directions or information about how to get here.
17  And some insight into what I may be discussing.
18   Q.   Okay.  Did you do anything else to
19  prepare that you did not already mention?
20   A.   No.
21         (Deposition Exhibit Number 1 was
22          marked for identification.)
23   Q.   (BY MR. TATUM)  Ms. Lydia, I'm handing
24  you what has been marked as Exhibit 1.
25         MR. TATUM:  Would you like a copy?

Linda Lydia - 6/6/2014

14

1          MS. RUDD:  Is it the topics?
2          MR. TATUM:  Yes.
3          MS. RUDD:  No.
4     A.  Okay.
5     Q.  (BY MR. TATUM)  Miss Lydia, have you
6  ever seen this document before?
7     A.  (Witness examined exhibit.)
8          I'm not sure, to be perfectly
9  honest.  I get a lot of documents forwarded to
10 me.
11    Q.  Um-hum.
12    A.  But I'm not sure if this one in
13 particular -- I can't say for sure.
14    Q.  You can hold on to that.
15    A.  Okay.
16    Q.  And, Miss Lydia, I represent to you
17 that this is the Defendants' Seconded Amended
18 Notice of Intention to Take Oral Deposition --
19    A.  Okay.
20    Q.  -- of the Texas State Conference of
21 NAACP Branches.
22    A.  Okay.
23    Q.  In other words, this is the notice of
24 the intent to take your --
25    A.  Okay.

15

1     Q.  -- deposition.
2     A.  Okay.  Got you.  All right.
3     Q.  And again, please, if you don't mind,
4  wait until I finish --
5     A.  Okay.
6     Q.  -- stating the question before you
7  answer so we don't talk over each other.
8          Miss Lydia, would you do me a favor
9  and turn to Page 5, please.
10         Are you there?
11    A.  Yes, sir.
12    Q.  Okay.  At the bottom of that page
13 there's a section entitled "Matters."  Do you see
14 that?
15    A.  Yes, sir.
16    Q.  Okay.  Following that title and on the
17 succeeding pages there are a number of -- taking
18 is a list of numbered paragraphs from 1 to 24
19 going onto page 8.  Do you see those paragraphs?
20    A.  Yes, sir.
21    Q.  Okay.  These are the matters that we
22 have noticed we'll be discussing in this
23 deposition today.  The Texas NAACP has stated
24 that they are not producing a witness to testify
25 to topics 3, 4, and 18.

16

1          MS. RUDD:  And, Stephen, let me
2  just say for the record that because Linda
3  operates the executive level of the Texas NAACP,
4  there may be topics in here that she's just not
5  familiar enough with the subject matter to
6  discuss, and she can tell you that in the context
7  of today's deposition.
8          MR. TATUM:  Okay.
9     Q.  (BY MR. TATUM)  Miss Lydia, are you
10 aware that you've been designated by the Texas
11 NAACP to testify on its behalf regarding the
12 matters contained in this notice?
13    A.  Yes, sir.
14    Q.  And are you willing and able to give
15 binding answers to questions that are based on
16 the matters contained in this notice?
17    A.  I would say some of them.
18    Q.  Are there any -- at the outset, upon
19 looking at it in front of you, that you are not
20 able to testify to?
21    A.  I would say there are a number of them.
22    Q.  Can you point out which ones those are.
23    A.  (Witness examined exhibit.)
24         I'm needing to read them.
25    Q.  Take your time.

17

1     A.  Okay.  Thank you.  (Witness examined
2  exhibit.)
3          There are a few that I'm not sure
4  that I completely understand, Mr. Tatum.  And
5  then there's some that I definitely do not have
6  knowledge of.
7     Q.  So to confirm, some of these matters
8  you don't understand --
9     A.  Um-hum.  I don't fully understand.
10    Q.  Sorry.  If you don't mind, please let
11 me finish my question.
12         There are some matters on here that
13 you don't understand, and there are others that
14 you are not prepared to testify to?
15    A.  That's correct.
16    Q.  Can you indicate which matters you are
17 not prepared to testify to today?
18    A.  The identity of your members on
19 September 17th, 2013.
20    Q.  And if you want to, you can just point
21 out the numbered paragraph.
22    A.  Okay.  Number 3.
23         Number 4.
24         Number 12.
25         Number 13.

18

1       Number 14.
2       Number 15.
3       Number 17.
4       Number 18.
5       Number 21.
6       Number 23.
7       And Number 24.
8       Oh, I'm sorry, and I missed
9  Number 7.
10     Q.   So to confirm, you are not prepared to
11 testify to Topics 3, 4, 7, 12, 13, 14, 15, 18,
12 21, 23 and 24; is that correct?
13 17 in his list.]
14     A.   Yes, sir.
15     Q.   And also to confirm, this is the first
16 time today that you've seen this document?
17     A.   Yes, sir.
18     Q.   So the topics that you did not mention,
19 you are prepared to testify to today?
20     A.   I think I said there were two sets of
21 --
22     Q.   That you didn't --
23     A.   -- concerns.  One is I didn't
24 understand some of the questions.  And the other
25 one is one I definitely do not have knowledge of.

19

1      Q.   Okay.  We'll see how these play out as
2  we go along.
3            MS. RUDD:  I think that's the best
4  way to do it.
5            MR. TATUM:  Okay.
6            (Deposition Exhibit Number 2 was
7            marked for identification.)
8      Q.   (BY MR. TATUM)  Miss Lydia, I'm handing
9  you what's been marked as Exhibit 2.
10     A.   Um-hum.
11     Q.   And I believe based on what you said
12 earlier that you will recognize this document --
13     A.   Okay.
14     Q.   -- but let me just ask.  Do you
15 recognize this document?
16     A.   Yes.
17     Q.   And what is this document?
18     A.   This is the complaint for declaratory
19 and injunctive re -- for relief.  Sorry.
20     Q.   And was this complaint filed by the
21 Texas NAACP?
22     A.   Yes.
23     Q.   Okay.  Did you assist or help in any
24 way in the preparation of this document?
25     A.   No.

20

1      Q.   Do you feel like you were prepared to
2  testify about the factual bases of the claims
3  stated in this complaint?
4      A.   For the most part.
5      Q.   For the most part.  Okay.
6            (Discussion off the record.)
7      Q.   (BY MR. TATUM)  And, Ms. Lydia, you
8  mentioned your employment in the real estate
9  industry.
10     A.   Yes, sir.
11     Q.   Are you also employed by the Texas
12 NAACP?
13     A.   No, I'm not.
14     Q.   What is your involvement with the Texas
15 NAACP?
16     A.   I'm an elected officer of the Texas
17 NAACP.
18     Q.   And as an elected officer, do you have
19 an official title?
20     A.   Yes, I do.
21     Q.   And what is that?
22     A.   Secretary.
23     Q.   And when were you elected to that
24 position?
25     A.   Gosh, probably about eight years ago --

21

1  and I'm not certain, but that is a speculation.
2  Around eight years ago.
3      Q.   That would be 2006?
4      A.   Yes.
5      Q.   And I think you answered this already,
6  but is that a paid position?
7      A.   No.
8      Q.   You act as secretary on a voluntary
9  basis?
10     A.   That's correct.
11     Q.   Okay.  And when you say "secretary," is
12 that secretary of the Texas NAACP?
13     A.   That's correct.
14     Q.   And I want to clarify, when I refer
15 to -- I'll be talking about the Texas NAACP.  And
16 when I say the Texas NAACP, I mean the Texas
17 Conference of NAACP Branches.
18     A.   Units.
19     Q.   Units.
20     A.   Um-hum.
21     Q.   They're also referred to as units?
22     A.   That's correct.
23     Q.   Okay.  In this case they've been called
24 branches --
25     A.   Okay.

Linda Lydia - 6/6/2014

22

1   Q.   -- so I'll call them branches.
2   A.   That's fine.
3   Q.   And there may be times when I just say
4   "NAACP."  If I do that, I'm referring to the
5   Texas Conference.  If I intend to speak to the
6   national NAACP, I will say so, and if that's not
7   clear, please ask me to clarify.
8   A.   Yes.
9   Q.   Okay.  So you said you were the
10  secretary for the Texas NAACP, correct?
11  A.   Yes.
12  Q.   Okay.  How long have you held that -- I
13  believe you said you've held that position for
14  eight years?
15  A.   Approximately.  I -- I also said I do
16  not know the exact date.  So it's somewhere in
17  that area.  Not for certain though.
18  Q.   Did you do anything for the Texas NAACP
19  before that?
20  A.   Yes.
21  Q.   And what was that?
22  A.   I was a state youth advisor.
23  Q.   And what does a state youth advisor do?
24  A.   Coordinate the activities of our youth
25  in college units in our state.

23

1   Q.   And how long were you a state youth
2   advisors?
3   A.   Probably for six years.  Again, I'm not
4   sure of the exact dates.
5   Q.   Did you do anything for the Texas NAACP
6   before you were a state youth advisor?
7   A.   I'm trying to make certain I'm not
8   overlooking something and not answering
9   factually.  I know I served in the capacity as
10  our ACT-SO coordinator, which is Academic,
11  Cultural, Technology and Scientific Olympics.
12  That's done on a statewide basis.  So I've done
13  that.
14         I think that's pretty much the
15  capacities that I've held within the State
16  Conference.
17  Q.   So you've been secretary for eight
18  years.  Before that you were state youth advisor
19  for four to six years --
20  A.   Um-hum.
21  Q.   -- roughly, and before that you were in
22  the roles you just spoke to.  Overall, how many
23  years have you been working for or with the Texas
24  NAACP?
25  A.   I would say probably around 20 years.

24

1   Q.   Okay.  When did you first become a
2   member of the Texas NAACP?
3   A.   I don't have a membership with the
4   Texas NAACP.
5   Q.   You are not a member of the Texas
6   NAACP?
7   A.   We do not have memberships within the
8   Texas State Conference of NAACP branches or
9   units, whichever term you use.  The memberships
10  would rest with the national via a branch or a
11  unit.  I am actually a member of the Dallas
12  NAACP.
13  Q.   So you're a member of the Dallas
14  branch --
15  A.   Um-hum.
16  Q.   -- of the Texas NAACP?
17  A.   Well, the branches come under the Texas
18  State Conference auspices.  But the membership
19  rests with the branches.  Branches, youth
20  councils and college chapters hold the
21  memberships.  The State Conference does not have
22  memberships.  Even our president, his membership
23  would be with a branch.
24  Q.   So you're -- I'm just trying to make
25  sure I understand this.

25

1   A.   Um-hum.
2   Q.   You're a member of the Dallas branch --
3   A.   Um-hum.
4   Q.   -- of the Texas NAACP or the National
5   NAACP?
6   A.   National NAACP.
7   Q.   Okay.  And how long have you been a
8   member of the Dallas branch of the National
9   NAACP?
10  A.   I've been a member of the NAACP
11  probably for, I would say, 40 years.  Not
12  necessarily affiliated with the Dallas branch
13  because I've lived in various locations.
14  Q.   Where have you lived?
15  A.   I lived in Nashville, Tennessee.  I was
16  a member of a college chapter in Nashville,
17  Tennessee.
18         I was a member of a unit in Grand
19  Prairie, Texas.
20         I was also a member of a unit in
21  Los Angeles, California.
22         And back to Dallas with the Dallas
23  NAACP.
24  Q.   So when you move -- moved back to
25  Dallas, you did not need to fill out a -- or

Linda Lydia - 6/6/2014

26

1  apply for a new membership to the Dallas branch.
2  Your previous membership stayed with you?
3       A.   Our membership structure is such, you
4  can either buy a yearly membership or you can buy
5  life memberships.  When I joined the Grand
6  Prairie NAACP, I became a life member.  So my
7  life membership could be transferred from one
8  unit to another unit with a life membership
9  versus a yearly membership.
10      Q.   All right.  And that involves a
11  one-time fee?
12      A.   A one-time fee.
13      Q.   Okay.  As secretary for the Texas
14  NAACP, what are your official duties or
15  responsibilities?
16      A.   Multitude.  I do communication to our
17  units.  That's generated by members of our
18  executive committee.  That would include our
19  officers and our standing committee chairs.
20           I also provide information to our
21  units, our branches and our youth councils and
22  our college chapters regarding activities
23  programming of our state conference.
24           I collect or take minutes of
25  meetings.

27

1           I coordinate our planning of
2  meetings, whether it's quarterly meetings or our
3  state conventions or other specially designated
4  meetings that we have during the year for various
5  purposes.
6       Q.   Do you manage or supervise anyone?
7       A.   Constitutionally, I manage our one paid
8  staff person and that would be Yannis Banks.
9       Q.   And when you say "constitutionally,"
10  what are you referring to?
11      A.   Well, at one time I did a lot of
12  management of Yannis, but with our legislative
13  session and the onset of a number of different
14  things, we sort of shifted his position to be a
15  legislative liaison.  And so at that time because
16  of the geographical proximity -- he lives in
17  Austin, I live in Dallas, so it was much easier
18  for that become -- come under the purview of Gary
19  Bledsoe, our State Conference president.
20      Q.   When you --
21      A.   We actually --
22      Q.   Sorry.  Go ahead.
23      A.   We actually needed him more in that
24  capacity than doing some of the administrative
25  things that he should have been doing or normally

28

1  does.  I will be doing that or I will designate
2  our assistant secretary to assist in performance.
3       Q.   Earlier when you said -- I believe you
4  said something to the effect of
5  "constitutionally" you manage one person or
6  something to that effect.
7       A.   Yes.  I did say that.
8       Q.   Okay.  When you refer -- when you say,
9  "constitutionally," are you referring to some
10  kind of governing document?
11      A.   Yes.
12      Q.   Okay.  And what is that?
13      A.   That would be our bylaws for our state
14  conference.
15           (Discussion off the record.)
16      Q.   (BY MR. TATUM)  So, Miss Lydia, you are
17  on the executive committee of the Texas NAACP,
18  correct?
19      A.   Yes.
20      Q.   And you attend, to the extent that you
21  can, all of the regular meetings of the executive
22  committee?
23      A.   That's correct.
24      Q.   How often does the executive committee
25  meet?

29

1       A.   Quarterly.
2       Q.   Do they meet in the same place every
3  year?
4       A.   No.
5       Q.   Where did they meet last time, if you
6  recall?
7       A.   Our last meeting was in Lufkin, Texas.
8       Q.   Do you regularly interact with Gary
9  Bledsoe, the president of the Texas NAACP?
10      A.   Yes.
11      Q.   Would you say you interact with him on
12  a daily basis?
13      A.   No.
14      Q.   Would you say you are available to him
15  on a daily basis?
16      A.   Yes.  To some extent.
17      Q.   And how do you normally communicate
18  with him?
19      A.   Text, phone conversations, e-mails.
20      Q.   And he lives in Austin as well,
21  correct?
22      A.   Yes.
23      Q.   Do you communicate with anyone at the
24  national office of the NAACP?
25      A.   Yes.

Linda Lydia - 6/6/2014

30

1    Q.   And who would you say you communicate
2  with?
3    A.   People in membership, branch and field
4  services, youth and college division, finance.
5    Q.   What is the branch and field services?
6    A.   The branch and field services would be
7  the department that would oversee the operation
8  of our units throughout the country.
9    Q.   How much time a week, generally, do you
10  spend fulfilling your duties as secretary of the
11  Texas NAACP as opposed to your other job in real
12  estate?
13    A.   That actually would vary, Mr. Tatum.
14  Let's just say I probably spend, on an average,
15  for the first six months of the year, probably 10
16  to 20 hours a week, and during convention
17  preparation, probably 40 hours a week.
18    Q.   So at that point it almost becomes like
19  a full-time job?
20    A.   Exactly.  And it definitely has become
21  more so that in the last few years.
22    Q.   As secretary, are you involved -- and I
23  think you may have said this -- are you involved
24  in finance matters with the Texas NAACP?
25    A.   Yes, I am.

31

1    Q.   Including budgeting and any other kind
2  of financial matters?
3    A.   Probably more in the area of
4  fundraising.  I also am responsible for execution
5  of vouchers for reimbursement of expenditures.
6    Q.   Reimbursement of expenditures by Texas
7  NAACP employees?
8    A.   Also for some of the volunteers who may
9  be functioning in the capacity of our state
10  conference doing various tasks.
11    Q.   And do you participate in the
12  organization or -- let me state that again.
13          Do you participate in the
14  organization of these volunteers that you refer
15  to?
16    A.   Yes.  I would think to some degree.
17    Q.   How does the Texas NAACP attract new
18  members?
19    A.   Again, the Texas NAACP does not have
20  members.  The units would be attracting new
21  members.  In the past, and not so much recently,
22  we have done a number of different things to
23  assist the branches in membership recruitment and
24  retention, which is a very important piece of
25  what it is we're supposed to be doing on the

32

1  state conference level.  We're supposed to be
2  doing that function to grow the organization from
3  the ground.
4    Q.   And what kind of activities are
5  involved with the recruiting and retention of
6  members at the branch level?
7    A.   The branch had various events, whether
8  it's membership recruitment at churches or
9  events.  They also send out solicitation, some
10  branches do and some don't.  So there is not a
11  real consistent way that they go about doing the
12  recruiting other than the fact that they do.
13    Q.   Now, you mentioned fundraising.  What
14  would you say is the primary source of funding
15  for the Texas NAACP?
16    A.   I would say it would definitely be
17  corporate support and sponsorship.
18    Q.   Are you involved with soliciting
19  corporate support and sponsorship?
20    A.   Yes, I am.
21    Q.   And what does that involve?
22    A.   Letter writing, for the most part.
23  Phone calling.  Following up with information
24  needed for sponsorship.
25    Q.   Do you know roughly how many -- when

33

1  you combine all of the members of the various
2  branches that make up the Texas NAACP --
3    A.   Um-hum.
4    Q.   -- do you know how many members that
5  includes?
6    A.   I would say approximately 10,000.
7    Q.   Do you recall when you began your role
8  as secretary what the membership was then,
9  generally?
10    A.   No.
11    Q.   Do you think it's increased over the
12  years?
13    A.   I'll be honest with you.  I'm not
14  really certain of that.  Again, because we do not
15  have membership rosters, so I wouldn't know that,
16  really.
17    Q.   Do the local branches keep membership
18  rosters?
19    A.   Um-hum.  Yes, they do.
20    Q.   Do the local branches submit any kind
21  of report or summaries of their activities or
22  memberships to the executive committee?
23    A.   They do submit quarterly reports that
24  are sent to the State Conference as well as to
25  the national office so they're required

34

1 constitutionally.
2           There is no reporting of their
3 membership totals to us.  That information is
4 held between the branches -- let me just say,
5 there are three different types of units that we
6 deal with.  We have branches which are the adult
7 units.  We have youth council which are
8 individuals under the age of 18, usually high
9 school or middle school students, and then we
10 have college chapters which is just what it says.
11 Students who are in college.
12    Q.   Um-hum.
13    A.   So that information is contained --
14 their membership is contained within those units.
15 Their memberships are solicited and forwarded to
16 the national office.  It has to go up the ladder
17 to the national office in order to obtain a
18 membership in the organization.  It's not
19 created.  That membership is not created on the
20 local level or the State Conference level, which
21 is the intermediary in this hierarchy.
22           So that information is held by the
23 units in the national office.  We are in there
24 just to assist the units as the first stop along
25 the way.

35

1    Q.   When you say "we," you mean the Texas
2 State Conference?
3    A.   Yes.
4    Q.   So the Texas State Conference, which is
5 made up of the executive committee --
6    A.   Um-hum.
7    Q.   -- acts as kind of a supervising or
8 governing body of the local branches; is that
9 correct?
10    A.   Yes.
11    Q.   Okay.
12    A.   But let me add, with the ultimate
13 programming and any other ultimate decisions are
14 done on the national level.  We supervise them in
15 an intermediary status.
16           If, in fact, they do not feel that
17 our supervision is appropriate, then they
18 obviously have a right to go to the national, and
19 they have the final word.  The national office
20 always has the final word because they are the
21 origin of the membership.
22    Q.   All right.  But when it comes to
23 organizing events, such as you mentioned
24 quarterly meetings, you mentioned a state
25 convention, when it comes to organizing those

36

1 kind of events, the executive committee, the
2 Texas State Conference, they are in charge of
3 supervising the organization of those activities.
4    A.   You're correct.
5    Q.   Okay.  Does the Texas State
6 Conference -- let me rephrase.
7           Do the local branches of Texas --
8 let me say that again.
9           Do the Texas branches of the
10 National NAACP share the same missions -- mission
11 statement and goals as the National NAACP?
12    A.   Yes.
13    Q.   Okay.  They don't have any separate
14 mission statements, goals or values apart from
15 the National NAACP?
16    A.   No, sir, they do not.
17    Q.   Miss Lydia, do you know what this
18 lawsuit is about?
19    A.   Yes, sir.
20    Q.   Can you tell me your understanding of
21 what this lawsuit is about?
22    A.   It's in response to Senate Bill 14.
23    Q.   And when you say "Senate Bill 14," you
24 mean Senate Bill 14 passed in 2011?
25    A.   Exactly.

37

1    Q.   You said it's in response to Senate
2 Bill 14, correct?
3    A.   Yes, sir.
4    Q.   And from here on out, I'll just refer
5 to it as SB 14, is that okay?
6    A.   That's great.
7    Q.   Okay.  Can you elaborate on "in
8 response to SB 14."  What does that mean?
9    A.   It is the bill that required voters in
10 the state of Texas, in addition to having their
11 voter registration card, that they had to have
12 some form of pictured ID in order to vote in the
13 electoral process in the state.
14    Q.   Do you know what those forms of photo
15 ID required by SB 14 are?
16    A.   I think I could probably get most of
17 them.  Passport, a right to carry card.
18    Q.   By that do you mean concealed handgun
19 license?
20    A.   Exactly.  A driver's license, an EIC,
21 and there's one other -- or there's two others.
22 Let me think about it.  Passport . . . I'm
23 sorry, I can't come up with the others.
24    Q.   Is one of those forms that you did not
25 come up with a personal ID card with a photograph

38

1  on it?
2      A.   If you're talking about the EIC
3  card . . . Is that what you're talking about?
4  Or are you talking about the DPS identification
5  card?
6      Q.   I'm not talking about an EIC.  I am
7  talking about the DPS identification.
8      A.   Yes, I'm sorry.  That was one of them,
9  yes.
10     Q.   And is another one an unexpired
11  military ID was one of them.
12     A.   Exactly.  That's the sixth one.
13     Q.   Okay.
14     A.   Exactly.
15     Q.   What is an EIC?
16     A.   Your Election Identification
17  Certificate that you can go to DPS and acquire if
18  you are trying to register to vote and you need
19  identification and you don't have the other
20  documentation.
21     Q.   Of those forms of ID that you just
22  listed, do you have any of those forms of ID?
23     A.   I have a Texas driver's license and I
24  also have a passport.
25     Q.   And those are both unexpired as of

39

1  today?
2      A.   Yes, sir.
3      Q.   Miss Lydia, do you vote?
4      A.   Yes, I do.
5      Q.   When was the last time that you voted?
6      A.   In the last election we had about two
7  weeks ago.
8      Q.   Miss Lydia, have you ever been unable
9  to vote because of the requirements of SB 14?
10     A.   No.
11     Q.   Have you ever been unable to vote for
12  any other reason?
13     A.   No.
14     Q.   Miss Lydia, why do you choose to vote?
15     A.   It is an absolute right that we have
16  earned and very hard-fought earned.  So I feel a
17  strong sense of responsibility to vote for those
18  people who did make those valiant efforts to open
19  those doors for us to vote.  Because for many
20  years we were denied the right to vote.
21     Q.   Miss Lydia, why did the Texas NAACP
22  join this lawsuit?
23     A.   Because of the impact it will have on
24  minorities.
25     Q.   And what is that impact?

40

1      A.   That impact is the burden of acquiring
2  an additional piece of identification when we
3  were operating with a voter's registration card.
4  And I guess in most states they still will
5  operate with a voter registration card, as the
6  only piece of identification needed to vote.
7      Q.   Miss Lydia, are you aware that the
8  United States is a party to this lawsuit
9  represented by the Department of Justice?
10     A.   Yes.
11     Q.   Is it the position of the Texas NAACP
12  that the United States does not adequately
13  represent its interest in this lawsuit?
14          MS. RUDD:  Objection --
15     A.   I really couldn't --
16          MS. RUDD:  Sorry.  Objection calls
17  for a legal conclusion.  You can answer.
18     A.   I really couldn't answer that question.
19     Q.   (BY MR. TATUM)  In joining this
20  this lawsuit, is the Texas NAACP representing the
21  rights of itself as an organization?
22     A.   Its rights as an organization for its
23  members, yes.
24     Q.   So it's representing the rights of the
25  members of the local branches?

41

1          MS. RUDD:  Objection.  Misstates
2  testimony.
3          MR. TATUM:  Let me rephrase.
4      Q.   (BY MR. TATUM)  In joining this
5  lawsuit, is the Texas NAACP representing its
6  members -- or the members of the local branches?
7      A.   I would say yes.
8      Q.   Okay.  Do you know if any of the
9  individual members of the Texas NAACP branches
10  sought to obtain counsel on their own to join
11  this lawsuit?
12     A.   Not to my knowledge.
13     Q.   Is legal representation a benefit of
14  being a member of the NAACP?
15     A.   In some cases.
16     Q.   Stated another way, does the Texas
17  NAACP offer legal representation to its members?
18     A.   In some cases.
19     Q.   And what cases are those, normally?
20     A.   Well, I think this particular complaint
21  would be the best example.
22     Q.   Are there any other examples you can
23  think of?
24     A.   I'm sure there are others, but I'm
25  sorry, it's not at the top of mind right now --

Linda Lydia - 6/6/2014

42

1  top of my mind right now.
2       Q.   Miss Lydia, how was the decision made
3  to join or initiate this lawsuit?
4            MS. RUDD:  And I just want to
5  caution you, Linda, not to reveal anything that
6  might have been discussed in conversations with
7  attorneys, including Mr. Bledsoe.
8       A.   I'm not sure.
9       Q.   (BY MR. TATUM)  Was there a meeting to
10 discuss the possibility of joining this lawsuit?
11      A.   Not sure of that either.
12      Q.   Did you attend any meetings where the
13 topic of joining this lawsuit was discussed?
14      A.   There would have been an approval by
15 our executive committee.
16      Q.   And you're on the executive committee,
17 correct?
18      A.   Yes, I am.
19      Q.   Okay.  Do you recall approving -- or do
20 you recall when the executive committee approved
21 the initiation of this lawsuit?
22      A.   I have no idea, but it would have had
23 to predate the actual filing.
24      Q.   Of course.  I'm talking now about the
25 period of time before this complaint was filed.

43

1  During that time, do you recall when the decision
2  was made to join this lawsuit?
3       A.   I'm sorry, I don't.  Not the date.  I
4  could not even begin to speculate on that.
5       Q.   But am I correct in saying that the
6  decision -- or the initiation of this lawsuit by
7  the Texas NAACP would have to have been approved
8  by the executive committee; is that correct?
9       A.   Yes, that's correct.
10      Q.   And you were on the executive
11 committee, correct?
12      A.   Yes, sir.
13      Q.   But you do not recall any instance when
14 that approval was made; is that correct?
15      A.   I don't recall the exact date that it
16 was made -- or it was approved, I think is what
17 you said.
18      Q.   But the initiation of this lawsuit was
19 approved by the executive committee; is that
20 correct?
21      A.   Yes, sir.  It was approved by the
22 executive committee and also it would have had to
23 have been approved by the national office of the
24 NAACP.  Both would have had to be obtained prior
25 to filing.

44

1       Q.   At the Texas level, did that approval
2  come in the form of a vote?
3       A.   Yes, sir.
4       Q.   And who participated in that vote?
5       A.   The executive committee members.
6       Q.   And was it on a -- was approval based
7  on a majority of the vote?
8       A.   Yes, sir.
9       Q.   Did you vote?
10      A.   I'm sure -- I probably was taking
11 minutes, to be quite honest with you.
12      Q.   You were taking minutes of the meeting
13 at which a decision to join this lawsuit was
14 approved; is that correct?
15      A.   That would -- that would be correct.
16      Q.   Was anyone else, besides those on the
17 executive committee, present at that meeting?
18      A.   No.  Would not have been.
19      Q.   It would have been solely the executive
20 committee?
21      A.   Yes, sir.  And they would have been the
22 only individuals who could have voted on it.
23      Q.   Was the meeting at which this vote or
24 approval took place, was that meeting publicized
25 to the Texas NAACP membership?

45

1       A.   No.  And let me add something to this.
2  Some of this -- this meeting could have very
3  well -- that's why I'm hesitating to say when it
4  happened.  This could have been via a conference
5  call of the executive committee and only those
6  individuals would have been invited to the call
7  and would have been allowed to vote.  So -- or we
8  could have sent it out.  You know, I'm not really
9  certain, okay?
10           So it's not that I'm trying to be
11 evasive.  It's just that I don't know.
12      Q.   Okay.  Was the membership -- was the
13 Texas NAACP membership aware that such a vote was
14 taking place?
15      A.   You're talking about the people outside
16 of the executive committee?
17      Q.   Exactly.
18      A.   I doubt it.
19      Q.   Was any kind of input or concerns of
20 the membership considered in making the vote to
21 join this lawsuit?
22      A.   Most definitely.
23      Q.   And in what form was that input?  Was
24 it letters?  Phone conversations with the
25 membership?

Linda Lydia - 6/6/2014

46

1    A.  I would say both, and we have had like
2  legislative days when we would go over bills that
3  are pending approval or that have been approved.
4  And at those sessions people would discuss the
5  impact of legislation of this nature or other
6  bills that were pending or that have been passed
7  that they felt would be akin to them.
8    Q.  At the executive committee level -- and
9  let me stop here for a second.  The executive
10  committee -- as briefly as you can, tell me who
11  makes up the executive committee.
12    A.  Sure.  Our elected adult officers, the
13  president and secretary of the youth and college
14  division, which is actually a separate division
15  of our State Conference, and all of the standing
16  committee chairs.  There -- I think we may have
17  as many as 15 standing committee chairs, so they
18  would comprise the executive committee.
19    Q.  Is -- are the identities of the
20  executive committee members, is that available to
21  the public anywhere?  For instance, on the --
22  sorry.  For instance, on the Texas NAACP website?
23    A.  I'm not even sure our website is up, so
24  I'm going to be really hesitant to answer that
25  one.  I'm not positive, but I know our membership

47

1  in the branches would know because we -- for
2  example, we have a criminal justice chair on the
3  state conference level.  We also have a criminal
4  justice chair in our branches and youth councils
5  and college chapters.  And so they provide some
6  leadership and programmatic kinds of input to
7  those individuals to assist them.  And that would
8  be true of all of our standing committee chairs.
9    Q.  Okay.  Going back to the meeting of the
10  executive committee where the topic of joining
11  this lawsuit was discussed --
12    A.  Um-hum --
13    Q.  -- and ultimately approved --
14    A.  Um-hum.
15    Q.  -- was there any discussion about the
16  resources involved in litigating a case like
17  this?
18        MS. RUDD:  And I'm going to object
19  on the basis of attorney/client privilege and
20  instruct the witness not to answer.
21        MR. TATUM:  Just to be clear, are
22  you objecting on the basis of the topic or the
23  content of --
24        MS. RUDD:  Okay.  So that's a good
25  clarification.  I'm objecting to the content.  If

48

1  you want to ask about the subject matter without
2  getting into any discussions that were had, I'm
3  perfectly fine with that.
4        MR. TATUM:  Okay.  Let me rephrase
5  the question.
6    Q.  (BY MR. TATUM)  Was the -- at this
7  meeting, where the joining of this lawsuit was
8  voted on and approved, was the topic of the
9  resources involved in litigating a case like this
10  discussed?
11    A.  I really don't recall that.
12    Q.  If it were discussed, would it be
13  contained in the minutes that you were keeping at
14  this meeting?
15    A.  Yes.
16    Q.  Where are those minutes held or where
17  are they filed?
18    A.  In our State Conference office.
19    Q.  Okay.  Are those publicly available?
20    A.  No.
21    Q.  In any of the discussions leading up to
22  the filing of this lawsuit by the Texas NAACP,
23  were there any discussions or meetings held with
24  the -- with any other party to this lawsuit?
25    A.  If there were any meetings or

49

1  discussions, I'm not -- I wasn't involved in them
2  and would not be aware of them.
3    Q.  Who would be involved in that kind of
4  meeting?
5    A.  I'm not sure.
6    Q.  Would it be someone at the executive
7  committee level?
8    A.  Well, I'm sure our president would have
9  been involved.  And perhaps our staff person, who
10  is our legislative liaison.  I'm not certain of
11  whom else would be involved.  You know, I can
12  speculate about it, but I wouldn't know for
13  certain.
14    Q.  Do you know if the Texas NAACP had any
15  kind of meetings or discussions with the Mexican
16  American Legislative Caucus leading up to the
17  initiation of this lawsuit?
18    A.  I have no idea, but I just noticed on
19  this that there was something about the Hispanic
20  community.  So I would tend to think based on
21  what I've read that, yes, there was and from
22  reading this, yes, I would say definitely there
23  was.
24    Q.  Have you yourself as secretary had any
25  communications with the Mexican American

50

1 Legislative Caucus?
2    A.   Not in an official capacity.
3    Q.   Did you have any communications with --
4 and I'll just call them MALC -- in any other
5 capacity?
6    A.   I assisted in planning a meeting during
7 the legislative session.  But beyond that, no.
8    Q.   And what was that meeting about?
9    A.   It was a dinner.  It was just a dinner.
10    Q.   Do you recall what legislative session
11 that was?
12    A.   It would have been the last session.
13    Q.   In 2013?
14    A.   No.  Actually would have been -- yeah,
15 it would have been 2'13.  Yes.  It would have
16 been 2'13.
17    Q.   Do you know if the Texas NAACP had any
18 meetings or discussions with the Texas League of
19 Young Voters leading up to the initiation of this
20 lawsuit?
21    A.   No knowledge of that.
22    Q.   Okay.  Do you know if the Texas NAACP
23 had any kind of meetings or discussions with any
24 other organization or group leading up to the
25 initiation of this lawsuit?

51

1    A.   No knowledge.
2         MR. TATUM:  Are you -- is everyone
3 all right as far as -- do we need to take a
4 break?
5         MS. RUDD:  I'm fine.
6         Are you okay, Linda, or do you need
7 a break?
8         THE WITNESS:  I'm good.
9    Q.   (BY MR. TATUM)  Miss Lydia, you
10 mentioned the Texas NAACP's involvement with
11 various activities at the Texas legislature.
12    A.   Um-hum.
13    Q.   Can you tell me a little bit more about
14 that.
15    A.   Beyond the Lobby Day, I know that
16 Yannis works almost full-time during the
17 legislative -- well, he does work full-time
18 during the legislative session contacting
19 representatives and carry forth the mission.
20 That's probably the extent of it.
21    Q.   What is the mission that you just
22 referred to?
23    A.   Ensuring justice and equality for
24 people of color and monitoring the bills and
25 measures that are impacting our community.

52

1    Q.   You mentioned Lobby Day.
2    A.   Um-hum.
3    Q.   What is Lobby Day?
4    A.   Lobby Day is where we have our units.
5 We all gather in the Austin area, and we have an
6 education chair who will identify bills that are
7 being proposed or pending passage that will
8 impact education in our state.
9         We have our political action chair
10 who will address those that are impacting
11 political action.  With the various standing
12 committees, they pretty much will coordinate --
13         (Phone interruption.)
14         MR. TATUM:  I'm sorry.
15         THE WITNESS:  That's okay.
16    A.   -- the concerns of their standing
17 committee.
18         We have criminal justice.
19         We have education.
20         We have political action.
21         We have youth initiatives.
22         So it covers the full-spectrum of
23 what's going on in our communities.
24    Q.   (BY MR. TATUM)  And who's in charge of
25 organizing Lobby Day?

53

1    A.   It's sort of a combined effort of our
2 State Conference president, myself and Yannis.  I
3 would say we were the three main players in
4 orchestrating that.
5    Q.   Does the Texas NAACP hold a Lobby Day
6 during every legislative session?
7    A.   I think we've done that fairly
8 consistently.
9    Q.   Dating back as far as your involvement?
10    A.   I would -- not that far, but maybe at
11 least for the last eight years.
12    Q.   Does the Texas NAACP, during the
13 legislative session, hold any meetings at the
14 capitol?
15    A.   Meetings at the capitol. . .  During
16 the Lobby Day?
17    Q.   Outside of Lobby Day.
18    A.   I'm sure that there are meetings that
19 bleed out from, you know, the Lobby Day, like our
20 health committee chair may have meetings with
21 someone in the Department of Health or -- that
22 are specific to something that's going on in the
23 legislature.  So, I mean, I couldn't say for
24 certain, but I think I have heard of them having
25 some meetings, but I don't know specifically.

54

```
 1     Q.   Does Mr. Banks or anyone on his behalf
 2   meet specifically with individual legislators?
 3     A.   I'm pretty certain he would.
 4     Q.   Have you yourself ever provided
 5   testimony regarding any bill during a legislative
 6   session?
 7     A.   No.
 8     Q.   If the Texas NAACP were to offer
 9   testimony at a legislative session, who would do
10   that?
11     A.   It would depend on the legislation.
12     Q.   Any kind of voter ID legislation?  Who
13   would typically give testimony regarding such
14   legislation?
15     A.   Probably Yannis.  Gary, perhaps.  Our
16   political action chair, Mr. Jefferson.
17     Q.   What is his name?
18     A.   Howard Jefferson.
19     Q.   Howard Jefferson?
20     A.   Um-hum.
21     Q.   And he is the political action chair of
22   the Texas NAACP?
23     A.   That's correct.
24     Q.   And what is his job?  What is the job
25   of -- what is a political action chair
```

55

```
 1   responsible for?
 2     A.   Political concerns impacting the
 3   minority community and others.
 4     Q.   And what kind of activities does that
 5   involve?
 6     A.   Well, obviously monitoring legislative
 7   measures, providing guidance and programmatic
 8   information or programmatic designs for the units
 9   to implement.
10     Q.   How long has that position existed?
11     A.   I would think since the national
12   created it.  The national office, you have to
13   understand, creates these standing committees.
14   It's done on our national board level.
15     Q.   During the legislative session, does
16   the Texas NAACP conduct any kind of polls or
17   surveys of its members?
18     A.   Regarding?
19     Q.   Regarding legislation that might affect
20   the Texas NAACP?
21     A.   I think that would be done within our
22   committees.  We would not do it as a whole.  I
23   think the committees, the standing committee
24   chairs.
25     You mentioned the standing committees.
```

56

```
 1   What are the various standing committees?
 2     A.   I'm going to try to give you all of
 3   them, but I can't promise you I'll come through
 4   with all of them.  I've had a lot of chemo.
 5     Q.   Give me as many as you can recall.
 6     A.   Okay.  Political action.
 7          Criminal justice.
 8          Youth work.
 9          ACT-SO.
10          Education.
11          Finance.
12          Communications.  Let's see.  What
13   else?
14          Housing.
15          Press and publicity.
16          Economic development.
17          That's just -- I can't think of any
18   others.  I'm sure there are lots more.
19     Q.   And those are standing committees
20   within the Texas NAACP?
21     A.   Yes.
22     Q.   Are you aware of any of those standing
23   committees conducting any kind of polls or
24   surveys of Texas NAACP members regarding voter ID
25   legislation?
```

57

```
 1     A.   No personal knowledge of that.
 2     Q.   Can you tell me about the activities of
 3   the Texas NAACP, specifically with regard to the
 4   enactment of SB 14?
 5     A.   Okay.  We did have a Lobby Day, and it
 6   was discussed.  The Bill itself was handed out.
 7   We were given talking points so that when we go
 8   to visit the different legislators that -- each
 9   of our units are from all across the state,
10   they're statewide, so they have various and
11   different legislators.  So they would go and
12   speak with them regarding supporting our
13   positions.
14     Q.   Any other activities outside of Lobby
15   Day?
16     A.   We would send out updates if there was
17   some movement and perhaps needed individuals to
18   talk with their legislators again.  We would send
19   out information asking them to do that.
20     Q.   With regard to any of the activities
21   that you've just described, does the Texas NAACP
22   coordinate with other groups such as MALC or the
23   Texas League of Young Voters?
24     A.   I really have no knowledge of them
25   coordinating directly with those groups, and I've
```

58

1  -- I've heard the names of the groups before, but
2  whether or not they're coordinating with them, I
3  have no know -- no direct knowledge of that.
4      Q.  During the legislature that enacted SB
5  14 --
6      A.  Um-hum.
7      Q.  -- are Texas NAACP members or members
8  of the branches encouraged to express their
9  concerns or any issues they have to the executive
10 committee or anyone else at the Texas NAACP?
11     A.  Yes.
12     Q.  And how would they do that?
13     A.  Probably just e-mails.
14     Q.  Do you read those e-mails?  Or do you
15 compile those communications?
16     A.  I -- unfortunately I cannot read every
17 e-mail that I get or I would never do anything
18 else.  Things that are germane to specific
19 committee chairs, that information is usually
20 forwarded on to them for handling or whatever.
21     Q.  But you do, to some extent, review
22 communications of members with the Texas NAACP;
23 is that correct?
24     A.  I do some of them, yes.  I don't
25 see all of them.  Please understand --

59

1      Q.  Sure.
2      A.  -- that everybody knows who the
3  standing committee chairs are.  If they have an
4  education issue, they know whom to contact.  They
5  have -- we provide them with that information.
6      Q.  Okay.  Are you aware of any studies or
7  reports or analyses that were considered by the
8  Texas NAACP in their involvement or participation
9  in the enactment of SB 14?
10     A.  No.
11     Q.  Any studies or reports that any talking
12 points developed by the Texas NAACP were based
13 on?
14     A.  I'm not sure.  I do not develop -- I
15 did not develop the talking points, so I couldn't
16 say what they use to create them.
17     Q.  Who did develop the talking points?
18     A.  I would think -- I would think maybe
19 Yannis.  Political action chair.
20     Q.  Mr. Jefferson?
21     A.  Yeah, Mr. Jefferson.
22     Q.  What kind of -- what kind of resources
23 of the Texas NAACP are spent on activities such
24 as Lobby Day or any other kind of
25 legislative-related activities?

60

1      A.  I would think a lot.  I couldn't tell
2  you the exact amount.  Just thinking of the
3  salary that we pay Yannis and his activities has
4  almost been exclusively dedicated to the
5  legislature and that was not the original intent
6  of his position.
7      Q.  What was the original intent of his
8  position?
9      A.  He would handle a large amount of
10 administrative work.  We have a lot of civil
11 rights complaints that far exceeds legislative
12 concerns that need to be addressed almost on a
13 day-to-day basis.
14     Q.  Are the resources expended towards
15 legislative activities?  Are those -- is that
16 something that is budgeted for?
17     A.  You know, you used that term before
18 about budget.  I guess -- I guess the -- the --
19 the reality of it is, our resources are not that
20 vast that we have an operational budget like,
21 say, maybe an AT&T or a 7-Eleven Southland
22 Corporation.
23          We expend our resources where
24 they're needed and it's more -- oftentimes it's
25 more reactive where budget sounds more proactive,

61

1  in my mind, that people can sit down and say,
2  we're going to spend $500 for educational
3  concerns and 500 -- no.  We don't do that.  We
4  don't compartmentalize like that.
5      Q.  So the Texas NAACP -- let me ask you:
6  Does the Texas NAACP compile an annual budget
7  every year?
8      A.  Our treasurer will put together
9  something.  But to be quite honest with you, as
10 far as actually -- I mean, we have certain
11 dollars that are set aside for certain purposes.
12 Example, we have a historical project going on --
13     Q.  Um-hum.
14     A.  -- and we have a certain dollar amount
15 that has been designated for that.  We have a
16 certain dollar amount for youth and college, and
17 we do not veer into those lanes because we have
18 those set aside for them.  But the rest of the
19 dollars are just basically operating funds.
20     Q.  And are those operating funds allocated
21 as on a need basis?  You mentioned where they're
22 needed --
23     A.  Um-hum.
24     Q.  -- are they allocated when and where
25 they're needed?

62

1    A.   That's pretty much it.
2    Q.   And who makes those decisions?
3    A.   Our executive committee.
4    Q.   Is that a similar voting approval
5    process?
6    A.   Yes.
7    Q.   Does the National NAACP have any input
8    into the allocation of funds at the state level?
9    A.   No.
10        MR. TATUM:  Could we go off record.
11        (A recess was taken.)
12        MR. TATUM:  All right.  Let's go
13   back on the record.
14   Q.   (BY MR. TATUM)  All right.  Miss Lydia,
15   we were talking about operational funds which you
16   stated were specifically designated for certain
17   purposes, and you don't -- I believe you said you
18   don't veer into those roads; is that correct?
19   A.   Um-hum.
20   Q.   Okay.  And you mentioned other funds of
21   the Texas NAACP that are allocated on an
22   as-needed basis --
23   A.   Um-hum.
24   Q.   -- is that a correct summarization of
25   what your testimony was?

63

1    A.   Yes.
2    Q.   Okay.  Do these as-needed funds, are
3    those allocated in such a manner during every
4    year?  Is that something that occurs every year
5    or is that something if there's no pressing need
6    you don't allocate anything for a specific need?
7    Does that make sense?
8    A.   Yeah, that makes sense.  Yes.  And no.
9    Example, when the issue of changing the textbooks
10   in Texas came up, funds were shifted to the
11   education committee so that they could conduct
12   needed activities to advocate in the interest of
13   our membership -- or I should say their
14   membership.
15   Q.   Do you recall when that textbook issue
16   was?
17   A.   I honestly have the worst things with
18   numbers.  That's the part that the chemo took
19   out.  I really don't know.  I have the hardest
20   time remembering that, but I do remember
21   attending the session but a couple of sessions in
22   Austin regarding that.
23   Q.   And regarding that issue, was it the
24   decision of the executive committee in response
25   to that issue to divert whatever amount of funds

64

1    were needed to address it?
2    A.   Definitely.  Our national president
3    actually came down for that event.
4    Q.   Was a similar decision made regarding
5    addressing SB 14?
6    A.   Yes, I think I've already stated that,
7    that it was approved and we had to redirect
8    resources to address this because of the
9    egregious nature of the bill.
10   Q.   Did the national president come down
11   for that decision?
12   A.   I know he was involved in some of it,
13   perhaps.  And I'm not certain of that.  Let me
14   just back out of that.
15   Q.   What kind of things does the executive
16   committee look at when deciding if and how -- or
17   if and what percentage of funds should be
18   allocated towards addressing a specific need like
19   SB 14?
20   A.   I'm not going to say that they
21   specifically say a dollar amount, but they
22   approve the resources for us to move forward with
23   trying to address what they consider as something
24   that would be punitive to our community, whether
25   it's with education, or whether it's with

65

1    political action or health issues.  It varies.
2    Q.   And did that decision-making process
3    vary from previous allocations of resources and
4    response to other issues like the Texas
5    schoolbook/textbook issue that you mentioned
6    before?
7    A.   I'm not sure I understand your
8    question.  I'm sorry.
9    Q.   Sure.
10        You mentioned that a decision was
11   made to allocate specific resources to address
12   the schoolbook issue, correct?
13   A.   Um-hum.
14   Q.   Okay.  Was the process that led to that
15   allocation, was that generally the same kind of
16   process that led to the allocation of resources
17   to address SB 14-related issues?
18   A.   Yes.
19   Q.   Okay.  Going back to the legislative
20   process that led to the enactment of SB 14, does
21   the Texas NAACP contend that SB 14 was enacted
22   through a process marked by departures from
23   normal legislative procedures?
24   A.   I think that was -- that was a -- yes.
25   I would say yes to that.

66

1    Q.   Can you tell me in what ways the
2  legislature diverted from normal procedures in
3  the enactment of SB 14?
4    A.   Well, rules were changed for passage by
5  the legislators.
6    Q.   Do you know what specific rules were
7  changed?
8    A.   If I'm not mistaken, it was from
9  two-thirds to just a simple majority vote was
10  changed in order to enact it.
11         I think the process for fast-pacing
12  the bill, the way it was handled in committee, a
13  special committee was formulated specifically.
14         I think there were a number of
15  things that were done to ensure the passage of
16  that bill.
17    Q.   Were any of these things -- and by
18  "things," I believe you mean the --
19    A.   Measures.
20    Q.   -- measures, rule changes, procedural
21  changes, were any of those -- were any of those
22  things done outside, in your opinion -- let me --
23  let me back out.
24         Does the Texas NAACP contend that
25  the legislature in enacting SB 14 acted out of

67

1  its permissible authority?
2    A.   Not knowing exactly what is permissible
3  and not permissible, but I know that there were
4  some changes that were put in place that would
5  absolutely guarantee the passage.
6    Q.   Does the Texas NAACP contend that those
7  changes were -- or does the Texas NAACP contend
8  that the legislature was not authorized to make
9  those changes?
10    A.   No, I don't think that that is the
11  contention.
12    Q.   Do you recall -- outside of SB 14, do
13  you recall any other bill for which similar
14  changes were made by the legislature?
15    A.   Not to my knowledge.
16    Q.   Did the Texas NAACP have the
17  opportunity to voice its concerns with SB 14 to
18  the legislature during that legislative session
19  and --
20    A.   I do --
21    Q.   Sorry.  And I'm referring to the 2011
22  legislature.
23    A.   I would venture to say that we only had
24  maybe one or two people who actually had an
25  opportunity to speak opposing or even providing

68

1  recommendations that could perhaps be used to
2  amend the scope of this bill.  I know there were
3  other people who were interested in speaking, but
4  due to time constraints, it didn't happen.
5    Q.   Does the Texas NAACP feel that its
6  voice was not adequately heard concerning SB 14?
7    A.   I think the better answer would be,
8  your question, do we feel that our
9  recommendations were not listened to?
10    Q.   Did you have ample opportunity to
11  present your recommendations?
12    A.   You know, that takes us down a long
13  road when you ask that question, because like
14  myself, I am a volunteer.  I am losing income as
15  I sit here today.  And all of our people who are
16  in our units, whether they're branch presidents
17  or whatever capacity they may hold, they are all
18  volunteers.  And so the process of supporting
19  yourself and your family does not always allow
20  you the leisure of going to Austin and waiting
21  for days, perhaps, to voice your concern.
22         We have, you know, always tried
23  to assist people in getting to Austin to provide
24  testimony and we have been successful in some --
25  with some -- the process of getting them there

69

1  and having them to provide testimony, not
2  necessarily that they were successful in changing
3  the outcome of the pending legislation, but I'm
4  not sure, the short answer I guess is.  I'm not
5  sure if our voices were heard in its entirety or
6  not.
7    Q.   Would you say that based on the
8  inherent nature of the Texas NAACP, they face --
9  you face certain challenges in getting your
10  message out and voice heard regarding specific
11  bills being proposed in the legislature?
12    A.   I think we do have some challenges,
13  yes.
14    Q.   And those challenges include kind of
15  what you were just talking about with regard to
16  getting volunteers mobilized and getting people
17  to the capitol and that kind of thing, correct?
18    A.   Exactly.
19    Q.   Okay.  Do you believe that SB 14 is the
20  cause of some of those challenges that y'all
21  face?
22    A.   Challenges in voting or I mean --
23    Q.   I'm talk -- I'm talking about the
24  legislature, getting your voice -- participating
25  in the legislative process.  You mentioned

70

1  earlier that the Texas NAACP faces certain
2  challenges in getting people to the capitol to
3  testify and voice concerns about various bills;
4  is that correct?
5      A.   Yes.
6      Q.   Okay.  Are those -- do those challenges
7  always exist?
8          MS. RUDD:  Objection; vague.
9      A.   I'm not sure that I could answer that,
10 because we're involved in so many different
11 things as it relates to civil rights and this is
12 just one component.
13     Q.   (BY MR. TATUM)  Okay.  Did anyone at
14 the Texas NAACP provide live testimony to the
15 legislature regarding SB 14?
16     A.   I'm certain, yes.
17     Q.   During that live testimony, were any
18 studies or data presented regarding the impact of
19 SB 14?
20     A.   I really don't know.  I wasn't there,
21 nor do I have the transcript of the proceedings.
22     Q.   Do you recall any kind of meetings that
23 were held to prepare for that live testimony?
24     A.   I have no knowledge of that.
25     Q.   Moving on to a different topic.

71

1      A.   Okay.
2      Q.   Does the Texas NAACP engage in any
3  activities related to voter registration?
4      A.   Definitely.
5      Q.   And what activities are those?
6      A.   We conduct voter registration drives.
7  We have a complete voter empowerment initiative
8  that includes voter registration, education,
9  mobilization and voter protection.  Those are the
10 four components and this is something that we
11 have had to really work a lot harder at, so to
12 speak, because of the changes in the law
13 regarding voting with the voter ID bill.
14         We had to ensure that people were,
15 one, aware that this had taken place, and we
16 wanted our units to please educate their
17 communities that this bill had become law, and
18 that there were certain things that must be done
19 that were different from what we had done
20 previously in order for people to vote.
21     Q.   Specifically with regard to voter
22 registration --
23     A.   Um-hum.
24     Q.   -- in what way did SB 14 change the
25 activities of the Texas NAACP?

72

1      A.   That not only were you getting someone
2  to fill out a voter registration card, you were
3  also giving them information about SB 4 -- 14
4  telling them, you know, that you need to make
5  certain that the name on this voter registration
6  card that you're filling out matches the name
7  that's on your pictured ID identically, otherwise
8  you may be denied the right to vote, so there was
9  a lot more -- education normally came after the
10 registration project.  Notice I said voter
11 registration, voter education, these are
12 compartmentalized.
13     Q.   Um-hum.
14     A.   But voter registration and education
15 became one at this point because of the nature of
16 SB 14.
17     Q.   So --
18     A.   I'm sorry.  In the new law.
19     Q.   So previously there was a -- there was
20 one compartment within the organization of the
21 Texas NAACP for voter registration purposes?
22     A.   Um-hum.
23     Q.   There was a separate compartment for
24 voter education purposes; is that correct?
25     A.   Yes, sir.

73

1      Q.   And is it your testimony that because
2  of SB 14, those two compartments, as you describe
3  them, have been merged into one?
4      A.   They've been merged into one and we
5  still have an education component, but
6  registration education -- well, it is now
7  registration education, then it's another
8  component of education still, okay, that involves
9  issues that we need to be looking out for and --
10 you know, and there is the mobilization,
11 encouraging people to get out and vote, providing
12 them with information about where their voting
13 locations are, and then we always have a voter
14 complaint hotline that we operate with attorneys
15 or through the national office to address voter
16 concerns during election.
17     Q.   To address voting concerns during any
18 election?
19     A.   Um-hum, any election.
20     Q.   How long has the Texas NAACP been
21 engaging in voter-registration-type activities?
22     A.   Since its inception.
23     Q.   Is that something the Texas NAACP has
24 always done?
25     A.   Yes, sir.

Linda Lydia - 6/6/2014

74

1    Q.   Okay.  And when you say -- when you're
2  talking about how it was previously just voter
3  registration and now it's voter registration
4  education --
5    A.   Um-hum.
6    Q.   -- what additional resources are
7  committed to the new compartment described as
8  voter registration education?
9    A.   We had to provide printed material
10 about the changes.  It's -- and obviously we were
11 instructing people, you know, that when you fill
12 out your voter registration card, make sure you
13 pull out your pictured ID that you're going to be
14 using, if you have one, that it matches that card
15 because of the discretionary power that a -- that
16 an election official has when it comes time to
17 vote.
18       If it does not match exactly, they
19 can decide that you're not the person that you
20 say you are or that your identifications, one or
21 the other, does not say -- says you are and you
22 could possibly be disqualified or be given a
23 provisional ballot which may or may not count,
24 depending on your actions later.
25    Q.   Are the resources that are dedicated to

75

1  voter registration/education, do those fall under
2  the category of set operating funds or the
3  as-needed funds that you were referring to
4  earlier?
5    A.   Definitely going to be the as-needed
6  funds as a result of SB 14.
7    Q.   So before SB 14 funds allocated for
8  registration activities, were those considered
9  operating funds?
10    A.   I would think so.  They're -- they're
11 -- they're both -- it all comes out of the
12 operating funds.  Okay?  I just think it's
13 required more effort and more financial resources
14 for printed material, voter registration has
15 become more of an education process, whereas
16 before it was just making certain that people
17 wrote legibly so that somebody could read the
18 registration card.
19       Now you're dealing with telling
20 people and providing them with information about
21 SB 14, where they can go and get an EIC, you
22 know, the fact that they need a birth
23 certificate, where you can go to get a birth
24 certificate if you need that for, you know, EICs
25 or whatever, so there are a number of pieces that

76

1  have been added to the pot, so to speak.
2    Q.   How has the Texas NAACP -- in the past,
3  prior to SB 14, how has the Texas NAACP allocated
4  resources to educate its members regarding other
5  changes to voter laws?
6    A.   We've created postcards about when the
7  State enacted re-enfranchisement for felons who
8  were off paper.  That was a piece that we would
9  hand out with voter registration cards to let
10 people know if they or family members were off
11 paper, no longer reporting to a probation or
12 parole officer, that they were now entitled to
13 vote again, so we created documents for that.
14    Q.   So -- sorry.
15    A.   That's okay.  Go ahead.
16    Q.   So did that process involve allocating
17 resources for making printouts and handouts and
18 fliers?
19    A.   Yeah.  We had -- we had a card, I just
20 told you.  We created a card with another group
21 --
22    Q.   Um-hum.
23    A.   -- that we handed out with voter
24 registration cards just so that people were aware
25 of the law.  Anytime you have any legislative

77

1  changes we try to educate our community about
2  those legislative changes.
3    Q.   And so the education of your members
4  regarding SB 14 is not the first time you've had
5  to educate your members regarding a change in
6  voter laws; is that correct?
7    A.   No.  But this is the most extensive
8  change we've ever had to make.
9    Q.   And other than the printouts and the
10 new compartment that you already mentioned, in
11 what ways has the education of your members
12 regarding SB 14 been more extensive than with
13 previous changes in the law?
14    A.   We have obviously been involved in this
15 litigation now for -- this was filed in, what,
16 2013, and during the legislative session, again
17 we were very actively involved in lobbying and
18 advocating against this bill.  We have had to
19 do -- we have developed resources that we have
20 provided to our branches to hand out to people
21 during the registration process.  We've had to
22 create information on where you can go and when
23 you can go and where the closest DPS office is,
24 the hours the DPS offices are open.
25       There is a whole plethora of things

78

1  that have come about as a result of this bill
2  that we've never encountered on such a lengthy --
3  for such a lengthy period of time, because the
4  learning curve is still going on.  We still have
5  people who show up to vote who do not realize
6  that they need these documents.  Students don't
7  understand why a state-issued student ID is not
8  suffice [sic] to vote when it's initiated by
9  the State as well.
10  Q.  And so are these resources you're
11  allocating towards SB 14-related issues, that
12  includes resources dedicated to the ongoing
13  litigation of this lawsuit, correct?
14  A.  Yes.
15  Q.  Going back to you were talking about --
16  talking about funds, financial resources of the
17  Texas NAACP, and you mentioned -- and correct me
18  if I'm misstating any of this -- you mentioned
19  funds that are kind of set at the beginning of
20  the year that you don't touch.  Have -- because
21  of SB 14, have you had to -- for lack of a better
22  word -- eat into any of those fund allocations?
23  A.  No.
24  Q.  Can you tell me what activities,
25  outreach activities, programming activities, any

79

1  kind of activity of the NAA- -- of the Texas
2  NAACP that it has -- that it usually conducts in
3  any given year.  Can you give me examples of such
4  activities that have been allocated less
5  resources as a direct result of SB 14?
6  A.  The utilization of Yannis Banks, our
7  one staff person, that has almost been -- I would
8  say he's gone from being in a position that was
9  60 percent administrative and he's now doing
10  probably 80 percent legislative as a result of
11  this bill.
12  Q.  He was doing 60 percent administrative?
13  A.  Um-hum.  But he's no longer doing that
14  because he doesn't have the time.
15  Q.  Could the Texas NAACP hire someone else
16  to make up for that lost time?
17  A.  No.  We can't afford that.  Our pockets
18  are not that deep.
19  Q.  Okay.  You mentioned voter ID
20  education --
21  A.  Um-hum.
22  Q.  -- how long has the Texas NAACP been
23  educating its members regarding voter
24  requirements -- regarding voter laws in general?
25  A.  Since its inception.

80

1  Q.  Now, I didn't mention this earlier,
2  when we talk about members, members are not --
3  card-carrying members of the Texas NAACP are not
4  the only people that the Texas NAACP serves; is
5  that correct?
6  A.  I'm sure there are lots of people who
7  would benefit, I would venture to say, from the
8  work of our association and I think that has --
9  that has history as well.
10  Q.  So would you say that the Texas NAACP
11  has a constituent base that are not necessarily
12  members?
13  A.  Yeah.
14  Q.  Okay.
15  A.  I would say that.
16  Sorry.  I should have clarified that
17  earlier.
18  Now, how specifically -- with
19  regard to educating its members regarding voting
20  laws, how specifically does the Texas NAACP
21  accomplish that purpose?
22  A.  We provide them with updates on
23  legislature such as this.  We send out
24  information regarding any irregularities or
25  things that have changed that would impact the

81

1  voting in their specific cities.
2  Q.  Do you hold any kind of workshops?
3  A.  During our annual convention and we
4  definitely -- and we have actually, I guess,
5  spent a great deal of time during the last
6  convention dealing with this particular deal and
7  the impact that it would have in our community
8  and the things that we need to do, sort of a
9  mobilization effort on the part of the units to
10  implement different activities to educate our
11  community.
12  Q.  And the state convention, is that an
13  annual event?
14  A.  That is.
15  Q.  Okay.  When is it normally held?
16  A.  The first or second weekend in October,
17  annually.
18  Q.  And does it occur in different
19  locations across the state?
20  A.  Absolutely.
21  Q.  Do you remember where the last one was?
22  A.  In Richardson.
23  Q.  That would have been October 2013?
24  A.  That's correct.
25  Q.  Okay.  And at that state convention,

82

```
 1  were workshops held meant to educate members
 2  regarding the requirements of SB 2014?
 3      A.  Yes.
 4      Q.  Were workshops held for any other
 5  purpose?
 6      A.  There were some other purpose, but the
 7  majority of it was on SB 14.
 8      Q.  Do you recall where the state
 9  convention was held in 2012?
10      A.  Yes.
11      Q.  And where was that?
12      A.  Corpus Christi.
13      Q.  And at the state convention in Corpus
14  Christi, were workshops held for the purpose of
15  educating Texas NAACP members regarding SB 14?
16      A.  If I'm not -- if I'm not incorrect, I
17  don't think the bill had been passed, but I think
18  it had been -- I want to say that the enactment
19  of it had been delayed at that time.  There was,
20  I'm sure, discussion about it, but I think there
21  had been some intervention.
22      Q.  For clarification purposes, I'll
23  represent to you that the bill became effective
24  January 1st, 2012, and it was the subject of
25  litigation involving the preclearance process.
```

83

```
 1      A.  Um-hum.
 2      Q.  And that litigation was resolved --
 3          MR. TATUM:  And, Amy, correct me if
 4  I'm wrong.
 5      Q.  (BY MR. TATUM)  -- in the summer
 6  of 2012, I believe.
 7          MS. RUDD:  (Witness nodded head.)
 8      Q.  (BY MR. TATUM)  Just for edification
 9  purposes.
10      A.  Thank you.  Well, then I'm -- okay.
11      Q.  So getting back to the 2012 state
12  conference held in Corpus --
13      A.  Um-hum.
14      Q.  -- I'm sorry if I'm repeating the
15  question, but do you recall any workshops held
16  during that conference specifically to educate
17  members regarding the requirements of SB 14?
18      A.  Yes.
19      Q.  And what does such a workshop entail?
20  What kind of thing goes on those workshops?
21      A.  Legislators perhaps will come in and
22  speak.  Attorneys who would discuss the bill and
23  the impact that it would have and remedies.
24      Q.  Do you know how many people attend
25  these state conventions, generally?
```

84

```
 1      A.  Between 500 to 1,000.
 2      Q.  At these state conventions, do y'all
 3  assist members with registering to vote or
 4  obtaining forms of ID required to vote?
 5      A.  We actually considered it at the
 6  Richardson convention --
 7      Q.  Um-hum.
 8      A.  -- but again, it was a weekend and DPS
 9  is not operational on Saturdays or weekends.
10      Q.  During those workshops, you educate
11  your members regarding the requirements of SB 14?
12      A.  Yes, we do.  And also, you know, the
13  ancillary things that -- like information on DPS
14  offices, the locations, the distances.  We had a
15  number of counties that didn't even have a DPS
16  office.  So, I mean, we would address and try to
17  deal with some of those concerns.
18      Q.  At the 2013 conference in Richardson,
19  for example --
20      A.  Um-hum --
21      Q.  -- does the Texas NAACP feel it had the
22  necessary resources to hold an effective
23  workshop?
24      A.  Yeah, I think we had the resources, but
25  we didn't have the ability to issue documents
```

85

```
 1  that would be needed to actually enable someone
 2  to vote if they did not have identification.
 3      Q.  Who sets the agenda for the state
 4  conventions?
 5      A.  It's a collaboration between our state
 6  conference president and the standing committee
 7  chairs.
 8      Q.  Do you recall where the state
 9  conference was held in 2011?
10      A.  I think it was Austin.
11      Q.  At that convention were workshops held
12  to educate members about the requirements of SB
13  14?
14      A.  If it was pending legislation, I'm
15  sure.  We always have a legislative session that
16  deals with pending bills that will impact our
17  community.
18      Q.  Okay.  So would you say that going back
19  to state conventions ten years ago, would you say
20  that at every one of those state conventions
21  there was some kind of workshop for the purpose
22  of educating members regarding voter laws?
23      A.  Not consistent.  I wouldn't think so
24  because we haven't had that many changes.  Beyond
25  the re-enfranchisement, I can't think of anything
```

Linda Lydia - 6/6/2014

86

1 else that we actually expended time or money to
2 educate our community on.  No, I can't think of
3 anything.
4     Q.   Were workshops held during those
5 conventions where voter ID laws weren't discussed
6 or weren't the subject of workshops, were
7 workshops held for other purposes?
8     A.   Yeah, we have workshops for a number of
9 different purposes, but not necessarily for were
10 we addressing voter education registration or any
11 of those issues because there were no real issues
12 at that time.
13     Q.   So every year is there some kind of
14 process or some kind of meeting where the topics
15 for the workshops to be held at the state
16 convention are discussed and decided upon?
17     A.   Yes.
18     Q.   Okay.  And the workshops, do they
19 change from year to year based on pressing needs
20 or matters?
21     A.   They change from year to year.  For the
22 most part, they're usually involved with branch
23 operations, procedure from the national that may
24 have changed.  That has been the majority, until
25 the last few years, of what our workshops

87

1 consisted of.  Quite honestly, the workshop in
2 Richardson, and I'm saying this because I
3 actually did have a member to say this.  It was
4 almost exclusively on this legislation and the
5 impact it was going to have and the importance of
6 what we needed to do to ensure the rights of
7 people to vote.
8     Q.   These kinds of workshops and
9 educational activities that the Texas NAACP
10 engages in, do they occur outside of the state
11 conventions; in other words, are there -- do they
12 hold these kind of workshops in any other kind of
13 forum or gathering?
14     A.   No, our units would do that.
15     Q.   The local branches would do that on
16 their own?
17     A.   With their membership.
18     Q.   And are you aware that they hold such
19 -- that they indeed have held such workshops at
20 the local level?
21     A.   Some of them have, I'm sure.
22     Q.   For these state conventions, are there
23 mass communications sent out to the membership,
24 mailers, e-mails, that kind of thing, to let them
25 know about the agenda?

88

1     A.   Yes, that's correct.
2     Q.   Do you know if those kinds of documents
3 have been produced in this litigation?
4     A.   I have no idea.
5     Q.   Okay.  Does the Texas NAACP assist
6 voters during elections?
7     A.   I'm not sure I understand exactly what
8 you mean by "assist" them.
9     Q.   Does the Texas NAACP engage in any
10 activities that assist its members or
11 constituents in the voting process?
12     A.   As far as going into a voting booth and
13 voting?  I mean, I'm still not sure.
14     Q.   Well, no, that would be illegal.
15     A.   Yeah, that's what I'm sitting here
16 thinking.  It's like, God no.
17     Q.   Okay.  I guess what I'm talking about,
18 do they assist people in getting to voting
19 places?
20     A.   Oh, you mean like rides to the polls?
21     Q.   Sure.
22     A.   Yeah, we -- we do that.
23     Q.   How long has the Texas NAACP been doing
24 that kind of thing?
25     A.   Again, probably since its inception.

89

1     Q.   Do they perform any kind of -- any
2 other kind of assistive functions for early
3 voting, absentee voting, does that apply to all
4 phases of the voting process?
5     A.   I would think -- early voting in Texas,
6 we try to encourage our membership to do early
7 voting because of the simplicity of it or they
8 can go anyplace in the county and vote versus
9 having to show up at an assigned precinct to vote
10 during the regularly scheduled election.  So we
11 do that for sure.
12         We have super Sundays where our
13 churches -- we join with our churches to try to
14 help get people to go to the polls after
15 services.  We definitely want to impact voter
16 turnout and that has been consistent.
17     Q.   What kinds of resources does the Texas
18 NAACP expend towards these kinds of
19 voter-assistance activities that you've talked
20 about?
21     A.   I'm not sure of an exact amount.  I
22 don't think I could give you that.
23     Q.   Does the Texas NAACP employee the use
24 of volunteers for these kinds of purposes?
25     A.   For the most part, it's strictly

Linda Lydia - 6/6/2014

90

1 volunteer.
2    Q.   As part of the assistance that Texas
3 NAACP provides to voters, does that include
4 helping voters gather the necessary documentation
5 to vote?
6    A.   Some of our units may have.  I'm not --
7 I'm not personally familiar with anyone who has
8 one of the units that has done something like
9 that.  I'm not really for sure.  But I know we
10 have encouraged them to assist their constituents
11 to -- to get the materials needed -- the
12 documents needed, whether it's a driver's license
13 or whether it's their birth certificate.
14    Q.   In the election cycles that have
15 occurred after the implementation of SB 14 --
16    A.   Um-hum.
17    Q.   -- has Texas NAACP assisted voters
18 during those elections in the manner that you've
19 just described?
20    A.   I'm sure we have.
21    Q.   Did those activities require more or
22 less resources than for previous elections prior
23 to SB 14?
24    A.   Definitely more.
25    Q.   In what way?

91

1    A.   You have to have a -- you have to have
2 a birth certificate to get a driver's license.
3 You have to have a birth certificate to get an
4 EIC.  I mean, those are all needed to move
5 forward in the process of getting identification.
6    Q.   But in the Texas NAACP's activities
7 related to assisting voters --
8    A.   Um-hum.
9    Q.   -- to vote --
10    A.   Okay.
11    Q.   -- have they expended more or less
12 resources for those activities as a result of SB
13 14?
14    A.   More.
15    Q.   In what way?
16    A.   Resources getting people to and from
17 sites, I'm sure were expended by some of our
18 units, where they need to get to DPS offices.
19 We've had Yannis who has been working exclusively
20 on this effort.  That has definitely increased
21 our expenditure.  Printing of material,
22 informational events to educate the community.
23 What else?  Just a number of different
24 activities.  Example that comes to mind, I know
25 some of the units who usually just do membership

92

1 recruitment, now as part of their membership
2 recruitment events, they do provide information,
3 and they always have the registration cards, but
4 they now also have to provide -- they provide
5 information about SB 14 and the requirements of
6 that as a prerequisite to vote.
7    Q.   Has the Texas NAACP in any way been
8 unable to fulfill its stated mission as a result
9 of SB 14?
10    A.   No.  I'd like to think that we're still
11 carrying out the mission of the NAACP.  Maybe not
12 to the extent that we have done previously
13 because of the allocations of whether it's
14 manpower or dollars to this particular effort.
15         I think we could have done more
16 with -- this is just my personal leaning now.  I
17 think we could have done more with resources to
18 give to students for scholarships, as we have
19 done in the past, and other youth-related
20 activities.
21    Q.   Are resources dedicated to scholarships
22 and youth-related activities, are those allocated
23 on an as-needed basis?
24    A.   Well, they were part of our
25 programmatic efforts.  We felt they were

93

1 important parts of it.
2    Q.   But those kinds of resources are not
3 included in the set operating funds that you
4 discussed earlier?
5    A.   No, they were not a part of those
6 dedicated funds, no.  They came out of the
7 operating fund.
8    Q.   Okay.  So I guess that's a better way
9 to -- I've been calling them operating funds this
10 whole time.  There are dedicated funds and then
11 there are operating funds?
12    A.   (Witness nodded head.)
13    Q.   Dedicated funds are set -- there's a
14 set amount --
15    A.   Um-hum.
16    Q.   -- that are dedicated for that, and
17 then operating funds, those are the ones that are
18 allocated on an as-needed basis?
19    A.   Yeah, discretionary.
20    Q.   Okay.  So just a recap.  Has SB 14 --
21 have the requirements of SB 14 impacted the
22 allocation of dedicated funds?
23    A.   No.  Not of dedicated.
24    Q.   Okay.  Outside of legislative
25 activities, outside of registration activities,

94

1 outside of voting activities -- I'm sorry,
2 outside of educational activities -- basically
3 outside from what we've already talked about with
4 regard to SB 14, what other kinds of activities
5 has the Texas NAACP engaged in with regard to SB
6 14?
7     A.  Okay.  Other than the litigation that
8 we're involved in, the education of our
9 community, I can't think of anything else.
10         (Deposition Exhibit Number 3 was
11         marked for identification.)
12     Q.  (BY MR. TATUM)  Ms. Lydia, I'm handing
13 you what's been marked as Exhibit 3.
14     A.  Um-hum.
15     Q.  Ms. Lydia, do you recognize this
16 document?
17     A.  Yes.
18     Q.  Okay.  I represent to you that this
19 document has been produced to the defendants in
20 this litigation.
21     A.  Um-hum.
22     Q.   Is this document representative of an
23 e-mail that you sent to -- or an e-mail exchange
24 between you and a Gillian Parrillo?
25     A.  Um-hum.

95

1         MS. RUDD:  You have to say yes.
2         MR. TATUM:  You have to say yes.
3     A.  Yes.  I'm sorry.
4     Q.  (BY MR. TATUM)  Thank you.
5         And is that dated October 2nd,
6 2013?
7     A.  That's correct.
8     Q.  Okay.  At the bottom of this page, it
9 says here, from Gillian Parrillo, "I will be
10 sending you hopefully before the end of the week
11 a draft plan of TCET for voter ID work in 2013
12 and 2014."  Is that correct?
13     A.  Yes.
14     Q.  What is TCET?
15     A.  I'm not really sure.
16     Q.  You don't know what the --
17     A.  Oh, it's the organization.  The Texas
18 Civic Engagement Table.
19     Q.  The Texas Civic Engagement Table?
20     A.  Um-hum.
21     Q.  Is that an organization that the Texas
22 NAACP regularly interacts with?
23     A.  I don't recall having interacted with
24 Mr. Parrillo before.  This was in preparation
25 for our state convention and he was probably

96

1 involved as a presenter.  And if you recall, I
2 did say that we did have presenters who came in
3 to discuss.
4     Q.  Does Mr. Parrillo work for the TCET?
5     A.  I'm really am not sure.  I would think
6 he does, based on this e-mail.
7     Q.  It mentions further down in the e-mail,
8 he says, "We are planning three more voter ID
9 seminars."
10     A.  Um-hum.
11     Q.  Are you familiar with those seminars?
12     A.  I never attended one of them.
13     Q.  Do you recall when they were?
14     A.  No, I do not.
15     Q.  Do you recall what they involved?
16     A.  No, I do not.
17     Q.  Were those seminars held by the TCET
18 and not the Texas NAACP?
19     A.  I have no idea.
20     Q.  Okay.  So you don't have any knowledge
21 of what these voter ID seminars he's referring to
22 are?
23     A.  No, not at all.
24     Q.  And the line below that he mentions
25 virtual phone banks, do you have any knowledge

97

1 about -- of what those are about?
2     A.  No.
3     Q.  Does the Texas NAACP ever conduct any
4 kind of phone bank activity?
5     A.  I think the national has a system that
6 they may utilize.
7     Q.  Does the Texas NAACP ever utilize a
8 phone bank?
9     A.   I think we are allowed the utilization
10 of the one that national has to send recorded
11 messages to people regarding get out to vote.
12     Q.  To your knowledge, has the Texas NAACP
13 ever used that service that the --
14     A.  Yes.
15     Q.  For what purposes have they used it?
16     A.  Probably trying to get people out to
17 vote.  Just encouraging people to go out and
18 vote.
19     Q.  Have they ever used it to -- for any
20 purpose directly related to SB 14?
21     A.  I'm not sure of that.  I sort of sensed
22 that's where you were going, but I really don't
23 remember --
24     Q.  Okay.
25     A.   -- to be honest.

98

1    Q.   At the very bottom of this same page,
2  it says, "Dallas County elections reaching out to
3  voters identified as not having ID."
4    A.   Um-hum.
5    Q.   Is that a correct reading of that
6  sentence?
7    A.   Yes.
8    Q.   What is he -- this is still in the
9  e-mail from Mr. Parrillo, what is he referring to
10  there?
11         MS. RUDD:  Objection; calls for
12  speculation.
13    A.   I have no idea.
14    Q.   (BY MR. TATUM)  Do you have any
15  knowledge regarding voters identified as having
16  not ID referenced in that statement?
17    A.   No, I don't.  Sorry.
18    Q.   Do you know who was -- who was reaching
19  out to voters identified as not having ID in that
20  statement?
21    A.   It says Dallas County elections.  I
22  really don't know who at the Dallas County
23  elections would have been doing that.
24    Q.   Okay.
25

99

1         (Deposition Exhibit Number 4 was
2         marked for identification.)
3    Q.   (BY MR. TATUM)  Ms. Lydia, I'm handing
4  you a document marked as Exhibit 4.
5    A.   Okay.
6    Q.   Ms. Lydia, I represent to you that this
7  document has been produced to the defendants in
8  this litigation.  Do you recognize this document?
9    A.   Yes.
10    Q.   What is this document?
11    A.   This is an e-mail that was sent out to
12  the branch presidents.
13    Q.   So everyone in that list is a branch
14  president; is that correct?
15    A.   For the most part.  There may be some
16  that are not.
17    Q.   Okay.  But there are branch presidents
18  included in that list of e-mail addresses?
19    A.   Yes, sir.
20    Q.   Okay.  And this was an e-mail sent by
21  you to that group on October 25th, 2013; is that
22  correct?
23    A.   That's correct.
24    Q.   Okay.  Can you briefly describe the
25  contents of this e-mail that you sent, as

100

1  illustrated here?
2    A.   Yeah, basically we were trying to find
3  out if there was a standard from county to county
4  as to how they are addressing the voter ID
5  measure.
6    Q.   And how did the Texas NAACP go about
7  making that determination?
8    A.   Just input from various people from
9  across the state.
10    Q.   So this e-mail is seeking input on that
11  issue from those e-mail addresses included in
12  that list?
13    A.   Yes, uh-huh.
14    Q.   Okay.  On the next page there is a
15  paragraph there that starts with, "No one tried
16  to scan my driver's license."  Do you see that?
17    A.   Um-hum.
18    Q.   Did you write that paragraph?
19    A.   Yes.  Um-hum.
20    Q.   Can you tell me a little bit more about
21  the events that are depicted or described in that
22  paragraph?
23    A.   Yes.  I think if you go back to the
24  first page where it indicates that Phyllis
25  indicated that they attempted to scan her

101

1  driver's license and it would not scan, so they
2  used other voter registration card.  And my
3  response was, I had a similar incident.  My
4  driver's license still does not match exactly the
5  voter registration card because my driver's
6  license did not match my name on the voter roll.
7  I showed my voter registration certificate, okay,
8  which also did not match.  And that they did
9  allow me to vote, a regular ballot.
10    Q.   So that describes something that
11  happened to you?
12    A.   Yes.  That happened to me, but let me
13  just make a disclosure.  I'm a precinct chair
14  too.  They know who I am at the voting location.
15    Q.   So let me ask you a little bit about
16  that.  You are a voting -- you're a voting
17  precinct chair?
18    A.   I'm a precinct chair, yes --
19    Q.   What does the --
20    A.   -- and I'm allowed to vote.
21    Q.   Sorry, say that again.
22    A.   I'm a precinct chair and I am allowed
23  to vote.
24    Q.   I'm not questioning that.
25    A.   Okay.

Linda Lydia - 6/6/2014

102

1    Q.   Describe what a precinct chair is.
2    A.   A precinct chair, you have a
3  geographical area where you try to provide
4  information to your community about voting.
5  Obviously the most important piece is  mobilizing
6  people to go out and vote, and I do registration
7  as well.
8    Q.   So are you a precinct chair for the
9  Texas NAACP?
10    A.   No.  For the county.
11    Q.   For the county?  Is that Dallas County?
12    A.   Yes.
13    Q.   Okay.  How long have you been a
14  precinct chair for Dallas County?
15    A.   Probably about ten years.
16    Q.   Are there any other duties that you
17  didn't describe for a precinct chair?
18    A.   I no long- -- I used to conduct
19  elections, but I don't do that anymore.
20    Q.   Okay.  So a precinct chair -- and I'm
21  trying to read what's on the live feed again.
22  It -- you get information out about getting
23  people to vote and you do -- you said you do
24  registration as well.  What does that mean?
25    A.   I do voter registration.

103

1    Q.   You help people get registered?
2    A.   Um-hum.
3    Q.   Is that -- you actually process the --
4    A.   I will hand out cards to people to fill
5  out and I also can -- I'm deputized where I can
6  fill out voter registration cards.
7    Q.   People dictate to you their information
8  and you fill out their registration cards for
9  them?
10    A.   Yes, sir.
11    Q.   And you do that for Dallas County?
12    A.   And again, it's volunteer.
13    Q.   Okay.
14    A.   I want to make sure you understand.
15  Dallas County is not paying me to do that.
16    Q.   That was going to be my next question.
17    A.   No.
18    Q.   Okay.  And you've been volunteering in
19  that capacity for about ten years you said?
20    A.   Yes.  Thereabouts.
21    Q.   Further down on this document that I
22  handed you --
23    A.   Um-hum.
24    Q.   -- it appears to be an e-mail from Gary
25  Bledsoe; is that correct?

104

1    A.   Yes.
2    Q.   And he is the president of the Texas
3  NAACP; is that correct?
4    A.   That's correct.
5    Q.   Okay.  In the paragraph that appears
6  below the name Yannis, there's a sentence in the
7  middle of that paragraph that says, "Also,
8  remember we wanted to take Bob's idea and have
9  some folks go without an ID and vote with a
10  provisional ballot and show their driver's
11  license later and then see if they were counted."
12  Is that correct?  Is that an accurate reading of
13  that statement?
14    A.   Um-huh.  That is.
15    Q.   Who is Bob?
16    A.   Bob Lydia.  He's our first vice
17  president.
18    Q.   Are you related to Bob Lydia?
19    A.   I'm his wife.
20    Q.   And he is the first vice president of
21  the Texas NAACP?
22    A.   That's correct.
23    Q.   So does that mean he's on the executive
24  committee?
25    A.   Yes, he is.

105

1    Q.   Okay.  Was Bob's idea, that is
2  summarized here in this sentence, was that idea
3  put into practice?
4    A.   To my knowledge, it was not.
5    Q.   On the last page there, just one quick
6  sentence at the top, it says, "Adding Robert to
7  this e-mail."  Is that Robert Knatsen (phonetic),
8  to your knowledge?
9    A.   You know, that's highly possible, but
10  I'm not certain.
11    Q.   Okay.  You don't know who Robert is
12  there for certain?
13    A.   I'm not sure who that Robert is --
14    Q.   Okay.
15    A.   -- for certain.  I think Yannis wrote
16  that.
17    Q.   It appears he did.
18    A.   Yeah.
19         (Deposition Exhibit Number 5 was
20         marked for identification.)
21    Q.   (BY MR. TATUM)  Ms. Lydia, I'm handing
22  you what's been marked as Exhibit 5.  And again,
23  I represent to you that this document has been
24  produced to the defendants in this litigation.
25  Do you recognize this document?

106

1   A.   Yes, sir.
2   Q.   Okay.  Is this an e-mail that you wrote
3   to the group of e-mail addresses listed there?
4   A.   Yes, sir.
5   Q.   And it was written on January 25th,
6   2014; is that correct?
7   A.   That's correct.
8   Q.   Okay.  And does this e-mail accurately
9   depict you wrote that day, to the best of your
10  memory?
11  A.   Yes, sir.
12  Q.   Okay.  And does that e-mail group,
13  similar to the last document I gave you, contain
14  the names and e-mail addresses of branch --
15  A.   Presidents.
16  Q.   -- presidents?  Does it include
17  political action chairs as well?
18  A.   Yes, it does.
19  Q.   If you could for me turn to the next
20  page.
21  A.   Um-hum.
22  Q.   Looking at the top of the page at the
23  paragraph beginning with "During our October
24  convention."
25  A.   Um-hum.

107

1   Q.   Okay.  It says there, "During our
2   October convention, it was decided that our units
3   would test the process of acquiring election
4   identification certificates from DPS offices
5   across the state."
6        Is that an accurate reading of that
7   statement?
8   A.   Yes, sir.
9   Q.   And did you write that statement?
10  A.   Yes, I did.
11  Q.   Okay.  Were those tests described in
12  that sentence conducted?
13  A.   To some level they were.
14  Q.   And can you describe the results of
15  that test?
16  A.   Whoa.  I'm not really certain of the
17  exact, because it was only done maybe in a couple
18  of the cities, and I don't remember or recall the
19  exact outcome as to acquiring the EIC.
20  Q.   Did that test involve -- I'm sorry.
21  I'll retract that question.
22       So you said this test was conducted
23  in a couple of cities; is that correct?
24  A.   Yeah, I think it was in a couple of
25  cities.

108

1   Q.   And do you recall the results of that
2   test?
3   A.   No, I really don't.  And I was just
4   trying to remember even which cities where I know
5   it was enacted and it was done, and I don't
6   recall them.
7   Q.   Do you know if as a result of those
8   tests anyone was unable to obtain an EIC?
9   A.   Not for sure.
10  Q.   Do you know -- sorry.
11  A.   I'm really not for sure.
12  Q.   Do you know what kind of resources were
13  expended to conduct those tests?
14  A.   Obviously man-hours.  People who had to
15  disengage from whatever they were doing to go to
16  the DPS office, and considering the hours they're
17  operating, they had to take off from work to go
18  do this, and obviously the resources of driving
19  there and making certain that they had the proper
20  documentation to acquire the EIC.
21  Q.   Do you know who conducted these tests?
22  A.   I'm not for sure.  I told you, I know
23  that only a couple of cities actually did it.  I
24  remember there was one particular city who said
25  they didn't have a DPS office, and, again, I --

109

1   and they -- and we didn't want them to have to
2   expand the funds going into another county that
3   was really quite distanced from them.
4        This has been part of our
5   contention is that these offices are just not
6   located close to where we live or work and so
7   it's created a financial hardship.
8   Q.   Do you know who would know the results
9   of these tests?
10  A.   The individuals who did them --
11  Q.   Do you know --
12  A.   -- obviously.
13  Q.   Do you know who would know who the
14  individuals that conducted these tests were?
15  A.   I should know, but I can't remember
16  them.  I want to think something -- I want to
17  think maybe --
18  Q.   Does someone know who these people are
19  that conducted these tests?
20  A.   I'm sure that someone who were a part
21  of this committee would know.
22  Q.   But you don't know who that is?
23  A.   No.  I'm not sure specifically who on
24  that committee would know.
25  Q.   Okay.  And again just to confirm, these

110

1  tests in some -- to some extent have been
2  conducted to date?
3       A.  Yes, they have.  Um-hum.
4       Q.  But you don't know the result of it?
5       A.  I don't know the outcome of them.
6       Q.  And you don't know who would know the
7  outcome of them?
8       A.  Not at this time.  I could probably
9  research it for you, but I don't know at this
10  time.
11      Q.  Think about it.
12      A.  Okay.  Let me think about it, and if I
13  come up with the names of the cities -- if I can
14  come up with the names of the cities, I can
15  perhaps come up with the name of the person.
16      Q.  You mentioned a conference call --
17  sorry, back to the document.
18      A.  Um-hum.
19      Q.  You mentioned a conference call to plan
20  the carrying out of this effort on Monday night
21  at 9:00 p.m.?
22      A.  Um-hum.
23      Q.  Do you recall if that conference call
24  took place?
25      A.  Yes, it did.

111

1       Q.  Who was on the conference call?
2       A.  I was definitely on the conference
3  call.  Our political action chair would have been
4  on the call.  And our co-chair, I'm sure she was
5  on it.  And various branch presidents.  All of
6  those names above the cc --
7       Q.  Um-hum.
8       A.  -- those are branch presidents, and
9  then as far as which ones were on it, I really,
10  really, really can't tell you.
11      Q.  The information that follows your
12  written paragraph there, titled "How to apply."
13      A.  Um-hum.
14      Q.  There's various information after that.
15  Some of it's stating, "To qualify for an EIC you
16  must bring documentation," and kind of describing
17  that documentation; is that correct?
18      A.  Yes, sir.
19      Q.  Who compiled that information?
20      A.  I copied and pasted it from the
21  Secretary of State website.  It's a copy and
22  paste straight from them.
23      Q.  So in order to -- again, in relation to
24  these tests, in order to educate those who would
25  be carrying out these tests, you sent information

112

1  on the process involved with getting an EIC from
2  the Secretary of State's website?
3       A.  Um-hum.  Um-hum.  Yes.
4       Q.  Did you send any other information
5  that's not included in this e-mail?
6       A.  I'm trying to think about that for a
7  second.  Is there anything I sent out with them.
8  There is a possibility that's lingering in the
9  back of my mind that may be locations of DPS
10  offices, at some point, may have been provided.
11  I'm not sure if it was with this or with
12  something at the state convention.
13          This was -- this was pursuant to
14  the state convention.  This came about in
15  January.  Our convention was in October, where
16  this committee, people had agreed to be a part of
17  this process.  So I'm not sure if we gave them
18  the DPS office locations, printed information,
19  because not everybody in our association have
20  access to internet and computers and, yadda,
21  yadda, yadda, to get all this information.  So we
22  have to provide a certain amount of printed
23  material to ensure execution of some of our
24  efforts.
25      Q.  On the last page of that document --

113

1       A.  Um-hum.
2       Q.  -- there's an e-mail from Yannis Banks,
3  it appears; is that correct?
4       A.  Um-hum.
5       Q.  Sent on December 23rd, 2013; is that
6  correct?
7       A.  Um-hum.
8       Q.  Do you know who he was sending that
9  e-mail to?
10      A.  I have no idea.
11      Q.  Do you know if he obtained -- from
12  whoever he was sending this e-mail to, do you
13  know if he obtained a list of names of people who
14  had to cast a provisional ballot in the state of
15  Texas?
16      A.  I have no idea.
17          (Deposition Exhibit Number 6 was
18          marked for identification.)
19      Q.  (BY MR. TATUM)  I'm handing you what's
20  been marked as Exhibit 6.
21      A.  Um-hum.
22      Q.  I represent to you that this document
23  has been presented or produced to the defendants
24  in this litigation.
25          Ms. Lydia, do you recognize this

114

1   document?
2       A.   Yes.
3       Q.   What is this document?
4       A.   This is an action alert.
5       Q.   And what is an action alert?
6       A.   These are sent out by our national
7   office.
8       Q.   So this was compiled and sent out by
9   the National NAACP office?
10      A.   It probably was sent to either Yannis
11  or myself, and we, in turn, probably dispersed it
12  to the units to let them know about it.
13      Q.   Did you disperse it by e-mail or snail
14  mail?
15      A.   E-mail, faxes, for the most part.
16      Q.   Down in the middle of this page under
17  the heading, "Now is your time to get involved,"
18  it states there, "We are calling on local
19  branches to help our efforts by taking the
20  following three steps."
21           Do you see that section?
22      A.   Yes, sir.
23      Q.   Okay.  Reading from that, the first
24  step says, "Visit free or low income health
25  clinics to see if coordinators are willing to

116

1            Do you know if any VFW hall
2   referred any persons who had an unexpired photo
3   ID required to vote?
4       A.   No, sir.
5       Q.   Okay.
6       A.   I do not know that.
7            (Deposition Exhibit Number 7 was
8            marked for identification.)
9       Q.   (BY MR. TATUM)  I'm handing you what's
10  been marked as Exhibit 7.  This document has been
11  produced to the defendants in this litigation.
12      A.   (Witness examined exhibit.)
13      Q.   Ms. Lydia, do you recognize this
14  document?
15      A.   Yes, sir, I do.
16      Q.   And what is this document?
17      A.   These are minutes of the meeting of our
18  last executive committee meeting, the first
19  quarter 2014 in Lufkin.
20      Q.   So that was the last quarterly
21  executive committee meeting held?
22      A.   Yes.
23      Q.   Okay.  You mentioned as secretary you
24  keep minutes of such meetings, correct?
25      A.   Um-hum, um-hum.

115

1   help us with referrals for citizens without IDs."
2            Is that a correct reading of that
3   statement?
4       A.   Yes, sir.
5       Q.   Do you know what kind of health clinics
6   were reached out to?
7       A.   I have no idea.
8       Q.   Do you know if they were reached out
9   to?
10      A.   No idea, sir.
11      Q.   Okay.  Do you know if any referrals
12  were obtained for citizens without IDs?
13      A.   No, I have no idea either.
14      Q.   Do you know, looking at Point 2, do you
15  know if any local church services with large
16  minority congregations were able to provide the
17  identity of persons without ID?
18      A.   No idea.
19      Q.   Looking at Point 3, what is a VFW hall,
20  do you know what that is?
21      A.   Veterans of Foreign War.
22      Q.   That statement says, "Go to the VFW
23  halls in your area and request assistance in
24  locating people who do not have the unexpired
25  photo ID required to vote."

117

1       Q.   Do these minutes represent what you
2   took down yourself?
3       A.   Yes, sir.
4       Q.   So you compiled this document?
5       A.   Yes.
6       Q.   Okay.  If you would, turn to -- it's
7   not marked with individual page numbers, but it's
8   basically the third page of this document.
9       A.   Um-hum.
10      Q.   The bottom quarter of that document
11  says 6043.
12      A.   Yes.
13      Q.   Okay.  Are you on that page?
14      A.   Yes, I am.
15      Q.   Okay.  The top of that page, it says,
16  "Voter ID is the other case scheduled for 9-17 in
17  Corpus Christi and it will also go to the Fifth
18  Circuit."
19           Is that an accurate reading of that
20  statement?
21      A.   Yes.
22      Q.   Could you read the first bullet point
23  under that statement, please.
24      A.   "I want to do a sting to see the ease
25  of getting the free voter ID with our branches."

Linda Lydia - 6/6/2014

118

1    Q.   What did you mean when you wrote "a
2  sting"?
3    A.   Well, a test.  The same thing that we
4  had talked about for the conference call.
5    Q.   And do you know if a sting to see the
6  ease of getting a free voter ID was conducted?
7    A.   I have not received any information
8  that anyone has done that.
9    Q.   Okay.  When you're referring to a sting
10  in this sentence, is that the same test that was
11  referred to in a previous document I showed to
12  you?
13    A.   Exactly.  It's a test.
14    Q.   Okay.  So you're referring to -- here
15  you're referring to getting an EIC?
16    A.   EIC, yes.
17    Q.   Okay.  Could you read the third bullet
18  point there, please.
19    A.   "Need examples of folks who were
20  denied."
21    Q.   Do you know if any of such examples
22  were found or provided?
23    A.   I have no idea.
24    Q.   Okay.  Is that also in reference to the
25  EIC test?

119

1    A.   Yes, sir.
2    Q.   Okay.  The very next line down mentions
3  a name TaNeika; is that correct?
4    A.   That's correct.
5    Q.   Who is that?
6    A.   She's the president of one of our
7  units.
8    Q.   One of the local branches?
9    A.   One of our branches of the state.
10    Q.   Right.  She's the president of one of
11  the local NAACP branches in Texas?
12    A.   Yes, uh-huh.
13    Q.   Do you know which branch?
14    A.   Killeen, Texas, I'm pretty certain.
15        (Deposition Exhibit Number 8 was
16        marked for identification.)
17    Q.   (BY MR. TATUM)  Handing you a copy of
18  what's been marked as Exhibit 8.  This has also
19  been produced to the defendants in this
20  litigation.
21        Ms. Lydia, do you recognize this
22  document?
23    A.   (Witness examined exhibit.)
24        Hmmm.  I'm going to have to say I
25  don't recognize it, but I know Election

120

1  Protection.  I'm familiar with it.  I really do
2  see a lot of documents.  I don't have any direct
3  recall of it, but it looks like something I
4  probably would have seen.
5    Q.   Okay.  Was this document, to your
6  knowledge, compiled by the NAACP, the Texas
7  NAACP?
8    A.   No, I don't think so.
9    Q.   Is this the kind of document that the
10  Texas NAACP would distribute to its members?
11    A.   It's informational.  I mean, obviously
12  this sort of clarifies to individuals what would
13  be needed to vote.  I mean, I wouldn't see
14  anything objectionable as long as it's
15  nonpartisan and it's not advocating for one party
16  over another, yeah, I would say we would do that.
17        We would hand out something like
18  this.  It would not be -- it would not be
19  something that would be opposed to our
20  constitution and bylaws.
21    Q.   So you mentioned it would be handed
22  out.  Is that the only way that something like
23  this would be distributed?
24    A.   Handed out, e-mailed, I would think.
25    Q.   Okay.

121

1    A.   And, yes, I think I have seen this
2  document before, and actually I think I saw it at
3  somebody else's event at a church, I think is
4  where I saw it.
5    Q.   That document was not created by the
6  Texas NAACP?
7    A.   Oh, no.  We did not create that.
8    Q.   Okay.  Does the Texas NAACP regularly
9  distribute materials that it did not itself
10  create?
11    A.   On occasion, and occasionally we will
12  coalesce.  Like the Texas Criminal Justice
13  coalition where we had the re-enfranchisement
14  effort, we coalesced with them to create a
15  document, that way we can -- our resources can go
16  further.
17    Q.   So do you often seek assistance from
18  other organizations to accomplish tasks such as
19  print-outs, fliers, handouts, that kind of thing?
20    A.   On occasions.
21    Q.   Okay.  And in return, do you provide
22  similar services to other organizations if they
23  ask for it?
24    A.   Again, they have to fall within the
25  purview of our national guidelines --

Linda Lydia - 6/6/2014

122

1    Q.  Of course.
2    A.  -- of coalescing, because we have to
3  have approval to coalesce in groups.
4          (Deposition Exhibit Number 9 was
5           marked for identification.)
6    Q.  (BY MR. TATUM)  I'm handing you what's
7  been identified as Exhibit 9.
8          MR. TATUM:  And I only brought one
9  copy of that.
10         MS. RUDD:  That's fine.  I'll just
11  share.
12         THE WITNESS:  Oh, okay.
13         MR. TATUM:  I didn't even bring one
14  for myself.
15    Q.  (BY MR. TATUM)  Ms. Lydia, that
16  document has been produced to defendants in this
17  litigation.  Do you recognize that document?
18    A.  Yes.
19    Q.  What is it?
20    A.  It's basically part of the study for
21  the EIC.
22    Q.  Okay.  So the study -- the test that
23  you referred to previously --
24    A.  Um-hum.
25    Q.  -- that is a -- how does that relate to

123

1  the test?
2    A.  Well, it basically is used to collect
3  the data that they would have obtained as a
4  result of going to a DPS office to try to obtain
5  an EIC.
6    Q.  And once filled out, who would those
7  forms have been submitted to?
8    A.  Once filled out, they should have been
9  submitted either to Yannis or myself.
10    Q.  Do you recall ever seeing a filled-out
11  version of that?
12    A.  No, I've never gotten one.
13    Q.  Okay.  I have no more documents to give
14  you right now.
15    A.  Okay.
16    Q.  That's the last of that string.
17         MR. TATUM:  Is everyone doing all
18  right?  Do we need to take a break for any
19  reason?
20         MS. MILLER:  Whenever you guys
21  want.
22         MS. RUDD:  I'm fine.  Are you okay?
23         THE WITNESS:  Yeah.
24         MR. TATUM:  Okay.
25         MS. MILLER:  Are we going to take a

124

1  break or are we continuing on?
2          MR. TATUM:  Oh.  No, sorry, Angela,
3  we're continuing on.
4          MS. MILLER:  Okay.  Sounds good.
5          MR. TATUM:  Okay.
6    Q.  (BY MR. TATUM)  Ms. Lydia, to the best
7  of your knowledge, have any Texas NAACP ever
8  expressed concerns to you or to the executive
9  committee regarding election crimes, voter fraud
10  or voter impersonation?
11    A.  No.
12    Q.  Has the Texas NAACP ever conducted any
13  studies or collected data from its members or
14  from any other sources relating to election
15  crimes, voter fraud or voter impersonation?
16    A.  No, not to my knowledge.
17    Q.  Are there plans to conduct any such
18  studies?
19    A.  Not to my knowledge.
20    Q.  Okay.  If there were plans to conduct
21  such studies, would you know about it?
22    A.  It would have to be voted on upon by
23  the executive committee.
24    Q.  On that note, do actions of the Texas
25  NAACP that must be voted on by the executive

125

1  committee, do those votes only occur at the
2  quarterly meetings?
3    A.  No.
4    Q.  Can they occur on a moment's notice or
5  outside of those quarterly meetings?
6    A.  Yes, they can.
7    Q.  Okay.
8    A.  Definitely.
9          MR. TATUM:  Actually, I think this
10  is a pretty good place to take a break, if that's
11  all right.  It's 11:40.  We're kind of
12  approaching the lunch hour.
13         Can we go off record to discuss
14  real quick.
15         MS. RUDD:  Sure.
16
17         (Discussion off the record.)
18         (Lunch recess.)
19
20         REPORTER'S NOTE:  Please be advised
21  that an UNCERTIFIED ROUGH DRAFT version of this
22  transcript exists.  If you are in possession of
23  said rough draft, please replace it immediately
24  with this CERTIFIED FINAL TRANSCRIPT.
25

126

1          AFTERNOON SESSION
2          MR. TATUM:  We're back on the
3    record.
4          EXAMINATION (CONTINUED)
5    BY MR. TATUM:
6    Q.   Ms. Lydia, before we took a break, we
7    were talking about activities of the Texas NAACP
8    related to SB 14.  You had previously talked
9    about -- we covered education.  We covered
10   registration.  We covered legislation, and then
11   right before the break, you were talking about
12   testing the process by which an EIC is obtained,
13   correct?
14   A.   Yes.
15   Q.   Are there any other activities related
16   to SB 14 that the Texas NAACP has committed
17   resources to that you did not already mention?
18   A.   I think I have mentioned a few
19   occasions the reallocations of staff to the
20   efforts related to the litigation itself --
21   excuse me -- as well as the focus, the main focus
22   of the activities that are being conducted by our
23   state conference.
24   Q.   So would you call --
25   A.   Excuse me.

127

1    Q.   Sorry.  When you say "the main focus of
2    the activities," what is the -- what is the main
3    focus of the activities, if you haven't already
4    described it?
5    A.   The litigation and preparing for this
6    litigation to try to reverse what has happened
7    because of the perceived impact on the voting
8    process within our state.
9    Q.   Are there any other kind of field tests
10   or stings that the Texas NAACP has conducted
11   related to SB 14?
12   A.   I think most of the other activities
13   would have been -- would be surrounding educating
14   our communities and that's an ongoing process.
15        As I said earlier, I don't think we
16   have been successful in getting this message to
17   as many people as we need to, but we have started
18   making inroads through our units to our distant
19   communities regarding the necessities that are
20   being required for people to vote.
21   Q.   Has the Texas NAACP itself been
22   actively seeking to identify either its own
23   members or registered voters in Texas that do not
24   have an acceptable form of ID to vote under
25   SB 14?

128

1    A.   I think that some of our units
2    definitely would have done that and would have
3    assisted them the best they could.  If it was
4    something that could be -- if there was -- if it
5    was a process that was -- or a procedure that was
6    needed, I know that some of our units would have
7    probably assisted them in getting that worked
8    out, whether it was telling them how to go about
9    getting -- and now some of them are
10   insurmountable, you know, where people who were
11   delivered by midwives and perhaps do not have a
12   birth certificate.
13        And then others, obviously you can
14   assist them by telling them where they need to go
15   to get a birth certificate in order to complete
16   the process of getting identification.
17   Q.   Does the Texas NAACP claim that it has
18   members or constituents who are registered to
19   vote but do not possess any the acceptable
20   forms of ID under SB 14?
21   A.   I'm not really sure of that.  Let me
22   just say I don't have personal knowledge of that.
23   Q.   You don't have personal knowledge of
24   whether there are any members of the Texas NAACP
25   who do not have an acceptable form of ID under

129

1    SB 14?
2    A.   When you consider the size of our
3    organization and the number of people we have, I
4    would be -- I think I would be really careless to
5    say that nobody has been impacted by the need for
6    this ID.  I think the odds are just absolutely in
7    favor of perhaps that having been the case, that
8    they have been negatively impacted.
9        MS. RUDD:  And maybe this is a good
10   place, Stephen, for me to interject that we're
11   not presently aware of any particular -- the
12   identity of any particular member who has been or
13   will be injured by Senate Bill 14 for the
14   purposes of proving standing in this case.  But
15   we will supplement that response if and when we
16   identify such a member.
17        So I think that's consistent with
18   what we agreed to, and it's consistent with what
19   Mr. Banks testified to in terms of not having yet
20   identified any particular member who suffered
21   injury as a result of Senate Bill 14.
22        MR. TATUM:  Okay.  So just to
23   confirm . . .
24        MS. RUDD:  So I think when we're
25   talking about that agreement --

Linda Lydia - 6/6/2014

130

1         MR. TATUM:  Yes.
2         MS. RUDD:  -- we're falling under
3  Number 2, Stephen.
4         MR. TATUM:  Okay.  And, Angela,
5  we're talking about the e-mail chain between Ezra
6  and Lindsey Wolf.
7         MS. MILLER:  Okay.
8         MR. TATUM:  The agreement that's
9  encompassed in that e-mail chain.
10        MS. MILLER:  Okay.
11        MR. TATUM:  Right now we're under
12  Number 2; that Texas NAACP is either unaware of
13  the identity of any particular member who has
14  been or may be injured by the implementation of
15  SB 14 or that it does not maintain sufficient
16  information to identify a particular member who
17  has been or may be injured by implementation of
18  SB 14.
19        MS. RUDD:  Correct.  And the only
20  caveat to that, I will add, is that it's a
21  present awareness.  So there may be a time where
22  we do become aware of a particular member's
23  identity, at which point we will give you that
24  information, as well, subject to the highly
25  confidential designation.

131

1         MR. TATUM:  Okay.  Thank you for
2  interjecting that.
3         If you would, give me a moment
4  to --
5         THE WITNESS:  No problem.
6     Q.  (BY MR. TATUM)  Ms. Lydia, does the
7  Texas NAACP -- are you ready?
8     A.  Yes.
9     Q.  Does the Texas NAACP contend that there
10  are associated costs with getting an EIC?
11    A.  Yes.
12    Q.  And what are those associated costs?
13    A.  Getting to a DPS office.  That would be
14  the first.  The hours of operation of the DPS
15  office would necessitate someone having to take
16  off of work in order to get there.
17        Birth certificates, if you do not
18  have a copy of one, you have to order those
19  through the Bureau of Vital Statistics.  There's
20  a cost associated with that.  Those are all, I
21  think, real causes -- costs, rather, associated
22  with getting an EIC.
23    Q.  Does the Texas NAACP believe that there
24  are associated costs with getting a voter
25  registration card?

132

1     A.  Not really, no.  There's no cost.  It's
2  free.
3     Q.  Are there any nonmonetary costs to
4  getting an EIC -- sorry.  Are there any
5  nonmonetary costs to getting a voter registration
6  card?
7     A.  The accessibility of voter registration
8  cards at every post office, library, church in
9  our community, makes it, as far as I am
10  concerned, a nonmonetary event.
11    Q.  So do you believe that there is no
12  associated costs, monetary or otherwise, with
13  getting a voter registration card?
14    A.  No.  There's not even postage required
15  to send the card in.  There's -- there's no cost.
16  You fill it out and send it.
17    Q.  Does that require time to fill out a
18  voter registration card?
19    A.  Well, yes, of course.
20    Q.  Do you consider the expense of time as
21  a cost with getting a voter registration card or
22  an EIC?
23    A.  Yeah, there is an expense of time.  If
24  that's what you want me to say.  Yes, there is.
25    Q.  I don't want you to say anything.  I

133

1  want you to give an honest answer.
2     A.  Well, obviously the card has to be
3  filled out by someone in order for it to be
4  processed by the election department within the
5  respective county.
6         So there is some time, but the time
7  involved in that is so minimal.  We're talking
8  name, address, date of birth, the last four of a
9  social or a driver's license, and you sign it.
10  It does not require production of a -- any type
11  of documentation to prove who you are.
12    Q.  Ms. Lydia, why does the Texas NAACP
13  feel it necessary to devote time and resources
14  towards voter registration activities?
15    A.  Because it -- because this is a right
16  of citizenship in this country, the right to
17  vote.  And especially it has been hard fought by
18  African-Americans.  The time was we had poll
19  taxes as a form of disenfranchising.  "How many
20  bubbles in a bar of soap" kind of lunacy testing.
21        So, yeah, there is a long and
22  egregious history of African and other
23  minorities being disenfranchised in this country.
24        And maybe I'm a little bit outraged
25  that I even have to answer that question because

134

1  it's so blatantly obviously.
2    Q.   Ms. Lydia, to be clear, I am not
3  questioning whether someone should have the right
4  to register to vote.
5    A.   Okay.  Understood.
6    Okay.  I don't want to come across
7  as --
8    A.   I gotcha.
9    Q.   -- as questioning that right.
10   A.   Okay.  Thank you.
11   Q.   What I'm wondering is if there are so
12 minimal costs to getting a voter registration
13 card --
14   A.   Um-hum.
15   Q.   -- why does the Texas NAACP devote so
16 many resources towards helping people get
17 registered?
18   A.   Because it's part of our mission.
19   Q.   And is it still able to fulfill that
20 part of its mission since the enactment of SB 14?
21   A.   Yes, with added -- with an added
22 burden.
23   Q.   And with regard to getting a voter
24 registration card, what is that added burden?
25   A.   We have to educate them about what they

135

1  have to do in order to utilize that voter
2  registration card.
3    Q.   Okay.
4    A.   If you don't have the documentation or
5  the ID to go with that voter registration card,
6  it's a worthless piece of paper.
7    Q.   Does the Texas NAACP contend that SB 14
8  amounts to a poll tax?
9    A.   I don't know if the Texas State NAACP
10 does, but I do.
11   Q.   And why do you believe that?
12   A.   Because it's another obstacle to
13 someone going to vote.  Anything that presents an
14 obstacle or an encumbrance to people exercising
15 their rights, you know, that was guaranteed under
16 the 14th, I think it -- I see it as being a
17 burden.
18   Q.   Ms. Lydia, to the best of your
19 knowledge, is SB 14 the first law that has -- or
20 the first bill that has changed the law with
21 regard to voting requirements in Texas?
22   A.   To my knowledge, it is.
23   Q.   Does the Texas NAACP contend that
24 minority citizens are less likely than white
25 citizens to have an acceptable form of ID under

136

1  SB 14?
2    A.   Yes.
3    Q.   And what is the basis for that claim?
4    A.   I think the socioeconomic factors that
5  are present in our community would lend to that.
6    Q.   Could you describe some of those
7  socioeconomic factors.
8    A.   Not everybody in our community.  I
9  think we have a disproportionately lower number
10 of individuals with automobiles, which in Texas
11 is a necessity.  If you lived in, say,
12 San Francisco where the BART can take you
13 anywhere and everywhere you want to go with ease
14 and affordability, I would say maybe not as much.
15 But in Texas, a car is essential because our mass
16 transportation system is not adequate.
17        And so as a result, if you don't
18 have a car, there's no way you could really get
19 to a DPS office unless you catch the bus, and
20 then you're talking about two or three buses to
21 get there because, again, the DPS offices are not
22 located in our neighborhoods.  The hours of
23 operation would require us to take off work in
24 order to go and apply for an EIC or any form of
25 identification that you would acquire through

137

1  DPS.  It's a burden and it's impacting us because
2  we don't have transportation, one.
3        We don't have the financial
4  resources.  Our unemployment is in double digits
5  whereas the rest of the country is in single
6  digits.  It's gone down some, yes.  But there
7  still is, you know, a disparity there, and so we
8  don't have the financial resources to catch the
9  bus as often or acquire other forms of
10 transportation to get to these places to acquire
11 identification.
12        Those, I think, are probably the
13 most compelling reasons.
14   Q.   And are those reasons that you just
15 summarized, are those based on any specific data
16 or studies or anything like that?
17   A.   I think the statistics are stated in
18 the complaint.
19   Q.   You'd defer to the statistics in the
20 complaint?
21   A.   Um-hum.
22   Q.   Okay.  Does the Texas NAACP contend
23 that minority citizens are less likely to be able
24 to obtain an acceptable form of ID than white
25 citizens?

Linda Lydia - 6/6/2014

138

1   A.   Yes.
2   Q.   And what is the basis for that claim?
3   A.   The socioeconomic reasons that I just
4   stated to you.
5   Q.   So you would refer to the answer to the
6   previous question?
7   A.   Yes, sir.
8   Q.   Are you familiar with the provisional
9   ballot?
10   A.   Oh, yeah.
11   Q.   Okay.  Is it correct to say that SB 14
12   provides that a provisional ballot will only be
13   counted if a voter subsequently presents one of
14   these six forms of acceptable ID required by SB
15   14 to the registrar within six days after the
16   election?
17   A.   Um-hum.  Yes, that's there.
18   Q.   Is what I just said a correct --
19   A.   Yes, that is built into SB 14.  Sorry.
20   Q.   Does the Texas NAACP contend that the
21   six-day allowance imposes a burden?
22   A.   Yes.
23   Q.   Why?
24   A.   Because instead of it being resolved at
25   the -- at the election site, you are required to

140

1   Q.   So it's more of a burden to have to
2   travel to the registrar to confirm a provisional
3   ballot?
4   A.   Exactly what I'm saying.
5   Q.   Does the fact that you're only allowed
6   six days to do that, does that impose a burden,
7   the time limit allowed?
8   A.   I'm not seeing the days as necessarily
9   a burden.  I think just the fact that you do have
10   to prove that you are who you say you are,
11   through one of those six forms of ID, by going to
12   an election department, a county election
13   department, that is the burden within itself.
14   Q.   Where are election places normally?
15   When we talk about polling places --
16   A.   Okay.
17   Q.   -- where are those -- can you give me
18   an example of where those are held?
19   A.   For the purpose of early voting or just
20   a regular election?
21   Q.   Either.
22   A.   During early voting, that's why we have
23   always encountered our people to do early voting.
24   They can go any place and vote within their
25   county.

139

1   show up at a county election department to
2   provide that information.  The resolution to the
3   problem cannot occur anywhere but at the election
4   department after that election has been
5   completed.
6   So, once again, we're talking about
7   resources diverted to go to the election
8   department, which again, is not in our
9   neighborhood, and you have to have transportation
10   to get there and their hours are even less than
11   the Department of Public Safety.  Theirs are 8:00
12   to 5:00.
13   Q.   Is it your position that it wouldn't be
14   a burden if you had to return to the polling
15   place?
16   A.   I think it would be less of a burden if
17   you could do it that same day and do the
18   resolution.
19   Q.   It would be less of a burden?
20   A.   Yeah, less of a burden.
21   Q.   Do you still have to travel to the
22   polling place?
23   A.   Well, the polling places are usually in
24   our neighborhoods because we're divided into
25   precincts.

141

1   Q.   Um-hum.
2   A.   So that makes it a lot easier for
3   people to actually show up and vote.
4   During the regularly scheduled
5   election, you have to go to an assigned precinct,
6   and if you move or if they decide to change the
7   location of the voting precinct -- but it's
8   always in closer proximity to where the person
9   lives.
10   Q.   So I guess what I'm kind of getting at,
11   are they held in elementary schools sometimes?
12   A.   Usually.
13   Q.   Or local public libraries?
14   A.   Um-hum.  Yes.
15   Q.   Are they generally held in places that
16   are open to the public?
17   A.   Yes.
18   Q.   Is it the Texas NAACP's position that
19   it would be less of a burden if you were able to
20   prove a provisional ballot by going back to an
21   election polling place than it is to go to the
22   registrar?
23   A.   I would say definitely.
24   Q.   So would the Texas NAACP prefer that a
25   polling place be kept open at one of these public

Linda Lydia - 6/6/2014

142

1 places in order to confirm provisional ballots?
2     A.  I can't speak for the entire
3 association or our state conference.
4     Q.   But you have been designated to testify
5 here on its behalf; is that correct?
6     A.   Yeah, but when I make the comment about
7 the distance, the distance to your polling place
8 is definitely going to be closer, in most
9 instances, I would say 90 percent, is going to be
10 closer than your election department.
11          So by virtue of that, it creates a
12 greater hardship than if you were going back to
13 the voting location where the issue arose.
14     Q.   Would it be less of a burden if voters
15 were given 12 days to confirm a provisional
16 ballot as opposed to six?
17     A.   I don't think that's going to make a
18 lot of difference one way or the other.  You
19 still have the expense incurred with getting to
20 the location and the expense incurred taking off
21 work to get there.
22     Q.   Does the Texas NAACP support the idea
23 of a provisional ballot?
24     A.   With the absence of anything else, I've
25 never heard an official position.

143

1     Q.   Do you think provisional ballots are
2 important?
3     A.   As a precinct chair, I would say yes.
4 But I also, as a precinct chair, know that most
5 of the times those ballots are never counted.
6     Q.   Provisional ballots are never counted?
7     A.   Very seldom.
8     Q.   Why is that?
9     A.   Because people do not come back or go
10 back into an election department and the
11 elections have already been decided by the time
12 they go back.  That's another thing.  Those
13 elections are decided the same evening, if not
14 early the next morning, so six days or 12 days
15 really isn't going to make a whole lot of
16 difference if you do show up.
17     Q.   You don't think that provisional
18 ballots make a difference?
19     A.   I don't think they've made any
20 differences in my history with voting.  I've
21 never known provisional ballots that have
22 impacted the outcome of an election.  Now, that's
23 not to say it hasn't happened somewhere else, but
24 it's not -- it's not part of what I know.
25     Q.   Just to confirm, what is your

144

1 understanding of the purpose of a provisional
2 ballot?
3     A.   To allow someone to exercise their
4 right to vote, and this is sort of like the last
5 stop along that way, if the person cannot provide
6 adequate identification or whatever is needed to
7 vote, then they are allowed to cast this ballot
8 and the ballot is separated, segregated from all
9 of other ballots that are going to be counted.
10 And they're contained separately in a box, and
11 then they're taken down to the county election
12 department, and as you stated, they have a
13 certain number of days to go there and provide
14 additional proof that they, in fact, were
15 authorized to vote.
16     Q.   Have you ever had to cast a provisional
17 ballot?
18     A.   Never.
19     Q.   Does the Texas NAACP claim that
20 minority citizens are less likely to be
21 appropriately educated about the change in
22 requirements for voting?
23     A.   I would have to say yes.
24     Q.   And what is that claim based on?
25     A.   It's based on the fact that our people

145

1 do not have the same level of computer literacy
2 as the rest of the population, whether that's
3 because of socioeconomic factors, they can't
4 afford a computer or cannot afford the internet
5 services that are needed to operate and acquire
6 this information.
7     I still send faxes to people,
8 branch presidents who do not have or cannot
9 operate, because of age.  And a lot of older
10 people have mastered, you know, the computer
11 system, but then we do have some older ones who
12 just have not given into that, for whatever
13 reason.
14     Q.   Do you think education about voter
15 requirements can only be accomplished through the
16 use of a computer?
17     A.   No.  No.
18     Q.   What other ways might someone be
19 educated about voter requirements?
20     A.   We -- that's why I told you that the
21 recruiting efforts by our branches, which always
22 have membership recruiting, that is, have always
23 included voter registration card because that's
24 part of our mission.
25     Now, we also do the education piece

Linda Lydia - 6/6/2014

146

1  about voter ID.  That is a necessity because we
2  are trying to reach out to people in our
3  community, whether it's through the churches or
4  whether other events that are going on in the
5  community, concerts, wherever we can reach the
6  masses, we go.
7       Q.   Does the Texas NAACP contend that
8  minority citizens are more likely to fall victim
9  to the discretionary application of voter ID
10  laws?
11      A.   I would think so.
12      Q.   And what is that claim based on?
13      A.   The fact -- the e-mail that you brought
14  up earlier.  The issue with Phyllis that was
15  stated about the requirements about the driver's
16  license scanning.  Now, there's no question
17  Phyllis wouldn't have been disenfranchised
18  because Phyllis is not a person who had been put
19  off, as Exhibit 4 -- it says, "Phyllis indicated
20  they attempted to scan her driver's license and
21  it would not scan, so they used her voter
22  registration card as proof of who she was."
23           So, you know, it's -- a lot of
24  people have had that issue, and there was
25  different activities -- that's the thing, when

147

1  you allow human discretion, some precinct
2  election officials, you know, they'll say, okay,
3  this is close enough.  And then there are others
4  who will say, no, you know, we need exact, so
5  you're going to have to sign off on this or
6  you're going to have to vote a provisional
7  ballot.  It's totally discretionary with an
8  election judge.
9           So, yes, that is one of our
10  contentions for sure.
11      Q.   I want to go back to that e-mail about
12  Phyllis.
13      A.   Um-hum.
14      Q.   I'm sorry, I'm trying to locate it.
15      A.   It's Exhibit 4.
16      Q.   Okay.  Are you referring to page 2 of
17  Exhibit 4, the paragraph -- I'll let you get
18  there.
19      A.   (Witness complied.)
20      Q.   Could you point to a specific -- I'm
21  looking at page 2, the paragraph beginning, "No
22  one tried to scan my driver's license."
23      A.   Go back to page 1 of Exhibit 4.  Under
24  the list of the recipients for that e-mail, it
25  says, "early voting."

148

1           "Early voting started on Monday and
2  President Bledsoe was trying to see if there was
3  a standard of ID in voters.  Phyllis indicated
4  they attempted to scan her driver's license and
5  it would not scan, so they used her voter
6  registration card."
7      Q.   Yes.
8      A.   And then she also talked about early
9  voting.  So there -- I mean, there have been
10  various and sundry rules that have been
11  imposed -- and, again, it's discretionary by the
12  election judge as to whether or not that person's
13  identification is adequate or not.
14      Q.   I understand that point you're making.
15  You've referred to this e-mail recounting
16  Phyllis's story --
17      A.   Um-hum.
18      Q.   -- as evidence of such discretionary
19  application of those laws.
20      A.   Um-hum.
21      Q.   Could you point to me exactly which
22  part of this story that happened to Phyllis
23  involves discretionary application of laws.
24      A.   What happened to her, and look at what
25  happened to me.  Two different voting locations.

149

1  One voting location was scanning driver's
2  license, and when they couldn't -- if she hadn't
3  had her voter registration card, she may not have
4  been able to vote, but she happened to carry it.
5           And then you look at what happened
6  when I went to vote and my ID did not match what
7  was on the voter's roll.  My driver's license
8  does not match what they have on their voter's
9  roll.
10      Q.   At what point was there a discretionary
11  application of the law made in those two stories?
12      A.   Well, they made a decision that they
13  would accept only -- if she didn't have the
14  driver's license -- I mean, the driver's license
15  would not scan, which they wanted a copy of.
16           They made a decision that, okay, we
17  need that information in order for you to vote,
18  obviously, so we can use your voter registration
19  card.  What if she had not had her voter
20  registration card and the driver's license did
21  not scan.  Someone could have exercised the, you
22  know, decision not to have allowed her to vote.
23      Q.   Are you required to have a voter
24  registration card to vote?
25      A.   Not -- I don't think you do anymore.  I

150

1  think all you need is an ID and it has to match
2  what's on the voter's roll.
3      Q.   So in both of these stories, both the
4  story that happened to you and Phyllis, y'all
5  were both able to vote, correct?
6      A.   Yeah.  We were definitely both able to
7  vote.
8      Q.   Okay.  So were y'all harmed in any way
9  in these two specific instances?
10     A.   No.  But that is an example of
11 discretion by the people who are conducting the
12 election, as to what they want and what they do
13 not want.
14     Q.   In these two stories, if the machine
15 were able to scan the driver's license, would
16 there have been -- what would have happened then?
17     A.   I'm sure everything would have been
18 fine, I mean, because that was what the necessity
19 was or that particular election judge to allow
20 her to vote.
21     Q.   So the problem occurred when the
22 machine couldn't scan the driver's license?
23     A.   Apparently.
24     Q.   Okay.  So after that happened, at what
25 point did the election official use his or her

151

1  own discretion to apply a voter law?
2      A.   Mr. Tatum, I can't tell you exactly at
3  what point they made the decision that she had a
4  voter registration card that would allow her to
5  vote.  I really don't know that.  I wasn't there.
6      Q.   Okay.
7      A.   Okay?  I'm only relaying what she told
8  us.
9      Q.   Do you know what discretionary law was
10 being applied in that instance?
11     A.   I'm not sure.
12     Q.   Okay.
13     A.   If there was a law other than this, it
14 was a decision made by the election judge.
15     Q.   So in that case, the ultimate decision
16 that was made by the election judge was to allow
17 both you and Phyllis to vote?
18     A.   Not the same election judge now.  Two
19 different election judges.
20     Q.   Right.  The respective election judges.
21     A.   Yes.  Um-hum.
22     Q.   Does the Texas NAACP contend that the
23 requirements of SB 14 constitute a prerequisite
24 to voting?
25     A.   Constitute . . .

152

1      Q.   A prerequisite to voting.
2      A.   Well, you have to have a voter
3  identification to vote.  Is that what you're
4  referencing?
5      Q.   I'm refer -- I'm referencing the
6  requirements of SB 14.
7      A.   You have to have voter identification
8  to vote, which is mandated in SB 14.
9      Q.   And does the Texas NAACP contend that
10 that mandate denies or abridges the right to vote
11 on the account of race or membership in a
12 language minority group?
13     A.   I think it definitely presents
14 impediments.
15     Q.   And what is the basis for that claim?
16     A.   The costs associated with acquiring the
17 needed identification to vote.  You don't even
18 need a voter's certifi- -- voter registration
19 card to go vote.  You have one of those six forms
20 of identification that must match something
21 that's written on the voter's roll.
22     Q.   Is the claim that SB 14 will deny or
23 abridge the right to vote on account of race or
24 membership in a language minority group based
25 on -- is that claim based on any kind of study

153

1  conducted by the NAACP or anyone else?
2      A.   I'm not sure of that.
3      Q.   Is that based on conversations that
4  members of the Texas NAACP executive committee
5  have had with members of the Texas NAACP?
6      A.   I would say that that would be true.
7      Q.   Does the Texas NAACP contend that SB 14
8  makes it impossible for anyone to vote?
9      A.   No.  I wouldn't say impossible.  That's
10 really extreme.  No.
11     Q.   Does the Texas NAACP contend that SB 14
12 forces eligible voters to choose between voting
13 and other uses of their limited time and
14 resources?
15     A.   Definitely.  Yes.
16     Q.   How does SB 14 force an eligible voter
17 to choose between voting and using their other
18 time?
19     A.   Time that they expend going to or from
20 a DPS office, waiting two to three hours to
21 receive service.  Sometimes even after being
22 there two or three hours, not receiving services
23 because they lacked a document that's needed; if
24 they're not adequately informed about the
25 expectations and requirements.

Linda Lydia - 6/6/2014

154

1       That's why we have worked really
2   diligently to try to make -- ensure that when
3   people do show up, take off from work, expend the
4   financial resources to get to a location, that
5   they are adequately prepared for obtaining the
6   document that they need to vote.
7       Q.   Before SB 14, did a voter have to
8   choose between voting and doing something else?
9       A.   Not really, because the voting
10  locations are open after traditional work hours.
11  So they could vote after work.  The polls usually
12  open before they go to work.  And early voting,
13  you can vote on Saturday and Sunday.  You cannot
14  go to DPS on Saturday and Sunday and get these
15  documents that we need to vote.
16      Q.   Would you agree that everyone must make
17  a conscious choice to vote at some point?
18      A.   Yeah.  I think you're right about that.
19  Yes.
20      Q.   Do you think that choice must be made,
21  irrespective of the laws there in place at that
22  time?
23      A.   When you have -- God, I wish I could
24  remember the statement.  When you have laws that
25  unnecessarily burden the people, poll taxes, "how

155

1   many bubbles are in a bar of soap," those kinds
2   of laws.
3       Q.   Could you explain a "how many bubbles
4   are in a bar of soap" type of law?
5       A.   Yeah.  It was a way of assessing
6   whether or not you had the capacity to vote.
7       Q.   I'd never heard that expression.
8       A.   You've never heard that before?
9       Q.   No, I have not.
10      A.   You're younger than I am, a lot
11  younger.
12          There was actually a test that used
13  to be administered to African-Americans, and one
14  of the common -- I mean, across the country --
15  especially in the south, one of the questions
16  that was asked of individuals in order for them
17  to get a voter registration was, "How many
18  bubbles are in a bar of soap?"
19          And you look like you're a very
20  well-educated man.  Why don't you tell me how
21  many bubbles you think were in a bar of soap?
22  Nobody knows that.  You talk about a
23  discretionary answer -- I mean question.  I mean,
24  whatever the answer is, it was probably wrong
25  anyhow, to disenfranchise people from voting.

156

1       And I'm sorry, I really thought you
2   knew what I was talking about when I was saying
3   "bubbles in a bar of soap."
4       That's okay.
5           Are you aware of any members of the
6   Texas NAACP that are registered to vote but have
7   chosen not to vote as a result of SB 14?
8       A.   No.
9       Q.   Do you know anyone who is registered to
10  vote but has made the conscious choice to not
11  vote because of SB 14?
12      A.   Sort of as a protest perhaps?  No, I've
13  never even heard of that concept of someone not
14  voting because of SB 14.  I mean, that's so
15  alien.  No.  I've never even thought about it.
16      Q.   Does the Texas NAACP not contend that
17  SB 14 forces people to choose between voting and
18  not voting?
19      A.   I think circumstances.
20      Q.   What do you mean by that?
21      A.   Circumstances would cause people to not
22  have gone, perhaps, and gotten the necessary
23  documents that they need to vote.  So I think
24  there are people who probably -- I don't know
25  them personally, and I want to make sure you

157

1   understand that.
2           But when you think of the
3   circumstances involved, and, you know, I do a lot
4   of voter registration, and I've approached people
5   about registering and they're like, no, they've
6   got to have that voter ID, and I'm not going to
7   that DPS office.  I can't take people to the DPS
8   office.  I work a job, and I have
9   responsibilities, too.
10      Q.   Ms. Lydia, what do you believe is the
11  purpose of SB 14?
12      A.   I think the intent and purpose was to
13  disenfranchise some voters, and it happens to be
14  minorities.
15      Q.   So do you believe that SB 14 was
16  enacted with discriminy intent --
17  discriminatory intent?
18      A.   I do.  I believe that.
19      Q.   Does the Texas NAACP contend that any
20  legislature who voted for SB 14 acted with
21  discriminatory intent?
22      A.   I think that by virtue of their vote
23  and the impact that it would have on certain
24  minorities in the state, I think there was an
25  intent by those legislators to be a part and

Linda Lydia - 6/6/2014

158

1  parcel of that.
2      Q.   Does the Texas NAACP contend that the
3  Texas legislature intended to harm minority
4  groups with the enactment of SB 14?
5      A.   If harm is defined as minimizing their
6  votes within the state, yes.
7      Q.   Are you aware of any polls taken by the
8  NAACP or any other entity that indicate whether
9  SB 14 is a politically popular bill?
10     A.   No.
11     Q.   Does the Texas NAACP support voter ID
12  requirements of any kind?
13     A.   I think citizenship requirements.
14     Q.   Does the Texas NAACP support voter
15  photo ID requirements of any kind?
16     A.   I don't think that should be a
17  prerequisite to vote, that you have a picture on
18  a card.  My citizenship alone should entitle me
19  to vote.
20     Q.   Does the Texas NAACP contend that a
21  person who is trying to vote should be the same
22  person who is registered to vote?
23     A.   Of course.  We don't -- we're not
24  fostering voter fraud.
25     Q.   I don't think I've already asked this

159

1  question.  If I have, please let me know.
2      A.   Okay.
3      Q.   To your knowledge, have any Texas NAACP
4  members ever expressed support for SB 14?
5      A.   I have never heard anyone personally
6  say they support SB 14, in the minority
7  community.
8      Q.   Okay.  I've got one follow-up question.
9      A.   Okay.
10     Q.   We're going to take a trip back to the
11  beginning parts of this deposition.
12     A.   Oh, okay.
13     Q.   When we're talking about the NAAC- --
14  Texas NAACP's activities with regard to voter ID
15  legislation, its legislative activities --
16     A.   Um-hum.
17     Q.   -- not just with respect to SB 14 but
18  any legislation --
19     A.   Okay.
20     Q.   -- does the Texas NAACP track or
21  monitor voter ID laws in other states?
22     A.   Yes, we do.
23     Q.   Are you aware of the voter ID law in
24  the state of Indiana that was the subject of a
25  case titled Crawford versus I believe it was

160

1  Marion County Election Board?
2      A.   No.
3      Q.   You're not aware of that law?
4      A.   No.
5      Q.   Do you -- with regard to voter ID laws
6  being proposed in other states, does the Texas
7  NAACP reach out to other branches of the NAACP in
8  those states to discuss concerns or share
9  information about voter ID legislation?
10     A.   Yes, we definitely do.
11     Q.   And who is in charge of doing that at
12  the Texas NAACP?
13     A.   Well, it's not so much somebody being
14  in charge of it.  We have national conventions
15  and regional conferences where we do discuss the
16  various legislative activities that are going on,
17  and then we have a legislative arm of the NAACP
18  that also filters down information to us about
19  what's going on in other states regarding to any
20  type of legislation.
21     Q.   And in that process, has there ever
22  been an exchange of material between Texas NAACP
23  and NAACP conferences in other states?
24     A.   I'm really not sure on that.  I would
25  think that we -- that they know about legislation

161

1  that's going on in our state.  I mean, everything
2  that we do is approved by the national office.
3  And the national office does, within their sphere
4  of activities, pass on information to other state
5  conferences, I'm sure, and say, you know, this is
6  a good source for you to contact regarding how to
7  handle this particular situation, because of the
8  activities they've had in their state.
9      Q.   Does the Texas NAACP commit operating
10  funds every year to the monitoring and tracking
11  of legislation -- voter ID legislation in other
12  states?
13     A.   No.
14     Q.   Ms. Lydia, does the Texas NAACP expect
15  that it will continue to be able to fulfill its
16  stated mission into the foreseeable future?
17     A.   Yes.
18     Q.   Okay.  I have no other questions to ask
19  you at this time.
20          May I ask you if now that you've
21  had a chance to contemplate any previous answers,
22  is there anything you'd like to supplement or
23  clarify regarding any answer you've given here
24  today?
25     A.   No.

162

1    Q.   No.
2         MR. TATUM:  Well, I have no more
3    questions.  I pass the witness.
4         MS. RUDD:  I have no questions.
5         MS. MILLER:  No questions from the
6    United States.
7         MR. TATUM:  Well, we'll reserve
8    further questions, and I believe we can go off
9    the record now.
10        THE COURT REPORTER:  Would you like
11   the witness to read and sign her deposition?
12        MS. RUDD:  Yes, ma'am.
13        THE COURT REPORTER:  And may I send
14   it to you?
15        MS. RUDD:  You may.
16
17
18        (The deposition concluded on
19         June 6, 2014, at 1:11 p.m.)
20
21
22
23
24
25

164

1         I, LINDA LYDIA, have read the foregoing
2    deposition and hereby affix my signature that
3    same is true and correct, except as noted above.
4
5
6
7                  _____
                        LINDA LYDIA
8
9    THE STATE OF:_____
10   COUNTY OF:_____
11
          Before me, _____, on this
12   day personally appeared
13        LINDA LYDIA,
14   known to me (or proved to me under oath or
     through
15   _____) to be
     the person whose name is subscribed to the
16   foregoing instrument and acknowledged to me that
     they executed the same for the purposes and
17   consideration therein expressed.
18   Given under my hand and seal of office this
     _____ day of _____, 2014.
19
20
21
22                _____
     NOTARY PUBLIC IN AND FOR
23
     THE STATE OF_____
24
25

163

1         CHANGES AND SIGNATURE
2         LINDA LYDIA - JUNE 6, 2014
3    PAGE-LINE |   CHANGE        REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20   _____
21   _____
22   _____
23   _____
24   _____
25   _____

165

1    STATE OF TEXAS   )
2    COUNTY OF DENTON )
3
4         REPORTER'S CERTIFICATION
5
          I, Karen L. D. Schoeve, Registered
6    Diplomate Reporter and Certified Realtime
     Reporter residing in the State of Texas, do
7    hereby certify:
8         That the foregoing deposition of LINDA
     LYDIA was taken before me at the time and place
9    herein set forth and that the witness was put
     under oath by me;
10
          That the testimony of the witness and all
11   objections made at the time of the examination
     were recorded stenographically by me, were
12   thereafter transcribed under my direction and
     supervision and that the foregoing is a true
13   record of same, to the best of my ability.
14        I further certify that I am neither counsel
     for nor related to any party to said action, nor
15   in any way interested in the outcome thereof.
16        In witness whereof, I have subscribed my
     name this 9th day of June, 2014.
17
18
19
20
21        _____
          Karen L. D. Schoeve, RDR, CRR
22        Integrity Legal Support Solutions
          Firm Registration No. 528
23        3100 W. Slaughter Lane, Suite A-101
          Austin, Texas 78748
24        (512) 320-8690
          (512) 320-8692 (fax)
25

```
                    $
$500 61:2

                    |
| 163:3

                    1
1 6:3 13:21,24 15:18
  147:23
1,000 84:1
1:11 3:7 162:19
10 30:15
10,000 33:6
105 6:11
11:40 125:11
113 6:13
116 6:15
119 6:17
12 17:24 18:11 142:15
  143:14
122 6:19
126 5:9
13 6:3 17:25 18:11
1332 7:24
14 18:1,11
  36:22,23,24
  37:2,5,8,15 39:9
  57:4 58:5 59:9
  64:5,19 65:20,21
  66:3,25 67:12,17
  68:6 69:19 70:15,19
  71:24 72:3,16 73:2
  75:6,7,21 76:3
  77:4,12 78:21 79:5
  82:7,15 83:17 84:11
  85:13 90:15,23 91:13
  92:5,9 93:20,21
  94:4,6 97:20
  126:8,16 127:11,25
  128:20 129:1,13,21
  130:15,18 134:20
  135:7,19 136:1
  138:11,15,19 151:23
```

```
152:6,8,22
153:7,11,16 154:7
156:7,11,14,17
157:11,15,20 158:4,9
159:4,6,17
14-related 65:17
  78:11
14th 4:9 135:16
15 12:19 18:2,11
  46:17
163 5:11
165 5:12
17 18:3,13
17th 17:19
18 15:25 18:4,11 34:8
19 6:5
1950 8:2
1st 82:24

                    2
2 6:5 19:6,9 115:14
  130:3,12 147:16,21
2:13-CV-193 1:8 7:14
2:13-CV-263 1:19
2:13-CV-291 2:5
2:13-CV-348 2:14
20 12:19 23:25 30:16
2006 21:3
2011 36:24 67:21 85:9
2012 82:9,24 83:6,11
2013 17:19 50:13
  77:16 81:23 84:18
  95:6,11 99:21 113:5
2014 2:24 3:6 6:16
  82:2 95:12 106:6
  116:19 162:19 163:2
  164:18 165:16
202 4:18
20530 4:17
```

```
209 4:9
21 18:5,12
2'13 50:15,16
213.808.5700 4:5
213.808.5760 4:5
2200 3:10
23 18:6,12
23rd 113:5
24 15:18 18:7,12
25 6:16
25th 99:21 106:5
2nd 95:5

                    3
3 6:7 15:25 17:22
  18:11 94:10,13
  115:19
3100 4:23 165:23
320-8690 4:24 165:24
320-8692 4:25 165:24
37th 4:4
3rd 8:2

                    4
4 5:4 6:9 15:25 17:23
  18:11 72:3 99:1,4
  146:19 147:15,17,23
40 25:11 30:17

                    5
5 6:11 15:9 105:19,22
5:00 139:12
500 61:3 84:1
512 4:24,25 165:24
512.463.3133 4:10
514-2919 4:18
528 4:23 165:22
5th 4:4
```

**6**

**6** 2:24 3:6 6:13
113:17,20 162:19
163:2

**60** 79:9,12

**6031** 6:10

**6036** 6:12

**6039** 6:8

**6043** 117:11

**6063** 6:18

**633** 4:4

**6th** 7:18

**7**

**7** 5:6 6:15 18:9,11
116:7,10

**7204** 4:17

**75116** 7:25

**78711** 4:10

**78748** 4:24 165:23

**7-Eleven** 60:21

**8**

**8** 6:17 15:19
119:15,18

**8:00** 139:11

**8:48** 3:7 7:18

**80** 79:10

**817.713.9492** 4:11

**9**

**9** 6:19 122:4,7

**9:00** 110:21

**90** 142:9

**90071-2013** 4:4

**9-17** 117:16

**94** 6:7

**950** 4:16

**99** 6:9

**9th** 165:16

**A**

**a.m** 3:7

**A-101** 4:23 165:23

**ability** 9:22 10:2
84:25 165:13

**able** 16:14,20 115:16
134:19 137:23 141:19
149:4 150:5,6,15
161:15

**above-styled** 3:6

**abridge** 152:23

**abridges** 152:10

**absence** 142:24

**absentee** 89:3

**absolute** 39:15

**absolutely** 67:5 81:20
129:6

**Academic** 23:10

**accept** 149:13

**acceptable** 127:24
128:19,25 135:25
137:24 138:14

**access** 112:20

**accessibility** 132:7

**accidentally** 11:4

**accomplish** 80:21
121:18

**accomplished** 145:15

**account** 152:11,23

**accurate** 9:23 10:2
104:12 107:6 117:19

**accurately** 10:6 106:8

**acknowledged** 164:16

**acquire** 38:17 108:20
136:25 137:9,10
145:5

**acquiring** 40:1
107:3,19 152:16

**across** 57:9 81:19
100:9 107:5 134:6
155:14

**act** 21:8

**acted** 66:25 157:20

**action** 1:7,18 2:4,13
6:14 52:9,11,20
54:16,21,25 56:6
59:19 65:1 106:17
111:3 114:4,5 165:14

**actions** 74:24 124:24

**actively** 77:17 127:22

**activities** 22:24
26:22 32:4 33:21
36:3 51:11 55:4
57:2,14,20 59:23,25
60:3,15 63:12
71:3,5,25 73:21 75:8
78:24,25 79:4 81:10
87:9 88:10 89:19
90:21 91:6,12,24
92:20,22 93:25
94:1,2,4 126:7,15,22
127:2,3,12 133:14
146:25 159:14,15
160:16 161:4,8

**activity** 79:1 97:4

**acts** 35:7

**ACT-SO** 23:10 56:9

**actual** 42:23

**actually** 12:23 24:11
27:21,23 30:13 46:14
50:14 61:10 64:3
67:24 81:4 84:5 85:1
86:1 87:3 103:3
108:23 121:2 125:9
141:3 155:12

**add** 35:12 45:1 130:20

**added** 76:1 134:21,24

**Adding** 105:6

**addition** 37:10

**additional** 40:2 74:6
144:14

**address** 52:10
64:1,8,23 65:11,17
73:15,17 84:16 133:8

**addressed** 60:12

**addresses** 99:18
100:11 106:3,14

**addressing** 64:5,18
86:10 100:4

**adequate** 136:16 144:6
148:13

**adequately** 40:12 68:6
153:24 154:5

**administered** 155:13

**administrative** 27:24
60:10 79:9,12

**adult** 34:6 46:12

**advised** 125:20

**advisor** 22:22,23
23:6,18

**advisors** 23:2

**advocate** 63:12

**advocating** 77:18
120:15

**affect** 9:22 10:2
55:19

**affiliated** 25:12

**affix** 164:2

**afford** 79:17 145:4

**affordability** 136:14

**African-Americans**
133:18,22 155:13

**Afternoon** 5:9 126:1

**against** 77:18

**age** 34:8 145:9

**agenda** 85:3 87:25

**ago** 12:16 20:25 21:2
39:7 85:19

**agreed** 112:16 129:18

**agreement** 129:25
130:8

**ahead** 27:22 76:15

**akin** 46:7

**alert** 6:14 114:4,5

**alien** 156:15

**allocate** 63:6 65:11

**allocated** 61:20,24
62:21 63:3 64:18
75:7 76:3 79:4 92:22
93:18

**allocating** 76:16
78:11

**allocation** 62:8
65:15,16 93:22

**allocations** 65:3
78:22 92:13

**allow** 8:22 11:5 68:19
101:9 144:3 147:1
150:19 151:4,16

**allowance** 138:21

**allowed** 45:7 97:9
101:20,22 140:5,7
144:7 149:22

**alone** 158:18

**already** 13:19 21:5
64:6 77:10 94:3
126:17 127:3 143:11
158:25

**am** 8:4 24:11 30:25
31:4 32:20 38:6
42:18 43:5 68:14
96:5 101:14,22
117:14 132:9 134:2
155:10 165:14

**amend** 68:2

**Amended** 14:17

**AMERICA** 1:13 4:13

**American** 1:6 2:3
49:16,25

**amount** 60:2,9
61:14,16 63:25 64:21
89:21 93:14 112:22

**amounts** 135:8

**ample** 68:10

**Amy** 4:3 8:14,23,25
11:25 12:9,12,22
83:3

**amy.rudd@dechert.com**
4:6

**analyses** 59:7

**ancillary** 84:13

**Anended** 6:3

**Angela** 4:14
8:13,14,21 124:2
130:4

**angela.miller5@usdoj.**
**gov** 4:18

**Angeles** 4:4 25:21

**ANNA** 1:4

**annual** 61:6 81:3,13

**annually** 81:17

**answer** 10:15,20 11:17
15:7 40:17,18 46:24
47:20 68:7 69:4 70:9
133:1,25 138:5
155:23,24 161:23

**answered** 21:5

**answering** 10:7,25
11:2,6 23:8

**answers** 9:23 10:3
16:15 161:21

**anyhow** 155:25

**anymore** 102:19 149:25

**anyone** 12:11,20 27:6
29:23 44:16 54:1
58:10 70:13 90:7
108:8 118:8 153:1,8
156:9 159:5

**anyplace** 89:8

**anything** 10:5 12:10

13:18 22:18 23:5
42:5 58:17 63:6
85:25 86:3 94:9
112:7 120:14 132:25
135:13 137:16 142:24
161:22

**Anytime** 76:25

**anywhere** 46:21 136:13
139:3

**apart** 36:14

**Apparently** 150:23

**Appearances** 5:4

**appeared** 164:12

**appears** 103:24 104:5
105:17 113:3

**application** 146:9
148:19,23 149:11

**applied** 151:10

**apply** 26:1 89:3
111:12 136:24 151:1

**approached** 157:4

**approaching** 125:12

**appropriate** 35:17

**appropriately** 144:21

**approval** 42:14 43:14
44:1,6,24 46:3 62:4
122:3

**approve** 64:22

**approved** 42:20
43:7,16,19,21,23
44:14 46:3 47:13
48:8 64:7 161:2

**approving** 42:19

**approximately** 22:15
33:6

**area** 22:17 31:3 52:5
102:3 115:23

**arm** 160:17

**arose** 142:13

**aside** 61:11,18

**as-needed** 62:22 63:2
75:3,5 92:23 93:18

**assessing** 155:5

**assigned** 89:9 141:5

**assist** 19:23 28:2
31:23 34:24 47:7
68:23 84:3
88:5,8,10,18 90:10
128:14

**assistance** 90:2
115:23 121:17

**assistant** 7:11 28:2

**assisted** 50:6 90:17
128:3,7

**assisting** 91:7

**assistive** 89:2

**associated**
131:10,12,20,21,24
132:12 152:16

**association** 1:17 80:8
112:19 142:3

**AT&T** 60:21

**attached** 3:13

**attempted** 100:25
146:20 148:4

**attend** 28:20 42:12
83:24

**attended** 4:13 96:12

**attending** 63:21

**attorney** 4:9,15 7:11
11:16,18 12:14

**attorney/client** 47:19

**attorneys** 42:7 73:14
83:22

**attract** 31:17

**attracting** 31:20

**audibly** 10:15

**auspices** 24:18

**Austin** 4:10,24 27:17
29:20 52:5 63:22

68:20,23 85:10
165:23

**authority** 67:1

**authorized** 67:8
144:15

**automobiles** 136:10

**available** 29:14 46:20
48:19

**Ave** 4:16

**Avenue** 3:10

**average** 30:14

**aware** 16:10 40:7
45:13 49:2 56:22
59:6 71:15 76:24
87:18 129:11 130:22
156:5 158:7 159:23
160:3

**awareness** 130:21

---

B

**ballot** 74:23 101:9
104:10 113:14
138:9,12 140:3
141:20 142:16,23
144:2,7,8,17 147:7

**ballots** 142:1
143:1,5,6,18,21
144:9

**bank** 97:4,8

**banks** 12:24 27:8 54:1
79:6 96:25 113:2
129:19

**bar** 133:20
155:1,4,18,21 156:3

**BART** 136:12

**base** 80:11

**based** 16:15 19:11
44:6 49:20 59:12
69:7 86:19 96:6
137:15 144:24,25
146:12 152:24,25
153:3

**bases** 20:2

**basically** 61:19 94:2
100:2 117:8 122:20
123:2

**basis** 21:9 23:12
29:12,15 47:19,22
60:13 61:21 62:22
92:23 93:18 136:3
138:2 152:15

**Bates** 6:8,10,12,14,18

**became** 26:6 72:15
82:23

**become** 24:1 27:18
30:20 71:17 75:15
130:22

**becomes** 30:18

**begin** 9:12 43:4

**beginning** 78:19
106:23 147:21 159:11

**behalf** 16:11 54:1
142:5

**believe** 19:11 22:13
28:3 62:17 66:18
69:19 83:6 131:23
132:11 135:11
157:10,15,18 159:25
162:8

**BELINDA** 2:11

**BENAVIDES** 1:18

**benefit** 41:13 80:7

**BENJAMIN** 1:6

**besides** 12:11 44:16

**BESSIAKE** 1:15

**best** 19:3 41:21 106:9
124:6 128:3 135:18
165:13

**better** 68:7 78:21
93:8

**beyond** 12:6,10 50:7
51:15 85:24

**bill** 36:22,23,24

37:2,9 54:5 57:6
64:9 66:12,16 67:13
68:2 71:13,17 77:18
78:1 79:11 82:17,23
83:22 129:13,21
135:20 158:9

**bills** 46:2,6 51:24
52:6 69:11 70:3
85:16

**binding** 16:15

**birth** 75:22,23 90:13
91:2,3 128:12,15
131:17 133:8

**bit** 51:13 100:20
101:15 133:24

**blatantly** 134:1

**Bledsoe** 12:14 27:19
29:9 42:7 103:25
148:2

**bleed** 53:19

**board** 55:14 160:1

**Bob** 104:15,16,18

**Bob's** 104:8 105:1

**body** 35:8

**booth** 88:12

**born** 8:1

**bottom** 15:12 95:8
98:1 117:10

**Bow** 7:24

**box** 144:10

**branch** 24:10,14,23
25:2,8,12 26:1
30:3,5,6 32:6,7
68:16 86:22
99:12,13,17 106:14
111:5,8 119:13 145:8

**branches** 2:2 6:4
14:21 21:17,24 22:1
24:8,17,19 26:21
31:23 32:10
33:2,17,20 34:4,6
35:8 36:7,9 40:25

41:6,9 47:1,4 58:8
77:20 87:15 114:19
117:25 119:8,9,11
145:21 160:7

**break** 51:4,7 123:18
124:1 125:10
126:6,11

**BRICKNER** 1:5

**briefly** 46:10 99:24

**bring** 13:13 111:16
122:13

**brought** 13:15 122:8
146:13

**bubbles** 133:20
155:1,3,18,21 156:3

**budget** 60:18,20,25
61:6

**budgeted** 60:16

**budgeting** 31:1

**built** 138:19

**bullet** 117:22 118:17

**burden** 40:1 134:22,24
135:17 137:1 138:21
139:14,16,19,20
140:1,6,9,13 141:19
142:14 154:25

**Bureau** 131:19

**BURNS** 1:4

**bus** 136:19 137:9

**buses** 136:20

**buy** 26:4

**bylaws** 28:13 120:20

---
C
---

**CA** 4:4

**California** 25:21

**capacities** 23:15

**capacity** 1:21,22
2:7,8,16,17 23:9
27:24 31:9 50:2,5

68:17 103:19 155:6

**capitol** 53:14,15
69:17 70:2

**car** 136:15,18

**card** 37:11,17,25
38:3,5 40:3,5 72:2,6
74:12,14 75:18
76:19,20 101:2,5
131:25
132:6,13,15,18,21
133:2 134:13,24
135:2,5 145:23
146:22 148:6
149:3,19,20,24 151:4
152:19 155:17 158:18

**card-carrying** 80:3

**cards** 76:9,24 92:3
103:4,6,8 132:8

**careless** 129:4

**CARRIER** 1:3

**carry** 37:17 51:19
149:4

**carrying** 92:11 110:20
111:25

**case** 1:9,21 2:6,15
7:14 11:17 21:23
47:16 48:9 117:16
129:7,14 151:15
159:25

**cases** 7:16
41:15,18,19

**cast** 113:14 144:7,16

**catch** 136:19 137:8

**category** 75:2

**Caucus** 2:3 49:16 50:1

**cause** 3:6 69:20
156:21

**causes** 131:21

**caution** 42:5

**caveat** 130:20

**cc** 111:6

**certain** 21:1 22:17
23:7 33:14 45:9
49:10,13 53:24 54:3
61:10,11,14,16 62:16
64:13 69:9 70:1,16
71:18 72:5 75:16
105:10,12,15 107:16
108:19 112:22 119:14
144:13 157:23

**certifi** 152:18

**certificate** 5:12 6:20
38:17 75:23,24 90:13
91:2,3 101:7
128:12,15

**certificates** 107:4
131:17

**CERTIFICATION** 165:4

**Certified** 4:21 125:24
165:6

**certify** 165:7,14

**chain** 6:8,10,12
130:5,9

**chair** 47:2,4 52:6,9
53:20 54:16,21,25
59:19
101:13,17,18,22
102:1,2,8,14,17,20
111:3 143:3,4

**chairs** 26:19 46:16,17
47:8 55:24 58:19
59:3 85:7 106:17

**challenges**
69:9,12,14,20,22
70:2,6

**chance** 161:21

**change** 71:24 77:5,8
86:19,21 141:6
144:21 163:3

**changed** 66:4,7,10
80:25 86:24 135:20

**changes** 5:11 66:20,21
67:4,7,9,14 71:12
74:10 76:5 77:1,2,13

85:24 163:1

**changing** 63:9 69:2

**chapter** 25:16

**chapters** 24:20 26:22
34:10 47:5

**charge** 36:2 52:24
160:11,14

**chemo** 56:4 63:18

**choice** 154:17,20
156:10

**choose** 39:14
153:12,17 154:8
156:17

**chosen** 156:7

**Christi** 1:2 82:12,14
117:17

**church** 115:15 121:3
132:8

**churches** 32:8 89:13
146:3

**Circuit** 117:18

**circumstances**
156:19,21 157:3

**cities** 81:1
107:18,23,25
108:4,23 110:13,14

**citizens** 1:6 115:1,12
135:24,25 137:23,25
144:20 146:8

**citizenship** 133:16
158:13,18

**city** 108:24

**Civic** 95:18,19

**civil** 1:7,18 2:4,13
3:12 4:15 60:10
70:11

**claim** 128:17 136:3
138:2 144:19,24
146:12 152:15,22,25

**claims** 20:2

**clarification** 11:11

47:25 82:22

**clarified** 80:16

**clarifies** 120:12

**clarify** 21:14 22:7
161:23

**CLARK** 1:15

**clear** 22:7 47:21
134:2

**clinics** 114:25 115:5

**close** 109:6 147:3

**closer** 141:8 142:8,10

**closest** 77:23

**coalesce** 121:12 122:3

**coalesced** 121:14

**coalescing** 122:2

**coalition** 121:13

**co-chair** 111:4

**collaboration** 85:5

**collect** 26:24 123:2

**collected** 124:13

**college** 22:25 24:20
25:16 26:22 30:4
34:10,11 46:13 47:5
61:16

**color** 51:24

**combine** 33:1

**combined** 53:1

**comes** 35:22,25 74:16
75:11 91:24

**comment** 142:6

**COMMISSIONERS** 1:18

**commit** 161:9

**committed** 74:7 126:16

**committee** 6:16
26:18,19 28:17,22,24
33:22 35:5 36:1
42:15,16,20
43:8,11,19,22
44:5,17,20 45:5,16

46:8,10,11,16,17,18,
20 47:8,10 49:7
52:17 53:20 55:23
58:10,19 59:3 62:3
63:11,24 64:16
66:12,13 85:6 104:24
109:21,24 112:16
116:18,21 124:9,23
125:1 153:4

**committees** 52:12
55:13,22,23,25
56:1,19,23

**common** 155:14

**communicate** 29:17,23
30:1

**communication** 26:16

**communications** 49:25
50:3 56:12 58:15,22
87:23

**communities** 52:23
71:17 127:14,19

**community** 49:20 51:25
55:3 64:24 77:1
81:7,11 85:17 86:2
91:22 94:9 102:4
132:9 136:5,8
146:3,5 159:7

**compartment** 72:20,23
74:7 77:10

**compartmentalize** 61:4

**compartmentalized**
72:12

**compartments** 73:2

**compelling** 137:13

**compile** 58:15 61:6

**compiled** 111:19 114:8
117:4 120:6

**complaint** 6:6 12:5
13:3,15 19:18,20
20:3 41:20 42:25
73:14 137:18,20

**complaints** 60:11

**complete** 71:7 128:15

**completed** 139:5

**completely** 17:4

**complied** 147:19

**component** 70:12
73:5,8

**components** 71:10

**comprise** 46:18

**computer**
145:1,4,10,16

**computers** 112:20

**concealed** 37:18

**concept** 156:13

**concern** 68:21

**concerned** 132:10

**concerning** 68:6

**concerns** 18:23 45:19
52:16 55:2 58:9
60:12 61:3 67:17
70:3 73:16,17 84:17
124:8 160:8

**concerts** 146:5

**concluded** 162:18

**conclusion** 40:17

**conduct** 55:16 63:11
71:6 97:3 102:18
108:13 124:17,20

**conducted** 107:12,22
108:21 109:14,19
110:2 118:6 124:12
126:22 127:10 153:1

**conducting** 56:23
150:11

**conducts** 79:2

**conference** 2:2 6:4
9:1 12:6,14,23 14:20
21:17 22:5 23:16
24:8,18,21 26:23
27:19 28:14 31:10
32:1 33:24 34:20
35:2,4 36:2,6 45:4

46:15 47:3 48:18
53:2 83:12,16 84:18
85:6,9 110:16,19,23
111:1,2 118:4 126:23
142:3

**conferences** 160:15,23
161:5

**confidential** 130:25

**confirm** 17:7 18:10,15
109:25 129:23 140:2
142:1,15 143:25

**congregations** 115:16

**connection** 9:7

**conscious** 154:17
156:10

**consider** 64:23 129:2
132:20

**consideration** 164:17

**considered** 45:20 59:7
75:8 84:5

**considering** 108:16

**consisted** 87:1

**consistent** 32:11
85:23 89:16
129:17,18

**consistently** 53:8

**consolidated** 1:20
2:6,15 7:16

**constituent** 80:11

**constituents** 88:11
90:10 128:18

**constitute** 151:23,25

**constitution** 120:20

**constitutionally**
27:7,9 28:5,9 34:1

**constraints** 68:4

**contact** 59:4 161:6

**contacting** 51:18

**contain** 106:13

**contained** 16:12,16

34:13,14 48:13
144:10

**contemplate** 161:21

**contend** 65:21 66:24
67:6,7 131:9
135:7,23 137:22
138:20 146:7 151:22
152:9 153:7,11
156:16 157:19
158:2,20

**content** 47:23,25

**contention** 67:11
109:5

**contentions** 147:10

**contents** 99:25

**context** 16:6

**continue** 161:15

**CONTINUED** 126:4

**continuing** 124:1,3

**control** 9:15

**convention** 30:16
35:25 81:3,6,12,25
82:9,13 84:6 85:11
86:16 95:25 106:24
107:2 112:12,14,15

**conventions** 27:3
83:25 84:2
85:4,19,20 86:5
87:11,22 160:14

**conversations** 29:19
42:6 45:24 153:3

**coordinate** 22:24 27:1
52:12 57:22

**coordinating** 57:25
58:2

**coordinator** 23:10

**coordinators** 114:25

**copied** 111:20

**copy** 13:25 111:21
119:17 122:9 131:18
149:15

**corporate** 32:17,19

**Corporation** 60:22

**Corpus** 1:2 82:12,13
83:12 117:17

**correct** 10:10
11:23,24 17:15 18:12
21:10,13,22 22:10
28:18,23 29:21 35:9
36:4 37:2 42:17
43:5,8,9,11,14,20
44:14,15 54:23 58:23
62:18,24 65:12 69:17
70:4 72:24 77:6
78:13,17 80:5 81:24
83:3 88:1 95:7,12
98:5 99:14,22,23
103:25 104:3,4,12,22
106:6,7 107:23
111:17 113:3,6 115:2
116:24 119:3,4
126:13 130:19
138:11,18 142:5
150:5 164:3

**cost** 131:20
132:1,15,21

**costs** 131:10,12,21,24
132:3,5,12 134:12
152:16

**council** 34:7

**councils** 24:20 26:21
47:4

**counsel** 11:23 41:10
165:14

**count** 74:23

**counted** 104:11 138:13
143:5,6 144:9

**counties** 84:15

**country** 30:8
133:16,23 137:5
155:14

**county** 1:7,17,18 89:8
98:2,21,22 100:3
102:10,11,14
103:11,15 109:2

133:5 139:1
140:12,25 144:11
160:1 164:10 165:2

**couple** 63:21
107:17,23,24 108:23

**course** 42:24 122:1
132:19 158:23

**court** 1:1 4:20 7:15
10:16 162:10,13

**covered** 126:9,10

**covers** 52:22

**Crawford** 159:25

**create** 59:16 77:22
121:7,10,14

**created** 34:19 55:12
76:6,13,20 109:7
121:5

**creates** 55:13 142:11

**Creek** 7:24

**crimes** 124:9,15

**criminal** 47:2,3 52:18
56:7 121:12

**CRR** 3:8 165:21

**Cultural** 23:11

**currently** 8:3,5

**curve** 78:4

**cycles** 90:14

_____

D
_____

**daily** 29:12,15

**Dallas** 1:7 3:11 7:19
24:11,13
25:2,8,12,22,25 26:1
27:17 98:2,21,22
102:11,14 103:11,15

**Darden** 7:22

**data** 70:18 123:3
124:13 137:15

**date** 12:17 22:16
43:3,15 110:2 133:8

**dated** 95:5

**dates** 23:4

**Dating** 53:9

**day** 51:15 52:1,3,4,25
53:5,16,17,19
57:5,15 59:24 106:9
139:17 164:12,18
165:16

**days** 12:16 46:2 68:21
138:15 140:6,8
142:15 143:14 144:13

**day-to-day** 60:13

**DC** 4:17

**deal** 34:6 81:5,6
84:17

**dealing** 75:19 81:6

**deals** 85:16

**December** 113:5

**DECHERT** 4:3

**decide** 74:19 141:6

**decided** 86:16 107:2
143:11,13

**deciding** 64:16

**decision** 42:2 43:1,6
44:13 63:24 64:4,11
65:10 149:12,16,22
151:3,14,15

**decision-making** 65:2

**decisions** 35:13 62:2

**declaratory** 6:6 19:18

**dedicated** 60:4 74:25
78:12 92:21
93:6,10,13,16,22,23

**deep** 79:18

**defendants** 1:11,24
2:9,19 3:5 4:7 6:3
7:12 14:17 94:19
99:7 105:24 113:23
116:11 119:19 122:16

**defer** 137:19

**defined** 158:5

**definitely** 17:5 18:25
30:20 32:16 45:22
49:22 64:2 71:4 75:5
81:4 89:15 90:24
91:20 111:2 125:8
128:2 141:23 142:8
150:6 152:13 153:15
160:10

**degree** 31:16

**DEL** 2:13

**delayed** 82:19

**DELEON** 1:3

**delivered** 128:11

**denied** 39:20 72:8
118:20

**denies** 152:10

**DENTON** 165:2

**deny** 152:22

**department** 1:23
2:8,18 4:16 30:7
40:9 53:21 133:4
139:1,4,8,11
140:12,13 142:10
143:10 144:12

**departures** 65:22

**depend** 54:11

**depending** 74:24

**depict** 106:9

**depicted** 100:21

**deposed** 9:8

**deposition** 2:22 3:3
6:4 7:17 9:15
12:4,12 13:1,5,9,21
14:18 15:1,23 16:7
19:6 94:10 99:1
105:19 113:17 116:7
119:15 122:4 159:11
162:11,18 164:2
165:8

**deputized** 103:5

describe 73:2 99:24
  102:1,17 107:14
  136:6

described 57:21 74:7
  90:19 100:21 107:11
  127:4

describes 101:10

describing 111:16

DESCRIPTION 6:2

designate 28:1

designated 16:10 27:3
  61:15 62:16 142:4

designation 130:25

designs 55:8

determination 100:7

develop 59:14,15,17

developed 59:12 77:19

development 56:16

devote 133:13 134:15

dictate 103:7

difference 142:18
  143:16,18

differences 143:20

different 27:13 31:22
  34:5 57:8,11
  70:10,25 71:19
  81:10,18 86:9 91:23
  146:25 148:25 151:19

digits 137:4,6

diligently 154:2

dinner 50:9

Diplomate 4:22 165:6

direct 58:3 79:5
  120:2

direction 165:12

directions 13:16

directly 57:25 97:20

Director 1:23 2:8,18

disclosure 101:13

discretion 147:1
  150:11 151:1

discretionary 74:15
  93:19 146:9 147:7
  148:11,18,23 149:10
  151:9 155:23

discriminatory
  157:17,21

discriminory 157:16

discuss 16:6 42:10
  46:4 83:22 96:3
  125:13 160:8,15

discussed 12:9
  42:6,13 47:11
  48:10,12 57:6
  86:5,16 93:4

discussing 13:17
  15:22

discussion
  12:13,15,18,21,22
  20:6 28:15 47:15
  82:20 125:17

discussions
  48:2,21,23 49:1,15
  50:18,23

disenfranchise 155:25
  157:13

disenfranchised
  133:23 146:17

disenfranchising
  133:19

disengage 108:15

disparity 137:7

disperse 114:13

dispersed 114:11

disproportionately
  136:9

disqualified 74:22

distance 142:7

distanced 109:3

distances 84:14

distant 127:18

distribute 120:10
  121:9

distributed 120:23

District 1:1 7:15

divert 63:25

diverted 66:2 139:7

divided 139:24

division 1:2 4:15
  30:4 46:14

document 14:6 18:16
  19:12,15,17,24 28:10
  94:16,19,22
  99:4,7,8,10 103:21
  105:23,25 106:13
  110:17 112:25 113:22
  114:1,3 116:10,14,16
  117:4,8,10 118:11
  119:22 120:5,9
  121:2,5,15 122:16,17
  153:23 154:6

documentation 38:20
  90:4 108:20
  111:16,17 133:11
  135:4

documents 13:4,13
  14:9 76:13 78:6
  84:25 88:2 90:12
  120:2 123:13 154:15
  156:23

DOJ 8:13

dollar 61:14,16 64:21

dollars 61:11,19
  92:14

done 11:3 23:12 31:22
  35:14 53:7 55:14,21
  66:15,22 71:18,19
  73:24 90:8
  92:12,15,17,19
  107:17 108:5 118:8
  128:2

doors 39:19

double 137:4

doubt 45:18

DPS 38:4,7,17
77:23,24 84:8,13,15
91:18 107:4
108:16,25 112:9,18
123:4 131:13,14
136:19,21 137:1
153:20 154:14 157:7

draft 95:11 125:21,23

Drive 7:24

driver's 37:20 38:23
90:12 91:2 100:16
101:1,4,5 104:10
133:9 146:15,20
147:22 148:4
149:1,7,14,20
150:15,22

drives 71:6

driving 108:18

due 68:4

duly 3:5 7:4

Duncanville 7:25

during 27:4 30:16
43:1 50:6 51:16,18
53:6,12,15 54:5
55:15 58:4 63:3
67:18 70:17 73:16,17
77:16,21 81:3,5
83:16 84:10 86:4
88:6 89:10 90:18
106:23 107:1 140:22
141:4

duties 26:14 30:10
102:16

---

E

earlier 19:12 28:3
70:1 75:4 80:1,17
93:4 127:15 146:14

early 89:2,5,6
140:19,22,23 143:14
147:25 148:1,8
154:12

earned 39:16

ease 117:24 118:6
136:13

easier 11:3 27:17
141:2

eat 78:22

Economic 56:16

edification 83:8

educate 71:16 76:4
77:1,5 81:10 82:1
83:16 84:10 85:12
86:2 91:22 111:24
134:25

educated 144:21
145:19

educating 79:23 80:19
82:15 85:22 127:13

education 1:15
52:6,8,19 56:10 59:4
63:11 64:25 71:8
72:9,11,14,24
73:5,6,7,8 74:4,8
75:15 77:3,11 79:20
86:10 94:8 126:9
145:14,25

educational 61:2 87:9
94:2

effect 28:4,6

effective 82:23 84:22

effort 53:1 75:13
81:9 91:20 92:14
110:20 121:14

efforts 39:18 92:25
112:24 114:19 126:20
145:21

egregious 64:9 133:22

EIC 6:20 37:20
38:2,6,15 75:21 91:4
107:19 108:8,20
111:15 112:1
118:15,16,25 122:21
123:5 126:12
131:10,22 132:4,22

136:24

EICs 75:24

eight 20:25 21:2
22:14 23:17 53:11

either 26:4 42:11
114:10 115:13 123:9
127:22 130:12 140:21

elaborate 37:7

elected 20:16,18,23
46:12

election 6:18,20
38:16 39:6
73:16,18,19 74:16
89:10 90:14 107:3
119:25 124:9,14
133:4 138:16,25
139:1,3,4,7
140:12,14,20
141:5,21 142:10
143:10,22 144:11
147:2,8 148:12
150:12,19,25
151:14,16,18,19,20
160:1

elections 88:6
90:18,22 98:2,21,23
102:19 143:11,13

electoral 37:13

elementary 141:11

eligible 153:12,16

else 10:5 12:11,20
13:18 44:16 49:11
56:13 58:10,18 79:15
86:1 91:23 94:9
142:24 143:23 153:1
154:8

else's 121:3

e-mail 6:8,10,12
58:17 94:23 96:6,7
98:9 99:11,18,20,25
100:10,11 103:24
105:7
106:2,3,8,12,14
112:5 113:2,9,12

114:13,15 130:5,9
146:13 147:11,24
148:15

**e-mailed** 8:20 120:24

**e-mails** 29:19
58:13,14 87:24

**employed** 8:3,5 20:11

**employee** 89:23

**employees** 31:7

**employment** 20:8

**empowerment** 71:7

**enable** 85:1

**enact** 66:10

**enacted** 58:4 65:21
76:7 108:5 157:16

**enacting** 66:25

**enactment** 57:4 59:9
65:20 66:3 82:18
134:20 158:4

**encompassed** 130:9

**encountered** 78:2
140:23

**encourage** 89:6

**encouraged** 58:8 90:10

**encouraging** 73:11
97:17

**encumbrance** 135:14

**engage** 71:2 88:9

**engaged** 94:5

**Engagement** 95:18,19

**engages** 87:10

**engaging** 73:21

**ensure** 66:15 71:14
87:6 112:23 154:2

**Ensuring** 51:23

**entail** 83:19

**ENTERO** 2:13

**entire** 142:2

**entirety** 69:5

**entitle** 158:18

**entitled** 15:13 76:12

**entity** 158:8

**equality** 51:23

**especially** 133:17
155:15

**ESPINOSA** 2:12

**essential** 136:15

**estate** 9:6 20:8 30:12

**ESTELA** 2:12

**ESTRADA** 2:12

**EULALIO** 2:11

**evasive** 45:11

**EVELYN** 1:5

**evening** 143:13

**event** 64:3 81:13
121:3 132:10

**events** 32:7,9 35:23
36:1 91:22 92:2
100:21 146:4

**everybody** 59:2 112:19
136:8

**everyone** 51:2 99:13
123:17 154:16

**everything** 150:17
161:1

**everywhere** 136:13

**evidence** 148:18

**exact** 12:17 22:16
23:4 43:15 60:2
89:21 107:17,19
147:4

**exactly** 30:20 36:25
37:20 38:12,14 45:17
67:2 69:18 74:18
88:7 101:4 118:13
140:4 148:21 151:2

**examination** 5:6,7,8
7:6 126:4 165:11

**examined** 14:7 16:23
17:1 116:12 119:23

**example** 41:21 47:2
61:12 63:9 84:19
91:24 140:18 150:10

**examples** 41:22 79:3
118:19,21

**exceeds** 60:11

**except** 164:3

**exchange** 94:23 160:22

**exclusively** 60:4 87:4
91:19

**excuse** 126:21,25

**executed** 164:16

**execution** 31:4 112:23

**executive** 6:16 16:3
26:18 28:17,21,24
33:22 35:5 36:1
42:15,16,20
43:8,10,19,22
44:5,17,19 45:5,16
46:8,9,11,18,20
47:10 49:6 58:9 62:3
63:24 64:15 104:23
116:18,21
124:8,23,25 153:4

**exercise** 144:3

**exercised** 149:21

**exercising** 135:14

**exhibit**
6:1,3,5,7,9,11,13,15
,17,19 13:21,24 14:7
16:23 17:2 19:6,9
94:10,13 99:1,4
105:19,22 113:17,20
116:7,10,12
119:15,18,23 122:4,7
146:19 147:15,17,23

**exist** 70:7

**existed** 55:10

**exists** 125:22

**expand** 109:2

expect 161:14

expectations 153:25

expend 60:23 89:18
153:19 154:3

expended 60:14 86:1
91:11,17 108:13

expenditure 91:21

expenditures 31:5,6

expense 132:20,23
142:19,20

explain 155:3

express 58:8

expressed 124:8 159:4
164:17

expression 155:7

extensive 77:7,12

extent 28:20 29:16
51:20 58:21 92:12
110:1

extreme 153:10

Ezra 130:5

—————————————
F

face 69:8,9,21

faces 70:1

fact 32:12 35:16
75:22 140:5,9
144:14,25 146:13

factors 136:4,7 145:3

factual 20:2

factually 23:9

fairly 53:7

fall 75:1 121:24
146:8

falling 130:2

familiar 16:5 90:7
96:11 120:1 138:8

family 68:19 76:10

fast-pacing 66:11

favor 15:8 129:7

fax 4:25 165:24

faxes 114:15 145:7

Federal 3:11 7:15

fee 26:11,12

feed 102:21

feel 20:1 35:16 39:16
68:5,8 84:21 133:13

feeling 9:17

felons 76:7

felt 46:7 92:25

field 30:3,5,6 127:9

Fifth 117:17

filed 12:6 19:20
42:25 48:17 77:15

filing 42:23 43:25
48:22

fill 25:25 72:2 74:11
103:4,6,8 132:16,17

filled 123:6,8 133:3

filled-out 123:10

filling 72:6

filters 160:18

final 35:19,20 125:24

finance 30:4,24 56:11

financial 31:2 75:13
78:16 109:7 137:3,8
154:4

fine 22:2 48:3 51:5
122:10 123:22 150:18

finish 10:25 11:6
15:4 17:11

Firm 4:23 165:22

first 7:4 9:16 18:15
24:1 30:15 34:24
77:4 81:16 100:24
104:16,20 114:23
116:18 117:22 131:14
135:19,20

fliers 76:18 121:19

Floor 4:4

FLOYD 1:3

flyer 6:18

focus 126:21 127:1,3

folks 104:9 118:19

follow-up 159:8

force 153:16

forces 153:12 156:17

foregoing 164:1,16
165:8,12

Foreign 115:21

foreseeable 161:16

form 37:12 44:2 45:23
127:24 128:25 133:19
135:25 136:24 137:24

forms 37:14,24
38:21,22 84:4 123:7
128:20 137:9 138:14
140:11 152:19

formulated 66:13

forth 51:19 165:9

forum 87:13

forward 64:22 91:5

forwarded 14:9 34:15
58:20

fostering 158:24

fought 133:17

Francisco 136:12

fraud 124:9,15 158:24

free 114:24 117:25
118:6 132:2

front 16:19

fulfill 92:8 134:19
161:15

fulfilling 30:10

full 7:21

full-spectrum 52:22

**full-time** 30:19
51:16,17

**fully** 17:9

**function** 32:2

**functioning** 31:9

**functions** 89:2

**fund** 1:15 78:22 93:7

**funding** 32:14

**fundraising** 31:4
32:13

**funds** 61:19,20
62:8,15,20
63:2,10,25 64:17
75:2,3,6,7,9,12
78:16,19
93:3,6,9,10,11,13,17
,22 109:2 161:10

**future** 161:16

---
G
---

**GANDY** 1:6

**GARCIA** 2:12

**Gary** 12:13 27:18 29:8
54:15 103:24

**gather** 52:5 90:4

**gathering** 87:13

**general** 4:9 7:11
79:24

**generally** 30:9 33:9
65:15 83:25 141:15

**generated** 26:17

**geographical** 27:16
102:3

**germane** 58:18

**getting** 48:2 68:23,25
69:9,16,24 70:2 72:1
83:11 88:18 91:5,16
102:22 112:1 117:25
118:6,15 127:16
128:7,9,16
131:10,13,22,24
132:4,5,13,21

134:12,23 141:10
142:19

**Gillian** 94:24 95:9

**given** 57:7 74:22 79:3
142:15 145:12 161:23
164:18

**giving** 72:3

**gladly** 11:13

**goals** 36:11,14

**God** 88:16 154:23

**gone** 79:8 137:6
156:22

**GORDON** 1:5

**Gosh** 20:25

**gotcha** 134:8

**gotten** 123:12 156:22

**governing** 28:10 35:8

**Governor** 1:10

**Grand** 25:18 26:5

**great** 8:17 37:6 81:5

**greater** 142:12

**ground** 9:13 32:3

**group** 50:24 76:20
99:21 106:3,12
152:12,24

**groups** 57:22,25 58:1
122:3 158:4

**grow** 32:2

**guarantee** 67:5

**guaranteed** 135:15

**guess** 40:4 60:18 69:4
81:4 88:17 93:8
141:10

**guidance** 55:7

**guidelines** 121:25

**guys** 123:20

---
H
---

**hall** 115:19 116:1

**halls** 115:23

**HAMILTON** 1:3

**hand** 76:9 77:20 103:4
120:17 164:18

**handed** 57:6 76:23
103:22 120:21,24

**handgun** 37:18

**handing** 13:23 19:8
94:12 99:3 105:21
113:19 116:9 119:17
122:6

**handle** 60:9 161:7

**handled** 66:12

**handling** 58:20

**handouts** 76:17 121:19

**happen** 68:4

**happened** 45:4
101:11,12 127:6
143:23 148:22,24,25
149:4,5 150:4,16,24

**happens** 157:13

**hard** 133:17

**harder** 71:11

**hardest** 63:19

**hard-fought** 39:16

**hardship** 109:7 142:12

**harm** 158:3,5

**harmed** 150:8

**haven't** 85:24 127:3

**having** 7:4 37:10
53:24 69:1 89:9
95:23 98:3,15,19
129:7,19 131:15

**head** 10:21,22 83:7
93:12

**heading** 114:17

**health** 53:20,21 65:1
114:24 115:5

**heard** 53:24 58:1 68:6
69:5,10 142:25

155:7,8 156:13 159:5

**held** 12:25 22:12,13
23:15 34:4,22
48:16,23 70:23 81:15
82:1,4,9,14 83:12,15
85:9,11 86:4,7,15
87:19 96:17 116:21
140:18 141:11,15

**help** 19:23 89:14
103:1 114:19 115:1

**helping** 90:4 134:16

**hereby** 164:2 165:7

**herein** 165:9

**hereto** 3:13

**HERMAN** 1:5

**he's** 79:8,9,13 96:21
104:16,23

**hesitant** 46:24

**hesitating** 45:3

**Hey** 8:12

**Hi** 8:14

**HIDALGO** 1:18

**hierarchy** 34:21

**high** 34:8

**highly** 105:9 130:24

**hire** 79:15

**Hispanic** 1:17 49:19

**historical** 61:12

**history** 80:9 133:22
143:20

**Hmmm** 119:24

**hold** 14:14 24:20
53:5,13 68:17 81:2
84:22 87:12,18

**honest** 14:9 33:13
44:11 61:9 97:25
133:1

**honestly** 63:17 87:1

**hopefully** 95:10

**hotline** 73:14

**hour** 13:10,11 125:12

**hours** 30:16,17 77:24
108:16 131:14 136:22
139:10 153:20,22
154:10

**HOUSE** 2:3

**Housing** 56:14

**Howard** 54:18,19

**human** 147:1

---
I
---

**I'd** 92:10 155:7

**ID** 37:12,15,25
38:11,21,22 54:12
56:24 71:13 72:7
74:13 78:7 79:19
84:4 86:5 95:11
96:8,21 98:3,16,19
100:4 104:9
115:17,25 116:3
117:16,25 118:6
127:24 128:20,25
129:6 135:5,25
137:24 138:14 140:11
146:1,9 148:3 149:6
150:1 157:6
158:11,15
159:14,21,23 160:5,9
161:11

**idea** 42:22 49:18 88:4
96:19 98:13 104:8
105:1,2 113:10,16
115:7,10,13,18
118:23 142:22

**identically** 72:7

**identification** 6:20
13:22 19:7
38:4,7,16,19 40:2,6
85:2 91:5 94:11 99:2
105:20 107:4 113:18
116:8 119:16 122:5
128:16 136:25 137:11
144:6 148:13
152:3,7,17,20

**identifications** 74:20

**identified** 98:3,15,19
122:7 129:20

**identify** 52:6 127:22
129:16 130:16

**identities** 46:19

**identity** 17:18 115:17
129:12 130:13,23

**IDs** 115:1,12

**I'll** 21:15 22:1 33:13
37:4 50:4 56:3 82:22
107:21 122:10 147:17

**illegal** 88:14

**illness** 9:22

**illustrated** 100:1

**I'm** 7:10,12 9:11,13
10:14 12:16 13:23
14:8,12 16:24 17:3
18:8 19:8 20:13,16
21:1 22:4 23:3,7
24:24 33:13 37:22
38:6,8 41:24 42:8,24
43:3 44:10 45:3,8,10
46:23,24,25 47:18,25
48:2 49:1,5,8,10
51:5,8 52:14 53:18
54:3 56:2,18 59:14
64:13,20 65:7,8 66:8
67:21 69:3,4,23
70:9,16 72:18 78:18
80:6 82:16,20
83:4,10,14 85:14
87:2,21
88:7,13,15,17 89:21
90:6,7,9,20 91:17
94:1,12 95:3,15 96:5
97:21 99:3
101:13,18,20,22,24
102:20 103:5 104:19
105:10,13,21
107:16,20 108:11,22
109:20,23 111:4
112:6,11,17 113:19
116:9 119:14,24
120:1 122:6 123:22

128:21 133:24 134:11
140:4,8 141:10
147:14,20 150:17
151:7,11 152:5 153:2
156:1 157:6 160:24
161:5

**IMANI** 1:15

**immediately** 125:23

**impact** 39:23,25 40:1
46:5 52:8 70:18
80:25 81:7 83:23
85:16 87:5 89:15
127:7 157:23

**impacted** 93:21
129:5,8 143:22

**impacting** 51:25 52:10
55:2 137:1

**impediments** 152:14

**impersonation**
124:10,15

**implement** 55:9 81:10

**implementation** 90:15
130:14,17

**importance** 87:5

**important** 31:24 93:1
102:5 143:2

**impose** 140:6

**imposed** 148:11

**imposes** 138:21

**impossible** 153:8,9

**INC** 2:13

**inception** 73:22 79:25
88:25

**incident** 101:3

**include** 26:18 69:14
90:3 106:16

**included** 93:3 99:18
100:11 112:5 145:23

**includes** 10:9 33:5
71:8 78:12

**including** 31:1 42:7

**income** 68:14 114:24

**incorrect** 82:16

**increased** 33:11 91:20

**incurred** 142:19,20

**indeed** 87:19

**INDEX** 5:1 6:1

**Indiana** 159:24

**indicate** 17:16 158:8

**indicated** 100:25
146:19 148:3

**indicates** 100:24

**individual** 41:9 54:2
117:7

**individuals** 34:8
44:22 45:6 47:7
57:17 109:10,14
120:12 136:10 155:16

**industry** 20:9

**information** 13:16
26:20 32:23
34:3,13,22 55:8
57:19 58:19 59:5
72:3 73:12 75:20
77:22 80:24 84:13
92:2,5 102:4,22
103:7
111:11,14,19,25
112:4,18,21 118:7
130:16,24 139:2
145:6 149:17
160:9,18 161:4

**informational** 91:22
120:11

**informed** 153:24

**inherent** 69:8

**initiate** 42:3

**initiated** 78:8

**initiation** 42:21
43:6,18 49:17
50:19,25

**initiative** 71:7

**initiatives** 52:21

**injunctive** 6:6 19:19

**injured** 129:13
130:14,17

**injury** 129:21

**input** 45:19,23 47:6
62:7 100:8,10

**inroads** 127:18

**insight** 13:17

**instance** 3:4 43:13
46:21,22 151:10

**instances** 142:9 150:9

**instead** 138:24

**instruct** 47:20

**instructing** 74:11

**instructs** 11:19

**instrument** 164:16

**insurmountable** 128:10

**Integrity** 4:22 165:22

**intend** 22:5

**intended** 158:3

**intent** 14:24 60:5,7
157:12,16,17,21,25

**Intention** 6:4 14:18

**interact** 29:8,11

**interacted** 95:23

**interacts** 95:22

**interest** 40:13 63:12

**interested** 68:3
165:15

**interject** 129:10

**interjecting** 131:2

**intermediary** 34:21
35:15

**internet** 112:20 145:4

**interruption** 8:11

52:13

**intervention** 82:21

**introduction** 8:23

**invited** 45:6

**involve** 32:21 55:5
  76:16 107:20

**involved** 30:22,23
  32:5,18 47:16 48:9
  49:1,3,9,11 64:12
  70:10 77:14,17 86:22
  94:8 96:1,15 112:1
  114:17 133:7 157:3

**involvement** 20:14
  51:10 53:9 59:8

**involves** 26:10 73:8
  148:23

**involving** 82:25

**irregularities** 80:24

**irrespective** 154:21

**isn't** 143:15

**issue** 59:4
  63:9,15,23,25
  65:5,12 84:25 100:11
  142:13 146:14,24

**issues** 58:9 65:1,4,17
  73:9 78:11 86:11

**it's** 22:16 27:2 32:8
  33:11 34:18 36:22
  37:1 40:24 41:25
  45:10,11 53:1 55:14
  60:24 64:25 73:7
  74:3,10 75:12 78:8
  85:5 88:16 89:25
  90:12,13 92:13 95:17
  103:12 109:7
  111:15,21 117:6,7
  118:13 120:11,14,15
  122:20 125:11 129:18
  130:20 132:1
  134:1,18 135:6,12
  137:1,6 140:1 141:7
  143:24 144:25
  146:3,23 147:7,15
  148:11 160:13

**I've** 23:12,15
  25:10,13 49:21 56:4
  57:25 58:1 64:6 93:9
  123:12 142:24 143:20
  156:12,15 157:4
  158:25 159:8

---
**J**
---

**JANE** 1:3

**January** 6:16 8:2
  82:24 106:5 112:15

**Jefferson** 54:16,18,19
  59:20,21

**job** 30:11,19 54:24
  157:8

**JOHN** 1:5,10,21 2:6,16

**join** 39:22 41:10 42:3
  43:2 44:13 45:21
  89:13

**joined** 26:5

**joining** 10:16 40:19
  41:4 42:10,13 47:10
  48:7

**JR** 2:11

**judge** 147:8 148:12
  150:19 151:14,16,18

**judges** 1:17 151:19,20

**June** 2:24 3:6 7:18
  162:19 163:2 165:16

**justice** 4:16 40:9
  47:2,4 51:23 52:18
  56:7 121:12

---
**K**
---

**Karen** 3:7 4:21
  165:5,21

**KEN** 1:6

**Killeen** 119:14

**kinds** 47:6 87:8 88:2
  89:17,18,24 93:2
  94:4 155:1

**Knatsen** 105:7

**knew** 156:2

**knowledge** 17:6 18:25
  41:12 50:21 51:1
  57:1,24 58:3 67:15
  70:24 96:20,25 97:12
  98:15 105:4,8 120:6
  124:7,16,19
  128:22,23 135:19,22
  159:3

**known** 143:21 164:14

**KOBY** 1:4

---
**L**
---

**LA** 2:13

**lack** 78:21

**lacked** 153:23

**ladder** 34:16

**Lane** 4:23 165:23

**lanes** 61:17

**language** 152:12,24

**LARA** 2:12,13

**large** 60:9 115:15

**last** 29:5,7 30:21
  39:5,6 50:12 53:11
  81:5,21 86:25 105:5
  106:13 112:25
  116:18,20 123:16
  133:8 144:4

**later** 8:18 74:24
  104:11

**LATIN** 1:6

**law** 3:9 71:12,17
  72:18 76:25 77:13
  135:19,20 149:11
  151:1,9,13 155:4
  159:23 160:3

**laws** 76:5 77:6 79:24
  80:20 85:22 86:5
  146:10 148:19,23
  154:21,24 155:2
  159:21 160:5

**lawsuit** 36:18,21

39:22 40:8,13,20
41:5,11
42:3,10,13,21
43:2,6,18 44:13
45:21 47:11
48:7,22,24 49:17
50:20,25 78:13

**Lead** 1:9

**leadership** 47:6

**leading** 48:21 49:16
50:19,24

**League** 1:6,14 50:18
57:23

**leaning** 92:16

**learning** 78:4

**least** 53:11

**led** 65:14,16,20

**legal** 4:22 40:17
41:13,17 165:22

**legibly** 75:17

**legislation** 46:5
54:11,12,14 55:19
56:25 69:3 85:14
87:4 126:10
159:15,18
160:9,20,25 161:11

**legislative** 2:3
27:12,15 46:2
49:10,16 50:1,7,10
51:17,18 53:6,13
54:5,9 55:6,15
60:11,15 65:19,23
67:18 69:25 76:25
77:2,16 79:10 85:15
93:24 159:15
160:16,17

**legislative-related**
59:25

**legislators** 54:2
57:8,11,18 66:5
83:21 157:25

**legislature** 51:11
53:23 58:4 60:5

66:2,25
67:8,14,18,22
69:11,24 70:15 80:23
157:20 158:3

**leisure** 68:20

**LENARD** 2:11

**lend** 136:5

**lengthy** 78:2,3

**less** 79:4 90:22 91:11
135:24 137:23
139:10,16,19,20
141:19 142:14 144:20

**Let's** 30:14 56:12
62:12

**Letter** 32:22

**letters** 45:24

**level** 16:3 32:1,6
34:20 35:14 44:1
46:8 47:3 49:7 55:14
62:8 87:20 107:13
145:1

**liaison** 27:15 49:10

**libraries** 141:13

**library** 132:8

**license** 37:19,20
38:23 90:12 91:2
100:16 101:1,4,6
104:11 133:9
146:16,20 147:22
148:4 149:2,7,14,20
150:15,22

**life** 26:5,6,7,8

**likely** 135:24 137:23
144:20 146:8

**limit** 140:7

**limited** 153:13

**Linda** 2:23 3:3 5:5
7:3,17,22 16:2 42:5
51:6 163:2
164:1,7,13 165:8

**Lindsey** 130:6

**line** 96:24 119:2

**lingering** 112:8

**LIONEL** 2:11

**list** 15:18 18:13
99:13,18 100:12
113:13 147:24

**listed** 38:22 106:3

**listened** 68:9

**literacy** 145:1

**litigating** 47:16 48:9

**litigation** 77:15
78:13 82:25 83:2
88:3 94:7,20 99:8
105:24 113:24 116:11
119:20 122:17 126:20
127:5,6

**little** 51:13 100:20
101:15 133:24

**live** 27:17
70:14,17,23 102:21
109:6

**lived** 25:13,14,15
136:11

**lives** 27:16 29:20
141:9

**LLP** 3:10 4:3

**Lobby** 51:15
52:1,3,4,25
53:5,16,17,19
57:5,14 59:24

**lobbying** 77:17

**local** 33:17,20 34:20
35:8 36:7 40:25 41:6
87:15,20 114:18
115:15 119:8,11
141:13

**locate** 147:14

**located** 109:6 136:22

**locating** 115:24

**location** 101:14 141:7
142:13,20 149:1

154:4

**locations** 25:13 73:13
  81:19 84:14 112:9,18
  148:25 154:10

**Locke** 3:10 7:19

**long** 12:18 22:12 23:1
  25:7 55:10 68:12
  73:20 79:22 88:23
  102:13,18 120:14
  133:21

**longer** 76:11 79:13

**LONGORIA** 1:18

**Lord** 3:10 7:19

**Los** 4:4 25:21

**losing** 68:14

**lost** 79:16

**lot** 14:9 27:11 56:4
  60:1,10 71:11 72:9
  120:2 141:2 142:18
  143:15 145:9 146:23
  155:10 157:3

**lots** 56:18 80:6

**low** 114:24

**lower** 136:9

**Lufkin** 6:16 29:7
  116:19

**LULAC** 1:7

**lunacy** 133:20

**lunch** 125:12,18

**Lydia** 2:12,23 3:3 5:5
  7:3,18,20,22,23 8:1
  9:3,16 11:22 12:3
  13:23 14:5,16 15:8
  16:9 19:8 20:7 28:16
  36:17 39:3,8,14,21
  40:7,19 42:2 51:9
  62:14 94:12,15
  99:3,6 104:16,18
  105:21 113:25 116:13
  119:21 122:15 124:6
  126:6 131:6 133:12
  134:2 135:18 157:10

161:14 163:2
164:1,7,13 165:8

————————————

M

**ma'am** 162:12

**machine** 3:9 150:14,22

**mail** 114:14

**mailers** 87:24

**main** 53:3 126:21
  127:1,2

**maintain** 130:15

**majority** 44:7 66:9
  82:7 86:24

**MALC** 50:4 57:22

**man** 155:20

**manage** 27:6,7 28:5

**management** 27:12

**mandate** 152:10

**mandated** 152:8

**man-hours** 108:14

**manner** 63:3 90:18

**manpower** 92:14

**MARC** 1:3

**MARGARITO** 2:12

**MARIA** 1:18

**Marion** 160:1

**marked** 13:22,24
  19:7,9 65:22
  94:11,13 99:2,4
  105:20,22 113:18,20
  116:8,10 117:7
  119:16,18 122:5

**marketing** 8:7 9:5

**MARTINEZ** 2:12,13

**mass** 87:23 136:15

**masses** 146:6

**mastered** 145:10

**match** 74:18 101:4,6,8
  149:6,8 150:1 152:20

**matches** 72:6 74:14

**material** 74:9 75:14
  91:21 112:23 160:22

**materials** 90:11 121:9

**matter** 7:13 16:5 48:1

**matters** 15:13,21
  16:12,16 17:7,12,16
  30:24 31:2 86:20

**MAXIMINA** 2:13

**may** 8:9 11:4 13:17
  16:4 22:3 30:23 31:8
  46:16 53:20 68:17
  72:8 74:23 86:23
  90:6 97:6 99:15
  112:9,10
  130:14,17,21 149:3
  161:20 162:13,15

**maybe** 12:19 13:10,11
  53:10 59:18 60:21
  67:24 92:11 107:17
  109:17 129:9 133:24
  136:14

**McCRAW** 1:22 2:7,17

**mean** 21:16 35:1 36:24
  37:8,18 53:23 61:10
  66:18 69:22 84:16
  88:8,13,20 91:4
  102:24 104:23 118:1
  120:11,13 148:9
  149:14 150:18
  155:14,23 156:14,20
  161:1

**meant** 82:1

**measure** 100:5

**measures** 51:25 55:7
  66:19,20

**medications** 10:1

**meet** 12:11 28:25
  29:2,5 54:2

**meeting** 29:7 42:9
  44:12,17,23,24 45:2
  47:9 48:7,14 49:4
  50:6,8 86:14

116:17,18,21

**meetings** 12:25 26:25
27:2,4 28:21 35:24
42:12 48:23,25 49:15
50:18,23
53:13,15,18,20,25
70:22 116:24 125:2,5

**MELLOR-CRUMLEY** 1:5

**member** 24:2,5,11,13
25:2,8,10,16,18,20
26:6 41:14 87:3
129:12,16,20
130:13,16

**members** 17:18 26:17
31:18,20,21 32:6
33:1,4 40:23,25
41:6,9,17 44:5 46:20
55:17 56:24 58:7,22
76:4,10 77:3,5,11
79:23 80:2,3,12,19
82:1,15 83:17
84:3,11 85:12,22
88:10 120:10 124:13
127:23 128:18,24
153:4,5 156:5 159:4

**member's** 130:22

**membership** 24:3,18,22
26:1,2,3,4,7,8,9
30:3 31:23 32:8
33:8,15,17
34:3,14,18,19 35:21
44:25 45:12,13,20,25
46:25 63:13,14
87:17,23 89:6 91:25
92:1 145:22
152:11,24

**memberships**
24:7,9,21,22 26:5
33:22 34:15

**memory** 106:10

**MENDEZ** 2:11

**mention** 13:19 18:18
80:1 126:17

**mentioned** 20:8 32:13
35:23,24 51:10 52:1

55:25 61:21 62:20
65:5,10 69:25 77:10
78:17,18 79:19
110:16,19 116:23
120:21 126:18

**mentions** 96:7,24
119:2

**merged** 73:3,4

**Mersal** 8:6

**message** 69:10 127:16

**messages** 97:11

**Mexican** 2:2 49:15,25

**MICHAEL** 1:4

**MICHELLE** 1:15

**middle** 34:9 104:7
114:16

**midwives** 128:11

**military** 38:11

**Miller** 4:14 5:8
8:12,13,17,21
123:20,25 124:4
130:7,10 162:5

**mind** 15:3 17:10 41:25
42:1 61:1 91:24
112:9

**minimal** 133:7 134:12

**minimizing** 158:5

**minorities** 39:24
133:23 157:14,24

**minority** 55:3 115:16
135:24 137:23 144:20
146:8 152:12,24
158:3 159:6

**minutes** 6:16 12:19
26:24 44:11,12
48:13,16 116:17,24
117:1

**Miss** 7:23 8:1 9:3,16
11:22 14:5,16 15:8
16:9 19:8 28:16
36:17 39:3,8,14,21
40:7,19 42:2 51:9

62:14

**missed** 18:8,12

**mission** 36:10,14
51:19,21 92:8,11
134:18,20 145:24
161:16

**missions** 36:10

**Misstates** 41:1

**misstating** 78:18

**mistaken** 66:8

**mobilization** 71:9
73:10 81:9

**mobilized** 69:16

**mobilizing** 102:5

**moment** 131:3

**moment's** 125:4

**Monday** 110:20 148:1

**monetary** 132:12

**money** 86:1

**monitor** 159:21

**monitoring** 51:24 55:6
161:10

**MONTEZ** 1:4

**months** 30:15

**morning** 7:8,9 10:5
143:14

**move** 25:24 64:22 91:4
141:6

**moved** 25:24

**movement** 57:17

**Moving** 70:25

**Multitude** 26:16

**myself** 53:2 68:14
114:11 122:14 123:9

---

N

**NAA** 79:1

**NAAC** 159:13

NAACP 2:2 6:4 9:1
14:21 15:23 16:3,11
19:21 20:12,15,17
21:12,15,16,17
22:4,6,10,18 23:5,24
24:2,4,6,8,12,16
25:4,5,6,9,10,23
26:6,14 28:17
29:9,24 30:11,24
31:7,17,19 32:15
33:2 36:10,11,15
39:21 40:11,20
41:5,9,14,17 43:7,24
44:25 45:13 46:22
48:22 49:14 50:17,22
53:5,12 54:8,22
55:16,20 56:20,24
57:3,21 58:7,10,22
59:8,12,23 61:5,6
62:7,21 65:21 66:24
67:6,7,16 68:5 69:8
70:1,14 71:2,25
72:21 73:20,23
76:2,3 78:17
79:2,15,22
80:3,4,10,20 82:15
84:21 87:9 88:5,9,23
89:18,23 90:3,17
92:7,11 94:5 95:22
96:18 97:3,7,12
100:6 102:9 104:3,21
114:9 119:11
120:6,7,10 121:6,8
124:7,12,25 126:7,16
127:10,21 128:17,24
130:12 131:7,9,23
133:12 134:15
135:7,9,23 137:22
138:20 141:24 142:22
144:19 146:7 151:22
152:9 153:1,4,5,7,11
156:6,16 157:19
158:2,8,11,14,20
159:3,20
160:7,12,17,22,23
161:9,14

NAACP's 51:10 91:6
141:18 159:14

Nashville 25:15,16

national 22:6 24:10
25:4,6,8 29:24 33:25
34:16,17,23
35:14,18,19
36:10,11,15 43:23
55:11,12,14 62:7
64:2,10 73:15 86:23
97:5,10 114:6,9
121:25 160:14
161:2,3

nature 46:5 64:9 69:8
72:15

necessarily 25:12
69:2 80:11 86:9
140:8

necessary 84:22 90:4
133:13 156:22

necessitate 131:15

necessities 127:19

necessity 136:11
146:1 150:18

negatively 129:8

neighborhood 139:9

neighborhoods 136:22
139:24

neither 165:14

NGR 1:9,20 2:5,14

night 110:20

nobody 129:5 155:22

nod 10:21

nodded 83:7 93:12

nonmonetary
132:3,5,10

nonpartisan 120:15

nor 70:21 165:14

normal 65:23 66:2

normally 27:25 29:17
41:19 72:9 81:15
140:14

NOTARY 164:22

note 124:24 125:20

noted 164:3

notice 6:3 14:18,23
16:12,16 72:10 125:4

noticed 15:22 49:18

NW 4:16

NWB 4:17

---

O

oath 164:14 165:9

object 11:16 47:18

objecting 47:22,25

Objection 40:14,16
41:1 70:8 98:11

objectionable 120:14

objections 165:11

obstacle 135:12,14

obtain 34:17 41:10
108:8 123:4 137:24

obtained 43:24
113:11,13 115:12
123:3 126:12

obtaining 84:4 154:5

obviously 35:18 55:6
68:22 74:10 77:14
102:5 108:14,18
109:12 120:11 128:13
133:2 134:1 149:18

occasion 121:11

occasionally 121:11

occasions 121:20
126:19

occur 81:18 87:10
125:1,4 139:3

occurred 90:15 150:21

occurs 63:4

October 81:16,23 95:5
99:21 106:23 107:2
112:15

**odds** 129:6

**offer** 41:17 54:8

**office** 4:9 29:24
33:25 34:16,17,23
35:19 43:23 48:18
55:12 73:15 77:23
84:16 108:16,25
112:18 114:7,9 123:4
131:13,15 132:8
136:19 153:20
157:7,8 161:2,3
164:18

**officer** 20:16,18
76:12

**officers** 26:19 46:12

**offices** 3:9 7:19
77:24 84:14 91:18
107:4 109:5 112:10
136:21

**official** 1:21,22
2:6,8,16,17 20:19
26:14 50:2 74:16
142:25 150:25

**officials** 147:2

**oftentimes** 60:24

**Oh** 18:8 88:20 95:17
121:7 122:12 124:2
138:10 159:12

**okay** 8:3,9,17
9:8,11,14,21
10:11,14,19
11:10,15,22 12:3,15
13:7,18
14:4,15,19,22,25
15:2,5,12,16,21 16:8
17:1,22 19:1,5,13,23
20:5 21:11,23,25
22:9,12 24:1 25:7
26:13 28:8,12 35:11
36:5,13 37:5,7 38:13
41:8 42:19 45:9,12
47:9,24 48:4,19
50:22 51:6 52:15
56:6 57:5 59:6 62:20
63:2 65:14,19 69:19

70:6,13 71:1 73:8
74:1 75:12 76:15
79:19 80:14 81:15,25
83:10 85:18 86:18
88:5,17 91:10
93:8,20,24 94:7,18
95:8 96:20 97:24
98:24 99:5,17,20,24
100:14 101:7,25
102:13,20 103:13,18
104:5 105:1,11,14
106:2,8,12 107:1,11
109:25 110:12 114:23
115:11 116:5,23
117:6,13,15
118:9,14,17,24 119:2
120:5,25 121:8,21
122:12,22
123:13,15,22,24
124:4,5,20 125:7
129:22 130:4,7,10
131:1 134:5,6,10
135:3 137:22 138:11
140:16 147:2,16
149:16 150:8,24
151:6,7,12 156:4
159:2,8,9,12,19
161:18

**older** 145:9,11

**Olympics** 23:11

**ones** 16:22 93:17
111:9 145:11

**one-time** 26:11,12

**ongoing** 78:12 127:14

**onset** 27:13

**onto** 15:19

**open** 39:18 77:24
141:16,25 154:10,12

**operate** 40:5 73:14
145:5,9

**operates** 16:3

**operating** 40:3
61:19,20 75:2,9,12
93:3,7,9,11,17
108:17 161:9

**operation** 30:7 131:14
136:23

**operational** 60:20
62:15 84:9

**operations** 86:23

**opinion** 66:22

**opportunity** 67:17,25
68:10

**opposed** 30:11 120:19
142:16

**opposing** 67:25

**Oral** 2:22 3:3 6:4
14:18

**orchestrating** 53:4

**order** 34:17 37:12
66:10 71:20
111:23,24 128:15
131:16,18 133:3
135:1 136:24 142:1
149:17 155:16

**organization** 31:12,14
32:2 34:18 36:3
40:21,22 50:24 72:20
95:17,21 129:3

**organizations**
121:18,22

**organizing** 35:23,25
52:25

**origin** 35:21

**original** 60:5,7

**ORTIZ** 1:4 2:11

**OSCAR** 1:4

**others** 17:13 37:21,23
41:24 55:3 56:18
128:13 147:3

**otherwise** 72:7 132:12

**outcome** 69:3 107:19
110:5,7 143:22
165:15

**outraged** 133:24

**outreach** 78:25

outset 16:18

outside 45:15 53:17
  57:14 66:22 67:12
  87:10 93:24,25
  94:1,2,3 125:5

Overall 13:7 23:22

overlooking 23:8

oversee 30:7

OZIAS 1:5

_____
P
_____

p.m 3:7 110:21 162:19

page 5:2 6:2
  15:9,12,19 95:8 98:1
  100:14,24 105:5
  106:20,22 112:25
  114:16 117:7,8,13,15
  147:16,21,23

PAGE-LINE 163:3

pages 15:17

paid 12:24 21:6 27:7

paper 76:8,11 135:6

paragraph 17:21
  100:15,18,22 104:5,7
  106:23 111:12
  147:17,21

paragraphs 15:18,19

parcel 158:1

parole 76:12

Parrillo 94:24
  95:9,24 96:4 98:9

participate 31:11,13

participated 44:4

participating 69:24

participation 59:8

particular 14:13
  41:20 81:6 92:14
  108:24 129:11,12,20
  130:13,16,22 150:19
  161:7

part-time 8:7

party 12:20 40:8
  48:24 120:15 165:14

pass 161:4 162:3

passage 52:7 66:4,15
  67:5

passed 36:24 46:6
  82:17

passport 37:17,22
  38:24

past 31:21 76:2 92:19

paste 111:22

pasted 111:20

pay 60:3

paying 103:15

PEGGY 1:5

pending 46:3,6 52:7
  69:3 85:14,16

Pennsylvania 4:16

PENNY 1:4

people 30:3 39:18
  45:15 46:4 51:24
  61:1 67:24
  68:3,15,23 69:16
  70:2 71:14,20 73:11
  74:11 75:16,20
  76:10,24 77:20 78:5
  80:4,6 83:24 87:7
  88:18 89:14 91:16
  97:11,16,17 100:8
  102:6,23 103:1,4,7
  108:14 109:18 112:16
  113:13 115:24
  127:17,20 128:10
  129:3 134:16 135:14
  140:23 141:3 143:9
  144:25 145:7,10
  146:2,24 150:11
  154:3,25 155:25
  156:17,21,24 157:4,7

perceived 127:7

percent 79:9,10,12

142:9

percentage 64:17

perfectly 14:8 48:3

perform 89:1

performance 28:2

perhaps 49:9 54:15
  57:17 64:13 68:1,21
  83:21 110:15 128:11
  129:7 156:12,22

period 42:25 78:3

permissible 67:1,2,3

PERRY 1:10

person 12:24 27:8
  28:5 49:9 74:19 79:7
  110:15 141:8 144:5
  146:18 158:21,22
  164:15

personal 37:25 57:1
  92:16 128:22,23

personally 90:7
  156:25 159:5 164:12

persons 115:17 116:2

person's 148:12

phases 89:4

phone 10:17 12:23
  29:19 32:23 45:24
  52:13 96:25 97:4,8

phonetic 105:7

photo 37:14 115:25
  116:2 158:15

photograph 37:25

Phyllis 100:24
  146:14,17,18,19
  147:12 148:3,22
  150:4 151:17

Phyllis's 148:16

picture 158:17

pictured 37:12 72:7
  74:13

piece 31:24 40:2,6

76:8 102:5 135:6
145:25

**pieces** 75:25

**places** 88:19 137:10
139:23 140:14,15
141:15 142:1

**PLAINTIFF** 4:13

**Plaintiff-Intervenors**
1:16,19

**Plaintiffs** 1:8,13
2:4,14 4:2

**plan** 95:11 110:19

**planning** 27:1 50:6
96:8

**plans** 124:17,20

**play** 19:1

**players** 53:3

**please** 7:20,21
10:19,20,24 11:12
15:3,9 17:10 22:7
58:25 71:16 117:23
118:18 125:20,23
159:1

**plethora** 77:25

**pockets** 79:17

**point** 16:22 17:20
30:18 72:15 112:10
115:14,19 117:22
118:18 130:23 147:20
148:14,21 149:10
150:25 151:3 154:17

**points** 57:7
59:12,15,17

**political** 52:9,11,20
54:16,21,25 55:2
56:6 59:19 65:1
106:17 111:3

**politically** 158:9

**poll** 133:18 135:8
154:25

**polling** 139:14,22,23
140:15 141:21,25

142:7

**polls** 55:16 56:23
88:20 89:14 154:11
158:7

**POPE** 1:4

**popular** 158:9

**population** 145:2

**position** 20:24 21:6
22:13 27:14 40:11
55:10 60:6,8 79:8
139:13 141:18 142:25

**positions** 57:13

**positive** 46:25

**possess** 128:19

**possession** 125:22

**possibility** 42:10
112:8

**possible** 105:9

**possibly** 74:22

**post** 132:8

**postage** 132:14

**postcards** 76:6

**pot** 76:1

**power** 74:15

**practice** 105:3

**Prairie** 25:19 26:6

**precinct** 89:9
101:13,17,18,22
102:1,2,8,14,17,20
141:5,7 143:3,4
147:1

**precincts** 139:25

**preclearance** 82:25

**predate** 42:23

**prefer** 141:24

**preliminary** 9:12

**preparation** 12:12
13:1,4 19:24 30:17
95:24

**prepare** 12:4 13:19
70:23

**prepared** 17:14,17
18:10,19 20:1 154:5

**preparing** 13:8 127:5

**prerequisite** 92:6
151:23 152:1 158:17

**present** 44:17 68:11
130:21 136:5

**presented** 70:18
113:23

**presenter** 96:1

**presenters** 96:2

**presently** 129:11

**presents** 135:13
138:13 152:13

**president** 24:22 27:19
29:9 46:13 49:8 53:2
64:2,10 85:6 99:14
104:2,17,20 119:6,10
148:2

**presidents** 68:16
99:12,17 106:15,16
111:5,8 145:8

**Press** 56:15

**pressing** 63:5 86:19

**pretty** 23:14 52:12
54:3 62:1 119:14
125:10

**prevent** 10:6

**previous** 26:2 65:3
77:13 90:22 118:11
138:6 161:21

**previously** 71:20
72:19 74:2 92:12
122:23 126:8

**primary** 32:14

**printed** 74:9 75:14
112:18,22

**Printing** 91:21

**printouts** 76:17 77:9

print-outs 121:19

prior 43:24 76:3
90:22

privilege 47:19

proactive 60:25

probably 12:16 20:25
23:3,25 25:11
30:14,15,17 31:3
37:16 44:10 51:20
54:15 58:13 79:10
88:25 95:25 97:16
102:15 110:8
114:10,11 120:4
128:7 137:12 155:24
156:24

probation 76:11

problem 8:19 131:5
139:3 150:21

procedural 66:20

procedure 3:12 86:23
128:5

procedures 65:23 66:2

proceedings 70:21

process 37:13 62:5
65:2,14,16,20,22
66:11 68:18,25 69:25
75:15 76:16 77:21
82:25 86:14 88:11
89:4 91:5 103:3
107:3 112:1,17
126:12 127:8,14
128:5,16 160:21

processed 133:4

produced 3:4 88:3
94:19 99:7 105:24
113:23 116:11 119:19
122:16

producing 15:24

product 8:8,10 9:4,6

production 133:10

programmatic 47:6
55:7,8 92:25

programming 26:23
35:13 78:25

project 61:12 72:10

promise 56:3

proof 144:14 146:22

proper 108:19

proposed 52:7 69:11
160:6

protection 6:18 71:9
120:1

protest 156:12

prove 133:11 140:10
141:20

proved 164:14

provide 9:23 10:2
26:20 47:5 59:5
68:23 69:1 70:14
74:9 80:22 92:2,4
102:3 112:22 115:16
121:21 139:2
144:5,13

provided 54:4 77:20
112:10 118:22

provides 90:3 138:12

providing 55:7 67:25
73:11 75:20

proving 129:14

provisional 74:23
104:10 113:14
138:8,12 140:2
141:20 142:1,15,23
143:1,6,17,21
144:1,16 147:6

provisions 3:12

proximity 27:16 141:8

public 1:23 2:8,18
46:21 139:11
141:13,16,25 164:22

publicity 56:15

publicized 44:24

publicly 48:19

PUEBLO 2:13

pull 74:13

punitive 64:24

purpose 80:21
82:5,6,14 85:21
97:20 140:19 144:1
157:11,12

purposes 27:5 61:11
62:17 72:21,24 82:22
83:9 86:7,9 89:24
97:15 129:14 164:16

pursuant 3:11 112:13

purview 27:18 121:25

_____

Q

qualify 111:15

quarter 116:19 117:10

quarterly 27:2 29:1
33:23 35:24 116:20
125:2,5

question 10:20,25
11:7,11,12,13,16,18
15:6 17:11 40:18
48:5 65:8 68:8,13
83:15 103:16 107:21
133:25 138:6 146:16
155:23 159:1,8

questioning 101:24
134:3,9

questions 9:12,24
10:3,7,15 16:15
18:24 155:15 161:18
162:3,4,5,8

quick 105:5 125:14

quite 44:11 61:9 87:1
109:3

_____

R

race 152:11,23

rather 131:21

RDR 3:8 165:21

re 19:19

**reach** 146:2,5 160:7

**reached** 115:6,8

**reaching** 98:2,18

**reactive** 60:25

**reading** 49:22 98:5
  104:12 107:6 114:23
  115:2 117:19

**ready** 131:7

**real** 9:6 20:8 30:11
  32:11 86:11 125:14
  131:21

**reality** 60:19

**realize** 78:5

**realized** 8:22

**reallocations** 126:19

**really** 33:14,16
  40:15,18 45:8 46:24
  48:11 57:24 63:19
  70:20 71:11 90:9
  95:15 96:5 97:22
  98:22 107:16
  108:3,11 109:3
  111:9,10 120:1
  128:21 129:4 132:1
  136:18 143:15 151:5
  153:10 154:1,9 156:1
  160:24

**Realtime** 4:21 165:6

**realtor** 8:6

**realtors** 9:7

**Realty** 8:6

**reason** 39:12 123:19
  145:13 163:3

**reasons** 137:13,14
  138:3

**recall** 29:6 33:7
  42:19,20 43:1,13,15
  48:11 50:10 56:5
  63:15 67:12,13 70:22
  82:8 83:15 85:8
  95:23 96:1,13,15
  107:18 108:1,6

110:23 120:3 123:10

**recap** 93:20

**receive** 153:21

**received** 118:7

**receiving** 153:22

**recently** 31:21

**recess** 62:11 125:18

**recipients** 147:24

**recognize** 19:12,15
  94:15 99:8 105:25
  113:25 116:13
  119:21,25 122:17

**recommendations**
  68:1,9,11

**record** 3:13 7:21 8:16
  16:2 20:6 28:15
  62:10,13 125:13,17
  126:3 162:9 165:13

**recorded** 97:10 165:11

**recounting** 148:15

**recruiting** 32:5,12
  145:21,22

**recruitment** 31:23
  32:8 92:1,2

**redirect** 64:7

**re-enfranchisement**
  76:7 85:25 121:13

**refer** 21:14 28:8
  31:14 37:4 138:5
  152:5

**reference** 118:24

**referenced** 98:16

**referencing** 152:4,5

**referrals** 115:1,11

**referred** 21:21 51:22
  116:2 118:11 122:23
  148:15

**referring** 22:4 27:10
  28:9 67:21 75:3
  96:21 98:9

118:9,14,15 147:16

**regard** 57:3,20 69:15
  71:21 80:19 94:4,5
  134:23 135:21 159:14
  160:5

**regarding** 16:11 26:22
  54:5,13 55:18,19
  56:24 57:12 63:22,23
  64:4 69:10 70:15,18
  71:13 76:4 77:4,5,12
  79:23,24 80:19,24
  82:2,15 83:17 84:11
  85:22 97:11 98:15
  124:9 127:19 160:19
  161:6,23

**regional** 160:15

**register** 38:18 134:4

**registered** 4:22 103:1
  127:23 128:18 134:17
  156:6,9 158:22 165:5

**registering** 84:3
  157:5

**registrar** 138:15
  140:2 141:22

**registration** 4:23
  37:11 40:3,5
  71:3,6,8,22
  72:2,5,10,11,14,21
  73:6,7 74:3,8,12
  75:8,14,18 76:9,24
  77:21 86:10 92:3
  93:25 101:2,5,7
  102:6,24,25 103:6,8
  126:10 131:25
  132:5,7,13,18,21
  133:14 134:12,24
  135:2,5 145:23
  146:22 148:6
  149:3,18,20,24 151:4
  152:18 155:17 157:4
  165:22

**registration/**
  **education** 75:1

**regular** 28:21 101:9
  140:20

regularly 29:8 89:10
   95:22 121:8 141:4

reimbursement 31:5,6

relate 122:25

related 71:3 91:7
   97:20 104:18
   126:8,15,20 127:11
   165:14

relates 70:11

relating 124:14

relation 111:23

relaying 151:7

relief 6:6 19:19

remedies 83:23

remember 63:20 81:21
   97:23 104:8 107:18
   108:4,24 109:15
   154:24

remembering 63:20

repeat 11:13

repeating 83:14

rephrase 11:13 36:6
   41:3 48:4

replace 125:23

report 33:21

reported 3:9

reporter 4:20,21,22
   10:16 162:10,13
   165:6

Reporter's 5:12
   125:20 165:4

reporting 34:2 76:11

reports 33:23 59:7,11

represent 14:16 40:13
   82:23 94:18 99:6
   105:23 113:22 117:1

representation
   41:13,17

representative 94:22

representatives 2:4

51:19

represented 11:23
   40:9

representing 7:12
   40:20,24 41:5

request 115:23

require 90:21 132:17
   133:10 136:23

required 33:25
   37:9,15 75:13 84:4
   115:25 116:3 127:20
   132:14 138:14,25
   149:23

requirements 39:9
   79:24 82:2 83:17
   84:11 85:12 92:5
   93:21 135:21 144:22
   145:15,19 146:15
   151:23 152:6 153:25
   158:12,13,15

research 110:9

reserve 162:7

reside 7:23,24

residing 165:6

resolution 139:2,18

resolved 83:2 138:24

resources 47:16 48:9
   59:22 60:14,19,23
   64:8,22 65:3,11,16
   74:6,25 75:13
   76:4,17 77:19
   78:10,12,16 79:5
   84:22,24 89:17 90:22
   91:12,16 92:17,21
   93:2 108:12,18
   121:15 126:17 133:13
   134:16 137:4,8 139:7
   153:14 154:4

respect 159:17

respective 133:5
   151:20

response 36:22 37:1,8
   63:24 65:4 101:3

129:15

responsibilities
   26:15 157:9

responsibility 39:17

responsible 31:4 55:1

rest 24:10 61:18
   137:5 145:2

rests 24:19

result 75:6 78:1
   79:5,10 91:12 92:8
   108:7 110:4 123:4
   129:21 136:17 156:7

results 107:14 108:1
   109:8

retail 8:7,9

retention 31:24 32:5

retract 107:21

return 121:21 139:14

reveal 42:5

reverse 127:6

review 13:4,8 58:21

Richardson 81:22
   84:6,18 87:2

RICK 1:10

rides 88:20

rights 4:15
   40:21,22,24 60:11
   70:11 87:6 135:15

road 68:13

roads 62:18

Robert 105:6,7,11,13

role 33:7

roles 23:22

roll 101:6 149:7,9
   150:2 152:21

Room 4:17

Ross 3:10

rosters 33:15,18

**rough** 125:21,23

**roughly** 23:21 32:25

**Rudd** 4:3 5:7
  8:14,15,19,25 11:25
  14:1,3 16:1 19:3
  40:14,16 41:1 42:4
  47:18,24 51:5 70:8
  83:7 95:1 98:11
  122:10 123:22 125:15
  129:9,24 130:2,19
  162:4,12,15

**rule** 66:20

**rules** 3:11 9:13
  66:4,6 148:10

------------------------
                S
------------------------

**Safety** 1:23 2:9,18
  139:11

**salary** 60:3

**San** 136:12

**Saturday** 154:13,14

**Saturdays** 84:9

**saw** 121:2,4

**SB** 37:5,8,15 39:9
  57:4 58:4 59:9
  64:5,19 65:17,20,21
  66:3,25 67:12,17
  68:6 69:19 70:15,19
  71:24 72:3,16 73:2
  75:6,7,21 76:3
  77:4,12 78:11,21
  79:5 82:2,7,15 83:17
  84:11 85:12 90:15,23
  91:12 92:5,9
  93:20,21 94:4,5
  97:20 126:8,16
  127:11,25 128:20
  129:1 130:15,18
  134:20 135:7,19
  136:1 138:11,14,19
  151:23 152:6,8,22
  153:7,11,16 154:7
  156:7,11,14,17
  157:11,15,20 158:4,9
  159:4,6,17

**scan** 100:16,25 101:1
  146:20,21 147:22
  148:4,5 149:15,21
  150:15,22

**scanning** 146:16 149:1

**scheduled** 89:10
  117:16 141:4

**Schoeve** 3:8 4:21
  165:5,21

**scholarships** 92:18,21

**school** 34:9

**schoolbook** 65:12

**schoolbook/textbook**
  65:5

**schools** 141:11

**Scientific** 23:11

**scope** 68:2

**seal** 164:18

**sec** 8:20

**second** 6:3 46:9 81:16
  112:7

**Seconded** 14:17

**secretary** 1:10,22
  2:7,17 20:22
  21:8,11,12 22:10
  23:17 26:13 28:2
  30:10,22 33:8 46:13
  49:24 111:21 112:2
  116:23

**section** 4:15 15:13
  114:21

**seeing** 123:10 140:8

**seek** 121:17

**seeking** 100:10 127:22

**seen** 14:6 18:16 120:4
  121:1

**segregated** 144:8

**seldom** 143:7

**seminars**
  96:9,11,17,21

**Senate** 36:22,23,24
  37:1 129:13,21

**send** 32:9 57:16,18
  80:23 97:10 112:4
  132:15,16 145:7
  162:13

**sending** 95:10
  113:8,12

**sense** 39:17 63:7,8

**sensed** 97:21

**sent** 33:24 45:8 87:23
  94:23 99:11,20,25
  111:25 112:7 113:5
  114:6,8,10

**sentence** 98:6 104:6
  105:2,6 107:12
  118:10

**separate** 36:13 46:14
  72:23

**separated** 144:8

**separately** 144:10

**September** 17:19

**SERGIO** 1:3

**served** 23:9

**serves** 80:4

**service** 9:7 97:13
  153:21

**services** 30:4,5,6
  89:15 115:15 121:22
  145:5 153:22

**session** 5:9 27:13
  50:7,10,12 51:18
  53:6,13 54:6,9 55:15
  63:21 67:18 77:16
  85:15 126:1

**sessions** 46:4 63:21

**sets** 18:20 85:3

**shake** 10:21

**share** 36:10 122:11
  160:8

**she's** 16:4 119:6,10

**shifted** 27:14 63:10

**short** 69:4

**shorthand** 3:9

**showed** 101:7 118:11

**sic** 18:12 78:8

**sign** 133:9 147:5
162:11

**signature** 5:11 163:1
164:2

**similar** 62:4 64:4
67:13 101:3 106:13
121:22

**simple** 66:9

**simplicity** 89:7

**single** 137:5

**sir** 9:25 10:4,13
15:11,15,20 16:13
18:14,17 20:10
36:16,19 37:3 39:2
43:12,21 44:3,8,21
72:25 73:25 99:19
103:10 106:1,4,11
107:8 111:18 114:22
115:4,10 116:4,15
117:3 119:1 138:7

**sit** 61:1 68:15

**site** 138:25

**sites** 91:17

**sitting** 11:25 88:15

**situation** 161:7

**six** 23:3,19 30:15
138:14,15 140:6,11
142:16 143:14 152:19

**six-day** 138:21

**sixth** 38:12

**size** 129:2

**Slaughter** 4:23 165:23

**sleep** 9:20

**sleepy** 9:18,19 10:9

**snail** 114:13

**soap** 133:20
155:1,4,18,21 156:3

**social** 133:9

**socioeconomic** 136:4,7
138:3 145:3

**solely** 44:19

**solicitation** 32:9

**solicited** 34:15

**soliciting** 32:18

**Solutions** 4:22 165:22

**somebody** 75:17 121:3
160:13

**someone** 49:6 53:21
72:1 79:15 85:1
109:18,20 131:15
133:3 134:3 135:13
144:3 145:18 149:21
156:13

**somewhere** 22:16
143:23

**sorry** 8:17 17:10 18:8
19:19 27:22 37:23
38:8 40:16 41:25
43:3 46:22 52:14
65:8 67:21 72:18
76:14 80:16 83:14
94:1 95:3 98:17
101:21 107:20 108:10
110:17 124:2 127:1
132:4 138:19 147:14
156:1

**sort** 27:14 53:1 81:8
97:21 120:12 144:4
156:12

**sought** 41:10

**sounds** 60:25 124:4

**source** 32:14 161:6

**sources** 124:14

**south** 155:15

**Southern** 1:1 7:15

**Southland** 60:21

**speak** 11:4 22:5 57:12
67:25 71:12 76:1
83:22 142:2

**speaking** 68:3

**special** 66:13

**specially** 27:3

**specific** 53:22 58:18
63:6 64:18 65:11
66:6 69:10 81:1
137:15 147:20 150:9

**specifically** 11:18
53:25 54:2 57:3
62:16 64:21 66:13
71:21 80:18,20 83:16
109:23

**speculate** 43:4 49:12

**speculation** 21:1
98:12

**spend** 30:10,14 61:2

**spent** 13:8 59:23 81:5

**sphere** 161:3

**spoke** 23:22

**sponsorship**
32:17,19,24

**staff** 12:24 27:8 49:9
79:7 126:19

**stamped**
6:8,10,12,14,18

**standard** 100:3 148:3

**standing** 26:19
46:15,17 47:8
52:11,16 55:13,23,25
56:1,19,22 59:3 85:6
129:14

**started** 8:15 127:17
148:1

**starting** 8:18

**starts** 100:15

**state** 1:11,21,22
2:2,7,16,17 3:8 6:4
7:11,20 9:1 12:6,14

```
14:20 22:22,23,25
23:1,6,15,18
24:8,18,21 26:23
27:3,19 28:13
31:9,12 32:1 33:24
34:20 35:2,4,24
36:2,5 37:10,13
46:15 47:3 48:18
52:8 53:2 57:9 62:8
76:7 78:9
81:12,19,25 82:8,13
83:11,25 84:2
85:3,5,8,19,20 86:15
87:10,22 95:25 100:9
107:5 111:21
112:12,14 113:14
119:9 126:23 127:8
135:9 142:3 157:24
158:6 159:24
161:1,4,8 164:9,23
165:1,6
```

**stated** 3:12 15:23
20:3 41:16 62:16
64:6 92:8 137:17
138:4 144:12 146:15
161:16

**state-issued** 78:7

**statement** 36:11
98:16,20 104:13
107:7,79 115:3,22
117:20,23 154:24

**statements** 36:14

**states** 40:4,8,12
114:18 159:21
160:6,8,19,23 161:12
162:6

**State's** 112:2

**STATES** 1:1,13 4:13

**statewide** 23:12 57:10

**stating** 10:25 15:6
111:15

**statistics** 131:19
137:17,19

**status** 35:15

**stayed** 26:2

**STEEN** 1:10,21 2:6,16

**stenographically**
165:11

**step** 114:24

**Stephen** 4:8 7:10 16:1
129:10 130:3

**stephen.tatum@texasat**
**torneygeneral.gov**
4:11

**steps** 114:20

**STEVE** 1:22 2:7,17

**sting** 117:24
118:2,5,9

**stings** 127:10

**stop** 34:24 46:9 144:5

**stories** 149:11
150:3,14

**story** 148:16,22 150:4

**straight** 111:22

**Street** 4:4,9

**strictly** 89:25

**string** 123:16

**strong** 39:17

**structure** 26:3

**student** 78:7

**students** 34:9,11 78:6
92:18

**studies** 59:6,11 70:18
124:13,18,21 137:16

**subject** 16:5 48:1
82:24 86:6 130:24
159:24

**submit** 33:20,23

**submitted** 123:7,9

**subscribed** 164:15
165:16

**subsequently** 138:13

**succeeding** 15:17

**successful** 68:24 69:2
127:16

**suffered** 129:20

**suffering** 9:21

**sufficient** 130:15

**sufficive** 78:8

**Suite** 3:10 4:23
165:23

**summaries** 33:21

**summarization** 62:24

**summarized** 105:2
137:15

**summer** 83:5

**Sunday** 154:13,14

**Sundays** 89:12

**sundry** 148:10

**super** 89:12

**supervise** 27:6 35:14

**supervising** 35:7 36:3

**supervision** 35:17
165:12

**supplement** 129:15
161:22

**support** 4:22 32:17,19
142:22 158:11,14
159:4,6 165:22

**supporting** 57:12
68:18

**supposed** 31:25 32:1

**sure** 12:16 14:8,12,13
17:3 23:4 24:25
41:24 42:8,11 44:10
46:12,23 49:5,8
53:18 56:18 59:1,14
65:7,9 69:4,5 70:9
74:12 80:6 82:20
85:15 87:21
88:7,13,21 89:11,21
90:9,20 91:17 95:15
96:5 97:21 103:14

105:13 108:9,11,22
109:20,23 111:4
112:11,17 125:15
128:21 147:10 150:17
151:11 153:2 156:25
160:24 161:5

**surrounding** 127:13

**surveys** 55:17 56:24

**sworn** 3:5 7:4 10:12

**system** 97:5 136:16
145:11

---
T
---

**Table** 95:18,19

**taking** 10:1 44:10,12
45:14 114:19 142:20

**talk** 15:7 57:18 69:23
80:2 140:15 155:22

**talked** 89:19 94:3
118:4 126:8 148:8

**talking** 21:15
38:2,3,4,6,7 42:24
45:15 57:7
59:11,15,17 62:15
69:15,23 74:2
78:15,16 88:17
126:7,11 129:25
130:5 133:7 136:20
139:6 156:2 159:13

**TaNeika** 119:3

**tasks** 31:10 121:18

**Tatum** 4:8 5:6 7:7,10
8:21 9:2,3 13:23,25
14:2,5 16:8,9 17:4
19:5,8 20:7 28:16
30:13 40:19 41:3,4
42:9 47:21 48:4,6
51:2,9 52:14,24
62:10,12,14 70:13
83:3,5,8 94:12
95:2,4 98:14 99:3
105:21 113:19 116:9
119:17 122:6,8,13,15
123:17,24 124:2,5,6
125:9 126:2,5 129:22

130:1,4,8,11 131:1,6
151:2 162:2,7

**tax** 135:8

**taxes** 133:19 154:25

**TAYLOR** 2:11

**TCET** 95:11,14 96:4,17

**Technology** 23:11

**teleconference** 4:13

**Telephone** 8:11

**ten** 85:19 102:15
103:19

**tend** 49:20

**Tennessee** 25:15,17

**term** 24:9 60:17

**terms** 129:19

**test** 107:3,15,20,22
108:2 118:3,10,13,25
122:22 123:1 155:12

**testified** 7:4 129:19

**testify** 15:24
16:11,20 17:14,17
18:11,19 20:2 70:3
142:4

**testimony** 41:2
54:5,9,13 62:25
68:24 69:1
70:14,17,23 73:1
165:10

**testing** 126:12 133:20

**tests** 107:11
108:8,13,21
109:9,14,19 110:1
111:24,25 127:9

**Texas**
1:1,7,10,14,17,21,23
2:2,3,7,8,16,18
3:8,11 4:10,24
6:4,16 7:11,16,19,25
8:25 14:20 15:23
16:3,10 19:21
20:11,14,16
21:12,15,16

22:5,10,18 23:5,23
24:2,4,5,8,16,17
25:4,19 26:13 28:17
29:7,9 30:11,24
31:6,17,19 32:15
33:2 35:1,4
36:2,5,7,9 37:10
38:23 39:21 40:11,20
41:5,9,16 43:7
44:1,25 45:13 46:22
48:22 49:14
50:17,18,22 51:10,11
53:5,12 54:8,22
55:16,20 56:20,24
57:3,21,23
58:7,10,22
59:8,12,23 61:5,6
62:21 63:10 65:4,21
66:24 67:6,7,16 68:5
69:8 70:1,14 71:2,25
72:21 73:20,23
76:2,3 78:17
79:1,15,22
80:3,4,10,20 82:15
84:21 87:9 88:5,9,23
89:5,17,23 90:2,17
91:6 92:7 94:5
95:17,19,21 96:18
97:3,7,12 100:6
102:9 104:2,21
113:15 119:11,14
120:6,10 121:6,8,12
124:7,12,24 126:7,16
127:10,21,23
128:17,24 130:12
131:7,9,23 133:12
134:15 135:7,9,21,23
136:10,15 137:22
138:20 141:18,24
142:22 144:19 146:7
151:22 152:9
153:4,5,7,11
156:6,16 157:19
158:2,3,11,14,20
159:3,14,20
160:6,12,22 161:9,14
165:1,6,23

**Text** 29:19

**textbook** 63:15

**textbooks** 63:9

**Thank** 9:2 17:1 83:10
   95:4 131:1 134:10

**that's** 8:19 10:10
   11:24 17:15 19:3
   21:10,13,22 22:2,6
   23:12,14 26:17 28:23
   37:6 38:12 43:9 45:3
   47:24 51:20 52:15
   53:22 54:23 56:17
   62:1 63:18 72:7
   76:15 81:24 88:1,15
   93:8 95:7 97:22
   99:23 104:4,22 105:9
   106:7 112:5,8 119:4
   122:10 123:16 125:10
   127:14 129:17 130:8
   132:24 138:17 140:22
   142:17 143:12,22
   145:2,20,23 146:25
   152:21 153:9,23
   154:1 156:4,14 161:1

**Theirs** 139:11

**Thereabouts** 103:20

**thereafter** 165:12

**therein** 164:17

**thereof** 165:15

**there's** 15:13 17:5
   37:21 63:5 93:13
   104:6 111:14 113:2
   131:19 132:1,14,15
   136:18 146:16

**they'll** 147:2

**they're** 21:21 33:25
   57:10 58:2 60:24
   61:21,25 68:16
   75:10,11 86:22
   108:16 144:10,11
   153:24 157:5

**they've** 21:23 73:4
   143:19 157:5 161:8

**third** 117:8 118:17

**throughout** 30:8

**title** 15:16 20:19

**titled** 111:12 159:25

**today** 9:17,22 10:12
   11:15,23 12:4 13:14
   15:23 17:17 18:16,19
   39:1 68:15 161:24

**today's** 16:7

**top** 41:25 42:1 105:6
   106:22 117:15

**topic** 42:13 47:10,22
   48:8 70:25

**topics** 14:1 15:25
   16:4 18:11,18 86:14

**totally** 147:7

**totals** 34:3

**touch** 78:20

**towards** 60:14 64:18
   78:11 89:18 133:14
   134:16

**track** 159:20

**tracking** 161:10

**traditional** 154:10

**transcribed** 165:12

**transcript** 70:21
   125:22,24

**transferred** 26:7

**transportation** 136:16
   137:2,10 139:9

**travel** 139:21 140:2

**treasurer** 61:8

**Trial** 4:15

**tried** 68:22 100:15
   147:22

**trip** 159:10

**true** 47:8 153:6 164:3
   165:12

**truth** 10:12

**truthful** 9:23 10:3

**truthfully** 10:7

**try** 11:1,5 56:2 77:1
   84:16 89:6,13 102:3
   123:4 127:6 154:2

**trying** 23:7 24:24
   38:18 45:10 64:23
   97:16 100:2 102:21
   108:4 112:6 146:2
   147:14 148:2 158:21

**TSC00006029** 6:10

**TSC00006032** 6:12

**TSC00006037** 6:8

**TSC00006058** 6:21

**TSC00006061** 6:14

**TSC00006062** 6:18

**turn** 15:9 106:19
   114:11 117:6

**turnout** 89:16

**two-thirds** 66:9

**type** 133:10 155:4
   160:20

**types** 34:5

**typically** 54:13

---

**U**

**U.S** 4:16

**uh-huh** 100:13 119:12

**ultimate** 35:12,13
   151:15

**ultimately** 47:13

**Um-huh** 104:14

**um-hum** 14:11 17:9
   19:10 21:20 23:20
   24:15 25:1,3 33:3,19
   34:12 35:6 47:12,14
   51:12 52:2 54:20
   58:6 61:13,23
   62:19,23 65:13 71:23
   72:13,22 73:19 74:5
   76:22 79:13,21
   83:1,13 84:7,20
   90:16 91:8 93:15

94:14,21,25 95:20
96:10 98:4 100:17,19
103:2,23 106:21,25
110:3,18,22 111:7,13
112:3 113:1,4,7,21
116:25 117:9 122:24
134:14 137:21 138:17
141:1,14 147:13
148:17,20 151:21
159:16

**unable** 39:8,11 92:8
108:8

**unaware** 130:12

**UNCERTIFIED** 125:21

**understand** 10:11,17
11:8,10,20
17:4,8,9,13 18:24
24:25 55:13 58:25
65:7 78:7 88:7
103:14 148:14 157:1

**understanding** 36:20
144:1

**Understood** 134:5

**unemployment** 137:4

**unexpired** 38:10,25
115:24 116:2

**unfortunately** 58:16

**UNION** 2:13

**unit** 24:11 25:18,20
26:8

**United** 1:1,6,13 4:13
40:8,12 162:6

**units** 21:18,19,21
22:25 24:9 26:17,21
30:8 31:20
34:5,7,14,23,24 52:4
55:8 57:9 68:16
71:16 81:9 87:14
90:6,8 91:18,25
107:2 114:12 119:7
127:18 128:1,6

**unless** 11:18 136:19

**unnecessarily** 154:25

**updates** 57:16 80:22

**upon** 16:18 86:16
124:22

**Urgent** 6:14

**usually** 34:8 58:19
79:2 86:22 91:25
139:23 141:12 154:11

**utility** 9:7

**utilization** 79:6 97:9

**utilize** 97:6,7 135:1

_____
V
_____

**vague** 70:8

**valiant** 39:18

**values** 36:14

**varies** 65:1

**various** 25:13 27:4
31:10 32:7 33:1
51:11 52:11 56:1
57:10 70:3 100:8
111:5,14 148:10
160:16

**vary** 30:13 65:3

**vast** 60:20

**VEASEY** 1:3

**veer** 61:17 62:18

**venture** 67:23 80:7

**version** 123:11 125:21

**versus** 26:9 89:8
159:25

**Veterans** 115:21

**VFW** 115:19,22 116:1

**via** 4:13 24:10 45:4

**vice** 104:16,20

**victim** 146:8

**virtual** 96:25

**virtue** 142:11 157:22

**visit** 57:8 114:24

**Vital** 131:19

**voice** 67:17 68:6,21
69:10,24 70:3

**voices** 69:5

**voluntary** 21:8

**volunteer** 68:14 90:1
103:12

**volunteering** 103:18

**volunteers** 31:8,14
68:18 69:16 89:24

**vote** 37:12 38:18
39:3,9,11,14,17,19,2
0 40:6 44:2,4,7,9,23
45:7,13,20 66:9
71:20 72:8 73:11
74:17 76:13 78:5,8
84:3,4 85:2 87:7
89:8,9 90:5 91:9
92:6 97:11,17,18
101:9,20,23 102:6,23
104:9 115:25 116:3
120:13 127:20,24
128:19 133:17 134:4
135:13 140:24 141:3
144:4,7,15 147:6
149:4,6,17,22,24
150:5,7,20 151:5,17
152:3,8,10,17,19,23
153:8
154:6,11,13,15,17
155:6
156:6,7,10,11,23
157:22
158:17,19,21,22

**voted** 39:5 44:22 48:8
124:22,25 157:20

**voter** 37:11 40:5
54:12 56:24
71:3,6,7,8,9,13,21
72:2,5,10,11,14,21,2
4 73:13,15
74:2,3,8,12 75:1,14
76:5,9,23 77:6
79:19,23,24 85:22
86:5,10 89:15 95:11
96:8,21 100:4

101:2,5,6,7 102:25
103:6 117:16,25
118:6 124:9,10,15
131:24
132:5,7,13,18,21
133:14 134:12,23
135:1,5 138:13
145:14,19,23
146:1,9,21 148:5
149:3,18,19,23
151:1,4 152:2,7,18
153:16 154:7 155:17
157:4,6 158:11,14,24
159:14,21,23 160:5,9
161:11

**voter-assistance**
89:19

**voter-registration-**
**type** 73:21

**voters** 37:9 88:6
90:3,4,17 91:7
98:3,15,19 127:23
142:14 148:3 153:12
157:13

**voter's** 40:3 149:7,8
150:2 152:18,21

**Voters** 1:14 50:19
57:23

**votes** 125:1 158:6

**voting** 4:15 62:4
69:22 71:13 73:12,17
80:19 81:1
88:11,12,13,18
89:3,4,5,7 94:1
101:14,16 102:4
127:7 135:21
140:19,22,23 141:7
142:13 143:20 144:22
147:25 148:1,9,25
149:1 151:24 152:1
153:12,17 154:8,9,12
155:25 156:14,17,18

**vouchers** 31:5

_____

W

**wait** 10:24 15:4

**waiting** 68:20 153:20

**War** 115:21

**Washington** 4:17

**wasn't** 49:1 70:20
151:5

**ways** 66:1 77:11
145:18

**website** 46:22,23
111:21 112:2

**week** 30:9,16,17 95:10

**weekend** 81:16 84:8

**weekends** 84:9

**weeks** 39:7

**we'll** 15:22 19:1
162:7

**well-educated** 155:20

**we're** 7:18 31:25 32:1
61:2 70:10 92:10
94:8 124:3 125:11
126:2 129:10,24
130:2,5,11 133:7
139:6,24 158:23
159:10,13

**West** 4:4,9

**we've** 53:7 76:6
77:8,21 78:2 91:19
94:3

**whatever** 58:20 63:25
68:17 75:25 108:15
144:6 145:12 155:24

**Whenever** 123:20

**whereas** 75:15 137:5

**whereof** 165:16

**wherever** 146:5

**whether** 27:2 32:7
58:2 64:24,25 68:16
90:12,13 92:13
128:8,24 134:3 145:2
146:3,4 148:12 155:6
158:8

**whichever** 24:9

**white** 135:24 137:24

**Whoa** 107:16

**whoever** 113:12

**whole** 55:22 77:25
93:10 143:15

**whom** 49:11 59:4

**who's** 52:24

**whose** 164:15

**wife** 104:19

**willing** 16:14 114:25

**wish** 154:23

**witness** 3:4 14:7
15:24 16:23 17:1
47:20 51:8 52:15
83:7 93:12 116:12
119:23 122:12 123:23
131:5 147:19
162:3,11 165:9,10,16

**Wolf** 130:6

**wondering** 134:11

**work** 51:17 56:8 60:10
71:11 80:8 95:11
96:4 108:17 109:6
131:16 136:23 142:21
154:3,10,11,12 157:8

**worked** 128:7 154:1

**working** 23:23 91:19

**works** 51:16

**workshop** 83:19 84:23
85:21 87:1

**workshops** 81:2
82:1,4,14 83:15,20
84:10 85:11
86:4,6,7,8,15,18,25
87:8,12,19

**worst** 63:17

**worthless** 135:6

**write** 100:18 107:9

**writing** 32:22

**written** 106:5 111:12
  152:21

**wrong** 83:4 155:24

**wrote** 75:17 105:15
  106:2,9 118:1

_____
        Y
_____

**yadda** 112:20,21

**y'all** 69:20 84:2
  150:4,8

**Yannis** 12:24 27:8,12
  51:16 53:2 54:15
  59:19 60:3 79:6
  91:19 104:6 105:15
  113:2 114:10 123:9

**yearly** 26:4,9

**yet** 129:19

**Young** 1:14 50:19
  57:23

**younger** 155:10,11

**yourself** 49:24 54:4
  68:19 117:2

**youth** 22:22,23,24
  23:1,6,18 24:19
  26:21 30:4 34:7
  46:13 47:4 52:21
  56:8 61:16

**youth-related**
  92:19,22

**you've** 10:11 16:10
  18:16 22:13 23:17
  57:21 77:4 89:19
  90:18 103:18 148:15
  155:8 161:20,23