UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
CORPUS CHRISTI DIVISION

MARC VEASEY, et al,                )
         Plaintiffs        )
                          )
VS.                                )   CIVIL ACTION
                          )
                          )   NO. 2:13-CV-00193
RICK PERRY, et al,                 )
         Defendants        )
                          )

-----------------------------------

ORAL DEPOSITION OF

KRISTINA MORA

JULY 15, 2014

VOLUME 1

-----------------------------------

     ORAL DEPOSITION OF KRISTINA MORA, produced as a

witness at the instance of the DEFENDANTS, and duly sworn,

was taken in the above-styled and numbered cause on

July 15, 2014, from 1:47 p.m. to 4:12 p.m., before Tobi

Moreland, CSR in and for the State of Texas, at the Texas

Office of the Attorney General, 1412 Main Street, Suite

810, pursuant to the Federal Rules of Civil Procedure and

any stipulations made on the record.

Kristina Mora - 7/15/2014

2

```
1
          A P P E A R A N C E S
2
3
   FOR THE PLAINTIFFS:
4
        U.S. DEPARTMENT OF JUSTICE
5        CIVIL RIGHTS DIVISION
         950 Pennsylvania Avenue, NW
6        NWB-7200
         Washington, DC 20530
7        Phone:  (202) 305-1840
         Email:  Avner.shapiro@usdoj.gov
8
        By:  Mr. Avner Shapiro, Esq.
9
10
   FOR THE DEFENDANTS:
11
        TEXAS ATTORNEY GENERAL'S OFFICE
12       CIVIL LITIGATION DIVISION
         P.O. Box 12548
13       Austin, Texas 78711-2548
         Phone:  (512) 475-0131
14       Email:  John.scott@texasattorneygeneral.gov
15       By:  Mr. John B. Scott,
             Deputy Attorney General
16           State Bar No. 17901500
17
18
   ALSO PRESENT:
19       Ms. Kristine Cruz, intern
         Mr. Matt Lueders, intern
20
21          * * * * *
22
23
24
25
```

3

```
1              INDEX
2
                            PAGE
3  Appearances.............................  2
   Corrections and Signature Page................. 88
4  Reporter's Certificate............................. 90
5
6
7  EXAMINATION BY MR. SCOTT............................  4
8
9
10
             EXHIBITS
11
   NO.   DESCRIPTION                    PAGE
12
         NO EXHIBITS WERE MARKED
13
14
15
16
17
18
19
20
21
22
23
24
25
```

4

```
1                   KRISTINA MORA,
2  having been first duly sworn, testified as follows:
3                   EXAMINATION
4  BY MR. SCOTT:
5      Q.   Hi.  Will you state your name for the record,
6  please, ma'am.
7      A.   Kristina Marie Mora.
8      Q.   Ms. Mora, my name is John Scott, and I represent
9  the State of Texas and some other defendants that have
10 been sued in a lawsuit filed down in Corpus Christi,
11 Texas, in federal court.  Do you understand that?
12     A.   Yes.
13     Q.   And you are a resident of Dallas County?
14     A.   Yes.
15     Q.   How long have you been a resident of Dallas
16 County?
17     A.   For 12 years.
18     Q.   Ms. Mora, during the course of your deposition
19 today, I'm going to be asking you a lot of questions and
20 you will be giving the answers hopefully to those
21 questions.  If at any time you don't understand one of my
22 questions for whatever reason, will you agree with me you
23 won't answer that question but you'll let me know?
24     A.   Yes.
25     Q.   And then another thing, if at any moment during
```

5

```
1  the course of your deposition you need to take a break,
2  whether to go to the restroom, for water or anything, let
3  me know and we'll stop as many times as you need.
4      A.   Okay.
5      Q.   If at any time you think that there is something
6  you need to bring up out of order that you had answered
7  earlier, please feel free to bring it up at that point in
8  time even though we may not be addressing that issue.
9  Okay?
10     A.   Okay.
11     Q.   You have been identified by the Department of
12 Justice as a person of potential knowledge, as a person
13 with knowledge of relevant facts in this case.  Do you
14 understand that?
15     A.   Yes.
16     Q.   And where do you currently work?
17     A.   I work at the Stewpot.
18     Q.   And how long have you worked at the Stewpot?
19     A.   For four years.
20     Q.   And what is your current position at the
21 Stewpot?
22     A.   Manager of casework services.
23     Q.   And how long have you held that position?
24     A.   For four years.
25     Q.   And prior to that, where had you been work-wise?
```

Kristina Mora - 7/15/2014

6

1      A.   Child and Family Guidance Center.
2      Q.   And where is that located?
3      A.   In Dallas off of Stemmons.
4      Q.   Job duties there?
5      A.   I had various job duties.  Upon leaving, I was
6   the manager of our Plano clinic.
7      Q.   Did you live up in Collin County, or you just
8   commuted?
9      A.   Commuted.
10     Q.   Okay.  And tell me what the functions behind
11  what you did in that job on a day-to-day basis.
12     A.   I managed qualified mental health professionals,
13  QMHPs, with their daily tasks of managing their case
14  loads.  We worked with people with mental illness.
15     Q.   And as part and parcel of those job
16  responsibilities as a manager -- fair statement, you were
17  a manager back then, right?
18     A.   Yes.
19     Q.   And there were tools you had at your disposal as
20  a manager for making sure that you were doing the proper
21  oversight of those you were in charge of managing, right?
22     A.   (Witness nods head.)
23     Q.   So some of those tools, as we sit here today,
24  were they formal processes that were in place as a result
25  of your employer, or were there some you came up with on

7

1   your own as an ability to properly -- what you felt was
2   properly manage the people you were in charge of?
3      A.   To my understanding, the majority of my
4   responsibility was given to me by my supervisor and the
5   director.
6      Q.   And so from the standpoint of -- how many people
7   were you in charge of overseeing in your old job, not now?
8      A.   Correct.  An average of 12 workers.
9      Q.   And was that true throughout your time there?
10  How long were you with that company?  I'm sorry.
11     A.   That's okay.  I was with that company for
12  approximately five years.
13     Q.   Okay.  And was that true during the entire
14  five-year period, your job duties?
15     A.   No, they changed.
16     Q.   Okay.  When did they change?
17     A.   After I had been there three years, I was
18  promoted to manager.
19     Q.   Okay.  And prior to going to that company --
20  again, what was the name of it?
21     A.   Child and Family Guidance Center.
22     Q.   Prior to going to Child and Family Guidance
23  Center in Plano, Texas, where had you worked before that?
24     A.   I worked for Starbucks.
25     Q.   Okay.  And how long did you work for Starbucks?

8

1      A.   For approximately nine months.
2      Q.   And your job duties at Starbucks were --
3      A.   I was started off as a barista, and I moved up
4   to shift supervisor.
5      Q.   And prior to going to work for Starbucks, what
6   had you done?
7      A.   Child Protective Services.
8      Q.   And how long did you work for the State of
9   Texas?
10     A.   I worked for Child Protective Services a little
11  less than two years.
12     Q.   And what did you do at CPS?
13     A.   I was an investigator.
14     Q.   And did you start as an investigator?
15     A.   Yes.
16     Q.   And your years of employment at CPS were what?
17     A.   I began in 2002, and I left in 2004.
18     Q.   And you were an investigator the entire time?
19     A.   Yes.
20     Q.   And which office did you work out of?
21     A.   Arlington.
22     Q.   And prior to going to work for Child Protective
23  Services, where did you work?
24     A.   I was a student.
25     Q.   Okay.  That was the goal in this process was to

9

1   figure out where you went to college.  Where did you go to
2   college?
3      A.   I graduated from Baylor University.
4      Q.   And what year did you get your degree?
5      A.   In 2002.
6      Q.   And what did you get a degree in?
7      A.   Social work, bachelor of arts in social work.
8      Q.   Have you done any post-graduate studies?
9      A.   No.
10     Q.   When you went to work for Child Protective
11  Services as an investigator, did you obtain any further
12  schooling while you were there or training outside of what
13  Child Protective Services provided to you?
14     A.   No.
15     Q.   Okay.  Same question with regard to the
16  organization you worked for in Plano, Texas, did they do
17  any outside -- send you to any outside training, whether
18  it was seminars or educational efforts, to enhance your
19  knowledge of what you were -- duties that you were
20  performing?
21     A.   Yes, I would have trainings.
22     Q.   Okay.  Was it on a regular basis, X number of
23  hours a year?  Was there something specific that you can
24  recall training-wise that you did while you were there?
25     A.   I did participate in trainings that were called

Kristina Mora - 7/15/2014

10

1 continuing education units.
2    Q.   Was that a part of professional certification
3 program you have?  Why were you doing the continuing
4 education program?
5    A.   While I -- upon graduating and during my time at
6 Child Protective Services and in the beginning of being at
7 Child and Family Guidance Center, I had a licensure as a
8 bachelor's level social worker.
9    Q.   What is that?
10   A.   It's just a licensure to be able to identify as
11 being a social worker after receiving your bachelor's
12 degree in that field.
13   Q.   Who issues the license?
14   A.   I don't remember.  I don't recall the exact name
15 of the department.
16   Q.   It's part of the State of Texas, though?
17   A.   Yes.
18   Q.   Okay.  One of a couple of agencies?  But not
19 Child Protective Services?
20   A.   No, sir.
21   Q.   Okay.  And you obtained that following
22 immediately after you got your degree from Baylor?
23   A.   Yes.
24   Q.   And then where did you grow up?
25   A.   I didn't grow up in any one location.  I moved

11

1 around various times.
2    Q.   So where did you graduate high school?
3    A.   In Arlington at James Bowie High School.
4    Q.   Okay.  Did you go all four years to Baylor?
5    A.   Yes.
6    Q.   Graduated Bowie in '98?
7    A.   Yes.
8    Q.   Are you registered to vote?
9    A.   I am not.
10   Q.   Have you ever been?
11   A.   No.
12   Q.   Now, how is it that you came to work for the
13 Stewpot?
14   A.   I was looking for work and found the opening and
15 applied for it.
16   Q.   Okay.  Now, you were at Child and Family -- my
17 gosh, I don't know why I can't recall that.  The company
18 in Plano, we'll call them.
19   A.   Okay.
20   Q.   You were with them immediately before you came
21 to work for the Stewpot, correct?
22   A.   Uh-huh.
23   Q.   Is that a yes?
24   A.   Yes.
25   Q.   So that was the other thing I need to get you to

12

1 agree to.  Always give me a yes, no, or some verbal word
2 because uh-huhs and nuh-uhs come out UH hyphen UH.  So we
3 won't know whether you meant yes or no.  I know what you
4 mean, but the record won't.  Is that agreement okay?
5    A.   Yes.
6    Q.   And you're doing great.  So with regard to --
7 why did you leave the company in Plano?
8    A.   I was let go.
9    Q.   Okay.  Was that a reduction in force?  Why was
10 it that you were let go?
11   A.   They didn't clarify the exact reason of why I
12 was let go.  Attendance, tardiness was one that they
13 identified.
14   Q.   Any other reasons that you can recall for the
15 reasons that they let you go that they identified other
16 than tardiness?
17   A.   No.
18   Q.   Okay.  With regard to leaving Starbucks, did you
19 leave there because you got the job in Plano?
20   A.   Yes.
21   Q.   And before that, you left Child Protective
22 Services as an investigator.  Why did you do that?
23   A.   I chose to leave, yes.  I chose to leave
24 primarily due to the large caseload.
25   Q.   Okay.  And how many cases were you handling to

13

1 go investigate when you left, approximately?
2    A.   As many as 50.
3    Q.   And that was on a monthly basis you were
4 required to be on top of those 40 -- I mean, those 50
5 cases, right?
6    A.   Yes.
7    Q.   Earlier today Reverend Buchanan was sitting in
8 your chair where you are right now and gave his deposition
9 as you are right now.  One of the things he identified
10 during the course of his deposition was there are weekly
11 staff meetings.  Do you -- are you aware of a weekly staff
12 meeting?
13   A.   Yes.
14   Q.   Takes place Tuesday somewhere around 2:45 after
15 the facility shuts down to the clients, correct?
16   A.   Yes.
17   Q.   Has that been true during your entire four years
18 with Stewpot?  Or is it three years, four years?
19   A.   Four years.  So yes, with the exception of
20 events we may have or a reason for not having one.
21   Q.   Sure.  But the normal -- it's set -- if there's
22 something that it has to yield to because it's a special
23 event, I understand that.  But otherwise, it is scheduled
24 for Tuesday at 2:45?
25   A.   At 3:00, the meeting is set, yes.

14

1  Q.  And that's for everybody that's on the staff
2  that's on payroll, or is that for everybody including
3  volunteers to attend?
4  A.  It's for staff members.
5  Q.  So what he described was a process where there
6  is a caseworker manager, and that's you, and you have a
7  number of people who report up to you about, I guess, what
8  they do on a daily basis.  So I want to walk through with
9  you a little bit of -- make sure I understood what your
10  job responsibilities are at Stewpot.
11      So would you please describe for the judge what
12  it is you do on a daily basis and your job duties as you
13  see them at Stewpot currently?
14  A.  My job duties as manager of casework services is
15  to assist in the opening -- responsibilities of the
16  opening of the Stewpot.  My responsibilities are also to
17  help in providing casework services to the clients who
18  voluntarily ask -- who come to the Stewpot.  I facilitate
19  the meeting that is specific for casework services.  I
20  help to implement the guidelines of casework services.  I
21  help in support with the director in implementing the
22  mission of the agency as a whole.
23      I'm responsible for the accounting -- partially
24  for the accounting with casework services.  I receive any
25  feedback from clients who may or may not be -- any

15

1  complaints that a client may have or any positive feedback
2  that they want to provide in response to services they
3  received.  I help to staff difficult or complicated
4  situations with clients that one of my staff members may
5  have difficulty in problem solving on their own.
6  Q.  Anything else you can think of?
7  A.  From my memory as far as my job description and
8  what was given to me, that's reflective of what's on
9  there.  There are other responsibilities that come up just
10  in the uniqueness of the clients that we serve.  One of
11  those would be in working with other partner agencies such
12  as the Texas Department of Public Safety or City of Dallas
13  Vital Records or other agencies who are also working with
14  our same clients.
15  Q.  Anything else?
16  A.  To the best of my knowledge, that would describe
17  it.
18  Q.  And have those job duties that you've now
19  described changed any over the four years that you've been
20  there?  Did you used to have more or less job
21  responsibilities, or have they stayed about the same?
22  A.  They've stayed about the same.
23  Q.  On average, how many clients will you have as
24  part of your casework services that you actually provide
25  yourself on a weekly basis?  Are we talking 100 people, 10

16

1  people, 2 people, average week?
2  A.  Average week, I would estimate between 50 and
3  75.
4  Q.  And of those 50 to 75 clients that you
5  personally help on average a week, are -- what would you
6  say their principal request from you as their caseworker
7  would be?  Is there a principal one, or is it so assorted
8  that it just depends on the week?
9  A.  The primary reason why the person is asking for
10  help to meet with me varies a lot.
11  Q.  And do you -- how do you document -- after you
12  visit with somebody, an individual, how will you document
13  what it is that which you've done for him or her?
14  A.  We have a database that we document the notes.
15  Q.  And that's just a computer system?  So does that
16  mean each person that comes in gets a unique client
17  identifier number or case number, or is it done by last
18  name in the system?
19  A.  To locate a client in the system, you can look
20  through name, date of birth, or sometimes Social Security
21  number.
22  Q.  Are any of the 50 to 75 people new clients to
23  the Stewpot, or would they all be recurring business?
24  A.  It would be a combination of new to the Stewpot
25  and people who are returning.

17

1  Q.  Okay.  And with regard to a new person, what
2  kind of paperwork will you have them fill out or help them
3  fill out so that you can set it up to make an evaluation
4  of what needs need to be addressed?
5  A.  When a new person comes who we've not met with
6  before, we do a search to verify that.  And if they are
7  not in our database, which is where we keep our notations,
8  then we would create a new profile for them in the
9  database.
10  Q.  What information do you obtain from them for the
11  database?
12  A.  Their name, date of birth, last four digits of
13  their social, the current shelter or location that they
14  are residing at night, an emergency contact, if they are a
15  United States veteran, if they are recently within the
16  past three months released from prison or jail, if a
17  person is a registered sex offender, if a person receives
18  income through government agencies such as Social Security
19  Administration, and the city or county they were born.
20  Q.  Anything else you can think of that goes into
21  the database for a new client?
22  A.  As far as the profile.
23  Q.  So what you just described is the profile; is
24  that correct?
25  A.  Yes.

18

1   Q.   So what else is there that y'all take in
2   information-wise from a new client other than profile
3   information?
4   A.   I'm sorry, and then if they have a phone number
5   to reach them.
6   Q.   So now let's go to the next step.   What
7   besides -- so that's profile information you obtain from
8   each new client.   What else do you obtain from each client
9   as they come in?
10   A.   We request for them to show us voluntarily what
11   forms of identification they already have with them.
12   Q.   Okay.   Then do you note that in their file?
13   A.   Uh-huh, yes.
14   Q.   And then what else?
15   A.   We also ask for them to present, if they have
16   one, a letter, what's called a letter of residency, which
17   is a letter from the shelter or the transitional housing
18   agency that they live with that documents their residency.
19   Q.   Okay.   Anything else?
20   A.   There are other supporting documents that we ask
21   for them to present, but those are on a case-by-case
22   situation based on their situation, where they're living
23   or what type of income they may receive.
24   Q.   And so once you get the information you've
25   described that you've acquired through the profile and the

19

1   other three items that you've identified, the forms of ID
2   that they have -- or two things, I'm sorry, the form of ID
3   and present a letter of residency, then you have a
4   conversation with them to try to determine what it is that
5   you can do to help them?
6   A.   Yes.
7   Q.   And that will determine next what other areas
8   you may need as far as background information or other
9   information you need from them?
10   A.   Yes.
11   Q.   And at the conclusion of that, do you then make
12   a decision on trying to get that person -- so let's say
13   it's an ID that the person needs and they know their
14   Social Security number, they know where they were born,
15   they were born in Dallas, Texas, we'll say for our
16   example, but they don't have a birth certificate and they
17   don't have an ID of any other kind and you've got money in
18   the budget to be able to get this information and this is
19   a person that wants to get a job, because I think from
20   talking to Reverend Buchanan, I understood that that may
21   come into play as well on whether you can get -- send them
22   in that direction toward getting an ID.
23   So the question gets to be with all of that as a
24   setup on the question, what would you undertake at that
25   point in time of a new client to do for them?  Will you go

20

1   ahead and try to get them to go get their birth
2   certificate and get their driver's license or voter
3   registration card on that same day?  Take me through that
4   process.  Is it a multiple day?  Do you tell them to come
5   back the next day?  I just want to understand where you go
6   from there.
7   MR. SHAPIRO:  Objection to form.
8   MR. SCOTT:  I object to it, too.  I'm
9   joining in.
10   A.   Can you rephrase your question?
11   Q.   (By Mr. Scott) I can.  So take me through the
12   next process that you go through with the new client.
13   A.   Okay.  After completing the profile and after
14   asking to see what forms of identification, what
15   supporting letter of residency they have, there are
16   follow-up questions that we will ask them to see if they
17   qualify for our financial assistance, if they've
18   identified that their specific need is for Texas ID or
19   other vital records.
20   Based on their answers to what their situation
21   is, then we will determine if they're eligible.  So if
22   they are eligible, then we will get further information
23   about exactly what documents they may or may not be
24   required to have in order to get the Texas ID or other
25   vital record, which is their goal to obtain.

21

1   Q.   So what is the -- what's the threshold for which
2   somebody becomes qualified or not financially?
3   A.   At the Stewpot through casework services, our
4   primary focuses are on individuals not only who are
5   experiencing homelessness but specifically who are
6   residing currently as of the time that they are coming to
7   request the assistance at an emergency shelter in the
8   Dallas area, a person who is residing in a place that is
9   not fit for habitation in the Dallas area, a person who is
10   recently, meaning within the past three months, released
11   from jail or prison, a person who receives unearned income
12   through an agency such as Social Security Administration,
13   a person who has been recently evicted, a person who shows
14   reasonable -- there are exceptions that we'll make if a
15   person is at risk of experiencing one of those
16   classifications, but those would be the qualifications
17   for it.
18   Q.   So if someone is currently employed, would that
19   person ever qualify for a photo ID assistance?
20   A.   Yes.
21   Q.   Okay.  Same question if someone is currently
22   employed, would someone ever qualify for obtaining a
23   Social Security certification -- I'm sorry, a replacement
24   birth certificate, financial assistance to get a birth
25   certificate?

22

1    A.  Yes, if the person meets the criteria of
2  experiencing homelessness, as staying in a homeless
3  shelter, place not fit for human habitation or a
4  transitional or supportive housing program for individuals
5  who were previously homeless.
6    Q.  Okay.  Your initial statement was someone who
7  lives in an unfit habitation.  Would that just include just
8  basically on the streets, right?
9    A.  Outside -- examples of that could be sleeping
10  outside, sleeping in a car, sleeping in an abandoned
11  building, sleeping in some type of structure that might be
12  on somebody's property, would be examples of --
13    Q.  Okay.  So out of those approximately, what was
14  it, 50 to 75 persons you see on average, how many of those
15  would be looking for an ID, a photo ID?
16    A.  More than half.
17    Q.  Okay.  And same question with regard to needing
18  a birth certificate?
19    A.  More than half would be in need of one,
20  specifically to answer that question, yes.
21    Q.  Okay.  And so what percentage of the folks that
22  you would see on an average week would be incarcerated
23  within the last three months?  Recently incarcerated, I
24  think is the term.  So they're recently released from
25  incarceration, however you want to address it.

24

1    Q.  Okay.  So it's a check to the Department of
2  Public Safety, in re:  John Scott photo ID?
3    A.  No.
4    Q.  Okay.  What does it say?
5    A.  Just made out to Texas Department of Public
6  Safety.
7    Q.  Okay.  And then do y'all have a tracking number
8  so you can backtrack from an accounting standpoint and
9  assign it to the client that y'all paid it for?
10    A.  Yes.
11    Q.  Describe that briefly.
12    A.  There is a check number on each check unique to
13  that check.  And in the database, when a person is issued
14  that check, it's created -- we create a case, and in that
15  case note, it's documented that specific check number and
16  then just verifies what the dollar amount equates to.
17    Q.  And what the purchase was for?
18    A.  Yes.
19    Q.  And so the same process would be followed with
20  vital statistics if someone was going over to the City of
21  Dallas to obtain a copy of their birth certificate,
22  correct?
23    A.  No, it is different.
24    Q.  Okay.  Describe that.
25    A.  We have a voucher that we issue to the client

23

1    A.  I don't have the exact percentage, but it would
2  be close to half, more than 25 percent.
3    Q.  Okay.  Of the recently released from
4  incarceration, what percentage of those people do not
5  have -- let me rephrase that.  What percentage of those
6  people are in need of birth certificates and/or photo IDs
7  that y'all see on average?
8    A.  I'm sorry, repeat the question again.
9    Q.  Sure.  Of the group of people that you see at
10  Stewpot that are recently released from incarceration,
11  what percentage of those people would you -- do you -- on
12  average come to Stewpot in need of either a photo ID or a
13  birth certificate or both?
14    A.  More than half, if not close to 75 percent.
15    Q.  Okay.  With regard to financial assistance that
16  you help provide to the folks who need either a photo ID
17  or a birth certificate or both, how is the payment for --
18  let's take the DPS payment for a photo ID.  How is that
19  payment made to the Department of Public Safety?
20    A.  The First Presbyterian Church issues hard copy
21  checks to us, and so a check is issued to the client to
22  pay for Texas Department of Public Safety items.
23    Q.  So does the check actually say to -- let's say
24  I'm the new client.  It would say to John Scott, paid to?
25    A.  No.

25

1  who qualifies for a Texas birth certificate for them to be
2  able to purchase the birth certificate specifically at
3  city hall.
4    Q.  How long does it take folks to go over to city
5  hall -- once they get over to city hall, how long does it
6  take them to get a birth certificate, on average?
7    A.  If the birth certificate is on record, they get
8  it at the same time that they make the purchase.
9    Q.  And if it's not on record?
10    A.  Then they will give them instructions that they
11  aren't able to issue the birth certificate at their
12  location, and then they -- typically on the feedback that
13  clients tell us, they're given directive to either go
14  through the county in which they were born or through the
15  state, through Austin.
16    Q.  And so to better understand your source of
17  knowledge, in the last four years, how many birth
18  certificates -- how many times have you accompanied a
19  client or anyone else over to the birth certificate
20  location at the vital statistics or to vital statistics
21  for the purpose of obtaining a birth certificate?
22    A.  Less than five times.
23    Q.  How about over the last two years, any times?
24    A.  Less than five times.
25    Q.  Very rare event?

Kristina Mora - 7/15/2014

---

**26**

1    A.   Yes.

2    Q.   Same type of question with regard to going to

3    the Department of Public Safety and helping someone obtain

4    some type of photo ID, either a driver's license or a

5    personal identification card.  How many times have you

6    accompanied someone during your four years at Stewpot over

7    to the Department of Public Safety to assist them in

8    obtaining that type of photo ID?

9    A.   When the Texas Department of Public Safety had a

10   location at city hall, it would happen infrequently, but

11   it did happen more often than currently after that

12   location closed down.

13   Q.   And do you recall when that happened?

14   A.   Approximately two years ago.

15   Q.   So in the past two years, have you accompanied

16   anyone for the purpose of obtaining some type of photo ID

17   at a Department of Public Safety office who originated

18   from Stewpot?

19   A.   Less than five times.

20   Q.   Would it have been the same five or less than

21   five clients at both locations?

22   A.   Not necessarily.

23   Q.   And by less than five, would that include zero?

24   A.   To clarify, you mean in one given year?

25   Q.   Yes, ma'am.  Let's say in 2013, do you recall

---

**27**

1    specifically taking anyone to go get a birth certificate

2    or photo ID?

3    A.   Yes.

4    Q.   Okay.  Do you recall doing it twice?

5    A.   Yes, but not the same office.

6    Q.   Okay.  And then the individuals you helped get

7    the photo IDs, do you recall their names?

8    A.   No.

9    Q.   Do you recall approximately when that took

10   place?

11   A.   No.

12   Q.   Do you recall which DPS offices you went to for

13   each of the two people?

14   A.   Specifically in 2013?

15   Q.   Yes, ma'am.

16   A.   Northwest Highway and Jupiter location in

17   Dallas.

18   Q.   And was that the closest location for you to

19   take them?

20   A.   Yes.  I'm sorry, one of three locations.

21   There's another office that's equally -- there's two that

22   are approximately equal locations.

23   Q.   Are all of them serviced by a bus line?

24   A.   They are on the train, and they are on the DART

25   system.

---

**28**

1    Q.   Okay.  So a combination either exclusively of

2    light rail and/or light rail and the bus system will get

3    someone to all three of those DPS locations, correct?

4    A.   They do require both the train -- the rail

5    system, the bus system, and walking.

6    Q.   How far is the walk from the last bus stop?

7    Let's pick one of the three, and let's go by each one.  So

8    there was -- Northwest Highway is one location you said,

9    correct?

10   A.   Yes.

11   Q.   So what's the closest bus stop to that location?

12   If you don't know, you can tell me that.

13   A.   Approximately not more than two blocks.

14   Q.   And the next location was at Jupiter, or was it

15   just Northwest Highway and Jupiter?

16   A.   That's one location.

17   Q.   And the second location is where?

18   A.   Red Bird.

19   Q.   And Red Bird, how far a walk is it from where

20   the bus or train departs the person to the closest point

21   to the DPS station?

22   A.   I would say less than two blocks.

23   Q.   And then what is the third location?

24   A.   That's the one referred to as the mega center.

25   Q.   And how far does a person have to walk that

---

**29**

1    takes train and/or bus to get to that location, the

2    closest point?

3    A.   That one is less than 2 miles.

4    Q.   Okay.  So the first two locations are much

5    easier for somebody to access than the mega center?

6    A.   Physically walking.

7    Q.   Physically walking?

8    A.   Yes.

9    Q.   And the mega center, the closest -- it's your

10   recollection that the closest bus or train that drops off

11   there is over 2 miles from there or within 2 miles?

12   A.   Within 2 miles.

13   Q.   That's a bigger range.  Is it more than a mile,

14   less than 2?  Is it more than 2 blocks?

15   A.   It is more than 2 blocks and less than 2 miles.

16   Q.   Okay.  That's fine.  What interaction do you

17   have on any kind of basis with the Department of Public

18   Safety?  Do you have a contact there when you have

19   questions?

20   A.   I do.

21   Q.   What's that person's name?

22   A.   I have two people that I communicate with.  One

23   is the supervisor, Kristi, or -- I don't know what her

24   exact role is there, but she's another staff member, and

25   her name is Diana.

---

Kristina Mora - 7/15/2014

30

1    Q.    And do you know which location they're at?
2    A.    The Northwest Highway and Jupiter.
3    Q.    And how long have you worked with both of those
4  ladies?
5    A.    More than two years.
6    Q.    And how have you found them in a professional
7  manner?  Competent, incompetent?
8    A.    I have found them competent.
9    Q.    And have they been courteous?
10   A.    Yes.
11   Q.    Do you know them in any social settings outside
12  of work?
13   A.    No.
14   Q.    So your interaction with them has been purely
15  professional, correct?
16   A.    Correct.
17   Q.    And with regard to your interaction with both,
18  it has involved questions you had regarding identification
19  or forms of identification they would be issuing on behalf
20  of clients?
21   A.    Repeat that again.
22   Q.    Sure.  Your interaction with them, did it deal
23  with just issues relating to photo IDs?
24   A.    Texas state ID, yes.
25   Q.    And when is the last time you had any dealing

31

1  with either one?
2    A.    Last week.
3    Q.    And what was that interaction about?
4    A.    It was a question in regards to suspension fees.
5    Q.    And what's a suspension fee?
6    A.    I don't know the exact definition of what Texas
7  Department of Public Safety says is a suspension fee.  How
8  it relates to what that question was with the staff member
9  was that when we look on the Texas Department of Public
10  Safety website to check eligibility to see if a client is
11  eligible to obtain a Texas driver's license, if it comes
12  up as a person having an outstanding fee, the question was
13  in regards to that.  A suspension appeared to be on that
14  person's case with Texas Department of Public Safety.
15  There was an outstanding fee, and the question is was it
16  in regards to that.
17   Q.    Was that with Ms. Davis's case?  Do you recall
18  what case it was involving?
19   A.    I don't.
20   Q.    Okay.  But it was your case, or it was someone
21  else's case?
22   A.    It was somebody else's case.
23   Q.    And with regard -- whose case was it?
24   A.    Cindy Bailey, one of my caseworkers.
25   Q.    Is that the normal process or procedure for --

32

1  it's my understanding you have five and a half people that
2  work under you --
3    A.    Yes.
4    Q.    -- as caseworkers?
5    A.    Yes.
6    Q.    Is Cindy a part time, or is she full time?
7    A.    Full time.
8    Q.    And is it the process that you do all the
9  calling to DPS or to vital statistics, or is it just
10  because she needed some help from a time management
11  standpoint?
12   A.    It is not an official agreement that I'm the
13  primary person who contacts them for questions.
14  But historically, normal course of business is
15  you're the point of contact between DPS and Stewpot?
16   A.    Yes.
17   Q.    And that's been true for at least the last
18  couple of years?
19   A.    Yes.
20   Q.    Have you dealt with anyone other than those two
21  ladies that you identified earlier at DPS?
22   A.    No.
23   Q.    And prior to --
24   A.    I'm sorry.  I'm sorry.  So those two individuals
25  at that location.  I also am in communication with the

33

1  supervisor of the Red Bird office.
2    Q.    And who is that?
3    A.    Jenita Washington.
4    Q.    Let me ask you some same questions about
5  Ms. Washington.  Have you found her to be professional in
6  your dealings with her?
7    A.    Yes.
8    Q.    Have you found her to be competent?
9    A.    Yes.
10   Q.    And courteous?
11   A.    Yes.
12   Q.    So anybody else that you deal with with regard
13  to the Department of Public Safety?
14   A.    Yes.
15   Q.    Who?
16   A.    Due to not interacting on a frequent basis, I
17  don't remember their exact names, but I have spoken with a
18  supervisor through the mega center location.  I believe --
19  I could be incorrect, but to my understanding, there are
20  three supervisors who I am potentially able to communicate
21  with.  I just don't recall their names.
22   Q.    And the phone -- so let's break that up a little
23  bit.  Who gave you the names of the folks over at the mega
24  center to deal with or their phone numbers?
25   A.    If I recall, to the best of my understanding, I

Kristina Mora - 7/15/2014

34

1 contacted the general number to that location and asked to
2 speak to a supervisor, and they directed me to one of the
3 staff members.  Then I obtained the other staff member's
4 information through that person.
5    Q.   Is that the same way that you obtained Kristi,
6 Diana, and Ms. Washington's name?
7    A.   No.
8    Q.   How is it different?
9    A.   At the time when the city hall DPS office was
10 open, I physically went to that location to ask to speak
11 to the supervisor there, and they were the ones that gave
12 me the contact information directly to the other
13 locations.
14    Q.   And have you -- so you said you spoke to someone
15 a couple of weeks ago?
16    A.   Yes.
17    Q.   Who is it you spoke to?
18    A.   Last week I spoke with Diana.
19    Q.   In the last two months, how many different
20 people at the Department of Public Safety would you say
21 you have spoken to, or how many times?
22    A.   The first question, I've spoken with three
23 different staff members.
24    Q.   Okay.
25    A.   And in the last month --

35

1    Q.   Last two months.
2    A.   I'm sorry, the last two months, anywhere from 10
3 phone call conversations to 15.
4    Q.   During any of those conversations, have you
5 raised the issue of election ID cards?
6    A.   No.
7    Q.   What would be the -- I mean, I'm trying to
8 understand better what your conversations with those folks
9 are regarding problems.  I'm assuming they're problems,
10 correct?
11    A.   Yes.
12    Q.   And you're reaching out to them to get their
13 assistance in resolving those problems, correct?
14    A.   Yes.
15    Q.   Is that because y'all have sent somebody over
16 there and they've come back empty handed, or what was the
17 typical problem?  I'll take any of the 10 to 15 that you
18 can recall in the past two months.
19    A.   A typical call that I'll send over there is to
20 ask to clarify what requirements a person needs to have
21 with them in order to successfully get the ID.
22    Q.   Okay.
23    A.   Forms of identification or fees in different
24 scenarios in order to successfully get the Texas
25 identification.

36

1    Q.   And so that's true of all 10 to 15 calls,
2 probably, right?
3    A.   There are a number of those people that we were
4 calling to verify what the expiration date was of their
5 last ID based on the person not being able to recall that
6 information.
7    Q.   Okay.  And so the Department of Public Safety,
8 if you call over there and say, I've got John Scott in the
9 room and he doesn't know whether he's got a valid ID or
10 not, he doesn't have it with him, he thinks it may be
11 valid, they'll answer the question as to whether I still
12 have a -- possess a valid ID if you call them?
13    A.   If I call with the client present, they're able
14 to verify what the status is of their Texas ID or driver's
15 license, yeah.
16    Q.   And that's something that if there's any other
17 caseworkers that you're -- that are there at Stewpot have
18 that issue with someone that they don't know whether they
19 have a valid one still or not, they would bring that
20 person over to you for you to help interact with the DPS?
21    A.   Yes.
22    Q.   They wouldn't do it on their own?
23    A.   Correct.
24    Q.   And do you know of an example where over the
25 last couple of months any of the individual caseworkers

37

1 would have been -- had individual conversations on their
2 own with the Department of Public Safety about one of the
3 caseworkers -- I'm sorry, about one of the cases that they
4 were working on?
5    A.   Just to clarify -- I'm sorry, can you repeat the
6 question?
7    Q.   Sure.  During the last two months, do you know
8 of any situation where one of the caseworkers at Stewpot
9 have had separate conversations with the Department of
10 Public Safety about one of the clients at Stewpot, not
11 involving you?
12    A.   To my recollection, I don't have any specific
13 examples; but it is possible that they have called the
14 Texas Department of Public Safety for general questions,
15 not questions specifically like the ones I've mentioned
16 before.
17    Q.   So if you're on vacation or gone for sick leave,
18 who takes over and does that?
19    A.   They don't.
20    Q.   Okay.
21    A.   They don't call.
22    Q.   During the course of your four years, have you
23 ever seen an individual who has come into the Stewpot and
24 asked for assistance in obtaining an identification card
25 of some kind so they can vote?

Kristina Mora - 7/15/2014

38

1    A.  Yes.
2    Q.  Okay.  Tell me who that -- how many times.
3    A.  In the four years that I've been there, I
4  couldn't recall exactly how many.  I do know that it
5  doesn't happen as often that that's the primary, but it
6  does happen that they identify that's the primary reason
7  of why they need their ID.  More often when they come in,
8  they identify that they need their ID, and then they have
9  multiple reasons when they describe why they need the ID,
10  and voting is included in that.
11    Q.  So one of the things that Reverend Buchanan
12  raised is that these -- the population is homeless that
13  come to y'all?
14    A.  Yes.
15    Q.  Is that true of everybody?
16    A.  No.
17    Q.  Okay.  So there are those people who are not
18  homeless that are simply down on their luck?
19    A.  Low income families.
20    Q.  And they would -- do y'all track in any form or
21  fashion when somebody comes and documents that they say
22  they need an identification for purposes of voting, do
23  y'all track that at all other than what you described in
24  the process of putting it in case notes?
25    A.  No, not differently from the case notes.  But we

39

1  do document if one of the documents that -- if they
2  qualify and one of the documents that we are assisting
3  them in obtaining is a voter's registration card, we do
4  document that.
5    Q.  So the only way to know for sure for certain how
6  many people -- strike that.  If a person comes in and
7  identifies that the only reason they want a photo ID is so
8  that they can go vote, would that be documented in their
9  case file?
10    A.  My best answer to that question would be that
11  there would be some that that would be documented in the
12  database specifically, and then there would be some that
13  it may not be documented.  For example, if that person
14  were to communicate that they needed their ID for the
15  purpose of being able to vote at our intake -- at our
16  front desk where we do the intake, the conversations and
17  information provided by the client at the front desk is
18  not documented.  It's documented when that person is able
19  to meet with a caseworker in their office.
20    And to be clear, though, my example is a person
21  who is there for a single item, that is, they want a voter
22  ID -- they want a photo ID so they can vote.  So there
23  would be no difference in what they are asked at the front
24  desk or at the caseworker situation, which I'm talking
25  about.  Are you aware of any situation like that that's

40

1  happened?
2    MR. SHAPIRO:  Objection, ambiguous
3  question.
4    A.  I can't say if that has happened before or not.
5  I do know that there have been people who have identified
6  at the front desk where we do our intake that they do need
7  ID in order to obtain voter -- I'm sorry, to be able to
8  vote.  That person may not have met the criteria to be
9  eligible to meet with a caseworker, so not all persons who
10  communicate their needs at the front desk have the
11  opportunity to meet with a caseworker at that same time.
12  So there are persons that have communicated at that front
13  desk that they need their ID in order to obtain voter --
14  the ability to vote but may not have been able to
15  communicate that to a caseworker in their office for it to
16  be documented.
17    Q.  (By Mr. Scott)  So now let's get out of the
18  realm of may from the standpoint of what you actually know
19  for sure for certain.
20    A.  Okay.
21    Q.  Do you recall the intake person -- I think y'all
22  have two intake people; is that correct?
23    A.  No.  We have three.  We have two part-time staff
24  members and one volunteer.
25    Q.  And do you recall specifically over the last

41

1  four years that you've been in your job having any of
2  those people identify to you either during the course of
3  business or at the 3:00 meeting on Tuesday, staff meeting,
4  that they had encountered that situation?
5    A.  Specifically that a person communicated they
6  needed an ID to be able to vote?  Yes.
7    Q.  And that would have come from one of those three
8  people?
9    A.  No, not necessarily.
10    Q.  Okay.
11    A.  Yes, but we have -- it could have come from them
12  specifically.  I could have encountered it myself at the
13  front desk, or one of the caseworkers, if a caseworker is
14  filling in for a person at the front desk.
15    Q.  So now let's limit the world down to as we sit
16  here today, can you recall a date and time where -- or a
17  date where you encountered that at the front desk, someone
18  seeking help obtaining a voter -- a photo ID in order to
19  vote?
20    A.  I do know that it has happened.  I can't recall
21  a specific date.
22    Q.  Okay.  And do you recall any individual as we
23  sit here today who brought that request to you?
24    A.  Not their specific name.
25    Q.  And as we sit here today, do you recall whether

Kristina Mora - 7/15/2014

42

1  it was a female or male that made that request?
2      A.   There have been males and there have been
3  females.
4      Q.   But for specifics of being able to remember
5  something specific, you don't have that recollection as we
6  sit here today?
7          MR. SHAPIRO:  Objection.
8      Q.   (By Mr. Scott)  Is that correct?
9          MR. SHAPIRO:  Mischaracterizes testimony.
10     A.   Can you rephrase?
11     Q.   (By Mr. Scott)  Sure.  As we sit here today, you
12  don't recall the name of a person who brought that issue
13  to you about not having a photo ID and needing assistance
14  in order to vote, correct?
15     A.   No, I don't recall their name.
16     Q.   And as we sit here today, you don't recall the
17  date that that person would have come in that you don't
18  recall the name of, correct?
19     A.   There are -- on more than one occasion, I have
20  experienced a person identifying that they needed ID to
21  obtain -- to be able to vote.
22     Q.   Yes.  But you don't recall -- I'm trying to find
23  out what you recall specifics.  I understand what you said
24  in general terms.  So now we're taking it to the next
25  level.  We know that you don't recall their name?

43

1      A.   Yes, sir.
2      Q.   So I think you testified that you don't recall
3  the date that any of those instances happened either,
4  correct?
5      A.   That is correct.
6      Q.   Okay.  So -- well, I guess that's all I need to
7  know.  The only way for a person such as me to know
8  exactly what y'all have put in your system on all these
9  different clients in the last four years, at least, to
10  find these people that you've identified would be to go
11  through those records, correct?
12     A.   Yes.
13     Q.   And those records are contained by patient -- I
14  mean, the client's name, their date of birth, and the last
15  four of their Social Security number, correct?
16     A.   It would be name or date of birth or the last
17  four digits of their social.
18     Q.   And is there an overall index of names, a
19  printed name index of everybody who has attended or is a
20  client or has been a client over the last four years?
21     A.   There is a -- the database would document
22  clients who have engaged in casework services who have met
23  with a caseworker.  So not all persons who have
24  communicated their need for services would be included in
25  that database.

44

1      Q.   And what's that document called?  Is there a
2  name for the document that keeps track of all that?
3      A.   I don't -- I wouldn't know how to refer to it as
4  a specific name.  It just would be the listing of -- I
5  believe it refers to just clients in that database.
6      Q.   Do you know a lady by the name of Hazel Davis?
7      A.   It is possible that that is a name of a client,
8  but I don't know specifically.
9      Q.   It may be somebody you know or are familiar with
10  their name that may be a client or a past client at the
11  Stewpot?
12     A.   Correct.
13     Q.   But somebody not that you have a personal
14  relationship or have ever worked with, correct?
15     A.   Correct.
16     Q.   And do you know what services Ms. Davis would
17  have obtained at Stewpot?
18     A.   No, not off the top of my head.
19     Q.   Do you recall interacting with the Department of
20  Public Safety at all on behalf of Ms. Davis?
21     A.   I don't recall that specifically.
22     Q.   What's your maiden name?
23     A.   Enriquez.
24     Q.   And then when did you get married?
25     A.   In 2007.

45

1      Q.   And do you have any children?
2      A.   I do, three.
3      Q.   Three?
4      A.   Yes.
5      Q.   Boys, girls, all different things?
6      A.   Boy, girl, boy.
7      Q.   Okay.  What are their ages?
8      A.   Seven, four, and about to be two.
9      Q.   And you currently reside in what city?
10     A.   Irving.
11     Q.   And how long have you lived there, ma'am?  Since
12  November 2011?
13     A.   No.  We moved to Irving --
14     Q.   March 2005?
15     A.   No.
16     Q.   This is why we ask these questions.
17     A.   I'm sorry, I don't recall the -- I believe it
18  was in 2008 that we moved to Irving.  I could be wrong.
19  It could be 2009.
20     Q.   Was the first place you lived in Irving on Red
21  Bird Drive?
22     A.   Yes.
23     Q.   And then you currently live on Cunningham
24  Street?
25     A.   Yes.

Kristina Mora - 7/15/2014

46

1   Q.   Have you ever attended Tarrant County College in
2   Fort Worth?
3   A.   Tarrant County Community College in --
4   Q.   Or Mansfield?
5   A.   Arlington, Mansfield, yes, I have.
6   Q.   Do you recall what classes you took while you
7   were there?
8   A.   They were just basic courses that I don't
9   remember specifically.  I believe there might have been an
10  English course, a literature course.  I remember there was
11  a physical -- no, I don't remember my courses there,
12  something to do with running.  We did running in the
13  course.
14  Q.   As we sit here today, can you identify -- can
15  you name a name of an individual that you know of either
16  firsthand or secondhand that has not been able to obtain a
17  photo ID as a result of y'alls efforts at the Stewpot?
18  A.   As of right now, yes, but we haven't -- we're
19  still working on it.
20  Q.   And what's that person's name?
21  A.   I'm sorry, you asked me, so then I go blank.
22  Linda Beckham.
23  Q.   And Ms. Beckham, how long -- is attempting to
24  get a Texas driver's license or a Texas photo ID?
25  A.   A Texas non-driver's ID.

47

1   Q.   And how long have y'all been attempting to do
2   that for Ms. Beckham?
3   A.   More than one year.
4   Q.   And what are the problems that y'all have
5   encountered?
6   A.   Ms. Beckham -- Ms. Beckham's birth was not
7   recorded through the state in which she was born, and so
8   she, although had different supporting forms of
9   identification, specifically the birth certificate has
10  been one of the difficult challenges in helping her to get
11  her ID.  We've had to initiate, and we're still going
12  through the delayed birth certificate request for her.
13  Q.   And when did y'all undertake to obtain the
14  delayed birth certificate request?
15  A.   Approximately -- we have not been able to start
16  that process until the beginning of this year, 2014.
17  Q.   So it is underway with DSHS?  Y'all have done it
18  with Department of State Health Services?
19  A.   Yes.  I'm sorry, it's through the state of
20  Oregon.
21  Q.   It is a process that they have certain
22  requirements regarding issuing a birth certificate for
23  somebody where they can't find record of birth in their
24  state?
25  A.   Correct.

48

1   Q.   And she believes she was born there, but she
2   doesn't have any proof and her relatives are all gone?
3   A.   The documentation that she has of her birth,
4   there is documentation of a city in Oregon where she was
5   born.  Unfortunately you have to have multiple documents
6   to support that.  And some of the documents, the one has
7   her name correctly, the city in which she reports being
8   born, but it does not include the date of birth.  It's not
9   incorrect, it just doesn't include the date of birth.  So
10  we've had to investigate different documents that we can
11  find that they are able to accept that document, name,
12  place of birth, and date of birth.  So that's been a
13  challenge.
14  Q.   So how long have y'all been dealing with the
15  state of Oregon on just simply trying to confirm that this
16  person actually was born in Oregon?
17  A.   To my best understanding, it was at least August
18  of 2013 that we began requesting her birth certificate
19  through the state of Oregon.
20  Q.   And that's why we're coming up on the year at
21  the end of this month?
22  A.   Uh-huh.
23  Q.   Is that correct?
24  A.   Work had been started before August of 2013, but
25  to try to obtain other supporting documents before going

49

1   through Oregon to send off for that first request for the
2   birth certificate.
3   Q.   Oregon wanted some baseline information in order
4   to be able to -- be able to issue a birth certificate to
5   begin with?
6   A.   Correct.  They require proof of identity in
7   order to obtain that birth certificate.
8   Q.   What type of proof of identity do they require?
9   A.   I do not recall specifically, but on average
10  with Texas or other out-of-state birth certificate,
11  out-of-state birth certificate requests, primarily it is
12  required to present a state ID or a state driver's license
13  or a United States passport.  If those cannot be shown,
14  then they -- various states may request to have a family
15  member to request that record on their behalf.
16  Q.   That have supporting documentation?
17  A.   That would have supporting documentation.  A
18  number of clients that we work with do not have
19  communication with living relatives or -- and/or do not
20  have any living -- or do not have any living relatives for
21  that to be possible.
22  Q.   Now, so Ms. Beckham, has she been your case that
23  you've worked on -- has she been your client the whole
24  time?
25  A.   No, but I have staffed and followed up on that

50

1 case specifically.
2    Q.   How is it that she ended up in Dallas, Texas?
3    A.   If I recall correctly, she -- it was due to
4 relocating due to marriage or a relationship.  I believe
5 it was marriage.
6    Q.   And did she marry in the state of Oregon?
7    A.   I don't recall if the marriage took place in
8 Oregon and then they moved to Texas or if they moved to
9 Texas in order to get married.
10    Q.   How old a woman is she?
11    A.   She is older than 50.
12    Q.   Has she gone to a -- have y'all attempted by
13 going to a Department of Public Safety license facility to
14 actually get an ID for her yet?
15    A.   The staff at the Stewpot have not on her behalf.
16 The client on her behalf has gone to -- on more than one
17 occasion to the Texas Department of Public Safety to
18 request being able to get her non-driver's ID.
19    Q.   And why would she have gone on more than one
20 occasion?
21    A.   In an effort to be able to get it.
22    Q.   She didn't have supporting documentation and
23 still doesn't have supporting documentation necessary to
24 obtain a driver's license or a photo ID in Texas, correct?
25    A.   That's correct.

51

1    Q.   And that's been true at least through the time
2 that y'all have worked with her at Stewpot, correct?
3    A.   That's correct.
4    Q.   And at least based upon your understanding
5 through conversation with her and conversations she's had
6 with staff, she's not had that type of proper
7 documentation in order to ever get that DPS since she's
8 been interacting with DPS during the time frame we've been
9 talking about, correct?
10    A.   I would not say it's correct to say ever.  But
11 yes, at point in time, there was not appropriate
12 documentation for her to successfully get a Texas ID.
13    Q.   Has she sought any other services over at
14 Stewpot?
15    A.   Yes.
16    Q.   What services?
17    A.   Clothing services, dental services, hygiene, and
18 then just general being present at the facility.
19    Q.   And does she -- is she a homeless person?
20    A.   She is experiencing homelessness.
21    Q.   And how long has that been true?
22    A.   Since we began working with her, which has
23 been -- would be more than a year.  I can't recall the
24 first time that we started working with Ms. Beckham in any
25 services at the Stewpot.  I do recall that we began the ID

52

1 services approximately summer of 2013.  She has been
2 homeless throughout the time that we have begun the ID
3 services with her.  Prior to that, it is required to be
4 homeless to be able to get the services that she was
5 getting, but I don't recall the interaction and
6 specifically asking her if she was homeless myself.
7    Q.   Was she registered to vote before she came -- in
8 Texas before she came to the Stewpot?
9    A.   I can't recall the answer to that.  I don't know
10 the answer to that question.
11    Q.   Do you recall whether y'all helped her obtain a
12 voter registration card for purposes of trying to get a
13 photo ID?
14    A.   Yes, sir.
15    Q.   And help me understand a little better that
16 process.  Voter ID cards, the obtaining of it is free,
17 right?  I mean, I can register for it, but there's no cost
18 associated in Texas in obtaining it?
19    A.   Correct.
20    Q.   And it will serve -- if I have an address on it,
21 which I can use Stewpot's address, it will serve as a form
22 of identification to help me obtain other documents I need
23 to get a photo ID, correct?
24    A.   Some documents.
25    Q.   Okay.  Is it a primary or secondary source for

53

1 photo ID from the Department of Public Safety?
2    A.   It is a supporting document.
3    Q.   If I have it together with a birth certificate,
4 I can obtain a photo ID, correct?
5    A.   That depends on if it's a -- if it's a
6 duplicate, a renewal, or if it's an original or if it's
7 been more than two years since their last one expired.
8    Q.   Well, if it's less than two years, I don't even
9 need a birth certificate, correct?
10    A.   It can be used, but no, it's not required.
11    Q.   But we're talking about someone who is coming in
12 and wanting a brand new photo ID, identification card.
13    A.   An original ID card?
14    Q.   Yes.
15    A.   Yes, it would -- it does count as one of the
16 supporting documents, but it would -- it and the birth
17 certificate would still require another supporting
18 document as well as their proof of residency.
19    Q.   And did you receive any training on ways to
20 assist people who are homeless in obtaining photo
21 identifications?
22    A.   No, not officially.
23    Q.   So you've got on-the-job learning since you
24 started at Stewpot?
25    A.   Correct.

54

1  Q.  And the Stewpot method at least is -- and I call
2  it the Stewpot method; it may be widespread amongst
3  different missions -- but is to obtain documents in the
4  least costly way, supporting documents in the least costly
5  way in order to obtain a photo ID for a person if that is,
6  in fact, the goal of obtaining a photo ID for the person,
7  for the client, correct?  You want to spend the least
8  amount of money to get there?
9  A.  Yes.  Cost of obtaining the documents is
10  definitely considered.
11  Q.  Yes.
12  A.  Yes.
13  Q.  And Reverend Buchanan said that last year y'all
14  had a budget of about $60,000 which was combined budget
15  for both birth certificates and photo IDs?
16  A.  Correct.
17  Q.  And that there were a little over 4200 people in
18  the year 2013 that obtained some combination of those
19  documents or photo IDs?  Does that sound about right to
20  you?
21  A.  I don't recall the specific number, but that
22  does sound like it would be possible that that's the
23  number.
24  Q.  And so being careful with those dollars and
25  cents and preserving them for the purpose of obtaining

55

1  either a birth certificate or a photo ID makes common
2  sense?
3  A.  Yes.
4  Q.  And a voter registration card -- are you aware
5  of any other missions that are like Stewpoint -- Stewpot,
6  I'm sorry, in the Dallas/Fort Worth metroplex?
7  A.  We are not aware of another agency or group that
8  provides financial assistance to obtain IDs or other vital
9  records.
10  Q.  How about down in Houston, are y'all aware of
11  one down there?
12  A.  Yes, through the Presbyterian Church, but I
13  don't recall the name.
14  Q.  And do you recall whether, in fact, they use a
15  similar process in using voter registration cards as a way
16  of obtaining a supporting document to effectuate getting a
17  photo ID?
18  A.  I'm actually not aware of what their procedures
19  are, but I would -- in understanding what's required, I
20  would guess that that would be true.
21  Q.  It's one of the easiest and most secure forms of
22  alternate supporting proof there is to obtain, right?
23  A.  I wouldn't say -- it is my opinion that it is
24  more possible to obtain a voter's registration card than
25  other documents that a person -- it's not even possible to

56

1  obtain.  But I would also say there are some barriers in
2  being able to obtain the voter's registration card for the
3  number of people we see as a whole.
4  Q.  What are those barriers?
5  A.  If a person is currently on parole or probation
6  or if they have committed a felony offense and are on
7  parole or probation.
8  Q.  And that's by statute?  They are just simply
9  not --
10  A.  Yes.
11  Q.  -- eligible?
12  A.  Correct.
13  Q.  Are any supporting documentation required when
14  you submit for someone like Ms. Beckham a -- an
15  application is filled out for her for a voter registration
16  card?
17  A.  Are you asking if any supporting documentation
18  is required to apply for a voter's registration card?
19  Q.  Yes.
20  A.  No.
21  Q.  And address-wise, what -- where would you have
22  put Ms. Beckham's address on the voter registration card?
23  A.  Yes.  When a client does ask the advice of a
24  caseworker in what address to put on there, we do tell
25  them or remind them that the address on the voter's

57

1  registration card must match, being that it is the
2  residence in which they're staying, what is going to be on
3  their affidavit of residency that is required for Texas
4  Department of Public Safety.
5  Also, when somebody is obtaining a vital record
6  such as a birth certificate and in the occasion when a
7  voter's registration card can be accepted as a form of
8  identification to obtain the birth certificate, the
9  addresses must match.  And so if a person is living at
10  various locations due to experiencing homelessness -- I'm
11  sorry, can you repeat your question?
12  Q.  No, I think you're doing fine.  Let's just
13  follow up with what you just said.  Are they able to
14  use -- do y'all allow -- how about this:  Do you allow or
15  does Stewpot allow any of the clients to use an address,
16  either physical address of Stewpot or some other Stewpot
17  controlled address, for the address to put on the voter
18  registration card?
19  A.  Yes, we make that available.
20  Q.  And is that also true for purposes of obtaining
21  a copy of the birth certificate, that it could be mailed
22  to that location?
23  A.  Yes.
24  Q.  Same thing with the Department of Public
25  Safety's ID card or license?

58

1    A.  That can be true, and it cannot be true.
2    Q.  Cover the two bases.  Let's start with the
3  first, it cannot be true.
4    A.  It cannot be true if a person is claiming an
5  address on their affidavit of residency that is not the
6  Stewpot, then they would not be able to have that ID sent
7  to the Stewpot.  It would have to go to the address that
8  they're -- the sworn statement has as their address.
9    Q.  How about the opposite, in the "can be true"?
10  Are there other cannots?
11    A.  No, that would be the scenario there.  In the
12  statement that it is true, that would be for persons who
13  are residing in habitats not fit for habitation, such as
14  on the street, and they do not have a physical address to
15  use.  Following some specific regulations that we have
16  with that, then we will allow them to use our address as
17  their -- on their affidavit, and we complete that
18  affidavit with them, notarized.
19         MR. SHAPIRO:  Are we getting close to a --
20         MR. SCOTT:  Yeah, probably just two more,
21  and then we'll take a break.
22    Q.  (By Mr. Scott)  So with regard to a person who
23  uses -- strike that.  Are there places to sleep there at
24  the Stewpot?
25    A.  No.

59

1    Q.  There's no place to really reside at the Stewpot
2  for any of the homeless folks, right?
3    A.  It is not -- the Stewpot is not a night shelter;
4  therefore, they're not able to sleep overnight.  They can
5  be present during open office business -- business hours.
6  They are able to be present at that time.
7    Q.  What percentage of the people that you -- that
8  are assisted through Stewpot use Stewpot address as their
9  address for purposes of their photo ID or their voter
10  registration card?
11    A.  I could not answer that question at this time.
12    Q.  That's not something y'all track how many
13  affidavits, for instance, that y'all execute?
14    A.  We do document when the Stewpot completes the
15  affidavit.  I don't know that number.
16    Q.  Who is the notary currently?
17    A.  Currently we have three notaries.
18    Q.  And what are their names?
19    A.  Judy Pfenninger, Mishaal --
20    Q.  Could you spell that last name?  I'm sorry.
21  Phonetically maybe.
22    A.  P-F-E-N-N-I-N-G-E-R.
23    Q.  Okay.
24    A.  Possibly incorrect.  Mishaal Riaz, and Reverend
25  Bruce Buchanan.

60

1         MR. SCOTT:  Good place to stop.  Let's take
2  a break, and I'll go through notes and start getting stuff
3  done so we can beat a little bit of traffic.
4         (Break taken from 3:18 p.m. to 3:28 p.m.)
5    Q.  (By Mr. Scott)  All right.  Back on the record.
6  So as we last left off, we were talking about addresses
7  and the use of the address, and I think you had identified
8  the three people who currently are notaries to the extent
9  an affidavit of residency needs to be signed or notarized
10  for the Department of Public Safety for the purpose of
11  obtaining an ID.  You've identified the three people at
12  Stewpot that you know of that have notaries, correct?
13    A.  Yes.
14    Q.  Has that been true, those three people,
15  throughout the last four years?
16    A.  No.
17    Q.  Who else?
18    A.  A previous employee.
19    Q.  Who is that?
20    A.  Trina Taylor.
21    Q.  And when did Trina Taylor leave?
22    A.  In August of 2013.
23    Q.  How come?  Why did she leave?
24    A.  She accepted a job at a different -- somewhere
25  else.

61

1    Q.  Okay.  Was it another not-for-profit?
2    A.  Yes.
3    Q.  And do you recall the name of that
4  not-for-profit?
5    A.  Yes, Austin Street Shelter.
6    Q.  Is that in Austin, or is it in Fort Worth -- I
7  mean Dallas?
8    A.  It's in Dallas.
9    Q.  Does she still work there, to your knowledge?
10    A.  Yes.
11    Q.  Are you friends with her?
12    A.  I do not have any personal interactions with her
13  other than work related.
14    Q.  Okay.  Earlier today -- this is Mr. Shapiro's
15  favorite line of questions, by the way.  Earlier today
16  Reverend Buchanan identified that he first met Mr. Shapiro
17  about two months ago.  When was the first time you met
18  Mr. Shapiro in person?
19    A.  It would be the same time that Reverend Buchanan
20  met him, which would be approximately two months ago.
21    Q.  And Reverend Buchanan's recollection was that
22  that was a Tuesday because there was a staff meeting that
23  took place afterwards.  Do you recall what date that was?
24    A.  I don't recall --
25    Q.  Do you recall how long --

62

1    A.  -- which date.  I'm sorry, I don't recall which
2  date I met Mr. Shapiro.
3    Q.  And do you recall how much time that y'all spent
4  visiting -- or you spent visiting with Mr. Shapiro that
5  day?
6    A.  It was, I would say, less than 30 minutes.
7    Q.  Did you understand during the course of the
8  conversation that he was helping represent the Department
9  of Justice in its lawsuit against the State of Texas?
10    A.  Yes.
11    Q.  And it would involve voter ID?
12    A.  Yes.
13    Q.  The law?  And do you have a personal opinion
14  about the Texas voter ID law?
15    A.  I don't have a personal opinion.
16    Q.  Neither for it, against it, as we sit here
17  today?
18    A.  No, I don't have a personal opinion about it.
19    Q.  With regard to identifying people who may have
20  been adversely affected by the voter ID law, were you able
21  to identify anybody or any group of individuals to
22  Mr. Shapiro that you believe might fall within the
23  category of people who have been adversely affected by the
24  Texas voter ID law?
25    A.  State your question again.

63

1         MR. SHAPIRO:  Objection, assumes facts not
2  in evidence.
3    Q.  (By Mr. Scott)  Sure.  Were you able to identify
4  to Mr. Shapiro any persons who you believed had been
5  adversely affected by the Texas voter ID law?
6    A.  I did not identify any specific persons that had
7  been adversely affected by it.
8    Q.  What did you identify to him?
9    A.  I gave him a general description that the
10  population of people that we serve potentially had been
11  affected by the law.
12    Q.  And tell me how they were possibly affected.
13    A.  Not being able to vote due to not being able to
14  obtain the identification that's required or having
15  difficulty in covering the costs of being able to obtain
16  the identification needed.
17    Q.  The group of people that you work with at
18  Stewpot that I think y'all refer to as clients, they are
19  people who are needing photo IDs for a variety of reasons,
20  correct?
21    A.  Yes.
22    Q.  Some of those reasons, I think from listening to
23  Reverend Buchanan's testimony, include things as primary
24  as a place to lay your head at night through the Dallas
25  Housing Authority to be able to obtain housing?

64

1    A.  Yeah.  I'm sorry, I wanted to go back to your
2  original, if I may.
3    Q.  Oh, sure.
4    A.  So you had asked, I believe, what -- how were
5  the population of people that we work with adversely
6  affected by that.
7    Q.  Sure.
8    A.  So those things were some of the reasons that I
9  had described to Mr. Shapiro as well as sharing
10  information about the clients that do not necessarily have
11  the financial burden because we're assisting them but
12  still have the difficulties in being able to obtain their
13  ID due to challenges in obtaining the supporting
14  documentation.
15    Q.  But in the four years you've been there, the
16  only person you can think of is Ms. Beckham that's been
17  unable to obtain a voter ID, correct?
18         MR. SHAPIRO:  Objection, misrepresents her
19  testimony.
20    A.  I didn't -- that is not correct.
21    Q.  (By Mr. Scott)  Tell me the names of the other
22  people that Stewpot has not been able to obtain photo IDs
23  for.
24    A.  I'm not able to give you specific names of all
25  the clients that have not been able to successfully get

65

1  their ID.
2    Q.  Give me the ones that you do recall as we sit
3  here today at your deposition.
4    A.  What I can say is that there are a number of
5  clients that we see on a daily basis who are not eligible
6  for our services, so therefore they -- we cannot -- I
7  cannot name those names because I do not know if they were
8  able to successfully obtain their ID or not.
9    Q.  So why were y'all unable to provide those
10  services to those people?
11    A.  Due to the reasons of eligibility that I had
12  identified before or if a person has already been assisted
13  financially in obtaining an ID three times, already three
14  times.  So we do not assist more than three times.
15    Q.  And that's the group of people you say that may
16  have been adversely affected even though you can't name
17  the specific name?
18    A.  Those people would be included as a part of
19  possibly being adversely.
20    Q.  And what other categories of people would you
21  put into that group?
22    A.  The persons that do not financially qualify --
23  I'm sorry, do not qualify for our financial assistance
24  would be part of that group.  People that have already
25  been assisted three times would be a part of that group.

66

1  Also a part of that group would be people who have come to
2  get assistance to obtain Texas ID but were not included in
3  the specific number of people we accept for that day and
4  who chose to leave and not to apply again.
5      Q.   Any other categories of people that you would
6  put into that group that you described as those persons
7  adversely affected?
8      A.   I would also include the persons that I cannot
9  name names specifically right now who still have pending
10 cases that we're working on who, like Ms. Beckham, we
11 haven't successfully been able to help them to obtain the
12 Texas ID yet, that they are still pending cases, so
13 therefore don't have the identification that would be
14 required to be able to vote.
15     Q.   Prior to helping Ms. Beckham get her voter
16 registration completed, how many times has Ms. Beckham
17 voted in the last four years?
18     A.   I don't know the answer to that question.
19     Q.   Do you know if Ms. Beckham attempted to vote in
20 any elections since she got her voter ID card?
21     A.   I don't know the answer to that question.
22     Q.   Do you still see Ms. Beckham?
23     A.   Yes.
24     Q.   Comes on a daily basis Monday through Friday?
25     A.   She comes a minimum on a weekly basis.

67

1      Q.   And her source of income, does any of it -- does
2  she receive any money from the State of Texas?
3      A.   No.
4      Q.   So where does her money come from?
5      A.   She is residing in a homeless shelter, and her
6  resources come from the donations from the shelters in
7  which she stays.
8      Q.   To your knowledge, she's not applied for any
9  type of financial assistance from the state or federal
10 government?
11     A.   I can't say whether or not she's applied.  I
12 know that she has not been awarded benefits due to the
13 fact that she doesn't have the proper identification to
14 complete that process.
15     Q.   Okay.  And what's her first name?
16     A.   Linda.
17     Q.   And how old a woman is she?
18     A.   Greater -- more than 50 years old.
19     Q.   And off the top of your head, would be the
20 greatest answer ever if you came through, do you know
21 what her date of birth is?
22     A.   I don't know exactly what her date of birth is.
23     Q.   I was going to let you go if you came through
24 with the answer.  Okay.  So let's get back to the
25 Mr. Shapiro line of questions.  So you visited with him

68

1  for about 30 minutes in that first visit in person?
2      A.   Yes, sir.
3      Q.   Did you have any telephone conversations with
4  him?
5      A.   No, we have not.
6      Q.   So when was -- have you had any other visits
7  with him in person other than that first time about two
8  months ago?
9      A.   Yes.
10     Q.   When was that?
11     A.   It was approximately one to two weeks later.
12     Q.   And he came back into town and visited with you
13 in person?
14     A.   We met in person, yes.
15     Q.   Where did y'all meet?
16     A.   In my office.
17     Q.   Okay.  And did you go through the database of
18 people looking for names of people to provide to
19 Mr. Shapiro off the database?
20     A.   No.
21     Q.   Did you ever try and find an individual to
22 identify to the Department of Justice of someone who had
23 been adversely affected or in that group of folks you
24 earlier described as being adversely affected?
25     A.   We did make it available to request any persons.

69

1  It was a very specific statement that we had given, giving
2  an opportunity for persons who had been adversely or
3  potentially adversely affected to be able to speak with
4  Mr. Shapiro that same day.
5      Q.   How did y'all spread the word on that?
6      A.   We have a microphone, and so I made that
7  opportunity available.  Then they can sign up and speak to
8  Mr. Shapiro, and then after -- in that same morning, then
9  Mr. Shapiro made that same request for people to come
10 forward.
11     Q.   So how many people signed up?
12     A.   Less than five people.
13     Q.   And do you recall the names of those five, or
14 did you maintain a copy of that signup sheet?
15         MR. SCOTT:  It's multifarious, I agree.
16     A.   I don't recall the names of the individuals, and
17 I -- I can't recall if I kept a copy of the signup or if
18 Mr. Shapiro has that information.
19     Q.   (By Mr. Scott)  And did you sit in on the
20 conversations with the individuals?
21     A.   No.
22     Q.   And are all five people -- you don't recall --
23 do you recall any of the names?
24     A.   I do not.
25     Q.   And so the five that you were able to run down

Kristina Mora - 7/15/2014

70

1 and bring into the fold that had signed up on the list,
2 those had signed up before Mr. Shapiro had come?  They had
3 already signed up to come before that day, or they signed
4 up the same day?
5     A.  It was at the same time.  So we made the
6 announcement, and then they voluntarily came and signed
7 up.
8     Q.  And did this happen on more than one occasion or
9 just this one occasion?
10     A.  This one occasion.
11     Q.  Have y'all done some other searching or running
12 of potential witnesses?
13     A.  No.
14     Q.  Have y'all ever done anything like -- is that
15 part of the normal process to go out and try and drum up
16 witnesses for people?
17     A.  We -- since I've been there in my time working
18 there, I have not been approached by an attorney and
19 requested to invite clients to meet with that attorney in
20 this nature.
21     Q.  Do you know if anybody else has ever had such an
22 invitation?
23     A.  I can't say other than the times that I've
24 worked there.
25     Q.  And Reverend Buchanan, was he okay with this

71

1 process taking place?  Did you get his approval in order
2 to do it, I guess?
3     A.  Yes.
4     Q.  And to your knowledge, have any of the
5 caseworkers been instructed in an attempt to locate
6 through their files or their dealings with their clients
7 potential witnesses for the Department of Justice?
8     A.  No.
9     Q.  So this is something that has been done
10 principally by you or Reverend Buchanan with regard to the
11 activities at the Stewpot?
12     A.  Repeat your question.
13     Q.  Sure.  So the activities done to recruit
14 potential witnesses for the Department of Justice lawsuit
15 against the State of Texas has principally been controlled
16 at the Stewpot by you or Reverend Buchanan, correct?
17         MR. SHAPIRO:  Objection, mischaracterizes
18 her testimony, compound question, objection as to form as
19 well.
20     Q.  (By Mr. Scott)  You may answer.
21     A.  Can you be more specific in your question?
22     Q.  To your knowledge, has anyone else at Stewpot
23 other than you and Reverend Buchanan attempted to recruit
24 potential witnesses for the Department of Justice in their
25 lawsuit against the State of Texas?

72

1     A.  I don't know if I agree with the word recruit,
2 but we did communicate an opportunity for those who were
3 interested to come forward to speak with Mr. Shapiro.  And
4 that happened on one occasion, and it was approved by
5 myself and Mr. Buchanan.
6     Q.  Were they given a -- were they eating lunch
7 there?  Was it a lunchtime meeting?  Did the meeting with
8 these five people, did it take place there -- strike all
9 that.  Did the meeting with these five people, did it all
10 take place at the Stewpot?
11     A.  Yes.
12     Q.  And was it during lunch hour?
13     A.  No.
14     Q.  Coffee, doughnuts, stuff provided while they did
15 the interviews?
16     A.  There were no coffee or doughnuts provided
17 during the interview.
18     Q.  Do you recall if there was -- how long the
19 interview process took place?
20     A.  I don't recall the exact amount of time, but it
21 was not -- I don't recall the exact amount of time.
22     Q.  Do you know whether any of these individuals,
23 the five that you don't recall the name of, do you recall
24 if any of them had sought mental health services from the
25 facilities available at Stewpot?

73

1     A.  I can't say whether or not they have sought
2 mental health services at the Stewpot.
3     Q.  You don't recall, or that's something you feel
4 you're not able to speak to because of privacy issues?
5     A.  I do not know if they engaged in mental health
6 services at the Stewpot or not.
7     Q.  Okay.  Percentage-wise, what percentage of the
8 population of clients are currently seeking or in the past
9 sought mental health services through Stewpot or the
10 partnership Stewpot provides?
11     A.  I don't know how many of the clients that we
12 serve at the Stewpot have engaged in mental health
13 services through the partner agency that we have at the
14 Stewpot specifically.
15     Q.  Are you able to estimate a percent?
16         MR. SHAPIRO:  Objection, ambiguous.
17     Q.  (By Mr. Scott)  Are you able to estimate a
18 percentage of the population of clients at Stewpot who
19 have currently or in the past sought mental health
20 services through Stewpot's partnership with a mental
21 health provider?
22     A.  For me it is difficult to answer that question
23 specifically because there are more than one mental health
24 providers, and we don't have any type of measurement on if
25 they meet with the one that is located at our facility or

74

1 if other -- if they meet with other mental health
2 professionals.
3     Q.   So to better understand what knowledge you have
4 and what is available in the records of the case records
5 for any client at Stewpot, if -- I thought I understood
6 you earlier to say that if y'all arrange for services for
7 a client, those services that y'all arrange for should be
8 documented in the case file for that client; is that
9 correct?
10     A.   I wouldn't say that is correct.  What I would
11 say is correct is that when a client meets with a
12 caseworker, they identify what their needs are.  So it's
13 based on what they have verbalized as their needs at that
14 time.  And we document the information or the referrals
15 that we've provided to the client in response to what they
16 have identified as their needs at that point in time.
17     Q.   When you hire a caseworker, how do you assure --
18 or do you direct them to maintain accurate and complete
19 records regarding the clients?
20     A.   When a new employee is hired, we train them on
21 acceptable forms of documentation.
22     Q.   And by acceptable, the only acceptable form is
23 complete and accurate information in the client's records,
24 right?
25     A.   It would be included in appropriate

75

1 documentation to be complete based on the interview that
2 they had and what was spoken about complete and truthful.
3     Q.   And services that were arranged as a result
4 of -- first of all, does the caseworker then try and
5 arrange services that they believe will meet the needs and
6 are available for that client?
7     A.   Not necessarily.
8     Q.   Who will?
9     A.   I cannot answer that question.
10     Q.   I'm talking about -- I'm talking about at
11 Stewpot.  I'm not talking about if somebody walks off --
12 one of the clients walks off and wanders over to Parkland
13 or to Southwestern or Baylor.  I'm talking about people
14 that are at your offices and facility.  You understand
15 that?
16     A.   I do.
17     Q.   And so are you telling me that there is the
18 possibility that one of the clients or all of the clients
19 are obtaining healthcare services that were arranged or
20 facilitated at Stewpot and are not documented in that
21 client's records of Stewpot?
22     A.   That is not necessarily true.
23     Q.   Have you ever corrected an employee for not
24 maintaining accurate records?
25     A.   No.

76

1     Q.   And when you were at Child Protective Services,
2 did you receive any training in proper recordkeeping?
3     A.   Yes.
4     Q.   And have you taken those lessons and installed
5 those with the folks at Stewpot?
6     A.   Not the entirety of the training that I received
7 at Child Protective Services have I given to my staff at
8 the Stewpot.
9     Q.   It wasn't about the entirety.  It was about
10 recordkeeping.  So recordkeeping that you learned --
11 recordkeeping processes and procedures that you learned at
12 Child Protective Services, have you taken that information
13 and tried to train as best possible the people that you
14 manage at Stewpot in recordkeeping?
15     A.   Specifically in recordkeeping, I have -- okay.
16 I'm sorry, ask your question one more time.
17         MR. SCOTT:   Read it back, please.
18         (Requested portion was read back.)
19     A.   I have taken -- the important principles of
20 recordkeeping that I learned with Child Protective
21 Services in their training, I have shared that with my
22 staff through their training in casework services.
23     Q.   (By Mr. Scott)  What are the important
24 principles of recordkeeping that you've shared with your
25 staff?

77

1     A.   I've shared with my staff the importance of that
2 there is documentation when a service is provided, there
3 is documentation that is truthful, documentation that is
4 concise and yet is descriptive enough that if another
5 person is to read it, can understand the best picture of
6 what happened during their interaction.
7     Q.   And how do you ensure that those important
8 principles that you've passed on to your staff are
9 actually being followed by your staff?
10     A.   I read not every but most notes of what the
11 caseworkers are documenting when they meet with their
12 clients.
13     Q.   And do you get a copy sent to you by e-mail or
14 some electronic means, or is there a shared drive database
15 that all can access at the same time?
16     A.   It is a shared database by staff members at the
17 Stewpot that can share and all look at that documentation.
18     Q.   Did anyone at the Department of Public Safety to
19 your knowledge tell anyone at Stewpot that it was okay to
20 sign an affidavit of residency and using the address at
21 Stewpot on Young Street?  Is it on Young Street?  What
22 street is it on?
23     A.   Our physical address is on Young Street.
24     Q.   Okay.
25     A.   And our mailing address is also Young Street.

78

1    Q.   And so do you recall any conversations with
2  anyone from Stewpot that you were a part of with
3  Department of Public Safety where they said it was okay
4  for an affidavit of residency to be filled out using
5  Stewpot's physical address on Young Street?
6    A.   Yes.
7    Q.   And who told y'all that?
8    A.   I'm sorry?
9    Q.   Who told you that?
10   A.   Who is the staff member through the Texas
11  Department of Public Safety?
12   Q.   Yes.
13   A.   It was -- it was the supervisor at the city
14  hall.  It's been more than one person.  The first time we
15  heard it was the supervisor at the city hall DPS location,
16  which I do not recall what her name is.  I know she's a
17  female.  I don't remember what her name is.  She was not
18  there a long time.
19   Q.   And you said it's multiple people?
20   A.   And then once that office closed and I initiated
21  conversations with supervisors at the previously mentioned
22  locations, I verified with them that the procedure we had
23  already been implementing in completing the affidavits for
24  those most appropriate, that that would be approved, and
25  they said that yes, those would be approved.

79

1    Q.   And do you recall when that conversation took
2  place, month, year?
3    A.   In 2012.
4    Q.   And when did the city hall location shut down?
5    A.   2012.
6    Q.   And why was it that you felt a need to refresh
7  and ask someone new this question about the affidavit of
8  residency?
9    A.   The law that required for proof of residency was
10  still relatively new, and in the beginning, there were in
11  our opinion understandingly some challenges in completing
12  the affidavit because Texas Department of Public Safety
13  did not train us in how to assist the clients that we
14  helped in fulfilling that requirement.  Therefore, we
15  initiated and said, this is what we do, this is how we
16  help our clients, how can we help in completing -- helping
17  them to complete this requirement.  Therefore, it was
18  agreed upon that we would be able to complete the
19  affidavit and for our address to be used and that it would
20  be notarized.
21   Q.   So this was a very important issue, obviously?
22   A.   Uh-huh.
23   Q.   Is that a yes?
24   A.   Yes.
25   Q.   So did you document this with a memorandum to

80

1  the file?
2    A.   No.
3    Q.   Did you document your telephone call in any way,
4  e-mail, some other thing?
5    A.   No.  It was a verbal confirmation from the
6  supervisor.
7    Q.   And you don't --
8    A.   At Texas.
9    Q.   And do you recall the supervisor's name, not the
10  city hall one but the other one in 2012?
11   A.   At the Northwest Highway and Jupiter location,
12  it was Kristi, is the supervisor at that location that I
13  had that conversation with, as well as Ms. Washington,
14  Jenita Washington, at the Red Bird office.
15   Q.   So you've run this to ground through multiple
16  sources, right?
17   A.   Correct.
18   Q.   And you recall all these specific instances that
19  you ran it to ground?  There's three different times that
20  you ran it to ground that it was proper to do an affidavit
21  of residency using the Young Street address as the
22  residency address for the clients?
23   A.   For some clients, not all clients.
24   Q.   Sure.  Percentage-wise, do you know?
25   A.   No.

81

1    Q.   And do you recall the time -- for
2  Ms. Washington, was that also in 2012?
3    A.   I'm sorry, to go back to that question that you
4  just stated, I can say that more affidavits are not
5  completed by the Stewpot using our address than are.
6    Q.   And so let's get back to Kristi and
7  Ms. Washington in 2012.  Why did you then after confirming
8  this with a supervisor at city hall and then confirming it
9  with Kristi at the Northwest Highway location for
10  Department of Public Safety did you feel a need to contact
11  Ms. Washington and confirm it with her?
12   A.   Because when I first began at the Stewpot in
13  2010, the partnership had -- between a Stewpot staff
14  person and Texas Department of Public Safety was primarily
15  just with the city hall location because of the close
16  proximity.  We did not have very few, if not any -- I
17  would say very few communications with other DPS offices.
18      When the city hall DPS office closed, for
19  continuity for our clients, I initiated contact with the
20  supervisor at Northwest Highway and Jupiter, and I also
21  contacted Red Bird office because they are different
22  locations and we would be having clients that potentially
23  would be going to either of those locations.  So I wanted
24  to confirm that the procedure we had in place for the
25  residency affidavit would be accepted and that we were

82

1 both in open communication that this is what our
2 procedures were and this is what we would be doing. So it
3 was less of trying to obtain approval to complete it and
4 more of just trying to have open communication for
5 continuity for the clients.
6     Q.   Did you ever attempt to obtain a memorandum of
7 understanding with the Department of Public Safety?
8     A.   No.
9     Q.   Have you ever attempted to get any kind of
10 official documentation from the Department of Public
11 Safety regarding the affidavit of residency and the use of
12 the Young Street address on behalf of Stewpot other than
13 your three conversations that you told me about through
14 somebody at these different locations?
15     A.   Well, we'd go off of the -- we do go off of the
16 literature that is accessible through the DPS website that
17 communicates that if a person is residing at a shelter or
18 who is getting mail services through an agency, that that
19 agency can complete the affidavit on their behalf. So
20 already, the Stewpot falls under that documentation that's
21 already printed up and available. So to answer your
22 question, no, it was not requested to have anything in
23 writing stating that we could fill out this affidavit.
24     Q.   So I get back to the question of -- I'm having
25 difficulty understanding. You seem like there was

83

1 something document-wise, whether it was on DPS's
2 website -- is that where that was that you just quoted?
3     A.   The DPS website, correct.
4     Q.   And so that seems like that's something that
5 satisfied you that y'all were doing it properly, correct?
6     A.   We saw the documentation. We read what it
7 stated. There were still questions on exactly how the
8 form should be completed because it says that a person
9 needs to come in person with the client if completing the
10 affidavit with them. There wasn't specific literature on
11 if it's an agency who is completing the affidavit on their
12 behalf. So therefore, I wanted to clarify how -- because
13 we would not be able to go in person with every client,
14 what would be the acceptable way that we could fill out
15 that affidavit on that client's behalf.
16     Q.   To your knowledge, does the Stewpot track how
17 many voter registration applications it passes out and
18 assists the clients in completing for purposes of
19 obtaining a voter registration card?
20     A.   Some, but not all.
21     Q.   Okay. So what is the most recent number you
22 recall, approximately, 2013?
23     A.   I don't know the exact number.
24     Q.   When is the last time you saw those numbers?
25     A.   I have not seen those numbers.

84

1     Q.   Ever?
2     A.   I'm sorry, I have not initiated looking up those
3 numbers.
4     Q.   That's not to your knowledge anything that's
5 provided in a report to anybody like an oversight
6 committee?
7     A.   No.
8     Q.   And that's not anything that was obtained in a
9 part of the VAT?
10     A.   Of the --
11     Q.   VAT, the V-A-T?
12     A.   The voter's registration number is not a part of
13 the assessment that was completed.
14     Q.   Do you think it's more or less than ten per
15 year?
16     A.   More or less -- clarify.
17     Q.   Are there more or less than ten voter
18 registrations that Stewpot assists in any given year,
19 calendar year?
20     A.   In the applications?
21     Q.   Yes.
22     A.   Yes, more than ten.
23     Q.   More than 100?
24     A.   It is possible.
25     Q.   A lot is possible? More than 100 probable or

85

1 less than 100?
2     A.   More than 100 probable.
3     Q.   So do you think it's more or less than 1,000?
4     A.   I would say that it's less than 1,000, in my
5 opinion.
6     Q.   Okay. And of that number, whatever number it
7 is, it is a number less than half that use Young Street as
8 the address on those voter registration cards as well?
9     A.   No, I would not make that same statement.
10     Q.   What percent would you believe that to be?
11     A.   That question is hard to answer because not all
12 of the applications that are completed do we read or do we
13 see. Many times we're just providing the piece of paper,
14 so we don't know exactly which address they use.
15     Q.   So of the ones you see, what percentage do you
16 think it is?
17     A.   I still don't -- I don't want to -- I'm sorry, I
18 can't answer that question. But what I can say is that we
19 do have a specific area where voter registration cards
20 that are being waited to be picked up by clients using the
21 Young Street address are maintained.
22     Q.   To your knowledge, are any ballots by mail ever
23 delivered for purposes of attempting to deliver to one of
24 the voters registered at the Young Street address, are
25 they ever delivered to the Young Street address of

86

1  Stewpot?
2      A.   There are ballots that I would guess are
3  delivered to the Stewpot.
4      Q.   And what is the process for holding onto those
5  until the client comes to pick those up?
6      A.   Sure.  Mail services -- general mail services
7  are available for clients to pick up with a picture ID,
8  and it is held for 30 days from the date we receive it.
9      Q.   And then it's returned to sender?
10     A.   It's returned to sender after 30 days.
11     Q.   Are there any turnout the vote operations that
12  are ever taking place over at the Stewpot during election
13  season?
14     A.   Not physically -- since I've been there for four
15  years, not physically at the Stewpot.
16     Q.   Where are they physically held?
17     A.   We have given information to clients in the four
18  years I've been working there that has given them
19  information about being able to engage in supportive
20  voters -- or voting events at the library specifically.
21  Other than that, I don't know of any.
22     Q.   Any -- so would those operations around the
23  library for voter turnout or voter participation, would
24  those have taken place during the last primary season,
25  which would have been March 2014 and May 2014, to your

87

1  knowledge?
2      A.   I don't know that, to my knowledge.
3      Q.   So same question but backtracking to the
4  November 2013 election?
5      A.   I would not say I would be able to say -- I
6  don't know the information to that question.
7          MR. SCOTT:  That's it.  Thank you for your
8  time.  Reserve the rest until the time of trial.
9          MR. SHAPIRO:  No questions.
10         THE REPORTER:  What would you like to do
11  about her reading and signing?
12         MR. SHAPIRO:  I'd like her to have a chance
13  to review the testimony.  So you'll have an opportunity to
14  review the testimony and sign it if you think it's
15  accurate or correct any mistake you see.
16         THE WITNESS:  Okay.
17         THE REPORTER:  Would you like a copy,
18  Mr. Shapiro?
19         MR. SHAPIRO:  I would.
20
21         (WHEREUPON DEPOSITION CONCLUDED
22             AT 4:12 P.M., JULY 15, 2014)
23
24
25

88

1              CHANGES AND SIGNATURE
2  WITNESS NAME: KRISTINA MORA
3  DATE: JULY 15, 2014
4  PAGE/LINE          CHANGE          REASON
5
6  _____  _____  _____
7  _____  _____  _____
8  _____  _____  _____
9  _____  _____  _____
10  _____  _____  _____
11  _____  _____  _____
12  _____  _____  _____
13  _____  _____  _____
14  _____  _____  _____
15  _____  _____  _____
16  _____  _____  _____
17  _____  _____  _____
18  _____  _____  _____
19  _____  _____  _____
20  _____  _____  _____
21  _____  _____  _____
22  _____  _____  _____
23  _____  _____  _____
24  _____  _____  _____
25

89

1      I, KRISTINA MORA, have read the foregoing
   deposition and hereby affix my signature that same is true
2  and correct, except as noted above.
3
4
                _____
5                KRISTINA MORA
6
7
8
9  THE STATE OF _____)
10  COUNTY OF _____)
11
12     Before me, _____, on this
13  day personally appeared KRISTINA MORA, known to me (or
14  proved to me under oath or through
15  _____) to be the person whose name
16  is subscribed to the foregoing instrument and acknowledged
17  to me that they executed the same for the purposes and
18  consideration therein expressed.
19     Given under my hand and seal of office this
20  _____ day of _____, _____.
21
22
23                _____
                  NOTARY PUBLIC IN AND FOR
24                THE STATE OF _____
                  COMMISSION EXPIRES: _____
25

Kristina Mora - 7/15/2014

90

1          UNITED STATES DISTRICT COURT
             SOUTHERN DISTRICT OF TEXAS
2               CORPUS CHRISTI DIVISION
3  MARC VEASEY, et al,        )
                              )
4        Plaintiffs           )
                              )
5  VS.                   ) CIVIL ACTION
                              )
6                        ) NO. 2:13-CV-00193
   RICK PERRY, et al,          )
7                              )
         Defendants        )
8
9
10         REPORTER'S CERTIFICATION
           DEPOSITION OF KRISTINA MORA
11             JULY 15, 2014
12      I, Tobi Moreland, Certified Shorthand Reporter in
   and for the State of Texas, hereby certify to the
13  following:
14      That the witness, KRISTINA MORA, was duly sworn by
   the officer and that the transcript of the oral deposition
15  is a true record of the testimony given by the witness;
16      That the deposition transcript was submitted on
   _____ to the witness or to the attorney for
17  the witness for examination, signature and return to
   Integrity Legal Support Solutions by _____;
18
        That the amount of time used by each party at the
19  deposition is as follows:
20     Mr. John B. Scott.....2 Hours, 15 Minutes
21     That pursuant to information given to the
   deposition officer at the time said testimony was taken,
22  the following includes counsel for all parties of record:
23   Mr. Avner Shapiro, Attorney for Plaintiffs
     Mr. John B. Scott, Attorney for Defendants
24
25     That $_____ is the deposition officer's
   charges to the Defendants for preparing the original

91

1  deposition transcript and any copies of exhibits;
2       I further certify that I am neither counsel for,
   related to, nor employed by any of the parties or
3  attorneys in the action in which this proceeding was
   taken, and further that I am not financially or otherwise
4  interested in the outcome of the action.
5       Certified to by me this _____ day of
   _____, 2014.
6
7
8
9
       _____
10       Tobi L. Moreland, CSR 3317
         Expires 12/31/15
11       Integrity Legal Support Solutions
         CRCB #528
12       3100 West Slaughter Lane
         Suite A-101
13       Austin, Texas 78748
         (512) 320-8690
14
15
16
17
18
19
20
21
22
23
24
25

---
$
---

**$** 90:25

**$60,000** 54:14

---
1
---

**1** 1:14

**1,000** 85:3,4

**1:47** 1:21

**10** 15:25 35:2,17 36:1

**100** 15:25 84:23,25
  85:1,2

**12** 4:17 7:8

**12/31/15** 91:10

**12548** 2:12

**1412** 1:23

**15** 1:13,21 35:3,17
  36:1 87:21 88:3
  90:11,20

**17901500** 2:16

---
2
---

**2** 3:3 16:1
  29:3,11,12,14,15

**2:13-CV-00193** 1:5
  90:6

**2:45** 13:14,24

**2002** 8:17 9:5

**2004** 8:17

**2005** 45:14

**2007** 44:25

**2008** 45:18

**2009** 45:19

**2010** 81:13

**2011** 45:12

**2012** 79:3,5 80:10
  81:2,7

**2013** 26:25 27:14
  48:18,24 52:1 54:18
  60:22 83:22 87:4

**2014** 1:13,21 47:16
  86:25 87:21 88:3
  90:11 91:5

**202** 2:7

**20530** 2:6

**25** 23:2

---
3
---

**3:00** 13:25 41:3

**3:18** 60:4

**3:28** 60:4

**30** 62:6 68:1 86:8,10

**305-1840** 2:7

**3100** 91:12

**320-8690** 91:13

**3317** 91:10

---
4
---

**4** 3:7

**4:12** 1:21 87:21

**40** 13:4

**4200** 54:17

**475-0131** 2:13

---
5
---

**50** 13:2,4 16:2,4,22
  22:14 50:11 67:18

**512** 2:13 91:13

**528** 91:11

---
7
---

**75** 16:3,4,22 22:14
  23:14

**78711-2548** 2:13

**78748** 91:13

---
8
---

**810** 1:24

**88** 3:3

---
9
---

**90** 3:4

**950** 2:5

**98** 11:6

---
A
---

**A-101** 91:12

**abandoned** 22:10

**ability** 7:1 40:14

**able** 10:10 19:18
  25:2,11 33:20
  36:5,13 39:15,18
  40:7,14 41:6 42:4,21
  46:16 47:15 48:11
  49:4 50:18,21 52:4
  56:2 57:13 58:6
  59:4,6 62:20
  63:3,13,15,25
  64:12,22,24,25 65:8
  66:11,14 69:3,25
  73:4,15,17 79:18
  83:13 86:19 87:5

**above-styled** 1:20

**accept** 48:11 66:3

**acceptable** 74:21,22
  83:14

**accepted** 57:7 60:24
  81:25

**access** 29:5 77:15

**accessible** 82:16

**accompanied** 25:18
  26:6,15

**accounting** 14:23,24
  24:8

**accurate** 74:18,23
  75:24 87:15

**acknowledged** 89:16

**acquired** 18:25

**action** 1:4 90:5
  91:3,4

**activities** 71:11,13

**actually** 15:24 23:23
40:18 48:16 50:14
55:18 77:9

**address** 22:25
52:20,21 56:22,24,25
57:15,16,17
58:5,7,8,14,16
59:8,9 60:7
77:20,23,25 78:5
79:19 80:21,22 81:5
82:12
85:8,14,21,24,25

**addressed** 17:4

**addresses** 57:9 60:6

**addressing** 5:8

**address-wise** 56:21

**Administration** 17:19
21:12

**adversely** 62:20,23
63:5,7 64:5 65:16,19
66:7 68:23,24 69:2,3

**advice** 56:23

**affected** 62:20,23
63:5,7,11,12 64:6
65:16 66:7 68:23,24
69:3

**affidavit** 57:3
58:5,17,18 59:15
60:9 77:20 78:4
79:7,12,19 80:20
81:25 82:11,19,23
83:10,11,15

**affidavits** 59:13
78:23 81:4

**affix** 89:1

**afterwards** 61:23

**against** 62:9,16
71:15,25

**agencies** 10:18
15:11,13 17:18

**agency** 14:22 18:18
21:12 55:7 73:13
82:18,19 83:11

**ages** 45:7

**ago** 26:14 34:15
61:17,20 68:8

**agreed** 79:18

**agreement** 12:4 32:12

**ahead** 20:1

**al** 1:3,6 90:3,6

**allow** 57:14,15 58:16

**already** 18:11
65:12,13,24 70:3
78:23 82:20,21

**alternate** 55:22

**am** 11:9 32:25 33:20
91:2,3

**ambiguous** 40:2 73:16

**amongst** 54:2

**amount** 24:16 54:8
72:20,21 90:18

**and/or** 23:6 28:2 29:1
49:19

**announcement** 70:6

**answer** 4:23 22:20
36:11 39:10 52:9,10
59:11 66:18,21
67:20,24 71:20 73:22
75:9 82:21 85:11,18

**answered** 5:6

**answers** 4:20 20:20

**anybody** 33:12 62:21
70:21 84:5

**anyone** 25:19 26:16
27:1 32:20 71:22
77:18,19 78:2

**anything** 5:2 15:6,15
17:20 18:19 70:14
82:22 84:4,8

**anywhere** 35:2

**Appearances** 3:3

**appeared** 31:13 89:13

**application** 56:15

**applications** 83:17
84:20 85:12

**applied** 11:15 67:8,11

**apply** 56:18 66:4

**approached** 70:18

**appropriate** 51:11
74:25 78:24

**approval** 71:1 82:3

**approved** 72:4
78:24,25

**approximately** 7:12
8:1 13:1 22:13 26:14
27:9,22 28:13 47:15
52:1 61:20 68:11
83:22

**area** 21:8,9 85:19

**areas** 19:7

**aren't** 25:11

**Arlington** 8:21 11:3
46:5

**arrange** 74:6,7 75:5

**arranged** 75:3,19

**arts** 9:7

**assessment** 84:13

**assign** 24:9

**assist** 14:15 26:7
53:20 65:14 79:13

**assistance** 20:17
21:7,19,24 23:15
35:13 37:24 42:13
55:8 65:23 66:2 67:9

**assisted** 59:8
65:12,25

**assisting** 39:2 64:11

**assists** 83:18 84:18

**associated** 52:18

**assorted** 16:7

**assumes** 63:1

**assuming** 35:9

assure 74:17

attempt 71:5 82:6

attempted 50:12 66:19
71:23 82:9

attempting 46:23 47:1
85:23

attend 14:3

Attendance 12:12

attended 43:19 46:1

attorney 1:23 2:11,15
70:18,19 90:16,23

attorneys 91:3

August 48:17,24 60:22

Austin 2:13 25:15
61:5,6 91:13

Authority 63:25

available 57:19 68:25
69:7 72:25 74:4 75:6
82:21 86:7

Avenue 2:5

average 7:8 15:23
16:1,2,5 22:14,22
23:7,12 25:6 49:9

Avner 2:8 90:23

Avner.shapiro@usdoj.g
ov 2:7

awarded 67:12

aware 13:11 39:25
55:4,7,10,18

---

**B**

bachelor 9:7

bachelor's 10:8,11

background 19:8

backtrack 24:8

backtracking 87:3

Bailey 31:24

ballots 85:22 86:2

Bar 2:16

barista 8:3

barriers 56:1,4

based 18:22 20:20
36:5 51:4 74:13 75:1

baseline 49:3

bases 58:2

basic 46:8

basically 22:8

basis 6:11 9:22 13:3
14:8,12 15:25 29:17
33:16 65:5 66:24,25

Baylor 9:3 10:22 11:4
75:13

beat 60:3

Beckham 46:22,23
47:2,6 49:22 51:24
56:14 64:16
66:10,15,16,19,22

Beckham's 47:6 56:22

becomes 21:2

begin 49:5

beginning 10:6 47:16
79:10

begun 52:2

behalf 30:19 44:20
49:15 50:15,16
82:12,19 83:12,15

behind 6:10

believe 33:18 44:5
45:17 46:9 50:4
62:22 64:4 75:5
85:10

believed 63:4

believes 48:1

benefits 67:12

besides 18:7

best 15:16 33:25
39:10 48:17 76:13
77:5

better 25:16 35:8

52:15 74:3

bigger 29:13

Bird 28:18,19 33:1
45:21 80:14 81:21

birth 16:20 17:12
19:16 20:1 21:24
22:18 23:6,13,17
24:21
25:1,2,6,7,11,17,19,
21 27:1 43:14,16
47:6,9,12,14,22,23
48:3,8,9,12,18
49:2,4,7,10,11
53:3,9,16 54:15 55:1
57:6,8,21 67:21,22

bit 14:9 33:23 60:3

blank 46:21

blocks 28:13,22
29:14,15

born 17:19 19:14,15
25:14 47:7
48:1,5,8,16

Bowie 11:3,6

Box 2:12

boy 45:6

Boys 45:5

brand 53:12

break 5:1 33:22 58:21
60:2,4

briefly 24:11

bring 5:6,7 36:19
70:1

brought 41:23 42:12

Bruce 59:25

Buchanan 13:7 19:20
38:11 54:13 59:25
61:16,19 70:25
71:10,16,23 72:5

Buchanan's 61:21
63:23

budget 19:18 54:14

building 22:11

burden 64:11

bus 27:23
28:2,5,6,11,20
29:1,10

business 16:23 32:14
41:3 59:5

―――――――――――
C
―――――――――――

calendar 84:19

cannots 58:10

car 22:10

card 20:3 26:5 37:24
39:3 52:12 53:12,13
55:4,24
56:2,16,18,22
57:1,7,18,25 59:10
66:20 83:19

cards 35:5 52:16
55:15 85:8,19

careful 54:24

case 5:13 6:13 16:17
24:14,15
31:14,17,18,20,21,22
,23 38:24,25 39:9
49:22 50:1 74:4,8

case-by-case 18:21

caseload 12:24

cases 12:25 13:5 37:3
66:10,12

casework 5:22
14:14,17,19,20,24
15:24 21:3 43:22
76:22

caseworker 14:6 16:6
39:19,24 40:9,11,15
41:13 43:23 56:24
74:12,17 75:4

caseworkers 31:24
32:4 36:17,25 37:3,8
41:13 71:5 77:11

categories 65:20 66:5

category 62:23

cause 1:20

center 6:1 7:21,23
10:7 28:24 29:5,9
33:18,24

cents 54:25

certain 39:5 40:19
47:21

certificate 3:4 19:16
20:2 21:24,25 22:18
23:13,17 24:21
25:1,2,6,7,11,19,21
27:1 47:9,12,14,22
48:18 49:2,4,7,10,11
53:3,9,17 55:1
57:6,8,21

certificates 23:6
25:18 54:15

certification 10:2
21:23 90:10

Certified 90:12 91:5

certify 90:12 91:2

chair 13:8

challenge 48:13

challenges 47:10
64:13 79:11

chance 87:12

change 7:16 88:4

changed 7:15 15:19

CHANGES 88:1

charge 6:21 7:2,7

charges 90:25

check 23:21,23
24:1,12,13,14,15
31:10

checks 23:21

Child 6:1 7:21,22
8:7,10,22 9:10,13
10:6,7,19 11:16
12:21 76:1,7,12,20

children 45:1

chose 12:23 66:4

Christi 1:2 4:10 90:2

Church 23:20 55:12

Cindy 31:24 32:6

city 15:12 17:19
24:20 25:3,4,5 26:10
34:9 45:9 48:4,7
78:13,15 79:4 80:10
81:8,15,18

Civil 1:4,24 2:5,12
90:5

claiming 58:4

clarify 12:11 26:24
35:20 37:5 83:12
84:16

classes 46:6

classifications 21:16

clear 39:20

client 15:1 16:16,19
17:21 18:2,8 19:25
20:12 23:21,24
24:9,25 25:19 31:10
36:13 39:17 43:20
44:7,10 49:23 50:16
54:7 56:23
74:5,7,8,11,15 75:6
83:9,13 86:5

clients 13:15
14:17,25
15:4,10,14,23
16:4,22 25:13 26:21
30:20 37:10 43:9,22
44:5 49:18 57:15
63:18 64:10,25 65:5
70:19 71:6
73:8,11,18 74:19
75:12,18 77:12
79:13,16 80:22,23
81:19,22 82:5 83:18
85:20 86:7,17

client's 43:14 74:23
75:21 83:15

**clinic** 6:6

**close** 23:2,14 58:19
81:15

**closed** 26:12 78:20
81:18

**closest** 27:18
28:11,20 29:2,9,10

**Clothing** 51:17

**coffee** 72:14,16

**college** 9:1,2 46:1,3

**Collin** 6:7

**combination** 16:24
28:1 54:18

**combined** 54:14

**comes** 16:16 17:5
31:11 38:21 39:6
66:24,25 86:5

**coming** 21:6 48:20
53:11

**COMMISSION** 89:24

**committed** 56:6

**committee** 84:6

**common** 55:1

**communicate** 29:22
33:20 39:14 40:10,15
72:2

**communicated** 40:12
41:5 43:24

**communicates** 82:17

**communication** 32:25
49:19 82:1,4

**communications** 81:17

**Community** 46:3

**commuted** 6:8,9

**company** 7:10,11,19
11:17 12:7

**competent** 30:7,8 33:8

**complaints** 15:1

**complete** 58:17 67:14

74:18,23 75:1,2
79:17,18 82:3,19

**completed** 66:16 81:5
83:8 84:13 85:12

**completes** 59:14

**completing** 20:13
78:23 79:11,16
83:9,11,18

**complicated** 15:3

**compound** 71:18

**computer** 16:15

**concise** 77:4

**CONCLUDED** 87:21

**conclusion** 19:11

**confirm** 48:15
81:11,24

**confirmation** 80:5

**confirming** 81:7,8

**consideration** 89:18

**considered** 54:10

**contact** 17:14 29:18
32:15 34:12 81:10,19

**contacted** 34:1 81:21

**contacts** 32:13

**contained** 43:13

**continuing** 10:1,3

**continuity** 81:19 82:5

**controlled** 57:17
71:15

**conversation** 19:4
51:5 62:8 79:1 80:13

**conversations**
35:3,4,8 37:1,9
39:16 51:5 68:3
69:20 78:1,21 82:13

**copies** 91:1

**copy** 23:20 24:21
57:21 69:14,17 77:13
87:17

**Corpus** 1:2 4:10 90:2

**correct** 7:8 11:21
13:15 17:24 24:22
28:3,9 30:15,16
35:10,13 36:23 40:22
42:8,14,18
43:4,5,11,15
44:12,14,15 47:25
48:23 49:6 50:24,25
51:2,3,9,10 52:19,23
53:4,9,25 54:7,16
56:12 60:12 63:20
64:17,20 71:16
74:9,10,11 80:17
83:3,5 87:15 89:2

**corrected** 75:23

**Corrections** 3:3

**correctly** 48:7 50:3

**cost** 52:17 54:9

**costly** 54:4

**costs** 63:15

**counsel** 90:22 91:2

**count** 53:15

**county** 4:13,16 6:7
17:19 25:14 46:1,3
89:10

**couple** 10:18 32:18
34:15 36:25

**course** 4:18 5:1 13:10
32:14 37:22 41:2
46:10,13 62:7

**courses** 46:8,11

**court** 1:1 4:11 90:1

**courteous** 30:9 33:10

**Cover** 58:2

**covering** 63:15

**CPS** 8:12,16

**CRCB** 91:11

**create** 17:8 24:14

**created** 24:14

**criteria** 22:1 40:8

**Cruz** 2:19

**CSR** 1:22 91:10

**Cunningham** 45:23

**current** 5:20 17:13

**currently** 5:16 14:13
21:6,18,21 26:11
45:9,23 56:5
59:16,17 60:8
73:8,19

---

D

**daily** 6:13 14:8,12
65:5 66:24

**Dallas** 4:13,15 6:3
15:12 19:15 21:8,9
24:21 27:17 50:2
61:7,8 63:24

**Dallas/Fort** 55:6

**DART** 27:24

**database** 16:14
17:7,9,11,21 24:13
39:12 43:21,25 44:5
68:17,19 77:14,16

**date** 16:20 17:12 36:4
41:16,17,21 42:17
43:3,14,16 48:8,9,12
61:23 62:1,2
67:21,22 86:8 88:3

**Davis** 44:6,16,20

**Davis's** 31:17

**day** 20:3,4,5 62:5
66:3 69:4 70:3,4
89:13,20 91:5

**days** 86:8,10

**day-to-day** 6:11

**DC** 2:6

**deal** 30:22 33:12,24

**dealing** 30:25 48:14

**dealings** 33:6 71:6

**dealt** 32:20

**decision** 19:12

**defendants** 1:6,19
2:10 4:9 90:7,23,25

**definitely** 54:10

**definition** 31:6

**degree** 9:4,6 10:12,22

**delayed** 47:12,14

**deliver** 85:23

**delivered** 85:23,25
86:3

**dental** 51:17

**department** 2:4 5:11
10:15 15:12 23:19,22
24:1,5 26:3,7,9,17
29:17 31:7,9,14
33:13 34:20 36:7
37:2,9,14 44:19
47:18 50:13,17 53:1
57:4,24 60:10 62:8
68:22 71:7,14,24
77:18 78:3,11 79:12
81:10,14 82:7,10

**departs** 28:20

**depends** 16:8 53:5

**deposition** 1:11,18
4:18 5:1 13:8,10
65:3 87:21 89:1
90:10,14,16,19,21,25
91:1

**Deputy** 2:15

**describe** 14:11 15:16
24:11,24 38:9

**described** 14:5 15:19
17:23 18:25 38:23
64:9 66:6 68:24

**description** 3:11 15:7
63:9

**descriptive** 77:4

**desk** 39:16,17,24
40:6,10,13
41:13,14,17

**determine** 19:4,7

20:21

**Diana** 29:25 34:6,18

**difference** 39:23

**different** 24:23
34:8,19,23 35:23
43:9 45:5 47:8 48:10
54:3 60:24 80:19
81:21 82:14

**differently** 38:25

**difficult** 15:3 47:10
73:22

**difficulties** 64:12

**difficulty** 15:5 63:15
82:25

**digits** 17:12 43:17

**direct** 74:18

**directed** 34:2

**direction** 19:22

**directive** 25:13

**directly** 34:12

**director** 7:5 14:21

**disposal** 6:19

**DISTRICT** 1:1 90:1

**DIVISION** 1:2 2:5,12
90:2

**document** 16:11,12,14
39:1,4 43:21 44:1,2
48:11 53:2,18 55:16
59:14 74:14 79:25
80:3

**documentation** 48:3,4
49:16,17 50:22,23
51:7,12 56:13,17
64:14 74:21 75:1
77:2,3,17 82:10,20
83:6

**documented** 24:15
39:8,11,13,18 40:16
74:8 75:20

**documenting** 77:11

**documents** 18:18,20

20:23 38:21 39:1,2
48:5,6,10,25
52:22,24 53:16
54:3,4,9,19 55:25

**document-wise** 83:1

**dollar** 24:16

**dollars** 54:24

**donations** 67:6

**done** 8:6 9:8 16:13,17
47:17 60:3 70:11,14
71:9,13

**doughnuts** 72:14,16

**DPS** 23:18 27:12
28:3,21 32:9,15,21
34:9 36:20 51:7,8
78:15 81:17,18 82:16
83:3

**DPS's** 83:1

**drive** 45:21 77:14

**driver's** 20:2 26:4
31:11 36:14 46:24
49:12 50:24

**drops** 29:10

**drum** 70:15

**DSHS** 47:17

**due** 12:24 33:16
50:3,4 57:10 63:13
64:13 65:11 67:12

**duly** 1:19 4:2 90:14

**duplicate** 53:6

**during** 4:18,25 7:13
10:5 13:10,17 26:6
35:4 37:7,22 41:2
51:8 59:5 62:7
72:12,17 77:6
86:12,24

**duties** 6:4,5 7:14 8:2
9:19 14:12,14 15:18

---

**E**

**earlier** 5:7 13:7
32:21 61:14,15 68:24

74:6

**easier** 29:5

**easiest** 55:21

**eating** 72:6

**education** 10:1,4

**educational** 9:18

**effectuate** 55:16

**effort** 50:21

**efforts** 9:18 46:17

**either** 23:12,16 25:13
26:4 28:1 31:1 41:2
43:3 46:15 55:1
57:16 81:23

**election** 35:5 86:12
87:4

**elections** 66:20

**electronic** 77:14

**eligibility** 31:10
65:11

**eligible** 20:21,22
31:11 40:9 56:11
65:5

**else** 15:6,15 17:20
18:1,8,14,19 25:19
33:12 60:17,25 70:21
71:22

**else's** 31:21,22

**e-mail** 77:13 80:4

**Email** 2:7,14

**emergency** 17:14 21:7

**employed** 21:18,22
91:2

**employee** 60:18 74:20
75:23

**employer** 6:25

**employment** 8:16

**empty** 35:16

**encountered**
41:4,12,17 47:5

**engage** 86:19

**engaged** 43:22 73:5,12

**English** 46:10

**enhance** 9:18

**Enriquez** 44:23

**ensure** 77:7

**entire** 7:13 8:18
13:17

**entirety** 76:6,9

**equal** 27:22

**equally** 27:21

**equates** 24:16

**Esq** 2:8

**estimate** 16:2
73:15,17

**et** 1:3,6 90:3,6

**evaluation** 17:3

**event** 13:23 25:25

**events** 13:20 86:20

**everybody** 14:1,2
38:15 43:19

**evicted** 21:13

**evidence** 63:2

**exact** 10:14 12:11
23:1 29:24 31:6
33:17 72:20,21 83:23

**exactly** 20:23 38:4
43:8 67:22 83:7
85:14

**examination** 3:7 4:3
90:17

**example** 19:16 36:24
39:13,20

**examples** 22:9,12
37:13

**except** 89:2

**exception** 13:19

**exceptions** 21:14

exclusively 28:1

execute 59:13

executed 89:17

exhibits 3:10,12 91:1

experienced 42:20

experiencing 21:5,15
22:2 51:20 57:10

expiration 36:4

expired 53:7

Expires 89:24 91:10

expressed 89:18

extent 60:8

---

### F

facilitate 14:18

facilitated 75:20

facilities 72:25

facility 13:15 50:13
51:18 73:25 75:14

fact 54:6 55:14 67:13

facts 5:13 63:1

fair 6:16

fall 62:22

falls 82:20

familiar 44:9

families 38:19

family 6:1 7:21,22
10:7 11:16 49:14

fashion 38:21

favorite 61:15

federal 1:24 4:11
67:9

fee 31:5,7,12,15

feedback 14:25 15:1
25:12

feel 5:7 73:3 81:10

fees 31:4 35:23

felony 56:6

felt 7:1 79:6

female 42:1 78:17

females 42:3

field 10:12

figure 9:1

file 18:12 39:9 74:8
80:1

filed 4:10

files 71:6

fill 17:2,3 82:23
83:14

filled 56:15 78:4

filling 41:14

financial 20:17 21:24
23:15 55:8 64:11
65:23 67:9

financially 21:2
65:13,22 91:3

fine 29:16 57:12

first 4:2 23:20 29:4
34:22 45:20 49:1
51:24 58:3 61:16,17
67:15 68:1,7 75:4
78:14 81:12

firsthand 46:16

fit 21:9 22:3 58:13

five 7:12 25:22,24
26:19,20,21,23 32:1
69:12,13,22,25
72:8,9,23

five-year 7:14

focuses 21:4

fold 70:1

folks 22:21 23:16
25:4 33:23 35:8 59:2
68:23 76:5

follow-up 20:16

force 12:9

foregoing 89:1,16

form 19:2 20:7 38:20
52:21 57:7 71:18
74:22 83:8

formal 6:24

forms 18:11 19:1
20:14 30:19 35:23
47:8 55:21 74:21

Fort 46:2 61:6

forward 69:10 72:3

frame 51:8

free 5:7 52:16

frequent 33:16

Friday 66:24

friends 61:11

front 39:16,17,23
40:6,10,12
41:13,14,17

fulfilling 79:14

full 32:6,7

functions 6:10

---

### G

general 1:23 2:15
34:1 37:14 42:24
51:18 63:9 86:6

GENERAL'S 2:11

gets 16:16 19:23

getting 19:22 52:5
55:16 58:19 60:2
82:18

girl 45:6

girls 45:5

given 7:4 15:8 25:13
26:24 69:1 72:6 76:7
84:18 86:17,18 89:19
90:15,21

giving 4:20 69:1

goal 8:25 20:25 54:6

gone 37:17 48:2

50:12,16,19

**gosh** 11:17

**government** 17:18
67:10

**graduate** 11:2

**graduated** 9:3 11:6

**graduating** 10:5

**great** 12:6

**Greater** 67:18

**greatest** 67:20

**ground** 80:15,19,20

**group** 23:9 55:7 62:21
63:17 65:15,21,24,25
66:1,6 68:23

**grow** 10:24,25

**guess** 14:7 43:6 55:20
71:2 86:2

**Guidance** 6:1 7:21,22
10:7

**guidelines** 14:20

---

### H

**habitation** 21:9
22:3,7 58:13

**habitats** 58:13

**half** 22:16,19 23:2,14
32:1 85:7

**hall** 25:3,5 26:10
34:9 78:14,15 79:4
80:10 81:8,15,18

**hand** 89:19

**handed** 35:16

**handling** 12:25

**happen** 26:10,11
38:5,6 70:8

**happened** 26:13 40:1,4
41:20 43:3 72:4 77:6

**hard** 23:20 85:11

**haven't** 46:18 66:11

**having** 4:2 13:20
31:12 41:1 42:13
63:14 81:22 82:24

**Hazel** 44:6

**head** 6:22 44:18 63:24
67:19

**health** 6:12 47:18
72:24
73:2,5,9,12,19,21,23
74:1

**healthcare** 75:19

**heard** 78:15

**held** 5:23 86:8,16

**help** 14:17,20,21 15:3
16:5,10 17:2 19:5
23:16 32:10 36:20
41:18 52:15,22 66:11
79:16

**helped** 27:6 52:11
79:14

**helping** 26:3 47:10
62:8 66:15 79:16

**hereby** 89:1 90:12

**he's** 36:9

**Hi** 4:5

**high** 11:2,3

**Highway** 27:16 28:8,15
30:2 80:11 81:9,20

**hire** 74:17

**hired** 74:20

**historically** 32:14

**holding** 86:4

**homeless** 22:2,5
38:12,18 51:19
52:2,4,6 53:20 59:2
67:5

**homelessness** 21:5
22:2 51:20 57:10

**hopefully** 4:20

**hour** 72:12

**hours** 9:23 59:5 90:20

**housing** 18:17 22:4
63:25

**Houston** 55:10

**human** 22:3

**hygiene** 51:17

**hyphen** 12:2

---

### I

**I'd** 87:12

**ID** 19:1,2,13,17,22
20:18,24 21:19 22:15
23:12,16,18 24:2
26:4,8,16 27:2 30:24
35:5,21 36:5,9,12,14
38:7,8,9 39:7,14,22
40:7,13 41:6,18
42:13,20 46:17,24,25
47:11 49:12
50:14,18,24 51:12,25
52:2,13,16,23
53:1,4,12,13 54:5,6
55:1,17 57:25 58:6
59:9 60:11
62:11,14,20,24 63:5
64:13,17 65:1,8,13
66:2,12,20 86:7

**identification** 18:11
20:14 26:5 30:18,19
35:23,25 37:24 38:22
47:9 52:22 53:12
57:8 63:14,16 66:13
67:13

**identifications** 53:21

**identified** 5:11
12:13,15 13:9 19:1
20:18 32:21 40:5
43:10 60:7,11 61:16
65:12 74:16

**identifier** 16:17

**identifies** 39:7

**identify** 10:10 38:6,8
41:2 46:14 62:21
63:3,6,8 68:22 74:12

identifying 42:20
  62:19

identity 49:6,8

IDs 23:6 27:7 30:23
  54:15,19 55:8 63:19
  64:22

I'll 35:17,19 60:2

illness 6:14

I'm 4:19 7:10 14:23
  18:4 19:2 20:8 21:23
  23:8,24 27:20
  32:12,24 35:2,7,9
  37:3,5 39:24 40:7
  42:22 45:17 46:21
  47:19 55:6,18 57:10
  59:20 62:1 64:1,24
  65:23 75:10,11,13
  76:16 78:8 81:3
  82:24 84:2 85:17

immediately 10:22
  11:20

implement 14:20

implementing 14:21
  78:23

importance 77:1

important 76:19,23
  77:7 79:21

incarcerated 22:22,23

incarceration 22:25
  23:4,10

include 22:7 26:23
  48:8,9 63:23 66:8

included 38:10 43:24
  65:18 66:2 74:25

includes 90:22

including 14:2

income 17:18 18:23
  21:11 38:19 67:1

incompetent 30:7

incorrect 33:19 48:9
  59:24

index 3:1 43:18,19

individual 16:12
  36:25 37:1,23 41:22
  46:15 68:21

individuals 21:4 22:4
  27:6 32:24 62:21
  69:16,20 72:22

information 17:10
  18:3,7,24 19:8,9,18
  20:22 34:4,12 36:6
  39:17 49:3 64:10
  69:18 74:14,23 76:12
  86:17,19 87:6 90:21

information-wise 18:2

infrequently 26:10

initial 22:6

initiate 47:11

initiated 78:20 79:15
  81:19 84:2

installed 76:4

instance 1:19 59:13

instances 43:3 80:18

instructed 71:5

instructions 25:10

instrument 89:16

intake 39:15,16
  40:6,21,22

Integrity 90:17 91:11

interact 36:20

interacting 33:16
  44:19 51:8

interaction 29:16
  30:14,17,22 31:3
  52:5 77:6

interactions 61:12

interested 72:3 91:4

intern 2:19

interview 72:17,19
  75:1

interviews 72:15

investigate 13:1
  48:10

investigator
  8:13,14,18 9:11
  12:22

invitation 70:22

invite 70:19

involve 62:11

involved 30:18

involving 31:18 37:11

Irving 45:10,13,18,20

issue 5:8 24:25 25:11
  35:5 36:18 42:12
  49:4 79:21

issued 23:21 24:13

issues 10:13 23:20
  30:23 73:4

issuing 30:19 47:22

item 39:21

items 19:1 23:22

it's 10:10,16
  13:21,22 14:4 19:13
  24:1,14,15 25:9 29:9
  32:1 39:18 47:19
  48:8 51:10
  53:5,6,8,10 55:21,25
  61:8 69:15 74:12
  78:14,19 83:11 84:14
  85:3,4 86:9,10 87:14

I've 34:22 36:8 37:15
  38:3 70:17,23 77:1
  86:14,18

---

J

jail 17:16 21:11

James 11:3

Jenita 33:3 80:14

job 6:4,5,11,15
  7:7,14 8:2 12:19
  14:10,12,14
  15:7,18,20 19:19
  41:1 60:24

**John** 2:15 4:8 23:24
  24:2 36:8 90:20,23

**John.scott@texasattor**
  **neygeneral.gov** 2:14

**joining** 20:9

**judge** 14:11

**Judy** 59:19

**July** 1:13,21 87:21
  88:3 90:11

**Jupiter** 27:16
  28:14,15 30:2 80:11
  81:20

**Justice** 2:4 5:12 62:9
  68:22 71:7,14,24

---
### K

**knowledge** 5:12,13
  9:19 15:16 25:17
  61:9 67:8 71:4,22
  74:3 77:19 83:16
  84:4 85:22 87:1,2

**known** 89:13

**Kristi** 29:23 34:5
  80:12 81:6,9

**Kristina** 1:12,18
  4:1,7 88:2 89:1,5,13
  90:10,14

**Kristine** 2:19

---
### L

**ladies** 30:4 32:21

**lady** 44:6

**Lane** 91:12

**large** 12:24

**last** 16:17 17:12
  22:23 25:17,23 28:6
  30:25 31:2 32:17
  34:18,19,25 35:1,2
  36:5,25 37:7 40:25
  43:9,14,16,20 53:7
  54:13 59:20 60:6,15
  66:17 83:24 86:24

**later** 68:11

**law** 62:13,14,20,24
  63:5,11 79:9

**lawsuit** 4:10 62:9
  71:14,25

**lay** 63:24

**learned** 76:10,11,20

**learning** 53:23

**least** 32:17 43:9
  48:17 51:1,4
  54:1,4,7

**leave** 12:7,19,23
  37:17 60:21,23 66:4

**leaving** 6:5 12:18

**Legal** 90:17 91:11

**less** 8:11 15:20
  25:22,24 26:19,20,23
  28:22 29:3,14,15
  53:8 62:6 69:12 82:3
  84:14,16,17
  85:1,3,4,7

**lessons** 76:4

**let's** 18:6 19:12
  23:18,23 26:25 28:7
  33:22 40:17 41:15
  57:12 58:2 60:1
  67:24 81:6

**letter** 18:16,17 19:3
  20:15

**level** 10:8 42:25

**library** 86:20,23

**license** 10:13 20:2
  26:4 31:11 36:15
  46:24 49:12 50:13,24
  57:25

**licensure** 10:7,10

**light** 28:2

**limit** 41:15

**Linda** 46:22 67:16

**line** 27:23 61:15
  67:25

**list** 70:1

**listening** 63:22

**listing** 44:4

**literature** 46:10
  82:16 83:10

**LITIGATION** 2:12

**little** 8:10 14:9
  33:22 52:15 54:17
  60:3

**live** 6:7 18:18 45:23

**lived** 45:11,20

**lives** 22:7

**living** 18:22 49:19,20
  57:9

**loads** 6:14

**locate** 16:19 71:5

**located** 6:2 73:25

**location** 10:25 17:13
  25:12,20 26:10,12
  27:16,18
  28:8,11,14,16,17,23
  29:1 30:1 32:25
  33:18 34:1,10 57:22
  78:15 79:4 80:11,12
  81:9,15

**locations** 26:21
  27:20,22 28:3 29:4
  34:13 57:10 78:22
  81:22,23 82:14

**long** 4:15 5:18,23
  7:10,25 8:8 25:4,5
  30:3 45:11 46:23
  47:1 48:14 51:21
  61:25 72:18 78:18

**lot** 4:19 16:10 84:25

**Low** 38:19

**luck** 38:18

**Lueders** 2:19

**lunch** 72:6,12

**lunchtime** 72:7

## M

**ma'am** 4:6 26:25 27:15
45:11

**maiden** 44:22

**mail** 82:18 85:22 86:6

**mailed** 57:21

**mailing** 77:25

**Main** 1:23

**maintain** 69:14 74:18

**maintained** 85:21

**maintaining** 75:24

**majority** 7:3

**male** 42:1

**males** 42:2

**manage** 7:2 76:14

**managed** 6:12

**management** 32:10

**manager** 5:22
6:6,16,17,20 7:18
14:6,14

**managing** 6:13,21

**manner** 30:7

**Mansfield** 46:4,5

**MARC** 1:3 90:3

**March** 45:14 86:25

**Marie** 4:7

**MARKED** 3:12

**marriage** 50:4,5,7

**married** 44:24 50:9

**marry** 50:6

**match** 57:1,9

**Matt** 2:19

**may** 5:8 13:20 14:25
15:1,4 18:23 19:8,20
20:23 36:10 39:13
40:8,14,18 44:9,10
49:14 54:2 62:19

64:2 65:15 71:20
86:25

**maybe** 59:21

**mean** 12:4 13:4 16:16
26:24 35:7 43:14
52:17 61:7

**meaning** 21:10

**means** 77:14

**meant** 12:3

**measurement** 73:24

**meet** 16:10 39:19
40:9,11 68:15 70:19
73:25 74:1 75:5
77:11

**meeting** 13:12,25
14:19 41:3 61:22
72:7,9

**meetings** 13:11

**meets** 22:1 74:11

**mega** 28:24 29:5,9
33:18,23

**member** 29:24 31:8
49:15 78:10

**members** 14:4 15:4
34:3,23 40:24 77:16

**member's** 34:3

**memorandum** 79:25 82:6

**memory** 15:7

**mental** 6:12,14 72:24
73:2,5,9,12,19,20,23
74:1

**mentioned** 37:15 78:21

**met** 17:5 40:8 43:22
61:16,17,20 62:2
68:14

**method** 54:1,2

**metroplex** 55:6

**microphone** 69:6

**mile** 29:13

**miles** 29:3,11,12,15

**minimum** 66:25

**minutes** 62:6 68:1
90:20

**mischaracterizes** 42:9
71:17

**Mishaal** 59:19,24

**misrepresents** 64:18

**mission** 14:22

**missions** 54:3 55:5

**mistake** 87:15

**moment** 4:25

**Monday** 66:24

**money** 19:17 54:8
67:2,4

**month** 34:25 48:21
79:2

**monthly** 13:3

**months** 8:1 17:16
21:10 22:23 34:19
35:1,2,18 36:25 37:7
61:17,20 68:8

**Mora** 1:12,18
4:1,7,8,18 88:2
89:1,5,13 90:10,14

**Moreland** 1:22 90:12
91:10

**morning** 69:8

**moved** 8:3 10:25
45:13,18 50:8

**multifarious** 69:15

**multiple** 20:4 38:9
48:5 78:19 80:15

**myself** 41:12 52:6
72:5

## N

**nature** 70:20

**necessarily** 26:22
41:9 64:10 75:7,22

**necessary** 50:23

**neither** 62:16 91:2

**night** 17:14 59:3
  63:24

**nine** 8:1

**nods** 6:22

**non-driver's** 46:25
  50:18

**nor** 91:2

**normal** 13:21 31:25
  32:14 70:15

**Northwest** 27:16
  28:8,15 30:2 80:11
  81:9,20

**notaries** 59:17
  60:8,12

**notarized** 58:18 60:9
  79:20

**notary** 59:16 89:23

**notations** 17:7

**note** 18:12 24:15

**noted** 89:2

**notes** 16:14 38:24,25
  60:2 77:10

**not-for-profit** 61:1,4

**November** 45:12 87:4

**nuh-uhs** 12:2

**NW** 2:5

**NWB-7200** 2:6

—————————————
O
—————————————

**oath** 89:14

**object** 20:8

**objection** 20:7 40:2
  42:7 63:1 64:18
  71:17,18 73:16

**obtain** 9:11 17:10
  18:7,8 20:25 24:21
  26:3 31:11 40:7,13
  42:21 46:16 47:13
  48:25 49:7 50:24

52:11,22 53:4 54:3,5
  55:8,22,24 56:1,2
  57:8 63:14,15,25
  64:12,17,22 65:8
  66:2,11 82:3,6

**obtained** 10:21 34:3,5
  44:17 54:18 84:8

**obtaining** 21:22 25:21
  26:8,16 37:24 39:3
  41:18 52:16,18 53:20
  54:6,9,25 55:16
  57:5,20 60:11 64:13
  65:13 75:19 83:19

**obviously** 79:21

**occasion** 42:19
  50:17,20 57:6
  70:8,9,10 72:4

**offender** 17:17

**offense** 56:6

**office** 1:23 2:11 8:20
  26:17 27:5,21 33:1
  34:9 39:19 40:15
  59:5 68:16 78:20
  80:14 81:18,21 89:19

**officer** 90:14,21

**officer's** 90:25

**offices** 27:12 75:14
  81:17

**official** 32:12 82:10

**officially** 53:22

**Oh** 64:3

**okay** 5:4,9,10 6:10
  7:11,13,16,19,25
  8:25 9:15,22
  10:18,21 11:4,16,19
  12:4,9,18,25 17:1
  18:12,19 20:13 21:21
  22:6,13,17,21
  23:3,15 24:1,4,7,24
  27:4,6 28:1 29:4,16
  31:20 34:24 35:22
  36:7 37:20 38:2,17
  40:20 41:10,22 43:6
  45:7 52:25 59:23

61:1,14 67:15,24
  68:17 70:25 73:7
  76:15 77:19,24 78:3
  83:21 85:6 87:16

**old** 7:7 50:10
  67:17,18

**older** 50:11

**ones** 34:11 37:15 65:2
  85:15

**on-the-job** 53:23

**onto** 86:4

**open** 34:10 59:5
  82:1,4

**opening** 11:14
  14:15,16

**operations** 86:11,22

**opinion** 55:23
  62:13,15,18 79:11
  85:5

**opportunity** 40:11
  69:2,7 72:2 87:13

**opposite** 58:9

**oral** 1:11,18 90:14

**order** 5:6 20:24
  35:21,24 40:7,13
  41:18 42:14 49:3,7
  50:9 51:7 54:5 71:1

**Oregon** 47:20
  48:4,15,16,19 49:1,3
  50:6,8

**organization** 9:16

**original** 53:6,13 64:2
  90:25

**originated** 26:17

**otherwise** 13:23 91:3

**outcome** 91:4

**out-of-state** 49:10,11

**outside** 9:12,17
  22:9,10 30:11

**outstanding** 31:12,15

overall 43:18

overnight 59:4

overseeing 7:7

oversight 6:21 84:5

---

P

p.m 1:21 60:4 87:21

P.O 2:12

Page 3:2,3,11

PAGE/LINE 88:4

paid 23:24 24:9

paper 85:13

paperwork 17:2

parcel 6:15

Parkland 75:12

parole 56:5,7

partially 14:23

participate 9:25

participation 86:23

parties 90:22 91:2

partner 15:11 73:13

partnership 73:10,20
  81:13

part-time 40:23

party 90:18

passed 77:8

passes 83:17

passport 49:13

past 17:16 21:10
  26:15 35:18 44:10
  73:8,19

patient 43:13

pay 23:22

payment 23:17,18,19

payroll 14:2

pending 66:9,12

Pennsylvania 2:5

people 6:14 7:2,6
  14:7 15:25
  16:1,22,25
  23:4,6,9,11 27:13
  29:22 32:1 34:20
  36:3 38:17 39:6
  40:5,22 41:2,8 43:10
  53:20 54:17 56:3
  59:7 60:8,11,14
  62:19,23 63:10,17,19
  64:5,22
  65:10,15,18,20,24
  66:1,3,5 68:18
  69:9,11,12,22 70:16
  72:8,9 75:13 76:13
  78:19

per 84:14

percent 23:2,14 73:15
  85:10

percentage 22:21
  23:1,4,5,11 59:7
  73:7,18 85:15

Percentage-wise 73:7
  80:24

performing 9:20

period 7:14

PERRY 1:6 90:6

person 5:12 16:9,16
  17:1,5,17
  19:12,13,19
  21:8,9,11,13,15,19
  22:1 24:13 28:20,25
  31:12 32:13 34:4
  35:20 36:5,20
  39:6,13,18,20
  40:8,21 41:5,14
  42:12,17,20 43:7
  48:16 51:19 54:5,6
  55:25 56:5 57:9
  58:4,22 61:18 64:16
  65:12 68:1,7,13,14
  77:5 78:14 81:14
  82:17 83:8,9,13
  89:15

personal 26:5 44:13

61:12 62:13,15,18

personally 16:5 89:13

persons 22:14 40:9,12
  43:23 58:12 63:4,6
  65:22 66:6,8 68:25
  69:2

person's 29:21 31:14
  46:20

Pfenninger 59:19

P-F-E-N-N-I-N-G-E-R
  59:22

phone 2:7,13 18:4
  33:22,24 35:3

Phonetically 59:21

photo 21:19 22:15
  23:6,12,16,18 24:2
  26:4,8,16 27:2,7
  30:23 39:7,22 41:18
  42:13 46:17,24 50:24
  52:13,23
  53:1,4,12,20
  54:5,6,15,19 55:1,17
  59:9 63:19 64:22

physical 46:11 57:16
  58:14 77:23 78:5

physically 29:6,7
  34:10 86:14,15,16

pick 28:7 86:5,7

picked 85:20

picture 77:5 86:7

piece 85:13

places 58:23

Plaintiffs 1:3 2:3
  90:4,23

Plano 6:6 7:23 9:16
  11:18 12:7,19

play 19:21

please 4:6 5:7 14:11
  76:17

point 5:7 19:25 28:20
  29:2 32:15 51:11

74:16

**population** 38:12
63:10 64:5 73:8,18

**portion** 76:18

**position** 5:20,23

**positive** 15:1

**possess** 36:12

**possibility** 75:18

**possible** 37:13 44:7
49:21 54:22 55:24,25
76:13 84:24,25

**possibly** 59:24 63:12
65:19

**post-graduate** 9:8

**potential** 5:12 70:12
71:7,14,24

**potentially** 33:20
63:10 69:3 81:22

**preparing** 90:25

**Presbyterian** 23:20
55:12

**present** 2:18 18:15,21
19:3 36:13 49:12
51:18 59:5,6

**preserving** 54:25

**previous** 60:18

**previously** 22:5 78:21

**primarily** 12:24 49:11
81:14

**primary** 16:9 21:4
32:13 38:5,6 52:25
63:23 86:24

**principal** 16:6,7

**principally** 71:10,15

**principles** 76:19,24
77:8

**printed** 43:19 82:21

**prior** 5:25 7:19,22
8:5,22 32:23 52:3
66:15

**prison** 17:16 21:11

**privacy** 73:4

**probable** 84:25 85:2

**probably** 36:2 58:20

**probation** 56:5,7

**problem** 15:5 35:17

**problems** 35:9,13 47:4

**procedure** 1:24 31:25
78:22 81:24

**procedures** 55:18
76:11 82:2

**proceeding** 91:3

**process** 8:25 14:5
20:4,12 24:19 31:25
32:8 38:24 47:16,21
52:16 55:15 67:14
70:15 71:1 72:19
86:4

**processes** 6:24 76:11

**produced** 1:18

**professional** 10:2
30:6,15 33:5

**professionals** 6:12
74:2

**profile** 17:8,22,23
18:2,7,25 20:13

**program** 10:3,4 22:4

**promoted** 7:18

**proof** 48:2 49:6,8
53:18 55:22 79:9

**proper** 6:20 51:6
67:13 76:2 80:20

**properly** 7:1,2 83:5

**property** 22:12

**Protective** 8:7,10,22
9:10,13 10:6,19
12:21 76:1,7,12,20

**proved** 89:14

**provide** 15:2,24 23:16
65:9 68:18

**provided** 9:13 39:17
72:14,16 74:15 77:2
84:5

**provider** 73:21

**providers** 73:24

**provides** 55:8 73:10

**providing** 14:17 85:13

**proximity** 81:16

**Public** 15:12 23:19,22
24:2,5 26:3,7,9,17
29:17 31:7,9,14
33:13 34:20 36:7
37:2,10,14 44:20
50:13,17 53:1
57:4,24 60:10 77:18
78:3,11 79:12
81:10,14 82:7,10
89:23

**purchase** 24:17 25:2,8

**purely** 30:14

**purpose** 25:21 26:16
39:15 54:25 60:10

**purposes** 38:22 52:12
57:20 59:9 83:18
85:23 89:17

**pursuant** 1:24 90:21

**putting** 38:24

—————————————

Q

**QMHPs** 6:13

**qualifications** 21:16

**qualified** 6:12 21:2

**qualifies** 25:1

**qualify** 20:17
21:19,22 39:2
65:22,23

**question** 4:23 9:15
19:23,24 20:10 21:21
22:17,20 23:8 26:2
31:4,8,12,15 34:22
36:11 37:6 39:10
40:3 52:10 57:11

59:11 62:25 66:18,21
71:12,18,21 73:22
75:9 76:16 79:7 81:3
82:22,24 85:11,18
87:3,6

**questions** 4:19,21,22
20:16 29:19 30:18
32:13 33:4 37:14,15
45:16 61:15 67:25
83:7 87:9

**quoted** 83:2

———————————

R

**rail** 28:2,4

**raised** 35:5 38:12

**ran** 80:19,20

**range** 29:13

**rare** 25:25

**re** 24:2

**reach** 18:5

**reaching** 35:12

**reading** 87:11

**really** 59:1

**realm** 40:18

**reason** 4:22 12:11
13:20 16:9 38:6 39:7
88:4

**reasonable** 21:14

**reasons** 12:14,15 38:9
63:19,22 64:8 65:11

**recall** 9:24 10:14
11:17 12:14 26:13,25
27:4,7,9,12 31:17
33:21,25 35:18 36:5
38:4 40:21,25
41:16,20,22,25
42:12,15,16,18,22,23
,25 43:2 44:19,21
45:17 46:6 49:9
50:3,7 51:23,25
52:5,9,11 54:21
55:13,14
61:3,23,24,25 62:1,3

**65**:2
69:13,16,17,22,23
72:18,20,21,23 73:3
78:1,16 79:1 80:9,18
81:1 83:22

**receive** 14:24 18:23
53:19 67:2 76:2 86:8

**received** 15:3 76:6

**receives** 17:17 21:11

**receiving** 10:11

**recent** 83:21

**recently** 17:15
21:10,13 22:23,24
23:3,10

**recollection** 29:10
37:12 42:5 61:21

**record** 1:25 4:5 12:4
20:25 25:7,9 47:23
49:15 57:5 60:5
90:15,22

**recorded** 47:7

**recordkeeping**
76:2,10,11,14,15,20,
24

**records** 15:13 20:19
43:11,13 55:9
74:4,19,23 75:21,24

**recruit** 71:13,23 72:1

**recurring** 16:23

**Red** 28:18,19 33:1
45:20 80:14 81:21

**reduction** 12:9

**refer** 44:3 63:18

**referrals** 74:14

**referred** 28:24

**refers** 44:5

**reflective** 15:8

**refresh** 79:6

**regard** 9:15 12:6,18
17:1 22:17 23:15
26:2 30:17 31:23

**33**:12 58:22 62:19
71:10

**regarding** 30:18 35:9
47:22 74:19 82:11

**regards** 31:4,13,16

**register** 52:17

**registered** 11:8 17:17
52:7 85:24

**registration** 20:3
39:3 52:12
55:4,15,24
56:2,15,18,22
57:1,7,18 59:10
66:16 83:17,19 84:12
85:8,19

**registrations** 84:18

**regular** 9:22

**regulations** 58:15

**related** 61:13 91:2

**relates** 31:8

**relating** 30:23

**relationship** 44:14
50:4

**relatively** 79:10

**relatives** 48:2
49:19,20

**released** 17:16 21:10
22:24 23:3,10

**relevant** 5:13

**relocating** 50:4

**remember** 10:14 33:17
42:4 46:9,10,11
78:17

**remind** 56:25

**renewal** 53:6

**repeat** 23:8 30:21
37:5 57:11 71:12

**rephrase** 20:10 23:5
42:10

**replacement** 21:23

report 14:7 84:5

Reporter 87:10,17
  90:12

Reporter's 3:4 90:10

reports 48:7

represent 4:8 62:8

request 16:6 18:10
  21:7 41:23 42:1
  47:12,14 49:1,14,15
  50:18 68:25 69:9

requested 70:19 76:18
  82:22

requesting 48:18

requests 49:11

require 28:4 49:6,8
  53:17

required 13:4 20:24
  49:12 52:3 53:10
  55:19 56:13,18 57:3
  63:14 66:14 79:9

requirement 79:14,17

requirements 35:20
  47:22

Reserve 87:8

reside 45:9 59:1

residence 57:2

residency 18:16,18
  19:3 20:15 53:18
  57:3 58:5 60:9 77:20
  78:4 79:8,9 80:21,22
  81:25 82:11

resident 4:13,15

residing 17:14 21:6,8
  58:13 67:5 82:17

resolving 35:13

resources 67:6

response 15:2 74:15

responsibilities 6:16
  14:10,15,16 15:9,21

responsibility 7:4

responsible 14:23

rest 87:8

restroom 5:2

result 6:24 46:17
  75:3

return 90:17

returned 86:9,10

returning 16:25

Reverend 13:7 19:20
  38:11 54:13 59:24
  61:16,19,21 63:23
  70:25 71:10,16,23

review 87:13,14

Riaz 59:24

RICK 1:6 90:6

RIGHTS 2:5

risk 21:15

role 29:24

room 36:9

Rules 1:24

run 69:25 80:15

running 46:12 70:11

——————————
S
——————————

Safety 15:12 23:19,22
  24:2,6 26:3,7,9,17
  29:18 31:7,10,14
  33:13 34:20 36:7
  37:2,10,14 44:20
  50:13,17 53:1 57:4
  60:10 77:18 78:3,11
  79:12 81:10,14
  82:7,11

Safety's 57:25

satisfied 83:5

saw 83:6,24

scenario 58:11

scenarios 35:24

scheduled 13:23

school 11:2,3

schooling 9:12

Scott 2:15 3:7 4:4,8
  20:8,11 23:24 24:2
  36:8 40:17 42:8,11
  58:20,22 60:1,5 63:3
  64:21 69:15,19 71:20
  73:17 76:17,23 87:7
  90:23

Scott.....2 90:20

seal 89:19

search 17:6

searching 70:11

season 86:13,24

second 28:17

secondary 52:25

secondhand 46:16

secure 55:21

Security 16:20 17:18
  19:14 21:12,23 43:15

seeking 41:18 73:8

seem 82:25

seems 83:4

seen 37:23 83:25

seminars 9:18

send 9:17 19:21 35:19
  49:1

sender 86:9,10

sense 55:2

sent 35:15 58:6 77:13

separate 37:9

serve 15:10 52:20,21
  63:10 73:12

service 77:2

serviced 27:23

services 5:22
  8:7,10,23 9:11,13
  10:6,19 12:22
  14:14,17,19,20,24

15:2,24 21:3
43:22,24 44:16 47:18
51:13,16,17,25
52:1,3,4 65:6,10
72:24 73:2,6,9,13,20
74:6,7 75:3,5,19
76:1,7,12,21,22
82:18 86:6

**settings** 30:11

**setup** 19:24

**Seven** 45:8

**sex** 17:17

**Shapiro** 2:8 20:7 40:2
42:7,9 58:19
61:16,18 62:2,4,22
63:1,4 64:9,18 67:25
68:19 69:4,8,9,18
70:2 71:17 72:3
73:16 87:9,12,18,19
90:23

**Shapiro's** 61:14

**share** 77:17

**shared** 76:21,24
77:1,14,16

**sharing** 64:9

**sheet** 69:14

**shelter** 17:13 18:17
21:7 22:3 59:3 61:5
67:5 82:17

**shelters** 67:6

**she's** 29:24 51:5,6,7
67:8,11 78:16

**shift** 8:4

**Shorthand** 90:12

**shown** 49:13

**shows** 21:13

**shut** 79:4

**shuts** 13:15

**sick** 37:17

**sign** 69:7 77:20 87:14

**signature** 3:3 88:1

89:1 90:17

**signed** 60:9 69:11
70:1,2,3,6

**signing** 87:11

**signup** 69:14,17

**similar** 55:15

**simply** 38:18 48:15
56:8

**single** 39:21

**sir** 10:20 43:1 52:14
68:2

**sit** 6:23 41:15,23,25
42:6,11,16 46:14
62:16 65:2 69:19

**sitting** 13:7

**situation** 18:22 20:20
37:8 39:24,25 41:4

**situations** 15:4

**Slaughter** 91:12

**sleep** 58:23 59:4

**sleeping** 22:9,10,11

**social** 9:7 10:8,11
16:20 17:13,18 19:14
21:12,23 30:11
43:15,17

**Solutions** 90:17 91:11

**solving** 15:5

**somebody** 16:12 21:2
29:5 31:22 35:15
38:21 44:9,13 47:23
57:5 75:11 82:14

**somebody's** 22:12

**someone** 21:18,21,22
22:6 24:20 26:3,6
28:3 31:20 34:14
36:18 41:17 53:11
56:14 68:22 79:7

**somewhere** 13:14 60:24

**sorry** 7:10 18:4 19:2
21:23 23:8 27:20
32:24 35:2 37:3,5

40:7 45:17 46:21
47:19 55:6 57:11
59:20 62:1 64:1
65:23 76:16 78:8
81:3 84:2 85:17

**sought** 51:13 72:24
73:1,9,19

**sound** 54:19,22

**source** 25:16 52:25
67:1

**sources** 80:16

**SOUTHERN** 1:1 90:1

**Southwestern** 75:13

**speak** 34:2,10 69:3,7
72:3 73:4

**special** 13:22

**specific** 9:23 14:19
20:18 24:15 37:12
41:21,24 42:5 44:4
54:21 58:15 63:6
64:24 65:17 66:3
69:1 71:21 80:18
83:10 85:19

**specifically** 21:5
22:20 25:2 27:1,14
37:15 39:12 40:25
41:5,12 44:8,21 46:9
47:9 49:9 50:1 52:6
66:9 73:14,23 76:15
86:20

**specifics** 42:4,23

**spell** 59:20

**spend** 54:7

**spent** 62:3,4

**spoke** 34:14,17,18

**spoken** 33:17 34:21,22
75:2

**spread** 69:5

**staff** 13:11 14:1,4
15:3,4 29:24 31:8
34:3,23 40:23 41:3
50:15 51:6 61:22

76:7,22,25
77:1,8,9,16 78:10
81:13

**staffed** 49:25

**standpoint** 7:6 24:8
32:11 40:18

**Starbucks** 7:24,25
8:2,5 12:18

**start** 8:14 47:15 58:2
60:2

**started** 8:3 48:24
51:24 53:24

**state** 1:22 2:16 4:5,9
8:8 10:16 25:15
30:24 47:7,18,19,24
48:15,19 49:12 50:6
62:9,25 67:2,9
71:15,25 89:9,24
90:12

**stated** 81:4 83:7

**statement** 6:16 22:6
58:8,12 69:1 85:9

**states** 1:1 17:15
49:13,14 90:1

**stating** 82:23

**station** 28:21

**statistics** 24:20
25:20 32:9

**status** 36:14

**statute** 56:8

**stayed** 15:21,22

**staying** 22:2 57:2

**stays** 67:7

**Stemmons** 6:3

**step** 18:6

**Stewpoint** 55:5

**Stewpot** 5:17,18,21
11:13,21 13:18
14:10,13,16,18
16:23,24 21:3
23:10,12 26:6,18

32:15 36:17
37:8,10,23 44:11,17
46:17 50:15
51:2,14,25 52:8
53:24 54:1,2 55:5
57:15,16 58:6,7,24
59:1,3,8,14 60:12
63:18 64:22
71:11,16,22 72:10,25
73:2,6,9,10,12,14,18
74:5 75:11,20,21
76:5,8,14
77:17,19,21 78:2
81:5,12,13 82:12,20
83:16 84:18
86:1,3,12,15

**Stewpot's** 52:21 73:20
78:5

**stipulations** 1:25

**stop** 5:3 28:6,11 60:1

**street** 1:23 45:24
58:14 61:5
77:21,22,23,25 78:5
80:21 82:12
85:7,21,24,25

**streets** 22:8

**strike** 39:6 58:23
72:8

**structure** 22:11

**student** 8:24

**studies** 9:8

**stuff** 60:2 72:14

**submit** 56:14

**submitted** 90:16

**subscribed** 89:16

**successfully** 35:21,24
51:12 64:25 65:8
66:11

**sued** 4:10

**Suite** 1:23 91:12

**summer** 52:1

**supervisor** 7:4 8:4

29:23 33:1,18
34:2,11 78:13,15
80:6,12 81:8,20

**supervisors** 33:20
78:21

**supervisor's** 80:9

**support** 14:21 48:6
90:17 91:11

**supporting** 18:20
20:15 47:8 48:25
49:16,17 50:22,23
53:2,16,17 54:4
55:16,22 56:13,17
64:13

**supportive** 22:4 86:19

**sure** 6:20 13:21 14:9
23:9 30:22 37:7 39:5
40:19 42:11 63:3
64:3,7 71:13 80:24
86:6

**suspension**
31:4,5,7,13

**sworn** 1:19 4:2 58:8
90:14

**system** 16:15,18,19
27:25 28:2,5 43:8

---

| T |
|---|

**taking** 27:1 42:24
71:1 86:12

**talking** 15:25 19:20
39:24 51:9 53:11
60:6 75:10,11,13

**tardiness** 12:12,16

**Tarrant** 46:1,3

**tasks** 6:13

**Taylor** 60:20,21

**telephone** 68:3 80:3

**ten** 84:14,17,22

**term** 22:24

**terms** 42:24

**testified** 4:2 43:2

**testimony** 42:9 63:23
64:19 71:18 87:13,14
90:15,21

**Texas** 1:1,22 2:11,13
4:9,11 7:23 8:9 9:16
10:16 15:12 19:15
20:18,24 23:22 24:5
25:1 26:9 30:24
31:6,9,11,14 35:24
36:14 37:14 46:24,25
49:10 50:2,8,9,17,24
51:12 52:8,18 57:3
62:9,14,24 63:5
66:2,12 67:2
71:15,25 78:10 79:12
80:8 81:14 90:1,12
91:13

**Thank** 87:7

**that's** 7:11 14:1,2,6
15:8 16:15 18:7
27:21 28:16,24
29:13,16 32:17
36:1,16 38:5,6 39:25
43:6 48:12,20 50:25
51:1,3 54:22 56:8
59:12 63:14 64:16
65:15 73:3 82:20
83:4 84:4,8 87:7

**therefore** 59:4 65:6
66:13 79:14,17 83:12

**therein** 89:18

**there's** 13:21 27:21
36:16 52:17 59:1
80:19

**they'll** 36:11

**they're** 18:22 20:21
22:24 25:13 30:1
35:9 36:13 57:2 58:8
59:4

**they've** 15:22 20:17
35:16

**third** 28:23

**threshold** 21:1

**throughout** 7:9 52:2
60:15

**Tobi** 1:21 90:12 91:10

**today** 4:19 6:23 13:7
41:16,23,25
42:6,11,16 46:14
61:14,15 62:17 65:3

**tools** 6:19,23

**top** 13:4 44:18 67:19

**toward** 19:22

**town** 68:12

**track** 38:20,23 44:2
59:12 83:16

**tracking** 24:7

**traffic** 60:3

**train** 27:24 28:4,20
29:1,10 74:20 76:13
79:13

**training** 9:12,17
53:19 76:2,6,21,22

**trainings** 9:21,25

**training-wise** 9:24

**transcript** 90:14,16
91:1

**transitional** 18:17
22:4

**trial** 87:8

**tried** 76:13

**Trina** 60:20,21

**true** 7:9,13 13:17
32:17 36:1 38:15
51:1,21 55:20 57:20
58:1,3,4,9,12 60:14
75:22 89:1 90:15

**truthful** 75:2 77:3

**try** 19:4 20:1 48:25
68:21 70:15 75:4

**trying** 19:12 35:7
42:22 48:15 52:12
82:3,4

**Tuesday** 13:14,24 41:3
61:22

**turnout** 86:11,23

**twice** 27:4

**type** 18:23 22:11
26:2,4,8,16 49:8
51:6 67:9 73:24

**typical** 35:17,19

**typically** 25:12

---

U

**U.S** 2:4

**UH** 12:2

**Uh-huh** 11:22 18:13
48:22 79:22

**uh-huhs** 12:2

**unable** 64:17 65:9

**understand** 4:11,21
5:14 13:23 20:5
25:16 35:8 42:23
52:15 62:7 74:3
75:14 77:5

**understanding** 7:3
32:1 33:19,25 48:17
51:4 55:19 82:7,25

**understandingly** 79:11

**understood** 14:9 19:20
74:5

**undertake** 19:24 47:13

**underway** 47:17

**unearned** 21:11

**unfit** 22:7

**Unfortunately** 48:5

**unique** 16:16 24:12

**uniqueness** 15:10

**United** 1:1 17:15
49:13 90:1

**units** 10:1

**University** 9:3

**upon** 6:5 10:5 51:4

79:18

---

**V**

**vacation** 37:17

**valid** 36:9,11,12,19

**varies** 16:10

**variety** 63:19

**various** 6:5 11:1
49:14 57:10

**VAT** 84:9,11

**V-A-T** 84:11

**VEASEY** 1:3 90:3

**verbal** 12:1 80:5

**verbalized** 74:13

**verified** 78:22

**verifies** 24:16

**verify** 17:6 36:4,14

**veteran** 17:15

**visit** 16:12 68:1

**visited** 67:25 68:12

**visiting** 62:4

**visits** 68:6

**vital** 15:13 20:19,25
24:20 25:20 32:9
55:8 57:5

**VOLUME** 1:14

**voluntarily** 14:18
18:10 70:6

**volunteer** 40:24

**volunteers** 14:3

**vote** 11:8 37:25
39:8,15,22 40:8,14
41:6,19 42:14,21
52:7 63:13 66:14,19
86:11

**voted** 66:17

**voter** 20:2 39:21
40:7,13 41:18
52:12,16 55:4,15

56:15,22 57:17 59:9
62:11,14,20,24 63:5
64:17 66:15,20
83:17,19 84:17
85:8,19 86:23

**voters** 85:24 86:20

**voter's** 39:3 55:24
56:2,18,25 57:7
84:12

**voting** 38:10,22 86:20

**voucher** 24:25

**VS** 1:4 90:5

---

**W**

**waited** 85:20

**walk** 14:8 28:6,19,25

**walking** 28:5 29:6,7

**walks** 75:11,12

**wanders** 75:12

**Washington** 2:6 33:3,5
80:13,14 81:2,7,11

**Washington's** 34:6

**wasn't** 76:9 83:10

**water** 5:2

**ways** 53:19

**website** 31:10 82:16
83:2,3

**we'd** 82:15

**week** 16:1,2,5,8 22:22
31:2 34:18

**weekly** 13:10,11 15:25
66:25

**weeks** 34:15 68:11

**we'll** 5:3 11:18 19:15
21:14 58:21

**we're** 42:24 46:18
47:11 48:20 53:11
64:11 66:10 85:13

**West** 91:12

**we've** 17:5 47:11

48:10 51:8 74:15

**whatever** 4:22 85:6

**WHEREUPON** 87:21

**whether** 5:2 9:17 12:3
19:21 36:9,11,18
41:25 52:11 55:14
67:11 72:22 73:1
83:1

**whole** 14:22 49:23
56:3

**whose** 31:23 89:15

**widespread** 54:2

**witness** 1:19 6:22
87:16 88:2
90:14,15,16,17

**witnesses** 70:12,16
71:7,14,24

**woman** 50:10 67:17

**work** 5:16,17 7:25
8:5,8,20,22,23
9:7,10 11:12,14,21
30:12 32:2 48:24
49:18 61:9,13 63:17
64:5

**worked** 5:18 6:14
7:23,24 8:10 9:16
30:3 44:14 49:23
51:2 70:24

**worker** 10:8,11

**workers** 7:8

**working** 15:11,13 37:4
46:19 51:22,24 66:10
70:17 86:18

**work-wise** 5:25

**world** 41:15

**Worth** 46:2 55:6 61:6

**writing** 82:23

**wrong** 45:18

---

**Y**

**y'all** 18:1 23:7
24:7,9 35:15

```
   38:13,20,23 40:21
   43:8 47:1,4,13,17
   48:14 50:12 51:2
   52:11 54:13 55:10
   57:14 59:12,13 62:3
   63:18 65:9 68:15
   69:5 70:11,14 74:6,7
   78:7 83:5
```

**y'alls** 46:17

**yet** 50:14 66:12 77:4

**yield** 13:22

**you'll** 4:23 87:13

**Young** 77:21,23,25
   78:5 80:21 82:12
   85:7,21,24,25

**yourself** 15:25

**you've** 15:18,19 16:13
   18:24,25 19:1,17
   41:1 43:10 49:23
   53:23 60:11 64:15
   76:24 77:8 80:15

--------------------------
              Z
--------------------------

**zero** 26:23