COBY SHORTER, III                                                         8/12/2014
CONFIDENTIAL TRANSCRIPT

1 (Pages 1 to 4)

## 1

```
 1          IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                  CORPUS CHRISTI DIVISION
 3  MARC VEASEY, et al.,         )
                                 )
 4        Plaintiff,             )
                                 )
 5  VS.                          )  CIVIL ACTION NUMBER:
                                 )  2:13-CV-193 (NGR)
 6  RICK PERRY, et al.,          )
                                 )
 7        Defendants.            )
                                 )
 8  _____)
    UNITED STATES OF AMERICA,    )
 9                               )
          Plaintiff,             )
10                               )
    VS.                          )  CIVIL ACTION NUMBER:
11                               )  2:13-CV-263 (NGR)
    TEXAS LEAGUE OF YOUNG VOTERS )
12  EDUCATION FUND, et al.,      )
                                 )
13    Plaintiff-Intervenors,     )
                                 )
14  TEXAS ASSOCIATION OF HISPANIC)
    COUNTY JUDGES AND COUNTY     )
15  COMMISSIONERS, et al.,       )
                                 )
16    Plaintiff-Intervenors,     )
                                 )
17  VS.                          )
                                 )
18  STATE OF TEXAS, et al.,      )
                                 )
19        Defendants.            )
                                 )
20  _____)
    TEXAS STATE CONFERENCE OF    )
21  NAACP BRANCHES, et al.,      )
                                 )
22        Plaintiffs,            )
                                 )  CIVIL ACTION NUMBER:
23  VS.                          )  2:13-CV-291(NGR)
                                 )
24  NANDITA BERRY, et al.,       )
                                 )
25        Defendants.            )
```

## 2

```
 1  BELINDA ORTIZ, et al.,    )
                              )
 2      Plaintiffs,           )
                              )
 3  VS.                       )  CIVIL ACTION NUMBER:
                              )  2:13-CV-348(NGR)
 4  STATE OF TEXAS, et al.,   )
                              )
 5      Defendants.           )
                              )
 6  _____)
 7
    ******************************************
 8
               DEPOSITION OF
 9
              COBY SHORTER, III
10
              AUGUST 12, 2014
11
    ******************************************
12
             HIGHLY CONFIDENTIAL
13
14      ORAL DEPOSITION OF COBY SHORTER, III, produced as a
15  witness at the instance of the Plaintiff, was duly
16  sworn, was taken in the above-styled and numbered cause
17  on the AUGUST 12, 2014 from 9:05 a.m. to 2:01 p.m.,
18  before Chris Carpenter, CSR, in and for the State of
19  Texas, reported by machine shorthand, at the Office of
20  the Attorney General, 209 West 14th Street, Austin, TX
21  78701, pursuant to the Federal Rules of Civil Procedure
22  and the provisions stated on the record or attached
23  hereto.
24
25
```

## 3

```
 1           A P P E A R A N C E S
 2  FOR THE UNITED STATES OF AMERICA:
 3      Jennifer Maranzano
        U.S. JUSTICE DEPARTMENT
 4      CIVIL RIGHTS DIVISION
        Room 7254 NWB
 5      950 Pennsylvania Avenue, N.W.
        Washington, D.C. 20530
 6      (202) 514-0828
        jennifer.maranzano@usdoj.gov
 7
    FOR THE NAMED DEFENDANTS AND THE WITNESS:
 8
        John Scott
 9      Assistant Deputy Attorney General
        ATTORNEY GENERAL OF TEXAS
10      P.O. Box 12548
        Austin, TX  78711-2548
11      (512) 475-3281
        john.scott@texasattorneygeneral.gov
12
        Rowe Jackson
13      General Counsel
        Texas Secretary of State's Office
14
15
16
17
18
19
20
21
22
23
24
25
```

## 4

```
 1                  INDEX
 2  Appearances.....................................2
 3  COBY SHORTER, III
 4    Examination by Ms. Maranzano...............6
 5  Signature and Changes..........................192
 6  Reporter's Certificate.........................193
 7
 8               EXHIBITS
 9  NO. DESCRIPTION                    PAGE MARKED
10
 1  SB 362 as Introduced in the Senate       31
 2  Excerpt from Committee of the Whole      34
    Transcript, March 10, 2009
 3  Excerpt from Senate Journal, March 18, 2009  35
 4  SB 14                                    46
 5  FAQs - Implementation of SB 14           50
 6  January 24, 2011 e-mail                  55
 7  Excerpt from Committee of the Whole      69
    Transcript, Jan. 25, 2011
 8  E-mail chain                             75
 9  E-Mail, Feb. 25, 2011 and Attachments    93
10  Excerpt of Texas House of Representatives  98
    Select Committee on Voter Identification and
    Voter Fraud Hearing Transcript, March 1
    2011
11  E-Mail, April 8, 2011             102
12  E-Mail, April 20, 2011            105
13  Memorandum of Understanding       118
14  E-Mail, Oct. 16, 2013 and Attachment  128
```

COBY SHORTER, III                                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

2 (Pages 5 to 8)

---

5

15  E-Mail 9/26/2013                      134
16  E-Mail, 9/27/2013                     137
17  E-Mail, 2/10/2014                     143
18  E-Mail Chain, 6/28/2013               150
19  September 30, 2013 e-mail             150
20  July 12, 2013 e-mail                  156
21  EIC Dashboard                         164
22  9/18/2013 e-mail                      185

---

6

            COBY SHORTER, III
having been first duly sworn to testify the truth, the
whole truth, and nothing but the truth, testified as
follows:

            EXAMINATION
BY MS. MARANZANO:
     Q.  Good morning.
     A.  Good morning.
     Q.  My name is Jennifer Maranzano.  I'm
representing the United States in this matter.  Can you
please state your name for the record?
     A.  My name is Coby Shorter, III.
     Q.  Mr. Shorter, do you understand you've been
placed under oath today?
     A.  Yes, ma'am.
     Q.  Is there any reason why you cannot testify
truthfully, accurately and completely today?
     A.  No, ma'am.
     Q.  Thank you.  Have you discussed your testimony
with anybody, your testimony in this deposition?
     MR. SCOTT:  Preparation, you mean?
     Q.  (By Ms. Maranzano)  No.  Apart from your
lawyers, have you discussed the fact that you are being
deposed with anybody?
     A.  No, no, ma'am.

---

7

     Q.  Have you talked to anyone who has been deposed
in this case about their deposition?
     A.  No, ma'am.
     Q.  Did you have any discussions about your
deposition with Mr. Ingram?
     A.  Mr. Ingram in our office?  No, ma'am.
     Q.  With Ms. McGeehan?
     A.  No, ma'am.
     Q.  Have you read any trial testimony from Texas V.
Holder?
     A.  From who?
     Q.  Texas versus Holder?
     A.  No, ma'am.
     Q.  Are you employed, Mr. Shorter?
     A.  Yes, ma'am.
     Q.  Where are you employed?
     A.  I'm primarily employed at the Secretary of
State's Office.
     Q.  And what's your position there?
     A.  I am the Deputy Secretary of State.
     Q.  And do you have other positions?
     A.  I'm a minister.
     Q.  Have you held other positions for the State of
Texas?
     A.  Yes, ma'am.

---

8

     Q.  What positions?
     A.  Hmm, I've worked at the Department of
Agriculture doing economic development work.  That goes
back.  Let's see.  I've worked in the Office of the
Governor as director of agriculture and environmental
policy or agriculture and conservation.  That was during
the Bush administration.  I have worked as the Deputy
Director of -- Deputy Director of Governmental
Appointments in the Office of the Governor, Governor
Perry.  And I've served here as Deputy Secretary since
2007.
     Q.  Is your position with the Secretary of State an
appointed position?
     A.  It is appointed by the Secretary of State.
     Q.  And which Secretary of State appointed you?
     A.  I was initially appointed by Secretary Phil
Wilson, and I have served -- he was the initial
appointment.
     Q.  Do you -- do you get reappointed each time
there's a new Secretary?
     A.  The Secretary decides who'll be the deputy, and
they've -- each one since him has asked me to continue
to serve.
     Q.  I see.  Prior to be appointing Deputy Secretary
of State, did you have any background in election

---

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

3 (Pages 9 to 12)

**Page 9**

1  administration or election policy?
2  **A.  What do you mean specifically?**
3  Q.  Have you done any work related to elections or
4  administering elections?
5  **A.  No, ma'am.  Are you referring specifically like**
6  **to election work or -- or --**
7  Q.  Yeah, I mean -- I mean, planning elections,
8  running elections, being involved in overseeing
9  elections.
10  **A.  From a governmental perspective?**
11  Q.  From any perspective.
12  **A.  Well, I mean, I have -- I've participated in**
13  **electoral process, but in terms of working administering**
14  **elections, like I do -- well, like the Office of the**
15  **State's Office does, no, ma'am.**
16  Q.  Okay.  Have you been involved in campaigns?
17  **A.  Yes, ma'am.**
18  Q.  Okay.  And what other -- what other work have
19  you been involved in when you say you've been involved
20  in the electoral process?
21  **A.  Well, my initial job, the one that I forgot**
22  **about since I -- before I came to Austin, I worked for**
23  **U.S. Senator Phil Gramm, and I worked on his campaign**
24  **staff.**
25  Q.  Okay.  Any other --

**Page 10**

1  **A.  That was prior to coming to -- that was prior**
2  **to coming to Austin.  I had forgotten about that.**
3  Q.  Okay.
4  **A.  That was between my first job, and that was my**
5  **second job.**
6  Q.  Have you worked on any other campaigns?
7  **A.  Worked?  When you say worked, like?**
8  Q.  Worked in any capacity, volunteered, been
9  involved in?
10  **A.  Well, I volunteered.**
11  Q.  And what campaigns are those?
12  **A.  I volunteered for the Governor when he was**
13  **running for agriculture commissioner and -- and**
14  **Governor.**
15  Q.  Have you ever served as a poll worker?
16  **A.  No, ma'am.**
17  Q.  Can you briefly describe your educational
18  background?
19  **A.  Yes, ma'am.  I have a bachelor's of science**
20  **from Texas A&M University.  I graduated in 1989, and I**
21  **have a master's of art from and Christian leadership**
22  **studies from Liberty University Seminary.**
23  Q.  Do you have any coursework or experience in IT
24  issues?
25  **A.  No more than probably a computer science course**

**Page 11**

1  somewhere down the road.  I can't specifically remember
2  a specific active course, no, ma'am.
3  Q.  A computer science course somewhere in your
4  education --
5  **A.  Going to high school or something like that.  I**
6  **don't -- as an age economics major, I don't recall -- and**
7  **it's been 20-plus years ago, I don't recall a specific**
8  **computer IT course.  I don't have an IT background.**
9  Q.  Okay.  I understand.  The Secretary of State is
10  the chief elections officer for the state, correct?
11  **A.  That is correct.**
12  Q.  And you're the second in charge after the
13  Secretary of State?
14  **A.  I'm -- yes, I am.**
15  Q.  What are your specific responsibilities with
16  regard to elections in Texas?
17  **A.  Well, my specific responsibilities are to make**
18  **sure that the elections director and the division have**
19  **the resources that they need to do their job.**
20  Q.  Do you -- do you mean monetary resources?
21  **A.  Monetary resources, computers, make sure --**
22  **office space, personnel.  I do operations, mainly**
23  **operations work within the agency.**
24  Q.  Do you primarily with regard to elections
25  oversee the director of elections?

**Page 12**

1  **A.  What do you mean by primarily?**
2  Q.  Well, you said your -- I think you said your
3  main job with regard to elections was making sure the
4  director of elections had appropriate resources.  So are
5  you involved mostly at the level of overseeing the
6  director of elections?
7  **A.  Yes.**
8  Q.  Okay.  How closely do you work with the
9  Secretary of State on his responsibilities?
10  **A.  Well, I'm -- I work very closely with the**
11  **Secretary of State.  The Secretary of State does not**
12  **work exclusively with me.  The Secretary does have**
13  **access to visit with the division directors his or**
14  **herself.**
15  Q.  And does the director of elections report
16  directly to you?
17  **A.  Yes.**
18  Q.  Does the elections director administer any
19  programs directly related to voters?
20  **A.  Well, the Secretary -- the director of**
21  **elections, the elections division within our agency is**
22  **the one that works with the counties to uniformly apply**
23  **elections in the state of Texas.**
24  Q.  Does the elections director do any work like
25  voter registration drives or outreach to military and

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

**13**

1 oversees voters or other programs that are directly
2 working with voters in the state?
3     A. Well, when you -- I'm -- I'm really not
4 understanding your -- your question. Could you ask me
5 again?
6     Q. Sure. Sure. Let me see if I can clarify. Are
7 there programs that the elections director works on that
8 are -- that are geared towards working directly with the
9 Texas voters such as conducting voter registration
10 drives or other activities like that?
11     A. Well, the elections director himself does not
12 put those type of activities on. We are, as an agency,
13 we are aware of those type of activities that go on, but
14 in terms of the office actually putting on a voter
15 registration drive from the Secretary of State's Office,
16 I'm not aware of that happening. Because we have such a
17 close working relationship with those individuals that
18 do those things, we are aware when those -- when those
19 type of activities happen.
20     Q. I see, but those -- when you say you have such
21 a close relationship with the individuals who do those
22 things, those are not individuals in your office,
23 correct?
24     A. Correct.
25     Q. Okay.

**14**

1     A. Or a relationship. I -- it's probably not -- I
2 can't say whether -- we know who those people are.
3     Q. What steps, if any, do you take to ensure that
4 the elections programs are being run effectively in your
5 office?
6     A. I periodically meet with the director of
7 elections, as well as other division heads, for them to
8 keep me apprised of what's going on in their respective
9 divisions.
10     Q. And how do you measure success of
11 election-related programs?
12     A. Well, feedback from the staff, feedback from
13 the Legislature, feedback from constituents, and making
14 sure that the overall process that is in place for
15 elections in the state of Texas is successful. You
16 know, we get through an election cycle and everything,
17 all the votes are counted, all of the issues are
18 addressed, and we prepare for the next election, making
19 sure that the staff has the resources to do that.
20     Q. How do you tend to get feedback from
21 constituents, legislators, staff?
22     A. Well, what do you mean?
23     Q. Do you -- do you have any sort of formal
24 process by which you solicit feedback or is it more
25 people might contact you and let you know and --

**15**

1     A. Well, most of the people that contact our
2 office about elections-related issues contact the actual
3 elections division. If the elections division feels
4 that it's something that I need to be made aware of,
5 they share it with me, but most of the contact is
6 through the process that the elections division itself
7 has in place on how they interact with the counties and
8 different groups.
9     Q. Okay. So the feedback that you're getting
10 mostly comes through the elections division?
11     A. Yes, ma'am, unless someone decides to provide
12 it individually, and that's very rare.
13     Q. Okay. Individually, you mean to you?
14     A. Correct.
15     Q. Okay. Do you have a role in appointing others
16 in the Secretary of State's Office?
17     A. Appointing in terms of hiring employees?
18     A. Uh-huh.
19     A. Yes, ma'am.
20     Q. And what is that role?
21     A. Any individual who is hired within the
22 Secretary of State's Office, once the division itself
23 has made a selection, I'm the individual who signs the
24 paperwork for the executive division on that individual
25 being hired, based on the recommendation from the

**16**

1 division.
2     Q. And the division you're talking about, is the
3 elections division?
4     A. The elections division or any division.
5     Q. I see. Okay. Were you involved in hiring
6 Mr. Ingram or appointing Mr. Ingram to be the director
7 of elections?
8     A. Yes, ma'am.
9     Q. And what was your role in that?
10     A. My role was interviewing, assisting with the
11 interviewing and providing information to the Secretary
12 so that a final decision could be made.
13     Q. What -- what were -- well, did you ask
14 Mr. Ingram to apply for that position?
15     A. I don't recall asking him. I think there were
16 several people that were -- that he was -- there were
17 several people that were interested in the position.
18 It's been a while since he actually applied, but I knew
19 he had an interest in the -- in the subject area.
20     Q. Uh-huh.
21     A. And I can't recall if I actually asked him,
22 asked him to apply, but when he -- when he applied for
23 the -- when he expressed his interest, we made sure that
24 he was able to visit with the actual Secretary so that a
25 decision could be made.

COBY SHORTER, III                                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

5 (Pages 17 to 20)

17

1   Q.  Who made sure he was able to visit with the
2   actual Secretary?  Did you say we made sure he was able?
3       A.  When I say we, myself.
4   Q.  Okay.
5       A.  The secretary who does scheduling, we made sure
6   that he was able to visit with the Secretary as -- as
7   with other candidates.
8   Q.  Okay.  What were the qualifications about --
9   what were the qualifications that Mr. Ingram possessed
10  that led you to believe he would be a good director of
11  elections?
12      A.  Hmm, like I say, it's been a while ago, but he
13  seemed to have a good understanding of -- of -- good
14  experience as an attorney.  We felt that, based on the
15  individual who had served before, having a legal
16  background was important.  And seemed to have a passion
17  for election-related ideas and activities.  Seemed to
18  really grasp the concepts of election law.  Not saying
19  that he was an expert at that time, but he understood --
20  he appeared to understand how to work through election
21  law enough to understand if I don't know it now, I know
22  how to -- I know how to become a quick study.  Well, he
23  was a quick study.
24  Q.  Do you recall if prior to his role as director
25  of elections he had a background in election

18

1   administration or election policy or he had done
2   election-related work?
3       A.  Well, I don't recall the specific things that
4   he had.
5   Q.  Uh-huh.
6       A.  I knew that he had an interest in election
7   policy.
8   Q.  Do you recall if he had any experience or
9   education in IT?
10      A.  I don't recall if he had experience in IT.
11  Q.  Okay.  What, if any, is your role in the
12  development of election-related legislation?
13      A.  My role?
14  Q.  Uh-huh.
15      A.  Little to none.
16  Q.  What is the role of the Secretary of State's
17  Office?
18      A.  We are -- the Secretary of State's Office as it
19  relates to legislation for Texas, for the Texas
20  legislation?
21  Q.  Yes, but election-related?
22      A.  Election-related?  We are a resource.  We are a
23  resource to the Legislature.
24  Q.  Do you -- do you also suggest technical fixes
25  to the election code or to laws related to elections?

19

1       A.  What do you mean by technical fixes?
2   Q.  If there's something in the law that doesn't
3   quite work when you administer elections, do you suggest
4   to the Legislature that they change sort of, not a
5   substantive change, but more of a technical change?
6       A.  I don't within the agency, but our staff works
7   with the Legislature on technical issues if there's a
8   need for a technical change.
9   Q.  And would that staff be the direct -- the
10  people within the elections division?
11      A.  Yes, ma'am.
12  Q.  Primarily?
13      A.  (Witness nods head yes.)
14  Q.  If a legislator intends to introduce an
15  election-related bill, does that person usually confer
16  with your office?
17      A.  At -- probably at some point, I'm not really
18  sure where that -- where in the process, because they
19  don't deal directly with me.
20  Q.  Do they do that primarily with the director of
21  elections?
22      A.  I would say primarily and with our legal
23  counsel in our office.
24  Q.  Do you -- do you know what that conferring is
25  generally about?  I know you just said you don't usually

20

1   do it yourself.  Do you have conversations as to what
2   usually happens during that conferral, like with whether
3   it's about implementing the bill, if the bill -- well,
4   let me just ask you first:  Do you -- do you have any
5   knowledge of what happens substantively during those
6   conferrals?
7       A.  No, ma'am, unless the staff comes and shares it
8   with me.  I mean, they meet.  I have the confidence in
9   the staff that they have been doing this for a long
10  time, and if it's something that rises to the level that
11  the Secretary needs to know about, they'll share it
12  with me.  But you know, technical issues and other
13  things, they -- they are professional enough, and we
14  have that type of confidence in them as a staff that
15  they can deal with the Legislature on those issues.
16  Q.  I guess what I'm wondering is do legislators
17  often confer with the -- with the Office of the
18  Secretary of State about how to implement a bill, would
19  that be one of the things that they're conferring about,
20  an elections-related bill?
21      A.  When you say how to implement?
22  Q.  In terms of after the bill is passed, how the
23  Secretary of State would go about implementing it,
24  putting it into action?
25      A.  I'm quite sure those -- those conversations are

COBY SHORTER, III                                        8/12/2014
CONFIDENTIAL TRANSCRIPT

---

21

1  had.
2      Q.  Do legislators also talk to the Office of the
3  Secretary of State about whether the bill conflicts with
4  any other election regulations or election laws?
5          MR. SCOTT:  Objection, form, speculation,
6  vague.  You can answer.
7      Q.  (By Ms. Maranzano)  You can answer if you know.
8      A.  I don't know.
9      Q.  Okay.  Is there one Senate committee that --
10 that your office works closely with on election-related
11 bills?
12     A.  I think most of the -- on the Senate side?
13     Q.  Uh-huh.
14     A.  I think most of the Senate bills go through
15 State Affairs.
16     Q.  Do you know who on that committee you usually
17 interact with?
18     A.  Who I interact with?
19         MR. SCOTT:  Objection, form, vague,
20 time.  You can answer.
21     Q.  (By Ms. Maranzano)  The name of the committee
22 staff.
23     A.  I don't know.
24     Q.  You don't have interactions yourself?
25     A.  No, ma'am.

---

22

1      Q.  Is there a committee on the House that your
2  office usually works with on election-related bills?
3      A.  House elections.
4      Q.  Does the Secretary of State's Office ever
5  conduct research on proposed legislation related to
6  elections on its own initiative?
7      A.  What type of research?
8      Q.  Any type of research?
9          MR. SCOTT:  Objection, form.
10     A.  I would have to defer to the elections director
11 on what type of research he does.
12     Q.  (By Ms. Maranzano)  Is it your understanding
13 that at times there is research done on proposed
14 legislation of the Secretary of State's own initiative,
15 not in response to a request but --
16     A.  Well, our elections staff worked to be informed
17 on the issues.
18     Q.  And would that research be shared with anybody?
19     A.  I guess if they deem a need for it to be
20 shared.
21     Q.  How would you determine if it needed to be
22 shared?
23     A.  How would I determine?
24     Q.  Uh-huh.
25     A.  It wouldn't be a determination that I would

---

23

1  make.  It would be a determination that the ones doing
2  this whatever research would, whether or not what they
3  found needed to be shared with someone.
4      Q.  And in terms of since we're talking about
5  legislation, would this be if the Secretary of State's
6  Office conducted research on proposed legislation, would
7  they share it with the Legislature?
8          MR. SCOTT:  Objection, form, vague.
9      A.  I mean, I --
10     Q.  (By Ms. Maranzano)  Do you not have personal
11 knowledge of what I'm asking?
12     A.  Not -- not extensively, no, ma'am.  I'm really
13 not understanding --
14     Q.  Okay.
15     A.  -- what you're asking.
16     Q.  Okay.  Do you monitor the Legislature's
17 deliberation on -- deliberations on election-related
18 laws?
19     A.  No, ma'am.
20     Q.  Do you testify on some of the election-related
21 bills?
22     A.  I have had to testify only one time.
23     Q.  And what were the circumstances of that time?
24     A.  The circumstances were, I think it was back in
25 2009, there was a Senate Committee of the Whole, which

---

24

1  all the Senators were there, and the request was for the
2  Secretary to testify, and the Secretary was not
3  available to serve as the resource witness, so in the
4  Secretary's absence, I had to serve as the resource
5  witness.
6      Q.  When your office testifies, either you or the
7  director of elections or the Secretary, do you always
8  testify as resource witnesses?
9          MR. SCOTT:  Objection, form.
10     A.  Yes.
11     Q.  (By Ms. Maranzano)  What is a resource witness?
12     A.  We provide -- we provide information as asked.
13     Q.  Do you -- do you believe it's important for the
14 public to have information about the impact of a bill
15 when that bill is pending?
16         MR. SCOTT:  Objection, form, vague.
17     Q.  (By Ms. Maranzano)  Do you understand?
18     A.  Not really.  I mean --
19     Q.  If a -- if a piece of legislation is pending in
20 the Legislature, do you think it's important for the
21 public to have information about the possible impact of
22 that bill?
23         MR. SCOTT:  Objection, form.  I think it's
24 argumentative.  It assumes facts -- assumes facts and
25 vague.  You can answer if you can.

---

COBY SHORTER, III                                                8/12/2014
CONFIDENTIAL TRANSCRIPT

**25**

1    A.  Whatever the -- I think an agency should give
2  the best information they can.
3    Q.  (By Ms. Maranzano)  Do you believe that the
4  best available analysis of the impact of legislation
5  should be made public?
6        MR. SCOTT:  Objection, form, assumes
7  facts, vague and argumentative.  Go ahead.
8    A.  Say it again.
9    Q.  (By Ms. Maranzano)  Do you believe that the
10 best available analysis of the impact of legislation
11 should be made public?
12       MR. SCOTT:  Same objection.  Plus
13 speculation.
14   A.  I mean, I -- if you have -- I -- that's what
15 we've always tried to do.
16   Q.  (By Ms. Maranzano)  Before Texas started to
17 enforce SB 14, was there a method for determining a
18 voter's identity at the polls?
19   A.  Well, you had your voter registration card or
20 if you didn't use it, you could use your -- your -- I
21 mean, your other forms of ID like your driver's license
22 to actually vote.
23   Q.  And before Texas started to enforce SB 14, if a
24 voter appeared without a voter registration card or one
25 of the other forms of ID, could the voter nevertheless

**26**

1  cast a ballot?
2    A.  Probably provisionally.
3    Q.  Do you know what -- in what circumstances that
4  provisional ballot would be counted?
5    A.  Ma'am, I would have to defer to the elections
6  staff to tell you that.
7    Q.  Okay.  Are you aware of any problems with that
8  system prior to the enforcement of SB 14?
9    A.  I would have to --
10       MR. SCOTT:  Objection, form, overly broad.
11   A.  Election staff would have to share that with
12 you.
13   Q.  (By Ms. Maranzano)  Does the Secretary of State
14 run a voter hotline?
15   A.  We have -- I wouldn't actually call it a -- I
16 don't know if you call it a hotline.  We have an 800
17 number where voters can call to get questions answered.
18   Q.  Did you -- did you run that hotline during the
19 2013 election?
20       MR. SCOTT:  Objection, form, vague.
21   A.  The -- what do you mean, did I personally run
22 it?
23   Q.  (By Ms. Maranzano)  No, I'm sorry, your office.
24   A.  Well, the 800 number has been available.
25   Q.  So the 800 number is available regularly; is

**27**

1  that true?
2    A.  Yes.
3    Q.  Is there any particular hotline that gets run
4  on election days if voters are having a problem?
5    A.  Well, it's that same 800 number, if I
6  understand -- if I remember correctly, but there are --
7  it's manned by multiple individuals.
8    Q.  Do you know how many calls or approximately how
9  many calls came in during the 2013 election?
10   A.  No, ma'am, I don't.
11   Q.  Have you had any discussions with counties
12 about whether or not they run voter hotlines on election
13 days?
14   A.  None that I can recall.
15   Q.  Do you have any awareness of whether counties
16 run hotlines on election days?
17   A.  Well, the counties -- counties do share with
18 our office various issues that come up on election
19 days.  The actual systems that the counties have in
20 place, I'm not personally aware of them, but there is --
21 there is some type of mechanism.  I don't know
22 specifically what it is.
23   Q.  When voters have -- have problems or run into
24 issues on election day, are they most likely to usually
25 contact their county election official?

**28**

1    A.  I -- I don't know.
2    Q.  It's certainly possible that voters have
3  problems on election day and don't contact the office of
4  the Secretary of State, right?
5    A.  I don't know that either, ma'am.
6    Q.  Are you familiar with the concept of a Spanish
7  surname analysis?
8    A.  Yes, ma'am.
9    Q.  What is that?
10   A.  It's data that's provided to our office that
11 gives names by the Hispanic surnames.
12   Q.  And is that data compiled by the -- the U.S.
13 census bureau?
14   A.  I can't remember the exact agency that provides
15 it to us, but it is provided to us by some outside
16 agency.
17   Q.  Okay.  And have you ever used that list and
18 compared it against the list of registered voters as a
19 proxy for determining the number of registered voters
20 who are Hispanic?
21   A.  Well, I know our office has looked and that,
22 but we also looked at the fact that the Hispanic surname
23 in itself is not a good indicator of -- of an ethnicity.
24   Q.  And why is it not a good indicator of
25 ethnicity?

---

29

1    A.  There are cases in the state of Texas where
2   individuals have Hispanic surnames and they're not
3   actually Hispanic.
4    Q.  Are you familiar with a list of omission and a
5   list of commission that goes along with the list of
6   Spanish surnames?
7    A.  No, ma'am.
8    Q.  So you -- you haven't used the omission and
9   commission rates when you've done the --
10   A.  I don't know what the process has been itself
11  within our office.
12   Q.  Okay.
13   A.  Directly.
14   Q.  How often has the office of the Secretary of
15  State conducted a Spanish surname analysis, by which I
16  mean what we talked about?
17   A.  I would have to ask the elections division to
18  give that.
19   Q.  Do you think it's fair to say that they do it
20  regularly?
21   A.  I would say that it's done every time that the
22  data is provided to the office.
23   Q.  Do you have any sense of how often you get the
24  data?
25   A.  Right offhand, ma'am, I -- I don't know

---

30

1   specifically without --
2    Q.  Do you know --
3    A.  -- without looking at the information.
4    Q.  Do you know -- well, strike that.
5        Have you done Spanish surname analysis --
6   analyses for preclearance submissions?
7    A.  I would defer that to our director of elections
8   as to what -- what they've -- what the division has
9   actually done.
10   Q.  You don't know if they've done those for
11  redistricting commissions, for example?
12   A.  Personally, I don't know.
13   Q.  Okay.  Did you -- did you discuss the
14  preclearance submissions with the director of elections
15  when those would get submitted to the Department of
16  Justice?
17        MR. SCOTT:  Objection, form, vague.
18   A.  I'm quite sure they made me aware of them, but
19  the specifics, what they were doing with a specific
20  deal, they wouldn't necessarily go into great detail
21  with me.
22   Q.  (By Ms. Maranzano)  You do -- do you consider
23  your IT department to be knowledgeable on how to deal
24  with one of these Spanish surname analysis?
25   A.  As knowledgeable as -- as they possibly could

---

31

1   be.
2    Q.  Do you consider Spanish surname analyses to be
3   a routine method of analysis in your office?
4        MR. SCOTT:  Objection, form, vague.
5    A.  I -- I don't know how routinely it is done.
6    Q.  (By Ms. Maranzano)  You don't have any sense?
7    A.  As I said before, when it's provided to -- when
8   the data is provided to the office, I know that our
9   office does it as they are required to do it.
10   Q.  If the Secretary of State's Office needed
11  information about the racial and ethnic demographics of
12  registered voters, is the Spanish surname analysis the
13  best method to determine that?
14   A.  I'm not the person that would be able to tell
15  you this.
16   Q.  Who would be able to answer that?
17   A.  I don't know.
18   Q.  Okay.  Are you familiar with SB 362 that was
19  introduced by Senator Fraser in 2009?
20   A.  Are you referring to the Voter ID bill --
21   Q.  Yes.
22   A.  -- of 2009?  If that's the one that I was -- I
23  testified on, I'm vaguely familiar with it.
24   Q.  Okay.
25        (Exhibit 1 marked for identification.)

---

32

1    Q.  (By Ms. Maranzano)  Mr. Shorter, I'm showing
2   you what we've marked as Deposition Exhibit 1.
3    A.  Okay.
4    Q.  Do you recognize this?
5    A.  I -- I recognize that it's a bill, but
6   recognizing its specific content --
7    Q.  I'll represent to you that this is a copy of SB
8   362 as it was introduced in the Senate.  Is this the
9   bill that you testified on in the Senate?
10   A.  It appears to be, ma'am.
11   Q.  Did you have any role in the development of
12  this bill?
13   A.  No, ma'am.
14   Q.  Did you -- did you testify once on this bill or
15  more than once?
16   A.  One time.
17   Q.  Do you recall the date?
18   A.  It was around March the 10th or 11th.
19   Q.  And I believe you testified earlier that you
20  were -- you testified as a resource witness?
21   A.  Yes.
22   Q.  Did you prepare prior to serving as a resource
23  witness?
24   A.  I had staff available to -- to give me
25  information that I would potentially need to possibly

COBY SHORTER, III
8/12/2014
CONFIDENTIAL TRANSCRIPT

9 (Pages 33 to 36)

---

33

1  answer some of the questions, you know, but extensive
2  preparation, I didn't, you know -- I found about my --
3  the desire for the committee to have me or the Secretary
4  to testify the day before or probably the 8th or 9th or
5  somewhere around there, of March, and staff -- staff
6  gave me information that I would potentially need to
7  answer potential questions that would -- that may come
8  up.
9      Q.  Did you talk to any legislators before you
10 testified about 362, SB 362?
11     A.  No more than the bill sponsor asking, when I
12 got there, asking me to represent the Secretary of
13 State's Office.
14     Q.  Did the bill sponsor, was he the person who
15 invited the Secretary of State to testify?
16     A.  I don't remember who actually made the
17 invitation.
18     Q.  Okay.  And when you were testifying on SB 362,
19 did you take the position for or against the bill?
20     A.  No, ma'am.
21     Q.  Did several senators ask you questions about SB
22 362 during your testimony?
23     A.  It's been so long ago.  I remember them asking
24 some hypothetical issues that could potentially come
25 up.  Even though I stayed there for a while, I didn't --

---

34

1  I didn't testify long.
2          (Exhibit 2 marked for identification.)
3      Q.  (By Ms. Maranzano)  I'm showing you what we've
4  marked as Deposition Exhibit Number 2.
5      A.  Uh-huh.
6      Q.  This I'll represent to you is an excerpt from
7  the Committee of the Whole transcript from March 10,
8  2009.  Can you look at page -- and there's a bunch of
9  different numbers at the bottom, but I'm looking at the
10 JA number, JA 003998.
11     A.  3998.
12     Q.  Yes.
13     A.  Okay.
14     Q.  And if you can just take a look at that page.
15 Do you see that Senator Van de Putte is asking you some
16 questions there?
17     A.  Uh-huh.
18     Q.  And do you see that -- that you say there's no
19 mechanisms to track race or ethnicity, and she expresses
20 some concern about gathering this information for a DOJ
21 submission.  Do you see that?
22     A.  Well, let me look.
23     Q.  Yes.
24     A.  Let's see.  Okay.  I read this, so.
25     Q.  And do you recall, do you see that you say

---

35

1  you'll follow up with her?
2      A.  Uh-huh.
3      Q.  Do you recall that you sent her a letter
4  following up on this inquiry?
5      A.  I recall that our staff prepared a letter for
6  my signature.
7      Q.  All right.
8          MS. MARANZANO:  If you'll mark this.
9          (Exhibit 3 marked for identification.)
10     A.  Okay.
11     Q.  (By Ms. Maranzano)  I'm showing you what we've
12 marked as Exhibit 3.
13     A.  Okay.
14     Q.  If you could take a look at sort of the second
15 and then on to the third and fourth page?
16     A.  Okay.
17     Q.  Do you see there's a letter there?
18     A.  Uh-huh.
19     Q.  Do you recognize this letter?
20     A.  Like I said, it's been a long time.  I
21 remember -- I would probably recognize it even more if
22 it were in its original form from our office.  But if
23 this is the letter that is the same as our office, this
24 was the letter that was prepared by our staff to respond
25 to the questions that Senator Van de Putte had.

---

36

1      Q.  And can you look at the page that has the 591
2  on the top right?
3      A.  Uh-huh.
4      Q.  And there's a question about does the Secretary
5  of State track the racial status of registered voters?
6      A.  Uh-huh.
7      Q.  And then do you see that you say that
8  information on voters with Hispanic surname is
9  inconclusive?
10     A.  Hold on.  I haven't gotten there yet.
11     Q.  Okay.
12     A.  Let me see, where is it?
13     Q.  That part is towards the end of the first
14 paragraph.
15     A.  Okay.
16     Q.  Now, is your basis for -- well, what is your
17 basis for characterizing it as inconclusive?  Is it what
18 we discussed earlier?
19     A.  I think clearly is what it states here.
20     Q.  So when you said, "We do not have" -- "we do
21 have data on the number of registered voters with
22 Hispanic surnames, but the data is inconclusive," what
23 is your basis for saying it's inclusive?
24     A.  Because of what it says here, the rest of that
25 sentence.  It simply matches the surname against the

COBY SHORTER, III                                      8/12/2014
CONFIDENTIAL TRANSCRIPT

---

37

1  identified Hispanic surnames.
2      Q.  And in 2009, did you have any other way of
3  determining if a voter was Hispanic?
4      A.  Not to my knowledge.
5      Q.  So would you think that a Hispanic surname
6  analysis would be the best available way to determine if
7  the voter was Hispanic?
8          MR. SCOTT:  Objection, form.
9      A.  I think based on what we said here it's
10  inconclusive.
11     Q.  (By Ms. Maranzano)  Do you see in the next
12  paragraph, you talk about submissions to the Department
13  of Justice, and then in the second sentence you say,
14  "For instance," and can you read that sentence.  "The
15  Texas Legislative Council assisted with the compilation
16  of data on race and ethnicity on redistricting bills."
17  Do you know what the Texas Legislative Council did to
18  compile all the data on race and ethnicity for
19  redistricting bills?
20     A.  Personally, I don't know, ma'am.
21     Q.  Do you know when you wrote this letter or sent
22  this letter?
23     A.  As I -- as I stated, this letter was an effort
24  of our office to answer the Senator.  So our staff
25  drafted the letter, who -- those are the individuals who

---

38

1  are the experts in this area.  Since I was the
2  individual who had been asked by the Senator, the letter
3  was -- we responded to her under my signature.
4      Q.  So as you sit here today, you don't know what
5  the Texas Legislature did; is that correct -- or I'm
6  sorry, the Texas Legislative Council did for that
7  analysis?
8      A.  I don't recall back to 2009.
9      Q.  Okay.  And then do you see that the next
10  sentence says, "A similar effort to obtain such
11  demographics may have required for a voter
12  identification bill"?  Is it fair to say that in March
13  of 2009, that you were aware of the potential need to
14  identify the racial demographics of registered voters
15  when you submitted the Voter ID bill to the Department
16  of Justice?
17     A.  I don't know, ma'am.
18     Q.  Well, what -- what -- what do you mean by that
19  sentence?
20     A.  As I said, back in 2009, I -- I don't -- other
21  than what it says, I don't know.
22     Q.  And in March of 2009, is it fair to say that
23  you knew the Legislature was interested in the
24  demographics of registered voters based on your
25  testimony as a resource witness?

---

39

1          MR. SCOTT:  Objection, form, vague.
2      Q.  (By Ms. Maranzano)  That -- wasn't that the
3  question that we looked at for Senator Van de Putte
4  where she was interested in asking about the
5  demographics of registered voters?
6      A.  I thought Senator Van de Putte was asking about
7  Hispanic surnames.  Without looking at the whole thing,
8  I thought that was what we were talking about.
9      Q.  As you see on page 3998, Senator Van de Putte
10  says --
11     A.  Hold on, hold on, 3 what?
12     Q.  3998.
13     A.  3998.
14     Q.  JA 00.
15     A.  Okay.
16     Q.  And Senator Van de Putte says, "So how would be
17  able if we don't know" --
18     A.  Where are you, ma'am?
19     Q.  In the middle of the page, Line 10.
20     A.  Okay.
21     Q.  And there's a comment by Senator Van de Putte
22  where she talks about the data, and she's asking about
23  registered voters who are African American or Latino.
24  Do you see that?
25     A.  Uh-huh.

---

40

1      Q.  So at least one legislator was interested in
2  knowing that, correct?
3      A.  I would presume that she has an interest in it.
4      Q.  And can you -- can you turn back to this letter
5  and look at the very first question here that's on page
6  590?
7      A.  Uh-huh.
8      Q.  And do you see that it's asking about the
9  difference between a citizenship certificate and
10  citizenship papers?
11     A.  Uh-huh.
12     Q.  And if you could take a look at SB 362, Section
13  63.0101.
14     A.  Wait a minute.  Where are you now?  Hold on,
15  because you --
16     Q.  I'll find the page number.
17     A.  -- you're taking it too fast here.
18     Q.  It's on Page 5 and JA 3244.
19     A.  Wait a minute.  Which document?  You've given
20  me two documents.  Which document are you talking about?
21  Are you talking about this one or are you talking about
22  this one?
23     Q.  The SB 362.
24     A.  All right.
25     Q.  Yeah.

---

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

---

41

1       A.  Now where do you want me to go in this?
2       Q.  Page 5.
3       A.  Page 5.
4       Q.  Which has a JA 3244?
5       A.  JA.  Okay.
6       Q.  And then if you look at Section 63.0101, which
7    is at Line 11.
8       A.  Line 11, okay.
9       Q.  And then I want you to take a look at
10   this section.  There's a Section A and a Section B in
11   63.0101.
12      A.  Okay.
13      Q.  And just let me know when you're ready.
14      A.  What else do you want me to look at?
15      Q.  Section A and B.  Did you look at that?
16      A.  Section A.  Okay.
17      Q.  Do you see Section A has language about a
18   United States citizenship certificate, correct?
19      A.  Uh-huh.
20      Q.  And Section B has language about a United
21   States -- or United States citizenship papers.  Do you
22   see that?
23      A.  Now where is Section B?  Okay.  I see papers
24   here.  Certificate here.  Okay.
25      Q.  And then in this letter, you're answering the

---

42

1    question of explaining the difference between a
2    citizenship certificate and citizenship papers.  Do you
3    see that?
4       A.  Okay.
5       Q.  Okay.  Now, in the second paragraph of the
6    letter, there's discussion of citizenship papers.  And
7    it states that the passport -- a U.S. passport and
8    certificate of citizenship would satisfy Section 63.0101
9    A and B.  And then it separately discusses birth
10   certificates and certificates of naturalization.  So my
11   question is:  Was it your position in 2009 that a
12   certificate of naturalization was intended to be
13   accepted under 63.0101 A?
14      A.  My personal position?
15      Q.  The position -- yeah, your personal position?
16      A.  My personal position, I didn't have a position.
17      Q.  What about the position of your office?
18      A.  All of this?
19      Q.  Uh-huh.
20      A.  A lawyer would have to tell me what this means.
21   I'm not a lawyer.  So I would have to defer to the
22   elections staff to tell me, okay, this was the response.
23   They verified that this needed to be in there.  I was
24   responding on behalf of the agency because I was the --
25   the witness that was up there.  But the staff was able

---

43

1    to -- had to draft the language to satisfy the question
2    that had been asked.  Without a staff here to walk me
3    through it again after five years, I don't remember.
4       Q.  Okay.  So sitting here today, you don't know
5    the answer to that?
6       A.  The answer to what?
7       Q.  To whether the certificate of naturalization
8    was, in 2009, whether your office thought that that was
9    part of 63.0101 A?
10      A.  I feel comfortable that what our staff put in
11   this letter was the most accurate information they had.
12      Q.  Okay.  Now, this letter is dated March 11,
13   correct?
14      A.  Yes, it appears to, yes, ma'am.
15      Q.  And you testified on March 10th, although I
16   believe the testimony went into the next day; is that
17   correct?
18      A.  Ma'am, I don't remember.  It's -- it -- I -- I
19   started -- I sat there starting the evening of the
20   9th.  I went through the 10th.  And I testified in the
21   wee hours of the morning of the 11th, somewhere like
22   5-ish or so in the morning.  I don't -- it was early.
23      Q.  Uh-huh.
24      A.  Most people weren't working about that time.
25   And upon -- upon getting through, I went back to our

---

44

1    staff and said we have these questions.  The staff
2    members that were there were able to write down the
3    questions.  We need to respond to the Senator.
4       Q.  And you responded that same day, these are in
5    the day, correct?
6       A.  If that's what this letter says.  Now, my dates
7    may be off on when I actually testified.  I just
8    remember it was early in the morning.
9       Q.  Now, when you -- when you serve as a resource
10   witness or when you served as the resource witness, the
11   one time, did you think it was important to respond to
12   all the questions that the legislators asked you?
13      A.  I thought it was important to answer the
14   questions that they asked me.
15      Q.  And would you try to respond such as in this
16   case even if you had to go back and get more information
17   and bring it back to them?
18      A.  If that had been the case.
19      Q.  Does the Legislature's funding of your office
20   motivate you to respond to their requests?
21      A.  The Legislature motivates me to respond to
22   their requests.
23      Q.  Do you believe that you're equally responsive
24   to members of the majority political party and the
25   minority political party?

---

COBY SHORTER, III                                              8/12/2014
CONFIDENTIAL TRANSCRIPT

---

45

1    A.  We're responsive to anyone that asks the
2  question.
3    Q.  Are there any circumstances, and this can be
4  even broader than just when you testified, in which you
5  have not responded to a legislator's question or request
6  for information?
7         MR. SCOTT:  Objection, vague and
8  ambiguous.
9    A.  What do you mean?
10   Q.  (By Ms. Maranzano)  As you sit here today, can
11 you recall any times when a legislator has asked you a
12 question or asked for information and you haven't
13 responded?
14        MR. SCOTT:  Objection, vague and
15 ambiguous.  You can answer.
16   A.  I -- ma'am, not that I -- I don't know of
17 any.  I mean, I can't recall any.
18   Q.  (By Ms. Maranzano)  Do you -- do you recall if
19 you got a response to your letter to Senator
20 Van de Putte?
21   A.  I don't recall.
22   Q.  Did you have communications about the substance
23 of the letter with any other Senators?
24   A.  No, not that I can recall.
25   Q.  With the Lieutenant Governor's Office?

---

46

1    A.  Not that I can recall, ma'am.
2    Q.  With any members of the House?
3    A.  No, ma'am, not that I can -- none that I can
4  recall.
5         (Exhibit 4 marked for identification.)
6    Q.  (By Ms. Maranzano)  I'm handing you what we've
7  marked as Exhibit 4.  Do you recognize this document?
8    A.  I see two exhibit numbers on here.
9    A.  Oh, yeah, that's --
10   A.  One says that 5 and one that says 4.
11   Q.  Well, 5 is because it's a previously used
12 exhibit.
13   A.  Oh, okay, all right.  So this would be Senate
14 Bill 14?
15   Q.  Did you have any role in the development of
16 Senate Bill 14?
17   A.  Direct -- direct development?
18   Q.  Yes.
19   A.  No, ma'am.
20   Q.  How about indirect development?
21   A.  Well, I supervised our elections staff.
22   Q.  Did they have -- did they have a role in the
23 development of the bill?
24   A.  I'm quite sure they answered questions from the
25 Legislature if they had them.

---

47

1    Q.  Do you know -- do you know who they had
2  conversations with?
3    A.  Absolutely -- no, ma'am, I --
4    Q.  But you didn't have any conversations with
5  legislators about the bill?
6    A.  No, ma'am.
7    Q.  Do you know if Senator Fraser consulted with
8  anyone in the elections division to ensure that the bill
9  did not create any conflict with the election code?
10   A.  I have no idea, ma'am.  You're talking about
11 this bill, Senate Bill 14?
12   Q.  Senate Bill 14.  Does your office receive
13 notification of allegations of in-person voter
14 impersonations?
15   A.  If our elections department would -- would
16 receive those, elections division, rather.
17   Q.  And are those something Mr. Ingram or whoever
18 the director of elections is discusses with you?
19   A.  Not in great detail, no more than if there's
20 one, we have one and they were following their
21 procedures for passing it on.
22   Q.  So you would know that there was an allegation
23 but you wouldn't know the details; is that correct?
24   A.  Quite possibly, yes, ma'am, I --
25   Q.  Prior to the passage of SB 14, were you aware

---

48

1  of any allegations of in-person voter impersonation in
2  Texas?
3    A.  I -- I don't -- you know, when you've been
4  around seven years, a lot of things happen at different
5  times.  I don't know if they happened before the bill or
6  after.
7    Q.  Well, as you sit here today, what allegations
8  of in-person voter impersonation are you aware of?
9    A.  I can't remember any specific ones.
10   Q.  Okay.
11   A.  Because they weren't -- they was passed on to
12 the appropriate authorities.
13   Q.  Do you know whether it's the Secretary of
14 State's position that under SB 14, a citizenship
15 certificate includes certificates of naturalization?
16   A.  What do you mean?
17   Q.  Well, can you take a look at -- let me find the
18 right page for you.
19   A.  Are you talking about the types of --
20   Q.  Yes.
21   A.  -- identification?
22   Q.  Yes.
23   A.  I know the different forms, but I would have to
24 have staff tell me which specific forms fall into what
25 categories.

---

COBY SHORTER, III                                           8/12/2014
CONFIDENTIAL TRANSCRIPT

13 (Pages 49 to 52)

49

1    Q.  Okay.  Are you aware of whether a certificate
2  of naturalization is accepted as a form of ID under SB
3  14?
4    **A.  Are you considering that a certificate of**
5  **citizenship?**
6    Q.  That's what I'm asking you.
7    **A.  I mean, is that what you were asking about?**
8    Q.  Yes, exactly.
9    **A.  I think it is one of the forms.  I had to go**
10 **back and think about that.  Citizenship is a -- should**
11 **be a form.**
12   Q.  And do you know who made that decision?
13   **A.  Who in terms of the bill?**
14   Q.  Well, if you look at the bill -- let's just
15 look at the bill for a moment.
16   **A.  So what page are you going to?**
17   Q.  Page 9 or Page 424 or DE --
18   **A.  My 424 says Page 7.**
19   Q.  DE 4188, do you see that?
20   **A.  Okay.  4188.**
21   Q.  And then Section 14 of the bill.
22   **A.  Okay.**
23   Q.  That's probably the easiest way to do it.  And
24 then do you see -- if you could just take a look at the
25 forms of ID that are --

50

1    **A.  All right.**
2    Q.  -- here.
3    **A.  Okay.**
4    Q.  Okay.  Now, let's take a look at this.
5    **A.  Okay.**
6    MS. MARANZANO:  We are marking this
7  Deposition Exhibit 6 -- 5.
8    (Exhibit 5 marked for identification.)
9    **A.  This is 4.  Okay, I got it.**
10   Q.  (By Ms. Maranzano)  Okay.  And I believe this
11 is on the second page.  It's on Page 463240.
12   **A.  463 what?**
13   Q.  Which is Page 4 at the top and the letter G.
14   **A.  Uh-huh.**
15   Q.  And do you see that according to the Secretary
16 of State frequently -- well, do you recognize this
17 document, what's been marked as Deposition Exhibit 5?
18   **A.  I recognize that it's a FAQ document.**
19   Q.  And do you see that under Section G, it says
20 the Secretary of State has determined -- researched the
21 legislative intent.  And do you see that the
22 determination has been made that citizenship
23 certificates includes certificates of naturalization?
24   **A.  Wait a minute.  Where are you?**
25   Q.  Under letter G.

51

1    **A.  G.  Okay.**
2    Q.  Okay.  So certificate of citizenship --
3  certificate of naturalization, that's not written
4  explicitly in the part of the bill that we just looked
5  at, right?
6    MR. SCOTT:  Objection, form, vague.
7  Mischaracterizes the bill and the document -- the bill,
8  SB 14, speaks for itself.  Go ahead.
9    Q.  (By Ms. Maranzano)  Did you see when you looked
10 at 63.0101, did you see certificate of naturalization
11 written in?
12   **A.  I have to go back and look.  I've seen so much**
13 **today.  Which one?**
14   Q.  That one that you have open.
15   **A.  And what am I looking at?**
16   Q.  63.0101?
17   **A.  63.1010.**
18   Q.  SB 14.
19   **A.  Okay.  And where am I looking?  Where do you**
20 **want me to look?**
21   Q.  I'm just asking you if you see certificate of
22 naturalization listed there.
23   MR. SCOTT:  Objection, form.  The document
24 4189 speaks for itself.
25   **A.  I see what the bill says.**

52

1    Q.  (By Ms. Maranzano)  So I'm wondering who made
2  the decision to include certificate of naturalization as
3  a form of ID that was allowed in -- under SB 14?
4    MR. SCOTT:  Objection, form.  I think this
5  is getting awful close to the deliberative process
6  privilege that the agency goes through.  And so I think
7  other than what the documents say on their surface, I
8  would --
9    Well, first of all, do you know?  I mean,
10 if you don't know, that may be the easiest way.  If you
11 don't know, just let her know.  But if you do know, then
12 I've got to follow up.
13   **A.  I don't know other than it would happen in the**
14 **elections division.**
15   Q.  (By Ms. Maranzano)  Okay.  Do you know what the
16 basis was of that decision?
17   **A.  No, ma'am.**
18   Q.  Do you know if that decision is memorialized in
19 a regulation?
20   **A.  What do you mean by memorialized?**
21   Q.  Is there a regulation -- is there anything in
22 writing other than these frequently asked questions that
23 says certificate of naturalization should be included?
24   **A.  I'm not aware.**
25   Q.  Okay.  Is this the case that the Secretary of

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

---

**53**

1  State has regulatory authority with regard to the forms
2  of ID allowed under SB 14?
3     **A.  I think Secretary of State's Office is not a**
4  **regulatory agency.**
5     Q.  Do you think that the decision to allow a
6  certificate of naturalization as one of the allowable
7  forms of ID under SB 14 is the decision that could be
8  reversed by a future administration?
9        MR. SCOTT:  Objection, form, speculation.
10 Objection, form, foundation.  You can answer.
11    **A.  I have no clue, ma'am.**
12    Q.  (By Ms. Maranzano)  Did you have any
13 conversations -- you can put that document away.
14    **A.  This one?  I can put this away?**
15    Q.  Yes.
16    **A.  Okay.**
17    Q.  Did you have any conversations with any
18 legislators about SB 14 while it was being considered?
19    **A.  Ma'am, none that I can recall.**
20    Q.  Did you have any conversations with anyone in
21 the Governor's office about SB 14?
22    **A.  None of -- none of any great substance.**
23    Q.  Did the Governor designate SB 14 as a
24 legislative emergency?
25    **A.  I don't -- I don't remember.**

---

**54**

1     Q.  Do you know why SB 14 would have been
2  designated as a legislative emergency?
3     **A.  No, ma'am.**
4     Q.  Was there any factual basis that necessitated
5  the Legislature to consider Voter ID bills in the first
6  60 days of the session?
7        MR. SCOTT:  Objection.
8     **A.  I have no idea.**
9     Q.  (By Ms. Maranzano)  Was there any spike in
10 in-person voter impersonation that had occurred?
11    **A.  I don't know.**
12    Q.  Are you aware of any particular decline in
13 voter confidence that has occurred?
14    **A.  I'm not aware of any.**
15    Q.  Did you provide any input into the decision to
16 make SB 14 a legislative emergency?
17    **A.  No, ma'am.**
18    Q.  Did the Secretary of State?
19    **A.  I'm not aware of -- of that.**
20    Q.  Wouldn't the Secretary of State be in the best
21 position to know whether there was an election-related
22 issue that needed to be addressed in the first 60 days
23 of the legislative session?
24       MR. SCOTT:  Objection, form, foundation,
25 speculation.

---

**55**

1     **A.  I mean, bills don't start with the Secretary of**
2  **State's Office.**
3     Q.  (By Ms. Maranzano)  But the Secretary of State
4  is the chief election official, correct?
5     **A.  We're the chief resource.**
6     Q.  Now, you said I believe earlier that you
7  usually work with committees, the Senate Committee on
8  State Affairs for election bills.
9     **A.  I don't.**
10    Q.  Your office does, correct?
11    **A.  Yes.**
12    Q.  And are you aware that SB 14 was referred
13 directly to the Committee of the Whole?
14    **A.  Ma'am, I don't -- I don't know the history of**
15 **the legislative process on the bill.**
16    Q.  Okay.  Fair enough.
17       MS. MARANZANO:  Can you mark this?
18       (Exhibit 6 marked for identification.)
19       MS. MARANZANO:  Okay.  At this point,
20 before we go further, I just want to note for the record
21 that this is a Highly Confidential document, so we're
22 going to designate this part of the transcript as highly
23 confidential.
24       MR. SCOTT:  We have run into this issue
25 with our wonderful court reporter before.

---

**56**

1        MS. MARANZANO:  Yes.
2        MR. SCOTT:  And from his standpoint, we
3  have had the following agreement on previous
4  depositions.  We want to see if we can get the same one
5  on this one so we make his life as easy as possible.
6  Which is that my the whole deposition in some sealed
7  content, but the only time anybody needs to do anything
8  special is when we get to that portion of the depo that
9  deals with the highly confidential.  So we treat it as
10 though it's, from an administrative process, he's
11 allowed to serve it upon us in a sealed manner, and it
12 just puts everybody on alert that they need to --
13 there's something in that deposition that's highly
14 confidential.
15       MS. MARANZANO:  I see.  So we'll --
16       MR. SCOTT:  So the whole depo --
17       MS. MARANZANO:  -- mark the whole
18 transcript as Highly Confidence, but we'll note on the
19 record when we're --
20       MR. SCOTT:  Yes.
21       MS. MARANZANO:  -- using a document that's
22 --
23       MR. SCOTT:  Yes.  That's way --
24       MS. MARANZANO:  Yeah.
25       MR. SCOTT:  -- nobody needs any special

---

COBY SHORTER, III                                                8/12/2014
CONFIDENTIAL TRANSCRIPT

57

1  permission to do anything except when we get to that
2  highly confidential section.
3          MS. MARANZANO:  That's fine as long as we
4  can agree that, you know, we're doing it as an
5  administrative convenience --
6          MR. SCOTT:  Absolutely, yes.
7          MS. MARANZANO:  -- but we're not agreeing
8  that the whole transcript is confidential.
9          MR. SCOTT:  Yes, yes, absolutely.
10         MS. MARANZANO:  All right.  But just so
11 I'm clear, will we continue to note on the record when
12 we're using highly confidential?
13         MR. SCOTT:  Absolutely.
14         MS. MARANZANO:  Okay.
15         MR. SCOTT:  And so we're just dealing with
16 it, it just kind of -- placing that burden -- I mean,
17 that removes the burden on him to break out any
18 subparts, and it just alerts somebody that there's
19 something in that document that's highly confidential.
20         MS. MARANZANO:  I see.  That makes sense.
21         MR. SCOTT:  And we only deal with the
22 subpart as being highly confidential.  The rest remains
23 un --
24         MS. MARANZANO:  Okay.
25         MR. SCOTT:  -- sharable with anybody you

58

1  want.
2          MS. MARANZANO:  Okay.  That sounds good.
3          MR. SCOTT:  Thank you.
4      Q.  (By Ms. Maranzano)  Mr. Shorter?
5      A.  Uh-huh.
6      Q.  I am showing you what we've marked as
7  Deposition Exhibit 6.  Do you recognize this document?
8      A.  No, ma'am.
9      Q.  Have you ever seen it before?
10     A.  No, ma'am.
11     Q.  Do you know who Jennifer Fagan is?
12     A.  Yes, ma'am.
13     Q.  And who is she?
14     A.  She works for Senate Committee on State
15 Affairs, or she used to.  I don't know if she's still
16 there or not.
17     Q.  And in 2011, she -- she worked for the Senate
18 Committee on State Affairs, correct?
19     A.  I think she did, yes.
20     Q.  In 2011?  And Senator Duncan chaired the
21 committee on State Affairs, correct?
22     A.  Yes, ma'am.
23     Q.  And did he preside over the debate on SB 14?
24     A.  I was not at that hearing.
25     Q.  Now, do you see in this document, Ms. Fagan is

59

1  asking Ms. McGeehan whether the Secretary of State or
2  any other local election officials collect ethnicity
3  information on voters?
4      A.  Uh-huh.
5      Q.  Who is Ms. McGeehan?
6      A.  Ms. McGeehan is the former director of
7  elections.
8      Q.  And when she sent this e-mail to Ms. McGeehan,
9  at that time, was Ms. McGeehan the director of
10 elections?
11     A.  It appears she was based on the e-mail here.
12     Q.  And Ms. McGeehan responded and talked about the
13 availability of the Hispanic surname analysis, correct?
14     A.  That appears to be correct.
15     Q.  Now, this e-mail was sent on January 24th,
16 right?
17     A.  That's what it -- yes, ma'am, according to this
18 document.
19     Q.  And is that the day before the Senate Committee
20 of the Whole took up SB 14?
21     A.  I have no idea.
22     Q.  Did Ms. McGeehan inform you that she's been
23 asked by Senator Duncan's staff to provide information
24 about the ethnicity of voters?
25     A.  I don't recall.

60

1      Q.  Are you aware of whether she made any response
2  to Ms. Fagan or to Senator Duncan's staff?
3      A.  I'm not aware.
4      Q.  Okay.  So --
5      A.  Other than what you've shown me here.
6      Q.  Okay.  Those are all the questions I have about
7  this document.
8      A.  Okay.  I can turn this one down?
9      Q.  Yes.
10     A.  Who do I give this one to?
11         MR. SCOTT:  Same pile.
12         MS. MARANZANO:  You can just put them in
13 the pile.
14     A.  Okay.
15     Q.  (By Ms. Maranzano)  Are you aware of whether
16 the division, the elections division at this time,
17 around January 24th, had prepared a monthly report of
18 Hispanic surname voters by household and county?
19     A.  Ma'am, I'm not aware.
20     Q.  Would it surprise you to learn that Mr. Ingram
21 testified that that's the case?
22     A.  No, it wouldn't surprise me.  I'm just -- I
23 mean -- I don't -- what -- what do you mean?
24     Q.  Would -- are you aware of whether the elections
25 division prepared a report of Hispanic surname voters

COBY SHORTER, III                                             8/12/2014
CONFIDENTIAL TRANSCRIPT

---

61

1   each month?
2       A.  I don't know exactly how often, how frequent it
3   is prepared.
4       Q.  Okay.
5       A.  I know it is prepared.
6       Q.  Okay.
7       A.  The frequency of it is not something that they
8   put on my desk every month.
9       Q.  Okay.  So that's what you were referring to
10  earlier when you said you know the list was prepared.
11      A.  I know it's prepared.  I know they follow
12  whatever procedures, but how -- how often is it done, I
13  can't give you without them telling me, without me
14  asking them, I can't give you a specific answer.
15      Q.  Do you -- do you know how the report is
16  prepared?
17      A.  What do you mean by how it's prepared?
18      Q.  Do you know what information is contained in
19  that report?
20      A.  It's been a while since I've seen one.  I would
21  have to see one to refresh my memory on it.
22      Q.  Do you know what the purpose of the report is?
23      A.  Not in great detail.
24      Q.  Do you give that report out to people who ask
25  for information about the ethnicity of voters?

---

62

1       A.  Where all the -- where all the staff provides
2   that particular list and who all they provide it to, I
3   don't know specifically.  Whoever the -- whoever asks
4   for it is more than likely capable of getting it.
5       Q.  So although you testified earlier that you
6   don't believe that the Spanish surname analysis is a
7   completely accurate --
8       A.  Uh-huh.
9       Q.  -- method, the Secretary of State's Office has
10  disseminated information using that form of analysis,
11  correct?
12      A.  That's the only information we have.
13      Q.  Do you know if you've ever disseminated that
14  information to the State Affairs Committee?
15      A.  Ma'am, I -- I specifically, I don't -- I
16  don't know.  I mean, I can't give you a -- if it was
17  requested by the committee, I'm quite sure our staff did
18  the best of their ability to provide it.
19      Q.  Do you recall that Ms. McGeehan testified
20  during the Committee of the Whole proceedings on the
21  Senate Bill 14?
22      A.  I remember her testifying.
23      Q.  Now, why did she testify in this case in SB 14
24  when --
25      A.  I have no clue.

---

63

1       Q.  Okay.
2       A.  It was not my decision.
3       Q.  Was it -- whose decision was it?
4       A.  I would presume it's the decision of the
5   committee.
6       Q.  Did you accompany Ms. McGeehan when she
7   testified as a resource witness?
8       A.  I was in the room.
9       Q.  And in the room, you mean you went to the --
10      A.  To the Senate floor.
11      Q.  Okay.  And you -- did you stay during the
12  committee's debate?
13      A.  Some of it.  I can't remember if I stayed for
14  the whole thing, ma'am.
15      Q.  Was that a common practice for you to accompany
16  other people when they went to the Legislature to
17  testify?
18      A.  It wasn't necessarily common practice, but in
19  that it was the Senate of the Whole, again, we didn't
20  know what to expect.  Ms. McGeehan wanted -- because I
21  had been there, I had been the witness before,
22  Ms. McGeehan as the elections director before the
23  Committee of the Whole just wanted me there, if nothing
24  more, for moral support.
25      Q.  And prior to the hearing on January 25, 2011

---

64

1   where Ms. McGeehan testified --
2       A.  Uh-huh.
3       Q.  -- the division had updated its analysis of
4   voters who had not supplied a driver's license number or
5   Social Security number with their voter registration
6   applications, correct?
7       A.  I don't remember.
8       Q.  Do you -- do you know how an analysis like that
9   would be derived?
10          MR. SCOTT:  Objection, form, foundation.
11      A.  What type of analysis?
12      Q.  (By Ms. Maranzano)  A list of voters who did
13  not supply a driver's license number or a Social
14  Security number, would that analysis be done by only
15  looking at the TEAM database?
16      A.  Ask the question -- ask me the question again,
17  please.  I didn't quite understand what you were asking.
18      Q.  Sure.  When the Secretary of State's Office
19  gives out information about voters who have not supplied
20  a driver's license number or a Social Security number on
21  a voter registration application, are they getting that
22  information from the TEAM database?
23      A.  Well, I mean, it would depend on what type of
24  request it is.
25      Q.  What do you mean by that?

---

COBY SHORTER, III                                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

---

65

1    A.  Just what I said, it depends on, you know, the
2  nature of -- of who's asking the question.  I mean,
3  what -- what is it that you're trying to -- to figure
4  out?  I mean, is it can the data be -- can the question
5  be answered simply by looking at TEAM data, or is there
6  another set of data that needs to be looked at as well.
7  I'm can't be -- I'm not the one that could tell you
8  that.  The election staff would be able to answer that
9  question as to whether or not the answers for a
10 particular query can be determined only by data that we
11 have in TEAM.
12    Q.  Okay.  I think maybe I'm not being clear.  When
13 -- when the elections division is supplying a list that
14 has the number of voters who didn't write their driver's
15 license number or their Social Security number on their
16 voter registration application, would that be -- that
17 information, would that come just from TEAM?
18    A.  Well, I think I've answered it as best I could.
19 It depends on, you know, are you just looking at the --
20 all of the data that's in TEAM?  I can't remember every
21 piece of information in TEAM.  Or are you having to look
22 at outside data to make comparisons with?
23    Q.  The information that would be supplied on the
24 voter registration application, what other database
25 would contain that?

---

66

1    A.  Well, not all voter applications have driver's
2  license.
3    Q.  Right, so -- so, but in terms of where you
4  would get that -- that information for the voter
5  registration applications that did have driver's license
6  numbers or that did have another number written on it,
7  that information comes from TEAM, right?
8    A.  I would presume.
9    Q.  Okay.  And as I think you just said, not every
10 voter registration application has a driver's license
11 number or a Social Security number, correct?
12    A.  That's what I've been told by staff.
13    Q.  And in fact, voters weren't required to supply
14 those numbers until 2006, correct?
15    A.  I don't know the exact date, was it 2006, but
16 I've been told that that was not a nonrequirement.
17    Q.  So information about voters who wrote or didn't
18 write a driver's license number or Social Security
19 number on a voter registration application, that
20 information is of limited use if you're trying to
21 determine who has a driver's license, correct?
22        MR. SCOTT:  Objection, form, foundation,
23 speculation.
24    A.  I'm not a technical person.  I wouldn't know.
25    Q.  (By Ms. Maranzano)  Now, besides updating the

---

67

1  list of voters who had driver's -- or wrote a driver's
2  license number on their voter registration application,
3  did the division, to your knowledge, conduct any other
4  research related to SB 14 before Ms. McGeehan testified?
5    A.  I can't remember.  There were some matching
6  exercises with -- with outside databases, but our staff
7  could never conclusively provide answers with any
8  confidence.
9    Q.  And I think -- I want to talk a little bit more
10 about that in a second.  But is it the case that the
11 Secretary of State's Office had a jury wheel from DPS
12 since about October 2010?  Does that sound correct to
13 you?
14    A.  I don't know the exact date, but we do have a
15 jury wheel.
16    Q.  And is it possible to match that jury wheel
17 with -- against TEAM?
18    A.  There's a process that the jury wheel goes
19 through, ma'am, not being a technical person, there is
20 some type of interaction.  I can't specifically speak to
21 how those two match together.
22    Q.  Okay.  I understand.  Did you anticipate when
23 you went over to the Committee of the Whole with
24 Ms. McGeehan that she was going to be asked for
25 information about the number of voters who didn't have a

---

68

1  driver's license or ID card?
2    A.  I had no -- I made no anticipation whatsoever.
3    Q.  Did you recall that that had come up in 2009?
4    A.  Ma'am, I don't even remember 2009 much, and I
5  don't remember much of what happened that day.
6    Q.  Do you think that a match against -- of DPS
7  jury pool and TEAM would have been a more accurate way
8  to get the number of individuals who might not have a
9  driver's license than using the number of individuals
10 who wrote or didn't write a driver's license number on
11 their voter registration card?
12        MR. SCOTT:  Objection, form, calls for
13 speculation.
14    A.  I don't know.
15    Q.  (By Ms. Maranzano)  When you were at -- at the
16 Capitol building on January 25th with Ms. McGeehan, did
17 you speak to legislators about SB 14 prior to her
18 testimony?
19        MR. SCOTT:  Objection, form, vague.  I
20 mean he goes to the Capitol every day.  Their office is
21 over there.
22    Q.  (By Ms. Maranzano)  When you were there with
23 Ms. McGeehan prior to her testimony?
24    A.  Not that I recall.
25    Q.  You don't recall a conversation with Senator

---

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

---

69

1  Williams?
2      **A. No, ma'am, I don't recall one. I -- I just**
3  **don't recall.**
4          MS. MARANZANO: Can you please mark this?
5          (Exhibit 7 marked for identification.)
6      **A. When was this?**
7      Q. (By Ms. Maranzano) I'm showing you what we've
8  marked as Deposition Exhibit 7.
9      **A. Okay.**
10     Q. This is an excerpt only, it's not the whole
11 transcript, from the January 25th, 2011 Committee of the
12 Whole proceeding.
13     **A. Okay.**
14     Q. On SB 14. Can you turn to Page 460?
15     **A. 460, okay.**
16     Q. Do you see that --
17     **A. Hold on. 460, okay.**
18         MR. SCOTT: And for the record, that's
19 Bates Number TX 816.
20         MS. MARANZANO: Thank you.
21     Q. (By Ms. Maranzano) On Line 7, do you see that
22 Senator Davis is asking a question of Ms. McGeehan about
23 the number of voters who wrote down their driver's
24 license on their voter registration application?
25     **A. Are you talking about Line 7 through 11?**

---

70

1      Q. Yes.
2      **A. Okay.**
3      Q. And then do you see Ms. McGeehan talks about --
4  can you just take a look at Ms. McGeehan's response?
5      **A. All right. Okay.**
6      Q. And do you see Ms. McGeehan, when she responds,
7  she references the Hispanic surname, correct, on the
8  bottom of the page?
9      **A. Okay.**
10     Q. And then Senator Davis talks about how she
11 thinks this is an important issue, correct, on the next
12 page, in terms of the implementation of this law and its
13 impact?
14     **A. Okay.**
15     Q. Are you aware of whether the Secretary of
16 State's Office had any follow-up with Senator Davis
17 after this exchange?
18     **A. Ma'am, I don't -- I don't recall.**
19     Q. Is it fair to say that Senator Davis was
20 interested in the demographics of registered voters?
21         MR. SCOTT: Objection, form,
22 speculation. Document speaks for itself.
23     Q. (By Ms. Maranzano) Based on her questions?
24     **A. I don't know, I mean, I don't know what -- it**
25 **is what it says.**

---

71

1      Q. Well, she says that it's an important issue to
2  try to understand, correct?
3      **A. I'd have to go back and read it. I see it**
4  **appears to me she asks, is there an intent to track it**
5  **going forward.**
6      Q. And on Page 460, she actually asks if there is
7  -- if the Secretary of State already breaks down that
8  information.
9      **A. Ma'am, I don't know why she's asking these**
10 **questions.**
11     Q. Okay. Do you know what Senator Davis's
12 position on SB 14 was?
13         MR. SCOTT: Objection, form, vague.
14     Q. (By Ms. Maranzano) Do you know how she voted
15 on SB 14?
16     **A. No, ma'am, I wasn't there when all the voting**
17 **was going on.**
18     Q. Can you turn to page 489?
19     **A. 489, okay.**
20     Q. And if you can look at Senator Williams'
21 comment which starts at Line 14.
22     **A. 14, okay.**
23     Q. Yeah. I want to focus your attention on what
24 he says towards the bottom and then it goes on to the
25 next page.

---

72

1      **A. Okay.**
2      Q. And do you see he's referencing that he talked
3  to Ms. McGeehan about a project to cross-reference the
4  driver's license and voter registration?
5      **A. Uh-huh.**
6      Q. And then do you see Ms. McGeehan talks about
7  timing for that when she says she hopes to get a
8  response to him by the end of the week?
9      **A. Uh-huh.**
10     Q. Were you there during that testimony?
11     **A. Ma'am, I don't remember. I may have been in**
12 **the room.**
13     Q. Okay.
14     **A. I may not have been.**
15     Q. Do you recall this request that was made by
16 Senator Williams?
17     **A. I don't recall a specific request. I do recall**
18 **our office attempting to cross-reference driver's**
19 **license and voter registration.**
20     Q. Okay. Did you think that -- all right. And
21 prior to Senator Williams' request on January 25th, are
22 you aware of any other such request for this
23 information?
24     **A. Like I said, I'm not aware of a specific**
25 **request. I'm just aware of the exercise that -- the**

---

COBY SHORTER, III                                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

19 (Pages 73 to 76)

73

1  exercises in trying to do cross-references between the
2  driver's license list and the voter registration list.
3  I'm not aware of how they all got started.
4      Q.  Can you look at the bottom of Page 490, at
5  Senator Williams' comment?
6      A.  490?
7      Q.  Uh-huh.  Where he's --
8      A.  490, okay.
9      Q.  -- he's still in the same exchange that he's
10  having with Ms. McGeehan?
11      A.  Okay.
12      Q.  And do you see that he talks about -- he
13  suggests that they could make -- if we gave legislative
14  intent as part of the bill tomorrow, do you see that?
15  It's right at the very bottom?
16      A.  Okay.
17      Q.  He's talking about legislative intent for you
18  all.  And then on the next page, and the Secretary of
19  State's Office to take that direction.  Are you aware of
20  whether that legislative intent was ever included in SB
21  14?
22      A.  Ma'am, I have no clue.
23      Q.  And what he's saying is -- it looks like he's
24  talking about training plans and voter education plans,
25  correct, on Page 491?

74

1      A.  He says if it's something you wanted to have
2  done in your training plans and voter education plans,
3  but I'm not sure really what he's referencing.
4      Q.  Well, you can read the whole statement.  And do
5  you see he says -- this is after he had asked
6  Ms. McGeehan about the -- the data matching.  And then
7  he asks if she needs further direction.  And then he
8  says, "For instance, if we wanted to target that
9  universe of people that we know are out there and maybe
10  make a little extra effort to make sure that they
11  understood they were going to have a new requirement
12  when they went to vote as far as getting a photo ID."
13      A.  Uh-huh.
14      Q.  Do you know if any legislative intent was put
15  into the bill?
16      A.  Ma'am, I don't know.
17      Q.  Do you know what Senator Williams' position on
18  SB 14 was?
19          MR. SCOTT:  Object.  If you know.
20      A.  I -- this is with -- I can't tell you how the
21  actual senators voted on this bill.
22      Q.  (By Ms. Maranzano)  Okay.  Now, I believe you
23  said that you're aware that a match was done between the
24  DPS database and the voter registration database?
25      A.  I'm aware that our office made several attempts

75

1  to try to -- try to make a match.  I'm also aware that
2  we were not very successful at it.
3          (Exhibit 8 marked for identification.)
4      Q.  (By Ms. Maranzano)  I'm showing you what we've
5  marked as Deposition Exhibit 8.
6      A.  Okay.
7      Q.  If you'll look at this, the whole thing.
8      A.  Okay.  Let's see here.  Okay.
9      Q.  Have you ever seen this document before?
10      A.  Ma'am, if I have, it's been so long ago, I
11  don't -- I don't remember the specifics of the document.
12  I remember the process.
13      Q.  Can you look at the third page where there's a
14  question at the top and a discussion.
15      A.  Uh-huh.
16      Q.  Do you know if you've seen the content on this
17  page before?
18      A.  I don't recall if I have.
19      Q.  When you talked about the -- the attempt to do
20  a match --
21      A.  Uh-huh.
22      Q.  -- is this write-up a write-up of that attempt
23  as far as you can tell?
24      A.  Ma'am, I don't remember the actual numbers.  I
25  just remember there were several attempts to do it, and

76

1  we got several different kind of answers.
2      Q.  And who oversaw that process of matching the
3  databases?
4      A.  That would have been a mixture of the elections
5  division and the IT division, but probably spearheaded
6  by the elections division.
7      Q.  And would that have been then spearheaded by
8  Ann McGeehan?
9      A.  Ann McGeehan or Karen Richards, I guess.
10      Q.  Do you know who analyzed the results of the
11  match?
12      A.  No, ma'am, I'm would presume their staff, but I
13  don't know specifically.
14      Q.  Can you look at this at the first page?
15      A.  Uh-huh.
16      Q.  And do you see at the very top?
17      A.  Uh-huh.
18      Q.  There's a message from Ann McGeehan, and in
19  that message she says, "Attached is a draft summary that
20  I will send to Coby and John" --
21      A.  Uh-huh.
22      Q.  -- "so they can distribute to legislative
23  folks."
24      A.  Uh-huh.
25      Q.  Does that refresh your recollection at all that

COBY SHORTER, III                                           8/12/2014
CONFIDENTIAL TRANSCRIPT

77

1  this may have been sent to you?
2     A.  Nuh-uh.
3     Q.  Do you believe that she meant Coby -- she meant
4  you by that?
5        MR. SCOTT:  Objection, form, speculation.
6     A.  It would not -- John -- John -- I presume
7  that's John that would have been our general counsel.  I
8  would not have distributed it to anyone.
9     Q.  (By Ms. Maranzano)  Who would have distributed
10 it to legislative folks?
11    A.  It would have either been Ann or her staff or
12 John, who was dealing directly with the legislative
13 affairs.
14    Q.  Would it surprise you to learn that
15 Ms. McGeehan testified that she sent this to you and
16 that she discussed it with you?
17    A.  It may have been discussed with me.  I mean,
18 the matching exercises, I remember visiting with our
19 staff about the matching exercises.  And I remember the
20 staff consistently telling me that we were trying to
21 match apples and oranges, and it wasn't giving
22 information that the staff was comfortable with or had
23 confidence in.
24    Q.  Okay.  Who told you that specifically?
25    A.  Ma'am, I don't remember exactly who it was.

78

1     Q.  Was it IT individuals?
2     A.  Ma'am, I don't remember exactly who it was.  I
3  mean, there were so many different people working on
4  these exercises, the IT people and the -- and I don't
5  recall these exercises being solely related to this
6  particular issue.  I'm -- I'm talking about matching
7  exercises where you're trying to take DPS and our
8  database and match them together.  And IT, Ann, all of
9  them, when they would bring the information, there was
10 always a different number.  There was never a number
11 that you could have confidence in.
12    Q.  Okay.  Well, with regard to this matching
13 exercise, in particular, with TEAM and the DPS database,
14 who did you talk to who said they didn't have confidence
15 in?
16    A.  As I said, I don't remember specifically.
17 Other than the staff.  It could have been Ann.  It could
18 have been the IT staff.  It could have been our -- the
19 elections division staff.  It was staff.  I don't recall
20 every -- every meeting that came into my office.  I just
21 know that staff shared with me.  It could have very well
22 been Ann.  It could have very well been our IT director.
23 That the information, every time they matched it
24 together, you always got a different answer.  The
25 matching -- the matching exercises did not appear to be

79

1  successful or something that we could have confidence in
2  the data that was being provided.
3     Q.  Were you aware when you discussed that with
4  them that they were doing this to respond to legislative
5  requests?
6     A.  Ma'am, I don't remember why they were doing
7  this.  This is 2011.  I don't -- I didn't know if they
8  were doing it for -- I don't recall if they were doing
9  it for -- I guess -- by looking at the -- this was
10 February, they were trying to answer somebody's
11 questions.  You know, we had several things going on at
12 the same time.  We had the Legislature, you got -- I
13 don't know what -- I don't know what specific questions
14 they were trying to answer.  All I know is that there
15 was a process going and they couldn't get an answer that
16 anybody was confident of.
17    Q.  But you were aware that legislators had asked
18 for this information, correct?
19    A.  Ma'am, I don't remember.
20    Q.  What was your reaction to the conclusion, which
21 is on the third page, that 600 -- somewhere between
22 678 -- 678,560 and 844,713 voters may not have been
23 issued a Texas driver's license or ID?
24       MR. SCOTT:  Objection, form, foundation,
25 and calls for speculation based upon his prior answer.

80

1  Go ahead if you can.
2     A.  I don't think I understood your question.
3     Q.  (By Ms. Maranzano)  Well, do you see the
4  conclusion at the bottom of that page?
5     A.  Uh-huh.
6     Q.  What was your reaction to that conclusion?
7       MR. SCOTT:  Objection, form, foundation.
8  The prior testimony was he didn't recall this document.
9  Subject to that objection, you can answer.
10    Q.  (By Ms. Maranzano)  You can answer.
11    A.  I mean, as I previously said, these exercises
12 were not -- there was -- there was no one in our -- no
13 one shared with me in our office that they had any
14 confidence in these numbers.  When the matching
15 exercises were done, I was even told my name was on
16 there.  I know I have an ID.
17    Q.  So my question, though, is just about the
18 numbers that you saw as part of this matching exercise.
19    A.  I don't remember the numbers that I saw.  I
20 just remember -- I remember staff consistently telling
21 me we are comparing apples to oranges, and every time we
22 do this, we come up with different answers.
23    Q.  And did you try to find out from the staff if
24 there was a way to conduct the match in a more effective
25 manner?

COBY SHORTER, III                                        8/12/2014
CONFIDENTIAL TRANSCRIPT

21 (Pages 81 to 84)

---

**81**

1 　　A. Well, I -- I directives -- I mean, I didn't
2 direct -- I asked the staff to continue to work on it to
3 the best of their ability.
4 　　Q. Was there any other way to determine how many
5 registered voters might have a driver's license or ID?
6 　　A. I wouldn't know.
7 　　Q. Was that something you asked staff?
8 　　A. I don't recall having -- I don't recall that
9 conversation, as I consistently say, I just remember
10 staff working on this consistently and not being able to
11 come up with a definitive answer.
12 　　Q. So when -- when you were working on the
13 matching exercise, did you distribute the results that
14 you found to anybody?
15 　　　　MR. SCOTT: Objection, form,
16 mischaracterizes the evidence, misstates his
17 evidence. Also, assumes facts not in evidence. You can
18 answer if you can.
19 　　A. Did I give somebody something?
20 　　Q. (By Ms. Maranzano) Did you distribute the --
21 the results from the matching exercises to anybody?
22 　　A. Not that I can recall ever doing.
23 　　Q. Did anybody in your office?
24 　　A. Ma'am, I don't know.
25 　　Q. Did you discuss the content of the matching

---

**82**

1 with anybody?
2 　　A. Not that I can recall.
3 　　Q. Did you discuss the conclusions with anybody?
4 　　A. I don't -- the only conclusions I discussed was
5 with my staff, that I can recall, was you don't have a
6 conclusive answer.
7 　　Q. Did you talk to Ms. McGeehan about whether or
8 not she should distribute the information to anybody?
9 　　A. I don't remember. I mean, I think -- I don't
10 think we ever got to a point where we got a conclusive
11 answer.
12 　　Q. Did -- did you talk to -- is this John referred
13 to in the e-mail, John Sepehri? Is he who you referred
14 to when --
15 　　　　MR. SCOTT: Objection, form, calls for
16 speculation.
17 　　A. I don't know if it's John Sepehri or if it's
18 John Mendoza.
19 　　Q. (By Ms. Maranzano) I believe that you
20 previously said that you thought that was the general
21 counsel?
22 　　A. It -- it -- back in 2011, I got to go back and
23 think who was general counsel then. It probably would
24 have been John Sepehri as our general counsel then.
25 　　Q. Do you recall if you had any conversations with

---

**83**

1 Mr. Sepehri about whether or not to distribute
2 information from the matches to anybody?
3 　　A. Ma'am, I don't recall. Like I said, I recall
4 the information not being conclusive. And I recall them
5 continuing to work on it.
6 　　Q. So to the best of your knowledge, nobody ever
7 responded to Senator Williams' request?
8 　　A. I don't know if they did or if they didn't.
9 　　Q. And that's not something that you would have
10 followed up on yourself?
11 　　A. No, because I wasn't -- there wouldn't have
12 been a reason for me to follow up on it, because as I've
13 said before, the elections division and the people that
14 handle legislative affairs are the individuals in our
15 office that deal directly with the Legislature.
16 　　Q. Do you -- do you recall Ms. McGeehan seeking
17 approval to distribute the results of this matching
18 analysis to anybody?
19 　　A. She may have.
20 　　Q. And she would have got that from you, correct?
21 　　A. Not -- not necessarily directly to me. She
22 could have also talked to the Secretary. She could have
23 talked to the general counsel.
24 　　Q. Do you recall her asking you --
25 　　A. Ma'am, I don't --

---

**84**

1 　　Q. -- for approval?
2 　　A. -- I don't -- I remember -- I remember them
3 working through the exercise. I really don't remember
4 what all they were doing with it. I just remember they
5 were working through an exercise of doing matches.
6 　　Q. If Ms. McGeehan had presented this to you,
7 being the matching exercise, do you think she would have
8 believed she needed your approval before she could
9 distribute it?
10 　　　　MR. SCOTT: Objection, form, calls for
11 speculation.
12 　　A. Not -- I don't know.
13 　　Q. (By Ms. Maranzano) You don't recall your
14 conversation with Ms. McGeehan about the matching
15 exercise?
16 　　A. As specific as I recall them going through
17 several chances or several tries to get an answer, I
18 don't recall them ever getting a conclusive answer that
19 anyone had confidence in.
20 　　Q. Would it surprise you to learn that the
21 Lieutenant Governor testified that he was briefed on the
22 information contained in this document?
23 　　A. I -- I have no idea if he was or not.
24 　　Q. Did you have any concerns that the Legislature
25 had requested information and your office wasn't

---

COBY SHORTER, III                                           8/12/2014
CONFIDENTIAL TRANSCRIPT

22 (Pages 85 to 88)

---

85

1  responding to it?
2         MR. SCOTT: Objection, form,
3  mischaracterizes his evidence, asked and answered. And
4  he's previously testified that he doesn't recall what
5  happened and what information was requested by the
6  Legislature.
7      Q. (By Ms. Maranzano) You can answer.
8      A. Well, I mean, I don't -- I don't -- I don't
9  recall.
10     Q. When you say that -- that comparing the
11 databases was comparing apples and oranges -- actually,
12 strike that.
13        Would it have been possible to release the
14 information that you found from doing this database
15 matching analysis with a disclaimer about the accuracy?
16        MR. SCOTT: Objection, form, speculation.
17     A. I don't know.
18     Q. (By Ms. Maranzano) You don't know if you could
19 have done that?
20     A. I mean, I would have to defer to staff to tell
21 me.
22     Q. What staff would you defer to, to tell you
23 whether or not you could do that?
24     A. Those involved in the process, elections,
25 staff, or counsel in our office. I --

---

86

1      Q. But aren't these people who directly report to
2  you?
3      A. Ann.
4      Q. I'm sorry, what?
5      A. Ann.
6      Q. Are these people who --
7      A. Meaning --
8      Q. -- who report to you as a general matter?
9  Or --
10     A. They report to me, but they also are experts in
11 their field. I'm not -- I'm not the expert. I'm the
12 manager of the experts. And they will be able to tell
13 me what they can and can't do. The particular scenario
14 that you just outlined, I don't recall that ever being
15 presented to me as an option.
16     Q. So you never discussed that?
17     A. I don't recall discussing that.
18     Q. And isn't it fair to say that you could also
19 present ideas to your staff?
20     A. It is fair to say that, but when they are the
21 experts in the area and they have more experience than I
22 do dealing with the Legislature, because they've done
23 that for years and years, I would rely on them to tell
24 me what's the best approach to take.
25     Q. Did you have the impression that your staff

---

87

1  wanted to get this information to a state where they
2  could distribute it?
3      A. I felt our staff was trying to the best of
4  their ability to get something that they could rely on
5  and that was good data. But through this process, and
6  this is not a -- you're isolating it to a particular
7  time that I can't -- can't pinpoint. This process of
8  matching throughout the time that I've seen it at the
9  agency, the answer -- the situation has always been the
10 same, you can't do it. It doesn't -- it doesn't work.
11 And the staff -- the issue of my saying apples and
12 oranges, that is language that has been given to me by
13 the staff. It's not my language. It's -- it's like
14 comparing apples and oranges. We can't get conclusive
15 evidence -- I mean, conclusive -- a conclusive answer.
16     Q. And was the -- was the voter registration
17 database compared to DPS for other reasons? I'm sorry,
18 let me just rephrase, because I'm realizing that was not
19 clear.
20        Do you match the voter registration
21 database to the DPS database for any other reasons apart
22 from this exercise?
23     A. Specifically, ma'am, I can't tell you
24 specifically how our staff uses it and what they match
25 it to without them specifically coming in and -- and

---

88

1  telling me what they matched it to.
2         MS. MARANZANO: Why don't we take about 10
3  minutes?
4         THE WITNESS: That's fine.
5         (Recess from 10:59 to 11:16 a.m.)
6      Q. (By Ms. Maranzano) Okay. Before the break we
7  were talking about a matching exercise.
8      A. Uh-huh.
9      Q. And you testified that you had some concerns
10 about the accuracy of the results from the matching
11 exercise, correct?
12     A. Yes, for all the matching exercises.
13     Q. Do you -- did you ever memorialize those
14 concerns in any writing?
15     A. I don't -- I don't recall. I mean, I think we
16 -- ultimately, we had to provide some numbers to -- I
17 think to your office as a result of some -- some
18 litigation later on, and we shared that we went through
19 this process but we had no confidence in those numbers
20 that we were providing then as well.
21     Q. Are you referring to the preclearance
22 submission?
23     A. I don't recall exactly what that document was
24 attached to.
25     Q. Okay. Any other instances that you wrote down

---

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

23 (Pages 89 to 92)

89

1  your concerns or had written communications about your
2  concerns about the accuracy of this matching?
3      **A.  It could possibly have happened, ma'am.  I**
4  **don't remember any.**
5      Q.  Okay.
6      **A.  It could possibly have.**
7      Q.  Did you think that -- that the results of the
8  matching would have been less reliable to look at than
9  say the number of individuals who hadn't written their
10  driver's license number on their voter registration
11  application?
12      **A.  I don't know.  This whole exercise -- my**
13  **apprehension about any of these exercises was driven by**
14  **the apprehension that staff had.  If staff had concerns**
15  **about it, I had concerns about it.  I wouldn't know how**
16  **to have concerns or not have concerns if staff wasn't.**
17      Q.  But I guess what I'm trying figure out is, how
18  did you weigh those concerns against the -- against the
19  fact that -- that there were requests for this
20  information?  So you were trying to balance the concerns
21  about the accuracy with the fact that this information
22  had been requested?
23      **A.  I mean, I don't think I specifically, on my**
24  **own, was trying to balance anything.  I think there was**
25  **a general consensus of everybody -- there appeared to be**

90

1  **a general consensus of everybody involved, staff -- and**
2  **what they were doing with it, because I wasn't on**
3  **day-to-day involved with what was happening in the**
4  **Legislature -- that's not my job -- there was just an**
5  **overall concern that this is not working.**
6      Q.  So your recollection as you sit here is that
7  there was a general consensus among everybody involved
8  in the matching exercise that this was so inaccurate,
9  that it shouldn't be distributed?
10      **A.  Well, it was just so inaccurate.**
11      Q.  Okay.  And that includes IT staff and elections
12  division staff?
13      **A.  As far as I remember.**
14      Q.  Can you think of anybody else that was
15  involved?
16      **A.  No, ma'am.  I don't remember anything.**
17      Q.  Did Ms. McGeehan ever express any concerns to
18  you that not releasing this information would damage her
19  relationship with Senator Williams?
20      **A.  I don't recall anything like that.**
21      Q.  Were there any concerns raised to you that the
22  political ramifications of releasing the numbers
23  involved in the match would have been difficult given
24  that the bill was still under consideration?
25      **A.  I don't recall any type of conversations like**

91

1  **that.**
2      Q.  Now if Senator Williams had included language,
3  legislative language, as he suggested during the debate,
4  would your office have released these numbers even if
5  they thought they weren't totally accurate?
6      **A.  I don't know.  I -- I don't -- I don't know**
7  **what he was trying do.  When you showed me this**
8  **document, I don't know what he was trying to accomplish.**
9      Q.  Did you ever discuss the matching exercises
10  with the Secretary of State?
11      **A.  I'm quite sure I did.**
12      Q.  And do you recall what her position was?
13      **A.  The same as mine:  Allow the staff to continue**
14  **to work on it.**
15      Q.  And did the staff continue to work on the
16  matching exercise?
17      **A.  Ma'am, I presume they may have.  I'm not really**
18  **sure how long they continued with it.  During the**
19  **legislative session elections is not the only issue that**
20  **I'm concerned with, so.  You know, where it -- where it**
21  **-- I just know we were dealing with the matching**
22  **exercises long after the Legislature was gone.  We were**
23  **still dealing with it.**
24      Q.  And why were you dealing with the matching
25  exercises after the Legislature was gone?

92

1      **A.  Because as I've repeatedly said, no one could**
2  **get to a conclusive answer.  And then there were other**
3  **requests that came in later from some legal processes**
4  **and there were requests that were made by the Department**
5  **of Justice, I believe, for this information, and we were**
6  **still going through the process of those apples and**
7  **oranges.**
8      Q.  I see.  Do you recall if you discussed the
9  matching process with anyone in the Governor's Office?
10      **A.  I probably did discuss it probably some of the**
11  **staffers but it wouldn't have been in terms of -- this**
12  **is over the length of the process, not in terms of**
13  **legislation.  I think my contact with the Governor's**
14  **Office or any other outside office on matching exercises**
15  **was probably after the -- after the Legislature had --**
16  **what do you call it -- had finished up.**
17      Q.  So you're conversation with the Governor's
18  Office about the matching would have been more of
19  subsequent issues that you were just talking about?
20      **A.  Correct.**
21      Q.  Okay.  And do you recall what the substance of
22  that conversation was?
23      **A.  The same as I've said before.**
24      Q.  Okay.
25      **A.  Nobody -- nobody could figure out to accurately**

COBY SHORTER, III                                                8/12/2014
CONFIDENTIAL TRANSCRIPT

---

93

1  do it.
2      Q.  And did you ever consult with any IT specialist
3  outside of the Secretary of State about this process?
4      A.  I don't recall if I did.  Some of our IT staff
5  have.
6      Q.  Was that anything you discussed with them or
7  suggested to them that they might want to do?
8      A.  Ma'am, I -- I don't remember.  I think, you
9  know, there were so many different IT specialists and
10  outside consultants that are in our office from time to
11  time doing different things, they may have asked someone
12  else how to do it.  But the end sum is, nobody figured
13  out how to do it.
14      Q.  Do you recall that when SB 14 -- well, do you
15  recall what committee SB 14 was referred to in the
16  House?
17      A.  No, ma'am, as I said, I was not that directly
18  involved.
19      Q.  Okay.
20          (Exhibit 9 marked for identification.)
21          MS. MARANZANO:  Okay.  For the record,
22  this also a highly confidential document and it is
23  marked Exhibit 9.
24      Q.  (By Ms. Maranzano) Can you take a look at this
25  document.

---

94

1      A.  Uh-huh.
2      Q.  Have you ever seen this before?
3      A.  Not that I can recall, ma'am.
4      Q.  Can you look at the second to last paragraph on
5  the first page.
6      A.  Second to the last?
7      Q.  Yeah.
8      A.  Okay.
9      Q.  Do you see Ms. McGeehan is talking about the
10  numbers of voters who have not been issued Texas
11  driver's license or personal ID cards?
12      A.  Okay.
13      Q.  Do you see she says that they're still working
14  with the IT department to analyze that data?
15      A.  Uh-huh.
16      Q.  As of February 25, would you say that was an
17  accurate assessment?
18      A.  What was?  What --
19      Q.  That she was -- that they were still working
20  with the IT department to analyze the data about who had
21  not had a Texas driver's license or personal ID card
22  issued by DPS?
23      A.  It appeared to be an ongoing process.
24      Q.  And this e-mail, it says at top, was sent on
25  Friday, February 25th, right?

---

95

1      A.  That's what it says.
2      Q.  And in this e-mail, she says she hopes to have
3  an analysis by Monday.  Was there anything that occurred
4  around February 25th that would lead Ms. McGeehan to
5  believe that the analysis would have been released by
6  Monday?
7      A.  Ma'am, I don't know.
8      Q.  You have no awareness of that?
9      A.  I have no what?
10      Q.  No awareness of this --
11      A.  I mean, I only based it on what she has written
12  here.
13      Q.  But if she was going to send such an analysis
14  to a -- to Representative Harless, would she have run
15  that by you, do you think?
16      A.  She could have.  But if she were going to run
17  it by me, it would have been given to others in our
18  executive office before it would have been given to me.
19      Q.  Such as?
20      A.  Our general counsel.
21      Q.  And is your general counsel -- it looks like he
22  was cc'd on this e-mail, right?
23      A.  He is.
24      Q.  So in February -- on February 25th, is there
25  anything that you recall that -- do you recall that you

---

96

1  -- that your office was feeling comfortable enough with
2  the match they were going to release it?
3      A.  No, ma'am, I don't recall.
4      Q.  Okay.  Do you recall that Ms. McGeehan
5  testified before the House Select Committee on Voter
6  Identification and Voter Fraud on March 1st, 2011?
7      A.  Ma'am, I don't know when she testified.
8      Q.  Okay.  Do you recall that she did testify
9  there?
10      A.  Testified where?
11      Q.  Before the House Select Committee on Voter
12  Identification and Voter Fraud?
13      A.  Would that be the -- are you talking about the
14  Committee of the Whole or?
15      Q.  No, I'm talking about a specific committee in
16  the House of Representatives.
17      A.  Where she specifically testified, I did not
18  keep a record of where staff went and who they testified
19  before.
20      Q.  Okay.
21      A.  She very well could have.
22      Q.  Okay, okay.  Did you talk to her before she
23  went and testified in the House of Representatives on SB
24  14?
25      A.  If I did, it was for her to potentially update

---

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

97

1   me on what was going on.
2       Q.   Did she seek authorization from you to release
3   this data?
4       A.   Ma'am, I don't remember.  As I said, I remember
5   them consistently working on the product.
6       Q.   So you don't recall as to whether or not you
7   all discussed how she should respond if she was asked
8   about the number of individuals without Texas driver's
9   license or ID?
10      A.   No, ma'am.
11      Q.   And would you say on March 1st, it would have
12  been accurate to say that the IT department was working
13  on that analysis?
14          MR. SCOTT:  Objection, form.
15      A.   I don't know.
16      Q.   (By Ms. Maranzano) Is that your understanding
17  of where the data matching process was at on March 1st?
18      A.   My understanding of the process is that it was
19  an ongoing process.  It was never conclusively completed
20  or finished at a point where -- when I say completed,
21  completed upon where there was any confidence that it
22  was accurate.  Every time they did it, they got a
23  different answer.
24      Q.   So would you say on March 1st, an accurate
25  response to a question about who had a Texas driver's

98

1   license or ID would have been that an analysis had been
2   done but it wasn't at a point yet to be released?
3           MR. SCOTT:  Objection, form, speculation.
4       A.   I don't know what I would have said on March
5   the -- March 1.  Or what the answer should have been on
6   March 1 or not.
7           MS. MARANZANO:  Can we mark this.
8           (Exhibit 10 marked for identification.)
9       A.   So are we through with this one?
10      Q.   (By Ms. Maranzano) Okay.  I'm showing you what
11  we marked as Exhibit 10.
12      A.   Okay.
13      Q.   If you could turn to Page 290.
14      A.   290.
15      Q.   On Line 9, there's a question and then there's
16  Ms. McGeehan response.  If you could look at and let me
17  know when you're ready.
18      A.   Okay.
19          MR. SCOTT:  What page again?
20          MS. MARANZANO:  290.
21      A.   Okay.
22      Q.   (By Ms. Maranzano) Now does this -- to start
23  with, does this look like its Ms. McGeehan's testimony
24  to the House Select Committee on Voter Identification
25  and Voter Fraud from March 1st, 2011?

99

1       A.   That's what it says.
2       Q.   Do you see that she was asked about whether or
3   not a match had been done with the driver's license file
4   to determine who had a -- which registered voters had a
5   driver's license?
6       A.   Yes.
7       Q.   And she responds that the IT that her -- IT --
8   or, "Our IT department is looking at that"?
9       A.   Uh-huh.
10      Q.   Do you believe that's an accurate statement of
11  what was occurring on March 1, 2011?
12          MR. SCOTT:  Objection, speculation.
13      A.   I can only go by what Ms. McGeehan is saying
14  here.
15      Q.   (By Ms. Maranzano) But at that point, she had
16  already -- there had already been a database matching
17  exercise, correct?
18      A.   I -- I can't remember the times when all of
19  these things were being done.
20      Q.   Well, if you look at Exhibit 8, that has the
21  date February 1st at the top.
22      A.   Okay.  Okay.
23      Q.   So as of February 1st, there had been already
24  been some analysis conducted, correct?
25      A.   There had been some attempts to match that were

100

1   -- that staff could not be conclusive about.
2       Q.   So I -- I guess what I'm wondering is why
3   Ms. McGeehan didn't respond during committee that there
4   had already been an attempt to match conducted.
5           MR. SCOTT:  Objection, form.
6       A.   Ma'am, I wasn't there.
7           MR. SCOTT:  Wait.  She didn't ask a
8   question.
9       Q.   (By Ms. Maranzano) Do you have any concerns
10  that Ms. McGeehan misled the House Select Committee on
11  Voter Identification and Voter Fraud?
12          MR. SCOTT:  Objection, form.  The record
13  speaks for itself.
14      A.   I mean, she says what she says.  I don't feel
15  she would have misled anyone.
16      Q.   (By Ms. Maranzano) And to the best of your
17  knowledge, between January 25, 2011, and May 27, 2011,
18  when SB 14 was signed into law, was anyone other than
19  the Lieutenant Governor provided with the matching
20  results?
21      A.   I'm not aware of the Lieutenant Governor -- I'm
22  personally not aware of the Lieutenant Governor being
23  given information.  I can't recall him getting it.  So I
24  don't know --
25      Q.   Anybody else, anybody outside the Secretary of

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

---

101

1  State's Office?
2      **A.  I don't know -- I don't recall anyone.**
3      Q.  Okay.
4      **A.  I don't remember.**
5      Q.  And did you have any conversations with Senator
6  Williams, did he follow up at all with you, personally,
7  about the --
8      **A.  None that I can recall.**
9      Q.  And did anybody in your office tell you that he
10 followed up with them about the status of his request?
11     **A.  None that I can -- no, none that I can recall**
12 **at all.**
13     Q.  Can you identify any other occasion on which
14 the Secretary of State's Office completed an analysis
15 based on a legislator's request and they did not provide
16 the analysis to the legislator?
17         MR. SCOTT:  Objection form,
18 mischaracterizes the evidence, misstates the evidence
19 and it's argumentative based on the form of the
20 question.
21         You may answer if you can.
22     **A.  I don't recall anything like that.**
23     Q.  (By Ms. Maranzano) You don't recall that that
24 happened?
25     **A.  I don't recall what happened?**

---

102

1      Q.  That -- that you completed analysis --
2      **A.  Ma'am, as I keep telling you --**
3          MR. SCOTT:  Let her finish the question.
4      Q.  (By Ms. Maranzano) -- based on a legislator's
5  request and then didn't provide that analysis of the
6  request?
7          MR. SCOTT:  Same objection.
8      **A.  I mean, I don't recall what all went into --**
9  **what all happened to it other than it didn't work.**
10     Q.  (By Ms. Maranzano) Did you -- did you monitor
11 the amendments at all to SB 14?
12     **A.  No, ma'am.  It's not my role.**
13         **(Exhibit 11 marked for identification.)**
14     Q.  (By Ms. Maranzano) I'm showing you what we've
15 marked as Deposition Exhibit 11.
16         MS. MARANZANO:  For the record, this is
17 also a highly confidential document.
18     Q.  (By Ms. Maranzano) Have you ever seen this
19 e-mail before?
20     **A.  No, ma'am.**
21     Q.  Can you -- can you look at the first sentence
22 of the e-mail.  Well, do you see this is an e-mail from
23 Mr. Beuck to Representative Harless?
24     **A.  I see that it's a -- yeah, a gentleman, and to**
25 **Representative Harless, okay.**

---

103

1      Q.  Do you know who Mr. Beuck is?
2      **A.  No, ma'am, I do not.**
3      Q.  Do you know if Representative Harless was on
4  the Conference Committee for SB 14?
5      **A.  I -- I don't recall who was on the Conference**
6  **Committee.**
7      Q.  Was Representative Harless the House sponsor of
8  SB 14?
9      **A.  I don't recall because I wasn't involved.**
10     Q.  Do you see that Mr. Beuck says that he's
11 waiting to hear from OAG and SOS on Monday morning about
12 these amendments.
13     **A.  I see where he says he's "Waiting to hear from**
14 **OAG and SOS Monday morning."**
15     Q.  Are you aware of whether anyone in your office
16 reviewed these amendments?
17         MR. SCOTT:  Objection, form, vague.
18     **A.  I'm not aware.**
19     Q.  (By Ms. Maranzano) You didn't review either of
20 these amendments --
21     **A.  No, ma'am.**
22     Q.  -- correct?
23         Why would the Secretary of State's Office
24 have been giving input on amendments to a bill?
25     **A.  We would only answer -- our staff would only**

---

104

1  **answer questions that a legislator had.**
2      Q.  How many times during your tenure has your
3  office responded to questions about amendments on a
4  bill?
5      **A.  I have no idea.  I don't keep account of that.**
6      Q.  Okay.  Do you have an approximation --
7      **A.  No, ma'am.**
8      Q.  -- is that a common occurrence?
9      **A.  Legislators call election staff, legislators**
10 **call other members, other staff, as do other agencies,**
11 **wanting to know various questions about various**
12 **things.  To qualify or -- I mean to quantify in terms of**
13 **a number, I don't have a clue.**
14     Q.  Okay.  Can you take a look at the -- the second
15 amendment that's discussed in this e-mail.
16     **A.  Okay.  Which one's the first one?**
17     Q.  It is Gonzales Amendment FA 26.
18     **A.  Okay.  Okay.**
19     Q.  And it's talking about affidavits being
20 executed on provisional ballots, correct?
21     **A.  I'm not really sure what it's talking about.**
22     Q.  Do you see it says, talking about "Amendment
23 applies to affidavits executed when people are claiming
24 the indigent/religous exemption"?
25     **A.  Okay.**

---

COBY SHORTER, III                                        8/12/2014
CONFIDENTIAL TRANSCRIPT

27 (Pages 105 to 108)

---

105

1    Q. "Under the amendment, someone could sign an
2  affidavit statement at the polling place the day of
3  election stating that they don't have ID because -- "
4  well, " -- be because indigent/religous objections, then
5  vote provisionally."
6    A. Okay.
7    Q. Now, is there any reason why SB 14 could not
8  have provided that an individual without an ID could
9  sign an affidavit?
10   A. I wouldn't know.
11        MR. SCOTT: Object, form, speculation.
12   Q. (By Ms. Maranzano) Do you know if prior to SB
13 14, provisional ballot was counted based on a signature
14 match?
15   A. You would have to ask our elections staff. I
16 wouldn't know.
17   Q. Okay. Do you know how it's determined whether
18 absentee ballots are counted or not?
19   A. Not specifically, no, ma'am.
20      (Exhibit 12 marked for identification.)
21   A. Which one was this? 11. Okay. Okay.
22   Q. (By Ms. Maranzano) Okay. I'm showing you what
23 we marked as Deposition Exhibit 12.
24      MS. MARANZANO: For the record, this is
25 also a highly confidential document.

---

106

1    Q. (By Ms. Maranzano) If you can take a look at
2  that for a moment.
3    A. Okay.
4    Q. Okay. Does this appear to you to be another
5  e-mail from Mr. Beuck to Representative Harless?
6    A. It appears to be.
7    Q. Do you see in that second paragraph, there's a
8  discussion of the Conference Committee removing a
9  requirement that the SOS education efforts be targeted
10 at low income and minority voters?
11   A. I see that.
12   Q. And then there's a comment that says, "OAG/SOS
13 concerns." Are you aware of whether the Secretary of
14 State's Office expressed concerns about an amendment to
15 target education efforts of low income and minority
16 voters?
17   A. I'm not aware.
18   Q. If concerns had been expressed about that,
19 would that have been something that was approved by you
20 or authorized by you?
21   A. It depends on what the concerns were. I'm not
22 aware of having conversation on a -- a Conference
23 Committee report about anything related to Senate Bill
24 14.
25   Q. Okay. Are you aware of whether provisions such

---

107

1  as that was included in the final version of SB 14?
2    A. Ma'am, I don't know.
3    Q. Okay. Other than the two amendments that we
4  just discussed, are you aware of whether the Secretary
5  of State expressed an opinion on any other legislative
6  amendments to SB 14?
7    A. None that I'm aware of.
8    Q. Did you -- you were ever informed of an
9  amendment offered by Senator Ellis that would have
10 required the Secretary of State to study the impact of
11 SB 14 on particular populations?
12   A. If I was informed, I don't remember.
13   Q. You didn't provide any impact --
14   A. No, ma'am.
15   Q. -- input on that amendment?
16      Just a reminder that we should try not to
17 talk over each other.
18      MR. SCOTT: She's making sure that you
19 understand that I have a chance to get an objection in.
20 If you don't -- if you say it too quick, I don't get
21 that objection in.
22   Q. (By Ms. Maranzano) Okay. And also so the court
23 reporter can get an accurate transcript.
24      MR. SCOTT: What?
25      (Laughter.)

---

108

1    A. Did I talk over you? I'm sorry. Please
2  forgive me.
3    Q. (By Ms. Maranzano) No, no, absolutely. I
4  think that you're anticipating the end of my question,
5  but.
6    A. No, I'm not, I'm just -- I know what I know,
7  and...
8    Q. If the Legislature had passed an amendment that
9  would have required the Secretary of State to study the
10 impact of SB 14 to determine if racial and ethic
11 minorities suffered a disparate impact pursuant to the
12 amendments Senator Ellis offered, would you have been
13 able to do that?
14      MR. SCOTT: Objection, form, speculation.
15      You can go ahead.
16   A. I don't know who would have. We do what -- you
17 know, if the Legislature passes a bill, we try to the
18 best of our ability to do what they ask us to do. How
19 it would get done, I don't know.
20   Q. (By Ms. Maranzano) Do you believe that you have
21 any responsibility to determine the effect of SB 14 on
22 minority voters?
23   A. I think we have a -- we have a responsibility
24 to determine the effect on all voters.
25      THE COURT REPORTER: I'm sorry?

---

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

28 (Pages 109 to 112)

---

109

1    A.  On all voters.
2    Q.  (By Ms. Maranzano) And are you taking steps to
3  try to determine the effect of SB 14 on all voters?
4    A.  Well, we're trying to the best of our ability
5  to implement the bill as the Legislature has passed it,
6  and then share with the Legislature -- if there are any
7  concerns, share with the Legislature those concerns as
8  they come forward.  I don't -- I haven't been apprised
9  of any major concerns that have been brought forward on
10  SB 14.  We just try to implement what the Legislature
11  passed.
12    Q.  And when you said you haven't been apprised of
13  any major concerns that have come forward, do you mean
14  like major concerns on the elections that the State has
15  held, or what are -- what are you referring to?
16    A.  Well, we haven't -- it hasn't -- we have where
17  there have been isolated incidents of individuals voting
18  -- that we've heard of in the media, but they have been
19  corrected.  We haven't seen any problems.
20    Q.  What sort of isolated incidents are you talking
21  about?
22    A.  Well, you hear of people going to get an ID and
23  they didn't have the proper documentation.  However, the
24  situation was remedied because once they were able to
25  get the proper documentation, they were able to get an

---

110

1  ID.
2    Q.  Okay.  So you've heard of isolated incidents of
3  individuals having issues getting ID.  But as you sit
4  here today, you're not aware of any other problems with
5  the effect of SB 14 on voters?
6    A.  No, ma'am.
7    Q.  Okay.
8    A.  I'm not aware.
9    Q.  Were you involved at all in the submission of
10  SB 14 to the Department of Justice under Section 5 for
11  preclearance?
12    A.  Our staff would have done that.  My involvement
13  would have been like on other preclearance, them letting
14  me know that they were doing it.
15    Q.  And did they submit to the department -- I
16  believe you referenced that they might have, but did
17  they submit a -- one of the results from one of the
18  matching exercises?
19    A.  I'm not sure if that was a part of preclearance
20  or if it were a part of some other pending litigation.
21    Q.  And when that was submitted to the department,
22  did you have any reason to believe that wasn't the best
23  available information that you could provide?
24    A.  Yes.  And we shared -- when we submitted that
25  information -- and I don't know what exercise -- I can't

---

111

1  recall what exercise it was specifically related to, but
2  I do recall our office sharing with -- with the
3  requesting entity that this is not reliable information.
4    Q.  Okay.  Okay.  But I -- I think my question is
5  slightly different than that.  I'm wondering if you have
6  any reason to that believe it wasn't the best available
7  information you could provide, not whether it was a
8  hundred percent accurate?
9    A.  What do you mean -- what do you mean by best
10  available?
11    Q.  I mean, was there any other information
12  available to you that you could provide to get this
13  information of potentially the number of people who had
14  driver's licenses?
15    A.  As far as -- as far as I know, we gave you all
16  what we had.  As far as I knew.
17    Q.  Do you know if a Spanish surname analysis was
18  conducted when you submitted that information?
19    A.  I can't remember, ma'am.
20    Q.  Are you aware of any problems with in-person
21  voter fraud in the November 2012 election?
22    A.  That would -- I would have to defer to our
23  elections division.  I don't remember the specific --
24  there are -- the specific issues that came up, I don't
25  remember specifically what they were.

---

112

1    Q.  Do you -- you don't remember specifically what
2  they were, what incidents came up?
3    A.  I don't remember the specifics of the incidents
4  that came up.  I don't know -- for instance, the
5  election staff, if they received those, they forwarded
6  it to the appropriate agencies.
7    Q.  As you sit here today, are you aware of any
8  allegations of in-person voter impersonation in the
9  November 2012 election?
10    A.  I can't remember.  I mean, I --
11    Q.  Okay.  Did any legislator ask you or your
12  office for information about in-person voter fraud in
13  November 2012, in the November 2012 election?
14    A.  I don't know if they did or not.
15    Q.  Are you aware of any facts that indicate that
16  the system wasn't working in the November 2012 election?
17    A.  What system?
18    Q.  The system in place to verify a voter's
19  identify.
20    A.  Ask the question again.
21    Q.  Are you aware of any facts that indicate that
22  the system to verify a voter's identity, in place in the
23  November 2012 election, was not working?
24    A.  The November 2012.  Was that pre-Voter ID or
25  post-Voter ID?

COBY SHORTER, III                                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

### 113

1   Q.  In November 2012, I'll represent to you that
2   the Voter ID bill had not been implemented yet.
3       A.  So what I'm -- I don't understand what you're
4   asking.  Are you asking me --
5       Q.  If there are any facts that came out of that
6   election that indicate to you that --
7       A.  I don't know.
8       Q.  Okay.  What has your role been in implementing
9   SB 14?
10      A.  My role has been making sure that our staff has
11  the resources available to implement the parts of the
12  bill that apply to the Secretary of State's Office.
13      Q.  And what parts are those?
14      A.  Off the top of my head, I cannot give you an
15  exhaustive list, but after a bill is passed, there are
16  certain duties that are given to the different
17  agencies.  We have a role in voter education and we have
18  a role in making sure that -- educating the counties,
19  educating the election workers statewide as to what the
20  new changes have been in -- since the last legislative
21  session, and getting ready for the next election
22  cycle.  My role is to make sure that the staff has the
23  resources, the computers, the -- you know, the tangible,
24  physical things they need to do their jobs on a daily
25  basis.

### 114

1   Q.  Have -- has your office had a role in the EIC
2   program?
3       A.  Yes, we have.
4       Q.  And what role has that been?
5       A.  To assist the DPS in development of -- excuse
6   me, of that program.
7       Q.  How have you assisted DPS?
8       A.  Well, collaboratively working with them to
9   develop partnerships between them and the counties so
10  that they can -- we have those relationships with county
11  elections administrators, and we've been able to work
12  those counties statewide to help them in determining
13  additional places where they could have their EIC
14  locations.
15      Q.  Has the Governor's Office had any role in the
16  EIC program?
17      A.  The role of no more than keeping them informed
18  as to what we were doing.
19      Q.  Has the Lieutenant Governor's Office had any
20  role in --
21      A.  Just in us keeping them informed with what
22  we're doing.
23      Q.  Has -- where did the authority that the
24  Secretary of State's Office has with regard to the EIC
25  program come from?

### 115

1       A.  Well, it's not our program, it's the DPS
2   program.  We just -- we're helping them to get the word
3   out, here's what's happening, and helping them to
4   establish their program.
5       Q.  So is there any guideline or procedure for that
6   responsibility or is that something that your office is
7   just taking on?
8       A.  What do you mean by guideline, procedure?
9       Q.  I'm wondering how -- how the responsibilities
10  in the EIC program are split up, how that -- who decides
11  who has what authority, is that a regulation, a
12  guideline, a procedure?
13      A.  Well, it's not really a regulatory --
14          MR. SCOTT:  Excuse me.  Let me object to
15  form.
16          But go ahead.
17      A.  I don't understand it as being a regulatory
18  function.  It's a -- our office uses it as a marketing
19  opportunity to get the word out.
20      Q.  (By Ms. Maranzano) So is --
21      A.  We don't have a statutory obligation on -- on
22  EIC.
23      Q.  Okay.  Has -- what are the steps the Secretary
24  of State has taken to ensure that individuals who seek
25  an EIC can obtain one?

### 116

1       A.  Well, we have a marketing -- a marketing
2   campaign that is seeking to inform Texas voters of what
3   the requirements are.  We -- so that's a campaign that's
4   ongoing right now.  We've worked with DPS to market EICs
5   and help them get the word out on EICs.  And we are
6   educating county officials and elections officials on --
7   based on what Senate Bill 14 says.  "Here's how you are
8   to operate your local elections with these new
9   requirements."
10      Q.  Did you work with DPS on the implementation of
11  mobile EIC units?
12      A.  Yes, I did.
13      Q.  Did you work with DPS on the instigation of
14  some hours on Saturdays where DPS would issue EICs?
15      A.  Well, when you say work with them, we -- that
16  was a part of the whole -- that whole strategy of making
17  time available.
18      Q.  That was DPS's -- part of DPS's strategy?
19      A.  Uh-huh.
20      Q.  And that was -- again, that was suggested to
21  them by the Secretary of State's Office?
22      A.  I think when we started working with them, they
23  already had that idea themselves, if I recall correctly.
24      Q.  Did you consider -- well, are there any other
25  efforts that you're working on with regard to the EIC

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

30 (Pages 117 to 120)

---

117

1  program?
2       A.  No.  None other than this, what we're currently
3  doing.
4       Q.  And did you consider other options in terms of
5  ensuring people could get EICs that you didn't end up
6  implementing?
7       A.  None that I can remember.  Just trying to get
8  these that we were doing off the ground.
9       Q.  Do you believe that the Secretary of State's
10 Office has the responsibility to ensure that individuals
11 who are eligible for an EIC are able to obtain one?
12      A.  What do you mean?
13      Q.  Do you believe that it's part of your office's
14 responsibility to ensure that somebody who is eligible
15 to get an EIC is actually able to do so?
16      A.  I think our role is to inform the individuals.
17 The role on issuing EIC is not a function of the
18 Secretary of State's Office, it's a function of our
19 sister agency, Department of Public Safety.  What we
20 were doing in this effort is casting a broad net, and as
21 we educate people on the upcoming cycle, allow them to
22 know that you have a -- you have this Election
23 Identification Certificate available to you if you don't
24 have one of these other forms of identification.
25      Q.  So you view the Secretary of State's role as

---

118

1  more of the education and outreach role?
2       A.  That's what we were statutory designated to do.
3       Q.  Okay.  Did -- did the Department of Public
4  Safety and the Secretary of State's Office enter a
5  memorandum of understanding regarding DPS-operated
6  mobile units?
7       A.  I believe we did, yes.
8            (Exhibit 13 marked for identification.)
9       A.  Okay.
10      Q.  (By Ms. Maranzano) I'm showing you what we
11 marked as Deposition Exhibit 13.
12      A.  Yes, ma'am.
13      Q.  Do you recognize that?
14      A.  This was the Memorandum of Understanding
15 between our agency and DPS.
16      Q.  Is it your understanding that either agency can
17 terminate this agreement at any time?
18      A.  Oh, I've got to look back and see what we
19 specifically say, but let's see.
20      Q.  If you want to look at Page 4.
21      A.  Page 4.  Okay.
22      Q.  At the top.
23      A.  Okay.  (Reading to himself.)
24      Q.  So is it your understanding that either party
25 can terminate this agreement at any time?

---

119

1       A.  You know, I guess when we entered it, we didn't
2  enter it to terminate it.
3       Q.  Is there any legal requirement that the
4  Secretary of State's Office and the DPS offer mobile EIC
5  centers to voters for future elections?
6       A.  There's none that I'm aware of.
7       Q.  Would you say that the mobile EIC program is
8  under discretion of the Secretary of State and DPS?
9       A.  I would -- I would say it's under the -- it's
10 really a discretion more of the DPS and how they want us
11 to continue to help them.
12      Q.  How were the locations for the mobile units
13 selected?
14      A.  I can't give you -- we looked at different
15 parts of the state.  You know, we didn't have -- we
16 looked at population areas, we looked at -- you know, we
17 had this list of potential non-matches but didn't really
18 know what that meant, and so you started looking on zip
19 codes and where are the potential non-matches and you --
20 and then we visited with local county elections
21 administrators to initially decide who wanted to help in
22 this effort initially and how we could work with them.
23 Most of them were excited about the possible idea
24 because we felt like -- everybody felt like we were
25 dealing with the unknown.  And they helped us determine

---

120

1  potential locations.  They, the counties, worked with us
2  to determine potential locations within their counties.
3       Q.  What was the potential no-match list?
4       A.  Excuse me?
5       Q.  Didn't you say you had a potential no-match
6  list?
7       A.  It's one of those that we provided to you all
8  earlier, the 7-800,000 number.
9       Q.  So I'm loosing you a little bit.  Do you mean
10 it was something that you had provided to the Department
11 of Justice?
12      A.  I don't know.  I thought we provided it to you.
13 It was a list of -- it was one of those bump-ups that we
14 bumped up and it was like, okay, we have this, we don't
15 know if these people have IDs or not because it's not
16 conclusive.  But you've got an XYZ in XYZ county, and
17 XYZ zip code, you've got X number of people who are not
18 a match.  We don't know what those are, we don't know
19 why they don't match, we don't know if they have an ID
20 or not, but we have this number here.
21           So we could potentially look at that.
22 It's not the sole factor, but that in some areas, in
23 some of your major metropolitan areas, that kind of
24 helps you to figure out where do we need to be.  And
25 likewise, you know, DPS, long-term, looked at whether or

---

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

---

**121**

1    not there were DPS offices even in those counties.
2        Q.  So the no-match list was some -- was a list
3    from one of the matching exercises that you previously
4    testified about, correct?
5        A.  It wasn't one, it was "the" list.  It was not
6    something that came out of it, it was -- it was the
7    list.
8        Q.  From a matching exercise between the DPS
9    database?
10       A.  The only thing I know how to refer those to
11   are, "no matches," I call them.  That's my personal list
12   of what I called it.
13       Q.  And did that list contain information about --
14   what information was included on that list?
15       A.  Ma'am, I don't remember exactly.  All I
16   remember was, there was a number of potential no
17   match -- no matches.
18       Q.  Do you recall whether there was any information
19   on who on that list had voted in the past?
20       A.  I don't recall that, ma'am.
21       Q.  Do you recall if there's any information about
22   the individual's race on that list?
23       A.  I don't -- I would think there wouldn't be
24   because we don't have any racial information.
25       Q.  You don't collect racial information on your

---

**122**

1    driver's license -- driver's licenses?
2        A.  I mean, without looking at it --
3        Q.  Okay.
4        A.  -- I don't know.  I don't think we do.
5        Q.  And did you use that no-match list to also do
6    PR or community education about the mobile units?
7        A.  What do you mean?
8        Q.  Did you use that no-match list to do any
9    community education?
10       A.  When we -- when we went to a county and said
11   we're going to be in Travis County, we, our staff worked
12   with the County and our staff had to put out press
13   releases that there was going to be a mobile unit at X
14   location for X amount of time.
15       Q.  And did your staff do any other PR or was that
16   left up to the county?
17       A.  I'm sorry?
18       Q.  Did you staff do any other publicity besides a
19   press release or was that left to the county?
20       A.  Well, the county did their own and we put out
21   press releases as well.
22       Q.  Okay.  And was there any other publicity that
23   your office did about the mobile units?
24       A.  Well, when it was initially announced, there
25   was a major press effort -- press event -- press

---

**123**

1    conference announcing it.  I don't recall if there was
2    -- the press showed up at any of the other locations or
3    not.
4        Q.  Any other publicities that you can think of
5    your office did with regard to mobile units?
6        A.  We did press releases.  We did, you know, press
7    releases, press announcements to let people know that
8    this was going to be happening.  And we would also put up on
9    our website --
10       Q.  Uh-huh.
11       A.  -- that these were the locations that it would
12   happen.  And really the counties did their -- who have
13   those relationships with their local papers, they
14   publicized it as well.
15       Q.  Okay.  And are you planning to use mobile units
16   in the future?
17           MR. SCOTT:  Objection, form,
18   mischaracterizes SOS's role, previous testimony.
19           You can answer.
20       A.  That's a function of DPS.
21       Q.  (By Ms. Maranzano) Are mobile units being --
22   are mobile units in operation currently?
23       A.  I'm not aware of any being in operation right
24   now.
25           MR. SCOTT:  Object to form.

---

**124**

1        Q.  (By Ms. Maranzano) Do you have any plans to use
2    mobile units in advance of the November 2014 election?
3        A.  If DPS -- that's a call of DPS, if they're --
4        Q.  Has there been discussion of rerunning the
5    no-match list to determine locations for mobile units?
6        A.  Not that I'm aware of.
7        Q.  And did the Secretary of State's Office provide
8    the notice to the counties about the mobile units that
9    you were -- that mobile units were coming to their
10   counties?
11       A.  Well, we did it in conjunction with DPS.
12       Q.  Did you -- did you consider how much advance
13   notice a county would need in order to do effective
14   publicity about the mobile units?
15       A.  Well, we worked with those counties to see if
16   they -- if they had the time and the resources to be
17   able to help us with the effort.  And those counties who
18   were able to do it were the counties that, you know, we
19   were able to work with.  We didn't -- and those counties
20   felt like they had the appropriate amount of time to do
21   it.
22       Q.  Did any county officials express to you that
23   they felt they didn't have enough notice to
24   appropriately publicize a mobile unit coming to their
25   county?

---

COBY SHORTER, III                                      8/12/2014
CONFIDENTIAL TRANSCRIPT

---

125

1    A.  You know, I think I remember Travis County
2  saying something, but they had just as much time as
3  everybody else.
4    Q.  Do you recall what your response was to Travis
5  County?
6    A.  I think we worked with them on some dates that
7  were more accommodating for them, and they accepted.  We
8  --
9    Q.  And have -- oh, I'm sorry.
10   A.  We didn't force a unit on anybody.  We asked
11  them, "Can you do this?  Do you want to do this?  And if
12  you don't want to do it, we'll go to a county that can."
13  So, anybody that took it, they accepted knowing what the
14  responsibilities were.
15   Q.  How -- how much --
16   A.  It may have been Travis, I don't know.
17   Q.  How much notice were you generally able to
18  provide to people?
19   A.  Because I wasn't doing it on a day-to-day
20  basis, I wasn't the one doing it, I don't know the time
21  frame associated.
22   Q.  Do you have a sense of if it was a couple of
23  days or if it was a week or it was?
24   A.  It was probably more than a couple of days
25  because it takes more than that to actually deploy the

---

126

1  equipment to the actual area.  It could have been some
2  weeks.  I don't know the exact amount of time.
3    Q.  Did the Secretary of State have any role on the
4  hours that mobile units were in operation?
5    A.  That was a function of DPS working with the
6  individual counties to determine what the hours were to
7  be.
8    Q.  Do you know if any mobile units operate -- or
9  operated outside of regular business hours?
10   A.  Ooh, I don't remember exactly the hours that
11  were associated with some of them.
12   Q.  You don't recall.
13   A.  I mean, I -- they could have.  I mean, I don't
14  know.  I think there were a couple that may have
15  operated on a Saturday.  I don't know the specifics on
16  which one -- what the hours specifically were on all of
17  them, because there were -- there were 25 different
18  units going different places.  And then you had the
19  counties that didn't have -- EIC that had -- it was --
20  it was the counties that didn't have DPS offices that
21  had units, and it was more or less a function of the
22  personnel that DPS could provide and how much time
23  work out with that individual county as to how much time
24  they had and when they wanted to do it.
25   Q.  So DPS made the sort of final decision about

---

127

1  the hours of the mobile units?
2    A.  I don't know if it was DPS or I don't know if
3  it was the individual county.
4    Q.  Okay.  Do you know who was staffing the mobile
5  units?
6    A.  Initially, it would have been DPS employees and
7  some of the county employees.  The last round, there
8  were some staff members from our office which were
9  trained by DPS and certified by them to work as well, so
10  they went out and helped DPS and county employees as
11  well on staffing them.
12   Q.  And for -- for units that were staffed by, say,
13  your office, would the hours still be determined by DPS
14  or a county?
15   A.  Yes, ma'am.
16   Q.  Okay.
17   A.  As far as I -- we just assisted DPS in those
18  counties.  We were never out there ourself alone.  We
19  were out there with DPS --
20   Q.  I see.
21   A.  -- or with the county.
22   Q.  There were no units that were staffed solely by
23  Secretary of State's staff?
24   A.  None that I can recall.  I would have to go
25  back and look at that to see if there were, but I --

---

128

1  there were generally at least two people, and I don't
2  recall us sending two of our staff members to go to one
3  place.  I don't recall that.
4    Q.  Was that -- why did you decide to help staff
5  these units?
6    A.  To help out.
7    Q.  Uh-huh.
8    A.  To help out.
9    Q.  Did DPS have any resource issues in terms of
10  staffing the mobile units?
11   A.  Well, DPS is a large agency, but they --
12  they're a busy agency, and when you start asking, you
13  know, individuals to travel three and four days a week,
14  it becomes a challenge, and it would become a challenge
15  to our agency.  But we have individuals in elections and
16  our field staff that were in some of these geographical
17  locations and it just made sense if they had a little
18  time, they could help out so that we could all spread --
19  spread the wealth.
20       MS. MARANZANO:  Mark that.
21       (Exhibit 14 marked for identification.)
22   A.  Whew, got another one.  All right.
23   Q.  (By Ms. Maranzano) I'm showing you what we
24  marked as Deposition Exhibit 14.
25   A.  Uh-huh.

---

COBY SHORTER, III                                              8/12/2014
CONFIDENTIAL TRANSCRIPT

---

129

1     Q.  Do you recognize this?
2     A.  I don't recognize the actual document.  I
3  probably have seen it.  I don't -- I know who the
4  individual is.
5     Q.  Did you receive a copy of this letter?
6     A.  I probably did, ma'am.
7     Q.  And can you take a look at it and -- well, who
8  is Bruce Elfant?
9     A.  He's the Travis County Tax Assessor/Collector.
10    Q.  And what -- what concerns is he raising in this
11 letter about the EIC mobile units?
12         MR. SCOTT:  Objection, form,
13 speculation.  The document speaks for itself.
14    A.  I guess he's giving his opinion.
15    Q.  (By Ms. Maranzano) Do you see that he raises a
16 concern about the hours of operation of the mobile
17 units?
18    A.  Okay.
19    Q.  Do you see that?
20    A.  Yes, ma'am.
21    Q.  And do you see that he raises a concern about
22 notice?
23    A.  What do you mean by notice?
24    Q.  About the notice that was provided to him.
25    A.  I see it -- no, wait a minute, are you talking

---

130

1  about --
2     Q.  In his letter.
3     A.  What specific statement are you talking about?
4     Q.  He says, "In a week and a half that we had to
5  prepare for the outreach locations..."
6     A.  Uh-huh.
7     Q.  And he -- and then he raises concern there
8  weren't weekend hours, correct?
9     A.  Uh-huh.
10    Q.  Was there a response made to Mr. Elfant, to the
11 best of your knowledge?
12    A.  I don't know if there was a response from
13 Mr. Ingram, but I know that we helped Travis County with
14 their effort.
15    Q.  You did?  In what ways?
16    A.  Well, we helped them to -- initially, he didn't
17 want to participate.  And we encouraged him, hey, to
18 participate in the effort.  "If you help -- if you get
19 the locations, we'll help you publicize, DPS will
20 provide the places for you, and they'll provide" -- I
21 mean, "DPS will provide the staffing for you, and we can
22 move forward."
23    Q.  So initially, was -- initially, when he voiced
24 concerns, that predates this letter, right, because this
25 looks like --

---

131

1     A.  Correct.
2     Q.  Okay.  And so after --
3     A.  I think.  I think.  I said correct.  I don't
4  know if this letter came before, but -- but or -- before
5  he voiced his concerns or after.
6     Q.  Well, this letter is about his experience with
7  working with the mobile EIC units, right?
8     A.  So I presume this is a letter that he provided
9  after it was over?  (Reading.)
10        Okay.  It appears that that's what it is.
11    Q.  So did you -- did you take any steps to respond
12 to his concerns that he raised in this letter?
13    A.  I didn't personally.  I don't know if
14 Mr. Ingram did or not.
15    Q.  Did you all take into consideration his
16 concerns as you went forward with the EIC mobile units
17 program?
18    A.  Any feedback that any county can give on how to
19 do it better, it was considered.  I don't -- you know,
20 when you're starting a new program and you're doing it
21 for the first time, you've got to figure out what works
22 and what doesn't work.
23    Q.  Did you encourage counties to try to have EIC
24 on mobile unit operation -- mobile units operate outside
25 of regular business hours or on the weekends?

---

132

1     A.  That -- that was not our role.  Our role was to
2  get them to -- our role was to encourage them to work
3  with DPS and even participate in the program.  What they
4  worked out with DPS was the function of the county and
5  DPS.
6     Q.  So your role primary was just to try to get --
7     A.  To make the introduction.
8     Q.  I see.
9     A.  DPS doesn't know elections -- or didn't know at
10 the time, elections, administrators or election
11 workers.  That staff knows those individuals.
12    Q.  Uh-huh.
13    A.  We made the introductions, so they could work
14 out their relationships and help where needed.
15    Q.  Now did counties enter into a -- enter a local
16 cooperation contract with DPS when they -- when they
17 would start to issue EICs?
18    A.  Ma'am, I have no idea.
19    Q.  You have no idea.  Were you involved at all
20 in the agreements that were made between the county
21 offices and DPS?
22    A.  I don't think I was.
23    Q.  Okay.  Do you know if counties -- well, some
24 counties have been trained to issue EICs, correct?
25        MR. SCOTT:  Object to form, speculation.

---

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

COBY SHORTER, III                                           8/12/2014
CONFIDENTIAL TRANSCRIPT

---

133

1    **A.  I -- that wasn't what our office did, so I**
2    **don't know of -- I don't know what kind of training --**
3    **there was contact with DPS and the counties.  What they**
4    **trained them on, I don't know.**
5    Q.  (By Ms. Maranzano) So, your office had been
6    involved with the mobile units staffed by DPS?
7    **A.  Correct.**
8    Q.  Had your office been involved at all in helping
9    DPS with programs where they partner with county offices
10   and they train county staff issue EICs?
11   **A.  On those counties where -- where they**
12   **potentially were working with county elections**
13   **administrators in those counties, we probably did help**
14   **them get an introduction.**
15   Q.  Okay.  And that was about as far as your role
16   went?
17   **A.  I don't know because there were other staff**
18   **members that were actually working day-to-day with DPS**
19   **on getting all of this set up.**
20   Q.  Okay.  Which staff members were working on
21   that?
22   **A.  The elections division.**
23   Q.  Do you know who in the elections division?
24   **A.  Oh, man, this was a situation where it was all**
25   **hands on deck.**

---

134

1    Q.  Do you know if counties have received any extra
2    resources for working on the EIC program?
3    **A.  I don't know.**
4    Q.  Has DPS received any extra resources for
5    working on the EIC program?
6    **A.  When you say resources?**
7    Q.  Appropriations?
8    **A.  I don't know if they received appropriations.**
9    **Some of the information -- we provided some assistance**
10   **with helping them get started with some of their**
11   **equipment.**
12   Q.  Has the Secretary of State's Office received
13   any additional resources for the EIC program
14   specifically?
15   **A.  No, ma'am.**
16   Q.  Have you heard from any counties, any concerns
17   that they don't have the resources to work on the EIC
18   program?
19   **A.  I haven't personally heard that.  I do not know**
20   **if our election division has or not.**
21           (Exhibit 15 marked for identification.)
22   Q.  (By Ms. Maranzano) Okay.  I'm showing you what
23   we've marked as Exhibit 15.
24   **A.  Uh-huh.**
25   Q.  Do you recognize this?

---

135

1    **A.  I recognize it as being an e-mail.**
2    Q.  Do you recall seeing this e-mail?
3    **A.  I'm quite sure I did see it.**
4    Q.  Do you know what this e-mail is about?
5    **A.  It seems to be about counties that had**
6    **difficulty -- or either "declined based on lack of**
7    **facility, staffing, population or some combination of**
8    **the three."**
9    Q.  And was this about -- well, the subject line --
10   or the attachment says "Copy of EIC County Judges."  Do
11   you know if this was about -- related to the EIC
12   program?
13   **A.  I'm quite sure it was.**
14   Q.  And do you know what -- what these counties
15   were declining?
16   **A.  Well, they declined to -- at the point of this**
17   **e-mail, they declined to participate in the mobile EIC**
18   **units at this particular point.  However, this is not to**
19   **say that they didn't ultimately end up participating.**
20   Q.  I understand that.  But --
21   **A.  This was a snapshot in time.**
22   Q.  Right, right.  What I'm wondering though is,
23   what -- what's your understanding of why they were
24   declining.  I mean, I see that it says "lack of
25   facility, staffing, population or some combination of

---

136

1    those three."  What was your understanding of what that
2    meant?
3    **A.  Just what it says.**
4    Q.  What does it mean to lack population?  That --
5    are they so small that --
6    **A.  Some of these areas have very, very small**
7    **voting populations.**
8    Q.  Like can you give me a sense of how --
9    **A.  I can't give you an exact number as to how --**
10   **but extremely small.**
11   Q.  So were they saying that the voting population
12   was so small it wasn't worth the effort?
13   **A.  I don't know what they were saying in terms --**
14   **I don't know.  I just know that there are some counties**
15   **that have small populations of voters.**
16   Q.  So which -- on this list which would you
17   consider those counties to be?
18   **A.  Right of the top of my head, without having an**
19   **atlas to be able to tell me what the populations are, I**
20   **don't know.  I do know that there are counties in Texas**
21   **that have small voting populations.  I don't know the**
22   **exact number, but.**
23   Q.  Were these counties declining to have the
24   mobile unit come to their county or were they declining
25   to issue the EICs themselves or do you know?

---

COBY SHORTER, III                                                8/12/2014
CONFIDENTIAL TRANSCRIPT

---

137

1    A.  I don't know but I would -- I don't know, okay?
2    Let me look at their e-mail and read it.
3         This appears to be related to mobile.  And
4    the reason I say that is because if it's dealing with
5    our Office, it's dealing with mobile EICs.
6    Q.  Okay.
7         (Exhibit 16 marked for identification.)
8    A.  A lot of exhibits.
9    Q.  (By Ms. Maranzano) Yeah.
10   A.  All right.  Okay.
11   Q.  I'm showing you what we marked as Deposition
12   Exhibit 16.  Can you look at this and see if you
13   recognize this?
14        MR. SCOTT:  Before you answer, let me take
15   a peek at it since my name is on it.
16   A.  Okay.
17   Q.  (By Ms. Maranzano) Okay.  Do you recognize this
18   document?
19   A.  I recognize what's in it.  You know, I'm not an
20   e-mail person, just so you know.
21   Q.  Uh-huh.
22   A.  So I recognize what the -- you know, thousands
23   of e-mails come across -- or hundreds of e-mails come
24   across my desk.  My staff knows if you want to talk to
25   me about an issue, you come talk to me.

---

138

1         I recognize the people involved.  I
2    recognize what the issue is about.
3    Q.  Okay.  Do you see towards the bottom of the
4    page where it talks about -- it's the third paragraph
5    from the bottom.
6    A.  Uh-huh.
7    Q.  And it talks about counties being nervous about
8    the increased responsibility and that they're -- it
9    refers to their staff as "their already overburdened
10   staff."
11   A.  Uh-huh.
12   Q.  Do you recall that concern being raised?
13   A.  Uh-huh.
14   Q.  And how did you respond to that?
15   A.  Well, the response was, "Let's educate the
16   counties on really what's involved."  Any time the State
17   or the Federal Government tells another body, "We'd like
18   you to do something," there are concerns.  What we had
19   to do was just sit down with the counties and explain to
20   them what's all involved in this process.  And most of
21   them, if I recall correctly, once they actually found
22   out that they weren't having to buy any equipment, they
23   weren't having to -- it wasn't going to, you know, cost
24   them anything, a great deal, there weren't going to be,
25   you know -- it wasn't anticipated that you're going to

---

139

1    have 5,000 people standing in line waiting for one of
2    these.  When they understood -- once the counties
3    understood what was involved, that it was something that
4    may happen occasionally and we wanted to make sure there
5    was that access, they became more comfortable with it.
6    Q.  And did you usually tell counties this would
7    only come up occasionally?
8    A.  No, only -- I mean, it's -- that's my
9    characterization of -- of what would happen.  What the
10   actual staff members shared with them, I don't know the
11   specifics of it but it was -- it was what we had seen
12   based on what has happened in other counties --
13   Q.  Uh-huh.
14   A.  -- that continue to do this, is not going to be
15   a difficult challenge for you.
16   Q.  If a county expressed concerns such as that
17   their staff was overburdened, did you monitor those
18   counties at all, sort of see how the implementation was
19   going?
20   A.  We monitored every place that a -- when I say
21   "we," not me personally, but the -- all of the counties
22   where all the units were, and all the units were
23   monitored by DPS staff.  That information was shared
24   with our election staff.
25   Q.  Okay.  And who on your election staff received

---

140

1    that information?
2    A.  I would say Mr. Ingram and anyone he would
3    share it with.
4    Q.  Did you -- did you consider that staff who --
5    who were, you know, self-identifying as overburdened,
6    might -- might try to avoid additional work?
7         MR. SCOTT:  Objection, form, speculation.
8    A.  What do you mean?
9    Q.  (By Ms. Maranzano) I mean, I'm wondering if
10   they have -- if staff that's already overburdened is
11   given an additional responsibility, if they'll actually
12   implement it effectively.  Is that something that the
13   Secretary of State's Office considered when they heard
14   things from counties about county staff being
15   overburdened?
16   A.  We work with counties to resolve their
17   issues.  I mean, whatever reasons a county gave, we
18   tried to work with them to make them feel comfortable.
19   I can't address an individual county's employee's, you
20   know, concerns about -- I mean, I don't know what -- I
21   don't know what the employees that they would have
22   working on this, what else they're doing --
23   Q.  Uh-huh.
24   A.  -- so we just -- our effort was to make
25   counties comfortable.

---

COBY SHORTER, III                                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

36 (Pages 141 to 144)

---

141

1    Q.  Okay.  And that's in the manner that you've
2  already testified about in terms of the education effort
3  to the counties.  Okay.
4    A.  That is correct.
5    Q.  Did you consider that counties may have a
6  different incentive to participate in the EIC program
7  because of the additional work without additional
8  resources?
9    A.  What do you mean additional work without
10  additional resources?
11    Q.  Well, if they participate in the EIC, it's
12  another task that they're given in addition to that
13  everything they've already had to be doing, correct?
14    A.  Well, I mean, most of the counties are not --
15  you know, 99 percent of them were excited about
16  participating, except for, you know, the few that
17  expressed concerns.  And then once you walked them
18  through and educated them on what was actually involved,
19  they're like, "Okay."
20    Q.  And when you said you're monitoring the EIC --
21  or your office is monitoring the --
22    A.  DPS is monitoring, and they're sharing
23  information with us.
24    Q.  Okay.  And has there been analysis done as to
25  whether counties are effectively implementing the EIC

---

142

1  program?
2    A.  There's been -- DPS has been doing some
3  tracking of what has been going on with it, how many
4  they've issued and so forth.  I don't know that number
5  off the top of my head, and I don't know the extent of
6  what else they're doing with the analysis.  I've seen
7  some analysis but I'm not the holder of it.  They've
8  kind of showed it to me.  Okay.  We're in the infancy of
9  this, you know, so I think it's kind of premature for us
10  to say we have all-inclusive analysis.  And we haven't
11  had a -- haven't had our major election, which is coming
12  up in November, yet.
13    Q.  Okay.  I want to come back to that analysis in
14  a minute.  But with regard to the counties -- the
15  counties that are participating, do you have any
16  knowledge, I think you said you don't work with counties
17  who are issuing EICs themselves, right?  That you're --
18    A.  No, that's not what I said.
19    Q.  Apart from the mobile units, have you been
20  involved in the counties that are issuing EICs out of
21  county offices?
22        MR. SCOTT:  Objection, form, vague.
23    A.  Yeah, I don't -- I don't know how to answer
24  that.  I mean, DPS, we've been assisting them.  There
25  may be a county -- and I don't know, there may have been

---

143

1  a county that needed our assistance, we may have
2  provided, without looking at data.
3    Q.  (By Ms. Maranzano) Okay.  Well, are you aware
4  of the hours of operations for counties that are issuing
5  EICs?
6    A.  No, ma'am not specifically.
7    Q.  Okay.
8    A.  It's probably been shared with me but I don't
9  remember.
10    Q.  Okay.  Do you know if any of them are outside
11  of regular business hours?
12    A.  I don't know.
13    Q.  Are you aware of any that are open on
14  Saturdays?
15    A.  I don't know.
16        (Exhibit 17 marked for identification.)
17    Q.  (By Ms. Maranzano) All right.  I'm showing you
18  what we've marked as Deposition Exhibit 17.  Do you
19  recognize this document?
20    A.  Like I said, I don't remember the specific
21  document, but I recognize the participants in the
22  document.  I need to read it.  (Reading.)
23        Okay.
24    Q.  Okay.  Can you look at the first paragraph.
25    A.  Uh-huh.

---

144

1    Q.  And it says, in the second line, "which now
2  gets us down to 31 counties that DPS will staff."  Was
3  there an effort to decrease the number of counties that
4  DPS would be staffing?
5        MR. SCOTT:  Objection, form, calls for
6  speculation.
7    Q.  What does that mean?  I mean, you were cc'd on
8  this e-mail, correct?
9        MR. SCOTT:  Objection, form, speculation.
10  The document speaks for itself.
11    A.  Well, you know, it kind depends on how you
12  interpret the word "down."  To me -- on this particular
13  document, to me, it means we're up to -- the same as up
14  to.
15    Q.  (By Ms. Maranzano) So, how did you -- when you
16  read this, you interpreted that to be the same as which
17  now gets us up to 31 counties?
18    A.  I don't know.
19    Q.  Are you aware of whether DPS was trying to
20  reduce the mobile units that it staffed?
21    A.  I'm aware that DPS was trying to get those --
22  those counties covered.  If county staff was available,
23  okay.  If DPS staff was available, okay.  The objective
24  here was, let's get these counties covered.
25    Q.  Did DPS have any resource issues staffing the

---

COBY SHORTER, III                                              8/12/2014
CONFIDENTIAL TRANSCRIPT

37 (Pages 145 to 148)

---

**145**

1 number of counties it needed to cover?
2    **A.  I'm not --**
3    Q.  You're not aware of that?
4    **A.  You know, I -- I don't know what their resource**
5 **level was in terms of staffing.**
6    Q.  That was never a concern that was shared with
7 you?
8    **A.  Well, it was a concern of staff, who's going to**
9 **do what, can we get as many people to help us as**
10 **possible?  And as I said, it was all hands on deck.**
11 **Sure, these staff members have other responsibilities,**
12 **but what do we need to do to work together?**
13    Q.  Did you ever believe that you were stretching
14 DPS's resources by -- well, strike that.
15        When DPS started running the EIC program,
16 do you know if it hired any additional staff solely for
17 the EICs?
18    **A.  I have no idea, ma'am.**
19    Q.  Can you see the bottom of this e-mail --
20    **A.  Uh-huh.**
21    Q.  -- it talks about meeting with James Bass?
22    **A.  Uh-huh.**
23    Q.  Why you were meeting with James Bass?
24    **A.  He was the interim director of the Texas**
25 **Department of Transportation, and at that particular**

---

**146**

1 **time, we were seeing what other agencies, State**
2 **agencies, that had facilities in all counties could**
3 **potentially help.**
4    Q.  And so you were looking to -- where it says "to
5 discuss EIC assistance from his agency" --
6    **A.  Uh-huh.**
7    Q.  -- were you hoping to use his facilities?
8    **A.  Hoping to use his facilities or maybe even some**
9 **of his staff if he had them in some of those areas.  But**
10 **it was determined that some of the areas we were looking**
11 **at -- and I don't remember the exact areas -- but there**
12 **were not -- there was not staff at those facilities 8**
13 **hours a day, 5 days a week.**
14    Q.  So was he able to offer assistance to the EIC
15 -- EIC assistance?
16    **A.  I don't recall.  I don't think he was, based on**
17 **the counties that we were looking at, at that particular**
18 **time.  The counties that we were looking at did not have**
19 **full-time staff at the locations in those counties.**
20    Q.  Okay.  And in the third paragraph, do you see
21 there's a reference to Secretary of State personnel --
22    **A.  Uh-huh.**
23    Q.  -- assisting in the special mobile EIC effort?
24    **A.  Uh-huh.**
25    Q.  Is that what you previously testified about

---

**147**

1 with Secretary of State personnel being trained to work
2 in some of these mobile units?
3    **A.  Yes, ma'am.**
4    Q.  And in terms of this phrase, "special mobile
5 EIC effort," what does that mean?
6    **A.  I have no clue.  It's just -- I think it's a**
7 **term probably that they picked up.  It was -- they were**
8 **-- they were special because they were mobile.**
9    Q.  I see.  So there's not any subset of the
10 mobile?
11    **A.  No.  They were different from the other ones.**
12    Q.  Okay.  Now I believe you testified earlier that
13 you weren't necessarily involved in the decision for DPS
14 to be opened on Saturdays?
15    **A.  Correct.**
16    Q.  Do you know anything about that program in
17 which DPS offices are open on Saturdays?
18    **A.  I just know that there were some locations that**
19 **they agreed to keep open on Saturdays to make available**
20 **for people to get EICs only.**
21    Q.  And is it your understanding that DPS chose
22 those locations or that the Secretary of State's Office
23 suggested the locations for DPS?
24    **A.  Those were DPS choices.**
25    Q.  And is it your understanding that the DPS has

---

**148**

1 the discretion to discontinue that program at any time?
2        MR. SCOTT:  Objection, form, speculation.
3    **A.  I don't have an understanding and I don't know**
4 **what they -- what they did to come up with -- how they**
5 **developed their program.**
6    Q.  (By Ms. Maranzano) Do you -- do you know how
7 many offices are open on Saturdays?
8    **A.  No, ma'am.**
9    Q.  Are you aware that prior to the implementation
10 of SB 14, DPS was the source of frequent citizen
11 complaints?
12        MR. SCOTT:  Objection, form.
13    **A.  No, ma'am.**
14    Q.  (By Ms. Maranzano) You never heard that?
15        MR. SCOTT:  Speculation, foundation.
16    **A.  Speculate.  They were -- they were what now?**
17    Q.  (By Ms. Maranzano) They were the source of many
18 citizen complaints?
19        MR. SCOTT:  Objection form, speculation,
20 foundation, assumes facts not in evidence.
21        Go ahead.
22    **A.  Citizen complaints about what?**
23    Q.  (By Ms. Maranzano) About DPS.  You never heard
24 from your constituents any concerns about long lines at
25 DPS or inadequate service at DPS?

---

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

149

1    A.  I mean, you hear things in the media, but no
2  questions directed to me.
3    Q.  But you had heard that that was an issue?
4    A.  Media accounts.
5    Q.  Did you consider that fact when you were
6  planning the EIC program and working with DPS to
7  implement the EIC?
8    A.  Consider what fact?
9    Q.  The fact that you the heard that there are
10 issues with long lines or service from the DPS?
11   A.  That wasn't a deciding factor on why we did
12 this.
13   Q.  Was that at all a factor in how to go about
14 implementing the EIC program?
15   A.  Not that I can recall.
16   Q.  Has the Secretary of State's Office requested
17 any additional resources from the Legislature for the
18 EIC program?
19   A.  No, ma'am.
20   Q.  Is that because you believe you have sufficient
21 resources to run the EIC program?
22       MR. SCOTT:  Objection, form, assumes facts
23 not in evidence, misstates testimony.
24   A.  It's not our program.
25   Q.  (By Ms. Maranzano) Okay.  So do you have any

150

1  plans to ask for resources for EIC -- for EIC-related
2  tasks?
3    A.  We're doing fine the way we are.  I mean, it's
4  a project that we're looking in it's infancy.  Before
5  we're able to make any determinations on what else is
6  needed, we need to complete a full election cycle, and
7  that won't be until November.
8    Q.  So is there a plan to assess the EIC program
9  after November?
10   A.  You'd have to ask -- I'm quite sure there will
11 be but that will led by DPS.
12   Q.  And will the SOS be involved in that?
13   A.  If they choose to allow us to be involved.
14       (Exhibit 18 marked for identification.)
15       MS. MARANZANO:  Do you want a break now?
16       THE COURT REPORTER:  Okay.  I could use
17 it.
18       (Recess 12:47 p.m. to 1:03 p.m.)
19       (Exhibit 19 marked for identification.)
20   Q.  (By Ms. Maranzano) Okay.  I am showing you
21 what we're marking as Deposition Exhibit --
22   A.  Uh-huh.
23   Q.  -- 19.
24   A.  Uh-huh.
25   Q.  Can you take a look at that?

151

1    A.  Yes, ma'am, I have.
2    Q.  Do you recognize it or the content of it?
3    A.  I recognize the content.  I don't remember the
4  specific -- I don't remember receiving it, but I'm quite
5  sure -- I know the issue here.
6    Q.  Okay.  And did you have any follow-up
7  conversations about the issue in this e-mail?
8    A.  No, ma'am, I didn't.  I don't recall having
9  any.
10   Q.  Did you respond to anybody about this e-mail?
11   A.  Not that I recall.
12   Q.  And when you saw that applicants -- this
13 information in the e-mail about applicants arriving
14 without the necessary underlying documents, did you take
15 any steps to ensure that there was appropriate publicity
16 or education about the necessary underlying documents
17 required to get an EIC?
18   A.  Based on this particular e-mail?
19   Q.  Yes.
20   A.  I don't recall doing anything, other than I
21 know my mode of operandi would be to make sure that it
22 had been publicized.
23   Q.  So you don't recall taking any actions in
24 response to this e-mail, but your general -- your
25 general strategy was to try to make sure that

152

1  information was publicized?
2    A.  Well if you look at this e-mail, it says that
3  person who did not have a document said that they would
4  come to a different site the next day.
5    Q.  Uh-huh.
6    A.  And the other person really didn't want an EIC,
7  they wanted a state ID.
8    Q.  But were you at all concerned that a person
9  didn't know what the underlying documentation was --
10 that was required?
11   A.  I don't know if the person didn't know or I
12 don't know if the person actually forgot the document.
13 I don't know why they didn't have a birth certificate.
14   Q.  And so you didn't you take any actions in
15 response to this e-mail?
16   A.  Well, it wouldn't have been necessary when the
17 person, according to the -- the feedback that we
18 received from the county administrator, the person said
19 they were coming back the next day.
20   Q.  And did you -- did you get other e-mails like
21 this, to the best of your recollection?
22   A.  I probably could have gotten those from
23 Mr. Ingram.  But as I shared with you earlier, I'm not a
24 creature of e-mails.
25   Q.  Uh-huh.  Did you -- did you make an effort to

COBY SHORTER, III                                      8/12/2014
CONFIDENTIAL TRANSCRIPT

39 (Pages 153 to 156)

153

1  keep apprised of the EIC program and how many EICs were
2  being issued?
3      **A. I kept up with what was going on with the**
4  **program. Without actually looking at the data, I can't**
5  **give you a specific number as to how many were issued on**
6  **XY date, but I kept -- I was briefed by staff, DPS.**
7      Q. Okay. Can we -- can you look at now what we
8  marked as Exhibit 18 --
9      **A. Yes, ma'am.**
10     Q. -- previously? I apologize for going out of
11  order.
12     **A. That's okay.**
13     Q. Does this e-mail or the content in it look
14  familiar to you? And there's also a back of the page.
15     **A. It looks like it could have come to me, yes.**
16     Q. Did you see reports like this that categorized
17  the issuance and inquiries of EICs; did you see things
18  like this regularly?
19     **A. I think I did, yes.**
20     Q. Do you know about how often you would see these
21  updates?
22     **A. Ma'am, when we were doing this, we could have**
23  **had updates daily. I mean, our staffs were talking**
24  **daily, so it would not have been uncommon for this type**
25  **of document to have been provided on a weekly or daily**

154

1  **basis.**
2      Q. And did those -- did those go to you on a
3  weekly or daily basis?
4      **A. Not necessarily. I could have been cc'd, or**
5  **they do have given it to the staff members, election**
6  **staff members that were -- were directly -- that**
7  **directly were working in that area.**
8      Q. Would they have gone to Mr. Ingram --
9          MR. SCOTT: Objection, form, speculation.
10     Q. (By Ms. Maranzano) -- on a daily or weekly
11  basis?
12     **A. I don't know.**
13     Q. Which staff? You said they would have gone to
14  the staff working in that area. Which staff were you
15  referring to?
16     **A. When I say staff, it could have gone to some**
17  **other individuals in Exec. It could have gone to our**
18  **counsel. It could have gone to our communications**
19  **staff. It probably did come to me. It could have gone**
20  **to Keith Ingram or anyone that he had designated on his**
21  **staff. I didn't -- I don't know who all was put on the**
22  **e-mail chain.**
23     Q. Okay. All right. Do you recall what you would
24  do when you received e-mails like this?
25     **A. What do you mean?**

155

1      Q. What did you do with this information?
2      **A. Read it.**
3      Q. And that's it?
4      **A. Passed it on to someone if it needed to be.**
5      Q. Like who?
6      **A. Could have been other executive staff. Could**
7  **have been the Secretary himself.**
8      Q. What would prompt you? What do you mean if it
9  needed to be, like what would prompt you to pass it on
10  to somebody?
11     **A. Someone would ask, we would look at where we**
12  **were in the program, how many had been issued.**
13     Q. So you looked at how many EICs were issued.
14  What were other pieces of information you were looking
15  at?
16     **A. That was pretty much it, how many had been**
17  **issued.**
18     Q. Did you look at how many inquiries had been
19  made?
20     **A. Well, when I say issued, I'm looking at issued**
21  **and inquiries.**
22     Q. Okay.
23     **A. What activity -- what activity were they**
24  **relating? What activity was there related to mobile**
25  **EICs? Were questions asked? Or were cards actually**

156

1  issued?
2      Q. And did you look at where the different regions
3  around the state that that was occurring in?
4      **A. I saw it based on this. I don't know what**
5  **these regions are without looking at a map. Or -- when**
6  **I say a map, a TxDOT -- not TxDOT -- a DPS map, for**
7  **instance. I don't know what 1A, 1B is without them**
8  **having the actual document that would tell me what 1 --**
9  **where 1A is.**
10     Q. Did the EIC information that you would get
11  would be DPS-compiled information, so was it compiled
12  generally according to DPS regions?
13     **A. This -- this information -- anything that we**
14  **get came to -- came to us from DPS. We -- I guess we --**
15  **we work with them to figure out what it was, based on**
16  **their regions that they had, they would tell us it was**
17  **in this area, this region, we accepted that.**
18     Q. Uh-huh. Okay.
19         (Exhibit 20 marked for identification.)
20     Q. (By Ms. Maranzano) Do you recognize this? I'm
21  showing what we've marked as Deposition Exhibit 20.
22     **A. Uh-huh.**
23     Q. Do you recognize this document or the content
24  within it?
25     **A. I recognize -- like I said, I recognize -- this**

COBY SHORTER, III                                               8/12/2014
CONFIDENTIAL TRANSCRIPT

40 (Pages 157 to 160)

---

157

1  appears to be a staff's report that was forwarded to me,
2  and I forwarded it to our counsel.
3      Q.   And so this was -- was this a similar document
4  that was a status report sent by DPS to you about the
5  EIC issuances and inquiries?
6      A.   It appears.  I mean, you know, sometimes it
7  would look like this and sometimes it would like this.
8      Q.   So it took the format that was either what's in
9  --
10     A.   It took the format of whatever way DPS wanted
11 to submit it to us.
12     Q.   Okay.  And when -- when you were getting
13 e-mails like what you looked at in Exhibit 18 or Exhibit
14 20, did you -- did you use the information in these
15 e-mails to target where mobile units should go?
16     A.   No.  I took this information, forwarded it to
17 our general counsel, so that he could give it to the
18 election staff, and the election staff would look at it
19 and make any determinations.  But this was -- it appears
20 that this was information that was provided based on
21 sites that had already been selected.
22     Q.   But the information contained, was that used to
23 evaluate where a good location might be to issue EICs or
24 mobile units or for providing information or education?
25 If you know?

---

158

1      A.   Well, it just provided information on
2  inquiries.  It provided information on -- it appears to
3  be a report of just what happened during that inquiry.
4      Q.   Are you aware of any changes that were made to
5  the EIC program based on information contained in the --
6  in the reports that you received from DPS, such as what
7  we've seen in Exhibit 18 or Exhibit 20?
8      A.   No.  As I stated previously, this is an
9  evolving process, so any information you'd get would
10 help you to tweak the program for what works and what
11 doesn't work.  I'm quite -- I feel comfortable that our
12 staff, if they saw something in one of these e-mails
13 that needed to be changed or tweaked, they changed or
14 adjusted, they shared that with DPS so that they could,
15 DPS could make the changes.  But since -- you know,
16 we're -- significant changes in what needs to be done,
17 if the changes need to be made, we're not -- we're not
18 at that point in the process.
19     Q.   Are you aware of any tweaks that were made by
20 your staff or recommended by your staff in the EIC
21 program?
22     A.   I can't -- well, the changes were made -- we're
23 now allowing non-DPS staff, like our staff, to work with
24 DPS.  That frees up a little more time.  But we're -- if
25 there have been technical -- or if there had been

---

159

1  changes in procedure on what has happened, the end
2  result for me is, when it gets to me, it's we're going
3  to be in XYZ, Texas on this date at this particular
4  time.  The election staff that's working the program
5  now, working the program with Mr. Ingram, if there are
6  technical issues, they're resolving those issues at that
7  level.
8      Q.   Okay.
9      A.   And I have not seen any that have risen to the
10 point, that I can recall off the top of my head, that
11 needed to be addressed by me.
12     Q.   Okay.  And when you say that you're not at the
13 point right now to sort of make changes to the EIC
14 program --
15     A.   Uh-huh.
16     Q.   -- can you just describe to me what you mean by
17 that?
18     A.   Well, generally, when new initiatives are taken
19 up by an agency between the time that the legislature is
20 in session and they come back, we will be at a point
21 after this particular election to present findings on
22 here's what happened.  We'll be at a point where we can
23 give complete analysis of what worked and what did not
24 work.  And at that point -- it would be premature for us
25 to make substantive big major changes when the biggest

---

160

1  election that we have in this cycle is yet to come.  So
2  our hope is let's allow -- let's continue to tweak,
3  let's continue -- if there need to be minor adjustments,
4  let's -- nothing has -- nothing has occurred that I'm
5  aware of or can recall right now that would -- that
6  would seem to be a need for a major change right now.
7  We have an upcoming election.  Once we complete that,
8  we'll be able to see, like, let's take the total concept
9  of primaries, major election -- general election,
10 constitutional election, you have them all that you've
11 had, now we can see in the whole total picture what's
12 worked and what hasn't worked.
13     Q.   So --
14     A.   Because if something happens one time, it might
15 just be an accident or a fluke.  But if there's a
16 consistent pattern of something happening, which I'm not
17 saying that there is, because it hasn't -- it hasn't
18 been reported, but once you have every type of a
19 potential election that you can have and you've gone
20 through it, then you present it to the Legislature and
21 see what the Legislature wants to do with it.
22     Q.   Now, I guess -- okay.  I guess what I'm
23 wondering, though, is that -- I mean, the EIC program is
24 -- it's largely within the discretion of DPS, correct?
25          MR. SCOTT:  Objection, form.

---

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

41 (Pages 161 to 164)

161

1   Q. (By Ms. Maranzano) I mean -- okay. Let me
2   back up. The particulars of the EIC program are not
3   spelled out in SB 14, right?
4       MR. SCOTT: Objection, form.
5   Q. (By Ms. Maranzano) You can -- you can -- if
6   you need to refer back to the exhibit, I can -- I can
7   find it for you.
8   A. Are you saying -- what are you asking me about
9   the EIC in Senate Bill 14? Is it in it?
10  Q. No, that's not what I'm asking. I'm asking
11  about the way that the EIC program is implemented is not
12  written into SB 14, right?
13  A. I'm not aware of it being.
14  Q. So -- so I guess I'm -- I'm a little unclear on
15  why you would wait for the Legislature to go back into
16  session to make changes to the EIC program.
17  A. Now that's not what I said.
18  Q. Okay. Then maybe you can clarify.
19  A. What I said was we have a major election coming
20  up in November.
21  Q. Uh-huh.
22  A. At the end of November, we will have a total
23  picture of every type of election that you can have.
24  You would have had primaries, you would have had a
25  smaller constitutional election, you would have had a

162

1   major general election. At that particular point, when
2   you -- when you analyze all of that data, then you can
3   better -- in my opinion as a manager -- determine what
4   has worked and what has not worked.
5   Q. Okay.
6   A. When you do that -- November, it takes you a
7   while to get it done -- when you finish that analysis, I
8   guess what, the Texas Legislature is in session. If
9   there is a need for something legislatively to occur for
10  this to continue, we will know that. Otherwise, we will
11  be able to keep doing what we're doing.
12  Q. In terms of a evaluating the EIC program, have
13  you considered whether it might be -- it might -- you
14  might want to evaluate it prior to the November 2014
15  election so that you can make sure you're implementing
16  the program effectively before a major federal election?
17  A. Well, based on what we have done so far, we
18  feel pretty comfortable with how we're implementing it.
19  Q. Okay. And what are you referring to when you
20  say based on what you've done so far?
21  A. Based on -- based on how the program is
22  operating now. We feel comfortable that that's the way
23  we should continue to do it as we approach the general
24  election.
25  Q. Okay. And I'm just -- I'm just moving you a

163

1   little bit on -- based on what we're doing now. I mean,
2   are you saying based on just the steps you're taking to
3   make EICs available? Or are you -- what are you looking
4   at to measure that this is how you should keep
5   implementing it?
6   A. Are you referring to the mobile units? Or --
7   Q. No, no, I'm referring to the EIC
8   program generally.
9   A. Okay. The EIC program overall is not a
10  function of the Secretary of State's Office.
11  Q. Uh-huh.
12  A. I'm referring specifically to these mobile
13  units that we're helping DPS with.
14  Q. Okay.
15  A. And when I -- so when I refer to EICs, I'm not
16  talking about EICs for the whole state of Texas. That's
17  DPS. I'm talking about the effort that we're helping to
18  market these mobile units and do -- because the mobile
19  unit is more of a marketing issue than a regulatory
20  function, statutory function, that has been given to
21  DPS, not to us.
22  Q. Now, do you -- do you consider the SOS
23  involvement in the EIC program to be limited to the
24  mobile units?
25  A. As educating people about limited to the mobile

164

1   units and educating people about what the requirements
2   are for voting.
3   Q. Okay. But have you used the information that
4   you've received from DPS to -- to change or refocus your
5   education at all?
6   A. Well, what do you mean?
7   Q. Well, when you get information from DPS that
8   has different inquiries that are made, have you used
9   that at all to evaluate your education program or to
10  change your education program?
11  A. Well, the information that you've shown me
12  today in terms of their inquiries, and I can't remember
13  the others without looking at them, doesn't indicate to
14  me that our effort to educate individuals has not been
15  successful.
16  Q. But as you sit here today, I'm just wondering
17  if you've received any information from DPS that has led
18  you to evaluate or make any changes to either your
19  education program or your mobile units?
20  A. No, I don't think we've received information
21  that warrant those types of changes as of yet.
22      (Exhibit 21 marked for identification.)
23  Q. (By Ms. Maranzano) I'm showing you what we've
24  marked as Deposition Exhibit 21.
25  A. Right.

COBY SHORTER, III                                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

---

165

1    Q.  Have you ever seen this or contents similar to
2  this?
3    **A.  You know, ma'am, I have seen some data**
4  **language, but it was not in this -- it was in a -- it**
5  **wasn't -- it didn't -- it was not packaged like this.**
6    Q.  Okay.  Where have you seen data similar to
7  this?
8    **A.  Well, DPS showed it to me.**
9    Q.  Have you heard of DPS's SharePoint site?
10   **A.  Personally, I haven't.**
11   Q.  Okay.  Are you familiar with how DPS is
12 maintaining information about the EICs?
13   **A.  I just know that they provided information to**
14 **us.  How they're doing it, I don't know.**
15   Q.  When did they provide information that was
16 similar to this?
17   **A.  Well, they provided it to us when they sat down**
18 **with us and met with us about next steps after we had**
19 **had our -- I don't remember the exact day, but after our**
20 **constitutional amendment election that we had.**
21   Q.  And what happened in that meeting about next
22 steps?
23   **A.  Well, we just kind of -- we talked about what**
24 **happen -- I mean, they talked to tell us where things**
25 **had happened.  And we talked about how we could**

---

166

1  **potentially get SOS employees trained and other agency**
2  **staff trained.**
3    Q.  Was that the only change to the program that
4  was discussed at that meeting?
5    **A.  I think so.**
6    Q.  Was --
7    **A.  I don't --**
8    Q.  I'm sorry.
9    **A.  I think DPS has procedures on how they do**
10 **things.  And I think by the time they had this meeting,**
11 **they had their internal procedures set up for how they**
12 **were going to operate the next time.  What those**
13 **procedures were, I don't know.  All I wanted to be able**
14 **to do was tell me -- tell me and my staff where to show**
15 **up so we can be trained.  Because just the size of our**
16 **agencies cause us to do things differently.**
17   Q.  Was it the Secretary of State's Office or DPS
18 who suggested that SOS staff be trained?
19   **A.  Well, we just kind of asked.  We were just, as**
20 **we sitting around the table, "Is this something I can**
21 **train?  We -- our staff members are elections**
22 **inspectors, and there's a training process, and I just**
23 **got to ask can we potentially train some of our staff**
24 **members who are good at elections inspecting, understand**
25 **the elections process, can we possibly train some of**

---

167

1  **them to do this?"  And they looked and said, "Yes, we**
2  **can."**
3    Q.  Okay.  But it was -- it was the suggestion of
4  someone from the Secretary of State's Office, can we be
5  trained?
6    **A.  It was probably my suggestion.**
7    Q.  Okay.  Now, do you see --
8    **A.  Actually, I think it was mine.**
9    Q.  Do you see as of the date that this was printed
10 out or issued --
11   **A.  Where is that?**
12   Q.  Well, there's not a date on here, but you can
13 look -- if you look at the various dates, it's certainly
14 at least late May 2014.
15   **A.  Oh, Lord.**
16   Q.  Now, on the very first page, do you see at that
17 time there is -- the EICs approved and issued, it says
18 those are 266?
19   **A.  Uh-huh, yes, ma'am.**
20   Q.  Does that sound about right to your
21 recollection that as of late May 2014?
22   **A.  It -- if this is a document that -- that they**
23 **showed us, it sounds right.**
24   Q.  Do you have a reaction to that number?
25   **A.  No.**

---

168

1    Q.  No reaction?
2    **A.  What type of reaction are you looking for?**
3    Q.  Does it seem small?  Does it seem large?  Does
4  it seem about what you would expect?
5    **A.  My reaction is there were voters that needed a**
6  **card, we provided a service, and if it had been one, one**
7  **more voter has that opportunity to have the data they**
8  **need.  I mean, I -- I'm not quite sure how you want me**
9  **to evaluate it.**
10   Q.  Do you believe that most voters in Texas
11 already have forms of ID that are required by SB 14?
12      MR. SCOTT:  Objection, form, foundation.
13   **A.  I don't know.**
14   Q.  (By Ms. Maranzano)  When you see -- when you
15 see the number 266 EICs issued -- and this was probably
16 late May of 2014.  Do you recall when you started
17 running the EIC program?
18      MR. SCOTT:  Objection, form,
19 mischaracterizes his testimony.
20   Q.  (By Ms. Maranzano)  I'm sorry.  Let me just
21 rephrase.
22      Do you recall when the State started to
23 issue EICs?
24   **A.  Ma'am, I can't remember the exact date.  It was**
25 **sometime in -- wait.  Wait.  Ask me the question again.**

---

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

169

1  Q.  When did EICs start to be issued?
2  **A.  The first one, I have to go back and look.  I**
3  **don't have a firm date as to when DPS started doing**
4  **that.**
5  Q.  Do you think that -- have you considered
6  whether the EIC program could be doing a better job?
7  **A.  That's not my role to do.**
8  Q.  You don't consider that your role?
9  **A.  No, because we're not -- are you talking about**
10 **mobile EICs?  Are you talking about EICs --**
11 Q.  We're talking about the overall program.
12 **Your question again?**
13 Q.  Have you considered whether the EIC program
14 could be improved?
15 **A.  That's not my role to consider.**
16 Q.  Do you think if you made suggestions to DPS
17 about ways to improve the EIC program, they would listen
18 to those suggestions?
19 **A.  I think DPS would listen to anyone that gave**
20 **them constructive positive advice that would help them.**
21 Q.  Are you aware that DPS has actually changed
22 items in the EIC program at the suggestion of the
23 Secretary of State's Office?
24 **A.  That could have happened.  Specifically what**
25 **those changes are, without someone recalling them for**

170

1  me, I can't name them.
2  Q.  Do you recall that initially DPS was taking
3  fingerprints of EIC applicants?
4  **A.  I don't know if I remember.  Ma'am, I can't**
5  **recall if they were or not.**
6  Q.  Okay.  So you wouldn't be aware that --
7  **A.  I may have been aware at one time, but I don't**
8  **remember specifically if they were doing it, but I -- I**
9  **just can't recall.**
10 Q.  Do you know if anyone from the Secretary of
11 State's Office suggested to them that they should stop
12 doing that practice?
13 **A.  Like I said, I don't remember.  I don't**
14 **remember specifically what they were doing.  If they**
15 **were doing that, that could have been a conversation**
16 **that someone in our office did have with me.**
17 Q.  And you don't know if that occurred?
18 **A.  I don't remember -- I don't remember**
19 **specifically fingerprinting.**
20 Q.  Do you recall any other parts of the EIC
21 program that were changed at the suggestion of the
22 Secretary of State?
23 **A.  Not without staff coming to me and refreshing**
24 **my memory.**
25 Q.  Have you or your office made any effort to

171

1  determine if eligible individuals are actually able to
2  obtain EICs?
3  **A.  What do you mean?**
4  Q.  Have you made any effort to determine whether
5  individuals who are eligible for an EIC are actually
6  getting through the process and getting an EIC issued to
7  them?
8  **A.  How would we know who those people are?**
9  Q.  Well, I'm asking you if you've made any efforts
10 to look into this.
11 **A.  I don't know how we would determine who those**
12 **people are.**
13 Q.  You don't know how you would determine who the
14 people are who are getting EICs?
15 **A.  No.  I thought your question was we -- I**
16 **understood your question to me to be:  Are you aware or**
17 **are we working with individuals who were trying to get**
18 **EICs.  Is that your question?**
19 Q.  My question is:  Are you making any effort to
20 look into the process of getting an EIC and whether
21 people who are eligible for an EIC and whether getting
22 EICs?
23 **A.  That's not our role.**
24 Q.  So have you done that?  I take it that's a no,
25 but I just want to be clear.

172

1  **A.  No, I mean, I don't -- I really don't know what**
2  **you're looking for, to be able to answer your question.**
3  **Statutorily how that program works on EICs is not a**
4  **function of our office.  We're only responsible for**
5  **educating people as to here are the requirements for**
6  **voting.  Analysis of EICs, what works and what doesn't**
7  **work, is not a function of the Secretary of State's**
8  **Office.  That's a function of DPS and whoever else the**
9  **Legislature deems should do that.  And they've not**
10 **deemed that the Secretary of State's Office should do**
11 **that at this point.**
12 Q.  Do you think that the Secretary of State's
13 Office could fulfill its implementation responsibilities
14 more effectively if it had more regulatory authority
15 under SB 14?
16 **A.  I think we're very effective in what we're**
17 **doing right now.**
18 Q.  Can you look back at Exhibit 21 and look at the
19 third page for me?
20 **A.  Uh-huh.**
21 Q.  And do you see on this page, it actually breaks
22 down the number of EICs that are issued at mobile units
23 and driver's license offices and county offices.
24 **A.  Are you talking about this fourth column over**
25 **here?**

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

44 (Pages 173 to 176)

173

1    Q.  Yes, exactly.
2    A.  Okay.  Okay.
3    Q.  Now, did you use this information to assess the
4  mobile unit program at all?
5    A.  I didn't personally.  I don't know if our staff
6  did.
7    Q.  Did you talk to any staff about that?
8    A.  About this particular document?
9    Q.  Uh-huh.
10   A.  I don't recall having a conversation with staff
11  about this document.
12   Q.  Did you have conversations with staff about the
13  fact that DPS was gathering this information and they
14  could use it as a way to assess the mobile unit program?
15   A.  I didn't have a discussion with them about
16  assessing the mobile unit based on this information, but
17  staff was available and staff was in the meeting where
18  DPS provided this information.
19   Q.  So are you aware of whether your staff used
20  this information to make any assessment or changes to
21  the EIC mobile unit program?
22   A.  I'm not aware of how you would use this data,
23  because right now it's just numbers.  When you have 25
24  mobile units and you got 254 counties, it's kind of safe
25  to say that you probably won't be in the same place you

174

1  were last time the next time you do it.
2    Q.  Have you used the number of EICs issued from
3  mobile units to --
4    A.  To do what?
5    Q.  To make any changes to your mobile unit
6  program.
7    A.  As I've consistently said, it's too early in
8  the game to make holistic changes in the mobile EIC
9  program because the biggest election and the biggest
10  election cycle is yet to come.
11   Q.  And can you look on -- on the seventh page of
12  this document?
13   A.  One, two, three, four, five, six, seven.  Are
14  we on the same page?
15   Q.  Does it have a list of counties?
16   A.  Did I count wrong?
17   Q.  Maybe I counted wrong.
18   A.  One, two, three, four, five, six -- I counted
19  wrong.  Forgive me, seven, yes, ma'am.
20   Q.  Have you used this information about the EICs
21  issued in different counties and different zip codes to
22  -- to target your education at all, your voter
23  education?
24   A.  Have we done what now?
25   Q.  Well, do you see that there's information about

175

1  how many EICs are issued by county and zip code?
2    A.  Uh-huh.
3    Q.  Have you used this information at all when
4  you're planning on your voter education program?
5    A.  No.  Our voter education program is -- uses
6  different analysis to target where we go, where --
7  target the state, the entire state.
8    Q.  What analysis does your voter education program
9  use?
10   A.  We have an outside vendor we hired.  They do
11  market analysis.  And based on that market analysis, it
12  teaches us, it shows us how to effectively cover the
13  entire state of Texas during our marketing campaign.
14   Q.  Can you -- can you take a look two pages back
15  on page 5?
16   A.  Two pages back from here?
17   Q.  Yes.
18   A.  All right.  I can't even see this.
19   Q.  Do you see there's information about different
20  demographics of EIC applicants?
21   A.  Okay.
22   Q.  Was there any analysis that you or your office
23  conducted related to the race of the -- the applicants?
24   A.  Ma'am, as I said before, we have not done any
25  analysis at this point because too early in the game.

176

1    Q.  And have you considered the racial breakdown of
2  EIC applicants --
3    A.  We've not --
4        MR. SCOTT:  Let her finish.
5    Q.  (By Ms. Maranzano)  -- as you plan for future
6  EIC mobile outreach or voter education outreach.
7    A.  We've not made any considerations at this
8  particular point.  It is too early in the game.
9    Q.  Have you instructed DPS or had any discussions
10  with DPS about the information that contained -- they
11  gathered and how to evaluate the program based on it?
12   A.  Not at this point.
13   Q.  What -- what is the purpose of gathering all
14  this information now?
15   A.  You would have to ask DPS that.  This is their
16  information.
17   Q.  Are you aware of the number of individuals who
18  have received the disability exemption under SB 14?
19   A.  No, ma'am.
20   Q.  If I told you that as of January 15, 2014, 18
21  individuals have received the disability exemption, what
22  would be your reaction to that number?
23   A.  I don't have a way to react to it because I
24  don't know what the circumstances are.
25   Q.  You don't think it's a -- you have no reaction

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

45 (Pages 177 to 180)

177

1  to knowing the number of registered voters in the state
2  of Texas, which I assume you know, do you have any
3  reaction to the fact that 18 people have received the
4  disability exemption?
5      A.  I don't know the circumstances --
6          MR. SCOTT:  Objection, form.
7      A.  I don't know the circumstances behind that
8  number.
9      Q.  (By Ms. Maranzano)  What do you mean by the
10 circumstances?
11     A.  I don't know what -- I don't know anything
12 about that particular number.  I don't know.
13     Q.  Okay.  Have you done any outreach with
14 disability groups to ensure that they're aware of the
15 disability exemption?
16     A.  Our office has -- with this particular
17 campaign, our office works with all groups and our
18 office interacts with advocates for disabilities to make
19 sure that their issues are addressed.
20     Q.  What do you mean by this particular campaign?
21 Did you say with regard to --
22     A.  Well, with any particular campaign.
23     Q.  Okay.
24     A.  Any particular election, our office -- campaign
25 is the incorrect word.  Election, election cycle.  We

178

1  frequently work, we being our election staff, we're
2  doing work with the advocates of -- of those with
3  disabilities to make sure that their issues are
4  addressed.
5      Q.  And have you worked with them specifically on
6  education about the disability exemption contained in SB
7  14, to the best of your knowledge?
8      A.  I would hope that our staff has been
9  interacting with them as they've have been directed to
10 interact with several different individuals and groups
11 as it relates to Senate Bill 14.  We're -- if there's an
12 issue, we want to address it with our constituent group.
13     Q.  Do you know what other advocacy groups your
14 office is working with?
15     A.  Ma'am, off the top of my head, I -- I can't --
16 Elections would have to tell me exactly who, because
17 they've been working with them.  Nothing at this
18 particular point has risen to the -- to the role where
19 these could be addressed by me, and it's been
20 effectively handled by our election staff.
21     Q.  Has the Secretary of State's Office done any
22 analysis of how many individuals have voted
23 provisionally because they lacked photo ID?
24     A.  I don't know.
25     Q.  You don't know of any analysis?

179

1      A.  I mean, I don't know if they're considering it
2  or if it's being done.  I don't know.  I mean, we're --
3  I would have to ask my elections staff have they done
4  that yet or is that something that is going to be done.
5  I personally don't know.
6      Q.  Okay.  Do you know if there's been any request
7  to the counties to do any such analysis?
8      A.  I'm -- I'm -- I don't know.
9      Q.  Are you aware of any errors by a county in
10 counting the provisional ballot that was cast by
11 somebody without an ID?
12     A.  Me personally?
13     Q.  Uh-huh.
14     A.  I'm not aware.  I'm not saying it didn't
15 happen.
16     Q.  I was just about to ask you:  Would you be
17 aware, if that was something that had happened, do you
18 believe you would be aware of it?
19     A.  If it were shared with our staff, I hope
20 someone would have shared it with me.
21     Q.  Has the Secretary of State's Office done any
22 analysis on what populations are more likely to vote by
23 mail?
24     A.  What do you mean by populations?
25     Q.  The demographics of people who are more likely

180

1  to vote by mail?
2      A.  I can't say specifically that has been done or
3  not.
4      Q.  Do you have any knowledge, as you sit here
5  today, about the demographics of people more likely to
6  vote by mail?
7      A.  Personally, probably not.
8      Q.  Would you agree that in many African American
9  communities there's a tradition of voting in person?
10     A.  Versus what?
11     Q.  Voting by mail.
12     A.  If -- I don't know.  If that's what the -- I
13 don't know what the statistics say.
14     Q.  You have no knowledge as you sit here today?
15     A.  I know how I vote.
16     Q.  But I'm asking about African American
17 communities in general.  Do you have any knowledge?
18     A.  Statistically?
19     Q.  Statistically or any other way.
20     A.  Why would I?
21     Q.  I'm just wondering would you agree --
22     A.  I can't agree with -- I cannot agree based on
23 the fact that I've not studied it.
24     Q.  Okay.  Has the Secretary of State's Office done
25 any analysis of voter turnout since SB 14 has been

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

46 (Pages 181 to 184)

181

implemented?
   A. I think we -- we know voter totals for the
constitutional amendment elections that we've had. I
can't give you specifics, but I do know that the total
number of voters was up.
   Q. And --
   A. Or increased.
   Q. Would you say that there's a number of
different factors that impact voter turnout on any given
election?
   A. I guess that could be said about any election.
   Q. Do you know what some of those factors are?
   A. You know, it could be a number of things. It
could be the issues. It could be the candidates. There
are a plethora of different issues that affect why a
person decides they want to go to the polls, and there's
nobody that has a silver-bullet answer as to if people
are going to turn out or not.
   Q. Have you ever heard that the weather can be a
factor in voter turnout?
   A. I've heard the press say that.
   Q. When you -- when you look at election turnout,
do you factor -- do you try to factor in these different
-- these different issues that can impact voter turnout?
   A. Me personally?

182

   Q. Yes.
   A. I look at the numbers.
   Q. You just look at the numbers?
   A. Uh-huh.
   Q. Do you think about the other things that might
-- do you think about all the different --
   A. I look at the numbers and I look at what they
were this year versus what they were last year. And
what they are this year since Senate Bill 14 has been
enacted is they're up.
   Q. Uh-huh. And do you correlate that with Senate
Bill 14?
   A. I haven't made a correlation at this point.
   Q. Okay. Do you consider the EIC program to be a
success?
   A. It's not for me to determine whether it's
successful or not.
   Q. Are you familiar with the legislative study
that's occurring on the implementation of SB 14?
   A. A current one?
   Q. Yes.
   A. I know that there are interim studies looking
at different things. Have I been specifically involved
in any of that? No, I haven't.
   Q. Do you know if Mr. Ingram is involved in any of

183

that?
   A. Like I said, I don't know the specifics of it.
I would -- if -- I don't know. If it's election-related
and if he's been asked, I'm quite sure he probably would
be involved.
   Q. So do you know any of the details of what this
study is looking at?
   A. Not at this point.
   Q. Okay. Do you believe DPS is the appropriate
agency to be issuing EICs?
   A. That's not for me to determine.
   Q. Apart from this responsibility of issuing EICs,
DPS doesn't have any other election-related functions,
correct?
   A. Well, I mean, they -- other than providing
their data, I mean, their list to us.
   Q. Their list?
   A. Of voters for like voter jury wheel and stuff
like that.
   Q. I see. So it provides the jury wheel to you to
use --
   A. We get DPS data from DPS.
   Q. I see. And apart from that, which is mostly
just providing you with data, it doesn't have any other
election-related responsibilities, correct?

184

   A. When you -- what type of election-related
responsibilities are you potentially referring to?
   Q. Any election-related responsibilities.
   A. Well, I mean, none, other than they are --
they're -- I mean, if there are law enforcement issues,
I mean, I guess they would, I mean, potentially be
involved. No, I guess that would be the local folks.
   Q. Is DPS primarily a law enforcement agency?
   A. Well, it's a law enforcement agency, and it's
an issue -- they're the agency that in the state of
Texas that issues identification.
   Q. Do you know if state troopers are often present
at driver's license offices?
   A. Driver's license offices where? Across Texas?
   Q. Uh-huh.
   A. Ma'am, it's been so long since I've been into
one, I don't know.
   Q. Do you know if any law enforcement tends to be
present in driver's license offices?
   A. Like I said --
   Q. No, you don't know?
   A. It's been so long since I've been in one. I've
been out to the state headquarters, and they have law
enforcement there. I've been to the one in my local
area out in Pflugerville, and I have no idea if there

COBY SHORTER, III                                          8/12/2014
CONFIDENTIAL TRANSCRIPT

185

1 was a law enforcement agent there or not. I went in and
2 asked my specific question and I left, so.
3    Q. Do you know if DPS runs warrant checks on EIC
4 applicants?
5    A. I don't -- for EICs, I don't know what they do.
6 At least, I can't remember what they do.
7    Q. What?
8    A. I said that I don't know. I can't necessarily
9 remember. They might.
10       MS. MARANZANO: Will you mark this?
11       (Exhibit 22 marked for identification.)
12    A. Without looking at something to refresh my
13 memory, I don't know if they do or not.
14    Q. (By Ms. Maranzano) Okay. I'm showing you what
15 we've marked as Deposition Exhibit 22. Do you recognize
16 this or the contents within it?
17    A. You know, I remember the issue of -- now that
18 I've seen this --
19    Q. Uh-huh.
20    A. -- that there was something they could do with
21 warrants. I don't remember what it was. But on the
22 mobile units, whatever it was, it was not done.
23    Q. It was not done? So in September of 2013, is
24 it fair to say that DPS was considering running warrant
25 checks on --

186

1    A. I don't know what they were considering doing.
2    Q. Okay. Well, it looks like --
3    A. Because --
4    Q. Yeah.
5    A. They say they have the ability to run them. It
6 doesn't say they were going to do it.
7    Q. Okay. So was there any discussion in response
8 to this e-mail about whether or not it made sense for
9 them to do warrant checks?
10    A. I think there was a clarification on our office
11 as far as are you going to do this or are you not, and
12 they more or less said they were not going to do it.
13    Q. Okay. And was that the extent of the
14 communication that you had with them about --
15    A. As far as I remember.
16    Q. And do you know if they did warrant checks on
17 EIC applicants in any other context?
18    A. I don't know, ma'am.
19    Q. Do you think applicants might be deterred from
20 applying for an EIC at an agency that they associate
21 with law enforcement?
22       MR. SCOTT: Objection, form,
23 specialization.
24    A. I don't know.
25    Q. (By Ms. Maranzano) You don't know?

187

1    A. No.
2    Q. How would you describe the relationship between
3 the office of the Secretary of State and DPS related to
4 the EIC program?
5    A. Great.
6    Q. Do you think each agency is similarly motivated
7 with respect to the EIC program?
8    A. I can't speak to the motivation of other
9 agencies. I can only speak to the motivation of the
10 Secretary of State's Office.
11    Q. At any time since DPS has begun issuing EICs,
12 have you had any concerns about tasking DPS with
13 additional work?
14    A. What do you mean by tasking them with
15 additional work?
16    Q. Have you had any concerns about the workload
17 that DPS has in terms of the EIC program?
18    A. I haven't had any concerns.
19    Q. Have you considered whether DPS has sufficient
20 resources to effectively implement the EIC program?
21    A. The EIC program?
22    Q. Uh-huh.
23    A. I'm not understanding why I would.
24    Q. Have you heard from anybody at DPS that they
25 don't think they have sufficient resources to

188

1 effectively implement the EIC program?
2    A. I haven't heard from them on the EIC program.
3 I mean, they -- we were able -- when we started talking
4 about mobile EICs, we were able to provide them some
5 assistance because they hadn't budgeted for that
6 particular effort, but what they're doing with the EICs,
7 separate from these mobile units, is their business and
8 their function and their budget. Don't have anything to
9 do with it. So the idea that we came up with jointly,
10 we didn't just say we have this idea of mobile EICs, you
11 all go do it. We said we have this idea of mobile EICs,
12 we will help you get it done.
13    Q. Were there any other ideas that you came up
14 with that you suggested to DPS --
15    A. No.
16    Q. -- about the EIC program?
17    A. At this point, just trying to get this one to
18 work.
19       MS. MARANZANO: Can we go off the record
20 for about two minutes? I think I'm just about finished.
21       (Recess from 1:58 to 1:59 p.m.)
22    Q. (By Ms. Maranzano) Are you aware of any
23 allegations of noncitizen voting?
24    A. No more than what you hear on the news
25 accounts.

COBY SHORTER, III                                                8/12/2014
CONFIDENTIAL TRANSCRIPT

48 (Pages 189 to 192)

---

**189**

1    Q.  You don't have any personal knowledge of any
2    allegations as you sit here today?
3        **A.  Not that I -- not that I can remember.**
4    Q.  Okay.  Would you -- is it fair to say that
5    Ms. McGeehan was a knowledgeable employee?
6        **A.  It's a fair statement.**
7    Q.  Trustworthy employee?
8        **A.  I would think so.**
9    Q.  And she reported directly to you, correct?
10       **A.  While she was -- while she was -- while -- for**
11   **the time that she was there while I was there, yes.**
12   Q.  Okay.  While she was the Director of
13   Elections --
14       **A.  Right.**
15   Q.  -- and while you were the Deputy --
16       **A.  Right.**
17   Q.  -- Secretary of State?
18       **A.  Right.  Now, what was that question you asked**
19   **again about noncitizens?**
20   Q.  If you were aware of any allegations of
21   noncitizen voting.
22       **A.  You hear these things all the time, and you**
23   **don't know.  I can't qualify where those statements came**
24   **from.**
25   Q.  Okay.  When you hear people talking about

---

**190**

1    illegal immigrants in Texas, what population do you
2    usually take them to be referring to?
3        **A.  I don't take them to -- any -- I mean, someone**
4    **who is not here legally can be from anywhere.**
5    Q.  Do you -- where is the largest immigrant
6    population in Texas, do you know?
7        **A.  Without somebody specifically telling me where**
8    **they're from.**
9    Q.  You don't know?
10       **A.  I wouldn't speculate on this because I may be**
11   **totally wrong.**
12   Q.  Okay.
13          MS. MARANZANO:  I don't have any further
14   questions.  Thank you for your time.
15          THE WITNESS:  Well, thank you.
16          MR. SCOTT:  We reserve ours.
17
18
19
20
21
22
23
24
25

---

**191**

1    CHANGES AND SIGNATURE
2        RE: VEASEY, ET AL. VS. PERRY, ET AL.
3    PAGE  LINE  CHANGE          REASON
4    _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   _____
13   _____
14   _____
15   _____
16   _____
17   _____
18   _____
19   _____
20       I, COBY SHORTER, III, have read the foregoing
21   deposition and hereby affix my signature that same is
22   true and correct, except as noted above.
23
24       _____
25          COBY SHORTER, III

---

**192**

1        IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
2            CORPUS CHRISTI DIVISION
3    MARC VEASEY, et al.,        )
4        Plaintiff,              )
                                 )
5    VS.                         ) CIVIL ACTION NUMBER:
                                 ) 2:13-CV-193 (NGR)
6    RICK PERRY, et al.,         )
7        Defendants.             )
     _____)
                                 )
8    UNITED STATES OF AMERICA,   )
9        Plaintiff,              )
                                 )
10   VS.                         ) CIVIL ACTION NUMBER:
                                 ) 2:13-CV-263 (NGR)
11   TEXAS LEAGUE OF YOUNG VOTERS )
12   EDUCATION FUND, et al.,     )
13   Plaintiff-Intervenors,      )
                                 )
14   TEXAS ASSOCIATION OF HISPANIC )
     COUNTY JUDGES AND COUNTY    )
15   COMMISSIONERS, et al.,      )
16   Plaintiff-Intervenors,      )
                                 )
17   VS.                         )
                                 )
18   STATE OF TEXAS, et al.,     )
                                 )
19   Defendants.                 )
     _____)
                                 )
20   TEXAS STATE CONFERENCE OF    )
21   NAACP BRANCHES, et al.,     )
22   Plaintiffs,                 )
                                 ) CIVIL ACTION NUMBER:
23   VS.                         ) 2:13-CV-291(NGR)
                                 )
24   NANDITA BERRY, et al.,      )
25   Defendants.                 )

---

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

COBY SHORTER, III                                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

49 (Pages 193 to 194)

193

1  BELINDA ORTIZ, et al.,        )
                                 )
2        Plaintiffs,      )
                                 )
3  VS.                  ) CIVIL ACTION NUMBER:
                        ) 2:13-CV-348(NGR)
4  STATE OF TEXAS, et al.,     )
                               )
5        Defendants.       )
   _____)
6
7            REPORTER'S CERTIFICATION
          DEPOSITION OF COBY SHORTER, III
8              AUGUST 12, 2014
9      I, Chris Carpenter, Certified Shorthand Reporter in
10  and for the State of Texas, hereby certify to the
11  following:
12      That the witness, COBY SHORTER, III, was duly sworn
13  by the officer and that the transcript of the oral
14  deposition is a true record of the testimony given by
15  the witness;
16      That the deposition transcript was submitted on the
17  _____day of _____, 2014, to the witness or to the
18  attorney for the witness for examination, signature and
19  return to _____,
20  by _____. 2014, and if returned,
21  the original transcript will forwarded to Jennifer
22  Maranzano, the custodial attorney;
23      That the amount of time used by each party at the
24  deposition is as follows:
25      Mr. Maranzano:  4 hours, 23 minutes

194

1      I further certify that I am neither counsel for,
2  related to, nor employed by any of the parties or
3  attorneys in the action in which this proceeding was
4  taken, and further that I am not financially or
5  otherwise interested in the outcome of the action.
6      Certified to by me this 12th of August, 2014.
7
8
9
                          Chris Carpenter, Texas CSR 1151
10                        Expiration Date: 12/31/2014
                          701 Brazos, Suite 380
11                        Austin, TX 78701
                          (512)292-4249
12
13   Firm Registration No. 344
14
15
16
17
18
19
20
21
22
23
24
25

COBY SHORTER, III                              8/12/2014
CONFIDENTIAL TRANSCRIPT

1

**A**

**A&M** 10:20
**a.m** 2:17 88:5
**ability** 62:18 81:3
  87:4 108:18 109:4
  186:5
**able** 16:24 17:1,2,6
  31:14,16 39:17
  42:25 44:2 65:8
  81:10 86:12 108:13
  109:24,25 114:11
  117:11,15 124:17
  124:18,19 125:17
  136:19 146:14
  150:5 160:8 162:11
  166:13 171:1 172:2
  188:3,4
**above-styled** 2:16
**absence** 24:4
**absentee** 105:18
**absolutely** 47:3 57:6
  57:9,13 108:3
**accepted** 42:13 49:2
  125:7,13 156:17
**access** 12:13 139:5
**accident** 160:15
**accommodating**
  125:7
**accompany** 63:6,15
**accomplish** 91:8
**account** 104:5
**accounts** 149:4
  188:25
**accuracy** 85:15 88:10
  89:2,21
**accurate** 43:11 62:7
  68:7 91:5 94:17
  97:12,22,24 99:10
  107:23 111:8
**accurately** 6:17
  92:25
**action** 1:5,10,22 2:3
  20:24 192:5,10,22

193:3 194:3,5
**actions** 151:23
  152:14
**active** 11:2
**activities** 13:10,12,13
  13:19 17:17
**activity** 155:23,23,24
**actual** 15:2 16:24
  17:2 27:19 74:21
  75:24 126:1 129:2
  139:10 156:8
**addition** 141:12
**additional** 114:13
  134:13 140:6,11
  141:7,7,9,10 145:16
  149:17 187:13,15
**address** 140:19
  178:12
**addressed** 14:18
  54:22 159:11
  177:19 178:4,19
**adjusted** 158:14
**adjustments** 160:3
**administer** 12:18
  19:3
**administering** 9:4,13
**administration** 8:7
  9:1 18:1 53:8
**administrative** 56:10
  57:5
**administrator**
  152:18
**administrators**
  114:11 119:21
  132:10 133:13
**advance** 124:2,12
**advice** 169:20
**advocacy** 178:13
**advocates** 177:18
  178:2
**affairs** 21:15 55:8
  58:15,18,21 62:14
  77:13 83:14
**affect** 181:15

**affidavit** 105:2,9
**affidavits** 104:19,23
**affix** 191:21
**African** 39:23 180:8
  180:16
**ag** 11:6
**agencies** 104:10
  112:6 113:17 146:1
  146:2 166:16 187:9
**agency** 11:23 12:21
  13:12 19:6 25:1
  28:14,16 42:24 52:6
  53:4 87:9 117:19
  118:15,16 128:11
  128:12,15 146:5
  159:19 166:1
  183:10 184:8,9,10
  186:20 187:6
**agent** 185:1
**ago** 11:7 17:12 33:23
  75:10
**agree** 57:4 180:8,21
  180:22,22
**agreed** 147:19
**agreeing** 57:7
**agreement** 56:3
  118:17,25
**agreements** 132:20
**agriculture** 8:3,5,6
  10:13
**ahead** 25:7 51:8 80:1
  108:15 115:16
  148:21
**al** 1:3,6,12,15,18,21
  1:24 2:1,4 191:2,2
  192:3,6,12,15,18,21
  192:24 193:1,4
**alert** 56:12
**alerts** 57:18
**all-inclusive** 142:10
**allegation** 47:22
**allegations** 47:13
  48:1,7 112:8 188:23
  189:2,20

**allow** 53:5 91:13
  117:21 150:13
  160:2
**allowable** 53:6
**allowed** 52:3 53:2
  56:11
**allowing** 158:23
**ambiguous** 45:8,15
**amendment** 104:15
  104:17,22 105:1
  106:14 107:9,15
  108:8 165:20 181:3
**amendments** 102:11
  103:12,16,20,24
  104:3 107:3,6
  108:12
**AMERICA** 1:8 3:2
  192:8
**American** 39:23
  180:8,16
**amount** 122:14
  124:20 126:2
  193:23
**analyses** 30:6 31:2
**analysis** 25:4,10 28:7
  29:15 30:5,24 31:3
  31:12 37:6 38:7
  59:13 62:6,10 64:3
  64:8,11,14 83:18
  85:15 95:3,5,13
  97:13 98:1 99:24
  101:14,16 102:1,5
  111:17 141:24
  142:6,7,10,13
  159:23 162:7 172:6
  175:6,8,11,11,22,25
  178:22,25 179:7,22
  180:25
**analyze** 94:14,20
  162:2
**analyzed** 76:10
**Ann** 76:8,9,18 77:11
  78:8,17,22 86:3,5
**announced** 122:24

COBY SHORTER, III                          8/12/2014
CONFIDENTIAL TRANSCRIPT

2

announcements
123:7
announcing 123:1
answer 21:6,7,20
24:25 31:16 33:1,7
37:24 43:5,6 44:13
45:15 53:10 61:14
65:8 78:24 79:10,14
79:15,25 80:9,10
81:11,18 82:6,11
84:17,18 85:7 87:9
87:15 92:2 97:23
98:5 101:21 103:25
104:1 123:19
137:14 142:23
172:2 181:17
answered 26:17
46:24 65:5,18 85:3
answering 41:25
answers 65:9 67:7
76:1 80:22
anticipate 67:22
anticipated 138:25
anticipating 108:4
anticipation 68:2
anybody 6:20,24
22:18 56:7 57:25
79:16 81:14,21,23
82:1,3,8 83:2,18
90:14 100:25,25
101:9 125:10,13
151:10 187:24
apart 6:22 87:21
142:19 183:12,23
apologize 153:10
appear 78:25 106:4
Appearances 4:2
appeared 17:20
25:24 89:25 94:23
appears 32:10 43:14
59:11,14 71:4 106:6
131:10 137:3 157:1
157:6,19 158:2
apples 77:21 80:21

85:11 87:11,14 92:6
applicants 151:12,13
170:3 175:20,23
176:2 185:4 186:17
186:19
application 64:21
65:16,24 66:10,19
67:2 69:24 89:11
applications 64:6
66:1,5
applied 16:18,22
applies 104:23
apply 12:22 16:14,22
113:12
applying 186:20
appointed 8:13,14,15
8:16
appointing 8:24
15:15,17 16:6
appointment 8:18
Appointments 8:9
apprehension 89:13
89:14
apprised 14:8 109:8
109:12 153:1
approach 86:24
162:23
appropriate 12:4
48:12 112:6 124:20
151:15 183:9
appropriately 124:24
appropriations 134:7
134:8
approval 83:17 84:1
84:8
approved 106:19
167:17
approximately 27:8
approximation 104:6
April 4:22,23
area 16:19 38:1
86:21 126:1 154:7
154:14 156:17
184:25

areas 119:16 120:22
120:23 136:6 146:9
146:10,11
argumentative 24:24
25:7 101:19
arriving 151:13
art 10:21
asked 8:22 16:21,22
24:12 38:2 43:2
44:12,14 45:11,12
52:22 59:23 67:24
74:5 79:17 81:2,7
85:3 93:11 97:7
99:2 125:10 155:25
166:19 183:4 185:2
189:18
asking 16:15 23:11
23:15 33:11,12,23
34:15 39:4,6,22
40:8 49:6,7 51:21
59:1 61:14 64:17
65:2 69:22 71:9
83:24 113:4,4
128:12 161:8,10,10
171:9 180:16
asks 45:1 62:3 71:4,6
74:7
assess 150:8 173:3,14
assessing 173:16
assessment 94:17
173:20
Assessor/Collector
129:9
assist 114:5
assistance 134:9
143:1 146:5,14,15
188:5
Assistant 3:9
assisted 37:15 114:7
127:17
assisting 16:10
142:24 146:23
associate 186:20
associated 125:21

126:11
ASSOCIATION
1:14 192:14
assume 177:2
assumes 24:24,24
25:6 81:17 148:20
149:22
atlas 136:19
attached 2:22 76:19
88:24
attachment 4:25
135:10
Attachments 4:18
attempt 75:19,22
100:4
attempting 72:18
attempts 74:25 75:25
99:25
attention 71:23
attorney 2:20 3:9,9
17:14 193:18,22
attorneys 194:3
August 2:10,17 193:8
194:6
Austin 2:20 3:10 9:22
10:2 194:11
authorities 48:12
authority 53:1
114:23 115:11
172:14
authorization 97:2
authorized 106:20
availability 59:13
available 24:3 25:4
25:10 26:24,25
32:24 37:6 110:23
111:6,10,12 113:11
116:17 117:23
144:22,23 147:19
163:3 173:17
Avenue 3:5
avoid 140:6
aware 13:13,16,18
15:4 26:7 27:20

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

3

30:18 38:13 47:25
48:8 49:1 52:24
54:12,14,19 55:12
60:1,3,15,19,24
70:15 72:22,24,25
73:3,19 74:23,25
75:1 79:3,17 100:21
100:22 103:15,18
106:13,17,22,25
107:4,7 110:4,8
111:20 112:7,15,21
119:6 123:23 124:6
143:3,13 144:19,21
145:3 148:9 158:4
158:19 160:5
161:13 169:21
170:6,7 171:16
173:19,22 176:17
177:14 179:9,14,17
179:18 188:22
189:20
**awareness** 27:15 95:8
95:10
**awful** 52:5

**B**

**B** 41:10,15,20,23
42:9
**bachelor's** 10:19
**back** 8:4 23:24 38:8
38:20 40:4 43:25
44:16,17 49:10
51:12 71:3 82:22,22
118:18 127:25
142:13 152:19
153:14 159:20
161:2,6,15 169:2
172:18 175:14,16
**background** 8:25
10:18 11:8 17:16,25
**balance** 89:20,24
**ballot** 26:1,4 105:13
179:10
**ballots** 104:20 105:18

**based** 15:25 17:14
37:9 38:24 59:11
70:23 79:25 95:11
101:15,19 102:4
105:13 116:7 135:6
139:12 146:16
151:18 156:4,15
157:20 158:5
162:17,20,21,21
163:1,2 173:16
175:11 176:11
180:22
**basis** 36:16,17,23
52:16 54:4 113:25
125:20 154:1,3,11
**Bass** 145:21,23
**Bates** 69:19
**begun** 187:11
**behalf** 42:24
**believe** 17:10 24:13
25:3,9 32:19 43:16
44:23 50:10 55:6
62:6 74:22 77:3
82:19 92:5 95:5
99:10 108:20
110:16,22 111:6
117:9,13 118:7
145:13 147:12
149:20 168:10
179:18 183:9
**believed** 84:8
**BELINDA** 2:1 193:1
**BERRY** 1:24 192:24
**best** 25:2,4,10 31:13
37:6 54:20 62:18
65:18 81:3 83:6
86:24 87:3 100:16
108:18 109:4
110:22 111:6,9
130:11 152:21
178:7
**better** 131:19 162:3
169:6
**Beuck** 102:23 103:1

103:10 106:5
**big** 159:25
**biggest** 159:25 174:9
174:9
**bill** 19:15 20:3,3,18
20:20,22 21:3 24:14
24:15,22 31:20 32:5
32:9,12,14 33:11,14
33:19 38:12,15
46:14,16,23 47:5,8
47:11,11,12 48:5
49:13,14,15,21 51:4
51:7,7,25 55:15
62:21 73:14 74:15
74:21 90:24 103:24
104:4 106:23
108:17 109:5 113:2
113:12,15 116:7
161:9 178:11 182:9
182:12
**bills** 21:11,14 22:2
23:21 37:16,19 54:5
55:1,8
**birth** 42:9 152:13
**bit** 67:9 120:9 163:1
**body** 138:17
**bottom** 34:9 70:8
71:24 73:4,15 80:4
138:3,5 145:19
**Box** 3:10
**BRANCHES** 1:21
192:21
**Brazos** 194:10
**break** 57:17 88:6
150:15
**breakdown** 176:1
**breaks** 71:7 172:21
**briefed** 84:21 153:6
**briefly** 10:17
**bring** 44:17 78:9
**broad** 26:10 117:20
**broader** 45:4
**brought** 109:9
**Bruce** 129:8

**budget** 188:8
**budgeted** 188:5
**building** 68:16
**bump-ups** 120:13
**bumped** 120:14
**bunch** 34:8
**burden** 57:16,17
**bureau** 28:13
**Bush** 8:7
**business** 126:9
131:25 143:11
188:7
**busy** 128:12
**buy** 138:22

**C**

**C** 3:1
**call** 26:15,16,17
92:16 104:9,10
121:11 124:3
**called** 121:12
**calls** 27:8,9 68:12
79:25 82:15 84:10
144:5
**campaign** 9:23 116:2
116:3 175:13
177:17,20,22,24
**campaigns** 9:16 10:6
10:11
**candidates** 17:7
181:14
**capable** 62:4
**capacity** 10:8
**Capitol** 68:16,20
**card** 25:19,24 68:1
68:11 94:21 168:6
**cards** 94:11 155:25
**Carpenter** 2:18
193:9 194:9
**case** 7:2 44:16,18
52:25 60:21 62:23
67:10
**cases** 29:1
**cast** 26:1 179:10

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

4

casting 117:20
categories 48:25
categorized 153:16
cause 2:16 166:16
cc'd 95:22 144:7
 154:4
census 28:13
centers 119:5
certain 113:16
certainly 28:2 167:13
certificate 4:6 40:9
 41:18,24 42:2,8,12
 43:7 48:15 49:1,4
 51:2,3,10,21 52:2
 52:23 53:6 117:23
 152:13
certificates 42:10,10
 48:15 50:23,23
CERTIFICATION
 193:7
certified 127:9 193:9
 194:6
certify 193:10 194:1
chain 4:17 5:4 154:22
chaired 58:20
challenge 128:14,14
 139:15
chance 107:19
chances 84:17
change 19:4,5,5,8
 160:6 164:4,10
 166:3 191:3
changed 158:13,13
 169:21 170:21
changes 4:5 113:20
 158:4,15,16,17,22
 159:1,13,25 161:16
 164:18,21 169:25
 173:20 174:5,8
 191:1
characterization
 139:9
characterizing 36:17
charge 11:12

checks 185:3,25
 186:9,16
chief 11:10 55:4,5
choices 147:24
choose 150:13
chose 147:21
Chris 2:18 193:9
 194:9
CHRISTI 1:2 192:2
Christian 10:21
circumstances 23:23
 23:24 26:3 45:3
 176:24 177:5,7,10
citizen 148:10,18,22
citizenship 40:9,10
 41:18,21 42:2,2,6,8
 48:14 49:5,10 50:22
 51:2
Civil 1:5,10,22 2:3,21
 3:4 192:5,10,22
 193:3
claiming 104:23
clarification 186:10
clarify 13:6 161:18
clear 57:11 65:12
 87:19 171:25
clearly 36:19
close 13:17,21 52:5
closely 12:8,10 21:10
clue 53:11 62:25
 73:22 104:13 147:6
Coby 2:9,14 4:3 6:1
 6:12 76:20 77:3
 191:20,25 193:7,12
code 18:25 47:9
 120:17 175:1
codes 119:19 174:21
collaboratively 114:8
collect 59:2 121:25
column 172:24
combination 135:7
 135:25
come 27:18 33:7,24
 65:17 68:3 80:22

81:11 109:8,13
 114:25 136:24
 137:23,23,25 139:7
 142:13 148:4 152:4
 153:15 154:19
 159:20 160:1
 174:10
comes 15:10 20:7
 66:7
comfortable 43:10
 77:22 96:1 139:5
 140:18,25 158:11
 162:18,22
coming 10:1,2 87:25
 124:9,24 142:11
 152:19 161:19
 170:23
comment 39:21
 71:21 73:5 106:12
commission 29:5,9
commissioner 10:13
COMMISSIONERS
 1:15 192:15
commissions 30:11
committee 4:10,16
 4:20 21:9,16,21
 22:1 23:25 33:3
 34:7 55:7,13 58:14
 58:18,21 59:19
 62:14,17,20 63:5,23
 67:23 69:11 93:15
 96:5,11,14,15 98:24
 100:3,10 103:4,6
 106:8,23
committee's 63:12
committees 55:7
common 63:15,18
 104:8
communication
 186:14
communications
 45:22 89:1 154:18
communities 180:9
 180:17

community 122:6,9
compared 28:18
 87:17
comparing 80:21
 85:10,11 87:14
comparisons 65:22
compilation 37:15
compile 37:18
compiled 28:12
 156:11
complaints 148:11,18
 148:22
complete 150:6
 159:23 160:7
completed 97:19,20
 97:21 101:14 102:1
completely 6:17 62:7
computer 10:25 11:3
 11:8
computers 11:21
 113:23
concept 28:6 160:8
concepts 17:18
concern 34:20 90:5
 129:16,21 130:7
 138:12 145:6,8
concerned 91:20
 152:8
concerns 84:24 88:9
 88:14 89:1,2,14,15
 89:16,16,18,20
 90:17,21 100:9
 106:13,14,18,21
 109:7,7,9,13,14
 129:10 130:24
 131:5,12,16 134:16
 138:18 139:16
 140:20 141:17
 148:24 187:12,16
 187:18
conclusion 79:20
 80:4,6
conclusions 82:3,4
conclusive 82:6,10

83:4 84:18 87:14,15
87:15 92:2 100:1
120:16
**conclusively** 67:7
97:19
**conduct** 22:5 67:3
80:24
**conducted** 23:6 29:15
99:24 100:4 111:18
175:23
**conducting** 13:9
**confer** 19:15 20:17
**conference** 1:20
103:4,5 106:8,22
123:1 192:20
**conferral** 20:2
**conferrals** 20:6
**conferring** 19:24
20:19
**confidence** 20:8,14
54:13 56:18 67:8
77:23 78:11,14 79:1
80:14 84:19 88:19
97:21
**confident** 79:16
**confidential** 2:12
55:21,23 56:9,14
57:2,8,12,19,22
93:22 102:17
105:25
**conflict** 47:9
**conflicts** 21:3
**conjunction** 124:11
**consensus** 89:25 90:1
90:7
**conservation** 8:6
**consider** 30:22 31:2
54:5 116:24 117:4
124:12 136:17
140:4 141:5 149:5,8
163:22 169:8,15
182:14
**consideration** 90:24
131:15

**considerations** 176:7
**considered** 53:18
131:19 140:13
162:13 169:5,13
176:1 187:19
**considering** 49:4
179:1 185:24 186:1
**consistent** 160:16
**consistently** 77:20
80:20 81:9,10 97:5
174:7
**constituent** 178:12
**constituents** 14:13,21
148:24
**constitutional** 160:10
161:25 165:20
181:3
**constructive** 169:20
**consult** 93:2
**consultants** 93:10
**consulted** 47:7
**contact** 14:25 15:1,2
15:5 27:25 28:3
92:13 133:3
**contain** 65:25 121:13
**contained** 61:18
84:22 157:22 158:5
176:10 178:6
**content** 32:6 56:7
75:16 81:25 151:2,3
153:13 156:23
**contents** 165:1
185:16
**context** 186:17
**continue** 8:22 57:11
81:2 91:13,15
119:11 139:14
160:2,3 162:10,23
**continued** 91:18
**continuing** 83:5
**contract** 132:16
**convenience** 57:5
**conversation** 68:25
81:9 84:14 92:17,22

106:22 170:15
173:10
**conversations** 20:1
20:25 47:2,4 53:13
53:17,20 82:25
90:25 101:5 151:7
173:12
**cooperation** 132:16
**copy** 32:7 129:5
135:10
**CORPUS** 1:2 192:2
**correct** 11:10,11
13:23,24 15:14 38:5
40:2 41:18 43:13,17
44:5 47:23 55:4,10
58:18,21 59:13,14
62:11 64:6 66:11,14
66:21 67:12 70:7,11
71:2 73:25 79:18
83:20 88:11 92:20
99:17,24 103:22
104:20 121:4 130:8
131:1,3 132:24
133:7 141:4,13
144:8 147:15
160:24 183:14,25
189:9 191:22
**corrected** 109:19
**correctly** 27:6 116:23
138:21
**correlate** 182:11
**correlation** 182:13
**cost** 138:23
**Council** 37:15,17
38:6
**counsel** 3:13 19:23
77:7 82:21,23,24
83:23 85:25 95:20
95:21 154:18 157:2
157:17 194:1
**count** 174:16
**counted** 14:17 26:4
105:13,18 174:17
174:18

**counties** 12:22 15:7
27:11,15,17,17,19
113:18 114:9,12
120:1,2 121:1
123:12 124:8,10,15
124:17,18,19 126:6
126:19,20 127:18
131:23 132:15,23
132:24 133:3,11,13
134:1,16 135:5,14
136:14,17,20,23
138:7,16,19 139:2,6
139:12,18,21
140:14,16,25 141:3
141:5,14,25 142:14
142:15,16,20 143:4
144:2,3,17,22,24
145:1 146:2,17,18
146:19 173:24
174:15,21 179:7
**counting** 179:10
**county** 1:14,14 27:25
60:18 114:10 116:6
119:20 120:16
122:10,11,12,16,19
122:20 124:13,22
124:25 125:1,5,12
126:23 127:3,7,10
127:14,21 129:9
130:13 131:18
132:4,20 133:9,10
133:12 135:10
136:24 139:16
140:14,17 142:21
142:25 143:1
144:22 152:18
172:23 175:1 179:9
192:14,14
**county's** 140:19
**couple** 125:22,24
126:14
**course** 10:25 11:2,3,8
**coursework** 10:23
**court** 1:1 55:25

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

6

107:22 108:25
  150:16 192:1
**cover** 145:1 175:12
**covered** 144:22,24
**create** 47:9
**creature** 152:24
**cross-reference** 72:3
  72:18
**cross-references** 73:1
**CSR** 2:18 194:9
**current** 182:20
**currently** 117:2
  123:22
**custodial** 193:22
**cycle** 14:16 113:22
  117:21 150:6 160:1
  174:10 177:25

**D**

**D.C** 3:5
**daily** 113:24 153:23
  153:24,25 154:3,10
**damage** 90:18
**Dashboard** 5:7
**data** 28:10,12 29:22
  29:24 31:8 36:21,22
  37:16,18 39:22 65:4
  65:5,6,10,20,22
  74:6 79:2 87:5
  94:14,20 97:3,17
  143:2 153:4 162:2
  165:3,6 168:7
  173:22 183:16,22
  183:24
**database** 64:15,22
  65:24 74:24,24 78:8
  78:13 85:14 87:17
  87:21,21 99:16
  121:9
**databases** 67:6 76:3
  85:11
**date** 32:17 66:15
  67:14 99:21 153:6
  159:3 167:9,12

168:24 169:3
  194:10
**dated** 43:12
**dates** 44:6 125:6
  167:13
**Davis** 69:22 70:10,16
  70:19
**Davis's** 71:11
**day** 27:24 28:3 33:4
  43:16 44:4,5 59:19
  68:5,20 105:2
  146:13 152:4,19
  165:19 193:17
**day-to-day** 90:3
  125:19 133:18
**days** 27:4,13,16,19
  54:6,22 125:23,24
  128:13 146:13
**de** 34:15 35:25 39:3,6
  39:9,16,21 45:20
  49:17,19
**deal** 19:19 20:15
  30:20,23 57:21
  83:15 138:24
**dealing** 57:15 77:12
  86:22 91:21,23,24
  119:25 137:4,5
**deals** 56:9
**debate** 58:23 63:12
  91:3
**decide** 119:21 128:4
**decides** 8:21 15:11
  115:10 181:16
**deciding** 149:11
**decision** 16:12,25
  49:12 52:2,16,18
  53:5,7 54:15 63:2,3
  63:4 126:25 147:13
**deck** 133:25 145:10
**decline** 54:12
**declined** 135:6,16,17
**declining** 135:15,24
  136:23,24
**decrease** 144:3

**deem** 22:19
**deemed** 172:10
**deems** 172:9
**Defendants** 1:7,19,25
  2:5 3:7 192:7,19,25
  193:5
**defer** 22:10 26:5 30:7
  42:21 85:20,22
  111:22
**definitive** 81:11
**deliberation** 23:17
**deliberations** 23:17
**deliberative** 52:5
**demographics** 31:11
  38:11,14,24 39:5
  70:20 175:20
  179:25 180:5
**department** 3:3 8:2
  30:15,23 37:12
  38:15 47:15 92:4
  94:14,20 97:12 99:8
  110:10,15,21
  117:19 118:3
  120:10 145:25
**depend** 64:23
**depends** 65:1,19
  106:21 144:11
**deploy** 125:25
**depo** 56:8,16
**deposed** 6:24 7:1
**deposition** 2:8,14
  6:20 7:2,5 32:2 34:4
  50:7,17 56:6,13
  58:7 69:8 75:5
  102:15 105:23
  118:11 128:24
  137:11 143:18
  150:21 156:21
  164:24 185:15
  191:21 193:7,14,16
  193:24
**depositions** 56:4
**deputy** 3:9 7:20 8:7,8
  8:10,21,24 189:15

**derived** 64:9
**describe** 10:17
  159:16 187:2
**DESCRIPTION** 4:8
**designate** 53:23
  55:22
**designated** 54:2
  118:2 154:20
**desire** 33:3
**desk** 61:8 137:24
**detail** 30:20 47:19
  61:23
**details** 47:23 183:6
**determination** 22:25
  23:1 50:22
**determinations**
  150:5 157:19
**determine** 22:21,23
  31:13 37:6 66:21
  81:4 99:4 108:10,21
  108:24 109:3
  119:25 120:2 124:5
  126:6 162:3 171:1,4
  171:11,13 182:16
  183:11
**determined** 50:20
  65:10 105:17
  127:13 146:10
**determining** 25:17
  28:19 37:3 114:12
**deterred** 186:19
**develop** 114:9
**developed** 148:5
**development** 8:3
  18:12 32:11 46:15
  46:17,20,23 114:5
**difference** 40:9 42:1
**different** 15:8 34:9
  48:4,23 76:1 78:3
  78:10,24 80:22 93:9
  93:11 97:23 111:5
  113:16 119:14
  126:17,18 141:6
  147:11 152:4 156:2

COBY SHORTER, III                        8/12/2014
CONFIDENTIAL TRANSCRIPT

7

164:8 174:21,21 175:6,19 178:10 181:9,15,23,24 182:6,23
**differently** 166:16
**difficult** 90:23 139:15
**difficulty** 135:6
**direct** 19:9 46:17,17 81:2
**directed** 149:2 178:9
**direction** 73:19 74:7
**directives** 81:1
**directly** 12:16,19 13:1,8 19:19 29:13 55:13 77:12 83:15 83:21 86:1 93:17 154:6,7 189:9
**director** 8:5,8,8 11:18,25 12:4,6,15 12:18,20,24 13:7,11 14:6 16:6 17:10,24 19:20 22:10 24:7 30:7,14 47:18 59:6 59:9 63:22 78:22 145:24 189:12
**directors** 12:13
**disabilities** 177:18 178:3
**disability** 176:18,21 177:4,14,15 178:6
**disclaimer** 85:15
**discontinue** 148:1
**discretion** 119:8,10 148:1 160:24
**discuss** 30:13 81:25 82:3 91:9 92:10 146:5
**discussed** 6:19,23 36:18 77:16,17 79:3 82:4 86:16 92:8 93:6 97:7 104:15 107:4 166:4
**discusses** 42:9 47:18
**discussing** 86:17

**discussion** 42:6 75:14 106:8 124:4 173:15 186:7
**discussions** 7:4 27:11 176:9
**disparate** 108:11
**disseminated** 62:10 62:13
**distribute** 76:22 81:13,20 82:8 83:1 83:17 84:9 87:2
**distributed** 77:8,9 90:9
**DISTRICT** 1:1,1 192:1,1
**division** 1:2 3:4 11:18 12:13,21 14:7 15:3 15:3,6,10,22,24 16:1,2,3,4,4 19:10 29:17 30:8 47:8,16 52:14 60:16,16,25 64:3 65:13 67:3 76:5,5,6 78:19 83:13 90:12 111:23 133:22,23 134:20 192:2
**divisions** 14:9
**document** 40:19,20 46:7 50:17,18 51:7 51:23 53:13 55:21 56:21 57:19 58:7,25 59:18 60:7 70:22 75:9,11 80:8 84:22 88:23 91:8 93:22,25 102:17 105:25 129:2,13 137:18 143:19,21,22 144:10,13 152:3,12 153:25 156:8,23 157:3 167:22 173:8 173:11 174:12
**documentation** 109:23,25 152:9
**documents** 40:20

52:7 151:14,16
**doing** 8:3 20:9 23:1 30:19 57:4 79:4,6,8 79:8 81:22 84:4,5 85:14 90:2 93:11 110:14 114:18,22 117:3,8,20 125:19 125:20 131:20 140:22 141:13 142:2,6 150:3 151:20 153:22 162:11,11 163:1 165:14 169:3,6 170:8,12,14,15 172:17 178:2 186:1 188:6
**DOJ** 34:20
**DPS** 67:11 68:6 74:24 78:7,13 87:17 87:21 94:22 114:5,7 115:1 116:4,10,13 116:14 118:15 119:4,8,10 120:25 121:1,8 123:20 124:3,3,11 126:5,20 126:22,25 127:2,6,9 127:10,13,17,19 128:9,11 130:19,21 132:3,4,5,9,16,21 133:3,6,9,18 134:4 139:23 141:22 142:2,24 144:2,4,19 144:21,23,25 145:15 147:13,17 147:21,23,24,25 148:10,23,25,25 149:6,10 150:11 153:6 156:6,12,14 157:4,10 158:6,14 158:15,24 160:24 163:13,17,21 164:4 164:7,17 165:8,11 166:9,17 169:3,16 169:19,21 170:2

172:8 173:13,18 176:9,10,15 183:9 183:13,22,22 184:8 185:3,24 187:3,11 187:12,17,19,24 188:14
**DPS's** 116:18,18 145:14 165:9
**DPS-compiled** 156:11
**DPS-operated** 118:5
**draft** 43:1 76:19
**drafted** 37:25
**drive** 13:15
**driven** 89:13
**driver's** 25:21 64:4 64:13,20 65:14 66:1 66:5,10,18,21 67:1 67:1 68:1,9,10 69:23 72:4,18 73:2 79:23 81:5 89:10 94:11,21 97:8,25 99:3,5 111:14 122:1 122:1 172:23 184:13,14,19
**drives** 12:25 13:10
**duly** 2:15 6:2 193:12
**Duncan** 58:20
**Duncan's** 59:23 60:2
**duties** 113:16

---

**E**

**E** 3:1,1
**e-mail** 4:15,17,18,22 4:23,25 5:1,2,3,4,5 5:6,8 59:8,11,15 82:13 94:24 95:2,22 102:19,22,22 104:15 106:5 135:1 135:2,4,17 137:2,20 144:8 145:19 151:7 151:10,13,18,24 152:2,15 153:13 154:22 186:8

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

8

**e-mails** 137:23,23
    152:20,24 154:24
    157:13,15 158:12
**earlier** 32:19 36:18
    55:6 61:10 62:5
    120:8 147:12
    152:23
**early** 43:22 44:8
    174:7 175:25 176:8
**easiest** 49:23 52:10
**easy** 56:5
**economic** 8:3
**economics** 11:6
**educate** 117:21
    138:15 164:14
**educated** 141:18
**educating** 113:18,19
    116:6 163:25 164:1
    172:5
**education** 1:12 11:4
    18:9 73:24 74:2
    106:9,15 113:17
    118:1 122:6,9 141:2
    151:16 157:24
    164:5,9,10,19
    174:22,23 175:4,5,8
    176:6 178:6 192:12
**educational** 10:17
**effect** 108:21,24
    109:3 110:5
**effective** 80:24
    124:13 172:16
**effectively** 14:4
    140:12 141:25
    162:16 172:14
    175:12 178:20
    187:20 188:1
**effort** 37:23 38:10
    74:10 117:20
    119:22 122:25
    124:17 130:14,18
    136:12 140:24
    141:2 144:3 146:23
    147:5 152:25

163:17 164:14
    170:25 171:4,19
    188:6
**efforts** 106:9,15
    116:25 171:9
**EIC** 5:7 114:1,13,16
    114:24 115:10,22
    115:25 116:11,25
    117:11,15,17 119:4
    119:7 126:19
    129:11 131:7,16,23
    134:2,5,13,17
    135:10,11,17 141:6
    141:11,20,25
    145:15 146:5,14,15
    146:23 147:5 149:6
    149:7,14,18,21
    150:1,8 151:17
    152:6 153:1 156:10
    157:5 158:5,20
    159:13 160:23
    161:2,9,11,16
    162:12 163:7,9,23
    168:17 169:6,13,17
    169:22 170:3,20
    171:5,6,20,21
    173:21 174:8
    175:20 176:2,6
    182:14 185:3
    186:17,20 187:4,7
    187:17,20,21 188:1
    188:2,16
**EIC-related** 150:1
**EICs** 116:4,5,14
    117:5 132:17,24
    133:10 136:25
    137:5 142:17,20
    143:5 145:17
    147:20 153:1,17
    155:13,25 157:23
    163:3,15,16 165:12
    167:17 168:15,23
    169:1,10,10 171:2
    171:14,18,22 172:3

172:6,22 174:2,20
    175:1 183:10,12
    185:5 187:11 188:4
    188:6,10,11
**either** 24:6 28:5
    77:11 103:19
    118:16,24 135:6
    157:8 164:18
**election** 8:25 9:1,6
    14:16,18 17:18,20
    17:25 18:1,6,25
    21:4,4 26:11,19
    27:4,9,12,16,18,24
    27:25 28:3 47:9
    55:4,8 59:2 65:8
    104:9 105:3 111:21
    112:5,9,13,16,23
    113:6,19,21 117:22
    124:2 132:10
    134:20 139:24,25
    142:11 150:6 154:5
    157:18,18 159:4,21
    160:1,7,9,9,10,19
    161:19,23,25 162:1
    162:15,16,24
    165:20 174:9,10
    177:24,25,25 178:1
    178:20 181:10,11
    181:22
**election-related**
    14:11 17:17 18:2,12
    18:21,22 19:15
    21:10 22:2 23:17,20
    54:21 183:3,13,25
    184:1,3
**elections** 9:3,4,7,8,9
    9:14 11:10,16,18,24
    11:25 12:3,4,6,15
    12:18,21,21,23,24
    13:7,11 14:4,7,15
    15:3,3,6,10 16:3,4,7
    17:11,25 18:25 19:3
    19:10,21 22:3,6,10
    22:16 24:7 26:5

29:17 30:7,14 42:22
    46:21 47:8,15,16,18
    52:14 59:7,10 60:16
    60:24 63:22 65:13
    76:4,6 78:19 83:13
    85:24 90:11 91:19
    105:15 109:14
    111:23 114:11
    116:6,8 119:5,20
    128:15 132:9,10
    133:12,22,23
    166:21,24,25
    178:16 179:3 181:3
    189:13
**elections-related**
    15:2 20:20
**electoral** 9:13,20
**Elfant** 129:8 130:10
**eligible** 117:11,14
    171:1,5,21
**Ellis** 107:9 108:12
**emergency** 53:24
    54:2,16
**employed** 7:14,16,17
    194:2
**employee** 189:5,7
**employee's** 140:19
**employees** 15:17
    127:6,7,10 140:21
    166:1
**enacted** 182:10
**encourage** 131:23
    132:2
**encouraged** 130:17
**enforce** 25:17,23
**enforcement** 26:8
    184:5,8,9,18,24
    185:1 186:21
**ensure** 14:3 47:8
    115:24 117:10,14
    151:15 177:14
**ensuring** 117:5
**enter** 118:4 119:2
    132:15,15

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

9

entered 119:1
entire 175:7,13
entity 111:3
environmental 8:5
equally 44:23
equipment 126:1
  134:11 138:22
errors 179:9
establish 115:4
et 1:3,6,12,15,18,21
  1:24 2:1,4 191:2,2
  192:3,6,12,15,18,21
  192:24 193:1,4
ethic 108:10
ethnic 31:11
ethnicity 28:23,25
  34:19 37:16,18 59:2
  59:24 61:25
evaluate 157:23
  162:14 164:9,18
  168:9 176:11
evaluating 162:12
evening 43:19
event 122:25
everybody 56:12
  89:25 90:1,7 119:24
  125:3
evidence 81:16,17,17
  85:3 87:15 101:18
  101:18 148:20
  149:23
evolving 158:9
exact 28:14 66:15
  67:14 126:2 136:9
  136:22 146:11
  165:19 168:24
exactly 49:8 61:2
  77:25 78:2 88:23
  121:15 126:10
  173:1 178:16
examination 4:4 6:5
  193:18
example 30:11
excerpt 4:10,12,16,19

34:6 69:10
exchange 70:17 73:9
excited 119:23
  141:15
exclusively 12:12
excuse 114:5 115:14
  120:4
Exec 154:17
executed 104:20,23
executive 15:24
  95:18 155:6
exemption 104:24
  176:18,21 177:4,15
  178:6
exercise 72:25 78:13
  80:18 81:13 84:3,5
  84:7,15 87:22 88:7
  88:11 89:12 90:8
  91:16 99:17 110:25
  111:1 121:8
exercises 67:6 73:1
  77:18,19 78:4,5,7
  78:25 80:11,15
  81:21 88:12 89:13
  91:9,22,25 92:14
  110:18 121:3
exhaustive 113:15
exhibit 31:25 32:2
  34:2,4 35:9,12 46:5
  46:7,8,12 50:7,8,17
  55:18 58:7 69:5,8
  75:3,5 93:20,23
  98:8,11 99:20
  102:13,15 105:20
  105:23 118:8,11
  128:21,24 134:21
  134:23 137:7,12
  143:16,18 150:14
  150:19,21 153:8
  156:19,21 157:13
  157:13 158:7,7
  161:6 164:22,24
  172:18 185:11,15
exhibits 4:7 137:8

expect 63:20 168:4
experience 10:23
  17:14 18:8,10 86:21
  131:6
expert 17:19 86:11
experts 38:1 86:10,12
  86:21
Expiration 194:10
explain 138:19
explaining 42:1
explicitly 51:4
express 90:17 124:22
expressed 16:23
  106:14,18 107:5
  139:16 141:17
expresses 34:19
extensive 33:1
extensively 23:12
extent 142:5 186:13
extra 74:10 134:1,4
extremely 136:10

F
FA 104:17
facilities 146:2,7,8,12
facility 135:7,25
fact 6:23 28:22 66:13
  89:19,21 149:5,8,9
  173:13 177:3
  180:23
factor 120:22 149:11
  149:13 181:20,23
  181:23
factors 181:9,12
facts 24:24,24 25:7
  81:17 112:15,21
  113:5 148:20
  149:22
factual 54:4
Fagan 58:11,25 60:2
fair 29:19 38:12,22
  55:16 70:19 86:18
  86:20 185:24 189:4
  189:6

fall 48:24
familiar 28:6 29:4
  31:18,23 153:14
  165:11 182:18
FAQ 50:18
FAQs 4:14
far 74:12 75:23 90:13
  111:15,15,16
  127:17 133:15
  162:17,20 186:11
  186:15
fast 40:17
Feb 4:18
February 79:10
  94:16,25 95:4,24,24
  99:21,23
federal 2:21 138:17
  162:16
feedback 14:12,12,13
  14:20,24 15:9
  131:18 152:17
feel 43:10 100:14
  140:18 158:11
  162:18,22
feeling 96:1
feels 15:3
felt 17:14 87:3
  119:24,24 124:20
  124:23
field 86:11 128:16
figure 65:3 89:17
  92:25 120:24
  131:21 156:15
figured 93:12
file 99:3
final 16:12 107:1
  126:25
financially 194:4
find 40:16 48:17
  80:23 161:7
findings 159:21
fine 57:3 88:4 150:3
fingerprinting
  170:19

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

10

**fingerprints** 170:3
**finish** 102:3 162:7
   176:4
**finished** 92:16 97:20
   188:20
**firm** 169:3 194:13
**first** 6:2 10:4 20:4
   36:13 40:5 52:9
   54:5,22 76:14 94:5
   102:21 104:16
   131:21 143:24
   167:16 169:2
**five** 43:3 174:13,18
**fixes** 18:24 19:1
**floor** 63:10
**fluke** 160:15
**focus** 71:23
**folks** 76:23 77:10
   184:7
**follow** 35:1 52:12
   61:11 83:12 101:6
**follow-up** 70:16
   151:6
**followed** 83:10
   101:10
**following** 35:4 47:20
   56:3 193:11
**follows** 6:4 193:24
**force** 125:10
**foregoing** 191:20
**forgive** 108:2 174:19
**forgot** 9:21 152:12
**forgotten** 10:2
**form** 21:5,19 22:9
   23:8 24:9,16,23
   25:6 26:10,20 30:17
   31:4 35:22 37:8
   39:1 49:2,11 51:6
   51:23 52:3,4 53:9
   53:10 54:24 62:10
   64:10 66:22 68:12
   68:19 70:21 71:13
   77:5 79:24 80:7
   81:15 82:15 84:10

85:2,16 97:14 98:3
100:5,12 101:17,19
103:17 105:11
108:14 115:15
123:17,25 129:12
132:25 140:7
142:22 144:5,9
148:2,12,19 149:22
154:9 160:25 161:4
168:12,18 177:6
186:22
**formal** 14:23
**format** 157:8,10
**former** 59:6
**forms** 25:21,25 48:23
   48:24 49:9,25 53:1
   53:7 117:24 168:11
**forth** 142:4
**forward** 71:5 109:8,9
   109:13 130:22
   131:16
**forwarded** 112:5
   157:1,2,16 193:21
**found** 23:3 33:2
   81:14 85:14 138:21
**foundation** 53:10
   54:24 64:10 66:22
   79:24 80:7 148:15
   148:20 168:12
**four** 128:13 174:13
   174:18
**fourth** 35:15 172:24
**frame** 125:21
**Fraser** 31:19 47:7
**fraud** 4:20 96:6,12
   98:25 100:11
   111:21 112:12
**frees** 158:24
**frequency** 61:7
**frequent** 61:2 148:10
**frequently** 50:16
   52:22 178:1
**Friday** 94:25
**fulfill** 172:13

**full** 150:6
**full-time** 146:19
**function** 115:18
   117:17,18 123:20
   126:5,21 132:4
   163:10,20,20 172:4
   172:7,8 188:8
**functions** 183:13
**FUND** 1:12 192:12
**funding** 44:19
**further** 55:20 74:7
   190:13 194:1,4
**future** 53:8 119:5
   123:16 176:5

— — — — — — — —
**G**
**G** 50:13,19,25 51:1
**game** 174:8 175:25
   176:8
**gathered** 176:11
**gathering** 34:20
   173:13 176:13
**geared** 13:8
**general** 2:20 3:9,9,13
   77:7 82:20,23,24
   83:23 86:8 89:25
   90:1,7 95:20,21
   151:24,25 157:17
   160:9 162:1,23
   180:17
**generally** 19:25
   125:17 128:1
   156:12 159:18
   163:8
**gentleman** 102:24
**geographical** 128:16
**getting** 15:9 43:25
   52:5 62:4 64:21
   74:12 84:18 100:23
   110:3 113:21
   133:19 157:12
   171:6,6,14,20,21
**give** 25:1 29:18 32:24
   60:10 61:13,14,24

62:16 81:19 113:14
119:14 131:18
136:8,9 153:5
157:17 159:23
181:4
**given** 40:19 87:12
   90:23 95:17,18
   100:23 113:16
   140:11 141:12
   154:5 163:20 181:9
   193:14
**gives** 28:11 64:19
**giving** 77:21 103:24
   129:14
**go** 13:13 20:23 21:14
   25:7 30:20 41:1
   44:16 49:9 51:8,12
   55:20 71:3 80:1
   82:22 99:13 108:15
   115:16 125:12
   127:24 128:2
   148:21 149:13
   154:2 157:15
   161:15 169:2 175:6
   181:16 188:11,19
**goes** 8:3 29:5 52:6
   67:18 68:20 71:24
**going** 11:5 14:8 49:16
   55:22 67:24 71:5,17
   74:11 79:11,15
   84:16 92:6 95:13,16
   96:2 97:1 109:22
   122:11,13 123:8
   126:18 138:23,24
   138:25 139:14,19
   142:3 145:8 153:3
   153:10 159:2
   166:12 179:4
   181:18 186:6,11,12
**Gonzales** 104:17
**good** 6:7,8 17:10,13
   17:13 28:23,24 58:2
   87:5 157:23 166:24
**gotten** 36:10 152:22

COBY SHORTER, III                          8/12/2014
CONFIDENTIAL TRANSCRIPT

11

Government 138:17
governmental 8:8
  9:10
Governor 8:5,9,9
  10:12,14 53:23
  84:21 100:19,21,22
Governor's 45:25
  53:21 92:9,13,17
  114:15,19
graduated 10:20
Gramm 9:23
grasp 17:18
great 30:20 47:19
  53:22 61:23 138:24
  187:5
ground 117:8
group 178:12
groups 15:8 177:14
  177:17 178:10,13
guess 20:16 22:19
  76:9 79:9 89:17
  100:2 119:1 129:14
  156:14 160:22,22
  161:14 162:8
  181:11 184:6,7
guideline 115:5,8,12

_____

          H

half 130:4
handing 46:6
handle 83:14
handled 178:20
hands 133:25 145:10
happen 13:19 48:4
  52:13 123:8,12
  139:4,9 165:24
  179:15
happened 48:5 68:5
  85:5 89:3 101:24,25
  102:9 139:12 158:3
  159:1,22 165:21,25
  169:24 179:17
happening 13:16
  90:3 115:3 160:16

happens 20:2,5
  160:14
Harless 95:14 102:23
  102:25 103:3,7
  106:5
head 19:13 113:14
  136:18 142:5
  159:10 178:15
headquarters 184:23
heads 14:7
hear 103:11,13
  109:22 149:1
  188:24 189:22,25
heard 109:18 110:2
  134:16,19 140:13
  148:14,23 149:3,9
  165:9 181:19,21
  187:24 188:2
hearing 4:20 58:24
  63:25
held 7:23 109:15
help 114:12 116:5
  119:11,21 124:17
  128:4,6,8,18 130:18
  130:19 132:14
  133:13 145:9 146:3
  158:10 169:20
  188:12
helped 119:25 127:10
  130:13,16
helping 115:2,3
  133:8 134:10
  163:13,17
helps 120:24
hereto 2:23
hey 130:17
high 11:5
highly 2:12 55:21,22
  56:9,13,18 57:2,12
  57:19,22 93:22
  102:17 105:25
hired 15:21,25
  145:16 175:10
hiring 15:17 16:5

Hispanic 1:14 28:11
  28:20,22 29:2,3
  36:8,22 37:1,3,5,7
  39:7 59:13 60:18,25
  70:7 192:14
history 55:14
Hmm 8:2 17:12
hold 36:10 39:11,11
  40:14 69:17
holder 7:10,12 142:7
holistic 174:8
hope 160:2 178:8
  179:19
hopes 72:7 95:2
hoping 146:7,8
hotline 26:14,16,18
  27:3
hotlines 27:12,16
hours 43:21 116:14
  126:4,6,9,10,16
  127:1,13 129:16
  130:8 131:25 143:4
  143:11 146:13
  193:25
House 4:19 22:1,3
  46:2 93:16 96:5,11
  96:16,23 98:24
  100:10 103:7
household 60:18
hundred 111:8
hundreds 137:23
hypothetical 33:24

_____

          I

ID 25:21,25 31:20
  38:15 49:2,25 52:3
  53:2,7 54:5 68:1
  74:12 79:23 80:16
  81:5 94:11,21 97:9
  98:1 105:3,8 109:22
  110:1,3 112:24,25
  113:2 120:19 152:7
  168:11 178:23
  179:11

idea 47:10 54:8 59:21
  84:23 104:5 116:23
  119:23 132:18,19
  145:18 184:25
  188:9,10,11
ideas 17:17 86:19
  188:13
identification 4:20
  31:25 34:2 35:9
  38:12 46:5 48:21
  50:8 55:18 69:5
  75:3 93:20 96:6,12
  98:8,24 100:11
  102:13 105:20
  117:23,24 118:8
  128:21 134:21
  137:7 143:16
  150:14,19 156:19
  164:22 184:11
  185:11
identified 37:1
identify 38:14 101:13
  112:19
identity 25:18 112:22
IDs 120:15
III 2:9,14 4:3 6:1,12
  191:20,25 193:7,12
illegal 190:1
immigrant 190:5
immigrants 190:1
impact 24:14,21 25:4
  25:10 70:13 107:10
  107:13 108:10,11
  181:9,24
impersonation 48:1,8
  54:10 112:8
impersonations
  47:14
implement 20:18,21
  109:5,10 113:11
  140:12 149:7
  187:20 188:1
implementation 4:14
  70:12 116:10

COBY SHORTER, III                                      8/12/2014
CONFIDENTIAL TRANSCRIPT

12

139:18 148:9
172:13 182:19
**implemented** 113:2
161:11 181:1
**implementing** 20:3
20:23 113:8 117:6
141:25 149:14
162:15,18 163:5
**important** 17:16
24:13,20 44:11,13
70:11 71:1
**impression** 86:25
**improve** 169:17
**improved** 169:14
**in-person** 47:13 48:1
48:8 54:10 111:20
112:8,12
**inaccurate** 90:8,10
**inadequate** 148:25
**incentive** 141:6
**incidents** 109:17,20
110:2 112:2,3
**include** 52:2
**included** 52:23 73:20
91:2 107:1 121:14
**includes** 48:15 50:23
90:11
**inclusive** 36:23
**income** 106:10,15
**inconclusive** 36:9,17
36:22 37:10
**incorrect** 177:25
**increased** 138:8
181:7
**INDEX** 4:1
**indicate** 112:15,21
113:6 164:13
**indicator** 28:23,24
**indigent/religous**
104:24 105:4
**indirect** 46:20
**individual** 15:21,23
15:24 17:15 38:2
105:8 126:6,23

127:3 129:4 140:19
**individual's** 121:22
**individually** 15:12,13
**individuals** 13:17,21
13:22 27:7 29:2
37:25 68:8,9 78:1
83:14 89:9 97:8
109:17 110:3
115:24 117:10,16
128:13,15 132:11
154:17 164:14
171:1,5,17 176:17
176:21 178:10,22
**infancy** 142:8 150:4
**inform** 59:22 116:2
117:16
**information** 16:11
24:12,14,21 25:2
30:3 31:11 32:25
33:6 34:20 36:8
43:11 44:16 45:6,12
59:3,23 61:18,25
62:10,12,14 64:19
64:22 65:17,21,23
66:4,7,17,20 67:25
71:8 72:23 77:22
78:9,23 79:18 82:8
83:2,4 84:22,25
85:5,14 87:1 89:20
89:21 90:18 92:5
100:23 110:23,25
111:3,7,11,13,18
112:12 121:13,14
121:18,21,24,25
134:9 139:23 140:1
141:23 151:13
152:1 155:1,14
156:10,11,13
157:14,16,20,22,24
158:1,2,5,9 164:3,7
164:11,17,20
165:12,13,15 173:3
173:13,16,18,20
174:20,25 175:3,19

176:10,14,16
**informed** 22:16
107:8,12 114:17,21
**Ingram** 7:5,6 16:6,6
16:14 17:9 47:17
60:20 130:13
131:14 140:2
152:23 154:8,20
159:5 182:25
**initial** 8:17 9:21
**initially** 8:16 119:21
119:22 122:24
127:6 130:16,23,23
170:2
**initiative** 22:6,14
**initiatives** 159:18
**input** 54:15 103:24
107:15
**inquiries** 153:17
155:18,21 157:5
158:2 164:8,12
**inquiry** 35:4 158:3
**inspecting** 166:24
**inspectors** 166:22
**instance** 2:15 37:14
74:8 112:4 156:7
**instances** 88:25
**instigation** 116:13
**instructed** 176:9
**intended** 42:12
**intends** 19:14
**intent** 50:21 71:4
73:14,17,20 74:14
**interact** 15:7 21:17
21:18 178:10
**interacting** 178:9
**interaction** 67:20
**interactions** 21:24
**interacts** 177:18
**interest** 16:19,23
18:6 40:3
**interested** 16:17
38:23 39:4 40:1
70:20 194:5

**interim** 145:24
182:22
**internal** 166:11
**interpret** 144:12
**interpreted** 144:16
**interviewing** 16:10
16:11
**introduce** 19:14
**introduced** 4:9 31:19
32:8
**introduction** 132:7
133:14
**introductions** 132:13
**invitation** 33:17
**invited** 33:15
**involved** 9:8,16,19,19
10:9 12:5 16:5
85:24 90:1,3,7,15
90:23 93:18 103:9
110:9 132:19 133:6
133:8 138:1,16,20
139:3 141:18
142:20 147:13
150:12,13 182:23
182:25 183:5 184:7
**involvement** 110:12
163:23
**isolated** 109:17,20
110:2
**isolating** 87:6
**issuance** 153:17
**issuances** 157:5
**issue** 54:22 55:24
70:11 71:1 78:6
87:11 91:19 116:14
132:17,24 133:10
136:25 137:25
138:2 149:3 151:5,7
157:23 163:19
168:23 178:12
184:10 185:17
**issued** 79:23 94:10,22
142:4 153:2,5
155:12,13,17,20,20

COBY SHORTER, III                          8/12/2014
CONFIDENTIAL TRANSCRIPT

13

156:1 167:10,17
168:15 169:1 171:6
172:22 174:2,21
175:1
**issues** 10:24 14:17
15:2 19:7 20:12,15
22:17 27:18,24
33:24 92:19 110:3
111:24 128:9
140:17 144:25
149:10 159:6,6
177:19 178:3
181:14,15,24 184:5
184:11
**issuing** 117:17
142:17,20 143:4
183:10,12 187:11
**items** 169:22

———

**J**

**JA** 34:10,10 39:14
40:18 41:4,5
**Jackson** 3:12
**James** 145:21,23
**Jan** 4:16
**January** 4:15 59:15
60:17 63:25 68:16
69:11 72:21 100:17
176:20
**Jennifer** 3:3 6:9
58:11 193:21
**jennifer.maranzan...**
3:6
**job** 9:21 10:4,5 11:19
12:3 90:4 169:6
**jobs** 113:24
**John** 3:8 76:20 77:6,6
77:7,12 82:12,13,17
82:18,24
**john.scott@texasat...**
3:11
**jointly** 188:9
**Journal** 4:12
**Judges** 1:14 135:10

192:14
**July** 5:6
**jury** 67:11,15,16,18
68:7 183:18,20
**Justice** 3:3 30:16
37:13 38:16 92:5
110:10 120:11

———

**K**

**Karen** 76:9
**keep** 14:8 96:18
102:2 104:5 147:19
153:1 162:11 163:4
**keeping** 114:17,21
**Keith** 154:20
**kept** 153:3,6
**kind** 57:16 76:1
120:23 133:2 142:8
142:9 144:11
165:23 166:19
173:24
**knew** 16:18 18:6
38:23 111:16
**know** 14:2,16,25
17:21,21,22 19:24
19:25 20:11,12 21:7
21:8,16,23 26:3,16
27:8,21 28:1,5,21
29:10,25 30:2,4,10
30:12 31:5,8,17
33:1,2 37:17,20,21
38:4,17,21 39:17
41:13 43:4 45:16
47:1,1,7,22,23 48:3
48:5,13,23 49:12
52:9,10,11,11,11,13
52:15,18 54:1,11,21
55:14 57:4 58:11,15
61:2,5,10,11,11,15
61:18,22 62:3,13,16
63:20 64:8 65:1,19
66:15,24 67:14
68:14 70:24,24 71:9
71:11,14 74:9,14,16

74:17,19 75:16
76:10,13 78:21 79:7
79:11,13,13,14
80:16 81:6,24 82:17
83:8 84:12 85:17,18
89:12,15 91:6,6,8
91:20,21 93:9 95:7
96:7 97:15 98:4,17
100:24 101:2 103:1
103:3 104:11
105:10,12,16,17
107:2 108:6,6,16,17
108:19 110:14,25
111:15,17 112:4,14
113:7,23 117:22
119:1,15,16,18
120:12,15,18,18,19
120:25 121:10
122:4 123:6,7
124:18 125:1,16,20
126:2,8,14,15 127:2
127:2,4 128:13
129:3 130:12,13
131:4,13,19 132:9,9
132:23 133:2,2,4,17
133:23 134:1,3,8,19
135:4,11,14 136:13
136:14,14,20,20,21
136:25 137:1,1,19
137:20,22 138:23
138:25 139:10
140:5,20,20,21
141:15,16 142:4,5,9
142:23,25 143:10
143:12,15 144:11
144:18 145:4,4,16
147:16,18 148:3,6
151:5,21 152:9,11
152:11,12,13
153:20 154:12,21
156:4,7 157:6,25
158:15 162:10
165:3,13,14 166:13
168:13 170:4,10,17

171:8,11,13 172:1
173:5 176:24 177:2
177:5,7,11,11,12
178:13,24,25 179:1
179:2,5,6,8 180:12
180:13,15 181:2,4
181:12,13 182:2,4
182:25 183:2,3,6
184:12,17,18,21
185:3,5,8,13,17
186:1,16,18,24,25
189:23 190:6,9
**knowing** 40:2 125:13
177:1
**knowledge** 20:5
23:11 37:4 67:3
83:6 100:17 130:11
142:16 178:7 180:4
180:14,17 189:1
**knowledgeable** 30:23
30:25 189:5
**knows** 132:11 137:24

———

**L**

**lack** 135:6,24 136:4
**lacked** 178:23
**language** 41:17,20
43:1 87:12,13 91:2
91:3 165:4
**large** 128:11 168:3
**largely** 160:24
**largest** 190:5
**late** 167:14,21 168:16
**Latino** 39:23
**Laughter** 107:25
**law** 17:18,21 19:2
70:12 100:18 184:5
184:8,9,18,23 185:1
186:21
**laws** 18:25 21:4
23:18
**lawyer** 42:20,21
**lawyers** 6:23
**lead** 95:4

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

14

**leadership** 10:21
**LEAGUE** 1:11
  192:11
**learn** 60:20 77:14
  84:20
**led** 17:10 150:11
  164:17
**left** 122:16,19 185:2
**legal** 17:15 19:22
  92:3 119:3
**legally** 190:4
**legislation** 18:12,19
  18:20 22:5,14 23:5
  23:6 24:19 25:4,10
  92:13
**legislative** 37:15,17
  38:6 50:21 53:24
  54:2,16,23 55:15
  73:13,17,20 74:14
  76:22 77:10,12 79:4
  83:14 91:3,19 107:5
  113:20 182:18
**legislatively** 162:9
**legislator** 19:14 40:1
  45:11 101:16 104:1
  112:11
**legislator's** 45:5
  101:15 102:4
**legislators** 14:21
  20:16 21:2 33:9
  44:12 47:5 53:18
  68:17 79:17 104:9,9
**legislature** 14:13
  18:23 19:4,7 20:15
  23:7 24:20 38:5,23
  44:21 46:25 54:5
  63:16 79:12 83:15
  84:24 85:6 86:22
  90:4 91:22,25 92:15
  108:8,17 109:5,6,7
  109:10 149:17
  159:19 160:20,21
  161:15 162:8 172:9
**Legislature's** 23:16

44:19
**length** 92:12
**let's** 8:4 34:24 49:14
  50:4 75:8 118:19
  138:15 144:24
  160:2,2,3,4,8
**letter** 35:3,5,17,19,23
  35:24 37:21,22,23
  37:25 38:2 40:4
  41:25 42:6 43:11,12
  44:6 45:19,23 50:13
  50:25 129:5,11
  130:2,24 131:4,6,8
  131:12
**letting** 110:13
**level** 12:5 20:10
  145:5 159:7
**Liberty** 10:22
**license** 25:21 64:4,13
  64:20 65:15 66:2,5
  66:10,18,21 67:2
  68:1,9,10 69:24
  72:4,19 73:2 79:23
  81:5 89:10 94:11,21
  97:9 98:1 99:3,5
  122:1 172:23
  184:13,14,19
**licenses** 111:14 122:1
**Lieutenant** 45:25
  84:21 100:19,21,22
  114:19
**life** 56:5
**likewise** 120:25
**limited** 66:20 163:23
  163:25
**line** 39:19 41:7,8
  69:21,25 71:21
  98:15 135:9 139:1
  144:1 191:3
**lines** 148:24 149:10
**list** 28:17,18 29:4,5,5
  61:10 62:2 64:12
  65:13 67:1 73:2,2
  113:15 119:17

120:3,6,13 121:2,2
  121:5,7,11,13,14,19
  121:22 122:5,8
  124:5 136:16
  174:15 183:16,17
**listed** 51:22
**listen** 169:17,19
**litigation** 88:18
  110:20
**little** 18:15 67:9
  74:10 120:9 128:17
  158:24 161:14
  163:1
**local** 59:2 116:8
  119:20 123:13
  132:15 184:7,24
**location** 122:14
  157:23
**locations** 114:14
  119:12 120:1,2
  123:2,11 124:5
  128:17 130:5,19
  146:19 147:18,22
  147:23
**long** 20:9 33:23 34:1
  35:20 57:3 75:10
  91:18,22 148:24
  149:10 184:16,22
**long-term** 120:25
**look** 34:8,14,22 35:14
  36:1 40:5,12 41:6,9
  41:14,15 48:17
  49:14,15,24 50:4
  51:12,20 65:21 70:4
  71:20 73:4 75:7,13
  76:14 89:8 93:24
  94:4 98:16,23 99:20
  102:21 104:14
  106:1 118:18,20
  120:21 127:25
  129:7 137:2,12
  143:24 150:25
  152:2 153:7,13
  155:11,18 156:2

157:7,18 167:13,13
  169:2 171:10,20
  172:18,18 174:11
  175:14 181:22
  182:2,3,7,7
**looked** 28:21,22 39:3
  51:4,9 65:6 119:14
  119:16,16 120:25
  155:13 157:13
  167:1
**looking** 30:3 34:9
  39:7 51:15,19 64:15
  65:5,19 79:9 99:8
  119:18 122:2 143:2
  146:4,10,17,18
  150:4 153:4 155:14
  155:20 156:5 163:3
  164:13 168:2 172:2
  182:22 183:7
  185:12
**looks** 73:23 95:21
  130:25 153:15
  186:2
**loosing** 120:9
**Lord** 167:15
**lot** 48:4 137:8
**low** 106:10,15

**M**
**ma'am** 6:15,18,25
  7:3,6,8,13,15,25 9:5
  9:15,17 10:16,19
  11:2 15:11,19 16:8
  19:11 20:7 21:25
  23:12,19 26:5 27:10
  28:5,8 29:7,25
  32:10,13 33:20
  37:20 38:17 39:18
  43:14,18 45:16 46:1
  46:3,19 47:3,6,10
  47:24 52:17 53:11
  53:19 54:3,17 55:14
  58:8,10,12,22 59:17
  60:19 62:15 63:14

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

15

67:19 68:4 69:2
70:18 71:9,16 72:11
73:22 74:16 75:10
75:24 76:12 77:25
78:2 79:6,19 81:24
83:3,25 87:23 89:3
90:16 91:17 93:8,17
94:3 95:7 96:3,7
97:4,10 100:6 102:2
102:12,20 103:2,21
104:7 105:19 107:2
107:14 110:6
111:19 118:12
121:15,20 127:15
129:6,20 132:18
134:15 143:6
145:18 147:3 148:8
148:13 149:19
151:1,8 153:9,22
165:3 167:19
168:24 170:4
174:19 175:24
176:19 178:15
184:16 186:18
**machine** 2:19
**mail** 179:23 180:1,6
180:11
**main** 12:3
**maintaining** 165:12
**major** 11:6 109:9,13
109:14 120:23
122:25 142:11
159:25 160:6,9
161:19 162:1,16
**majority** 44:24
**making** 12:3 14:13
14:18 107:18
113:10,18 116:16
171:19
**man** 133:24
**manager** 86:12 162:3
**manned** 27:7
**manner** 56:11 80:25
141:1

**map** 156:5,6,6
**Maranzano** 3:3 4:4
6:6,9,22 21:7,21
22:12 23:10 24:11
24:17 25:3,9,16
26:13,23 30:22 31:6
32:1 34:3 35:8,11
37:11 39:2 45:10,18
46:6 50:6,10 51:9
52:1,15 53:12 54:9
55:3,17,19 56:1,15
56:17,21,24 57:3,7
57:10,14,20,24 58:2
58:4 60:12,15 64:12
66:25 68:15,22 69:4
69:7,20,21 70:23
71:14 74:22 75:4
77:9 80:3,10 81:20
82:19 84:13 85:7,18
88:2,6 93:21,24
97:16 98:7,10,20,22
99:15 100:9,16
101:23 102:4,10,14
102:16,18 103:19
105:12,22,24 106:1
107:22 108:3,20
109:2 115:20
118:10 123:21
124:1 128:20,23
129:15 133:5
134:22 137:9,17
140:9 143:3,17
144:15 148:6,14,17
148:23 149:25
150:15,20 154:10
156:20 161:1,5
164:23 168:14,20
176:5 177:9 185:10
185:14 186:25
188:19,22 190:13
193:22,25
**MARC** 1:3 192:3
**March** 4:11,12,20
32:18 33:5 34:7

38:12,22 43:12,15
96:6 97:11,17,24
98:4,5,6,25 99:11
**mark** 35:8 55:17
56:17 69:4 98:7
128:20 185:10
**marked** 4:8 31:25
32:2 34:2,4 35:9,12
46:5,7 50:8,17
55:18 58:6 69:5,8
75:3,5 93:20,23
98:8,11 102:13,15
105:20,23 118:8,11
128:21,24 134:21
134:23 137:7,11
143:16,18 150:14
150:19 153:8
156:19,21 164:22
164:24 185:11,15
**market** 116:4 163:18
175:11,11
**marketing** 115:18
116:1,1 163:19
175:13
**marking** 50:6 150:21
**master's** 10:21
**match** 67:16,21 68:6
74:23 75:1,20 76:11
77:21 78:8 80:24
87:20,24 90:23 96:2
99:3,25 100:4
105:14 120:18,19
121:17
**matched** 78:23 88:1
**matches** 36:25 83:2
84:5 121:11,17
**matching** 67:5 74:6
76:2 77:18,19 78:6
78:12,25,25 80:14
80:18 81:13,21,25
83:17 84:7,14 85:15
87:8 88:7,10,12
89:2,8 90:8 91:9,16
91:21,24 92:9,14,18

97:17 99:16 100:19
110:18 121:3,8
**matter** 6:10 86:8
**McGeehan** 7:7 59:1
59:5,6,8,9,12,22
62:19 63:6,20,22
64:1 67:4,24 68:16
68:23 69:22 70:3,6
72:3,6 73:10 74:6
76:8,9,18 77:15
82:7 83:16 84:6,14
90:17 94:9 95:4
96:4 98:16 99:13
100:3,10 189:5
**McGeehan's** 70:4
98:23
**mean** 6:21 9:2,7,7,12
11:20 12:1 14:22
15:13 19:1 20:8
23:9 24:18 25:14,21
26:21 29:16 38:18
45:9,17 48:16 49:7
52:9,20 55:1 57:16
60:23,23 61:17
62:16 63:9 64:23,25
65:2,4 68:20 70:24
77:17 78:3 80:11
81:1 82:9 85:8,20
87:15 88:15 89:23
95:11 100:14 102:8
104:12 109:13
111:9,9,11 112:10
115:8 117:12 120:9
122:2,7 126:13,13
129:23 130:21
135:24 136:4 139:8
140:8,9,17,20 141:9
141:14 142:24
144:7,7 147:5 149:1
150:3 153:23
154:25 155:8 157:6
159:16 160:23
161:1 163:1 164:6
165:24 168:8 171:3

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

172:1 177:9,20
179:1,2,24 183:15
183:16 184:4,5,6,6
187:14 188:3 190:3
**Meaning** 86:7
**means** 42:20 144:13
**meant** 77:3,3 119:18
136:2
**measure** 14:10 163:4
**mechanism** 27:21
**mechanisms** 34:19
**media** 109:18 149:1,4
**meet** 14:6 20:8
**meeting** 78:20 145:21
145:23 165:21
166:4,10 173:17
**members** 44:2,24
46:2 104:10 127:8
128:2 133:18,20
139:10 145:11
154:5,6 166:21,24
**memorandum** 4:24
118:5,14
**memorialize** 88:13
**memorialized** 52:18
52:20
**memory** 61:21
170:24 185:13
**Mendoza** 82:18
**message** 76:18,19
**met** 165:18
**method** 25:17 31:3
31:13 62:9
**metropolitan** 120:23
**middle** 39:19
**military** 12:25
**mine** 91:13 167:8
**minister** 7:22
**minor** 160:3
**minorities** 108:11
**minority** 44:25
106:10,15 108:22
**minute** 40:14,19
50:24 129:25

142:14
**minutes** 88:3 188:20
193:25
**mischaracterizes**
51:7 81:16 85:3
101:18 123:18
168:19
**misled** 100:10,15
**misstates** 81:16
101:18 149:23
**mixture** 76:4
**mobile** 116:11 118:6
119:4,7,12 122:6,13
122:23 123:5,15,21
123:22 124:2,5,8,9
124:14,24 126:4,8
127:1,4 128:10
129:11,16 131:7,16
131:24,24 133:6
135:17 136:24
137:3,5 142:19
144:20 146:23
147:2,4,8,10 155:24
157:15,24 163:6,12
163:18,18,24,25
164:19 169:10
172:22 173:4,14,16
173:21,24 174:3,5,8
176:6 185:22 188:4
188:7,10,11
**mode** 151:21
**moment** 49:15 106:2
**Monday** 95:3,6
103:11,14
**monetary** 11:20,21
**monitor** 23:16
102:10 139:17
**monitored** 139:20,23
**monitoring** 141:20
141:21,22
**month** 61:1,8
**monthly** 60:17
**moral** 63:24
**morning** 6:7,8 43:21

43:22 44:8 103:11
103:14
**motivate** 44:20
**motivated** 187:6
**motivates** 44:21
**motivation** 187:8,9
**move** 130:22
**moving** 162:25
**multiple** 27:7

**N**

**N** 3:1
**N.W** 3:5
**NAACP** 1:21 192:21
**name** 6:9,11,12 21:21
80:15 137:15 170:1
**NAMED** 3:7
**names** 28:11
**NANDITA** 1:24
192:24
**naturalization** 42:10
42:12 43:7 48:15
49:2 50:23 51:3,10
51:22 52:2,23 53:6
**nature** 65:2
**necessarily** 30:20
63:18 83:21 147:13
154:4 185:8
**necessary** 151:14,16
152:16
**necessitated** 54:4
**need** 11:19 15:4 19:8
22:19 32:25 33:6
38:13 44:3 56:12
113:24 120:24
124:13 143:22
145:12 150:6
158:17 160:3,6
161:6 162:9 168:8
**needed** 22:21 23:3
31:10 42:23 54:22
84:8 132:14 143:1
145:1 150:6 155:4,9
158:13 159:11

168:5
**needs** 20:11 56:7,25
65:6 74:7 158:16
**neither** 194:1
**nervous** 138:7
**net** 117:20
**never** 67:7 78:10
86:16 97:19 127:18
145:6 148:14,23
**nevertheless** 25:25
**new** 8:20 74:11
113:20 116:8
131:20 159:18
**news** 188:24
**NGR** 1:5,11 192:5,11
**no-match** 120:3,5
121:2 122:5,8 124:5
**nods** 19:13
**non-DPS** 158:23
**non-matches** 119:17
119:19
**noncitizen** 188:23
189:21
**noncitizens** 189:19
**nonrequirement**
66:16
**note** 55:20 56:18
57:11
**noted** 191:22
**notice** 124:8,13,23
125:17 129:22,23
129:24
**notification** 47:13
**November** 111:21
112:9,13,13,16,23
112:24 113:1 124:2
142:12 150:7,9
161:20,22 162:6,14
**Nuh-uh** 77:2
**number** 1:5,10,22 2:3
26:17,24,25 27:5
28:19 34:4,10 36:21
40:16 64:4,5,13,14
64:20,20 65:14,15

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

17

65:15 66:6,11,11,18
66:19 67:2,25 68:8
68:9,10 69:19,23
78:10,10 89:9,10
97:8 104:13 111:13
120:8,17,20 121:16
136:9,22 142:4
144:3 145:1 153:5
167:24 168:15
172:22 174:2
176:17,22 177:1,8
177:12 181:5,8,13
192:5,10,22 193:3
**numbered** 2:16
**numbers** 34:9 46:8
66:6,14 75:24 80:14
80:18,19 88:16,19
90:22 91:4 94:10
173:23 182:2,3,7
**NWB** 3:4

**O**

**OAG** 103:11,14
**OAG/SOS** 106:12
**oath** 6:14
**object** 74:19 105:11
115:14 123:25
132:25
**objection** 21:5,19
22:9 23:8 24:9,16
24:23 25:6,12 26:10
26:20 30:17 31:4
37:8 39:1 45:7,14
51:6,23 52:4 53:9
53:10 54:7,24 64:10
66:22 68:12,19
70:21 71:13 77:5
79:24 80:7,9 81:15
82:15 84:10 85:2,16
97:14 98:3 99:12
100:5,12 101:17
102:7 103:17
107:19,21 108:14
123:17 129:12

140:7 142:22 144:5
144:9 148:2,12,19
149:22 154:9
160:25 161:4
168:12,18 177:6
186:22
**objections** 105:4
**objective** 144:23
**obligation** 115:21
**obtain** 38:10 115:25
117:11 171:2
**occasion** 101:13
**occasionally** 139:4,7
**occur** 162:9
**occurred** 54:10,13
95:3 160:4 170:17
**occurrence** 104:8
**occurring** 99:11
156:3 182:19
**Oct** 4:25
**October** 67:12
**offer** 119:4 146:14
**offered** 107:9 108:12
**offhand** 29:25
**office** 2:19 3:13 7:6
7:18 8:4,9 9:14,15
11:22 13:14,15,22
14:5 15:2,16,22
18:17,18 19:16,23
20:17 21:2,10 22:2
22:4 23:6 24:6
26:23 27:18 28:3,10
28:21 29:11,14,22
31:3,8,9,10 33:13
35:22,23 37:24
42:17 43:8 44:19
45:25 47:12 53:3,21
55:2,10 62:9 64:18
67:11 68:20 70:16
72:18 73:19 74:25
78:20 80:13 81:23
83:15 84:25 85:25
88:17 91:4 92:9,14
92:14,18 93:10

95:18 96:1 101:1,9
101:14 103:15,23
104:3 106:14 111:2
112:12 113:12
114:1,15,19,24
115:6,18 116:21
117:10,18 118:4
119:4 122:23 123:5
124:7 127:8,13
133:1,5,8 134:12
137:5 140:13
141:21 147:22
149:16 163:10
166:17 167:4
169:23 170:11,16
170:25 172:4,8,10
172:13 175:22
177:16,17,18,24
178:14,21 179:21
180:24 186:10
187:3,10
**office's** 117:13
**officer** 11:10 193:13
**offices** 121:1 126:20
132:21 133:9
142:21 147:17
148:7 172:23,23
184:13,14,19
**official** 27:25 55:4
**officials** 59:2 116:6,6
124:22
**oh** 46:9,13 118:18
125:9 133:24
167:15
**okay** 9:16,18,25 10:3
11:9 12:8 13:25
15:9,13,15 16:5
17:4,8 18:11 21:9
23:14,16 26:7 28:17
29:12 30:13 31:18
31:24 32:3 33:18
34:13,24 35:10,13
35:16 36:11,15 38:9
39:15,20 41:5,8,9

41:12,16,23,24 42:4
42:5,22 43:4,12
46:13 48:10 49:1,20
49:22 50:3,4,5,9,10
51:1,2,19 52:15,25
53:16 55:16,19
57:14,24 58:2 60:4
60:6,8,14 61:4,6,9
63:1,11 65:12 66:9
67:22 69:9,13,15,17
70:2,5,9,14 71:11
71:19,22 72:1,13,20
73:8,11,16 74:22
75:6,8,8 77:24
78:12 88:6,25 89:5
90:11 92:21,24
93:19,21 94:8,12
96:4,8,20,22,22
98:10,12,18,21
99:22,22 101:3
102:25 104:6,14,16
104:18,18,25 105:6
105:17,21,21,22
106:3,4,25 107:3,22
110:2,7 111:4,4
112:11 113:8
115:23 118:3,9,21
118:23 120:14
122:3,22 123:15
127:4,16 129:18
131:2,10 132:23
133:15,20 134:22
137:1,6,10,16,17
138:3 139:25 141:1
141:3,19,24 142:8
142:13 143:3,7,10
143:23,24 144:23
144:23 146:20
147:12 149:25
150:16,20 151:6
153:7,12 154:23
155:22 156:18
157:12 159:8,12
160:22 161:1,18

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

18

162:5,19,25 163:9
163:14 164:3 165:6
165:11 167:3,7
170:6 173:2,2
175:21 177:13,23
179:6 180:24
182:14 183:9
185:14 186:2,7,13
189:4,12,25 190:12
**omission** 29:4,8
**once** 15:22 32:14,15
109:24 138:21
139:2 141:17 160:7
160:18
**one's** 104:16
**ones** 23:1 48:9
147:11
**ongoing** 94:23 97:19
116:4
**Ooh** 126:10
**open** 51:14 143:13
147:17,19 148:7
**opened** 147:14
**operandi** 151:21
**operate** 116:8 126:8
131:24 166:12
**operated** 126:9,15
**operating** 162:22
**operation** 123:22,23
126:4 129:16
131:24
**operations** 11:22,23
143:4
**opinion** 107:5 129:14
162:3
**opportunity** 115:19
168:7
**option** 86:15
**options** 117:4
**oral** 2:14 193:13
**oranges** 77:21 80:21
85:11 87:12,14 92:7
**order** 124:13 153:11
**original** 35:22 193:21

**ORTIZ** 2:1 193:1
**ourself** 127:18
**outcome** 194:5
**outlined** 86:14
**outreach** 12:25 118:1
130:5 176:6,6
177:13
**outside** 28:15 65:22
67:6 92:14 93:3,10
100:25 126:9
131:24 143:10
175:10
**overall** 14:14 90:5
163:9 169:11
**overburdened** 138:9
139:17 140:5,10,15
**overly** 26:10
**oversaw** 76:2
**oversee** 11:25
**overseeing** 9:8 12:5
**oversees** 13:1

**P**

**P** 3:1,1
**p.m** 2:17 150:18,18
188:21
**P.O** 3:10
**packaged** 165:5
**page** 4:8 34:8,14
35:15 36:1 39:9,19
40:5,16,18 41:2,3
48:18 49:16,17,17
49:18 50:11,11,13
69:14 70:8,12 71:6
71:18,25 73:4,18,25
75:13,17 76:14
79:21 80:4 94:5
98:13,19 118:20,21
138:4 153:14
167:16 172:19,21
174:11,14 175:15
191:3
**pages** 175:14,16
**papers** 40:10 41:21

41:23 42:2,6 123:13
**paperwork** 15:24
**paragraph** 36:14
37:12 42:5 94:4
106:7 138:4 143:24
146:20
**part** 36:13 43:9 51:4
55:22 73:14 80:18
110:19,20 116:16
116:18 117:13
**participants** 143:21
**participate** 130:17,18
132:3 135:17 141:6
141:11
**participated** 9:12
**participating** 135:19
141:16 142:15
**particular** 27:3 54:12
62:2 65:10 78:6,13
86:13 87:6 107:11
135:18 144:12
145:25 146:17
151:18 159:3,21
162:1 173:8 176:8
177:12,16,20,22,24
178:18 188:6
**particulars** 161:2
**parties** 194:2
**partner** 133:9
**partnerships** 114:9
**parts** 113:11,13
119:15 170:20
**party** 44:24,25
118:24 193:23
**pass** 155:9
**passage** 47:25
**passed** 20:22 48:11
108:8 109:5,11
113:15 155:4
**passes** 108:17
**passing** 47:21
**passion** 17:16
**passport** 42:7,7
**pattern** 160:16

**peek** 137:15
**pending** 24:15,19
110:20
**Pennsylvania** 3:5
**people** 14:2,25 15:1
16:16,17 19:10
43:24 61:24 63:16
74:9 78:3,4 83:13
86:1,6 104:23
109:22 111:13
117:5,21 120:15,17
123:7 125:18 128:1
138:1 139:1 145:9
147:20 163:25
164:1 171:8,12,14
171:21 172:5 177:3
179:25 180:5
181:17 189:25
**percent** 111:8 141:15
**periodically** 14:6
**permission** 57:1
**Perry** 1:6 8:10 191:2
192:6
**person** 19:15 31:14
33:14 66:24 67:19
137:20 152:3,6,8,11
152:12,17,18 180:9
181:16
**personal** 23:10 42:14
42:15,16 94:11,21
121:11 189:1
**personally** 26:21
27:20 30:12 37:20
100:22 101:6
131:13 134:19
139:21 165:10
173:5 179:5,12
180:7 181:25
**personnel** 11:22
126:22 146:21
147:1
**perspective** 9:10,11
**Pflugerville** 184:25
**Phil** 8:16 9:23

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

19

**photo** 74:12 178:23
**phrase** 147:4
**physical** 113:24
**picked** 147:7
**picture** 160:11
    161:23
**piece** 24:19 65:21
**pieces** 155:14
**pile** 60:11,13
**pinpoint** 87:7
**place** 14:14 15:7
    27:20 105:2 112:18
    112:22 128:3
    139:20 173:25
**placed** 6:14
**places** 114:13 126:18
    130:20
**placing** 57:16
**Plaintiff** 1:4,9 2:15
    192:4,9
**Plaintiff-Intervenors**
    1:13,16 192:13,16
**Plaintiffs** 1:22 2:2
    192:22 193:2
**plan** 150:8 176:5
**planning** 9:7 123:15
    149:6 175:4
**plans** 73:24,24 74:2,2
    124:1 150:1
**please** 6:11 64:17
    69:4 108:1
**plethora** 181:15
**Plus** 25:12
**point** 19:17 55:19
    82:10 97:20 98:2
    99:15 135:16,18
    158:18 159:10,13
    159:20,22,24 162:1
    172:11 175:25
    176:8,12 178:18
    182:13 183:8
    188:17
**policy** 8:6 9:1 18:1,7
**political** 44:24,25

90:22
**poll** 10:15
**polling** 105:2
**polls** 25:18 181:16
**pool** 68:7
**population** 119:16
    135:7,25 136:4,11
    190:1,6
**populations** 107:11
    136:7,15,19,21
    179:22,24
**portion** 56:8
**position** 7:19 8:12,13
    16:14,17 33:19
    42:11,14,15,15,16
    42:16,17 48:14
    54:21 71:12 74:17
    91:12
**positions** 7:21,23 8:1
**positive** 169:20
**possessed** 17:9
**possible** 24:21 28:2
    56:5 67:16 85:13
    119:23 145:10
**possibly** 30:25 32:25
    47:24 89:3,6 166:25
**post-Voter** 112:25
**potential** 33:7 38:13
    119:17,19 120:1,2,3
    120:5 121:16
    160:19
**potentially** 32:25
    33:6,24 96:25
    111:13 120:21
    133:12 146:3 166:1
    166:23 184:2,6
**PR** 122:6,15
**practice** 63:15,18
    170:12
**pre-Voter** 112:24
**preclearance** 30:6,14
    88:21 110:11,13,19
**predates** 130:24
**premature** 142:9

159:24
**preparation** 6:21
    33:2
**prepare** 14:18 32:22
    130:5
**prepared** 35:5,24
    60:17,25 61:3,5,10
    61:11,16,17
**present** 86:19 159:21
    160:20 184:12,19
**presented** 84:6 86:15
**preside** 58:23
**press** 122:12,19,21
    122:25,25,25 123:2
    123:6,6,7 181:21
**presume** 40:3 63:4
    66:8 76:12 77:6
    91:17 131:8
**pretty** 155:16 162:18
**previous** 56:3 123:18
**previously** 46:11
    80:11 82:20 85:4
    121:3 146:25
    153:10 158:8
**primaries** 160:9
    161:24
**primarily** 7:17 11:24
    12:1 19:12,20,22
    184:8
**primary** 132:6
**printed** 167:9
**prior** 8:24 10:1,1
    17:24 26:8 32:22
    47:25 63:25 68:17
    68:23 72:21 79:25
    80:8 105:12 148:9
    162:14
**privilege** 52:6
**probably** 10:25 14:1
    19:17 26:2 33:4
    35:21 49:23 76:5
    82:23 92:10,10,15
    125:24 129:3,6
    133:13 143:8 147:7

152:22 154:19
    167:6 168:15
    173:25 180:7 183:4
**problem** 27:4
**problems** 26:7 27:23
    28:3 109:19 110:4
    111:20
**procedure** 2:21 115:5
    115:8,12 159:1
**procedures** 47:21
    61:12 166:9,11,13
**proceeding** 69:12
    194:3
**proceedings** 62:20
**process** 9:13,20
    14:14,24 15:6 19:18
    29:10 52:5 55:15
    56:10 67:18 75:12
    76:2 79:15 85:24
    87:5,7 88:19 92:6,9
    92:12 93:3 94:23
    97:17,18,19 138:20
    158:9,18 166:22,25
    171:6,20
**processes** 92:3
**produced** 2:14
**product** 97:5
**professional** 20:13
**program** 114:2,6,16
    114:25 115:1,2,4,10
    117:1 119:7 131:17
    131:20 132:3 134:2
    134:5,13,18 135:12
    141:6 142:1 145:15
    147:16 148:1,5
    149:6,14,18,21,24
    150:8 153:1,4
    155:12 158:5,10,21
    159:4,5,14 160:23
    161:2,11,16 162:12
    162:16,21 163:8,9
    163:23 164:9,10,19
    166:3 168:17 169:6
    169:11,13,17,22

COBY SHORTER, III                              8/12/2014
CONFIDENTIAL TRANSCRIPT

170:21 172:3 173:4
173:14,21 174:6,9
175:4,5,8 176:11
182:14 187:4,7,17
187:20,21 188:1,2
188:16
**programs** 12:19 13:1
13:7 14:4,11 133:9
**project** 72:3 150:4
**prompt** 155:8,9
**proper** 109:23,25
**proposed** 22:5,13
23:6
**provide** 15:11 24:12
24:12 54:15 59:23
62:2,18 67:7 88:16
101:15 102:5
107:13 110:23
111:7,12 124:7
125:18 126:22
130:20,20,21
165:15 188:4
**provided** 28:10,15
29:22 31:7,8 79:2
100:19 105:8 120:7
120:10,12 129:24
131:8 134:9 143:2
153:25 157:20
158:1,2 165:13,17
168:6 173:18
**provides** 28:14 62:1
183:20
**providing** 16:11
88:20 157:24
183:15,24
**provisional** 26:4
104:20 105:13
179:10
**provisionally** 26:2
105:5 178:23
**provisions** 2:22
106:25
**proxy** 28:19
**public** 24:14,21 25:5

25:11 117:19 118:3
**publicities** 123:4
**publicity** 122:18,22
124:14 151:15
**publicize** 124:24
130:19
**publicized** 123:14
151:22 152:1
**purpose** 61:22
176:13
**pursuant** 2:21 108:11
**put** 13:12 43:10
53:13,14 56:6 60:12
61:8 74:14 122:12
122:20 123:8
154:21
**puts** 56:12
**Putte** 34:15 35:25
39:3,6,9,16,21
45:20
**putting** 13:14 20:24

---
**Q**

**qualifications** 17:8,9
**qualify** 104:12
189:23
**quantify** 104:12
**query** 65:10
**question** 13:4 36:4
39:3 40:5 42:1,11
43:1 45:2,5,12
64:16,16 65:2,4,9
69:22 75:14 80:2,17
97:25 98:15 100:8
101:20 102:3 108:4
111:4 112:20
168:25 169:12
171:15,16,18,19
172:2 185:2 189:18
**questions** 26:17 33:1
33:7,21 34:16 35:25
44:1,3,12,14 46:24
52:22 60:6 70:23
71:10 79:11,13

104:1,3,11 149:2
155:25 190:14
**quick** 17:22,23
107:20
**quite** 19:3 20:25
30:18 46:24 47:24
62:17 64:17 91:11
135:3,13 150:10
151:4 158:11 168:8
183:4

---
**R**

**R** 3:1
**race** 34:19 37:16,18
121:22 175:23
**racial** 31:11 36:5
38:14 108:10
121:24,25 176:1
**raised** 90:21 131:12
138:12
**raises** 129:15,21
130:7
**raising** 129:10
**ramifications** 90:22
**rare** 15:12
**rates** 29:9
**react** 176:23
**reaction** 79:20 80:6
167:24 168:1,2,5
176:22,25 177:3
**read** 7:9 34:24 37:14
71:3 74:4 137:2
143:22 144:16
155:2 191:20
**Reading** 118:23
131:9 143:22
**ready** 41:13 98:17
113:21
**realizing** 87:18
**really** 13:3 17:18
19:17 23:12 24:18
74:3 84:3 91:17
104:21 115:13
119:10,17 123:12

138:16 152:6 172:1
**reappointed** 8:19
**reason** 6:16 83:12
105:7 110:22 111:6
137:4 191:3
**reasons** 87:17,21
140:17
**recall** 11:6,7 16:15,21
17:24 18:3,8,10
27:14 32:17 34:25
35:3,5 38:8 45:11
45:17,18,21,24 46:1
46:4 53:19 59:25
62:19 68:3,24,25
69:2,3 70:18 72:15
72:17,17 75:18 78:5
78:19 79:8 80:8
81:8,8,22 82:2,5,25
83:3,3,4,16,24
84:13,16,18 85:4,9
86:14,17 88:15,23
90:20,25 91:12 92:8
92:21 93:4,14,15
94:3 95:25,25 96:3
96:4,8 97:6 100:23
101:2,8,11,22,23,25
102:8 103:5,9 111:1
111:2 116:23
121:18,20,21 123:1
125:4 126:12
127:24 128:2,3
135:2 138:12,21
146:16 149:15
151:8,11,20,23
154:23 159:10
160:5 168:16,22
170:2,5,9,20 173:10
**recalling** 169:25
**receive** 47:12,16
129:5
**received** 112:5 134:1
134:4,8,12 139:25
152:18 154:24
158:6 164:4,17,20

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

176:18,21 177:3
**receiving** 151:4
**Recess** 88:5 150:18
  188:21
**recognize** 32:4,5
  35:19,21 46:7 50:16
  50:18 58:7 118:13
  129:1,2 134:25
  135:1 137:13,17,19
  137:22 138:1,2
  143:19,21 151:2,3
  156:20,23,25,25
  185:15
**recognizing** 32:6
**recollection** 76:25
  90:6 152:21 167:21
**recommendation**
  15:25
**recommended**
  158:20
**record** 2:22 6:11
  55:20 56:19 57:11
  69:18 93:21 96:18
  100:12 102:16
  105:24 188:19
  193:14
**redistricting** 30:11
  37:16,19
**reduce** 144:20
**refer** 121:10 161:6
  163:15
**reference** 146:21
**referenced** 110:16
**references** 70:7
**referencing** 72:2 74:3
**referred** 55:12 82:12
  82:13 93:15
**referring** 9:5 31:20
  61:9 88:21 109:15
  154:15 162:19
  163:6,7,12 184:2
  190:2
**refers** 138:9
**refocus** 164:4

**refresh** 61:21 76:25
  185:12
**refreshing** 170:23
**regard** 11:16,24 12:3
  53:1 78:12 114:24
  116:25 123:5
  142:14 177:21
**regarding** 118:5
**region** 156:17
**regions** 156:2,5,12,16
**registered** 28:18,19
  31:12 36:5,21 38:14
  38:24 39:5,23 70:20
  81:5 99:4 177:1
**registration** 12:25
  13:9,15 25:19,24
  64:5,21 65:16,24
  66:5,10,19 67:2
  68:11 69:24 72:4,19
  73:2 74:24 87:16,20
  89:10 194:13
**regular** 126:9 131:25
  143:11
**regularly** 26:25
  29:20 153:18
**regulation** 52:19,21
  115:11
**regulations** 21:4
**regulatory** 53:1,4
  115:13,17 163:19
  172:14
**related** 9:3 12:19
  18:25 22:5 67:4
  78:5 106:23 111:1
  135:11 137:3
  155:24 175:23
  187:3 194:2
**relates** 18:19 178:11
**relating** 155:24
**relationship** 13:17,21
  14:1 90:19 187:2
**relationships** 114:10
  123:13 132:14
**release** 85:13 96:2

97:2 122:19
**released** 91:4 95:5
  98:2
**releases** 122:13,21
  123:6,7
**releasing** 90:18,22
**reliable** 89:8 111:3
**rely** 86:23 87:4
**remains** 57:22
**remedied** 109:24
**remember** 11:1 27:6
  28:14 33:16,23
  35:21 43:3,18 44:8
  48:9 53:25 62:22
  63:13 64:7 65:20
  67:5 68:4,5 72:11
  75:11,12,24,25
  77:18,19,25 78:2,16
  79:6,19 80:19,20,20
  81:9 82:9 84:2,2,3,4
  89:4 90:13,16 93:8
  97:4,4 99:18 101:4
  107:12 111:19,23
  111:25 112:1,3,10
  117:7 121:15,16
  125:1 126:10 143:9
  143:20 146:11
  151:3,4 164:12
  165:19 168:24
  170:4,8,13,14,18,18
  185:6,9,17,21
  186:15 189:3
**reminder** 107:16
**removes** 57:17
**removing** 106:8
**repeatedly** 92:1
**rephrase** 87:18
  168:21
**report** 12:15 60:17
  60:25 61:15,19,22
  61:24 86:1,8,10
  106:23 157:1,4
  158:3
**reported** 2:19 160:18

189:9
**reporter** 55:25
  107:23 108:25
  150:16 193:9
**Reporter's** 4:6 193:7
**reports** 153:16 158:6
**represent** 32:7 33:12
  34:6 113:1
**Representative** 95:14
  102:23,25 103:3,7
  106:5
**Representatives** 4:19
  96:16,23
**representing** 6:10
**request** 22:15 24:1
  45:5 64:24 72:15,17
  72:21,22,25 83:7
  101:10,15 102:5,6
  179:6
**requested** 62:17
  84:25 85:5 89:22
  149:16
**requesting** 111:3
**requests** 44:20,22
  79:5 89:19 92:3,4
**required** 31:9 38:11
  66:13 107:10 108:9
  151:17 152:10
  168:11
**requirement** 74:11
  106:9 119:3
**requirements** 116:3
  116:9 164:1 172:5
**rerunning** 124:4
**research** 22:5,7,8,11
  22:13,18 23:2,6
  67:4
**researched** 50:20
**reserve** 190:16
**resolve** 140:16
**resolving** 159:6
**resource** 18:22,23
  24:3,4,8,11 32:20
  32:22 38:25 44:9,10

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

22

55:5 63:7 128:9
144:25 145:4
**resources** 11:19,20
11:21 12:4 14:19
113:11,23 124:16
134:2,4,6,13,17
141:8,10 145:14
149:17,21 150:1
187:20,25
**respect** 187:7
**respective** 14:8
**respond** 35:24 44:3
44:11,15,20,21 79:4
97:7 100:3 131:11
138:14 151:10
**responded** 38:3 44:4
45:5,13 59:12 83:7
104:3
**responding** 42:24
85:1
**responds** 70:6 99:7
**response** 22:15 42:22
45:19 60:1 70:4
72:8 97:25 98:16
125:4 130:10,12
138:15 151:24
152:15 186:7
**responsibilities** 11:15
11:17 12:9 115:9
125:14 145:11
172:13 183:25
184:2,3
**responsibility** 108:21
108:23 115:6
117:10,14 138:8
140:11 183:12
**responsible** 172:4
**responsive** 44:23
45:1
**rest** 36:24 57:22
**result** 88:17 159:2
**results** 76:10 81:13
81:21 83:17 88:10
89:7 100:20 110:17

**return** 193:19
**returned** 193:20
**reversed** 53:8
**review** 103:19
**reviewed** 103:16
**Richards** 76:9
**RICK** 1:6 192:6
**right** 28:4 29:25 35:7
36:2 40:24 46:13
48:18 50:1 51:5
57:10 59:16 66:3,7
70:5 72:20 73:15
94:25 95:22 116:4
123:23 128:22
130:24 131:7
135:22,22 136:18
137:10 142:17
143:17 154:23
159:13 160:5,6
161:3,12 164:25
167:20,23 172:17
173:23 175:18
189:14,16,18
**RIGHTS** 3:4
**risen** 159:9 178:18
**rises** 20:10
**road** 11:1
**role** 15:15,20 16:9,10
17:24 18:11,13,16
32:11 46:15,22
102:12 113:8,10,17
113:18,22 114:1,4
114:15,17,20
117:16,17,25 118:1
123:18 126:3 132:1
132:1,2,6 133:15
169:7,8,15 171:23
178:18
**room** 3:4 63:8,9
72:12
**round** 127:7
**routine** 31:3
**routinely** 31:5
**Rowe** 3:12

**Rules** 2:21
**run** 14:4 26:14,18,21
27:3,12,16,23 55:24
95:14,16 149:21
186:5
**running** 9:8 10:13
145:15 168:17
185:24
**runs** 185:3

_____
**S**
_____

**S** 3:1
**safe** 173:24
**Safety** 117:19 118:4
**sat** 43:19 165:17
**satisfy** 42:8 43:1
**Saturday** 126:15
**Saturdays** 116:14
143:14 147:14,17
147:19 148:7
**saw** 80:18,19 151:12
156:4 158:12
**saying** 17:18 36:23
73:23 87:11 99:13
125:2 136:11,13
160:17 161:8 163:2
179:14
**says** 36:24 38:10,21
39:10,16 44:6 46:10
46:10 49:18 50:19
51:25 52:23 70:25
71:1,24 72:7 74:1,5
74:8 76:19 94:13,24
95:1,2 99:1 100:14
100:14 103:10,13
104:22 106:12
116:7 130:4 135:10
135:24 136:3 144:1
146:4 152:2 167:17
**SB** 4:9,13,14 25:17
25:23 26:8 31:18
32:7 33:10,18,21
40:12,23 47:25
48:14 49:2 51:8,18

52:3 53:2,7,18,21
53:23 54:1,16 55:12
58:23 59:20 62:23
67:4 68:17 69:14
71:12,15 73:20
74:18 93:14,15
96:23 100:18
102:11 103:4,8
105:7,12 107:1,6,11
108:10,21 109:3,10
110:5,10 113:9
148:10 161:3,12
168:11 172:15
176:18 178:6
180:25 182:19
**scenario** 86:13
**scheduling** 17:5
**school** 11:5
**science** 10:19,25 11:3
**Scott** 3:8 6:21 21:5
21:19 22:9 23:8
24:9,16,23 25:6,12
26:10,20 30:17 31:4
37:8 39:1 45:7,14
51:6,23 52:4 53:9
54:7,24 55:24 56:2
56:16,20,23,25 57:6
57:9,13,15,21,25
58:3 60:11 64:10
66:22 68:12,19
69:18 70:21 71:13
74:19 77:5 79:24
80:7 81:15 82:15
84:10 85:2,16 97:14
98:3,19 99:12 100:5
100:7,12 101:17
102:3,7 103:17
105:11 107:18,24
108:14 115:14
123:17,25 129:12
132:25 137:14
140:7 142:22 144:5
144:9 148:2,12,15
148:19 149:22

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

23

154:9 160:25 161:4
168:12,18 176:4
177:6 186:22
190:16
**sealed** 56:6,11
**second** 10:5 11:12
35:14 37:13 42:5
50:11 67:10 94:4,6
104:14 106:7 144:1
**secretary** 3:13 7:17
7:20 8:10,12,14,15
8:16,20,21,24 9:15
11:9,13 12:9,11,11
12:12,20 13:15
15:16,22 16:11,24
17:2,5,6 18:16,18
20:11,18,23 21:3
22:4,14 23:5 24:2,2
24:7 26:13 28:4
29:14 31:10 33:3,12
33:15 36:4 48:13
50:15,20 52:25 53:3
54:18,20 55:1,3
59:1 62:9 64:18
67:11 70:15 71:7
73:18 83:22 91:10
93:3 100:25 101:14
103:23 106:13
107:4,10 108:9
113:12 114:24
115:23 116:21
117:9,18,25 118:4
119:4,8 124:7 126:3
127:23 134:12
140:13 146:21
147:1,22 149:16
155:7 163:10
166:17 167:4
169:23 170:10,22
172:7,10,12 178:21
179:21 180:24
187:3,10 189:17
**Secretary's** 24:4
**section** 40:12 41:6,10

41:10,10,15,16,17
41:20,23 42:8 49:21
50:19 57:2 110:10
**Security** 64:5,14,20
65:15 66:11,18
**see** 8:4,24 13:6,20
16:5 34:15,18,21,24
34:25 35:17 36:7,12
37:11 38:9 39:9,24
40:8 41:17,22,23
42:3 46:8 49:19,24
50:15,19,21 51:9,10
51:21,25 56:4,15
57:20 58:25 61:21
69:16,21 70:3,6
71:3 72:2,6 73:12
73:14 74:5 75:8
76:16 80:3 92:8
94:9,13 99:2 102:22
102:24 103:10,13
104:22 106:7,11
118:18,19 124:15
127:20,25 129:15
129:19,21,25 132:8
135:3,24 137:12
138:3 139:18
145:19 146:20
147:9 153:16,17,20
160:8,11,21 167:7,9
167:16 168:14,15
172:21 174:25
175:18,19 183:20
183:23
**seeing** 135:2 146:1
**seek** 97:2 115:24
**seeking** 83:16 116:2
**seen** 51:12 58:9 61:20
75:9,16 87:8 94:2
102:18 109:19
129:3 139:11 142:6
158:7 159:9 165:1,3
165:6 185:18
**Select** 4:20 96:5,11
98:24 100:10

**selected** 119:13
157:21
**selection** 15:23
**self-identifying** 140:5
**Seminary** 10:22
**Senate** 4:9,12 21:9,12
21:14 23:25 32:8,9
46:13,16 47:11,12
55:7 58:14,17 59:19
62:21 63:10,19
106:23 116:7 161:9
178:11 182:9,11
**Senator** 9:23 31:19
34:15 35:25 37:24
38:2 39:3,6,9,16,21
44:3 45:19 47:7
58:20 59:23 60:2
68:25 69:22 70:10
70:16,19 71:11,20
72:16,21 73:5 74:17
83:7 90:19 91:2
101:5 107:9 108:12
**senators** 24:1 33:21
45:23 74:21
**send** 76:20 95:13
**sending** 128:2
**sense** 29:23 31:6
57:20 125:22
128:17 136:8 186:8
**sent** 35:3 37:21 59:8
59:15 77:1,15 94:24
157:4
**sentence** 36:25 37:13
37:14 38:10,19
102:21
**separate** 188:7
**separately** 42:9
**Sephri** 82:13,17,24
83:1
**September** 5:5
185:23
**serve** 8:23 24:3,4
44:9 56:11
**served** 8:10,17 10:15

17:15 44:10
**service** 148:25
149:10 168:6
**serving** 32:22
**session** 54:6,23 91:19
113:21 159:20
161:16 162:8
**set** 65:6 133:19
166:11
**seven** 48:4 174:13,19
**seventh** 174:11
**sharable** 57:25
**share** 15:5 20:11 23:7
26:11 27:17 109:6,7
140:3
**shared** 22:18,20,22
23:3 78:21 80:13
88:18 110:24
139:10,23 143:8
145:6 152:23
158:14 179:19,20
**SharePoint** 165:9
**shares** 20:7
**sharing** 111:2 141:22
**Shorter** 2:9,14 4:3
6:1,12,13 7:14 32:1
58:4 191:20,25
193:7,12
**shorthand** 2:19 193:9
**show** 166:14
**showed** 91:7 123:2
142:8 165:8 167:23
**showing** 32:1 34:3
35:11 58:6 69:7
75:4 98:10 102:14
105:22 118:10
128:23 134:22
137:11 143:17
150:20 156:21
164:23 185:14
**shown** 60:5 164:11
**shows** 175:12
**side** 21:12
**sign** 105:1,9

COBY SHORTER, III                           8/12/2014
CONFIDENTIAL TRANSCRIPT

24

signature 4:5 35:6
    38:3 105:13 191:1
    191:21 193:18
signed 100:18
significant 158:16
signs 15:23
silver-bullet 181:17
similar 38:10 157:3
    165:1,6,16
similarly 187:6
simply 36:25 65:5
sister 117:19
sit 38:4 45:10 48:7
    90:6 110:3 112:7
    138:19 164:16
    180:4,14 189:2
site 152:4 165:9
sites 157:21
sitting 43:4 166:20
situation 87:9 109:24
    133:24
six 174:13,18
size 166:15
slightly 111:5
small 136:5,6,10,12
    136:15,21 168:3
smaller 161:25
snapshot 135:21
Social 64:5,13,20
    65:15 66:11,18
sole 120:22
solely 78:5 127:22
    145:16
solicit 14:24
somebody 57:18
    81:19 117:14
    155:10 179:11
    190:7
somebody's 79:10
sorry 26:23 38:6 86:4
    87:17 108:1,25
    122:17 125:9 166:8
    168:20
sort 14:23 19:4 35:14

109:20 126:25
    139:18 159:13
SOS 103:11,14 106:9
    150:12 163:22
    166:1,18
SOS's 123:18
sound 67:12 167:20
sounds 58:2 167:23
source 148:10,17
SOUTHERN 1:1
    192:1
space 11:22
Spanish 28:6 29:6,15
    30:5,24 31:2,12
    62:6 111:17
speak 67:20 68:17
    187:8,9
speaks 51:8,24 70:22
    100:13 129:13
    144:10
spearheaded 76:5,7
special 56:8,25
    146:23 147:4,8
specialist 93:2
specialists 93:9
specialization 186:23
specific 11:2,7,15,17
    18:3 30:19 32:6
    48:9,24 61:14 72:17
    72:24 79:13 84:16
    96:15 111:23,24
    130:3 143:20 151:4
    153:5 185:2
specifically 9:2,5
    11:1 27:22 30:1
    62:3,15 67:20 76:13
    77:24 78:16 87:23
    87:24,25 89:23
    96:17 105:19 111:1
    111:25 112:1
    118:19 126:16
    134:14 143:6
    163:12 169:24
    170:8,14,19 178:5

180:2 182:23 190:7
specifics 30:19 75:11
    112:3 126:15
    139:11 181:4 183:2
speculate 148:16
    190:10
speculation 21:5
    25:13 53:9 54:25
    66:23 68:13 70:22
    77:5 79:25 82:16
    84:11 85:16 98:3
    99:12 105:11
    108:14 129:13
    132:25 140:7 144:6
    144:9 148:2,15,19
    154:9
spelled 161:3
spike 54:9
split 115:10
sponsor 33:11,14
    103:7
spread 128:18,19
staff 9:24 14:12,19,21
    19:6,9 20:7,9,14
    21:22 22:16 26:6,11
    32:24 33:5,5 35:5
    35:24 37:24 42:22
    42:25 43:2,10 44:1
    44:1 46:21 48:24
    59:23 60:2 62:1,17
    65:8 66:12 67:6
    76:12 77:11,19,20
    77:22 78:17,18,19
    78:19,21 80:20,23
    81:2,7,10 82:5
    85:20,22,25 86:19
    86:25 87:3,11,13,24
    89:14,14,16 90:1,11
    90:12 91:13,15 93:4
    96:18 100:1 103:25
    104:9,10 105:15
    110:12 112:5
    113:10,22 122:11
    122:12,15,18 127:8

127:23 128:2,4,16
    132:11 133:10,17
    133:20 137:24
    138:9,10 139:10,17
    139:23,24,25 140:4
    140:10,14 144:2,22
    144:23 145:8,11,16
    146:9,12,19 153:6
    154:5,6,13,14,14,16
    154:19,21 155:6
    157:18,18 158:12
    158:20,20,23,23
    159:4 166:2,14,18
    166:21,23 170:23
    173:5,7,10,12,17,17
    173:19 178:1,8,20
    179:3,19
staff's 157:1
staffed 127:12,22
    133:6 144:20
staffers 92:11
staffing 127:4,11
    128:10 130:21
    135:7,25 144:4,25
    145:5
staffs 153:23
standing 139:1
standpoint 56:2
start 55:1 98:22
    128:12 132:17
    169:1
started 25:16,23
    43:19 73:3 116:22
    119:18 134:10
    145:15 168:16,22
    169:3 188:3
starting 43:19 131:20
starts 71:21
state 1:18,20 2:4,18
    6:11 7:20,23 8:12
    8:14,15,25 11:9,10
    11:13 12:9,11,11,23
    13:2 14:15 20:18,23
    21:3,15 26:13 28:4

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

COBY SHORTER, III                                     8/12/2014
CONFIDENTIAL TRANSCRIPT

29:1,15 33:15 36:5
50:16,20 53:1 54:18
54:20 55:3,8 58:14
58:18,21 59:1 62:14
71:7 87:1 91:10
93:3 107:5,10 108:9
109:14 115:24
119:8,15 126:3
138:16 146:1,21
147:1 152:7 156:3
163:16 168:22
170:22 175:7,7,13
177:1 184:10,12,23
187:3 189:17
192:18,20 193:4,10
**State's** 3:13 7:18 9:15
13:15 15:16,22
18:16,18 22:4,14
23:5 31:10 33:13
48:14 53:3 55:2
62:9 64:18 67:11
70:16 73:19 101:1
101:14 103:23
106:14 113:12
114:24 116:21
117:9,18,25 118:4
119:4 124:7 127:23
134:12 140:13
147:22 149:16
163:10 166:17
167:4 169:23
170:11 172:7,10,12
178:21 179:21
180:24 187:10
**stated** 2:22 37:23
158:8
**statement** 74:4 99:10
105:2 130:3 189:6
**statements** 189:23
**states** 1:1,8 3:2 6:10
36:19 41:18,21,21
42:7 192:1,8
**statewide** 113:19
114:12

**stating** 105:3
**Statistically** 180:18
180:19
**statistics** 180:13
**status** 36:5 101:10
157:4
**Statutorily** 172:3
**statutory** 115:21
118:2 163:20
**stay** 63:11
**stayed** 33:25 63:13
**steps** 14:3 109:2
115:23 131:11
151:15 163:2
165:18,22
**stop** 170:11
**strategy** 116:16,18
151:25
**Street** 2:20
**stretching** 145:13
**strike** 30:4 85:12
145:14
**studied** 180:23
**studies** 10:22 182:22
**study** 17:22,23
107:10 108:9
182:18 183:7
**stuff** 183:18
**subject** 16:19 80:9
135:9
**submission** 34:21
88:22 110:9
**submissions** 30:6,14
37:12
**submit** 110:15,17
157:11
**submitted** 30:15
38:15 110:21,24
111:18 193:16
**subpart** 57:22
**subparts** 57:18
**subsequent** 92:19
**subset** 147:9
**substance** 45:22

53:22 92:21
**substantive** 19:5
159:25
**substantively** 20:5
**success** 14:10 182:15
**successful** 14:15 75:2
79:1 164:15 182:17
**suffered** 108:11
**sufficient** 149:20
187:19,25
**suggest** 18:24 19:3
**suggested** 91:3 93:7
116:20 147:23
166:18 170:11
188:14
**suggestion** 167:3,6
169:22 170:21
**suggestions** 169:16
169:18
**suggests** 73:13
**Suite** 194:10
**sum** 93:12
**summary** 76:19
**supervised** 46:21
**supplied** 64:4,19
65:23
**supply** 64:13 66:13
**supplying** 65:13
**support** 63:24
**sure** 11:18,21 12:3
13:6,6 14:14,19
16:23 17:1,2,5
19:18 20:25 30:18
46:24 62:17 64:18
74:3,10 91:11,18
104:21 107:18
110:19 113:10,18
113:22 135:3,13
139:4 145:11
150:10 151:5,21,25
162:15 168:8
177:19 178:3 183:4
**surface** 52:7
**surname** 28:7,22

29:15 30:5,24 31:2
31:12 36:8,25 37:5
59:13 60:18,25 62:6
70:7 111:17
**surnames** 28:11 29:2
29:6 36:22 37:1
39:7
**surprise** 60:20,22
77:14 84:20
**sworn** 2:16 6:2
193:12
**system** 26:8 112:16
112:17,18,22
**systems** 27:19

_____

**T**

**table** 166:20
**take** 14:3 33:19 34:14
35:14 40:12 41:9
48:17 49:24 50:4
70:4 73:19 78:7
86:24 88:2 93:24
104:14 106:1 129:7
131:11,15 137:14
150:25 151:14
152:14 160:8
171:24 175:14
190:2,3
**taken** 2:16 115:24
159:18 194:4
**takes** 125:25 162:6
**talk** 21:2 33:9 37:12
67:9 78:14 82:7,12
96:22 107:17 108:1
137:24,25 173:7
**talked** 7:1 29:16
59:12 72:2 75:19
83:22,23 165:23,24
165:25
**talking** 16:2 23:4
39:8 40:20,21,21
47:10 48:19 69:25
73:17,24 78:6 88:7
92:19 94:9 96:13,15

COBY SHORTER, III                                  8/12/2014
CONFIDENTIAL TRANSCRIPT

26

104:19,21,22
109:20 129:25
130:3 153:23
163:16,17 169:9,10
169:11 172:24
188:3 189:25
**talks** 39:22 70:3,10
72:6 73:12 138:4,7
145:21
**tangible** 113:23
**target** 74:8 106:15
157:15 174:22
175:6,7
**targeted** 106:9
**task** 141:12
**tasking** 187:12,14
**tasks** 150:2
**Tax** 129:9
**teaches** 175:12
**TEAM** 64:15,22 65:5
65:11,17,20,21 66:7
67:17 68:7 78:13
**technical** 18:24 19:1
19:5,7,8 20:12
66:24 67:19 158:25
159:6
**tell** 26:6 31:14 42:20
42:22 48:24 65:7
74:20 75:23 85:20
85:22 86:12,23
87:23 101:9 136:19
139:6 156:8,16
165:24 166:14,14
178:16
**telling** 61:13 77:20
80:20 88:1 102:2
190:7
**tells** 138:17
**tend** 14:20
**tends** 184:18
**tenure** 104:2
**term** 147:7
**terminate** 118:17,25
119:2

**terms** 9:13 13:14
15:17 20:22 23:4
49:13 66:3 70:12
92:11,12 104:12
117:4 128:9 136:13
141:2 145:5 147:4
162:12 164:12
187:17
**testified** 6:3 31:23
32:9,19,20 33:10
43:15,20 44:7 45:4
60:21 62:5,19 63:7
64:1 67:4 77:15
84:21 85:4 88:9
96:5,7,10,17,18,23
121:4 141:2 146:25
147:12
**testifies** 24:6
**testify** 6:2,16 23:20
23:22 24:2,8 32:14
33:4,15 34:1 62:23
63:17 96:8
**testifying** 33:18
62:22
**testimony** 6:19,20
7:9 33:22 38:25
43:16 68:18,23
72:10 80:8 98:23
123:18 149:23
168:19 193:14
**Texas** 1:1,11,14,18
1:20 2:4,19 3:9,13
4:19 7:9,12,24
10:20 11:16 12:23
13:9 14:15 18:19,19
25:16,23 29:1 37:15
37:17 38:5,6 48:2
79:23 94:10,21 97:8
97:25 116:2 136:20
145:24 159:3 162:8
163:16 168:10
175:13 177:2
184:11,14 190:1,6
192:1,11,14,18,20

193:4,10 194:9
**thank** 6:19 58:3
69:20 190:14,15
**thing** 39:7 63:14 75:7
121:10
**things** 13:18,22 18:3
20:13,19 48:4 79:11
93:11 99:19 104:12
113:24 140:14
149:1 153:17
165:24 166:10,16
181:13 182:5,23
189:22
**think** 12:2 16:15
21:12,14 23:24
24:20,23 25:1 29:19
36:19 37:5,9 44:11
49:9,10 52:4,6 53:3
53:5 58:19 65:12,18
66:9 67:9 68:6
72:20 80:2 82:9,10
82:23 84:7 88:15,17
89:7,23,24 90:14
92:13 93:8 95:15
108:4,23 111:4
116:22 117:16
121:23 122:4 123:4
125:1,6 126:14
131:3,3 132:22
142:9,16 146:16
147:6 153:19
164:20 166:5,9,10
167:8 169:5,16,19
172:12,16 176:25
181:2 182:5,6
186:10,19 187:6,25
188:20 189:8
**thinks** 70:11
**third** 35:15 75:13
79:21 138:4 146:20
172:19
**thought** 39:6,8 43:8
44:13 82:20 91:5
120:12 171:15

**thousands** 137:22
**three** 128:13 135:8
136:1 174:13,18
**time** 8:19 17:19
20:10 21:20 23:22
23:23 29:21 32:16
35:20 43:24 44:11
56:7 59:9 60:16
78:23 79:12 80:21
87:7,8 93:10,11
97:22 116:17
118:17,25 122:14
124:16,20 125:2,20
126:2,23 128:18
131:21 132:10
135:21 138:16
146:1,18 148:1
158:24 159:4,19
160:14 166:10,12
167:17 170:7 174:1
174:1 187:11
189:11,22 190:14
193:23
**times** 22:13 45:11
48:5 99:18 104:2
**timing** 72:7
**today** 6:14,17 38:4
43:4 45:10 48:7
51:13 110:4 112:7
164:12,16 180:5,14
189:2
**told** 66:12,16 77:24
80:15 176:20
**tomorrow** 73:14
**top** 36:2 50:13 75:14
76:16 94:24 99:21
113:14 118:22
136:18 142:5
159:10 178:15
**total** 160:8,11 161:22
181:4
**totally** 91:5 190:11
**totals** 181:2
**track** 34:19 36:5 71:4

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

27

tracking 142:3
tradition 180:9
train 133:10 166:21
  166:23,25
trained 127:9 132:24
  133:4 147:1 166:1,2
  166:15,18 167:5
training 73:24 74:2
  133:2 166:22
transcript 4:11,16,20
  34:7 55:22 56:18
  57:8 69:11 107:23
  193:13,16,21
Transportation
  145:25
travel 128:13
Travis 122:11 125:1
  125:4,16 129:9
  130:13
treat 56:9
trial 7:9
tried 25:15 140:18
tries 84:17
troopers 184:12
true 27:1 191:22
  193:14
Trustworthy 189:7
truth 6:2,3,3
truthfully 6:17
try 44:15 71:2 75:1,1
  80:23 107:16
  108:17 109:3,10
  131:23 132:6 140:6
  151:25 181:23
trying 65:3 66:20
  73:1 77:20 78:7
  79:10,14 87:3 89:17
  89:20,24 91:7,8
  109:4 117:7 144:19
  144:21 171:17
  188:17
turn 40:4 60:8 69:14
  71:18 98:13 181:18
turnout 180:25 181:9

181:20,22,24
tweak 158:10 160:2
tweaked 158:13
tweaks 158:19
two 40:20 46:8 67:21
  107:3 128:1,2
  174:13,18 175:14
  175:16 188:20
TX 2:20 3:10 69:19
  194:11
TxDOT 156:6,6
type 13:12,13,19
  20:14 22:7,8,11
  27:21 64:11,23
  67:20 90:25 153:24
  160:18 161:23
  168:2 184:1
types 48:19 164:21

---

### U

U.S 3:3 9:23 28:12
  42:7
Uh-huh 15:18 16:20
  18:5,14 21:13 22:24
  34:5,17 35:2,18
  36:3,6 39:25 40:7
  40:11 41:19 42:19
  43:23 50:14 58:5
  59:4 62:8 64:2 72:5
  72:9 73:7 74:13
  75:15,21 76:15,17
  76:21,24 80:5 88:8
  94:1,15 99:9 116:19
  123:10 128:7,25
  130:6,9 132:12
  134:24 137:21
  138:6,11,13 139:13
  140:23 143:25
  145:20,22 146:6,22
  146:24 150:22,24
  152:5,25 156:18,22
  159:15 161:21
  163:11 167:19
  172:20 173:9 175:2

179:13 182:4,11
  184:15 185:19
  187:22
ultimately 88:16
  135:19
un 57:23
unclear 161:14
uncommon 153:24
underlying 151:14,16
  152:9
understand 6:13 11:9
  17:20,21 24:17 27:6
  64:17 67:22 71:2
  107:19 113:3
  115:17 135:20
  166:24
understanding 4:24
  13:4 17:13 22:12
  23:13 97:16,18
  118:5,14,16,24
  135:23 136:1
  147:21,25 148:3
  187:23
understood 17:19
  74:11 80:2 139:2,3
  171:16
uniformly 12:22
unit 122:13 124:24
  125:10 131:24
  136:24 163:19
  173:4,14,16,21
  174:5
United 1:1,8 3:2 6:10
  41:18,20,21 192:1,8
units 116:11 118:6
  119:12 122:6,23
  123:5,15,21,22
  124:2,5,8,9,14
  126:4,8,18,21 127:1
  127:5,12,22 128:5
  128:10 129:11,17
  131:7,16,24 133:6
  135:18 139:22,22
  142:19 144:20

147:2 157:15,24
  163:6,13,18,24
  164:1,19 172:22
  173:24 174:3
  185:22 188:7
universe 74:9
University 10:20,22
unknown 119:25
upcoming 117:21
  160:7
update 96:25
updated 64:3
updates 153:21,23
updating 66:25
use 25:20,20 66:20
  122:5,8 123:15
  124:1 146:7,8
  150:16 157:14
  173:3,14,22 175:9
  183:21
uses 87:24 115:18
  175:5
usually 19:15,25 20:2
  21:16 22:2 27:24
  55:7 139:6 190:2

---

### V

V 7:9
vague 21:6,19 23:8
  24:16,25 25:7 26:20
  30:17 31:4 39:1
  45:7,14 51:6 68:19
  71:13 103:17
  142:22
vaguely 31:23
Van 34:15 35:25 39:3
  39:6,9,16,21 45:20
various 27:18 104:11
  104:11 167:13
VEASEY 1:3 191:2
  192:3
vendor 175:10
verified 42:23
verify 112:18,22

COBY SHORTER, III                                    8/12/2014
CONFIDENTIAL TRANSCRIPT

28

**version** 107:1
**versus** 7:12 180:10
  182:8
**view** 117:25
**visit** 12:13 16:24 17:1
  17:6
**visited** 119:20
**visiting** 77:18
**voiced** 130:23 131:5
**volunteered** 10:8,10
  10:12
**vote** 25:22 74:12
  105:5 179:22 180:1
  180:6,15
**voted** 71:14 74:21
  121:19 178:22
**voter** 4:20,20 12:25
  13:9,14 25:19,24,24
  25:25 26:14 27:12
  31:20 37:3,7 38:11
  38:15 47:13 48:1,8
  54:5,10,13 64:5,21
  65:16,24 66:1,4,10
  66:19 67:2 68:11
  69:24 72:4,19 73:2
  73:24 74:2,24 87:16
  87:20 89:10 96:5,6
  96:11,12 98:24,25
  100:11,11 111:21
  112:8,12 113:2,17
  168:7 174:22 175:4
  175:5,8 176:6
  180:25 181:2,9,20
  181:24 183:18
**voter's** 25:18 112:18
  112:22
**voters** 1:11 12:19
  13:1,2,9 26:17 27:4
  27:23 28:2,18,19
  31:12 36:5,8,21
  38:14,24 39:5,23
  59:3,24 60:18,25
  61:25 64:4,12,19
  65:14 66:13,17 67:1

67:25 69:23 70:20
79:22 81:5 94:10
99:4 106:10,16
108:22,24 109:1,3
110:5 116:2 119:5
136:15 168:5,10
177:1 181:5 183:18
192:11
**votes** 14:17
**voting** 71:16 136:7
  136:11,21 164:2
  172:6 180:9,11
  188:23 189:21
**VS** 1:5,10,17,23 2:3
  191:2 192:5,10,17
  192:23 193:3

---

**W**

**wait** 40:14,19 50:24
  100:7 129:25
  161:15 168:25,25
**waiting** 103:11,13
  139:1
**walk** 43:2
**walked** 141:17
**want** 41:1,9,14 51:20
  55:20 56:4 58:1
  67:9 71:23 93:7
  118:20 119:10
  125:11,12 130:17
  137:24 142:13
  150:15 152:6
  162:14 168:8
  171:25 178:12
  181:16
**wanted** 63:20,23 74:1
  74:8 87:1 119:21
  126:24 139:4 152:7
  157:10 166:13
**wanting** 104:11
**wants** 160:21
**warrant** 164:21
  185:3,24 186:9,16
**warrants** 185:21

**Washington** 3:5
**wasn't** 39:2 63:18
  71:16 77:21 83:11
  84:25 89:16 90:2
  98:2 100:6 103:9
  110:22 111:6
  112:16 121:5
  125:19,20 133:1
  136:12 138:23,25
  149:11 165:5
**way** 37:2,6 49:23
  52:10 56:23 68:7
  80:24 81:4 150:3
  157:10 161:11
  162:22 173:14
  176:23 180:19
**ways** 130:15 169:17
**we'll** 56:15,18 125:12
  130:19 159:22
  160:8
**we're** 23:4 45:1 55:5
  55:21 56:19 57:4,7
  57:12,15 109:4
  114:22 115:2 117:2
  122:11 142:8
  144:13 150:3,4,5,21
  158:16,17,17,22,24
  159:2 162:11,18
  163:1,13,17 169:9
  169:11 172:4,16,16
  178:1,11 179:2
**we've** 25:15 32:2
  34:3 35:11 46:6
  58:6 69:7 75:4
  102:14 109:18
  114:11 116:4
  134:23 142:24
  143:18 156:21
  158:7 164:20,23
  176:3,7 181:3
  185:15
**wealth** 128:19
**weather** 181:19
**website** 123:9

**wee** 43:21
**week** 72:8 125:23
  128:13 130:4
  146:13
**weekend** 130:8
**weekends** 131:25
**weekly** 153:25 154:3
  154:10
**weeks** 126:2
**weigh** 89:18
**went** 43:16,20,25
  63:9,16 67:23 74:12
  88:18 96:18,23
  102:8 122:10
  127:10 131:16
  133:16 185:1
**weren't** 43:24 48:11
  66:13 91:5 130:8
  138:22,23,24
  147:13
**West** 2:20
**whatsoever** 68:2
**wheel** 67:11,15,16,18
  183:18,20
**Whew** 128:22
**Williams** 69:1 71:20
  72:16,21 73:5 74:17
  83:7 90:19 91:2
  101:6
**Wilson** 8:17
**witness** 2:15 3:7
  19:13 24:3,5,11
  32:20,23 38:25
  42:25 44:10,10 63:7
  63:21 88:4 190:15
  193:12,15,17,18
**witnesses** 24:8
**wonderful** 55:25
**wondering** 20:16
  52:1 100:2 111:5
  115:9 135:22 140:9
  160:23 164:16
  180:21
**word** 115:2,19 116:5

COBY SHORTER, III
CONFIDENTIAL TRANSCRIPT

8/12/2014

29

144:12 177:25
**work** 8:3 9:3,6,18
  11:23 12:8,10,12,24
  17:20 18:2 19:3
  55:7 81:2 83:5
  87:10 91:14,15
  102:9 114:11
  116:10,13,15
  119:22 124:19
  126:23 127:9
  131:22 132:2,13
  134:17 140:6,16,18
  141:7,9 142:16
  145:12 147:1
  156:15 158:11,23
  159:24 172:7 178:1
  178:2 187:13,15
  188:18
**worked** 8:2,4,7 9:22
  9:23 10:6,7,7,8
  22:16 58:17 116:4
  120:1 122:11
  124:15 125:6 132:4
  159:23 160:12,12
  162:4,4 178:5
**worker** 10:15
**workers** 113:19
  132:11
**working** 9:13 13:2,8
  13:17 43:24 78:3
  81:10,12 84:3,5
  90:5 94:13,19 97:5
  97:12 112:16,23
  114:8 116:22,25
  126:5 131:7 133:12
  133:18,20 134:2,5
  140:22 149:6 154:7
  154:14 159:4,5
  171:17 178:14,17
**workload** 187:16
**works** 12:22 13:7
  19:6 21:10 22:2
  58:14 131:21
  158:10 172:3,6

177:17
**worth** 136:12
**wouldn't** 22:25 26:15
  30:20 47:23 54:20
  60:22 66:24 81:6
  83:11 89:15 92:11
  105:10,16 121:23
  152:16 170:6
  190:10
**write** 44:2 65:14
  66:18 68:10
**write-up** 75:22,22
**writing** 52:22 88:14
**written** 51:3,11 66:6
  89:1,9 95:11 161:12
**wrong** 174:16,17,19
  190:11
**wrote** 37:21 66:17
  67:1 68:10 69:23
  88:25

**X**
**X** 120:17 122:13,14
**XY** 153:6
**XYZ** 120:16,16,17
  159:3

**Y**
**yeah** 9:7 40:25 42:15
  46:9 56:24 71:23
  94:7 102:24 137:9
  142:23 186:4
**year** 182:8,8,9
**years** 11:7 43:3 48:4
  86:23,23
**YOUNG** 1:11 192:11

**Z**
**zip** 119:18 120:17
  174:21 175:1

**0**
**00** 39:14
**003998** 34:10

**1**
**1** 4:9,20 31:25 32:2
  98:5,6 99:11 156:8
**1:03** 150:18
**1:58** 188:21
**1:59** 188:21
**10** 4:11,19 34:7 39:19
  88:2 98:8,11
**10:59** 88:5
**102** 4:22
**105** 4:23
**10th** 32:18 43:15,20
**11** 4:22 41:7,8 43:12
  69:25 102:13,15
  105:21
**11:16** 88:5
**1151** 194:9
**118** 4:24
**11th** 32:18 43:21
**12** 2:10,17 4:23 5:6
  105:20,23 193:8
**12/31/2014** 194:10
**12:47** 150:18
**12548** 3:10
**128** 4:25
**12th** 194:6
**13** 4:24 118:8,11
**134** 5:1
**137** 5:2
**14** 4:13,14,25 25:17
  25:23 26:8 46:14,16
  47:11,12,25 48:14
  49:3,21 51:8,18
  52:3 53:2,7,18,21
  53:23 54:1,16 55:12
  58:23 59:20 62:21
  62:23 67:4 68:17
  69:14 71:12,15,21
  71:22 73:21 74:18
  93:14,15 96:24
  100:18 102:11
  103:4,8 105:7,13
  106:24 107:1,6,11

108:10,21 109:3,10
  110:5,10 113:9
  116:7 128:21,24
  148:10 161:3,9,12
  168:11 172:15
  176:18 178:7,11
  180:25 182:9,12,19
**143** 5:3
**14th** 2:20
**15** 5:1 134:21,23
  176:20
**150** 5:4,5
**156** 5:6
**16** 4:25 5:2 137:7,12
**164** 5:7
**17** 5:3 143:16,18
**18** 4:12 5:4 150:14
  153:8 157:13 158:7
  176:20 177:3
**185** 5:8
**19** 5:5 150:19,23
**192** 4:5
**193** 4:6
**1989** 10:20
**1A** 156:7,9
**1B** 156:7
**1st** 96:6 97:11,17,24
  98:25 99:21,23

**2**
**2** 4:2,10 34:2,4
**2/10/2014** 5:3
**2:01** 2:17
**2:13-CV-193** 1:5
  192:5
**2:13-CV-263** 1:11
  192:11
**2:13-CV-291(NGR)**
  1:23 192:23
**2:13-CV-348(NGR)**
  2:3 193:3
**20** 4:23 5:6 156:19,21
  157:14 158:7
**20-plus** 11:7

COBY SHORTER, III

8/12/2014

CONFIDENTIAL TRANSCRIPT

30

**2006** 66:14,15
**2007** 8:11
**2009** 4:11,12 23:25
  31:19,22 34:8 37:2
  38:8,13,20,22 42:11
  43:8 68:3,4
**2010** 67:12
**2011** 4:15,16,18,21
  4:22,23 58:17,20
  63:25 69:11 79:7
  82:22 96:6 98:25
  99:11 100:17,17
**2012** 111:21 112:9,13
  112:13,16,23,24
  113:1
**2013** 4:25 5:5,6 26:19
  27:9 185:23
**2014** 2:10,17 124:2
  162:14 167:14,21
  168:16 176:20
  193:8,17,20 194:6
**202** 3:6
**20530** 3:5
**209** 2:20
**21** 5:7 164:22,24
  172:18
**22** 5:8 185:11,15
**23** 193:25
**24** 4:15
**24th** 59:15 60:17
**25** 4:16,18 63:25
  94:16 100:17
  126:17 173:23
**254** 173:24
**25th** 68:16 69:11
  72:21 94:25 95:4,24
**26** 104:17
**266** 167:18 168:15
**27** 100:17
**290** 98:13,14,20

---
**3**

**3** 4:12 35:9,12 39:11
**30** 5:5

**31** 4:9 144:2,17
**3244** 40:18 41:4
**34** 4:10
**344** 194:13
**35** 4:12
**362** 4:9 31:18 32:8
  33:10,10,18,22
  40:12,23
**380** 194:10
**3998** 34:11 39:9,12
  39:13

---
**4**

**4** 4:13 46:5,7,10 50:9
  50:13 118:20,21
  193:25
**4188** 49:19,20
**4189** 51:24
**424** 49:17,18
**46** 4:13
**460** 69:14,15,17 71:6
**463** 50:12
**463240** 50:11
**475-3281** 3:11
**489** 71:18,19
**490** 73:4,6,8
**491** 73:25

---
**5**

**5** 4:14 40:18 41:2,3
  46:10,11 50:7,8,17
  110:10 146:13
  175:15
**5-ish** 43:22
**5,000** 139:1
**50** 4:14
**512** 3:11
**512)292-4249** 194:11
**514-0828** 3:6
**55** 4:15
**590** 40:6
**591** 36:1

---
**6**

**6** 4:4,15 50:7 55:18
  58:7
**6/28/2013** 5:4
**60** 54:6,22
**600** 79:21
**63.0101** 40:13 41:6
  41:11 42:8,13 43:9
  51:10,16
**63.1010** 51:17
**678** 79:22
**678,560** 79:22
**69** 4:16

---
**7**

**7** 4:16 49:18 69:5,8
  69:21,25
**7-800,000** 120:8
**701** 194:10
**7254** 3:4
**75** 4:17
**78701** 2:21 194:11
**78711-2548** 3:10

---
**8**

**8** 4:17,22 75:3,5
  99:20 146:12
**800** 26:16,24,25 27:5
**816** 69:19
**844,713** 79:22
**8th** 33:4

---
**9**

**9** 4:18 49:17 93:20,23
  98:15
**9/18/2013** 5:8
**9/26/2013** 5:1
**9/27/2013** 5:2
**9:05** 2:17
**93** 4:18
**950** 3:5
**98** 4:19
**99** 141:15
**9th** 33:4 43:20