```
 1            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
 2                 CORPUS CHRISTI DIVISION
 3   MARC VEASEY, JANE HAMILTON,      )
     SERGIO DELEON, FLOYD J. CARRIER,)
 4   ANNA BURNS, MICHAEL MONTEZ,      )
     PENNY POPE, OSCAR ORTIZ, KOBY    )
 5   OZIAS, JOHN MELLOR-CRUMMEY,      )
     JANE DOE, JOHN DOE, LEAGUE OF    )   CIVIL ACTION NO.
 6   UNITED LATIN AMERICAN CITIZENS   )   2:13-CV-193 (NGR)
     (LULAC), AND DALLAS COUNTY,      )   (lead case)
 7   TEXAS                            )
                                      )
 8   VS.                              )
                                      )
 9   RICK PERRY, Governor of Texas,   )
     and JOHN STEEN, Texas Secretary  )
10   of State,                        )
     _____)
11                                    )
     UNITED STATES OF AMERICA,        )
12                                    )
     V.                               )
13                                    )
     STATE OF TEXAS, JOHN STEEN, in   )   CIVIL ACTION NO.
14   his official capacity as Texas   )    2:13-CV-263 (NGR)
     Secretary of State, and STEVE    )   (consolidated case)
15   MCCRAW, in his official capacity )
     as Director of the Texas         )
16   Department of Public Safety,     )
     _____)
17                                    )
     TEXAS STATE CONFERENCE OF NACCP  )
18   BRANCHES, AND THE MEXICAN        )
     AMERICAN LEGISLATIVE CAUCUS OF   )
19   THE TEXAS HOUSE OF               )
     REPRESENTATIVES,                 )
20                                    )
     V.                               )   CIVIL ACTION NO.
21                                    )   2:13-CV-291 (NGR)
     JOHN STEEN, in his official      )   (consolidated case)
22   capacity as Texas Secretary of   )
     State, and STEVE MCCRAW, in his  )
23   official capacity as Director of )
     the Texas Department of Public   )
24   Safety                           )
25
```

1   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

2                       ORAL DEPOSITION OF

3                         STAN STANART

4                        JUNE 17, 2014

5   \*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

6

7            ORAL DEPOSITION of STAN STANART, produced as a

8   witness at the instance of the Plaintiffs, was taken in

9   the above-styled and numbered cause on JUNE 17, 2014,

10  from 10:01 a.m. to 1:46 p.m., before Cynthia C. Miller,

11  CSR in and for the State of Texas, reported by machine

12  shorthand, at the Office of Vince Ryan, County Attorney,

13  1019 Congress, 15th Floor, Houston, Texas, pursuant to

14  the Federal Rules of Civil Procedure and the following

15  stipulation and waiver of counsel:

16           IT WAS STIPULATED AND AGREED by and between

17  counsel that if the original of said deposition is not

18  signed or available at the time of trial or any hearing,

19  an unsigned copy may be used in lieu thereof.

20

21

22

23

24

25

```
 1
 2                         APPEARANCES
 3
     FOR THE PLAINTIFFS:
 4
         Mr. Chad W. Dunn
 5       Mr. K. Scott Brazil
         BRAZIL & DUNN
 6       4201 Cypress Creek Pkwy, Suite 530
         Houston, Texas  77068
 7       281-580-6310
         281-580-6362 (fax)
 8
 9
10   FOR THE PLAINTIFF UNITED STATES OF AMERICA:
11       Mr. Abner Shapiro (via telephone)
         DEPARTMENT OF JUSTICE
12       Civil Rights Division
         950 Pennsylvania Avenue N.W. (NWB-7200)
13       Washington, D.C.  20530
         202-514-2919
14       202-307-3961 (fax)
15
16
     FOR THE DEFENDANTS STATE OF TEXAS,
17   RICK PERRY, JOHN STEEN, AND STEVE McCRAW:
18       Mr. John B. Scott
         DEPUTY ATTORNEY GENERAL FOR LITIGATION
19       Southern District of Texas No. 10418
         209 West 14th Street
20       Austin, Texas  78701
         512-475-0131
21       512-475-2994 (fax)
22
23
24
25
```

```
 1                    APPEARANCES CONTINUED
 2
       FOR THE DEPONENT:
 3
            Mr. Douglas P. Ray
 4          SENIOR ASSISTANT COUNTY ATTORNEY
            1019 Congress, 15th Floor
 5          Houston, Texas  77002
            713-274-5463
 6          713-755-8772 (fax)
 7
 8
            Ms. Sonya Aston
 9          HARRIS COUNTY CLERK'S OFFICE
            Administrator of Elections
10          1001 Preston, 4th Floor
            Houston, Texas  77002
11          713-755-5792
            713-755-2617 (fax)
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1                            INDEX
 2
 3                                                Page
 4
    Stipulations..........................................1
 5
    Appearances.........................................3/4
 6
 7
 8
    Testimony of STAN STANART
 9
         Examination by Mr. Dunn............................6
10
         Examination by Mr. Shapiro......................126
11
         Examination by Mr. Scott........................151
12
         Further Examination by Mr. Dunn.................187
13
14
    Changes and Signature.........................189/190
15
    Reporter's Certificate............................191
16
17
                          EXHIBITS
18
    Stanart Deposition Exhibit No. 1.....................89
19
         (Examples)
20  Stanart Deposition Exhibit No. 2....................155
         (Deposition Notice)
21
22
23
24
25
```

1                        STAN STANART,

2      having been first duly sworn, testified as follows:

3                        EXAMINATION

4      BY MR. DUNN:

5            Q.   Please tell us your name.

6            A.   Stan Stanart.

7            Q.   Mr. Stanart, my name is Chad Dunn.  I'm here

8      with my partner, Scott Brazil.  We represent the Veasey,

9      LULAC, Dallas County plaintiffs in this lawsuit

10     concerning the photo ID law.  Do you understand that?

11           A.   Yes, sir.

12           Q.   You understand you're not a party to the case?

13           A.   Correct, yes.

14           Q.   Okay.  You're represented by the Harris County

15     Attorney's Office, and specifically Mr. Ray here today;

16     is that right?

17           A.   Yes.

18           Q.   Okay.  You've given a deposition before?

19           A.   I don't believe so, no.

20           Q.   All right.  So it won't be any different than

21     these last few questions have been.  We're just going to

22     have a conversation over the course of the morning to

23     try to understand facts as you see them that pertain to

24     the case.

25                        If you have any questions about the

1    process as we go, please feel free to ask them.

2                    It's important you let me finish my

3    question before you answer, because the court reporter

4    can't take down both of us at the same time.

5                    And if you shake your head or make a

6    noise as an answer, I may ask, "Is that a 'yes' or

7    'no,'" that's really just because I'm trying to keep our

8    record straight.  Fair enough?

9         A.   That's fine.  My neck doesn't move, it's

10   stuck, so I won't do that.

11        Q.   You and I have met before --

12        A.   Yes.

13        Q.   -- in the redistricting case in San Antonio;

14   is that right?

15        A.   Correct.

16        Q.   In fact, you testified at least a couple times

17   in the redistricting case called by the State; is that

18   right?

19        A.   Three times.

20        Q.   Three times, sorry.  Did you testify in one of

21   the actual trials of the case, or were they always

22   hearings about when the election ought to be held?  Do

23   you remember?

24        A.   It was three times.  And I'm sure it was

25   all -- usually around the mechanics of when the election

1    could be held.

2         Q.   Okay.  Who was it that you would coordinate

3    with at the state to line up your testimony in terms of

4    when to testify and come down there, that sort of thing?

5         A.   Donna -- I forget her last name.  Donna.

6         Q.   Donna something?

7         A.   Yeah, Donna something.

8         Q.   Okay.  All right.  Fair enough.  So just a

9    little bit about yourself.  You know, obviously, I know

10   these questions and answers, but so our record is clear,

11   our judge may not know who you are.  Could you tell us

12   what your job is today?

13        A.   I'm Harris County Clerk, and the chief

14   election official for Harris County.

15        Q.   When were you elected to that position?

16        A.   In November of 2010.

17        Q.   And what party are you a nominee of?

18        A.   I'm a Republican.

19        Q.   And what's your race?

20        A.   I'm Caucasian.

21        Q.   And your age?

22        A.   I am 58.

23        Q.   Excellent.  So can you kind of give us just a

24   thumbnail sketch of your background, where you grew up,

25   when to school, that sort of thing?

1      A.    Grew up in Oklahoma, out of Broken Arrow.

2    Went to Oklahoma State University.   Trained as an

3    electronics engineer.   Worked in the defense industry

4    for 11 years as a hardware/software engineer.

5              I worked on the Space Station at the

6    central test facility as an engineer.   And then worked

7    at Compaq computer in product development as an

8    engineer.

9              Then I worked at the tax office as an IT

10   specialist for a while.   And then I've worked -- been

11   elected to county clerk.

12      Q.    Prior to your election as county clerk, had

13   you ever run for office?

14      A.    Yes, I had run for the Harris County

15   Department of Education in 2008.

16      Q.    Was that successful or unsuccessful?

17      A.    Successful in the primary.   In the, as we call

18   it the Obama tsunami in 2008, I did not win in the

19   general election.

20      Q.    Any other offices you've sought?

21      A.    Precinct chair.

22      Q.    Is that all?

23      A.    That's all I can think of, yes.

24      Q.    All right.   So other than the times you sought

25   election, whether it's precinct chair, or Department of

1    Education, or your current position --

2         A.   I have been -- was elected to the electoral

3    college processing party back in 2000.

4         Q.   I see, to go to Congress and vote for

5    president?

6         A.   Well, you vote just at the capitol, but vote

7    for president in the electoral college.

8         Q.   So other than those times that you've sought

9    elective office, have you done any work in elections?

10   Have you volunteered for a campaign, administer,

11   precinct judge?

12        A.   Yes, election, small stuff.  I've been

13   election judge several times.  I've been a clerk at an

14   election.  Not a lot, but some.

15              Let's see.  Helped out with different

16   campaigns, not what I'd call heavily, but never -- I

17   know I did work on -- a guy ran for Congress against Ted

18   Poe.  Wrong thing to do.

19        Q.   So he ran against Ted Poe?

20        A.   Yes.

21        Q.   Okay.

22        A.   When he was first elected, first elected.

23        Q.   But you did at least one cycle serve as an

24   election judge; is that right?

25        A.   Not as -- I have one time served as an

 1    election judge.

 2         Q.   When was that?

 3         A.   Oh, back when I worked at -- on the Space

 4    Station.  I would say early '90s.

 5         Q.   I see.

 6         A.   Yeah.

 7         Q.   Do you still live in the same precinct that

 8    you worked as an election judge?

 9         A.   No, no, it's on the opposite side of the

10    county.

11         Q.   Do you know your -- do you happen to know your

12    precinct number, as you sit here today, where you live

13    now?

14         A.   We actually moved a couple years ago.  And

15    it's either -- it's like 516, but I'm not sure that's

16    it.

17         Q.   Sure.

18         A.   It might be 517.

19         Q.   What part of town, generally, do you live in?

20         A.   I live up towards the south of Willowbrook.

21         Q.   Okay.

22         A.   Off of 1960.

23         Q.   So other than that stint in the '90s as an

24    election judge in one cycle, have you otherwise worked

25    in elections?

1      A.   I worked several times as a clerk.

2      Q.   I see, okay.

3      A.   So I understand the process on the ground.

4  I've been precinct chairman where I actually got someone

5  else to run the election.  It's more efficient to have

6  someone else do it.

7      Q.   And, of course, since you've been clerk, it's

8  been one of your responsibilities to run the entire

9  county election; is that right?

10     A.   Correct.  And working in the tax office at the

11  voter registration side of it, I just take

12  technology-type projects if they're small, but I did a

13  little bit of work there when I was in that office.

14     Q.   You used to work in the tax office?

15     A.   Yes.

16     Q.   What years did you work there?

17     A.   The three-and-a-half years before I was

18  elected as county clerk.

19     Q.   What was your role there?

20     A.   I was basically IT -- hardware IT, in charge

21  of the computer systems.

22     Q.   Who were the tax assessors, assessors that you

23  worked under when you were there?

24     A.   Paul Bettencourt, Leo Vasquez, and Don

25  Sumners.

1      Q.    So you were hired during the Bettencourt

2   administration?

3      A.    Yes.

4      Q.    And who recruited you for that job, or did you

5   interview with?

6      A.    I knew Paul.   Paul.

7      Q.    I see.   It wasn't a matter of they posted the

8   job and you applied, this was something that came up

9   between you in your discussions with Mr. Bettencourt?

10      A.    Yes.

11      Q.    Well, obviously, we want to talk to you today,

12   and I promise not to waste much of your time.   This, I

13   expect, is going to take a couple hours, but not the

14   better part of your day.

15      A.    All right.

16      Q.    But before we get to that, I do want to know a

17   little bit about what you did to prepare for your

18   deposition.   You got a deposition notice that asked for

19   some documents.

20      A.    Right.

21      Q.    And we received three boxes of documents.

22      A.    Yes.

23      Q.    Is that your recollection of what was

24   produced?

25      A.    Yes.   My staff went through a lot of stuff and

1    tried to pull up everything that they could find that

2    related to what your requests were.  So, to the best of

3    our knowledge, we do have those exhibited in those

4    documents.

5        Q.   Okay.  And I didn't bring the boxes in here

6    today because it's quite a task just to move them

7    around.

8        A.   Yes.

9        Q.   But just to describe them for our record, they

10   are three large banker boxes of documents, and all three

11   boxes are full; is that right?

12       A.   Yes, sir.  Yes.

13       Q.   Did you attempt to collect any documents

14   outside of your office, but otherwise in the custody of

15   Harris County, that were responsive to the subpoena?

16       A.   If we had anything, any knowledge outside of

17   this office, yes, we would have tried to gather

18   everything we could.

19       Q.   All right.

20       A.   The majority of it, I think, would be here,

21   but I don't know of anything --

22       Q.   I'm not suggesting there is anything else.

23       A.   Yeah, right.

24       Q.   Okay.  Who was it in your office that was

25   responsible for this?

1       A.   Largely, Sonya.

2       Q.   I see.

3       A.   My administrator of elections.  She's the most

4   knowledgeable, and she is also an attorney.

5       Q.   Okay.  Now, other than any discussions you

6   might have had with Mr. Ray or somebody at the county

7   attorney's office, did you speak with anybody in

8   preparation for the deposition?

9       A.   Well, like I said, I talked a little bit to

10   Doug Ray, a little bit to Sonya, but it wasn't any what

11   I would call extensive -- in fact, it was very short

12   preparation.  Just general answer questions shortly type

13   of directions.

14       Q.   Have you been contacted by the United States

15   Department of Justice at any time about your activities,

16   or your office's activities in implementing Senate

17   Bill 14?

18       A.   Not -- I don't think so.

19       Q.   And just so we're clear, you understand when I

20   talk about Senate Bill 14, I'm talking about --

21       A.   The photo ID.

22       Q.   -- the photo ID law that the legislature

23   passed.

24       A.   Right.

25       Q.   Okay.  Have you at any point been contacted by

1    the Texas Attorney General's office as it relates either

2    to implementation of S.B. 14, or your testimony, and/or

3    participation in this case?

4         A.   I think there was an e-mail about scheduling

5    of this event.  I don't -- I don't think there is

6    anything that -- any interaction-type discussion.

7         Q.   So you think the extent of any communications

8    you've had with the Attorney General's office as it

9    relates to either this case or S.B. 14 was an e-mail

10   trying to arrange a convenient time for the deposition;

11   is that right?

12        A.   To the best of my knowledge, yes.

13        Q.   Okay.  Has anybody with the Texas Attorney

14   General's office interviewed you or discussed with you

15   what your testimony may be?

16        A.   No.

17        Q.   Have you at any time been notified by anybody,

18   not just the Texas Attorney General's office, that you

19   might be desired or wanted as a witness in the trial of

20   this case scheduled in September in Corpus Christi?

21        A.   No, I don't believe so.

22        Q.   Have you come to learn whether anybody on your

23   staff has been similarly contacted about potentially

24   being a witness?

25        A.   Not to my knowledge, no.

1      Q.   All right.  So Senate Bill 14 that's the

2   subject law in this case was passed in 2011, is that

3   your recollection?

4      A.   Correct.

5      Q.   Okay.  And because of the -- I'm just trying

6   to save us some time here, because of the Section 5

7   case, it was delayed in implementation, would you agree,

8   the pre-clearance issue delayed Senate Bill 14

9   implementation in your office?

10     A.   Yes, it was delayed, yes.

11     Q.   Okay.  And then in June of 2013, the U.S.

12   Supreme Court issued the Shelby County vs. Holder

13   opinion.

14     A.   Right.

15     Q.   And shortly thereafter, the State Attorney

16   General's office cleared the implementation of Senate

17   Bill 14, is that your recollection of events?

18              MR. SCOTT:  Objection; form.

19     A.   Yes.

20     Q.   (By Mr. Dunn)  When is it, if you know, that

21   your office first began to take steps to implement

22   Senate Bill 14?

23     A.   I think because we knew the potential of it

24   being there, we had discussions of, you know, the

25   logistics of implementing it, you know, and that would

1    be forms because, you know, kind of work if this

2    changes -- I think we heard that the state would want to

3    implement it the next election.

4              And as a result, we're so large that, you

5    know, for us to put all of our implementation things in

6    place, we would have to get a jump on it.

7              So mostly all dealing around the

8    different forms we needed, you know, kind of the

9    what-ifs discussions that we had.

10       Q.   All right.

11       A.   I wouldn't call it extensive.

12       Q.   Even while implementation of S.B. 14 was being

13   held up, your office was working on getting ready for

14   implementation, if it ever happened.  Is that what I

15   understand you to say?

16       A.   I think it was closer to the time when we

17   thought the Supreme Court would rule.

18       Q.   I see.

19       A.   In looking forward, "Oh, this could change,

20   this could happen.  So, therefore, let's try to get a

21   little ahead of it."

22       Q.   Do you know what month that you started that

23   work in earnest?

24       A.   I have no idea.  It was -- I don't know.  A

25   whole season, I guess.  Three or four months before that

 1    ruling maybe, but I don't remember exactly.

 2        Q.   Okay.  Do you -- who on your staff was

 3    principally responsible for implementation of S.B. 14?

 4        A.   Well, we would take direction from the

 5    Secretary of State on any implementation of things, but

 6    we also knew that there would be forms that we would

 7    need to have planning for budget, if we had to, you

 8    know, get new forms.

 9             Just looking at do we have the means,

10    what are our roadblocks we would have, if this came out

11    this way.

12        Q.   Okay.  But you -- I guess what I'm trying to

13    find out, did you say, "All right, look, Jane, you're

14    going to be the go-to lead in the office for

15    coordinating with the Secretary of State on

16    implementation of S.B. 14"?

17             Did you have somebody that was kind of

18    ramrodding that implementation?

19        A.   John German at that time was the administrator

20    of elections.  We were just more knowledgeable of what's

21    going on.  I mean, it was a small group.  I don't know

22    that there was any one point person.

23             We basically were going to have to

24    respond -- we were going to be in a position of

25    responding to when will the Secretary of State say,

1    "Okay, we're going to do this, so therefore, you know,

2    do this."

3         Q.   So just for our record, could you spell

4    Mr. German's first and last name?

5         A.   John German.

6         Q.   Is it --

7         A.   John, just J-O-H-N.  And German, like the

8    country.

9         Q.   Now, you mentioned some of the things, you

10   coordinating with the director -- with direction of the

11   Secretary of State, and you had to work on forms and you

12   were planning for the budget issues.  These are things I

13   wrote down that you just mentioned.

14        A.   I'm not sure how much coordination.  There

15   wasn't really coordination.  It was just probably in

16   brief discussions that this could likely happen, that we

17   would be prepared.

18             It wasn't any meetings or anything of

19   that nature, other than people, you know, Secretary of

20   State conferences, the normal course of business type of

21   items.

22        Q.   So there wasn't any special --

23        A.   Not really.

24        Q.   -- coordination of events?

25        A.   No.

1     Q.    So to the extent there was direction from the

2     Secretary of State, that came to you in the regular

3     course as other direction from the Secretary of State

4     comes?

5     A.    Pretty much so, yeah.

6     Q.    Okay.  So with regard to these forms and the

7     budget planning you had to do, were there any resources

8     available to you from the state to implement Bill 14?

9     A.    I don't -- I don't recall that there was, but

10    I'm not -- I don't really remember that there was money

11    from the state to implement.

12               I mean, we had money in our budget to do

13    it, and I do have some discretionary money in my office

14    that I can use for projects that are deemed -- that fall

15    under the keeping control of my records essentially.

16    Q.    So -- and I'd like to ask you a little bit

17    more about that, but to the best of your recollection,

18    there wasn't any funds that came from the state

19    earmarked for implementation to Senate Bill 14 in Harris

20    County?

21    A.    Not direct funds, no.  I believe they did

22    advertising in helping getting the word out.

23    Q.    But those were activities that the state paid

24    for and directed, not you?

25    A.    Correct.

1      Q.    Okay.  And I'm not trying to, you know, drill

2    this down to too fine of a point, but all I'm trying to

3    find out:  Was there a wire transfer or check sent to

4    the state to Harris County to help in any way with

5    Senate Bill 14?

6      A.    I don't recall any, no.

7      Q.    Okay.  So you mentioned that you have some

8    discretionary funds.

9      A.    Yes.

10     Q.    And so did you use any of your discretionary

11   funds on Senate Bill 14 implementation?

12     A.    We did things to get the word out.  I mean, we

13   did billboards around the county, you know, reminding

14   people to bring your photo ID to the polls.

15           We did, you know, lots of brochures, lots

16   of posters, lots of fliers, that we really contacted

17   just about anybody, any government agency, schools, your

18   ISDs, your colleges, the city, libraries, everywhere we

19   could think of, we mass-distributed those type of

20   information getting the word out about photo ID being

21   required at the poll to vote.

22     Q.    These things that you just described, they

23   cost money, I assume.

24     A.    Most of it doesn't.  I mean, most of the

25   print, extra cost, but I don't think any cost of extra

1    brochures, extra printing, anything, it wasn't anything

2    I couldn't handle on the budget.

3         Q.    Okay.   It was things you had to spend money

4    on, but you could handle it with your regular budget?

5         A.    Yeah, but even the billboards was covered by

6    the budget.

7         Q.    So did you at any point go to commissioners'

8    court --

9         A.    No.

10        Q.    Let me finish my question.

11        A.    I'm sorry.

12        Q.    You probably know where I'm going.   Did you at

13   any point go to commissioners' court and ask for

14   supplemental budget monies to implement S.B. 14?

15        A.    No.

16        Q.    Other than the advertisements that you've

17   described, the pamphlets, the posters, the billboards,

18   was there any other expenditure your office had to occur

19   in order to implement Senate Bill 14?

20        A.    Well, we had to design some new forms, but,

21   you know, we have printing costs associated with forms

22   anyway.

23             So, yeah, we probably had to -- we

24   haven't really scrapped them, we're probably not using

25   the old forms as a result.   We kept them on hand just in

1    case things went back the other way.

2        Q.   From my standpoint, hopefully that's a smart

3    move on your part.

4        A.   We just keep them, you know, we're trying to

5    save the taxpayer dollars, and I have got a nice big

6    warehouse that allows me to keep them.

7        Q.   All right.  So other than the printing and

8    design of those forms, there is no other money that your

9    office spent that it wouldn't have to spend if S.B. 14

10   had never come along?

11       A.   I probably went out a little bit more.  We

12   made the best effort, I mean, have a photo outreach

13   department, and they went to more -- probably more

14   locations.

15               And then I told them to do the maximum

16   push to get this word out, so all the community

17   organizations they would go to.

18               I just did -- I probably did more than

19   what they would normally do.  In other words, we worked

20   them very hard to get the word out.  So, yeah, they had

21   more -- more things to do.

22               We had more brochures, more fliers got

23   handed out than normal.  But, yeah, there wasn't any big

24   expense, I think, in the big picture when we look at our

25   whole budget.

1      Q.    Okay.   Now, at one point in time, some

2   counties, for example, Dallas County, my client, took

3   the Secretary of State on its offer to pay an outside

4   vendor to match the state-wide TEAM database with the

5   state driver's license database and get a list of folks

6   in Dallas County who didn't match.

7      A.    Right.

8      Q.    And then send notifications to.  Is that

9   something, to your knowledge, that Harris County did?

10     A.    Yes, we did the -- we did that internally

11  here.  We actually -- we don't pay a vendor to do it.

12     Q.    Okay.

13     A.    We actually did a hard match of the DPS

14  database to the voter registration roll, and everybody

15  that, you know, wasn't on suspense we mailed a letter

16  to.

17             But yes, that was an extra cost, but here

18  again, my budget was able to do that.  It was over

19  90,000 mailings that we did, to people who -- like I

20  said, if you were on suspense, in other words, your

21  voter registration card had been returned, so we weren't

22  going to waste money sending it to those that would be

23  returned.

24             So everybody that was not a hard match, I

25  mean, it could be a soft match, we would still send them

1    a letter.

2         Q.   And who in your office performed that match

3    for you?

4         A.   Myself, and some of my IT staff did that.

5         Q.   Okay.  And not to be too picky, so you're

6    saying you, Mr. Stanart, sat at the computer and hit the

7    keys and made it happen?

8         A.   I'm an engineer, I'm a software engineer.

9         Q.   Okay.  All right.

10        A.   I did some of that, yes.

11        Q.   So the list or output you got from such a

12   match, is that contained in the documents that were

13   produced?

14        A.   Should be.  I believe so, isn't it?  The

15   matched?

16        Q.   I saw some lists in there, but I didn't know

17   exactly what they were.  So that's why I'm asking.

18        A.   Right.  We can provide that if we -- if, for

19   some reason, it's not in there.

20        Q.   Okay.  And do you recall essentially how many

21   people came up on that match?

22        A.   It's over 1.8 million.  I don't remember the

23   exact number, but the -- like I said, after taking out

24   the ones that are in suspense, it was a little over

25   90,000 that we actually mailed the letters to.

```
1          Q.   Oh, I'm sorry.  I thought it was $90,000 in

2     mailings.

3          A.   No.

4          Q.   You're say there's 90,000 people you mailed

5     to?

6          A.   Yes, over 90,000 people that we actually

7     mailed those letters.  And the samples of the letter are

8     in there.  There was -- and the letter was refreshed

9     also for the primaries.

10               So anybody who got newly registered that

11    we could not match, and had not previously gotten a

12    letter, we actually did, we sent that mailing was much

13    smaller.  I forget the numbers.

14         Q.   And I'm not going to try to hold you, is that

15    like a thousand, or 5,000, or 10,000?

16         A.   Yeah, yeah.  It's not a large number.

17         Q.   Okay.  And are those the only two mailings you

18    did that were sort of S.B. 14-related?

19         A.   Yes.  I don't think we did one for the runoff

20    just because it's the same people that voted in the

21    primary, we would expect them to show up.  We'll do it

22    again in November is our plan.

23         Q.   Was there any direction from the state for you

24    to do that?  I mean, did somebody, in other words, tell

25    you you should do this, and that's why you did it, or
```

1    you came up with it on your own?

2        A.   We came up with it on our own.  After Dallas

3    had done it, we had other elected officials, you know,

4    asked us to do the same, but it was also in our mind.

5        Q.   I see.  Do you know any other counties that

6    have done it, other than Dallas County?

7        A.   No, I don't personally know of others.

8        Q.   Okay.  Do you have some kind of a system, I

9    don't know if it's a LISTSERV, or conference, or

10   telephone -- regular telephone calls, where you

11   communicate with other county election officers?

12       A.   There is a LISTSERV of -- you know, county

13   clerks, and one for people that do elections.  I don't

14   read it very often.

15       Q.   Okay.

16       A.   There's a lot of e-mails that pop across

17   there.

18       Q.   If it's anything like the LISTSERVs I'm on, it

19   fills your inbox.

20       A.   Yeah.  I actually hit -- automatically pull it

21   off into another archive folder.  I don't even -- it

22   doesn't come into my inbox.

23       Q.   Do you know the name of this LISTSERV?

24       A.   It's the Texas Association of Counties.

25   There's an election LISTSERV.

1        Q.   I see.

2        A.   And, of course, the county clerk one, too.

3   Most everything you do in the election should be on the

4   election Web site.  If it's not inconceivably it's not

5   there.

6        Q.   So these two lists, they are both administered

7   by the Texas Association of Counties --

8        A.   Yes, yes.

9        Q.   Do a little bit better at letting me finish my

10  question, keep our record a little straighter.

11       A.   Okay.

12       Q.   All right.  So I just want to make sure I

13  understand all the things you spent money on.  You made

14  some forms, and billboards and advertisements, you did

15  the approximately 90,000 piece mailing.  Then later in

16  the primary, you did a smaller mailing.  Is that all?

17       A.   We did, you know, radio interviews, TV

18  interviews.  Of course, we did -- went to the -- as much

19  as possible, get as much free media as possible.

20       Q.   Okay.

21       A.   We did lots of press releases, extra press

22  releases.  Our motivation was to get the press on board.

23  I think they did a pretty good job of actually getting

24  the word out.

25                   Of course, we did, like I said, a lot of

1    press releases.  I had my staff recall -- follow up with

2    the press releases after we had sent them out, just

3    did -- just to get the interest up.

4                    We wanted the word to get out to every

5    voter in Harris County that you need to bring a photo

6    ID.  We didn't want anybody to not know, even though

7    there is always somebody who hides under a rock that

8    doesn't, but we did our very best to get that out.

9        Q.   So other than those things, you can't think of

10   anything else that you spent money to implement?

11       A.   No.

12       Q.   One more question about the LISTSERV.  You

13   said that, you know, you have to output that to another

14   device because it's so voluminous, I guess.  Do you

15   still have any of the LISTSERV postings?

16       A.   Yeah, yeah.

17       Q.   And do you know whether in response to the

18   document requests your staff went through and just --

19   produced which of those were related to S.B. 14?

20       A.   I don't know if we did -- they did or not.  I

21   mean, we just gave it to the IT to pull the e-mails off

22   of the -- you know, the list of keywords.

23       Q.   Okay.

24       A.   I don't know if that one would have got picked

25   up or not, but we can do that, if you wish.

1     Q.   How far back would you have LISTSERV postings?

2     A.   Two years, at least.

3     Q.   Okay.

4     A.   Three years maybe, three years.  I don't know.

5  It's a bunch.

6     Q.   Anybody in your office, other than you, that

7  is on the LISTSERV?

8     A.   Elections.  Are you on there, Sonya?  Yes, I

9  think Sonya is.  It's for elections administrators, and

10  it's for, you know, clerks that run elections, or the

11  tax assessor-collectors that do voter registration.

12           I would think they would have those.  Not

13  that I ever delete anything, but they would have

14  probably a more complete list than me.

15     Q.   Do you think somebody in the tax office is

16  also on this LISTSERV?

17     A.   I don't know.  I don't know if they subscribe

18  to it or not.

19     Q.   And just for our court that might not be

20  familiar with Harris County, we have a tax office

21  here --

22     A.   Yes.

23     Q.   -- that does voter registration.

24     A.   Right.

25     Q.   And then you're the county clerk, and you're

1   in charge of administering the rest of the election; is

2   that right?

3       A.   Right.

4       Q.   All right.  Now, I assume in addition to the

5   things you've mentioned, in order to implement S.B. 14,

6   you had to train some staff and volunteers, election

7   workers.

8       A.   Oh, yes, yes.

9       Q.   Okay.  And when do you think the first such

10  training occurred?

11      A.   Well, it was shortly after it was told to be

12  implemented.

13      Q.   Okay.

14      A.   All of our clerks got multiple points of

15  training.  Whether that be in e-mails, through the

16  in-person requirement we had for them to come get

17  trained.  The videos that we put on our Web site for

18  them, for training.  The Power Points.

19              Just, you know, we tried our very best to

20  do the most excellent job possible to get to them, "This

21  is what it takes for you to implement voter ID."

22      Q.   And so -- but it is the case you didn't do any

23  of these trainings prior to the Shelby County decision?

24      A.   No, because it wasn't -- it wasn't there.

25      Q.   Right.

 1          A.   We didn't want to confuse our workers until --

 2     you know, two different directions.

 3          Q.   How many election clerks, you know,

 4     roundabout, does Harris County have?

 5          A.   Clerks, I mean, we have a lot.  We have 5,000

 6     clerks on a big election.  I mean, it's -- and judges.

 7     I mean, it's just a lot of people that it takes to run

 8     our elections.

 9          Q.   Do you know about how many election judges

10     Harris County has?

11          A.   We had, I think, last November 776 polling

12     locations, I believe.  It's really close to that number.

13     Because it changes according on what's available.

14          Q.   Would that number -- and I understand,

15     somewhere around 770.

16          A.   Yes, right.

17          Q.   I'm not trying to nail you down to exactly,

18     but would that number be more or less the same as in a

19     presidential election?

20          A.   Yes, it does not -- it depends.  You know, if

21     we -- redistricting drives how many precincts we have,

22     but then the reality is you can't have -- you don't have

23     dinky precinct.

24               We have zero population precincts because

25     of how the lines get drawn, but we usually combo them up

1    very similar, even with redistricting.

2          Q.   Okay.  So if I understand it, in terms of your

3    office training election workers in Harris County about

4    S.B. 14, you've got somewhere in the neighborhood of

5    seven to 800 election judges that need to be trained.

6          A.   Yes.

7          Q.   And you've got somewhere in the neighborhood

8    of 5,000 election clerks that need to be trained; is

9    that right?

10         A.   Well, we give training to the judges and

11   alternate judges most extensive because the judge is

12   responsible for, you know, hiring the clerks.

13         Q.   Okay.

14         A.   And so when they do those last-minute hirings,

15   the best training they can get is to go to the -- our

16   Web site, the local videos, and they are requested that

17   they do that.

18              But as long as the judges and the

19   alternate judges that are actually running the polls are

20   getting trained, then we're confident that things should

21   work correctly, as best as possible, at the polls.

22         Q.   Okay.  So is another way of saying what you

23   just said is your office makes sure the judges and

24   alternate judges are trained, and then it's the job of

25   the judges and alternate judges to get the clerks

1    trained?

2         A.   Well, we actually -- yeah, we ask them to do

3    that.  We provide training to anybody, any clerks --

4         Q.   I see.

5         A.   -- that will come.  It's not like we're

6    restricted.

7         Q.   Okay.

8         A.   But the requirement is that we get the judge

9    and alternate judge training.

10        Q.   Okay.  So some of the clerks come to the

11   training.

12        A.   Yes.

13        Q.   And other clerks will get the training from

14   their election judge or alternate judge?

15        A.   Correct.  And also we tell them to do the

16   video on-line.  I think everybody is required on-line to

17   take an hour of that.

18        Q.   And when you say they were required to take

19   this video, did they click some box on a computer?

20        A.   Yes.  They go to harrisvotes.com and there's a

21   training module.

22        Q.   And then they would certify in some way

23   electronically that they watched it; is that it?

24        A.   No, we did not have that.

25        Q.   Okay.

1          A.   But the in-person was for the judge and the

2     alternate judge.

3          Q.   Can anybody, other than the election -- an

4     election clerk -- I mean, could I go on the Web site

5     right now and watch this video?

6          A.   Yes, go to harrisvotes.  I think it's still up

7     there.  Right?  Yes.

8          Q.   All right.  Are there any other aspects of the

9     training that I've missed out on, that we haven't talked

10    about?

11         A.   We went around the county to, you know, the

12    election law that Sonya pretty much does.  We go to

13    different locations around the county to make it easier

14    for the judges to get there, have multiple, many, many

15    sessions available.

16              So we -- like I said, we tried to manage

17    to get everybody trained as much as possible.

18         Q.   And you feel like you were successful in that

19    regard?

20         A.   Yes.

21         Q.   Do you feel like you were successful in

22    getting out the word to voters?

23         A.   Yes.

24         Q.   And what matrix, if any, do you use to

25    determine whether you were successful on either or both

1    of those things?

2         A.   Well, I think two major matrix is voter

3    turnout, okay?  And then the other item would be the

4    number of people who voted provisionally due to not

5    having an ID.

6         Q.   Now, as far as your office is concerned, you

7    obviously administer federal, statewide, countywide

8    elections.

9         A.   Right.

10        Q.   And you're also responsible, I assume, for

11   some smaller units, like some school districts and

12   things of that nature?

13        A.   We do some of their elections, but we are not

14   responsible for them.

15        Q.   Okay.

16        A.   It's only when there is an election

17   administrator, that they have to run all the elections.

18   The clerk does not.

19        Q.   So what elections, since June of 2013 when

20   Shelby County came out from the Supreme Court, have you

21   administered under Senate Bill 14?

22        A.   Well, we did the -- it seems like it was a

23   real small entity -- we did, of course, the November '13

24   election.  But it seems like there was a -- something

25   small we did.  Like a -- I don't even recall.

1               I think there might have been one really,

2     really small we did previous to the November '13.  But

3     the November '13 was the first one.

4          Q.   I think there was some municipal elections

5     back in September.  I didn't know if there was any in

6     Harris County, though.

7          A.   There was -- that's what I'm thinking.  I

8     think there was one.

9          Q.   Okay.

10         A.   But anyway, November '13 was our major one,

11    and that was our first real one.  And then let's see.

12    Of course, we did the Senate District 4 -- no.

13         Q.   Six?

14         A.   Is it 6?  I forget if that was in -- was that

15    in that time frame?

16         Q.   I don't think so.

17         A.   No, that was before that.  Yeah.  Okay.  We

18    did, of course, the primary, and then the runoff primary

19    this year.

20         Q.   So except for maybe a small city election, you

21    think it was November of 2013 -- and I'm not sitting

22    here trying to quiz you on this.

23         A.   Right, yes.

24         Q.   I want to know what elections to look at.

25         A.   Those are the major, significant ones.

1          Q.    Okay.  So the November 2013 election.

2          A.    Right.

3          Q.    And the primary and primary runoff that

4     happened in 2014.

5          A.    Right.

6          Q.    And there might have been a city, but you

7     don't, for example, recall administering an election for

8     Lone Star College?

9          A.    No, we did that in May of 2013, so that was

10    pre-Shelby.

11         Q.    All right.  Now, you said that the matrix that

12    you would use, did voter turnout, and then -- well,

13    let's talk about that first.

14               Have you sat down and looked at the voter

15    turnout in November of 2013, or in this recent primary,

16    and compared it in Harris County to a similar election

17    in the past?

18         A.    Yes.  Yeah.

19         Q.    And what did you determine about voter

20    turnout, say, compared to the November -- I guess it

21    would be 2011 election and the November 2013 election?

22         A.    It was -- they were higher.  I mean, they were

23    higher than the previous ones.  I looked back two or

24    three others.  They were higher.  I forget how

25    significantly higher, but they were higher than those.

1                    The primary was -- other than the last --

2     the two years when Ted Cruz was on the ballot for the

3     primary, for Republicans it was higher, the Democrat

4     County wasn't as high, just because.

5          Q.   Okay.  So other than looking at, you know, the

6     gross figure of voters, there was 10,000 in this

7     election?

8          A.   Right.

9          Q.   In this one there was 12,000.  Did you do any

10    sub-analysis of those?

11         A.   No, I don't think so.

12         Q.   In other words --

13         A.   We look at countywide.

14         Q.   Just a countywide gross analysis?

15         A.   Correct.

16         Q.   Okay.  I'm just trying to find out:  Did you

17    go in and say, "Well, identify a certain subset of

18    voters that showed up in one election and see if they

19    came back on the next"?

20         A.   No.

21         Q.   The other thing you mentioned was the number

22    of provisional ballots.

23         A.   Yes.

24         Q.   So did you review the number of provisional

25    ballots in a pre-Senate Bill 14 election and then

1    compare it to the like election after Senate Bill 14?

2        A.   I don't recall that I personally did that.

3        Q.   Okay.

4        A.   I don't know the exact numbers.  I do know the

5    numbers of the November election that had photo ID.

6        Q.   So what was -- I guess how is it that you

7    analyzed the number of provisional ballots to come to

8    the conclusion that you had successfully gotten the word

9    out and adequately trained your staff on Senate Bill 14?

10       A.   Well, the provisional ballots that were photo

11   ID, were 105.  Of those, six were not even registered.

12   So we had the nine left.  And of those numbers, you

13   know, eight people came back in cure.

14                We did -- and I don't remember the exact

15   when we did it.  We did some cursory match back to the

16   DPS database.

17                And if I recall, there was about

18   two-thirds of them that we could say those people have

19   photo IDs, they left them at home, or whatever, I mean,

20   so...

21       Q.   And was there any, you know, paperwork, or a

22   report, or something generated?

23       A.   No, I don't think so.  I think it was just a

24   general query.

25       Q.   Okay.  Those figures are helpful for November.

1   Do you have them also for the runoff?  I'm sorry, for

2   the primary?

3        A.   For the primary?

4        Q.   Yeah.

5        A.   I don't know.  I think I've been given

6   something.  I mean, we can look at it and see.

7        Q.   Sure.  If you have something handy.

8        A.   I think I have an e-mail to that effect.

9   Let's see here.  Yes.  The runoff election we also had

10  for the City of Houston election last November, that was

11  in 2014.  I forgot to mention that.

12       Q.   Okay.

13       A.   And we had five IDs there, and none of them

14  came back and cured.

15       Q.   None of them did?  I'm sorry.  I didn't hear.

16       A.   Yes, none came back and cured.  November the

17  5th we had eight that came back and cured.  We had --

18  let's see.  In the Democrat primary, we had nine --

19  well, we had a total of ten, one that was cured.

20            And in the Republicans, we had 25 that

21  were ID, and four of those came back and cured.  So it

22  was ten and 25, Democrat and Republican.

23       Q.   Now, other than your own analysis of this for

24  your own purposes as an elected officer running

25  elections here in Harris County, have you shared these

1    figures with anyone else prior to now?

2         A.   I think last November I think I shared it with

3    the media, you know, that the numbers were there, that's

4    out there, yes.

5         Q.   What about the state or the United States

6    Department of Justice?

7         A.   To my knowledge, I don't think we have.  I

8    mean, I know we put out -- I think I put these numbers

9    out last November in a press release, for the runoff, or

10   somewhere in there.  It should be in your packet of

11   information there.

12        Q.   Okay.  And with respect to this group of

13   people who appeared with no ID and didn't cure --

14        A.   Correct.

15        Q.   -- did your office do anything to reach out

16   for them, or otherwise work on their situation for

17   future elections?

18        A.   I'm thinking there's some letter that goes out

19   to them, but I don't recall what the specifics of them

20   are.

21        Q.   There may be a letter, but I guess what I'm

22   asking is:  Was there somebody on your staff that was

23   sort of tasked to say, "All right, make contact, to the

24   extent you can, with these folks that fill out the

25   provisional afterwards and see if we can help them get

1    an ID"?

2        A.   Like I said, most of them do have IDs.

3        Q.   Okay.

4        A.   So the letter to them saying, you know, "You

5    must have an ID is why your vote is being rejected,"

6    well, everybody who gets provisional, is rejected, they

7    get a letter, so I would think that would be included in

8    there.  That is our reach out to them.  Did we do more

9    than that, I don't know.

10       Q.   Okay.  Did you, at any time, do an analysis or

11   consider the number of people, if any, who didn't show

12   up because they didn't think they could meet the ID

13   requirement, or were worried that they couldn't?

14       A.   No.  I mean, how would I know that?

15       Q.   And I'm not suggesting you could.

16       A.   Yeah.

17       Q.   Now, is your -- you know, one of the IDs

18   that's permitted under Senate Bill 14 is called an EIC,

19   an election identification certificate.

20       A.   Yes.

21       Q.   Do you know what I'm talking about when I say

22   EIC?

23       A.   Yes, definitely.

24       Q.   Does your office have the ability to issue

25   EIC?

```
 1          A.    No, DPS is the one who issues those.  We did
 2   assist DPS and the Secretary of State in finding some
 3   temporary locations.
 4                In fact, they used one of my offices in
 5   the county.  Initially, it was four temporary locations
 6   in addition to the 12 DPS locations in the county.  We
 7   assisted them in locating some of those locations.
 8          Q.    Locating some of the four temporary ones?
 9          A.    Yes, yes, yes.
10          Q.    Okay.  And I want to talk about that, that's
11   important, but for right now, I want to focus on your
12   office's ability to issue an S.B. 14-approved ID.  And,
13   as I understand it, you lack that authority; is that
14   right?
15          A.    That's correct, yes.
16          Q.    Okay.  Is that something you've ever asked for
17   or inquired if you could be given the authority or the
18   opportunity to meet that need, if any?
19          A.    There might have been a discussion, but I
20   don't think so.
21          Q.    Okay.
22          A.    Our job really was to implement the law as
23   it's written right now.
24          Q.    Well, did you ever testify before the
25   legislature as it related to changing the law for photo
```

1    ID requirements?

2         A.   I don't believe so, no.

3         Q.   Do you know if anybody in your office or

4    Harris County did?

5         A.   We had testified probably on mechanics, and we

6    provide support on what's possible, what's the

7    implications if you do this.

8              In other words, try to help -- we are

9    here to help legislators assist them to make sure they

10   don't mess up stuff, break something, for us and other

11   election administrators across the state.

12        Q.   So as part of your consultation with the

13   legislators, did you mention, or do you recall anybody

14   mentioning issuing photo IDs at the same time

15   registration certificates are issued?

16        A.   I don't know.

17        Q.   Okay.

18        A.   I mean, we try to keep out of the politics, my

19   office, the legislature, we try to implement what's

20   relevant, and what's practical, and what makes sense.

21        Q.   So going back to the DPS offices, if I heard

22   you correctly, there are 12 regular offices in Harris

23   County.

24        A.   Correct.

25        Q.   And there were four temporary offices set up;

1    is that right?

2         A.   Right.

3         Q.   Do you know if there are any DPS offices in --

4    inside Loop 610 in Houston?

5         A.   I believe there are, yes.

6         Q.   Where are they?

7         A.   I'd have to go look.  One time I looked at the

8    map.

9         Q.   Okay.

10        A.   But I don't remember.

11        Q.   And that's fine, when you don't know

12   something, just tell me you don't know it.

13        A.   Right, yes.

14        Q.   Can you recall for us where the four temporary

15   locations are?

16        A.   One of them was a church here within the Loop.

17   I think that one is actually one the Secretary of State

18   identified.  I've been there, I forget the name of the

19   place, okay?  Down here close to Rice University.

20                   Another one was down in Pasadena at --

21   where I have one of my offices.  Another one was at a

22   City of Houston facility in the north -- I mean, north

23   of the Loop.

24                   It might be within the Loop, but it's not

25   very far away, or maybe just north.  And then another

1     one, I believe, was at Lone Star College-Victory.

2          Q.   So that got me to five locations.

3          A.   It's four.

4          Q.   Well, you said there was a church that you

5     couldn't remember where.

6          A.   Right.

7          Q.   One near Rice University.

8          A.   No, that's the same one.

9          Q.   Oh, same one?

10         A.   Yeah, the church is the same one.

11         Q.   Oh, okay.   I got it.   And which of those did

12    you help locate?

13         A.   All except for the church.

14         Q.   Okay.

15         A.   They called -- the secretary of state's office

16    called and said, "Hey, can you help us find something

17    for locations," so with these temporary ones, one that

18    made strategic sense.   And we looked where we knew the

19    populations might be best served and we had those

20    locations.

21         Q.   And did your office staff any of those

22    locations at all?

23         A.   No, that was all done by DPS.   They had, I

24    believe, two workers at each of those locations.

25         Q.   Do you know whether any EICs were issued?

```
 1          A.   No, I don't know what they did.

 2          Q.   I mean, in other words, you weren't given any

 3     kind of report that said --

 4          A.   There was some verbal, initially.

 5          Q.   Okay.

 6          A.   And I heard it was small numbers that were

 7     done, but I don't know the specifics of those.  The

 8     Secretary of State or DPS would have the exact numbers.

 9          Q.   What was the time period these four temporary

10     locations were opened?

11          A.   It was during that period before the election.

12     Now, I believe two of them actually, because of low

13     service, they moved them to two other -- to other

14     locations in the state, to better utilize the resources.

15     So for a while, they had four.  Then they had just two.

16          Q.   Do you know the two that were closed and moved

17     someplace else?

18          A.   The church was kept as one.  I don't -- I'm

19     not positive, but I suspect it was Victory, but -- Lone

20     Star College-Victory, but I don't remember.

21          Q.   Okay.  All right.  And you said these were

22     open around the election, but which election?

23          A.   The November election.

24          Q.   Okay.

25          A.   The November election.
```

1          Q.    Were there any mobile units in the recent

2    primary election?

3          A.    I believe there was talk about it, and I don't

4    really -- we weren't involved in that, so I don't know

5    for sure --

6          Q.    Okay.

7          A.    -- how many there was or if there was some in

8    Harris County.

9          Q.    And there's also some discussion in this case

10   about mobile EIC.

11         A.    That's the same thing.

12         Q.    Okay.

13         A.    Temporary is mobile.  I mean, some laptops on

14   a table in a building.

15         Q.    Okay.

16         A.    It's not like it's anything other than, you

17   know.

18         Q.    Yeah.  I just wanted to make sure I wasn't

19   missing, you know, there wasn't these four, and then

20   there was roaming units or some things.

21         A.    No, that's the same thing, the temporary.

22         Q.    Okay.  One of the reports that we had received

23   is that there was advertisement for a mobile EIC unit,

24   and the voter went there and it wasn't there at the

25   location that was advertised.

1        A.    Right.

2        Q.    Again, I don't know if any of this is true.

3   It's just a report I got.

4        A.    Right.

5        Q.    And they ultimately found the location about a

6   block away.

7        A.    A block away?

8        Q.    And included at the EIC mobile unit location

9   was a desk for King Street Patriot staff.

10       A.    Okay.

11       Q.    Are you aware of King Street Patriot staff

12   being involved in any of the mobile stations?

13       A.    Not to my knowledge, no.

14       Q.    Do you know whether poll watchers are

15   permitted to work EIC-issuing locations?

16       A.    It's not -- poll watchers is what I do for

17   elections.   EIC is not something that I run.

18       Q.    Okay.  So you don't know is the answer?

19       A.    No, I don't know.

20       Q.    All right.

21       A.    Yeah.  It doesn't make sense to me.

22       Q.    Has anybody with King Street Patriots assisted

23   your office in implementing Senate Bill 14?

24       A.    No.  Why would they?

25       Q.    Other than the effort by the state to set up

1    the mobile EIC units, are you aware of any other

2    outreach in Harris County to issue S.B. 14-eligible IDs?

3        A.   Yes.  I actually did a -- I guess it was TV

4    interview with the League of Women Voters where they

5    said their emphasis, and also my personal emphasis, was

6    recommending people get a personal ID over the EIC ID

7    because if you can afford the -- I think if you're over

8    62, 65, you can get it for only $6.

9              And my understanding, they and other --

10   League of Women Voters, other organizations were

11   actually encouraging people to get a personal ID because

12   they have much more functionality than just the EIC.

13             The EIC, of course, is only voting.  And

14   personal ID can be used for cashing checks, going to the

15   airport, et cetera, et cetera.

16       Q.   And I understand there was, I'm sure,

17   community advertisement.

18       A.   Yes, sir.

19       Q.   But do you know, was there other sort of

20   offices set up, or special hours, or special something

21   that happened to make it easier to get an S.B.

22   14-eligible ID in Harris County?

23       A.   By government?

24       Q.   Yes.

25       A.   The DPS locations I understood were opened on

1    Saturdays before the election, and we put that on our

2    advise to media also.

3              Other than that, yeah, there was some

4    Saturdays.  I don't recall how much -- I don't recall

5    Saturdays, but I don't remember how many Saturdays to

6    provide that access.

7        Q.   And you would put that out in any kind of

8    media that you would send out?

9        A.   If I knew about it, yes, yes.

10             (Recess from 10:53 a.m. to 10:58 a.m.)

11        Q.   (By Mr. Dunn)  Mr. Stanart, during the break,

12    we discovered that you had been sent a letter from the

13    Department of Justice --

14        A.   Yes.

15        Q.   -- asking for the provisional ballot

16    information --

17        A.   Right.

18        Q.   -- a few weeks ago, and your office responded

19    and provided that; is that right?

20        A.   I just saw the letters.  I'm not positive we

21    responded.  I'm assuming we do.

22        Q.   Okay.

23        A.   And then also, of course, I think some of the

24    documents we had I think the Department of Justice has

25    asked for them, I think it's similar to the same

1    documents I think you have, we have delivered to them

2    also.

3         Q.   Okay.  The documents responsive to the

4    subpoena you received?

5         A.   Yeah, yes.  A different subpoena, but the

6    same -- almost of the same exact documents.

7         Q.   All right.  I want to talk a minute about

8    voter fraud.

9         A.   Okay.

10        Q.   You have -- are you aware of any cases of

11   voter fraud in Harris County?

12        A.   Well, we have people vote twice, yes.

13        Q.   Okay.

14        A.   And we actually are working on the list from

15   last November and the primaries that we will be sending

16   over to the DA's of -- I don't know what we are down to.

17             We want to do extensive research to

18   actually verify that that's what's happened here, that

19   people who vote in both primaries, we will send those

20   lists over to the DA.

21             We have had -- we will probably have

22   about 50, but we are not finished culling it out, that

23   we'll be sending over.

24             I know previous elections, we've had

25   hundreds where people have voted twice.  And so those

```
1    are -- some have been sent over by previous clerks to

2    the DA, and some have not.

3                   I mean, I try to send over lists myself.

4    We have -- I hear stories from, you know, poll watchers

5    and things, you know, where people used to come in with

6    multiple voter registration cards and were using those

7    to attempt to vote more than once.

8         Q.   Other than voting more than once, are you

9    aware of any other voter fraud in Harris County?

10        A.   We have turned over to the Attorney General a

11   judge for not following the law in their duties.

12        Q.   An election judge?

13        A.   A ballot board judge.

14        Q.   Who was that?

15        A.   That is -- I forget her name.  My name went

16   blank.

17        Q.   Is this Jill Moffet?

18        A.   Yes, Jill Moffet, yes.

19        Q.   And what was your concern about Ms. Moffett's

20   compliance with the law?

21        A.   She was accepting ballots that legally she

22   should not have been accepting.

23        Q.   What kind of ballots was she accepting?

24        A.   Provisional ballots.

25        Q.   Was there a particular characteristic of these
```

1    provisional ballots?  I mean, did they all have the same

2    problems, or were they random issues?

3        A.    It was related to people who had voted in

4    precincts other than their precinct where they were

5    supposed to vote in an election.

6        Q.    And so Ms. Moffet was voting, I guess, as a

7    member of the ballot board to tabulate provisional

8    ballots for people who had cast a ballot in the wrong

9    precinct?

10       A.    Correct.

11       Q.    Do you know whether the officers that that

12   voter voted on were the same officers they would have

13   voted on had they voted in their precinct?

14       A.    I'm not sure.

15       Q.    Okay.  And you referred this to the district

16   attorney's office; is that right?

17       A.    Yes, yes.

18       Q.    Okay.

19       A.    And the attorney general, or the secretary of

20   state -- I'm sorry, to the secretary of state.

21       Q.    Who at the secretary of state did you report

22   this information?

23       A.    I think it was just addressed to the secretary

24   of state, but it probably, you know, was specifically to

25   the director of elections.

```
 1          Q.   Was this a letter?

 2          A.   Yes.

 3          Q.   Written by you, or signed by you at least?

 4          A.   Yes, yes.

 5          Q.   Okay.  Is that in the materials that were

 6     produced?

 7          A.   I think, but I'm not positive.

 8          Q.   All right.  Well, we'll follow up.  And so the

 9     letter that was sent to the secretary of state, was it

10     just copied to the district attorney, or was there a

11     separate one sent to the district attorney?

12          A.   I don't recall.  There could have been

13     separate, or it might have been a cc.  I'm not sure.

14          Q.   What, if anything, has come from that

15     referral?

16          A.   I understand there's some investigation going

17     on.

18          Q.   Okay.

19          A.   Other than that, I don't know any details.

20          Q.   Do you know if a grand jury --

21          A.   No, I don't know of anything.

22          Q.   You don't know if a grand jury has taken

23     testimony on that?

24          A.   No, not to my knowledge.

25          Q.   Okay.  All right.  So other than people voting
```

 1     twice and the situation you just described with

 2     Ms. Moffet, are you aware of any other voter fraud in

 3     Harris County?

 4          A.   I mean, every election, if we find something

 5     that doesn't look right, we will send that over to the

 6     DA.

 7               We do have, you know, where we see people

 8     who are signing ballots for more than one person.

 9     That's happened here.

10          Q.   Mail ballots?

11          A.   Yes, yeah.  We'll send items over to them to

12     investigate, for investigation.  I don't recall every

13     type of things that we've seen because usually, yes, a

14     lot of it's associated around mail ballots.

15               You know, we've heard of -- I know there

16     has been some investigation the county attorney's office

17     has done on mail ballots that was obviously canvassed

18     from the same street type thing, you know.

19          Q.   Are you aware of any incident in Harris County

20     that Senate Bill 14 would have prevented?

21          A.   I believe that because those people, like I

22     said, who used multiple voter registration cards, that

23     having photo ID has -- would make that more difficult

24     for someone to go down that path and vote for multiple

25     people.

1      Q.   Well, prior to Senate Bill 14's

2   implementation, are you aware of any time where somebody

3   actually did vote in Harris County, and if there had

4   been an ID requirement, it would have prevented them

5   from violating the law?

6      A.   Other than poll watcher feedback or something

7   like that, no, I don't have the specifics.

8      Q.   Okay.  And somebody who has multiple

9   registration cards, that -- the registration cards could

10   all have the same or very similar names on them with

11   different addresses; is that right?

12      A.   It's possible, yes.

13      Q.   I mean, you know, so when you say you're

14   getting feedback that somebody has gone to a polling

15   location, they have multiple voter registration cards,

16   that doesn't mean they have voter registration cards for

17   different people they're trying to vote, necessarily.

18   It just means that somebody may have registered multiple

19   times?

20            MR. SCOTT:   Objection; form.

21      A.   That could be speculated.

22      Q.   (By Mr. Dunn)  Well, or you could speculate

23   that they were trying to vote for somebody else.

24      A.   Right.

25      Q.   But either way, it's speculation; is that

1    right?

2         A.   Right.

3         Q.   Okay.  Now, I know it's not your job to run

4    the voter roll.

5         A.   Right.

6         Q.   And, you know, so we're going to investigate

7    that, obviously, separately.  But have you ever looked

8    at the Harris County voter roll and analyzed, you know,

9    the extent of people with similar names being on there

10   multiple times?

11        A.   Not in recent days, but I have done a little

12   bit of that, yes.

13        Q.   I mean, are you able to confirm for us that

14   there are a number of entries for people with either the

15   same or very similar names at different addresses in the

16   county?

17        A.   Yes, I do believe there are some of those in

18   there, yes.

19        Q.   For example, if somebody had their home

20   residence, and then they had a couple of rental

21   properties, and maybe they lived at some point in time

22   at each of those rental properties, they could end up

23   getting a voter registration card at each of the three

24   properties.

25        A.   Yes.

1        Q.   Okay.

2        A.   They should be returning them or doing

3   something, but yes.

4        Q.   And then if they showed up at the -- at each

5   of those three polling locations with their card and

6   with an ID, with a name that matched that card, they

7   could vote three times, even after S.B. 14, couldn't

8   they?

9                    MR. SCOTT:   Objection; form.

10       A.   That's likely, but we're going to be looking

11  for them.

12       Q.   (By Mr. Dunn)  Okay.  I hope you are.  I mean,

13  nobody should get to vote more than once.

14       A.   Exactly, exactly.

15       Q.   Are you aware of any prosecutions in Harris

16  County of voter fraud, you know, whether it developed

17  before you were elected or since?

18       A.   I believe, yes, I know of at least one, but I

19  don't recall the specifics.

20       Q.   I mean --

21       A.   There has been prosecutions, I just don't know

22  the details.

23       Q.   The one you remember, I'm sure you don't know

24  the name, but do you remember what the issue was, or

25  what they had done?

 1          A.   I know that there's one out there.

 2          Q.   Okay.

 3          A.   One or more.  I think there's more than one,

 4     but I don't know.

 5          Q.   Do you know what time frame, generally, or the

 6     '90s, or this decade?

 7          A.   Probably the '90s, but -- or 2000s.  We're in

 8     the 2000s, yes.

 9          Q.   Okay.  All right.  So there's a couple of

10     issues that I just kind of want to go back and fill in

11     on the training.

12          A.   Yes.

13          Q.   So let's start with the training real quick.

14     Let me tick through a few things and make sure we've

15     covered these.  You have a video on a Web site --

16          A.   Correct.

17          Q.   -- that ideally every election worker should

18     have watched.

19          A.   Correct.

20          Q.   Okay.  Was there any kind of written training

21     material that every election worker would get?

22          A.   Yes.  In fact, at the break, Sonya reminded me

23     that every one of our clerks is given written materials,

24     and they also had to sign that they had read the written

25     materials.

```
 1                      So not only did every judge get the
 2      personal training, but each clerk was supposed to have
 3      signed the information about photo ID at the polls where
 4      they worked.  So every clerk had that information.
 5          Q.    On the training portion of it, what kind of
 6      assistance, if any, did you get from the secretary of
 7      State's office?
 8          A.    They provided the -- they provided videos
 9      themselves.  They provided, you know, tons of
10      information on the how-tos, you know.  We just tried to
11      make the same information to pass through in friendlier,
12      more fun ways, so they would pay attention.
13          Q.    Okay.  So the video you use on your Web site,
14      did you produce that, or was it from the secretary of
15      state?
16          A.    No, I think actually we produced it ourselves,
17      here.
18          Q.    Okay.
19          A.    But it's got the same content as what they
20      had.
21          Q.    So it's something the county would have spent
22      money on?
23          A.    Well, we had IT guys that took the cameras we
24      already had here.
25          Q.    Okay.
```

1     A.   We did the videos out at the warehouse, or

2   around the office, so, you know, we didn't hire anybody.

3     Q.   Okay.

4     A.   It wasn't like it was any additional cost.

5     Q.   So why not use the video that the secretary of

6   state provided?

7     A.   I think ours is more --

8     Q.   More better?

9     A.   More better.

10     Q.   Okay.  Did you have any information

11   technology, like computers that you had to acquire to

12   implement S.B. 14?

13     A.   No, not the specific -- nothing that we

14   weren't already using.

15     Q.   Was there anything else involved in the

16   training of workers on S.B. 14 that your office did that

17   we haven't talked about?

18     A.   There probably is because, like I said, I

19   don't know every detail of all the how-to training.

20     Q.   Okay.

21     A.   I've gone to, you know, several of them, but I

22   know the -- when we get new clerks in, that they

23   actually get, you know, e-slate-type training on the

24   mechanics.

25                     And I know at each of those mechanic

1    training there's also -- because of photo ID they

2    incorporate into those training some of the photo ID

3    hotspots, let's say, into that training also.  Because

4    our goal was to make sure all of our collection clerks,

5    all of our judges knew how to implement and deal with

6    photo ID as much as possible.

7        Q.   And so it sounds like you also had some

8    seminars where these folks could show up.

9        A.   Yeah.  We called them election law training

10   classes that we have around the county at different

11   campus.

12       Q.   Were those mandatory for election workers, or

13   voluntary?

14       A.   They're mandatory for the judges and the

15   alternate judges, and the -- you know, open to the --

16   all the clerks.

17       Q.   Okay.  One of the things that is in Senate

18   Bill 14 is a "substantially similar" requirement in

19   terms of comparing the voter registration --

20       A.   Right.

21       Q.   -- to the S.B. 14-approved ID.  You know what

22   I'm talking about?

23       A.   Yes.

24       Q.   Okay.  Is the "substantially similar"

25   requirement something that your office trained on as

1    well?

2        A.    Yes, yes.

3        Q.    Okay.   In your experience in going around to

4    polling locations while voting is going on, the people

5    who are at the desk receiving voters, looking at the ID,

6    comparing it to the registration, are those typically

7    election clerks, or election judges, or alternate

8    judges, or all three?

9        A.    It depends on what you're talking about.   Are

10   you talking about early voting, or are you talking about

11   election day?

12       Q.    Well, let's take early voting, first.

13       A.    Okay.

14       Q.    What's the situation in early voting?

15       A.    In early voting we have electronic poll votes

16   that the judge or the clerk that's assigned that's

17   trained on how to use the actual training poll book,

18   they will actually look someone up, and it will bring

19   back the best match.

20              In our early voting now, we will -- it

21   will bring back the match and also will have the matched

22   DPS name in our early voting laptops that we use.

23              And we actually use it in the runoff for

24   election day, too.   And we actually print now the label

25   that has the voter's name and the pre-matched DPS name

1    on the label.

2                    So that if there is a match, which we've

3    done, you know, for a substantial portion of the voters

4    in Harris County, we have already pre-matched them, they

5    already have the name there printed.

6                    As long as there's a match, it will

7    already tell them, there's nothing the voter needs to

8    do.  If it's the similar name we matched, they've just

9    got to initial "similar name."

10        Q.    All right.  So you've said a lot there I want

11   to make sure I understand.  You have these early voting

12   laptops, I think you called them.

13        A.    Correct.

14        Q.    They are available at every early voting

15   location.

16        A.    Correct.

17        Q.    And did I hear you say you use those laptops

18   during the runoff as well?

19        A.    We use those in some locations in the runoff

20   on election day.

21        Q.    Okay.

22        A.    We use them -- all the other times, all the

23   other elections, we had the paper on election day.  And

24   the paper, we did the same thing, we printed the

25   matching DPS name on the hard matches, was already

1    pre-printed in the book.

2              So that all the voter would have to do

3    was initial "I am the same person," and then it was also

4    the option of "update my voter registration box."

5         Q.   All right.

6         A.   They would do that.

7         Q.   So let me back up and make sure we make sense

8    of this for our record.  First, your office actually

9    went and crossed the DPS database with the Harris County

10   voter registration base --

11        A.   Yes.

12        Q.   -- and tried to pre-match IDs to individual

13   voters; is that right?

14        A.   Yes, and that took care of most similar names.

15        Q.   Okay.

16        A.   Because most people we had enough data points

17   that we could match.  And we would only call it a match

18   if it was a hard match.

19        Q.   And I'll come back to the hard and soft.

20        A.   Right.

21        Q.   And how you got to that.

22        A.   Right.

23        Q.   Now I just want to understand the mechanics of

24   it.

25        A.   Right.

1      Q.   So in your office, in the main Harris County

2    attorney's office -- Harris County clerk's office --

3      A.   Yes.

4      Q.   -- made a match and made an initial

5    determination of whether there was a match between ID

6    and registrants; is that right?

7      A.   Yes.  So clerks wouldn't have to think on

8    those issues.

9      Q.   All right.  And you did that all the way back

10   to the first election under S.B. 14?

11     A.   No, we did not have -- in early voting, we did

12   not have that at the earliest elections.  We just have

13   it now.  We did it just recently on early voting.

14     Q.   Okay.  So you implemented this for the first

15   time on early voting for the primary in 2014?

16     A.   The primary runoff.

17     Q.   For the primary runoff?

18     A.   Yes.

19     Q.   So is it fair to say that the system that

20   we're going through and describing now has only been

21   used in one election in Harris County so far?

22     A.   Yes.  Where we print the actual matched name

23   during early voting.

24     Q.   When did you first in your office start doing

25   a preliminary match and providing it to election workers

1    in any form?

2        A.   We did that for the November 5th election, but

3    we only had it on the election day in the printed paper

4    poll books.  We didn't have the electronic system

5    updated to handle the matched name ID.

6        Q.   So if we focus on the November election during

7    the early voting period in the November 2013 election --

8        A.   Yes.

9        Q.   -- poll workers did not have this pre-match

10   run by your office?

11       A.   Correct.  They were actually having to do the

12   matching.  But the computer, when they would look

13   someone up, they would be at the end of the potential

14   people that would match.  I mean, while a hard match is

15   just this is the one, we're 99.99 percent sure this is

16   the one.

17            While you might have two or three listed,

18   for the worker then would have to use their knowledge to

19   say, "Oh, it's this one or not."

20       Q.   Okay.

21       A.   They would ask the voter, "Are you this

22   person?"

23       Q.   But starting in the general election, in

24   November of 2013, your office provided in paper form a

25   pre-match; is that right?

1         A.   For the poll books on election day, yes.

2         Q.   Okay.  And what did you do on this subject in

3   the 2014 primary election in March?

4         A.   It's the same.  It was the same.

5         Q.   It was in paper?

6         A.   It was the same.  The early voting was the

7   electronic, where the early voting clerks had to do the

8   matching on similar names themselves.  Just like it was

9   in November.

10        Q.   Okay.

11        A.   And then the paper on election day both times

12  was pre-matched.

13        Q.   I see, okay.  And then when it came time for

14  the runoff in 2014, what did you do?

15        A.   That's when we had implemented the match.

16        Q.   Okay.

17        A.   And it might have only been on election day.

18  I really forget.  I mean, I can ask her if we had it in

19  early voting or it.

20        Q.   Well, let's find this out, if you don't mind.

21        A.   Did we have that in early voting, too?  We

22  did, didn't we?

23             MS. ASTON:  I believe we did, yes.

24        A.   For the runoff, yes, yes, we did.  We would

25  have.

```
 1        Q.   (By Mr. Dunn)  So you had it for -- your best
 2   recollection is you had it for early voting and on
 3   election day --
 4        A.   For the runoff --
 5        Q.   -- in 2014?
 6        A.   Yes, when we used the electronic poll books.
 7        Q.   Yes.  We have to do a better job of not
 8   talking over one another.  All right?  And I'm doing as
 9   bad a job as you.
10        A.   All right.
11        Q.   So just to make sure that's clear in our
12   record, in the primary runoff election in 2014, both in
13   early voting and election day, there was a pre-match
14   performed by your office and provided to the workers; is
15   that right?
16        A.   Restate that, please.
17        Q.   In the primary runoff in 2014 --
18        A.   Yes.
19        Q.   -- there was a pre-match --
20        A.   Yes.
21        Q.   -- that your office performed and provided to
22   election workers both for early vote and election?
23        A.   Correct, yes.
24        Q.   Was that all done by laptop, or were any of
25   those in paper?
```

1        A.    On election day, some of it was paper and some

2    was by laptop.

3        Q.    Okay.

4        A.    We have a lot less polling locations, we have

5    a limited number of electronic poll books.  We couldn't

6    support a normal election day.  There's lot of

7    consolidation in the runoff, so we couldn't support half

8    of it.

9        Q.    And when you say electronic poll books, is

10   that the same thing as this laptop you mentioned

11   earlier?

12       A.    Yes.

13       Q.    Did you acquire any of these laptops for this

14   purpose?

15       A.    No, we've had them for years.

16       Q.    So this match process that you've been

17   describing, there was no fiscal impact, as far as you

18   know, for the county?

19       A.    We had our vendor implement it in their

20   product, but under the normal service maintenance

21   agreement that we have with them.  Generally, no

22   additional cost.

23       Q.    So let me back up.  You know, you said that

24   when the first voting started under S.B. 14, you didn't

25   yet have the pre-matched, election workers had to make

1    the decision in the field; is that right?

2        A.    In early voting.

3        Q.    In early voting?

4        A.    Yes.

5        Q.    So why didn't you have it?  You hadn't thought

6    of it yet?

7        A.    We didn't have time.  The vendor couldn't get

8    it.  They couldn't get it done in the time frame we

9    wanted them to.

10            Because as soon as we -- now, you know,

11   when we came up with the concept of doing it, you know,

12   by the time we got to them to try to get it done, they

13   just couldn't pull it off.

14       Q.    What's the name of this vendor?

15       A.    It's VoTech Corporation.

16       Q.    And so from your standpoint, it wasn't like

17   something came up during that initial early voting

18   period where the election workers were doing it on their

19   own, that made you want to implement the system --

20       A.    No, no, we wanted to do it initially.

21       Q.    Okay.

22       A.    They just -- they couldn't get it done in a

23   time frame that we wanted them to get it done in.

24       Q.    Now, this process of pre-matching and sending

25   to the election workers, do you know if any other county

1   does that?

2        A.   I know pre-matching, Dallas County did it for

3   purposes of mailing.  I don't know if they've been doing

4   more than that.

5        Q.   Okay.

6        A.   I don't know if any other counties are doing

7   this.

8        Q.   Okay.

9        A.   I think -- I think just in passing VoTech said

10  that Dallas was interested.  I don't know where they are

11  at on that.

12       Q.   You didn't have to pay, you, as Harris County,

13  didn't have to pay VoTech anything extra to do that?

14       A.   No, it was under our normal maintenance

15  agreement.

16       Q.   Okay.  For the voter roll?

17       A.   Well --

18       Q.   Why does the county -- let me back up.  Why

19  does the county have an agreement with VoTech, to begin

20  with?

21       A.   They are our database that we use our -- for

22  the voter reg uses it.  They have their own server, and

23  then we use it also in -- we have a server on my side of

24  the house in the county clerk's office where we run the

25  elections out of.

1                   The election programming is done on that

2     product.  That's where we copy the voter roll from the

3     voter registrar also.

4          Q.   So where did this idea come from to do the

5     pre-match?

6          A.   I think they came from my office.

7          Q.   Okay.  And, I mean, can you -- are you able to

8     identify the person who had this idea?

9          A.   Maybe me, I think, if I was going to guess.

10         Q.   All right.

11         A.   Probably, I think.  But I'm not positive of

12    that.

13         Q.   Okay.

14         A.   I'm a technical guy, okay?  Engineers do these

15    kind of things.

16         Q.   So at any point did you express to the

17    secretary of state's office either, A, you had this

18    idea, or B, you were going to do it?

19         A.   Yes.  We had to get clearance on the forms

20    because we modified the forms, to accept the label to do

21    it this way.  So any time they change any form, they

22    have to review and approve.

23         Q.   "They" being the Texas Secretary of State?

24         A.   Yes.

25         Q.   Who was it over there that you would deal with

1    on those issues?

2         A.   On forms, I'm not positive, but Keith Ingram

3    is the one who was involved in this process.   But

4    somebody in his legal department, I think, does the

5    forms.   Ashley maybe.   I don't know.

6         Q.   But if you call the secretary of state's

7    office to talk about S.B. 14 implementation, is it Keith

8    Ingram you contact?

9         A.   Usually Sonya does most of the contacting.

10        Q.   Okay.

11        A.   But, you know, I see Keith, you know, at

12   conferences and whatnot, and I'll see him --

13   occasionally, I'll contact him.   Not very often.

14        Q.   So back to this pre-match process, as I

15   understand it, the pre-match is a comparison of the

16   Harris County voter registration database to the Harris

17   County portion of the state driver's license database.

18        A.   Correct.

19        Q.   Okay.   And I assume because it's not available

20   to you, there is no similar match done, say, to the

21   passport database --

22        A.   Yes.

23        Q.   -- or the concealed handgun database, or any

24   of these others?

25        A.   Correct.

1          Q.   So if a voter presents themselves at a polling

2     location, and let's say they have been pre-matched to

3     their driver's license, but they present their passport

4     or their concealed handgun license --

5          A.   Correct.

6          Q.   -- are they still going to be allowed to vote?

7          A.   Of course.

8          Q.   Okay.  Just because you're pre-matched in the

9     software doesn't mean you're now going to be restricted

10    to using that ID?

11         A.   Correct, yeah.

12         Q.   On the same token, just because you're

13    pre-matched doesn't mean if a voter shows up and they

14    have forgotten ID at home that it's going to be forgiven

15    because they've already been matched; right?

16         A.   Right.

17         Q.   They are not going to be allowed to do that?

18         A.   They have to have a photo ID, yes.

19         Q.   All right.  Now, you mentioned the issue of

20    hard and soft matches.

21         A.   Correct.

22         Q.   And who came up with what is a hard and soft

23    match, as far as your office is concerned?

24         A.   Me, and my IT team.

25         Q.   Okay.

1     A.   We kind of -- multiple criteria.  You've got

2  Social Security numbers, for some people, the last four

3  digits in the voter registration database.  You have

4  driver's license number, about half the people.  You

5  have addresses, you have first names, you have last

6  names.

7          So what you look at is preponderance of

8  the data.  You don't have to have the same last name for

9  me to get a match on you if you've gotten married.

10     Q.   Okay.

11     A.   Because I have got enough data points there

12  that I can say that's you.

13     Q.   All right.

14     A.   But then you get down to the soft matches are

15  the ones that say, "I can't say that's you or that's

16  you," so that to me is a soft match when it's your --

17  when it's more than one person that is a potential

18  match, then that's not a match for me.

19     Q.   So in the first early voting period, in the

20  November 2013 election, when you were leaving it to poll

21  workers because you didn't have the pre-match system in

22  place yet --

23     A.   Right.

24     Q.   -- did you do a training on what was a hard

25  match and soft match and what was acceptable?

```
1         A.   We did training on similar names.

2         Q.   Okay.

3         A.   On what's -- in fact, I think we have a video

4    on similar names.  We, you know -- and we -- because the

5    clerks that run early voting are actually our temporary

6    employees of the county clerk's office, they have been

7    there longer, they know how to use things, we can give

8    them better training, they are more of our A-team on

9    running our polls.

10             So they were able to -- we showed them

11   what similar name required and the criteria to go

12   through it.  And the end result is I don't know anybody

13   that didn't get to vote because it was a similar name

14   issue in Harris County.

15        Q.   All right.  So when you were doing that early

16   vote period in 2013, you didn't -- you didn't use the

17   sort of hard match/soft match matrix of using multiple

18   data points, instead it was just comparing names?

19        A.   The clerk is looking at the names, they are

20   looking up the person.

21        Q.   Right.

22        A.   Remember, the first thing when they swipe the

23   electronic system is going to do is try to match the

24   driver's license.  If there is a driver's license name,

25   they will present the names that will match the driver's
```

1   license, it will always be one person.  So it makes it

2   easy right there.

3              But otherwise, it's going to start

4   looking at the -- if there's not a DPS ID in the voter

5   registration database, it's going to start looking at

6   address, last name type things, and present, you know, a

7   potential match to the clerk there.

8              So it makes it a short list.  The clerk

9   can always ask -- if the addresses match, it's a pretty

10  easy match for the clerk then because they are presented

11  with a short list.  Or then they can always ask the

12  voter, "Are you this person or this person?"

13       Q.   So what if the person comes in with a

14  passport?

15       A.   Same, same way.  They are looking up by last

16  name.  Usually they will just do a name search.

17       Q.   And when they are looking up -- are they

18  looking up in the voter registration file, or the DPS

19  file?

20       A.   The voter registration file was all that we

21  had at that time.  You can't even look up the straight

22  DPS on our system, I don't think.  Other than when you

23  swipe, it does the automatic match.

24       Q.   Okay.

25       A.   Otherwise, you're actually going to put in

```
 1    name or address, you can put any pieces of fields.  You

 2    can put in, you know, first three letters of a last

 3    name, or first letter of a first name, to actually help

 4    you bring up a list, get enough information to get a

 5    short list --

 6         Q.   Sure.

 7         A.   -- is the whole goal of the clerk running the

 8    electronic poll book.

 9         Q.   So if you came in with your driver's license

10    with the magnetic strip that the number won't scan, can

11    they type in the number and get the same deal, or the

12    same sort of short list that you described?

13         A.   You know.  You might be able to.  I'm not

14    positive.  Can they?  Yes, yes, that's true.

15         Q.   All right.  But in that early voting period in

16    2013, there was a comparison of similar names performed

17    by the election worker --

18         A.   Yes.

19         Q.   -- on a case-by-case basis; is that right?

20         A.   Yes, yes.

21         Q.   And then starting in the November 2013

22    election day, and as you've described in elections

23    since, there is a more detailed, as I would describe it,

24    metric use where you use multiple data points to

25    determine whether people are the same?
```

 1          A.   Yes, right.

 2          Q.   Now, are you aware of whether any election

 3     workers, whether by training or by confusion, have

 4     looked at an entry when somebody came in, and there

 5     wasn't an automatic match as discovered by your office,

 6     and just assumed that they needed to be rejected, even

 7     when they did have an ID?

 8          A.   If they have confusion, they call downtown,

 9     and we're able to look them up.

10          Q.   Okay.

11          A.   I don't know of anybody who had their vote,

12     even provisionally, that brought in a photo ID that was

13     not allowed to vote.  The end result is --

14          Q.   A full ballot?

15          A.   Yes, got a full ballot, if they got a photo

16     ID.  I think we were able to match everybody up on a

17     similar name, to the best of my knowledge.

18          Q.   And do you know if other counties have had

19     similar success?

20          A.   No, I don't, not too much, no.

21          Q.   This hard match/soft match matrix, do you have

22     that reflected in, you know, whether it's a software

23     code, or if A and B, then hard match, if C and D, soft

24     match, that sort of thing?

25          A.   It's a series of queries.  You run a query on

1    the database, first this way, then you exclude all those

2    people, and then you run ones that are left.  So it's --

3    makes it easier as the pile gets smaller, the one you

4    unmatched, you're only looking at the unmatched ones.

5         Q.   I assume you would be able to provide us this

6    query.

7         A.   Yes, the series of queries that we used, yes.

8         Q.   Okay.  Did you at any time take your -- I'm

9    just going to call it a query because I don't know what

10   else to refer to it as.

11        A.   Yeah, right.

12        Q.   Did you at any time take the query and run it

13   by the secretary of state's office?

14        A.   I don't know that we did.  I don't know if we

15   did.

16        Q.   I'm just trying to find out, you know, who, in

17   addition to you, helped develop that query system.

18        A.   It's just -- it's basically logic.  I mean,

19   what engineers do.

20        Q.   Okay.  All right.  So the answer is outside of

21   your office, you're not aware of anybody else having a

22   hand in doing that?

23        A.   No, no idea.

24        Q.   Okay.  On the election workers that you

25   utilized, I think you mentioned earlier that the

1    election judges are principally responsible for locating

2    their election workers.  Is that right?  Did I hear that

3    right?

4         A.   Yes.  The election judges, yes.

5         Q.   And are there any sort of minimum requirements

6    to qualify as an election worker?

7         A.   Registered voter, I believe.

8         Q.   Okay.

9         A.   And over 18 -- well, no.  Over 16 now.  Recent

10   law change.

11        Q.   And so is it -- is there -- you know, I

12   understand I can hire a paralegal in my office, they've

13   got to be 18, a legal citizen to vote, those minimum

14   requirement, but there's other things I'm looking for

15   when I hire somebody.

16             So I'm trying to find out:  Do you have

17   some kind of matrix in your office so something that you

18   train election judges to look for in an election worker?

19        A.   We probably have guidelines.  I'd have to ask,

20   on -- you know, ideally they can read.

21        Q.   Okay.

22        A.   But someone -- well, unless they are a

23   translator, they can speak English.  Even our

24   translators we ask that they be bilingual so they can

25   also work as a clerk because they have to be able to

1    read and, you know, help -- be able to read the

2    instructions themselves to help the clerk.

3         Q.   Let me come at it from a different angle.   So

4    when an election judge locates election workers to work

5    in her precinct, is it pretty much up to her discretion

6    who she hires, subject to them being a lawful citizen

7    and meeting the legal requirements for the position?

8         A.   Pretty much, yeah.   I mean, we -- I think we

9    do tell them, you know, we have a list of our

10   instructions that, you know, guidelines, but no hard

11   laws.   The only laws are what's in the -- what's in the

12   statutes.

13        Q.   I didn't know if there was a situation, for

14   example, where an election judge would identify a few

15   election workers that they thought were good candidates,

16   and then those candidates would have to be vetted by

17   somebody in your office to make sure they were.

18        A.   No.

19        Q.   So it's up to the election judge essentially,

20   in compliance with the applicable law.

21        A.   Yeah, whatever the law is, yes, right.

22        Q.   All right.   Is there any kind of testing or

23   analysis of the degree to which training has been

24   successful in an election worker?

25        A.   We do track complaints and other things, so we

1    feedback to the parties on people who just don't get it.

2    There's always a few.

3              There's always -- always, for some

4    reasons, as large a region as we are, that have hygiene

5    issues, to, you know, talk to the person, see if we can

6    resolve this, or if they don't, to not resubmit them as

7    a worker.

8        Q.   Other than that, though, there's no sort of,

9    like, quiz or test they're given to make sure they

10   understand some basic issues?

11       A.   Like I said, we have them for photo ID, this

12   last time, we had them sign, you know, acknowledge that

13   they understood certain things about photo ID.  But

14   generally, there is not a test for the workers.

15             Like I said, if there's issues during

16   training, that we see the person just really isn't able

17   to do the job, we refer back to the parties, let them

18   know, "Hey, this is not a good candidate."

19             Or after the fact, you know, if there are

20   issues at the polls related to a person, then we will

21   feed it back to a party.

22             Sometimes it can be resolved, you know, a

23   personality issue we can just have them work at a

24   different location in the future.  But we work closely

25   with the parties to make sure our polls are equipped.

1          Oh, yes, there is testing.  When they do

2     e-slate training, they are tested on the results of

3     the -- can they, you know, how to hook things together,

4     how to assemble the voting machines, how to, you know,

5     select the ballot style for the voter.

6          In other words, how to run the machine.

7     There is some testing that let's us know whether they

8     need training or not.  Or like I said, recommendation

9     back to the parties that this person is not the best

10    candidate.

11        Q.   Okay.  So -- but there is no testing about,

12    you know, for example, here is a list of 14 IDs, which

13    of these are acceptable under Senate Bill 14, and then

14    election workers are expected to do it?

15        A.   They're presented with a list that they have

16    right there with them at the polls of acceptable IDs,

17    they are shown those.  They have the video training that

18    every one of them was supposed to watch this last time

19    on acceptable photo IDs, that are acceptable.

20        So they should have fairly good knowledge

21    and testing on -- not testing, but pretty well

22    information presented to them if they have actually paid

23    any attention to what the acceptable photo IDs are.

24        Q.   Okay.  But they don't have an exam that they

25    have to take before they are approved for work?

1        A.    No, I don't think there's a multiple choice.

2        Q.    All right.   On the substantially similar

3   issues, I have a few examples here I want to ask you and

4   see how it would come out in your match.   Okay?

5        A.    Okay.

6             MR. DUNN:   I don't have extra copies of

7   them.   There are four or five of them here.   Do you want

8   to make a copy?   Does it matter?

9             MR. SCOTT:   I'll come look.

10            MR. DUNN:   Sure.

11            MR. SCOTT:   Is that all right?

12            MR. DUNN:   Sure.   I guess I'll just mark

13  this set as Exhibit 1.   Actually, I'm going to number

14  the pages.   Here we go.   I do actually have an extra set

15  for you.   To save us some time, I took out a few

16  examples.   There you go.

17            MR. SCOTT:   Thank you.

18            (Stanart Deposition Exhibit No. 1 was

19  marked and is made a part of this deposition.)

20       Q.    (By Mr. Dunn)   All right.   I've handed you

21  Exhibit 1 which contains six pages which I have now

22  numbered.

23       A.    Uh-huh.

24       Q.    So starting with Page 1, if you take a look at

25  this example, it gives you the information on a poll

1    book.  And then it gives the information on the driver's

2    license that the voter would see.

3              You'll note in this example that the name

4    is different, both the first and last name are

5    different, the date of birth is the same.

6         A.   Right.

7         Q.   And addresses are different.  Do you see that?

8         A.   Uh-huh.

9         Q.   Is that a "yes"?

10        A.   Yes.  I see that, yes.

11        Q.   Okay.  So would this be a match of any kind?

12        A.   It depends.  Because in our voter roll, we

13   have driver's license for about half the voters.  We

14   have also last four digits of Social Security that we

15   have in the database.

16        Q.   Let's assume this is all the information that

17   you have.

18        A.   That's all the information that I have?

19        Q.   Yes.

20        A.   The only thing that's the same here is the

21   date of birth.  I would think that would be insufficient

22   to say that's the same person.

23        Q.   It would not be, or it would be?  I just

24   didn't hear you.

25        A.   It would be insufficient on here.

1          Q.    Okay.

2          A.    You would need more information than just

3     this.

4          Q.    So from your viewpoint, this is a voter that

5     would either be rejected or given a provisional

6     affidavit?

7          A.    The potentiality would be there, yes.

8          Q.    Okay.  Well, and I guess you use the word

9     "potential."  And that's a good point.  Does that mean

10    that some election workers may look at this and say, "I

11    think this is the same person, so I'm going to let them

12    vote," other election workers would say it's not?

13         A.    There could be more -- if more information was

14    provided than just this, then the election worker might

15    accept.  But with just this only, I would think that

16    they would ask this person to vote provisionally.

17         Q.    Okay.  But it's possible that an election

18    worker might not?

19         A.    Like I said, I don't know of anybody that was

20    turned away from voting in our elections in Harris

21    County due to a similar name issue.

22         Q.    Okay.  And I appreciate that.

23         A.    Yeah.

24         Q.    You told me that.

25         A.    Yeah.

1    Q.   I thank you for that.

2    A.   Yeah.

3    Q.   But focusing on this example, is it possible

4    that if this person appeared in Harris County, for one

5    election worker they would be permitted to vote a full

6    ballot, and another election worker would give them a

7    provisional ballot, or reject it?

8    A.   I would suspect if this was the only

9    information given, that they would be asked to vote

10   provisionally.

11   Q.   Okay.  If you could go with me to Page 2.  On

12   Page 2, we have the same first name, a different last

13   name, female individual, at least if Elizabeth is a

14   female name.  Date of birth is the same.  And then the

15   address is different.  Do you agree that's a summary of

16   the information on Page 2?

17   A.   Correct.

18   Q.   Okay.  So what -- how would this person be

19   handled in a Harris County voting location, if that's

20   all the information you have for them?

21   A.   Once again, I would think that is insufficient

22   to say it is the same person.

23   Q.   Okay.

24   A.   Once again, like I said, our database has more

25   information, and we likely would have -- if it is the

1    same person, we likely would have matched them.

2         Q.   And do you recognize that -- again, focusing

3    on only the information.

4         A.   Right.

5         Q.   The only information you have, do you

6    recognize a different poll worker would come to a

7    different conclusion than you just came to?

8         A.   That they would let them vote?

9         Q.   Yes.

10        A.   That's not how we trained them.

11        Q.   Okay.  So in your view, as long as your

12   training has been successful, a hundred out of a hundred

13   times this person presents themselves to different

14   people, they're going to get rejected from voting?

15        A.   They're going to be allowed to vote

16   provisionally.

17        Q.   Okay.

18        A.   Every person gets to vote provisionally.  And

19   so they have the opportunity then to provide, you know,

20   proof of that they are the matching -- same matching

21   person --

22        Q.   Okay.

23        A.   -- to the authorities.  Yeah, to the

24   authorities, to be counted.

25        Q.   Now, on Page 3, in this example, the U.S.

1    passport doesn't have an address on it.

2         A.   Correct.

3         Q.   Okay.  So the passport has a date of birth and

4    a name, again, in this case a woman.  And their poll

5    book has the same first name, different last name, same

6    date of birth.  And, of course, the poll book also has

7    an address.

8              How would this person be dealt with by

9    one of your election workers who's properly responding

10   to their training?

11        A.   My suspicion is that they might let them vote

12   if they asked if they still lived at such-and-such

13   address.

14        Q.   Is that the correct judgment, in your view?

15        A.   They would ask for more information, they

16   probably would ask, "Do you have something else other

17   than just the passport?"

18        Q.   And assuming the voter says, "This is what I

19   got, this is all I have."

20        A.   They would make a call downtown, they might

21   end up talking to Doug Ray here.

22        Q.   Okay.

23        A.   "Doug, what's your best opinion on this one?"

24   Because our goal is let everybody vote.

25        Q.   Okay.  Obviously, that's easy you could just

1    do that, but then you're not really complying with

2    S.B. 14.

3         A.   No, I understand.   They would probably end up

4    voting provisionally.

5         Q.   If you were making the decision, that's your

6    judgment?

7         A.   Yes, that would -- if that is all that's

8    there.

9         Q.   Okay.

10        A.   Then that's probably the right answer.

11        Q.   All right.   I've just got a few more of these.

12        A.   Okay.

13        Q.   Page 4 now.

14        A.   All right.

15        Q.   We have a Christopher Johnson, in the poll

16   book, it's Chris Johnson.   In the driver's license

17   database, it could be a male or female, I assume.

18        A.   Right.

19        Q.   And the date of birth is different.

20        A.   Right.

21        Q.   But the address is the same.

22        A.   Yeah, but the first part of the name is the

23   same, too.   That's part of our criteria, we will look at

24   pieces of the name.

25                    In fact, we will look at the pieces of

1    the name, first, middle, too, to help us identify

2    because that's very common that people go by a middle

3    name.

4        Q.   Sure.

5        A.   Or go by something different.  But yes, that

6    would be a pretty obvious match.  We would actually

7    have -- if there is not another obvious other Chris

8    Johnson at the same address -- wait a second.  These are

9    different dates of birth.

10            That would -- that's probably a father

11   and a son.  So we would probably -- what's going to

12   happen is more than likely is we're going to match it to

13   the right one, though.

14            Because you're going to be presenting me

15   with this here, but if there's another registered voter,

16   we're probably going to capture the right birthday date.

17   We would probably have pre-caught this because of the

18   birthday match.

19       Q.   So your poll worker would look at it and say,

20   "This guy obviously wasn't born in 1911, so it must be

21   the other one"?

22       A.   No, no.  We would do a match -- the date of

23   births here are so far off, that this -- we would have

24   matched to the correct one with the correct birthday,

25   probably be pre-matched.

1                      So our election worker wouldn't probably

2      have to do anything, in this example.

3          Q.    So which one of these would you work off?

4          A.    You wouldn't work with either one, because

5      that's not a match.

6          Q.    Okay.  But when the voter comes in --

7          A.    The voter will more than likely -- Christopher

8      Senior here, okay, the one that's born in 1911, he's

9      going to be obviously that he's born in 1911.  He's over

10     100 years old.

11         Q.    Okay.

12         A.    In fact, more than likely, this person is

13     voting by mail and not showing up.

14         Q.    Or maybe even dead.

15         A.    Or even dead, correct.  Probably the younger

16     one, if -- this is a different person because of the

17     date of birth.  One is a senior, one is a junior.

18                      I would think that we would not have

19     pre-matched this.  Then it would come down to the date

20     of birth would be the criteria that would say probably

21     don't -- you would vote provisionally if you would let

22     this person vote at all.

23         Q.    All right.  Well, we know the voter comes in

24     with an ID that has their picture on it.

25         A.    Correct.

1      Q.   That they are Chris Johnson born on

2  August 2nd, 1994.

3      A.   Correct.

4      Q.   And he says he was registered to vote.

5      A.   Uh-huh.

6      Q.   When you look it up in the database, though,

7  the only entry you see is this other Chris Johnson.

8      A.   If that's the only one -- like I said, when we

9  do our matching, we'll look at all of them, and we're

10  going to try to match the one that they think matches.

11      Q.   Okay.

12      A.   We would not pre-match to the wrong one.  So,

13  yes, in this case, to me that's a different date of

14  birth.

15      Q.   So any time you see a different date of birth,

16  you would consider that a not match?

17      A.   No.  Here is what we would do, and our process

18  is we would call voter registration would get involved

19  in this, and they would actually pull up the

20  application, the actual image of the physical card, and

21  they would be able to look if that's the date on that

22  card.

23           Then the date that we have in our

24  database would be legit and, therefore, they would say

25  that's the same person.

1       Q.   You're saying the poll worker would get

2  somebody on the phone and work this problem?

3       A.   Yes, yes.

4       Q.   In the meantime, there's a line backing up, I

5  would assume, because that's one worker --

6       A.   No, we got more than -- early voting, we got

7  multiple workers.  Like I said, we pre-matched on

8  election day.

9            And also on election day, if the worker

10  sees it's a different birth date, it's a different

11  person, it's a senior.  So I would think that if they

12  are not able to get ahold of someone that could verify

13  the image, which more than likely that's what they would

14  do, they would probably make them vote provisionally.

15      Q.   So there is this variable where the election

16  worker says, "I'm going to investigate this further," I

17  mean, some, as you've already recognized might say,

18  "Look, it's a different date of birth, it's a

19  provisional ballot," that's the end of the query, would

20  you agree?

21      A.   If the voter complains, they would call the

22  office.

23      Q.   Okay.  So if a voter would get angry or maybe

24  push back, then you would expect the voter to contact

25  your office, and as you suggest, maybe the tax office

1    would pull up the original voter registration card --

2         A.    Right.

3         Q.    -- and see if maybe this date of birth on the

4    poll book it was entered incorrectly?

5         A.    Incorrectly entered in the databases, yes.

6         Q.    And through that process, who would be the

7    decision-maker?  Once the decision was made to call the

8    county office on this voter, now who is going to decide

9    whether they get to vote a full ballot?

10        A.    When the voter reg tells them it's a typo in

11   the database, they go ahead and let them vote a regular

12   ballot.

13        Q.    Would your office be involved in this call at

14   all, other than the election worker works for you?

15        A.    I don't think so.  At this point in time, no.

16        Q.    Okay.

17        A.    We have a good working relationship on

18   election day with them.  They have their phone bank down

19   there, and that's how they're -- we're going to the

20   source for these kind of informations, so we let them be

21   the authority on looking back at the regs.

22              And that's the best thing, go back and

23   look at the original image of the voter registration

24   base, make sure there wasn't a typo in the database so

25   the issue can be resolved.

1              And if it was a typo, then the voter

2    would vote regularly.  If it's different, then the voter

3    can only vote provisionally.

4         Q.   All right.

5         A.   For all purposes, it's a different person.

6         Q.   Now, if you go with me to No. 5, this person

7    shows up with a military ID.  So he didn't have a date

8    of birth or an address on it.

9         A.   Right.

10        Q.   It's just got their name.  But they are in the

11   poll book.

12        A.   Right.

13        Q.   They have a date of birth there.

14        A.   Right.

15        Q.   A date of an address.  Is this person going to

16   be allowed to vote?

17        A.   To my knowledge, everybody who came with a

18   military ID that had a matching name, they accepted them

19   to vote.

20        Q.   So somebody uses a military ID because it has

21   less data on it, just naturally has a better chance of

22   getting accepted to vote than somebody who brings in,

23   say, a driver's license which has an address and date of

24   birth that might not match, would you agree?

25        A.   No, because nobody was denied the vote

1    because -- that I know of, in Harris County, because of

2    an ID issue.

3         Q.   All right.  I keep hearing you say that.

4         A.   Yeah.

5         Q.   I don't have any reason to disagree with that.

6         A.   Yeah.

7         Q.   Instead, I'm going about a very specific

8    situation, and all I'm asking you is:  Since a military

9    ID doesn't have a address and date of birth, it's going

10   to necessarily be easier to vote and get a match with

11   than a driver's license which has a date of birth and an

12   address.

13                 MR. SCOTT:  Objection; form.

14        Q.   (By Mr. Dunn)  Or do you know?

15        A.   My suspicion is, once again, the clerk would

16   probably ask for more information if they have it, if

17   the voter has it.  If they didn't, more than likely,

18   yes, they would be allowed to vote.

19        Q.   All right.  And if the clerk did ask the

20   citizen for more information, at that point they would

21   just be taking the citizen's word for it; right?

22                 In other words, if they said,

23   "Ms. Johnson, what's your date of birth:  And she says,

24   "November 4, 1994," then you could say that's a good

25   match?

1      A.    Usually a voter would pull out a photo ID or a

2      driver's license, something of that nature.

3      Q.    Okay.

4      A.    That's the practice.

5      Q.    Usually.

6      A.    Usually, I would not say exclusively, yes.

7      Q.    And then the last example, No. 6, again this

8      is a --

9      A.    That would be a hard one, yes.  I would think

10     with that information, that information only, and that's

11     all the voter had, it would be difficult to allow that

12     person to vote, other than provisionally.

13     Q.    Okay.  Again, we're on Page 6 of Exhibit 1.

14     Here it's Elizabeth Smith in the poll book.  There's a

15     date of birth, there's an address, but she presents a

16     military ID that only has a name on it and it's

17     Elizabeth Johnson.

18     A.    Yes.  Without her providing more information,

19     I would suspect the clerk would ask her to vote

20     provisionally.  But, here again, I don't know of anyone

21     in Harris County that went down this path.

22     Q.    Okay.  Has your office at any point compiled a

23     list of nicknames?

24     A.    I don't think -- I don't think we did any

25     matching with nicknames.  Other than like I said,

1    looking at middle names as a possible match to a first

2    name, we did that kind of stuff.  But not necessarily a

3    Richard/William type nickname list.

4        Q.   How about any investigation of Hispanic

5    nicknames and Hispanic names that match other similar

6    names?

7        A.   I don't believe not in our matching that we

8    did, I don't think we did any of that.

9        Q.   Okay.

10       A.   I think now for statistics basis, maybe some

11   of the people have done that, but not for actual

12   voting-type issues.

13       Q.   So, you know, I consider myself 99.9 percent

14   ignorant in being able to match Hispanic names with

15   Hispanic nicknames, but I am told that Kiko and Nacho

16   are nicknames or full names that people use for other

17   names.

18       A.   Right.

19       Q.   So when you perform your hard and soft match

20   that you provide to the poll workers, how do you make

21   sure, if at all, that you're catching those?

22       A.   We didn't.

23       Q.   Okay.

24       A.   I mean, that's -- I can't make that

25   assumption, so that would not -- that's -- if I don't

1   have enough other data points that would help me match,

2   that would not be a criteria to match, the nicknames

3   stuff.

4        Q.   Would it be the same, say, for example, for

5   Chuck and Charles?

6        A.   Like I said, if we look at the three, maybe

7   first three letters, but you're going to look at other

8   data points, too.

9        Q.   Okay.

10       A.   We don't go -- we didn't go down the path of

11   nicknames.  I imagine you could probably match some

12   people on that, but that's work.

13       Q.   Okay.

14       A.   I mean, to me that's not as straightforward,

15   so we left that into those that aren't our hard match,

16   we will give that on discretion of the election worker.

17            Remember, we've got Spanish translators

18   at just about the majority of our posts, too, so they

19   would know that information, so they could use their

20   knowledge to help identify a similar name if we did not

21   have it hard matched on all the other data elements.

22       Q.   You said something there I want to make sure I

23   understand.  Is it the case when you did the query

24   electronically, you would just match the first three

25   characters, is that what I head you say?

 1          A.   Sometimes, along with other data points.

 2          Q.   Okay.

 3          A.   Like I said, I can show you the breakdown of

 4     how we would match.

 5          Q.   So sometimes in your query that you would run,

 6     you would be looking for a full match on the name, and

 7     sometimes you would say, "Well, if we had the first

 8     three letters of a name or each name," and then this

 9     other factor was the same, we would consider that a

10     match; is that right?

11          A.   I would have to go back and look at the

12     specifics.

13          Q.   All this would be in the query you ran?

14          A.   Yes.   Like I said, if it's not -- we had more

15     criteria we did we found that wasn't perfect.   Like I

16     said, if I couldn't get a 99.99 percent match, I didn't

17     want to use it.

18               Even though there was a lot of what I

19     call close matches or, you know, suspected matches,

20     there wasn't enough data points there for us to say,

21     yeah, that's the same person.

22          Q.   All right.   So when you have a close match, as

23     you just described it, in that case you give that person

24     a provisional ballot?

25          A.   No, I leave it up to the election judge at the

1  location to determine whether it's the similar name as

2  the same person.

3      Q.   I see.   So this pre-match that you're

4  performing is advisory?

5      A.   Pretty much, so, yes.

6      Q.   Okay.

7      A.   We're pretty confident in the advice we're

8  giving them, but if they find out -- I haven't heard of

9  anywhere it's incorrect, okay?

10      Q.   Okay.

11      A.   Feedback, it was incorrect.   But, of course,

12  the ones that we don't match, then it's up to the clerk

13  to determine if that person does show up, you know,

14  which one is the ones in the poll book is this person.

15  They are going to ask them, to some degree in their

16  judgment like they have always done.   Some they know the

17  person, too.

18      Q.   Right.   So if they know the person and they

19  otherwise see something there on the ground --

20      A.   Right.

21      Q.   -- that is inconsistent with whatever maybe

22  match your office has performed, they are trained, go

23  with what you're seeing, use your judgment there in the

24  field?

25      A.   Yes.   A similar name would not work without

1    them being able to do that.

2        Q.   Okay.  You've mentioned several times that

3    there was nobody that was rejected for a name mismatch;

4    is that right?

5        A.   To my knowledge, yes, yes.

6        Q.   Okay.  And so of those people that you

7    itemized for us earlier that had cast provisional

8    ballots related to ID, none of those were name

9    mismatches?

10        A.   Yes.  They came in with ID, they showed up

11    with no ID.  Some of them forgot them at home, or

12    whatever.

13        Q.   Okay.

14        A.   They somehow got to the poll and it was

15    someone else, and had gotten it and decided, "Well, I'll

16    just go ahead and vote now provisionally."  And after

17    the election results was seen, they probably didn't

18    bother to come cure it because it wouldn't have made any

19    difference.

20        Q.   Did anybody tell you that that's what they

21    did, or that's just your belief?

22        A.   That's just my belief.

23        Q.   Okay.

24        A.   Knowing that people do have IDs, that I would

25    be able to see, like two-thirds of them did, that didn't

 1    present it, I looked at doing our matching, about

 2    two-thirds of the people that you could say, well, they

 3    do have them.  So -- and I did hear the word out there

 4    some people wanting to make a point, too.  There's

 5    always those that purposely didn't do it to make a

 6    point.

 7         Q.   So you think some of these people came and

 8    left their IDs at home just to --

 9         A.   Yeah.  To make a point on ID.  The numbers

10    were very small, but that's what they did.

11         Q.   Did anybody tell you that that's what they

12    did?

13         A.   Not directly, but I heard, yes.

14         Q.   Some of these people could have been issued an

15    ID, they just don't have it any more, like they lost it,

16    it burned in a fire.

17         A.   Yes.  That's why they have the cure period to

18    go to DPS and take care of it.

19         Q.   Have you had any complaints from citizens

20    about the photo ID requirement?

21         A.   I'm sure there's some, yeah, there's some

22    small people that complain about it, yes.  But not very

23    many.  I mean, in the big picture, I thought the

24    election went well.

25         Q.   Would you have people lodge these complaints

1    by phone, or mail, or e-mail, or all three?

2         A.   I've got -- probably got a few e-mails and a

3    few by phone, but like I said, pretty small numbers.

4         Q.   The ballot board, did the Harris County ballot

5    board refuse to tabulate professional ballots from

6    voters who didn't come and cure?

7         A.   Not to my knowledge.

8         Q.   So it's your belief that the cured ballots

9    were tabulated and included in the official results,

10   even if the citizen didn't come and cure?

11        A.   Oh, no, no.  I'm sorry, no, only the ones that

12   cured actually would be the ones that count.  The ones

13   they did not cure, no, they did not get counted.

14        Q.   Okay.  Do you know what the cost is?  And this

15   may be outside your wheelhouse, but do you know what the

16   cost is to get a marriage certificate in Harris County?

17        A.   Seventy-two bucks, I believe.

18        Q.   Seventy-two?

19        A.   Yes.

20        Q.   Okay.

21        A.   Seventy-one or 72.

22        Q.   Okay.

23        A.   Make it 72.

24        Q.   And I should have been more clear, not

25   somebody who is --

1       A.    And you are saying a certificate or license,

2    okay, that's a license.

3       Q.    Right.

4       A.    Okay.  You want a certificate.  It seems like

5    it's 22, but don't hold me to that.

6       Q.    Okay.  Like I said, some of these things you

7    may not know anything about.

8       A.    Since my office does that, I do know about it.

9       Q.    Does your office, when you're doing a

10   pre-match during an election, the poll worker, have the

11   ability to look up marriage activity in any other

12   county?

13      A.    No.

14      Q.    In other words, if Elizabeth Johnson came in

15   and one of her records showed Elizabeth Shaw and she

16   said, "Well, I got married, and that's why it's

17   different," your office wouldn't have any way to figure

18   that out unless it happened in Harris County?

19      A.    We do have -- I mean, we do have access to the

20   whole voter roll in the whole State of Texas and the

21   whole DPS for the whole State of Texas.  So maybe we

22   could figure out some of that stuff, but that's not a

23   focus.  That's not something we normally do.

24      Q.    Okay.  So in that example with Elizabeth

25   Johnson shows up with an ID says this and Elizabeth Shaw

1    is on the voter roll, without any other matching

2    documentation, you're not going to go look it up or

3    confirm her story that she, in fact, was married and

4    that's why her name is different?

5         A.   Well, when we do our matching, though, the

6    last name changed can be an acceptable -- if the address

7    is the same and date of birth is the same, and

8    especially if I get a driver's license database that

9    matches, that's the same person.

10        Q.   Right.

11        A.   So we can look at -- we can accept -- if the

12   first name is the same, the middle name is the same, and

13   the last name is different, and the date of birth is the

14   same, the address is the same, that's the same person.

15   We're not worried about that.

16        Q.   But they have a passport, for example, and you

17   don't have the data points.

18        A.   If I don't have the other data points, I

19   pre-match that person -- remember, though, for the

20   clerk, though, it's already been matched to the DPS

21   name.

22             Hopefully, now at least they have a

23   driver's license and the voter registration is the same.

24   That would be -- if that name is printed as the DPS

25   match to that person, that's probably enough data points

1  for the clerk to accept that person as with the passport

2  for as the same person.

3      Q.   If they have a passport but they don't have a

4  driver's license, and it was never issued to them --

5      A.   Oh, okay.  Well, then I couldn't do that, of

6  course.  Got it.

7      Q.   Then you'll just have Elizabeth Johnson on the

8  passport with a date of birth, Elizabeth Shaw with a

9  date of birth on the data roll, and an address.

10     A.   Correct.  That wouldn't be enough data points.

11     Q.   They would be provided a provisional ballot?

12     A.   Unless the voter provided some other

13  information that had an address on it for us.

14     Q.   Oh, so could they bring their light bill?

15     A.   They are not supposed to, but I would suspect

16  if they did, that might be something that you would

17  convince a clerk to do.

18          Even though the training says otherwise,

19  or they know the person, or something like that.

20     Q.   Okay.

21     A.   Yeah.  The idea is to get as many people

22  voting as possible that should be voting.

23     Q.   Do you know who in Harris County, you know,

24  what jurisdictions have the authority ability to issue

25  birth certificates?

1          A.    My office does.

2          Q.    I can go buy a birth certificate from the

3    Harris County Clerk?

4          A.    Yes, we can get it for the whole State of

5    Texas, you know, a registered copy at my main office

6    here, or the nine branches around the county.

7          Q.    Do you know what that costs?

8          A.    I think it's around 22 bucks, but I'm not

9    positive.

10          Q.    Do you know what other -- or even how many

11    other jurisdictions in the county are able to issue

12    birth certificates?

13          A.    I think we're the only one.

14          Q.    Okay.  There has been some discussion in this

15    case about the cost of birth certificates being waived

16    for some set of circumstances.  Are you familiar with

17    those requirements?

18          A.    Vaguely.  I think I've heard that, yes.  Yes,

19    in fact, yeah, they waive most of the fees, I think, for

20    that.

21                In fact, I think all except for $2 or

22    something is waived.  And I didn't advertise this to the

23    public, but I did tell my staff, if that is an issue for

24    someone who wants one, I would personally pay that out

25    of my pocket.  Don't advertise that to the world.

 1          Q.    Okay.  So did your -- I understand you didn't

 2     advertise that.

 3          A.    Yes.

 4          Q.    Okay.  But did your office advertise that the

 5     fees would be forgiven for birth certificates if

 6     somebody couldn't afford one?

 7          A.    I don't recall that we did.

 8          Q.    Do you know whether your office ever did

 9     actually forgive the fees?

10          A.    I don't think we had anybody ask.

11          Q.    Okay.  I guess that's a good point.

12          A.    Yeah.

13          Q.    So if I walked into the Harris County Clerk's

14     office and everything is working according to the

15     training -- all right?

16          A.    Yes.

17          Q.    And I ask for an ID, am I told, if you can't

18     afford it --

19          A.    Let me take that back.

20          Q.    Okay.

21          A.    I think it did happen.  And I just don't know

22     how much it happened, but it seems like I remember the

23     discussion.  That's why I came up with the discussion

24     about the extra $2, and I said, "Well, if they make an

25     issue of that, I'll pay that."

1           But I just don't know how much it

2   happened.  But yeah.  Did we overly advertise it, I

3   don't think we did.  But if it was an issue for the

4   person, then, of course, the waiver of the fee, I think,

5   would come into play.

6       Q.   So if a person walks up to the desk and says,

7   "I want a birth certificate," they're going to be told,

8   "Okay, it's $22," and they say, "Oh, okay, thanks

9   anyway," and leave.

10      A.   Okay.

11      Q.   Then they are not volunteered and told, "Oh,

12  wait a minute, if you can't afford one, we can pay it

13  for you"?

14      A.   I don't know.

15      Q.   Okay.

16      A.   I don't know the answer.  We would have to ask

17  the people that work in those departments.  Whatever

18  guidance was given to them, from the state, is what they

19  followed, is my assumption.

20      Q.   What is the name of the sub-unit of your

21  department?

22      A.   Vital statistics.

23      Q.   Vital statistics?

24      A.   Or personal records, I guess.  Personal

25  records department.

```
 1        Q.   Do you -- as the county clerk, you also
 2   oversee the court records for the county courts at law
 3   and the probate court; is that right?
 4        A.   Yes, county civil courts and probate courts.
 5        Q.   And there is a legal process by which somebody
 6   can have their name changed.  Are you generally familiar
 7   with that?
 8        A.   Yes.
 9        Q.   Do you know if that can be filed in county
10   clerk, or district court, or either one?
11        A.   I don't know.
12        Q.   I don't either, so that's why I'm asking you.
13        A.   I don't know.
14        Q.   Okay.  I've always seen them in district
15   court.
16        A.   Yes, I think that's the only place I've seen
17   them, too.
18        Q.   Okay.  So you've never issued -- you don't
19   have access to the district court records, I assume?
20        A.   No, I go to the Web portal like everybody else
21   does.
22        Q.   Okay.  Do you have a computer database that
23   will let you pull up, like, district court name change
24   records?
25        A.   I know that the district clerk has a portal on
```

1   their Web site that let's people see some things.  I

2   don't know how much it let's them see.

3        Q.   Okay.

4        A.   I've never personally done it.  My staff might

5   use it, might not use it, I don't know.

6        Q.   So if a voter were to report to vote at one of

7   your voter registration, and their ID doesn't match the

8   voter registration records, and they say, "I've got a

9   court order changing my name," what, if anything, is

10  required to let them vote a full ballot?

11       A.   Hopefully, we've pre-matched that person so

12  that wouldn't be an issue for the clerks.

13       Q.   Okay.

14       A.   Here again, they can call downtown, and

15  potentially we can look that up ourselves.  But like I

16  said, I don't know of anybody on a similar name issue

17  that was denied the right to vote in Harris County.

18       Q.   So when somebody comes, and if they had a

19  certified copy of their record or their name change, is

20  that something that the poll worker is trained to

21  accept?

22       A.   No, they are not trained to accept that, no.

23       Q.   Okay.

24       A.   Like I said, though, nobody, to my knowledge,

25  was refused so somehow or another --

1      Q.   If that situation happened --

2      A.   If that happened, they probably would have

3  gotten ahold of somebody in my office, figured out how

4  to verify that was the same person.

5      Q.   And one of the tools that they might use is

6  this database --

7      A.   Yes.

8      Q.   -- with court activity?

9      A.   Yeah.

10     Q.   Similarly, that database could be used to

11  address somebody who had been convicted of a felony and

12  had their conviction discharged?

13     A.   Correct.  Yeah, we have access to the felony

14  database, and we have access to the -- to those kind

15  of -- I don't even know all the databases we have access

16  to.  So we could probably have ways of getting to other

17  information.

18     Q.   When you gave some assistance to the secretary

19  of state's office on locating the four mobile EIC

20  units --

21     A.   Yes.

22     Q.   -- did you -- how did you decide where would

23  be a good place to do that?

24     A.   We pulled up their existing map of where we

25  had locations at right now.

1        Q.    Okay.

2        A.    And we looked at, you know, our best guess of

3   the general areas that we knew of facilities then that

4   would meet the criteria of probably the minorities that

5   we felt maybe would be potentially -- it's poor people

6   essentially that might be in a position of not having

7   IDs, we know of locations in this general area that

8   would be a good location.

9        Q.    Would you go through -- for example, that

10  mailing you did of 90,000 people who didn't match, would

11  you plot that out by Zip code and look and say, "Okay,

12  there's a large cluster here," or was it basically there

13  is not an office here and it's a poor population?

14       A.    You know, I don't recall.  We might have

15  actually geocoded the voters and looked at a DOT map to

16  help us do that.

17       Q.    I'm seeing Sonya shake her head.

18       A.    I don't remember if we did.  Did we?  Yeah, we

19  did.  The non-matches we geocoded on a map, and we

20  looked at -- you know, we don't have a perfect match on

21  geocoding.

22       Q.    Sure.

23       A.    Say we get 90 percent of the people on this

24  right, then we look at the existing locations and look

25  at the host, and look at where, you know, where is their

1    location that we know about that we could be -- a place

2    to use.  So we used some intelligence behind it.

3         Q.   Good.  Is this geocode map in the documents

4    produced?

5                   MS. ASTON:  Probably.

6         A.   I don't know.  It might have one of those

7    created and thrown away at the time, though, too.

8         Q.   (By Mr. Dunn)  I didn't see it, but it's a lot

9    of stuff.  I could have missed it.

10        A.   I mean, we could have someone redo that.  It's

11   probably in a Web shot, create, thrown away after use.

12        Q.   I see.  Okay.  Did you attempt to analyze the

13   racial characteristics of the Zip codes --

14        A.   No.

15        Q.   -- that had a large number of non-matches?

16        A.   No, no.  It's just the ones that we don't

17   match.

18        Q.   All right.  Now, I want to talk about the

19   disability exemption.  Do you know of anybody in Harris

20   County in these past elections where S.B. 14 has been in

21   effect obtained a disability exemption?

22        A.   I believe there was a few, at least one, two,

23   something.  The tax office would have a better idea of

24   that than I would, but I would believe there was.

25        Q.   Okay.

1        A.    I don't know the exact number.  Very small.

2        Q.    Did you -- when S.B. 14 was being crafted, did

3   you have any input in the bill?

4        A.    No, not really.  I mean, other than mechanics.

5   That's a good -- don't do that because it might break.

6   But, you know, there was always -- I mean, we get asked

7   things because we're so large.

8        Q.    Who was it that you consulted with on the bill

9   in the legislature?

10       A.    I don't recall.  I mean, it was usually the --

11  information from maybe the secretary of state, don't

12  break this.  But it wasn't -- we weren't very involved

13  in it, let's put it that way.

14       Q.    Okay.  And I guess that's what I'm trying to

15  find out --

16       A.    Yeah.

17       Q.    You know, if you were on the -- I believe one

18  of the sponsors, for example, was

19  Representative Harless, a Houston state representative.

20       A.    Yes, yes.

21       Q.    You were on the phone with her in her office.

22  Or Senator Fraser.

23       A.    Very little on the phone.  Even though she was

24  my state rep, I was on there very little, very little

25  discussions with her.

1       Q.   Okay.  Any of them that you can recall?

2       A.   Discussions?  I mean, I had very little

3  discussions with her in terms of that.

4       Q.   Is there any conversation you can recall with

5  a legislative staff or legislative member about any part

6  of S.B. 14?

7       A.   None that come to mind.

8       Q.   I didn't hear you.

9       A.   Nothing is coming to mind.

10      Q.   Okay.  All right.  And have you done -- do you

11  do any post-election surveys or maybe seminars where you

12  bring in a number of election workers and talk about how

13  things went?

14      A.   We will do -- we did with the parties, we did

15  a post-election, we've had occasionally, and I think

16  here recently we did one with the parties.

17      Q.   Political parties?

18      A.   Yeah.

19      Q.   Okay.

20      A.   Because they are the ones that provide our

21  workers.

22      Q.   Right.

23      A.   So we did have a post-election meeting.  I

24  don't know, it was after the primary or after the

25  November election.  Sonya had those.  We ask for their

1    input.  We give feedback on the workers, we ask certain

2    people not to come back.  And we give them reasons why,

3    you know.

4         Q.   Yeah.

5         A.   So we do have that.

6         Q.   Did you have any kind of survey that you send

7    out about ID issues and issues that came up?

8         A.   No, no.  We didn't do any.

9         Q.   Did you collect any -- whether it's an Excel

10   spreadsheet or some other kind of journal or notebook,

11   the number of ID issues that came up and had to be

12   worked by your office in the election?

13        A.   I'm thinking during early voting we kept track

14   of the numbers by early voting locations.

15        Q.   The numbers of what?

16        A.   Of people who had ID issues.  But it wasn't

17   always accurate until we actually got the documents,

18   provisional ballots back.

19        Q.   Okay.

20        A.   And we counted them.  The better number really

21   was the provisionals that came back.  Because when we

22   report our daily numbers, it's nice to know how many

23   provisional ballots have been cast versus how many

24   actuals.

25        Q.   All right.  I'm going to take a break here for

```
 1    a minute.  I'm pretty close to finished, and so we'll

 2    come back in about five, ten minutes.

 3         A.   Okay.  Sounds great.

 4              (Recess from 12:15 p.m. to 12:21 p.m.)

 5         Q.   (By Mr. Dunn)  So just to clarify, while we

 6    were on break, you learned that after the election, an

 7    e-mail from your office was sent out to election

 8    judges --

 9         A.   Uh-huh.

10         Q.   -- to give any feedback about issues that

11    arose.

12         A.   Yeah, positive or negative.  Usually we

13    emphasize the positives.

14         Q.   Okay.

15         A.   But it's nice to get some of the good things

16    that went on on election day.

17         Q.   Did you get any S.B. 14-related feedback?

18         A.   We might have.  I don't know.  We would have

19    to double-check with that.  And I'm sure it would be

20    captured in the e-mails if it was.

21         Q.   Did you at any point purchase something or pay

22    money to the Secretary of State for materials or

23    information you used to implement S.B. 14?

24         A.   I don't know of anything.  I don't think so.

25         Q.   Okay.
```

1          A.    No.

2          Q.    Well, I appreciate you coming today.  I know

3     you're a busy person and thanks for answering my

4     questions.

5                    MR. DUNN:  Pass the witness.

6                    THE WITNESS:  All right.

7                    MR. DUNN:  John, are you going to have

8     questions?

9                    MR. SCOTT:  I do have some.

10                   MR. DUNN:  Do you want to move here?

11                   MR. SCOTT:  I can talk loud enough down

12     here.  If it becomes a problem, you let me know,

13     Mr. Stanart.

14                   MR. SHAPIRO:  Who is that talking?  Who

15     is next?  I'm Mr. Shapiro.  I'm having trouble hearing.

16                   MR. DUNN:  John Scott for the State.

17                   MR. SHAPIRO:  I may have questions.

18                   MR. SCOTT:  Do you want to go first in

19     case we lose the landline?  Go ahead.

20                   MR. DUNN:  Mr. Shapiro, why don't you go

21     ahead.

22                   MR. SHAPIRO:  Okay.  Thank you.

23                             EXAMINATION

24     BY MR. SHAPIRO (via telephone):

25          Q.    Again, this is Abner Shapiro with the

```
 1    Department of Justice, representing the United States --
 2    one of the attorneys representing the United States.
 3                    And, Mr. Stanart, I, to, will attempt not
 4    to talk over you.  And all the rules of the road that
 5    Mr. Dunn laid out at the outset for depositions are
 6    still -- still apply.
 7                    I'm going to keep this relatively brief
 8    because he covered most of the areas I was interested in
 9    covering, quite frankly.  But just a few follow-up
10    questions.
11                    You had discussed at one point the effort
12    to publicize the new ID requirement.  And among other
13    things, you mentioned billboards that have gone up.
14        A.   Yes, sir.
15        Q.   Is that right?
16        A.   Yes, sir.
17        Q.   And where were you -- what decision did you
18    make about where to put up those billboards?  How did
19    you decide which parts of the county to put those
20    billboards up?
21        A.   Well, the space was actually donated by Clear
22    Channel.
23        Q.   Okay.
24        A.   And so they pretty much kind of selected the
25    locations based upon their availability, because we
```

1    basically only had to pay for the vinyl.  And so it was

2    kind of a partnership with them.

3                    So that they used, you know, free space

4    they had, and they did kind of -- but, you know, they

5    kind of picked, you know, so we would get the most

6    exposure.

7                    But also they were restricted by what was

8    available that they wouldn't sell to a paying customer.

9        Q.    I see.  So do you know how many billboards you

10   put up for on this issue?  Let's say in the lead up to

11   the November election.

12       A.    I believe it was 40.

13       Q.    Forty?

14       A.    Yes, sir.

15       Q.    Do you have a sense where in the county those

16   billboards went up?

17       A.    They were just all over the county.  Like I

18   said, it was driven by what was available by Clear

19   Channel that they didn't have a paying customer paying

20   for at that time.

21       Q.    Okay.  So you have no sense as to where -- if

22   all the billboards were in one part of the county, you

23   wouldn't know, or generally, what's your sense of it?

24       A.    No, they were distributed through all

25   population centers, and we actually did have some of the

 1     billboards in Spanish, as well as Vietnamese and

 2     Chinese, and those were targeted other language than

 3     English was actually trying to target into the high

 4     population centers of that language.

 5                    And Clear Channel, they know their

 6     customers, and they know where they would position those

 7     to have the most impact.

 8         Q.    Okay.  And did you -- in the documents you

 9     provided us in discovery, did you -- is that -- does

10     that include information about where those billboards

11     went up?

12         A.    I don't know.  I mean, it might.

13         Q.    Okay.

14         A.    I think it does include the examples of the

15     billboards in the four languages.

16         Q.    Okay.  But you could provide that to us?

17         A.    I think we could probably get that from Clear

18     Channel.

19         Q.    And what can you tell us, generally, about the

20     type of information that was on those billboards?

21         A.    It was real simple.  It had a picture of a

22     photo ID on it, and the message was, "Bring your photo

23     ID to the polls."  And then we had a link to our Web

24     site, harrisvotes.com.  And then I think we had, you

25     know, my name, County Clerk, Stan Stanart.

1       Q.    Okay.

2       A.    And it had my title, too, to know who's

3   sending the message out.

4       Q.    Okay.  Great.

5       A.    You know, as few words as possible to get the

6   most impact.

7       Q.    Okay.  Good.  And the image that was used in

8   that billboard, was that included in the information you

9   provided us?

10      A.    Yes, I believe so, yes.

11      Q.    Okay.  And what, if anything, did that

12  billboard advertise and say about the ability to obtain

13  an EIC or another type of ID?

14      A.    Well, it didn't because, you know, billboards,

15  you've got just a quick snapshot of the message, but it

16  did have harrisvotes.com on there, in there in white on

17  a black bar that ran across two-thirds of the way down.

18            And on harrisvotes.com, we talked

19  about -- we had a link on the main page, you know "photo

20  ID required."  And on that page, we talked about photo

21  IDs, and we had a page on EICs as well.

22      Q.    So just to clarify, you're not talking about

23  what the text is on the Harris County link, but in terms

24  of the advertisements, on the billboard, what did that

25  advertisement say about getting, if anything, about

1    getting an ID?

2        A.    All it said was --

3        Q.    How to get an EIC ID?

4        A.    No, it did not address that.  It said, "bring

5    your photo ID to the polls," and it had the Web site

6    link.

7        Q.    Okay.  And you also, I believe, discussed

8    brochures that your office has produced on getting the

9    word out on the ID requirement; is that right?

10       A.    Correct.

11       Q.    Okay.  And is that also a document that's been

12   provided in the course of discovery?

13       A.    Yes, it is.  And like I said, it's also in all

14   four languages.

15       Q.    Okay.  And what does that document say about

16   getting an EIC, if anything?

17       A.    I don't have one in front of me to look at.

18       Q.    Okay.  To your knowledge, do you know if it

19   says anything about how to obtain an EIC?

20       A.    I'm not positive.  I suspect it does.  I do

21   know we did press releases that talked about the EICs

22   and the locations where people could obtain the EICs.

23       Q.    Okay.

24       A.    And we did get a lot of media from the

25   billboards.  We actually made the front page of the

1    Houston Chronicle with the billboards.

2        Q.   Okay.  And when you say you got a lot of

3    media, does that mean that the papers sort of reiterated

4    the message that was on the billboard?

5        A.   You got it, yes.  And they had a lot more

6    details on their messages then.

7        Q.   Now, is it also true that your office puts

8    out -- I think it's sort of typical of election offices,

9    they put out and publicize a date and time of election?

10        A.   Correct.

11        Q.   That's part of the publicity that election

12    offices not engage in, is that something your office

13    does, has routine announcements, this is the date and

14    time of the election and has service announcements on

15    radio and service announcements of different types?  Is

16    that something your office engages in?

17        A.   We put press releases out to the media with

18    those kind of details in it, and then they put it out in

19    their own verbiage, their own method.

20        Q.   Okay.  And subsequent to S.B. 14's passage,

21    did those press releases that you put out include

22    information you put on about the new voter ID

23    information?

24        A.   As soon as it was approved -- you know, I

25    mean, as soon as the Supreme Court announced that any

1    press releases after that, we started emphasizing it

2    because our goal was to make sure that the message got

3    penetrated as deep as possible to the voters in Harris

4    County.

5         Q.   Okay.  So am I understanding you correctly

6    that when your office now puts out the press release

7    concerning the election with a date and time, you're

8    also at the very same time putting out press releases

9    concerning the voter ID requirements?  Is that what

10   you're telling me?

11        A.   Yes, we always -- we mentioned it.  It's on

12   harrisvotes.com.  You know, right there on the front

13   page, it says "photo ID required."

14             Yeah, we've been constantly talking about

15   photo ID that I think it's pretty well penetrated our

16   voters, but we will have another good push come

17   November.

18        Q.   And what do those press releases, those

19   routine press releases that come out when you're

20   announcing elections and dates and time say about the

21   EIC and how to get the EIC?  Does it say anything at all

22   about that?

23        A.   We did have some that said something about it

24   back when it was more appropriate in timing, but we do,

25   you know, always drive people to our Web site and our

1    press releases for more details.

2        Q.   Okay.  But I understand that you identify the

3    Web site, but in terms of the routine, sort of press

4    release relating to elections that also discuss the ID

5    requirement, what do they say about how to get an EIC,

6    if anything?  Do they say anything?

7        A.   Some of the press releases did.  But like I

8    said, it was more appropriate right before the November

9    election, and before the primary, but you have the --

10   you should have all the press releases in the documents

11   that's been provided to you.

12       Q.   Okay.  Thank you.  Now, with regard to the --

13   to concerns about whether there are residents in the

14   county who are otherwise eligible to vote who don't have

15   photo IDs, is that a concern that has been brought to

16   the attention of your office since the passage of

17   S.B. 14?

18       A.   Most of the community organizations that I

19   know of that I've worked with, in talking to the League

20   of Women Voters, have all told me they are all trying to

21   get people to use the personal IDs instead of the EICs

22   because it has much more use as an identification

23   document.  It can be used to cash checks, and to go to

24   the airport, to go to city hall, other things.

25                  And if you're over, I believe, 62, it

1    only costs $6.  It's a minimal charge.  And that's why

2    all these communities out there that are helping people

3    with their IDs are really pushing them towards that

4    personal ID.

5         Q.   I mean, to what extent has your office tried

6    to kind of get a handle of the extent of the problem,

7    the nature of this problem, that is to say, how many

8    residents may not have picture IDs?  Is that something

9    you tried to investigate?

10              MR. SCOTT:  Objection; form.

11        A.   Say what?

12              MR. SCOTT:  I'm just putting an objection

13   on the record.  I'm sorry.  Please go ahead.

14        Q.   (By Mr. Shapiro)  Let me rephrase that.

15   Sorry.  To what extent have you attempted to investigate

16   the number of individuals who are in your county without

17   photo ID?

18        A.   Well, I don't have that information.  All I

19   can look at is the anecdotal information with the number

20   of people that attempted to show up without photo ID.

21              As I said previously, we've actually, you

22   know, looked at our matching to the DPS.  And I can,

23   without doing any significant work, see that two-thirds

24   of them actually do have a DPS-issued ID.

25              Then also the number of complaints that

1    we received around ID issues has been insignificant.

2    And the number of people who actually cured and have

3    dealt -- trying to get an EIC has been very, very small.

4         Q.   Now, has the secretary of state's office

5    provided you with any information about whether there

6    might be residents in your county without IDs, without

7    picture IDs?

8         A.   No, I don't think there's very many out there

9    because they can't get any government services without

10   having a picture ID these days.

11        Q.   Have you determined whether there are certain

12   areas in the county where this may be more of an issue

13   than in other areas?

14        A.   No.  Like I said, I don't know of any -- I

15   know of -- I don't know of anybody who is in this

16   category that's -- almost hypothetical category because

17   you can't -- there is here no government services you

18   can have without a photo ID.

19                  You can't go to the -- you can't cash a

20   check, you can't do anything a normal person would do

21   without having a photo ID.

22        Q.   Now, you were -- you mentioned, I think, the

23   total of provisional ballots that were cast, I believe

24   in the 2013 election because of the ID requirement.  I

25   believe you said it was 105; was that right?

1      A.   Yes.   And six of those were not even

2   registered to vote.

3      Q.   What is the total of all the provisional

4   ballots cast because of the ID requirement to date, not

5   just that one election?

6      A.   Well, that was the largest numbers.   The other

7   numbers are really small.   Here it is.   Let's see.   We

8   had in the November -- the December election runoff,

9   there was five, and none of those were cured.

10           In the Democratic primary, there were

11   ten, and one of those was cured.   And the Republican

12   primary, there was 25, and four of those were cured.

13      Q.   So that's your sum total?

14      A.   Yes, that's it.   I mean, it's been -- when you

15   look at the number of people who are voting in Harris

16   County, that's a very, very small number.

17      Q.   And you said there were, you believe,

18   two-thirds of those in the November 2013 election had

19   had an ID -- had had an ID?

20      A.   Yes.   Because I can go match two-thirds of

21   them back to a DPS ID, you know, running a query back to

22   the DPS ID.   You can see these people actually possess

23   IDs.

24           For some reason, they did not show up at

25   the polls with the IDs, and it's very well possible more

1      than that two-thirds actually have IDs, I just -- it

2      gets into my hard match/soft match type criteria.

3          Q.    Okay.  And for those who do not have -- who

4      came and did not have an ID, did you analyze where those

5      individuals, you know, what parts of the county they

6      reside in?

7          A.    Believe it or not, they are all over the

8      county.  In fact, some of them were out in Memorial, or

9      what I call the higher neighbors.  Not your poor

10     neighborhoods, by any means.

11             There is no pattern of those people who

12     voted provisionally that tracked any kind of poor or

13     minority neighbors.

14         Q.    Did you attempt to analyze that?  I mean, I

15     understand you're asserting that now.  What is that

16     based on?  Is that based on an analysis, job that was

17     conducted?

18         A.    We just geocoded them, put them on the Harris

19     County map.  And you can see they're just equally spaced

20     across the county.

21             I mean, there is no rhyme or reason why

22     and there.  You wouldn't -- it wasn't -- it didn't

23     follow your -- your additional minority or traditional

24     poor neighbors.  Not that there wasn't there, I'm just

25     saying it didn't follow a pattern.

1      Q.   Okay.  When you say that you found -- done an

2  analysis of the data, could you break that down for me?

3  Was that analysis of just that one election of the 105?

4      A.   Yes.

5      Q.   Or was that a total --

6      A.   Yes.  We just plot -- basically, we just

7  plotted each of those individuals of the 105.  I think

8  we might have thrown out the unregistered, but just

9  plotted them on a map, those addresses on Harris County,

10  and you could see that they were just across Harris

11  County.

12      Q.   And that's distribution, for even

13  distribution, did that hold when you were just analyzing

14  those individuals who just don't have a match with the

15  ID?

16      A.   I don't remember.  I think all we did was just

17  the ones who didn't -- all we plotted was those that --

18  and that doesn't mean that they don't have an ID.

19           All I'm telling you is that I could not

20  easily match with the data that was in the voter

21  registration database to the DPS ID for about a third of

22  them.

23      Q.   Okay.  So I'm just trying to clarify which

24  individuals you plotted.

25      A.   I think we plotted all of them.

```
 1          Q.    You plotted all 105.  And did you separately
 2    kind of try to figure out what was going on with that
 3    one-third minority --
 4          A.    No.
 5          Q.    -- figure out whether there was an even
 6    distribution --
 7          A.    No.
 8          Q.    -- with regard to that one-third?
 9          A.    No, I don't think we did, but we could easily
10    do it.  But no, I don't think we did.
11          Q.    And is it -- did I understand you correctly
12    when you said you felt that you had succeeded in making
13    residents in your county aware of the new voter ID
14    requirement, by and large?  And if so, could you expand
15    on what you meant by that?
16          A.    Well, because we reached out to every
17    community organization across Harris County that we
18    could find.  I mean, I actually charged my staff in
19    voter outreach to do the biggest, the best, hardest job
20    you've ever done in getting the word out about an issue.
21                And so we reached out in the City of
22    Houston, your other cities, your colleges, even the
23    professor in the colleges.  You know, we obtained their
24    e-mails, and we e-mailed to them.
25                We went to every library, every school
```

1    district in the county, to every principal.  We

2    communicated to the high schools.  Of course, you can't

3    vote the other ones.

4                    But we communicated to them that they

5    needed to have a photo ID to vote.  And gave them

6    information about, you know, going to our Web site for

7    more details.

8                    We had these posters put out that we

9    distributed to them about this information.  We did our

10   darnedest to get the word out.

11                   We got the media involved because they

12   had the big bullhorns, whether through the radio, or

13   through the TVs, or the printed press, and also in every

14   language.

15                   We got the word out to them about the

16   need.  And then there was -- so there was many, many

17   columns written, tons of information put out to the

18   voters that, you know, you need a photo ID to vote.  And

19   the end result, I believe, show that we did a good job

20   in getting the word out.

21       Q.   Okay.  And I'm not sure I fully followed the

22   comparison that you said you did between your voter

23   registration list and the DPS database.

24                   I think you said that there was

25   discrepancies that resulted in 93 -- 90,000?

1    A.   90,000 that -- a little over 90,000 that did

2    not have a hard match.

3    Q.   90,000 that didn't have a hard match.

4    A.   In other words, I wasn't confident that it was

5    the same person.

6    Q.   Okay.

7    A.   So if we didn't have a 99.99 percent

8    confidence that it was the same person then we didn't --

9    even though we might know it's one of these two people,

10   it was not -- it didn't meet my criteria.

11   Q.   Okay.  So this is my point of confusion.  So

12   part of this is whether there's a discrepancy between

13   the names and there's not an exact match.

14   A.   Correct.

15   Q.   But then there is also -- is there also

16   another -- does that 90,000 also include all those

17   individuals for whom they are only on the registration

18   list, and you cannot find any photo ID for them in the

19   DPS database, is that --

20   A.   Well, no.  It's also I can't give a hard

21   match.  It's like, you might match two or three people,

22   but there's not enough data points there for me to say

23   which one of those three people you are.

24                 In other words, there is insufficient

25   data in the voter database -- voter registration

1    database to actually hard match.

2              If we had a driver's license in the voter

3    registration address for every one of them, then we

4    would -- it would make it pretty easy on us, but we

5    don't.  We've only got it for about half of them.

6        Q.   I see.  So -- I'm sorry I'm being obtuse.  So

7    at the end of the day, can you tell what percentage of

8    those -- of the 90,000 is coming from discrepancies

9    between the -- let's say the driver's license and the

10   registration, and what percentage just don't have a

11   driver's license?

12       A.   I have no way of knowing that they don't have

13   a driver's license, or a personal ID.  Remember, the DPS

14   database includes people who have personal IDs.

15       Q.   Right, right.

16       A.   And that's over 200,000 people of our

17   registered voters, if I remember right.  It's a huge

18   number.

19       Q.   Right.  Okay.  Thank you.  That's helpful.

20   One moment, please.

21       A.   Okay.

22       Q.   Now, going back to this issue of the

23   provisional ballots that were cast.  To what extent do

24   you have any information indicating that the voters who

25   cast provisional ballots because of the ID requirement

1   would be unqualified to vote, or otherwise ineligible to

2   vote were it not for the photo requirement?  Do you have

3   any such information?

4        A.   No, I don't think there's any way to come to

5   that conclusion.  We went to great lengths to help the

6   voters deal with the cure process.  The tax office is,

7   you know, two floors -- two floors below us.

8             And we actually brought in DPS to do the

9   cure here in my offices, too.  So we had a one-stop shop

10   for the voters.

11            So they -- you know, I just don't see

12   where there's any evidence that those that didn't come

13   cure didn't have IDs, because there wasn't any close

14   races.

15            If there had been close races, you might

16   have drug some more people to say, "Hey, my vote would

17   make a difference."  But when you have things so largely

18   different, I suspect most of the people stayed home

19   because it doesn't matter.

20        Q.   What's your -- what's your perception as to

21   whether any of those ballots, those provisional ballots,

22   were cast by individuals who were not qualified to vote?

23            Do you have reason that any of those

24   individuals were, let's say, felons, or in any way

25   undocumented, or do you have any reason to suspect that?

1        A.   Well, of the 105, six of them were not even

2   registered.  So that -- there's one reason why they

3   wouldn't even be qualified anyway, regardless of having

4   an ID issue or not.

5                The others, I'm not sure there's been an

6   analysis.  And if there has, I don't believe I've been

7   shown that information.

8        Q.   Did your office have any interest in

9   investigating whether any of those individuals were, in

10  fact, eligible to vote?

11       A.   I mean, it seems like that's more of a voter

12  registration issue.  But remember, everyone that did

13  not -- that did not -- whose ballot we did not count, we

14  sent them a letter telling them why it was not counted.

15               So if it was for an ID issue, you know,

16  then they were noted that they need to go get an ID,

17  whether that be an EIC, or a personal ID, or a driver's

18  license, or bring one of the other acceptable forms of

19  IDs to vote.

20       Q.   Okay.  Now, you mentioned that there were, I

21  believe -- was it four DPS offices in Harris County?

22  Did I get that right?

23       A.   No.  There's 12 permanent and four what we

24  call mobile.

25       Q.   I see.

1      A.   Or temporary ones that was provided for the --

2    to support the November election.

3      Q.   Do you have any sense as to whether any of

4    those offices are accessible to public transport, and

5    which of those offices are accessible to public

6    transport?

7      A.   I don't know positive, but I'm certain that

8    they probably all do.  But off the top of my head, three

9    of them.  And I would suspect the fourth one does

10   because you basically -- other than that church, they're

11   public locations.

12           You know, like community centers, or a

13   college, or another one was a community center, I think,

14   for the city.  They should have.  I mean, there are

15   enough buses around Harris County that go by these

16   general areas that I can't imagine that they don't.  But

17   I don't know for positive.

18     Q.   And you said that when a person's applying for

19   an EIC who doesn't have a birth certificate, you can get

20   a birth certificate from your office; is that right?

21     A.   That's correct.  I mean, my downtown branch or

22   any of my nine satellite offices around the county.

23     Q.   Okay.  And you described -- and I don't think

24   I fully understand which circumstances of the cost being

25   defrayed.  Are you aware of the circumstances that that

1    would be are defrayed?  What are they?

2         A.   Yes.

3         Q.   What are the circumstances?

4         A.   My understanding is if they are there to get

5    the -- that evidence for the purpose of using it to get

6    an election certificate, that the state will waive its

7    fee.

8                   But apparently, there is like a $2 fee

9    that can't be waived.  And I have personally told my

10   staff that's in charge of that department, that if

11   someone makes an issue of paying the $2, that I would

12   personally take it out of my pocket and pay it.  And

13   nobody has.

14        Q.   To your knowledge, has anyone had their costs

15   defrayed in getting a birth certificate from your

16   office?

17        A.   I believe they have.  I just don't have any

18   numbers or any specifics readily available of that.

19        Q.   Do you have records of that?

20        A.   Oh, I'm sure we do.  I'm sure we have got

21   records of it, and we can probably get that information.

22        Q.   Can you get that to us?

23        A.   Yes.

24        Q.   What is -- what is the policy of your office

25   if an individual arrives at your office and says, "I

1    want a birth certificate because I need one to get my

2    EIC"?

3                    What would a person -- what would the

4    policy be in terms of how that person is charged?

5         A.   They were told that the state is waiving its

6    fee.  And, to the best of my knowledge, they are

7    probably told it's an additional $2 fee.  And if they

8    made an issue of that, we would waive that, and I would

9    personally pay it.

10        Q.   So it's your understanding that in every

11   instance whenever an individual has mentioned that he's

12   getting an EIC and needs a birth certificate, that your

13   office has defrayed the cost?

14        A.   The state, I think, waives their portion of

15   it, all except for $2.  But there's been very, very few

16   EICs issued in Harris County, it's my understanding.

17   Maybe a couple dozen or so.

18                    I mean, it's not very many.  So it's not

19   really -- this is not what you call an everyday issue,

20   by any means, in my office.

21        Q.   Okay.  And the individuals who work in your

22   office who are providing these birth certificates, have

23   they been trained on this policy?  And when?

24        A.   Well, the people that are in charge, they are

25   aware of it.  And this, I mean, this happened back

1    before -- when this waiver came -- actually came through

2    from the state.  I just -- I mean, here's the thing I

3    think has happened, is why you're not seeing so many of

4    these EICs, is the League of Women Voters and other

5    assistive agencies out there have helped people get the

6    personal IDs.

7              And at the same time, they have also

8    helped, I think, defray the cost of getting any birth

9    certificate, if it was needed, and also helped with any

10   cost with getting the personal ID, if it was -- if the

11   person needed assistance with the financial means of it.

12             And I think this happened last fall, well

13   before the election.  That's why you're not seeing very

14   many numbers in the EICs.

15        Q.   Okay.  So do you know whether DPS conducts a

16   record check on individuals, let's say, for outstanding

17   warrants, or traffic tickets when they try to get an

18   Texas ID from a DPS office?

19        A.   No, not to my knowledge, I've not heard that.

20        Q.   So if someone is trying to get a Texas

21   driver's license, do you know if DPS would see if there

22   are any outstanding tickets before they would renew a

23   driver's license?

24        A.   Not to my knowledge.

25        Q.   Not to your knowledge?

1        A.    No.

2        Q.    Would that be a concern to you if they were?

3        A.    I'd have to look at the circumstances why and

4   what they're doing there.  But it depends on the

5   circumstances.  We've got some -- one, a criminal,

6   No. 1, is nice to know, he's there.

7        Q.    Almost done.  You had explained the disability

8   exemption previously, but I didn't quite follow that

9   explanation.  What documents -- well, let me back up.

10             What needs to be presented in order to

11   qualify for that exemption?

12        A.    Well, you actually -- believe it or not, you

13   deal with the voter registrar with this issue.  They're

14   the ones who deal with this.

15             It might actually be more appropriate

16   that you ask them this afternoon.  I mean, I just don't

17   know the details.  They do.

18        Q.    So you don't know the detail of the process by

19   which voters obtain a disability exemption?

20        A.    No, because it's voter registration and they

21   administer that end of the process.

22        Q.    And do you maintain the records of who gets

23   it?

24        A.    Yes.  It gets flagged in our system, so that

25   we do know that.  We print it in the poll books so that

1   our election workers know that they have been -- they

2   got a disability waiver on the photo ID issue, but

3   that's the extent of our training.  The actual how it's

4   done is actually done through voter registration.

5       Q.   Okay.  And I think you had mentioned that

6   there were very few waivers up to this point.

7       A.   To the best of my knowledge, it's very few,

8   yes.

9       Q.   Do you have a number, or can you provide us

10  with a number?

11      A.   I don't have a number, but I'm sure we can get

12  a number.

13            MR. SHAPIRO:  Thank you.  I think that's

14  all I have.  Thank you.

15            THE WITNESS:  You're welcome.

16                      EXAMINATION

17  BY MR. SCOTT:

18      Q.   Mr. Stanart, my name is John Scott.  I

19  represent the defendants in the case.

20      A.   All right.

21      Q.   If, for any reason, during my questions you

22  don't understand one of them, please let me know, and

23  we'll reask it until we get on the same wavelength.  All

24  right?

25      A.   All right.

1    Q.   All right.   What's the most populus county in

2    the State of Texas?

3    A.   Harris County.

4    Q.   Okay.   How many, approximately, registered

5    voters are in Harris County, as we sit here today?

6    A.   We're real close to two million.

7    Q.   And to your knowledge, over the past three

8    major elections that have been conducted in Harris

9    County using voter ID, how many people have been

10   prevented from voting as a result of not having proper

11   ID?

12   A.   It's a small number.   It's what, 150

13   approximately -- what's that number I just read out?

14   Yes.

15            MR. RAY:   Listen to the question.

16   Q.   (By Mr. Scott)   And of those, let's break it

17   back down by the election.   We know in the primary

18   elections which were held back in March of this year,

19   the Republican primary, there were approximately 25

20   people who presented without proper ID and were asked to

21   cast a provisional ballot; correct?

22   A.   That is correct, yes.

23   Q.   And of those, at least none of those people --

24   I'm sorry, four of those people came back and provided

25   adequate identification.

1          A.    Yes.

2          Q.    And those four ballots were then counted; is

3    that correct?

4          A.    Correct.

5          Q.    The other 21 were not?

6          A.    Correct.

7          Q.    Okay.   On the Democratic side of the primary,

8    there were ten ballots cast --

9          A.    Yes.

10          Q.    -- provisionally, because they did not present

11    proper photo ID.

12          A.    Right.

13          Q.    One of those people came back and presented

14    proper photo ID, and that ballot was, in fact, counted?

15          A.    Correct.

16          Q.    Then back in November of 2013, I think you

17    said there was 105 provisional ballots that were cast

18    because the person did not have proper photo ID.

19          A.    Right.

20          Q.    Of those, six of them did not have -- were not

21    even registered to vote.

22          A.    Correct.

23          Q.    And then when y'all did a data research, or a

24    further analysis, you found that about two-thirds, or 66

25    of the remaining 99 people actually did, in fact, have

1    photo ID through the Department of Public Service.

2         A.   Yes.  And eight of them actually came in and

3    cured.

4         Q.   Okay.  So eight out of that 99 actually came

5    and cured and their ballots were, in fact, counted?

6         A.   Correct.

7         Q.   Had the other, I guess, 90 -- I'm sorry,

8    60 -- what is that?  So 58 people come forward and

9    brought their IDs that they, in fact, had from the

10   Department of Public Service, and done it within the

11   six-day cure period --

12        A.   Yes.

13        Q.   -- would your county have counted those

14   ballots?

15        A.   Well, yes.  Yes.

16        Q.   Okay.

17        A.   And more of them potentially have IDs.  I'm

18   just saying those are the ones I could hard match.

19        Q.   So have you -- do you still have the ability

20   to capture and turn over the identification of those 105

21   people from the November election --

22        A.   Yes.

23        Q.   -- that cast the provisional ballots?

24        A.   Yes.

25

1              (Stanart Deposition Exhibit No. 2 was

2     marked and is made a part of this deposition.)

3         Q.    (By Mr. Scott)  And let me hand you -- and

4     we'll mark this as Exhibit 2 to your deposition, that

5     which I believe is the deposition notice.  And I'll hand

6     you that, ask you to look at that.

7         A.    Yes.

8         Q.    Is that the deposition notice you received to

9     be here today?

10        A.    It appears to be, yes.

11        Q.    And it had attached to it things to bring to

12    the deposition.

13        A.    Correct.

14        Q.    From the earlier discussion you had with

15    Mr. Dunn, it appears that you had, prior to today's

16    deposition, already produced all those materials to him

17    in the form of, I guess, documents in three banker's

18    boxes, I think was the description I heard.

19        A.    Yes, yes, to the best of our ability.

20        Q.    Okay.  Now, I have not seen those documents,

21    and I don't see them here today, so they're not present

22    today, that you've seen; right?

23        A.    No.

24        Q.    And were those supposed to --

25              MR. SCOTT:  I guess let's take a stop

1    from the question to you, at least on the record,

2    Mr. Dunn, are those documents you're going to attach as

3    an exhibit to this deposition?  It appears they were

4    produced to comply with the deposition notice.

5                    MR. DUNN:  Well, we can talk about how

6    they were produced.  I thought you got them, too.  I

7    didn't get them until Friday.

8                    And, frankly, with given their volume, I

9    haven't got to look at much of them myself.  But it was

10   my understanding the county was producing to all

11   parties.  If they're not, I'm happy to arrange a way to

12   get them produced to you.

13                   MR. RAY:  Well, the procedure we followed

14   was that I was contacted by Mr. Baron, and he said could

15   I provide the documents that he was requesting pursuant

16   to his notice early.  So I gave -- I had him pick them

17   up.

18                   And to tell you the truth, I just

19   presumed that they would all be available to all of you.

20   I didn't try to figure out whether to make copies for

21   everybody.  I had relied on Mr. Baron to handle that.

22                   MR. DUNN:  Okay.

23                   MR. RAY:  So maybe that was not the best

24   policy, but that's what we did.

25                   MR. DUNN:  I think we just, you know,

1    miscommunicated.

2                    MR. SCOTT:  So I'm trying to figure out a

3    procedure by which we can make sure we get a complete

4    copy of the exhibits attached to the deposition after

5    the depo, which isn't an unusual problem, but let's make

6    sure we've got a complete universe of the record.

7                    Would it be the best for Mr. Dunn to

8    bring those back to you so that you can confirm, and

9    then attach those as Exhibit 3 to the deposition

10   en mass, and we'll just have them Bates labeled?

11                   MR. DUNN:  I'm fine with that.  I'm

12   throwing -- can we have the conversation off the record

13   and then confirm what we're going to do?

14                   MR. SCOTT:  Yeah, that's fine.

15                   (Recess from 1:05 p.m. to 1:09 p.m.)

16                   MR. SCOTT:  It is my understanding that

17   at the next break, after this deposition, we are going

18   to adjourn to go down to Mr. Dunn's car, the county is

19   going to review the documents to make sure that they

20   are, in fact, the same universe of documents that were

21   provided on Friday to Mr. Baron in response to the duces

22   tecum to the notice today, which has been marked as

23   Exhibit 2 to the deposition.

24                   Mr. Dunn is going to undertake to explore

25   getting it done electronically.  That failing, the

1     documents will be made available, what, within a week

2     for the state to obtain and make copies of as well.  Is

3     that correct?

4              MR. DUNN:  Yes.

5              MR. SCOTT:  DOJ, y'all agree with that?

6              MR. SHAPIRO:  That's fine.  Works for me.

7        Q.   (By Mr. Scott)  Okay.  So let's turn our

8     attention now, if we could, to the Department of

9     Justice.  It's my understanding that they have obtained

10    some documents from Harris County as well.

11       A.   Correct, yes.

12       Q.   Do you know if -- was it John Powers with the

13    Department of Justice that y'all dealt with?

14       A.   I have no idea.  Do you know?

15             MR. RAY:  Are you talking about the

16    copies of the -- copies of the affidavits?

17             MR. SCOTT:  I don't know what all they

18    have got.  So I guess I'm trying to track down what

19    Department of Justice has gotten.

20             MR. SHAPIRO:  I believe that John Powers

21    obtained affidavits -- provisional ballot affidavits

22    from recent primary elections --

23             MR. RAY:  Okay.  It's two-fold.

24             MR. SHAPIRO:  -- from Harris County

25    fairly recently.  Is that --

```
1                    MR. RAY:  It's two-fold.  Yeah.  We
2    received a subpoena from the Justice Department which
3    asked us for a volume of documents which we produced to
4    them how long ago?
5                    MS. ASTON:  At least a month ago.
6                    MR. RAY:  At least a month ago.
7                    MS. ASTON:  That was to John Smith.
8                    MR. RAY:  That was to John Smith.
9                    THE WITNESS:  Yes.
10                   MR. RAY:  Now, recently, we received the
11   letter from John Powers this request for copies of the
12   affidavits that were filed on the provisional ballots
13   for that election.  We provided those to him a little
14   over a week ago.
15                   MR. SHAPIRO:  Right.
16                   MR. RAY:  So I don't know if John Smith
17   is -- would he be working on this case, Mr. Shapiro,
18   John Smith?
19                   MR. SHAPIRO:  He's with the attorney's
20   office, but yeah, he would be assisting us.
21       Q.  (By Mr. Scott)  Okay.  And so do you know of
22   any other documents that Harris County has produced to
23   the Department of Justice in this lawsuit?
24       A.  Is that the same lawsuit, though?
25       Q.  Yes.  This lawsuit, which is Veasey versus
```

1    Perry.

2          A.    Not that I know of.

3                MR. RAY:  Just those two.

4          A.    Yeah, just those two there, yes.

5          Q.    (By Mr. Scott)  So there was a subpoena issued

6    to Harris County approximately a month ago?

7          A.    More than a month ago.  That was like

8    two-and-a-half months ago.  You know, they gave us a

9    month to reply, and we did.  And we delivered it down to

10   the Department of Justice building, or office.

11         Q.    Do you know if the Harris County Clerk has

12   received any -- well, let me informationally:  How do

13   y'all keep track of Public Information Act requests, or

14   requests under Public of Information Act?

15         A.    The person in my voter outreach deals with

16   voter registration -- I mean, voter-type issues.  Voter

17   issues usually come through her, or through Sonya.  And

18   then over at my other admin building, they take care of

19   it.  Depends on what the issue is around.

20         Q.    So since that lawsuit began in, I don't know,

21   a little over, what, a year ago, approximately?  I don't

22   know when it was filed.  Approximately a year ago?

23                MR. DUNN:  June of 2013.

24         Q.    (By Mr. Scott)  June 2013.  Are you aware of

25   any Public Information Act requests for documents about

1    voting histories of -- through the Harris County --

2    through y'all's office?

3         A.   We constantly get requests for voting

4    histories.  We sell CDs of them for such and such

5    election, you know, to all those people that voted in an

6    election.

7         Q.   And do you keep track of all the PIA requests?

8         A.   Yes, we have a spreadsheet that we keep track

9    of who has asked for what.

10        Q.   Okay.  And was that one of the documents that

11   y'all produced, to people who requested documents?

12        A.   No, because that's just general voting

13   history.  It wasn't tied to this lawsuit in any way.

14        Q.   For sure, for certain, nobody that requested

15   any PIA documents from -- yeah, I'm sorry.  Public

16   Information document requests --

17        A.   Yeah.

18        Q.   -- who identified themselves as potentially an

19   expert for one of the parties, or are working for an

20   expert?

21        A.   I have no knowledge of that.

22        Q.   Okay.

23        A.   They might have, but I don't know of anything.

24        Q.   Nothing that comes to mind, as we sit here?

25        A.   Correct.

1        Q.    On Exhibit 1, Mr. Dunn and you went through a

2    number of potential examples of names.

3        A.    Right.

4        Q.    Oh, five or six examples.   Which will be

5    examples, I believe, the subject matter was similar name

6    issues?

7        A.    Correct, right.

8        Q.    With regard to elections that have been held

9    since voter ID became the law or applicable, so the

10    November '13, the March '14, and May runoff election, in

11    any of those three elections, have there been any voters

12    who presented identification which required them to

13    execute a similar name affidavit whose ballot was not

14    counted?

15        A.    I don't know of anybody who had -- that voted

16    provisionally in any of those elections, or the runoff

17    election in December, for the City of Houston that, you

18    know, had to vote provisionally because of the similar

19    name issue.

20        Q.    So there's really been four elections.

21        A.    Yes.

22        Q.    Under voter ID, I apologize.

23        A.    Yeah, that's fine.   I forgot it initially

24    myself.

25        Q.    So there was the November 2013 election.

1      A.   Yes.

2      Q.   Including a constitutional election.

3      A.   Right.

4      Q.   There was a December 2013 runoff election for

5   City Council and Mayor -- or City Council.

6      A.   Yes, yeah.

7      Q.   City of Houston.

8      A.   Yes.

9      Q.   There was the March primary 2014 elections.

10      A.   Yes.

11      Q.   And there were the runoff elections for the

12   primaries, which was conducted in May of 2014.

13      A.   Right.

14      Q.   And during all four of those elections,

15   S.B. 14 was the controlling law regarding photo ID and

16   similar names; correct?

17      A.   Correct.

18      Q.   Now, the similar name affidavit, would you

19   describe for the judge what the similar name affidavit

20   entails for the voter to do?

21      A.   To initial a little box that says, "I'm the

22   same person."  If the person's name is different, they

23   have to initial a little box that says, "I'm the same

24   person as the person that's registered."

25      Q.   And the person already signs their name at the

1    polling place when they are identified as a voter;

2    correct?

3        A.    Yes.

4        Q.    So besides signing their name, which they

5    would normally do, they would then initial a small box

6    that's there on that same sheet?

7        A.    Yes, yes.

8        Q.    And approximately how much time would that

9    take?

10       A.    A second or two, at the maximum.

11       Q.    And so from a standpoint of delaying an

12   election or polling place, the operation of a polling

13   place, do you have an opinion whether that is --

14   accounts for any delays that folks would actually

15   encounter at a polling place?

16       A.    It's almost -- it's such a small part of the

17   whole check-in process that it's really almost

18   insignificant in the time that it takes to check a

19   person in to vote.

20       Q.    So in the four elections we've talked about

21   that were conducted in Harris County since S.B. 14

22   became the law of the land, there -- if I understand you

23   correctly, there has not been a single person as a

24   result of a similar name issue whose had to cast a

25   provisional ballot; is that correct?

1      A.   To best of my knowledge, yes.

2      Q.   Your department has done an enormous amount of

3   outreach to the community --

4      A.   Yes.

5      Q.   -- to let the folks know out in Harris County,

6   the voters, what they needed to do for an election as a

7   result of S.B. 14, and generally, just to advertise

8   elections; correct?

9      A.   Yes.  But we did a lot of extra effort on

10  photo ID.

11     Q.   And tried to make sure that accurate

12  information was put out there to the neighbors.

13     A.   Correct, yes.

14     Q.   Are you aware of any politicians who have put

15  out information that was -- you would been able to

16  determine was not correct, or misinformation about photo

17  ID, voter ID, or similar names?

18     A.   I think we've seen some information to that

19  effect, yes.

20     Q.   Tell me what you've seen.

21     A.   I mean, I don't have a document in front of

22  me, but there were people soliciting for information --

23  have we got examples of that?

24          MS. ASTON:  I can't remember.

25          A.   I think we've seen some information that we

1    can obtain that -- where people were handing out people

2    who -- soliciting people who, quote, to be harmed by

3    photo ID.

4        Q.    (By Mr. Scott)  Okay.  And have you seen any

5    situations where actually house of representatives,

6    perhaps I think specifically Representative Miles may

7    have given some information about whether people would

8    have to cast provisional ballots if they had similar

9    name issues?

10       A.    I believe we see that, yes, yes.

11       Q.    Do you know of any other situations where

12   elected officials have given misinformation to the

13   voters?

14       A.    I believe there is, I just don't remember any

15   specifics about it, yes.

16       Q.    Okay.  Is that something your department tries

17   to track when it hears about it?

18       A.    Yes.  I mean, we try to communicate to them if

19   it's misinformation, if possible.  But I don't -- we

20   could probably try to gather what we have.  I don't know

21   if we got very much, but yes, we will try to gather

22   that.

23             And it might be included in those

24   documents, I'm not positive.  If it was captured on the

25   e-mail with one of the keywords, it would possibly have

1    gotten captured.

2        Q.   Now, early on in your deposition, Mr. Dunn

3    asked you to identify whether you were Caucasian or not.

4        A.   Yes, sir.

5        Q.   Is that -- does your race play any role in the

6    ability of you to do your job?

7        A.   Not at all.

8        Q.   Okay.  And does it play any role in the

9    decisions you make as the chief election officer for

10   Harris County?

11       A.   Not at all.

12       Q.   Has it at any time during the time you've been

13   the chief election officer?

14       A.   No way.

15       Q.   Approximately how long have you been dealing

16   with elections, including your time as the chief

17   election officer, election judge, election clerk, and as

18   a precinct chair, total number of years?

19       A.   About nine years.

20       Q.   Elections in Texas are implemented at the

21   county level; is that correct?

22       A.   Correct.

23       Q.   Would you go back through a little bit of the

24   training that you provide as the chief election officer

25   for Harris County to the election judges, and then for

1  their election clerks before elections, such as the one

2  back in November of 2014 -- I mean, 2013, I'm sorry?

3      A.     We did extensive training for everyone.

4  No. 1, we let them all know that, you know, photo ID is

5  here, and you have to get special training, so make sure

6  you participate in the training.

7              Every judge and every alternate judge was

8  required to get the election law training, and it

9  specifically dealt with photo ID.  Also every polling

10 place was supposed to have trained people that could

11 operate the equipment.

12             And we supplemented photo ID training in

13 that training as well.  Every clerk, you know, was

14 provided on election day at their polling locations

15 supplemental information about photo ID, which they had

16 to sign acknowledging that they had read and obtained

17 the material.

18             We had on our Web site photo ID training.

19 We did, with the county attorney's office, a phone call

20 before the elections with our election judges giving

21 them the opportunity to ask any questions about

22 implementation of photo ID, and any laws, any legal

23 issues, questions they had, implementation issues.

24             Like I said, our Web site had the

25 extensive training.  We just -- we went as much as

1   possible to make sure that that our clerks knew how to

2   implement all the laws associated with S.B. 14.

3             Also, we worked hard to get the word out

4   that our voters would know how to deal with photo ID

5   when they showed up at the polls.

6        Q.   We have an election coming up in November of

7   2014.

8        A.   Correct.

9        Q.   Will your office undertake to do the same

10  steps that you did back in 2013 --

11       A.   Yes.

12       Q.   -- again, for this November 2014 election?

13       A.   Correct.  We will actually -- we are already

14  talked about doing billboards again, talking to our

15  billboard -- Clear Channel again.

16            We were already going to plan on doing

17  the letters again to anybody who we couldn't do a hard

18  match to, we will send a letter saying -- letting them

19  know they must have photo ID.  Not that they don't

20  already have an ID, but we can't do a hard match on

21  those people.

22       Q.   Do y'all ever try and estimate all the hours

23  that are extended on the training and education that are

24  put forth in preparing for an election like 2014, that's

25  coming up or the one that was performed back in November

1    of 2013?

2         A.    Well, it's a big deal, I mean, the amount of

3    hours it takes.  I mean, I have -- we have -- running

4    elections, I think I have about 35 full-time employees,

5    but then I have 500 temporary employees.

6              And then, of course, on election day, we

7    might have 5,000 or more people who actually work at the

8    polls, or assist in the elections somewhere or another

9    in Harris County.  So we have a big budget.

10        Q.    And every one of those individuals is expected

11   to be trained, properly trained and educated on what the

12   current law is at the time of the election; is that

13   correct?

14        A.    To the best of our ability.  We're not

15   perfect.  We try to get as close as we can.

16        Q.    Now, part of that -- I mean, part of the

17   election doesn't just start on whenever election day is

18   in November; right?

19        A.    No way.

20        Q.    In fact, y'all will begin mailing ballots out

21   for the 2014 November election on September 5th of 2014;

22   correct?

23        A.    That sounds about right, 45 days before the

24   election, yes.

25        Q.    And that will include -- starting that day

1    will start a number of different deadlines and for

2    requesting of ballots.

3         A.   Oh, yeah.

4         Q.   Some of which will include the requirement of

5    photo ID with those ballots for the people that are

6    casting those ballots; correct?

7         A.   People casting personally.  Ballot by mail

8    does not require a photo ID, yes.

9         Q.   Well, it's my understanding that there are

10   some ballots that will require photo ID, that are

11   mail-in.

12        A.   Well, that was there beforehand, you had to

13   provide proof of ID for the first-time voter, yes, yes.

14        Q.   Okay.

15        A.   They had to make a xeroxed copy.

16        Q.   For instance, a military or overseas ballot

17   that's a first-time voter, those folks will need to send

18   in a copy of their ID with their ballot; correct?

19        A.   Yes.

20        Q.   And those ballots will go out September 20th

21   to the military and overseas ballots; is that correct,

22   does that sound about right?

23        A.   It's 45 days before.

24        Q.   Got it.  The information you've received --

25   earlier you testified that you take direction from the

1    secretary of state for the implementation of Senate

2    Bill 14.

3        A.    Correct.

4        Q.    Did you find that that information was

5    correct, that you were provided from the secretary of

6    state?

7        A.    Yeah, they do a good job.

8        Q.    On the no-match list that you developed, I

9    think you said it was approximately 90,000 people that

10   you came up with early on that were soft matches or no

11   matches.

12       A.    Remember, it's more than that because we take

13   out the people who, you know, voter registration cards

14   have been returned.

15       Q.    Yes.

16       A.    So we didn't mail to those people because they

17   don't live there.  It's just going to get returned, so,

18   yes.

19       Q.    And how do you know when a person's

20   registration is mailed back to you?  They are placed in

21   a suspense file; correct, or y'all are supposed to?

22       A.    Yeah.

23       Q.    If you receive a voter registration back, it

24   is supposed to be placed -- the voter is supposed to

25   place into suspense; correct?

1    A.    Correct, yes.

2    Q.    And how are they designated, is there a

3  sub-list, or is it just a hyphenation, or something on

4  the records?

5    A.    Yeah.  Instead of an A for active, it's S for

6  suspense.  They are still printed on the poll book.

7  They are still able for a person to vote.  They just

8  need to provide a new address when they come vote.

9    Q.    After you culled those people whose voter

10  registration cards were returned to the Harris County

11  Clerk's office --

12    A.    Yes.

13    Q.    -- you ended up with about 90,000 people?

14    A.    That returned to the voter registration

15  office.

16    Q.    The voter registration office, I'm sorry.

17    A.    Yes.

18    Q.    You ended up with about 90,000?

19    A.    About 90,000, 91,000, we mailed the letters

20  to.

21    Q.    Of the folks that you sent letters, or letters

22  were sent out to those 91,000 people --

23    A.    Yes.

24    Q.    -- what happened to those folks?  Was there a

25  percentage?  Did y'all do any follow-up?  What happened?

1      A.   We just noticed them that they had to have

2 photo ID.  No, we didn't do anything more than that.  Of

3 course, some of those came back, too, undeliverable

4 because they have moved, too.

5           But the whole idea was to let people know

6 that you needed to have photo ID so that they know

7 how -- in other words, if we wasn't positive that they

8 had a photo ID, in other words, I wasn't 99.99 percent

9 confident they had an ID, then I was just letting them

10 know you need one.

11           Now, a lot of those people do.  I just

12 can't say for that 99.99 percent accuracy that they do.

13      Q.   Of the ones that you received some

14 correspondence back, where y'all's letter came back, did

15 you place those in suspense?

16      A.   No.

17      Q.   Did you mark those that the letter was

18 returned?

19      A.   No.  That's not my job.

20      Q.   Okay.

21      A.   I don't do voter registration.

22      Q.   Do you know if that was done on any those

23 records?

24      A.   No, they are still active voters.  Until their

25 voter registration is returned, they are not going to be

1     put in that status.

2                    Okay.  They are going to still be in that

3     status until the next time the voter registrar sends

4     them a card, then it will probably get returned.  And

5     then that's when they will be put on the suspense.

6          Q.   Was that list of approximately 91,000 voters

7     that were sent those letter, was that part of the

8     materials that were turned over?

9          A.   Yes.  You got copies of letters, and it was

10    updated again for the primaries.

11         Q.   Okay.

12         A.   Just basically, the dates that were changed.

13         Q.   Did the number stay about the same, 91,000?

14         A.   No, we didn't re-mail again.  We only mailed

15    them once.  We only mailed the new people that had

16    gotten registered since then that no longer matched.

17                    If they had gotten a letter the first

18    time, we didn't send another letter the second time.  We

19    didn't think it was prudent to use the taxpayers' money

20    the second time.

21         Q.   Now, you mentioned that the State of Texas or

22    the secretary of state's office offered to help on this

23    process that y'all undertook regarding the no matches or

24    the soft matches.

25         A.   I don't know how much --

```
1          Q.   It's a job you took on your own?

2          A.   We pretty much took it on our own, but we let

3     them know what we were doing.

4          Q.   But the state did reach out to you originally?

5               MR. DUNN:  Objection; form.

6          Q.   (By Mr. Scott)  Is that correct?  Maybe not.

7          A.   I don't know.  I forget how much.  There was

8     probably some discussion about how we could do things,

9     and I think we came up with this in -- our idea.

10              But it's not like they didn't reach out

11    to us, but at the same time, I don't remember

12    specifically on this issue.

13         Q.   How long were you a software engineer?

14         A.   A long time.

15         Q.   How many years?

16         A.   I don't know.  25 years.  I mean, I'm 58.  I

17    came out of college, you know, at 22, working as a

18    hardware software engineer.  I mean --

19         Q.   So coming up with a software program that

20    would identify no matches, soft matches is something

21    you -- is just another software engineering problem that

22    was there to be solved by you?

23         A.   Yes.  Yeah.  It's a problem to solve that

24    engineers do, yes.

25         Q.   I think Mr. Dunn was asking you about this
```

1    earlier, and I don't know -- I wasn't real clear on what

2    the answer was.

3                    How many reported problems has your

4    office received?  And if you want to break it down by

5    one of the four elections, or by election, regarding

6    voter ID, where you had voters who said they did not

7    believe they were able to vote because they didn't have

8    proper ID, or the ability to obtain proper ID.  Do you

9    know of anybody like that?

10        A.   Do I know of -- that didn't vote a regular

11   ballot, you mean?

12        Q.   You know, that's a horrible question.

13        A.   Yeah, I was going to say.

14        Q.   It was horrible.  Let's rephrase it.

15        A.   Okay.

16        Q.   To your knowledge, in any of the four

17   elections, have you heard of anyone who was unable to

18   vote because they were not able to obtain photo ID, they

19   simply could not come up with the documents?

20        A.   No, I've not heard of that at all.  Yeah, the

21   ability to not obtain the documents necessary to get

22   either an EIC, or a personal ID, or driver's license, no

23   I've not personally heard of one that did not have that.

24        Q.   And I think earlier in your deposition you

25   said that you sent out an e-mail asking for pro and con

1  comments, your office sends it out.

2      A.   From the election judges, yes.

3      Q.   From all the election judges in the county.

4      A.   Yeah.

5      Q.   Do you recall ever having that comment relayed

6  to you by any of the election judges throughout Harris

7  County, over any of those four elections?

8      A.   No, not that I've heard, not that got back to

9  me.

10      Q.   Okay.

11      A.   More than likely, we would have investigated

12  it if we did.  We would want to know what's going on.

13  Because our idea here is to serve the voters.

14      Q.   And there's, I think you said, 776 polling

15  places in Harris County.

16      A.   Yeah.  In the November election, we had 1,064

17  precincts.

18      Q.   Have you seen any of the precincts where

19  there's been a higher than usual number of provisional

20  ballots?  And I think your answer was no earlier, but I

21  want to make sure I understand that.

22           By polling places, were there any that

23  had larger numbers than you would have anticipated as a

24  percentage of the population?

25      A.   There's one election we had some judges let

1    people vote provisionally, and I don't know if it was in

2    this election, where they were letting people vote, when

3    they were not registered to vote.

4                    In other words, not where their polling

5    place was for that election day.  We had a judge let

6    people vote from other precincts, like it was their

7    early voting.  I do know we had that, so we had a lot of

8    provisionals go on.

9         Q.   So let me make sure I understand that.  So

10   there was a -- one of the elections, one of the four

11   elections --

12        A.   I don't know if it was one of those four, I

13   don't recall which election it was.  Maybe I'm adding

14   confusion by bringing this up.

15        Q.   No, no, I want to make sure I understand for

16   this issue.

17        A.   Yeah.

18        Q.   There was an election, which one we don't

19   know.

20        A.   Right.

21        Q.   But during that election, there were a high

22   number of provisional ballots that were cast, or allowed

23   to be cast --

24        A.   Yes.

25        Q.   -- in one of -- one of the polling places --

```
 1          A.   Yes.

 2          Q.   -- as a result of the decision by the election

 3     judge.

 4          A.   Yes, not following the law.

 5          Q.   That they would allow provisional ballots to

 6     be cast at that precinct, or that polling place, even

 7     though it was the wrong polling place for the voter to

 8     cast their vote?

 9          A.   Correct.

10          Q.   Is that a correct summary?

11          A.   Yes, but that's not a photo ID issue.

12          Q.   But from a practical standpoint, that is an

13     issue with regard to the number of provisional ballots.

14          A.   Yes.

15          Q.   And would also be a reason that you would have

16     to really dig down deep and understand what's going on

17     with any of the provisional ballots to say, "This is an

18     issue with provisional ballots"; correct?

19          A.   Exactly.  Every one of them has its own issue.

20     Every provisional ballot you've got to go and look at

21     what really is going on here to understand what the

22     issue is.

23          Q.   In the November 2013 election -- just one more

24     follow-up on that, if I could.  With regard to the

25     two-thirds of the individuals who had photo ID but
```

1    appeared at the polling place without photo ID and were

2    allowed to cast provisional ballots.

3         A.   That's how many, in hindsight, that we looked

4    at we matched against the voter -- I mean, the DPS ID,

5    database to say that they did have IDs, yes.

6         Q.   Did you do any further follow-up on any of

7    those folks that y'all identified?

8         A.   Other than the fact that everyone whose ballot

9    was not counted because of ID issues, they got a letter.

10   As a result of that, no, there was no follow-up on that.

11   At least I don't know of any.

12        Q.   With regard to documents that your office

13   produced in response to the subpoena that the Department

14   of Justice, I guess, served upon y'all --

15        A.   Yes.

16        Q.   I don't know if they courtesy copied anyone

17   else with that.  And so do you have the ability to

18   recreate or get a copy of all those documents that were

19   produced to the Department of Justice?

20        A.   I believe so, yes.

21        Q.   Okay.

22        A.   It's a very similar list.  It's like the same

23   list was shared between the two parties.

24        Q.   Okay.

25        A.   So it's very similar, if I remember right.

```
1                    MS. ASTON:  It's not a hundred percent.

2          A.   It's not a hundred percent, but it's like

3     90-plus percent.

4          Q.   (By Mr. Scott)  And Department of Justice, you

5     think, has had those documents for at least

6     two-and-a-half months?

7          A.   No, no, no.  I think that's when they

8     originally requested them, two-and-a-half months ago.

9     They have had them over a month or so ago.  We had

10    scheduling issues.

11                   MS. ASTON:  Two batches.

12         A.   That's right, we gave it to them in two

13    batches, but we had scheduling issues with them, when

14    they were available to drop off.

15         Q.   (By Mr. Scott)  Okay.  You testified earlier

16    that every election you send matters that don't look

17    right to the district attorney, or to the secretary of

18    state.

19         A.   We will send -- yeah.  And we're not always

20    timely because we're so freaking busy, but we do send

21    issues that we think need to be looked at on voters

22    attempting to do things we don't think is proper, we'll

23    send it over to the DA.

24         Q.   With regard to photo ID, do you have an

25    opinion as to whether -- not just addressing photo
```

1      identification or photo impersonation fraud, but photo

2      fraud in general, do you believe it's helped to tamp

3      that down?

4           A.    I think the one thing I've seen back from the

5      voters is higher confidence in the election process

6      because we do have photo IDs.

7                      Yeah.  Whether -- how much it does tamp

8      down fraud, which I would suspect it does to some

9      degree, I don't think that's the big issue.  I think

10     it's the confidence that it gives to the voters as a

11     whole body in the whole process is more secure because

12     of accepting photo ID.

13          Q.    Have you seen voter participation in Harris

14     County increase, decrease, or stay about the same as a

15     percentage of prior elections before voter ID?

16          A.    Actually, last November it increased it.

17     Well, you don't know if it increased it, but there was a

18     significant increase last November over the previous

19     two-year cycles in Harris County.

20          Q.    Percentage-wise, how big of an increase?

21          A.    I wish I had the number in front of me, I'd

22     tell you.

23          Q.    Okay.

24          A.    But it was significant.  And in the primaries,

25     other than the last primary, the turnout was much higher

1    for the Republican party anyway, going back.  Other than

2    the previous one, like I said, when Ted Cruz was in it.

3    We were probably, oh, 50, 60 percent higher than the

4    previous two cycles before that.

5         Q.    And the Republican primary had 25, I think,

6    provisional ballots cast; is that correct?

7         A.    Yes.

8         Q.    As a result of no photo ID?

9         A.    Yes, they had two-and-a-half times the number

10   of provisional ballots because of ID issues that the

11   Democratic party did.

12        Q.    Would they probably have had about

13   two-and-a-half times the turnout?

14        A.    Yes, it was very similar.  It hits both

15   parties, apparently.

16        Q.    You've got a lot of different polling places

17   with a lot of different judges, and so I'm assuming, but

18   I want your answer, that there are more efficient judges

19   who operate the polling places.

20        A.    Yes.  There are some better than others, yes.

21        Q.    And with regard to the delays that someone

22   might -- a voter might encounter at a polling place.

23        A.    Yes.

24        Q.    Absent having a camera in there, is there any

25   way to know what the cause of those delays are?

1      A.    Some election judges will tell us what it is.

2      I mean, or an alternate judge will tell us, but I don't

3      see where the photo ID actually added any delay.

4              In fact, we have -- we find that in early

5      voting where we've been doing the electronic poll books,

6      the majority of the people were already using driver's

7      license as a check-in process.

8              And we find it's a faster check-in

9      process as a result of just swiping their ID than it is

10     to actually sit there and either manually look it up, or

11     the old days of paper, you would have the whole county

12     there, you would take forever to go find the book that

13     has the two millionth name in it or something.

14     Q.    Now, earlier, you testified that the birth

15     certificate is issued by the vital statistics portion of

16     your office.

17     A.    Yeah.   Personal records I think is what it's

18     actually called.

19     Q.    Okay.   So someone can come to the downtown

20     location, or I think you said you had nine satellite

21     areas.

22     A.    Yes, yes.

23     Q.    And in all those locations, an individual who

24     wanted a birth certificate for purposes of obtaining an

25     election ID card --

1        A.    Yes.

2        Q.    -- would have to fill out a specific form for

3    that type of birth certificate, is my understanding; is

4    that correct?

5        A.    You know, I don't really know, but it makes

6    sense it probably is still.

7        Q.    Okay.  Do y'all have a triage person at

8    y'all's locations that when someone comes in, they

9    direct them on where they need to go, or do they just

10   get in line in the que, and when they get up there, they

11   ask?

12       A.    Well, the downtown location is fairly large,

13   okay?  But the branches, a lot of the branches only have

14   two or three clerks in them, so they do basically

15   everything.

16       Q.    Do you track time when someone walks into the

17   office, for instance, in any of the satellite offices,

18   before they receive service?

19       A.    No, I don't think so.  Whether it's a busy

20   location or not a busy location, they know how to deal

21   with it out there.

22       Q.    And if you hear of a complaint about waits,

23   you, as the head election official, or the head of the

24   -- Harris County clerk, you will implement steps to fix

25   that; correct?

1      A.   Oh, yes, most definitely, yes.

2      Q.   Customer service?

3      A.   Customer service.   Yeah, hey, I'm on the

4  ballot, I want these people happy.

5              MR. SCOTT:   Okay.   I thank you for your

6  you courtesy.   Pass the witness.

7              THE WITNESS:   You're welcome.

8                   FURTHER EXAMINATION

9  BY MR. DUNN:

10     Q.   Mr. Scott asked you about the effect of

11 S.B. 14, and you stated the opinion it had the effect of

12 buoying voter confidence, or something to that effect;

13 is that right?

14     A.   Yes.

15     Q.   So is it the case then, in your experience, in

16 election judges, that you've noticed that voter

17 confidence has been on the decline?

18     A.   I don't know if I could say "yes" or "no" to

19 that question.   It's not something I looked at.   I've

20 just gotten feedback from multiple people that, "I have

21 more confidence in the system as a result of having

22 photo ID."

23     Q.   Did you have -- when you would hear that back

24 from people, would you have conversation with them about

25 how it is that their confidence got questioned to begin

1    with?

2         A.   No, I didn't have that discussion.

3         Q.   Okay.  You're aware that the attorney

4    general's office went around for several years, in both

5    public events and private investigations, spending a

6    great deal of tax dollars looking for voter fraud?  Are

7    you familiar with this investigation?

8              MR. SCOTT:  Objection; form.

9         A.   No, not really, no.

10        Q.   (By Mr. Dunn) You have no idea that the

11   attorney general himself, for example, was doing media

12   events talking about rampant voter fraud that he was

13   doing that he was investigating or attempting to

14   discover?

15             MR. SCOTT:  Objection; form.

16        A.   No.

17             MR. DUNN:  Nothing further.  Thank you,

18   sir.

19             MR. RAY:  Mr. Shapiro, have you got

20   anything?

21             MR. SHAPIRO:  Nothing further.  Thank

22   you.

23             MR. RAY:  Okay.  I guess we're done.

24

25

```
1                    CHANGES AND SIGNATURE

           FOR THE DEPOSITION OF STAN STANART

2                      JUNE 17, 2014

3     PAGE    LINE    CHANGE                    REASON

4     _____

5     _____

6     _____

7     _____

8     _____

9     _____

10    _____

11    _____

12    _____

13    _____

14    _____

15    _____

16    _____

17    _____

18    _____

19    _____

20    _____

21    _____

22    _____

23    _____

24    _____

25    _____
```

1            I, STAN STANART, have read the foregoing

2    deposition and hereby affix my signature that same is

3    true and correct, except as noted above.

4

5

6

7                     _____

                     STAN STANART

8

9    THE STATE OF _____ )

10   COUNTY OF _____ )

11           Before me, _____, on

    this day personally appeared STAN STANART, known to me

12   or proved to me under oath or through _____

    (description of identity card or other document) to be

13   the person whose name is subscribed to the foregoing

    instrument and acknowledged to me that they executed the

14   same for the purposes and consideration therein

    expressed.

15

           Given under my hand and seal of office

16   this _____ day of _____, 2014.

17

18

                     _____

19                    NOTARY PUBLIC IN AND FOR

                     THE STATE OF _____

20

21

22

23

24

25

```
 1                IN THE UNITED STATES DISTRICT COURT
                 FOR THE SOUTHERN DISTRICT OF TEXAS
 2                     CORPUS CHRISTI DIVISION
 3    MARC VEASEY, JANE HAMILTON,       )
      SERGIO DELEON, FLOYD J. CARRIER,)
 4    ANNA BURNS, MICHAEL MONTEZ,       )
      PENNY POPE, OSCAR ORTIZ, KOBY     )
 5    OZIAS, JOHN MELLOR-CRUMMEY,       )
      JANE DOE, JOHN DOE, LEAGUE OF     )   CIVIL ACTION NO.
 6    UNITED LATIN AMERICAN CITIZENS    )   2:13-CV-193 (NGR)
      (LULAC), AND DALLAS COUNTY,       )   (lead case)
 7    TEXAS                             )
                                        )
 8    VS.                               )
                                        )
 9    RICK PERRY, Governor of Texas,    )
      and JOHN STEEN, Texas Secretary   )
10    of State,                         )
      _____)
11                                      )
      UNITED STATES OF AMERICA,         )
12                                      )
      V.                                )
13                                      )
      STATE OF TEXAS, JOHN STEEN, in    )   CIVIL ACTION NO.
14    his official capacity as Texas    )    2:13-CV-263 (NGR)
      Secretary of State, and STEVE     )   (consolidated case)
15    MCCRAW, in his official capacity  )
      as Director of the Texas          )
16    Department of Public Safety,      )
      _____)
17                                      )
      TEXAS STATE CONFERENCE OF NACCP   )
18    BRANCHES, AND THE MEXICAN         )
      AMERICAN LEGISLATIVE CAUCUS OF    )
19    THE TEXAS HOUSE OF                )
      REPRESENTATIVES,                  )
20                                      )
      V.                                )   CIVIL ACTION NO.
21                                      )   2:13-CV-291 (NGR)
      JOHN STEEN, in his official       )   (consolidated case)
22    capacity as Texas Secretary of    )
      State, and STEVE MCCRAW, in his   )
23    official capacity as Director of)
      the Texas Department of Public    )
24    Safety                            )
25
```

1                    REPORTER'S CERTIFICATION

                   DEPOSITION OF STAN STANART

2                       JUNE 17, 2014

3          I, Cynthia C. Miller, a Certified Shorthand

4     Reporter in and for the State of Texas, do hereby

5     certify that the facts as stated by me in the caption

6     hereto are true, that the above and foregoing answers of

7     the witness, STAN STANART, to the questions as indicated

8     were made before me by the said witness after being

9     first duly sworn to testify to the truth, and same were

10    reduced to writing under my direction; that the above

11    and foregoing deposition as set forth in writing is a

12    full, true and correct transcript of the proceedings had

13    at the time of taking said deposition; that as requested

14    the deposition was made available for the witness to

15    read and sign.

16          I further certify that I am not, in any

17    capacity, a regular employee of the party in whose

18    behalf this deposition is taken, nor in the regular

19    employ of their attorney, and that I am not interested

20    in the cause, nor of kin or counsel to either of the

21    parties.

22

23

24

25

```
 1
 2              GIVEN under my hand and seal of office on this,
 3      the 9th day of July, A. D. 2014.
 4
 5
 6
 7                        _____
                          CYNTHIA C. MILLER, Texas CSR 8065
 8                        Certification Expiration 12/31/2014
                          Firm Registration No. 378
 9                        P.O. Box 169
                          Tomball, Texas 77377
10                        281.376.9303
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```