JOE STRAUS                                                        6/23/2014
CONFIDENTIAL TRANSCRIPT

1 (Pages 1 to 4)

## Page 1

```
1            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
2                  CORPUS CHRISTI DIVISION
3
  MARC VEASEY, et al.,          )
4           Plaintiffs,         )
5  v.                           ) Civil Action
                                ) No. 2:13-cv-193(NGR)
6  RICK PERRY, et al.,          )
            Defendants.         )
7  _____  )
                                )
8  UNITED STATES OF AMERICA,    )
            Plaintiff,          )
9                               )
  TEXAS LEAGUE OF YOUNG         )
10 VOTERS EDUCATION FUND,       )
   et al.,                      )
11          Plaintiff-          )
            Intervenors,        )
12                              ) Civil Action
   TEXAS ASSOCIATION OF         ) No. 2:13-cv-263(NGR)
13 HISPANIC COUNTY JUDGES AND   )
   COUNTY COMMISSIONERS,        )
14 et al.,                      )
            Plaintiff-          )
15          Intervenors,        )
                                )
16 v.                           )
                                )
17 STATE OF TEXAS, et al.,      )
            Defendants.         )
18 _____  )
19
                ORAL DEPOSITION OF
20                  JOE STRAUS
                   JUNE 23, 2014
21
22             HIGHLY CONFIDENTIAL
23
24      ORAL DEPOSITION OF JOE STRAUS, produced as a
25 witness at the instance of the Plaintiff United States
```

## Page 2

```
1  of America, and duly sworn, was taken in the
2  above-styled and -numbered cause on JUNE 23, 2014, from
3  9:02 a.m. to 12:30 p.m., before KELLY E. FISHER, CSR, in
4  and for the State of Texas, reported by machine
5  shorthand, at the Office of the Attorney General, 209
6  West 14th Street, Austin, Texas 78701 pursuant to the
7  Federal Rules of Civil Procedure and the provisions
8  stated on the record herein.
```

## Page 3

```
                    APPEARANCES

  FOR THE PLAINTIFF UNITED STATES OF AMERICA:

      Mr. Bruce Gear
      U.S. DEPARTMENT OF JUSTICE
      Civil Rights Division
      950 Pennsylvania Avenue, NW
      NWB Room 7254
      Washington, DC  20530
      Phone: 202-514-4609
      bruce.gear@usdoj.gov

  FOR THE VEASEY PLAINTIFFS:

      Mr. Chad W. Dunn
      BRAZIL & DUNN, LLP
      4201 Cypress Creek Parkway
      Suite 530
      Houston, Texas  77068
      Phone: 281-380-6310
      chad@brazilandunn.com

  FOR THE PLAINTIFF-INTERVENORS TEXAS LEAGUE OF YOUNG
  VOTERS EDUCATION FUND, ET AL.:

      Mr. Richard Shordt
      WILMERHALE
      1875 Pennsylvania Avenue, NW
      Washington, DC  20006
      Phone: 202-663-6693
      richard.shordt@wilmerhale.com

  FOR THE DEFENDANT STATE OF TEXAS:

      Mr. John B. Scott
      OFFICE OF THE ATTORNEY GENERAL
      Executive Administration Office
      209 West 14th Street
      8th Floor
      Austin, Texas  78701
      Phone: 512-936-0680
      john.scott@texasattorneygeneral.gov
```

## Page 4

```
              APPEARANCES (CONTINUED)

  FOR THE SPEAKER:

      Mr. Frank Battle
      OFFICE OF THE House OF REPRESENTATIVES
      General Counsel
      P.O. Box 2910
      Austin, Texas  78768-2910
      Phone: 512-463-1000
      frank.battle@speaker.state.tx.us

      Mr. Arthur C. D'Andrea
      Mr. Jay Dyer
      Ms. Brook Popp
      OFFICE OF THE ATTORNEY GENERAL
      Office of the Solicitor General
      P.O. Box 12548
      Austin, Texas  78711-2548
      Phone: 512-936-2868
      arthur.dandrea@oag.state.tx.us

  ALSO PRESENT:

      Ms. Zoe Jones
      WILMERHALE
      1875 Pennsylvania Avenue, NW
      Washington, DC  20006
      Phone: 202-663-6693
```

---

**5**

I N D E X

                                        PAGE

APPEARANCES................................ 2

WITNESS: JOE STRAUS

EXAMINATION
    By Mr. Dunn........................... 7
    By Mr. Gear........................... 74
    By Mr. Shordt......................... 114
    By Mr. Scott.......................... 141

FURTHER EXAMINATION
    By Mr. Shordt......................... 142
    By Mr. Gear........................... 143

CHANGES AND SIGNATURE.................... 145

REPORTER'S CERTIFICATION................. 147

---

**7**

JOE STRAUS,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. DUNN:
    Q. Please tell us your name.
    A. Joe Straus.
    Q. Speaker Straus, my name is Chad Dunn.  I
represent a group of plaintiffs -- individual plaintiffs
who have filed a lawsuit against the state under federal
law concerning the Senate Bill 14 passed in 2011
concerning the photo identification required to vote.
Do you understand that?
    A. Yes.
    Q. I'm going to ask you a series of questions
today, try to keep it as brief as possible.  I don't
expect it to be any less friendly than -- than we've
been so far this morning.  And then these other
attorneys may avail themselves of the opportunity to ask
you some questions.  Do you understand that?
    A. I do.
    Q. Have you given a deposition before ever?
    A. I have in something similar to this, yes.
    Q. Sure.  You gave one in this case.  Is that
right?
    A. Right.

---

**6**

E X H I B I T S

NO.   DESCRIPTION                    PAGE
1     San Antonio Express-News
      article June 7, 2009............. 78

2     Redacted letter from Joe Straus
      regarding SB 14.................. 89
3     12-page document from Speaker
      Straus' legislative files........ 92

4     Fraser Files Voter Fraud
      Measures........................ 95
5     7-page document from Speaker
      Straus' legislative files ....... 101

6     Voter ID Bill Summary SB14 (82R
      engrossed)...................... 108
7     One page handwritten notes
      TX_00012065..................... 117

8     Talking Points Against Student
      ID Amendment.................... 120
9     House Journal excerpt........... 126

---

**8**

    Q. Did you also give testimony in the
redistricting cases?
    A. Yes.
    Q. And how many times in those cases?
    A. Once.
    Q. So you understand the basic process.  I won't
spend a lot of your time on the rules.  But I may
occasionally ask you, if you shake your head or make a
noise, is that a yes or a no.
    A. Okay.
    Q. I'm doing that to make sure our court reporter
gets an audible answer down.  Do you understand?
    A. Yes.
    Q. Obviously if you don't understand my question,
it's incumbent on you to tell us.  There's no way for us
to know whether you understand the question.  Fair
enough?
    A. Yes.
    Q. You're represented by counsel here today.  Is
that true?
    A. That's true.
    Q. And who is that?
    A. Frank Battle.
    Q. All right.  Do you have any other attorneys
with you?

JOE STRAUS                                                  6/23/2014
CONFIDENTIAL TRANSCRIPT

---

9

1    A. The Attorney General's Office is representing
2  me as well.
3    Q. All right. So I'm going to go through a little
4  bit of your background. Some of these questions may
5  seem silly since, you know, most of this stuff I know,
6  but maybe our judge or somebody else in the record
7  won't.
8    A. Okay.
9    Q. Tell us where you were born and when, please.
10   A. San Antonio, Texas, in 1959, September 1st,
11  1959.
12   Q. Is that where you live today?
13   A. Yes.
14   Q. What is your position today?
15   A. Speaker of the Texas House.
16   Q. And that means you're an elected state
17  representative as well. Is that true?
18   A. That's correct.
19   Q. In what district?
20   A. District 121.
21   Q. When were you first elected there?
22   A. 2005.
23   Q. From what party are you a nominee?
24   A. Republican.
25   Q. Have you been elected to that state House

---

10

1  district since 2005?
2    A. Yes.
3    Q. Have you had any major competitive races?
4  Let's start with the first race. Was there -- was it a
5  heavily contested race?
6    A. Yes.
7    Q. On both the general and primary election or
8  just the --
9    A. It was a special election. There were several
10  candidates.
11   Q. Was it a partisan special election?
12   A. There were Republicans and Democrats and an
13  independent.
14   Q. And so was it the case where Republican --
15  there was a Republican primary and a Democratic primary,
16  or --
17   A. It was an open -- open -- it was an open-seat
18  special election.
19   Q. And I probably should have said this at the
20  beginning, but we got to be careful to not talk over one
21  another, because our court reporter can only take down
22  one of us. So she'll be yelling at us by the end of the
23  day if we don't accommodate that.
24        Can you recall the names of your opponents
25  in that first open race?

---

11

1    A. I'm sure I can if you give me a minute. Rose
2  Spector, a gentleman named Sil-- -- Paul Silber and a
3  fellow named -- his last name was Starnes.
4    Q. Those were all persons seeking the Republican
5  nomination?
6    A. No. It was an open-seat -- an open-seat
7  special election.
8    Q. Oh, that's right.
9    A. Rose Spector was a Democrat.
10   Q. I see.
11   A. Former Supreme Court justice.
12   Q. Who was your predecessor in office?
13   A. Elizabeth Ames Jones.
14   Q. All right. And when were you elected speaker?
15   A. In January of 2009.
16   Q. All right. Obviously I want to come back to
17  your legislative activities, but just a little bit more
18  on your background. I assume you went to high school in
19  San Antonio.
20   A. I did.
21   Q. Where did you graduate there?
22   A. Alamo Heights High School.
23   Q. And you attended college?
24   A. I did.
25   Q. Where was that?

---

12

1    A. I graduated from Vanderbilt.
2    Q. What was your degree there?
3    A. Political science.
4    Q. Any education past the Vanderbilt degree?
5    A. Not formal, no.
6    Q. Okay. And besides the work that you do now,
7  what have you done for a vocation?
8    A. I've done a number of things. I worked -- I
9  had some minor political-related jobs, or appointed
10  jobs, in the Reagan Administration back in the early to
11  mid-'80s.
12        I worked in private business, real estate,
13  for a short time. I mean, a number of things.
14   Q. Do you have --
15   A. I'm old.
16   Q. Okay. Outside your career in the legislature
17  and as Speaker of the House, which I'm sure taxes your
18  time, what is it that you would describe you do --
19   A. The last -- the last 15 or so years, probably,
20  maybe more. I've been in the insurance and executive
21  benefits and investments business.
22   Q. And you run that business out of San Antonio?
23   A. Yes.
24   Q. Is that a business that you own?
25   A. I'm a sole proprietor, yes.

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

---

13

1  Q. And what's the name of that entity?
2  **A. Bennett & Straus LLC. I'm a sole proprietor,**
3  **but we have an LLC with a partner.**
4  Q. Do you have any employees?
5  **A. Yeah.**
6  Q. How many?
7  **A. One in the business office.**
8  Q. All right. You're married?
9  **A. Yes.**
10  Q. And have children?
11  **A. I do.**
12  Q. How many children?
13  **A. Two.**
14  Q. All right. So that's enough on the background.
15  We'll get to the legislative activities. When you
16  joined the legislature in 2005, did you run on any
17  particular issues?
18  **A. Specific issues, like not -- sort of a**
19  **general -- a general Republican, you know, generic -- I**
20  **can't really recall other than just the generic fiscal**
21  **restraint, low tax.**
22  Q. All right. Fair enough. And I'm not trying to
23  get you any place you don't want to go --
24  **A. There wasn't -- I don't recall a particular**
25  **single issue or anything that was stressed.**

---

14

1  Q. Some folks, you know, run -- they want to
2  improve schools or border security or --
3  **A. Yeah.**
4  Q. -- or issues like that. You don't recall
5  something central to your campaign?
6  **A. No.**
7  Q. Okay. Obviously we're here to talk about
8  Senate Bill 14 and identification requirements for
9  voting in general. And first I'd like to ask you, have
10  you carried any such bills in your career?
11  **A. Which ones? Restate the question.**
12  Q. Bills that relate to requiring identification
13  to vote.
14  **A. No.**
15  Q. Have you served on any of the committees that
16  might be assigned election-related measures?
17  **A. No.**
18  Q. Prior to becoming speaker, give us a general
19  sense of what type of committee assignments you had,
20  please.
21  **A. Oh, I served -- I served -- when I was elected**
22  **in a special election, there were two committees**
23  **available that were open, so I was assigned to those.**
24  **I'm trying to remember what they were. Economic**
25  **development, I believe, and whatever they called**

---

15

1  **judiciary and civil -- or what was it called then?**
2  **Civil juris prudence -- judiciary and civil juris**
3  **prudence, I think.**
4         **And then later I served on pensions and**
5  **investments and a committee we no longer have called**
6  **regulated industries. Maybe I've got the order mixed**
7  **up, but I remember those comments.**
8  Q. Was there a particular area of policy that you
9  developed an expertise in or spent a great deal of time
10  on?
11  **A. Some from the regulated industries committee**
12  **having to do with -- with energy efficiency and some --**
13  **eliminating obsolete tax.**
14  Q. So it sounds like --
15  **A. Telecommunications.**
16  Q. And I'm not trying to undermine your experience
17  at all, but it doesn't sound like election-related
18  issues with something that you really spent a lot of
19  time on.
20  **A. No.**
21  Q. Is that true?
22  **A. That's right.**
23  Q. Okay. Now, you ran in the special course in
24  2005 and then in each even-numbered-year election since,
25  I'd assume?

---

16

1  **A. Yes.**
2  Q. In any of your campaigns have you encountered
3  experience of voter fraud?
4  **A. Not that I'm aware of, no.**
5  Q. Other than the open campaign that you had in
6  2005, have you had other reelections that you would
7  consider were tightly contested?
8  **A. Tightly?**
9  Q. Yes, sir.
10  **A. Strenuously.**
11  Q. Okay. What years were those?
12  **A. The last two primaries.**
13  Q. That's in 2012 and '14?
14  **A. That's correct.**
15  Q. Do you have a regular set of campaign
16  consultants, campaign managers or somebody that advises
17  you in that regard?
18  **A. I've had different campaign managers each**
19  **cycle.**
20  Q. Okay. So it's not the case that you have sort
21  of a standard team that you've relied upon?
22  **A. For campaign -- you know, not on the ground in**
23  **the district campaign, no.**
24  Q. So returning to your legislative work, have you
25  publicly called for a tightening of any requirements as

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

17

1  it comes to elections?
2     **A.  I don't recall.**
3     Q.  Okay.  And I understand, you know, everybody
4  gives a lot of --
5     **A.  Yeah, not in a great -- not in a great deal of**
6  **specificity, no.**
7     Q.  That wasn't sort of a pet issue of yours is
8  really what I'm getting at.
9     **A.  That's correct.**
10    Q.  Okay.  When is it that you first, if you ever
11  did, really get into a proposal in the legislature as it
12  pertains to photo identification for voting?
13    **A.  Did I get into it?**
14    Q.  Yeah, study the issue, read a bill, look at it.
15       MR. D'ANDREA:  The witness is going to
16  assert legislative privilege, but we -- I'm going to
17  allow him to answer under seal with the understanding
18  that we'll preserve the privilege.
19       MR. SCOTT:  And Chad --
20       Mr. Speaker, before you answer --
21       Chad, this brings up an issue that came up
22  in the last deposition, how we handled the housekeeping
23  of the actual deposition.
24       What we agreed to in the last deposition
25  was to go ahead and put -- keep -- treat the whole

18

1  deposition as though it's under seal, even though there
2  are specific parts therein that aren't.  To the extent
3  you're using -- making use of anything that's not been
4  specifically identified during the deposition as being
5  under seal -- we don't need anybody's permission at all,
6  obviously, but it helps everybody make sure that we --
7  everybody knows that this deposition is to be kept under
8  seal, or at least parts.  Are you okay with that?
9       MR. DUNN:  I think I'm okay with that with
10  the clarification.  So if it's necessary to include a
11  portion of the deposition in a filing with the court
12  that has not been identified today by one of the
13  attorneys present as legislative privilege, no leave is
14  necessary.  Is that right?
15       MR. SCOTT:  Absolutely correct.
16       MR. D'ANDREA:  Yes.
17       MR. DUNN:  But if it involves an excerpt of
18  the deposition where it has been noted by Mr. D'Andrea
19  or somebody else that legislative privilege is at issue,
20  then we would need to confer with the witness' lawyer.
21  Is that true?
22       MR. SCOTT:  That's correct.
23       Everybody agree with that?
24       MR. DUNN:  I'm fine with that.
25       MR. SHORDT:  Yes, that's fine.

19

1     Q.  (BY MR. DUNN)  All right.  So according to my
2  investigation, there have been identification
3  requirements for voting, you know, for some time,
4  decades, of course, you might imagine.  And I don't want
5  to try to sit here and quiz you and waste your time
6  today, but do you have some general description of what
7  the identification requirements were before Senate Bill
8  14?
9     **A.  I don't recall specifically what they were.**
10    Q.  And that's fair.  When you don't know
11  something, then, you know, obviously, just let us know
12  that.
13       Do you understand what IDs are permitted
14  under Senate Bill 14?
15    **A.  Oh, gosh.  I don't recall anymore.  It's been a**
16  **while since I've paid any attention to it.  I know that**
17  **I take my driver's license with me and my voter**
18  **registration card.**
19    Q.  Okay.  I think this is fairly clear for the
20  record, but I just want to put a fine point on it.
21  Prior to your election of speaker, did you carry any
22  bills that adjusted the photo -- or the identification
23  requirements for voting?
24    **A.  No, I did not.**
25    Q.  Can you recall if you sponsored or cosponsored

20

1  any?
2     **A.  I don't recall.  I know that various bills came**
3  **up in sessions before I served as speaker, and I'm sure**
4  **I voted on them, but I don't remember whether I signed**
5  **onto them or not.  I could have.**
6     Q.  None of them particularly come to mind?
7     **A.  No.**
8     Q.  So in 2011, the legislature passed Senate Bill
9  14, which I'm sure you gathered from the title, started
10  over in the Senate.  First I want to understand if you
11  recall what committee that was assigned to in the House.
12    **A.  I believe we had a select committee for**
13  **voter -- voting -- voter identification and voter**
14  **security related bills.**
15    Q.  And what is your authority as speaker of the
16  House as it pertains to committees?
17    **A.  Well, I -- the speaker makes appointments to**
18  **committees and appoints chairmen.  Some of the**
19  **committee -- some of the committee slots are filled,**
20  **roughly half of them, I think, by seniority.  And then**
21  **others are at the discretion of the speaker.**
22    Q.  What about the existence of the committee at
23  all, I mean, whether it's necessary --
24    **A.  The House makes that decision, but the speaker**
25  **has recommendations he makes.**

JOE STRAUS                                                      6/23/2014
CONFIDENTIAL TRANSCRIPT

---

21

Q. So if the House wants to create a new committee on whatever subject, how does it go about doing that procedurally?

**A. I guess that's in the rules. The committees of the House are passed in the House rules on the first day of the session or first few days of the session.**

Q. And so when each legislature begins, the House adopts a set of rules to govern its proceedings. Is that right?

**A. That's correct.**

Q. And I assume that, at least initially, the rules from the previous legislature are used as the starting point. Is that right?

**A. Yes.**

Q. How is it that proposals are made to change those rules?

**A. The members -- the members propose changes.**

Q. And when they -- do they do that prior to the session beginning, or do they do that formally on the floor in the form of amendments or both?

**A. They do it during the rules housekeeping work in the early days of the session. If they want to make changes, they propose them, and we pass a set of rules, sometimes -- usually with a few changes.**

Q. Is this rules committee process something that

---

22

begins before the legislature convenes?

**A. There are members who get together and discuss proposed rules changes and talk about how rules are working, yes.**

Q. And then once the session is underway, a draft set of rules, I assume, comes out for members to review?

**A. I assume so. I don't recall.**

Q. So do you recall where it is the idea originated to -- in 2011 to have a select committee as it pertains to voter identification requirements?

MR. D'ANDREA: I'm going to assert privilege and allow the witness to answer under seal.

**A. I don't remember how it came up. I knew -- everyone knew that voter security and voter identification legislation was likely to be a very hot topic for the legislature to consider just in -- just based on discussion leading up to the session. I don't recall specifically how the decision was made to create a committee for voter security and voter ID bills.**

Q. (BY MR. DUNN) Was this an idea of yours to create this committee?

**A. I don't -- I don't recall.**

Q. Was it -- was the idea to appoint this committee something that was coming from members?

**A. Again, I really don't remember.**

---

23

Q. Were there any other issues sent to this committee other than bills relating to voter identification?

**A. I imagine there were -- every session there are quite a few bills, I think, that are -- that are proposed that have generally something to do with voter fraud, voter security, voter identification. So I think there were -- I'm sure there were some number. I don't remember the number of bills that were referred -- we could look it up -- to that committee.**

Q. And again, I'm not trying to quiz you on every bill sent there. I'm just trying to get a sense for your point of view as speaker of the House. Was the committee to focus on voter identification requirements, or was it more expansive to deal with other voter-related issues?

**A. I don't remember the name of the committee, but I think the name and the jurisdiction of the committee would pretty well describe the type of bills that would go there. As I recall, it was voter -- voter-fraud or voter-security related.**

Q. Do you recall any person lobbying you or attempting to persuade you to create this committee or install certain members?

MR. D'ANDREA: Legislative privilege.

---

24

You may answer under seal.

**A. No, I don't.**

Q. (BY MR. DUNN) If this committee had not been created in 2011, then what committees in the House would normally have seen legislation relating to voter identification?

**A. I assume the -- the elections committee could -- some could, I suppose, go to state affairs committee. I'm not sure of others.**

Q. And so just before I move on, to make sure I've got all this, is there anything else that you remember about the creation of the special committee in 2011 that handled Senate Bill 14 that we haven't talked about?

**A. No.**

Q. Was the special committee in 2011 that handled Senate Bill 14 created because similar pieces of legislation and past legislative cycles had been held up in either the elections or state affairs committee?

MR. D'ANDREA: Legislative privilege.

You may answer under seal.

**A. I don't recall that -- I don't recall the process of -- or the timelines of certain bills in the past, so I can't say that that's the reason.**

Q. (BY MR. DUNN) So as you sit here today, is it then the case that you can't tell us why there was a

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

7 (Pages 25 to 28)

---

25

1  special committee in 2011 for identification --
2      **A. Other than from time to time we -- we create**
3  **select committees, these types of special committees,**
4  **just to -- just to move a particular issue off to the**
5  **side so that the normal operating committee -- like the**
6  **elections committee in this case, probably -- would --**
7  **would go about dealing with the other type of issues**
8  **that they -- other bills that they have without being**
9  **distracted by something that everyone knew would be a**
10 **high-profile, much-debated issue.**
11     Q. Do you recall whether senior members of the
12 elections committee had, prior to 2011, either opposed
13 or otherwise wanted to loosen some of the requirements
14 and proposed photo identification bills?
15     **A. I can't remember who -- who served on the**
16 **previous committees.**
17     Q. Now, again, I'm sure something that is
18 elementary to you, but could you just kind of walk us
19 through, walk the court through, when a bill comes from
20 the Senate over to the House, how it's processed by the
21 House?
22         Again, sort of tracking when there's a
23 special-committee-type situation.  So what happens as
24 far as when the bill comes over from the Senate?  Comes
25 to you, I assume.

---

26

1      **A. Well, it comes to the House.  And it's -- it's**
2  **referred.  It goes through the referral process that all**
3  **bills go through.**
4      Q. And what is the referral process?
5      **A. It would be referred to a committee.**
6      Q. And who makes that decision?
7      **A. You know, typically it's the -- the**
8  **parliamentarian's office.**
9      Q. Do you have input or influence in that process?
10     **A. From time to time, I might be consulted about**
11 **certain referrals, but I try not to be too engaged in**
12 **that.**
13     Q. Are there times when you've gone to the
14 parliamentarian and said, "I want this bill to go to
15 that committee"?
16     **A. I think all members talk to the parliamentarian**
17 **about that.**
18     Q. Okay.  I would think that the parliamentarian
19 might be a little more responsive to the speaker than
20 other members.  Is that the case?
21     **A. You don't know our parliamentarian.**
22     Q. Okay.  Well, in 2011, who was the
23 parliamentarian?
24     **A. Chris Griesel in '11.**
25     Q. Is that the parliamentarian today?

---

27

1      **A. Yes.**
2      Q. So I'll return to my earlier question.  Does
3  the parliamentarian respond somewhat more favorably to
4  recommendations from the speaker for appointment -- or
5  referral of bills to committee than other members?
6      **A. Pardon me?**
7      Q. Does the parliamentarian -- is -- are they more
8  responsive to the speaker when the speaker makes a
9  request to referral a bill to --
10     **A. You'd have to ask him.  I don't know.**
11     Q. That's not something you've experienced?
12     **A. I wouldn't know how responsive he is to anyone.**
13 **I mean, I think he has a good working relationship with**
14 **all the members.**
15     Q. So returning --
16     **A. You know, I don't think he's compliant to**
17 **anyone.**
18     Q. So returning to the bill process, the Senate
19 bill comes to the House, the parliamentarian assigns a
20 committee.  In the case where there's a special
21 committee with, for example, voter identification in the
22 title, I would assume it's not too difficult for the
23 parliamentarian to figure out where a photo
24 identification requirement ought to go.  Is that about
25 right?

---

28

1      **A. I would think that's correct.**
2      Q. All right.  Once in committee, what happens?
3      **A. Then the committee chairman decides -- decides**
4  **whether or not to take up the matter.**
5      Q. Can you recall who the committee chairman was
6  on Senate Bill 14 in 2011?
7      **A. I believe it was Representative Bonnen.**
8      Q. Did you have any discussions with
9  Representative Bonnen about the progress or dealings
10 with Senate Bill 14?
11     **A. Oh --**
12         MR. D'ANDREA:  Legislative privilege.
13         You may answer under seal.
14     **A. I imagine I did.  I talk to all the committee**
15 **chairmen.  But I don't recall specifically.  I'm sure I**
16 **did.**
17     Q. (BY MR. DUNN)  There's no discussion that you
18 recall with Representative Bonnen as it relates to
19 Senate Bill 14 in 2011.  Is that right?
20     **A. The question again?**
21     Q. I just want to confirm that there's no
22 discussion that you ever had in 2011 with Representative
23 Bonnen pertaining to Senate Bill 14 that you can relate
24 to us.
25     **A. Not in any kind of detail.  I'm sure I did talk**

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

29

1  to him.  But I don't recall a specific conversation with
2  him on the bill, but I'm sure we did talk.
3       Q.  And -- and I can tell you're confused by some
4  of these questions, so let me see if I can -- a lot of
5  times -- all I'm really trying to do is find out what
6  you might testify to in trial in this case.  This is our
7  only chance to visit with you before the case is tried.
8  So --
9       A.  Yeah.
10      Q.  -- if you're going to show up and say, "I met
11 with Representative Bonnen on this day and we talked
12 about the bill," that's all I want to find out.
13      A.  No, I can't -- I can't recall a specific
14 conversation.
15      Q.  Did you propose to Representative Bonnen, or
16 anyone else, a timeline on which the committee ought to
17 deal with the bill or report it out of committee, if at
18 all?
19           MR. D'ANDREA:  Legislative privilege.
20           You may answer under seal.
21      A.  Not to my recollection.
22      Q.  (BY MR. DUNN)  Is it fair to describe your
23 involvement with Senate Bill 14 as hands off?
24      A.  Generally.  I mean, I think that would be
25 fairly close to accurate.

30

1       Q.  Did you direct the committee in terms of the
2  type of opportunities they would provide for public
3  input?
4       A.  Did I -- did I do what?
5       Q.  Direct the special committee in terms of how
6  many opportunities for public input.
7       A.  No, I didn't.
8       Q.  Was it fair to say that that was left to
9  Representative Bonnen?
10      A.  Yes.
11      Q.  Well, obviously the legislative record shows
12 that Senate Bill 14 was reported favorably by the
13 committee.  Again, what happens to the bill after that?
14      A.  I suppose it went to the calendars committee.
15      Q.  And do you recall who the chair of the
16 calendars committee was in 2011?
17      A.  I'm trying to remember.  Don't tell him I can't
18 remember.  I think it was -- I think it was -- I think
19 it was Todd Hunter.
20      Q.  That's a pretty plum position, is it not?
21      A.  Yeah.  I'm just trying to get the sessions
22 straight.
23      Q.  No, I understand.
24      A.  I know it was Brian McCall in 2009.  In '11 --
25 I think Hunter's been chairman two sessions.

31

1       Q.  What is the role of the calendars committee?
2       A.  It's the committee that -- that prepares the
3  calendar for consideration of legislation on the floor.
4       Q.  Does it also, on occasion, serve as a
5  gatekeeper?
6       A.  A gatekeeper?
7       Q.  Well, let me put it this way.  If a majority of
8  the calendars committee doesn't support a measure, is it
9  likely to get some time on the floor for debate and
10 vote?
11      A.  I don't know -- I don't know how the calendars
12 committee operates internally.  I don't know their
13 process for moving bills to the floor.
14      Q.  So you don't know whether it's the case that
15 the calendars committee holds up bills that they're not
16 in support of, at least in majority?
17      A.  I believe they can, sure.
18      Q.  I mean, that happens all the time, does it not?
19      A.  It happens regularly.
20      Q.  Is there also an individual member authority to
21 hold a bill for some period of time?
22      A.  Again, I don't -- I never served on the
23 calendars committee myself.  I don't know.  I hear that
24 certain -- I think there's a certain understanding in
25 the committee that members have the ability to -- to --

32

1  to slow a bill down if they'd like, but I'm not sure how
2  it works specifically or -- I'm not -- I don't know.
3       Q.  Have you ever contacted, whether it's the chair
4  or a member of the calendars committee, and asked them
5  to hold up a bill?
6            MR. D'ANDREA:  Legislative privilege.
7            You may answer under seal.
8       A.  If I have, it's been very rare.
9       Q.  (BY MR. DUNN)  And have you ever done so on an
10 election-related measure?
11      A.  Not that I recall.
12      Q.  Had you -- well, strike that.
13           Can you recall what part -- you know, at
14 the beginning, middle or towards the end of the 2011
15 session that Senate Bill 14 was considered by the floor?
16      A.  I don't recall.
17      Q.  And can you recall whether you played any role
18 as to the timing of the floor debate?
19      A.  I don't.  I don't believe I did.
20      Q.  And when the bill passed the House, did you
21 vote on it?
22      A.  I've rarely voted as speaker, and I don't -- I
23 don't recall.  I don't think so.
24      Q.  What are the rules or the tradition of the
25 House as it pertains to the speaker voting on a measure?

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

33

1   A. You know, I don't know before -- before my
2   tenure. But since I've been there, I very rarely have
3   voted other than on -- very rare occasions.
4   Typically -- typically I've voted with members who had
5   to make tough calls on budget issues, maybe a couple of
6   other things, but I can't remember what they are at the
7   moment.
8       Q. But you don't recall voting on Senate Bill 14?
9       A. I don't remember voting on it. I don't think I
10  did.
11      Q. Was there a conference committee on Senate Bill
12  14?
13      A. I don't remember.
14      Q. Okay. So let me just see if I can recap.
15      A. I would imagine there was, but I don't recall.
16      Q. You don't recall what the rationale was behind
17  having a special committee on voter identification. Is
18  that right?
19      A. Other than just knowing that it was going to be
20  a, you know, high-profile issue that a number of members
21  had worked on previously. It's not an unusual thing to
22  have select committees for certain types of -- of
23  issues.
24      Q. You don't recall any particular strategy to the
25  timing of the debate of Senate Bill 14 in the House?

34

1       A. I don't.
2       Q. You don't recall having any conversations with
3   members of the elections committee or calendars
4   committee as it pertains to the bill. Is that right?
5       A. Not specifically, no. I'm sure I did, but I
6   don't recall specifically.
7       Q. You don't remember making any speeches on the
8   floor as it pertains to the bill?
9       A. Me?
10      Q. Yes.
11      A. Oh, no.
12      Q. Do you recall having any communications with
13  the governor's office as it pertains to Senate Bill 14?
14      A. I do not.
15      Q. Do you recall having any communications with
16  the Lieutenant Governor or the Lieutenant Governor's
17  office as it pertains to the Senate bill?
18          MR. D'ANDREA: Legislative privilege.
19          You may answer under seal.
20      A. I don't recall specifically. I'm sure, as a
21  high-profile issue, it must have come up in our routine
22  meetings, but I don't recall a specific conversation.
23      Q. (BY MR. DUNN) Do you recall any communications
24  with the attorney general or the attorney general's
25  office?

35

1       A. I don't.
2       Q. Did you attend any of the select committee --
3   the House select committee meetings as it pertained to
4   Senate Bill 14?
5       A. I don't think so.
6       Q. Did you, in 2011, have staff that you assigned
7   to each of the committees?
8       A. Oh, yes. A staff's assigned to all the
9   committees.
10      Q. And do you -- did each staff member have
11  certain committee assignments?
12      A. Yes.
13      Q. Do you remember who was assigned the select
14  committee on photo identification, voter fraud?
15      A. I'm assuming it was Meredith Fowler, who has
16  been on my staff since I began as speaker. There may
17  have been more than her too, but I would assume that she
18  would have been watching most closely.
19      Q. Is Ms. Fowler an attorney?
20      A. Yes.
21      Q. Does she have election-related experience
22  outside of working for your staff?
23      A. I don't know.
24      Q. Did you have any communication with the
25  Secretary of State's office as it pertains to Senate

36

1   Bill 14?
2       A. I don't believe I did personally.
3       Q. Do you -- do you recall having any
4   communications with individual county election officers
5   as it pertains to Senate Bill 14?
6       A. Don't believe so. Somebody may have contacted
7   me, but I don't remember.
8       Q. You may not be able to answer this, and if you
9   can't, that's fine. But would you have supported Senate
10  Bill 14 by a vote if it had been appropriate, if you had
11  been a House member?
12          MR. D'ANDREA: Legislate privilege.
13          You may answer under seal.
14      A. I voted -- I'm sure these types of bills came
15  up before I was speaker in '05 and '07, and I voted for
16  voter -- voter-ID-related legislation. This one
17  specifically, I'm sure I would have voted for it.
18      Q. (BY MR. DUNN) And when you have supported
19  measures on voter identification requirements, what was
20  your rationale for doing so?
21          MR. D'ANDREA: Legislative privilege.
22          You may answer under seal.
23      A. Just generally the -- support the policy of
24  voter -- voter security, valid integrity and -- you
25  know, generally I don't . . . you know, I just have -- I

Case 2:13-cv-00193   Document 718-4   Filed on 11/14/14 in TXSD   Page 10 of 62

---

37

1  had a record of supporting voter ballot security and
2  voter ID legislation.
3      Q. (BY MR. DUNN)  There were a number of bills
4  proposed both in 2011 and prior sessions on voter
5  identification requirements.  And some of them could be
6  described as more stringent and some of them could be
7  described as more stringent than the current law but not
8  as stringent as other proposals.  Did you have a line
9  that you drew in terms of supporting such measures?
10     A. No.
11     Q. Was it your view that there was no
12 identification requirement too stringent?
13         MR. D'ANDREA:  Legislative privilege.
14         You may answer under seal.
15     A. Ask the question again.
16     Q. (BY MR. DUNN)  I'm just trying to determine if
17 there was a line where you said, "Okay, now the
18 identification requirements are too tight, too difficult
19 that I can't support any longer," or was it just any
20 additional requirements?
21     A. No, as the -- as the presiding officer, I
22 really didn't draw any lines in the sand or take a
23 position on whether a bill was too strong or not strong
24 enough or any of that.  I leave the details of the
25 debate and the amending of legislation up to the

---

38

1  members.
2      Q. So from your standpoint in 2011, if the House
3  had chosen to pass a photo identification measure,
4  that's fine; if the House had chosen not to pass one,
5  that would have been fine with you?
6      A. House passes things that don't please me
7  100 percent routinely.  And they fail to pass things
8  that I would love to see happen routinely.  So, no, I'm
9  not really micromanaging bills and legislation to my
10 desires.
11     Q. What if a measure -- you know, outside of the
12 election-related requirement, what if a measure, in your
13 view, was going to violate federal law?  Would you still
14 permit the House to pass it?
15     A. I would hope that we would have a long
16 discussion about what we were getting into.  And we try
17 very hard not to do that.
18     Q. And you have some persuasive ability as a
19 speaker, I would assume, to change --
20     A. I hope so.
21     Q. All right.
22     A. Probably because I don't overuse it.
23     Q. So have you had an occasion where you thought a
24 measure on any subject might cross purposes with federal
25 law?

---

39

1          MR. D'ANDREA:  Legislate privilege.
2          You may answer under seal.
3      A. I remember the -- one instance of the -- there
4  was this whole thing with the TSA and invasive pat downs
5  in security -- of security officials at airports that I
6  did try to persuade the House to be very careful about.
7      Q. (BY MR. DUNN)  As it relates to Senate Bill 14,
8  do you remember receiving or making any analysis of its
9  compliance with federal law?
10     A. I don't.
11     Q. Do you recall at any time considering a
12 comparison of other states' ID requirements with Texas?
13     A. I believe that was done, but I don't recall
14 specifically or that I was involved in it.
15     Q. Did you request any information, whether from
16 the Secretary of State or some other source, about the
17 folks who might be impacted by Senate Bill 14?
18     A. I did not.
19     Q. Is that the sort of thing that you would have
20 expected members to do?
21     A. Yes.  If that were to be -- if that were
22 appropriate to be done, I would imagine the members
23 working on a particular bill for or against would be
24 requesting that.
25     Q. You understand that one of the allegations in

---

40

1  this lawsuit is that Senate Bill 14 disproportionately
2  impacts minority citizens such as African Americans and
3  Latinos.  Do you understand that's generally an issue in
4  this case?
5      A. I've heard that, yes.
6      Q. All right.  Do you have an opinion on whether
7  that's the case?
8      A. Not particularly, no.  I think -- from what I
9  understand, there's been very little, if any, hindrances
10 as was predicted.  I think, from what I understand, the
11 law's worked pretty well.
12     Q. So you've been informed that there have been
13 very few people who have been rejected from voting as a
14 result of Senate Bill 14?
15     A. I believe I've read that.
16     Q. Where would you have read that information?
17     A. Just in the daily newspapers.
18     Q. Have you had any briefing from government
19 officials on that subject?
20     A. Not that I recall.
21     Q. Is this a topic of inquiry that -- in other
22 words, that you or your staff has reached out to
23 government officials to get briefed on the effects of?
24     A. I'm sure they have, but I don't recall.
25     Q. Have you recalled seeing any figures on the

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

11 (Pages 41 to 44)

41

1  number of people that have been prevented from voting or
2  who were forced to cast a provisional ballot as a result
3  of Senate Bill 14.
4      **A. I believe there's been news coverage of it, but**
5  **I don't recall specifically beyond just not being**
6  **alarmed at a large number of those cases.**
7      Q. Outside of the news coverage, you've had no
8  official reporting of this information?
9      **A. Not that I'm aware of.**
10     Q. So returning back, though, to the legislative
11  process, you, as speaker, and other members, I would
12  assume, have the authority to go to state agencies and
13  ask for reports and information on considered measures.
14  Is that right?
15     **A. Yes.**
16     Q. Do you know whether it had ever been requested,
17  on Senate Bill 14, the number of people in the state who
18  lack one of the acceptable forms of ID under Senate Bill
19  14?
20     **A. I don't know.**
21     Q. And then I assume similarly you wouldn't know,
22  then, whether information had been requested from a
23  government source as to the racial makeup of people who
24  didn't posses one of the IDs acceptable under Senate
25  Bill 14?

42

1      **A. I don't know. Again, I think that might have**
2  **been covered in some news stories, but I'm not aware of**
3  **any government reporting or agency reporting.**
4      Q. Is that the type of information, though, as
5  speaker of the House, you would have hoped and expected
6  somebody to obtain and review?
7      **A. Yes.**
8      Q. From your standpoint as speaker, had such
9  information been obtained and had it shown a disparate
10  impact on minority citizens, would that have changed
11  your support for the bill?
12         MR. D'ANDREA: Legislative privilege.
13         You may answer under seal.
14     **A. Ask the question again.**
15     Q. (BY MR. DUNN) Sure. You know, from your
16  standpoint as speaker, had you received such data and
17  had such data shown Senate Bill 14 would have a
18  disparate impact on minority citizens, would that have
19  changed your support for the bill?
20     **A. Before we passed it in 2011?**
21     Q. Yes, sir.
22     **A. I would think that the members would have had a**
23  **discussion about that, yes.**
24     Q. You don't recall being a part of any such
25  discussion?

43

1      **A. I don't.**
2      Q. And we've had some discussion about what data
3  you've received since Senate Bill 14's implementation.
4  I just want to make sure I have it clear.
5      **A. Okay.**
6      Q. You've had no official briefing or debriefing
7  from any government sources to the effect of Senate Bill
8  14; the only information you have is from reading
9  newspapers. Is that right?
10     **A. As I recall, yes. I mean, my staff may have,**
11  **from time to time, mentioned something to me, but no --**
12  **not any -- no formal meetings or any kind of alarming-**
13  **type briefing, no.**
14     Q. I'm not asking what was discussed at this
15  point, before Mr. Scott gets too excited. I just want
16  to know, have you had any briefing with the attorney
17  general's office as it pertains to this lawsuit?
18     **A. Only yesterday, just letting me -- just going**
19  **over --**
20         MR. D'ANDREA: I'd instruct you not to
21  **answer to the extent you divulge attorney/client**
22  **privilege, but you may talk about the existence of --**
23     **A. Yeah, I visited with him about what to expect**
24  **this morning.**
25     Q. (BY MR. DUNN) All right. And really all I'm

44

1  trying to determine is if -- prior to whatever
2  discussions you've had to prepare for this deposition,
3  if you'd had any briefings from the attorney general's
4  office from the date of passage of Senate Bill 14 until
5  the present about its legality implementation, et
6  cetera.
7      **A. No.**
8      Q. Have you requested any such communications?
9      **A. Don't believe so, no.**
10     Q. The -- the State, I'm sure, is involved in an
11  amount of litigation at any given time on any given
12  subjects. We know about redistricting, for example.
13         Do you, as speaker of the House, receive
14  legal briefings about pending litigation involving the
15  State?
16     **A. I would think very rarely.**
17     Q. I mean, is there --
18     **A. I'm not a lawyer, and so my staff probably**
19  **knows I'm not, you know, into -- I wouldn't be**
20  **particularly interested in following every -- every**
21  **moment of every legal case.**
22     Q. All right.
23     **A. Only as certain legal cases impact the work of**
24  **the legislature or an upcoming session of legislature.**
25     Q. Now, before a measure is considered by the

JOE STRAUS                                                      6/23/2014
CONFIDENTIAL TRANSCRIPT

12 (Pages 45 to 48)

45

1  House, it will be reviewed and a bill analysis will be
2  prepared.  Is that right?
3       A.  Yes.
4       Q.  Was it the agency that would have done that on
5  Senate Bill 14?
6       A.  Who would have done it?
7       Q.  Well, right.  I mean, sometime -- I'm fairly
8  familiar with the process too.  I know sometimes when
9  Senate bills come over, the House will just rely on the
10 Senate research's bill analysis; sometimes they prepare
11 their own.  And you may not know in this case.
12      A.  I don't know who did the analysis.
13      Q.  All right.  Did you influence at all who would
14 be involved in the preparation of the analysis?
15      A.  No.
16      Q.  Who would have made that decision?
17      A.  I don't know.
18      Q.  Did you attend a bill signing for Senate Bill
19 14?
20      A.  I don't recall.  I don't think so.  I might
21 have.  I really don't remember.
22      Q.  Again, focusing on your past support for voter
23 identification measures, have you -- do you recognize
24 that there are some set of barriers that the government
25 can erect of voting that would be -- whether illegal,

46

1  ill-advised?
2       A.  Yes.
3       Q.  I mean, in other words, if you had to show up
4  at three different locations in a row to secure your
5  vote, at some point, it can be come burdensome?
6       A.  Yes.
7       Q.  Okay.  And I assume as a public officer that's
8  not something you support?
9       A.  That's correct.
10      Q.  I asked you earlier what -- the various
11 identifications that were permitted under Senate Bill
12 14, and I think you said you didn't recall.  And I want
13 to go through some, though, that aren't included.  For
14 example, federal employee IDs are not included in Senate
15 Bill 14.  Is that something that you see erects an
16 unreasonable burden?
17      A.  That a federal ID cannot be used?
18      Q.  Yes, sir.
19      A.  I haven't really thought about it.  I don't
20 know why there wouldn't be.
21      Q.  How about a state government-issued ID for
22 employees?
23      A.  I don't know why they wouldn't be allowed.
24      Q.  And also student IDs issued by state of Texas
25 higher educational institutions?

47

1       A.  The question is?
2       Q.  Whether you think that those IDs ought to be
3  accepted in voting.
4       A.  I wouldn't have a problem with that.
5       Q.  Do you know why it is Senate Bill 14 doesn't
6  include those IDs?
7       A.  I don't know.
8       Q.  Do you know whether an analysis had been
9  performed as to the makeup or the availability of
10 various IDs to different racial groups?
11          MR. D'ANDREA:  Legislative privilege.
12          You many answer under seal.
13      A.  The question again?
14      Q.  (BY MR. DUNN)  Do you know whether an analysis
15 was performed during the consideration of Senate Bill 14
16 as to the availability of certain ideas -- IDs by
17 various racial groups?
18      A.  I don't recall.
19      Q.  In the debates over Senate Bill 14 that you
20 witnessed --
21      A.  Uh-huh.
22      Q.  -- did you hear any comments by members of the
23 legislature that had racial undertones?
24          MR. D'ANDREA:  Legislative privilege.
25          You may answer under seal.

48

1       A.  Racial -- can you give me a little more?
2       Q.  (BY MR. DUNN)  Sure.  For example, a member of
3  the legislature, either by direct language or by
4  allusions, led you to believe they were supporting
5  Senate Bill 14 because they wanted to keep, for example,
6  Latinos from voting.
7       A.  No, I have not heard that.
8       Q.  Have you heard, in 2011, over the course of any
9  legislative debate, someone use racially negative
10 language?
11          MR. SCOTT:  Objection; form.
12      A.  In the debate of this bill?
13      Q.  (BY MR. DUNN)  We can start on Senate Bill 14,
14 on the debate of Senate Bill 14.  Do you recall any
15 member using racially negative language?
16          MR. D'ANDREA:  Legislative privilege.
17          You may answer under seal.
18      A.  I don't recall, no.
19      Q.  (BY MR. DUNN)  And not just in the debate, in
20 private conversation concerning Senate Bill 14.
21      A.  No.
22      Q.  How about any other measure in the 2011
23 session?
24          MR. D'ANDREA:  Legislative privilege.
25          You may answer under seal.

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

---

**49**

1    A.  No, I don't recall.
2    Q.  (BY MR. DUNN)  One of the issues that will
3  obviously be decided in this case is what the
4  legislative intent behind Senate Bill 14 was.  And I
5  understand from your testimony that you didn't vote on
6  it.  Are you able to tell us or testify what the
7  legislative intent for Senate Bill 14 was?
8            MR. D'ANDREA:  Objection; calls for
9  speculation.
10   A.  Just --
11           THE WITNESS:  Am I to answer?
12           MR. D'ANDREA:  Yes.  Oh, I'm sorry, yes.
13   A.  I think just general voter ballot security just
14  to be certain that those who were casting votes were
15  doing so legitimately.
16   Q.  (BY MR. DUNN)  Any other legislative purpose
17  that you're aware of?
18   A.  Not that I'm aware of, no.
19   Q.  Now, on the ballot security issue, were you
20  aware of incidents of voter-related activity that was
21  illegal or could have been illegal that Senate Bill 14
22  was designed to prevent?
23   A.  No, I'm not.
24   Q.  And so you've previously testified that ballot
25  security was an issue that you supported.  Why was it

---

**50**

1  that you saw additional measures were required for
2  ballot security, despite having not seen any evidence of
3  such voter fraud that would be prevented by that
4  measure?
5            MR. D'ANDREA:  Objection; assumes facts not
6  in evidence.
7            THE WITNESS:  What did you say?
8            MR. D'ANDREA:  You may answer if you can.
9            THE WITNESS:  All right.
10   A.  Again, I just had a -- I have a record of
11  voting for measures that -- that called for
12  identification at the polling place, but it wasn't --
13  wasn't in relation to any specific incident that I was
14  aware of.
15   Q.  (BY MR. DUNN)  Well, you know, I'm sure you've
16  heard of that Texas or southern saying, "If it ain't
17  broke, don't fix it."
18   A.  Uh-huh.
19   Q.  So what was it about the system that you
20  thought was broken that you were trying to fix when you
21  supported such measures?
22   A.  I didn't have a -- I -- I didn't -- my -- my
23  support for it could just as easily be considered that I
24  wouldn't oppose it because I didn't think opposing it
25  was appropriate.  I saw no problem with presenting a

---

**51**

1  photo ID to vote just as you do to cash a check or --
2  you know, at the airport or the bank or wherever.
3    Q.  So another way, then, to restate that is, from
4  your standpoint there was no harm --
5    A.  Right.
6    Q.  -- in Senate Bill 14?
7    A.  Yeah.
8    Q.  And there might be some benefit, so it was
9  worth supporting.  Is that about right?
10   A.  Yeah.  I mean, again, it wasn't my bill.  But
11  when these issues came up in previous legislatures
12  before I was serving as presiding officer, I supported
13  them.
14   Q.  Now, also around 2011, the Texas Department of
15  Public Safety began requiring citizenship requirement --
16  or citizenship documents to issue driver's license or
17  identifications.  Are you aware of that?
18   A.  I remember that, yes.
19   Q.  Initially that change in policy was done on --
20  by the agency, not by the legislature.  Are you aware of
21  that?
22   A.  I vaguely recall that.
23   Q.  Were you at all involved in DPS's decision to
24  start requiring citizenship to issue --
25   A.  No --

---

**52**

1    Q.  -- IDs?
2    A.  -- I'm not.
3    Q.  Later --
4    A.  I remember discussing it with them when it
5  became an issue during legislature, legislative session.
6    Q.  And how had it become an issue?
7    A.  Well, as I recall, there were members who
8  were -- who were opposing that policy.  And I just
9  remember -- I remember some conversation with -- either
10  with DPS or with members who were interested in the
11  issue.
12           And I believe I'm remembering this
13  correctly that I was surprised that Texas was in a small
14  minority of states that didn't already handle it that
15  way.  So the change I think DPS made was more conforming
16  with most states, which, if I'm correct, was surprising
17  to me.
18   Q.  When -- when was this?
19   A.  I can't remember.  In '11, I guess.
20   Q.  And do you remember who it was at DPS that you
21  spoke with about this issue?
22   A.  No, I don't.
23   Q.  Do you remember what members of the legislature
24  were involved?
25   A.  I know that Representative Cook is very

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

53

1  interested in this issue.
2      Q.  Later the legislature gave DPS the authority to
3  require citizenship documents by statute.  Is that
4  right?
5      A.  I don't recall how we resolved it.  I think
6  that's right.
7      Q.  Is -- again, if you don't know, just tell us
8  that.  But is one of the legislative purposes behind
9  Senate Bill 14 to determine and ensure that folks who
10 receive a ballot are U.S. citizens?
11         MR. D'ANDREA:  Legislative privilege.
12         You may answer under seal.
13         And objection; calls for speculation.
14     A.  I assume so.
15     Q.  (BY MR. DUNN)  Do you know whether any of the
16 identifications permitted under Senate Bill 14 can be
17 obtained without proving one is a citizen?
18     A.  I don't know.
19     Q.  Back to the DPS issue, though, for a moment, it
20 sounds like it was not the case that you directed or
21 otherwise suggested to DPS to begin requiring
22 citizenship documents to issue IDs.
23     A.  Oh, no.
24     Q.  Have you been briefed on or otherwise looked
25 into difficulties that some citizens may have,

54

1  especially elderly citizens, in obtaining documentation
2  to show they were born in the United States, for
3  example?
4          MR. D'ANDREA:  Legislative privilege.
5          You may answer under seal.
6      A.  I know that it's been a matter that's been
7  reviewed and discussed, but I don't -- I think there
8  were provisions made, weren't there, in the bill for
9  elderly and for -- I've forgotten what it was.
10 65-year-olds or something.  I think some of these -- I
11 think some of these matters were considered in the
12 legislation, if I'm not mistaken.
13     Q.  (BY MR. DUNN)  There is a provision in the bill
14 for people over the age of 65 to vote by mail.  Is that
15 what you're referring to?
16     A.  I think so.
17     Q.  And they can vote by mail without showing such
18 identification?
19     A.  That's correct.
20     Q.  Is it your recollection that the reason such
21 provision was included in the bill was a recognition
22 that many of the elderly citizens would be unable to
23 obtain citizenship documentation?
24     A.  I don't recall.
25     Q.  So when it comes to the various IDs that are

55

1  permitted, it's your belief that each of those IDs, a
2  citizen would have to prove their citizenship in order
3  to obtain.  Is that right?
4          MR. D'ANDREA:  Asked and answered.
5      A.  I don't recall exactly what the ID requirements
6  are.
7      Q.  (BY MR. DUNN)  So is that a "I don't know"?
8      A.  I don't know.
9      Q.  All right.
10     A.  Yeah.
11     Q.  You mentioned earlier -- I'm going to kind of
12 shift gears on you and talk about your voting.  I assume
13 that you vote somewhat regularly as a public official?
14     A.  Oh, voting like on election day?
15     Q.  Yes, sir.
16     A.  Yes.
17     Q.  Not voting in the House, but voting for elected
18 officers --
19     A.  Yes.
20     Q.  -- and measures.
21         Do you vote in person or by mail?
22     A.  I vote in person.
23     Q.  And why do you do it by in person rather than
24 mail?
25     A.  Habit.  Try to be home around elections.  And

56

1  early voting lasts so long, there's generally an
2  opportunity for me to vote in person.
3      Q.  And when you vote in person, is it -- is it on
4  election day or early voting or a mixture?
5      A.  Almost always, I vote early.
6      Q.  Do you see the decision as to when to vote,
7  whether early or on election day, is a valuable choice
8  that you treasure?
9          MR. SCOTT:  Objection; form, relevance.
10     A.  What was the question again?
11     Q.  (BY MR. DUNN)  Do you see the decision -- or
12 the choice, the opportunity that you have to vote early
13 or on election day, as a valuable choice?
14     A.  Yes.
15     Q.  I mean, there -- have there been occasions, for
16 example, where you said, "Well, I think I'm going to
17 wait to vote till election day because there's some hot
18 issues in this race I want to see flesh out"?
19     A.  No, that hasn't really been a consideration for
20 me.
21     Q.  So from your standpoint, is the driving factor
22 when you vote the convenience, when you're able to --
23     A.  Travel schedule and convenience, yes.
24     Q.  All right.  You mentioned that when you vote,
25 you take your voter registration card and your driver's

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

---

57

1    license.  Is that right?
2        A.  Yes.
3        Q.  And has that been true even prior to Senate
4    Bill 14?
5        A.  For me, yes.
6        Q.  Can you tell me when your Texas driver's
7    license expires?
8        A.  No, I can't.
9        Q.  Is it something you have on you, you could look
10   at?
11       A.  Uh-huh.
12       Q.  Would you mind doing that for me?
13       A.  No.  Sure hope it hasn't expired.
14           9-1-2017.
15       Q.  You can recall when -- thank you very much.
16   Can you recall when you last renewed it?
17       A.  I do remember.
18       Q.  When was that?
19       A.  It was when my youngest daughter turned 18, I
20   think, and she wanted a new license, so I went with her.
21   And it was the first day of hunting season.  It was my
22   birthday, September 1st, almost three years ago, I
23   think.
24       Q.  So that would be September 1st, 2011?
25       A.  I think that's right.

---

58

1        Q.  Can you recall when you went and renewed your
2    driver's license, whether you had to bring documentation
3    showing you were a U.S. citizen?
4        A.  I don't remember.
5        Q.  Can you recall whether your daughter was
6    required to do the same?
7        A.  Again, I don't remember.
8        Q.  Do you know --
9        A.  I think, as I recall, I could have done it
10   online, maybe.  I don't think I needed to go in person
11   at all, but since she was going, I just wanted to see
12   what the experience was like --
13       Q.  Okay.
14       A.  -- after spending a lot of money upgrading the
15   driver's license offices.
16       Q.  That's something I want to talk about,
17   obviously, later today.  Before -- before we get to
18   that, you were suggesting that you thought you could
19   renew your license online?
20       A.  I thought so.
21       Q.  Is it your understanding you can renew your
22   license on unlimited occasions online or just a few or
23   one?
24       A.  I don't know.
25       Q.  You got something in the mail, I assume, that

---

59

1    gave you your options?
2        A.  I don't remember.  I think maybe I just went
3    because my daughter was going and I said, "Well, maybe
4    I'll just do it now."  I really don't recall.
5        Q.  So are you aware whether or not there are many
6    Texans who posses a state-issued driver's license who
7    didn't have to prove identification?
8        A.  I'm not aware.
9        Q.  When you went with your daughter to renew your
10   license, and hers it sounds like, what location did you
11   go to?
12       A.  We went to one on the southeast side of San
13   Antonio.
14       Q.  What time of day did you go there?
15       A.  I want to say it was mid -- no, it was -- it
16   was in the afternoon, mid -- mid to late afternoon.
17       Q.  Did you go with anyone else other than you and
18   your daughter?
19       A.  Just the two of us.
20       Q.  How long were you there?
21       A.  Longer than I wanted to be.  I wanted to go
22   shoot doves that afternoon.
23       Q.  Was it opening day of dove season?
24       A.  Uh-huh.
25       Q.  Oh, I see.

---

60

1        A.  Yeah.
2        Q.  Were you there 30 minutes? an hour? two hours?
3        A.  We were there a good -- over an hour.
4        Q.  There used to be a DPS office here near the
5    capitol that folks could avail themselves of.  Is that
6    right?
7        A.  I heard about it.  I never went.
8        Q.  All right.  So I assume you couldn't tell us
9    anything about that?
10       A.  Couldn't tell you anything about it.  Is it not
11   still here?
12       Q.  It might be.  I don't know.  Back when I worked
13   here, it was one of my favorite things of working in the
14   legislature.  Walk over there, there wasn't anybody else
15   there.  It was like the Maytag repairman in there.
16           Anyway, did you consider the wait that you
17   had at the DPS office to be unreasonable?
18       A.  It was longer than it should have been.
19       Q.  Did you follow up with any agency official
20   about that?
21       A.  I did.  I did talk to my staff about it, yes.
22       Q.  Who on your staff did you speak with?
23       A.  I don't recall.  Probably my chief of staff.
24       Q.  Did you go directly to the agency and speak
25   with anyone?

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

61

1    **A. I don't think so.**
2    Q. Did you direct your staff to do so?
3       MR. D'ANDREA:  Legislative privilege.
4       You may answer under seal.
5    **A. I don't remember specifically.  I just remember**
6    **expressing myself that we should be doing better in**
7    **terms of wait times at driver's license offices,**
8    **especially in view of an appropriation that was made to**
9    **make them more efficient, to upgrade their technology.**
10   Q. (BY MR. DUNN)  And did you have any follow-up
11   from that conversation with your staff about your
12   experience?
13   **A. I have heard over time that there have been**
14   **improvements, but I'm not -- not aware.**
15   Q. And I appreciate that.  Thank you for that
16   answer.  But did your staff come back to you and say,
17   "We met with this agency, and here's what's happening"
18   to respond --
19   **A. I think --**
20      MR. D'ANDREA:  Legislative privilege.
21      You may answer under seal.
22   **A. I think they have talked to the agency about**
23   **it.**
24   Q. (BY MR. DUNN)  And then your staff would report
25   back to you?

62

1    **A. Generally, yeah.**
2    Q. And again, you think it was the chief of staff
3    that handled that for you?
4    **A. I would assume so.  I don't recall.**
5    Q. And what is that person's name?
6    **A. Jesse Ancira.**
7    Q. All right.  I want to move on to the DPS
8    funding issue that you've alluded to.  But if it's
9    acceptable to you, I'd like to take a break.
10   **A. Sure.**
11      MR. DUNN:  All right.
12      (Recess from 10:10 a.m. to 10:24 a.m.)
13   Q. (BY MR. DUNN)  All right, Mr. Speaker, I think
14   I've got maybe another 30 or 45 minutes for myself, and
15   then I'll pass it off to these folks.
16   **A. Okay.**
17   Q. I know your time is valuable.
18      We were going to, before we went on break,
19   talk about the DPS funding issue.
20   **A. Uh-huh.**
21   Q. Can you recall what time period it came up that
22   the legislature started to consider giving DPS more
23   funding?
24   **A. It was in the -- I think it was the 2011 budget**
25   **appropriations bill.**

63

1    Q. Was that something driven by the appropriations
2    committee and the appropriations chair?
3    **A. It was driven -- as I recall, Senator Williams,**
4    **I think, was mainly involved with that.**
5    Q. I mean, it wasn't the case that the agency came
6    to you and you told appropriations, "Look, this is
7    something we need to find" --
8    **A. No, I did not.**
9    Q. Again, is this a process that, other than
10   presiding over the House generally, you weren't really
11   involved in?
12   **A. Not in a specific way, no.**
13   Q. Do you recall any conversations to the effect
14   of, you know, "We need to try to do something about
15   these lines at DPS because of the photo identification
16   requirement"?
17      MR. D'ANDREA:  Legislative privilege.
18      You many answer under seal.
19   **A. No, it was more a modernization of something**
20   **that had -- didn't look like it was keeping up with**
21   **current acceptable customer service metrics.**
22   Q. (BY MR. DUNN)  So from your point of view, were
23   the issues unrelated in terms of the DPS modernization
24   and the photo identification bill?
25      MR. D'ANDREA:  Legislative privilege.

64

1       You may answer under seal.
2    **A. Yeah, I hadn't really tied the two together.  I**
3    **just thought the driver's license offices ought to be**
4    **working more efficiently generally.**
5    Q. (BY MR. DUNN)  You mentioned metrics.  Had you
6    seen some data or metrics or measurements as to wait
7    times or which offices were more efficient, et cetera?
8    **A. I don't recall.  There was some talk about it,**
9    **but I don't remember what they were.**
10   Q. Was that information, to your knowledge, that
11   the legislature had requested either by resolution or
12   bill in the past?
13   **A. I don't remember.**
14   Q. And so I would assume it's also your answer you
15   don't know if such information exists?
16   **A. I -- I don't know, but I -- I can't -- it seems**
17   **to me that there was something developed.  Whether it**
18   **was before '11 or after '11, I'm not sure.**
19   Q. For example, with your experience in the south
20   side of San Antonio office, did you ask for, obtain or
21   receive metrics about that office's wait times?
22   **A. I did not.**
23   Q. And do you know whether the Department of
24   Public Safety was provided any additional funding to
25   deal with issues that relate to Senate Bill 14?

JOE STRAUS                                              6/23/2014
CONFIDENTIAL TRANSCRIPT

17 (Pages 65 to 68)

65

1       A.  I don't know whether there was any kind of
2   direct tie to that legislation or whether it was just to
3   modernize and upgrade their equipment and become more
4   efficient.
5       Q.  Do you remember if there was a fiscal impact
6   reported for Senate Bill 14?
7       A.  I remember a discussion about it, but I don't
8   remember what it was.
9       Q.  You don't know whether there was money
10  appropriated for Senate Bill 14?
11      A.  I don't -- I don't recall.  I know there was a
12  discussion about making allowances for those who did not
13  have a photo ID to obtain one at no cost to them.
14      Q.  This is the EIC, the election identification
15  certificate?
16      A.  I suppose so.
17      Q.  But do you recall any appropriation or
18  re-categorization of appropriated money that was to be
19  used for implementing Senate Bill 14?
20      A.  I don't.
21      Q.  Do you know whether the Department of Public
22  Safety has access to the statewide birth certificate
23  information?
24      A.  I don't.
25      Q.  Do you know whether that issue was debated as

66

1   part of the modernization of DPS?
2       A.  I don't recall.
3       Q.  Do you know whether any consideration was given
4   to issuing IDs at non-DPS offices?
5       A.  I don't remember.
6       Q.  All right.  And I would assume, then, you
7   similarly don't remember if there was any fiscal impact
8   to such ideas?
9       A.  That's correct.  I don't know.
10      Q.  I'm going to represent to you that over the
11  course of the handful of legislatures before 2011, photo
12  identification bills were considered by the legislature
13  and, that I've noted anyway, over time, those bills
14  became more restrictive from when they were first
15  proposed to when Senate Bill 14 was passed.  Do you have
16  any recollection of that?
17      A.  I don't, really.  I don't -- I haven't compared
18  one to another.
19      Q.  Now, I've noted also in the public history that
20  photo identification bills prior to 2011 were hotly
21  contested and they would get close to passing and then
22  one chamber or the other would get stalled up.  Is that
23  your basic recollection?
24      A.  Yes.
25      Q.  Do you know whether the purpose of creating the

67

1   special committee in the House was to prevent such
2   stalling --
3       MR. D'ANDREA:  Legislative privilege.
4       You may answer under seal.
5       Q.  (BY MR. DUNN) -- in 2011?
6       MR. D'ANDREA:  I'm sorry.
7       A.  No, I don't recall that being a reason.
8       Q.  (BY MR. DUNN)  Do you know why the photo
9   identification bills became more restrictive as it got
10  to 2011?
11      A.  I don't.
12      Q.  In the consideration of the 2011 Senate Bill 14
13  and other related identification measures, did you ever
14  receive any threats or talking to's by other government
15  officers about "Make sure this bill gets passed, or
16  else"?
17      MR. D'ANDREA:  Legislative privilege.
18      You may answer under seal.
19      A.  No.
20      Q.  (BY MR. DUNN)  Did you ever have somebody call
21  into question to you their support for you as Speaker
22  unless they saw photo identification measure pass?
23      MR. D'ANDREA:  Legislative privilege.
24      You may answer under seal.
25      A.  No, I don't recall that.

68

1       Q.  (BY MR. DUNN)  Initially Senate Bill 14 had to
2   be pre-cleared under the federal Voting Rights Act,
3   Section 5.  And the State sought preclearance through a
4   lawsuit in Washington, D.C.  Are you generally familiar
5   with that event or those series of events?
6       A.  Very generally.
7       Q.  I mean, you realize that happened?  That's all
8   I --
9       A.  Yes.
10      Q.  And ultimately the court that considered that
11  preclearance request issued a ruling denying
12  preclearance.  Are you aware of that?
13      A.  Generally, yeah.
14      Q.  Did you ever read that ruling?
15      A.  I did not.
16      Q.  I can tell you that the legal effect of that
17  ruling was to prevent Senate Bill 14 from being
18  implemented, at least initially.
19      MR. D'ANDREA:  Objection; mischaracterizes
20  the ruling.
21      Q.  (BY MR. DUNN)  And then the United States
22  Supreme Court issued an opinion called Shelby County vs.
23  Holder and found that the coverage formula for Section 5
24  didn't apply to Texas anymore.  Are you generally
25  familiar that that occurred?

JOE STRAUS                                                      6/23/2014
CONFIDENTIAL TRANSCRIPT

18 (Pages 69 to 72)

---

69

1    **A. Generally.**
2    Q. All right. Did you ever read the Shelby County
3    opinion?
4    **A. Did not.**
5    Q. So just to make sure I'm clear and I've got
6    this in the record without objection, you haven't read
7    the district court's ruling on preclearance for Senate
8    Bill 14?
9    **A. That's correct.**
10   Q. And you also haven't read the Shelby County
11   opinion?
12   **A. That's correct.**
13   Q. The Texas attorney general took the position
14   that once the Shelby County opinion was issued, that
15   Senate Bill 14 could be implemented, and he announced as
16   such. Do you recall that happening?
17   **A. Yes.**
18   Q. Were you consulted at all before that decision?
19   **A. No.**
20       MR. SCOTT: Objection; form.
21   Q. (BY MR. DUNN) Was there, in other words, any
22   contact with your office about "Preclearance is no
23   longer required. We can implement Senate Bill 14 if we
24   want to"?
25   **A. I'm sure there was contact with my office,**

---

70

1    yeah.
2    Q. Can you relay any of that to us?
3    **A. No.**
4    Q. Do you know what consideration, if any, was
5    made of the factual findings that the United States
6    District Court in D.C. found in the preclearance case
7    before implementation?
8    **A. No.**
9    Q. Do you know whether the district court opinion
10   on preclearance found that Senate Bill 14 would have a
11   disparate impact on minority citizens?
12       MR. D'ANDREA: Objection; assumes facts not
13   in evidence. Those findings have been vacated.
14   **A. What was the question?**
15   Q. (BY MR. DUNN) Do you know whether the district
16   court opinion in the preclearance action found that
17   Senate Bill 14 would have a disparate impact on minority
18   citizens?
19   **A. I don't know.**
20       MR. SCOTT: Same objection.
21   Q. (BY MR. DUNN) Do you know whether Senate
22   Bill -- or do you know whether the preclearance decision
23   in D.C., what it found as it pertains to the State's
24   ability to prove Senate Bill 14 was not passed with a
25   discriminatory intent?

---

71

1    **A. I don't.**
2    Q. I just want to ask you a little bit about
3    voting behavior. I assume you've done some analysis of
4    voter behavior in your district.
5    **A. Like what?**
6    Q. All right. Well, let's start with this. Do
7    you know the general racial makeup of the citizens in
8    your district?
9    **A. Not exactly, no.**
10   Q. Do you have some sense of it?
11   **A. Not -- not -- not that I would -- if you -- if**
12   **you gave it to me, I could say that it wouldn't surprise**
13   **me.**
14   Q. Okay. I don't have it with me --
15   **A. I don't have it with me either.**
16   Q. And I'm not trying to quiz you on it, but I
17   know that some members, for example, can say, "My
18   district's" --
19   **A. No, I don't know.**
20   Q. -- "80 percent Anglo, about, or 20 percent"
21   this.
22   **A. No, I don't know.**
23   Q. Okay. Have you ever analyzed whether the --
24   **A. I have known. I just don't recall what it is.**
25   Q. Sure. I mean, that's information you've looked

---

72

1    at in the past?
2    **A. Yes.**
3    Q. Have you ever looked at whether voting behavior
4    in your district is racially polarized?
5    **A. No, I haven't looked.**
6    Q. Have you looked at such information on voters
7    statewide?
8    **A. I'm sure I've read about it in articles.**
9    Q. What do you recall reading in articles?
10   **A. Generally it's the -- it's the coverage of the**
11   **percentage of minority votes for certain candidates.**
12   Q. And what's your sense of that coverage?
13   **A. How -- how well or not well certain Republicans**
14   **are doing in a certain cycle with minority voters. But**
15   **I don't -- I don't remember what those numbers are**
16   **either, frankly.**
17   Q. Well, and not focusing on exact numbers, but is
18   it your recollection that voters in Texas are racially
19   polarized, that, for example, blacks and Hispanics vote
20   for one party's nominee and a large number of Anglos
21   vote for another party's nominee, or is that something
22   you just don't know?
23   **A. I mean, I seem to have read about it, yeah. I**
24   **mean, I think that has been the case recently.**
25   Q. All right.

---

JOE STRAUS                                           6/23/2014
CONFIDENTIAL TRANSCRIPT

---

73

1    A. I think everybody's polarized.
2    Q. On everything?
3    A. Yeah.
4    Q. All right. What did you do to prepare for your
5  deposition today? You told me you spoke with some
6  lawyers at the attorney general's office. I don't want
7  you to get into that, okay? But other than that, did
8  you speak with anybody else?
9    A. No.
10   Q. Did you review any documents?
11   A. Only maybe a couple things that these gentlemen
12  may have shown me from -- I don't remember what they --
13  you know, nothing -- nothing -- "review" would be too
14  strong of a word.
15   Q. Okay. Can you recall any document that you
16  looked at?
17   A. No.
18   Q. Even what it was?
19   A. Give me a minute, I'll -- I'll remember
20  something they showed me, but I don't remember what they
21  were. Nothing that caught my attention.
22   Q. Did you --
23       THE WITNESS: Sorry, guys.
24   Q. (BY MR. DUNN) Did you review the text of
25  Senate Bill 14?

---

74

1    A. I did not.
2    Q. And I assume you didn't review the earlier
3  court decision that pertains to Senate Bill 14?
4    A. No, I did not.
5    Q. Did you review any of the rulings that the
6  judge presiding over this case has issued?
7    A. No.
8    Q. All right. Have I been courteous to you today?
9    A. Let me fill out your card. I'll give you a 10.
10   Q. Okay. Out of 100?
11       Thank you, Mr. Speaker. I appreciate your
12  time.
13   A. You bet.
14       EXAMINATION
15  BY MR. GEAR:
16   Q. Sir, my name is Bruce Gear. I'm with the
17  Department of Justice. I'm one of the attorneys
18  representing the United States. And just to start off,
19  I'd like to just go back over quickly the ground
20  rules --
21   A. Okay.
22   Q. -- of the deposition.
23   A. Uh-huh.
24   Q. I'll be asking the questions. You're going to
25  answer, and you've been answering using verbal

---

75

1  responses, and you understand you have to continue to do
2  that.
3       You also understand that you continue to be
4  under oath and that you're expected to give complete and
5  full answers, correct?
6    A. Yes.
7    Q. All right. So I guess I want to start where --
8  where we left off regarding the Texas v. Holder
9  decision. And I understand that you testified that you
10  did not read that decision, or you don't recall reading
11  that decision?
12   A. I'm sure I didn't read it.
13   Q. Was there -- at any point, was there any type
14  of briefing in the legislature regarding the Texas v.
15  Holder decision?
16       MR. D'ANDREA: Legislative privilege.
17       You may answer under seal.
18   A. My counsel may have discussed it with me, but I
19  don't -- I don't remember reading an analysis or a
20  legislative analysis, no.
21   Q. (BY MR. GEAR) Well, and more -- more
22  specifically, I'm trying to understand as -- the
23  legislature as a whole, the House, was there ever a time
24  where the subject of Texas v. Holder was discussed in --
25  in the House?

---

76

1    A. I don't recall.
2    Q. Did you or your staff have any discussions with
3  the lieutenant governor following the Texas v. Holder
4  decision?
5       MR. D'ANDREA: Legislative privilege.
6       You may answer under seal.
7    A. I don't recall having one. My office may have.
8  I don't know.
9    Q. (BY MR. GEAR) Do you recall who may have been
10  involved in that meeting?
11   A. I'm not sure there was one. But I would assume
12  if there was, it would be my -- either my chief of staff
13  or my counsel here, Mr. Battle.
14   Q. So during the implementation of SB14, did you
15  or your staff play any role in the implementation of
16  SB14?
17   A. Not that I'm aware of, no.
18   Q. Were you asked to play any particular role
19  during the implementation of SB14, as speaker?
20   A. Not that I recall, no.
21   Q. Have you received any updates from any agency
22  regarding the implementation of SB14?
23   A. Not to my knowledge.
24   Q. And when I say "updates," I'm talking about
25  written documentation discussing the progress of

---

JOE STRAUS                                                      6/23/2014
CONFIDENTIAL TRANSCRIPT

---

77

1  implementation.
2      **A. Not to me directly, no.**
3      Q. Are you aware who, if anyone, would have
4  received such updates in the House?
5      **A. No, I don't know.**
6      Q. Are you aware of whether or not the Secretary
7  of State's office engaged in any analysis regarding the
8  impact of SB14 on minority voters since the
9  implementation of SB14?
10     **A. I'm not aware.**
11     Q. Are you aware of whether the legislators who
12 supported SB14 have made any attempt to assess the
13 impact of SB14 on minority voters?
14     **A. I don't know.**
15     Q. Are you aware of any agency in the -- in the
16 state that has attempted to assess the impact of SB14 on
17 minority voters?
18     **A. I'm not aware.**
19     Q. All right. And just to round that circle, are
20 you aware of any analysis whatsoever since the
21 implementation of SB14 to determine the impact of SB14
22 on voters generally?
23     **A. I don't know.**
24     Q. Do you know any -- whether there are any state
25 agencies that have attempted to determine the number of

---

78

1  provisional ballots that have been cast based on the
2  provisions of SB14?
3      **A. Say the question again.**
4      Q. Do you -- do you know if there are any agencies
5  that have attempted to determine the number of
6  provisional ballots that have been cast based on the
7  provisions of SB14?
8      **A. I don't know.**
9          MR. GEAR:  Could I have this marked,
10 please?
11         (Straus Exhibit No. 1 was marked.)
12     Q. (BY MR. GEAR) While the sticker covers it up,
13 this was previously marked as U.S. Exhibit 470, and I
14 believe the --
15     **A. My last name just has one s on the end.  It
16 happens all the time.  That's a Democrat spelling.**
17     Q. She did it.
18         Anyway, the -- this was previously marked
19 as Exhibit -- U.S. Exhibit 470, and I would represent
20 that you provided testimony regarding this particular
21 document during your last deposition.  Do you recall
22 seeing this document?
23     **A. I do now, yes.**
24     Q. And for the record, this is a news article.
25 Can you describe the document for me?

---

79

1      **A. Describe it?**
2      Q. The title, the date.
3      **A. Oh, yeah.  San Antonio Express News, June 7,
4 2009.**
5      Q. And directing your attention to page 1, the
6  fourth paragraph, I believe, do you see where it says,
7  "The issue of ballot security is important, but the way
8  the Senate behaved at the first opportunity did nothing
9  to help the House pass a responsible anti-voter fraud
10 bill"?
11         Do you see that?
12     **A. I see that, yes.**
13     Q. Can you explain to me what you -- and based on
14 your prior testimony --
15     **A. Uh-huh.**
16     Q. -- I believe you described that as an accurate
17 quote, correct?
18     **A. I don't always say that about the media --
19 about the press, but, yeah, I think probably it probably
20 was.**
21     Q. So based on your statement, can you explain to
22 me what you meant by "the way the Senate behaved at the
23 first opportunity"?
24         MR. D'ANDREA:  Legislative privilege.
25         You may answer under seal.

---

80

1      **A. I mean, I'm having a hard time remembering that
2 long ago now, but I think in 2009, there was some change
3 in the regular order of business of the Senate to bring
4 this bill up, and I think it -- it was -- I felt that it
5 was -- this comment was really related to the measures
6 taken in the Senate and timing related to other business
7 of the House.**
8      Q. (BY MR. GEAR)  So let's see if we can put some
9  context to the -- time period.  You said "to bring
10 this bill up."  Are you referring to Senator Fraser's
11 bill?
12     **A. I'm trying to remember.  I don't remember whose
13 bill it was or what it was.  I think what I was probably
14 referring to was that the 140 days we have in the
15 legislature and when bills move and so forth, and I
16 think it was just the whole atmospherics of House and
17 Senate.**
18     Q. Is it fair to say that in 2009, the Senate
19 introduced a voter photo identification legislation?
20     **A. Did they?**
21     Q. Did they?
22     **A. Yes.**
23     Q. And do you recall if -- do you recall the
24 number of that particular piece of legislation?
25     **A. I don't.**

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

81

1    Q. If I was to represent to you that it was Senate
2  Bill 362, would that help refresh your recollection?
3    A. No.
4    Q. Do you recall who the author of that bill was?
5    A. You mentioned Fraser, so I guess I vaguely
6  remember he was the author.
7    Q. Am I correct or do you recall that the Senate
8  modified the two-thirds-of-consent requirement to bring
9  Senator Fraser's bill to the Senate forum?
10      MR. D'ANDREA: Objection; that
11 mischaracterizes the rule.
12   Q. (BY MR. GEAR) You can answer.
13      MR. D'ANDREA: Yes, please.
14   A. Yeah, I vaguely recall that, yeah.
15   Q. And that change was in -- made in 2009.  Am I
16 correct?
17   A. I -- yeah. Yes.
18   Q. And do you recall if the change to the
19 two-thirds rule was a subject matter specific to Senator
20 Fraser's bill?
21   A. I assume so, yes.  As I remember at this point,
22 yes.
23   Q. So, now, turning back to what's now been marked
24 as Exhibit 1 --
25   A. Uh-huh.

82

1    Q. -- the news article, "The issue of ballot
2  security is important, but the way the Senate behaved at
3  the first opportunity," did our discussion at all help
4  refresh your recollection as to what was going on during
5  that time period?
6       MR. D'ANDREA: Legislative privilege.
7       You may answer under seal.
8    A. Yeah, a little bit.  I think it was -- as I
9  recall, my comments were really regarding the ability of
10 the House to pass legislation, and I think the House and
11 the Senate, as is not unusual, had different views about
12 which body should act and when and how we relate to one
13 another.
14   Q. (BY MR. GEAR) You also indicate in your -- in
15 your quote that they did nothing to help pass a
16 responsible antifraud -- anti-voter fraud bill.  Can you
17 explain what you meant by that?
18      MR. D'ANDREA: Legislative privilege.
19      You may answer under seal.
20   A. Yeah, I don't remember exactly at this point,
21 but -- I don't remember exactly what it was.
22   Q. (BY MR. GEAR) Was there some type of
23 disagreement between the House and the Senate as to what
24 type of voter photo identification legislation should be
25 advanced?

83

1       MR. D'ANDREA: Also privileged.
2    A. Well, I don't know that we were that
3  coordinated, but I did -- I do recall that -- that the
4  House, in 2009, was a very closely divided House with --
5  on a partisan basis.
6       And as I remember, the Senate was acting on
7  its own and on its own time frame, and the House was
8  a -- was a, you know, difficult, close body to manage.
9  And I think that's what these comments were related to.
10   Q. (BY MR. GEAR) And to finish this quote, you
11 ended with, "It's become all politics."  Can you explain
12 that?
13      MR. D'ANDREA: Also privileged.
14   A. No, I can't.
15   Q. (BY MR. GEAR) Turning your attention to
16 page 2, the third paragraph, you're also quoted as
17 saying, "Everything would have been wonderful, but it
18 wasn't my choice to deal with it this way . . . we
19 had" -- strike that -- "but it wasn't my choice to deal
20 with it the way we had to with the temperature turned up
21 as much as it was.  That was the Lieutenant Governor
22 David Dewhurst's decision."
23      Do you see where it says that?
24   A. I see that, yes.
25   Q. What decision did the lieutenant governor make

84

1  regarding voter photo ID legislation?
2       MR. D'ANDREA: Legislative privilege.
3       You may answer under seal.
4    A. I don't recall what it was.
5    Q. (BY MR. GEAR) Does the lieutenant governor
6  control the legislative calendar?
7    A. Yes.
8    Q. Do you recall if he made a decision regarding
9  the legislative calendar in 2009 as it relates to voter
10 photo identification?
11   A. I recall that -- I don't remember the
12 specifics, but I do think they -- that they brought --
13 yes, I think he -- I think what I was talking about was,
14 this was not making -- some of their procedures over
15 there was not making it easier for a closely divided
16 House to deal with matters such as this.
17   Q. And "the procedures over there," you're
18 referring to the Senate?
19   A. (Nodding head affirmatively.)
20   Q. And what procedures specifically were you
21 concerned with?
22   A. I don't remember.  I don't remember anymore.
23   Q. Is it fair to say that the procedures that you
24 were concerned about were deviations from the normal
25 procedures that are followed in the Senate?

JOE STRAUS                                               6/23/2014
CONFIDENTIAL TRANSCRIPT

---

85

1      A. I don't -- I really don't recall.
2      Q. You go on to be quoted as saying, "While I'm
3  supportive of voter ID and ballot security, I thought it
4  was unwise for him to take the extraordinary measure
5  that he did to get it to this place."
6          Did I read that correctly?
7      A. I suppose so, yes.  I mean, you read the
8  article correctly, yes.
9      Q. And do you believe that this is an accurate
10 quote?
11     A. I believe it is.  This was what was to be an
12 off-the-record discussion with the reporter.
13     Q. That turned into --
14     A. Turned out not to be, yes.
15     Q. When you say "unwise for him," are you
16 referring to David Dewhurst?
17     A. I suppose --
18         MR. D'ANDREA:  Legislative privilege.
19         You can answer under seal.
20     A. I suppose so.
21     Q. (BY MR. GEAR)  And when you're referring to
22 "the extraordinary measure that he did to get it to this
23 place," you're referring to voter photo ID legislation?
24         MR. D'ANDREA:  Also privileged.
25     A. I suppose so.

---

86

1      Q. (BY MR. GEAR)  That's a yes?
2      A. Yeah, it is.  Yeah.
3      Q. And when you're referring to "the extraordinary
4  measure," can you explain that for me?
5      A. I cannot.
6         MR. D'ANDREA:  Also privileged.
7      A. I cannot.
8      Q. (BY MR. GEAR)  So as you sit here today, you
9  don't recall what extraordinary measure --
10     A. I don't remember --
11     Q. -- that David Dewhurst took --
12     A. -- anymore.  I remember --
13         THE REPORTER:  I'm sorry.  Could you repeat
14 the question, please?
15     Q. (BY MR. GEAR)  I'm sorry.  That was my fault.
16         As you sit here today, you do not recall
17 the extraordinary measure that David Dewhurst took to
18 get the photo ID legislation in place?
19         MR. D'ANDREA:  Asked and answered.
20         MR. GEAR:  I believe we overspoke each
21 other, and the court reporter asked me to repeat the
22 question.
23         MR. D'ANDREA:  Well, I know.  I meant
24 before that.
25         MR. GEAR:  Sure.

---

87

1      A. I don't -- I don't recall anymore.
2      Q. (BY MR. GEAR)  Near the bottom of page 2, I
3  think it's the third paragraph up, it says, "Both sides
4  are taking a really hard position and exaggerating it
5  when you indicate both sides are taking a hard
6  position."
7          Can you tell me what sides you were
8  referring to?
9         MR. D'ANDREA:  Legislative privilege.
10         You may answer under seal.
11     A. I guess it was the -- the arguments that they
12 were making and the debate over the bill.
13     Q. (BY MR. GEAR)  And when you say "the arguments
14 that they were making," the quote goes on to say that
15 "Democrats exaggerate the danger of a more modest bill,
16 and Republicans exaggerate the depth of the problem that
17 needs to be addressed."
18         Do you see that?
19     A. I see that, yes.
20     Q. And do you -- again, do you believe that that's
21 an accurate quote?
22     A. I suppose so.  It was a long time ago and, I
23 thought, off the record, so I don't even remember making
24 it, but I don't have reason to believe it wasn't.
25     Q. So starting with the beginning of this quote,

---

88

1  what positions -- what hard positions do you believe
2  were being exaggerated when it came to Senator Fraser's
3  photo ID legislation?
4         MR. D'ANDREA:  Also privileged.
5      A. I do not recall.
6      Q. (BY MR. GEAR)  Do you recall what positions the
7  Democrats, as -- as it relates to your quote, what
8  positions they were taking and possibly exaggerating?
9      A. I don't.
10     Q. Do you recall what positions the Republicans
11 were exaggerating as it relates to photo ID legislation?
12     A. I don't.
13     Q. And more specifically, it indicates that
14 Republicans were exaggerating the depth of the problem
15 that needs to be addressed.  What problem needed to be
16 addressed with photo ID legislation, as you understand
17 it?
18     A. The issue of voter fraud.
19     Q. And specifically, is -- was that limited to
20 in-person voter fraud at the polling place?
21     A. Yes.
22     Q. And are you aware of whether -- and I'm going
23 to change the time period.  SB14, did that deal with
24 by-mail ballot fraud in any form or fashion?
25     A. I don't know.

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

23 (Pages 89 to 92)

---

89

1        (Straus Exhibit No. 2 was marked.)
2        Q. (BY MR. GEAR) So I'm showing you what's been
3    marked as Exhibit No. 2. And I'll give you a chance to
4    look at that.
5            MR. GEAR: And I would note for the record
6    that this is a highly confidential document and that I
7    understand how we're handling these.
8            MR. SCOTT: Which is that these and
9    following -- any questions regarding the highly
10   confidential document will automatically be kept under
11   seal, is my understanding.
12           MR. GEAR: Yes.
13           MR. SCOTT: Okay.
14       A. (Examines document.)
15           MR. D'ANDREA: Counsel, just to be clear,
16   this was redacted, right, the X marks?
17           MR. GEAR: Not by me.
18           MR. D'ANDREA: Okay.
19           MR. GEAR: I'll put it on the record.
20           MR. D'ANDREA: Okay.
21       Q. (BY MR. GEAR) So I've given you an opportunity
22   to look at Exhibit No. 2. Can you identify this for me?
23       A. How would I do that?
24       Q. What -- let's start with, what is it?
25       A. It's a letter.

---

90

1        Q. And it's prepared for your signature, correct?
2        A. That's correct.
3        Q. And --
4        A. It looks like it was to a constituent of a
5    member of the House. It was addressed to me, but a
6    constituent of another member.
7            MR. GEAR: And I would make a
8    representation that this appears to have come from
9    Speaker Straus' legislative files. Unfortunately, when
10   it printed, the numbers in the right-hand corner were
11   cut off.
12       Q. (BY MR. GEAR) Did you have -- make a habit of
13   drafting letters to respond to constituents during the
14   consideration of SB14?
15       A. Did I make a habit of?
16       Q. Drafting letters to respond to constituents
17   during the consideration of SB14.
18       A. I don't recall. I would assume so.
19       Q. And have you seen this particular draft
20   letter --
21       A. I don't remember.
22       Q. -- previously?
23       A. I don't remember.
24       Q. Do you approve draft letters that are sent to
25   constituents?

---

91

1        A. I don't know that I see every one of them.
2        Q. But do you make a habit of approving draft
3    letters that are sent out to constituents?
4        A. I try to.
5        Q. All right. And specifically, I just want to
6    turn your attention to paragraph 2.
7        A. Uh-huh.
8        Q. "The 82nd Legislature convened on January 11,
9    2011. To date, there has been no legislation filed to
10   address potential fraud related to mail-in ballots."
11           Do you see that?
12       A. I see that, yes.
13       Q. And is it fair to say that SB14 did not address
14   fraud related to mail-in ballots?
15       A. I don't recall what was in the bill.
16       Q. All right. But based upon your letter, does it
17   appear to represent that SB14 does not address potential
18   fraud related to mail-in ballots?
19       A. Based on this letter, yes.
20       Q. Now, staying along the -- along the line of
21   your discussions with constituents, did you communicate
22   with constituents during the consideration of SB14?
23       A. I don't remember.
24       Q. You certainly communicated with constituents
25   regarding SB14 and --

---

92

1        A. Yes.
2        Q. -- and the issue of by-mail ballot fraud,
3    correct?
4        A. Yes.
5        Q. Do you recall communicating with constituents
6    regarding concerns of noncitizens voting?
7        A. I don't recall.
8            (Straus Exhibit No. 3 was marked.)
9            MR. GEAR: Again, I would represent for the
10   record that this is a highly confidential document, that
11   it appears to have come from the legislative files of
12   Speaker Straus.
13       Q. (BY MR. GEAR) And I'll just give you a chance
14   to look at this.
15       A. (Examines document.) Okay.
16       Q. Does this help refresh your recollection as to
17   whether or not you communicated with your constituents
18   regarding noncitizens voting at the polls?
19       A. It appears I did, yes.
20       Q. And I'd direct your attention to -- actually,
21   strike that.
22           At the bottom of Exhibit No. 2 [sic], it
23   has a series of -- it has a file address. Do you see
24   that?
25       A. Down in the corner, right corner?

---

JOE STRAUS                                                6/23/2014
CONFIDENTIAL TRANSCRIPT

---

93

1    Q. At the very bottom.
2    **A. Yeah.**
3    Q. And it's the -- capitol/texas. And it shows,
4  reading through it, CMS/Email/2009-02-11.
5         MR. D'ANDREA: I'm sorry, counsel.
6    **A. Oh, here.**
7         **MR. D'ANDREA: I thought you said**
8  **Exhibit 2. I'm sorry.**
9    **A. Okay.**
10   Q. (BY MR. GEAR) Do you recognize this as coming
11 from your files?
12   **A. I don't know.**
13   Q. Can you tell me specifically what this document
14 is, referring to the first page?
15   **A. It's a response to someone who wrote about**
16 **voter ID and voter fraud.**
17   Q. And it's prepared for your signature, correct?
18   **A. Either that or it's an e-mail response.**
19   Q. Okay. So directing your attention to
20 paragraph 2 --
21   **A. Uh-huh.**
22   Q. -- it says, "As you are aware, state and
23 federal law both require all voters to be citizens, but
24 current law requires no photo identification or proof of
25 citizenship when registering to vote or when voting. I

---

94

1  agree that we need to revise our current Texas voting
2  laws to ensure that only U.S. citizens who are Texas
3  residents are voting in our Texas elections."
4         Do you see that?
5    **A. I do, yes.**
6    Q. Is it fair to say that you received
7  communication from your constituents regarding concerns
8  that noncitizens were voting at the polls?
9         MR. D'ANDREA: Legislative privilege.
10        You may answer under seal.
11   **A. I don't recall what the communication was that**
12 **they were writing about, but I would assume that was --**
13 **I would assume that's correct.**
14   Q. (BY MR. GEAR) And when you say you "agree that
15 we need to revise our current Texas voting laws to
16 ensure that only U.S. citizens who are Texas residents
17 are voting in our Texas elections," what are you basing
18 that -- that position on?
19   **A. I'm guessing that it was the no photo**
20 **identification.**
21   Q. Did you have any research or analysis that
22 would suggest that noncitizens were actually voting at
23 the polls in Texas?
24   **A. Not that I recall.**
25   Q. Did you convene any committees to determine if

---

95

1  noncitizens were voting at the polls in Texas?
2    **A. That may have been -- that may have been**
3  **subject to a hearing of a committee, but I don't recall.**
4    Q. Do you recall what the results or the findings
5  of that committee may have been?
6    **A. No.**
7    Q. Do you recall if -- during the course of
8  consideration for voter photo ID legislation, that the
9  topic of noncitizens voting came up during public
10 debate?
11   **A. I imagine it did. I don't recall specifically.**
12   Q. Do you recall if legislators who supported the
13 bill raised the concern that noncitizens may be voting
14 at the polls?
15        MR. D'ANDREA: Legislative privilege.
16        You may answer under seal.
17   **A. I vaguely recall that, sure. I think it's been**
18 **part of the debate.**
19   Q. (BY MR. GEAR) And do you recall if there was
20 also private discussion regarding noncitizens possibly
21 voting at the polls?
22        MR. D'ANDREA: Also privileged.
23   **A. I don't recall.**
24        **(Straus Exhibit No. 4 was marked.)**
25   Q. (BY MR. GEAR) I'm showing you what's been

---

96

1  marked as Exhibit No. 3, I believe. And I'll give you a
2  chance to --
3         THE REPORTER: 4.
4    Q. (BY MR. GEAR) 4. And I'll give you a chance
5  to look at that.
6         MR. GEAR: Thank you.
7    **A. (Examines document.)**
8    Q. (BY MR. GEAR) Just let me know when you've had
9  a chance to review it.
10   **A. (Examines document.) Okay.**
11   Q. Can you identify what this document is for me,
12 please?
13   **A. It looks like a press release from Senator**
14 **Fraser.**
15   Q. And do you recognize this to be an official
16 press release from his office?
17   **A. It appears to be, yes.**
18   Q. And directing your attention to paragraph 4
19 where it indicates, "I want to ensure that illegal
20 aliens, noncitizens" and other -- "and people otherwise
21 not qualified do not dilute the legitimate votes cast by
22 citizens."
23        Do you see where it says that?
24   **A. Yes, I do.**
25   Q. And not to ask you for the truth of the matter

---

JOE STRAUS                                                      6/23/2014
CONFIDENTIAL TRANSCRIPT

25 (Pages 97 to 100)

---

97

1  asserted, but do you recall discussions similar to this
2  taking place during debate regarding photo ID
3  legislation?
4      **A. Not specifically, but I would imagine they did.**
5      Q. Do you recall ever responding to allegations
6  that noncitizens may be voting at the polls?
7          MR. D'ANDREA: Legislative privilege.
8          You may answer under seal.
9      **A. No, I don't recall.**
10     Q. (BY MR. GEAR) Do you have an opinion as to
11 whether or not noncitizens may have been voting at the
12 polls?
13     **A. An opinion?**
14     Q. An opinion, yes.
15     **A. No.**
16     Q. And are you aware of any -- other than the
17 committee that may have convened to look at the issue,
18 are you aware of any other communications with any of
19 the other legislators regarding this issue of
20 noncitizens voting at the polls?
21         MR. D'ANDREA: Also privileged.
22     **A. No.**
23     Q. (BY MR. GEAR) You may have been asked this
24 previously by Attorney Dunn. Do you recall one of the
25 issues being raised during the public debate that photo

---

98

1  ID legislation may result in the disenfranchisement of
2  minority voters?
3      **A. Yes.**
4      Q. And did you publicly respond to that concern in
5  any way?
6      **A. I don't recall.**
7      Q. Did you convene any committees that would have
8  reviewed that issue in any detail?
9      **A. Not that I remember, no.**
10     Q. Are you aware of any committees being convened
11 that did, in fact, look at the issue of whether or not
12 voter photo identification would -- requirements would
13 result in the disenfranchisement of minority voters?
14     **A. No.**
15     Q. Do you recall receiving communications from
16 constituents regarding their concern that photo ID
17 legislation would result in the disenfranchisement of
18 minority voters?
19         MR. D'ANDREA: Legislative privilege.
20         You may answer under seal.
21     **A. I don't recall.**
22     Q. (BY MR. GEAR) And so as you sit here today,
23 are you aware of any analysis that was conducted in the
24 House that reviewed the issue of voter photo ID
25 legislation and its impact on minority voters?

---

99

1      **A. I'm not aware.**
2      Q. You talked a bit about the process how a bill
3  comes from the Senate to the -- to the House. I don't
4  completely understand that process. But other than the
5  bill itself, is there any other material that comes
6  along with the -- the transfer of -- of the bill? Does
7  that make sense?
8      **A. It makes sense, but I'm not sure. I'm not sure
9  what comes with a -- with a bill. I don't see anything.**
10     Q. So is the bill actually transferred
11 electronically? Is it --
12     **A. I don't know.**
13     Q. -- walked across to the House? I mean, I don't
14 know. Generally.
15     **A. I believe so, yeah. They're -- they're brought
16 to us.**
17     Q. Physically? Okay.
18     **A. I think so.**
19     Q. Regarding SB14 specifically, when you receive
20 the bill in the House, does that also include the
21 analysis that may have been conducted?
22     **A. When we receive it? I really don't know. I
23 never -- I never look at the physical bills when they
24 come. You'd have to ask the clerk or others that handle
25 that. I don't know.**

---

100

1      Q. Based on your knowledge --
2      **A. Uh-huh.**
3      Q. -- are you aware of whether any analysis
4  related to SB14 was -- was sent from the Senate to the
5  House along with the bill?
6      **A. I don't know.**
7      Q. And as you sit here today, do you recall
8  reviewing any analysis that was conducted at the Senate
9  level regarding SB14?
10     **A. I don't recall.**
11     Q. Who is Meredith Fowler?
12     **A. She's a member of the Speaker staff.**
13     Q. Your staff?
14     **A. Yes.**
15     Q. Okay. And did she assist you in -- in
16 reviewing SB14 during your consideration of the bill?
17     **A. I imagine she did, yes.**
18     Q. What --
19     **A. It would have been in her portfolio.**
20     Q. I'm sorry. I missed the last part.
21     **A. I said it would have been an issue in her
22 portfolio, yes.**
23     Q. And if you recall, do you ask -- do you recall
24 asking her to conduct any particular tasks regarding
25 analyzing SB14?

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

---

101

1    **A. No.**
2    Q. Do you recall receiving any written analysis
3    from Ms. Fowler regarding SB14?
4         MR. D'ANDREA: Legislative privilege.
5         You may answer under seal.
6         I'd also like to caution that Ms. Fowler's
7    a lawyer. So to the extent that this is -- to the
8    extent her portfolio involves policy discussions, you
9    may answer that under seal subject to the legislative
10   privilege. But to the extent she's giving you legal
11   advice, that's attorney/client protected. It sounds
12   like we're still in policy land. So I think you can
13   answer this under seal.
14   **A. The question?**
15   Q. (BY MR. GEAR) Do you recall receiving any
16   analysis from Attorney Fowler regarding --
17   **A. I don't.**
18   Q. -- SB14?
19   **A. I do not.**
20        **(Straus Exhibit No. 5 was marked.)**
21   Q. (BY MR. GEAR) I'm handing you what's been
22   marked as Exhibit No. 5.
23        MR. GEAR: And I will, again, represent
24   that this is identified as a highly confidential
25   document which appears to have come from the legislative

---

102

1    files of Speaker Straus.
2    **A. Uh-huh.**
3    Q. (BY MR. GEAR) And I'd direct your attention to
4    page 2 --
5         MR. GEAR: You can have a copy.
6         MR. SCOTT: Thanks, Bruce.
7    Q. (BY MR. GEAR) -- at the bottom. And before we
8    get into this document, have you seen this document
9    before?
10   **A. I don't recall, but I could -- could well have,**
11   **probably did.**
12   Q. Do you see where it says, "as described
13   above" -- sorry. Strike that.
14        It's titled Elections. "Voter ID" --
15   **A. Uh-huh.**
16   Q. -- "as described above will be a big issue.
17   However, with Republicans' super majority, I anticipate
18   legislation passing this time."
19        Do you see that?
20   **A. Yes, I do see it.**
21   Q. And this is referring to voter photo ID
22   legislation?
23   **A. Yes.**
24   Q. "I think a straight photo ID requirement is the
25   likely type of legislation that will pass this session."

---

103

1         Do you recall the discussions with your
2    staff regarding the type of photo ID legislation that
3    was likely to pass in 2011?
4         MR. D'ANDREA: Legislative privilege.
5         You may answer under seal.
6    **A. I don't recall.**
7    Q. (BY MR. GEAR) Can you -- can you tell me, if
8    you recall, why there was an opinion that a straight
9    photo ID requirement would likely pass during the -- a
10   straight photo ID legislation would likely pass?
11        MR. D'ANDREA: Privileged and calls for
12   speculation.
13   **A. I don't -- I don't know. And I'm not even sure**
14   **I know what a straight photo ID -- I don't know what**
15   **that means.**
16   Q. (BY MR. GEAR) Would you consider SB14 a
17   straight photo ID legislation?
18   **A. It's a photo ID, yes. I'm not sure what the --**
19   **yeah. Okay, yes.**
20   Q. So on the flip side, would you consider Senator
21   Fraser's previous 2009 bill as a non -- strike that.
22        Senator Fraser's photo ID bill allowed both
23   photo and non-photo ID, correct?
24   **A. I think so.**
25   Q. And would you have considered that to be a

---

104

1    moderate bill?
2    **A. Compared to this, to one that requires only a**
3    **photo ID?**
4    Q. Yes.
5    **A. Yes.**
6    Q. So would you agree that SB14, as passed, was
7    more stringent than prior photo ID legislation that was
8    proposed in both the Senate and the House?
9    **A. I think that's correct.**
10   Q. Have you ever heard discussion that SB14, as
11   passed, was one of the most stringent bills in the
12   country?
13   **A. I've heard it described that way, yes.**
14   Q. And do you agree with that position?
15   **A. I -- I don't know.**
16   Q. And when you say you heard it described, you've
17   heard it described by the legislators?
18        MR. D'ANDREA: Privileged.
19        You may answer under seal.
20   **A. It seems that I have. I mean, I've seen it**
21   **written about that way.**
22   Q. (BY MR. GEAR) Do you -- do you know why --
23   from the 2009 bill to SB14, what -- the reason for
24   reducing the types of allowable ID? Do you know the
25   reason for that?

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

---

105

1        MR. D'ANDREA:  Also privileged.
2     **A. I don't.**
3     Q. (BY MR. GEAR)  Were you involved in any
4  communications regarding the types of ID that -- that
5  would only be allowed in SB14?
6        MR. D'ANDREA:  Also privileged.
7     **A. I don't remember.**
8     Q. (BY MR. GEAR)  Did you receive any type of
9  written documentation identifying the types of ID that
10  would only be allowed in SB14?
11        MR. D'ANDREA:  The same assertion of
12  privilege.
13     **A. I don't recall.**
14     Q. (BY MR. GEAR)  So as you sit here today, is it
15  fair to say you have no idea or you don't recall, more
16  fair to the representation, why certain types of ID were
17  included in SB14 and others were not?
18        MR. D'ANDREA:  Privileged.
19     **A. I'm sorry.  I don't recall.**
20     Q. (BY MR. GEAR)  Do you recall discussion during
21  the consideration of SB14 that certain types of photo
22  and non-photo ID may be in the possession of
23  noncitizens?
24        MR. D'ANDREA:  Privileged.
25     **A. So what's the question again?**

---

106

1     Q. (BY MR. GEAR)  Do you recall during the
2  consideration of SB14 that certain types of ID would not
3  be allowed because they may be in the possession of
4  noncitizens who may --
5     **A. No.**
6     Q. -- be voting at the polls?
7     **A. No, I don't recall.**
8     Q. Was there an intent in the legislature to make
9  SB14 more stringent than other photo ID legislation that
10  was proposed previously?
11        MR. D'ANDREA:  Privileged and calls for
12  speculation that the legislature is a they, not an it.
13     Q. (BY MR. GEAR)  Well, it or they.  You can
14  answer.
15     **A. You'd have to talk to the bill author.  I don't**
16  **know.**
17     Q. When reviewing Exhibit No. 5 --
18     **A. Uh-huh.**
19     Q. -- and looking at the language "straight photo
20  ID requirement" --
21     **A. Uh-huh.**
22     Q. -- what do you think that meant?
23     **A. I guess after our discussion here, in comparing**
24  **it to other bills, it's -- it's a voter -- it's an ID**
25  **requirement for a photo ID.**

---

107

1     Q. Only?
2     **A. Yes.**
3     Q. Why was that important, if you know, to pass a
4  photo ID legislation that only allowed for photo ID?
5     **A. I don't know.**
6     Q. In 2009, the photo ID legislation offered
7  ID and non-photo ID.  Do you have an opinion as to
8  whether that was sufficient to prove a voter's ID at the
9  polling place?
10     **A. An opinion?**
11     Q. Yes.
12     **A. I would -- I would think that the photo ID**
13  **would be more proof.**
14     Q. And why is that?  What are you basing that --
15  that on?
16     **A. The -- the visual proof.**
17     Q. And when you say "the visual proof," can you
18  explain that a little bit more?  I'm not sure I
19  understand what that is.
20     **A. Well, a photograph of the person.**
21     Q. So you testified previously that when you vote
22  at the polls, you take your voter registration card.  Is
23  a voter registration card sufficient to prove someone's
24  identity at the polls?
25     **A. It has been until --**

---

108

1     Q. The passage --
2     **A. -- now.**
3     Q. "Now" meaning the passage of SB14?
4     **A. That's correct, yeah.**
5     Q. Before I get into my questions, do you need to
6  take a break at all, or are you --
7     **A. I could -- I could take a --**
8     Q. Sure.
9     **A. -- very short one.**
10        MR. GEAR:  Yeah, why don't we do that.
11        (Recess from 11:30 a.m. to 11:41 a.m.)
12        (Straus Exhibit No. 6 was marked.)
13     Q. (BY MR. GEAR)  So I've handed you what's been
14  marked as Exhibit No. 6, and I'll give you a chance to
15  look at that.
16        MR. GEAR:  And again, I'll represent that
17  this is a highly confidential document that appears to
18  have come from the -- well, a highly confidential
19  document.
20     **A. (Examines document.)**
21        **MR. D'ANDREA:  Counsel, I don't know who it**
22  **comes from, but one of the -- that -- especially that**
23  **first paragraph, the last sentence of it, starts to feel**
24  **like legal advice.**
25        MR. GEAR:  The first paragraph, last

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

---

109

1  sentence?
2          MR. D'ANDREA: ". . . Supreme Court's
3  approval of Indiana's photo ID law and the DOJ's
4  approval" --
5          THE REPORTER: I'm sorry. Can you slow
6  down, please?
7          MR. D'ANDREA: I'm sorry.
8          ". . . likely to be upheld under both
9  constitutional review and Section 5 Voting Act Review,"
10  it looks like it could be attorney/client communication.
11  I can't tell who it came from or who it's to.
12          MR. GEAR: And unfortunately, I don't know
13  either.
14          MR. D'ANDREA: I know. I mean, it --
15          MR. GEAR: Well, I guess the question is,
16  how do you want to proceed on this particular document?
17          MR. SCOTT: Well, it's highly confidential,
18  so the whole line of questioning is all going to be
19  under seal anyway. So subject to that, I think --
20          Arthur, it's you-all's call whether you
21  want to go --
22          MR. D'ANDREA: Yeah, typically we have --
23  we have instructed not to answer for attorney/client,
24  but as long as you will not construe it as a waiver of
25  all other attorney/client communication, then I'm happy

---

110

1  to proceed under seal.
2          MR. GEAR: I will agree.
3          MR. D'ANDREA: Thank you.
4     Q. (BY MR. GEAR) So for the record, let's just
5  make this clear. You're looking at Exhibit No. 6, which
6  is identified as "Voter ID Bill Summary SB14 (82R
7  engrossed.)"
8          Have you seen this document before?
9     A. I don't recall seeing it.
10     Q. Can you tell me what this document is?
11     A. It's a voter ID bill summary.
12     Q. And is this something that you would usually
13  receive or review in your course of regular business?
14     A. I wouldn't say -- I wouldn't -- it's possible.
15     Q. Do you know who prepares bill summaries?
16     A. No. On this, I would think Meredith Fowler
17  would if this came -- is this -- this is from my office?
18     Q. I don't want to make that representation. Do
19  you --
20     A. Yeah.
21     Q. -- recognize this as coming from your office?
22     A. I don't. But it certainly could be.
23     Q. Is it possible that this was prepared by
24  Meredith Fowler as your --
25     A. I would -- I would think it would be possible.

---

111

1     Q. Do you see at the top where it says, "SB14
2  would give Texas arguably the strictest photo ID law in
3  the country"?
4     A. I do.
5     Q. And again, is it your understanding that SB14
6  was arguably the strictest photo ID law in the country?
7     A. Is it my understanding? Yes.
8     Q. And just running through the middle of the page
9  quickly, Substantive Provisions, "A voter must present
10  an acceptable photo ID on election day."
11          Do you see where it says that?
12     A. No. Where is it?
13     Q. The middle of the page --
14     A. Oh, yes.
15     Q. -- the first page.
16     A. Yes, uh-huh. Yep.
17     Q. Is it your understanding that SB14, under the
18  provisions of SB14, a Texas driver's license cannot be
19  expired more than 60 days?
20     A. Yes.
21     Q. And that an ID card issued by DPS cannot be
22  expired more than 60 days?
23     A. Yes.
24     Q. Do you have any understanding of what type of
25  military IDs are allowed under SB14?

---

112

1     A. I do not.
2     Q. Do you -- are you familiar with the provisions
3  of SB14 as it applies to passports?
4     A. No.
5     Q. Do you know what type of U.S. citizenship
6  documents are allowed under SB14?
7     A. I don't.
8     Q. And a CHL -- do you know what a CHL is?
9     A. Yes.
10     Q. And what is a CHL?
11     A. It's the concealed handgun license.
12     Q. Do you know what the provisions of SB14 say
13  related to a handgun license?
14     A. I think they're allowed as a form of photo ID.
15     Q. And is it your understanding that they cannot
16  be expired more than 60 days?
17     A. That's what this says, yes.
18     Q. Now, here, it -- below that, it talks about
19  Exception 1, "A voter who is 70 years or older on
20  January 1st, 2012, need only present a voter
21  registration card on election day."
22          Do you see that?
23     A. Yes.
24     Q. Is that your understanding of what SB14 allows?
25     A. Yes.

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

---

113

1    Q. Exception No. 2, "A voter who is disabled and
2  has provided a physician certification of the" need --
3  did I read that right?  Strike that.
4         Exception No. 2, "A voter who is disabled
5  and has provided a physician certification of the
6  disability to the registrar and received a registration
7  card marked 'Photo ID not required' need only present
8  the registration card on election day."
9         Do you know, as you sit here today, whether
10 or not a person is allowed to present a physician
11 certification to qualify under the provisions of SB14?
12   **A. I don't know.  I'm just reading from the**
13 **summary, but I would assume that's the case.**
14   Q. Do you know -- if I represented to you that a
15 physician certification was removed from the language of
16 SB14, would that help refresh your recollection?
17   **A. I don't have a recollection of it.**
18   Q. Were you involved in any communications
19 regarding disability exemptions related to SB14?
20   **A. I was not.**
21   Q. Were you involved in any communications related
22 to indigency and SB14?
23   **A. No.**
24   Q. Do you know if the indigency provisions remain
25 or were removed from SB14?

---

114

1    **A. I don't recall.**
2    Q. Are you familiar with the provisions of SB14 as
3  it relates to substantially similar names?
4    **A. No, I'm not.**
5    Q. Are you aware of any communications with either
6  your staff or other legislators related to the issue of
7  substantially similar names?
8    **A. I'm not.**
9    Q. Are you familiar or do you know what the
10 criminal penalties were related to voter fraud prior to
11 the implementation of SB14?
12   **A. I don't recall.**
13        MR. GEAR:  I believe at this point, I'll
14 pass the witness.
15        EXAMINATION
16 BY MR. SHORDT:
17   Q. Speaker, for the record, I'm Richard Shordt.
18 I'm representing Texas League of Young Voters Education
19 Fund group.  With me is Zoe Jones, a summer associate at
20 our firm WilmerHale.
21        I want to go back a couple hours ago in the
22 deposition, if you remember that far.  Mr. Dunn asked
23 you a few questions about the use of various IDs
24 pertaining to voting and confirming identification at
25 the poles.  And earlier in response to a question about

---

115

1  whether state employee IDs should be used, you responded
2  you're not sure why it would not be allowed.
3         Can you elaborate on why you think state
4  employee IDs should not be prohibited from being used to
5  confirm identification at the pole?
6    **A. Just my personal opinion.  I don't know why a**
7  **government ID would not be sufficient.**
8    Q. Is it fair to say that you think that Texas
9  agencies, for example, the Texas attorney general's
10 office, has sufficient procedures in place to ensure
11 that an ID is only given to a person whose picture is on
12 it?
13   **A. I would think so.**
14   Q. So you would have no problem if somebody from,
15 say, the Texas Department of Agriculture, went to a
16 pole, showed their state ID; that should be allowed for
17 an individual to prove their -- who they are?
18   **A. I would have no problem with that.**
19   Q. You also said you -- I believe you would have
20 no problem with a federal employee identification card
21 being used by an individual at the pole.  Is that
22 correct?
23   **A. I think I said that, yes.**
24   Q. So if, for instance, a U.S. attorney based here
25 in Austin or in Houston wanted to go vote and they used

---

116

1  their federal employee identification, that should be
2  sufficient for proving their identification at the pole?
3    **A. In my personal opinion.**
4    Q. Do you know why state employee IDs and federal
5  employ IDs are not allowed under SB14?
6         MR. D'ANDREA:  Objection; calls for
7  speculation.
8    **A. I do not know.**
9    Q. (BY MR. SHORDT)  Did you have any conversations
10 with any senators or representatives during the debate
11 over SB14 as to why federal or state employee IDs are
12 not allowed to be -- or are not included in SB14?
13        MR. D'ANDREA:  Legislative privilege.  The
14 witness may answer under seal.
15   **A. No, I did not.**
16        MR. SHORDT:  I take exception to the
17 question of whether -- or whether he has waived or not
18 waived that privilege.  He answered the questions
19 earlier, I thought, with respect to conversations.
20        MR. D'ANDREA:  The record will . . .
21   Q. (BY MR. SHORDT)  Now, you said also you would
22 not have a problem with student IDs with photos on it
23 from Texas universities or colleges being sufficient
24 identification for SB14 purposes.  Is that correct?
25   **A. I'm not an expert in ID accuracy or**

---

JOE STRAUS                                                            6/23/2014
CONFIDENTIAL TRANSCRIPT

---

117

1   verification, but I wouldn't see a problem.  I don't
2   know of a problem with that.
3        Q. So you don't know of student IDs ever being
4   used for fraudulent purposes for voting in any election
5   in Texas?
6        A. I'm not aware of that.
7        Q. Do you -- are you aware of any analysis that
8   has ever been undertaken to that effect?
9        A. I'm not.
10       Q. Are you aware that this was a talking point
11  used during debate on SB14 that student IDs could be
12  forged?  Do you recall any discussions on that point?
13       A. I don't recall that.
14          (Straus Exhibit No. 7 was marked.)
15       MR. SHORDT:  Is that Exhibit 7?
16       THE REPORTER:  7, yes.
17       MR. D'ANDREA:  I'd like to note for the
18  record this is marked highly confidential.
19       Q. (BY MR. SHORDT)  Can you please tell me -- have
20  you seen what has been marked as Exhibit 7?  And it is
21  highly confidential, as identified by Mr. D'Andrea.
22       A. It doesn't look familiar.  They may have shown
23  it to me, but I didn't read it.
24       Q. Do you know who prepared it?
25       A. No, I don't know.  Meredith, I assume.  But I

---

118

1   don't recognize the writing.
2        Q. Can you read the top line for me, please?
3        A. "New," and then in parentheses, "for Dem
4   support."
5        Q. You see Item No. 2 listed?
6        A. Uh-huh.
7        Q. It says "63.0101(a)(6)" --
8        A. Yes.
9        Q. -- "allows public or private," underlined,
10  "college ID cards"?
11       A. Yes.
12       Q. Did you have any conversations with democratic
13  representatives or senators who are seeking to gain
14  support for voter ID legislation by returning IDs that
15  are acceptable photo IDs for voting?
16       MR. D'ANDREA:  Privileged.
17       You may answer under seal.
18       A. No.
19       Q. (BY MR. SHORDT)  Do you know which Republicans
20  in the House or Senate may have floated the idea to
21  include public or private college ID cards to attract
22  democratic support --
23       THE REPORTER:  I'm sorry.
24       MR. SHORDT:  Sorry.
25       THE REPORTER:  The end of the question,

---

119

1   "public or private college ID cards to attract
2   democratic support" --
3        MR. SHORDT:  I'll ask the question again.
4   We'll move closer to you.
5        THE REPORTER:  Okay, great.
6        (Briefly off the record.)
7        Q. (BY MR. SHORDT)  I'll ask the question again.
8   Sorry.
9        Do you know if -- which Republican
10  senators, representatives may have floated the idea of
11  including student IDs in SB14 to attract their support
12  for the legislation?
13       A. I don't --
14       MR. D'ANDREA:  Privileged.
15       A. I don't know.
16       Q. (BY MR. SHORDT)  Do you know which Republican
17  legislators in the House or the Senate who may have been
18  particularly opposed to allowing photo IDs be included
19  in SB14?
20       MR. D'ANDREA:  Also privileged.
21       You may answer.
22       A. Ask it again.
23       Q. (BY MR. SHORDT)  Are there any Republicans on
24  the House or Senate side who may have been particularly
25  opposed to allowing student IDs be included in SB14?

---

120

1        A. I don't know.
2           (Straus Exhibit No. 8 was marked.)
3        THE REPORTER:  Number 8.
4        MR. D'ANDREA:  I'd like to note for the
5   record that this is also designated confidential.
6        MR. SHORDT:  This is Exhibit 8?
7        THE REPORTER:  Yes.
8        Q. (BY MR. SHORDT)  Speaker Straus, have you seen
9   this document, this confidential document that has been
10  labeled Exhibit 8 before?
11       A. Doesn't look familiar to me, no.
12       Q. Do you know who prepared it?
13       A. No, I don't.
14       Q. Do you recall during SB14 any debate on the
15  floor or in committee pertaining to whether or not
16  student IDs should be allowed to be included in SB14?
17       A. I don't recall.
18       Q. Did you have any discussions with
19  representatives about an amendment to SB14 offered on
20  the floor as to whether a student ID should be
21  permitted?
22       A. I don't recall having one, no.
23       MR. D'ANDREA:  Privileged before.
24       THE WITNESS:  Sorry.
25       MR. D'ANDREA:  No, that's fine.

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

---

121

1  Q. (BY MR. SHORDT)  Do you see where it states
2  that -- and this will be line -- sorry, the third
3  bullet -- "There is no assurance to the State that the
4  persons who process student IDs are capable of providing
5  the same type of security in issuing those IDs as the
6  state or federal government would be in the types
7  discussed in SB14"?
8      A. I see that, yes.
9      Q. Do you agree with that statement?
10     A. I don't know enough to agree or disagree.
11     Q. Earlier didn't you say, though, that you had no
12  problem with including student IDs?
13     A. Yeah, but also, I'm not an expert in security
14  of ID production.
15     Q. Did anybody -- or strike that.
16         Was there any discussion during SB14
17  debate, any analysis provided, any report provided
18  addressing the sufficiency of student ID preparation at
19  Texas colleges and universities?
20     A. I don't know.
21     Q. Did you ask for that?
22         MR. D'ANDREA:  Privileged.
23     A. I did not ask for it, no.
24     Q. (BY MR. SHORDT)  If you could look at bullet
25  No. 1.  Do you see where it says, "There is no

---

122

1  uniformity amongst Texas institutions of higher
2  education for making student IDs"?  Second bullet --
3  sub-bullet, I'm sorry, "Some do not have expiration
4  dates"?
5      A. Okay.  I see it, yes.
6      Q. Do you know why an expiration date of an ID
7  would prove or disprove that an individual in the
8  picture was not the person whose name was on the ID?
9      A. No.
10     Q. Do you know why -- why an individual -- do you
11  know why photo IDs, under SB14, must have an expiration
12  date?
13     A. I don't.
14     Q. If I can direct your attention to the fifth
15  bullet, blocked bullet.  It says, "Ease of forging
16  student IDs."  Are you aware of any analysis conducted
17  or reports provided on whether -- or on forging of
18  student IDs in Texas?
19     A. No.  I only have two daughters.  No, I don't --
20  I don't know.
21     Q. Hopefully they're not forging student IDs.
22     A. I hope not.
23     Q. Or any other IDs.
24     A. I hope not.
25     Q. Are you aware of any analysis or reports of

---

123

1  state drivers' licenses or state personal IDs with
2  respect to forging of them in Texas?
3      A. No, I'm not.
4      Q. And when I say that, during -- during debate on
5  SB14, there was no evidence presented to that effect?
6      A. I don't recall.
7      Q. The bullet above that states, "Students should
8  have the types of documents needed to procure a driver's
9  license or ID card for attending their institution."  A
10  sub-bullet, "Birth certificate, DL," which I believe is
11  driver's license, "social security card, etc."
12         Do you agree with this statement?
13     A. Do I agree with it?
14     Q. Correct.
15     A. I don't see -- for a student ID?
16     Q. Correct.
17     A. I don't -- I don't -- I don't see a problem
18  there.
19     Q. Was any evidence presented, any analysis
20  undertaken, to determine if Texas college students do in
21  fact have the necessary documents to prepare a driver's
22  license or ID card for attending an institution?
23     A. I don't recall.
24     Q. I direct your attention to the bullet that
25  reads, "Students are still eligible to vote absentee in

---

124

1  their home precinct."
2         Can a student vote absentee if their home
3  precinct is the same county where the university is
4  located?
5      A. Say that again.
6      Q. Can a student vote absentee ballot if their
7  home precinct or home district is in the county where
8  the university is located?
9      A. I don't know.  I don't know why not.
10     Q. Can a student -- can an individual who is in
11  the county on the day of an election vote absentee
12  ballot?
13     A. Oh, oh, oh.
14     Q. Sorry.  Let me rephrase the first question.
15     A. Give me an example, yeah.
16     Q. So let's assume that a student is from Travis
17  County and attends U.T.
18         MR. D'ANDREA:  And is under 65.
19     Q. (BY MR. SHORDT)  And is under 65.
20     A. Okay.
21     Q. So a 22-year-old student, for example.  Can
22  they vote absentee in the general election if they're in
23  Travis County on the day of the election?
24     A. Can they vote absentee on the day --
25     Q. Can they vote absentee in the election if they

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

---

125

1  are going to be in the county on the day of the
2  election?
3      **A. Absentee or early vote?**
4      Q. Absentee.
5      **A. I don't know the answer.**
6      Q. Do you know, was a study conducted to determine
7  how many students in Texas do not posses an SB14 valid
8  identification?
9      **A. I don't know.**
10     Q. Would you agree there are probably thousands of
11 Texas college students from the same county where their
12 college or university is located?
13         MR. D'ANDREA: Objection; assumes facts not
14 in evidence, calls for speculation.
15     Q. (BY MR. SHORDT) You can answer.
16         MR. D'ANDREA: You can answer.
17     **A. I would think so.**
18     Q. (BY MR. SHORDT) The last bullet on this page
19 says, quote, allowing this type of identification would
20 only cause confuse -- probably means cause to confuse --
21 pole workers because there are so many types.
22         Do you know if there is training for pole
23 workers in Texas?
24     **A. I think so. I think there is, yes.**
25     Q. Do you know how many types of IDs Texas pole

---

126

1  workers may see in any given election?
2      **A. I don't.**
3      Q. Do you know how many types of -- different
4  types of military IDs there are?
5      **A. How many types of --**
6      Q. Different types of military IDs that are --
7      **A. No, I don't -- I don't know.**
8      Q. Do you know how many Texas universities and
9  colleges there are?
10     **A. I should, but I don't.**
11     Q. To your knowledge, is there any evidence that
12 suggests that student IDs have ever been used to commit
13 voter fraud in any election in Texas?
14     **A. I'm not aware.**
15     Q. Have you ever asked for that information?
16     **A. No.**
17     Q. Have you ever had conversations with other
18 members or senators who have discussed that?
19         MR. D'ANDREA: Privileged.
20     **A. No, I haven't.**
21         **(Straus Exhibit No. 9 was marked.)**
22     Q. (BY MR. SHORDT) I'm showing you what's been
23 marked as Exhibit No. 9. And I will represent it is an
24 excerpt of the House Journal from the 82nd Texas
25 legislature regular session proceedings that occurred on

---

127

1  Wednesday, March 23rd, 2011. The entire journal is, I
2  think, a couple hundred pages long, so I have just a few
3  pages that I want to ask you about.
4      **A. Okay.**
5      Q. Can you turn to what is the second page of the
6  document at the top that's labeled page 969?
7      **A. Okay. And say what?**
8      Q. I want to direct your attention to Amendment
9  No. 15. It states, "Representative Martinez offered the
10 following amendment . . ."
11     **A. Okay.**
12     Q. And do you -- if you could read this section
13 and let me know what this amendment says in Section 3,
14 please.
15     **A. (Examines document.) You want me to read**
16 **the -- tell me again. What do you want me to do?**
17     Q. Section 3 -- and feel free to paraphrase. Can
18 you tell me what the purpose of Section 3, what the
19 purpose of this amendment was, what it adds?
20     **A. (Examines document.) That a fee may not be**
21 **charged for an ID.**
22     Q. Do you understand this amendment to mean that a
23 fee will not be charged for the -- for obtaining any
24 documents that can be used for an individual to obtain
25 an ID that is permissible to vote under SB14?

---

128

1      **A. That -- that's what I would think it says, yes.**
2      Q. And earlier I believe you said -- you testified
3  that an election identification certificate was created
4  in SB14 so an individual could get, free of charge, a
5  photo ID to vote pursuant to SB14. Is that correct?
6      **A. I thought so.**
7      Q. Do you understand that this amendment would
8  allow an individual seeking to get a birth certificate
9  or another identification -- another form of
10 identification's underlying document needed in order to
11 obtain an election identification certificate?
12     **A. I assume that's what it says, yeah.**
13     Q. Do you recall just -- do you recall any debate
14 on Amendment No. 15 when SB14 -- I'm sorry --
15     **A. Not specifically, but I'm sure there was.**
16         THE REPORTER: Can you ask the question
17 again?
18     Q. (BY MR. SHORDT) Do you recall debate on
19 Amendment No. 15 when SB14 was debated?
20     **A. I don't.**
21     Q. And does the record reflect here that this
22 amendment was tabled?
23     **A. Yes.**
24     Q. And does "tabled" mean that it did not pass?
25     **A. That's correct.**

JOE STRAUS                                                            6/23/2014
CONFIDENTIAL TRANSCRIPT

---

**129**

1    Q. So is it fair to say that this amendment did
2  not pass and, as a result, individuals still are
3  required to pay fees in order to obtain documents that
4  they may need to obtain an election identification
5  certificate?
6         MR. D'ANDREA: Objection; misstates the
7  evidence in the record.
8         MR. SCOTT: Objection; form,
9  mischaracterization of the evidence.
10   Q. (BY MR. SHORDT) You can answer.
11   **A. Well, it says that this amendment failed.**
12   Q. I'll re-ask the question. "This amendment
13  failed" means that -- strike that.
14         Was there any amendment that passed, any
15  amendment to SB14 that passed that permitted a waiver of
16  fees for obtaining documents necessary to get an
17  election identification certificate?
18   **A. I don't know.**
19   Q. If an election identification certificate being
20  free is a reason that SB14 is compliant with the Voting
21  Rights Act, why should the underlying documents not be
22  free?
23         MR. SCOTT: Objection; form, vague.
24         You can answer, if you can.
25   **A. I don't -- I don't know why they shouldn't be.**

---

**130**

1    Q. (BY MR. SHORDT) Do you think they should be?
2         MR. SCOTT: Objection; form.
3    **A. To be in compliance with the Voting Rights Act?**
4    Q. (BY MR. SHORDT) In general, do you think that
5  if an individual wants to obtain an EIC and they do not
6  posses, for example, a birth certificate, should that
7  person have to pay for a birth certificate in order to
8  get a free election identification certificate to vote
9  under SB14?
10   **A. I really don't know. I don't know -- I don't**
11  **know what a -- what the cost of a birth certificate is.**
12   Q. At the time, I can represent to you I believe
13  the cost of a birth certificate was $22 when SB14 was
14  passed.
15         Would an individual who did not have the
16  requisite photo identification to vote under SB14 have
17  to pay $22 to get a birth certificate in order to then
18  get what is deemed to be a free election identification
19  certificate in order to vote?
20         MR. SCOTT: Objection; form, foundation.
21   Q. (BY MR. SHORDT) You can answer.
22   **A. I guess a matter of opinion. I don't -- is**
23  **this for a replacement birth certificate or somebody**
24  **that doesn't have one?**
25   Q. For either.

---

**131**

1         MR. SCOTT: Objection; form, foundation.
2    Q. (BY MR. SHORDT) If you think there's a
3  distinction, then you can --
4    **A. I do. I think there's a distinction,**
5  **personally. It's just my opinion.**
6    Q. Okay, for replacement?
7    **A. I think for replacement, I think -- I don't**
8  **think you should have -- I think you should have to pay**
9  **for it.**
10   Q. And if they did not have a birth certificate?
11   **A. Then that may be a different matter. But I**
12  **don't know who doesn't have one.**
13   Q. Do you believe that everybody in Texas has a
14  birth certificate?
15         MR. SCOTT: Objection; form, foundation.
16   **A. I don't -- I don't know how -- I don't know how**
17  **other states deal with birth certificates or how that**
18  **works.**
19   Q. (BY MR. SHORDT) Do you believe that every
20  person born in the state of Texas was issued a birth
21  certificate when they were born?
22   **A. I would doubt that everyone, no. But I don't**
23  **know. I don't know how that works.**
24   Q. Do you -- one second.
25         So just to be clear, I want to make sure I

---

**132**

1  understand your answer. You don't know if every person
2  born in the state of Texas -- is it your --
3         MR. D'ANDREA: Objection; asked and
4  answered.
5         MR. SCOTT: I thought you were finished
6  with the question.
7    Q. (BY MR. SHORDT) I will restate the question.
8         Is it your testimony that you do not know
9  if an individual born in Texas is issued a birth
10  certificate?
11   **A. I would assume they should be.**
12   Q. Do you have any reason to believe that there
13  are individuals in Texas --
14   **A. I don't.**
15   Q. -- who do not have birth certificates?
16   **A. I don't. I don't know anything about it.**
17   Q. You don't know anything about it?
18   **A. I don't know how birth certificates are -- are**
19  **issued.**
20   Q. Do you know what the unemployment rate in Texas
21  was when SB14 was debated in 2011?
22   **A. No, I don't.**
23   Q. Do you know what the average poverty level was
24  in Texas in 2011?
25   **A. I don't.**

---

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

133

1    Q. Do you know what the minimum wage was in Texas
2  in 2011 when SB14 was debated?
3    A. I don't recall.
4    Q. Do you understand that -- let me ask this.
5       You said earlier you had not read or
6  analyzed any of the -- the opinions issued with respect
7  to Texas vs. Holder.  Is that right?
8    A. That's correct.
9    Q. Did you read or review any -- the Crawford vs.
10 Marion County Supreme Court opinion?
11   A. No.
12   Q. Are you aware that that Supreme Court case
13 requires states to undertake a burden analysis when
14 passing photo identification laws to vote?
15      MR. SCOTT:  Objection; form, foundation,
16 mischaracterization.
17   Q. (BY MR. SHORDT)  You can answer.
18   A. No.
19   Q. What do you think -- how would you define a
20 burden, economic burden, on an individual to vote in
21 Texas?
22   A. I wouldn't know how to define it.
23   Q. Do you think that requiring an individual to
24 pay $22 to get a birth certificate in order to get a
25 free election identification certificate constitutes a

135

1  location from your House?
2    A. The early voting or the same day -- or the
3  election-day voting.
4    Q. We'll start with early voting.
5    A. Closest one is probably, I'd guess, within
6  2 miles, within 3 miles.
7    Q. And what about same day?
8    A. Oh, it's within -- within a mile and a half.
9    Q. And I apologize if you asked -- if Mr. Dunn
10 asked this question earlier, but how far is the driver's
11 license bureau from your home?
12   A. Well, I don't know where the closest one is
13 anymore.  I'd say probably, I'm guessing, 6 or 7 miles
14 maybe.
15   Q. Do you drive when you go to get -- to get your
16 driver's license renewed?
17   A. Yes.
18   Q. Are there counties in Texas where the driver's
19 license office might be more than 50 miles from where an
20 individual lives?
21   A. I would assume so, yes.
22   Q. Do you know what the average gallon of gas
23 costs right about now?
24   A. Average?
25   Q. Yeah.

134

1  burden on their right to vote?
2       MR. SCOTT:  Objection; form,
3  mischaracterization of the evidence.
4    A. It could be.
5    Q. (BY MR. SHORDT) Can you elaborate?  What do
6  you mean "it could be"?
7    A. Well, could it be a burden, yes, it could be a
8  burden.
9    Q. In what way?
10   A. To pay money.
11   Q. Do you know -- do you know how many Texans use
12 public transportation?
13   A. I don't.
14   Q. I assume the answer is true, isn't that in 2011
15 when SB14 was debated?
16      THE REPORTER:  I'm sorry.  Can you
17 repeat it again?
18   A. I don't -- I don't know the answer.
19      THE REPORTER:  Can you repeat the question
20 again?
21   Q. (BY MR. SHORDT)  I assume that that is the same
22 answer as to when SB14 was debated in 2011.
23      THE REPORTER:  And your answer?
24   A. I don't know.
25   Q. (BY MR. SHORDT) How far is your polling

136

1    A. Well over $3.
2    Q. So if you were to drive 100 miles round-trip
3  from your home to the driver's license bureau, get an ID
4  and return, that would cost 10 or 15 dollars, probably?
5       MR. SCOTT:  Objection; form, relevance.
6    Q. (BY MR. SHORDT)  You can answer.
7    A. How many miles?
8    Q. Say 100 miles round-trip.
9    A. Wouldn't cost me that much.  But it depends on
10 the car you drive, I suppose.
11   Q. Would it cost more than $5?
12   A. Oh, yeah.
13   Q. When -- do you think that it's a burden -- you
14 mentioned earlier that you waited longer than you wanted
15 to in the driver's license line, about an hour, to get a
16 driver's license.
17      Are you aware of any studies that have
18 analyzed driver's license bureau wait times?
19   A. I vaguely recall there were some done, but I
20 don't -- I don't remember them.
21   Q. You don't remember specifics of what the wait
22 time might be?
23   A. I don't.
24   Q. How long do you think a wait time at a -- to
25 get your driver's license should be?  What's reasonable?

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

35 (Pages 137 to 140)

137

1  Certainly less than an hour.  Would two hours be
2  unreasonable?
3            MR. SCOTT:  Objection; form, foundation.
4  Q.  (BY MR. SHORDT)  You can answer.
5  **A.  Two hours be unreasonable?**
6  Q.  Correct.
7  **A.  It would be unfortunate, yes.**
8  Q.  Would it be unreasonable?
9            MR. SCOTT:  Objection; form, foundation.
10  **A.  I think it's unnecessary.**
11  Q.  (BY MR. SHORDT)  Do you think that -- if an
12  individual had to pay for a 100-mile round-trip drive to
13  the driver's license bureau after having paid up to $22
14  for a birth certificate to get what is a free election
15  identification certificate, would you consider that to
16  be a burden?
17            MR. D'ANDREA:  Objection; mischaracterizes
18  the record.
19            MR. SCOTT:  Objection; form, foundation.
20  Q.  (BY MR. SHORDT)  You can answer.
21  **A.  Would it be a burden?**
22  Q.  Earlier you testified --
23  **A.  It would be an expense, yes.  It would be**
24  **expensive --**
25  Q.  Earlier you testified -- sorry to cut you off.

138

1            Earlier you testified that there could be
2  different burdens on an individual.  If a person was
3  below the poverty line, would paying for gas for that
4  round-trip and would paying for an underlying document
5  for an election identification certificate constitute a
6  burden, in your mind?
7            MR. SCOTT:  Objection; form, asked and
8  answered.
9  **A.  Yes.**
10  Q.  (BY MR. SHORDT)  Do you know how long the lines
11  are to -- strike that.
12            Are you aware of any analysis or reports
13  addressing wait times at polling locations in Texas?
14  **A.  No.**
15  Q.  Do you understand -- or are you aware of any
16  instances where individuals will have to wait in excess
17  of one hour to vote?
18  **A.  Heard of that, yes.**
19  Q.  Can you tell me where -- when you heard about
20  that?
21  **A.  No.  Just news reports.  I haven't had to wait**
22  **an hour.**
23  Q.  Would those have been recent elections?
24  **A.  I don't remember.**
25  Q.  Do you know if there were waits at poles in

139

1  excess of two hours?
2  **A.  I don't know.**
3  Q.  But you have heard of waiting at an election --
4  or waiting in line in order to vote at election time?
5  **A.  Yes.**
6  Q.  Do you think that it's a burden for an
7  individual who might -- do you think it's a burden for
8  an individual to have to wait longer than one hour to
9  vote?
10            MR. SCOTT:  Objection; form, foundation,
11  vague.
12  **A.  Yes.**
13  Q.  (BY MR. SHORDT)  Are you aware or do you know
14  if minorities in Texas constitute the majority of
15  individuals who live at or below the poverty line?
16  **A.  I think that's probably correct.**
17  Q.  What's the basis of your understanding?
18  **A.  Just recollection of seeing that information.**
19  Q.  Do you recall if -- if the relative poverty
20  level of minorities in Texas was addressed during the
21  SB14 debate?
22  **A.  I don't recall.**
23  Q.  Have you ever asked for that information?
24  **A.  No.**
25  Q.  Have you discussed that with other members or

140

1  senators?
2            MR. D'ANDREA:  Privileged.
3  **A.  I don't recall discussing it, no.**
4  Q.  (BY MR. SHORDT)  So do you recall -- strike
5  that.
6            Your testimony is that you do not recall,
7  during SB14, whether the poverty -- whether the poverty
8  level of minorities in Texas of Texas voters was
9  discussed?
10            MR. D'ANDREA:  Privileged.
11            MR. SCOTT:  Objection; asked and answered.
12  **A.  I imagine it has -- it was.**
13  Q.  (BY MR. SHORDT)  As -- at the time SB14 was
14  debated in 2011, were you aware of any specific
15  incidents of in-person voter fraud?
16  **A.  No.**
17  Q.  In Texas?
18  **A.  No.**
19  Q.  Anywhere in the United States?
20  **A.  I'm not aware.**
21  Q.  And so I understand your testimony, you are not
22  aware of a single instance of voter fraud that's ever
23  occurred in Texas involving the use of a student
24  identification card?
25  **A.  Not aware, no.**

---

**141**

<sup></sup>**EXAMINATION**
BY MR. SCOTT:
Q. Mr. Speaker --
MR. SCOTT: Are y'all --
MR. SHORDT: I have no more questions.
MR. SCOTT: May I clear something up?
MR. SHORDT: Yeah.
Q. (BY MR. SCOTT) Let me hand you what's been marked as Exhibit 7 to your deposition. What we know is, that document didn't come from the 2011 session, correct? Make sure.
**A. 2011 instead of 2010.**
Q. So unless somebody had a time machine, this wouldn't have been something somebody was able to consider during the 2011 consideration of SB14 as far as talking points for getting democratic support for the bill, correct?
**A. Yeah. It says 2011 instead of 2010, so it had -- it had to be later.**
Q. It had to have been before 2011 session, which would have been the 82nd session, correct?
**A. I would assume so, yes.**
Q. Okay. With regards to rules, early on in your deposition you and Mr. Dunn spoke a little bit about legislative rules.

**142**

Is it true that each session creates its own rules, there are no holdovers?
**A. That's right. We approve -- we approve rules each time.**
Q. And so each legislature such as the 82nd was not bound by anything done by the 81st?
**A. That's correct.**
Q. And whatever rules are passed there are unique to it even if they replicate everything from the 81st?
**A. That's right.**
MR. SCOTT: Okay. Thank you for your time. Pass the witness.
MR. SHORDT: I have one follow-up question, Mr. Scott.
FURTHER EXAMINATION
BY MR. SHORDT:
Q. You testified that -- with respect to the exhibit that Mr. Scott just showed you that you -- scratch that.
With respect to that exhibit -- I'm sorry. What is that exhibit?
MR. D'ANDREA: 7.
MR. SHORDT: Thank you.
Q. (BY MR. SHORDT) You testified you've not seen Exhibit 7 before. Is that right?

---

**143**

**A. I don't remember seeing it.**
Q. And you don't know who prepared it?
**A. Don't.**
Q. So you have absolutely no idea what year this is from?
**A. I don't know anything about it.**
MR. SHORDT: Thank you. That's all.
MR. DUNN: Nothing further from me.
MR. GEAR: Actually I have one follow-up question.
THE WITNESS: Yeah.
FURTHER EXAMINATION
BY MR. GEAR:
Q. Regarding the rules, isn't it true that there are some time-honored rules that are revisited every session?
**A. Yeah. I mean, the rules -- the rules don't drastically change necessarily from session to session.**
Q. And isn't it also true that the two-thirds rule was considered a time-honored rule until 2009?
MR. D'ANDREA: Objection; mischaracterizes the record.
**A. That's a Senate rule, and I -- I don't -- that's their business.**
MR. SCOTT: Nothing further.

**144**

(The deposition was concluded at 12:30 p.m. (Straus Exhibit Nos. 1 through 9 marked during this deposition are attached hereto.)

---

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

37 (Pages 145 to 148)

145

1          JOE STRAUS
2          JUNE 23, 2014
3      CHANGES AND SIGNATURE
4  PAGE/LINE  CHANGE      REASON
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

146

1  _____
2  _____
3      I, JOE STRAUS, have read the foregoing
4  deposition and hereby affix my signature that same is
5  true and correct, except as noted above.
6
7          _____
8              JOE STRAUS
9  THE STATE OF TEXAS    )
   COUNTY OF _____)
10
11     Before me, _____, on this day
12 personally appeared JOE STRAUS, known to me (or proved
13 to me on the oath or through _____)
14 (description of identity card or other document) to be
15 the person whose name is subscribed to the foregoing
16 instrument and acknowledged to me that he/she executed
17 the same for the purposes and consideration therein
18 expressed.
19     Given under my hand and seal of office this _____
20 day of _____, 2014.
21
22      _____
23      NOTARY PUBLIC IN AND FOR
24      THE STATE OF _____
25

147

1           IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
2                CORPUS CHRISTI DIVISION
3
   MARC VEASEY, et al.,      )
4      Plaintiffs,           )
                             )
5  v.                        ) Civil Action
                             ) No. 2:13-cv-193(NGR)
6  RICK PERRY, et al.,       )
      Defendants.            )
7  _____     )
                             )
8  UNITED STATES OF AMERICA, )
      Plaintiff,             )
9                            )
   TEXAS LEAGUE OF YOUNG     )
10 VOTERS EDUCATION FUND,    )
   et al.,                   )
11      Plaintiff-           )
         Intervenors,        )
12                           ) Civil Action
   TEXAS ASSOCIATION OF      ) No. 2:13-cv-263(NGR)
13 HISPANIC COUNTY JUDGES    )
   AND COUNTY COMMISSIONERS, )
14 et al.,                   )
         Plaintiff-          )
15       Intervenors,        )
                             )
16 v.                        )
                             )
17 STATE OF TEXAS, et al.,   )
      Defendants.            )
18 _____     )
19
20
21        REPORTER'S CERTIFICATION
          DEPOSITION OF JOE STRAUS
22         TAKEN JUNE 23, 2014
23     I, Kelly E. Fisher, a Certified Shorthand Reporter
24 in and for the State of Texas, hereby certify to the
25 following:

148

1      That the witness, JOE STRAUS, was duly sworn by the
2  officer and that the transcript of the oral deposition
3  is a true record of the testimony given by the witness;
4      That the original deposition was delivered to
5  Mr. Bruce Gear;
6      That a copy of this certificate was served on all
7  parties and/or the witness shown herein on
8  _____.
9      I further certify that pursuant to FRCP Rule
10 30(f)(1) that the signature of the deponent  was
11 requested by the deponent or a party before the
12 completion of the deposition and that the signature is
13 to be before any notary public and returned within 30
14 days from date of receipt of the transcript.  If
15 returned, the attached Changes and Signature Page
16 contains any changes and the reasons therefore.
17     I further certify that I am neither counsel for,
18 related to, nor employed by any of the parties or
19 attorneys in the action in which this proceeding was
20 taken, and further that I am not financially or
21 otherwise interested in the outcome of the action.
22
23
24
25

JOE STRAUS                                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

38 (Pages 149 to 150)

149

1    Certified to by me this 2nd day of July, 2014.
2
3
4    _____
     KELLY E. FISHER, CSR No. 2834
5    Expiration Date: 12-31-15
     U.S. LEGAL SUPPORT, INC.
6    Firm Registration No. 344
     701 Brazos, Suite 380
7    Austin, Texas 78701
     (512) 292-4249
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

150

1    COUNTY OF TRAVIS  )
2    STATE OF TEXAS    )
3        I hereby certify that the witness was notified on
4    _____ that the witness has 30 days or
5    (____) days per agreement of counsel) after being
6    notified by the officer that the transcript is available
7    for review by the witness and if there are changes in
8    the form or substance to be made, then the witness shall
9    sign a statement reciting such changes and the reasons
10   given by the witness for making them;
11       That the witness' signature was/was not returned as
12   of _____.
13       Subscribed and sworn to on this, the _____ day of
14   _____, 2014.
15
16
17   _____
     KELLY E. FISHER, CSR No. 2834
18   Expiration Date: 12-31-15
     U.S. LEGAL SUPPORT, INC.
19   Firm Registration No. 344
     701 Brazos, Suite 380
20   Austin, Texas 78701
     (512) 292-4249
21
22
23
24
25

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

1

**A**

**$22** 130:13,17 133:24 137:13
**$3** 136:1
**$5** 136:11
**a.m** 2:3 62:12,12 108:11,11
**ability** 31:25 38:18 70:24 82:9
**able** 36:8 49:6 56:22 141:14
**above-styled** 2:2
**absentee** 123:25 124:2,6,11,22,24,25 125:3,4
**absolutely** 18:15 143:4
**acceptable** 41:18,24 62:9 63:21 111:10 118:15
**accepted** 47:3
**access** 65:22
**accommodate** 10:23
**accuracy** 116:25
**accurate** 29:25 79:16 85:9 87:21
**acknowledged** 146:16
**act** 68:2 82:12 109:9 129:21 130:3
**acting** 83:6
**action** 1:5,12 70:16 147:5,12 148:19,21
**activities** 11:17 13:15
**activity** 49:20
**actual** 17:23
**additional** 37:20 50:1 64:24
**address** 91:10,13,17 92:23
**addressed** 87:17 88:15,16 90:5 139:20

**addressing** 121:18 138:13
**adds** 127:19
**adjusted** 19:22
**Administration** 3:21 12:10
**adopts** 21:8
**advanced** 82:25
**advice** 101:11 108:24
**advises** 16:16
**affairs** 24:8,18
**affirmatively** 84:19
**affix** 146:4
**African** 40:2
**afternoon** 59:16,16 59:22
**age** 54:14
**agencies** 41:12 77:25 78:4 115:9
**agency** 42:3 45:4 51:20 60:19,24 61:17,22 63:5 76:21 77:15
**ago** 57:22 80:2 87:22 114:21
**agree** 18:23 94:1,14 104:6,14 110:2 121:9,10 123:12,13 125:10
**agreed** 17:24
**agreement** 150:5
**Agriculture** 115:15
**ahead** 17:25
**ain't** 50:16
**airport** 51:2
**airports** 39:5
**al** 1:3,6,10,14,17 3:14 147:3,6,10,14,17
**Alamo** 11:22
**alarmed** 41:6
**alarming** 43:12
**aliens** 96:20
**allegations** 39:25 97:5

**allow** 17:17 22:12 128:8
**allowable** 104:24
**allowances** 65:12
**allowed** 46:23 103:22 105:5,10 106:3 107:4 111:25 112:6 112:14 113:10 115:2,16 116:5,12 120:16
**allowing** 119:18,25 125:19
**allows** 112:24 118:9
**alluded** 62:8
**allusions** 48:4
**amending** 37:25
**amendment** 6:14 120:19 127:8,10,13 127:19,22 128:7,14 128:19,22 129:1,11 129:12,14,15
**amendments** 21:20
**America** 1:8 2:1 3:2 147:8
**Americans** 40:2
**Ames** 11:13
**amount** 44:11
**analysis** 39:8 45:1,10 45:12,14 47:8,14 71:3 75:19,20 77:7 77:20 94:21 98:23 99:21 100:3,8 101:2 101:16 117:7 121:17 122:16,25 123:19 133:13 138:12
**analyzed** 71:23 133:6 136:18
**analyzing** 100:25
**Ancira** 62:6
**and/or** 148:7
**Anglo** 71:20
**Anglos** 72:20
**announced** 69:15

**answer** 8:12 17:17,20 22:12 24:1,20 28:13 29:20 32:7 34:19 36:8,13,22 37:14 39:2 42:13 43:21 47:12,25 48:17,25 49:11 50:8 53:12 54:5 61:4,16,21 63:18 64:1,14 67:4 67:18,24 74:25 75:17 76:6 79:25 81:12 82:7,19 84:3 85:19 87:10 94:10 95:16 97:8 98:20 101:5,9,13 103:5 104:19 106:14 109:23 116:14 118:17 119:21 125:5,15,16 129:10 129:24 130:21 132:1 133:17 134:14,18,22,23 136:6 137:4,20
**answered** 55:4 86:19 116:18 132:4 138:8 140:11
**answering** 74:25
**answers** 75:5
**anti-voter** 79:9 82:16
**anticipate** 102:17
**antifraud** 82:16
**Antonio** 6:3 9:10 11:19 12:22 59:13 64:20 79:3
**anybody** 60:14 73:8 121:15
**anybody's** 18:5
**anymore** 19:15 68:24 84:22 86:12 87:1 135:13
**anyway** 60:16 66:13 78:18 109:19
**apologize** 135:9
**appear** 91:17

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

2

**APPEARANCES** 3:1
  4:1 5:3
**appeared** 146:12
**appears** 90:8 92:11
  92:19 96:17 101:25
  108:17
**applies** 112:3
**apply** 68:24
**appoint** 22:23
**appointed** 12:9
**appointment** 27:4
**appointments** 20:17
**appoints** 20:18
**appreciate** 61:15
  74:11
**appropriate** 36:10
  39:22 50:25
**appropriated** 65:10
  65:18
**appropriation** 61:8
  65:17
**appropriations** 62:25
  63:1,2,6
**approval** 109:3,4
**approve** 90:24 142:3
  142:3
**approving** 91:2
**area** 15:8
**arguably** 111:2,6
**arguments** 87:11,13
**Arthur** 4:7 109:20
**arthur.dandrea@o...**
  4:11
**article** 6:3 78:24 82:1
  85:8
**articles** 72:8,9
**asked** 32:4 46:10
  55:4 76:18 86:19,21
  97:23 114:22
  126:15 132:3 135:9
  135:10 138:7
  139:23 140:11
**asking** 43:14 74:24
  100:24

**assert** 17:16 22:11
**asserted** 97:1
**assertion** 105:11
**assess** 77:12,16
**assigned** 14:16,23
  20:11 35:6,8,13
**assignments** 14:19
  35:11
**assigns** 27:19
**assist** 100:15
**associate** 114:19
**ASSOCIATION**
  1:12 147:12
**assume** 11:18 15:25
  21:11 22:6,7 24:7
  25:25 27:22 35:17
  38:19 41:12,21 46:7
  53:14 55:12 58:25
  60:8 62:4 64:14
  66:6 71:3 74:2
  76:11 81:21 90:18
  94:12,13 113:13
  117:25 124:16
  128:12 132:11
  134:14,21 135:21
  141:22
**assumes** 50:5 70:12
  125:13
**assuming** 35:15
**assurance** 121:3
**atmospherics** 80:16
**attached** 144:3
  148:15
**attempt** 77:12
**attempted** 77:16,25
  78:5
**attempting** 23:23
**attend** 35:2 45:18
**attended** 11:23
**attending** 123:9,22
**attends** 124:17
**attention** 19:16 73:21
  79:5 83:15 91:6
  92:20 93:19 96:18

102:3 122:14
  123:24 127:8
**attorney** 2:5 3:21 4:9
  9:1 34:24,24 35:19
  43:16 44:3 69:13
  73:6 97:24 101:16
  115:9,24
**attorney/client** 43:21
  101:11 109:10,23
  109:25
**attorneys** 7:18 8:24
  18:13 74:17 148:19
**attract** 118:21 119:1
  119:11
**audible** 8:12
**Austin** 2:6 3:23 4:5
  4:10 115:25 149:7
  150:20
**author** 81:4,6 106:15
**authority** 20:15
  31:20 41:12 53:2
**automatically** 89:10
**avail** 7:18 60:5
**availability** 47:9,16
**available** 14:23 150:6
**Avenue** 3:5,16 4:15
**average** 132:23
  135:22,24
**aware** 16:4 41:9 42:2
  49:17,18,20 50:14
  51:17,20 59:5,8
  61:14 68:12 76:17
  77:3,6,10,11,15,18
  77:20 88:22 93:22
  97:16,18 98:10,23
  99:1 100:3 114:5
  117:6,7,10 122:16
  122:25 126:14
  133:12 136:17
  138:12,15 139:13
  140:14,20,22,25

———— **B** ————
**B** 3:20 6:1

**back** 11:16 12:10
  41:10 53:19 60:12
  61:16,25 74:19
  81:23 114:21
**background** 9:4
  11:18 13:14
**ballot** 37:1 41:2
  49:13,19,24 50:2
  53:10 79:7 82:1
  85:3 88:24 92:2
  124:6,12
**ballots** 78:1,6 91:10
  91:14,18
**bank** 51:2
**barriers** 45:24
**based** 22:17 78:1,6
  79:13,21 91:16,19
  100:1 115:24
**basic** 8:6 66:23
**basing** 94:17 107:14
**basis** 83:5 139:17
**Battle** 4:3 8:23 76:13
**becoming** 14:18
**began** 35:16 51:15
**beginning** 10:20
  21:19 32:14 87:25
**begins** 21:7 22:1
**behaved** 79:8,22 82:2
**behavior** 71:3,4 72:3
**belief** 55:1
**believe** 14:25 20:12
  28:7 31:17 32:19
  36:2,6 39:13 40:15
  41:4 44:9 48:4
  52:12 78:14 79:6,16
  85:9,11 86:20 87:20
  87:24 88:1 96:1
  99:15 114:13
  115:19 123:10
  128:2 130:12
  131:13,19 132:12
**benefit** 51:8
**benefits** 12:21
**Bennett** 13:2

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

3

bet 74:13
better 61:6
beyond 41:5
big 102:16
bill 6:10 7:10 14:8
  17:14 19:7,14 20:8
  23:12 24:13,16
  25:19,24 26:14 27:9
  27:18,19 28:6,10,19
  28:23 29:2,12,17,23
  30:12,13 31:21 32:1
  32:5,15,20 33:8,11
  33:25 34:4,8,13,17
  35:4 36:1,5,10
  37:23 39:7,17,23
  40:1,14 41:3,17,18
  41:25 42:11,17,19
  43:3,7 44:4 45:1,5
  45:10,18,18 46:11
  46:15 47:5,15,19
  48:5,12,13,14,20
  49:4,7,21 51:6,10
  53:9,16 54:8,13,21
  57:4 62:25 63:24
  64:12,25 65:6,10,19
  66:15 67:12,15 68:1
  68:17 69:8,15,23
  70:10,17,22,24
  73:25 74:3 79:10
  80:4,10,11,13 81:2
  81:4,9,20 82:16
  87:12,15 91:15
  95:13 99:2,5,6,9,10
  99:20 100:5,16
  103:21,22 104:1,23
  106:15 110:6,11,15
  141:17
bills 14:10,12 19:22
  20:2,14 22:19 23:2
  23:5,9,19 24:22
  25:8,14 26:3 27:5
  31:13,15 36:14 37:3
  38:9 45:9 66:12,13
  66:20 67:9 80:15

99:23 104:11
  106:24
birth 65:22 123:10
  128:8 130:6,7,11,13
  130:17,23 131:10
  131:14,17,20 132:9
  132:15,18 133:24
  137:14
birthday 57:22
bit 9:4 11:17 71:2
  82:8 99:2 107:18
  141:24
blacks 72:19
blocked 122:15
body 82:12 83:8
Bonnen 28:7,9,18,23
  29:11,15 30:9
border 14:2
born 9:9 54:2 131:20
  131:21 132:2,9
bottom 87:2 92:22
  93:1 102:7
bound 142:6
Box 4:5,10
BRAZIL 3:10
Brazos 149:6 150:19
break 62:9,18 108:6
Brian 30:24
brief 7:15
briefed 40:23 53:24
briefing 40:18 43:6
  43:13,16 75:14
briefings 44:3,14
Briefly 119:6
bring 58:2 80:3,9
  81:8
brings 17:21
broke 50:17
broken 50:20
Brook 4:8
brought 84:12 99:15
Bruce 3:3 74:16
  102:6 148:5
bruce.gear@usdoj....

3:7
budget 33:5 62:24
bullet 121:3,24 122:2
  122:15,15 123:7,24
  125:18
burden 46:16 133:13
  133:20,20 134:1,7,8
  136:13 137:16,21
  138:6 139:6,7
burdens 138:2
burdensome 46:5
bureau 135:11 136:3
  136:18 137:13
business 12:12,21,22
  12:24 13:7 80:3,6
  110:13 143:24
by-mail 88:24 92:2

─────────────
         C
─────────────
C 4:7
calendar 31:3 84:6,9
calendars 30:14,16
  31:1,8,11,15,23
  32:4 34:3
call 67:20 109:20
called 14:25 15:1,5
  16:25 50:11 68:22
calls 33:5 49:8 53:13
  103:11 106:11
  116:6 125:14
campaign 14:5 16:5
  16:15,16,18,22,23
campaigns 16:2
candidates 10:10
  72:11
capable 121:4
capitol 60:5
capitol/texas 93:3
car 136:10
card 19:18 56:25
  74:9 107:22,23
  111:21 112:21
  113:7,8 115:20
  123:9,11,22 140:24

146:14
cards 118:10,21
  119:1
career 12:16 14:10
careful 10:20 39:6
carried 14:10
carry 19:21
case 7:23 10:14 16:20
  24:25 25:6 26:20
  27:20 29:6,7 31:14
  40:4,7 44:21 45:11
  49:3 53:20 63:5
  70:6 72:24 74:6
  113:13 133:12
cases 8:2,4 41:6
  44:23
cash 51:1
cast 41:2 78:1,6
  96:21
casting 49:14
caught 73:21
cause 2:2 125:20,20
caution 101:6
central 14:5
certain 23:24 24:22
  26:11 31:24,24
  33:22 35:11 44:23
  47:16 49:14 72:11
  72:13,14 105:16,21
  106:2
certainly 91:24
  110:22 137:1
certificate 65:15,22
  123:10 128:3,8,11
  129:5,17,19 130:6,7
  130:8,11,13,17,19
  130:23 131:10,14
  131:21 132:10
  133:24,25 137:14
  137:15 138:5 148:6
certificates 131:17
  132:15,18
certification 5:11
  113:2,5,11,15

JOE STRAUS                                        6/23/2014
CONFIDENTIAL TRANSCRIPT

4

147:20
**Certified** 147:23
   149:1
**certify** 147:24 148:9
   148:17 150:3
**cetera** 44:6 64:7
**Chad** 3:9 7:7 17:19
   17:21
**chad@brazilandd...**
   3:12
**chair** 30:15 32:3 63:2
**chairman** 28:3,5
   30:25
**chairmen** 20:18
   28:15
**chamber** 66:22
**chance** 29:7 89:3
   92:13 96:2,4,9
   108:14
**change** 21:15 38:19
   51:19 52:15 80:2
   81:15,18 88:23
   143:18 145:4
**changed** 42:10,19
**changes** 5:10 21:17
   21:23,24 22:3 145:3
   148:15,16 150:7,9
**charge** 128:4
**charged** 127:21,23
**check** 51:1
**chief** 60:23 62:2
   76:12
**children** 13:10,12
**CHL** 112:8,8,10
**choice** 56:7,12,13
   83:18,19
**chosen** 38:3,4
**Chris** 26:24
**CHRISTI** 1:2 147:2
**circle** 77:19
**citizen** 53:17 55:2
   58:3
**citizens** 40:2 42:10
   42:18 53:10,25 54:1

54:22 70:11,18 71:7
   93:23 94:2,16 96:22
**citizenship** 51:15,16
   51:24 53:3,22 54:23
   55:2 93:25 112:5
**civil** 1:5,12 2:7 3:4
   15:1,2,2 147:5,12
**clarification** 18:10
**clear** 19:19 43:4 69:5
   89:15 110:5 131:25
   141:6
**clerk** 99:24
**close** 29:25 66:21
   83:8
**closely** 35:18 83:4
   84:15
**closer** 119:4
**closest** 135:5,12
**CMS/Email/2009-...**
   93:4
**college** 11:23 118:10
   118:21 119:1
   123:20 125:11,12
**colleges** 116:23
   121:19 126:9
**come** 11:16 20:6
   34:21 45:9 46:5
   61:16 90:8 92:11
   99:24 101:25
   108:18 141:10
**comes** 17:1 22:6
   25:19,24,24 26:1
   27:19 54:25 99:3,5
   99:9 108:22
**coming** 22:24 93:10
   110:21
**comment** 80:5
**comments** 15:7 47:22
   82:9 83:9
**COMMISSIONERS**
   1:13 147:13
**commit** 126:12
**committee** 14:19
   15:5,11 20:11,12,19

20:19,22 21:1,25
   22:9,19,21,24 23:2
   23:10,14,17,18,23
   24:3,7,9,12,15,18
   25:1,5,6,12 26:5,15
   27:5,20,21 28:2,3,5
   28:14 29:16,17 30:1
   30:5,13,14,16 31:1
   31:2,8,12,15,23,25
   32:4 33:11,17 34:3
   34:4 35:2,3,11,14
   63:2 67:1 95:3,5
   97:17 120:15
**committees** 14:15,22
   20:16,18 21:4 24:4
   25:3,3,16 33:22
   35:7,9 94:25 98:7
   98:10
**communicate** 91:21
**communicated** 91:24
   92:17
**communicating** 92:5
**communication**
   35:24 94:7,11
   109:10,25
**communications**
   34:12,15,23 36:4
   44:8 97:18 98:15
   105:4 113:18,21
   114:5
**compared** 66:17
   104:2
**comparing** 106:23
**comparison** 39:12
**competitive** 10:3
**complete** 75:4
**completely** 99:4
**completion** 148:12
**compliance** 39:9
   130:3
**compliant** 27:16
   129:20
**concealed** 112:11
**concern** 95:13 98:4

98:16
**concerned** 84:21,24
**concerning** 7:10,11
   48:20
**concerns** 92:6 94:7
**concluded** 144:1
**conduct** 100:24
**conducted** 98:23
   99:21 100:8 122:16
   125:6
**confer** 18:20
**conference** 33:11
**confidential** 1:22
   89:6,10 92:10
   101:24 108:17,18
   109:17 117:18,21
   120:5,9
**confirm** 28:21 115:5
**confirming** 114:24
**conforming** 52:15
**confuse** 125:20,20
**confused** 29:3
**consider** 16:7 22:16
   60:16 62:22 103:16
   103:20 137:15
   141:15
**consideration** 31:3
   47:15 56:19 66:3
   67:12 70:4 90:14,17
   91:22 95:8 100:16
   105:21 106:2
   141:15 146:17
**considered** 32:15
   41:13 44:25 50:23
   54:11 66:12 68:10
   103:25 143:20
**considering** 39:11
**constituent** 90:4,6
**constituents** 90:13,16
   90:25 91:3,21,22,24
   92:5,17 94:7 98:16
**constitute** 138:5
   139:14
**constitutes** 133:25

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

5

**constitutional** 109:9
**construe** 109:24
**consultants** 16:16
**consulted** 26:10
   69:18
**contact** 69:22,25
**contacted** 32:3 36:6
**contains** 148:16
**contested** 10:5 16:7
   66:21
**context** 80:9
**continue** 75:1,3
**CONTINUED** 4:1
**control** 84:6
**convene** 94:25 98:7
**convened** 91:8 97:17
   98:10
**convenes** 22:1
**convenience** 56:22,23
**conversation** 29:1,14
   34:22 48:20 52:9
   61:11
**conversations** 34:2
   63:13 116:9,19
   118:12 126:17
**Cook** 52:25
**coordinated** 83:3
**copy** 102:5 148:6
**corner** 90:10 92:25
   92:25
**CORPUS** 1:2 147:2
**correct** 9:18 16:14
   17:9 18:15,22 21:10
   28:1 46:9 52:16
   54:19 66:9 69:9,12
   75:5 79:17 81:7,16
   90:1,2 92:3 93:17
   94:13 103:23 104:9
   108:4 115:22
   116:24 123:14,16
   128:5,25 133:8
   137:6 139:16
   141:11,17,21 142:7
   146:5

**correctly** 52:13 85:6
   85:8
**cosponsored** 19:25
**cost** 65:13 130:11,13
   136:4,9,11
**costs** 135:23
**counsel** 4:4 8:19
   75:18 76:13 89:15
   93:5 108:21 148:17
   150:5
**counties** 135:18
**country** 104:12 111:3
   111:6
**county** 1:13,13 36:4
   68:22 69:2,10,14
   124:3,7,11,17,23
   125:1,11 133:10
   146:9 147:13,13
   150:1
**couple** 33:5 73:11
   114:21 127:2
**course** 15:23 19:4
   48:8 66:11 95:7
   110:13
**court** 1:1 8:11 10:21
   11:11 18:11 25:19
   68:10,22 70:6,9,16
   74:3 86:21 133:10
   133:12 147:1
**court's** 69:7 109:2
**courteous** 74:8
**coverage** 41:4,7
   68:23 72:10,12
**covered** 42:2
**covers** 78:12
**Crawford** 133:9
**create** 21:1 22:18,21
   23:23 25:2
**created** 24:4,16
   128:3
**creates** 142:1
**creating** 66:25
**creation** 24:12
**Creek** 3:10

**criminal** 114:10
**cross** 38:24
**CSR** 2:3 149:4
   150:17
**current** 37:7 63:21
   93:24 94:1,15
**customer** 63:21
**cut** 90:11 137:25
**cycle** 16:19 72:14
**cycles** 24:17
**Cypress** 3:10

---

**D**

**D** 5:1
**D'Andrea** 4:7 17:15
   18:16,18 22:11
   23:25 24:19 28:12
   29:19 32:6 34:18
   36:12,21 37:13 39:1
   42:12 43:20 47:11
   47:24 48:16,24 49:8
   49:12 50:5,8 53:11
   54:4 55:4 61:3,20
   63:17,25 67:3,6,17
   67:23 68:19 70:12
   75:16 76:5 79:24
   81:10,13 82:6,18
   83:1,13 84:2 85:18
   85:24 86:6,19,23
   87:9 88:4 89:15,18
   89:20 93:5,7 94:9
   95:15,22 97:7,21
   98:19 101:4 103:4
   103:11 104:18
   105:1,6,11,18,24
   106:11 108:21
   109:2,7,14,22 110:3
   116:6,13,20 117:17
   117:21 118:16
   119:14,20 120:4,23
   120:25 121:22
   124:18 125:13,16
   126:19 129:6 132:3
   137:17 140:2,10

142:22 143:21
**D.C** 68:4 70:6,23
**daily** 40:17
**danger** 87:15
**data** 42:16,17 43:2
   64:6
**date** 44:4 79:2 91:9
   122:6,12 148:14
   149:5 150:18
**dates** 122:4
**daughter** 57:19 58:5
   59:3,9,18
**daughters** 122:19
**David** 83:22 85:16
   86:11,17
**day** 10:23 21:5 29:11
   55:14 56:4,7,13,17
   57:21 59:14,23
   111:10 112:21
   113:8 124:11,23,24
   125:1 135:2,7
   146:11,20 149:1
   150:13
**days** 21:6,22 80:14
   111:19,22 112:16
   148:14 150:4,5
**DC** 3:6,17 4:15
**deal** 15:9 17:5 23:15
   29:17 64:25 83:18
   83:19 84:16 88:23
   131:17
**dealing** 25:7
**dealings** 28:9
**debate** 31:9 32:18
   33:25 37:25 48:9,12
   48:14,19 87:12
   95:10,18 97:2,25
   116:10 117:11
   120:14 121:17
   123:4 128:13,18
   139:21
**debated** 65:25 128:19
   132:21 133:2
   134:15,22 140:14

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

6

**debates** 47:19
**debriefing** 43:6
**decades** 19:4
**decided** 49:3
**decides** 28:3,3
**decision** 20:24 22:18
  26:6 45:16 51:23
  56:6,11 69:18 70:22
  74:3 75:9,10,11,15
  76:4 83:22,25 84:8
**deemed** 130:18
**DEFENDANT** 3:19
**Defendants** 1:6,17
  147:6,17
**define** 133:19,22
**degree** 12:2,4
**delivered** 148:4
**Dem** 118:3
**Democrat** 11:9 78:16
**democratic** 10:15
  118:12,22 119:2
  141:16
**Democrats** 10:12
  87:15 88:7
**denying** 68:11
**Department** 3:4
  51:14 64:23 65:21
  74:17 115:15
**depends** 136:9
**deponent** 148:10,11
**deposition** 1:19,24
  7:21 17:22,23,24
  18:1,4,7,11,18 44:2
  73:5 74:22 78:21
  114:22 141:9,24
  144:1,3 146:4
  147:21 148:2,4,12
**depth** 87:16 88:14
**describe** 12:18 23:19
  29:22 78:25 79:1
**described** 37:6,7
  79:16 102:12,16
  104:13,16,17
**description** 6:2 19:6

  146:14
**designated** 120:5
**designed** 49:22
**desires** 38:10
**despite** 50:2
**detail** 28:25 98:8
**details** 37:24
**determine** 37:16 44:1
  53:9 77:21,25 78:5
  94:25 123:20 125:6
**developed** 15:9 64:17
**development** 14:25
**deviations** 84:24
**Dewhurst** 85:16
  86:11,17
**Dewhurst's** 83:22
**different** 16:18 46:4
  47:10 82:11 126:3,6
  131:11 138:2
**difficult** 27:22 37:18
  83:8
**difficulties** 53:25
**dilute** 96:21
**direct** 30:1,5 48:3
  61:2 65:2 92:20
  102:3 122:14
  123:24 127:8
**directed** 53:20
**directing** 79:5 93:19
  96:18
**directly** 60:24 77:2
**disability** 113:6,19
**disabled** 113:1,4
**disagree** 121:10
**disagreement** 82:23
**discretion** 20:21
**discriminatory** 70:25
**discuss** 22:2
**discussed** 43:14 54:7
  75:18,24 121:7
  126:18 139:25
  140:9
**discussing** 52:4 76:25
  140:3

**discussion** 22:17
  28:17,22 38:16
  42:23,25 43:2 65:7
  65:12 82:3 85:12
  95:20 104:10
  105:20 106:23
  121:16
**discussions** 28:8 44:2
  76:2 91:21 97:1
  101:8 103:1 117:12
  120:18
**disenfranchisement**
  98:1,13,17
**disparate** 42:9,18
  70:11,17
**disproportionately**
  40:1
**disprove** 122:7
**distinction** 131:3,4
**distracted** 25:9
**district** 1:1,1 9:19,20
  10:1 16:23 69:7
  70:6,9,15 71:4,8
  72:4 124:7 147:1,1
**district's** 71:18
**divided** 83:4 84:15
**Division** 1:2 3:4
  147:2
**divulge** 43:21
**DL** 123:10
**document** 6:6,9
  73:15 78:21,22,25
  89:6,10,14 92:10,15
  93:13 96:7,10,11
  101:25 102:8,8
  108:17,19,20
  109:16 110:8,10
  120:9,9 127:6,15,20
  128:10 138:4
  141:10 146:14
**documentation** 54:1
  54:23 58:2 76:25
  105:9
**documents** 51:16

  53:3,22 73:10 112:6
  123:8,21 127:24
  129:3,16,21
**doing** 8:11 21:2
  36:20 49:15 57:12
  61:6 72:14
**DOJ's** 109:3
**dollars** 136:4
**doubt** 131:22
**dove** 59:23
**doves** 59:22
**downs** 39:4
**DPS** 52:10,15,20 53:2
  53:19,21 60:4,17
  62:7,19,22 63:15,23
  66:1 111:21
**DPS's** 51:23
**draft** 22:5 90:19,24
  91:2
**drafting** 90:13,16
**drastically** 143:18
**draw** 37:22
**drew** 37:9
**drive** 135:15 136:2
  136:10 137:12
**driven** 63:1,3
**driver's** 19:17 51:16
  56:25 57:6 58:2,15
  59:6 61:7 64:3
  111:18 123:8,11,21
  135:10,16,18 136:3
  136:15,16,18,25
  137:13
**drivers** 123:1
**driving** 56:21
**duly** 2:1 7:2 148:1
**Dunn** 3:9,10 5:6 7:4
  7:7 18:9,17,24 19:1
  22:20 24:3,24 28:17
  29:22 32:9 34:23
  36:18 37:3,16 39:7
  42:15 43:25 47:14
  48:2,13,19 49:2,16
  50:15 53:15 54:13

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

7

55:7 56:11 61:10,24
62:11,13 63:22 64:5
67:5,8,20 68:1,21
69:21 70:15,21
73:24 97:24 114:22
135:9 141:24 143:8
**Dyer** 4:8

**E**

**E** 2:3 5:1 6:1 147:23
149:4 150:17
**e-mail** 93:18
**earlier** 27:2 46:10
55:11 74:2 114:25
116:19 121:11
128:2 133:5 135:10
136:14 137:22,25
138:1
**early** 12:10 21:22
56:1,4,5,7,12 125:3
135:2,4 141:23
**Ease** 122:15
**easier** 84:15
**easily** 50:23
**economic** 14:24
133:20
**education** 1:10 3:14
12:4 114:18 122:2
147:10
**educational** 46:25
**effect** 43:7 63:13
68:16 117:8 123:5
**effects** 40:23
**efficiency** 15:12
**efficient** 61:9 64:7
65:4
**efficiently** 64:4
**EIC** 65:14 130:5
**either** 24:18 25:12
48:3 52:9 64:11
71:15 72:16 76:12
93:18 109:13 114:5
130:25
**elaborate** 115:3

134:5
**elderly** 54:1,9,22
**elected** 9:16,21,25
11:14 14:21 55:17
**election** 10:7,9,11,18
11:7 14:22 15:24
19:21 36:4 55:14
56:4,7,13,17 65:14
111:10 112:21
113:8 117:4 124:11
124:22,23,25 125:2
126:1,13 128:3,11
129:4,17,19 130:8
130:18 133:25
137:14 138:5 139:3
139:4
**election-day** 135:3
**election-related**
14:16 15:17 32:10
35:21 38:12
**elections** 17:1 24:7
24:18 25:6,12 34:3
55:25 94:3,17
102:14 138:23
**electronically** 99:11
**elementary** 25:18
**eligible** 123:25
**eliminating** 15:13
**Elizabeth** 11:13
**employ** 116:5
**employed** 148:18
**employee** 46:14
115:1,4,20 116:1,4
116:11
**employees** 13:4 46:22
**encountered** 16:2
**ended** 83:11
**energy** 15:12
**engaged** 26:11 77:7
**engrossed** 6:11 110:7
**ensure** 53:9 94:2,16
96:19 115:10
**entire** 127:1
**entity** 13:1

**equipment** 65:3
**erect** 45:25
**erects** 46:15
**especially** 54:1 61:8
108:22
**estate** 12:12
**et** 1:3,6,10,14,17 3:14
44:5 64:7 147:3,6
147:10,14,17
**even-numbered-year**
15:24
**event** 68:5
**events** 68:5
**everybody** 17:3 18:6
18:7,23 131:13
**everybody's** 73:1
**evidence** 50:2,6
70:13 123:5,19
125:14 126:11
129:7,9 134:3
**exact** 72:17
**exactly** 55:5 71:9
82:20,21
**exaggerate** 87:15,16
**exaggerated** 88:2
**exaggerating** 87:4
88:8,11,14
**EXAMINATION** 5:5
5:8 7:3 74:14
114:15 141:1
142:15 143:12
**Examines** 89:14
92:15 96:7,10
108:20 127:15,20
**example** 27:21 44:12
46:14 48:2,5 54:3
56:16 64:19 71:17
72:19 115:9 124:15
124:21 130:6
**exception** 112:19
113:1,4 116:16
**excerpt** 6:15 18:17
126:24
**excess** 138:16 139:1

**excited** 43:15
**executed** 146:16
**executive** 3:21 12:20
**exemptions** 113:19
**exhibit** 78:11,13,19
78:19 81:24 89:1,3
89:22 92:8,22 93:8
95:24 96:1 101:20
101:22 106:17
108:12,14 110:5
117:14,15,20 120:2
120:6,10 126:21,23
141:9 142:18,20,21
142:25 144:2
**existence** 20:22 43:22
**exists** 64:15
**expansive** 23:15
**expect** 7:16 43:23
**expected** 39:20 42:5
75:4
**expense** 137:23
**expensive** 137:24
**experience** 15:16
16:3 35:21 58:12
61:12 64:19
**experienced** 27:11
**expert** 116:25 121:13
**expertise** 15:9
**expiration** 122:3,6,11
149:5 150:18
**expired** 57:13 111:19
111:22 112:16
**expires** 57:7
**explain** 79:13,21
82:17 83:11 86:4
107:18
**Express** 79:3
**Express-News** 6:3
**expressed** 146:18
**expressing** 61:6
**extent** 18:2 43:21
101:7,8,10
**extraordinary** 85:4
85:22 86:3,9,17

JOE STRAUS                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

8

**F**

fact 98:11 123:21
factor 56:21
facts 50:5 70:12
  125:13
factual 70:5
fail 38:7
failed 129:11,13
fair 8:16 13:22 19:10
  29:22 30:8 80:18
  84:23 91:13 94:6
  105:15,16 115:8
  129:1
fairly 19:19 29:25
  45:7
familiar 45:8 68:4,25
  112:2 114:2,9
  117:22 120:11
far 7:17 25:24 114:22
  134:25 135:10
  141:15
fashion 88:24
fault 86:15
favorably 27:3 30:12
favorite 60:13
federal 2:7 7:9 38:13
  38:24 39:9 46:14,17
  68:2 93:23 115:20
  116:1,4,11 121:6
fee 127:20,23
feel 108:23 127:17
fees 129:3,16
fellow 11:3
felt 80:4
fifth 122:14
figure 27:23
figures 40:25
file 92:23
filed 7:9 91:9
files 6:6,7,9 90:9
  92:11 93:11 102:1
filing 18:11
fill 74:9

filled 20:19
financially 148:20
find 29:5,12 63:7
findings 70:5,13 95:4
fine 18:24,25 19:20
  36:9 38:4,5 120:25
finish 83:10
finished 132:5
firm 114:20 149:6
  150:19
first 7:2 9:21 10:4,25
  14:9 17:10 20:10
  21:5,6 57:21 66:14
  79:8,23 82:3 93:14
  108:23,25 111:15
  124:14
fiscal 13:20 65:5 66:7
Fisher 2:3 147:23
  149:4 150:17
fix 50:17,20
flesh 56:18
flip 103:20
floated 118:20
  119:10
floor 3:22 21:20 31:3
  31:9,13 32:15,18
  34:8 120:15,20
focus 23:14
focusing 45:22 72:17
folks 14:1 39:17 53:9
  60:5 62:15
follow 60:19
follow-up 61:10
  142:13 143:9
followed 84:25
following 44:20 76:3
  89:9 127:10 147:25
follows 7:2
forced 41:2
foregoing 146:3,15
forged 117:12
forging 122:15,17,21
  123:2
forgotten 54:9

form 21:20 48:11
  56:9 69:20 88:24
  112:14 128:9 129:8
  129:23 130:2,20
  131:1,15 133:15
  134:2 136:5 137:3,9
  137:19 138:7
  139:10 150:8
formal 12:5 43:12
formally 21:19
Former 11:11
forms 41:18
formula 68:23
forth 80:15
forum 81:9
found 68:23 70:6,10
  70:16,23
foundation 130:20
  131:1,15 133:15
  137:3,9,19 139:10
fourth 79:6
Fowler 35:15,19
  100:11 101:3,16
  110:16,24
Fowler's 101:6
frame 83:7
Frank 4:3 8:23
frank.battle@spea...
  4:6
frankly 72:16
Fraser 6:7 81:5 96:14
Fraser's 80:10 81:9
  81:20 88:2 103:21
  103:22
fraud 6:7 16:3 23:7
  35:14 50:3 79:9
  82:16 88:18,20,24
  91:10,14,18 92:2
  93:16 114:10
  126:13 140:15,22
fraudulent 117:4
FRCP 148:9
free 127:17 128:4
  129:20,22 130:8,18

133:25 137:14
friendly 7:16
full 75:5
Fund 1:10 3:14
  114:19 147:10
funding 62:8,19,23
  64:24
further 5:8 142:15
  143:8,12,25 148:9
  148:17,20

**G**

gain 118:13
gallon 135:22
gas 135:22 138:3
gatekeeper 31:5,6
gathered 20:9
Gear 3:3 5:6,9 74:15
  74:16 75:21 76:9
  78:9,12 80:8 81:12
  82:14,22 83:10,15
  84:5 85:21 86:1,8
  86:15,20,25 87:2,13
  88:6 89:2,5,12,17
  89:19,21 90:7,12
  92:9,13 93:10 94:14
  95:19,25 96:4,6,8
  97:10,23 98:22
  101:15,21,23 102:3
  102:5,7 103:7,16
  104:22 105:3,8,14
  105:20 106:1,13
  108:10,13,16,25
  109:12,15 110:2,4
  114:13 143:9,13
  148:5
gears 55:12
general 2:5 3:21 4:4
  4:9,9 10:7 13:19,19
  14:9,18 19:6 34:24
  49:13 69:13 71:7
  124:22 130:4
general's 9:1 34:24
  43:17 44:3 73:6

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

9

115:9
**generally** 23:6 29:24
36:23,25 40:3 56:1
62:1 63:10 64:4
68:4,6,13,24 69:1
72:10 77:22 99:14
**generic** 13:19,20
**gentleman** 11:2
**gentlemen** 73:11
**getting** 17:8 38:16
141:16
**give** 8:1 11:1 14:18
48:1 73:19 74:9
75:4 89:3 92:13
96:1,4 108:14 111:2
124:15
**given** 7:21 44:11,11
66:3 89:21 115:11
126:1 146:19 148:3
150:10
**gives** 17:4
**giving** 62:22 101:10
**go** 9:3 13:23 17:25
21:2 23:20 24:8
25:7 26:3,14 27:24
41:12 46:13 58:10
59:11,14,17,21
60:24 74:19 85:2
109:21 114:21
115:25 135:15
**goes** 26:2 87:14
**going** 7:14 9:3 17:15
17:16 22:11 29:10
33:19 38:13 43:18
55:11 56:16 58:11
59:3 62:18 66:10
74:24 82:4 88:22
109:18 125:1
**good** 27:13 60:3
**gosh** 19:15
**govern** 21:8
**government** 40:18,23
41:23 42:3 43:7
45:24 67:14 115:7

121:6
**government-issued**
46:21
**governor** 34:16 76:3
83:21,25 84:5
**governor's** 34:13,16
**graduate** 11:21
**graduated** 12:1
**great** 15:9 17:5,5
119:5
**Griesel** 26:24
**ground** 16:22 74:19
**group** 7:8 114:19
**groups** 47:10,17
**guess** 21:4 52:19 75:7
81:5 87:11 106:23
109:15 130:22
135:5
**guessing** 94:19
135:13
**guys** 73:23

## H

**H** 6:1
**habit** 55:25 90:12,15
91:2
**half** 20:20 135:8
**hand** 141:8 146:19
**handed** 108:13
**handful** 66:11
**handgun** 112:11,13
**handing** 101:21
**handle** 52:14 99:24
**handled** 17:22 24:13
24:15 62:3
**handling** 89:7
**hands** 29:23
**handwritten** 6:12
**happen** 38:8
**happened** 68:7
**happening** 61:17
69:16
**happens** 25:23 28:2
30:13 31:18,19

78:16
**happy** 109:25
**hard** 38:17 80:1 87:4
87:5 88:1
**harm** 51:4
**he/she** 146:16
**head** 8:8 84:19
**hear** 31:23 47:22
**heard** 40:5 48:7,8
50:16 60:7 61:13
104:10,13,16,17
138:18,19 139:3
**hearing** 95:3
**heavily** 10:5
**Heights** 11:22
**held** 24:17
**help** 79:9 81:2 82:3
82:15 92:16 113:16
**helps** 18:6
**hereto** 144:4
**high** 11:18,22
**high-profile** 25:10
33:20 34:21
**higher** 46:25 122:1
**highly** 1:22 89:6,9
92:10 101:24
108:17,18 109:17
117:18,21
**hindrances** 40:9
**HISPANIC** 1:13
147:13
**Hispanics** 72:19
**history** 66:19
**hold** 31:21 32:5
**Holder** 68:23 75:8,15
75:24 76:3 133:7
**holdovers** 142:2
**holds** 31:15
**home** 55:25 124:1,2,7
124:7 135:11 136:3
**hope** 38:15,20 57:13
122:22,24
**hoped** 42:5
**Hopefully** 122:21

**hot** 22:15 56:17
**hotly** 66:20
**hour** 60:2,3 136:15
137:1 138:17,22
139:8
**hours** 60:2 114:21
137:1,5 139:1
**House** 4:4 6:15 9:15
9:25 12:17 20:11,16
20:24 21:1,5,5,7
23:13 24:4 25:20,21
26:1 27:19 32:20,25
33:25 35:3 36:11
38:2,4,6,14 39:6
42:5 44:13 45:1,9
55:17 63:10 67:1
75:23,25 77:4 79:9
80:7,16 82:10,10,23
83:4,4,7 84:16 90:5
98:24 99:3,13,20
100:5 104:8 118:20
119:17,24 126:24
135:1
**housekeeping** 17:22
21:21
**Houston** 3:11 115:25
**hundred** 127:2
**Hunter** 30:19
**Hunter's** 30:25
**hunting** 57:21

## I

**ID** 6:10,14 22:19 37:2
39:12 41:18 46:17
46:21 51:1 55:5
65:13 84:1 85:3,23
86:18 88:3,11,16
93:16 95:8 97:2
98:1,16,24 102:14
102:21,24 103:2,9
103:10,14,17,18,22
103:23 104:3,7,24
105:4,9,16,22 106:2
106:9,20,24,25

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

10

107:4,4,6,7,7,8,12
109:3 110:6,11
111:2,6,10,21
112:14 113:7 115:7
115:11,16 116:25
118:10,14,21 119:1
120:20 121:14,18
122:6,8 123:9,15,22
127:21,25 128:5
136:3
idea 22:8,20,23
105:15 118:20
119:10 143:4
ideas 47:16 66:8
identification 7:11
14:8,12 17:12 19:2
19:7,22 20:13 22:10
22:15 23:3,7,14
24:6 25:1,14 27:21
27:24 33:17 35:14
36:19 37:5,12,18
38:3 45:23 50:12
54:18 59:7 63:15,24
65:14 66:12,20 67:9
67:13,22 80:19
82:24 84:10 93:24
94:20 98:12 114:24
115:5,20 116:1,2,24
125:8,19 128:3,9,11
129:4,17,19 130:8
130:16,18 133:14
133:25 137:15
138:5 140:24
identification's
128:10
identifications 46:11
51:17 53:16
identified 18:4,12
101:24 110:6
117:21
identify 89:22 96:11
identifying 105:9
identity 107:24
146:14

IDs 19:13 41:24
46:14,24 47:2,6,10
47:16 52:1 53:22
54:25 55:1 66:4
111:25 114:23
115:1,4 116:4,5,11
116:22 117:3,11
118:14,15 119:11
119:18,25 120:16
121:4,5,12 122:2,11
122:16,18,21,23
123:1 125:25 126:4
126:6,12
ill-advised 46:1
illegal 45:25 49:21,21
96:19
imagine 19:4 23:4
28:14 33:15 39:22
95:11 97:4 100:17
140:12
impact 42:10,18
44:23 65:5 66:7
70:11,17 77:8,13,16
77:21 98:25
impacted 39:17
impacts 40:2
implement 69:23
implementation 43:3
44:5 70:7 76:14,15
76:19,22 77:1,9,21
114:11
implemented 68:18
69:15
implementing 65:19
important 79:7 82:2
107:3
improve 14:2
improvements 61:14
in-person 88:20
140:15
incident 50:13
incidents 49:20
140:15
include 18:10 47:6

99:20 118:21
included 46:13,14
54:21 105:17
116:12 119:18,25
120:16
including 119:11
121:12
incumbent 8:15
independent 10:13
Indiana's 109:3
indicate 82:14 87:5
indicates 88:13 96:19
indigency 113:22,24
individual 7:8 31:20
36:4 115:17,21
122:7,10 124:10
127:24 128:4,8
130:5,15 132:9
133:20,23 135:20
137:12 138:2 139:7
139:8
individuals 129:2
132:13 138:16
139:15
industries 15:6,11
influence 26:9 45:13
information 39:15
40:16 41:8,13,22
42:4,9 43:8 64:10
64:15 65:23 71:25
72:6 126:15 139:18
139:23
informed 40:12
initially 21:11 51:19
68:1,18
input 26:9 30:3,6
inquiry 40:21
install 23:24
instance 1:25 39:3
115:24 140:22
instances 138:16
institution 123:9,22
institutions 46:25
122:1

instruct 43:20
instructed 109:23
instrument 146:16
insurance 12:20
integrity 36:24
intent 49:4,7 70:25
106:8
interested 44:20
52:10 53:1 148:21
internally 31:12
Intervenors 1:11,15
147:11,15
introduced 80:19
invasive 39:4
investigation 19:2
investments 12:21
15:5
involved 39:14 44:10
45:14 51:23 52:24
63:4,11 76:10 105:3
113:18,21
involvement 29:23
involves 18:17 101:8
involving 44:14
140:23
issue 13:25 17:7,14
17:21 18:19 25:4,10
33:20 34:21 40:3
49:19,25 51:16,24
52:5,6,11,21 53:1
53:19,22 62:8,19
65:25 79:7 82:1
88:18 92:2 97:17,19
98:8,11,24 100:21
102:16 114:6
issued 46:24 68:11,22
69:14 74:6 111:21
131:20 132:9,19
133:6
issues 13:17,18 14:4
15:18 23:1,16 25:7
33:5,23 49:2 51:11
56:18 63:23 64:25
97:25

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

11

**issuing** 66:4 121:5
**Item** 118:5

---

**J**

**January** 11:15 91:8
  112:20
**Jay** 4:8
**Jesse** 62:6
**jobs** 12:9,10
**Joe** 1:20,24 5:4 6:4
  7:1,6 145:1 146:3,7
  146:12 147:21
  148:1
**John** 3:20
**john.scott@texasat...**
  3:24
**joined** 13:16
**Jones** 4:14 11:13
  114:19
**journal** 6:15 126:24
  127:1
**judge** 9:6 74:6
**JUDGES** 1:13
  147:13
**judiciary** 15:1,2
**July** 149:1
**June** 1:20 2:2 6:3
  79:3 145:2 147:21
**juris** 15:2,2
**jurisdiction** 23:18
**justice** 3:4 11:11
  74:17

---

**K**

**keep** 7:15 17:25 48:5
**keeping** 63:20
**Kelly** 2:3 147:23
  149:4 150:17
**kept** 18:7 89:10
**kind** 25:18 28:25
  43:12 55:11 65:1
**knew** 22:13,14 25:9
**know** 8:16 9:5,5
  13:19 14:1 16:22

17:3 19:3,10,11,11
19:16 20:2 26:7,21
27:10,12,16 30:24
31:11,11,12,14,23
32:2,13 33:1,1,20
35:23 36:25,25
38:11 41:16,20,21
42:1,15 43:16 44:12
44:19 45:8,11,12,17
46:20,23 47:5,7,8
47:14 50:15 51:2
52:25 53:7,15,18
54:6 55:7,8 58:8,24
60:12 62:17 63:14
64:15,16,23 65:1,9
65:11,21,25 66:3,9
66:25 67:8 70:4,9
70:15,19,21,22 71:7
71:17,19,22 72:22
73:13 76:8 77:5,14
77:23,24 78:4,8
83:2,8 86:23 88:25
91:1 93:12 96:8
99:12,14,22,25
100:6 103:13,14,14
104:15,22,24
106:16 107:3,5
108:21 109:12,14
110:15 112:5,8,12
113:9,12,14,24
114:9 115:6 116:4,8
117:2,3,24,25
118:19 119:9,15,16
120:1,12 121:10,20
122:6,10,11,20
124:9,9 125:5,6,9
125:22,25 126:3,7,8
127:13 129:18,25
130:10,10,11
131:12,16,16,23,23
132:1,8,16,17,18,20
132:23 133:1,22
134:11,11,18,24
135:12,22 138:10

138:25 139:2,13
141:9 143:2,6
**knowing** 33:19
**knowledge** 64:10
  76:23 100:1 126:11
**known** 71:24 146:12
**knows** 18:7 44:19

---

**L**

**labeled** 120:10 127:6
**lack** 41:18
**land** 101:12
**language** 48:3,10,15
  106:19 113:15
**large** 41:6 72:20
**lasts** 56:1
**late** 59:16
**Latinos** 40:3 48:6
**law** 7:10 37:7 38:13
  38:25 39:9 93:23,24
  109:3 111:2,6
**law's** 40:11
**laws** 94:2,15 133:14
**lawsuit** 7:9 40:1
  43:17 68:4
**lawyer** 18:20 44:18
  101:7
**lawyers** 73:6
**leading** 22:17
**League** 1:9 3:14
  114:18 147:9
**leave** 18:13 37:24
**led** 48:4
**left** 30:8 75:8
**legal** 44:14,21,23
  68:16 101:10
  108:24 149:5
  150:18
**legality** 44:5
**Legislate** 36:12 39:1
**legislation** 22:15 24:5
  24:17 31:3 36:16
  37:2,25 38:9 54:12
  65:2 80:19,24 82:10

82:24 84:1 85:23
86:18 88:3,11,16
91:9 95:8 97:3 98:1
98:17,25 102:18,22
102:25 103:2,10,17
104:7 106:9 107:4,6
118:14 119:12
**legislative** 6:6,9
  11:17 13:15 16:24
  17:16 18:13,19
  23:25 24:17,19
  28:12 29:19 30:11
  32:6 34:18 36:21
  37:13 41:10 42:12
  47:11,24 48:9,16,24
  49:4,7,16 52:5 53:8
  53:11 54:4 61:3,20
  63:17,25 67:3,17,23
  75:16,20 76:5 79:24
  82:6,18 84:2,6,9
  85:18 87:9 90:9
  92:11 94:9 95:15
  97:7 98:19 101:4,9
  101:25 103:4
  116:13 141:25
**legislators** 77:11
  95:12 97:19 104:17
  114:6 119:17
**legislature** 12:16
  13:16 17:11 20:8
  21:7,12 22:1,16
  44:24,24 47:23 48:3
  51:20 52:5,23 53:2
  60:14 62:22 64:11
  66:12 75:14,23
  80:15 91:8 106:8,12
  126:25 142:5
**legislatures** 51:11
  66:11
**legitimate** 96:21
**legitimately** 49:15
**let's** 10:4 71:6 80:8
  89:24 110:4 124:16
**letter** 6:4 89:25 90:20

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

12

91:16,19
**letters** 90:13,16,24
  91:3
**letting** 43:18
**level** 100:9 132:23
  139:20 140:8
**license** 19:17 51:16
  57:1,7,20 58:2,15
  58:19,22 59:6,10
  61:7 64:3 111:18
  112:11,13 123:9,11
  123:22 135:11,16
  135:19 136:3,15,16
  136:18,25 137:13
**licenses** 123:1
**lieutenant** 34:16,16
  76:3 83:21,25 84:5
**limited** 88:19
**line** 37:8,17 91:20
  109:18 118:2 121:2
  136:15 138:3 139:4
  139:15
**lines** 37:22 63:15
  138:10
**listed** 118:5
**litigation** 44:11,14
**little** 9:3 11:17 26:19
  40:9 48:1 71:2 82:8
  107:18 141:24
**live** 9:12 139:15
**lives** 135:20
**LLC** 13:2,3
**LLP** 3:10
**lobbying** 23:22
**located** 124:4,8
  125:12
**location** 59:10 135:1
**locations** 46:4 138:13
**long** 38:15 56:1 59:20
  80:2 87:22 109:24
  127:2 136:24
  138:10
**longer** 15:5 37:19
  59:21 60:18 69:23

136:14 139:8
**look** 17:14 23:10 57:9
  63:6,20 89:4,22
  92:14 96:5 97:17
  98:11 99:23 108:15
  117:22 120:11
  121:24
**looked** 53:24 71:25
  72:3,5,6 73:16
**looking** 106:19 110:5
**looks** 90:4 96:13
  109:10
**loosen** 25:13
**lot** 8:7 15:18 17:4
  29:4 58:14
**love** 38:8
**low** 13:21

---

**M**

**machine** 2:4 141:13
**mail** 54:14,17 55:21
  55:24 58:25
**mail-in** 91:10,14,18
**major** 10:3
**majority** 31:7,16
  102:17 139:14
**makeup** 41:23 47:9
  71:7
**making** 18:3 34:7
  39:8 65:12 84:14,15
  87:12,14,23 122:2
  150:10
**manage** 83:8
**managers** 16:16,18
**MARC** 1:3 147:3
**March** 127:1
**Marion** 133:10
**marked** 78:9,11,13
  78:18 81:23 89:1,3
  92:8 95:24 96:1
  101:20,22 108:12
  108:14 113:7
  117:14,18,20 120:2
  126:21,23 141:9

144:2
**marks** 89:16
**married** 13:8
**Martinez** 127:9
**material** 99:5
**matter** 28:4 54:6
  81:19 96:25 130:22
  131:11
**matters** 54:11 84:16
**Maytag** 60:15
**McCall** 30:24
**mean** 12:13 20:23
  27:13 29:24 31:18
  43:10 44:17 45:7
  46:3 51:10 56:15
  63:5 68:7 71:25
  72:23,24 80:1 85:7
  99:13 104:20
  109:14 127:22
  128:24 134:6
  143:17
**meaning** 108:3
**means** 9:16 103:15
  125:20 129:13
**meant** 79:22 82:17
  86:23 106:22
**measure** 31:8 32:10
  32:25 38:3,11,12,24
  44:25 48:22 50:4
  67:22 85:4,22 86:4
  86:9,17
**measurements** 64:6
**measures** 6:8 14:16
  36:19 37:9 41:13
  45:23 50:1,11,21
  55:20 67:13 80:5
**media** 79:18
**meeting** 76:10
**meetings** 34:22 35:3
  43:12
**member** 31:20 32:4
  35:10 36:11 48:2,15
  90:5,6 100:12
**members** 21:17,17

22:2,6,24 23:24
  25:11 26:16,20 27:5
  27:14 31:25 33:4,20
  34:3 38:1 39:20,22
  41:11 42:22 47:22
  52:7,10,23 71:17
  126:18 139:25
**mentioned** 43:11
  55:11 56:24 64:5
  81:5 136:14
**Meredith** 35:15
  100:11 110:16,24
  117:25
**met** 29:10 61:17
**metrics** 63:21 64:5,6
  64:21
**micromanaging** 38:9
**mid** 12:11 59:15,16
  59:16
**middle** 32:14 111:8
  111:13
**mile** 135:8
**miles** 135:6,6,13,19
  136:2,7,8
**military** 111:25
  126:4,6
**mind** 20:6 57:12
  138:6
**minimum** 133:1
**minor** 12:9
**minorities** 139:14,20
  140:8
**minority** 40:2 42:10
  42:18 52:14 70:11
  70:17 72:11,14 77:8
  77:13,17 98:2,13,18
  98:25
**minute** 11:1 73:19
**minutes** 60:2 62:14
**mischaracterization**
  129:9 133:16 134:3
**mischaracterizes**
  68:19 81:11 137:17
  143:21

JOE STRAUS

6/23/2014

CONFIDENTIAL TRANSCRIPT

13

**missed** 100:20
**misstates** 129:6
**mistaken** 54:12
**mixed** 15:6
**mixture** 56:4
**moderate** 104:1
**modernization** 63:19
  63:23 66:1
**modernize** 65:3
**modest** 87:15
**modified** 81:8
**moment** 33:7 44:21
  53:19
**money** 58:14 65:9,18
  134:10
**morning** 7:17 43:24
**move** 24:10 25:4 62:7
  80:15 119:4
**moving** 31:13
**much-debated** 25:10

**N**

**N** 5:1
**name** 7:5,7 11:3 13:1
  23:17,18 62:5 74:16
  78:15 122:8 146:15
**named** 11:2,3
**names** 10:24 114:3,7
**near** 60:4 87:2
**necessarily** 143:18
**necessary** 18:10,14
  20:23 123:21
  129:16
**need** 18:5,20 63:7,14
  94:1,15 108:5
  112:20 113:2,7
  129:4
**needed** 58:10 88:15
  123:8 128:10
**needs** 87:17 88:15
**negative** 48:9,15
**neither** 148:17
**never** 31:22 60:7
  99:23,23

**new** 21:1 57:20 118:3
**news** 41:4,7 42:2
  78:24 79:3 82:1
  138:21
**newspapers** 40:17
  43:9
**Nodding** 84:19
**noise** 8:9
**nomination** 11:5
**nominee** 9:23 72:20
  72:21
**non** 103:21
**non-DPS** 66:4
**non-photo** 103:23
  105:22 107:7
**noncitizens** 92:6,18
  94:8,22 95:1,9,13
  95:20 96:20 97:6,11
  97:20 105:23 106:4
**normal** 25:5 84:24
**normally** 24:5
**Nos** 144:2
**notary** 146:22 148:13
**note** 89:5 117:17
  120:4
**noted** 18:18 66:13,19
  146:5
**notes** 6:12
**notified** 150:3,6
**number** 12:8,13 23:8
  23:9 33:20 37:3
  41:1,6,17 72:20
  77:25 78:5 80:24
  120:3
**numbered** 2:2
**numbers** 72:15,17
  90:10
**NW** 3:5,16 4:15
**NWB** 3:5

**O**

**oath** 75:4 146:13
**objection** 48:11 49:8
  50:5 53:13 56:9

68:19 69:6,20 70:12
  70:20 81:10 116:6
  125:13 129:6,8,23
  130:2,20 131:1,15
  132:3 133:15 134:2
  136:5 137:3,9,17,19
  138:7 139:10
  140:11 143:21
**obsolete** 15:13
**obtain** 42:6 54:23
  55:3 64:20 65:13
  127:24 128:11
  129:3,4 130:5
**obtained** 42:9 53:17
**obtaining** 54:1
  127:23 129:16
**obviously** 8:14 11:16
  14:7 18:6 19:11
  30:11 49:3 58:17
**occasion** 31:4 38:23
**occasionally** 8:8
**occasions** 33:3 56:15
  58:22
**occurred** 68:25
  126:25 140:23
**off-the-record** 85:12
**offered** 107:6 120:19
  127:9
**office** 2:5 3:21,21 4:4
  4:9,9 9:1 11:12 13:7
  26:8 34:13,17,25
  35:25 43:17 44:4
  60:4,17 64:20 69:22
  69:25 73:6 76:7
  77:7 96:16 110:17
  110:21 115:10
  135:19 146:19
**office's** 64:21
**officer** 37:21 46:7
  51:12 148:2 150:6
**officers** 36:4 55:18
  67:15
**offices** 58:15 61:7
  64:3,7 66:4

**official** 41:8 43:6
  55:13 60:19 96:15
**officials** 39:5 40:19
  40:23
**oh** 11:8 14:21 19:15
  28:11 34:11 35:8
  49:12 53:23 55:14
  59:25 79:3 93:6
  111:14 124:13,13
  124:13 135:8
  136:12
**okay** 8:10 9:8 12:6,16
  14:7 15:23 16:11,20
  17:3,10 18:8,9
  19:19 26:18,22
  33:14 37:17 43:5
  46:7 58:13 62:16
  71:14,23 73:7,15
  74:10,21 89:13,18
  89:20 92:15 93:9,19
  96:10 99:17 100:15
  103:19 119:5 122:5
  124:20 127:4,7,11
  131:6 141:23
  142:11
**old** 12:15
**older** 112:19
**once** 8:5 22:5 28:2
  69:14
**ones** 14:11
**online** 58:10,19,22
**open** 10:17,17,25
  14:23 16:5
**open-seat** 10:17 11:6
  11:6
**opening** 59:23
**operates** 31:12
**operating** 25:5
**opinion** 40:6 68:22
  69:3,11,14 70:9,16
  97:10,13,14 103:8
  107:7,10 115:6
  116:3 130:22 131:5
  133:10

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

14

**opinions** 133:6
**opponents** 10:24
**opportunities** 30:2,6
**opportunity** 7:18
  56:2,12 79:8,23
  82:3 89:21
**oppose** 50:24
**opposed** 25:12
  119:18,25
**opposing** 50:24 52:8
**options** 59:1
**oral** 1:19,24 148:2
**order** 15:6 55:2 80:3
  128:10 129:3 130:7
  130:17,19 133:24
  139:4
**original** 148:4
**originated** 22:9
**ought** 27:24 29:16
  47:2 64:3
**outcome** 148:21
**outside** 12:16 35:22
  38:11 41:7
**overspoke** 86:20
**overuse** 38:22

**P**

**p.m** 2:3 144:1
**P.O** 4:5,10
**page** 5:2 6:2,12 79:5
  83:16 87:2 93:14
  102:4 111:8,13,15
  125:18 127:5,6
  148:15
**PAGE/LINE** 145:4
**pages** 127:2,3
**paid** 19:16 137:13
**paragraph** 79:6
  83:16 87:3 91:6
  93:20 96:18 108:23
  108:25
**paraphrase** 127:17
**Pardon** 27:6
**parentheses** 118:3

**Parkway** 3:10
**parliamentarian**
  26:14,16,18,21,23
  26:25 27:3,7,19,23
**parliamentarian's**
  26:8
**part** 32:13 42:24 66:1
  95:18 100:20
**particular** 13:17,24
  15:8 25:4 33:24
  39:23 76:18 78:20
  80:24 90:19 100:24
  109:16
**particularly** 20:6
  40:8 44:20 119:18
  119:24
**parties** 148:7,18
**partisan** 10:11 83:5
**partner** 13:3
**parts** 18:2,8
**party** 9:23 148:11
**party's** 72:20,21
**pass** 21:23 38:3,4,7
  38:14 62:15 67:22
  79:9 82:10,15
  102:25 103:3,9,10
  107:3 114:14
  128:24 129:2
  142:12
**passage** 44:4 108:1,3
**passed** 7:10 20:8 21:5
  32:20 42:20 66:15
  67:15 70:24 104:6
  104:11 129:14,15
  130:14 142:8
**passes** 38:6
**passing** 66:21 102:18
  133:14
**passports** 112:3
**pat** 39:4
**Paul** 11:2
**pay** 129:3 130:7,17
  131:8 133:24
  134:10 137:12

**paying** 138:3,4
**penalties** 114:10
**pending** 44:14
**Pennsylvania** 3:5,16
  4:15
**pensions** 15:4
**people** 40:13 41:1,17
  41:23 54:14 96:20
**percent** 38:7 71:20
  71:20
**percentage** 72:11
**performed** 47:9,15
**period** 31:21 62:21
  80:9 82:5 88:23
**permissible** 127:25
**permission** 18:5
**permit** 38:14
**permitted** 19:13
  46:11 53:16 55:1
  120:21 129:15
**PERRY** 1:6 147:6
**person** 23:22 55:21
  55:22,23 56:2,3
  58:10 107:20
  113:10 115:11
  122:8 130:7 131:20
  132:1 138:2 146:15
**person's** 62:5
**personal** 115:6 116:3
  123:1
**personally** 36:2
  131:5 146:12
**persons** 11:4 121:4
**persuade** 23:23 39:6
**persuasive** 38:18
**pertained** 35:3
**pertaining** 28:23
  114:24 120:15
**pertains** 17:12 20:16
  22:10 32:25 34:4,8
  34:13,17 35:25 36:5
  43:17 70:23 74:3
**pet** 17:7
**Phone** 3:6,12,17,23

  4:6,11,16
**photo** 7:11 17:12
  19:22 25:14 27:23
  35:14 38:3 51:1
  63:15,24 65:13
  66:11,20 67:8,22
  80:19 82:24 84:1,10
  85:23 86:18 88:3,11
  88:16 93:24 94:19
  95:8 97:2,25 98:12
  98:16,24 102:21,24
  103:2,9,10,14,17,18
  103:22,23 104:3,7
  105:21 106:9,19,25
  107:4,4,6,12 109:3
  111:2,6,10 112:14
  113:7 118:15
  119:18 122:11
  128:5 130:16
  133:14
**photograph** 107:20
**photos** 116:22
**physical** 99:23
**Physically** 99:17
**physician** 113:2,5,10
  113:15
**picture** 115:11 122:8
**piece** 80:24
**pieces** 24:16
**place** 13:23 50:12
  85:5,23 86:18 88:20
  97:2 107:9 115:10
**Plaintiff** 1:8,11,14,25
  3:2 147:8,11,14
**PLAINTIFF-INT...**
  3:14
**plaintiffs** 1:4 3:8 7:8
  7:8 147:4
**play** 76:15,18
**played** 32:17
**please** 7:5 9:9 14:20
  38:6 78:10 81:13
  86:14 96:12 109:6
  117:19 118:2

JOE STRAUS                                    6/23/2014
CONFIDENTIAL TRANSCRIPT

127:14
**plum** 30:20
**point** 19:20 21:13
  23:13 43:15 46:5
  63:22 75:13 81:21
  82:20 114:13
  117:10,12
**points** 6:13 141:16
**polarized** 72:4,19
  73:1
**pole** 115:5,16,21
  116:2 125:21,22,25
**poles** 114:25 138:25
**policy** 15:8 36:23
  51:19 52:8 101:8,12
**Political** 12:3
**political-related** 12:9
**politics** 83:11
**polling** 50:12 88:20
  107:9 134:25
  138:13
**polls** 92:18 94:8,23
  95:1,14,21 97:6,12
  97:20 106:6 107:22
  107:24
**Popp** 4:8
**portfolio** 100:19,22
  101:8
**portion** 18:11
**position** 9:14 30:20
  37:23 69:13 87:4,6
  94:18 104:14
**positions** 88:1,1,6,8
  88:10
**posses** 41:24 59:6
  125:7 130:6
**possession** 105:22
  106:3
**possible** 7:15 110:14
  110:23,25
**possibly** 88:8 95:20
**potential** 91:10,17
**poverty** 132:23 138:3
  139:15,19 140:7,7

**pre-cleared** 68:2
**precinct** 124:1,3,7
**preclearance** 68:3,11
  68:12 69:7,22 70:6
  70:10,16,22
**predecessor** 11:12
**predicted** 40:10
**preparation** 45:14
  121:18
**prepare** 44:2 45:10
  73:4 123:21
**prepared** 45:2 90:1
  93:17 110:23
  117:24 120:12
  143:2
**prepares** 31:2 110:15
**present** 4:13 18:13
  44:5 111:9 112:20
  113:7,10
**presented** 123:5,19
**presenting** 50:25
**preserve** 17:18
**presiding** 37:21
  51:12 63:10 74:6
**press** 79:19 96:13,16
**pretty** 23:19 30:20
  40:11
**prevent** 49:22 67:1
  68:17
**prevented** 41:1 50:3
**previous** 21:12 25:16
  51:11 103:21
**previously** 33:21
  49:24 78:13,18
  90:22 97:24 106:10
  107:21
**primaries** 16:12
**primary** 10:7,15,15
**printed** 90:10
**prior** 14:18 19:21
  21:18 25:12 37:4
  44:1 57:3 66:20
  79:14 104:7 114:10
**private** 12:12 48:20

95:20 118:9,21
  119:1
**privilege** 17:16,18
  18:13,19 22:12
  23:25 24:19 28:12
  29:19 32:6 34:18
  36:12,21 37:13 39:1
  42:12 43:22 47:11
  47:24 48:16,24
  53:11 54:4 61:3,20
  63:17,25 67:3,17,23
  75:16 76:5 79:24
  82:6,18 84:2 85:18
  87:9 94:9 95:15
  97:7 98:19 101:4,10
  103:4 105:12
  116:13,18
**privileged** 83:1,13
  85:24 86:6 88:4
  95:22 97:21 103:11
  104:18 105:1,6,18
  105:24 106:11
  118:16 119:14,20
  120:23 121:22
  126:19 140:2,10
**probably** 10:19 12:19
  25:6 38:22 44:18
  60:23 79:19,19
  80:13 102:11
  125:10,20 135:5,13
  136:4 139:16
**problem** 47:4 50:25
  87:16 88:14,15
  115:14,18,20
  116:22 117:1,2
  121:12 123:17
**procedurally** 21:3
**Procedure** 2:7
**procedures** 84:14,17
  84:20,23,25 115:10
**proceed** 109:16 110:1
**proceeding** 148:19
**proceedings** 21:8
  126:25

**process** 8:6 21:25
  24:22 26:2,4,9
  27:18 31:13 41:11
  45:8 63:9 99:2,4
  121:4
**processed** 25:20
**procure** 123:8
**produced** 1:24
**production** 121:14
**progress** 28:9 76:25
**prohibited** 115:4
**proof** 93:24 107:13
  107:16,17
**proposal** 17:11
**proposals** 21:15 37:8
**propose** 21:17,23
  29:15
**proposed** 22:3 23:6
  25:14 37:4 66:15
  104:8 106:10
**proprietor** 12:25
  13:2
**protected** 101:11
**prove** 55:2 59:7
  70:24 107:8,23
  115:17 122:7
**proved** 146:12
**provide** 30:2
**provided** 64:24 78:20
  113:2,5 121:17,17
  122:17
**providing** 121:4
**proving** 53:17 116:2
**provision** 54:13,21
**provisional** 41:2 78:1
  78:6
**provisions** 2:7 54:8
  78:2,7 111:9,18
  112:2,12 113:11,24
  114:2
**prudence** 15:2,3
**public** 30:2,6 46:7
  51:15 55:13 64:24
  65:21 66:19 95:9

U.S. LEGAL SUPPORT - AUSTIN, TEXAS
512-292-4249

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

16

97:25 118:9,21
119:1 134:12
146:22 148:13
**publicly** 16:25 98:4
**purpose** 49:16 66:25
127:18,19
**purposes** 38:24 53:8
116:24 117:4
146:17
**pursuant** 2:6 128:5
148:9
**put** 17:25 19:20 31:7
80:8 89:19

## Q

**qualified** 96:21
**qualify** 113:11
**question** 8:14,16
14:11 27:2 28:20
37:15 42:14 47:1,13
56:10 67:21 70:14
78:3 86:14,22
101:14 105:25
109:15 114:25
116:17 118:25
119:3,7 124:14
128:16 129:12
132:6,7 134:19
135:10 142:13
143:10
**questioning** 109:18
**questions** 7:14,19 9:4
29:4 74:24 89:9
108:5 114:23
116:18 141:5
**quickly** 74:19 111:9
**quite** 23:5
**quiz** 19:5 23:11 71:16
**quote** 79:17 82:15
83:10 85:10 87:14
87:21,25 88:7
125:19
**quoted** 83:16 85:2

## R

**race** 10:4,5,25 56:18
**races** 10:3
**racial** 41:23 47:10,17
47:23 48:1 71:7
**racially** 48:9,15 72:4
72:18
**raised** 95:13 97:25
**ran** 15:23
**rare** 32:8 33:3
**rarely** 32:22 33:2
44:16
**rate** 132:20
**rationale** 33:16 36:20
**re-ask** 129:12
**re-categorization**
65:18
**reached** 40:22
**read** 17:14 40:15,16
68:14 69:2,6,10
72:8,23 75:10,12
85:6,7 113:3 117:23
118:2 127:12,15
133:5,9 146:3
**reading** 43:8 72:9
75:10,19 93:4
113:12
**reads** 123:25
**Reagan** 12:10
**real** 12:12
**realize** 68:7
**really** 13:20 15:18
17:8,11 22:25 29:5
37:22 38:9 43:25
45:21 46:19 56:19
59:4 63:10 64:2
66:17 80:5 82:9
85:1 87:4 99:22
130:10
**reason** 24:23 54:20
67:7 87:24 104:23
104:25 129:20
132:12 145:4

**reasonable** 136:25
**reasons** 148:16 150:9
**recall** 10:24 13:20,24
14:4 17:2 19:9,15
19:25 20:2,11 22:7
22:8,18,22 23:20,22
24:21,21 25:11 28:5
28:15,18 29:1,13
30:15 32:11,13,16
32:17,23 33:8,15,16
33:24 34:2,6,12,15
34:20,22,23 36:3
39:11,13 40:20,24
41:5 42:24 43:10
45:20 46:12 47:18
48:14,18 49:1 51:22
52:7 53:5 54:24
55:5 57:15,16 58:1
58:5,9 59:4 60:23
62:4,21 63:3,13
64:8 65:11,17 66:2
67:7,25 69:16 71:24
72:9 73:15 75:10
76:1,7,9,20 78:21
80:23,23 81:4,7,14
81:18 82:9 83:3
84:4,8,11 85:1 86:9
86:16 87:1 88:5,6
88:10 90:18 91:15
92:5,7 94:11,24
95:3,4,7,11,12,17
95:19,23 97:1,5,9
97:24 98:6,15,21
100:7,10,23,23
101:2,15 102:10
103:1,6,8 105:13,15
105:19,20 106:1,7
110:9 114:1,12
117:12,13 120:14
120:17,22 123:6,23
128:13,13,18 133:3
136:19 139:19,22
140:3,4,6
**recalled** 40:25

**recap** 33:14
**receipt** 148:14
**receive** 44:13 53:10
64:21 67:14 99:19
99:22 105:8 110:13
**received** 42:16 43:3
76:21 77:4 94:6
113:6
**receiving** 39:8 98:15
101:2,15
**Recess** 62:12 108:11
**reciting** 150:9
**recognition** 54:21
**recognize** 45:23
93:10 96:15 110:21
118:1
**recollection** 29:21
54:20 66:16,23
72:18 81:2 82:4
92:16 113:16,17
139:18
**recommendations**
20:25 27:4
**record** 2:8 9:6 19:20
30:11 37:1 50:10
69:6 78:24 87:23
89:5,19 92:10 110:4
114:17 116:20
117:18 119:6 120:5
128:21 129:7
137:18 143:22
148:3
**redacted** 6:4 89:16
**redistricting** 8:2
44:12
**reducing** 104:24
**reelections** 16:6
**referral** 26:2,4 27:5,9
**referrals** 26:11
**referred** 23:9 26:2,5
**referring** 54:15 80:10
80:14 84:18 85:16
85:21,23 86:3 87:8
93:14 102:21

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

17

reflect 128:21
refresh 81:2 82:4
  92:16 113:16
regard 16:17
regarding 6:5 75:8
  75:14 76:22 77:7
  78:20 82:9 84:1,8
  89:9 91:25 92:6,18
  94:7 95:20 97:2,19
  98:16 99:19 100:9
  100:24 101:3,16
  103:2 105:4 113:19
  143:14
regards 141:23
registering 93:25
registrar 113:6
registration 19:18
  56:25 107:22,23
  112:21 113:6,8
  149:6 150:19
regular 16:15 80:3
  110:13 126:25
regularly 31:19
  55:13
regulated 15:6,11
rejected 40:13
relate 14:12 28:23
  64:25 82:12
related 20:14 23:16
  23:21 67:13 80:5,6
  83:9 91:10,14,18
  100:4 112:13
  113:19,21 114:6,10
  148:18
relates 28:18 39:7
  84:9 88:7,11 114:3
relating 23:2 24:5
relation 50:13
relationship 27:13
relative 139:19
relay 70:2
release 96:13,16
relevance 56:9 136:5
relied 16:21

rely 45:9
remain 113:24
remember 14:24
  15:7 20:4 22:13,25
  23:9,17 24:11 25:15
  30:17,18 33:6,9,13
  34:7 35:13 36:7
  39:3,8 45:21 51:18
  52:4,9,9,19,20,23
  57:17 58:4,7 59:2
  61:5,5 64:9,13 65:5
  65:7,8 66:5,7 72:15
  73:12,19,20 75:19
  80:12,12 81:6,21
  82:20,21 83:6 84:11
  84:22,22 86:10,12
  87:23 90:21,23
  91:23 98:9 105:7
  114:22 136:20,21
  138:24 143:1
remembering 52:12
  80:1
removed 113:15,25
renew 58:19,21 59:9
renewed 57:16 58:1
  135:16
repairman 60:15
repeat 86:13,21
  134:17,19
rephrase 124:14
replacement 130:23
  131:6,7
replicate 142:9
report 29:17 61:24
  121:17
reported 2:4 30:12
  65:6
reporter 8:11 10:21
  85:12 86:13,21 96:3
  109:5 117:16
  118:23,25 119:5
  120:3,7 128:16
  134:16,19,23
  147:23

REPORTER'S 5:11
  147:20
reporting 41:8 42:3,3
reports 41:13 122:17
  122:25 138:12,21
represent 7:8 66:10
  78:19 81:1 91:17
  92:9 101:23 108:16
  126:23 130:12
representation 90:8
  105:16 110:18
representative 9:17
  28:7,9,18,22 29:11
  29:15 30:9 52:25
  127:9
representatives 4:4
  116:10 118:13
  119:10 120:19
represented 8:19
  113:14
representing 9:1
  74:18 114:18
Republican 9:24
  10:14,15 11:4 13:19
  119:9,16
Republicans 10:12
  72:13 87:16 88:10
  88:14 102:17
  118:19 119:23
request 27:9 39:15
  68:11
requested 41:16,22
  44:8 64:11 148:11
requesting 39:24
require 53:3 93:23
required 7:11 50:1
  58:6 69:23 113:7
  129:3
requirement 27:24
  37:12 38:12 51:15
  63:16 81:8 102:24
  103:9 106:20,25
requirements 14:8
  16:25 19:3,7,23

22:10 23:14 25:13
  36:19 37:5,18,20
  39:12 55:5 98:12
requires 93:24 104:2
  133:13
requiring 14:12
  51:15,24 53:21
  133:23
requisite 130:16
research 94:21
research's 45:10
residents 94:3,16
resolution 64:11
resolved 53:5
respect 116:19 123:2
  133:6 142:17,20
respond 27:3 61:18
  90:13,16 98:4
responded 115:1
responding 97:5
response 93:15,18
  114:25
responses 75:1
responsible 79:9
  82:16
responsive 26:19
  27:8,12
restate 14:11 51:3
  132:7
restraint 13:21
restrictive 66:14 67:9
result 40:14 41:2
  98:1,13,17 129:2
results 95:4
return 27:2 136:4
returned 148:13,15
  150:11
returning 16:24
  27:15,18 41:10
  118:14
review 22:6 42:6
  73:10,13,24 74:2,5
  96:9 109:9,9 110:13
  133:9 150:7

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

18

reviewed 45:1 54:7
98:8,24
reviewing 100:8,16
106:17
revise 94:1,15
revisited 143:15
Richard 3:15 114:17
richard.shordt@w...
3:18
RICK 1:6 147:6
right 7:24,25 8:24 9:3
11:8,14,16 13:8,14
13:22 15:22 18:14
19:1 21:9,13 27:25
28:2,19 33:18 34:4
38:21 40:6 41:14
43:9,25 44:22 45:2
45:7,13 50:9 51:5,9
53:4,6 55:3,9 56:24
57:1,25 60:6,8 62:7
62:11,13 66:6 69:2
71:6 72:25 73:4
74:8 75:7 77:19
89:16 91:5,16 92:25
113:3 133:7 134:1
135:23 142:3,10,25
right-hand 90:10
Rights 3:4 68:2
129:21 130:3
role 31:1 32:17 76:15
76:18
Room 3:5
Rose 11:1,9
roughly 20:20
round 77:19
round-trip 136:2,8
137:12 138:4
routine 34:21
routinely 38:7,8
row 46:4
rule 81:11,19 143:19
143:20,23 148:9
rules 2:7 8:7 21:4,5,8
21:12,16,21,23,25

22:3,3,6 32:24
74:20 141:23,25
142:2,3,8 143:14,15
143:17,17
ruling 68:11,14,17,20
69:7
rulings 74:5
run 12:22 13:16 14:1
running 111:8

## S

s 6:1 78:15
Safety 51:15 64:24
65:22
San 6:3 9:10 11:19
12:22 59:12 64:20
79:3
sand 37:22
saw 50:1,25 67:22
saying 50:16 83:17
85:2
says 79:6 83:23 87:3
93:22 96:23 102:12
111:1,11 112:17
118:7 121:25
122:15 125:19
127:13 128:1,12
129:11 141:18
SB 6:5
SB14 6:10 76:14,16
76:19,22 77:8,9,12
77:13,16,21,21 78:2
78:7 88:23 90:14,17
91:13,17,22,25
99:19 100:4,9,16,25
101:3,18 103:16
104:6,10,23 105:5
105:10,17,21 106:2
106:9 108:3 110:6
111:1,5,17,18,25
112:3,6,12,24
113:11,16,19,22,25
114:2,11 116:5,11
116:12,24 117:11

119:11,19,25
120:14,16,19 121:7
121:16 122:11
123:5 125:7 127:25
128:4,5,14,19
129:15,20 130:9,13
130:16 132:21
133:2 134:15,22
139:21 140:7,13
141:15
schedule 56:23
school 11:18,22
schools 14:2
science 12:3
Scott 3:20 5:7 17:19
18:15,22 43:15
48:11 56:9 69:20
70:20 89:8,13 102:6
109:17 129:8,23
130:2,20 131:1,15
132:5 133:15 134:2
136:5 137:3,9,19
138:7 139:10
140:11 141:2,4,6,8
142:11,14,18
143:25
scratch 142:19
seal 17:17 18:1,5,8
22:12 24:1,20 28:13
29:20 32:7 34:19
36:13,22 37:14 39:2
42:13 47:12,25
48:17,25 53:12 54:5
61:4,21 63:18 64:1
67:4,18,24 75:17
76:6 79:25 82:7,19
84:3 85:19 87:10
89:11 94:10 95:16
97:8 98:20 101:5,9
101:13 103:5
104:19 109:19
110:1 116:14
118:17 146:19
season 57:21 59:23

second 122:2 127:5
131:24
Secretary 35:25
39:16 77:6
section 68:3,23 109:9
127:12,13,17,18
secure 46:4
security 14:2 20:14
22:14,19 23:7 36:24
37:1 39:5,5 49:13
49:19,25 50:2 79:7
82:2 85:3 121:5,13
123:11
see 11:10 29:4 33:14
38:8 46:15 56:6,11
56:18 58:11 59:25
79:6,11,12 80:8
83:23,24 87:18,19
91:1,11,12 92:23
94:4 96:23 99:9
102:12,19,20 111:1
111:11 112:22
117:1 118:5 121:1,8
121:25 122:5
123:15,17 126:1
seeing 40:25 78:22
110:9 139:18 143:1
seeking 11:4 118:13
128:8
seen 24:5 50:2 64:6
90:19 102:8 104:20
110:8 117:20 120:8
142:24
select 20:12 22:9 25:3
33:22 35:2,3,13
Senate 7:10 14:8 19:7
19:14 20:8,10 24:13
24:16 25:20,24
27:18 28:6,10,19,23
29:23 30:12 32:15
33:8,11,25 34:13,17
35:4,25 36:5,9 39:7
39:17 40:1,14 41:3
41:17,18,24 42:17

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

19

43:3,7 44:4 45:5,9
45:10,18 46:11,14
47:5,15,19 48:5,13
48:14,20 49:4,7,21
51:6 53:9,16 57:3
64:25 65:6,10,19
66:15 67:12 68:1,17
69:7,15,23 70:10,17
70:21,24 73:25 74:3
79:8,22 80:3,6,17
80:18 81:1,7,9 82:2
82:11,23 83:6 84:18
84:25 99:3 100:4,8
104:8 118:20
119:17,24 143:23
**Senator** 63:3 80:10
81:9,19 88:2 96:13
103:20,22
**senators** 116:10
118:13 119:10
126:18 140:1
**senior** 25:11
**seniority** 20:20
**sense** 14:19 23:12
71:10 72:12 99:7,8
**sent** 23:1,12 90:24
91:3 100:4
**sentence** 108:23
109:1
**September** 9:10
57:22,24
**series** 7:14 68:5
92:23
**serve** 31:4
**served** 14:15,21,21
15:4 20:3 25:15
31:22 148:6
**service** 63:21
**serving** 51:12
**session** 21:6,6,19,22
22:5,17 23:4 32:15
44:24 48:23 52:5
102:25 126:25
141:10,20,21 142:1

143:16,18,18
**sessions** 20:3 30:21
30:25 37:4
**set** 16:15 21:8,23
22:6 45:24
**shake** 8:8
**she'll** 10:22
**Shelby** 68:22 69:2,10
69:14
**shift** 55:12
**shoot** 59:22
**Shordt** 3:15 5:7,9
18:25 114:16,17
116:9,16,21 117:15
117:19 118:19,24
119:3,7,16,23 120:6
120:8 121:1,24
124:19 125:15,18
126:22 128:18
129:10 130:1,4,21
131:2,19 132:7
133:17 134:5,21,25
136:6 137:4,11,20
138:10 139:13
140:4,13 141:5,7
142:13,16,23,24
143:7
**short** 12:13 108:9
**shorthand** 2:5 147:23
**show** 29:10 46:3 54:2
**showed** 73:20 115:16
142:18
**showing** 54:17 58:3
89:2 95:25 126:22
**shown** 42:9,17 73:12
117:22 148:7
**shows** 30:11 93:3
**sic** 92:22
**side** 25:5 59:12 64:20
103:20 119:24
**sides** 87:3,5,7
**sign** 150:9
**signature** 5:10 90:1
93:17 145:3 146:4

148:10,12,15
150:11
**signed** 20:4
**signing** 45:18
**Sil** 11:2
**Silber** 11:2
**silly** 9:5
**similar** 7:22 24:16
97:1 114:3,7
**similarly** 41:21 66:7
**single** 13:25 140:22
**sir** 16:9 42:21 46:18
55:15 74:16
**sit** 19:5 24:24 86:8,16
98:22 100:7 105:14
113:9
**situation** 25:23
**slots** 20:19
**slow** 32:1 109:5
**small** 52:13
**social** 123:11
**sole** 12:25 13:2
**Solicitor** 4:9
**somebody** 9:6 16:16
18:19 36:6 42:6
67:20 115:14
130:23 141:13,14
**someone's** 107:23
**somewhat** 27:3 55:13
**sorry** 49:12 67:6
73:23 86:13,15 93:5
93:8 100:20 102:13
105:19 109:5,7
118:23,24 119:8
120:24 121:2 122:3
124:14 128:14
134:16 137:25
142:20
**sort** 13:18 16:20 17:7
25:22 39:19
**sought** 68:3
**sound** 15:17
**sounds** 15:14 53:20
59:10 101:11

**source** 39:16 41:23
**sources** 43:7
**south** 64:19
**southeast** 59:12
**southern** 1:1 50:16
147:1
**speak** 60:22,24 73:8
**speaker** 4:2 6:6,9 7:7
9:15 11:14 12:17
14:18 17:20 19:21
20:3,15,17,21,24
23:13 26:19 27:4,8
27:8 32:22,25 35:16
36:15 38:19 41:11
42:5,8,16 44:13
62:13 67:21 74:11
76:19 90:9 92:12
100:12 102:1
114:17 120:8 141:3
**special** 10:9,11,18
11:7 14:22 15:23
24:12,15 25:1,3
27:20 30:5 33:17
67:1
**special-committee-...**
25:23
**specific** 13:18 18:2
29:1,13 34:22 50:13
63:12 81:19 140:14
**specifically** 18:4 19:9
22:18 28:15 32:2
34:5,6,20 36:17
39:14 41:5 61:5
75:22 84:20 88:13
88:19 91:5 93:13
95:11 97:4 99:19
128:15
**specificity** 17:6
**specifics** 84:12
136:21
**Spector** 11:2,9
**speculation** 49:9
53:13 103:12
106:12 116:7

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

20

125:14
**speeches** 34:7
**spelling** 78:16
**spend** 8:7
**spending** 58:14
**spent** 15:9,18
**spoke** 52:21 73:5
  141:24
**sponsored** 19:25
**staff** 35:6,10,16,22
  40:22 43:10 44:18
  60:21,22,23 61:2,11
  61:16,24 62:2 76:2
  76:12,15 100:12,13
  103:2 114:6
**staff's** 35:8
**stalled** 66:22
**stalling** 67:2
**standard** 16:21
**standpoint** 38:2 42:8
  42:16 51:4 56:21
**Starnes** 11:3
**start** 10:4 48:13
  51:24 71:6 74:18
  75:7 89:24 135:4
**started** 20:9 62:22
**starting** 21:13 87:25
**starts** 108:23
**state** 1:17 2:4 3:19
  7:9 9:16,25 24:8,18
  39:16 41:12,17
  44:10,15 46:21,24
  68:3 77:16,24 93:22
  115:1,3,16 116:4,11
  121:3,6 123:1,1
  131:20 132:2 146:9
  146:23 147:17,24
  150:2
**State's** 35:25 70:23
  77:7
**state-issued** 59:6
**stated** 2:8
**statement** 79:21
  121:9 123:12 150:9

**states** 1:1,8,25 3:2
  39:12 52:14,16 54:2
  68:21 70:5 74:18
  121:1 123:7 127:9
  131:17 133:13
  140:19 147:1,8
**statewide** 65:22 72:7
**statute** 53:3
**staying** 91:20
**sticker** 78:12
**stories** 42:2
**straight** 30:22 102:24
  103:8,10,14,17
  106:19
**strategy** 33:24
**Straus** 1:20,24 5:4
  6:4,6,9 7:1,6,7 13:2
  78:11 89:1 90:9
  92:8,12 95:24
  101:20 102:1
  108:12 117:14
  120:2,8 126:21
  144:2 145:1 146:3,7
  146:12 147:21
  148:1
**Street** 2:6 3:22
**Strenuously** 16:10
**stressed** 13:25
**strictest** 111:2,6
**strike** 32:12 83:19
  92:21 102:13
  103:21 113:3
  121:15 129:13
  138:11 140:4
**stringent** 37:6,7,8,12
  104:7,11 106:9
**strong** 37:23,23
  73:14
**student** 6:13 46:24
  116:22 117:3,11
  119:11,25 120:16
  120:20 121:4,12,18
  122:2,16,18,21
  123:15 124:2,6,10

124:16,21 126:12
  140:23
**students** 123:7,20,25
  125:7,11
**studies** 136:17
**study** 17:14 125:6
**stuff** 9:5
**sub-bullet** 122:3
  123:10
**subject** 21:2 38:24
  40:19 75:24 81:19
  95:3 101:9 109:19
**subjects** 44:12
**subscribed** 146:15
  150:13
**substance** 150:8
**substantially** 114:3,7
**Substantive** 111:9
**sufficiency** 121:18
**sufficient** 107:8,23
  115:7,10 116:2,23
**suggest** 94:22
**suggested** 53:21
**suggesting** 58:18
**suggests** 126:12
**Suite** 3:11 149:6
  150:19
**summaries** 110:15
**summary** 6:10 110:6
  110:11 113:13
**summer** 114:19
**super** 102:17
**support** 31:8,16
  36:23 37:19 42:11
  42:19 45:22 46:8
  50:23 67:21 118:4
  118:14,22 119:2,11
  141:16 149:5
  150:18
**supported** 36:9,18
  49:25 50:21 51:12
  77:12 95:12
**supporting** 37:1,9
  48:4 51:9

**supportive** 85:3
**suppose** 24:8 30:14
  65:16 85:7,17,20,25
  87:22 136:10
**Supreme** 11:11 68:22
  109:2 133:10,12
**sure** 7:23 8:11 11:1
  12:17 18:6 20:3,9
  23:8 24:9,10 25:17
  28:15,25 29:2 31:17
  32:1 34:5,20 36:14
  36:17 40:24 42:15
  43:4 44:10 48:2
  50:15 57:13 62:10
  64:18 67:15 69:5,25
  71:25 72:8 75:12
  76:11 86:25 95:17
  99:8,8 103:13,18
  107:18 108:8 115:2
  128:15 131:25
  141:11
**surprise** 71:12
**surprised** 52:13
**surprising** 52:16
**sworn** 2:1 7:2 148:1
  150:13
**system** 50:19

---

**T**

**T** 6:1
**tabled** 128:22,24
**take** 10:21 19:17 28:4
  37:22 56:25 62:9
  85:4 107:22 108:6,7
  116:16
**taken** 2:1 80:6
  147:21 148:20
**talk** 10:20 14:7 22:3
  26:16 28:14,25 29:2
  43:22 55:12 58:16
  60:21 62:19 64:8
  106:15
**talked** 24:13 29:11
  61:22 99:2

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

21

talking 6:13 67:14
76:24 84:13 117:10
141:16
talks 112:18
tasks 100:24
tax 13:21 15:13
taxes 12:17
team 16:21
technology 61:9
Telecommunications
15:15
tell 7:5 8:15 9:9 24:25
29:3 30:17 49:6
53:7 57:6 60:8,10
68:16 87:7 93:13
103:7 109:11
110:10 117:19
127:16,18 138:19
temperature 83:20
tenure 33:2
terms 30:1,5 37:9
61:7 63:23
testified 7:2 49:24
75:9 107:21 128:2
137:22,25 138:1
142:17,24
testify 29:6 49:6
testimony 8:1 49:5
78:20 79:14 132:8
140:6,21 148:3
Texans 59:6 134:11
Texas 1:1,9,12,17 2:4
2:6 3:11,14,19,23
4:5,10 9:10,15
39:12 46:24 50:16
51:14 52:13 57:6
68:24 69:13 72:18
75:8,14,24 76:3
94:1,2,3,15,16,17
94:23 95:1 111:2,18
114:18 115:8,9,15
116:23 117:5
121:19 122:1,18
123:2,20 125:7,11

125:23,25 126:8,13
126:24 131:13,20
132:2,9,13,20,24
133:1,7,21 135:18
138:13 139:14,20
140:8,8,17,23 146:9
147:1,9,12,17,24
149:7 150:2,20
text 73:24
thank 57:15 61:15
74:11 96:6 110:3
142:11,23 143:7
Thanks 102:6
they'd 32:1
thing 33:21 39:4,19
things 12:8,13 33:6
38:6,7 60:13 73:11
think 15:3 18:9 19:19
20:20 23:5,7,18
26:16,18 27:13,16
28:1 29:24 30:18,18
30:18,25 31:24
32:23 33:9 35:5
40:8,10 42:1,22
44:16 45:20 46:12
47:2 49:13 50:24
52:15 53:5 54:7,10
54:11,16 56:16
57:20,23,25 58:9,10
59:2 61:1,19,22
62:2,13,24 63:4
72:24 73:1 79:19
80:2,4,13,16 82:8
82:10 83:9 84:12,13
84:13 87:3 95:17
99:18 101:12
102:24 103:24
104:9 106:22
107:12 109:19
110:16,25 112:14
115:3,8,13,23
125:17,24,24 127:2
128:1 130:1,4 131:2
131:4,7,7,8,8

133:19,23 136:13
136:24 137:10,11
139:6,7,16
third 83:16 87:3
121:2
thought 38:23 46:19
50:20 58:18,20 64:3
85:3 87:23 93:7
116:19 128:6 132:5
thousands 125:10
threats 67:14
three 46:4 57:22
tie 65:2
tied 64:2
tight 37:18
tightening 16:25
tightly 16:7,8
till 56:17
time 8:7 12:13,18
15:9,19 19:3,5 25:2
25:2 26:10,10 31:9
31:18,21 39:11
43:11,11 44:11
59:14 61:13 62:17
62:21 66:13 74:12
75:23 78:16 80:1,9
82:5 83:7 87:22
88:23 102:18
130:12 136:22,24
139:4 140:13
141:13 142:4,11
time-honored 143:15
143:20
timeline 29:16
timelines 24:22
times 8:4 26:13 29:5
61:7 64:7,21 136:18
138:13
timing 32:18 33:25
80:6
title 20:9 27:22 79:2
titled 102:14
to's 67:14
today 7:15 8:19 9:12

9:14 18:12 19:6
24:24 26:25 58:17
73:5 74:8 86:8,16
98:22 100:7 105:14
113:9
Todd 30:19
told 63:6 73:5
top 111:1 118:2
127:6
topic 22:16 40:21
95:9
tough 33:5
tracking 25:22
tradition 32:24
training 125:22
transcript 148:2,14
150:6
transfer 99:6
transferred 99:10
transportation
134:12
Travel 56:23
Travis 124:16,23
150:1
treasure 56:8
treat 17:25
trial 29:6
tried 29:7
true 8:20,21 9:17
15:21 18:21 57:3
134:14 142:1
143:14,19 146:5
148:3
truth 96:25
try 7:15 19:5 26:11
38:16 39:6 55:25
63:14 91:4
trying 13:22 14:24
15:16 23:11,12 29:5
30:17,21 37:16 44:1
50:20 71:16 75:22
80:12
TSA 39:4
turn 91:6 127:5

JOE STRAUS                                          6/23/2014
CONFIDENTIAL TRANSCRIPT

turned 57:19 83:20
  85:13,14
turning 81:23 83:15
two 13:13 14:22
  16:12 30:25 59:19
  60:2 64:2 122:19
  137:1,5 139:1
two-thirds 81:19
  143:19
two-thirds-of-cons...
  81:8
TX_00012065 6:12
type 14:19 23:19 25:7
  30:2 42:4 43:13
  75:13 82:22,24
  102:25 103:2 105:8
  111:24 112:5 121:5
  125:19
types 25:3 33:22
  36:14 104:24 105:4
  105:9,16,21 106:2
  121:6 123:8 125:21
  125:25 126:3,4,5,6
typically 26:7 33:4,4
  109:22

U

U.S 3:4 53:10 58:3
  78:13,19 94:2,16
  112:5 115:24 149:5
  150:18
U.T 124:17
uh-huh 47:21 50:18
  57:11 59:24 62:20
  74:23 79:15 81:25
  91:7 93:21 100:2
  102:2,15 106:18,21
  111:16 118:6
ultimately 68:10
unable 54:22
underlined 118:9
underlying 128:10
  129:21 138:4
undermine 15:16

understand 7:12,19
  8:6,12,14,16 17:3
  19:13 20:10 30:23
  39:25 40:3,9,10
  49:5 75:1,3,9,22
  88:16 89:7 99:4
  107:19 127:22
  128:7 132:1 133:4
  138:15 140:21
understanding 17:17
  31:24 58:21 89:11
  111:5,7,17,24
  112:15,24 139:17
undertake 133:13
undertaken 117:8
  123:20
undertones 47:23
underway 22:5
unemployment
  132:20
unfortunate 137:7
unfortunately 90:9
  109:12
uniformity 122:1
unique 142:8
United 1:1,8,25 3:2
  54:2 68:21 70:5
  74:18 140:19 147:1
  147:8
universities 116:23
  121:19 126:8
university 124:3,8
  125:12
unlimited 58:22
unnecessary 137:10
unreasonable 46:16
  60:17 137:2,5,8
unrelated 63:23
unusual 33:21 82:11
unwise 85:4,15
upcoming 44:24
updates 76:21,24
  77:4
upgrade 61:9 65:3

upgrading 58:14
upheld 109:8
use 18:3 48:9 114:23
  134:11 140:23
usually 21:24 110:12

V

v 1:5,16 75:8,14,24
  76:3 147:5,16
vacated 70:13
vague 129:23 139:11
vaguely 51:22 81:5
  81:14 95:17 136:19
valid 36:24 125:7
valuable 56:7,13
  62:17
Vanderbilt 12:1,4
various 20:2 46:10
  47:10,17 54:25
  114:23
VEASEY 1:3 3:8
  147:3
verbal 74:25
verification 117:1
view 23:13 37:11
  38:13 61:8 63:22
views 82:11
violate 38:13
visit 29:7
visited 43:23
visual 107:16,17
vocation 12:7
vote 7:11 14:13 31:10
  32:21 36:10 46:5
  49:5 51:1 54:14,17
  55:13,21,22 56:2,3
  56:5,6,12,17,22,24
  72:19,21 93:25
  107:21 115:25
  123:25 124:2,6,11
  124:22,24,25 125:3
  127:25 128:5 130:8
  130:16,19 133:14
  133:20 134:1

138:17 139:4,9
voted 20:4 32:22 33:3
  33:4 36:14,15,17
voter 6:7,10 16:3
  19:17 20:13,13,13
  22:10,14,14,19,19
  23:2,6,7,7,14,15,20
  24:5 27:21 33:17
  35:14 36:16,19,24
  36:24 37:1,2,4
  45:22 49:13 50:3
  56:25 71:4 80:19
  82:24 84:1,9 85:3
  85:23 88:18,20
  93:16,16 95:8 98:12
  98:24 102:14,21
  106:24 107:22,23
  110:6,11 111:9
  112:19,20 113:1,4
  114:10 118:14
  114:24 130:15,22
voter's 107:8
voter-fraud 23:20
voter-ID-related
  36:16
voter-related 49:20
voter-security 23:21
voters 1:10 3:14 72:6
  72:14,18 77:8,13,17
  77:22 93:23 98:2,13
  98:18,25 114:18
  140:8 147:10
votes 49:14 72:11
  96:21
voting 14:9 17:12
  19:3,23 20:13 32:25
  33:8,9 40:13 41:1
  45:25 47:3 48:6
  50:11 55:12,14,17
  55:17 56:1,4 68:2
  71:3 72:3 92:6,18
  93:25 94:1,3,8,15
  94:17,22 95:1,9,13
  95:21 97:6,11,20

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

23

106:6 109:9 114:24
117:4 118:15
129:20 130:3 135:2
135:3,4
**vs** 68:22 133:7,9

---
**W**
---

**W** 3:9
**wage** 133:1
**wait** 56:17 60:16 61:7
64:6,21 136:18,21
136:24 138:13,16
138:21 139:8
**waited** 136:14
**waiting** 139:3,4
**waits** 138:25
**waived** 116:17,18
**waiver** 109:24 129:15
**walk** 25:18,19 60:14
**walked** 99:13
**want** 11:16 13:23
14:1 19:4,20 20:10
21:22 26:14 28:21
29:12 43:4,15 46:12
56:18 58:16 59:15
62:7 69:24 71:2
73:6 75:7 91:5
96:19 109:16,21
110:18 114:21
127:3,8,15,16
131:25
**wanted** 25:13 48:5
57:20 58:11 59:21
59:21 115:25
136:14
**wants** 21:1 130:5
**was/was** 150:11
**Washington** 3:6,17
4:15 68:4
**wasn't** 13:24 17:7
50:12,13 51:10
60:14 63:5 83:18,19
87:24
**waste** 19:5

**watching** 35:18
**way** 8:15 31:7 51:3
52:15 63:12 79:7,22
82:2 83:18,20 98:5
104:13,21 134:9
**we'll** 13:15 17:18
119:4 135:4
**we're** 14:7 89:7
101:12
**we've** 7:16 43:2
**Wednesday** 127:1
**went** 11:18 30:14
57:20 58:1 59:2,9
59:12 60:7 62:18
115:15
**weren't** 54:8 63:10
**West** 2:6 3:22
**whatsoever** 77:20
**Williams** 63:3
**WilmerHale** 3:16
4:14 114:20
**witness** 1:25 5:4
17:15 18:20 22:12
49:11 50:7,9 73:23
114:14 116:14
120:24 142:12
143:11 148:1,3,7
150:3,4,7,8,10,11
**witnessed** 47:20
**wonderful** 83:17
**word** 73:14
**words** 40:22 46:3
69:21
**work** 12:6 16:24
21:21 44:23
**worked** 12:8,12
33:21 40:11 60:12
**workers** 125:21,23
126:1
**working** 22:4 27:13
35:22 39:23 60:13
64:4
**works** 32:2 131:18,23
**worth** 51:9

**wouldn't** 27:12 41:21
44:19 46:20,23 47:4
50:24 71:12 110:14
110:14 117:1
133:22 136:9
141:14
**writing** 94:12 118:1
**written** 76:25 101:2
104:21 105:9
**wrote** 93:15

---
**X**
---

**X** 5:1 6:1 89:16

---
**Y**
---

**y'all** 141:4
**yeah** 13:5 14:3 17:5
17:14 29:9 30:21
43:23 51:7,10 55:10
60:1 62:1 64:2
68:13 70:1 72:23
73:3 79:3,19 81:14
81:14,17 82:8,20
86:2,2 93:2 99:15
103:19 108:4,10
109:22 110:20
121:13 124:15
128:12 135:25
136:12 141:7,18
143:11,17
**year** 143:4
**years** 12:19 16:11
57:22 112:19
**yelling** 10:22
**Yep** 111:16
**yesterday** 43:18
**you-all's** 109:20
**Young** 1:9 3:14
114:18 147:9
**youngest** 57:19

---
**Z**
---

**Zoe** 4:14 114:19

---
**0**
---

**05** 36:15
**07** 36:15

---
**1**
---

**1** 6:3 78:11 79:5
81:24 112:19
121:25 144:2
**10** 74:9 136:4
**10:10** 62:12
**10:24** 62:12
**100** 38:7 74:10 136:2
136:8
**100-mile** 137:12
**101** 6:9
**108** 6:11
**11** 26:24 30:24 52:19
64:18,18 91:8
**11:30** 108:11
**11:41** 108:11
**114** 5:7
**117** 6:12
**12-31-15** 149:5
150:18
**12-page** 6:6
**12:30** 2:3 144:1
**120** 6:14
**121** 9:20
**12548** 4:10
**126** 6:15
**14** 6:5 7:10 14:8
16:13 19:8,14 20:9
24:13,16 28:6,10,19
28:23 29:23 30:12
32:15 33:8,12,25
34:13 35:4 36:1,5
36:10 39:7,17 40:1
40:14 41:3,17,19,25
42:17 43:8 44:4
45:5,19 46:12,15
47:5,15,19 48:5,13
48:14,20 49:4,7,21
51:6 53:9,16 57:4
64:25 65:6,10,19

JOE STRAUS
CONFIDENTIAL TRANSCRIPT

6/23/2014

24

66:15 67:12 68:1,17
  69:8,15,23 70:10,17
  70:24 73:25 74:3
**14's** 43:3
**140** 80:14
**141** 5:7
**142** 5:9
**143** 5:9
**145** 5:10
**147** 5:11
**14th** 2:6 3:22
**15** 12:19 127:9
  128:14,19 136:4
**18** 57:19
**1875** 3:16 4:15
**1959** 9:10,11
**1st** 9:10 57:22,24
  112:20

___

**2**

**2** 5:3 6:4 83:16 87:2
  89:1,3,22 91:6
  92:22 93:8,20 102:4
  113:1,4 118:5 135:6
**2:13-cv-193(NGR)**
  1:5 147:5
**2:13-cv-263(NGR)**
  1:12 147:12
**20** 71:20
**20006** 3:17 4:15
**2005** 9:22 10:1 13:16
  15:24 16:6
**2009** 6:3 11:15 30:24
  79:4 80:2,18 81:15
  83:4 84:9 103:21
  104:23 107:6
  143:20
**2010** 141:12,18
**2011** 7:10 20:8 22:9
  24:4,12,15 25:1,12
  26:22 28:6,19,22
  30:16 32:14 35:6
  37:4 38:2 42:20
  48:8,22 51:14 57:24

62:24 66:11,20 67:5
  67:10,12 91:9 103:3
  127:1 132:21,24
  133:2 134:14,22
  140:14 141:10,12
  141:15,18,20
**2012** 16:13 112:20
**2014** 1:20 2:2 145:2
  146:20 147:21
  149:1 150:14
**202-514-4609** 3:6
**202-663-6693** 3:17
  4:16
**20530** 3:6
**209** 2:5 3:22
**22-year-old** 124:21
**23** 1:20 2:2 145:2
  147:21
**23rd** 127:1
**281-380-6310** 3:12
**2834** 149:4 150:17
**2910** 4:5
**292-4249** 149:7
  150:20
**2nd** 149:1

___

**3**

**3** 6:6 92:8 96:1
  127:13,17,18 135:6
**30** 60:2 62:14 148:13
  150:4
**30(f)(1)** 148:10
**344** 149:6 150:19
**362** 81:2
**380** 149:6 150:19

___

**4**

**4** 6:7 95:24 96:3,4,18
**4201** 3:10
**45** 62:14
**470** 78:13,19

___

**5**

**5** 6:9 68:3,23 101:20

101:22 106:17
  109:9
**50** 135:19
**512** 149:7 150:20
**512-463-1000** 4:6
**512-936-0680** 3:23
**512-936-2868** 4:11
**530** 3:11

___

**6**

**6** 6:10 108:12,14
  110:5 135:13
**60** 111:19,22 112:16
**63.0101(a)(6)** 118:7
**65** 54:14 124:18,19
**65-year-olds** 54:10

___

**7**

**7** 5:6 6:3,12 79:3
  117:14,15,16,20
  135:13 141:9
  142:22,25
**7-page** 6:9
**70** 112:19
**701** 149:6 150:19
**7254** 3:5
**74** 5:6
**77068** 3:11
**78** 6:3
**78701** 2:6 3:23 149:7
  150:20
**78711-2548** 4:10
**78768-2910** 4:5

___

**8**

**8** 6:13 120:2,3,6,10
**80** 71:20
**80s** 12:11
**81st** 142:6,9
**82nd** 91:8 126:24
  141:21 142:5
**82R** 6:10 110:6
**89** 6:5
**8th** 3:22

___

**9**

**9** 6:15 126:21,23
  144:2
**9-1-2017** 57:14
**9:02** 2:3
**92** 6:6
**95** 6:8
**950** 3:5
**969** 127:6