UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF TEXAS, | : | Docket No. CA 12-128 |
| | : | |
| Plaintiff | : | |
| v. | : | |
| | : | |
| ERIC H. HOLDER, JR., in his | : | Washington, D.C. |
| Official Capacity as | : | Monday, July 9, 2012 |
| Attorney General of the | : | P.M. SESSION |
| United States, | : | |
| | : | |
| Defendant, and | : | |
| | : | |
| ERIC KENNIE, et al., | : | |
| | : | |
| Intervenor-Defendants | : | 2:00 p.m. |

. . . . . . . . . . . . . . . . : . . . . . . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL
DAY 1 - P.M. SESSION
BEFORE THE HONORABLE DAVID S. TATEL
UNITED STATES CIRCUIT JUDGE
THE HONORABLE ROSEMARY M. COLLYER
THE HONORABLE ROBERT L. WILKINS
UNITED STATES DISTRICT JUDGES

APPEARANCES:

For the Plaintiff:       PATRICK K. SWEETEN
                         JOHN WILLIAM MCKENZIE
                         MATTHEW H. FREDERICK
                         STACEY NAPIER
                         OFFICE OF THE ATTORNEY GENERAL
                         OF TEXAS
                         209 West 14th Street
                         7th Floor (MC-059)
                         Austin, TX 78701
                         (512) 936-1695

                         ADAM K. MORTARA
                         ASHA L. I. SPENCER
                         JOHN M. HUGHES
                         BARTLIT BECK HERMAN
                            PALENCHAR & SCOTT, LLP
                         54 West Hubbard Street
                         Suite 300
                         Chicago, IL.  60654
                         (312) 494-4469

For the Defendant:          ELIZABETH STEWART WESTFALL
                               MEREDITH BELL-PLATTS
                               JENNIFER MARANZANO
                               DANIEL J. FREEMAN
                               RISA BERKOWER
                               BRUCE I. GEAR
                               SPENCER R. FISHER
                               U.S. DEPARTMENT OF JUSTICE
                               Civil Rights Division,
                               Voting Section
                               950 Pennsylvania Avenue, NW
                               NWB-Room 7202
                               Washington, DC 20530
                               (202) 305-7766


For the Intervenor         EZRA D. ROSENBERG
Defendants:                 DECHERT LLP
                               902 Carnegie Center
                               Suite 500
                               Princeton, NJ  08540-6531
                               (609) 955-3200

                               JOSEPH GERALD HEBERT
                               J. GERALD HEBERT, P.C.
                               191 Somervelle Street
                               Suite 405
                               Alexandria, VA  22304
                               (703) 628-4673

                               CHAD W. DUNN
                               BRAZIL & DUNN
                               4201 FM 1960 West
                               Suite 530
                               Houston, TX 77068
                               (281) 580-6310

                               ADAM M. HARRIS
                               FRIED, FRANK, HARRIS, SHRIVER &
                                   JACOBSON LLP
                               One New York Plaza
                               24th Floor
                               New York, NY 10004
                               (212) 859-8953

JORGE SANCHEZ
MEXICAN AMERICAN LEGAL DEFENSE &
   EDUCATIONAL FUND, INC
11 East Adams Suite #700
Chicago, IL 60603
(312) 427-0701

NANCY G. ABUDU
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA  30303
(404) 523-2721


Court Reporter:          REBECCA STONESTREET, RPR, CRR
                         Official Court Reporter
                         Room 6511, U.S. Courthouse
                         Washington, D.C.  20001
                         (202) 354-3249


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **JOSE ALISEDA** | | | | |
| By Mr. Freeman | 5 | -- | -- | -- |
| By Mr. Sanchez | -- | 31 | -- | -- |
| | | | | |
| **FORREST MITCHELL** | | | | |
| By Mr. Sweeten | 33 | -- | 69 | -- |
| By Mr. Gear | -- | 49 | -- | -- |
| | | | | |
| **SENATOR THOMAS WILLIAMS** | | | | |
| By Mr. Frederick | 69 | -- | -- | -- |
| By Mr. Fisher | -- | 100 | -- | -- |
| By Ms. Abudu | -- | 129 | -- | -- |
| | | | | |
| **THOMAS SAGER** | | | | |
| By Mr. Mortara | 135 | -- | -- | -- |

# E X H I B I T S

| NUMBER | ADMITTED |
|---|---|

(NO EXHIBITS MOVED INTO EVIDENCE.)

*Rebecca Stonestreet        (202) 354-3249        kingreporter2@verizon.net*

1              **P R O C E E D I N G S**

2              THE COURT:  As some of the people who have been here

3     before with me know, I have a really bad voice because I have

4     half a paralyzed larynx, and so I only have half a voice.  But

5     anyway, now I have this fancy little thing which I didn't have

6     the last time.  So I've moved into the Britney Spears age or

7     something.  You're not supposed to laugh, as if I were clearly

8     too old to be Britney Spears, you know.  I'm not really.

9              Mr. Freeman, your turn.

10             MR. FREEMAN:  Thank you.  Daniel Freeman on behalf of

11    the defendant, Attorney General Eric H. Holder, Jr.

12    **(JOSE ALISEDA, PLAINTIFF witness, having been previously duly**

13                    **sworn, testified as follows:)**

14                    **CROSS-EXAMINATION**

15    BY MR. FREEMAN:

16    Q.  Good afternoon, Representative.

17    A.  Good afternoon.

18    Q.  I'm hoping that you and I can clarify a few issues

19    concerning SB14.  So you were a member of the select committee

20    on voter identification and voter fraud.  Correct?

21    A.  Yes.

22    Q.  And the bills that you offered concerning mail-in ballot

23    fraud, they were not referred to the select committee on voter

24    identification and voter fraud.  Correct?

25    A.  That's correct.

1    Q.  And you weren't the chairman of the select committee.

2    Correct?

3    A.  No.

4    Q.  And you didn't carry SB14 in the House.  Correct?

5    A.  That's correct.

6    Q.  And you weren't an author of SB14.  Correct?

7    A.  I was a coauthor.

8    Q.  You were a cosponsor.  Correct?

9    A.  I think the term is joint author, coauthor, and author.

10   Q.  In fact, you weren't one of the five House sponsors, either.

11   Correct?

12   A.  That's correct.

13   Q.  And during the House debate, you were chosen to deliver

14   concluding remarks in support of SB14.  Correct?

15   A.  Let me put it this way:  I volunteered.

16   Q.  Okay.  But no one else provided the concluding remarks in

17   favor of SB14 at the conclusion of the debate.  Correct?

18   A.  On behalf of the Republicans, it wasn't SB14 then, it was

19   the House version of SB14.  Yes, I provided the closing remarks

20   on behalf of the Republicans on what would have been the House

21   version of SB14.

22   Q.  Now, you were one of only five or six Hispanic legislators

23   who supported SB14.  Correct?

24   A.  I believe at the time we had six Hispanic legislators and

25   two black Republican legislators.

1          MR. FREEMAN:  Your Honor, I'll move to strike

2  everything after his response concerning Hispanic legislators as

3  nonresponsive to my question.

4          THE WITNESS:  I'll agree it wasn't.  Yes, six.

5          THE COURT:  All right.

6          MR. FREEMAN:  Thank you.

7          THE COURT:  That is, the witness has stricken his own

8  statement, and why don't you ask the question again.

9          MR. FREEMAN:  He has answered it.

10          THE COURT:  Oh, okay.  Everybody is happy.

11  BY MR. FREEMAN:

12  Q.  Now, Representative, you don't know of any other examples

13  when a freshman legislator has delivered closing remarks on a

14  major bill.  Correct?

15  A.  I haven't been there but one term, so that's correct, I

16  don't know.

17  Q.  Okay.  Now, you testified during your direct examination

18  about your closing remarks at the end of the House debate.

19  Correct?

20  A.  Yes.

21  Q.  And it's important that you speak truthfully and honestly

22  when you speak on the Floor of the Texas House of

23  Representatives.  Correct?

24  A.  Yes.

25  Q.  And your closing remarks were true statements.  Correct?

1    A.  I believe they were.

2    Q.  And you stand by those remarks today?

3    A.  Yes.

4    Q.  If we can bring up Joint Appendix page 2160 and 2161 side by

5    side, please.

6            Representative, does this accurately reflect your

7    closing remarks?

8    A.  It's a little blurry, but it looks like it appears to be my

9    remarks, yes.

10   Q.  Okay, good.  Let's zoom in on the first paragraph.  Thank

11   you.

12           Now, Representative, you claimed on the House Floor

13   that you need an ID to cash a check or to rent a movie.

14   Correct?

15   A.  Yes.

16   Q.  But you can deposit a check in an ATM without showing a

17   photo ID.  Right?

18   A.  I never have.

19   Q.  But it's possible.  Correct?

20   A.  I understand it's possible.

21   Q.  And you can withdraw cash at an ATM without showing a photo

22   ID.  Correct?

23   A.  That I have, yes.

24   Q.  And when you sign up on-line for Netflix or for

25   Blockbuster - to the extent it still exists - you can provide a

1    credit card.  Correct?

2    A.  When I signed up for Blockbuster, I had to go to the store

3    and sign up for it.

4    Q.  But if you sign up on-line for a video rental service, no

5    one asks you to show ID.  Right?

6    A.  Come to think of it, I did sign up for Netflix and that's

7    correct.  I didn't need to provide an ID, just a credit card.

8    Q.  And you've said in another context that you need a photo ID

9    to fly on a plane.  Correct?

10   A.  I believe that's the requirement, yes.

11   Q.  But a person can use a photo ID to board a flight.  Right?

12   A.  Yes.

13   Q.  But a Texan can't vote under SB14 with an employee ID.

14   Correct?

15   A.  I consider a military ID card as an employee ID card.

16   Q.  As a general matter, a Texan can't vote - other than with a

17   military ID card - with an employee ID card.  Correct?

18   A.  That's correct.

19   Q.  Let's move on to the next paragraph.

20        Now, Representative, you told other members of the

21   House that voters, plural, told you that they don't vote because

22   of voter fraud.  Correct.

23   A.  Yes.

24   Q.  But no one testified in hearings that they don't vote

25   because of voter fraud.  Correct?

1    A.  That's correct.

2    Q.  And just so we're clear, you testified earlier that SB14

3    relates to showing identification when you vote in person.

4    Correct?

5    A.  Yes.

6    Q.  But only one person - not voters, plural - has told you that

7    they don't vote because of voter impersonation.  Correct?

8    A.  I've had that statement repeated to me by more than one

9    person.

10   Q.  Representative, did you have your deposition taken in this

11   case?

12   A.  Yes.

13   Q.  And you and I spoke together.  Correct?

14   A.  Yes.

15   Q.  And we spoke in front of a court reporter.  Correct?

16   A.  Yes.

17   Q.  And you provided testimony under oath.  Correct?

18   A.  Yes.

19        JUDGE COLLYER:  I have to say to Counsel, we really do

20   know the record.  You really don't need to go through everything

21   that's already in the record.  Just a short reference to the

22   record would really be sufficient so that you can speed up.

23   Okay?

24        MR. FREEMAN:  Okay.  Thank you, Your Honor.

25   BY MR. FREEMAN:

1    Q.  And when you testified at your deposition, you assured me

2    that you would give full and complete answers.  Correct?

3    A.  Yes.

4            MR. FREEMAN:  Let the record reflect that I'm providing

5    a copy of Representative Aliseda's deposition to opposing

6    counsel.  And may I approach the witness, Your Honor?

7            JUDGE COLLYER:  Yes, you may.

8    BY MR. FREEMAN:

9    Q.  Representative, were you asked the following question on

10   page 200, beginning at line eight, and did you provide the

11   following answer:

12           QUESTION:  "Did they -- did you ever have any

13   conversations with constituents because those constituents

14   believed that people were impersonating other people at the

15   polls?"

16           ANSWER:  "I think I did have some discussion about that

17   when I was at a campaign event in Atascosa County."

18           QUESTION:  "Do you recall who the person was?"

19           ANSWER:  "No."

20           Now, Representative, you didn't mention more than one

21   person to me, did you?

22   A.  That was in reference to a question about impersonating

23   other people at the polls.  One of the reasons I did the voter

24   fraud investigations in Beeville regarding mail and ballot fraud

25   is because people were telling me that they weren't

1    participating because they thought it was no use.  This was a

2    specific question about voter impersonation at the polls.  I

3    still stand by that answer.

4    Q.  But SB14 concerns voter impersonation.  Correct?

5    A.  Yes.  But -- okay.

6    Q.  Now, the complaint that you hear more often than about voter

7    impersonation is that people are registered to vote who

8    shouldn't be.  Right?

9    A.  Please ask that again.

10   Q.  The complaint that you hear more often from constituents is

11   that people are registered to vote who shouldn't be.  Correct?

12   A.  That is the belief by the public, yes.

13   Q.  Can a person tell just by looking at someone whether they're

14   eligible to register to vote?

15   A.  No.

16   Q.  And, of course, you've said yourself that noncitizen voting

17   isn't a big problem in Texas.  Correct?

18   A.  I believe it's not a big problem, but I believe the public

19   believes it's a big problem.

20   Q.  And voting by undocumented workers isn't a problem in Texas,

21   because people who are here illegally would be worried about

22   voting.  Correct?

23   A.  That is my belief, yes.

24   Q.  Let's move on.

25        Now, you also expressed concerns on the Floor of the

1    Texas House about someone registering as Mickey Mouse casting a

2    ballot.  Correct?

3    A.  Yes.

4    Q.  Do you know if anyone registered as Mickey Mouse has ever

5    actually successfully cast a ballot?

6    A.  I don't know.

7    Q.  Did you also tell your colleagues that in 1990 you

8    investigated and prosecuted voter fraud cases?

9    A.  Yes.

10   Q.  But as a county attorney you only prosecuted crimes, you

11   didn't investigate crimes.  Correct?

12   A.  If you look at my language, I had investigated.  I asked the

13   Texas Rangers to investigate it, that's correct.

14   Q.  And you never prosecuted any cases of in-person voter

15   impersonation.  Right?

16   A.  I didn't prosecute any.  I did believe -- there was a time

17   in Bee County that we had some serious questions about what was

18   going on.  As I testified earlier, I requested the district

19   judge to impound some ballots.  I believe some of the

20   allegations may have had something to do with in-person, but I

21   don't know for sure.  I can't remember.  It was 20 years ago.

22   Q.  So in 1990, the incident that you spoke about to your

23   colleagues on the House Floor, you had not actually investigated

24   any incidences at that time?

25   A.  At that time, that's correct.

1    Q.  Okay.  In the 1990 incident, you charged four individuals

2    with misdemeanor unlawful assistance.  Correct?

3    A.  That's correct.

4    Q.  No charges related to in-person voter impersonation.

5    Correct?

6    A.  That's correct.

7    Q.  No charges related to noncitizen voting.  Correct?

8    A.  That's correct.

9    Q.  But you presented this information to your colleagues on the

10   House Floor as evidence in support of SB14.  Correct?

11   A.  No, I presented the voter fraud -- the reason I said that is

12   I had it actually investigated voter fraud and that it had

13   occurred.  I didn't say what kind of voter fraud.  That wasn't

14   my intention.

15   Q.  But you were speaking at the close of legislative debate in

16   support of SB14.  Correct?

17   A.  Yes.  It was not in support of SB14.  It was a House version

18   of SB14.

19   Q.  Let's move on to the next paragraph.

20   A.  But if you want to know why I said that, if you read on --

21   Q.  Representative, there's no question pending.

22   A.  All right.

23   Q.  Thank you.

24          Representative, did you discuss with your colleagues

25   the seven counties that make up your district?

1    A.  Yes.

2    Q.  Is your district majority Hispanic?

3    A.  Yes.

4    Q.  And of the seven counties in your district, only four have

5    functioning driver's licenses offices.   Correct?

6    A.  I think that's what we determined at the deposition that

7    you --

8    Q.  And in --

9    A.  -- did of me.

10   Q.  I apologize for interrupting you, sir.   In South Texas it's

11   usually about 30 miles between county seats.   Correct?

12   A.  That's correct.

13   Q.  That's because it's about as far as a horse can ride in a

14   day.   Correct?

15   A.  That's what I explained to you.

16   Q.  And for voters in counties in your district with no driver's

17   license office, the closest driver's license office will always

18   be farther that the closest polling place.   Correct?

19   A.  Yes, that's true.

20   Q.  And based on your understanding of your district and your

21   constituents, if one of your constituents has to miss work to

22   travel 30 miles each way to a driver's license office during the

23   work day, that's a burden.   Correct?

24   A.  I find it hard to accept the premise of your hypothetical.

25   How are they working without some kind of photo identification?

1    Q.   Representative, I'll repeat my question and ask you to

2    answer it.   And based on your understanding of your district and

3    your constituents, if one of your constituents has to miss work

4    to travel 30 miles each way to a driver's license office during

5    the work day, that's a burden.   Correct?

6    A.   Yes, that's a burden.

7    Q.   Does it cost $22 to obtain a birth certificate in Texas?

8    A.   I think I told you at the deposition I didn't know.   But you

9    gave me that figure, and it sounds about right.

10   Q.   And again, based on your understanding of your district, and

11   your constituents, if someone has to pay $22 for a birth

12   certificate, regardless of why they need to obtain it, that's a

13   burden.   Correct?

14   A.   Yes.

15   Q.   But you think that politicians should stop coddling Latino

16   adults who presume it is the government's responsibility to bus

17   in unregistered voters to the nearest DPS office to get an ID.

18   Right?

19   A.   I don't think those are my language -- that's not my words.

20   I do think that the Hispanic people are a self-reliant people.

21   Emiliano Zapata, one of the heroes of the Mexican revolution

22   said, "It is better to die on my feet than live on my knees."

23   Q.   But Representative, you agree with the sentiment that

24   politicians should stop coddling Latino adults who presume it

25   the government's responsibility to bus in registered voter to

1    the nearest DPS to get an ID.  Right?

2    A.  I don't think it's the government's responsibility to do

3    that.  That's correct.

4    Q.  Let's go back to your closing statement.  You explained to

5    your colleagues that voter registration rates in some county in

6    your district are far above statewide averages.  Right?

7    A.  Yes.

8    Q.  But a good registrar can maintain voter rolls.  Right?

9    A.  A good registrar can maintain them within a certain degree,

10   because all of the procedures that you have, the Secretary of

11   State's individual talked about, takes several months for each

12   step.

13   Q.  But you don't know what a voter registrar's powers are

14   concerning the removal of dead voters.  Correct?

15   A.  I heard the testimony of the Secretary of State.

16   Q.  But beyond what you heard in the courtroom today, you don't

17   have personal knowledge of those powers, those procedures.

18   Right?

19   A.  I had a vague idea, because as county attorney I had to

20   research some of those things.

21   Q.  Okay.  And you also mentioned Box 13 to your colleagues when

22   describing the need for SB14.  Right?

23   A.  Yes.

24   Q.  Box 13 was an allegedly stocked ballot box during one of

25   President Johnson's Senate campaigns.  Right?

1    A.  That's correct.  That occurred in my district.

2    Q.  That was in the 1940s or 50s.  Correct?

3    A.  1948, to be exact.

4    Q.  Back when President Johnson was in the Senate, Texas still

5    had segregation in many different parts of society.  Isn't that

6    right?

7    A.  I was born in 1956.  I didn't come to this country until I

8    was four years old, so I wouldn't have -- but I believe as a

9    general rule, you're probably saying something correct.

10   Q.  Okay.  But you don't think that the segregation from the

11   1940s and 1950s supports continued application of Section 5 to

12   Texas, do you?

13   A.  If your question is:  Do I believe that Texas still needs

14   the Voting Rights Act with respect to an issue like this, my

15   answer is no.

16   Q.  Representative, my question is whether evidence of

17   segregation in the 1940s and 50s supports the continued remedy

18   of Section 5 of the Voting Rights Act in Texas?

19   A.  No, I think we've gotten past that.

20   Q.  You also told your colleagues that in 2004, in Bee County, a

21   woman cast a vote as if she were her deceased mother.  Correct?

22   A.  Yes.

23   Q.  But that woman didn't cast the ballot in person.  Right?

24   A.  No, it was a mail-in ballot.

25   Q.  So SB14, the bill that you were discussing on the Floor at

1   the time that you mentioned that incident, would not have

2   required the voter to show any kind of ID before mailing in that

3   ballot.  Right?

4   A.  Eventually, I believe that SB14 will help clean up the

5   mail-in ballot process as well.  As individuals become older,

6   they will all have identification as they pass that magic

7   threshold of 65, and I think, at that point, that we can go

8   backwards as an investigator and find out what's going on.

9           So are you correct in saying at the day that I

10  testified, would SB14 have cured it?  The answer is no.  But I

11  was thinking also of the future.

12  Q.  So the answer is no.  Correct?

13  A.  At that day the answer was no, but I had other intentions as

14  well.

15  Q.  And you didn't provide that important detail, that the

16  incident in Bee County was a mail-in ballot, to your colleague

17  when you spoke on the Floor.  Correct?

18  A.  That's correct.

19  Q.  Okay.  You also described the results of a 2007 audit of

20  Texas' voter rolls in your statement in support of SB14.  Right?

21  A.  Yes.

22  Q.  Did you review the audit prior to describing it on the Floor

23  of the Texas House?

24  A.  Actually, I did.

25  Q.  And did the audit not find a single incident in which

1   potentially ineligible voters actually voted during a prior

2   election?

3   A.  I believe the Secretary of State's witness already testified

4   as to why that would have been the case.  But yes, that's

5   correct, that was one of the -- I think the actual finding was

6   that they couldn't determine whether in-person voter fraud had

7   occurred by dead people or people ineligible to vote at the

8   time.

9   Q.  Representative, am I correct that the audit did not identify

10  a single incident among all of those ineligible voters where one

11  of those ineligible voters had actually cast a ballot?  Correct?

12  A.  That's correct.  They used the constitutional election for

13  2005 or something.  Most people -- you wouldn't expect voter

14  fraud for a constitutional election.

15  Q.  So the answer is yes, they did not?

16  A.  That's correct.  Yes, the answer is yes.

17  Q.  So you mentioned the number of potentially ineligible voters

18  on the rolls of the Floor of the Texas House, but you didn't

19  mention that none of these ineligible voters actually cast a

20  ballot according to the findings of the audit report.  Correct?

21  A.  That's correct.

22  Q.  You also claimed on the House Floor that election officials

23  had told you that they had witnessed in-person voter fraud.

24  Correct?

25  A.  Yes.

1    Q.  But am I correct that no one who testified in committee

2    really said that they had personally witnessed in-person voter

3    fraud?

4    A.  That I can't remember.

5    Q.  Isn't it the case that the closest testimony is from a

6    witness who claimed that yet another official felt pretty sure

7    that he had seen the same guy vote three different times?

8    A.  That I can't remember, to be honest with you.

9    Q.  Is there a document that might refresh your recollection?

10   A.  I would assume the testimony that we took during those

11   couple of days of hearing testimony.

12          MR. FREEMAN:  Could we bring up Joint Appendix page

13   1474?  And could we also bring up 1475.  My apologies,

14   Your Honor.

15   BY MR. FREEMAN:

16   Q.  And if you could review those transcripts and see if it

17   refreshes your recollection.

18   A.  Yeah, I'm finding it very difficult to read.  Maybe if you

19   could read it for me.

20          MR. FREEMAN:  With your permission, Your Honor.

21          JUDGE COLLYER:  Yes, go ahead.

22   BY MR. FREEMAN:

23   Q.  "But one election judge told me" --

24          JUDGE COLLYER:  If you could just identify the page and

25   lines that you're reading, so the record is clear.

```
 1              MR. FREEMAN:  Thank you.  It's Joint Appendix page
 2    1475, beginning on line one.
 3    BY MR. FREEMAN:
 4    Q.  "But one election judge told me that they know or they felt
 5    pretty sure that they saw the same guy come vote three different
 6    times with three different cards, but there's not a case on
 7    that."
 8    A.  I read that.  And I also remember somebody saying something
 9    about drawerfuls of voter registration cards, and I thought that
10    came out in the testimony.  But the problem is, I can confuse
11    what we heard in the testimony to things that were said to me in
12    preparation for the bill.
13    Q.  But you testified that you received testimony in committee
14    that someone had said that they had witnessed in-person voter
15    fraud?
16    A.  Yes.
17    Q.  But in fact, the testimony in committee was that there was
18    hearsay suspicion of in-person voter fraud.  Correct?
19    A.  That's the way it appears, yes.
20    Q.  Finally, you told your colleagues that an election official
21    had testified that a voter showed up with multiple ID cards.
22    Right?
23    A.  Yes.
24    Q.  But the testimony in committee was that the voter only cast
25    one ballot.  Correct?  It's not on the same page,
```

```
 1    Representative.
 2    A.  I don't know.  I don't remember.
 3              MR. FREEMAN:  If we could bring up page 1542 of the
 4    Joint Appendix.
 5    BY MR. FREEMAN:
 6    Q.  Does that refresh your recollection, Representative?
 7    A.  Can you point me to the area, please?
 8    Q.  Sure.  Beginning on line one.
 9    A.  Okay.  It reads, "Second, I observed a voter who spread out
10    multiple voter registration cards like a deck of cards.  She
11    said, 'Which can I use here?  They always send me extras.'"
12              I don't understand the question.
13    Q.  But she only voted with one of those cards.  Right?
14    A.  I believe that was the testimony, yes.
15    Q.  But you didn't tell your colleagues that the voter only
16    voted once.  Correct?
17    A.  No, I didn't.
18    Q.  And if a voter had duplicate registration certificates in
19    her name, she could use the same photo ID to vote each time.
20    Correct?
21    A.  Yes, that would be true.
22    Q.  Okay.
23    A.  Although, I think we'll arrive at a point, because of the
24    way the driver's license is with the magnetic strip, that we'll
25    be able to scan the thing and determine whether someone has
```

1    actually voted before or not.

2    Q.  But SB14 doesn't provide any funding for that kind of

3    technology.   Correct?

4    A.  I believe that's the wave of the future.

5    Q.  Okay.  Now, you testified earlier also that you campaigned

6    on four planks.  Right?

7    A.  Yes.

8    Q.  And you said you campaigned on the issue of voter ID.

9    Correct?

10   A.  Yes.

11   Q.  But you didn't print any campaign materials about voter ID

12   in Spanish.  Correct?

13   A.  No, I can't say that I did.

14   Q.  And you don't have any copies of the printed material

15   mentioning voter ID.  Right?

16   A.  I think that at the deposition I directed you to my campaign

17   web site.  If they've been erased since then, I don't know.  But

18   I didn't keep any of my materials, that's correct.

19   Q.  You anticipated my next question.  In fact, did you know

20   your campaign web site is still up?

21   A.  Great.

22   Q.  So if we could --

23          MR. FREEMAN:  Well, may I approach, Your Honor?

24          JUDGE COLLYER:  Yes.

25   BY MR. FREEMAN:

1    Q.   Representative, is that a copy of your campaign web site?

2    A.   Yes, some of it.

3            MR. FREEMAN:   Sorry.   That will be Defendant

4    Exhibit 579.

5    BY MR. FREEMAN:

6    Q.   Now, if you look at the second page of your campaign web

7    site?

8            MR. FREEMAN:   If we could put that up on the screen as

9    well.

10   BY MR. FREEMAN:

11   Q.   Is that the complete text of the Letter From Jose that is

12   partially visible on the first page?

13   A.   It looks to be, yes.

14   Q.   And that letter talks about the economy.   Right?

15   A.   Yes.

16   Q.   And it talks about the budget.   Right?

17   A.   Yes.

18   Q.   And it talks about government spending.   Right?

19   A.   Yes.

20   Q.   Talks about red tape.   Right?

21   A.   Yes.

22   Q.   It talks about private property rights.   Right?

23   A.   That it does.

24   Q.   Talks about border security.   Right?

25   A.   Yes.

1    Q.  It does not mention voter ID.  Correct?

2    A.  No, but my campaign material did, and I thought I posted it

3    on my web site.  One of -- I must have sent out at least one

4    mailer on voter ID.  My opponent had voted against voter ID two

5    or three times, and I beat her over the head with it.

6    Q.  Representative -- I apologize for interrupting you.

7    A.  Yes.

8    Q.  Representative, you look at the first page from your

9    campaign web site from 2010, you posted an endorsement from NRA.

10   Right?

11   A.  Yes.

12   Q.  And you posted from Texas Right to Life.  Correct?

13   A.  Yes.

14   Q.  But if you look at the whole web page, the whole documents

15   in front of you, there's nothing related to voter ID.  Right?

16   A.  This is not everything that we had on my web site.

17   Q.  What page from your web site is missing?

18   A.  I believe I posted all my mailers at one time.

19   Q.  Can you tell me where on your web site those mailers appear?

20   A.  They would have shown up probably where I had, like,

21   newspaper articles.  I would have to talk to my consultant, but

22   we would send out a mailer and then post it.  And I must have

23   done not only mailers, I must have done newspaper ads and I post

24   my newspaper ads.

25            I don't understand your point, though.  You know, did I

1  have campaign material that had -- discussed voter ID, the

2  answer is yes.  Does it look like it's on my web site?  If this

3  is all my web site, it doesn't appear like it's on my web site.

4  Q.  Now, Representative, you testified earlier that you know of

5  noncitizens who have voted.  Correct?

6  A.  Yes.

7  Q.  But you didn't mention those noncitizen in the committee

8  hearings.  Right?

9  A.  No.

10  Q.  And you didn't mention them in your closing statement at the

11  end of the House debate.  Correct?

12  A.  That's correct.

13  Q.  In fact, you didn't mention those noncitizens in any public

14  proceeding in the Texas legislature.  Correct?

15  A.  That's correct.

16  Q.  And that's because all of those noncitizens have driver's

17  licenses.  Correct?

18  A.  That's correct.

19  Q.  And that's because noncitizens can obtain a Texas driver's

20  license.  Correct?

21  A.  They can.

22  Q.  So SB14 wouldn't have stopped them from voting.  Correct?

23  A.  I'm not so sure that it would not.

24  Q.  Okay.  Now, you also testified that in South Texas you have

25  a lot of issues related to corruption.  Correct?

1    A.  Yes.

2    Q.  But the politicaros that you mentioned, they're vote

3    harvesters.  Right?

4    A.  Yes.

5    Q.  They push voters to cast mail-in ballots.  Right?

6    A.  Yes.

7    Q.  And the election laws that they break have to do with

8    absentee balloting and voter assistance.  Right?

9    A.  Yes.

10   Q.  But SB14 concerns in-person voting.  Right?

11   A.  Yes.

12   Q.  So SB14 won't do anything about unlawful assistance.

13   Correct?

14   A.  I think eventually it will.

15   Q.  Pardon me?

16   A.  I think eventually it will.

17   Q.  Now, you also testified that there was recently a voter

18   fraud allegation in Jim Wells County.  Correct?

19   A.  Yes.

20   Q.  And in Brooks County?

21   A.  Yes.

22   Q.  But none of those allegations involved the in-person voter

23   impersonation.  Correct?

24   A.  All I read was the newspaper account, something about 18

25   people that were over 110 voting in that election, when the

1    margin was only 19.

2    Q.   And they were over 110 years old because their database

3    entries in the voter registration database were listed as

4    01/01/1900 or 01/01/1901.  Correct?

5    A.   Yes.

6    Q.   And isn't it the case that the other allegations concerned

7    mailing of different rounds of ballots because of a misprinting

8    of mail-in ballots?

9    A.   That was the account of the newspaper article.  Yes.

10   Q.   Nothing about in-person voter fraud.  Right?

11   A.   It wasn't specific enough for me to determine that's

12   what was the case.  But the conclusion I drew, it was probably

13   some kind of mail-in ballot fraud.

14   Q.   You testified earlier that in-person voter fraud is hard to

15   detect.  Right?

16   A.   Yes.

17   Q.   So if a person --  if a voter is going to commit in-person

18   voter fraud, they have to show someone else's voter registration

19   card.  They have to obtain it.  Correct?

20   A.   Under the current state of the law, yes.

21   Q.   And, of course, in the cases that you testified about, if

22   those witnesses were telling the truth, then the in-person voter

23   fraud was detected.  Right?

24   A.   Run that by me again, please.

25   Q.   If an individual testified, told you about their knowledge

1   of in-person voter fraud, in-person voter impersonation, then

2   they detected it, they saw it.  Right?

3   A.  Yes.

4   Q.  And to the extent that in-person voter fraud has not been

5   detected, you have no basis to know that it exists.  Right?

6   A.  I believe our attorney general has actually prosecuted some

7   cases of in-person voter fraud.

8   Q.  But I'm talking about the cases that haven't been detected.

9   You have no basis to know that they exist.  Correct?

10  A.  That's correct.

11  Q.  And one last question.  You don't know if some of the

12  general public's purpose in supporting this bill was

13  discriminatory.  Right?

14  A.  Some of the general public's?

15  Q.  Yes.

16  A.  Are you saying do I know what my constituents have in their

17  heart?

18  Q.  I'm asking if you know whether some of the general public's

19  purpose in supporting SB14 was discriminatory?

20  A.  No one ever expressed to me the idea that pass SB14 because

21  it's going to keep Hispanics and blacks from voting, if that's

22  your question.

23  Q.  But you don't know if some other portion of the general

24  public who didn't speak to you had --

25  A.  That's correct, I don't know that.

1          MR. FREEMAN:  I have no further questions.  Thank you.

2          THE COURT: Thank you.  And for the intervenors?

3          MR. SANCHEZ:  Jorge Sanchez for the -- Jorge Sanchez

4    for the Rodriguez intervenors.

5                    CROSS-EXAMINATION

6    BY MR. SANCHEZ:

7    Q.  You spoke about a situation in South Texas during your

8    direct about election administrators being in cahoots with

9    candidates to steal elections.

10   A.  Yes.

11   Q.  A photo ID law wouldn't prevent that from happening, would

12   it?

13   A.  I'm trying to think.  You know, when you have a system that

14   has --

15   Q.  That's -- it's really a yes or no question.

16   A.  I'm thinking that there's a possibility it could.

17   Q.  You mentioned Mexico as a place which requires a photo ID to

18   vote.

19   A.  Yes.

20   Q.  Isn't that a national ID card that Mexico has?

21   A.  It's a biometric federally issued voter identification card,

22   yes.

23   Q.  Which everyone has?

24   A.  Yes.

25   Q.  And you're required to have it for things other than voting.

1    Is that correct?

2    A.  Yes.

3    Q.  And do you think that -- strike that.

4         The fact that there's a photo ID requirement to vote in

5    Mexico has not stopped electoral fraud in Mexico, has it?

6    A.  I think it gave the people some confidence -- some more

7    confidence in the system, but I think you're correct, there's

8    always allegations of voter fraud in Mexico, as there's always

9    allegations of voter fraud in South Texas.

10   Q.  You chose Mexico as an example because a lot of the

11   opposition that was against SB14 was from the Latino core.

12   Isn't that correct?

13   A.  No, I chose Mexico as an example because I came from Mexico.

14   Q.  You're aware of the "Sanctuary Cities" bill, are you not?

15   A.  Yes.

16   Q.  And this bill was also quite controversial during the

17   session, was it not?

18   A.  I fail to see the controversy in it.

19   Q.  Were there people who were vocally opposed to it?

20   A.  Yeah, the Democrats who wanted to make hay that they were

21   the champions of the Hispanic people.

22   Q.  This was also emergency legislation, though, was it not?

23   A.  The governor had the right to designate things that we could

24   take up before the normal course of events, and yes, he

25   designated Sanctuary Cities as one of those things, yes.

1    Q.  So that an anti-immigrant bill was basically put on a fast

2    track.

3    A.  I disagree with that characterization.

4           MR. McKENZIE:  I consider the question argumentative,

5    so I object.

6           JUDGE COLLYER:  This is cross-examination.  I'm not

7    going to sustain the objection.  The question has been answered.

8    Go ahead.

9    A.  I disagree that it was an anti-immigrant bill.

10   BY MR. SANCHEZ:

11   Q.  You voted for it, though, didn't you?

12   A.  I voted for it, yes.  It was simply a restatement of federal

13   law.

14   Q.  I'm not sure that that's correct after the ruling in the

15   Arizona case.  But I have no further questions.

16          JUDGE COLLYER:  All right.  Thank you.  Is there any

17   other cross-examination?  No.

18          Any redirect?  No.  Thank you very much, sir.  You are

19   excused.

20          THE WITNESS:  Thank you, Judge.  Enjoyed it.  Not

21   really.

22          JUDGE COLLYER:  I think we'll probably enjoy it a

23   little better than you might think.

24          All right.  If Texas will call its next witness.  I

25   also want to tell people where we are on time, just for the

1    purpose.  Through lunch -- not counting the cross-examinations

2    of Representative Aliseda, through lunch Texas had used 12.5 of

3    its hours, the United States had used 41 minutes, and the

4    intervenors had used 13 minutes.

5            Go right ahead, sir.  Nice to see you again.

6            MR. SWEETEN:  Good afternoon, Your Honor.  Thank you.

7    Patrick Sweeten on behalf of the State of Texas.  The State of

8    Texas calls Major Forrest Mitchell.

9            (Oath administered by Courtroom Clerk.)

10   **(FORREST MITCHELL, PLAINTIFF witness, having been duly sworn,**

11   **testified as follows:)**

12   **DIRECT EXAMINATION**

13   BY MR. SWEETEN:

14   Q.  Good afternoon, Major Mitchell.

15   A.  Good afternoon, sir.

16   Q.  Can you introduce yourself to the court, please?

17   A.  Yes.  My name is Forrest Andrew Mitchell and I am a major

18   with the law enforcement division of the Attorney General's

19   Office for the State of Texas.

20   Q.  What is it you do for the Texas Attorney General's Office?

21           JUDGE COLLYER:  Excuse me.  Is major a title?  Is major

22   a rank or is major a name?

23           THE WITNESS:  Major is a rank that I hold.

24           THE COURT:  Thank you, sir.  Go ahead.

25   BY MR. SWEETEN:

1   Q.  What is it that you do for the Texas Attorney General's
2   Office?
3   A.  I'm a state criminal investigator with supervisory
4   responsibility.
5   Q.  And where do you currently live?
6   A.  I live in Austin, Texas with my wife and children.
7   Q.  How long have you worked for the Office of Attorney General
8   in Austin?
9   A.  Since -- in September it will be 15 years.
10  Q.  And what did you do when you first joined the office?
11  A.  When I first joined the office, I was assigned to the
12  prosecution assistance division, and our job was to travel
13  around the state and help smaller rural jurisdictions in the
14  capital murder prosecutions.
15  Q.  And what was your next position with the Office of Attorney
16  General after that?
17  A.  In June of 2005 I was promoted to the rank of lieutenant
18  within the Special Investigations Unit.
19  Q.  Can you tell the Court what it is that the Special
20  Investigations Unit does?
21  A.  Yes.  The Special Investigations Unit is a team of -- or has
22  teams of investigators that conduct criminal investigations in a
23  wide variety of areas.  Some of these areas include money
24  laundering, human trafficking, public integrity, white collar
25  crime, and election violations.  I also have a team of

1    investigators who assist local DA's with criminal cases as well.

2    Q.  When was this unit formed, sir?

3    A.  It was formed in the summer of 2005.

4    Q.  And how many law enforcement officers do you supervise total

5    within the SIU?

6    A.  There are 40 investigators in the Special Investigations

7    Unit.

8    Q.  How, do all of those work on elections investigations?

9    A.  No, sir, only a portion.

10   Q.  And in fact, of the 64 officers under your charge, how many

11   work on elections violations?

12   A.  We currently have three investigators assigned to work

13   election cases in the State of Texas.

14   Q.  And how do you refer to that subgroup of the SIU?

15   A.  We refer to them as the elections team.

16   Q.  Now, what are the types of election code violations that the

17   election team investigates?

18   A.  It would be illegal voting and other violations of the Texas

19   election code, or Penal Code offenses surrounding elections.

20   Q.  And let's focus on the illegal voting cases for a moment.

21   Are there different types of illegal voting cases that you

22   investigate?

23   A.  Yes, sir.  Under Chapter 64 of the Texas Election Code, the

24   offense of illegal voting is kind of broken into four

25   categories:  The first category would be an ineligible voter

1    casting a ballot in an election; another would be voter

2    impersonation; another example is a voter who votes more than

3    once in an election; and then the final type of illegal voting

4    is a person who marks a ballot contrary to the instructions of a

5    voter.

6    Q.   Okay.   Now, one of the things you said is "voter

7    impersonation."   What is that?

8    A.   Voter impersonation is when someone uses another's identity

9    to cast a ballot in an election, either to vote again or to vote

10   in an election they're not eligible to vote in.

11   Q.   Now, I want to talk first before we go into that in more

12   detail about the referral investigation process.   How does the

13   SIU learn of potential cases of election violations?

14   A.   The Office of the Attorney General receives investigative

15   referral requests from a wide variety of sources.   The first

16   would be the Texas Secretary of State's Office; another source

17   would be the local district and county attorneys, and then also

18   from elections administrators and then from local law

19   enforcement.   And then when the Attorney General's Office

20   receives these referrals, they're routed to the Special

21   Investigations Unit.

22   Q.   So we're clear, does the Office of Attorney General ever

23   initiate investigations on its own without a referral?

24   A.   By our policy, we're referral driven.

25   Q.   Are all election violation referrals to the Office of

38

1    Attorney General typically routed to the SIU office?

2    A.  Yes, sir.

3    Q.  Does the SIU or the Office of Attorney General's office have

4    sole jurisdiction over election violation cases within the

5    State of Texas?

6    A.  No, sir.  Local district and county attorneys have

7    concurrent jurisdiction on elections, and also the federal

8    government has jurisdiction in, I would presume, national

9    elections.

10   Q.  Now, are those county DA's or county attorneys, are they

11   required to refer to the Office of Attorney General cases to

12   you, or can they prosecute those on their own?

13   A.  There's no legal requirement for the local county and

14   district attorneys to refer a case to us.  They have concurrent

15   jurisdiction and they're capable of investigating and

16   prosecuting those on their own.

17   Q.  In addition to your supervisory responsibilities, have you

18   personally been assigned to investigate election violations?

19   A.  Yes, sir.  I have been assigned cases and I have assisted in

20   investigation of election code offenses.

21   Q.  And do you keep track of all election violation cases that

22   are referred to your office?

23   A.  Yes, sir, I do.

24   Q.  And how do you do that?

25   A.  I maintain an Excel spreadsheet which is divided into three

Rebecca Stonestreet          (202) 354-3249          kingreporter2@verizon.net

1    books.  The first book would be all of the election code
2    referrals that come into our office; and the second book would
3    be the prosecutions resolved; and then the third book of the
4    spreadsheet would be the charges pending.
5    Q.  So when the SIU receives a referral, what do you do with
6    respect to the spreadsheet?
7    A.  The first thing that we do is that we assign the referral a
8    tracking number, and then we examine the allegations and record
9    them on our spreadsheet.
10   Q.  And how do you maintain those spreadsheets?
11             JUDGE COLLYER:  Isn't this already addressed in the
12   record and ruled on by the court?
13             MR. SWEETEN:  Yes, Your Honor.  I'm just laying
14   foundation for the spreadsheets that I'm going to talk about.
15             JUDGE COLLYER:  Yes, but we've already ruled on the
16   spreadsheets, didn't we?  Wasn't there an objection to the
17   spreadsheets because the government didn't see the underlying
18   documentation, and I ruled it was a business record?
19             MR. SWEETEN:  Yes, i think that's right.
20             THE COURT:  So why don't we just move on?
21             MR. SWEETEN:  Yes, ma'am.
22             THE COURT:  Great.  Good thinking.
23   BY MR. SWEETEN:
24   Q.  So let's talk about the spreadsheets, and in particular I'm
25   going to show you what's been marked as PX-41.  Can you see

1    that?

2    A.  Yes, sir, I can.

3    Q.  Can you identify for us what is PX-41?

4    A.  This is the election code violation spreadsheet that I

5    maintain as the supervisor of the Special Investigations Unit,

6    and it contains the referrals that our office receives.

7    Q.  And can you tell us what data that you input into this

8    spreadsheet?

9    A.  In this spreadsheet I input the county of the alleged

10   violation, and then also the election involved, and then the

11   Secretary of State's Office referral date, and then also the

12   allegations that were made.  I also, if the source is from a

13   local DA or a local law enforcement officer or local elections

14   administrator, I'll record that.

15   Q.  And you update this how frequently?

16   A.  Monthly.

17   Q.  I'm going to show you what's been marked as Plaintiff's

18   Exhibit 42.  Can you tell the Court what this spreadsheet is,

19   PX-42?

20   A.  This is the spreadsheet that I maintain as the supervisor of

21   the Special Investigations Unit, and it contains the

22   prosecutions that the Attorney General's Office has either

23   prosecuted or worked with a local district attorney or county

24   attorney to prosecute.

25           JUDGE COLLYER:  What is the title of this document at

1        the top?

2                THE WITNESS:  The title says "Election Code Referrals

3        of the Office of the Attorney General, Prosecutions Resolved."

4                JUDGE COLLYER:  Thank you.  And that's PX-42?

5                THE WITNESS:  Yes, Your Honor.

6                JUDGE COLLYER:  Thank you, sir.

7        BY MR. SWEETEN:

8        Q.  And can you tell us just generally what's contained in this

9        document?

10       A.  This document is going to contain the county of the offense,

11       the county where it was prosecuted, the name of the defendant,

12       the allegations that were made in that election, the election

13       involved, the cause number of the case, and then the charge that

14       was filed by indictment, and then also the resolution date, the

15       relevant statute under the Election Code or Penal Code, and then

16       finally what the disposition of the case is.

17       Q.  And I'll show you one more document --

18               JUDGE COLLYER:  Mr. Sweeten, I'm sorry to interrupt

19       you.  Do you know how to operate that well enough to just blow

20       up a little bit of that last exhibit?

21               MR. SWEETEN:  No, I'm afraid I don't, but someone at my

22       table can.

23               THE COURT: All lawyers need friends.

24               MR. HUGHES:  Is that too close, Your Honor?

25               THE COURT:  Oh, no, not for me.

1          MR. SWEETEN:  Your Honor, I can give the court paper
2    copies if the court wants it.
3          JUDGE COLLYER:  No, I got it.  I just actually wanted
4    to see how it was because I couldn't see it.  Thank you, sir.
5    Thank you, Mr. Sweeten.
6    BY MR. SWEETEN:
7    Q.  And I'm going to show you the third document, the last one,
8    and I'll try to center it so Your Honor can see it.  Okay.  And
9    there's the title of that document is "Election Code Referrals
10   to the Office of Attorney General, Charges Pending Resolution."
11   Can you tell the court briefly what this document shows?
12          JUDGE WILKINS:  What is the exhibit number, sir?
13          MR. SWEETEN:  It's PX-43.
14   A.  Exhibit 43 represents the cases which are currently pending
15   resolution.  These are cases that have been indicted and are
16   currently awaiting trial.
17   BY MR. SWEETEN:
18   Q.  And these last two, PX-42 and 43, how often are they
19   updated?
20   A.  I maintain those or update those as there's some sort of
21   resolution or disposition in the case.
22   Q.  Now, after you receive the referral and enter it on your
23   spreadsheet, what do you do after that?
24   A.  Well, we evaluate the case and make sure that the criminal
25   investigation is warranted, and then it would be approved -- or

1    it would be assigned to a member of the elections team to

2    investigate.

3    Q.  Now, is every case that's referred to SIU, is that

4    investigated?

5    A.  No, sir, there are certain circumstances where the cases

6    aren't investigated.  One example may be that the statute of

7    limitations has expired; it could also be that it is not really

8    a criminal offense; or it could be that it's a Class C

9    misdemeanor, which is the lowest level of criminal offense in

10    the State of Texas which is punishable by a fine only.  Because

11    we have a limited amount of resources, we wouldn't investigate

12    those.

13    Q.  When you refer an election violation for additional

14    investigation, what do you do after that?

15    A.  It would go to a member of the special investigations

16    election team.

17    Q.  And does SIU actually handle the prosecution of cases?

18    A.  No, sir.  Upon the completion of a criminal investigation

19    where we believe that there's sufficient evidence to charge a

20    case, we would refer that to the criminal prosecutions of the

21    Office of Attorney General, or a local district or county

22    attorney.

23    Q.  Do your spreadsheets, PX-41 through 43, do they contain any

24    entries related to cases that are investigated by county

25    district attorneys or county attorneys?

1   A.  If and only if the Special Investigations Unit or the

2   criminal prosecutions division has been involved in the case.

3   Q.  Does your spreadsheet contain federal investigations of

4   election violations?

5   A.  No, sir, we don't have information on federal prosecutions

6   or investigations.

7   Q.  All right.  Now, in terms of referrals of election

8   violations to SIU for investigation, how many have been

9   referred?

10  A.  Since approximately 2002, there have been 320 referrals made

11  to the Office of the Attorney General.

12  Q.  And of those 320 referrals, how many different Texas

13  counties does that represent?

14  A.  I believe it represents 97 of the 254 counties.

15  Q.  Now, you talked about the referral process and sometimes you

16  don't proceed with it.  So let me ask you, of the 320 referrals,

17  how many has the SIU actually investigated?

18  A.  Since 2004, we've investigated a total of 186 cases.

19  Q.  So of the 186 investigated cases that SIU has investigated,

20  in general terms, the types of election code violations, what

21  types of election code violations do those involve?

22  A.  These could be illegal voting or other violations of the

23  Texas Election Code or Penal Code offenses.

24  Q.  Of the 186 cases, how many of those have been referred for

25  prosecution?

1    A.  62.

2    Q.  Of the 62 cases that have been referred to prosecution, how

3    many have resulted in positive outcomes or convictions?

4    A.  I believe that number is 50.

5    Q.  One of the areas you described earlier is illegal voting,

6    and I think one of those types is in-person voter fraud.  So I

7    want to ask you, of the 62 cases referred for prosecution, how

8    many of those involved voter impersonation?

9    A.  There are a total of six cases that involved voter

10   impersonation that were prosecuted.

11   Q.  And of the 62 cases referred for prosecution, how many

12   involve in-person voter impersonation?

13   A.  There have been five cases that have been sent for

14   prosecution involving in-person voter impersonation.

15   Q.  Does this tally include any referrals from the May

16   primaries?

17   A.  No, sir.

18   Q.  Is there any case that you've investigated that comes to

19   mind that involves in-person voter impersonation?

20   A.  Yes, sir, there is a case.

21   Q.  Can you tell the Court the general facts of that case?

22   A.  This case involved the 2009 Progreso Independent School

23   District election down in Hidalgo County and this case involved

24   two brothers and their mother who went to the polling place.

25   One brother -- I'm sorry, if I may clarify.  One brother was

1    actually incarcerated in the state penitentiary in San Antonio;

2    the other brother went to the polling place with the

3    incarcerated brother's voter registration certificate and he

4    presented himself as if he were his brother.

5           This was discovered by a poll worker inside the

6    location, and she alerted the election judge.  However, since

7    the voter had a lawful voter registration certificate, the

8    elections department let him proceed to vote.

9    Q.  Now, were there -- other than the two -- other than the

10   brother who attempted to vote on behalf of the other brother,

11   was there another defendant involved in that case?

12   A.  Yes, there was.  The other defendant, Reyna Almanza, is the

13   mother of the two sons, and she was actually present with

14   Lorenzo Antonio Almanza, and she interjected with the election

15   judge and vouched for the identity of her son who was using the

16   impersonation -- the impersonated voter registration

17   certificate.

18   Q.  How was it that case was discovered and brought to the

19   attention of the authorities?

20   A.  The case was brought to light through the poll worker who

21   was present at the polling place.

22   Q.  And the poll worker, did she know both brothers?

23   A.  Yes, she did.  The poll worker actually went to high school

24   with the incarcerated brother.

25   Q.  As a supervisor or an investigator with SIU, you've worked

1    on cases involving voter impersonation at the polling place?

2    A.  That's correct.

3    Q.  From your experience, can you tell us how difficult it is to

4    detect in-person voter impersonation at the polling place?

5    A.  I would say it's very difficult to detect.

6    Q.  Why is that?

7    A.  Because it would require somebody at the polling place

8    actually having personal knowledge of the voter who is

9    presenting themselves as the impersonated voter, and then they

10   would also additionally have to be able to observe how that

11   person is checked in during the accepting a voter process.

12   Q.  As compared to mail-in voting fraud, how difficult is

13   in-person voter impersonation to detect or investigate?

14           MR. GEAR:  Objection.  Calls for speculation.

15           JUDGE COLLYER:  I think that adds not quite

16   speculation, given the witness' experience.  I don't know that

17   it has a whole lot of foundation, but that goes to weight, not

18   admissibility, so we'll let him answer the question.

19           Go ahead, sir.

20   A.  I believe in-person voter impersonation is more difficult to

21   detect than mail-in ballot, for instance, voter impersonation.

22   And it really deals with the amount of time that the suspect

23   spends with the voters.  In mail-in ballot cases, they spend a

24   great deal of time with the voters, and use their mail-in

25   ballots to cast the election.  In voter impersonation cases

1  there's very little interaction with the witnesses, so

2  frequently they're unable to identify the suspects through a

3  conventional photo array.

4  BY MR. SWEETEN:

5  Q.  In addition to this case, have you -- are you aware of any

6  other additional pending voter impersonation cases within the

7  State of Texas?

8  A.  Pending criminal cases?

9  Q.  Yeah, currently.

10  A.  We have currently two pending criminal cases in the State of

11  Texas right now with the Attorney General's Office that involve

12  voter impersonation.  One is the Mara Comparion (ph) case out of

13  Bexar County, and then the second case is Lorenzo Antonio

14  Almanza, the one in Hildago County.

15  Q.  Are you aware of any others that your office is not pursuing

16  or investigating?

17  A.  No, I'm not aware.

18  Q.  Are you familiar --

19  A.  I apologize.

20  Q.  Okay.

21  A.  I am aware of another case that is being investigated by a

22  local district attorney up in Tarrant County, where a mother had

23  her son vote in an election.

24  Q.  Are you familiar with a voter ID bill at issue in this case,

25  Senate Bill 14, just generally the terms?

1    A.  Yes, I am.

2    Q.  Does Senate Bill 14 increase the penalties for voter

3    impersonation?

4    A.  Yes, sir, it does.  It affects all types of illegal voting,

5    not just voter impersonation.  It enhances the penalty for a

6    criminal attempt from a Class A misdemeanor to a state jail

7    felony, and then it also it enhances the actual offense of

8    illegal voting from a third degree felony to a second degree

9    felony.  And that would apply to all four types of illegal

10   voting.

11   Q.  As a law enforcement officer, do you have an opinion whether

12   requiring identification at the polling places will be helpful

13   with your investigative efforts?

14   A.  I do.

15          MR. GEAR:  Objection.

16          THE COURT:  Objection sustained.  The witness' answer

17   will be stricken.

18          MR. SWEETEN:  I pass the witness.  Thanks.

19          THE COURT:  Thank you, Mr. Sweeten.

20          MR. GEAR:  My name is Bruce Gear.  I represent

21   Eric Holder in this case.

22                        **CROSS-EXAMINATION**

23   BY MR. GEAR:

24   Q.  Major Mitchell, isn't it true that you did not testify

25   before the legislature during the 2011 legislative session?

```
1    A.  That is correct, I did not testify.
2    Q.  During your direct testimony you identified five cases of
3    voter impersonation, and I assume, that's five cases of voter
4    impersonation at the polling place?
5    A.  Yes, sir, there are five cases of in-person voter
6    impersonation at the polling place.
7    Q.  And then you identified a second -- or a sixth case, and I
8    believe, you identified that as Tarrant County?
9    A.  Well, sir, I identified a case that we were also involved in
10   which was the Melvin K. Ponce (ph) investigation, which was a
11   mail-in ballot voter impersonation.
12   Q.  And the Melvin K. Ponce case, that would not have been
13   covered by SB14 had it been in place.  Isn't that correct?
14   A.  Into what regard?
15   Q.  In regards SB14 would not have stopped the Melvin K. Ponce
16   case.  Isn't that correct?
17   A.  It could have had a deterrent effect.
18   Q.  It's a by mail ballot case.  Correct?
19   A.  Yes, sir, it is.
20   Q.  It is not a case where Melvin K. Ponce appeared in person
21   and pretended to be someone else at the polling place.  Correct?
22   A.  Yes, sir, you are correct.
23   Q.  And just so I'm clear, SB14, as it's drafted, deals
24   specifically with voter impersonation at the polling place.
25   Isn't that your understanding?
```

1   A.   No, sir, it is drafted in that one of the portions of SB14

2   deals with the offense of illegal voting, and there are four

3   categories of that.   And it enhances the penalty range for all

4   four types of the offense.

5   Q.   You had a deposition in this case.   Correct?

6   A.   Yes, sir.

7   Q.   And we discussed Melvin K. Ponce.   Correct?

8   A.   Yes, sir, we did.

9   Q.   And didn't I ask you the question whether or not SB14 would

10   have prevented voter fraud in that case as it applies to SB14?

11   A.   For the purposes of the voter ID requirement at a polling

12   place, that case would not have -- it would not have prevented

13   it.

14   Q.   Now, the other case that you spoke about was Reyna Almanza.

15   Is that correct?

16   A.   Yes, sir.

17   Q.   And isn't it true that Reyna Almanza did not cast a ballot

18   during the 2009 school district election?

19   A.   I do not believe that Reyna Almanza cast a ballot in that

20   election.

21   Q.   The second case that you talked about was Lorenzo Antonio

22   Almanza.   Correct?

23   A.   Yes, sir.

24   Q.   Isn't it true that there's no conviction in this case?

25   A.   Yes, sir, that case is currently pending.

1    Q.  The third case that you talked about was Delores McMillan.

2    Or you didn't actually identify that, but do you understand

3    Delores McMillan as being one of the voter impersonation cases

4    that you've identified here today?

5    A.  Yes, sir, it is one of the five.

6    Q.  And Delores Millan (sic) was an election worker.  Correct?

7    A.  Yes, sir, she was an election worker in the 2010 primary

8    elections in Dallas County.

9    Q.  Now, the election code violation that you're referencing

10   regarding Delores McMillan was one that occurred before the

11   polling place even opened.  Isn't that accurate?

12   A.  Yes, sir, that is my understanding of the case facts.

13   Q.  This is not a case where she presented an identification to

14   someone and pretended to be someone else.  Isn't that accurate?

15   A.  That's correct.

16   Q.  SB14 would not have prevented the case of Delores McMillan

17   because it occurred before the polls opened.  Isn't that

18   correct?

19   A.  Again, I believe there could have been a deterrent effect

20   based upon the statute, but it would not have prevented her from

21   doing so.

22   Q.  And you also mentioned, and I believe you mentioned her by

23   name, but I'm going to use the initials M.C.  If I do that,

24   would you understand who I'm talking about?

25   A.  Yes, sir, I would.

1    Q.  And there's no conviction in the M.C. case, is there?

2    A.  No, that case is currently pending as well, sir.

3    Q.  And M.C. has been found mentally incompetent.  Isn't that

4    correct?

5    A.  I believe so, yes, sir.

6    Q.  And under the charge of voter impersonation, there would

7    need to be a finding of intent, that that person intended to

8    violate the law.  Isn't that correct?

9    A.  The elements of the offense, I believe, are intentionally or

10   knowingly.

11   Q.  And then finally, the last case that you mentioned was --

12   and actually didn't mention it by name, but Jack Crowder, III.

13   Would that be one of the voter impersonation cases that you're

14   identifying here today for the judges?

15   A.  Yes, sir, that is Jack Carol Crowder and that was the 2008

16   general elections in Harris County, Houston, Texas.

17   Q.  Now, the allegation for the Jack Carol Crowder case is that

18   he voted on behalf of his deceased father.  Is that accurate?

19   A.  Yes, sir, he presented his deceased father's voter

20   registration certificate and cast a ballot in that election.

21   Q.  And how do you know he presented his father's voter

22   registration card?

23   A.  I believe he told me that, and he provided the voter

24   registration certificate to us during an interview.

25   Q.  Again, you had a deposition in this case.  Correct?

1    A.  Yes, sir.

2    Q.  And you believe it's important to tell the truth, or you did

3    tell the truth during your deposition.  Correct?

4    A.  Yes, sir, I did.

5    Q.  And during the deposition didn't you tell me that you

6    learned that information by looking at the indictment papers,

7    that it would be included in the indictment papers that he used

8    his father's voter registration card?

9    A.  You could find -- yes, I believe I did say that.

10            MR. GEAR:  Permission to hand something to the other

11   counsel.

12            THE COURT:  Yes, go right ahead.  Thank you, sir.

13            MR. GEAR:  Could you present Exhibit 240, please?

14            JUDGE WILKINS:  Whose Exhibit 240?

15            MR. GEAR:  It's DE 240.

16   BY MR. GEAR:

17   Q.  I'll give you a chance to look at this document before I ask

18   you any questions.

19   A.  Yes, sir.

20   Q.  Is this the indictment document that you were referring to

21   regarding Jack Carol Crowder?

22   A.  Yes, sir, I believe it is.

23            MR. GEAR:  Could you pull up the last paragraph,

24   please.

25

1    BY MR. GEAR:

2    Q.  I would ask you to take a look at the paragraph that's been

3    called up and tell me if you see anywhere in that paragraph that

4    he used his father's voter registration card to vote?

5    A.  No, sir, I don't see it in there.

6    Q.  So you could be incorrect on that point.  Right?

7    A.  As far as my deposition, I was incorrect.  I said that I

8    thought the one place it may be would be in the indictment.

9    Q.  But it's your testimony today that he told you that?

10   A.  It is my testimony today that we interviewed Jack Carol

11   Crowder during this investigation, and Jack Carol Crowder

12   advised us that he --

13   Q.  Can you --  I'm sorry.  Were you done?

14        MR. SWEETEN:  Your Honor, the witness wasn't finished

15   responding t0 --

16        THE COURT:  He's letting him finish, I promise,

17   Mr. Sweeten.

18   A.  Yes, sir, during the investigation, he advised us that he

19   used his father's voter registration certificate and he gave it

20   to us.

21   BY MR. GEAR:

22   Q.  Now, you've referenced your spreadsheet, which is

23   Exhibit 41, I believe?

24   A.  41, 42, and 43.

25   Q.  That information is not contained anywhere within your

1    spreadsheet, is it?

2    A.  No, sir.

3    Q.  During your direct testimony you also talked about

4    noncitizen voting.  Do you recall that?

5    A.  In today's?

6    Q.  Yes.

7    A.  I don't believe I've discussed noncitizens voting today.

8    Q.  Let me ask you this question:  Based on the referrals to the

9    Office of the Attorney General, between 2002 and 2012, how many

10   cases of noncitizen voting can you identify?

11   A.  I can think of a few, probably three or four.

12   Q.  During your deposition did you indicate that you had three

13   that you could call to mind?

14   A.  That seems correct.

15   Q.  In discussing specifically those three cases, the first case

16   would be Debra Briseno, which was a 2006 primary election.

17   Isn't that correct?

18   A.  Yes, sir, Debra Briseno was a defendant that was charged as

19   a result of elections misconduct in the 2008 primary election.

20   Q.  And she was a voter registrar during that election, wasn't

21   she?

22   A.  Yes, sir.  She was a city councilperson for the City of

23   Port Lavaca, and had signed up as a deputy voter registrar for

24   the 2008 primary.

25   Q.  And that case did not result in any charges to noncitizens.

1    Isn't that accurate?

2    A.  No, sir, no noncitizens were charged in that criminal

3    investigation.

4    Q.  The second case that, I believe, you have in mind is the

5    2008 Hidalgo County election.  Is that accurate?

6    A.  I believe so, yes.

7    Q.  And you don't actually know the facts of that case, do you,

8    all of the facts?

9    A.  I'm not aware of all of the facts because our office only

10   assisted in a portion of the investigation that was conducted by

11   the local district attorney's office.

12   Q.  And as you sit here today, you can not testify before the

13   court that there were any noncitizens charged in that case, can

14   you?

15   A.  No, sir.

16   Q.  The third case, and I believe this is the final case that

17   you are able to identify, is the 2010 Dallas County election.

18   Isn't that right?

19   A.  That is correct, sir.  That was the 2010 primary election in

20   Dallas, Dallas County.

21   Q.  And that case involved by-mail ballot fraud.  Correct?

22   A.  That case involved a number of allegations, I think, maybe

23   10 allegations of different types.  One of the allegations was

24   mail-in ballot fraud; others were illegal voting.

25   Q.  Well, it's true, is it not, that there were no noncitizens

1   charged in the 2010 Dallas County election?

2   A.   That is correct.   There were no charges of noncitizen

3   illegal voting.

4   Q.   And you have no knowledge of any other cases where

5   noncitizens were alleged to have voted.   Isn't that correct?

6   A.   I really only know the cases that are referred to our

7   office.

8           JUDGE COLLYER:   But the answer to the question is no,

9   you know of none?

10          THE WITNESS:   Yes, Your Honor, I don't know of any

11   others.

12          JUDGE COLLYER:   No, you don't know of any involving

13   noncitizen illegal voting?

14          THE WITNESS:   Yes, Your Honor, I do not know of any

15   others involving noncitizen U.S. -- or noncitizens voting.

16          JUDGE COLLYER:   Let me back up.   The 2010 Dallas

17   primary, you just said that didn't include any charge of

18   noncitizen voting.   Right?

19          THE WITNESS:   That is correct, Your Honor.

20          JUDGE COLLYER:   And the 2008 Hidalgo County election,

21   you said you can't say that there was any noncitizen voting in

22   that case?

23          THE WITNESS:   That's correct, Your Honor.

24          JUDGE COLLYER:   And the voter registrar case involving

25   somebody named Briseno, that didn't include any charge about

1    noncitizens?

2            THE WITNESS:  No, noncitizens were charged in that

3    case.

4            JUDGE COLLYER:  Okay.  So those are the three cases I

5    thought you identified during your deposition as possibly

6    involving noncitizens.

7            THE WITNESS:  Yes, Your Honor.

8            JUDGE COLLYER:  Are there others?

9            THE WITNESS:  There are others that we conducted

10   investigations, but the allegations were unsubstantiated.

11           JUDGE COLLYER:  Okay.  So there are no noncitizen

12   voting cases in which the allegations were substantiated?

13           THE WITNESS:  If I may, Your Honor, in the Dallas 2010

14   case, and in the Hidalgo County case -- I'm sorry, the

15   Calhoun County case involving deputy voter registrar, it was

16   determined that noncitizens had voted in those elections;

17   however, they lacked the *mens rea*, the intentionally or

18   knowingly, for them to be criminally charged.

19           JUDGE COLLYER:  Okay.  Go ahead.

20   BY MR. GEAR:

21   Q.  So to sum that up, as far as the Attorney General's Office

22   is concerned of Texas, there's been no cases where noncitizen

23   voters have been charged for voter impersonation.  Isn't that

24   accurate?

25   A.  Yes, sir.

1    Q.  Now, the Attorney General's Office for Texas has had

2    jurisdiction over Election Code violations since --

3              JUDGE WILKINS:  I'm sorry, I need to interrupt for a

4    second.  When you said that there was a lack of *mens rea* and so

5    there were no charges brought, what did you mean by "a lack of

6    *mens rea*"?

7              THE WITNESS:  The noncitizens in this case were

8    approached by deputy voter registrars and told that if they had

9    a driver's license, that they were eligible to vote in an

10   election.  And these deputy voter registrars, for the purposes

11   of Texas law, are considered public servants.  So the voters

12   were unaware that they were not eligible to vote in the election

13   as defined in the illegal voting statute.

14             JUDGE WILKINS:  So they did not intend to break the

15   law, is what you're saying?

16             THE WITNESS:  Yes, Your Honor.

17             JUDGE WILKINS:  All right.  Thank you.

18   BY MR. GEAR:

19   Q.  Are you aware of whether or not the noncitizens that were --

20   the allegations of noncitizens in those cases, are you aware of

21   whether or not those noncitizens had driver's licenses?

22   A.  I can say in the Debra Briseno case, I believe they did have

23   Texas driver's licenses.  I'm not certain about the Dallas case.

24   Q.  So the previous question I asked, and I'm sorry, I didn't

25   hear the answer, the Office of the Attorney General had

1   jurisdiction, or has jurisdiction, and has had jurisdiction over

2   Election Code violations since 1985.  Correct?

3   A.  Yes, sir, I believe the Office of the Attorney General has

4   that concurrent jurisdiction with local prosecutors for quite

5   some time.

6   Q.  And the Office of the Attorney General has made

7   Election Code violations a priority of the office.  Isn't that

8   correct?

9   A.  Yes, sir, it is a priority amongst many.

10  Q.  And isn't it a fact that pursuant to Texas Election Code

11  annotated 273.001, local prosecutors and DA's are required to

12  deliver notice to the Secretary of State within 30 days of

13  beginning an Election Code investigation?  Isn't it true?

14  A.  I believe that's correct.

15  Q.  And that notice also requires that they include the date on

16  which the election was held.  Isn't that also true?

17  A.  I would have to look at the statute to be absolutely

18  certain.

19  Q.  You were asked about the referral system, but isn't it, in

20  fact, true that the Office of the Attorney General has the

21  authority to investigate an Election Code on their own

22  initiative?

23  A.  Yes, sir, if we have reason to believe an offense occurred.

24  However, our policy, we restrict ourselves to just referrals.

25  Q.  And they have the authority to do that even without a

1    referral if they believe a violation has occurred.  Isn't that

2    correct?

3    A.  We have the legal authority under Chapter 273 to do so, yes,

4    sir.

5    Q.  Pursuant to Texas Election Code annotated 273.001, again,

6    the Office of the Attorney General has the authority to direct

7    county and district attorneys to conduct or assist the Office of

8    the Attorney General in investigations.  Isn't that correct?

9    A.  I believe that's the statute, yes, sir.

10   Q.  The Office of the Attorney General even has the authority to

11   direct the Department of Public Safety to conduct investigations

12   if they so choose.  Isn't that correct?

13   A.  Yes, sir, I believe, that's accurate.

14   Q.  You indicated during your direct that voter impersonation at

15   the polls is difficult to detect.  Do you recall that testimony?

16   A.  Yes, sir, I do.

17   Q.  Voter impersonation is similar to any other crime, in that

18   it involves proof beyond a reasonable doubt.  Correct?

19   A.  Yes, sir.

20   Q.  You would agree that anyone at the polling place has the

21   ability to detect in-person voter impersonation.  Correct?

22   A.  I'm sorry, could you ask the question again?

23   Q.  There are a lot of people in the polling place on election

24   day generally.  Correct?

25   A.  No, sir, there's a restricted number.  Only the voters

1    representing themselves to vote, and then also the poll workers

2    who are present during that election.

3    Q.  Let me rephrase that question for you.  There are poll

4    workers?

5    A.  Yes, sir.

6    Q.  Poll watchers?

7    A.  Yes, sir.

8    Q.  Voters?

9    A.  Yes, sir.

10   Q.  And there's any other host of individuals that may come and

11   go from the polling place at any given time.  Correct?

12   A.  Yes, sir.

13   Q.  And so my question to you was:  Any of those individuals

14   have the ability to detect in-person voter impersonation.

15   Correct?

16   A.  I think I said in my deposition and also here today that I

17   think the only way it will be detected is if the person actually

18   has a personal relationship and knows the voter who is

19   presenting the false documents.

20   Q.  Well, in fact, one of the voter impersonation cases that you

21   have before the Office of the Attorney General was detected by a

22   DPS trooper who was not in the polling place at the time.

23   Correct?

24   A.  Yes, sir, it was detected sometimes afterwards.

25   Q.  And there's also another in-person voter impersonation case

1    that was detected by a citizen group who was not necessarily in

2    the polling place at the time.  Correct?

3    A.  Yes, sir, it was.

4    Q.  And regarding the evidence in a polling place, isn't it a

5    fact that by statutory law, the Office of the Attorney General

6    has the ability to impound evidence following an election?

7    A.  Yes, sir.  The Texas Attorney General's Office or local

8    district or county attorney may request from a district judge in

9    state court the ability to impound election records.

10   Q.  And I also want to ask you, isn't it a fact that the Office

11   of the Attorney General has a long-standing policy of working

12   with local law enforcement, district attorneys, and county

13   attorneys, in investigating Election Code violations?

14   A.  We try to work with local law enforcement and local

15   prosecutors on all types of cases, including election cases.

16   Q.  And you often work in conjunction with local attorneys and

17   DA's in investigating and sometimes prosecuting Election Code

18   violations.  Isn't that correct?

19   A.  Yes, sir.  The Jack Carol Crowder is an example of that

20   case.  That was actually prosecuted with the assistance of the

21   Harris County District Attorney's Office.

22   Q.  So the answer to that was yes?

23   A.  Yes, sir.

24        MR. GEAR:  If I could have one moment, please.

25        JUDGE COLLYER:  Yes, sir.

```
 1    BY MR. GEAR:
 2    Q.  Isn't it true that the criminal charges or the criminal
 3    portion of SB14 has already been precleared and is currently in
 4    effect?
 5    A.  I don't know that, sir.
 6    Q.  Would you agree that the current laws as they're in place
 7    act as a deterrent in preventing in-person voter impersonation?
 8              MR. SWEETEN:  Objection, Your Honor.  Outside the
 9    scope, and the court didn't allow me to ask this question.
10              JUDGE COLLYER:  Yeah, I think more the latter, but I
11    think this witness can't make that conclusion.
12              MR. GEAR:  I have nothing further.
13              JUDGE COLLYER:  Thank you very much, Mr. Gear.  Oh I'm
14    sorry, sir, go right ahead.
15              MR. ROSENBERG:  Thank you.  I'll be very quick.
16    Ezra Rosenberg for the intervenor defendants.
17    BY MR. ROSENBERG:
18    Q.  Major Mitchell, nice to see you again.
19    A.  Yes, sir.
20    Q.  Very quickly, you started out -- in response to
21    Mr. Sweeten's questions you said there were six cases of voter
22    impersonation.  But just to make sure we all know what we're
23    talking about, one was Ponce, which was an absentee ballot case.
24    Right?
25    A.  That is correct, sir.
```

1    Q.  One of them was Ms. Almanza, the mother who, herself, didn't
2    try to impersonate anyone.  Right?
3    A.  No, sir, she was charged as a party to the offense of
4    illegal voter.
5    Q.  Right.  But that's one of your five?
6    A.  Yes, sir.
7    Q.  But she, herself, didn't try to impersonate anyone.  She
8    aided and abetted, allegedly, her son.  Is that correct?
9    A.  Well, she's been convicted of that, yes, sir.
10   Q.  But again, so we're really dealing with four allegations of
11   individual people who went to a polling booth, supposedly - I'll
12   get to two more - and tried to impersonate someone else, not
13   five.  Isn't that correct?  Because Mrs. Almanza didn't do that?
14   A.  That's correct.
15   Q.  Then of the four, we have Ms. McMillan, who was the election
16   worker herself, who kind of cooked the books before the polls
17   opened.  Right?
18   A.  Yes, sir, that's correct.
19   Q.  So then we're down to three.  And the other one, M.C., we've
20   been calling her, is a woman who has been declared mentally
21   incompetent and used photo IDs that she had to identify herself
22   at the polling place.  So she didn't try to impersonate anyone
23   but herself.  Right?
24   A.  She used multiple identities, including her deceased sister.
25   Q.  But they were all photo IDs with her photo on it.  Correct?

1    A.  I'm not sure which type of document she used at the polling

2    place.  She had driver's license and she also had voter

3    registration certificates and all the different identities.

4    Q.  But sitting here today, you can't say one way or the other.

5    A.  No, sir.

6    Q.  Then we're down to two, Crowder and Mr. Almanza.  Correct?

7    A.  Yes, sir.

8    Q.  And that's over 10 years from 2002 to 2011, two people whom

9    you're saying might have been prevented from impersonating

10   someone else by SB14's photo ID requirements.  Right?

11   A.  These are two cases of the cases that have been referred to

12   our office.

13   Q.  And those are the only ones you know of that you've

14   testified to.  Is that correct?

15   A.  With the exception of the case I've become aware of in

16   Tarrant County.

17   Q.  I understand.  The one you read about in the newspaper.

18   Correct?

19   A.  Yes, sir.

20   Q.  Then prior to 2002, you're not aware of any others.  Isn't

21   that correct?

22   A.  That's correct, sir.

23   Q.  And just because a crime is difficult to detect doesn't

24   necessarily mean people are committing it.  Isn't that correct?

25   A.  I'm sorry, could you state that one more time?

1    Q.   Sure.   Just because a crime may be difficult to detect

2    doesn't necessarily mean that people are committing it.   Isn't

3    that correct?

4    A.   I would agree.

5    Q.   And in fact, in-person voter impersonation in the polling

6    booth is a crime that, by definition, is committed in broad

7    daylight in front of people.   Right?

8    A.   In-person voter impersonation would be in front of somebody,

9    that's correct.

10   Q.   And in fact, it's committed, if committed at all, in front

11   of people who are looking out for that kind of thing, isn't it?

12   A.   Well, I don't know if I would agree with that statement

13   completely.

14   Q.   Well, poll watchers, election workers, aren't they supposed

15   to be looking out for that sort of thing?

16   A.   The job of a poll worker who is accepting voters is to

17   verify the voter's eligibility to vote in an election.   They do

18   not have the ability to verify their identity.   An example would

19   be if someone came into the polling place with a bank statement,

20   which is currently authorized under Texas law.

21   Q.   But in fact, you've already talked about at least one of

22   your cases that was, in fact, spotted by a poll worker.   Wasn't

23   that so?

24   A.   That is correct, sir.

25        MR. ROSENBERG:   I have no further questions.   Thank

1    you.

2              JUDGE COLLYER:  Thank you, sir.  Is there any redirect?

3              MR. SWEETEN:  Yes, Your Honor, short redirect.

4                        **REDIRECT EXAMINATION**

5    BY MR. SWEETEN:

6    Q.  Of all the types of voter fraud that you investigate as an

7    investigator, which is the most difficult to detect?

8    A.  I would think in-person voter impersonation.

9    Q.  With respect to the Almanza case, can you tell us who has

10   been charged in that fact pattern that you described earlier in

11   your testimony?

12   A.  Both Lorenzo Almanza and Reyna Almanza were charged with

13   illegal voter impersonation, and then Reyna Almanza has been

14   convicted by Brooks County court for illegal voting, voting

15   impersonation.

16   Q.  And the other case is pending.  Is that correct?

17   A.  Yes, sir.

18             MR. SWEETEN:  No further questions.

19             JUDGE COLLYER:  Well, all right, then, you are excused.

20   Thank you very much, Major.

21             MR. FREDERICK:  Matthew Frederick for the State of

22   Texas.  The State calls Senator Thomas Williams.

23             (Oath administered by Courtroom Clerk.)

24    **(SENATOR THOMAS WILLIAMS, PLAINTIFF witness, having been duly**

25                  **sworn, testified as follows:)**

1                      **DIRECT EXAMINATION**

2      BY MR. FREDERICK:

3      Q.  Good afternoon, Senator.  Will you please introduce yourself

4      to the court?

5      A.  Sure.  My name is Tommy Williams.  I'm the state senator for

6      District 4, it's the southeastern corner of the state.

7      Q.  And when were you first elected to the Senate?

8      A.  In 2002.

9      Q.  Have you held any other elected office in Texas?

10     A.  Yes, I was a House member.  I was elected in 1996, and I

11     served three times in the Texas House.

12     Q.  And what role did you have in the passage of Senate Bill 14?

13     A.  I was a joint author.

14     Q.  I want to talk briefly about the history of voter ID

15     registration in Texas.  To your knowledge, when did the Texas

16     legislature first consider voter ID legislation?

17     A.  To the best of my knowledge, it was in 1997.  My first

18     session in the Texas House of Representatives, Deborah Danburg,

19     a liberal Democrat out of the Houston area, passed a photo ID

20     bill out of the House, and as I recall, there was no opposition.

21     It got 140 out of 150 votes.

22     Q.  And what did the Danburg bill provide, to your recollection?

23     A.  If you showed up to vote and you didn't have your voter

24     registration card, you had to present a photo ID to vote.

25     Q.  Did the Danburg bill pass the Senate?

1   A.  It did, but not in the same form that it passed the House.

2   Q.  How did it change in the Senate?

3   A.  Well, it was amended in the Senate State Affairs Committee,

4   and essentially it gave us the law that we have today, where you

5   could provide a utility bill.  It's essentially what we're

6   operating under today.

7   Q.  And in 2005, did the Texas House pass voter ID legislation

8   in that session?

9   A.  I'm sorry, could you say when again?

10  Q.  Of course.  In 2005 --

11  A.  Yes.

12  Q.  -- did the Texas House pass voter ID legislation?

13  A.  Yes, they did.

14  Q.  Was that House Bill 1706?

15  A.  Yes.

16  Q.  Now, did that bill pass the Senate?

17  A.  It did not.

18  Q.  What happened to that bill in the Senate?

19  A.  It died in committee.

20  Q.  So it never came up for a vote?

21  A.  No.

22  Q.  Moving up to 2007, did the Texas House pass voter ID

23  legislation again in 2007?

24  A.  Yes.

25  Q.  And was that House Bill 218?

1    A.  Yes.

2    Q.  Now, what happened to House Bill 218 in the Senate?

3    A.  Well, it didn't pass.  It did make it out of committee, and

4    there was an attempt to suspend the rules in '07 to bring the

5    bill up out of the regular order of business, but that failed,

6    ultimately.

7    Q.  Can you explain for the court briefly what is the regular

8    order of business in the Senate?

9    A.  The regular order of business is defined in the rules as the

10   order in which we would take up bills, the regular order of

11   business to consider bills on the floor of the Senate, and that

12   would be the order in which they passed from committee -- the

13   order that they passed out of their substantive committee.

14   Q.  Is it accurate to say that the regular order is a type of

15   calendaring mechanism in the Senate rules?

16   A.  It is the default calendar for the Senate.

17   Q.  Now, you mentioned a vote to suspend the rules, to suspend

18   the regular order of business.  Why was it necessary to suspend

19   the regular order of business?

20   A.  Are we talking about in 2007?

21   Q.  Yes, in 2007.

22   A.  I wanted to be sure.  It was necessary because to consider

23   that bill we had to take it out of the regular order of

24   business.  There was a blocker bill in place ahead of it.

25   Q.  And so what vote is required to bring up the bill out of the

1    regular order of business?

2    A.  In both the House and the Senate, to take up a bill out of

3    the regular order of business, it requires two-thirds of the

4    members present and voting to agree to suspend the regular order

5    of business.

6    Q.  Now, did the Senate rules require a two-thirds vote to bring

7    every bill to the floor?

8    A.  No.

9    Q.  Do the Senate rules require two-thirds -- a two-thirds vote

10   to pass a bill?

11   A.  No, a majority vote.

12   Q.  Now, does the Senate commonly consider bills out of the

13   regular order of business?

14   A.  It does happen very frequently in the Senate.

15   Q.  And is it accurate to say that there is somewhat of a

16   tradition or a custom of considering bills out of the regular

17   order in the Senate?

18   A.  Yes, it's evolved over the last 40 or 50 years, probably

19   started in the 1950s sometime.

20   Q.  And is that what senators refer to when they refer to the

21   "two-thirds tradition" or the "two-thirds rule" in the Senate?

22   A.  Yes.

23   Q.  Now, what is the primary function of that two-thirds

24   tradition in the Senate?

25   A.  It's a calendaring mechanism.  It's a way that we control

1    the flow of legislation and how it comes to the floor.

2    Q.  And how does that compare to the calendaring mechanism used

3    in the Texas House?

4    A.  Well, in the Texas House you have a calendars committee, and

5    when a bill is passed out of the substantive committee, it is

6    referred to the calendars committee.  And the bills come out of

7    the calendars committee in the regular order of business, and it

8    would be very unusual for the House to take a bill up out of the

9    regular order of business because they take it in the -- the way

10   they came out of the calendars committee is the regular order of

11   business.

12   Q.  And that's how bills get taken up?

13   A.  Correct.

14   Q.  And so as a practical matter, how many House members

15   determine the order in which bills are considered?

16   A.  Well, the calendars committee are the Speaker's most trusted

17   associates, and you might say the chairman of the calendars

18   committee and the Speaker are really the only ones that decide.

19   There are other members of the committee, but certainly you

20   don't want to get crossways with them.  I found out the hard way

21   in my first year in my legislative package.

22   Q.  So back to the 2007 Voter ID Bill, you mentioned that there

23   was a vote on a motion to suspend the regular order, and what

24   happened on that vote?

25   A.  We're talking about in 2005 now?

1    Q.  In 2007.

2    A.  In '7, 2007?

3    Q.  Yes.

4    A.  Well, the lieutenant governor recognized Senator Frasier to

5    suspend the regular order of business to take up and consider

6    that bill, and the suspension passed.  There were two-thirds of

7    the members who were present and voting who voted to suspend the

8    regular order of business.

9    Q.  Now, were any members absent at the time that vote was

10   taken?

11   A.  There are two that I recall very notably.  Senator Whitmire,

12   the Dean of the Senate protested very loudly that he was counted

13   present when we called the roll, but he was off the floor when

14   the bill came out, and he came running back into the chamber and

15   wanted to be shown voting no.  So there was a big hubbub about

16   that and a discussion between Senator Whitmire and the President

17   of the Senate, the lieutenant governor.

18   Q.  Was anyone else absent during that first vote?

19   A.  Yes, the other person who was absent was Senator Uresti.

20   Q.  Is it common in the Senate to bring a bill up for vote when

21   members are absent?

22   A.  Happens all the time.

23   Q.  Is it common also to wait until opponents of the bill are

24   absent to bring it up for a vote to suspend the regular order?

25   A.  No.  We have an intent calendar in the Senate, and before

1   you can bring a bill -- before you can move to suspend the

2   regular order of business, you have to place a bill on the

3   intent calendar for at least two days during the first 130 days

4   of the session.  A session is 140 days long.  It's only one day

5   at the end of the session.

6   Q.  So then would it be possible just to introduce a bill and

7   call for a vote to suspend if it had never been announced?

8   A.  No, not at all.  The whole purpose of the intent calendar is

9   to make sure that members know when someone is planning to bring

10   a bill up, or planning to ask to suspend the regular order of

11   business.

12   Q.  Now, once a bill has been put on the intent calendar, is it

13   common at that point to, let's say, make sure you have the votes

14   at the moment when you call for a motion to suspend?

15   A.  Right.  You look around to make sure your votes are there

16   before you try to bring your bill up.

17   Q.  So in 2007, the first motion to suspend passed with a vote

18   of two-thirds members present voting, and at that point could

19   the Senate have debated and voted on that bill?

20   A.  Yes, we could have.

21   Q.  And how many votes were required to pass the bill at that

22   point?

23   A.  A simple majority of the members present and voting.

24   Q.  And based on the vote on the motion to suspend, what would

25   have happened if the Senate had voted on SB18?

1   A.  I believe the bill would have passed with a comfortable

2   margin.

3   Q.  Is that what happened?

4   A.  No.

5   Q.  What happened?

6   A.  The lieutenant governor called for a second vote in

7   deference to Senator Whitmire, and during that time, while roll

8   was being called, Senator Uresti showed up in the chamber.  He

9   had been previously absent.  So once they were both on the

10  floor, the motion to suspend the regular order of business

11  failed.

12  Q.  So there was a second vote?

13  A.  Correct.

14  Q.  And did Lieutenant Governor Dewhurst have to call for a

15  second vote?

16  A.  No, he did not, under our rules.

17  Q.  And so was the end result that that 2007 Voter ID Bill was

18  not even brought to the floor for debate?

19  A.  That's correct, it was never debated.  It was brought to the

20  floor on a motion to suspend, but never debated.

21  Q.  Now, while all of this was happening, was voter ID a popular

22  bill among voters?

23  A.  Yes, very popular.

24  Q.  Was there anything that you or senators had seen that

25  indicated the popularity of that bill?

1    A.   There were a number of surveys - I don't recall any one in

2    particular - that showed that this bill had overwhelming support

3    in the state, and that it was popular among both Democrats and

4    Republicans, and that it also cut across all ethnic lines.   It

5    was very popular with Hispanics, African-Americans, and Anglos.

6    Q.   So this was a popular bill.   Why is it that the Senate

7    couldn't get it on the floor to debate?

8    A.   Consideration was being blocked in a parliamentary maneuver

9    by the Democrats.

10   Q.   Is there anything wrong with using the parliamentary rules

11   to block or kill legislation?

12   A.   No, it's part of the process.

13   Q.   Let's move on to 2009.   In 2009, did the Senate adopt a rule

14   for voter ID legislation?

15   A.   Yes, we did, 5.11(d).

16   Q.   And what did that rule provide?

17   A.   5.11(d), I was the author of that rule change, and what that

18   essentially did was create a special order by majority vote for

19   voter ID legislation to prevent voter fraud.

20   Q.   And what is a special order?

21   A.   A special order takes precedent over the regular order of

22   business.   It is above all resolutions, it's above all bills

23   that are to be considered, and there's a time certain that that

24   issue would come before the body.

25            The other thing that I did in that rule is, I wanted to

1    be sure that all the members of the Senate had an opportunity to

2    participate in the hearing rather than have it go to a

3    nine-member committee.  The lieutenant governor would have to

4    refer the bill.  If you were going to use the special order, you

5    had to refer it to a Committee of the Whole.

6    Q.  How are the Senate rules created?

7    A.  They're adopted at the beginning of each legislative

8    session.

9    Q.  And how many votes are required to adopt the Senate rules?

10   A.  A simple majority.

11   Q.  Now, was there a debate on the Senate rules in 2009?

12   A.  Yeah, there was over six hours of debate just on 5.11(d).

13   Q.  And did you discuss Rule 5.11(d) on the record during the

14   debate?

15   A.  Publicly, extensive public comments.  And all of our

16   comments were reduced to writing and placed in the

17   *Senate Journal*.

18   Q.  As you can recall, where did the idea of setting a special

19   order by majority vote come from?

20        MS. ABUDU:  Object, Your Honor.  Going beyond the scope

21   of conversations that were considered privileged in the

22   senator's deposition.

23        MR. FREDERICK:  Your Honor, I should have been clear.

24   I'm limiting my question.  As we mentioned, this was debated and

25   printed in the *Senate Journal*, and the only testimony that I

1    intend to elicit and will elicit is in the *Senate Journal*.

2            JUDGE COLLYER:  Why don't you reframe your question so

3    it's clear, so the witness knows what you're asking?

4            MR. FREDERICK:  Thank you, Your Honor.

5            JUDGE COLLYER:  Thank you, sir.

6    BY MR. FREDERICK:

7    Q.  In the debate on Rule 5.11(d) in 2009, did you explain

8    during that debate where this idea of setting a special order by

9    majority vote came from?

10   A.  I did.

11   Q.  And can you recall what explanation you gave on the record?

12   A.  Yes.  What I stated publicly on the record during the rules

13   debate was that as a result of research I had done in

14   parliamentary procedure and the tradition of the Senate around

15   the two-thirds rule, I was surprised to find that there were

16   many instances where the Senate had set aside the two-thirds

17   tradition and proceeded in some other manner.  And to the best

18   of my recollection, the special order by majority vote had been

19   used twice, and when the Democrats controlled the body, and I

20   believe it was -- both times under Lieutenant Governor

21   Bob Bullock, as I recall.  Excuse me, hobby.  It was under

22   Hobby, I beg your pardon.

23   Q.  You mentioned that during the rules debate you said you

24   wanted to get the Voter ID Bill before the body.  As you stated

25   during the debate, did you give any explanation related to how

1    the bill came up in 2007 for why you wanted to implement

2    Rule 5.11(d)?

3    A.  So you're asking me in 2009 did I offer an explanation?

4    Q.  Yes, sir.

5    A.  And I did, and I said that part of the reason that I wanted

6    to propose the rule change was because I felt badly about what

7    happened in 2007.  I was chair of the Republican caucus in 2007,

8    I was in the Senate, I was responsible for rounding up our votes

9    and making sure they were on the floor, and I just felt like on

10   this issue, all of the members of the Senate deserved to be able

11   to participate in the committee hearing and in the debate and

12   the process.  And I much preferred having a direct approach to

13   this rather than trying to bring the bill up when somebody was

14   out sick or off the floor or something like that.  So I said all

15   of those things publicly.

16   Q.  And do you recall how you characterized during the debate

17   kind of the situation with the Voter ID Bill up to that point in

18   2009?

19   A.  I'm sorry, could you say that again?

20   Q.  Of course.  Do you recall during the debate on Rule 5.11(d)

21   how you characterized the, I'll say an impasse, over voter ID in

22   the Senate?

23   A.  Well, it was an intractable issue, and the use of a special

24   order is a device that had been used by the Senate traditionally

25   when you reached an impasse and you had an intractable issue.

1          Some examples that I gave publicly in my testimony

2     then - or in my floor debate - was probably the most sweeping

3     tax reform bill that's ever been passed in the legislature known

4     as the Pevatoe bill was passed in the regular order of business,

5     and then we had two redistricting bills that had been passed by

6     a special order.  And so this was not an uncommon procedure.

7          In fact, I found over 140 instances where bills had

8     passed the Senate over the last 40 or 50 years, and those bills

9     did not go through what you might call the normal process, where

10    you suspended the regular order of business.

11    Q.  And in 2009, what committee in the Senate considered

12    Senate Bill 362?

13    A.  In 2009?

14    Q.  Yes.

15    A.  The Committee of the Whole.

16    Q.  What is the Committee of the Whole?

17    A.  The Committee of the Whole is every member of the Senate.

18    We typically meet in the chamber, and the difference is that

19    we're not on the floor debating an issue, so it's less formal in

20    the sense that the rules of debate that govern the operation of

21    the Senate when we're on the floor don't operate.  It 's a more

22    informal meeting in the sense like a committee meeting would be,

23    so that members are allowed to question, you don't have to worry

24    about going out of order on the questions, they can introduce

25    evidence, they can ask the witnesses questions directly.

1          So it operates like a regular committee hearing, but

2     every member of the Senate is involved.

3     Q.  And does every member of the Senate have an equal right to

4     participate in the proceeding?

5     A.  Yes.

6     Q.  How often does the Senate refer bills to the Committee of

7     the Whole?

8     A.  Well, it's not what I would call frequent, but it is a part

9     of the Senate tradition.  In that same session we also referred

10    two other issues to the Committee of the Whole.  The Texas Youth

11    Commission was put into a conservatorship, and that issue was

12    referred to the Committee of the Whole; and Texas Southern

13    University was put into a conservatorship, and that was also

14    referred to the Committee of the Whole.

15          And I believe in the 10 years that I've been in the

16    Senate, we've also considered redistricting bills in the Senate

17    of the whole.

18    Q.  In 2009, how long did the Committee of the Whole meet to

19    consider SB362?

20    A.  About 24 hours.

21    Q.  Is that longer than a normal committee hearing?

22    A.  Much longer.

23    Q.  Did Senate Bill 362 pass the Senate in 2009?

24    A.  Yes.

25    Q.  Did it pass in the House?

1   A.  It did not.

2   Q.  What happened to that bill in the House?

3   A.  It was chubbed to death.  It died an ugly death from

4   chubbing.

5   Q.  Can you explain to the court what chubbing is?

6   A.  Chubbing is a dilatory tactic, it's a parliamentary

7   maneuver, and it's typically used in the House.  It's not so

8   much in the Senate.

9           And in this instance, what was done is you had a

10  calendar before the House, local and uncontested bills that are

11  noncontroversial legislation that have been referred to be

12  passed with a very limited, if any, debate.  They're mostly

13  bills that deal with local issues.  And so the chubbing is when

14  you ask the maximum allowable time limit of questions on each

15  one of those individual bills.

16          So it's a dilatory tactic to delay getting to

17  legislation, say, on the major state calendar which would be

18  behind the local calendar.

19  Q.  And what happened in 2009 to Senate Bill 362 as a result of

20  chubbing?

21  A.  It died in the House.  They were never able to get to it in

22  the regular order of business.

23  Q.  Now, is chubbing within the rules?

24  A.  Oh, yes, it is.

25  Q.  So in 2005 and 2007, voter ID bills had passed the House and

1    died in the Senate.  Right?

2    A.  Correct.

3    Q.  And then in 2009, a Voter ID Bill passed the Senate and died

4    in the House.  Right?

5    A.  That's correct.

6    Q.  So moving to 2011, did the governor designate voter ID

7    legislation as an emergency item?

8    A.  He did.

9    Q.  And what's the effect of designating an emergency item under

10   the Texas Constitution?

11   A.  It allowed us to take the issue up and consider it during

12   the first 30 days of the session.  The state Constitution

13   prohibits the consideration of bills for the first 30 days of

14   the session without suspending the constitutional order of

15   business, which is four-fifths.  And then it also prohibits

16   consideration of bills on the floor for the first 60 days.

17            So the exception to that is if it's something that's

18   designated as an emergency item by the governor.

19   Q.  And how long is the total legislative session in Texas?

20   A.  Only 140 days, every other year.

21   Q.  And so what the committee considered -- was the Voter ID

22   Bill in 2011, was that Senate Bill 14?

23   A.  Yes.

24   Q.  Now, what committee considered that bill in 2011?

25   A.  Committee of the Whole.

1   Q.  How long did that committee hearing last?

2   A.  You know, I don't remember exactly.  It was a few hours.  It

3   was a long meeting, but most of the testimony from -- or the

4   testimony from the previous session was incorporated by

5   reference.  So it was a six or nine-hour committee hearing.  It

6   went for a long time, but it wasn't as long as the one in the

7   previous session.

8   Q.  And in 2011, was there also a Senate rule that allowed voter

9   ID legislation to be set as a special order by majority vote?

10  A.  Yes.  Same rule, 5.11(d).

11  Q.  And was SB14 set as a special order in 2011?

12  A.  Yes.

13  Q.  Now, in 2011, how many bills were ahead of SB14 in the

14  regular order of business?

15  A.  None.

16  Q.  So does that mean that Senate Bill 14 could have been

17  considered in the regular order of business without a two-thirds

18  vote?

19  A.  Yes.

20  Q.  Is that how it was considered?

21  A.  No.

22  Q.  Generally speaking, is there a reason why a bill first in

23  the regular order would instead be set as a special order?

24  A.  I think, and the reason it was set as a special order, was

25  because it provides a time certain for the issue to be debated,

1    and everyone is on notice about when the issue is going to be

2    brought before the body.

3    Q.  Are you familiar with the term "blocker bill"?

4    A.  I am.

5    Q.  What is a blocker bill?

6    A.  Well, a blocker bill is an innocuous piece of legislation

7    that is usually passed out of the Senate administration

8    committee at the beginning of the session, and it sits at the

9    top of the calendar.  And then the intent is not to pass that

10   legislation, but all the bills behind that, behind the blocker

11   bill, you would have to suspend the regular order of business to

12   take up and consider the bill.

13          So there are a few exceptions to that.

14   Q.  And so is having that blocker bill, is that part of the

15   two-thirds tradition in the Senate?

16   A.  It is.

17   Q.  Do the Senate rules provide for a blocker bill?

18   A.  No, not explicitly.

19   Q.  Is the Senate required to use blocker bills?

20   A.  No.

21   Q.  And when the legislature meets in a special session, can the

22   Senate conduct business without a blocker bill?

23   A.  They do.  We do frequently not have a blocker bill during

24   the special session.  The reason is, the governor sets the

25   agenda for the special session; really only those issues that

1    the governor brings up can be considered in a special session;

2    what we're called for, in other words.

3    Q.  Let's move on.  I want to talk briefly about the Department

4    of Public Safety.  Now, you currently chair the Transportation

5    and Homeland Security Committee in the Senate.  Is that right?

6    A.  That's correct.

7    Q.  And in that role, do you have any responsibility regarding

8    the Department of Public Safety?

9    A.  I do.  My committee has oversight over the Department of

10   Public Safety, and the driver's license division is a part of

11   the Department of Public Safety.

12   Q.  So as chair of that committee, have you been involved in the

13   DPS's driver's license operations?

14   A.  I have been.

15   Q.  In 2011, did the legislature provide some additional funding

16   for DPS's driver's license operations?

17   A.  We did.  We gave them everything they asked for in the

18   driver's license division.  It was $66 million.  My instructions

19   to the folks over there were that I wanted to know what it would

20   take to get it so that we had no more than a 30-minute wait in

21   any of the offices.  So they said it would take $66 million, and

22   that's what we gave them, for the biennium.  That's for

23   two years.

24   Q.  And what steps is the DPS currently taking to reach that

25   goal and improve its services?

```
 1    A.  They've taken a number of steps.  They've hired 260 plus
 2    employees and they're training those folks.  Some of them are
 3    trained, some of them are in the process of being trained at
 4    this time.  Two or three of the most significant things they've
 5    done are technology upgrades.  They had a very antiquated
 6    computer system.  They're upgrading that computer system.  And
 7    then they've gone from having a direct telephone line into each
 8    DPS office.
 9              MS. ABUDU:  I'm going to object that he's testifying to
10    the extent of the outside of his knowledge here.  He's a state
11    senator testifying to the operations of the DPS.
12              JUDGE COLLYER:  For which he has oversight as a
13    senator.  But sir, you need to restrain your testimony to what
14    you know personally and not what -- I mean, you might know
15    something in your oversight capacity.
16              THE WITNESS:  Yes, ma'am.
17              JUDGE COLLYER:  But otherwise not.
18              THE WITNESS:  Shall I answer the question now?
19              JUDGE COLLYER:  Yes, go right ahead.
20    A.  Based on my conversations with the Department of Public
21    Safety, in follow-up meetings in my office in the capitol, I've
22    asked them what kind of progress they've made.  And what they've
23    informed me is that they've hired over 260 new employees, they
24    tell me that they have put in a Voice Over Internet telephone
25    system.  What that does and what it means is, it allows them
```

1    to -- I'm told that it allows them to distribute the work to

2    where the people --

3            MS. ABUDU:  I'm going to object that this is hearsay

4    testimony.  If he can testify to what he personally knows.

5            JUDGE COLLYER:  Yes, this does sound like hearsay

6    testimony.

7            MR. FREDERICK:  I'm happy to rephrase the question.

8            JUDGE COLLYER:  All right.  Why don't you do that?

9    Forgive me, sir, but the witness is testifying at great length,

10   which calls for objections, and perhaps if you made shorter

11   questions it would help.  Thank you.

12   BY MR. FREDERICK:

13   Q.  Based on your interactions with the Department of Public

14   Safety, are they making improvements to their telephone system?

15   A.  Yes.

16   Q.  And can you explain, based on your -- based on what the DPS

17   has informed you they are doing?

18   A.  They've installed --

19           MR. FISHER:  Object, Your Honor, again, about hearsay

20   about information he's been told.  If we had someone here from

21   the DPS to testify, that would be great, but it doesn't appear

22   that we do.

23           MR. FREDERICK:  I'm only asking what he's been told in

24   his role as oversight.

25           JUDGE COLLYER:  But it's irrelevant to us if it's not

1    for the truth of the matter asserted.  So what do we care what

2    they're doing to their phone system if it's not for the truth of

3    the matter, which means he's not really a competent witness

4    since all he knows is what he's been told.  Isn't that right?

5              MR. FREDERICK:  Well, I'm not sure that is right,

6    Your Honor.  I mean, to the extent that he has reviewed reports

7    or...

8              JUDGE COLLYER:  Yeah, the reports themselves might be

9    business records; his testimony as to the nature of what he's

10   learned in those reports, though, that would be hearsay,

11   wouldn't it?

12             MR. FREDERICK:  I'm not sure that I would agree with

13   that, Your Honor.

14             JUDGE COLLYER:  Some of this is already in your

15   proposed findings of facts, and the parties have sparred back

16   and forth on the proposed findings of fact.  Did the information

17   in your proposed findings of fact come from this witness?

18   You're not sure.

19             MR. FREDERICK:  I'm not sure that I want to reveal what

20   I've discussed with somebody who is a client.

21             JUDGE COLLYER:  Okay.  Why don't I put it this way:  Is

22   this witness planned to support those proposed findings of fact?

23   Can you answer that one?

24             MR. FREDERICK:  Yes.

25             JUDGE COLLYER:  Okay.  So then, I guess you have to

 1    face up to the hearsay objection.

 2         Why don't we take a quick break, since it's really time

 3    for a break anyway.  Let the panel consider collectively the

 4    objection, and let you consult with your colleagues, and then

 5    we'll resume.  How is that?

 6         MR. FREDERICK:  Thank you, Your Honor.

 7         JUDGE COLLYER:  It gives us all a chance to get this

 8    right.

 9         All right.  It's four of 4:00, and we'll break for

10    15 minutes.

11         (Recess taken at 3:58 p.m.)

12         JUDGE COLLYER:  We all agreed that actually you have a

13    hearsay problem.  What did you decide?

14         MR. FREDERICK:  Well, Your Honor, what I am asking is

15    for the senator's personal knowledge that he gained in his role

16    of oversight over the DPS.  The fact that that knowledge may

17    have come from conversations with DPS or information provided by

18    DPS doesn't make it hearsay because it is his personal

19    knowledge.  If anything, the source of his knowledge would go to

20    the weight, not the admissibility.

21         I am not asking him what someone told him out of court

22    to admit it for the truth of the matter asserted, I'm only

23    asking him what he knows.

24         JUDGE COLLYER:  Except that the hearsay exception is

25    for state of mind, not what he knows.

1          MR. FREDERICK:  Well, Your Honor, but my position is

2     prior to that, this is not hearsay because I'm not asking him

3     for an out-of-court statement, I'm asking him for his knowledge,

4     and that the source of that knowledge -- the source of that

5     knowledge does not make it hearsay.  The other side has --

6          JUDGE COLLYER:  But his knowledge is only gained --

7     it's not personal knowledge, it's only gained from statements or

8     reports from others.  It's not as if he works at DPS.  Right?  I

9     mean, that's not the problem -- excuse us for having this

10    argument in front of you, sir.  There's no disrespect.  But he

11    doesn't have personal knowledge in the sense that he was there,

12    he did it, he saw it, that sort of knowledge base.  It's

13    knowledge he gained only from a distance; that is, from reports,

14    testimony, meetings, whatever.  However you want to frame that,

15    that's all offered for the truth, and therefore hearsay.

16         MR. FREDERICK:  But Your Honor, if I may, it would

17    be -- the source of his knowledge is his work with DPS.  It

18    would not be any different if we called, let's say, a DPS

19    supervisor, who the source of his or her knowledge would be from

20    documents he or she might have read, reports from other

21    employees.  All that knowledge would be gathered from various

22    sources, and if I were to ask for that knowledge in court, I

23    would not be asking for an out-of-court statement, I would just

24    be asking for knowledge.  And the source of that knowledge goes

25    to the weight, if anything, and not to its admissibility.

1          JUDGE COLLYER:  Okay.  What does the United States say?

2          MR. FISHER:  Yes, Your Honor, I would say that he's

3    phrased his questions as far as "you told me" or "I've been

4    told," and I think that that is categorized as hearsay.

5          THE COURT:  Are you Mr. Sells?

6          MR. FISHER:  I'm Mr. Fisher, Your Honor.  I haven't had

7    a chance to introduce myself.

8          JUDGE COLLYER:  Mr. Fisher.  I just wanted to make sure

9    I got your name right.  Hold on one second.  The panel will

10   reconvene right here in front of you.

11         (OFF THE RECORD.)

12         JUDGE COLLYER:  You saw it in person.  Wow.  We still

13   agree with each other that it's not -- that it's barred by

14   hearsay.  And so this witness cannot testify to what DPS was

15   doing with its phone system or otherwise.  He can testify to

16   money that was, what do you call it, appropriated for a purpose;

17   he can't testify to whether DPS is actually going to carry out

18   that purpose.  That's for them to say.  And he's not a 36(b)

19   witness, as somebody from the agency might be, he's just -

20   again, pardon me, sir - a senator.

21         You didn't take insult at that, did you, sir?

22         THE WITNESS:  I did, actually.

23         JUDGE COLLYER:  No insult was intended, I assure you.

24         MR. FREDERICK:  Okay.  Then may I continue, Your Honor?

25         JUDGE COLLYER:  Yes, you go right ahead and proceed.

1    Thank you.

2    BY MR. FREDERICK:

3    Q.  Senator, you testified that in your knowledge, the

4    legislature had provided money to DPS to improve operations.

5    Now, in your knowledge, without telling me what anybody else has

6    told you, what is the DPS currently doing with that money to

7    improve its services?

8    A.  Hiring new employees, installing new technology, and opening

9    new offices.

10        MR. FISHER:  Objection, Your Honor.  I think we're

11   covering the same ground here.

12        JUDGE COLLYER:  I think we are.  I mean, let me repeat.

13   This is in your -- in the record.  Unless there is contest about

14   these facts, you don't need to present them by a live witness.

15   We've allowed you to enter depositions and live witness

16   testimony from the same person.  You really -- I promise, we

17   asked you to submit all that stuff, and we actually read most of

18   it.

19        MR. FREDERICK:  I understand.  Thank you.

20        JUDGE COLLYER:  And will have read all of it by the

21   time we're done.  Okay?

22        MR. FREDERICK:  Thank you, Your Honor.  And I will move

23   on.  Thank you.

24        JUDGE COLLYER:  Okay.

25   BY MR. FREDERICK:

1   Q.   Senator Williams, does Senate Bill 14, the 2011 Voter ID

2   Bill, provide for an ID for people who may not already have a

3   state driver's license or other ID?

4   A.   Yes, it does.   It provides for a free election

5   identification certificate for anyone who doesn't have one of

6   the other prescribed forms of identification, free of charge.

7   Q.   Now, did the Senate receive any analysis from the Secretary

8   of State's office showing how many people did not have one of

9   the forms of ID required by SB14?

10  A.   Not to my knowledge.

11  Q.   Do you have any knowledge of how many voters will be

12  affected by SB14?

13  A.   I do not.

14  Q.   To your knowledge --

15  A.   I think all voters will be affected equally.

16  Q.   And why do you say that?

17  A.   Well, I say it because we're going to give a free ID.   If

18  you can't afford the $10 that it would cost for a state

19  identification card, then we'll provide you an election

20  identification certificate free of charge.

21  Q.   And if a person who already has an ID wants to continue to

22  vote after that ID expires, what will they have to do?

23  A.   Well, they would have to renew it.   And the way the rules

24  have been promulgated, it's just like the driver's licenses; you

25  can renew it every six years on-line, by telephone, or by mail,

1    and every 12 years you have to come in because we want to get a

2    new picture.

3    Q.  Now, are you aware of the argument that Texans in rural

4    parts of the state may have trouble getting to a DPS office?

5    A.  Yes, I've heard those arguments.

6    Q.  And in your understanding, is part of that argument that

7    people in the western, sparsely populated parts of the state

8    will be affected in that way?

9    A.  That argument has been put forward.  You know, what my

10   response to it would be is that I think people who live in

11   West Texas, west of I-35 - the more sparsely populated areas of

12   the state - are accustomed to driving long distances for routine

13   tasks.  To go to the store, to go to the courthouse, all of

14   those things are things that you have to plan ahead to do when

15   you live in a remote area like that.

16   Q.  And do you believe that Texans in rural parts of the state

17   are likely to have state ID already?

18   A.  Well, I do.  I --

19          MR. FISHER:  Objection, Your Honor.  There's been no

20   foundation laid as to why this witness would have any knowledge

21   about the substance of this question.

22          JUDGE COLLYER:  Go ahead.

23          MR. FREDERICK:  If I may ask a foundational question.

24          JUDGE COLLYER:  Go right ahead.

25   BY MR. FREDERICK:

1    Q.   Senator, have you taken any steps to determine for yourself

2    whether Texans in rural parts of West Texas would already have

3    the ID required by SB14?

4    A.   I did.   I looked at two counties.   I looked at

5    Brewster County, which is where Marathon is located, a very

6    remote area of the state in the Big Bend region, and I asked the

7    Department of Public Safety to tell me how many people live in

8    Brewster County who have a driver's license and a state ID, and

9    it was about 8,300 people.   And then I looked at the voting age

10   population in the 2010 census for that same county, and it's

11   about 7,300 people, something like that; about 1,000 less.   So

12   you've got -- there are more people who have IDs than there are

13   people of the voting age population.

14        I also looked in Val Verde County, which is where

15   Del Rio is located, right at the tip of Texas, and that county,

16   I think, as I recall, had around 43,000 people who had a

17   driver's license or a state-issued ID, and about 34,000,

18   roughly, of those people were voting age population in the

19   county.   That's the size of the voting age population in that

20   county.

21   Q.   What does that indicate to you about the current state of ID

22   possession in those areas?

23   A.   It would lead me to believe that a very large portion of the

24   voting age population already has either a state ID or a

25   driver's license.

1          JUDGE COLLYER:  What was the name of the second county
2     that you mentioned?
3          THE WITNESS:  Val Verde County.  It's where Del Rio is
4     located, right down in the tip of Texas.
5          JUDGE COLLYER:  Thank you, sir.
6     BY MR. FREDERICK:
7     Q.  And Senator, to your knowledge, who's Senate district are
8     those counties located in?
9     A.  Senator Uresti represents Brewster County.  I'm not sure
10    about Val Verde County.  I think it's in his district, but I'm
11    not positive.
12    Q.  Let's move on to the final topic.  Senator, what was the
13    legislature's purpose in enacting Senate Bill 14?
14    A.   I've stated publicly that the purpose of Senate Bill 14 was
15    to prevent in-person voter fraud, and to shore up people's
16    confidence in our electoral system, protect the integrity of the
17    ballot box.
18    Q.  The Senate heard testimony about in-person voter fraud from
19    somebody close to you, didn't?
20    A.  Yes.  My brother, my youngest brother.
21    Q.  What was your brother's testimony to the legislature?
22    A.  My brother's testimony to the legislature and the Committee
23    of the Whole was about our maternal grandfather, who died around
24    1935 and continued to vote regularly in the Democratic primary
25    in Harrison County until about 1994.  Roughly 60 years after he

```
 1    died, he was still voting.
 2    Q.  Other than deterring and detecting voter fraud --
 3            JUDGE COLLYER:  Does that indicate that he was a
 4    strong-willed Texan?
 5            THE WITNESS:  I guess he was.  I never knew him.
 6    BY MR. FREDERICK:
 7    Q.  Other than deterring and detecting voter fraud and
 8    preserving confidence in elections, did the legislature have any
 9    other purpose in passing Senate Bill 14?
10    A.  No.
11            MR. FREDERICK:  Pass the witness.
12            JUDGE COLLYER:  Thank you, sir.
13            MR. FISHER:  Your Honor, Spencer Fisher representing
14    the Attorney General.
15                        CROSS-EXAMINATION
16    BY MR. FISHER:
17    Q.  Good afternoon, Senator.
18    A.  Good afternoon, Mr. Fisher.
19    Q.  Let's talk about the issues that you raised regarding voter
20    identification in 2007.  You stated that you were a supporter of
21    HB218 in 2007.  Correct?
22    A.  Yes.
23    Q.  And you stated that HB218 failed to get the necessary votes
24    to come to the Floor of the Senate.  Is that correct?
25    A.  That's correct.
```

1  Q.  And you were aware that there were publicly expressed

2  concerns about the impact of HB218 on minority voters?

3  A.  I don't know that I was aware of any publicly expressed

4  concerns, but I know that there was opposition.  I mean, there

5  was publicly expressed; I don't know who specifically you're

6  talking about.

7  Q.  So the answer to the question, Senator, is that a yes?

8  A.  Would you restate the question?

9  Q.  Absolutely.  Are you aware that there were publicly

10  expressed concerns about the impact of HB218 on minority voters?

11  A.  Yes.

12  Q.  And you talked about how HB218 was brought to the Floor.

13  Did you mention that it had been put on the intent calendar?  Is

14  that correct?

15  A.  It was on the intent calendar I believe for at least a week

16  before the bill was -- before there was a motion to suspend.

17  Q.  And isn't it true that usually when the Senate is in

18  session, there's ceremonial tasks that take up the first hour or

19  two of each day's session; for instance, recognizing the

20  physician of the day or recognizing folks that have come to

21  watch the Senate session.  Is that correct?

22  A.  That's true.  Sometimes.  I'm not sure that it was true that

23  day.  Sometimes we begin the day on -- the previous legislative

24  day carries over to the next calendar day.  And I believe that

25  might have been the case that, day but I'm not positive.  It was

1    several years ago.

2    Q.  So the answer to that question is yes.  Is that correct?

3    A.  I wouldn't -- I don't believe I could agree with that.

4    Q.  So your answer is no, the Senate doesn't usually conduct

5    ceremonial tasks for the first hour or two of each session.  Is

6    that right?

7    A.  Not every day.

8    Q.  And isn't it true that on the day HB218 was brought to a

9    vote to suspend the order of business, that it was held first

10   thing in the morning, before anything else had been done that

11   day?  Is that correct?

12   A.  That's not my recollection.

13   Q.  And prior to a vote being taken on whether to take up HB218,

14   you testified in your direct testimony that you ensured that all

15   the supporters of the bill were on the Floor.  Is that right?

16   A.  That's correct.

17   Q.  And you mentioned that there were actually two votes taken

18   in the Senate on whether to bring HB218 to the Floor.  Is that

19   right?

20   A.  That's correct.

21   Q.  And the result of the first vote was that more than

22   two-thirds of the senators present voted to suspend the regular

23   order of business and take up HB218.  Is that right?

24   A.  The first vote, yes.

25   Q.  And Senator Carlos Uresti was not present on the Senate

1   Floor for that first vote because he was ill.  Is that right?

2   A.  I believe he was excused as being ill.

3   Q.  And Senator Uresti is Hispanic.  Correct?

4   A.  Yes, he is.

5   Q.  He represents a large Hispanic population in Texas.  Is that

6   correct?

7   A.  Yes.

8   Q.  Senator Uresti had publicly opposed HB218.  Is that right?

9   A.  I believe he had.  I don't know that he expressed that to

10   me, but I would have presumed that he was against it.

11   Q.  The result of the second vote on HB218 was that the Senate

12   was not able to suspend the regular order of business and take

13   up the bill.  Is that correct?

14   A.  That's correct.

15   Q.  And Senator Uresti, you mentioned in your direct testimony,

16   voted in that second vote.  Is that correct?

17   A.  That's right.  He came to the Floor.

18   Q.  And you stated that it was common -- in your direct

19   testimony you stated that it was common that bills are brought

20   up when senators are absent.  Isn't that right?

21   A.  It happens all the time.

22   Q.  And is it the case that you were disappointed in how the

23   Senate handled the two votes on HB218 in 2007?

24   A.  Yes, that was my public statement in the following session,

25   in '09.

1    Q.  And in that same public statement, did you characterize the

2    vote on the Senate Floor as, quote, "a very ugly scene,"

3    unquote?

4    A.  I did.

5    Q.  And you proposed a rules resolution addressing the issue of

6    voter identification for the next legislative session.  Correct?

7    A.  In the '09 session, I proposed that.  I didn't --

8    Q.  And in your direct testimony - I'm sorry for speaking over

9    you - you characterized that as a rules change.  Correct?

10   A.  Correct.

11   Q.  And this was the very session after HB218 had failed to gain

12   a two-thirds vote to come to the Floor of the Senate.  Correct?

13   A.  That's correct.

14   Q.  Let's talk about that rules resolution.  In 2009, the Senate

15   considered and passed voter ID legislation titled SB362.

16   Correct?

17   A.  I'm sorry, say that again.

18   Q.  Absolutely.  In 2009, the Senate considered and passed voter

19   ID legislation titled SB362.  Correct?

20   A.  That's correct.

21   Q.  And we've talked about, and you mentioned in your direct

22   testimony, you were the sponsor of that rules resolution that

23   allowed SB362 to be considered on the Floor of the Senate.

24   Correct?

25   A.  That's correct.

1    Q.  And without that change in the Senate rules, that change you

2    mentioned earlier, SB362 would not have been considered on the

3    Floor of the Senate in 2009.  Correct?

4    A.  I'm not sure I agree with that.

5    Q.  The vote to bring SB362 to the Floor of the Senate was a

6    majority vote.  Correct?

7    A.  Yes.

8    Q.  The Senate adopts a rules resolution prior to each

9    legislative session.  Is that right?

10   A.  That's correct.

11   Q.  And the rules set forth how the Senate will operate during

12   that session.  Is that right?

13   A.  That's correct.

14   Q.  And Senator Whitmire in 2009 - and you mentioned

15   Senator Whitmire in your direct testimony - he was the Dean of

16   the Senate at that time.  Is that right?

17   A.  He still is.

18   Q.  And that means he ranked first in seniority and had the most

19   years of service.  Correct?

20   A.  That's correct.

21   Q.  And as the Dean of the Senate, Senator Whitmire had

22   introduced the Senate rules in 2005, in the 79th session, and in

23   2007, in the 80th legislative session.  Is that right?

24   A.  That's correct.

25   Q.  And it's a matter of public record, isn't it, that you

1    carried SR14, the Senate resolution in 2009, to the Floor

2    because Senator Whitmire did not want to do it.  Correct?

3    A.  That's correct.

4    Q.  And the tradition of requiring two-thirds of members to

5    bring substantive issues before the Floor of the Texas Senate

6    builds consensus.  Correct?

7    A.  It can.

8    Q.  Was the answer to the question yes or no, Senator?  Does it

9    build consensus?

10   A.  Not always.

11   Q.  The two-thirds rule is an important process for bringing

12   substantive issues before the Texas Senate.  Correct?

13   A.  As I stated previously in my direct testimony, I believe

14   that its primary function is as a calendaring mechanism.  It

15   controls the flow of legislation to the Floor.

16   Q.  Well, Senator, you mentioned a six-hour hearing on

17   Senate Resolution 14.  Is that correct?

18   A.  That's correct.  It was --

19   Q.  And during that hearing you gave testimony.  Is that

20   correct?

21   A.  No.  It was a debate on the Floor, it wasn't a hearing.

22   Senate Resolution 14, is that what you're asking about?

23   Q.  Yes, Senator.

24   A.  It wouldn't be testimony, it was Floor debate.

25   Q.  And during that hearing, you spoke.  Is that right, Senator?

1    A.   I did.

2         MR. FISHER:   If we could bring up Defense Exhibit 557.

3    BY MR. FISHER:

4    Q.   Would this be a copy the first page of the *Senate Journal?*

5    You mentioned that the hearing on Senate Bill 14 had been

6    reduced to writing.   Would this be a copy of the first page of

7    that recording that you mentioned?

8    A.   I agree that it is the *Senate Journal*.   It was the

9    proceedings of the Senate, it wasn't a hearing.

10   Q.   Did you just characterize it as a hearing, Senator?   Did I

11   mishear that?   I'm sorry.

12   A.   I think you characterized it as a hearing.   It was the

13   proceeding.   We were in session.   That's different.   A hearing

14   happens in committee; we were on the Floor.   These were the

15   proceedings of the Senate.

16   Q.   Thank you for the clarification, Senator.

17        MR. FISHER:   If we could go to the next page of this

18   exhibit, please, and that would be 6235.   If we could bring up

19   the highlighted portion of that, please.   If we go to the page

20   before this, actually.

21   BY MR. FISHER:

22   Q.   Let's go to the page before this, before we go to this page,

23   because this is one long paragraph.   Senator Williams, do you

24   see at the bottom of that page, that's you speaking --

25   A.   Yes.   These are my remarks --

1    Q.   -- in this proceeding?

2    A.   -- yeah.

3    Q.   Okay.  So we'll move to the next page and we'll go to the

4    highlighted portion.

5            MR. FISHER:   If we could blow that up, please.

6    BY MR. FISHER:

7    Q.   And I believe here you're speaking about the two-thirds

8    rule.  Is that correct, Senator?

9    A.   Correct.

10   Q.   And here you say you believe that "bringing substantive

11   issues before the body is an important process that we go

12   through in this Senate to build a consensus and to allow us to

13   work with the Lieutenant Governor, so that through our ability

14   to get 21 votes, and his ability to recognize us, there's a

15   balancing of the issues that come before this body.  And I think

16   that's a good thing."

17           Did I read that correctly, Senator?

18   A.   You did.

19   Q.   And you've resisted efforts --

20           MR. FISHER:   And we can take that down, please.

21   BY MR. FISHER:

22   Q.   You've resisted efforts by those seeking to do away with the

23   two-thirds rule.  Is that correct?

24   A.   That is correct.  And I believe that I stated that publicly

25   in this same testimony -- in these same proceedings.

1    Q.  And we've talked about this earlier, but within Senate

2    Resolution 14 there was a majority vote requirement rather than

3    a two-thirds vote requirement to set bills addressing the issue

4    of voter identification as special orders.  Correct?

5    A.  That's correct.

6    Q.  And you mentioned Rule 5.11(d) as being a rule applicable to

7    that.  Correct?

8    A.  Correct.

9    Q.  And Rule 16.077 was also applicable to setting voter

10   identification to a majority vote to be set as a special order.

11   Correct?

12   A.  I would have to look at it and see, if you have a copy of

13   it.  I can't tell you off the top of my head about 16.077.

14   Q.  And would it help you to see the text of the rule?  Is that

15   right?

16   A.  Yes, it would.

17           MR. FISHER:  If we could bring up Defense Exhibit 385.

18   BY MR. FISHER:

19   Q.  So you'll see the first page, it's the Senate Rules,

20   January 14th, 2009, Senate Resolution 14?

21   A.  Yeah.

22   Q.  And we could go to .034.002, and we'll see here -- and is

23   this Rule 5.11(d)?

24   A.  Yes.

25   Q.  And we can blow up the (d) portion there.

1    A.  I can see that, yeah.

2    Q.  And so this is the rule that you mentioned which sets the

3    majority vote requirement --

4    A.  Correct.

5    Q.  -- sending matters related to voter identification, setting

6    them as special orders.  Correct?

7    A.  Yes.

8    Q.  Now, in your direct testimony you mentioned something about

9    voter fraud in the context of 5.11(d).  And can you show me at

10    any point in 5.11(d) where the words "voter fraud" appear?

11    A.  No, it doesn't.  It says "relating to voter identification

12    requirements."

13    Q.  Thank you, Senator.

14           And if we could move on to -- and we talked about

15    16.07.  I was going to bring that up for you.

16           MR. FISHER:  If we could move on to that, and that's

17    that side-by-side comparison.

18    BY MR. FISHER:

19    Q.  So you see 16.07 at the bottom of the page on the left, and

20    that's 3204 of Defense Exhibit 385.  And on the right-hand side

21    you'll see the next page it carries over, and we see 16.077.

22    And 16.07 --

23           MR. FISHER:  If you could blow up that first line after

24    Rule 16.07, please.  Thank you.

25    BY MR. FISHER:

1    Q.  And a vote of the majority members of the Senate is required

2    to - and if we move over to the next page, to seven - and it set

3    voter identification requirement bills for special order.  Is

4    that correct?

5    A.  Yes.  Okay, yeah.

6    Q.  Do you see anything in there about voter fraud, Senator?

7    A.  No.

8    Q.  And during the hearing on SR14, you said that you modeled

9    Rule 5.11(d) off of the rules of the 67th legislative session in

10   1981 addressing the issue of redistricting.  Correct?

11   A.  I believe that's correct.

12   Q.  And in your direct testimony you said there were many

13   instances where special orders had been used, and they had been

14   used twice under Governor Hobby.  Correct?

15   A.  I believe that they were used twice for -- well, it was two

16   redistricting bills, but it was one set of orders.  And I

17   believe that the rule was in place for two sessions, the 67th

18   and the 68th.

19   Q.  Well, you stated that redistricting was set to a special

20   order.  Is that correct?

21   A.  Yes, redistricting was -- I believe that was the issue that

22   Governor Hobby used a special order on.

23   Q.  And this is from the research that you talked about in the

24   hearings on SR14.  Is that correct?

25   A.  Yes.

1    Q.  And during that hearing, other senators voiced disagreement

2    with your research.  Is that right?

3    A.  No, I think they were -- they didn't necessarily agree with

4    what I was saying, but I'm not sure -- yeah, there were people

5    who disagreed with me, yeah.

6    Q.  And did they disagree with you because they disagreed about

7    your research?  Is that correct?

8    A.  I don't recall that that was their comment.

9    Q.  And so you mentioned that Rule 5.11(d) was modeled after the

10   79th legislative session.  Is that right?

11   A.  Not the 79th.

12   Q.  I apologize.  I misspoke.  The 67th legislative session.  Is

13   that correct, Senator?

14   A.  Yeah.

15       MR. FISHER:  Actually, if we could bring up Defense

16   Exhibit 557 -- I'm sorry, scratch that.

17   BY MR. FISHER:

18   Q.  We have Senate Resolution 67 from the 81st legislative

19   session, and you can see the date at the bottom here, Senator,

20   and this is Senate Resolution 98, and it's adopted on

21   February 5th, 1981.  So would that be the 67th legislative

22   session?  Is that correct?

23   A.  You know, I don't know.  It could be.

24   Q.  Well, Senator, a legislative session would adopt rules in

25   January or February.  Is that correct?

1    A.   Correct.

2    Q.   And we're talking about the legislative session -- they

3    occur on odd numbered years.   Is that right?

4    A.   That's correct.

5    Q.   So here we have February 5th, 1981.   Is that correct?

6    A.   Yeah.

7              JUDGE WILKINS:   Look in the first paragraph.

8    BY MR. FISHER:

9    Q.   So in the first paragraph --

10   A.   Where it says 67th --

11   Q.   -- do you see 67th legislature?

12   A.   Uh-huh.

13   Q.   And if we move on to pages 12, 13, and 14 of this exhibit,

14   and we'll see special orders on the bottom of page 12.   Correct,

15   Senator?

16   A.   Yes.

17   Q.   And I'll let you take a look at the text after the

18   number 14 and under the category of Special Orders, and ask if

19   you can point me to the area where redistricting bills are

20   allowed to be set as special orders pursuant to a majority vote.

21   A.   It wasn't in -- I don't believe it was in this rules

22   resolution.   I believe it was a separate resolution.

23   Q.   So a separate resolution -- your testimony is that a

24   separate resolution set redistricting as a special order.   Is

25   that correct?

1    A.   To the best of my recollection, yes.

2    Q.   And voter identification, however, under Rule 5.11(d) and

3    Rule 16.077 were contained in the Senate Resolution 14 in 2009.

4    Is that correct?

5    A.   Yes.

6    Q.   And they were contained in the Senate resolution the next

7    year, in 2011.   Is that right?

8    A.   That's correct.

9    Q.   And during the hearing on SR14 - and you mentioned this in

10   your direct testimony - you defined voter ID as an intractable

11   issue in the Texas Senate?

12   A.   That was a part of my public testimony, yes.

13   Q.   And that's why you proposed a majority vote to address it.

14   Is that right?

15   A.   That's correct.

16   Q.   And you also mentioned - and Rule 5.11(d) provided for - a

17   favorable report from the Committee on the Whole (sic).

18   Correct?

19   A.   Yes.

20   Q.   And Rule 5.11(d) provided for a Committee on the Whole

21   hearing because you wanted the entire Senate to hear the bill.

22   Was that your testimony?

23   A.   Correct.

24        MR. FISHER:   If we could take that down, please.   Thank

25   you.

1    BY MR. FISHER:

2    Q.  To have Senate Bill 14 considered by a Committee on the

3    Whole could have been written into a rule.  Isn't that right?

4    A.  I'm not sure I follow your question.

5    Q.  Well, Senator, you combined a two-thirds vote, a majority

6    vote, to bring 5.11(d) to the Floor, correct, as a special

7    order.  Correct?

8    A.  Yes.

9    Q.  And it also says in 5.11(d), "after getting a favorable

10   report from the Committee on the Whole."  Correct?

11   A.  Yes.

12   Q.  And so Senator, I'm asking, is there any relation between

13   the two-thirds rule and the Committee on the Whole in

14   Rule 5.11(d)?  Couldn't a voter identification bill have been

15   sent to the Committee on the Whole without a majority vote to

16   set it as a special order?

17   A.  Are you asking me if the lieutenant governor could have

18   referred the bill to the Committee of the Whole without

19   Rule 5.11(d)?  Is that your question?

20   Q.  No.  The question, Senator, is:  If you needed to have a

21   majority vote requirement, does the majority vote requirement

22   have anything to do with the Committee on the Whole?

23   A.  No, it allows it to be set on the calendar as a special

24   order by a majority vote.

25   Q.  You stated during the hearing on SR14 that there was a

1    willingness to accommodate the concerns that had been expressed

2    about the potential of disenfranchising people in Texas.

3    Correct?

4    A.  Yes.

5    Q.  And two-thirds of the Senate did not vote to pass SB362.

6    Correct?

7    A.  That's correct.

8    Q.  It was passed by a majority vote.  Is that right?

9    A.  That's correct.

10   Q.  And after the Committee on the Whole hearing in 2009, every

11   ethnic and racial minority senator voted against SB362.

12   Correct?

13   A.  That's correct.

14   Q.  And out of all of the issues facing the Texas legislature at

15   the beginning of the session in 2009, SR14 - specifically

16   Rules 5.11(d) and 16.077 - only concern the issues of voter

17   identification.  Correct?

18   A.  That's correct.

19   Q.  And the language of those rules was carried over - and you

20   said this in your direct testimony - to 2011.  Is that correct?

21   A.  Correct.

22   Q.  And you also mentioned that during the 2011 session, SB14

23   was in fact made a special order by a majority vote.  Is that

24   correct?

25   A.  Yes.

1    Q.  And it was also sent prior to that to a Committee of the

2    Whole hearing.  Is that right?

3    A.  Right.

4    Q.  Let's discuss that Committee of the Whole hearing.  Prior to

5    that Committee of the Whole hearing on January 25th, 2011, which

6    you mentioned in your direct testimony was an extended hearing;

7    24 hours, I think you said.  Is that correct?

8    A.  In 2009 --

9    Q.  No, we're talking about 2011, Senator.

10   A.  It wasn't 24 hours in 2011.  It was in '09.  It was six or

11   nine hours.  I'm not sure exactly how long.

12   Q.  Thanks for the correction, Senator.

13        Prior to the Committee on the Whole hearing in

14   January 2011 - on January 25th, 2011 - you requested that the

15   Secretary of State's office perform an analysis.  Correct?

16   A.  Yes.

17   Q.  And you specifically requested that Ann McGeehan, the

18   elections director at the time, perform an analysis cross

19   referencing registered voters and driver's license databases.

20   Is that right?

21   A.  Yes.

22   Q.  And you asked Ms. McGeehan on the public record if she

23   needed any additional direction from the legislature to

24   accomplish this cross referencing.  Right?

25   A.  I believe that's correct.

1    Q.  And you brought this request up again during the Committee

2    on the Whole hearing, and you confirmed this request with a

3    representative of DPS who was testifying, Rebecca Davio.

4    Correct?

5    A.  I believe that's correct.

6    Q.  And you're not sure if your office ever got a response to

7    this request.  Is that right?

8    A.  I wasn't sure when I was deposed.  Subsequent to my

9    deposition, I went back and checked with my office staff, and we

10   did not receive that report.

11   Q.  But you considered this information important enough to ask

12   about it twice on the public record.  Is that right?

13   A.  Yes.

14   Q.  And your request was made before the House considered the

15   bill.  Is that right?

16   A.  Yes.

17   Q.  And your request was made before SB14 was signed into law.

18   Is that correct?

19   A.  Yes.

20   Q.  And you were aware that there was testimony during the

21   Committee on the Whole concerning the disproportional impact of

22   SB14 on minority voters.  Correct?

23   A.  There was testimony to that effect.

24   Q.  Now, you mentioned a study, and I didn't get all of the

25   counties, but you mentioned the County of Brewster, is that

1    correct, in your direct testimony?

2    A.  In my direct testimony, it really wasn't a study, I just

3    asked the DPS to provide me with some information and then I

4    cross checked it with the census.  So for two counties.

5    Q.  Now, was that information, was that part of the public

6    record, Senator, the information you got from DPS?

7    A.  I believe it's publicly available.  I don't know what you

8    mean by -- is it part of the public record of the testimony from

9    Senate Bill 11 -- 14?

10   Q.  The information that you asked for from DPS, the information

11   you received from that agency, is that part of the public

12   record?

13   A.  Yes, I think you can make a request and get that from the

14   Department of Public Safety.  Are you asking me is it part of

15   the public record from the 2011 session?

16   Q.  Senator, I'm asking if the information that you got is part

17   of the public record that your office received from DPS as part

18   of the public record, and if we could go find it right now.

19   A.  If you could go get it from DPS?  Is that what you're asking

20   me?

21   Q.  The information you received, yes, Senator.

22   A.  Yeah.

23        MR. FISHER:  To the extent that that information is not

24   part of the public record, I would move to strike that

25   information as being privileged communication between the

1    Senator and DPS as an agency.

2            JUDGE COLLYER:  I don't know whether it is or is not.

3    What do you advise, sir?

4            MR. FREDERICK:  Your Honor, our position would be that

5    to the extent that was a request made in the Senator's capacity

6    as chair of the committee, or in any capacity after the passage

7    of Senate Bill 14, it's not my understanding that that would

8    be --

9            JUDGE COLLYER:  I didn't know it was after the -- was

10   it really after the passage?  After?  So you don't think it's

11   relevant?

12           MR. FREDERICK:  That's not what I'm saying.  That's not

13   what I'm saying, Your Honor.

14           JUDGE COLLYER:  I'm sorry.  Don't let me finish your

15   sentence for you.  Why don't you finish your own sentence?

16           MR. FREDERICK:  My only point was that to the extent

17   that request was made after the passage of Senate Bill 14, I

18   don't believe that it would fall into the legislative privilege

19   as would a pre-passage investigation of a bill.

20           JUDGE COLLYER:  So your position is that it's not

21   privileged by the legislative privilege, and therefore it is

22   available?

23           MR. FREDERICK:  Correct, Your Honor.

24           JUDGE COLLYER:  And has it been produced?

25           MR. FISHER:  No, Your Honor.

1                   JUDGE COLLYER:  Has it been sought?

2                   MR. FREDERICK:  Your Honor, I believe --

3                   MR. FISHER:  Not to my knowledge, Your Honor.

4                   MR. FREDERICK:  I believe it has been produced, because

5        the entire DPS database has been produced.

6                   JUDGE COLLYER:  Could you do me a favor?  We're not

7        going to get a record if you don't come to the microphone.  Say

8        that again.

9                   MR. FREDERICK:  Your Honor, I believe that it is -- it

10       has been produced because the entire DPS database has been

11       produced.  I believe it is also available publicly.

12                  JUDGE COLLYER:  Okay.

13                  MR. FISHER:  Your Honor, I believe this information was

14       asked about in Senator Williams' deposition and it was objected

15       to.  And I can point to the lines where his counsel instructed

16       him not to testify to any analysis conducted, on the basis of

17       legislative privilege.

18                  JUDGE COLLYER:  Including this one?

19                  MR. FISHER:  You have to look at the phrase of the

20       question, Your Honor, and whether it was that broad.  But

21       counsel did object to a question about analysis that he

22       conducted, based on the grounds of legislative privilege.

23                  JUDGE COLLYER:  Well, right, and I understand that.

24       But the question is whether or not the deposition objection

25       would have extended to an analysis performed by DPS after the

1    law had been passed.

2            MR. FISHER:  So Your Honor, it doesn't really matter

3    what is on the record here and the deposition, you're saying it

4    depends --

5            JUDGE COLLYER:  No, no, no, what matters is, when the

6    objection was made in the deposition, how broad was the

7    question.

8            MR. FISHER:  I can read you the question, Your Honor.

9    It starts on page 183, line 24:  "Okay.  And did you ask -- did

10   you or your staff conduct any analysis related to the voter ID

11   issue?"

12           There was an objection:  "Do not answer the question

13   unless -- except for referring to matters of the public record,

14   that is a matter that is legislatively privileged.  Your

15   analysis, mental impressions, opinions, thoughts about the

16   legislation are privileged."

17           "Would you repeat the question, please?"

18           The question again was asked:  "Okay.  Did you ask --

19   did you or your staff conduct any analysis related to the voter

20   ID issue?"

21           And the answer was:  "My staff would have reviewed

22   SB14."

23           MR. FREDERICK:  Your Honor, I have not reviewed that

24   specific part of the deposition, but in our privilege assertions

25   we have always allowed legislators to answer questions about

1     post-enactment conduct as long as it did not reveal

2     pre-enactment thoughts and mental impressions.

3          JUDGE COLLYER:  Well, let me ask you this:  Did you

4     defend the deposition?

5          MR. FREDERICK:  I did not defend Senator Williams'

6     deposition, Your Honor.

7          JUDGE COLLYER:  Okay.  So at the moment we don't really

8     know.  Hold on one second.

9          MR. SWEETEN:  Your Honor, I defended Senator Williams'

10     deposition, and it is as Mr. Frederick --

11          JUDGE COLLYER:  Why don't you come to the microphone?

12     Whatever you want to say, you want to say at the microphone.

13     Hold on one second.

14          (OFF THE RECORD.)

15          JUDGE COLLYER:  Go ahead, sir.

16          MR. SWEETEN:  Yes, Your Honor.  First of all, the

17     question - I don't know that it was read to you in full - which

18     is, "And in drafting Senate Bill 14, did you or your staff

19     review any reports or studies," and at that point I interposed

20     an objection of legislative privilege.

21          And it has been our consistent position, as

22     Mr. Frederick articulated, that with respect to the legislative

23     privilege, to the extent post-enactment events would reveal

24     their thoughts, mental impressions that they had about the bill,

25     that would be one thing.  But this clearly is post-enactment --

1              JUDGE COLLYER:  Wait.  But the question the -- I

2    thought that the witness said that he sought this study

3    pre-enactment.

4              MR. SWEETEN:  I don't think that's what the witness

5    said.  I think he sought it at a later time.

6              JUDGE COLLYER:  No, I don't think so.  I mean, yeah,

7    when did you seek this?

8              THE WITNESS:  It was after the bill passed.

9              JUDGE COLLYER:  And what was the purpose of asking?

10             THE WITNESS:  To verify for myself that my impression

11   was correct, that most of the people in rural West Texas already

12   have a driver's license or a state ID.  It was just a way for me

13   to check.

14             JUDGE COLLYER:  Okay.  Then there's nothing privileged

15   about it.

16   BY MR. FISHER:

17   Q.  Senator, isn't it true that studies conducted after the

18   passage of SB14 would be irrelevant to your knowledge prior to

19   casting a vote on the bill?

20   A.  I didn't have that direct knowledge, you're correct, when

21   the bill passed.

22             JUDGE COLLYER:  Thank you, Mr. Sweeten.

23             MR. SWEETEN:  Thank you, Your Honor.

24   BY MR. FISHER:

25   Q.  And you ascribed a number - I think it was 140 - to the

125

1    number of bills considered out of order that had been done, in

2    your research.  Is that correct, Senator?

3    A.  That's correct.  I think in my deposition I said it was

4    about 70, and I went back and reviewed my research and found

5    that I got the number 70 from another legislator who had

6    counted, and I think he had miscounted the bills.  So 140, 141,

7    is the correct number.

8    Q.  Would it surprise you if the Senate Parliamentarian,

9    Karina Davis, said that since 2004, between 2,000 and 5,000

10   bills were passed, but only 20 to 25 bills were passed without

11   suspension of the regular order of business?

12   A.  It wouldn't surprise me at all for the time period.  The

13   time period I'm talking about dates back to when Ben Barnes was

14   lieutenant governor and I was in junior high.

15   Q.  And how many bills does the Senate typically pass a year,

16   Senator?

17   A.  There are usually 5,000 bills, roughly, that are filed, and

18   roughly 12 or 14 hundred end up passing both chambers and be

19   in -- or signed into law by the governor.

20   Q.  And there are voters in Texas who reside in counties without

21   driver's license offices.  Is that correct?

22   A.  That's correct.

23   Q.  And in your direct testimony you talked about the election

24   identification certificate, and to obtain this you need a birth

25   certificate.  Is that right?

1    A.  Correct.  That would be one of the acceptable forms.  There

2    are some others, but for most people that's what they would use,

3    would be a certified copy of their birth certificate.

4    Q.  And if there's a cost to obtaining a birth certificate,

5    there's a cost to obtaining the election identification

6    certificate.  Correct?

7    A.  I don't think so.  You have to have a birth certificate to

8    enroll in our public schools.  I mean, it's a very common thing

9    that you have to have, and I don't really see it -- it's just

10   one of the things of life.

11   Q.  Senator, you gave a deposition in this case.  Correct?

12   A.  I did.

13   Q.  And during that deposition you told the truth in the

14   questions that you were asked.  Is that correct?

15          JUDGE COLLYER:  Okay.  Just go on to the questions.

16   There's no jury, so it's okay.

17   A.  Yes.

18          MR. FISHER:  It's been drilled into me.

19          JUDGE COLLYER:  I understand.

20   BY MR. FISHER:

21   Q.  If you could turn to page 202 of that deposition - and I've

22   also handed counsel a copy - and I'll read the question.  It

23   starts on page three of page 202.  I'll wait for you to get

24   there, Senator.

25          And the question is: "Okay.  If the documents needed

```
 1    to get the election identification certificate are not free,
 2    isn't there a cost to voting for those who lack the necessary
 3    documents?"
 4           Answer:  "And my response would be that, yes, there is
 5    a cost, but I don't believe that that cost is an unreasonable
 6    burden based on" - and then we have an objection from
 7    Mr. Sweeten, "Just answer the question" -  "the testimony that
 8    was taken during the debate on this."
 9           Did I read that correctly, Senator?
10    A.  Yes.
11           MR. FISHER:  Your Honor, if I could have a moment.
12           JUDGE COLLYER:  Yes.
13           (OFF THE RECORD.)
14           MR. FISHER:  Your Honor, I conclude my questioning at
15    this time.  Thank you.
16           JUDGE TATEL:  Senator Williams, I just have one
17    question.
18           THE WITNESS:  Yes, Your Honor.
19           JUDGE TATEL:  Do I understand that there was an
20    amendment proposed to make the birth certificate or any other
21    document required for the EIC free, and that that amendment was
22    tabled?
23           THE WITNESS:  That's correct.
24           JUDGE TATEL:  Do you know why?
25           THE WITNESS:  I think that it would have been an undue
```

1    burden on the counties, which their offices would be the ones

2    that would have to provide that.

3              JUDGE TATEL:  But we don't -- maybe I asked the

4    question the wrong way.  When a bill is proposed and tabled, is

5    there --

6              THE WITNESS:  An amendment, you mean?

7              JUDGE TATEL:  I'm sorry, thank you.  An amendment is

8    proposed and tabled, is there any public legislative record for

9    why?

10             THE WITNESS:  Only the debate on the Floor.

11             JUDGE TATEL:  So there would have been debate --

12   somebody would have proposed the amendment, so if we went and

13   looked at the -- was there debate on this amendment?

14             THE WITNESS:  I believe there was.

15             JUDGE TATEL:  And do you think the opposition to it was

16   that this would have been a financial burden on the counties?

17             THE WITNESS:  You know, it's been a few years, so I

18   think --

19             JUDGE TATEL:  Yeah.

20             THE WITNESS:  -- without having the testimony in front

21   of me, it would be difficult do say exactly.

22             JUDGE TATEL:  Right.  I understand.  But you think

23   that's in the legislative record?  We could go find that.

24             THE WITNESS:  I believe it is.

25             JUDGE TATEL:  And you're thinking that the reason,

1    probably, was that people were concerned about the burden this

2    would impose on the agencies.   Right?

3             THE WITNESS:   Yeah.

4             JUDGE TATEL:   Thank you.

5             MS. ABUDU:   Your Honor, if I may?

6             JUDGE COLLYER:   Yes, please.

7             MS. ABUDU:   Nancy Abudu on behalf of the defendant

8    intervenors.

9                        **CROSS-EXAMINATION**

10   BY MS. ABUDU:

11   Q.   Good afternoon, Senator Williams.

12   A.   Good to see you again.

13   Q.   Good to see you as well.   You and I had occasion to meet

14   during your deposition in Austin.   Right?

15   A.   Yes.

16   Q.   And you testified during your direct examination that you

17   looked at some 2010 census numbers to determine the impact that

18   Senate Bill 14 might have on voters.   Correct?

19   A.   After the bill passed I did, yes.

20   Q.   And in fact, you served on the Senate committee for

21   redistricting.   Correct?

22   A.   I did.

23   Q.   So you're aware that post the 2010 census, Texas is now a

24   majority minority state?

25   A.   Yes.

1    Q.  And in fact, in your district, District 4, after

2    redistricting, the number of Hispanic -- or the voting age

3    population within the Hispanic community has increased.  Right?

4    A.  Yes.

5    Q.  And the African-American voting age population has also

6    increased.  Correct?

7    A.  I suspect it has, yes.

8    Q.  And in fact, the Anglo voting age population has decreased.

9    Isn't that right?

10   A.  Are you talking about in my Senate district?

11   Q.  In District 4.

12   A.  I don't know that.

13   Q.  Would a document help refresh your recollection?

14   A.  It could, yeah.

15   Q.  What I'm going to --

16           JUDGE COLLYER:  Are you asking -- I'm sorry.  Are you

17   asking him about the results of the census?

18           MS. ABUDU:  Well, he's testified that he reviewed

19   census data to determine the impact that Senate Bill 14 would

20   have on voters, so I just want to be clear in terms of --

21           JUDGE COLLYER:  So you're asking him about the census

22   data as it affects Senate District 4?

23           MS. ABUDU:  Yes.

24           JUDGE COLLYER:  And you're saying you don't know?

25           THE WITNESS:  Not without having it in front of me.

1    BY MS. ABUDU:

2    Q.  And, in fact, during your deposition --

3              JUDGE COLLYER:  If I could say, I find that amazing.

4    That's just a comment.  I find that amazing, in all of this time

5    and effort, that you don't know how the census affected your own

6    district.  Go ahead, ma'am.

7              THE WITNESS:  Not exactly.

8    BY MS. ABUDU:

9    Q.  Well, okay.  But you acknowledge that the Hispanic voting

10   age population and the African-American voting age population,

11   they have increased?

12   A.  I suspect they did, yes.

13             JUDGE COLLYER:  Senator, stop.  Did the Hispanic voting

14   age population increase in the State of Texas between 2000 and

15   2010?

16             THE WITNESS:  Yes, ma'am, it did.  I think she was

17   asking me about my Senate district.  I'm --

18             JUDGE COLLYER:  She was indeed.  First I was asking you

19   about Texas.

20             THE WITNESS:  It did.

21             JUDGE COLLYER:  Now, did it increase in your district?

22             THE WITNESS:  It probably did.  Without having the data

23   right in front of me, I can't tell you for sure.

24             JUDGE COLLYER:  Go ahead, ma'am.

25             MS. ABUDU:  I can present him with a document to

1    refresh his recollection, if that would be helpful.

2    BY MS. ABUDU:

3    Q.  And what I've just provided you was the court-ordered

4    interim plan particularly for District 4, and it does show a

5    decrease in the Anglo voting age population.  Do you see that

6    now?

7    A.  From the benchmark plan, yes, I see that.  Yes.

8    Q.  Okay.  All right.  And during your deposition you testified

9    that as a senator, it is important to know the racial

10   demographics of your district.  Correct?

11   A.  Yes, it is.

12   Q.  Now, you also testified during your deposition that

13   generally - not always, but generally - minority voters vote for

14   minority candidates.  Correct?

15   A.  You said that.  I said it happens sometimes.  I think you

16   said that.  I don't believe I said that.

17   Q.  All right.  Well, but you do agree that there are instances,

18   obviously, when minority voters tend to vote for minority

19   candidates.  Correct?

20   A.  In some instances.

21   Q.  All right.  And if that is indeed the case, then with Texas

22   being a majority minority state, it is possible that Anglos

23   within the Texas legislature at some point could become the

24   minority.  Isn't that right?

25   A.  Yes.

1    Q.   Now, would you agree that any law that decreases the voter
2    participation of minority voters could lead to Anglos remaining
3    a majority in the legislature?
4    A.   I haven't considered that before.
5    Q.   Well, considering it now, would you agree that that is a
6    possibility?
7    A.   I guess it is a possibility.
8    Q.   Uh-huh.   And if it is indeed established that Senate Bill 14
9    has a negative and disparate impact on minority voters, would
10   you still support Senate Bill 14?
11   A.   I don't believe that's what the record is going to show.
12   Q.   Well, if the record does establish that, would you still
13   support Senate Bill 14?
14   A.   I think that all voters were affected equally by this
15   requirement, and that we're giving a free election
16   identification certificate away, and that no one will be
17   disfranchised.
18   Q.   I would like you to answer my question, please.
19   A.   That's the best that I can answer it.
20   Q.   I also want to clarify something with respect to birth
21   certificates that Judge Tatel asked you.   Are you aware of which
22   agency in particular issues birth certificates?
23   A.   The State issues birth certificates, the Health and Human
24   Services Department, Department of State Health Services, I
25   believe issues it, and I think the county governments may issue

1    them, also.

2    Q.  All right.  But you do know that it is the Bureau of Vital

3    Statistics in Texas, the state agency, that issues birth

4    certificates.  Correct?

5    A.  That is one agency that issues them, yes.

6         MS. ABUDU:  Just one moment.  Thank you very much for

7    your time, Senator.

8         JUDGE COLLYER:  All right.  Thank you.  Is there any

9    redirect?

10        MR. FREDERICK:  Nothing more from the State,

11   Your Honor.

12        JUDGE COLLYER:  Thank you very much, Senator.  We

13   appreciate your time.

14        All right.  Does Texas have another witness to call?

15        MR. MORTARA:  Yes, we do, Your Honor.  The State calls

16   Professor Thomas Sager.

17        JUDGE COLLYER:  All right, Professor Sager.

18        Let me try again to say that you do not have to repeat

19   information that's already in the record.  Did you catch that?

20        MR. MORTARA:  What I understand you to be saying is

21   that information that is already before the court should not

22   generally be repeated.  Our direct of Professor Sager consists

23   of summaries of his opinions, some of which were discussed at a

24   deposition, some of which are in his second report.  However, I

25   understand the court's admonishment and injunction.

1          JUDGE COLLYER:  I just am trying to get this done in

2     the time we have available.

3          MR. MORTARA:  Absolutely, Your Honor.

4          JUDGE COLLYER:  Because you're going to run out of time

5     and not be able to finish if you don't get it done in the time

6     available, and that will be sad but true.

7               (Oath administered by Courtroom Clerk.)

8          MR. MORTARA:  Your Honor, may I proceed?

9          JUDGE COLLYER:  Yes, please do so.  Thank you.

10         **(THOMAS SAGER, PLAINTIFF witness, having been duly sworn,**

11                    **testified as follows:)**

12                    **DIRECT EXAMINATION**

13    BY MR. MORTARA:

14    Q.  Professor Sager, could you introduce yourself to the court?

15    A.  I am Thomas W. Sager from the University of Texas at Austin.

16    Q.  And what is your position at the University of Texas?

17    A.  I'm a tenured full professor of statistics in the Department

18    of Information, Risk, and Operations Management in the McCombs

19    school of business.

20         MR. MORTARA:  And understanding the court's

21    acknowledgment (sic), Your Honor, Professor Sager's CV is at

22    Plaintiff's Exhibit 12, and we would offer him as an expert in

23    statistics and the analysis of large databases.

24         JUDGE COLLYER:  Without objection, the professor will

25    be admitted as an expert.

1        MR. HEBERT:  No objection to Professor Sager being

2    declared an expert.

3        JUDGE COLLYER:  Go ahead.

4    BY MR. MORTARA:

5    Q.  Professor Sager, briefly for the court, could you explain

6    what materials you started with for purposes of your testimony

7    here today?

8    A.  There were three sets of data that I started with.  One was

9    a set of Texas voter registrants, numbering approximately

10   13 million, provided by the Texas Secretary of State; another

11   set of data came from the Texas Department of Public Safety, and

12   consisted of Texas driver's licenses - approximately 26 million

13   of them - and that included state ID, and another data set of

14   license to carry consisting of more than 800,000 records.

15       Then, in addition, I had available to me a data set

16   which is a subset of the Texas voter registrants that was

17   prepared by Dr. Stephen Ansolabehere, consisting of

18   approximately 1.5 million Texas registrants, and my

19   understanding is that this is the focus of my testimony here

20   today.

21   Q.  What is your understanding of how Professor Ansolabehere

22   arrived at his 1.5 million VRNID - or Voter Registration No ID -

23   list?

24   A.  My understanding is that he started with the same data sets

25   that I just mentioned - namely the Texas voter registrants and

1    the DPS data - and he attempted to match the Texas voter

2    registrants to the DPS data using three different sweeps so that

3    he could identify those on the Texas voter registrant list who

4    had and did not have access to this sort of ID.

5          And his three sweeps, my understanding is that the

6    first sweep was based upon full Social Security number, all nine

7    digits, requiring a match in both data sets; that is, a voter

8    registrant would have to have the same Social Security number in

9    the DPS database in order to match.  The second sweep for those

10   that did not match on the first sweep consisted of a match on

11   identical first name, last name, and date of birth, with a full

12   match being required on all three in order to declare a match.

13   The third sweep was like the second, except that it added middle

14   name as an additional criterion.

15   Q.  And Professor, did you help us prepare a board that outlines

16   those three sweeps?

17   A.  Yes, I did.

18          MR. MORTARA:  Mr. Hughes, could you put up the board

19   for me?  He's a little stronger than me, Your Honor.

20          JUDGE WILKINS:  Just to clear up while they're doing

21   that, did the third sweep include date of birth or not?

22          MR. MORTARA:  It did, Your Honor.  It did.

23          JUDGE COLLYER:  Do you agree with that, Professor?

24          THE WITNESS:  Yes.

25   BY MR. MORTARA:

1    Q.  And shown here on the board are the three sweeps you just

2    outlined, Professor Sager.  Correct?

3    A.  Yes.

4    Q.  Now, my first question is that Sweep 2 says exact first

5    name, exact last name, and exact DOB; and Sweep 3 has first,

6    middle, last, and DOB.  How is it that someone could match on

7    the third sweep but not on the second one?

8    A.  Well, that was somewhat puzzling to me, too, at first, and I

9    commented on that in my report.  However, I've subsequently

10   learned that the way that Dr. Ansolabehere's matching works is

11   that he required that there be a unique set of these criteria in

12   both sets of databases before he will even permit a match to

13   occur.

14          So, for example, let's suppose that there's a

15   John Smith born on January 1, 1950, in the voter registrant

16   list.  Let us suppose that there are two John Smiths -- well,

17   maybe not different people, but there are two records for

18   John Smith also born on January 1, 1950, in the driver's license

19   file.  Then, because there are two of these identical matches on

20   the criteria for Sweep 2 in the driver's license file, my

21   understanding is that Dr. Ansolabehere's matching method would

22   not permit the John Smith in the voter registration list to

23   match either of the entries that are in the driver's license

24   file.

25          But on the other hand, if these two John Smith records

1    in the driver's license file each have a middle name, and that

2    middle name is different, then those become distinguishable

3    entries in the driver's license file, so they are available for

4    matching the John Smith that exists on the voter registration

5    list.

6    Q.  And is the same thing true for duplicate entries in the

7    voter registration database, somebody is in the voter

8    registration database twice?

9    A.  Yes.

10   Q.  And are there duplicate entries in Professor Ansolabehere's

11   VRNID?

12   A.  Yes, there are.  For one thing, not everybody has a middle

13   name, so that might result in that.  And for another,

14   Dr. Ansolabehere identified I think about 125,000 that are not

15   unique, and I have seen many instances of that as I have gone

16   through the records myself.

17   Q.  And when you say they are not unique, do you mean that

18   they're just two different people with the same name or they're

19   the same person in twice?

20   A.  Could be the same person twice, yes.

21   Q.  I want to talk about the three sweeps in greater detail.

22   You said that Professor Ansolabehere used three sweeps, but did

23   all three sweeps actually get used on all of the entries in the

24   voter registration database?

25   A.  No.  It's important to note that the voter registration

 1    database has less than half of its entries with full

 2    Social Security number, and so Sweep Number 1 would not even

 3    apply to the over 50 percent that lack full Social Security

 4    number.  They would have to move on to Sweeps 2 and 3 in order

 5    to obtain a potential match.

 6    Q.  What did you do with Dr. Ansolabehere's VRNID after you got

 7    it?

 8    A.  Well, one of the things that I did was that I looked at it

 9    to determine just whether additional matches could be made using

10    other criteria than Dr. Ansolabehere used.

11    Q.  And did you help us --

12    A.  And furthermore, I also was looking for patterns in the data

13    that might indicate potential problems with the matching.

14    Q.  And did you help us prepare a slide that lists your

15    additional matches?

16    A.  Yes, I did.

17         MR. MORTARA:  I'm going to publicize that now,

18    Your Honor.  It's on the screen.

19    BY MR. MORTARA:

20    Q.  And could you just briefly list your matches, and then I

21    have an immediate question.

22    A.  There were four separate sets of criteria.  One was Social

23    Security number nine - that's full Social Security - combo,

24    which means full Social Security number plus at least one of

25    first, last, or date of birth; the second sweep was requiring a

1    match on first name, last name, and date of birth, all three;

2    the third sweep was a match on four-digit Social Security number

3    and first name and last name, all three being required for a

4    match; and the fourth was a four-digit Social Security number

5    plus date of birth, those two being required for a match.

6    Q.  And Professor Ansolabehere -- I'm sure everyone wants to

7    know, you have first name, last name, and date of birth in your

8    set, but Professor Ansolabehere had already done that.  Why

9    would you think you would get any additional matches?

10   A.  Well, one thing that Dr. Ansolabehere did was to, quote,

11   unquote, "clean" the driver's license and license to carry data

12   sets by removing those certain numbers of them for various

13   reasons.  In the case of the driver's license file,

14   approximately one-quarter of them were removed for various

15   reasons.  I did not remove those when I made my sweeps, and so

16   therefore there was the possibility of picking up additional

17   sweeps on those items.

18   Q.  Can you walk us through the most significant of the

19   truncations or cleanings that Professor Ansolabehere performed

20   on the driver's license database?

21   A.  There were three that were of particular note.  One was the

22   elimination of expired licenses - expired over 60 days - from

23   the driver's license set; another was the elimination of dead

24   people from the driver's license file; and the third was the

25   elimination of duplicate Social Security numbers from the

1    driver's license file.

2    Q.  And can you describe for the court the outcome effects - how

3    this affects the VRNID - of each of these eliminations from the

4    driver's license database?

5    A.  It's important to keep in mind that whenever any set of

6    records are removed from the ID list - the driver's license and

7    the license to carry list - but they are not removed from the

8    voter registration list, then that reduces the number of

9    opportunities for obtaining a match between the voter

10   registration file and the ID files.

11        JUDGE COLLYER:  I'm sorry.  That might be true, that it

12   reduces the chance to make a match, but would the match be an

13   accurate match if the person removed has a license that's more

14   than 60 days expired and can't be used as an ID anyway?

15        THE WITNESS:  Well, that's an important question,

16   Your Honor.  And in my opinion, one needs to think twice about

17   doing that, because there are certain subsets of the expired

18   licenses that one may not want to remove for the purpose of

19   matching, and I would like to illustrate that.

20        Suppose, for instance, that you have a person with an

21   expired license who has also moved out of state; then that

22   person would not be an eligible Texas voter.  And so what

23   happens when that person is removed from the ID list but is left

24   in the registration list, then that person no longer has the

25   ability to be matched in the driver's license file, and

143

1    therefore there will not be a match on that person and that

2    person will end up in the VRNID database, which does not

3    indicate that they have no access to ID, it simply means that

4    they're out of state now and no longer eligible to be a Texas

5    voter.  So at least in that case, in the case of persons who

6    have moved out of state, I think we want to really consider

7    whether we want to eliminate them from the driver's license file

8    before we do the match.

9           Another illustration is for expired licenses, my

10   understanding is that if they are expired less than two years,

11   it is very convenient to renew them on-line, and such persons

12   may choose to do so.  Another possibility is that those who are

13   expired more than two years have at least at some point in the

14   past shown that they have the motivation and wherewithal to

15   obtain Texas ID, and may yet do so again.

16   BY MR. MORTARA:

17   Q.  And Professor, you don't have an expert opinion on how hard

18   it is to renew a driver's license on-line versus get one for the

19   first time, do you?

20   A.  I have no expert opinion, I just know in my own personal

21   experience it was very easy to do because that's how I did it

22   the last time that my license was up for renewal.

23          JUDGE COLLYER:  And it will be possible the next time.

24   But the real question is how all of those variations affect the

25   legitimacy of the statistical analysis.  Right?  I mean, you

1    recognize that those are variations, and that some of the people

2    who don't have recent licenses don't have recent licenses

3    because they're ineligible for licenses because they've moved

4    out of state.

5            THE WITNESS:  Yes.

6            JUDGE COLLYER:  Right.  So they're not going to renew

7    unless they've moved out of state and can't get a license in

8    Washington, D.C. because they don't have a Texas license, and

9    then they'll renew but they haven't moved back.

10           THE WITNESS:  Right.

11           JUDGE COLLYER:  Okay.  It's a mess.

12           MR. MORTARA:  Exactly, Your Honor.  Exactly.

13   BY MR. MORTARA:

14   Q.  And for the court, how many of the people on

15   Professor Ansolabehere's VRNID list match to expired entries in

16   the Texas driver's license or ID database?

17   A.  More than 400,000.

18   Q.  You also mentioned that Professor Ansolabehere excised

19   entries for deceased persons from the driver's license database.

20   What effect does that have on the VRNID?

21   A.  One again, it reduces the possibility of matching.  Let me

22   illustrate.  Suppose we have a voter registrant who is the same

23   as a Texas driver's license in the two files, and we find out by

24   looking at the driver's license file that that person is

25   deceased.  Well, if they're the same person, then if they're

1    deceased in the driver's license file, they're also deceased in

2    the voter registration file.

3              So if the deceased are removed from the driver's

4    license file but left in the voter registration file, then that

5    means that the deceased in the voter registration list cannot

6    match those people in the driver's license file, and therefore

7    the deceased will remain in the voter registration list, not

8    match, and end up in VRNID.

9    Q.  And how many dead people did Professor Ansolabehere put in

10   his VRNID?

11   A.  About 50,000.

12   Q.  And finally, could you just briefly discuss any issue with

13   removing entries with duplicate Social Security numbers from the

14   driver's license database?

15   A.  Well, once again, if we remove records from the driver's

16   license file or the license to carry file, what it does is to

17   remove the possibility of matching on certain criteria.  For

18   instance, it may be the case that there are two records for the

19   same individual in the driver's license file, but they might

20   have different variations of name.  One might be in as Tom and

21   one might be in as Thomas, and if the voter registration list

22   shows a record for Thomas, then whether you find a match for

23   these same people will depend upon which of the two records is

24   removed from the driver's license file.  If the record Thomas is

25   removed, then Thomas in the voter registration list will not

1    match the Tom that's in the driver's license file.  And so that

2    would result in an item that should have been matched but isn't,

3    and ends up in VRNID.

4         MR. MORTARA:  Your Honor, it is approaching 5:30.  This

5    is a good break point.  It is up to the court.

6         JUDGE COLLYER:  It's up to you, sir.  You have

7    two minutes, two whole minutes.  It's up to you.

8         MR. MORTARA:  As we did at redistricting, Your Honor,

9    the State of Texas is happy to surrender two minutes to the

10   court, and thanks you for your time.

11        JUDGE COLLYER:  Two whole minutes, and the court thanks

12   you for that courtesy.  We'll take your two minutes.  Thank you,

13   sir.

14        I'm going to add this all up, verify it, and I will

15   have one of the law clerks come out and tell everybody what I

16   think the time passed so far by each of the parties today is, so

17   everybody will know going into tomorrow.

18        MR. MORTARA:  Thank you, Your Honor.

19        JUDGE COLLYER:  Again, I don't know how to urge you any

20   more strongly.  We have looked at this stuff, so you don't have

21   to spend too much time on things we've already looked at, since

22   time is short.

23        Thank you, everybody.  Have a nice evening.  Good luck.

24   We'll see you tomorrow.

25        (Proceedings adjourned at 5:31 p.m.)

```
 1                CERTIFICATE OF OFFICIAL COURT REPORTER

 2

 3            I, Rebecca Stonestreet, certify that the foregoing is a

 4       correct transcript from the record of proceedings in the

 5       above-entitled matter.

 6

 7

 8

 9       _____          _____

10       SIGNATURE OF COURT REPORTER                  DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**#**

**#700** [1] - 3:2

**$**

**$10** [1] - 96:18
**$22** [2] - 16:7, 16:11
**$66** [2] - 88:18, 88:21

**'**

**'07** [1] - 72:4
**'09** [3] - 103:25, 104:7, 117:10
**'Which** [1] - 23:11

**0**

**01/01/1900** [1] - 29:4
**01/01/1901** [1] - 29:4
**034.002** [1] - 109:22
**08540-6531** [1] - 2:13

**1**

**1** [4] - 1:11, 138:15, 138:18, 140:2
**1,000** [1] - 98:11
**1.5** [2] - 136:18, 136:22
**10** [3] - 57:23, 67:8, 83:15
**100** [1] - 4:8
**10004** [1] - 2:24
**11** [2] - 3:2, 119:9
**110** [2] - 28:25, 29:2
**12** [5] - 97:1, 113:13, 113:14, 125:18, 135:22
**12-128** [1] - 1:3
**12.5** [1] - 34:2
**125,000** [1] - 139:14
**129** [1] - 4:9
**13** [5] - 17:21, 17:24, 34:4, 113:13, 136:10
**130** [1] - 76:3
**135** [1] - 4:10
**14** [28] - 48:25, 49:2, 70:12, 85:22, 86:16, 96:1, 99:13, 99:14, 100:9, 106:17, 106:22, 107:5, 109:2, 109:20, 113:13, 113:18, 114:3, 115:2, 119:9, 120:7, 120:17, 123:18, 125:18, 129:18, 130:19, 133:8, 133:10, 133:13
**140** [6] - 70:21, 76:4, 82:7, 85:20, 124:25, 125:6

**141** [1] - 125:6
**1440** [1] - 3:6
**1474** [1] - 21:13
**1475** [2] - 21:13, 22:2
**14th** [2] - 1:19, 109:20
**15** [2] - 35:9, 92:10
**150** [1] - 70:21
**1542** [1] - 23:3
**16.07** [4] - 110:15, 110:19, 110:22, 110:24
**16.077** [5] - 109:9, 109:13, 110:21, 114:3, 116:16
**1706** [1] - 71:14
**18** [1] - 28:24
**183** [1] - 122:9
**186** [3] - 44:18, 44:19, 44:24
**19** [1] - 29:1
**191** [1] - 2:15
**1935** [1] - 99:24
**1940s** [3] - 18:2, 18:11, 18:17
**1948** [1] - 18:3
**1950** [2] - 138:15, 138:18
**1950s** [2] - 18:11, 73:19
**1956** [1] - 18:7
**1960** [1] - 2:19
**1981** [3] - 111:10, 112:21, 113:5
**1985** [1] - 61:2
**1990** [3] - 13:7, 13:22, 14:1
**1994** [1] - 99:25
**1996** [1] - 70:10
**1997** [1] - 70:17

**2**

**2** [3] - 138:4, 138:20, 140:4
**2,000** [1] - 125:9
**20** [2] - 13:21, 125:10
**200** [1] - 11:10
**2000** [1] - 131:14
**20001** [1] - 3:10
**2002** [5] - 44:10, 56:9, 67:8, 67:20, 70:8
**2004** [3] - 18:20, 44:18, 125:9
**2005** [8] - 20:13, 35:17, 36:3, 71:7, 71:10, 74:25, 84:25, 105:22
**2006** [1] - 56:16
**2007** [18] - 19:19, 71:22, 71:23, 72:20, 72:21, 74:22, 75:1, 75:2, 76:17, 77:17, 81:1, 81:7, 84:25, 100:20, 100:21, 103:23, 105:23
**2008** [5] - 53:15, 56:19, 56:24, 57:5, 58:20
**2009** [24] - 45:22, 51:18, 78:13, 79:11, 80:7, 81:3, 81:18, 82:11, 82:13, 83:18, 83:23, 84:19, 85:3, 104:14,

104:18, 105:3, 105:14, 106:1, 109:20, 114:3, 116:10, 116:15, 117:8
**2010** [11] - 26:9, 52:7, 57:17, 57:19, 58:1, 58:16, 59:13, 98:10, 129:17, 129:23, 131:15
**2011** [19] - 49:25, 67:8, 85:6, 85:22, 85:24, 86:8, 86:11, 86:13, 88:15, 96:1, 114:7, 116:20, 116:22, 117:5, 117:9, 117:10, 117:14, 119:15
**2012** [2] - 1:6, 56:9
**202** [4] - 2:9, 3:11, 126:21, 126:23
**20530** [1] - 2:9
**209** [1] - 1:19
**21** [1] - 108:14
**212** [1] - 2:24
**2160** [1] - 8:4
**2161** [1] - 8:4
**218** [2] - 71:25, 72:2
**22304** [1] - 2:16
**230** [1] - 3:6
**24** [4] - 83:20, 117:7, 117:10, 122:9
**240** [3] - 54:13, 54:14, 54:15
**24th** [1] - 2:23
**25** [1] - 125:10
**254** [1] - 44:14
**25th** [2] - 117:5, 117:14
**26** [1] - 136:12
**260** [2] - 89:1, 89:23
**273** [1] - 62:3
**273.001** [2] - 61:11, 62:5
**281** [1] - 2:20
**2:00** [1] - 1:10

**3**

**3** [2] - 138:5, 140:4
**30** [6] - 15:11, 15:22, 16:4, 61:12, 85:12, 85:13
**30-minute** [1] - 88:20
**300** [1] - 1:24
**30303** [1] - 3:7
**305-7766** [1] - 2:9
**31** [1] - 4:4
**312** [2] - 1:25, 3:3
**320** [3] - 44:10, 44:12, 44:16
**3204** [1] - 110:20
**33** [1] - 4:6
**34,000** [1] - 98:17
**354-3249** [1] - 3:11
**36(b** [1] - 94:18
**362** [3] - 82:12, 83:23, 84:19
**385** [2] - 109:17, 110:20
**3:58** [1] - 92:11

**4**

**4** [5] - 70:6, 130:1, 130:11, 130:22, 132:4
**40** [3] - 36:6, 73:18, 82:8
**400,000** [1] - 144:17
**404** [1] - 3:7
**405** [1] - 2:16
**41** [3] - 34:3, 55:23, 55:24
**42** [2] - 40:18, 55:24
**4201** [1] - 2:19
**427-0701** [1] - 3:3
**43** [4] - 42:14, 42:18, 43:23, 55:24
**43,000** [1] - 98:16
**49** [1] - 4:6
**494-4469** [1] - 1:25
**4:00** [1] - 92:9

**5**

**5** [3] - 4:4, 18:11, 18:18
**5,000** [2] - 125:9, 125:17
**5.11(d** [18] - 78:17, 79:13, 80:7, 81:2, 81:20, 109:6, 109:23, 110:10, 111:9, 112:9, 114:2, 114:16, 114:20, 115:6, 115:9, 115:14, 115:19, 116:16
**5.11(d)** [4] - 78:15, 79:12, 86:10, 110:9
**50** [4] - 45:4, 73:18, 82:8, 140:3
**50,000** [1] - 145:11
**500** [1] - 2:12
**50s** [2] - 18:2, 18:17
**512** [1] - 1:20
**523-2721** [1] - 3:7
**530** [1] - 2:19
**54** [1] - 1:24
**557** [2] - 107:2, 112:16
**579** [1] - 25:4
**580-6310** [1] - 2:20
**5:30** [1] - 146:4
**5:31** [1] - 146:25
**5th** [2] - 112:21, 113:5

**6**

**60** [4] - 85:16, 99:25, 141:22, 142:14
**60603** [1] - 3:3
**60654** [1] - 1:25
**609** [1] - 2:13
**62** [4] - 45:1, 45:2, 45:7, 45:11
**6235** [1] - 107:18

**628-4673** [1] - 2:17
**64** [2] - 36:10, 36:23
**65** [1] - 19:7
**6511** [1] - 3:10
**67** [1] - 112:18
**67th** [6] - 111:9, 111:17, 112:12, 112:21, 113:10, 113:11
**68th** [1] - 111:18
**69** [2] - 4:6, 4:8

**7**

**7** [1] - 75:2
**7,300** [1] - 98:11
**70** [2] - 125:4, 125:5
**703** [1] - 2:17
**7202** [1] - 2:8
**77068** [1] - 2:20
**78701** [1] - 1:20
**79th** [3] - 105:22, 112:10, 112:11
**7th** [1] - 1:19

**8**

**8,300** [1] - 98:9
**800,000** [1] - 136:14
**80th** [1] - 105:23
**81st** [1] - 112:18
**859-8953** [1] - 2:24

**9**

**9** [1] - 1:6
**902** [1] - 2:12
**936-1695** [1] - 1:20
**950** [1] - 2:8
**955-3200** [1] - 2:13
**97** [1] - 44:14
**98** [1] - 112:20

**A**

**abetted** [1] - 66:8
**ability** [8] - 62:21, 63:14, 64:6, 64:9, 68:18, 108:13, 108:14, 142:25
**able** [7] - 23:25, 47:10, 57:17, 81:10, 84:21, 103:12, 135:5
**above-entitled** [1] - 147:5
**absent** [7] - 75:9, 75:18, 75:19, 75:21, 75:24, 77:9, 103:20
**absentee** [2] - 28:8, 65:23
**absolutely** [4] - 61:17, 101:9,

104:18, 135:3
**Abudu** [2] - 4:9, 129:7
**ABUDU** [14] - 3:4, 79:20, 89:9, 90:3, 129:5, 129:7, 129:10, 130:18, 130:23, 131:1, 131:8, 131:25, 132:2, 134:6
**accept** [1] - 15:24
**acceptable** [1] - 126:1
**accepting** [2] - 47:11, 68:16
**access** [2] - 137:4, 143:3
**accommodate** [1] - 116:1
**accomplish** [1] - 117:24
**according** [1] - 20:20
**account** [2] - 28:24, 29:9
**accurate** [10] - 52:11, 52:14, 53:18, 57:1, 57:5, 59:24, 62:13, 72:14, 73:15, 142:13
**accurately** [1] - 8:6
**accustomed** [1] - 97:12
**acknowledge** [1] - 131:9
**acknowledgment** [1] - 135:21
**act** [1] - 65:7
**Act** [2] - 18:14, 18:18
**actual** [2] - 20:5, 49:7
**ADAM** [2] - 1:21, 2:21
**Adams** [1] - 3:2
**add** [1] - 146:14
**added** [1] - 137:13
**addition** [3] - 38:17, 48:5, 136:15
**additional** [9] - 43:13, 48:6, 88:15, 117:23, 137:14, 140:9, 140:15, 141:9, 141:16
**additionally** [1] - 47:10
**address** [1] - 114:13
**addressed** [1] - 39:11
**addressing** [3] - 104:5, 109:3, 111:10
**adds** [1] - 47:15
**adjourned** [1] - 146:25
**administered** [3] - 34:9, 69:23, 135:7
**administration** [1] - 87:7
**administrator** [1] - 40:14
**administrators** [2] - 31:8, 37:18
**admissibility** [3] - 47:18, 92:20, 93:25
**admit** [1] - 92:22
**admitted** [1] - 135:25
**ADMITTED** [1] - 4:14
**admonishment** [1] - 134:25
**adopt** [3] - 78:13, 79:9, 112:24
**adopted** [2] - 79:7, 112:20

**adopts** [1] - 105:8
**ads** [2] - 26:23, 26:24
**adults** [2] - 16:16, 16:24
**advise** [1] - 120:3
**advised** [2] - 55:12, 55:18
**Affairs** [1] - 71:3
**affect** [1] - 143:24
**affected** [5] - 96:12, 96:15, 97:8, 131:5, 133:14
**affects** [3] - 49:4, 130:22, 142:3
**afford** [1] - 96:18
**afraid** [1] - 41:21
**African** [3] - 78:5, 130:5, 131:10
**African-American** [2] - 130:5, 131:10
**African-Americans** [1] - 78:5
**afternoon** [9] - 5:16, 5:17, 34:6, 34:14, 34:15, 70:3, 100:17, 100:18, 129:11
**afterwards** [1] - 63:24
**age** [13] - 5:6, 98:9, 98:13, 98:18, 98:19, 98:24, 130:2, 130:5, 130:8, 131:10, 131:14, 132:5
**agencies** [1] - 129:2
**agency** [6] - 94:19, 119:11, 120:1, 133:22, 134:3, 134:5
**agenda** [1] - 87:25
**ago** [2] - 13:21, 102:1
**agree** [17] - 7:4, 16:23, 62:20, 65:6, 68:4, 68:12, 73:4, 91:12, 94:13, 102:3, 105:4, 107:8, 112:3, 132:17, 133:1, 133:5, 137:23
**agreed** [1] - 92:12
**ahead** [19] - 21:21, 33:8, 34:5, 34:24, 47:19, 54:12, 59:19, 65:14, 72:24, 86:13, 89:19, 94:25, 97:14, 97:22, 97:24, 123:15, 131:6, 131:24, 136:3
**aided** [2] - 3:13, 66:8
**al** [1] - 1:9
**alerted** [1] - 46:6
**Alexandria** [1] - 2:16
**Aliseda** [1] - 34:2
**ALISEDA** [2] - 4:3, 5:12
**Aliseda's** [1] - 11:5
**allegation** [2] - 28:18, 53:17
**allegations** [15] - 13:20, 28:22, 29:6, 32:8, 32:9, 39:8, 40:12, 41:12, 57:22, 57:23, 59:10, 59:12, 60:20, 66:10
**alleged** [2] - 40:9, 58:5
**allegedly** [2] - 17:24, 66:8
**allow** [2] - 65:9, 108:12

**allowable** [1] - 84:14
**allowed** [7] - 82:23, 85:11, 86:8, 95:15, 104:23, 113:20, 122:25
**allows** [3] - 89:25, 90:1, 115:23
**Almanza** [14] - 46:12, 46:14, 48:14, 51:14, 51:17, 51:19, 51:22, 66:1, 66:13, 67:6, 69:9, 69:12, 69:13
**amazing** [2] - 131:3, 131:4
**amended** [1] - 71:3
**amendment** [6] - 127:20, 127:21, 128:6, 128:7, 128:12, 128:13
**AMERICAN** [2] - 3:1, 3:5
**American** [2] - 130:5, 131:10
**Americans** [1] - 78:5
**amount** [2] - 43:11, 47:22
**analysis** [11] - 96:7, 117:15, 117:18, 121:16, 121:21, 121:25, 122:10, 122:15, 122:19, 135:23, 143:25
**Andrew** [1] - 34:17
**Anglo** [2] - 130:8, 132:5
**Anglos** [3] - 78:5, 132:22, 133:2
**Ann** [1] - 117:17
**annotated** [2] - 61:11, 62:5
**announced** [1] - 76:7
**another's** [1] - 37:8
**Ansolabehere** [11] - 136:17, 136:21, 139:14, 139:22, 140:10, 141:6, 141:8, 141:10, 141:19, 144:18, 145:9
**Ansolabehere's** [5] - 138:10, 138:21, 139:10, 140:6, 144:15
**answer** [28] - 11:11, 12:3, 16:2, 18:15, 19:10, 19:12, 19:13, 20:15, 20:16, 27:2, 47:18, 49:16, 58:8, 60:25, 64:22, 89:18, 91:23, 101:7, 102:2, 102:4, 106:8, 122:12, 122:21, 122:25, 127:4, 127:7, 133:18, 133:19
**ANSWER** [2] - 11:16, 11:19
**answered** [2] - 7:9, 33:7
**answers** [1] - 11:2
**anti** [2] - 33:1, 33:9
**anti-immigrant** [2] - 33:1, 33:9
**anticipated** [1] - 24:19
**antiquated** [1] - 89:5
**Antonio** [4] - 46:1, 46:14, 48:13, 51:21
**anyway** [3] - 5:5, 92:3, 142:14

**apologies** [1] - 21:13
**apologize** [4] - 15:10, 26:6, 48:19, 112:12
**appear** [4] - 26:19, 27:3, 90:21, 110:10
**APPEARANCES** [1] - 1:15
**appeared** [1] - 50:20
**Appendix** [4] - 8:4, 21:12, 22:1, 23:4
**applicable** [2] - 109:6, 109:9
**application** [1] - 18:11
**applies** [1] - 51:10
**apply** [2] - 49:9, 140:3
**appreciate** [1] - 134:13
**approach** [3] - 11:6, 24:23, 81:12
**approached** [1] - 60:8
**approaching** [1] - 146:4
**appropriated** [1] - 94:16
**approved** [1] - 42:25
**area** [5] - 23:7, 70:19, 97:15, 98:6, 113:19
**areas** [5] - 35:23, 45:5, 97:11, 98:22
**argument** [4] - 93:10, 97:3, 97:6, 97:9
**argumentative** [1] - 33:4
**arguments** [1] - 97:5
**Arizona** [1] - 33:15
**array** [1] - 48:3
**arrive** [1] - 23:23
**arrived** [1] - 136:22
**article** [1] - 29:9
**articles** [1] - 26:21
**articulated** [1] - 123:22
**ascribed** [1] - 124:25
**ASHA** [1] - 1:22
**aside** [1] - 80:16
**asserted** [2] - 91:1, 92:22
**assertions** [1] - 122:24
**assign** [1] - 39:7
**assigned** [5] - 35:11, 36:12, 38:18, 38:19, 43:1
**assist** [2] - 36:1, 62:7
**assistance** [5] - 14:2, 28:8, 28:12, 35:12, 64:20
**assisted** [2] - 38:19, 57:10
**associates** [1] - 74:17
**assume** [2] - 21:10, 50:3
**assure** [1] - 94:23
**assured** [1] - 11:1
**Atascosa** [1] - 11:17
**Atlanta** [1] - 3:7
**ATM** [2] - 8:16, 8:21
**attempt** [2] - 49:6, 72:4
**attempted** [2] - 46:10, 137:1
**attention** [1] - 46:19
**Attorney** [34] - 1:6, 5:11, 34:18, 34:20, 35:1, 35:7,

35:15, 37:14, 37:19, 37:22, 38:1, 38:3, 38:11, 40:22, 41:3, 42:10, 43:21, 44:11, 48:11, 56:9, 59:21, 60:1, 60:25, 61:3, 61:6, 61:20, 62:6, 62:8, 62:10, 63:21, 64:5, 64:7, 64:11, 100:14
**ATTORNEY** [1] - 1:18
**attorney** [8] - 13:10, 17:19, 30:6, 40:23, 40:24, 43:22, 48:22, 64:8
**Attorney's** [1] - 64:21
**attorney's** [1] - 57:11
**attorneys** [10] - 37:17, 38:6, 38:10, 38:14, 43:25, 62:7, 64:12, 64:13, 64:16
**audit** [5] - 19:19, 19:22, 19:25, 20:9, 20:20
**Austin** [3] - 1:20, 35:6, 35:8, 129:14, 135:15
**author** [4] - 6:6, 6:9, 70:13, 78:17
**authorities** [1] - 46:19
**authority** [5] - 61:21, 61:25, 62:3, 62:6, 62:10
**authorized** [1] - 68:20
**available** [7] - 119:7, 120:22, 121:11, 135:2, 135:6, 136:15, 139:3
**Avenue** [1] - 2:8
**averages** [1] - 17:6
**awaiting** [1] - 42:16
**aware** [17] - 32:14, 48:5, 48:15, 48:17, 48:21, 57:9, 60:19, 60:20, 67:15, 67:20, 97:3, 101:1, 101:3, 101:9, 118:20, 129:23, 133:21

**B**

**backwards** [1] - 19:8
**bad** [1] - 5:3
**badly** [1] - 81:6
**balancing** [1] - 108:15
**ballot** [28] - 5:22, 11:24, 13:2, 13:5, 17:24, 18:23, 18:24, 19:3, 19:5, 19:16, 20:11, 20:20, 22:25, 29:13, 37:1, 37:4, 37:9, 47:21, 47:23, 50:11, 50:18, 51:17, 51:19, 53:20, 57:21, 57:24, 65:23, 99:17
**balloting** [1] - 28:8
**ballots** [5] - 13:19, 28:5, 29:7, 29:8, 47:25
**bank** [1] - 68:19
**Barnes** [1] - 125:13
**barred** [1] - 94:13
**BARTLIT** [1] - 1:23

**base** [1] - 93:12
**based** [13] - 15:20, 16:2, 16:10, 52:20, 56:8, 76:24, 89:20, 90:13, 90:16, 121:22, 127:6, 137:6
**basis** [3] - 30:5, 30:9, 121:16
**beat** [1] - 26:5
**BECK** [1] - 1:23
**become** [4] - 19:5, 67:15, 132:23, 139:2
**Bee** [3] - 13:17, 18:20, 19:16
**Beeville** [1] - 11:24
**BEFORE** [1] - 1:12
**beg** [1] - 80:22
**begin** [1] - 101:23
**beginning** [7] - 11:10, 22:2, 23:8, 61:13, 79:7, 87:8, 116:15
**behalf** [7] - 5:10, 6:18, 6:20, 34:7, 46:10, 53:18, 129:7
**behind** [3] - 84:18, 87:10
**belief** [2] - 12:12, 12:23
**believes** [1] - 12:19
**BELL** [1] - 2:3
**BELL-PLATTS** [1] - 2:3
**Ben** [1] - 125:13
**BENCH** [1] - 1:11
**benchmark** [1] - 132:7
**Bend** [1] - 98:6
**BERKOWER** [1] - 2:5
**best** [4] - 70:17, 80:17, 114:1, 133:19
**better** [2] - 16:22, 33:23
**between** [8] - 15:11, 56:9, 75:16, 115:12, 119:25, 125:9, 131:14, 142:9
**Bexar** [1] - 48:13
**beyond** [3] - 17:16, 62:18, 79:20
**biennium** [1] - 88:22
**big** [4] - 12:17, 12:18, 12:19, 75:15
**Big** [1] - 98:6
**bill** [72] - 7:14, 18:25, 22:12, 30:12, 32:14, 32:16, 33:1, 33:9, 48:24, 70:20, 70:22, 70:25, 71:5, 71:16, 71:18, 72:5, 72:23, 72:24, 72:25, 73:2, 73:7, 73:10, 74:5, 74:8, 75:6, 75:14, 75:20, 75:23, 76:1, 76:2, 76:6, 76:10, 76:12, 76:16, 76:19, 76:21, 77:1, 77:22, 77:25, 78:2, 78:6, 79:4, 81:1, 81:13, 82:3, 82:4, 84:2, 85:24, 86:22, 87:3, 87:5, 87:6, 87:11, 87:12, 87:14, 87:17, 87:22, 87:23, 101:16, 102:15, 103:13, 114:21, 115:14, 115:18,

118:15, 120:19, 123:24, 124:8, 124:19, 124:21, 128:4, 129:19
**Bill** [33] - 48:25, 49:2, 70:12, 71:14, 71:25, 72:2, 74:22, 77:17, 80:24, 81:17, 82:12, 83:23, 84:19, 85:3, 85:22, 86:16, 96:1, 96:2, 99:13, 99:14, 100:9, 107:5, 115:2, 119:9, 120:7, 120:17, 123:18, 129:18, 130:19, 133:8, 133:10, 133:13
**bills** [34] - 5:22, 72:10, 72:11, 73:12, 73:16, 74:6, 74:12, 74:15, 78:22, 82:5, 82:7, 82:8, 83:6, 83:16, 84:10, 84:13, 84:15, 84:25, 85:13, 85:16, 86:13, 87:10, 87:19, 103:19, 109:3, 111:3, 111:16, 113:19, 125:1, 125:6, 125:10, 125:15, 125:17
**biometric** [1] - 31:21
**birth** [17] - 16:7, 16:11, 125:24, 126:3, 126:4, 126:7, 127:20, 133:20, 133:22, 133:23, 134:3, 137:11, 137:21, 140:25, 141:1, 141:5, 141:7
**bit** [1] - 41:20
**black** [1] - 6:25
**blacks** [1] - 30:21
**block** [1] - 78:11
**Blockbuster** [2] - 8:25, 9:2
**blocked** [1] - 78:8
**blocker** [10] - 72:24, 87:3, 87:5, 87:6, 87:10, 87:14, 87:17, 87:19, 87:22, 87:23
**blow** [4] - 41:19, 108:5, 109:25, 110:23
**blurry** [1] - 8:8
**board** [4] - 9:11, 137:15, 137:18, 138:1
**Bob** [1] - 80:21
**body** [6] - 78:24, 80:19, 80:24, 87:2, 108:11, 108:15
**book** [3] - 39:1, 39:2, 39:3
**books** [2] - 39:1, 66:16
**booth** [2] - 66:11, 68:6
**border** [1] - 25:24
**born** [3] - 18:7, 138:15, 138:18
**bottom** [4] - 107:24, 110:19, 112:19, 113:14
**Box** [2] - 17:21, 17:24
**box** [2] - 17:24, 99:17
**BRAZIL** [1] - 2:18
**break** [6] - 28:7, 60:14, 92:2, 92:3, 92:9, 146:5

**Brewster** [4] - 98:5, 98:8, 99:9, 118:25
**briefly** [7] - 42:11, 70:14, 72:7, 88:3, 136:5, 140:20, 145:12
**bring** [22] - 8:4, 21:12, 21:13, 23:3, 72:4, 72:25, 73:6, 75:20, 75:24, 76:1, 76:9, 76:16, 81:13, 102:18, 105:5, 106:5, 107:2, 107:18, 109:17, 110:15, 112:15, 115:6
**bringing** [2] - 106:11, 108:10
**brings** [1] - 88:1
**Briseno** [4] - 56:16, 56:18, 58:25, 60:22
**Britney** [2] - 5:6, 5:8
**broad** [3] - 68:6, 121:20, 122:6
**broken** [1] - 36:24
**Brooks** [2] - 28:20, 69:14
**brother** [9] - 45:25, 46:2, 46:4, 46:10, 46:24, 99:20
**brother's** [3] - 46:3, 99:21, 99:22
**brothers** [2] - 45:24, 46:22
**brought** [10] - 46:18, 46:20, 60:5, 77:18, 77:19, 87:2, 101:12, 102:8, 103:19, 118:1
**Bruce** [1] - 49:20
**BRUCE** [1] - 2:5
**budget** [1] - 25:16
**build** [2] - 106:9, 108:12
**builds** [1] - 106:6
**Bullock** [1] - 80:21
**burden** [8] - 15:23, 16:5, 16:6, 16:13, 127:6, 128:1, 128:16, 129:1
**Bureau** [1] - 134:2
**bus** [2] - 16:16, 16:25
**business** [35] - 39:18, 72:5, 72:8, 72:9, 72:11, 72:18, 72:19, 72:24, 73:1, 73:3, 73:5, 73:13, 74:7, 74:9, 74:11, 75:5, 75:8, 76:2, 76:11, 77:10, 78:22, 82:4, 82:10, 84:22, 85:15, 86:14, 86:17, 87:11, 87:22, 91:9, 102:9, 102:23, 103:12, 125:11, 135:19
**BY** [61] - 5:15, 7:11, 10:25, 11:8, 21:15, 21:22, 22:3, 23:5, 24:25, 25:5, 25:10, 31:6, 33:10, 34:13, 34:25, 39:23, 41:7, 42:6, 42:17, 48:4, 49:23, 54:16, 55:1, 55:21, 59:20, 60:18, 65:1, 65:17, 69:5, 70:2, 80:6, 90:12, 95:2, 95:25, 97:25,

99:6, 100:6, 100:16, 107:3, 107:21, 108:6, 108:21, 109:18, 110:18, 110:25, 112:17, 113:8, 115:1, 124:16, 124:24, 126:20, 129:10, 131:1, 131:8, 132:2, 135:13, 136:4, 137:25, 140:19, 143:16, 144:13
**by-mail** [1] - 57:21

# C

**CA** [1] - 1:3
**cahoots** [1] - 31:8
**calendar** [13] - 72:16, 75:25, 76:3, 76:8, 76:12, 84:10, 84:17, 84:18, 87:9, 101:13, 101:15, 101:24, 115:23
**calendaring** [4] - 72:15, 73:25, 74:2, 106:14
**calendars** [6] - 74:4, 74:6, 74:7, 74:10, 74:16, 74:17
**Calhoun** [1] - 59:15
**campaign** [9] - 11:17, 24:11, 24:16, 24:20, 25:1, 25:6, 26:2, 26:9, 27:1
**campaigned** [2] - 24:5, 24:8
**campaigns** [1] - 17:25
**candidates** [3] - 31:9, 132:14, 132:19
**cannot** [2] - 94:14, 145:5
**capable** [1] - 38:15
**Capacity** [1] - 1:6
**capacity** [3] - 89:15, 120:5, 120:6
**capital** [1] - 35:14
**capitol** [1] - 89:21
**card** [14] - 9:1, 9:7, 9:15, 9:17, 29:19, 31:20, 31:21, 53:22, 54:8, 55:4, 70:24, 96:19
**cards** [6] - 22:6, 22:9, 22:21, 23:10, 23:13
**care** [1] - 91:1
**Carlos** [1] - 102:25
**Carnegie** [1] - 2:12
**Carol** [6] - 53:15, 53:17, 54:21, 55:10, 55:11, 64:19
**carried** [2] - 106:1, 116:19
**carries** [2] - 101:24, 110:21
**carry** [6] - 6:4, 94:17, 136:14, 141:11, 142:7, 145:16
**case** [83] - 10:11, 20:4, 21:5, 22:6, 29:6, 29:12, 33:15, 38:14, 41:13, 41:16, 42:21, 42:24, 43:3, 43:20, 44:2, 45:18, 45:20, 45:21, 45:22, 45:23, 46:11, 46:18, 46:20,

48:5, 48:12, 48:13, 48:21, 48:24, 49:21, 50:7, 50:9, 50:12, 50:16, 50:18, 50:20, 51:5, 51:10, 51:12, 51:14, 51:21, 51:24, 51:25, 52:1, 52:12, 52:13, 52:16, 53:1, 53:2, 53:11, 53:17, 53:25, 56:15, 56:25, 57:4, 57:7, 57:13, 57:16, 57:21, 57:22, 58:22, 58:24, 59:3, 59:14, 59:15, 60:7, 60:22, 60:23, 63:25, 64:20, 65:23, 67:15, 69:9, 69:16, 101:25, 103:22, 126:11, 132:21, 141:13, 143:5, 145:18
**cases** [53] - 13:8, 13:14, 29:21, 30:7, 30:8, 36:1, 36:13, 36:20, 36:21, 37:13, 38:4, 38:11, 38:19, 38:21, 42:14, 42:15, 43:5, 43:17, 43:24, 44:18, 44:19, 44:24, 45:2, 45:7, 45:9, 45:11, 45:13, 47:1, 47:23, 47:25, 48:6, 48:8, 48:10, 50:2, 50:3, 50:5, 52:3, 53:13, 56:10, 56:15, 58:4, 58:6, 59:4, 59:12, 59:22, 60:20, 63:20, 64:15, 65:21, 67:11, 68:22
**cash** [2] - 8:13, 8:21
**cast** [12] - 13:5, 18:21, 18:23, 20:11, 20:19, 22:24, 28:5, 37:9, 47:25, 51:17, 51:19, 53:20
**casting** [3] - 13:1, 37:1, 124:19
**catch** [1] - 134:19
**categories** [2] - 36:25, 51:3
**categorized** [1] - 94:4
**category** [2] - 36:25, 113:18
**caucus** [1] - 81:7
**census** [8] - 98:10, 119:4, 129:17, 129:23, 130:17, 130:19, 130:21, 131:5
**center** [1] - 42:8
**Center** [1] - 2:12
**ceremonial** [2] - 101:18, 102:5
**certain** [9] - 17:9, 43:5, 60:23, 61:18, 78:23, 86:25, 141:12, 142:17, 145:17
**certainly** [1] - 74:19
**CERTIFICATE** [1] - 147:1
**certificate** [19] - 16:7, 16:12, 46:3, 46:7, 46:17, 53:20, 53:24, 55:19, 96:5, 96:20, 125:24, 125:25, 126:3, 126:4, 126:6, 126:7, 127:1, 127:20, 133:16
**certificates** [6] - 23:18, 67:3,

133:21, 133:22, 133:23, 134:4
**certified** [1] - 126:3
**certify** [1] - 147:3
**CHAD** [1] - 2:18
**chair** [4] - 81:7, 88:4, 88:12, 120:6
**chairman** [2] - 6:1, 74:17
**chamber** [3] - 75:14, 77:8, 82:18
**chambers** [1] - 125:18
**champions** [1] - 32:21
**chance** [4] - 54:17, 92:7, 94:7, 142:12
**change** [6] - 71:2, 78:17, 81:6, 104:9, 105:1
**Chapter** [2] - 36:23, 62:3
**characterization** [1] - 33:3
**characterize** [2] - 104:1, 107:10
**characterized** [4] - 81:16, 81:21, 104:9, 107:12
**charge** [8] - 36:10, 41:13, 43:19, 53:6, 58:17, 58:25, 96:6, 96:20
**charged** [11] - 14:1, 56:18, 57:2, 57:13, 58:1, 59:2, 59:18, 59:23, 66:3, 69:10, 69:12
**Charges** [1] - 42:10
**charges** [7] - 14:4, 14:7, 39:4, 56:25, 58:2, 60:5, 65:2
**check** [3] - 8:13, 8:16, 124:13
**checked** [3] - 47:11, 118:9, 119:4
**Chicago** [2] - 1:25, 3:3
**children** [1] - 35:6
**choose** [2] - 62:12, 143:12
**chose** [2] - 32:10, 32:13
**chosen** [1] - 6:13
**chubbed** [1] - 84:3
**chubbing** [6] - 84:4, 84:5, 84:6, 84:13, 84:20, 84:23
**CIRCUIT** [1] - 1:12
**circumstances** [1] - 43:5
**Cities** [2] - 32:14, 32:25
**citizen** [1] - 64:1
**city** [1] - 56:22
**City** [1] - 56:22
**CIVIL** [1] - 3:5
**Civil** [1] - 2:7
**claimed** [3] - 8:12, 20:22, 21:6
**clarification** [1] - 107:16
**clarify** [3] - 5:18, 45:25, 133:20
**Class** [2] - 43:8, 49:6
**clean** [2] - 19:4, 141:11

**cleanings** [1] - 141:19
**clear** [8] - 10:2, 21:25, 37:22, 50:23, 79:23, 80:3, 130:20, 137:20
**clearly** [2] - 5:7, 123:25
**Clerk** [3] - 34:9, 69:23, 135:7
**clerks** [1] - 146:15
**client** [1] - 91:20
**close** [3] - 14:15, 41:24, 99:19
**closest** [3] - 15:17, 15:18, 21:5
**closing** [7] - 6:19, 7:13, 7:18, 7:25, 8:7, 17:4, 27:10
**coauthor** [2] - 6:7, 6:9
**coddling** [2] - 16:15, 16:24
**code** [8] - 36:16, 36:19, 38:20, 39:1, 40:4, 44:20, 44:21, 52:9
**Code** [17] - 36:19, 36:23, 41:2, 41:15, 42:9, 44:23, 60:2, 61:2, 61:7, 61:10, 61:13, 61:21, 62:5, 64:13, 64:17
**collar** [1] - 35:24
**colleague** [1] - 19:16
**colleagues** [10] - 13:7, 13:23, 14:9, 14:24, 17:5, 17:21, 18:20, 22:20, 23:15, 92:4
**collectively** [1] - 92:3
**COLLYER** [110] - 1:13, 10:19, 11:7, 21:21, 21:24, 24:24, 33:6, 33:16, 33:22, 34:21, 39:11, 39:15, 40:25, 41:4, 41:6, 41:18, 42:3, 47:15, 58:8, 58:12, 58:16, 58:20, 58:24, 59:4, 59:8, 59:11, 59:19, 64:25, 65:10, 65:13, 69:2, 69:19, 80:2, 80:5, 89:12, 89:17, 89:19, 90:5, 90:8, 90:25, 91:8, 91:14, 91:21, 91:25, 92:7, 92:12, 92:24, 93:6, 94:1, 94:8, 94:12, 94:23, 94:25, 95:12, 95:20, 95:24, 97:22, 97:24, 99:1, 99:5, 100:3, 100:12, 120:2, 120:9, 120:14, 120:20, 120:24, 121:1, 121:6, 121:12, 121:18, 121:23, 122:5, 123:3, 123:7, 123:11, 123:15, 124:1, 124:6, 124:9, 124:14, 124:22, 126:15, 126:19, 127:12, 129:6, 130:16, 130:21, 130:24, 131:3, 131:13, 131:18, 131:21, 131:24, 134:8, 134:12, 134:17, 135:1, 135:4, 135:9, 135:24, 136:3, 137:23,

142:11, 143:23, 144:6, 144:11, 146:6, 146:11, 146:19
**COLUMBIA** [1] - 1:2
**combined** [1] - 115:5
**combo** [1] - 140:23
**comfortable** [1] - 77:1
**comment** [2] - 112:8, 131:4
**commented** [1] - 138:9
**comments** [2] - 79:15, 79:16
**Commission** [1] - 83:11
**commit** [1] - 29:17
**committed** [3] - 68:6, 68:10
**committee** [36] - 5:19, 5:23, 6:1, 21:1, 22:13, 22:17, 22:24, 27:7, 71:19, 72:3, 72:12, 72:13, 74:4, 74:5, 74:6, 74:7, 74:10, 74:16, 74:18, 74:19, 79:3, 81:11, 82:11, 82:22, 83:1, 83:21, 85:21, 85:24, 86:1, 86:5, 87:8, 88:9, 88:12, 107:14, 120:6, 129:20
**Committee** [28] - 71:3, 79:5, 82:15, 82:16, 82:17, 83:6, 83:10, 83:12, 83:14, 83:18, 85:25, 88:5, 99:22, 114:17, 114:20, 115:2, 115:10, 115:13, 115:15, 115:18, 115:22, 116:10, 117:1, 117:4, 117:5, 117:13, 118:1, 118:21
**committing** [2] - 67:24, 68:2
**common** [6] - 75:20, 75:23, 76:13, 103:18, 103:19, 126:8
**commonly** [1] - 73:12
**communication** [1] - 119:25
**community** [1] - 130:3
**compare** [1] - 74:2
**compared** [1] - 47:12
**Comparion** [1] - 48:12
**comparison** [1] - 110:17
**competent** [1] - 91:3
**complaint** [2] - 12:6, 12:10
**complete** [2] - 11:2, 25:11
**completely** [1] - 68:13
**completion** [1] - 43:18
**computer** [3] - 3:13, 89:6
**computer-aided** [1] - 3:13
**concern** [1] - 116:16
**concerned** [3] - 29:6, 59:22, 129:1
**concerning** [5] - 5:19, 5:22, 7:2, 17:14, 118:21
**concerns** [7] - 12:4, 12:25, 28:10, 101:2, 101:4, 101:10, 116:1
**conclude** [1] - 127:14
**concluding** [2] - 6:14, 6:16

**conclusion** [3] - 6:17, 29:12, 65:11
**concurrent** [3] - 38:7, 38:14, 61:4
**conduct** [8] - 35:22, 62:7, 62:11, 87:22, 102:4, 122:10, 122:19, 123:1
**conducted** [5] - 57:10, 59:9, 121:16, 121:22, 124:17
**confidence** [4] - 32:6, 32:7, 99:16, 100:8
**confirmed** [1] - 118:2
**confuse** [1] - 22:10
**conjunction** [1] - 64:16
**consensus** [3] - 106:6, 106:9, 108:12
**conservatorship** [2] - 83:11, 83:13
**consider** [12] - 9:15, 33:4, 70:16, 72:11, 72:22, 73:12, 75:5, 83:19, 85:11, 87:12, 92:3, 143:6
**consideration** [3] - 78:8, 85:13, 85:16
**considered** [20] - 60:11, 74:15, 78:23, 79:21, 82:11, 83:16, 85:21, 85:24, 86:17, 86:20, 88:1, 104:15, 104:18, 104:23, 105:2, 115:2, 118:11, 118:14, 125:1, 133:4
**considering** [2] - 73:16, 133:5
**consisted** [2] - 136:12, 137:10
**consistent** [1] - 123:21
**consisting** [2] - 136:14, 136:17
**consists** [1] - 134:22
**constituents** [9] - 11:13, 12:10, 15:21, 16:3, 16:11, 30:16
**Constitution** [2] - 85:10, 85:12
**constitutional** [3] - 20:12, 20:14, 85:14
**consult** [1] - 92:4
**consultant** [1] - 26:21
**contain** [3] - 41:10, 43:23, 44:3
**contained** [4] - 41:8, 55:25, 114:3, 114:6
**contains** [2] - 40:6, 40:21
**contest** [1] - 95:13
**context** [2] - 9:8, 110:9
**continue** [2] - 94:24, 96:21
**continued** [3] - 18:11, 18:17, 99:24
**contrary** [1] - 37:4
**control** [1] - 73:25

**controlled** [1] - 80:19
**controls** [1] - 106:15
**controversial** [1] - 32:16
**controversy** [1] - 32:18
**convenient** [1] - 143:11
**conventional** [1] - 48:3
**conversations** [4] - 11:13, 79:21, 89:20, 92:17
**convicted** [2] - 66:9, 69:14
**conviction** [2] - 51:24, 53:1
**convictions** [1] - 45:3
**cooked** [1] - 66:16
**copies** [2] - 24:14, 42:2
**copy** [7] - 11:5, 25:1, 107:4, 107:6, 109:12, 126:3, 126:22
**core** [1] - 32:11
**corner** [1] - 70:6
**correct** [286] - 5:20, 5:24, 5:25, 6:2, 6:4, 6:5, 6:6, 6:8, 6:11, 6:12, 6:14, 6:17, 6:23, 7:14, 7:15, 7:19, 7:23, 7:25, 8:14, 8:19, 8:22, 9:1, 9:7, 9:9, 9:14, 9:17, 9:18, 9:22, 9:25, 10:1, 10:4, 10:7, 10:13, 10:15, 10:17, 11:2, 12:4, 12:11, 12:17, 12:22, 13:2, 13:11, 13:13, 13:25, 14:2, 14:3, 14:5, 14:6, 14:7, 14:8, 14:10, 14:16, 15:5, 15:11, 15:12, 15:14, 15:18, 15:23, 16:5, 16:13, 17:3, 17:14, 18:1, 18:2, 18:9, 18:21, 19:9, 19:12, 19:17, 19:18, 20:5, 20:9, 20:11, 20:12, 20:16, 20:20, 20:21, 20:24, 21:1, 22:18, 22:25, 23:16, 23:20, 24:3, 24:9, 24:12, 24:18, 26:1, 26:12, 27:5, 27:11, 27:12, 27:14, 27:15, 27:17, 27:18, 27:20, 27:22, 27:25, 28:13, 28:18, 28:23, 29:4, 29:19, 30:9, 30:10, 30:25, 32:1, 32:7, 32:12, 33:14, 47:2, 50:1, 50:13, 50:16, 50:18, 50:21, 50:22, 51:5, 51:7, 51:15, 51:22, 52:6, 52:15, 52:18, 53:4, 53:8, 53:25, 54:3, 56:14, 56:17, 57:19, 57:21, 58:2, 58:5, 58:19, 58:23, 61:2, 61:8, 61:14, 62:2, 62:8, 62:12, 62:18, 62:21, 62:24, 63:11, 63:15, 63:23, 64:2, 64:18, 65:25, 66:8, 66:13, 66:14, 66:18, 66:25, 67:6, 67:14, 67:18, 67:21, 67:22, 67:24, 68:3, 68:9, 68:24, 69:16, 74:13, 77:13,

77:19, 85:2, 85:5, 88:6,
100:21, 100:24, 100:25,
101:14, 101:21, 102:2,
102:11, 102:16, 102:20,
103:3, 103:6, 103:13,
103:14, 103:16, 104:6,
104:9, 104:10, 104:12,
104:13, 104:16, 104:19,
104:20, 104:24, 104:25,
105:3, 105:6, 105:10,
105:13, 105:19, 105:20,
105:24, 106:2, 106:3,
106:6, 106:12, 106:17,
106:18, 106:20, 108:8,
108:9, 108:23, 108:24,
109:4, 109:5, 109:7, 109:8,
109:11, 110:4, 110:6,
111:4, 111:10, 111:11,
111:14, 111:20, 111:24,
112:7, 112:13, 112:22,
112:25, 113:1, 113:4,
113:5, 113:14, 113:25,
114:4, 114:8, 114:15,
114:18, 114:23, 115:6,
115:7, 115:10, 116:3,
116:6, 116:7, 116:9,
116:12, 116:13, 116:17,
116:18, 116:20, 116:21,
116:24, 117:7, 117:15,
117:25, 118:4, 118:5,
118:18, 118:22, 119:1,
120:23, 124:11, 124:20,
125:2, 125:3, 125:7,
125:21, 125:22, 126:1,
126:6, 126:11, 126:14,
127:23, 129:18, 129:21,
130:6, 132:10, 132:14,
132:19, 134:4, 138:2,
147:4
**correction** [1] - 117:12
**correctly** [2] - 108:17, 127:9
**corruption** [1] - 27:25
**cosponsor** [1] - 6:8
**cost** [7] - 16:7, 96:18, 126:4,
126:5, 127:2, 127:5
**councilperson** [1] - 56:22
**Counsel** [1] - 10:19
**counsel** [5] - 11:6, 54:11,
121:15, 121:21, 126:22
**counted** [2] - 75:12, 125:6
**counties** [12] - 14:25, 15:4,
15:16, 44:13, 44:14, 98:4,
99:8, 118:25, 119:4,
125:20, 128:1, 128:16
**counting** [1] - 34:1
**country** [1] - 18:7
**county** [25] - 13:10, 15:11,
17:5, 17:19, 37:17, 38:6,
38:10, 38:13, 40:9, 40:23,
41:10, 41:11, 43:21, 43:24,

43:25, 62:7, 64:8, 64:12,
98:10, 98:15, 98:19, 98:20,
99:1, 133:25
**County** [31] - 11:17, 13:17,
18:20, 19:16, 28:18, 28:20,
45:23, 48:13, 48:14, 48:22,
50:8, 52:8, 53:16, 57:5,
57:17, 57:20, 58:1, 58:20,
59:14, 59:15, 64:21, 67:16,
69:14, 98:5, 98:8, 98:14,
99:3, 99:9, 99:10, 99:25,
118:25
**couple** [1] - 21:11
**course** [5] - 12:16, 29:21,
32:24, 71:10, 81:20
**COURT** [18] - 1:1, 5:2, 7:5,
7:7, 7:10, 31:2, 34:24,
39:20, 39:22, 41:23, 41:25,
49:16, 49:19, 54:12, 55:16,
94:5, 147:1, 147:10
**court** [26] - 10:15, 34:16,
39:12, 42:1, 42:2, 42:11,
57:13, 64:9, 65:9, 69:14,
70:4, 72:7, 84:5, 92:21,
93:3, 93:22, 93:23, 132:3,
134:21, 135:14, 136:5,
142:2, 144:14, 146:5,
146:10, 146:11
**Court** [5] - 3:9, 3:9, 35:19,
40:18, 45:21
**court's** [2] - 134:25, 135:20
**court-ordered** [1] - 132:3
**courtesy** [1] - 146:12
**courthouse** [1] - 97:13
**Courthouse** [1] - 3:10
**courtroom** [1] - 17:16
**Courtroom** [3] - 34:9, 69:23,
135:7
**covered** [1] - 50:13
**covering** [1] - 95:11
**create** [1] - 78:18
**created** [1] - 79:6
**credit** [2] - 9:1, 9:7
**crime** [5] - 35:25, 62:17,
67:23, 68:1, 68:6
**crimes** [2] - 13:10, 13:11
**criminal** [15] - 35:3, 35:22,
36:1, 42:24, 43:8, 43:9,
43:18, 43:20, 44:2, 48:8,
48:10, 49:6, 57:2, 65:2
**criminally** [1] - 59:18
**criteria** [5] - 138:11, 138:20,
140:10, 140:22, 145:17
**criterion** [1] - 137:14
**CROSS** [6] - 4:2, 5:14, 31:5,
49:22, 100:15, 129:9
**cross** [6] - 33:6, 33:17, 34:1,
117:18, 117:24, 119:4
**CROSS-EXAMINATION** [5] -
5:14, 31:5, 49:22, 100:15,

129:9
**cross-examination** [2] -
33:6, 33:17
**cross-examinations** [1] -
34:1
**crossways** [1] - 74:20
**Crowder** [8] - 53:12, 53:15,
53:17, 54:21, 55:11, 64:19,
67:6
**CRR** [1] - 3:9
**cured** [1] - 19:10
**current** [3] - 29:20, 65:6,
98:21
**custom** [1] - 73:16
**cut** [1] - 78:4
**CV** [1] - 135:21

**D**

**D.C** [3] - 1:5, 3:10, 144:8
**DA** [1] - 40:13
**DA's** [4] - 36:1, 38:10, 61:11,
64:17
**Dallas** [8] - 52:8, 57:17,
57:20, 58:1, 58:16, 59:13,
60:23
**Danburg** [3] - 70:18, 70:22,
70:25
**Daniel** [1] - 5:10
**DANIEL** [1] - 2:4
**data** [14] - 40:7, 130:19,
130:22, 131:22, 136:8,
136:11, 136:13, 136:15,
136:24, 137:1, 137:2,
137:7, 140:12, 141:11
**database** [15] - 29:2, 29:3,
121:5, 121:10, 137:9,
139:7, 139:8, 139:24,
140:1, 141:20, 142:4,
143:2, 144:16, 144:19,
145:14
**databases** [3] - 117:19,
135:23, 138:12
**DATE** [1] - 147:10
**date** [10] - 40:11, 41:14,
61:15, 112:19, 137:11,
137:21, 140:25, 141:1,
141:5, 141:7
**dates** [1] - 125:13
**DAVID** [1] - 1:12
**Davio** [1] - 118:3
**Davis** [1] - 125:9
**DAY** [1] - 1:11
**day's** [1] - 101:19
**daylight** [1] - 68:7
**days** [11] - 21:11, 61:12,
76:3, 76:4, 85:12, 85:13,
85:16, 85:20, 141:22,
142:14

**DC** [1] - 2:9
**DE** [1] - 54:15
**dead** [4] - 17:14, 20:7,
141:23, 145:9
**deal** [2] - 47:24, 84:13
**dealing** [1] - 66:10
**deals** [3] - 47:22, 50:23, 51:2
**Dean** [3] - 75:12, 105:15,
105:21
**death** [2] - 84:3
**debate** [27] - 6:13, 6:17, 7:18,
14:15, 27:11, 77:18, 78:7,
79:11, 79:12, 79:14, 80:7,
80:8, 80:13, 80:23, 80:25,
81:11, 81:16, 81:20, 82:2,
82:20, 84:12, 106:21,
106:24, 127:8, 128:10,
128:11, 128:13
**debated** [5] - 76:19, 77:19,
77:20, 79:24, 86:25
**debating** [1] - 82:19
**Deborah** [1] - 70:18
**Debra** [3] - 56:16, 56:18,
60:22
**deceased** [11] - 18:21, 53:18,
53:19, 66:24, 144:19,
144:25, 145:1, 145:3,
145:5, 145:7
**DECHERT** [1] - 2:11
**decide** [2] - 74:18, 92:13
**deck** [1] - 23:10
**declare** [1] - 137:12
**declared** [2] - 66:20, 136:2
**decrease** [1] - 132:5
**decreased** [1] - 130:8
**decreases** [1] - 133:1
**default** [1] - 72:16
**defend** [2] - 123:4, 123:5
**defendant** [6] - 5:11, 41:11,
46:11, 46:12, 56:18, 129:7
**Defendant** [3] - 1:8, 2:3, 25:3
**defendants** [1] - 65:16
**Defendants** [2] - 1:10, 2:11
**defended** [1] - 123:9
**Defense** [4] - 107:2, 109:17,
110:20, 112:15
**DEFENSE** [1] - 3:1
**deference** [1] - 77:7
**defined** [3] - 60:13, 72:9,
114:10
**definition** [1] - 68:6
**degree** [3] - 17:9, 49:8
**Del** [2] - 98:15, 99:3
**delay** [1] - 84:16
**deliver** [2] - 6:13, 61:12
**delivered** [1] - 7:13
**Delores** [5] - 52:1, 52:3,
52:6, 52:10, 52:16
**Democrat** [1] - 70:19

**Democratic** [1] - 99:24
**Democrats** [4] - 32:20, 78:3, 78:9, 80:19
**demographics** [1] - 132:10
**department** [1] - 46:8
**Department** [13] - 62:11, 88:3, 88:8, 88:9, 88:11, 89:20, 90:13, 98:7, 119:14, 133:24, 135:17, 136:11
**DEPARTMENT** [1] - 2:6
**deposed** [1] - 118:8
**deposit** [1] - 8:16
**deposition** [33] - 10:10, 11:1, 11:5, 15:6, 16:8, 24:16, 51:5, 53:25, 54:3, 54:5, 55:7, 56:12, 59:5, 63:16, 79:22, 118:9, 121:14, 121:24, 122:3, 122:6, 122:24, 123:4, 123:6, 123:10, 125:3, 126:11, 126:13, 126:21, 129:14, 131:2, 132:8, 132:12, 134:24
**depositions** [1] - 95:15
**deputy** [4] - 56:23, 59:15, 60:8, 60:10
**describe** [1] - 142:2
**described** [3] - 19:19, 45:5, 69:10
**describing** [2] - 17:22, 19:22
**deserved** [1] - 81:10
**designate** [2] - 32:23, 85:6
**designated** [2] - 32:25, 85:18
**designating** [1] - 85:9
**detail** [3] - 19:15, 37:12, 139:21
**detect** [11] - 29:15, 47:4, 47:5, 47:13, 47:21, 62:15, 62:21, 63:14, 67:23, 68:1, 69:7
**detected** [8] - 29:23, 30:2, 30:5, 30:8, 63:17, 63:21, 63:24, 64:1
**detecting** [2] - 100:2, 100:7
**determine** [8] - 20:6, 23:25, 29:11, 74:15, 98:1, 129:17, 130:19, 140:9
**determined** [2] - 15:6, 59:16
**deterrent** [3] - 50:17, 52:19, 65:7
**deterring** [2] - 100:2, 100:7
**device** [1] - 81:24
**Dewhurst** [1] - 77:14
**die** [1] - 16:22
**died** [7] - 71:19, 84:3, 84:21, 85:1, 85:3, 99:23, 100:1
**difference** [1] - 82:18
**different** [16] - 18:5, 21:7, 22:5, 22:6, 29:7, 36:21, 44:12, 57:23, 67:3, 93:18,

107:13, 137:2, 138:17, 139:2, 139:18, 145:20
**difficult** [10] - 21:18, 47:3, 47:5, 47:12, 47:20, 62:15, 67:23, 68:1, 69:7, 128:21
**digit** [2] - 141:2, 141:4
**digits** [1] - 137:7
**dilatory** [2] - 84:6, 84:16
**DIRECT** [4] - 4:2, 34:12, 70:1, 135:12
**direct** [27] - 7:17, 31:8, 50:2, 56:3, 62:6, 62:11, 62:14, 81:12, 89:7, 102:14, 103:15, 103:18, 104:8, 104:21, 105:15, 106:13, 110:8, 111:12, 114:10, 116:20, 117:6, 119:1, 119:2, 124:20, 125:23, 129:16, 134:22
**directed** [1] - 24:16
**direction** [1] - 117:23
**directly** [1] - 82:25
**director** [1] - 117:18
**disagree** [3] - 33:3, 33:9, 112:6
**disagreed** [2] - 112:5, 112:6
**disagreement** [1] - 112:1
**disappointed** [1] - 103:22
**discovered** [2] - 46:5, 46:18
**discriminatory** [2] - 30:13, 30:19
**discuss** [4] - 14:24, 79:13, 117:4, 145:12
**discussed** [5] - 27:1, 51:7, 56:7, 91:20, 134:23
**discussing** [2] - 18:25, 56:15
**discussion** [2] - 11:16, 75:16
**disenfranchising** [1] - 116:2
**disfranchised** [1] - 133:17
**disparate** [1] - 133:9
**disposition** [2] - 41:16, 42:21
**disproportional** [1] - 118:21
**disrespect** [1] - 93:10
**distance** [1] - 93:13
**distances** [1] - 97:12
**distinguishable** [1] - 139:2
**distribute** [1] - 90:1
**district** [31] - 13:18, 14:25, 15:2, 15:4, 15:16, 15:20, 16:2, 16:10, 17:6, 18:1, 37:17, 38:6, 38:14, 40:23, 43:21, 43:25, 48:22, 51:18, 57:11, 62:7, 64:8, 64:12, 99:7, 99:10, 130:1, 130:10, 131:6, 131:17, 131:21, 132:10
**District** [7] - 45:23, 64:21, 70:6, 130:1, 130:11, 130:22, 132:4

**DISTRICT** [3] - 1:1, 1:2, 1:14
**divided** [1] - 38:25
**Division** [1] - 2:7
**division** [5] - 34:18, 35:12, 44:2, 88:10, 88:18
**DOB** [2] - 138:5, 138:6
**Docket** [1] - 1:3
**document** [14] - 21:9, 40:25, 41:9, 41:10, 41:17, 42:7, 42:9, 42:11, 54:17, 54:20, 67:1, 127:21, 130:13, 131:25
**documentation** [1] - 39:18
**documents** [5] - 26:14, 63:19, 93:20, 126:25, 127:3
**done** [12] - 26:23, 55:13, 80:13, 84:9, 89:5, 95:21, 102:10, 125:1, 135:1, 135:5, 141:8
**doubt** [1] - 62:18
**down** [6] - 45:23, 66:19, 67:6, 99:4, 108:20, 114:24
**DPS** [32] - 16:17, 17:1, 63:22, 88:24, 89:8, 89:11, 90:16, 90:21, 92:16, 92:17, 92:18, 93:8, 93:17, 93:18, 94:14, 94:17, 95:4, 95:6, 97:4, 118:3, 119:3, 119:6, 119:10, 119:17, 119:19, 120:1, 121:5, 121:10, 121:25, 137:1, 137:2, 137:9
**DPS's** [2] - 88:13, 88:16
**Dr** [7] - 136:17, 138:10, 138:21, 139:14, 140:6, 140:10, 141:10
**drafted** [2] - 50:23, 51:1
**drafting** [1] - 123:18
**drawerfuls** [1] - 22:9
**drew** [1] - 29:12
**drilled** [1] - 126:18
**driven** [1] - 37:24
**driver's** [53] - 15:5, 15:16, 15:17, 15:22, 16:4, 23:24, 27:16, 27:19, 60:9, 60:21, 60:23, 67:2, 88:10, 88:13, 88:16, 88:18, 96:3, 96:24, 98:8, 98:17, 98:25, 117:19, 124:12, 125:21, 136:12, 138:18, 138:20, 138:23, 139:1, 139:3, 141:11, 141:13, 141:20, 141:23, 141:24, 142:1, 142:4, 142:6, 142:25, 143:7, 143:18, 144:16, 144:19, 144:23, 144:24, 145:1, 145:3, 145:6, 145:14, 145:15, 145:19, 145:24, 146:1

**driving** [1] - 97:12
**duly** [4] - 5:12, 34:10, 69:24, 135:10
**DUNN** [2] - 2:18, 2:18
**duplicate** [5] - 23:18, 139:6, 139:10, 141:25, 145:13
**during** [53] - 6:13, 7:17, 15:22, 16:4, 17:24, 20:1, 21:10, 31:7, 32:16, 47:11, 49:25, 50:2, 51:18, 53:24, 54:3, 54:5, 55:11, 55:18, 56:3, 56:12, 56:20, 59:5, 62:14, 63:2, 75:18, 76:3, 77:7, 79:13, 80:8, 80:12, 80:23, 80:25, 81:16, 81:20, 85:11, 87:23, 105:11, 106:19, 106:25, 111:8, 112:1, 114:9, 115:25, 116:22, 118:1, 118:20, 126:13, 127:8, 129:14, 129:16, 131:2, 132:8, 132:12

# E

**East** [1] - 3:2
**easy** [1] - 143:21
**economy** [1] - 25:14
**EDUCATIONAL** [1] - 3:2
**effect** [6] - 50:17, 52:19, 65:4, 85:9, 118:23, 144:20
**effects** [1] - 142:2
**effort** [1] - 131:5
**efforts** [3] - 49:13, 108:19, 108:22
**EIC** [1] - 127:21
**eight** [1] - 11:10
**either** [5] - 6:10, 37:9, 40:22, 98:24, 138:23
**elected** [3] - 70:7, 70:9, 70:10
**Election** [14] - 36:23, 41:2, 41:15, 42:9, 44:23, 60:2, 61:2, 61:7, 61:10, 61:13, 61:21, 62:5, 64:13, 64:17
**election** [72] - 20:2, 20:12, 20:14, 20:22, 21:23, 22:4, 22:20, 28:7, 28:25, 31:8, 35:25, 36:13, 36:16, 36:17, 36:19, 37:1, 37:3, 37:9, 37:10, 37:13, 37:25, 38:4, 38:18, 38:20, 38:21, 39:1, 40:4, 40:10, 41:12, 43:13, 43:16, 44:4, 44:7, 44:20, 44:21, 45:23, 46:6, 46:14, 47:25, 48:23, 51:18, 51:20, 52:6, 52:7, 52:9, 53:20, 56:16, 56:19, 56:20, 57:5, 57:17, 57:19, 58:1, 58:20,

establish [1] - 133:12
established [1] - 133:8
et [1] - 1:9
ethnic [2] - 78:4, 116:11
evaluate [1] - 42:24
evening [1] - 146:23
event [1] - 11:17
events [2] - 32:24, 123:23
eventually [3] - 19:4, 28:14, 28:16
evidence [6] - 14:10, 18:16, 43:19, 64:4, 64:6, 82:25
EVIDENCE [1] - 4:16
evolved [1] - 73:18
exact [4] - 18:3, 138:4, 138:5
exactly [6] - 86:2, 117:11, 128:21, 131:7, 144:12
examination [4] - 7:17, 33:6, 33:17, 129:16
EXAMINATION [9] - 5:14, 31:5, 34:12, 49:22, 69:4, 70:1, 100:15, 129:9, 135:12
examinations [1] - 34:1
examine [1] - 39:8
example [7] - 32:10, 32:13, 37:2, 43:6, 64:19, 68:18, 138:14
examples [2] - 7:12, 82:1
Excel [1] - 38:25
except [3] - 92:24, 122:13, 137:13
exception [3] - 67:15, 85:17, 92:24
exceptions [1] - 87:13
excised [1] - 144:18
excuse [3] - 34:21, 80:21, 93:9
excused [3] - 33:19, 69:19, 103:2
Exhibit [11] - 25:4, 40:18, 42:14, 54:13, 54:14, 55:23, 107:2, 109:17, 110:20, 112:16, 135:22
exhibit [4] - 41:20, 42:12, 107:18, 113:13
EXHIBITS [1] - 4:16
exist [1] - 30:9
exists [3] - 8:25, 30:5, 139:4
expect [1] - 20:13
experience [3] - 47:3, 47:16, 143:21
expert [5] - 135:22, 135:25, 136:2, 143:17, 143:20
expired [10] - 43:7, 141:22, 142:14, 142:17, 142:21, 143:9, 143:10, 143:13, 144:15
expires [1] - 96:22
explain [5] - 72:7, 80:7, 84:5,

elections [17] - 31:9, 36:8, 36:11, 36:15, 36:19, 37:18, 38:7, 38:9, 40:13, 43:1, 46:8, 52:8, 53:16, 56:19, 59:16, 100:8, 117:18
electoral [2] - 32:5, 59:16
elements [1] - 53:9
elicit [2] - 80:1
eligibility [1] - 68:17
eligible [6] - 12:14, 37:10, 60:9, 60:12, 142:22, 143:4
eliminate [1] - 143:7
elimination [3] - 141:22, 141:23, 141:25
eliminations [1] - 142:3
ELIZABETH [1] - 2:3
emergency [4] - 32:22, 85:7, 85:9, 85:18
Emiliano [1] - 16:21
employee [3] - 9:13, 9:15, 9:17
employees [4] - 89:2, 89:23, 93:21, 95:8
enacting [1] - 99:13
enactment [5] - 123:1, 123:2, 123:23, 123:25, 124:3
end [7] - 7:18, 27:11, 76:5, 77:17, 125:18, 143:2, 145:8
endorsement [1] - 26:9
ends [1] - 146:3
enforcement [7] - 34:18, 36:4, 37:19, 40:13, 49:11, 64:12, 64:14
enhances [3] - 49:5, 49:7, 51:3
enjoy [1] - 33:22
enjoyed [1] - 33:20
enroll [1] - 126:8
ensured [1] - 102:14
enter [2] - 42:22, 95:15
entire [3] - 114:21, 121:5, 121:10
entitled [1] - 147:5
entries [11] - 29:3, 43:24, 138:23, 139:3, 139:6, 139:10, 139:23, 140:1, 144:15, 144:19, 145:13
equal [1] - 83:3
equally [2] - 96:15, 133:14
erased [1] - 24:17
ERIC [2] - 1:5, 1:9
Eric [2] - 5:11, 49:21
essentially [3] - 71:4, 71:5, 78:18

60:10, 60:12, 61:16, 62:23, 63:2, 64:6, 64:9, 64:15, 66:15, 68:14, 68:17, 96:4, 96:19, 125:23, 126:5, 127:1, 133:15

90:16, 136:5
explained [2] - 15:15, 17:4
explanation [3] - 80:11, 80:25, 81:3
explicitly [1] - 87:18
expressed [6] - 12:25, 30:20, 101:1, 101:3, 101:5, 101:10, 103:9, 116:1
extended [2] - 117:6, 121:25
extensive [1] - 79:15
extent [8] - 8:25, 30:4, 89:10, 91:6, 119:23, 120:5, 120:16, 123:23
extras [1] - 23:11
Ezra [1] - 65:16
EZRA [1] - 2:11

F

face [1] - 92:1
facing [1] - 116:14
fact [26] - 6:10, 22:17, 24:19, 27:13, 32:4, 36:10, 61:10, 61:20, 63:20, 64:5, 64:10, 68:5, 68:10, 68:21, 68:22, 69:10, 82:7, 91:16, 91:17, 91:22, 92:16, 116:23, 129:20, 130:1, 130:8, 131:2
facts [7] - 45:21, 52:12, 57:7, 57:8, 57:9, 91:15, 95:14
fail [2] - 32:18
failed [4] - 72:5, 77:11, 100:23, 104:11
fall [1] - 120:18
false [1] - 63:19
familiar [3] - 48:18, 48:24, 87:3
fancy [1] - 5:5
far [6] - 15:13, 17:6, 55:7, 59:21, 94:3, 146:16
fast [1] - 33:1
father [1] - 53:18
father's [5] - 53:19, 53:21, 54:8, 55:4, 55:19
favor [2] - 6:17, 121:6
favorable [2] - 114:17, 115:9
February [1] - 112:21, 112:25, 113:5
federal [4] - 33:12, 38:7, 44:3, 44:5
federally [1] - 31:21
feet [1] - 16:22
felony [3] - 49:7, 49:8, 49:9
felt [4] - 21:6, 22:4, 81:6, 81:9
few [5] - 5:18, 56:11, 86:2, 87:13, 128:17
fifths [1] - 85:15

figure [1] - 16:9
file [2] - 138:19, 138:20, 138:24, 139:1, 139:3, 141:13, 141:24, 142:1, 142:10, 142:25, 143:7, 144:24, 145:1, 145:2, 145:4, 145:6, 145:16, 145:19, 145:24, 146:1
filed [2] - 41:14, 125:17
files [2] - 142:10, 144:23
final [3] - 37:3, 57:16, 99:12
finally [4] - 22:20, 41:16, 53:11, 145:12
financial [1] - 128:16
findings [5] - 20:20, 91:15, 91:16, 91:17, 91:22
fine [1] - 43:10
finish [4] - 55:16, 120:14, 120:15, 135:5
finished [1] - 55:14
first [49] - 8:10, 25:12, 26:8, 35:10, 35:11, 36:25, 37:11, 37:15, 39:1, 39:7, 54:5, 70:7, 70:16, 70:17, 74:21, 75:18, 76:3, 76:17, 85:12, 85:13, 85:16, 86:22, 101:18, 102:5, 102:9, 102:21, 102:24, 103:1, 105:18, 107:4, 107:6, 109:19, 110:23, 113:7, 113:9, 123:16, 131:18, 137:6, 137:10, 137:11, 138:4, 138:5, 138:8, 140:25, 141:1, 141:3, 141:7, 143:19
Fisher [3] - 4:8, 100:13, 100:18
FISHER [40] - 2:6, 90:19, 94:2, 94:6, 95:10, 97:19, 100:13, 100:16, 107:2, 107:3, 107:17, 107:21, 108:5, 108:6, 108:20, 108:21, 109:17, 109:18, 110:16, 110:18, 110:23, 110:25, 112:15, 112:17, 113:8, 114:24, 115:1, 119:23, 120:25, 121:3, 121:13, 121:19, 122:2, 122:8, 124:16, 124:24, 126:18, 126:20, 127:11, 127:14
fisher [2] - 94:6, 94:8
five [9] - 6:10, 6:22, 45:13, 50:2, 50:3, 50:5, 52:5, 66:5, 66:13
flight [1] - 9:11
floor [14] - 72:11, 73:7, 74:1, 75:13, 77:10, 77:18, 77:20, 78:7, 81:9, 81:14, 82:2, 82:19, 82:21, 85:16

**Floor** [31] - 1:19, 2:23, 7:22, 8:12, 12:25, 13:23, 14:10, 18:25, 19:17, 19:22, 20:18, 20:22, 100:24, 101:12, 102:15, 102:18, 103:1, 103:17, 104:2, 104:12, 104:23, 105:3, 105:5, 106:1, 106:5, 106:15, 106:21, 106:24, 107:14, 115:6, 128:10

**flow** [2] - 74:1, 106:15

**fly** [1] - 9:9

**FM** [1] - 2:19

**focus** - 36:20, 136:19

**folks** [3] - 88:19, 89:2, 101:20

**follow** [2] - 89:21, 115:4

**follow-up** [1] - 89:21

**following** [4] - 11:9, 11:11, 64:6, 103:24

**follows** [4] - 5:13, 34:11, 69:25, 135:11

**FOR** [1] - 1:2

**foregoing** [1] - 147:3

**forgive** [1] - 90:9

**form** [1] - 71:1

**formal** [1] - 82:19

**formed** [2] - 36:2, 36:3

**forms** [3] - 96:6, 96:9, 126:1

**FORREST** [2] - 4:5, 34:10

**Forrest** [2] - 34:8, 34:17

**forth** [2] - 91:16, 105:11

**forward** [1] - 97:9

**foundation** [3] - 39:14, 47:17, 97:20

**FOUNDATION** [1] - 3:5

**foundational** [1] - 97:23

**four** [16] - 14:1, 15:4, 18:8, 24:6, 36:24, 49:9, 51:2, 51:4, 56:11, 66:10, 66:15, 85:15, 92:9, 140:22, 141:2, 141:4

**four-digit** [2] - 141:2, 141:4

**four-fifths** [1] - 85:15

**fourth** [1] - 141:4

**frame** [1] - 93:14

**FRANK** [1] - 2:22

**Frasier** [1] - 75:4

**fraud** [43] - 5:20, 5:23, 5:24, 9:22, 9:25, 11:24, 13:8, 14:11, 14:12, 14:13, 20:6, 20:14, 20:23, 21:3, 22:15, 22:18, 28:18, 29:10, 29:13, 29:14, 29:18, 29:23, 30:1, 30:4, 30:7, 32:5, 32:8, 32:9, 45:6, 47:12, 51:10, 57:21, 57:24, 69:6, 78:19, 99:15, 99:18, 100:2, 100:7, 110:9, 110:10, 111:6

**Frederick** [4] - 4:8, 69:21,
123:10, 123:22

**FREDERICK** [37] - 1:17, 69:21, 70:2, 79:23, 80:4, 80:6, 90:7, 90:12, 90:23, 91:5, 91:12, 91:19, 91:24, 92:6, 92:14, 93:1, 93:16, 94:24, 95:2, 95:19, 95:22, 95:25, 97:23, 97:25, 99:6, 100:6, 100:11, 120:4, 120:12, 120:16, 120:23, 121:2, 121:4, 121:9, 122:23, 123:5, 134:10

**free** [7] - 96:4, 96:6, 96:17, 96:20, 127:1, 127:21, 133:15

**freeman** [1] - 5:9

**FREEMAN** [26] - 2:4, 5:10, 5:15, 7:1, 7:6, 7:9, 7:11, 10:24, 10:25, 11:4, 11:8, 21:12, 21:15, 21:20, 21:22, 22:1, 22:3, 23:3, 23:5, 24:23, 24:25, 25:3, 25:5, 25:8, 25:10, 31:1

**Freeman** [2] - 4:4, 5:10

**frequent** [1] - 83:8

**frequently** [4] - 40:15, 48:2, 73:14, 87:23

**freshman** [1] - 7:13

**FRIED** [1] - 2:22

**friends** [1] - 41:23

**front** [10] - 10:15, 26:15, 68:7, 68:8, 68:10, 93:10, 94:10, 128:20, 130:25, 131:23

**full** [9] - 11:2, 123:17, 135:17, 137:6, 137:11, 140:1, 140:3, 140:23, 140:24

**function** [2] - 73:23, 106:14

**functioning** [1] - 15:5

**FUND** [1] - 3:2

**funding** [2] - 24:2, 88:15

**furthermore** [1] - 140:12

**future** [2] - 19:11, 24:4

**G**

**GA** [1] - 3:7

**gain** [1] - 104:11

**gained** [4] - 92:15, 93:6, 93:7, 93:13

**gathered** [1] - 93:21

**GEAR** [17] - 2:5, 47:14, 49:15, 49:20, 49:23, 54:10, 54:13, 54:15, 54:16, 54:23, 55:1, 55:21, 59:20, 60:18, 64:24, 65:1, 65:12

**Gear** [3] - 4:6, 49:20, 65:13

**General** [24] - 1:6, 5:11, 35:7,
35:16, 37:14, 37:22, 38:1, 38:11, 41:3, 42:10, 43:21, 44:11, 56:9, 60:25, 61:3, 61:6, 61:20, 62:6, 62:8, 62:10, 63:21, 64:5, 64:11, 100:14

**general** [10] - 9:16, 18:9, 30:6, 30:12, 30:14, 30:18, 30:23, 44:20, 45:21, 53:16

**GENERAL** [1] - 1:18

**General's** [14] - 34:18, 34:20, 35:1, 37:19, 38:3, 40:22, 48:11, 59:21, 60:1, 64:7

**generally** [7] - 41:8, 48:25, 62:24, 86:22, 132:13, 134:22

**GERALD** [2] - 2:14, 2:15

**given** [2] - 47:16, 63:11

**goal** [1] - 88:25

**govern** [1] - 82:20

**government** [3] - 25:18, 38:8, 39:17

**government's** [3] - 16:16, 16:25, 17:2

**governments** [1] - 133:25

**governor** [12] - 32:23, 75:4, 75:17, 77:6, 79:3, 85:6, 85:18, 87:24, 88:1, 115:17, 125:14, 125:19

**Governor** [5] - 77:14, 80:20, 108:13, 111:14, 111:22

**grandfather** [1] - 99:23

**Great** [1] - 39:22

**great** [4] - 24:21, 47:24, 90:9, 90:21

**greater** [1] - 139:21

**ground** [1] - 95:11

**grounds** [1] - 121:22

**group** [1] - 64:1

**guess** [3] - 91:25, 100:5, 133:7

**guy** [2] - 21:7, 22:5

**H**

**half** [3] - 5:4, 140:1

**hand** [3] - 54:10, 110:20, 138:25

**handed** [1] - 126:22

**handle** [1] - 43:17

**handled** [1] - 103:23

**happy** [3] - 7:10, 90:7, 146:9

**hard** [4] - 15:24, 29:14, 74:20, 143:17

**HARRIS** [2] - 2:21, 2:22

**Harris** [2] - 53:16, 64:21

**Harrison** [1] - 99:25

**harvesters** [1] - 28:3

**hay** [1] - 32:20

**HB218** [13] - 100:21, 100:23, 101:2, 101:10, 101:12, 102:8, 102:13, 102:18, 102:23, 103:8, 103:11, 103:23, 104:11

**head** [2] - 26:5, 109:13

**Health** [2] - 133:23, 133:24

**hear** [4] - 12:6, 12:10, 60:25, 114:21

**heard** [5] - 17:15, 17:16, 22:11, 97:5, 99:18

**hearing** [28] - 21:11, 79:2, 81:11, 83:1, 83:21, 86:1, 86:5, 106:16, 106:19, 106:21, 106:25, 107:5, 107:9, 107:10, 107:12, 107:13, 111:8, 112:1, 114:9, 114:21, 115:25, 116:10, 117:2, 117:4, 117:5, 117:6, 117:13, 118:2

**hearings** [3] - 9:24, 27:8, 111:24

**hearsay** [14] - 22:18, 90:3, 90:5, 90:19, 91:10, 92:1, 92:13, 92:18, 92:24, 93:2, 93:5, 93:15, 93:16, 94:4, 94:14

**heart** [1] - 30:17

**HEBERT** [3] - 2:14, 2:15, 136:1

**held** [3] - 61:16, 70:9, 102:9

**help** [8] - 19:4, 35:13, 90:11, 109:14, 130:13, 137:15, 140:11, 140:14

**helpful** [2] - 49:12, 132:1

**HERMAN** [1] - 1:23

**heroes** [1] - 16:21

**herself** [5] - 66:1, 66:7, 66:16, 66:21, 66:23

**Hidalgo** [4] - 45:23, 57:5, 58:20, 59:14

**high** [2] - 46:23, 125:14

**highlighted** [2] - 107:19, 108:4

**Hildago** [1] - 48:14

**himself** [1] - 46:4

**hired** [2] - 89:1, 89:23

**hiring** [1] - 95:8

**Hispanic** [12] - 6:22, 6:24, 7:2, 15:2, 16:20, 32:21, 103:3, 103:5, 130:2, 130:3, 131:9, 131:13

**Hispanics** [2] - 30:21, 78:5

**history** [1] - 70:14

**hobby** [1] - 80:21

**Hobby** [3] - 80:22, 111:14, 111:22

**hold** [4] - 34:23, 94:9, 123:8, 123:13

**holder** [1] - 5:11

**Holder** [1] - 49:21
**HOLDER** [1] - 1:5
**Homeland** [1] - 88:5
**honest** [1] - 21:8
**honestly** [1] - 7:21
**Honor** [72] - 7:1, 10:24, 11:6,
21:14, 21:20, 24:23, 34:6,
39:13, 41:5, 41:24, 42:1,
42:8, 55:14, 58:10, 58:14,
58:19, 58:23, 59:7, 59:13,
60:16, 65:8, 69:3, 79:20,
79:23, 80:4, 90:19, 91:6,
91:13, 92:6, 92:14, 93:1,
93:16, 94:2, 94:6, 94:24,
95:10, 95:22, 97:19,
100:13, 120:4, 120:13,
120:23, 120:25, 121:2,
121:3, 121:9, 121:13,
121:20, 122:2, 122:8,
122:23, 123:6, 123:9,
123:16, 124:23, 127:11,
127:14, 127:18, 129:5,
134:11, 134:15, 135:3,
135:8, 135:21, 137:19,
137:22, 140:18, 142:16,
144:12, 146:4, 146:8,
146:18
**HONORABLE** [3] - 1:12,
1:13, 1:13
**hoping** [1] - 5:18
**horse** [1] - 15:13
**host** [1] - 63:10
**hour** [4] - 86:5, 101:18,
102:5, 106:16
**hours** [7] - 34:3, 79:12,
83:20, 86:2, 117:7, 117:10,
117:11
**House** [41] - 6:4, 6:10, 6:13,
6:19, 6:20, 7:18, 7:22,
8:12, 9:21, 13:1, 13:23,
14:10, 14:17, 19:23, 20:18,
20:22, 27:11, 70:10, 70:11,
70:18, 70:20, 71:1, 71:7,
71:12, 71:14, 71:22, 71:25,
72:2, 73:2, 74:3, 74:4,
74:8, 74:14, 83:25, 84:2,
84:7, 84:10, 84:21, 84:25,
85:4, 118:14
**Houston** [3] - 2:20, 53:16,
70:19
**Hubbard** [1] - 1:24
**hubbub** [1] - 75:15
**Hughes** [1] - 137:18
**HUGHES** [2] - 1:22, 41:24
**human** [1] - 35:24
**Human** [1] - 133:23
**hundred** [1] - 125:18
**hypothetical** [1] - 15:24

**I**

**I-35** [1] - 97:11
**ID** [81] - 8:13, 8:17, 8:22, 9:5,
9:7, 9:8, 9:11, 9:13, 9:15,
9:17, 16:17, 17:1, 19:2,
22:21, 23:19, 24:8, 24:11,
24:15, 26:1, 26:4, 26:15,
27:1, 31:11, 31:17, 31:20,
32:4, 48:24, 51:11, 67:10,
70:14, 70:16, 70:19, 70:24,
71:7, 71:12, 71:22, 74:22,
77:17, 77:21, 78:14, 78:19,
80:24, 81:17, 81:21, 84:25,
85:3, 85:6, 85:21, 86:9,
96:1, 96:2, 96:3, 96:9,
96:17, 96:21, 96:22, 97:17,
98:3, 98:8, 98:17, 98:21,
98:24, 104:15, 104:19,
114:10, 122:10, 122:20,
124:12, 136:13, 136:22,
137:4, 142:6, 142:10,
142:14, 142:23, 143:3,
143:15, 144:16
**idea** [4] - 17:19, 30:20,
79:18, 80:8
**identical** [2] - 137:11, 138:19
**identification** [26] - 5:20,
5:24, 10:3, 15:25, 19:6,
31:21, 49:12, 52:13, 96:5,
96:6, 96:19, 96:20, 100:20,
104:6, 109:4, 109:10,
110:5, 110:11, 111:3,
114:2, 115:14, 116:17,
125:24, 126:5, 127:1,
133:16
**identified** [7] - 50:2, 50:7,
50:8, 50:9, 52:4, 59:5,
139:14
**identify** [9] - 20:9, 21:24,
40:3, 48:2, 52:2, 56:10,
57:17, 66:21, 137:3
**identifying** [1] - 53:14
**identities** [2] - 66:24, 67:3
**identity** [3] - 37:8, 46:15,
68:18
**IDs** [3] - 66:21, 66:25, 98:12
**III** [1] - 53:12
**IL** [2] - 1:25, 3:3
**ill** [2] - 103:1, 103:2
**illegal** [18] - 36:18, 36:20,
36:21, 36:24, 37:3, 44:22,
45:5, 49:4, 49:8, 49:9,
51:2, 57:24, 58:3, 58:13,
60:13, 66:4, 69:13, 69:14
**illegally** [1] - 12:21
**illustrate** [2] - 142:19, 144:22
**illustration** [1] - 143:9
**immediate** [1] - 140:21

**immigrant** [2] - 33:1, 33:9
**impact** [6] - 101:2, 101:10,
118:21, 129:17, 130:19,
133:9
**impasse** [2] - 81:21, 81:25
**impersonate** [4] - 66:2, 66:7,
66:12, 66:22
**impersonated** [2] - 46:16,
47:9
**impersonating** [3] - 11:14,
11:22, 67:9
**impersonation** [49] - 10:7,
12:2, 12:14, 12:7, 13:15,
14:4, 28:23, 30:1, 37:2,
37:7, 37:8, 45:8, 45:10,
45:12, 45:14, 45:19, 46:16,
47:1, 47:4, 47:13, 47:20,
47:21, 47:25, 48:6, 48:12,
49:3, 49:5, 50:3, 50:4,
50:6, 50:11, 50:24, 52:3,
53:6, 53:13, 59:23, 62:14,
62:17, 62:21, 63:14, 63:20,
63:25, 65:7, 65:22, 68:5,
68:8, 69:8, 69:13, 69:15
**implement** [1] - 81:1
**important** [10] - 7:21, 19:15,
54:2, 106:11, 108:11,
118:11, 132:9, 139:25,
142:5, 142:15
**impose** [1] - 129:2
**impound** [3] - 13:19, 64:6,
64:9
**impression** [1] - 124:10
**impressions** [3] - 122:15,
123:2, 123:24
**improve** [3] - 88:25, 95:4,
95:7
**improvements** [1] - 90:14
**in-person** [35] - 13:14, 13:20,
14:4, 20:6, 20:23, 21:2,
22:14, 22:18, 28:10, 28:22,
29:10, 29:14, 29:17, 29:22,
30:1, 30:4, 30:7, 45:6,
45:12, 45:14, 45:19, 47:4,
47:13, 47:20, 50:5, 62:21,
63:14, 63:25, 65:7, 68:5,
68:8, 69:8, 99:15, 99:18
**INC** [2] - 3:2, 3:5
**incarcerated** [3] - 46:1, 46:3,
46:24
**incidences** [1] - 13:24
**incident** [6] - 13:22, 14:1,
19:1, 19:16, 19:25, 20:10
**include** [6] - 35:23, 45:15,
58:17, 58:25, 61:15,
137:21
**included** [2] - 54:7, 136:13
**including** [3] - 64:15, 66:24,
121:18
**incompetent** [2] - 53:3,

66:21
**incorporated** [1] - 86:4
**incorrect** [2] - 55:6, 55:7
**increase** [3] - 49:2, 131:14,
131:21
**increased** [2] - 130:3, 130:6,
131:11
**indeed** [3] - 131:18, 132:21,
133:8
**Independent** [1] - 45:22
**indicate** [5] - 56:12, 98:21,
100:3, 140:13, 143:3
**indicated** [2] - 62:14, 77:25
**indicted** [1] - 42:15
**indictment** [5] - 41:14, 54:6,
54:7, 54:20, 55:8
**individual** [5] - 17:11, 29:25,
66:11, 84:15, 145:19
**individuals** [4] - 14:1, 19:5,
63:10, 63:13
**ineligible** [8] - 20:1, 20:7,
20:10, 20:11, 20:17, 20:19,
36:25, 144:3
**informal** [1] - 82:22
**information** [20] - 14:9, 44:5,
54:6, 55:25, 90:20, 91:16,
92:17, 118:11, 119:3,
119:5, 119:6, 119:10,
119:16, 119:21, 119:23,
119:25, 121:13, 134:19,
134:21
**Information** [1] - 135:18
**informed** [2] - 89:23, 90:17
**initials** [1] - 52:23
**initiate** [1] - 37:23
**initiative** [1] - 61:22
**injunction** [1] - 134:25
**innocuous** [1] - 87:6
**input** [2] - 40:7, 40:9
**inside** [1] - 46:5
**installed** [1] - 90:18
**installing** [1] - 95:8
**instance** [5] - 47:21, 84:9,
101:19, 142:20, 145:18
**instances** [6] - 80:16, 82:7,
111:13, 132:17, 132:20,
139:15
**instead** [1] - 86:23
**instructed** [1] - 121:15
**instructions** [2] - 37:4, 88:18
**insult** [2] - 94:21, 94:23
**integrity** [2] - 35:24, 99:16
**intend** [2] - 60:14, 80:1
**intended** [2] - 37:3, 94:23
**intent** [8] - 53:7, 75:25, 76:3,
76:8, 76:12, 87:9, 101:13,
101:15
**intention** [1] - 14:14
**intentionally** [2] - 53:9,
59:17

**intentions** [1] - 19:13
**interaction** [1] - 48:1
**interactions** [1] - 90:13
**interim** [1] - 132:4
**interjected** [1] - 46:14
**Internet** [1] - 89:24
**interposed** [1] - 123:19
**interrupt** [2] - 41:18, 60:3
**interrupting** [2] - 15:10, 26:6
**intervenor** [1] - 65:16
**Intervenor** [2] - 1:10, 2:11
**Intervenor-Defendants** [1] - 1:10
**intervenors** [4] - 31:2, 31:4, 34:4, 129:8
**interview** [1] - 53:24
**interviewed** [1] - 55:10
**INTO** [1] - 4:16
**intractable** [3] - 81:23, 81:25, 114:10
**introduce** [6] - 34:16, 70:3, 76:6, 82:24, 94:7, 135:14
**introduced** [1] - 105:22
**investigate** [9] - 13:11, 13:13, 36:22, 38:18, 43:2, 43:11, 47:13, 61:21, 69:6
**investigated** [13] - 13:8, 13:12, 13:23, 14:12, 43:4, 43:6, 43:24, 44:17, 44:18, 44:19, 45:18, 48:21
**investigates** [1] - 36:17
**investigating** [4] - 38:15, 48:16, 64:13, 64:17
**investigation** [13] - 37:12, 38:20, 42:25, 43:14, 43:18, 44:8, 50:10, 55:11, 55:18, 57:3, 57:10, 61:13, 120:19
**investigations** [10] - 11:24, 35:22, 36:8, 37:23, 43:15, 44:3, 44:6, 59:10, 62:8, 62:11
**Investigations** [8] - 35:18, 35:20, 35:21, 36:6, 37:21, 40:5, 40:21, 44:1
**investigative** [2] - 37:14, 49:13
**investigator** [4] - 19:8, 35:3, 46:25, 69:7
**investigators** [4] - 35:22, 36:1, 36:6, 36:12
**involve** [3] - 44:21, 45:12, 48:11
**involved** [14] - 28:22, 40:10, 41:13, 44:2, 45:8, 45:9, 45:22, 45:23, 46:11, 50:9, 57:21, 57:22, 83:2, 88:12
**involves** [2] - 45:19, 62:18
**involving** [7] - 45:14, 47:1, 58:12, 58:15, 58:24, 59:6, 59:15

**irrelevant** [2] - 90:25, 124:18
**issue** [21] - 18:14, 24:8, 48:24, 78:24, 81:10, 81:23, 81:25, 82:19, 83:11, 85:11, 86:25, 87:1, 104:5, 109:3, 111:10, 111:21, 114:11, 122:11, 122:20, 133:25, 145:12
**issued** [2] - 31:21, 98:17
**issues** [17] - 5:18, 27:25, 83:10, 84:13, 87:25, 100:19, 106:5, 106:12, 108:11, 108:15, 116:14, 116:16, 133:22, 133:23, 133:25, 134:3, 134:5
**item** [4] - 85:7, 85:9, 85:18, 146:2
**items** [1] - 141:17

**J**

**Jack** [7] - 53:12, 53:15, 53:17, 54:21, 55:10, 55:11, 64:19
**JACOBSON** [1] - 2:22
**jail** [1] - 49:6
**January** [7] - 109:20, 112:25, 117:5, 117:14, 138:15, 138:18
**JENNIFER** [1] - 2:4
**Jim** [1] - 28:18
**job** [2] - 35:12, 68:16
**JOHN** [2] - 1:16, 1:22
**John** [6] - 138:15, 138:16, 138:18, 138:22, 138:25, 139:4
**Johnson** [1] - 18:4
**Johnson's** [1] - 17:25
**joined** [2] - 35:10, 35:11
**Joint** [4] - 8:4, 21:12, 22:1, 23:4
**joint** [2] - 6:9, 70:13
**Jorge** [2] - 31:3
**JORGE** [1] - 3:1
**Jose** [1] - 25:11
**JOSE** [2] - 4:3, 5:12
**JOSEPH** [1] - 2:14
**Journal** [5] - 79:17, 79:25, 80:1, 107:4, 107:8
**Jr** [1] - 5:11
**JR** [1] - 1:5
**Judge** [2] - 33:20, 133:21
**judge** [6] - 13:19, 21:23, 22:4, 46:6, 46:15, 64:8
**JUDGE** [128] - 1:12, 10:19, 11:7, 21:21, 21:24, 24:24, 33:6, 33:16, 33:22, 34:21, 39:11, 39:15, 40:25, 41:4, 41:6, 41:18, 42:3, 42:12,

47:15, 54:14, 58:8, 58:12, 58:16, 58:20, 58:24, 59:4, 59:8, 59:11, 59:19, 60:3, 60:14, 60:17, 64:25, 65:10, 65:13, 69:2, 69:19, 80:2, 80:5, 89:12, 89:17, 89:19, 90:5, 90:8, 90:25, 91:8, 91:14, 91:21, 91:25, 92:7, 92:12, 92:24, 93:6, 94:1, 94:8, 94:12, 94:23, 94:25, 95:12, 95:20, 95:24, 97:22, 97:24, 99:1, 99:5, 100:3, 100:12, 113:7, 120:2, 120:9, 120:14, 120:20, 120:24, 121:1, 121:6, 121:12, 121:18, 121:23, 122:5, 123:3, 123:7, 123:11, 123:15, 124:1, 124:6, 124:9, 124:14, 124:22, 126:15, 126:19, 127:12, 127:16, 127:19, 127:24, 128:3, 128:7, 128:13, 128:19, 128:22, 128:25, 129:4, 129:6, 130:16, 130:21, 130:24, 131:3, 131:13, 131:18, 131:21, 131:24, 134:8, 134:12, 134:17, 135:1, 135:4, 135:9, 135:24, 136:3, 137:20, 137:23, 142:11, 143:23, 144:6, 144:11, 146:6, 146:11, 146:19
**judges** [1] - 53:14
**JUDGES** [1] - 1:14
**July** [1] - 1:6
**June** [1] - 35:17
**junior** [1] - 125:14
**jurisdiction** [9] - 38:4, 38:7, 38:8, 38:15, 60:2, 61:1, 61:4
**jurisdictions** [1] - 35:13
**jury** [1] - 126:16
**JUSTICE** [1] - 2:6

**K**

**Karina** [1] - 125:9
**keep** [4] - 24:18, 30:21, 38:21, 142:5
**KENNIE** [1] - 1:9
**kill** [1] - 78:11
**kind** [10] - 14:13, 15:25, 19:2, 24:2, 29:13, 36:24, 66:16, 68:11, 81:17, 89:22
**knees** [1] - 16:22
**knowingly** [2] - 53:10, 59:18
**knowledge** [35] - 17:17, 29:25, 47:8, 58:4, 70:15,

70:17, 89:10, 92:15, 92:16, 92:19, 93:3, 93:4, 93:5, 93:6, 93:7, 93:11, 93:12, 93:13, 93:17, 93:19, 93:21, 93:22, 93:24, 95:3, 95:5, 96:10, 96:11, 96:14, 97:20, 99:7, 121:3, 124:18, 124:20
**known** [1] - 82:3
**knows** [6] - 63:18, 80:3, 90:4, 91:4, 92:23, 92:25

**L**

**lack** [4] - 60:4, 60:5, 127:2, 140:3
**lacked** [1] - 59:17
**laid** [1] - 97:20
**language** [3] - 13:12, 16:19, 116:19
**large** [3] - 98:23, 103:5, 135:23
**larynx** [1] - 5:4
**last** [18] - 5:6, 30:11, 41:20, 42:7, 42:18, 53:11, 54:23, 73:18, 82:8, 86:1, 137:11, 138:5, 138:6, 140:25, 141:1, 141:3, 141:7, 143:22
**Latino** [3] - 16:15, 16:24, 32:11
**latter** [1] - 65:10
**laugh** [1] - 5:7
**laundering** [1] - 35:24
**Lavaca** [1] - 56:23
**law** [21] - 29:20, 31:11, 33:13, 34:18, 36:4, 37:18, 40:13, 49:11, 53:8, 60:11, 60:15, 64:5, 64:12, 64:14, 68:20, 71:4, 118:17, 122:1, 125:19, 133:1, 146:15
**lawful** [1] - 46:7
**laws** [2] - 28:7, 65:6
**lawyers** [1] - 41:23
**laying** [1] - 39:13
**lead** [2] - 98:23, 133:2
**learn** [1] - 37:13
**learned** [3] - 54:6, 91:10, 138:10
**least** [7] - 26:3, 68:21, 76:3, 101:15, 140:24, 143:5, 143:13
**left** [3] - 110:19, 142:23, 145:4
**LEGAL** [1] - 3:1
**legal** [2] - 38:13, 62:3
**legislation** [19] - 32:22, 70:16, 71:7, 71:12, 71:23, 74:1, 78:11, 78:14, 78:19,

84:11, 84:17, 85:7, 86:9, 87:6, 87:10, 104:15, 104:19, 106:15, 122:16
**legislative** [24] - 14:15, 49:25, 74:21, 79:7, 85:19, 101:23, 104:6, 105:9, 105:23, 111:9, 112:10, 112:12, 112:18, 112:21, 112:24, 113:2, 120:18, 120:21, 121:17, 121:22, 123:20, 123:22, 128:8, 128:23
**legislatively** [1] - 122:14
**legislator** [2] - 7:13, 125:5
**legislators** [5] - 6:22, 6:24, 6:25, 7:2, 122:25
**legislature** [15] - 27:14, 49:25, 70:16, 82:3, 87:21, 88:15, 95:4, 99:21, 99:22, 100:8, 113:11, 116:14, 117:23, 132:23, 133:3
**legislature's** [1] - 99:13
**legitimacy** [1] - 143:25
**length** [1] - 90:9
**less** [4] - 82:19, 98:11, 140:1, 143:10
**Letter** [1] - 25:11
**letter** [1] - 25:14
**letting** [1] - 55:16
**level** [1] - 43:9
**liberal** [1] - 70:19
**LIBERTIES** [1] - 3:5
**license** [56] - 15:17, 15:22, 16:4, 23:24, 27:20, 60:9, 67:2, 88:10, 88:13, 88:16, 88:18, 96:3, 98:8, 98:17, 98:25, 117:19, 124:12, 125:21, 136:14, 138:18, 138:20, 138:23, 139:1, 139:3, 141:11, 141:13, 141:20, 141:23, 141:24, 142:1, 142:4, 142:6, 142:7, 142:13, 142:21, 142:25, 143:7, 143:18, 143:22, 144:7, 144:8, 144:16, 144:19, 144:23, 144:24, 145:1, 145:4, 145:6, 145:14, 145:16, 145:19, 145:24, 146:1
**licenses** [12] - 15:5, 27:17, 60:21, 60:23, 96:24, 136:12, 141:22, 142:18, 143:9, 144:2, 144:3
**lieutenant** [7] - 35:17, 75:4, 75:17, 77:6, 79:3, 115:17, 125:14
**Lieutenant** [3] - 77:14, 80:20, 108:13
**Life** [1] - 26:12
**life** [1] - 126:10

**light** [1] - 46:20
**likely** [1] - 97:17
**limit** [1] - 84:14
**limitations** [1] - 43:7
**limited** [2] - 43:11, 84:12
**limiting** [1] - 79:24
**line** [11] - 8:24, 9:4, 11:10, 22:2, 23:8, 89:7, 96:25, 110:23, 122:9, 143:11, 143:18
**lines** [3] - 21:25, 78:4, 121:15
**list** [16] - 136:23, 137:3, 138:16, 138:22, 139:5, 140:20, 142:6, 142:7, 142:8, 142:23, 142:24, 144:15, 145:5, 145:7, 145:21, 145:25
**listed** [1] - 29:3
**lists** [1] - 140:14
**live** [8] - 16:22, 35:5, 35:6, 95:14, 95:15, 97:10, 97:15, 98:7
**LLP** [3] - 1:23, 2:11, 2:22
**local** [22] - 36:1, 37:17, 37:18, 38:6, 38:13, 40:13, 40:23, 43:21, 48:22, 57:11, 61:4, 61:11, 64:7, 64:12, 64:14, 64:16, 84:10, 84:13, 84:18
**located** [4] - 98:5, 98:15, 99:4, 99:8
**location** [1] - 46:6
**long-standing** [1] - 64:11
**look** [13] - 13:12, 25:6, 26:8, 26:14, 27:2, 54:17, 55:2, 61:17, 76:15, 109:12, 113:7, 113:17, 121:19
**looked** [9] - 98:4, 98:9, 98:14, 128:13, 129:17, 140:8, 146:20, 146:21
**looking** [6] - 12:13, 54:6, 68:11, 68:15, 140:12, 144:24
**looks** [2] - 8:8, 25:13
**Lorenzo** [4] - 46:14, 48:13, 51:21, 69:12
**loudly** [1] - 75:12
**lowest** [1] - 43:9
**luck** [1] - 146:23
**lunch** [2] - 34:1, 34:2

---

**M**

**M.C** [4] - 52:23, 53:1, 53:3, 66:19
**ma'am** [5] - 39:21, 89:16, 131:6, 131:16, 131:24
**machine** [1] - 3:12

**magic** [1] - 19:6
**magnetic** [1] - 23:24
**mail** [17] - 5:22, 11:24, 18:24, 19:5, 19:16, 28:5, 29:8, 29:13, 47:12, 47:21, 47:23, 47:24, 50:11, 50:18, 57:21, 57:24, 96:25
**mail-in** [13] - 5:22, 18:24, 19:5, 19:16, 28:5, 29:8, 29:13, 47:12, 47:21, 47:23, 47:24, 50:11, 57:24
**mailer** [2] - 26:4, 26:22
**mailers** [3] - 26:18, 26:19, 26:23
**mailing** [2] - 19:2, 29:7
**maintain** [7] - 17:8, 17:9, 38:25, 39:10, 40:5, 40:20, 42:20
**Major** [4] - 34:8, 34:14, 65:18, 69:20
**major** [6] - 7:14, 34:17, 34:21, 34:22, 34:23, 49:24, 84:17
**majority** [26] - 15:2, 73:11, 76:23, 78:18, 79:10, 79:19, 80:9, 80:18, 86:9, 105:6, 109:2, 109:10, 110:3, 111:1, 113:20, 114:13, 115:5, 115:15, 115:21, 115:24, 116:8, 116:23, 129:24, 132:22, 133:3
**Management** [1] - 135:18
**maneuver** [2] - 78:8, 84:7
**manner** [1] - 80:17
**Mara** [1] - 48:12
**MARANZANO** [1] - 2:4
**Marathon** [1] - 98:5
**margin** [2] - 29:1, 77:2
**marked** [2] - 39:25, 40:17
**marks** [1] - 37:4
**match** [26] - 137:1, 137:7, 137:9, 137:10, 137:12, 138:6, 138:12, 138:23, 140:5, 141:1, 141:2, 141:4, 141:5, 142:9, 142:12, 142:13, 143:1, 143:8, 144:15, 145:6, 145:8, 145:22, 146:1
**matched** [2] - 142:25, 146:2
**matches** [5] - 138:19, 140:9, 140:15, 140:20, 141:9
**matching** [7] - 138:10, 138:21, 139:4, 140:13, 142:19, 144:21, 145:17
**material** [3] - 24:14, 26:2, 27:1
**materials** [3] - 24:11, 24:18, 136:6
**maternal** [1] - 99:23
**matter** [9] - 9:16, 74:14, 91:1,

91:3, 92:22, 105:25, 122:2, 122:14, 147:5
**matters** [2] - 110:5, 122:5, 122:13
**Matthew** [1] - 69:21
**MATTHEW** [1] - 1:17
**maximum** [1] - 84:14
**MC-059** [1] - 1:19
**McCombs** [1] - 135:18
**McGeehan** [2] - 117:17, 117:22
**McKENZIE** [1] - 33:4
**MCKENZIE** [1] - 1:16
**McMillan** [5] - 52:1, 52:3, 52:10, 52:16, 66:15
**mean** [15] - 60:5, 67:24, 68:2, 86:16, 89:14, 91:6, 93:9, 95:12, 101:4, 119:8, 124:6, 126:8, 128:6, 139:17, 143:25
**means** [6] - 89:25, 91:3, 105:18, 140:24, 143:3, 145:5
**mechanism** [4] - 72:15, 73:25, 74:2, 106:14
**meet** [3] - 82:18, 83:18, 129:13
**meeting** [3] - 82:22, 86:3
**meetings** [2] - 89:21, 93:14
**meets** [1] - 87:21
**Melvin** [5] - 50:10, 50:12, 50:15, 50:20, 51:7
**member** [8] - 5:19, 43:1, 43:15, 70:10, 79:3, 82:17, 83:2, 83:3
**members** [15] - 9:20, 73:4, 74:14, 74:19, 75:7, 75:9, 75:21, 76:9, 76:18, 76:23, 79:1, 81:10, 82:23, 106:4, 111:1
**mens** [3] - 59:17, 60:4, 60:6
**mental** [3] - 122:15, 123:2, 123:24
**mentally** [2] - 53:3, 66:20
**mention** [8] - 11:20, 20:19, 26:1, 27:7, 27:10, 27:13, 53:12, 101:13
**mentioned** [33] - 17:21, 19:1, 20:17, 28:2, 31:17, 52:22, 53:11, 72:17, 74:22, 79:24, 80:23, 99:2, 102:17, 103:15, 104:21, 105:2, 105:14, 106:16, 107:5, 107:7, 109:6, 110:2, 110:8, 112:9, 114:9, 114:16, 116:22, 117:6, 118:24, 118:25, 136:25, 144:18
**mentioning** [1] - 24:15
**MEREDITH** [1] - 2:3
**mess** [1] - 144:11

method [1] - 138:21
Mexican [1] - 16:21
MEXICAN [1] - 3:1
Mexico [8] - 31:17, 31:20,
32:5, 32:8, 32:10, 32:13
Mickey [2] - 13:1, 13:4
microphone [3] - 121:7,
123:11, 123:12
middle [5] - 137:13, 138:6,
139:1, 139:2, 139:12
might [17] - 21:9, 33:23,
67:9, 74:17, 82:9, 89:14,
91:8, 93:20, 94:19, 101:25,
129:18, 139:13, 140:13,
142:11, 145:19, 145:20,
145:21
miles [3] - 15:11, 15:22, 16:4
military [2] - 9:15, 9:17
Millan [1] - 52:6
million [6] - 88:18, 88:21,
136:10, 136:12, 136:18,
136:22
mind [5] - 45:19, 56:13, 57:4,
92:25, 142:5
minority [13] - 101:2, 101:10,
116:11, 118:22, 129:24,
132:13, 132:14, 132:18,
132:22, 132:24, 133:2,
133:9
minutes [8] - 34:3, 34:4,
92:10, 146:7, 146:9,
146:11, 146:12
misconduct [1] - 56:19
miscounted [1] - 125:6
misdemeanor [3] - 14:2,
43:9, 49:6
mishear [1] - 107:11
misprinting [1] - 29:7
miss [2] - 15:21, 16:3
missing [1] - 26:17
misspoke [1] - 112:12
MITCHELL [2] - 4:5, 34:10
Mitchell [5] - 34:8, 34:14,
34:17, 49:24, 65:18
modeled [2] - 111:8, 112:9
moment [6] - 36:20, 64:24,
76:14, 123:7, 127:11,
134:6
Monday [1] - 1:6
money [4] - 35:23, 94:16,
95:4, 95:6
monthly [1] - 40:16
months [1] - 17:11
morning [1] - 102:10
MORTARA [19] - 1:21,
134:15, 134:20, 135:3,
135:8, 135:13, 135:20,
136:4, 137:18, 137:22,
137:25, 140:17, 140:19,
143:16, 144:12, 144:13,

146:4, 146:8, 146:18
Mortara [1] - 4:10
most [11] - 20:13, 69:7,
74:16, 82:2, 86:3, 89:4,
95:17, 105:18, 124:11,
126:2, 141:18
mostly [1] - 84:12
mother [5] - 18:21, 45:24,
46:13, 48:22, 66:1
motion [7] - 74:23, 76:14,
76:17, 76:24, 77:10, 77:20,
101:16
motivation [1] - 143:14
Mouse [2] - 13:1, 13:4
move [17] - 7:1, 9:19, 12:24,
14:19, 39:20, 76:1, 78:13,
88:3, 95:22, 99:12, 108:3,
110:14, 110:16, 111:2,
113:13, 119:24, 140:4
MOVED [1] - 4:16
moved [6] - 5:6, 142:21,
143:6, 144:3, 144:7, 144:9
movie [1] - 8:13
moving [2] - 71:22, 85:6
MR [167] - 5:10, 5:15, 7:1,
7:6, 7:9, 7:11, 10:24,
10:25, 11:4, 11:8, 21:12,
21:15, 21:20, 21:22, 22:1,
22:3, 23:3, 23:5, 24:23,
24:25, 25:3, 25:5, 25:8,
25:10, 31:1, 31:3, 31:6,
33:4, 33:10, 34:6, 34:13,
34:25, 39:13, 39:19, 39:21,
39:23, 41:7, 41:21, 41:24,
42:1, 42:6, 42:13, 42:17,
47:14, 48:4, 49:15, 49:18,
49:20, 49:23, 54:10, 54:13,
54:15, 54:16, 54:23, 55:1,
55:14, 55:21, 59:20, 60:18,
64:24, 65:1, 65:8, 65:12,
65:15, 65:17, 68:25, 69:3,
69:5, 69:18, 69:21, 70:2,
79:23, 80:4, 80:6, 90:7,
90:12, 90:19, 90:23, 91:5,
91:12, 91:19, 91:24, 92:6,
92:14, 93:1, 93:16, 94:2,
94:6, 94:24, 95:2, 95:10,
95:19, 95:22, 95:25, 97:19,
97:23, 97:25, 99:6, 100:6,
100:11, 100:13, 100:16,
107:2, 107:3, 107:17,
107:21, 108:5, 108:6,
108:20, 108:21, 109:17,
109:18, 110:16, 110:18,
110:23, 110:25, 112:15,
112:17, 113:8, 114:24,
115:1, 119:23, 120:4,
120:12, 120:16, 120:23,
120:25, 121:2, 121:3,
121:4, 121:9, 121:13,

121:19, 122:2, 122:8,
122:23, 123:5, 123:9,
123:16, 124:4, 124:16,
124:23, 124:24, 126:18,
126:20, 127:11, 127:14,
134:10, 134:15, 134:20,
135:3, 135:8, 135:13,
135:20, 136:1, 136:4,
137:18, 137:22, 137:25,
140:17, 140:19, 143:16,
144:12, 144:13, 146:4,
146:8, 146:18
MS [12] - 79:20, 89:9, 129:5,
129:7, 129:10, 130:18,
130:23, 131:1, 131:8,
131:25, 132:2, 134:6
multiple [3] - 22:21, 23:10,
66:24
murder [1] - 35:14
must [3] - 26:3, 26:22, 26:23

N

name [26] - 23:19, 34:17,
34:22, 41:11, 49:20, 52:23,
53:12, 70:5, 94:9, 99:1,
137:11, 137:14, 138:5,
139:1, 139:2, 139:13,
139:18, 141:1, 141:3,
141:7, 145:20
named [1] - 58:25
namely [1] - 136:25
NANCY [1] - 3:4
Nancy [1] - 129:7
NAPIER [1] - 1:17
national [2] - 31:20, 38:8
nature [1] - 91:9
nearest [2] - 16:17, 17:1
necessarily [4] - 64:1, 67:24,
68:2, 112:3
necessary [4] - 72:18, 72:22,
100:23, 127:2
need [12] - 8:13, 9:7, 9:8,
10:20, 16:12, 17:22, 41:23,
53:7, 60:3, 89:13, 95:14,
125:24
needed [3] - 115:20, 117:23,
126:25
needs [2] - 18:13, 142:16
negative [1] - 133:9
Netflix [2] - 8:24, 9:6
never [8] - 8:18, 13:14,
71:20, 76:7, 77:19, 77:20,
84:21, 100:5
new [5] - 89:23, 95:8, 95:9,
97:2
New [2] - 2:23, 2:24
newspaper [6] - 26:21,
26:23, 26:24, 28:24, 29:9,

67:17
next [13] - 9:19, 14:19, 24:19,
33:24, 35:15, 101:24,
104:6, 107:17, 108:3,
110:21, 111:2, 114:6,
143:23
nice [3] - 34:5, 65:18, 146:23
nine [5] - 79:3, 86:5, 117:11,
137:6, 140:23
nine-hour [1] - 86:5
nine-member [1] - 79:3
NJ [1] - 2:13
NO [1] - 4:16
noncitizen [12] - 12:16, 14:7,
27:7, 56:4, 56:10, 58:2,
58:13, 58:15, 58:18, 58:21,
59:11, 59:22
noncitizens [19] - 27:5,
27:13, 27:16, 27:19, 56:7,
56:25, 57:2, 57:13, 57:25,
58:5, 58:15, 59:1, 59:2,
59:6, 59:16, 60:7, 60:19,
60:20, 60:21
noncontroversial [1] - 84:11
none [4] - 20:19, 28:22, 58:9,
86:15
nonresponsive [1] - 7:3
normal [3] - 32:24, 82:9,
83:21
notably [1] - 75:11
note [2] - 139:25, 141:21
nothing [5] - 26:15, 29:10,
65:12, 124:14, 134:10
notice [3] - 61:12, 61:15,
87:1
NRA [1] - 26:9
NUMBER [1] - 4:14
number [24] - 20:17, 39:8,
41:13, 42:12, 45:4, 57:22,
62:25, 78:1, 89:1, 113:18,
124:25, 125:1, 125:5,
125:7, 130:2, 137:6, 137:8,
140:2, 140:4, 140:23,
140:24, 141:2, 141:4,
142:8
Number [1] - 140:2
numbered [1] - 113:3
numbering [1] - 136:9
numbers [1] - 129:17,
141:12, 141:25, 145:13
NW [2] - 2:8, 3:6
NWB [1] - 2:8
NWB-Room [1] - 2:8
NY [1] - 2:24

O

oath [1] - 10:17
Oath [3] - 34:9, 69:23, 135:7

**object** [6] - 33:5, 79:20, 89:9, 90:3, 90:19, 121:21
**objected** [1] - 121:14
**objection** [17] - 33:7, 39:16, 47:14, 49:15, 49:16, 65:8, 92:1, 92:4, 95:10, 97:19, 121:24, 122:6, 122:12, 123:20, 127:6, 135:24, 136:1
**objections** [1] - 90:10
**observe** [1] - 47:10
**observed** [1] - 23:9
**obtain** [7] - 16:7, 16:12, 27:19, 29:19, 125:24, 140:5, 143:15
**obtaining** [3] - 126:4, 126:5, 142:9
**obviously** [1] - 132:18
**occasion** [1] - 129:13
**occur** [2] - 113:3, 138:13
**occurred** [7] - 14:13, 18:1, 20:7, 52:10, 52:17, 61:23, 62:1
**odd** [1] - 113:3
**OF** [8] - 1:2, 1:3, 1:11, 1:18, 1:18, 2:6, 147:1, 147:10
**OFF** [3] - 94:11, 123:14, 127:13
**offense** [10] - 36:24, 41:10, 43:8, 43:9, 49:7, 51:2, 51:4, 53:9, 61:23, 66:3
**offenses** [3] - 36:19, 38:20, 44:23
**offer** [2] - 81:3, 135:22
**offered** [2] - 5:22, 93:15
**OFFICE** [1] - 1:18
**office** [27] - 15:17, 15:22, 16:4, 16:17, 35:10, 35:11, 38:1, 38:3, 38:22, 39:2, 40:6, 48:15, 57:9, 57:11, 58:7, 61:7, 67:12, 70:9, 89:8, 89:21, 96:8, 97:4, 117:15, 118:6, 118:9, 119:17
**Office** [34] - 34:19, 34:20, 35:2, 35:7, 35:15, 37:14, 37:16, 37:19, 37:22, 37:25, 38:3, 38:11, 40:11, 40:22, 41:3, 42:10, 43:21, 44:11, 48:11, 56:9, 59:21, 60:1, 60:25, 61:3, 61:6, 61:20, 62:6, 62:7, 62:10, 63:21, 64:5, 64:7, 64:10, 64:21
**officer** [2] - 40:13, 49:11
**officers** [2] - 36:4, 36:10
**offices** [5] - 15:5, 88:21, 95:9, 125:21, 128:1
**OFFICIAL** [1] - 147:1
**Official** [2] - 1:6, 3:9
**official** [2] - 21:6, 22:20

**officials** [1] - 20:22
**often** [5] - 12:6, 12:10, 42:18, 64:16, 83:6
**old** [3] - 5:8, 18:8, 29:2
**older** [1] - 19:5
**on-line** [5] - 8:24, 9:4, 96:25, 143:11, 143:18
**once** [5] - 23:16, 37:3, 76:12, 77:9, 145:15
**one** [92] - 6:10, 6:16, 6:22, 7:15, 9:5, 9:24, 10:6, 10:8, 11:20, 11:23, 15:21, 16:3, 16:21, 17:24, 20:5, 20:10, 21:1, 21:23, 22:2, 22:4, 22:25, 23:8, 23:13, 26:3, 26:18, 30:11, 30:20, 32:25, 37:6, 41:17, 42:7, 43:6, 45:5, 45:6, 45:25, 48:12, 48:14, 51:1, 52:3, 52:5, 52:10, 53:13, 55:8, 57:23, 63:20, 64:24, 65:23, 66:1, 66:5, 66:19, 67:4, 67:17, 67:25, 68:21, 76:4, 78:1, 84:15, 86:6, 91:23, 94:9, 96:5, 96:8, 107:23, 111:16, 121:18, 123:8, 123:13, 123:25, 126:1, 126:10, 127:16, 133:16, 134:5, 134:6, 136:8, 138:7, 139:12, 140:8, 140:22, 140:24, 141:10, 141:14, 141:21, 142:16, 142:18, 143:18, 144:21, 145:20, 145:21, 146:15
**One** [1] - 2:23
**one-quarter** [1] - 141:14
**ones** [3] - 67:13, 74:18, 128:1
**opened** [3] - 52:11, 52:17, 66:17
**opening** [1] - 95:8
**operate** [3] - 41:19, 82:21, 105:11
**operates** [1] - 83:1
**operating** [1] - 71:6
**operation** [1] - 82:20
**Operations** [1] - 135:18
**operations** [4] - 88:13, 88:16, 89:11, 95:4
**opinion** [4] - 49:11, 142:16, 143:17, 143:20
**opinions** [2] - 122:15, 134:23
**opponent** [1] - 26:4
**opponents** [1] - 75:23
**opportunities** [1] - 142:9
**opportunity** [1] - 79:1
**opposed** [2] - 32:19, 103:8
**opposing** [1] - 11:5
**opposition** [4] - 32:11, 70:20, 101:4, 128:15

**or..** [1] - 91:7
**order** [67] - 72:5, 72:8, 72:9, 72:10, 72:12, 72:13, 72:14, 72:18, 72:19, 72:23, 73:1, 73:3, 73:4, 73:13, 73:17, 74:7, 74:9, 74:10, 74:15, 74:23, 75:5, 75:8, 75:24, 76:2, 76:10, 77:10, 78:18, 78:20, 78:21, 79:4, 79:19, 80:8, 80:18, 81:24, 82:4, 82:6, 82:10, 82:24, 84:22, 85:14, 86:9, 86:11, 86:14, 86:17, 86:23, 86:24, 87:11, 102:9, 102:23, 103:12, 109:10, 111:3, 111:20, 111:22, 113:24, 115:7, 115:16, 115:24, 116:23, 125:1, 125:11, 137:9, 137:12, 140:4
**ordered** [1] - 132:3
**Orders** [1] - 113:18
**orders** [6] - 109:4, 110:6, 111:13, 111:16, 113:14, 113:20
**otherwise** [2] - 89:17, 94:15
**ourselves** [1] - 61:24
**out-of-court** [2] - 93:3, 93:23
**outcome** [1] - 142:2
**outcomes** [1] - 45:3
**outlined** [1] - 138:2
**outlines** [1] - 137:15
**outside** [2] - 65:8, 89:10
**oversight** [5] - 88:9, 89:12, 89:15, 90:24, 92:16
**overwhelming** [1] - 78:2
**own** [8] - 7:7, 37:23, 38:12, 38:16, 61:21, 120:15, 131:5, 143:20

## P

**P.C** [1] - 2:15
**P.M** [2] - 1:6, 1:11
**p.m** [3] - 1:10, 92:11, 146:25
**package** [1] - 74:21
**page** [29] - 8:4, 11:10, 21:12, 21:24, 22:1, 22:25, 23:3, 25:6, 25:12, 26:8, 26:14, 26:17, 107:4, 107:6, 107:17, 107:19, 107:22, 107:24, 108:3, 109:19, 110:19, 110:21, 111:2, 113:14, 122:9, 126:21, 126:23
**pages** [1] - 113:13
**PALENCHAR** [1] - 1:23
**panel** [2] - 92:3, 94:9
**paper** [1] - 42:1
**papers** [2] - 54:6, 54:7

**paragraph** [9] - 8:10, 9:19, 14:19, 54:23, 55:2, 55:3, 107:23, 113:7, 113:9
**paralyzed** [1] - 5:4
**pardon** [3] - 28:15, 80:22, 94:20
**Parliamentarian** [1] - 125:8
**parliamentary** [4] - 78:8, 78:10, 80:14, 84:6
**part** [15] - 78:12, 81:5, 83:8, 87:14, 88:10, 97:6, 114:12, 119:5, 119:8, 119:11, 119:14, 119:16, 119:17, 119:24, 122:24
**partially** [1] - 25:12
**participate** [3] - 79:2, 81:11, 83:4
**participating** [1] - 12:1
**participation** [1] - 133:2
**particular** [4] - 39:24, 78:2, 133:22, 141:21
**particularly** [1] - 132:4
**parties** [2] - 91:15, 146:16
**parts** [5] - 18:5, 97:4, 97:7, 97:16, 98:2
**party** [1] - 66:3
**pass** [17] - 19:6, 30:20, 49:18, 70:25, 71:7, 71:12, 71:16, 71:22, 72:3, 73:10, 76:21, 83:23, 83:25, 87:9, 100:11, 116:5, 125:15
**passage** [6] - 70:12, 120:6, 120:10, 120:17, 120:19, 124:18
**passed** [26] - 70:19, 71:1, 72:12, 72:13, 74:5, 75:6, 76:17, 77:1, 82:3, 82:4, 82:5, 82:8, 84:12, 84:25, 85:3, 87:7, 104:15, 104:18, 116:8, 122:1, 124:8, 124:21, 125:10, 129:19, 146:16
**passing** [2] - 100:9, 125:18
**past** [2] - 18:19, 143:14
**Patrick** [1] - 34:7
**PATRICK** [1] - 1:16
**pattern** [1] - 69:10
**patterns** [1] - 140:12
**pay** [1] - 16:11
**Peachtree** [1] - 3:6
**Penal** [3] - 36:19, 41:15, 44:23
**penalties** [1] - 49:2
**penalty** [2] - 49:5, 51:3
**Pending** [1] - 42:10
**pending** [9] - 14:21, 39:4, 42:14, 48:6, 48:8, 48:10, 51:25, 53:2, 69:16
**penitentiary** [1] - 46:1
**Pennsylvania** [1] - 2:8

**people** [50] - 5:2, 11:14, 11:23, 11:25, 12:7, 12:11, 12:21, 16:20, 20:7, 20:13, 28:25, 32:6, 32:19, 32:21, 33:25, 62:23, 66:11, 67:8, 67:24, 68:2, 68:7, 68:11, 90:2, 96:2, 96:8, 97:7, 97:10, 98:7, 98:9, 98:11, 98:12, 98:13, 98:16, 98:18, 112:4, 116:2, 124:11, 126:2, 129:1, 138:17, 139:18, 141:24, 144:1, 144:14, 145:6, 145:9, 145:23
**people's** [1] - 99:15
**percent** [1] - 140:3
**perform** [2] - 117:15, 117:18
**performed** [2] - 121:25, 141:19
**perhaps** [1] - 90:10
**period** [2] - 125:12, 125:13
**permission** [2] - 21:20, 54:10
**permit** [2] - 138:12, 138:22
**person** [64] - 9:11, 10:3, 10:6, 10:9, 11:18, 11:21, 12:13, 13:14, 13:20, 14:4, 18:23, 20:6, 20:23, 21:2, 22:14, 22:18, 28:10, 28:22, 29:10, 29:14, 29:17, 29:22, 30:1, 30:4, 30:7, 37:4, 45:6, 45:12, 45:14, 45:19, 47:4, 47:11, 47:13, 47:20, 50:5, 50:20, 53:7, 62:21, 63:14, 63:17, 63:25, 65:7, 68:5, 68:8, 69:8, 75:19, 94:12, 95:16, 96:21, 99:15, 99:18, 139:19, 139:20, 142:13, 142:20, 142:22, 142:23, 142:24, 143:1, 143:2, 144:24, 144:25
**personal** [8] - 17:17, 47:8, 63:18, 92:15, 92:18, 93:7, 93:11, 143:20
**personally** [4] - 21:2, 38:18, 89:14, 90:4
**persons** [3] - 143:5, 143:11, 144:19
**Pevatoe** [1] - 82:4
**ph** [2] - 48:12, 50:10
**phone** [2] - 91:2, 94:15
**photo** [16] - 8:17, 8:21, 9:8, 9:11, 15:25, 23:19, 31:11, 31:17, 32:4, 48:3, 66:21, 66:25, 67:10, 70:19, 70:24
**phrase** [1] - 121:19
**phrased** [1] - 94:3
**physician** [1] - 101:20
**picking** [1] - 141:16
**picture** [1] - 97:2

**piece** [1] - 87:6
**place** [29] - 15:18, 31:17, 45:24, 46:2, 46:21, 47:1, 47:4, 47:7, 50:4, 50:6, 50:13, 50:21, 50:24, 51:12, 52:11, 55:8, 62:20, 62:23, 63:11, 63:22, 64:2, 64:4, 65:6, 66:22, 67:2, 68:19, 72:24, 76:2, 111:17
**placed** [1] - 79:16
**places** [1] - 49:12
**Plaintiff** [2] - 1:4, 1:16
**PLAINTIFF** [4] - 5:12, 34:10, 69:24, 135:10
**Plaintiff's** [2] - 40:17, 135:22
**plan** [3] - 97:14, 132:4, 132:7
**plane** [1] - 9:9
**planks** [1] - 24:6
**planned** [1] - 91:22
**planning** [2] - 76:9, 76:10
**PLATTS** [1] - 2:3
**Plaza** [1] - 2:23
**plural** [2] - 9:21, 10:6
**plus** [3] - 89:1, 140:24, 141:5
**point** [17] - 19:7, 23:7, 23:23, 26:25, 55:6, 76:13, 76:18, 76:22, 81:17, 110:10, 113:19, 120:16, 121:15, 123:19, 132:23, 143:13, 146:5
**policy** [3] - 37:24, 61:24, 64:11
**politicaros** [1] - 28:2
**politicians** [2] - 16:15, 16:24
**poll** [10] - 46:5, 46:20, 46:22, 46:23, 63:1, 63:3, 63:6, 68:14, 68:16, 68:22
**polling** [25] - 15:18, 45:24, 46:2, 46:21, 47:1, 47:4, 47:7, 49:12, 50:4, 50:6, 50:21, 50:24, 51:11, 52:11, 62:20, 62:23, 63:11, 63:22, 64:2, 64:4, 66:11, 66:22, 67:1, 68:5, 68:19
**polls** [6] - 11:15, 11:23, 12:2, 52:17, 62:15, 66:16
**Ponce** [6] - 50:10, 50:12, 50:15, 50:20, 51:7, 65:23
**popular** [5] - 77:21, 77:23, 78:3, 78:5, 78:6
**popularity** [1] - 77:25
**populated** [2] - 97:7, 97:11
**population** [13] - 98:10, 98:13, 98:18, 98:19, 98:24, 103:5, 130:3, 130:5, 130:8, 131:10, 131:14, 132:5
**Port** [1] - 56:23
**portion** [6] - 30:23, 36:9, 57:10, 65:3, 98:23, 107:19, 108:4, 109:25

**portions** [1] - 51:1
**position** [6] - 35:15, 93:1, 120:4, 120:20, 123:21, 135:16
**positive** [3] - 45:3, 99:11, 101:25
**possession** [1] - 98:22
**possibility** [7] - 31:16, 133:6, 133:7, 141:16, 143:12, 144:21, 145:17
**possible** [5] - 8:19, 8:20, 76:6, 132:22, 143:23
**possibly** [1] - 59:5
**post** [6] - 26:22, 26:23, 123:1, 123:23, 123:25, 129:23
**post-enactment** [3] - 123:1, 123:23, 123:25
**posted** [4] - 26:2, 26:9, 26:12, 26:18
**potential** [4] - 37:13, 116:2, 140:5, 140:13
**potentially** [2] - 20:1, 20:17
**powers** [2] - 17:13, 17:17
**practical** [1] - 74:14
**pre** [3] - 120:19, 123:2, 124:3
**pre-enactment** [2] - 123:2, 124:3
**pre-passage** [1] - 120:19
**precedent** [1] - 78:21
**precleared** [1] - 65:3
**preferred** [1] - 81:12
**premise** [1] - 15:24
**preparation** [1] - 22:12
**prepare** [2] - 137:15, 140:14
**prepared** [1] - 136:17
**prescribed** [1] - 96:6
**present** [14] - 46:13, 46:21, 54:13, 63:2, 70:24, 73:4, 75:7, 75:13, 76:18, 76:23, 95:14, 102:22, 102:25, 131:25
**presented** [6] - 14:9, 14:11, 46:4, 52:13, 53:19, 53:21
**presenting** [2] - 47:9, 63:19
**preserving** [1] - 100:8
**President** [3] - 17:25, 18:4, 75:16
**presume** [3] - 16:16, 16:24, 38:8
**presumed** [1] - 103:10
**pretended** [2] - 50:21, 52:14
**pretty** [2] - 21:6, 22:5
**prevent** [3] - 31:11, 78:19, 99:15
**prevented** [5] - 51:10, 51:12, 52:16, 52:20, 67:9
**preventing** [1] - 65:7
**previous** [4] - 60:24, 86:4, 86:7, 101:23

**previously** [3] - 5:12, 77:9, 106:13
**primaries** [1] - 45:16
**primary** [9] - 52:7, 56:16, 56:19, 56:24, 57:19, 58:17, 73:23, 99:24, 106:14
**Princeton** [1] - 2:13
**print** [1] - 24:11
**printed** [2] - 24:14, 79:25
**priority** [2] - 61:7, 61:9
**private** [1] - 25:22
**privilege** [7] - 120:18, 120:21, 121:17, 121:22, 122:24, 123:20, 123:23
**privileged** [6] - 79:21, 119:25, 120:21, 122:14, 122:16, 124:14
**problem** [7] - 12:17, 12:18, 12:19, 12:20, 22:10, 92:13, 93:9
**problems** [1] - 140:13
**procedure** [2] - 80:14, 82:6
**procedures** [2] - 17:10, 17:17
**proceed** [4] - 44:16, 46:8, 94:25, 135:8
**proceeded** [1] - 80:17
**proceeding** [4] - 27:14, 83:4, 107:13, 108:1
**proceedings** [5] - 107:9, 107:15, 108:25, 146:25, 147:4
**Proceedings** [1] - 3:12
**process** [10] - 19:5, 37:12, 44:15, 47:11, 78:12, 81:12, 82:9, 89:3, 106:11, 108:11
**produced** [6] - 3:12, 120:24, 121:4, 121:5, 121:10, 121:11
**Professor** [20] - 134:16, 134:17, 134:22, 135:14, 135:21, 136:1, 136:5, 136:21, 137:15, 137:23, 138:2, 139:10, 139:22, 141:6, 141:8, 141:19, 143:17, 144:15, 144:18, 145:9
**professor** [2] - 135:17, 135:24
**Progreso** [1] - 45:22
**progress** [1] - 89:22
**prohibits** [2] - 85:13, 85:15
**promise** [2] - 55:16, 95:16
**promoted** [1] - 35:17
**promulgated** [1] - 96:24
**proof** [1] - 62:18
**property** [1] - 25:22
**propose** [1] - 81:6
**proposed** [11] - 91:15, 91:16, 91:17, 91:22, 104:5, 104:7,

114:13, 127:20, 128:4,
128:8, 128:12
**prosecute** [3] - 13:16, 38:12,
40:24
**prosecuted** [8] - 13:8, 13:10,
13:14, 30:6, 40:23, 41:11,
45:10, 64:20
**prosecuting** [2] - 38:16,
64:17
**prosecution** [7] - 35:12,
43:17, 44:25, 45:2, 45:7,
45:11, 45:14
**Prosecutions** [1] - 41:3
**prosecutions** [6] - 35:14,
39:3, 40:22, 43:20, 44:2,
44:5
**prosecutors** [3] - 61:4,
61:11, 64:15
**protect** [1] - 99:16
**protested** [1] - 75:12
**provide** [14] - 8:25, 9:7,
11:10, 19:15, 24:2, 70:22,
71:5, 78:16, 87:17, 88:15,
96:2, 96:19, 119:3, 128:2
**provided** [10] - 6:16, 6:19,
10:17, 53:23, 92:17, 95:4,
114:16, 114:20, 132:3,
136:10
**provides** [2] - 86:25, 96:4
**providing** [1] - 11:4
**public** [23] - 12:12, 12:18,
27:13, 30:24, 35:24, 60:11,
79:15, 103:24, 104:1,
105:25, 114:12, 117:22,
118:12, 119:5, 119:8,
119:11, 119:15, 119:17,
119:18, 119:24, 122:13,
126:8, 128:8
**Public** [10] - 62:11, 88:4,
88:8, 88:10, 88:11, 89:20,
90:13, 98:7, 119:14,
136:11
**public's** [3] - 30:12, 30:14,
30:18
**publicize** [1] - 140:17
**publicly** [13] - 79:15, 80:12,
81:15, 82:1, 99:14, 101:1,
101:3, 101:5, 101:9, 103:8,
108:24, 119:7, 121:11
**pull** [1] - 54:23
**punishable** [1] - 43:10
**purpose** [11] - 30:12, 30:19,
34:1, 76:8, 94:16, 94:18,
99:13, 99:14, 100:9, 124:9,
142:18
**purposes** [3] - 51:11, 60:10,
136:6
**pursuant** [3] - 61:10, 62:5,
113:20
**pursuing** [1] - 48:15

**push** [1] - 28:5
**put** [12] - 6:15, 25:8, 33:1,
76:12, 83:11, 83:13, 89:24,
91:21, 97:9, 101:13,
137:18, 145:9
**puzzling** [1] - 138:8
**PX-41** [3] - 39:25, 40:3, 43:23
**PX-42** [3] - 40:19, 41:4, 42:18
**PX-43** [1] - 42:13

## Q

**quarter** [1] - 141:14
**QUESTION** [2] - 11:12, 11:18
**questioning** [1] - 127:14
**questions** [15] - 13:17, 31:1,
33:15, 54:18, 65:21, 68:25,
69:18, 82:24, 82:25, 84:14,
90:11, 94:3, 122:25,
126:14, 126:15
**quick** [2] - 65:15, 92:2
**quickly** [1] - 65:20
**quite** [3] - 32:16, 47:15, 61:4
**quote** [2] - 104:2, 141:10

## R

**racial** [2] - 116:11, 132:9
**raised** [1] - 100:19
**range** [1] - 51:3
**Rangers** [1] - 13:13
**rank** [3] - 34:22, 34:23, 35:17
**ranked** [1] - 105:18
**rates** [1] - 17:5
**rather** [2] - 79:2, 81:13,
109:2
**rea** [3] - 59:17, 60:4, 60:6
**reach** [1] - 88:24
**reached** [1] - 81:25
**read** [14] - 14:20, 21:18,
21:19, 22:8, 28:24, 67:17,
93:20, 95:17, 95:20,
108:17, 122:8, 123:17,
126:22, 127:9
**reading** [1] - 21:25
**reads** [1] - 23:9
**real** [1] - 143:24
**really** [23] - 5:3, 5:8, 10:19,
10:20, 10:22, 21:2, 31:15,
33:21, 43:7, 47:22, 58:6,
66:10, 74:18, 87:25, 91:3,
92:2, 95:16, 119:2, 120:10,
122:2, 123:7, 126:9, 143:6
**reason** [7] - 14:11, 61:23,
81:5, 86:22, 86:24, 87:24,
128:25
**reasonable** [1] - 62:18
**reasons** [3] - 11:23, 141:13,

141:15
**REBECCA** [1] - 3:9
**Rebecca** [2] - 118:3, 147:3
**receive** [3] - 42:22, 96:7,
118:10
**received** [4] - 22:13, 119:11,
119:17, 119:21
**receives** [4] - 37:14, 37:20,
39:5, 40:6
**recent** [1] - 144:2
**recently** [1] - 28:17
**Recess** [1] - 92:11
**recognize** [2] - 108:14, 144:1
**recognized** [1] - 75:4
**recognizing** [2] - 101:19,
101:20
**recollection** [9] - 21:9,
21:17, 23:6, 70:22, 80:18,
102:12, 114:1, 130:13,
132:1
**reconvene** [1] - 94:10
**record** [34] - 10:20, 10:21,
10:22, 11:4, 21:25, 39:8,
39:12, 39:18, 40:14, 79:13,
80:11, 80:12, 95:13,
105:25, 117:22, 118:12,
119:6, 119:8, 119:12,
119:15, 119:17, 119:18,
119:24, 121:7, 122:3,
122:13, 128:8, 128:23,
133:11, 133:12, 134:19,
145:22, 145:24, 147:4
**RECORD** [3] - 94:11, 123:14,
127:13
**recording** [1] - 107:7
**records** [10] - 64:9, 91:9,
136:14, 138:17, 138:25,
139:16, 142:6, 145:15,
145:18, 145:23
**RECROSS** [1] - 4:2
**red** [1] - 25:20
**REDIRECT** [2] - 4:2, 69:4
**redirect** [4] - 33:18, 69:2,
69:3, 134:9
**redistricting** [11] - 82:5,
83:16, 111:10, 111:16,
111:19, 111:21, 113:19,
113:24, 129:21, 130:2,
146:8
**reduced** [2] - 79:16, 107:6
**reduces** [3] - 142:8, 142:12,
144:21
**refer** [8] - 36:14, 36:15,
38:11, 38:14, 43:13, 43:20,
73:20, 79:4, 79:5, 83:6
**reference** [3] - 10:21, 11:22,
86:5
**referenced** [1] - 55:22
**referencing** [3] - 52:9,
117:19, 117:24

**referral** [11] - 37:12, 37:15,
37:23, 37:24, 39:5, 39:7,
40:11, 42:22, 44:15, 61:19,
62:1
**Referrals** [2] - 41:2, 42:9
**referrals** [11] - 37:20, 37:25,
39:2, 40:6, 44:7, 44:10,
44:12, 44:16, 45:15, 56:8,
61:24
**referred** [16] - 5:23, 38:22,
43:3, 44:9, 44:24, 45:2,
45:7, 45:11, 58:6, 67:11,
74:6, 83:9, 83:12, 83:14,
84:11, 115:18
**referring** [2] - 54:20, 122:13
**reflect** [2] - 8:6, 11:4
**reform** [1] - 82:3
**reframe** [1] - 80:2
**refresh** [4] - 21:9, 23:6,
130:13, 132:1
**refreshes** [1] - 21:17
**regard** [1] - 50:14
**regarding** [6] - 11:24, 52:10,
54:21, 64:4, 88:7, 100:19
**regardless** [1] - 16:12
**regards** [1] - 50:15
**region** [1] - 98:6
**register** [1] - 12:14
**registered** [5] - 12:7, 12:11,
13:4, 16:25, 117:19
**registering** [1] - 13:1
**registrant** [4] - 137:3, 137:8,
138:15, 144:22
**registrants** [5] - 136:9,
136:16, 136:18, 136:25,
137:2
**registrar** [6] - 17:8, 17:9,
56:20, 56:23, 58:24, 59:15
**registrar's** [1] - 17:13
**registrars** [2] - 60:8, 60:10
**registration** [33] - 17:5, 22:9,
23:10, 23:18, 29:3, 29:18,
46:3, 46:7, 46:16, 53:20,
53:22, 53:24, 54:8, 55:4,
55:19, 67:3, 70:15, 70:24,
138:22, 139:4, 139:7,
139:8, 139:24, 139:25,
142:8, 142:10, 142:24,
145:2, 145:4, 145:5, 145:7,
145:21, 145:25
**Registration** [1] - 136:22
**regular** [35] - 72:5, 72:7,
72:9, 72:10, 72:14, 72:18,
72:19, 72:23, 73:1, 73:3,
73:4, 73:13, 73:16, 74:7,
74:9, 74:10, 74:23, 75:5,
75:8, 75:24, 76:2, 76:10,
77:10, 78:21, 82:4, 82:10,
83:1, 84:22, 86:14, 86:17,
86:23, 87:11, 102:22,

103:12, 125:11
**regularly** [1] - 99:24
**related** [9] - 14:4, 14:7, 26:15, 27:25, 43:24, 80:25, 110:5, 122:10, 122:19
**relates** [1] - 10:3
**relating** [1] - 110:11
**relation** [1] - 115:12
**relationship** [1] - 63:18
**relevant** [2] - 41:15, 120:11
**reliant** [1] - 16:20
**remain** [1] - 145:7
**remaining** [1] - 133:2
**remarks** [10] - 6:14, 6:16, 6:19, 7:13, 7:18, 7:25, 8:2, 8:7, 8:9, 107:25
**remedy** [1] - 18:17
**remember** [6] - 13:21, 21:4, 21:8, 22:8, 23:2, 86:2
**remote** [2] - 97:15, 98:6
**removal** [1] - 17:14
**remove** [4] - 141:15, 142:18, 145:15, 145:17
**removed** [8] - 141:14, 142:6, 142:7, 142:13, 142:23, 145:3, 145:24, 145:25
**removing** [2] - 141:12, 145:13
**renew** [6] - 96:23, 96:25, 143:11, 143:18, 144:6, 144:9
**renewal** [1] - 143:22
**rent** [1] - 8:13
**rental** [1] - 9:4
**repeat** [4] - 16:1, 95:12, 122:17, 134:18
**repeated** [2] - 10:8, 134:22
**rephrase** [2] - 63:3, 90:7
**report** [6] - 20:20, 114:17, 115:10, 118:10, 134:24, 138:9
**reported** [1] - 3:12
**REPORTER** [2] - 147:1, 147:10
**reporter** [1] - 10:15
**Reporter** [2] - 3:9, 3:9
**reports** [7] - 91:6, 91:8, 91:10, 93:8, 93:13, 93:20, 123:19
**represent** [2] - 44:13, 49:20
**representative** [11] - 8:6, 10:10, 11:9, 14:21, 14:24, 16:1, 18:16, 20:9, 26:6, 26:8, 118:3
**Representative** [12] - 5:16, 7:12, 8:12, 9:20, 11:5, 11:20, 16:23, 23:1, 23:6, 25:1, 27:4, 34:2
**Representatives** [2] - 7:23, 70:18

**representing** [2] - 63:1, 100:13
**represents** [4] - 42:14, 44:14, 99:9, 103:5
**Republican** [2] - 6:25, 81:7
**Republicans** [3] - 6:18, 6:20, 78:4
**request** [9] - 64:8, 118:1, 118:2, 118:7, 118:14, 118:17, 119:13, 120:5, 120:17
**requested** [3] - 13:18, 117:14, 117:17
**requests** [1] - 37:15
**require** [3] - 47:7, 73:6, 73:9
**required** [16] - 19:2, 31:25, 38:11, 61:11, 72:25, 76:21, 79:9, 87:19, 96:9, 98:3, 111:1, 127:21, 137:12, 138:11, 141:3, 141:5
**requirement** [11] - 9:10, 32:4, 38:13, 51:11, 109:2, 109:3, 110:3, 111:3, 115:21, 133:15
**requirements** [2] - 67:10, 110:12
**requires** [3] - 31:17, 61:15, 73:3
**requiring** [4] - 49:12, 106:4, 137:7, 140:25
**research** [7] - 17:20, 80:13, 111:23, 112:2, 112:7, 125:2, 125:4
**reside** [1] - 125:20
**resisted** [2] - 108:19, 108:22
**Resolution** [8] - 42:10, 106:17, 106:22, 109:2, 109:20, 112:18, 112:20, 114:3
**resolution** [13] - 41:14, 42:15, 42:21, 104:5, 104:14, 104:22, 105:8, 106:1, 113:22, 113:23, 113:24, 114:6
**resolutions** [1] - 78:22
**resolved** [1] - 39:3
**Resolved** [1] - 41:3
**resources** [1] - 43:11
**respect** [5] - 18:14, 39:6, 69:9, 123:22, 133:20
**responding** [1] - 55:15
**response** [5] - 7:2, 65:20, 97:10, 118:6, 127:4
**responsibilities** [1] - 38:17
**responsibility** [5] - 16:16, 16:25, 17:2, 35:4, 88:7
**responsible** [1] - 81:8
**restate** [1] - 101:8
**restatement** [1] - 33:12
**restrain** [1] - 89:13

**restrict** [1] - 61:24
**restricted** [1] - 62:25
**result** [9] - 56:19, 56:25, 77:17, 80:13, 84:19, 102:21, 103:11, 139:13, 146:2
**resulted** [1] - 45:3
**results** [2] - 19:19, 130:17
**resume** [1] - 92:5
**reveal** [3] - 91:19, 123:1, 123:23
**review** [3] - 19:22, 21:16, 123:19
**reviewed** [5] - 91:6, 122:21, 122:23, 125:4, 130:18
**revolution** [1] - 16:21
**Reyna** [6] - 46:12, 51:14, 51:17, 51:19, 69:12, 69:13
**ride** [1] - 15:13
**right-hand** [1] - 110:20
**rights** [1] - 25:22
**Rights** [3] - 2:7, 18:14, 18:18
**Rio** [2] - 98:15, 99:3
**RISA** [1] - 2:5
**Risk** [1] - 135:18
**ROBERT** [1] - 1:13
**Rodriguez** [1] - 31:4
**role** [4] - 70:12, 88:7, 90:24, 92:15
**roll** [2] - 75:13, 77:7
**rolls** [3] - 17:8, 19:20, 20:18
**Room** [2] - 2:8, 3:10
**ROSEMARY** [1] - 1:13
**Rosenberg** [1] - 65:16
**ROSENBERG** [4] - 2:11, 65:15, 65:17, 68:25
**roughly** [4] - 98:18, 99:25, 125:17, 125:18
**rounding** [1] - 81:8
**rounds** [1] - 29:7
**routed** [2] - 37:20, 38:1
**routine** [1] - 97:12
**RPR** [1] - 3:9
**Rule** [16] - 79:13, 80:7, 81:2, 81:20, 109:6, 109:9, 109:23, 110:24, 111:9, 112:9, 114:2, 114:3, 114:16, 114:20, 115:14, 115:19
**rule** [19] - 18:9, 73:21, 78:13, 78:16, 78:17, 78:25, 80:15, 81:6, 86:8, 86:10, 106:11, 108:8, 108:23, 109:6, 109:14, 110:2, 111:17, 115:3, 115:13
**ruled** [3] - 39:12, 39:15, 39:18
**Rules** [2] - 109:19, 116:16
**rules** [29] - 72:4, 72:9, 72:15, 72:17, 73:6, 73:9, 77:16,

78:10, 79:6, 79:9, 79:11, 80:12, 80:23, 82:20, 84:23, 87:17, 96:23, 104:5, 104:9, 104:14, 104:22, 105:1, 105:8, 105:11, 105:22, 111:9, 112:24, 113:21, 116:19
**ruling** [1] - 33:14
**run** [2] - 29:24, 135:4
**running** [1] - 75:14
**rural** [5] - 35:13, 97:3, 97:16, 98:2, 124:11

---

**S**

**sad** [1] - 135:6
**Safety** [10] - 62:11, 88:4, 88:8, 88:10, 88:11, 89:21, 90:14, 98:7, 119:14, 136:11
**Sager** [8] - 134:16, 134:17, 134:22, 135:14, 135:15, 136:1, 136:5, 138:2
**SAGER** [2] - 4:10, 135:10
**Sager's** [1] - 135:21
**San** [1] - 46:1
**SANCHEZ** [4] - 3:1, 31:3, 31:6, 33:10
**Sanchez** [2] - 4:4, 31:3
**Sanctuary** [2] - 32:14, 32:25
**saw** [4] - 22:5, 30:2, 93:12, 94:12
**SB14** [46] - 5:19, 6:4, 6:6, 6:14, 6:17, 6:18, 6:19, 6:21, 6:23, 9:13, 10:2, 12:4, 14:10, 14:16, 14:17, 14:18, 17:22, 18:25, 19:4, 19:10, 19:20, 24:2, 27:22, 28:10, 28:12, 30:19, 30:20, 32:11, 50:13, 50:15, 50:23, 51:1, 51:9, 51:10, 52:16, 65:3, 86:11, 86:13, 96:9, 96:12, 98:3, 116:22, 118:17, 118:22, 122:22, 124:18
**SB14's** [1] - 67:10
**SB18** [1] - 76:25
**SB362** [8] - 83:19, 104:15, 104:19, 104:23, 105:2, 105:5, 116:5, 116:11
**scan** [1] - 23:25
**scene** [1] - 104:2
**school** [3] - 46:23, 51:18, 135:19
**School** [1] - 45:22
**schools** [1] - 126:8
**scope** [2] - 65:9, 79:20
**SCOTT** [1] - 1:23
**scratch** [1] - 112:16

**screen** [2] - 25:8, 140:18
**seats** [1] - 15:11
**second** [22] - 25:6, 39:2, 48:13, 49:8, 50:7, 51:21, 57:4, 60:4, 77:6, 77:12, 77:15, 94:9, 99:1, 103:11, 103:16, 123:8, 123:13, 134:24, 137:9, 137:13, 138:7, 140:25
**Second** [1] - 23:9
**Secretary** [9] - 17:10, 17:15, 20:3, 37:16, 40:11, 61:12, 96:7, 117:15, 136:10
**Section** [3] - 2:7, 18:11, 18:18
**Security** [12] - 88:5, 137:6, 137:8, 140:2, 140:3, 140:23, 140:24, 141:2, 141:4, 141:25, 145:13
**security** [1] - 25:24
**see** [30] - 21:16, 32:18, 34:5, 39:17, 39:25, 42:4, 42:8, 55:3, 55:5, 65:18, 107:24, 109:12, 109:14, 109:19, 109:22, 110:1, 110:19, 110:21, 111:6, 112:19, 113:11, 113:14, 126:9, 129:12, 129:13, 132:5, 132:7, 146:24
**seek** [1] - 124:7
**seeking** [1] - 108:22
**segregation** [3] - 18:5, 18:10, 18:17
**select** [3] - 5:19, 5:23, 6:1
**self** [1] - 16:20
**self-reliant** [1] - 16:20
**Sells** [1] - 94:5
**Senate** [137] - 17:25, 18:4, 48:25, 49:2, 70:7, 70:12, 70:25, 71:2, 71:3, 71:16, 71:18, 72:2, 72:8, 72:11, 72:15, 72:16, 73:2, 73:6, 73:9, 73:12, 73:14, 73:17, 73:21, 73:24, 75:12, 75:17, 75:20, 75:25, 76:19, 76:25, 78:6, 78:13, 79:1, 79:6, 79:9, 79:11, 79:17, 79:25, 80:1, 80:14, 80:16, 81:8, 81:10, 81:22, 81:24, 82:8, 82:11, 82:12, 82:17, 82:21, 83:2, 83:3, 83:6, 83:9, 83:16, 83:23, 84:8, 84:19, 85:1, 85:3, 85:22, 86:8, 86:16, 87:7, 87:15, 87:17, 87:19, 87:22, 88:5, 96:1, 96:7, 99:7, 99:13, 99:14, 99:18, 100:9, 100:24, 101:17, 101:21, 102:4, 102:18, 102:25, 103:11, 103:23, 104:2, 104:12,

104:14, 104:18, 104:23, 105:1, 105:3, 105:5, 105:8, 105:11, 105:16, 105:21, 105:22, 106:1, 106:5, 106:12, 106:17, 106:22, 107:4, 107:5, 107:8, 107:9, 107:15, 108:12, 109:1, 109:19, 109:20, 111:1, 112:18, 112:20, 114:3, 114:6, 114:11, 114:21, 115:2, 116:5, 119:9, 120:7, 120:17, 123:18, 125:8, 125:15, 129:18, 129:20, 130:10, 130:19, 130:22, 131:17, 133:8, 133:10, 133:13
**Senator** [54] - 69:22, 70:3, 75:4, 75:11, 75:16, 75:19, 77:7, 77:8, 99:7, 100:17, 101:7, 102:25, 103:3, 103:15, 105:14, 105:15, 105:21, 106:2, 106:8, 106:16, 106:23, 106:25, 107:10, 107:16, 107:23, 108:8, 108:17, 110:13, 111:6, 112:13, 112:19, 112:24, 113:15, 115:5, 115:12, 115:20, 117:9, 117:12, 119:6, 119:16, 119:21, 120:1, 121:14, 123:5, 123:9, 124:17, 125:2, 125:16, 126:24, 127:9, 127:16, 129:11, 134:7, 134:12
**SENATOR** [2] - 4:7, 69:24
**senator** [14] - 70:5, 89:11, 89:13, 94:20, 95:3, 96:1, 98:1, 99:9, 99:12, 103:8, 116:11, 126:11, 131:13, 132:9
**senator's** [2] - 79:22, 92:15
**Senator's** [1] - 120:5
**senators** [5] - 73:20, 77:24, 102:22, 103:20, 112:1
**send** [2] - 23:11, 26:22
**sending** [1] - 110:5
**seniority** [1] - 105:18
**sense** [3] - 82:20, 82:22, 93:11
**sent** [4] - 26:3, 45:13, 115:15, 117:1
**sentence** [2] - 120:15
**sentiment** [1] - 16:23
**separate** [4] - 113:22, 113:23, 113:24, 140:22
**September** [1] - 35:9
**serious** [1] - 13:17
**servants** [1] - 60:11
**served** [2] - 70:11, 129:20
**service** [2] - 9:4, 105:19

**Services** [2] - 133:24
**services** [2] - 88:25, 95:7
**SESSION** [2] - 1:6, 1:11
**session** [42] - 32:17, 49:25, 70:18, 71:8, 76:4, 76:5, 79:8, 83:9, 85:12, 85:14, 85:19, 86:4, 86:7, 87:8, 87:21, 87:24, 87:25, 88:1, 101:18, 101:19, 101:21, 102:5, 103:24, 104:6, 104:7, 104:11, 105:9, 105:12, 105:22, 105:23, 107:13, 111:9, 112:10, 112:12, 112:19, 112:22, 112:24, 113:2, 116:15, 116:22, 119:15
**sessions** [1] - 111:17
**set** [23] - 80:16, 86:9, 86:11, 86:23, 86:24, 105:11, 109:3, 109:10, 111:2, 111:16, 111:19, 113:20, 113:24, 115:16, 115:23, 136:9, 136:11, 136:13, 136:15, 138:11, 141:8, 141:23, 142:5
**sets** [8] - 87:24, 110:2, 136:8, 136:24, 137:7, 138:12, 140:22, 141:12
**setting** [4] - 79:18, 80:8, 109:9, 110:5
**seven** [3] - 14:25, 15:4, 111:2
**several** [2] - 17:11, 102:1
**shall** [1] - 89:18
**shore** [1] - 99:15
**short** [3] - 10:21, 69:3, 146:22
**shorter** [1] - 90:10
**shorthand** [1] - 3:12
**show** [10] - 9:5, 19:2, 29:18, 39:25, 40:17, 41:17, 42:7, 110:9, 132:4, 133:11
**showed** [4] - 22:21, 70:23, 77:8, 78:2
**showing** [4] - 8:16, 8:21, 10:3, 96:8
**shown** [4] - 26:20, 75:15, 138:1, 143:14
**shows** [2] - 42:11, 145:22
**SHRIVER** [1] - 2:22
**sic** [2] - 52:6, 135:21
**sic)** [1] - 114:17
**sick** [1] - 81:14
**side** [6] - 8:4, 8:5, 93:5, 110:17, 110:20
**side-by-side** [1] - 110:17
**sign** [4] - 8:24, 9:3, 9:4, 9:6
**sIGNATURE** [1] - 147:10
**signed** [4] - 9:2, 56:23, 118:17, 125:19
**significant** [2] - 89:4, 141:18

**similar** [1] - 62:17
**simple** [2] - 76:23, 79:10
**simply** [2] - 33:12, 143:3
**single** [2] - 19:25, 20:10
**sister** [1] - 66:24
**sit** [1] - 57:12
**site** [12] - 24:17, 24:20, 25:1, 25:7, 26:3, 26:9, 26:16, 26:17, 26:19, 27:2, 27:3
**sits** [1] - 87:8
**sitting** [1] - 67:4
**situation** [2] - 31:7, 81:17
**SIU** [12] - 36:5, 36:14, 37:13, 38:1, 38:3, 39:5, 43:3, 43:17, 44:8, 44:17, 44:19, 46:25
**six** [10] - 6:22, 6:24, 7:4, 45:9, 65:21, 79:12, 86:5, 96:25, 106:16, 117:10
**six-hour** [1] - 106:16
**sixth** [1] - 50:7
**size** [1] - 98:19
**slide** [1] - 140:14
**smaller** [1] - 35:13
**Smith** [5] - 138:15, 138:18, 138:22, 138:25, 139:4
**Smiths** [1] - 138:16
**Social** [11] - 137:6, 137:8, 140:2, 140:3, 140:22, 140:23, 140:24, 141:2, 141:4, 141:25, 145:13
**society** [1] - 18:5
**sole** [1] - 38:4
**someone** [18] - 12:13, 13:1, 16:11, 22:14, 23:25, 29:18, 37:8, 41:21, 50:21, 52:14, 66:12, 67:10, 68:19, 76:9, 90:20, 92:21, 138:16
**Somervelle** [1] - 2:15
**sometime** [1] - 73:19
**sometimes** [6] - 44:15, 63:24, 64:17, 101:22, 101:23, 132:15
**somewhat** [2] - 73:15, 138:8
**son** [3] - 46:15, 48:23, 66:8
**sons** [1] - 46:13
**sorry** [20] - 25:3, 41:18, 45:25, 55:13, 59:14, 60:3, 60:24, 62:22, 65:14, 67:25, 71:9, 81:19, 104:8, 104:17, 107:11, 112:16, 120:14, 128:7, 130:16, 142:11
**sort** [4] - 42:20, 68:15, 93:12, 137:4
**sought** [3] - 121:1, 124:2, 124:5
**sound** [1] - 90:5
**sounds** [1] - 16:9
**source** [8] - 37:16, 40:12, 92:19, 93:4, 93:17, 93:19,

93:24
**sources** [2] - 37:15, 93:22
**South** [4] - 15:10, 27:24, 31:7, 32:9
**southeastern** [1] - 70:6
**Southern** [1] - 83:12
**Spanish** [1] - 24:12
**sparred** [1] - 91:15
**sparsely** [2] - 97:7, 97:11
**Speaker** [1] - 74:18
**Speaker's** [1] - 74:16
**speaking** [5] - 14:15, 86:22, 104:8, 107:24, 108:7
**Spears** [2] - 5:6, 5:8
**special** [32] - 43:15, 78:18, 78:20, 78:21, 79:4, 79:18, 80:8, 80:18, 81:23, 82:6, 86:9, 86:11, 86:23, 86:24, 87:21, 87:24, 87:25, 88:1, 109:4, 109:10, 110:6, 111:3, 111:13, 111:19, 111:22, 113:14, 113:20, 113:24, 115:6, 115:16, 115:23, 116:23
**Special** [9] - 35:18, 35:19, 35:21, 36:6, 37:20, 40:5, 40:21, 44:1, 113:18
**specific** [3] - 12:2, 29:11, 122:24
**specifically** [5] - 50:24, 56:15, 101:5, 116:15, 117:17
**speculation** [2] - 47:14, 47:16
**speed** [1] - 10:22
**SPENCER** [2] - 1:22, 2:6
**Spencer** [1] - 100:13
**spend** [2] - 47:23, 146:21
**spending** [1] - 25:18
**spends** [1] - 47:23
**sponsor** [1] - 104:22
**sponsors** [1] - 6:10
**spotted** [1] - 68:22
**spread** [1] - 23:9
**spreadsheet** [13] - 38:25, 39:4, 39:6, 39:9, 40:4, 40:8, 40:9, 40:18, 40:20, 42:23, 44:3, 55:22, 56:1
**spreadsheets** [6] - 39:10, 39:14, 39:16, 39:17, 39:24, 43:23
**SR14** [6] - 106:1, 111:8, 111:24, 114:9, 115:25, 116:15
**STACEY** [1] - 1:17
**staff** [5] - 118:9, 122:10, 122:19, 122:21, 123:18
**stand** [2] - 8:2, 12:3
**standing** [1] - 64:11
**started** [5] - 65:20, 73:19,

136:6, 136:8, 136:24
**starts** [2] - 122:9, 126:23
**state** [36] - 29:20, 35:3, 35:13, 46:1, 49:6, 64:9, 67:25, 70:5, 70:6, 78:3, 84:17, 85:12, 89:10, 92:25, 96:3, 96:18, 97:4, 97:7, 97:12, 97:16, 97:17, 98:6, 98:8, 98:17, 98:21, 98:24, 124:12, 129:24, 132:22, 134:3, 136:13, 142:21, 143:4, 143:6, 144:4, 144:7
**STATE** [1] - 1:3
**State** [20] - 17:15, 34:7, 34:19, 36:13, 38:5, 43:10, 48:7, 48:10, 61:12, 69:21, 69:22, 71:3, 131:14, 133:23, 133:24, 134:10, 134:15, 136:10, 146:9
**State's** [6] - 17:11, 20:3, 37:16, 40:11, 96:8, 117:15
**state-issued** [1] - 98:17
**statement** [11] - 7:8, 10:8, 17:4, 19:20, 27:10, 68:12, 68:19, 93:3, 93:23, 103:24, 104:1
**statements** [2] - 7:25, 93:7
**STATES** [3] - 1:1, 1:12, 1:14
**States** [3] - 1:7, 34:3, 94:1
**statewide** [1] - 17:6
**statistical** [1] - 143:25
**Statistics** [1] - 134:3
**statistics** [2] - 135:17, 135:23
**statute** [6] - 41:15, 43:6, 52:20, 60:13, 61:17, 62:9
**statutory** [1] - 64:5
**steal** [1] - 31:9
**step** [1] - 17:12
**Stephen** [1] - 136:17
**steps** [3] - 88:24, 89:1, 90:1
**STEWART** [1] - 2:3
**still** [10] - 8:25, 12:3, 18:4, 18:13, 24:20, 94:12, 100:1, 105:17, 133:10, 133:12
**stocked** [1] - 17:24
**STONESTREET** [1] - 3:9
**Stonestreet** [1] - 147:3
**stop** [3] - 16:15, 16:24, 131:13
**stopped** [3] - 27:22, 32:5, 50:15
**store** [2] - 9:2, 97:13
**Street** [4] - 1:19, 1:24, 2:15, 3:6
**stricken** [2] - 7:7, 49:17
**strike** [3] - 7:1, 32:3, 119:24
**strip** [1] - 23:24
**strong** [1] - 100:4
**strong-willed** [1] - 100:4

**stronger** [1] - 137:19
**strongly** [1] - 146:20
**studies** [2] - 123:19, 124:17
**study** [3] - 118:24, 119:2, 124:2
**stuff** [2] - 95:17, 146:20
**subgroup** [1] - 36:14
**submit** [1] - 95:17
**subsequent** [1] - 118:8
**subsequently** [1] - 138:9
**subset** [1] - 136:16
**subsets** [1] - 142:17
**substance** [1] - 97:21
**substantiated** [1] - 59:12
**substantive** [5] - 72:13, 74:5, 106:5, 106:12, 108:10
**successfully** [1] - 13:5
**sufficient** [2] - 10:22, 43:19
**Suite** [6] - 1:24, 2:12, 2:16, 2:19, 3:2, 3:6
**sum** [1] - 59:21
**summaries** [1] - 134:23
**summer** [1] - 36:3
**supervise** [1] - 36:4
**supervisor** [4] - 40:5, 40:20, 46:25, 93:19
**supervisory** [2] - 35:3, 38:17
**support** [9] - 6:14, 14:10, 14:16, 14:17, 19:20, 78:2, 91:22, 133:10, 133:13
**supported** [1] - 6:23
**supporter** [1] - 100:20
**supporters** [1] - 102:15
**supporting** [2] - 30:12, 30:19
**supports** [2] - 18:11, 18:17
**suppose** [4] - 138:14, 138:16, 142:20, 144:22
**supposed** [2] - 5:7, 68:14
**supposedly** [1] - 66:11
**surprise** [2] - 125:8, 125:12
**surprised** [1] - 80:15
**surrender** [1] - 146:9
**surrounding** [1] - 36:19
**surveys** [1] - 78:1
**suspect** [3] - 47:22, 130:7, 131:12
**suspects** [1] - 48:2
**suspend** [22] - 72:4, 72:17, 72:18, 73:4, 74:23, 75:5, 75:7, 75:24, 76:1, 76:7, 76:10, 76:14, 76:17, 76:24, 77:10, 77:20, 87:11, 101:16, 102:9, 102:22, 103:12
**suspended** [1] - 82:10
**suspending** [1] - 85:14
**suspension** [2] - 75:6, 125:11
**suspicion** [1] - 22:18

**sustain** [1] - 33:7
**sustained** [1] - 49:16
**sweep** [8] - 137:6, 137:9, 137:10, 137:13, 137:21, 138:7, 140:25, 141:2
**Sweep** [4] - 138:4, 138:5, 138:20, 140:2
**sweeping** [1] - 82:2
**sweeps** [9] - 137:2, 137:5, 137:16, 138:1, 139:21, 139:22, 139:23, 141:15, 141:17
**Sweeps** [1] - 140:4
**SWEETEN** [25] - 1:16, 34:6, 34:13, 34:25, 39:13, 39:19, 39:21, 39:23, 41:7, 41:21, 42:1, 42:6, 42:13, 42:17, 48:4, 49:18, 55:14, 65:8, 69:3, 69:5, 69:18, 123:9, 123:16, 124:4, 124:23
**Sweeten** [8] - 4:6, 34:7, 41:18, 42:5, 49:19, 55:17, 124:22, 127:7
**Sweeten's** [1] - 65:21
**sworn** [4] - 5:13, 34:10, 69:25, 135:10
**system** [10] - 31:13, 32:7, 61:19, 89:6, 89:25, 90:14, 91:2, 94:15, 99:16

---

**T**

**t0** [1] - 55:15
**table** [1] - 41:22
**tabled** [3] - 127:22, 128:4, 128:8
**tactic** [2] - 84:6, 84:16
**talks** [6] - 25:14, 25:16, 25:18, 25:20, 25:22, 25:24
**tally** [1] - 45:15
**tape** [1] - 25:20
**Tarrant** [3] - 48:22, 50:8, 67:16
**tasks** [3] - 97:13, 101:18, 102:5
**Tatel** [1] - 133:21
**TATEL** [12] - 1:12, 127:16, 127:19, 127:24, 128:3, 128:7, 128:11, 128:15, 128:19, 128:22, 128:25, 129:4
**tax** [1] - 82:3
**team** [6] - 35:21, 35:25, 36:15, 36:17, 43:1, 43:16
**teams** [1] - 35:22
**technology** [3] - 24:3, 89:5, 95:8
**telephone** [4] - 89:7, 89:24, 90:14, 96:25

tend [1] - 132:18
tenured [1] - 135:17
term [3] - 6:9, 7:15, 87:3
terms [4] - 44:7, 44:20, 48:25, 130:20
testified [28] - 5:13, 7:17, 9:24, 10:2, 11:1, 13:18, 19:10, 20:3, 21:1, 22:13, 22:21, 24:5, 27:4, 27:24, 28:17, 29:14, 29:21, 29:25, 34:11, 67:14, 69:25, 95:3, 102:14, 129:16, 130:18, 132:8, 132:12, 135:11
testify [9] - 49:24, 50:1, 57:12, 90:4, 90:21, 94:14, 94:15, 94:17, 121:16
testifying [4] - 89:9, 89:11, 90:9, 118:3
testimony [58] - 10:17, 17:15, 21:5, 21:10, 21:11, 22:10, 22:11, 22:13, 22:17, 22:24, 23:14, 50:2, 55:9, 55:10, 56:3, 62:15, 69:11, 79:25, 82:1, 86:3, 86:4, 89:13, 90:4, 90:6, 91:9, 93:14, 95:16, 99:18, 99:21, 99:22, 102:14, 103:15, 103:19, 104:8, 104:22, 105:15, 106:13, 106:19, 106:24, 108:25, 110:8, 111:12, 113:23, 114:10, 114:12, 114:22, 116:20, 117:6, 118:20, 118:23, 119:1, 119:2, 119:8, 125:23, 127:7, 128:20, 136:6, 136:19
Texan [3] - 9:13, 9:16, 100:4
Texans [3] - 97:3, 97:16, 98:2
TEXAS [2] - 1:3, 1:18
Texas [98] - 7:22, 12:17, 12:20, 13:1, 13:13, 15:10, 16:7, 18:4, 18:12, 18:13, 18:18, 19:23, 20:18, 26:12, 27:14, 27:19, 27:24, 31:7, 32:9, 33:24, 34:2, 34:7, 34:8, 34:19, 34:20, 35:1, 35:6, 36:13, 36:18, 36:23, 37:16, 38:5, 43:10, 44:12, 44:23, 48:7, 48:11, 53:16, 59:22, 60:1, 60:11, 60:23, 61:10, 62:5, 64:7, 68:20, 69:22, 70:9, 70:11, 70:15, 70:18, 71:7, 71:12, 71:22, 74:3, 74:4, 83:10, 83:12, 85:10, 85:19, 97:11, 98:2, 98:15, 99:4, 103:5, 106:5, 106:12, 114:11, 116:2, 116:14, 124:11, 125:20, 129:23, 131:14, 131:19,

132:21, 132:23, 134:3, 134:14, 135:15, 135:16, 136:9, 136:10, 136:11, 136:12, 136:16, 136:18, 136:25, 137:1, 137:3, 142:22, 143:4, 143:15, 144:8, 144:16, 144:23, 146:9
Texas' [1] - 19:20
text [3] - 25:11, 109:14, 113:17
THE [64] - 1:2, 1:12, 1:13, 1:13, 1:18, 5:2, 7:4, 7:5, 7:7, 7:10, 31:2, 33:20, 34:23, 34:24, 39:20, 39:22, 41:2, 41:5, 41:23, 41:25, 49:16, 49:19, 54:12, 55:16, 58:10, 58:14, 58:19, 58:23, 59:2, 59:7, 59:9, 59:13, 60:7, 60:16, 89:16, 89:18, 94:5, 94:11, 94:22, 99:3, 100:5, 123:14, 124:8, 124:10, 127:13, 127:18, 127:23, 127:25, 128:6, 128:10, 128:14, 128:17, 128:20, 128:24, 129:3, 130:25, 131:7, 131:16, 131:20, 131:22, 137:24, 142:15, 144:5, 144:10
themselves [3] - 47:9, 63:1, 91:8
therefore [5] - 93:15, 120:21, 141:16, 143:1, 145:6
they've [11] - 24:17, 89:1, 89:4, 89:7, 89:22, 89:23, 90:18, 144:3, 144:7
thinking [4] - 19:11, 31:16, 39:22, 128:25
third [10] - 39:3, 42:7, 49:8, 52:1, 57:16, 137:13, 137:21, 138:7, 141:2, 141:24
thirds [23] - 73:3, 73:6, 73:9, 73:21, 73:23, 75:6, 76:18, 80:15, 80:16, 86:17, 87:15, 102:22, 104:12, 106:4, 106:11, 108:7, 108:23, 109:3, 115:5, 115:13, 116:5
Thomas [7] - 69:22, 134:16, 135:15, 145:21, 145:22, 145:24, 145:25
THOMAS [4] - 4:7, 4:10, 69:24, 135:10
thoughts [3] - 122:15, 123:2, 123:24
three [26] - 21:7, 22:5, 22:6, 26:5, 36:12, 38:25, 56:11, 56:12, 56:15, 59:4, 66:19, 70:11, 89:4, 126:23, 136:8,

137:2, 137:5, 137:12, 137:16, 138:1, 139:21, 139:22, 139:23, 141:1, 141:3, 141:21
threshold [1] - 19:7
tip [2] - 98:15, 99:4
title [4] - 34:21, 40:25, 41:2, 42:9
titled [2] - 104:15, 104:19
today [15] - 8:2, 17:16, 52:4, 53:14, 55:9, 55:10, 56:7, 57:12, 63:16, 67:4, 71:4, 71:6, 136:7, 136:20, 146:16
today's [1] - 56:5
together [1] - 10:13
Tom [2] - 145:20, 146:1
Tommy [1] - 70:5
tomorrow [2] - 146:17, 146:24
took [1] - 21:10
top [3] - 41:1, 87:9, 109:13
topic [1] - 99:12
total [4] - 36:4, 44:18, 45:9, 85:19
track [2] - 33:2, 38:21
tracking [1] - 39:8
tradition [8] - 73:16, 73:21, 73:24, 80:14, 80:17, 83:9, 87:15, 106:4
traditionally [1] - 81:24
trafficking [1] - 35:24
trained [1] - 89:3
training [1] - 89:2
transcript [2] - 3:12, 147:4
TRANSCRIPT [1] - 1:11
transcription [1] - 3:13
transcripts [1] - 21:16
Transportation [1] - 88:4
travel [3] - 15:22, 16:4, 35:12
trial [1] - 42:16
TRIAL [1] - 1:11
tried [1] - 66:12
trooper [1] - 63:22
trouble [1] - 97:4
true [19] - 7:25, 15:19, 23:21, 49:24, 51:17, 51:24, 57:25, 61:13, 61:16, 61:20, 65:2, 101:17, 101:22, 102:8, 124:17, 135:6, 139:6, 142:11
truncations [1] - 141:19
trusted [1] - 74:16
truth [8] - 29:22, 54:2, 54:3, 91:1, 91:2, 92:22, 93:15, 126:13
truthfully [1] - 7:21
try [7] - 42:8, 64:14, 66:2, 66:7, 66:22, 76:16, 134:18
trying [3] - 31:13, 81:13,

135:1
turn [2] - 5:9, 126:21
twice [8] - 80:19, 111:14, 111:15, 118:12, 139:8, 139:19, 139:20, 142:16
two [64] - 6:25, 26:4, 42:18, 45:24, 46:9, 46:13, 48:10, 66:12, 67:6, 67:8, 67:11, 73:3, 73:6, 73:9, 73:21, 73:23, 75:6, 75:11, 76:3, 76:18, 80:15, 80:16, 82:5, 83:10, 86:17, 87:15, 88:23, 89:4, 98:4, 101:19, 102:5, 102:17, 102:22, 103:23, 104:12, 106:4, 106:11, 108:7, 108:23, 109:3, 111:15, 111:17, 115:5, 115:13, 116:5, 119:4, 138:16, 138:17, 138:19, 138:25, 139:18, 141:5, 143:10, 143:13, 144:23, 145:18, 145:23, 146:7, 146:9, 146:11, 146:12
two-thirds [23] - 73:3, 73:6, 73:9, 73:21, 73:23, 75:6, 76:18, 80:15, 80:16, 86:17, 87:15, 102:22, 104:12, 106:4, 106:11, 108:7, 108:23, 109:3, 115:5, 115:13, 116:5
TX [1] - 1:20, 2:20
type [3] - 37:3, 67:1, 72:14
types [11] - 36:16, 36:21, 44:20, 44:21, 45:6, 49:4, 49:9, 51:4, 57:23, 64:15, 69:6
typically [4] - 38:1, 82:18, 84:7, 125:15

━━━━━━━━━━━━━

## U

U.S [2] - 2:6, 3:10, 58:15
ugly [2] - 84:3, 104:2
ultimately [1] - 72:6
unable [1] - 48:2
unaware [1] - 60:12
uncommon [1] - 82:6
uncontested [1] - 84:10
under [17] - 9:13, 10:17, 29:20, 36:10, 36:23, 41:15, 53:6, 62:3, 68:20, 71:6, 77:16, 80:20, 80:21, 85:9, 111:14, 113:18, 114:2
underlying [1] - 39:17
undocumented [1] - 12:20
undue [1] - 127:25
UNION [1] - 3:5
unique [3] - 138:11, 139:15, 139:17

**Unit** [8] - 35:18, 35:20, 35:21, 36:7, 37:21, 40:5, 40:21, 44:1

**unit** [1] - 36:2

**UNITED** [3] - 1:1, 1:12, 1:14

**United** [3] - 1:7, 34:3, 94:1

**University** [3] - 83:13, 135:15, 135:16

**unlawful** [2] - 14:2, 28:12

**unless** [3] - 95:13, 122:13, 144:7

**unquote** [2] - 104:3, 141:11

**unreasonable** [1] - 127:5

**unregistered** [1] - 16:17

**unsubstantiated** [1] - 59:10

**unusual** [1] - 74:8

**up** [75] - 8:4, 8:24, 9:2, 9:3, 9:4, 9:6, 10:22, 14:25, 19:4, 21:12, 21:13, 22:21, 23:3, 24:20, 25:8, 26:20, 32:24, 41:20, 48:22, 54:23, 55:3, 56:23, 58:16, 59:21, 70:23, 71:20, 71:22, 72:5, 72:10, 72:25, 73:2, 74:8, 74:12, 75:5, 75:20, 75:24, 76:10, 76:16, 77:8, 81:1, 81:8, 81:13, 81:17, 85:11, 87:12, 88:1, 89:21, 92:1, 99:15, 101:18, 102:13, 102:23, 103:13, 103:20, 107:2, 107:18, 108:5, 109:17, 109:25, 110:15, 110:23, 112:15, 118:1, 125:18, 137:18, 137:20, 141:16, 143:2, 143:22, 145:8, 146:3, 146:5, 146:6, 146:7, 146:14

**update** [2] - 40:15, 42:20

**updated** [1] - 42:19

**upgrades** [1] - 89:5

**upgrading** [1] - 89:6

**Uresti** [7] - 75:19, 77:8, 99:9, 102:25, 103:3, 103:8, 103:15

**urge** [1] - 146:19

**uses** [1] - 37:8

**utility** [1] - 71:5

## V

**VA** [1] - 2:16

**vague** [1] - 17:19

**Val** [3] - 98:14, 99:3, 99:10

**variations** [3] - 143:24, 144:1, 145:20

**variety** [2] - 35:23, 37:15

**various** [3] - 93:21, 141:12, 141:14

**Verde** [3] - 98:14, 99:3, 99:10

**verify** [4] - 68:17, 68:18, 124:10, 146:14

**version** [3] - 6:19, 6:21, 14:17

**versus** [1] - 143:18

**video** [1] - 9:4

**violate** [1] - 53:8

**violation** [8] - 37:25, 38:4, 38:21, 40:4, 40:10, 43:13, 52:9, 62:1

**violations** [16] - 35:25, 36:11, 36:16, 36:18, 37:13, 38:18, 44:4, 44:8, 44:20, 44:21, 44:22, 60:2, 61:2, 61:7, 64:13, 64:18

**visible** [1] - 25:12

**Vital** [1] - 134:2

**vocally** [1] - 32:19

**Voice** [1] - 89:24

**voice** [2] - 5:3, 5:4

**voiced** [1] - 112:1

**volunteered** [1] - 6:15

**vote** [86] - 9:13, 9:16, 9:21, 9:24, 10:3, 10:7, 12:7, 12:11, 12:14, 18:21, 20:7, 21:7, 22:5, 23:19, 28:2, 31:18, 32:4, 37:9, 37:10, 46:8, 46:10, 48:23, 55:4, 60:9, 60:12, 63:1, 68:17, 70:23, 70:24, 71:20, 72:17, 72:25, 73:6, 73:9, 73:11, 74:23, 74:24, 75:9, 75:18, 75:20, 75:24, 76:7, 76:17, 76:24, 77:6, 77:12, 77:15, 78:18, 79:19, 80:9, 80:18, 86:9, 86:18, 96:22, 99:24, 102:9, 102:13, 102:21, 102:24, 103:1, 103:11, 103:16, 104:2, 104:12, 105:5, 105:6, 109:2, 109:3, 109:10, 110:3, 111:1, 113:20, 114:13, 115:5, 115:6, 115:15, 115:21, 115:24, 116:5, 116:8, 116:23, 124:19, 132:13, 132:18

**voted** [17] - 20:1, 23:13, 23:16, 24:1, 26:4, 27:5, 33:11, 33:12, 53:18, 58:5, 59:16, 75:7, 76:19, 76:25, 102:22, 103:16, 116:11

**Voter** [8] - 74:22, 77:17, 80:24, 81:17, 85:3, 85:21, 96:1, 136:22

**voter** [191] - 5:20, 5:23, 5:24, 9:22, 9:25, 10:7, 11:23, 12:2, 12:4, 12:6, 13:8, 13:14, 14:4, 14:11, 14:12, 14:13, 16:25, 17:5, 17:8, 17:13, 19:2, 19:20, 20:6,

20:13, 20:23, 21:2, 22:9, 22:14, 22:18, 22:21, 22:24, 23:9, 23:10, 23:15, 23:18, 24:8, 24:11, 24:15, 26:1, 26:4, 26:15, 27:1, 28:8, 28:17, 28:22, 29:3, 29:10, 29:14, 29:17, 29:18, 29:22, 30:1, 30:4, 30:7, 31:21, 32:8, 32:9, 36:25, 37:1, 37:2, 37:5, 37:6, 37:8, 45:6, 45:8, 45:9, 45:12, 45:14, 45:19, 46:3, 46:7, 46:16, 47:1, 47:4, 47:8, 47:9, 47:11, 47:13, 47:20, 47:21, 47:25, 48:6, 48:12, 48:24, 49:2, 49:5, 50:3, 50:5, 50:11, 50:24, 51:10, 51:11, 52:3, 53:6, 53:13, 53:19, 53:21, 53:23, 54:8, 55:4, 55:19, 56:20, 56:23, 58:24, 59:15, 59:23, 60:8, 60:10, 62:14, 62:17, 62:21, 63:14, 63:18, 63:20, 63:25, 65:7, 65:21, 66:4, 67:2, 68:5, 68:8, 69:6, 69:8, 69:13, 70:14, 70:16, 70:23, 71:7, 71:12, 71:22, 77:21, 78:14, 78:19, 81:21, 84:25, 85:6, 86:8, 99:15, 99:18, 100:2, 100:7, 100:19, 104:6, 104:15, 104:18, 109:4, 109:9, 110:5, 110:9, 110:10, 110:11, 111:3, 111:6, 114:2, 114:10, 115:14, 116:16, 122:10, 122:19, 133:1, 136:9, 136:16, 136:25, 137:1, 137:3, 137:7, 138:15, 138:22, 139:4, 139:7, 139:24, 139:25, 142:8, 142:9, 142:22, 143:5, 144:22, 145:2, 145:4, 145:5, 145:7, 145:21, 145:25

**voter's** [1] - 68:17

**voters** [33] - 9:21, 10:6, 15:16, 16:17, 17:14, 20:1, 20:10, 20:11, 20:17, 20:19, 28:5, 47:23, 47:24, 59:23, 60:11, 62:25, 63:8, 68:16, 77:22, 96:11, 96:15, 101:2, 101:10, 117:19, 118:22, 125:20, 129:18, 130:20, 132:13, 132:18, 133:2, 133:9, 133:14

**votes** [11] - 37:2, 70:21, 76:13, 76:15, 76:21, 79:9, 81:8, 100:23, 102:17, 103:23, 108:14

**voting** [53] - 12:16, 12:20, 12:22, 14:7, 27:22, 28:10,

28:25, 30:21, 31:25, 36:18, 36:20, 36:21, 36:24, 37:3, 44:22, 45:5, 47:12, 49:4, 49:8, 49:10, 51:2, 56:4, 56:7, 56:10, 57:24, 58:3, 58:13, 58:15, 58:18, 58:21, 59:12, 60:13, 69:14, 73:4, 75:7, 75:15, 76:18, 76:23, 98:9, 98:13, 98:18, 98:19, 98:24, 100:1, 127:2, 130:2, 130:5, 130:8, 131:9, 131:10, 131:13, 132:5

**Voting** [3] - 2:7, 18:14, 18:18

**vouched** [1] - 46:15

**VRNID** [10] - 136:22, 139:11, 140:6, 142:3, 143:2, 144:15, 144:20, 145:8, 145:10, 146:3

## W

**wait** [4] - 75:23, 88:20, 124:1, 126:23

**walk** [1] - 141:18

**wants** [3] - 42:2, 96:21, 141:6

**warranted** [1] - 42:25

**Washington** [4] - 1:5, 2:9, 3:10, 144:8

**watch** [1] - 101:21

**watchers** [2] - 63:6, 68:14

**wave** [1] - 24:4

**web** [13] - 24:17, 24:20, 25:1, 25:6, 26:3, 26:9, 26:14, 26:16, 26:17, 26:19, 27:2, 27:3

**week** [1] - 101:15

**weight** [3] - 47:17, 92:20, 93:25

**Wells** [1] - 28:18

**West** [6] - 1:19, 1:24, 2:19, 97:11, 98:2, 124:11

**west** [1] - 97:11

**western** [1] - 97:7

**WESTFALL** [1] - 2:3

**wherewithal** [1] - 143:14

**white** [1] - 35:24

**Whitmire** [7] - 75:11, 75:16, 77:7, 105:14, 105:15, 105:21, 106:2

**Whole** [26] - 79:5, 82:15, 82:16, 82:17, 83:7, 83:10, 83:12, 83:14, 83:18, 85:25, 99:23, 114:17, 114:20, 115:3, 115:10, 115:13, 115:15, 115:18, 115:22, 116:10, 117:2, 117:4, 117:5, 117:13, 118:2, 118:21

**whole** [7] - 26:14, 47:17, 76:8, 83:17, 146:7, 146:11
**wide** [2] - 35:23, 37:15
**wife** [1] - 35:6
**WILKINS** [8] - 1:13, 42:12, 54:14, 60:3, 60:14, 60:17, 113:7, 137:20
**willed** [1] - 100:4
**WILLIAM** [1] - 1:16
**Williams** [6] - 69:22, 70:5, 96:1, 107:23, 127:16, 129:11
**WILLIAMS** [2] - 4:7, 69:24
**Williams'** [3] - 121:14, 123:5, 123:9
**willingness** [1] - 116:1
**withdraw** [1] - 8:21
**WITNESS** [42] - 4:2, 7:4, 33:20, 34:23, 41:2, 41:5, 58:10, 58:14, 58:19, 58:23, 59:2, 59:7, 59:9, 59:13, 60:7, 60:16, 89:16, 89:18, 94:22, 99:3, 100:5, 124:8, 124:10, 127:18, 127:23, 127:25, 128:6, 128:10, 128:14, 128:17, 128:20, 128:24, 129:3, 130:25, 131:7, 131:16, 131:20, 131:22, 137:24, 142:15, 144:5, 144:10
**witness** [26] - 5:12, 7:7, 11:6, 20:3, 21:6, 33:24, 34:10, 49:18, 55:14, 65:11, 69:24, 80:3, 90:9, 91:3, 91:17, 91:22, 94:14, 94:19, 95:14, 95:15, 97:20, 100:11, 124:2, 124:4, 134:14, 135:10
**witness'** [2] - 47:16, 49:16
**witnessed** [3] - 20:23, 21:2, 22:14
**witnesses** [3] - 29:22, 48:1, 82:25
**woman** [3] - 18:21, 18:23, 66:20
**words** [3] - 16:19, 88:2, 110:10
**worker** [9] - 46:5, 46:20, 46:22, 46:23, 52:6, 52:7, 66:16, 68:16, 68:22
**workers** [4] - 12:20, 63:1, 63:4, 68:14
**works** [2] - 93:8, 138:10
**worried** [1] - 12:21
**worry** [1] - 82:23
**wow** [1] - 94:12
**writing** [2] - 79:16, 107:6
**written** [1] - 115:3

## Y

**year** [4] - 74:21, 85:20, 114:7, 125:15
**years** [18] - 13:21, 18:8, 29:2, 35:9, 67:8, 73:18, 82:8, 83:15, 88:23, 96:25, 97:1, 99:25, 102:1, 105:19, 113:3, 128:17, 143:10, 143:13
**York** [2] - 2:23, 2:24
**youngest** [1] - 99:20
**yourself** [5] - 12:16, 34:16, 70:3, 98:1, 135:14
**Youth** [1] - 83:10

## Z

**Zapata** [1] - 16:21
**zoom** [1] - 8:10