```
                    UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                  :      Docket No. CA 12-128
                                 :
        Plaintiff                :
v.                               :
                                 :
ERIC H. HOLDER, JR., in his      :      Washington, D.C.
Official Capacity as             :      Tuesday, July 10, 2012
Attorney General of the          :      P.M. SESSION
United States,                   :
                                 :
        Defendant, and           :
                                 :
ERIC KENNIE, et al.,             :
                                 :
        Intervenor-Defendants    :      2:00 p.m.
. . . . . . . . . . . . . . . . .:. . . . . . . . . . . . . . .
                    TRANSCRIPT OF BENCH TRIAL
                      DAY 2 - P.M. SESSION
                BEFORE THE HONORABLE DAVID S. TATEL
                   UNITED STATES CIRCUIT JUDGE
                THE HONORABLE ROSEMARY M. COLLYER
                 THE HONORABLE ROBERT L. WILKINS
                   UNITED STATES DISTRICT JUDGES
```

APPEARANCES:

 For the Plaintiff:          PATRICK K. SWEETEN
                             JOHN WILLIAM MCKENZIE
                             MATTHEW H. FREDERICK
                             STACEY NAPIER
                             JONATHAN F. MITCHELL
                             OFFICE OF THE ATTORNEY GENERAL
                                OF TEXAS
                             209 West 14th Street
                             7th Floor (MC-059)
                             Austin, TX 78701
                             (512) 936-1695

                             ADAM K. MORTARA
                             ASHA L. I. SPENCER
                             JOHN M. HUGHES
                             BARTLIT BECK HERMAN
                                PALENCHAR & SCOTT, LLP
                             54 West Hubbard Street
                             Suite 300
                             Chicago, IL.  60654
                             (312) 494-4469

APPEARANCES CONTINUED:


For the Defendant:          ELIZABETH STEWART WESTFALL
                            MEREDITH BELL-PLATTS
                            JENNIFER MARANZANO
                            DANIEL J. FREEMAN
                            RISA BERKOWER
                            BRUCE I. GEAR
                            SPENCER R. FISHER
                            BRYAN L. SELLS
                            RICHARD ALAN DELLHEIM
                            U.S. DEPARTMENT OF JUSTICE
                            Civil Rights Division,
                            Voting Section
                            950 Pennsylvania Avenue, NW
                            NWB-Room 7202
                            Washington, DC 20530
                            (202) 305-7766


For the Intervenor          EZRA D. ROSENBERG
Defendants:                 DECHERT LLP
                            902 Carnegie Center
                            Suite 500
                            Princeton, NJ  08540-6531
                            (609) 955-3200

                            JOSEPH GERALD HEBERT
                            J. GERALD HEBERT, P.C.
                            191 Somervelle Street
                            Suite 405
                            Alexandria, VA  22304
                            (703) 628-4673

                            CHAD W. DUNN
                            BRAZIL & DUNN
                            4201 FM 1960 West
                            Suite 530
                            Houston, TX 77068
                            (281) 580-6310

                            ADAM M. HARRIS
                            FRIED, FRANK, HARRIS, SHRIVER &
                               JACOBSON LLP
                            One New York Plaza
                            24th Floor
                            New York, NY 10004
                            (212) 859-8953

APPEARANCES CONTINUED:          LUIS O. FIGUEROA
                                MEXICAN AMERICAN LEGAL DEFENSE AND
                                EDUCATIONAL FUND
                                110 Broadway
                                Suite 300
                                San Antonio, TX 78205
                                (210) 224-5476


                                NANCY G. ABUDU
                                AMERICAN CIVIL LIBERTIES UNION
                                FOUNDATION, INC.
                                230 Peachtree Street, NW
                                Suite 1440
                                Atlanta, GA  30303
                                (404) 523-2721


Court Reporter:                 REBECCA STONESTREET, RPR, CRR
                                Official Court Reporter
                                Room 6511, U.S. Courthouse
                                Washington, D.C.  20001
                                (202) 354-3249


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

4

# C O N T E N T S

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|----------|--------|-------|----------|---------|
| **REP. TREY MARTINEZ FISCHER** | | | | |
| By Ms. Westfall | 5 | -- | 19 | -- |
| By Mr. Hughes | -- | 7 | -- | -- |
| | | | | |
| **REP. RAFAEL ANCHIA** | | | | |
| By Ms. Berkower | 20 | -- | 45 | -- |
| By Mr. Hebert | 37 | -- | -- | -- |
| By Mr. Garza | 38 | -- | -- | -- |
| By Mr. Sweeten | -- | 39 | -- | -- |
| | | | | |
| **J. MORGAN KROUSSER** | | | | |
| By Mr. Dellheim | 48 | -- | 118 | -- |
| By Mr. Hughes | -- | 81 | -- | -- |
| By Mr. Hebert | -- | -- | 121 | -- |
| | | | | |
| **VICTORIA RODRIGUEZ** | | | | |
| By Mr. Figueroa | 123 | -- | -- | -- |

# E X H I B I T S

| NUMBER: | ADMITTED |
|---------|----------|

(NO EXHIBITS MOVED INTO EVIDENCE.)

5

| | |
|---|---|
| 1 | **P R O C E E D I N G S** |
| 2 | JUDGE COLLYER:  Whenever you're ready, ma'am. |
| 3 | MS. WESTFALL:  Thank you. |
| 4 | **(REP. TREY MARTINEZ FISCHER, DEFENDANT witness, having been** |
| 5 | **previously duly sworn, testified as follows:)** |
| 6 | **CONTINUED DIRECT EXAMINATION** |
| 7 | BY MS. WESTFALL: |
| 8 | Q.  Representative, I believe before lunch you were testifying |
| 9 | about DPS offices and driver's license offices in San Antonio. |
| 10 | Correct? |
| 11 | A.  Yes, I was. |
| 12 | Q.  Based on your participation in the legislative debate on |
| 13 | Senate Bill 14, were bill supporters aware of the concerns that |
| 14 | you had about the accessibility of those offices? |
| 15 | A.  I think that was definitely made part of the debate, and it |
| 16 | was certainly something that was brought up again in |
| 17 | appropriations in terms of making sure -- every bill in the |
| 18 | legislature has a fiscal note.  So, in other words, if you're |
| 19 | going to spend money, it will say so in the bill analysis.  And |
| 20 | in SB14, the fiscal note was for $2,026,000, and $2 million was |
| 21 | HAVA money for voter education. |
| 22 | So in the fiscal note for Senate Bill 14, there were |
| 23 | $2,026,000 appropriated in the bill analysis.  Two million was |
| 24 | Help America Vote Act monies for voter education, to comport |
| 25 | with the adjustments in the law, and $26,000 was for web site |

1   updates.  There was no money or resources allocated to make sure

2   that these IDs not only were going to be accessible and free,

3   but that we were going to make the means more widely available

4   for people who can't get them.

5   Q.  And was there any response at all to the concerns of bill

6   opponents that there would not be adequate access to driver's

7   license offices?

8   A.  Well, the truth be told, there is actually precedent in our

9   House rules that say that fiscal notes don't have to be

10  accurate.  They're sort of like our guesstimates.  And then

11  secondly, I think that the budget had not been taken up at the

12  time of Senate Bill 14 because this was way ahead in the

13  priority scale.

14          And so if there was any discussion, it might have been

15  sort of deflections that we will get to that when we discuss

16  agency appropriations when we get to our budget, which we know

17  at the time, our budget was already minus $27 billion to keep up

18  with existing services.  So I would see this as a new service

19  that needed to be provided to a number of Texans who did not

20  have this ID.  So I'm not sure that that could have been

21  absorbed with the existing agency resources.

22  Q.  So were any steps taken at all to increase access to

23  driver's license offices?

24  A.  The only thing I know, and it's just been through inquiry

25  with department officials and my colleagues, is that the

1    Department of Public Safety adjusted their hours of operation by

2    one hour on Tuesdays to close at 6 p.m.

3    Q.  Thank you.

4           MS. WESTFALL:  I have no further questions at this

5    time.

6           THE COURT:  Thank you.  I'm sorry, I didn't realize how

7    close to the end you were.

8           MS. WESTFALL:  That's okay.  I was going to raise it

9    with you, but I decided that you needed to eat lunch.

10          JUDGE COLLYER:  That's very kind.

11          MR. HUGHES:  Your Honor, if you'll just bear with me

12   while I set up my computer.

13          JUDGE COLLYER:  Yes, sir.

14          MR. HUGHES:  You would think I hadn't practiced that

15   right before lunch.  Your Honor, John Hughes for the State of

16   Texas.  It's my first time to speak at this trial, and it's nice

17   to be back before Your Honor.

18          JUDGE COLLYER:  Thank you, sir.  Nice to see you too.

19   Go right ahead.

20          MR. HUGHES:  May I proceed?

21          JUDGE COLLYER:  Please.

22                         **CROSS-EXAMINATION**

23   BY MR. HUGHES:

24   Q.  Good afternoon, Representative Martinez Fischer.

25   A.  Good afternoon.

1    Q.  We met right before lunch.  I'm John Hughes.  I represent

2    the State of Texas.  I've just got a few questions for you.

3    A.  Sure.

4    Q.  The first, I just want to make sure we're clear, you've been

5    out spoken here today about criticism of Senate Bill 14,

6    including your concern it could disenfranchise minority voters.

7    Right?

8    A.  Yes, sir.

9    Q.  And you've also talked about the difficulty of getting to

10   DPS, getting a driver's license in the San Antonio area where

11   you live.  Right?

12   A.  Yes.

13   Q.  And as you've indicated, you've shared your thoughts and

14   concerns about SB14 and access to DPS and getting a driver's

15   license, you shared those during the legislative debates on

16   SB14.  Right?

17   A.  I think what I said is that upon making inquiry about

18   resources, most of that discussion was deflected towards the

19   budget.  A lot of the fact finding that I did was after passage

20   of the bill, just in terms of talking as this issue has been

21   before us, as whether it would be reporter inquiries, or

22   speaking at conferences and policy convenings, and responding to

23   requests for interview by members of the media.  I had to learn

24   a lot more about the implications of this law as it heads

25   towards preclearance.

1    Q.  And that was kind of where I was going.  You were an

2    outspoken critic of SB14 during the legislative process.  Right?

3    A.  To characterize it as being a critic, I thought I was

4    representing my District, so I was advocating.  If it was

5    critical, I apologize.

6    Q.  I didn't mean to put a negative connotation on it, sir.  You

7    opposed SB14 and made remarks in opposition to it during the

8    legislative process.  Right?

9    A.  That is correct.

10   Q.  Just like you've made remarks today critical or in

11   opposition to SB14.  Right?

12   A.  That's right.

13   Q.  And as you alluded to, you've also made remarks in the media

14   that have been in opposition to and talk about the consequences

15   of SB14.  Right?

16   A.  Yes.

17   Q.  Okay.  And I would like to talk to you a little bit about

18   that.  In fact, you appeared on television with

19   Representative Aliseda in March of 2011 to talk about SB14.

20   Right?

21   A.  Yes.

22   Q.  And you appeared on, I think it was -- is it KXAN?  Is that

23   the San Antonio TV station?

24   A.  That's not -- doesn't sound familiar for San Antonio.  That

25   may be Austin.

1   Q.  I'm sorry, Austin.  Is that the TV station you recall

2   appearing on in March of 2011?

3   A.  I don't recall appearing on it, but I've done a lot of

4   interviews and there is a KXAN in Austin.

5   Q.  Let me just show you something that might refresh your

6   memory.

7   A.  Sure.

8   Q.  And it's not this.  And you see here we've got a YouTube

9   screen-grab talking about yourself and Representative Aliseda?

10  A.  I certainly see him.

11  Q.  Yeah, and you see your name there.  Right?

12  A.  I do.

13  Q.  And you see that the KXAN uploaded this March 27, 2011.  You

14  see that?

15  A.  Yes.

16  Q.  And your name is right there.  Right?

17  A.  It is.

18  Q.  And I would like to just show you about five seconds of

19  that, and then ask you some questions.  Okay?

20  A.  Sure.

21  Q.  All right.

22          (Videotape played in open court.)

23  Q.  So there in March 2011, on TV in Austin, KXAN, your

24  statement was, "If a driver's license required under SB14, that

25  could be a problem for your mother because," your statement was,

1    "she didn't have a driver's license."  Right?

2    A.  That's what I said.

3    Q.  Okay.  And then we don't need to watch the whole video, but

4    I think you went on to explain in your remarks that she is

5    elderly and didn't drive at the time, so it wouldn't make sense

6    for her to have a driver's license.  Right?

7    A.  Yes.

8    Q.  Okay.  And then, I think, fast forwarding to this year,

9    April 2012, you participated in a national teleconference

10   sponsored by the Brennan Center concerning voter ID.  Right?

11   A.  I did.

12   Q.  You had a number of media outlets called into that, and you

13   spoke about your concerns about the implications of

14   Senate Bill 14.  Right?

15   A.  Right.

16   Q.  And I would like to show you some of the things that were

17   attributed to you, and I will show you what we've marked, I

18   think, it's Exhibit 506 for references purposes, and I'll blow

19   it up so you can see it.

20       You see here on Exhibit 506 it says, "Representative

21   Trey Martinez Fischer of San Antonio, Texas says his elderly

22   mother could be become one of millions of Americans likely to be

23   barred from participating in this year's voting process because

24   of newly enacted voter suppression legislation."  Do you see

25   that?

1    A.   I do.

2    Q.   Do you recall giving remarks to that effect at the

3    Brennan Center sponsored national teleconference in April of

4    this year?

5    A.   Yes.

6    Q.   And in fact, you went on to say that she's got no driver's

7    license, no passport, no concealed handgun license, the only

8    forms of voter identification under Texas Senate Bill 14.  Then

9    you say that she would be shut out, and there you mean shut out

10   of the electoral process.  Right?

11   A.   Correct.

12   Q.   And this was reported here which, I think, is in the

13   politics and governance of the New America media web site, but

14   it was also reported elsewhere in the media.  Correct?

15   A.   I believe so.

16   Q.   And I would like to show you one example of that from the

17   *Texas Tribune*, and we've marked this one Exhibit 509.  And

18   again, this is in April of 2012, and I've highlighted from the

19   *Texas Tribune* talking about this Brennan Center call that you

20   participated in.  Do you see that?

21   A.   I do.

22   Q.   And flipping to the second page, again, at least it's

23   attributed to you in this report that you said during that call

24   that you believed the law will disenfranchise many voters.  Did

25   you say that in the call?

1   A.  I'm sure I did.

2   Q.  And as kind of anecdotal evidence in support of that

3   statement, you said that your mother would be an example of

4   someone who would be disenfranchised under Senate Bill 14.

5   Right?

6   A.  Right.

7   Q.  And, you know, you've taken time to familiarize yourself

8   with kind of the debate over voter ID generally, and have

9   educated yourself so you can talk knowledgeably to the media

10  about these issues.  Right?

11  A.  I try.

12  Q.  And have you noticed in doing that, when you read media

13  accounts that are accounting kind of opponents of voter ID, that

14  there's frequently kind of an anecdotal story identifying

15  somebody who is going to be shut out of the process because they

16  don't have ID.  Have you seen that in some other media accounts?

17  A.  I've seen that on both sides of the debate, yes.

18  Q.  Anecdotal evidence is often put forward in some of these

19  news accounts.  Right?

20  A.  Yes.

21  Q.  After the April 2012 Brennan Center conference, we'll fast

22  forward to June of 2012, when you gave a deposition in this

23  case.  Right?

24  A.  I did.

25  Q.  And during that deposition, when you were questioned by an

1   attorney from the State of Texas who could check to see whether

2   your mother had a driver's license, you admitted or explained in

3   that deposition that she did, in fact, have a driver's license.

4   Right?

5   A.  Yes.

6   Q.  Okay.  And you didn't issue a press release at that time

7   correcting your prior statements.  Right?

8   A.  I did not.

9   Q.  And you didn't call KXAN to correct the false statement that

10  appeared on TV there.  Right?

11  A.  I did not.

12  Q.  And you did not call the Brennan Center or any of the news

13  outlets that reported the anecdotal evidence that you offered on

14  the Brennan Center call to correct the false statement.  Right?

15  A.  I did not.

16  Q.  And in your deposition, you explained that you thought that

17  your mother's driver's license would be expiring in the very

18  near future.  Right?

19  A.  Yes.

20  Q.  And that you have no compelling reason for her to renew it

21  because her doctor would have a problem with it and she hasn't

22  driven in years.  Right?

23  A.  Two years, I think I said.

24  Q.  Okay.  And those same concerns about not driving and the

25  doctor would have existed at the time you appeared on TV and

1    said she didn't have a license in March 2011.  Right?

2    A.  Yes.

3    Q.  Okay.  And before you swore under oath that that license was

4    about to expire, did you do -- what did you do to check to see

5    if that would be accurate?

6    A.  Well, to be clear, my mother has Parkinson's disease, and

7    she is my mother and I'm very protective of my mother, as I'm

8    sure you are of yours.  So I had every reason to believe the

9    fact that she's not driving, and the reason why I know that is

10   because I bought her a car that sits in the driveway, and the

11   reason why I know that is because members who work in my law

12   office take her to and from every place she needs to go.

13          And so I, in my mind, believed that she did not have a

14   driver's license.  In my mind, I believed that when she applied

15   for her disabled placard for her vehicle, that they were made

16   aware of her medical condition, and I did not know until I asked

17   my mom to see her wallet.  Now, one of the things with a very

18   independent 73-year-old mother is, you don't get into her purse

19   without asking her.  I never had done it.

20          And so when I learned that her license was still active

21   and not being used, I corrected myself.  I didn't feel like I

22   had made this intentional omission.  I felt it's my mother, I

23   have the right to talk about my mother; I think if anyone should

24   be upset, it should be her, because I mischaracterized the fact

25   she didn't have a driver's license.

1              But the fact remains that she does not have a concealed

2    handgun license.  That I know.  The fact remains that she does

3    not have a passport.  The fact remains that she doesn't have a

4    national birth certificate, and the fact remains that she

5    doesn't have a military ID.  So when that license expires,

6    because we are not going to misrepresent her ability to drive

7    before the Department of Public Safety, I don't know what my

8    mother is going to do should SB14 preclear.

9    Q.  Let me just make sure a couple of things we agree on.  You

10   didn't check to see whether your mother had a driver's license

11   before you went on TV and said she didn't, and talked to the

12   Brennan Center on the national teleconference.  You only checked

13   before you had to give sworn testimony in this case.  Right?

14   A.  That's not correct.

15              MR. GARZA:  Objection.  The witness has answered that

16   question, Your Honor.

17              THE COURT:  Well, this is cross-examination, so I will

18   let the question be asked, although I think we have the

19   testimony.  So you can ask your question and then proceed.

20   Okay?

21   A.  To be clear, not remembering the exact date that I asked my

22   mother, it wasn't in anticipation of a deposition under oath.

23   It came up in the course of conversation, I would imagine

24   looking at this chronology, sometime between April of 2011 and

25   the time I took a deposition.

1  BY MR. HUGHES:

2  Q.  And in the deposition you said you thought your mom's

3  driver's license would expire in the very near future, and my

4  very specific question is, what did you do to check that

5  statement?

6  A.  Oh, I asked my mom about her driver's license, and I looked

7  at her license.

8  Q.  Okay.  When does it expire?

9  A.  I know it's active now, and I'm going to guess, but I think

10  it's going to expire sometime in 2014, 2015, something like

11  that.

12  Q.  Okay.  If the official records of Texas show that it will

13  not expire until 2017, you wouldn't have any reason to dispute

14  that.  Right?

15  A.  Absolutely.  I'm guessing right now, so whatever the record

16  says is what the record says.

17  Q.  And if the official records of Texas say that she actually

18  renewed that license in August of 2011, after you went on TV and

19  said she was no longer driving, which I'm not disputing that

20  she's not driving, but if the official records show that she

21  renewed it in 2011, you have no reason to dispute that.  Right?

22  A.  Absolutely not.

23  Q.  And just so the record is clear, what is your mother's name?

24  A.  Her name is Guadeloupe.

25  Q.  And Martinez Fischer.  Right?

1    A.   Yes.  I don't know if that's on her license, but yes.

2    Q.  And date of birth?

3    A.   July 28th.

4              JUDGE COLLYER:  We don't really need that here.

5              MR. HUGHES:  I would just like to show him --

6              JUDGE COLLYER:  What I would like you to do is show him

7    a document and have him agree that yes, that document contains

8    his mother's correct date of birth.  But we don't need it in the

9    transcript, because then you'll have to go back and find it and

10   redact it.  I'm helping you.

11             MR. HUGHES:  Thank you, Your Honor.  I do appreciate

12   the help.  I was not mindful of that.  So I've now...

13             JUDGE COLLYER:  Yes.  You see, I'm helping you, so just

14   say, "Does this look accurate?"  And he can say, "Why, yes, that

15   looks accurate."

16             MR. HUGHES:  Thank you, Your Honor.

17   BY MR. HUGHES:

18   Q.  Representative Martinez Fischer, I believe I've put before

19   you on the screen what we've marked Exhibit 700 for

20   identification purposes, and this is the official state records

21   concerning your mother's -- both her renewal and expiration date

22   of her driver's license.  Does that look accurate to you?

23   A.  That appears accurate, yes.

24   Q.  Just so we're clear, it shows that she renewed it.  The date

25   it was last issued was August 18, 2011.  Right?

1    A.  That's what it says, yes.

2    Q.  And even though she was no longer driving, she went ahead

3    and renewed her license.  Right?

4    A.  That's what it appears, yes.

5    Q.  And that's because people need driver's licenses to do all

6    sorts of things in our society besides just drive.  Right?

7    A.  That's one way of looking at it, yes.

8              MR. HUGHES:  No further questions.

9              JUDGE COLLYER:  All right.  Thank you, Mr. Hughes.  Is

10   there any redirect?

11             MR. GARZA:  No redirect, Your Honor.

12             JUDGE COLLYER:  All right, then.  Thank you very much,

13   sir.

14             MS. WESTFALL:  May I?

15             JUDGE COLLYER:  Oh, there is redirect.

16             THE WITNESS:  I'm sorry.

17             JUDGE COLLYER:  I am sorry.  I excused you.

18             MS. WESTFALL:  My apologies.  I just have one question.

19                         **REDIRECT EXAMINATION**

20   BY MS. WESTFALL:

21   Q.  Representative, do you recall any evidence presented during

22   the debate on the Senate Bill 14, other than anecdotal evidence,

23   that in-person voter fraud is a problem in Texas?

24   A.  Mostly anecdotal evidence, and mostly we need this because

25   we can't catch people because we don't know they're doing it.

 1          MS. WESTFALL:  Thank you.  I have no further questions.

 2          JUDGE COLLYER:  Thank you.  Is there any other

 3    redirect?  Now you're excused.

 4          THE WITNESS:  Thank you, Judge.

 5          JUDGE COLLYER:  All right.  Do the defendants have

 6    another witness to call?

 7          MS. BERKOWER:  Yes, we do, Your Honor.

 8          JUDGE COLLYER:  Can you introduce yourself?

 9          MS. BERKOWER:  Yes, ma'am.  My name is Risa Berkower

10    and I represent the Attorney General, Eric Holder, in this case.

11    And the Attorney General would like to call Texas House

12    Representative Rafael Anchia.

13              (Oath administered by Courtroom Clerk.)

14          MS. BERKOWER:  Your Honor, may I proceed?

15          JUDGE COLLYER:  Yes, please do.

16    **(REP. RAFAEL ANCHIA, DEFENDANT witness, having been duly sworn,**

17                     **testified as follows:)**

18                       **DIRECT EXAMINATION**

19    BY MS. BERKOWER:

20    Q.  Could you please state your name for the record?

21    A.  Rafael Michael Anchia.

22    Q.  Have you ever been a member of any Latino organizations?

23    A.  Yes, I'm past chair of the National Association of Latino

24    Elected Officials Education Fund; I'm also a member of the

25    Mexican American Legislative Caucus in Texas.

1   Q.  Are you currently a member of the Texas House?

2   A.  I am.

3   Q.  Which district do you represent?

4   A.  I represent District 103.

5   Q.  How long have you been a House member?

6   A.  I was elected in 2004 and began my service in January of

7   2005.

8   Q.  Where is your district located?

9   A.  District 103 is the western corridor of Dallas County and

10  includes portions of the cities of Dallas, Irving,

11  Farmers Branch and Carrollton.

12  Q.  What percentage of your constituents are Hispanic?

13  A.  Approximately 70 percent.

14  Q.  And what percentage of your constituents are

15  African-American?

16  A.  Well, the black and Hispanic percentages of District 103

17  under the old redistricting map and the new redistricting map

18  are both over 80 percent.

19  Q.  Do you believe that it's important to understand the racial

20  demographics of your constituents?

21  A.  I do.  I think it's important in representing a community

22  that you understand cultural differences, language differences,

23  country of origin differences.  All those I think are important

24  characteristics of a community and the more that one understands

25  about them, the better representative one can be.

1    Q.  What are the poverty rates in your District?

2    A.  Poverty rates are very high.  During the last decennial

3    census, the per capita income of the residents of District 103

4    was about $13,500.  And to put that in context, the state

5    average per capita income was about $20,500.  So in light of the

6    fact that Dallas is one of the wealthiest places in the state, I

7    represented some of the persons on the lowest rung of the

8    socioeconomic ladder in one of the wealthiest places in the

9    state.

10   Q.  Have you ever served on the House Elections Committee?

11   A.  I have.

12   Q.  When were you on that committee?

13   A.  I was in 2005, 2007, and 2009.

14   Q.  During your time in the legislature, has the House

15   considered voter identify legislation?

16   A.  Yes, during each session that I have served in the

17   legislature there has been a photo identification bill that has

18   moved through the process.

19   Q.  Did you attend the House hearings for each of these bills?

20   A.  I did.

21   Q.  Were you absent for any?

22   A.  I might have been, but I don't think so.

23   Q.  In 2011, you said you were not on the Elections Committee.

24   Did you attend any hearings on voter identification legislation

25   that session?

1    A.  To be clear, I was neither on the Elections Committee nor on

2    the Select Committee that was established for the purposes of

3    hearing Senate Bill 14.  I was on neither of the committees.

4    But I did sit in at the invitation of the chair, which was an

5    open invitation to all members and typically a courtesy afforded

6    to members of the legislature.  I did sit in on the first public

7    hearing related to the Senate Bill 14.

8    Q.  When you say "the first public hearing," did that committee

9    hold any other hearings?

10   A.  I think after the point of order, there was a very brief

11   hearing.  After the point of order was sustained and the bill

12   was recommitted, I believe, there was a brief hearing, and I

13   don't think I attended that one since it was just for purposes

14   of voting the bill out.  I don't think any public testimony was

15   taken.

16   Q.  Were you involved with any interim committees or

17   subcommittees that addressed voter identification issues?

18   A.  I was a member of the Elections Committee in 2005, 2007, and

19   2009.  I also participated in interim charges, so that means

20   studying the issue of photo identification, voter impersonation,

21   voter fraud generally.

22   Q.  Between 2005 and 2011, when the House considered voter

23   identification bills, has the public justification given for the

24   bills always been the same?

25   A.  No, I consider that the public justification has changed

1    over time.  Initially, when we began talking about photo ID in

2    the legislature, there were general discussions about the voter

3    fraud, and examples were given about different types of voter

4    fraud, and I think it was suggested publicly that voter fraud

5    was an epidemic in the State of Texas.

6         When we drilled down a little bit deeper through public

7    debate, committee hearing, the review of scholarly publications,

8    we realized photo ID is just designed to deal with one type of

9    voter fraud and that's in-person impersonation at the polling

10   location.  So then the discussion changed from a general matter

11   of voter fraud to simply voter impersonation.

12        And then, when we drilled a little bit further in

13   subsequent sessions, we realized that the incidents of voter

14   impersonation was rare, and then after that, there was a subtle

15   confluence of the discussion of voter impersonation at the polls

16   with other issues.

17   Q.  Just to be clear, when you said -- when you were describing

18   the initial justifications for the bill, what time period are

19   you talking about?

20   A.  2005 was the first time that a photo ID bill was offered in

21   the legislature that was contemporaneous with my service in the

22   legislature.  So I recall that 2005 was the first session that

23   we saw a photo ID bill.

24   Q.  And you said that there was hearings concerning voter fraud

25   around that time period.  Can you be more specific?  Around that

1   time period, what were the conclusions of the evidence -- what

2   was the evidence that you learned during those hearings?

3   A.  Well, the conclusions were that voter fraud, in fact, did

4   occur in the State of Texas, but it was almost exclusively -- I

5   shouldn't say exclusively, but a great percentage of that voter

6   fraud involved mail-in ballots.  And there were claims of

7   official oppression, there were concerns about collusion with

8   election officials.  So there were a number of cases of voter

9   fraud generally.  There was bribery.

10        But when we drilled down into the data, we found that

11   voter impersonation was actually a very small percentage of all

12   the cases.  And in fact, it wasn't until later on that we

13   actually found documented cases of in-person impersonation at

14   the polls.

15   Q.  You said that the justifications for voter fraud changed

16   over time.  After 2005, what was the next stage?

17   A.  Well, 2005 into 2007, there was a confluence of the issue of

18   voter impersonation and photo ID with issues related to

19   noncitizen voting.  And there was a connotation that there were

20   large numbers of undocumented persons voting in Texas elections.

21   And we looked into this issue as well.  And after taking

22   testimony in committee, actually having a subcommittee dedicated

23   to the incidents of noncitizen voting and mail-in ballot fraud,

24   we were able to determine that it occurred in very small numbers

25   in the State of Texas.

1          And after the 2007 session and going into 2009 and

2     beyond, the justification for the bill moved from impersonation,

3     then on to noncitizen voting - illegal immigrant voting,

4     essentially - and then became about the integrity of elections

5     and preventing the disenfranchisement of validly cast votes by

6     avoiding invalidly cast votes.

7     Q.  So you said that justification arose during the 2009

8     session, or around that time?

9     A.  Around 2009 in 2011, you start to hear a lot less of the

10    illegal aliens voting and more of integrity of elections.

11    Q.  Did the House examine whether voter ID would preserve the

12    integrity of elections?

13    A.  Not as far as I can tell.  I mean, the House took a lot of

14    testimony, to be clear.  The thing about photo ID that I always

15    found interesting that was offered up by proponents was that

16    this was some failsafe mechanism for preventing voter

17    impersonation at the polls.

18          And I recall in one committee hearing, and I don't

19    remember which one, we had the Department of Public Safety of

20    the State of Texas come in and bring in a bunch of fake IDs,

21    fake Texas identifications.  We asked the members of the

22    committee if they could discern which ones were real and which

23    ones were fake, and it was interesting.  There were many IDs

24    that had been picked up by DPS that were actually quite real

25    looking.  And we wondered aloud if, in fact, a photo ID

1    requirement, even when you did have a valid driver's license in

2    front of you, would prevent impersonation to the extent it did

3    exist.

4         So there was always a question in my mind about whether

5    or not photo ID was as ironclad and fail safe as members -- the

6    proponents suggested.

7    Q.  Following the evidence that you heard in 2009, did the

8    justifications for voter ID shift again in 2011?

9    A.  Well, towards the end of 2011, I recall having a dialogue

10   with the bill author on the House Floor about the justification,

11   and I was asking her about voter impersonation, and she

12   responded, "This isn't about voter impersonation, this is about

13   the integrity of elections."  And I think she said, "I believe

14   in my heart that turnout will increase."

15        So I think it became a new justification in that this

16   bill would increase voter confidence, and therefore, voter

17   turnout would increase.  So it was being offered, I think at

18   that point, as a way to expand the franchise, which I did not

19   believe and I did not agree with.

20   Q.  During House consideration of SB14, what evidence, if any,

21   was presented that the bill would increase voter confidence?

22   A.  I think there were allusions to Indiana, and a comparison

23   was made between turnout numbers among minority populations in

24   Indiana, between the 2006 or 2008.  So they took off-year

25   election numbers and then presidential election numbers and

1    compared them and said, "Hey, look, African-American turnout

2    went up."  I thought it might be a coincidence that we had an

3    African-American candidate for president at the time, and maybe

4    that was the reason that turnout went up.

5             It was also important to note that Indiana was an

6    important battleground state in 2008, so you had significant

7    resources spent at that time.  I believe that that was the

8    reason for turnout going up, and not the existence of a photo ID

9    requirement.

10   Q.  Did the House hear any evidence that voter turnout or voter

11   confidence would increase in Texas?

12   A.  No.

13   Q.  During House consideration of SB14, what evidence, if any,

14   was presented that the bill would ensure ballot integrity?

15   A.  I'm not sure.  None comes to mind.  But I know a lot of

16   people talked about it and said it affirmatively.  But I don't

17   recall any studies, for example, by the Department of Public

18   Safety or by the Secretary of State's office that suggested it

19   would increase ballot integrity.

20   Q.  During House consideration of SB14, what concerns were

21   raised about the impact of the bill on minority voters?

22   A.  Members of the Mexican American Legislative Caucus and the

23   Black Caucus talked both in committee, in public, and on the

24   House Floor about the potential adverse impact of SB14 on

25   minority communities; the difficulties in getting the ID that it

1    takes to get photo ID, the availability of DPS stations, budget

2    cuts to DPS.  All of those issues that you've heard earlier

3    today were articulated often by minority members of the

4    legislature.

5    Q.  Were you one of those members --

6    A.  I was.

7    Q.  -- who articulated?

8    A.  Yes.

9    Q.  Do you believe your concerns were taken seriously and your

10   concerns addressed?

11        MR. SWEETEN:  Objection.  Calls for speculation,

12   Your Honor.

13        JUDGE COLLYER:  No, it wouldn't be speculation as to

14   whether he believes it or not.  I'm not sure that his belief,

15   called belief, is relevant, but you might reframe the question

16   as to what happened that -- you know, was there a response or

17   something more like that.

18   BY MS. BERKOWER:

19   Q.  How did bill supporters respond to the concerns raised?

20   A.  I felt that we were allowed to ask questions, offer up

21   amendments, but I never felt like that there was truly a

22   collaborative approach to taking into account our concerns.  In

23   fact, at different times during the Floor debate the bill

24   sponsor was, I believe, intentionally evasive and refused to

25   answer questions from -- certainly from me and from other

1    members of the Mexican American Legislative Caucus, about the

2    bill itself.  And there were other instances where there was

3    very little debate on amendment's that we brought up and they

4    were summarily tabled.

5    Q.  Was there a time when the House considered amendments to

6    SB14?

7    A.  Yes.

8         MS. BERKOWER:  Could we please have JA 002151, please?

9    And could you expand the bottom half of the page, starting with

10   Amendment No. 58, please?

11   BY MS. BERKOWER:

12   Q.  Representative Anchia, do you recall introducing

13   Amendment 58 to SB14?

14   A.  Yes.

15   Q.  What would this amendment have done?

16   A.  If I'm reading it correctly, it would have delayed

17   implementation of SB14 until such time as the Secretary of State

18   completed a study that was segregated by race and ethnicity and

19   county related to access to photo identification, with a focus

20   on minority populations.

21        So it didn't impact the underlying bill, necessarily,

22   the effectiveness of the bill, it just merely delayed it until

23   such time as the study was conducted by the Secretary of State's

24   office.

25   Q.  And what was the purpose of conducting that study?

1   A.  Well, to that date it did not appear that any study had been

2   conducted by the chief elections officer, who is the Texas

3   Secretary of State, related to the availability and the

4   penetration of these newly required documents among Hispanic or

5   African-American populations.  And we had spent a lot of time

6   taking testimony on the fact that there is maybe lower

7   penetration in minority populations with respect to the

8   documents -- the photo identification documents that were being

9   requested in the bill, so we wanted to make sure we had it

10  right.  After all, we were dealing with voting rights, and these

11  are protected classes under the Voting Rights Act, so we wanted

12  to make sure that the chief elections officer at least gave us

13  the data so that we knew if any problems would exist.

14  Q.  And would this amendment have proposed any changes at all to

15  SB14's identification requirements?

16  A.  No.

17  Q.  What happened to this amendment?

18  A.  I believe this amendment was tabled.

19          MS. BERKOWER:  Could we have JA 2099, please?  Could

20  you, again, expand the second half of the page, starting with

21  amendment Number 15, please?

22  BY MS. BERKOWER:

23  Q.  Do you remember Amendment 15, Representative?

24  A.  I do.

25  Q.  What would this amendment have done?

1    A.  This amendment, by Representative Martinez, suggests that if

2    people were obtaining documents, and it takes ID to get ID - and

3    I think that's what this amendment was getting at - that if it

4    took ID to get ID in order to vote, that those forms of

5    identification would be free of charge to the person requesting

6    them.  Because while a free ID was available under the bill, we

7    were concerned that there were charges for the underlying

8    documents, including birth certificates, which, I believe in the

9    State of Texas cost $22.  So we wanted to get at that with -- I

10   think Representative Martinez wanted to get at that with this

11   amendment.

12   Q.  Would this amendment have changed SB14's identification

13   requirements?

14   A.  No.

15   Q.  What happened to this amendment?

16   A.  This amendment was tabled.

17           JUDGE TATEL:  Do you know why it was tabled?

18           THE WITNESS:  I do not.

19           JUDGE TATEL:  Could it have been because the members of

20   the legislature were worried about the cost?

21           THE WITNESS:  It is possible.  I don't recall the

22   articulated reason.

23           JUDGE TATEL:  When an amendment is tabled, is there

24   debate, or could we look at the debate and find out the answer

25   to that question?

1          THE WITNESS:  Yes, Your Honor, there is often debate on

2     these issues, but I do not recall what Representative Harless

3     argued when she made the motion to table the amendment.

4     BY MS. BERKOWER:

5     Q.  At the time the House voted on SB14, how many of the

6     questions raised about the Bill's negative impact on minority

7     voters, if any, had been answered by bill supporters?

8     A.  I spent a lot of time on the back microphone asking the

9     House bill sponsor questions about how the bill was going to

10    impact minority populations.  And to give some further context,

11    on the Texas House there's a front microphone where a bill

12    author or sponsor lays out and explains a bill or amendments,

13    and there's a back microphone where questions are asked.

14          So I spent a lot of time on the back microphone with

15    the bill's House sponsor, Patricia Harless, asking her about any

16    studies that she was aware of related to how this bill would

17    impact protected classes in the State of Texas.  And after

18    asking many times, maybe up to six, seven, or eight times, I

19    don't know that I ever got a clear answer.  Either the bill

20    sponsor did not know or did not want to answer.

21    Q.  In the face of these types of unanswered questions, how many

22    House members who supported the bill changed their decision to

23    vote in favor of SB14?

24    A.  I'm not aware of any.

25    Q.  Representative, you testified that there's a high rate of

1    poverty in your district.  How many of your constituents depend

2    on public transportation because they don't own cars?

3    A.  I don't have exact figures on that, but I suspect there are

4    fairly high percentages of persons who do not have automobiles,

5    rely on Dallas Area Rapid Transit, which offers bus service, van

6    service, and also commuter rail service.

7    Q.  Is there a sizable portion of your constituents who hold

8    hourly wage jobs?

9    A.  Yes.

10   Q.  How will SB14's requirements impact your constituents?

11   A.  Well, I think it will -- to the extent that there is a lower

12   penetration rate of valid passports, photo identification,

13   concealed handgun licenses among the low socioeconomic status

14   constituents that I represent - specifically African-Americans

15   and Latinos, they comprise about 80 percent of the district - I

16   think it will have a significant impact.  You've got the cost

17   involved in getting underlying documents, then you have the time

18   and effort that it takes to leave work, potentially put your

19   children in child care, hop on a bus, hop on a train, get to

20   different DPS offices, wait in line, and then try to receive

21   your ID.

22           This is time consuming, it can be cumbersome, it can be

23   expensive because you've got to make a financial decision to

24   leave an hourly wage job to pay the money to get underlying

25   documents, and then you've got the expense of actually getting

1    somewhere.  So I think it can create a significant hardship.

2    Q.  Would an unexpected expense of $22 be a burden to your

3    constituents?

4    A.  I imagine for many at the lowest rung of the socioeconomic

5    ladder in the district that I represent, it would be.

6    Q.  Representative Anchia, why is this issue important to you?

7    A.  It's important to me for a number of reasons.  I'm a son of

8    emigrants to this country.  My mother is from Mexico and my

9    father is from Northern Spain.  My father is the son of a sheep

10   herder, and they came to this country for a better life.  My

11   mother is a public schoolteacher and always taught her children,

12   who are both lawyers, that civic engagement was important.  I

13   think that's one of the reasons I'm engaged in public service

14   today.

15          So when we're talking about civic engagement in a

16   foundation, civic engagement is voting and potentially abridging

17   those rights, we need to balance the access to the franchise

18   with ballot security.  And I've said often, and I said it on the

19   House Floor and it's available in the tape, that I think there

20   is a photo ID regime out there for the State of Texas out there

21   that might work, but SB14 is not it.  The list is entirely too

22   small for available documents, and there's no vote-saving

23   mechanism.

24          So I take it pretty seriously, and I've tried to spend

25   a lot of time focusing on this bill.  I fear it's going to

1    disenfranchise a lot of people.

2            MS. BERKOWER:  No further questions at this time,

3    Your Honor.

4            JUDGE TATEL:  I just have one question.

5    Representative, do you know whether -- if someone doesn't have a

6    driver's license and they want to get an EIC, can they get the

7    birth certificate and the EIC in the same trip, do you know?  Do

8    you go to the same place to get them?

9            THE WITNESS:  I don't believe you do.  I think you

10   would have to go to the county to get your birth certificate, or

11   you could get it through the Texas Bureau of Vital Statistics at

12   the state level, and then you would have to get your EIC at a

13   Department of Public Safety office.  That's my understanding of

14   how the system would work.

15           MR. HEBERT:  I'm Gerald Hebert for the Kennie

16   intervenors.  I just have one minute of questions.

17           JUDGE COLLYER:  Mr. Hebert, Judge Tatel has asked me to

18   ask counsel to identify their clients and their law firm.

19   You've identified your clients, and who is your law firm?

20           MR. HEBERT:  My law firm is the firm of J. Gerald

21   Hebert, PC.  I'm a sole practitioner.

22           JUDGE COLLYER:  Isn't that amazing?

23           MR. HEBERT:  And my co-counsel is Mr. Chad Dunn, and he

24   is of the law firm of Brazil & Dunn in Houston, Texas.

25           JUDGE COLLYER:  Mr. Hebert, it's nice to see you again.

1   Go ahead.

2                           **DIRECT EXAMINATION**

3   BY MR. HEBERT:

4   Q.  Representative Anchia, just a minute of questions here.  The

5   City of Arlington, Texas, is just to the west of your district.

6   Correct?

7   A.  Yes, sir.

8   Q.  And isn't that true that the City of Arlington, Texas, is

9   the largest urban municipality in the United States without a

10  public transportation system?

11  A.  That's my understanding.

12  Q.  And many of the constituents in Arlington, Tarrant County,

13  right next door, and in Dallas County who can't afford a car or

14  don't own a car rely heavily on public transportation when it's

15  available.  Isn't that true?

16  A.  Yes.

17          MR. SWEETEN:  Your Honor, I'm going to object to the

18  leading nature of the questions that are being posed.

19          JUDGE COLLYER:  Right.  This isn't cross-examination

20  so...

21          MR. HEBERT:  Right.

22  BY MR. HEBERT:

23  Q.  Do you know how many DPS offices are in Tarrant County?

24  A.  No.

25          MR. HEBERT:  No further questions.  Thank you.

1          JUDGE COLLYER:  Thank you.

2          MR. GARZA:  I've got one question, Your Honor, if

3     that's all right.

4          JUDGE COLLYER:  Yes, please identify yourself for the

5     record and for Judge Tatel.

6          MR. GARZA:  Jose Garza, and I represent the Mexican

7     American Legislative Caucus and the Texas branch of NAACP, and I

8     am with the Law Office of Jose Garza in Texas.

9          JUDGE COLLYER:  Thank you, sir.

10                          **DIRECT EXAMINATION**

11     BY MR. GARZA:

12     Q.  Representative Anchia, Representative Martinez Fischer

13     testified that the SB14 was assigned to a special committee, and

14     that the members of the special committee were appointed by the

15     speaker of the House.  Do you know what impact that has in terms

16     of the ability of minority members of the legislature to impact

17     the legislation in committee?

18     A.  One of the things it does do is it obviates seniority picks.

19     And the way that works typically in the Texas legislature, if

20     you are populating a standing committee, members who have been

21     in the legislature for a long time rise in seniority in the body

22     and are able to pick the committees of their choice.  And by

23     setting up a select committee, they all became picks of the

24     speaker of the House, and there were no seniority picks

25     available.  I believe six of the topmost senior members of the

 1    legislature are minority members.

 2          So this may have had an impact on the composition of

 3    the committee.

 4          JUDGE COLLYER:  Thank you, sir.  Is there any

 5    cross-examination?  Mr. Sweeten?

 6          MR. SWEETEN:  Yes, Your Honor.

 7                        **CROSS-EXAMINATION**

 8    BY MR. SWEETEN:

 9    Q.  Good afternoon, Representative Anchia.

10    A.  Good afternoon.

11    Q.  We met approximately a month ago whenever I took your

12    deposition in Austin.  Correct?

13    A.  Correct.

14    Q.  Now, I'm going to ask you a few questions about your

15    testimony here today.  First thing is that you, yourself, are on

16    a select committee in the House, correct, currently?

17    A.  Recently, I was placed on a select committee to do interim

18    study of school finance.

19    Q.  That is the House Select Committee on School Finance?

20    A.  That is correct.

21    Q.  You're appointed to be on that select committee by

22    Speaker Straus.  Correct?

23    A.  Correct.

24    Q.  Speaker Straus is a Republican.  Right?

25    A.  Correct.

1    Q.  Now, let's talk a little bit about the issue of voter fraud

2    that has gone through the --

3    A.  May I add one more thing about the select committee?

4    Q.  Sure.

5    A.  I think an important distinction for the court is that this

6    select committee is not designed to hear bills.  It has an

7    interim charge of simply studying the school finance system.  So

8    that I think that is worth mentioning.

9    Q.  Nevertheless, you are on the select committee currently

10   appointed by a Republican speaker.  Right?

11   A.  Correct.  Out of session.

12   Q.  So in 2011 you were not a member of the House Select

13   Committee on Voter Fraud.  Correct?

14   A.  That is correct.

15   Q.  You were permitted by then Republican chair of the

16   committee, Dennis Bonnen, to ask questions of witnesses, and you

17   freely did so.  Correct?

18   A.  That is correct.  In fact, I believe the chairman either

19   invited me specifically to sit as a nonvoting member of the

20   committee, and ask questions, or it may be just an open

21   invitation.  It is frequently the prerogative of chairs, but

22   chairs usually invite all members of the legislature to come sit

23   in on committee hearings if there's a particular subject matter

24   of interest.  But you are correct.

25   Q.  Okay.  And you wouldn't dispute the fact that 39 witnesses

41

1   were called to testify either as proponents or opponents of the

2   that legislation in that committee.  Right?

3   A.  I don't know the exact number but it was a long night.

4   Q.  You, yourself, questioned Chris Ward, an attorney,

5   concerning the *Crawford* decision.  Is that correct?

6   A.  I don't recall, but I do recall I asked a lot of questions

7   on the select committee.

8   Q.  You wouldn't dispute that you quizzed Ann McGeehan, the

9   Secretary of State.  Correct?

10  A.  I do remember that, yes.

11  Q.  You quizzed Rebecca Davio of the DPS.  Correct?

12  A.  I asked her questions, yes.

13  Q.  David Maxwell of the Attorney General's office?

14  A.  I asked him questions as well.

15  Q.  That was all in open proceeding.  Other members of the

16  committee were there and listening to other points of view than

17  yours.  Correct?

18  A.  That is correct.

19  Q.  Now, it's a true statement, isn't it, that strengthening the

20  integrity of the election system is an important thing to you.

21  Correct?

22  A.  True.

23  Q.  And you agree that ensuring that those who show up to the

24  polls are who they say they are is a laudable goal?

25  A.  Yes.

1    Q.  Under current Texas law, a person can go to the polls and

2    utilize a utility bill to vote.  Is that correct?

3    A.  Isn't it two forms of nonphoto ID?

4    Q.  And if that's -- let me just ask you, do you know one way or

5    the other whether a utility bill is sufficient?

6    A.  I don't recall.  I don't recall.

7    Q.  Do you know if a pay stub is sufficient to vote?

8    A.  I don't recall.

9    Q.  Now, with respect to minority support of voter ID, there

10   were a number of House minority members who voted for SB14.

11   Correct?

12   A.  I believe there were.

13   Q.  And can you name those for the court?

14   A.  I believe Representatives Aliseda, Pena, Garza, Margo,

15   Carter, White voted in favor of the bill.

16   Q.  Now, I'm going to change the subject --

17   A.  Torres.  Excuse me.  Also Torres.

18   Q.  I'm changing the subject a little and just ask you a couple

19   of questions about the practice of chubbing.  Okay?  We've heard

20   some testimony about it, so I'm not going to go into great

21   detail.  But I want to ask you, when the House rules were

22   adopted in 2011, those rules eliminated the ability to chub the

23   local calendar.  Isn't that right?

24          MS. BERKOWER:  Objection, Your Honor, this is outside

25   the scope of the direct examination.  He didn't testify at all

1    about the House rules.

2         MR. SWEETEN:  Your Honor, she's brought up all four of

3    the legislative proceedings.  This relates to an issue that

4    occurred in the 2011 session.  It's been brought up by other

5    witnesses and it's directly relevant to 2011.

6         JUDGE COLLYER:  Actually, your point is well taken, and

7    in a normal trial I would sustain your objection.  Excuse me for

8    my verbiage here.  But in this trial, where everybody has been

9    racing through to get things done, I will not require the

10   witness to come back to be a witness for the State of Texas to

11   answer this question.  You may go ahead, sir.

12        MR. SWEETEN:  Thank you, Your Honor.

13   BY MR. SWEETEN:

14   Q.  In 2011, the House rules -- a Senate resolution was passed

15   to eliminate chubbing on the local calendar.  Correct?

16   A.  Yes.

17   Q.  You voted yea?

18   A.  Did you say Senate resolution?  I apologize.

19   Q.  Well, I may have misspoke.  It's a House resolution?

20   A.  That's correct.

21   Q.  And you voted yea for that resolution to eliminate chubbing

22   on the local calendar in '11.  Right?

23   A.  Yeah, so the answer is yes.  But it was part of a much

24   larger rules package, and I voted in favor of it.

25   Q.  Nevertheless, you voted yes?

1    A.  That is correct.  That is correct.

2    Q.  Now, as you're sitting here, with respect to the different

3    forms of ID provided by SB14, you don't know which forms of ID

4    racial minorities are more likely to have.  Is that correct?

5    A.  No, I carried -- you are correct, I carried an amendment to

6    that effect --

7    Q.  If you could just answer my question.

8    A.  I'm sorry.

9    Q.  Which you have.

10          If asked those numbers, it would be pure supposition on

11   your part to offer an opinion on that issue.  Correct?

12   A.  We just don't know.  And I may add --

13   Q.  Well, actually, I think you've answered my question on that.

14   A.  Okay.

15   Q.  You would agree that Representatives of the House have a

16   duty to represent their constituents.  Correct?

17   A.  Yes.

18   Q.  And you try to do that?

19   A.  Yes.

20   Q.  And there's nothing wrong with a representative voting for

21   policies that are favored by his constituents?

22   A.  Yes.

23   Q.  And you don't have any basis to dispute that voter

24   identification is supported by the majority of voters in the

25   State of Texas?

```
 1   A.  I have no basis to dispute that.  I have no basis to affirm

 2   it either.

 3   Q.  And when we talked on June 6th, you indicated that you have

 4   no personal knowledge of a single Texas registered voter who

 5   does not possess a form of ID that will permit him or her to

 6   vote if SB14 is enforced.  Correct?

 7   A.  Stated at that time, yes.

 8            MR. SWEETEN:  No further questions.  Thank you.

 9            THE COURT:  All right.  Thank you.  Is there any

10   redirect?

11            MS. BERKOWER:  Yes, Your Honor.  Briefly.

12                    REDIRECT EXAMINATION

13   BY MS. BERKOWER:

14   Q.  You were just asked whether you were able to question DPS

15   and secure -- sorry.  You were just asked whether you were

16   allowed to question DPS representatives and representatives from

17   the Secretary of State's office at the select committee hearing.

18   Do you remember that?

19   A.  Yes.

20   Q.  And that was Ms. McGeehan and Ms. Davio?

21   A.  Yes.

22   Q.  Were they able to fully answer the questions you asked of

23   them?

24   A.  No.  What we were driving at was trying to get a sense of

25   what the ID penetration rate was, how much this was going to
```

1    cost, and we also wanted to get a sense of how many people would

2    not have ID.  And they were unable to answer that.

3    Q.  To your knowledge, was that evidence ever presented to the

4    House in 2011?

5    A.  No.

6    Q.  Did you ask other -- well, did you ever seek to learn how

7    many people did not have the ID required by SB14 yourself?

8    A.  Yes.

9    Q.  What did you do?

10   A.  Well, I asked -- for starters, I asked the bill author - or

11   excuse me, the House bill sponsor - if she had any data related

12   to the potential disenfranchising effect on this bill on

13   protected classes, and specifically African-Americans and

14   Hispanics.  I also asked her about Asians, because in

15   Harris County that's an important minority population.  And she

16   was unaware of any studies related to that, the availability

17   of -- the availability of ID in those populations.

18           And I later carried an amendment that asked that we not

19   change the subject of the bill, simply delay its implementation

20   until the Secretary of State's office was able to provide us

21   with a study gauging this, and that amendment was defeated and I

22   believe the House sponsor opposed it.

23   Q.  As a Representative in the House, do you have the resources

24   yourself to conduct this type of study?

25   A.  No, we typically rely on the executive branch to do these

1    things, the chief elections officer of the State of Texas, who

2    is the Secretary of State.  So it was thought that the Secretary

3    of State would be able to furnish this data to the members of

4    the legislature so we could make good decisions, and that was

5    never furnished.

6    Q.  You testified a minute ago that politicians often work on

7    policies -- that work to effectuate policies that are popular

8    among their constituents.  Do you remember that?

9    A.  That's right, I do.

10   Q.  As an elected representative, do you have a duty to assess

11   whether the policies favored by your constituents are lawful?

12   A.  Lawful and constitutional, you're absolutely right about

13   that.  I imagine Jim Crow laws and the poll tax in Texas were

14   immensely popular in many districts, many state representative

15   districts and many state districts throughout Texas, but as it

16   turns out, they were immoral and unconstitutional.

17   Q.  Turning your attention back to the select committee just for

18   a moment, were you able to vote when the select committee heard

19   SB14?

20   A.  I was not.

21   Q.  Why not?

22   A.  Because I was not a member of the select committee.

23            MS. BERKOWER:  I have nothing further, Your Honor.

24            JUDGE COLLYER:  All right.  Thank you very much.  Do

25   the defendants have any other witnesses to present?  Woops,

1    you're done.

2              THE WITNESS:  Thank you.

3              JUDGE COLLYER:  Thank you.  It was nice to meet you,

4    Representative Anchia.

5              MR. DELLHEIM:  We call Richard Kousser.

6              (Oath administered by Courtroom Clerk.)

7              MR. DELLHEIM:  Good afternoon, Your Honors.  My name is

8    Richard Dellheim.  I'm an attorney representing Eric Holder, and

9    I'm with the United States Department of Justice.

10             JUDGE COLLYER:  And could you just spell your last name

11   for us, sir?

12             MR. DELLHEIM:  Of course.  D-E-L-L-H-E-I-M.

13             JUDGE COLLYER:  Thank you, sir.

14             MR. DELLHEIM:  May I proceed, Your Honors?

15             JUDGE COLLYER:  Please, go right ahead when you're

16   ready.

17             MR. DELLHEIM:  Thank you very much.

18       **(J. MORGAN KROUSSER, DEFENDANT witness, having been duly sworn,**

19                      **testified as follows:)**

20                        **DIRECT EXAMINATION**

21   BY MR. DELLHEIM:

22   Q.  Good afternoon, Dr. Kousser.

23   A.  Good afternoon.

24   Q.  Would you please introduce yourself to the Court?

25   A.  I'm a professor of history in social science at the

1   California Institute of Technology.

2        JUDGE COLLYER:  Why don't you give us your name for the

3   record, first?  That would help.

4        THE WITNESS:  Certainly.  It is J. Morgan, M-O-R-G-A-N,

5   Kousser, K-O-U-S-S-E-R.

6        JUDGE COLLYER:  Thank you, sir.

7   BY MR. DELLHEIM:

8   Q.  How long have you been a professor at CalTech?

9   A.  I've been a professor at CalTech since 1971.  I've been

10  there since 1969.

11  Q.  And you've been retained as an expert witness in this case?

12  A.  That's correct.

13  Q.  What were you asked to examine in this case?

14  A.  I was asked to examine whether the intentions of the

15  legislature in passing SB14 were racially discriminatory.

16  Q.  And have you ever analyzed the intent underlying the

17  adoption of specific requirements for in-person voting in your

18  scholarly research and writing?

19  A.  I have.  My doctoral dissertation and first book, which was

20  called "The Shaping of Southern Politics," considered the

21  passage of all the election laws, I think, in the 11

22  ex-confederate states in the period from 1880 through 1910.  I

23  considered registration laws, secret ballot laws, poll taxes,

24  literacy tests, understanding clauses, what were called

25  "eight-box" laws, which were a form of literacy test, and

1    everything else that was -- that took place during that time in

2    the manner of changing election laws.

3            And that focus -- my focus there after determining

4    through a statistical analysis what the effects of those changes

5    were was on the intent of the legislatures and constitutional

6    conventions.  In particular, it was widely thought that the --

7    and widely talked about at that time that they had a racially

8    discriminatory intent; I also asked whether they meant to

9    discriminate against poor whites when they passed such laws as

10   the poll tax, and whether they meant to hamper the development

11   of parties opposed to the Democratic Party, Republican Party,

12   Populace Party, similar parties.  I concluded that they had all

13   three intentions to disfranchise African-Americans, poor whites,

14   and to disadvantage opposition parties.

15   Q.  Dr. Kousser, have you served as an expert witness in other

16   federal voting rights cases?  And if so, how many?

17   A.  I have, in approximately 37 such cases.

18   Q.  How many of those cases involved an analysis of legislative

19   intent?

20   A.  Approximately 15.  Some of them involved both statistical

21   testimony and an analysis of intent.  For example, in a recent

22   Texas redistricting cases, I testified on both in both

23   San Antonio and I believe in this courtroom.

24   Q.  And did any of those lawsuits challenge restrictions on

25   registration or voting?

1    A.   When I first testified, the first case that I ever testified

2    in was a case that when it came to the Supreme Court was a case

3    known as *Hunter v. Underwood* in 1985.  And it concerned, I

4    believe, it's Section 201 of the Alabama Constitution of 1901,

5    which was the so-called petty crimes provision.  It

6    disfranchised people for such crimes as miscegenation and wife

7    beating, and I concluded that it was adopted with a racially

8    discriminatory intent.  The appeals court and later the Supreme

9    Court came to the same conclusion.

10   Q.   Were there any other cases in which you testified as an

11   expert witness on the subject of legislative intent that you

12   consider to be significant for this court to know?

13   A.   Well, perhaps the most significant one was *Garza v. Los*

14   *Angeles County Board of Supervisors*.  And what I testified to

15   there was about the redistrictings, the set of redistrictings

16   that took place from 1959 through 1981 which left it impossible

17   to elect a Latino candidate of choice in the election.  The

18   District Court and later the appeals court agreed with my

19   conclusions, and part of the appeals court decision was drawn

20   from my report.

21   Q.   Dr. Kousser, let's turn to this case for a second.  Have you

22   reached conclusions in regard to the questions you were asked to

23   investigate here?  And that is specifically whether SB14 was

24   adopted with a discriminatory purpose?

25   A.   I have.

1    Q.   What were those conclusions?

2    A.   The conclusion was that it was adopted with a discriminatory

3    purpose.

4    Q.   Before we get into the substance of your opinion, I want to

5    know what types of source materials you examined as part of your

6    methodology to determine that question.

7    A.   I looked at hearings, I looked at legislative debates, I

8    looked at newspaper articles, I looked at scholarly sources

9    about Texas and about political science and history, and I also

10   looked at depositions.

11   Q.   Are those the type of source materials you normally examine

12   when you consider these kinds of issues?

13   A.   They are.   Usually, I don't have depositions available, but

14   they were available in this case.

15   Q.   Let's talk for a second about your methodologies.   The

16   methodology you employed in examining this issue is the same

17   methodology you employed in other cases such as *Garza*?

18   A.   It is.   After the *Garza* case and after the decision of the

19   District Court being so favorable, I thought I would submit the

20   paper to a law review for publication, and I decided to include

21   a section, a general section on how to determine intent.   The

22   paper as it was eventually published was called, "How to

23   Determine Intent, Lessons From LA."   In that I set out -- tried

24   to set out some sort of standard method or consideration of

25   questions that one might always take into account in determining

1    intent, particularly of election laws for my purposes and for

2    the purposes of other scholars, maybe of courts, in trying to

3    look at these.

4         I drew on both my own experience in analyzing these

5    sort of the things, and I looked at what federal District

6    Courts, appeals courts, and the U.S. Supreme Court had said

7    about such issues, since they tended to talk about such issues

8    more than historians typically did.

9         So I tried to learn from all of these and put them in

10   some sort of systematic order.

11   Q.  Dr. Kousser, I'm going to ask you briefly to describe that

12   methodology.  I'm going to put something up on the screen.

13        MR. DELLHEIM:  Would you please put up Defense

14   Exhibit 580?

15        JUDGE COLLYER:  580.  Thank you.

16   BY MR. DELLHEIM:

17   Q.  Dr. Kousser, do you recognize what's on the screen in front

18   of you?

19   A.  Yes.

20   Q.  What is that?

21   A.  It's a prettified picture of a document that I sent to the

22   Justice Department, and they're better at doing pretty pictures

23   than I am.  It sets out the 10 purpose factors that I talked

24   about in a chapter of my book, *"Colorblind Injustice"*.  And it's

25   of use in trying to analyze such -- the intentions of passage of

1    election laws.

2    Q.  I want you briefly to go through these factors and help the

3    Court how one goes about trying to determine legislative intent.

4    Briefly, sir.

5    A.  I'll try to be as brief as possible.  Models of human

6    behavior is a sort of cautionary note.  Everybody starts to

7    analyze things with certain assumptions or prior beliefs or

8    guesses, and this calls on us to essentially make them

9    self-conscious.

10          For example, in this particular case, the State seems

11    to believe that if a law was passed with certain provisions

12    anywhere at any time, that it must have had the same motives as

13    a law similar to it passed in any other state at any other time;

14    in particular, if it was passed in Indiana in 2005, then a law

15    which was somewhat similar that was passed in Texas in 2011 must

16    have the same purposes.  And the first factor is simply to say,

17    all right, we've got to look at the evidence to see whether

18    that's true, and not just decide the case by assumption.

19          The historical context is more or less

20    self-explanatory.  It could be called the historical background.

21    The text of the law or the lines of districts can be important.

22    The lines of districts, particularly compared to the demographic

23    composition of those districts, was very important in the Texas

24    redistricting trial.  We saw lots of pictures of those

25    particular districts.

1          Demographic facts, how did the demography of the area

2    change, what was it, the climate of racial politics, that's

3    basically self-explanatory.  The background of key decision

4    makers, and other actions of key decision makers.  One might

5    look at such things as what other sorts of bills did they push,

6    favor, sometimes the background is exceedingly important.

7          Statements by important participants, the eighth

8    factor, is self-explanatory.  State policies and institutional

9    rules; in particular, it's important to look to see if there was

10   some deviation from normal procedures that enabled something to

11   pass, as in this case.

12         And the final factor, impact, or effect, is important;

13   particularly, the anticipated impact or effect is important for

14   trying to determine intent.

15   Q.  Are you familiar with the case that's commonly known as

16   *Arlington Heights*?

17   A.  I am.

18   Q.  To what extent, if any, does your methodology overlap with

19   the *Arlington Heights* factors?

20   A.  I think six of them are almost exactly the same.  I've

21   broken down some of the *Arlington Heights* factors a bit.

22   *Arlington Heights* would probably consider demographic facts part

23   of the historical context.  I simply broke that out separately.

24   Q.  And to your knowledge, has your methodology ever been

25   challenged by other scholars as invalid?

1     A.   I do not think so.

2     Q.   Has any court rejected your methodology as unreliable?

3     A.   Not that I'm aware of.

4     Q.   Let's get to the heart of your analysis, if we could.   And

5     let's start with the historical background.   Would you summarize

6     for the court the historical background or the context in which

7     SB14 was considered?

8     A.   Well, the social context is particularly important.   A

9     demographic fact of particular importance is that between 2000

10    and 2010, for the first time since statehood, Texas became a

11    majority/minority state.   It had been majority non-Hispanic

12    white from the time that it entered the union in 1846 to 2000

13    census.   During that period of time it changed.

14          And this was a change which was very often commented

15    upon in the run-up to redistricting.   It was widely understood

16    that the major growth of population had been Hispanic during

17    that period of time, and there was considerable concern on the

18    part of non-Hispanic whites about losing control.

19          There were two other things that happened which were

20    political facts at the time which were particularly important.

21    The first is that the Republican Party dominance grew.   The

22    Republican Party in the 2002 election took over the state House

23    of Representatives for the first time, I think, since

24    Reconstruction.   Now they control both houses of the state

25    legislature, all the major state offices, and so on.

1          That group -- the Republican dominance is increasingly

2     in a racially polarized electorate.  During the Texas

3     redistricting trial, I and a bunch of other expert witnesses did

4     a lot of statistical analysis of elections in Texas during that

5     period of time, and all of us agreed substantially that there

6     was quite overwhelming racial polarization in those elections.

7          The Republican Party was dependent on white votes, not

8     Hispanic/white votes; the Democratic Party was increasingly

9     dependent on black and Latino votes.  So those three things put

10    together, an emerging majority minority population, Republican

11    dominance, and an increasing racial polarization, set the stage

12    for the passage of SB14.

13    Q.  Explain briefly how those factors relate to the passage of

14    SB14?

15    A.  They relate because the Republicans essentially had two

16    alternative strategies; either they would make more of an appeal

17    to Latinos in particular, and African-Americans as well,

18    Asian-Americans in certain areas of Texas, directly adopting

19    policies that they favored, or they would try to reduce the

20    number of those people that were voting.  If they wanted to

21    retain their dominance and continue to be the dominant political

22    party, they had those two choices.  In SB14, they made the

23    second choice.

24    Q.  Let's talk, if we could, briefly about the sequence of

25    events leading to SB14's passage.

1    A.  It starts in 2005, as Representative Anchia was saying.

2    That was the first consideration of a bill on voter

3    identification.  And the struggle from 2005 through 2009 shows

4    that this is not simply a rational, simple bill that ought to

5    appeal to everybody, everybody is against voter fraud, nobody

6    wants dishonest elections, and all that sort of stuff.  In fact,

7    it was a brutal battle between members of the two political

8    parties, and particularly minority members in the

9    Democratic Party, and majority members.

10           In the initial bill, there was an effort to block it,

11   and it succeeded.  Let me explain quite quickly the rule.

12   Q.  And if I may interrupt you, when you say "the initial bill,"

13   what time frame are we talking about?

14   A.  We're talking about 2005.

15   Q.  Thank you.

16   A.  The rule that was particularly important was the so-called

17   two-thirds rule in the Senate.  From the 1950s, at least, on, it

18   required two-thirds of all senators to bring a bill to the

19   Floor; one-third of all senators could block the consideration

20   of the bill.  And this built sort of comity, a familial

21   atmosphere.  The Senate is often described as a family in Texas.

22   But if the Democrats continued to hold one-third, and they

23   really, really, wanted to, they could block the consideration of

24   a bill.

25           They did so in the Senate in 2005.  There was one way

1    around this, and that was for a bill to have passed the Senate,

2    then pass the House, get amended in the House; if the amendments

3    were okay with the Senate sponsor, then the bill could be voted

4    on even if it didn't have two-thirds to take it up.  That

5    happened at the end of the session in 2005, and Senator Ellis of

6    Houston, an African-American Representative, threatened a

7    filibuster over the last couple of days.  He did not have to

8    carry this out because of another rule.  But it was a really

9    nasty fight in 2005.

10          It became much nastier in 2007.  And in 2007, it became

11   nastier because one of the state senators -- the Democrats had

12   only 11 state senators, I think, in 2007.  It became nastier

13   because one of the state senators, Senator Gallegos of Houston,

14   had a liver transplant at the beginning of the session, and he

15   was in the hospital for a long time.  With a month to go in the

16   legislative session, he insisted on checking out of the hospital

17   and coming back, and then he had to go back for an examination

18   about a week before the legislative session ended.  There was

19   evidence that his body was rejecting the liver, but against

20   doctor's orders he checked out of the hospital and came back and

21   they set up a bed for him in an antechamber, a hospital bed,

22   where he stayed for three days to ensure that the bill didn't

23   pass.

24   Q.  When you say "the bill," you're talking about the Voter ID

25   Bill?

1    A.   I'm talking about the Voter ID Bill.

2    Q.   And that was in 2007?

3    A.   And that was in 2007.

4    Q.   Was the bill brought up again in 2009?

5    A.   It was.  And the major change in 2009 was that only for

6    voter identification bill, the two-thirds rule was suspended.

7    Not for any other bills.  Democrats proposed that it apply to

8    education bills, budget bills, and such.  But only for voter

9    identification was the two-thirds rule suspended.

10   Q.   Why is that?

11   A.   The Democrats could not block voter ID in the Senate in

12   2009.

13   Q.   Were there any other changes in procedure that you find to

14   be relevant to your analysis here?

15   A.   Well, in 2009 -- I think the court must be aware of the term

16   "chub" by now.  In 2009, Democrats in the House executed a chub,

17   which was sort of a multiperson filibuster.  House

18   Representatives couldn't talk indefinitely, as senators could.

19   They could only talk for 10 minutes.  So they used the fact at

20   the end of the legislative session that there were a lot of

21   bills that came up under the local and consent calendar which

22   had priority that could be discussed endlessly.  So they each

23   talked for nine-and-a-half minutes, and executed a five-day chub

24   which ended up putting off any action whatsoever on

25   approximately 200 bills, many of which were really quite

1    important.

2         The Democrats felt so strongly about this that they

3    were willing to give up about 80,000 children on the CHIP

4    program, and they did.

5    Q.  What role did Hispanic or African-American legislators play

6    in the passage of those bills in 2005, 2007, 2009?

7    A.  They were very active.  Most of the Democratic legislators

8    were minority and they held leadership positions, so they

9    obviously played a considerable role.  Senator Ellis was the

10   filibusterer.  Most of the people who engaged in the chub in

11   2009 were minority members, and Senator Gallegos and

12   Senator Uresti, I won't describe that incident, but it's in my

13   paper, were very active in 2007.

14   Q.  Dr. Kousser, why are these partisan struggles relevant to

15   your analysis of racial purpose?

16   A.  Well, they are because, as I pointed out earlier, the Texas

17   electorate is very racially polarized, and the legislative

18   houses are very racially polarized.  About 90 percent of the

19   representatives in every -- of the Republicans in every session

20   of the state legislature during that time period have been

21   non-Hispanic whites.  Particularly in 2011, the vast majority of

22   the Democratic state legislatures are minorities.  So there is a

23   confluence.  There's such a high correlation between

24   partisanship and race that a bill that has partisan effects

25   would have racial effects.

1          Furthermore, if you look at who would be disfranchised,

2     this is not just any bill, this is not just a budget bill, this

3     is not just a schools bill, this is a bill that would have the

4     effect of making it more difficult for particular people to

5     vote.  Who would it make more difficult for people to vote?

6     What sorts of people in the Democratic coalition would have more

7     difficulty voting because of this?  They would be minorities,

8     primarily, some elderly people, some college students, but

9     predominantly minorities.

10          So a bill that disfranchises Democrats and particularly

11     affects poorer people has a very disproportionate effect on

12     minorities.  It's impossible to separate those two.

13     Q.  Let's step forward a little bit to 2011, and I you'll agree

14     with me there's a difference outcome in 2011.  Correct?

15     A.  There was.

16     Q.  What accounts for the different outcome in 2011?  How come

17     SB14 passed where its predecessor bills did not?

18     A.  The first thing was the 2010 elections.  In particular, the

19     Republicans did well in the lower house of the state

20     legislature.  In 2008, with the Obama surge, the lower house of

21     the state legislature was 76/74 Republican, and in that context,

22     the Republicans had to compromise, or at least possibly had the

23     compromise more than they did later.

24          By 2011, at the end of the election in 2010, they had a

25     99 to 51 majority, and two Representatives shifted after the

1    election from Democratic to Republican, giving the Republicans a

2    more than two-thirds majority, 101 to 49 in the lower house of

3    the state legislature.  This meant that one other potential

4    procedural device that the Democrats could have used which was

5    to break a quorum by leaving the state as they had done in the

6    Tom Delay redistricting in 2003.  This was no longer open to

7    them because two-thirds was a quorum.

8          So at that point, the Democrats had little choice.  And

9    one of the changes, another change that went through --

10   Q.  Forgive me.  When you say "change," you mean a procedural

11   change?

12   A.  Change in the procedure of the house was to get rid of the

13   chub.  There were some Democrats who were not happy with the

14   chub in 2009, who wanted to see their bills voted on.  With the

15   Republicans able to kill a chub at any time because all they

16   needed was two-thirds vote to change the rules even in the

17   middle of the session, there was no real reason to keep it.  And

18   so Democrats joined Republicans in changing the rules to make it

19   impossible to have a chub.

20         There were other things in 2011.  The bills -- one of

21   the reasons that the Democrats had been able to run a chub, and

22   one of the reasons that Senator Ellis had only had to threaten a

23   filibuster at the last minute, was that the bills got delayed.

24   In the Texas legislature, a bill, I think, has to be declared an

25   emergency bill to be acted on finally in the first 60 days.

1    Governor Perry declared that voter ID was an emergency bill in

2    2011, and Lieutenant Governor Dewhurst ranked it first on the

3    list so that it would have to be taken up first.  It couldn't

4    move towards the end of the session and let the Democrats find

5    some other procedural device to stop this.

6    Q.  And as you testified, the bill passed.  How would you

7    characterize the degree of minority support for SB14?

8    A.  Democratic minority members voted unanimously against it, I

9    believe.  There were some minority votes against it -- for it,

10   rather.  They were Republicans.  In the Texas redistricting

11   trial, I did an analysis of racially polarized voting in all of

12   the contests involving Hispanic Republicans during the decade

13   from 2002, the eight years from 2002 -- the five elections from

14   2002 through 2010, and I also analyzed the elections in 2010 for

15   other minority Republicans.

16           In all of those elections, and I present those tables

17   as part of my prime report in this case, just reprinting them,

18   in essence, from the Texas redistricting report, in all of those

19   cases minorities, minority voters, voted against the minority

20   Republicans, often quite overwhelmingly.

21   Representative Aliseda, for example, got approximately

22   23 percent of the Hispanic vote in 2010.  He was not the

23   candidate of choice.

24           So all of the minority representatives who voted for

25   SB14 were not representatives of choice of the minority

1   community, and I don't think that should be considered the

2   decision of the minority community on the basis of that

3   evidence.

4   Q.  Okay.  Well, let's talk for a second about what the

5   proponents of the law put forward as the basis for the necessity

6   of passing it.

7            JUDGE COLLYER:  I'm sorry to interrupt you, sir.  Are

8   you, therefore, moving to a new subject matter?

9            MR. DELLHEIM:  Yes, ma'am.

10           JUDGE COLLYER:  I'm going to pull the rug out from

11   under you, which I seem to do on a fairly regular basis in this

12   trial.  Since I'm the timekeeper, I get to do that.  It's now

13   3:30, so we will take a break.  Okay?  Thank you, sir.

14           Thank you, Dr. Kousser.  Please don't talk about your

15   testimony during the break.  Okay?

16           THE WITNESS:  Certainly.

17           (Recess taken at 3:32 p.m.)

18           JUDGE COLLYER:  Go ahead, Mr. Dellheim.

19           JUDGE TATEL:  Just hold on one second.  I just wanted

20   to ask your witness one question before you keep going.

21           MR. DELLHEIM:  Sure.

22           JUDGE TATEL:  Dr. Kousser, when you were testifying

23   earlier about racially -- the situation when you have racially

24   polarized voting.

25           THE WITNESS:  Yes.

1          JUDGE TATEL:  And you were making a point that when you

2     have, say, a Republican legislature that wants to protect its

3     power by disenfranchising Democrats, the effect of that is also

4     where you have polarized voting to disenfranchise minorities.

5     Right?

6          THE WITNESS:  Correct.

7          JUDGE TATEL:  I understand that, you know, we're

8     dealing with the effects prong of Section 5, but as a scholar

9     researching this, how do you sort out the motive?  How do you

10    determine in a situation like that whether the motive - because

11    that's what you're testifying about - was partisan or racial?

12    What are the scholarly approaches to answering that question?

13    How do you answer that?

14         THE WITNESS:  Well --

15         JUDGE TATEL:  Do you see my point?

16         THE WITNESS:  I do.  Let me talk just a second about

17    some of the evidence on that particular point.  During the

18    debates there was considerable discussion both in the House and

19    the Senate - and popularly - about the racial incidence of the

20    effect of the legislation, and a great deal of that effect was

21    anticipated.  So what I would focus on here is the anticipated

22    effect to try to determine the intent, and there were --

23         JUDGE TATEL:  In a state where you have -- we can just

24    keep this away from Texas for a minute, because it's probably

25    easier, and then I'll let you go back to your questioning.  But

1    in a situation where you have racially polarized voting,

2    obviously everybody is going to know that, aren't they?

3              THE WITNESS:  Yes.

4              JUDGE TATEL:  People will know that.  And members of

5    the legislature will know that restraining Democratic voting

6    will limit minority voting.  But I'm still not quite sure I

7    understand from a scholarly point of view how you -- what you

8    look at to reach a conclusion that, well, in one state where

9    this occurs, it's primarily -- or it's a partisan effort, it's

10   just Democrats -- Republicans wanting to maintain political

11   power, whereas in another state what's going on is racial.  I

12   mean, is it possible to do that?

13             THE WITNESS:  It is possible, I think.  And I think

14   what you have to do is to look at the particular evidence in

15   that state.  It's different from the evidence that we have

16   available, at least, for Indiana.  And in Texas there was a

17   great deal of discussion about the racial incidence of the

18   effects of the law, and there were attempts by Democrats to try

19   to find out -- one of the things that I talk about in the paper

20   is that Republicans resisted again and again efforts to have

21   studies made of the racial incidence of the effect of the law.

22   And I think -- suppose that we were here.  Suppose that the

23   Secretary of State's office or the DPS or some other official

24   group had conducted a matching program, had conducted a survey

25   which was representative - a large enough sample so that

1    reliable inferences could be drawn - and suppose that they had

2    found that there was a racially discriminatory impact of the

3    law.  Suppose that that had happened before the passage of SB14.

4    This would be a pretty open and shut case.

5              JUDGE TATEL:  On purpose?

6              THE WITNESS:  On purpose.

7              JUDGE TATEL:  Really?  Tell me why.

8              THE WITNESS:  Because the anticipation of the effect

9    would have been apparent to everybody.

10             JUDGE TATEL:  Yeah, but if their purpose -- suppose

11   their purpose is totally partisan.  They're Republicans wanting

12   to maintain control, and they find out that -- yeah, they do a

13   study, and they find out that as a result of this they're going

14   to disenfranchise a large number of Democratic minorities.  Does

15   that mean their motive is racial?

16             THE WITNESS:  If they're disproportionately

17   disenfranchising minorities, yes, I think it does.  The same

18   thing was true --

19             JUDGE TATEL:  I don't understand the difference between

20   the two prongs of Section 5 effect.  I understand your effects

21   case, easily.  Why don't you continue?  Maybe you see where I'm

22   coming from, and counsel, maybe you -- you know --

23             THE WITNESS:  I do --

24             JUDGE TATEL:  -- as you try to frame your questions,

25   you may want to focus on this for me.  Okay?  Go ahead.

1           MR. DELLHEIM:  Thank you very much, Your Honor.

2   BY MR. DELLHEIM:

3   Q.  Dr. Kousser, I want to turn back to SB14 at the time that it

4   was passed or adopted in 2011.  What were the proponents of the

5   law putting forward as the reason for the necessity of passing

6   SB14?

7   A.  Well, they put two arguments, primarily, forward.  One of

8   the arguments was that there was widespread fraud, and they

9   particularly focused in public and probably more outside the

10  legislative arena on the idea that there was widespread

11  in-person voting by, quote, "illegal aliens," end quote.

12          And the second was whether the bill would restore

13  confidence in the integrity of the political process.  That sort

14  of formula was used quite considerably in the legislature from

15  2007 on, and it almost replaced the fraud considerations in

16  2011.

17  Q.  What evidence was there that the legislature considered of

18  the existence of in-person voting fraud that SB14 was intended

19  to eliminate?

20  A.  There was a considerable amount of initial talk about such

21  fraud in a series of arenas, including the legislature.  And

22  when the claims were examined -- sorry, when the claims were

23  examined in considerable detail and much more carefully, the

24  claims would dissolve.

25          There's a point in the paper when I discuss a claim

1    that was made by a web site called The Texas Watchdog just

2    before the 2008 election that there were 6,000 dead people

3    voting in Dallas County, on the rolls in Dallas County.  It took

4    the *Dallas Morning News* about two months to go through very

5    specifically all of those people, and I put in about a page of

6    that newspaper article.  It goes from 6,000, and it goes down

7    one by one until finally they conclude that perhaps one person

8    voted illegally from that list of 6,000.  They did the same

9    thing in the legislature.

10         And the most important of the efforts to talk about

11   fraud, which turned out not to turn out very much fraud, was led

12   by the Attorney General.  The Attorney General in 2006, after

13   the first consideration of the Voting ID Bill in 2005, and after

14   that had failed, launched an investigation into what he called,

15   quote, an "epidemic" of voter fraud.  He started with this large

16   conclusion, and he said he was going to devote $1.4 million of

17   the Governor's funds to holding conferences with local

18   officials, sheriffs, election officials, district attorneys, and

19   so on around the state.  He specified the counties that he was

20   going into; he said that it would cover about 70 percent of the

21   registered voters in Texas; he would prosecute a great deal more

22   election fraud.

23         But in 2008, when the man in the Attorney General's

24   office, Eric Nichols, who was in charge of the office that had

25   conducted this inquiry, testified before the Committee of the

1    Whole Senate on the Voter ID Bill, he said that he had found

2    perhaps -- they had found and investigated perhaps 30 instances;

3    they had convicted many fewer; and there was perhaps one case of

4    in-person voter fraud that they had brought to light and

5    convicted.

6           So it starts with a large list and a large claim, and

7    it ends with almost no in-person voter fraud proven.  And it was

8    done similarly in San Antonio with the district attorney there,

9    and in claims that were made by other people.

10   Q.  Okay.  What other reasons were given, in addition to fraud,

11   for the passing of SB14?

12   A.  Well, the confidence in the integrity of the political

13   process was talked about quite a lot.  At the end of the

14   discussion in 2011 in the House, when Representative Harless was

15   discussing things with Representative Anchia, she said at the

16   end of her soliloquy that this is not about fraud, and she had

17   talked about the confidence in the electoral process.  But they

18   never presented any evidence whatsoever that there was a

19   dramatic decline in the confidence in the electoral process.

20   They presented no surveys to show that Texans lacked confidence

21   in the integrity of the election process.

22          And with the Republicans in control and winning

23   election after election, it was exceedingly implausible that

24   they were -- they had suddenly lost confidence in the electoral

25   process, and Democrats, who were losing overwhelmingly, had

1    great confidence in the electoral process.  Nor was there any

2    evidence whatsoever offered that SB14 would restore any

3    confidence in the electoral process if there was a lack of it.

4    Q.  So you're aware of no evidence actually that was presented

5    to the legislature.  Is that correct?

6    A.  That's right.  Nobody ever testified that they had so badly

7    lost confidence in the electoral process that they had stopped

8    voting, or anything like that.

9         There was one point that was made that was quite

10   extreme along this line.  Both in 2009 and 2011, in the Senate

11   and in the House, sponsors of the bill would say that more

12   minorities would start to vote as a result of the passage of

13   SB14 because they would -- they had stopped voting because they

14   lacked confidence in the electoral process, and they would start

15   voting again if SB14 were passed and they could have more

16   confidence in the electoral process.  This seemed to me so

17   completely implausible, given the other discussion that took

18   place, that it undermined my confidence in the argument.

19   Q.  Were there statements by participants at that time that you

20   considered to be relevant in your analysis here?

21   A.  There were, and I think I've talked about some of them.

22   Lieutenant Governor Dewhurst continually talked about the

23   illegal aliens voting.  I think I've talked about a referendum,

24   or a couple of referenda that Republicans held in 2006 and 2008

25   about voter ID.  He actually ran a TV commercial that said that

1    voter ID was a way to stop illegal aliens from voting.

2          This was also discussed by the sponsor of the bill in

3    2007 in her speech, and it was -- there were widespread

4    discussions of illegal aliens voting.  One of the most

5    interesting, in a way, was there was a person who testified in

6    2011 - I believe before a House committee - and he said that

7    voter ID was aimed at illegal aliens voting.  And he was pressed

8    upon this by several representatives, finally including

9    Representative Pena, who although he had changed to the

10   Republican party, still denied that there were large numbers of

11   illegal aliens voting.  And this witness finally said that he

12   was for the bill whether there was a problem that it solved or

13   not.

14   Q.  And I believe your testimony is there was no evidence of a

15   problem put before the legislature at that time.  Correct?

16   A.  That's correct.

17          MR. HUGHES:  Object to the leading.

18          JUDGE COLLYER:  It's a wrap-up.

19          JUDGE TATEL:  Since we're pausing for a second, again,

20   it 's a question -- I'm going to ask you the question as a

21   scholar.  I hear what you're saying.  You have shifting

22   rationales.  Right?

23          THE WITNESS:  That's correct.

24          JUDGE TATEL:  And how do you know that those shifting

25   rationales -- they could be pretext for disenfranchising

1    minorities; they could also be pretext for disenfranchising

2    Democrats, couldn't they?

3            THE WITNESS:  They could.

4            JUDGE TATEL:  How do we as a court know which it is?

5            THE WITNESS:  Well, I had to consider this issue quite

6    considerably in "The Shaping of Southern Politics," and it was

7    exactly the same issue.  It was whether disfranchising blacks,

8    which meant disfranchising Republicans, had a partisan or a

9    racial concern.  First of all, there was more evidence that it

10   was a racial concern.  They said that sort of thing.  But these

11   things were -- they were so connected with each other that it

12   was impossible to do one without doing the other.

13           What they tried to do also was to disadvantage

14   minorities in the South in the late 19th and early

15   20th centuries by making it impossible for them to have a

16   political vehicle which was viable which would make it possible

17   for them to win elections, to get policies that they favored

18   passed and so on.  So that in that case - and I think in this

19   one - the partisan effect had an additional racial effect

20   because it made it more difficult for the people who adhered to

21   that party to get what they wanted passed, not just as Black in

22   the late 19th century or as Black and Latino here, but as people

23   who had a particular set of political ideals and political

24   interests that they wanted to forward.

25           The partisan effect multiplies the racial effect.  I

1    argued that in "The Shaping of Southern Politics," and I would

2    argue that here, too.

3            JUDGE TATEL:  Uh-huh.  Thank you.

4    BY MR. DELLHEIM:

5    Q.  Dr. Kousser, as part of your analysis, did you look at the

6    text of SB14?  And if so, was there anything within the text

7    that you find relevant to your opinion?

8    A.  I did.  Table 1 of my longer paper looks at the current

9    requirements and the texts of the bills -- the requirements in

10   the bills from 2005, 2007, 2009, and also at SB14.  And the

11   difference in the bills is quite interesting and informative.

12           Currently, there are a large number of identifying

13   documents that can be used.  They were constrained a good deal

14   in the bills in 2005, 2007, 2009, but not so much as SB14.

15   There were still non-photo ID documents that could be used to

16   identify yourself in the earlier bills.  The big change is,

17   between all of the other bills and the current requirements and

18   SB14, there was a very severe narrowing of the identification

19   documents that would be available.  And this is relevant to the

20   intention, because it meant that what the bills were trying to

21   do - and particularly what SB14 was trying to do - was to

22   constrain the electorate by constraining the documents that they

23   could use to identify themselves.

24           Table 3, which is towards the end of my first report,

25   looks at all the amendments that were proposed in the Senate in

1    2011, and tries to determine what the effects of those bills

2    would have been by just looking at them, and whether the

3    legislature was open to continuing to make it possible for

4    minorities and other members to be able to vote.  All of the

5    important amendments, the really important amendments that were

6    proposed by minority and other Democratic legislators, were

7    rejected.

8            One was particularly interesting with regard to the

9    discriminatory intent of the framers.  It was offered by

10   Senator Ellis, and it called on the Secretary of State to issue

11   an annual report on the ethnic consequences, the effect on

12   groups of voters identified by ethnicity, of SB14.  That was

13   rejected, as were all of the major Democratic amendments.

14           So these show what the bill could have been and what

15   the intentions could have been if the legislature had wanted to

16   expand the suffrage or keep it the way that it was, or to ease

17   it a bit from SB14.  But they were all rejected.

18   Q.  Picking up on your testimony regarding the rejection of

19   Senator Ellis' amendment, what other evidence were you able to

20   uncover regarding the anticipated effect of SB14, were it to go

21   into effect?

22   A.  There were three kinds of evidence that were offered, and

23   particularly in the Committee of the Whole Senate consideration

24   in 2009.  One was that the sponsor of the bill, Senator Frasier,

25   said under questioning from the Democrats that he had received

1    some statistics from the Secretary of State's office, and of the

2    last approximately five million registrations in Texas, about

3    12 percent of those people registered without presenting a photo

4    ID.  They presented Social Security numbers in order to

5    register.  Some of those people may have had photo IDs, some of

6    whom may have had photo IDs that would work under SB14 later.

7    But you've got an idea that there were roughly 800,000 people,

8    which is 12 percent of the five million, that would be affected

9    by this, and if you multiplied that out to get what the --

10             MR. HUGHES:  Your Honor, I'm going to object.  I don't

11   believe this is disclosed in Dr. Kousser's report.  Correct me

12   if I'm wrong, counsel, but we're --

13             THE WITNESS:  I believe it was.  I can't cite you the

14   page, but I did, I think, include that discussion.

15             MR. HUGHES:  It's 100 pages long.

16             JUDGE COLLYER:  Yes, we have lots of pages.  Why don't

17   you keep going, and then if you discover later...

18             MR. HUGHES:  It's withdrawn.

19             JUDGE COLLYER:  Okay.

20             MR. DELLHEIM:  Thank you, Your Honor.

21             JUDGE COLLYER:  I know that Dr. Kousser was in the

22   middle of something.  Forgive us, Doctor.  Maybe you could

23   reframe another question to get us back on track?

24             MR. DELLHEIM:  I will.  And this question will go at

25   least in part to a question Judge Tatel asked.

1    BY MR. DELLHEIM:

2    Q.  Dr. Kousser, with respect to the evidence before the

3    legislature at the time it considered SB14 in 2011, to what

4    extent was there evidence that the legislature knew or that it

5    didn't know what the impact of SB14 would be on minority voters?

6    A.  Well, there was considerable evidence, because the

7    Democrats - particularly minority members - asked again and

8    again for studies of the incidence, the general incidence of

9    people not having photo IDs or other IDs that would be legal

10   under any of the particular bills, and they also asked for the

11   Secretary of State or the DPS to make studies of the racial

12   incidence of those bills.

13          Particularly, the Senate minority leader,

14   Senator Leticia Van de Putte, who is Latina, from San Antonio,

15   asked the Secretary of State's office for a study of the ethnic

16   consequences of the bill.  All of these efforts -- and they were

17   made again and again on the Floor.  All of these efforts were

18   rebuffed.  There was never such a study made, or at least it was

19   not made public at the time of SB14's passage.

20   Q.  And as a scholar, what do you infer from the fact that

21   minority legislators requested specific evidence with respect to

22   the impact of SB14 on minority voters, and that evidence was not

23   provided?

24   A.  Well, everyone had an idea that there might be an effect on

25   minority voters, because there was testimony at hearings, again

1    in the Committee of the Whole Senate in 2009, by a lot of expert

2    witnesses from the outside.  The Brennan Center people in

3    particular said that they had done surveys that showed that

4    minorities were less likely to have such documents.

5          The failure to respond to the inquiry by Democrats who

6    asked for such information convinces me that the sponsors of the

7    bill, the Republican sponsors of the bill, simply didn't want to

8    know - didn't want to let anybody else know, either - what the

9    consequences were.  So that seems to me evidence of racially

10   discriminatory intent.

11   Q.  Did anyone, any witnesses before the legislature, promise to

12   provide the requested information regarding the potential ethnic

13   or racial impact of SB14?

14   A.  I believe Mr. Shorter, who was with the Secretary of State's

15   office, did.

16   Q.  And was that information provided?

17   A.  No.

18   Q.  Dr. Kousser, are you offering any opinion as to any

19   legislator's subjective intent in this case?

20   A.  No.  The 10 intent factors are based on public information

21   and on public statements and public actions.  I don't have

22   anybody on a psychiatrist's couch.  I can't find out what they

23   found deep in their heart, and I don't think it would be

24   relevant.

25   Q.  Let me ask you another question.  You were asked by the

1    court, how do we know whether a legislature's action is -- was

2    triggered by partisan interests or racial interests.  As a

3    scholar, do you have to separate them, and is there judicial

4    authority that helps inform your opinion?

5    A.  Well, one of the things that's most interesting about that

6    is that from time to time people do separate them.  I tried to

7    do so in the Texas redistricting case, but here it's hard to

8    separate them.

9           What's most clear about this sort of bill is, it's not

10   going to have a big impact on middle class white Democrats in

11   Travis County, Austin.  They have photo IDs.  Or middle class

12   Black and Hispanic Democrats in Houston or San Antonio.  The

13   people who are really going to be affected by this are

14   relatively poor people who are quite disproportionately

15   minority.

16          So if it affects Democrats, and it's mostly going to

17   affect their members who are a minority, then it has an effect

18   on minorities, which is disproportionate and I believe intended.

19   Q.  And you're familiar with the case of *Garza*.  You testified

20   as an expert.  Correct?

21   A.  Yes.  In the *Garza* case there is a very interesting opinion

22   by Judge Kozinski in the appeals court decision, and he has a

23   sort of metaphor about racially discriminatory intent.  He says

24   something to the effect that if you're a white homeowner and you

25   sign a racially restrictive covenant because you want to keep

1     the value of your house, and you think the value of your house

2     would diminish if people of color moved into the neighborhood,

3     have you engaged in intentionally racially discriminatory

4     actions.  He concluded that you had.  I think that's actually

5     quite a good analysis.

6              MR. DELLHEIM:  I have no further questions at this

7     time.  Thank you, Dr. Kousser.

8              JUDGE COLLYER:  Thank you very much.  Did any other

9     defendant wish to question this witness?

10             MR. HEBERT:  No, Your Honor.

11             JUDGE COLLYER:  All right.  Did someone from the

12    United States?  I'm sorry.  I know Texas considers itself

13    sovereign, but that was a bit much.

14             MR. MORTARA:  We're all from the United States here.

15    Ms. Spencer is also an Australian, though.

16             JUDGE COLLYER:  Well, we won't mention Australia,

17    because I'm having enough trouble between Texas and the

18    United States.

19             Mr. Hughes, if you would, please, on behalf of the

20    great State of Texas.

21             MR. HUGHES:  Thank you, Your Honor.  Again, I'll need

22    one moment.

23                        **CROSS-EXAMINATION**

24    BY MR. HUGHES:

25    Q.  Good afternoon, Dr. Kousser.

1    A.  Good afternoon, Mr. Hughes.

2    Q.  It's kind of like old times here.

3         Now, in your report in this case, and in your direct

4    testimony with Mr. Dellheim, you mentioned a book that you

5    wrote.  Right?

6    A.  I believe I did.

7    Q.  You mentioned the book "Colorblind Injustice."  Correct?

8    A.  That's correct.

9    Q.  And in fact, you put on the screen for the court a

10   demonstrative that you and the Department of Justice created

11   that had 10 different factors that you identify in your book

12   "Colorblind Injustice."  Correct?

13   A.  That's correct.

14   Q.  And those are the factors that you are using.  They're like

15   your analytical framework that you're using to get at your

16   opinions in this case.  Correct?

17   A.  Right.

18   Q.  And I want to ask you a few questions about the concluding

19   pages of your book.  Okay?  And I want to start on page -- let

20   me just put it up on the screen and blow it up.  Dr. Kousser,

21   I've got the book here, but I've put a photocopy of a page of

22   the book on the screen.

23        MR. HUGHES:  And for Your Honors, for convenience,

24   we've marked this as Exhibit 543.

25   BY MR. HUGHES:

1    Q.  Dr. Kousser, you recognize this as a page out of the book

2    that discloses your analytical framework in this case.  Right?

3    A.  I did not use my analytical framework to analyze *Shaw*.

4    Q.  Dr. Kousser, you need to focus on my questions.  I'm under

5    very tight time limits --

6    A.  Very well.

7    Q.  -- and I'm asking you, is this a page, or one of the pages

8    out of the book that you used to disclose your analytical

9    framework in this case?

10   A.  This is a page which is not derived from the analytical

11   framework.  The analytical framework is described in the book.

12   It is used to analyze --

13   Q.  Dr. Kousser, I don't mean to cut you off, but you're not

14   answering my question.  Is this a page from the book that you

15   disclosed the analytical framework that you used in this case,

16   yes or no?

17   A.  It is a page from the book.  At another point in the book I

18   disclose the analytical framework.

19   Q.  Now, in this last few pages of the book you talk about a

20   case called *Shaw v. Reno* and its progeny.  Right?

21   A.  Correct.

22   Q.  And *Shaw* against *Reno* was a case, was a 5 /4 U.S. Supreme

23   Court decision authored by Justice O'Connor, joined by

24   Chief Justice Rehnquist, Justices Scalia, Kennedy, and Thomas.

25   Right?

1    A.  Yes.

2    Q.  And in the concluding paragraphs of your book, you conclude

3    that *Shaw* and its progeny are wrong, as wrong as *Plessy* and as

4    wrong as *Dred Scott*.  Right?

5    A.  That's what I wrote in 1999.

6    Q.  And to be clear - I think everybody knows - but *Dred Scott*

7    was a Supreme Court case that endorsed slavery.  Right?

8    A.  Yes.

9    Q.  And *Plessy* endorsed segregation.  Right?

10   A.  Yes.

11   Q.  And you would agree that both of those are racist opinions,

12   black marks upon our nation.  Right?

13   A.  Yes.

14   Q.  Two of the worst Supreme Court opinions of all time.  Right?

15   A.  Yes.

16   Q.  And at the time that you published your book, you concluded

17   that Justice O'Connor authored, and Chief Justice Rehnquist and

18   Justices Kennedy, Scalia, and Thomas signed their names to, an

19   opinion that was as evil as the U.S. Supreme Court opinion that

20   endorsed slavery and the U.S. Supreme Court opinion that

21   endorsed segregation.  Right?

22   A.  I did not say evil, I said wrong.

23   Q.  But you just agreed *Plessy* and *Dred Scott* are evil opinions.

24   Right?

25   A.  But I said *Shaw* was wrong.  I think it was empirically

1    wrong, and I spend 467 pages -- this is page 465.  I have a

2    whole chapter discussing *Shaw vs. Reno*, I testified in *Shaw vs.*

3    *Hunt*.  I have a whole chapter discussing the evidence that was

4    used in *Shaw vs. Hunt*, and I come to the conclusion that it was

5    wrong.  It was wrong empirically, and I can discuss that at some

6    length.  You don't want to take the time to do it.  But I think

7    that Justice O'Connor's opinion --

8    Q.  Dr. Kousser, I think again you've gotten way beyond my

9    question.  What you wrote in the book was that Justice O'Connor

10   and the other justices that joined the opinion joined an opinion

11   as wrong as the case that endorsed slavery and as wrong as the

12   case that endorsed segregation.  That's what you wrote in your

13   book.  Right?

14   A.  Wrong is not evil.  *Plessy* was wrong --

15   Q.  Dr. Kousser, I just asked you if you wrote in your book that

16   Justice O'Connor authored and Chief Justice Rehnquist and the

17   other justices we've mentioned joined an opinion that was as

18   wrong as *Dred Scott* and *Plessy*.  That's what you wrote in your

19   book.  It's on the screen.  Right?

20   A.  That's correct.  That's correct.

21   Q.  And I want to look at the very last paragraph of the book.

22   And this is the very last paragraph of the book,

23   "Colorblind Injustice."  Right?

24   A.  Yes.

25   Q.  And the highlighted portion that I have, I'll read it:

1    "When radicals purposely distort the history of those times and

2    the repressive intervening years in an effort to wipe out the

3    legacies of those epic struggles, when they employ colorblind

4    rhetoric in what is actually an attempt to redeem white

5    supremacy once more by deconstructing the Second Reconstruction,

6    it becomes the duty of a historian to set the record (sic)

7    straight."  Do you see that?

8    A.  Set the story straight.

9    Q.  I'm sorry.  Do you see that language?

10   A.  Yes.

11   Q.  And what you're referring to there is the *Shaw v. Reno* and

12   its progeny.  Right?

13   A.  And other cases.  As I discussed in my deposition, I was

14   particularly concerned there with the historical sketch that

15   Justice Scalia has offered in lots of places in which he has

16   said that the history of the United States leads you to believe

17   that the 14th Amendment means no consideration of race

18   whatsoever, not that it means discrimination.  It means

19   discrimination -- it has meant in the history of the

20   United States discrimination against people who were black, who

21   were Latino, et cetera, not just any --

22   Q.  Dr. Kousser, again, you're not answering my question.  I

23   would like to hand you your deposition.

24            MR. HUGHES:  May I approach, Your Honor?

25            JUDGE COLLYER:  Yes, go right ahead.

1    BY MR. HUGHES:

2    Q.  Dr. Kousser, I'm looking at page 51, line 12, which I have

3    opened to that page for you.  Do you see that?

4    A.  Yes.

5    Q.  And do you see at page 51, line 12, I read the paragraph

6    that we've just read together.  Right?

7    A.  Yes.

8    Q.  And then if you flip over to page 52, I say, line 9:  "And

9    what you're talking about there is the *Shaw* case.  Right?"

10           And you answer:  "The *Shaw* case and its progeny."  That

11   was your sworn testimony.  Right?

12   A.  Yes.  And on 53 I start discussing Justice Scalia.

13   Q.  And the opinion you're expressing at the end of your book,

14   the book that's cited in your report in this case, is that

15   Justice O'Connor authored, and that Chief Justice Rehnquist,

16   Justices Kennedy, Scalia, and Thomas joined an opinion that

17   employed colorblind rhetoric that had the effect of promoting

18   white supremacy.  Right?

19   A.  That's correct.

20   Q.  And you've actually thought about whether the purpose of

21   *Shaw* against *Reno* was to promote white supremacy, haven't you?

22   A.  Yes, I think I discuss that in my deposition.

23   Q.  And what you said is you think it's possible - your words at

24   the deposition were "up in the air"- that Justice O'Connor's

25   purpose in *Shaw* was to promote white supremacy, but at a minimum

1    you think she should have been aware that it would have that

2    effect.  That's what you think.  Right?

3    A.  That's correct.

4    Q.  Now that we've looked at the concluding paragraphs of the

5    book that discloses your methodology in this case, I want to

6    turn to talk about voter ID.  And my first question is:  Your

7    basic opinion is that the Texas Voter ID law was enacted with a

8    racially discriminatory purpose.  Right?

9    A.  Right.

10   Q.  In fact, it's your opinion that the elected officials in

11   Texas, including every member of the Texas legislature who

12   supported and voted for the Texas Voter ID law, were motivated

13   by racially discriminatory purposes.  You think that.  Right?

14   A.  Correct.

15   Q.  And you agree, though, that in the public record, there were

16   race neutral purposes that were identified for the Texas

17   Voter ID law.  Right?

18   A.  Yes.

19   Q.  One of the race neutral purposes that was identified as

20   supportive of Texas Voter ID law was to decrease election fraud,

21   you talked about with the Department of Justice's counsel.

22   Right?

23   A.  Right.

24   Q.  And another race neutral purpose that was identified as

25   supportive of the Texas Voter ID law was to increase confidence

1    in the electoral process.  Right?

2    A.  Right.

3    Q.  But what you say, in essence, is that these race neutral

4    reasons are all pretextual, and that you have the ability to

5    look behind these supposedly pretextual purposes and determine

6    that what's really going on is a racially discriminatory

7    purpose; in other words, an intent to burden minority voters.

8    Right?

9    A.  Correct.

10   Q.  And this is not the first time, is it, Dr. Kousser, that you

11   have tried to convince a court that a voter ID law was passed

12   with pretextual purposes in order to impermissibly burden

13   certain voters, is it?

14   A.  I think what you're referring to is the fact that I

15   participated in a historian's amicus brief in the *Crawford* case.

16   I'm not sure I would characterize it exactly that way.

17   Q.  Well, let's look at that brief, Dr. Kousser.  You were

18   pressing it.  And what I've got on the screen we've marked as

19   Exhibit 513, that's the historian's amicus brief that you're

20   referring to in the *Crawford* case.  Right?

21   A.  That's correct.

22   Q.  And if we turn to the table of contents, two of the

23   arguments presented in the amicus brief you signed your name to

24   sound familiar.  One is:  "The evidence strongly suggests

25   Indiana's photo ID law was enacted with partisan intent to

1    burden certain voters."  That was an argument you signed your

2    name to in *Crawford*.  Right?

3    A.  Yes.  But that was not the part of the brief that I

4    primarily was responsible for.

5    Q.  But it's in the brief you signed your name to?

6    A.  It is a brief that I signed.

7    Q.  And the other part that I guess bears more on what you did

8    there and what you're doing here, is that the reasons given for

9    Indiana's photo ID law are not credible.  Right?

10   A.  Yes.  Again, that's not the part of the brief that I

11   particularly worked on.  The part of the brief that I

12   particularly worked on is the part that is cited in

13   Justice Souter's dissent, those pages.

14   Q.  But you signed your name to a brief that presented these two

15   arguments.  Right?

16   A.  That's correct.  That's correct.

17   Q.  And in fact, the Supreme Court disagreed with the point of

18   view set forth in this brief, and upheld Indiana's voter ID law,

19   citing as valid purposes decreasing fraud and increasing

20   confidence in the electoral process.  Right?

21   A.  They did.

22   Q.  Same two reasons that the Texas legislature cited for SB14.

23   Right?

24   A.  I believe that there was no intentional discrimination

25   claim, either partisan or racial, in the *Crawford* case.

1   Q.  Dr. Kousser, you've got to focus on my questions.

2   Mr. Mortara has put me on a short leash on the time limit.  My

3   question is:  The reason that the Supreme Court said that the

4   Indiana statutes were valid - decreasing fraud, increasing

5   confidence in the electoral process - are the same race neutral

6   reasons cited by the Texas legislature in this case.  Right?

7   A.  Yes.  And I discussed that in my earlier testimony.

8   Q.  And of course you think *Crawford* was wrongly decided.

9   Right?

10  A.  I discussed this in my deposition.  I think that there

11  should have been -- it should have been brought differently.  It

12  should have had an intentional discrimination claim, it should

13  have waited until they had plaintiffs who were denied the right

14  to vote, and I think that Justice Stevens should have put more

15  emphasis on whether there was current emphasis -- there was

16  current evidence of voter fraud.

17        So I agree with you, I think particularly in the last

18  part of it, that it was wrongly decided.  I did not like the

19  *Crawford* decision in that regard.

20  Q.  And you recognize that the Supreme Court found that

21  detecting fraud was a valid interest, even though there was no

22  evidence in the record in that case of any in-person voter fraud

23  in Indiana.  You understand that.  Right?

24  A.  But this is a different case.  As I said before --

25  Q.  Dr. Kousser, you've got to answer the question --

1    A.   Yes.

2    Q.   -- that I ask you.

3    A.   The difference in this case --

4    Q.   It's not a question about whether there's a difference, it's

5    whether the Supreme Court found that detecting fraud was valid

6    on a record with no evidence of in-person voter fraud.  It's a

7    yes or no question.

8    A.   They found that.

9    Q.   Now let's turn to another part of your opinion.  I think you

10   mentioned this with Mr. Dellheim, and that was you mentioned

11   Attorney General Abbott's efforts to investigate and prosecute

12   election fraud.  Right?

13   A.   That's not how I would characterize them.  But yes.

14   Q.   Well, an important part of your overall opinion in this case

15   is your opinion that the Attorney General of Texas had a highly

16   visible investigation to find in-person voter fraud, and that

17   that investigation failed.  Right?

18   A.   Yes.

19   Q.   And basically, your testimony is that the Attorney General,

20   through this investigation, canvassed the State of Texas trying

21   to find voter fraud, and in particular in-person voter fraud, in

22   order to drum up political support for a Voter ID Bill.

23   Correct?

24   A.   Correct.

25   Q.   And that's a theme that you highlight in your report, and I

1    believe for the record the report is Defense Exhibit 548.  I

2    would like to show you a page out of your report, Dr. Kousser.

3    This is paragraph nine of your report, and this is kind of in

4    the introductory paragraphs to your report, where you're

5    summarizing what the ultimate contents of the substantive parts

6    of the report will be.  Right?

7    A.  Right.

8    Q.  Okay.  And in paragraph nine you move past the description

9    of the section that is going to set forth the facts, and you

10   say, "I then turn to the section of the paper that concentrates

11   more directly on motive."  Right?

12   A.  Well, they're facts about motive, but yes.

13   Q.  And when you're describing the section of the report that

14   discloses your paper -- or your opinion about motive, you say

15   that -- you're focusing first on the evidence that was offered

16   to support and undermine the central proposition of proponents

17   of voter ID laws, that they are aimed at actual, well

18   documented, in-person voter fraud.  "Texans made unparalleled

19   efforts to uncover such fraud.  The Attorney General's Office

20   conducted an expensive six-year-long, high visibility campaign

21   to find it."  Do you see that?

22   A.  Yes.

23   Q.  And so what you're talking about there is that you say, "The

24   Attorney General's Office conducted an expensive six-year-long

25   campaign to go and actually find in-person voter fraud.  That's

1    your testimony.  Right?

2    A.  To go -- as I said during the direct testimony, to hold

3    hearings, hold meetings, to inform local officials about what it

4    took to look for voting fraud, and to I think stimulate

5    investigations that he could pursue on voting fraud.

6    Q.  Dr. Kousser, let's just focus on what's on the screen.  What

7    you're talking about in this paragraph on the screen is that you

8    say that the Attorney General's Office conducted an expensive

9    six-year-long, high visibility campaign to find it.  You see

10   that language.  Right?

11   A.  Yes.

12   Q.  And the antecedent to it, and the only antecedent to it in

13   this paragraph, is "in-person voter fraud."  Right?

14   A.  Yes.

15   Q.  Now, I want to show you what was marked at your deposition

16   as Exhibit 7, but it's now Trial Exhibit 547.  And this is --

17   let me just ask you if you recognize it.  This is a news column

18   put out by the Attorney General that's the first public

19   announcement of what you've referred to as the

20   Attorney General's investigation to find in-person voter fraud

21   in order to generate support for photo ID.  Right?

22   A.  Yes.  There are various forms of this particular article.

23   One is a weekly column, but they're substantially similar.

24   Q.  And this is the one you cited in your report.  Right?

25   A.  Yes.

1   Q.   Okay.  And this exhibit, 547, the document that you say is

2   the Attorney General's public announcement to find in-person

3   voter fraud in order to build support for photo ID, it does not

4   mention in-person voter fraud, does it?

5   A.   No.  And I said that particularly in my report.

6   Q.   And it does not mention that the Attorney General is looking

7   to find in-person voter fraud, does it?

8   A.   It doesn't say he's looking.  He's going to hold all these

9   meetings and tell local officials how to find voting fraud, and

10  he is going to prosecute -- if you go on in the document, he is

11  going to increase the number of prosecutions for voting fraud.

12  Q.   There's not one mention of in-person voter fraud in this,

13  what you say is the announcement of the investigation to find

14  in-person voter fraud, is there?

15  A.   No.

16  Q.   And in fact, all of the examples of election fraud given in

17  this column have to do with other kinds of election fraud other

18  than in-person voter fraud.  Right?

19  A.   Yes.

20  Q.   And the news column that you say is the public announcement

21  of the Attorney General's investigation to find in-person voter

22  fraud to drum up political support for photo ID does not mention

23  photo ID, does it?

24  A.   No.  In the historical context, as I discussed --

25  Q.   It's just a yes or no question, Dr. Kousser.  It does not

1    mention photo ID, does it?

2    A.  It does not mention photo ID.

3    Q.  And it doesn't mention -- and I'm not trying to be rude,

4    Dr. Kousser.  But if you have explanations, the Department of

5    Justice can get up here and you can give all the explanations on

6    their clock that you want.  Okay?

7    A.  Fine.

8    Q.  And the article also does not mention any reforms to

9    election laws, does it?

10   A.  No.

11   Q.  And what the Attorney General lists in this announcement

12   that you say was to build public support for voter photo ID by

13   fighting in-person voter fraud is actually a recitation of

14   instances of what the Attorney General states are actual past

15   examples of fraud.  Right?

16   A.  Yes.

17   Q.  And you haven't disclosed in either of your reports any

18   opinion that calls into question the validity of any of the

19   specific instances of voter fraud the Attorney General

20   identified in this March 2006 column.  Right?

21   A.  I think that's correct.

22   Q.  And in fact, I think you would say you agree that if the

23   Attorney General was actually trying to build public support for

24   photo ID - even though that's not mentioned, nor in-person voter

25   fraud mentioned in this announcement - your testimony would be

1    that the Attorney General would have promoted this announcement

2    to the public so that the public would hear about the

3    announcement and he could start to build support for photo ID.

4    You would agree, if what you say is true, that's what the

5    Attorney General would be doing.  Right?

6    A.  He did.

7    Q.  And --

8    A.  He did.  His weekly column, which he put out as a form of

9    this, was run in various newspapers.  For example, it was run in

10   the *Ft. Worth Star Telegram*.  I don't know which other

11   newspapers it was run in.  But it was a weekly column and it was

12   picked up by some newspapers.  The *Dallas Morning News* had an

13   article on this, the El Paso newspaper had an article on this at

14   the time.  So it got out there.

15   Q.  You know that he didn't even issue a press release, it was

16   just a news column on the web site.  Right?

17   A.  We discussed this in the deposition.  It is not mentioned

18   among his press releases.

19   Q.  Now, Dr. Kousser, I think during -- I know during your

20   direct testimony that you talked with the Department of Justice

21   about rule change relating to the chubbing practice.  Do you

22   recall that testimony?

23   A.  Yes.

24   Q.  And I think you know that the rule change that changed the

25   chubbing practice in 2011 was part of a larger package of rule

1   changes that received essentially unanimous support from the

2   members of the Texas House.  Right?

3   A.  Yes.

4   Q.  And I think you suggested that there was no -- that because

5   there were so many Republican members of the House, that it

6   wouldn't have made any sense for the Democrats to oppose the

7   chubbing rule.  You suggested that.  Right?

8   A.  Yes.

9   Q.  But you haven't disclosed in either of your reports any

10  statement in the legislative record that that's what was going

11  on, have you?

12  A.  No.

13  Q.  Now, part of the narrative that you provide in your

14  declaration, your report to the court, concerns the changes that

15  occurred after the Republican wave election in 2010.  Right?

16  A.  Correct.

17  Q.  In fact, I think you say the wave election was one thing

18  that helped -- the 2010 wave election was one thing that helped

19  Republicans pass the Texas Voter ID law.  Right?

20  A.  Yes.

21  Q.  And I would like to show you a part of your report, which

22  again is D-548.  You recognize this as a page from your report,

23  right, Dr. Kousser?

24  A.  Yes.

25  Q.  I'll make it easier for you.  In paragraph 53 you talk

1    about -- you say, "Smith was ousted from the chairmanship" --

2    and that's a reference to Todd Smith.  Right?

3    A.  Yes.

4    Q.  And he had been the chairman of the House Elections

5    Committee in 2009, when the Voter ID Bill died in the House.

6    Right?

7    A.  Yes.

8    Q.  So you say, "Smith was ousted from the chairmanship in favor

9    of a more dependable conservative, Patricia Harless, of Spring,

10   a rapidly growing, overwhelmingly white area on the northern

11   border of Harris County."  Do you see that?

12   A.  Yes.

13   Q.  That's part of the narrative that you're providing in

14   support of your opinions in this case.  Right?

15   A.  Yes.

16   Q.  So it's your view that you're expressing here that

17   Patricia Harless became the chair of elections for 2011.  Right?

18   A.  Yes.

19   Q.  And what I'm showing you here, Dr. Kousser, we've marked

20   Exhibit 534 that shows the chairs of the different committees

21   for the 2011 Texas House.  Do you see what I'm showing you?

22   A.  Yes.

23   Q.  And if we go down to elections, you see that there?

24   A.  Yes.

25   Q.  And Patricia Harless was not the chair of the elections

1    committee in 2011, was she?

2    A.  Seems not.  I was wrong.  Sorry.

3    Q.  The other thing you said was that she was from an

4    overwhelmingly white district outside of Houston.  Right?

5    A.  My -- I tell my students not to trust Wikipedia.  I should

6    not have.

7    Q.  So you don't know whether she's from an overwhelmingly

8    white --

9    A.  I looked at Spring -- the white proportion of Spring itself,

10   and Wikipedia said that it was overwhelmingly white.  So that's

11   what I took it from.

12   Q.  Now, do you know that Patricia Harless is Representative of

13   House District Number 126?

14   A.  I think I read that in the deposition.

15   Q.  So you disagree with me on that, that she's the

16   representative from 126?

17   A.  No, no, I think you're correct.  I think I read that at the

18   deposition.

19   Q.  And I think you've already discussed it at length here

20   today, that you have prior experience in Texas litigation

21   regarding the Voting Rights Act related to redistricting.

22   Right?

23   A.  Yes.

24   Q.  And as part of that, you've had access to demographic data

25   about the various districts in Texas.  Right?

1    A.  I did.

2    Q.  But you didn't look that up before you said that

3    Patricia Harless was from an overwhelmingly white district, did

4    you?

5    A.  I did not look up the ethnic composition of her district.

6    Q.  And what I'm showing you here, I'll blow it up on the

7    screen -- and you recognize this, don't you, from your

8    redistricting experience, as the kind of demographic information

9    that's available about the various House districts?

10   A.  Yes.

11   Q.  And what you see here for House District --

12           JUDGE WILKINS:  For the record, identify what this is.

13           MR. HUGHES:  Yes, Your Honor.  This is Exhibit 558, and

14   what this is is demographic information concerning House

15   District 126 for the district that was in place during the 2010

16   elections that would have elected Representative Harless to the

17   House.

18   BY MR. HUGHES:

19   Q.  What you see there over on the right --

20           JUDGE COLLYER:  Wait, wait, wait, the witness has to do

21   this.

22           MR. HUGHES:  Now I'm going to shift to ask the

23   question.

24   BY MR. HUGHES:

25   Q.  So now, Dr. Kousser, it's back to you and me.  And you see

1   on the right over there where it says A, B, H, and so forth?

2   A.  Yes.  This is population.  I would look at CVAP or voting

3   age population, by preference.

4   Q.  Thank you, Dr. Kousser.  If you see over here on the left,

5   VAP, that's voting age population.  Right?

6   A.  Yes.

7   Q.  And what we see is that in what you said was an

8   overwhelmingly white district, in fact the Anglo voting age

9   population is only 42.9 percent.  Right?

10  A.  I did not mean her district, and I should have checked the

11  district composition before making the statement.

12  Q.  But what you said in the report was she's from an

13  overwhelmingly white district.  Right?

14  A.  No, I said an overwhelmingly white area.  I meant Spring.  I

15  looked up Spring in Wikipedia and it was overwhelmingly white.

16  So I should have looked up the districts.  I apologize.

17  Q.  Now I want to look at another part of your report, D-548.

18  I'll put it on the screen.  And in your report you discuss the

19  notion - I think you already discussed it today - that there

20  were some minority members of the Texas legislature that voted

21  for Senate Bill 14.  Do you recall that discussion?

22  A.  Yes.

23  Q.  But what you say is that their votes don't do anything to

24  convince you that the law was not passed with a racially

25  discriminatory purpose, because I think your analysis is they

1    don't represent -- they're not the minority-preferred candidate

2    of choice from their district.  Right?

3    A.  Yes.  They were elected by Anglo votes, and their political

4    futures are tied up with Anglo voters, not Latino voters, not

5    Black voters, not Asian-American voters.

6    Q.  But what you do say is that if there were evidence that

7    representatives that represented minority communities voted for

8    SB14, that that fact could partly undermine a case for

9    discriminatory intent.  Right?

10   A.  I think I used the word "legitimate representatives."

11   Q.  And I think the way that I understand your approach in this

12   area to figure out whether a representative is a legitimate

13   minority candidate of choice is you would look at racially

14   polarized voting data, demographic voting data, and see if that

15   candidate was receiving the majority of minority votes in their

16   district.  Right?

17   A.  Yes.

18   Q.  And you say if there was a representative that satisfied

19   that legitimacy test, so to speak, that voted for SB14, then

20   that fact could partly undermine a case for discriminatory

21   intent.  Right?

22   A.  Yes.

23   Q.  But you didn't disclose to the court in your declaration

24   that there in fact was a minority candidate of choice that voted

25   for SB14, did you?

1    A.  Do you mean Representative Pena?

2    Q.  No, sir.  Do you know who Representative Pickett is?

3    A.  I do not remember Representative Pickett.

4    Q.  So you're not aware that Representative Pickett represents

5    District 79 in El Paso?

6    A.  I believe he's a Democrat, he's a white Democrat.

7    Q.  And are you aware -- now, again, you had evidence that --

8    racially polarized voting data that you could have looked at.

9    Right?

10   A.  I could have looked at it for Pickett.  I did not.

11   Q.  You could have figured out whether Pickett was the minority

12   candidate of choice.  Right?

13   A.  He's a Democrat, he's in El Paso, I assume he's a minority

14   candidate of choice.  But he's white.

15   Q.  But I thought you just told me that the legitimacy test of a

16   representative being a minority candidate of choice was just

17   that they were supported by a majority of minority voters in

18   their district.  That's what you told me.  Right?

19   A.  Yes.

20   Q.  And are you now saying that the color of the skin of the

21   representative is the legitimacy test for whether or not a

22   candidate is a minority candidate of choice?

23   A.  It would make it -- it would tend to undermine the case a

24   bit more if he were in fact a minority.

25   Q.  But that doesn't count for Representative Pena or Aliseda.

1    Right?  It only matters if they're Democrats.  Right?

2    A.  If both of those things are true, then it helps to undermine

3    the case for intentional discrimination.

4    Q.  But you would never take the position, ever, in a

5    redistricting case that a white candidate that was preferred by

6    a majority of minority voters wasn't the minority candidate of

7    choice.  You would not take that position, and you in fact have

8    taken the contrary position time and again, haven't you?

9    A.  Generally I think I've tried to take the position that

10   minorities prefer - other things being equal - to elect minority

11   candidates of choice, but there are certainly instances in which

12   it's the case that Democrats, white Democrats, can be minority

13   candidates of choice.  It depends upon the circumstances.  I

14   will certainly grant your position here.

15   Q.  So you agree that Joe Pickett was a minority candidate of

16   choice for his district.  Right?

17   A.  He was.

18   Q.  And you know he voted for SB14.  Right?

19   A.  I remember that now.

20   Q.  But you didn't disclose that to the court in this discussion

21   in your report.  Right?

22   A.  I was thinking of minority -- members who were minorities

23   themselves.

24   Q.  Now, we've heard a fair bit of discussion about newspapers

25   today, Dr. Kousser.

1        JUDGE COLLYER:  Excuse me.  Can I ask another question?

2   No, never mind.  I won't ask.  Sorry.  No, you went close to

3   another case that I sort of know that record, and I don't want

4   to confuse things.  Keep going.

5        MR. HUGHES:  After 5:30, I'm willing to stand here and

6   talk about the case.

7        JUDGE COLLYER:  Right.  After 5:30 we can have the

8   conversation.  Right.  As long as everybody else stays.

9   BY MR. HUGHES:

10  Q.  Dr. Kousser, we've heard some testimony about newspaper

11  articles today.  In fact, you cite newspaper articles numerous

12  times in your report.  Right?

13  A.  Correct.

14  Q.  And you also cite a number of editorials in your report.

15  Right?

16  A.  Yes.

17  Q.  And the reason that you cite those editorials, I gather, is

18  because you think they're important evidence for the court to

19  consider on the issues that you're considering in this case.

20  Right?

21  A.  They're indicative of strands of public opinion, and that's

22  important in my -- in this particular case, yes.

23  Q.  So, for example, I think I counted you cited, I think, three

24  *Dallas Morning News* editorials that were opposing voter ID in

25  your report.  You would agree with that.  Right?

1    A.  I haven't counted them, but I agree with that.

2    Q.  And you've cited a number of other editorials from

3    newspapers around the state that oppose voter ID as part of the

4    evidence that you are marshaling in support of the conclusion

5    that you've reached that SB14 was passed with a racially

6    discriminatory intent.  Right?

7    A.  Yes.

8    Q.  Now, one thing that you didn't disclose was a *Dallas Morning*

9    *News* editorial that addressed the exact question you're trying

10   to answer here, which is whether or not the Texas legislature

11   was acting with a racially discriminatory purpose when it

12   enacted SB14.  Right?  You didn't cite that?

13   A.  I'm not sure what you have in mind.

14          MR. HUGHES:  This is Plaintiff's Exhibit 37, for the

15   record.

16   BY MR. HUGHES:

17   Q.  And you see, Dr. Kousser, this is a *Dallas Morning News*

18   editorial?  Do you see that?

19   A.  It's June 19th, 2012.  I don't think I cited anything that

20   late.

21   Q.  Dr. Kousser, I think what you're seeing is the date we

22   printed it.

23   A.  I'm sorry, I apologize.

24   Q.  It's actually published, if you see right here where I'm

25   highlighting, April 19, 2012.  Do you see that?

1    A.  Yes.  I'm not sure I cited anything that late, but...

2    Q.  But you didn't cite this.  Right?

3    A.  No.

4    Q.  And I took -- your rebuttal report comes after April 19th.

5    Right?

6    A.  Both of the reports come after April 19th, but the story is

7    over for me, pretty much, after the passage of SB14.

8    Q.  So what you see here is, the title of the editorial is,

9    "Abbott is Right, Holder is Wrong."  Right?

10   A.  Yes.

11         MR. HUGHES:  If the court would just take judicial

12   notice of that, we could all go home.

13   BY MR. HUGHES:

14   Q.  But let's look at what the article has to say.

15         JUDGE COLLYER:  Do you want us to take judicial notice

16   of the fact that that's the opinion of the *Dallas Morning News*?

17         MR. HUGHES:  I was more looking for the truth of the

18   matter.

19         JUDGE COLLYER:  Oh, I see.

20   BY MR. HUGHES:

21   Q.  And you see here in the editorial it says, "The Texas Voter

22   ID law, regardless of how you feel about it, was modeled on the

23   one that was passed in Indiana ruled constitutional by the

24   Supreme Court.  In other words, it was not the product of a

25   cabal working with ill intent behind the scenes."  Do you see

1    that?

2    A.  Yes.

3    Q.  So that's the *Dallas Morning News* -- I mean, you cited

4    editorials where they say that, we don't think that SB14 is a

5    good idea and it should get voted down.  That's what you cite in

6    your report.  Right?

7    A.  Yes.

8    Q.  And here we have an article that actually addresses the

9    issue that you're addressing in this case, which is whether

10   there was an ill intent behind the Texas Voter ID law, and in

11   fact the newspaper that opposed SB14 concludes it was not the

12   product of a cabal working with ill intent behind the scenes.

13   Do you see that?

14   A.  Yes.  I'm not sure that I would disagree with that, a cabal

15   working with ill intent behind the scenes.  They were pretty

16   open about what they wanted to do.

17   Q.  Then the article goes on to say, "Passing laws identical to

18   Indiana's is a national strategy of proponents of voter ID.

19   Republicans are driving this issue, and to no one's surprise,

20   Texas followed the vetted model."  Do you see that?

21   A.  Yes.

22   Q.  And you don't disagree that that's what happened, do you?

23   A.  I agree it was not to anybody's surprise, after they got an

24   overwhelming majority, that they passed the bill.

25   Q.  And another part of your opinion that you're offering in

1    this case is about the process, and the *Dallas Morning News*

2    editorial goes on to say -- and I don't need to highlight

3    everything.  The second point is equally important.  The

4    legislative --

5              JUDGE COLLYER:  Wait.  I hate to say anything.  There's

6    no objection over here.  This is in evidence.  The expert didn't

7    rely on it, it comes after his report.  It is really just an

8    editorial -- with all respect to the *Dallas Morning News*, it's

9    really just an editorial from Dallas.  You know, what really

10   matters, why don't we stop this and move on?

11             MR. HUGHES:  Thank you, Your Honor.

12             JUDGE COLLYER:  You've made your point, it's made well.

13   You got it?

14             MR. HUGHES:  Thank you, Your Honor.

15             JUDGE COLLYER:  Okay.

16   BY MR. HUGHES:

17   Q.  Dr. Kousser, one last topic before we finish our time

18   together, and that is, in addition to the two race neutral

19   reasons that we talked about earlier that were given in support

20   of the voter ID law - detecting fraud, increasing confidence in

21   the electoral process - an additional reason that was given, a

22   purpose identified as supportive of the Texas Voter ID law, was

23   that it was a popular law that was responsive to constituent

24   demand.  Right?

25   A.  That was in Professor Shaw's report.  Yes.

1   Q.  I think that's also part of what you agreed in your

2   deposition was part of the reason given on the legislative

3   record.  Right?

4   A.  There was discussion of this in the legislative record, yes.

5   Q.  And I would like to show you a quote from another expert in

6   this case to see whether you agree with it.  This is Exhibit 24,

7   for the record, an article by Professor Ansolabehere.  And let

8   me just read this portion to you, Dr. Kousser.  Before I do, you

9   know who Dr. Stephen Ansolabehere is.  Right?

10  A.  Yes.

11  Q.  And he is in fact the other Department of Justice expert

12  witness in this case.  Right?

13  A.  Yes.

14  Q.  And what he says is, "Perhaps the most surprising

15  demographic or political comparison arose with race, and the

16  surprise was the lack of division.  Over 70 percent of whites,

17  blacks, and Hispanics support the requirement.  Black and

18  Hispanic voters did not express measurably less support for

19  voter ID requirements than whites.  Such findings suggest the

20  Congressional Black Caucus and the Democratic Party leadership

21  may have been wholly out of step with the analogous segments of

22  the electorate on this issue."  Do you agree with that

23  statement?

24  A.  No.

25          MR. DELLHEIM:  Objection, Your Honor.

1      JUDGE COLLYER:  What's the objection?  Hold on one

2  minute.

3      MR. DELLHEIM:  Your Honor, I'm objecting based on the

4  misleading nature of the question.  The quote is with respect to

5  the Help America Vote Act.

6      MR. HUGHES:  I think the quote speaks for itself.  It's

7  about voter ID requirements.  It says right there.

8      JUDGE COLLYER:  In any event, the quote is slightly out

9  of context.  The question has been asked and answered.  The

10 record will note it's slightly out of context, but it's been

11 asked and answered.  How is that?

12     MR. HUGHES:  I think the document will speak for itself

13 with regard to context.

14     JUDGE COLLYER:  Oh, Mr. Hughes.

15     MR. HUGHES:  I hope.

16     JUDGE COLLYER:  Go on.

17 BY MR. HUGHES:

18 Q.  Now, Dr. Kousser, you know that the Texas surveys that

19 Professor Shaw discloses in his report show not only the surveys

20 he conducted himself, but the other surveys that had been

21 previously done by others that he cited show similar levels of

22 public support for voter ID amongst Texans.  Right?  You saw

23 that in his report?

24 A.  I have a section of my second report which responds to that

25 specifically, and one of the things that I found is that the

1    support, particularly among minorities, for such a bill varied

2    from poll to poll.

3              For example, in one poll --

4    Q.  Dr. Kousser --

5    A.  -- as I pointed in the report --

6    Q.  Dr. Kousser --

7    A.  As I pointed out in the report --

8    Q.  Dr. Kousser, you've got to answer my question, which was not

9    about your report, it was about the contents of Professor Shaw's

10   report.  And all I'm asking you is if you're familiar with the

11   report - which you obviously are, since you responded to it -

12   and that you would agree with me that the polls identified in

13   that report show similar levels of public support for voter ID

14   in Texas.  You would agree with that?

15   A.  I do not agree with that.  In one poll, as I was saying,

16   only 44 percent of Hispanics supported voter ID.  That was the

17   only poll that had a cue that said that the bill might affect

18   Hispanics.  If there had been, as I discussed there, other cues

19   that went to African-Americans, that were more skeptical of the

20   idea that there was fraud in elections, that used the catch

21   phrase "voter suppression" that Democrats used, just as it used

22   the catch phrase "voter fraud," then the results I think would

23   have been different.  But they were not all, anywhere near,

24   70 percent.

25   Q.  Just let me see if we can reach agreement.  You don't

1    dispute that there are polls, surveys of Texas voters, including

2    Hispanics and African-Americans, that show greater than

3    50 percent support amongst those groups in Texas.  There are

4    some polls that show that.  We could at least agree on that.

5    Right?

6    A.  There are some polls that show that, there are some polls

7    that do not.

8    Q.  You've just been criticizing some of those polls, but you

9    told me in your deposition, you're not a survey expert and

10   you've never conducted a survey.  Right?

11   A.  That's correct.

12   Q.  You still stand by that.  Right?

13   A.  Yes.

14   Q.  Now, in your analytical framework, it is possible that even

15   if a majority of Hispanics in Texas want a photo voter ID law to

16   pass, that you could nevertheless conclude that such a law has a

17   racially discriminatory purpose?  That's possible in your

18   theoretical framework.  Right?

19   A.  It is possible, depending upon what else was the case in the

20   historical record.

21   Q.  Now let's talk about a couple of things that you said about

22   the popularity of voter ID.  One of the things you said is, we

23   shouldn't worry about these poll results -- or we should ignore

24   them because you have a poll from the 1940s that shows that poll

25   taxes were popular.  Right?

1    A.  I'm sorry, I did not say that we should ignore them, I said

2    that the fact that a majority is in favor of a particular law

3    does not mean that the law is devoid of racial intentions, and

4    that that majority may be racially inclined.  So I used the only

5    thing I could find in the Gallup surveys, which was a survey on

6    the poll tax, and it looked at seven states which had still the

7    poll tax - including Texas at that point - and there was

8    overwhelming support for the poll tax among the public in those

9    states.  It doesn't mean that -- just because a majority

10   supports something doesn't mean that there's no racial intent in

11   the passage, or continuation of that.

12   Q.  Now, Dr. Kousser, you would agree with me that that you

13   would be astonished if there had been any minority support for

14   the poll tax.  That's what you told me in your deposition.

15   Right?

16   A.  Yes.

17   Q.  And so when you cite the poll tax example, you're citing

18   something that was presumably popular with Anglos but not with

19   minorities.  Right?

20   A.  Yes.

21   Q.  And if the evidence -- if the evidence in this case is that

22   a majority of Hispanic and African-American Texans are in favor

23   of voter ID, that's a different scenario than the poll tax

24   scenario.  Right?

25   A.  It's a different scenario.  But I discussed quite

1    explicitly, as a result of reading Professor Shaw's report, that

2    the model of legislative action that he presents implicitly

3    which says that there is this autonomous public opinion out

4    there - not formed by anybody else, but just floating out

5    there - and the legislators see it and respond to it, that's

6    naive.  And I went through the evidence quite extensively to try

7    to show how that public opinion was created.

8              So that was my response, and that's the fuller

9    response.

10   Q.  And that's what I want to talk to you about right now,

11   Dr. Kousser.  And that is, what you say is that the -- stepping

12   back from voter ID for a minute, as a matter of theory that you

13   believe is correct, that elite politicians, by staying on

14   message and being disciplined, can gin up public support for

15   policies that benefit the elite politicians but not necessarily

16   voters.  That's a fair summary of what's in your rebuttal

17   report.  Right?

18   A.  They can in some instances.  Sometimes they fail.  In this

19   instance I think they succeeded.

20   Q.  And before we get to voter ID, that general political

21   theory, that you see elite politicians, by staying disciplined,

22   can gin up public support for policies that benefit them but not

23   voters, that's a party neutral theory.  It could apply to

24   Democrats or Republicans.  Right?

25   A.  Yes.

1    Q.  And now stepping into how you've applied it in this case,

2    what you say is that the public support for voter ID in Texas

3    was manipulated by Republican politicians by going out and

4    talking about it and building up public support for voter ID.

5    Right?

6    A.  Yes.

7    Q.  But you agree that during the entire -- you agree that

8    there's been a long, pretty contentious debate about voter ID

9    amongst Republicans and Democrats in Texas.  Right?

10   A.  Yes.

11   Q.  And since 2005 until now, that debate has gone on.  Right?

12   A.  Yes.

13   Q.  And the Democrats, they've gotten their message out, calling

14   voter ID things like poll tax, and suggesting its's going to

15   disenfranchise minorities.  That's reported, even reported in

16   your report, in various media accounts.  Right?

17   A.  They try.

18   Q.  In fact, many of the state's biggest newspapers have come

19   out against voter ID.  Right?

20   A.  Correct.

21   Q.  But what your testimony is, your opinion in this case, is to

22   the extent that Democrats, Hispanics, and blacks in Texas are in

23   favor of a photo voter ID law, that the political support

24   amongst those groups was the result of manipulation by

25   Republican proponents of voter ID.  That's your opinion.  Right?

1   A.  Yes.

2           MR. HUGHES:  No further questions.

3   A.  And you ask how that can be done.  Why did Republicans

4   succeed so well --

5   BY MR. HUGHES:

6   Q.  Dr. Kousser, it was a yes or no question.  You've answered

7   my question.  You can take up the response on the Department's

8   time.  Thank you.

9           JUDGE COLLYER:  Thank you, sir.  Is there any redirect?

10          MR. DELLHEIM:  Just briefly, Your Honor.

11                     **REDIRECT EXAMINATION**

12  BY MR. DELLHEIM:

13  Q.  Dr. Kousser, do you understand *Crawford* to approve of any

14  voter ID bill, even one that is racially discriminatory?

15  A.  No.

16  Q.  With respect to the Attorney General's public campaign in

17  response to his announcement that there was an epidemic of voter

18  fraud in Texas, how much did they spend on that campaign?

19  A.  I think they spent about $700,000.

20  Q.  With respect to the racial composition of Spring, Texas --

21          MR. DELLHEIM:  Can we bring up Exhibit 582, please?

22          MR. HUGHES:  If I may object.  My objection is that the

23  report relates to the district that Representative Harless was

24  elected to in 2010.  I believe what's being shown on the screen

25  relates to a district that was drawn in the 2011 redistricting

1    process, and it's not an apples to apples comparison.

2              JUDGE COLLYER:  Oh, wow.  This is from the Western

3    District of Texas?

4              MR. HUGHES:  No, I'm sorry, this is the legislative

5    plan that was adopted by the Texas legislature redrawing 126,

6    not what she was elected out of in 2010.

7              JUDGE COLLYER:  I see.  Okay.  Okay, I got it.

8              MR. DELLHEIM:  And that is correct, and this plan I

9    think shows that it was in fact -- that it is in fact

10   overwhelmingly majority white as we sit here today.

11             JUDGE COLLYER:  Now wait a minute.  Hold still.  And

12   what -- does Dr. Kousser know which one he relied upon?  Because

13   it might not be correct -- forgive me.  It might not be correct,

14   Mr. Hughes, but it might explain his statement.  So -- although

15   I thought he didn't look at the district, actually.

16             MR. HUGHES:  Yeah, I kind of think that's another

17   reason it's not appropriate --

18             JUDGE COLLYER:  Kind of think that's another reason.

19   But you have to understand the difference here.  This is not a

20   district that -- is it in place as a result of --

21             MR. HUGHES:  No.  No one has ever been elected out of

22   the district --

23             JUDGE COLLYER:  Well, wait a minute.  What did the

24   Western District of Texas do when it drew the map that is

25   currently going to elections?

```
 1              MR. HUGHES:  That I don't know, with respect to 126,
 2     but I'm told it's definitively different because it's
 3     Harris County, which got changed.
 4              JUDGE COLLYER:  Oh, okay.  So nobody has ever been
 5     elected out of this particular design?
 6     BY MR. DELLHEIM:
 7     Q.  Dr. Kousser, what's your understanding of the racial
 8     composition of Spring, Texas?
 9     A.  My understanding is that Spring itself, not the
10     District 126, but that Spring itself is overwhelmingly white.
11              JUDGE COLLYER:  Spring is a community, I take it?
12              THE WITNESS:  Spring is a community.
13     BY MR. DELLHEIM:
14     Q.  And when you opined that the Texas legislature acted with
15     discriminatory purpose, I think I heard your testimony to be
16     that every member of the body voted -- who voted in favor of
17     SB14 voted with a discriminatory purpose.  Is that correct?
18     A.  Yes.
19     Q.  Would you explain that, please?
20     A.  They had a self-interest as Republicans in passing a bill
21     which helped the Republican Party by discriminating against the
22     people who were most vulnerable, making it most likely that they
23     would not be able to vote among the Democratic electorate.  And
24     those were minorities.
25     Q.  And to what extent, if any, do your opinions hinge on a
```

1    finding of racial animus for any of the members who voted in

2    favor of SB14?

3    A.  Not at all.  I've been against a racial animus criterion for

4    racially discriminatory intent for a long time.  I have a

5    discussion in another part of "Colorblind Injustice," and I do

6    think Judge Kozinski's opinion on that is quite persuasive.

7    Q.  And would you agree with me that the probative value of a

8    poll in this case depends on the validity of that poll?

9    A.  Indeed, yes.

10        MR. DELLHEIM:  I have no further questions.  Thank you,

11   Your Honor.

12        JUDGE COLLYER:  Thank you, sir.  Yes?

13        MR. HEBERT:  Your Honor, I have two questions on

14   redirect.

15        JUDGE COLLYER:  All right.  This is Mr. Hebert,

16   Judge Tatel.

17        MR. HEBERT:  Yes, I'm sorry.  Mr. Hebert representing

18   the Kennie intervenors.

19                    **REDIRECT EXAMINATION**

20   BY MR. HEBERT:

21   Q.  Dr. Kousser real quick.  In all of the review of legislative

22   history and other public records and all the rest that you

23   looked at, did you uncover any evidence that those supporting

24   SB14 claimed that it was being done to achieve a partisan gain?

25   A.  There was no discussion of that by Republicans at all.  No

1    claims.

2    Q.  In the book "Colorblind Injustice" that we've heard so much

3    about today, did that win any awards?

4    A.  It won two awards.  It was co-winner of the Lillian Smith

5    award from the Southern Regional Council, and the Ralph Bunche

6    award from the American Political Science Association.

7    Q.  Thank you.

8           MR. HEBERT:  That's all I have.

9           JUDGE COLLYER:  All right, then.  Thank you very much,

10   Dr. Kousser.

11          THE WITNESS:  Thank you very much.  It's good to see

12   you again.

13          JUDGE COLLYER:  It's been good to see you.  Thank you,

14   sir.

15          All right.  Do you have another witness, sir?

16          MR. ROSENBERG:  Yes.  Ezra Rosenberg from Dechert, LLP

17   acting right now as liaison counsel, in my liaison counsel role.

18   We do have a witness whom we hope we can get on and off by 5:30,

19   Victoria Rodriguez, who will be presented by Jorge Sanchez from

20   MALDEF.

21          MR. FIGUEROA:  Slight revision.  This is Luis Figueroa

22   with the Rodriguez intervenors for MALDEF.

23          JUDGE COLLYER:  Now, back up a second.  Tell me

24   again -- I know you represent the MALDEF intervenors.  What was

25   your name?

123

```
 1              MR. FIGUEROA:  I'm Luis Figueroa, and I represent the

 2    Rodriguez intervenors.

 3              JUDGE COLLYER:  Thank you.  Rodriguez intervenors,

 4    Luis Figueroa.

 5              Please, ma'am, if you would take the stand.

 6              (Oath administered by Courtroom Clerk.)

 7    (VICTORIA RODRIGUEZ, INTERVENOR-DEFENDANT witness, having been

 8              duly sworn, testified as follows:)

 9                          DIRECT EXAMINATION

10    BY MR. FIGUEROA:

11    Q.  Could you please state your name for the record?

12    A.  My name is Victoria Rose Rodriguez.

13    Q.  And where do you reside?

14    A.  611 West Vestal, in San Antonio, Texas.

15    Q.  And how old are you?

16    A.  I'm 18.

17    Q.  And where do you go to school?

18    A.  I go to school at -- I just graduated from Brooks Academy of

19    Science and Engineering on the south side of San Antonio.

20    Q.  And where will you be attending in the fall?

21    A.  St. Mary's University.

22    Q.  And are you currently a registered voter in Texas?

23    A.  Yes.

24    Q.  And do you plan to vote in the November general election?

25    A.  Yes, I do.
```

1    Q.  And are you aware of Senate Bill 14?

2    A.  Yes.

3    Q.  And how did you and when did you become aware of Senate Bill

4    14?

5    A.  My school offered all the seniors on our senior year

6    internships, and my friend Stephanie, she interned with the law

7    firm MALDEF.  And we would go back to school and we would all

8    talk about our internships, and she asked me and my twin sister

9    if we had any forms of Texas identification, and I told her no.

10           And then she started talking about this case, and

11   that's when me and my sister decided that we wanted to volunteer

12   for it and get involved in it.

13   Q.  Thank you.  And do you possess any of the forms of

14   identification required by Senate Bill 14 to vote in person?

15   A.  No.

16   Q.  So you don't have a Texas driver's license?

17   A.  No.

18   Q.  Do you have a Texas personal identification card?

19   A.  No.

20   Q.  And you don't possess a license to carry a concealed

21   handgun, military ID, or U.S. passport?

22   A.  No.

23   Q.  What documents do you have?

24   A.  I have a birth certificate, a voter registration card, and a

25   student ID.

1    Q.  And why have you not obtained a Texas driver's license?

2    A.  The simple fact that when me and my sister do obtain a

3    driver's license, they automatically put us on the car

4    insurance, and we can't afford that.

5    Q.  And are you aware of a document called an election

6    identification certificate?

7    A.  I was not at first, but yes, now I am.

8    Q.  And is there a reason why you can not obtain an election

9    identification certificate if Senate Bill 14 was enacted?

10   A.  Just that my dad works all day, every day of the week, and

11   my mother, she's the sole caretaker of my grandmother, and she's

12   always with her and taking her where she needs to go, her

13   appointments, and it's kind of hard for her to schedule just a

14   day to go to DPS to get one.  And also, I don't think I have the

15   proof of residency documents, the correct ones.

16   Q.  So let's get to that.  Assuming you could get to DPS, you

17   don't believe you have the underlying documents to get the free

18   election identification certificate?

19   A.  Correct.

20   Q.  I'm going to place before you Defendant-Intervenor's

21   Exhibit 34.  It lists the documents which can establish Texas

22   residency.  I would like you to review it and tell me when

23   you're done.

24        MS. SPENCER:  Your Honor, I would like to object to the

25   introduction of this evidence.

1           JUDGE COLLYER:  Well, if you do so at a microphone,

2     where I can hear you.

3           MS. SPENCER:  Your Honor, Asha Spencer for the State of

4     Texas from the law firm of Bartlit Beck Herman Palenchar &

5     Scott.  I would like to object to the introduction of this

6     evidence.  It is incorrect.  They are presenting the Texas

7     regulations that do not pertain to the requirements for

8     receiving an election identification certificate; these are

9     instead the regulations for the documents required to receive a

10    state ID card.  That is an entirely different matter.

11          MR. FIGUEROA:  May I respond?

12          JUDGE COLLYER:  Yes, please.

13          MR. FIGUEROA:  Your Honor, the regulation states that

14    to establish domicile in Texas for a commercial driver's license

15    or identification certificate, an applicant must reside in Texas

16    for 30 days.  These codes were put into place after the

17    enactment of Senate Bill 14, and we believe that the

18    Administrative Code does apply to an election identification

19    certificate.

20          MS. SPENCER:  Your Honor, the counsel is reading the

21    regulations in an entirely separate part of the Texas

22    Administrative Code.  The Texas Administrative Code,

23    Section 15.182, which is under Subsection L titled "Election

24    Identification Certificate," contains the required documents

25    that you must present to receive an election identification

1   certificate.

2           JUDGE COLLYER:  And what is the difference between

3   them?

4           MR. SPENCER:  There are a few differences, Your Honor.

5   The most important one for this discussion is that to obtain an

6   election identification certificate, you are not required to

7   provide proof of domicile.  The regulations that counsel is

8   presenting for a state ID card do have a requirement for proving

9   domicile, and it is those required documents that counsel is

10  presenting.

11          MR. FIGUEROA:  May I respond?

12          JUDGE COLLYER:  Yes.

13          MR. FIGUEROA:  My response would just be the code

14  itself refers to, one, an identification certificate.  It

15  doesn't apply to an identification card.  So on the face of the

16  regulation, it seems to apply to an identification certificate,

17  which would -- by definition, election identification

18  certificate seems to apply.

19          Two, since the enactment of this code was enacted after

20  the passage of SB14, it's not clear from the face of the code

21  that she's citing from whether or not other parts of the code

22  are incorporated.  It is not clear in the code, and it's a newly

23  enacted code, a newly enacted regulation.

24          So that would be our interpretation.

25          JUDGE COLLYER:  Okay.  Why don't we do this?  I

1    understand the objection, I understand the argument the other

2    way, and I don't have the code in front of me to look at either

3    one of them.  So why don't you go ahead with your examination,

4    Mr. Figueroa, and we will figure it out later.  This is a bench

5    trial, after all, so we have a little more flexibility than we

6    do if we had a jury.

7          MR. FIGUEROA:  We would be happy to brief on the issue.

8          JUDGE COLLYER:  We don't need briefs, sir, I promise.

9    At least not on this topic.

10          MS. SPENCER:  Thank you, Your Honor.

11          JUDGE COLLYER:  It's not that I don't love your

12   writing.  Don't misunderstand me.  But we'll just go ahead and

13   let you do your examination so we can move on.  Okay?

14          MR. FIGUEROA:  Okay.  Thank you, Your Honor.

15   BY MR. FIGUEROA:

16   Q.  So Victoria, could you please take a look at that list of

17   documents?

18          JUDGE COLLYER:  Did you put it in front of her?

19          MR. FIGUEROA:  Yes.

20   A.  Okay.

21          JUDGE WILKINS:  Just for the record, this is Exhibit --

22   Defendant-Intervenor Exhibit 34.  Correct?

23          MR. FIGUEROA:  Yes, Your Honor.

24          JUDGE WILKINS:  And this list comes from what specific

25   section of the code?

1          MR. FIGUEROA:  Oh, it comes from Title 37 of the Public

2    Safety and Corrections Code, Part One, Chapter 15.  It is

3    Section 15.49.

4          JUDGE COLLYER:  I thought it was 15.182.

5          MS. SPENCER:  Your Honor, 15.182 is the part of the

6    Texas Code that refers to the identification documents required

7    to get an election identification certificate.

8          JUDGE COLLYER:  Okay.  So we have 15.182, and I'm

9    sorry, your --

10         MR. FIGUEROA:  15.49.

11         JUDGE COLLYER:  Thank you, sir.

12         MR. FIGUEROA:  Thank you, Your Honor.

13         JUDGE COLLYER:  Thank you.  Go right ahead.

14   BY MR. Figueroa:

15   Q.  Okay.  You've had a chance to review that document?

16   A.  Yes.

17   Q.  Do you have any of the documents listed in the exhibit?

18   A.  All I have is a Texas voter registration card and a high

19   school report card and transcript.

20   Q.  And does your transcript or report card --

21         JUDGE TATEL:  I'm sorry, what?  What was your second

22   thing?

23         THE WITNESS:  High school report card and transcript.

24         JUDGE TATEL:  Oh, report card.  Sorry.

25   BY MR. HEBERT:

1    Q.  Does your report card or transcript have a home address on

2    it?

3    A.  No.

4    Q.  So besides those two documents, are there any others on the

5    list that could be used to establish residency which you have?

6    A.  No.

7    Q.  Do you know which documents your parents have or don't have

8    on that list?

9    A.  No, I don't know.

10   Q.  Are you aware of the process for absentee - or voting by

11   mail - in Texas?

12   A.  I'm unfamiliar with the process.

13   Q.  Do you suffer from any disability that would prevent you

14   from voting in person?

15   A.  No.

16   Q.  And were you -- and where do you plan to be on the general

17   election day of this year?

18   A.  At St. Mary's University.

19   Q.  So you would be in San Antonio?

20   A.  Yes.

21   Q.  Now, let me just briefly ask you, you traveled from

22   San Antonio to Washington, D.C. to testify in this trial.  Is

23   that correct?

24   A.  Yes.

25   Q.  How did you manage to board the plane to come to

1    Washington, D.C.?

2    A.  I just showed security my high school ID card, and that was

3    sufficient enough to get me through.

4    Q.  And what did you show to take the train from Baltimore to

5    D.C.?

6    A.  My high school ID card.

7    Q.  And what about the hotel you're staying?  Did you have to

8    show ID there?

9    A.  Yes.

10   Q.  And what did you have to show?

11   A.  My high school ID card as well.

12   Q.  And to enter this courtroom, what did you have to show?

13   A.  My high school ID card.

14   Q.  So today you could vote with your voter registration card,

15   your student ID, or your birth certificate.  Is that your

16   understanding?

17   A.  Yes.

18   Q.  And under Senate Bill 14, could you vote with those same

19   documents?

20   A.  No.

21   Q.  And is the information that you've testified today the same

22   for your twin sister, Nicole Rodriguez?

23   A.  Yes, it is.

24       MS. SPENCER:  Objection, Your Honor.  Leading the

25   witness.

```
 1              JUDGE COLLYER:  It is leading, but these are yes and no
 2    questions and answers.  We're rushing so we'll get it through.
 3    You'll have an opportunity tomorrow morning.  Okay?
 4              MR. FIGUEROA:  Yes, Your Honor.  I was trying to move
 5    it along.
 6              JUDGE COLLYER:  No, no, go right ahead.  Finish up, if
 7    you can.
 8    BY MR. HEBERT:
 9    Q.  Just to sum up, for you and your sister, the current
10    documents that you have are what?
11    A.  A birth certificate, voter registration card, and a high
12    school student ID card.
13    Q.  And you do not believe that is enough under Senate Bill 14?
14    A.  No.
15              MR. FIGUEROA:  Thank you.  That's all I have.
16              JUDGE COLLYER:  I have one question.  I take it your
17    high school student ID card has your photo?
18              THE WITNESS:  Yes.
19              JUDGE COLLYER:  And does it have your date of birth?
20              THE WITNESS:  No.
21              JUDGE COLLYER:  Okay.  Thank you.
22              We have two minutes remaining.
23              MR. MORTARA:  Your Honor, you can charge those to
24    Texas.  We'll talk to Victoria tomorrow.
25              JUDGE COLLYER:  I can charge them to Texas.  Wow,
```

1    two days in a row we get two minutes from Texas.  All right,

2    we'll take them.  Thank you, everybody.  Have a nice evening,

3    don't work too hard.

4         MR. MORTARA:  Thank you, Your Honor.

5         JUDGE COLLYER:  Thank you.  Thank you, everybody.

6         (Proceedings adjourned at 5:31 p.m.)

7

8

9              **CERTIFICATE OF OFFICIAL COURT REPORTER**

10

11        **I, Rebecca Stonestreet, certify that the foregoing is a**

12   **correct transcript from the record of proceedings in the**

13   **above-entitled matter.**

14

15

16

17   _____        _____

18   **SIGNATURE OF COURT REPORTER**                **DATE**

19

20

21

22

23

24

25

## $

**$13,500** [1] - 21:4
**$2,026,000** [2] - 4:20, 4:23
**$20,500** [1] - 21:5
**$22** [2] - 31:9, 34:2
**$26,000** [1] - 4:25
**$27** [1] - 5:17
**$700,000** [1] - 117:19

## '

**'11** [1] - 42:22

## /

**/4** [1] - 82:22

## 0

**002151** [1] - 29:8
**08540-6531** [1] - 2:14

## 1

**1** [1] - 74:8
**1.4** [1] - 69:16
**10** [5] - 1:6, 52:23, 59:19, 78:20, 81:11
**100** [1] - 76:15
**10004** [1] - 2:25
**101** [1] - 62:2
**103** [4] - 20:4, 20:9, 20:16, 21:3
**11** [2] - 48:21, 58:12
**110** [1] - 3:3
**12** [4] - 76:3, 76:8, 86:2, 86:5
**12-128** [1] - 1:3
**126** [6] - 99:13, 99:16, 100:15, 118:5, 119:1, 119:10
**14** [18] - 4:13, 4:22, 5:12, 7:5, 10:14, 11:8, 12:4, 18:22, 22:3, 22:7, 101:21, 123:1, 123:4, 123:14, 124:9, 125:17, 130:18, 131:13
**1440** [1] - 3:8
**14th** [2] - 1:19, 85:17
**15** [4] - 30:21, 30:23, 49:20, 128:2
**15.182** [4] - 125:23, 128:4, 128:5, 128:8
**15.49** [2] - 128:3, 128:10
**18** [2] - 17:25, 122:16
**1846** [1] - 55:12
**1880** [1] - 48:22

**19** [1] - 106:25
**1901** [1] - 50:4
**191** [1] - 2:16
**1910** [1] - 48:22
**1940s** [1] - 113:24
**1950s** [1] - 57:17
**1959** [1] - 50:16
**1960** [1] - 2:20
**1969** [1] - 48:10
**1971** [1] - 48:9
**1981** [1] - 50:16
**1985** [1] - 50:3
**1999** [1] - 83:5
**19th** [5] - 73:14, 73:22, 106:19, 107:4, 107:6

## 2

**2** [2] - 1:11, 4:20
**200** [1] - 59:25
**2000** [2] - 55:9, 55:12
**20001** [1] - 3:12
**2002** [4] - 55:22, 63:13, 63:14
**2003** [1] - 62:6
**2004** [1] - 20:6
**2005** [20] - 20:7, 21:13, 22:18, 22:22, 23:20, 23:22, 24:16, 24:17, 53:14, 57:1, 57:3, 57:14, 57:25, 58:5, 58:9, 60:6, 69:13, 74:10, 74:14, 116:11
**2006** [4] - 26:24, 69:12, 71:24, 95:20
**2007** [15] - 21:13, 22:18, 24:17, 25:1, 58:10, 58:12, 59:2, 59:3, 60:6, 60:13, 68:15, 72:3, 74:10, 74:14
**2008** [6] - 26:24, 27:6, 61:20, 69:2, 69:23, 71:24
**2009** [21] - 21:13, 22:19, 25:1, 25:7, 25:9, 26:7, 57:3, 59:4, 59:5, 59:12, 59:15, 59:16, 60:6, 60:11, 62:14, 71:10, 74:10, 74:14, 75:24, 78:1, 98:5
**201** [1] - 50:4
**2010** [11] - 55:10, 61:16, 61:24, 63:14, 63:22, 97:15, 97:18, 100:15, 117:24, 118:6
**2011** [40] - 8:19, 9:2, 9:13, 9:23, 14:1,

15:24, 16:18, 16:21, 17:25, 21:23, 22:22, 25:9, 26:8, 26:9, 39:12, 41:22, 42:4, 42:5, 42:14, 45:4, 53:15, 60:21, 61:13, 61:14, 61:16, 61:24, 62:20, 63:2, 68:4, 68:16, 70:14, 71:10, 72:6, 75:1, 77:3, 96:25, 98:17, 98:21, 99:1, 117:25
**2012** [7] - 1:6, 10:9, 11:18, 12:21, 12:22, 106:19, 106:25
**2014** [1] - 16:10
**2015** [1] - 16:10
**2017** [1] - 16:13
**202** [2] - 2:10, 3:13
**20530** [1] - 2:10
**209** [1] - 1:19
**2099** [1] - 30:19
**20th** [1] - 73:15
**210** [1] - 3:5
**212** [1] - 2:25
**22304** [1] - 2:17
**224-5476** [1] - 3:5
**23** [1] - 63:22
**230** [1] - 3:8
**24** [1] - 110:6
**24th** [1] - 2:24
**27** [1] - 9:13
**281** [1] - 2:21
**28th** [1] - 17:3
**2:00** [1] - 1:10

## 3

**3** [1] - 74:24
**30** [2] - 70:2, 125:16
**300** [2] - 1:24, 3:4
**30303** [1] - 3:9
**305-7766** [1] - 2:10
**312** [1] - 1:25
**34** [2] - 124:21, 127:22
**354-3249** [1] - 3:13
**37** [3] - 49:17, 106:14, 128:1
**39** [1] - 39:25
**3:30** [1] - 64:13
**3:32** [1] - 64:17

## 4

**404** [1] - 3:9
**405** [1] - 2:17
**42.9** [1] - 101:9
**4201** [1] - 2:20
**44** [1] - 112:16
**465** [1] - 84:1
**467** [1] - 84:1

**49** [1] - 62:2
**494-4469** [1] - 1:25

## 5

**5** [3] - 65:8, 67:20, 82:22
**50** [1] - 113:3
**500** [1] - 2:13
**506** [2] - 10:18, 10:20
**509** [1] - 11:17
**51** [3] - 61:25, 86:2, 86:5
**512** [1] - 1:20
**513** [1] - 88:19
**52** [1] - 86:8
**523-2721** [1] - 3:9
**53** [2] - 86:12, 97:25
**530** [1] - 2:20
**534** [1] - 98:20
**54** [1] - 1:24
**543** [1] - 81:24
**547** [2] - 93:16, 94:1
**548** [1] - 92:1
**558** [1] - 100:13
**58** [2] - 29:10, 29:13
**580** [2] - 52:14, 52:15
**580-6310** [1] - 2:21
**582** [1] - 117:21
**5:30** [3] - 105:5, 105:7, 121:18
**5:31** [1] - 132:6

## 6

**6** [1] - 6:2
**6,000** [3] - 69:2, 69:6, 69:8
**60** [1] - 62:25
**60654** [1] - 1:25
**609** [1] - 2:14
**611** [1] - 122:14
**628-4673** [1] - 2:18
**6511** [1] - 3:12
**6th** [1] - 44:3

## 7

**7** [1] - 93:16
**70** [4] - 20:13, 69:20, 110:16, 112:24
**700** [1] - 17:19
**703** [1] - 2:18
**7202** [1] - 2:9
**73-year-old** [1] - 14:18
**76/74** [1] - 61:21
**77068** [1] - 2:21
**78205** [1] - 3:4
**78701** [1] - 1:20
**79** [1] - 103:5
**7th** [1] - 1:19

## 8

**80** [2] - 20:18, 33:15
**80,000** [1] - 60:3
**800,000** [1] - 76:7
**859-8953** [1] - 2:25

## 9

**9** [1] - 86:8
**90** [1] - 60:18
**902** [1] - 2:13
**936-1695** [1] - 1:20
**950** [1] - 2:9
**955-3200** [1] - 2:14
**99** [1] - 61:25

## A

**Abbott** [1] - 107:9
**Abbott's** [1] - 91:11
**ability** [4] - 15:6, 37:16, 41:22, 88:4
**able** [24] - 24:24, 37:22, 44:14, 44:22, 45:20, 46:3, 46:18, 62:15, 62:21, 75:4, 75:19, 119:23
**above-entitled** [1] - 132:13
**abridging** [1] - 34:16
**absent** [1] - 21:21
**absentee** [1] - 129:10
**absolutely** [3] - 16:15, 16:22, 46:12
**absorbed** [1] - 5:21
**ABUDU** [1] - 3:6
**Academy** [1] - 122:18
**access** [6] - 5:6, 5:22, 7:14, 29:19, 34:17, 99:24
**accessibility** [1] - 4:14
**accessible** [1] - 5:2
**account** [2] - 28:22, 51:25
**accounting** [1] - 12:13
**accounts** [5] - 12:13, 12:16, 12:19, 61:16, 116:16
**accurate** [6] - 5:10, 14:5, 17:14, 17:15, 17:22, 17:23
**achieve** [1] - 120:24
**Act** [4] - 4:24, 30:11, 99:21, 111:5
**acted** [2] - 62:25, 119:14
**acting** [2] - 106:11, 121:17
**action** [3] - 59:24, 79:1, 115:2

**actions** [3] - 54:4, 78:21, 80:4
**active** [4] - 14:20, 16:9, 60:7, 60:13
**actual** [2] - 92:17, 95:14
**ADAM** [2] - 1:21, 2:22
**add** [2] - 39:3, 43:12
**addition** [2] - 70:10, 109:18
**additional** [2] - 73:19, 109:21
**address** [1] - 129:1
**addressed** [3] - 22:17, 28:10, 106:9
**addresses** [1] - 108:8
**addressing** [1] - 108:9
**adequate** [1] - 5:6
**adhered** [1] - 73:20
**adjourned** [1] - 132:6
**adjusted** [1] - 6:1
**adjustments** [1] - 4:25
**administered** [3] - 19:13, 47:6, 122:6
**Administrative** [3] - 125:18, 125:22
**admitted** [1] - 13:2
**adopted** [6] - 41:22, 50:7, 50:24, 51:2, 68:4, 118:5
**adopting** [1] - 56:18
**adoption** [1] - 48:17
**adverse** [1] - 27:24
**advocating** [1] - 8:4
**affect** [2] - 79:17, 112:17
**affected** [2] - 76:8, 79:13
**affects** [2] - 61:11, 79:16
**affirm** [1] - 44:1
**affirmatively** [1] - 27:16
**afford** [2] - 36:13, 124:4
**afforded** [1] - 22:5
**African** [13] - 20:15, 27:1, 27:3, 30:5, 33:14, 45:13, 49:13, 56:17, 58:6, 60:5, 112:19, 113:2, 114:22
**African-American** [7] - 20:15, 27:1, 27:3, 30:5, 58:6, 60:5, 114:22
**African-Americans** [6] - 33:14, 45:13, 49:13, 56:17, 112:19, 113:2

**afternoon** [9] - 6:24, 6:25, 38:9, 38:10, 47:7, 47:22, 47:23, 80:25, 81:1
**age** [3] - 101:3, 101:5, 101:8
**agency** [2] - 5:16, 5:21
**ago** [2] - 38:11, 46:6
**agree** [25] - 15:9, 17:7, 26:19, 40:23, 43:15, 61:13, 83:11, 87:15, 90:17, 95:22, 96:4, 104:15, 105:25, 106:1, 108:23, 110:6, 110:22, 112:12, 112:14, 112:15, 113:4, 114:12, 116:7, 120:7
**agreed** [4] - 50:18, 56:5, 83:23, 110:1
**agreement** [1] - 112:25
**ahead** [13] - 5:12, 6:19, 18:2, 36:1, 42:11, 47:15, 64:18, 67:25, 85:25, 127:3, 127:12, 128:13, 131:6
**aided** [1] - 3:15
**aimed** [2] - 72:7, 92:17
**air** [1] - 86:24
**al** [1] - 1:9
**Alabama** [1] - 50:4
**ALAN** [1] - 2:7
**Alexandria** [1] - 2:17
**aliens** [7] - 25:10, 68:11, 71:23, 72:1, 72:4, 72:7, 72:11
**Aliseda** [5] - 8:19, 9:9, 41:14, 63:21, 103:25
**allocated** [1] - 5:1
**allowed** [2] - 28:20, 44:16
**alluded** [1] - 8:13
**allusions** [1] - 26:22
**almost** [4] - 24:4, 54:20, 68:15, 70:7
**aloud** [1] - 25:25
**alternative** [1] - 56:16
**amazing** [1] - 35:22
**amended** [1] - 58:2
**Amendment** [4] - 29:10, 29:13, 30:23, 85:17
**amendment** [18] - 29:15, 30:14, 30:17, 30:18, 30:21, 30:25, 31:1, 31:3, 31:11, 31:12, 31:15, 31:16, 31:23, 32:3, 43:5,

45:18, 45:21, 75:19
**amendment's** [1] - 29:3
**amendments** [8] - 28:21, 29:5, 32:12, 58:2, 74:25, 75:5, 75:13
**America** [3] - 4:24, 11:13, 111:5
**AMERICAN** [2] - 3:2, 3:7
**American** [13] - 19:25, 20:15, 27:1, 27:3, 27:22, 29:1, 30:5, 37:7, 58:6, 60:5, 102:5, 114:22, 121:6
**Americans** [8] - 10:22, 33:14, 45:13, 49:13, 56:17, 56:18, 112:19, 113:2
**amicus** [3] - 88:15, 88:19, 88:23
**amount** [1] - 68:20
**analogous** [1] - 110:21
**analysis** [14] - 4:19, 4:23, 49:4, 49:18, 49:21, 55:4, 56:4, 59:14, 60:15, 63:11, 71:20, 74:5, 80:5, 101:25
**analytical** [9] - 81:15, 82:2, 82:3, 82:8, 82:10, 82:11, 82:15, 82:18, 113:14
**analyze** [3] - 52:25, 53:7, 82:3, 82:12
**analyzed** [2] - 48:16, 63:14
**analyzing** [1] - 52:4
**Anchia** [10] - 19:12, 19:21, 29:12, 34:6, 36:4, 37:12, 38:9, 47:4, 57:1, 70:15
**ANCHIA** [1] - 19:16
**AND** [1] - 3:2
**anecdotal** [6] - 12:2, 12:14, 12:18, 13:13, 18:22, 18:24
**Angeles** [1] - 50:14
**Anglo** [3] - 101:8, 102:3, 102:4
**Anglos** [1] - 114:18
**animus** [2] - 120:1, 120:3
**Ann** [1] - 40:8
**announcement** [9] - 93:19, 94:2, 94:13, 94:20, 95:11, 95:25, 96:1, 96:3, 117:17

**annual** [1] - 75:11
**Ansolabehere** [2] - 110:7, 110:9
**answer** [14] - 28:25, 31:24, 32:19, 32:20, 42:11, 42:23, 43:7, 44:22, 45:2, 65:13, 86:10, 90:25, 106:10, 112:8
**answered** [6] - 15:15, 32:7, 43:13, 111:9, 111:11, 117:6
**answering** [2] - 65:12, 82:14, 85:22
**answers** [1] - 131:2
**antecedent** [2] - 93:12
**antechamber** [1] - 58:21
**anticipated** [4] - 54:13, 65:21, 75:20
**anticipation** [2] - 15:22, 67:8
**Antonio** [14] - 3:4, 4:9, 7:10, 8:23, 8:24, 10:21, 49:23, 70:8, 77:14, 79:12, 122:14, 122:19, 129:19, 129:22
**apologies** [1] - 18:18
**apologize** [4] - 8:5, 42:18, 101:16, 106:23
**apparent** [1] - 67:9
**appeal** [2] - 56:16, 57:5
**appeals** [5] - 50:8, 50:18, 50:19, 52:6, 79:22
**appear** [1] - 30:1
**APPEARANCES** [3] - 1:14, 2:1, 3:2
**appeared** [4] - 8:18, 8:22, 13:10, 13:25
**appearing** [2] - 9:2, 9:3
**apples** [1] - 118:1
**applicant** [1] - 125:15
**applied** [2] - 14:14, 116:1
**apply** [6] - 59:7, 115:23, 125:18, 126:15, 126:16, 126:18
**appointed** [3] - 37:14, 38:21, 39:10
**appointments** [1] - 124:13
**appreciate** [1] - 17:11
**approach** [3] - 28:22, 85:24, 102:11

**approaches** [1] - 65:12
**appropriate** [1] - 118:17
**appropriated** [1] - 4:23
**appropriations** [2] - 4:17, 5:16
**approve** [1] - 117:13
**April** [8] - 10:9, 11:3, 11:18, 12:21, 15:24, 106:25, 107:4, 107:6
**area** [5] - 7:10, 54:1, 98:10, 101:14, 102:12
**Area** [1] - 33:5
**areas** [1] - 56:18
**arena** [1] - 68:10
**arenas** [1] - 68:21
**argue** [1] - 74:2
**argued** [2] - 32:3, 74:1
**argument** [3] - 71:18, 89:1, 127:1
**arguments** [4] - 68:7, 68:8, 88:23, 89:15
**Arlington** [7] - 36:5, 36:8, 36:12, 54:16, 54:19, 54:21, 54:22
**arose** [2] - 25:7, 110:15
**article** [8] - 69:6, 93:22, 95:8, 96:13, 107:14, 108:8, 108:17, 110:7
**articles** [2] - 51:8, 105:11
**articulated** [3] - 28:3, 28:7, 31:22
**ASHA** [1] - 1:22
**Asha** [1] - 125:3
**Asian** [2] - 56:18, 102:5
**Asian-American** [1] - 102:5
**Asian-Americans** [1] - 56:18
**Asians** [1] - 45:14
**assess** [1] - 46:10
**assigned** [1] - 37:13
**Association** [2] - 19:23, 121:6
**assume** [1] - 103:13
**Assuming** [1] - 124:16
**assumption** [1] - 53:18
**assumptions** [1] - 53:7
**astonished** [1] - 114:13
**Atlanta** [1] - 3:9

**atmosphere** [1] - 57:21

**attempt** [1] - 85:4

**attempts** [1] - 66:18

**attend** [2] - 21:19, 21:24

**attended** [1] - 22:13

**attending** [1] - 122:20

**attention** [1] - 46:17

**attorney** [4] - 13:1, 40:4, 47:8, 70:8

**Attorney** [25] - 1:6, 19:10, 19:11, 40:13, 69:12, 69:23, 91:11, 91:15, 91:19, 92:19, 92:24, 93:8, 93:18, 93:20, 94:2, 94:6, 94:21, 95:11, 95:14, 95:19, 95:23, 96:1, 96:5, 117:16

**ATTORNEY** [1] - 1:18

**attorneys** [1] - 69:18

**attributed** [2] - 10:17, 11:23

**August** [2] - 16:18, 17:25

**Austin** [7] - 1:20, 8:25, 9:1, 9:4, 9:23, 38:12, 79:11

**Australia** [1] - 80:16

**Australian** [1] - 80:15

**author** [2] - 26:10, 32:12, 45:10

**authored** [4] - 82:23, 83:17, 84:16, 86:15

**authority** [1] - 79:4

**automatically** [1] - 124:3

**automobiles** [1] - 33:4

**autonomous** [1] - 115:3

**availability** [4] - 28:1, 30:3, 45:16, 45:17

**available** [11] - 5:3, 31:6, 34:19, 34:22, 36:15, 37:25, 51:13, 51:14, 66:16, 74:19, 100:9

**Avenue** [1] - 2:9

**average** [1] - 21:5

**avoiding** [1] - 25:6

**award** [2] - 121:5, 121:6

**awards** [2] - 121:3, 121:4

**aware** [14] - 4:13, 14:16, 32:16, 32:24, 55:3, 59:15, 71:4, 87:1, 103:4, 103:7, 123:1, 123:3, 124:5,

129:10

# B

**background** [5] - 53:20, 54:3, 54:6, 55:5, 55:6

**badly** [1] - 71:6

**balance** [1] - 34:17

**ballot** [5] - 24:23, 27:14, 27:19, 34:18, 48:23

**ballots** [1] - 24:6

**Baltimore** [1] - 130:4

**barred** [1] - 10:23

**BARTLIT** [1] - 1:23

**Bartlit** [1] - 125:4

**based** [3] - 4:12, 78:20, 111:3

**basic** [1] - 87:7

**basis** [6] - 43:23, 44:1, 64:2, 64:5, 64:11

**battle** [1] - 57:7

**battleground** [1] - 27:6

**bear** [1] - 6:11

**bears** [1] - 89:7

**beating** [1] - 50:7

**became** [8] - 25:4, 26:15, 37:23, 55:10, 58:10, 58:12, 98:17

**BECK** [1] - 1:23

**Beck** [1] - 125:4

**become** [2] - 10:22, 123:3

**becomes** [1] - 85:6

**bed** [2] - 58:21

**BEFORE** [1] - 1:12

**began** [2] - 20:6, 23:1

**beginning** [1] - 58:14

**behalf** [1] - 80:19

**behavior** [1] - 53:6

**behind** [5] - 88:5, 107:25, 108:10, 108:12, 108:15

**belief** [2] - 28:14, 28:15

**beliefs** [1] - 53:7

**believes** [1] - 28:14

**BELL** [1] - 2:3

**BELL-PLATTS** [1] - 2:3

**BENCH** [1] - 1:11

**bench** [1] - 127:4

**benefit** [2] - 115:15, 115:22

**Berkower** [1] - 19:9

**BERKOWER** [16] - 2:5, 19:7, 19:9, 19:14, 19:19, 28:18,

29:8, 29:11, 30:19, 30:22, 32:4, 35:2, 41:24, 44:11, 44:13, 46:23

**better** [3] - 20:25, 34:10, 52:22

**between** [11] - 15:24, 22:22, 26:23, 26:24, 55:9, 57:7, 60:23, 67:19, 74:17, 80:17, 126:2

**beyond** [2] - 25:2, 84:8

**big** [2] - 74:16, 79:10

**biggest** [1] - 116:18

**Bill** [24] - 4:13, 4:22, 5:12, 7:5, 10:14, 11:8, 12:4, 18:22, 22:3, 22:7, 58:25, 59:1, 69:13, 70:1, 91:22, 98:5, 101:21, 123:1, 123:3, 123:14, 124:9, 125:17, 130:18, 131:13

**bill** [79] - 4:13, 4:17, 4:19, 4:23, 5:5, 7:20, 21:17, 22:11, 22:14, 23:18, 23:20, 23:23, 25:2, 26:10, 26:16, 26:21, 27:14, 27:21, 28:19, 28:23, 29:2, 29:21, 29:22, 30:9, 31:6, 32:7, 32:9, 32:11, 32:12, 32:16, 32:19, 32:22, 34:25, 41:2, 41:5, 41:15, 45:10, 45:11, 45:12, 45:19, 57:2, 57:4, 57:10, 57:12, 57:18, 57:20, 57:24, 58:1, 58:3, 58:22, 58:24, 59:4, 59:6, 60:24, 61:2, 61:3, 61:10, 62:24, 62:25, 63:1, 63:6, 68:12, 71:11, 72:2, 72:12, 75:14, 75:24, 77:16, 78:7, 79:9, 108:24, 112:1, 112:17, 117:14, 119:20

**Bill's** [1] - 32:6

**bill's** [1] - 32:15

**billion** [1] - 5:17

**bills** [25] - 21:19, 22:23, 22:24, 39:6, 54:5, 59:7, 59:8, 59:21, 59:25, 60:6, 61:17, 62:14, 62:20, 62:23, 74:9, 74:10,

74:11, 74:14, 74:16, 74:17, 74:20, 75:1, 77:10, 77:12

**birth** [10] - 15:4, 17:2, 17:8, 31:8, 35:7, 35:10, 123:24, 130:15, 131:11, 131:19

**bit** [10] - 8:17, 23:6, 23:12, 39:1, 54:21, 61:13, 75:17, 80:13, 103:24, 104:24

**black** [4] - 20:16, 56:9, 83:12, 85:20

**Black** [7] - 27:23, 73:21, 73:22, 79:12, 102:5, 110:17, 110:20

**blacks** [3] - 73:7, 110:17, 116:22

**block** [4] - 57:10, 57:19, 57:23, 59:11

**blow** [3] - 10:18, 81:20, 100:6

**board** [1] - 129:25

**Board** [1] - 50:14

**body** [3] - 37:21, 58:19, 119:16

**Bonnen** [1] - 39:16

**book** [27] - 48:19, 52:24, 81:4, 81:7, 81:11, 81:19, 81:21, 81:22, 82:1, 82:8, 82:11, 82:14, 82:17, 82:19, 83:2, 83:16, 84:9, 84:13, 84:15, 84:19, 84:21, 84:22, 86:13, 86:14, 87:5, 121:2

**border** [1] - 98:11

**bottom** [1] - 29:9

**bought** [1] - 14:10

**box** [1] - 48:25

**branch** [2] - 37:7, 45:25

**Branch** [1] - 20:11

**BRAZIL** [1] - 2:19

**Brazil** [1] - 35:24

**break** [3] - 62:5, 64:13, 64:15

**Brennan** [8] - 10:10, 11:3, 11:19, 12:21, 13:12, 13:14, 15:12, 78:2

**bribery** [1] - 24:9

**brief** [15] - 22:10, 22:12, 53:5, 88:15, 88:17, 88:19, 88:23, 89:3, 89:5, 89:6, 89:10, 89:11, 89:14,

89:18, 127:7

**briefly** [8] - 44:11, 52:11, 53:2, 53:4, 56:13, 56:24, 117:10, 129:21

**briefs** [1] - 127:8

**bring** [3] - 25:20, 57:18, 117:21

**Broadway** [1] - 3:3

**broke** [1] - 54:23

**broken** [1] - 54:21

**Brooks** [1] - 122:18

**brought** [7] - 4:16, 29:3, 42:2, 42:4, 59:4, 70:4, 90:11

**BRUCE** [1] - 2:5

**brutal** [1] - 57:7

**BRYAN** [1] - 2:6

**budget** [5] - 5:11, 5:16, 5:17, 7:19, 28:1, 59:8, 61:2

**build** [4] - 94:3, 95:12, 95:23, 96:3

**building** [1] - 116:4

**built** [1] - 57:20

**bunch** [2] - 25:20, 56:3

**Bunche** [1] - 121:5

**burden** [4] - 34:2, 88:7, 88:12, 89:1

**Bureau** [1] - 35:11

**bus** [2] - 33:5, 33:19

**but..** [1] - 107:1

**BY** [43] - 4:7, 6:23, 16:1, 17:17, 18:20, 19:19, 28:18, 29:11, 30:22, 32:4, 36:3, 36:22, 37:11, 38:8, 42:13, 44:13, 47:21, 48:7, 52:16, 68:2, 74:4, 77:1, 80:24, 81:25, 86:1, 100:18, 100:24, 105:9, 106:16, 107:13, 107:20, 109:16, 111:17, 117:5, 117:12, 119:6, 119:13, 120:20, 122:10, 127:15, 128:14, 128:25, 131:8

# C

**CA** [1] - 1:3

**cabal** [3] - 107:25, 108:12, 108:14

**calendar** [4] - 41:23, 42:15, 42:22, 59:21

**California** [1] - 48:1

**CalTech** [2] - 48:8, 48:9
**campaign** [5] - 92:20, 92:25, 93:9, 117:16, 117:18
**candidate** [15] - 27:3, 50:17, 63:23, 102:1, 102:13, 102:15, 102:24, 103:12, 103:14, 103:16, 103:22, 104:5, 104:6, 104:15
**candidates** [2] - 104:11, 104:13
**canvassed** [1] - 91:20
**Capacity** [1] - 1:6
**capita** [2] - 21:3, 21:5
**car** [4] - 14:10, 36:13, 36:14, 124:3
**card** [19] - 123:18, 123:24, 125:10, 126:8, 126:15, 128:18, 128:19, 128:20, 128:23, 128:24, 129:1, 130:2, 130:6, 130:11, 130:13, 130:14, 131:11, 131:12, 131:17
**care** [1] - 33:19
**carefully** [1] - 68:23
**caretaker** [1] - 124:11
**Carnegie** [1] - 2:13
**carried** [3] - 43:5, 45:18
**Carrollton** [1] - 20:11
**carry** [2] - 58:8, 123:20
**cars** [1] - 33:2
**Carter** [1] - 41:15
**case** [67] - 12:23, 15:13, 19:10, 48:11, 48:13, 50:1, 50:2, 50:21, 51:14, 51:18, 53:10, 53:18, 54:11, 54:15, 63:17, 67:4, 67:21, 70:3, 73:18, 78:19, 79:7, 79:19, 79:21, 81:3, 81:16, 82:2, 82:9, 82:15, 82:20, 82:22, 83:7, 84:11, 84:12, 86:9, 86:10, 86:14, 87:5, 88:15, 88:20, 89:25, 90:6, 90:22, 90:24, 91:3, 91:14, 98:14, 102:8, 102:20, 103:23, 104:3, 104:5, 104:12, 105:3, 105:6,

105:19, 105:22, 108:9, 109:1, 110:6, 110:12, 113:19, 114:21, 116:1, 116:21, 120:8, 123:10
**cases** [11] - 24:8, 24:12, 24:13, 49:16, 49:17, 49:18, 49:22, 50:10, 51:17, 63:19, 85:13
**cast** [2] - 25:5, 25:6
**catch** [3] - 18:25, 112:20, 112:22
**Caucus** [6] - 19:25, 27:22, 27:23, 29:1, 37:7, 110:20
**cautionary** [1] - 53:6
**census** [2] - 21:3, 55:13
**Center** [9] - 2:13, 10:10, 11:3, 11:19, 12:21, 13:12, 13:14, 15:12, 78:2
**central** [1] - 92:16
**centuries** [1] - 73:15
**century** [1] - 73:22
**certain** [5] - 53:7, 53:11, 56:18, 88:13, 89:1
**certainly** [7] - 4:16, 9:10, 28:25, 48:4, 64:16, 104:11, 104:14
**certificate** [18] - 15:4, 35:7, 35:10, 123:24, 124:6, 124:9, 124:18, 125:8, 125:15, 125:19, 126:1, 126:6, 126:14, 126:16, 126:18, 128:7, 130:15, 131:11
**CERTIFICATE** [1] - 132:9
**Certificate** [1] - 125:24
**certificates** [1] - 31:8
**certify** [1] - 132:11
**cetera** [1] - 85:21
**Chad** [1] - 35:23
**CHAD** [1] - 2:19
**chair** [5] - 19:23, 22:4, 39:15, 98:17, 98:25
**chairman** [2] - 39:18, 98:4
**chairmanship** [2] - 98:1, 98:8
**chairs** [3] - 39:21, 39:22, 98:20
**challenge** [1] - 49:24

**challenged** [1] - 54:25
**chance** [1] - 128:15
**change** [13] - 41:16, 45:19, 54:2, 55:14, 59:5, 62:9, 62:10, 62:11, 62:12, 62:16, 74:16, 96:21, 96:24
**changed** [9] - 22:25, 23:10, 24:15, 31:12, 32:22, 55:13, 72:9, 96:24, 119:3
**changes** [6] - 30:14, 49:4, 59:13, 62:9, 97:1, 97:14
**changing** [3] - 41:18, 49:2, 62:18
**Chapter** [1] - 128:2
**chapter** [3] - 52:24, 84:2, 84:3
**characteristics** [1] - 20:24
**characterize** [4] - 8:3, 63:7, 88:16, 91:13
**charge** [5] - 31:5, 39:7, 69:24, 131:23, 131:25
**charges** [2] - 22:19, 31:7
**check** [4] - 13:1, 14:4, 15:10, 16:4
**checked** [3] - 15:12, 58:20, 101:10
**checking** [1] - 58:16
**Chicago** [1] - 1:25
**chief** [3] - 30:2, 30:12, 46:1
**Chief** [4] - 82:24, 83:17, 84:16, 86:15
**child** [1] - 33:19
**children** [3] - 33:19, 34:11, 60:3
**CHIP** [1] - 60:3
**choice** [17] - 37:22, 50:17, 56:23, 62:8, 62:23, 63:25, 102:2, 102:13, 102:24, 103:12, 103:14, 103:16, 103:22, 104:7, 104:11, 104:13, 104:16
**choices** [1] - 56:22
**Chris** [1] - 40:4
**chronology** [1] - 15:24
**chub** [10] - 41:22, 59:16, 59:23, 60:10, 62:13, 62:14, 62:15, 62:19, 62:21
**chubbing** [6] - 41:19, 42:15, 42:21, 96:21,

96:25, 97:7
**CIRCUIT** [1] - 1:12
**circumstances** [1] - 104:13
**cite** [8] - 76:13, 105:11, 105:14, 105:17, 106:12, 107:2, 108:5, 114:17
**cited** [11] - 86:14, 89:12, 89:22, 90:6, 93:24, 105:23, 106:2, 106:19, 107:1, 108:3, 111:21
**cities** [1] - 20:10
**citing** [3] - 89:19, 114:17, 126:21
**City** [2] - 36:5, 36:8
**civic** [3] - 34:12, 34:15, 34:16
**Civil** [1] - 2:8
**CIVIL** [1] - 1:1
**claim** [4] - 68:25, 70:6, 89:25, 90:12
**claimed** [1] - 120:24
**claims** [6] - 24:6, 68:22, 68:24, 70:9, 121:1
**class** [2] - 79:10, 79:11
**classes** [3] - 30:11, 32:17, 45:13
**clauses** [1] - 48:24
**clear** [13] - 7:4, 14:6, 15:21, 16:23, 17:24, 22:1, 23:17, 25:14, 32:19, 79:9, 83:6, 126:20, 126:22
**Clerk** [3] - 19:13, 47:6, 122:6
**clients** [2] - 35:18, 35:19
**climate** [1] - 54:2
**clock** [1] - 95:6
**close** [3] - 6:2, 6:7, 105:2
**co** [2] - 35:23, 121:4
**co-counsel** [1] - 35:23
**co-winner** [1] - 121:4
**coalition** [1] - 61:6
**Code** [5] - 125:18, 125:22, 128:2, 128:6
**code** [8] - 126:13, 126:19, 126:20, 126:21, 126:22, 126:23, 127:2, 127:25
**codes** [1] - 125:16
**coincidence** [1] - 27:2
**collaborative** [1] - 28:22

**colleagues** [1] - 5:25
**college** [1] - 61:8
**collusion** [1] - 24:7
**COLLYER** [91] - 1:13, 4:2, 6:10, 6:13, 6:18, 6:21, 17:4, 17:6, 17:13, 18:9, 18:12, 18:15, 18:17, 19:2, 19:5, 19:8, 19:15, 28:13, 35:17, 35:22, 35:25, 36:19, 37:1, 37:4, 37:9, 38:4, 42:6, 46:24, 47:3, 47:10, 47:13, 47:15, 48:2, 48:6, 52:15, 64:7, 64:10, 64:18, 72:18, 76:16, 76:19, 76:21, 80:8, 80:11, 80:16, 85:25, 100:20, 105:1, 105:7, 107:15, 107:19, 109:5, 109:12, 109:15, 111:1, 111:8, 111:14, 111:16, 117:9, 118:2, 118:7, 118:11, 118:18, 118:23, 119:4, 119:11, 120:12, 120:15, 121:9, 121:13, 121:23, 122:3, 125:1, 125:12, 126:2, 126:12, 126:25, 127:8, 127:11, 127:18, 128:4, 128:8, 128:11, 128:13, 131:1, 131:6, 131:16, 131:19, 131:21, 131:25, 132:5
**color** [2] - 80:2, 103:20
**colorblind** [2] - 85:3, 86:17
**Colorblind** [6] - 52:24, 81:7, 81:12, 84:23, 120:5, 121:2
**COLUMBIA** [1] - 1:2
**column** [8] - 93:17, 93:23, 94:17, 94:20, 95:20, 96:8, 96:11, 96:16
**coming** [2] - 58:17, 67:22
**comity** [1] - 57:20
**commented** [1] - 55:14
**commercial** [2] - 71:25, 125:14

**Committee** [11] -
21:10, 21:23, 22:1,
22:2, 22:18, 38:19,
39:13, 69:25, 75:23,
78:1, 98:5

**committee** [31] -
21:12, 22:8, 23:7,
24:22, 25:18, 25:22,
27:23, 37:13, 37:14,
37:17, 37:20, 37:23,
38:3, 38:16, 38:17,
38:21, 39:3, 39:6,
39:9, 39:16, 39:20,
39:23, 40:2, 40:7,
40:16, 44:17, 46:17,
46:18, 46:22, 72:6,
99:1

**committees** [4] - 22:3,
22:16, 37:22, 98:20

**commonly** [1] - 54:15

**communities** [2] -
27:25, 102:7

**community** [6] -
20:21, 20:24, 64:1,
64:2, 119:11, 119:12

**commuter** [1] - 33:6

**compared** [2] - 27:1,
53:22

**comparison** [3] -
26:22, 110:15, 118:1

**compelling** [1] - 13:20

**completed** [1] - 29:18

**completely** [1] - 71:17

**comport** [1] - 4:24

**composition** [6] -
38:2, 53:23, 100:5,
101:11, 117:20,
119:8

**comprise** [1] - 33:15

**compromise** [2] -
61:22, 61:23

**computer** [2] - 3:15,
6:12

**computer-aided** [1] -
3:15

**concealed** [4] - 11:7,
15:1, 33:13, 123:20

**concentrates** [1] -
92:10

**concern** [4] - 7:6,
55:17, 73:9, 73:10

**concerned** [3] - 31:7,
50:3, 85:14

**concerning** [5] -
10:10, 17:21, 23:24,
40:5, 100:14

**concerns** [12] - 4:13,
5:5, 7:14, 10:13,
13:24, 24:7, 27:20,
28:9, 28:10, 28:19,

28:22, 97:14

**conclude** [3] - 69:7,
83:2, 113:16

**concluded** [4] - 49:12,
50:7, 80:4, 83:16

**concludes** [1] -
108:11

**concluding** [3] -
81:18, 83:2, 87:4

**conclusion** [6] - 50:9,
51:2, 66:8, 69:16,
84:4, 106:4

**conclusions** [5] -
24:1, 24:3, 50:19,
50:22, 51:1

**condition** [1] - 14:16

**conduct** [1] - 45:24

**conducted** [10] -
29:23, 30:2, 66:24,
69:25, 92:20, 92:24,
93:8, 111:20, 113:10

**conducting** [1] - 29:25

**confederate** [1] -
48:22

**conference** [1] - 12:21

**conferences** [2] -
7:22, 69:17

**confidence** [19] -
26:16, 26:21, 27:11,
68:13, 70:12, 70:17,
70:19, 70:20, 70:24,
71:1, 71:3, 71:7,
71:14, 71:16, 71:18,
87:25, 89:20, 90:5,
109:20

**confluence** [3] -
23:15, 24:17, 60:23

**confuse** [1] - 105:4

**Congressional** [1] -
110:20

**connected** [1] - 73:11

**connotation** [2] - 8:6,
24:19

**conscious** [1] - 53:9

**consent** [1] - 59:21

**consequences** [4] -
8:14, 75:11, 77:16,
78:9

**conservative** [1] -
98:9

**consider** [6] - 22:25,
50:12, 51:12, 54:22,
73:5, 105:19

**considerable** [6] -
55:17, 60:9, 65:18,
68:20, 68:23, 77:6

**considerably** [2] -
68:14, 73:6

**consideration** [10] -
26:20, 27:13, 27:20,

51:24, 57:2, 57:19,
57:23, 69:13, 75:23,
85:17

**considerations** [1] -
68:15

**considered** [10] -
21:15, 22:22, 29:5,
48:20, 48:23, 55:7,
64:1, 68:17, 71:20,
77:3

**considering** [1] -
105:19

**considers** [1] - 80:12

**constituent** [1] -
109:23

**constituents** [13] -
20:12, 20:14, 20:20,
33:1, 33:7, 33:10,
33:14, 34:3, 36:12,
43:16, 43:21, 46:8,
46:11

**Constitution** [1] - 50:4

**constitutional** [3] -
46:12, 49:5, 107:23

**constrain** [1] - 74:22

**constrained** [1] -
74:13

**constraining** [1] -
74:22

**consuming** [1] - 33:22

**contains** [2] - 17:7,
125:24

**contemporaneous** [1]
- 23:21

**contentious** [1] -
116:8

**contents** [3] - 88:22,
92:5, 112:9

**contests** [1] - 63:12

**context** [11] - 21:4,
32:10, 53:19, 54:23,
55:6, 55:8, 61:21,
94:24, 111:9,
111:10, 111:13

**continually** [1] - 71:22

**continuation** [1] -
114:11

**continue** [2] - 56:21,
67:21

**CONTINUED** [3] - 2:1,
3:2, 4:6

**continued** [1] - 57:22

**continuing** [1] - 75:3

**contrary** [1] - 104:8

**control** [4] - 55:18,
55:24, 67:12, 70:22

**convenience** [1] -
81:23

**convenings** [1] - 7:22

**conventions** [1] - 49:6

**conversation** [2] -
15:23, 105:8

**convicted** [2] - 70:3,
70:5

**convince** [2] - 88:11,
101:24

**convinces** [1] - 78:6

**correct** [81] - 4:10,
8:9, 11:11, 11:14,
13:9, 13:14, 15:14,
17:8, 36:6, 38:12,
38:13, 38:16, 38:20,
38:22, 38:23, 38:25,
39:11, 39:13, 39:14,
39:17, 39:18, 39:24,
40:5, 40:9, 40:11,
40:17, 40:18, 40:21,
41:2, 41:11, 42:15,
42:20, 43:1, 43:4,
43:5, 43:11, 43:16,
44:6, 48:12, 61:14,
65:6, 71:5, 72:15,
72:16, 72:23, 76:11,
79:20, 81:7, 81:8,
81:12, 81:13, 81:16,
82:21, 84:20, 86:19,
87:3, 87:14, 88:9,
88:21, 89:16, 91:23,
91:24, 95:21, 97:16,
99:17, 105:13,
113:11, 115:13,
116:20, 118:8,
118:13, 119:17,
124:15, 124:19,
127:22, 129:23,
132:12

**corrected** [1] - 14:21

**correcting** [1] - 13:7

**Corrections** [1] -
128:2

**correctly** [1] - 29:16

**correlation** [1] - 60:23

**corridor** [1] - 20:9

**cost** [4] - 31:9, 31:20,
33:16, 45:1

**couch** [1] - 78:22

**Council** [1] - 121:5

**counsel** [10] - 35:18,
35:23, 67:22, 76:12,
87:21, 121:17,
125:20, 126:7, 126:9

**count** [1] - 103:25

**counted** [2] - 105:23,
106:1

**counties** [1] - 69:19

**country** [3] - 20:23,
34:8, 34:10

**county** [2] - 29:19,
35:10

**County** [11] - 20:9,

36:12, 36:13, 36:23,
45:15, 50:14, 69:3,
79:11, 98:11, 119:3

**couple** [5] - 15:9,
41:18, 58:7, 71:24,
113:21

**course** [3] - 15:23,
47:12, 90:8

**court** [20] - 9:22, 39:5,
41:13, 50:8, 50:12,
50:18, 50:19, 55:2,
55:6, 59:15, 73:4,
79:1, 79:22, 81:9,
88:11, 97:14,
102:23, 104:20,
105:18, 107:11

**COURT** [6] - 1:1, 6:6,
15:17, 44:9, 132:9,
132:18

**Court** [19] - 3:11, 3:11,
47:24, 50:2, 50:9,
50:18, 51:19, 52:6,
53:3, 82:23, 83:7,
83:14, 83:19, 83:20,
89:17, 90:3, 90:20,
91:5, 107:24

**courtesy** [1] - 22:5

**Courthouse** [1] - 3:12

**Courtroom** [3] -
19:13, 47:6, 122:6

**courtroom** [2] - 49:23,
130:12

**courts** [2] - 52:2, 52:6

**Courts** [1] - 52:6

**covenant** [1] - 79:25

**cover** [1] - 69:20

**Crawford** [8] - 40:5,
88:15, 88:20, 89:2,
89:25, 90:8, 90:19,
117:13

**create** [1] - 34:1

**created** [2] - 81:10,
115:7

**credible** [1] - 89:9

**crimes** [2] - 50:5, 50:6

**criterion** [1] - 120:3

**critic** [2] - 8:2, 8:3

**critical** [2] - 8:5, 8:10

**criticism** [1] - 7:5

**criticizing** [1] - 113:8

**cross** [3] - 15:17,
36:19, 38:5

**CROSS** [3] - 6:22,
38:7, 80:23

**cross-examination** [3]
- 15:17, 36:19, 38:5

**CROSS-
EXAMINATION** [3] -
6:22, 38:7, 80:23

**Crow** [1] - 46:13

**CRR** [1] - 3:11
**cue** [1] - 112:17
**cues** [1] - 112:18
**cultural** [1] - 20:22
**cumbersome** [1] - 33:22
**current** [6] - 41:1, 74:8, 74:17, 90:15, 90:16, 131:9
**cut** [1] - 82:13
**cuts** [1] - 28:2
**CVAP** [1] - 101:2

**D**

**D-548** [2] - 97:22, 101:17
**D-E-L-L-H-E-I-M** [1] - 47:12
**D.C** [5] - 1:5, 3:12, 129:22, 130:1, 130:5
**dad** [1] - 124:10
**Dallas** [17] - 20:9, 20:10, 21:6, 33:5, 36:13, 69:3, 69:4, 96:12, 105:24, 106:8, 106:17, 107:16, 108:3, 109:1, 109:8, 109:9
**DANIEL** [1] - 2:4
**data** [8] - 24:10, 30:13, 45:11, 46:3, 99:24, 102:14, 103:8
**DATE** [1] - 132:18
**date** [8] - 15:21, 17:2, 17:8, 17:21, 17:24, 30:1, 106:21, 131:19
**David** [1] - 40:13
**DAVID** [1] - 1:12
**Davio** [2] - 40:11, 44:20
**DAY** [1] - 1:11
**days** [5] - 58:7, 58:22, 62:25, 125:16, 132:1
**DC** [1] - 2:10
**de** [1] - 77:14
**dead** [1] - 69:2
**deal** [5] - 23:8, 65:20, 66:17, 69:21, 74:13
**dealing** [2] - 30:10, 65:8
**debate** [13] - 4:12, 4:15, 12:8, 12:17, 18:22, 23:7, 28:23, 29:3, 31:24, 32:1, 116:8, 116:11
**debates** [3] - 7:15, 51:7, 65:18
**decade** [1] - 63:12
**decennial** [1] - 21:2

**Dechert** [1] - 121:16
**DECHERT** [1] - 2:12
**decide** [1] - 53:18
**decided** [5] - 6:9, 51:20, 90:8, 90:18, 123:11
**decision** [11] - 32:22, 33:23, 40:5, 50:19, 51:18, 54:3, 54:4, 64:2, 79:22, 82:23, 90:19
**decisions** [1] - 46:4
**declaration** [2] - 97:14, 102:23
**declared** [2] - 62:24, 63:1
**decline** [1] - 70:19
**deconstructing** [1] - 85:5
**decrease** [1] - 87:20
**decreasing** [2] - 89:19, 90:4
**dedicated** [1] - 24:22
**deep** [1] - 78:23
**deeper** [1] - 23:6
**defeated** [1] - 45:21
**Defendant** [4] - 1:8, 2:3, 124:20, 127:22
**DEFENDANT** [4] - 4:4, 19:16, 47:18, 122:7
**defendant** [1] - 80:9
**Defendant-Intervenor** [1] - 127:22
**Defendant-Intervenor's** [1] - 124:20
**defendants** [2] - 19:5, 46:25
**Defendants** [2] - 1:10, 2:12
**Defense** [2] - 52:13, 92:1
**DEFENSE** [1] - 3:2
**definitely** [1] - 4:15
**definition** [1] - 126:17
**definitively** [1] - 119:2
**deflected** [1] - 7:18
**deflections** [1] - 5:15
**degree** [1] - 63:7
**Delay** [1] - 62:6
**delay** [1] - 45:19
**delayed** [3] - 29:16, 29:22, 62:23
**DELLHEIM** [28] - 2:7, 47:5, 47:7, 47:12, 47:14, 47:17, 47:21, 48:7, 52:13, 52:16, 64:9, 64:21, 68:1, 68:2, 74:4, 76:20,

76:24, 77:1, 80:6, 110:25, 111:3, 117:10, 117:12, 117:21, 118:8, 119:6, 119:13, 120:10
**Dellheim** [4] - 47:8, 64:18, 81:4, 91:10
**demand** [1] - 109:24
**Democrat** [3] - 103:6, 103:13
**Democratic** [13] - 49:11, 56:8, 57:9, 60:7, 60:22, 61:6, 62:1, 66:5, 67:14, 75:6, 75:13, 110:20, 119:23
**democratic** [1] - 63:8
**Democrats** [32] - 57:22, 58:11, 59:11, 59:16, 60:2, 61:10, 62:4, 62:8, 62:13, 62:18, 62:21, 63:4, 65:3, 66:10, 66:18, 70:25, 73:2, 75:25, 77:7, 78:5, 79:10, 79:12, 79:16, 97:6, 104:1, 104:12, 112:21, 115:24, 116:9, 116:13, 116:22
**democrats** [1] - 59:7
**demographic** [9] - 53:22, 54:1, 54:22, 55:9, 99:24, 100:8, 100:14, 102:14, 110:15
**demographics** [1] - 20:20
**demography** [1] - 54:1
**demonstrative** [1] - 81:10
**denied** [2] - 72:10, 90:13
**Dennis** [1] - 39:16
**department** [1] - 5:25
**DEPARTMENT** [1] - 2:7
**Department** [12] - 6:1, 15:7, 25:19, 27:17, 35:13, 47:9, 52:22, 81:10, 87:21, 95:4, 96:20, 110:11
**Department's** [1] - 117:7
**dependable** [1] - 98:9
**dependent** [2] - 56:7, 56:9
**deposition** [20] - 12:22, 12:25, 13:3,

13:16, 15:22, 15:25, 16:2, 38:12, 85:13, 85:23, 86:22, 86:24, 90:10, 93:15, 96:17, 99:14, 99:18, 110:2, 113:9, 114:14
**depositions** [2] - 51:10, 51:13
**derived** [1] - 82:10
**describe** [2] - 52:11, 60:12
**described** [2] - 57:21, 82:11
**describing** [2] - 23:17, 92:13
**description** [1] - 92:8
**design** [1] - 119:5
**designed** [2] - 23:8, 39:6
**detail** [2] - 41:21, 68:23
**detecting** [3] - 90:21, 91:5, 109:20
**determine** [9] - 24:24, 51:6, 51:21, 53:3, 54:14, 65:10, 65:22, 75:1, 88:5
**Determine** [1] - 51:23
**determining** [2] - 49:3, 51:25
**development** [1] - 49:10
**deviation** [1] - 54:10
**device** [2] - 62:4, 63:5
**devoid** [1] - 114:3
**devote** [1] - 69:16
**Dewhurst** [2] - 63:2, 71:22
**dialogue** [1] - 26:9
**died** [1] - 98:5
**difference** [7] - 61:14, 67:19, 74:11, 91:3, 91:4, 118:19, 126:2
**differences** [4] - 20:22, 20:23, 126:4
**different** [14] - 23:3, 28:23, 33:20, 43:2, 61:16, 66:15, 81:11, 90:24, 98:20, 112:23, 114:23, 114:25, 119:2, 125:10
**differently** [1] - 90:11
**difficult** [3] - 61:4, 61:5, 73:20
**difficulties** [1] - 27:25
**difficulty** [2] - 7:9, 61:7
**diminish** [1] - 80:2
**DIRECT** [6] - 4:6,

19:18, 36:2, 37:10, 47:20, 122:9
**direct** [4] - 41:25, 81:3, 93:2, 96:20
**directly** [3] - 42:5, 56:18, 92:11
**disability** [1] - 129:13
**disabled** [1] - 14:15
**disadvantage** [2] - 49:14, 73:13
**disagree** [3] - 99:15, 108:14, 108:22
**disagreed** [1] - 89:17
**discern** [1] - 25:22
**disciplined** [2] - 115:14, 115:21
**disclose** [5] - 82:8, 82:18, 102:23, 104:20, 106:8
**disclosed** [4] - 76:11, 82:15, 95:17, 97:9
**discloses** [1] - 82:2, 87:5, 92:14, 111:19
**discover** [1] - 76:17
**discriminate** [1] - 49:9
**discriminating** [1] - 119:21
**discrimination** [6] - 85:18, 85:19, 85:20, 89:24, 90:12, 104:3
**discriminatory** [23] - 48:15, 49:8, 50:8, 50:24, 51:2, 67:2, 75:9, 78:10, 79:23, 80:3, 87:8, 87:13, 88:6, 101:25, 102:9, 102:20, 106:6, 106:11, 113:17, 117:14, 119:15, 119:17, 120:4
**discuss** [5] - 5:15, 68:25, 84:5, 86:22, 101:18
**discussed** [11] - 59:22, 72:2, 85:13, 90:7, 90:10, 94:24, 96:17, 99:19, 101:19, 112:18, 114:25
**discussing** [4] - 70:15, 84:2, 84:3, 86:12
**discussion** [16] - 5:14, 7:18, 23:10, 23:15, 65:18, 66:17, 70:14, 71:17, 76:14, 101:21, 104:20, 104:24, 110:4, 120:5, 120:25, 126:5
**discussions** [2] -

23:2, 72:4
**disease** [1] - 14:6
**disenfranchise** [6] -
7:6, 11:24, 35:1,
65:4, 67:14, 116:15
**disenfranchised** [1] -
12:4
**disenfranchisement**
[1] - 25:5
**disenfranchising** [5] -
45:12, 65:3, 67:17,
72:25, 73:1
**disfranchise** [1] -
49:13
**disfranchised** [2] -
50:6, 61:1
**disfranchises** [1] -
61:10
**disfranchising** [2] -
73:7, 73:8
**dishonest** [1] - 57:6
**disproportionate** [2] -
61:11, 79:18
**disproportionately** [2]
- 67:16, 79:14
**dispute** [7] - 16:13,
16:21, 39:25, 40:8,
43:23, 44:1, 113:1
**disputing** [1] - 16:19
**dissent** [1] - 89:13
**dissertation** [1] -
48:19
**dissolve** [1] - 68:24
**distinction** [1] - 39:5
**distort** [1] - 85:1
**district** [25] - 20:3,
20:8, 33:1, 33:15,
34:5, 36:5, 69:18,
70:8, 99:4, 100:3,
100:5, 100:15,
101:8, 101:10,
101:11, 101:13,
102:2, 102:16,
103:18, 104:16,
117:23, 117:25,
118:15, 118:20,
118:22
**District** [16] - 8:4,
20:4, 20:9, 20:16,
21:1, 21:3, 50:18,
51:19, 52:5, 99:13,
100:11, 100:15,
103:5, 118:3,
118:24, 119:10
**DISTRICT** [3] - 1:1,
1:2, 1:14
**districts** [10] - 46:14,
46:15, 53:21, 53:22,
53:23, 53:25, 99:25,
100:9, 101:16

**division** [1] - 110:16
**Division** [1] - 2:8
**Docket** [1] - 1:3
**Doctor** [1] - 76:22
**doctor** [2] - 13:21,
13:25
**doctor's** [1] - 58:20
**doctoral** [1] - 48:19
**document** [8] - 17:7,
52:21, 94:1, 94:10,
111:12, 124:5,
128:15
**documented** [2] -
24:13, 92:18
**documents** [27] -
30:4, 30:8, 31:2,
31:8, 33:17, 33:25,
34:22, 74:13, 74:15,
74:19, 74:22, 78:4,
123:23, 124:15,
124:17, 124:21,
125:9, 125:24,
126:9, 127:17,
128:6, 128:17,
129:4, 129:7,
130:19, 131:10
**domicile** [3] - 125:14,
126:7, 126:9
**dominance** [4] -
55:21, 56:1, 56:11,
56:21
**dominant** [1] - 56:21
**done** [13] - 9:3, 14:19,
29:15, 30:25, 42:9,
47:1, 62:5, 70:8,
78:3, 111:21, 117:3,
120:24, 124:23
**door** [1] - 36:13
**down** [6] - 23:6, 24:10,
54:21, 69:6, 98:23,
108:5
**DPS** [15] - 4:9, 7:10,
7:14, 25:24, 28:1,
28:2, 33:20, 36:23,
40:11, 44:14, 44:16,
66:23, 77:11,
124:14, 124:16
**Dr** [56] - 47:22, 49:15,
50:21, 52:11, 52:17,
60:14, 64:14, 64:22,
68:3, 74:5, 76:11,
76:21, 77:2, 78:18,
80:7, 80:25, 81:20,
82:1, 82:4, 82:13,
84:8, 84:15, 85:22,
86:2, 88:10, 88:17,
90:1, 90:25, 92:2,
93:6, 94:25, 95:4,
96:19, 97:23, 98:19,
100:25, 101:4,

104:25, 105:10,
106:17, 106:21,
109:17, 110:8,
110:9, 111:18,
112:4, 112:6, 112:8,
114:12, 115:11,
117:6, 117:13,
118:12, 119:7,
120:21, 121:10
**dramatic** [1] - 70:19
**drawn** [3] - 50:19,
67:1, 117:25
**Dred** [4] - 83:4, 83:6,
83:23, 84:18
**drew** [2] - 52:4, 118:24
**drilled** [3] - 23:6,
23:12, 24:10
**drive** [3] - 10:5, 15:6,
18:6
**driven** [1] - 13:22
**driver's** [24] - 4:9, 5:6,
5:23, 7:10, 7:14,
9:24, 10:1, 10:6,
11:6, 13:2, 13:3,
13:17, 14:14, 14:25,
15:10, 16:3, 16:6,
17:22, 18:5, 26:1,
35:6, 123:16, 124:1,
124:3, 125:14
**driveway** [1] - 14:10
**driving** [7] - 13:24,
14:9, 16:19, 16:20,
18:2, 44:24, 108:19
**drum** [2] - 91:22,
94:22
**duly** [4] - 4:5, 19:16,
47:18, 122:8
**Dunn** [2] - 35:23,
35:24
**DUNN** [2] - 2:19, 2:19
**during** [29] - 7:15, 8:2,
8:7, 11:23, 12:25,
18:21, 21:2, 21:14,
21:16, 24:2, 25:7,
26:20, 27:13, 27:20,
28:23, 49:1, 55:13,
55:16, 56:2, 56:4,
60:20, 63:12, 64:15,
65:17, 93:2, 96:19,
100:15, 116:7
**duty** [3] - 43:16, 46:10,
85:6

---

# E

**early** [1] - 73:14
**ease** [1] - 75:16
**easier** [2] - 65:25,
97:25
**easily** [1] - 67:21
**eat** [1] - 6:9

**editorial** [7] - 106:9,
106:18, 107:8,
107:21, 109:2,
109:8, 109:9
**editorials** [5] - 105:14,
105:17, 105:24,
106:2, 108:4
**educated** [1] - 12:9
**Education** [1] - 19:24
**education** [3] - 4:21,
4:24, 59:8
**EDUCATIONAL** [1] -
3:3
**effect** [26] - 11:2, 43:6,
45:12, 54:12, 54:13,
61:4, 61:11, 65:3,
65:20, 65:22, 66:21,
67:8, 67:20, 73:19,
73:25, 75:11, 75:20,
75:21, 77:24, 79:17,
79:24, 86:17, 87:2
**effectiveness** [1] -
29:22
**effects** [7] - 49:4,
60:24, 60:25, 65:8,
66:18, 67:20, 75:1
**effectuate** [1] - 46:7
**effort** [4] - 33:18,
57:10, 66:9, 85:2
**efforts** [6] - 66:20,
69:10, 77:16, 77:17,
91:11, 92:19
**EIC** [3] - 35:6, 35:7,
35:12
**eight** [3] - 32:18,
48:25, 63:13
**eight-box** [1] - 48:25
**eighth** [1] - 54:7
**either** [10] - 32:19,
39:18, 40:1, 44:2,
56:16, 78:8, 89:25,
95:17, 97:9, 127:2
**El** [3] - 96:13, 103:5,
103:13
**elderly** [3] - 10:5,
10:21, 61:8
**elect** [2] - 50:17,
104:10
**Elected** [1] - 19:24
**elected** [9] - 20:6,
46:10, 87:10,
100:16, 102:3,
117:24, 118:6,
118:21, 119:5
**Election** [1] - 125:23
**election** [37] - 24:8,
26:25, 40:20, 48:21,
49:2, 50:17, 52:1,
53:1, 55:22, 61:24,
62:1, 69:2, 69:18,

69:22, 70:21, 70:23,
87:20, 91:12, 94:16,
94:17, 95:9, 97:15,
97:17, 97:18,
122:24, 124:5,
124:8, 124:18,
125:8, 125:18,
125:25, 126:6,
126:17, 128:7,
129:17
**Elections** [5] - 21:10,
21:23, 22:1, 22:18,
98:4
**elections** [22] - 24:20,
25:4, 25:10, 25:12,
26:13, 30:2, 30:12,
46:1, 56:4, 56:6,
57:6, 61:18, 63:13,
63:14, 63:16, 73:17,
98:17, 98:23, 98:25,
100:16, 112:20,
118:25
**electoral** [13] - 11:10,
70:17, 70:19, 70:24,
71:1, 71:3, 71:7,
71:14, 71:16, 88:1,
89:20, 90:5, 109:21
**electorate** [5] - 56:2,
60:17, 74:22,
110:22, 119:23
**eliminate** [3] - 42:15,
42:21, 68:19
**eliminated** [1] - 41:22
**elite** [3] - 115:13,
115:15, 115:21
**ELIZABETH** [1] - 2:3
**Ellis** [4] - 58:5, 60:9,
62:22, 75:10
**Ellis'** [1] - 75:19
**elsewhere** [1] - 11:14
**emergency** [2] -
62:25, 63:1
**emerging** [1] - 56:10
**emigrants** [1] - 34:8
**emphasis** [2] - 90:15
**empirically** [2] -
83:25, 84:5
**employ** [1] - 85:3
**employed** [3] - 51:16,
51:17, 86:17
**enabled** [1] - 54:10
**enacted** [8] - 10:24,
87:7, 88:25, 106:12,
124:9, 126:19,
126:23
**enactment** [2] -
125:17, 126:19
**end** [11] - 6:7, 26:9,
58:5, 59:20, 61:24,
63:4, 68:11, 70:13,

70:16, 74:24, 86:13
**ended** [2] - 58:18, 59:24
**endlessly** [1] - 59:22
**endorsed** [6] - 83:7, 83:9, 83:20, 83:21, 84:11, 84:12
**ends** [1] - 70:7
**enforced** [1] - 44:6
**engaged** [3] - 34:13, 60:10, 80:3
**engagement** [3] - 34:12, 34:15, 34:16
**Engineering** [1] - 122:19
**ensure** [2] - 27:14, 58:22
**ensuring** [1] - 40:23
**enter** [1] - 130:12
**entered** [1] - 55:12
**entire** [1] - 116:7
**entirely** [3] - 34:21, 125:10, 125:21
**entitled** [1] - 132:13
**epic** [1] - 85:3
**epidemic** [3] - 23:5, 69:15, 117:17
**equal** [1] - 104:10
**equally** [1] - 109:3
**ERIC** [2] - 1:5, 1:9
**Eric** [3] - 19:10, 47:8, 69:24
**essence** [2] - 63:18, 88:3
**essentially** [4] - 25:4, 53:8, 56:15, 97:1
**establish** [3] - 124:21, 125:14, 129:5
**established** [1] - 22:2
**et** [2] - 1:9, 85:21
**ethnic** [4] - 75:11, 77:15, 78:12, 100:5
**ethnicity** [2] - 29:18, 75:12
**evasive** [1] - 28:24
**evening** [1] - 132:2
**event** [1] - 111:8
**events** [1] - 56:25
**eventually** [1] - 51:22
**evidence** [50] - 12:2, 12:18, 13:13, 18:21, 18:22, 18:24, 24:1, 24:2, 26:7, 26:20, 27:10, 27:13, 45:3, 53:17, 58:19, 64:3, 65:17, 66:14, 66:15, 68:17, 70:18, 71:2, 71:4, 72:14, 73:9, 75:19, 75:22, 77:2, 77:4, 77:6, 77:21,

77:22, 78:9, 84:3, 88:24, 90:16, 90:22, 91:6, 92:15, 102:6, 103:7, 105:18, 106:4, 109:6, 114:21, 115:6, 120:23, 124:25, 125:6
**evil** [4] - 83:19, 83:22, 83:23, 84:14
**ex** [1] - 48:22
**ex-confederate** [1] - 48:22
**exact** [4] - 15:21, 33:3, 40:3, 106:9
**exactly** [3] - 54:20, 73:7, 88:16
**EXAMINATION** [13] - 4:6, 6:22, 18:19, 19:18, 36:2, 37:10, 38:7, 44:12, 47:20, 80:23, 117:11, 120:19, 122:9
**examination** [7] - 15:17, 36:19, 38:5, 41:25, 58:17, 127:3, 127:13
**examine** [4] - 25:11, 48:13, 48:14, 51:11
**examined** [3] - 51:5, 68:22, 68:23
**examining** [1] - 51:16
**example** [9] - 11:16, 12:3, 27:17, 49:21, 53:10, 63:21, 96:9, 105:23, 112:3, 114:17
**examples** [3] - 23:3, 94:16, 95:15
**exceedingly** [2] - 54:6, 72:23
**exclusively** [2] - 24:4, 24:5
**excuse** [4] - 41:17, 42:7, 45:11, 105:1
**excused** [2] - 18:17, 19:3
**executed** [2] - 59:16, 59:23
**executive** [1] - 45:25
**Exhibit** [18] - 10:18, 10:20, 11:17, 17:19, 52:14, 81:24, 88:19, 92:1, 93:16, 98:20, 100:13, 106:14, 110:6, 117:21, 124:21, 127:21, 127:22
**exhibit** [2] - 94:1, 128:17

**exist** [2] - 26:3, 30:13
**existed** [1] - 13:25
**existence** [2] - 27:8, 68:18
**existing** [2] - 5:18, 5:21
**expand** [4] - 26:18, 29:9, 30:20, 75:16
**expense** [2] - 33:25, 34:2
**expensive** [4] - 33:23, 92:20, 92:24, 93:8
**experience** [3] - 52:4, 99:20, 100:8
**expert** [10] - 48:11, 49:15, 50:11, 56:3, 78:1, 79:20, 109:6, 110:5, 110:11, 113:9
**expiration** [1] - 17:21
**expire** [5] - 14:4, 16:3, 16:8, 16:10, 16:13
**expires** [1] - 15:5
**expiring** [1] - 13:17
**explain** [5] - 10:4, 56:13, 57:11, 118:14, 119:19
**explained** [2] - 13:2, 13:16
**explains** [1] - 32:12
**explanations** [2] - 95:4, 95:5
**explanatory** [3] - 53:20, 54:3, 54:8
**explicitly** [1] - 115:1
**express** [1] - 110:18
**expressing** [2] - 86:13, 98:16
**extensively** [1] - 115:6
**extent** [6] - 26:2, 33:11, 54:18, 77:4, 116:22, 119:25
**extreme** [1] - 71:10
**EZRA** [1] - 2:12
**Ezra** [1] - 121:16

## F

**face** [3] - 32:21, 126:15, 126:20
**fact** [44] - 7:19, 8:18, 11:6, 13:3, 14:9, 14:24, 15:1, 15:2, 15:3, 15:4, 21:6, 24:3, 24:12, 25:25, 28:23, 30:6, 39:18, 39:25, 55:9, 57:6, 59:19, 77:20, 81:9, 87:10, 88:14, 89:17, 94:16, 95:22, 97:17, 101:8, 102:8,

102:20, 102:24, 103:24, 104:7, 105:11, 107:16, 108:11, 110:11, 114:2, 116:18, 118:9, 124:2
**factor** [2] - 53:16, 54:8, 54:12
**factors** [8] - 52:23, 53:2, 54:19, 54:21, 56:13, 78:20, 81:11, 81:14
**facts** [5] - 54:1, 54:22, 55:20, 92:9, 92:12
**fail** [2] - 26:5, 115:18
**failed** [2] - 69:14, 91:17
**failsafe** [1] - 91:18
**failure** [1] - 78:5
**fair** [2] - 104:24, 115:16
**fairly** [2] - 33:4, 64:11
**fake** [3] - 25:20, 25:21, 25:23
**fall** [1] - 122:20
**false** [2] - 13:9, 13:14
**familial** [1] - 57:20
**familiar** [5] - 8:24, 54:15, 79:19, 88:24, 112:10
**familiarize** [1] - 12:7
**family** [1] - 57:21
**far** [1] - 25:13
**Farmers** [2] - 20:11
**fast** [2] - 10:8, 12:21
**father** [2] - 34:9
**favor** [10] - 32:23, 41:15, 42:24, 54:6, 98:8, 114:2, 114:22, 116:23, 119:16, 120:2
**favorable** [1] - 51:19
**favored** [4] - 43:21, 46:11, 56:19, 73:17
**fear** [1] - 34:25
**federal** [2] - 49:16, 52:5
**felt** [4] - 14:22, 28:20, 28:21, 60:2
**few** [5] - 7:2, 38:14, 81:18, 82:19, 126:4
**fewer** [1] - 70:3
**fight** [1] - 58:9
**fighting** [1] - 95:13
**Figueroa** [5] - 121:21, 122:1, 122:4, 127:4, 128:14
**FIGUEROA** [18] - 3:2, 121:21, 122:1, 122:10, 125:11,

125:13, 126:11, 126:13, 127:7, 127:14, 127:15, 127:19, 127:23, 128:1, 128:10, 128:12, 131:4, 131:15
**figure** [2] - 102:12, 127:4
**figured** [1] - 103:11
**figures** [1] - 33:3
**filibuster** [3] - 58:7, 59:17, 62:23
**filibusterer** [1] - 60:10
**final** [1] - 54:12
**finally** [4] - 62:25, 69:7, 72:8, 72:11
**Finance** [1] - 38:19
**finance** [2] - 38:18, 39:7
**financial** [1] - 33:23
**findings** [1] - 110:19
**fine** [1] - 95:7
**finish** [2] - 109:17, 131:6
**firm** [7] - 35:18, 35:19, 35:20, 35:24, 123:7, 125:4
**first** [28] - 6:16, 7:4, 22:6, 22:8, 23:20, 23:22, 38:15, 48:3, 48:19, 50:1, 53:16, 55:10, 55:21, 55:23, 57:2, 61:18, 62:25, 63:2, 63:3, 69:13, 73:9, 74:24, 87:6, 88:10, 92:15, 93:18, 124:7
**fiscal** [4] - 4:18, 4:20, 4:22, 5:9
**FISCHER** [1] - 4:4
**Fischer** [5] - 6:24, 10:21, 16:25, 17:18, 37:12
**FISHER** [1] - 2:6
**five** [5] - 9:18, 59:23, 63:13, 76:2, 76:8
**five-day** [1] - 59:23
**flexibility** [1] - 127:5
**flip** [1] - 86:8
**flipping** [1] - 11:22
**floating** [1] - 115:4
**Floor** [8] - 1:19, 2:24, 26:10, 27:24, 28:23, 34:19, 57:19, 77:17
**FM** [1] - 2:20
**focus** [8] - 29:19, 49:3, 65:21, 67:25, 82:4, 90:1, 93:6
**focused** [1] - 68:9

focusing [2] - 34:25, 92:15
followed [1] - 108:20
following [1] - 26:7
follows [4] - 4:5, 19:17, 47:19, 122:8
FOR [1] - 1:2
foregoing [1] - 132:11
forgive [3] - 62:10, 76:22, 118:13
form [3] - 44:5, 48:25, 96:8
formed [1] - 115:4
forms [8] - 11:8, 31:4, 41:3, 43:3, 93:22, 123:9, 123:13
formula [1] - 68:14
forth [3] - 89:18, 92:9, 101:1
forward [7] - 12:18, 12:22, 61:13, 64:5, 68:5, 68:7, 73:24
forwarding [1] - 10:8
FOUNDATION [1] - 3:7
foundation [1] - 34:16
four [1] - 42:2
frame [2] - 57:13, 67:24
framers [1] - 75:9
framework [10] - 81:15, 82:2, 82:3, 82:9, 82:11, 82:15, 82:18, 113:14, 113:18
franchise [2] - 26:18, 34:17
FRANK [1] - 2:23
Frasier [1] - 75:24
Fraud [1] - 39:13
fraud [65] - 18:23, 22:21, 23:3, 23:4, 23:9, 23:11, 23:24, 24:3, 24:6, 24:9, 24:15, 24:23, 39:1, 57:5, 68:8, 68:15, 68:18, 68:21, 69:11, 69:15, 69:22, 70:4, 70:7, 70:10, 70:16, 87:20, 89:19, 90:4, 90:16, 90:21, 90:22, 91:5, 91:6, 91:12, 91:16, 91:21, 92:18, 92:19, 92:25, 93:4, 93:5, 93:13, 93:20, 94:3, 94:4, 94:7, 94:9, 94:11, 94:12, 94:14, 94:16, 94:17, 94:18, 94:22, 95:13, 95:15, 95:19, 95:25,
109:20, 112:20, 112:22, 117:18
FREDERICK [1] - 1:16
free [4] - 5:2, 31:5, 31:6, 124:17
freely [1] - 39:17
FREEMAN [1] - 2:4
frequently [2] - 12:14, 39:21
FRIED [1] - 2:23
friend [1] - 123:6
front [5] - 26:2, 32:11, 52:17, 127:2, 127:18
Ft [1] - 96:10
fuller [1] - 115:8
fully [1] - 44:22
Fund [1] - 19:24
FUND [1] - 3:3
funds [1] - 69:17
furnish [1] - 46:3
furnished [1] - 46:5
furthermore [1] - 61:1
future [2] - 13:18, 16:3
futures [1] - 102:4

# G

GA [1] - 3:9
gain [1] - 120:24
Gallegos [2] - 58:13, 60:11
Gallup [1] - 114:5
GARZA [5] - 15:15, 18:11, 37:2, 37:6, 37:11
Garza [8] - 37:6, 37:8, 41:14, 50:13, 51:17, 51:18, 79:19, 79:21
gather [1] - 105:17
gauging [1] - 45:21
GEAR [1] - 2:5
general [7] - 23:2, 23:10, 51:21, 77:8, 115:20, 122:24, 129:16
General [16] - 1:6, 19:10, 19:11, 69:12, 91:11, 91:15, 91:19, 93:18, 94:6, 95:11, 95:14, 95:19, 95:23, 96:1, 96:5
GENERAL [1] - 1:18
General's [9] - 40:13, 69:23, 92:19, 92:24, 93:8, 93:20, 94:2, 94:21, 117:16
generally [4] - 12:8, 22:21, 24:9, 104:9
generate [1] - 93:21
Gerald [1] - 35:15,
35:20
GERALD [2] - 2:15, 2:16
gin [2] - 115:14, 115:22
given [9] - 22:23, 23:3, 70:10, 71:17, 89:8, 94:16, 109:19, 109:21, 110:2
goal [1] - 40:24
governance [1] - 11:13
governor [1] - 63:1
Governor [2] - 63:2, 71:22
Governor's [1] - 69:17
grab [1] - 9:9
graduated [1] - 122:18
grandmother [1] - 124:11
grant [1] - 104:14
great [7] - 24:5, 41:20, 65:20, 66:17, 69:21, 71:1, 80:20
greater [1] - 113:2
grew [1] - 55:21
group [2] - 56:1, 66:24
groups [3] - 75:12, 113:3, 116:24
growing [1] - 98:10
growth [1] - 55:16
Guadeloupe [1] - 16:24
guess [2] - 16:9, 89:7
guesses [1] - 53:8
guessing [1] - 16:15
guesstimates [1] - 5:10

# H

half [3] - 29:9, 30:20, 59:23
hamper [1] - 49:10
hand [1] - 85:23
handgun [4] - 11:7, 15:2, 33:13, 123:21
happy [2] - 62:13, 127:7
hard [3] - 79:7, 124:13, 132:3
hardship [1] - 34:1
Harless [10] - 32:2, 32:15, 70:14, 98:9, 98:17, 98:25, 99:12, 100:3, 100:16, 117:23
Harris [3] - 45:15, 98:11, 119:3
HARRIS [2] - 2:22,
2:23
hate [1] - 109:5
HAVA [1] - 4:21
heads [1] - 7:24
hear [6] - 25:9, 27:10, 39:6, 72:21, 96:2, 125:2
heard [6] - 26:7, 28:2, 41:19, 46:18, 104:24, 105:10, 119:15, 121:2
hearing [8] - 22:3, 22:7, 22:8, 22:11, 22:12, 23:7, 25:18, 44:17
hearings [9] - 21:19, 21:24, 22:9, 23:24, 24:2, 39:23, 51:7, 77:25, 93:3
heart [3] - 26:14, 55:4, 78:23
heavily [1] - 36:14
Hebert [6] - 35:15, 35:17, 35:21, 35:25, 120:15, 120:17
HEBERT [16] - 2:15, 2:16, 35:15, 35:20, 35:23, 36:3, 36:21, 36:22, 36:25, 80:10, 120:13, 120:17, 120:20, 121:8, 128:25, 131:8
Heights [4] - 54:16, 54:19, 54:21, 54:22
held [2] - 60:8, 71:24
Help [2] - 4:24, 111:5
help [3] - 17:12, 48:3, 53:2
helped [3] - 97:18, 119:21
helping [2] - 17:10, 17:13
helps [2] - 79:4, 104:2
herder [1] - 34:10
Herman [1] - 125:4
HERMAN [1] - 1:23
high [14] - 21:2, 32:25, 33:4, 60:23, 92:20, 93:9, 128:18, 128:23, 130:2, 130:6, 130:11, 130:13, 131:11, 131:17
highlight [2] - 91:25, 109:2
highlighted [2] - 11:18, 84:25
highlighting [1] - 106:25
highly [1] - 91:15
himself [1] - 111:20
hinge [1] - 119:25
Hispanic [13] - 20:12, 20:16, 30:4, 55:11, 55:16, 55:18, 60:5, 60:21, 63:12, 63:22, 79:12, 110:18, 114:22
Hispanic/white [1] - 56:8
Hispanics [7] - 45:14, 110:17, 112:16, 112:18, 113:2, 113:15, 116:22
historian [1] - 85:6
historian's [2] - 88:15, 88:19
historians [1] - 52:8
historical [8] - 53:19, 53:20, 54:23, 55:5, 55:6, 85:14, 94:24, 113:20
history [6] - 47:25, 51:9, 85:1, 85:16, 85:19, 120:22
hold [6] - 22:9, 33:7, 57:22, 64:19, 93:2, 93:3, 94:8, 111:1, 118:11
HOLDER [1] - 1:5
Holder [3] - 19:10, 47:8, 107:9
holding [1] - 69:17
home [2] - 107:12, 129:1
homeowner [1] - 79:24
Honor [48] - 6:11, 6:15, 6:17, 15:16, 17:11, 17:16, 18:11, 19:7, 19:14, 28:12, 32:1, 35:3, 36:17, 37:2, 38:6, 41:24, 42:2, 42:12, 44:11, 46:23, 68:1, 76:10, 76:20, 80:10, 80:21, 85:24, 100:13, 109:11, 109:14, 110:25, 111:3, 117:10, 120:11, 120:13, 124:24, 125:3, 125:13, 125:20, 126:4, 127:10, 127:14, 127:23, 128:5, 128:12, 130:24, 131:4, 131:23, 132:4
HONORABLE [3] - 1:12, 1:13, 1:13
Honors [3] - 47:7,

47:14, 81:23
**hop** [2] - 33:19
**hope** [2] - 111:15, 121:18
**hospital** [4] - 58:15, 58:16, 58:20, 58:21
**hotel** [1] - 130:7
**hour** [1] - 6:2
**hourly** [2] - 33:8, 33:24
**hours** [1] - 6:1
**house** [6] - 61:19, 61:20, 62:2, 62:12, 80:1
**House** [57] - 5:9, 19:11, 20:1, 20:5, 21:10, 21:14, 21:19, 22:22, 25:11, 25:13, 26:10, 26:20, 27:10, 27:13, 27:20, 27:24, 29:5, 32:5, 32:9, 32:11, 32:15, 32:22, 34:19, 37:15, 37:24, 38:16, 38:19, 39:12, 41:10, 41:21, 42:1, 42:14, 42:19, 43:15, 45:4, 45:11, 45:22, 45:23, 55:22, 58:2, 59:16, 59:17, 65:18, 70:14, 71:11, 72:6, 97:2, 97:5, 98:4, 98:5, 98:21, 99:13, 100:9, 100:11, 100:14, 100:17
**houses** [2] - 55:24, 60:18
**Houston** [6] - 2:21, 35:24, 58:6, 58:13, 79:12, 99:4
**Hubbard** [1] - 1:24
**Hughes** [7] - 6:15, 7:1, 18:9, 80:19, 81:1, 111:14, 118:14
**HUGHES** [47] - 1:22, 6:11, 6:14, 6:20, 6:23, 16:1, 17:5, 17:11, 17:16, 17:17, 18:8, 72:17, 76:10, 76:15, 76:18, 80:21, 80:24, 81:23, 81:25, 85:24, 86:1, 100:13, 100:18, 100:22, 100:24, 105:5, 105:9, 106:14, 106:16, 107:11, 107:13, 107:17, 107:20, 109:11, 109:14, 109:16, 111:6, 111:12, 111:15, 111:17,

117:2, 117:5, 117:22, 118:4, 118:16, 118:21, 119:1
**human** [1] - 53:5
**Hunt** [2] - 84:3, 84:4
**Hunter** [1] - 50:3

**I**

**ID** [106] - 5:20, 10:10, 12:8, 12:13, 12:16, 15:5, 23:1, 23:8, 23:20, 23:23, 24:18, 25:11, 25:14, 25:25, 26:5, 26:8, 27:8, 27:25, 28:1, 31:2, 31:4, 31:6, 33:21, 34:20, 41:3, 41:9, 43:3, 44:5, 44:25, 45:2, 45:7, 45:17, 58:24, 59:1, 59:11, 63:1, 69:13, 70:1, 71:25, 72:1, 72:7, 74:15, 76:4, 87:6, 87:7, 87:12, 87:17, 87:20, 87:25, 88:11, 88:25, 89:9, 89:18, 91:22, 92:17, 93:21, 94:3, 94:22, 94:23, 95:1, 95:2, 95:12, 95:24, 96:3, 97:19, 98:5, 105:24, 106:3, 107:22, 108:10, 108:18, 109:20, 109:22, 110:19, 111:7, 111:22, 112:13, 112:16, 113:15, 113:22, 114:23, 115:12, 115:20, 116:2, 116:4, 116:8, 116:14, 116:19, 116:23, 116:25, 117:14, 123:21, 123:25, 125:10, 126:8, 130:2, 130:6, 130:8, 130:11, 130:13, 130:15, 131:12, 131:17
**idea** [5] - 68:10, 76:7, 77:24, 108:5, 112:20
**ideals** [1] - 73:23
**identical** [1] - 108:17
**identification** [35] - 11:8, 17:20, 21:17, 21:24, 22:17, 22:20, 22:23, 29:19, 30:8, 30:15, 31:5, 31:12, 33:12, 43:24, 57:3, 59:6, 59:9, 74:18,

123:9, 123:14, 123:18, 124:6, 124:9, 124:18, 125:8, 125:15, 125:18, 125:25, 126:6, 126:14, 126:15, 126:16, 126:17, 128:6, 128:7
**Identification** [1] - 125:24
**identifications** [1] - 25:21
**identified** [8] - 35:19, 75:12, 87:16, 87:19, 87:24, 95:20, 109:22, 112:12
**identify** [7] - 21:15, 35:18, 37:4, 74:16, 74:23, 81:11, 100:12
**identifying** [2] - 12:14, 74:12
**IDs** [8] - 5:2, 25:20, 25:23, 76:5, 76:6, 77:9, 79:11
**ignore** [2] - 113:23, 114:1
**IL** [1] - 1:25
**ill** [4] - 107:25, 108:10, 108:12, 108:15
**illegal** [8] - 25:3, 25:10, 68:11, 71:23, 72:1, 72:4, 72:7, 72:11
**illegally** [1] - 69:8
**imagine** [3] - 15:23, 34:4, 46:13
**immensely** [1] - 46:14
**immigrant** [1] - 25:3
**immoral** [1] - 46:16
**impact** [18] - 27:21, 27:24, 29:21, 32:6, 32:10, 32:17, 33:10, 33:16, 37:15, 37:16, 38:2, 54:12, 54:13, 67:2, 77:5, 77:22, 78:13, 79:10
**impermissibly** [1] - 88:12
**impersonation** [13] - 22:20, 23:9, 23:11, 23:14, 23:15, 24:11, 24:13, 24:18, 25:2, 25:17, 26:2, 26:11, 26:12
**implausible** [2] - 70:23, 71:17
**implementation** [2] - 29:17, 45:19
**implications** [2] - 7:24, 10:13

**implicitly** [1] - 115:2
**importance** [1] - 55:9
**important** [30] - 20:19, 20:21, 20:23, 27:5, 27:6, 34:6, 34:7, 34:12, 39:5, 40:20, 45:15, 53:21, 53:23, 54:6, 54:7, 54:9, 54:12, 54:13, 55:8, 55:20, 57:16, 60:1, 69:10, 75:5, 91:14, 105:18, 105:22, 109:3, 126:5
**impossible** [5] - 50:16, 61:12, 62:19, 73:12, 73:15
**in-person** [25] - 18:23, 23:9, 24:13, 48:17, 68:11, 68:18, 70:4, 70:7, 90:22, 91:6, 91:16, 91:21, 92:18, 92:25, 93:13, 93:20, 94:2, 94:4, 94:7, 94:12, 94:14, 94:18, 94:21, 95:13, 95:24
**INC** [1] - 3:7
**incidence** [6] - 65:19, 66:17, 66:21, 77:8, 77:12
**incident** [1] - 60:12
**incidents** [2] - 23:13, 24:23
**inclined** [1] - 114:4
**include** [2] - 51:20, 76:14
**includes** [1] - 20:10
**including** [7] - 7:6, 31:8, 68:21, 72:8, 87:11, 113:1, 114:7
**income** [2] - 21:3, 21:5
**incorporated** [1] - 126:22
**incorrect** [1] - 125:6
**increase** [9] - 5:22, 26:14, 26:16, 26:17, 26:21, 27:11, 27:19, 87:25, 94:11
**increasing** [4] - 56:11, 89:19, 90:4, 109:20
**increasingly** [2] - 56:1, 56:8
**indeed** [1] - 120:9
**indefinitely** [1] - 59:18
**independent** [1] - 14:18
**Indiana** [8] - 26:22, 26:24, 27:5, 53:14, 66:16, 90:4, 90:23, 107:23

**Indiana's** [4] - 88:25, 89:9, 89:18, 108:18
**indicated** [2] - 7:13, 44:3
**indicative** [1] - 105:21
**infer** [1] - 77:20
**inferences** [1] - 67:1
**inform** [2] - 79:4, 93:3
**information** [7] - 78:6, 78:12, 78:16, 78:20, 100:8, 100:14, 130:21
**informative** [1] - 74:11
**initial** [4] - 23:18, 57:10, 57:12, 68:20
**Injustice** [5] - 81:7, 81:12, 84:23, 120:5, 121:2
**Injustice"** [1] - 52:24
**inquiries** [1] - 7:21
**inquiry** [4] - 5:24, 7:17, 69:25, 78:5
**insisted** [1] - 58:16
**instance** [1] - 115:19
**instances** [6] - 29:2, 70:2, 95:14, 95:19, 104:11, 115:18
**instead** [1] - 125:9
**Institute** [1] - 48:1
**institutional** [1] - 54:8
**insurance** [1] - 124:4
**integrity** [10] - 25:4, 25:10, 25:12, 26:13, 27:14, 27:19, 40:20, 68:13, 70:12, 70:21
**intended** [2] - 68:18, 79:18
**Intent** [1] - 51:23
**intent** [28] - 48:16, 49:5, 49:8, 49:19, 49:21, 50:8, 50:11, 51:21, 52:1, 53:3, 54:14, 65:22, 75:9, 78:10, 78:19, 78:20, 79:23, 88:7, 88:25, 102:9, 102:21, 106:6, 107:25, 108:10, 108:12, 108:15, 114:10, 120:4
**intention** [1] - 74:20
**intentional** [4] - 14:22, 89:24, 90:12, 104:3
**intentionally** [2] - 28:24, 80:3
**intentions** [5] - 48:14, 49:13, 52:25, 75:15, 114:3
**interest** [3] - 39:24, 90:21, 119:20

**interesting** [7] - 25:15, 25:23, 72:5, 74:11, 75:8, 79:5, 79:21
**interests** [3] - 73:24, 79:2
**interim** [4] - 22:16, 22:19, 38:17, 39:7
**interned** [1] - 123:6
**internships** [2] - 123:6, 123:8
**interpretation** [1] - 126:24
**interrupt** [2] - 57:12, 64:7
**intervening** [1] - 85:2
**INTERVENOR** [1] - 122:7
**Intervenor** [3] - 1:10, 2:12, 127:22
**Intervenor's** [1] - 124:20
**INTERVENOR-DEFENDANT** [1] - 122:7
**Intervenor-Defendants** [1] - 1:10
**intervenors** [6] - 35:16, 120:18, 121:22, 121:24, 122:2, 122:3
**interview** [1] - 7:23
**interviews** [1] - 9:4
**introduce** [2] - 19:8, 47:24
**introducing** [1] - 29:12
**introduction** [2] - 124:25, 125:5
**introductory** [1] - 92:4
**invalid** [1] - 54:25
**invalidly** [1] - 25:6
**investigate** [2] - 50:23, 91:11
**investigated** [1] - 70:2
**investigation** [7] - 69:14, 91:16, 91:17, 91:20, 93:20, 94:13, 94:21
**investigations** [1] - 93:5
**invitation** [3] - 22:4, 22:5, 39:21
**invite** [1] - 39:22
**invited** [1] - 39:19
**involved** [6] - 22:16, 24:6, 33:17, 49:18, 49:20, 123:12
**involving** [1] - 63:12
**ironclad** [1] - 26:5

**Irving** [1] - 20:10
**issue** [18] - 7:20, 13:6, 22:20, 24:17, 24:21, 34:6, 39:1, 42:3, 43:11, 51:16, 73:5, 73:7, 75:10, 96:15, 108:9, 108:19, 110:22, 127:7
**issued** [1] - 17:25
**issues** [10] - 12:10, 22:17, 23:16, 24:18, 28:2, 32:2, 51:12, 52:7, 105:19
**its's** [1] - 116:14
**itself** [8] - 29:2, 80:12, 99:9, 111:6, 111:12, 119:9, 119:10, 126:14

**J**

**JA** [2] - 29:8, 30:19
**JACOBSON** [1] - 2:23
**January** [1] - 20:6
**JENNIFER** [1] - 2:4
**Jim** [1] - 46:13
**job** [1] - 33:24
**jobs** [1] - 33:8
**Joe** [1] - 104:15
**John** [2] - 6:15, 7:1
**JOHN** [2] - 1:16, 1:22
**joined** [6] - 62:18, 82:23, 84:10, 84:17, 86:16
**JONATHAN** [1] - 1:17
**Jorge** [1] - 121:19
**Jose** [2] - 37:6, 37:8
**JOSEPH** [1] - 2:15
**JR** [1] - 1:5
**Judge** [7] - 19:4, 35:17, 37:5, 76:25, 79:22, 120:6, 120:16
**JUDGE** [116] - 1:12, 4:2, 6:10, 6:13, 6:18, 6:21, 17:4, 17:6, 17:13, 18:9, 18:12, 18:15, 18:17, 19:2, 19:5, 19:8, 19:15, 28:13, 31:17, 31:19, 31:23, 35:4, 35:17, 35:22, 35:25, 36:19, 37:1, 37:4, 37:9, 38:4, 42:6, 46:24, 47:3, 47:10, 47:13, 47:15, 48:2, 48:6, 52:15, 64:7, 64:10, 64:18, 64:19, 64:22, 65:1, 65:7, 65:15, 65:23, 66:4, 67:5, 67:7, 67:10, 67:19, 67:24, 72:18, 72:19,

72:24, 73:4, 74:3, 76:16, 76:19, 76:21, 80:8, 80:11, 80:16, 85:25, 100:12, 100:20, 105:1, 105:7, 107:15, 107:19, 109:5, 109:12, 109:15, 111:1, 111:8, 111:14, 111:16, 117:9, 118:2, 118:7, 118:11, 118:18, 118:23, 119:4, 119:11, 120:12, 120:15, 121:9, 121:13, 121:23, 122:3, 125:1, 125:12, 126:2, 126:12, 126:25, 127:8, 127:11, 127:18, 127:21, 127:24, 128:4, 128:8, 128:11, 128:13, 128:21, 128:24, 131:1, 131:6, 131:16, 131:19, 131:21, 131:25, 132:5
**JUDGES** [1] - 1:14
**judicial** [3] - 79:3, 107:11, 107:15
**July** [2] - 1:6, 17:3
**June** [3] - 12:22, 44:3, 106:19
**jury** [1] - 127:6
**JUSTICE** [2] - 2:7
**Justice** [21] - 47:9, 52:22, 81:10, 82:23, 82:24, 83:17, 84:7, 84:9, 84:16, 85:15, 86:12, 86:15, 86:24, 89:13, 90:14, 95:5, 96:20, 110:11
**Justice's** [1] - 87:21
**justices** [2] - 84:10, 84:17
**Justices** [3] - 82:24, 83:18, 86:16
**justification** [6] - 22:23, 22:25, 25:2, 25:7, 26:10, 26:15
**justifications** [3] - 23:18, 24:15, 26:8

**K**

**K-O-U-S-S-E-R** [1] - 48:5
**keep** [8] - 5:17, 62:17, 64:20, 65:24, 75:16, 76:17, 79:25, 105:4

**Kennedy** [3] - 82:24, 83:18, 86:16
**Kennie** [2] - 35:15, 120:18
**KENNIE** [1] - 1:9
**key** [2] - 54:3, 54:4
**kill** [1] - 62:15
**kind** [12] - 6:10, 8:1, 12:2, 12:8, 12:13, 12:14, 81:2, 92:3, 100:8, 118:16, 118:18, 124:13
**kinds** [3] - 51:12, 75:22, 94:17
**knowledge** [3] - 44:4, 45:3, 54:24
**knowledgeably** [1] - 12:9
**known** [2] - 50:3, 54:15
**knows** [1] - 83:6
**Kousser** [56] - 47:5, 47:22, 48:5, 49:15, 50:21, 52:11, 52:17, 60:14, 64:14, 64:22, 68:3, 74:5, 76:21, 77:2, 78:18, 80:7, 80:25, 81:20, 82:1, 82:4, 82:13, 84:8, 84:15, 85:22, 86:2, 88:10, 88:17, 90:1, 90:25, 92:2, 93:6, 94:25, 95:4, 96:19, 97:23, 98:19, 100:25, 101:4, 104:25, 105:10, 106:17, 106:21, 109:17, 110:8, 111:18, 112:4, 112:6, 112:8, 114:12, 115:11, 117:6, 117:13, 118:12, 119:7, 120:21, 121:10
**Kousser's** [1] - 76:11
**Kozinski** [1] - 79:22
**Kozinski's** [1] - 120:6
**KROUSSER** [1] - 47:18
**KXAN** [5] - 8:22, 9:4, 9:13, 9:23, 13:9

**L**

**LA** [1] - 51:23
**lack** [2] - 71:3, 110:16
**lacked** [2] - 70:20, 71:14
**ladder** [2] - 21:8, 34:5
**language** [3] - 20:22, 85:9, 93:10

**large** [8] - 24:20, 66:25, 67:14, 69:15, 70:6, 72:10, 74:12
**larger** [2] - 42:24, 96:25
**largest** [1] - 36:9
**last** [11] - 17:25, 21:2, 47:10, 58:7, 62:23, 76:2, 82:19, 84:21, 84:22, 90:17, 109:17
**late** [4] - 73:14, 73:22, 106:20, 107:1
**later..** [1] - 76:17
**Latina** [1] - 77:14
**Latino** [7] - 19:22, 19:23, 50:17, 56:9, 73:22, 85:21, 102:4
**Latinos** [2] - 33:15, 56:17
**laudable** [1] - 40:24
**launched** [1] - 69:14
**law** [42] - 4:25, 7:24, 11:24, 14:11, 35:18, 35:19, 35:20, 35:24, 41:1, 51:20, 53:11, 53:13, 53:14, 53:21, 64:5, 66:18, 66:21, 67:3, 68:5, 87:7, 87:12, 87:17, 87:20, 87:25, 88:11, 88:25, 89:9, 89:18, 97:19, 101:24, 107:22, 108:10, 109:20, 109:22, 109:23, 113:15, 113:16, 114:2, 114:3, 116:23, 123:6, 125:4
**Law** [1] - 37:8
**lawful** [2] - 46:11, 46:12
**laws** [12] - 46:13, 48:21, 48:23, 48:25, 49:2, 49:9, 52:1, 53:1, 92:17, 95:9, 108:17
**lawsuits** [1] - 49:24
**lawyers** [1] - 34:12
**lays** [1] - 32:12
**leader** [1] - 77:13
**leadership** [2] - 60:8, 110:20
**leading** [5] - 36:18, 56:25, 72:17, 130:24, 131:1
**leads** [1] - 85:16
**learn** [3] - 7:23, 45:6, 52:9
**learned** [2] - 14:20, 24:2
**leash** [1] - 90:2

**least** [9] - 11:22, 30:12, 57:17, 61:22, 66:16, 76:25, 77:18, 113:4, 127:9
**leave** [2] - 33:18, 33:24
**leaving** [1] - 62:5
**led** [1] - 69:11
**left** [2] - 50:16, 101:4
**legacies** [1] - 85:3
**LEGAL** [1] - 3:2
**legal** [1] - 77:9
**legislation** [6] - 10:24, 21:15, 21:24, 37:17, 40:2, 65:20
**Legislative** [4] - 19:25, 27:22, 29:1, 37:7
**legislative** [21] - 4:12, 7:15, 8:2, 8:8, 42:3, 49:18, 50:11, 51:7, 53:3, 58:16, 58:18, 59:20, 60:17, 68:10, 97:10, 109:4, 110:2, 110:4, 115:2, 118:4, 120:21
**legislator's** [1] - 78:19
**legislators** [5] - 60:5, 60:7, 75:6, 77:21, 115:5
**legislature** [42] - 4:18, 21:14, 21:17, 22:6, 23:2, 23:21, 23:22, 28:4, 31:20, 37:16, 37:19, 37:21, 38:1, 39:22, 46:4, 48:15, 55:25, 60:20, 61:20, 61:21, 62:3, 62:24, 65:2, 66:5, 68:14, 68:17, 68:21, 69:9, 71:5, 72:15, 75:3, 75:15, 77:3, 77:4, 78:11, 87:11, 89:22, 90:6, 101:20, 106:10, 118:5, 119:14
**legislature's** [1] - 79:1
**legislatures** [2] - 49:5, 60:22
**legitimacy** [3] - 102:19, 103:15, 103:21
**legitimate** [2] - 102:10, 102:12
**length** [2] - 84:6, 99:19
**less** [4] - 25:9, 53:19, 78:4, 110:18
**Lessons** [1] - 51:23
**Leticia** [1] - 77:14

**level** [1] - 35:12
**levels** [2] - 111:21, 112:13
**liaison** [2] - 121:17
**LIBERTIES** [1] - 3:7
**license** [35] - 4:9, 5:7, 5:23, 7:10, 7:15, 9:24, 10:1, 10:6, 11:7, 13:2, 13:3, 13:17, 14:1, 14:3, 14:14, 14:20, 14:25, 15:2, 15:5, 15:10, 16:3, 16:6, 16:7, 16:18, 17:1, 17:22, 18:3, 26:1, 35:6, 123:16, 123:20, 124:1, 124:3, 125:14
**licenses** [2] - 18:5, 33:13
**Lieutenant** [2] - 63:2, 71:22
**life** [1] - 34:10
**light** [2] - 21:5, 70:4
**likely** [4] - 10:22, 43:4, 78:4, 119:22
**Lillian** [1] - 121:4
**limit** [2] - 66:6, 90:2
**limits** [1] - 82:5
**line** [5] - 33:20, 71:10, 86:2, 86:5, 86:8
**lines** [2] - 53:21, 53:22
**list** [8] - 34:21, 63:3, 69:8, 70:6, 127:16, 127:24, 129:5, 129:8
**listed** [1] - 128:17
**listening** [1] - 40:16
**lists** [2] - 95:11, 124:21
**literacy** [2] - 48:24, 48:25
**litigation** [1] - 99:20
**live** [1] - 7:11
**liver** [2] - 58:14, 58:19
**LLP** [4] - 1:23, 2:12, 2:23, 121:16
**local** [7] - 41:23, 42:15, 42:22, 59:21, 69:17, 93:3, 94:9
**located** [1] - 20:8
**location** [1] - 23:10
**look** [25] - 17:14, 17:22, 27:1, 31:24, 52:3, 53:17, 54:5, 54:9, 61:1, 66:8, 66:14, 74:5, 84:21, 88:5, 88:17, 93:4, 100:2, 100:5, 101:2, 101:17, 102:13, 107:14, 118:15, 127:2, 127:16

**looked** [16] - 16:6, 24:21, 51:7, 51:8, 51:10, 52:5, 87:4, 99:9, 101:15, 101:16, 103:8, 103:10, 114:6, 120:23
**looking** [8] - 15:24, 18:7, 25:25, 75:2, 86:2, 94:6, 94:8, 107:17
**looks** [3] - 17:15, 74:8, 74:25
**Los** [1] - 50:13
**losing** [2] - 55:18, 70:25
**lost** [2] - 70:24, 71:7
**love** [1] - 127:11
**low** [1] - 33:13
**lower** [5] - 30:6, 33:11, 61:19, 61:20, 62:2
**lowest** [2] - 21:7, 34:4
**Luis** [3] - 121:21, 122:1, 122:4
**LUIS** [1] - 3:2
**lunch** [4] - 4:8, 6:9, 6:15, 7:1

**M**

**ma'am** [4] - 4:2, 19:9, 64:9, 122:5
**machine** [1] - 3:14
**mail** [3] - 24:6, 24:23, 129:11
**mail-in** [2] - 24:6, 24:23
**maintain** [2] - 66:10, 67:12
**major** [4] - 55:16, 55:25, 59:5, 75:13
**majority** [17] - 43:24, 55:11, 56:10, 57:9, 60:21, 61:25, 62:2, 102:15, 103:17, 104:6, 108:24, 113:15, 114:2, 114:4, 114:9, 114:22, 118:10
**majority/minority** [1] - 55:11
**makers** [1] - 54:4
**MALDEF** [4] - 121:20, 121:22, 121:24, 123:7
**man** [1] - 69:23
**manage** [1] - 129:25
**manipulated** [1] - 116:3
**manipulation** [1] -

116:24
**manner** [1] - 49:2
**map** [3] - 20:17, 118:24
**MARANZANO** [1] - 2:4
**March** [6] - 8:19, 9:2, 9:13, 9:23, 14:1, 95:20
**Margo** [1] - 41:14
**marked** [7] - 10:17, 11:17, 17:19, 81:24, 88:18, 93:15, 98:19
**marks** [1] - 83:12
**marshaling** [1] - 106:4
**Martinez** [7] - 6:24, 10:21, 16:25, 17:18, 31:1, 31:10, 37:12
**MARTINEZ** [1] - 4:4
**Mary's** [2] - 122:21, 129:18
**matching** [1] - 66:24
**materials** [2] - 51:5, 51:11
**matter** [7] - 23:10, 39:23, 64:8, 107:18, 115:12, 125:10, 132:13
**matters** [2] - 104:1, 109:10
**MATTHEW** [1] - 1:16
**Maxwell** [1] - 40:13
**MC-059** [1] - 1:19
**McGeehan** [2] - 40:8, 44:20
**MCKENZIE** [1] - 1:16
**mean** [13] - 8:6, 11:9, 25:13, 62:10, 66:12, 67:15, 82:13, 101:10, 103:1, 108:3, 114:3, 114:9, 114:10
**means** [5] - 5:3, 22:19, 85:17, 85:18
**meant** [7] - 49:8, 49:10, 62:3, 73:8, 74:20, 85:19, 101:14
**measurably** [1] - 110:18
**mechanism** [2] - 25:16, 34:23
**media** [9] - 7:23, 8:13, 10:12, 11:13, 11:14, 12:9, 12:12, 12:16, 116:16
**medical** [1] - 14:16
**meet** [1] - 47:3
**meetings** [2] - 93:3, 94:9
**member** [10] - 19:22, 19:24, 20:1, 20:5,

22:18, 39:12, 39:19, 46:22, 87:11, 119:16
**members** [35] - 7:23, 14:11, 22:5, 22:6, 25:21, 26:5, 27:22, 28:3, 28:5, 29:1, 31:19, 32:22, 37:14, 37:16, 37:20, 37:25, 38:1, 39:22, 40:15, 41:10, 46:3, 57:7, 57:8, 57:9, 60:11, 63:8, 66:4, 75:4, 77:7, 79:17, 97:2, 97:5, 101:20, 104:22, 120:1
**memory** [1] - 9:6
**mention** [9] - 80:16, 94:4, 94:6, 94:12, 94:22, 95:1, 95:2, 95:3, 95:8
**mentioned** [8] - 81:4, 81:7, 84:17, 91:10, 95:24, 95:25, 96:17
**mentioning** [1] - 39:8
**MEREDITH** [1] - 2:3
**merely** [1] - 29:22
**message** [2] - 115:14, 116:13
**met** [2] - 7:1, 38:11
**metaphor** [1] - 79:23
**method** [1] - 51:24
**methodologies** [1] - 51:15
**methodology** [8] - 51:6, 51:16, 51:17, 52:12, 54:18, 54:24, 55:2, 87:5
**MEXICAN** [1] - 3:2
**Mexican** [4] - 19:25, 27:22, 29:1, 37:6
**Mexico** [1] - 34:8
**Michael** [1] - 19:21
**microphone** [5] - 32:8, 32:11, 32:13, 32:14, 125:1
**middle** [4] - 62:17, 76:22, 79:10, 79:11
**might** [13] - 5:14, 9:5, 21:22, 27:2, 28:15, 34:21, 51:25, 54:4, 77:24, 112:17, 118:13, 118:14
**military** [2] - 15:5, 123:21
**million** [5] - 4:20, 4:23, 69:16, 76:2, 76:8
**millions** [1] - 10:22
**mind** [6] - 14:13, 14:14, 26:4, 27:15,

105:2, 106:13
**mindful** [1] - 17:12
**minimum** [1] - 86:25
**minorities** [21] - 43:4,
60:22, 61:7, 61:9,
61:12, 63:19, 65:4,
67:14, 67:17, 71:12,
73:1, 73:14, 75:4,
78:4, 79:18, 104:10,
104:22, 112:1,
114:19, 116:15,
119:24
**minority** [57] - 7:6,
26:23, 27:21, 27:25,
28:3, 29:20, 30:7,
32:6, 32:10, 37:16,
38:1, 41:9, 41:10,
45:15, 56:10, 57:8,
60:8, 60:11, 63:7,
63:8, 63:9, 63:15,
63:19, 63:24, 63:25,
64:2, 66:6, 75:6,
77:5, 77:7, 77:13,
77:21, 77:22, 77:25,
79:15, 79:17, 88:7,
101:20, 102:1,
102:7, 102:13,
102:15, 102:24,
103:11, 103:13,
103:16, 103:17,
103:22, 103:24,
104:6, 104:10,
104:12, 104:15,
104:22, 114:13
**minority-preferred** [1]
- 102:1
**minus** [1] - 5:17
**minute** [9] - 35:16,
36:4, 46:6, 62:23,
65:24, 111:2,
115:12, 118:11,
118:23
**minutes** [4] - 59:19,
59:23, 131:22, 132:1
**miscegenation** [1] -
50:6
**mischaracterized** [1] -
14:24
**misleading** [1] - 111:4
**misrepresent** [1] -
15:6
**misspoke** [1] - 42:19
**misunderstand** [1] -
127:12
**MITCHELL** [1] - 1:17
**model** [2] - 108:20,
115:2
**modeled** [1] - 107:22
**models** [1] - 53:5
**mom** [2] - 14:17, 16:6

**mom's** [1] - 16:2
**moment** [2] - 46:18,
80:22
**money** [4] - 4:19, 4:21,
5:1, 33:24
**monies** [1] - 4:24
**month** [2] - 38:11,
58:15
**months** [1] - 69:4
**MORGAN** [2] - 47:18,
48:4
**Morgan** [1] - 48:4
**morning** [1] - 131:3
**Morning** [9] - 69:4,
96:12, 105:24,
106:8, 106:17,
107:16, 108:3,
109:1, 109:8
**Mortara** [1] - 90:2
**MORTARA** [4] - 1:21,
80:14, 131:23, 132:4
**most** [12] - 7:18,
50:13, 60:7, 60:10,
69:10, 72:4, 79:5,
79:9, 110:14,
119:22, 126:5
**mostly** [3] - 18:24,
79:16
**mother** [16] - 9:25,
10:22, 12:3, 13:2,
14:6, 14:7, 14:18,
14:22, 14:23, 15:8,
15:10, 15:22, 34:8,
34:11, 124:11
**mother's** [4] - 13:17,
16:23, 17:8, 17:21
**motion** [1] - 32:3
**motivated** [1] - 87:12
**motive** [6] - 65:9,
65:10, 67:15, 92:11,
92:12, 92:14
**motives** [1] - 53:12
**move** [5] - 63:4, 92:8,
109:10, 127:13,
131:4
**moved** [3] - 21:18,
25:2, 80:2
**moving** [1] - 64:8
**MR** [123] - 6:11, 6:14,
6:20, 6:23, 15:15,
16:1, 17:5, 17:11,
17:16, 17:17, 18:8,
18:11, 28:11, 35:15,
35:20, 35:23, 36:3,
36:17, 36:21, 36:22,
36:25, 37:2, 37:6,
37:11, 38:6, 38:8,
42:2, 42:12, 42:13,
44:8, 47:5, 47:7,
47:12, 47:14, 47:17,

47:21, 48:7, 52:13,
52:16, 64:9, 64:21,
68:1, 68:2, 72:17,
74:4, 76:10, 76:15,
76:18, 76:20, 76:24,
77:1, 80:6, 80:10,
80:14, 80:21, 80:24,
81:23, 81:25, 85:24,
86:1, 100:13,
100:18, 100:22,
100:24, 105:5,
105:9, 106:14,
106:16, 107:11,
107:13, 107:17,
107:20, 109:11,
109:14, 109:16,
110:25, 111:3,
111:6, 111:12,
111:15, 111:17,
117:2, 117:5,
117:10, 117:12,
117:21, 117:22,
118:4, 118:8,
118:16, 118:21,
119:1, 119:6,
119:13, 120:10,
120:13, 120:17,
120:20, 121:8,
121:16, 121:21,
122:1, 122:10,
125:11, 125:13,
126:4, 126:11,
126:13, 127:7,
127:14, 127:15,
127:19, 127:23,
128:1, 128:10,
128:12, 128:14,
128:25, 131:4,
131:8, 131:15,
131:23, 132:4
**MS** [29] - 4:3, 4:7, 6:4,
6:8, 18:14, 18:18,
18:20, 19:1, 19:7,
19:9, 19:14, 19:19,
28:18, 29:8, 29:11,
30:19, 30:22, 32:4,
35:2, 41:24, 44:11,
44:13, 46:23,
124:24, 125:3,
125:20, 127:10,
128:5, 130:24
**multiperson** [1] -
59:17
**multiplied** [1] - 76:9
**multiplies** [1] - 73:25
**municipality** [1] - 36:9
**must** [5] - 53:12,
53:15, 59:15,
125:15, 125:25

**N**

**NAACP** [1] - 37:7
**naive** [1] - 115:6
**name** [17] - 9:11, 9:16,
16:23, 16:24, 19:9,
19:20, 41:13, 47:7,
47:10, 48:2, 88:23,
89:2, 89:5, 89:14,
121:25, 122:11,
122:12
**names** [1] - 83:18
**NANCY** [1] - 3:6
**NAPIER** [1] - 1:17
**narrative** [2] - 97:13,
98:13
**narrowing** [1] - 74:18
**nastier** [3] - 58:10,
58:11, 58:12
**nasty** [1] - 58:9
**nation** [1] - 83:12
**National** [1] - 19:23
**national** [5] - 10:9,
11:3, 15:4, 15:12,
108:18
**nature** [2] - 36:18,
111:4
**near** [3] - 13:18, 16:3,
112:23
**necessarily** [2] -
29:21, 115:15
**necessity** [2] - 64:5,
68:5
**need** [10] - 10:3, 17:4,
17:8, 18:5, 18:24,
34:17, 80:21, 82:4,
109:12, 127:8
**needed** [5] - 5:19, 6:9,
62:16
**needs** [2] - 14:12,
124:12
**negative** [2] - 8:6,
32:6
**neighborhood** [1] -
80:2
**neutral** [7] - 87:16,
87:19, 87:24, 88:3,
90:5, 109:18, 115:23
**never** [8] - 14:19,
28:21, 46:5, 70:18,
77:18, 104:4, 105:2,
113:10
**nevertheless** [3] -
39:9, 42:25, 113:16
**New** [3] - 2:24, 2:25,
11:13
**new** [4] - 5:18, 20:17,
26:15, 64:8
**newly** [4] - 10:24,
30:4, 126:22, 126:23

**news** [5] - 12:19,
13:12, 93:17, 94:20,
96:16
**News** [9] - 69:4, 96:12,
105:24, 106:9,
106:17, 107:16,
108:3, 109:1, 109:8
**newspaper** [6] - 51:8,
69:6, 96:13, 105:10,
105:11, 108:11
**newspapers** [6] -
96:9, 96:11, 96:12,
104:24, 106:3,
116:18
**next** [2] - 24:16, 36:13
**nice** [5] - 6:16, 6:18,
35:25, 47:3, 132:2
**Nichols** [1] - 69:24
**Nicole** [1] - 130:22
**night** [1] - 40:3
**nine** [3] - 59:23, 92:3,
92:8
**nine-and-a-half** [1] -
59:23
**NJ** [1] - 2:14
**nobody** [3] - 57:5,
71:6, 119:4
**non** [4] - 55:11, 55:18,
60:21, 74:15
**non-Hispanic** [3] -
55:11, 55:18, 60:21
**non-photo** [1] - 74:15
**noncitizen** [3] - 24:19,
24:23, 25:3
**none** [1] - 27:15
**nonphoto** [1] - 41:3
**nonvoting** [1] - 39:19
**normal** [2] - 42:7,
54:10
**normally** [1] - 51:11
**Northern** [1] - 34:9
**northern** [1] - 98:10
**note** [4] - 4:18, 4:20,
4:22, 27:5, 53:6,
111:10
**notes** [1] - 5:9
**nothing** [2] - 43:20,
46:23
**notice** [2] - 107:12,
107:15
**noticed** [1] - 12:12
**notion** [1] - 101:19
**November** [1] - 122:24
**now..** [1] - 17:12
**number** [12] - 5:19,
10:12, 24:8, 34:7,
40:3, 41:10, 56:20,
67:14, 74:12, 94:11,
105:14, 106:2
**Number** [2] - 30:21,

99:13
**numbers** [8] - 24:20, 24:24, 26:23, 26:25, 43:10, 72:10, 76:4
**numerous** [1] - 105:11
**NW** [2] - 2:9, 3:8
**NWB** [1] - 2:9
**NWB-Room** [1] - 2:9
**NY** [1] - 2:25

# O

**O'Connor** [5] - 82:23, 83:17, 84:9, 84:16, 86:15
**O'Connor's** [2] - 84:7, 86:24
**Oath** [3] - 19:13, 47:6, 122:6
**oath** [2] - 14:3, 15:22
**Obama** [1] - 61:20
**object** [6] - 36:17, 72:17, 76:10, 117:22, 124:24, 125:5
**objecting** [1] - 111:3
**objection** [10] - 15:15, 28:11, 41:24, 42:7, 109:6, 110:25, 111:1, 117:22, 127:1, 130:24
**obtain** [3] - 124:2, 124:8, 126:5
**obtained** [1] - 124:1
**obtaining** [1] - 31:2
**obviates** [1] - 37:18
**obviously** [3] - 60:9, 66:2, 112:11
**occur** [1] - 24:4
**occurred** [3] - 24:24, 42:4, 97:15
**occurs** [1] - 66:9
**OF** [8] - 1:2, 1:3, 1:11, 1:18, 1:18, 2:7, 132:9, 132:18
**off-year** [1] - 26:24
**offer** [2] - 28:20, 43:11
**offered** [10] - 13:13, 23:20, 25:15, 26:17, 71:2, 75:9, 75:22, 85:15, 92:15, 123:5
**offering** [2] - 78:18, 108:25
**offers** [1] - 33:5
**Office** [4] - 37:8, 92:19, 92:24, 93:8
**OFFICE** [1] - 1:18
**office** [3] - 14:12, 27:18, 29:24, 35:13, 40:13, 44:17, 45:20,

66:23, 69:24, 76:1, 77:15, 78:15
**officer** [3] - 30:2, 30:12, 46:1
**offices** [8] - 4:9, 4:14, 5:7, 5:23, 33:20, 36:23, 55:25
**OFFICIAL** [1] - 132:9
**Official** [2] - 1:6, 3:11
**official** [6] - 16:12, 16:17, 16:20, 17:20, 24:7, 66:23
**officials** [5] - 5:25, 24:8, 69:18, 87:10, 93:3, 94:9
**Officials** [1] - 19:24
**often** [8] - 12:18, 28:3, 32:1, 34:18, 46:6, 55:14, 57:21, 63:20
**old** [3] - 20:17, 81:2, 122:15
**omission** [1] - 14:22
**once** [1] - 85:5
**One** [2] - 2:24, 128:2
**one** [77] - 6:2, 10:22, 11:16, 11:17, 14:17, 18:7, 18:18, 20:24, 20:25, 21:6, 21:8, 22:13, 23:8, 25:18, 25:19, 28:5, 34:13, 35:4, 35:16, 37:2, 37:18, 39:3, 41:4, 50:13, 51:25, 53:3, 54:4, 57:19, 57:22, 57:25, 58:11, 58:13, 62:3, 62:9, 62:20, 62:22, 64:19, 64:20, 66:8, 66:19, 68:7, 69:7, 70:3, 71:9, 72:4, 73:12, 73:19, 75:8, 75:24, 79:5, 80:22, 82:7, 87:19, 88:24, 93:23, 93:24, 94:12, 97:17, 97:18, 106:8, 107:23, 109:17, 111:1, 111:25, 112:3, 112:15, 113:22, 117:14, 118:12, 118:21, 124:14, 126:5, 126:14, 127:3, 131:16
**one's** [1] - 108:19
**one-third** [2] - 57:19, 57:22
**ones** [3] - 25:22, 25:23, 124:15
**open** [8] - 9:22, 22:5, 39:20, 40:15, 62:6, 67:4, 75:3, 108:16

**opened** [1] - 86:3
**operation** [1] - 6:1
**opined** [1] - 119:14
**opinion** [30] - 43:11, 51:4, 74:7, 78:18, 79:4, 79:21, 83:19, 83:20, 84:7, 84:10, 84:17, 86:13, 86:16, 87:7, 87:10, 91:9, 91:14, 91:15, 92:14, 95:18, 105:21, 107:16, 108:25, 115:3, 115:7, 116:21, 116:25, 120:6
**opinions** [6] - 81:16, 83:11, 83:14, 83:23, 98:14, 119:25
**opponents** [3] - 5:6, 12:13, 40:1
**opportunity** [1] - 131:3
**oppose** [2] - 97:6, 106:3
**opposed** [4] - 8:7, 45:22, 49:11, 108:11
**opposing** [1] - 105:24
**opposition** [4] - 8:7, 8:11, 8:14, 49:14
**oppression** [1] - 24:7
**order** [9] - 22:10, 22:11, 31:4, 52:10, 76:4, 88:12, 91:22, 93:21, 94:3
**orders** [1] - 58:20
**organizations** [1] - 19:22
**origin** [1] - 20:23
**ought** [1] - 57:4
**ousted** [2] - 98:1, 98:8
**outcome** [2] - 61:14, 61:16
**outlets** [2] - 10:12, 13:13
**outside** [4] - 41:24, 68:9, 78:2, 99:4
**outspoken** [1] - 8:2
**overall** [1] - 91:14
**overlap** [1] - 54:18
**overwhelming** [3] - 56:6, 108:24, 114:8
**overwhelmingly** [13] - 63:20, 70:25, 98:10, 99:4, 99:7, 99:10, 100:3, 101:8, 101:13, 101:14, 101:15, 118:10, 119:10
**own** [3] - 33:2, 36:14, 52:4

# P

**P.C** [1] - 2:16
**P.M** [2] - 1:6, 1:11
**p.m** [4] - 1:10, 6:2, 64:17, 132:6
**package** [2] - 42:24, 96:25
**page** [19] - 11:22, 29:9, 30:20, 69:5, 76:14, 81:19, 81:21, 82:1, 82:7, 82:10, 82:14, 82:17, 84:1, 86:2, 86:3, 86:5, 86:8, 92:2, 97:22
**pages** [7] - 76:15, 76:16, 81:19, 82:7, 82:19, 84:1, 89:13
**Palenchar** [1] - 125:4
**PALENCHAR** [1] - 1:23
**paper** [8] - 51:20, 51:22, 60:13, 66:19, 68:25, 74:8, 92:10, 92:14
**paragraph** [8] - 84:21, 84:22, 86:5, 92:3, 92:8, 93:7, 93:13, 97:25
**paragraphs** [3] - 83:2, 87:4, 92:4
**parents** [1] - 129:7
**Parkinson's** [1] - 14:6
**part** [31] - 4:15, 42:23, 43:11, 50:19, 51:5, 54:22, 55:18, 63:17, 74:5, 76:25, 89:3, 89:7, 89:10, 89:11, 89:12, 90:18, 91:9, 91:14, 96:25, 97:13, 97:21, 98:13, 99:24, 101:17, 106:3, 108:25, 110:1, 110:2, 120:5, 125:21, 128:5
**Part** [1] - 128:2
**participants** [2] - 54:7, 71:19
**participated** [4] - 10:9, 11:20, 22:19, 88:15
**participating** [1] - 10:23
**participation** [1] - 4:12
**particular** [20] - 39:23, 49:6, 53:10, 53:14, 53:25, 54:9, 55:9, 56:17, 61:4, 61:18, 65:17, 66:14, 73:23, 77:10, 78:3, 91:21,

93:22, 105:22, 114:2, 119:5
**particularly** [21] - 52:1, 53:22, 54:13, 55:8, 55:20, 57:8, 57:16, 60:21, 61:10, 68:9, 74:21, 75:8, 75:23, 77:7, 77:13, 85:14, 89:11, 89:12, 90:17, 94:5, 112:1
**parties** [4] - 49:11, 49:12, 49:14, 57:8
**partisan** [12] - 60:14, 60:24, 65:11, 66:9, 67:11, 73:8, 73:19, 73:25, 79:2, 88:25, 89:25, 120:24
**partisanship** [1] - 60:24
**partly** [2] - 102:8, 102:20
**parts** [2] - 92:5, 126:21
**party** [4] - 56:22, 72:10, 73:21, 115:23
**Party** [10] - 49:11, 49:12, 55:21, 55:22, 56:7, 56:8, 57:9, 110:20, 119:21
**Paso** [3] - 96:13, 103:5, 103:13
**pass** [5] - 54:11, 58:2, 58:23, 97:19, 113:16
**passage** [13] - 7:19, 48:21, 52:25, 56:12, 56:13, 56:25, 60:6, 67:3, 71:12, 77:19, 107:7, 114:11, 126:20
**passed** [18] - 42:14, 49:9, 53:11, 53:13, 53:14, 53:15, 58:1, 61:17, 63:6, 68:4, 71:15, 73:18, 73:21, 88:11, 101:24, 106:5, 107:23, 108:24
**Passing** [1] - 108:17
**passing** [5] - 48:15, 64:6, 68:5, 70:11, 119:20
**passport** [3] - 11:7, 15:3, 123:21
**passports** [1] - 33:12
**past** [3] - 19:23, 92:8, 95:14
**Patricia** [6] - 32:15, 98:9, 98:17, 98:25, 99:12, 100:3
**PATRICK** [1] - 1:15

**pausing** [1] - 72:19
**pay** [2] - 33:24, 41:7
**PC** [1] - 35:21
**Peachtree** [1] - 3:8
**Pena** [4] - 41:14, 72:9, 103:1, 103:25
**penetration** [4] - 30:4, 30:7, 33:12, 44:25
**Pennsylvania** [1] - 2:9
**people** [33] - 5:4, 18:5, 18:25, 27:16, 31:2, 35:1, 45:1, 45:7, 50:6, 56:20, 60:10, 61:4, 61:5, 61:6, 61:8, 61:11, 66:4, 69:2, 69:5, 70:9, 73:20, 73:22, 76:3, 76:5, 76:7, 77:9, 78:2, 79:6, 79:13, 79:14, 80:2, 85:20, 119:22
**per** [2] - 21:3, 21:5
**percent** [13] - 20:13, 20:18, 33:15, 60:18, 63:22, 69:20, 76:3, 76:8, 101:9, 110:16, 112:16, 112:24, 113:3
**percentage** [4] - 20:12, 20:14, 24:5, 24:11
**percentages** [2] - 20:16, 33:4
**perhaps** [5] - 50:13, 69:7, 70:2, 70:3
**Perhaps** [1] - 110:14
**period** [8] - 23:18, 23:25, 24:1, 48:22, 55:13, 55:17, 56:5, 60:20
**permit** [1] - 44:5
**permitted** [1] - 39:15
**Perry** [1] - 63:1
**person** [31] - 18:23, 23:9, 24:13, 31:5, 41:1, 48:17, 68:11, 68:18, 69:7, 70:4, 70:7, 72:5, 90:22, 91:6, 91:16, 91:21, 92:18, 92:25, 93:13, 93:20, 94:2, 94:4, 94:7, 94:12, 94:14, 94:18, 94:21, 95:13, 95:24, 123:14, 129:14
**personal** [2] - 44:4, 123:18
**persons** [3] - 21:7, 24:20, 33:4
**persuasive** [1] - 120:6

**pertain** [1] - 125:7
**petty** [1] - 50:5
**photo** [36] - 21:17, 22:20, 23:1, 23:8, 23:20, 23:23, 24:18, 25:14, 25:25, 26:5, 27:8, 28:1, 29:19, 30:8, 33:12, 34:20, 74:15, 76:3, 76:5, 76:6, 77:9, 79:11, 88:25, 89:9, 93:21, 94:3, 94:22, 94:23, 95:1, 95:2, 95:12, 95:24, 96:3, 113:15, 116:23, 131:17
**photocopy** [1] - 81:21
**phrase** [2] - 112:21, 112:22
**pick** [1] - 37:22
**picked** [2] - 25:24, 96:12
**Pickett** [6] - 103:2, 103:3, 103:4, 103:10, 103:11, 104:15
**picking** [1] - 75:18
**picks** [3] - 37:18, 37:23, 37:24
**picture** [1] - 52:21
**pictures** [2] - 52:22, 53:24
**placard** [1] - 14:15
**place** [9] - 14:12, 35:8, 49:1, 50:16, 71:18, 100:15, 118:20, 124:20, 125:16
**placed** [1] - 38:17
**places** [3] - 21:6, 21:8, 85:15
**Plaintiff** [2] - 1:4, 1:15
**Plaintiff's** [1] - 106:14
**plaintiffs** [1] - 90:13
**plan** [4] - 118:5, 118:8, 122:24, 129:16
**plane** [1] - 129:25
**PLATTS** [1] - 2:3
**play** [1] - 60:5
**played** [2] - 9:22, 60:9
**Plaza** [1] - 2:24
**Plessy** [5] - 83:3, 83:9, 83:23, 84:14, 84:18
**point** [16] - 22:10, 22:11, 26:18, 42:6, 62:8, 65:1, 65:15, 65:17, 66:7, 68:25, 71:9, 82:17, 89:17, 109:3, 109:12, 114:7
**pointed** [3] - 60:16, 112:5, 112:7
**points** [1] - 40:16

**polarization** [2] - 56:6, 56:11
**polarized** [9] - 56:2, 60:17, 60:18, 63:11, 64:24, 65:4, 66:1, 102:14, 103:8
**policies** [9] - 43:21, 46:7, 46:11, 54:8, 56:19, 73:17, 115:15, 115:22
**policy** [1] - 7:22
**Political** [1] - 121:6
**political** [16] - 51:9, 55:20, 56:21, 57:7, 66:10, 68:13, 70:12, 73:16, 73:23, 91:22, 94:22, 102:3, 110:15, 115:20, 116:23
**politicians** [5] - 46:6, 115:13, 115:15, 115:21, 116:3
**politics** [2] - 11:13, 54:2
**Politics** [3] - 48:20, 73:6, 74:1
**poll** [20] - 46:13, 48:23, 49:10, 112:2, 112:3, 112:15, 112:17, 113:23, 113:24, 114:6, 114:7, 114:8, 114:14, 114:17, 114:23, 116:14, 120:8
**polling** [1] - 23:9
**polls** [11] - 23:15, 24:14, 25:17, 40:24, 41:1, 112:12, 113:1, 113:4, 113:6, 113:8
**poor** [3] - 49:9, 49:13, 79:14
**poorer** [1] - 61:11
**Populace** [1] - 49:12
**popular** [5] - 46:7, 46:14, 109:23, 113:25, 114:18
**popularity** [1] - 113:22
**popularly** [1] - 65:19
**populating** [1] - 37:20
**population** [7] - 45:15, 55:16, 56:10, 101:2, 101:3, 101:5, 101:9
**populations** [6] - 26:23, 29:20, 30:5, 30:7, 32:10, 45:17
**portion** [3] - 33:7, 84:25, 110:8
**portions** [1] - 20:10
**posed** [1] - 36:18

**position** [5] - 104:4, 104:7, 104:8, 104:9, 104:14
**positions** [1] - 60:8
**possess** [3] - 44:5, 123:13, 123:20
**possible** [10] - 31:21, 53:5, 66:12, 66:13, 73:16, 75:3, 86:23, 113:14, 113:17, 113:19
**possibly** [1] - 61:22
**potential** [4] - 27:24, 45:12, 62:3, 78:12
**potentially** [2] - 33:18, 34:16
**poverty** [3] - 21:1, 21:2, 33:1
**power** [2] - 65:3, 66:11
**practice** [3] - 41:19, 96:21, 96:25
**practiced** [1] - 6:14
**practitioner** [1] - 35:21
**precedent** [1] - 5:8
**preclear** [1] - 15:8
**preclearance** [1] - 7:25
**predecessor** [1] - 61:17
**predominantly** [1] - 61:9
**prefer** [1] - 104:10
**preference** [1] - 101:3
**preferred** [2] - 102:1, 104:5
**prerogative** [1] - 39:21
**present** [3] - 46:25, 63:16, 125:25
**presented** [11] - 18:21, 26:21, 27:14, 45:3, 70:18, 70:20, 71:4, 76:4, 88:23, 89:14, 121:19
**presenting** [4] - 76:3, 125:6, 126:8, 126:10
**presents** [1] - 115:2
**preserve** [1] - 25:11
**president** [1] - 27:3
**presidential** [1] - 26:25
**press** [3] - 13:6, 96:15, 96:18
**pressed** [1] - 72:7
**pressing** [1] - 88:18
**presumably** [1] - 114:18
**pretext** [2] - 72:25, 73:1

**pretextual** [3] - 88:4, 88:5, 88:12
**prettified** [1] - 52:21
**pretty** [6] - 34:24, 52:22, 67:4, 107:7, 108:15, 116:8
**prevent** [2] - 26:2, 129:13
**preventing** [2] - 25:5, 25:16
**previously** [2] - 4:5, 111:21
**primarily** [4] - 61:8, 66:9, 68:7, 89:4
**prime** [1] - 63:17
**Princeton** [1] - 2:14
**printed** [1] - 106:22
**priority** [2] - 5:13, 59:22
**probative** [1] - 120:7
**problem** [5] - 9:25, 13:21, 18:23, 72:12, 72:15
**problems** [1] - 30:13
**procedural** [3] - 62:4, 62:10, 63:5
**procedure** [2] - 59:13, 62:12
**procedures** [1] - 54:10
**proceed** [4] - 6:20, 15:19, 19:14, 47:14
**proceeding** [1] - 40:15
**proceedings** [2] - 42:3, 132:12
**Proceedings** [2] - 3:14, 132:6
**process** [25] - 8:2, 8:8, 10:23, 11:10, 12:15, 21:18, 68:13, 70:13, 70:17, 70:19, 70:21, 70:25, 71:1, 71:3, 71:7, 71:14, 71:16, 88:1, 89:20, 90:5, 109:1, 109:21, 118:1, 129:10, 129:12
**produced** [1] - 3:14
**product** [2] - 107:24, 108:12
**professor** [3] - 47:25, 48:8, 48:9
**Professor** [5] - 109:25, 110:7, 111:19, 112:9, 115:1
**progeny** [4] - 82:20, 83:3, 85:12, 86:10
**program** [2] - 60:4, 66:24
**promise** [2] - 78:11, 127:8

**promote** [2] - 86:21, 86:25
**promoted** [1] - 96:1
**promoting** [1] - 86:17
**prong** [1] - 65:8
**prongs** [1] - 67:20
**proof** [2] - 124:15, 126:7
**proponents** [8] - 25:15, 26:6, 40:1, 64:5, 68:4, 92:16, 108:18, 116:25
**proportion** [1] - 99:9
**proposed** [4] - 30:14, 59:7, 74:25, 75:6
**proposition** [1] - 92:16
**prosecute** [3] - 69:21, 91:11, 94:10
**prosecutions** [1] - 94:11
**protect** [1] - 65:2
**protected** [3] - 30:11, 32:17, 45:13
**protective** [1] - 14:7
**proven** [1] - 70:7
**provide** [4] - 45:20, 78:12, 97:13, 126:7
**provided** [4] - 5:19, 43:3, 77:23, 78:16
**providing** [1] - 98:13
**proving** [1] - 126:8
**provision** [1] - 50:5
**provisions** [1] - 53:11
**psychiatrist's** [1] - 78:22
**Public** [6] - 6:1, 15:7, 25:19, 27:17, 35:13, 128:1
**public** [37] - 22:6, 22:8, 22:14, 22:23, 22:25, 23:6, 27:23, 33:2, 34:11, 34:13, 36:10, 36:14, 68:9, 77:19, 78:20, 78:21, 87:15, 93:18, 94:2, 94:20, 95:12, 95:23, 96:2, 105:21, 111:22, 112:13, 114:8, 115:3, 115:7, 115:14, 115:22, 116:2, 116:4, 117:16, 120:22
**publication** [1] - 51:20
**publications** [1] - 23:7
**publicly** [1] - 23:4
**published** [3] - 51:22, 83:16, 106:24
**pull** [1] - 64:10
**pure** [1] - 43:10

**purpose** [20] - 29:25, 50:24, 51:3, 52:23, 60:15, 67:5, 67:6, 67:10, 67:11, 86:20, 86:25, 87:8, 87:24, 88:7, 101:25, 106:11, 109:22, 113:17, 119:15, 119:17
**purposely** [1] - 85:1
**purposes** [13] - 10:18, 17:20, 22:2, 22:13, 52:1, 52:2, 53:16, 87:13, 87:16, 87:19, 88:5, 88:12, 89:19
**purse** [1] - 14:18
**pursue** [1] - 93:5
**push** [1] - 54:5
**put** [24] - 8:6, 12:18, 17:18, 21:4, 33:18, 52:9, 52:12, 52:13, 56:9, 64:5, 68:7, 69:5, 72:15, 81:9, 81:20, 81:21, 90:2, 90:14, 93:18, 96:8, 101:18, 124:3, 125:16, 127:18
**Putte** [1] - 77:14
**putting** [2] - 59:24, 68:5

**Q**

**questioned** [2] - 12:25, 40:4
**questioning** [2] - 65:25, 75:25
**questions** [36] - 6:4, 7:2, 9:19, 18:8, 19:1, 28:20, 28:25, 32:6, 32:9, 32:13, 32:21, 35:2, 35:16, 36:4, 36:18, 36:25, 38:14, 39:16, 39:20, 40:6, 40:12, 40:14, 41:19, 44:8, 44:22, 50:22, 51:25, 67:24, 80:6, 81:18, 82:4, 90:1, 117:2, 120:10, 120:13, 131:2
**quick** [1] - 120:21
**quickly** [1] - 57:11
**quite** [16] - 25:24, 56:6, 57:11, 59:25, 63:20, 66:6, 68:14, 70:13, 71:9, 73:5, 74:11, 79:14, 80:5, 114:25, 115:6, 120:6
**quizzed** [2] - 40:8, 40:11
**quorum** [2] - 62:5,

62:7
**quote** [7] - 68:11, 69:15, 110:5, 111:4, 111:6, 111:8

**R**

**race** [10] - 29:18, 60:24, 85:17, 87:16, 87:19, 87:24, 88:3, 90:5, 109:18, 110:15
**racial** [27] - 20:19, 43:4, 54:2, 56:6, 56:11, 60:15, 60:25, 65:11, 65:19, 66:11, 66:17, 66:21, 67:15, 73:9, 73:10, 73:19, 73:25, 77:11, 78:13, 79:2, 89:25, 114:3, 114:10, 117:20, 119:7, 120:1, 120:3
**racially** [27] - 48:15, 49:7, 50:7, 56:2, 60:17, 60:18, 63:11, 64:23, 66:1, 67:2, 78:9, 79:23, 79:25, 80:3, 87:8, 87:13, 88:6, 101:24, 102:13, 103:8, 106:5, 106:11, 113:17, 114:4, 117:14, 120:4
**racing** [1] - 42:9
**racist** [1] - 83:11
**radicals** [1] - 85:1
**Rafael** [2] - 19:12, 19:21
**RAFAEL** [1] - 19:16
**rail** [1] - 33:6
**raise** [1] - 6:8
**raised** [3] - 27:21, 28:19, 32:6
**Ralph** [1] - 121:5
**ran** [1] - 71:25
**ranked** [1] - 63:2
**Rapid** [1] - 33:5
**rapidly** [1] - 98:10
**rare** [1] - 23:14
**rate** [3] - 32:25, 33:12, 44:25
**rates** [2] - 21:1, 21:2
**rather** [1] - 63:10
**rational** [1] - 57:4
**rationales** [2] - 72:22, 72:25
**reach** [2] - 66:8, 112:25
**reached** [2] - 50:22, 106:5
**read** [7] - 12:12,

84:25, 86:5, 86:6, 99:14, 99:17, 110:8
**reading** [3] - 29:16, 115:1, 125:20
**ready** [2] - 4:2, 47:16
**real** [4] - 25:22, 25:24, 62:17, 120:21
**realize** [1] - 6:6
**realized** [2] - 23:8, 23:13
**really** [12] - 17:4, 57:23, 58:8, 59:25, 67:7, 75:5, 79:13, 88:6, 109:7, 109:9
**reason** [18] - 13:20, 14:8, 14:9, 14:11, 16:13, 16:21, 27:4, 27:8, 31:22, 62:17, 68:5, 90:3, 105:17, 109:21, 110:2, 118:17, 118:18, 124:8
**reasons** [10] - 34:7, 34:13, 62:21, 62:22, 70:10, 88:4, 89:8, 89:22, 90:6, 109:19
**Rebecca** [2] - 40:11, 132:11
**REBECCA** [1] - 3:11
**rebuffed** [1] - 77:18
**rebuttal** [2] - 107:4, 115:16
**receive** [3] - 33:20, 125:9, 125:25
**received** [2] - 75:25, 97:1
**receiving** [2] - 102:15, 125:8
**recent** [1] - 49:21
**recently** [1] - 38:17
**Recess** [1] - 64:17
**recitation** [1] - 95:13
**recognize** [6] - 52:17, 82:1, 90:20, 93:17, 97:22, 100:7
**recommitted** [1] - 22:12
**Reconstruction** [2] - 55:24, 85:5
**record** [23] - 16:15, 16:16, 16:23, 19:20, 37:5, 48:3, 85:6, 87:15, 90:22, 91:6, 92:1, 97:10, 100:12, 105:3, 106:15, 110:3, 110:4, 110:7, 111:10, 113:20, 122:11, 127:21, 132:12
**records** [5] - 16:12,

16:17, 16:20, 17:20, 120:22
**redact** [1] - 17:10
**redeem** [1] - 85:4
**redirect** [7] - 18:10, 18:11, 18:15, 19:3, 44:10, 117:9, 120:14
**REDIRECT** [4] - 18:19, 44:12, 117:11, 120:19
**redistricting** [14] - 20:17, 49:22, 53:24, 55:15, 56:3, 62:6, 63:10, 63:18, 79:7, 99:21, 100:8, 104:5, 117:25
**redistrictings** [2] - 50:15
**redrawing** [1] - 118:5
**reduce** [1] - 56:19
**reference** [1] - 98:2
**references** [1] - 10:18
**referenda** [1] - 71:24
**referendum** [1] - 71:23
**referred** [1] - 93:19
**referring** [3] - 85:11, 88:14, 88:20
**refers** [2] - 126:14, 128:6
**reforms** [1] - 95:8
**reframe** [2] - 28:15, 76:23
**refresh** [1] - 9:5
**refused** [1] - 28:24
**regard** [4] - 50:22, 75:8, 90:19, 111:13
**regarding** [4] - 75:18, 75:20, 78:12, 99:12
**regardless** [1] - 107:22
**regime** [1] - 34:20
**Regional** [1] - 121:5
**register** [1] - 76:5
**registered** [4] - 44:4, 69:21, 76:3, 122:22
**registration** [6] - 48:23, 49:25, 123:24, 128:18, 130:14, 131:11
**registrations** [1] - 76:2
**regular** [1] - 64:11
**regulation** [3] - 125:13, 126:16, 126:23
**regulations** [4] - 125:7, 125:9, 125:21, 126:7
**Rehnquist** [4] - 82:24,

**rejected** [4] - 55:2,
75:7, 75:13, 75:17
**rejecting** [1] - 58:19
**rejection** [1] - 75:18
**relate** [2] - 56:13,
56:15
**related** [8] - 22:7,
24:18, 29:19, 30:3,
32:16, 45:11, 45:16,
99:21
**relates** [3] - 42:3,
117:23, 117:25
**relating** [1] - 96:21
**relatively** [1] - 79:14
**release** [2] - 13:6,
96:15
**releases** [1] - 96:18
**relevant** [8] - 28:15,
42:5, 59:14, 60:14,
71:20, 74:7, 74:19,
78:24
**reliable** [1] - 67:1
**relied** [1] - 118:12
**rely** [4] - 33:5, 36:14,
45:25, 109:7
**remaining** [1] - 131:22
**remains** [4] - 15:1,
15:2, 15:3, 15:4
**remarks** [5] - 8:7,
8:10, 8:13, 10:4,
11:2
**remember** [7] - 25:19,
30:23, 40:10, 44:18,
46:8, 103:3, 104:19
**remembering** [1] -
15:21
**renew** [1] - 13:20
**renewal** [1] - 17:21
**renewed** [4] - 16:18,
16:21, 17:24, 18:3
**Reno** [5] - 82:20,
82:22, 84:2, 85:11,
86:21
**REP** [2] - 4:4, 19:16
**replaced** [1] - 68:15
**report** [50] - 11:23,
50:20, 63:17, 63:18,
74:24, 75:11, 76:11,
81:3, 86:14, 91:25,
92:1, 92:2, 92:3,
92:4, 92:6, 92:13,
93:24, 94:5, 97:14,
97:21, 97:22,
101:12, 101:17,
101:18, 104:21,
105:12, 105:14,
105:25, 107:4,
108:6, 109:7,
109:25, 111:19,

111:23, 111:24,
112:5, 112:7, 112:9,
112:10, 112:11,
112:13, 115:1,
115:17, 116:16,
117:23, 128:19,
128:20, 128:23,
128:24, 129:1
**reported** [6] - 3:14,
11:12, 11:14, 13:13,
116:15
**REPORTER** [2] -
132:9, 132:18
**Reporter** [2] - 3:11,
3:11
**reporter** [1] - 7:21
**reports** [3] - 95:17,
97:9, 107:6
**represent** [11] - 7:1,
19:10, 20:3, 20:4,
33:14, 34:5, 37:6,
43:16, 102:1,
121:24, 122:1
**representative** [10] -
20:25, 43:20, 46:10,
46:14, 66:25, 99:16,
102:12, 102:18,
103:16, 103:21
**Representative** [36] -
4:8, 6:24, 8:19, 9:9,
10:20, 17:18, 18:21,
19:12, 29:12, 30:23,
31:1, 31:10, 32:2,
32:25, 34:6, 35:5,
36:4, 37:12, 38:9,
45:23, 47:4, 57:1,
58:6, 63:21, 70:14,
70:15, 72:9, 99:12,
100:16, 103:1,
103:2, 103:3, 103:4,
103:25, 117:23
**Representatives** [5] -
41:14, 43:15, 55:23,
59:18, 61:25
**representatives** [8] -
44:16, 60:19, 63:24,
63:25, 72:8, 102:7,
102:10
**represented** [2] - 21:7,
102:7
**representing** [4] - 8:4,
20:21, 47:8, 120:17
**represents** [1] - 103:4
**repressive** [1] - 85:2
**reprinting** [1] - 63:17
**Republican** [19] -
38:24, 39:10, 39:15,
49:11, 55:21, 55:22,
56:1, 56:7, 56:10,
61:21, 62:1, 65:2,

72:10, 78:7, 97:5,
97:15, 116:3,
116:25, 119:21
**Republicans** [24] -
56:15, 60:19, 61:19,
61:22, 62:1, 62:15,
62:18, 63:10, 63:12,
63:15, 63:20, 66:10,
66:20, 67:11, 70:22,
71:24, 73:8, 97:19,
108:19, 115:24,
116:9, 117:3,
119:20, 120:25
**requested** [3] - 30:9,
77:21, 78:12
**requesting** [1] - 31:5
**requests** [1] - 7:23
**require** [1] - 42:9
**required** [10] - 9:24,
30:4, 45:7, 57:18,
123:14, 125:9,
125:24, 126:6,
126:9, 128:6
**requirement** [4] -
26:1, 27:9, 110:17,
126:8
**requirements** [10] -
30:15, 31:13, 33:10,
48:17, 74:9, 74:17,
110:19, 111:7, 125:7
**research** [1] - 48:18
**researching** [1] - 65:9
**reside** [2] - 122:13,
125:15
**residency** [3] -
124:15, 124:22,
129:5
**residents** [1] - 21:3
**resisted** [1] - 66:20
**resolution** [4] - 42:14,
42:18, 42:19, 42:21
**resources** [5] - 5:1,
5:21, 7:18, 27:7,
45:23
**respect** [10] - 30:7,
41:9, 43:2, 77:2,
77:21, 109:8, 111:4,
117:16, 117:20,
119:1
**respond** [5] - 28:19,
78:5, 115:5, 125:11,
126:11
**responded** [2] - 26:12,
112:11
**responding** [1] - 7:22
**responds** [1] - 111:24
**response** [7] - 5:5,
28:16, 115:8, 115:9,
117:7, 117:17,
126:13

**responsible** [1] - 89:4
**responsive** [1] -
109:23
**rest** [1] - 120:22
**restore** [2] - 68:12,
71:2
**restraining** [1] - 66:5
**restrictions** [1] - 49:24
**restrictive** [1] - 79:25
**result** [5] - 67:13,
71:12, 115:1,
116:24, 118:20
**results** [2] - 112:22,
113:23
**retain** [1] - 56:21
**retained** [1] - 48:11
**review** [5] - 23:7,
51:20, 120:21,
124:22, 128:15
**revision** [1] - 121:21
**rhetoric** [2] - 85:4,
86:17
**Richard** [2] - 47:5,
47:8
**RICHARD** [1] - 2:7
**rid** [1] - 62:12
**Rights** [3] - 2:8, 30:11,
99:21
**rights** [3] - 30:10,
34:17, 49:16
**RISA** [1] - 2:5
**Risa** [1] - 19:9
**rise** [1] - 37:21
**ROBERT** [1] - 1:13
**Rodriguez** [6] -
121:19, 121:22,
122:2, 122:3,
122:12, 130:22
**RODRIGUEZ** [1] -
122:7
**role** [3] - 60:5, 60:9,
121:17
**rolls** [1] - 69:3
**Room** [2] - 2:9, 3:12
**Rose** [1] - 122:12
**ROSEMARY** [1] - 1:13
**ROSENBERG** [2] -
2:12, 121:16
**Rosenberg** [1] -
121:16
**roughly** [1] - 76:7
**row** [1] - 132:1
**RPR** [1] - 3:11
**rude** [1] - 95:3
**rug** [1] - 64:10
**rule** [10] - 57:11,
57:16, 57:17, 58:8,
59:6, 59:9, 96:21,
96:24, 96:25, 97:7
**ruled** [1] - 107:23

**rules** [9] - 5:9, 41:21,
41:22, 42:1, 42:14,
42:24, 54:9, 62:16,
62:18
**run** [5] - 55:15, 62:21,
96:9, 96:11
**run-up** [1] - 55:15
**rung** [2] - 21:7, 34:4
**rushing** [1] - 131:2

## S

**safe** [1] - 26:5
**Safety** [6] - 6:1, 15:7,
25:19, 27:18, 35:13,
128:2
**sample** [1] - 66:25
**San** [14] - 3:4, 4:9,
7:10, 8:23, 8:24,
10:21, 49:23, 70:8,
77:14, 79:12,
122:14, 122:19,
129:19, 129:22
**Sanchez** [1] - 121:19
**satisfied** [1] - 102:18
**saving** [1] - 34:22
**saw** [3] - 23:23, 53:24,
111:22
**SB14** [70] - 4:20, 7:14,
7:16, 8:2, 8:7, 8:11,
8:15, 8:19, 9:24,
15:8, 26:20, 27:13,
27:20, 27:24, 29:6,
29:13, 29:17, 32:5,
32:23, 34:21, 37:13,
41:10, 43:3, 44:6,
45:7, 46:19, 48:15,
50:23, 55:7, 56:12,
56:14, 56:22, 61:17,
63:7, 63:25, 67:3,
68:3, 68:6, 68:18,
70:11, 71:2, 71:13,
71:15, 74:6, 74:10,
74:14, 74:18, 74:21,
75:12, 75:17, 75:20,
76:6, 77:3, 77:5,
77:22, 78:13, 89:22,
102:8, 102:19,
102:25, 104:18,
106:5, 106:12,
107:7, 108:4,
108:11, 119:17,
120:2, 120:24,
126:20
**SB14's** [5] - 30:15,
31:12, 33:10, 56:25,
77:19
**scale** [1] - 5:13
**Scalia** [5] - 82:24,
83:18, 85:15, 86:12,
86:16

scenario [3] - 114:23, 114:24, 114:25
scenes [3] - 107:25, 108:12, 108:15
schedule [1] - 124:13
scholar [4] - 65:8, 72:21, 77:20, 79:3
scholarly [5] - 23:7, 48:18, 51:8, 65:12, 66:7
scholars [2] - 52:2, 54:25
school [14] - 38:18, 39:7, 122:17, 122:18, 123:5, 123:7, 128:19, 128:23, 130:2, 130:6, 130:11, 130:13, 131:12, 131:17
School [1] - 38:19
schools [1] - 61:3
schoolteacher [1] - 34:11
Science [2] - 121:6, 122:19
science [2] - 47:25, 51:9
scope [1] - 41:25
Scott [5] - 83:4, 83:6, 83:23, 84:18, 125:5
SCOTT [1] - 1:23
screen [14] - 9:9, 17:19, 52:12, 52:17, 81:9, 81:20, 81:22, 84:19, 88:18, 93:6, 93:7, 100:7, 101:18, 117:24
screen-grab [1] - 9:9
second [14] - 11:22, 30:20, 50:21, 51:15, 56:23, 64:4, 64:19, 65:16, 68:12, 72:19, 109:3, 111:24, 121:23, 128:21
Second [1] - 85:5
secondly [1] - 5:11
seconds [1] - 9:18
secret [1] - 48:23
Secretary [15] - 27:18, 29:17, 29:23, 30:3, 40:9, 44:17, 45:20, 46:2, 66:23, 75:10, 76:1, 77:11, 77:15, 78:14
Section [6] - 2:8, 50:4, 65:8, 67:20, 125:23, 128:3
section [7] - 51:21, 92:9, 92:10, 92:13,

111:24, 127:25
secure [1] - 44:15
Security [1] - 76:4
security [2] - 34:18, 130:2
see [54] - 5:18, 6:18, 9:8, 9:10, 9:11, 9:13, 9:14, 10:19, 10:20, 10:24, 11:20, 13:1, 14:4, 14:17, 15:10, 17:13, 35:25, 53:17, 54:9, 62:14, 65:15, 67:21, 85:7, 85:9, 86:3, 86:5, 92:21, 93:9, 98:11, 98:21, 98:23, 100:11, 100:19, 100:25, 101:4, 101:7, 102:14, 106:17, 106:18, 106:24, 106:25, 107:8, 107:19, 107:21, 107:25, 108:13, 108:20, 110:6, 112:25, 115:5, 115:21, 118:7, 121:11, 121:13
seeing [1] - 106:21
seek [1] - 45:6
seem [1] - 64:11
segments [1] - 110:21
segregated [1] - 29:18
segregation [2] - 83:9, 83:21, 84:12
Select [3] - 22:2, 38:19, 39:12
select [12] - 37:23, 38:16, 38:17, 38:21, 39:3, 39:6, 39:9, 40:7, 44:17, 46:17, 46:18, 46:22
self [5] - 53:9, 53:20, 54:3, 54:8, 119:20
self-conscious [1] - 53:9
self-explanatory [3] - 53:20, 54:3, 54:8
self-interest [1] - 119:20
SELLS [1] - 2:6
Senate [33] - 4:13, 4:22, 5:12, 7:5, 10:14, 11:8, 12:4, 18:22, 22:3, 22:7, 42:14, 42:18, 57:17, 57:21, 57:25, 58:1, 58:3, 59:11, 65:19, 70:1, 71:10, 74:25, 75:23, 77:13, 78:1, 101:21, 123:1,

123:3, 123:14, 124:9, 125:17, 130:18, 131:13
senator [1] - 60:9
Senator [9] - 58:5, 58:13, 60:11, 60:12, 62:22, 75:10, 75:19, 75:24, 77:14
senators [6] - 57:18, 57:19, 58:11, 58:12, 58:13, 59:18
senior [2] - 37:25, 123:5
seniority [3] - 37:18, 37:21, 37:24
seniors [1] - 123:5
sense [4] - 10:5, 44:24, 45:1, 97:6
sent [1] - 52:21
separate [5] - 61:12, 79:3, 79:6, 79:8, 125:21
separately [1] - 54:23
sequence [1] - 56:24
series [1] - 68:21
seriously [2] - 28:9, 34:24
served [3] - 21:10, 21:16, 49:15
service [7] - 5:18, 20:6, 23:21, 33:5, 33:6, 34:13
services [1] - 5:18
SESSION [2] - 1:6, 1:11
session [15] - 21:16, 21:25, 23:22, 25:1, 25:8, 39:11, 42:4, 58:5, 58:14, 58:16, 58:18, 59:20, 60:19, 62:17, 63:4
sessions [1] - 23:13
set [14] - 6:12, 50:15, 51:23, 51:24, 56:11, 58:21, 73:23, 85:6, 85:8, 89:18, 92:9
sets [1] - 52:23
setting [1] - 37:23
seven [2] - 32:18, 114:6
several [1] - 72:8
severe [1] - 74:18
Shaping [3] - 48:20, 73:6, 74:1
shared [2] - 7:13, 7:15
Shaw [14] - 82:3, 82:20, 82:22, 83:3, 83:25, 84:2, 84:4, 85:11, 86:9, 86:10, 86:21, 86:25, 111:19

Shaw's [1] - 109:25, 112:9, 115:1
sheep [1] - 34:9
sheriffs [1] - 69:18
shift [2] - 26:8, 100:22
shifted [1] - 61:25
shifting [2] - 72:21, 72:24
short [1] - 90:2
shorter [1] - 78:14
shorthand [1] - 3:14
show [7] - 9:5, 9:18, 10:16, 10:17, 11:16, 16:12, 16:20, 17:5, 17:6, 40:23, 70:20, 75:14, 92:2, 93:15, 97:21, 110:5, 111:19, 111:21, 112:13, 113:2, 113:4, 113:6, 115:7, 130:4, 130:8, 130:10, 130:12
showed [2] - 78:3, 130:2
showing [3] - 98:19, 98:21, 100:6
shown [1] - 117:24
shows [5] - 17:24, 57:3, 98:20, 113:24, 118:9
SHRIVER [1] - 2:23
shut [4] - 11:9, 12:15, 67:4
sic [1] - 85:6
side [1] - 122:19
sides [1] - 12:17
sign [1] - 79:25
sIGNATURE [1] - 132:18
signed [6] - 83:18, 88:23, 89:1, 89:5, 89:6, 89:14
significant [5] - 27:6, 33:16, 34:1, 50:12, 50:13
similar [6] - 49:12, 53:13, 53:15, 93:23, 111:21, 112:13
similarly [1] - 70:8
simple [2] - 57:4, 124:2
simply [7] - 23:11, 39:7, 45:19, 53:16, 54:23, 57:4, 78:7
single [1] - 44:4
sister [5] - 123:8, 123:11, 124:2, 130:22, 131:9
sit [5] - 22:4, 22:6, 39:19, 39:22, 118:10

site [4] - 4:25, 11:13, 69:1, 96:16
sits [1] - 14:10
sitting [1] - 43:2
situation [3] - 64:23, 65:10, 66:1
six [6] - 32:18, 37:25, 54:20, 92:20, 92:24, 93:9
six-year-long [3] - 92:20, 92:24, 93:9
sizable [1] - 33:7
skeptical [1] - 112:19
sketch [1] - 85:14
skin [1] - 103:20
slavery [3] - 83:7, 83:20, 84:11
slight [1] - 121:21
slightly [1] - 111:8, 111:10
small [3] - 24:11, 24:24, 34:22
Smith [4] - 98:1, 98:2, 98:8, 121:4
so-called [2] - 50:5, 57:16
so.. [1] - 36:20
social [2] - 47:25, 55:8
Social [1] - 76:4
society [1] - 18:6
socioeconomic [3] - 21:8, 33:13, 34:4
sole [2] - 35:21, 124:11
soliloquy [1] - 70:16
solved [1] - 72:12
someone [3] - 12:4, 35:5, 80:11
Somervelle [1] - 2:16
sometime [2] - 15:24, 16:10
sometimes [2] - 54:6, 115:18
somewhat [1] - 53:15
somewhere [1] - 34:1
son [2] - 34:7, 34:9
sorry [19] - 6:6, 9:1, 18:16, 18:17, 43:8, 44:15, 64:7, 68:22, 80:12, 85:9, 99:2, 105:2, 106:23, 114:1, 118:4, 120:17, 128:9, 128:21, 128:24
sort [15] - 5:10, 5:15, 51:24, 52:5, 52:10, 53:6, 57:6, 57:20, 59:17, 65:9, 68:13, 73:10, 79:9, 79:23, 105:3

**sorts** [3] - 18:6, 54:5, 61:6
**sound** [2] - 8:24, 88:24
**source** [2] - 51:5, 51:11
**sources** [1] - 51:8
**Souter's** [1] - 89:13
**South** [1] - 73:14
**south** [1] - 122:19
**Southern** [4] - 48:20, 73:6, 74:1, 121:5
**sovereign** [1] - 80:13
**Spain** [1] - 34:9
**Speaker** [1] - 38:22
**speaker** [4] - 37:15, 37:24, 38:24, 39:10
**speaking** [1] - 7:22
**speaks** [1] - 111:6
**special** [2] - 37:13, 37:14
**specific** [6] - 16:4, 23:25, 48:17, 77:21, 95:19, 127:24
**specifically** [6] - 33:14, 39:19, 45:13, 50:23, 69:5, 111:25
**specified** [1] - 69:19
**speculation** [2] - 28:11, 28:13
**speech** [1] - 72:3
**spell** [1] - 47:10
**Spencer** [2] - 80:15, 125:3
**SPENCER** [9] - 1:22, 2:6, 124:24, 125:3, 125:20, 126:4, 127:10, 128:5, 130:24
**spend** [4] - 4:19, 34:24, 84:1, 117:18
**spent** [5] - 27:7, 30:5, 32:8, 32:14, 117:19
**spoken** [1] - 7:5
**sponsor** [10] - 28:24, 32:9, 32:12, 32:15, 32:20, 45:11, 45:22, 58:3, 72:2, 75:24
**sponsored** [2] - 10:10, 11:3
**sponsors** [3] - 71:11, 78:6, 78:7
**Spring** [11] - 98:9, 99:9, 101:14, 101:15, 117:20, 119:8, 119:9, 119:10, 119:11, 119:12
**St** [2] - 122:21, 129:18
**STACEY** [1] - 1:17

**stage** [2] - 24:16, 56:11
**stand** [3] - 105:5, 113:12, 122:5
**standard** [1] - 51:24
**standing** [1] - 37:20
**Star** [1] - 96:10
**start** [7] - 25:9, 55:5, 71:12, 71:14, 81:19, 86:12, 96:3
**started** [2] - 69:15, 123:10
**starters** [1] - 45:10
**starting** [2] - 29:9, 30:20
**starts** [3] - 53:6, 57:1, 70:6
**STATE** [1] - 1:3
**state** [33] - 17:20, 19:20, 21:4, 21:6, 21:9, 27:6, 35:12, 46:14, 46:15, 53:13, 54:8, 55:11, 55:22, 55:24, 55:25, 58:11, 58:12, 58:13, 60:20, 60:22, 61:19, 61:21, 62:3, 62:5, 65:23, 65:8, 66:11, 66:15, 69:19, 106:3, 122:11, 125:10, 126:8
**State** [24] - 6:15, 7:2, 13:1, 23:5, 24:4, 24:25, 25:20, 29:17, 30:3, 31:9, 32:17, 34:20, 40:9, 42:10, 43:25, 46:1, 46:2, 46:3, 53:10, 75:10, 77:11, 80:20, 91:20, 125:3
**State's** [8] - 27:18, 29:23, 44:17, 45:20, 66:23, 76:1, 77:15, 78:14
**state's** [1] - 116:18
**statehood** [1] - 55:10
**statement** [11] - 9:24, 9:25, 12:3, 13:9, 13:14, 16:5, 40:19, 97:10, 101:11, 110:23, 118:14
**statements** [4] - 13:7, 54:7, 71:19, 78:21
**states** [5] - 48:22, 95:14, 114:6, 114:9, 125:13
**STATES** [3] - 1:1, 1:12, 1:14
**States** [8] - 1:7, 36:9, 47:9, 80:12, 80:14,

80:18, 85:16, 85:20
**station** [2] - 8:23, 9:1
**stations** [1] - 28:1
**statistical** [3] - 49:4, 49:20, 56:4
**statistics** [1] - 76:1
**Statistics** [1] - 35:11
**status** [1] - 33:13
**statutes** [1] - 90:4
**stayed** [1] - 58:22
**staying** [3] - 115:13, 115:21, 130:7
**stays** [1] - 105:8
**step** [2] - 61:13, 110:21
**Stephanie** [1] - 123:6
**Stephen** [1] - 110:9
**stepping** [2] - 115:11, 116:1
**steps** [1] - 5:22
**Stevens** [1] - 90:14
**STEWART** [1] - 2:3
**still** [7] - 14:20, 66:6, 72:10, 74:15, 113:12, 114:6, 118:11
**stimulate** [1] - 93:4
**Stonestreet** [1] - 132:11
**STONESTREET** [1] - 3:11
**stop** [3] - 63:5, 72:1, 109:10
**stopped** [2] - 71:7, 71:13
**story** [3] - 12:14, 85:8, 107:6
**straight** [2] - 85:7, 85:8
**strands** [1] - 105:21
**strategies** [1] - 56:16
**strategy** [1] - 108:18
**Straus** [2] - 38:22, 38:24
**Street** [4] - 1:19, 1:24, 2:16, 3:8
**strengthening** [1] - 40:19
**strongly** [2] - 60:2, 88:24
**struggle** [1] - 57:3
**struggles** [2] - 60:14, 85:3
**stub** [1] - 41:7
**student** [4] - 123:25, 130:15, 131:12, 131:17
**students** [2] - 61:8, 99:5
**studies** [6] - 27:17,

32:16, 45:16, 66:21, 77:8, 77:11
**study** [10] - 29:18, 29:23, 29:25, 30:1, 38:18, 45:21, 45:24, 67:13, 77:15, 77:18
**studying** [2] - 22:20, 39:7
**stuff** [1] - 57:6
**subcommittee** [1] - 24:22
**subcommittees** [1] - 22:17
**subject** [6] - 39:23, 41:16, 41:18, 45:19, 50:11, 64:8
**subjective** [1] - 78:19
**submit** [1] - 51:19
**Subsection** [1] - 125:23
**subsequent** [1] - 23:13
**substance** [1] - 51:4
**substantially** [2] - 56:5, 93:23
**substantive** [1] - 92:5
**subtle** [1] - 23:14
**succeed** [1] - 117:4
**succeeded** [2] - 57:11, 115:19
**suddenly** [1] - 70:24
**suffer** [1] - 129:13
**sufficient** [3] - 41:5, 41:7, 130:3
**suffrage** [1] - 75:16
**suggest** [1] - 110:19
**suggested** [5] - 23:4, 26:6, 27:18, 97:4, 97:7
**suggesting** [1] - 116:14
**suggests** [2] - 31:1, 88:24
**Suite** [6] - 1:24, 2:13, 2:17, 2:20, 3:4, 3:8
**sum** [1] - 131:9
**summarily** [1] - 29:4
**summarize** [1] - 55:5
**summarizing** [1] - 92:5
**summary** [1] - 115:16
**Supervisors** [1] - 50:14
**support** [28] - 12:2, 41:9, 63:7, 91:22, 92:16, 93:21, 94:3, 94:22, 95:12, 95:23, 96:3, 97:1, 98:14, 106:4, 109:19, 110:17, 110:18,

111:22, 112:1, 112:13, 113:3, 114:8, 114:13, 115:14, 115:22, 116:2, 116:4, 116:23
**supported** [5] - 32:22, 43:24, 87:12, 103:17, 112:16
**supporters** [3] - 4:13, 28:19, 32:7
**supporting** [1] - 120:23
**supportive** [3] - 87:20, 87:25, 109:22
**supports** [1] - 114:10
**suppose** [5] - 66:22, 67:1, 67:3, 67:10
**supposedly** [1] - 88:5
**supposition** [1] - 43:10
**suppression** [2] - 10:24, 112:21
**supremacy** [4] - 85:5, 86:18, 86:21, 86:25
**Supreme** [13] - 50:2, 50:8, 52:6, 82:22, 83:7, 83:14, 83:19, 83:20, 89:17, 90:3, 90:20, 91:5, 107:24
**surge** [1] - 61:20
**surprise** [3] - 108:19, 108:23, 110:16
**surprising** [1] - 110:14
**survey** [4] - 66:24, 113:9, 113:10, 114:5
**surveys** [7] - 70:20, 78:3, 111:18, 111:19, 111:20, 113:1, 114:5
**suspect** [1] - 33:3
**suspended** [2] - 59:6, 59:9
**sustain** [1] - 42:7
**sustained** [1] - 22:11
**Sweeten** [1] - 38:5
**SWEETEN** [9] - 1:15, 28:11, 36:17, 38:6, 38:8, 42:2, 42:12, 42:13, 44:8
**swore** [1] - 14:3
**sworn** [6] - 4:5, 15:13, 19:16, 47:18, 86:11, 122:8
**system** [4] - 35:14, 36:10, 39:7, 40:20
**systematic** [1] - 52:10

# T

**Table** [2] - 74:8, 74:24
**table** [2] - 32:3, 88:22
**tabled** [5] - 29:4,
  30:18, 31:16, 31:17,
  31:23
**tables** [1] - 63:16
**tape** [1] - 34:19
**Tarrant** [2] - 36:12,
  36:23
**TATEL** [23] - 1:12,
  31:17, 31:19, 31:23,
  35:4, 64:19, 64:22,
  65:1, 65:7, 65:15,
  65:23, 66:4, 67:5,
  67:7, 67:10, 67:19,
  67:24, 72:19, 72:24,
  73:4, 74:3, 128:21,
  128:24
**Tatel** [4] - 35:17, 37:5,
  76:25, 120:16
**taught** [1] - 34:11
**tax** [9] - 46:13, 49:10,
  114:6, 114:7, 114:8,
  114:14, 114:17,
  114:23, 116:14
**taxes** [2] - 48:23,
  113:25
**Technology** [1] - 48:1
**teleconference** [3] -
  10:9, 11:3, 15:12
**Telegram** [1] - 96:10
**television** [1] - 8:18
**tend** [1] - 103:23
**tended** [1] - 52:7
**term** [1] - 59:15
**terms** [3] - 4:17, 7:20,
  37:15
**test** [4] - 48:25,
  102:19, 103:15,
  103:21
**testified** [19] - 4:5,
  19:17, 32:25, 37:13,
  46:6, 47:19, 49:22,
  50:1, 50:10, 50:14,
  63:6, 69:25, 71:6,
  72:5, 79:19, 84:2,
  122:8, 130:21
**testify** [3] - 40:1,
  41:25, 129:22
**testifying** [3] - 4:8,
  64:22, 65:11
**testimony** [25] - 15:13,
  15:19, 22:14, 24:22,
  25:14, 30:6, 38:15,
  41:20, 49:21, 64:15,
  72:14, 75:18, 77:25,
  81:4, 86:11, 90:7,
  91:19, 93:1, 93:2,

95:25, 96:20, 96:22,
  105:10, 116:21,
  119:15
**tests** [1] - 48:24
**Texans** [5] - 5:19,
  70:20, 92:18,
  111:22, 114:22
**Texas** [118] - 6:16, 7:2,
  10:21, 11:8, 11:17,
  11:19, 13:1, 16:12,
  16:17, 18:23, 19:11,
  19:25, 20:1, 23:5,
  24:4, 24:20, 24:25,
  25:20, 25:21, 27:11,
  30:2, 31:9, 32:11,
  34:20, 35:11,
  35:24, 36:5, 36:8,
  37:7, 37:8, 37:19,
  41:1, 42:10, 43:25,
  44:4, 46:1, 46:13,
  46:15, 49:22, 51:9,
  53:15, 53:23, 55:10,
  56:2, 56:4, 56:18,
  57:21, 60:16, 62:24,
  63:10, 63:18, 65:24,
  66:16, 69:1, 69:21,
  76:2, 79:7, 80:12,
  80:17, 80:20, 87:7,
  87:11, 87:12, 87:16,
  87:20, 87:25, 89:22,
  90:6, 91:15, 91:20,
  97:2, 97:19, 98:21,
  99:20, 99:25,
  101:20, 106:10,
  107:21, 108:10,
  108:20, 109:22,
  111:18, 112:14,
  113:1, 113:3,
  113:15, 114:7,
  116:2, 116:9,
  116:22, 117:18,
  117:20, 118:3,
  118:5, 118:24,
  119:8, 119:14,
  122:14, 122:22,
  123:9, 123:16,
  123:18, 124:1,
  124:21, 125:4,
  125:6, 125:14,
  125:15, 125:21,
  125:22, 126:6,
  128:18, 129:11,
  131:24, 131:25,
  132:1
**TEXAS** [2] - 1:3, 1:18
**text** [3] - 53:21, 74:6
**texts** [1] - 74:9
**THE** [36] - 1:2, 1:12,
  1:13, 1:13, 1:18, 6:6,
  15:17, 18:16, 19:4,

31:18, 31:21, 32:1,
  35:9, 44:9, 47:2,
  48:4, 64:16, 64:25,
  65:6, 65:14, 65:16,
  66:3, 66:13, 67:6,
  67:8, 67:16, 67:23,
  72:23, 73:3, 73:5,
  76:13, 119:12,
  121:11, 128:23,
  131:18, 131:20
**theme** [1] - 91:25
**themselves** [2] -
  74:23, 104:23
**theoretical** [1] -
  113:18
**theory** [3] - 115:12,
  115:21, 115:23
**therefore** [2] - 26:16,
  64:8
**they've** [1] - 116:13
**thinking** [1] - 104:22
**third** [2] - 57:19, 57:22
**thirds** [8] - 57:17,
  57:18, 58:4, 59:6,
  59:9, 62:2, 62:7,
  62:16
**Thomas** [3] - 82:24,
  83:18, 86:16
**thoughts** [1] - 7:13
**threaten** [1] - 62:22
**threatened** [1] - 58:6
**three** [5] - 49:13, 56:9,
  58:22, 75:22, 105:23
**throughout** [1] - 46:15
**tied** [1] - 102:4
**tight** [1] - 82:5
**timekeeper** [1] - 64:12
**Title** [1] - 128:1
**title** [1] - 107:8
**titled** [1] - 125:23
**today** [13] - 7:5, 8:10,
  28:3, 34:14, 38:15,
  99:20, 101:19,
  104:25, 105:11,
  118:10, 121:3,
  130:14, 130:21
**Todd** [1] - 98:2
**together** [3] - 56:10,
  86:6, 109:18
**Tom** [1] - 62:6
**tomorrow** [2] - 131:3,
  131:24
**took** [13] - 15:25,
  25:13, 26:24, 31:4,
  38:11, 49:1, 50:16,
  55:22, 69:3, 71:17,
  93:4, 99:11, 107:4
**topic** [2] - 109:17,
  127:9
**topmost** [1] - 37:25

**Torres** [2] - 41:17
**totally** [1] - 67:11
**towards** [5] - 7:18,
  7:25, 26:9, 63:4,
  74:24
**track** [1] - 76:23
**train** [2] - 33:19, 130:4
**transcript** [7] - 3:14,
  17:9, 128:19,
  128:20, 128:23,
  129:1, 132:12
**TRANSCRIPT** [1] -
  1:11
**transcription** [1] -
  3:15
**Transit** [1] - 33:5
**transplant** [1] - 58:14
**transportation** [3] -
  33:2, 36:10, 36:14
**traveled** [1] - 129:21
**Travis** [1] - 79:11
**Trey** [1] - 10:21
**TREY** [1] - 4:4
**trial** [9] - 6:16, 42:7,
  42:8, 53:24, 56:3,
  63:11, 64:12, 127:5,
  129:22
**Trial** [1] - 93:16
**TRIAL** [1] - 1:11
**Tribune** [2] - 11:17,
  11:19
**tried** [7] - 34:24,
  51:23, 52:9, 73:13,
  79:6, 88:11, 104:9
**tries** [1] - 75:1
**triggered** [1] - 79:2
**trip** [1] - 35:7
**trouble** [1] - 80:17
**true** [8] - 36:8, 36:15,
  40:19, 40:22, 53:18,
  67:18, 96:4, 104:2
**truly** [1] - 28:21
**trust** [1] - 99:5
**truth** [2] - 5:8, 107:17
**try** [10] - 12:11, 33:20,
  43:18, 53:5, 56:19,
  65:22, 66:18, 67:24,
  115:6, 116:17
**trying** [12] - 44:24,
  52:2, 52:25, 53:3,
  54:14, 74:20, 74:21,
  91:20, 95:3, 95:23,
  106:9, 131:4
**Tuesday** [1] - 1:6
**Tuesdays** [1] - 6:2
**turn** [7] - 50:21, 68:3,
  69:11, 87:6, 88:22,
  91:9, 92:10
**turned** [1] - 69:11
**turning** [1] - 46:17

**turnout** [7] - 26:14,
  26:17, 26:23, 27:1,
  27:4, 27:8, 27:10
**turns** [1] - 46:16
**TV** [8] - 8:23, 9:1,
  9:23, 13:10, 13:25,
  15:11, 16:18, 71:25
**twin** [2] - 123:8,
  130:22
**two** [32] - 4:23, 13:23,
  41:3, 55:19, 56:15,
  56:22, 57:7, 57:17,
  57:18, 58:4, 59:6,
  59:9, 61:12, 61:25,
  62:2, 62:7, 62:16,
  67:20, 68:7, 69:4,
  83:14, 88:22, 89:14,
  89:22, 109:18,
  120:13, 121:4,
  126:19, 129:4,
  131:22, 132:1
**two-thirds** [8] - 57:17,
  57:18, 58:4, 59:6,
  59:9, 62:2, 62:7,
  62:16
**TX** [3] - 1:20, 2:21, 3:4
**type** [3] - 23:8, 45:24,
  51:11
**types** [3] - 23:3, 32:21,
  51:5
**typically** [4] - 22:5,
  37:19, 45:25, 52:8

# U

**U.S** [7] - 2:7, 3:12,
  52:6, 82:22, 83:19,
  83:20, 123:21
**ultimate** [1] - 92:5
**unable** [1] - 45:2
**unanimous** [1] - 97:1
**unanimously** [1] -
  63:8
**unanswered** [1] -
  32:21
**unaware** [1] - 45:16
**unconstitutional** [1] -
  46:16
**uncover** [2] - 75:20,
  92:19, 120:23
**under** [18] - 9:24, 11:8,
  12:4, 14:3, 15:22,
  20:17, 30:11, 31:6,
  41:1, 59:21, 64:11,
  75:25, 76:6, 77:10,
  82:4, 125:23,
  130:18, 131:13
**underlying** [6] - 29:21,
  31:7, 33:17, 33:24,
  48:16, 124:17
**undermine** [5] - 92:16,

102:8, 102:20, 103:23, 104:2
**undermined** [1] - 71:18
**understood** [1] - 55:15
**underwood** [1] - 50:3
**undocumented** [1] - 24:20
**unexpected** [1] - 34:2
**unfamiliar** [1] - 129:12
**UNION** [1] - 3:7
**union** [1] - 55:12
**UNITED** [3] - 1:1, 1:12, 1:14
**United** [8] - 1:7, 36:9, 47:9, 80:12, 80:14, 80:18, 85:16, 85:20
**University** [2] - 122:21, 129:18
**unparalleled** [1] - 92:18
**unreliable** [1] - 55:2
**up** [51] - 4:16, 5:11, 5:17, 6:12, 10:19, 15:23, 25:15, 25:24, 27:2, 27:4, 27:8, 28:20, 29:3, 32:18, 37:23, 40:23, 42:2, 42:4, 52:12, 52:13, 55:15, 58:4, 58:21, 59:4, 59:21, 59:24, 60:3, 63:3, 72:18, 75:18, 81:20, 86:24, 91:22, 94:22, 95:5, 96:12, 100:2, 100:5, 100:6, 101:15, 101:16, 102:4, 115:14, 115:22, 116:4, 117:7, 117:21, 121:23, 131:6, 131:9
**updates** [1] - 5:1
**upheld** [1] - 89:18
**uploaded** [1] - 9:13
**upset** [1] - 14:24
**urban** [1] - 36:9
**Uresti** [1] - 60:12
**utility** [2] - 41:2, 41:5
**utilize** [1] - 41:2

---

**V**

**VA** [1] - 2:17
**valid** [6] - 26:1, 33:12, 89:19, 90:4, 90:21, 91:5
**validity** [2] - 95:18, 120:8
**validly** [1] - 25:5

**value** [3] - 80:1, 120:7
**van** [1] - 33:5
**Van** [1] - 77:14
**VAP** [1] - 101:5
**varied** [1] - 112:1
**various** [5] - 93:22, 96:9, 99:25, 100:9, 116:16
**vast** [1] - 60:21
**vehicle** [2] - 14:15, 73:16
**verbiage** [1] - 42:8
**Vestal** [1] - 122:14
**vetted** [1] - 108:20
**viable** [1] - 73:16
**Victoria** [3] - 121:19, 122:12, 127:16, 131:24
**VICTORIA** [1] - 122:7
**video** [1] - 10:3
**Videotape** [1] - 9:22
**view** [4] - 40:16, 66:7, 89:18, 98:16
**visibility** [2] - 92:20, 93:9
**visible** [1] - 91:16
**Vital** [1] - 35:11
**volunteer** [1] - 123:11
**vote** [19] - 31:4, 32:23, 34:22, 41:2, 41:7, 44:6, 46:18, 61:5, 62:16, 63:22, 71:12, 75:4, 90:14, 119:23, 122:24, 123:14, 130:14, 130:18
**Vote** [2] - 4:24, 111:5
**vote-saving** [1] - 34:22
**voted** [24] - 32:5, 41:10, 41:15, 42:17, 42:21, 42:24, 42:25, 58:3, 62:14, 63:8, 63:19, 63:24, 69:8, 87:12, 101:20, 102:7, 102:19, 102:24, 104:18, 108:5, 119:16, 119:17, 120:1
**voter** [110] - 4:21, 4:24, 10:10, 10:24, 11:8, 12:8, 12:13, 18:23, 21:15, 21:24, 22:17, 22:20, 22:21, 22:22, 23:2, 23:3, 23:4, 23:9, 23:11, 23:13, 23:15, 23:24, 24:3, 24:5, 24:8, 24:11, 24:15, 24:18, 25:11, 25:16, 26:8, 26:11, 26:12, 26:16,

26:21, 27:10, 39:1, 41:9, 43:23, 44:4, 57:2, 57:5, 59:6, 59:8, 59:11, 63:1, 69:15, 70:4, 70:7, 71:25, 72:1, 72:7, 87:6, 88:11, 89:18, 90:16, 90:22, 91:6, 91:16, 91:21, 92:17, 92:18, 92:25, 93:13, 93:20, 94:3, 94:4, 94:7, 94:12, 94:14, 94:18, 94:21, 95:12, 95:13, 95:19, 95:24, 105:24, 106:3, 108:18, 109:20, 110:19, 111:7, 111:22, 112:13, 112:16, 112:21, 112:22, 113:15, 113:22, 114:23, 115:12, 115:20, 116:2, 116:4, 116:8, 116:14, 116:19, 116:23, 116:25, 117:14, 117:17, 122:22, 123:24, 128:18, 130:14, 131:11
**Voter** [15] - 39:13, 58:24, 59:1, 70:1, 87:7, 87:12, 87:17, 87:20, 87:25, 91:22, 97:19, 98:5, 107:21, 108:10, 109:22
**voters** [24] - 7:6, 11:24, 27:21, 32:7, 43:24, 63:19, 69:21, 75:12, 77:5, 77:22, 77:25, 88:7, 88:13, 89:1, 102:4, 102:5, 103:17, 104:6, 110:18, 113:1, 115:16, 115:23
**votes** [9] - 25:5, 25:6, 56:7, 56:8, 56:9, 63:9, 101:23, 102:3, 102:15
**Voting** [4] - 2:8, 30:11, 69:13, 99:21
**voting** [45] - 10:23, 22:14, 24:19, 24:20, 24:23, 25:3, 25:10, 30:10, 34:16, 43:20, 48:17, 49:16, 49:25, 56:20, 61:7, 63:11, 64:24, 65:4, 66:1, 66:5, 66:6, 68:11, 68:18, 69:3, 71:8, 71:13, 71:15, 71:23,

72:1, 72:4, 72:7, 72:11, 93:4, 93:5, 94:9, 94:11, 101:2, 101:5, 101:8, 102:14, 103:8, 129:10, 129:14
**vs** [3] - 84:2, 84:4
**vulnerable** [1] - 119:22

---

**W**

**wage** [2] - 33:8, 33:24
**wait** [7] - 33:20, 100:20, 109:5, 118:11, 118:23
**waited** [1] - 90:13
**wallet** [1] - 14:17
**wants** [2] - 57:6, 65:2
**Ward** [1] - 40:4
**Washington** [5] - 1:5, 2:10, 3:12, 129:22, 130:1
**watch** [1] - 10:3
**Watchdog** [1] - 69:1
**wave** [1] - 97:15, 97:17, 97:18
**wealthiest** [2] - 21:6, 21:8
**web** [4] - 4:25, 11:13, 69:1, 96:16
**week** [2] - 58:18, 124:10
**weekly** [3] - 93:23, 96:8, 96:11
**West** [4] - 1:19, 1:24, 2:20, 122:14
**west** [1] - 36:5
**western** [1] - 20:9
**Western** [2] - 118:2, 118:24
**WESTFALL** [9] - 2:3, 4:3, 4:7, 6:4, 6:8, 18:14, 18:18, 18:20, 19:1
**whatsoever** [4] - 59:24, 70:18, 71:2, 85:18
**whereas** [1] - 66:11
**white** [24] - 55:12, 56:7, 79:10, 79:24, 85:4, 86:18, 86:21, 86:25, 98:10, 99:4, 99:8, 99:9, 99:10, 100:3, 101:8, 101:13, 101:14, 101:15, 103:6, 103:14, 104:5, 104:12, 118:10, 119:10

**White** [1] - 41:15
**whites** [6] - 49:9, 49:13, 55:18, 60:21, 110:16, 110:19
**whole** [3] - 10:3, 84:2, 84:3
**Whole** [3] - 70:1, 75:23, 78:1
**wholly** [1] - 110:21
**widely** [4] - 5:3, 49:6, 49:7, 55:15
**widespread** [3] - 68:8, 68:10, 72:3
**wife** [1] - 50:6
**Wikipedia** [3] - 99:5, 99:10, 101:15
**WILKINS** [4] - 1:13, 100:12, 127:21, 127:24
**WILLIAM** [1] - 1:16
**willing** [2] - 60:3, 105:5
**win** [2] - 73:17, 121:3
**winner** [1] - 121:4
**winning** [1] - 70:22
**wipe** [1] - 85:2
**wish** [1] - 80:9
**withdrawn** [1] - 76:18
**WITNESS** [28] - 18:16, 19:4, 31:18, 31:21, 32:1, 35:9, 47:2, 48:4, 64:16, 64:25, 65:6, 65:14, 65:16, 66:3, 66:13, 67:6, 67:8, 67:16, 67:23, 72:23, 73:3, 73:5, 76:13, 119:12, 121:11, 128:23, 131:18, 131:20
**witness** [19] - 4:4, 15:15, 19:6, 19:16, 42:10, 47:18, 48:11, 49:15, 50:11, 64:20, 72:11, 80:9, 100:20, 110:12, 121:15, 121:18, 122:7, 130:25
**witnesses** [7] - 39:16, 39:25, 42:5, 46:25, 56:3, 78:2, 78:11
**won** [1] - 121:4
**wondered** [1] - 25:25
**woops** [1] - 46:25
**word** [1] - 102:10
**words** [4] - 4:18, 86:23, 88:7, 107:24
**works** [2] - 37:19, 124:10
**worried** [1] - 31:20
**worry** [1] - 113:23

**worst** [1] - 83:14
**worth** [1] - 39:8
**Worth** [1] - 96:10
**wow** [2] - 118:2, 131:25
**wrap** [1] - 72:18
**wrap-up** [1] - 72:18
**writing** [2] - 48:18, 127:12
**wrongly** [2] - 90:8, 90:18
**wrote** [6] - 81:5, 83:5, 84:9, 84:12, 84:15, 84:18

## Y

**year** [8] - 10:8, 11:4, 26:24, 92:20, 92:24, 93:9, 123:5, 129:17
**year's** [1] - 10:23
**years** [4] - 13:22, 13:23, 63:13, 85:2
**York** [2] - 2:24, 2:25
**yourself** [11] - 9:9, 12:7, 12:9, 19:8, 37:4, 38:15, 40:4, 45:7, 45:24, 47:24, 74:16
**YouTube** [1] - 9:8