UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| STATE OF TEXAS, | : | Docket No. CA 12-128 |
| | : | |
| Plaintiff | : | |
| v. | : | |
| | : | |
| ERIC H. HOLDER, JR., in his | : | Washington, D.C. |
| Official Capacity as | : | Wednesday, July 11, 2012 |
| Attorney General of the | : | P.M. SESSION |
| United States, | : | |
| | : | |
| Defendant, and | : | |
| | : | |
| ERIC KENNIE, et al., | : | |
| | : | |
| Intervenor-Defendants | : | 2:00 p.m. |

. . . . . . . . . . . . . . . : . . . . . . . . . . . . . .

TRANSCRIPT OF BENCH TRIAL
DAY 3 - P.M. SESSION
BEFORE THE HONORABLE DAVID S. TATEL
UNITED STATES CIRCUIT JUDGE
THE HONORABLE ROSEMARY M. COLLYER
THE HONORABLE ROBERT L. WILKINS
UNITED STATES DISTRICT JUDGES

APPEARANCES:

For the Plaintiff:      PATRICK K. SWEETEN
                        JOHN WILLIAM MCKENZIE
                        MATTHEW H. FREDERICK
                        STACEY NAPIER
                        OFFICE OF THE ATTORNEY GENERAL
                        OF TEXAS
                        209 West 14th Street
                        7th Floor (MC-059)
                        Austin, TX 78701
                        (512) 936-1695

                        ADAM K. MORTARA
                        ASHA L. I. SPENCER
                        JOHN M. HUGHES
                        BARTLIT BECK HERMAN
                           PALENCHAR & SCOTT, LLP
                        54 West Hubbard Street
                        Suite 300
                        Chicago, IL.  60654
                        (312) 494-4469

```
For the Defendant:        ELIZABETH STEWART WESTFALL
                          MEREDITH BELL-PLATTS
                          JENNIFER MARANZANO
                          DANIEL J. FREEMAN
                          RISA BERKOWER
                          BRUCE I. GEAR
                          SPENCER R. FISHER
                          U.S. DEPARTMENT OF JUSTICE
                          Civil Rights Division,
                          Voting Section
                          950 Pennsylvania Avenue, NW
                          NWB-Room 7202
                          Washington, DC 20530
                          (202) 305-7766


For the Intervenor        EZRA D. ROSENBERG
Defendants:               DECHERT LLP
                          902 Carnegie Center
                          Suite 500
                          Princeton, NJ  08540-6531
                          (609) 955-3200

                          JOSEPH GERALD HEBERT
                          J. GERALD HEBERT, P.C.
                          191 Somervelle Street
                          Suite 405
                          Alexandria, VA  22304
                          (703) 628-4673

                          CHAD W. DUNN
                          BRAZIL & DUNN
                          4201 FM 1960 West
                          Suite 530
                          Houston, TX 77068
                          (281) 580-6310

                          ADAM M. HARRIS
                          FRIED, FRANK, HARRIS, SHRIVER &
                             JACOBSON LLP
                          One New York Plaza
                          24th Floor
                          New York, NY 10004
                          (212) 859-8953
```

NANCY G. ABUDU
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION, INC.
230 Peachtree Street, NW
Suite 1440
Atlanta, GA  30303
(404) 523-2721

JORGE SANCHEZ
MEXICAN AMERICAN LEGAL DEFENSE &
   EDUCATIONAL FUND, INC
11 East Adams Suite #700
Chicago, IL 60603
(312) 427-0701


Court Reporter:            REBECCA STONESTREET, RPR, CRR
                          Official Court Reporter
                          Room 6511, U.S. Courthouse
                          Washington, D.C.  20001
                          (202) 354-3249


Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

# C O N T E N T S

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| REV. PETER JOHNSON | | | | |
| By Ms. Abudu | 5 | -- | -- | -- |
| By Mr. Frederick | -- | 8 | -- | -- |
| SENATOR RODNEY ELLIS | | | | |
| By Mr. Dunn | 9 | -- | 50 | -- |
| By Ms. Maranzano | 34 | -- | 52 | -- |
| By Mr. Mortara | -- | 35 | -- | -- |
| RANDALL BUCK WOOD | | | | |
| By Mr. Dunn | 53 | -- | -- | -- |
| HENRY FLORES | | | | |
| By Mr. Sanchez | 66 | -- | 87 | -- |
| By Mr. Frederick | -- | 78 | -- | -- |
| DR. DAVID MARKER | | | | |
| By Mr. Rosenberg | 106 | -- | 129 | -- |
| By Mr. Hughes | -- | 116 | -- | -- |

VIDEOTAPED TESTIMONY OF SENATOR CARLOS URESTI - 132

# E X H I B I T S

| NUMBER | ADMITTED |
|---|---|

(NO EXHIBITS MOVED INTO EVIDENCE.)

1                    **P R O C E E D I N G S**

2              JUDGE WILKINS:  Have a seat, sir.

3              MS. ABUDU:  Would the Court like for me to do my

4      introduction again?  Do I need to state my name for the record

5      again?

6              JUDGE WILKINS:  No.  It's Ms. Abudu, right?  You can

7      resume.

8              MS. ABUDU:  Thank you.

9      **(REV. PETER JOHNSON, DEFENDANT witness, having been previously**

10                   **duly sworn, testified as follows:)**

11                        **DIRECT EXAMINATION**

12     BY MS. ABUDU:

13     Q.  Reverend Johnson, do you oppose Senate Bill 14?

14     A.  Absolutely.

15     Q.  Could you tell the court why?

16     A.  Well, first, it is a threat to democracy itself, not just

17     this particular Senate bill, but the threat on voting rights

18     itself.  The national threat is a threat to our democracy.

19              And Texas in particular, where I am -- and I know there

20     are a lot of advantages in this particular bill that say that if

21     you're senior citizens you can vote absentee or you can do a

22     mail-in ballot.  I have a number of African-American senior

23     citizen women -- my mother-in-law is 91 years old.  Black people

24     who are 75 years and older have a deep appreciation for the

25     right to vote because they remember when they couldn't vote.

1    Consequently, I have a group of African-American senior citizen
2    women, they want to go to the voting polls and stand in line and
3    vote at the voting polls.  There's a certain degree of dignity
4    for them to do this.  For me personally, it is an imposition on
5    my time, because they won't go unless I take them.  So I can't
6    say, I'm going to send a van to pick you-all up.  No, Reverend,
7    I'm going to wait for you.  You got to come and take us to vote.
8         Because these people appreciate this sacred right to
9    vote, and they're not going to vote absentee.  For
10   President Obama's election, I begged them to vote early, because
11   I knew it was going to be long, long, lines.  And, of course, I
12   couldn't convince them to vote early.  On election day I had to
13   get seats for them to sit in because the lines were so long at
14   some of those voting precincts.
15        These are people who it would be a sin to take the
16   right to vote from these old women.  And no, they don't drive,
17   they don't have no picture ID, they don't go international
18   nowheres, so they don't have a passport.  Their little checks go
19   to the bank; the bank pays their bills.  But they vote.  And you
20   don't have to beg them to vote.  On election day, they going to
21   start calling me early in the morning:  "Honey, what time you
22   going to come get us?"
23        Your first question, yeah, I deeply oppose it.  It is a
24   solution in search of a problem.
25   Q.  Beyond seniors, are there any other groups of voters that

1    you believe based on your decades of experience doing voting

2    rights work who will be affected by Senate Bill 14?

3    A.  Yeah, beyond seniors, for instance, African-American

4    young -- young African-American men.  Let's say you're 25 years

5    old, you vote; you get a ticket in Dallas, it cost you $85.

6    You're either unemployed or underemployed, and instead of paying

7    the $85, I think I'm going to sit this ticket out.  I'll spend

8    five days or four days in jail and sit it out.  You come out of

9    jail, you owe the State of Texas three or four thousand dollars,

10   some kind of scheme that the Texas legislature came up with that

11   I don't really understand how to explain it.  But this scheme

12   has disenfranchised a large, large, large, portion of low income

13   men who have traffic tickets that they can't afford to pay the

14   State of Texas off.  There's an $80 ticket that turned into the

15   State of Texas for three or four thousand dollars.

16          I talk to young men like this almost on a weekly basis

17   that come to my office because they can't get their driver's

18   license now, you see.

19   Q.  And in addition to African-American men, that group that you

20   just talked about, are there other groups of voters who would be

21   affected by Senate Bill 14?

22   A.  Well, I think students will be -- whether they are black,

23   white, or Hispanic, Texas students are going to be deeply

24   affected by this.  And if you look at the way students came out

25   and voted four years ago when the quarterback for the University

1    of Texas endorsed President Obama, students in Texas voted in

2    great, great, numbers for President Obama.  This is directed at

3    denying students the right to participate.

4         MS. ABUDU:  I have no further questions for

5    Reverend Johnson at this time.  Thank you, sir.  I pass the

6    witness.

7         JUDGE WILKINS:  All right.  Any examination,

8    cross-examination?

9         MR. FREDERICK:  Matthew Frederick for the State of

10   Texas.

11                        **CROSS-EXAMINATION**

12   BY MR. FREDERICK:

13   Q.  Good afternoon, Reverend Johnson.

14   A.  Happy afternoon to you, sir.

15   Q.  On behalf of the State of Texas, while we do not agree with

16   all of your testimony, particularly about the state government,

17   we do want to thank you for your service in the civil rights

18   movement and your continued service to the State of Texas.

19   That's all I have.  Thank you.

20        JUDGE WILKINS:  All right.  You can step down.  I

21   assume there's no redirect?

22        MS. ABUDU:  No, sir.  Thank you.

23        JUDGE WILKINS:  All right.  You can step down, sir.

24        THE WITNESS:  Thank you.

25        MR. ROSENBURG:  With Your Honor's permission, we would

1    like to call our next witness.

2            JUDGE WILKINS:  Yes.

3            MR. ROSENBURG:  Senator Rodney Ellis, who will be

4    presented by Chad Dunn.

5            MR. DUNN:  This is Chad Dunn from Brazil & Dunn in

6    Houston.  Since it's come up so much, I was born and raised in

7    Spring, Texas, although we called it Sprang.  I also need to

8    note that Senator Ellis is also a witness on behalf of the

9    United States Department of Justice.

10           JUDGE WILKINS:  Certainly.

11           MR. DUNN:  I should have mentioned, I represent the

12   Kennie Intervenors.

13                   (Oath administered by Courtroom Clerk.)

14        **(SENATOR RODNEY ELLIS, DEFENDANT witness, having been duly**

15                  **sworn, testified as follows:)**

16                          **DIRECT EXAMINATION**

17   BY MR. DUNN:

18   Q.  Senator, please state your name.

19   A.  My name is Rodney Ellis.

20   Q.  Could you spell that for our record, sir?

21   A.  R-O-D-N-E-Y, E-L-L-I-S.

22   Q.  Would you introduce yourself to the Court, please?

23   A.  I'm a member of the Texas State Senate, and I've been a

24   member of the Senate for 22 years.

25   Q.  Where from?

1    A.   Houston.

2    Q.   Can you describe your district to us?

3    A.   It's a city district.   I take in some of the wealthiest

4    neighborhoods, most of the poorest neighborhoods, a very diverse

5    district that Barbara Jordan once represented in the state

6    Senate.

7    Q.   How would you describe it racially?

8    A.   It's about 40 percent African-American, about 30 percent

9    Hispanic, you know, probably about 10 percent other, somewhere

10   in that neighborhood, and about 10 percent Anglo.   Ten percent

11   other would be Asian-American, South Asian-American.

12   Q.   Over the time that you've represented the district, has it

13   always been a predominantly minority district?

14   A.   Yes.

15   Q.   What is the community that anchors the voting in the

16   district, mostly?

17   A.   The African-American community.

18   Q.   Now, you mentioned that you represent some of the wealthier

19   parts of the city.   You said that they're in your district.   Is

20   that where most of your votes come from?

21   A.   No.

22   Q.   Have you gotten to know the voters in your district over the

23   last 20-some-odd years?

24   A.   I think so.   I've lasted 22 years.   I think we know one

25   another.

1    Q.  How would you describe the voters in terms of their income

2    level?

3    A.  It's a poor district; I mean, a high percentage of people

4    who get free lunches at the public schools.  It's a fairly poor

5    district, but I do represent the medical center and downtown,

6    some very wealthy buildings.  But basically a poor district.

7    Q.  For our records, is it fair to describe you as an

8    African-American?

9    A.  Last time I checked.

10   Q.  All right.  Some things that we see don't come down in our

11   record.

12            You were here for Reverend Johnson's testimony.  Is

13   that a fact?

14   A.  I was.

15   Q.  You haven't been here for the other parts of the trial,

16   though?

17   A.  That's correct.

18   Q.  You heard Reverend Johnson testify about some incidents of,

19   we'll call them, racial discord in Texas.  Did you hear that?

20   A.  I did.

21   Q.  Do you agree with Reverend Johnson's assessment that racial

22   tension in Texas is improving?

23   A.  I do.  We've made tremendous progress in Texas, and we have

24   tremendous amount of work yet to do.

25   Q.  Do you believe that the racial tension exists at all anymore

1    in Texas?

2    A.  Yes, it does exist.

3    Q.  Is that something you've experienced as an African-American

4    in the state?

5    A.  In subtle ways.  I mean, I've been fairly blessed, but in

6    subtle ways.  As a kid once, many years ago, I was arrested in

7    an incident, and I think race had a bit to do with it.  But that

8    was some time ago.

9    Q.  What are some of your legislative accomplishments that

10   you're most proud of?

11   A.  First the state's budget.  I had the privilege of being the

12   finance chair and passed the budget unanimously in '01.  I

13   passed the James Byrd Hate Crimes Act long before the federal

14   government could do it, and I'm very proud of it.  It took me a

15   decade to pass it, the James Byrd, B-Y-R-D, Hate Crimes Act in

16   Texas in 2001, after working to pass it for a decade under our

17   two-thirds tradition.  But I did pass it after a decade.

18   Q.  About how many bills have you passed, Senator?

19   A.  Over 500.

20   Q.  Turning back to Mr. Byrd, could you describe that gentleman

21   to the court, who he was?

22   A.  He was an African-American in Jasper, Texas,

23   well-publicized; one of the most horrific hate crimes in modern

24   American history, dragged to death in Jasper, Texas.

25   Q.  Jasper is in East Texas.  Is that true?

1    A.   Yes.

2    Q.   Have you followed up on the racial situation in East Texas?

3    A.   I have.   I haven't been to Jasper in about six years, but

4    recently they had an African-American police chief who was fired

5    in a fairly well-publicized incident, and some people lost

6    office over it.   So there are racial tensions there, and issues

7    involving Mr. Byrd's grave being defaced over the years.

8    Q.   And the discharge of the police chief, has that happened

9    just in the last few months?

10   A.   Got a lot of press, *New York Times*.   It was at least within

11   the last six months.

12   Q.   Back to the Hate Crimes Bill, was that an easy piece of

13   legislation to pass?

14   A.   Tough.

15   Q.   How long did it take you?

16   A.   A decade.

17   Q.   Is it fair to describe the debate on that bill as having

18   some racial under tones?

19   A.   It did.   We had a couple of fairly high profile incidents of

20   race crimes, but, you know, race was a part of it; obviously,

21   issues of sexual orientation was there, and swastika issues.

22   But issues of race and class were a big part of it.

23   Q.   How were you ultimately able to overcome at least initial

24   opposition to pass that bill?

25   A.   I think that a lot of my colleagues who had reservations,

1    over time came around from working with them.  It was sort of

2    like the atomic bomb every session that would blow up at some

3    point.

4           A presidential race helped.  That bill, the lack of

5    that bill passing, got a lot of press when Governor Bush was

6    running for president.  So I think after he left, I think a lot

7    of my colleagues didn't really like that spotlight being on our

8    state was a factor, and I also chaired an influential committee

9    and I was probably a lot nicer that session.  That might have

10   helped.

11   Q.  Those senators that initially had opposition, did you have

12   to ultimately answer all their questions about the bill before

13   you could get it through?

14   A.  Yeah, I did, we say "water down."  It was a good bill, but I

15   did over time have to make concessions.  But it was still a good

16   bill, a strong bill, but I did have to tone it down a bit to get

17   some support.

18   Q.  I want to turn now to Senate Bill 14, which is the photo ID

19   bill that's at issue in this case.  You're familiar with that,

20   aren't you, sir?

21   A.  Yes.

22   Q.  And as we talk about the procedure on that bill, to the

23   extent you can make some reflections to the James Byrd Bill, I'd

24   appreciate it.  But the first thing I want to talk about -- and

25   there's already been testimony on this, and the Court has asked

1    us to only cover, as best we can, new issues.  So I'm going to

2    kind of direct you to some new topics as we move on.  Let me

3    know if you get lost.

4           There's been some testimony about the bill being

5    declared an emergency.  Is that your recollection?

6    A.  It was.

7    Q.  What does that mean?

8    A.  That means that the governor declares a bill an emergency so

9    it won't need a four-fifths vote, four-fifths of the membership

10   in order to get it passed in the first 30 days of a legislative

11   session.

12   Q.  In your experience, what kind of bills are typically made

13   emergencies?

14   A.  Well, generally ones that are an emergency.  You know,

15   something that has great public policy impact.  But it is a

16   governor's prerogative.

17   Q.  In terms of Senate Bill 14, was there any impending election

18   that made that bill an emergency factor?

19   A.  No.

20   Q.  Do you have an opinion as to why it was made an emergency?

21   A.  Well, they knew that some members, particularly the members

22   who represent minority districts in the legislature, would use

23   every procedural hurdle possible to try to keep the bill from

24   passing.

25   Q.  Had many of those procedural hurdles been used against you

1    in the James Byrd Bill?

2    A.  Oh, yes.

3    Q.  Any governor ever make your bill an emergency?

4    A.  No, sir.

5    Q.  There's also been some testimony about a 21-vote Rule or

6    tradition.  Do you know what I'm speaking of?

7    A.  I do.

8    Q.  Can you just describe that as you understand it?

9    A.  It takes two-thirds of the membership to bring up a bill -

10   not a resolution, but a bill on the Floor of the Senate -

11   probably patterned after the cloture tradition here in

12   Washington to cut off a filibuster in the U.S. Senate.  It

13   forces you to find a consensus, forces you to wait until an

14   issue is ripe, forces you to get your bill killed.

15   Q.  Is that what happened to you time and again on the

16   James Byrd Bill?

17   A.  Yeah, for a decade.  And most of the bills I carry a

18   fairly -- they're the ones that I have to work a bit to make

19   sure they're ripe.

20   Q.  Do many of your bills impact directly the minority community

21   in the state?

22   A.  They do.  Over 22 years, I'm proud of my entire record, but

23   I have carried a lot of criminal justice reforms.  I would say

24   I've got a pretty good civil rights record in the legislature.

25   Q.  There's been some testimony here that bills pass in the

1    Senate all the time on just a majority vote.  Would you agree

2    with that?

3    A.  No.

4    Q.  What types of bills are passed on a majority vote, if any?

5    A.  Bills that don't matter to anybody, or either bills where

6    nobody is paying attention, or when the tradition is changed,

7    there's usually an eruption.

8    Q.  Had the tradition been changed on redistricting bills?

9    A.  Yes.  In 2003, we did re-redistricting in the middle of the

10   decade, and they did pass that bill with a majority vote.  They

11   broke the two-thirds tradition, which triggered a group of us -

12   including this old man - breaking the quorum.  I was in

13   New Mexico in exile for 48 days.

14   Q.  When you would deal with the 21-vote tradition in working

15   with other senators, did you ever come across an opportunity to

16   skip past it yourself?

17   A.  I did.

18   Q.  When was that?

19   A.  In, I think, 1993.  In 1991 and 1993 I was trying to

20   integrate the judiciary, and there was a lawsuit to force us --

21   I was trying to force the state to elect judges from -- district

22   judges from something less than a county-wide vote.  We elect

23   judges in Texas.

24   Q.  What would the effect of that been?

25   A.  It would have given us a larger number of African-Americans

1    and Hispanics on judicial branches in Texas, as what happened in

2    Mississippi and Louisiana.

3    Q.   What happened when you tried to, shall we say, skirt the

4    21-vote rule?

5    A.   Well, I didn't try to skirt it.  It came up at a deposition.

6    The Attorney General wanted the House and the Senate and the

7    Lieutenant Governor and Speaker to sign off on the settlement,

8    which is unprecedented, but that's what he wanted.  So he wanted

9    a vote in the Senate.  And there was a resolution coming up -

10    why they had it there, I don't know - involving judicial

11    redistricting.  I think it was a bill to say we resolved it, we

12    ought to go back and reapportion judicial districts.  And it was

13    the next one coming up on the agenda.

14    Q.   What does that mean, when it's the next bill coming up?

15    A.   That means it's not out of order.  And a resolution takes a

16    majority vote.  It was not a bill, it was a resolution.  So I

17    was going to pass it by majority voters.  It was coming up.  I

18    was going to substitute something different from what it

19    initially said, but my substitution was germane.

20        The presiding officer of the Senate, the lieutenant

21    governor, was a Democrat, called me in and said, "You think

22    you're slick, you found a way to get your resolution up, but

23    you're going to bust this place up by the seams, and if I were

24    you, I would pray on that a little bit."

25        So I backed down.  I went and met with some of my

1    colleagues who didn't agree with me, Republicans, and some

2    Democrats who weren't crazy about it.  And the compromise we

3    reached was instead of passing that resolution through the

4    Senate, which under the rules the resolution could be passed by

5    majority vote, I could have asked the Senate to meet in

6    Committee of the Whole and I could pass the resolution through

7    the committee, not through the Senate.  Same 31 votes, but

8    pretty important.

9           Then I went to the Attorney General and said, "Hey, I

10   can't pass it through the Senate.  I'm going to rip tradition.

11   It will come back to haunt me in the Senate.  Will you take a

12   simple vote that you don't need in Committee of the Whole on

13   this resolution?"  He said, "Yes."  I did it, and we passed it.

14   Then the judges went to court and blocked me in federal court.

15   So, so much for that.

16   Q.  Just to be clear, the measure didn't pass the Senate as a

17   whole, it only passed the Committee of the Whole?

18   A.  That is correct.

19   Q.  So it didn't have the effect, to the extent resolutions do,

20   of becoming law.  Is that true?

21   A.  True.  And resolutions, I could pass one resolved that we

22   honor the great lawyers in this room today.  It's worth the

23   paper it's written on.

24   Q.  Right.  Now, there's also been some testimony here about the

25   intent calendar in the Senate, and in particular, that the

1    intent calendar gives ample notice to senators as to what may be

2    debated.  Do you agree with that?

3    A.  No.

4    Q.  Why not?

5    A.  The intent calendar is simply a list of all of the bills

6    that are eligible to come up on the floor.  The tradition is,

7    you have your two-thirds, you have your 21 votes or you would

8    not be recognized, and you are recognized at the pleasure of the

9    presiding officer.

10        So even if you have 31 votes - I've been there - and if

11   the presiding officer of the Senate chooses not to recognize you

12   to bring it up, you don't get to bring it up.  It is a strong

13   president of the Senate tradition form of government in Texas,

14   lieutenant governor controls the floor of legislation.

15   Q.  There's also been some testimony that it's common for

16   senators to bring up important pieces of legislation when

17   another senator is absent.  Is that true, in your view?

18   A.  No, that's not true, unless the senator cut a little deal.

19   I know it's hard for you-all to believe we do that, if I say,

20   "Could you vote on this while I'm out?"  But you don't do that.

21   We leave our votes sometimes.  It's a small body, 31 members, so

22   you have to have some element of trust among one another.  So if

23   one has to eat, go to the doctor, go to facilities, you don't

24   try to slip something past somebody.  If so, I would have passed

25   a lot more than 500 bills.

1    Q.  Would it have been out of the ordinary for a major piece of

2    legislation like Senate Bill 14 to pass and be brought up while

3    another senator is out of the room?

4    A.  Very much out of the ordinary.

5    Q.  Now, I want to turn to the debate on Senate Bill 14 itself.

6    Did you offer some amendments in that debate?

7    A.  I did.

8    Q.  Do you remember what they were?

9    A.  Well, one was to permit students to use their ID from a

10   public university; one was a same-day voter registration; a

11   third one was to measure whether or not this legislation, this

12   bill, would have a disparate impact on racial and ethnic

13   minorities, the elderly, a whole list of things prospectively,

14   so after it passed.

15   Q.  So I'm going to turn first to the public school university

16   ID amendment.

17       MR. DUNN:  For the record, I'll indicate that's at

18   Joint Appendix 2740 and it was Floor Amendment 19.

19   BY MR. DUNN:

20   Q.  Can you describe generally what that amendment would have

21   done?

22   A.  It would have said you could use your student ID from any

23   public university in Texas.  I think my reference was to

24   four-year universities, not community colleges.  I just can't

25   remember.  I think four-year universities.

1    Q.  Why did you think that would be helpful?

2    A.  A lot of young people are just not -- you know, they may not

3    have a driver's license, they may have lost their driver's

4    license, you have to motivate them to go get ID.  Plus, somebody

5    had an amendment -- I think I thought of that one sort of on the

6    fly.  Someone had an amendment for handguns, and normally I'm

7    someone who is not necessarily in line with the gun-toting

8    crowd.

9    Q.  Did you vote for the amendment allowing for a handgun

10   license to work?

11   A.  I did, in part hoping I would get a little sympathy and get

12   some votes for mine.

13   Q.  Did you make some comments on the Floor on the handgun

14   license?

15   A.  I did.  I did.

16   Q.  What sort of things did you say that you thought might get

17   you some sympathy later on?

18   A.  "I'm going to vote for this.  You-all know that I'm not a

19   big fan of handguns.  Unlike some of you who tote guns on the

20   Floor in the middle of a debate, I'm not licensed to carry.  I'm

21   going to vote for this and hope you will be as equally

22   sensitive," or something like that, "with an amendment I'm going

23   to ask you to consider shortly."

24   Q.  And that was the next amendment?

25   A.  Pretty close.  I don't remember when.

1    Q.  Now, what was the opposition, if there was any, to the

2    university ID amendment of yours?

3    A.  One question that came up was, do I know how many

4    universities we have in Texas.  And I didn't know, still not

5    sure.  It might be 40 or 50.  But it was along the lines of

6    whether each university could have a different policy.  Do we

7    know if they all have the same policy.  And if you are a student

8    in college in Texas, do you have to be a citizen.  Then there

9    may be something in the record of me saying I don't think

10   anybody who is in the country illegally would try to vote.

11   Q.  Are you aware of how many IDs -- forms and types of IDs

12   there are of military IDs?

13   A.  A lot of them.  I know we think of the Army, the Navy, the

14   Air Force, but you've got various folks have their state

15   National Guards, you've got a lot of them.  I don't know how

16   many, but there are a lot of them.

17   Q.  What was the fate of your university ID amendment?

18   A.  All of the members who represent minority districts voted

19   for it; others voted against it.

20   Q.  Was it tabled?

21   A.  Yes.

22   Q.  The second amendment you mentioned was same-day

23   registration.  Can you describe what that would have done?

24   A.  That would have provided what happens in Iowa, several other

25   states - I can't remember off the top of my head - where you can

1    go and register to vote with whatever system the state puts in

2    place on the day of voting.  So in our state we have a couple of

3    weeks of early voting.  You have to go in, whatever procedures

4    one wanted to put in place, if you wanted to require that they

5    have a photo ID or sign an affidavit, but you could register

6    people on the day that they go to vote, which several states in

7    America do.

8         MR. DUNN:  And for the record, that's in Joint Appendix

9    2745 to 2746.

10   BY MR. DUNN:

11   Q.  What was the opposition, if there was any, to that

12   amendment?

13   A.  Very limited discussion.  Something along the lines of:  I

14   know you've had that bill before, so you have ample time to get

15   your votes and bring that up, I'm sure it would be two-thirds,

16   and bring it up as a separate bill.  But it was very limited

17   discussions.  It was pretty much dismissed out of hand.

18   Q.  Is that true of all three of these amendments?

19   A.  All three of mine, and probably all 30 or 40 that were

20   offered.

21   Q.  What was the fate of the same-day registration amendment?

22   A.  It failed.  I think maybe 20, 21 -- 31 of us, I may have had

23   10 votes for it.

24   Q.  And what were the characteristics of the senators who

25   supported it, the amendment?

1    A.  I had most of the members who represent minority districts,

2    with the exception of one, I think.

3    Q.  And then the final amendment you mentioned was a report on

4    the bill.  Can you describe to the Court what that amendment

5    would have done?

6    A.  Well, it could have asked --

7              MR. DUNN:  Excuse me, Senator.

8              JUDGE COLLYER:  Excuse me.  I apologize to everybody

9    for interrupting.  Thank you.  Go ahead, sir.

10             MR. DUNN:  Just for the court, Senator Rodney Ellis is

11   on the stand.

12   BY MR. DUNN:

13   Q.  We're talking about the third and final amendment.  Can you

14   describe to the Court what it was?

15   A.  It asked for a breakdown by race, ethnicity, age, other

16   factors of who would not have a government ID.  It would give a

17   breakdown after this bill was implemented, what the impact was

18   in various communities.  So it was essentially to get an answer

19   to all of the questions that I and others were asking before the

20   bill would go into effect.  So at least I wanted to know after

21   it went into effect.

22   Q.  Would the amendment at all have delayed or changed the

23   implementation or effect of the bill?

24   A.  No, not at all.

25   Q.  It was simply a report --

1    A.  Yes.

2    Q.  -- to be given.

3         What was the opposition, if any, to the amendment?

4    A.  The comment was made, you're a member of the Senate, you can

5    ask the Secretary of State just like anybody else can.  My

6    reaction was, I have asked.  I didn't get it before the bill

7    came up on the floor, so I would like to get it after the bill

8    passed.  Everybody knew the votes were there.

9    Q.  Over the course of the debate, did other senators mention

10   during the debate that they were seeking information from

11   Secretary of State and not receiving it?

12   A.  They did.

13   Q.  In spite of that event, what was the outcome of your

14   amendment?

15   A.  It failed.  All the members who represented minority

16   districts voted for it and all the members who did not voted

17   against it.

18        MR. DUNN:  For the record, that's at Joint Appendix

19   2747.

20   BY MR. DUNN:

21   Q.  Now, how many bills have you passed, Senator, in your

22   history?

23   A.  A little over 500 that I've been the lead sponsor on.

24   Q.  When you do that and you get down to the Senate Floor and

25   you're trying to get your 21 votes, what are some of key

1    characteristics you need to have to get the 21 votes?

2    A.  I need to know what the bill does.  I need to know of any

3    impacts it may have on various groups.  I ought to be able to

4    respond to questions like what inadvertent impact, what

5    unintended consequences would it have.  I have to know what it

6    is, tell people how it would impact their districts.  Sometimes

7    you've got to give members a sense of how it would impact their

8    politics if you know better than -- if it's your bill, you ought

9    to know about it, or at least I ought to know about it.  I'll

10   need for them to vote for me again, so I need to know.

11   Q.  When you asked Senator Fraser questions about

12   Senate Bill 14, questions along the lines you just described,

13   what kind of response would you receive?

14   A.  Very minimal:  "I'm not advised.  Ask the Secretary of

15   State."

16   Q.  Is that the typical response you expect from a senator on a

17   main line bill?

18   A.  No, that would indicate to me that either the person didn't

19   feel that good about what they were doing.

20   Q.  Now, also there's evidence that the photo ID bill was in

21   various sessions leading up to its final passage.  And you were

22   present for those debates.  Is that true?

23   A.  Yes.

24   Q.  How would you describe the progression of the bill?  Did it

25   get more restrictive or less restrictive, better or worse?

1    A.  It got more restrictive over the years.  We meet every other

2    year, so every session it was stronger.

3    Q.  Is that a typical circumstance that bills as they spend time

4    in the legislature get more restrictive?

5    A.  No.  Usually to get more support, unless something changes,

6    unless people change their mind, usually you make some

7    concessions to try and get your votes to accommodate concerns

8    that are raised.

9    Q.  What, if anything, allowed the Senate to make the ID bill

10   more restrictive this session?

11   A.  Majority vote.  You know, if you have any votes, you can do

12   whatever you want to do.  And to be able to pass it by a simple

13   majority as opposed to a two-thirds vote, I assume there's very

14   little reason to make concessions.

15   Q.  Now, just a few issues I'm going to jump around, and then

16   I'm almost finished.  But you're familiar with African-Americans

17   in particular in your district that vote, and you heard

18   Reverend Johnson's testimony earlier about older

19   African-Americans?

20   A.  Yes.

21   Q.  What is your opinion on older African-American voters'

22   propensity to vote in person or mail?

23   A.  My daddy is 91.  It's a rich tradition to go and vote on

24   election day.  My wife is younger, and she still goes to vote on

25   election day.  It's just -- it's -- old habits die hard.  So

1    even with a two-week voting period, if I had a challenger in a

2    primary, I would worry about what might happen on election day.

3    All that early ballot, mail-in, not with my black voters, it

4    just does not work.  They want to vote on election day.

5    Q.  Now, Reverend Johnson also talked about a gentleman who had

6    parking tickets and would lose their license.  Do you remember

7    that testimony?

8    A.  I do.

9    Q.  Is that a problem that you have in your district?

10   A.  Major problem; my district and statewide, at least over a

11   million people because of surcharges we put on tickets.  It's a

12   civil penalty, it's not a felony.  You still have a right to

13   vote.

14   Q.  Is there any effect in your mind for requiring this new

15   state election certificate to be issued at the DPS office?  Is

16   there any significance of that to you?

17   A.  Most people in their right mind, if you owe for a ticket,

18   you probably wouldn't show up and pass somebody in a uniform and

19   say, "I would like to come get my state issued ID so I can

20   vote."  That's just not high on your priority list if you're in

21   your right mind.

22   Q.  Are there members of the minority community who may not have

23   a parking ticket issue, but still have some apprehension about

24   being before a uniformed officer?

25        MR. MORTARA:  Your Honor, I object on foundation

1    grounds.

2            JUDGE COLLYER:  I think there's been sufficient

3    foundation.  Do you agree with me?  I only heard a little bit of

4    this.

5            JUDGE WILKINS:  Yeah, overruled.

6    A.  Yes, I'm a state senator.  If a law enforcement official

7    stops me rushing to the airport, I'm going to put on my very

8    gentle attitude.  Culturally, I think, I don't know about other

9    groups, but clearly for blacks, yeah, that's still an

10   apprehension of law enforcement, for whatever reason, because of

11   historical issues.

12   BY MR. DUNN:

13   Q.  I'm going to move to another issue now.  There's been some

14   testimony in this case about Representative Deborah Danburg.

15   Are you familiar with her?

16   A.  I am.

17   Q.  Who is she, for the court?

18   A.  She's a state representative, Anglo state representative

19   that represented the 10 percent of my district that is

20   Anglo-American.

21   Q.  There was some testimony about her in 1997 carrying a bill -

22   I believe it was House Bill 330 - dealing with identification

23   and voting.  Do you recall that bill?

24   A.  I do.

25   Q.  The testimony, I believe, here was that the bill passed the

1    House overwhelmingly, and that it would require the showing of

2    photo ID, and that was ultimately changed in the Senate.  Is

3    that how you recall it?

4    A.  The bill did pass overwhelmingly; I think unanimously in the

5    Senate.  I voted for it.  I don't know if we had a journal in

6    the Senate that year.  What that bill did was make it easier to

7    vote, so if you didn't have your voter registration card, but

8    you went to vote and your name -- if you didn't have your card

9    and your name is not in the directory as someone who is

10   registered, you could show an ID and still be able to vote.

11       So what that bill did was make it easier to vote, which

12   is why both parties -- I don't think a soul testified against

13   it.  So that bill was not restricting anybody's ability to vote,

14   it was making it easier.

15   Q.  Which governor signed that bill?

16   A.  Governor Bush.

17   Q.  The parameters in that bill, is that ultimately what we're

18   operating under today and before Senate Bill 14 is put into

19   effect?

20   A.  It is.

21   Q.  Now, Senator, is it your opinion that Senate Bill 14 will

22   have a disparate impact on the minority community?

23   A.  It is.

24   Q.  Why do you think that?

25   A.  I think most of the people in Texas who don't have

1    government issued ID are African-Americans or Hispanics, and

2    that's validated by -- I've seen the Brennan Report, the

3    Baker Carter or Carter Baker Commission Report.  Based on my

4    personal experience, people that -- in my district who complain

5    about surcharges disproportionately, even in overwhelmingly

6    minority district, they are my Black and Hispanic constituents.

7    Q.  What effect, if any, did the State, not having provided you

8    information that you asked for, have on your opinion?

9    A.  Well, it indicated to me that the State knew that it would

10   have a disproportionate impact on people of color, which is why

11   they didn't want to go and supply the information.  I just don't

12   think it's that hard to go and pull the data and see who has

13   surcharges.  I mean, on our driver's licenses we put the race

14   and ethnicity on that there.  That's the common ID most people

15   would have on the driver's licenses.

16   Q.  What effect, if any, did it have that all of your amendments

17   were rejected?

18   A.  That indicated to me a tremendous insensitivity, and that my

19   colleagues knew what they were doing, intended to do it, and

20   operating under the rules of the majority vote, they were going

21   to do it.

22   Q.  In your opinion, was there serious consideration of your

23   amendments and those of any of the other minority members of the

24   legislature?

25   A.  One.  I think it was a minority member who offered the

1    licensed handgun holder.  I'm not sure, but I think that was

2    Senator Hinojosa who offered that.

3    Q.  Senator, do you have opinion as to whether the Senate as a

4    whole passed Senate Bill 14 with a discriminatory intent?

5    A.  I do.

6    Q.  Why do you have that opinion?

7    A.  Based on my experience.  I've been there 22 years.  Hey, I

8    know it.  I love all my colleagues.  One is in the audience

9    today.  They are my friends, but they knew what they were doing

10   and they intended to do it.  Speeches on the Floor made the

11   comment to them that those are decent people that passed the

12   poll tax, but they were on the wrong side of history.  In this

13   crowd, they're my friends, but they're on the wrong side of

14   history.  Good people did a very bad thing.

15   Q.  How can one know whether this is political interests at play

16   or -- let me strike that.

17         Was there any argument made during the debate that one

18   of the purposes for this bill was to keep Democrats from voting?

19   A.  Now, this bill has everything to do with race and nothing to

20   do with party.  Particularly, as it relates to Hispanics.

21   Governor Bush, as an example, did very well with Hispanic

22   voters.  Despite my efforts to minimize, he did very well.  This

23   bill would disenfranchise the very Hispanics who voted for

24   Governor Bush.

25         MR. DUNN:  Thank you, Senator.  No more questions.

```
 1          MS. MARANZANO:  Good afternoon.  Jennifer Maranzano on
 2     behalf of the Attorney General.
 3                        DIRECT EXAMINATION
 4     BY MS. MARANZANO:
 5     Q.  Senator, I just have a few questions.  Are you familiar with
 6     the driver's license offices in your district?
 7     A.  I am.
 8     Q.  Are the driver's license offices in your district easily
 9     accessible by public transportation?
10     A.  No, they're not.  I have an inner city district, so we're
11     inside the loop, the loop that's around the inner city of
12     Houston.  I must admit we senators get VIP treatment.  We show
13     up and somebody will give us our license.  For my constituents,
14     they don't have that privilege.
15     Q.  What are the approximate wait times at the driver's license
16     office's in your district?
17     A.  I've heard complaints that the lines have been as long as
18     two, three, four hours.
19     Q.  What, if any, law enforcement presence exists in the
20     driver's license offices?
21     A.  Quite a bit.  I mean, as I said, I haven't been in a while,
22     but when I went to get my license, I didn't have any surcharges
23     on me, but the last time I went, law enforcement is there.
24     Q.  Would some of your constituents be intimidated to go to an
25     office with a law enforcement presence?
```

1    A.  Yes.

2    Q.  Why is that?

3    A.  As I stated earlier, just the tradition, I think, for

4    African-Americans in general, there's a fear of law enforcement.

5    But if you have a surcharge, if you owe a ticket, if you owe for

6    something, you know, that's probably not the best place to go

7    past someone in a Texas Rangers uniform to go get this so-called

8    state issued ID in order to vote.

9         MS. MARANZANO:  Thank you.  I have nothing further.

10         JUDGE WILKINS:  All right.  Cross-examination?

11         MR. MORTARA:  Yes, Your Honor.  A moment, Your Honor,

12    while I set up my computer.

13                    **CROSS-EXAMINATION**

14    BY MR. MORTARA:

15    Q.  Hello again, Senator Ellis.

16    A.  How are you?

17    Q.  I'm doing great.  It's great to see you again.  We spoke a

18    little bit in January.  Do you remember that?

19    A.  I do.

20    Q.  I think we spoke for about three minutes, maybe less;

21    probably just six or seven today.  I want to talk about some of

22    the statements that were made in the Committee of the Whole.

23    You talked a lot about the discussions in the Committee of the

24    Whole and on the Senate Floor.  Right?

25    A.  That's correct.

1    Q.  And I think you know the exchange I'm going to talk to you

2    about.  It happened on January 25th, 2011.  And I'm showing you

3    what was marked at your deposition as Ellis 3, and is now

4    Plaintiff Exhibit 573, but it's definitely a case of

5    over-designation because it begins on JA 000375, for the Court's

6    reference.

7            And I want to take your attention to the bottom of the

8    second page, where you ask Senator Fraser down around what has

9    been transcribed at line 15 and then at line 19, you ask

10   Senator Fraser, "Are you confident, Senator, that your bill

11   would not have a disparate impact on the elderly, on women, on

12   those that are physically challenged, on racial ethnic

13   minorities?"

14           Senator Fraser answers, "I am."

15           You begin again, "Are you confident, Senator Fraser?"

16   Probably talking over each other.  He says, "Absolutely sure."

17   He says, "I have not filed the bill -- I would not have filed

18   the bill if I had thought about that.  I want to make sure that

19   every person in the state has a right to vote.  The -- not --

20   you know, the right that we extend to them, they should have

21   that, and I do not believe that in any way we're impacting that,

22   and that -- that -- you know, I want to make sure that the

23   groups you're talking about, you know, women, minority, elderly,

24   that they all have the right to vote; and I believe my bill does

25   that."

1          And you said, "Okay.  And I know that's your intent."

2    That's what you said in the Committee of the Whole.  Correct?

3    A.  Correct.

4    Q.  When you gave your sworn testimony in this case to my

5    colleague Mr. Sweeten, you told him that what you said in the

6    Committee of the Whole to Senator Fraser was a lie.  Right?

7    A.  That's correct.

8    Q.  So at least at one point, when you were talking in the

9    Committee of the Whole this one time, at least this one time,

10   you lied.  Correct?

11   A.  As you know, the rest of the testimony said it was

12   comparable to saying the gentle lady from wherever.  That's what

13   you call southern genteel, being polite.

14   Q.  Senator Ellis, this did not say, "Gentle lady," or "Gentle

15   woman," it says, "I know that's your intent."  Correct?

16   A.  I suggest you ask Senator Fraser does he think I think that

17   was his intent or was I being nice.

18   Q.  Senator Ellis, can you focus on my question?

19   A.  I did.

20   Q.  What you said is, "And I know that's your intent."  Correct?

21   A.  That's correct.

22   Q.  According to you, if a Latino or African-American voted for

23   Senate Bill 14 in either the House or the Senate, it's your

24   opinion they weren't representing their constituents who were

25   Black or Latino.  Right?

 1    A.  That's correct.

 2    Q.  And, in fact, you've compared minority representatives that

 3    voted for Senate Bill 14 to blacks who supported the South in

 4    the Civil War, correct?

 5    A.  That's correct.

 6    Q.  But you're also aware that the vast majority, the majority

 7    of polling on this issue, shows that both Latinos and

 8    African-Americans, a majority of them support a photo ID

 9    requirement.  Correct?

10    A.  Depends on the question that was asked in the poll.

11    Q.  You're aware that the majority of polls show that a majority

12    of African-Americans and Latinos support a photo identification

13    requirement.  Correct?

14    A.  I am aware that polls that have asked certain questions have

15    indicated that African-Americans and Hispanics support them.

16    I'm also aware that --

17    Q.  Senator Ellis, if the Justice Department or your friend

18    Mr. Dunn wants to ask you for further clarification --

19          JUDGE COLLYER:  This was an answer to the question.  I

20    think he's entitled to finish it.

21    A.  I'm just making a point.  I'm aware of polls if the question

22    that is asked, do you support a voter ID law if you know the law

23    will have a disproportionate impact on African-Americans and

24    Hispanics, then I am told that those polls have indicated the

25    answer is no.

```
 1    BY MR. MORTARA:
 2    Q.  I want to talk a little bit about -- you mentioned on direct
 3    what you call the rich tradition of African-Americans voting in
 4    person.  Do you remember that?
 5    A.  Yes.
 6    Q.  You talked about your -- was it your father?
 7    A.  My father.
 8    Q.  And you talked about even your wife, you said she votes in
 9    person as well?
10    A.  Yes.
11    Q.  And I want to talk a little bit about your household and ID
12    possession.
13    A.  Yes.
14    Q.  You live in Houston, you said.  Right?
15    A.  That's correct.
16    Q.  And you live in your district, you said it was basically an
17    inner city district?
18    A.  Yes.
19    Q.  Do you have a valid Texas driver's license?
20    A.  I do.
21    Q.  And does your wife have a valid Texas driver's license?
22    A.  Yes.
23    Q.  And does your daughter, Maria, have a valid Texas driver's
24    license?
25    A.  Mariah does have a Texas driver's license.
```

1    Q.  Please excuse me, Senator Ellis.  That's the problem when

2    Mr. Sweeten takes a deposition and I come up here, I just read

3    the transcript.

4            And does your daughter, Nicole, have a valid Texas

5    driver's license?

6    A.  Yes, she does.

7    Q.  Now, Senator Ellis, I've got to ask you to help me identify

8    some people, and I'm going to show you a name.  This is a little

9    bit complicated because there's some personal identification

10   here.  I want to be aware of the Court's guidance.  So I'm going

11   to put something up on the computer that has some information,

12   and then I'm going to hand you a piece of paper that has more

13   and see if you can identify the person in this list.

14           MR. MORTARA:  And for the Court's benefit, this that

15   I'm about to show is an excerpt, an individual name from what

16   will be on Plaintiff's Exhibit 1, which will be an encrypted

17   data set given to the Court which will include

18    Professor Ansolabehere's list of voters that allegedly do not

19   have identification.  The Witness doesn't need to be inquired

20   about how that happened, I just want to show him a name from the

21   list and see if he knows the person.

22   BY MR. MORTARA:

23   Q.  And Senator Ellis --

24           JUDGE TATEL:  Excuse me.  This is a name from -- could

25   you just say again where this name comes from.

1          MR. MORTARA:  It comes from Professor Ansolabehere's

2     VRNID list.  I just want to ask Senator Ellis if he knows this

3     person.

4          MR. DUNN:  Objection, Your Honor.

5          JUDGE COLLYER:  There seem to be objections.  It's your

6     witness, sir.  You get to speak first.

7          MR. DUNN:  I was going to yield to the gentle lady.

8     The objection is that the cross-examination is outside of the

9     scope.

10          MR. MORTARA:  Your Honor, we went through this

11     yesterday.

12          JUDGE COLLYER:  Okay.  Yes, ma'am.

13          MS. MARANZANO:  Your Honor, I was also going to object

14     because we have no idea what list this is from.

15          JUDGE COLLYER:  My concern is that you have just

16     testified, and counsel can't testify.  So if you can get a

17     stipulation as to what this is, then you're fine.  If you can

18     pin it to a document that's admitted, you're fine.  If you can

19     get the witness to identify it, that's fine.  But you can't

20     testify as to what it is.

21          MR. MORTARA:  Your Honor, you're absolutely correct.

22          JUDGE COLLYER:  Well, good.

23          MR. MORTARA:  That's why I'm showing the witness what

24     will be from Plaintiff's Exhibit 1.  The Justice Department gave

25     us an exhibit deemed Plaintiff's Exhibit 1 --

```
 1              JUDGE COLLYER:  But now you're testifying.

 2              MR. MORTARA:  But Your Honor, just to be clear, this is

 3      a list of two million people.  You cannot print it out --

 4              JUDGE COLLYER:  Believe me, I'm sorry, you can get a

 5      stipulation from the Justice Department.  If this comes from

 6      them, you get a stipulation.  I'll wait.

 7              MR. MORTARA:  Your Honor, I've been asking them since

 8      last Friday.

 9              JUDGE COLLYER:  Well, all right.

10              MR. MORTARA:  And I said I need it by Monday morning

11      when we start, and they said, "No."

12              JUDGE COLLYER:  Okay, okay, okay.  Let's not argue

13      about that here.  Is there a reason why the Justice Department

14      cannot identify this document as having come from the

15      Justice Department?

16              MS. MARANZANO:  Your Honor, there are multiple

17      databases at issue here, and I think this was just referred to

18      as Dr. Ansolabehere's database, and we're not sure whether it's

19      the list that contains 1.9 million names or 1.5 million names.

20              JUDGE COLLYER:  I can't actually hear you.  Say that

21      again.  I heard up to the part about Dr. Ansolabehere's

22      database, and then you said?

23              MS. MARANZANO:  Dr. Ansolabehere has two data sets that

24      are at issue, there's one with 1.5 million names and one with

25      1.9 million names, and we have no idea which data set --
```

```
 1              JUDGE COLLYER:  Well, okay.  Why don't we do this.  Why
 2      don't you go somewhere else with your questioning.  Why don't we
 3      have the font who knows all things and the font who knows all
 4      things talk to each other.
 5              MR. MORTARA:  Your Honor, that would be great.  These
 6      are my last questions for Senator Ellis, and unfortunately for
 7      Amanda --
 8              JUDGE COLLYER:  She doesn't know.
 9              MR. MORTARA:  -- the databases here are exclusively in
10      the province of one or two attorneys over there and me over
11      here.  And the issue here -- I'll explain it.
12      Professor Ansolabehere did give us two data sets; they both
13      contain the exact same list of people.  One of them has racial
14      information in it, the other one does not.  You can see on the
15      screen right now that the exact same name of the file they gave
16      us, records matched to Catalist for analysis.  They know what
17      file I'm talking about, they know how to look this up and what
18      they're trying --
19              JUDGE COLLYER:  I can't say whether they do or don't.
20              MR. MORTARA:  They do.
21              JUDGE COLLYER:  Well, to be perfectly fair, I'm not
22      sure you can.  You might have capabilities that neither of the
23      attorneys on the other side does.
24              Okay.  Can you not identify this as something from -- I
25      mean, Mr. Freeman, you're the one with the hands-on stuff about
```

1    this, aren't you?

2         MR. FREEMAN:  Your Honor, from the information that's

3    in front of us now -- and this is Dan Freeman for the

4    Attorney General.  From the information in front of me now, I

5    can't tell if this is the complete data that was produced to the

6    State as part of the underlying data to Dr. Ansolabehere's

7    report, or whether this is Dr. Ansolabehere's final 1.5 million

8    person VRNID list.  And particularly the way that counsel is

9    characterizing it has led to some confusion, because he's

10   calling it Dr. Ansolabehere's list, but then he's telling us

11   that there are nearly two million people on it.  That would

12   suggest that it's both, which it certainly can't be.

13        MR. MORTARA:  Your Honor --

14        JUDGE COLLYER:  Yeah, why don't we do this.  I think

15   Judge Tatel is right.  Why don't we just have Senator Ellis, who

16   is looking here very bemused, why don't we have Senator Ellis

17   answer your questions, and then we can argue later about what

18   this is and whether it's here and whether it should be here and

19   whether the testimony should remain in or not.  How is that?

20   Oh, that sounds so smart.  Thank you, Judge Tatel.

21        JUDGE TATEL:  The Court of Appeals.

22        JUDGE COLLYER:  I knew we brought a Court of Appeals

23   judge to the trial for a good reason.

24        MR. MORTARA:  Your Honor, thank you very much.  I'm

25   very much sorry.  That was sort of what I was trying to do.

```
 1            JUDGE COLLYER:  No, no, no, just questions.  We need
 2      your questions.
 3            MR. MORTARA:  Thank you very much.
 4      BY MR. MORTARA:
 5      Q.  Senator Ellis, I'm now going to proceed, and the
 6      Justice Department is going to eventually figure out whether
 7      what I'm showing you is correct.
 8            JUDGE COLLYER:  No comments.  Questions.
 9      BY MR. MORTARA:
10      Q.  Now, you have a name on your screen, and I'm going to give
11      you some supplemental information on a piece of paper that has
12      even more personal information than is on the screen to help you
13      identify the person that you're looking at.
14            JUDGE COLLYER:  I'm sorry.  Now, that you really can't
15      do.
16            MR. MORTARA:  It's just personal data that I've been
17      instructed by the State of Texas not to put on a screen in the
18      courtroom.  It is the address of the person involved.
19            MR. DUNN:  Since the Senator is about to be handed a
20      document that I don't have, would it be trouble if I stood next
21      to him?
22            JUDGE COLLYER:  Absolutely not.
23            MR. MORTARA:  Your Honor, may I approach the bar?
24            JUDGE WILKINS:  Has this document been marked.
25            MR. MORTARA:  It's been marked Plaintiff's
```

1    Exhibit 1-Ellis 1, because it's an entry from Plaintiff's

2    Exhibit 1.

3    BY MR. MORTARA:

4    Q.  Mr. Dunn has given it to you?

5    A.  Yes.

6    Q.  Who is the person that's listed there?

7    A.  Licia Ellis.

8    Q.  Who is Licia Ellis who resides at the address on the piece

9    of paper in front of you?

10   A.  News to me.  If she's at my house, I sure want to know about

11   it.

12   Q.  And why is that?

13   A.  Because if the implication is that's my wife, her name is

14   Licia Green, and her mother happens to be Caucasian but her

15   father is black.  She would be very offended if I identified

16   this as her and said she was Caucasian.

17   Q.  Thank you, Senator Ellis.  That's what I'm getting at.  So

18   you're saying the entry here for a person whose address is what

19   you just confirmed is your home address, whose name is Licia,

20   your wife's name is Licia.  Right?

21   A.  That's correct.

22   Q.  And what is your wife's middle name now?

23   A.  Ann.

24   Q.  And the middle name here is shown as Ann, and I'm not going

25   to say the birth date, but can you confirm the birth date is

1    your wife's birth date?

2    A.  Now, you're going to get me in divorce court, young man.

3    You've gone too far now.

4    Q.  I'm not putting the birthday on the record, Senator, but

5    that is your wife's birthday.  Correct?

6    A.  Might be.

7           JUDGE COLLYER:  On a bad day.

8           THE WITNESS:  I take the Fifth Amendment on that.

9    BY MR. MORTARA:

10   Q.  And her last name there is Ellis.  Correct?

11   A.  That is what it says here.

12   Q.  And the problem you have in part is that her last name right

13   now, according to you, is Green.  Right?

14   A.  (Nodding.)

15   Q.  And the race is listed for this person --

16          JUDGE WILKINS:  You have to verbally respond.

17          THE WITNESS:  Yes.

18   BY MR. MORTARA:

19   Q.  And the race that's listed for this person in the database

20   that I'm showing you is Caucasian.

21   A.  That's correct.

22   Q.  And that's not true for your wife, is it?

23   A.  She doesn't consider herself Caucasian.

24   Q.  Let me just ask you this:  What's the name on your wife's

25   driver's license?

1    A.  I haven't looked at it lately.

2    Q.  If I showed you a document from the Department of Public

3    Safety, would that refresh your recollection as to the name on

4    your wife's driver's license?

5    A.  It may be the name on it, but to be honest with you, I

6    haven't looked at her driver's license.

7         MR. MORTARA:  Your Honor, may I attempt to refresh the

8    witness' recollection with a document from the Department of

9    Public Safety?

10         JUDGE COLLYER:  Well, he hasn't said that it will

11    refresh his recollection.

12         MR. MORTARA:  I thought he said it might.

13    A.  It may be her driver's license, but I don't know how you do

14    in your household, but I don't ask my wife for ID before she

15    comes in.

16         MR. MORTARA:  Senator Ellis, I think you might get me

17    divorced.

18    BY MR. MORTARA:

19    Q.  Your wife, as far as you know, uses the legal name

20    Licia Green?

21    A.  That's correct.

22    Q.  And you have no reason to believe that's not the name on her

23    driver's license?

24    A.  I have no reason to believe that.

25    Q.  But you don't know what name she's registered to vote under,

1    do you?

2    A.  I would have no earthly idea.  I vote early.

3    Q.  Now, I want to show you another list of names from this

4    database.

5             MR. MORTARA:  And that will be it, Your Honor.

6    BY MR. MORTARA:

7    Q.  And you can see I'm just going to change Licia here to

8    Nicole.  You have a daughter called Nicole.  Right?

9    A.  That's correct.

10   Q.  And with the same procedure, we have what's marked

11   PX 1-Ellis 2, and what you can see on the screen, Senator, is

12   three names, three Nicole Ellises, and I want to ask you about

13   the one in the middle at the address that you see there.  Do you

14   know who that person is?

15   A.  I'm not sure.  This is obviously not a yes or no answer.  It

16   has her listed as Caucasian.

17   Q.  The problem that you have is that the person in the middle

18   you've identified basically as your daughter?

19             JUDGE COLLYER:  He didn't.  He didn't.

20   BY MR. MORTARA:

21   Q.  Senator Ellis, other than the race, you would recognize the

22   person in the middle as your daughter Nicole, whom you just

23   testified has a Texas driver's license.  Right?

24   A.  I think that's the case.  We've got a pretty full house of

25   kids, so with her I'm not so sure.  I have to check my

1    Blackberry on these birth dates.  But other than Caucasian, that

2    is my address and that is Nicole's first name.  I don't know

3    what that UNS is.  What is that?  Is that a middle name?

4    Q.  Unfortunately, I'm not allowed to answer your questions.

5    A.  That may be her.

6    Q.  Thank you.

7              MR. MORTARA:  I have no further questions, Senator.

8              JUDGE COLLYER:  All right.  Is there any redirect?

9              MR. DUNN:  There is short redirect, Your Honor.

                          **REDIRECT EXAMINATION**

11   BY MR. DUNN:

12   Q.  Senator, I would like to take you back to the excerpt that

13   Mr. Mortara showed you on the Senator Fraser debate --

14   A.  Yes.

15   Q.  -- where you said, "I understand that's your intent," or

16   something like that to Senator Fraser.  Is that right?

17   A.  That's correct.

18   Q.  What were you trying to do during the course of that

19   discussion?

20   A.  You know, it's a heated discussion.  It's sort of like being

21   polite, saying, "Hey, Senator, I understand this is what you're

22   saying, but."  So it would be comparable to when you see us

23   debating in any legislative body, you say "the gentle person" or

24   "my friend" or "I like to work with you," even when you don't

25   mean it.

1    Q.  Were you shortly after that offering an amendment?

2    A.  I was.

3    Q.  Despite what you said in the record, do you have reason to

4    believe that the legislature's intent was different than you

5    told Senator Fraser there on the Floor?

6    A.  Yeah, I think the legislature's intent was to pass a bill

7    that would have a disparate impact on the minorities.  I know

8    Senator Fraser didn't want to carry the bill.

9    Q.  How do you know that, sir?

10   A.  He's my friend, he's my desk mate.  We talk all the time.

11   During the process of the discussion I said, "Troy, why are you

12   doing this?"  And he said, "Hey, I drew the bean, it was my

13   turn."  I don't think his heart was really in it based on the

14   answers he gave when I asked substantive questions about the

15   impact as well.

16   Q.  Thank you, Senator.

17        MR. MORTARA:  Just a small issue of legislative

18   privilege.  The Senator has just testified about the

19   conversation he just had with Senator Fraser.  He also testified

20   to some more conversations in his deposition.  We had a motion

21   in limine about this, about whether one senator could waive

22   another's privilege or whether it's got to be a joint waiver.  I

23   just want to advise the Court of that issue.  I'm sure the Court

24   can take it for all it's worth.

25        JUDGE COLLYER:  Thank you.

1           MR. DUNN:  May I respond briefly?

2           JUDGE COLLYER:  Yes.

3           MR. DUNN:  I can't say it quite as artfully as

4    Mr. Mortara, but something about opening doors and not liking

5    what's behind it.  The question was about Senator Fraser's

6    intent on the Floor.  That's what the cross-examination was

7    about, and I think he opened the door to the answer.

8           MR. MORTARA:  Your Honor, that is false.  That was a

9    public statement in the Community of the Whole.

10          JUDGE COLLYER:  Wait, wait, one was public and one may

11   have been just between them.  The substance, however, is

12   correct.

13          MR. MORTARA:  Correct.

14          JUDGE COLLYER:  We'll figure it out.

15          MR. DUNN:  Nothing further, Your Honor, on this

16   witness.

17          And I happen to have the next witness.

18          JUDGE COLLYER:  And you happen to have the next witness

19   too.  Oh, I'm sorry, the United States.

20          MS. MARANZANO:  Thank you, Your Honor.  Just very

21   briefly.

22          JUDGE COLLYER:  It's a good thing there are good people

23   around here to keep me straight.

24                         REDIRECT EXAMINATION

25   BY MS. MARANZANO:

1    Q.  Senator, do you believe you have an obligation to vote

2    against bills that you believe are unlawful, even if they have

3    popular support?

4    A.  I do.

5              MR. MORTARA:  Your Honor, this is outside the scope of

6    my cross-examination by a mile.

7              MS. MARANZANO:  I have nothing further.  Thank you.

8              JUDGE COLLYER:  Okay.  Senator Ellis, it's nice to see

9    you again, sir.  Thank you very much.

10             THE WITNESS:  My honor.

11             MR. DUNN:  May I proceed?

12             JUDGE COLLYER:  Please.  Who is your next witness?

13             MR. DUNN:  The Defendant Intervenors call Randall

14   "Buck" Wood.

15             (Oath administered by Courtroom Clerk.)

16   **(RANDALL BUCK WOOD, DEFENDANT witness, having been duly sworn,**

17                    **testified as follows:)**

18                     **DIRECT EXAMINATION**

19   BY MR. DUNN:

20   Q.  All right, Mr. Wood, there's some water to your right.

21   Would you please state your name?

22   A.  Randall Buck Wood.

23   Q.  For our record, would you spell that, sir?

24   A.  R-A-N-D-A-L-L, B-U-C-K, W-O-O-D.

25   Q.  Where are you from, sir?

1    A.   I'm presently reside in Austin, Texas.

2    Q.   And what type of business are you in?

3    A.   I'm a lawyer.

4    Q.   How long?

5    A.   I was admitted to the bar in 1968.

6    Q.   And Mr. Wood, as I'm sure you understand, the court has your

7    CV and your report before them, so we're going to skip over some

8    of these things, but I do want to talk a little bit about your

9    background.

10           In terms of practicing law, what type of experience do

11   you have on election matters?

12   A.   In 1969 I was named the director of elections for the

13   Secretary of State's Office in Texas, and I served in that

14   capacity until 19 -- late 1972.  Once I went into private

15   practice, I have -- I am the busiest election lawyer in the

16   State of Texas, and have been for many, many, years.

17   Q.   Are some of the types of election matters you've handled

18   called election contests?

19   A.   Yes.

20   Q.   Can you describe what those are to the Court?

21   A.   Those are formal trials.  They're technically not part of

22   the judiciary system, but they're formal trials to try to

23   determine who won on election or whether or not the election

24   results can be determined.

25   Q.   Do most of these contests occur in a court of law?

1     A.  Yes.

2     Q.  Are there also election contests that are adjudicated by the

3     legislature?

4     A.  If an election contest is brought in a general election,

5     that is heard by the particular House or the Senate.  The House

6     or the Senate, wherever -- if it's a senator, it's tried to the

7     Senate, if it's the a house, it's tried in the House.

8     Q.  Have you handled contests in both of those bodies?

9     A.  Yes.

10    Q.  Have you handled contests around the state in judicial

11    District Courts?

12    A.  I don't know how many, but yes.

13    Q.  Could you estimate for us?

14    A.  More than 50.

15    Q.  Are you aware of any other attorneys in the state that have

16    done as much election experience as you?

17    A.  No.

18    Q.  Have you represented Republican and Democratic nominees?

19    A.  Yes.

20    Q.  What are some of the more noteworthy cases, or can you name

21    one of the noteworthy cases that you handled?

22    A.  One of them is a sort of famous case.  A Republican

23    candidate for the state Senate, his name is Jeff Wentworth, was

24    disqualified by the Republican party on the basis of a

25    constitutional provision, and I represented him, and it went all

 1     the way to the Supreme Court and the Supreme Court reversed

 2     30 years of precedent and put him on the ballot.

 3     Q.   And you represented the Republican nominee there?

 4     A.   Yes.

 5     Q.   How many cases - an estimate - have you taken that are

 6     election related that has gone to the state Supreme Court?

 7     A.   Two dozen.

 8     Q.   Now, in the course of handling election matters, do people

 9     occasionally make the allegation that there's illegal voting

10     going on?

11     A.   That term "illegal voting," yeah, that's what you're doing.

12     You're trying to determine if someone voted that was not

13     eligible to vote, or if there are other procedures that happened

14     during the election that could have affected the outcome of the

15     election.

16     Q.   Have you investigated illegal voting in the course of

17     working on behalf of your private clients?

18     A.   Before I ever take a case, either on a defendant's side or

19     the plaintiff's side, I investigate the case, because these are

20     very difficult cases to win.  So usually, by the time the

21     lawsuit is filed, a considerable investigation has been done,

22     and in many instances, because of the investigation, the lawsuit

23     is not filed.

24     Q.   How many witnesses would you say you've deposed or

25     interviewed or spoken with about illegal voting matters?

1    A.  I know I've put more than a thousand voters on the stand,

2    and in investigations, I'm sure there's another thousand or

3    more.

4    Q.  Now, there's been some testimony in this case about an

5    election contest involving Donna Howard.  Were you involved in

6    that matter?

7    A.  Yes, I was Donna Howard's lead counsel.

8    Q.  When did what happen?

9    A.  2010.

10   Q.  Would you describe the issues to the Court?

11   A.  The election, it was over 50,000 people voted in the

12   election, and it came down after a recount to 16 votes.  The

13   loser - not Ms. Howard, she was the winner - filed an election

14   contest in the House of Representatives in Texas, and we spent

15   two weeks in trial.

16        Now, the trial was actually before a committee and a

17   master that was taking the testimony, and the allegations came

18   down to some 35 people who appeared not to be eligible to vote.

19   And that was the crux of the problem, whether these people were

20   actually eligible to vote.

21   Q.  So is it true, then, that in that case the Republican

22   nominee alleged that there had been illegal voting?

23   A.  Yes.

24   Q.  Did you investigate that allegation?

25   A.  We investigated it.  We took it very seriously.

1    Q.  What did you discover, if anything?

2    A.  We discovered that there were a considerable number of

3    people, in my experience, that were -- appeared to be ineligible

4    to vote in that election, over 30.  I think 28 of them actually

5    took the stand in that case and testified.

6    Q.  In the illegal voting you found, what kind of illegal voting

7    was it?

8    A.  It was almost exclusively -- in fact, I think it was

9    exclusively people who had moved and were no longer eligible to

10   vote in that race.  They didn't reside in that district.

11   Q.  Now, these case that you did discover of illegal out of

12   county voters, was that reported in the newspapers?

13   A.  This was -- of course, the race was in Austin,

14   Travis County, so then the capitol is there.  It was front page

15   of the newspaper, one section or the other, and on television

16   every night for more than two weeks.

17   Q.  Have you seen any prosecutions of those out-of-county

18   voters?

19   A.  No.

20   Q.  Now, are you aware -- are you aware of any techniques --

21   well, strike that.

22        It's been stated here in testimony that it's difficult

23   to discover illegal in-person voter impersonation.  Do you agree

24   with that?

25   A.  No.

1    Q.  Why not?

2    A.  Because it's easy to the determine that in any

3    investigation.  First of all, let me make this preliminary

4    comment.  I've never seen anybody impersonate someone else.

5    I've heard of maybe one instance of it in 40-some odd years, but

6    it really can't be done.  One person might walk in somewhere on

7    a lark and try to do that, but you can't do it on any sort of

8    scale.  You can't affect an outcome of an election or anything.

9          You can't do it in an organized fashion, you can't do

10   it in a fraudulent fashion, because you would have to know if

11   you were going to impersonate a voter, one, you would have to

12   know if that voter has already voted, and if he has, obviously

13   you're not going to go in and impersonate them.  And you have to

14   feel comfortable that that person is not going to come and vote

15   later, and find out that person has already voted, because

16   you'll get caught.  So you have to know all of those things in

17   order to do it.

18         And in my opinion, I'm not saying it never happens, but

19   I've never, in 40-some odd years of being in elections, ever

20   found somebody trying to impersonate somebody else.

21   Q.  When somebody shows up to in-person vote, do they have to

22   sign in?

23   A.  Yes.

24   Q.  Does the sign-in act as a tool that you use to look for

25   illegal impersonation?

1    A.  Oh, absolutely.

2    Q.  In the course of your practice -- I want to make sure this

3    is clear.  In the course of your practice in the last 40 years,

4    have you looked for extensively illegal in-person voter

5    impersonation?

6    A.  I have looked for it.  One of the things you look for -- in

7    Texas -- this hasn't happened -- it's not a common practice now,

8    but it was many, many, years ago, where they would stuff the

9    ballot box.  And what they would do is at the end of the day,

10   the election officials would go through and look at who hadn't

11   turned up to vote, and they would sign them in and put a ballot

12   in the ballot box, or in some cases a punch card or something of

13   that nature, which means they would be doing it at the bottom of

14   the list, the voter registration list.  You go and look and see

15   when the people signed in, and you start looking -- and it takes

16   a few phone calls literally to determine that person said, "No,

17   I didn't go vote," and in every instance I've ever tried, they

18   say, "Sure I voted."

19        So it's not hard and it's something you can look for,

20   and I will not -- I will say this:  Since we look for things

21   that would discover this kind of information, but it's not

22   something you would spend an inordinate amount of time on

23   because it doesn't exist.

24   Q.  And when you find illegal voting, what do you find?

25   A.  I'm sorry?

1    Q.  When you do find illegal voting, what kind is it?

2    A.  It's almost exclusively by mail, and people who do not

3    reside in the particular jurisdiction and they're living in

4    San Antonio and they've been living there 10 years and they're

5    still voting at mama's house.

6         MR. DUNN:  No further questions.

7         JUDGE COLLYER:  Is there any other -- hold on.  Any

8    other defendant who would like to question this witness?

9         MR. WESTFALL:  No, Your Honor.

10        MR. MORTARA:  Same for us.

11        JUDGE COLLYER:  All right.  You are excused.

12        MR. MORTARA:  Your Honor, I just wanted to take this

13   opportunity to go through the issue that happened in

14   Senator Ellis' deposition on cross, on the State's time, right

15   now.  We have an issue.  Professor Ansolabehere is going to be

16   here tomorrow, and I really want to talk to him about his list.

17   And I gave it to the Justice Department last Friday, and I've

18   been virtually begging them to agree that's the database.  And

19   they haven't done that.  Tomorrow it is Professor Ansolabehere's

20   cross, and I really do not want the Justice Department to be

21   standing up challenging entries from the man's own data set that

22   he gave us.

23        So I'm looking for a solution here, and I'm seeking

24   help, because the Justice Department has so far, day after day,

25   since Friday or Saturday morning when I gave it to them, not

1      confirmed that's the list.  And it's what they gave us, it's the

2      data they gave us.  I gave it back to them.  It's the same

3      thing.

4              I'm just having a little trouble here because I have to

5      cross Professor Ansolabehere.  The way we're going and the rate

6      I'm talking right now, we're not going to have a lot of time,

7      and, as you know, we believe, and it's our position, there are a

8      lot of problems with the list.

9              JUDGE COLLYER:  Okay.  Who is going to speak for the

10     United States?  Ms. Westfall.

11             MS. WESTFALL:  Yes, Your Honor.  We are more than happy

12     to have discussions with the State about whatever database he is

13     relying upon to examine these fact witnesses, but we are

14     unaware, when he's in the middle of an examination of a fact

15     witness, which exhibit he's referring to, which database,

16     whether it's the 1.5 million, whether it's the 1.9 million.  So

17     I don't think we need to discuss this in front of the Court.

18             JUDGE COLLYER:  No, I appreciate the difference between

19     the incident in the midst of the Senator Ellis' examination, or

20     cross, and the underlying issue - slightly different, same

21     relative - that Mr. Mortara is mentioning.  He says he gave you

22     a database on Saturday -- to someone.  Forgive me, someone, and

23     said, "Can you confirm that this is 'X' from Dr. Ansolabehere" -

24     whatever "X" is supposed to be - and he's gotten no response.

25             MS. WESTFALL:  This morning, Your Honor, we did produce

1      a clean copy of the database that had the errors removed to the

2      State, and I think we should continue these discussions not

3      before the Court but between each other.

4            MR. MORTARA:  Your Honor, if I may, on the State's

5      time, there is a serious problem here, and the serious problem

6      is that when I have discussions with them when you're not here,

7      I do not get any answers.  And the other serious problems is,

8      Ms. Westfall herself does not know what's going on.  The

9      database we got this morning is not the databases that

10     Professor Ansolabehere gave us.  The database we got this

11     morning are the rectified, cleaned driver's license database.

12           I'm talking about his two lists of 1.893 million

13     voters.  They're the same list.  One has race, one doesn't.  The

14     DOJ lawyers don't even realize that the two files

15     Professor Ansolabehere gave us have the same number of entries

16     and the same people in them.  So convincing them that what they

17     gave us is what they gave us is a virtual impossibility when

18     they don't know what they gave us.

19           I said to them, "Please, just give it back to me, give

20     it back to me so you can confirm this is the right thing,

21     re-serve it on me, put it on a hard drive, do something and I

22     will swear as an officer of the court that what I'm looking at

23     is the thing they gave me."  They won't do that, they haven't

24     done it, and this is critical for Professor Ansolabehere's

25     cross.  Because what's going on here is I want to show him that

1    there's real problems with this list, and they want to stop me.

2         JUDGE COLLYER:  Please, go ahead.

3         JUDGE WILKINS:  Ms. Westfall, did the Attorney General

4    keep a copy of whatever it was that it produced to Texas?

5         MS. WESTFALL:  This morning on the driver's license?

6         JUDGE WILKINS:  No, no, whatever you originally

7    produced to Texas from Dr. Ansolabehere.

8         MS. WESTFALL:  I am not, unfortunately, able to

9    represent one way or the other -- I'm sure we did keep a copy.

10   I'm confident that we would have kept a copy, but I don't have

11   personal knowledge of that, and the attorneys who do are not in

12   the courtroom at present.

13        We're happy to have discussions with the State when we

14   have the right people together in the room.

15        JUDGE COLLYER:  Well, why don't we do this.  Why don't

16   we do this.  With respect to the United States of America, it

17   has numerous people, some of whom are very computer intelligent,

18   in the room.  And maybe one of those persons could leave the

19   room and go to a part of the courthouse like the annex, atrium,

20   where you can actually get a telephone to work, and you can say

21   to somebody who knows the answer to this question:  What is the

22   answer to this question posed by the State of Texas?

23        It seems to me -- it seems to me to be a legitimate

24   question that's being posed by Mr. Mortara, and he just needs to

25   get an answer:  Yes, that is, yes, it is, I admit it is,

1    whatever it is you want to know.

2           Now, if you -- are you handling the next witness?  Who

3    is the next witness?

4           MR. MORTARA:  No, Your Honor, I think the next witness

5    is --

6           MR. ROSENBERG:  He'll be from the Defendant Intervenor,

7    Your Honor.

8           JUDGE COLLYER:  Are you handling it?

9           MR. MORTARA:  Assuredly not, Your Honor.  I'm not

10   allowed to handle any witnesses other than Senator Ellis for a

11   few minutes and Professor Ansolabehere from now on.

12          JUDGE COLLYER:  I don't know who is making the calls,

13   but clearly a very smart person.

14          MR. MORTARA:  That would be me, Your Honor.

15          JUDGE COLLYER:  That was a joke.  I just want the

16   record to be clear that I had a smile on my face when I said

17   that.

18          All right.  Who is the smart person on behalf of the

19   United States of America who is going to walk down the hallway

20   to where the annex is and make this phone call?

21          MS. WESTFALL:  That would be me, Your Honor.

22          JUDGE COLLYER:  You don't speak computer.

23          MS. WESTFALL:  But I need to consult with other

24   attorneys in the office.

25          JUDGE COLLYER:  Okay.  Then you go together.

1          MS. WESTFALL:  On an unrelated issue, while I'm before

2     the podium, I wanted to advise the Court that we've had more

3     harmonious discussions about exhibits, and I would like to

4     advise the Court that we have -- the parties have agreed that if

5     we have any objections to any of the exhibits on each other's

6     trial exhibit lists, that we will notify each other by Thursday.

7     Is it okay and permissible to the Court to file a notice that

8     lists any objections to exhibits this evening or by tomorrow?

9          JUDGE COLLYER:  Sounds wonderful.

10          MS. WESTFALL:  Wonderful.  We do have agreement on

11     something.

12          JUDGE COLLYER:  You're going to call your next witness?

13          MR. ROSENBERG:  Ezra Rosenberg from Dechert on behalf

14     of Defendant Intervenors.  The next witness will be

15     Dr. Henry Flores, who will be presented by Jorge Sanchez from

16     MALDEF.

17          (Oath administered by Courtroom Clerk.)

18          **(HENRY FLORES, DEFENDANT witness, having been duly sworn,**

19                    **testified as follows:)**

20                    **DIRECT EXAMINATION**

21     BY MR. SANCHEZ:

22     Q.  Good afternoon.  Could you please state your name for the

23     record?

24     A.  Henry Flores.

25     Q.  And Dr. Flores, what is your current occupation or

1    employment?

2    A.  I'm the dean of the graduate school at St. Mary's University

3    in San Antonio, Texas, and I'm also a professor of political

4    science at the same university.

5    Q.  And what kinds of -- what courses do you teach as a

6    professor?

7    A.  I teach research methods, statistics, sometimes Latino

8    politics and election politics.

9    Q.  And the research method class that you referenced, is that

10   qualitative or quantitative research methods that you teach?

11   A.  It includes both.

12   Q.  You prepared a report for this case.  Is that not correct?

13   A.  That's correct.

14   Q.  And in that report you highlight your past participation in

15   litigation and your qualifications as well.  Is that correct?

16   A.  That's correct.

17   Q.  Were you an expert for the Republican Party in the 1991

18   Texas redistricting?

19   A.  Yes, I was.

20   Q.  Did you do other work for the Republican Party?

21   A.  I've consulted with the Bexar County Republican Party from

22   time to time on some election issues.

23   Q.  When you were hired as an expert for this case, what is it

24   that you were asked to study or consider?

25   A.  I was asked to determine whether or not there was a racial

1    purpose behind the writing, the construction of Senate Bill 14.

2    Q.  And your report has sections about changing demographics,

3    about noncitizen voting fraud as a rationale for SB14, and one

4    about the racially charged atmosphere around the 2011

5    legislative session.  Can you tell me about the changing

6    demographics and its significance to your report?

7    A.  Well, the State of Texas has been undergoing some dramatic

8    demographic changes over the last 30, 40 years, but more

9    importantly and most recently in the last 20 years.  And it's

10   become increasingly Latino.  We are now a majority/minority

11   state.  Some projections, depending on who you're speaking to,

12   indicate that the State of Texas is by 2020, 2030 will be a

13   majority Latino state.  The majority of infants born in Texas

14   now are Latino.

15        So the important thing for me is that as I was doing

16   the research, occasionally the issue of demographics would come

17   up around the discussion during the consideration for various

18   voter ID bills from 2005 to 2011.

19   Q.  What was it about the way that the issue of changing

20   demographics came up that you found significant for the

21   conclusion that you reached in your report?

22   A.  When looking at Senate Bill 14 specifically, I began my

23   research by looking at the legislative record.  I started really

24   from the front end going backwards.  I looked at the 82nd

25   session in 2011, and the dialogue between the senators and

1    between the House members whenever the bill was being considered

2    in either chamber kept speaking to it periodically.

3         And then as I worked my way back, I actually ran across

4    one particular incident where Representative Anchia had asked

5    Representative Harless about the bill, and she just blurted out

6    that the reason that they were considering voter ID was that the

7    population demographics were changing and they had to pass that

8    bill now to stop it.

9    Q.  What role -- what is the role of noncitizen voting fraud in

10   terms -- excuse me.  Scratch that.

11        Why is noncitizen voting fraud relevant to the context

12   of SB14?

13   A.  Well, when I was looking at the rationale and the

14   legislative rationale for the passage or the writing of Senate

15   Bill 14 and designing it the way it was, one issue that came up

16   early on was -- in 2005, 2007, 2009 legislative sessions was the

17   whole idea that voter identification was important to act as a

18   deterrent to voting fraud, massive voting fraud.  As a matter of

19   fact, in every legislative session there's some reference to the

20   massive voting fraud being committed by illegal immigrants that

21   are coming across the border.

22        So I began to do research on voting fraud itself to

23   find out what the incidents of voting fraud have been

24   historically in the State of Texas, and it was minimal.  I mean,

25   I found one or two cases mentioned here or there in various

1    sources, but when you did see voting fraud, for the most part it

2    was almost fraud that was perpetrated around mail-in ballots.

3         So I didn't -- when I realized that, I said, well,

4    voting fraud really then is not the real reason for the passage

5    of the bill, and I started looking for other reasons.

6    Q.  And what did you conclude those other reasons were?

7    A.  Well, given all the rhetoric that was going on in the

8    various legislative sessions, it seemed to me that

9    Senate Bill 14 -- Senate Bill 14 had been turned into an

10   anti-immigration bill, and that they were passing voter

11   identification to prevent immigrants from coming into the

12   United States.  And as we've heard from testimony earlier today,

13   it's pretty hard to do in-person voting fraud as it is, let

14   alone by one individual, let alone masses of undocumented people

15   coming across the border at any given time.

16        So that rhetoric, the more I thought about it, I said,

17   well, you know, if this is what they're really after, the

18   proponents of the bill, then where do illegal immigrants or

19   undocumented workers come from in the State of Texas

20   principally?  They come from Mexico, they come from

21   Latin America, so Senate Bill 14 in my own mind turned into an

22   anti-Latino bill; and as a result, I concluded that was one of

23   the reasons I concluded that race was at the heart of Senate

24   Bill 14.

25   Q.  One of the other sections of your report talks about the

 1    atmosphere around the 2011 Texas legislative session.  How does

 2    that factor into your report?

 3    A.  I don't remember which state representative mentioned this,

 4    I think it was Martinez Fischer who mentioned they're working in

 5    a pressure cooker-type of atmosphere.  And one of the things I

 6    went and did was try to look at really what kind of atmosphere

 7    was surrounding the legislative session, and by some estimates,

 8    there were as many as 100 immigration bills filed, bills that --

 9    there was three bills on English as an official language, there

10    was a bill that wanted all children in bilingual education

11    classes identified by name, there was another bill that wanted

12    to tax remittances to Mexico, Central America, and South America

13    only.  You know, I don't know why they didn't add Canada,

14    Africa, Europe, and Asia, but it was very specifically, Mexico,

15    Central America, and South America.  You add them all up and

16    you've got this entire environment, legislative environment,

17    that together with the dialogue surrounding the passage of

18    Senate Bill 14, and race was at the heart of the whole thing.

19         The layer outside the legislature is a layer of the

20    social environment, mostly by the media, and you saw a lot of

21    media speaking to -- there were press conferences, there was a

22    couple of rallies held on the state capitol for instance that

23    were captured on YouTube, and I think the Court saw that in the

24    redistricting lawsuit.  I'm not sure.  Where one individual

25    actually said that the reason they couldn't get any good

1    immigration bills passed in the State of Texas was because there

2    were too many Hispanic legislators elected to office and they

3    had to get rid of them all.

4         And really, that was the environment surrounding the

5    legislature, so for me, race was at the heart of this entire

6    thing.  You know, frankly, I said this in my deposition, and I

7    said this in my report, I've been through three rounds of

8    redistricting and I've been observing Texas politics for

9    30 years.  I'm a native Texan, my grandfather was one of the

10   founders of the LULAC, and I've never seen the environment in

11   the state capitol as bad this year, as far as race is concerned,

12   ever in my professional life.

13   Q.  In your report you talk about this concept of anchoring as

14   part of your methodology and how you arrived at your

15   conclusions.  Could you talk to me a little bit more about this

16   concept?

17   A.  Yeah, anchoring is -- comes out of the world of decision

18   theory, and in a most recent book by Daniel Kahneman - I may

19   have mispronounced his name - is a Nobel Laureate in Economic

20   Sciences and he studies the way organizations and individuals

21   make decisions about everyday life and strategic planning and

22   budget, et cetera.

23        Anchoring is really the whole concept that whenever

24   we're trying to make a decision, we're kind of anchored in one

25   particular place.  We have a starting point that we begin the

1    decision process from.  The courts start with the law, for

2    instance.  You don't -- none of us really start with a blank

3    slate on anything.

4         And for me, the Texas state legislature was anchored in

5    the whole concept of race relations, and the way they viewed

6    Latinos when they were considering and writing Senate Bill 14.

7    So that was the foundation of what they were -- that was behind

8    their thinking on this law.

9    Q.  You also talk about in your report the shifting terminology

10   or language, rhetoric used around these issues.  Could you

11   explain a little bit more about what the significance of that

12   is?

13   A.  I think Senator Ellis talked about southern genteelism, and

14   I'll get to that in just a second.  Essentially, as I said, I've

15   been watching Texas politics for 30 years, and I've been a

16   victim of racism periodically throughout my lifetime, and in the

17   1950s, it was very clear what kind of language was used to talk

18   about Latinos.  I mean, we were called greasers, we were called

19   beaners, we were called spics, we were called messcans.  That

20   verbiage has been left behind.  That language has turned into

21   Spanish surname and Hispanic and Mexicanos and Tejanos and

22   Mexican-Americans.  Now we've become -- it's what Eduardo

23   Bonilla Silva writes about in his book, *White Supremacy and*

24   *Racism*, when he talks about the language of silence really is

25   what racism has turned into.

1          In the state legislature, we've become illegal aliens,

2     we've become voter fraud, we've become the integrity of the

3     ballot, for all practical purposes.  For me, the rhetoric of

4     racism has evolved from base language and base descriptions to

5     silence, to other code words.

6     Q.  And what does that silence accomplish?

7     A.  What it accomplishes is really kind of warding off and

8     avoiding real discussions about the legality of -- and the

9     reality of the law.  And it's played out in the legislative

10    record.  I counted -- on March 23rd, for instance, in 2011, in

11    the *House Journal*, there are at least three instances where

12    Representative Raymond, Representative Veasey, and I think maybe

13    it was Representative Raymond - again, it might have been

14    Martinez Fischer - actually tried to engage

15    Representative Harless, who was the author of the bill, or was

16    carrying the bill in the House, actually attempted to engage her

17    in the whole issue of whether or not Senate Bill 14 violated the

18    Voting Rights Act.  She finally admitted that the State of Texas

19    was under Section 5 of the Voting Rights Act, but she did not

20    want to discuss the issue of whether or not Senate Bill 14

21    violated the Voting Rights Act per se.  As a matter of fact, at

22    one point she just simply said, "This is an issue for the

23    federal courts.  We don't need to be considering this here," and

24    then the discussion just moved on.

25          So it was just silence.  Really, for me I interpreted

1    it as a complete avoidance of the discussion of racism

2    surrounding this bill.

3    Q.  Although the State of Texas has never put forth the

4    rationale of partisan politics as the reason why it passed SB14,

5    there has been some issue about whether or not partisanship or

6    racism was what was driving this bill.  Do you have an opinion

7    on this matter?

8    A.  I don't know.  You know, I was going to be flippant about

9    it, but I'm not going to do that.  You know, the partisan issue

10   to me is a by-product of really what's going on.  This bill --

11   and if you listened to the testimony, for instance, of

12   Ms. Camarillo earlier, and the work of Southwest Voter, they're

13   focused on registering brand new first time voters.  If this

14   bill were to come into effect, this bill would not even allow a

15   whole array of 18-year olds that -- we have a population of

16   18-year olds being eligible to vote every day, every day across

17   the state.  If this bill goes into effect, this builds a wall

18   against those 18-year olds.  They're not going to be able to

19   register to vote.

20        MR. FREDERICK:  I object to this testimony.  This was

21   not disclosed in Dr. Flores' report.  He specifically said he

22   does not offer any opinion on effect.  I move to strike this

23   testimony.

24        JUDGE COLLYER:  All right.  Why don't we take that

25   under consideration.  We'll just continue.  But I appreciate the

1   point you've made.  You can go ahead, sir.

2   BY MR. SANCHEZ:

3   Q.  Let me change gears here a little bit.  One of the documents

4   that you reviewed in preparing your report was the expert report

5   that was prepared by Dr. Engstrom in this matter.  Is that not

6   correct?

7   A.  That's correct.

8       (OFF THE RECORD.)

9   BY MR. SANCHEZ:

10  Q.  We're looking at page 10 of Dr. Engstrom's report, and I

11  just want to highlight a little bit of this for you and I want

12  you to have a look at this paragraph.  If you could read it to

13  yourself.

14  A.  Did you want me to read it?

15  Q.  If you could read it to yourself, and then I have a question

16  or two to ask you about it.

17  A.  Sorry.  (Witness complies.)

18       JUDGE WILKINS:  Is there an exhibit number for this

19  report?

20       MR. SANCHEZ yes.  It's Defendant Intervenor's Exhibit

21  Number 2, and it is a DIA 6 through 84.

22       JUDGE TATEL:  Counsel, why don't you ask him to read it

23  out loud?

24  BY MR. SANCHEZ:

25  Q.  Would you please read it out loud?

1    A.  Certainly.  "Latinos in South Texas have been highly

2    cohesive in their candidate preferences for Latino candidates in

3    both general elections and Democratic primaries.  They were also

4    cohesive in their support for Latino candidate for Railroad

5    Commission in the 2010 Republican primary.  This preference was

6    shared in only one general election, and not in any of the

7    primary elections.  In short, in only one of the 17 general or

8    primary elections did Latinos and non-Latino voters in the

9    county share a preference for a Latino candidate.  The analyses

10   of these elections, held over the last three election years, and

11   for a variety of offices, reveal the presence of racially

12   polarized voting in both general and primary elections across

13   the 52 counties in South Texas."

14   Q.  Now, general elections are between the two top vote getters

15   in either party.  Is that not correct?

16   A.  That's correct.

17   Q.  And a primary election is, by definition, an election

18   between two members of the same party.  Is that not correct?

19   A.  At least two members of the same party.

20   Q.  And so what Dr. Engstrom found was racially polarized voting

21   in primary elections, where Republicans were running against

22   Republicans or Democrats were running against Democrats.  Is

23   that not correct, according to this study?

24   A.  That's correct.

25   Q.  If you go through the study, there are numerous instances

1   where Dr. Engstrom finds the same thing.  Is that not correct?

2   A.  That's correct.

3           MR.  SANCHEZ I don't have any further questions at this

4   moment.

5           JUDGE COLLYER:  All right.  Is there anyone else from

6   the defendants who wishes to question this witness?

7           MR. ROSENBERG:  No, Your Honor.

8           JUDGE COLLYER:  All right.  Anybody from the State of

9   Texas who wishes to do cross?

10          MR. FREDERICK:  Yes, Your Honor.

11          JUDGE COLLYER:  It's Mr. Frederick, isn't it?

12          MR. FREDERICK:  Yes, Your Honor.

13          JUDGE COLLYER:  This is Matthew Frederick from the

14  Attorney General's Office.

15          MR. FREDERICK:  I beg your pardon, Your Honor.  If you

16  give me one moment to set up, please.

17          JUDGE COLLYER:  Uh-huh.

18          MR. FREDERICK:  Thank you, Your Honor.

19          JUDGE COLLYER:  Go right ahead when you're ready.

20                          **CROSS-EXAMINATION**

21  BY MR. FREDERICK:

22  Q.  Good afternoon, Dr. Flores.

23  A.  Good afternoon.

24  Q.  My name is Matt Frederick, I represent the State of Texas.

25  I would like to ask you a few questions.

1            Now, you mentioned a moment ago in your testimony, you

2     started to talk about the effect that you expected

3     Senate Bill 14 to have.  Isn't that right?

4     A.  I said it could build a barrier.

5     Q.  Now, you didn't actually provide an opinion on the effect of

6     Senate Bill 14 in your report, did you?

7     A.  No, I used the subjunctive, so I didn't do a study.

8     Q.  You did no studies on the effect of SB14.  Is that right?

9     A.  That's correct.

10    Q.  And you are not an expert on the effect of SB14, are you?

11    A.  No.

12    Q.  Dr. Flores, when you wrote your expert report in this case,

13    you had not read the *Crawford* decision.  Isn't that right?

14    A.  That's correct.

15    Q.  And yet you were designated to provide a report on the

16    legislative intent behind Senate Bill 14.  Is that right?

17    A.  That's correct.

18    Q.  And so when you wrote your report, you did not consider that

19    the Supreme Court had endorsed specific nondiscriminatory

20    purposes that might justify voter ID laws, did you?

21            MR. SANCHEZ:  Objection.  Calls for --

22            THE COURT:  Could you come to the microphone, please.

23            MR. SANCHEZ:  Calls for a legal conclusion from someone

24    who has not been put forth as a legal expert.

25            JUDGE COLLYER:  All right.  Why don't you reframe your

1    question?

2              MR. FREDERICK:  Of course.

3    BY MR. FREDERICK:

4    Q.  Let me ask another question to begin.  Before you wrote your

5    report, you had read the *Arlington Heights* case.  Is that right?

6    A.  That's correct.

7    Q.  And in fact, part of your report purports to apply the

8    *Arlington Heights* factors.  Is that right?

9    A.  I used them as guidelines.

10   Q.  You used them as guidelines.  So you applied guidelines to

11   render an expert report that you got from a Supreme Court

12   decision.  Is that right?

13   A.  I used them as guidelines to look at the legislative

14   process, the way the Texas legislature functioned in considering

15   Senate Bill 14.

16   Q.  And *Arlington Heights* wasn't about the Texas legislature,

17   was it?

18   A.  No, it was not.

19   Q.  Right.  And you didn't read -- are you aware of what

20   *Crawford* is about now?  It's about a Voter ID Bill in Indiana,

21   isn't it?

22   A.  That's correct.

23   Q.  And you read parts of the *Crawford* decision during your

24   deposition, didn't you?

25   A.  Yes, I did.

1    Q.  So you're now aware that *Crawford* -- in *Crawford* the

2    Supreme Court identified deterring election fraud as a

3    legitimate nondiscriminatory reason that might justify a voter

4    ID law.  Isn't that right?

5              MR. SANCHEZ:  Same objection, Your Honor.

6              JUDGE COLLYER:  I'll let him answer the question.  I

7    appreciate the objection.  I'll let him answer the question,

8    recognizing that he's not a lawyer.

9    A.  Could you repeat your question, please?

10   BY MR. FREDERICK:

11   Q.  Of course.  Having read the *Crawford* opinion, you are aware

12   now, are you not, that the Supreme Court identified the interest

13   in deterring election fraud as a legitimate nondiscriminatory

14   reason to adopt a voter ID law.  Isn't that right?

15   A.  That's correct.

16   Q.  And having read *Crawford*, you are aware that the

17   Supreme Court identified safeguarding voter confidence as a

18   legitimate nondiscriminatory reason to adopt a voting ID law.

19   Isn't that right?

20   A.  That's correct.

21   Q.  And you would agree, wouldn't you, that combatting voter

22   fraud could be a nondiscriminatory purpose for enacting a voter

23   ID law.  Right?

24   A.  It could be.

25   Q.  And you would agree that promoting confidence in elections

1    is a legitimate nondiscriminatory reason for adopting a voter ID

2    law, wouldn't you?

3    A.  It could be.

4    Q.  But you didn't consider those holdings from *Crawford* when

5    you wrote your report, did you?

6    A.  I was looking strictly at what the Texas state legislature

7    was doing, and studying the rhetoric of the Texas state

8    legislature.

9    Q.  So that's a no?

10    A.  I didn't look at the Indiana state legislature when they

11    were passing their bill.

12    Q.  And you didn't look at the *Crawford* decision, did you?

13    A.  No.

14    Q.  Having read *Crawford*, are you aware -- you are aware, aren't

15    you, that the Supreme Court relied on a report by the

16    Carter Baker Commission.  Is that right?

17    A.  Yes, they did.

18    Q.  But when you wrote your report, you had not read the

19    Carter Baker Report, had you?

20    A.  That's correct.

21    Q.  And because you can't know what the Carter Baker Report

22    said, you couldn't say whether relying on the Carter Baker

23    Report could provide evidence of a nondiscriminatory purpose,

24    could you?

25    A.  Not at that time.

1   Q.  And it's your position that you can make a determination

2   about purpose without reviewing what the effect of

3   Senate Bill 14 might be.  Isn't that right?

4   A.  Yes.

5   Q.  And you've testified that you aren't aware of any evidence

6   of a nondiscriminatory purpose behind SB14.  Isn't that right?

7   A.  That's correct.

8   Q.  In fact, your specific instructions before rendering your

9   opinion were to look for evidence of a discriminatory purpose,

10  weren't they?

11  A.  That's incorrect.

12  Q.  Do you recall when your deposition was taken in this case,

13  Dr. Flores?

14  A.  Yes.

15  Q.  I'm going to read a portion of your deposition.  I'm going

16  to give you a copy to read along.

17          MR. FREDERICK:  May I approach, Your Honor?

18          JUDGE COLLYER:  Yes.

19          MR. SANCHEZ:  What page is that?

20          MR. FREDERICK:  Hang on one moment, and I'll give you a

21  page.  I'm reading from page 83, lines 10 to 12.

22  BY MR. FREDERICK:

23  Q.  Question:  "You were asked to look for evidence of a

24  discriminatory purpose?"

25          Answer:  "That's correct."

1          That's your sworn testimony, isn't it?

2     A.   That's correct.

3     Q.   And the fact is, you didn't even look for evidence of a

4     nondiscriminatory purpose, did you?

5     A.   I didn't find any.

6     Q.   Well, the fact is, you didn't look for any.  Isn't that

7     right?

8     A.   I looked for some, and I didn't find any.  I looked at data,

9     and it just led me down this particular path.

10    Q.   Still on page 83 I'm going to read another portion of your

11    deposition.  This is lines 13 through 17.

12         Question:  "You were not asked to look for evidence of

13    the purpose of Senate Bill 14, whatever that might be -- that

14    purpose might be."

15         Answer:  "No, that's not what you asked.  You asked

16    nondiscriminatory purpose.  I did not look for that."

17         That's your sworn testimony, isn't it.

18    A.   I think we were engaging in some communication issues at

19    that particular part of the deposition, and we had to really

20    kind of work things out.  Because I didn't quite understand the

21    way he worded the question, and I came back and he came back and

22    I came back, and eventually we had to call a little time-out and

23    redo the whole thing.  The court reporter had to read back

24    pieces of the deposition -- that happened like three times.

25    Q.   That's your sworn testimony, isn't it?

1    A.  Yes.

2    Q.  Maybe we can clear some of this up.

3         Now, the reason that you didn't look for any evidence

4    of discriminatory purpose is because your only instruction was

5    to look for evidence of discriminatory purpose.  Isn't that

6    right?

7    A.  No.  If you look at my expert report, my charge was to look

8    to see whether or not there was a racial purpose behind the

9    bill.  As a matter of fact, I say so later on in the deposition,

10   during the regular questioning and in redirect my attorney came

11   back and cleared that up as well, because of the

12   misunderstanding in communication between me and Mr. Aston.

13   Q.  I understand.  I want to read another portion of your

14   deposition.  This starts at page 82, line 25, continuing through

15   page 83, line 6.  This is on line 25.

16        "You were asked to write a report on the purpose of

17   Senate Bill 14.  Why didn't" -- "You were asked to write a

18   report on the purpose of Senate Bill 14.  Why didn't you look to

19   see if there was any evidence of a nondiscriminatory purpose?"

20        Answer:  "Because I was asked to look if there was

21   evidence for discriminatory purpose, and so that's what I was

22   looking for.  And while I was in that search, I didn't see

23   evidence of the other sort."

24        That's your sworn testimony.  Correct?

25   A.  Again, that was part of the miscommunication that was going

1    on between me and Mr. Aston, and I couldn't --

2    Q.  I need you to just stick to my question, because I'm under

3    severe time constraints.

4         JUDGE COLLYER:  I'm sorry, he's allowed to answer your

5    question, though, so let him finish.

6         MR. FREDERICK:  Thank you, Your Honor.

7    A.  And later in the deposition I clarified that statement,

8    that, in fact, my charge was what the charge says in my expert

9    report, that I was charged to see whether or not there was a

10   racial purpose behind Senate Bill 14.  My attorney also came

11   back later at the end of the deposition and clarified that.

12   BY MR. FREDERICK:

13   Q.  I have one more question.  You weren't retained to get a

14   complete and full picture of any and all purposes behind Senate

15   Bill 14, were you?

16   A.  I was retained, as I explained in my expert report and what

17   I've said before the Court today, to see whether or not there

18   was a racial purpose behind Senate Bill 14.

19   Q.  I'm going to read one last part of your deposition.  This is

20   page 84, lines 19 to 22.

21        Question:  "Would you agree that to get a complete and

22   full picture of any and all purposes beyond -- behind Senate

23   Bill 14, an analysis of all purposes would be done?"

24        Answer:  "Maybe.  But that wasn't why I was retained."

25        Is that your sworn testimony.

1    A.  I already have testified to why I was retained.

2         MR. FREDERICK:  No further questions.

3         JUDGE COLLYER:  Thank you, sir.  I think you have a

4    colleague who wants to show you something.

5         MR. SANCHEZ:  I only have a couple of questions.

6         JUDGE COLLYER:  All right.  A couple of questions.

7         MR. SANCHEZ:  A minor indulgence.

8                        **REDIRECT EXAMINATION**

9    BY MR. SANCHEZ:

10   Q.  Is Indiana a Section 5 covered state, to your knowledge,

11   Dr. Flores?

12   A.  Not to my knowledge.

13   Q.  And I just wanted to put in front of you -- this is a

14   portion of your deposition, it's page 168, and I wanted to draw

15   your attention to this exchange here.

16        The question is:  "If these members stated that they

17   were not aware of any member of the body who voted with a

18   discriminatory purpose, would that be something that you would

19   factor into your analysis?"

20        And could you read what your response was?

21   A.  "What I would do in a situation like that, in compiling my

22   expert report, if I had uncovered something like that, very

23   clearly, just the way you stated, the hypothetical case that you

24   stated, I would seek an interview with him or her and asked

25   them, 'How did you know this?'  And try to get more depth to

1     that particular response."

2     Q.  So you would at least look into it, was the next question?

3     A.  "Well, yeah, I mean, I was -- I was -- I was charged to seek

4     whether -- whether there was racial purpose behind the

5     legislation.  And, of course, I would look into it.

6     Absolutely."

7              MR. SANCHEZ:  I don't have any further questions.

8              JUDGE TATEL:  I just have a quick question.

9     Dr. Flores, are you testifying that in your expert opinion that

10    there is only a racial purpose behind the bill, or that race is

11    one of the purposes behind the bill?  What exactly is your

12    opinion on that?

13             THE WITNESS:  Well, it is the central purpose behind

14    the bill.  I don't know if there are any other purposes,

15    Your Honor, because I was only asked to see whether or not there

16    was a racial purpose behind the bill.  But to me, even though

17    voter fraud and the integrity of the election system were used

18    as the rationale, it turned out to be a superficial rationale,

19    masking what I found to be a racial purpose behind the bill.

20             JUDGE TATEL:  And you're a political scientist.  Right?

21             THE WITNESS:  Yes, Your Honor.

22             JUDGE TATEL:  I see.  And to reach that judgment, you

23    relied on the publicly available records.  Right?

24             THE WITNESS:  Yes, Your Honor.

25             JUDGE TATEL:  Uh-huh.  And what in the training of a

1    political scientist equips you to make a judgment about the

2    racial motivation that that record reveals that the court

3    couldn't make on its own?  Do you understand my question?

4         THE WITNESS:  Yes, Your Honor, I think I do.

5    Essentially what I did was, in my training as a statistician and

6    a professor who teaches research methods and design, I created a

7    research design so I could focus in on exactly what the

8    legislature was doing.  So to help me -- the design helped me to

9    organize the data and evaluate what information both on a

10   legislative record, in scholarly research, because I did look at

11   some scholarly research, at the other expert reports.  I looked

12   at obviously a bunch of media, although you give that less

13   weight.  That just really speaks to some of the atmosphere

14   around it.  And if you recall, I also submitted an expert report

15   in the Texas redistricting lawsuit, where I spoke to this

16   particular concept.

17        So how to put together a very systematic structured

18   design to look at this issue and look at the information and

19   organize it as such is really what's in my background and

20   training that allows me to do this.

21        JUDGE TATEL:  And that's all in your report.  Correct?

22        THE WITNESS:  Yes, Your Honor.

23        JUDGE TATEL:  And I don't want to use up any more of

24   the State's time -- or the Intervenor's time.  So the Court can

25   read the report itself.  Right?

```
 1                THE WITNESS:  Yes, Your Honor.

 2                JUDGE TATEL:  We can read all the materials that you,

 3     with your research skills, organized?

 4                THE WITNESS:  Certainly, Your Honor.

 5                JUDGE TATEL:  Setting aside your personal experience

 6     which you mentioned earlier, growing up in Texas, tell me once

 7     again what it is -- what is it that -- I understand organizing

 8     the materials, I understand all of that, organizing it,

 9     displaying it.  Right?

10                THE WITNESS:  Yes, Your Honor.

11                JUDGE TATEL:  Research skill, I got that.  But once

12     that is done, what you've done in your report, what is it about

13     the training of a political scientist that equips you to make

14     the ultimate judgment about motivation?  Or, to put it a

15     different way, how would you look at that judgment any

16     differently than this Court would, that question any differently

17     than a court would?

18                THE WITNESS:  I'm not sure --

19                JUDGE TATEL:  Aren't we both evaluating the same record

20     that you, through your research skills, have assembled?

21                THE WITNESS:  I'm not sure if we would look at it

22     differently.  Essentially, what it is about my training is that

23     I've spent my professional career looking at Latino politics and

24     Latino voting behavior, I've conducted surveys.  So I was able

25     to -- and I've studied the legislative process.  I even took a
```

1    sabbatical and was a lobbyist for a semester in Austin to

2    understand exactly how this whole process works.

3           So in my unique sort of situation, I understand what

4    was going on in the Texas state legislature -- I'm a Texas

5    political scientist, and I was able to understand it from that

6    point of view, understand the rhetoric, understand the rules,

7    the parliamentary rules, and how they deviated from the norm,

8    understand the whole racial environment of the state and the

9    politics thereof, so that I could bring that experience and all

10   those years of research, put it in the right research design

11   framework, so that I could present it to you in Court.

12          Now, you'll come probably obviously from a much

13   different point of view than I will come at it.  Whether or not

14   we'll reach the same conclusion, Your Honor, obviously I can't

15   comment on that because that's -- you will look at it from a

16   constitutional/legal point of view, and I'm not a lawyer, I'm

17   not a judge.  I can just look at it from my own political

18   science point of view as an expert in Latino politics and

19   research design and techniques.

20          JUDGE TATEL:  Thank you, Doctor.

21          THE WITNESS:  Thank you, Your Honor.

22          JUDGE COLLYER:  I had one other question.  Forgive me.

23   Earlier in your testimony, Dr. Flores, you testified to

24   questions that Representative, I think it's Anchia, was

25   directing to Representative Harless.  Are they Representatives

```
 1     or Senators?

 2             THE WITNESS:  No, they're Representatives.

 3             JUDGE COLLYER:  That's what I thought.  About voter ID,

 4     and you referenced a response from her that with the demographic

 5     changes in the population, the legislature had to adopt voter ID

 6     now to stop it.  Is that in your report so I can find it?

 7             THE WITNESS:  Yes, Your Honor, it is.

 8             JUDGE COLLYER:  Thank you.  That's what I wanted to

 9     know.

10             MR. SANCHEZ:  I have nothing further, Your Honor.

11             JUDGE COLLYER:  Time to take a break.  We'll be gone

12     for 15 minutes.

13             (Recess taken at 4:01 p.m.)

14             MR. MORTARA:  Your Honor, Mr. Sells is here from the

15     Justice Department to I think negatively report on our

16     discussions.

17             JUDGE COLLYER:  Mr. Sells wasn't even part of your

18     discussions.  Anyway, go ahead, Mr. Sells.

19             MR. SELLS:  Your Honor, for the record, Bryan Sells for

20     the Attorney General, Eric Holder.  It's my understanding that

21     there's a dispute now about two files that are part of PX-1, and

22     Mr. Mortara will correct me if I misspeak.  One is a version of

23     the VRNID list that is matched to the Catalist database for race

24     and potentially other information, and one version of the VRNID

25     list that is not matched to the Catalist database.  Is that
```

1        correct so far?  Because I was not in the courtroom when there

2        was an earlier colloquy.  I want to make sure we're talking

3        about the same files.

4              MR. MORTARA:  Your Honor, for the record, we have a

5        variety of problems.  Those are the two Professor Ansolabehere

6        data sets that constitute a list of 1.893 million people that

7        has been sometimes called -- yesterday that was called the

8        VRNID.  It includes in that database a list of about 268,000

9        people that have, quote, "ambiguous driver's license status,"

10       and a further list of 125,000 that are duplicates.  You saw

11       Mr. Ingram the first day of trial, he was in there twice.  He's

12       a duplicate.  So that 1.893 million is the DOJ's entire list of

13       people that they say may be affected by Senate Bill 14.  It's

14       the single most critical piece in the case.  It is not two

15       databases that have different lists.  They're the same people.

16       So I want to establish for the record -- and those are two that

17       we have a problem with.

18             We also would like the ability to show

19       Professor Ansolabehere entries from the driver's license

20       database, one we produced to the intervenors that lacks full

21       nine-digit Social Security numbers, which I also provided to the

22       Justice Department on Saturday morning.

23             JUDGE COLLYER:  All right.  Go ahead, Mr. Sells.

24             MR. SELLS:  I want to provide the court with some of

25       the relevant chronology, at least with respect to the VRNID

1    lists first, and then we can talk about the other files.

2         The parties held an ESI conference in March; at that

3    time Texas was represented by its solicitor general,

4    Jonathan Mitchell.  And at that conference, Mr. Mitchell refused

5    to put Texas' technical people on the line, and in fact refused

6    to identify them.  So the Department of Justice's technical

7    people could not have a meeting of the minds with Texas'

8    technical people to agree on a file format for the disclosure of

9    electronically stored information.

10        As a result, on June 1st, the date of the expert report

11   disclosure in this case, the Department of Justice disclosed

12   Professor Ansolabehere's report, along with his data, in the

13   format that Professor Ansolabehere used it.  It is called Stata.

14   Stata is a software program commonly used in the political

15   sciences; I understand from Professor Sager that it is produced

16   by the Texas A&M University.  The file as an appendage .dta.

17        On Saturday, July 7th - just a few days ago -

18   Mr. Mortara hand delivered to the Department of Justice a hard

19   drive containing what he hoped would be a joint data exhibit.

20   This was delivered to us Saturday at noon.  We immediately put

21   our technical staff examining that data, and with respect to the

22   two files at issue, our legal and technical support person was

23   able to determine that they are not the same files that we

24   disclosed on June 1st.  We don't know the nature of the

25   difference, but we know that there's a very large difference in

1    the file size, and they're not in dta format.

2           Our expert witness was in Spain.  He just returned from

3    Spain today.  Our expert witness' assistant was a Sabbath

4    observant over the weekend, and was not available until very

5    late Sunday night.  As soon as he got back on Sunday night, our

6    expert witness' assistant went to work on other matters that

7    Mr. Mortara has brought up, and maybe we'll talk about those as

8    well.

9           But what we think has happened is, now Mr. Mortara

10   wants to cross-examine witnesses based upon those databases that

11   our people have verified are not the data that we have produced

12   to them.  We're willing to put our legal/technical support

13   people on the stand or with a declaration to say that, if

14   necessary.  But we think Mr. Mortara has an authentication

15   problem.  We will not stipulate to that data.  He chose not to

16   make the people who converted or modified that data at the

17   Office of the Attorney General available as witnesses so they

18   could be subject to cross-examination; the other possibility is

19   he could have purchased Stata from the Texas A&M University so

20   the data could be used in the native format.  He chose not to do

21   that, either.

22          So I believe that's where we are with respect to those

23   two files.

24          JUDGE COLLYER:  All right.  Do you have, Mr. Mortara,

25   any knowledge if the data on your hard drive is not in dta

1    format, what format it is?

2         MR. MORTARA:  Your Honor, it's in what's called a text

3    delimited file.  I can explain and elaborate, and I would be

4    pleased to take the State's time to do so.

5         JUDGE COLLYER:  Well, I'm not the techie, so maybe one

6    of my colleagues is.  I'm not the techie.  But the question is,

7    if it's not in dta format, is there a question, a legitimate

8    question, as to whether putting it in another format has in any

9    way changed the file, its internal format or something, so that

10   it seems bigger than the one you got?

11        MR. MORTARA:  No, there's not, Your Honor.  In fact,

12   there's a basic explanation.  But before I get there, let me

13   elaborate as to certain issues that are, I don't think, in

14   dispute.

15        JUDGE WILKINS:  Can I just interrupt for one second?

16   Did you mean comma delimited file or text delimited file?

17        MR. MORTARA:  Your Honor, a comma delimited file, you

18   can see on the ELMO here, will have data - which I'm using a

19   scribbled line -  and then a comma to delineate the columns in

20   the data.  A text delimited file is a sort of super set of

21   comma, in the sense that sometimes you don't want to use commas

22   because they could appear in the data themselves.

23        So, for instance, in the data that the

24   Justice Department got back - which is identical entries to the

25   dta file we got from Professor Ansolabehere - the delimiter is

1    the straight line character, and those delimiters, when you add

2    them into the file, create the increased file size.  It has

3    nothing to do with additional entries, and of course they can

4    confirm that.  What Mr. Sells did not say is that the two files

5    have exactly the same number of entries, because of course they

6    contain exactly the same data.

7           As to what software program to use, Stata is

8    outrageously expensive --

9           JUDGE COLLYER:  I'm sorry.  Believe me, that is so far

10   beyond anything we can address here either at trial or right

11   now.  I don't want to hear about how expensive Stata is or

12   anything else.  Your position is that there are the same

13   entries; it appears longer because it's a text delimited file

14   with a parallel bar -- it's not parallel, but anyway.

15          MR. MORTARA:  It's the vertical bar character.

16          JUDGE COLLYER:  Vertical.  Thank you.  That's the term,

17   vertical bar to separate instead of commas.  All right.

18   Dr. Ansolabehere will be here tomorrow.  He'll be able to tell

19   us.  Dr. Ansolabehere's assistant would probably be able to tell

20   us.  He or she is not here.  No one is here to tell us these

21   things.  But however it works, the techies for the Department of

22   Justice say:  We're not in a position to stipulate.

23          Now, I can't say anything about that.  If they don't

24   think they can stipulate, they can get on the stand, maybe.  I

25   don't think we actually care.  But if that's the way it's going

```
 1    to work, then you can bring -- I'm sorry, the Department of

 2    Justice can bring.  I didn't mean to make this personal to you,

 3    Mr. Sells.  The Department of Justice can bring a hard drive

 4    computer, Dr. Ansolabehere's database; you can bring your

 5    computer, your database.  You can say, okay, I'm going to look

 6    this up, and you can run your inquiry; and then DOJ can run the

 7    same inquiry and see if we come up with the same information.

 8    And if we do, tsk, there we are.  If we don't, tsk, there we

 9    are.

10            MR. MORTARA:  We would be totally happy with that,

11    Your Honor.  The only thing that I would add is, the Department

12    of Justice is going to have potentially some difficulty making

13    this work quickly.  I would offer to help them and convert it to

14    a good database format, which is called SQL, that I can help

15    them with.

16            When I first started doing this, when I was getting my

17    crash course over the weekend, the 25-million-person driver's

18    license database, to search it for one person takes about

19    65 seconds.  Until you do -- I had the legal and technical

20    support people.  You heard about Oscar Viaz earlier.  He

21    actually is responsible for teaching me how to do this.  And you

22    can create some indices to speed up the searches.  I could help

23    them with that.  But I'm totally happy for that, as long as it

24    doesn't take five minutes every time I ask.

25            JUDGE COLLYER:  That I can't speak to, whether they're
```

1    willing to have Mr. Viaz or someone else advise on how this can

2    be shortened.  That is not my issue.  The issue is the integrity

3    of the underlying data.  And if Dr. Ansolabehere is satisfied

4    with accepting the underlying data in the way you suggest, and

5    he thinks, oh, that's fine, no difference, then that's fine, no

6    difference.  If the Department of Justice and/or

7    Dr. Ansolabehere say, no, no, don't touch it because that will

8    make a difference, then we wait.  I don't know what to tell you

9    to do.  I don't have an answer.

10          MR. MORTARA:  Your Honor, the only thing I would like

11    to express is, this list is the basis for the

12    Justice Department's discriminatory effect case.  The entire

13    basis is this list, and the quality of it is the entire basis of

14    our opposition to the discriminatory effect case after you get

15    past the social science literature, which we think is a

16    threshold.  It is extraordinarily critical to our case.

17          JUDGE COLLYER:  I am not denying - I can't agree or

18    deny - what you say.  I accept that.  Maybe we should put

19    Dr. Ansolabehere on first in the morning, and if we don't get to

20    anybody else tomorrow, we don't get to anybody else.  Although

21    there are two other witnesses tomorrow.

22          This is not a problem that the court can solve for you.

23    The Department of Justice, for reasons expressed, is unwilling

24    to stipulate.  It says you've actually changed the data -

25    perhaps not materially, but you have changed the data - and so

1    we can't stipulate or we won't stipulate that it's the same.

2    It's, quote, "not identical."  The data may be the same, but

3    it's in a slightly different format.

4         When they say that to me, I can't say, no, no, no, you

5    must stipulate.  I can't do that.  And I can't tell you, you

6    have to use their database in the way that they did it, because

7    no, no, no, you say wait, wait, wait, I've figured this one out.

8    You've got to do that tomorrow, gentlemen, ladies.  Ladies,

9    gentlemen, gentlemen, good luck with it.

10        MR. MORTARA:  Your Honor, I have an alternate procedure

11    that I offered the Justice Department that I would like to

12    inform the court of, which is that we would go through the

13    examination and then we would file with the court a list of

14    every single entry we looked at, and they could criticize them

15    if they wanted.  They won't, because these are exactly right.

16    But they could criticize the entries and say they were wrong.  I

17    just have limited time here.

18        JUDGE COLLYER:  The issue is --  believe me, I don't

19    mean to make this any more difficult than it already is, and I

20    appreciate that, Mr. Mortara.  The issue is what

21    Dr. Ansolabehere will say about it, not what I say about it,

22    what you say about it, what you think about it.  Ultimately what

23    I think about it may add a little, but it's really whether

24    Dr. Ansolabehere thinks you're treating his data properly.  Just

25    a second.  Let me fix this.

1           MR. MORTARA:  Your Honor --

2           JUDGE WILKINS:  Hold on a minute.

3           JUDGE COLLYER:  Questions.

4           JUDGE WILKINS:  Mr. Mortara, just so I understand what

5    it is you're trying to do, so we can solve the problem and move

6    on, am I correct that what you want to be able to do tomorrow is

7    to question Dr. Ansolabehere about whether a specific person --

8    or I'm sorry, whether a specific entry is present in his VRNID

9    data set with a record that matches someone who you believe

10   actually does have some form of ID that could be used under

11   SB14?  Is that what you want to do?

12          MR. MORTARA:  Yes.  The only reason I'm hesitating a

13   little bit is I'm trying to make sure that you have all the

14   information.  I'm going through my cross in my head, so I'm

15   thinking about it.

16          Yes.  For instance, Senator Ellis' wife is one that I

17   would like to ask him about.  Catalist classified that person as

18   Caucasian; Senator Ellis testified she's not.  I want to ask him

19   about that and just say, okay, now let's find the driver's

20   license entry.  She has a driver's license; that's what he said.

21   Now let's move on.  And ask him about Keith Ingram, why is he in

22   there?

23          And there's two points to this, of course.  One is that

24   this is a list of 1.9 million people - 1.5, if you count their

25   subgroup - and it's a huge number of people, but the odds that

1    it would be erroneously connected to two people in this trial,

2    that's the point, obviously.  So that's what I want to do.

3          But there are a couple of other things, and I'm trying

4    to think.  I think generally what I want to do is show him a

5    name on the list, and then be able to search in the driver's

6    license database for a similar name, like Licia Ellis versus

7    Licia Green, and prove that that person has a driver's license.

8          JUDGE WILKINS:  All right.  Dr. Ansolabehere, is he

9    going to be here tomorrow with anyone who has worked with him as

10    far as these databases?  Does he have like an assistant, and is

11    that assistant going to be present in town tomorrow, Mr. Sells?

12          MR. SELLS:  Your Honor, he does have an assistant, and

13    I am not aware that his assistant will be in town tomorrow.  I

14    don't think so, but I'm not certain.

15          JUDGE WILKINS:  All right.  Will Dr. Ansolabehere have

16    with him on a computer that he can bring to this courtroom his

17    database, or the data that he used?

18          MR. SELLS:  I think that's unlikely, Your Honor, and I

19    think that is because unlike in the redistricting trial, where

20    the software is relatively compact, this data is a large piece

21    of software, large data sets that cannot be easily transported.

22          I could be wrong about that, too.  That's not something

23    I had a chance to ask him before I came over.

24          JUDGE WILKINS:  Well, here was my idea of how we

25    resolve this - but we need to hear the next witness and move

1    on - is that Dr. Ansolabehere can bring his data, bring his

2    computer, and bring his assistant, and when he's being

3    questioned by Texas, his assistant can run the same query here,

4    and if his assistant finds that, you know, based on

5    Dr. Ansolabehere's data there's some different result, then the

6    assistant can be called to testify to that.  And if he doesn't,

7    then we know that -- or you can reach a stipulation that the

8    results would be the same.

9          Or another way to do it is we could do Dr. Ansolabehere

10   first, and he can be questioned, and then over the lunch break

11   or whatever, if he has access to it, he can run those tests.

12   And then, if he wants to come back after lunch and say, no, when

13   I run the query, I come up with something different, then he can

14   testify to that on kind of an out-of-order redirect or

15   something, and then there could be some recross, if necessary,

16   on that.

17         But that was my way of trying to figure out how to do

18   that.  But I think that you need to have him, if he's got his

19   data, or the ability to have the data and to do it, to bring it

20   with him tomorrow, and if he's got an assistant or somebody else

21   who can testify as a fact witness - not somebody on your legal

22   team, where you're going to have a privilege or other issue -

23   then have that person to be able to assist us so that we could

24   try to expedite this.

25         MR. MORTARA:  Your Honor, Texas would love that

1    solution.

2         JUDGE COLLYER:  Well, we don't know whether he's

3    bringing someone with him, and it's probably too late, at 20 to

4    5:00, to insist or to ask that he do so.  If he has someone with

5    him or if there's someone locally that he knows well enough,

6    knows how he does his work well enough to assist him, that would

7    be a great help to us all.  Otherwise, we'll put in the first

8    half of the database or something, and we just ask and see how

9    far we can go to verify whether they're the same database.

10         MR. MORTARA:  Your Honor, they could also check

11   remotely.  I mean, I know that we could do the fact witness over

12   the telephone.  They can definitely get this done.  Mr. Sells

13   has already told me they can load this database into

14   Microsoft Excel.  Obviously I have it walking around in my

15   computer.  This is highly portable stuff; I have the entire

16   25,000,000 driver's license database on my computer.

17         JUDGE COLLYER:  Well, don't tell anyone in Texas.

18         MR. MORTARA:  Your Honor, for the record, you have no

19   idea how hard it was for me to get ahold of this.

20         JUDGE COLLYER:  Oh, my goodness.  Well, it's hard for

21   you to get ahold of it; try being Mr. Sells.

22         MR. MORTARA:  I think it was hard for everybody, as

23   Professor Sager testified.  But the point of this is - and I

24   don't mean to belabor it - the integrity of this list is the

25   whole case on -- the whole their case on discriminatory effect.

1    Not all of our case.  And if they can't allow us to ask him, "Is

2    this person on your list," then we have a real problem.

3          JUDGE COLLYER:  I don't think that your terminology

4    quite understands the issue.  It is not a question of, if they

5    can't allow us to question him.  The problem is that for good

6    reason or ill, you have changed the data - not the data per se,

7    but the format - therefore, the techies looking at it quickly

8    can't say it's the same.  And that's not their fault.  It's not

9    your fault, either; it just happens to be the truth of the

10   matter.

11         And I'm accepting fully from you that the underlying

12   data is in fact identical, but the format is not, and so

13   somebody who worked with it in its original format of Stata or

14   whatever it is cannot look at what you've done and say:  Looks

15   the same to me.

16         MR. SELLS:  Your Honor, if I could respond to

17   Judge Wilkins, I think before the end of the day I could find

18   out if either or both of your scenarios is feasible, and report

19   to the court just before we recess for the day.  I would

20   certainly be willing to do that.

21         JUDGE COLLYER:  Okay.  That would be great.  Thank you.

22         All right.  Let's keep moving.  I don't even know where

23   we are, but something important was about to happen, I'm sure of

24   it.  We were on redirect -- no, did we finish?  We finished.  I

25   excused the witness.

1          Another witness, sir, an intervenor witness.

2          MR. ROSENBERG:  An intervenor witness, Your Honor.

3    Ezra Rosenberg from Dechert, LLP for Texas State Conference of

4    NAACP branches and the Mexican-American Legislative Caucus.  And

5    I would like to call to the stand Dr. David Marker.

6          JUDGE COLLYER:  All right.  Dr. Marker, would you come

7    forward, please?  I hope you were entertained, sir.

8          (Oath administered by Courtroom Clerk.)

9          JUDGE COLLYER:  Before anybody gets too serious, sir,

10   are you a statistician?

11         THE WITNESS:  Yes.

12         JUDGE COLLYER:  Well, that's wonderful.  Then you did

13   enjoy the last conversation.

14   **(DR. DAVID MARKER, DEFENDANT witness, having been duly sworn,**

15                **testified as follows:)**

16                **DIRECT EXAMINATION**

17   BY MR. ROSENBERG:

18   Q.  Dr. Marker, could you briefly tell the court the nature --

19         JUDGE COLLYER:  Start with your name.

20   BY MR. ROSENBERG:

21   Q.  Yes.  Please identify yourself for the record, please.

22   A.  David Allen Marker.

23   Q.  Would you please explain to the court the nature of the

24   statistician work that you do?

25   A.  I'm a statistician that specializes in surveys.  I've worked

1    for a company, Westat, for the last 28 years, and I do surveys;

2    design the surveys, design the sample, oversee the data

3    collection, the analysis, and supervise others who are doing

4    that.

5    Q.  And could you explain to the court the sort of surveys that

6    you work with at Westat?

7    A.  In general the surveys, almost all of them, are for the

8    federal government.  They are ones that have to achieve a high

9    enough level of quality to support either government regulation

10   or possible use in court cases, so they have to be of the

11   highest caliber.

12          MR. ROSENBERG:  And Your Honors, DIX 07 is Dr. Marker's

13   resume', which we've listed.  We will be moving it into

14   evidence.  And without objection, I would offer Dr. Marker as an

15   expert in survey work, survey research, sampling methodology,

16   survey response rates, survey evaluation, and data analysis.

17          MR. HUGHES:  No objection.

18          JUDGE COLLYER:  All right.  Without objection,

19   Dr. Marker is received as an expert in surveys, extended as just

20   described.

21          MR. ROSENBERG:  Thank you, Your Honor.

22   BY MR. ROSENBERG:

23   Q.  Dr. Marker, did you review Dr. Shaw's surveys of

24   Dr. Ansolabehere's 1.9 million list?

25   A.  Yes, I did.

1    Q.  And did you draw any conclusions after your review?

2    A.  I did.

3    Q.  And can you tell the court what your primary conclusion is

4    about Dr. Shaw's survey?

5    A.  My primary conclusion is that the response rate is

6    exceedingly low, at approximately two percent, which is out of

7    bounds with the surveys that are requested and used by the

8    government.

9    Q.  And when you use the phrase "response rate," could you

10   briefly explain what you mean by that?

11   A.  It's the amount of completed cases divided by the amount of

12   cases you tried to reach that were eligible.  So you exclude

13   those who died and things like that.

14   Q.  Are there potential problems with a response rate that, as

15   you've described, it is extremely low?

16   A.  Yes.

17   Q.  And what are they?

18   A.  That the data -- that if the people who responded to your

19   survey are in important ways different from the ones who did not

20   participate, then the estimates that you got are really

21   irrelevant, that they will not at all reflect the underlying

22   true overall population estimates that you're trying to

23   understand.

24   Q.  And does the appropriateness of a particular level of a

25   response rate vary with the particular purpose of the survey?

1    A.  It often can, yes.

2    Q.  And can you explain how?

3    A.  If the purpose of your survey is to help with marketing,

4    market research, and you want to know -- 25 years ago we had a

5    survey of how you eat your Oreo cookies and what you eat it

6    with.  If you're trying to develop a marketing strategy for

7    that, you don't need a very high response rate to be able to

8    understand -- to be able to guide the marketing strategy.

9         If you are looking at some of the planning of how to

10   allocate resources in a political campaign - to use Dr. Shaw's

11   example from earlier - then you don't have to be nearly as

12   accurate, especially if you're looking at how things change over

13   time, rather than estimating an actual level.

14        That is very different from when you are trying to

15   understand and make policy and make decisions based on the

16   survey data.  Then you have to be much more careful.

17   Q.  And in that latter context, what is the level of response

18   rates that are typically seen?

19   A.  So before anybody can do a survey for the federal

20   government, under the auspices of the federal government, it

21   must be approved by the Office of Management and Budget, and

22   they have a guidance that is that the survey should try to

23   achieve an 80 percent response rate, 8-0.  They recognize that

24   that's not always possible.  It has gotten harder over time.

25   And so they allow you to do lower response rate surveys, but you

1    must explain how you are going to try and maximize the response

2    rate to get as close to 80 as possible, and what are you going

3    to do to examine the nonresponse bias, potentially, from the

4    lower response rate.

5            MR. ROSENBERG:  And for the record, Your Honors, we

6    have listed as DIX 119 the OMB guidelines, and specifically at

7    page 1130.

8    BY MR. ROSENBERG:

9    Q.  Have you ever seen a survey, Dr. Marker, used by

10   governments -- used by the government that was based on as low a

11   response rate as in Dr. Shaw's survey?

12   A.  No.

13   Q.  And what are the specific consequences in terms of the

14   two percent or two percent to 2.5 percent response rate of

15   Dr. Shaw's surveys in terms of the problems that you described

16   earlier?

17   A.  I don't know exactly --

18   Q.  That was a poorly phrased question.  I think you mentioned

19   that you don't know as much about the remaining population.

20   Could you explain what you meant to the court by that?

21   A.  Sure.  Let me start by saying what happens when you have a

22   very high response rate.  That makes it easier to compare.  If

23   you have a very high response rate, something like 80 percent,

24   then even if the nonrespondents are different, what you have has

25   reflected most of the population that's out there, so that the

1   truth for the whole population is going to be very close to what

2   you come up for the 80 percent.

3          When in contrast you only got responses from

4   two percent of those you tried, and 98 percent did not

5   participate, if they are not a very lucky representative sample,

6   then what they got is going to be dominated by what the other

7   98 percent do.  And your two percent is not much better than

8   guesswork, because the other 98 percent is going to dominate it.

9   Q.  Now, Dr. Shaw this morning testified that his surveys had a

10  margin of error on the general survey of plus or minus

11  five percent.  Doesn't that mean that there's no response with

12  the respondent -- no problem with the response rate?

13  A.  We have to separate two things.  What he refers to as the

14  margin of error - what in the survey research community the more

15  careful terminology is the sampling error - is talking about how

16  accurate an estimate of that many completed cases is.  So he's

17  basing it on his 600 or 1,000 completed cases.

18         But it is very different if you tried to survey 1,200

19  people and get 1,000 of them to participate, compared to if you

20  tried, as he did, to get 44,000 people to participate and only

21  1,000 do.  Because again, the issue is not whether you have

22  enough people to predict what those people really meant, it's

23  how well do they reflect the general population you wanted to

24  estimate.

25         So the margin of error is only talking about the one

1    component; the sampling error due to the number of completed

2    cases, and variance and bias - nonresponse bias and other forms

3    of bias - are two very important separate components of the

4    accuracy of a study.

5    Q.  Well, couldn't the problems that you talk about be cured by

6    weighting the results of the survey?

7    A.  It would help.

8    Q.  Did that occur here?

9    A.  And it did not occur here.  It would not ameliorate the

10   whole problem, because there are two ways in which the

11   nonresponse bias can be very important and have an impact.

12          The first is, if you over sample -- if you end up,

13   because of the convenience, the fact that it was only people

14   that were easy to reach that participated, that you end up with

15   lots more, in this case, elderly and whites, then if you weight

16   the data, you will try and reallocate so you get the right -- at

17   least the right age distribution that you should have to match

18   the population you were looking at, the 1.9 or 1.5 million.

19   That will help.  That will take into account if the elderly are

20   significantly different with respect to voter ID from the young

21   people.  So that's why it helps.

22          But it only goes so far.  The issue is, are the young

23   people who responded, the two percent, are they like all of the

24   other young people?  Are the elderly who responded like the

25   elderly who didn't?  Are the blacks who responded like the

 1    typical blacks?  And that doesn't get help by weighting.

 2    Q.  And in any event, did Dr. Shaw weight -- provide the

 3    defendant intervenors or the court with a weighted analysis of

 4    Dr. Ansolabehere's 1.9 million list survey?

 5    A.  I have not seen such a thing.

 6    Q.  Are you familiar with the Pew study that Dr. Shaw testified

 7    about?

 8    A.  Yes.

 9    Q.  Does it stand for the proposition that the two percent

10    response rate in Dr. Shaw's surveys produce acceptable results?

11    A.  Not at all.

12    Q.  And why not?

13    A.  Well, first of all, the nine percent that the Pew standard

14    survey is getting is four times the response rate that Dr. Shaw

15    reported.  The differences probably can be accounted for by a

16    number of differences in methodology.  The Pew standard

17    methodology is to try everybody who they attempt to survey seven

18    times during a five-day period, evenings, weekends, daytime, a

19    variety of different times.  It appears that Dr. Shaw's survey

20    only attempted to reach people one time.

21         Second of all, the Pew survey uses cell phones and land

22    lines; Dr. Shaw only did land lines.  As we heard, cell phones

23    are more expensive, they get a little bit less response rate

24    than the land lines.  So the Pew actually got more than

25    nine percent from the land lines to get a nine percent overall.

1                And then the biggest difference, even beyond the four

2         times the response rate, is that the purpose of the Pew paper

3         was not to compare the nine percent of their standard with the

4         22 percent that they got from the more intensive survey that

5         they reported, it was to compare and see how both of those did

6         against what they call U.S. government surveys, which in their

7         examples were either the current population survey or the

8         American communities survey.  Those are examples of surveys that

9         get the high response rates that OMB demands that the government

10        relies upon.

11               And what Pew reported was that on many characteristics,

12        their surveys, whether the nine or 22 percent, were able to

13        match on what percent are Democrats and Republicans, what

14        percent are poor and what percent are elderly, those kind of the

15        issues.  But they also found that on a number of key items

16        generally related to civic engagements, civic connectedness,

17        whether he did nine or 22 percent, even that extra telephone

18        survey attempt was not sufficient and got you no closer to what

19        you wanted.

20               And we're not talking about one or two percent

21        difference.  The Pew surveys reported, I believe -- I would have

22        to look to get the exact numbers, but I believe it was that

23        31 percent of the people said that in the last year they had

24        contacted a local elected official, where according to the

25        government surveys, it's 10 percent.  And the amount who talked

1      to their neighbors was reported at close to 60 percent, but

2      according to the government it is only 40 percent.

3           So there are very major differences between what was

4      being reported in the government survey.

5      Q.  And that's even at a nine percent response rate?

6      A.  And even at a 22 percent.

7      Q.  You mentioned that the Pew study has a minimum of multiple

8      calls.  Is there also a difference between the standard

9      methodology for Pew in terms of when those calls are made

10     compared to what Dr. Shaw did?

11     A.  I believe so.  What Pew reported is similar in general

12     approach to when we do telephone surveys, that you require that

13     the interviewers -- you supervise the system so that you make

14     sure calls are made at different times of day, different days of

15     the week, so that you ensure that everybody has the opportunity,

16     no matter when they work, what kind of work schedule they have.

17     And in particular, also, you're trying to get people who are

18     single persons, single adults in the household, so that there's

19     a lot less time during the week that they are home than when you

20     have multiple people in the household.

21          So by spreading that around, you get a much more

22     representative sample.  And as far as we can tell, Dr. Shaw's

23     survey only included one attempt.  I don't know when.  It didn't

24     say.

25     Q.  Finally, Dr. Marker, based on your 30 years of experience,

1    do you consider Dr. Shaw's surveys a statistically valid

2    scientific survey for the purpose of determining who among

3    Dr. Ansolabehere's 1.9 million list do or do not possess the

4    documents required by SB14?

5    A.  I don't believe a two percent survey can provide

6    statistically valid estimates.

7            MR. ROSENBERG:  Thank you, Dr. Marker.  I have no

8    further questions.  I pass the witness.

9            JUDGE COLLYER:  Is there any other among defense

10   counsel who wish to question this witness?

11           MS. WESTFALL:  No, there isn't, Your Honor.

12           JUDGE COLLYER:  All right.  Mr. Hughes?

13                          **CROSS-EXAMINATION**

14   BY MR. HUGHES:

15   Q.  Good afternoon, Dr. Marker.

16   A.  Good afternoon.

17   Q.  We've met before.  Nice to see you again.

18           You have not attempted to do your own survey in this

19   case, have you?

20   A.  Correct.

21   Q.  And you're not offering any affirmative opinion in this

22   case, are you?  In other words, you're not suggesting that

23   you're offering an opinion about whether Hispanic or Black

24   registered voters in Texas possess the relevant forms of ID

25   under SB14 at a lower rate that Anglo voters, are you?

1    A.  That's correct.

2    Q.  The only thing you've come here to testify about are

3    concerns you have with Dr. Shaw's survey.  Right?

4    A.  Yes.

5    Q.  And one thing you talked about in your direct examination

6    are the kinds of surveys that you do at Westat for the federal

7    government, typically.  Right?

8    A.  Yes.

9    Q.  And you list some examples of those surveys in the report

10   that you provided to the court, don't you?

11   A.  Yes.

12   Q.  One of them, I think, is about over-the-road truckers, the

13   health of over-the-road truckers?

14   A.  Yes.

15   Q.  And the way that survey was conducted is, there were

16   actually in-person interviewers that went to truck stops and

17   talked to truckers.  Right?

18   A.  That's correct.

19   Q.  And that survey was in the field for a number of months.

20   Correct?

21   A.  That survey was for a number of months in order to

22   understand the seasonal variation in truck drivers.

23   Q.  And another survey that you mentioned in your report - I

24   think you mentioned four; we're going to talk about all of them

25   briefly - is a survey of family day care center providers.  Do

1    you recall that one?

2    A.  Right.

3    Q.  And that was a survey where participation was mandatory.

4    Right?

5    A.  Correct.

6    Q.  And you expect a higher response rate where you have to

7    participate in the survey because you're receiving government

8    benefits than you would from a telephone survey, wouldn't you?

9    A.  Yes indeed.

10   Q.  Okay.  And another survey that you talk about in your report

11   is of hydraulic fracking well operators.  Right?

12   A.  Yes.

13   Q.  I might not have gotten that exactly right, but close

14   enough.  And no survey has been started on that, yet, right, has

15   there?  At least at the time of your deposition?

16   A.  No, that's not correct.  The survey to collect information

17   on the sample of wells has been collected; the analysis has not

18   been done yet.

19   Q.  And again, that's an example where well operators that are

20   being regulated or potentially regulated by the EPA are in a

21   receipt of survey requests from the regulating agency, and they

22   agree to participate in the survey.  Right?

23   A.  Yes.

24   Q.  Again, a different situation than a telephone survey.

25   Right?

1    A.   Yes.

2    Q.   Okay.  And the other survey that you mentioned in your

3    report is a survey I think that was conducted on an Indian

4    reservation, where there was in-person interviews by

5    Native American members of the same tribe that was being

6    studied.  Right?

7    A.   That's correct.

8    Q.   And the interviews lasted a long time, and the survey was in

9    the field for over the course of a year.  Right?

10   A.   Again, the reason it was in the field for over a year was

11   that there's concern about different eating patterns in

12   different seasons.  So we attempted to collect information every

13   quarter, every three months, from each person.

14   Q.   Now, you are not sure whether you've done a survey,

15   telephone or otherwise, that was in the field for less than two

16   weeks, are you?

17   A.   That's true, telephone or otherwise.

18   Q.   And in the field, just hopefully you can agree with me,

19   that's the amount of time that the survey is taking place.

20   Right?

21   A.   The time during which you try to collect the data.

22   Q.   And you agree that for certain types of questions, like

23   public opinion, phone-based surveys that are in the field for a

24   short period of time can get very good estimates.  Right?

25   A.   They can get estimates that achieve the necessary quality

1     for what they are designed for.

2     Q.  And now I want to talk to you about your opinions concerning

3     nonresponse bias.  And what your opinion is, is because

4     Professor Shaw's surveys have a low response rate, and because

5     of the potential for nonresponse bias, your opinion is that the

6     results of Professor Shaw's survey potentially could not be

7     validly extrapolated to the target survey population.  Correct?

8     A.  I believe that's correct.  If you could read it again, it

9     probably wouldn't hurt.

10    Q.  Because Professor Shaw's surveys have a low response rate,

11    and because of the potential for nonresponse bias, your opinion

12    is that the results of Professor Shaw's survey potentially could

13    not be validly extrapolated to the target survey population.

14    Correct?

15    A.  Correct.

16    Q.  And the basic idea, the concern about nonresponse bias, is

17    that when you have a low response rate, you run the risk - as

18    you've explained - that the responders to the survey are not

19    representative of the target population?

20    A.  Yes.

21    Q.  And at the time of your deposition, you did not know one way

22    or the other whether or not the survey responders to

23    Professor Shaw's surveys are representative of the population

24    that was the subject of those surveys.  Right?

25    A.  That's correct.

1    Q.  And you did not disclose in your report in this case any

2    effort to determine whether the responders to Professor Shaw's

3    surveys were likely or unlikely to be representative of the

4    population that was surveyed.  Right?

5    A.  That's correct, I did no data collection.

6    Q.  And you have not disclosed any methodology or basis to

7    determine whether the survey responders to Professor Shaw's

8    surveys were likely or unlikely to be representative of the

9    population surveyed.  Right?

10   A.  Say that one again.

11   Q.  You have not disclosed any methodology or basis to determine

12   whether the survey responders to Professor Shaw's surveys were

13   likely or unlikely to be representative of the population

14   surveyed.

15              JUDGE COLLYER:  You almost want to write that one down.

16              THE WITNESS:  What was that?

17              JUDGE COLLYER:  I said, you almost want to write that

18   one down.

19              THE WITNESS:  Yeah.

20   A.  Dr. Shaw attempted to demonstrate representative business

21   through some of his comparisons in his statements and in his

22   testimony this morning, and I reviewed some of those, and part

23   of that was his reference to the Pew study, and I referenced it

24   there.

25              So I think the answer is no to what you said, that we

1   have comparisons that we tried to make, but I didn't do any

2   independent further evaluation, if that's what you're asking.

3   BY MR. HUGHES:

4   Q.  I'm not sure I have an answer.  I'm going to ask it one more

5   time.  You have not disclosed any methodology or basis to

6   determine whether the survey responders to Professor Shaw's

7   surveys were likely or unlikely to be representative of the

8   population surveyed.  Correct?

9   A.  Again, the way that's worded, it sounds like we have no

10  information on whether or not they are representative, and he

11  has provided some information that has been discussed and that

12  we discussed at the deposition.

13          JUDGE TATEL:  Dr. Marker, this is pretty critical, so

14  is your point that based on expert knowledge about response

15  rates, that you don't need to do your own independent survey to

16  know that a two percent response rate is an inadequate basis on

17  which to make a judgment about the representativeness of the

18  survey?  Is that the point?

19          THE WITNESS:  That is absolutely the point.  And not

20  making that as my own --

21          JUDGE TATEL:  I understand.

22          THE WITNESS:  Okay.

23  BY MR. HUGHES:

24  Q.  Professor Marker, one final question that's somewhat similar

25  to the last but slightly different.  You have not even disclosed

1    a methodology to assess the likelihood one way or the other

2    whether Professor Shaw's surveys are representative of the

3    population surveyed, have you?

4    A.  What's the difference between that and the previous

5    question?

6    Q.  May I hand you your deposition?

7    A.  Sure.

8            MR. HUGHES:  May I approach, Your Honor?

9            JUDGE COLLYER:  Yes, yes.

10   BY MR. HUGHES:

11   Q.  I'm going to start at page 128, line 17.

12           MR. ROSENBERG:  I'm sorry, what?

13           MR. HUGHES:  128, line 17.  Let me know when you're

14   there.

15   BY MR. HUGHES:

16   Q.  Question:  "Again, you haven't done anything to assess the

17   likelihood one way or the other --"

18           And then you said, Answer:  "As I said, I don't --"

19           And Mr. Rosenberg said, "Hold on, let him finish the

20   question."

21           "Whether the survey responders to Professor Shaw's

22   surveys are representative of the population surveyed.  Right?"

23           Answer:  "Correct."

24           Was that your sworn testimony?

25   A.  Yes.

1          MR. HUGHES:  No further questions.

2          MR. ROSENBERG:  And just for the record, Mr. Hughes

3     forgot to note that I did object to the form of that question

4     that was asked, and I repeat that objection.  Thank you.

5          JUDGE COLLYER:  Okay.  Was there any redirect?  Yes,

6     there is, hold on.

7          MR. ROSENBERG:  No further questions.  Thank you.  And

8     thank you, Dr. Marker.

9          JUDGE COLLYER:  Just one second.

10         JUDGE TATEL:  We don't have a jury here, so let's spend

11    a minute on this.  Mr. Hughes, are you up here?  Because you're

12    perfectly willing to correct me if I'm asking the wrong

13    question.  Okay?

14         MR. HUGHES:  Yes, sir.

15         JUDGE TATEL:  But as I understand the debate the two of

16    you are having, is that Dr. Marker is saying that based on

17    survey research, that his opinion is that a survey with a

18    two percent response rate provides an inadequate basis for

19    making a judgment about the representativeness of those who

20    responded.  You're asking him, I take it, whether or not there

21    are -- he's done any independent research of any independent

22    surveys of his own of Dr. Shaw's data to find out that it is in

23    fact not representative.  Is that your point?

24         MR. HUGHES:  I think it's slightly different,

25    Your Honor.

1          JUDGE TATEL:  I'm glad I asked.  What's the difference?

2          MR. HUGHES:  So I think the debate is that the question

3     is in survey research whether there's a nonresponse bias.  What

4     that means is, if you have a low response rate to the survey,

5     your concern is, are the responders representative of the rest

6     of the population.

7          JUDGE TATEL:  Right.

8          MR. HUGHES:  And what Dr. Marker admitted to me today

9     and in his deposition is that he didn't know one way or the

10    other whether the responders to Professor Shaw's surveys were

11    representative of the population that was being surveyed, and he

12    didn't disclose in his report any effort to determine whether

13    the responders of Professor Shaw's surveys were representative.

14    He just doesn't know.

15         JUDGE TATEL:  But how is that different from his

16    judgment that a two percent response rate is an inadequate basis

17    upon which to make that judgment, that that's what survey

18    research shows?

19         MR. HUGHES:  Well, I think that --

20         JUDGE TATEL:  Are we talking at cross purposes?

21         MR. HUGHES:  You may be accurately articulating

22    Dr. Marker's opinion, with which Professor Shaw disagrees.

23         JUDGE TATEL:  I'm not stating it myself, I'm just

24    trying to understand the debate the two of you are having.  And

25    what I understand you saying is that he hasn't done any

1    independent survey to prove what he -- to prove his judgment

2    that the two percent response rate is inadequate.

3         MR. HUGHES:  And I think what I was trying to get at,

4    Your Honor, is as Professor Shaw testified today, he said, okay,

5    I've got a low response rate; let's look at the people I

6    actually surveyed, and did I get people that make me feel

7    comfortable extrapolating the results of my survey to the target

8    population.  So Professor Shaw did that, and his testimony

9    speaks for itself, but he testified he was comfortable

10   extrapolating the results to the target population.

11        All I was trying to elicit from the witness was that he

12   hadn't done the same thing.

13        JUDGE TATEL:  I'm glad you brought that up, because we

14   don't have the transcript from this morning, and I wanted to ask

15   Dr. Marker his reaction to exactly what you just said.

16        And correct me if I'm wrong, the way I heard

17   Dr. Shaw -- correct me if I'm wrong, Mr. Hughes.  What I heard

18   Dr. Shaw say in response to your redirect this morning was that

19   he said:  Look, I understand it's a small response rate, but I

20   looked at the responses and I see in those responses a group

21   that looks pretty representative.  Right?

22        MR. HUGHES:  That's right, Your Honor.

23        JUDGE TATEL:  That's what he said.  He said:  Look,

24   I've looked at the list; we've got minorities, we've got

25   elderly, we've got an economic mix.  Right?

```
 1              MR. HUGHES:  Yeah, what he --

 2              JUDGE TATEL:  And that gives me comfort that this is a

 3    representative group even though it's only a two percent

 4    response rate.  Right?  And your point is, Dr. Marker didn't do

 5    that.

 6              MR. HUGHES:  Exactly.

 7              JUDGE TATEL:  But my question to you is, what do you

 8    think about Dr. Shaw's response?  Does that give you any

 9    confidence that maybe even with a two percent response rate,

10    he's got something on the basis of which he can make a judgment?

11              THE WITNESS:  No, I don't believe he does.  Because

12    again, go back to Pew, which he brought up as the example.  Pew

13    has a much higher response rate than he does, matches on many

14    more characteristics than he showed.  He only looked at - or

15    only reported looking at - the low income number.  He knows that

16    his numbers, he said, didn't match on elderly or on race or any

17    of these other characteristics.  And even when Pew matched on

18    income, it was totally off on many other factors that maybe,

19    maybe related to what we're talking about.

20              Another good example was even though it had the same --

21    Pew had the right percentage poor, it had 17 percent -- well, it

22    was way off -- Pew or the American Community survey, one has

23    10 percent on food stamps and the other has 17 percent on food

24    stamps.  So even though their telephone survey at Pew was

25    getting poor people, it wasn't getting a representative sample
```

1    of poor people, it was getting poor people who either had more

2    or less use of food stamps.  So at two percent, you don't go any

3    further because it is so far removed.

4         And if I could give one simple example to show how far

5    removed it is from government accepted surveys.  There's a large

6    scale telephone survey that Westat has done since its inception

7    in the early '90s, the National Household Education survey.

8    It's a household survey, and originally it got 70, 73 percent

9    response rates in the '90s.  By the middle of the last decade,

10   it got to 40 percent response rate.

11        The government said, that's too low, stop.  We're not

12   going to pay you for a 40 percent response rate because we can't

13   tell about all the bias possibilities that are there.  They

14   spent a lot of money having us and others research, and now the

15   Census Bureau has started doing it using alternative methods

16   that they believe will get over 50 percent.  40 percent was

17   just, stop the presses, we're not going to go any further.

18        So when you're presented with a two percent response

19   rate, you don't do additional analyses, you just know that's not

20   good enough.  So that's why.

21        MR. HUGHES:  Your Honor, if I may, since Dr. Shaw is

22   not here to defend himself, in addition to looking at the people

23   that were actually surveyed, particularly in the Hispanic and

24   Black survey population, and determining that in those

25   populations there were more lower socioeconomic and low

1    education level survey respondents than you expect to see in the

2    rest of the population - so he said, okay, that gives me

3    comfort - in addition to doing that and the other things he

4    explained, one of the things we've got to keep in mind about the

5    reason for the low response rate is the quality of

6    Professor Ansolabehere's list.  And we've already heard some

7    testimony about dead people --

8              JUDGE TATEL:  That's a different question.

9              MR. HUGHES:  Okay.  Well, that drives the response

10   rate.

11             JUDGE TATEL:  And Dr. Marker won't be back tomorrow.

12   Is that right?

13             MR. ROSENBERG:  No, we were not intending on it.

14             JUDGE TATEL:  That's okay.  Thank you.

15             MR. ROSENBERG:  If I could ask just one follow-up

16   question to this colloquy --

17             JUDGE COLLYER:  Yes.

18             MR. ROSENBERG:  -- without accepting some of

19   Mr. Hughes' characterizations of what Dr. Shaw said this

20   morning.

21                         REDIRECT EXAMINATION

22   BY MR. ROSENBERG:

23   Q.  Dr. Marker, were there other reasons as to why Dr. Shaw's

24   explanation as to his responses, the sort of responses that he

25   got, were not something that could be reliable in terms of the

1    weighting issues and the lack of a basis upon which to compare?

2            MR. HUGHES:  I object, because I'm very leery of a new

3    undisclosed opinion to which I have absolutely no ability to

4    respond to.

5            MR. ROSENBERG:  And I will represent this is not a new

6    opinion, it is what he said at his deposition.

7    A.  You'll have to restate the question.

8    BY MR. ROSENBERG:

9    Q.  Are there other issues in connection with what Judge Tatel

10   was asking you about Dr. Shaw's statement this morning that he

11   was comfortable with the responses in order to draw conclusions?

12   A.  I believe there were, but I would have to go back and look

13   through the deposition.  If you could direct me to --

14   Q.  No, I can't do that.  That would be leading and I would have

15   to object to myself.

16   A.  I mean, so let's see what we have talked about this time

17   versus the deposition.  We talked about weighting, we talked

18   about -- we haven't talked about problems with the list that

19   Mr. Hughes just mentioned, which I don't believe will affect the

20   response rate calculation.

21   Q.  Let me just ask one question.  Do you have a basis upon

22   which to compare the responses that Dr. Shaw received to

23   anything else?

24   A.  We have both Pew data, we have the ACS, the government

25   surveys.  Again, Dr. Hughes -- sorry.  Dr. Shaw --

1   Q.  Let me try this, if I can.  Do you have a basis to compare

2   it to Dr. Ansolabehere's population?

3   A.  Okay.  The only sub part of Dr. Ansolabehere's population

4   that was mentioned, I believe, was the elderly and the poor.  Do

5   I have that correct from his data?  I believe that's what was

6   there.  And he overrepresented the elderly tremendously - two

7   and a half to one, if I'm not mistaken - and without weighting

8   the data, it's clearly not representative.  And I don't remember

9   the numbers.  I would have to be shown the table that Mr. Hughes

10  showed me at the deposition.

11        MR. ROSENBERG:  Okay.  I have no further questions.

12  Thank you.

13        JUDGE COLLYER:  All right.  Thank you very much.  Thank

14  you, Dr. Marker.

15        MR. MORTARA:  Your Honor, it's Adam Mortara for the

16  State.  I'm hoping we have a resolution to my cross-examination

17  issue.  I don't know that because I haven't heard from the

18  Justice Department yet.  I did want to offer yet another option

19  to the court.

20        There's no more witnesses for today, so I thought --

21        JUDGE COLLYER:  No, what happened to Mister --

22        MR. MORTARA:  Oh, you're going to play a video?  Oh, I

23  thought we were done.  Oh, we're going to video hour.  I'm

24  sorry, Your Honor, I thought there were no more live witnesses.

25  There are no more live witnesses, there's video hour.

```
 1              JUDGE COLLYER:  There are no more live witnesses.
 2    Well, video 45 minutes or something.  It's already quarter
 3    after.  Do you think we can do it?
 4              MR. GEAR:  My name is Bruce Gear, I represent
 5    Eric Holder in this matter.  The video is for Carlos Uresti, and
 6    it's approximately 26 minutes long.  We would like to at least
 7    start the video tonight if that would be permissible.
 8              JUDGE COLLYER:  Please do, because we're going to be
 9    hard put for time tomorrow.
10              MR. GEAR:  With your permission, we would proceed.
11              JUDGE COLLYER:  I have a question for you.  I don't
12    know the answer to this because I've never had a video
13    deposition shown in court.  Does the court reporter take this
14    down like a regular witness?
15              MR. HUGHES:  Yes, Your Honor.
16              JUDGE COLLYER:  All right.  You and I, we know things.
17    Go right ahead, Mr. Gear.
18              (Following is videotaped testimony of
19               SENATOR CARLOS URESTI played in open court:)
20    Q.  Senator, good morning.
21    A.  Good morning.
22    Q.  Again, my name is Bruce Gear, I'm with the Department of
23    Justice, and I represent Eric Holder in this case.  I'll be
24    asking you a series of questions.  You've been placed under
25    oath, and we expect you to answer the questions fully and
```

1    completely and truthfully.  Do you understand that?

2    A.  Yes, sir.

3    Q.  Okay.  And is there anything that would prevent you from

4    answering the questions truthfully today?

5    A.  No, sir.

6    Q.  Okay.  So with that, I'm just going to go right into your

7    questioning.

8         Are you currently a member of the Texas Senate?

9    A.  Yes, sir.

10   Q.  Which district do you represent in the Senate?

11   A.  District 19.

12   Q.  How long have you been a Senate member?

13   A.  Just over six years.

14   Q.  Did you serve in the government prior to becoming a senator?

15   A.  Yes, sir, I served as a State Representative for

16   District 118.

17   Q.  And as far as District 118 is concerned, was any of

18   District 118 encompassed in your current district?

19   A.  Most of District 118 is in District 19, which is --

20   District 118 is primarily in Bexar County.

21   Q.  And what percentage of that district would you say is in

22   your current Senate district?

23   A.  Approximately 85 percent.

24   Q.  Could you please describe your Senate district

25   geographically?

```
 1     A.  Yes, sir.  Senate District 19 commences primarily on the
 2     southeast side of San Antonio, which is in Bexar County, and
 3     extends all the way to El Paso, which if you were to drive it,
 4     is about a nine-hour drive one way from San Antonio to El Paso.
 5     That includes 23 counties, all or part of 23 counties.  It
 6     doesn't include the city of El Paso, but it includes the
 7     County of El Paso.  It's approximately a little over 50,000
 8     square miles; it includes two-thirds of the Texas/Mexico border;
 9     it has about 62 school districts.  So it's considered the
10     largest geographical Senate district in the continental
11     United States.
12     Q.  And what percentage of your constituents are
13     African-American or Hispanic?
14           MR. SWEETEN:  Objection.  Compound.  Go ahead.
15     A.  Approximately five percent.
16     Q.  And let me break that up.  What percentage of your
17     constituents are African-American?
18     A.  Yes, sir.  Approximately five percent of my constituents are
19     African-American.
20     Q.  What percentage of your constituents are Hispanic?
21     A.  Just shy of 70 percent.
22     Q.  Do you believe that it's important to understand the racial
23     demographics of your constituents?
24     A.  Absolutely.
25     Q.  Why?
```

1    A.  Well, I learned a long time ago as a legislator that you

2    have to represent your district, you have to vote your district,

3    and the only way to truly understand your district and to vote

4    your district is to know the people that you represent.  And

5    given that 75 percent of my -- approximately 75 percent of my

6    constituency are either African-American or Hispanic, I think

7    that's very important in the way that I represent them.

8    Q.  Thank you.  What are the poverty rates in your district, do

9    you know that?

10   A.  Generally, yes, sir.  My district is considered the second

11   to third poorest district in the State of Texas.  At least as

12   far as the 2000 census is concerned, the per capita income is

13   about $12,500 per year.  There's a number of my constituents

14   that live in poverty, or right along -- right at the border or

15   level of the federal poverty level.

16   Q.  Are minorities in your district more or less likely to own a

17   vehicle as compared to Anglos?

18        MR. SWEETEN:  Objection to foundation.

19   A.  Based on what I know about my district, they're less likely

20   to own a vehicle.

21   Q.  And how do you know this?

22   A.  Well, again, I've represented Senate District 19 for about

23   six years.  I don't think, I candidly can say, anyone knows my

24   district better than I do.  I have toured it extensively, I've

25   traveled it quite often, I have block-walked my neighborhoods, I

1    have had town hall meetings, I've had large groups of folks come

2    in and talk to me.  I've gotten to know my district pretty well.

3    I know, for example, in Maverick County, the poverty levels are

4    pretty high; I know in Presidio County, along the border,

5    they're pretty high.

6          So based on my representation of the district, I can

7    make that statement.

8    Q.  Can you discuss the availability of public transportation in

9    your district?

10   A.  I can say that in San Antonio, the transportation, bus

11   transportation, is actually pretty good.  It's pretty

12   impressive.  But once you leave San Antonio - and by that I mean

13   you go 20 miles outside of Bexar County - there's no

14   infrastructure, bus transportation, other than perhaps a

15   Greyhound bus.  So if you wanted to catch a Greyhound bus from

16   Del Rio, for example, you could take the Greyhound, but within

17   the city of Del Rio, there's no bus transportation.

18   Q.  And again, how do you know this?

19   A.  I know it based on the fact that I've represented it so

20   long.  I know Del Rio very well.  And I'm not just speaking

21   about Del Rio, I'm speaking about Eagle Pass, which is another

22   large town in my district, and Uvalde, so on and so forth.  In

23   other words, other than San Antonio, which is on one end of the

24   district, and El Paso, which is at the other end, there's no

25   infrastructure to speak of within those towns.

1    Q.   In 2007, was a photo Voter ID Bill considered by the

2    Texas Senate?

3    A.   Yes, sir.

4    Q.   Was that bill HB218?

5    A.   Yes, sir, I think that's correct.

6    Q.   Was there an attempt to bring HB218 to the Senate Floor for

7    a vote?

8    A.   Yes, sir, there was.

9    Q.   Who made that decision to bring it to the Floor for a vote?

10   A.   My understanding was the lieutenant governor,

11   David Dewhurst.

12   Q.   And that's David Dewhurst?

13   A.   Yes, sir.

14   Q.   When did you first learn that the lieutenant governor was

15   going to attempt to bring HB218 to the Floor?

16   A.   The morning that that occurred, I was actually home in my

17   apartment - I was sick with the flu - and I was called by

18   Senator Hinojosa to essentially hurry my butt up and get to the

19   Senate Floor because the Voter ID Bill, as we called it, was

20   going to come up.

21   Q.   So you first learned about the vote by Senator Hinojosa?

22   A.   Yes, sir.

23   Q.   Why were you not in the Senate that day?

24   A.   Again, I had the flu.  I went home early that afternoon --

25   the day before, rather.  I was suffering with the flu, and I

 1    went home, tried to get better.  The following morning, the day
 2    that the bill came up, again, I was in bed sick, and I called in
 3    essentially to the Secretary of the Senate, Patsy Spaw, to
 4    advise her that I would be in later in the afternoon.  Plus, I
 5    called two other committee chairmen - chairman and chairwoman -
 6    to advise them of the same.
 7    Q.  And who were the two other committee chairmen and women?
 8    A.  It was Chairman Brimer, Kim Brimer.  He was the chairman at
 9    the time of the administration committee, and we had an early
10    committee hearing that morning.  And Senator Jane Nelson, she's
11    the chairwoman of health and human services.
12    Q.  Do you recall what you told Senator Brimer?
13    A.  We actually called their offices.  They weren't in yet.  We
14    called pretty early in the morning.  Again, I don't like to be
15    late to meetings, and I was a freshman senator, and I was trying
16    to do the senatorial thing and just simply put them on notice
17    that I would be in later in the morning.  I was going to try to
18    rest and feel better.
19    Q.  What was your reaction when you heard that HB218 was being
20    brought to the Senate Floor?
21    A.  I was stunned.  Again, I was sick in bed.  At first I
22    thought -- quite frankly, I thought Senator Hinojosa was teasing
23    me.  But then, when I heard it in his voice he was not teasing
24    me, I jumped out of bed and got dressed as quickly as I could,
25    and literally ran to the Capitol from my apartment, which was

1    about 50 to 60 yards away, and ran onto the Senate Floor to cast

2    my vote in objection to the bill.

3    Q.  Do you recall if you had any conversations with other

4    senators about whether this would happen while you were out

5    sick?

6    A.  The day before, I was in the members lounge laying on one of

7    the chairs - because again, I was sick with the flu - and I

8    recall Senator Leticia Van de Putte and Senator Kyle Janek were

9    in the members lounge, and again they were kind of teasing me,

10   but they encouraged me to go home.  What's interesting is,

11   Senator Janek is a doctor and Senator Van de Putte is a

12   pharmacist, and so I actually was seeking some medical advice

13   from them, if you will.  And they encouraged me to go home, and

14   Senator Janek specifically said, "It's not like we're going to

15   take up the Voter ID Bill, Carlos."  And I said, "Okay, I'm

16   going to go home," and that's, in fact, what I did.

17            MR. SWEETEN:  Objection, hearsay, and move to strike

18   the hearsay sections.

19            MR. GEAR:  This is a contemporaneous statement, it's an

20   effect on the listener, it's not being offered for the truth of

21   the matter asserted.

22            THE WITNESS:  Can we stop for a moment, please?

23            (Pause in videotaped deposition.)

24            (Videotaped testimony resumed:)

25   Q.  Why did you decide to come in late that day to the Senate?

1    A.  Well, it really wasn't my decision.  I was sick with the

2    flu; I didn't have any energy the day before.  Again, I had gone

3    home early, which is not like me to do, but I didn't have a

4    choice.  And so I felt that I was able to call in, let my

5    colleagues know I would be coming in later in the morning.

6          Because it's the custom of the Senate that after we do

7    roll call first thing in the morning, we do the prayer; then we

8    do Doctor of the Day, which is where we identify the doctor

9    that's going to take care of the senators for the day, they kind

10   of volunteer; we do resolutions where we honor, for example, a

11   soldier that might have just returned from one of the wars; we

12   honor -- we do county days, Uvalde County day; somebody is

13   celebrating their 50th anniversary, so on and so forth.  And

14   that usually takes -- sometimes it takes two or three hours, but

15   at a minimum, an hour, hour and a half.

16          So I felt comfortable that given that that was the way

17   things were going on a daily basis, one; coupled with the fact

18   that I had informed my colleagues that I was out with the flu,

19   that I could get a couple of hours of rest before we started the

20   Senate's business.

21   Q.  Was the vote done differently that day?

22   A.  Absolutely.

23   Q.  How was it done differently?

24   A.  Well, I was in there when it all commenced, but as I

25   understand it, they - the lieutenant governor, the presiding

1   officer - decided to skip with the resolutions, the normal

2   resolutions of the day, and go straight into bringing up, as we

3   call it, the Voter ID Bill.  In other words, what normally would

4   have taken an hour to two hours handling the resolutions,

5   honoring the soldiers, Marines, et cetera, was put on hold, and

6   immediately that bill was called up.

7   Q.  Did HB218 pass the Senate?

8   A.  No, sir.  I was able to make it to the Floor in time to vote

9   against it on the second time that the lieutenant governor

10  called it up.

11  Q.  After HB218 failed to pass in the Senate, did there come a

12  time when you had a conversation with the lieutenant governor

13  about the bill?

14         MR. SWEETEN:  Objection.  It's legislative privilege.

15  Go ahead.

16         MR. GEAR:  And I would just respond to that that there

17  is a motion in limine pending.  If the court rules in your

18  favor, then you would have an opportunity to move to strike his

19  answer.

20         Please answer.

21  A.  Immediately after I made it onto the Senate Floor, you

22  basically vote -- if you vote against the bill, you hold up two

23  fingers; if you vote for a bill, you hold up one finger.  I

24  walked onto the Senate floor and I held up my two fingers.

25  Again, I didn't realize everything that had happened before.

1         After the roll call was completed, the presiding

2    officer gaveled, said that the bill failed to pass, and within a

3    few -- a minute or so, the presiding officer, Lieutenant

4    Governor Dewhurst, walked up to my desk, and I was sitting

5    slouched down like this trying to catch my breath.  He leaned

6    over my desk and said, "Senator" -- he said, "Carlos, I'm sorry,

7    but I had to try to pass that bill."

8    Q.  And that conversation took place on the Floor?

9    A.  Yes, sir.  Immediately after the vote.

10   Q.  After 2007, the vote, what if anything did supporters do of

11   the bill to ensure -- in 2009 to ensure that they could

12   successfully bring voter ID legislation to the Floor for a full

13   vote?

14        MR. HUGHES:  Objection to foundation; objection, calls

15   for speculation.

16   A.  Well, what we have in the Senate is we have what's called

17   the two-thirds rule.  There are 31 state senators, and

18   essentially what that means is, before a bill can be called up

19   for consideration on the Senate Floor for a vote, two-thirds of

20   the senators that are present have to agree to bring up the bill

21   for debate, for discussion.  Now, they can vote against the

22   bill, ultimately, or they can of course vote in favor of it, but

23   to bring up a bill, two-thirds have to agree to do that.

24        And that's what I think allows our Senate to work so

25   well together.  It allows for compromise.  Because regardless of

1    what party is in the majority, if you don't have 21 senators

2    agreeing to bring up the bill, then you have to reach across the

3    aisle to get other senators to work with you to vote to bring up

4    that bill.

5            In this situation, the -- and it only takes a majority

6    of the senators to change the rules.  The majority would be the

7    Republican senators at the time agreed to do away with the

8    two-thirds rule with regard to the Voter ID Bill.

9    Q.  Do you recall any discussion in 2007 off the record among

10   legislators --

11           (End videotaped testimony.)

12           JUDGE COLLYER:  Can we stop this now?  I'm sorry, the

13   members of the court have commitments.  I don't know why they

14   have day jobs, too, when they're in the middle of this trial,

15   but they do.

16           So let's pick this up, back it up a little bit, because

17   we missed the last question that was being asked just then, and

18   we'll take it up again in the morning.

19           MR. GEAR:  Thank you, Your Honor.

20           JUDGE COLLYER:  Thank you.

21           (Proceedings adjourned at 5:37 p.m.)

22

23

24

25

1                    **CERTIFICATE OF OFFICIAL COURT REPORTER**

2

3              I, Rebecca Stonestreet, certify that the foregoing is a

4    correct transcript from the record of proceedings in the

5    above-entitled matter.

6

7

8

9    _____          _____

10   SIGNATURE OF COURT REPORTER                 DATE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**#**

**#700** [1] - 3:6

**$**

**$12,500** [1] - 135:13
**$80** [1] - 7:14
**$85** [2] - 7:5, 7:7

**'**

**'01** [1] - 12:12
**'90s** [2] - 128:7, 128:9
**'How** [1] - 87:25
**'X'** [1] - 62:23

**0**

**000375** [1] - 36:5
**07** [1] - 107:12
**08540-6531** [1] - 2:13

**1**

**1** [5] - 40:16, 41:24, 41:25, 46:1, 46:2
**1,000** [3] - 111:17, 111:19, 111:21
**1,200** [1] - 111:18
**1-Ellis** [2] - 46:1, 49:11
**1.5** [6] - 42:19, 42:24, 44:7, 62:16, 101:24, 112:18
**1.893** [2] - 63:12, 93:6, 93:12
**1.9** [8] - 42:19, 42:25, 62:16, 101:24, 107:24, 112:18, 113:4, 116:3
**10** [9] - 10:9, 10:10, 24:23, 30:19, 61:4, 76:10, 83:21, 114:25, 127:23
**100** [2] - 4:8, 71:8
**10004** [1] - 2:24
**11** [2] - 1:6, 3:6
**1130** [1] - 110:7
**118** [5] - 133:16, 133:17, 133:18, 133:19, 133:20
**119** [1] - 110:6
**12** [1] - 83:21
**12-128** [1] - 1:3
**125,000** [1] - 93:10
**128** [2] - 123:11, 123:13
**129** [1] - 4:9
**13** [1] - 84:11
**135** [1] - 4:10
**14** [37] - 5:13, 7:2, 7:21, 14:18, 15:17, 21:2, 21:5,

27:12, 31:18, 31:21, 33:4, 37:23, 38:3, 68:1, 68:22, 69:15, 70:9, 70:21, 70:24, 71:18, 73:6, 74:17, 74:20, 79:3, 79:6, 79:16, 80:15, 83:3, 84:13, 85:17, 85:18, 86:10, 86:15, 86:18, 86:23, 93:13
**1440** [1] - 3:3
**14th** [1] - 1:19
**15** [2] - 36:9, 92:12
**16** [1] - 57:12
**168** [1] - 87:14
**17** [6] - 77:7, 84:11, 123:11, 123:13, 127:21, 127:23
**18-year** [3] - 75:15, 75:16, 75:18
**19** [8] - 21:18, 36:9, 54:14, 86:20, 133:11, 133:19, 134:1, 135:22
**191** [1] - 2:15
**1950s** [1] - 73:17
**1960** [1] - 2:19
**1968** [1] - 54:5
**1969** [1] - 54:12
**1972** [1] - 54:14
**1991** [2] - 17:19, 67:17
**1993** [2] - 17:19
**1997** [1] - 30:21
**1st** [2] - 94:10, 94:24

**2**

**2** [2] - 49:11, 76:21
**2.5** [1] - 110:14
**20** [4] - 24:22, 68:9, 104:3, 136:13
**20-some-odd** [1] - 10:23
**2000** [1] - 135:12
**20001** [1] - 3:10
**2001** [1] - 12:16
**2003** [1] - 17:9
**2005** [2] - 68:18, 69:16
**2007** [4] - 69:16, 137:1, 142:10, 143:9
**2009** [2] - 69:16, 142:11
**2010** [2] - 57:9, 77:5
**2011** [6] - 36:2, 68:4, 68:18, 68:25, 71:1, 74:10
**2012** [1] - 1:6
**202** [2] - 2:9, 3:11
**2020** [1] - 68:12
**2030** [1] - 68:12
**20530** [1] - 2:9
**209** [1] - 1:19
**21** [5] - 20:7, 24:22, 26:25, 27:1, 143:1
**21-vote** [3] - 16:5, 17:14, 18:4

**212** [1] - 2:24
**22** [9] - 9:24, 10:24, 16:22, 33:7, 86:20, 114:4, 114:12, 114:17, 115:6
**22304** [1] - 2:16
**23** [2] - 134:5
**230** [1] - 3:2
**23rd** [1] - 74:10
**24th** [1] - 2:23
**25** [4] - 7:4, 85:14, 85:15, 109:4
**25,000,000** [1] - 104:16
**25-million-person** [1] - 98:17
**25th** [1] - 36:2
**26** [1] - 132:6
**268,000** [1] - 93:8
**2740** [1] - 21:18
**2745** [1] - 24:9
**2746** [1] - 24:9
**2747** [1] - 26:19
**28** [2] - 58:4, 107:1
**281** [1] - 2:20
**2:00** [1] - 1:10

**3**

**3** [2] - 1:11, 36:3
**30** [9] - 10:8, 15:10, 24:19, 56:2, 58:4, 68:8, 72:9, 73:15, 115:25
**300** [1] - 1:24
**30303** [1] - 3:3
**305-7766** [1] - 2:9
**31** [7] - 4:4, 19:7, 20:10, 20:21, 24:22, 114:23, 142:17
**312** [2] - 1:25, 3:7
**33** [1] - 4:6
**330** [1] - 30:22
**35** [1] - 57:18
**354-3249** [1] - 3:11

**4**

**40** [9] - 10:8, 23:5, 24:19, 60:3, 68:8, 115:2, 128:10, 128:12, 128:16
**40-some** [2] - 59:5, 59:19
**404** [1] - 3:4
**405** [1] - 2:16
**4201** [1] - 2:19
**427-0701** [1] - 3:7
**44,000** [1] - 111:20
**45** [1] - 132:2
**48** [1] - 17:13
**49** [1] - 4:6
**494-4469** [1] - 1:25
**4:01** [1] - 92:13

**5**

**5** [3] - 4:4, 74:19, 87:10
**50** [4] - 23:5, 55:14, 128:16, 139:1
**50,000** [2] - 57:11, 134:7
**500** [4] - 2:12, 12:19, 20:25, 26:23
**50th** [1] - 140:13
**512** [1] - 1:20
**52** [1] - 77:13
**523-2721** [1] - 3:4
**530** [1] - 2:19
**54** [1] - 1:24
**573** [1] - 36:4
**580-6310** [1] - 2:20
**5:00** [1] - 104:4
**5:37** [1] - 143:21

**6**

**6** [2] - 76:21, 85:15
**60** [2] - 115:1, 139:1
**600** [1] - 111:17
**60603** [1] - 3:7
**60654** [1] - 1:25
**609** [1] - 2:13
**62** [1] - 134:9
**628-4673** [1] - 2:17
**65** [1] - 98:19
**6511** [1] - 3:10
**69** [2] - 4:6, 4:8

**7**

**70** [2] - 128:8, 134:21
**703** [1] - 2:17
**7202** [1] - 2:8
**73** [1] - 128:8
**75** [3] - 5:24, 135:5
**77068** [1] - 2:20
**78701** [1] - 1:20
**7th** [2] - 1:19, 94:17

**8**

**8-0** [1] - 109:23
**80** [4] - 109:23, 110:2, 110:23, 111:2
**82** [1] - 85:14
**82nd** [1] - 68:24
**83** [3] - 83:21, 84:10, 85:15
**84** [2] - 76:21, 86:20
**85** [1] - 133:23
**859-8953** [1] - 2:24

## 9

**902** [1] - 2:12
**91** [2] - 5:23, 28:23
**936-1695** [1] - 1:20
**950** [1] - 2:8
**955-3200** [2] - 2:13
**98** [3] - 111:4, 111:7, 111:8

## A

**A&M** [2] - 94:16, 95:19
**ability** [4] - 31:13, 93:18, 103:19, 130:3
**able** [19] - 13:23, 27:3, 28:12, 31:10, 64:8, 75:18, 90:24, 91:5, 94:23, 97:18, 97:19, 101:6, 102:5, 103:23, 109:7, 109:8, 114:12, 140:4, 141:8
**above-entitled** [1] - 144:5
**absent** [2] - 20:17
**absentee** [2] - 5:21, 6:9
**Absolutely** [1] - 36:16
**absolutely** [9] - 5:14, 41:21, 45:22, 60:1, 88:6, 122:19, 130:3, 134:24, 140:22
**ABUDU** [6] - 3:1, 5:3, 5:8, 5:12, 8:4, 8:22
**Abudu** [2] - 4:9, 5:6
**accept** [1] - 99:18
**acceptable** [1] - 113:10
**accepted** [1] - 128:5
**accepting** [3] - 99:4, 105:11, 129:18
**access** [1] - 103:11
**accessible** [1] - 34:9
**accommodate** [1] - 28:7
**accomplish** [1] - 74:6
**accomplishes** [1] - 74:7
**accomplishments** [1] - 12:9
**according** [5] - 37:22, 47:13, 77:23, 114:24, 115:2
**account** [1] - 112:19
**accounted** [1] - 113:15
**accuracy** [1] - 112:4
**accurate** [2] - 109:12, 111:16
**accurately** [1] - 125:21
**achieve** [3] - 107:8, 109:23, 119:25
**ACS** [1] - 130:24
**act** [2] - 59:24, 69:17
**Act** [5] - 12:13, 12:15, 74:18, 74:19, 74:21
**actual** [1] - 109:13
**ADAM** [2] - 1:21, 2:21
**Adam** [1] - 131:15
**Adams** [1] - 3:6

**add** [5] - 71:13, 71:15, 97:1, 98:11, 100:23
**addition** [3] - 7:19, 128:22, 129:3
**additional** [2] - 97:3, 128:19
**address** [7] - 45:18, 46:8, 46:18, 46:19, 49:13, 50:2, 97:10
**adjourned** [1] - 143:21
**adjudicated** [1] - 55:2
**administered** [4] - 9:13, 53:15, 66:17, 106:8
**administration** [1] - 138:9
**admit** [2] - 34:12, 64:25
**ADMITTED** [1] - 4:15
**admitted** [4] - 41:18, 54:5, 74:18, 125:8
**adopt** [3] - 81:14, 81:18, 92:5
**adopting** [1] - 82:1
**adults** [1] - 115:18
**advantages** [1] - 5:20
**advice** [1] - 139:12
**advise** [6] - 51:23, 66:2, 66:4, 99:1, 138:4, 138:6
**advised** [1] - 27:14
**affect** [2] - 59:8, 130:19
**affected** [5] - 7:2, 7:21, 7:24, 56:14, 93:13
**affidavit** [1] - 24:5
**afford** [1] - 7:13
**Africa** [1] - 71:14
**African** [27] - 5:22, 6:1, 7:3, 7:4, 7:19, 10:8, 10:17, 11:8, 12:3, 12:22, 13:4, 17:25, 28:16, 28:19, 28:21, 32:1, 35:4, 37:22, 38:8, 38:12, 38:15, 38:23, 39:3, 134:13, 134:17, 134:19, 135:6
**African-American** [17] - 5:22, 6:1, 7:3, 7:4, 7:19, 10:8, 10:17, 11:8, 12:3, 12:22, 13:4, 28:21, 37:22, 134:13, 134:17, 134:19, 135:6
**African-Americans** [10] - 17:25, 28:16, 28:19, 32:1, 35:4, 38:8, 38:12, 38:15, 38:23, 39:3
**afternoon** [10] - 8:13, 8:14, 34:1, 66:22, 78:22, 78:23, 116:15, 116:16, 137:24, 138:4
**age** [2] - 25:15, 112:17
**agency** [1] - 118:21
**agenda** [1] - 18:13
**ago** [8] - 7:25, 12:6, 12:8, 60:8, 79:1, 94:17, 109:4, 135:1
**agree** [18] - 8:15, 11:21, 17:1,

19:1, 20:2, 30:3, 58:23, 61:18, 81:21, 81:25, 86:21, 94:8, 99:17, 118:22, 119:18, 119:22, 142:20, 142:23
**agreed** [2] - 66:4, 143:7
**agreeing** [1] - 143:2
**agreement** [1] - 66:10
**ahead** [9] - 25:9, 64:2, 76:1, 78:19, 92:18, 93:23, 132:17, 134:14, 141:15
**ahold** [2] - 104:19, 104:21
**aided** [1] - 3:13
**Air** [1] - 23:14
**airport** [1] - 30:7
**aisle** [1] - 143:3
**al** [1] - 1:9
**Alexandria** [1] - 2:16
**aliens** [1] - 74:1
**allegation** [2] - 56:9, 57:24
**allegations** [1] - 57:17
**alleged** [1] - 57:22
**allegedly** [1] - 40:18
**Allen** [1] - 106:22
**allocate** [1] - 109:10
**allow** [4] - 75:14, 105:1, 105:5, 109:25
**allowed** [4] - 28:9, 50:4, 65:10, 86:4
**allowing** [1] - 22:9
**allows** [3] - 89:20, 142:24, 142:25
**almost** [8] - 7:16, 28:16, 58:8, 61:2, 70:2, 107:7, 121:15, 121:17
**alone** [2] - 70:14
**alternate** [1] - 100:10
**alternative** [1] - 128:15
**Amanda** [1] - 43:7
**ambiguous** [1] - 93:9
**ameliorate** [1] - 112:9
**amendment** [20] - 21:16, 21:20, 22:5, 22:6, 22:9, 22:22, 22:24, 23:2, 23:17, 23:22, 24:12, 24:21, 24:25, 25:3, 25:4, 25:13, 25:22, 26:3, 26:14, 51:1
**Amendment** [2] - 21:18, 47:8
**amendments** [4] - 21:6, 24:18, 32:16, 32:23
**America** [8] - 24:7, 64:16, 65:19, 70:21, 71:12, 71:15
**American** [25] - 5:22, 6:1, 7:3, 7:4, 7:19, 10:8, 10:11, 10:17, 11:8, 12:3, 12:22, 12:24, 13:4, 28:21, 30:20, 37:22, 106:4, 114:8, 119:5, 127:22, 134:13, 134:17, 134:19, 135:6
**AMERICAN** [2] - 3:1, 3:5

**Americans** [11] - 17:25, 28:16, 28:19, 32:1, 35:4, 38:8, 38:12, 38:15, 38:23, 39:3, 73:22
**amount** [6] - 11:24, 60:22, 108:11, 114:25, 119:19
**ample** [2] - 20:1, 24:14
**analyses** [2] - 77:9, 128:19
**analysis** [7] - 43:16, 86:23, 87:19, 107:3, 107:16, 113:3, 118:17
**Anchia** [2] - 69:4, 91:24
**anchored** [2] - 72:24, 73:4
**anchoring** [3] - 72:13, 72:17, 72:23
**anchors** [1] - 10:15
**Anglo** [4] - 10:10, 30:18, 30:20, 116:25
**Anglo-American** [1] - 30:20
**Anglos** [1] - 135:17
**Ann** [2] - 46:23, 46:24
**annex** [2] - 64:19, 65:20
**anniversary** [1] - 140:13
**another's** [1] - 51:22
**Ansolabehere** [24] - 42:23, 43:12, 61:15, 62:5, 62:23, 63:10, 63:15, 64:7, 65:11, 93:5, 93:19, 94:13, 96:25, 97:18, 99:3, 99:7, 99:19, 100:21, 100:24, 101:7, 102:8, 102:15, 103:1, 103:9
**Ansolabehere's** [19] - 40:18, 41:1, 42:18, 42:21, 44:6, 44:7, 44:10, 61:19, 63:24, 94:12, 97:19, 98:4, 103:5, 107:24, 113:4, 116:3, 129:6, 131:2, 131:3
**answer** [23] - 14:12, 25:18, 38:19, 38:25, 44:17, 49:15, 50:4, 52:7, 64:21, 64:22, 64:25, 81:6, 81:7, 86:4, 86:24, 99:9, 121:25, 122:4, 123:23, 132:12, 132:25, 141:19, 141:20
**Answer** [4] - 83:25, 84:15, 85:20, 123:18
**answering** [1] - 133:4
**answers** [3] - 36:14, 51:14, 63:7
**anti** [2] - 70:10, 70:22
**anti-immigration** [1] - 70:10
**anti-Latino** [1] - 70:22
**Antonio** [7] - 61:4, 67:3, 134:2, 134:4, 136:10, 136:12, 136:23
**anyway** [2] - 92:18, 97:14
**apartment** [2] - 137:17, 138:25
**apologize** [1] - 25:8

Appeals [2] - 44:21, 44:22
appear [1] - 96:22
APPEARANCES [1] - 1:15
appeared [2] - 57:18, 58:3
appendage [1] - 94:16
Appendix [3] - 21:18, 24:8, 26:18
applied [1] - 80:10
apply [1] - 80:7
appreciate [6] - 6:8, 14:24, 62:18, 75:25, 81:7, 100:20
appreciation [1] - 5:24
apprehension [2] - 29:23, 30:10
approach [4] - 45:23, 83:17, 115:12, 123:8
appropriateness [1] - 108:24
approved [1] - 109:21
approximate [1] - 34:15
argue [2] - 42:12, 44:17
argument [1] - 33:17
Arlington [3] - 80:5, 80:8, 80:16
Army [1] - 23:13
array [1] - 75:15
arrested [1] - 12:6
arrived [1] - 72:14
artfully [1] - 52:3
articulating [1] - 125:21
ASHA [1] - 1:22
Asia [1] - 71:14
Asian [2] - 10:11
Asian-American [2] - 10:11
aside [1] - 90:5
assembled [1] - 90:20
asserted [1] - 139:21
assess [2] - 123:1, 123:16
assessment [1] - 11:21
assist [2] - 103:23, 104:6
assistant [12] - 95:3, 95:6, 97:19, 102:10, 102:11, 102:12, 102:13, 103:2, 103:3, 103:4, 103:6, 103:20
assume [2] - 8:21, 28:13
assuredly [1] - 65:9
aston [2] - 85:12, 86:1
Atlanta [1] - 3:3
atmosphere [5] - 68:4, 71:1, 71:5, 71:6, 89:13
atomic [1] - 14:2
atrium [1] - 64:19
attempt [6] - 48:7, 113:17, 114:18, 115:23, 137:6, 137:15
attempted [5] - 74:16, 113:20, 116:18, 119:12, 121:20
attention [3] - 17:6, 36:7,

87:15
attitude [1] - 30:8
ATTORNEY [1] - 1:18
Attorney [9] - 1:6, 18:6, 19:9, 34:2, 44:4, 64:3, 78:14, 92:20, 95:17
attorney [2] - 85:10, 86:10
attorneys [5] - 43:10, 43:23, 55:15, 64:11, 65:24
audience [1] - 33:8
auspices [1] - 109:20
Austin [4] - 1:20, 54:1, 58:13, 91:1
authentication [1] - 95:14
author [1] - 74:15
availability [1] - 136:8
available [3] - 88:23, 95:4, 95:17
Avenue [1] - 2:8
avoidance [1] - 75:1
avoiding [1] - 74:8
aware [19] - 23:11, 38:6, 38:11, 38:14, 38:16, 38:21, 40:10, 55:15, 58:20, 80:19, 81:1, 81:11, 81:16, 82:14, 83:5, 87:17, 102:13

# B

backed [1] - 18:25
background [2] - 54:9, 89:19
backwards [1] - 68:24
bad [3] - 33:14, 47:7, 72:11
Baker [6] - 32:3, 82:16, 82:19, 82:21, 82:22
ballot [7] - 5:22, 29:3, 56:2, 60:9, 60:11, 60:12, 74:3
ballots [1] - 70:2
bank [2] - 6:19
bar [5] - 45:23, 54:5, 97:14, 97:15, 97:17
Barbara [1] - 10:5
barrier [1] - 79:4
BARTLIT [1] - 1:23
base [1] - 74:4
based [15] - 7:1, 32:3, 33:7, 51:13, 95:10, 103:4, 109:15, 110:10, 115:25, 119:23, 122:14, 124:16, 135:19, 136:6, 136:19
basic [2] - 96:12, 120:16
basing [1] - 111:17
basis [16] - 7:16, 55:24, 99:11, 99:13, 121:6, 121:11, 122:5, 122:16, 124:18, 125:16, 127:10, 130:1, 130:21, 131:1, 140:17
bean [1] - 51:12

beaners [1] - 73:19
BECK [1] - 1:23
become [5] - 68:10, 73:22, 74:1, 74:2
becoming [2] - 19:20, 133:14
bed [3] - 138:2, 138:21, 138:24
BEFORE [1] - 1:12
beg [2] - 6:20, 78:15
began [2] - 68:22, 69:22
begged [1] - 6:10
begging [1] - 61:18
begin [3] - 36:15, 72:25, 80:4
begins [1] - 36:5
behalf [6] - 8:15, 9:8, 34:2, 56:17, 65:18, 66:13
behavior [1] - 90:24
behind [17] - 52:5, 68:1, 73:7, 73:20, 79:16, 83:6, 85:8, 86:10, 86:14, 86:18, 86:22, 88:4, 88:10, 88:11, 88:13, 88:16, 88:19
belabor [1] - 104:24
BELL [1] - 2:3
BELL-PLATTS [1] - 2:3
bemused [1] - 44:16
BENCH [1] - 1:11
benefit [1] - 40:14
benefits [1] - 118:8
BERKOWER [1] - 2:5
best [2] - 15:1, 35:6
better [6] - 27:8, 27:25, 111:7, 135:24, 138:1, 138:18
between [12] - 52:11, 62:18, 63:3, 68:25, 69:1, 77:14, 77:18, 85:12, 86:1, 115:3, 115:8, 123:4
Bexar [4] - 67:21, 133:20, 134:2, 136:13
beyond [6] - 6:25, 7:3, 86:22, 97:10, 114:1
bias [11] - 110:3, 112:2, 112:3, 112:11, 120:3, 120:5, 120:11, 120:16, 125:3, 128:13
big [2] - 13:22, 22:19
bigger [1] - 96:10
biggest [1] - 114:1
bilingual [1] - 71:10
Bill [48] - 5:13, 7:2, 7:21, 13:12, 14:18, 14:23, 15:17, 16:1, 16:16, 21:2, 21:5, 27:12, 30:22, 31:18, 31:21, 33:4, 37:23, 38:3, 68:1, 68:22, 69:15, 70:9, 70:21, 70:24, 71:18, 73:6, 74:17, 74:20, 79:3, 79:6, 79:16, 80:15, 80:20, 83:3, 84:13, 85:17, 85:18, 86:10, 86:15,

86:18, 86:23, 93:13, 137:1, 137:19, 139:15, 141:3, 143:8
bill [97] - 5:17, 5:20, 13:17, 13:24, 14:4, 14:5, 14:12, 14:14, 14:16, 14:19, 14:22, 15:4, 15:8, 15:18, 15:23, 16:3, 16:9, 16:10, 16:14, 17:10, 18:11, 18:14, 18:16, 21:12, 24:14, 24:16, 25:4, 25:17, 25:20, 25:23, 26:6, 26:7, 27:2, 27:8, 27:17, 27:20, 27:24, 28:9, 30:21, 30:23, 30:25, 31:4, 31:6, 31:11, 31:13, 31:15, 31:17, 33:18, 33:19, 33:23, 36:10, 36:17, 36:18, 36:24, 51:6, 51:8, 69:1, 69:5, 69:8, 70:5, 70:10, 70:18, 70:22, 71:10, 71:11, 74:15, 74:16, 75:2, 75:6, 75:10, 75:14, 75:17, 82:11, 85:9, 88:10, 88:11, 88:14, 88:16, 88:19, 137:4, 138:2, 139:2, 141:6, 141:13, 141:22, 141:23, 142:2, 142:7, 142:11, 142:18, 142:20, 142:22, 142:23, 143:2, 143:4
bills [20] - 6:19, 12:18, 15:12, 16:17, 16:20, 16:25, 17:4, 17:5, 17:8, 20:5, 20:25, 26:21, 28:3, 53:2, 68:18, 71:8, 71:9, 72:1
birth [4] - 46:25, 47:1, 50:1
birthday [2] - 47:4, 47:5
bit [18] - 12:7, 14:16, 16:18, 18:24, 30:3, 34:21, 35:18, 39:2, 39:11, 40:9, 54:8, 72:15, 73:11, 76:3, 76:11, 101:13, 113:23, 143:16
black [3] - 7:22, 29:3, 46:15
Black [5] - 5:23, 32:6, 37:25, 116:23, 128:24
Blackberry [1] - 50:1
blacks [4] - 30:9, 38:3, 112:25, 113:1
blank [1] - 73:2
blessed [1] - 12:5
block [1] - 135:25
block-walked [1] - 135:25
blocked [1] - 19:14
blow [1] - 14:2
blurted [1] - 69:5
bodies [1] - 55:8
body [3] - 20:21, 50:23, 87:17
bomb [1] - 14:2
Bonilla [1] - 73:23
book [2] - 72:18, 73:23
border [5] - 69:21, 70:15,

**born** [2] - 9:6, 68:13
**bottom** [2] - 36:7, 60:13
**bounds** [1] - 108:7
**box** [2] - 60:9, 60:12
**branches** [2] - 18:1, 106:4
**brand** [1] - 75:13
**BRAZIL** [1] - 2:18
**Brazil** [1] - 9:5
**break** [3] - 92:11, 103:10, 134:16
**breakdown** [2] - 25:15, 25:17
**breaking** [1] - 17:12
**breath** [1] - 142:5
**Brennan** [1] - 32:2
**briefly** [5] - 52:1, 52:21, 106:18, 108:10, 117:25
**Brimer** [3] - 138:8, 138:12
**bring** [24] - 16:9, 20:12, 20:16, 24:15, 24:16, 91:9, 98:1, 98:2, 98:3, 98:4, 102:16, 103:1, 103:2, 103:19, 137:6, 137:9, 137:15, 142:12, 142:20, 142:23, 143:2, 143:3
**bringing** [2] - 104:3, 141:2
**broke** [1] - 17:11
**brought** [7] - 21:2, 44:22, 55:4, 95:7, 126:13, 127:12, 138:20
**BRUCE** [1] - 2:5
**Bruce** [2] - 132:4, 132:22
**Bryan** [1] - 92:19
**BUCK** [3] - 4:7, 53:16, 53:24
**Buck** [2] - 53:14, 53:22
**Budget** [1] - 109:21
**budget** [3] - 12:11, 12:12, 72:22
**build** [1] - 79:4
**buildings** [1] - 11:6
**builds** [1] - 75:17
**bunch** [1] - 89:12
**Bureau** [1] - 128:15
**bus** [5] - 136:10, 136:14, 136:15, 136:17
**Bush** [4] - 14:5, 31:16, 33:21, 33:24
**busiest** [1] - 54:15
**business** [3] - 54:2, 121:20, 140:20
**bust** [1] - 18:23
**butt** [1] - 137:18
**BY** [44] - 5:12, 8:12, 9:17, 21:19, 24:10, 25:12, 26:20, 30:12, 34:4, 35:14, 39:1, 40:22, 45:4, 45:9, 46:3, 47:9, 47:18, 48:18, 49:6, 49:20, 50:11, 52:25, 53:19, 66:21, 76:2, 76:9, 76:24, 78:21, 80:3, 81:10, 83:22,

86:12, 87:9, 106:17, 106:20, 107:22, 110:8, 116:14, 122:3, 122:23, 123:10, 123:15, 129:22, 130:8
**by-product** [1] - 75:10
**Byrd** [6] - 12:13, 12:15, 12:20, 14:23, 16:1, 16:16
**BYRD** [1] - 12:15
**Byrd's** [1] - 13:7

**C**

**CA** [1] - 1:3
**calculation** [1] - 130:20
**calendar** [3] - 19:25, 20:1, 20:5
**caliber** [1] - 107:11
**Camarillo** [1] - 75:12
**campaign** [1] - 109:10
**Canada** [1] - 71:13
**candidate** [4] - 55:23, 77:2, 77:4, 77:9
**candidates** [1] - 77:2
**candidly** [1] - 135:23
**cannot** [4] - 42:3, 42:14, 102:21, 105:14
**capabilities** [1] - 43:22
**capacity** [1] - 54:14
**Capacity** [1] - 1:6
**capita** [1] - 135:12
**Capitol** [1] - 138:25
**capitol** [3] - 58:14, 71:22, 72:11
**captured** [1] - 71:23
**card** [3] - 31:7, 31:8, 60:12
**care** [3] - 97:25, 117:25, 140:9
**career** [1] - 90:23
**careful** [2] - 109:16, 111:15
**Carlos** [3] - 132:5, 139:15, 142:6
**CARLOS** [1] - 132:19
**Carnegie** [1] - 2:12
**carried** [1] - 16:23
**carry** [3] - 16:17, 22:20, 51:8
**carrying** [2] - 30:21, 74:16
**Carter** [6] - 32:3, 82:16, 82:19, 82:21, 82:22
**case** [31] - 14:19, 30:14, 36:4, 37:4, 49:24, 55:22, 56:18, 56:19, 57:4, 57:21, 58:5, 58:11, 67:12, 67:23, 79:12, 80:5, 83:12, 87:23, 93:14, 94:11, 99:12, 99:14, 99:16, 104:25, 105:1, 112:15, 116:19, 116:22, 121:1, 132:23
**cases** [12] - 55:20, 55:21,

56:5, 56:20, 60:12, 69:25, 107:10, 108:11, 108:12, 111:16, 111:17, 112:2
**cast** [1] - 139:1
**Catalist** [4] - 43:16, 92:23, 92:25, 101:17
**catch** [2] - 136:15, 142:5
**Caucasian** [7] - 46:14, 46:16, 47:20, 47:23, 49:16, 50:1, 101:18
**Caucus** [1] - 106:4
**caught** [1] - 59:16
**celebrating** [1] - 140:13
**cell** [2] - 113:21, 113:22
**census** [1] - 135:12
**Census** [1] - 128:15
**Center** [1] - 2:12
**center** [2] - 11:5, 117:25
**Central** [2] - 71:12, 71:15
**central** [1] - 88:13
**certain** [5] - 6:3, 38:14, 96:13, 102:14, 119:22
**certainly** [5] - 9:10, 44:12, 77:1, 90:4, 105:20
**certificate** [1] - 29:15
**CERTIFICATE** [1] - 144:1
**certify** [1] - 144:3
**cetera** [2] - 72:22, 141:5
**CHAD** [1] - 2:18
**Chad** [2] - 9:4, 9:5
**chair** [1] - 12:12
**chaired** [1] - 14:8
**chairman** [2] - 138:5, 138:8
**Chairman** [1] - 138:8
**chairmen** [2] - 138:5, 138:7
**chairs** [1] - 139:7
**chairwoman** [2] - 138:5, 138:11
**challenged** [1] - 36:12
**challenger** [1] - 29:1
**challenging** [1] - 61:21
**chamber** [1] - 69:2
**chance** [1] - 102:23
**change** [5] - 28:6, 49:7, 76:3, 109:12, 143:6
**changed** [8] - 17:6, 17:8, 25:22, 31:2, 96:9, 99:24, 99:25, 105:6
**changes** [3] - 28:5, 68:8, 92:5
**changing** [4] - 68:2, 68:5, 68:19, 69:7
**character** [2] - 97:1, 97:15
**characteristics** [5] - 24:24, 27:1, 114:11, 127:14, 127:17
**characterizations** [1] - 129:19
**characterizing** [1] - 44:9

**charge** [3] - 85:7, 86:8
**charged** [3] - 68:4, 86:9, 88:3
**check** [2] - 49:25, 104:10
**checked** [1] - 11:9
**checks** [1] - 6:18
**Chicago** [2] - 1:25, 3:7
**chief** [2] - 13:4, 13:8
**children** [1] - 71:10
**choice** [1] - 140:4
**chooses** [1] - 20:11
**chose** [2] - 95:15, 95:20
**chronology** [1] - 93:25
**CIRCUIT** [1] - 1:12
**circumstance** [1] - 28:3
**citizen** [3] - 5:23, 6:1, 23:8
**citizens** [1] - 5:21
**city** [7] - 10:3, 10:19, 34:10, 34:11, 39:17, 134:6, 136:17
**civic** [2] - 114:16
**civil** [3] - 8:17, 16:24, 29:12
**Civil** [2] - 2:7, 38:4
**CIVIL** [1] - 3:1
**clarification** [1] - 38:18
**clarified** [2] - 86:7, 86:11
**class** [2] - 13:22, 67:9
**classes** [1] - 71:11
**classified** [1] - 101:17
**clean** [1] - 63:1
**cleaned** [1] - 63:11
**clear** [6] - 19:16, 42:2, 60:3, 65:16, 73:17, 85:2
**cleared** [1] - 85:11
**clearly** [4] - 30:9, 65:13, 87:23, 131:8
**Clerk** [4] - 9:13, 53:15, 66:17, 106:8
**clients** [1] - 56:17
**close** [5] - 22:25, 110:2, 111:1, 115:1, 118:13
**closer** [1] - 114:18
**cloture** [1] - 16:11
**code** [1] - 74:5
**cohesive** [2] - 77:2, 77:4
**colleague** [2] - 37:5, 87:4
**colleagues** [8] - 13:25, 14:7, 19:1, 32:19, 33:8, 96:6, 140:5, 140:18
**collect** [3] - 118:16, 119:12, 119:21
**collected** [1] - 118:17
**collection** [2] - 107:3, 121:5
**college** [1] - 23:8
**colleges** [1] - 21:24
**colloquy** [2] - 93:2, 129:16
**COLLYER** [101] - 1:13, 25:8, 30:2, 38:19, 41:5, 41:12, 41:15, 41:22, 42:1, 42:4, 42:9, 42:12, 42:20, 43:1,

43:8, 43:19, 43:21, 44:14,
44:22, 45:1, 45:8, 45:14,
45:22, 47:7, 48:10, 49:19,
50:8, 51:25, 52:2, 52:10,
52:14, 52:18, 52:22, 53:8,
53:12, 61:7, 61:11, 62:9,
62:18, 64:2, 64:15, 65:8,
65:12, 65:15, 65:22, 65:25,
66:9, 66:12, 75:24, 78:5,
78:8, 78:11, 78:13, 78:17,
78:19, 79:25, 81:6, 83:18,
86:4, 87:3, 87:6, 91:22,
92:3, 92:8, 92:11, 92:17,
93:23, 95:24, 96:5, 97:9,
97:16, 98:25, 99:17,
100:18, 101:3, 104:2,
104:17, 104:20, 105:3,
105:21, 106:6, 106:9,
106:12, 106:19, 107:18,
116:9, 116:12, 121:15,
121:17, 123:9, 124:5,
124:9, 129:17, 131:13,
131:21, 132:1, 132:8,
132:11, 132:16, 143:12,
143:20
**color** [1] - 32:10
**COLUMBIA** [1] - 1:2
**columns** [1] - 96:19
**combatting** [1] - 81:21
**comfort** [2] - 127:2, 129:3
**comfortable** [5] - 59:14,
126:7, 126:9, 130:11,
140:16
**coming** [8] - 18:9, 18:13,
18:14, 18:17, 69:21, 70:11,
70:15, 140:5
**comma** [4] - 96:16, 96:17,
96:19, 96:21
**commas** [2] - 96:21, 97:17
**commenced** [1] - 140:24
**commences** [1] - 134:1
**comment** [4] - 26:4, 33:11,
59:4, 91:15
**comments** [2] - 22:13, 45:8
**Commission** [3] - 32:3, 77:5,
82:16
**commitments** [1] - 143:13
**committed** [1] - 69:20
**committee** [7] - 14:8, 19:7,
57:16, 138:5, 138:7, 138:9,
138:10
**Committee** [8] - 19:6, 19:12,
19:17, 35:22, 35:23, 37:2,
37:6, 37:9
**common** [3] - 20:15, 32:14,
60:7
**commonly** [1] - 94:14
**communication** [2] - 84:18,
85:12
**communities** [2] - 25:18,

114:8
**community** [7] - 10:15,
10:17, 16:20, 21:24, 29:22,
31:22, 111:14
**Community** [2] - 52:9,
127:22
**compact** [1] - 102:20
**company** [1] - 107:1
**comparable** [2] - 37:12,
50:22
**compare** [6] - 110:22, 114:3,
114:5, 130:1, 130:22,
131:1
**compared** [4] - 38:2, 111:19,
115:10, 135:17
**comparisons** [2] - 121:21,
122:1
**compiling** [1] - 87:21
**complain** [1] - 32:4
**complaints** [1] - 34:17
**complete** [4] - 44:5, 75:1,
86:14, 86:21
**completed** [5] - 108:11,
111:16, 111:17, 112:1,
142:1
**completely** [1] - 133:1
**complicated** [1] - 40:9
**complies** [1] - 76:17
**component** [1] - 112:1
**components** [1] - 112:3
**Compound** [1] - 134:14
**compromise** [2] - 19:2,
142:25
**computer** [11] - 3:13, 35:12,
40:11, 64:17, 65:22, 98:4,
98:5, 102:16, 103:2,
104:15, 104:16
**computer-aided** [1] - 3:13
**concept** [5] - 72:13, 72:16,
72:23, 73:5, 89:16
**concern** [4] - 41:15, 119:11,
120:16, 125:5
**concerned** [2] - 72:11,
133:17, 135:12
**concerning** [1] - 120:2
**concerns** [2] - 28:7, 117:3
**concessions** [3] - 14:15,
28:7, 28:14
**conclude** [1] - 70:6
**concluded** [2] - 70:22, 70:23
**conclusion** [5] - 68:21,
79:23, 91:14, 108:3, 108:5
**conclusions** [3] - 72:15,
108:1, 130:11
**conducted** [3] - 90:24,
117:15, 119:3
**Conference** [1] - 106:3
**conference** [2] - 94:2, 94:4
**conferences** [1] - 71:21
**confidence** [3] - 81:17,

81:25, 127:9
**confident** [3] - 36:10, 36:15,
64:10
**confirm** [4] - 46:25, 62:23,
63:20, 97:4
**confirmed** [2] - 46:19, 62:1
**confusion** [1] - 44:9
**connected** [1] - 102:1
**connectedness** [1] - 114:16
**connection** [1] - 130:9
**consensus** [1] - 16:13
**consequences** [2] - 27:5,
110:13
**consequently** [1] - 6:1
**consider** [6] - 22:23, 47:23,
67:24, 79:18, 82:4, 116:1
**considerable** [2] - 56:21,
58:2
**consideration** [4] - 32:22,
68:17, 75:25, 142:19
**considered** [4] - 69:1, 134:9,
135:10, 137:1
**considering** [4] - 69:6, 73:6,
74:23, 80:14
**constituency** [1] - 135:6
**constituents** [10] - 32:6,
34:13, 34:24, 37:24,
134:12, 134:17, 134:18,
134:20, 134:23, 135:13
**constitute** [1] - 93:6
**constitutional** [1] - 55:25
**constitutional/legal** [1] -
91:16
**constraints** [1] - 86:3
**construction** [1] - 68:1
**consult** [1] - 65:23
**consulted** [1] - 67:21
**contacted** [1] - 114:24
**contain** [2] - 43:13, 97:6
**containing** [1] - 94:19
**contains** [1] - 42:19
**contemporaneous** [1] -
139:19
**contest** [3] - 55:4, 57:5,
57:14
**contests** [5] - 54:18, 54:25,
55:2, 55:8, 55:10
**context** [2] - 69:11, 109:17
**continental** [1] - 134:10
**continue** [2] - 63:2, 75:25
**continued** [1] - 8:18
**continuing** [1] - 85:14
**contrast** [1] - 111:3
**controls** [1] - 20:14
**convenience** [1] - 112:13
**conversation** [4] - 51:19,
106:13, 141:12, 142:8
**conversations** [2] - 51:20,
139:3

**convert** [1] - 98:13
**converted** [1] - 95:16
**convince** [1] - 6:12
**convincing** [1] - 63:16
**cooker** [1] - 71:5
**cooker-type** [1] - 71:5
**cookies** [1] - 109:5
**copy** [5] - 63:1, 64:4, 64:9,
64:10, 83:16
**correct** [77] - 11:17, 19:18,
35:25, 37:2, 37:3, 37:7,
37:10, 37:15, 37:20, 37:21,
38:1, 38:4, 38:5, 38:9,
38:13, 39:15, 41:21, 45:7,
46:21, 47:5, 47:10, 47:21,
48:21, 49:9, 50:17, 52:12,
52:13, 67:12, 67:13, 67:15,
67:16, 76:6, 76:7, 77:15,
77:16, 77:18, 77:23, 77:24,
78:1, 78:2, 79:9, 79:14,
79:17, 80:6, 80:22, 81:15,
81:20, 82:20, 83:7, 83:25,
84:2, 85:24, 89:21, 92:22,
93:1, 101:6, 116:20, 117:1,
117:18, 117:20, 118:5,
118:16, 119:7, 120:7,
120:8, 120:14, 120:15,
120:25, 121:5, 122:8,
123:23, 124:12, 126:16,
126:17, 131:5, 137:5,
144:4
**cost** [1] - 7:5
**counsel** [5] - 41:16, 44:8,
57:7, 76:22, 116:10
**count** [1] - 101:24
**counted** [1] - 74:10
**counties** [3] - 77:13, 134:5
**country** [1] - 23:10
**county** [5] - 17:22, 58:12,
58:17, 77:9, 140:12
**County** [9] - 58:14, 67:21,
133:20, 134:2, 134:7,
136:3, 136:4, 136:13,
140:12
**county-wide** [1] - 17:22
**couple** [7] - 13:19, 24:2,
71:22, 87:5, 87:6, 102:3,
140:19
**coupled** [1] - 140:17
**course** [17] - 6:11, 26:9,
50:18, 56:8, 56:16, 58:13,
60:2, 60:3, 80:2, 81:11,
88:5, 97:3, 97:5, 98:17,
101:23, 119:9, 142:22
**courses** [1] - 67:5
**Court** [33] - 3:9, 3:9, 5:3,
9:22, 14:25, 25:4, 25:14,
40:17, 44:21, 44:22, 51:23,
54:20, 56:1, 56:6, 57:10,
62:17, 63:3, 66:2, 66:4,

66:7, 71:23, 79:19, 80:11,
81:2, 81:12, 81:17, 82:15,
86:17, 89:24, 90:16, 91:11
**COURT** [4] - 1:1, 79:22,
144:1, 144:10
**court** [32] - 5:15, 12:21,
19:14, 25:10, 30:17, 47:2,
54:6, 54:25, 63:22, 84:23,
89:2, 90:17, 93:24, 99:22,
100:12, 100:13, 105:19,
106:18, 106:23, 107:5,
107:10, 108:3, 110:20,
113:3, 117:10, 131:19,
132:13, 132:19, 141:17,
143:13
**Court's** [3] - 36:5, 40:10,
40:14
**Courthouse** [1] - 3:10
**courthouse** [1] - 64:19
**courtroom** [4] - 45:18, 64:12,
93:1, 102:16
**Courtroom** [1] - 9:13, 53:15,
66:17, 106:8
**Courts** [1] - 55:11
**courts** [2] - 73:1, 74:23
**cover** [1] - 15:1
**covered** [1] - 87:10
**crash** [1] - 98:17
**Crawford** [10] - 79:13, 80:20,
80:23, 81:1, 81:11, 81:16,
82:4, 82:12, 82:14
**crazy** [1] - 19:2
**create** [2] - 97:2, 98:22
**created** [1] - 89:6
**Crimes** [3] - 12:13, 12:15,
13:12
**crimes** [2] - 12:23, 13:20
**criminal** [1] - 16:23
**critical** [4] - 63:24, 93:14,
99:16, 122:13
**criticize** [2] - 100:14, 100:16
**cross** [16] - 8:8, 35:10, 41:8,
52:6, 53:6, 61:14, 61:20,
62:5, 62:20, 63:25, 78:9,
95:10, 95:18, 101:14,
125:20, 131:16
**CROSS** [5] - 4:2, 8:11, 35:13,
78:20, 116:13
**cross-examination** [7] - 8:8,
35:10, 41:8, 52:6, 53:6,
95:18, 131:16
**CROSS-EXAMINATION** [4] -
8:11, 35:13, 78:20, 116:13
**cross-examine** [1] - 95:10
**crowd** [2] - 22:8, 33:13
**CRR** [1] - 3:9
**crux** [1] - 57:19
**culturally** [1] - 30:8
**cured** [1] - 112:5
**current** [4] - 66:25, 114:7,

133:18, 133:22
**custom** [1] - 140:6
**cut** [2] - 16:12, 20:18
**CV** [1] - 54:7

## D

**D.C** [2] - 1:5, 3:10
**daddy** [1] - 28:23
**daily** [1] - 140:17
**Dallas** [1] - 7:5
**Dan** [1] - 44:3
**Danburg** [1] - 30:14
**DANIEL** [1] - 2:4
**Daniel** [1] - 72:18
**data** [54] - 32:12, 40:17,
42:23, 42:25, 43:12, 44:5,
44:6, 45:16, 61:21, 62:2,
84:8, 89:9, 93:6, 94:12,
94:19, 94:21, 95:11, 95:15,
95:16, 95:20, 95:25, 96:18,
96:20, 96:22, 96:23, 97:6,
99:3, 99:4, 99:24, 99:25,
100:2, 100:24, 101:9,
102:17, 102:20, 102:21,
103:1, 103:5, 103:19,
105:6, 105:12, 107:2,
107:16, 108:18, 109:16,
112:16, 119:21, 121:5,
124:22, 130:24, 131:5,
131:8
**database** [27] - 42:18, 42:22,
47:19, 49:4, 61:18, 62:12,
62:15, 62:22, 63:1, 63:9,
63:10, 63:11, 92:23, 92:25,
93:8, 93:20, 98:4, 98:5,
98:14, 98:18, 100:6, 102:6,
102:17, 104:8, 104:9,
104:13, 104:16
**databases** [6] - 42:17, 43:9,
63:9, 93:15, 95:10, 102:10
**DATE** [1] - 144:10
**date** [4] - 46:25, 47:1, 94:10
**dates** [1] - 50:1
**daughter** [5] - 39:23, 40:4,
49:8, 49:18, 49:22
**DAVID** [3] - 1:12, 4:11,
106:14
**David** [4] - 106:5, 106:22,
137:11, 137:12
**DAY** [1] - 1:11
**days** [7] - 7:8, 15:10, 17:13,
94:17, 115:14, 140:12
**daytime** [1] - 113:18
**DC** [1] - 2:9
**de** [2] - 139:8, 139:11
**dead** [1] - 129:7
**deal** [2] - 17:14, 20:18
**dealing** [1] - 30:22

**dean** [1] - 67:2
**death** [1] - 12:24
**debate** [12] - 13:17, 21:5,
21:6, 22:20, 26:9, 26:10,
33:17, 50:13, 124:15,
125:2, 125:24, 142:21
**debated** [1] - 20:2
**debates** [1] - 27:22
**debating** [1] - 50:23
**Deborah** [1] - 30:14
**decade** [7] - 12:15, 12:16,
12:17, 13:16, 16:17, 17:10,
128:9
**decades** [1] - 7:1
**decent** [1] - 33:11
**DECHERT** [1] - 2:11
**Dechert** [2] - 66:13, 106:3
**decide** [1] - 139:25
**decided** [1] - 141:1
**decision** [9] - 72:17, 72:24,
73:1, 79:13, 80:12, 80:23,
82:12, 137:9, 140:1
**decisions** [2] - 72:21, 109:15
**declaration** [1] - 95:13
**declared** [1] - 15:5
**declares** [1] - 15:8
**deemed** [1] - 41:25
**deep** [1] - 5:24
**deeply** [2] - 6:23, 7:23
**defaced** [1] - 13:7
**defend** [1] - 128:22
**defendant** [2] - 61:8, 113:3
**DEFENDANT** [5] - 5:9, 9:14,
53:16, 66:18, 106:14
**Defendant** [6] - 1:8, 2:3,
53:13, 65:6, 66:14, 76:20
**defendant's** [1] - 56:18
**defendants** [1] - 78:6
**Defendants** [2] - 1:10, 2:11
**DEFENSE** [1] - 3:5
**defense** [1] - 116:9
**definitely** [2] - 36:4, 104:12
**definition** [1] - 77:17
**degree** [1] - 6:3
**Del** [4] - 136:16, 136:17,
136:20, 136:21
**delayed** [1] - 25:22
**delimited** [6] - 96:3, 96:16,
96:17, 96:20, 97:13
**delimiter** [1] - 96:25
**delimiters** [1] - 97:1
**delineate** [1] - 96:19
**delivered** [2] - 94:18, 94:20
**demands** [1] - 114:9
**democracy** [2] - 5:16, 5:18
**Democrat** [1] - 18:21
**Democratic** [2] - 55:18, 77:3
**Democrats** [5] - 19:2, 33:18,
77:22, 114:13

**demographic** [2] - 68:8, 92:4
**demographics** [6] - 68:2,
68:6, 68:16, 68:20, 69:7,
134:23
**demonstrate** [1] - 121:20
**deny** [1] - 99:18
**denying** [2] - 8:3, 99:17
**DEPARTMENT** [1] - 2:6
**Department** [27] - 9:9, 38:17,
41:24, 42:5, 42:13, 42:15,
45:6, 48:2, 48:8, 61:17,
61:20, 61:24, 92:15, 93:22,
94:6, 94:11, 94:18, 96:24,
97:21, 98:1, 98:3, 98:11,
99:6, 99:23, 100:11,
131:18, 132:22
**Department's** [1] - 99:12
**deposed** [1] - 56:24
**deposition** [29] - 18:5, 36:3,
40:2, 51:20, 61:14, 72:6,
80:24, 83:12, 83:15, 84:11,
84:19, 84:24, 85:9, 85:14,
86:7, 86:11, 86:19, 87:14,
118:15, 120:21, 122:12,
123:6, 125:9, 130:6,
130:13, 130:17, 131:10,
132:13, 139:23
**depth** [1] - 87:25
**describe** [15] - 10:2, 10:7,
11:1, 11:7, 12:20, 13:17,
16:8, 21:20, 23:23, 25:4,
25:14, 27:24, 54:20, 57:10,
133:24
**described** [4] - 27:12,
107:20, 108:15, 110:15
**descriptions** [1] - 74:4
**design** [8] - 89:6, 89:7, 89:8,
89:18, 91:10, 91:19, 107:2
**designated** [1] - 79:15
**designation** [1] - 36:5
**designed** [1] - 120:1
**designing** [1] - 69:15
**desk** [3] - 51:10, 142:4,
142:6
**despite** [2] - 33:22, 51:3
**determination** [1] - 83:1
**determine** [11] - 54:23,
56:12, 59:2, 60:16, 67:25,
94:23, 121:2, 121:7,
121:11, 122:6, 125:12
**determined** [1] - 54:24
**determining** [2] - 116:2,
128:24
**deterrent** [1] - 69:18
**deterring** [2] - 81:2, 81:13
**develop** [1] - 109:6
**deviated** [1] - 91:7
**Dewhurst** [3] - 137:11,
137:12, 142:4
**DIA** [1] - 76:21

**dialogue** [2] - 68:25, 71:17
**die** [1] - 28:25
**died** [1] - 108:13
**difference** [11] - 62:18, 94:25, 99:5, 99:6, 99:8, 114:1, 114:21, 115:8, 123:4, 125:1
**differences** [3] - 113:15, 113:16, 115:3
**different** [25] - 18:18, 23:6, 51:4, 62:20, 90:15, 91:13, 93:15, 100:3, 103:5, 103:13, 108:19, 109:14, 110:24, 111:18, 112:20, 113:19, 115:14, 118:24, 119:11, 119:12, 122:25, 124:24, 125:15, 129:8
**differently** [5] - 90:16, 90:22, 140:21, 140:23
**difficult** [3] - 56:20, 58:22, 100:19
**difficulty** [1] - 98:12
**digit** [1] - 93:21
**dignity** [1] - 6:3
**DIRECT** [7] - 4:2, 5:11, 9:16, 34:3, 53:18, 66:20, 106:16
**direct** [4] - 15:2, 39:2, 117:5, 130:13
**directed** [1] - 8:2
**directing** [1] - 91:25
**directly** [1] - 16:20
**director** [1] - 54:12
**directory** [1] - 31:9
**disagrees** [1] - 125:22
**discharge** [1] - 13:8
**disclose** [2] - 121:1, 125:12
**disclosed** [7] - 75:21, 94:11, 94:24, 121:6, 121:11, 122:5, 122:25
**disclosure** [2] - 94:8, 94:11
**discord** [1] - 11:19
**discover** [4] - 58:1, 58:11, 58:23, 60:21
**discovered** [1] - 58:2
**discriminatory** [10] - 33:4, 83:9, 83:24, 85:4, 85:5, 85:21, 87:18, 99:12, 99:14, 104:25
**discuss** [3] - 62:17, 74:20, 136:8
**discussed** [2] - 122:11, 122:12
**discussion** [9] - 24:13, 50:19, 50:20, 51:11, 68:17, 74:24, 75:1, 142:21, 143:9
**discussions** [10] - 24:17, 35:23, 62:12, 63:2, 63:6, 64:13, 66:3, 74:8, 92:16, 92:18
**disenfranchise** [1] - 33:23

**disenfranchised** [1] - 7:12
**dismissed** [1] - 24:17
**disparate** [4] - 21:12, 31:22, 36:11, 51:7
**displaying** [1] - 90:9
**disproportionate** [2] - 32:10, 38:23
**disproportionately** [1] - 32:5
**dispute** [2] - 92:21, 96:14
**disqualified** [1] - 55:24
**distribution** [1] - 112:17
**District** [10] - 55:11, 133:11, 133:16, 133:17, 133:18, 133:19, 133:20, 134:1, 135:22
**district** [46] - 10:2, 10:3, 10:5, 10:12, 10:13, 10:16, 10:19, 10:22, 11:3, 11:5, 11:6, 17:21, 28:17, 29:9, 29:10, 30:19, 32:4, 32:6, 34:6, 34:8, 34:10, 34:16, 39:16, 39:17, 58:10, 133:10, 133:18, 133:21, 133:22, 133:24, 134:10, 135:2, 135:3, 135:4, 135:8, 135:10, 135:11, 135:16, 135:19, 135:24, 136:2, 136:6, 136:9, 136:22, 136:24
**DISTRICT** [3] - 1:1, 1:2, 1:14
**districts** [7] - 15:22, 18:12, 23:18, 25:1, 26:16, 27:6, 134:9
**diverse** [1] - 10:4
**divided** [1] - 108:11
**Division** [1] - 2:7
**divorce** [1] - 47:2
**DIX** [2] - 107:12, 110:6
**Docket** [1] - 1:3
**doctor** [3] - 20:23, 139:11, 140:8
**Doctor** [2] - 91:20, 140:8
**document** [6] - 41:18, 42:14, 45:20, 45:24, 48:2, 48:8
**documents** [2] - 76:3, 116:4
**DOJ** [2] - 63:14, 98:6
**DOJ's** [1] - 93:12
**dollars** [2] - 7:9, 7:15
**dominate** [1] - 111:8
**dominated** [1] - 111:6
**done** [23] - 21:21, 23:23, 25:5, 55:16, 56:21, 59:6, 61:19, 63:24, 86:23, 90:12, 104:12, 105:14, 118:18, 119:14, 123:16, 124:21, 125:25, 126:12, 128:6, 131:23, 140:21, 140:23
**Donna** [2] - 57:5, 57:7
**door** [1] - 52:7

**doors** [1] - 52:4
**down** [16] - 8:20, 8:23, 11:10, 14:14, 14:16, 18:25, 26:24, 36:8, 57:12, 57:18, 65:19, 84:9, 121:15, 121:18, 132:14, 142:5
**downtown** [1] - 11:5
**dozen** [1] - 56:7
**DPS** [1] - 29:15
**DR** [2] - 4:11, 106:14
**Dr** [89] - 42:18, 42:21, 42:23, 44:6, 44:7, 44:10, 62:23, 64:7, 66:15, 66:25, 75:21, 76:5, 76:10, 77:20, 78:1, 78:22, 79:12, 83:13, 87:11, 88:9, 91:23, 97:18, 97:19, 98:4, 99:3, 99:7, 99:19, 100:21, 100:24, 101:7, 102:8, 102:15, 103:1, 103:5, 103:9, 106:5, 106:6, 106:18, 107:12, 107:14, 107:19, 107:23, 107:24, 108:4, 109:10, 110:9, 110:11, 110:15, 111:9, 113:2, 113:4, 113:6, 113:10, 113:14, 113:19, 113:22, 115:10, 115:22, 115:25, 116:1, 116:3, 116:7, 116:15, 117:3, 121:20, 122:13, 124:8, 124:16, 124:22, 125:8, 125:22, 126:15, 126:17, 126:18, 127:4, 127:8, 128:21, 129:11, 129:19, 129:23, 130:10, 130:22, 130:25, 131:2, 131:3, 131:14
**dragged** [1] - 12:24
**dramatic** [1] - 68:7
**draw** [3] - 87:14, 108:1, 130:11
**dressed** [1] - 138:24
**drew** [1] - 51:2
**drive** [7] - 6:16, 63:21, 94:19, 95:25, 98:3, 134:3, 134:4
**driver's** [30] - 7:17, 22:3, 32:13, 32:15, 34:6, 34:8, 34:15, 34:20, 39:19, 39:21, 39:23, 39:25, 40:5, 47:25, 48:4, 48:6, 48:13, 48:23, 49:23, 63:11, 64:5, 93:9, 93:19, 98:17, 101:19, 101:20, 102:5, 102:7, 104:16
**drivers** [1] - 117:22
**drives** [1] - 129:9
**driving** [1] - 75:6
**dta** [5] - 94:16, 95:1, 95:25, 96:7, 96:25
**due** [1] - 112:1

**duly** [5] - 5:10, 9:14, 53:16, 66:18, 106:14
**Dunn** [4] - 9:4, 9:5, 38:18
**dunn** [1] - 46:4
**DUNN** [28] - 2:18, 2:18, 9:5, 9:11, 9:17, 21:17, 21:19, 24:8, 24:10, 25:7, 25:10, 25:12, 26:18, 26:20, 30:12, 33:25, 41:4, 41:7, 45:19, 50:9, 50:11, 52:1, 52:3, 52:15, 53:11, 53:13, 53:19, 61:6
**duplicate** [1] - 93:12
**duplicates** [1] - 93:10
**during** [11] - 26:10, 33:17, 50:18, 51:11, 56:14, 68:17, 80:23, 85:10, 113:18, 115:19, 119:21

# E

**E-L-L-I-S** [1] - 9:21
**Eagle** [1] - 136:21
**early** [12] - 6:10, 6:12, 6:21, 24:3, 29:3, 49:2, 69:16, 128:7, 137:24, 138:9, 138:14, 140:3
**earthly** [1] - 49:2
**easier** [4] - 31:6, 31:11, 31:14, 110:22
**easily** [2] - 34:8, 102:21
**East** [3] - 3:6, 12:25, 13:2
**easy** [3] - 13:12, 59:2, 112:14
**eat** [3] - 20:23, 109:5
**eating** [1] - 119:11
**Economic** [1] - 72:19
**economic** [1] - 126:25
**Eduardo** [1] - 73:22
**education** [2] - 71:10, 129:1
**Education** [1] - 128:7
**EDUCATIONAL** [1] - 3:6
**effect** [21] - 17:24, 19:19, 25:20, 25:21, 25:23, 29:14, 31:19, 32:7, 32:16, 75:14, 75:17, 75:22, 79:2, 79:5, 79:8, 79:10, 83:2, 99:12, 99:14, 104:25, 139:20
**effort** [2] - 121:2, 125:12
**efforts** [1] - 33:22
**either** [15] - 7:6, 17:5, 27:18, 37:23, 56:18, 69:2, 77:15, 95:21, 97:10, 105:9, 105:18, 107:9, 114:7, 128:1, 135:6
**El** [5] - 134:3, 134:4, 134:6, 134:7, 136:24
**elaborate** [2] - 96:3, 96:13
**elderly** [12] - 21:13, 36:11, 36:23, 112:15, 112:19,

112:24, 112:25, 114:14, 126:25, 127:16, 131:4, 131:6
**elect** [2] - 17:21, 17:22
**elected** [2] - 72:2, 114:24
**election** [39] - 6:10, 6:12, 6:20, 15:17, 28:24, 28:25, 29:2, 29:4, 29:15, 54:11, 54:15, 54:17, 54:18, 54:23, 55:2, 55:4, 55:16, 56:6, 56:8, 56:14, 56:15, 57:5, 57:11, 57:12, 57:13, 58:4, 59:8, 60:10, 67:8, 67:22, 77:6, 77:10, 77:17, 81:2, 81:13, 88:17
**elections** [10] - 54:12, 59:19, 77:3, 77:7, 77:8, 77:10, 77:12, 77:14, 77:21, 81:25
**electronically** [1] - 94:9
**element** [1] - 20:22
**elicit** [1] - 126:11
**eligible** [7] - 20:6, 56:13, 57:18, 57:20, 58:9, 75:16, 108:12
**ELIZABETH** [1] - 2:3
**ELLIS** [2] - 4:5, 9:14
**Ellis** [28] - 9:3, 9:8, 9:19, 25:10, 35:15, 36:3, 37:14, 37:18, 38:17, 40:1, 40:7, 40:23, 41:2, 43:6, 44:15, 44:16, 45:5, 46:7, 46:8, 46:17, 47:10, 48:16, 49:21, 53:8, 65:10, 73:13, 101:18, 102:6
**Ellis'** [3] - 61:14, 62:19, 101:16
**Ellises** [1] - 49:12
**ELMO** [1] - 96:18
**emergencies** [1] - 15:13
**emergency** [6] - 15:5, 15:8, 15:14, 15:18, 15:20, 16:3
**employment** [1] - 67:1
**enacting** [1] - 81:22
**encompassed** [1] - 133:18
**encouraged** [2] - 139:10, 139:13
**encrypted** [1] - 40:16
**end** [8] - 60:9, 68:24, 86:11, 105:17, 112:12, 112:14, 136:23, 136:24
**End** [1] - 143:11
**endorsed** [2] - 8:1, 79:19
**energy** [1] - 140:2
**enforcement** [6] - 30:6, 30:10, 34:19, 34:23, 34:25, 35:4
**engage** [2] - 74:14, 74:16
**engagements** [1] - 114:16
**engaging** [1] - 84:18
**English** [1] - 71:9

**Engstrom** [3] - 76:5, 77:20, 78:1
**Engstrom's** [1] - 76:10
**enjoy** [1] - 106:13
**ensure** [3] - 115:15, 142:11
**entertained** [1] - 106:7
**entire** [7] - 16:22, 71:16, 72:5, 93:12, 99:12, 99:13, 104:15
**entitled** [2] - 38:20, 144:5
**entries** [8] - 61:21, 63:15, 93:19, 96:24, 97:3, 97:5, 97:13, 100:16
**entry** [5] - 46:1, 46:18, 100:14, 101:8, 101:20
**environment** [6] - 71:16, 71:20, 72:4, 72:10, 91:8
**EPA** [1] - 118:20
**equally** [1] - 22:21
**equips** [2] - 89:1, 90:13
**ERIC** [2] - 1:5, 1:9
**Eric** [3] - 92:20, 132:5, 132:23
**erroneously** [1] - 102:1
**error** [5] - 111:10, 111:14, 111:15, 111:25, 112:1
**errors** [1] - 63:1
**eruption** [1] - 17:7
**ESI** [1] - 94:2
**especially** [1] - 109:12
**essentially** [7] - 25:18, 73:14, 89:5, 90:22, 137:18, 138:3, 142:18
**establish** [1] - 93:16
**estimate** [4] - 55:13, 56:5, 111:16, 111:24
**estimates** [6] - 71:7, 108:20, 108:22, 116:6, 119:24, 119:25
**estimating** [1] - 109:13
**et** [3] - 1:9, 72:22, 141:5
**ethnic** [2] - 21:12, 36:12
**ethnicity** [2] - 25:15, 32:14
**Europe** [1] - 71:14
**evaluate** [1] - 89:9
**evaluating** [1] - 90:19
**evaluation** [2] - 107:16, 122:2
**evening** [1] - 66:8
**evenings** [1] - 113:18
**event** [2] - 26:13, 113:2
**eventually** [2] - 45:6, 84:22
**everyday** [1] - 72:21
**EVIDENCE** [1] - 4:17
**evidence** [13] - 27:20, 82:23, 83:5, 83:9, 83:23, 84:3, 84:12, 85:3, 85:5, 85:19, 85:21, 85:23, 107:14
**evolved** [1] - 74:4

**exact** [3] - 43:13, 43:15, 114:22
**exactly** [10] - 88:11, 89:7, 91:2, 97:5, 97:6, 100:15, 110:17, 118:13, 126:15, 127:6
**examination** [12] - 8:7, 8:8, 35:10, 41:8, 52:6, 53:6, 62:14, 62:19, 95:18, 100:13, 117:5, 131:16
**EXAMINATION** [14] - 5:11, 8:11, 9:16, 34:3, 35:13, 50:10, 52:24, 53:18, 66:20, 78:20, 87:8, 106:16, 116:13, 129:21
**examine** [3] - 62:13, 95:10, 110:3
**examining** [1] - 94:21
**example** [9] - 33:21, 109:11, 118:19, 127:12, 127:20, 128:4, 136:3, 136:16, 140:10
**examples** [3] - 114:7, 114:8, 117:9
**exceedingly** [1] - 108:6
**Excel** [1] - 104:14
**exception** [1] - 25:2
**excerpt** [2] - 40:15, 50:12
**exchange** [2] - 36:1, 87:15
**exclude** [1] - 108:12
**exclusively** [4] - 43:9, 58:8, 58:9, 61:2
**excuse** [5] - 25:7, 25:8, 40:1, 40:24, 69:10
**excused** [2] - 61:11, 105:25
**exhibit** [5] - 41:25, 62:15, 66:6, 76:18, 94:19
**Exhibit** [7] - 36:4, 40:16, 41:24, 41:25, 46:1, 46:2, 76:20
**EXHIBITS** [1] - 4:17
**exhibits** [3] - 66:3, 66:5, 66:8
**exile** [1] - 17:13
**exist** [2] - 12:2, 60:23
**exists** [2] - 11:25, 34:19
**expect** [4] - 27:16, 118:6, 129:1, 132:25
**expected** [1] - 79:2
**expedite** [1] - 103:24
**expensive** [3] - 97:8, 97:11, 113:23
**experience** [10] - 7:1, 15:12, 32:4, 33:7, 54:10, 55:16, 58:3, 90:5, 91:9, 115:25
**experienced** [1] - 12:3
**expert** [22] - 67:17, 67:23, 76:4, 79:10, 79:12, 79:24, 80:11, 85:7, 86:8, 86:16, 87:22, 88:9, 89:11, 89:14, 91:18, 94:10, 95:2, 95:3,

95:6, 107:15, 107:19, 122:14
**explain** [10] - 7:11, 43:11, 73:11, 96:3, 106:23, 107:5, 108:10, 109:2, 110:1, 110:20
**explained** [3] - 86:16, 120:18, 129:4
**explanation** [2] - 96:12, 129:24
**express** [1] - 99:11
**expressed** [1] - 99:23
**extend** [1] - 36:20
**extended** [1] - 107:19
**extends** [1] - 134:3
**extensively** [2] - 60:4, 135:24
**extent** [2] - 14:23, 19:19
**extra** [1] - 114:17
**extraordinarily** [1] - 99:16
**extrapolated** [2] - 120:7, 120:13
**extrapolating** [1] - 126:7, 126:10
**extremely** [1] - 108:15
**EZRA** [1] - 2:11
**Ezra** [2] - 66:13, 106:3

## F

**face** [1] - 65:16
**facilities** [1] - 20:23
**fact** [23] - 11:13, 38:2, 58:8, 62:13, 62:14, 69:19, 74:21, 80:7, 83:8, 84:3, 84:6, 85:9, 86:8, 94:5, 96:11, 103:21, 104:11, 105:12, 112:13, 124:23, 136:19, 139:16, 140:17
**factor** [4] - 14:8, 15:18, 71:2, 87:19
**factors** [3] - 25:16, 80:8, 127:18
**failed** [4] - 24:22, 26:15, 141:11, 142:2
**fair** [3] - 11:7, 13:17, 43:21
**fairly** [5] - 11:4, 12:5, 13:5, 13:19, 16:18
**false** [1] - 52:8
**familiar** [5] - 14:19, 28:16, 30:15, 34:5, 113:6
**family** [1] - 117:25
**famous** [1] - 55:22
**fan** [1] - 22:19
**far** [14] - 47:3, 48:19, 61:24, 72:11, 93:1, 97:9, 102:10, 104:9, 112:22, 115:22, 128:3, 128:4, 133:17, 135:12

fashion [2] - 59:9, 59:10
fate [2] - 23:17, 24:21
father [3] - 39:6, 39:7, 46:15
fault [2] - 105:8, 105:9
favor [2] - 141:18, 142:22
fear [1] - 35:4
feasible [1] - 105:18
federal [8] - 12:13, 19:14, 74:23, 107:8, 109:19, 109:20, 117:6, 135:15
felony [1] - 29:12
felt [2] - 140:4, 140:16
few [8] - 13:9, 28:15, 34:5, 60:16, 65:11, 78:25, 94:17, 142:3
field [6] - 117:19, 119:9, 119:10, 119:15, 119:18, 119:23
Fifth [1] - 47:8
fifths [2] - 15:9
figure [3] - 45:6, 52:14, 103:17
figured [1] - 100:7
file [17] - 43:15, 43:17, 66:7, 94:8, 94:16, 95:1, 96:3, 96:9, 96:16, 96:17, 96:20, 96:25, 97:2, 97:13, 100:13
filed [6] - 36:17, 56:21, 56:23, 57:13, 71:8
files [8] - 63:14, 92:21, 93:3, 94:1, 94:22, 94:23, 95:23, 97:4
filibuster [1] - 16:12
final [5] - 25:3, 25:13, 27:21, 44:7, 122:24
finally [2] - 74:18, 115:25
finance [1] - 12:12
fine [5] - 41:17, 41:18, 41:19, 99:5
finger [1] - 141:23
fingers [2] - 141:23, 141:24
finish [4] - 38:20, 86:5, 105:24, 123:19
finished [2] - 28:16, 105:24
fired [1] - 13:4
first [22] - 5:16, 6:23, 12:11, 14:24, 15:10, 21:15, 41:6, 50:2, 59:3, 75:13, 93:11, 94:1, 98:16, 99:19, 103:10, 104:7, 112:12, 113:13, 137:14, 137:21, 138:21, 140:7
Fischer [2] - 71:4, 74:14
FISHER [1] - 2:6
Fisher [1] - 4:8
five [6] - 7:8, 98:24, 111:11, 113:18, 134:15, 134:18
five-day [1] - 113:18
fix [1] - 100:25
flippant [1] - 75:8

Floor [22] - 1:19, 2:23, 16:10, 21:18, 22:13, 22:20, 26:24, 33:10, 35:24, 51:5, 52:6, 137:6, 137:9, 137:15, 137:19, 138:20, 139:1, 141:8, 141:21, 142:8, 142:12, 142:19
floor [4] - 20:6, 20:14, 26:7, 141:24
FLORES [2] - 4:10, 66:18
Flores [9] - 66:15, 66:24, 66:25, 78:22, 79:12, 83:13, 87:11, 88:9, 91:23
Flores' [1] - 75:21
flu [6] - 137:17, 137:24, 137:25, 139:7, 140:2, 140:18
fly [1] - 22:6
FM [1] - 2:19
focus [2] - 37:18, 89:7
focused [1] - 75:13
folks [2] - 23:14, 136:1
follow [1] - 129:15
follow-up [1] - 129:15
followed [1] - 13:2
following [1] - 138:1
Following [1] - 132:18
follows [5] - 5:10, 9:15, 53:17, 66:19, 106:15
font [2] - 43:3
food [3] - 127:23, 128:2
FOR [1] - 1:2
force [2] - 17:20, 17:21
Force [1] - 23:14
forces [3] - 16:13, 16:14
foregoing [1] - 144:3
forgive [2] - 62:22, 91:22
forgot [1] - 124:3
form [3] - 20:13, 101:10, 124:3
formal [2] - 54:21, 54:22
format [14] - 94:8, 94:13, 95:1, 95:20, 96:1, 96:7, 96:8, 96:9, 98:14, 100:3, 105:7, 105:12, 105:13
forms [3] - 23:11, 112:2, 116:24
forth [4] - 75:3, 79:24, 136:22, 140:13
forward [1] - 106:7
FOUNDATION [1] - 3:2
foundation [5] - 29:25, 30:3, 73:7, 135:18, 142:14
founders [1] - 72:10
four [12] - 7:8, 7:9, 7:15, 7:25, 15:9, 21:24, 21:25, 34:18, 113:14, 114:1, 117:24
four-fifths [2] - 15:9
four-year [2] - 21:24, 21:25

fracking [1] - 118:11
framework [1] - 91:11
FRANK [1] - 2:22
frankly [2] - 72:6, 138:22
Fraser [12] - 27:11, 36:8, 36:10, 36:14, 36:15, 37:6, 37:16, 50:13, 50:16, 51:5, 51:8, 51:19
Fraser's [1] - 52:5
fraud [17] - 68:3, 69:9, 69:11, 69:18, 69:20, 69:22, 69:23, 70:1, 70:2, 70:4, 70:13, 74:2, 81:2, 81:13, 81:22, 88:17
fraudulent [1] - 59:10
FREDERICK [18] - 1:17, 8:9, 8:12, 75:20, 78:10, 78:12, 78:15, 78:18, 78:21, 80:2, 80:3, 81:10, 83:17, 83:20, 83:22, 86:6, 86:12, 87:2
Frederick [5] - 4:8, 8:9, 78:11, 78:13, 78:24
free [1] - 11:4
Freeman [3] - 4:4, 43:25, 44:3
FREEMAN [2] - 2:4, 44:2
freshman [1] - 138:15
Friday [3] - 42:8, 61:17, 61:25
FRIED [1] - 2:22
friend [3] - 38:17, 50:24, 51:10
friends [2] - 33:9, 33:13
front [7] - 44:3, 44:4, 46:9, 58:14, 62:17, 68:24, 87:13
full [5] - 49:24, 86:14, 86:22, 93:20, 142:12
fully [2] - 105:11, 132:25
functioned [1] - 80:14
FUND [1] - 3:6

## G

GA [1] - 3:3
gaveled [1] - 142:2
GEAR [6] - 2:5, 132:4, 132:10, 139:19, 141:16, 143:19
Gear [4] - 4:6, 132:4, 132:17, 132:22
gears [1] - 76:3
general [12] - 35:4, 55:4, 77:3, 77:6, 77:7, 77:12, 77:14, 94:3, 107:7, 111:10, 111:23, 115:11
General [8] - 1:6, 18:6, 19:9, 34:2, 44:4, 64:3, 92:20, 95:17
GENERAL [1] - 1:18

General's [1] - 78:14
generally [5] - 15:14, 21:20, 102:4, 114:16, 135:10
genteel [1] - 37:13
genteelism [1] - 73:13
gentle [4] - 30:8, 37:12, 41:7, 50:23
Gentle [2] - 37:14
gentleman [2] - 12:20, 29:5
gentlemen [3] - 100:8, 100:9
geographical [1] - 134:10
geographically [1] - 133:25
GERALD [2] - 2:14, 2:15
germane [1] - 18:19
getters [1] - 77:14
given [8] - 17:25, 26:2, 40:17, 46:4, 70:7, 70:15, 135:5, 140:16
glad [2] - 125:1, 126:13
goodness [1] - 104:20
government [22] - 8:16, 12:14, 20:13, 25:16, 32:1, 107:8, 107:9, 108:8, 109:20, 110:10, 114:6, 114:9, 114:25, 115:2, 115:4, 117:7, 118:7, 128:5, 128:11, 130:24, 133:14
governments [1] - 110:10
Governor [4] - 14:5, 18:7, 33:24, 142:4
governor [12] - 15:8, 16:3, 18:21, 20:14, 31:15, 31:16, 33:21, 137:10, 137:14, 140:25, 141:9, 141:12
governor's [1] - 15:16
graduate [1] - 67:2
grandfather [1] - 72:9
grave [1] - 13:7
greasers [1] - 73:18
great [9] - 8:2, 15:15, 19:22, 35:17, 43:5, 104:7, 105:21
Green [4] - 46:14, 47:13, 48:20, 102:7
Greyhound [2] - 136:15, 136:16
grounds [1] - 30:1
group [5] - 6:1, 7:19, 17:11, 126:20, 127:3
groups [6] - 6:25, 7:20, 27:3, 30:9, 36:23, 136:1
growing [1] - 90:6
Guards [1] - 23:15
guesswork [1] - 111:8
guidance [2] - 40:10, 109:22
guide [1] - 109:8
guidelines [5] - 80:9, 80:10, 80:13, 110:6
gun [1] - 22:7
gun-toting [1] - 22:7
guns [1] - 22:19

# H

**habits** [1] - 28:25
**half** [3] - 104:8, 131:7, 140:15
**hall** [1] - 136:1
**hallway** [1] - 65:19
**hand** [4] - 24:17, 40:12, 94:18, 123:6
**handed** [1] - 45:19
**handgun** [3] - 22:9, 22:13, 33:1
**handguns** [2] - 22:6, 22:19
**handle** [1] - 65:10
**handled** [4] - 54:17, 55:8, 55:10, 55:21
**handling** [4] - 56:8, 65:2, 65:8, 141:4
**hands** [1] - 43:25
**hands-on** [1] - 43:25
**hang** [1] - 83:20
**happy** [5] - 8:14, 62:11, 64:13, 98:10, 98:23
**hard** [13] - 20:19, 28:25, 32:12, 60:19, 63:21, 70:13, 94:18, 95:25, 98:3, 104:19, 104:20, 104:22, 132:9
**harder** [1] - 109:24
**Harless** [3] - 69:5, 74:15, 91:25
**harmonious** [1] - 66:3
**HARRIS** [2] - 2:21, 2:22
**Hate** [3] - 12:13, 12:15, 13:12
**hate** [1] - 12:23
**haunt** [1] - 19:11
**HB218** [6] - 137:4, 137:6, 137:15, 138:19, 141:7, 141:11
**head** [2] - 23:25, 101:14
**health** [2] - 117:13, 138:11
**hear** [4] - 11:19, 42:20, 97:11, 102:25
**heard** [16] - 11:18, 28:17, 30:3, 34:17, 42:21, 55:5, 59:5, 70:12, 98:20, 113:22, 126:16, 126:17, 129:6, 131:17, 138:19, 138:23
**hearing** [1] - 138:10
**hearsay** [2] - 139:17, 139:18
**heart** [4] - 51:13, 70:23, 71:18, 72:5
**heated** [1] - 50:20
**HEBERT** [2] - 2:14, 2:15
**Heights** [3] - 80:5, 80:8, 80:16
**held** [4] - 71:22, 77:10, 94:2, 141:24
**hello** [1] - 35:15
**help** [12] - 40:7, 45:12, 61:24,

89:8, 98:13, 98:14, 98:22, 104:7, 109:3, 112:7, 112:19, 113:1
**helped** [3] - 14:4, 14:10, 89:8
**helpful** [1] - 22:1
**helps** [1] - 112:21
**HENRY** [2] - 4:10, 66:18
**Henry** [2] - 66:15, 66:24
**HERMAN** [1] - 1:23
**herself** [2] - 47:23, 63:8
**hesitating** [1] - 101:12
**high** [10] - 11:3, 13:19, 29:20, 107:8, 109:7, 110:22, 110:23, 114:9, 136:4, 136:5
**higher** [2] - 118:6, 127:13
**highest** [1] - 107:11
**highlight** [2] - 67:14, 76:11
**highly** [2] - 77:1, 104:15
**himself** [1] - 128:22
**Hinojosa** [4] - 33:2, 137:18, 137:21, 138:22
**hired** [1] - 67:23
**Hispanic** [11] - 7:23, 10:9, 32:6, 33:21, 72:2, 73:21, 116:23, 128:23, 134:13, 134:20, 135:6
**Hispanics** [6] - 18:1, 32:1, 33:20, 33:23, 38:15, 38:24
**historical** [1] - 30:11
**historically** [1] - 69:24
**history** [4] - 12:24, 26:22, 33:12, 33:14
**Hold** [1] - 123:19
**hold** [6] - 61:7, 101:2, 124:6, 141:5, 141:22, 141:23
**holder** [1] - 33:1
**HOLDER** [1] - 1:5
**Holder** [3] - 92:20, 132:5, 132:23
**holdings** [1] - 82:4
**home** [9] - 46:19, 115:19, 137:16, 137:24, 138:1, 139:10, 139:13, 139:16, 140:3
**honest** [1] - 48:5
**honey** [1] - 6:21
**Honor** [60] - 29:25, 35:11, 41:4, 41:10, 41:13, 41:21, 42:2, 42:7, 42:16, 43:5, 44:2, 44:13, 44:24, 45:23, 48:7, 49:5, 50:9, 52:8, 52:15, 52:20, 53:5, 61:9, 61:12, 62:11, 62:25, 63:4, 65:4, 65:7, 65:9, 65:14, 65:21, 78:7, 78:10, 78:12, 78:15, 78:18, 81:5, 83:17, 86:6, 88:15, 88:21, 88:24, 89:4, 89:22, 90:1, 90:4, 90:10, 91:14, 91:21, 92:7,

92:10, 92:14, 92:19, 93:4, 96:2, 96:11, 96:17, 98:11, 99:10, 100:10, 101:1, 102:12, 102:18, 103:25, 104:10, 104:18, 105:16, 106:2, 107:21, 116:11, 123:8, 124:25, 126:4, 126:22, 128:21, 131:15, 131:24, 132:15, 143:19
**honor** [4] - 19:22, 53:10, 140:10, 140:12
**Honor's** [1] - 8:25
**HONORABLE** [3] - 1:12, 1:13, 1:13
**honoring** [1] - 141:5
**Honors** [2] - 107:12, 110:5
**hope** [2] - 22:21, 106:7
**hoped** [1] - 94:19
**hopefully** [1] - 119:18
**hoping** [2] - 22:11, 131:16
**horrific** [1] - 12:23
**hour** [6] - 131:23, 131:25, 134:4, 140:15, 141:4
**hours** [4] - 34:18, 140:14, 140:19, 141:4
**House** [11] - 18:6, 30:22, 31:1, 37:23, 55:5, 55:7, 57:14, 69:1, 74:11, 74:16
**house** [4] - 46:10, 49:24, 55:7, 61:5
**household** [5] - 39:11, 48:14, 115:18, 115:20, 128:8
**Household** [1] - 128:7
**Houston** [5] - 2:20, 9:6, 10:1, 34:12, 39:14
**Howard** [2] - 57:5, 57:13
**Howard's** [1] - 57:7
**Hubbard** [1] - 1:24
**huge** [1] - 101:25
**HUGHES** [25] - 1:22, 107:17, 116:14, 122:3, 122:23, 123:8, 123:10, 123:13, 123:15, 124:1, 124:14, 124:24, 125:2, 125:8, 125:19, 125:21, 126:3, 126:22, 127:1, 127:6, 128:21, 129:9, 130:2, 132:15, 142:14
**Hughes** [7] - 116:12, 124:2, 124:11, 126:17, 130:19, 130:25, 131:9
**Hughes'** [1] - 129:19
**human** [1] - 138:11
**hurdle** [1] - 15:23
**hurdles** [1] - 15:25
**hurry** [1] - 137:18
**hurt** [1] - 120:9
**hydraulic** [1] - 118:11
**hypothetical** [1] - 87:23

# I

**ID** [42] - 6:17, 14:18, 21:9, 21:16, 21:22, 22:4, 23:2, 23:17, 24:5, 25:16, 27:20, 28:9, 29:19, 31:2, 31:10, 32:1, 32:14, 35:8, 38:8, 38:22, 39:11, 48:14, 68:18, 69:6, 79:20, 80:20, 81:4, 81:14, 81:18, 81:23, 82:1, 92:3, 92:5, 101:10, 112:20, 116:24, 137:1, 137:19, 139:15, 141:3, 142:12, 143:8
**idea** [7] - 41:14, 42:25, 49:2, 69:17, 102:24, 104:19, 120:16
**identical** [3] - 96:24, 100:2, 105:12
**identification** [6] - 30:22, 38:12, 40:9, 40:19, 69:17, 70:11
**identified** [6] - 46:15, 49:18, 71:11, 81:2, 81:12, 81:17
**identify** [9] - 40:7, 40:13, 41:19, 42:14, 43:24, 45:13, 94:6, 106:21, 140:8
**IDs** [3] - 23:11, 23:12
**IL** [2] - 1:25, 3:7
**ill** [1] - 105:6
**illegal** [16] - 56:9, 56:11, 56:16, 56:25, 57:22, 58:6, 58:11, 58:23, 59:25, 60:4, 60:24, 61:1, 69:20, 70:18, 74:1
**illegally** [1] - 23:10
**immediately** [4] - 94:20, 141:6, 141:21, 142:9
**immigrants** [3] - 69:20, 70:11, 70:18
**immigration** [3] - 70:10, 71:8, 72:1
**impact** [14] - 15:15, 16:20, 21:12, 25:17, 27:4, 27:6, 27:7, 31:22, 32:10, 36:11, 38:23, 51:7, 51:15, 112:11
**impacting** [1] - 36:21
**impacts** [1] - 27:3
**impending** [1] - 15:17
**impersonate** [4] - 59:4, 59:11, 59:13, 59:20
**impersonation** [3] - 58:23, 59:25, 60:5
**implementation** [1] - 25:23
**implemented** [1] - 25:17
**implication** [1] - 46:13
**important** [10] - 19:8, 20:16, 68:15, 69:17, 105:23, 108:19, 112:3, 112:11,

134:22, 135:7
**importantly** [1] - 68:9
**imposition** [1] - 6:4
**impossibility** [1] - 63:17
**impressive** [1] - 136:12
**improving** [1] - 11:22
**in-person** [6] - 58:23, 59:21, 60:4, 70:13, 117:16, 119:4
**inadequate** [4] - 122:16, 124:18, 125:16, 126:2
**inadvertent** [1] - 27:4
**INC** [2] - 3:2, 3:6
**inception** [1] - 128:6
**incident** [4] - 12:7, 13:5, 62:19, 69:4
**incidents** [3] - 11:18, 13:19, 69:23
**include** [2] - 40:17, 134:6
**included** [1] - 115:23
**includes** [5] - 67:11, 93:8, 134:5, 134:6, 134:8
**including** [1] - 17:12
**income** [5] - 7:12, 11:1, 127:15, 127:18, 135:12
**incorrect** [1] - 83:11
**increased** [1] - 97:2
**increasingly** [1] - 68:10
**indeed** [1] - 118:9
**independent** [5] - 122:2, 122:15, 124:21, 126:1
**Indian** [1] - 119:3
**Indiana** [3] - 80:20, 82:10, 87:10
**indicate** [3] - 21:17, 27:18, 68:12
**indicated** [4] - 32:9, 32:18, 38:15, 38:24
**indices** [1] - 98:22
**individual** [3] - 40:15, 70:14, 71:24
**individuals** [1] - 72:20
**indulgence** [1] - 87:7
**ineligible** [1] - 58:3
**infants** [1] - 68:13
**influential** [1] - 14:8
**inform** [1] - 100:12
**information** [20] - 26:10, 32:8, 32:11, 40:11, 43:14, 44:2, 44:4, 45:11, 45:12, 60:21, 89:9, 89:18, 92:24, 94:9, 98:7, 101:14, 118:16, 119:12, 122:10, 122:11
**informed** [1] - 140:18
**infrastructure** [2] - 136:14, 136:25
**Ingram** [2] - 93:11, 101:21
**initial** [1] - 13:23
**inner** [3] - 34:10, 34:11, 39:17

**inordinate** [1] - 60:22
**inquired** [1] - 40:19
**inquiry** [2] - 98:6, 98:7
**insensitivity** [1] - 32:18
**inside** [1] - 34:11
**insist** [1] - 104:4
**instance** [9] - 7:3, 59:5, 60:17, 71:22, 73:2, 74:10, 75:11, 96:23, 101:16
**instances** [3] - 56:22, 74:11, 77:25
**instead** [3] - 7:6, 19:3, 97:17
**instructed** [1] - 45:17
**instruction** [1] - 85:4
**instructions** [1] - 83:8
**integrate** [1] - 17:20
**integrity** [4] - 74:2, 88:17, 99:2, 104:24
**intelligent** [1] - 64:17
**intended** [2] - 32:19, 33:10
**intending** [1] - 129:13
**intensive** [1] - 114:4
**intent** [13] - 19:25, 20:1, 20:5, 33:4, 37:1, 37:15, 37:17, 37:20, 50:15, 51:4, 51:6, 52:6, 79:16
**interest** [1] - 81:12
**interesting** [1] - 139:10
**interests** [1] - 33:15
**internal** [1] - 96:9
**international** [1] - 6:17
**interpreted** [1] - 74:25
**interrupt** [1] - 96:15
**interrupting** [1] - 25:9
**Intervenor** [3] - 1:10, 2:11, 65:6
**intervenor** [2] - 106:1, 106:2
**Intervenor's** [2] - 76:20, 89:24
**Intervenor-Defendants** [1] - 1:10
**intervenors** [2] - 93:20, 113:3
**Intervenors** [3] - 9:12, 53:13, 66:14
**interview** [1] - 87:24
**interviewed** [1] - 56:25
**interviewers** [2] - 115:13, 117:16
**interviews** [2] - 119:4, 119:8
**intimidated** [1] - 34:24
**INTO** [1] - 4:17
**introduce** [1] - 9:22
**introduction** [1] - 5:4
**investigate** [2] - 56:19, 57:24
**investigated** [2] - 56:16, 57:25
**investigation** [3] - 56:21, 56:22, 59:3

**investigations** [1] - 57:2
**involved** [2] - 45:18, 57:5
**involving** [3] - 13:7, 18:10, 57:5
**Iowa** [1] - 23:24
**irrelevant** [1] - 108:21
**issue** [33] - 14:19, 16:14, 29:23, 30:13, 38:7, 42:17, 42:24, 43:11, 51:17, 51:23, 61:13, 61:15, 62:20, 66:1, 68:16, 68:19, 69:15, 74:17, 74:20, 74:22, 75:5, 75:9, 89:18, 94:22, 99:2, 100:18, 100:20, 103:22, 105:4, 111:21, 112:22, 131:17
**issued** [4] - 29:15, 29:19, 32:1, 35:8
**issues** [19] - 13:6, 13:21, 13:22, 15:1, 28:15, 30:11, 57:10, 67:22, 73:10, 84:18, 96:13, 114:15, 130:1, 130:9
**items** [1] - 114:15
**itself** [6] - 5:16, 5:18, 21:5, 69:22, 89:25, 126:9

**J**

**JA** [1] - 36:5
**JACOBSON** [1] - 2:22
**jail** [2] - 7:8, 7:9
**James** [5] - 12:13, 12:15, 14:23, 16:1, 16:16
**Jane** [1] - 138:10
**Janek** [3] - 139:8, 139:11, 139:14
**January** [2] - 35:18, 36:2
**Jasper** [4] - 12:22, 12:24, 12:25, 13:3
**Jeff** [1] - 55:23
**Jennifer** [1] - 34:1
**JENNIFER** [1] - 2:4
**jobs** [1] - 143:14
**JOHN** [2] - 1:16, 1:22
**Johnson** [5] - 5:13, 8:5, 8:13, 11:18, 29:5
**JOHNSON** [2] - 4:3, 5:9
**Johnson's** [3] - 11:12, 11:21, 28:18
**joint** [2] - 51:22, 94:19
**Joint** [3] - 21:18, 24:8, 26:18
**joke** [1] - 65:15
**Jonathan** [1] - 94:4
**Jordan** [1] - 10:5
**JORGE** [1] - 3:5
**Jorge** [1] - 66:15
**JOSEPH** [1] - 2:14
**Journal** [1] - 74:11
**journal** [1] - 31:5

**JR** [1] - 1:5
**Judge** [4] - 44:15, 44:20, 105:17, 130:9
**JUDGE** [151] - 1:12, 5:2, 5:6, 8:7, 8:20, 8:23, 9:2, 9:10, 25:8, 30:2, 30:5, 35:10, 38:19, 40:24, 41:5, 41:12, 41:15, 41:22, 42:1, 42:4, 42:9, 42:12, 42:20, 43:1, 43:8, 43:19, 43:21, 44:14, 44:21, 44:22, 45:1, 45:8, 45:14, 45:22, 45:24, 47:7, 47:16, 48:10, 49:19, 50:8, 51:25, 52:2, 52:10, 52:14, 52:18, 52:22, 53:8, 53:12, 61:7, 61:11, 62:9, 62:18, 64:2, 64:3, 64:6, 64:15, 65:8, 65:12, 65:15, 65:22, 65:25, 66:9, 66:12, 75:24, 76:18, 76:22, 78:5, 78:8, 78:11, 78:13, 78:17, 78:19, 79:25, 81:6, 83:18, 86:4, 87:3, 87:6, 88:8, 88:20, 88:22, 88:25, 89:21, 89:23, 90:2, 90:5, 90:11, 90:19, 91:20, 91:22, 92:3, 92:8, 92:11, 92:17, 93:23, 95:24, 96:5, 96:15, 97:9, 97:16, 98:25, 99:17, 100:18, 101:2, 101:3, 101:4, 102:8, 102:15, 102:24, 104:2, 104:17, 104:20, 105:3, 105:21, 106:6, 106:9, 106:12, 106:19, 107:18, 116:9, 116:12, 121:15, 121:17, 122:13, 122:21, 123:9, 124:5, 124:9, 124:10, 124:15, 125:1, 125:7, 125:15, 125:20, 125:23, 126:13, 126:23, 127:2, 127:7, 129:8, 129:11, 129:14, 129:17, 131:13, 131:21, 132:1, 132:8, 132:11, 132:16, 143:12, 143:20
**judge** [2] - 44:23, 91:17
**judges** [4] - 17:21, 17:22, 17:23, 19:14
**JUDGES** [1] - 1:14
**judgment** [10] - 88:22, 89:1, 90:14, 90:15, 122:17, 124:19, 125:16, 125:17, 126:1, 127:10
**judicial** [4] - 18:1, 18:10, 18:12, 55:10
**judiciary** [2] - 17:20, 54:22
**July** [2] - 1:6, 94:17
**jump** [1] - 28:15
**jumped** [1] - 138:24
**June** [2] - 94:10, 94:24

**jurisdiction** [1] - 61:3
**jury** [1] - 124:10
**justice** [1] - 16:23
**JUSTICE** [1] - 2:6
**Justice** [25] - 9:9, 38:17, 41:24, 42:5, 42:13, 42:15, 45:6, 61:17, 61:20, 61:24, 92:15, 93:22, 94:11, 94:18, 96:24, 97:22, 98:2, 98:3, 98:12, 99:6, 99:12, 99:23, 100:11, 131:18, 132:23
**Justice's** [1] - 94:6
**justify** [2] - 79:20, 81:3

## K

**Kahneman** [1] - 72:18
**keep** [7] - 15:23, 33:18, 52:23, 64:4, 64:9, 105:22, 129:4
**Keith** [1] - 101:21
**KENNIE** [1] - 1:9
**Kennie** [1] - 9:12
**kept** [2] - 64:10, 69:2
**key** [2] - 26:25, 114:15
**kid** [1] - 12:6
**kids** [1] - 49:25
**killed** [1] - 16:14
**Kim** [1] - 138:8
**kind** [17] - 7:10, 15:2, 15:12, 27:13, 58:6, 60:21, 61:1, 71:6, 72:24, 73:17, 74:7, 84:20, 103:14, 114:14, 115:16, 139:9, 140:9
**kinds** [2] - 67:5, 117:6
**knowledge** [5] - 64:11, 87:10, 87:12, 95:25, 122:14
**knows** [9] - 40:21, 41:2, 43:3, 64:21, 104:5, 104:6, 127:15, 135:23
**Kyle** [1] - 139:8

## L

**lack** [2] - 14:4, 130:1
**lacks** [1] - 93:20
**ladies** [2] - 100:8
**lady** [3] - 37:12, 37:14, 41:7
**land** [4] - 113:21, 113:22, 113:24, 113:25
**language** [6] - 71:9, 73:10, 73:17, 73:20, 73:24, 74:4
**large** [9] - 7:12, 94:25, 102:20, 102:21, 128:5, 136:1, 136:22
**larger** [1] - 17:25
**largest** [1] - 134:10

**lark** [1] - 59:7
**last** [21] - 10:23, 11:9, 13:9, 13:11, 34:23, 42:8, 43:6, 47:10, 47:12, 60:3, 61:17, 68:8, 68:9, 77:10, 86:19, 106:13, 107:1, 114:23, 122:25, 128:9, 143:17
**lasted** [2] - 10:24, 119:8
**late** [5] - 54:14, 95:5, 104:3, 138:15, 139:25
**lately** [1] - 48:1
**Latin** [1] - 70:21
**Latino** [14] - 37:22, 37:25, 67:7, 68:10, 68:13, 68:14, 70:22, 77:2, 77:4, 77:8, 77:9, 90:23, 90:24, 91:18
**Latinos** [6] - 38:7, 38:12, 73:6, 73:18, 77:1, 77:8
**latter** [1] - 109:17
**Laureate** [1] - 72:19
**law** [20] - 5:23, 19:20, 30:6, 30:10, 34:19, 34:23, 34:25, 35:4, 38:22, 54:10, 54:25, 73:1, 73:8, 74:9, 81:4, 81:14, 81:18, 81:23, 82:2
**laws** [1] - 79:20
**lawsuit** [5] - 17:20, 56:21, 56:22, 71:24, 89:15
**lawyer** [4] - 54:3, 54:15, 81:8, 91:16
**lawyers** [2] - 19:22, 63:14
**layer** [2] - 71:19
**laying** [1] - 139:6
**lead** [2] - 26:23, 57:7
**leading** [2] - 27:21, 130:14
**leaned** [1] - 142:5
**learn** [1] - 137:14
**learned** [2] - 135:1, 137:21
**least** [15] - 13:10, 13:23, 25:20, 27:9, 29:10, 37:8, 37:9, 74:11, 77:19, 88:2, 93:25, 112:17, 118:15, 132:6, 135:11
**leave** [3] - 20:21, 64:18, 136:12
**led** [2] - 44:9, 84:9
**leery** [1] - 130:2
**left** [2] - 14:6, 73:20
**legal** [6] - 48:19, 79:23, 79:24, 94:22, 98:19, 103:21
**LEGAL** [1] - 3:5
**legal/technical** [1] - 95:12
**legality** [1] - 74:8
**legislation** [7] - 13:13, 20:14, 20:16, 21:2, 21:11, 88:5, 142:12
**Legislative** [1] - 106:4
**legislative** [19] - 12:9, 15:10, 50:23, 51:17, 68:5, 68:23,

69:14, 69:16, 69:19, 70:8, 71:1, 71:7, 71:16, 74:9, 79:16, 80:13, 89:10, 90:25, 141:14
**legislator** [1] - 135:1
**legislators** [2] - 72:2, 143:10
**legislature** [18] - 7:10, 15:22, 16:24, 28:4, 32:24, 55:3, 71:19, 72:5, 73:4, 74:1, 80:14, 80:16, 82:6, 82:8, 82:10, 89:8, 91:4, 92:5
**legislature's** [2] - 51:4, 51:6
**legitimate** [6] - 64:23, 81:3, 81:13, 81:18, 82:1, 96:7
**less** [10] - 17:22, 27:25, 35:20, 89:12, 113:23, 115:19, 119:15, 128:2, 135:16, 135:19
**Leticia** [1] - 139:8
**level** [8] - 11:2, 107:9, 108:24, 109:13, 109:17, 129:1, 135:15
**levels** [1] - 136:3
**LIBERTIES** [1] - 3:1
**license** [33] - 7:18, 22:3, 22:4, 22:10, 22:14, 29:6, 34:6, 34:8, 34:13, 34:15, 34:20, 34:22, 39:19, 39:21, 39:24, 39:25, 40:5, 47:25, 48:4, 48:6, 48:13, 48:23, 49:23, 63:11, 64:5, 93:9, 93:19, 98:18, 101:20, 102:6, 102:7, 104:16
**licensed** [2] - 22:20, 33:1
**licenses** [2] - 32:13, 32:15
**Licia** [9] - 46:7, 46:8, 46:14, 46:19, 46:20, 48:20, 49:7, 102:6, 102:7
**lie** [1] - 37:6
**lied** [1] - 37:10
**Lieutenant** [2] - 18:7, 142:3
**lieutenant** [7] - 18:20, 20:14, 137:10, 137:14, 140:25, 141:9, 141:12
**life** [2] - 72:12, 72:21
**lifetime** [1] - 73:16
**likelihood** [2] - 123:1, 123:17
**likely** [6] - 121:3, 121:8, 121:13, 122:7, 135:16, 135:19
**limine** [2] - 51:21, 141:17
**limited** [3] - 24:13, 24:16, 100:17
**line** [13] - 6:2, 22:7, 27:17, 36:9, 85:14, 85:15, 94:5, 96:19, 97:1, 123:11, 123:13
**lines** [3] - 6:11, 6:13, 23:5, 24:13, 27:12, 34:17, 83:21, 84:11, 86:20, 113:22,

113:24, 113:25
**list** [41] - 20:5, 21:13, 29:20, 40:13, 40:18, 40:21, 41:2, 41:14, 42:3, 42:19, 43:13, 44:8, 44:10, 49:3, 60:14, 61:16, 62:1, 62:8, 63:13, 64:1, 92:23, 92:25, 93:6, 93:8, 93:10, 93:12, 99:11, 99:13, 100:13, 101:24, 102:5, 104:24, 105:2, 107:24, 113:4, 116:3, 117:9, 126:24, 129:6, 130:18
**listed** [6] - 46:6, 47:15, 47:19, 49:16, 107:13, 110:6
**listened** [1] - 75:11
**listener** [1] - 139:20
**lists** [5] - 63:12, 66:6, 66:8, 93:15, 94:1
**literally** [2] - 60:16, 138:25
**literature** [1] - 99:15
**litigation** [1] - 67:15
**live** [6] - 39:14, 39:16, 131:24, 131:25, 132:1, 135:14
**living** [2] - 61:3, 61:4
**LLP** [4] - 1:23, 2:11, 2:22, 106:3
**load** [1] - 104:13
**lobbyist** [1] - 91:1
**local** [1] - 114:24
**locally** [1] - 104:5
**look** [41] - 7:24, 43:17, 59:24, 60:6, 60:10, 60:14, 60:19, 60:20, 71:6, 76:12, 80:13, 82:10, 82:12, 83:9, 83:23, 84:3, 84:6, 84:12, 84:16, 85:3, 85:5, 85:7, 85:18, 85:20, 88:2, 88:5, 89:10, 89:18, 90:15, 90:21, 91:15, 91:17, 98:5, 105:14, 114:22, 126:5, 126:19, 126:23, 130:12
**looked** [12] - 48:1, 48:6, 60:4, 60:6, 68:24, 84:8, 89:11, 100:14, 126:20, 126:24, 127:14
**looking** [19] - 44:16, 45:13, 60:15, 61:23, 63:22, 68:22, 68:23, 69:13, 70:5, 76:10, 82:6, 85:22, 90:23, 105:7, 109:9, 109:12, 112:18, 127:15, 128:22
**looks** [2] - 105:14, 126:21
**loop** [2] - 34:11
**lose** [1] - 29:6
**loser** [1] - 57:13
**lost** [3] - 13:5, 15:3, 22:3
**loud** [2] - 76:23, 76:25

**Louisiana** [1] - 18:2
**lounge** [2] - 139:6, 139:9
**love** [2] - 33:8, 103:25
**low** [13] - 7:12, 108:6, 108:15, 110:10, 120:4, 120:10, 120:17, 125:4, 126:5, 127:15, 128:11, 128:25, 129:5
**lower** [4] - 109:25, 110:4, 116:25, 128:25
**luck** [1] - 100:9
**lucky** [1] - 111:5
**LULAC** [1] - 72:10
**lunch** [2] - 103:10, 103:12
**lunches** [1] - 11:4

## M

**ma'am** [1] - 41:12
**machine** [1] - 3:12
**mail** [5] - 5:22, 28:22, 29:3, 61:2, 70:2
**mail-in** [3] - 5:22, 29:3, 70:2
**main** [1] - 27:17
**major** [3] - 21:1, 29:10, 115:3
**majority** [19] - 17:1, 17:4, 17:10, 18:16, 18:17, 19:5, 28:11, 28:13, 32:20, 38:6, 38:8, 38:11, 68:13, 143:1, 143:5, 143:6
**majority/minority** [1] - 68:10
**MALDEF** [1] - 66:16
**mama's** [1] - 61:5
**man** [2] - 17:12, 47:2
**man's** [1] - 61:21
**Management** [1] - 109:21
**mandatory** [1] - 118:3
**MARANZANO** [10] - 2:4, 34:1, 34:4, 35:9, 41:13, 42:16, 42:23, 52:20, 52:25, 53:7
**Maranzano** [1] - 34:1
**March** [2] - 74:10, 94:2
**margin** [3] - 111:10, 111:14, 111:25
**Maria** [1] - 39:23
**Mariah** [1] - 39:25
**Marines** [1] - 141:5
**marked** [4] - 36:3, 45:24, 45:25, 49:10
**MARKER** [2] - 4:11, 106:14
**Marker** [4] - 106:5, 106:6, 106:22, 122:24
**marker** [17] - 106:18, 107:14, 107:19, 107:23, 110:9, 115:25, 116:7, 116:15, 122:13, 124:8, 124:16, 125:8, 126:15, 127:4, 129:11, 129:23, 131:14

**marker's** [2] - 107:12, 125:22
**market** [1] - 109:4
**marketing** [3] - 109:3, 109:6, 109:8
**Martinez** [2] - 71:4, 74:14
**Mary's** [1] - 67:2
**masking** [1] - 88:19
**masses** [1] - 70:14
**massive** [2] - 69:18, 69:20
**master** [1] - 57:17
**match** [3] - 112:17, 114:13, 127:16
**matched** [4] - 43:16, 92:23, 92:25, 127:17
**matches** [2] - 101:9, 127:13
**mate** [1] - 51:10
**materially** [1] - 99:25
**materials** [2] - 90:2, 90:8
**Matt** [1] - 78:24
**matter** [12] - 17:5, 57:6, 69:18, 74:21, 75:7, 76:5, 85:9, 105:10, 115:16, 132:5, 139:21, 144:5
**matters** [5] - 54:11, 54:17, 56:8, 56:25, 95:6
**MATTHEW** [1] - 1:17
**Matthew** [2] - 8:9, 78:13
**Maverick** [1] - 136:3
**maximize** [1] - 110:1
**MC-059** [1] - 1:19
**MCKENZIE** [1] - 1:16
**mean** [20] - 11:3, 12:5, 15:7, 18:14, 32:13, 34:21, 43:25, 50:25, 69:24, 73:18, 88:3, 96:16, 98:2, 100:19, 104:11, 104:24, 108:10, 111:11, 130:16, 136:12
**means** [5] - 15:8, 18:15, 60:13, 125:4, 142:18
**meant** [2] - 110:20, 111:22
**measure** [2] - 19:16, 21:11
**media** [3] - 71:20, 71:21, 89:12
**medical** [2] - 11:5, 139:12
**meet** [2] - 19:5, 28:1
**meeting** [1] - 94:7
**meetings** [2] - 136:1, 138:15
**member** [7] - 9:23, 9:24, 26:4, 32:25, 87:17, 133:8, 133:12
**members** [18] - 15:21, 20:21, 23:18, 25:1, 26:15, 26:16, 27:7, 29:22, 32:23, 69:1, 77:18, 77:19, 87:16, 119:5, 139:6, 139:9, 143:13
**membership** [2] - 15:9, 16:9
**men** [4] - 7:4, 7:13, 7:16, 7:19
**mention** [1] - 26:9
**mentioned** [17] - 9:11, 10:18,

23:22, 25:3, 39:2, 69:25, 71:3, 71:4, 79:1, 90:6, 110:18, 115:7, 117:23, 117:24, 119:2, 130:19, 131:4
**mentioning** [1] - 62:21
**MEREDITH** [1] - 2:3
**messcans** [1] - 73:19
**met** [2] - 18:25, 116:17
**method** [1] - 67:9
**methodology** [9] - 72:14, 107:15, 113:16, 113:17, 115:9, 121:6, 121:11, 122:5, 123:1
**methods** [4] - 67:7, 67:10, 89:6, 128:15
**MEXICAN** [1] - 3:5
**Mexican** [2] - 73:22, 106:4
**Mexican-American** [1] - 106:4
**Mexican-Americans** [1] - 73:22
**Mexicanos** [1] - 73:21
**Mexico** [4] - 17:13, 70:20, 71:12, 71:14
**microphone** [1] - 79:22
**Microsoft** [1] - 104:14
**middle** [1] - 17:9, 22:20, 46:22, 46:24, 49:13, 49:17, 49:22, 50:3, 62:14, 128:9, 143:14
**midst** [1] - 62:19
**might** [17] - 14:9, 22:16, 23:25, 29:2, 43:22, 47:6, 48:12, 48:16, 59:6, 74:13, 79:20, 81:3, 83:3, 84:13, 84:14, 118:13, 140:11
**mile** [1] - 53:6
**miles** [2] - 134:8, 136:13
**military** [1] - 23:12
**million** [13] - 29:11, 42:3, 42:19, 42:24, 42:25, 44:7, 44:11, 62:16, 63:12, 93:6, 93:12, 101:24, 107:24, 112:18, 113:4, 116:3
**mind** [6] - 28:6, 29:14, 29:17, 29:21, 70:21, 129:4
**minds** [1] - 94:7
**mine** [2] - 22:12, 24:19
**minimal** [2] - 27:14, 69:24
**minimize** [1] - 33:22
**minimum** [2] - 115:7, 140:15
**minor** [1] - 87:7
**minorities** [5] - 21:13, 36:13, 51:7, 126:24, 135:16
**minority** [13] - 11:13, 15:22, 16:20, 23:18, 25:1, 26:15, 29:22, 31:22, 32:6, 32:23, 32:25, 36:23, 38:2
**minus** [1] - 111:10

**minute** [3] - 101:2, 124:11, 142:3
**minutes** [6] - 35:20, 65:11, 92:12, 98:24, 132:2, 132:6
**miscommunication** [1] - 85:25
**mispronounced** [1] - 72:19
**missed** [1] - 143:17
**Mississippi** [1] - 18:2
**misspeak** [1] - 92:22
**mistaken** [1] - 131:7
**Mister** [1] - 131:21
**misunderstanding** [1] - 85:12
**Mitchell** [2] - 94:4
**mix** [1] - 126:25
**modern** [1] - 12:23
**modified** [1] - 95:16
**moment** [6] - 35:11, 78:4, 78:16, 79:1, 83:20, 139:22
**Monday** [1] - 42:10
**money** [1] - 128:14
**months** [5] - 13:9, 13:11, 117:19, 117:21, 119:13
**morning** [25] - 6:21, 42:10, 61:25, 62:25, 63:9, 63:11, 64:5, 93:22, 99:19, 111:9, 121:22, 126:14, 126:18, 129:20, 130:10, 132:20, 132:21, 137:16, 138:1, 138:10, 138:14, 138:17, 140:5, 140:7, 143:18
**MORTARA** [63] - 1:21, 29:25, 35:11, 35:14, 39:1, 40:14, 40:22, 41:1, 41:10, 41:21, 41:23, 42:2, 42:7, 42:10, 43:5, 43:9, 43:20, 44:13, 44:24, 45:3, 45:4, 45:9, 45:16, 45:23, 45:25, 46:3, 47:9, 47:18, 48:7, 48:12, 48:16, 48:18, 49:5, 49:6, 49:20, 50:7, 51:17, 52:8, 52:13, 53:5, 61:10, 61:12, 63:4, 65:4, 65:9, 65:14, 92:14, 93:4, 96:2, 96:11, 96:17, 97:15, 98:10, 99:10, 100:10, 101:1, 101:12, 103:25, 104:10, 104:18, 104:22, 131:15, 131:22
**Mortara** [14] - 4:10, 50:13, 52:4, 62:21, 64:24, 92:22, 94:18, 95:7, 95:9, 95:14, 95:24, 100:20, 101:4, 131:15
**most** [16] - 10:4, 10:20, 12:10, 12:23, 16:17, 25:1, 29:17, 31:25, 32:14, 54:25, 68:9, 70:1, 72:18, 93:14, 110:25, 133:19
**mostly** [2] - 10:16, 71:20

**mother** [2] - 5:23, 46:14
**mother-in-law** [1] - 5:23
**motion** [2] - 51:20, 141:17
**motivate** [1] - 22:4
**motivation** [2] - 89:2, 90:14
**move** [8] - 15:2, 30:13,
   75:22, 101:5, 101:21,
   102:25, 139:17, 141:18
**moved** [2] - 58:9, 74:24
**MOVED** [1] - 4:17
**movement** [1] - 8:18
**moving** [2] - 105:22, 107:13
**MR** [183] - 8:9, 8:12, 8:25,
   9:3, 9:5, 9:11, 9:17, 21:17,
   21:19, 24:8, 24:10, 25:7,
   25:10, 25:12, 26:18, 26:20,
   29:25, 30:12, 33:25, 35:11,
   35:14, 39:1, 40:14, 40:22,
   41:1, 41:4, 41:7, 41:10,
   41:21, 41:23, 42:2, 42:7,
   42:10, 43:5, 43:9, 43:20,
   44:2, 44:13, 44:24, 45:3,
   45:4, 45:9, 45:16, 45:19,
   45:23, 45:25, 46:3, 47:9,
   47:18, 48:7, 48:12, 48:16,
   48:18, 49:5, 49:6, 49:20,
   50:7, 50:9, 50:11, 51:17,
   52:1, 52:3, 52:8, 52:13,
   52:15, 53:5, 53:11, 53:13,
   53:19, 61:6, 61:9, 61:10,
   61:12, 63:4, 65:4, 65:6,
   65:9, 65:14, 66:13, 66:21,
   75:20, 76:2, 76:9, 76:20,
   76:24, 78:3, 78:7, 78:10,
   78:12, 78:15, 78:18, 78:21,
   79:21, 79:23, 80:2, 80:3,
   81:5, 81:10, 83:17, 83:19,
   83:20, 83:22, 86:6, 86:12,
   87:2, 87:5, 87:7, 87:9,
   88:7, 92:10, 92:14, 92:19,
   93:4, 93:24, 96:2, 96:11,
   96:17, 97:15, 98:10, 99:10,
   100:10, 101:1, 101:12,
   102:12, 102:18, 103:25,
   104:10, 104:18, 104:22,
   105:16, 106:2, 106:17,
   106:20, 107:12, 107:17,
   107:21, 107:22, 110:5,
   110:8, 116:7, 116:14,
   122:3, 122:23, 123:8,
   123:10, 123:12, 123:13,
   123:15, 124:1, 124:2,
   124:7, 124:14, 124:24,
   125:2, 125:8, 125:19,
   125:21, 126:3, 126:22,
   127:1, 127:6, 128:21,
   129:9, 129:13, 129:15,
   129:18, 129:22, 130:2,
   130:5, 130:8, 131:11,
   131:15, 131:22, 132:4,

132:10, 134:14, 135:18,
   139:17, 139:19, 141:14,
   141:16, 142:14, 143:19
**MS** [23] - 5:3, 5:8, 5:12, 8:4,
   8:22, 34:1, 34:4, 35:9,
   41:13, 42:16, 42:23, 52:20,
   52:25, 53:7, 62:11, 62:25,
   64:5, 64:8, 65:21, 65:23,
   66:1, 66:10, 116:11
**multiple** [3] - 42:16, 115:7,
   115:20
**must** [4] - 34:12, 100:5,
   109:21, 110:1

## N

**NAACP** [1] - 106:4
**name** [39] - 5:4, 9:18, 9:19,
   31:8, 31:9, 40:8, 40:15,
   40:20, 40:24, 40:25, 43:15,
   45:10, 46:13, 46:19, 46:20,
   46:22, 46:24, 47:10, 47:12,
   47:24, 48:3, 48:5, 48:19,
   48:22, 48:25, 50:2, 50:3,
   53:21, 55:20, 55:23, 66:22,
   71:11, 72:19, 78:24, 102:5,
   102:6, 106:19, 132:4,
   132:22
**named** [1] - 54:12
**names** [6] - 42:19, 42:24,
   42:25, 49:3, 49:12
**NANCY** [1] - 3:1
**NAPIER** [1] - 1:17
**National** [2] - 23:15, 128:7
**national** [1] - 5:18
**native** [2] - 72:9, 95:20
**Native** [1] - 119:5
**nature** [4] - 60:13, 94:24,
   106:18, 106:23
**Navy** [1] - 23:13
**nearly** [2] - 44:11, 109:11
**necessarily** [1] - 22:7
**necessary** [3] - 95:14,
   103:15, 119:25
**need** [20] - 5:4, 9:7, 15:9,
   19:12, 27:1, 27:2, 27:10,
   40:19, 42:10, 45:1, 62:17,
   65:23, 74:23, 86:2, 102:25,
   103:18, 109:7, 122:15
**needs** [1] - 64:24
**negatively** [1] - 92:15
**neighborhood** [1] - 10:10
**neighborhoods** [3] - 10:4,
   135:25
**neighbors** [1] - 115:1
**Nelson** [1] - 138:10
**never** [6] - 59:4, 59:18,
   59:19, 72:10, 75:3, 132:12
**new** [6] - 15:1, 15:2, 29:14,

75:13, 130:2, 130:5
**New** [4] - 2:23, 2:24, 13:10,
   17:13
**news** [1] - 46:10
**newspaper** [1] - 58:15
**newspapers** [1] - 58:12
**next** [15] - 9:1, 18:13, 18:14,
   22:24, 45:20, 52:17, 52:18,
   53:12, 65:2, 65:3, 65:4,
   66:12, 66:14, 88:2, 102:25
**nice** [3] - 37:17, 53:8, 116:17
**nicer** [1] - 14:9
**Nicole** [5] - 40:4, 49:8, 49:12,
   49:22
**Nicole's** [1] - 50:2
**night** [3] - 58:16, 95:5
**nine** [9] - 93:21, 113:13,
   113:25, 114:3, 114:12,
   114:17, 115:5, 134:4
**nine-digit** [1] - 93:21
**nine-hour** [1] - 134:4
**NJ** [1] - 2:13
**NO** [1] - 4:17
**Nobel** [1] - 72:19
**nobody** [1] - 17:6
**nominee** [2] - 56:3, 57:22
**nominees** [1] - 55:18
**non** [1] - 77:8
**non-Latino** [1] - 77:8
**noncitizen** [3] - 68:3, 69:9,
   69:11
**nondiscriminatory** [11] -
   79:19, 81:3, 81:13, 81:18,
   81:22, 82:1, 82:23, 83:6,
   84:4, 84:16, 85:19
**none** [1] - 73:2
**nonrespondents** [1] -
   110:24
**nonresponse** [8] - 110:3,
   112:2, 112:11, 120:3,
   120:5, 120:11, 120:16,
   125:3
**noon** [1] - 94:20
**norm** [1] - 91:7
**normal** [1] - 141:1
**normally** [2] - 22:6, 141:3
**note** [2] - 9:8, 124:3
**noteworthy** [2] - 55:20,
   55:21
**nothing** [6] - 33:19, 35:9,
   52:15, 53:7, 92:10, 97:3
**notice** [3] - 20:1, 66:7,
   138:16
**notify** [1] - 66:6
**nowheres** [1] - 6:18
**NUMBER** [1] - 4:15
**Number** [1] - 76:21
**number** [14] - 5:22, 17:25,
   58:2, 63:15, 76:18, 97:5,
   101:25, 112:1, 113:16,

114:15, 117:19, 117:21,
   127:15, 135:13
**numbers** [5] - 8:2, 93:21,
   114:22, 127:16, 131:9
**numerous** [2] - 64:17, 77:25
**NW** [2] - 2:8, 3:2
**NWB** [1] - 2:8
**NWB-Room** [1] - 2:8
**NY** [1] - 2:24

## O

**oath** [1] - 132:25
**Oath** [4] - 9:13, 53:15, 66:17,
   106:8
**Obama** [2] - 8:1, 8:2
**Obama's** [1] - 6:10
**object** [6] - 29:25, 41:13,
   75:20, 124:3, 130:2,
   130:15
**objection** [16] - 41:4, 41:8,
   79:21, 81:5, 81:7, 107:14,
   107:17, 107:18, 124:4,
   134:14, 135:18, 139:2,
   139:17, 141:14, 142:14
**objections** [3] - 41:5, 66:5,
   66:8
**obligation** [1] - 53:1
**observant** [1] - 95:4
**observing** [1] - 72:8
**obviously** [8] - 13:20, 49:15,
   59:12, 89:12, 91:12, 91:14,
   102:2, 104:14
**occasionally** [2] - 56:9,
   68:16
**occupation** [1] - 66:25
**occur** [3] - 54:25, 112:8,
   112:9
**occurred** [1] - 137:16
**odd** [2] - 59:5, 59:19
**odds** [1] - 101:25
**OF** [8] - 1:2, 1:3, 1:11, 1:18,
   1:18, 2:6, 144:1, 144:10
**OFF** [1] - 76:8
**offended** [1] - 46:15
**offer** [5] - 21:6, 75:22, 98:13,
   107:14, 131:18
**offered** [5] - 24:20, 32:25,
   33:2, 100:11, 139:20
**offering** [3] - 51:1, 116:21,
   116:23
**Office** [4] - 54:13, 78:14,
   95:17, 109:21
**office** [6] - 7:17, 13:6, 29:15,
   34:25, 65:24, 72:2
**OFFICE** [1] - 1:18
**office's** [1] - 34:16
**officer** [8] - 18:20, 20:9,
   20:11, 29:24, 63:22, 141:1,

**offices** [5] - 34:6, 34:8, 34:20, 77:11, 138:13
**official** [3] - 30:6, 71:9, 114:24
**Official** [2] - 1:6, 3:9
**OFFICIAL** [1] - 144:1
**officials** [1] - 60:10
**often** [2] - 109:1, 135:25
**old** [5] - 5:23, 6:16, 7:5, 17:12, 28:25
**older** [3] - 5:24, 28:18, 28:21
**olds** [3] - 75:15, 75:16, 75:18
**OMB** [2] - 110:6, 114:9
**once** [6] - 10:5, 12:6, 54:14, 90:6, 90:11, 136:12
**One** [1] - 2:23
**one** [102] - 10:24, 12:23, 18:13, 19:21, 20:22, 20:23, 21:9, 21:10, 21:11, 22:5, 23:3, 24:4, 25:2, 32:25, 33:8, 33:15, 33:17, 37:8, 37:9, 42:24, 43:10, 43:13, 43:14, 43:25, 49:13, 51:21, 52:10, 55:21, 55:22, 58:15, 59:5, 59:6, 59:11, 60:6, 63:13, 64:9, 64:18, 68:3, 69:4, 69:15, 69:25, 70:14, 70:22, 70:25, 71:5, 71:24, 72:9, 72:24, 74:22, 76:3, 77:6, 77:7, 78:16, 83:20, 86:13, 86:19, 88:11, 91:22, 92:22, 92:24, 93:20, 96:5, 96:10, 96:15, 97:20, 98:18, 100:7, 101:16, 101:23, 111:25, 113:20, 114:20, 115:23, 117:5, 117:12, 118:1, 120:21, 121:10, 121:15, 121:18, 122:4, 122:24, 123:1, 123:17, 124:9, 125:9, 127:22, 128:4, 129:4, 129:15, 130:21, 131:7, 134:4, 136:23, 139:6, 140:11, 140:17, 141:23
**ones** [4] - 15:14, 16:18, 107:8, 108:19
**open** [1] - 132:19
**opened** [1] - 52:7
**opening** [1] - 52:4
**operating** [2] - 31:18, 32:20
**operators** [2] - 118:11, 118:19
**opinion** [26] - 15:20, 28:21, 31:21, 32:8, 32:22, 33:3, 33:6, 37:24, 59:18, 75:6, 75:22, 79:5, 81:11, 83:9, 88:9, 88:12, 116:21, 116:23, 119:23, 120:3, 120:5, 120:11, 124:17,

**opinions** [1] - 120:2
**opportunity** [4] - 17:15, 61:13, 115:15, 141:18
**oppose** [2] - 5:13, 6:23
**opposed** [1] - 28:13
**opposition** [6] - 13:24, 14:11, 23:1, 24:11, 26:3, 99:14
**option** [1] - 131:18
**order** [7] - 15:10, 18:15, 35:8, 59:17, 103:14, 117:21, 130:11
**ordinary** [2] - 21:1, 21:4
**Oreo** [1] - 109:5
**organizations** [1] - 72:20
**organize** [2] - 89:9, 89:19
**organized** [2] - 59:9, 90:3
**organizing** [2] - 90:7, 90:8
**orientation** [1] - 13:21
**original** [1] - 105:13
**originally** [2] - 64:6, 128:8
**Oscar** [1] - 98:20
**otherwise** [3] - 104:7, 119:15, 119:17
**ought** [4] - 18:12, 27:3, 27:8, 27:9
**out-of-county** [1] - 58:17
**out-of-order** [1] - 103:14
**outcome** [3] - 26:13, 56:14, 59:8
**outrageously** [1] - 97:8
**outside** [4] - 41:8, 53:5, 71:19, 136:13
**over-designation** [1] - 36:5
**over-the-road** [2] - 117:12, 117:13
**overall** [2] - 108:22, 113:25
**overcome** [1] - 13:23
**overrepresented** [1] - 131:6
**overruled** [1] - 30:5
**oversee** [1] - 107:2
**overwhelmingly** [3] - 31:1, 31:4, 32:5
**owe** [4] - 7:9, 29:17, 35:5
**own** [10] - 61:21, 70:21, 89:3, 91:17, 116:18, 122:15, 122:20, 124:22, 135:16, 135:20

## P

**P.C** [1] - 2:15
**P.M** [2] - 1:6, 1:11
**p.m** [3] - 1:10, 92:13, 143:21
**page** [13] - 36:8, 58:14, 76:10, 83:19, 83:21, 84:10, 85:14, 85:15, 86:20, 87:14, 110:7, 123:11

**PALENCHAR** [1] - 1:23
**paper** [5] - 19:23, 40:12, 45:11, 46:9, 114:2
**paragraph** [1] - 76:12
**parallel** [2] - 97:14
**parameters** [1] - 31:17
**pardon** [1] - 78:15
**parking** [2] - 29:6, 29:23
**parliamentary** [1] - 91:7
**part** [19] - 13:20, 13:22, 22:11, 42:21, 44:6, 47:12, 54:21, 64:19, 70:1, 72:14, 80:7, 84:19, 85:25, 86:19, 92:17, 92:21, 121:22, 131:3, 134:5
**participate** [7] - 8:3, 108:20, 111:5, 111:19, 111:20, 118:7, 118:22
**participated** [1] - 112:14
**participation** [2] - 67:14, 118:3
**particular** [16] - 5:17, 5:19, 5:20, 19:25, 28:17, 55:5, 61:3, 69:4, 72:25, 84:9, 84:19, 88:1, 89:16, 108:24, 108:25, 115:17
**particularly** [5] - 8:16, 15:21, 33:20, 44:8, 128:23
**parties** [3] - 31:12, 66:4, 94:2
**partisan** [2] - 75:4, 75:9
**partisanship** [1] - 75:5
**parts** [3] - 10:19, 11:15, 80:23
**party** [6] - 33:20, 55:24, 77:15, 77:18, 77:19, 143:1
**Party** [3] - 67:17, 67:20, 67:21
**Paso** [5] - 134:3, 134:4, 134:6, 134:7, 136:24
**Pass** [1] - 136:21
**pass** [24] - 8:5, 12:15, 12:16, 12:17, 13:13, 13:24, 16:25, 17:10, 18:17, 19:6, 19:10, 19:16, 19:21, 21:2, 28:12, 29:18, 31:4, 51:6, 69:7, 116:8, 141:7, 141:11, 142:2, 142:7
**passage** [4] - 27:21, 69:14, 70:4, 71:17
**passed** [17] - 12:12, 12:13, 12:18, 15:10, 17:4, 19:4, 19:13, 19:17, 20:24, 21:14, 26:8, 26:21, 30:25, 33:4, 33:11, 72:1, 75:4
**passing** [5] - 14:5, 15:24, 19:3, 70:10, 82:11
**passport** [1] - 6:18
**past** [5] - 17:16, 20:24, 35:7, 67:14, 99:15
**path** [1] - 84:9

**PATRICK** [1] - 1:16
**Patsy** [1] - 138:3
**patterned** [1] - 16:11
**patterns** [1] - 119:11
**Pause** [1] - 139:23
**pay** [2] - 7:13, 128:12
**paying** [2] - 7:6, 17:6
**pays** [1] - 6:19
**Peachtree** [1] - 3:2
**penalty** [1] - 29:12
**pending** [1] - 141:17
**Pennsylvania** [1] - 2:8
**people** [69] - 5:23, 6:8, 6:15, 11:3, 13:5, 22:2, 24:6, 27:6, 28:6, 29:11, 29:17, 31:25, 32:4, 32:10, 32:14, 33:11, 33:14, 40:8, 42:3, 43:13, 44:11, 52:22, 56:8, 57:11, 57:18, 57:19, 58:3, 58:9, 60:15, 61:2, 63:16, 64:14, 64:17, 70:14, 93:6, 93:9, 93:13, 93:15, 94:5, 94:7, 94:8, 95:11, 95:13, 95:16, 98:20, 101:24, 101:25, 102:1, 108:18, 111:19, 111:20, 111:22, 112:13, 112:21, 112:23, 112:24, 113:20, 114:23, 115:17, 115:20, 126:5, 126:6, 127:25, 128:1, 128:22, 129:7, 135:4
**per** [4] - 74:21, 105:6, 135:12, 135:13
**percent** [61] - 10:8, 10:9, 10:10, 30:19, 108:6, 109:23, 110:14, 110:23, 111:2, 111:4, 111:7, 111:8, 111:11, 112:23, 113:9, 113:13, 113:25, 114:3, 114:4, 114:12, 114:13, 114:14, 114:17, 114:20, 114:23, 114:25, 115:1, 115:2, 115:5, 115:6, 116:5, 122:16, 124:18, 125:16, 126:2, 127:3, 127:9, 127:21, 127:23, 128:2, 128:8, 128:10, 128:12, 128:16, 128:18, 133:23, 134:15, 134:18, 134:21, 135:5
**percentage** [6] - 11:3, 127:21, 133:21, 134:12, 134:16, 134:20
**perfectly** [2] - 43:21, 124:12
**perhaps** [2] - 99:25, 136:14
**period** [3] - 29:1, 113:18, 119:24
**periodically** [2] - 69:2, 73:16
**permissible** [2] - 66:7, 132:7
**permission** [2] - 8:25,

132:10

**permit** [1] - 21:9
**perpetrated** [1] - 70:2
**person** [39] - 27:18, 28:22, 36:19, 39:4, 39:9, 40:13, 40:21, 41:3, 44:8, 45:13, 45:18, 46:6, 46:18, 47:15, 47:19, 49:14, 49:17, 49:22, 50:23, 58:23, 59:6, 59:14, 59:15, 59:21, 60:4, 60:16, 65:13, 65:18, 70:13, 94:22, 98:18, 101:7, 101:17, 102:7, 103:23, 105:2, 117:16, 119:4, 119:13
**personal** [7] - 32:4, 40:9, 45:12, 45:16, 64:11, 90:5, 98:2
**personally** [1] - 6:4
**persons** [2] - 64:18, 115:18
**PETER** [2] - 4:3, 5:9
**Pew** [19] - 113:6, 113:13, 113:16, 113:21, 113:24, 114:2, 114:11, 114:21, 115:7, 115:9, 115:11, 121:23, 127:12, 127:17, 127:21, 127:22, 127:24, 130:24
**pharmacist** [1] - 139:12
**phone** [3] - 60:16, 65:20, 119:23
**phone-based** [1] - 119:23
**phones** [2] - 113:21, 113:22
**photo** [7] - 14:18, 24:5, 27:20, 31:2, 38:8, 38:12, 137:1
**phrase** [1] - 108:9
**phrased** [1] - 110:18
**physically** [1] - 36:12
**pick** [2] - 6:6, 143:16
**picture** [3] - 6:17, 86:14, 86:22
**piece** [7] - 13:12, 21:1, 40:12, 45:11, 46:8, 93:14, 102:20
**pieces** [2] - 20:16, 84:24
**pin** [1] - 41:18
**place** [7] - 18:23, 24:2, 24:4, 35:6, 72:25, 119:19, 142:8
**placed** [1] - 132:24
**Plaintiff** [3] - 1:4, 1:16, 36:4
**plaintiff's** [1] - 56:19
**Plaintiff's** [5] - 40:16, 41:24, 41:25, 45:25, 46:1
**planning** [2] - 72:21, 109:9
**PLATTS** [1] - 2:3
**play** [2] - 33:15, 131:22
**played** [2] - 74:9, 132:19
**Plaza** [1] - 2:23
**pleased** [1] - 96:4
**pleasure** [1] - 20:8

**plus** [3] - 22:4, 111:10, 138:4
**podium** [1] - 66:2
**point** [17] - 14:3, 37:8, 38:21, 72:25, 74:22, 76:1, 91:6, 91:13, 91:16, 91:18, 102:2, 104:23, 122:14, 122:18, 122:19, 124:23, 127:4
**points** [1] - 101:23
**polarized** [2] - 77:12, 77:20
**police** [2] - 13:4, 13:8
**policy** [4] - 15:15, 23:6, 23:7, 109:15
**polite** [2] - 37:13, 50:21
**political** [9] - 33:15, 67:3, 88:20, 89:1, 90:13, 91:5, 91:17, 94:14, 109:10
**politics** [9] - 27:8, 67:8, 72:8, 73:15, 75:4, 90:23, 91:9, 91:18
**poll** [2] - 33:12, 38:10
**polling** [1] - 38:7
**polls** [6] - 6:2, 6:3, 38:11, 38:14, 38:21, 38:24
**poor** [9] - 11:3, 11:4, 11:6, 114:14, 127:21, 127:25, 128:1, 131:4
**poorest** [2] - 10:4, 135:11
**poorly** [1] - 110:18
**popular** [1] - 53:3
**population** [28] - 69:7, 75:15, 92:5, 108:22, 110:19, 110:25, 111:1, 111:23, 112:18, 114:7, 120:7, 120:13, 120:19, 120:23, 121:4, 121:9, 121:13, 122:8, 123:3, 123:22, 125:6, 125:11, 126:8, 126:10, 128:24, 129:2, 131:2, 131:3
**populations** [1] - 128:25
**portable** [1] - 104:15
**portion** [5] - 7:12, 83:15, 84:10, 85:13, 87:14
**posed** [2] - 64:22, 64:24
**position** [4] - 62:7, 83:1, 97:12, 97:22
**possess** [2] - 116:3, 116:24
**possession** [1] - 39:12
**possibilities** [1] - 128:13
**possibility** [1] - 95:18
**possible** [4] - 15:23, 107:10, 109:24, 110:2
**potential** [3] - 108:14, 120:5, 120:11
**potentially** [6] - 92:24, 98:12, 110:3, 118:20, 120:6, 120:12
**poverty** [4] - 135:8, 135:14, 135:15, 136:3
**practical** [1] - 74:3

**practice** [4] - 54:15, 60:2, 60:3, 60:7
**practicing** [1] - 54:10
**pray** [1] - 18:24
**prayer** [1] - 140:7
**precedent** [1] - 56:2
**precincts** [1] - 6:14
**predict** [1] - 111:22
**predominantly** [1] - 10:13
**preference** [2] - 77:5, 77:9
**preferences** [1] - 77:2
**preliminary** [1] - 59:3
**prepared** [2] - 67:12, 76:5
**preparing** [1] - 76:4
**prerogative** [1] - 15:16
**presence** [3] - 34:19, 34:25, 77:11
**present** [6] - 27:22, 64:12, 91:11, 101:8, 102:11, 142:20
**presented** [3] - 9:4, 66:15, 128:18
**presently** [1] - 54:1
**president** [2] - 14:6, 20:13
**President** [3] - 6:10, 8:1, 8:2
**presidential** [1] - 14:4
**presiding** [6] - 18:20, 20:9, 20:11, 140:25, 142:1, 142:3
**Presidio** [1] - 136:4
**press** [3] - 13:10, 14:5, 71:21
**presses** [1] - 128:17
**pressure** [1] - 71:5
**pretty** [14] - 16:24, 19:8, 22:25, 24:17, 49:24, 70:13, 122:13, 126:21, 136:2, 136:4, 136:5, 136:11, 138:14
**prevent** [2] - 70:11, 133:3
**previous** [1] - 123:4
**previously** [1] - 5:9
**primaries** [1] - 77:3
**primarily** [2] - 133:20, 134:1
**primary** [9] - 29:2, 77:5, 77:7, 77:8, 77:12, 77:17, 77:21, 108:3, 108:5
**Princeton** [1] - 2:13
**principally** [1] - 70:20
**print** [1] - 42:3
**priority** [1] - 29:20
**private** [2] - 54:14, 56:17
**privilege** [6] - 12:11, 34:14, 51:18, 51:22, 103:22, 141:14
**problem** [17] - 6:24, 29:9, 29:10, 40:1, 47:12, 49:17, 57:19, 63:5, 93:17, 95:15, 99:22, 101:5, 105:2, 105:5, 111:12, 112:10

**problems** [8] - 62:8, 63:7, 64:1, 93:5, 108:14, 110:15, 112:5, 130:18
**procedural** [2] - 15:23, 15:25
**procedure** [3] - 14:22, 49:10, 100:10
**procedures** [2] - 24:3, 56:13
**proceed** [3] - 45:5, 53:11, 132:10
**Proceedings** [2] - 3:12, 143:21
**proceedings** [1] - 144:4
**process** [5] - 51:11, 73:1, 80:14, 90:25, 91:2
**produce** [2] - 62:25, 113:10
**produced** [7] - 3:12, 44:5, 64:4, 64:7, 93:20, 94:15, 95:11
**product** [1] - 75:10
**professional** [2] - 72:12, 90:23
**professor** [3] - 67:3, 67:6, 89:6
**Professor** [35] - 40:18, 41:1, 43:12, 61:15, 61:19, 62:5, 63:10, 63:15, 63:24, 65:11, 93:5, 93:19, 94:12, 94:13, 94:15, 96:25, 104:23, 120:4, 120:6, 120:10, 120:12, 120:23, 121:2, 121:7, 121:12, 122:6, 122:24, 123:2, 123:21, 125:10, 125:13, 125:22, 126:4, 126:8, 129:6
**profile** [1] - 13:19
**program** [2] - 94:14, 97:7
**progress** [1] - 11:23
**progression** [1] - 27:24
**projections** [1] - 68:11
**promoting** [1] - 81:25
**propensity** [1] - 28:22
**properly** [1] - 100:24
**proponents** [1] - 70:18
**proposition** [1] - 113:9
**prosecutions** [1] - 58:17
**prospectively** [1] - 21:13
**proud** [3] - 12:10, 12:14, 16:22
**prove** [3] - 102:7, 126:1
**provide** [6] - 79:5, 79:15, 82:23, 93:24, 113:2, 116:5
**provided** [5] - 23:24, 32:7, 93:21, 117:10, 122:11
**providers** [1] - 117:25
**provides** [1] - 124:18
**province** [1] - 43:10
**provision** [1] - 55:25
**public** [10] - 11:4, 15:15, 21:10, 21:15, 21:23, 34:9, 52:9, 52:10, 119:23, 136:8

**Public** [2] - 48:2, 48:9
**publicized** [2] - 12:23, 13:5
**publicly** [1] - 88:23
**pull** [1] - 32:12
**punch** [1] - 60:12
**purchased** [1] - 95:19
**purports** [1] - 80:7
**purpose** [30] - 68:1, 81:22, 82:23, 83:2, 83:6, 83:9, 83:24, 84:4, 84:13, 84:14, 84:16, 85:4, 85:5, 85:8, 85:16, 85:18, 85:19, 85:21, 86:10, 86:18, 87:8, 88:4, 88:10, 88:13, 88:16, 88:19, 108:25, 109:3, 114:2, 116:2
**purposes** [9] - 33:18, 74:3, 79:20, 86:14, 86:22, 86:23, 88:11, 88:14, 125:20
**put** [25] - 24:4, 29:11, 30:7, 31:18, 32:13, 40:11, 45:17, 56:2, 57:1, 60:11, 63:21, 75:3, 79:24, 87:13, 89:17, 90:14, 91:10, 94:5, 94:20, 95:12, 99:18, 104:7, 132:9, 138:16, 141:5
**puts** [1] - 24:1
**Putte** [2] - 139:8, 139:11
**putting** [2] - 47:4, 96:8
**PX** [1] - 49:11
**PX-1** [1] - 92:21

## Q

**qualifications** [1] - 67:15
**qualitative** [1] - 67:10
**quality** [4] - 99:13, 107:9, 119:25, 129:5
**quantitative** [1] - 67:10
**quarter** [2] - 119:13, 132:2
**quarterback** [1] - 7:25
**query** [2] - 103:3, 103:13
**questioned** [2] - 103:3, 103:10
**questioning** [3] - 43:2, 85:10, 133:7
**questions** [34] - 8:4, 14:12, 25:19, 27:4, 27:11, 27:12, 33:25, 34:5, 38:14, 43:6, 44:17, 45:1, 45:2, 45:8, 50:4, 50:7, 51:14, 61:6, 78:3, 78:25, 87:2, 87:5, 87:6, 88:7, 91:24, 101:3, 116:8, 119:22, 124:1, 124:7, 131:11, 132:24, 132:25, 133:4
**quick** [1] - 88:8
**quickly** [3] - 98:13, 105:7, 138:24

**quite** [6] - 34:21, 52:3, 84:20, 105:4, 135:25, 138:22
**quorum** [1] - 17:12
**quote** [2] - 93:9, 100:2

## R

**race** [22] - 12:7, 13:20, 13:22, 14:4, 25:15, 32:13, 33:19, 47:15, 47:19, 49:21, 58:10, 58:13, 63:13, 70:23, 71:18, 72:5, 72:11, 73:5, 88:10, 92:23, 127:16
**racial** [20] - 11:19, 11:21, 11:25, 13:2, 13:6, 13:18, 21:12, 36:12, 43:13, 67:25, 85:8, 86:10, 86:18, 88:4, 88:10, 88:16, 88:19, 89:2, 91:8, 134:22
**racially** [4] - 10:7, 68:4, 77:11, 77:20
**racism** [5] - 73:16, 73:25, 74:4, 75:1, 75:6
**Racism** [1] - 73:24
**Railroad** [1] - 77:4
**raised** [2] - 9:6, 28:8
**rallies** [1] - 71:22
**ran** [3] - 69:3, 138:25, 139:1
**RANDALL** [3] - 4:7, 53:16, 53:24
**Randall** [2] - 53:13, 53:22
**Rangers** [1] - 35:7
**rate** [41] - 62:5, 108:5, 108:9, 108:14, 108:25, 109:7, 109:23, 109:25, 110:2, 110:4, 110:11, 110:14, 110:22, 110:23, 111:12, 113:10, 113:14, 113:23, 114:2, 115:5, 116:25, 118:6, 120:4, 120:10, 120:17, 122:16, 124:18, 125:4, 125:16, 126:2, 126:5, 126:19, 127:4, 127:9, 127:13, 128:10, 128:12, 128:19, 129:5, 129:10, 130:20
**rates** [6] - 107:16, 109:18, 114:9, 122:15, 128:9, 135:8
**rather** [2] - 109:13, 137:25
**rationale** [6] - 68:3, 69:13, 69:14, 75:4, 88:18
**Raymond** [2] - 74:12, 74:13
**re** [2] - 17:9, 63:21
**re-districting** [1] - 17:9
**re-serve** [1] - 63:21
**reach** [7] - 88:22, 91:14, 103:7, 108:12, 112:14, 113:20, 143:2

**reached** [2] - 19:3, 68:21
**reaction** [3] - 26:6, 126:15, 138:19
**read** [24] - 40:2, 76:12, 76:14, 76:15, 76:22, 76:25, 79:13, 80:5, 80:19, 80:23, 81:11, 81:16, 82:14, 82:18, 83:15, 83:16, 84:10, 84:23, 85:13, 86:19, 87:20, 89:25, 90:2, 120:8
**reading** [1] - 83:21
**ready** [1] - 78:19
**real** [4] - 64:1, 70:4, 74:8, 105:2
**reality** [1] - 74:9
**realize** [2] - 63:14, 141:25
**realized** [1] - 70:3
**reallocate** [1] - 112:16
**really** [25] - 7:11, 14:7, 45:14, 51:13, 59:6, 61:16, 61:20, 68:23, 70:4, 70:17, 71:6, 72:4, 72:23, 73:2, 73:24, 74:7, 74:25, 75:10, 84:19, 89:13, 89:19, 100:23, 108:20, 111:22, 140:1
**reapportion** [1] - 18:12
**reason** [20] - 28:14, 30:10, 42:13, 44:23, 48:22, 48:24, 51:3, 69:6, 70:4, 71:25, 75:4, 81:3, 81:14, 81:18, 82:1, 85:3, 101:12, 105:6, 119:10, 129:5
**reasons** [5] - 70:5, 70:6, 70:23, 99:23, 129:23
**Rebecca** [1] - 144:3
**REBECCA** [1] - 3:9
**receipt** [1] - 118:21
**receive** [1] - 27:13
**received** [2] - 107:19, 130:22
**receiving** [2] - 26:11, 118:7
**recent** [1] - 72:18
**recently** [2] - 13:4, 68:9
**recess** [1] - 105:19
**Recess** [1] - 92:13
**recognize** [3] - 20:11, 49:21, 109:23
**recognized** [2] - 20:8
**recognizing** [1] - 81:8
**recollection** [4] - 15:5, 48:3, 48:8, 48:11
**RECORD** [1] - 76:8
**record** [29] - 5:4, 9:20, 11:11, 16:22, 16:24, 21:17, 23:9, 24:8, 26:18, 47:4, 51:3, 53:23, 65:16, 66:23, 68:23, 74:10, 89:2, 89:10, 90:19, 92:19, 93:4, 93:16, 101:9, 104:18, 106:21, 110:5, 124:2, 143:9, 144:4
**records** [3] - 11:7, 43:16,

**recount** [1] - 57:12
**recross** [1] - 103:15
**RECROSS** [1] - 4:2
**rectified** [1] - 63:11
**redirect** [8] - 8:21, 50:8, 50:9, 85:10, 103:14, 105:24, 124:5, 126:18
**REDIRECT** [5] - 4:2, 50:10, 52:24, 87:8, 129:21
**redistricting** [8] - 17:8, 17:9, 18:11, 67:18, 71:24, 72:8, 89:15, 102:19
**redo** [1] - 84:23
**reference** [4] - 21:23, 36:6, 69:19, 121:23
**referenced** [2] - 67:9, 92:4, 121:23
**referred** [1] - 42:17
**referring** [1] - 62:15
**refers** [1] - 111:13
**reflect** [2] - 108:21, 111:23
**reflected** [1] - 110:25
**reflections** [1] - 14:23
**reforms** [1] - 16:23
**reframe** [1] - 79:25
**refresh** [3] - 48:3, 48:7, 48:11
**refused** [2] - 94:4, 94:5
**regard** [1] - 143:8
**regardless** [1] - 142:25
**register** [3] - 24:1, 24:5, 75:19
**registered** [3] - 31:10, 48:25, 116:24
**registering** [1] - 75:13
**registration** [5] - 21:10, 23:23, 24:21, 31:7, 60:14
**regular** [2] - 85:10, 132:14
**regulated** [2] - 118:20
**regulating** [1] - 118:21
**regulation** [1] - 107:9
**rejected** [1] - 32:17
**related** [3] - 56:6, 114:16, 127:19
**relates** [1] - 33:20
**relations** [1] - 73:5
**relative** [1] - 62:21
**relatively** [1] - 102:20
**relevant** [3] - 69:11, 93:25, 116:24
**reliable** [1] - 129:25
**relied** [2] - 82:15, 88:23
**relies** [1] - 114:10
**relying** [2] - 62:13, 82:22
**remain** [1] - 44:19
**remaining** [1] - 110:19
**remember** [10] - 5:25, 21:8, 21:25, 22:25, 23:25, 29:6,

88:23

35:18, 39:4, 71:3, 131:8
**remittances** [1] - 71:12
**remotely** [1] - 104:11
**removed** [3] - 63:1, 128:3, 128:5
**render** [1] - 80:11
**rendering** [1] - 83:8
**repeat** [2] - 81:9, 124:4
**report** [50] - 25:3, 25:25, 44:7, 54:7, 67:12, 67:14, 68:2, 68:6, 68:21, 70:25, 71:2, 72:7, 72:13, 73:9, 75:21, 76:4, 76:10, 76:19, 79:6, 79:12, 79:15, 79:18, 80:5, 80:7, 80:11, 82:5, 82:15, 82:18, 85:7, 85:16, 85:18, 86:9, 86:16, 87:22, 89:14, 89:21, 89:25, 90:12, 92:6, 92:15, 94:10, 94:12, 105:18, 117:9, 117:23, 118:10, 119:3, 121:1, 125:12
**Report** [5] - 32:2, 32:3, 82:19, 82:21, 82:23
**reported** [10] - 3:12, 58:12, 113:15, 114:5, 114:11, 114:21, 115:1, 115:4, 115:11, 127:15
**REPORTER** [2] - 144:1, 144:10
**reporter** [2] - 84:23, 132:13
**Reporter** [2] - 3:9, 3:9
**reports** [1] - 89:11
**represent** [15] - 9:11, 10:18, 11:5, 15:22, 23:18, 25:1, 64:9, 78:24, 130:5, 132:4, 132:23, 133:10, 135:2, 135:4, 135:7
**representation** [1] - 136:6
**Representative** [10] - 30:14, 69:4, 69:5, 74:12, 74:13, 74:15, 91:24, 91:25, 133:15
**representative** [23] - 30:18, 71:3, 111:5, 115:22, 120:19, 120:23, 121:3, 121:8, 121:13, 121:20, 122:7, 122:10, 123:2, 123:22, 124:23, 125:5, 125:11, 125:13, 126:21, 127:3, 127:25, 131:8
**representativeness** [2] - 122:17, 124:19
**Representatives** [3] - 57:14, 91:25, 92:2
**representatives** [1] - 38:2
**represented** [10] - 10:5, 10:12, 26:15, 30:19, 55:18, 55:25, 56:3, 94:3, 135:22, 136:19

**representing** [1] - 37:24
**Republican** [10] - 55:18, 55:22, 55:24, 56:3, 57:21, 67:17, 67:20, 67:21, 77:5, 143:7
**Republicans** [4] - 19:1, 77:21, 77:22, 114:13
**requested** [1] - 108:7
**requests** [1] - 118:21
**require** [3] - 24:4, 31:1, 115:12
**required** [1] - 116:4
**requirement** [2] - 38:9, 38:13
**requiring** [1] - 29:14
**research** [24] - 67:7, 67:9, 67:10, 68:16, 68:23, 69:22, 89:6, 89:7, 89:10, 89:11, 90:3, 90:11, 90:20, 91:10, 91:19, 107:15, 109:4, 111:14, 124:17, 124:21, 125:3, 125:18, 128:14
**reservation** [1] - 119:4
**reservations** [1] - 4:15
**reside** [3] - 54:1, 58:10, 61:3
**resides** [1] - 46:8
**resolution** [6] - 16:10, 18:9, 18:15, 18:16, 18:22, 19:3, 19:4, 19:6, 19:13, 131:16
**resolutions** [6] - 19:19, 19:21, 140:10, 141:1, 141:2, 141:4
**resolve** [1] - 102:25
**resolved** [2] - 18:11, 19:21
**resources** [1] - 109:10
**respect** [5] - 64:16, 93:25, 94:21, 95:22, 112:20
**respond** [6] - 27:4, 47:16, 52:1, 105:16, 130:4, 141:16
**responded** [5] - 108:18, 112:23, 112:24, 112:25, 124:20
**respondent** [1] - 111:12
**respondents** [1] - 129:1
**responders** [10] - 120:18, 120:22, 121:2, 121:7, 121:12, 122:6, 123:21, 125:5, 125:10, 125:13
**response** [53] - 27:13, 27:16, 62:24, 87:20, 88:1, 92:4, 107:16, 108:5, 108:9, 108:14, 108:25, 109:7, 109:17, 109:23, 109:25, 110:1, 110:4, 110:11, 110:14, 110:22, 110:23, 111:11, 111:12, 113:10, 113:14, 113:23, 114:2, 114:9, 115:5, 118:6, 120:4, 120:10, 120:17, 122:14, 122:16, 124:18, 125:4,

125:16, 126:2, 126:5, 126:18, 126:19, 127:4, 127:8, 127:9, 127:13, 128:9, 128:10, 128:12, 128:18, 129:5, 129:9, 130:20
**responses** [7] - 111:3, 126:20, 129:24, 130:11, 130:22
**responsible** [1] - 98:21
**rest** [5] - 37:11, 125:5, 129:2, 138:18, 140:19
**restate** [1] - 130:7
**restricting** [1] - 31:13
**restrictive** [5] - 27:25, 28:1, 28:4, 28:10
**result** [3] - 70:22, 94:10, 103:5
**results** [6] - 54:24, 103:8, 112:6, 113:10, 120:6, 120:12, 126:7, 126:10
**resume** [1] - 5:7
**resume'** [1] - 107:13
**resumed** [1] - 139:24
**retained** [4] - 86:13, 86:16, 86:24, 87:1
**returned** [2] - 95:2, 140:11
**REV** [2] - 4:3, 5:9
**reveal** [1] - 77:11
**reveals** [1] - 89:2
**Reverend** [9] - 5:13, 6:6, 8:5, 8:13, 11:12, 11:18, 11:21, 28:18, 29:5
**reversed** [1] - 56:1
**review** [2] - 107:23, 108:1
**reviewed** [2] - 76:4, 121:22
**reviewing** [1] - 83:2
**rhetoric** [6] - 70:7, 70:16, 73:10, 74:3, 82:7, 91:6
**rich** [2] - 28:23, 39:3
**rid** [1] - 72:3
**rights** [4] - 5:17, 7:2, 8:17, 16:24
**Rights** [4] - 2:7, 74:18, 74:19, 74:21
**Rio** [4] - 136:16, 136:17, 136:20, 136:21
**rip** [1] - 19:10
**ripe** [2] - 16:14, 16:19
**RISA** [1] - 2:5
**risk** [1] - 120:17
**road** [2] - 117:12, 117:13
**ROBERT** [1] - 1:13
**Rodney** [3] - 9:3, 9:19, 25:10
**RODNEY** [3] - 4:5, 9:14, 9:21
**role** [2] - 69:9
**roll** [2] - 140:7, 142:1
**Room** [2] - 2:8, 3:10
**room** [5] - 19:22, 21:3, 64:14, 64:18, 64:19

**ROSEMARY** [1] - 1:13
**Rosenberg** [3] - 66:13, 106:3, 123:19
**ROSENBERG** [23] - 2:11, 65:6, 66:13, 78:7, 106:2, 106:17, 106:20, 107:12, 107:21, 107:22, 110:5, 110:8, 116:7, 123:12, 124:2, 124:7, 129:13, 129:15, 129:18, 129:22, 130:5, 130:8, 131:11
**ROSENBURG** [2] - 8:25, 9:3
**rounds** [1] - 72:7
**RPR** [1] - 3:9
**rule** [3] - 18:4, 142:17, 143:8
**Rule** [1] - 16:5
**rules** [6] - 19:4, 32:20, 91:6, 91:7, 141:17, 143:6
**run** [6] - 98:6, 103:3, 103:11, 103:13, 120:17
**running** [3] - 14:6, 77:21, 77:22
**rushing** [1] - 30:7

---

## S

**Sabbath** [1] - 95:3
**sabbatical** [1] - 91:1
**sacred** [1] - 6:8
**safeguarding** [1] - 81:17
**Safety** [2] - 48:3, 48:9
**Sager** [2] - 94:15, 104:23
**same-day** [3] - 21:10, 23:22, 24:21
**sample** [6] - 107:2, 111:5, 112:12, 115:22, 118:17, 127:25
**sampling** [3] - 107:15, 111:15, 112:1
**San** [7] - 61:4, 67:3, 134:2, 134:4, 136:10, 136:12, 136:23
**SANCHEZ** [16] - 3:5, 66:21, 76:2, 76:9, 76:20, 76:24, 78:3, 79:21, 79:23, 81:5, 83:19, 87:5, 87:7, 87:9, 88:7, 92:10
**Sanchez** [2] - 4:4, 66:15
**satisfied** [1] - 99:3
**Saturday** [5] - 61:25, 62:22, 93:22, 94:17, 94:20
**saw** [3] - 71:20, 71:23, 93:10
**SB14** [9] - 68:3, 69:12, 75:4, 79:8, 79:10, 83:6, 101:11, 116:4, 116:25
**scale** [2] - 59:8, 128:6
**scenarios** [1] - 105:18
**schedule** [1] - 115:16
**scheme** [2] - 7:10, 7:11

**scholarly** [2] - 89:10, 89:11
**school** [3] - 21:15, 67:2, 134:9
**schools** [1] - 11:4
**science** [3] - 67:4, 91:18, 99:15
**Sciences** [1] - 72:20
**sciences** [1] - 94:15
**scientific** [1] - 116:2
**scientist** [4] - 88:20, 89:1, 90:13, 91:5
**scope** [2] - 41:9, 53:5
**SCOTT** [1] - 1:23
**scratch** [1] - 69:10
**screen** [5] - 43:15, 45:10, 45:12, 45:17, 49:11
**scribbled** [1] - 96:19
**se** [2] - 74:21, 105:6
**seams** [1] - 18:23
**search** [4] - 6:24, 85:22, 98:18, 102:5
**searches** [1] - 98:22
**seasonal** [1] - 117:22
**seasons** [1] - 119:12
**seat** [1] - 5:2
**seats** [1] - 6:13
**second** [9] - 23:22, 36:8, 73:14, 96:15, 100:25, 113:21, 124:9, 135:10, 141:9
**seconds** [1] - 98:19
**Secretary** [5] - 26:5, 26:11, 27:14, 54:13, 138:3
**section** [1] - 58:15
**Section** [3] - 2:7, 74:19, 87:10
**sections** [3] - 68:2, 70:25, 139:18
**Security** [1] - 93:21
**see** [29] - 7:18, 11:10, 32:12, 35:17, 40:13, 40:21, 43:14, 49:7, 49:11, 49:13, 50:22, 53:8, 60:14, 70:1, 85:8, 85:19, 85:22, 86:9, 86:17, 88:15, 88:22, 96:18, 98:7, 104:8, 114:5, 116:17, 126:20, 129:1, 130:16
**seek** [2] - 87:24, 88:3
**seeking** [3] - 26:10, 61:23, 139:12
**seem** [1] - 41:5
**sells** [1] - 92:14
**Sells** [9] - 92:17, 92:18, 92:19, 93:23, 97:4, 98:3, 102:11, 104:12, 104:21
**SELLS** [5] - 92:19, 93:24, 102:12, 102:18, 105:16
**semester** [1] - 91:1
**Senate** [93] - 5:13, 5:17, 7:2, 7:21, 9:23, 9:24, 10:6,

14:18, 15:17, 16:10, 16:12, 17:1, 18:6, 18:9, 18:20, 19:4, 19:5, 19:7, 19:10, 19:11, 19:16, 19:25, 20:11, 20:13, 21:2, 21:5, 26:4, 26:24, 27:12, 28:9, 31:2, 31:5, 31:6, 31:18, 31:21, 33:3, 33:4, 35:24, 37:23, 38:3, 55:5, 55:6, 55:7, 55:23, 68:1, 68:22, 69:14, 70:9, 70:21, 70:23, 71:18, 73:6, 74:17, 74:20, 79:3, 79:6, 79:16, 80:15, 83:3, 84:13, 85:17, 85:18, 86:10, 86:14, 86:18, 86:22, 93:13, 133:8, 133:10, 133:12, 133:22, 133:24, 134:1, 134:10, 135:22, 137:2, 137:6, 137:19, 137:23, 138:3, 138:20, 139:1, 139:25, 140:6, 141:7, 141:11, 141:21, 141:24, 142:16, 142:19, 142:24
**Senate's** [1] - 140:20
**senator** [14] - 9:3, 20:17, 20:18, 21:3, 27:16, 30:6, 33:3, 34:5, 45:5, 51:21, 53:1, 55:6, 133:14, 138:15
**SENATOR** [3] - 4:5, 9:14, 132:19
**Senator** [64] - 9:8, 9:18, 12:18, 25:7, 25:10, 26:21, 27:11, 31:21, 33:2, 33:25, 35:15, 36:8, 36:10, 36:14, 36:15, 37:6, 37:14, 37:16, 37:18, 38:17, 40:1, 40:7, 40:23, 41:2, 43:6, 44:15, 44:16, 45:19, 46:17, 47:4, 48:16, 49:11, 49:21, 50:7, 50:12, 50:13, 50:16, 50:21, 51:5, 51:8, 51:16, 51:18, 51:19, 52:5, 53:8, 61:14, 62:19, 65:10, 73:13, 101:16, 101:18, 132:20, 137:18, 137:21, 138:10, 138:12, 138:22, 139:8, 139:11, 139:14, 142:6
**senatorial** [1] - 138:16
**senators** [16] - 14:11, 17:15, 20:1, 20:16, 24:24, 26:9, 34:12, 68:25, 139:4, 140:9, 142:17, 142:20, 143:1, 143:3, 143:6, 143:7
**Senators** [1] - 92:1
**send** [1] - 6:6
**senior** [3] - 5:21, 5:22, 6:1
**seniors** [2] - 6:25, 7:3
**sense** [2] - 27:7, 96:21
**sensitive** [1] - 22:22
**separate** [4] - 24:16, 97:17,

111:13, 112:3
**series** [1] - 132:24
**serious** [5] - 32:22, 63:5, 63:7, 106:9
**seriously** [1] - 57:25
**serve** [2] - 63:21, 133:14
**served** [2] - 54:13, 133:15
**service** [2] - 8:17, 8:18
**services** [1] - 138:11
**SESSION** [2] - 1:6, 1:11
**session** [10] - 14:2, 14:9, 15:11, 28:2, 28:10, 68:5, 68:25, 69:19, 71:1, 71:7
**sessions** [3] - 27:21, 69:16, 70:8
**set** [7] - 35:12, 40:17, 42:25, 61:21, 78:16, 96:20, 101:9
**sets** [4] - 42:23, 43:12, 93:6, 102:21
**setting** [1] - 90:5
**settlement** [1] - 18:7
**seven** [2] - 35:21, 113:17
**several** [2] - 23:24, 24:6
**severe** [1] - 86:3
**sexual** [1] - 13:21
**shall** [1] - 18:3
**share** [1] - 77:9
**shared** [1] - 77:6
**Shaw** [16] - 111:9, 113:2, 113:6, 113:14, 113:22, 115:10, 121:20, 125:22, 126:4, 126:8, 126:17, 126:18, 128:21, 129:19, 130:22, 130:25
**Shaw's** [27] - 107:23, 108:4, 109:10, 110:11, 110:15, 113:10, 113:19, 115:22, 116:1, 117:3, 120:4, 120:6, 120:10, 120:12, 120:23, 121:2, 121:7, 121:12, 122:6, 123:2, 123:21, 124:22, 125:10, 125:13, 127:8, 129:23, 130:10
**shifting** [1] - 73:9
**short** [3] - 50:9, 77:7, 119:24
**shortened** [1] - 99:2
**shorthand** [1] - 3:12
**shortly** [2] - 22:23, 51:1
**show** [9] - 29:18, 31:10, 34:12, 38:11, 40:8, 40:15, 40:20, 49:3, 63:25, 87:4, 93:18, 102:4, 128:4
**showed** [4] - 48:2, 50:13, 127:14, 131:10
**showing** [5] - 31:1, 36:2, 41:23, 45:7, 47:20
**shown** [3] - 46:24, 131:9, 132:13
**shows** [3] - 38:7, 59:21, 125:18

**SHRIVER** [1] - 2:22
**shy** [1] - 134:21
**sick** [6] - 137:17, 138:2, 138:21, 139:5, 139:7, 140:1
**side** [6] - 33:12, 33:13, 43:23, 56:18, 56:19, 134:2
**sign** [5] - 18:7, 24:5, 59:22, 59:24, 60:11
**sign-in** [1] - 59:24
**sIGNATURE** [1] - 144:10
**signed** [2] - 31:15, 60:15
**significance** [3] - 29:16, 68:6, 73:11
**significant** [1] - 68:20
**significantly** [1] - 112:20
**silence** [4] - 73:24, 74:5, 74:6, 74:25
**Silva** [1] - 73:23
**similar** [3] - 102:6, 115:11, 122:24
**simple** [3] - 19:12, 28:12, 128:4
**simply** [4] - 20:5, 25:25, 74:22, 138:16
**sin** [1] - 6:15
**single** [4] - 93:14, 100:14, 115:18
**sit** [3] - 6:13, 7:7, 7:8
**sitting** [1] - 142:4
**situation** [5] - 13:2, 87:21, 91:3, 118:24, 143:5
**six** [5] - 13:3, 13:11, 35:21, 133:13, 135:23
**size** [2] - 95:1, 97:2
**skill** [1] - 90:11
**skills** [2] - 90:3, 90:20
**skip** [3] - 17:16, 54:7, 141:1
**skirt** [2] - 18:3, 18:5
**slate** [1] - 73:3
**slick** [1] - 18:22
**slightly** [4] - 62:20, 100:3, 122:25, 124:24
**slip** [1] - 20:24
**slouched** [1] - 142:5
**small** [3] - 20:21, 51:17, 126:19
**smart** [3] - 44:20, 65:13, 65:18
**smile** [1] - 65:16
**so-called** [1] - 35:7
**social** [2] - 71:20, 99:15
**Social** [1] - 93:21
**socioeconomic** [1] - 128:25
**software** [4] - 94:14, 97:7, 102:20, 102:21
**soldier** [1] - 140:11
**soldiers** [1] - 141:5
**solicitor** [1] - 94:3

**solution** [3] - 6:24, 61:23, 104:1
**solve** [2] - 99:22, 101:5
**someone** [14] - 22:6, 22:7, 31:9, 35:7, 56:12, 59:4, 62:22, 79:23, 99:1, 101:9, 104:3, 104:4, 104:5
**Somervelle** [1] - 2:15
**sometimes** [6] - 20:21, 27:6, 67:7, 93:7, 96:21, 140:14
**somewhat** [1] - 122:24
**somewhere** [3] - 10:9, 43:2, 59:6
**soon** [1] - 95:5
**sorry** [15] - 42:4, 44:25, 45:14, 52:19, 60:25, 76:17, 86:4, 97:9, 98:1, 101:8, 123:12, 130:25, 131:24, 142:6, 143:12
**sort** [12] - 14:1, 22:5, 22:16, 44:25, 50:20, 55:22, 59:7, 85:23, 91:3, 96:20, 107:5, 129:24
**soul** [1] - 31:12
**sounds** [3] - 44:20, 66:9, 122:9
**sources** [1] - 70:1
**South** [6] - 10:11, 38:3, 71:12, 71:15, 77:1, 77:13
**southeast** [1] - 134:2
**southern** [2] - 37:13, 73:13
**Southwest** [1] - 75:12
**Spain** [2] - 95:2, 95:3
**Spanish** [1] - 73:21
**Spaw** [1] - 138:3
**Speaker** [1] - 18:7
**speaking** [6] - 16:6, 68:11, 69:2, 71:21, 136:20, 136:21
**speaks** [2] - 89:13, 126:9
**specializes** [1] - 106:25
**specific** [5] - 79:19, 83:8, 101:7, 101:8, 110:13
**specifically** [5] - 68:22, 71:14, 75:21, 110:6, 139:14
**speculation** [1] - 142:15
**speeches** [1] - 33:10
**speed** [1] - 98:22
**spell** [2] - 9:20, 53:23
**SPENCER** [2] - 1:22, 2:6
**spend** [4] - 7:7, 28:3, 60:22, 124:10
**spent** [3] - 57:14, 90:23, 128:14
**spics** [1] - 73:19
**spite** [1] - 26:13
**spoken** [1] - 56:25
**sponsor** [1] - 26:23
**spotlight** [1] - 14:7

**Sprang** [1] - 9:7
**spreading** [1] - 115:21
**Spring** [1] - 9:7
**SQL** [1] - 98:14
**square** [1] - 134:8
**St** [1] - 67:2
**STACEY** [1] - 1:17
**staff** [1] - 94:21
**stamps** [3] - 127:23, 127:24, 128:2
**stand** [8] - 6:2, 25:11, 57:1, 58:5, 95:13, 97:24, 106:5, 113:9
**standard** [4] - 113:13, 113:16, 114:3, 115:8
**standing** [1] - 61:21
**start** [9] - 6:21, 42:11, 60:15, 73:1, 73:2, 106:19, 110:21, 123:11, 132:7
**started** [7] - 68:23, 70:5, 79:2, 98:16, 118:14, 128:15, 140:19
**starting** [1] - 72:25
**starts** [1] - 85:14
**Stata** [6] - 94:13, 94:14, 95:19, 97:7, 97:11, 105:13
**STATE** [1] - 1:3
**state** [39] - 5:4, 8:16, 9:18, 10:5, 12:4, 14:8, 16:21, 17:21, 23:14, 24:1, 24:2, 29:15, 29:19, 30:6, 30:18, 35:8, 36:19, 53:21, 55:10, 55:15, 55:23, 56:6, 66:22, 68:11, 68:13, 71:3, 71:22, 72:11, 73:4, 74:1, 75:17, 82:6, 82:7, 82:10, 87:10, 91:4, 91:8, 142:17
**State** [32] - 7:9, 7:14, 7:15, 8:9, 8:15, 8:18, 9:23, 26:5, 26:11, 27:15, 32:7, 32:9, 44:6, 45:17, 54:16, 62:12, 63:2, 64:13, 64:22, 68:7, 68:12, 69:24, 70:19, 72:1, 74:18, 75:3, 78:8, 78:24, 106:3, 131:16, 133:15, 135:11
**state's** [1] - 12:11
**State's** [5] - 54:13, 61:14, 63:4, 89:24, 96:4
**statement** [5] - 52:9, 86:7, 130:10, 136:7, 139:19
**statements** [2] - 35:22, 121:21
**STATES** [3] - 1:1, 1:12, 1:14
**states** [2] - 23:25, 24:6
**States** [8] - 1:7, 9:9, 52:19, 62:10, 64:16, 65:19, 70:12, 134:11
**statewide** [1] - 29:10
**stating** [1] - 125:23

**statistically** [2] - 116:1, 116:6
**statistician** [4] - 89:5, 106:10, 106:24, 106:25
**statistics** [1] - 67:7
**status** [1] - 93:9
**step** [2] - 8:20, 8:23
**STEWART** [1] - 2:3
**stick** [1] - 86:2
**still** [9] - 14:15, 23:4, 28:24, 29:12, 29:23, 30:9, 31:10, 61:5, 84:10
**stipulate** [7] - 95:15, 97:22, 97:24, 99:24, 100:1, 100:5
**stipulation** [4] - 41:17, 42:5, 42:6, 103:7
**Stonestreet** [1] - 144:3
**STONESTREET** [1] - 3:9
**stood** [1] - 45:20
**stop** [7] - 64:1, 69:8, 92:6, 128:11, 128:17, 139:22, 143:12
**stops** [2] - 30:7, 117:16
**stored** [1] - 94:9
**straight** [3] - 52:23, 97:1, 141:2
**strategic** [1] - 72:21
**strategy** [2] - 109:6, 109:8
**Street** [4] - 1:19, 1:24, 2:15, 3:2
**strictly** [1] - 82:6
**strike** [5] - 33:16, 58:21, 75:22, 139:17, 141:18
**strong** [2] - 14:16, 20:12
**stronger** [1] - 28:2
**structured** [1] - 89:17
**student** [2] - 21:22, 23:7
**students** [6] - 7:22, 7:23, 7:24, 8:1, 8:3, 21:9
**studied** [2] - 90:25, 119:6
**studies** [2] - 72:20, 79:8
**study** [8] - 67:24, 77:23, 77:25, 79:7, 112:4, 113:6, 115:7, 121:23
**studying** [1] - 82:7
**stuff** [3] - 43:25, 60:8, 104:15
**stunned** [1] - 138:21
**sub** [1] - 131:3
**subgroup** [1] - 101:25
**subject** [2] - 95:18, 120:24
**subjunctive** [1] - 79:7
**submitted** [1] - 89:14
**substance** [1] - 52:11
**substantive** [1] - 51:14
**substitute** [1] - 18:18
**substitution** [1] - 18:19
**subtle** [2] - 12:5, 12:6
**successfully** [1] - 142:12
**suffering** [1] - 137:25

**sufficient** [2] - 30:2, 114:18
**suggest** [3] - 37:16, 44:12, 99:4
**suggesting** [1] - 116:22
**Suite** [6] - 1:24, 2:12, 2:16, 2:19, 3:3, 3:6
**Sunday** [2] - 95:5
**super** [1] - 96:20
**superficial** [1] - 88:18
**supervise** [2] - 107:3, 115:13
**supplemental** [1] - 45:11
**supply** [1] - 32:11
**support** [12] - 14:17, 28:5, 38:8, 38:12, 38:15, 38:22, 53:3, 77:4, 94:22, 95:12, 98:20, 107:9
**supported** [2] - 24:25, 38:3
**supporters** [1] - 142:10
**supposed** [1] - 62:24
**Supremacy** [1] - 73:23
**Supreme** [9] - 56:1, 56:6, 79:19, 80:11, 81:2, 81:12, 81:17, 82:15
**surcharge** [1] - 35:5
**surcharges** [4] - 29:11, 32:5, 32:13, 34:22
**surname** [1] - 73:21
**surrounding** [4] - 71:7, 71:17, 72:4, 75:2
**survey** [78] - 107:15, 107:16, 108:4, 108:19, 108:25, 109:3, 109:5, 109:16, 109:19, 109:22, 110:9, 110:11, 110:10, 111:14, 111:18, 112:6, 113:4, 113:14, 113:17, 113:19, 113:21, 114:4, 114:7, 114:8, 114:18, 115:4, 115:23, 116:2, 116:5, 116:18, 117:3, 117:15, 117:19, 117:21, 117:23, 117:25, 118:3, 118:7, 118:8, 118:10, 118:14, 118:16, 118:21, 118:22, 118:24, 119:2, 119:3, 119:8, 119:14, 119:19, 120:6, 120:7, 120:12, 120:13, 120:18, 120:22, 121:7, 121:12, 122:6, 122:15, 122:18, 123:21, 124:17, 125:3, 125:4, 125:17, 126:1, 126:7, 127:22, 127:24, 128:6, 128:7, 128:8, 128:24, 129:1
**surveyed** [9] - 121:4, 121:9, 121:14, 122:8, 123:3, 123:22, 125:11, 126:6, 128:23
**surveys** [38] - 90:24, 106:25,

107:1, 107:2, 107:5, 107:7,
107:19, 107:23, 108:7,
109:25, 110:15, 111:9,
113:10, 114:6, 114:8,
114:12, 114:21, 114:25,
115:12, 116:1, 117:6,
117:9, 119:23, 120:4,
120:10, 120:23, 120:24,
121:3, 121:8, 121:12,
122:7, 123:2, 123:22,
124:22, 125:10, 125:13,
128:5, 130:25
**swastika** [1] - 13:21
**swear** [1] - 63:22
**Sweeten** [3] - 4:6, 37:5, 40:2
**SWEETEN** [5] - 1:16, 134:14,
135:18, 139:17, 141:14
**sworn** [12] - 5:10, 9:15, 37:4,
53:16, 66:18, 84:1, 84:17,
84:25, 85:24, 86:25,
106:14, 123:24
**sympathy** [2] - 22:11, 22:17
**system** [4] - 24:1, 54:22,
88:17, 115:13
**systematic** [1] - 89:17


**T**


**table** [1] - 131:9
**tabled** [1] - 23:20
**talks** [2] - 70:25, 73:24
**target** [5] - 120:7, 120:13,
120:19, 126:7, 126:10
**Tatel** [3] - 44:15, 44:20,
130:9
**TATEL** [31] - 1:12, 40:24,
44:21, 76:22, 88:8, 88:20,
88:22, 88:25, 89:21, 89:23,
90:2, 90:5, 90:11, 90:19,
91:20, 122:13, 122:21,
124:10, 124:15, 125:1,
125:7, 125:15, 125:20,
125:23, 126:13, 126:23,
127:2, 127:7, 129:8,
129:11, 129:14
**tax** [2] - 33:12, 71:12
**teach** [3] - 67:5, 67:7, 67:10
**teaches** [1] - 89:6
**teaching** [1] - 98:21
**team** [1] - 103:22
**teasing** [3] - 138:22, 138:23,
139:9
**techie** [2] - 96:5, 96:6
**techies** [2] - 97:21, 105:7
**technical** [6] - 94:5, 94:6,
94:8, 94:21, 94:22, 98:19
**technically** [1] - 54:21
**techniques** [2] - 58:20, 91:19
**Tejanos** [1] - 73:21

**telephone** [10] - 64:20,
104:12, 114:17, 115:12,
118:8, 118:24, 119:15,
119:17, 127:24, 128:6
**television** [1] - 58:15
**ten** [1] - 10:10
**tension** [2] - 11:22, 11:25
**tensions** [1] - 13:6
**term** [2] - 56:11, 97:16
**terminology** [3] - 73:9,
105:3, 111:15
**terms** [8] - 11:1, 15:17,
54:10, 69:10, 110:13,
110:15, 115:9, 129:25
**testified** [20] - 5:10, 9:15,
31:12, 41:16, 49:23, 51:18,
51:19, 53:17, 58:5, 66:19,
83:5, 87:1, 91:23, 101:18,
104:23, 106:15, 111:9,
113:6, 126:4, 126:9
**testify** [7] - 11:18, 41:16,
41:20, 103:6, 103:14,
103:21, 117:2
**testifying** [2] - 42:1, 88:9
**testimony** [37] - 8:16, 11:12,
14:25, 15:4, 16:5, 16:25,
19:24, 20:15, 28:18, 29:7,
30:14, 30:21, 30:25, 37:4,
37:11, 44:19, 57:4, 57:17,
58:22, 70:12, 75:11, 75:20,
75:23, 79:1, 84:1, 84:17,
84:25, 85:24, 86:25, 91:23,
121:22, 123:24, 126:8,
129:7, 132:18, 139:24,
143:11
**tests** [1] - 103:11
**Texan** [1] - 72:9
**Texas** [82] - 5:19, 7:9, 7:10,
7:14, 7:15, 7:23, 8:1, 8:10,
8:15, 8:18, 9:7, 9:23,
11:19, 11:22, 11:23, 12:1,
12:16, 12:22, 12:24, 12:25,
13:2, 17:23, 18:1, 20:13,
21:23, 23:4, 23:8, 31:25,
35:7, 39:19, 39:21, 39:23,
39:25, 40:4, 45:17, 49:23,
54:1, 54:13, 54:16, 57:14,
60:7, 64:4, 64:7, 64:22,
67:3, 67:18, 68:7, 68:12,
68:13, 69:24, 70:19, 71:1,
72:1, 72:8, 73:4, 73:15,
74:18, 75:3, 77:1, 77:13,
78:9, 78:24, 80:14, 80:16,
82:6, 82:7, 89:15, 90:6,
91:4, 94:3, 94:16, 95:19,
103:3, 103:25, 104:17,
106:3, 116:24, 133:8,
135:11, 137:2
**TEXAS** [2] - 1:3, 1:18
**Texas'** [2] - 94:5, 94:7

**Texas/Mexico** [1] - 134:8
**text** [4] - 96:2, 96:16, 96:20,
97:13
**THE** [31] - 1:2, 1:12, 1:13,
1:13, 1:18, 8:24, 47:8,
47:17, 53:10, 76:8, 79:22,
88:13, 88:21, 88:24, 89:4,
89:22, 90:1, 90:4, 90:10,
90:18, 90:21, 91:21, 92:2,
92:7, 106:11, 121:16,
121:19, 122:19, 122:22,
127:11, 139:22
**themselves** [1] - 96:22
**theory** [1] - 72:18
**therefore** [1] - 105:7
**thereof** [1] - 91:9
**they've** [1] - 61:4
**thinking** [2] - 73:8, 101:15
**thinks** [2] - 99:5, 100:24
**third** [3] - 21:11, 25:13,
135:11
**thirds** [11] - 12:17, 16:9,
17:11, 20:7, 24:15, 28:13,
134:8, 142:17, 142:19,
142:23, 143:8
**thousand** [4] - 7:9, 7:15,
57:1, 57:2
**threat** [4] - 5:16, 5:17, 5:18
**three** [15] - 7:9, 7:15, 24:18,
24:19, 34:18, 35:20, 49:12,
71:9, 72:7, 74:11, 77:10,
84:24, 119:13, 140:14
**threshold** [1] - 99:16
**throughout** [1] - 73:16
**Thursday** [1] - 66:6
**ticket** [5] - 7:5, 7:7, 7:14,
29:17, 29:23, 35:5
**tickets** [3] - 7:13, 29:6, 29:11
**time-out** [1] - 84:22
**today** [11] - 19:22, 31:18,
33:9, 35:21, 70:12, 86:17,
95:3, 125:8, 126:4, 131:20,
133:4
**together** [5] - 64:14, 65:25,
71:17, 89:17, 142:25
**tomorrow** [14] - 61:16, 61:19,
66:8, 97:18, 99:20, 99:21,
100:8, 101:6, 102:9,
102:11, 102:13, 103:20,
129:11, 132:9
**tone** [1] - 14:16
**tones** [1] - 13:18
**tonight** [1] - 132:7
**took** [5] - 12:14, 57:25, 58:5,
90:25, 142:8
**tool** [1] - 59:24
**top** [2] - 23:25, 77:14
**topics** [1] - 15:2
**totally** [3] - 98:10, 98:23,
127:18

**tote** [1] - 22:19
**toting** [1] - 22:7
**touch** [1] - 99:7
**tough** [1] - 13:14
**toured** [1] - 135:24
**town** [4] - 102:11, 102:13,
136:1, 136:22
**towns** [1] - 136:25
**tradition** [13] - 12:17, 16:6,
16:11, 17:6, 17:8, 17:11,
17:14, 19:10, 20:6, 20:13,
28:23, 35:3, 39:3
**traffic** [1] - 7:13
**training** [5] - 88:25, 89:5,
89:20, 90:13, 90:22
**transcribed** [1] - 36:9
**transcript** [4] - 3:12, 40:3,
126:14, 144:4
**TRANSCRIPT** [1] - 1:11
**transcription** [1] - 3:13
**transportation** [6] - 34:9,
136:8, 136:10, 136:11,
136:14, 136:17
**transported** [1] - 102:21
**traveled** [1] - 135:25
**Travis** [1] - 58:14
**treating** [1] - 100:24
**treatment** [1] - 34:12
**tremendous** [3] - 11:23,
11:24, 32:18
**tremendously** [1] - 131:6
**TRIAL** [1] - 1:11
**trial** [10] - 11:15, 44:23,
57:15, 57:16, 66:6, 93:11,
97:10, 102:1, 102:19,
143:14
**trials** [2] - 54:21, 54:22
**tribe** [1] - 119:5
**tried** [11] - 18:3, 55:6, 55:7,
60:17, 74:14, 108:12,
111:4, 111:18, 111:20,
122:1, 138:1
**triggered** [1] - 17:11
**trouble** [2] - 45:20, 62:4
**Troy** [1] - 51:11
**truck** [2] - 117:16, 117:22
**truckers** [3] - 117:12, 117:13,
117:17
**true** [11] - 12:25, 19:20,
19:21, 20:17, 20:18, 24:18,
27:22, 47:22, 57:21,
108:22, 119:17
**truly** [1] - 135:3
**trust** [1] - 20:22
**truth** [3] - 105:9, 111:1,
139:20
**truthfully** [1] - 133:1, 133:4
**try** [19] - 15:23, 18:5, 20:24,
23:10, 28:7, 54:22, 59:7,
71:6, 87:25, 103:24,

104:21, 109:22, 110:1, 112:16, 113:17, 119:21, 131:1, 138:17, 142:7

**trying** [22] - 17:19, 17:21, 26:25, 43:18, 44:25, 50:18, 56:12, 59:20, 72:24, 101:5, 101:13, 102:3, 103:17, 108:22, 109:6, 109:14, 115:17, 125:24, 126:3, 126:11, 138:15, 142:5

**tsk** [2] - 98:8

**turn** [4] - 14:18, 21:5, 21:15, 51:13

**turned** [7] - 7:14, 60:11, 70:9, 70:21, 73:20, 73:25, 88:18

**turning** [1] - 12:20

**twice** [1] - 93:11

**two** [68] - 12:17, 16:9, 17:11, 20:7, 24:15, 28:13, 29:1, 34:18, 42:3, 42:23, 43:10, 43:12, 44:11, 56:7, 57:15, 58:16, 63:12, 63:14, 69:25, 76:16, 77:14, 77:18, 77:19, 92:21, 93:5, 93:14, 93:16, 94:22, 95:23, 97:4, 99:21, 101:23, 102:1, 108:6, 110:14, 111:4, 111:7, 111:13, 112:3, 112:10, 112:23, 113:9, 114:20, 116:5, 119:15, 122:16, 124:15, 124:18, 125:16, 125:24, 126:2, 127:3, 127:9, 128:2, 128:18, 131:6, 134:8, 138:5, 138:7, 140:14, 141:4, 141:22, 141:24, 142:17, 142:19, 142:23, 143:8

**two-thirds** [11] - 12:17, 16:9, 17:11, 20:7, 24:15, 28:13, 134:8, 142:17, 142:19, 142:23, 143:8

**two-week** [1] - 29:1

**TX** [2] - 1:20, 2:20

**type** [3] - 54:2, 54:10, 71:5

**types** [4] - 17:4, 23:11, 54:17, 119:22

**typical** [3] - 27:16, 28:3, 113:1

**typically** [3] - 15:12, 109:18, 117:7

## U

**U.S** [4] - 2:6, 3:10, 16:12, 114:6

**ultimate** [1] - 90:14

**ultimately** [6] - 13:23, 14:12, 31:2, 31:17, 100:22,

142:22

**unanimously** [2] - 12:12, 31:4

**unaware** [1] - 62:14

**uncovered** [1] - 87:22

**under** [13] - 12:16, 13:18, 19:4, 31:18, 32:20, 48:25, 74:19, 75:25, 86:2, 101:10, 109:20, 116:25, 132:24

**underemployed** [1] - 7:6

**undergoing** [1] - 68:7

**underlying** [6] - 44:6, 62:20, 99:3, 99:4, 105:11, 108:21

**undisclosed** [1] - 130:3

**undocumented** [2] - 70:14, 70:19

**unemployed** [1] - 7:6

**unfortunately** [3] - 43:6, 50:4, 64:8

**uniform** [2] - 29:18, 35:7

**uniformed** [1] - 29:24

**unintended** [1] - 27:5

**UNION** [1] - 3:1

**unique** [1] - 91:3

**UNITED** [3] - 1:1, 1:12, 1:14

**United** [8] - 1:7, 9:9, 52:19, 62:10, 64:16, 65:19, 70:12, 134:11

**universities** [3] - 21:24, 21:25, 23:4

**University** [4] - 7:25, 67:2, 94:16, 95:19

**university** [7] - 21:10, 21:15, 21:23, 23:2, 23:6, 23:17, 67:4

**unlawful** [1] - 53:2

**unless** [4] - 6:5, 20:18, 28:5, 28:6

**unlike** [2] - 22:19, 102:19

**unlikely** [5] - 102:18, 121:3, 121:8, 121:13, 122:7

**unprecedented** [1] - 18:8

**unrelated** [1] - 66:1

**UNS** [1] - 50:3

**unwilling** [1] - 99:23

**up** [74] - 6:6, 7:10, 9:6, 13:2, 14:2, 16:9, 18:5, 18:9, 18:13, 18:14, 18:17, 18:22, 18:23, 20:6, 20:12, 20:16, 21:2, 23:3, 24:15, 24:16, 26:7, 27:21, 29:18, 34:13, 35:12, 40:2, 40:11, 42:21, 43:17, 59:21, 60:11, 61:21, 68:17, 68:20, 69:15, 71:15, 78:16, 85:2, 85:11, 89:23, 90:6, 95:7, 98:6, 98:7, 98:22, 103:13, 111:2, 112:12, 112:14, 124:11, 126:13, 127:12, 129:15, 134:16, 137:18, 137:20,

138:2, 139:15, 141:2, 141:6, 141:10, 141:22, 141:23, 141:24, 142:4, 142:18, 142:20, 142:23, 143:2, 143:3, 143:16, 143:18

**Uresti** [1] - 132:5

**URESTI** [1] - 132:19

**uses** [2] - 48:19, 113:21

**Uvalde** [2] - 136:22, 140:12

## V

**VA** [1] - 2:16

**valid** [6] - 39:19, 39:21, 39:23, 40:4, 116:1, 116:6

**validated** [1] - 32:2

**validly** [2] - 120:7, 120:13

**Van** [2] - 139:8, 139:11

**van** [1] - 6:6

**variance** [1] - 112:2

**variation** [1] - 117:22

**variety** [3] - 77:11, 93:5, 113:19

**various** [7] - 23:14, 25:18, 27:3, 27:21, 68:17, 69:25, 70:8

**vary** [1] - 108:25

**vast** [1] - 38:6

**Veasey** [1] - 74:12

**vehicle** [2] - 135:17, 135:20

**verbally** [1] - 47:16

**verbiage** [1] - 73:20

**verified** [1] - 95:11

**verify** [1] - 104:9

**version** [2] - 92:22, 92:24

**versus** [2] - 102:6, 130:17

**vertical** [2] - 97:15, 97:16, 97:17

**Viaz** [2] - 98:20, 99:1

**victim** [1] - 73:16

**video** [7] - 131:22, 131:23, 131:25, 132:2, 132:5, 132:7, 132:12

**videotaped** [4] - 132:18, 139:23, 139:24, 143:11

**view** [5] - 20:17, 91:6, 91:13, 91:16, 91:18

**viewed** [1] - 73:5

**violated** [2] - 74:17, 74:21

**VIP** [1] - 34:12

**virtual** [1] - 63:17

**virtually** [1] - 61:18

**voice** [1] - 138:23

**volunteer** [1] - 140:10

**vote** [81] - 5:21, 5:25, 6:3, 6:7, 6:9, 6:10, 6:12, 6:16, 6:19, 6:20, 7:5, 15:9, 17:1, 17:4, 17:10, 17:22, 18:9,

18:16, 19:5, 19:12, 20:20, 22:9, 22:18, 22:21, 23:10, 24:1, 24:6, 27:10, 28:11, 28:13, 28:17, 28:22, 28:23, 28:24, 29:4, 29:13, 29:20, 31:7, 31:8, 31:10, 31:11, 31:13, 32:20, 35:8, 36:19, 36:24, 48:25, 49:2, 53:1, 56:13, 57:18, 57:20, 58:4, 58:10, 59:14, 59:21, 60:11, 60:17, 75:16, 75:19, 77:14, 135:2, 135:3, 137:7, 137:9, 137:21, 139:2, 140:21, 141:8, 141:22, 141:23, 142:9, 142:10, 142:13, 142:19, 142:21, 142:22, 143:3

**voted** [16] - 7:25, 8:1, 23:18, 23:19, 26:16, 31:5, 33:23, 37:22, 38:3, 56:12, 57:11, 59:12, 59:15, 60:18, 87:17

**voter** [25] - 21:10, 31:7, 38:22, 58:23, 59:11, 59:12, 60:4, 60:14, 68:18, 69:6, 69:17, 70:10, 74:2, 79:20, 81:3, 81:14, 81:17, 81:21, 81:22, 82:1, 88:17, 92:3, 92:5, 112:20, 142:12

**Voter** [7] - 75:12, 80:20, 137:1, 137:19, 139:15, 141:3, 143:8

**voters** [16] - 6:25, 7:20, 10:22, 11:1, 18:17, 29:3, 33:22, 40:18, 57:1, 58:12, 58:18, 63:13, 75:13, 77:8, 116:24, 116:25

**voters'** [1] - 28:21

**votes** [15] - 10:20, 19:7, 20:7, 20:10, 20:21, 22:12, 24:15, 24:23, 26:8, 26:25, 27:1, 28:7, 28:11, 39:8, 57:12

**Voting** [4] - 2:7, 74:18, 74:19, 74:21

**voting** [37] - 5:17, 6:2, 6:3, 6:14, 7:1, 10:15, 24:2, 24:3, 29:1, 30:23, 33:18, 39:3, 56:9, 56:11, 56:16, 56:25, 57:22, 58:6, 60:24, 61:1, 61:5, 68:3, 69:9, 69:11, 69:18, 69:20, 69:22, 69:23, 70:1, 70:4, 70:13, 77:12, 77:20, 81:18, 90:24

**VRNID** [7] - 41:2, 44:8, 92:23, 92:24, 93:8, 93:25, 101:8

## W

**W-O-O-D** [1] - 53:24

**wait** [10] - 6:7, 16:13, 34:15,

42:6, 52:10, 99:8, 100:7
**waive** [1] - 51:21
**waiver** [1] - 51:22
**walk** [2] - 59:6, 65:19
**walked** [3] - 135:25, 141:24, 142:4
**walking** [1] - 104:14
**wall** [1] - 75:17
**wants** [4] - 38:18, 87:4, 95:10, 103:12
**War** [1] - 38:4
**warding** [1] - 74:7
**wars** [1] - 140:11
**Washington** [4] - 1:5, 2:9, 3:10, 16:12
**watching** [1] - 73:15
**water** [2] - 14:14, 53:20
**ways** [4] - 12:5, 12:6, 108:19, 112:10
**wealthier** [1] - 10:18
**wealthiest** [1] - 10:3
**wealthy** [1] - 11:6
**Wednesday** [1] - 1:6
**week** [3] - 29:1, 115:15, 115:19
**weekend** [2] - 95:4, 98:17
**weekends** [1] - 113:18
**weekly** [1] - 7:16
**weeks** [4] - 24:3, 57:15, 58:16, 119:16
**weight** [3] - 89:13, 112:15, 113:2
**weighted** [1] - 113:3
**weighting** [5] - 112:6, 113:1, 130:1, 130:17, 131:7
**well-publicized** [2] - 12:23, 13:5
**wells** [1] - 118:17
**Wentworth** [1] - 55:23
**West** [3] - 1:19, 1:24, 2:19
**Westat** [4] - 107:1, 107:6, 117:6, 128:6
**WESTFALL** [11] - 2:3, 61:9, 62:11, 62:25, 64:5, 64:8, 65:21, 65:23, 66:1, 66:10, 116:11
**westfall** [3] - 62:10, 63:8, 64:3
**White** [1] - 73:23
**white** [1] - 7:23
**whites** [1] - 112:15
**Whole** [9] - 19:6, 19:12, 19:17, 35:22, 35:24, 37:2, 37:6, 37:9, 52:9
**whole** [16] - 19:17, 21:13, 33:4, 69:17, 71:18, 72:23, 73:5, 74:17, 75:15, 84:23, 91:2, 91:8, 104:25, 111:1, 112:10
**wide** [1] - 17:22

**wife** [8] - 28:24, 39:8, 39:21, 46:13, 47:22, 48:14, 48:19, 101:16
**wife's** [6] - 46:20, 46:22, 47:1, 47:5, 47:24, 48:4
**Wilkins** [1] - 105:17
**WILKINS** [21] - 1:13, 5:2, 5:6, 8:7, 8:20, 8:23, 9:2, 9:10, 30:5, 35:10, 45:24, 47:16, 64:3, 64:6, 76:18, 96:15, 101:2, 101:4, 102:8, 102:15, 102:24
**WILLIAM** [1] - 1:16
**willing** [4] - 95:12, 99:1, 105:20, 124:12
**win** [1] - 56:20
**winner** [1] - 57:13
**wish** [1] - 116:10
**wishes** [2] - 78:6, 78:9
**WITNESS** [25] - 4:2, 8:24, 47:8, 47:17, 53:10, 88:13, 88:21, 88:24, 89:4, 89:22, 90:1, 90:4, 90:10, 90:18, 90:21, 91:21, 92:2, 92:7, 106:11, 121:16, 121:19, 122:19, 122:22, 127:11, 139:22
**witness** [35] - 5:9, 8:6, 9:1, 9:8, 9:14, 41:6, 41:19, 41:23, 52:16, 52:17, 52:18, 53:12, 53:16, 61:8, 62:15, 65:2, 65:3, 65:4, 66:12, 66:14, 66:18, 78:6, 95:2, 102:25, 103:21, 104:11, 105:25, 106:1, 106:2, 106:14, 116:8, 116:10, 126:11, 132:14
**Witness** [2] - 40:19, 76:17
**witness'** [3] - 48:8, 95:3, 95:6
**witnesses** [10] - 56:24, 62:13, 65:10, 95:10, 95:17, 99:21, 131:20, 131:24, 131:25, 132:1
**woman** [1] - 37:15
**women** [6] - 5:23, 6:2, 6:16, 36:11, 36:23, 138:7
**won** [1] - 54:23
**wonderful** [3] - 66:9, 66:10, 106:12
**Wood** [2] - 53:14, 53:22
**WOOD** [2] - 4:7, 53:16
**wood** [2] - 53:20, 54:6
**worded** [2] - 84:21, 122:9
**words** [4] - 74:5, 116:22, 136:23, 141:3
**workers** [1] - 70:19
**works** [2] - 91:2, 97:21
**world** [1] - 72:17
**worry** [1] - 29:2
**worse** [1] - 27:25

**worth** [2] - 19:22, 51:24
**write** [4] - 85:16, 85:17, 121:15, 121:17
**writes** [1] - 73:23
**writing** [3] - 68:1, 69:14, 73:6
**written** [1] - 19:23
**wrote** [5] - 79:12, 79:18, 80:4, 82:5, 82:18

## Y

**yards** [1] - 139:1
**year** [9] - 21:24, 21:25, 28:2, 31:6, 72:11, 114:23, 119:9, 119:10, 135:13
**years** [31] - 5:23, 5:24, 7:4, 7:25, 9:24, 10:23, 10:24, 12:6, 13:3, 13:7, 16:22, 28:1, 33:7, 54:16, 56:2, 59:5, 59:19, 60:3, 60:8, 61:4, 68:8, 68:9, 72:9, 73:15, 77:10, 91:10, 107:1, 109:4, 115:25, 133:13, 135:23
**yesterday** [2] - 41:11, 93:7
**yield** [1] - 41:7
**York** [3] - 2:23, 2:24, 13:10
**you-all** [3] - 6:6, 20:19, 22:18
**young** [8] - 7:4, 7:16, 22:2, 47:2, 112:20, 112:22, 112:24
**younger** [1] - 28:24
**yourself** [5] - 9:22, 17:16, 76:13, 76:15, 106:21
**YouTube** [1] - 71:23