## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
         Plaintiff,                )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
         Defendant,                )
                                   )
ERIC KENNIE, et al,                )
                                   )
         Defendant-Intervenors,    )
                                   )
TEXAS STATE CONFERENCE OF          )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )   (RMC-DST-RLW)
                                   )   Three-Judge Court
         Defendant-Intervenors,    )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
         Defendant-Intervenors,    )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al,                     )
                                   )
         Defendant-Intervenors,    )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
         Defendant-Intervenors.    )

********************************************
ORAL DEPOSITION OF
REPRESENTATIVE RAFAEL ANCHIA
JUNE 6, 2012
********************************************

## 2

1    ORAL DEPOSITION OF REPRESENTATIVE RAFAEL ANCHIA,

2  produced as a witness at the instance of the Defendant,

3  was duly sworn, was taken in the above-styled and

4  numbered cause on the JUNE 6, 2012, from 1:48 a.m. to

5  5:07 p.m., before Chris Carpenter, CSR, in and for the

6  State of Texas, reported by machine shorthand, at the

7  offices of The Texas Attorney's Office, 209 West 14th

8  Street, 1st Floor Conference Room, Austin, TX 78701,

9  pursuant to the Federal Rules of Civil Procedure and the

10 provisions stated on the record or attached hereto.

## 3

A P P E A R A N C E S
FOR THE PLAINTIFF, STATE OF TEXAS:
    Patrick K. Sweeten
    Stacey Napier
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
    Austin, TX 78711-2548
    209 West 14th Street
    8th Floor
    Austin, TX 78701
    (512) 936-1307
    patrick.sweeten@texasattorneygeneral.gov

FOR THE DEFENDANT, HOLDER, ET AL:

    Jennifer Maranzano
    Angela Miller
    U.S. DEPARTMENT OF JUSTICE
    950 Pennsylvania Avenue, NW
    NWB - Room 7202
    Washington, DC 20530
    (202) 305-7766
    jennifer.maranzano@usdoj.gov
FOR THE DEFENDANT-INTERVENOR MEXICAN AMERICAN
LEGISLATIVE CAUCUS:

    Jose Garza
    LAW OFFICE OF JOSE GARZA
    7414 Robin Rest Dr.
    San Antonio, TX 98209
    (210) 392-2856
    garzapalm@aol.com
    Martin Golando (MALC)
    Tricia Horatio (MALC)

## 4

INDEX
Appearances......................................3
REPRESENTATIVE RAFAEL ANCHIA
    Examination by Mr. Sweeten.................5
    Examination by Ms. Maranzano.............140
    Further Examination by Mr. Sweeten.......141
Signature and Changes............................143
Reporter's Certificate...........................145

EXHIBITS

NO. DESCRIPTION                              PAGE MARKED

1    Defendant United States' First          21
     Supplemental Rule 26 Disclosures
2    Members Who Have Waived Privilege           25
3    Declaration of Rafael Anchia            29
4    Minute Order,  April 3, 2012            29
5    Lighthouse Opinion Polling              64
6    Questions About Voter Identification        67
7    Amendment for SB 14                     100
8    House Journal, 82nd Legislature, Monday     124
     Jan. 24, 2011

9    House Journal, 82nd Legislature, Monday,    133
     May 16, 2011



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**5**

1    REPRESENTATIVE RAFAEL ANCHIA,
2  having been first duly sworn to testify the truth, the
3  whole truth, and nothing but the truth, testified as
4  follows:
5                EXAMINATION
6  BY MR. SWEETEN:
7    Q.  Good afternoon.
8    A.  Good afternoon.
9    Q.  Would you please state your full name for the
10 record?
11   A.  Rafael Michael Anchia.
12   Q.  Okay.  What's your date of birth?
13   A.  9-26-68.
14   Q.  Okay.  And where do you live?
15   A.  I live in Dallas, Texas.
16   Q.  Okay.  What's your residence address?
17   A.  1418 Yakimo, that's Y-A-K-I-M-O, Drive, Dallas,
18 Texas, 75208.
19   Q.  Okay.  And I'm going to be asking you some
20 questions today.  This is -- let me ask you, have you
21 take a -- have you been deposed before?
22   A.  One time --
23   Q.  Okay.
24   A.  -- when I was on the Dallas School Board.
25   Q.  Okay.  We can talk about that.  But today, when

**6**

1  I'm asking you questions, if you don't understand
2  anything that I'm asking you, if you would just ask me
3  to rephrase it, I'd be happy to do that.  Otherwise,
4  I'll assume you understood the question that was asked;
5  is that fair?
6    A.  Yes.
7    Q.  In addition, the court reporter is here to take
8  down everything and so he can't take down shakes of the
9  head, nods, uh-huhs, nuh-huhs, that sort of thing.  And
10 so we just need a verbal response to any questions that
11 we pose.
12   A.  Yes.
13   Q.  We'll take a break if you need to.  I typically
14 would like to take a break about every -- once every
15 hour or so.  I don't currently have an estimate as to
16 how long we're going to be here today, but I certainly
17 hope we can avoid some of the lengthy depositions that
18 we've had over the last several weeks.  So we'll --
19 we'll do our best to make this as efficient and make it
20 go by as quickly as possible.
21   A.  Thank you.
22   Q.  Let's talk about your deposition.  When -- you
23 gave it while you were a member of the Dallas school
24 board; is that right?
25   A.  Yes.

**7**

1    Q.  Can you just give me a general description of
2  the litigation involved?
3    A.  There was a school desegregation case that had
4  been filed in the early '70s.  And the Dallas school
5  board had petitioned the court in Judge Barefoot
6  Sanders' federal court.  He had jurisdiction over this
7  particular desegregation case and we petitioned him to
8  get out from under the desegregation case.
9    Q.  Okay.  So you were a petitioner.  On behalf of
10 the school board, you petitioned to -- yeah, was it a
11 federal court order?
12   A.  Yes, I think that's right; it was a federal
13 court order, as far as I recall.
14   Q.  Okay.  So you were the petitioner asking the
15 court to lift the desegregation order that had been put
16 in place since what time period?
17   A.  The '70s, I believe.
18   Q.  Okay.  What was the basis of that petition?
19   A.  That the school district was desegregated, I
20 believe.  And I don't recall all the facts.  It was
21 about 10, 11 years ago, but to my recollection, that --
22 the district had complied and the school district was
23 desegregated.
24   Q.  Okay.  So there wasn't a need from the view of
25 you or the Dallas school board to continue with the

**8**

1  federal court order imposing orders related to
2  desegregation, correct?
3    A.  That was the sense of the board.
4    Q.  Things have changed since the 1970s?
5    A.  That was the sense of the board.
6    Q.  Okay.  And you gave testimony in that case?
7    A.  I did.
8    Q.  Was that your sense as well?
9    A.  That I gave testimony in that case, yes.
10   Q.  Back up, no.  That as to -- was it your sense
11 as well that the -- that the Dallas school district had
12 been desegregated at that point or had been --
13   A.  It was my sense that the order had been
14 complied with.
15   Q.  Okay.  Tell me, specifically, what had changed
16 between the time that that order had entered, had been
17 entered, and the time that you petitioned the federal
18 court to vacate that order.
19   A.  My sense was that the district had complied
20 with the requirements of the -- of the court order.
21   Q.  Okay.
22   A.  So it was a compliance -- it was a compliance
23 question.
24   Q.  And compliance, how did they comply?
25   A.  There were a series of programs that had been



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 9

1    instituted at the school district, and at the time,
2    there was only one majority school -- there was one
3    majority high school left and that was Seagoville High
4    School. We had a program called the M & M Program,
5    minority-to-majority schools to comply with that court
6    order; we instituted the program and it had been working
7    well. And even the monitor that was reviewing the
8    district's progress had made the point that compliance
9    had -- compliance was occurring with the court order.
10      Q.  Okay. In working on that litigation, did you
11   have some familiarity with the conditions that existed
12   at the time that the federal court order had been
13   entered?
14      A.  I did read quite a bit of history.
15      Q.  Okay. Can you give us a sense of what the
16   precursor events that led to the entry of that order?
17      A.  There were two different -- essentially, there
18   were two different school districts. There was a school
19   district for an Anglo majority and there was a separate
20   system for either African-Americans or Hispanics.
21      Q.  I want to ask you, who first contacted you
22   about this lawsuit?
23      A.  I don't recall.
24      Q.  Okay.
25      A.  Who first contacted me about it? I don't know.

## 10

1    Q.  When did you first talk with attorneys at the
2    Department of Justice regarding this case?
3    A.  Maybe a month and a half ago, two months ago.
4       Q.  Okay. Who did you talk to at the Department of
5    Justice?
6       A.  The names escape me. I think we spoke at the
7    -- and I forgot your name, I'm sorry.
8       Q.  You're pointing to Jennifer Maranzano; is that
9    right?
10      A.  Jennifer Maranzano. I believe Jennifer
11   Maranzano and I spoke on the phone. There was another
12   lawyer but I'm unaware -- I don't recall that person's
13   name.
14      Q.  Okay. Do you have a more specific date as to
15   when you were contacted?
16      A.  I don't.
17      Q.  You filed an affidavit in this case. Do you
18   remember signing an affidavit?
19      A.  I do.
20      Q.  Do you think that you were contacted or
21   you had contact with the Department of Justice at or
22   near the time that the affidavit was signed?
23      A.  Prior to is my recollection.
24      Q.  Okay. How long prior to?
25      A.  I don't recall exactly. But possibly a week to

## 11

1    two weeks.
2       Q.  Okay. Had you had any contact with the
3    Department of Justice prior to that time?
4       A.  No.
5       Q.  Do you know who else, was it a man or woman you
6    talked to at the Department of Justice?
7       A.  I don't recall.
8       Q.  Who was a party to the conversation?
9       A.  Members of the Department of Justice and
10   myself.
11      Q.  Okay. Tell me what was discussed during the
12   conversation.
13      A.  My recollection of the photo ID bills that had
14   been filed from my first session to the present day, and
15   the processes surrounding those photo ID, the
16   legislative processes surrounding the photo ID
17   legislation.
18      Q.  Okay. And so went through sort of the history
19   of the photo ID bills within the -- and your involvement
20   with them in the House?
21      A.  Yeah. Among other things, right.
22      Q.  Okay. What are the other things?
23      A.  We referenced -- or I referenced studies that I
24   had read, research that I had done. I talked about
25   committee reports, testimony that I had heard. I had

## 12

1    been on the Elections Committee for three terms, prior
2    to the 2011 session, which talked about those
3    experiences as well.
4       Q.  How long did the meeting last?
5       A.  It wasn't a meeting, it was a phone conference.
6       Q.  How long did the phone conference last?
7       A.  Less than an hour.
8       Q.  Have you -- have you had follow-up
9    conversations with the Department of Justice?
10      A.  There have been two phone conferences, but I
11   have not spoken to the Department -- any representative
12   of the Department of Justice until I saw Ms. Maranzano
13   today, outside this building.
14      Q.  Okay. So you saw her today and you had --
15   you've described two conferences --
16      A.  Uh-huh.
17      Q.  -- teleconferences?
18      A.  Phone conferences.
19      Q.  Okay. And so you've described for me the first
20   one. Tell me about the second teleconference. When did
21   it happen?
22      A.  In close proximity to the first one, maybe a
23   week to ten days out. So I had the first conference,
24   and the second one related to the affidavit --
25      Q.  Okay.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 13

1   A.  -- just to follow up on whether or not the
2   contents of the affidavit were reflective of our prior
3   conversation.
4       Q.  Who drafted the affidavit?
5       A.  I don't know.
6       Q.  You didn't draft the affidavit?
7       A.  No.
8       Q.  Okay.  The affidavit was drafted for you by
9   somebody at the Department of Justice?
10      A.  Yes.
11      Q.  Were you sent drafts of the affidavit?
12      A.  Yes.
13      Q.  Do you have drafts of the affidavit?
14      A.  No.
15      Q.  Okay.  Did you make changes on the affidavit?
16      A.  I don't recall, but I think -- I don't recall
17  exactly but I think there were some minor changes to the
18  affidavit.
19      Q.  When you were contacted, were you -- did you
20  talk about the allegations made in this case by the
21  Department of Justice by the intervenors, by the Texas
22  Attorney General's Office?
23      A.  It was mainly to recount my recollection
24  of the legislative process and the bills that had been
25  filed.

### 14

1       Q.  The second one you've indicated that the
2   substance of the conversation related to the affidavit
3   that you were executing, correct?
4       A.  Yes.
5       Q.  Anything else discussed in that conversation?
6       A.  Not that I recall.
7       Q.  Were you told that you were going to testify at
8   trial or that they would call you to testify at trial in
9   this case?
10      A.  No.
11      Q.  Have you had discussions with the Department of
12  Justice about whether or not you were going to testify
13  in case?
14      A.  No.
15      Q.  Do you have plans to be in Washington, D.C., in
16  July?
17      A.  I am holding dates open in case I am called to
18  testify in July.
19      Q.  It's my understanding you are not asserting the
20  legislative privilege in this litigation; is that
21  correct?
22      A.  Yes.
23      Q.  Okay.  Let me back up before we get into
24  that.  And I want to ask you, you're represented today
25  by counsel; is that right?

### 15

1       MR. GARZA:  Yes.
2       Q.  And who is your counsel?
3       MR. GARZA:  Jose Garza.
4       Q.  (By Mr. Sweeten) Okay.  And when did you first
5   contact Mr. Garza regarding his representation of you
6   for this deposition?
7       A.  I don't recall.
8       Q.  Okay.  Would it have been sometime this year,
9   last year?
10      A.  No, this year.
11      Q.  Okay.  Would it have been within the last two
12  months?
13      A.  Yes.
14      Q.  Okay.  Who is paying for your legal services?
15      A.  I'm not sure.  Nobody, as far as I can tell.
16      Q.  Okay.  Are you -- have you had discussions with
17  other attorneys who represent intervenors in this
18  litigation?
19      A.  Yes.
20      Q.  Okay.  Tell me who you've talked to?
21      A.  Nina Perales.
22      Q.  Okay.  Anyone else?
23      A.  Luis Figueroa.
24      MR. GARZA:  Okay.  He's not a lawyer.
25      THE WITNESS:  Oh, he's not?  I didn't know

### 16

1   that.
2       Q.  (By Mr. Sweeten) All right.  So let's talk
3   about your discussions with Ms. Perales.  Can you tell
4   me the dates that those occurred?
5       A.  Today.
6       Q.  Okay.  Have you talked with her before today?
7       A.  No.
8       Q.  Okay.
9       A.  Well, yes, I have talked to her before today.
10      Q.  Tell me about Mr. Figueroa.  Well, let me back
11  up then.  When did you talk to Ms. Perales -- let me ask
12  you this:  Did you talk to about her this litigation?
13      A.  No.
14      Q.  Okay.  You know her from other occasions or?
15      A.  Yes, from having testified before the Elections
16  Committee, from having worked on redistricting, --
17      Q.  Okay.
18      A.  -- a number -- a number of other initiatives.
19      Q.  Let me ask you:  Did you -- did you talk to her
20  about voter ID any time prior to today?
21      A.  Yes.
22      Q.  And about this litigation?
23      A.  No.
24      Q.  Okay.  You talked to her during sessions?
25      A.  During sessions, correct.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

17

1    Q.  Mr. Figueroa --
2    A.  Yes.
3    Q.  -- can you tell me who that is?
4    A.  Mr. Figueroa works at MALDEF and he frequently
5    testifies before the committee, the Elections Committee
6    or other committees when there are issues of interest to
7    MALDEF.
8    Q.  When did you speak with Mr. Figueroa?
9    A.  Today.
10   Q.  Okay.  Have you spoken with him before today
11   about this litigation?
12   A.  No.
13   Q.  Have you spoken with him before today about
14   voter ID?
15   A.  Yes.
16   Q.  Okay.  Would that have been during the
17   sessions?
18   A.  Yes.
19   Q.  Have you been a party to a lawsuit before?
20   A.  Yes.
21   Q.  Okay.  Can you tell me what did that involve; a
22   civil matter?
23   A.  The ISD redistricting litigation.
24   Q.  Okay.  Is that the same that we've discussed
25   already?

18

1    A.  Yes.
2    Q.  Okay.  Any other lawsuits that you've been a
3    party to?
4    A.  Yes.
5    Q.  Okay.
6    A.  I was a defendant in a number of other matters
7    in my capacity as a school board trustee.
8    Q.  Okay.  Can you give me a general sense of the
9    litigation?
10   A.  Any time the school district was sued, I was
11   named as defendant in my capacity as trustee so it was
12   across the board.
13   Q.  Okay.
14   A.  We had all kinds of different litigation.
15   Q.  Have your testified at trial?
16   A.  Yes.
17   Q.  Okay.  Can you tell me about that?
18   A.  I testified at trial in the redistricting
19   litigation.
20   Q.  Okay.  Any other time?
21   A.  I mean, not -- excuse me, in the desegregation
22   litigation.
23   Q.  Okay.  You had -- you had no involvement in
24   redistricting litigation; is that accurate?
25   A.  Correct.

19

1    Q.  You didn't testify, your deposition wasn't
2    taken?
3    A.  Correct.
4    Q.  Let's talk about your deposition
5    preparation.  Can you tell me, what did you do to
6    prepare for this deposition today?
7    A.  I went through and I tried to read portions of
8    the House Journal to refresh my memory.  I looked at
9    maybe some old e-mails.
10   Q.  Okay.
11   A.  And I tried to just think about the history of
12   the photo ID legislation.
13   Q.  Okay.
14   A.  Just to recount it.
15   Q.  Did you meet with your attorneys?
16   A.  Yes.
17   Q.  How long did you meet with them?
18   A.  About an hour.
19   Q.  When?
20   A.  Monday -- Monday, this past Monday.
21   Q.  Past Monday.  Did you read any depositions
22   taken in this case?
23   A.  No.
24   Q.  Did you -- when you met with your counsel, did
25   you meet with anybody else outside of your counsel?

20

1    A.  No.
2    Q.  Just the two of you?
3    A.  Well, the general counsel of our office sat in
4    the meeting, that's Tricia Horatio.  Tricia is sitting
5    at end of the table.
6    Q.  Okay.  And can you identify who she is and?
7    A.  She's the general counsel/legislative director
8    for our office, for our state office.
9    Q.  For your state office?
10   A.  Correct.
11   Q.  Anybody else attend?
12   A.  No.
13   Q.  So tell me about your job.  You're a lawyer?
14   A.  Oh, let me back up.  Marty Golando was in
15   attendance.  So the three people on this side of the
16   table: Jose Garza, Martin Golando, and Tricia Horatio.
17   Q.  Okay, very good.  You're a lawyer?
18   A.  I am.
19   Q.  You work for Haynes and Boone?
20   A.  Haynes and Boone, LLP.
21   Q.  Okay.  What you do you do?
22   A.  I am a -- I'm a corporate finance lawyer.
23   Q.  You work out of Dallas?
24   A.  I'm in the Dallas office.
25   Q.  How long have you held that position?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 21

1    A.  Since November of 2006.
2    Q.  Have you ever taken a deposition?
3    A.  No.
4    Q.  Okay.
5        MR. SWEETEN:  Actually, I'm going to back
6   up.  I'm going ask the court reporter to mark this.
7        (Exhibit 1 marked for identification.)
8    Q.  (By Mr. Sweeten) Okay.  I handed you a document
9   which we've marked as -- and, by the way, your
10  pronunciation of your name Anchia?
11   A.  Anchia, accent on the I.
12   Q.  Okay.  Anchia.
13       I've handed you what we've marked as
14  Anchia 1.  And I want you to turn, if you would, first,
15  just if you'd look at title of it which is "Defendant
16  United States First Supplemental Rule 26
17  Disclosures."  And there you're listed.  And it says,
18  "Representative Rafael Anchia, care of Ezra Rosenberg at
19  Dechert LLP."
20       First, Ezra Rosenberg, who is -- who is
21  he?
22   A.  I believe he's a lawyer at Dechert LLP.
23   Q.  Does Mr. Rosenberg represent you in this
24  matter?
25   A.  I'm not aware that he does.

## 22

1    Q.  Okay.  Let's read the description
2   below.  "Representative Anchia will likely have
3   discoverable information regarding history, development,
4   enactment, and plans for implementation of Senate Bill
5   14."  And then it references your declaration.
6        Now, the Department of Justice filed this,
7   so -- and if you look at the back, the date of filing is
8   April 13, 2012.  Is it a fair statement that at the time
9   that this was filed, you had one conversation with the
10  Department of Justice?
11   A.  Not sure of the exact date, but I think it is a
12  fair assumption to suggest that I would, yes.
13   Q.  Okay.  And that was that hour-long discussion
14  you had on the telephone with the Department of Justice?
15   A.  Yes.
16   Q.  Okay.  And then it says, "See Declaration."
17  Had you executed the declaration at that time; do you
18  know?
19   A.  I don't recall.
20   Q.  Okay.  You can put that aside.  I'm finished
21  with it.
22       All right.  I want to talk to you about
23  legislative privilege.  You are not asserting the
24  legislative privilege for this deposition today; is that
25  correct?

## 23

1    A.  That is correct.
2    Q.  Okay.  You understand that there are a number
3   of members of the House and Senate who are asserting the
4   legislative privilege.  Are you aware of that?
5    A.  I don't know that.
6    Q.  Okay.  Well, there are.  And the -- when I'm
7   asking you questions today, the legislative privilege,
8   it provides a protection for discussions that you've had
9   with representatives who have asserted that privilege.
10  And so when I'm asking you questions, I'm not asking you
11  to disclose discussions that you've had with them, with
12  members of their legislative staffs, okay?  Do you
13  understand that?
14   A.  I believe I do.  So if I -- then just to
15  clarify:  If I've had a conversation with a member on
16  the House floor related to this legislation in my
17  official capacity, front mic/back mic, for example,
18  that, I imagine, is not subject to legislative
19  privilege, correct?
20   Q.  That's right.  That's another prong of it,
21  which is a public statement on the front or back mic,
22  public speeches, those are not part of the privilege.  But
23  --
24   A.  And let me ask --
25   Q.  Go ahead.

## 24

1    A.  I'm sorry.  And then, just -- I just want to
2   clarify the parameters.  So if I had had -- if I had a
3   conversation with a member off to the side on the House
4   floor and they had mentioned something to me, the
5   legislative privilege does attach to that conversation?
6    Q.  And -- and when I'm asking you questions --
7   first, yes.
8    A.  Okay.
9    Q.  And two, when I asking you questions today, I'm
10  not asking you for those privileged types of
11  communications.
12   A.  Okay.
13   Q.  So if I'm asking you about, for example,
14  Representative Harless has asserted the privilege.  I'm
15  not asking for communications that you've had with her
16  that were not on the front or back mic or in a public
17  committee setting.
18   A.  Okay.
19       MR. GARZA:  Will you identify the
20  representative that has not waived their privilege so
21  that he -- I mean, if you ask a general question about
22  "have you had any conversations with any
23  representative," then Representative Anchia has waived
24  the privilege.  He's going to answer your questions.
25  He's going to talk about those.  So unless you identify



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 25

1  that you do not want him, in response to that question
2  about a particular legislator, he's not going to know
3  which ones to avoid.
4          MR. SWEETEN:  Well, let's do two things:
5  One, I've got a list in front of me of those who have
6  affirmatively waived the privilege.  So I'm going to
7  give that to you.  And I'm going to have him mark that
8  as Anchia Exhibit 2.
9          (Exhibit 2 marked for identification.)
10         MR. GARZA:  And this is a list of people
11 who have waived privilege?
12         MR. SWEETEN:  These are the individuals
13 who affirmatively waived the privilege.
14     Q.  (By Mr. Sweeten)  So I want to familiarize
15 yourself with that list.
16     A.  Okay.  I've read the list.
17     Q.  Okay.  So when I'm asking you questions today
18 that would implicate discussions you've had with
19 legislators, if you would confine your answers that are
20 subject to the legislative privilege to these
21 individuals listed on Anchia Exhibit 2, then we'll have
22 an understanding that you're not going to provide
23 information that would be subject to the legislative
24 privilege; is that fair?
25     A.  I understand.

## 26

1          MR. GARZA:  By the way, we -- just for the
2  record, we disagree with the State's interpretation
3  of how far legislative privilege extends.  Once
4  Representative Anchia has waived it, we don't believe
5  that the restriction that the State has placed on it
6  applies.  Nevertheless, he's indicated that his question
7  does not pertain to other legislators other than the
8  ones on this list.  So if there are other discussions
9  that whether or not legislative privilege applies to
10 them, he's not asking about that.
11         MR. SWEETEN:  Okay.  As I understand,
12 Counsel, I think what you're saying is you don't agree
13 with what we assert as the scope of the privilege, but I
14 think you're also saying that it's of no moment.
15         MR. GARZA:  It's of no moment because your
16 question is restricted in itself.
17         MR. SWEETEN:  That's right.
18     Q.  (By Mr. Sweeten)  Now, I want to give another
19 wrinkle to you.  Because I can ask and I will want you
20 to identify whether a conversation occurred.  The time
21 and place, I may ask you that.  So I don't want the
22 substance of the communication.  What I'd be asking
23 about is about whether such a communication occurred,
24 perhaps who was involved in it and how long, okay?
25     A.  May I ask about nonverbal communications during

## 27

1  a conversation.  For example, if Member X had shown me a
2  message that he or she was receiving on an iPhone
3  related to -- related to the House debate, that was --
4  that was directing answers and it was part of a
5  conversation, is that --
6      Q.  I think --
7      A.  Is that covered by the privilege?
8      Q.  That's a good question and it will be a case-
9  by-case basis.  But I think it will depend upon who
10 showed --
11     A.  If it was someone who had asserted -- who is
12 not on this list?
13     Q.  Right.  And -- and so, well, I'm going to --
14 I'm going to ask you about that and we'll talk about
15 that conversation or what you're referring to --
16     A.  Okay.
17     Q.  -- for the most part.  If you're talking about
18 the conversations you've had with legislative staff,
19 with legislators that are not a matter of public record,
20 that -- and those are subject to the privilege, and
21 those would not be -- you know, I'm not going to be
22 asking about that and that's -- that's subject to the
23 privilege.
24     A.  Okay.
25     Q.  Okay.

## 28

1          MR. GARZA:  Also, just to be clear, if
2  there are other representatives who have waived the
3  privilege but are not on this list, Patrick, you're not
4  asking about those either?  As long as they're not on
5  this list, you're not asking about those conversations;
6  is that correct?
7          MR. SWEETEN:  Well, and I don't want to
8  say I'm not asking about those conversations because I
9  may be asking whether a conversation occurred.  I'm not
10 going to ask the substance.
11         MR. GARZA:  No, I understand about the
12 substance.
13         MR. SWEETEN:  I'm not going to ask the
14 substance of those.
15         Now if you're aware of an affirmative
16 waiver of a legislative privilege that is not contained
17 on this list, you have personal knowledge of that and
18 can represent that that person has so waived, then we
19 can take that up and I think we would include that.
20         Are you making that representation that
21 are additional?
22         MR. GARZA:  I don't know.  I haven't
23 reviewed this list.
24     Q.  (By Mr. Sweeten)  Okay.  I'm going to hand you
25 what we'll mark as Anchia 3.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

29

1      (Exhibit 3 marked for identification.)
2      Q.  (By Mr. Sweeten) Okay.  Can you generally
3  identify what this exhibit is, Exhibit 3?
4      A.  This appears to be the Declaration of Rafael
5  Anchia.
6      Q.  Okay.  And let's turn to the back page.  Is
7  this your signature on the -- Page 4, correct?
8      A.  Yes.
9      Q.  Okay.  And it's signed 4-9-12.  So April 9th of
10  this year.  Was this the date that you exchanged the
11  draft and then ultimately the final product that was the
12  -- your declaration?
13      A.  Yes.
14      Q.  Okay.  Were you told by the Department of
15  Justice that this document would be used in a legal
16  proceeding?
17      A.  I don't recall.
18      Q.  Was it your understanding that it would be?
19      A.  Yes.
20      Q.  Okay.
21          MR. SWEETEN:  And we'll have this marked
22  as Anchia 4.
23          (Exhibit 4 marked for identification.)
24      Q.  (By Mr. Sweeten) And I will represent to you
25  that this is a Minute Order from the United States

---

30

1  District Court, District of Columbia.
2      A.  Can I ask you a question about that?
3      Q.  Sure.
4      A.  What is a minute order?
5      Q.  It's an order from the Court.
6      A.  Okay.
7      Q.  Okay.  I'm going to ask you to just read the
8  minute order to yourself and then I'm going to ask you
9  questions about it.
10      A.  Okay.
11      Q.  Okay.  So the date of this minute order, if
12  you'll look at the top, it's an e-mail.  It's April 3,
13  2012.  Do you see that?
14      A.  I do.
15      Q.  Had you had any conversations with the
16  Department of Justice prior to this minute order
17  issuing?
18      A.  I don't recall the exact date of the -- of our
19  discussions, so it would be impossible for me to say
20  whether it was before or after.
21      Q.  When you were contacted by the Department of
22  Justice, were you told that they had a impending
23  deadline to file information as set forth in this minute
24  order?
25      A.  I don't recall.

---

31

1      Q.  Okay.  You don't know one way or the other
2  whether you were contacted prior to the entry of this
3  minute order?
4      A.  I do not.
5      Q.  Were you contacted during -- at any time during
6  the preclearance portion of this case, which would have
7  ended with the preclearance denial on March 12, 2012?
8      A.  I don't recall.  Well, I don't recall that I
9  was.
10      Q.  Okay.  Have you had any written correspondence
11  with the Department of Justice, at any time, prior to
12  exchanging this declaration that we've talked about as
13  Anchia 3?
14      A.  I had a initial conference call that I referred
15  to earlier.  So, yes.  So the answer is yes.
16      Q.  I've asked written communications?
17      A.  Oh, written?
18      Q.  Yeah.
19      A.  Yes.
20      Q.  Okay.  Can you tell me when did you have
21  written communication with the Department of Justice?
22      A.  It would have been draft -- a draft of this --
23  of this declaration prior to the 9th of April.
24      Q.  During the preclearance process, before March
25  12, 2012, did you have any discussions with anybody at

---

32

1  the Department of Justice about Senate Bill 14?
2      A.  Not that I'm aware of.  Not -- not that I
3  recall.
4      Q.  Did you have any discussions, of any kind,
5  about the matters -- about the preclearance process?
6      A.  Yes.
7      Q.  Okay.  With the Department of Justice?
8      A.  No.
9      Q.  Okay.
10      A.  Not that I recall.
11      Q.  So your first contact with the Department of
12  Justice would have been after the March 12, 2012
13  preclearance denial date; is that right?
14      A.  As far as I can recall, yes.
15      Q.  You can put that aside.  Thank you.
16      All right.  Let's look at your
17  declaration.  Let me ask you:  Do you know if this was
18  filed with the District Court in Washington, D.C.?
19      A.  What is this?
20      Q.  This is Deposition Exhibit Number 3, the
21  declaration.
22      A.  Anchia 3?
23      Q.  Yes.  Were you aware this was filed with the --
24  with the D.C. Circuit Court?
25      A.  Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 33

1    Q.   All right.  Let's look at the first paragraph.
2    All right.  The first sentence says, "My name is Rafael
3    Anchia.  I am a resident of Dallas, Texas, registered to
4    vote in Dallas County.  I am Hispanic."
5            Who wrote that first sentence?
6    A.   I think I did.
7    Q.   Okay.
8    A.   At least, I furnished the information that
9    comprised that first sentence.
10   Q.   Okay.
11   A.   So wrote -- if you're asking did I type this
12   in, is that the question you're asking?  I just want
13   some  -- when you -- when you say "wrote," since this is
14   a typed document -- and I'm not trying to be -- I'm just
15   trying to answer the question that's asked.
16   Q.   That's fair.  Go ahead.
17   A.   So I furnished this information.  I did not
18   type this information.
19   Q.   Okay.  Did you write -- did you -- did you give
20   them a draft of your declaration or was that given to
21   you?
22   A.   I received the first draft after we had spoken
23   during that -- that first conference call that we had --
24   that I referenced earlier.
25   Q.   So the first written product that became your

## 34

1    declaration was sent to you by the Department of
2    Justice?
3    A.   Yes.
4    Q.   Okay.  And how long was the first draft that
5    they sent you?
6    A.   It was roughly -- roughly, these three-plus
7    pages.
8    Q.   Okay.  This declaration has 18 paragraphs.  Do
9    you remember how many paragraphs the first draft had?
10   A.   I do not.
11   Q.   Okay.  Do you have a copy of the first draft
12   that the Department of Justice sent you?
13   A.   I do not.
14   Q.   Okay.  What did you do with that?
15   A.   Probably recycled it.
16   Q.   Was that sent to you on e-mail?
17   A.   Yes.
18   Q.   And do you save your e-mails?
19   A.   Sometimes.
20   Q.   Okay.  What's your retention policy regarding
21   e-mails such as this?
22   A.   It depends.  In the -- at the State office, our
23   retention policy -- I asked that our retention policy be
24   consistent with whatever Leg Council or the Governor's
25   Office has as a retention policy.

## 35

1    Q.   So I guess -- I guess that's another question:
2    Were you sent the e-mail on a State account or was this
3    on your private e-mail account or was it a work e-mail
4    account?
5    A.   I don't recall.
6    Q.   Do you recall any e-mail communications you've
7    had with the Department of Justice and which account
8    that would have been on?
9    A.   I don't recall the exact account but it would
10   relate to the draft.
11   Q.   Did you send a red-line draft back with
12   changes?
13   A.   I don't believe so, no.
14   Q.   Did you sign the first draft given to you?
15   A.   No.
16   Q.   Okay.  Did you call them and tell them what you
17   wanted changed?
18   A.   I believe that's right, yes.  We did have a
19   phone conversation.  We --
20   Q.   What did you ask -- go ahead.
21   A.   Yes.
22   Q.   You can finish.  I'm sorry.  I don't want to
23   trip on your answer.
24   A.   No.  We had a phone conversation related to the
25   draft.

## 36

1    Q.   What did you ask to have changed?
2    A.   I don't recall, to be honest.
3    Q.   Let's look at the second paragraph.  "I'm
4    currently a member of the Texas House of
5    Representatives, representing District 103 in western
6    Dallas County.  District 103 is a majority Hispanic
7    district in which Hispanic voters are able to control
8    the outcome of the election."  Is that what you wrote?
9    A.   That is what I said.
10   Q.   And what does that mean, that last sentence.
11   It's "a majority Hispanic district in which Hispanic
12   voters are able to control the outcome of the election,"
13   what does that mean?
14   A.   That based on the voter turnout in the
15   district, if Hispanic registered voters were to turn out
16   in large numbers, they could elect the person of their
17   choice.
18   Q.   Okay.  What is the racial makeup of District
19   103?
20   A.   The prior District 103, so that the 103 that I
21   have run in previously, pre-redistricting, is about
22   70-plus percent Hispanic.
23   Q.   Okay.  Can you give me the general parameters
24   of your district, geographically?
25   A.   Goes from North Oak Cliff, essentially,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

37

1  Methodist Hospital is in Dallas, all the way up to old
2  downtown Carrollton.  And, again, this is the
3  pre-redistricting, the pre-redistricting parameter.  And
4  on the east side, it goes -- the eastern most edge is
5  the intersection of Inwood and Lovers -- Inwood and
6  Mockingbird.  And the western most edge is Loop 12 at,
7  what used to be, Texas Stadium.
8       Q.  Okay.  What are the other racial groups that
9  make up your district?
10      A.  It's about 70 to 74 percent Hispanic, somewhere
11  in there, and about 10 percent African-American -- and
12  these are round numbers.  And I'd say about 4 percent
13  Asian, maybe 3 to 4 percent Asian, and then the
14  remainder is Anglo.
15      Q.  Let's go to Paragraph 3.  "I was first selected
16  to represent District 103 in November 2004 and I've
17  continued to represent the district since that date."
18          Is that your first election of any kind
19  outside of the school board?
20      A.  Yes.
21      Q.  Have you served as House member since 2004?
22      A.  Yes.
23      Q.  "I have been a member of the Mexican American
24  Legislative Caucus during every session in which I have
25  served.  I also served on the House Elections Committee

---

38

1  in my first three terms from 2005 to 2010."
2       A.  That is correct.
3       Q.  What other groups are you a member of?  I
4  understand you're a member of Democratic party?
5       A.  Correct.
6       Q.  Okay.  What other groups?
7       A.  I sit on the Bill and Rita Clemens Center for
8  Southwest Studies at my alma mater, Southern Methodist
9  University.  I'm on the president's -- President Gerald
10  Turner's advisory council for young leaders at Southern
11  Methodist University.  I am a member of a group called
12  the Dallas Assembly, which is a group of leaders in the
13  Dallas area.  I'm a member -- I'm an alumnae of a group
14  called Leadership Dallas.  I am a member of the Catholic
15  Campus Community at SMU.  There are a lot of groups I'm
16  a member of.
17      Q.  Okay.
18      A.  I -- I serve on the board of the Hoblitzelle
19  Foundation.  H-O-B-L-I-T-Z-E-L-L-E, is my best
20  recollection of how to spell that.  Member of the Oak
21  Cliff Lions Club.
22      Q.  Lot of groups.
23      A.  Yeah.  UT Southwestern Foundation -- medical
24  school foundation.
25      Q.  Okay.  The next paragraph, you discuss -- you

---

39

1  say, "The House Elections Committee considered bills to
2  require voters to show photo identification in the 79th
3  Legislature, House Bill 1706; 80th Legislature, House
4  Bill 218; and the 81st Legislature, Senate Bill
5  362."  Let's start with that paragraph.  Did you support
6  any of that legislation?
7       A.  No.
8       Q.  Okay.  You were opposed to House Bill 1706?
9       A.  Yes.
10      Q.  House Bill 218?
11      A.  Yes.
12      Q.  And Senate Bill 362?
13      A.  Yes.
14      Q.  Okay.  You've opposed any legislative bills
15  related to the photo identification at polls -- poll
16  places, correct?
17      A.  Bills, yes.  I've supported amendments that
18  would have created a photo identification requirement,
19  but they were unsuccessful.
20      Q.  Okay.  Now, the next sentence says, "Each photo
21  identification bill introduced in the prior legislative
22  sessions allowed for more forms of identification than
23  does Senate Bill 14," right?
24      A.  Yes.
25      Q.  Did I read that right?

---

40

1       A.  Yes.
2       Q.  That's a true statement?
3       A.  To the best of my recollection, yes.
4       Q.  But in any event, you opposed all of them?
5       A.  Yes.
6       Q.  Can you tell us why it is that you have not
7  supported any of these versions of photo identification
8  bills?
9       A.  Because I think they would have the tendency to
10  disenfranchise many groups including ethnic and racial
11  minorities.
12      Q.  Okay.  What I'm -- what I'm hearing is you
13  think that they would have a discriminatory effect; is
14  that what you're saying?
15      A.  Yes.
16      Q.  Okay.  Let me ask you:  As you're sitting here,
17  do you believe that House Bill 1706 had a discriminatory
18  purpose?
19      A.  Yes.
20      Q.  Okay.  Do you believe that House Bill 218 had a
21  discriminatory purpose?
22      A.  Yes.
23      Q.  Do you believe that Senate Bill 362 had a
24  discriminatory purpose?
25      A.  Yes.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 41

1    Q.  And you believe Senate Bill 14 had a
2  discriminatory purpose?
3    A.  Yes.
4    Q.  As to each of those, and we could go down the
5  list, do you believe all four of them had a
6  discriminatory effect?
7    A.  Yes.
8    Q.  Okay.  And we'll get into that more later.
9       Now, Paragraph 5.  "Throughout
10  consideration of these bills, proponents of voter photo
11  identification attempted to gain support for the bills
12  by making statements about large numbers of undocumented
13  Hispanics arriving and illegally voting in elections."
14  Did I read that sentence right?
15    A.  Yes.
16    Q.  Okay.  So without revealing matters of
17  legislative privilege, can you tell me who made such
18  statements?
19    A.  Betty Brown, Leo Berman, and a number of
20  witnesses who testified before the committee, including
21  Paul Bettencourt from Harris County, George Hammerlein
22  from Harris County, and a number of other witnesses who
23  I have not -- who I don't recall, but came to testify
24  before the committee.
25    Q.  Okay.  So you're saying those four individuals

## 42

1  and maybe others --
2    A.  At least those four individuals.
3    Q.  Okay.  Let me finish my question.
4    A.  Sorry.
5    Q.  You said that those four individuals and maybe
6  other witnesses who testified --
7    A.  (Witness nods head yes.)
8    Q.  -- made statements that large numbers of
9  undocumented Hispanics arriving and illegally -- let me
10  -- let me start over.
11      You said that they made statements that
12  attempted to gain support for the bills by making
13  statements about large numbers of undocumented Hispanics
14  arriving and illegally voting in elections.  Each one of
15  those did?
16    A.  Yes.  The essence of their -- the essence of
17  their testimony was to that effect, yes.
18    Q.  When you say testimony -- and you've -- you've
19  talked about two people that provided testimony.  And
20  then you've talked about two legislators, Betty Brown
21  and Leo Berman.  So I want to take those separately.
22    A.  Yes.
23    Q.  Let's start with Betty Brown.  Is the statement
24  that you're referring to from Betty Brown, was that a
25  matter of public record on the Floor?

## 43

1    A.  Yes.
2    Q.  Okay.  Can you tell me exactly what she said
3  that aligns with what you've written on Paragraph 5?
4    A.  I'd have to look at the -- at the House Journal
5  to tell you exactly what she said.  But the essence of
6  what she said, she had stacks of paper at the dais, and
7  she said that these -- these are illegal immigrant
8  voters and that is why we need this legislation.  And I
9  can't recall if she read the names of these folks,
10  whether that was in committee or on the Floor.  There
11  were many Spanish surnames in that stack of paper.  And
12  I don't recall, when I was looking through the papers,
13  whether the Spanish surnames -- whether I discovered
14  that they were Spanish surnames and that was discussed
15  in committee or on the House floor, but it was related
16  to Betty Brown's comments.
17    Q.  So Betty Brown made public statements
18  that you believe are set forth or described in Paragraph
19  5?
20    A.  Yes.  The essence of her comments is consistent
21  with my statement.
22    Q.  Okay.  Those are matters of public record that
23  Betty Brown made?
24    A.  Yes.
25    Q.  When did she make them, what session?

## 44

1    A.  Betty Brown would have made those, I believe,
2  in the 2000 -- let me look back.  I believe in the 80th
3  legislative session.
4    Q.  Okay.  So the 80th Legislature, House Bill 218.
5    A.  Okay.
6    Q.  So in connection with House Bill 218, Betty
7  Brown made public statements that you believe are
8  described in Paragraph 5?
9    A.  Yes.
10    Q.  Okay.  Let's talk about Leo Berman.  And we're
11  going to get back to Betty Brown because you address it
12  in the affidavit --
13    A.  Okay.
14    Q.  -- so we'll talk about that.
15    A.  Okay.
16    Q.  Leo Berman.  Actually, let me back up.  Is
17  there any other statement that you're aware of that
18  Betty Brown made, other than what you've just described?
19    A.  I think in committee, Betty Brown made
20  statements related to undocumented immigrants voting as
21  well.
22    Q.  Okay.  What did she specifically say in
23  committee?
24    A.  I don't recall specifically.  But -- but my
25  recollection is that that was the sense of her -- some



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Representative Rafael Anchia                                     June 6, 2012

## 45

1    of her comments in committee.
2        Q.  Okay.  That the sense of these comments that
3    she made is that large numbers of undocumented Hispanics
4    are arriving and illegally voting?
5        A.  Uh-huh.
6        Q.  Yes?
7        A.  Yes.
8        Q.  Now, let me just ask you:  Is it illegal if a--
9    an undocumented alien votes, under current law, without
10   any of these photo identification bills, is that
11   illegal?
12       A.  Yes.
13       Q.  Okay.  What about a permanent resident who's a
14   non-citizen, would that be illegal for somebody like
15   that to vote?
16       A.  Yes.
17       Q.  Let's talk about your discussions or your --
18   what you've said about Mr. Berman, okay?
19       A.  (Witness nods head yes.)
20       Q.  Representative Berman, when did he -- first of
21   all, are these public statements that you're referring
22   to that Representative Berman made?
23       A.  Yes.
24       Q.  Okay.  And can you tell me what legislative --
25   in what legislative session Mr. Berman made those

## 46

1    remarks?
2        A.  I'm trying to think when he was committee
3    chair, but that may have been in the 80th legislative
4    session as well.  I may be confusing the 80th and the
5    81st but...
6        Q.  So Representative Berman made public statements
7    in either the 80th or the 81st --
8        A.  In fact, they were written.
9        Q.  Okay.
10       A.  They were written.
11       Q.  All right.  Let me back up then.  In the 80th
12   or 81st Legislature, he made a public written statement
13   that indicated that undocumented Hispanics are arriving
14   and illegally voting?
15       A.  Yes, "illegal aliens voting," I believe were
16   his -- his exact written -- I'd have to go back and look
17   at his letter, but yes.
18       Q.  And how is that a matter of public record?  Is
19   that introduced in -- in?
20       A.  I believe he wrote it as a letter to the editor
21   to the Tyler paper.
22       Q.  Okay.
23       A.  And we discussed it in committee.
24       Q.  So there was a letter to the editor from
25   Representative Berman and it was discussed in committee?

## 47

1        A.  Correct.
2        Q.  Okay.  And both those discussions -- and by the
3    way, was the discussion with Representative Berman --
4        A.  Yes.
5        Q.  Okay.  So --
6        A.  He was the chair of the committee at the time.
7        Q.  Okay.  So both the discussion with
8    Representative Berman and the letter to the editor, you
9    believe evidenced that -- that he's saying that large
10   numbers of undocumented Hispanics are arriving and
11   illegally voting?
12       A.  Correct.
13       Q.  By itself, is that statement, "that large
14   numbers of undocumented Hispanics are arriving and
15   illegally voting," does that show discrimination or
16   discriminatory purpose in your view?
17       A.  I think it's part of a -- the statement, by the
18   way, I believe to be untrue.  And is part of, I think, a
19   manipulation of public opinion to try to put a Hispanic
20   face on a problem, or an alleged problem, and it is
21   designed, I think, to stoke fears about Hispanics
22   voting, generally.
23       Q.  Well, you're -- you're addressing a subjective
24   element to that.
25       A.  Uh-huh.

## 48

1        Q.  You're interpreting those remarks that --
2        A.  That is my interpretation, correct.
3        Q.  So when you're saying that those evidenced
4    discriminatory purpose, you're saying my interpretation,
5    as Representative Anchia, is that those remarks are
6    discriminatory?
7        A.  I think that is evidence of discriminatory
8    purpose, yes.  Which I think that -- yeah, yes.
9        Q.  Is there anything else that Representative
10   Berman uttered publicly or privately that you believe
11   evidence what you set forth in Paragraph 5?
12       A.  I imagine private communications would be
13   privileged.
14       Q.  And -- that's a good catch.  And I'm not
15   asking you for the substance, I'm asking you:  Have you
16   had private conversations with him that you believe
17   evidence discrimination?  So just a general subject
18   matter.
19       A.  Yes.
20       Q.  And can you tell me when those communications
21   occurred?
22       A.  It occurred before a debate that we had where
23   we were set to go on TV and we were visiting at the TV
24   station and he was getting makeup put on.
25       Q.  Okay.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

49

```
1    A.  And we had a -- we had a discussion.
2    Q.  Okay.  How long was the discussion?
3    A.  Five minutes.
4    Q.  Who else was present?
5    A.  The makeup artist.
6    Q.  Okay.  Can you tell me the station where this
7  occurred?
8    A.  I don't know the call letters.
9    Q.  Who -- who interviewed you that day?
10   A.  I believe it was Paul Stekler.
11   Q.  Who is Paul Stekler?
12   A.  He's a -- he is a PBS TV interviewer --
13   Q.  In Dallas?
14   A.  No, no.  In Austin.
15   Q.  In Austin.  Any other statements by
16 Representative Berman that you believe are part of your
17 description of -- set forth in Paragraph 5?
18   A.  Not that I recall.
19   Q.  Okay.  Can you tell me the time frame that that
20 occurred, that interview?
21   A.  I think it was either during the 2005 or 2007
22 session.
23   Q.  Okay.  Now you've referenced something that
24 Mr. Berman said, I think you said in either the 80th or
25 81st session.  You haven't referenced anything he said
```

50

```
1  in the 82nd.  Can you identify -- is there any time in
2  the 82nd that Representative Berman uttered such a
3  statement?
4    A.  No.  I don't believe he was involved in the
5  legislation.
6    Q.  Okay.  He wasn't involved in the legislation,
7  Senate Bill 14?
8    A.  Yeah.  Not that I recall.
9    Q.  Okay.  Because Representative Berman wasn't on
10 the Select Committee that considered the bill?
11   A.  I don't recall.
12   Q.  Well, what did you mean that he wasn't involved
13 in the legislation?
14   A.  He wasn't the author of the legislation.  I
15 think in prior sessions, he had authored legislations to
16 this effect.
17   Q.  All right.  You talked about Paul Bettencourt.
18 Who is that?
19   A.  I want to say he's the Harris County Tax
20 Assessor.  He was the Harris County Tax Assessor-
21 Collector.
22   Q.  Okay.  And he uttered statements that -- that
23 you generally described as "large numbers of
24 undocumented Hispanics arriving and illegally voting in
25 elections," something to that affect.
```

51

```
1    A.  Something along those lines.
2    Q.  And he made those statements in public, in
3  testimony?
4    A.  Yes.
5    Q.  And he made those during which session?
6    A.  Either during the -- I think during the 2007
7  session, if not during the 2009 session.
8    Q.  Okay.  Any other sessions?
9    A.  I don't recall.
10   Q.  Do you recall specifically what he said?
11   A.  Not exactly.
12   Q.  It would be on the record, I assume?
13   A.  Yes.
14   Q.  Okay.  If we want to read it for ourselves,
15 it's there?
16   A.  Yes.
17   Q.  Any other statements Mr. Bettencourt made?
18   A.  Not that I recall.
19   Q.  Okay.  You ever talk to him?
20   A.  No.
21   Q.  Okay.  You're referring to his public
22 testimony?
23   A.  Yes.
24   Q.  All right.  George Hammerly?
25   A.  Hammerlein, I think.
```

52

```
1    Q.  And who is George Hammerlein?
2    A.  I believe he worked for Paul Bettencourt at the
3  Harris County tax assessor-collector's office in the
4  voting division.
5    Q.  When did Mr. Hammerlein testify?
6    A.  Either in 2007 or 2009.
7    Q.  The testimony was public?
8    A.  Yes.
9    Q.  Was in it committee or was it on the --
10   A.  I believe it was in committee.
11   Q.  And, again, you think what Mr. Hammerlein said
12 fits the description of "large numbers of undocumented
13 Hispanics arriving and illegally voting in elections"?
14   A.  Yes.
15   Q.  Do you know what he said specifically?
16   A.  He talked about a match that his office had
17 done between the jury pool lists and the voter
18 registration lists, and he asserted that the two
19 inconsistent statements where a person says they're a
20 U.S. citizen and their voter registration card -- and on
21 -- and the inconsistent statement where the person said
22 that they were not a U.S. citizen in the jury pool,
23 confirmed that there were undocumented persons voting in
24 these elections.  And in fact, the stack of papers that
25 he handed out had many Spanish surname persons that he
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 53

1    was alleging were voting illegally -- or illegal
2    immigrants who were voting.
3        Q.   Everything that he said was on the public
4    record?
5        A.   Yes.
6        Q.   Did you find out information that later led you
7    to believe that what he was saying is not true?
8        A.   Yes.
9        Q.   Okay.  Can you tell me what you found out?
10       A.   Well, we talked to -- we talked to some of the
11   same people that he said were illegal immigrants and
12   they, in fact, were U.S. citizens.
13       Q.   Who is "we"?
14       A.   Our office, our state office.
15       Q.   Did you talk with anyone?
16       A.   I'm trying to think.  Yes, I believe I did talk
17   to some of those persons who were alleged to have been
18   illegal immigrants.
19       Q.   You got their names from his testimony sometime
20   if the --
21       A.   From the stack -- I'm sorry.
22       Q.   Let me finish the question.  Sometime in the
23   2007 or 2009 time frame?
24       A.   Yes.
25       Q.   You got his -- whatever he testified to

## 54

1    publicly, you got the names of the individuals?
2        A.   Yes.
3        Q.   And you or someone from your office contacted
4    these individuals?
5        A.   Yes.
6        Q.   Who did you specifically talk to?
7        A.   I don't recall.
8        Q.   Who did the members of your office talk to?
9        A.   I don't recall.
10       Q.   And what did you -- what was the substance of
11   -- when you contacted these people, what did you find
12   out?
13       A.   I asked them whether they were undocumented or
14   not.
15       Q.   Okay.  And how many people did you talk to?
16       A.   I don't know.
17       Q.   Was it more than one?
18       A.   I don't remember.
19       Q.   Can you give -- is there a record you could
20   look at and get us the name of that individual?
21       A.   It's possible.  I'll look to see if we still
22   have those records.  But we talked about some of that
23   research in one of my committee reports when Chairman --
24   when Chairman Berman was the chair of the committee.  It
25   was included in public, in the Elections Committee

## 55

1    report.
2        Q.   So the results of those communications are set
3    forth in what?
4        A.   In a -- the Elections Committee report.  To the
5    best of my recollection, from either the 2007 or 2009
6    session, whenever Chairman Berman was Chair.
7        Q.   Okay.  Now you've identified --
8        A.   May I also --
9        Q.   Go ahead.
10       A.   I'd also like to point out that on the House
11   floor when Betty Brown had that same stack, it appeared,
12   of what she was calling illegal alien voters,
13   Representative Hochberg went and inspected those
14   documents and found them to be -- found her statements
15   to be inaccurate as well.  Because you asked me earlier
16   how I -- how I believe that not to be true.
17       Q.   Okay.  And now we're talking about Betty Brown.
18   And we can talk about that but --
19       A.   I may have jumped ahead.
20       Q.   No, that's okay.  In fact, let's talk about it.
21       A.   Okay.
22       Q.   You, in Paragraph 6 of this affidavit, you say
23   that, "In 2009, former Representative Betty Brown, who
24   is Anglo, held up a stack of papers during the House
25   floor debate and said they proved that illegal aliens

## 56

1    were voting."  Is that what she said?
2        A.   Yes.
3        Q.   That's what you're referring to when you
4    discussing Betty Brown's statement?
5        A.   Correct.
6        Q.   And in this affidavit filed with the court,
7    you're relating to the court that it's Representative
8    Hochberg is the one who spoke with her or that
9    subsequently examined the papers and said they didn't
10   contain any evidence, right?
11       A.   Yes.
12       Q.   You -- you didn't do that yourself; you didn't
13   do that inspection yourself?
14       A.   Well -- I mean, to the extent that it was the
15   same stack of papers, and I believe it was, the same
16   stack that George Hammerlein and Paul Bettencourt had
17   presented to our office, then, yes, we had examined
18   those papers.
19       Q.   So you're indicating that what Betty Brown held
20   up is the same thing that --
21       A.   It is my recollection that it was the same
22   stack of papers.
23       Q.   Okay.  Let me finish the question and I'll try
24   to let you finish the answer.
25       A.   I apologize.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 57

1    Q.   When we read it, it will be crazy.
2    A.   Right.  I understand.
3    Q.   Okay.  Let's -- let me just ask you to make
4    sure it's clear:  The stack of payments that you're
5    indicating were in Betty Brown's hands, you're
6    indicating were the same stack of papers that
7    Mr. Bettencourt had held up or referenced in his public
8    testimony?
9    A.   It is my recollection that they were the same.
10   Q.   You didn't add, in Paragraph 6, that you had
11   personally discussed this matter with individuals listed
12   on those papers though, did you?
13   A.   No.
14   Q.   Okay.  Is there reason you didn't put that in
15   there?
16   A.   No.
17   Q.   Okay.  In fact, what you say is, is you
18   referenced Representative Hochberg and say that he's the
19   one that examined the papers?
20   A.   Yes.
21   Q.   Okay.  Why didn't you put what you had done in
22   there?
23   A.   I -- I assume I forgot.
24   Q.   Okay.  Let go back up to Paragraph 5.  We
25   didn't go over one of your sentences here.  It is, "In

## 58

1    essence, they sold the concept of photo identification
2    requirements for voting on the backs of Latinos."  Did I
3    read that right?
4    A.   Yes.
5    Q.   All right.  So when you're saying "they sold,"
6    you're referring to Betty Brown, Leo Berman, Paul
7    Bettencourt and George Hammerlein?
8    A.   And many other people who testified before the
9    committee.
10   Q.   Okay.  Anyone else you're referring to?
11   A.   I mean, not by name -- not that I can recall by
12   name.
13   Q.   And it's your interpretation of what they're
14   saying is that they are selling the concept of photo
15   identification on the backs of Latinos?
16   A.   Yes.
17   Q.   Is that right?
18   A.   Yes.
19   Q.   Is that all Latinos?
20   A.   I'm not sure I understand the question.
21   Q.   Okay.  Well, when you say the words "on the
22   backs of Latinos," what do you mean?
23   A.   What I mean by that is that there was this
24   narrative that I heard during my three sessions on the
25   Elections Committee from people who would come and

## 59

1    testify as to the need for photo identification, that
2    there were undocumented persons -- and either explicitly
3    or implicitly, that there were Hispanic voting at the
4    polls.  When I would ask people at the committee, you
5    know, whether or not they knew they were -- whether they
6    were documented or undocumented, whether they were
7    illegally voting or not illegally voting, could never
8    come up with a -- with an example.  But it was
9    generally, there was this sense that the Hispanics that
10   were voting were somehow illegal and if that is -- and
11   if that is the case, we need this photo identification
12   to stop them from doing so.
13   Q.   There would not be a discriminatory purpose, in
14   your view, of trying to curb non-citizens voting?
15   A.   No.
16   Q.   But your interpretation of these remarks is
17   that they are selling this on the backs of Latinos?
18   That's your interpretation, right?
19   A.   That's right.
20   Q.   Are there any other individuals that we haven't
21   yet discussed?  You've referenced some witnesses who
22   testified, and you referenced Brown, Berman,
23   Bettencourt, and Hammerlein.  Anybody else who, in your
24   view, was selling the concept of photo identification on
25   the backs of Latinos?

## 60

1    A.   No.  Other than the people who testified before
2    the committee, sort of, you know, the blog
3    infrastructure where you would read things out in blogs,
4    you know, where there were concerns about illegal
5    immigrants, Hispanic illegal immigrants voting in
6    elections, and then some direct statements that we heard
7    during the legislative process, then I would say no.
8    Q.   Okay.
9         MR. SWEETEN:  Can you read the answer
10   back, please.
11        (The requested portion was read back by
12   the reporter.)
13   Q.   So in that answer, you're referencing bloggers,
14   you're referencing these four individuals, and then
15   others who testified.  Okay.  Now, none of those
16   references that you've made relate to anything that
17   occurred in the 82nd Legislature.  Would you agree with
18   that?
19   A.   No.
20   Q.   Okay.  Well, let's go through it.  Brown's
21   remarks weren't in the 82nd?
22   A.   Right.
23   Q.   Berman's weren't in the 82nd?
24   A.   Right.
25   Q.   Bettencourt's weren't in the 82nd?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 61

1    A.  Right.
2    Q.  Hammerlein's weren't in the 82nd?
3    A.  Right.
4    Q.  Other witnesses?
5    A.  Yes.
6    Q.  Who?
7    A.  I don't have names for you but we did have
8    other witnesses during the 82nd legislative session.
9    Q.  If we wanted to check to see who those
10   witnesses are --
11   A.  It would probably be in the public record.
12   Q.  Okay.  Let me -- let me just finish the
13   question.
14   A.  Sorry.
15   Q.  If we want to check to see who those witnesses
16   are, who made statements that there were -- that the
17   concept of photo identification was being sold on the
18   backs of Latinos, we can just look at the 82nd
19   legislature transcript to find those; is that right?
20   A.  I don't think they would have said this exact
21   thing.  This is my interpretation of their comments.  So
22   would you have had a witness that was in favor of photo
23   ID, would have said, "We're selling this on the backs of
24   Latinos," then I'd say you will not find that in the
25   transcript.

## 62

1    Q.  So as far as participation in the 82nd
2    legislature, either as a legislator or as a witness,
3    those individuals who sold this on the backs of Latinos,
4    the court could just look at the transcript and they can
5    make their own interpretation as to whether or not those
6    statements made in public record were selling it on the
7    backs of Latinos, right?
8    A.  Yes.
9    Q.  Okay.  Let's go to Paragraph 7.  "In 2011,
10   House leadership formed the Select Committee on Voter
11   Identification and Fraud which solely addressed Senate
12   Bill 14."  Let's talk about that first sentence.  How
13   many select committees have you been a member of?
14   A.  None.
15   Q.  How many select committees --
16   A.  Oh, not true.  One.
17   Q.  Okay.  Which select committee was that?
18   A.  The Select Committee on School Finance.
19   Q.  Okay.  How many bills did the Select Committee
20   on School Finance consider?
21   A.  None.  It is a -- it is a committee that has
22   recently been formed and has had one hearing.
23   Q.  And are you familiar with other select
24   committees being established within the House?
25   A.  No.

## 63

1    Q.  Okay.  Is this the -- so the only two select
2    committees you're aware of are the Select Committee on
3    Voter Identification and Fraud in 2011 and this recent
4    select committee that you're a member of now on School
5    Finance?
6    A.  Yes.  As far as I recall, those are the only
7    two.
8    Q.  Who established the Select Committee on School
9    Finance?
10   A.  I imagine the Speaker of the House.
11   Q.  Okay.  And you were -- you're a member or do
12   you have a leadership position on the committee?
13   A.  No.
14   Q.  As you're sitting here, you don't know how many
15   bills the select committee that you're on is going to
16   consider?
17   A.  No.
18   Q.  You don't have an estimate?
19   A.  Because the bill filing period hasn't opened.
20   Q.  Okay.
21   A.  So I -- we don't know.
22   Q.  Or whether this committee will even hear bills?
23   A.  I think it's just an interim committee.
24   Q.  Okay.
25        MR. GARZA:  We've been going for about an

## 64

1    hour and quarter.  Can we take a break?
2        MR. SWEETEN:  Sure.  Absolutely.  Let's do
3    that.
4        (Recess from 2:59 to 3:10 p.m.)
5    Q.  (By Mr. Sweeten) Photo identification bills are
6    popular with the general population, right?
7    A.  I don't know.
8    Q.  Okay.  Have you consulted any polls regarding
9    that issue?
10   A.  No.
11   Q.  Okay.  Let me show you what we'll mark as
12   Anchia Exhibit 5.
13       (Exhibit 5 marked for identification.)
14   Q.  (By Mr. Sweeten) I have handed you what we've
15   marked as Anchia Exhibit 5.  Do you see that in front of
16   you?
17   A.  I do.
18   Q.  And that document is a Lighthouse Opinion Poll,
19   Fall 2010, Statewide Landscape Benchmark Survey.  Have
20   you ever seen this poll before?
21   A.  No.
22   Q.  Okay.  If you could turn to Page 3.  There's a
23   section called Voter ID Requirement.
24   A.  Okay.  That is the bottom of Page 3?
25   Q.  That's correct.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 65

1   A.  Photo Voter ID Requirement?
2   Q.  Correct.  That poll asks the question: "Do you
3   favor or oppose requiring a valid photo ID before a
4   person is allowed to vote," correct?
5   A.  Yes.
6   Q.  Okay.  And underneath the numbers, it says 86
7   percent favor it.  Do you see that on the left column?
8   A.  Yes.
9   Q.  It says 94 percent of Republicans favor it, and
10  75 percent of Democrats favor it.  Did I read that
11  correctly?
12  A.  Yes.
13  Q.  Okay.  And then it has, underneath it says 22
14  percent of Democrats are opposed to it, and 5 percent of
15  Republicans are opposed to it, for a total of 12
16  percent.  Did I read that correctly?
17  A.  Walk me through that one more time.  I didn't
18  follow.
19  Q.  Okay.  12 percent oppose -- according to the
20  poll, 12 percent oppose this question, correct?
21  A.  Yes.
22  Q.  All right.  And that includes 22 percent of
23  Democrats polled oppose it, right?
24  A.  Yes.
25  Q.  And 5 percent of Republicans?

## 66

1   A.  Yes.
2   Q.  Now, if you'll look at the racial breakdown to
3   the right, it says, "White, Black, Hispanic," and there
4   it says, "86 percent of whites favor it, 82 percent of
5   blacks favor it, 83 percent of Hispanics favor it."  Did
6   I read all that correctly?
7   A.  Yes.
8   Q.  Do you have any reason to dispute the results
9   of this poll?
10  A.  I don't know the sample size.  I don't know who
11  they talked to.  I don't know the questions that were
12  asked and how they were asked.  I don't know the
13  fundamentals of the poll.
14  Q.  You have not seen this poll before?
15  A.  So I would have no information to dispute or
16  affirm the results.
17  Q.  Does it matter to you if people support a bill,
18  when you're making a calculation such as you have here,
19  that a bill is discriminatory?
20  A.  Restate your question.
21  Q.  Okay.  You have made allegations that this bill
22  has a discriminatory purpose.  You have said that today,
23  right?
24  A.  Yes.
25  Q.  Okay.  Does it factor into your consideration

## 67

1   that the -- whether or not something is supported by the
2   populace, by voters?
3   A.  It might.
4   Q.  Okay.  You hadn't seen this before, this
5   Lighthouse Poll?
6   A.  No.
7   Q.  Okay.  I'm going to hand you what we'll go
8   ahead and mark as Anchia 6.
9   (Exhibit 6 marked for identification.)
10  MR. SWEETEN:  Here's a copy for you,
11  Counsel, and just to make it official, here's another
12  copy as well.
13  Q.  (By Mr. Sweeten) And what I'm showing you are
14  one, two, three, four, five, six, seven, -- 11 boxes
15  that represent questions about voter identification,
16  okay?  So I want to ask you:  Have you -- there's a poll
17  -- the first box references a survey by Fox News, from
18  April 9th through April 11, 2012, based on 910 telephone
19  interviews.  Do you see that?
20  A.  I do.
21  Q.  And do you see above that 70 percent of voter
22  identification -- 70 percent of those polled said that
23  voter identification are laws needed to stop illegal
24  voting.  Do you see that?  Did I read that right?
25  A.  Yes.

## 68

1   Q.  Are you aware of this poll, outside of what I'm
2   showing you today?
3   A.  No.
4   Q.  Okay.  It says, "26 percent of voter
5   identification laws are unnecessary and discourage legal
6   voting," right?
7   A.  Yes.
8   Q.  According to this poll, it is -- by 70 to 26,
9   is it popular with those surveyed, correct?
10  A.  Yes.
11  Q.  But you've never seen this poll before?
12  A.  No.
13  Q.  Okay.  Let's look at the next one.  This is a
14  survey by Fox News, January 12 through January 14, 2012,
15  based on 906 telephone interviews.  The question asked,
16  "Do you think people should be required to show a valid
17  form of state or federally-issued photo identification
18  to prove U.S. citizenship before being allowed to vote?"
19  Do you see that 80 percent of people surveyed say "Yes"?
20  A.  Yes.
21  Q.  And 19 percent say "No"?
22  A.  Yes.
23  Q.  And would you agree that that poll shows that
24  it is overwhelmingly popular, this question as posed in
25  the telephone survey?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 69

1        A.  No.  What -- what this says to me is that of
2    the 906 people, 80 percent answered yes to the question
3    that was asked.
4        Q.  Okay.  Do you have a problem with the
5    methodology utilized, or do you not know one way or the
6    other?
7        A.  I don't know one way or the other.
8        Q.  Have you seen this poll before, this one?
9        A.  No.
10       Q.  Did you ever rely upon this poll in any way?
11       A.  No.
12       Q.  Let's look at the next one.  The next one is,
13   Survey by Fox News.  Methodology:  Conducted by Anderson
14   Robbins Research, Shaw & Company survey, April 3rd
15   through April 5th, 2011.  Now, that was during the 82nd
16   Legislature, correct?
17       A.  Those dates coincided with the 82nd
18   Legislature, correct.
19       Q.  And this is a national poll, and they asked,
20   "Do you think requiring U.S. citizens to show
21   identification before being allowed to vote in elections
22   is a good or a bad idea?"  88 percent say it's a good
23   idea.  Did I read that right?
24       A.  You read that correctly.
25       Q.  Were you aware of this poll?

## 71

1        A.  Yes.
2        Q.  Okay.  This poll would seem to show that it is
3    a popular thing so have voter identification, correct?
4        A.  This poll shows me that of the 900 people that
5    were given telephone interviews, 83 percent answered the
6    above question as being a good idea.
7        Q.  Okay.  Had you seen this poll?
8        A.  No.
9        Q.  Did you rely upon this in any way?
10       A.  No.
11       Q.  The next poll, Pew Research, People and the
12   Press.  Methodology:  Conducted October 17th through
13   October 22nd of 2006.  The question asked:  "On election
14   day, should voters be required to show an official photo
15   identification, such as a driver's license, or shouldn't
16   they have to do this?"  78 percent, should show photo
17   ID.  Did I read that correctly?
18       A.  Yes.
19       Q.  Okay.  If you'll look -- this one is broken out
20   by White, Black, and Hispanic.  And do you see under
21   Hispanic it says, "83 percent say should show photo ID."
22   Did I read that correctly?
23       A.  Yes.
24       Q.  Under Black, "74 percent say should show photo
25   ID."

## 70

1        A.  I was not.
2        Q.  Okay.  Let's look at another national poll.
3    This one is surveyed by Fox News conducted by Opinion
4    Dynamics, June 9 through June 10, 2009.  So this would
5    have been during the 81st Legislative session, correct,
6    or just after?
7        A.  I believe that these dates would have been
8    after the conclusion of the 81st Legislative Session.
9        Q.  Okay.  And the question posed:  "Do you think
10   people should be required to show photo identification
11   or a social security card to prove U.S. citizenship
12   before being allowed register to vote?"  91 percent say
13   yes, it should.  Did I read that right?
14       A.  Yes.
15       Q.  Were you aware of this poll?
16       A.  No.
17       Q.  I'm going to show you next one, a survey by Fox
18   News, June 9 through June 10.  "Do you think
19   requiring voters to show photo identification at their
20   polling places before being allowed to vote is a good
21   idea because it helps avoid fraud or a bad idea because
22   it can discriminate against people who don't have a
23   driver's license or other photo ID?"  83 percent of the
24   survey responders say it's a good idea.  Did I read that
25   correctly?

## 72

1        A.  Yes.
2        Q.  Under White, "77 percent should show photo ID."
3        A.  Yes.
4        Q.  Is this a poll you ever read prior to today?
5        A.  No.
6        Q.  Were you aware of this poll?
7        A.  I don't recall being aware of it.
8        Q.  The next one I'm going to show is on the next
9    page.  This is "Survey by NBC News, Wall Street Journal,
10   conducted April 21st through April 24th, 2006, based on
11   1100 telephone interviews.  The question posed was:
12   "I'm going to read you several major changes that could
13   be made in politics or specific policies.  For each one,
14   please tell me whether you would strongly favor, mildly
15   favor, feel neutral about, or mildly oppose or strongly
16   oppose this change... Require voters to produce a valid
17   photo identification when they go to vote."  52 percent
18   say they strongly favor this measure, correct?
19       A.  Yes.
20       Q.  Did I read that correctly?
21       A.  You did.
22       Q.  By the way, do you have any -- did you hear
23   about this poll --
24       A.  No.
25       Q.  -- prior to today?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Representative Rafael Anchia                                June 6, 2012

| 73 | 75 |
|---|---|

**73**

1    A.  Not -- I don't recall having seen this poll.
2    Q.  19 percent say they mildly favor it, right?
3    A.  That is correct.
4    Q.  Okay.  12 percent say feel neutral, and 7
5    percent combined are either mildly or strongly opposed.
6    Did I read that right?
7    A.  Yes.
8    Q.  Okay.  Any problems with any of the methodology
9    in here or is it because --
10    A.  I would have no basis to know.
11    Q.  Okay.  Here we've got a Texas poll on the next
12    page.  "The Texas legislature recently considered
13    legislation stating that people have to provide photo ID
14    in order to vote in Texas elections.  Supporters say
15    such an ID check is required to purchase groceries or
16    receive any government services and is needed to
17    guarantee the integrity of the electoral system.
18    Opponents say there is no evidence that unregistered
19    people are voting in Texas, and that a voter ID
20    requirement would disproportionately discourage
21    Hispanics and senior citizens, who are less likely to
22    have ID, from voting.  Do you support or oppose voter ID
23    legislation?  Would that be strongly or just
24    somewhat.  54 percent of the respondents say they
25    strongly support photo ID."  Correct?  Is that right?

**75**

1    correctly?
2    Q.  Yes.
3    A.  It provides, I think, arguments on one side of
4    the issue.  Some people argue that requiring registered
5    voters to present government-issued photo ID at the
6    polls reduces voter fraud and does not place major
7    obstacles.  So yes, you did characterize that correctly.
8    Q.  Okay.  So this poll would seem to indicate that
9    this is overwhelmingly popular with Texas citizens, if
10    the poll results are to be believed, right?
11    A.  Yes.  This poll -- yes, this poll was conducted
12    of 800 registered voters in Texas, and they answered it,
13    they answered accordingly.
14    Q.  Here we've got another poll on the
15    bottom.  A survey conducted between June 11th and 29th
16    of 2009, of 924 adults in Texas.  There it says, "70
17    percent agree with the proposition that requiring
18    registered voters to present a government-issued photo
19    identification at the polls before they can be allowed
20    to vote."  70 percent agree with that.  Did I
21    characterize that correctly?
22    A.  Did you 73 percent?
23    Q.  70 percent.
24    A.  Or 70?  That is correct.
25    Q.  Okay.  It's broken out into White, black,

| 74 | 76 |
|---|---|

**74**

1    A.  You read that correctly.
2    Q.  Okay.  The next line says, "17 percent somewhat
3    support"?
4    A.  Yes.
5    Q.  Okay.  And then the combined numbers for
6    somewhat opposed or strongly opposed is 26 percent; is
7    that right?
8    A.  Somewhat supposed and strongly opposed combined
9    are 26 percent, that's correct.
10    Q.  Okay.  Now, is this a poll which was -- a
11    survey conducted by the Texans for the Texas Lyceum
12    dated June 5th through the 12th, 2009.  Is this a poll
13    that you've ever before?
14    A.  I don't recall having seen this poll.
15    Q.  All right.  There are additional polls.  There
16    is one from the -- the next page is a survey conducted
17    from February 11th through 17th of 2011.  That would be
18    during the 82 Legislative Session, correct?
19    A.  Yes.
20    Q.  Of 800 registered voters in Texas.  And with
21    the question posed about voter ID, 75 percent agree that
22    voters should be required to present a government-issued
23    photo ID at the polls before they can be allowed to
24    vote.  Did I characterize that correctly?
25    A.  The -- did you characterize this question

**76**

1    Hispanic, all of those groups agree that voters should
2    present a government-issued photo identification at the
3    polls before they can be allowed to vote; is that right?
4    A.  That is correct.
5    Q.  Did you review this poll at any time?
6    A.  I did not.
7    Q.  Okay.  The last one is a poll conducted, it's a
8    survey of 800 adults in Texas, and the question posed
9    is:  "Do you agree or disagree with requiring registered
10    voters to present a government-issued voter
11    identification at the polls before they can be allowed
12    to vote?"  Again, 69 percent agree with that
13    proposition.  Did I read that correctly?
14    A.  Yes.
15    Q.  Whites, blacks, and Hispanics, the majority of
16    them agree with that proposition as well; is that
17    correct?
18    A.  That's correct.
19    Q.  Okay.  Did you ever review this poll?
20    A.  No.
21    Q.  Is it a true statement that --
22    A.  And if I just might ask:  What is the source of
23    this poll?  The other polls that you talked about.  I
24    mean, I wouldn't know whether I did or not, because it's
25    not sourced.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 77

1  Q.  It's not on there.  It's not sourced.
2  A.  Okay.  Okay.
3  Q.  Would you agree that -- I have just shown you a
4  number of national and Texas state polls.  Would you
5  agree that every single one that I showed you -- we just
6  went through them all.  Every one of them shows that
7  photo identification is a popular issue with voters?
8  A.  Yes, in each of the polls you showed me, it was
9  a -- it was a popular proposition.
10  Q.  Are you aware of any polls that show the
11  contrary?
12  A.  I am aware of no polls.
13  Q.  Are those who agree with photo identification,
14  as represented in that poll, any of those polls, are
15  those people attempting to purposefully discriminate
16  against blacks, Hispanics, or any other minority groups?
17  A.  I don't know.
18  Q.  Let's go back to the -- to your declaration.
19  If we can turn to Paragraph 7.  I'm sorry.  I think we
20  did 7.  Let's do Paragraph 8.
21  Here you say, "Based on my experience in
22  the legislature, I believe the proponents of Senate Bill
23  14 wanted to move the bill through the legislative
24  process as quickly as possible to ensure its passage."
25  Did I read that correctly?

## 78

1  A.  Yes.
2  Q.  Is it unusual for individuals to want to move
3  their bills quickly through the legislative process?
4  A.  It is not unusual for individuals to want to
5  move their bills quickly through the legislative
6  process.
7  Q.  If you have a bill that you think is important
8  to you, do you try to move those quickly through the
9  legislative process?
10  A.  Yes.
11  Q.  Okay.  And because, if they get hung up, they
12  may not get enacted, right?
13  A.  Yes.
14  Q.  Now, here you add that, "The demographics of
15  Texas are changing, and a photo identification
16  requirement, like redistricting, is a way to decrease
17  the impact of the minority vote."
18  A.  Yes.
19  Q.  What's the basis for that statement?
20  A.  The basis is the 2010 census for the first part
21  of the -- for the first part of the phrase, the
22  demographics are changing, of Texas are changing.  The
23  second part speaks to legislative initiatives that can
24  be used to reduce the impact of minority vote.
25  Q.  Okay.  What are you aware of, as far as any

## 79

1  sort of data analysis, that indicates that Senate Bill
2  14 will decrease the impact of the minority vote?
3  A.  We received testimony, during the legislative
4  session, that in the Select Committee -- and to be
5  clear, I was not on the Select Committee, but sat
6  through the one hearing that we had in committee -- that
7  suggested that the minority vote would be decreased if
8  Senate Bill 14 was enacted.
9  Q.  Whose testimony are you referring to?
10  A.  I don't recall.
11  Q.  Can you give us a description of what they
12  said?
13  A.  Toby Moore has testified, and I believe he is
14  the former project manager for the Carter-Baker
15  Commission.  He has testified in the past, and I believe
16  during the 82nd Session, either in writing or in person,
17  I don't recall which, that Senate Bill 14 and a photo ID
18  requirement would have a disenfranchising impact on
19  minority voters.
20  Q.  What was the basis of his statement?
21  A.  His experience as the program manager for the
22  Carter-Baker Commission and a statistical analysis.
23  Q.  Okay.  Can you tell us the basis of his
24  statistical analysis?
25  A.  No, I don't recall.  I just know -- I just

## 80

1  remember his conclusions.
2  Q.  Okay.  Now, you also understand the Carter-
3  Baker Commission recommended having photo
4  identification?
5  A.  Among a number of different proposals.  And I
6  think President Carter and Secretary Baker wrote an
7  op-ed, years later, that said that the intent of the --
8  the recommendations of the Carter-Baker Commission could
9  not be taken in isolation, but must be taken as a
10  totality.  And the proponents of photo ID were taking
11  that one recommendation out of context.  And that was a
12  New York Times editorial that we distributed on the
13  House floor.
14  Q.  Okay.  And we probably ought to take that
15  editorial in context, too.  We don't have it here to
16  discuss.  Let me just ask you this:  Was it a finding of
17  the Carter-Baker Commission that it would be -- that
18  photo identification would be a good thing?  Was it a
19  recommendation?
20  A.  It was a recommendation among about eight --
21  maybe about 80 recommendations, that taken together
22  would improve elections.
23  Q.  Did you interpret the Carter-Baker Commission's
24  recommendation about photo ID as an attempt to sell
25  photo identification requirements on the backs of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 81

1  Latinos?
2      A.  No, because their recommendations included an
3  expansion of the franchise, and also they recommended
4  mechanisms by which less people would be disenfranchised
5  if you did include a -- did include a photo ID
6  requirement.  So there were offsets to that -- to that
7  requirement included.
8      Q.  Okay.  Did you -- did you read, in the Carter-
9  Baker report where they say, "Greater uniformity and
10 procedures for voter registration and identification is
11 essential to guarantee the free exercise of the vote all
12 U.S. citizens"?
13     A.  I did.
14     Q.  Do you agree with that statement?
15     A.  I do.
16     Q.  Okay.  Did you see where they indicated --
17     A.  If I can add to my last answer.  I do, but I
18 don't see that that -- the passage that you quoted to me
19 is a -- that calls for a photo ID regime consistent with
20 SB 14.
21     Q.  Okay.  Are you familiar with their
22 recommendation, quote, "We rejected the first option,
23 eliminating any requirements, because we believe that
24 citizens should identify themselves as the correct
25 person on the registration list when they vote."

## 82

1      A.  I agree with that.  And Texas has a voter ID
2  identification standard currently.
3      Q.  It's not one that requires photo
4  identification, though, is it?
5      A.  That's correct.  But I don't believe the
6  passage that you read --
7      Q.  Okay.
8      A.  -- speaks to the photo identification.
9      Q.  All right.  Well, you understand that the
10 Carter-Baker Commission reported that, quote, "We
11 believe that the need for additional electoral reform is
12 abundantly clear, and our recommendations will bolster
13 HAVA to further strengthen public confidence in the
14 electoral process."
15     A.  Yes.
16     Q.  Do you believe that electoral reform and the
17 need for it was abundantly clear in the 2007 session?
18     A.  I think it continues to be abundantly clear.
19     Q.  So, and by saying that, you're saying that --
20 what specific -- what's abundantly clear to you?
21     A.  The data related to voter participation.  Texas
22 ranks 50th amongst 50 states in voter participation.
23 And so I do believe that election reform is necessary.
24         It is my belief that in order to have a
25 strong democracy, you need robust voter participation,

## 83

1  and our current -- we've consistently ranked in the
2  lowest quintile, in terms of voter participation in the
3  state, and I think that, that requires reform.
4      Q.  It's a true statement, I think you would agree,
5  that strengthening the integrity of the election system
6  is an important and laudable goal?
7      A.  Yes.
8      Q.  Do you agree that ensuring that those who show
9  up to the polls are who they say they are is a laudable
10 goal?
11     A.  Yes.
12     Q.  So it's your opinion that photo identification
13 is a way to decrease the impact of the minority vote?
14     A.  Yes.
15     Q.  You've told me about the testimony from
16 Mr. Toby Moore?
17     A.  Yes.
18     Q.  Is there any other data that you have reviewed
19 that indicates that?
20     A.  The Brennan Center on -- the Brennan Center at
21 New York University has released studies related to the
22 percentage of persons that are out of ID, who do not
23 have the requisite ID to show at the polls, the
24 requisite photo ID, I should say.  And that appeared to
25 be a very large number, and we've received testimony on

## 84

1  that as well.
2      Q.  Any other testimony that you're referring to?
3      A.  Not that I recall.
4      Q.  Okay.  Any other data you have reviewed?
5      A.  Not -- not that I recall.
6      Q.  Okay.
7      A.  I couldn't name it for you today.
8      Q.  So you were persuaded that the impact of photo
9  identification requirements in impacting minorities, by
10 the testimony of Mr. Moore and the testimony of someone
11 from the Brennan Center, those two were persuasive to
12 you?
13     A.  Yes.
14     Q.  Okay.  You haven't identified any other
15 information.  Is there anything else that you're relying
16 upon?
17     A.  Yeah.  I have read other scholarly studies that
18 I just don't recall right now.
19     Q.  Okay.  Let's go the ninth paragraph.  Here you
20 say, "During the Floor debate of Senate Bill 14,
21 Representative Patricia Harless, who is Anglo, served as
22 the bill's primary sponsor in the House, but refused to
23 provide substantive responses to many questions posed by
24 legislators representing minority constituents."  Did I
25 read that correctly?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

85

1      A.   Yes.
2      Q.   First of all, you're referring to her public
3  testimony?
4      A.   Yes.
5      Q.   And her public participation in dialogue, and
6  is that in the committee, or is that on the Floor, or
7  both?
8      A.   Both.
9      Q.   Now, you added that she is Anglo.  Why did you
10 put that in there?
11     A.   It describes her ethnicity.
12     Q.   I mean, but it's in an affidavit filed with the
13 court.  Why is it important that she is Anglo in that
14 sentence?
15     A.   I don't know.
16     Q.   Okay.  Who put that in there; the Department of
17 Justice or you?
18     A.   It's probably something we discussed on the
19 phone, but I don't recall.
20     Q.   Okay.  So its importance is, to you, of no
21 moment?
22     A.   I think it is a descriptor of her ethnicity.
23     Q.   So, you put it in there because it describes
24 her ethnicity.  I mean, you didn't say she's blonde.
25 You didn't say that she's anything.  You said she's

---

86

1  Anglo?
2      A.   Correct.
3      Q.   Okay.  And why is that important to put in your
4  declaration, her race?
5      A.   I don't recall.  I may have been asked question
6  what is her ethnicity, and that was -- that might have
7  been my response.  But I don't recall exactly.
8      Q.   Okay.  Now, you're saying, on the Floor, she
9  "refused to provide substantive responses to many
10 questions posed by legislators representing minority
11 constituencies."  Who?  Who were the legislators
12 representing minority constituencies that she refused to
13 provide substantive responses to?
14     A.   I recall that she was evasive when I questioned
15 her from the back microphone.
16     Q.   Okay.  So you?
17     A.   So, me.
18     Q.   Okay.  Who else?
19     A.   I'd have to go back and look at the Journal.
20 At this -- at this time, I don't recall.
21     Q.   Okay.  So certainly we know your testimony is
22 that in Paragraph 9, who she's refusing to provide
23 substantive responses to is you, right?
24     A.   Yeah.  Today, that's what I remember.
25     Q.   Okay.  Now, you were a known opponent of this

---

87

1  bill?
2      A.   Yes.
3      Q.   If anybody asked about Rafael Anchia, they
4  would know that he is opposed to photo identification,
5  because you have been opposed in '07, 09, and '11,
6  right?
7      A.   Opposed to House Bill 1706, House Bill 218,
8  362, and SB 114, yes.
9      Q.   All right.  So you were her opponent, and you
10 were questioning her on the Floor of the House?
11     A.   Correct.
12     Q.   Okay.  And you're saying that in that context,
13 that she was refusing to provide substantive responses?
14     A.   Yes.
15     Q.   Okay.  Can you give us a specific instance when
16 that occurred?
17     A.   I'd have to look at the House Journal.  It was
18 very difficult to get her to answer questions.  I don't
19 know that I have that journal entry in front of me.
20     Q.   Okay.
21     A.   But when I was asking her questions at the
22 outset of the litigation, it appeared that as though she
23 did not want to answer direct questions and instead was
24 referring to talking points.  And I would answer -- I
25 would ask questions on a number of different occasions

---

88

1  and would not receive direct responses.
2      Q.   Okay.  Now --
3      A.   That was my perception.
4      Q.   She's not the only person you've ever talked to
5  that you didn't get direct responses from?
6      A.   No.  Usually members, you know, in a debate
7  will try to answer directly, yes.
8      Q.   Okay.  Is it your testimony --
9      A.   But then she is not the only person, no.
10     Q.   Okay.  Fine.  I've got a 14-year-old boy.
11     A.   (Laughing.)
12     Q.   But my question is:  Are you suggesting that
13 her lack of responsiveness indicates some purposeful
14 discrimination about Senate Bill 14?
15     A.   I think that her lack of responsiveness related
16 to her being defensive about the impact of Senate
17 Bill 14.
18     Q.   Okay.  You interpreted her nonresponsiveness as
19 being defensive?
20     A.   Yes.
21     Q.   Not as being -- evidencing some sort of
22 discriminatory purpose of her bill?
23     A.   Her -- her evasiveness, I don't think -- it is
24 difficult to infer what her -- what the motivation for
25 her defensiveness was, but when I asked her about the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Representative Rafael Anchia                                June 6, 2012

---

89

1    impact of the bill on Hispanics and African Americans
2    and Asians, she did not want to answer those questions.
3        Q.   You're doing -- you're interpreting how she was
4    responding to your questions, and I'm asking you what
5    does your interpretation, how does it inform your view
6    on whether or not Senate Bill 14 in the House was
7    discriminatory or not, from a discriminatory purpose?
8            MR. GARZA:   Asked and answered,
9    objection.  You can answer the question.
10       A.   Okay.  My perception and what -- and my
11   inference from her evasiveness is that she either knew
12   but didn't want to disclose the adverse impacts on -- on
13   minority voters, or did not want to know the adverse
14   impacts so she wouldn't have to answer.
15       Q.   (By Mr. Sweeten) So it's either conscious
16   indifference, the second part, or she intentionally
17   didn't want to answer that question?
18       A.   Yeah, or -- maybe this is covered by your
19   first part, like a plausible deniability.  So I just
20   don't -- yeah, I don't know.
21       Q.   But --
22       A.   Because the answer would be damning.
23       Q.   You would agree with me, wouldn't you, that
24   that is your subjective interpretation of your dialogue
25   with her?

---

90

1        A.   Yes.
2        Q.   Okay.  And if we want to know what was said, we
3    would go to the record.
4        A.   Yes.
5        Q.   Okay.  And you would also, wouldn't you, agree
6    that there is certainly room for other interpretations?
7        A.   It is possible.
8        Q.   Let's go to the next paragraph.  Let me just
9    ask you:  Are you saying, based upon that dialogue, that
10   Representative Harless had a purposeful intent to
11   discriminate against racial minorities based on that
12   dialogue?
13       A.   I was trying -- based on that dialogue, I
14   perceived that she was not answering questions that
15   would have been telling about the discriminatory impact
16   of the bill on racial and ethnic minorities.  I do
17   believe that.
18       Q.   Do you -- in saying that, are you inferring,
19   based upon your subjective interpretation of
20   Representative Harless's discussion about, that she
21   had a discriminatory purpose in pursuing this bill?
22       A.   I don't know what her purpose was.
23       Q.   Now, there's another sentence, which is,
24   "Representative Harless had a BlackBerry or phone with
25   her during the debate, and at times she seemed to be

---

91

1    reading from it."
2        A.   Yes.
3        Q.   Do you have a BlackBerry?
4        A.   No.
5        Q.   Do you have an iPhone?
6        A.   Yes.
7        Q.   Okay.  Do you sometimes look at your iPhone on
8    the Floor?
9        A.   On the Floor, yes, but not when I'm on the
10   front microphone --
11       Q.   Okay.
12       A.   -- laying out a bill.
13       Q.   Have you seen other members use a BlackBerry
14   device or an iPhone when they're on the Floor?
15       A.   Yes.
16       Q.   Okay.  What about when they're on the mic?
17       A.   It's extremely rare --
18       Q.   But it happens?
19       A.   -- from what I can tell.
20       Q.   It happens?
21       A.   I don't recall another instance of a member
22   laying out a bill with a BlackBerry or an iPhone and
23   periodically going to it, and what appeared to be
24   receiving instructions or answers, and was that my
25   perception.

---

92

1        Q.   And there's no House rule against looking at a
2    BlackBerry?
3        A.   No, not at all.
4        Q.   There's no House rule against looking at an
5    iPhone?
6        A.   No.
7        Q.   She wasn't in violation of any rule in doing
8    that?
9        A.   No, I don't believe so.
10       Q.   All right.  It's your interpretation that she's
11   -- in looking at the BlackBerry, how does that in any
12   way inform anyone's view as to whether or not this bill
13   had a discriminatory purpose?
14       A.   What it said to me was that she was receiving
15   some coaching from a third party.
16       Q.   Okay.
17       A.   On her answers.
18       Q.   So, do you know --
19       A.   And I guess I would add that whether -- and it
20   was unclear to me whether she had a discriminatory
21   purpose or whether a third party might have a
22   discriminatory purpose, that may have been sending her
23   e-mails.  So that's why I included it, although I don't
24   know who that was.  I don't know for a fact.
25       Q.   Okay.  So you're not inferring that because she

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Representative Rafael Anchia                                    June 6, 2012

---

93

1    was looking at a BlackBerry, that that evidences any
2    sort of discriminatory purpose?
3         A.  No, I am not.
4         Q.  Discriminatory intent by her?
5         A.  No.
6         Q.  Nor -- okay.  So your interpretation is that
7    she's receiving information from someone while she's on
8    the mic?
9         A.  Yes.
10        Q.  Would that be unusual for -- and let me finish.
11   I'm sorry.  I'm sorry.
12        Q.  Would it be unusual for a Representative or a
13   Senator to receive information from someone when they're
14   answering questions about a bill they're supporting?
15        A.  Yes, I believe it would be.
16        Q.  Okay.  Is it the means that's unusual or -- in
17   other words, the fact that it was a BlackBerry, or is it
18   the fact she was receiving any sort of help?
19        A.  No, it's not unusual for people to receive help
20   from other members on the House floor, and you do see
21   that typically.  And, in fact, I believe Representative
22   Harless received help from other members in laying out
23   the bill and answering questions.
24        Q.  Okay.  So it's not unusual to receive
25   assistance when you're answering questions --

---

94

1         A.  No.
2         Q.  -- from smart people like you, right?  Right?
3         A.  It is not unusual to receive --
4         Q.  Okay.
5         A.  -- from others.
6         Q.  All right.  It sounds like to me that it's the
7    fact she -- your interpretation is the fact she received
8    it digitally is unusual?
9         A.  That -- that is correct.
10        Q.  But in no way does that evidence racial animus?
11        A.  I don't -- I don't see -- it is impossible for
12   me to discern what -- what that would evidence.
13        Q.  Okay.  Paragraph 10, "On the Floor, I expressed
14   concern that Senate Bill 14 would have a
15   disproportionate impact on the ability of African
16   American and Hispanic voters to participate in
17   elections."  Did I read that correctly?
18        A.  Yes.
19        Q.  You expressed that in the -- on the House floor
20   debate, right?
21        A.  Yes.
22        Q.  Okay.  We've already talked about the sources
23   by which you had the view that this would have a
24   discriminatory impact, correct, or are additional
25   sources that support your view?

---

95

1         A.  During the four sessions that I spent working
2    on photo identification, I consulted experts and read
3    scholarly publications that I may not recall now, but I
4    did do quite a bit of research on it.
5         Q.  You were fairly vocal on the House floor about
6    this bill?
7         A.  Yes.
8         Q.  You used what you had at your disposal; you
9    expressed to it the other members of the House when you
10   were engaged in the debate, correct?
11        A.  Yes.
12        Q.  Would you say that there is something that you
13   didn't express in the debate regarding the alleged
14   disproportionate impact of this bill on racial
15   minorities?
16        A.  I suspect I expressed it, either on the House
17   floor or in committee, yeah.
18        Q.  Okay.
19        A.  I'm sorry.  I've expressed it publicly.
20        Q.  You've been very public in your expressions
21   about this bill.  If you -- I'm asking it this way,
22   which is:  Are you saying that you've expressed in full
23   your views in the support for you indicating that this
24   bill has a disproportionate impact in a public
25   statement?

---

96

1         A.  I believe I have, yes.
2         Q.  Okay.  Is there any other information that you
3    have that would suggest that Patricia Harless's purpose
4    in supporting this bill was a discriminatory one?
5         A.  No.
6         Q.  Okay.  On Paragraph 10, I think we've talked
7    about that first sentence, the second one is, "I and
8    a number of other representatives of African American
9    and Hispanic constituencies repeatedly raised the
10   concern on the Floor during the legislative debate on
11   Senate Bill 14."  And when you're saying that concern,
12   it's the disproportionate impact of Senate Bill 14,
13   correct?
14        A.  Yes.  On minority voters, yes.
15        Q.  Okay.  And we've talked about, I think, the
16   waterfront on that issue, what you had, right?  What you
17   had at your disposal, you expressed it?
18        A.  Yes.
19        Q.  Okay.  "As a result, few, if any, members of
20   the Texas House could have lacked knowledge of this
21   issue."  So you're saying my views, and other African
22   American and Hispanic -- representatives of African
23   American and Hispanic constituencies were raised during
24   the hearings?
25        A.  Yes.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 97

1    Q.  Okay.  Then you say, "As a result, few, if any,
2  members of the Texas House could have lacked knowledge
3  of this issue."  Okay.  Now, by "this issue" that means
4  what?
5    A.  The disproportionate impact -- the suggestions
6  by African American and -- representatives of African
7  American and Hispanic constituencies that Senate Bill 14
8  would have a disproportionate adverse impact on minority
9  constituencies.
10    Q.  Okay.  And the bill ultimately passed, all
11  right?  And I want to ask you:  You understand that
12  there was testimony for and there was testimony against
13  the bill, and there was a -- would you agree there was
14  full public airing of the issues on the House floor or
15  in committee?
16    A.  Over the course of -- yeah, over the course of
17  eight years, I believe there were.  Or four sessions, I
18  should say.  Not eight years.  But four sessions.
19    Q.  So the arguments for and the arguments against
20  have been expressed in all those sessions?
21    A.  Yes.
22    Q.  There weren't hidden -- the issues for and
23  against, they were not concealed, they were out in the
24  open?
25    A.  Yes.  I will note that they did change over

### 98

1  time.
2    Q.  Right.
3    A.  Your original -- during earlier sessions, the
4  suggestion was that this bill was designed to combat
5  voter fraud generally.  And then when it was pointed out
6  that this photo identification legislation is designed
7  to deal with a specific type of voter fraud, then there
8  was also a discussion about illegal immigrant voting --
9  I shouldn't say illegal immigrant -- noncitizen voting,
10  and that this was a way to deal with noncitizen voting.
11    And then in the 82nd legislative session,
12  the pretext or the motivation or the reason given for
13  this bill became integrity of elections.  And then at
14  the end of the debate, it was -- in fact, I think
15  Representative Harless said it wasn't -- it was no
16  longer about voter fraud.  It was just about integrity
17  of elections.  And then at the end of the debate, it
18  became about a mechanism to increase voter turnout.
19    So, I think the motivation or the
20  ostensible reason for the bill evolved over time.
21    Q.  But your view that the reasons for the bill
22  evolved over time, is based on what?
23    A.  The reasons given by the authors of the bill
24  for the need for photo ID.
25    Q.  So it's an interpretation of matters of the

### 99

1  public record?
2    A.  Yes.
3    Q.  Testimony for or against and statements made by
4  the representatives that would all be contained in the
5  public record?
6    A.  That's correct.
7    Q.  And that's your opinion?
8    A.  Yes.
9    Q.  Okay.  And you understand that many other
10  people, just as many people supported this bill against
11  your view, don't share that opinion?
12    A.  Yes.
13    Q.  You say that, quote, "The proponents of
14  SB 14 rejected opportunities to amend the bill to
15  respond to this concern or other criticisms of the bill
16  raised by minority legislators."  Do you know, as you're
17  sitting here, how many amendments were offered to the
18  bill?
19    A.  I don't recall.
20    Q.  Okay.  Do you know if one of your amendments
21  was accepted to the bill?
22    A.  I don't think so.
23    Q.  Would it surprise you if you had an amendment
24  to the bill that was accepted?
25    A.  Yeah, I guess it would surprise me.

### 100

1    (Exhibit 7 marked for identification.)
2    A.  Oh, yes.
3    Q.  (By Mr. Sweeten)  I have handed you what's been
4  marked as Anchia Exhibit 7; is that right?
5    A.  Yes.
6    Q.  And can you tell me what Anchia Exhibit 7 is?
7    A.  Yes.  It relates to a duplicate license or
8  certificate fee, and the laundry list of types of state
9  IDs that SB 14 contained that did not require -- or that
10  would be not charged for did not include a duplicate
11  license or certificate.  So there were two categories
12  that were spelled out in the legislation, but they had
13  forgotten this one, and this was a cleanup amendment to
14  make sure that they picked up all three.
15    Q.  Okay.
16    A.  Because the author was unaware of this
17  duplicate license.
18    Q.  So you offered an amendment?
19    A.  And it was accepted, yeah.  I remember it now.
20    Q.  Okay.  You can put that aside.
21    A.  And I'm surprised.
22    Q.  There were minority members who supported this
23  bill; is that right?
24    A.  Yes.
25    Q.  Okay.  Can you name some of them?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

**101**

1    A.  Aaron Pena.  Jose Aliseda.  John Garza.  Dee
2    Margo, D-e-e, M-a-r-g-o, two words.  John White.  John
3    White?  James White.  Stephanie Carter.
4        Q.  I think I asked you this, but you know how many
5    amendments were offered on the bill?
6        A.  I don't.  I don't remember.
7        Q.  And it follows that you wouldn't know how many
8    were accepted or not?
9        A.  That's correct.
10       Q.  I want to ask you about Paragraph 12.
11       A.  Okay.
12       Q.  Actually, I'm sorry, 13.  You said, "I
13   additionally offered an amendment to provide that SB 14
14   would not be implemented unless the Comptroller
15   certified that the changes made by the legislation would
16   not reduce the revenue made available to the Texas
17   Mobility Fund, as well as an amendment to provide that
18   SB 14 would not be implemented unless a specific
19   appropriation were provided in a general appropriations
20   act of the 82nd Legislature."  Did I read that
21   correctly?
22       A.  Yes.
23       Q.  Was there an appropriation for this bill?
24       A.  I don't recall.
25       Q.  Okay.  Paragraph 14 says, "Proponents of SB 14

---

**102**

1    tabled all four of these amendments with little debate."
2        A.  Correct.
3        Q.  You wrote that in your declaration, correct?
4        A.  Yes.
5        Q.  Okay.  Now, you didn't add that there was an
6    amendment that you had provided that was accepted,
7    right?
8        A.  I had forgotten, yes.
9        Q.  Okay.  So were there a total of five amendments
10   that you offered?
11       A.  I don't recall.
12       Q.  Was the amendment that we just went through
13   that you offered and that was accepted and added to the
14   bill, was that accepted with little debate?
15       A.  Yes, I believe -- I believe there was not much
16   debate on that amendment.
17       Q.  Okay.  Now, you say, in Paragraph 15, "I am
18   opposed to Senate Bill 14 and voted against its passage
19   largely because I believe, based in part on the
20   testimony in the record, that it will harm minority
21   voters and limit their ability to participate in
22   elections."  Did I read that correctly?
23       A.  Yes.
24       Q.  That's a view that you expressed during the
25   legislative session on the Floor?

---

**103**

1        A.  Yes.
2        Q.  In committee?
3        A.  Yes.
4        Q.  And, in fact, while we're talking about
5    committee, you were not on the Select Committee, right?
6        A.  Yes.
7        Q.  Okay.  But I had noted that allowed to -- that
8    you spoke at the committee hearing?
9        A.  I participated in the committee, yes.
10       Q.  And whose discretion is it to allow you to
11   question if you're not on a committee?
12       A.  I imagine the chairman of the committee.
13       Q.  So you weren't prohibited from -- even though
14   not -- you weren't a committee member of the Select
15   Committee, you weren't in any way prohibited from
16   participating in the discussion?
17       A.  I think that is -- that is a courtesy that is
18   afforded to committee members on all committees.
19       Q.  And needless to say, it was a courtesy afforded
20   to you for the Select Committee?
21       A.  On this committee, correct.  And I believe it
22   was -- the invitation was made that anybody who wanted
23   to participate there could, so...
24       Q.  And you took them on that?
25       A.  I did.

---

**104**

1        Q.  And they allowed that to go on.
2        A.  Yes.
3        Q.  Okay.  And who was the chair?
4        A.  Chairman Bonnen, B-o-n-n-e-n.
5        Q.  And he is a Republican, right?
6        A.  He is.
7        Q.  Okay.  Now, in this sentence you say, "Largely
8    because I believe, based in part on the testimony of the
9    record, that it will harm minority voters and limit
10   their ability to participate in elections."
11       Okay.  So here we're talking -- and tell
12   me if I'm wrong.  But here we're talking about a
13   discriminatory effect of the bill; is that right?
14       A.  Yes, I believe this speaks to my views on the
15   discriminatory effect of the bill.
16       Q.  Okay.  We're not here talking about the
17   discriminatory purpose that you have alleged
18   previously.  We're talking about the effect?
19       A.  Yes.
20       Q.  Okay.  Now, I don't want to beat a dead horse.
21   But you have told me all the bases for why you believe
22   that there's a discriminatory effect.  We've talked
23   about that.  You've provided testimony on that issue,
24   right?
25       A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 105

1 Q. All right. I just want to make sure there's
2 nothing else that we haven't discussed -- that we
3 haven't discussed thus far on the discriminatory effect
4 on this bill?
5 A. Yes.
6 Q. All right. Paragraph 16 you say, "The 82nd
7 legislature had the tensest racial climate of any
8 session in which I have served."
9 A. Yes.
10 Q. Can you -- now, below you say, "Debates
11 concerning redistricting, the Sanctuary Cities bill,
12 which would have allowed Texas peace officers to
13 investigate the immigration status of individuals who
14 are arrested or lawfully detained were characterized by
15 thinly-veiled hostility of Texas's growing Hispanic
16 population." Did I read that correctly?
17 A. Yes.
18 Q. Now, this -- let me just ask you: What
19 happened with this Sanctuary Cities bill?
20 A. It was ultimately defeated in a special
21 session. But versions of it passed both the House and
22 Senate. And I think it wasn't defeated. It died in
23 conference committee, as far as I can tell or recall.
24 Q. Okay. So, the topic sentence of 16 talks about
25 the tensest racial climate. The second sentence talks

## 106

1 about that there were -- basically it refers to three
2 legislative initiatives: Redistricting, Sanctuary
3 Cities bill -- actually, it was just those two.
4 A. Two, yeah.
5 Q. Okay. Are those the reasons, those two bills
6 the reasons that you felt that the 82nd Legislature was
7 the tensest racial climate you've been through?
8 A. Yes.
9 Q. So, it is because the topic of those two pieces
10 of legislation is what leads you to your belief that
11 that was the tensest racial climate of any session,
12 correct?
13 A. Yes. Those are among the two reasons, yeah.
14 Q. And, what -- well, they're among the two. I
15 need to know the -- what are the reasons for why it was
16 the tensest racial climate, in your view?
17 A. Yeah. Those two bills, other immigration-
18 related legislation that was filed, I think, gave rise
19 to -- to that feeling.
20 Q. Which bill is that?
21 A. There were a number of them that were -- there
22 were probably a couple dozen that were filled -- that
23 were filed. And then, I mean, the backdrop of this
24 session, on the run-up to the session, you would hear,
25 in campaigns, immigration, the immigration issue brought

## 107

1 up quite a bit. And I think that, on a lead-up to the
2 -- to the session, the rhetoric around immigration
3 seemed to be pretty hostile.
4 Q. So, you've referred to some legislative
5 matters, and that you're saying the rhetoric around the
6 issue, correct?
7 A. Around the immigration issue, yeah.
8 Q. Okay. Is that the rhetoric around the bill?
9 A. Around -- well, typically, it was during --
10 during election cycles, people on the run-up to the
11 legislative session, there was a lot of discussion on
12 immigration-related issues. I had seen mailers that had
13 been dropped against certain candidates that were
14 immigration related that had Spanish -- or that had
15 Hispanic persons depicted in them. And it was -- so I
16 considered it pretty -- pretty hostile.
17 And then as we led into the session, there
18 were a number of anti-immigrant bills filed, and there
19 were rallies where criticisms were made of Hispanic
20 legislators who got a lot of hate mail, you know, on
21 immigration-related issues. When I spoke against the
22 Sanctuary Cities legislation, that video was -- excerpts
23 of that video was posted on YouTube, and there was a lot
24 of really -- there were, I think, hateful things said
25 there. So I think the cumulative impact of all these

## 108

1 things created a pretty tense environment.
2 Q. Okay. So let's talk about the rhetoric, and I
3 want to make sure I've got it all. You said that there
4 was lot of rhetoric around these issues outside of the
5 committee and process; is that right?
6 A. Yeah. Yes, sir.
7 Q. What is -- can you give me a sense of what that
8 rhetoric you're referring to was?
9 A. The essence -- and, you know, I can't give you
10 specific examples of this at this time. But the essence
11 was that the growth in the Hispanic population is driven
12 by illegal immigration, and that, you know, we needed to
13 do something at the state level to deal with this, and
14 it manifested itself in different pieces of immigration-
15 related legislation. And then different candidates --
16 you got the sense that different candidates were being
17 attacked for their positions related to immigration, and
18 which usually meant Hispanic immigration.
19 Q. You said that you couldn't refer to specific
20 instances of this rhetoric.
21 A. Yeah.
22 Q. Okay. Is it fair -- and then you did mention
23 something about a Spanish language newspaper?
24 A. No. It was a mailer that was dropped against a
25 colleague in the House that somebody sent to me that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 109

1  showed Hispanic gang members and, you know, Hispanics
2  holding somebody up in their kitchen, and it was
3  pretty -- it was pretty provocative.  I don't know where
4  that mailer is now, but it made -- it made a big impact
5  on me.
6      Q.   Who sent the mailer?
7      A.   I don't recall.  I don't recall.  And I don't
8  think there was a disclaimer on it.  I mean, it just...
9      Q.   Was a legislator involved in sending that?
10     A.   I couldn't tell.  I don't know.
11     Q.   And it was sent about who in particular?
12     A.   I can't remember the candidate, but --
13     Q.   Do you have a copy?
14     A.   No, I don't.
15     Q.   Okay.  But you saw a mailer that you thought
16  looked like it was racially offensive?
17     A.   Yes.
18     Q.   Because it had pictures of a Hispanic
19  legislator with gang members around him?
20     A.   No.  I don't -- no, it's just Hispanic gang
21  members or, you know, ostensibly criminals, so you
22  couldn't tell.  You know, in one picture, it really did
23  look like gang members, and there was three pictures.
24  And another picture, there was -- I want to say a DEA
25  agent or an ICE agent handcuffing people and putting

## 110

1  them in a van.  And then the final picture was what
2  appeared to be a couple being held at shotgun point by
3  two Latinos.
4      Q.   Okay.  Where did you see this?
5      A.   It got e-mailed to me, I want to say.
6      Q.   And who -- a constituent e-mailed it?
7      A.   I don't remember.
8      Q.   And it referenced some --
9      A.   A race.  Yeah, a race.  I don't remember if it
10  was legislative race or not, but yeah.
11     Q.   Oh, it was about candidates?
12     A.   Yes.
13     Q.   And you don't remember which candidates?
14     A.   No, I don't recall.
15     Q.   Okay.
16     A.   I could -- I could dig a little bit and try to
17  remember.
18     Q.   You don't know where it originated?
19     A.   No.
20     Q.   Okay.  It was just something you saw in 2011?
21     A.   Yes.  I believe in 2011, yes, sir.
22     Q.   What other evidence, outside of the actual
23  legislative process, did you see of a racially-tense
24  climate?
25     A.   I saw a video of a Tea Party rally on the

## 111

1  Capitol steps, where there was a suggestion that the
2  reason we couldn't move -- or the reason that certain
3  legislation didn't move is because we had too many
4  Hispanic legislators.
5      Q.   Who uttered those statements?
6      A.   I don't know.
7      Q.   Was the legislator even there?
8      A.   I don't know.
9      Q.   Anything involving the legislature that you
10  felt like lent itself a racially-intense climate?
11     A.   The bills that were filed, I think.  And
12  especially these two bills.  I think these are -- you
13  know, I think touch points or --
14     Q.   Okay.  And I just want to get clear in my mind,
15  but what I'm hearing you say is, there were a couple of
16  instances of rhetoric that didn't involve legislators,
17  and then there were a couple of bills.  Is there
18  anything else that you think that -- and we'll talk
19  about the bills.
20     A.   Yeah.
21     Q.   Is there anything else that you think lent
22  itself to a tense racial climate?
23          MR. GARZA:  I don't think those are the
24  only things that he mentioned, but anyway.
25     Q.   (By Mr. Sweeten) But if there's something else?

## 112

1      A.   At this -- at this time, I don't -- I don't
2  know that I have anything else.
3      Q.   Okay.  And so you think the Sanctuary Cities
4  bill was -- which didn't pass, by the way, right?
5      A.   That is correct.
6      Q.   Okay.  You think the Sanctuary Cities bill had
7  -- was evidenced racial tension?
8      A.   Yes.
9      Q.   Okay.  And you think redistricting evidenced
10  racial tension?
11     A.   Yes.
12     Q.   Is there anything else that you believe
13  contributed to a tense racial climate that we haven't
14  discussed?
15     A.   Not that I recall at this time.
16     Q.   Okay.  And the Sanctuary Cities bill, was it
17  brought to a vote at the House?
18     A.   Yes.
19     Q.   How many did it -- what was the vote; do you
20  recall?
21     A.   I don't recall.
22     Q.   But it lost, so somewhere over --
23     A.   The Sanctuary Cities bill, I think, passed.
24     Q.   Okay.  And then what happened to it afterwards?
25     A.   It went to the Senate.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 113

1    Q.  Okay.  And did it pass the Senate?

2    A.  Not the -- not the House bill.  There was a

3    separate Sanctuary Cities bill that the Senate passed

4    and sent over to the House.

5    Q.  Okay.  And then what happened with that bill?

6    A.  I don't recall, but I don't think it got a vote

7    in the House.

8    Q.  Okay.  So for whatever reason, it did not

9    become law?

10   A.  Yes, that is correct.

11   Q.  The Senate voted on a different bill

12   than the House had voted for?

13   A.  That is my recollection, yes.

14   Q.  Okay.  Okay.  So, Paragraph 17, you say, "Based

15   on the history of photo identification bills in Texas,

16   the comments made about the bills, the procedures

17   employed to enact Senate Bill 14, and the likely impact

18   of Senate Bill 14 on minority voters, I believe Senate

19   Bill 14 was passed, at least in part, with racially-

20   discriminatory intent."  So I want to exam you on some

21   of these statements.

22   A.  Okay.

23   Q.  The first is:  Comments made about the

24   bills.  Have we discussed -- we talked about the

25   comments made in other sessions.  What are the comments

---

### 114

1    made about Senate Bill 14 that lead you to believe that

2    Senate Bill 14 was passed, at least in part, with

3    racially-discriminatory intent?

4    A.  It was mainly things that I heard in the

5    committee that would be public record.

6    Q.  Okay.  So if we were -- if we want to look and

7    say, "This is what Representative Anchia thinks

8    evidences racially-discriminatory intent," we would look

9    to the public record from 2011, right?

10   A.  Yes, specifically committee hearings.

11   Q.  And there's not anything else outside of that,

12   that we would look at?

13   A.  Not that I recall.

14   Q.  Okay.  Then you say, "The procedures employed

15   to enact Senate Bill 14."  What procedures, in your

16   view, evidenced that Senate Bill 14 was passed, at least

17   in part, with racially-discriminatory intent?

18   A.  Well, there were a couple of rules that --

19   Q.  Did you say "rules"?

20   A.  Rules.  I'm sorry.  Rules that were changed.

21   The two-thirds rule in the Senate, I thought, was

22   unusual.  It had occurred one time before on the photo

23   ID legislation in 2009, as far as I recall.  The

24   creation of the Select Committee I thought was unusual

25   and a different -- a different tactic.

---

### 115

1    The fact that in the conference committee,

2    a new ID was created and the legislature had to go

3    outside the bounds for this new ID, was also very

4    unusual.  I think the procedure differed from a typical

5    procedure on a bill.

6    Q.  What are select committees?  What is the

7    purpose of a select committee?

8    A.  From my experience, select committees are

9    usually convened in the interim to study an issue and

10   make recommendations to the legislature.

11   Q.  Okay.  So you're not -- you're not opposed to

12   the concept of a select committee because you sit on

13   one?

14   A.  Right.

15   Q.  Okay.  You're not opposed to a select committee

16   being convened?

17   A.  No.

18   Q.  So what is it about the select committee that

19   leads you to believe that that was, quote, "in part,

20   passed with a racially-discriminatory intent"?

21   A.  I think the select committee being convened

22   during the session to hear one bill was extremely

23   unusual, and it was designed to, I think, speed the

24   process along, and the result of that bill, in my view,

25   is a discriminatory effect.

---

### 116

1    Q.  Okay.

2    A.  So, I have not seen, during my four sessions in

3    the legislature, the creation of a select committee to

4    deal with just one bill.

5    Q.  Okay.  But you testified it's to speed the bill

6    along is what you testified that you believe the reason

7    for the select committee?

8    A.  Uh-huh.

9    Q.  Is that right?

10   A.  Yeah.  Yes, sir.

11   Q.  And certainly not a motivation that you're

12   unfamiliar with, right?

13   A.  Certainly.

14   Q.  You like to speed your legislation along so it

15   gets passed?

16   A.  Although I've never received a select committee

17   to hear just one of my bills.  I'd like that very much.

18   Q.  Okay.  How long have you been in the House?

19   A.  Four regular sessions and four special

20   sessions.

21   Q.  Okay.  Have Democrats had control of the

22   House?  Did they have it in '05?

23   A.  No.

24   Q.  '07?

25   A.  No.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

117

1   Q.   '09?
2   A.   No.
3   Q.   '11?
4   A.   No.
5       Q.   Okay.  Let's talk the two-thirds rule.  You're
6   talking about the two-thirds rule in the Senate?
7       A.   In the Senate.
8       Q.   Okay.  So this is not -- when you're talking
9   about the two-thirds rule, you're -- and let me make
10  sure I'm clear.  You're saying that the use of the
11  two-thirds rule was, in part, used for racially-
12  discriminatory intent; is that right?
13      A.   I think the -- the two-thirds rule was used to
14  move the bill -- a bill along that would have the effect
15  of discriminating against minority voters.
16      Q.   So you don't have a problem with the procedure
17  of the two-thirds rule being -- what's the term?
18      A.   Suspended?  Waived?
19      Q.   Yeah.  You don't have a problem with the
20  two-thirds rule being suspended?
21      A.   I do, yes, because I think the two-thirds rule
22  is in place in order to protect minority rights, and
23  those minorities rights can be racial or ethnic
24  minorities where they can be minority views in the
25  legislature generally.  They can be rural versus urban

---

118

1   views.  They can be North Texas versus South Texas.  And
2   they can be partisan views.  But the two-thirds rule is
3   designed to protect minority positions in the
4   legislature.
5       Q.   Okay.  But --
6       A.   So -- I'm sorry.
7       Q.   Go ahead, no, finish.
8       A.   So I believe a waiver of that rule is extremely
9   unusual, and I think it is not appropriate.
10      Q.   How unusual is it?
11      A.   Very.
12      Q.   Okay.
13      A.   I don't think it -- I think it -- my
14  understanding is that it's been only done once before,
15  or maybe twice before the last 50 years.  It could be
16  more.
17      Q.   It was done in '09?
18      A.   For photo ID.
19      Q.   But in '09?
20      A.   Yes.
21      Q.   The two-thirds rule was suspended?
22      A.   Yes, for the same issue.
23      Q.   It was done in '11?
24      A.   Yes.
25      Q.   Are you familiar with whether or not --

---

119

1   Lieutenant Governor Bullock, it was done under his
2   administration?
3       A.   I'm not familiar with that.
4       Q.   Would that change your view, if you were to
5   learn that Lieutenant Governor Bullock, under his --
6   when he was the lieutenant governor, he suspended the
7   two-thirds rule, would that?
8       A.   It would likely not change my view.  The
9   frequency of the suspension of the rule might change my
10  view.  It is my understanding that the view was -- or
11  that the rule is waived infrequently, and based on my
12  experience -- and just four sessions in the legislature,
13  granted, the legislature has been around a lot longer
14  than me -- but that is -- that is extremely unusual.
15      Q.   Lieutenant Governor Bullock was of what party?
16      A.   He was a Democrat.
17      Q.   Okay.  What about Lieutenant Governor Hobby;
18  are you familiar with --
19      A.   A Democrat.
20      Q.   Okay.  And are you familiar with whether the
21  two-thirds rule was in any way suspended?
22      A.   I am not -- I am not familiar.
23      Q.   Do you know how long it's been around?
24      A.   Over a hundred years.  Maybe 140 years, in that
25  ballpark.

---

120

1       Q.   You're familiar with the concept that each
2   session, the Senate sets the new Senate rules, right?
3       A.   Yes.  Yes.
4       Q.   Those are not always the same?
5       A.   No, that is correct.
6       Q.   That is not even a rule.  What you're saying,
7   the two-thirds rule is not even a rule.  It's a
8   tradition, you're saying, or is it a rule?
9       A.   I have been under the impression that it is a
10  -- it is either a rule or tradition.
11      Q.   But the 83rd Legislative Session, the Senate
12  will come and adopt what rules they think that they want
13  to operate under, right?
14      A.   Yes, that is correct.
15      Q.   They have absolute right to change the
16  parliamentary rules as it relates to the two-thirds
17  rule, correct?
18      A.   They do.
19      Q.   It's not illegal the two-thirds rule being
20  changed; it's something you're just saying doesn't
21  happen a lot?
22      A.   That is correct.
23      Q.   You're not saying it invalidates the
24  legislation?
25      A.   No, I'm saying that.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 121

1     Q.   It's purely up to the Senate that's sitting in
2 any given session, correct?
3     A.   That is correct.
4         MR. SWEETEN:   Let's take a quick break.
5         (Recess from 4:25 p.m. to 4:34 p.m.)
6     Q.   (By Mr. Sweeten) Prior to the break, we were
7 talking about the two-thirds rule, and this is in -- let
8 me just bring you back to the context.
9         In Paragraph 17, you talked about the
10 procedures employed to enact Senate Bill 14. And then
11 the last part of the statement says, "Was passed, at
12 least in part, with racially-discriminatory intent."
13         Have you testified to all the reasons you
14 believe the Select Committee was a procedure that was --
15 in part, had racially-discriminatory intent to it?
16     A.   I believe so.
17     Q.   Okay.   Let's go back to the two-thirds rule,
18 and I want to you ask:   Do House bills -- if a Senate
19 bill is passed and comes to over to the House and you
20 want to amend a piece of legislation to the Senate
21 bill -- first of all, you've done that before?
22     A.   Yes.
23     Q.   Okay.   And when you do it, it doesn't go back
24 to the Senate for a full vote and require a two-thirds
25 vote, correct?

## 122

1     A.   That is correct.
2     Q.   Okay.   So, in the instance where a House member
3 amends a Senate bill, adding their legislation to the
4 Senate bill, that's an instance where don't have a
5 two-thirds vote of the Senate as to that provision,
6 correct?
7     A.   I believe that is correct.
8     Q.   Okay.   And in fact what happens is, once the
9 House bill amends the Senate bill, it goes to conference
10 committee after that point, and you are not on a
11 two-thirds rule in that instance, correct?
12     A.   That is correct.
13     Q.   And you've utilized that procedure for -- on
14 bills that you have wanted to get passed, you have used
15 that procedure?
16     A.   Yes.
17     Q.   In other words, you've gone around the
18 two-thirds rule to get your bill, gone around the Senate
19 two-thirds rule yourself, to get your own bill passed in
20 that instance?
21     A.   Through an amendment strategy?
22     Q.   Uh-huh.
23     A.   Yes.
24     Q.   Is there anything discriminatory about the
25 times you have done it?

## 123

1     A.   No.
2     Q.   Okay.   I'm going to ask you about chubbing.   In
3 2009, were you -- well, let me find the questions.   Tell
4 the court, what is chubbing?
5     A.   My understanding that chubbing is the
6 equivalent of a filibuster, where members will ask
7 questions of bill authors in order to run out the clock
8 on a particular legislative session, or, I shouldn't say
9 session, but run out the clock during the period which
10 bills may be considered on the House floor.
11     Q.   Okay.   And that's just the local calendar
12 matters, right, local matters?
13     A.   Correct.
14     Q.   Did you engage in chubbing during the House
15 calendar of -- during 2009, that session?
16     A.   I don't believe I did.
17     Q.   Was chubbing -- did chubbing occur during that
18 time?
19     A.   It's difficult to tell whether chubbing
20 occurred or not.   I suspect, my gut instinct is that
21 some members of the legislature were filibustering photo
22 ID legislation.
23     Q.   Okay.   What is the purpose of chubbing?
24     A.   To kill a bill.
25     Q.   Okay.   Now, in 2011, there was an amendment to

## 124

1 the House rule to limit the practice of chubbing; is
2 that correct?
3     A.   That's my understanding, yes.
4     Q.   Okay.   And you supported that rule change?
5     A.   I don't recall.
6     Q.   Okay.
7         (Exhibit 8 marked for identification.)
8     Q.   (By Mr. Sweeten) So I want to turn your
9 attention to page 173 of the -- by the way, can you just
10 identify for the record what this document is, Anchia 8
11 is?
12     A.   Anchia 8 appears to be the House Journal of the
13 82nd Legislature, Regular Session, proceedings on the
14 7th day Monday, January 24th, 2011.
15     Q.   Thank you.   Can you turn to Page 173 of the
16 House journal, please.   You have a shortened version of
17 that.   It's the first page after --
18     A.   Thank you.
19     Q.   And I'm pointing in particular to the very last
20 paragraph.   If you would just read that to yourself.
21 You don't have to read it out loud.
22     A.   (Reviewing document.)
23     Q.   So that -- what I've handed to you relates to
24 House Bill 4, correct, House Resolution 4?
25     A.   Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 125

1   Q.   And House Resolution 4 was to eliminate the
2   chubbing procedure for that session, correct?
3   A.   I believe House Bill 4 was the entirety of the
4   House rules.  And contained within the entirety of the
5   House rules, there was -- I believe there was this
6   provision that you're referring to at the bottom
7   paragraph of page 173.
8   Q.   Okay.  And thank you for the clarification.
9   So you're saying that as part of the
10  overall House Resolution 4, part of it was the provision
11  on chubbing, which eliminates chubbing for that session,
12  right?
13  A.   And I'm not trying to split hairs, but I
14  believe that this deals exclusively with chubbing
15  related to the local and consent calendar, which is how
16  the filibuster in 2009 occurred.  But I believe chubbing
17  would be available as -- even under these House rules,
18  as you got close to the end of a -- of the last day for
19  bills to be considered on the House floor.
20  Q.   Okay.
21  A.   But with respect to the local and consent
22  calendar, that is correct.
23  Q.   So what had happened in 2009 was, there was
24  chubbing taking place as to the local calendar?
25  A.   That is correct.

### 126

1   Q.   All right.  This House Resolution 4 eliminates
2   that for the 2011 session, correct?
3   A.   I believe that is right.
4   Q.   And how did you vote on that?  If you could
5   turn to Page 232.
6   A.   I believe I was "No."  On Page 232, I was
7   "Nay."
8   Q.   Okay.  The final vote of the resolution is at
9   the bottom of 232.  Do you see that, where it says,
10  "HR 4 as amended was adopted by Record 30 -- 143 Yeas,
11  zero Nays."
12  A.   Yes, I do see that.
13  Q.   Okay.  And on the next page, it shows who the
14  Yeas were.
15  A.   I'm sorry.  I see it now.
16  Q.   Okay.
17  A.   Yes.  I was looking at the wrong page.
18  Q.   That's okay.
19  A.   It looks as if I voted "Yea."
20  Q.   So you voted "Yea" for a House
21  resolution that eliminated chubbing on the local
22  calendar for the 2011 session?
23  A.   That is correct.
24  Q.   Okay.  Now, I want to go back.  We were talking
25  about procedures when I moved you to chubbing, so let's

### 127

1   go back to the procedures that you've identified -- or
2   that you allude to in Paragraph 17 that you think were
3   utilized and that showed that SB 14 was passed, at least
4   in part, with racially-discriminatory intent.  Okay?
5   Are you with me?
6   A.   Yes.
7   Q.   Okay.  So we've talked about the two-thirds
8   rule.  We've talked about the Select Committee.  Now,
9   you said something about an outside of the bounds
10  resolution?
11  A.   Yes.
12  Q.   Can you tell me what you mean by that?
13  A.   Well, we pointed out, during the Floor debate,
14  that paying for free IDs by hitting the Texas Mobility
15  Fund -- by "hitting it," we mean by charging the Texas
16  Mobility Fund -- might be violative of bond covenants
17  for the Texas Mobility Fund and how we raise money for
18  -- raise money to build roads through long-term
19  indebtedness.  And I think we tried to deal with that on
20  the House floor, and it was -- we were unsuccessful.
21  And then in conference committee, it was
22  my recollection that the new ID -- or the ID regime that
23  was originally in Senate Bill 4, as it passed the House
24  and the Senate was eliminated, and the revenue stream to
25  pay for it was eliminated, and a new ID and revenue

### 128

1   stream was substituted in conference committee.
2   And I seem to recall that I objected to
3   that.  And because that was a completely new issue, that
4   it required a resolution by the House to go outside of
5   the bounds, which means that is what -- that is a
6   legislative maneuver to -- or legislative motion that is
7   made to -- to change things in conference committee is
8   probably the easiest way to describe it.  I'm sorry I
9   wasn't more artful.
10  Q.   No, no.  That's fine.  But it sounds to me like
11  this related to a funding issue.  Funding of what?
12  A.   And of an ID.
13  Q.   Funding of a --
14  A.   Of an ID that a person under certain -- a
15  strict set of circumstances could go in and receive for
16  free.
17  Q.   Okay.  What specifically was the change?
18  A.   That the funding for this was no longer coming
19  out of the Texas Mobility Fund, and that my recollection
20  was -- and without looking at it, it would be tough to
21  say -- but my recollection was that a new form of ID was
22  created by the conference committee.  So it was -- and
23  I'm sorry.  But it was a funding issue, yes, but it also
24  related to the form of ID, a form of free ID.
25  Q.   And what form of ID are you talking about?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

129

1      A.  I don't remember, but different than the ID as
2  were included in Senate Bill 14 as it came out of the
3  House and the Senate.
4      Q.  Okay.  And the funding source was changed to
5  what?
6      A.  I don't recall, but it was changed out of the
7  Texas Mobility Fund.
8      Q.  So it no longer came from the Texas Mobility
9  Fund, but came from another source?
10     A.  Yes, sir.
11     Q.  Okay.  So the funding source change, and you're
12 saying -- is it your testimony here today that out of
13 conference committee, there was an ID added to Senate
14 Bill 14?
15     A.  Substituted.  I think there was an ID
16 substituted for those that were previously -- my
17 recollection is, that there was a new form of ID that
18 was substituted in to the conference committee or by the
19 conference committee in to the legislation.  That's my
20 best recollection.
21     Q.  Okay.  How often do outside of the bounds
22 resolutions -- or resolutions, how often do they occur?
23     A.  I'm not sure, but it doesn't occur often, from
24 my experience.  Again, only four sessions, but in my
25 experience, it does not occur frequently.

---

130

1      Q.  Okay.  Can you think of other instances where
2  that's occurred?
3      A.  I know that it has occurred during my four
4  sessions, but I can't think of specific instances.
5      Q.  Okay.  Have you ever called a point of order on
6  a bill?
7      A.  Yes.
8      Q.  When did you do that?
9      A.  I can't remember.  It's been more than once.
10     Q.  Okay.  When is a point of order typically used
11 during a legislative session?
12     A.  When there is a violation of the House rules or
13 the Constitution.
14     Q.  Did you call a point of order on the voter ID
15 bill?
16     A.  I believe I did on that, yes.
17     Q.  Okay.  In what instance?
18     A.  I believe I called a point of order related to
19 the constitutionality of the revenue stream from the
20 Texas Mobility Fund, so this very same funding issue
21 that we just discussed.  I read the use of that Mobility
22 Fund as being unconstitutional.  But my point of order
23 was overruled.  It was not sustained.
24     Q.  Any other points of order that you raised?
25     A.  It's possible, but I don't recall.

---

131

1      Q.  As a general matter, it's true that House rules
2  can be used to both to expedite a bill, as in the
3  suspension of a five-day posting rule, as well as to
4  kill a bill?
5      A.  Oh, yes.
6      Q.  Can be used to delay a bill?
7      A.  Yes.
8      Q.  And that's not unusual?
9      A.  To delay a bill?  No.
10     Q.  Okay.
11     A.  Using the House rules, no, that is not unusual.
12     Q.  I want to talk about Senate Bill 14 in the
13 Senate, first of all.  That was heard -- I imagine you
14 had your own work going on in the House, so were you a
15 person that -- were you involved at all in the Senate
16 proceedings?
17     A.  I watched some of it, but a very small
18 fraction.
19     Q.  Okay.  And you watched the proceedings there?
20     A.  Either in the Senate chambers or on TV.
21     Q.  Okay.  And is there any -- you haven't talked
22 about it other than in the context of the two-thirds
23 rule.  Is there anything that you saw with respect to
24 the Senate bill that was heard in the Senate that you
25 believe -- that you haven't testified to so far that you

---

132

1  believe shows a discriminatory intent or purpose?
2      A.  No.
3      Q.  Okay.  Have we talked about all of the
4  procedural issues that you believe evidenced that Senate
5  Bill 14 was passed, at least in part, with a racially-
6  discriminatory intent?  Have we covered those here?
7      A.  Yes, sir.
8      Q.  Okay.  Are there any other procedural issues
9  that you believe evidence that?
10     A.  Not that I recall at this time.
11     Q.  Now, we've talked about why you believe that
12 the bill has a racially-discriminatory effect.
13     A.  Yes.
14     Q.  Are there additional reasons other than what
15 we've discussed that you believe evidence a
16 discriminatory purpose of this bill?
17     A.  I just want to make sure I understand.  The
18 lead into the question was related to effect, and the
19 second part of the question was related to purpose?
20     Q.  Yes, and I can break them up if it's a problem.
21     A.  No.  No.
22     Q.  All right.
23     A.  So, I'm sorry.  Can you restate the question?
24 I confused myself.
25     Q.  No problem.  No problem.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 133

1    We've discussed at length your belief as
2  to why you believe that this had a discriminatory
3  effect.  Is there anything else that we haven't covered
4  today that lends to that belief you have?
5    A.  No.  I think we've covered most of it, yeah.
6    Q.  Now, I want to go back to discriminatory
7  purpose.  We've gone through your affidavit.  We have
8  gone through some testimony that you've had about
9  certain individuals.  Is there anything else that you
10  believe evidences a discriminatory purpose of this bill
11  other than what you've testified to?
12    A.  Not that I recall at this time.
13    Q.  Okay.  Okay.  We're going to mark this as
14  Anchia Exhibit 9.
15        (Exhibit 9 marked for identification.)
16    Q.  (By Mr. Sweeten) Okay.  I'm going to ask you to
17  turn to page 4054, which shows the yeas as to Senate
18  Bill 14, and adoption of the conference committee
19  report.
20    A.  4054?
21    Q.  Yes, sir.
22    Q.  Okay.
23    Q.  Are you there?
24    A.  I'm on page 4054.
25    Q.  Take your time to orient yourself, and I'll ask

## 134

1  you a few questions about it.
2    A.  Okay.
3    Q.  Okay.
4    A.  Now, if you can walk me through what I'm
5  looking here.  Senate Bill 14, Adoption of Conference
6  Committee Report.  Okay.  I'm oriented.
7    Q.  Okay.  So here we have the adoption of the
8  conference committee report.  So on the bottom of 4054
9  is where it starts.  And here, "Representative Harless
10  submitted the conference committee report on Senate
11  Bill 14.  She moved to adopt the conference committee
12  report on SB 14.  The motion to adopt the conference
13  committee report on SB 14 prevailed by 98 to 46."
14        First, did I read that correctly?
15    A.  Yes, sir.
16    Q.  So, you, on this, voted, show as a nay?
17    A.  Yes, sir.
18    Q.  So you voted against there.  And the
19  individuals that are yea are the individuals within the
20  House of Representatives that voted for this bill,
21  correct?
22    A.  Yes.
23    Q.  I want to ask you to circle on this which one
24  of these legislators had a discriminatory purpose in
25  passing Senate Bill 14.

## 135

1    A.  I don't know.
2    Q.  Okay.  Senate Bill 14 provided for the free
3  identification within the bill, correct?
4    A.  Yes.
5    Q.  It allows any citizen that wants to vote to get
6  a free identification from the Department of Public
7  Safety.  Is that what it says?
8    A.  Yes, provided they did certain things.
9    Q.  Provided they did what?
10    A.  They had to fill out an affidavit.  They could
11  state a religious objection, and I think the affidavit
12  related to indigency.  And I seem to recall there was a
13  cure period, when you had to come back and issue the
14  affidavit related to religious objection or indigency.
15  So you had to actually go to the DPS -- excuse me.  That
16  was to cure a vote.
17    Q.  Uh-huh.
18    A.  A provisional ballot.  But I'm trying to
19  remember how that worked.  So I don't recall exactly
20  what the mechanisms were.
21    Q.  Okay.
22    A.  But you didn't get a -- I recall you had to do
23  a couple of different things before you got a free ID.
24    Q.  Okay.  And I think you're talking about -- some
25  of this has been about the religious exemption portion.

## 136

1    A.  I think there was a religious exemption where
2  your religion didn't permit you to have a photograph
3  taken or something like that.
4    Q.  Okay.  I would assume that your opinion it's a
5  tiny fraction of the individuals who would --
6    A.  Yes, sir.
7    Q.  Okay.  So the free -- in order for someone of
8  limited means to get a free identification, what is it
9  they have to do?
10    A.  Under SB 14?
11    Q.  Yes.
12    A.  I'd have to go back and look at the
13  legislation.
14    Q.  Okay.  But nonetheless, they don't have to pay
15  for the issuance of an identification in order to vote?
16    A.  That is correct.
17    Q.  Do you know, as you're sitting here, any
18  statistical data about the different forms of
19  identification that appear on Senate Bill 14, as to
20  which forms of ID racial minorities are more or less
21  likely to have?
22    A.  No.  We asked for that data in committee over
23  the years, and I believe the Secretary of State's Office
24  was unable to provide it, and DPS was unable to provide
25  it, because I don't think they -- they were unable to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

137

1    match the voter registration rolls with the ID, those
2    who held ID. I think I carried the amendment that asked
3    that we have the Secretary of State study this issue
4    before we implemented the legislation. I don't know,
5    sitting here, and I don't think the legislators knew at
6    the time.
7        Q.  Now, this is something that you have been --
8    you've been against photo identification in '07 -- in
9    '05, actually, in '05, '07, '09, and '11, correct?
10       A.  Yeah. I've been against those bills as filed
11   and amended.
12       Q.  What studies have you commissioned in order to
13   assess that?
14       A.  None.
15       Q.  Do you know, as you're sitting here, the number
16   of individuals that will be -- that can potentially be
17   impacted by Senate Bill 14?
18       A.  I do not. I do not know that.
19       Q.  Is it a fair statement that if I were to ask
20   you what those numbers were, that it would be pure
21   supposition on your part?
22       A.  That is correct.
23       Q.  You agree, Representative Anchia, don't you,
24   that representatives of the House have a duty to
25   represent their constituents?

---

138

1        A.  Yes.
2        Q.  And do you try to do that?
3        A.  Yes.
4        Q.  Okay. There is nothing wrong with a
5    representative voting for policies favored by his or her
6    constituents, correct?
7        A.  No.
8        Q.  Is it politically rational for an elected
9    official to vote for policies favored by his or her
10   constituents?
11       A.  Yes.
12       Q.  Do you have any basis to dispute that voter
13   identification is supported by a majority of voters in
14   the state of Texas?
15       A.  No.
16       Q.  Do you have any personal knowledge of a single
17   Texas registered voter who does not possess a form of ID
18   that will permit him or her to vote if SB 14 is
19   enforced?
20       A.  If you could read that to me one more time.
21       Q.  Do you have any personal knowledge of a single
22   Texas registered voter who does not possess a form of ID
23   that will permit him or her to vote if SB 14 is
24   enforced?
25       A.  No.

---

139

1        Q.  Do you have a driver's license?
2        A.  Yes.
3        Q.  A passport?
4        A.  Yes.
5        Q.  Okay. Do those in your home have a driver's
6    license that live with you?
7        A.  No.
8        Q.  Okay. Do they have passports?
9        A.  Yes.
10       Q.  Are you registered to vote?
11       A.  Yes.
12           MR. SWEETEN:  Let me take a five-minute
13   break.
14           (Recess from 5:01 p.m. to 5:04 p.m.)
15       Q.  (By Mr. Sweeten) Representative Anchia, we're
16   back on the record.
17           Now, I've asked you a number of questions
18   today. Have we communicated today? You think that
19   you've understood my questions?
20       A.  Yes, sir.
21       Q.  Have I been polite to you during this
22   examination?
23       A.  Extremely.
24       Q.  Okay.
25           MR. SWEETEN:  At this time, I have no

---

140

1    further questions for the witness, and I'll pass. I
2    will reserve questions the time of trial.
3            THE WITNESS:  Thank you.
4            MR. GARZA:  I reserve questions until time
5    of trial.
6            EXAMINATION
7    BY MS. MARANZANO:
8        Q.  My name is Jennifer Maranzano. I'm
9    representing Defendant Attorney General Eric Holder in
10   this matter. I just have a couple of questions for you.
11       Q.  You testified earlier that you believed
12   SB 14 was passed with discriminatory intent; is that
13   right?
14       A.  Yes.
15       Q.  And you said earlier that this was your
16   subjective interpretation; is that correct?
17       A.  Yes.
18       Q.  Are you basing this interpretation of the
19   legislative intent of SB 14, in part, on your years of
20   experience in the legislature?
21           MR. SWEETEN:  Objection, leading. Go
22   ahead.
23       A.  Yes.
24       Q.  (By Ms. Maranzano) Are you basing this
25   interpretation also in part on your years of service in

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 141 | | 143 | |
|---|---|---|---|
| 1 | the Elections Committee? | 1 | CHANGES AND SIGNATURE |
| 2 | MR. SWEETEN:  Same objection. | 2 | RE: TEXAS VS. HOLDER, ET AL |
| 3 | A.  Yes. | 3 | PAGE LINE CHANGE        REASON |
| 4 | Q.  (By Ms. Maranzano) And are you also basing your | 4 | _____ |
| 5 | interpretation, in part, on your years of working with | 5 | _____ |
| 6 | some of the very same legislators who supported SB 14? | 6 | _____ |
| 7 | MR. SWEETEN:  Objection, leading. | 7 | _____ |
| 8 | A.  Yes. | 8 | _____ |
| 9 | MR. MARANZANO:  I have nothing further. | 9 | _____ |
| 10 | FURTHER EXAMINATION | 10 | _____ |
| 11 | BY MR. SWEETEN: | 11 | _____ |
| 12 | Q.  Have we discussed here today the basis for your | 12 | _____ |
| 13 | opinion that Senate Bill 14 has a discriminatory purpose | 13 | _____ |
| 14 | in full? | 14 | _____ |
| 15 | A.  Yes. | 15 | _____ |
| 16 | Q.  Have we discussed here today your basis for | 16 | _____ |
| 17 | claiming that Senate Bill 14 has a discriminatory | 17 | _____ |
| 18 | impact? | 18 | _____ |
| 19 | A.  Yes. | 19 | _____ |
| 20 | MR. SWEETEN:  Okay.  Nothing further. | 20 | I, REPRESENTATIVE RAFAEL ANCHIA, have read the |
| 21 | MR. GARZA:  We'll continue to reserve | 21 | foregoing deposition and hereby affix my signature that |
| 22 | questions until time of trial. | 22 | same is true and correct, except as noted above. |
| 23 | MR. SWEETEN:  All right.  Thank you very | 23 | |
| 24 | much. | 24 | _____ |
| 25 | THE WITNESS:  Appreciate you. | 25 | REPRESENTATIVE RAFAEL ANCHIA |

| 142 | | 144 | |
|---|---|---|---|
| 1 | (Signature reserved.) | 1 | THE STATE OF _____) |
| 2 | (Deposition concluded at 5:07 p.m.) | 2 | COUNTY OF _____) |
| 3 | | 3 | |
| 4 | | 4 | Before me,_____, on this day |
| 5 | | 5 | personally appeared REPRESENTATIVE RAFAEL ANCHIA, known |
| 6 | | 6 | to me (or proved to me under oath or |
| 7 | | 7 | through_____ (description of identity |
| 8 | | 8 | card or other document) to be the person whose name is |
| 9 | | 9 | subscribed to the foregoing instrument and acknowledged |
| 10 | | 10 | to me that they executed the same for the purposes and |
| 11 | | 11 | consideration therein expressed. |
| 12 | | 12 | Given under my hand and seal of office |
| 13 | | 13 | this_____day of _____, 2012. |
| 14 | | 14 | |
| 15 | | 15 | |
| 16 | | 16 | _____ |
| 17 | | 17 | NOTARY PUBLIC IN AND FOR |
| 18 | | | THE STATE OF _____ |
| 19 | | 18 | |
| 20 | | 19 | |
| 21 | | 20 | |
| 22 | | 21 | |
| 23 | | 22 | |
| 24 | | 23 | |
| 25 | | 24 | |
| | | 25 | |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

145

```
 1          IN THE UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF COLUMBIA
 2
    STATE OF TEXAS,          )
 3                          )
              Plaintiff,    )
 4                          )
    VS.                     )
 5                          )
    ERIC H. HOLDER, JR. in his )
 6  official capacity as Attorney )
    General of the United States, )
 7                          )
              Defendant,    )
 8                          )
    ERIC KENNIE, et al,      )
 9                          )
              Defendant-Intervenors,  )
10                          )
    TEXAS STATE CONFERENCE OF   ) CASE NO. 1:12-CV-00128
11  NAACP BRANCHES,         ) (RMC-DST-RLW)
                          ) Three-Judge Court
12            Defendant-Intervenors,  )
                          )
13  TEXAS LEAGUE OF YOUNG VOTERS  )
    EDUCATION FUND, et al,   )
14                          )
              Defendant-Intervenors,  )
15                          )
    TEXAS LEGISLATIVE BLACK   )
16  CAUCUS, et al,           )
                          )
17            Defendant-Intervenors,  )
                          )
18  VICTORIA RODRIGUEZ, et al.,  )
                          )
19            Defendant-Intervenors.  )
20          REPORTER'S CERTIFICATION
        DEPOSITION OF REPRESENTATIVE RAFAEL ANCHIA
21              JUNE 6, 2012
22      I, Chris Carpenter, Certified Shorthand Reporter in
23  and for the State of Texas, hereby certify to the
24  following:
25      That the witness, REPRESENTATIVE RAFAEL ANCHIA, was
```

146

```
 1  duly sworn by the officer and that the transcript of the
 2  oral deposition is a true record of the testimony given
 3  by the witness;
 4      That the deposition transcript was submitted on the
 5  _____ day of _____, 2012, to the witness or to the
 6  attorney for the witness for examination, signature and
 7  return to_____, by
 8  _____, 2012; and if returned, the original
 9  transcript will forwarded to Patrick Sweeten, the
10  custodial attorney;
11      That the amount of time used by each party at the
12  deposition is as follows:
13      Mr. Sweeten: 2 hours, 55 minutes
14      Ms. Maranzano:  1 minute
15      I further certify that I am neither counsel for,
16  related to, nor employed by any of the parties or
17  attorneys in the action in which this proceeding was
18  taken, and further that I am not financially or
19  otherwise interested in the outcome of the action.
20      Certified by me this 7th day of June, 2012.
21
22
            Chris Carpenter, Texas CSR 115
23      Expiration Date:  12/31/2012
        100 Congress Avenue, Suite 2000
24      Austin, TX  78701
        (512)328-5557
25      Firm Registration No. 283
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com