## 1

343861 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                         *
        Plaintiff,                      *
VS.                                     *
ERIC H. HOLDER, JR., in his             *
official capacity as Attorney           *
General of the United States,           *
        Defendant,                      *
ERIC KENNIE, et al,                     *
        Defendant-Intervenors,          *
TEXAS STATE CONFERENCE OF NAACP         * CASE NO.
BRANCHES, et al,                        * 1:12-CV-00128
        Defendant-Intervenors,          * (RMC-DST-RLW)
TEXAS LEAGUE OF YOUNG VOTERS            * THREE-JUDGE COURT
EDUCATION FUND, et al,                  *
        Defendant-Intervenors,          *
TEXAS LEGISLATIVE BLACK CAUCUS,         *
et al,                                  *
        Defendant-Intervenors,          *
VICTORIA RODRIGUEZ, et al               *
        Defendant-Intervenors.          *

TELEPHONIC DEPOSITION OF SENATOR KENNETH LYNN ARMBRISTER
UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:

            Spencer R. Fisher, Esquire
            U.S. Department of Justice
            950 Pennsylvania Avenue, NW
            Northwestern Building, Suite 7146
            Washington, DC 20530

Date                    Edith A. Boggs, CSR

6-8-12              HOUSTON, TEXAS

## 2

1
2
3
4
5
6
7
8        DEPOSITION OF SENATOR KENNETH LYNN ARMBRISTER
9
10
11       DEPOSITION AND ANSWERS of SENATOR KENNETH LYNN
12   ARMBRISTER, taken before Edith A. Boggs, a certified
13   shorthand reporter in Harris County for the State of
14   Texas, taken at the offices of Dechert, LLP, 300 West
15   6th Street, Suite 2010, Austin, Texas, on the 8th day of
16   June, 2012, between the hours of 9:25 a.m. and 4:59 p.m.
17
18
19
20
21
22
23
24
25

## 3

1
2
3
4    A P P E A R A N C E S
5
     ATTORNEY FOR PLAINTIFF, STATE OF TEXAS:
6
     Office of the Attorney General of Texas
     P.O. Box 12548 (78711-2548)
7    209 West 8th Street, 8th Floor
     Austin, Texas 78701
8    By: Reynolds Bascom Brissenden, IV, Esquire
9    (512) 936-1307
     reynolds.brissenden@aog.state.tx.us
10
11
     ATTORNEYS FOR DEFENDANT, HOLDER, ET AL:
12
13   U.S. Department of Justice
     950 Pennsylvania Avenue, NW
14   Northwestern Building, Suite 7146
     Washington, DC 20530
15
16   By: Spencer R. Fisher, Esquire,
     Jennifer Maranzano, Esquire,
     Angela Miller, Esquire,
17   and Victor Williamson, Esquire
18   (202) 305-7766
     spencer.fisher@usdoj.gov
19
20
21
22
23
24
25

## 4

1
     A P P E A R A N C E S (Continued)
2
3
     ATTORNEY FOR DEFENDANT-INTERVENORS, TEXAS LEAGUE OF
4    YOUNG VOTERS EDUCATION FUND:
5    Fried, Frank, Harris, Shriver & Jacobson, LLP
     One New York Plaza
6    New York, New York 10004
7    By: Adam Harris, Esquire
     (Present telephonically)
8
9    (212) 859-8000
     adam.harris@friedfrank.com
10
11   ALSO PRESENT:
12
     David Morales, Esquire, Office of the Governor
13   Jessica Olson, Esquire, Office of the Governor
14
15   REPORTED BY:
16
     Ms. Edith A. Boggs
17
18
19
20
21
22
23
24
25

## 5

EXAMINATION INDEX

QUESTIONS BY                    PAGE

Mr. Fisher                        7

Mr. Harris                        226

Mr. Fisher                        231

INDEX OF EXHIBITS

NO.   MARKED   DESCRIPTION
      OR FIRST
      REFERENCED
5     189      SB 14
8     204      Texas Legislature Online History
               for SB 14

28    138      HB 218

29    162      SB 362

44    114      HB 1706

45    153      Declaration of Carlos Uresti

163   162      Texas Legislature Online History
               for SB 362
168   180      Senate Journal, Second Day,
               Wednesday, January 14, 2009

170   186      Senate Rules adopted by 82nd
               Legislature January 19, 2011, Senate Resolution No. 36
190   18       Second Amended Notice of Deposition
191   114      Texas Legislature Online History
               for HB 1706

## 6

192   127      Texas Politics, Wednesday, May 4,
               2005

193   129      Minutes, Senate Committee on State
               Affairs, Tuesday, April 18, 2006
194   139      Texas Legislature Online History
               for HB 218

195   190      2011 Session Accomplishments

196   201      Article - After Six-Year Fight,
               Perry Signs Voter ID into Law
197   211      Emergency legislation letter signed
               by Rick Perry dated January 20, 2011

198   211      Senate Journal, Fourth Day, Monday,
               January 24, 2011
310   25       Amended Notice of Deposition of
               Michael Schofield

## 7

PROCEEDINGS

THE COURT REPORTER:  Would counsel please introduces themselves for the record, and their affiliations.

MR. FISHER:  Yes, Spencer Fisher, representing the Attorney General of the United States.

MS. MARANZANO:  Jennifer Maranzano representing the Attorney General.

MS. MILLER:  Angela Miller representing the Attorney General.

MS. OLSON:  Jessica Olson, State of Texas.

MR. MORALES:  David Morales, Governor's Office.

MR. BRISSENDEN:  Reynolds Brissenden for the State of Texas and the witness.

THE WITNESS:  Senator Ken Armbrister, Legislative Director for the Governor's Office.

SENATOR KENNETH LYNN ARMBRISTER was called as a witness and, being first duly sworn by the notary, testified as follows:

EXAMINATION

Q.  (BY MR. FISHER)  Good morning, sir.
If I could have you state and spell your name for the record, please.

A.  Yes.  Title Senator, first name Kenneth,

## 8

K E N N E T H, middle initial L, last name Armbrister,
A R M B R I S T E R.

Q.  Okay.  Senator, I'll go over a few ground rules of the deposition today.

First, obviously, you just gave your oath to testify truthfully, accurately and completely at all times.  And you understand that, correct?

A.  I understand.

Q.  The court reporter sitting here to my right will prepare a transcript of everything that is said today.  So, you must respond to my questions verbally.  So, no head shaking.  Even uh-huh or anything that's nonverbal is not acceptable because we can't make a transcript.  So, you understand that as well?

A.  I understand.

Q.  And if you could please wait for me to finish my questions, and I'll try to do the same for you, wait for you to finish answering before I ask a question and that way, you know, when someone reads the transcript, it's clear who is speaking and when.  Is that clear?

A.  That is clear.

Q.  And I'll try to ask clear questions at all times but I might not be successful at all times.  So, if you don't understand a question, could you please let me know and I will do my best to make it clear for you?

9

1  Okay?
2      A. I will let you know.
3      Q. And if you wish to stop and take a break at any
4  time, let me know, and I'll try to accommodate you.  If
5  we're kind of in a line of questioning, I'll do my best
6  to kind of wrap things up, and we can take a break.
7      So, is that clear?
8      A. That's clear.
9      Q. Do you have any questions about any of the
10  instructions, basic ground rules?
11      A. I have no questions.
12      Q. Are you on any medication today that would affect
13  your ability to testify?
14      A. No.
15      Q. And is there any reason why you can't testify
16  truthfully and accurately today?
17      A. No.
18      Q. So, I might use the term "voter ID" during this
19  deposition, and I want you to interpret this term
20  broadly to mean a requirement that a voter present a
21  form of identification, whether it has a photo on it or
22  otherwise, prior to voting.  Does that make sense?
23      A. Yes.
24      Q. And then I'll also use the term "photo ID," and
25  that references a requirement that a voter show a photo

10

1  ID before voting.  So, two different terms, voter ID and
2  photo ID.  I'll try to make it clear what I'm talking
3  about.
4      A. Yes.  Question, when you mentioned that term
5  "photo ID," the bill that was passed only identified
6  certain photo identifications, in other words, I
7  couldn't use a Wal-Mart card.
8      Q. Correct.
9      A. So --
10      Q. Yes.  And when we get to the bills -- I actually
11  have the bills here with me.  You notice this lovely
12  folder on the desk here, and I actually have the text of
13  the bills, and we can walk through some of that, and I
14  think it will all be clear at that time.  We'll make
15  clear what we're talking about at the time is what the
16  bills required and what they referred to at all times.
17      A. I see.
18      Q. Is all that clear?
19      A. Yes, that's clear.
20      Q. I might also refer to the Governor, the
21  Governor's staff, your staff or yourself and, again,
22  this being the beginning of the deposition, I'm not a
23  hundred percent clear if you even have staff or, you
24  know, how many folks you manage.  We'll get to those
25  questions, and it will be a little bit easier for me as

11

1  we go along but I will at all times try to be clear when
2  I'm referring to your actions, the actions of your staff
3  or the action of the Governor's Office or the actions of
4  the Governor.
5      A. Okay.
6      Q. And if that's not clear, can you please ask me to
7  clarify, and I will do so?
8      A. That's fair.
9      Q. And when I refer to minority voters, I mean
10  voters that are nonwhite, nonAnglo voters.  Does that
11  make sense?
12      A. Yes.
13      Q. Okay.  Are you represented by counsel today?
14      A. Yes, Reynolds --
15      THE WITNESS:  I forgot your last name.
16      MR. BRISSENDEN:  Brissenden.
17      A. -- Brissenden, and accompanied with our General
18  Counsel, David Morales, and Associate General Counsel,
19  Jessica Olson.
20      Q. (BY MR. FISHER)  Okay.  Senator, have you ever
21  been deposed before?
22      A. Yes, I have.
23      Q. And can you tell me the circumstances of that
24  deposition, please?
25      Can you tell me the circumstances of that

12

1  deposition, please?
2      A. Yes, I can.  I have a question.
3      Q. Sure.
4      A. Do you want to divide between criminal and civil?
5      Q. I think that's another question but sure, we can
6  go with criminal first and then civil.
7      A. Only reason I ask, from June of 1969 until
8  January of 1983, I was in law enforcement.  So, there
9  were many cases where I guess you could call it a
10  deposition but we were involved with a similar process
11  on the criminal side.
12      Since that period of time -- I'm trying to think
13  of the date -- I was involved with a civil lawsuit
14  involving a franchise business where the franchisor took
15  us, the franchisee, to court, and there were depositions
16  involved in it, on a dispute of the franchise agreement
17  language.
18      Q. Do you know about what date that was?
19      A. It was in the '90s.  I'm not sure exactly what
20  period of time that was.
21      Q. Okay.  So, it's fair to --
22      A. It was a federal court proceeding in Beaumont,
23  Texas.
24      Q. So, it's fair to say numerous cases in the '70s,
25  early '80s as a member of law enforcement and then a

## 13

1  civil case in the '90s where you were deposed in a
2  franchisee/franchisor dispute in federal court, is that
3  fair?
4      A.  That's correct.
5      Q.  And have you testified in court before, as a
6  member of law enforcement or otherwise?
7      A.  In law enforcement, many times at all three
8  levels.  In Texas, you have municipal courts, county
9  courts and then state district courts.  And in law
10  enforcement, various cases that I had worked on over
11  that 14-year period, I had to testify in court as either
12  the investigative officer or the arresting officer or
13  one of those type situations.
14     Q.  And after you left law enforcement?
15     A.  No.  I did serve on a jury.
16     Q.  Okay.  So, were you a party to the suit that you
17  mentioned in the '90s or were you just part of the case?
18     A.  I was part.  My brother-in-law and I had a
19  Precision Tune franchise, and it was a disagreement over
20  a section of the franchise agreement.  And we were sued
21  for failing to comply with the franchise agreement but
22  we won.
23     Q.  So, you were a defendant in that case?
24     A.  Yes.
25     Q.  And I'm guessing the plaintiff was the

## 14

1  franchisor?
2      A.  Right.
3      Q.  The main company whoever franchised?
4      A.  Right.
5      Q.  So, what did you do to prepare for today's
6  deposition?
7      A.  Visited with my attorneys.
8      Q.  And who were the attorneys that you visited with?
9      A.  This gentleman to my right, Reynolds --
10         THE WITNESS:  Excuse me.
11         MR. BRISSENDEN:  That's okay.
12     A.  And our General Counsel, David Morales.
13     Q.  (BY MR. FISHER)  And was this just one meeting
14  with those attorneys?
15     A.  Counting today, there would have been two.
16     Q.  And was there anyone else present besides those
17  attorneys?
18     A.  There was a young lady, Brooke.
19         THE WITNESS:  In you all's office.
20     A.  And then another gentleman, John.
21     Q.  (BY MR. FISHER)  Okay.
22     A.  And I don't know their last names, or I don't
23  recall it.
24     Q.  And during this meeting, not the meeting today
25  but the previous meeting that you referred to, did you

## 15

1  review any documents?
2      A.  No.
3      Q.  And other than your attorneys, did you speak to
4  anyone else about your deposition today?
5      A.  No.  I told my wife that I would be in a
6  deposition.
7      Q.  That's a fairly typical answer.  It's also
8  probably a good idea.
9      A.  Yeah.
10     Q.  And did you bring any notes or documents with you
11  today?
12     A.  No.
13     Q.  So, a few words about privilege.  I'll be asking
14  you questions today, and I'll be doing so in conformance
15  with recent court orders.  We had an order on June 5th.
16  We had an order yesterday addressing privilege issues.
17  And I will seek to ask questions that are in compliance
18  with those orders.
19         Is it your understanding that as an employee of
20  the Governor's Office, you may assert or invoke a
21  privilege in response to my questions?
22     A.  Yes.
23     Q.  And do you know the privilege that you will be
24  invoking?
25     A.  In laymen's terms.  I'm not an attorney.  So, I

## 16

1  don't know the legal parts of it.  I'll have to rely on
2  my attorney for that.
3      Q.  And you said you weren't an attorney, so, I'm
4  assuming you haven't reviewed any of the Court's orders
5  regarding privileges; is that correct?
6      A.  That's correct.
7      Q.  And have you reviewed any of the parties' briefs
8  regarding privilege in this case?
9      A.  I don't know exactly what a brief is but no.
10     Q.  It's a written document just describing the
11  parties' positions on certain legal issues.
12     A.  No.
13     Q.  And you mentioned that you don't know exactly
14  what the term or legal term is for the privilege that
15  you're asserting but are you aware that you've asserted
16  some kind of privilege over documents and materials that
17  might be in you or your staff's possession?
18     A.  Go a little further.  I'm not --
19     Q.  I can clarify.  And thank you for asking.
20     A.  Okay.
21     Q.  This is one of the times where you can ask me to
22  clarify my question, and I'll do the best to make it
23  clear.
24     A.  Okay.
25     Q.  I know you just indicated that you weren't sure

## 17

1    exactly what the legal term was for the privilege that
2    you will be asserting.
3        A. Right.
4        Q. But you do know that there's a privilege involved
5    here with your work?
6        A. I've been told that.
7        Q. Do you know if that privilege was asserted with
8    regard to documents that are in your possession or in
9    the possession of your staff in the Governor's Office?
10       A. I don't know that.
11       Q. So, you don't know if you've asserted a privilege
12   over any documents or materials in your possession or in
13   the possession of the Governor's staff?
14       A. No.
15       Q. Do you understand that your attorneys may have
16   invoked a privilege that prevented certain documents
17   from being turned over that were in your possession or
18   in the possession of your staff to the United States in
19   this case?
20       A. I don't -- I don't know what the attorneys did.
21       Q. Okay. Well, I think you've indicated -- you've
22   made it clear you will be asserting a privilege over
23   certain responses in your testimony today; is that
24   correct?
25       A. Depends on the question.

## 18

1        Q. If you'd like to waive your privilege in response
2    to any question, you let me know.
3        A. I will.
4        Q. All right.
5            (Off the record.)
6        MR. FISHER:  I believe we were joined by
7    another attorney.  If we could have that attorney
8    identify themselves, please.
9        MR. WILLIAMSON:  My name is Victor
10   Williamson.  I'm with the U.S. Department of Justice.
11       THE WITNESS:  I'm Ken.
12       MR. WILLIAMSON:  Pleasure to meet you.
13           (Exhibit 190 marked.)
14       Q. (BY MR. FISHER)  Senator, correct?
15       A. Yes.
16       Q. Senator, I'm going to hand you what's been marked
17   as Exhibit 190.  It is a seven-page document, and it's
18   titled Second Amended Notice of Deposition.  And do you
19   recognize this document?  Have you seen it before?
20       A. Yes.  This was the first document that I've
21   seen --
22       Q. Okay.  So, you --
23       A. -- of this nature?
24       Q. So, you have not seen it before, this is the
25   first time you saw it?

## 19

1        A. No.  My question was this was the first one that
2    came to us back a couple of weeks ago that was --
3    well --
4        Q. I think the only difference between this
5    document -- there was another document produced
6    regarding the location change from the U.S. Attorney's
7    Office to this law firm but I believe this document is
8    the document that would have been in existence a couple
9    of weeks ago.
10       A. Okay.  I haven't -- this is the first time I've
11   seen this one.
12       Q. Okay.
13       A. But the one I saw with today's date, what I was
14   looking at, it had the wrong floor and room number on
15   it.  It had 210 rather than 2010.  So --
16       Q. Senator, I'm glad we all got to the right place
17   today.  And, you know, you can check me on this but I
18   think that what might have changed is just the
19   location --
20       A. Right.
21       Q. -- and date but I think that the rest of the
22   document would have remained the same.
23       A. Okay.  Yeah.
24       Q. So, let's go ahead and take a look.  And if you
25   look on Page 5, you'll see a header titled Documents?

## 20

1        A. Yes.
2        Q. And have you looked at this information under the
3    header Documents before?
4        A. On previous like documents, yes.
5        Q. But on this document?
6        A. Well, being the first time I've seen it, I would
7    have to --
8        Q. So, by "previous like documents," you mean the
9    ones where the location or the time might have been
10   different?
11       A. Yeah, or two weeks ago.  And let me say I do
12   appreciate you all affording me last week.  It was a
13   family funeral that I had to attend.  So, I had to
14   change until today.  So, I appreciate you all's
15   indulgence in that.
16           So, when you asked me, I think this chart under
17   Documents is the same as it's always been.
18       Q. Okay.
19       A. So, yes, I've seen these.
20       Q. And I do appreciate the fact that, you know, we
21   did have to reschedule, and I'm sorry about the
22   circumstances of that.
23       MR. FISHER:  I think we do need to take a
24   quick break right here.
25           (Short recess.)

## 21

1    Q.  (BY MR. FISHER)  All right, sir.  I want to be
2  respectful of your time, obviously.
3        So, we were talking about the Documents header on
4  Page 5.  You said that you had seen this before.  So,
5  just generally, did you undertake a search for the
6  documents that are referred to under the Documents
7  header?
8    A.  Yes.
9    Q.  Okay.  Can you describe that search, who
10 conducted it?
11   A.  I did.  I looked through my files for any of
12 these 1 through 12 items.
13   Q.  And did anyone else -- was it just you that
14 conducted that search?
15   A.  Of my things in my possession, yes.
16   Q.  And were there things that were not in your
17 possession that were searched for as well underneath
18 this Documents header?
19   A.  Not by me.
20   Q.  Okay.  Who searched for those?
21   A.  I guess everybody that got one of these notices.
22   Q.  So, it's possible that if a notice was given to
23 someone else in the Governor's Office, they searched for
24 records but you're not sure of that --
25   A.  No.

## 22

1    Q.  -- is that correct?
2    A.  No.
3    Q.  So, as we sit here today, the only thing that you
4  know is that you searched for the documents that you had
5  that were responsive to -- I guess it's 1 through 12
6  on -- underneath the Documents header; is that correct?
7    A.  That's correct.
8    Q.  So, we'll go through these quickly, and if you
9  could just verify for me that you searched for the
10 documents.
11       So, with regard to number 1, if you would take a
12 look at that, and you can read it quickly.  I know
13 you've seen it before.  So, you searched for the
14 documents that were responsive to number 1; is that
15 correct?
16   A.  That's correct.
17   Q.  Okay.  And did you find anything that was
18 responsive to number 1?
19   A.  No.
20   Q.  And with regard to number 2, did you conduct a
21 search for those documents?
22   A.  Yes, I did.
23   Q.  And did you find anything responsive to those?
24   A.  No.
25   Q.  Number 3, did you conduct a search for documents

## 23

1  responsive to number 3?
2    A.  Yes.
3    Q.  And did you find anything responsive to that
4  question?
5    A.  No.
6    Q.  And number 4, you conducted that search as well,
7  correct?
8    A.  Yes.
9    Q.  And did you find anything responsive to that
10 question?
11   A.  No.
12   Q.  Number 5, you conducted that search as well,
13 correct?
14   A.  Correct.
15   Q.  And did you find anything responsive to number 5?
16   A.  No.
17   Q.  And number 6, you conducted that search, correct?
18   A.  I did.
19   Q.  And did you find anything responsive to number 6?
20   A.  No.
21   Q.  And number 7, you conducted a search for
22 documents responsive to number 7, correct?
23   A.  Correct.
24   Q.  And did you find anything responsive to number 7?
25   A.  No.

## 24

1    Q.  And number 8, you conducted a search for
2  documents responsive to number 8, correct?
3    A.  Correct.
4    Q.  And did you find anything responsive to number 8?
5    A.  No.
6    Q.  Number 9, you conducted a search for documents
7  responsive to number 9, correct?
8    A.  Correct.
9    Q.  And did you find anything responsive to number 9?
10   A.  No.
11   Q.  And number 10, you conducted a search for
12 documents responsive to number 10, correct?
13   A.  Correct.
14   Q.  Did you find anything responsive to number 10?
15   A.  No.
16   Q.  And number 11, you conducted a search for
17 documents responsive to number 11, correct?
18   A.  Correct.
19   Q.  And did you find anything responsive to number
20 11?
21   A.  No.
22   Q.  And, lastly, number 12, you conducted a search
23 for documents responsive to number 12, correct?
24   A.  Correct.
25   Q.  And did you find anything responsive to number

Senator Kenneth  Lynn Armbrister                                 June 8, 2012

---

25

1    12?
2        A. No.
3        Q. So, I'm now -- you can put that aside, please,
4    and I'm going to hand you what's been previously
5    marked -- I'm going to hand you what's been previously
6    marked as Exhibit 310.  And this is an amended notice of
7    deposition, much like the one I just gave you.  You'll
8    notice on the second page instead of your name appearing
9    there, you'll see a different name, and the name that
10   appears there is Michael Schofield.  Do you know who
11   Michael Schofield is?  It's on the third line down.
12   You're on the right page.  Third line down in the bold
13   letters.
14       A. Yes.  Uh-huh.
15       Q. Do you know Michael Schofield?
16       A. Yes.
17       Q. Who is he?
18       A. Michael was an employee with the Governor's
19   Office and was one of the analysts -- or the analyst
20   over this particular field of bills that came in
21   involving elections.
22       Q. And does he still work for the Governor?
23       A. No.
24       Q. And do you know approximately when he left?
25       A. The closest I can get is sometime in 2011.

---

26

1        Q. Okay.
2        A. I don't know exactly when he left.
3        Q. First six months of the year?
4        A. No, because we were in session.
5        Q. So, probably second half of the year?
6        A. It's from June -- probably from July on.
7        Q. So, he left sometime between July and December of
8    2011; is that correct?
9        A. I would think, yes.
10       Q. So, if we could turn to, again, the Documents
11   header, and that will be on Page 5.  It's going to look
12   similar to the notice that had your name on it.
13       A. Okay.
14       Q. You found that.  So, Mr. Schofield noted that he
15   had searched his own files for documents that were
16   responsive to the requests underneath the Documents
17   header but since he had left the Governor's Office --
18   and we know, based on your testimony, he did leave --
19   that he was not able to conduct a search of documents
20   that were responsive to items 1 through 12 of his
21   amended notice.
22       A. Okay.
23       Q. He was unaware if a search had been conducted or
24   not.  Do you know if a search was conducted by the
25   Governor's staff for documents responsive based on 1

---

27

1    through 12 of this Amended Notice of Deposition for
2    Michael Schofield?
3        MR. BRISSENDEN: Objection to the extent the
4    question mischaracterizes the testimony of Mr. Schofield
5    but you can answer.
6        Q. (BY MR. FISHER)  You can answer, Senator.
7        A. Okay.  No, I don't know if a search was made of
8    his documents.
9        Q. So, you can set that aside, Senator.
10       Do you know is there a person in the Governor's
11   Office who is the central point of contact for
12   maintaining records?
13       A. Yes.
14       Q. And who would that be?
15       A. I don't know if it's our HR -- well, I don't know
16   who it is, the actual person's name but somebody is
17   assigned that task, whether it's IT people or somebody
18   in the General Counsel's office.
19       Q. So, if someone -- and we can use Mr. Schofield as
20   an example.  If someone leaves the office -- you know,
21   if you were to ever leave the office or someone leaves
22   the office, what do they do with the records that are in
23   their possession that they've been working on?  I guess,
24   what happens to that material?
25       A. If it's official business, not personal

---

28

1    possessions, it would be -- I don't want to call them a
2    team because there's not really a team but, obviously,
3    the General Counsel's office, any -- the Policy Director
4    of the Budget Planning & Policy Division, and then Greg
5    Davidson, our General Clerk, has official documents.
6        Q. I think I count three things there.  Is it
7    General Counsel, Budget Planning & Policy, and then Greg
8    Davis?  Are those three separate things --
9        A. Yes.
10       Q. -- the General Counsel, Budget Planning & Policy
11   and then Greg Davis?
12       A. Right.  Those are various divisions within the
13   Governor's Office.
14       Q. So, as we sit here today, you don't know if a
15   search was conducted for documents responsive to the
16   Amended Notice of Deposition by these folks either
17   for -- let's ask first for your documents, correct?
18       A. That's correct.
19       Q. Because you've conducted your own search,
20   correct?
21       A. That's correct.
22       Q. And then you don't know if anyone in that -- in
23   those capacities did a search for documents for someone
24   who had left, like Michael Schofield, based on the
25   Amended Notice that I handed you?

## 29

1    A.  That's correct.
2    Q.  So, is there an ongoing retention policy?  So, is
3  there something written down somewhere where it says
4  that you need to hang on to E-mails, drafts, notes,
5  reports or other documents in the Governor's Office?
6    A.  It depends on the nature of the document.
7  Obviously --
8    Q.  Let me hold you there, and we'll just start with
9  E-mails.
10    A.  E-mails, we -- I don't know so much if it's an
11  official written policy as it is the nature of the
12  server that we have retains them for seven days.  We're
13  told if you have something you want to keep, you need to
14  print it out or it's wiped out in seven days.
15    Q.  Can you archive E-mails?
16    A.  I would assume that you could.
17    Q.  Do you know what I mean by archiving an E-mail?
18    A.  Yes.
19    Q.  So, I guess the main way to retain E-mails is to
20  print them out; is that correct?
21    A.  If you want to, or you could use the archive.
22    Q.  And when you did the search for the documents
23  that were responsive to the Amended Notice of Deposition
24  in your case, did you search your printed E-mails as
25  well as the archived E-mails you might have?

## 30

1    A.  I did the printed.  I didn't do the archived
2  because I don't archive.
3    Q.  What about written correspondence, correspondence
4  that comes from constituents or otherwise to the
5  Governor's Office?
6    A.  That goes to Greg Davidson, who is the -- he's
7  the Director of -- his official title, I believe, is
8  General Clerk but he also is the Director over
9  Constituent Communications.  That's the division name.
10    Q.  I had that name wrong earlier, and I apologize
11  for that.  It's Greg Davidson; is that correct?
12    A.  Davidson, that's correct, D A V I D S O N.
13    Q.  Now, what about speeches, drafts of speeches that
14  the Governor has given, where would those materials be
15  retained or are they retained?  Is there any specific
16  format?
17    A.  I don't know.
18    Q.  What about notes, notes that are taken in
19  meetings, notes that are taken on telephone calls, any
20  specific retention policy for that material?
21    A.  No.
22    Q.  What about reports, reports that are done, for
23  instance -- we talked about Mr. Schofield briefly, we'll
24  talk about him a little bit more but, for instance, his
25  analyses of bills or other reports that are done, are

## 31

1  those retained somewhere?
2    A.  Not in our office.
3    Q.  Okay.  Where are they retained?
4    A.  I would assume with the service that we pay for
5  to track the bills.
6    Q.  What service is that?
7    A.  Telecon.
8    Q.  And does Telecon receive paper documents from
9  your office?
10    A.  Not that I know of.
11    Q.  Do they receive electronic documents from your
12  office?
13    A.  If there's a format -- I don't know if I'm
14  qualified to answer because I don't even have a password
15  for it.  If I need something off of it, I call the
16  analyst and say, "What do you have on this bill," but
17  the ones I have seen before, there's just a format on a
18  screen and you fill in the blanks.  It has various
19  questions on any bill that's going through the process,
20  what does the bill do, how does it change law, does it
21  amend the constitution, da, da, da.  It's a checklist,
22  if you will.
23    Q.  And is that -- the policy analysis or bill
24  analysis, is that something that, for instance,
25  Mr. Schofield would work on, a policy analyst; is that

## 32

1  correct?
2    A.  Yes.
3    Q.  What happens -- and we'll talk a little bit more
4  about that.  I do have more questions on that but what
5  happens to that document?  So, right now, we're just
6  talking about retention.  You know, after that is
7  produced, where is it?  What happens to it?  Does it --
8    A.  I don't know.
9    Q.  Okay.  Fair enough.  That's fine.
10    A.  Yeah.
11    Q.  And do you know if there's any off site storage
12  facility where the Governor's documents are sent?
13    A.  If they fall within the State's purview, they
14  would go over to the Library and Archives.
15      I don't know of any -- I've been in my position
16  going on -- January will be five years.  I've never
17  heard of an off site storage facility other than those
18  documents that, in the normal course of government
19  business, automatically are sent over to the Library and
20  Archives.
21    Q.  Have you sent anything over to the Library and
22  Archives?
23    A.  I have not, not in this position.
24    Q.  In your position as a Legislator, did you send
25  things over to Library and Archives?

Senator Kenneth  Lynn Armbrister                              June 8, 2012

## 33

1    A. Once I retired, then -- I mean, I was in the
2    Legislature 24 years. So, my staff, every so often,
3    with the State's policy, would move things over.
4    Q. So, I'm assuming over 24 years, you had 1 or 2
5    documents you had to send over; is that correct?
6    A. That's correct.
7    Q. Or maybe 1 or 2 million documents you had to send
8    over.
9    So, let's move away from records and retention.
10   A. Okay.
11   Q. I notice some sleepy eyes in the room after
12   discussing that in detail.
13   Can you tell me a little bit about your
14   educational background, Senator?
15   A. Yes. How far back do you want to go?
16   Q. We can start with college undergraduate.
17   A. Okay. You don't want to hear about public school
18   and all that.
19   I have an undergraduate from Sam Houston State
20   University and graduate studies while I was attending
21   the FBI National Academy through the University of
22   Virginia.
23   Q. And can you tell me a little bit about the FBI
24   Academy? Under what circumstances did you go? Did you
25   get a certification? Were you ever -- let me ask you

## 34

1    first -- I'm sorry for the multiple questions.
2    A. Sure.
3    Q. Did you ever serve with the FBI?
4    A. No.
5    Q. So, what were the circumstances of you going to
6    the FBI Academy and getting a certification?
7    A. There were -- at the time, 1975, there were two
8    ways to become an agent. One is to apply directly. And
9    if you're not an attorney or a CPA, you have to have at
10   least three years degree experience. That was what got
11   me into law enforcement on graduation from college was
12   to do the three years degree experience.
13   The other road was you were nominated. You go
14   through an extensive background check and all the things
15   that would be for a new agent, and you attend what's
16   called the FBI National Academy. It's essentially the
17   same curriculum as a new agent.
18   I attended the 103rd session of the National
19   Academy, which began in September of '75 and ended the
20   week before Christmas in '75.
21   We had what we call NA people, and then you had
22   new agents' class going through at the same time. So,
23   we got exactly the same type and nature of training
24   other than we missed the section of who to salute and
25   the agency hierarch and the organizational chart.

## 35

1    At that time, you could make an election to
2    either stay with the Bureau and there would be another
3    two weeks of training, where you would get that who to
4    salute and those type of things, or you could tell them,
5    "Thank you for all the training," and come back home.
6    And I elected to come back home.
7    Q. Okay. So, you had already been employed with law
8    enforcement?
9    A. Yes.
10   Q. You went to the FBI Academy and then just went
11   back to law enforcement, having received some training
12   from the FBI; is that correct?
13   A. Right.
14   Q. So, can you tell me a little bit about your law
15   enforcement experience?
16   A. Sure.
17   Q. And that's either prior to the FBI or after you
18   came back, just kind of encompass that all in one, I
19   guess.
20   A. Upon graduation from college, I was employed by
21   the Victoria Texas Police Department, and this was in
22   June of 1969.
23   You worked starting right at the bottom,
24   regardless of degree. You started at the bottom of rank
25   and position and job functions.

## 36

1    I attended the Victoria Police Academy the fall
2    of 1969 and, upon graduation, then was assigned Patrol
3    Division -- or Operations Division duties, which
4    entailed everything from traffic enforcement, to
5    investigation, to felon.
6    Anything that happened on my 8-hour shift in my
7    particular area of responsibility, geographic area of
8    responsibility, I would get the call and go out and
9    process the complaint.
10   And I served in that role for three and a half
11   years, and then I was promoted to a Sergeant's position,
12   which was more supervisory of people doing what I used
13   to do for the first three and a half years.
14   And a year later, I was promoted to Lieutenant
15   and took over the Regional Police Academy. At the same
16   time, I was also teaching at the Victoria Community
17   College in their criminal justice curriculum.
18   And I did that until I left to go to the FBI
19   National Academy. Like I say, you had to be a
20   nominated, and an agent out of Corpus Christi nominated
21   me, that we had worked together on some bank fraud
22   cases, nominated me to go. And so, that was when I went
23   to the FBI National Academy.
24   I came back. The reason I came back, my son was
25   three years old, my daughter was eight months old, my

Senator Kenneth  Lynn Armbrister                          June 8, 2012

## 37

1    class' first five-year duty assignment was going to be
2    New York City, and I wasn't going to take babies and a
3    wife who had never been out of Texas to New York for
4    five years.
5        Q.  Understood.
6        A.  So, I chose to come back, and I came back to take
7    over -- again take over the Coordinator's job or the
8    Director's job of the Regional Police Academy, and I was
9    doing that until I was chose to run for the House of
10   Representatives.
11       Q.  Okay.  So, it was basically patrol work, which
12   was -- I guess the subject matter there would be kind of
13   general, correct?
14       A.  Yeah.  I mean, my first six months there, also
15   because I wasn't from Victoria, Texas, I was a
16   natural -- and I only 21 years old.  I was a natural
17   for undercover work as well and drug enforcement.
18           And so, I had to do what you see on TV they had
19   to do, grow the long hair and work in that.
20           And then after graduation from the Victoria
21   Police Academy, then patrol functions.
22       Q.  Let me just interjection, you said "natural for
23   undercover" -- and I'm still trying to picture the long
24   hair.
25       A.  Yeah.

## 38

1        Q.  That was because you weren't from the town; is
2    that correct?
3        A.  Nobody knew me in that town.
4        Q.  No one knew you?
5        A.  No.
6        Q.  Okay.  And then you moved on to the Sergeant's
7    job; is that right?
8        A.  Yes.
9        Q.  And then went to the FBI?
10       A.  Lieutenant's job.  And that's when I first was
11   assigned to the Police Academy.
12       Q.  Okay.
13       A.  The local Police Academy, which was a ten-county.
14   When I say "regional," we provided mandated training.
15   The State requires X number of hours to be a licensed or
16   certified peace officer in the State, and our academy
17   was -- at the time, we handled the training for ten
18   counties.
19       Q.  And what -- what was your position at the Police
20   Academy?  I think you mentioned it but --
21       A.  I was the Director.
22       Q.  And how long were you the Director of the Police
23   Academy?
24       A.  From 1974 until 1983, with that break of time
25   from September to December of '75 when I was gone.

## 39

1        Q.  Okay.  And so, in this capacity either as a
2    Director at a Police Academy or as someone that was
3    working as a Patrol Agent, did the topic of voter fraud
4    ever come up that you recollect?
5        A.  No, not back then.
6        Q.  And in these capacities either as the Police
7    Academy Director or as Patrol Officer in Victoria, did
8    the topic of illegal immigration come up?
9        A.  Oh, yes.  We -- in fact, I used to be -- prior
10   to -- I believe it was the Arizona case where the
11   Supreme Court ruled that only the INS, at the time, had
12   jurisdiction over illegals, we were expected to arrest
13   illegals.  In fact, INS, for each illegal, would send me
14   my choice of either a box of .357 Magnum shells or .38
15   Special shells for every illegal I picked up.
16       Q.  So, that was something that you were involved in
17   as a Patrol Officer?
18       A.  Yes.
19       Q.  And then when you moved on to be the Director of
20   the Police Academy, did you give instruction on, you
21   know, the methods that you used as a Patrol Officer as
22   far as what to do when you encounter an illegal
23   immigrant or how to take care of that situation?
24       A.  No, because the law had changed, and we didn't
25   have jurisdiction any more.

## 40

1        Q.  So, the law removed jurisdiction over what you
2    had previously done as a Patrol Officer?
3        A.  Right.
4        Q.  You mentioned that the issue of voter fraud did
5    not come up at that time, and that was the time you were
6    patrolling and also the time you were Director of the
7    Police Academy, you didn't have any classes that you
8    gave on voter fraud or any information you gave to your
9    students; is that correct?
10       A.  No -- or that's correct.
11       Q.  So, at that time, did you serve in any elected
12   capacity while in Victoria while you were with the
13   police?
14       A.  In 1978 -- no -- 1979, I was elected to the
15   Victoria Independent School District Board of Trustees.
16   I was a school board member.
17       Q.  And how long did you serve on that board?
18       A.  One term.
19       Q.  So, that would have been a two-year term?
20       A.  Three-year term.  I was elected to the House of
21   Representatives in '82.  So, in Texas, under our
22   constitution, as soon as you announce for a different
23   office, you vacate the current office.
24           So, there was an opening for a State
25   Representative position.  And I was serving at that time

Senator Kenneth  Lynn Armbrister                                    June 8, 2012

## 41

1  as Vice Chair of the School Board, and as soon as I
2  announced that I was going to run for that open State
3  House seat, my term on the School Board was over.
4      Q.  And you mentioned elected, so, you were elected
5  to the position with the School Board; is that correct?
6      A.  Yes.
7      Q.  Was that a partisan position or nonpartisan?
8      A.  Nonpartisan.
9      Q.  Do you remember if you were elected based upon a
10  district or was it at large, meaning --
11      A.  It was at large at the time.
12      Q.  Has that changed since then?
13      A.  Yes.
14      Q.  You mentioned you were the Vice Chair, did you
15  hold any other positions on the School Board?
16      A.  No.
17      Q.  And in your capacity as the Vice Chair of the
18  School Board, with regard to School Board elections
19  which you participated in, did the issue of voter fraud
20  ever come up at that time?
21      A.  No, sir.
22      Q.  And in this capacity as Vice Chair of the School
23  Board, did the issue of illegal immigration ever come
24  up?
25      A.  No, sir.  Well, only from the standpoint of

## 43

1      Q.  And was this for the county or the city?
2      A.  This was the city.
3      Q.  And when you were elected to the House, you
4  served as a representative of Victoria County, so,
5  expanded to the whole county as representative?
6      A.  That's correct.
7      Q.  And how long did you serve in the Texas House?
8      A.  Two terms or four years.  I served from -- like I
9  say, you take office the second Tuesday of January in an
10  odd numbered year.  So, it was January of 1983, and I
11  served in that capacity until I ran for the Senate in
12  1986.
13          And the Senator before me had moved on to another
14  office as well.  That opened that seat.  So, I ran for
15  that seat and won election to the Senate.  And I took
16  the oath of office in the Senate that January of 1987.
17      Q.  Okay.  And when you were a member of the House --
18  and so, just a member of the House and we'll talk about
19  the Senate shortly -- did you serve on any committees
20  that involved or dealt with election law issues?
21      A.  No.  No.
22      Q.  Did you sponsor any legislation that you remember
23  or amendments that dealt with election law issues?
24      A.  No.
25      Q.  And this is a similar question to the questions

## 42

1  the -- there was a question by another board member at a
2  board meeting, and the superintendent said, "We are
3  obligated to provide an education to anybody that comes
4  in the door regardless of status."  I remember that.
5  That was at an open meeting.
6      Q.  So, there was a question by a board member
7  regarding providing education to illegal immigrants, and
8  the response was, "We're obligated to do so"?
9      A.  That's correct.
10      Q.  And you were just an observer of that
11  communication; is that right?
12      A.  Yes.
13      Q.  So, you were elected in 1982 to the House.  What
14  district were you elected from?
15      A.  It was a district that was comprised of three
16  counties.  At the time the number was 32, District 32.
17  The three counties were Refugio.  It's R E F U G I O but
18  it's pronounced like it has an R.  Refugio, Calhoun and
19  Victoria Counties, Victoria being the most populace of
20  the three.
21      Q.  And just for clarification if we can go back,
22  when you were mentioning that you served on the
23  Victoria, you know, police, was that -- was there a City
24  of Victoria and a County of Victoria?
25      A.  That's correct.

## 44

1  I've asked previously but now we're talking about your
2  service in the House.
3      A.  Okay.
4      Q.  Did the issue of voter fraud come up during your
5  service in the House?
6      A.  I can't remember.  That was 1983.
7      Q.  And the issue of illegal immigration, was that an
8  issue that was dealt with during your time in the Texas
9  House?
10      A.  No.
11      Q.  So, you mentioned you were elected to the Senate
12  in 1986?
13      A.  Elected in '86, took the office in '87.
14      Q.  And from what district?
15      A.  The Senate District would be 18.
16      Q.  And did that share the geographic area of
17  District -- you said 32 or was that different?
18      A.  It was -- it encompassed District 32 but it went
19  from three counties in the House District to, at that
20  time under that particular -- before the '91
21  redistricting, there were 18 other counties -- or 18
22  counties total.
23      Q.  About how many folks did you represent?
24      A.  About 500,000.
25      Q.  Am I correct that the Texas Senate districts are

## 45

1  drawn so that they are roughly equal in population; is
2  that correct?
3      A. Yes.  Yes.  You take the Decennial census, take
4  31 -- there's only 31 State Senators -- 31 divided into
5  whatever the official census number is, and that's
6  theoretically how many people each Senator represents.
7      Q. And your district, obviously -- let me ask you
8  first -- strike that.
9      **How long did you serve in the Senate?**
10     **A. 20 years.**
11     **Q. And that would be from 1987 --**
12     **A. 1987 to 2007.**
13     Q. And so, your district did change, I'm guessing,
14 at least two times?
15     A. Yes.
16     Q. Did you serve on any committees that involved or
17 dealt with election law during your time in the Texas
18 Senate?
19     A. Yes.
20     Q. Okay.  What committees did you serve on that
21 dealt with election law during your time in the Texas
22 Senate?
23     A. State Affairs.
24     Q. Did you serve on any other committees?
25     A. Yes.  I served on several.  Like I say, with just

## 46

1  31 members, you have to essentially do the same volume
2  of work as 150 House members.  So, we all -- in the
3  Senate, you serve on quite a few committees.
4      Q. And do you remember some of those?
5      A. Sure.  I served on every committee in the
6  Senate -- when I went over there, there were only nine
7  standing committees.  Now, there are more than that, and
8  the Senate decides through their rules how many
9  committees that you have but at the time -- but
10 virtually every committee I served on or chaired other
11 than the Jurisprudence Committee because of not being an
12 attorney.  I believe that was the only one that I did
13 not either serve on or chair.
14     Q. And did you have leadership positions in these
15 committees?
16     A. Yes.
17     Q. And what were those?
18     A. I chaired the Intergovernmental Relations
19 Committee during one period of time.  I was the Chair of
20 the State Affairs Committee for a period of time.  I was
21 the Chair of the Criminal Justice Committee for a period
22 of time.  And then my last chairmanship was Natural
23 Resources, water, air, those noncontroversial issues.
24     Q. And does the State Affairs Committee have
25 oversight over elections law issues?

## 47

1      A. When I chaired it, it did.
2      Q. And has that changed since you chaired it?
3      A. I believe it has.
4      Q. And what's the current situation?
5      A. I think they have a separate committee that
6  handles elections.
7      Q. And do you know the title of that committee?
8      A. I do not.
9      Q. And we're going to jump ahead just a little bit
10 but just because I think the subject matter is somewhat
11 similar.
12     Have you been appointed to any kind of task
13 forces since you've left the Senate to serve with the
14 Governor, as a member of a task force?
15     A. No.
16     Q. And so, you haven't served on the Task Force For
17 Homeland Security?
18     A. I did but I was still in the Senate.
19     Q. Okay.
20     A. This was right after 911, and Governor Perry,
21 like then President Bush, it was his first year when, of
22 course, 911 occurred.
23     And Governor Perry at the time nominated me to be
24 on this -- our Homeland Security Task Force, chaired by
25 at that time Land Commissioner David Dewhurst,

## 48

1  subsequently then Lieutenant Governor David Dewhurst.
2      Q. Okay.
3      A. And with members of the general public, as well
4  as elected members on that committee.
5      Q. So, in addition to your job as a Texas State
6  Senator and in addition to your service on, as we've
7  talked about, multiple, multiple committees, you served
8  on the Governor's Task Force on Homeland Security as an
9  elected Senator?
10     A. Yes.
11     Q. Is that right?
12     A. Yes.
13     Q. And did you serve on any other task force
14 projects, I guess, while you were an elected Senator?
15     A. Define "task force."  I'm not trying to be
16 evasive.  Here's the deal:  As you know, the Legislature
17 means 140 days every odd numbered year.  So, that
18 18-month period between sessions, your committee is
19 still in place, and we're tasked with interim charges,
20 we refer to them, where we'll look at bills either that
21 have passed or that were introduced that were of such
22 nature that it -- we didn't want to take them up in
23 140 -- there's too much here, it represented too much of
24 a change.
25     Chairing the Natural Resources Committee and the

## 49

1  water issues, air quality issues, those type things
2  required a lot of time during that interim, not really a
3  task force but we were meeting in various locales around
4  the state on those particular subject matters.
5      Q. So, there could be, between sessions, certain
6  subject matters that you're assigned to handle?
7      A. That's correct.
8      Q. And they might not have the formal term of task
9  force but it is other subject matter that you're
10  addressing, correct?
11     A. Yes.
12     Q. So, given your experience -- we've talked about
13  with the Task Force on Homeland Security, we've talked
14  about your work as the Chair of the State Affairs
15  Committee, as well as your law enforcement experience,
16  are you aware of the types of documents in Texas that
17  establish citizenship?
18     A. Not specifically.
19     Q. Do you know whether you have to be a citizen to
20  get a driver's license in Texas?
21     A. I don't know. I think you do but I don't know.
22     Q. And do you know whether you have to be a citizen
23  to get a license to carry a concealed handgun in Texas?
24     A. You do, a Texas resident.
25     Q. Could you be a Texas resident without being a

## 50

1  citizen of the United States?
2      A. Sure.
3      Q. So --
4      A. Not for concealed handgun, though.
5      Q. So, for concealed handgun, by Texas resident, you
6  mean someone who is a citizen of the United States,
7  correct?
8      A. That's correct. I don't have one, by the way. I
9  don't have a concealed --
10     Q. Handgun or -- let me clarify.
11     A. I don't have a license.
12     Q. So, that means you don't have the handgun, fair
13  enough?
14     A. That doesn't mean that. It doesn't mean that.
15  You know, you carry one for 14 years every day, the
16  novelty is not there.
17     Q. Understood, Senator. Understood.
18         So, during your time as a Senator, did you
19  sponsor or author any legislation or amendments that
20  involved elections that you are aware of that you
21  remember?
22     A. No.
23     Q. And similar question to what I've asked: During
24  your time as a Senator, did the issue of voter fraud
25  come up generally?

## 51

1      A. From time to time.
2      Q. And do you remember in what context that issue
3  came up?
4         MR. BRISSENDEN: I'm going to instruct you
5  that to the extent you have knowledge or information
6  that requires you -- to the extent this question
7  requires you to disclose information, analysis, work
8  that you did with regard to specific pieces of
9  legislation, I'd instruct you not to answer that
10  question.
11         To the extent you can answer that question
12  based upon information that's in the public record, you
13  may answer.
14         THE WITNESS: Okay.
15     Q. (BY MR. FISHER) Did you have anything publicly
16  that you're aware of that came up with regard to voter
17  fraud during your time as a Texas State Senator?
18     A. Not publicly.
19     Q. So, with regard to any information regarding when
20  voter fraud came up, you would be asserting legislative
21  privilege over that information on the advice of
22  counsel; is that correct?
23     A. That's correct.
24     Q. And similar question, generally, did the issue of
25  illegal immigration come up during your time as the

## 52

1  Texas State Senator?
2         MR. BRISSENDEN: My instruction to you would
3  be the same.
4      Q. (BY MR. FISHER) Just for the record, we have to
5  make it clear.
6      A. Okay.
7      Q. So, did the issue of illegal immigration come up
8  with regard to public information during your time as a
9  Texas State Senator?
10     A. It came up.
11     Q. Okay. But with regard to actual substance, are
12  you asserting legislative privilege over that
13  information based on the advice of counsel?
14     A. I am.
15     Q. So, we talked about your law enforcement
16  experience, we talked about your time in the House, in
17  the Senate. Your current position, if you can just tell
18  me about that and how you came to be employed by the
19  Governor.
20     A. When I chose not to seek reelection for another
21  term, the Governor called me and asked would I be
22  interested in coming and filling this position with his
23  staff, and I told him that I would.
24     Q. And who had the position prior to you having it?
25     A. I believe it was Dan Shelley, another former

### 53

1    member of the Senate.
2        Q.  And if we could just make clear, your actual
3    title is Legislative Affairs Director; is that correct?
4        A.  Legislative Director.
5        Q.  Legislative Director?
6        A.  Right.
7        Q.  And do you know how you were selected for the
8    position?
9        A.  I was the best for the -- no.  Like I say, he
10   called me.  And once I made the announcement that I
11   would not be seeking reelection, it was the very next
12   day I received a phone call from the Governor.
13       Q.  So, is it fair to say you weren't seeking the
14   position?
15       A.  No.
16       Q.  And you received a phone call asking if you were
17   interested in it?
18       A.  That's correct.
19       Q.  And did you know Governor Perry prior to that?
20       A.  Yes.
21       Q.  Had you interacted with him?
22       A.  Yes.
23       Q.  Obviously, we talked about your service on the
24   Task Force.  Was it with things like the Task Force and
25   other things between legislative sessions and during

### 54

1    legislative sessions that you had an opportunity to
2    interact with the Governor?
3        A.  Yes.
4        Q.  And in your experience and your knowledge -- and
5    let me clarify.  Let me make it clear for the record.
6        During your time as a member of the Texas House
7    and a member of the Texas State Senate, you were elected
8    as a Democrat; is that correct?
9        A.  That's correct.
10       Q.  And so, in your experience, has a Democrat served
11   in the Legislative Director role for a Republican
12   Governor that you know of?
13       A.  There could have been one, Hilary Doran under
14   Governor Clements.
15       Q.  And so, the reverse also, do you know of any
16   Republicans that have served for a Democratic Governor
17   of Texas?
18       A.  I'm trying to think of the five Governors I've
19   worked with.  No.
20       Q.  And so, the next question -- and this is, I know,
21   a general question but it is very important for us to
22   get this figured out now as we move forward so I don't
23   ask you questions that you don't know the answer to, or
24   I try not to anyway.
25       A.  Okay.

### 55

1        Q.  So that we're clear on the questions I'm asking
2    you -- and this goes all the way back to when we started
3    and talked about, you know, if I'm asking you questions
4    about what you do, what your staff does or what folks in
5    the Governor's Office do or what the Governor does, it's
6    helpful for me to know what your job duties as the
7    Legislative Director are.  So, if you can let me know
8    what those are and be specific, and then we'll try to
9    get that even more figured out so that I know kind of
10   what your role is in the Governor's Office.
11       A.  Okay.  It's -- I guess you could categorize it
12   under several different elements.  I'll use that term.
13   If it's -- when he can't be somewhere --
14       Q.  And by "he," you mean the Governor, correct?
15       A.  When the Governor can't be somewhere in the House
16   or the Senate, I'm the face that they see.  If it's --
17   if it's legislation related, I work with our policy
18   staff, and if they have a problem getting into an
19   office, then I usually can go through the -- break
20   through the speed bump.
21       Q.  Okay.  Let me stop you there real quickly just
22   because I don't want to have to go back and then we'll
23   all get confused about what I'm asking.
24       First of all -- and this is just a question for
25   clarification -- do you believe you had some kind of

### 56

1    area of expertise that made you particularly qualified
2    so that the Governor called you and offered you the
3    position or was it based on your lengthy term in the
4    Senate or --
5        MR. BRISSENDEN:  Objection.  Speculation.
6    And to the extent that that information -- or that
7    question requires you to divulge information as part of
8    the deliberative process in which the Governor selected
9    you, to the extent you have any information based upon
10   communications you had from individuals within your
11   office, I instruct you not to disclose that information.
12       THE WITNESS:  Okay.
13       Q.  (BY MR. FISHER)  Okay.  So, you're not going to
14   answer based on the deliberative process privilege on
15   the advice of your counsel; is that correct?
16       A.  That's correct.
17       Q.  So, let me rephrase.
18       When the Governor called you -- and this is aside
19   from any communications that might have taken place --
20   what was your thought about why you were being called?
21   The length of time in the Senate, was that it, or
22   something else, some kind of particular area of
23   expertise you had developed, perhaps your law
24   enforcement experience or something else that you
25   thought made you an attractive candidate?

## 57

1      A.  Not being in an elected office any more, I was
2  the best one for the job.
3      Q.  Do you have any --
4      A.  The reason I said not being in politics, we like
5  to say me, me, me, but I was it.
6      Q.  So, you feel you were the most qualified person
7  for the job; is that correct?
8      A.  That's correct.
9      Q.  So, we were talking about -- and I had a couple
10  of questions that I wanted to ask before we moved on
11  with your duties because you mentioned a couple of
12  things I wanted to ask about.
13      The first thing you said is when the Governor
14  can't be the face that members of the House and Senate
15  see, what do you mean by being the face that House and
16  Senate members see?
17      A.  A House member or Senate member sometimes says,
18  "I've got to talk to the Governor.  I've got to talk to
19  him," they will call me first.
20      Q.  Okay.  So, if the Governor is not available, as
21  you mentioned earlier, you are the person --
22      A.  Right.
23      Q.  -- who will take a call from a House member or
24  Senate member or meet in person as well, I guess; is
25  that correct?

## 58

1      A.  That's correct.
2      Q.  And when someone has to talk to the Governor, are
3  those discussions about -- I'm not asking the substance
4  but are those communications about legislation, things
5  that are pending?
6      A.  The whole gamut.  It runs the gamut of what
7  members want to talk to him about.
8      Q.  So, it could be legislation that's pending,
9  legislation that's up for consideration; is that
10  correct?
11      A.  Could be.
12      Q.  And it could be any other number of issues that a
13  State Legislator would need to talk to the Governor
14  about; is that right?
15      A.  That's correct.
16      Q.  And can you identify some other areas where a
17  State Legislator would want to talk to the Governor or
18  need to talk to the Governor?
19      MR. BRISSENDEN:  I'm going to instruct you
20  that to the extent you can answer that question
21  generally, at a general level, you may do so.
22      To the extent that question requires you to
23  rely upon specific communications that you have had with
24  Legislators, communications that those Legislators have
25  had with you, I instruct you that those are privileged

## 59

1  communications and not to disclose those.
2      A.  Okay.  Generally, the requests range from trying
3  to get a constituent appointed to a board or commission.
4  At times over the five years I've been there, when a
5  member has decided that he or she has had all this fun
6  they want, and before they announce to the public, they
7  want to tell the Governor first.  More of a protocol
8  type thing, "Hey, I want to tell you, Governor, I'm not
9  running any more and before I" -- those type things.
10      So, when I say it runs the gamut of things that
11  they want to talk about, very seldom does it ever broach
12  on issues specific.
13      Q.  (BY MR. FISHER)  In this role, do you see
14  yourself as -- since you're the face for the Governor in
15  this role, do you see yourself as a gatekeeper?  Do you
16  determine whether certain things you can deal with and
17  pass information to the Governor or certain things maybe
18  that person does need to go see the Governor face to
19  face?  For instance, if someone is leaving, do you want
20  them to actually see the Governor and are there other
21  instances where you just kind of pass information along?
22      MR. BRISSENDEN:  My instruction to you would
23  be the same.
24      THE WITNESS:  Okay.  Generally?
25      MR. BRISSENDEN:  Yes, generally.

## 60

1      A.  Generally, there is some gatekeeping role.
2      What was the other part of it?
3      Q.  (BY MR. FISHER)  Just do you see yourself as
4  someone who has to make a determination about what
5  information or if -- you know, if a Legislator comes to
6  you with certain information, do you make a
7  determination I can tell the Governor that information
8  and that's fine or do I need to put that person face to
9  face with the Governor on this topic?
10      MR. BRISSENDEN:  Objection.  Vague.
11      And my instruction to you would be the same.
12      A.  Generally, at times, that has occurred.
13      Q.  (BY MR. FISHER)  Okay.  And so, you also
14  mentioned -- and I guess this would be more of a gate
15  opener role -- policy staff getting into an office, and
16  that would be, I guess, the reverse.  So, these are
17  folks from the Governor's Office trying to talk to
18  specific Legislators; is that correct?
19      A.  That's correct.
20      Q.  And so, there are times generally where --
21      A.  Or staff.
22      Q.  And so, there are -- it's fair to say there are
23  times where folks from your office need to meet with
24  folks from either staff or Legislators, Texas
25  Legislators, and you help facilitate those meetings or

## 61

1  conversations; is that correct?
2      A.  That's correct, if they can't get in.
3      Q.  What would be a reason why someone couldn't get
4  into an office?
5          MR. BRISSENDEN:  My instruction to you would
6  be the same.  Again, we're talking in general terms.
7          THE WITNESS:  Okay.
8          MR. BRISSENDEN:  And to the extent you can
9  answer that question based upon general procedure and
10  general knowledge, you may answer.
11          To the extent that that question requires
12  you to rely upon specific instances and specific
13  examples in dealing with specific Legislators, I would
14  instruct you not to answer.
15          THE WITNESS:  Okay.
16      A.  Generally, when the availability -- we'll call it
17  that -- occurs, it's during a legislative session while
18  either the House or the Senate are actually in session.
19  Analysts don't have floor privileges, and if it's
20  something through the process, they have to get --
21  either the member has requested some information or
22  there's something about -- an amendment placed on there
23  and they have to tell that member, "We don't like that,"
24  or, "We do like that," they don't have access to the
25  floor.  I do.

## 62

1          So, I can go and pull the member off and say,
2  "Hey, this thing that you just agreed to is" -- so,
3  generally, that's what I'm talking about.
4          I don't ever recall in my five years that an
5  analyst was barred from at least talking to staff.  That
6  has not occurred.
7      Q.  (BY MR. FISHER)  Okay.  And when you mentioned
8  access to the floor, is this some kind of formalized
9  access or is this just based on your position as a
10  long-standing member of the Legislature?
11      A.  It's formalized.  If I'm not in this position and
12  I'm not a registered lobbyist, then as a former member,
13  I would have access since I served in both Houses but --
14  because if you are a, quote, lobbyist, registered
15  lobbyist or you don't have experience, then it's a
16  formal process by which you are granted access to the
17  floor while they are in session.
18      Q.  So, there's really a few ways to get access to
19  the floor.  One is someone in your position as a
20  Legislative Director.  Two is a lobbyist?
21      A.  Lobbyists are not.
22      Q.  Lobbyists are not?
23      A.  No.
24      Q.  Three would be former House and Senate members.
25  So, really, you're allowed under two of those positions,

## 63

1      I guess?
2      A.  Right.
3      Q.  As Legislative Director and as a former
4  longstanding member of the Legislature as well?
5      A.  Right.  But I have to have an ID card and go
6  through the House procedure and the Senate procedure.
7      Q.  So, it is very formalized --
8      A.  Yes.
9      Q.  -- as far as who is allowed to go in that
10  building?
11      A.  No, the floor while they are in session.  Anybody
12  can go in the building.
13      Q.  Are you, in your capacity as Legislative
14  Director, involved in drafting legislation?
15      A.  Define "drafting."  Do I actually write it?
16      Q.  Yes.
17      A.  No.
18      Q.  Do you suggest changes for legislation based upon
19  the Governor's priorities?
20      A.  I can.
21      Q.  Have you done that in the past five years, the
22  time that you've served as Legislative Director?
23      A.  I've helped formulate policy.
24      Q.  Have you helped formulate legislation?
25      A.  Yes.

## 64

1      Q.  And are you involved in analyzing existing
2  legislation and bills?
3      A.  To a certain extent, yes.
4      Q.  And so, if you're involved in analyzing an
5  existing bill or piece of legislation, how does your
6  role in potentially being involved in, you know -- as we
7  mentioned earlier just a few seconds ago, drafting or
8  redrafting legislation, how does that come into play?
9  So, if we have an existing bill, where does your role
10  come in as far as someone who might make changes or, as
11  you mentioned, suggest changes to existing policy or
12  bills?
13          MR. BRISSENDEN:  Again, we're talking just
14  general terms.
15      A.  Generally, any bill that gets filed, bill or
16  resolution, the Governor's role in the legislative
17  process comes at the end of the process.  In other
18  words, we can either sign it, we can veto it or, under
19  Texas law, a bill that reaches us before the 130th day
20  of the legislative session, we can do nothing and it
21  becomes a law without the Governor's signature.  That's
22  in the constitution.  If it comes to us from the 130th
23  day to the 140th day, then we have 20 days to analyze
24  it.
25          So, because every bill -- I don't have the luxury

Senator Kenneth  Lynn Armbrister                        June 8, 2012

---

65

1    of not assuming that they may end up on our desk, we --
2    that's why we have analysts in each subject area, if you
3    will, that reviews those bills, and we have -- during a
4    session, we have frequent meetings on -- for a group of
5    people to review.
6        Q.  (BY MR. FISHER)  You mentioned policy analysts
7    who are assigned certain subject matters, and would one
8    of those policy analysts be someone we mentioned
9    earlier, Mr. Schofield?  Was he in that position?
10       A.  He would have been.
11       Q.  And would you be someone who would read the bill
12   analyses prepared by Mr. Schofield?
13       A.  At times, yeah, generally, at times.
14       Q.  Do you know who else would read those analyses
15   that are prepared by him?
16       A.  I would guess his direct supervisory person.
17       Q.  And what role do those analyses play in making a
18   determination -- well, strike that.
19           When are the analyses prepared?
20       A.  When a bill gets filed, we assign them to an
21   analyst, and we ask them to do their analysis within
22   three days.
23       Q.  So, prior to the bill being filed, do you or
24   members of your staff have any information about the
25   bill or is it all after the bill is filed and the

---

66

1    analysis is conducted?
2        A.  All after.
3        Q.  Okay.  So, a bill is filed and --
4        A.  I mean, from time to time, if somebody before the
5    session starts or before they file a bill says, "I'm
6    thinking about filing a bill doing this, do you think
7    the Governor would support that," general terms, and
8    without seeing the bill I'd say, "We have to see the
9    bill."
10       Q.  So, is it fair to say there might be what could
11   be called a 10,000-foot discussion that gets narrowed
12   down after the actual language of a bill is filed; is
13   that correct?
14       A.  That's correct.
15       Q.  And so, after a bill is actually filed, a bill
16   analysis is done by someone like Mr. Schofield; is that
17   correct?
18       A.  That's correct.
19       Q.  And the folks that review that might be yourself;
20   is that correct?
21       A.  At some point in the process, I would.
22       Q.  And another person that might look at that might
23   be his director or supervisor; is that correct?
24       A.  That's correct.
25       Q.  And are these -- I'm sorry.

---

67

1        A.  I was just clearing my throat.
2        Q.  Are these -- do these bill analysts play a role
3    in determining whether the Governor will support a bill
4    or not?
5        A.  No.
6            MR. BRISSENDEN:  I'm going to -- yeah, to
7    the extent that question requires you to disclose
8    information, thoughts, opinions, mental impressions
9    about legislation, I instruct you not to answer.
10           To the extent you can, as a matter of
11   general procedure, answer that question, you may.
12       A.  Generally, no.
13       Q.  (BY MR. FISHER)  And how does the Governor
14   determine whether to support a bill or not if not based
15   upon an analysis conducted by someone like
16   Mr. Schofield?
17           MR. BRISSENDEN:  Objection to the extent it
18   calls for speculation but it also requires the witness
19   to divulge information in regards to deliberation, the
20   deliberation process, as well as what the Court has
21   determined to be legislative acts and is part of the
22   legislative privilege.  And so, under both privileges, I
23   instruct the witness not to answer.
24           THE WITNESS:  Okay.
25       Q.  (BY MR. FISHER)  And you're not going to answer

---

68

1    that question based on the advice of counsel, correct?
2        A.  That's correct.
3        Q.  Would you ever read -- you said -- you mentioned
4    you would read bill analyses prepared by policy
5    analysts, correct?
6        A.  At times.
7        Q.  And would you ever go back and look at the
8    underlying documents that a policy analyst relied on?
9    So, if Mr. Schofield provides you with a bill analysis,
10   would you look at what he looked at to come up with that
11   analysis?
12       A.  No.
13       Q.  So, a bill has been filed.  We have a policy
14   analysis that's done in your office by someone like
15   Mr. Schofield.  That's reviewed by folks in your office,
16   correct?
17       A.  There is one person that makes a review, did he
18   fill in all the blanks.
19       Q.  Okay.
20       A.  But she doesn't -- it's more -- and I don't use
21   it in a demeaning term.  It's more secretarial, did you
22   turn a document with all the blanks filled in or not.
23   She makes no analysis of the quality or what's in there.
24       Q.  And by "she," you're referring to?
25       A.  Julie Kopycinski.

69

1    Q.  Fair enough.  So, it's fair to say, based upon
2    what you just said, that you wouldn't, in your capacity,
3    or a member of your staff, tell a policy analyst what to
4    look at before doing their bill analysis?
5    A.  No, not at that point.
6    Q.  So, you mentioned that the Governor's role comes
7    later in the process --
8    A.  Right.
9    Q.  -- a few minutes ago?
10   A.  His official role.
11   Q.  Okay.
12   A.  Sign, veto or --
13   Q.  So, his official role, whether to sign or veto a
14   bill, comes later in the process.  Does he have an
15   unofficial role prior to that determination?
16        MR. BRISSENDEN:  Instruct you to the
17   extent that question requires you to disclose thoughts,
18   opinions, mental impressions, analysis about
19   legislation, specific pieces of legislation,
20   communications that you've had with staff members in
21   your office, I'd instruct you not to answer that
22   question.
23        THE WITNESS:  Okay.
24   Q.  (BY MR. FISHER)  So, just to be clear for the
25   sake of the record, you are not answering that question

70

1    on the advice of counsel?
2    A.  That's correct.
3    Q.  In your role as Legislative Director, do you talk
4    to members of the Legislature about the Governor's
5    priorities during a session?
6    A.  Yes.
7    Q.  And do you discuss certain bills, specific bills?
8    A.  I have to -- in Texas, a Governor is not allowed
9    to file a bill in and of his own signature.  So, I have
10   to get a bill sponsor in the House and a bill sponsor in
11   the Senate.
12   Q.  So, there might be times where you're seeking to
13   have a bill sponsored in the House or the Senate on
14   behalf of the Governor?
15   A.  Yes.
16   Q.  And where would that -- where would a bill like
17   that come from --
18        MR. BRISSENDEN:  To the extent that you --
19   Q.  (BY MR. FISHER)  -- just generally?
20        MR. BRISSENDEN:  To the extent you can
21   answer that question as a matter of general procedure,
22   you may do so.
23        To the extent that question requires you to
24   disclose communications that you've had with the
25   Governor or other members of the Governor's staff, I

71

1    instruct you not to disclose those.
2        Also, to the extent that that requires you
3    to disclose your thoughts, opinions, mental impressions
4    or analysis about legislation, I'd instruct you -- and
5    including deliberations, I would instruct you not to
6    answer.
7    A.  Okay.  In general, you have an initiative.  The
8    House and the Senate have their own rules that all of
9    those bills -- or those that result in the filing of a
10   bill must be drafted by legislative counsel.
11       I could take them something that these attorneys
12   here have written up, it wouldn't be good enough for the
13   House and the Senate.  They have to have their own
14   attorneys draft up a bill.
15       So, when I talk to a member about an initiative,
16   in general, then they take that general initiative and
17   they go and talk to their attorneys at Legislative
18   Council.
19       They then draft up a bill and file the bill, and
20   at that time then, we will review it to see if it
21   matches what we had in mind.
22   Q.  (BY MR. FISHER)  So, there might be things that
23   you term initiatives that are priorities of the Governor
24   that would engender a bill being filed eventually in the
25   House or the Senate?

72

1    A.  That's correct.
2    Q.  So, we talked a little bit about your legislative
3    duties.  We talked about -- and I termed it a gatekeeper
4    and a gate opener role.  I think that was a fair
5    characterization; is that correct?
6    A.  Sure.
7    Q.  Do you have any nonlegislative related duties in
8    the Governor's Office, so, things that aren't related to
9    dealing with the Legislature?
10   A.  Sure.  The Governor will get invitations to speak
11   probably 10 times a day in 20 different events.  He
12   can't be at all of them.  So, a lot of those, they get
13   me rather than him.
14       Yesterday -- there's a -- I think it's a
15   nationwide initiative.  Chambers of Commerce have this
16   program called -- yesterday was Mid Valley Leadership
17   where they bring in young professionals in their
18   community and they learn about city government, county
19   government, state government and they even travel to
20   Washington to learn about federal government.
21       When they come to the State, as yesterday a group
22   did, I was the one -- they wanted the Governor.  He
23   couldn't be here.  Unfortunately, a house member died,
24   and his funeral was there that he had to attend.
25       I did that.  It's nonlegislative in the pure

## 73

1  sense but it's one of the functions that I do is fill in
2  on speeches and those type things.
3      Q. So, you fill in for the Governor when he can't be
4  somewhere, and sometimes folks are a little disappointed
5  they didn't get Governor Perry; is that correct?
6      A. Sure.
7      Q. I wanted to clear up one thing.  I just have one
8  more question on kind of what goes on when a bill is
9  filed by a Legislator.
10     A. Okay.
11     Q. We talked about a bill is filed.  You all become
12  aware of it.  There is kind of a secretarial procedure
13  where a policy analysis is done?
14     A. Right, not in my shop but they -- any bill that's
15  filed -- and in the legislative session, there will be
16  anywhere from 6,500 to 7,000 proposed law changes.  Yes,
17  that's always amazed me.
18        But we get a notice that's been filed.  I
19  review this, and I say, "Okay.  This needs to go to
20  Reynolds.  This one needs to go to David.  This one
21  needs to go here," and we'll assign it to an analyst who
22  works in another building under another director.
23     Q. Okay.  And that's a lot of bills, 6,500 to 7,000,
24  correct?
25     A. (Witness indicated by nodding his head

## 74

1  affirmatively.)
2      Q. So, those are all assigned out.  Do they all come
3  back to you or do only some come back to you that are of
4  certain interest or is it just -- you don't get -- do
5  you get 7,000 bills back to take a look at?
6      A. No.  No.  The only time that we get bills back
7  is -- as we like to say, if the system works, the
8  majority of those never pass.
9         If we see movement or nonmovement over an
10  initiative that we support is the only time that they
11  will come back to me.
12        By movement, I'm talking about it's been filed,
13  oh, they've granted a hearing, oh, it's out of
14  committee, oh, it's passed the Senate or the House,
15  whatever.
16     Q. And if a bill has just merely been filed and a
17  policy analysis has been done, what is the step that's
18  taken to determine whether it has the Governor's support
19  or not?
20        MR. BRISSENDEN:  I'm going to instruct you
21  to the extent you can answer that question without
22  disclosing information or rely upon specific instances
23  of legislation that have been deliberated or where
24  recommendations have been made or opinions have been
25  formulated, to the extent you can do so without relying

## 75

1  upon that information, you may answer the question as a
2  matter of general procedure.
3         To the extent that you have to rely upon
4  specific instances dealing with legislation, then I
5  instruct you not to answer.
6      A. Okay.  On the advice of my attorney, I won't
7  answer.
8      Q. (BY MR. FISHER)  Let me take another try.
9      A. Okay.
10     Q. It's just as a general matter, you know, a bill
11  has been filed, a policy analysis has been done, it
12  could be one of these 7,000 bills, and that's a lot of
13  bills, does the Governor weigh in on 7,000 bills?
14     A. No.  No.
15     Q. Do you know, for instance, the general priorities
16  of the Governor with regard to legislation?
17     A. Generally.
18     Q. And do those general priorities factor into
19  whether you pay attention to a bill or not, one of those
20  7,000 bills?  Do those priorities of the Governor
21  determine whether you are tracking that bill or not?
22        MR. BRISSENDEN:  My instruction to you would
23  be the same as just previously.
24        THE WITNESS:  Right.
25     Q. (BY MR. FISHER)  And you're not going to answer

## 76

1  that on the advice of counsel; is that correct?
2      A. On the advice of counsel, I'll forego that
3  answer.
4      Q. Do you advise the Governor on what legislation he
5  should support or not support?
6      A. No.
7      Q. Does -- he provided that advice by someone in
8  the --
9      A. Well, let me be -- under oath, once a bill
10  reaches us, it goes through a process where several
11  different people have to actually sign off on the bill.
12  So, that could be construed as advice.
13        So, in all honesty, under oath, I guess you could
14  say if I didn't sign off on the bill, I would be
15  advising him not to sign it.  If I did sign off on it, I
16  guess that would be --
17     Q. And by sign off, is there a form that you fill
18  out or --
19     A. That's correct.
20     Q. And you're not looking at all 7,000 bills,
21  correct?
22     A. No.
23     Q. So, you're only deciding whether to sign off on a
24  certain subset of those bills; is that correct?
25     A. Right.

Senator  Kenneth  Lynn  Armbrister                              June 8, 2012

---

77

1      Q. And you mentioned earlier that's based upon
2   movement, potentially movement within either the House
3   or the Senate?
4      A. Sure.  Yes.  Excuse me.
5      Q. Could it also be based upon the Governor's
6   priorities?
7          MR. BRISSENDEN:  Same instruction as before.
8      A. On advice of counsel, I won't.
9      Q. (BY MR. FISHER)  So, you decline to answer based
10  on advice of counsel?
11     A. I decline, yes.
12     Q. So, we talked about your role on the actual floor
13  of the House and the Senate and then within the
14  chambers, which you said anyone has access to but I'm
15  assuming you factor in more importantly in that than,
16  for instance, I would.  Are you the point of contact
17  between the Governor's Office and the Legislature when
18  it comes to legislation?
19     A. I am one of the points of contact.
20     Q. And who would other points of contact be in the
21  office?
22     A. I have a person that works with me whose sole
23  function is to help with the Senate and a person that
24  works with me whose sole purpose is the House liaison.
25  House liaison, Senate liaison.

---

78

1      Q. So, you have a House and Senate liaison.  Do they
2   sit in your office or do they sit in the Senate and
3   House building?
4      A. They sit in the division.  They are in my
5   division, yeah.
6      Q. And your division is?
7      A. It's on the first floor of the Capitol.
8      Q. The title of your division?
9      A. Legislative Division.
10     Q. And you're the head of that division; is that
11  correct?
12     A. That's correct.
13     Q. And do you have -- you mentioned a couple -- I
14  know you have a House and Senate liaison.  What are
15  their names?
16     A. Currently, David Eichler, E I C H L E R, is the
17  Senate liaison.  Jennifer White, common spelling
18  Jennifer, is the House liaison, but she's only been in
19  that position for about two and a half months.
20     Q. Okay.  And prior to that, who was the --
21     A. Sarah Floerke, F L O E R K E --
22     Q. Thank you.
23     A. -- was the House liaison.
24     Q. And do you have other staff that you supervise
25  aside from the House and Senate liaisons?

---

79

1      A. Yes.  I had my administrative assistant.
2   Unfortunately, she passed away in January with cancer.
3      Q. Sorry to hear that.
4      A. Thank you.
5          And then Julie Kopycinski, K O P Y C I N S K I, I
6   believe.  And recently as of maybe January, a young man
7   named Travis Richmond, who is kind of a researcher.
8      Q. Do you have interns?
9      A. From time to time, we've had interns, yes.  I
10  don't have any currently or didn't during the last
11  session.
12     Q. Are these staff employed with you full-time,
13  meaning between sessions as well?
14     A. Yes.
15     Q. And specifically your staff, who on your staff
16  has worked on election law issues that you know of?
17     A. I don't know anybody specifically on my staff
18  that's worked on that other than, in general, if it's
19  a bill involving -- if it's going through the Senate, it
20  would be David, and if it was going through the House,
21  it would have been Sarah or now Jennifer.
22     Q. Okay.  So, if a voter identification bill or
23  photo identification bill was going through the Senate,
24  David would have been the staffer that was assigned that
25  bill as his responsibility; is that correct?

---

80

1      A. No.  No.  The analysts have control of the bill.
2   We -- our role is more interpersonal rather than an
3   actual bill.
4      Q. So, what do the liaisons do for you?
5      A. They do more for the members than they do
6   actually for me.  In that role that we have -- if I
7   happen to be on the House floor, one of them has always
8   got a question or -- in general, they've got a request,
9   "Hey, can you get me in to see the Governor in two
10  weeks?"
11         "Yeah, we'll put you down and see what his
12  schedule looks like," that kind of thing.
13     Q. So, it's fair to say -- you know, I've
14  characterized these as the gatekeeper and gate opener
15  role.  Is it fair to say that your liaisons are kind of
16  gate openers, people who want to see the Governor that
17  are in the Legislature?
18     A. Sure.
19     Q. How often do you communicate with Legislators, or
20  members of your staff?  So now we've kind of identified
21  the universe of your staff.  So, how often do you or the
22  members you just mentioned in your staff communicate
23  with the Legislators, let's say during session first?
24     A. Oh, during session?
25     Q. Yes.

---

### 81

1    A.  Probably there's not a day that doesn't go by
2    that I don't have a conversation with 1 of the 181 of
3    them.
4    Q.  You mentioned conversation, is this in-person
5    communication mostly?
6    A.  Uh-huh.
7    Q.  Do you do E-mails at all with members of the
8    Legislature?
9    A.  I would have to say I might have over the time
10   but it's not a current deal.  Every one of them has got
11   my cell phone number and --
12   Q.  So --
13   A.  -- I'm there every day.  So, they know where to
14   find me.
15   Q.  Face-to-face conversations is one way?
16   A.  Uh-huh.  Telephone.
17   Q.  Telephone conversations are another way --
18   A.  Right.
19   Q.  -- that you could speak with Legislators?
20   A.  Yes.
21   Q.  Do you do E-mail yourself?
22   A.  I do E-mails but it's not a way that a member
23   during a legislative session uses to correspond with me.
24   Q.  Would members of your staff E-mail Legislators?
25   A.  They could.

---

### 82

1    Q.  Would they E-mail Legislators' staff potentially?
2    A.  They could.  I don't know.
3    Q.  And out of session, is there a difference in the
4    level of communication between --
5    A.  Oh, sure.  They are not here but -- instead of
6    every single day, it may be -- well, this week, I talked
7    to one by telephone.  When I came in this morning to the
8    Capitol, there were two House members fixing to go to
9    the Democratic convention and stopped and we visited,
10   just chitchat.
11   And I talked to one about a lady I know from
12   Victoria whose daughter died of a particular illness is
13   going to have a walk here and needed an Austin
14   Legislator if she would kick it off.  And I talked to
15   her because she's also a nurse, and she said she would
16   be happy to kick off this event, you know, things like
17   that.
18   Q.  Okay.  So --
19   A.  That was this morning at 8:00 o'clock, but yeah,
20   the level of contact goes way down during the interim.
21   Q.  And given that Legislators are not here, do you
22   have to do more telephone communications rather than
23   face-to-face?
24   A.  Yeah, they will call me mostly.  Mine when I call
25   them now is if the Governor is going -- as a matter of

---

### 83

1    courtesy, we alert members if the Governor is going to
2    be in Tyler, Texas, and so, I will call the House member
3    and the Senate member from Tyler and say, "The Governor
4    is going to be at this event in your town on this date
5    and time.  If you care to go, just give me a heads up."
6    So, those type calls.
7    Q.  So, you would alert folks if the Governor is
8    going to be in their area?
9    A.  Yeah.
10   Q.  During session, how do members generally learn
11   about the Governor's priorities or agenda?
12   MR. BRISSENDEN:  I would object to the
13   extent that the question calls for speculation as to how
14   those members learn.
15   To the extent you can answer that question
16   as a matter of general procedure, you may do so but to
17   the extent that question requires you to disclose
18   communication that you've had with Legislators, with
19   Legislators' staff, among your own staff, with state
20   agencies or Texas Legislative Council, I would instruct
21   you not to answer.
22   A.  Okay.  In general, the Governor is required to
23   present to a Joint Session of the Legislature early in
24   the session.  I can't give you the exact date because
25   it, you know, ebbs and flows with whatever the calendar

---

### 84

1    is for that particular year.
2    He's required to address the Joint Session with a
3    State of the State speech, and usually that is the
4    format for -- the official format for the Governor
5    laying out his vision and initiatives.
6    The Governor, like any political animal, there is
7    a bully pulpit and, generally, that's done by a variety
8    of means with -- but those are all public events.  They
9    are press releases or --
10   Q.  (BY MR. FISHER)  Okay.  So, the other way -- by
11   bully pulpit, I think you mean that he might give
12   speeches --
13   A.  Yeah.
14   Q.  -- he might write an editorial or other ways to
15   get folks --
16   A.  He doesn't write editorials but they're all press
17   events.  So, they're public events where he plays out
18   his positions and initiatives.
19   Q.  So, earlier when we talked about initiatives a
20   few minutes ago, there are some initiatives you said
21   that the Governor takes on and has drafted.
22   A.  Uh-huh.
23   Q.  And so, how would Legislators find out about
24   those initiatives?  Because, obviously, as you mentioned
25   earlier, as the Governor, you can't bring legislation

## 85

1    into the House or Senate.  So, how would a House or
2    Senate member know about those initiatives?
3        MR. BRISSENDEN:  Same objection and same
4    instruction.
5        A.  In general, if the initiative takes a statutory
6    change, they will know as soon as I show up and ask them
7    would they carry this piece of legislation.
8        Q.  (BY MR. FISHER)  So, in general, it's fair to say
9    that the Governor, through you or a member of your
10   staff, would ask House or Senate members to take up an
11   initiative of his?
12       A.  That's correct.
13       Q.  All right.  We've been going at it for a little
14   while here, so, let's take a quick break.  I do want to
15   be respectful of your time.
16       A.  I'm with you guys, whatever you all need.
17       Q.  We'll do ten minutes.
18       A.  I blocked out the whole month for you, save the
19   19th.
20       Q.  I can't stay that long.
21           (Short recess.)
22       Q.  (BY MR. FISHER)  We'll get started again.
23       A.  I need to amend one of your background questions.
24       Q.  Sure.  And let me just mention at any time -- and
25   I will ask you a question at the end --

## 86

1        A.  Okay.
2        Q.  -- but at any time that you have something else
3    that you want to say about a question that was
4    previously asked, just let me know.
5        A.  Okay.  This is on the depositions.  I don't know
6    why I didn't think of it before.
7            In 1993, I passed -- again, I don't want it to
8    sound like me, me, me but it was the keynote piece of
9    legislation having to do with the Edwards Aquifer
10   Authority, which was a water supply for the City of San
11   Antonio and points south.
12          Because in that bill we had removed an existing
13   groundwater board and replaced it with a new board, it
14   was a Department of Justice issue on the Voter Rights
15   Act.
16       Q.  Okay.
17       A.  The board -- and so, I was deposed on that
18   particular issue.  And the law stood because I had
19   removed or gotten rid of an old board that had at large
20   districts and replaced it with a single member district
21   board.
22       Q.  And so, we'll skip ahead here.  I was --
23       A.  I just wanted to give you that input.  I don't
24   know why I didn't think of that when you were asking me
25   the depo questions before.

## 87

1        Q.  And you were deposed in that case?
2        A.  Yes, I was, in the federal courthouse in Victoria
3    by a gentleman and lady from the Department of Justice.
4        Q.  And so, the case involved a school district that
5    had moved from at large to single member or the other
6    way around?
7        A.  Water district, groundwater district.
8        Q.  And it moved from at large to single member
9    districts; is that correct?
10       A.  That's right.  That was part of it.  That wasn't
11   the whole issue.  The whole issue was a result of a
12   federal endangered species lawsuit.
13          The region that this aquifer authority covered --
14   and the federal judge, Judge Bunton, allowed the state
15   to come up with a new regulatory scheme or policy over
16   that six-county region.  And I was the one carrying that
17   legislation.
18          And part of -- I realized that the old authority
19   was not getting the job done.  They weren't protecting
20   the endangered species, and so, we replaced it, as one
21   of the sections in a multi-page regulatory bill, with
22   this new authority.  By authority, I'm talking about the
23   board.
24          And when we designed that, we designed it as
25   single member districts rather than at large.  And so,

## 88

1    the deposition was about the formation -- the section of
2    the bill, the formation of that.  You've taken an old
3    elected board out and replaced it with a new elected
4    board but they liked the configuration that we had done,
5    so, it passed.
6        Q.  And was this a case?
7        A.  Yes.  There was -- some of the former board
8    members filed under the Voters Right Act that we were
9    denying voters.
10          Well, the Court then ruled, "No, you actually
11   enhance voters with single member districts rather than
12   at large positions."
13       Q.  And do you remember the name of the case, the
14   name of the members?
15       A.  I don't remember the name of the case.  The bill
16   was Senate Bill 1477 from the 93rd -- 1993 Legislature,
17   whatever legislative session that was.
18       Q.  Okay.  So, you mentioned the Voting Rights Act
19   and, I assume, based upon that case and any other
20   context you've mentioned as well, the State Affairs
21   Committee, law enforcement, are you familiar with
22   Section 5 of the Voting Rights Act?
23          MR. BRISSENDEN:  I'm going to instruct you
24   to the extent you can answer that question without
25   disclosing analysis and thoughts and work that you've

89

1   done in regard to particular pieces of legislation as
2   part of your legislative experience, you may answer.
3          But to the extent you cannot answer that
4   question without relying on that information, then I
5   instruct you not to answer.
6      A.  I would have to look at it to see if I was -- I
7   may be familiar with concepts but I --
8      Q.  (BY MR. FISHER)  Okay.
9      A.  -- the legal aspects, I'm --
10     Q.  Fair enough.  Are you familiar with the fact that
11  Texas -- and you mentioned that in the context of the
12  '93 suit, there was a change made to the election of the
13  water district members.
14     A.  Right.
15     Q.  Are you familiar that to make those kind of
16  changes, it has to go through a preclearance process
17  with the Justice Department?
18     A.  I've always heard that, yes.  I never knew why
19  but I've always heard that.
20     Q.  Do you believe that compliance with the Voting
21  Rights Act is an important goal?
22          MR. BRISSENDEN:  Objection.  Vague.
23          To the extent that you have knowledge or
24  information that you have -- that's responsive to that
25  question that you have learned as part of your process

90

1   and experience as a Legislator working and developing
2   thoughts, opinions, mental impressions, analysis based
3   on the work that you've done regarding pieces of
4   legislation, I'd instruct you not to answer.
5          To the extent that you have knowledge,
6   thoughts about the Voters Right Act separate and apart
7   from your work in the Legislature or in the Governor's
8   Office, you may answer.
9      A.  Repeat the question again.
10     Q.  (BY MR. FISHER)  Sure.  The question was do you
11  believe that compliance -- and we talked about the
12  Voting Rights Act.  You mentioned it being brought up in
13  the context of the case that you were involved in.  Do
14  you believe that compliance with the Voters Right Act is
15  important?
16          MR. BRISSENDEN:  Same objection and same
17  instruction.
18     A.  If I'm -- can I have a side-bar?  Is that what
19  you call it?  Can I have a conversation with my
20  attorney?
21     Q.  (BY MR. FISHER)  If it's about privilege issues,
22  then yes.  If it doesn't concern issues of privilege,
23  related to privilege, then I would ask you to answer the
24  question.
25          MR. BRISSENDEN:  Do you need a break?  Do

91

1   you need a side-bar to discuss privilege?
2          THE WITNESS:  Yeah.  I'm not real sure.
3          MR. FISHER:  We'll go off the record.
4          (Short recess.)
5      A.  Thank you for that.  My answer is while I was an
6   elected official, I had to take an oath to support,
7   defend, protect Constitution laws of this state and of
8   the United States.
9          My opinion as a U.S. citizen is we're obligated
10  to follow all of the laws -- whether we agree or not, we
11  are obligated to follow all the laws of the land at the
12  time.
13     Q.  (BY MR. FISHER)  And so, Section 5 is the law of
14  the land now and your understanding of the Voters Right
15  Act -- I know you're not familiar maybe with the
16  specific provisions but the Voting Rights Act is the law
17  of the land now?
18     A.  That's correct.
19     Q.  So, could you describe, as a general matter, what
20  steps either you or your staff take in the Governor's
21  Office to ensure that bills comply with the law of the
22  land?
23          MR. BRISSENDEN:  I believe that question
24  would require you to divulge your opinions,
25  recommendations and deliberations that you have

92

1   undertaken as a part of the Governor's Office, the
2   Governor's decisions and policies.
3          Also, to the extent that it invokes your
4   thoughts and opinions and mental impressions and
5   analysis about legislation and its process of having
6   legislation precleared, specifically SB 14, I would
7   instruct you not to answer.
8      A.  I will follow my attorney's advice, and if you
9   want to clarify.
10     Q.  (BY MR. FISHER)  So, you're not answering that
11  question on the advice of your counsel, correct?
12     A.  That's correct.
13     Q.  Are you aware of any communications in the
14  Governor's Office regarding compliance with the Voting
15  Rights Act?
16     A.  No.
17     Q.  Does the Texas Department of State have any
18  involvement in the proposal or enactment of legislation,
19  to your knowledge?
20     A.  Secretary of State's Office?
21     Q.  Secretary of State's Office, correct.
22     A.  Ask it again.
23     Q.  Do they have any involvement in the proposal or
24  enactment of laws in Texas?
25          MR. BRISSENDEN:  Objection.  Compound.

## 93

1     To the extent that you can answer that
2  question as a general matter, you may do so.
3     To the extent that requires you to disclose
4  communications you've had with your staff and with state
5  agencies, including the Secretary of State's office, I
6  would instruct you not to answer.
7     A.  Okay.  In general, I have been aware of a bill or
8  a set of bills that have been requested by the Secretary
9  of State's office having to do generally with logistic
10  practices, corporate filing sections.
11     There was one last session involving sports
12  agents and those type but anything outside of the
13  logistics of the operation of the office, they don't
14  have any role.
15     Q.  (BY MR. FISHER)  You mentioned the Secretary of
16  State potentially requesting bills.
17     A.  Uh-huh.
18     Q.  Would those requests go to the Governor's Office
19  or would those requests go to Legislators?
20     A.  Legislators.
21     Q.  So, the Governor's Office wouldn't have any role
22  in -- I guess it would be an initiative -- proposing an
23  initiative based upon the needs of the Texas Secretary
24  of State's Office?
25     MR. BRISSENDEN:  My instruction to you would

## 94

1  be the same as before.
2     A.  In general, no.
3     Q.  (BY MR. FISHER)  Texas also has a Department of
4  Protective Services, correct?  Is that the correct
5  terminology?
6     A.  Let's see.  Is that Regulatory Protective -- the
7  children?
8     Q.  DPS.
9     A.  Oh, Department of Public Safety.
10     Q.  Public Safety.
11     A.  Yes.  Yes.  We have a DFPS that I was getting
12  confused about.  That's family -- children, used to be
13  called Child Welfare.
14     Q.  Thank you for the clarification on the
15  terminology.
16     So, would DPS, in a similar vein as the Secretary
17  of State's Office, be involved in legislation involving
18  license requirements, driver's license requirements,
19  anything that falls under their general jurisdiction?
20     MR. BRISSENDEN:  Same instruction.
21     A.  I'm -- generally, if they did, they would go to
22  the Legislature.  They wouldn't come to us.
23     Q.  (BY MR. FISHER)  And is the Department of Vital
24  Statistics, is that another agency within the Texas
25  government?

## 95

1     A.  I believe that's under the Health Department.
2  You're talking about births and deaths?
3     Q.  Correct.
4     A.  I think that's under the Health Department.
5     Q.  So, would the Health Department, similarly, come
6  to the Governor's Office with any proposals for
7  legislation?
8     MR. BRISSENDEN:  Same instruction.
9     A.  Generally, no, they would go to the Legislature.
10     Q.  (BY MR. FISHER)  Are you aware that anyone in the
11  Secretary of State's Office has asked the Governor to
12  include initiatives in his public speeches, such as
13  State of the State and other the public forums that you
14  mentioned earlier?
15     A.  I'm not aware.
16     Q.  So, would it be fair to characterize the State of
17  the State speech and you mentioned no editorials but the
18  other speeches and other public appearance that you
19  characterized as bully pulpit, is it fair to
20  characterize that as the Governor's legislative agenda
21  for the year, or session?  I know it's every other year.
22     A.  That would be a -- that would be a format that he
23  uses.  The official format is the State of the State.
24     Q.  Is it fair to say that the Governor has a
25  legislative agenda for each session?

## 96

1     A.  It would be fair to say that.
2     Q.  And who would be involved in preparing that
3  legislative agenda within the Governor's Office broadly,
4  not just your staff?
5     A.  The entire office usually participates in that,
6  all the divisions, other than IT.  I mean, they may put
7  it on the web site but they don't formulate policy.
8     Q.  And specifically with regard to certain subject
9  areas, would certain subject areas be developed by
10  certain folks in the office?
11     A.  The analysts, our Budget Planning & Policy
12  Division.
13     Q.  So, the Budget Planning & Policy Division would
14  handle the legislative agenda; is that correct?
15     A.  They would be charged with bringing all the
16  information to the table, not necessarily handling the
17  agenda.
18     Q.  And who acts on that information or who handles
19  the agenda?
20     A.  That's when -- once a decision is made that it
21  would take a statutory change to effect this initiative,
22  that's when I go visit with members to see if they will
23  have a bill drafted.
24     Q.  And just for clarification, by "statutory change"
25  you mean something --

## 97

1  A. As opposed to a rule.
2  Q. Okay. So --
3  A. A rule, an agency can change protocol by just
4  changing their rules.  And there's a process you follow
5  to change their rules.  It's got to be published and
6  have hearings and all of that but if it requires a law
7  change, a statute change, then we have to have a bill
8  drafted.
9  Q. And that would also encompass something that's
10  not a change, meaning new legislation as well; is that
11  correct?
12  A. That's right.  Right.  Change could be amending
13  an existing law or brand new law is a change.
14  Q. And are you familiar with the American
15  Legislative Exchange Council, known as ALEC?
16  A. Yes.
17  Q. And can you generally describe for me what it is?
18  A. There are probably a myriad of associations but
19  the three that is most often attended by members of the
20  Texas Legislature when I was in the Legislature was ALEC
21  or American Legislative Exchange Council, the NCSL,
22  National Conference of State Legislators, and then
23  there's a subset of that, the SLC, Southern Legislative
24  Conference.  And those three are the ones commonly
25  attended, their conferences, by various members of the

## 98

1  Legislature.
2  Q. Are you familiar also with a group called Safe
3  Texas, Safe and Fair Elections Texas?
4  A. No.
5  Q. So, going back to the three that you did mention,
6  ALEC, NCSL and SLC --
7  A. Uh-huh.
8  Q. -- as a member of -- or as the Legislative
9  Director and a member of the Governor's Office, are
10  those things that you would attend now?
11  A. I could but I haven't.
12  Q. Would members of the Governor's staff attend
13  those type of meetings or events?
14  A. We have one gentleman that attends regularly a
15  subset of, I believe, NCSL Budget Writers.  And from
16  time to time, there may be some analysts that have
17  attended various conferences of NCSL or SLC or ALEC but
18  they don't go through me to sign off to attend.  That
19  involves travel and hotels and expenses.  I don't do
20  that part of it.
21  Q. If we could just take one step back and let me
22  just ask you what your knowledge or what your
23  understanding is about the role of ALEC?
24  A. They are a group that's available to State
25  Legislators.  I'm sure they have staff that formulate

## 99

1  general policy that if a House member or Senate member
2  said, you know, "I'm thinking about changing daylight
3  savings time," and he would call up there and say, "Do
4  you all have any proposals or have you all researched
5  this?"  It's just a resource really.  They act as a
6  resource to -- for members if they want to use them
7  to -- under the guise of why reinvent the wheel if
8  somebody has already invented it, what have you all
9  done.
10  Q. You mentioned members and Legislators.  Is this
11  organization catered to Legislators and not to Governors
12  or members of the Governor's staff?
13  A. Right.  Governors are usually either the NGA,
14  National Governors Association, that we're not a member
15  of, or the RGA, Republican Governors Association.
16  Governor Perry was Chair of that.
17  And I'm sure there's a DGA, Democratic Governors
18  Association but I'm not familiar.  I know Ann Richards,
19  when she was Governor, was a member of that.
20  But DGA and NGA have kind of coalesced into one
21  group because that's everybody, the Rs and Ds.
22  Q. The RGA, what role do they provide for the
23  Governor?
24  MR. BRISSENDEN:  I'm going to instruct you
25  to the extent --

## 100

1  A. I don't know.  I don't go to those.
2  Q. (BY MR. FISHER)  Are you aware of either ALEC,
3  NCSL or SLC providing any technical assistance to the
4  Governor with regard to his initiatives and legislation?
5  A. No.
6  Q. You mentioned you don't know about RGA but are
7  you aware of RGA providing any technical assistance to
8  the Governor with regard to his initiatives or the
9  legislative agenda?
10  MR. BRISSENDEN:  I'm going to instruct you
11  to the extent that --
12  A. I don't know.
13  MR. BRISSENDEN:  -- you have information
14  that would be privileged not to disclose that.
15  A. I don't.
16  Q. (BY MR. FISHER)  Your answer is you don't know?
17  A. I don't know.
18  Q. And you haven't personally attended any RGA
19  conferences; is that correct?
20  A. I went to one RGA conference on health.  I look
21  at her, she used to be our go-to person on health
22  issues.
23  When her predecessor was there, I attended a
24  morning session at Reynolds Plantation in Georgia and
25  played golf in the afternoon.

Senator Kenneth  Lynn Armbrister                    June 8, 2012

## 101

1     Q.  Was the -- and this would not be with regard to
2  the afternoon, obviously, but was the topic of election
3  law or voter identification discussed at that
4  conference?
5     A.  No, sir.  It was strictly Medicare, Medicaid
6  issues.
7     Q.  Was the topic of voter fraud discussed?
8     A.  No, sir.  That was probably four years ago.
9     Q.  When -- I failed to ask you this question earlier
10 and I should have because I do understand as a State
11 Senator, you're employed I guess what could be
12 considered part-time; is that correct?
13    A.  In Texas, yes, citizen Legislators, meaning
14 you're here for 140 days and then you have to go back
15 and live under the laws that you pass.
16    Q.  I do remember that, from Governor Perry's
17 campaign, in fact.
18    A.  Right.
19    Q.  Were you employed in any other capacity while a
20 member of the Texas State Senate?
21    A.  Yes.
22    Q.  And what was that?
23    A.  I was manager of a private security company,
24 rent-a-cops, burglar alarms, fire alarms, access
25 systems, electric gates.

## 103

1     A.  Well, I'm Chairman of the board of a bank.
2     Q.  What bank is that?
3     A.  Frontier Bank of Texas.  It's in Elgin, Texas and
4  a branch in Bastrop.  And then I serve on the board of
5  the First Tee of Greater Austin, which is teaching life
6  skills for golf.
7     Q.  And are those positions -- and I'm assuming
8  you're not compensated for those positions?
9     A.  No.  We're a de novo bank.  So, board members
10 can't be compensated for at least seven years under the
11 Federal Banking Act.  This was a bank that we started a
12 couple of years ago.
13    Q.  So, switching directions, do you remember when
14 you last renewed your driver's license?
15       Strike that.
16       Let me ask you first do you have a Texas driver's
17 license?
18    A.  Yes, I do.
19    Q.  Do you remember when you last renewed your
20 driver's license?
21    A.  Yes.  When this became full-time, we moved
22 from --
23    Q.  I'm sorry, by "this"?
24    A.  The job with Governor Perry.
25    Q.  Okay.

## 102

1     Q.  And how long did you do that?
2     A.  I did that from 1985 until I went to work for
3  Governor Perry, until 2007.
4     Q.  Okay.  So, for over 20 years --
5     A.  Right.
6     Q.  -- you had a job outside of being --
7     A.  Right.
8     Q.  -- a Texas State Legislator?
9     A.  Right.
10    Q.  And now that you're working for Governor Perry,
11 it sounds like you don't have another position --
12    A.  No.
13    Q.  -- is that correct?
14    A.  Well --
15    Q.  Aside from grandfather?
16    A.  Grandfather, and I was railroaded -- they call it
17 an election but I'm the block captain for Neighborhood
18 Watch.  That's it.
19    Q.  My wife is the president of our homeowners
20 association.  I understand those things happen.
21    A.  Yeah.
22    Q.  Let me ask you when you -- do you know when you
23 last renewed --
24    A.  Were you asking about boards?
25    Q.  Sure, if you're a member of any boards.

## 104

1     A.  When that became full-time and we moved from
2  Victoria, Texas to Round Rock, Texas where we now reside
3  and I had to change my driver's license to reflect the
4  new address, at that time I could prerenew.  It wasn't
5  up for renewal but I prerenewed.  And that was three
6  years ago -- actually, four years ago.  Excuse me.
7     Q.  So, you moved from Victoria to Round Rock, which
8  is in the Austin area --
9     A.  Yes.
10    Q.  -- because of the job in Austin?
11    A.  Just north of Austin.
12    Q.  And where did you renew your license?  Was it in
13 Round Rock or Victoria?
14    A.  It was actually in Austin.
15    Q.  Austin?
16    A.  At the DPS office.  There used to be an office
17 just across the street from the Capitol.  They've now
18 moved that function out to their main campus out on
19 Lamar Street but it was easy to walk across the street
20 and say, "Hey, I need to change my address on my
21 driver's license."
22    Q.  And how far was it when it was the old office,
23 how far was that from your work location?
24    A.  The old office was across the street from the
25 Capitol.

Senator  Kenneth  Lynn Armbrister                    June 8, 2012

## 105

1    Q.  And where is the new office?  How far would that
2   be?
3       A.  I think they've moved it out -- I'm not sure
4   where they moved it but I guess you would go to the DPS
5   headquarters.  They are on Lamar Street, which would be,
6   from the Capitol, as the crow flies, we say, maybe four
7   miles.
8          I could have done it in -- in fact, my wife did
9   it in Round Rock, and that's about two miles from where
10  we live.  They have a substation there.  You can go in
11  and get your driver's license.
12      Q.  And do you know how long it took you to take care
13  of the change in address on your driver's license?
14      A.  The effective change was immediate.  You get a
15  temporary piece of paper, and you still have your old
16  one with the old address but you have a piece of paper.
17         And then it took about -- I think I got it in the
18  mail four days later maybe.
19      Q.  Did the piece of paper have your photo
20  identification on it?
21      A.  No.  It's just a receipt.
22      Q.  So, while you were waiting for the license with
23  the renewed address to come, you didn't have an
24  address -- you didn't have a license with a photo
25  identification that reflected your current address; is

## 106

1   that correct?
2       A.  That's correct.
3       Q.  Were you born in Texas?
4       A.  Yes.
5       Q.  Do you have a copy of your birth certificate?
6       A.  Not with me but I do have a copy of it.
7       Q.  And do you know where you would go to get a copy
8   if you didn't have yours any more, if, for instance,
9   between Victoria and Round Rock, the movers left the box
10  somewhere?
11      A.  Yes, I can go online and get it from the Health
12  Department.
13      Q.  And do you know how much that would cost?
14      A.  No, I don't.
15      Q.  Do you know how long that would take to get?
16      A.  No, I don't.
17      Q.  And did you vote a couple of weeks ago in the
18  Texas primary?
19      A.  Yes, I did.
20      Q.  And how far was the polling place from your home
21  or work, wherever you go?
22      A.  From my home, mile and a half, two miles.
23      Q.  And did you vote in person?
24      A.  Yes.
25      Q.  Do you prefer to vote in person?

## 107

1       A.  I usually do, yes.
2       Q.  Have you ever voted by absentee?
3       A.  No.  Well, under the old system, I did a couple
4   of times in city elections because we were in session
5   and I couldn't get back to Victoria when I lived there.
6          So, I would request an absentee ballot be mailed
7   to me, and I would fill it out and mail it back in.  I
8   did that a couple of times over the years but it was for
9   city elections or local elections when they came up
10  during the session.
11      Q.  I know you've been a candidate numerous, numerous
12  times, so, that might preclude this happening but do you
13  have any experience related to election administration,
14  for instance, working as a poll worker, as a poll
15  watcher, anything of that sort?
16      A.  No.
17      Q.  Have you, while voting, ever witnessed someone
18  trying to impersonate another voter in the polling
19  place?
20      A.  I have not witnessed that.
21      Q.  Have you ever witnessed someone other than a U.S.
22  citizen trying to vote in a polling place?
23      A.  I have not.
24      Q.  And the system for absentee ballots that you
25  mentioned that went through a change, can you just tell

## 108

1   me what it was previously and what it is now?
2       A.  Yes.  Used to, before we had early voting, all we
3   had was absentee voting.  And once we initiated early
4   voting, then it pretty much did away with the reason
5   that you do absentee, other than folks that cannot get
6   to the polls.  Nursing home, those type people, we still
7   have that available to them but basically when we
8   changed the law -- and I can't remember when it was.  It
9   was back several years ago -- that allowed you a certain
10  period of time for early voting.  The intent was if you
11  knew you were going to be out of town or whatever, which
12  everybody is eligible for early voting.  You didn't have
13  to give a reason.
14      Q.  I assume that doesn't apply to folks in the
15  military or overseas for some reason?
16      A.  Yes, they have a different -- HAVA, is it?
17      Q.  There's a federal rule that covers that?
18      A.  Right.
19      Q.  Another acronym?
20      A.  Right.
21      Q.  You said a few years ago, was this during your
22  time in the Governor's office or were you still in the
23  Senate?
24      A.  No, I was in the Senate when that changed.
25      Q.  Were you involved in that legislation at all in

Senator Kenneth   Lynn Armbrister                    June 8, 2012

## 109

1   the Senate?
2       A. No.
3       Q. Did you vote on it?
4       A. I'm sure I probably did if it was in the Senate,
5   yeah.
6       Q. Do you remember which way you voted on that
7   legislation?
8       A. I would have probably voted for it.
9       Q. Do you remember the bill number or anything?
10      A. (Witness indicated by shaking his head
11  negatively.)
12      Q. No?
13      A. No. Excuse me. No.
14      Q. So, we've talked a little bit about Texas'
15  current voting system. We just talked about a change
16  that it went through. What is your understanding of the
17  current system in Texas for verifying the identity of a
18  voter?
19      A. When we vote, I take my voter registration card
20  and present that to the man or lady that's manning the
21  desk, and then they hand me a ballot -- or they hand
22  me -- they walk me over to an electronic carousel and we
23  vote electronically now.
24      If I don't have my card -- and a couple of times
25  I've met my wife. She said, "Hey, we need to vote

## 110

1   before 7:00 o'clock." And I will give them my name, and
2   I was asked for my ID, and I would give them my driver's
3   license.
4       Q. So, you either present a voter registration card
5   or a license; is that correct?
6       A. Right.
7       Q. And has that been your experience in all of the
8   elections you've voted in?
9       A. That I've had to do it that way, yes.
10      Q. And that's the way you voted a couple of weeks
11  ago in the primary?
12      A. I had my voter registration card, uh-huh.
13      Q. Are you aware of any problems with the current
14  system in Texas?
15          MR. BRISSENDEN: Objection. Vague.
16      To the extent that you have knowledge or
17  information that is responsive to that question and that
18  question requires you to divulge that knowledge in
19  connection with your work on legislation pertaining to
20  voter ID legislation, including SB 14, your thoughts,
21  opinions, mental impressions and analysis, I would
22  instruct you not to answer the question.
23      To the extent that you have information that
24  is contained as a part of the public record, you may
25  answer.

## 111

1       A. Okay. And tell me your question again.
2       Q. (BY MR. FISHER) Yes. And I'll rephrase slightly
3   to do away with the vagueness.
4       But are you aware of any problems with Texas'
5   current system for verifying the identity of a voter
6   when voting, which we've just described as voter
7   registration card or, in the absence of that, some other
8   form of ID, which you said was a license?
9           MR. BRISSENDEN: My instruction to you would
10  be the same.
11          THE WITNESS: Okay. And that instruction is
12  not to answer?
13          MR. BRISSENDEN: To the extent that you can
14  answer the question based on information that's in the
15  public record --
16          THE WITNESS: Oh, okay.
17          MR. BRISSENDEN: -- testimony, evidence that
18  was presented in the public record, you may --
19      A. I don't have any information in the public
20  record.
21      Q. (BY MR. FISHER) Let's keep in mind as we move
22  forward, I know SB 14 was mentioned, you were not in the
23  Texas Legislature when SB 14 was passed; is that
24  correct?
25      A. That's correct.

## 112

1       Q. When did you first hear of any support for
2   enacting photo identification for voting in Texas?
3           MR. BRISSENDEN: I'm sorry, could you read
4   the question back?
5       (Whereupon, the requested testimony was read
6   back as follows:
7   QUESTION: When did you first hear of any support
8   for enacting photo identification for voting in
9   Texas?)
10          MR. BRISSENDEN: Again, to the extent that
11  you have knowledge that's contained in the public
12  record --
13          THE WITNESS: In the public record?
14          MR. BRISSENDEN: -- as a source of
15  information, you may disclose that.
16      To the extent that you have knowledge or
17  information that is a part of your work in connection
18  with legislation, particularly voter ID bills and SB 14,
19  do not disclose that information.
20      A. Okay. In the public record, the first time I was
21  aware of a bill was in 19 -- excuse me -- 2009.
22      Q. (BY MR. FISHER) So, a quick question. Just back
23  up for a second on your understanding of Texas' current
24  system for verifying the identity of a voter. If you
25  didn't have that registration card, is it your

## 113

1   understanding you could present a nonphoto ID, so, a
2   utility bill, for instance, to verify your
3   identification as well?
4       A. I don't know what they have to do. I always
5   just -- as a matter of course, I walk in and put it down
6   and they take it. I don't know what's actually required
7   but I use it because it's easy to pull out and hand it
8   to them and say, "Here's who I am."
9       Q. So, it's fair to say the election worker doesn't
10  ask you for your driver's license, you just produce it
11  and --
12      A. I just produced it.
13      Q. So, a similar question. We talked about in the
14  ground rules portion the difference between voter ID and
15  photo ID. And I'll ask you the same question.
16          When did you first hear about support for
17  enacting a voter ID identification requirement in Texas?
18          MR. BRISSENDEN: My instruction would be the
19  same to you. To the extent you have information that's
20  contained in the public record, you may disclose that.
21          To the extent you have information that's
22  not in the public record, that's part of your work on
23  legislation that you developed or gained, I instruct you
24  not to answer.
25      A. Okay. Public records would be the bill that was

## 114

1   filed in the 2009 session.
2       Q. (BY MR. FISHER) And what bill was that, Senator?
3       A. I don't know what the number was. It was a photo
4   ID, voter ID.
5       Q. Do you recall supporting any voter ID or photo ID
6   measures while you were in the Texas Legislature?
7       A. When I was in the Legislature, I don't recall.
8       Q. Do you recall ever voting on either photo ID or
9   voter ID legislation?
10      A. No.
11      Q. All right. I'm going to hand you what's been
12  previously marked as Exhibit 44. And so, what this is
13  is a copy of a bill. You notice in the upper right-hand
14  corner it says HB No. 1706?
15      A. Uh-huh.
16      Q. I'll let you take a look at this prior to asking
17  you any questions about it.
18          Did you have a chance to take a look?
19      A. Okay.
20      Q. So, just for clarification purposes -- and we'll
21  make this easier. I can walk and chew gum at the same
22  time. So, I'll introduce as well -- I'll give you
23  Exhibit 191.
24          (Exhibit 191 marked.)
25      Q. (BY MR. FISHER) And Exhibit 191 is a three-page

## 115

1   document. You'll see in the upper left-hand corner
2   Texas Legislature Online History, Bill HB 1706. And so,
3   to the extent that that helps you with this piece of
4   legislation, do you recognize Exhibit 191 and Exhibit
5   44?
6       A. Is this 44?
7       Q. Yes. The copy of the legislation is Exhibit 44,
8   and 191 is the Texas Legislature Online History I just
9   handed you.
10      A. I recognize it as a bill. I don't -- whether
11  it's final or as filed or whatever, I can't recognize
12  that. This is the first time I've seen this but I'm
13  familiar with the Texas Legislature Online and their
14  format.
15          MR. BRISSENDEN: So our record is clear and
16  clean, can we have the exhibit here marked as
17  Exhibit 44?
18          MR. FISHER: Yes.
19          MR. BRISSENDEN: Great. Thank you.
20      Q. (BY MR. FISHER) So, Senator, were you in the
21  Senate in 2005? Is that correct?
22      A. That is correct.
23      Q. And based upon the bill history, does it appear
24  that HB 1706 came to the Senate in 2005? And I direct
25  you to probably the first page of that Online History

## 116

1   where you'll see the --
2       A. Okay. Yeah, it looks like it was. It was
3   referred to State Affairs.
4       Q. And were you on the State Affairs Committee in
5   2005 in the Senate?
6       A. I'll have to check. I think I was. I wasn't
7   Chair of it by then. I had moved over to Chair of
8   Natural Resources.
9       Q. So, as a member -- if you were a member of the
10  State Affairs Committee, would this have been a bill
11  that would have come to your committee and been
12  considered by it based on the Online history in
13  Exhibit 191?
14      A. If the Chairman would have granted a hearing, it
15  would have come to the full committee. We wouldn't have
16  seen it until the Chair decides to grant a hearing.
17  According to this history, it was just referred.
18      Q. What does referred mean?
19      A. Bills are required three readings, if you will.
20  The first time a bill -- the first reading is the
21  Secretary of the Senate says, "House Bill 1706 referred
22  to the Senate Committee on State Affairs." That's the
23  first reading.
24          Then it's referred to the committee, and the
25  committee Chairman makes a determination whether to

Senator Kenneth Lynn Armbrister                                    June 8, 2012

---

## 117

1  grant a hearing on that particular bill. If the Chair
2  decides, "I'm not giving it a hearing," it's done, it's
3  dead, it's gone.
4      Q. And based on the Online History here, what does
5  it appear?
6      A. It appears it was just referred. There was no
7  committee action, so, we didn't have a hearing on it,
8  according to this.
9      Q. And --
10     A. If you'll look in the House, what I'm talking
11  about, it was filed February 28th of '05, read for the
12  first time, referred to the Elections Committee,
13  referred directly to subcommittee by Chair, that means
14  the Chairman decided to give it a hearing but
15  immediately referred it to that subcommittee.
16        Then they scheduled a public hearing of the
17  subcommittee. So, that's an indication that the bill --
18  there was some action other than just arriving, and you
19  can read on and on and on.
20        The way this reads in this History, it was
21  received from the House 05-04. It was -- has the first
22  reading.
23        And when that occurs, the Secretary of the Senate
24  has usually got a stack of bills, and she's just going
25  through, "House Bill 1706 referred to State Affairs.

## 118

1  House Bill 2105 referred to" -- it's just boom, boom,
2  machine gun.
3        And then when you see here, "Referred to State
4  Affairs," that means there was no action taken by the
5  committee. So, other than the Chairman and staff
6  looking at it and saying, "I'm not giving that a
7  hearing," that's all that happened.
8      Q. To come to that conclusion, you've compared
9  what's on the third page that indicates the actions of
10  the House to what's on the first page of the exhibit
11  indicating the actions of the Senate?
12     A. Right.
13     Q. So, if I could direct your attention back to
14  Exhibit 44, which was the actual bill language.
15     A. Okay.
16     Q. Are you testifying here today that you are not
17  familiar with the bill or not familiar with the
18  language? Is that correct?
19     A. That's correct.
20     Q. Just backing up for a second, do you have any
21  knowledge based on the public record as to why the
22  Online History from the Senate State Affairs Committee
23  reads as it does, meaning read for the first time,
24  referred and then no further action?
25        MR. BRISSENDEN: Again, we're limiting that

## 119

1  to what is in the public record.
2      A. Under the public record, it means no action was
3  taken by the Senate.
4      Q. (BY MR. FISHER) So, returning back to
5  Exhibit 44 -- and, like I said, I'm going to walk and
6  chew gum at the same time here with two exhibits -- are
7  you aware of the forms of allowable voter ID under HB
8  1706?
9      A. I'm not familiar. I could read.
10     Q. And if I could direct your attention to Page 4
11  under Documentation of Proof of Identification.
12     A. Okay.
13     Q. And that's 63.0101.
14     A. Okay.
15     Q. And so, if you could just take a look at those
16  forms of identification for me.
17     A. Okay.
18     Q. And I believe that goes until Page 7.
19     A. Right. And if it helps you, when you're reading
20  Texas proposals, anything not underlined is existing
21  language in law. Anything underlined would be proposed
22  new language.
23     Q. And you did mention --
24     A. If that helps.
25     Q. You did mention the form of the bill earlier.

## 120

1  The bills we're using -- we'll use some more -- I
2  believe are the engrossed versions. We've checked that
3  but we can always go back to the exhibit and verify
4  that.
5      A. Okay.
6      Q. So, the language you're looking at would be that
7  version.
8      A. Okay. Engrossed meaning the language that came
9  over from the House?
10     Q. Correct.
11     A. Okay. All right. Okay.
12     Q. So, could you describe the types of
13  identification that were permissible under this version
14  of the bill?
15        And I can be more specific.
16        Does it include photo identification and nonphoto
17  identification?
18     A. It does include both.
19     Q. And as far as the driver's license, the
20  expiration date of the driver's license in A 1, what is
21  that?
22     A. Wait a minute. That has not expired or that
23  expired no earlier than two years before the date of
24  presentation.
25     Q. Okay. And under 3, does it allow -- that would

---

121

1    be the next page -- a valid employee identification
2    card, is that correct, that contains the person's
3    photograph?
4        A. Yes.  Uh-huh.
5        Q. And does it allow in 6 for student identification
6    cards issued by either public or private institutions of
7    higher education?
8        A. It does.
9        Q. And does it allow for identification cards issued
10   by a Texas State agency?  And I direct your attention to
11   8.
12       A. It does.
13       Q. And does it allow for photo identification cards
14   issued by a County Elections Administrator or a County
15   Clerk?  And I direct your attention to 9.
16       A. It does.
17       Q. And so, sitting here today, are you aware of any
18   communications you had relating to HB 1706 while you
19   were in the Texas State Senate?
20       A. I'm not aware.
21       Q. And are you aware of the source of any of the
22   legislative language in that HB 1706?
23       A. No.
24       Q. And when we talked about your search for
25   documents earlier, would your search for documents have

---

122

1    turned up any documents related to HB 1706?
2        A. No.
3        Q. So, we talked about 1706 being referred to the
4    State Affairs Committee, correct?
5        A. Yes.
6        Q. And --
7        A. In the Senate.
8        Q. In the Senate.  Correct.  And so, what is the
9    purpose of referring a bill to the State Affairs
10   Committee?
11            MR. BRISSENDEN:  I'm going to instruct you
12   at this time that to the extent you can answer that
13   question as a general matter, what the general procedure
14   is or the purpose is, you may answer.
15            To the extent that it requires you to
16   disclose your thoughts, analysis, opinions or mental
17   impressions as to this specific piece of legislation at
18   that time, I instruct you not to answer.
19       A. Okay.  Generally, when a bill is received in the
20   Senate, either it has a Senate origination or, in this
21   case, a House bill that has come over from the House.
22            The Lieutenant Governor makes a determination of
23   an assignment to the various committees in the Senate.
24   Then, as I mentioned, after, in this case, he, Governor
25   Dewhurst, makes a determination where the bill will go.

---

123

1    There's nothing in the Senate rules that says every bill
2    on elections has got to go here, every bill on water has
3    got to go there.  It's really up to -- the Lieutenant
4    Governor makes the determination.
5            And then it's given back to the Secretary of the
6    Senate, and she goes through the formality of the first
7    reading, and that's when it's -- that's when it's read.
8        Q. (BY MR. FISHER)  And my question may be slightly
9    different than that.
10       A. Okay.
11       Q. Based on your -- and we talked about longstanding
12   experience in the Senate and we talked about numerous,
13   numerous committees, given the small size of the Senate,
14   they made you do everything -- what is the purpose of
15   referring a bill to one of these committees?  What
16   actions do they take on these bills?
17            MR. BRISSENDEN:  My instruction to you would
18   be the same.
19       A. Okay.  Generally, the purpose of the committee
20   process is to allow members of the public to participate
21   in the process.
22            At that point, if a hearing is granted, anybody
23   for or against a proposal comes in and testifies and
24   offers testimony or exhibits or whatever they want to
25   bring to the members' attention, their likes or dislikes

---

124

1    of a particular proposal.
2        Q. (BY MR. FISHER)  And as a Chair of committees, as
3    someone who has served on committees, do you think that
4    is an important role for the public to play in
5    consideration of a bill?
6            MR. BRISSENDEN:  Objection.  Vague.
7            To the extent you can answer that question
8    without disclosing your thoughts, opinions, mental
9    analysis and impressions about your experience in
10   connection with specification legislation, pieces of
11   legislation, including SB 14, you may answer.
12       A. Okay.  I extremely support the public's right to
13   participate in the process.
14       Q. (BY MR. FISHER)  And did you find that the public
15   participating in the process, as a committee member and
16   as a Chair of a committee, was helpful when determining
17   what to do about certain pieces of legislation?
18            MR. BRISSENDEN:  Same instruction.
19            You're asking him as a general matter?
20       A. As a general matter?
21       Q. (BY MR. FISHER)  We can read back the question.
22       A. Okay.
23            (Whereupon, the requested testimony was read back
24   as follows:
25            QUESTION:  And did you find that the public

## 125

1    participating in the process, as a committee
2    member and as a Chair of a committee, was helpful
3    when determining what to do about certain pieces
4    of legislation?)
5        MR. BRISSENDEN:  Because you include the
6    term "specific legislation," in that question --
7        MR. FISHER:  The term was "certain pieces of
8    legislation."
9        MR. BRISSENDEN:  "Certain pieces of
10   legislation," that implicates specific litigation and
11   would require him to disclose his mental impressions,
12   thoughts, analysis and impressions as to specific pieces
13   of legislation and call upon his experience in relation
14   to that legislation, that specific legislation.
15       So, I would instruct you not to answer.
16   A.  Okay.  On advice of counsel, I'll not answer.
17   Q.  (BY MR. FISHER)  Was the input of the public
18   helpful when you served as a committee member and also
19   as a Chair of a committee?
20   A.  Generally?  Generally?
21   Q.  Yes, generally.
22   A.  Yes, generally, it was.
23   Q.  So, with regard to Exhibit 44 and the
24   accompanying exhibit describing the legislative
25   history -- and I'm not going to make you go back through

## 126

1    and read any more --
2    A.  Okay.
3    Q.  -- but do you recall a letter from Senate
4    Democrats -- and you were a Senate Democrat at the time,
5    correct?
6    A.  Uh-huh.
7    Q.  Is that correct?
8    A.  Yes.
9    Q.  Do you recall a letter from Senate Democrats
10   indicating that they would not support bringing this
11   bill to a vote in the Senate?
12       MR. BRISSENDEN:  To the extent that that
13   question requires you to disclose communications that
14   you've had with other Legislators or their staff or your
15   own staff, I would instruct you not to answer the
16   question.
17   A.  On advice of attorney, I will -- I'll not answer
18   the question.
19   Q.  (BY MR. FISHER)  Are you aware of a public letter
20   issued by Senate Democrats in 2005 in relation to HB
21   1706 saying that they would not support bringing HB 1706
22   to a vote on the floor in the Senate?
23   A.  I don't recall.  Did I sign it?  I don't recall.
24   Q.  Are you aware of whether the Governor took a
25   public position on 1706?

## 127

1    A.  I'm not aware.
2        MR. FISHER:  I think here is a good time --
3    it's almost 12:45.  We'll take a lunch break.
4        (Lunch recess.)
5        (Exhibit 192 marked.)
6    Q.  (BY MR. FISHER)  Okay.  Senator, I'm going to
7    give you what has been marked as Exhibit 192, if you
8    could take a look at that.  And Exhibit 192 says Texas
9    Politics on the top.  It's dated May 4th, 2005.  It
10   says, "Notes from the left on the state of politics in
11   Texas today."
12       And I'll go ahead and just read the first two
13   lines for you.  It says, "Latinos for Texas blog
14   breaking:  Senator Dems unite since against HB 1706.
15   Senate Democrats block HB 1706 before it is passed.  11
16   Democrats sign letter to block voter picture ID bill.
17   As the Texas House tries once again to pass HB 1706 by
18   Mary Denny, Senate Democrats have signed its death
19   warrant."
20       And so, we were just discussing HB 1706.  We were
21   discussing a letter written by Senate Democrats at the
22   time.  Do you remember -- does this refresh your
23   recollection at all about the circumstances of HB 1706
24   at that time?
25   A.  None.

## 128

1    Q.  And how many Democrats were --
2    A.  No.  Excuse me.
3    Q.  How many Democrats were in the Senate at that
4    time in 2005?
5    A.  I can't remember.  I'd have to look.
6    Q.  Is it possible that there were more than 11
7    Democrats in the Senate in 2005?
8    A.  Yeah, it's possible.  I would have to look.  I
9    just don't recall.
10   Q.  So, it is possible that you either signed or did
11   not sign the letter?
12   A.  That's possible.
13   Q.  Okay.  We can go ahead and put that one to the
14   side.
15       So, between the 2005 and 2007 sessions, do you
16   recall holding a public hearing on a committee interim
17   charge in the State Affairs Committee?
18   A.  No.
19   Q.  Do you recall holding a public hearing regarding
20   a committee interim charge concerning a study and
21   recommendations on how election officials could verify
22   the identity of a voter without hindering a person's
23   right to vote?
24   A.  No.  And let me be sure that we're clear.  I was
25   just on the committee at that time, so, I wouldn't have

## 129

1  been -- when you asked me the question, "Did you hold
2  it," only the Chairman can call for holding, but I don't
3  recall any study on the issue.
4      Q.  Okay.  Thank you for the clarification.  I'll
5  rephrase.
6      Do you remember being part of a hearing on a
7  committee interim charge that addressed voter ID issues?
8      A.  No.
9          (Exhibit 193 marked.)
10     Q.  (BY MR. FISHER)  So, I'll hand you what's been
11  marked as Exhibit 193.  And if you would take a look,
12  please, at the top, you'll see the notation Senate
13  Committee on State Affairs, Tuesday, April 18, 2006,
14  8:00 a.m., Senate Chamber.  "Pursuant to a notice posted
15  in accordance with Senate Rule 11.18, a public hearing
16  of the Senate Committee on State Affairs was held on
17  Tuesday, April 18, 2006 in the Senate Chamber at Austin,
18  Texas."  Members present, do you see your name there
19  listed?
20     A.  Yes, I do.
21     Q.  And if you would, I can make it a little easier.
22  We can turn to the second page, which is on the back.
23  And you'll see, "At 10:42 a.m. the Chair recessed the
24  committee until upon adjournment of the full Senate.
25  The committee reconvened at 12:10 p.m. and took

## 130

1  testimony on Committee Interim Charge #3."
2      And if you would, go ahead and read Committee
3  Interim Charge #3 for me.
4      A.  "Study and make recommendations on how election
5  officials could verify the identity of a voter without
6  hindering a person's right to vote.  Include an analysis
7  of the extent to which individuals are casting multiple
8  votes because of any lack of voter identification
9  verification.  Make recommendations on how the State
10  could improve its vote by mail system to ensure the
11  authenticity of those ballots."
12     Q.  And, Senator, we did touch on this very, very
13  briefly in the beginning but could you please describe
14  what a committee interim charge is, how this Interim
15  Charge #3 in this exhibit would have come to the
16  attention of the State Affairs Committee?
17     A.  When the legislature has completed its regular
18  session business, after the conclusion of the 140 days,
19  then the Lieutenant Governor traditionally issues out
20  interim charges of various subject matters to the
21  various committees in the Senate for them to take up and
22  consider.
23     One of the things I first looked at on this
24  letter was the date.  '06, that's an even year.  So, I
25  knew they weren't -- we weren't in session.  And so,

## 131

1  that would indicate that this is an interim committee,
2  as specified in the minutes of the committee.
3      Q.  So, if you're -- and let's just get the logistics
4  straight, and you've mentioned this earlier.  You, as a
5  Texas State Senator, are part-time essentially, correct?
6      A.  Uh-huh.
7      Q.  So, between sessions, you go back home; is that
8  right?
9      A.  That's correct.
10     Q.  So, in April, 2006, you would have been back in
11  Victoria, Texas; is that right?
12     A.  For the most part, yes.
13     Q.  So, if a hearing like this is convened on
14  April 18th, 2006, and in 2006, you are back in Victoria,
15  Texas, do you have to take a trip to Austin to be a part
16  of this hearing?
17     A.  Yes, you do.
18     Q.  And so, the members that are present here, these
19  are all members that have traveled back from wherever it
20  is that they are located to be part of this hearing on
21  the interim charge; is that right?
22     A.  That's correct.
23     Q.  And where would an interim charge come from?  So,
24  who gives the interim charge -- generally, who gives an
25  interim charge to a committee?

## 132

1      A.  Traditionally, any member may request or any
2  interest may request that the Legislature take up as an
3  interim charge.
4      Interim charges usually fall in two categories.
5  You have passed a bill in the previous session and you
6  want the committee to take a further look to see do we
7  need to fine tune this in the next session, is it
8  working, was the intent realized in the language of the
9  bill, recognizing the fact that any piece of legislation
10  is a statement of -- or establishment of policy without
11  regards to logistics, sometimes the logistics don't
12  match up.
13     And so, interim committees take a look and see,
14  okay, is this working or do we need to do some tweaking
15  in the next regular session.
16     The other category that they fall in is that
17  someone has brought an issue that represents such a
18  change in the way that Texans carry out their lives and
19  businesses and whatnot that the Lieutenant Governor or
20  at somebody's request will agree and say, "Yeah, let's
21  take a look at that.  We'll give you -- instead of
22  having just a few minutes in a committee to consider the
23  issue that didn't pass, now we've got 18 months to take
24  a look at it and see what's happened or see if this is
25  something we really need to do."

---

### 133

1        So, in those two instances, usually they result
2   in an interim charge, which upon completion of the
3   study, if you will -- because that's all -- there can be
4   no official action taken by an interim committee.  They
5   do produce at the end a report that takes each charge
6   and issues the findings and recommendations of the
7   charge so that at the next session of the Legislature,
8   the proponents can take that report and find things in
9   the report that -- not justifies but strengthens their
10  position or the opponents can also do the same as well.
11  You're not making a decision for or against.  You're
12  trying to get down into the weeds, as we say, on a
13  particular issue.
14       Q.  Okay.  Do you recall the interim charge
15  referenced in this exhibit?
16       A.  No.
17       Q.  So, you couldn't characterize whether this was --
18  and you mentioned two categories, tweaking or, for major
19  issues, considering issues further at the behest of the
20  Lieutenant Governor.  You wouldn't be able to say
21  whether this was in that first category or in that
22  second category; is that correct?
23       A.  No, I wouldn't.  It's strictly up to the
24  Lieutenant Governor to decide what goes on there.
25       Q.  And you can't tell by looking at this whether it

---

### 134

1   was broached by a member of the committee or by the
2   Lieutenant Governor; is that right?
3        A.  Not by what this says.
4        Q.  And you mentioned producing a report.  Do you
5   know if a report was produced with regard to Committee
6   Interim Charge #3?
7        A.  There should have been.
8        Q.  Okay.
9        A.  Every interim charge, there should be a report on
10  that charge.
11       Q.  And do you recall the testimony given on this
12  charge?  It mentions that there was testimony given.
13       A.  I don't recall.  And let me kind of explain.  At
14  any point during a hearing, if you show up, you get
15  counted as present.  That doesn't mean that you were
16  there for the entire time or for every testimony and
17  everything else.
18       I was looking at the one before that, the Kelo
19  versus City of New London decision.
20       Q.  Correct.
21       A.  I was very interested in it from a natural
22  resources perspective, and I wanted to see, also
23  representing the coast, that we had a similar thing to
24  Kelo on the coast of Texas that I was there for.  I do
25  see that.

---

### 135

1        Q.  So, given you remember that interim charge, do
2   you know if a report -- do you know for sure if a report
3   was produced on that interim charge --
4        A.  Yes.
5        Q.  -- Kelo versus New London?
6        A.  Right.
7        Q.  And is that something that you looked at, that
8   report?
9        A.  Right.
10       Q.  And did you consider that as you moved forward
11  with any potential legislation about Kelo or issues
12  regarding Kelo?
13            MR. BRISSENDEN:  I'm going to have to
14  instruct you not to answer the question based on
15  privilege as that delves into opinions, recommendations
16  and thought processes as to what you did and did not
17  consider as to that particular piece of legislation.
18  And the Court has instructed that that's already -- or
19  that is privileged.  Instruct you not to answer.
20       A.  Okay.  On the advice of counsel, I won't answer
21  that question.
22       Q.  (BY MR. FISHER)  Do you consider reports issued
23  based upon committee interim charges -- did you consider
24  them just as a general matter important in how you would
25  address things during the next legislative session?

---

### 136

1            MR. BRISSENDEN:  If you can answer that
2   question without relying upon your experience as to
3   specific pieces of legislation, you may do so but to the
4   extent that that requires you to draw upon your
5   experience in connection with your work on legislation,
6   then I instruct you not to answer.
7        A.  Okay.  Generally, if it was an issue that I was
8   either involved in -- then I would find some value.
9   Otherwise, I wouldn't pay any attention.  I would hope
10  they get wrapped in bright paper so I wouldn't trip over
11  them.
12       Q.  (BY MR. FISHER)  I haven't heard that one before.
13       A.  It's a common saying that we use up there.
14       Q.  All right.  So, you've said you don't recall and
15  don't even know if you were present during the hearing
16  on Committee Interim Charge #3, correct?
17       A.  I can't remember.
18       Q.  And you don't recall if you had any
19  communications with other Legislators about Committee
20  Interim Charge #3?
21       A.  I don't recall.
22       Q.  Do you recall if you had any communications with
23  the Governor's Office concerning Committee Interim
24  Charge #3?
25            MR. BRISSENDEN:  And I'm going to at this

## 137

1    time invoke the privilege and instruct you not to answer
2    as to communications that you had in regards to
3    legislation.
4         A.  Okay.  On the advice of counsel, I won't respond
5    to that one or answer that question.
6         Q.  (BY MR. FISHER)  And I'll rephrase just as a yes
7    or no question.
8             Did you have any communications concerning
9    Committee Interim Charge #3 with anyone from the
10   Governor's Office?
11            MR. BRISSENDEN:  And I'm going to instruct
12   the same instruction.
13        A.  I'll follow my attorney's advice.
14        Q.  (BY MR. FISHER)  And if you -- if there was a
15   report produced based on Committee Interim Charge #3,
16   would you have run across that report in your search for
17   documents responsive to today's Amended Notice of
18   Deposition?
19        A.  No.  No, I wouldn't have those in my possession.
20        Q.  And where would those documents be?  Where would
21   that report be?
22        A.  It's either still in the Senate or it's in the
23   Legislative Library.  Possibly online.  I don't know
24   where they put those.
25        Q.  Let's go ahead and put that aside.

## 138

1             And in 2007 -- and forgive me if -- I just don't
2    remember -- did you serve the full session in 2007?  Is
3    that correct?
4         A.  I was in the Governor's Office in 2007.
5         Q.  So, you left the Senate in 2007 in January?
6         A.  January 4th, 2007.  I began with Governor Perry
7    January 7th, three days later.
8         Q.  And the session would have started on?
9         A.  The next Tuesday, whichever -- let's see.  Let's
10   see.  Whatever the --
11        Q.  Fair enough.
12        A.  The second Tuesday in January, whatever that date
13   was.
14        Q.  Fair enough.  Do you recall in your capacity as
15   Legislative Director that there was a photo ID bill
16   introduced in that legislative session in 2007?
17        A.  I don't.  The earliest one I remember is '09.
18        Q.  Okay.  I'm going to hand you what's previously
19   been marked as Exhibit 28.  And on Exhibit 28, you'll
20   notice it's a 13-page document.  It's got the notation
21   HB 218 in the upper right-hand corner.
22        A.  Yes.
23        Q.  And does that look familiar to you at all, HB
24   218?
25        A.  No.

## 139

1         Q.  Okay.  Well, let's consider the additional
2    information provided in Exhibit -- what will be marked
3    as Exhibit 194 as well.
4             (Exhibit 194 marked.)
5         Q.  (BY MR. FISHER)  And that states in the upper
6    left-hand corner Texas Legislature Online History HB
7    218?
8         A.  Correct.
9         Q.  In looking at Exhibit 194 and Exhibit 28, does
10   that refresh your recollection at all of the bill that
11   was introduced in 2007 concerning voter ID?
12        A.  Like I say, I don't remember this one at all.
13        Q.  Do you recall, as the Legislative Director, voter
14   ID being one of the Governor's legislative priorities --
15   publicly stated legislative priorities in 2007?
16        A.  No, I don't remember that.
17        Q.  And do you remember it being any part of the
18   Governor's legislative agenda in 2007?
19        A.  No.
20        Q.  And do you know whether you or your staff had any
21   communications with Legislators in 2007 regarding voter
22   ID?
23        A.  I didn't.  Whether the two gentlemen that are
24   different than the two that I mentioned earlier did but
25   for me personally, I had no communication with any

## 140

1    member.
2         Q.  And you mentioned that you're not familiar with
3    HB 218.  If we could turn -- I'll direct your attention
4    again, similar to the last bill we looked at, to Page 9.
5    And this is Section 63.0101.
6         A.  Got it.
7         Q.  Documentation of Proof of Identification, if you
8    can go ahead and take a look at that.  And that runs
9    until -- again, until Page 11.  If you could, go ahead
10   and take a look at those forms of ID.
11        A.  Okay.
12        Q.  And so, taking a look at that, do you notice
13   that, similar to HB 1706, it does provide for nonphoto
14   ID?
15        A.  Yes.
16        Q.  And if you look at A 1 on Page 9, do you see the
17   expiration for driver's license?
18        A.  Yes.  It's similar to the previous reviewed
19   document.
20        Q.  And if you look at number 3, do you see a valid
21   employee identification card that contains the person's
22   photograph; is that correct?
23        A.  That's correct.
24        Q.  And if you look at number 6, do you see a student
25   identification card issued by a public or private

## 141

1  institution of higher education?
2      A.  That's correct.
3      Q.  And if you look at number 8, do you see a valid
4  identification card that contains the person's
5  photograph and is issued by, A, an agency or institution
6  of the federal government or, B, an agency, institution
7  or political subdivision of the state?
8      A.  I see that.
9      Q.  And so, does it appear to you, just looking at
10  the two requirements, that HB 218 is similar or
11  dissimilar to HB 1706 from 2005?
12      A.  It's -- I would have to say those two choices, it
13  is similar.  There is a change, it looks like.  In that
14  one, I didn't see military ID but it's replaced by an
15  institution of the federal government and I think that
16  was what they -- I think the other one had military ID.
17      Q.  At any time, if you want to look at the previous
18  exhibit, we can do that as well.
19          If you look at Page 9, number 2, I think you'll
20  see United States military ID.
21      A.  Okay.  Then I'll have to say similar.
22      Q.  But to the extent you want to look at a previous
23  exhibit, let me know.
24      A.  Okay.
25      Q.  You've stated you don't recall HB 218.  Do you

## 142

1  know if anyone in the Governor's Office played any role
2  in the development of HB 218?
3      A.  I don't recall.
4      Q.  Are you aware of any communications concerning
5  the development of HB 218?
6      A.  No.
7      Q.  Do you recall monitoring -- and you've mentioned
8  that monitoring the course of bills is something that
9  you do as the Legislative Director.  Do you recall
10  monitoring the consideration of HB 218 in the House?
11      A.  If it was filed, there would have been somebody
12  assigned to it to monitor it but I don't know if that
13  was Schofield at the time or who was handling those in
14  '07.
15      Q.  Do you recall monitoring consideration of HB 218
16  in the Senate?  And if you look at what we marked as
17  Exhibit 194, I think you'll see that it was considered
18  in the Senate.
19      A.  Yes.
20      Q.  Do you recall doing that monitoring at all?
21      A.  No.  No.
22      Q.  Do you know if -- and you mentioned Mr.
23  Schofield.  Do you know if a policy analysis was
24  performed by Mr. Schofield on HB 218?
25      A.  I don't know because I didn't see it, but

## 143

1  following our protocol, there would have been something
2  but I can't say with certainty that yeah, I know for
3  sure it was done.  I'm just saying our protocol at the
4  time hadn't changed.  Every bill assigned to them, they
5  have to do an analysis.
6      Q.  Are you aware or do you remember any
7  communications within the Governor's Office concerning
8  HB 218?
9      A.  I don't recall it ever even coming up.
10      Q.  Do you recall any conversations originating from
11  outside of the Governor's Office concerning HB 218, for
12  instance, constituent communications to the Governor
13  concerning HB 218?
14      A.  I wouldn't know that information.
15      Q.  Who would know that?  Would that be the
16  Constituents Communications Director that you mentioned
17  earlier?  And I'm sorry, his name, I forgot.
18      A.  Greg Davidson.
19      Q.  And I got that name wrong earlier.  I apologize
20  for that.
21      A.  That's okay.
22      Q.  If you look at what's been marked as
23  Exhibit 194 -- and you were very helpful in walking
24  through HB 1706.  I wonder if I could ask you to do the
25  same here.

## 144

1      A.  Okay.
2      Q.  After the House passed HB 218, was it considered
3  by the Senate?
4      A.  Received in the House on 4-25.  Had its first
5  reading on 4-26.  Referred to State Affairs.  It was
6  scheduled for a public hearing on the 30th.  They had
7  the public hearing.  Testimony was taken.
8          There was a substitute apparently adopted and
9  reported out of the committee after the substitute.
10  Substitute means that if a bill comes either as an
11  original or from the House in this case, if the Senate
12  makes any changes, that represents a substitute, and so,
13  then it is voted on as substituted or as amended, you
14  can say that as well, but as substituted.
15          So, it indicates that there was a change made in
16  the Senate to the original bill as received from the
17  House and there -- on 5-1, May 1st, committee report
18  printed and distributed, and then it was placed on the
19  Senate Intent Calendar.
20      Q.  And just backing up for a second, Senator -- and
21  I do appreciate you walking through this -- I do see --
22  and this is prior to what you just said -- that it was
23  referred to the State Affairs Committee on 4-26-2007; is
24  that correct?
25      A.  That's correct.

## 145

1  Q.  And if you could -- and I thank you for the
2  explanation of a substitution.  Let me ask you, based on
3  the interim charge in 2006, are you aware that any
4  change -- that substitution was made on the basis of
5  Committee Interim Charge #3 from April, 2006?
6  A.  I don't have any information for that.
7  Q.  So, you mentioned placed on the Intent Calendar.
8  What is the Intent Calendar, if I can ask you what that
9  is, please?
10  A.  Okay.  In the Senate, to bring a bill up out of
11  its regular order, what that refers to, this being --
12  has a number 218, that means before you hear 218, you
13  have to have heard 217, '16, '15, '14, all the way back
14  down to House Bill 1 before you can take this up.
15  The way -- the work around of that is what's
16  referred to as the two-thirds rule.  So, any bill that
17  comes to the Senate floor that's out of the regular
18  order of business, you have to have two-thirds or 21
19  votes.
20  If I'm the author of a bill and I put that bill
21  on the Intent Calendar, that serves notice to all of my
22  colleagues and to anyone in the general public that I
23  intend to ask to bring this bill up out of its regular
24  order, get my 21 votes so that we can take it up for
25  floor debate or second reading, and that's what the

## 146

1  Intent Calendar serves.
2  Q.  And you mentioned the two-thirds rule, what's
3  your understanding about the purpose of that rule?
4  A.  The rule is because the rules -- because of the
5  regular order of business, it's a methodology by which
6  you can take up bills that are not sequentially in
7  order.  And to do that under Senate rules, you have to
8  have two-thirds of the members agree to let you do that.
9  That's what the two-thirds rule is.
10  Q.  Let me ask you why two-thirds, why not
11  three-fifths or some other number?
12  A.  That's just a number that's just kind of always
13  been there.
14  Q.  Do you know how long it's been there, how long
15  it's been in place?
16  A.  I went there in '87 and it was there.  So, it's
17  always kind of been there.
18  Q.  Is it fair to say it's been in place for a while?
19  A.  That's absolutely fair.  You see, over in the
20  House, they have a separate committee.  It's called a
21  Calendars Committee.  Another way for the laymen to look
22  at it, they're the agenda setting.  They determine when
23  bills will come up to the House floor.
24  In the Senate, the entire Senate acts as the
25  Calendars Committee.  That's why we have the two-thirds

## 147

1  that are bringing it up.  So, we all look at all of the
2  bills that are eligible.  So, we can decide as a body,
3  all 31, that if two-thirds of our body agrees, we'll let
4  you take a run, as we call it.
5  Q.  And two-thirds seems like a pretty high number.
6  Would you agree that that requires a general consensus
7  on bills before they are brought up before the Senate?
8  A.  Pretty much.
9  MR. BRISSENDEN:  Objection.  Vague.
10  THE WITNESS:  Oh, I'm sorry.
11  Q.  (BY MR. FISHER)  You can still answer, Senator.
12  A.  What was the question?
13  Q.  The question was that two-thirds seems like a
14  pretty high number.  Would you agree that a two-thirds
15  vote to bring a bill before the Senate engenders a
16  certain general consensus on a bill prior to it being
17  voted on?
18  MR. BRISSENDEN:  Objection.  Vague.
19  THE WITNESS:  Do what?
20  MR. BRISSENDEN:  Go ahead.  You may answer.
21  A.  That would indicate that you've got support.
22  We've had -- there was one Lieutenant Governor that
23  wouldn't give you -- let you bring your bill up unless
24  you brought 21 names to him, Governor Hobby.  You had to
25  show him that you had 21 names.

## 148

1  That doesn't mean they are going to vote for it
2  if something -- you bring it up and somebody puts an
3  amendment on it and everybody peals off of it.
4  Q.  (BY MR. FISHER)  Would you agree or disagree that
5  the vast majority of bills in the Texas State Senate are
6  brought up by operation of the two-thirds rule?
7  MR. BRISSENDEN:  Objection.  Vague.
8  To the extent you can answer that question
9  relying upon general information that's a matter of
10  public record, you may do so.
11  To the extent you have information that you
12  are relying upon based upon your experience in
13  connection with your work on specific legislation that
14  you've been involved with, I'd instruct you not to
15  answer.
16  A.  Okay.  Generally, that is but there have been
17  exceptions.
18  Q.  (BY MR. FISHER)  And do you remember what those
19  exceptions were?
20  MR. BRISSENDEN:  Same instruction.
21  A.  I'll follow my attorney's advice and not answer
22  that one under privilege.
23  Q.  (BY MR. FISHER)  Okay.  And so, based upon the
24  public record, do you remember examples of -- public
25  examples where the two-thirds rule was not followed when

### 149

1    a bill was brought before the Senate floor?
2       A.  Governor Hobby '91 redistricting.  Governor
3    Bullock.  I don't remember the thing.  I just remember
4    we had one under Governor Bullock, and he cited Governor
5    Hobby.  And then Governor Dewhurst on Congressional
6    redistricting in '03 or '01, whenever it was, citing
7    both Governor Bullock and Governor Hobby.
8       Q.  So, about how many bills would you say that you
9    vote on per session on average?  And I know you said the
10   number earlier was 6,500 to 7,000 but I know all of
11   those are not voted on.  How many bills would you vote
12   on as a Senator during each session?
13      A.  Can I ask for a clarification?  And I'll explain
14   for the clarification.
15      Q.  Sure.
16      A.  As a member of the Senate, you could have say
17   Bill A.  If you're on a committee, you're voting for or
18   against Bill A.  If it then comes to the floor, you're
19   voting again on -- for or against Bill A.  So, is your
20   question about roughly how many votes are cast on the
21   floor or in total committee and --
22      Q.  Let me clarify.  I'm talking about votes that are
23   taken on the floor.
24      A.  Okay.
25      Q.  About average, if you had to guess, how many, on

### 150

1    average, would you vote on during a session?
2          MR. BRISSENDEN:  If you can answer, I don't
3    want you guessing.
4       A.  On the advice of my attorney, it would be a
5    guess, so, I won't answer that.
6       Q.  (BY MR. FISHER)  Would you say it's more than a
7    hundred bills?
8       A.  Yes.
9       Q.  And so, you've given -- and you've served on the
10   Senate for over 20 years; is that correct?
11      A.  Yes.
12      Q.  So, was that about ten sessions; is that correct?
13      A.  Ten regular sessions and a myriad of specials.
14      Q.  So, during those ten regular sessions, about a
15   hundred bills a session or over a hundred bills a
16   session, we can safely assume more than a thousand
17   bills; is that correct?
18      A.  Oh, yes.
19      Q.  And so, you've given me -- was it three examples
20   of bills where the two-thirds rule was not followed; is
21   that right?  Governor Hobby, Governor Bullock and
22   Lieutenant Governor Dewhurst; is that correct?
23      A.  That I can remember.
24      Q.  So, would you say that the vast majority of bills
25   that were brought to the floor during your time in the

### 151

1    Senate were voted on by two-thirds of the Senators to
2    bring the bill to the floor before being voted on by --
3    you know, an up or down vote by the Senate?
4          MR. BRISSENDEN:  Objection.  Vague.
5          THE WITNESS:  I'm sorry?
6          MR. BRISSENDEN:  Go ahead.  You may answer.
7       A.  Yes.
8       Q.  (BY MR. FISHER)  Could you tell me just based
9    on -- we can go back to Exhibit 194.  Can you tell me
10   what happened to HB 218?  And I think we've gotten up to
11   placed on the Intent Calendar, which is on the first
12   page.
13      A.  Yes, placed on the Intent Calendar.
14      Q.  Can you tell me what happened?
15      A.  Co-sponsor authorized, that means once I get it
16   to the floor, another way to try to indicate support is
17   you sign a card allowing other members of the Senate to
18   co-author the bill.  The author has to give permission
19   for -- say if you wanted to sign on, you liked the bill,
20   you wanted to be a co-author, I would have to give you
21   permission.  So, that's what that indicates,
22   co-sponsorship was authorized.
23          Then the two-thirds rule, see rules suspended,
24   regular order of business occurred on the 15th of May.
25   They had a record vote to do that, to suspend the rules.

### 152

1          Then it's read the second time.  In other words,
2    the Secretary of the Senate again gets up and she reads
3    the caption.  In this instance she would say, "House
4    Bill 218 relating to requiring a voter to present proof
5    of identification."
6          There is considerable debate between when the
7    author brings it up, suspending the regular order of
8    business, it's read the second time, and then after the
9    debate, you request a vote.
10         And at that point, according to this, a motion to
11   suspend the regular order fails.  You have another vote
12   there, and that failed on the 15th by record vote.
13         And they tried to bring it back to life, it looks
14   like there, because they offered another opportunity for
15   more people to sign onto it.
16      Q.  Okay.
17      A.  And that was the last that happened.  In other
18   words, once it failed on second reading to go to third
19   reading -- and to go to third reading, it takes
20   two-thirds because you're suspending the Constitution,
21   and that's why that two-thirds is there.
22         So, it looks like it didn't get the required 21
23   votes or two-thirds.  It's two-thirds of the members
24   present and voting.  So, it doesn't have to be 21.  It
25   can be a combination.  You take however many happen to

## 153

1  be in the room, two-thirds of those that are present and
2  voting.
3          Without seeing the actual vote, that's what
4  happened to it.  It died on the second reading -- or
5  movement to the third reading.
6      Q.  I think we can discuss a little bit more the
7  issue with quorum that you just mentioned in the context
8  of the next exhibit.
9      A.  Okay.
10     Q.  And that's been previously marked as Exhibit 45.
11  And Exhibit 45 says Declaration of Carlos Uresti.  And
12  you'll notice, Senator, if you turn to the last page,
13  you'll see his signature and the date of April 9th,
14  2012.  You have to flip it over there.
15     A.  Okay.
16     Q.  I'll let you take a look briefly.  Have you seen
17  this document before?
18     A.  No.  No, I have not.
19     Q.  Who is Carlos Uresti?
20     A.  Carlos Uresti is a Senator from the home county
21  of San Antonio, Texas.
22     Q.  And did you serve with Senator Uresti?
23     A.  I did not in the Senate.  He came to the Senate
24  after I had left.  I think his first session was '07.
25     Q.  I'm going to go ahead and direct your attention

## 154

1  to paragraphs 6 and 7, if you would take a look at
2  those.
3      A.  Okay.
4      Q.  And so, we're discussing the context of HB 218,
5  the legislative history of HB 218, and you mentioned
6  that it passed a two-thirds vote and then failed a
7  two-thirds vote.
8          And what I wanted to ask you is if paragraph 6
9  and 7 concerning HB 218 provide you with any knowledge
10  about what happened during that vote?
11          You can actually go ahead and read 8 and 9 as
12  well.
13     A.  Okay.
14     Q.  Do you recall the events described in these
15  paragraphs?
16     A.  No.  No, I wasn't on the floor.
17     Q.  As a matter of public knowledge, public
18  information, do you recall the events described in
19  paragraphs 6, 7, 8 and 9?
20     A.  No.  No.
21     Q.  If you were to compare paragraphs 6, 7, 8 and 9
22  and what's described there, does that seem consistent
23  with Exhibit 194, which was the history you just read me
24  where you said that the rules were suspended and the
25  motion to suspend the rules later failed?

## 155

1      A.  Right.
2      Q.  Does that seem consistent with the exhibit?
3      A.  Right.  Like I say, the two-thirds is not a firm
4  21.  It's two-thirds of the members present and voting.
5  So, if you had 29 members, then two-thirds of 29, you
6  would need 19 votes --
7      Q.  And during your time in the Senate --
8      A.  -- or 20 votes, whatever two-thirds is.
9      Q.  And during your time in the Senate, do you recall
10  votes being taken when Senators were not on the floor in
11  order to establish a quorum, such as what's described in
12  paragraphs 6, 7, 8 and 9?
13     A.  Yes.
14     Q.  And so, you recall instances where -- and I'm not
15  talking about Senators just not being present because
16  they are not there --
17     A.  Right.
18     Q.  -- but where Senators have checked in and they
19  are just not on the floor --
20     A.  Right.
21     Q.  -- where votes have been taken to establish a
22  quorum in their absence?
23     A.  Right.
24     Q.  Do you recall instances like that happening?
25     A.  Yes.

## 156

1      Q.  Can you tell me about those instances?
2      A.  When the Senate convenes, you have roll call.
3  And, theoretically, you can't continue unless there is a
4  quorum.  A quorum is 16 votes.
5          So, it's very possible, especially this time -- I
6  believe the date on here we were reading, that's the
7  last part of the session.  It's not unusual at all for
8  you to be there for roll call, be counted as present at
9  that time -- point in time and then you've got a bill
10  that you're working on -- this was a House bill.  You're
11  working on a Senate bill, and you're over in the House
12  talking to House members about trying to get your bill
13  out of committee.
14          This is the last part of the session, you're in
15  that final two or three weeks before a bill can actually
16  get out of either House.  So, it's not unusual for them
17  to be off the floor for a lot of reasons.  They could be
18  in the bathroom.  They could be --
19          And what can happen is any member of the Senate
20  at any time, before a vote is actually called for, they
21  can call for a quorum.  And then they would have to
22  stop, recall the roll to establish how many people are
23  present and voting on the floor.  And at that point,
24  that number can be different than what happened at the
25  morning's roll call.  So, yes, this would happen.

## 157

1      The significance of, "I was sick with the flu"
2   statement, several years ago another member of the
3   Senate from San Antonio, Bexar County, was going through
4   dialysis.
5      Q. Is that Senator Gallegos, Senator?
6      A. No. He died. Senator Gallegos was another one
7   that was -- he had a liver transplant.
8      Senator Greg Luna was going through dialysis, and
9   we delayed action on a bill at his request until his
10   three-hour dialysis treatment. And we did that as a
11   courtesy. Everybody in the Senate agreed and let him
12   get there so that he could vote on a particular bill.
13   As it was, they didn't need his vote but he wanted to be
14   on record as voting for this -- it was a children's
15   education bill that he wanted to be sure and have his
16   name on there. Otherwise, it would have shown in the
17   record that he was not present for the vote.
18      So, that happens at times. They will give each
19   other a courtesy to do that but there's been many
20   instances when it wasn't that firm 21 but it was the
21   firm two-thirds.
22      And our rule is -- the Senate's rule is very
23   specific, it's two-thirds of the members present and
24   voting.
25      Q. Let's read paragraphs 8 and 9 together.

## 158

1      A. All right.
2      Q. And I mean together as in reading them in
3   context. "When I arrived at the Senate" -- and this is
4   Senator Uresti talking -- "Senator John Whitmire, an
5   opponent of HB 218, told me that he was counted absent
6   from the vote even though he had checked in on the
7   Senate floor and had only momentarily stepped out, prior
8   to the vote. It is highly unusual, and a deviation of
9   Senate procedures, to consider a Senate absent after he
10   or she has checked in on the Senate floor. Although HB
11   218 passed on its first vote prior to my arrival,
12   opponents of the bill forced a second vote. Because HB
13   218 did not receive the support of two-thirds of Senate
14   members, HB 218 was defeated."
15      A. Right.
16      Q. Is that consistent with the usual practice of the
17   Texas State Senate, in your opinion?
18      MR. BRISSENDEN: Let me instruct you to the
19   extent you can answer that question based upon
20   public record and based upon your general experience,
21   you may answer.
22      To the extent that this question requires
23   you to rely upon statements that are contained in this
24   exhibit that you've already testified to twice that
25   you're not familiar with and requires you to rely upon

## 159

1   your thoughts, opinions, your impressions and analysis
2   in connection with your work on this particular piece of
3   legislation and offer an opinion about this procedure,
4   I'd instruct you not to answer.
5      Q. (BY MR. FISHER) And, Senator, let me ask you,
6   did you work on this piece of legislation?
7      A. No.
8      Q. I thought that was your previous testimony.
9      A. This was in '07?
10      Q. Correct.
11      A. No. I was in the Governor's Office in '07.
12      Q. Correct.
13      A. I didn't work on this one. My first was '09.
14      MR. FISHER: Can you read back the last
15   question, please?
16      (Whereupon, the requested testimony was read back
17   as follows:
18      QUESTION: Is that consistent with the usual
19      practice of the Texas State Senate, in your
20      opinion?)
21      A. And the answer was yes. As a matter of public
22   record as stated in here, what Senator Whitmire said was
23   indicated on here, as a matter of public record.
24      If he was out, they didn't need the firm 21.
25   They still needed two-thirds. So, if a Senator -- in

## 160

1   this case 2 were missing if you count Whitmire and
2   Uresti, then it's two-thirds of 29, which they wouldn't
3   have needed 21. That would have been -- quick math.
4   They would have needed 19 votes to bring up the bill.
5   So, that was here when the rules were suspended there on
6   5-15, Journal Page 2063.
7      Then when -- in 8 when Senator Whitmire was back
8   on the floor and Senator Uresti had got there, then they
9   needed 21 and they didn't have that.
10      Q. (BY MR. FISHER) And earlier you mentioned that
11   accommodations are sometimes made, you mentioned someone
12   on dialysis, are you aware of other instances where
13   accommodations were not made for Senators that were sick
14   that were not on the floor?
15      A. I don't know of any.
16      Q. Do you remember at this time -- so, the time
17   period we're discussing is May, 2007. If you look at
18   the Legislative History, I think you'll see that.
19      A. Right.
20      Q. And do you remember at that time the Lieutenant
21   Governor issued a letter concerning the votes on HB 218?
22   I think we've established there were two votes. Do you
23   remember the Lieutenant Governor issuing a letter on
24   that?
25      A. No.

Senator Kenneth Lynn Armbrister                    June 8, 2012

---

161

1      Q.  Do you recall reading any information in the
2  newspaper, any public information about the votes that
3  were taken on HB 218?
4      A.  I don't remember that.  I can't remember what I
5  read in the newspaper yesterday.  And I'm not trying to
6  be facetious with you.  No, I don't remember reading
7  anything about it.
8      Q.  Senator, we went through in detail your knowledge
9  of the Senate, your long-time service in the Senate, as
10 well as the fact that you had just taken a job with
11 Governor Perry at the time; is that correct?
12     A.  During that session, yes.
13     Q.  And so, about four months earlier, you had taken
14 a job?
15     A.  Yes.
16     Q.  You can't recall at this time whether -- and do
17 you agree that this situation would have been something
18 that's newsworthy, the fact that votes were being taken
19 with Senators that were possibly not in the chamber, you
20 know, is this something that you expect would make an
21 impact on the public?
22         MR. BRISSENDEN:  Objection.  Vague.  Calls
23 for speculation.
24     A.  You'll have to be more -- you're -- I agree with
25 my attorney that the question was a little vague.

---

162

1      Q.  (BY MR. FISHER)  Well, as the Legislative
2  Director for the Governor and someone who had just
3  served for over 20 years in the Senate, is it unusual
4  that a situation like this is something that would not
5  have an impact on you so that you remember it --
6      A.  No.
7      Q.  -- you know, five years later?
8      A.  No.
9      Q.  Okay.  And we've talked about 2009.  You can put
10 those exhibits to side.  We've talked about 2009 a few
11 times.
12     A.  Yes.
13     Q.  You've mentioned 2009.  So, was a photo
14 identification bill introduced in the Senate in 2009?
15     A.  It was either the House or the Senate.
16     Q.  I'll go ahead and give you what's been previously
17 marked as Exhibit 29.  And you'll notice that Exhibit 29
18 looks like a lot of the other exhibits we've looked at.
19 It's a Bill to Be Entitled an Act, and in the upper
20 right-hand corner it says SB No. 362?
21     A.  Yes, sir.
22     Q.  And at the same time -- this has been, I think,
23 working efficiently for us.  I'll go ahead and give you
24 what was previously marked as Exhibit 163.
25     A.  Okay.

---

163

1      Q.  In the upper left-hand corner of Exhibit 163,
2  you'll see Texas Legislature Online History, and you'll
3  notice the bill is SB 362.
4      A.  Okay.
5      Q.  Is that correct?
6      A.  That is correct.
7      Q.  Okay.  And so, is this the bill that was
8  introduced in 2009 that you've mentioned concerning
9  voter ID?
10     A.  Yes.  Uh-huh.
11     Q.  And in your capacity as the Governor's
12 Legislative Director, was voter ID on the Governor's
13 legislative priorities in 2009?
14     A.  It was not one of our priority bills.
15     Q.  Was any part of the Governor's legislative agenda
16 in 2009 photo ID?
17     A.  No.
18     Q.  Do you know if the Governor's Office had any --
19 this is either you or your staff -- had any
20 communications with outside groups in 2009 regarding
21 voter ID?
22     A.  I did not have any outside communications with
23 anybody.
24     Q.  Did anyone on your staff have communications with
25 outside groups concerning voter ID in 2009?

---

164

1      A.  I'm sorry, I don't know if they did or not.
2      Q.  Are you aware of anyone in the Governor's Office,
3  more broadly, having communications with outside groups
4  in 2009 concerning voter ID?
5      A.  I'm not aware of anybody.  Nobody ever said
6  anything to me about it.
7      Q.  Are you familiar with the provisions of SB 362?
8      A.  Generally.  I'd have to look through this to
9  refresh myself.
10     Q.  I think I can direct you kind of to the similar
11 areas that we've been looking at in the previous bills.
12 If you'll look at Page 5, I think you'll see Section
13 63.0101.
14     A.  Okay.
15     Q.  And that's under Section 10.  So, I'll go ahead
16 and let you take a look at that.  And that runs to Page
17 7.
18     A.  Right.  Got it.
19     Q.  And so, what forms of ID would have been
20 allowable under SB 362?
21         And I can ask you more specific questions.
22         Would a valid identification card that contains
23 the person's photograph issued by an agency or
24 institution of the federal government or an agency,
25 institution or political subdivision of this state have

Senator Kenneth Lynn Armbrister                                June 8, 2012

## 165

1    been allowed under number 6?
2        A. Yes.  Number 7.
3        Q. Well, it looks like --
4        A. Oh, it's 6, yes, you're correct.
5        Q. You mentioned there's crossed-outs and
6    underlines, and I understand it makes things a little
7    confusing at times.
8        A. Yes.  Right.
9        Q. In Section B, do you see there was a provision
10   for nonphoto identification as well in Section B?
11       A. Yes, I do.
12       Q. And if you look at Section A 1, do you see the
13   expiration date listed there for a driver's license
14   issued by the Department of Public Safety?
15       A. I don't see a date but it does have a -- it does
16   have a statement about expired or not expired within two
17   years.
18       Q. Okay.
19       A. It's not a date certain.  I think we are talking
20   about the same thing.
21       Q. So, the answer is expired no earlier than two
22   years before the date of presentation; is that right?
23       A. That's correct.
24       Q. Do you notice differences -- and feel free to
25   take HB 218 up again but do you notice any differences

## 167

1    you're calling for a date, and this says it expired or
2    if you're using that synonymous, okay, but -- yeah, I
3    agree they are both the same language.
4        Q. And do both provide for a valid identification
5    card that contains the person's photograph and is issued
6    by an agency or institution of the federal government or
7    an agency, institution or political subdivision of the
8    state?
9        A. Yes.  6 in Senate Bill 362, and House Bill 218,
10   subsection 8.
11       Q. Thank you, Senator.
12           And were you or anyone in the Governor's
13   Office -- are you aware that anyone was involved in the
14   development of SB 362?
15       A. I was not involved with it.  I don't know if
16   anybody else was in our office.
17       Q. Are you aware of any communications between
18   yourself or your staff with those who were developing SB
19   362?
20       A. Again, I was not, and I'm not aware of any of the
21   staff that was involved with the development of it.
22       Q. Are you aware of the source of the legislative
23   language in SB 362?
24       A. No.
25       Q. Are you aware of any communications with

## 166

1    between SB 362 and HB 218 as far as allowable forms of
2    ID?
3        A. I hate to be slow but you've asked me do I see
4    any differences rather than a while ago you asked me do
5    I see similarities.
6           3 is different on 218.  It talks about the valid
7    employee ID card.
8        Q. Okay.
9        A. And here 3 is United States citizenship
10   certificate.
11       Q. Okay.  And do you know what a United States
12   citizenship certificate is?
13       A. I don't have any idea.
14       Q. Do you notice that --
15       A. Is that a passport?
16       Q. Do you notice that --
17       A. I don't know.
18       Q. -- nonphoto identification is provided for in
19   both bills?  Is that correct?
20       A. Let's see.  Yes.
21       Q. And with regard to the expiration date listed in
22   Sections A 1 of both bills, are those expiration dates
23   similar?
24       A. The expiration statement but, again, there's no
25   date but there's a statement.  It may be semantics but

## 168

1    Legislators from the Governor's Office concerning what
2    forms of ID were included in SB 362?
3        A. No.
4        Q. Are you aware of any -- are you aware of the
5    Governor's Office being aware of any analysis about
6    which registered voters did or did not possess one of
7    the forms of ID required by SB 362?
8        A. No, I'm not aware of that.
9        Q. Did you or any members of your staff have
10   communications about SB 362 with current or former
11   Legislators who had worked on or introduced past photo
12   identification bills?
13       A. I did.
14       Q. And who did you have those conversations with?
15       A. Todd Smith in the House.  He was the committee
16   Chair of the committee that it was going through in the
17   House.  It had already passed the Senate.  My
18   conversations were with him and no other member.
19       Q. And there was no one else present during those
20   conversations; is that correct?
21       A. Not that I recall.
22       Q. And was that a face-to-face conversation?
23       A. It was a face-to-face conversation.
24       Q. Are you aware of anyone else in the Governor's
25   Office having communications about SB 362 with at that

Senator  Kenneth  Lynn  Armbrister                          June 8, 2012

---

### 169

1  time current or former Legislators who had offered
2  previous photo identification bills?
3      A.  No, I'm not aware of anybody else.
4      Q.  So, was it just one meeting with Todd Smith; is
5  that correct?
6      A.  Right.
7      Q.  Are you aware of communications from you or your
8  staff with officials or Legislators from other states
9  about SB 362?
10     A.  I had no outside communication about it with
11  anybody.
12     Q.  Did anyone on your staff have outside
13  communications?
14     A.  I don't know.
15     Q.  Would you know if they did?  Is that something
16  they would report to you?
17     A.  No, not necessarily.
18     Q.  Are you aware of any communications about SB 362
19  with outside interest groups from you or your staff in
20  the Governor's Office?
21     A.  I had none with any outside interest groups, and
22  I don't know about staff.
23     Q.  More broadly, anyone in the Governor's Office
24  that had outside communications about SB 326 with
25  outside interest groups?

---

### 170

1      A.  I wouldn't have known that.
2      Q.  Are you aware of any communications that you and
3  your staff had with groups representing minority voters
4  during the consideration of SB 362?
5      A.  I had no such meetings, and I wouldn't know if
6  the staff did.  I would doubt it but I don't know if
7  they did or not.
8      Q.  And going back to the communication you had with
9  Representative Smith, can you tell me the general nature
10  of that conversation?
11         MR. BRISSENDEN:  I think the witness has
12  answered the question that you posed earlier about
13  whether or not he had communication regarding the bill.
14  Going beyond that and asking the nature of the
15  communications would be privileged, and I instruct you
16  not to answer.
17     A.  On the advice of the attorney, I would not answer
18  that under privilege.
19     Q.  (BY MR. FISHER)  Do you know if a policy analysis
20  was performed on SB 362 at any point?  And we talked
21  about Mr. Schofield and the job that he does.  Are you
22  aware of that analysis being conducted?
23     A.  I've not seen it but, again, protocol dictates
24  that one be done.
25     Q.  And so, you would say that you didn't review the

---

### 171

1  analysis then --
2      A.  No.
3      Q.  -- based on the answer to your last question; is
4  that correct?
5      A.  That's correct.
6      Q.  And we talked a little bit earlier about things
7  that would go into that analysis, the underlying facts,
8  the documents that Mr. Schofield or someone like him
9  would rely upon.  Are you aware of you or anyone in your
10  staff reviewing the underlying documentation that would
11  go into an analysis -- or that went into the analysis of
12  SB 362?
13     A.  I didn't personally review that, and I don't know
14  if anybody in the staff did.
15     Q.  And would that kind of analysis, the underlying
16  analysis, underlying bill analysis, would that involve
17  legislation from other states?  Would it consider things
18  that had been done in other states?  For instance, in
19  this case, photo identification bills from other states?
20         MR. BRISSENDEN:  I'm going to instruct you
21  not to answer.  That question delves into privileged
22  deliberations and analysis as to what was and was not
23  considered in particular in this piece of legislation
24  in the Governor's Office, and the Court has considered that
25  to be -- I believe in the orders that have come out on

---

### 172

1  June 5th and June 7th, that would be privileged, the
2  legislative privilege.  Instruct you not to answer.
3      A.  Under advice of my attorney, I will not answer
4  under privileged communication.
5      Q.  (BY MR. FISHER)  And let me be clear about my
6  question.  I'm not asking about your time in the
7  Legislature.  I'm not asking about the work that's been
8  done in the Governor's Office.  I'm asking about the
9  underlying facts that have gone into an analysis that's
10  gone by the Governor's staff and I'm asking if those
11  underlying facts would take into consideration photo
12  identification bills from other states, other
13  jurisdictions that have those laws on the books?
14         MR. BRISSENDEN:  And the Court's order
15  issued yesterday, June 7th, specifically addresses work
16  that is done by the Governor and his office pertaining
17  to legislative acts, legislative functions, the Court
18  has found that legislative privilege applies, and I
19  would instruct you not to answer the question.
20     A.  On the advice of the attorney, I won't answer
21  under privileged communication.
22     Q.  (BY MR. FISHER)  And so, what was the purpose of
23  SB 362, according to your understanding?
24         MR. BRISSENDEN:  Let me instruct the witness
25  that the Court has found that you may answer the

## 173

1    question with regards to the general purpose of a piece
2    of legislation but with regards to your opinions, your
3    analysis, your views and motivations of supporting or
4    not supporting a piece of legislation, I instruct you
5    not to answer.
6        THE WITNESS:  Could you read me the question
7    again?
8        (Whereupon, the requested testimony was read back
9    as follows:
10       QUESTION:  And so, what was the purpose of SB
11   362, according to your understanding?)
12       A.  To enhance the credibility and -- of the vote on
13   a particular election.
14       Q.  (BY MR. FISHER)  And are you aware there was a
15   problem in Texas with the credibility of the votes in
16   particular elections?
17       MR. BRISSENDEN:  To the extent that question
18   requires you to divulge information that you developed
19   in the course of your work as the Director of
20   Legislative Affairs of the Governor's Office in
21   connection with this piece of legislation, I'd instruct
22   you not to answer.
23       To the extent you can rely upon information
24   that would be contained in the public record, you can do
25   so.

## 174

1        A.  I don't have any information on the public
2    record.  So, on advice of attorney, I won't answer.
3        Q.  (BY MR. FISHER)  And who are the main opponents
4    to SB 362?
5        A.  Define "main opponents."
6        Q.  Who are the opponents to SB 362?
7        A.  Probably every member of the House and the Senate
8    that were Democrats.
9        Q.  And did the Governor -- strike that.
10       Did you or your staff in the Governor's Office
11   have any communications with Legislators who opposed SB
12   362?
13       A.  I didn't.
14       Q.  Did any members of your staff have communications
15   with Legislators who opposed SB 362?
16       A.  I don't know.
17       Q.  And, more broadly, just for the sake of the
18   record, anyone in the Governor's Office that you're
19   aware of that had conversations with Legislators who
20   opposed SB 362?
21       A.  Not to my knowledge.
22       Q.  All right.  So, we have Exhibit 163, which I've
23   handed you, and that's the Texas Legislature Online
24   History and based on --
25       A.  Okay.  Exhibit 163?

## 175

1        Q.  It's been previously marked and that's why the
2    numbering is a little different.
3        A.  I got it.
4        Q.  And if you take a look at that, can you tell me
5    what happened to SB 362?
6        A.  Okay.  It was prefiled this date 12-15, that's
7    December 15th of '08.  Members are allowed to prefile
8    bills within 30 days of a legislative session.  And with
9    that date, that tells me that bill was prefiled in the
10   Senate.
11       The Senate convened the second Tuesday of
12   January, and that -- in '09.  It had its first reading
13   there on 2-17, and it was referred to the Committee of
14   the Whole.
15       Now, you have standing committees, such as we've
16   talked about before, State Affairs.  When you see a
17   notation Committee of the Whole, that means the entire
18   Senate then becomes the committee.  And that's been done
19   quite a few times on various issues that are of such
20   statewide import we want to give everybody a bite of the
21   apple, so to speak, at the committee hearing.
22       Again, co-authorization was authorized.  It got
23   scheduled for a public hearing, and then they had the
24   public hearing the next month, March the 10th.
25       Testimony was taken.  Co-author authorized, that

## 176

1    means somebody has probably signed onto it and had to
2    get that authorization in the record.
3        Q.  Senator, if I can just stop you there and ask you
4    a question.
5        A.  Okay.
6        Q.  You talked about the consideration of the
7    Committee of the Whole?
8        A.  Yes.
9        Q.  And we talked earlier about bills being referred
10   to specific committees in order to get feedback from the
11   public.  Is your understanding that a bill that's
12   referred to the Committee of the Whole, that same
13   procedure is not followed; is that correct?  It doesn't
14   go to an individual committee?
15       A.  It doesn't go to an individual committee.  It
16   goes to the entire Senate, and they act as the
17   committee.
18       Q.  And you said that it has happened before.  Can
19   you tell me in what instances you recall other bills
20   being filed with the Committee of the Whole without
21   going to an individual specific committee first?
22       A.  Most of the redistricting bills follow that
23   track.  I had a particular 50-year state water plan
24   because it was truly for the entire state, wanted to get
25   everybody involved with the formulation of that.

## 177

1    We've had other bills over time.  If I had time
2  to look, I could tell you specifics but those are some
3  of the -- it's really an activity -- if you're a Senator
4  not sitting on a particular committee and you have a
5  vested interest in an issue, it gives you that
6  opportunity to lobby on the full committee.  So, it's
7  done really as a convenience to ensure that statewide
8  every member of the Senate gets in there and gets to do
9  work on a bill in the committee setting.
10    Q.  Is the public heard from in these Committee of
11  the Whole hearings as well?
12    A.  Absolutely.  Right.  They meet on the Senate
13  floor.  And at that point, the entire floor is open and
14  people sign up to testify, and they take testimony until
15  the last one gets through.
16    Q.  And you started to read the history of the bill
17  somewhat.
18    A.  Right.
19    Q.  And we had looked in the context of HB 218, and
20  you pointed out to me the point where the bill survived
21  the two-thirds vote to be brought to the floor, and I
22  know we had some more discussion about that but are you
23  able to show me on here any point where SB 362 received
24  a two-thirds vote --
25    A.  Yes.

## 178

1    Q.  -- from the Senate?
2    A.  After the committee process, as you're going down
3  through -- down here closer to the bottom, testimony
4  taken in committee, it was reported out of the committee
5  favorably without amendments.  In other words, the bill
6  is filed, was not amended in the committee.  Then it was
7  set as a special order.  And the next entry there, 3-11
8  over here it looks like Journal Page 464, a record vote
9  was taken.
10    The special order is a process within the
11  committee still.  So, that's where it's voted out of
12  committee, and the report was printed and distributed,
13  and there's what we call a 24-hour layout rule.  You
14  can't just take a bill and get out of committee and have
15  it up there unless, again, you suspend that rule.  Well,
16  they didn't do it with this one.  There was no vote
17  taken to do it.
18    So, it -- you see here it came out of committee
19  on the 12th, didn't come before the Senate until the
20  17th, so, there's five days there.
21    It was read for the second time on the 17th.
22  Point of order was called on it.  The point of order was
23  overruled.
24    Remarks ordered printed, which any member of the
25  Senate for whatever reason, debate, testimony, whatever,

## 179

1  can ask for the discussion between two members to be
2  printed, and that's what that indicates.
3    There were amendments offered, and the bill was
4  amended.  They had a record vote on that amendment.
5  Another amendment offered.  You keep going, and then
6  right up here on 3-17, Journal Entry 520, you see that
7  record vote.
8    Q.  Okay.
9    A.  And then the next entry is passed to engrossment.
10  The record vote, that means that it passed.
11    Q.  Senator --
12    A.  Now, the two-thirds -- let me go back here.  When
13  it says laid before the Senate --
14    Q.  Well, Senator, if I could just ask you -- I
15  see -- we could pull out the previous exhibit on HB 218
16  and you pointed out to me exactly where the rules were
17  suspended in the regular order of business, and you
18  described that to me in great detail.
19    A.  Right.
20    Q.  Can you point anywhere on this history --
21    A.  Yeah, laid before the Senate.
22    Q.  So, laid before the Senate, that means the same
23  thing?
24    A.  Yes.
25    Q.  Would it surprise you at all if the two-thirds

## 180

1  rule was set aside for SB 362 and actually was not
2  followed?
3    A.  Wouldn't surprise me, no.  And as I read this
4  entry laid before the Senate, that wasn't a two-thirds.
5    Q.  So, I hand you what's been marked as Exhibit 168,
6  previously marked as Exhibit 168, and you'll see that it
7  says Senate Journal, 81st Legislature, Regular Session,
8  Second Day, Wednesday, January 14, 2009.
9    A.  Uh-huh.
10    Q.  And would that be the beginning of the
11  legislative session?  Is that correct?
12    A.  That would have been -- being Wednesday, that
13  would have been the second day.
14    Q.  Second day of the legislative session.  Thank
15  you, Senator.
16    A.  If the 13th was the first day.
17    Q.  And if we go to --
18    A.  Could have been the week -- well, that's about
19  right.  The 13th would have been probably about the
20  second day.  Not having a calendar here, I can only
21  guess.  Second day means second day of the session.
22    Q.  If we turn to -- and it's numbered Page 23 in the
23  upper right-hand corner.  I didn't give you all the
24  pages just to save some trees.
25    A.  Right.  I got it.

## 181

1  Q. And I'll turn your attention to Rule 5.11 A on
2  the second page -- or on this page of the exhibit.
3  A. I have it.
4  Q. And could you go ahead and read that?
5  A. "Special orders. Rule 5.11 A, any bill,
6  resolution or other measure may be made a
7  special order for a future time of the session by an
8  affirmative vote of two-thirds of the members present."
9  Q. And, Senator, let me ask you is that, you know,
10  what we've been discussing here, the two-thirds rule or
11  what you've also called the 21-vote rule, which is only
12  required if there's 31 present but essentially the
13  two-thirds rule; is that correct?
14  A. No. Special order is different.
15  Q. Okay. Can you tell me how special order is
16  different?
17  A. Well, the two-thirds is so that you can take a
18  bill up out of its regular order. So, special orders,
19  you make a motion to declare something a special order
20  and it takes two-thirds. That's what this is referring
21  to.
22  Q. The language here in Rule 5.11 A, is this a
23  description of how the two-thirds rule essentially
24  works? Is that correct?
25  A. Let's see. Which two-thirds rule are you talking

## 182

1  about? The one to suspend the regular order or special
2  orders?
3  Q. I guess if you could explain to me the difference
4  between suspending the regular order and the special
5  orders.
6  A. Okay. The regular order is before they could
7  have taken up 362, they would have had to have heard
8  Senate Bill 1 all the way to Senate Bill 361 before they
9  could take it up. So, because they are going to take it
10  up before any or all of those have been heard, that's
11  out of its regular order. That requires two-thirds
12  vote.
13  A special order is a little bit -- it's another
14  process or procedure, if you will. As it says, "Any
15  bill, resolution or other measure may on any day be made
16  a special order for a future time of the session by an
17  affirmative vote of two-thirds."
18  In other words, Ladies and Gentleman of the
19  Senate, I move to make Senate Bill 14 a special order
20  bill to be taken up April 1st, that requires two-thirds.
21  That gives a time certain.
22  In other words, as I explained on the Intent
23  Calendar, I've given my intent I'm going to do it. By
24  special order now, the Senate can vote for a time
25  certain for a bill to be taken up, and that's what

## 183

1  special orders are.
2  Q. So, a special order requires a two-thirds vote?
3  A. A two-thirds vote.
4  Q. And if you look at Section D, so, Rule 5.11 D, if
5  you could read that for me.
6  A. "Notwithstanding Subsection A" -- and this is new
7  language apparently -- "a bill or resolution relating to
8  voter identification requirements reported favorably
9  from the Committee of the Whole Senate may be set as a
10  special order for a time at least 24 hours after the
11  motion is adopted by a majority of the members of the
12  Senate."
13  Q. And so, that language there, "majority of the
14  members of the Senate," is that different than the
15  two-thirds requirement?
16  A. Yes, it is. That's -- the majority of the
17  members are 16.
18  Q. Are you aware of the purpose of specifying voter
19  identification requirements in Rule 5.11 D?
20  MR. BRISSENDEN: Objection. Privileged.
21  Instruct the witness not to answer under legislative
22  privilege.
23  A. Okay. I would not answer under -- on advice of
24  the attorney under legislative privilege.
25  Q. (BY MR. FISHER) Are you aware of any

## 184

1  communications regarding Rule 5.11 D between yourself or
2  your staff and Legislators in the Texas Legislature?
3  A. No, there were none by me or staff that I know
4  of.
5  Q. And prior to 2009 -- and so we are -- you know,
6  the date on this is January 14th, 2009. Are you aware
7  of any similar -- and this is based on your experience
8  as a long-time Senator -- similar carve-outs, if you
9  will, that are similar in nature to Rule 5.11 D from the
10  rule that we talked about in 5.11 A?
11  MR. BRISSENDEN: Objection. Vague and
12  ambiguous and conclusory.
13  To the extent you can answer the question
14  based upon information that's in the public record, you
15  may do so.
16  A. I don't recall if it's in the public record or
17  not. I don't recall. There may have been. I don't
18  remember any.
19  Q. (BY MR. FISHER) Do you know if anyone -- are you
20  aware of anyone in the Governor's Office being involved
21  in drafting the language that appears in Rule 5.11 D?
22  A. No.
23  Q. Did you have a -- and some Senators -- do some
24  Senators have a public stance on the two-thirds rule,
25  either for it or against it?

185

1    A. (Witness indicated by nodding his head
2    affirmatively.)
3    Q. Is that a yes?
4    A. Yes. That's correct. Excuse me.
5    Q. And did you have a public stance on the
6    two-thirds rule while you were in the Senate?
7    A. Not publicly.
8    Q. Are you aware of any other communications related
9    to the rules contained in 5.11 A or D within the
10   Governor's office?
11   A. I'm not aware of any communication in the
12   Governor's Office about it.
13   Q. Did you ever have an occasion to vote on any
14   rules similar to Rule 5.11 D?
15       MR. BRISSENDEN: Objection. Vague.
16   A. I can't remember.
17   Q. (BY MR. FISHER) Is this similar to language that
18   you saw while you were serving in the Texas State
19   Senate, Rule 5.11 A?
20       MR. BRISSENDEN: Objection. Vague and
21   ambiguous.
22       THE WITNESS: I'm sorry?
23       MR. BRISSENDEN: You can answer.
24   A. D was never there when I was there but A, B and C
25   were there. Those were existing.

186

1    Q. (BY MR. FISHER) So, I'll hand you what's been
2    marked as Exhibit 170.
3    A. Okay.
4    Q. It's similar to the last exhibit.
5    A. Spencer, are we through with these?
6    Q. Yes.
7    A. Okay.
8    Q. Senate Rules adopted by the 82nd Legislature,
9    January 19, 2011.
10   A. Got it.
11   Q. And I'll turn your attention to Rule 5.11 A and D
12   and ask you if those appear similar to what you just
13   read in the previous exhibit?
14   A. They appear similar.
15   Q. And with regard to the rules in 2011 now,
16   referencing specifically the year 2011, are you aware of
17   any communications that the Governor's staff or you had
18   concerning Rule 5.11?
19   A. I had no communication, and I don't know about
20   staff.
21   Q. And is this -- would this operate in a similar
22   way as the rule we just looked at and discussed in
23   detail as far as the two-thirds vote for Rule 5.11 A and
24   then the majority vote for Rule 5.11 D in order to bring
25   a bill to the floor?

187

1    A. That appears correct. Okay. Yeah.
2    Q. And did you or your staff have any communications
3    with any Legislators concerning the adoption of Rule
4    5.11 A through D?
5    A. I certainly didn't, and I don't know about staff.
6    Q. All right.
7        MR. FISHER: Let's go off the record here.
8    I think we've been at it for a while. Take ten minutes.
9        (Short recess.)
10       MR. FISHER: Back on the record.
11   Q. (BY MR. FISHER) Senator, if we could return back
12   to -- we looked at Exhibit 45 a minute ago, and that was
13   the Declaration of Senator Uresti. I'm just going to
14   point your attention to a different section of that
15   declaration. We'll look at paragraphs 10 and 11 now.
16   We've been talking about the two-thirds rule.
17       We see in 10, "In 2011, the Senate majority
18   exempted SB 14 outright from requiring support of
19   two-thirds of the Senate. In other words, the
20   requirement that at least 20 Senators agree on SB 14
21   before it could be called up for debate on the Senator
22   floor was waived."
23       And then we continue on to the next page and in
24   11 we see, "Requiring two-thirds of the Senate to
25   support a bill is a basic, foundational rule of the

188

1    Senate, which was highly unusual to waive, especially
2    when the waiver was only applied to one bill. Of the
3    thousands of bills awaiting debate on the Senate floor,
4    the two-thirds rule was only waived for SB 14 and was
5    applied to all other pending Senate bills."
6        Did you have a different view of whether -- and
7    we talked about Rule 5.11 D was highly unusual activity?
8    A. In regards to 10 -- excuse me -- 10 and 11 --
9        MR. BRISSENDEN: Let me instruct you, first
10   of all, that to the extent that question requires you to
11   divulge information that you have, knowledge that you
12   have and have developed with regards to SB 14 as a part
13   of your work as the Director of Legislative Affairs for
14   the Governor, your thoughts, mental impressions,
15   opinions and analysis, I would instruct you not to
16   answer.
17       But to the extent that you can answer that
18   based upon matters of the public record, then you may do
19   so.
20       THE WITNESS: Can I ask you a question?
21       MR. BRISSENDEN: Do you need to take a
22   break?
23       THE WITNESS: A real quick question.
24       (Off the record.)
25   A. In regards to the statements in 10 and 11,

## 189

1  publicly, I think anybody could come to that conclusion.
2      Q.  (BY MR. FISHER)  So, I'm going to hand you
3  Exhibit No. 5, previously marked as Exhibit No. 5.  And,
4  again, we're dealing with legislative language, which
5  maybe you thought you had gotten away from since you
6  left the Texas State Senate but I'm going to make you
7  relive today.
8          And so, Exhibit 5, we'll see that it's, again, a
9  bill.  In the upper right-hand corner, you'll see SB No.
10  14.  And on this one, I can point you to the last page,
11  and you can take a look at that, and I think that will
12  give you some context as far as the version you're
13  looking at.
14      A.  Last page.  Okay.
15      Q.  And do you recognize this document?
16      A.  Yes.
17      Q.  And what is it?
18      A.  It is a photocopy of a bill that was passed by
19  the Legislature and signed by the Governor into law.
20      Q.  And was that in 2011?  Is that correct?
21      A.  May 27th, 2011.
22      Q.  Are you familiar with SB 14 and its general
23  subject matter?
24      A.  Yes.
25      Q.  And what was that?

## 190

1      A.  This was a bill for the purpose of enhancing
2  public integrity of elections.
3      Q.  I'm going to hand what you we'll mark as
4  Exhibit 195.
5          (Exhibit 195 marked.)
6      Q.  (BY MR. FISHER)  And you'll see at the top of
7  that is -- the words 2011 Session Accomplishments.
8      A.  Okay.
9      Q.  And if you look at the upper left-hand corner, we
10  see Governor's Priorities?
11      A.  Got it.
12      Q.  And we see there's one, two, three, four, five,
13  six, seven priorities listed underneath that heading.
14  And we see in the middle, the third one down is, "Voter
15  ID:  Texas now requires voters to present a photo ID at
16  the polls, which will protect the integrity of our
17  elections."  And have you seen this document before?
18      A.  I haven't seen this document.
19      Q.  Have you seen documents similar to this document?
20      A.  I've seen documents similar to it, yes.
21      Q.  And who typically creates these types of
22  documents in the Governor's Office?
23      A.  Our Budget Planning & Policy Group, as well as
24  our press section.
25      Q.  And for what purposes are these types of

## 191

1  documents created?
2      A.  As anybody in elected office, you want to give
3  kind of a report card out to your constituency of what
4  you were able to do during the legislative session.  I
5  used to do it in when I was in the Senate, tell people
6  what bills I carried, passed, what they -- those types
7  of things.
8      Q.  And so, the audience for this would be the public
9  at large?
10      A.  Yes.
11      Q.  Residents of Texas, I guess?
12      A.  Public at large.
13      Q.  And under voter ID, is it your understanding that
14  that would refer to SB 14?  Is that correct?
15      A.  It doesn't say it here, but yes, that was the
16  only, as we say, dog in the hunt.
17      Q.  And do you believe it's accurate concerning --
18  its statement about the Governor's priorities is
19  accurate, concerning the Governor's priorities and voter
20  ID being one of those?
21      A.  Yes.
22      Q.  And did you and your staff consider voter ID to
23  be a priority in 2011?
24      A.  Yes, we did.
25      Q.  And was it part of the Governor's legislative

## 192

1  agenda in 2011?
2      A.  It was a priority.  It was not a bill that we
3  asked to be drafted.
4      Q.  And what's your understanding about -- if it was
5  not a bill that you asked to be drafted, what's your
6  understanding about the drafting of SB 14 as far as the
7  authorship of SB 14?
8      A.  My understanding by that statement, it's not a
9  bill we asked to be drafted.  For instance, I went to a
10  member on the sonogram and asked them to have it
11  drafted.  I went to them on eminent domain reform.  So,
12  that was one we were really pushing for after working
13  with various groups and all, as opposed to one that you
14  had authors that had carried the bill before that had
15  indicated they were going to file it again.  As it was,
16  I think we saw it was prefiled.  So, we already knew it
17  was in the hopper.
18      Q.  And so, this -- and I guess you termed those, as
19  you just referred to the sonogram and the eminent domain
20  bills, those would be termed, I guess, initiatives from
21  the Governor's Office; is that correct?
22      A.  Right.
23      Q.  And so, voter ID was fairly characterized, based
24  upon your testimony, as not an initiative; is that
25  correct?

### 193

1    A. It was a priority but as far as a -- was this
2    part of the package that we tried to get through, that's
3    correct.
4    Q. It's correct that it was not part of the package?
5    A. It was not part of the package.
6    Q. So, we'll do this one more time, and this is the
7    last time we'll make you do this but we'll take a look
8    at --
9    A. Oh, Spencer.
10   Q. I know you're enjoying yourself, Senator.
11        We'll take a look at the allowable forms of ID
12   under SB 14.  And if you'll take a look at Exhibit
13   No. 5, I think it might be right here.
14   A. Got it.
15   Q. And I can draw your attention to Page 9, and we
16   have Section 14, 63.0101.  And I'll ask you to just go
17   to the middle of Page 10.
18   A. Okay.
19   Q. If you could take a look at those forms of ID.
20   A. Middle of Page 10.  Okay.  Let's see.  Okay.
21   Q. And we've spent some time.  We talked about HB
22   1706 first.  We talked about HB 218.  We talked about SB
23   362.  And we talked about some of the things that those
24   had in common, some of the things they didn't have in
25   common.  And some of the things we have talked about

### 194

1    along the way, we talked about nonphoto ID.  Do you see
2    any provision for nonphoto ID in SB 14?
3    A. I'm not familiar with the United States
4    citizenship -- oh, it says that contains -- so, I would
5    assume that does.  Passport I know does.  Handgun
6    license does.  Military ID does.  And driver's license
7    does.  I see none in this one.
8    Q. And with regard to -- and we talked about -- we
9    had a little bit of a discussion about the word
10   "expiration date," so, I'll use a different term.
11        As far as the expiration time period, if you take
12   a look at what's number 1 now under 63.0101 --
13   A. Got it.
14   Q. -- we see the expiration time period listed there
15   as expired no earlier than 60 days before the date of
16   presentation.  And is that different than what we saw in
17   SB 362, HB 218 and HB 1706?
18   A. Yes.
19   Q. And what did we see in those bills as far as the
20   expiration time period?
21   A. 2 years as opposed to 60 days before the date of
22   presentation.
23   Q. And if you look at the allowable forms of ID, do
24   you see in SB 14 any provision for IDs issued by federal
25   agencies or state agencies?

### 195

1    A. No.  That was stricken in this version.
2    Q. And where is it stricken?
3    A. It's not in here.  So, it was -- whereas the
4    others had it in there, I don't see that in there.
5    Q. We talked a little bit about -- well, let me ask
6    you do you see a difference between SB 14 and SB 362 as
7    far as the allowable forms of identification?
8    A. Yes.
9    Q. And do you see a difference between SB 14 and HB
10   218 as far as the allowable forms of identification?
11   A. Yes.
12   Q. And do you see a difference between SB 14 and HB
13   1706 as far as the allowable forms of identification?
14   A. Yes.
15   Q. Would you say there are more allowable forms of
16   identification under SB 362 than SB 14?
17   A. More.
18   Q. And would you say there are more available under
19   HB 218 than SB 14, more forms of allowable
20   identification?
21   A. More.
22   Q. And would you say there are more forms of
23   allowable identification under HB 1706 than SB 14?
24   A. More.
25   Q. And so, would you say that SB 14 is more or less

### 196

1    restrictive with regard to the allowable forms of
2    identification than previous bills that have been
3    offered and have failed passage in the Legislature?
4        MR. BRISSENDEN:  I'm going to object to the
5    extent that requires the witness to offer his opinion as
6    to SB 14.  And I would consider that privileged under
7    legislative privilege and instruct him not to answer.
8    A. On the advice of my attorney, I would invoke
9    legislative privilege.
10   Q. (BY MR. FISHER)  We talked about the election
11   identification certificate.  I believe we talked about
12   that previously.  Do you know what an election
13   identification certificate is?  And that's mentioned in
14   number 1, 63.01011, and it actually is underlined
15   language there.
16   A. Where are you?
17   Q. We're at Section 14, 63.0101, number 1 and then
18   you have driver's license and after it says election
19   identification certificate.
20   A. Right.
21   Q. Are you aware of what an election identification
22   certificate is?
23   A. No.
24   Q. And are you aware of what a citizenship
25   certificate is?  And I'm referring to -- I guess it

## 197

1  would be number 3.  We have a number 4 stricken out in
2  front of it.
3       A.  Right.  I'm not familiar with that.
4       Q.  And it talks about military identifications in
5  number 2.
6       A.  Yes.
7       Q.  And we have language here, and we talked about
8  expiration time period language.  The expiration time
9  period language we have here is expired no earlier than
10 60 days before the date of presentation.  Do you know
11 how often military identifications expire?
12      A.  No, sir.
13      Q.  Are you aware of any communications that either
14 you or your staff in the Governor's Office had regarding
15 the forms of ID that are included in SB 14?
16          MR. BRISSENDEN:  I would instruct you not to
17 disclose communications that you had with regards to
18 specific provisions of SB 14 with your staff, other
19 state agencies, other Legislators, their staff, Texas
20 Legislative Council.  Instruct you not to answer.
21      A.  On the advice of attorney, I will not answer due
22 to privilege.
23      Q.  (BY MR. FISHER)  Let me be clear, I'm not
24 referring to the substance of your communications.  I'm
25 asking whether you had any communications with anyone

## 198

1  about the forms of ID to be included in SB 14, either
2  you or your staff?
3          MR. BRISSENDEN:  I believe the question goes
4  beyond simply asking him as a general matter whether
5  he's had communications regarding SB 14, and I instruct
6  him not to answer.
7       A.  On the advice of my attorney, I will invoke the
8  privilege.
9       Q.  (BY MR. FISHER)  Did you or your staff have any
10 communications regarding SB 14?
11      A.  I'm sorry?
12      Q.  Did you or your staff have communications with
13 anyone regarding SB 14?
14      A.  I did with staff.  No one outside of the office.
15      Q.  Okay.  And who were the staff that you had
16 communication regarding SB 14?
17      A.  Mike Schofield.
18      Q.  And we've talked about Mr. Schofield today in
19 your testimony.  Did Mr. Schofield conduct a policy
20 analysis of SB 14?
21      A.  If he followed protocol, yes.
22      Q.  And when did you have discussions with
23 Mr. Schofield about SB 14?
24      A.  It would have occurred after the bill had passed
25 out of the Senate to the House in a general discussion

## 199

1  with analysts over a packet of bills, where are we on
2  this, where are we on that, where are we on this.
3       Q.  And would that have been in person?
4       A.  Yes.
5       Q.  And was there anyone else present during that
6  discussion?
7       A.  Yes.  That would have been quite a few people in
8  our office.
9       Q.  So, was this in the context of a meeting?  Is
10 that correct?
11      A.  Yes.  During the legislative session -- it
12 depends on what part of the session it's in, we get
13 updates weekly, every two weeks, every three.  Depends
14 on -- early parts of the session, you don't need those
15 but later in the session, we get updates, status reports
16 of where things are.
17      Q.  And you mentioned previously that SB 14 was not
18 an initiative, as you've described it today, on behalf
19 of the Governor, that's correct?
20      A.  Right.
21      Q.  And so, with regard to input regarding the
22 drafting of SB 14, you're not aware of the Governor's
23 Office having any input into the drafting of SB 14?
24      A.  I don't know of any -- I certainly didn't, and I
25 don't know -- and my staff surely wouldn't have.  I

## 200

1  don't know -- I don't know of any if we did.
2       Q.  Are you aware of any correspondence the Governor
3  received urging him to veto SB 14?
4       A.  I'm not aware.
5       Q.  Any correspondence urging him to sign it?
6       A.  I'm not aware of that either.
7       Q.  Correspondence concerning general opposition to
8  SB 14?
9       A.  I'm not aware of that.  That would be Greg
10 Davidson.
11      Q.  And are you aware of the purpose of SB 14?
12      A.  Yes.
13          MR. BRISSENDEN:  Objection.  Asked and
14 answered.  I believe -- to the extent -- let me instruct
15 the witness to the extent you can answer the question,
16 the Court has said you can answer that question as a
17 matter of general purpose.
18          Beyond that, though, in terms of divulging
19 or disclosing information about the intent of SB 14,
20 your opinions, your analysis, mental thought processes
21 about SB 14, that would be privileged.
22      A.  Okay.  The general intent was to enhance the
23 integrity of elections.
24      Q.  (BY MR. FISHER)  Do you know which bills the
25 Governor vetoed during the last session, which be

Senator Kenneth Lynn Armbrister                          June 8, 2012

---

### 201

1  the session we're talking about?
2      A.  It was somewhat of a record for those that we did
3  not veto this time.  I say that again not in a facetious
4  term but the Governor's very first session, he set
5  almost a record of vetoes.  And for the last three
6  sessions, they've come down.  Less than 15 bills were
7  vetoed.
8          (Exhibit 196 marked.)
9      Q.  (BY MR. FISHER)  So, we'll move to Exhibit 196.
10  And I'll just instruct you to keep Exhibit 5, SB 14,
11  handy.
12      A.  Okay.
13      Q.  But we'll take a look at Exhibit 196.  And you'll
14  notice at the top of this document it reads, "After
15  six-year fight, Perry signs voter ID into law."
16      A.  Right.
17      Q.  It's from the Texas Observer, and it's dated
18  May 27, 2011?
19      A.  Yes, sir.
20      Q.  And I'll just direct your attention to the third
21  paragraph.  And you'll see the quote -- and this is
22  actually -- I just asked you about veto, and this is
23  actually -- and we have a picture here of the Governor
24  signing the bill into law.
25          "'This simple action, no more complicated than

---

### 202

1  cashing a check down at the HEB or applying for a
2  library card down the street, will appropriately help
3  maintain the integrity and fairness of our electoral
4  system here in the Lone Star State,' Governor Perry said
5  at the signing."
6      A.  Okay.
7      Q.  And in your role as Legislative Director, would
8  you -- well, first of all, would you be at the signing?
9      A.  Not necessarily.
10      Q.  And are you aware of -- or do you play any role
11  in formulating the quotes that appear here?
12      A.  No.  Our press people handle all of the quotes,
13  speeches, all of that.
14      Q.  And do you see any difference between voting and
15  cashing a check or applying for a library card?
16      A.  Currently?
17      Q.  Yes.  As you sit here today, do you see any
18  difference in those activities?
19      A.  Yeah.  I need a photo ID to cash a check.  I
20  don't need one to vote.
21      Q.  Well, do you have --
22      A.  Well, now I do.
23      Q.  Do you believe that voting is a fundamental
24  right?
25      A.  I do.

---

### 203

1      Q.  And is cashing a check a fundamental right?
2      A.  No.
3      Q.  And is getting a library card a fundamental
4  right?
5      A.  No.
6      Q.  Are you aware of any communications either you or
7  your staff or the Governor's Office had concerning the
8  impact of SB 14 on minority voters?
9          MR. BRISSENDEN:  I'm going to object and,
10  under privilege, instruct the witness not to answer.
11      A.  On advice of attorney, I would invoke the
12  privilege.
13      Q.  (BY MR. FISHER)  And are you aware of --
14          THE WITNESS:  Is it privilege, clause?
15          MR. BRISSENDEN:  Privilege.
16          THE WITNESS:  Okay.
17      Q.  (BY MR. FISHER)  And are you aware of any
18  communications either you or your staff in the
19  Governor's Office had about SB 14 with other current or
20  former Legislators?
21          MR. BRISSENDEN:  Just to be clear, you're
22  asking in general terms about SB 14?
23          MR. FISHER:  Correct.
24      A.  I had a conversation after the bill passed with
25  the House author.

---

### 204

1      Q.  (BY MR. FISHER)  And the House author was?
2      A.  Patricia Harless.
3      Q.  And when did this -- you said after the bill
4  passed?  Do you have a --
5      A.  After the bill passed.  I wasn't there during the
6  floor debate.  I was there later in the day, and she
7  walked over to me and she said, "I passed voter ID."
8          And my conversation was, "Congratulations.  Good
9  work."
10      Q.  And after it passed the House, it was signed into
11  law by the Governor; is that correct?
12      A.  Not immediately but yeah, subsequent.  Let's see.
13  Well, let's see.  When did it pass the House?  Do we
14  have that?  Here we go.  No, that's 362.
15          (Off the record.)
16      Q.  (BY MR. FISHER)  Okay.  So, Senator, I'm going to
17  hand you what's been previously introduced as Exhibit
18  No. 8.
19      A.  Okay.
20      Q.  And, again, this is similar to the other Texas
21  Legislature Online Histories that we've looked at, the
22  difference being this is related to SB 14.
23      A.  Okay.
24      Q.  And so, my previous question was about signature
25  by the Governor, and I asked you whether it was signed

Senator Kenneth  Lynn Armbrister                    June 8, 2012

## 205

1  by the Governor after it passed the House, SB 14?
2     A.  Right.  We received the bill in our office on May
3  the 18th of 2011, and the Governor signed the bill looks
4  like 9 days later on May the 27th.  The difference in
5  time, we're allowed ten days, except this -- May 18th
6  fell within that other time where we have 20 days to
7  sign.  So, there was a 9-day lag between the time we had
8  it, it's reviewed and processed and then he actually is
9  on campus, as we say, for him to actually officially
10  sign the bill.
11     Q.  You said that after it passed the House, you had
12  a conversation with Representative Harless where you
13  said, "Good job"?
14     A.  Right.
15     Q.  Is it a fair assumption that you -- the Governor,
16  prior to getting this bill -- prior to getting any
17  bill -- let's make it more general.
18     Prior to getting any bill, does the Governor
19  already know whether he's going to sign it or not or is
20  there some consideration period that takes place?  And
21  I'm talking generally, not just with relation to SB 14.
22     MR. BRISSENDEN:  To the extent that -- well,
23  first of all, objection.  Speculation.
24     To the extent that you can answer that
25  question as a general matter, I'll allow you to do so.

## 206

1     To the extent that requires you to rely upon
2  your experience based upon specific pieces of
3  legislation during your experience as Director of
4  Legislative Affairs, I'd instruct you not to answer.
5     A.  Okay.  Generally, you passed a water plan, he's
6  in favor of planning for water, but somewhere in the
7  process in its final -- before final passage, an
8  amendment goes on that he can't, then generally that
9  would offset but from general, he knows -- he won't sign
10  anything until after we've gone through our review of
11  bills that we've received.
12     Q.  (BY MR. FISHER)  And you mentioned earlier -- we
13  talked about in detail your job you're currently doing,
14  and you said one of those responsibilities is to monitor
15  legislation.  So, you would, as a general matter, keep
16  the Governor informed of changes that happen to bills,
17  amendments that happen on a real time basis as things
18  are going on, you wouldn't wait until the bill passed to
19  find out what's in it, for lack of a better term?
20     A.  Generally, real time, no.  Like the president,
21  they've got a lot of other duties.  He relies upon me
22  plus staff to get down into the weeds on all the bills
23  and see if there's anything.
24     And then we have a sit down with him and go over
25  the bills for him to sign.  And it's still his call at

## 207

1  the end of the day but he won't in and of himself want
2  to know or need to know until it's time for him to make
3  a decision.
4     Q.  And you said -- and we talked about the general
5  intent of SB 14 is enhancing the integrity of elections;
6  is that correct?
7     A.  That's correct.
8     Q.  And are you aware of any other purpose of SB 14,
9  general purpose of SB 14 besides that?
10     A.  I'm not aware.
11     Q.  And are you aware of you or your staff having
12  conversations with officials or Legislators from other
13  states regarding SB 14?
14     A.  I had no other conversations with people from
15  other states or organizations.
16     Q.  Are you aware of you or your staff in the
17  Governor's Office having communications about SB 14 with
18  interest groups?
19     A.  No.
20     Q.  And so, we talked about Mr. Schofield.  We talked
21  about, under a general protocol, a policy analysis would
22  have been performed on SB 14; is that correct?
23     A.  That's correct.
24     Q.  And are you aware of the underlying facts upon
25  which that analysis relied?

## 208

1     A.  No.
2     Q.  Are you aware of you or your staff in the
3  Governor's Office conducting any analysis as to how many
4  registered voters possess the required forms of ID
5  required by SB 14?
6     MR. BRISSENDEN:  I'm going to instruct you
7  at this time that that question invokes both the
8  legislative process privilege as well as the
9  deliberative process privilege, and I'll instruct you
10  not to answer.
11     A.  On the advice of my attorney, I will not answer
12  under privilege.
13     Q.  (BY MR. FISHER)  Prior to signing SB 14, did you
14  or anyone on your staff in the Governor's Office have
15  communications regarding -- and we talked about it
16  earlier -- the Voting Rights Act and SB 14?
17     MR. BRISSENDEN:  Same instruction.
18     A.  Okay.  On advice of attorney -- my attorney, I
19  will invoke the privilege.
20     Q.  (BY MR. FISHER)  Going back to the bill analysis
21  that's performed on a bill, is any of that bill
22  analysis -- and this is a general question -- does any
23  of that bill analysis take into consideration the impact
24  of the bill on citizens of Texas as a whole?
25     MR. BRISSENDEN:  And the same instruction.

## 209

1  THE WITNESS:  The privilege instruction?
2  MR. BRISSENDEN:  Yes, same instruction.
3  A.  Okay.  On advice of my attorney, I will not
4  answer that under privilege.
5  Q.  (BY MR. FISHER)  So, we talked about your role
6  earlier as Legislative Director with regard to bills
7  that are moving through the House and the Senate.  Did
8  you or your staff play any role in a strategy ensuring
9  that SB 14 move through the House or the Senate?
10  A.  I didn't.  I don't think either one of my staff
11  did.  I don't know if they did but they never reported
12  to me that they were actively involved at all.
13  Q.  We also talked about your role -- your being able
14  to go on the floor.  Were you on the floor during the
15  consideration of SB 14, on the Senate floor?
16  A.  No.
17  Q.  And did you read the floor debate transcript --
18  A.  No.
19  Q.  -- of SB 14?
20  A.  No.
21  Q.  Let me ask you a general question just based on
22  your experience as a Texas Legislator.  Are you aware of
23  the term -- someone using the term, "I am not advised,"
24  on the floor in response to questions?
25  A.  That's been used for years.

## 210

1  Q.  And what does that mean?
2  A.  "I don't know.  I'm not advised."
3  MR. FISHER:  Let's take a quick break here.
4  (Short recess.)
5  MR. FISHER:  We'll go back on the record.
6  Q.  (BY MR. FISHER)  Senator, after the passage of SB
7  14 and we did just see the article indicating that the
8  Governor signed the bill --
9  A.  Yes.
10  Q.  -- did you or your staff in the Governor's Office
11  have any role in seeking preclearance from the Justice
12  Department?
13  A.  No.  That would be our legal people or the
14  State's -- the Attorney General's Office, I guess.  We
15  don't handle that part of it.
16  Q.  So, that would be handled outside of the
17  Governor's Office; is that correct?
18  A.  Yes.
19  Q.  Okay.  Senator, is it your understanding that SB
20  14 was submitted by the Governor as an emergency matter
21  to be considered by the 82nd Legislature in 2011?
22  A.  I believe it was, yes.
23  Q.  And I have -- actually, I'm going to hand you two
24  exhibits, and they'll be marked as 197 and 198.
25  A.  Okay.

## 211

1  (Exhibits 197-198 marked.)
2  Q.  (BY MR. FISHER)  They are not bill drafts, so,
3  they are hopefully a little easier to look at and
4  process.
5  A.  Okay.
6  On 197, you'll see on the top it says State of
7  Texas, Office of the Governor.  To the Senate and House
8  of Representatives of the 82nd Texas Legislature,
9  Regular Session.
10  And then Exhibit 198 will be the Senate Journal,
11  82nd Legislature, Regular Session, and that's dated
12  January 24, 2011.
13  A.  Got it.
14  Q.  And so, what are we looking at?  I guess with the
15  first exhibit, are you familiar with this document at
16  all?  And that's Exhibit 197.
17  A.  Yes.
18  Q.  And what is that document?
19  A.  This is a document that the Governor signed that
20  designated the consideration of legislation that requires a
21  voter to present proof of identification when voting and
22  declaring that particular issue an emergency matter for
23  immediate consideration to the Senate and House.
24  Q.  And if we take a look at the second exhibit,
25  which was Exhibit 198 --

## 212

1  A.  Okay.
2  Q.  -- we see on the second page, which is actually
3  paginated as 54, a statement from the Office of the
4  Governor, and it uses the same language, "Legislation
5  that requires a voter to present proof of identification
6  when voting"?
7  A.  Yes.
8  Q.  And can you explain what this document is, based
9  upon your time in the Senate and your work for the
10  Office of Governor, what this proclamation constitutes
11  in this Senate bill?
12  A.  The Constitution of Texas is specific in not only
13  setting when a legislation will begin but it's also
14  specific when members of the Legislature, either House,
15  may actually take up legislation.
16  The Constitution also provides an exception to
17  that limitation.  The emergency order is the exception
18  or complies with the exception piece in the
19  constitution.  It's a methodology that is used many
20  times in our history to allow both Houses of Legislature
21  to begin work in earnest at a faster pace.
22  Q.  And in your experience as a Legislator and
23  working for the Governor's Office, just generally, who
24  would initiate a bill of this kind that circumvents -- I
25  guess what you said was the Texas Constitution?

### 213

1    A. Right.

2    Q. And we can refer to it as an emergency article?

3    A. Right.

4    Q. Who would initiate that process?

5    A. Generally, it's the members wanting to -- knowing

6  they only have 140 days -- if I had my way when I was in

7  the Senate, I would want everything I had declared an

8  emergency so I could get the ball rolling sooner.

9    It is a methodology that the Governor can use on

10  his own but as a general matter, we wait until we

11  receive a request from an author.

12    Q. And in your experience as a member of the

13  Legislature, is the designation of an emergency item a

14  common event?  Is it typical or is it something

15  atypical?

16    A. It's a common event.

17    Q. And by common event, do you mean something that

18  happens every session?

19    A. Every session for vast different topics.  With

20  181 of them up there, every one of them wanting to get

21  going, especially those with some tenure and experience,

22  they know that the crush of the -- toward the end of the

23  session, the likelihood of a piece of legislation that

24  they have may get caught up in just the bundle and it

25  never gets out.

### 214

1    Q. And you mentioned that each Legislator would like

2  to have all of their bills --

3    A. Right.

4    Q. -- designated as emergency legislation.  Does

5  that ever happen, that all of your bills are designated

6  as emergency legislation?

7    A. No.

8    Q. Would you say it happens to the majority of a

9  Legislator's bills, as a general matter?

10    A. As a general matter, no, not under Governor

11  Perry.

12    Q. And under Governor Perry, has he, as a general

13  matter, resisted adding things as emergency items in

14  legislative sessions?

15    A. I don't know if I would use the term "resist."

16  He hasn't honored the request on several different

17  things.

18    Q. So, he's been asked to do this with regard to

19  some legislation and has declined in certain instances

20  to do that?

21    A. Right.

22    Q. And after the emergency designation is given to a

23  piece of legislation, does it automatically get

24  considered within the first 60 days?

25    A. It depends on each House.  And as I laid out kind

### 215

1  of the protocols that occur, if the speaker or the

2  Lieutenant Governor -- then it falls to them to see how

3  far on the gas pedal that they push, and then it would

4  fall to a committee Chair to see how much further down

5  the gas pedal they want to push to determine the

6  rapidity by which a bill is taken up.

7    This is a just a protocol that sets in place the

8  car moving down the track faster than what the

9  Constitution says they can be on the track of moving.

10    Q. And we talked a little bit about how this is

11  done.  You mentioned it typically comes from members.

12    A. Right.

13    Q. Is there a formalized process or is this

14  something that -- for instance -- and we talked a long

15  time ago -- well, more than five hours ago -- about your

16  role as a gate opener.

17    A. Right.

18    Q. Would this be something where a member would seek

19  to talk to the Governor about an emergency bill issue?

20    A. It could be.  In times past, it has been.

21    Q. And based upon your experience in the

22  Legislature, can declaring a bill an emergency item be

23  viewed as a political decision?  I know it has a

24  procedural impact but can the designation itself be

25  considered a political move by the Governor or the

### 216

1  member who sought emergency designation?

2    MR. BRISSENDEN:  Objection.  Speculation and

3  vague.

4    To the extent you can answer, go ahead.

5    A. Well, that was going to be my answer, I could

6  only speculate what the Governor's perception is of a

7  request.  I don't know what -- in all candor, I don't

8  know what he considers.

9    I think he looks at the merits of the issue

10  rather than the politics of it, if it's something that,

11  one, he would want to support, two --

12    Q. (BY MR. FISHER)  When the Governor makes a

13  decision to designate something as an emergency piece of

14  legislation, have you, in your experience, seen that

15  taken by the public and in the public arena as a

16  political decision on a certain bill, meaning does that

17  indicate that there's politics at work beyond the

18  procedure?  And the procedure is the procedure but are

19  there politics involved beyond that?

20    MR. BRISSENDEN:  Objection.  Vague and

21  ambiguous.  Calls for speculation.

22    A. Not by the public.

23    Q. (BY MR. FISHER)  Do you see the designation of a

24  piece of legislation as an emergency bill as indicating

25  that the Governor supports that piece of legislation or

## 217

1   is it more broad than that?
2        A.  It's not any more broad.  The language in this
3   particular one --
4        Q.  And you're referring to Exhibit 197?
5        A.  197, legislation that requires a voter to present
6   proof of identification when voting, it doesn't say what
7   kind of proof or getting down into the details.
8   Obviously, that could be read that he's interested in
9   the integrity of the electoral process.
10       Q.  And so, I'm going to kind of ask a question out
11  of context here but are you aware of who Travis Richmond
12  is?
13       A.  Yes.
14       Q.  And what is his role in Governor Perry's office?
15       A.  Currently now he has been reassigned to my shop.
16  He was one of the gentlemen that I mentioned earlier
17  that's in there.  He's our research person within my
18  shop.
19       Q.  Okay.
20       A.  If an issue is there, I'm going to really get --
21  what good researchers do best, they get down as far as
22  they can go, Travis does that for me now.
23       Q.  And in his work doing research for you, does he
24  provide you with -- as a general matter, does he provide
25  you with memorandum or how does he convey the results of

## 218

1   his research to you?  I assume he doesn't hand you a
2   stack of documents?
3        A.  No.  It's verbal.
4        Q.  Okay.
5        A.  And he's only been in that role with me three
6   months maybe.
7        Q.  And what was his previous role prior to coming to
8   work for you?
9        A.  He was Special Assistant to Ray Sullivan, who is
10  the Chief of Staff.
11       Q.  Do you know if he's an attorney?
12       A.  No, he's not.  He used to be a newspaper
13  reporter, probably Fort Worth Star Telegram, I believe.
14       Q.  And are you aware of any communications with you
15  or your staff regarding designation of voter
16  identification as an emergency matter for the 82nd
17  Legislature?
18       A.  I know within our office -- by our office, I'm
19  talking the Governor's Office -- once this bill was
20  prefiled, there was a discussion.
21       Q.  And do you know who took part in that discussion?
22       A.  I was at the meeting, Sarah Floerke, David
23  Eichler both -- at the time, Sarah was the House
24  liaison, David was the Senate liaison, Ray Sullivan,
25  Kathy Walt, Ray was the Chief of Staff, Kathy was the

## 219

1   Deputy Chief of Staff, Brandy Marty, who was at that
2   time the Director of Budget Planning & Policy, and Jeff
3   Boyd, who at the time was our General counsel.
4        Q.  And, so you said after prefiling, do you have a
5   general idea of what month this conversation took place?
6        A.  That would have been in December or January.  He
7   didn't file it until -- I believe the history line said
8   12-15.
9        Q.  And what was the general nature of that
10  discussion?
11            MR. BRISSENDEN:  I'm going to instruct the
12  witness that the question invokes a matter that is
13  privileged and not to disclose the substance of the
14  communication.
15       A.  Okay.  On the advice of attorney, I'll invoke the
16  privilege.
17            (Short recess.)
18       Q.  (BY MR. FISHER)  Okay.  Senator, we'll go back on
19  the record.
20            So, in your role as the Legislative Director, you
21  monitor -- we talked about you monitoring bills.  If a
22  bill has been designated as an emergency item, as a
23  general matter, is that something that you would follow
24  the progress of?
25       A.  Not any more so than the myriad of other bills

## 220

1   going through.  I mean, it -- unless, of course, it was
2   one of our designated -- one of our priority bills.
3        Q.  And as a general matter, are you aware of the
4   criteria the Governor's Office uses to designate
5   bills as emergency matters?
6            MR. BRISSENDEN:  To the extent that that
7   question requires you to disclose information, thoughts,
8   opinions, analysis, deliberations, motivations
9   pertaining to emergency declaration that we've been
10  discussing and SB 14, legislation pertaining to voter
11  identification bills, I would instruct you not to
12  answer.
13            To the extent you can answer that question
14  on a general -- based upon general information,
15  information that's in the record and based upon your
16  experience outside of the Governor's Office, you may
17  answer.
18       A.  Okay.  As a general, we don't have a set
19  criteria.  Each instance is taken up on its own merits.
20       Q.  (BY MR. FISHER)  And were you or your staff in
21  the Governor's Office involved in any communications
22  regarding emergency items in the 2011 session?
23       A.  Say it again.
24       Q.  Were you or your staff involved in any
25  communications regarding the designation of emergency

### 221

1 items in the 2011 session?

2 　A.  I was not.

3 　Q.  Are you aware of your staff --

4 　A.  Other than just the discussion phase that I

5 talked about earlier with senior staff.

6 　Q.  And that was the meeting that we had discussed

7 previously, correct?

8 　A.  Yeah.

9 　Q.  So, I've got a list of other folks to ask you

10 about, and these names, I don't believe, have come up

11 previously.  So, we just talked about -- was it

12 Travis --

13 　A.  Richmond.

14 　Q.  Richmond.  Can you tell me who Jeff Boyd is?

15 　A.  Jeff Boyd, during the session, was our General

16 Counsel.  David Morales, who had to leave, is the

17 General Counsel now.  Jeff Boyd is now the Chief of

18 Staff.

19 　Q.  So, Jeff Boyd is now Chief of Staff for the

20 Governor?

21 　A.  Right.  Ray Sullivan left, and Jeff Boyd is now

22 Chief of Staff.

23 　Q.  About what time did Jeff Boyd take over that

24 position and did Mr. Morales take over the General

25 Counsel position?

### 222

1 　A.  Probably the closest I can get you is Ray

2 probably left September, October, and Jeff moved over to

3 take Chief of Staff two or three days later.

4 　Q.  And do you know a Jimmy Blacklock?

5 　A.  I know Jimmy.  He's with the Attorney General's

6 Office, works with Daniel Hodge.

7 　Q.  And David Schneck?

8 　A.  No, I don't know that name.

9 　Q.  Reed Clay, do you know a Reed Clay?

10 　A.  No, I don't know that name.

11 　Q.  And for the folks that you mentioned you knew,

12 and that was Jeff Boyd and Jimmy Blacklock, are you

13 aware of them being involved in the preclearance process

14 for SB 14?

15 　A.  No.

16 　Q.  Are you aware of any Legislators making public

17 statements about illegal aliens voting?

18 　A.  Like I say, I wasn't involved with the floor

19 debate in either House.  So, I haven't heard that

20 statement made.

21 　Q.  Do you believe that there's a connection between

22 voter photo identification bills and growth of the

23 noncitizen population in Texas?

24 　A.  I wouldn't have any --

25 　　MR. BRISSENDEN:  I'm going to instruct the

### 223

1 witness that to the extent that requires you to disclose

2 your thoughts, opinions, mental analysis and impressions

3 about legislation involving voter ID legislation, I

4 would instruct you not to answer.

5 　A.  On advice of attorney, I would invoke the

6 privilege.

7 　Q.  (BY MR. FISHER)  Have you heard publicly anyone

8 make an assertion about photo ID being necessary because

9 of a growth of noncitizen population in Texas?

10 　A.  No.

11 　Q.  Are you aware of any cases of voter fraud

12 occurring in Texas?

13 　　MR. BRISSENDEN:  To the extent that question

14 requires you to rely upon your analysis, opinions and

15 thoughts, mental impressions, information that you

16 learned about in your role as Governor in relation to SB

17 14 or other voter ID legislation or, actually, in your

18 role as Senator prior to serving in the Governor's

19 Office in connection with pieces of legislation, I would

20 instruct you not to answer.

21 　　To the extent that you have information

22 aside from your roles in the Legislature or in the

23 Governor's Office or to the extent there's information

24 that you're aware of in the public record, you may

25 answer the question.

### 224

1 　A.  Okay.  On the one part, I would follow the advice

2 of my attorney.

3 　　On the other, I have no personal knowledge of

4 that.

5 　Q.  (BY MR. FISHER)  Are you aware of the Governor's

6 Office receiving any complaints regarding voter fraud

7 from constituents?

8 　A.  That would be Greg Davidson.  They wouldn't come

9 to me.

10 　Q.  Is it fair to say that -- and you've mentioned

11 Greg Davidson a few times.

12 　A.  Right.

13 　Q.  Do the concerns -- and this is a general

14 question -- concerns of citizens and constituents play a

15 role in determinations about whether to support or

16 oppose bills or propose initiatives?

17 　A.  Sure.  Citizen input we value in our office.

18 Each week, Greg gives us an update on different issues,

19 whatever they may be.  We received 3,000 phone calls or

20 letters on the last shuttle flight to save Johnson Space

21 Center and that type of thing.

22 　Q.  So, in the questions that I've asked you today,

23 and we have referred to Mr. Davidson's name, is it fair

24 to say that on any -- let's just go with regard to the

25 last question I asked -- that issue of voter fraud did

Senator Kenneth  Lynn Armbrister                        June 8, 2012

## 225

1  not come up in any kind of context where you would be
2  made aware of constituent concerns through Mr. Davidson?
3     A. Absolutely.
4     Q. And are you aware of you or your staff receiving
5  any complaints about voter fraud from local election
6  officials?
7     A. I didn't receive any. I don't know about staff.
8     Q. And with regard to your knowledge -- public
9  knowledge, information that's in the public record, are
10  you aware of any incidents of mail-in ballot fraud
11  occurring in the State of Texas?
12    A. I have no knowledge of that.
13    Q. And we've got another name to ask you about. Do
14  you know an Eric Wilson?
15    A. Yes.
16    Q. And what is his role in the Governor's Office?
17    A. He's not in the Governor's Office. He's over at
18  the Secretary of State's office, if it's the same Eric
19  Wilson. His father used to be a House member years ago.
20    Q. And what does he do at the Secretary of State's
21  office?
22    A. I'm not real sure.
23        (Off the record.)
24        MR. FISHER: At this time, we'll go back on
25  the record.

## 226

1         And, Mr. Harris, if you'd like to go ahead
2  with your questioning for the Senator.
3         MR. HARRIS: Thank you.
4         EXAMINATION
5     Q. (BY MR. HARRIS) I'm Adam Harris with the law
6  firm of Fried, Frank, Harris, Shriver & Jacobson. We
7  are counsel to defendant-intervenors, Texas League of
8  Young Voters Education Fund.
9         I'll keep this brief because I know you've been
10  answering questions for a long time now.
11        My first question is are you familiar with the
12  group known as the King Street Patriots?
13    A. The what?
14    Q. The King Street Patriots.
15    A. No, I'm not familiar with that group.
16    Q. You're not? Okay. How has the Governor done --
17  Governor Perry done in his elections amongst Hispanic
18  voters?
19        MR. BRISSENDEN: Objection. Vague.
20    A. I don't have anything to do with elections. I
21  don't know.
22    Q. (BY MR. HARRIS) Do you generally follow the
23  Governor's election results?
24    A. Only if he won, or the presidential race if he
25  lost.

## 227

1     Q. You don't have any understanding as to how the
2  Governor has done amongst Hispanic voters?
3         MR. BRISSENDEN: Same objection.
4     Q. (BY MR. HARRIS) You can answer the question.
5     A. I have no idea.
6     Q. How about amongst African American voters, do you
7  have any understanding as to how the Governor has done
8  in his elections amongst African American voters in
9  Texas?
10        MR. BRISSENDEN: Objection. Vague and
11  ambiguous.
12    A. No, sir.
13    Q. (BY MR. HARRIS) I think you testified previously
14  that unlike some of the previous voter ID bills, SB 14
15  would not allow an individual to vote with a student ID.
16  Is that your understanding?
17    A. If you'll give me a moment to relook at -- is
18  that Exhibit 5?
19    Q. Certainly.
20    A. For the five criteria in Senate Bill 14, I don't
21  see that on there.
22    Q. Do you have any understanding as to why SB 14
23  does not allow an individual to vote with a student ID?
24        MR. BRISSENDEN: Objection. Privileged.
25  Instruct the witness not to answer.

## 228

1     Q. (BY MR. HARRIS) Senator, putting aside any
2  privileged communications, do you have any understanding
3  based on the public record as to why SB 14 does not
4  allow an individual to vote with a student ID?
5         MR. BRISSENDEN: Same objection. I instruct
6  the witness not to answer.
7         MR. HARRIS: Well, I believe the question
8  was putting aside any privileged communications, whether
9  the Senator has any knowledge based on the public
10  record. So, I would ask that you reconsider the
11  objection.
12        MR. BRISSENDEN: And to the extent the
13  question requires him to do an analysis of information
14  that is both within the public record and not within the
15  public record, that question would be privileged, and I
16  would instruct him not to answer.
17    A. On my advice of my attorney --
18    Q. (BY MR. HARRIS) We'll move on.
19        Senator, do you have any reason to think that a
20  student ID is not a good indicator that someone is who
21  they say they are?
22    A. Say it again.
23    Q. Do you have any reason to think that a student ID
24  would not be a good indicator that someone is who they
25  say they are?

## 229

1    MR. BRISSENDEN:  I'm going to instruct the
2  witness not to answer the question.  Again, it's
3  pertaining to particular provisions within SB 14.
4  Instruct the witness not to answer.
5    Q. (BY MR. HARRIS)  Beyond any particular provisions
6  of SB 14, in general, do you have any opinion as to
7  whether a student ID would or would not be a good
8  indicator if someone is who they say they are?
9    MR. BRISSENDEN:  Again, same instruction.
10   Q. (BY MR. HARRIS)  I believe you testified earlier
11 that Governor Perry designated voter ID as an emergency
12 item; is that correct?
13   A. That's correct, sir.
14   Q. In general, putting aside any particular piece of
15 legislation, how does the Governor or the Governor's
16 Office decide which legislation to designate as an
17 emergency item?
18   MR. BRISSENDEN:  Objection.  Asked and
19 answered.
20   Q. (BY MR. HARRIS)  You can answer the question.  I
21 apologize if my phone connection was not great during
22 this but you may answer the question.
23   MR. BRISSENDEN:  I caution you that to the
24 extent that that question requires you to divulge
25 information that you have, knowledge that you've learned

## 230

1  as a part of your role as Director of Legislative
2  Affairs in the Governor's Office, I would instruct you
3  not to answer the question.
4    To the extent that you can, I believe you've
5  already answered the question in general terms, you may
6  do so.
7    A. In general terms, Mr. Harris, we have no written
8  criteria that is used.  It's strictly up to him.  I've
9  carried things to him before and he gave me a flat,
10 "No," and I've carried other things and he said, "Let's
11 do it."  It's strictly up to him.
12   Q. (BY MR. HARRIS)  You testified earlier that the
13 general purpose of SB 14 was to, quote, enhance the
14 integrity of elections.  Do you recall that testimony?
15   A. Yes.
16   Q. Do you assert that the current election system in
17 Texas lacks integrity?
18   MR. BRISSENDEN:  To the extent that that
19 question requires you to divulge your opinions, your
20 analysis, thought processes in regards to voter ID
21 legislation, including SB 14, I would instruct you not
22 to answer the question.
23   A. On advice of my attorney, I won't answer.
24   Q. (BY MR. HARRIS)  Senator, are you able to answer
25 the question?

## 231

1    A. On the advice of my attorney, I'm not able to
2  answer the question.
3    Q. Have you ever heard any Texas voter or any of the
4  constituents in Texas express the view that the current
5  system of elections in Texas lacks integrity?
6    A. I have not -- I have no knowledge of that.
7    Q. Now, have you ever heard any Texas voter or
8  constituent in Texas express the view that he or she
9  lacks confidence in the current system of elections in
10 Texas?
11   A. They have not expressed that to me.
12   MR. HARRIS:  At this time, I have no further
13 questions.
14   THE WITNESS:  Thank you, Mr. Harris.
15   FURTHER EXAMINATION
16   Q. (BY MR. FISHER)  Okay.  Senator, we talked
17 about -- today we've talked about HB 1706, HB 218, SB
18 362 and SB 14, and we've kind of did a bill comparison.
19 We looked at the individual provisions of those bills
20 today.  Are you aware of the circumstances changing in
21 Texas with regard to the electoral process during the
22 consideration of those bills?  And that would be from
23 2005 to 2011.
24   MR. BRISSENDEN:  To the extent that that
25 question requires you to divulge information that you

## 232

1  analyzed or considered or did not consider as a part of
2  your analysis, consideration, deliberations in
3  connection with voter ID legislation and including SB
4  14, I would instruct you not to answer.
5    A. On advice of my attorney, I cannot answer.
6    Q. (BY MR. FISHER)  And do you believe SB 14 will
7  have an effect on voting in Texas?
8    MR. BRISSENDEN:  Same objection.  Same
9  instruction.
10   A. Same answer, on advice of my attorney.
11   Q. (BY MR. FISHER)  As a general matter, does SB 14
12 require a voter to do something that they are not
13 required to do now under current law as it stands?
14   A. Yes.
15   Q. At any time since the passage of SB 14, have you
16 come to believe it was passed with a discriminatory
17 purpose?
18   MR. BRISSENDEN:  To the extent that that
19 question requires you to divulge your opinions, your
20 analysis, your views of SB 14 as part of your role in
21 the Governor's Office in connection with that work, I
22 instruct you not to answer.
23   A. On the advice of the attorney -- my attorney, I
24 will invoke not to answer.
25   Q. (BY MR. FISHER)  And you said that SB 14 will

## 233

1  require some action beyond what is currently required
2  under Texas law in order for a person to vote, correct?
3      A. Yes.
4      Q. Do you believe that that requirement will have
5  any effect on minority voters?
6          MR. BRISSENDEN: And I would instruct you
7  under the privilege not to answer the question.
8      A. On the advice of my attorney, I invoke the
9  privilege.
10     Q. (BY MR. FISHER) Have you heard any Texas
11  Legislator express to you or to your staff the view that
12  SB 14 could prevent a legitimately registered voter from
13  voting in Texas?
14         MR. BRISSENDEN: And I would instruct the
15  witness not to disclose communications that you've had
16  with either your staff, with other Legislators and their
17  staff and not to disclose those communications in
18  answering the question. Instruct you not to answer.
19     A. On the advice of my attorney, I will honor my
20  attorney's request, however you want to say it.
21     Q. (BY MR. FISHER) Senator, I only have about ten
22  more bills for us to go through and then we're --
23     A. Okay. I like this.
24     Q. The old Legislator is coming out in you.
25         Would you like to change any of the answers

## 234

1  you've provided today, Senator, now that you've had a
2  chance to reflect on answers you've given? And you did
3  change one earlier. Is there anything else you'd like
4  to change as we sit here?
5      A. Just looking at this --
6      Q. And by "this," you're referring to?
7      A. To Exhibit 5.
8      Q. Okay.
9      A. On the question relating to forms of
10  identification that do not have a photo associated --
11  and I want to -- they can under -- on Page 1, under
12  written documentation -- well, it's -- there starting on
13  line 5 and then going down to line 19, number 2 there on
14  line 17, a statement in a form prescribed by the
15  Secretary of State that the applicant does not have a
16  form of identification acceptable under 63.0101, I don't
17  know what preceded -- the preceding number 1 A and B
18  have to do with a disability or whatever. I don't know
19  if 2 provides if you don't have one of these other ones
20  that this one then comes into play and you do that just
21  by filling out a form with the Secretary of State. I
22  don't know what that is.
23     Q. Well, Senator, if you look at little i, which is
24  on Section 7, I think you'll see that it's referring to
25  the basis of disability.

## 235

1      A. Okay. So, I don't want to change my answer then.
2  I just saw that and I said, "Well, wait a minute, I
3  answered you one way a while ago."
4      Q. The question we asked on SB 14 was whether it
5  provided -- and we saw in the other bills --
6      A. Okay.
7      Q. -- there was kind of a spelling out and we talked
8  about the issues of nonphoto ID --
9      A. Right.
10     Q. -- and if there was something similar that you
11  saw in SB 14.
12     A. Okay.
13     Q. Do you see anything similar with regard to
14  nonphoto ID in SB 14 that we saw in HB 218, SB 362 or HB
15  1706?
16     A. Did I see anything different?
17     Q. Do you see anything similar, meaning we looked at
18  those bills and we saw Section B --
19     A. There's some similarities but the vast majority
20  are different.
21     Q. So, the vast majority are different in SB 14 than
22  in the previous bills; is that correct?
23     A. Right, as far as inclusive of these other things.
24     Q. Okay. Is there any information that you recall
25  now? So, any questions I asked you where you said you

## 236

1  didn't remember that you later remembered?
2      A. No.
3      Q. Anything additional that you want to share at
4  this time?
5      A. No.
6          MR. FISHER: So, I have no additional
7  questions. Thank you, Senator.
8          I think we'll, as the practice has been,
9  keep it open.
10         THE WITNESS: Okay.
11         MR. FISHER: And with that, we'll conclude.
12         (Whereupon at 4:59 p.m. the
13         deposition was adjourned.)
14
15
16
17
18
19
20
21
22
23
24
25

## 237

```
1          E R R A T A   S H E E T

2

3     Correction            Page    Line

4

5     _____

6

7     _____

8

9     _____

10

11    _____

12

13    _____

14

15    _____

16

17    _____

18

19    _____

20

21    _____

22

23    _____

24

25
```

## 238

```
1          I, SENATOR KENNETH LYNN ARMBRISTER, have read the
      foregoing deposition and hereby affix my signature that
2     same is true and correct, except as noted above.

3          _____
           SENATOR KENNETH LYNN ARMBRISTER
4
      THE STATE OF _____
5     COUNTY OF _____
6     Before me, _____, on this day personally
      appeared SENATOR KENNETH LYNN ARMBRISTER, known to me
7     (or proved to me under oath or through _____)
      (description of identity card or other document) to be
8     the person whose name is subscribed to the foregoing
      instrument and acknowledged to me that they executed the
9     same for the purposes and consideration therein
      expressed.
10
      Given under my hand and seal of office this _____ day
11    of _____, _____.
12    _____
      NOTARY PUBLIC IN AND FOR
13    THE STATE OF _____
14
15
16
17
18
19
20
21
22
23
24
25
```

## 239

```
1     STATE OF TEXAS      *
      COUNTY OF HARRIS    *
2
3          I, the undersigned certified shorthand reporter
      and notary public in and for the State of Texas, certify
      that the facts stated in the foregoing pages are true
4     and correct.
5          I further certify that I am neither attorney or
      counsel for, nor related to or employed by, any of the
6     parties to the action in which this deposition is taken
      and, further, that I am not a relative or employee of
7     any counsel employed by the parties hereto, or
      financially interested in the action.
8
9          SUBSCRIBED AND SWORN TO under my hand and seal of
      office on this the 11th day of June, 2012.
10
11
           EDITH A. BOGGS, CSR
12         Certified Shorthand Reporter and
           Notary Public in and for
13         the State of Texas
14    Notary Expires:  5-10-2016
      Certificate No. 3022
15    Expiration date:  12-31-2013
      Esquire Deposition Solutions, LLC
16    Registration No. 3
17
18
19
20
21
22
23
24
25
```