**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
    Plaintiff,                     )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR., IN            )
HIS OFFICIAL CAPACITY AS           )
ATTORNEY GENERAL OF THE            )
UNITED STATES,                     )
                                   )
    Defendant,                     )
                                   )
ERIC KENNIE, ET AL.,               )
                                   )
    Defendant-Intervenors,         )
                                   )
THE TEXAS SATE CONFERENCE          )
OF NAACP BRANCHES, ET              )  CASE NO. 1:12-CV-00128
AL.,                               )  (RMC-DST-RLW)
                                   )  Three-Judge Court
    Defendant-Intervenors,         )
                                   )
TEXAS LEAGUE OF YOUNG              )
VOTERS EDUCATION FUND, ET          )
AL.,                               )
                                   )
    Defendant-Intervenors,         )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, ET AL.,                    )
                                   )
    Defendant-Intervenors,         )
                                   )
VICTORIA RODRIGUEZ, ET             )
AL.,                               )
                                   )
    Defendant-Intervenors.         )

**2**

1   ********************************************************
2           ORAL DEPOSITION OF
3              GLENN BAYRON
4              JUNE 12, 2012
5   ********************************************************
6       ORAL DEPOSITION OF GLENN BAYRON, produced as a
7   witness at the instance of the Defendants Eric H. Holder,
8   et al., and duly sworn, was taken in the above-styled and
9   numbered cause on Wednesday, June 12, 2012, from
10  12:28 p.m. to 2:23 p.m., before Tamara K. Chapman, CSR in
11  and for the State of Texas, reported by machine shorthand,
12  at the Omni, 9821 Colonnade Boulevard, San Antonio, Texas,
13  pursuant to the Federal Rules of Civil Procedure and the
14  provisions stated on the record or attached hereto.

**3**

1
2
3   FOR THE PLAINTIFF STATE OF TEXAS:
        Mr. Adam Aston
4       ATTORNEY GENERAL OF TEXAS
        Civil Medicaid Fraud Division
5       209 W. 15th Street
        Austin, Texas 78701
6       adam.aston@oag.state.tx.us
7
8   FOR THE DEFENDANTS ERIC H. HOLDER, ET AL.:
        Ms. Michelle McLeod
9       U.S. DEPARTMENT OF JUSTICE
        1800 G Street, 7254
10      NWB - Room 7202
        Washington, DC 20006
11      michelle.mcleod@usdoj.gov
12
13  RODRIGUEZ DEFENDANT-INTERVENORS:
        Ms. Nina Perales
14      110 Broadway, Suite 300
        San Antonio, Texas 78205
15      nperales@maldef.org
16
17  ALSO PRESENT:
        MR. Luis Figueroa - Legislative Staff Attorney
18      MALDEF
        110 Broadway, Suite 300
19      San Antonio, Texas 78205
        lfigueroa@maldef.org
20
21
22
23
24
25

**4**

1                I N D E X
2                                PAGE
3
    APPEARANCES................................  2
4
    GLENN BAYRON
5
    EXAMINATION
6       Examination By Mr. Aston ..............  5
    CHANGES AND SIGNATURE.....................  58
8
    SIGNATURE PAGE............................  59
10
11  REPORTER'S CERTIFICATION..................  61
12
13              E X H I B I T S
14  NO.  DESCRIPTION                    PAGE
15   1   Notice
         (No Bates - 7 pages)
                                          8
16   2   SB 14
         (no Bates - 17 pages)
17                                        16
18   3   Defendant-Intervenor Southwest Voter
         Registration Eduction Project's
         Response to Plaintiff's First
19       Request for Production
         (no Bates - 7 pages)
20                                        54



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 5

1          GLENN BAYRON,
2   having been first duly sworn, testified as follows:
3          EXAMINATION
4   BY MR. ASTON:
5      Q. Good afternoon.
6      A. Hello.
7      Q. Once again, my name is Adam Aston.  I represent
8   the State of Texas.  Would you please state and then spell
9   your name for the record.
10     A. Glenn Bayron, G-L-E-N-N B-A-Y-R-O-N.
11     Q. Have you ever been deposed?
12     A. No.
13     Q. Have you ever seen a deposition?
14     A. Just the one I saw just prior to this.
15     Q. Are you suffering from any illness or taking any
16  medication that will affect your ability to provide
17  accurate answers to my questions?
18     A. No.
19     Q. You aware of anything else that might prevent you
20  from accurately answering my questions?
21     A. Okay.
22     Q. Go over a few things like we did for the
23  deposition this morning.  Please answer audibly so the
24  reporter can take down your answers.  A nod or a head
25  shake cannot be reported.  Do you understand?

## 6

1      A. Yes.
2      Q. If you don't understand my question or if you'd
3   like for me to speak slower at any time, please let me
4   know and I will do so.
5      A. Okay.
6      Q. Please wait until I finish my question to answer,
7   and I will try and wait until you finish your answers to
8   ask the next question.  Okay?
9      A. Okay.
10     Q. Your lawyer may object to a question.  Even if
11  she objects, unless she instructs you not to answer,
12  please do so.
13     A. Okay.
14     Q. Are you represented by counsel today?
15     A. Yes.
16     Q. And who is your counsel?
17     A. Nina Perales.
18     Q. Anyone else?
19     A. Luis Figueroa.
20     Q. And when did that representation begin?
21     A. I guess whenever Mi Familia Vota came on board
22  with the suit.  I don't have an exact date.
23     Q. Do you understand that you have been designated
24  to provide testimony on behalf of the Mi Familia Vota
25  Education Fund today?

## 7

1      A. Yes.
2      Q. And unless I indicate otherwise, when I use the
3   term "you" or "Mi Familia or "your organization" during
4   the questions in this deposition, that term includes the
5   Mi Familia Vota Education Fund and anyone acting on its
6   behalf.  Do you understand?
7      A. Yes.
8      Q. Did you do any preparation for your deposition
9   today?
10     A. Yes.
11     Q. What did you do?
12     A. I met with the attorneys yesterday upon my
13  arrival in San Antonio and prior to that, reviewed some of
14  the materials related to the case that were made available
15  to me.
16     Q. When you say "materials," do you mean the
17  pleadings in this case?
18     A. I'm not exactly sure what the term of the
19  document is.  I believe that looks a lot like the
20  document, the one that's next to you there.  I believe
21  it's a notice.
22     Q. You said "the document."  Did you only review one
23  document?
24     A. No.  No, there was an additional document that I
25  believe was a summary of specific answers to questions

## 8

1   that was submitted to Mi Familia Vota to my boss, Carlos
2   Duarte.
3      Q. Can you spell that name, please?
4      A. C A-R-L-O-S D-U-A-R-T-E.
5      Q. Did you meet with anyone else at Mi Familia in
6   order to prepare for this deposition?
7      A. No.
8      Q. Did you have any e-mail discussions or phone
9   conversations?
10     A. No.
11         (Exhibit 1 was marked.)
12     Q. (BY MR. ASTON) You've been handed what has been
13  marked Exhibit 1.  Would you please review it and then
14  we'll discuss it briefly.
15         (Witness reviews document.)
16     Q. (BY MR. ASTON) Are you familiar with this
17  document?
18     A. Yes.
19     Q. And this is the one marked "Notice" --
20     A. Correct.
21     Q. -- "of Intention to Take Deposition"?
22     A. (Witness nods.)
23     Q. You've been asked -- or I guess Mi Familia has
24  been asked to designate someone to testify as to 11
25  topics.  Are you familiar with all 11 topics here?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 9

1  A.  Yes.

2  Q.  And you've been designated to testify as to all

3  of the topics?

4  A.  That is correct.

5  Q.  And you're prepared to testify --

6  A.  Yes.

7  Q.  -- as to all...

8       Your preparations to testify as to these topics,

9  anything in addition to what we've already discussed?

10  A.  No.

11  Q.  Look at Topic 6, please, on Page 2.  Topic 6:

12  Any policy making or advocacy-related work performed by or

13  on behalf of Mi Familia Vota Education Fund regarding

14  voter identification.

15  A.  To my knowledge, Mi Familia Vota Education Fund

16  has not engaged in any specific advocacy-related work

17  pursuant to this work.

18  Q.  Not just as to Senate Bill 14 or this current,

19  but previously before?

20  A.  Correct.  To my knowledge.

21  Q.  Does Mi Familia generally engage in

22  policy-related activities such as these as to other topics

23  perhaps?

24  A.  The Educational [sic] Fund, because if it's

25  501(c)(3) status, is limited in its ability to engage in

## 10

1  public policy advocacy.  Our mission primarily is related

2  to promoting civic -- specific engagement in the Latino

3  community through voter registration and information on

4  citizenship classes as well as promoting voter

5  mobilization.

6  Q.  Topic 8 on your list:  Mi Familia Vota Education

7  Fund's election-related activities, including but not

8  limited to, driving voters to the polls, assistance with

9  mail-in ballots and poll watching.

10       Are those the sorts of activities that you're

11  referring to?

12  A.  Among others, yes.

13  Q.  And the others would be like registration and

14  voter education?

15  A.  Exactly.

16  Q.  And that would be Topic 7?

17  A.  Yes.

18  Q.  A few background questions on the organization

19  itself.  When was the organization founded?

20  A.  To be honest with you, I don't know.  I believe

21  it was in the early 2000s.  I've only been with the

22  organization since late 2011.

23  Q.  And the corporate structure of the organization,

24  as you mentioned a moment ago, 501(c)(3); is that correct?

25  A.  That is correct.  That is one aspect.  There is a

## 11

1  501(c)(4) element -- branch to the organization as well.

2  Q.  And what does that branch do?

3  A.  Currently that -- well, within Texas?  Is that

4  what you're referring to?

5  Q.  Yes.

6  A.  Okay.  That branch is currently involved in

7  organizing community groups along issues that are of

8  importance to those groups and facilitating their

9  involvement in the civic engagement process.

10  Q.  Now, might that include things other than

11  election and voting-related --

12  A.  Yes.

13  Q.  -- activities.

14       Do you know how many employees Mi Familia has?

15  A.  I believe at this point currently -- again,

16  talking about the Texas operation total -- in total, about

17  16 employees.

18  Q.  In Texas?

19  A.  Uh-huh.

20  Q.  And what is your role?

21  A.  I am the state coordinator.

22  Q.  And what do you do as the state coordinator?

23  A.  I work directly under the state director in

24  managing and overseeing both the (c)(3) and the (c)(4)

25  aspects of the organization.  And I should probably

## 12

1  clarify that when I say the (c)(4), that I am, by

2  definition, not talking about Mi Familia Vota Educational

3  Fund.

4       I supervise a voter registration coordinator and

5  his team of canvass leads and canvassers.

6  Q.  Now, you mentioned a minute ago the (c)(4)

7  portion has a different name.  What is that name?

8  A.  Mi Familia Vota Texas.

9  Q.  Does the organization rely on volunteers?

10  A.  Yes.

11  Q.  Do you know about how many volunteers the

12  organization would have in a given year?

13  A.  Since I've only been with the organization for

14  about eight or nine months, I couldn't say in total.  I

15  know that depending on the activity.  Currently, for

16  example, we probably work with about 15 or 20 volunteers

17  at any given time.

18  Q.  And what is the organization -- I think at this

19  point we're going back to the Education Fund portion --

20  A.  Right.

21  Q.  -- their primary activities?

22  A.  Voter registration, voter education.  And we will

23  eventually be engaging in a get-out-the-vote.  I guess

24  "voter mobilization" is the term.

25  Q.  And where is -- where are they headquartered, the



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Glenn Bayron                                                    June 12, 2012

## 13

1  office?

2      A.  In Houston.

3      Q.  Is that the only Texas office?

4      A.  Yes.

5      Q.  And do they have offices in other states?

6      A.  Mi Familia Vota has offices in other states.

7      Q.  Do you know how many states?

8      A.  Yes.

9      Q.  How many?

10     A.  California, Colorado, Nevada, Arizona and

11  Florida.

12     Q.  And does the Texas portion interact significantly

13  with the others or are they generally independent?

14     A.  What do you mean by "significantly"?

15     Q.  That's a good question.

16         Is it fair to say that each state sort of

17  operates independently of the others with some supervision

18  from maybe a national group?

19     A.  I believe perhaps "autonomously" is a better word

20  than "independently."  My boss interacts more with his

21  peers among state directors, for example, on a regular

22  basis than I would with the -- my peers who were

23  coordinators.  But I would say there is a regular amount

24  of interaction among the state staffs.

25     Q.  And would you have an idea of how many employees

## 14

1  the entire organization would have?

2      A.  I could not guess.  I do not know.

3      Q.  Would you consider Texas to be one of the larger

4  staffs?

5      A.  I don't know.

6      Q.  Is Mi Familia a membership organization?

7      A.  No.

8      Q.  So they do not have individual members?

9      A.  Correct.

10     Q.  What is the annual budget for Mi Familia Vota

11  here in Texas?

12     A.  I can only speak to the annual budget of

13  Educational Fund.  To my knowledge, I believe it is

14  approximately $700,000.

15     Q.  And that would be the Texas portion --

16     A.  Correct.

17     Q.  -- of the Education Fund?

18     A.  Yes.  That would be the Mi Familia Vota

19  Educational Fund budget.

20     Q.  How does the organization raise money?

21     A.  Through foundation grants and -- well, actually

22  foundation grants are the only ones I am specifically

23  aware of.  I believe we may receive funding from SEIU, but

24  I'm not sure.  We do not have individual donor bases, to

25  my knowledge.

## 15

1      Q.  And what about grants from governmental agencies?

2      A.  I do not believe we receive grants from

3  government entities.

4      Q.  Do you know how much money has been received from

5  these private grants --

6      A.  No.

7      Q.  -- in the last year?

8      A.  No, I do not.

9      Q.  Has the organization made plans to assist voters

10  with compliance with Senate Bill 14?

11     A.  We have -- I have not engaged in any specific

12  conversations thus far related to any sort of, quote,

13  what-if type scenarios if the passage of the law were to

14  be permanent.

15     Q.  Are you aware of anyone else at Mi Familia making

16  those plans?

17     A.  No.

18     Q.  So then is it fair to also say that no plans have

19  been implemented, to your knowledge?

20     A.  To my knowledge, no plans have been implemented.

21     Q.  If it is implemented, will the organization

22  educate voters about the requirements of Senate Bill 14?

23     A.  With serious reservations.

24     Q.  Why the reservations?

25     A.  Because the organization holds that the intent

## 16

1  and impact of this bill are both detrimental and

2  counterproductive to Latino citizen slash civic

3  participation.

4      Q.  What will the organization do, how will they

5  conduct that education?

6      A.  We will continue our efforts to inform eligible

7  voters within the Latino community as to where they can

8  vote; if necessary, how the process works in terms of

9  registering to vote; and provide information on polling

10  locations and rules and regulations.

11     Q.  Will the organization help voters obtain either

12  the identification required or the underlying documents

13  necessary to obtain the identification required by Senate

14  Bill 14?

15     A.  We have not -- or I have not been involved in any

16  conversations thus far that have talked about specific

17  steps in helping people obtain identification documents.

18         (Exhibit 2 was marked.)

19     Q.  (BY MR. ASTON)  You have been given what has been

20  marked as Exhibit No. 2.  Would you please review it and

21  we'll discuss it briefly.

22         (Witness reviews document.)

23     Q.  (BY MR. ASTON)  Are you familiar with this

24  document?

25     A.  Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 17

1    Q.  And you're familiar with Senate Bill 14?
2    A.  Correct.
3    Q.  Have you read the bill?
4    A.  Not every word.  I have glanced over it.
5    Q.  Have you read parts of it?
6    A.  I've read section headings, and I believe I
7    understand the main points.
8    Q.  When did you first hear about the bill?
9    A.  In the fall, I believe.
10   Q.  Have you discussed the bill with anyone at
11   Mi Familia?
12   A.  Yes.
13   Q.  With whom did you speak?
14   A.  My boss and one or two other employees, perhaps.
15   Casual conversations with the other employees.
16   Q.  Would all these conversations have been with the
17   16 employees here in Texas that you referred to earlier?
18   A.  Correct.
19   Q.  What did you talk about during those
20   conversations?
21   A.  The nature of the bill, what we perceive to be
22   its intent and its impact, both on, again, Latino voter
23   participation and access as well as implications for our
24   efforts to promote civic engagement among Latino voters in
25   Texas.

## 18

1    Q.  I'll talk to you a minute about a few of the
2    provisions of the bill.  Would you turn to Page 3, please.
3    Section 5:  Voter Identification Education.
4    Have you read or reviewed this provision of the
5    bill?
6    MS. PERALES:  Sorry, there were two
7    paragraphs numbered 5, so he's just finding his way.
8    MR. ASTON:  That's quite all right.
9    A.  Yes, I'm sorry, your question was?
10   Q.  (BY MR. ASTON)  If you're familiar with this
11   provision of the bill, either because you've read it or
12   you've discussed it with others?
13   A.  I'm just taking a minute to glance at the
14   introductory paragraph to refresh my memory.
15   Q.  Sure.
16   (Witness reviews document.)
17   A.  Okay.
18   Q.  (BY MR. ASTON)  Had you read that provision
19   before?
20   A.  I don't recall specifically reading this
21   provision before.
22   Q.  Had you discussed it before, that you know of?
23   A.  Only perhaps in the context of the larger scope
24   of the bill's impact.
25   Q.  Would you agree that this provision requires the

## 19

1    Secretary of State as well as voter registrars to
2    undertake some efforts to educate the community in the
3    event that Senate Bill 14 goes into law as to the new
4    requirements?
5    A.  Insofar as that those efforts are not
6    specifically described in the bill, at least at my current
7    glancing of it, yes.
8    Q.  Page 9 starting on Line 13, please review
9    Section 14 of the bill.
10   (Witness reviews document.)
11   A.  Okay.
12   Q.  (BY MR. ASTON)  Have you read this provision
13   before?
14   A.  Yes.
15   Q.  So you're familiar with the list of acceptable
16   photo identification documents?
17   A.  Correct.
18   Q.  Do you know what an election identification
19   certificate is?
20   A.  Yes.
21   Q.  On Line 18.
22   Describe, please, your understanding of what an
23   election identification certificate --
24   A.  Line 18 is actually scratched out here.  I'm
25   sorry.  Are we talking about page --

## 20

1    Q.  I'm on Page 9.
2    Q.  I'm on Page 10.
3    Q.  I'm sorry.
4    A.  It is my understanding that this is a document
5    that would be made available to eligible voters upon
6    request at various state agencies, including Department of
7    Public Safety offices and that this document currently
8    does not exist.
9    Q.  If you will hold your place there on Page 9 but
10   also turn to Page 13.  Line 17 begins, Section 20:
11   Election identification certificate.
12   If you'd take a minute to familiarize yourself.
13   (Witness reviews document.)
14   A.  Okay.
15   Q.  (BY MR. ASTON)  Had you read that provision
16   before?
17   A.  Not specifically.  Word for word, no.
18   Q.  But had you discussed the election identification
19   certificate provision?
20   A.  Yes.
21   Q.  Or the -- if not the provision itself but --
22   A.  I was aware that this proposed form of
23   identification was part of this proposed legislation.
24   Q.  Turning back to Page 9.  United States military
25   identification cards.  On Page 10, United States



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Glenn Bayron                                                June 12, 2012

## 21

1   citizenship certificate and a U.S. passport.  You agree
2   that those forms of identification are acceptable forms
3   under Senate Bill 14, correct?
4        A.  I have never seen in my personal experience a
5   U.S. military identification card.  The only type of
6   citizenship certificate that I'm familiar with are those
7   that are provided in the context of naturalization
8   ceremonies, and I'm a holder of a U.S. passport.  Without
9   actually having seen the first two, going on the
10  assumption that they are legitimate documents, my answer
11  would be yes.
12       Q.  You mentioned earlier that Mi Familia does not
13  have members but has employees and staff.  Are you aware
14  of any of the employees or staff at your organization that
15  lack a photo ID required by Senate Bill 14 to vote?
16       A.  Mi Familia Vota employees are not only U.S.
17  citizens but legal residents of the United States.
18       Q.  In those 16?
19       A.  Correct.
20       Q.  Okay.  Of those who are citizens and registered
21  to vote, are you aware of any of the staff or employees
22  that are registered but who do not have one of the photo
23  ID documents on that list?
24            MS. PERALES:  You can answer if you know.
25       A.  I do not know of any that do not, but -- that, to

## 22

1   me, is, you know, I -- I don't -- I haven't seen all of
2   their IDs.
3        Q.  (BY MR. ASTON)  Fair enough.
4        Does Mi Familia represent anyone else besides
5   the organization in this litigation?
6        A.  Can you repeat -- can you expand on that?  I'm
7   not exactly sure what I you mean by "represent."
8        Q.  Mi Familia, as an organization, has entered this
9   lawsuit and -- on behalf of itself.
10       A.  Uh-huh.
11       Q.  Does it purport to be entering this lawsuit on
12  behalf of anyone else?
13       A.  To my knowledge, no.
14       Q.  Let's talk about Senate Bill 14.  And if the
15  Court preclears that law, how does Mi Familia believe the
16  implementation of Senate Bill 14 will harm Mi Familia?
17       A.  First and foremost, we are of the position that
18  our constituents, as eligible voters within the Latino
19  community, would be harmed; that the process and ability
20  for them to exercise their legal right to vote would be
21  hindered and obstructed and, therefore, by definition, our
22  work, which is designed to facilitate and help enable them
23  to exercise their voting rights more easily, would be
24  burdened and obstructed.
25       Q.  Anything else?

## 23

1        A.  No.
2        Q.  You mentioned constituents.  I guess that would
3   be distinct from members.  But who does Mi Familia believe
4   to be its constituents?
5        A.  The Latino community.  We are -- our mission is
6   to promote civic engagement within the Latino community.
7        Q.  Throughout --
8        A.  In --
9        Q.  -- the state in its entirety?
10       A.  In -- well, currently we're operating only within
11  the confines of Harris County.
12       Q.  But do you consider that your constituents are
13  the Latino and Hispanic community in Harris County or in
14  the state of Texas or something different?
15       A.  Specifically Harris County.  But conceptually,
16  throughout the state of Texas.
17       Q.  Does Mi Familia register voters?
18       A.  Yes.
19       Q.  What percentage of the budget -- the annual
20  budget is dedicated to voter registration?
21       A.  The (c)(3) budget as it stands now is dedicated
22  exclusively to our voter registration efforts at this
23  time.
24       Q.  Does Mi Familia conduct voter education
25  activities?

## 24

1        A.  Yes.  And I should clarify that when I speak of
2   voter registration activities, I am including within that,
3   from a programmatic perspective, that voter education is
4   part of voter registration.
5        Q.  So is it fair to say your organization does not
6   break down between registration and education activities?
7        A.  We view voter education as part of the
8   registration process, as well as part of voter
9   mobilization process.
10       Q.  That would include getting people to vote and
11  taking them to the polls?
12       A.  If requested to do so.
13       Q.  And so you would say all of those things you
14  would consider to be one -- they're not distinct functions
15  in your organization's view?
16       A.  I would characterize them as complementary
17  functions.
18       Q.  And other than -- well, would you say that for
19  those three basic functions, the registration, education,
20  and mobilization, that constitutes, combined, what
21  percentage of the budget?
22       A.  Well, factoring in my staff time and that of the
23  state directors, that is pretty much 100 percent of what
24  we are doing in (c)(3) -- in the educational fund side.
25  That is what we do.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 25

1     Q. Has Mi Familia hosted any speakers about voter ID
2  legislation, either SB 14 or previous legislation?
3     A. No, not to my knowledge.
4     Q. Has your organization produced any reports on
5  voter ID legislation?
6     A. No.
7     Q. Has it conducted any surveys?
8     A. No.
9     Q. Conducted any studies?
10    A. No.
11    Q. And again, just to be clear, that's not just for
12  Senate Bill 14, but that's previous voter ID legislation.
13    A. No.  To my knowledge, no.
14    Q. Did your organization provide its staff with any
15  materials on voter ID during the 2011 legislative session?
16    A. Can you repeat that question again?  I'm sorry.
17    Q. Sure.  Did your organization provide its staff
18  with any materials, written documents, regarding voter ID
19  during the 2011 legislative session?
20    A. I came on board to Mi Familia Vota in my current
21  capacity in February of 2012.  Any communications prior to
22  that related to this or any other issue before the Texas
23  legislature, I am unaware of.
24    Q. Did Mi Familia meet with any interest groups
25  during the legislative session or before regarding Senate

## 26

1  Bill 14?
2     A. Can you clarify the parameters of what you are
3  calling the 2011 legislative session?
4     Q. The session would have been from January until, I
5  believe, June when they left.  And before I would
6  certainly include the months certainly leading up to,
7  during the bill filing, and then the consideration.
8     A. To my knowledge, no.
9     Q. To your knowledge, has the organization met with
10  any of those groups about voter ID legislation in previous
11  years?
12    Q. Prior to 2011?
13    Q. In earlier legislative sessions when other bills
14  were considered.
15    A. I do not know.  My understanding is that
16  Mi Familia Vota Educational Fund is a relatively young
17  organization in the state of Texas.  So I do not think so,
18  no.
19    Q. Did any groups provide your organization's staff
20  with written materials or documents regarding voter ID
21  legislation, say between the legislative session, during
22  the session, and now?
23    A. Mi Familia Vota Educational Fund interacts
24  regularly with a variety of other (c)(3) organizations
25  within the state of Texas that have similar missions.  We

## 27

1  discuss issues pertaining to voter registration, the
2  empowerment of our constituencies.  And where our missions
3  coincide, we collaborate in discussions.  But I do not
4  know of any specific meetings or strategy sessions of this
5  nature.
6     Q. And to your knowledge, no documents were traded
7  back and forth?  Or no written materials?
8     A. In recent months we have received updates from
9  other organizations as far as the status of some of this
10  legislation.  But it has been distributed in the context
11  of casual information exchange with no specific strategies
12  that I have been involved in.
13    Q. When you say "in recent months," are you
14  referring to maybe calendar year 2012?
15    A. During my tenure with the organization.
16    Q. Which began in February?
17    A. In my current position, yes.
18    Q. Mi Familia Vota Education Fund intervened with
19  other parties; is that correct?
20    A. I don't know what you mean by "intervene" -- oh,
21  do you mean in the context of this --
22    Q. In this litigation, yes, sir.
23    A. My understanding is that the Mexican American
24  Legal Defense and Educational Fund is representing both
25  Mi Familia Vota and the Southwest Texas Voter Education

## 28

1  Project.  This is my understanding.
2     Q. Has Mi Familia met with Southwest Voter
3  Registration Education Project?
4     A. Not to my knowledge, no.
5     Q. Have they met with the two individual women?
6     A. No.
7     Q. So you're not aware of any conversations or
8  e-mails or exchange of documents between Southwest Voter
9  and Mi Familia with regard to Senate Bill 14 or this
10  litigation?
11    A. Correct.
12    THE WITNESS:  Do you think we might be able
13  to take a five-minute restroom break?
14    MR. ASTON:  We certainly can.
15    THE WITNESS:  Okay.
16    Q. (BY MR. ASTON)  I do have one more question on
17  this section, if we could.
18    A. Sure.
19    Q. The claims of Southwest Voter and Mi Familia, to
20  your knowledge, are they based upon the same legal and
21  factual contentions?
22    A. We challenge the intent of this bill.  We believe
23  it is detrimental of the voter interests of the Latino
24  community and other minority communities.  We see its
25  impact as very negative for eligible voters in this state.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Glenn Bayron
June 12, 2012

## 29

1   Q.  But are you aware of any of the legal or factual
2   contentions that you're making -- your organization is
3   making that are independent from those of Southwest Voter?
4       MS. PERALES:  You can answer, if you know.
5   A.  I do not know of anything that specifically would
6   distinguish us from the position in the Southwest Voter
7   Education Project.
8       MR. ASTON:  Can we go off the record?
9       (Break.)
10  Q.  (BY MR. ASTON)  Did you personally speak with
11  anyone at the Department of Justice about Senate Bill 14?
12  A.  No.
13  Q.  Did Mi Familia speak, to your knowledge, with the
14  Department of Justice about Senate Bill 14?
15  A.  To my knowledge, no.
16  Q.  And that would include during the legislative
17  session, afterwards during the preclearance proceedings,
18  and during this litigation?
19  A.  Correct.
20  Q.  And that would include phone conversations,
21  e-mails and letter, and any other correspondence?
22  A.  To my knowledge, correct.
23  Q.  Does Mi Familia contend that Senate Bill 14 will
24  have the effect of denying or abridging Hispanics' and
25  Latinos' right to vote on account of race, color, or

## 30

1   membership in a language minority group?
2   A.  Yes, this is our contention.
3   Q.  What is the basis for that contention?
4   A.  The historical framework of minority voting in
5   the State of Texas; the demonstrated relative disadvantage
6   that the Latino community has in being able to produce the
7   identification documents outlined in the bill; various
8   structural limitations, including cost,
9   location/accessibility, to obtaining such documents.
10  Q.  Anything else?
11  A.  Again, we feel that it is the intent of a
12  majority of Texas legislators to curtail and impede the
13  full voting power of the Latino and other minority
14  communities through passage of this bill.  We believe that
15  this presents added undue burden and obstruction to the
16  free exercise of eligible voting among Latinos and our
17  ability as an organization to complete our mission.
18  Q.  You mentioned a moment ago something to the
19  effect that you believe Hispanics and Latinos might be
20  less likely to have photo IDs as listed in Senate Bill 14.
21  Is it your contention that they are less likely than
22  others to have each of those or some of those photo IDs?
23  A.  I cannot speak to the specific statistical
24  percentages for each form of identification.  But overall,
25  I believe it has been demonstrated that the Latino

## 31

1   community in general has a lower likelihood of meeting
2   these newer, more stringent requirements for voting, and
3   that, therefore, by definition, it is a violation of the
4   Voting Rights Act.
5   Q.  Is it possible that Latinos have an ID such as a
6   passport at a greater or higher rate than other Texas
7   citizens?
8   A.  I have no empirical information regarding the
9   percentage of Latinos who hold passports vis-à-vis other
10  ethnic groups.
11      Given what is required to obtain a passport,
12  first and foremost, cost.  In addition to that, limited
13  number of U.S. passport agencies in the state of Texas,
14  and the need for, at times, interurban transportation to
15  obtain one, I would think that it is an additional burden
16  on an identifiable percentage of the Latino community.  I
17  have no specific numbers in mind.
18  Q.  I just want to make sure you have an opportunity
19  to provide all of the answers that you wish to provide.
20  Is that the entire version of your organization's evidence
21  that Senate Bill 14 will have the effect of denying or
22  abridging Hispanics and Latinos' right to vote?
23  A.  I think that when we look at not only issues of
24  effect, but given how the law or, rather, the bill came
25  into being, the historical framework of voting vis-à-vis

## 32

1   minority voting in Texas among other states governed by
2   the Voting Rights Act, the timing of the legislation,
3   given the larger national discussion of voting and voter
4   fraud that is particularly targeted to the Latino
5   community presumptively, I feel that it is a reasonable
6   connection to think that there is sufficient evidence of
7   purposeful intent to disempower the Latino voting group.
8   Q.  We will definitely talk about purpose in a
9   minutes.  But again, I don't want to cut you off short.
10      As far as effect goes, is there anything else
11  that you wanted to add?
12  A.  No.
13  Q.  Does Mi Familia contend that Senate Bill 14 will
14  have the effect of denying or abridging African-Americans'
15  right to vote on account of race, color or membership in a
16  language minority group?
17  A.  We are not empowered to speak for the
18  African-American community; however, we feel that many of
19  the barriers that are faced by Latinos in this bill are
20  similarly faced by African Americans.
21  Q.  What is the basis for that contention?  Is it
22  everything you've said before, or are there other things
23  you'd like to add?
24  A.  I think everything's been said.  If I had to
25  emphasize one concept, it would be history.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Glenn Bayron
June 12, 2012

## 33

1    Q.  Does Mi Familia contend that Senate Bill 14 will
2    have the effect of denying or abridging Asian-Americans'
3    right to vote on account of race, color or membership in a
4    language minority group?
5        A.  Again, I cannot speak to specific issues related
6    to the Asian community.  Our focus is working with the
7    Latino community in representing the legitimate interests
8    of the Latino community.
9        Q.  Has Mi Familia conducted any studies or any
10   surveys on the effect of Senate Bill 14 on minority
11   voters?
12       A.  No.
13       Q.  Is Mi Familia familiar with polls regarding
14   support for voter ID legislation?
15       A.  I am not specifically familiar with individual
16   polls.  I have not seen any specific reports of that
17   nature.
18       Q.  Is your organization aware of polls showing that
19   the majority of Texans support a photographic ID
20   requirement to vote regardless of their political
21   affiliation?
22       A.  Again, I have not seen any specific polling data
23   related to that question; however, I will say that the
24   popularity of the legislation is irrelevant, as far as we
25   view it.

## 34

1        Q.  Are you aware of any polls showing that the
2    majority of Texans support a photographic ID requirement
3    to vote regardless of their race?
4        Q.  Can you repeat the question, please?
5        Q.  Sure.  Are you aware of any polls showing that
6    the majority of Texans support a photographic ID
7    requirement to vote regardless of their race?
8        A.  No.
9        Q.  Are you aware of any polls showing that the
10   majority of Texans support a photographic ID requirement
11   to vote, regardless of their membership in a language
12   minority?
13       A.  No.
14       Q.  Does Mi Familia believe that elderly voters are
15   more likely than the average voter to lack a form of
16   identification required by Senate Bill 14?
17       A.  I believe that in the context that I've outlined,
18   meaning as it impacts the Latino community, the barriers
19   that I have referenced are present for the elderly
20   community within the Latino community.
21           Beyond that, I am not prepared to speak on a
22   larger scale about the impact on the elderly.
23       Q.  Does Mi Familia believe that indigent voters are
24   more likely than the average voter to lack a form of
25   identification required by Senate Bill 14?

## 35

1        A.  In the context of indigent Latinos, we view that
2    this bill would be a detriment to their ability to
3    exercise the legitimate right to vote.
4        Q.  Do you believe that disabled voters are more
5    likely than the average voter to lack a form of
6    identification required by Senate Bill 14?
7        A.  I do not know.
8        Q.  Do you believe that rural voters are more likely
9    than the average voter to lack a form of identification
10   required by Senate Bill 14?
11       A.  Given what I know about the 70-some-odd counties
12   within the State of Texas, assuming a good portion of them
13   are rural in nature that do not have departments of public
14   safety as offices that would be issuers of some of the IDs
15   in question here, I would think that, yes, the rural
16   population is at a specific disadvantage.  And within that
17   context, the Latino rural population is at an even larger
18   disadvantage.
19       Q.  Do you believe that young voters are more likely
20   than the average voter to lack a form of identification
21   required by Senate Bill 14?
22       A.  I think that particularly since student IDs have
23   been specifically excluded from the list of eligible
24   acceptable forms of identification in this bill, that that
25   would put youth at a higher rate of burden and being

## 36

1    prevented from voting.
2           Again, specifically as it pertains to the Latino
3    community, that that burden is even more present.
4        Q.  And now, we're going to shift from currently
5    having to obtaining the IDs.  Do you believe that indigent
6    voters are less likely than nonindigent voters to be able
7    to obtain the underlying documents and then to obtain a
8    form of identification required under Senate Bill 14?
9        A.  Can you repeat the question again?  I'm sorry.
10          MR. ASTON:  Sure.
11          Could you read it back?
12          (The requested material was read.)
13       A.  I would think that indigent voters are presented
14   with a wide variety of challenges, but I cannot pretend to
15   be able to enumerate them.
16       Q.  (BY MR. ASTON)  What about the elderly, do you
17   believe that they are less likely than the nonelderly to
18   be able to obtain the documents and then an ID?
19       A.  I feel like we've -- that this question sounds
20   like a question you've asked previously or is it just --
21   is there a specific wording maybe that's maybe different?
22   Have we not covered how the elderly perhaps are impacted
23   or what I perceive is how the elderly are impacted in this
24   bill?  I want to be able to answer your question
25   completely, but it's -- I'm -- it's starting to feel like



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Glenn Bayron                                                    June 12, 2012

---

### 37

1   maybe I'm mishearing things, but I've heard this question
2   before.
3       Q.  I don't believe I've asked the question before.
4   You may have -- you've certainly discussed the elderly in
5   other contexts.  But I guess the question is, do you
6   believe that the elderly are less likely than nonelderly
7   to be able to obtain the documents they would need and
8   then to obtain --
9       A.  I don't know.
10      Q.  -- the photo ID?
11      A.  I don't know.
12      Q.  What about rural voters?
13      A.  I think my previous statement about limitations
14  in the rural area, particularly those given the absence of
15  the issuing offices --
16      Q.  You're referring to the DPS office?
17      A.  Correct.
18          -- present challenges.  And given the good
19  number of Latinos who live in the rural area, I think the
20  challenges are presented to them specifically.
21      Q.  Okay.  Finally, young voters.  Do you believe
22  that they are less likely than non-young voters to be able
23  to obtain the underlying documents and then to obtain a
24  photo ID?
25      A.  I think I can say with some certainty that in the

### 38

1   Latino, young eligible voters are at a disadvantage in
2   terms of as it relates to what's proposed in this bill.
3       Q.  Specifically as to obtaining the documents
4   necessary and then obtaining an ID?
5       A.  You say the documents necessary and then
6   obtaining the ID as if they are two different --
7       Q.  Well, for example, obtaining the birth
8   certificate that you would then use to obtain the photo
9   ID.
10      A.  I don't know.
11      Q.  Does Mi Familia know how many Texas registered
12  voters lack one of the forms of photo ID that is required
13  by Senate Bill 14?
14      A.  I recall seeing some data about particularly the
15  percentage of Latinos versus the larger population.  And I
16  seem to recall that Latinos do not have the identification
17  at a higher percentage than other groups.
18      Q.  Do you know what information you're referring to
19  when you say you've seen some information?
20      A.  I can't -- I don't remember the specific report.
21  I want to say it may be the information that was produced
22  leading up to -- or actually, no.  I believe it might have
23  been a newspaper article, but I don't recall.
24      Q.  Do you know if that information discussed or
25  included all types of photo ID listed by Senate Bill 14?

### 39

1       A.  I don't recall.
2       Q.  Can Mi Familia identify any Texas registered
3   voter who does not currently have one of the types of
4   photo ID required by Senate Bill 14?
5       A.  No.
6       Q.  Does Mi Familia know how many Texas registered
7   voters lack the documents that would be necessary to
8   obtain a state-issued photo ID?
9       A.  Can you repeat that, please.
10          MR. ASTON:  Would you read it back, please.
11          (The requested material was read.)
12      A.  I don't have a specific number in my head, no.
13      Q.  (BY MR. ASTON)  Can Mi Familia identify any Texas
14  registered voter who does not have the documents necessary
15  to get a state-issued photo ID?
16      A.  No.
17      Q.  Has Mi Familia done any studies of photo ID
18  possession by Texas registered voters?
19      A.  No.
20      Q.  Has Mi Familia conducted any surveys of photo ID
21  possession by Texas registered voters?
22      A.  No.
23      Q.  You mentioned at the beginning that Mi Familia
24  Texas is affiliated -- or not affiliated, perhaps, but
25  there are other states in which Mi Familia overall --

### 40

1       A.  Yes.
2       Q.  -- operates?
3       A.  Yes.
4       Q.  Is Georgia one of those states?
5       A.  No.
6       Q.  Is Indiana one of those states?
7       A.  No.
8       Q.  Is Mi Familia aware that both of those states
9   have photo identification laws currently in place?
10      A.  We are aware.  I don't have any specific details
11  as to the nature of those laws.
12      Q.  But Mi Familia is aware that there are other
13  states that have photo identification requirements to
14  vote?
15      A.  Yes.
16      Q.  That have -- that are in place currently?
17      A.  Yes.
18      Q.  Let's talk for a few minutes about purpose.  Does
19  Mi Familia contend that Senate Bill 14 was enacted with a
20  discriminatory purpose?
21      A.  Yes.
22      Q.  What is the basis for that contention?
23      A.  I believe I outlined several of the points in a
24  related question earlier, but I will recall the main
25  points.

---



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 41

1  Q. Before you do, you're referring to your answer to
2  the, I believe, initial question, does Mi Familia contend
3  that Senate Bill 14 was enacted -- will have a
4  discriminatory effect.
5  A. Yes.
6  Q. That answers what you're referring to?
7  A. Yes. But just to be on the safe side, I want to
8  make sure that I restate for purposes of clarity.
9  First and foremost, the historical framework
10 that put Texas under the jurisdiction of the Voting Rights
11 Act and the National Voter Registration Act.
12 Subsequently, the manner in which the legislation evolved
13 through both Houses of the Texas State Legislature in
14 which any and all attempts among minority legislators to
15 submit amendments or other recommended changes to the
16 legislation were rejected.
17 The focus on a supposed crisis of voter fraud
18 that had has yet to be demonstrated by the authors of this
19 bill.
20 The focus on a supposed crisis of voter
21 impersonation that has yet to be demonstrated by the
22 authors of this bill and the supporters of this bill.
23 The correlation between the timing of its evolution and
24 other national political dialogues in other states related
25 to voter identification, particularly as they impact the

## 42

1  Latino community.
2  And the indisputable importance of the fact that
3  we're about to embark on a presidential election.
4  Q. I want to be absolutely clear that we got all of
5  that.
6  MR. ASTON: Would you mind reading it back
7  to make sure that he's satisfied that he didn't leave
8  anything out.
9  (The requested material was read.)
10 Q. (BY MR. ASTON) That covers it?
11 A. Yes.
12 Q. Okay. First you discussed the history that got
13 us within the Voting Rights Act. How does -- we're all
14 aware of the history, but how is it that -- how is it that
15 Mi Familia contends -- what are the contentions -- that
16 what happened long ago in the past continues to inform
17 what the legislature does today?
18 A. I think the one similarity that comes to mind is
19 that people who are otherwise eligible to vote are being
20 presented with undue and unnecessary burdens to do so.
21 That's the best and simplest way I can draw that
22 correlation.
23 Q. You mentioned minority amendments.
24 A. (Witness nods.)
25 Q. Is it your contention that every amendment

## 43

1  offered by a member of the legislature who was a member of
2  a minority group was rejected?
3  A. I have read anecdotally that that is the case. I
4  cannot name specific legislators nor can I name specific
5  amendments.
6  Q. You mentioned how the bill evolved through both
7  Houses. I think you followed that with the minority
8  amendment discussion. Is there anything else about how
9  the bill evolved through the Houses that Mi Familia
10 contends constituted discriminatory purpose?
11 A. I have no specific information to suggest
12 additional items related to that.
13 Q. The last one, national political dialogue. What
14 are you referring to?
15 A. I'm drawing a connection to what we see happening
16 in other states as far as voter ID laws being proposed in
17 areas of the country where there are high percentages of
18 Latino voters and where the issue of Latino eligibility to
19 participate in the voting process appears to be put on the
20 defensive. Without demonstrating cause.
21 Q. Is there anything else, before we move on to a
22 different topic, that you would like to add to your
23 contention as to the discriminatory purpose that
24 Mi Familia believes underlies Senate Bill 14?
25 A. No.

## 44

1  Q. Does Mi Familia contend that preventing voter
2  fraud was not a purpose of Senate Bill 14?
3  A. We challenge the assertion that voter fraud
4  exists on any sizable, significant or otherwise noticeable
5  level at all, absent any proof to the contrary.
6  Q. Is it your contention that the members of the
7  legislature could not have thought preventing voter fraud
8  was one of the purposes of this bill?
9  A. Again, I struggle with the invocation of the term
10 "voter fraud" in this conversation given the absence of
11 demonstrable data to show that it is even an issue.
12 Q. Do you contend that the Texas legislature
13 intended to harm poor people by passing Senate Bill 14?
14 A. I do not see anything in this bill that
15 demonstrates that they are representing the interest --
16 interests, rather, of poor people.
17 Q. I think that's at least slightly different. Do
18 you believe that they intended to harm poor people when
19 they passed the bill?
20 A. I can't speak to what is in the individual hearts
21 and minds of every legislator who voted in favor of this
22 bill. I have not seen anything to indicate that they are
23 taking into consideration the impact on a wide number of
24 citizens -- or, rather, a wide cross-section of citizens,
25 including poor people, as far as their ability to exercise



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 45

1    the right to vote.
2            Perhaps it depends on how you define "harm."
3        Q.  Does Mi Familia contend that the Texas
4    legislature intended to harm young people by passing
5    Senate Bill 14?
6        A.  Again, insomuch as a -- what I would call a
7    blatant disregard for the importance of preserving the
8    civil rights of young people, particularly Latinos.
9        Q.  Does Mi Familia contend that the Texas
10   legislature intended to harm elderly people by passing
11   Senate Bill 14?
12       A.  I think my answer is probably the same.
13       Q.  Does Mi Familia contend that the Texas
14   legislature intended to harm rural voters in passing
15   Senate Bill 14?
16       A.  Again, in the disregard over impact?  Yes.
17       Q.  And does Mi Familia contend that the Texas
18   legislature intended to harm urban voters by passing
19   Senate Bill 14?
20       A.  I think particularly in the context of limiting
21   the legitimate voting rights of Latinos and other minority
22   groups who tend to be overrepresented in urban areas, yes.
23       Q.  I just want to make clear that I have it right.
24   As to poor, young, elderly and rural, you contend that it
25   was a disregard for their interests?

## 46

1        A.  Purposeful disregard.
2        Q.  Is there any other evidence or anything else
3    Mi Familia contends other than that disregard?
4        A.  I want to emphasize that by stating "purposeful"
5    I am demonstrating a perception on our part that there is
6    intent, yes.  That is my point.
7        Q.  Can you name any members of the Texas legislature
8    that Mi Familia contends acted with a discriminatory
9    purpose in supporting and voting for Senate Bill 14?
10       A.  I cannot name specific names, no.  We are
11   inferring that by voting for the bill in support of the
12   bill -- in other words, a yay -- that all of the
13   intentions that I have previously expressed hold true for
14   every legislator or who did so.
15       Q.  So it's Mi Familia's contention that everyone who
16   voted to support this bill did so with the discriminatory
17   intent that we've been discussing?
18       A.  At a minimum insofar as described in my use of
19   the term "purposeful disregard."
20       Q.  Do you know if any members of the legislature who
21   are a member of a minority group voted for the bill?
22       A.  I don't have a list in my head of all of the
23   legislators who voted for the bill.
24            MR. ASTON:  Go off the record a minute.
25            (Break.)

## 47

1        Q.  (BY MR. ASTON)  Does Mi Familia support the idea
2    that one should have to register to vote?
3        A.  Yes.
4        Q.  And does the organization support the idea to
5    make sure that those who show up to vote are registered?
6        A.  Yes.  We believe that there are already laws in
7    place to ensure that.
8        Q.  And should Texas make sure that when someone
9    shows up to vote, he or she is who he or she says he or
10   she is?
11       A.  Yes.  And, again, we believe that there are
12   already laws in place to ensure that.
13            (Brief disturbance.)
14            (Discussion off the record.)
15       Q.  (BY MR. ASTON)  Do you know how many other states
16   have photo ID requirements in place at this time?
17       A.  No.
18       Q.  Are you aware that the United States Supreme
19   Court considered Indiana's photo ID law in a case called
20   Crawford versus Marion County Election Board?
21       A.  I am not aware of the specifics of that case.
22       Q.  But you're aware that it exists?
23       A.  Only insofar that you referenced Indiana's voter
24   ID law some time ago.
25       Q.  Before today had you heard that the Supreme Court

## 48

1    had reviewed a photo ID law a few years ago?
2        A.  I have a vague recollection but I don't have -- I
3    don't recall any specifics.
4        Q.  How would Mi Familia define voter fraud?
5        A.  Not being a lawyer, I would define voter fraud as
6    someone who is ineligible to vote either attempting to or
7    actually voting.
8        Q.  Would you also include an eligible voter who
9    votes by saying that he or she is someone else and votes
10   for someone else?
11       A.  Do you mean -- by saying that, do you mean voter
12   impersonation?
13       Q.  Yes.  Either in person or by collecting mail-in
14   ballots, filling them out for someone else, and submitting
15   them?
16       A.  I would say yes.  But given the -- again, going
17   back to a previous statement about the absence of any
18   significant evidence to suggest that either voter fraud or
19   voter impersonation is a problem in the state of Texas, I
20   don't see the relevance.
21       Q.  Following up on your most recent answer, and it's
22   an answer that you've given a couple of other times, do
23   you believe Texas should have to wait until it discovers a
24   significant amount of in-person voter fraud before the
25   legislature enacts a bill designed to prevent that fraud?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 49

1    A. First, I would suggest that Texas already has
2    mechanisms in place to prevent voter fraud in the current
3    books. And if there were going to be any justification
4    for adding undue burden on the electorate, particularly
5    the Latino electorate, to address any sort of purported
6    problem with either voter fraud or voter impersonation,
7    that it is reasonable to expect that the proponents of
8    such a law demonstrate that the problem exists in the
9    first place.
10    Q. You just mentioned that Mi Familia believes there
11   are currently laws in place designed to prevent in-person
12   voter fraud. Is that a fair characterization of something
13   that you -- of one of the things you just said in that
14   previous answer?
15    A. In the larger context of voter fraud in general,
16   yes, I believe that the current Texas statutes that are
17   designed to implement our election laws are sufficient.
18    Q. What I'm wondering, what I'm asking, is that
19   Mi Familia asserts there is not currently evidence of
20   voter fraud but that we already have laws on the books
21   designed to prevent that fraud. Mi Familia contends that
22   because there is not this fraud, Texas should not be
23   allowed to enact Senate Bill 14. My question is, does
24   Mi Familia contend that the other laws that are currently
25   in place designed to prevent fraud should not have been

## 50

1    enacted?
2    A. You'd have to give me a specific law before I can
3    speak about it. I can't answer --
4    Q. Well, I guess I would ask you, the laws that
5    you're referring to when you say -- you referred to laws
6    we have in place designed to prevent voter fraud. Maybe
7    let's start there.
8    What laws are you referring to?
9    A. I cannot enumerate for you every single law on
10   the books that relates to voting or the elections process.
11   But Mi Familia Vota in its role as an organization that
12   promotes civic engagement, specifically voter
13   registration/education, abides by the laws.
14    We have some issues with some of the more recent
15   laws, particularly those pertaining to what we perceive as
16   burdensome requirements placed on those who seek to
17   register voters, but we're in compliance with the laws.
18   I've come here today specifically prepared to speak about
19   the detrimental impact and the intent behind that impact
20   on Senate Bill 14. I cannot speak specifically about any
21   other legislation individually.
22    Q. How about as a collective whole? Is it your
23   contention that what we have in place is proper but Senate
24   Bill 14 goes too far, or something else?
25    A. I believe Senate Bill 14 moves us backwards. And

## 51

1    I'll refer back to my comments about its impact directly
2    on the -- on Texas' role in the Voting Rights Act. I
3    believe it is regressive. I believe it hinders the
4    legitimate rights of eligible Latino voters.
5    Q. Do you believe that a law requiring one to
6    vote -- I'm sorry -- requiring one to register in advance
7    of election day serves -- has those same concerns?
8    A. I think it would depend on the specific aspects
9    of the requirements and limitations on when and how one
10   can register. The concept of registering in and of itself
11   is a value-neutral concept. But it cannot be seen as such
12   without a context. And so, therefore, I would state that
13   for me to fully answer the question, you would have to
14   give me the context and requirements under which a person
15   could legally register to vote.
16    Q. How about the requirements currently in place in
17   Texas that require you to register weeks in advance of an
18   election?
19    A. Going on the assumption -- and this is an
20   assumption -- that those requirements are applied equally
21   across constituents, in and of itself, registration, one
22   could argue that there pros and cons for a shortened or
23   long -- lengthened time frames. But in and of itself,
24   registration applied equally across to its citizens in and
25   of itself is not a hindrance.

## 52

1    Q. What about the requirement that you show up to
2    the poll with a form of an identification?
3    A. I believe that the voter registration certificate
4    currently fulfills that requirement.
5    Q. And requiring them to keep it -- requiring a
6    voter not to lose it and to bring it with him or her to
7    the polls?
8    MS. PERALES: Objection to the extent it
9    mischaracterizes the current law, which provides for a
10   number of forms of identification beyond the voter
11   certificate.
12    MR. ASTON: Sure.
13    Q. (BY MR. ASTON) You're not required to take the
14   voter registration certificate. You can bring other forms
15   that people might have.
16    A. (Witness nods.)
17    Q. But you're required to show up to the polls with
18   an identification of some sort, whether it's the one that
19   they send you when you register or it's one that you have
20   otherwise?
21    A. Correct. And going on the assumption, again,
22   that the vote -- the mechanism for registering to vote
23   which produces the voter registration certificate is made
24   available to all constituencies and communities. And that
25   is acceptable.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

### 53

1  I'm not clear -- well, I'll leave it at that.
2    Q.  Does Mi Familia believe laws like we've just been
3  discussing, requiring one to register and requiring one to
4  present an identification of some sort at the poll, are
5  laws designed to prevent voter fraud?
6      MS. PERALES:  You can answer if you know.
7    A.  Beyond the purpose of implementing a legitimate
8  election, Mi Familia Vota is not in a position to
9  speculate on the motivation -- specific motivations of the
10  State of Texas in terms of any specific regulation related
11  to voting, whether that's the registration process, long
12  or short, or the specific requirements that are -- that
13  one needs to abide by to go and vote.
14    Q.  (BY MR. ASTON)  Would Mi Familia agree that such
15  requirements would make it harder for one to commit voter
16  fraud?
17    A.  Are you referring to the current requirements in
18  place?
19    Q.  The current requirements in place that we've been
20  discussing, the registration requirement and the
21  presentation of --
22    So beyond -- not those related to SB 14.
23    Not SB 14.  Those currently that are in place
24  that we've been discussing the last few minutes,
25  requirements such as those.  Would you agree they make it

---

### 54

1  harder for one to commit voter fraud?
2    A.  I would argue at face value that that is
3  specifically why there is no need for SB 14.
4    Q.  Which gets us to the question I asked sort of at
5  the beginning of this line.  Is it your contention that
6  there would need to be some or substantial or a great deal
7  of additional voter fraud already discovered before Texas
8  could enact a law designed to prevent that fraud?
9      MS. PERALES:  Objection to the extent that
10  it suggests that there has been voter fraud discovered to
11  date.
12    You may answer.
13    A.  Where I struggle with this is because I -- I am
14  not aware of any such voter fraud problem to begin with,
15  which fuels my contention -- and perhaps I should take
16  this opportunity to reinforce that contention -- that
17  there is a demonstrated intent on the part of the Texas
18  legislators who voted in favor of this legislation, and
19  the absence of any evidence of the kinds of voter fraud
20  and voter impersonation that get discussed, about intent
21  to curtail and limit the legitimate voting power of the
22  Latino community.
23    (Exhibit 3 was marked.)
24    Q.  (BY MR. ASTON)  Please take a minute to review
25  what's been marked as Exhibit 3.

---

### 55

1    (Witness reviews document.)
2    A.  Okay.
3    Q.  (BY MR. ASTON)  Have you ever seen this document?
4    A.  Some of the talking points, or bullet items,
5  rather, ring a bell, but I don't know if -- I don't recall
6  seeing this specific e-mail, if that's what you're asking.
7    Q.  And remind us again, the name in bold, Carlos
8  Duarte --
9    A.  Duarte.
10    Q.  -- Duarte, I'm sorry -- what is his position at
11  Mi Familia?
12    A.  Texas state director.
13    Q.  About a third of the way down the page, do you
14  see the four bullet points?
15    A.  Yes.  That first one begins:  The voter
16  suppression law, et cetera?
17    Q.  Yes.  Bullet point No. 3, the second piece of
18  that.
19    A.  "Proponents of voter suppression laws have no
20  evidence to support those claims" --
21    Q.  Starting with "meanwhile."
22    A.  "Meanwhile at least nine people around the
23  country have been denied their right to vote because of
24  these laws."
25    Yes.

---

### 56

1    Q.  Okay.  Yes.  It says:  Meanwhile, at least nine
2  people around the country have been denied their right to
3  vote because of these laws.
4    Does Mi Familia have any evidence or any -- are
5  they aware of anything about those nine people?
6    A.  I am unaware about this specific item.
7    Q.  Is Mi Familia aware of any other people in any
8  state in which there is currently a photo ID law in place
9  that have not been allowed to vote in 2010 or 2012 or 2008
10  as a result of not having a photo identification?
11    A.  I have no information about any specific cases
12  that have been brought to my attention.
13    Q.  So Mi Familia is not aware of any voter in any of
14  those states?
15    A.  I am not aware.  Insofar as I am speaking for
16  Mi Familia Vota, I am limited, given the amount of time
17  I've been with the organization.  And so I don't -- I'm
18  not aware of.  So to my knowledge, no, I don't know.
19      MS. PERALES:  And then just to point out for
20  the record, the text that you're discussing is part of an
21  e-mail that's going to Mr. Duarte at Mi Familia.
22    MR. ASTON:  That is correct.
23    Q.  (BY MR. ASTON)  To your knowledge, did Mi Familia
24  receive that e-mail and do any investigation as to those
25  nine people or any others?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 57

1     A.  I am unaware of any details related to that.
2          MR. ASTON:  That's all I have.
3          MS. PERALES:  Do you have anything?
4          MS. McCLEOD:  No, nothing.
5          MS. PERALES:  I reserve my questions for the
6     time of trial.
7          We are done.
8          THE WITNESS:  Okay.
9          MR. ASTON:  You are finished.
10         THE WITNESS:  Thank you.  Do I return these
11    documents to you?
12         MS. PERALES:  Everything with a sticky on it
13    goes to the court reporter.
14         THE REPORTER:  You want a copy, right, of
15    the transcript?
16         MS. McCLEOD:  Yes, I would like a copy of
17    the transcript.
18         THE REPORTER:  What about you, Ms. Perales,
19    would you like a copy of the transcript?
20         MS. PERALES:  I think Dechert has a standing
21    order, and so I'm with them.
22         (THE DEPOSITION CONCLUDED AT 2:23 P.M.)
23
24
25

## 58

1              CHANGES AND SIGNATURE
2     PAGE    LINE    CHANGE        REASON
3     _____
4     _____
5     _____
6     _____
7     _____
8     _____
9     _____
10    _____
11    _____
12    _____
13    _____
14    _____
15    _____
16    _____
17    _____
18    _____
19    _____
20    _____
21    _____
22    _____
23    _____
24    _____
25              GLENN BAYRON

## 59

1              SIGNATURE PAGE
2
3          I, GLENN BAYRON, have read the foregoing
      deposition and hereby affix my signature that same is true
4     and correct, except as noted above.
5
6     _____
      GLENN BAYRON
7
8
9     THE STATE OF _____)
10    COUNTY OF _____)
          Before me, _____, on this
11    day personally appeared GLENN BAYRON, known to me (or
      proved to me under oath or through
12    _____) (description of identity card
      or other document) to be the person whose name is
13    subscribed to the foregoing instrument and acknowledged to
      me that they executed the same for the purposes and
14    consideration therein expressed.
          Given under my hand and seal of office this
15    _____ day of _____, 2012.
16
17
18    _____
      NOTARY PUBLIC IN AND FOR
19    THE STATE OF _____
      COMMISSION EXPIRES: _____
20
21
22
23
24
25

## 60

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2                                )
3     STATE OF TEXAS,            )
                                 )
4          Plaintiff,            )
                                 )
5     VS.                        )
                                 )
6                                )
      ERIC H. HOLDER, JR., IN    )
7     HIS OFFICIAL CAPACITY AS   )
      ATTORNEY GENERAL OF THE    )
8     UNITED STATES,             )
                                 )
9          Defendant,            )
                                 )
10    ERIC KENNIE, ET AL.,       )
                                 )
11        Defendant-Intervenors, )
                                 )
12    THE TEXAS SATE CONFERENCE  )
      OF NAACP BRANCHES, ET      ) CASE NO. 1:12-CV-00128
13    AL.,                       ) (RMC-DST-RLW)
                                 ) Three-Judge Court
14        Defendant-Intervenors, )
15    TEXAS LEAGUE OF YOUNG      )
      VOTERS EDUCATION FUND, ET  )
16    AL.,                       )
                                 )
17        Defendant-Intervenors, )
                                 )
18    TEXAS LEGISLATIVE BLACK    )
      CAUCUS, ET AL.,            )
19                               )
          Defendant-Intervenors, )
20                               )
      VICTORIA RODRIGUEZ, ET     )
21    AL.,                       )
                                 )
22        Defendant-Intervenors. )
23
24
25


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Glenn Bayron                                                    June 12, 2012

61

1       REPORTER'S CERTIFICATION
        DEPOSITION OF GLENN BAYRON
2       JUNE 12, 2012
3
4       I, Tamara K. Chapman, Certified Shorthand Reporter in
5   and for the State of Texas, hereby certify to the
6   following:
7       That the witness, GLENN BAYRON, was duly sworn by the
8   officer and that the transcript of the oral deposition is
9   a true record of the testimony given by the witness;
10      That the deposition transcript was submitted on
11  _____ to the witness or to the attorney for
12  the witness for examination, signature and return to me by
13  _____;
14      That the amount of time used by each party at the
15  deposition is as follows:
16  MR. ASTON - 1:40
17  MS. McLEOD - 0:00
18  MS. PERALES - 00:00
19      That pursuant to information given to the deposition
20  officer at the time said testimony was taken, the
21  following includes counsel for all parties of record:
22      Mr. Adam Aston - FOR THE PLAINTIFF STATE OF TEXAS
23      Ms. Michelle McLeod - FOR THE DEFENDANTS ERIC H.
24  HOLDER, ET AL.
25      Ms. Nina Perales - RODRIGUEZ DEFENDANT-INTERVENORS

62

1       That $_____ is the deposition officer's charges
2   to the Plaintiff for preparing the original deposition
3   transcript and any copies of exhibits;
4       I further certify that I am neither counsel for,
5   related to, nor employed by any of the parties or
6   attorneys in the action in which this proceeding was
7   taken, and further that I am not financially or otherwise
8   interested in the outcome of the action.
9       Certified to by me this 14th day of June, 2012.
10
11
12  
    _____
    Tamara K. Chapman, Texas CSR 7248
13  Expiration Date:  12/31/12
    Esquire Deposition Solutions
14  Firm Registration No. 283
    100 Congress Avenue, Suite 2020
15  Austin, Texas 78701
    T: 512.634.1980
16  F: 512.328.8139
    www.esquiresolutions.com
17
18
19
20
21
22
23
24
25

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS