## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                          )
    Plaintiff,                       )
                                     )
VS.                                      )
                                     )
ERIC H. HOLDER, JR. in his               )
official capacity as Attorney            )
General of the United States,            )
    Defendant,                       )
                                     )
ERIC KENNIE, et al,                      )
    Defendant-Intervenors,           )
                                     )
TEXAS STATE CONFERENCE OF                )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,                          )  (RMC-DST-RLW)
    Defendant-Intervenors,           )  Three-Judge Court
                                     )
TEXAS LEAGUE OF YOUNG VOTERS             )
EDUCATION FUND, et al,                   )
    Defendant-Intervenors,           )
                                     )
TEXAS LEGISLATIVE BALCK                  )
CAUCUS, et al,                           )
    Defendant-Intervenors,           )
                                     )
VICTORIA RODRIGUEZ, et al.,              )
    Defendant-Intervenors.           )

*********************************************
ORAL DEPOSITION OF
COLBY BEUCK
MAY 14, 2012
*********************************************

## 2

1    ORAL DEPOSITION OF COLBY BEUCK, produced as a
2  witness at the instance of the Defendant, was duly
3  sworn, was taken in the above-styled and numbered cause
4  on the MAY 14, 2012, from 9:50 a.m. to 6:08 p.m., before
5  Chris Carpenter, CSR, in and for the State of Texas,
6  reported by machine shorthand, at the offices of The
7  United States Attorney, 816 Congress Avenue, Suite 1000,
8  Austin, Texas 78701, pursuant to the Federal Rules of
9  Civil Procedure and the provisions stated on the record
10  or attached hereto.

## 3

1           A P P E A R A N C E S
2  FOR THE PLAINTIFF, STATE OF TEXAS:
3    Patrick K. Sweeten
      Matthew Frederick
4    Jonathan F. Mitchell
      OFFICE OF THE ATTORNEY GENERAL OF TEXAS
5    P.O. Box 12548
      Austin, TX 78711-2548
6
      209 West 8th Street
7    8th Floor
      Austin, TX 78701
8
      (512) 936-1307
9    patrick.sweeten@aog.state.tx.us
10  FOR THE DEFENDANT, HOLDER, ET AL:
11    Elizabeth S. Westfall
      Daniel Freeman
12    Risa Berkower
      Jennifer Maranzano
13    Bruce Gear
      U.S. DEPARTMENT OF JUSTICE
14    950 Pennsylvania Avenue, NW
      NWB - Room 7202
15    Washington, DC 20530
      (202) 305-7766
16    elizabeth.westfall@usdoj.gov
17  FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
      NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
18  CAUCUS:
19    Ezra D. Rosenberg
      DECHERT, LLP
20    Suite 500
      902 Carnegie Center
21    Princeton, NJ 08540-6531
      (609) 955-3200
22    ezra.rosenberg@dechert.com
23
24
25

## 4

1  FOR THE KENNIE INTERVENORS:
2    Chad W. Dunn
      BRAZIL & DUNN, LLP
3    4201 Cypress Creek Parkway
      Suite 530
4    Houston, TX 77068
      (281) 580-6310
5    chad@brazilanddunn.com
6  FOR THE RODRIGUEZ INTERVENORS:
7    Amy Pederson (by telephone)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**5**

INDEX

Appearances.........................................3

COLBY BEUCK
    Examination by Ms. Westfall.................7
    Examination by Mr. Rosenberg.............249

Signature and Changes...........................278

Reporter's Certificate...........................280

EXHIBITS

NO. DESCRIPTION                          PAGE MARKED

2   Notice of Deposition                     19

3   Letter From Lt. Governor Dewhurst on Voter    32
    I.D. Bill
4   House Bill 112                           56
5   Senate Bill 14                           111
6   Georgia Statute on Photo Indentification   142
7   Printout From the Website of Rep.        157
    Patricia Harless

8   Bill History of SB 14                    190

9   House Journal, March 23, 2011            214

10  Bloomberg Article: Texas Voter           220
    Identification Law Blocked by Justice
    Department as Biased

**6**

1    (Witness sworn)
2    THE REPORTER:  Would all counsel present
3    state their names and affiliations.
4    MS. WESTFALL:  I'm Elizabeth Westfall.
5    I'm with the U.S. Department of Justice.  I represent
6    the Attorney General in this matter.
7    MR. FREEMAN:  Dan Freeman, also with the
8    Department of Justice representing the Attorney General.
9    MS. BERKOWER:  Risa Berkower, also with
10   the Justice Department.
11   MS. MARANZANO:  Jennifer Maranzano, also
12   with the Justice Department.
13   MR. GEAR:  Bruce Gear, also with the
14   Justice Department.
15   MR. ROSENBERG:  Ezra Rosenberg from
16   Dechert, LLP, representing the Texas State Conference of
17   NAACP Branches and the Mexican-American Legislative
18   Caucus.
19   MR. DUNN:  Chad Dunn for the Defendant
20   Kennie Intervenors.
21   MR. MITCHELL:  Jonathan Mitchell for the
22   State of Texas.
23   MR. FREDERICK:  Matthew Frederick for the
24   State of Texas.
25   MR. SWEETEN:  Patrick Sweeten with the

**7**

1    Texas Attorney General's Office on behalf of the State
2    of Texas and on behalf of the witness.
3    THE REPORTER:  And on the phone?
4    MS. PEDERSON:  Amy Pederson for the
5    Rodriguez Intervenors.
6    MS. WESTFALL:  Thank you.
7    COLBY BEUCK,
8    having been first duly sworn to testify the truth, the
9    whole truth, and nothing but the truth, testified as
10   follows:
11   EXAMINATION
12   BY MS. WESTFALL:
13   Q.  Good morning, Mr. Beuck.  Could you state and
14   spell your name for the record, please.
15   A.  Yes.  My name is Colby, C-o-l-b-y, and my last
16   name is Beuck, and it's spelled B-e-u-c-k.
17   Q.  Have you ever been deposed?
18   A.  No.  This is my first time.
19   Q.  Great.  I'm going to go over some ground rules
20   so you'll understand how today will go, will operate.
21   Today you will be -- you're under oath.
22   You have been sworn in, and you'll be testifying
23   truthfully, accurately, and completely.  Do you agree
24   with that?
25   A.  Yes.

**8**

1    Q.  The court reporter will prepare a transcript of
2    everything that's said today, so you must respond to
3    questions orally without shaking your head or nodding.
4    Okay?
5    A.  Okay.
6    Q.  You must wait for me to finish my question
7    before you answer; otherwise, we'll be talking over each
8    other.  Do you understand?
9    A.  Yes.
10   Q.  I will try to ask you clear questions, but if
11   you don't understand a question, will you let me know?
12   A.  Yes.
13   Q.  If you would like to take a break, you may do
14   so, but please tell me, and I'll try to accommodate you,
15   but if there is a question pending, I would ask that you
16   answer that question first.  Do you agree?
17   A.  Yes.
18   Q.  And you understand that you're under oath
19   today; is that right?
20   A.  Yes.
21   Q.  And you may be subject to penalty of perjury
22   for giving false or misleading testimony; is that
23   correct?
24   A.  Yes.
25   Q.  Do you understand these instructions?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 9

1      A.  Yes, I do.
2      Q.  Do you have any questions about these
3  instructions?
4      A.  No, I do not.
5          MR. SWEETEN:  Elizabeth, I think it's
6  appropriate here for me to go ahead and tell you that as
7  you know, we will be asserting the legislative privilege
8  with respect to this deposition.
9          To the extent that you're asking questions
10  that reveal thoughts and opinions about legislation or
11  in furtherance of the legislative process, we'll be
12  objecting to and not be providing answers with respect
13  to communications between legislators and staff members;
14  communications between legislators and other
15  legislators, as well as legislative staffers;
16  communications between constituents and legislators or
17  staff; communications between legislators and staff and
18  state agencies, including the Lieutenant Governor's
19  Office or the Office of the Governor, and communications
20  between legislators and staff of the Legislative
21  Council.  And with that, we'll go ahead and let you
22  proceed.
23          MS. WESTFALL:  One clarifying question,
24  Mr. Sweeten:  Is that with regard to communications in
25  both directions?

## 10

1          MR. SWEETEN:  That's correct, it is.
2          And also, I also want to just make sure
3  it's clear on the record, this does not include, we will
4  not be asserting legislative privilege as to matters of
5  public record.  That would include committee hearings,
6  House floor proceedings or debates or public speeches.
7          MS. WESTFALL:  Thank you.
8      Q.  (By Ms. Westfall)  Mr. Beuck, are you on any
9  medication today that would affect your ability to
10  testify?
11      A.  No, I'm not.
12      Q.  Is there any reason why you can't testify
13  truthfully today?
14      A.  No.
15      Q.  Just in terms of ground rules, I will use the
16  terms "voter ID" and "photo ID" interchangeably during
17  this deposition.  And I want you to interpret those
18  terms broadly to mean a requirement that a voter present
19  a form of identification, whether it has a photo or not,
20  when voting in person at the polls before being able to
21  vote a regular ballot.  Do you understand?
22      A.  Yes.
23      Q.  If I refer to Representative Harless, I'm
24  referring to the representative, her office and staff.
25  Do you understand?

## 11

1      A.  Yes.
2      Q.  And when I refer to the term "minority voters,"
3  I mean voters who are not white, who are not Anglo.  Do
4  you understand?
5      A.  Yes.
6      Q.  Thank you.
7          Are you represented by counsel here today?
8      A.  Yes, I am.
9      Q.  Who is your lawyer?
10      A.  Patrick, Matt, and Jonathan.
11      Q.  Have you been deposed before?
12      A.  No.  This is my first time.
13      Q.  Have you ever testified in court?
14      A.  No, I have not.
15      Q.  Have you ever been involved in a case where the
16  State of Texas was a plaintiff or a defendant?
17          MR. SWEETEN:  Objection to the term
18  "involved."
19      Q.  (By Ms. Westfall)  You may answer.
20      A.  Involved as a?
21      Q.  Did you have any participation in any
22  litigation in which the State of Texas was a party?
23      A.  Yes.
24      Q.  Tell me about that litigation.  Describe the
25  nature of the litigation, please.

## 12

1      A.  I was an attorney for the Lieutenant Governor's
2  Office, and there was a case that I was a participant in
3  as an attorney.
4          MR. SWEETEN:  Elizabeth, Mr. Beuck is an
5  attorney.  I don't know the specific issue that you're
6  going to be asking him about, but obviously, to the
7  extent that it would -- that it would implicate any sort
8  of attorney-client privilege, I'm going to instruct him
9  that he should not answer that question.
10          I'm not sure we're there yet, but with
11  respect to -- you know, I'm not sure what you're getting
12  at or whether that's public record.  We may need to take
13  a short visit and sort this out as to what this is.  But
14  you can continue asking based on that.
15      Q.  (By Ms. Westfall)  I'm not asking you to reveal
16  any attorney-client communications you may have had in
17  representing the Lieutenant Governor in the
18  participation of the litigation you just described, but
19  could you tell me the name of the litigation?
20      A.  I'm trying to remember the parties' names.  It
21  was an -- I can't remember the parties' names.  I
22  apologize.
23      Q.  What was the nature of the dispute?
24      A.  The dispute was a -- it was a taxpayer dispute.
25      Q.  What year was this?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 13

1   A.  This was in 2000 -- 2009, I believe.
2   Q.  What court --
3   A.  2010.
4   Q.  Okay.  Sorry.  What court was this in?
5   A.  Here in Austin.
6   Q.  Is this ongoing?
7   A.  No.
8   Q.  How was it resolved?
9   A.  I do not know the final result.
10  Q.  What was your involvement in that litigation?
11  A.  I was involved with the discovery, preparation
12  of materials.  Preparation of materials.
13      I'm sorry, I'll project.
14      MR. ROSENBERG:  Please speak up.
15      THE WITNESS:  Okay.
16  Q.  (By Ms. Westfall)  Were you employed with the
17  Lieutenant Governor at that time?
18  A.  Yes, I was.
19  Q.  Did you work in his personal office, his
20  legislative office?
21  A.  I worked in his capitol office, yes.
22  Q.  What did you do to prepare for today's
23  deposition?
24  A.  I read through the House transcript for the
25  debate on voter ID.

### 14

1   Q.  Do you do anything else?
2   A.  No.
3   Q.  Did you read any other materials?
4   A.  In preparation for today's, no.
5   Q.  Did you meet with your attorneys?
6   A.  Yes.
7   Q.  For how long?
8   A.  I would say two to four hours.
9   Q.  And who here did you meet with at this table?
10  A.  Patrick and Matt.
11  Q.  Other than your attorneys, did you speak to
12  anyone else about this deposition?
13  A.  That would include my boss?
14  Q.  Outside of your family.
15  A.  Outside of my family.  Okay.  No.
16  Q.  Did you talk to Representative Harless?
17      MR. SWEETEN:  Objection to the extent that
18  this reveals any thoughts, opinions about legislature or
19  the furtherance of the legislative process, don't reveal
20  communications between yourself and Representative
21  Harless.
22      MS. WESTFALL:  Mr. Sweeten, I'm going to
23  be asking questions today.  I understand that you're
24  asserting legislative privilege, but I will be ask --
25  the fact that a conversation occurred is not privileged.

### 15

1   We will be asking you questions throughout the day to
2   establish, essentially, a privilege log so that we may
3   move to compel as the court has ordered us.  Is that --
4   are you agreeable to that?
5       MR. SWEETEN:  Obviously, you can ask the
6   questions that you want to ask.  When you ask him what
7   the conversation was about, which was the preface of
8   your question, then I think we're getting into the
9   substance of the communication, which is not something
10  that he can -- he's going testify to.
11  Q.  (By Ms. Westfall)  Did you have any
12  conversation with Representative Harless over the
13  weekend in advance of this deposition?
14  A.  No.
15  Q.  Did you have a conversation with Representative
16  Harless in the last two weeks?
17  A.  Yes.
18  Q.  Was it about this deposition?
19      MR. SWEETEN:  Objection.  I'm going to
20  instruct you not to answer communications that you've
21  had with -- with Representative Harless.
22      MS. WESTFALL:  Mr. Sweeten, in terms of
23  the temporal scope of the privilege, we are going to
24  argue -- and I'm wondering if you will agree -- that the
25  privilege ends when the law is signed, which was May

### 16

1   2011, was it not?
2       MR. SWEETEN:  I think that's when it was
3   signed, yes.
4       MS. WESTFALL:  Therefore, what
5   privilege -- what privilege are you asserting?  What
6   legislation does this pertain to?
7       MR. SWEETEN:  Well, I think to the extent
8   that it reveals any thoughts or opinions about
9   legislation of any kind, that those communications are
10  privileged.  I've let you ask about when he met with
11  Representative Harless, but I don't think that it's
12  appropriate for him to go into the substance of those
13  communications.
14      MR. ROSENBERG:  If I could --
15      MS. WESTFALL:  Are you taking a position
16  that legislative privilege extends past the signing of
17  Senate Bill 14?
18      (Mr. Sweeten conferring with co-counsel.)
19      MS. WESTFALL:  Could we go off the record
20  while there's a break?
21      MR. SWEETEN:  Sure, that's fine
22      (Off the record at 10:03 a.m. to
23  10:08 a.m.)
24      MS. WESTFALL:  We're back on the record.
25  Mr. Sweeten, did you have an answer to the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 17

1 question that was left pending with you?
2     MR. SWEETEN: I do. I think, as you said,
3 that the bill was passed in May of 2011. Our position
4 would be that he can discuss -- he could reveal
5 discussions with Representative Harless that occurred
6 after passage, except to the extent that those
7 conversations relate to matters that occurred before the
8 passage of the bill. So if he's discussing --
9         Any discussions that you've had with
10 Patricia Harless or other members who have claimed the
11 privilege or their staffs that related to the passage of
12 Senate Bill 14, that legislation, do not reveal
13 those. However, if any discussions that you've had, you
14 can reveal -- after passage of May 2011, you can reveal
15 information or discussions that you've had, as long as
16 they don't relate to the prepassage matters. Does that
17 make sense? We can talk about that if you --
18     THE WITNESS: Can we talk about it?
19     MR. SWEETEN: Okay. Let me talk with the
20 witness about it.
21     MS. WESTFALL: Let's go off the record
22 again.
23     (Recess at 10:09 a.m to 10:10 a.m.)
24     MS. WESTFALL: We're going back on the
25 record. Thank you.

## 18

1     Q. (By Ms. Westfall) Mr. Beuck, how many
2 conversations did you have with Representative Harless
3 in advance of this deposition about this deposition?
4     A. Several.
5     Q. Fewer than ten?
6     A. Yes.
7     Q. More than five?
8     A. I would say between five and ten.
9     Q. What was the general subject matter of the
10 topics that you discussed?
11     A. The majority of the conversations were
12 regarding scheduling, the fact of when I was going to be
13 deposed, when she was going to be deposed. That was the
14 majority of the conversations.
15     Q. Did you discuss Senate Bill 14 at all?
16     MR. SWEETEN: I'm going to, again, caution
17 the witness that based upon the legislative privilege,
18 do not reveal discussions that you've had with
19 Representative Harless at any time that relate to the
20 passage of Senate Bill 14. You can discuss matters that
21 don't relate to legislation that occurred after the
22 passage of Senate Bill 14.
23     THE WITNESS: Okay.
24     Q. (By Ms. Westfall) Did you bring any notes or
25 documents with you today?

## 19

1     A. No.
2         (Exhibit 2 marked for identification.)
3     Q. (By Ms. Westfall) I'm going to hand you a
4 document that's been marked U.S. Exhibit 2. Have you
5 seen this document before?
6     A. Yes.
7     Q. What is it?
8     A. This is my Notice of Deposition, I believe.
9     Q. When did you first receive this?
10     A. A week ago, I believe, or several weeks ago.
11     Q. What did you do when you received this?
12     A. I went back through our documents and made sure
13 I -- we had produced all the documents requested.
14     Q. How did you conduct that search?
15     A. The search for e-mails, there were a keyword
16 search through our e-mail system, a document search
17 through our files.
18     Q. And when you talk about files, these are paper
19 files?
20     A. Paper files, yes.
21     Q. Where are they located?
22     A. In the Capitol office.
23     Q. Are they located in Representative Harless's
24 office itself?
25     A. No. They would be located in our -- our file

## 20

1 system, which is not located in her office.
2     Q. And where is that file system located?
3     A. In the front room.
4     Q. What is --
5     A. File cabinets.
6     Q. What is the front room?
7     A. I'm sorry?
8     Q. What is the front room?
9     A. The -- the common area of the office.
10     Q. And by "office," do you mean the Capitol
11 office?
12     A. Capitol office, yes.
13     Q. Who maintains those documents?
14     A. Myself, and I would say I would be the
15 custodian of those records.
16     Q. And you're the custodian of the records for
17 Senate Bill 14 or a broader category of documents?
18     A. Could you be -- a broader category of
19 documents.
20     Q. For all documents in the front office or only
21 certain bills?
22     A. Not all documents. We have other employees in
23 the office who -- who maintain the files as
24 well. Senate Bill 14 was -- I was the primary staff
25 person responsible for that legislation, so those files



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

---

**21**

1 were under my supervision.
2     Q.  So you searched hard copy files.  You searched
3 e-mail.  What other records and documents did you search
4 in response to Exhibit 2?
5     A.  Electronic files as well.  Not just
6 e-mails. Our saved files.
7     Q.  Did you look on a shared drive?
8     A.  Yes.
9     Q.  Where did you look on the shared drive?  What
10 particular drive on the --
11    A.  Looking for the -- the X drive is our shared
12 file -- our shared drive for the office.
13    Q.  How did you conduct that search of the X drive?
14    A.  With keywords, and as well as manually going
15 through and looking through the documents.
16    Q.  How many documents did you discover through
17 that search on the X drive?
18    A.  The electronic files on the X drive, I would
19 say more than -- more than 50.
20    Q.  What did you do with those documents?
21    A.  I turned them over to my attorneys.
22    Q.  And which of your attorneys here today did you
23 turn them over to?
24    A.  Stacey Napier -- Schiff -- I'm sorry.  She
25 changed her last name.  But it was an attorney with the

---

**22**

1 Attorney General's Office.
2     Q.  When did you turn those documents over to
3 Ms. Napier?
4     A.  I believe it was -- the majority of the
5 documents I turned over several weeks ago.  There was
6 additional documents in here that were not -- we
7 received several, and I believe there was another
8 request for documents.  This covered the majority of
9 that.  What this did not cover, we produced recently.  I
10 believe it was last week.
11    Q.  Turning your attention now to Exhibit -- U.S.
12 Exhibit 2, do you see the list of documents in that
13 document, a numbered list after Attachment A?
14    A.  Okay.  This is Number 2, "All documents and
15 communications not limited to --"
16    Q.  I was just turning your attention to the list
17 of documents.  And you now see that list of documents --
18    A.  Yes.
19    Q.  -- correct?
20    A.  Yes.  Yes.
21    Q.  Turning your attention to Number 7, do you see
22 that request?
23    A.  Yes.
24    Q.  Did you search for those documents?
25    A.  Yes.

---

**23**

1     Q.  Where did you search for those documents?
2     A.  I have a file for the documents that are --
3 that would be under that, that request.
4     Q.  Did you produce any documents to your attorney?
5     A.  Yes.
6     Q.  How many?
7     A.  I don't know the number of files.
8         MR. SWEETEN:  He's asked you to speak up
9 just a little bit, if you would.
10        THE WITNESS:  I'm sorry.
11        MR. SWEETEN:  No, you're doing fine.
12    Q.  (By Ms. Westfall)  Turning to your attention to
13 Number 8 in U.S. Exhibit 2, do you see that number?
14    A.  Yes.
15    Q.  And what is it?
16    A.  All public statements you or others in your
17 office, including the Legislature, have made about voter
18 ID.
19    Q.  Did you conduct a search for these documents?
20    A.  Yes, I did.
21    Q.  How many documents did you find?
22    A.  I would say five to ten.
23    Q.  Representative Harless didn't make more public
24 statements on SB 14?
25    A.  That we had in our possession, I would say five

---

**24**

1 to ten.
2     Q.  Did she make other -- more than five to ten
3 public statements about SB 14?
4     A.  I would believe so.
5     Q.  And who would know where those are maintained?
6     A.  I can't answer.  I don't know.
7         MR. SWEETEN:  Objection, assumes facts not
8 in evidence.
9     Q.  (By Ms. Westfall)  Did you provide those public
10 statements to Ms. Napier?
11    A.  That was -- that was part of the documents that
12 I turned over, yes.
13    Q.  Turning your attention to Number 11, what is
14 that request?
15    A.  All documents and communications concerning
16 civil and criminal allegations, investigations,
17 warnings, enforcement actions.
18    Q.  Did you conduct a search for those documents?
19    A.  Yes.
20    Q.  Did you find any documents?
21    A.  Yes.
22    Q.  What were those documents?
23    A.  We had -- there was --
24        MS. WESTFALL:  I would note for the record
25 that the witness is reviewing the document.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 25

1    A.  Yes.  I did turn over information regarding
2  that.  There were statistics on the Attorney General's
3  investigations into voter fraud.
4    Q.  (By Ms. Westfall)  Was that the sum total of
5  the documents that you turned over in response to Number
6  11?
7    A.  I believe there was also some newspaper
8  articles on fraud investigations.
9    Q.  Were those fraud investigations in the state of
10  Texas?
11    A.  Yes.  And there could have been some that were
12  nationwide.  The majority of them were for Texas.
13    Q.  Thank you, Mr. Beuck.
14        Could you tell me where you went to
15  college?
16    A.  The University of Georgia.
17    Q.  What year did you graduate?
18    A.  1999.
19    Q.  Did you go to law school?
20    A.  Yes.
21    Q.  Where did you go to law school?
22    A.  The University of Texas.
23    Q.  What year did you graduate?
24    A.  2002.
25    Q.  As a general matter, do you vote in elections

## 26

1  in Texas?
2    A.  Yes.
3    Q.  Do you vote in person or absentee?
4    A.  I vote in person.
5    Q.  How far is your polling place from your
6  residence?
7    A.  I would say it's close.  Several blocks.  I'm
8  not very good with distance, but I would say it's close,
9  walkable.
10    Q.  Do you have a driver's license?
11    A.  Yes, I do.
12    Q.  How far is the nearest driver license office
13  from your residence?
14    A.  I believe it's on North Lamar.  I can't tell
15  you the distance, but it is -- I'm not very good
16  distance.  So I know where it is.  It's driveable.
17  About a 15-minute drive, perhaps.
18    Q.  Do you know its hours of operation?
19    A.  No, I do not.
20    Q.  When was the last time you visited that driver
21  license office?
22    A.  I don't know.  I don't know.
23    Q.  When did you last renew your driver's license?
24    A.  I do not know.  I'd have to look at my -- I
25  cannot remember when I renewed my license.

## 27

1    Q.  Do you have a Texas driver's license?
2    A.  Yes, I do.
3    Q.  Do you recall ever waiting in line at the
4  driver license office?
5    A.  I believe I did.  Yes, I have waited in a
6  driver's license office.
7    Q.  Do you recall how long you waited in line?
8    A.  That was several years ago.  No, I do not
9  remember.
10    Q.  Were you born in Texas?
11    A.  Yes, I was.
12    Q.  Do you have a certified copy of your birth
13  certificate?
14    A.  Yes.
15    Q.  Do you have any experience related to election
16  law?
17    A.  Could you be -- elaborate on that?
18    Q.  Outside of your work on voter ID in the
19  Legislature, do you have any experience in election law?
20    A.  No, I do not.
21    Q.  Have you ever worked as a poll worker?
22    A.  No, I have not.
23    Q.  Have you ever worked as a poll watcher?
24    A.  No, I have not.
25    Q.  Have you ever witnessed any problems in the

## 28

1  polls while you were voting?
2    A.  No.
3    Q.  Have you ever witnessed any voter trying to
4  impersonate another voter?
5    A.  No, I have not.
6    Q.  What was your first job out of law school?
7    A.  I was employed with the County Attorney's
8  Office, Travis County Attorney's Office.
9    Q.  What year was that?
10    A.  That was immediately after graduation, 2002.
11    Q.  How long were you employed in that office?
12    A.  That job was, I believe, for several months
13  while I was studying for the bar exam.
14    Q.  Was it a clerkship, in essence?
15    A.  Yes.
16    Q.  And what was your next legal job after that?
17    A.  That would be with the Office of the Lieutenant
18  Governor beginning in 2003.
19    Q.  Did you ever work for a law firm named Chapel
20  Hill and Lawrence?
21    A.  Yes, I did.
22    Q.  When did you work there?
23    A.  That was a summer internship, and I can't
24  remember.
25    Q.  Was it during law school?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                MAY 14, 2012

---

### 29

1  A.  It was during law school.  I'm trying to
2  remember which year.  I believe it was my -- I guess it
3  would have been in 2000.
4  Q.  What year did --
5  A.  Or thereabouts.
6  Q.  I'm sorry.  I'm doing something I wasn't
7  supposed to, which was to talk over you.
8        What year did you start working for
9  Lieutenant Governor Dewhurst?
10  A.  That was in 2003.
11  Q.  In what capacity were you hired?
12  A.  I was hired as a policy analyst.
13  Q.  How did you come about getting this job?
14  A.  I interviewed for the position.
15  Q.  Why did you decide you wanted to work for the
16  Lieutenant Governor for Dewhurst?
17  A.  I've always been interested in state
18  government, and I thought I would be very good for the
19  position.
20  Q.  Could you describe the policy analyst position?
21  A.  Yes.  My duties?  I was to track legislation
22  and monitor the issues that I was responsible for, for
23  the Lieutenant Governor and senior staff.
24  Q.  Did you have any connection with the Lieutenant
25  Governor before interviewing for his office -- with his

### 30

1  office?
2  A.  No.
3  Q.  What issues did you handle for him?
4  A.  Initially, jurisprudence issues.  The
5  Jurisprudence Committee was my committee that I was
6  tasked with following.  Then criminal justice issues and
7  -- criminal justice was mainly my policy area.
8  Q.  What did the Jurisprudence Committee handle as
9  a general matter?
10  A.  A variety of legal issues.  I would say
11  anything from family law matters to other civil -- civil
12  legal matters.
13  Q.  Did you handle election issues for Governor --
14  Lieutenant Governor Dewhurst?
15  A.  No, I did not.
16  Q.  Did you handle voter ID?
17  A.  No, I did not.
18  Q.  How long were you employed with Lieutenant
19  Governor Dewhurst?
20  A.  Seven years.
21  Q.  So you didn't handle voter ID at all?
22  A.  I was not in -- Voter ID was not my -- it was
23  not my area.
24  Q.  Did you remain a policy analyst for the
25  duration of your employment with Mr. Dewhurst?

### 31

1  A.  Yes.  I believe my title was Counsel For Public
2  Policy.
3  Q.  Who handled voter ID issues for Mr. Dewhurst
4  when you were working for him?
5  A.  Bryan Hebert.
6  Q.  Would you spell list last name?
7  A.  I believe it's H-e-b-e-r-t.
8  Q.  What was his title?
9  A.  I do not know.
10  Q.  Was he -- did he handle all aspects of voter ID
11  for the Lieutenant Governor or certain aspects?
12  A.  I can't speak to that.  I don't know.  He was
13  the policy analyst in charge of that issue.  I don't
14  know his scope.
15  Q.  How big is the office?
16  A.  25 to 35 people.
17  Q.  How many policy analysts?
18  A.  Ten.
19  Q.  And you were employed there --
20  A.  Plus or minus ten.
21  Q.  You were employed there until 2009; is that
22  correct?
23  A.  2009, yes.
24  Q.  Would you say that voter ID was one of the
25  Lieutenant Governor's signature issues?

### 32

1        MR. SWEETEN:  Objection, calls for
2  speculation.
3  Q.  (By Ms. Westfall)  You may answer.
4  A.  I know it was an issue he was very interested
5  in.  I can't speculate on his priorities, but I know it
6  was an important issue.
7  Q.  Did he have a press person handle voter IDs
8  issues?
9  A.  Yes.
10  Q.  Who was that person?
11  A.  While I was employed?
12  Q.  Yes.
13  A.  Mike Wintemute.
14  Q.  Are you aware of whether he drafted a letter
15  that Lieutenant Governor Dewhurst wrote in 2007
16  regarding voter ID?
17  A.  No, I don't have any knowledge of that.
18        MS. WESTFALL:  Could you please mark this
19  U.S. 3 and hand it to the witness?
20        (Exhibit 3 marked for identification.)
21  Q.  (By Ms. Westfall)  You've been handed U.S. 3.
22  Do you recognize this document?
23        MR. SWEETEN:  Caution the witness to
24  review the document before answering a question about
25  it.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

---

**33**

1    A.   (Viewing documents.) It appears this is a
2    letter from the Lieutenant Governor or a -- printed in
3    the Texas Weekly.
4    Q.   (By Ms. Westfall)  Have you ever seen this
5    letter before?
6    A.   I do not remember it.
7    Q.   Do you know who wrote this for Mr. Dewhurst?
8    A.   No, I do not.
9    Q.   Why did you stop working for Mr. Dewhurst?
10   A.   I was looking to grow as my -- in my -- my
11   position, I was looking to just grow professionally, and
12   I felt that a change was good.
13   Q.   So when did you stop working for him?
14   A.   November of 2009.
15   Q.   Did you come to be employed elsewhere at that
16   time?
17   A.   Yes.
18   Q.   Where did you become employed?
19   A.   With Representative Patricia Harless.
20   Q.   How did you obtain that position?
21   A.   Interviewed.
22   Q.   Did you have any connection with Representative
23   Harless prior to November 2009?
24   A.   No.
25   Q.   So it was a cold interview?

---

**34**

1    A.   I was informed of the position through a
2    friend.
3    Q.   Who was the friend?
4    A.   Lisa Kaufman.
5    Q.   Is Lisa Kaufman employed by Ms. Harless?
6    A.   No.
7    Q.   Who is Lisa Kaufman?
8    A.   She works -- she is a former employee of the
9    Speaker.
10   Q.   Speaker Straus?
11   A.   Yes.
12   Q.   Did you she tell you about the availability of
13   a chief of staff position with Ms. Harless?
14   A.   Yes.
15   Q.   When did you interview with her?
16   A.   Fall 2009.
17   Q.   How long have you -- have you held that
18   position continuously up to the present?
19   A.   Yes.
20   Q.   What are your responsibilities as chief of
21   staff for Representative Harless?
22   A.   It varies during the time of year.  During
23   session, my responsibilities are different than during
24   the interim.  Primarily during session, I'm responsible
25   for the Representative's legislation.  As chief of

---

**35**

1    staff, also responsible for operating the office,
2    employees, and also constituent communications.
3    Q.   Do you also engage in communications with the
4    executive branch on behalf of Representative Harless?
5    A.   Meaning the Governor's Office?
6    Q.   Well, we'll start with the Governor's Office.
7    Do you engage in those communications on her behalf or
8    with her?
9    A.   If the Governor's Office calls, I'm usually the
10   one to answer the phone.
11   Q.   And would the same be true for the Lieutenant
12   Governor's Office?
13   A.   Currently, I'm the only employee, so yes, I'm
14   the one answering the phone.
15   Q.   So the office is you, currently, for
16   Representative Harless?
17   A.   Full-time employee, yes.
18   Q.   Do you have any legislative areas that you
19   focus on?
20   A.   With my current employee?  I'm sorry.  In my
21   current employment?
22   Q.   Yes.
23   A.   My areas -- Representative Harless is on the
24   State Affairs Committee.  Those were the issues that she
25   had asked me to -- to monitor specifically.

---

**36**

1    Q.   State Affairs handles voter ID issues; does it
2    not?
3    A.   No, it does not.
4    Q.   What does it handle?
5    A.   It handles a wide variety of issues related to
6    electric, dereg -- electric.  Some social issues.  It's
7    a fairly large committee that receives a lot of
8    different legislation.  Electric power,
9    telecommunications are the major issues that come from
10   through that committee, as well as social issues.
11   Q.   Is she running for reelection this year?
12   A.   Yes.
13   Q.   Are you involved in the campaign in any way?
14   A.   No.
15   Q.   When Representative Harless is considering how
16   to vote on a bill, do you advise her on that?
17   MR. SWEETEN:  I'm going to caution the
18   witness to the extent that your answer may reveal
19   thoughts or opinions about legislation or in furtherance
20   of the legislative process, don't answer that.  You can
21   answer as a general matter.
22   MS. WESTFALL:  Mr. Sweeten, I understand
23   your -- I understand your concerns about privilege, but
24   I would ask that you not -- that you refrain from
25   speaking objections as general matter, and that the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 37

1 witness be able to answer questions about the fact of a
2 communication having occurred.
3   MR. SWEETEN:  Okay.  And thus far, I have
4 let him answer questions about the fact of the
5 communication.  However, it's my duty to assert the
6 privilege that is appropriate here, and that is the
7 legislative privilege with respect to these issues.  And
8 so I will caution him, as we proceed, to avoid providing
9 information related to the communications that we've
10 outlined.  With that, you can go ahead.
11   A.  As -- as part of my job duties, I -- I do --
12 I'm asked to make recommendations on legislation.
13   Q.  (By Ms. Westfall)  Do you generally do that for
14 Representative Harless?
15   A.  Yes.
16   Q.  And how do those recommendations -- how are
17 those recommendations conveyed?
18   A.  A variety of ways.
19   Q.  In-person meetings?
20   A.  Yes.
21   Q.  Telephone meetings?
22   A.  Yes.
23   Q.  E-mail?
24   A.  Yes.
25   Q.  Texting?

## 38

1   A.  Yes.
2   Q.  Do you e-mail her on a work e-mail, or her
3 personal e-mail, or all the above?
4   A.  All of the above.
5   Q.  What do you generally -- what e-mail do you
6 generally use with Representative Harless?
7   A.  It depends.  Typically, it is her -- her -- a
8 personal account.
9   Q.  Under Texas FOIA, public information law, are
10 citizens able to obtain e-mails through the government
11 account?
12   A.  I'm not an expert --
13   Q.  To the extent you know.
14   A.  -- on the public information law, so I can't --
15 I know state e-mails are subject to the open records
16 law.
17   Q.  Do you know whether legislators sometimes use
18 personal e-mail to avoid FOIA?
19   MR. SWEETEN:  Objection, calls for
20 speculation.
21   Q.  (By Ms. Westfall)  You may answer.
22   A.  I can't speak to that.  I don't know.  I can't
23 speak for other legislators.
24   Q.  Do you know whether Representative Harless has
25 a Gmail account?

## 39

1   A.  I don't believe she does.
2   Q.  She uses Yahoo?
3   A.  No.
4   Q.  What is your role, generally, when
5 Representative Harless sponsors a bill?
6   A.  Sponsoring a bill, the legislation comes
7 over from the Senate.  As other legislation, I prepare
8 the legislation to make its way through the process, the
9 legislative process.
10   Q.  So is it your testimony that bills all
11 originate in the Senate, or do some originate in the
12 House?
13   A.  No.  No.  Bills do originate in the House.  You
14 said sponsor a bill.  That would be -- sponsoring
15 legislation is -- for Representative Harless would be a
16 Senate bill.  An author, she would be the author of the
17 bill if it was House bill.
18   Q.  I see.  Thank you for clarifying that for me.
19   Have your responsibilities changed during
20 the course of your employment with Representative
21 Harless?
22   A.  No.
23   Q.  Do you represent Representative Harless in an
24 attorney-client capacity?
25   A.  Yes, I have.

## 40

1   Q.  On what occasion?  Just -- and I'm not asking
2 you to talk about privileged communications.  Just
3 generally, when have you represented her as her
4 attorney?
5   A.  When she requests legal advice.
6   Q.  And is that in your capacity as chief of
7 staff?  You're providing her with legal advice?  Is that
8 your testimony?
9   A.  When -- when there is a question on legal
10 issues, I provide my legal advice.
11   Q.  So I believe you testified that you're the sole
12 staff person right now; is that right?
13   A.  Full time.  We do have part-time staff.
14   Q.  Is there anyone else in the office who has ever
15 handled voter ID issues while you've been employed with
16 Representative Harless?
17   A.  No.
18   Q.  You're the person who does everything on that
19 issue for her right now?
20   A.  Yes.
21   Q.  How many election-related bills has
22 Representative Harless sponsored?
23   A.  Besides voter ID, we -- we had two bills last
24 session.  I don't know other sessions.  I can speak to
25 the past session.  But I'm not qualified to speak on the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                          MAY 14, 2012

## 41

1  other sessions when I was not there.
2      Q.  Could you tell me the bill number for the first
3  one?
4      A.  The bill number for?
5      Q.  You said there were two bills, election-related
6  bills?
7      A.  No.  I don't know the bill numbers.
8      Q.  Could you describe the bills for me?
9      A.  There was one bill regarding school board --
10  school board elections, there in Harris County, to help
11  our local school district with the costs associated with
12  running an election.
13      Q.  Would you describe the other bill?
14      A.  The other bill had to do with translating the
15  election materials, the costs associated with Harris
16  County translating the election materials.  Harris
17  County had asked to -- for our office to help with that,
18  to see if the Secretary of State would translate those
19  materials so that there's uniformity across the state.
20  That's what the legislation did.
21      Q.  And so the purpose of the bill was to provide
22  funding for the printing of those materials; is that
23  right?
24      A.  The actual translation of the election
25  materials.

## 42

1      Q.  Why did Representative Harless sponsor that
2  legislation?
3      MR. SWEETEN:  I'm going to object to the
4  extent that the question may ask him to reveal thoughts
5  or opinions about legislation in furtherance of the
6  legislative process, and you're asking about a specific
7  communication between Ms. Harless and Mr. Beuck.
8      MS. WESTFALL:  Let me strike that
9  question.
10      Q.  (By Ms. Westfall)  What was the purpose of that
11  legislation?
12      A.  The purpose was to -- Harris County had
13  concerns regarding the translation of those election
14  materials.  They felt that because there were several
15  other counties that were now going be required to
16  translate into these other languages, that there should
17  be a uniform translation across -- across the state.
18      Q.  What is your understanding of why Harris County
19  decided that Representative Harless was the person to
20  carry that bill?
21      MR. SWEETEN:  Objection, calls for
22  speculation.
23      Q.  (By Ms. Westfall)  You may answer.
24      A.  I can't speak to that.
25      MS. WESTFALL:  Mr. Sweeten, I would ask

## 43

1  that you make your objections in a shorter fashion so
2  that there is not coaching of the witness.
3      MR. SWEETEN:  Counsel, I just said,
4  "Objection, calls for speculation."  How would you like
5  me to rephrase that?
6      MS. WESTFALL:  "Objection, speculation."
7      MR. SWEETEN:  Okay.  I will shorten it to
8  that.
9      Q.  (By Ms. Westfall)  I believe you testified
10  earlier, and this was of interest to me the, the
11  difference between sponsoring and authoring a bill.
12      So when a bill comes from the Senate and
13  it comes to the House and it's being sponsored in the
14  House?  Is that right?  That's a correct term?
15      A.  Yes.  House -- we House sponsor the
16  legislation.
17      Q.  How is it decided which member will be
18  sponsoring the Senate Bill?
19      A.  From my experience, it is the committee, and
20  leadership will make that determination.
21      Q.  Is it leadership in both the House and the
22  Senate decide who will carry that bill in House?
23      A.  Typically, I would say it would just be the
24  House leadership makes that determination.
25      Q.  And in the House, when you refer to leadership,

## 44

1  who, other than the Speaker, is involved in that
2  decision?
3      A.  I can't say.  I don't know.
4      Q.  Is it chiefly the decision of the Speaker?
5      MR. SWEETEN:  Objection, calls for
6  speculation.
7      A.  I don't know.
8      Q.  (By Ms. Westfall)  How many immigration-related
9  bills has Representative Harless sponsored, authored, or
10  co-sponsored during your employment with her office?
11      A.  We had a -- one bill.
12      Q.  Could you tell me about that bill?
13      A.  Yes.  It was a bill -- I believe it was called
14  a Sanctuary City Bill.
15      Q.  What did Sanctuary City Bill do?
16      A.  This was legislation she had filed in previous
17  sessions.  It was -- it was not my focus this session,
18  so I'm not the expert on it.  So I really -- the details
19  of the legislation, I know it's to -- I really don't
20  know the details on it, to be honest.
21      Q.  Could you describe the basic purpose of the
22  bill?
23      A.  The purpose of the bill was to --
24      MR. SWEETEN:  I'm going to make sure
25  that -- with respect to this question, I'm going to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 45

1 object to it to the extent it calls for you to provide
2 information that's covered by the legislative privilege
3 which could be communications with Representative
4 Harless.  With that, you can go ahead and answer.
5         MS. WESTFALL:  Mr. Sweeten, are you taking
6 the position that questions related to the purpose of
7 legislation are covered by legislative privilege, so I
8 understand this for the record?
9         MR. SWEETEN:  Just so it's clear, I'm
10 saying that any communications that he's had with
11 Representative Harless about the purpose of the bill
12 would be covered by legislative privilege.  If you're
13 asking him based on the text of the bill or his general
14 understanding, I think that would be -- that's fair
15 game.
16    Q.  (By Ms. Westfall) My question stands.  What
17 was the purpose of the Sanctuary Cities Bill?  You may
18 answer.
19         MR. SWEETEN:  My instruction stands.
20    A.  The purpose of the legislation was to prohibit
21 cities from providing a sanctuary regarding immigration
22 laws, federal immigration laws.
23    Q.  (By Ms. Westfall)  Could you explain that a
24 little bit further?  It's not clear to me.  Could you
25 describe it a little further?

## 46

1         MS. WESTFALL:  I want to note for the
2 record that the witness is pausing and thinking about
3 his answer.
4    A.  The legislation was in response to cities that
5 were not enforcing immigration laws, and the legislation
6 was intended to -- to prohibit that.
7    Q.  (By Ms. Westfall)  And she sponsored this bill
8 in 2009; is that correct?
9    A.  Yes.
10    Q.  Had this bill been introduced prior to 2009 in
11 some way, shape, or form?
12    A.  Yes.
13    Q.  Who introduced it previously?
14    A.  I -- I don't know.
15    Q.  Do you know why Representative Harless
16 introduced the bill in 2009?
17         MR. SWEETEN:  Objection, speculation.
18    Q.  (By Ms. Westfall)  You may answer.
19    A.  Her constituents had requested it.
20    Q.  What area does she represent?
21    A.  Spring, Texas.
22    Q.  Where is that?
23    A.  Northwest Harris County.
24    Q.  Northwest Harris County.  Which of her
25 constituents asked her to sponsor the bill?

## 47

1         MR. SWEETEN:  Objection.  I'm going to
2 instruct the witness not to answer to the extent that
3 that information reveals thoughts and opinions about
4 legislation or furtherance of the legislative process,
5 and it relates to communications between you and
6 Representative Harless, communications between
7 constituents and legislative staff or Representative
8 Harless, communications between legislators or
9 legislative staff.
10         With that cautionary instruction, you can
11 go ahead and answer to the extent you have an answer.
12         MS. WESTFALL:  Mr. Sweeten, I want to
13 clarify whether you are including within the privilege a
14 promise that a legislature makes for a constituent to
15 sponsor a bill.  Would you say that that is privileged?
16         MR. SWEETEN:  I am saying that any
17 communications between constituents and a legislator
18 would be covered by the legislative privilege.
19         MS. WESTFALL:  And that is about
20 legislation, generally, in either direction?
21         MR. SWEETEN:  In either direction
22 regarding legislation, that's correct.
23         MS. WESTFALL:  Court reporter, could you
24 read back the question?
25         (The requested portion was read by the

## 48

1 reporter.)
2    A.  I can't speak to an individual constituent who
3 asked.  I know several have been in contact.
4    Q.  (By Ms. Westfall)  Could you tell me the
5 identity of the constituents?
6         MS. WESTFALL:  And that's outside the
7 privilege, Mr. Sweeten.
8    A.  The identity?
9    Q.  (By Ms. Westfall)  Who were these constituents?
10    A.  Constituents.  That's about -- I don't know the
11 individual identities of these -- these people.
12    Q.  Were there any lobbyists who requested her to
13 sponsor the bill?
14    A.  I don't know.
15    Q.  Were there any interest groups that asked her
16 to sponsor the bill?
17    A.  I don't know.
18    Q.  Are you familiar with a group ALEC?
19    A.  Yes.
20    Q.  Did ALEC ask her to sponsor the bill?
21    A.  I cannot speculate.  I don't know.
22    Q.  How many bills did she sponsor in 2009?
23    A.  I think we sponsored around -- more than five
24 Senate bills, five to ten Senate bills.  We authored
25 approximately ten House bills, 10 to 15.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

49

1    Q.  And could you remind me:  Did she sponsor or
2  author the Sanctuary Cities Bill in the House in 2009?
3    A.  She was an author.  We had filed legislation on
4  that.
5    Q.  Do you know why she was selected to carry the
6  bill rather than Representative Solomons?
7    A.  Which bill?
8    Q.  Sanctuary Cities.
9    A.  There were several Sanctuary City bills last
10 session.  Representative Solomons, I believe, had one as
11 well.
12   Q.  What happened to Representative Harless's
13 Sanctuary Cities bill?
14   A.  It did not move.
15   Q.  Did not move out of committee?
16   A.  Correct.
17   Q.  What committee was it considered by?
18   A.  State Affairs.
19   Q.  Why did it not move out of committee?
20   A.  I can't speculate.  I don't know.
21   Q.  Who was Chair of State Affairs at that time,
22 committee?
23   A.  Byron Cook.  Representative Byron Cook.
24   Q.  Is it generally the Chair who decides which
25 bills move out of committee?

---

50

1    A.  Typically.
2    Q.  Do you believe that compliance with the Texas
3  Constitution is an important consideration in the
4  law-making process?
5    A.  Yes.
6    Q.  How do you ensure that there is compliance with
7  the Texas Constitution in drafting a bill?
8    A.  Reading the Constitution helps.
9    Q.  Take any other steps?
10   A.  Consulting with Texas Legislative Council.
11   Q.  Could you describe generally for me your role
12 in drafting a bill between you and the Council?
13   A.  Generally speaking, there is an idea for
14 legislation, and I take that legislation, the ideas, the
15 general ideas, and request counsel to assist in drafting
16 the legislation.
17   Q.  So the Texas Legislative Council does the
18 actual -- provides the technical support in drafting the
19 bill; is that correct?
20   A.  As well as legal.
21   Q.  And you provide the concept and get it to
22 them?  Is that how it works?
23   A.  Yes.
24   Q.  Do you believe that the compliance with federal
25 law is an important consideration in the law-making

---

51

1  process?
2    A.  Yes.
3    Q.  How do you ensure compliance with federal law
4  in drafting legislation?
5    A.  The same as with Texas constitutional law.  You
6  study the federal law, as best you can, and consult with
7  Texas Legislative Council.
8    Q.  Are you familiar with Section 5 of the Voting
9  Rights Act?
10   A.  Yes.
11   Q.  When did you first learn about Section 5?
12   A.  Quite sometime ago.  I can't say.  Probably
13 high school.
14   Q.  How does the Legislature ensure compliance with
15 Section 5 of the Voting Rights Act?
16        MR. SWEETEN:  Objection, speculation.
17   A.  (By Ms. Westfall)  You may answer.
18   A.  Could you repeat the question?
19   Q.  How does the Legislature ensure compliance with
20 Section 5?
21        MR. SWEETEN:  Same objection.
22   A.  By taking the same steps of studying the law
23 and consulting with counsel.
24   Q.  (By Ms. Westfall)  Do you believe that
25 compliance with the Federal Voting Rights Act is an

---

52

1  important consideration in the law-making process?
2        MR. SWEETEN:  Objection, vague.  Go ahead,
3  you can answer.
4    A.  I believe following all laws is important, all
5  federal law is important.
6    Q.  (By Ms. Westfall)  Are there any particular
7  steps that you take with regard to ensuring that
8  election laws comply with Section 5, that you haven't
9  already testified to?
10   A.  No.
11   Q.  What is Texas's current system for determining
12 how to verify the identity of a voter at the polls?
13   A.  The current voting system.
14   Q.  Before SB 14 --
15   A.  Yes.
16   Q.  -- since that's not being implemented?
17   A.  A -- for regular voting, not early voting?
18   Q.  Let me withdraw the question.  Strike the
19 question.  I will rephrase.
20        What is the current system, under Texas
21 law, for determining how to verify the identity of a
22 voter who is voting in person on either early voting or
23 on election day?
24   A.  I believe with early voting, there is a -- I
25 show my driver's license when I early vote.  That's

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

---

### 53

1   typically what I do.  When you are voting on election
2   day, you have the option of showing your registration
3   card, your voter registration card, or there are a
4   couple of other documents that you are able to show to
5   verify your identity.
6        Q.   What are those documents?
7        A.   It's a pretty long list.  I don't know.  I've
8   never used that.  So I know there is a -- there's
9   personal records of some sort.
10       Q.   So when you're answering these questions, are
11  you testifying based on your personal experience as a
12  voter?
13       A.   My personal experience?  No.  As well as what I
14  know from the issue.
15       Q.   Are there any problems with the current system
16  you just described for verifying a voter's identity when
17  he shows up at the polls on election day?
18       A.   Yes, I think there are concerns.
19       Q.   What are those concerns?
20       A.   That an individual would be able to -- to vote
21  and use someone else's identity.
22       Q.   Are you aware of any times that that's occurred
23  in Texas?
24       A.   Yes, I believe there are examples.
25       Q.   Could you tell me about what those examples

### 54

1   are?
2        A.   The specific cases, I can't say.  I can't speak
3   to.
4        Q.   Do you know how many cases there have been?
5        A.   No, I do not.
6        Q.   Do you know how many allegations of in-person
7   voting fraud there have been in Texas?
8        A.   No, I do not.
9        Q.   Do you know how many convictions of in-person
10  voting fraud in Texas?
11       A.   No, I don't have those numbers.
12       Q.   Are there any other concerns with the current
13  system for verifying a voter's identity that you haven't
14  already testified about today?
15       MR. SWEETEN:  Are you asking if he has
16  concerns?  Just to clarify the question.  Any concerns?
17       A.   My personal concerns?
18       Q.   (By Ms. Westfall)  Is the question -- you had
19  testified that there were concerns with the system.  I
20  asked you whether there were concerns.  Is the question
21  not clear to you?
22       A.   No.  If you could --
23       Q.   You said earlier that there were problems with
24  the current system for verifying a voter's identity.  Do
25  you remember testifying about that?

### 55

1        A.   Yes.
2        Q.   And then you just testified about in-person
3   voter fraud, and we had some discussion about that,
4   right?
5        A.   Yes.
6        Q.   Are there any other problems or concerns that
7   the current system, in your view, fails to address?
8        A.   Beyond somebody voting for somebody else?
9        Q.   Correct.
10       A.   I think that's the major concern.
11       Q.   Okay.
12       A.   That I'm aware of.
13       Q.   That's the sum total of the problem, as you see
14  it, with the current system; is that correct?
15       A.   Well, I can't speak to the sum total.  I know
16  that's the -- the major -- the major issue.
17       Q.   As you sit here today testifying, I want to
18  know every single concern and problem with the current
19  system, and that's my question.  Does that clarify the
20  question for you?
21       A.   I believe I've answered it.
22       Q.   Okay.  You testified earlier that you started
23  to work for Representative Harless in November of 2009,
24  correct?
25       A.   Correct.

### 56

1        Q.   Was there a time after you were hired by
2   Representative Harless that you started to work on photo
3   ID issues?
4        A.   When did I begin working on photo ID issues?
5        Q.   For Representative Harless.
6        A.   For Representative Harless?  We prefiled
7   legislation, in the fall of 2010, so there about,
8   around.
9        MS. WESTFALL:  Could you mark this as U.S.
10  Exhibit 4.
11       (Exhibit 4 marked for identification.)
12       MS. WESTFALL:  Thank you.
13       Q.   (By Ms. Westfall)  You've been handed what's
14  been marked U.S. 4.  Take a look at it.  Let me know
15  when you've had a chance to review it.
16       A.   (Viewing documents.)
17       Q.   Have you had a chance to take a look?
18       A.   Yes.  This is the House Bill 112, the
19  legislation we -- Representative Harless prefiled.
20       Q.   Were you involved in developing this bill?
21       A.   Yes.
22       Q.   Were you involved in drafting this bill?
23       A.   In the drafting process?
24       Q.   Yes.
25       A.   Yes.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 57

1    Q.   Could you describe that process for me?
2    A.   The process is as with other bills, as I
3    described earlier, the idea for the legislation was
4    brought up, and I researched the issue, and I contacted
5    Texas Legislative Council for assistance in drafting.
6    Q.   Did you do anything else, in the drafting or
7    development process, for HB 112?
8    A.   Beyond researching the issue and that's -- no.
9    Q.   Thank you for your testimony.
10           Could you describe the basic provisions of
11   HB 112?
12   A.   (Viewing documents.)
13           MS. WESTFALL:  Please note for the record
14   that the witness is reviewing Exhibit 4.
15   A.   Could you repeat -- you're asking the basic --
16   Q.   (By Ms. Westfall)  Could you describe the basic
17   provisions of HB 112?
18   A.   Yes.  There is -- this is the voter
19   identification legislation.  There is a -- a voter must
20   present to an election officer one form of
21   identification.  And then that lists -- those are, I
22   guess, what you would consider to be photo ID, or two
23   different forms of identification.  Then that lists
24   several -- I believe that's -- that's the -- the list of
25   other documents that you would be able to show.

### 58

1    Q.   How long did it take to draft this bill?
2    A.   I don't recall.
3    Q.   Did it take more than three months?
4    A.   I don't believe so.  I don't think it took
5    longer than three months.
6    Q.   How many meetings did you have with
7    Representative Harless about this bill?
8    A.   Several.
9    Q.   Less than ten?
10   A.   I'd say five to ten.
11   Q.   Did you have meetings about HB 112 in 2010,
12   prior to the filing in November of 2010?
13   A.   It would be in the fall of 2010, early -- I'm
14   sorry, excuse me.  Later summer, early fall.
15   Q.   How long did it take to draft the bill with the
16   Texas Legislative Council?
17   A.   I do not remember.
18   Q.   A matter of weeks?
19   A.   I think it was several weeks.
20   Q.   How many communications did you have with the
21   Texas Legislative Council about HB 112?
22   A.   No more than five.
23   Q.   Did you consider any other -- turning your
24   attention to U.S. 4, did you consider any other,
25   including any other kinds of ID in this bill, as

### 59

1    allowable by voters?
2    A.   Additional forms of photo identification?  No.
3    Q.   Did you consider any other forms of nonphoto
4    identification?
5    A.   No.
6    Q.   So HB 112 allowed for two forms of nonphoto ID;
7    is that correct?
8    A.   Yes.
9    Q.   Does that establish a person's identity?
10   A.   Would two forms of identification establish a
11   person's identity?
12   Q.   That's the question, yes.
13   A.   I believe it's -- I believe there's a greater
14   likelihood of identifying the person -- correctly
15   identifying the person more than current law under this
16   bill, yes.
17   Q.   So the use of two forms of nonphoto ID would
18   increase the likelihood that you could confirm a voter's
19   identity; is that correct?
20   A.   Yes, I believe it would.
21   Q.   And that's why Representative Harless included
22   it in this bill; is that right?
23           MR. SWEETEN:  Objection to the form.  Also
24   objection to the fact that you're asking him to
25   speculate as to what Representative Harless believes and

### 60

1    you're asking -- it implicates communications that he
2    may have had with Representative Harless.  So to the
3    extent -- and so I'm going to object to privilege.
4           Do not answer that if your answer reveals
5    communications you've had with Representative Harless.
6           MS. WESTFALL:  I'm gonna strike that
7    question.  Actually, I'm not going to strike.  I'm going
8    to leave it pending, because I'm going to move on that
9    question to compel.
10   Q.   (By Ms. Westfall)  I'm gonna ask you another
11   question.  What was the purpose of allowing the use of
12   two nonphoto forms of ID in HB 112?
13           MR. SWEETEN:  Again, do not reveal
14   communications that you've with Representative Harless
15   in answering that question.
16           MS. WESTFALL:  Mr. Sweeten, I'm not asking
17   him to talk about communications.  I'm asking him what
18   was the purpose of a particular provision in a
19   particular bill.
20           MR. SWEETEN:  You're asking him what the
21   purpose of this bill is, is that the question?
22           MS. WESTFALL:  Are you taking the position
23   that asking questions about the purpose of provisions in
24   legislation is protected by legislative privilege?  Is
25   that your position?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 61

1     MR. SWEETEN:  What I'm saying is, that if
2  there's a discussion that he's had with Representative
3  Harless, that he does not have to reveal that, and that
4  is privileged.  So to the extent that he can answer
5  based upon his own testimony, I'm gonna let him -- on
6  his own perception, I'm going to let him do that.  But I
7  will not let him reveal communications that he's had
8  with Representative Harless.
9     MS. WESTFALL:  That's abundantly clear,
10  and I'm not -- that's not the question.  So thank you
11  for your testimony, Mr. Sweeten.
12     Q.  (By Ms. Westfall)  You may answer.
13     MR. SWEETEN:  I'm not testifying.  I'm
14  trying to make sure that the record is clear, and I'm
15  trying to make sure that the witness is clear on my
16  instruction as to privilege.  With that, go ahead.
17     MS. WESTFALL:  Thank you.
18     Q.  (By Ms. Westfall)  You may answer.
19     A.  Could you repeat the question?
20     Q.  I certainly could.
21         What was the purpose of allowing the use
22  of two forms of nonphoto ID in HB 112?
23     A.  To improve the likelihood that the person
24  voting is who they say they are.
25     Q.  Turning your attention to Section 63.0101 on

## 62

1  Page 5.  Do you see that?
2     A.  Uh-huh.
3     Q.  And continuing on to Page 6, do you see that it
4  allowed the use of driver's licenses that had not
5  expired earlier than two years before the date of
6  presentation?
7     A.  Under Subsection 1?
8     Q.  Correct.
9     A.  Yes.
10     Q.  Why was the two-year number selected?
11     A.  I don't know.
12     Q.  Do you see under Subsection 2 of that same
13  section a reference to United States military
14  identification cards?
15     A.  Yes.
16     Q.  Could you describe the form of identification
17  cards that is described or referenced by that statement?
18     A.  A United States military identification card?
19     Q.  Yes.  What kind of cards does that include?
20     A.  I think that would include from the
21  United States military.  I can't say beyond that --
22     Q.  Do you know --
23     A.  -- what that would include.
24     Q.  You know where this particular provision
25  came from?

## 63

1     A.  I believe this language was from the
2  legislation as from the 2009 legislation.
3     Q.  And what was that bill?
4     A.  I do not remember the bill number.
5     Q.  Was much of this list of acceptable forms of ID
6  from the 2009 bill?
7     A.  Yes.
8     Q.  I believe you testified that you were involved
9  in development of HB 112?
10     A.  Yes.
11     Q.  Could you describe that process, to the extent
12  you haven't already testified about it?
13     A.  I believe I answered as my -- my involvement, I
14  believe I already answered.
15     Q.  So it's simply communications with
16  Representative Harless on five occasions in -- or ten
17  occasions in the fall of 2010; is that correct?
18     MR. SWEETEN:  Objection, misstates his
19  testimony.
20     Q.  (By Ms. Westfall)  You may answer.
21     A.  My -- my involvement with House Bill 112, yes,
22  conversations with Representative Harless, five to ten,
23  approximately, researching the issue and communications
24  with counsel.
25     Q.  Were there any activities related to the

## 64

1  development of the bill before the fall of 2010?
2     A.  Activities?  Could you be --
3     Q.  Were you involved in developing the bill prior
4  to the fall of 2010?
5     A.  House Bill 112?
6     Q.  Yes.
7     A.  No.
8     Q.  I believe you testified that you looked to the
9  bill in 2009 as a model, in part or in whole, for
10  HB 112; is that correct?
11     A.  That's correct.
12     Q.  Did you look at any other previous bills in
13  drafting HB 112?
14     A.  When I was researching the issue, I looked at
15  previous legislation, so I believe 2007, 2009.
16     Q.  Do you remember what parts of those previous
17  bills you drew from in drafting HB 112?
18     A.  No, I don't.  The specifics on which parts, I
19  don't remember.
20     Q.  Did you look at any other states' photo ID laws
21  in drafting HB 112?
22     A.  In my research, yes, I did.
23     Q.  Which states?
24     A.  Specifically, the Indiana legislation on voter
25  identification, the Georgia, were states that I looked



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

65

1  to.

2      Q.  Did anyone direct you to look at those states?

3          MR. SWEETEN:  Objection to the extent that

4  it attempts to reveal communications between he and

5  other legislative staff and/or Representative Harless.

6  He can answer it if it does not implicate those

7  communications or other communications I've articulated

8  today.

9      A.  Did anybody direct me to look at those states

10  specifically?

11      Q.  (By Ms. Westfall)  Yes.

12      A.  I came to that conclusion on my own, after

13  researching the issue, that those were two states I

14  needed to look at.

15      Q.  Do you remember any provisions that you drew

16  from the Georgia photo ID law to include in HB 112?

17      A.  No, I don't remember specifically.

18      Q.  Do you recall anything in the Georgia photo ID

19  law that you rejected and did not include in HB 112?

20      A.  No.

21      Q.  Do you recall any aspect of the Indiana photo

22  ID law that you included in HB 112?

23      A.  No, I don't know the specific provisions from

24  the individual states.

25      Q.  Did you take any steps in the drafting process

---

66

1  or development of HB 112 as a result of looking to any

2  states' other photo ID laws?

3      A.  Can you restate?  I'm sorry.

4      Q.  Did you make any changes to HB 112 as a result

5  of reviewing other states' photo ID laws?

6      A.  My primary model for this bill was the

7  legislation from 2009.  I know the -- those were taken

8  into consideration when that was drafted in 2009.  As

9  far as my -- I can't -- I don't know.

10      Q.  Did you look to any models from any interest

11  group or lobbyist in drafting HB 112?

12      A.  No.

13      Q.  Did you have any communications with other

14  legislators other than Representative Harless, about

15  HB 112?

16          MR. SWEETEN:  Can you read the question

17  back.

18          (The requested portion was read by the

19  court reporter.)

20          MR. SWEETEN:  I'm going to instruct him

21  not to reveal any communications that you've had.  The

22  fact of the communication, I will allow you to answer

23  that.

24          MS. WESTFALL:  Thank you, Mr. Sweeten.

25          MR. SWEETEN:  You're welcome.

---

67

1      A.  No, I have not.

2      Q.  (By Ms. Westfall)  So you solely talked to

3  Representative Harless, is that correct, as to

4  legislators, about 112?

5      A.  That's correct.

6      Q.  Did you talk to any legislative staff in

7  developing HB 112?

8      A.  Yes.

9      Q.  Who were those staff people?

10          MR. SWEETEN:  Same instruction.  You can

11  reveal who you talked to or the facts about the

12  communication, but not the substance of the

13  communication.

14      Q.  (By Ms. Westfall)  You may answer.

15      A.  Okay.  Senator Fraser's office and the

16  Lieutenant Governor's Office.

17      Q.  Could you identify the particular staff person

18  in Senator Fraser's office with whom you had

19  communications about HB 112?

20      A.  Janice McCoy.

21          MR. ROSENBERG:  Would you speak up,

22  please?

23          THE WITNESS:  I'm sorry.

24      A.  Janice McCoy.

25      Q.  (By Ms. Westfall)  Was there anyone else in the

---

68

1  office you had communications with?  I'm sorry, in

2  Senator Fraser's office?

3      A.  No.

4      Q.  How many communications did you have with

5  Ms. McCoy?

6      A.  Less than five.

7      Q.  Were these communications in the fall of 2010?

8      A.  I don't remember.

9      Q.  Were any of these conversations in 2009?

10      A.  In 2009?  No.

11      Q.  Were any of these conversations in the first

12  half of 2010?

13      A.  With --

14      Q.  With Ms. McCoy?

15      A.  With Ms. -- no, no.  The first half of -- no,

16  2010, no.

17      Q.  Were the two of you the sole parties to these

18  conversations?

19      A.  Yes.

20      Q.  Were these conversations conducted in person?

21      A.  No.

22      Q.  Were these conversation on the telephone?

23      A.  Yes.

24      Q.  Were any of these conversations on e-mail?

25      A.  Not that I remember.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

---

### 69

1    Q.  Were any of these conversations on text?
2    A.  No.
3    Q.  And you just testified that you also had
4    communications with a staff person from Mr. Dewhurst's
5    office.  Is that correct?
6    A.  Yes.
7    Q.  Who was that staff person?
8    A.  Bryan.  Bryan Hebert.
9    Q.  H-e-b-e-r-t?
10   A.  Yes.
11   Q.  What is his title?
12   A.  I don't know his exact title.
13   Q.  Were these conversations in the fall of 2010?
14   A.  Yes.
15   Q.  How many conversations did you have with
16   Mr. Hebert?
17   A.  Less than five.
18   Q.  Were the two of you the sole parties to those
19   communications?
20   A.  Yes.
21   Q.  Were those communications in person?
22   A.  Yes.
23   Q.  Where was the location of those communications?
24   A.  In Mr. Hebert's office.
25   Q.  How long were the meetings?

### 70

1    A.  Less than 30 minutes.
2    Q.  Did you have any e-mail communication between
3    the two of you after those meetings?
4    A.  Yes.
5    Q.  Have you produced those e-mails to your
6    attorneys?
7    A.  I did not have those documents.
8    Q.  They no longer existed in your e-mail system?
9    A.  That's correct.
10   Q.  What happened to them?
11   A.  They were -- I don't know what happened to
12   them.  I do not have them.  They were deleted.
13   Q.  Who would know what happened to those e-mails?
14   A.  I don't know.
15   Q.  Now that you remember you had e-mail --
16       MR. SWEETEN:  Can we work towards a break
17   maybe in about five minutes?  Just pretty soon we'd like
18   to take a break.
19       MS. WESTFALL:  Certainly.
20   Q.  (By Ms. Westfall)  Now that you remember you
21   had e-mail with Mr. Hebert, did you have any e-mail
22   communication with Ms. McCoy?
23   A.  In 2000 --
24   Q.  In 2010?
25   A.  No, not that I remember.

### 71

1    Q.  Do you remember whether you had any other
2    meetings with any other legislative staff or staff in
3    the Governor's Office in 2010 regarding HB 112?
4    A.  No.  That's all.
5    Q.  Did you have any other communications regarding
6    HB 112 in which Representative Harless was present?
7    A.  I'm sorry.  Can you repeat the question?
8    Q.  Any other communications -- any communications
9    regarding HB 112 at which Representative Harless was
10   present?
11   A.  Communications with myself and Representative
12   Harless?
13   Q.  And a third party.
14   A.  No, I don't remember.
15   Q.  Did you have any communications with officials
16   or legislators in other states in the fall of 2010
17   regarding the development of HB 112?
18   A.  No.
19   Q.  Did you have any communications with anyone in
20   Georgia regarding their photo ID law?
21   A.  No.
22   Q.  Did you have any communications with --
23   A.  I'm sorry.  Regarding House Bill 112?
24   Q.  Correct.
25   A.  No, no communications.

### 72

1    Q.  Did you have any communications with anyone
2    anybody in Indiana regarding their law?
3    A.  No.
4    Q.  Did you have any communications with any
5    interest groups or lobbyists concerning HB 112?
6    A.  No.
7    Q.  Did you have any communications with any
8    interest group representing minority voters regarding
9    the development of HB 112?
10   A.  No.
11   Q.  Did you have -- other than what you just
12   testified about, did you have any discussions with
13   anybody about the forms of ID to include in HB 112?
14       MR. SWEETEN:  Objection to the extent that
15   you're asking to him to reveal communications that are
16   specifically covered by the legislative privilege.  I
17   can go through those if you need to me to familiarize.
18   But otherwise, are you familiar with what we're talking
19   about?
20       THE WITNESS:  Yes.
21       MR. SWEETEN:  Okay.  Then with that
22   instruction, you can go ahead and answer Ms. Westfall's
23   question.
24   A.  Okay.  Could you repeat it?
25   Q.  (By Ms. Westfall)  Sure.  Did you have any

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 73

1 discussions with anyone about the forms of ID to include
2 in HB 112?
3    A.   Besides who I --
4    Q.   Besides the people you already testified about?
5    A.   No.
6    Q.   Conversations.  Thank you.
7       Mr. Sweeten, if you don't mind, I have
8 about five more minutes just to get through the section.
9       MR. SWEETEN:  That's fine.  Go ahead.
10       MS. WESTFALL:  And it will be a logical
11 break.
12    Q.   (By Ms. Westfall)  Did you analyze which
13 registered voters did not possess any or all of the
14 forms of ID identified in HB 112?
15    A.   No, I did not.
16    Q.   Did you read any research or analysis of voter
17 ID to assist you in drafting HB 112, that you haven't
18 already testified to?
19    A.   Yes, I did research the issue.
20    Q.   I believe you testified earlier that you had
21 researched other states' laws?
22    A.   Yes.
23    Q.   Was there anything else, any other research
24 that you conducted to assist you in new drafting HB 112?
25    A.   Yes, I -- yes.

## 74

1    Q.   Tell me what that research consisted of.
2    A.   My research on voter ID generally consisted of
3 law review articles; basically what I could get my hands
4 on, as far as research goes.
5    Q.   Which law review articles did you review?
6    A.   I can't remember.
7    Q.   Do you remember the authors of the law review
8 articles?
9    A.   No.
10    Q.   Do you remember the publications in which they
11 were published?
12    A.   No.
13    Q.   Did you conduct or instruct anyone to conduct
14 an analysis of the impact of HB 112 on minority voters?
15    A.   No.
16    Q.   Why didn't you?
17       MS. WESTFALL:  Please note for the record
18 that the witness is thinking about a response.
19    A.   Can you repeat it?
20    Q.   (By Ms. Westfall)  Certainly.  Did you conduct
21 or --
22       MS. WESTFALL:  Actually, court reporter,
23 could you read back that question?
24       (The requested portion was read by the
25 court reporter.)

## 75

1    Q.   (By Ms. Westfall)  The question before that
2 was:  Did you conduct or instruct anyone to conduct an
3 analysis of the impact of HB 112 on minority voters?
4    A.   Okay.
5    Q.   "Why didn't you?" was the question.
6    A.   And why didn't I?  Okay.
7    Q.   Yes, thank you.
8    A.   For House Bill 112, I was not -- I was not
9 asked.
10    Q.   You testified earlier that you understood this
11 change would be subject to Section 5 of the Voting
12 Rights Act, correct?
13    A.   I'm sorry.  I don't remember that.  Could
14 you --
15    Q.   Is it your understanding or was -- I'm sorry,
16 strike that.
17       Was it your understanding, at the time of
18 the drafting of HB 112, that it would be subject to
19 preclearance for Section 5 of the Voting Rights Act?
20    A.   The voter ID legislation would be subject to
21 preclearance, yes.  Yes, that was my understanding.
22    Q.   Did you take any steps in response to your
23 understanding of that?
24    A.   With House Bill 112?
25    Q.   Yes.

## 76

1    A.   With my research and my conversations and
2 consulting with Legislative Council.
3    Q.   Were you directed not to analyze the impact of
4 HB 112 on minority voters?
5       MR. SWEETEN:  Objection.  Don't reveal any
6 communications between legislators, staff, and you, or
7 any of the other areas that we've discussed.
8       THE WITNESS:  Okay.
9    Q.   (By Ms. Westfall)  To the extent you can
10 answer, can you answer?
11    A.   Was I directed to not --
12    Q.   Analyze the impact of HB 112 on minority
13 voters?
14    A.   I think --
15       MR. SWEETEN:  Again, if the answer to the
16 question involves you revealing communications between a
17 legislator, staff members, staff state agencies,
18 including the Governor or Lieutenant Governor's Office
19 or communications between the Texas Legislative Council,
20 if that's the basis of your answer, do not reveal that.
21    A.   No, I was not directed.
22    Q.   (By Ms. Westfall)  Is your answer you weren't
23 directed or you're not answering because your counsel
24 has instructed you not to answer?
25    A.   I'm sorry?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 77

1    Q.  Are you not answering the question?

2    A.  No.

3    Q.  You are not able to answer the question?

4    A.  I am answering the question:  That was not a

5    directive.

6    Q.  Are you familiar with the concept of Spanish

7    surname voter registration?

8    A.  I am now.

9    Q.  Were you at the time of the drafting of HB 112?

10   A.  No.

11   Q.  And just to go back to the -- to the testimony

12   that you just provided about not having been instructed

13   not to analyze the impact, that is your answer with

14   regard to outside of any communications that your

15   counsel is asserting is privileged; is that correct?

16   A.  I'm sorry.  Could you --

17   Q.  I'm just trying to understand the answer that

18   you just gave, the testimony that you just gave when I

19   asked you:  Were you directed not to analyze the impact

20   of HB 112 on minority votes, and you said, "I was not

21   instructed that."  Is that correct?

22   A.  Yes.

23   Q.  But you were at --

24   A.  I'm sorry.  I'm getting twisted.

25   Q.  That's okay.  We're going to take a break

## 78

1    shortly.

2        Your counsel had just instructed you that

3    you should not answer that question if it meant

4    revealing any communications that you had --

5    A.  Right.

6    Q.  -- with Representative Harless, other

7    legislators, or staff; is that correct?

8    A.  Yes.

9    Q.  So that question you did not answer with regard

10   to any directives you had made -- you may have received

11   from those individuals; is that correct?

12   A.  Okay.

13       MR. SWEETEN:  Do you need a take a minute

14   and we can discuss the privilege assertion, if you --

15       MS. WESTFALL:  Mr. Sweeten, I have a

16   question pending and you've instructed him, and I'm

17   trying to clarify his testimony for the record.

18       MR. SWEETEN:  I understand.  But I'm also

19   -- I'm allowed, per the rules, to discuss with him the

20   assertion of privilege when appropriate.  This is

21   certainly a time -- the entire premise of your question

22   is based upon privilege.  I can talk with him about that

23   assertion.

24       MS. WESTFALL:  Why don't we move on and

25   finish these questions, and we can take a break in five

## 79

1    minutes?  How about that?

2        Q.  (By Ms. Westfall)  What was the purpose of

3    HB 112?

4        MR. SWEETEN:  Objection to the extent that

5    that question calls for you to provide information about

6    communications between legislators, legislative staff,

7    or any of other enumerated areas.  Do not provide an

8    answer to that question if it does implicate those

9    communications.

10       A.  Okay.  I believe the purpose of House Bill 112

11   is to improve the elections process by strengthening the

12   identity requirements for voters.

13       Q.  (By Ms. Westfall)  Did Representative Harless

14   make any public statements concerning HB 112?

15       A.  I can't remember.

16       Q.  Was there a press release concerning HB 112?

17       A.  I can't remember.

18       Q.  Did HB 112 generate any support?

19       A.  Support?

20       Q.  For the bill from any source?

21       MR. SWEETEN:  You can answer it to the

22   extent that it doesn't implicate the areas of

23   communication that we previously discussed.

24       THE WITNESS:  Okay.

25       MR. SWEETEN:  If it does implicate those,

## 80

1    do not provide an answer to that question.

2        A.  The question again.  Did we receive positive

3    supportive --

4        Q.  (By Ms. Westfall)  Did it generate any support

5    from any source?

6        A.  Positive comments.

7        Q.  Yeah.  Support would be positive, not negative.

8        A.  Yes.  Yes.

9        Q.  And from what sources?

10       A.  Constituents.

11       Q.  Who were those constituents?

12       MR. SWEETEN:  I'm going to instruct you

13   not to answer communications because I think it would

14   reveal communications between you, your office, and

15   constituents.

16       MS. WESTFALL:  Are you not -- are you

17   instructing him not to identify constituents?  Because

18   that a privilege log issue, and I need to have that

19   answered today, Mr. Sweeten.

20       MR. SWEETEN:  What I'm telling you is that

21   the way you've come into this question, which is "what

22   did you talk about," and now you're asking that.

23       I mean, I -- as far as -- as I've told

24   you, he can provide information about the fact that the

25   conversation occurred or that he received -- or with



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

81

1    whom he spoke.  But he's not going to reveal
2    communications and the substance of those communication
3    with constituents as --
4            MS. WESTFALL:  A privilege log includes a
5    general generic description of the subject matter of the
6    communication, does it not, Mr. Sweeten?
7            MR. SWEETEN:  I think a general
8    description, yes.  Now, you've asked him, "Did you get
9    supportive constituent comments," and I think we're
10   really beyond the general description of it.
11           MS. WESTFALL:  That's extremely general,
12   in my mind.  I would like to know for the record whether
13   you are refusing to provide a very basic standard entry
14   in a privilege log, which is:  Who made the
15   communication, generally what it was about, and who
16   received it?  And right now, I have an extremely generic
17   description of the communication, which was support for
18   a bill, and I have the recipient, who was the sender.
19   Who was the constituent is my question.
20           MR. SWEETEN:  Yeah, I think the way you
21   phrased the question, I think that you're asking him to
22   reveal communications regarding Senate Bill 14, and
23   you're asking him about the substance of those.  I'm
24   going to instruct him not to answer that question.
25           MS. WESTFALL:  And that's with regard to

---

82

1    all supporters, not just constituents?
2            MR. SWEETEN:  It's with respect to all
3    constituents.  It's not -- that's part of what we've
4    asserted in the court documents, as well as today, is
5    privileged.  It's communications between constituents
6    and Representative Harless's office, which would include
7    Mr. Beuck.
8        Q.  (By Ms. Westfall)  Was there any support from
9    any interest groups for HB 112?
10       A.  Could you be more specific on interest group?
11       Q.  A group, an organization of people.  Were there
12   any organizations of people, nonprofit, for profit,
13   lobbyists, other groups that expressed support for
14   HB 112?
15       A.  I can't remember.
16       Q.  And the bill was introduced in 2010, correct?
17       A.  Yes.
18       Q.  It's years ago, right?  By my math.  Am I
19   right?
20       A.  Correct.
21       Q.  After it was filed -- after HB 112 was filed in
22   November 2010, what happened to the bill?
23       A.  The bill did not move forward.
24       Q.  Was it referred to a committee?
25       A.  I believe it was referred to a committee.

---

83

1        Q.  Was it the Select Committee on Voter ID?
2        A.  I believe so.
3        Q.  What happened to it after that?
4        A.  It did not move forward.
5        Q.  Okay.
6            MR. SWEETEN:  Let's go ahead and take a
7    break.
8            MS. WESTFALL:  Oh, let me ask one
9    question.
10       Q.  (By Ms. Westfall)  Did --
11           MS. WESTFALL:  Actually, let's take a
12   break.
13           (Recess 11:43 a.m. to 12:01 p.m.)
14       Q.  (By Ms. Westfall)  Could you describe the
15   record retention policy in Representative Harless's
16   office?
17       A.  There is a -- e-mails -- the Texas Legislative
18   Council runs the -- the e-mail system -- are typically
19   delete every 30 days.  We -- I archive materials.  You
20   have to archive materials in order for them to not be
21   deleted.
22       Q.  Did you take any steps to archive materials
23   related to voter ID?
24       A.  Yes.
25       Q.  When did you take those steps?

---

84

1        A.  The -- I saved the initial archive, I believe,
2    was a communication from the Attorney General's Office.
3        Q.  So that was this year, in 2012?
4        A.  Yes.
5        Q.  Did you archive any photo ID-related materials
6    prior to 2012?
7        A.  Yes, I did have some.
8        Q.  What were those materials?
9        A.  My documents and e-mails and electronic files.
10       Q.  Where did you save those files?
11       A.  They were located -- the electronic files were
12   on the X drive, the e-mails were in my e-mail archive,
13   and the documents were located in the file.
14       Q.  What was the approximate date on which you
15   started to archive those materials?
16       A.  Really, from the beginning of the Senate Bill
17   14, the important documents, the documents that I
18   believed needed to be saved, they were, beginning with
19   the committee hearing on Senate Bill 14.
20       Q.  Did you start to archive bills related to the
21   development of Senate Bill 14 at the end of 2010,
22   beginning of 2011?
23       A.  I don't -- could you repeat it?  The documents
24   in preparation for Senate Bill 14 --
25       Q.  That is correct.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 85

1      A.  -- prior to --
2      Q.  In 2010, 2011.
3      A.  I don't know.
4      Q.  You just remember that you started to archive
5  as of the time of the committee hearing; is that
6  correct?
7      A.  No, that's -- that's I believe where at least
8  my -- I know we have documents.  That's where my
9  e-mails, I believe.
10     Q.  So in the archived part of your computer
11 system, you have e-mails, you have documents that were
12 formerly on the shared drive.  Are there any other
13 electronic communications that you archived?
14     A.  You said e-mails and -- yes, we have e-mails
15 and our saved electronic documents, Word files, and that
16 type of thing.
17     Q.  What was the -- what is the volume, the number
18 of those documents?
19     A.  The electronic documents, I think anywhere from
20 50 to a hundred e-mails.  50 to a hundred, they're a
21 good number.
22     Q.  Have you provided each and every electronic
23 document on SB 14 to your counsel?
24     A.  Yes.
25     Q.  When did you do that?

## 86

1      A.  I believe about a month ago.
2      Q.  Could you tell me the domain on which
3  Representative Harless maintains a personal e-mail
4  account?
5      A.  By domain you mean?
6      Q.  Who was her provider for personal e-mail?  I'm
7  not asking you her e-mail address.
8      A.  Okay.
9      Q.  Just the provider.
10     A.  AOL.
11     Q.  Did you search for e-mail in response to -- her
12 personal AOL e-mail in response to -- either the
13 deposition notice that she received or the document
14 request that the Attorney General propounded in March?
15     A.  No, I don't have access.
16     Q.  Has anyone, to your knowledge, searched her AOL
17 account?
18     A.  She did.
19     Q.  How do you know that?
20     A.  She told me.
21     Q.  And I believe you testified earlier that you
22 found e-mails had been deleted.  Was that related to
23 communications that you had had with Senator Fraser's
24 staff person or Lieutenant Governor Dewhurst's staff
25 person?

## 87

1      A.  I believe it was with -- with the Lieutenant
2  Governor's Office.  That was in reference to House Bill
3  112 in late summer, early fall 2010.
4      Q.  Did you delete those e-mails?
5      A.  No.  I believe they were automatically deleted.
6      Q.  That was pursuant to an e-mail deletion policy
7  that exists in the Governor's Office or in your office?
8      A.  Yes.
9      Q.  What is that policy?
10     A.  The one I described earlier.  After 30 days,
11 e-mails are deleted.
12     Q.  Was there a reason you didn't save those
13 e-mails?
14     A.  I didn't believe they needed to be saved.  They
15 were transitory in nature, in my opinion.
16     Q.  Did Representative Harless hold any events in
17 her district related to HB 112?
18     A.  Can you be more specific on events?  Are you
19 referring to --
20     Q.  Were there any town meetings, any meetings with
21 constituents, any meetings with legislators, any
22 meetings whatsoever in her district regarding to HB 112?
23     A.  I think she'd have to speak to that.  I don't
24 know.
25     Q.  Aren't you her chief of staff?

## 88

1      A.  Yes.
2          MR. SWEETEN:  Objection, argumentative.
3      Q.  (By MS. WESTFALL)  Did Representative Harless
4  send any constituent mail regarding HB 112?
5      A.  Yes, I believe we did.
6      Q.  When was that mail sent?
7      A.  Anywhere from when the bill was filed to
8  January, February of 2011.
9      Q.  Was this a newsletter sent to constituents,
10 either electronically or in paper?
11     A.  Yes.
12     Q.  Have you produced that communication to your
13 counsel?
14     A.  Yes.
15     Q.  Was there more than one?
16     A.  I don't know.
17     Q.  Was that sent to all constituents?
18     A.  The e-mail newsletter is sent to an e-mail
19 database that we have, which includes people who ask to
20 be on the newsletter or constituents who e-mail in.
21 We've compiled it over the years, so it's a pretty large
22 group.
23     Q.  Have you had any other communications with
24 constituents, except for that newsletter, regarding
25 HB 112?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 89

1    A.  It's possible there could be some other --
2  other constituent communication letters and that type of
3  thing.  I can't say specifically.
4    Q.  Was there any communication with Mr. Paul
5  Bettencourt and Representative Harless or your office
6  concerning HB 112?
7    A.  Not to my knowledge.
8    Q.  Was there any communication between any member
9  of the King Street Patriots and Representative Harless
10 or anyone in her office concerning HB 112?
11   A.  Not to my knowledge.
12   Q.  Was there any communication between Catherine
13 Engelbrecht and Representative Harless or anyone in her
14 office concerning HB 112?
15   A.  Not to my knowledge.
16   Q.  Who would know whether these communications
17 were made in your office besides you?
18   A.  Who would be the best judge of who has
19 communicated with Representative Harless?  I believe
20 Representative Harless.
21   Q.  Would anyone else besides her know?
22   A.  I believe that's probably the most appropriate
23 person.
24   Q.  Were there any communications between anyone at
25 the American Legislative Exchange Council, otherwise

## 90

1  known as ALEC, and Representative Harless or anyone at
2  her office concerning HB 112?
3    A.  I don't know.  Not to my knowledge.
4    Q.  Would Representative Harless be the only one
5  who would be able to answer that question?
6    A.  I'm answering these questions based on my
7  knowledge of who is -- I did not have a conversation
8  with them, and I can't speak for Representative Harless.
9    Q.  Thank you.
10       What does the term Legislative Emergency
11 mean within the Texas Legislature?
12   A.  An emergency item as declared, as issued by
13 Governor?
14   Q.  (Nods head yes.)
15   A.  Typically, an emergency item is not subject to
16 the rules, the calendar rules associated with
17 nonemergency item legislation.
18   Q.  What types of bills, typically, are emergency
19 legislation?
20   A.  It varies.  Since I've been at the Capitol,
21 there's local bills that -- it's entirely up to the
22 Governor.  It varies.
23   Q.  What is your understanding of the criteria for
24 becoming emergency legislation?
25       MR. SWEETEN:  Objection, speculation.

## 91

1    A.  My thought is that it's an item that needs
2  immediate attention.
3    Q.  (By MS. WESTFALL)  Turning back to the
4  newsletters that were sent to the constituents regarding
5  HB 112 that you just testified about, could you describe
6  the substance of that communication?
7        MR. SWEETEN:  I'm going to instruct you
8  not to provide and reveal information regarding the
9  substance of correspondence between Representative
10 Harless's office and constituents.
11       MS. WESTFALL:  Just to clarify, you are
12 taking the position that communications sent in to a
13 large number of constituents, a mass form mailing, to
14 lots and lots of people, falls within legislative
15 privilege?  Is that right, Mr. Sweeten?
16       MR. SWEETEN:  Well, I mean, I think I've
17 been clear on the fact that if it's a public record,
18 including committee hearings, House Floor proceedings,
19 debates, public speeches, that sort of thing.  We're
20 talking about -- if you're asking about mass mailings, I
21 mean, there would probably be -- we'd have to have a
22 discussion.  Okay.  I think at this point, since -- if
23 you're talking about a mass mailing, we're going to
24 allow him to answer questions about that, because I
25 think that falls within, sort of, more of the public

## 92

1  record.
2        MS. WESTFALL:  And I believe he testified
3  it was a newsletter.  Have you produced those
4  newsletters in this litigation to us?  Are they on your
5  privilege log?
6        MR. SWEETEN:  We can check that.
7        MS. WESTFALL:  To extent that they haven't
8  been produced, since you're agreeing that they're not
9  privileged, I ask they be produced immediately.
10       MR. SWEETEN:  Okay.
11   Q.  (By Ms. Westfall)  And what was the substance
12 of communication regarding HB 112 in the newsletter you
13 just testified about?
14   A.  Okay.  The -- as I remember it, there was a --
15 I believe there was a newsletter which contained the
16 bills that we prefiled.
17   Q.  Did it describe HB '12?
18   A.  Briefly, yes, I think it did.
19   Q.  What did it say?
20   A.  I can't remember without -- I can't remember.
21 It briefly described that it was a -- I'm not going to
22 speculate.  I can't remember.
23   Q.  Did it talk about the purposes of HB '12?
24   A.  The basic purpose, yes, I think it did.
25   Q.  Do you recall what it said?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 93

1  A.  No, I don't.
2  Q.  Would it refresh your recollection to have that
3  document in front of you?
4  A.  You know, it might.  I can -- I believe it said
5  it was a photo identification bill.  It was a fairly
6  short newsletter briefly describing the bills that we
7  prefiled.
8  Q.  Was photo ID declared to be a legislative
9  emergency for the 82nd Legislature?
10  A.  Yes, it was.
11  Q.  Do you know how that decision was made?
12  A.  No, I do not.
13  Q.  Were you at all involved in that decision?
14  A.  No, I was not.
15  Q.  Did you attend any meetings regarding that
16  decision?
17  A.  No.
18  Q.  Did you see any written materials about that
19  decision?
20  A.  Other than the Governor's proclamation, no.
21  Q.  Did you receive any e-mail on that subject?
22  A.  News reports.
23  Q.  Are you aware of any communications in which
24  you were involved regarding declaring photo ID
25  legislative emergency in the 82nd Congress at which

## 94

1  Representative Harless was not present?
2  A.  Go back.  I'm sorry.
3  Q.  Sorry.  I'm going to strike that question,
4  because it was very long.
5  Are you aware of any communications
6  regarding declaring photo ID to be a legislative
7  emergency in which Representative Harless did not
8  participate?
9  MR. SWEETEN:  Objection, vague.  Go ahead.
10  A.  Okay.  Meetings where she did not -- meetings
11  that went on where she did not participate.  No, I'm not
12  may.
13  Q.  (By MS. WESTFALL) Why was voter ID a
14  legislative emergency?
15  MR. SWEETEN:  Objection, speculation.
16  A.  That would be speculating.  The Governor's
17  decision.
18  Q.  (By MS. WESTFALL)  What was the purpose of
19  declaring a legislative emergency?
20  MR. SWEETEN:  Same objection.
21  A.  I can't speak for to purpose.  I can tell you
22  what that effect is, but I can't speak to the purpose.
23  Q.  (By MS. WESTFALL)  Was any election set to
24  occur within the first 60 days of 2011?
25  A.  I'm sorry?

## 95

1  Q.  Were there any elections scheduled to be held
2  in the first 60 days of the legislative session in 2011?
3  A.  I don't remember.
4  Q.  Are you aware of anything that made SB 14
5  urgent for the legislators' consideration in 2011?
6  A.  The concerns -- I mentioned it earlier when we
7  were talking about the intent of House Bill 112, the
8  concerns of -- regarding the integrity of the elections
9  process.
10  Q.  Is there any other reason why photo ID was such
11  a high priority for the Governor, that you're aware of?
12  A.  Not that I'm aware of.
13  Q.  Was Representative Harless the House sponsor of
14  SB 14?
15  A.  Yes.
16  Q.  And when did you learn that Representative
17  Harless would be the sponsor of the SB 14?
18  MR. SWEETEN:  Caution the witness not to
19  reveal communications between -- in the areas that I've
20  already described.  You can rely upon information
21  contained within the public record, as we have already
22  outlined as well.  Go ahead.
23  A.  I first learned she was going to be the House
24  sponsor in a press release from Chairman Bonnen,
25  B-o-n-n-e-n.

## 96

1  Q.  (By MS. WESTFALL)  When was that press release?
2  A.  February, I believe.  I don't remember the
3  date.  Some point in February.
4  Q.  That was -- your testimony is, you had no idea
5  she was sponsoring the bill until you saw a press
6  release?
7  A.  That was my first knowledge of it, yes.
8  Q.  Did you have any communications at all
9  regarding Representative Harless's sponsorship of SB
10  14?
11  MR. SWEETEN:  Can you read the question
12  back, please.
13  (The requested portion was read by the
14  court reporter.)
15  MR. SWEETEN:  Okay.  I'm going to instruct
16  the witness that to the extent -- and I'm going to
17  object to the question.  But to an extent that your
18  answer would reveal thoughts and opinions about
19  legislation or in furtherance of the legislative
20  process, do not reveal communications between
21  legislators and staff members, communications between
22  legislators and other legislators and their staff,
23  communication between constituents and legislative
24  staff, communications between legislative staff and
25  state agencies, including the Governor and Lieutenant



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 97

1  Governor's Office, and communications between
2  legislators' staff and the Texas Legislative Council.
3       To the extent you can answer it without
4  revealing those communications, you are free to do so.
5       MS. WESTFALL: And Mr. Sweeten, to
6  clarify, you are not objecting to him testifying about
7  the fact that a communication occurred, because that is
8  not privileged, correct?
9       MR. SWEETEN: Counsel, as this deposition
10  has proceeded, I have allowed you to establish the fact
11  of the communication, and I will continue to do so.
12       MS. WESTFALL: Thank you. Thank you.
13  Q.  (By MS. WESTFALL Can you answer my question?
14  A.  Yes.  Yes.  I did have communications.
15  Q.  How many?
16  A.  Less than ten.
17  Q.  When were those communications held?
18  A.  January, February of 2011.
19  Q.  Who was a party to those communications?
20  A.  Representative Harless.
21  Q.  Anybody else?
22  A.  Senator Fraser's office.
23  Q.  Are you referring to the staff person you
24  testified?
25  A.  Yes.  Yes.  Janice McCoy.

## 98

1  Q.  Janice --
2  A.  Janice McCoy.
3  Q.  Were all ten of these discussions with --
4  A.  It wasn't exactly ten.
5  Q.  I'm sorry.  Were these discussions about
6  Representative Harless sponsoring SB 14 with
7  Representative Harless, you, and Ms. McCoy?  All of
8  them?
9  A.  No.  No.  No, that's not what I --
10  Q.  Maybe -- why don't we start with the first
11  communication about --
12  A.  Okay.
13  Q.  -- that you were involved in.
14  A.  My communications with Representative Harless.
15  Q.  And was that in January 2011?
16  A.  I would say January and February.
17  Q.  Were those communications in person?
18  A.  Yes.
19  Q.  Were those meetings in her office?
20  A.  Yes.
21  Q.  Were they all in her office?
22  A.  Yes, we did have -- I believe we had a phone
23  conversation as well.
24  Q.  Did you have any e-mail communication with
25  Representative Harless about her sponsorship of SB 14?

## 99

1  A.  Not that I remember.
2  Q.  Did you have any meetings with Representative
3  Harless and Ms. McCoy?
4  A.  Not that I remember.
5  Q.  Did you have any meetings just with Ms. McCoy?
6  A.  I had a phone conversation.
7  Q.  Did you only have one?
8  A.  At the most, two.  I can remember one.  I would
9  say at the most two.
10  Q.  When were these phone conversations?
11  A.  January and February.
12  Q.  How long were the phone conversations?
13  A.  Brief.
14  Q.  And just to make the record, Mr. Sweeten, what
15  were the conversations about?
16       MR. SWEETEN: Objection.  Do not reveal
17  the content of those communications, to the extent it
18  would -- if it would implicate legislative privilege.
19  I'm going to instruct you not to answer that question.
20  Q.  (By MS. WESTFALL And what were the
21  conversations you had with Representative Harless about
22  regarding her sponsorship of SB 14?
23       MR. SWEETEN: The same objection.  It
24  calls for him to reveal legislative privileged
25  information.

## 100

1  Q.  (By Ms. Westfall)  Is it your testimony there
2  were no e-mail whatsoever regarding -- that you were
3  aware of or party to involving Representative Harless's
4  sponsorship of SB 14?
5  A.  Not that I remember.
6  Q.  Did you have any communications with the
7  Governor's Office, the Lieutenant Governor's Office,
8  regarding Representative Harless's sponsorship of SB 14?
9       MR. SWEETEN: Again, don't reveal the
10  content of the conversation, but you can discuss if you
11  had such conversations with those offices.
12  A.  The Lieutenant Governor's Office.
13  Q.  (By MS. WESTFALL) Was it a staff person in that
14  office that you had the communication with?
15  A.  Yes.
16  Q.  Who was the staff person?
17  A.  Bryan, Bryan Hebert.
18  Q.  How many communications did you have with him?
19  A.  One.
20  Q.  When were these communications -- that
21  communication?  I'm sorry.
22  A.  February, January of 2011.
23  Q.  Was that a phone call?
24  A.  Yes.
25  Q.  What was it about?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 101

1    A.   I can't speak to that without revealing --
2    without the privilege.
3        MR. SWEETEN:  Objection, it calls for him
4    to reveal matters that are legislative privileged.
5    Q.   (By MS. WESTFALL) Did you have any
6    communications with the Department of Public Safety
7    regarding SB 14 and Representative Harless's sponsorship
8    of that bill?
9        MR. SWEETEN:  Can you read that back?  I'm
10   sorry, I didn't get that whole question.
11       (The requested portion read back by the
12   reporter.)
13       MR. SWEETEN:  Don't reveal
14   communications.  You can reveal whether or not such a
15   conversation -- if a conversation at that time occurred.
16   A.   No.
17   Q.   (By Ms. Westfall)  Did you have any such
18   conversations with anyone from the Secretary of State's
19   Office?
20       MR. SWEETEN:  The same instruction.
21   A.   No.
22   Q.   (By Ms. Westfall)  Were you involved in the
23   development of drafting of SB 14?
24   A.   Yes.
25   Q.   Can you describe your role in development of

---

### 102

1    SB 14?
2    A.   I was -- my responsibility was to research the
3    issue, review past legislation, and to work with the
4    Texas Legislative Council on of drafting the
5    legislation.
6    Q.   When did you start undertaking those
7    activities?
8    A.   With regard to Senate Bill 14?
9    Q.   Yes.
10   A.   I think that would have been late -- late
11   February.  When it was determined that Representative
12   Harless would be the sponsor, that's when I actually
13   started working on Senate Bill 14.
14   Q.   How did you come to have that responsibility
15   for developing SB 14?
16       MR. SWEETEN:  Don't reveal any
17   communications, but if you can do so without revealing
18   those, you can go ahead and answer the question.
19   A.   As her chief of staff, my responsibilities
20   include legislation.  That's my primary responsibility
21   during the legislative sessions, to help with her
22   legislative package.
23   Q.   (By MS. WESTFALL) Did you work with other staff
24   people or members in developing SB 14?
25   A.   Yes.

---

### 103

1    Q.   Who were those members or staff?
2    A.   The two previous staff I've mentioned with
3    Senator Fraser's office and the Lieutenant Governor's
4    Office.  I also had conversations with the Speaker's
5    office, Meredith Fowler.
6    Q.   What's her title with Speaker Straus?
7    A.   She's a policy analyst.  I don't know her
8    title.
9    Q.   Anybody else?
10   A.   Steven Schar is the committee clerk for the --
11   the Select Committee on Voter Identification.  I had
12   communications with him as well.
13   Q.   So how did the development work amongst this
14   group you just identified?
15       MR. SWEETEN:  Don't reveal the
16   communications that occurred between you and anyone in
17   those offices that you've mentioned, but to the extent
18   you can answer it without doing so, you can answer.
19       THE WITNESS:  Okay.
20   A.   The process, when it came over and the Senate
21   Bill 14 came over from the Senate, Representative
22   Harless was asked to be the House sponsor.  I then went
23   about my job of seeing the legislation, helping her with
24   moving the legislation through the process.
25   Q.   (By Ms. Westfall) Did you have any involvement

---

### 104

1    with SB 14 before it arrived in the House?
2    A.   No, I did not.
3    Q.   Did Representative Harless?
4    A.   Not to my knowledge.  I can't speak for her.
5    Q.   Are you aware of any discussions about how to
6    structure or draft the ID requirements or the allowable
7    forms of ID under SB 14?
8        MR. SWEETEN:  Don't reveal any
9    communications between the legislators or their staff in
10   answering this question.  If you -- go ahead.
11   A.   The -- I'm sorry.  Could you repeat it?
12   Q.   Certainly.
13   A.   It's the forms of identification, the
14   discussions behind which ones to --
15   Q.   (Nods head yes.)
16   A.   No, I'm not aware of it, not to my knowledge.
17   Q.   So you just got the bill from the Senate, and
18   you didn't talk about the forms of ID that were
19   required; is that right?
20       MR. SWEETEN:  Objection.  You're asking
21   him to reveal the communications.  You're asking him,
22   did he discuss the forms of ID, which is a
23   particularized conversation about Senate Bill 14;
24   therefore, I'm going to instruct him not to answer that
25   question.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                                    MAY 14, 2012

---

### 105

1    Q.   (By Ms. Westfall)  Who were the people who know
2    who could tell us about the ID -- strike that.
3            Other than the staff that you've just
4    listed, are there any other people who could -- with
5    information about the types of allowable forms of ID
6    that were considered to be included in SB 14 when it
7    arrived in the House?
8    A.   You're asking before it arrived in the House
9    who was involved in --
10   Q.   No, when it arrived in the House.
11   A.   Okay.  When it arrived in the House, who had --
12   the staff?
13   Q.   (Nods head yes.)
14   Q.   Okay.  And you asked if there was anybody else?
15   A.   (Nods head yes.)
16   A.   No.
17   Q.   Did you have discussions about the form of ID
18   to include in SB 14?
19           MR. SWEETEN:  I'm going to instruct him
20   not to answer that.  I think that you're asking him
21   about the specific communication which is legislatively
22   privileged.
23   Q.   (By Ms. Westfall)  Are you aware of whether
24   Representative Harless had any discussions about the
25   forms of ID to include in SB 14?

---

### 106

1    A.   I can't -- I can't say that.  I can't speak for
2    her.  I don't know.
3    Q.   Are you aware of any written communications
4    about the forms of ID that were included in SB 14?
5    A.   Other than what was in the bill, no.
6    Q.   There was no e-mail on this topic at all?
7    A.   On the --
8    Q.   Forms of ID to include in SB 14?
9    A.   Not that I remember.
10   Q.   Who would know the answer to that question?
11   A.   I can't speak for other people.  I don't know.
12   Q.   Can you describe the drafting process for
13   SB 14?
14   A.   The bill, as it came over from the Senate,
15   there were several amendments that were added on in the
16   Senate.  The bill that we had in committee was -- was
17   the product of the Senate and their amendments on the
18   floor, and that -- that was the -- that was the drafting
19   process, was rolling those -- those amendments in.
20   Q.   So that was kind of like technical in nature?
21   A.   Technical, yes.  And there were also changes
22   that we had made.
23   Q.   Did you have communications with the
24   Legislative Council back and forth with drafts of SB 14
25   when it arrived in the House?

---

### 107

1    A.   Yes.
2    Q.   How many drafts did you exchange?
3    A.   Two to three.
4    Q.   When were those drafts exchanged?
5    A.   February.
6    Q.   Who was the person at the Legislative Council
7    with whom you communicated?
8    A.   Jennifer is her first name, I believe.
9    Q.   Jennifer Jackson?
10   A.   Yes.  Thank you.
11   Q.   She was the sole person you had communications
12   with at the Council?
13   A.   Yes.
14   Q.   Were the other staff people you just listed
15   earlier involved in those communications as well; i.e.,
16   Ms. McCoy, staff from the Lieutenant Governor's Office,
17   staff from Speaker Straus's office?
18   A.   Were they involved in my communications with --
19   no.  It was my communicating with Jennifer.
20   Q.   So the two of you were the sole parties to
21   those drafts; is that correct?
22   A.   Yes.
23   Q.   Did Representative Harless look at these
24   drafts?
25   A.   Yes.

---

### 108

1    Q.   Was she part of communications with
2    Ms. Jackson?
3    A.   No.  I was the -- I was the point of contact
4    with Council.
5    Q.   What were the changes that were made through
6    the drafting process with the Council?
7    A.   The changes that Council made in the various
8    drafts?  Is that you're asking?
9    Q.   Yes.
10   A.   I don't remember the specific changes that were
11   made.  I know there were at least two drafts.
12   Q.   Did you play any role before -- you may have
13   testified about this earlier, but please remind me.  Did
14   you have any role in the development of SB 14 before it
15   arrived in the House?
16   A.   No.
17   Q.   So you did not do any research to figure out how to
18   craft that bill as it originated in the Senate; is that
19   correct?
20   A.   No.  That was for the Senators and -- no.
21   Q.   Did you conduct any research when it arrived in
22   the House, in terms of looking to other states' models?
23   Doing any other research?
24   A.   Yes.
25   Q.   Could you tell me about that research.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                          MAY 14, 2012

---

**109**

1     A.   The research fell in line with my research on
2  House Bill 112.  It involved looking to other states,
3  Georgia, Indiana, researching legal opinions.
4     Q.   What sort of legal opinions?
5     A.   Specifically the Indiana case.
6     Q.   Did you read Crawford, the Crawford decision?
7     A.   Yes.  Yes.
8     Q.   Did it cause you to change any of the drafting
9  of the bill, SB 14?
10         MR. SWEETEN:  I'm going to object to that.
11  I think that calls for his thought process in how he
12  reacted to the Crawford decision, et cetera.  I think
13  that's out -- I think that is legislatively privileged,
14  so I'm going to instruct him not to answer that
15  question.
16     Q.   (By Ms. Westfall)  Did you have any
17  communications with any interest group about SB 14 as
18  you were developing it?
19     A.   No.
20     Q.   Did you have any communications with any
21  lobbyist?
22     A.   No.
23     Q.   Did you have any communications with other
24  legislators or staff, who you haven't already testified
25  about, in developing SB 14?

---

**110**

1         MR. SWEETEN:  Don't reveal any
2  communications in that category.  You can reveal whether
3  or not you've had discussions with individuals and other
4  staff.
5     A.   It was -- could you repeat the question?  I'm
6  sorry.
7     Q.   (By Ms. Westfall)Did you have any
8  communications with any interest groups or constituents
9  regarding the development of SB 14?
10         MR. SWEETEN:  The same instruction.
11         THE WITNESS:  Is that a different --
12     Q.   (By Ms. Westfall)  Answer that question,
13  please.
14     A.   Okay.  Constituents regarding the development
15  of SB 14?  No.
16     Q.   Did you have any communication with the
17  American Legislative Exchange Council?
18     A.   No.
19     Q.   Did you have communications with any experts on
20  the topic of voter ID in developing SB 14?
21     A.   And experts?
22     Q.   Any people from outside the state who write or
23  think about voter ID.
24     A.   No, I didn't have any discussions.
25         MS. WESTFALL:  Could you mark this is

---

**111**

1  Exhibit 5.
2         (Exhibit 5 marked for identification.)
3     Q.   (By Ms. Westfall) I'm handing you what's been
4  marked as U.S. Exhibit 5.  Do you recognize this?
5     A.   It appears to be Senate Bill 14.  I'm not --
6  Senate Bill 14 as it was signed by the Governor.
7     Q.   Was this a different form of the bill from what
8  was received in the House?
9     A.   Yes.
10     Q.   What were the differences?
11     A.   Would you like me to go through the bill?
12     Q.   Well, the major differences.
13     A.   The major differences.  Okay.
14     Q.   The major differences.
15     A.   The Section 1 has to do with the disability
16  exemption.  As that came over from the Senate, the
17  standard was different.  I believe it was based on a
18  physician's note.  And in the version as it was signed
19  by the Governor, there is a written documentation from
20  the Social Security Administration or Department of
21  Veterans Affairs.
22         The -- I believe in the Senate bill, the
23  concealed handgun license, there was no language
24  regarding the expired -- the House added the language
25  regarding the -- that it's not expired 60 days before

---

**112**

1  the date of presentation.
2         The exemption for the religion objection
3  was worded -- I believe was worded differently in the
4  Senate's version of the bill.
5         The natural -- excuse me -- the natural
6  diaster language contained -- the final version of the
7  bill was added in the House, so that was not contained
8  in the Senate's version of the bill.
9         The language on the election
10  identification certificate was not in the Senate's
11  version of the bill.  I might have missed some, but from
12  my reading through the bill, those are the ones I
13  remember right now.
14     Q.   Thank you.
15         Going back to your development of SB 14,
16  did you have any communications with any groups
17  representing minority voters in developing SB 14?
18     A.   Can you repeat that?
19         MS. WESTFALL:  Could you read back the
20  question please, sir.
21         (The requested portion was read by the
22  court reporter.)
23         MR. SWEETEN:  Don't reveal the substance
24  of any communication.  You can answer, identify the fact
25  of the communication.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 113

1    A.  Yes.
2    Q.  (By Ms. Westfall) What were those groups?
3    A.  I believe we received communications from -- it
4  was either LULAC or MALC, and as well as the -- those
5  are the ones I remember.
6    Q.  Are you talking about MALDEF?
7    A.  I'm sorry.  MALDEF.
8    Q.  And were any steps taken in response -- in
9  drafting SB 14, in response to those communications?
10   A.  I don't remember the nature of the
11 communications, so I can't say.
12   Q.  So you're --
13   A.  But I do remember we were -- we were contacted
14 by them.
15   Q.  Did you receive written communications?
16   A.  I don't remember.  I know there was
17 communication.  I believe there was an office visit from
18 an individual.
19   Q.  Do you recall one visit from someone from
20 MALDEF?
21   A.  Yes.
22   Q.  Do you recall who that person was?
23   A.  No, I don't.
24   Q.  Do you recall when that meeting took place?
25   A.  No, I don't.

## 114

1    Q.  Do you recall whether it was Luis Figueroa?
2    A.  I can't remember.
3    Q.  Were you at that meeting?
4    A.  The office visit, I don't remember.
5    Q.  Who was at that meeting, besides the
6  representative from MALDEF and the representative?
7    A.  I don't remember.
8    Q.  And sitting here today, you can't recall
9  whether any steps were taken in response to that meeting
10 with regard to the development of SB 14; is that right?
11   A.  I don't.
12   Q.  You don't recall?
13   A.  I don't recall.
14   Q.  You can't identify any steps, in other words,
15 that were taken in response to that?
16   MR. SWEETEN:  Objection, argumentative.
17   Q.  (By Ms. Westfall) You may answer.
18   A.  I don't recall the specifics of the
19 communication; therefore, I can't speak to what was
20 changed.
21   Q.  And Representative Harless is the only person
22 who would be able to speak to that; is that right?
23   MR. SWEETEN:  Objection as to -- you don't
24 have to answer that question.
25   MS. WESTFALL:  What's your basis?

## 115

1    MR. SWEETEN:  The basis is, you're asking
2  him to say, will Representative Harless answer that
3  question, and how would he possibly --
4    MS. WESTFALL:  I said, is she the only
5  person who would know, and that goes to the motion to
6  compel which we will file.
7    MR. SWEETEN:  Okay.  I'm going to go
8  ahead, and I'll let you answer the question, but I'm
9  going to object to the question for speculation.  Go
10 ahead.
11   A.  I don't know.  I can't --
12   Q.  (By Ms. Westfall) Turning back to Exhibit 5,
13 SB 14, how was the decision reached on the forms of ID
14 to include in SB 14 on the House side?
15   MR. SWEETEN:  Objection.  Don't answer the
16 question.  That calls for him to provide thoughts and
17 opinions about legislation in furtherance of the
18 legislative process and is legislatively privileged.
19   Q.  (By Ms. Westfall)  Did you conduct or
20 Representative Harless conduct any analysis to determine
21 what forms of ID to include in SB 14 when it came to the
22 House?
23   MR. SWEETEN:  Objection, compound.
24   Q.  (By Ms. Westfall)  You may answer.
25   A.  I can answer for myself, and yes, I did look at

## 116

1  forms of identification.
2    Q.  What analysis did you conduct?
3    A.  In my research on voter identification issues,
4  there were different forms of identification out there,
5  and they were considered.
6    Q.  So you looked at -- as you testified earlier,
7  you looked at Georgia and Indiana; is that correct?
8    A.  Correct.
9    Q.  Did you look to previous iterations of voter ID
10 in the House or Senate?
11   A.  Correct.
12   Q.  Which previous iterations did you look to?
13   A.  In my research on the issue, I looked at -- I
14 believe I looked at 2007, 2009.
15   Q.  Could you describe the forms of ID that are
16 acceptable under Senate Bill 14?
17   A.  Acceptable forms of identification would be a
18 driver's license, an election identification
19 certificate, a personal identification card issued by
20 DPS.  Those are DPS issued identification.  Next would
21 be a military identification card.  A United States
22 citizens certificate, a United States passport, and a
23 license -- concealed carry license.
24   Q.  Were any other forms of ID considered during
25 the drafting and development of SB 14 on the House side?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 117

1    MR. SWEETEN:  Objection to the question.
2 You're asking him to reveal thoughts and opinions about
3 what was considered in formulating this legislation.  It
4 also calls for speculation.
5    So I'm going to instruct you, if you can
6 answer based upon your own personal knowledge, but I
7 don't want you to reveal any communications between any
8 of the categories that we've been discussing today.
9    A.  In the committee and on the House floor, there
10 were, I believe, a few other forms of identification
11 that were discussed and brought up as a --
12    MR. SWEETEN:  Let me be clear also.  To
13 the extent -- and I want to be consistent that this --
14 I'm not including in this instruction matters of public
15 record, including committee hearings or House Floor
16 debates, so that is not included in that instruction.
17    Q.  (By Ms. Westfall)  My question is limited to
18 the time when the House received SB 14, to the time the
19 committee considered it.
20    A.  Okay.
21    Q.  Were any other forms of ID considered in the
22 development to be added to SB 14?
23    MR. SWEETEN:  Same objection.
24    A.  I think if I answer that, that's going to be
25 privileged.

## 118

1    MR. SWEETEN:  Elizabeth, I'm sorry, I've
2 got to go to take a break.
3    MS. WESTFALL:  Absolutely.  By all means.
4 Let's take a break.  Do you want to do lunch?
5    (Lunch recess from 12:53 to 1:51 p.m.)
6 BY MS. WESTFALL:
7    Q.  I believe we were talking about U.S. Exhibit
8 Number 5, SB 14.
9    A.  Yes.
10    Q.  During consideration and development of SB 14,
11 did you consider allowing the use of expired forms of
12 ID?
13    A.  During the development, after it came over from
14 the Senate, did I consider other -- expired forms of
15 identification?
16    Q.  Yes.
17    A.  The --
18    MR. SWEETEN:  Hold on a second.  I'm going
19 to object.  I think to the extent that this requires him
20 to reveal thoughts and opinions about legislation or in
21 furtherance of the legislative process, I think that
22 this is potentially legislatively privileged.
23    If you're asking him in the drafting
24 stage, as he's drafting this, was that considered his --
25 as he looking at it?  I can let him answer as to that,

## 119

1 but don't reveal any -- you're not to reveal your
2 thought process or any communications surrounding that
3 issue.  Go ahead.
4    MS. WESTFALL:  So just to be clear, you're
5 directing him not to answer as to communications he had
6 with Representative Harless, other staff, other
7 legislators regarding expired forms of ID?
8    MR. SWEETEN:  Yeah.  I'm absolutely
9 instructing him not to answer with respect to the
10 conversations that he's had with any of those
11 individuals or any of them that I've named.  And so I
12 guess to the extent that you can answer her question
13 without revealing that information, you can do so.
14    A.  The -- the issue of expired licenses, that --
15 yes, that was something that was -- I thought of.
16    Q.  (By Ms. Westfall)  And it wasn't included in SB
17 14 as enacted by the House; is that right?
18    A.  That's correct.
19    Q.  Turning your attention to Exhibit 5 --
20    A.  Well, some expired are, I mean, past 60 days.
21 Sorry to interrupt.
22    Q.  Right.  And you testified earlier that HB 112
23 allowed for forms of I.D. that had expired two years
24 earlier; is that correct?
25    A.  I believe -- yes, I believe that's what's in

## 120

1 112.
2    Q.  So why the change in Representative Harless's
3 position from HB 112 to SB 14?
4    MR. SWEETEN:  Don't answer as to Harless's
5 position.  We're not here to answer on what Harless's
6 position is.  That's legislatively privileged.  So don't
7 answer that question.
8    THE WITNESS:  Okay.
9    Q.  (By Ms. Westfall)  Turning your attention back
10 to SB 14, can you tell me how the -- how it came to be
11 included, the license to carry a concealed handgun, why
12 was that a form of acceptable ID?
13    MR. SWEETEN:  Hold on.  You're asking
14 about the thought process of the development of this
15 legislation.  This witness cannot provide that
16 information.  It's legislatively privileged for him to
17 talk about any conversations he's had or the thought
18 process or opinions about the legislation.  So I think
19 your -- your question invades the legislative privilege
20 as phrased.
21    Q.  (By Ms. Westfall)  Who were the persons who
22 would know about the development and inclusion of that
23 form of ID in SB 14?
24    A.  The concealed handgun license?
25    Q.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                                MAY 14, 2012

---

121

1      A.   That was a Senate floor amendment.  I believe
2  Senator Hinojosa offered that amendment.
3      Q.   To the Senate bill?
4      A.   Correct.
5      Q.   Why was it included on the Senate, do you know?
6          MR. SWEETEN:  Objection.  I think that
7  that asks for him to speculate as to what -- why the
8  Senate included it.  It also invades the legislative
9  privilege protections, and he doesn't have to provide
10 that information.
11     Q.   (By Ms. Westfall)  Do you know anything else
12 about the -- that was in the public record about why
13 license to carry licenses were included as allowable ID?
14         MR. SWEETEN:  You can answer.  It's of
15 public record.
16     A.   Okay.  I don't remember the debate, just -- the
17 specific part of that debate.  It was a lengthy debate,
18 but beyond that, it was Senator Hinojosa.
19     Q.   (By Ms. Westfall)  What was the purpose of
20 including the license to carry ID as an allowable form
21 of ID in SB 14?
22         MR. SWEETEN:  I'm going to object to
23 that.  You're asking for matters that are legislatively
24 privileged.  You're also asking him to speculate as to
25 the intent of individuals who passed Senate Bill 14.

---

122

1  That's outside of what he's able to testify about, and
2  it's privileged.
3          MS. WESTFALL:  Just to be clear,
4  Mr. Sweeten, the purpose of -- questions about the
5  purpose of particular provisions of SB 14 are privileged
6  according to your client?
7          MR. SWEETEN:  What I'm saying is that you
8  asked him to speculate as to what the purpose was when
9  Senate Bill 14 came over to the House.  You're asking
10 him to go into the mindset of what those senators --
11 what their thought process was.  So on two points, one,
12 it's asking for speculation.  You're calling for
13 speculation for him to do so.
14         MS. WESTFALL:  But you're not instructing
15 the witness --
16         MR. SWEETEN:  Secondly --
17         MS. WESTFALL:  -- not to answer on that
18 basis.
19         MR. SWEETEN:  Secondly, I do believe that
20 it invades -- it asks him to reveal thoughts and
21 opinions about legislation or in furtherance of the
22 legislative process.  I think it does that.  So I --
23 with respect to that issue, I'm going to instruct him
24 not to answer that question.
25         MS. WESTFALL:  Okay.  Just to be clear, I

---

123

1  believe earlier in this deposition, you've allowed him
2  to answer questions regarding purpose, have you not?
3          MR. SWEETEN:  You asked him specifically
4  about what -- I don't know that you said the word
5  "purpose," so we'll have to look at the transcript.  But
6  I think you asked him about what he did when he was
7  drafting the bill and other matters that were within his
8  purview when he was looking at the bill.
9          That's a different thing than asking
10 him with a final -- with a Senate Bill 14 coming over
11 from the Senate, it's a completely different thing for
12 you to ask him to glean what the purpose of that bill
13 was.
14     Q.   (By Ms. Westfall)  Do you know the racial
15 composition of Texans who have license to carry
16 licenses?
17     A.   No, I do not.
18     Q.   Do you know whether anyone in the legislature
19 or their staff looked into that issue in considering SB
20 14?
21     A.   No, I do not.
22     Q.   Do you know whether holders of these licenses
23 are disproportionately White relative to Texas
24 registered voters?
25     A.   I don't have -- I don't know.  I don't have

---

124

1  information on that.
2      Q.   Do you know whether anyone in the legislature
3  or their staff looked into that issue when considering
4  whether to include license to carry as a form of
5  allowable ID in SB 14?
6          MR. SWEETEN:  I'm going to let you answer
7  that, but do not reveal conversations you've had with
8  other legislators, legislative staff, or any
9  conversations you've had with Representative Harless or
10 any state agencies, including those that I've enumerated
11 before.
12     A.   I can't speak for other offices and their
13 research that they did when this amendment was offered
14 in the Senate.
15     Q.   (By Ms. Westfall)  But answering my question,
16 do you know whether anyone looked into that issue of
17 racial composition of those licensed holders?
18     A.   No, I can't --
19     Q.   You don't know?
20     A.   I don't know.
21     Q.   Are you aware of any discussions with
22 legislators or staff expressing concern or opinions that
23 including this form of ID might disproportionately favor
24 White voters?
25         MR. SWEETEN:  Don't reveal any

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK
MAY 14, 2012

## 125

1  conversations you've had as enumerated previously.  I
2  can list those if you're not familiar with what I'm
3  telling you, but don't list the -- do not discuss
4  communications you've had with staff members,
5  legislators or the other entities.
6      A.  Conversations regarding CHL license and the --
7  I'm sorry?
8          MS. WESTFALL:  Could you read back the
9  question, please?
10         (Requested portion read back by the court
11  reporter.)
12         MR. SWEETEN:  I'm going to instruct you
13  not to answer the question based upon the legislative
14  privilege.  I will allow you to discuss matters of
15  public record in answering this question.
16      A.  Okay.  And no, I don't remember any
17  conversations.
18      Q.  (By Ms. Westfall)  Was there anything on the
19  public record about the discussion of the racial
20  composition of people who hold license to carry licenses
21  in Texas?
22      A.  I don't remember from the Senate debate.
23      Q.  Was there anything in the House debate?
24      A.  I don't remember that issue coming up.
25      Q.  Turning your attention back to SB 14, how did

## 126

1  the disability exception that you testified about
2  earlier arose -- arise?
3          MR. SWEETEN:  Don't reveal communications
4  that you've had with any of the legislative staff,
5  legislators, state agencies, constituents.
6      A.  How did the initial language, the initial --
7  this was also an amendment placed on the Senate -- an
8  amendment from the Senate, a floor amendment, and in our
9  committee substitute, we -- we -- we made some
10  modifications to the disability exemption.
11     Q.  (By Ms. Westfall)  Do you know whether the
12  disability exemption was included in SB 14 in response
13  to any concerns that were raised about the bill?
14         MR. SWEETEN:  Don't reveal any
15  conversations you've had.  You can testify as to the
16  public record.
17     A.  I -- I can't say.  Senator Patrick offered that
18  amendment, and I can't speak for his office.
19     Q.  (By Ms. Westfall)  With regard to SB 14, how
20  did the exception regarding religious objections to
21  photo IDs arise?
22         MR. SWEETEN:  Don't testify as to any
23  conversations that you've had with respect to this.  You
24  can testify as to matters revealed in the public record.
25     A.  I believe that exemption came from another

## 127

1  Senate floor amendment.  I can't remember the author of
2  that amendment.
3      Q.  (By Ms. Westfall)  Was that exemption not put
4  in, in the conference committee of SB 14?
5      A.  The religious exemption?
6      Q.  Yes.
7      A.  I believe it's in the -- yes, it's in the
8  final.
9      Q.  But was it inserted during conference?
10     A.  The language was -- I believe there were a few
11  changes to that language, but as a whole, it was kept
12  throughout the process after it was put on in the
13  Senate.
14     Q.  Do you know whether putting in that exemption
15  was in response to any concerns that were raised?
16         MR. SWEETEN:  Don't reveal the thought
17  process revealed within conversations.  You can testify
18  as to matters within the public record.
19     A.  Concerns, when you mentioned -- when you say
20  "concerns," are you -- can you elaborate on that, or is
21  that just concerns from --
22     Q.  (By Ms. Westfall)  Was the religious
23  exemption or -- that was included in SB 14, included
24  because there were concerns expressed by any outside
25  group, constituent, et cetera, that you're aware of?

## 128

1          MR. SWEETEN:  You can testify as to
2  matters of the public record.  Don't reveal
3  conversations.
4      A.  Okay.  I don't remember the Senate debate when
5  that amendment came up.  Senator -- I think it was
6  Senator Duncan, I'm not a hundred percent sure on that,
7  offered that amendment, but I do not remember the
8  justification for placing it in there.
9      Q.  (By Ms. Westfall)  SB 14 includes military ID
10  as a form of appropriate identification, does it not?
11     A.  Yes.
12     Q.  What does that mean?
13         MR. SWEETEN:  Objection, asked and
14  answered.
15     Q.  (By Ms. Westfall)  You may answer.
16     A.  I'm sorry.  I missed that.
17         MR. SWEETEN:  Just asked and answered.
18  You can go ahead and answer her question.
19     A.  Okay.  The -- that shows up in Section 36.0101
20  and the United States military identification
21  card.  You're asking what does that include?  I think
22  that's the language speaks for itself.
23     Q.  (By Ms. Westfall)  Actually, it really
24  doesn't.  Do you have any specific information about
25  what types of cards or the providence of such cards?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 129

1    A.  Beyond the text of the bill, no.
2    Q.  Did you have any discussion with Representative
3    Harless or any other staff or legislators concerning how
4    to define military ID under SB 14?
5            MR. SWEETEN:  Don't reveal the substance
6    of discussions.
7    A.  Yes.
8    Q.  (By Ms. Westfall)  When were those
9    discussions?  When did they take place?
10   A.  The summer of 2011.
11   Q.  That was after the bill was passed?
12   A.  Correct.
13   Q.  Who was involved in those discussions?
14   A.  Representative Harless and myself.
15   Q.  Just the two of you?
16   A.  In that instance, yes, Representative Harless
17   and myself.
18   Q.  Was there more than one conversation?
19   A.  Yes.
20   Q.  And how many other conversations?
21   A.  I'm going to say less than five.
22   Q.  Was this related to any legislative act?
23           MR. SWEETEN:  Objection to the question as
24   vague.  I also am going to tell you, don't reveal the
25   substance of any discussions that you've had with

---

## 130

1    Representative Harless, any other legislator or any
2    other staff member.
3    Q.  (By Ms. Westfall)  This was after the bill was
4    signed into law, was it not?
5    A.  Correct.
6    Q.  So you had more than -- you had a handful of
7    conversations with Representative Harless about military
8    IDs, correct?
9    A.  Yes.
10   Q.  And it was you and Representative Harless for
11   at least one of those conversations; is that right?
12   A.  For those conversations, yes.
13   Q.  Was this an in-person conversation?
14   A.  A telephone conversation.
15   Q.  Who were the parties to the other conversations
16   about military ID in the summer of 2011?
17   A.  I had a conversation with the Secretary of
18   State's Office.
19   Q.  Was that just between you and the Secretary of
20   State --
21   A.  Yes.
22   Q.  -- office?  Who in that office did you talk to?
23   A.  At that time, John Sepehri, I believe, that's
24   who was working with.
25           THE REPORTER:  Sorry.  What was that last

---

## 131

1    name?
2            THE WITNESS:  Sepehri is how you pronounce
3    it.  I'm not sure on the spelling.
4            MR. FREDERICK:  S-e-p-e-h-r-i.
5    Q.  (By Ms. Westfall)  When you -- what prompted
6    your conversation with Representative Harless about
7    military IDs?
8            MR. SWEETEN:  Don't reveal it if it
9    relates to any conversations you've had with any of the
10   enumerated people.  You can answer it if it does not do
11   that.  Okay?
12   A.  Okay.  I think that's part of the privilege.
13   Q.  (By Ms. Westfall)  So you can't answer?
14   A.  What prompted me to look into this issue, that
15   would be.
16   Q.  Does that answer apply to questions that I have
17   about the other conversations that you've had with
18   Secretary of State's office about military ID?
19   A.  What prompted me to contact the Secretary --
20   yes.
21   Q.  Yes.
22   A.  Yes.
23   Q.  When you were drafting SB 14 and developing it
24   in the House side, did you assess the number of forms of
25   military ID that would be included in the bill?

---

## 132

1    A.  No.
2    Q.  Did you believe that the forms of military ID
3    would be easily recognizable by poll workers?
4    A.  I believe that was the testimony or the
5    thought.
6            MS. WESTFALL:  Mr. Sweeten, could you
7    explain why you have directed the witness not to testify
8    about conversations related to SB 14 that occurred after
9    its enactment?
10           MR. SWEETEN:  Yeah.  Conversations that
11   occurred after the enactment of Senate Bill 14 that
12   discuss the Senate Bill 14 process, as well as the
13   legislative process in enacting it, are just as I said
14   earlier today, we're asserting that those are
15   privileged.
16           As to conversations that don't relate
17   to the passage development of Senate Bill 14, you know,
18   he can answer those questions.  I haven't stopped you
19   from doing that.  But as they relate back to the process
20   by which Senate Bill 14 was passed, I'm instructing him
21   not to answer those questions.
22   Q.  (By Ms. Westfall)  Now that you've heard from
23   your counsel, Mr. Sweeten, on his position on the
24   privilege, do you want to amend or clarify any of the
25   responses that you've given today in answer to any of my



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK

MAY 14, 2012

## 133

1  questions?
2      A.  I'm sorry.  The --
3      Q.  Mr. Sweeten has explained a distinction about
4  conversations concerning the development of SB 14 that
5  occurred after --
6      A.  Post passage, if it involves Senate Bill 14, is
7  that --
8      Q.  Correct.  Do you want to amend any of the
9  answers to any of the questions that I've asked?
10     A.  Not that -- no.
11     Q.  Okay.  Why does Senate Bill 14 include military
12  ID and not student ID?
13         MR. SWEETEN:  Objection.  I think that
14  calls for matters that are legislatively privileged.
15  They also impact conversations that occurred regarding
16  the bill that are not a public matter.
17             He can testify as to the public
18  hearing, the public aspects of this case, including
19  committee, et cetera, but not to the matters that are
20  nonpublic.
21     A.  The -- debate in committee and on the
22  floor, these forms of identification were chosen because
23  they were readily identifiable and secure.
24     Q.  (By Ms. Westfall)  Aren't there many, many
25  forms of military IDs?

## 134

1      A.  I -- I'm not advised.  I don't --
2      Q.  Do you know or do you not know?
3         MR. SWEETEN:  Objection, asked and
4  answered.
5      Q.  (By Ms. Westfall)  You may answer.
6      A.  I don't know.
7      Q.  Why is it that Senate Bill 14 that
8  Representative Harless carried does not include nonphoto
9  ID as acceptable ID?
10         MR. SWEETEN:  Objection.  I think that
11  you're asking him to reveal conversations that relate --
12  that would be legislatively privileged, conversations
13  that we've enumerated before.
14             And to the -- so I'm going to object
15  to the extent that those conversations reveal thoughts
16  and opinions about legislation or in furtherance of the
17  legislative process, that I'm instructing him not to
18  answer those questions.
19     Q.  (By Ms. Westfall)  Do you have any -- any
20  response to that question that is not -- that is outside
21  the privilege that your counsel is asserting?
22     A.  Why photo identification, is that --
23     Q.  Why SB 14 did not include nonphoto ID as
24  acceptable ID?
25         MR. SWEETEN:  Again, you can testify as to

## 135

1  the public record.  Don't reveal conversations,
2  communications, that we've enumerated.
3      A.  Photo identification is -- is -- further
4  strengthens the -- the ability of the poll workers to
5  verify these people are who they say they are.
6      Q.  (By Ms. Westfall)  So you testified earlier
7  that Representative Harless filed the bill in November
8  2010 that included nonphoto ID as acceptable ID, did she
9  not?
10     A.  That's correct.
11     Q.  Why did she change her position in the
12  intervening months between when she filed HB 112 in
13  November 2010 and when she started carrying SB 14 at the
14  beginning of 2011?
15         MR. SWEETEN:  Objection, speculation.
16  Objection.  It calls for him to provide matters that are
17  legislatively privileged, reveal -- potentially reveal
18  conversations with Representative Harless.
19             To the extent that you can answer that
20  based upon the public record, you can do so.
21     Q.  (By Ms. Westfall)  Can you provide any
22  testimony in response to my question given your
23  counsel's instruction?
24     A.  No.  I think that would be within the
25  privilege.

## 136

1      Q.  Did you have any discussions with anyone other
2  than Representative Harless about why there was such a
3  shift between HB 112 and SB 14 in terms of allowable
4  forms of identification?
5         MR. SWEETEN:  Court reporter, could you
6  please read that question back?
7      (Requested portion read back by the court
8  reporter.)
9         MR. SWEETEN:  I'm going to instruct you
10  not to reveal discussions with legislators, with staff
11  members, with any members of state agencies, with the
12  Texas Legislative Council, other staffers.  Those are
13  legislatively privileged.  Do not reveal those.
14  However, if you can answer her question based upon the
15  public record, I will allow you to do so.
16     Q.  (By Ms. Westfall)  Do you have any response
17  in -- in response -- any testimony in response to my
18  question given your counsel's instruction?
19     A.  No.  I did not have any -- I did not have
20  conversations.
21     Q.  You did not have conversations with
22  Representative Harless about why she changed your
23  position, is that your testimony?
24     A.  No, that's not my testimony.  You -- this -- my
25  understanding was that your question was about people



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

| 137 |
| --- |

1    outside of Representative Harless.
2       Q.  Okay.  So to the extent that it was public, did
3    not involve staff, did not involve legislators, you did
4    not have conversations about why there was a shift in
5    allowable forms of ID from HB 112 to SB 14; is that
6    right?
7       A.  Correct.
8           MR. SWEETEN:  Don't reveal any
9    conversations you've had with Representative Harless
10   regarding that issue.
11          THE WITNESS:  Okay.
12      Q.  (By Ms. Westfall)  Did you have any discussions
13   outside of the legislature with anyone about the change
14   in the form of the bill from HB 112 to SB 14?
15      A.  No.
16      Q.  Did you have any conversations with any
17   constituents about the change in the bill -- bills?
18      A.  No.
19      Q.  Any groups?
20      A.  No.
21      Q.  Did you have any discussion with anyone in the
22   -- actually, strike that.
23          Did anyone in the media or the press ask
24   you or Representative Harless, any other staff or any
25   legislators, why -- why the bill changed from HB -- why

| 138 |
| --- |

1    the forms of allowable ID changed from HB 112 to SB 14?
2           MR. SWEETEN:  Objection, compound.
3       Q.  (By Ms. Westfall)  You may answer.
4       A.  Not that I remember.
5       Q.  There was no scrutiny of that issue at all?
6           MR. SWEETEN:  Objection to form, vague.
7       Q.  (By Ms. Westfall)  You may answer.
8       A.  Not that I remember.
9       Q.  Is it your testimony here today that you don't
10   recall a single question about why the use of nonphoto
11   ID was included in HB 112 and not included in SB 14?  Is
12   that your testimony?
13          MR. SWEETEN:  Are you saying "media
14   question," because your last question --
15          MS. WESTFALL:  I'm saying any question.
16          MR. SWEETEN:  Any question from anyone?
17          MS. WESTFALL:  Correct.
18          MR. SWEETEN:  Don't reveal any constituent
19   questions or any questions between legislators,
20   legislative staff, TLC or state agencies in answering
21   that question.
22      A.  I -- I don't remember it.  If it happened, I
23   don't remember.
24      Q.  (By Ms. Westfall)  Why in your mind did the --
25   did SB 14 not include nonphoto ID?

| 139 |
| --- |

1           MR. SWEETEN:  Don't reveal any
2    communications in answering that.  You can rely on the
3    public record, or if you can provide your personal
4    opinion, in your mind, as to that question.
5       A.  I mentioned it earlier.  I think it provides,
6    it strengthens the election workers' ability to prove
7    they are who they say they are when they come to vote.
8       Q.  (By Ms. Westfall)  Was there anything that
9    happened in the beginning of 2011 or end of 2010 that
10   prompted the legislature to feel there was a need for
11   stricter ID?
12          MR. SWEETEN:  Objection.  I think that
13   calls for legislatively privileged information.  And
14   don't reveal any sort of communication that was
15   discussed.  Don't reveal the -- don't reveal the
16   thoughts and opinions about legislation or furtherance
17   of the legislative process that you've learned through
18   communications.
19      A.  Anything that happened as far as -- that's
20   pretty broad.  Can you be more specific?
21      Q.  (By Ms. Westfall)  Was there -- were there any
22   changes in circumstance, any changes with regard to
23   election administration, any in-person voter fraud, any
24   decrease in public confidence at elections that you can
25   point to, that would cause the legislature to conclude

| 140 |
| --- |

1    that it needed to introduce a legislation about nonphoto
2    forms of ID?
3           MR. SWEETEN:  Same instruction.  Don't
4    reveal legislatively privileged information.
5       A.  Without revealing privileged communications, I
6    would say no.
7       Q.  (By Ms. Westfall)  So you testified earlier
8    that you drafted HB 112, correct?
9       A.  The --
10      Q.  At the request of Representative Harless; is
11   that right?
12          MR. SWEETEN:  Objection, misstates prior
13   testimony.  And don't reveal conversations that you had
14   with Representative Harless.
15      A.  Okay.  The bill came over from the Senate.  Did
16   I have it drafted to -- I did have it drafted to
17   incorporate the Senate amendments, technical, and then
18   the changes that we made in the committee substitute.
19      Q.  (By Ms. Westfall)  Are you referring to HB 112
20   or SB 14?
21      A.  SB 14.
22      Q.  Okay.  Turning your attention to HB 112, you
23   drafted that --
24      A.  I'm sorry.  Was that -- yes.  Yes, I did.
25      Q.  -- at Representative Harless's request; is that



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 141

1 correct?
2     A. Yes. Yes.
3     Q. And it informs -- forms -- it included forms of
4 nonphoto ID, correct?
5     A. That's correct.
6     Q. Why was it included in HB 112 and not in SB
7 14?
8         MR. SWEETEN: Don't reveal legislatively
9 privileged information. That includes all the
10 communications that we've talked about. To the extent
11 you can answer based on your own personal knowledge,
12 I'll let you do that.
13        THE WITNESS: Okay.
14        MR. SWEETEN: Or matters of the public
15 record, okay?
16    Q. (By Ms. Westfall) Do you have any testimony in
17 response to my question?
18    A. No.
19    Q. Did you review the Georgia photo ID bill in
20 crafting, drafting or developing SB 14?
21    A. Yes, I did in my research.
22    Q. Are you familiar with the law?
23    A. I am familiar with it. I'm by no means an
24 expert.
25        MS. WESTFALL: Would you mark this as U.S.

### 142

1 6?
2        (Exhibit 6 marked for identification.)
3    Q. (By Ms. Westfall) You've been handed U.S. 6.
4 Would you look at the document and tell me if you
5 recognize it?
6    A. This appears to be a Georgia statute on photo
7 identification -- I'm sorry, on voter identification.
8    Q. Have you seen this before?
9    A. Yes.
10   Q. When did you last review it?
11   A. I'd say early 2011.
12   Q. Given the list of IDs in the Georgia statute,
13 is it fair to say that SB 14 allows for a narrower range
14 of IDs that are allowable than does the Georgia statute?
15   A. I would say it allows for a different, looks
16 like two different forms that the Senate bill does not.
17   Q. What are those forms?
18   A. A valid employee identification card, and then
19 a valid tribal identification card.
20   Q. Do you know why SB 14 does not allow for
21 employee identification cards?
22       MR. SWEETEN: I'm going to object. I'm
23 going to instruct you not to answer to the extent that
24 it reveals any communications that you've had with
25 respect to any of the categories that we've previously

### 143

1 talked about. Do not reveal the thoughts and opinions
2 on legislation in furtherance of the legislative
3 process. Okay? If you can answer it based on matters
4 of public record, you can go ahead and do so.
5    A. That issue was discussed on the House floor. I
6 remember the debate. And the concerns with employee
7 identification cards were standardization of the form
8 and security of the form, of the form of identification.
9    Q. (By Ms. Westfall) And do you know why tribal
10 IDs were not included?
11       MR. SWEETEN: In Senate Bill 14, is that
12 the question?
13       MS. WESTFALL: In Senate Bill 14.
14       MR. SWEETEN: Okay. I'm going to instruct
15 you not to answer unless based upon the public record.
16   A. Similar concerns with readily identifiable and
17 a standardized readily identifiable form, from my
18 recollection of the debate.
19   Q. (By Ms. Westfall) Is it fair to say that there
20 are differences between the Georgia law and the Texas
21 law, Senate Bill 14?
22   A. You can say there are differences.
23   Q. Are you familiar with the Indiana photo ID law?
24   A. Yes.
25   Q. Are there any differences between SB 14 and the

### 144

1 Indiana law?
2    A. I believe there are.
3    Q. Do you know what they are?
4    A. Without a copy of the Indiana law, I can't say
5 specifically.
6    Q. Could you list each and every purpose for the
7 enactment of SB 14?
8        MR. SWEETEN: Don't answer that question,
9 other than unless you can do so based upon matters of
10 public record.
11       MS. WESTFALL: Mr. Sweeten.
12       MR. SWEETEN: Uh-huh.
13       MS. WESTFALL: You have allowed repeatedly
14 him -- you've allowed this witness to answer that
15 question repeatedly on other topics during this
16 deposition. Are you changing -- is this --
17       MR. SWEETEN: I'm saying --
18       MS. WESTFALL: Is your position on this
19 topic changing because we're now talking about SB 14?
20       MR. SWEETEN: You're talking about a piece
21 of legislation. You're asking him to glean and provide
22 information as to the legislative -- all the legislative
23 intent behind the passage of that. He cannot do that.
24 It's legislatively privileged.
25       So I'm going to instruct him not to


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

145

1   answer that question because -- except for to the extent
2   it implicates matters of public record.
3      Q.   (By Ms. Westfall)  As to matters of public
4   record, tell me every single purpose you're aware of for
5   SB 14.
6      A.   To deter and detect voter fraud, to increase
7   voter confidence.
8      Q.   Anything else?
9      A.   Those are the ones I'm aware of.
10     Q.   Was any part of the purpose of SB 14 to
11  decrease the number of Hispanic voters?
12          MR. SWEETEN:  I'm going to instruct you
13  not to answer that question based on any conversations
14  you've had with legislators, with staff, with state
15  agencies, with anyone else in those enumerated
16  categories related to the legislative process.  I will
17  allow you to answer based upon matters of public record.
18     A.   No.  That was not a stated purpose for the
19  bill.
20     Q.   (By Ms. Westfall)  And are you asserting that
21  you can't answer that question based on advice of
22  counsel that's privileged?
23          MR. SWEETEN:  I think you misstate his
24  answer.  I've allowed him to answer based only upon the
25  public record, and he's done so.

---

146

1      Q.   (By Ms. Westfall)  Are you aware of any -- the
2   existence of any conversations about decreasing the
3   number of Hispanic voters in SB 14?
4          MR. SWEETEN:  Other than matters of public
5   record, do not reveal any conversations you've had with
6   any legislator, legislative staff, state agency, Texas
7   Legislative Council or anyone else.  Okay?  You can
8   testify about matters of public record.
9          MS. WESTFALL:  Mr. Sweeten, are you
10  instructing him not to answer about the existence of
11  conversations, because that is depriving me of the right
12  to make my record on a privilege log basis.
13          MR. SWEETEN:  You are asking him --
14          MS. WESTFALL:  -- so we can move to
15  compel.
16          MR. SWEETEN:  -- the -- the preface of
17  your question is as to substance.
18          MS. WESTFALL:  Existence.
19          MR. SWEETEN:  You're asking him substance
20  of -- you're asking about him a topic, a specific
21  topic:  Are you aware of conversations regarding X
22  topic?  He can talk to you about individuals.  I've let
23  him today talk about individuals he's had discussions
24  with, dates of those, approximately.  Whether they were
25  by e-mail or in person.  I've let him do that.

---

147

1          But you're now asking about him
2   substance of conversations, and he's not going to
3   provide substance of conversations.  That is
4   legislatively privileged.
5          MS. WESTFALL:  You're instructing him not
6   to answer?
7          MR. SWEETEN:  That's correct.
8      Q.   (By Ms. Westfall)  Are you aware of any
9   discussions or communications about the racial impact of
10  SB 14?
11          MR. SWEETEN:  You can answer that question
12  to the extent it appears on the public record.  You
13  cannot -- I'm instructing you not to answer with respect
14  to matters that are conversations that we've enumerated
15  before that are legislatively privileged.
16     Q.   (By Ms. Westfall)  Do you have any testimony in
17  response to my question?
18     A.   The -- could you --
19     Q.   Are you aware of any communications regarding
20  the racial impact of SB 14?
21     A.   It was an issue that was discussed on the House
22  floor.
23     Q.   Those are the only discussions you're aware of;
24  is that correct, that you can testify about based on the
25  instructions of your counsel?

---

148

1      A.   Yes.  And in the committee.
2      Q.   Are you aware of any discussions of SB 14 and
3   Hispanic voters?
4          MR. SWEETEN:  Confine your answer to
5   matters of the public record and committee hearing
6   testimony.  I'm going to instruct you not to answer
7   based upon the conversations that we've enumerated
8   because they're legislatively privileged.
9          Go ahead.
10     A.   Any discussions involving SB 14 and Hispanic
11  voters?  I believe that it was discussed in committee
12  and on the House floor.
13     Q.   (By Ms. Westfall)  Other than that, you're not
14  going to answer my question based on privilege?
15     A.   Correct.
16     Q.   Are you aware of anyone else who knows about
17  any communications regarding SB 14 and Hispanic voters?
18          MR. SWEETEN:  Don't reveal matters that
19  are legislatively privileged or implicate the
20  conversation or the categories of conversations that
21  we've discussed earlier.  You can discuss matters of the
22  public record.
23     A.   Based on that, no, based on the public record.
24     Q.   (By Ms. Westfall)  You mean based on the public
25  record, no?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 149 | 151 |
|---|---|
| 1    A.  No. | 1    you not to answer to the extent that that would reveal |
| 2    Q.  Is that your answer? | 2    communications that we've previously enumerated that |
| 3    A.  Yeah. | 3    would be legislatively privileged.  To the extent that |
| 4    Q.  Was any part of the purpose of SB 14 to | 4    you have knowledge responsive to this question based |
| 5    decrease the number of any minority voter group -- | 5    upon the public record, I will allow you to provide that |
| 6         MR. SWEETEN:  You can answer -- | 6    answer. |
| 7         MS. WESTFALL:  -- in participating in | 7    A.  There have been changes over the sessions in |
| 8    elections? | 8    the voter ID bills, yes. |
| 9         MR. SWEETEN:  You can answer based upon | 9    Q.  (By Ms. Westfall)  In the purpose of the voter |
| 10   the public record.  Don't reveal any communications | 10   ID bills? |
| 11   between you and other legislators or staff regarding -- | 11   A.  I'm sorry.  The purpose, no, I don't believe |
| 12   A.  To my knowledge of the debate, no, that was | 12   there's been a -- |
| 13   not -- it was discussed, but that was not a stated | 13   Q.  Isn't it true that at one time the proponents |
| 14   purpose. | 14   of voter ID in Texas asserted that it would prevent |
| 15   Q.  (By Ms. Westfall)  So that's based on the | 15   noncitizens from voting in elections? |
| 16   public record; is that correct? | 16        MR. SWEETEN:  Same objection and |
| 17   A.  (Witness nodding.) | 17   instruction. |
| 18   Q.  That would be -- | 18   A.  I don't recall that.  I can really only speak |
| 19   A.  That's correct. | 19   to my involvement in this most recent legislative |
| 20   Q.  That would be the House floor and Senate | 20   session, 2011.  I can't speak for other. |
| 21   floor -- | 21   Q.  (By Ms. Westfall)  Can I turn your attention |
| 22   A.  That's correct. | 22   back to US Exhibit Number 3? |
| 23   Q.  -- committee testimony; is that correct? | 23   A.  (Witness complies.) |
| 24   A.  Correct. | 24   Q.  Turning your attention to US Number 3. |
| 25   Q.  Was any part of the purpose of SB 14 to | 25   A.  Okay. |

| 150 | 152 |
|---|---|
| 1    discriminate in any way against any group of voters on | 1    Q.  Doesn't this indicate that your former |
| 2    the basis of race or ethnicity? | 2    employer, Lieutenant Governor Dewhurst, indicated that |
| 3         MR. SWEETEN:  Same objection.  I'm going | 3    the purpose of photo ID was to prevent noncitizens from |
| 4    to instruct you not to answer based upon conversations | 4    voting?  Isn't that right? |
| 5    you've had with legislators, state agencies, staffers. | 5    A.  I believe I mentioned this earlier.  I don't |
| 6    You can answer the question with respect to matters of | 6    remember this letter, and as far as what the letter |
| 7    the public record. | 7    says, (reading) -- |
| 8    A.  No.  That was not a stated purpose of -- public | 8    Q.  But I believe you just testified today that the |
| 9    stated purpose of -- to my knowledge, no, that was not. | 9    reasons you're aware of for SB 14 are voter fraud and |
| 10   Q.  (By Ms. Westfall)  Was any part of the purpose | 10   voter confidence; is that correct? |
| 11   of SB 14 for partisan purposes? | 11   A.  Those -- |
| 12        MR. SWEETEN:  Same instruction. | 12        MR. SWEETEN:  I'm going to object to you |
| 13   A.  It was discussed.  It was not a purpose, as I | 13   providing any -- and I'm going to instruct you not to |
| 14   remember from the debate, from the bill offered. | 14   answer based upon the legislative privilege as to any of |
| 15   Q.  (By Ms. Westfall)  Was any part of the purpose | 15   the categories enumerated.  To the extent you have |
| 16   of SB 14 to depress Democrat -- participation of | 16   information related to the public record, you can |
| 17   Democrats in elections to further the partisan interest | 17   provide that. |
| 18   of Republican candidates? | 18        THE WITNESS:  Okay. |
| 19        MR. SWEETEN:  Same instruction. | 19        MS. WESTFALL:  Mr. Sweeten, I was just |
| 20   A.  No.  That was not a stated purpose of the | 20   asking him about his previous testimony on the purposes, |
| 21   authors for Senate Bill 14. | 21   which I believe were -- the purposes are currently, as |
| 22   Q.  (By Ms. Westfall)  Did the purpose of photo ID | 22   you're testifying and sitting here today, the purposes |
| 23   in Texas evolve over time and between legislative | 23   of SB 14 are to prevent voter fraud and to increase |
| 24   sessions? | 24   voter confidence.  Am I correctly stating your |
| 25        MR. SWEETEN:  Again, I'm going to instruct | 25   testimony? |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 153

1   MR. SWEETEN:  Are you talking about his
2   personal thoughts on the matter?
3   MS. WESTFALL:  The purpose of the
4   legislation.
5   MR. SWEETEN:  And what I'm telling you,
6   and I've tried to be consistent with respect to this, is
7   that he's not going to testify about the purpose of
8   Senate Bill 14 as to every conversation that every
9   legislator had.  He's not going to reveal that
10  information.  I'm going to instruct him not to.
11      If you're going to ask him as to his
12  personal understanding of this legislation, you know,
13  I've let you do that to some degree.  So he can provide
14  that, but don't reveal any sort of legislatively
15  privileged information.
16      Q.   (By Ms. Westfall)  As to the issue of voter
17  fraud, isn't it true that voter ID only would prevent
18  in-person voter impersonation; is that correct?
19      A.   That -- that is my understanding.
20      Q.   It's not the universe of voter fraud, it's that
21  category of voter fraud; is that correct?
22  MR. SWEETEN:  Objection, that calls for
23  speculation.  Are you asking him specifically about this
24  letter?
25  MS. WESTFALL:  I am not.

## 154

1   MR. SWEETEN:  Okay.  All right.  Can you
2   restate the question, or we can have him read it back if
3   you prefer?
4       Q.   (By Ms. Westfall)  Can you answer my question?
5   MR. SWEETEN:  No, no, no, no.  I don't
6   know the question.  I'm going to ask the court reporter
7   to read it back first.
8       (Requested portion read back by the court
9   reporter.)
10  MR. SWEETEN:  I'm going to let you answer
11  that.  I don't want you to reveal anything that's the
12  subject of legislative privilege in the areas that I've
13  enumerated.  Go ahead and answer based upon your
14  personal understanding of the public record.
15      A.   And I was speaking from my -- this most recent
16  session.  I can't speak for the Lieutenant Governor back
17  in two thousand and -- I believe this was in 2009.
18      Q.   (By Ms. Westfall)  Okay.  You were working for
19  the Lieutenant Governor at that point though, correct?
20      A.   Correct.
21      ==Q.   Okay.  So in answer to my question, the two==
22  ==things you testified about in terms of the purposes of==
23  ==SB 14 were voter fraud and voter confidence, correct?==
24  ==MR. SWEETEN:  Don't reveal matters of==
25  ==legislative privilege.  You can testify as to the public==

## 155

1   ==record or your personal understanding.==
2       ==A.   Yes.  I believe that's right.==
3       ==Q.   (By Ms. Westfall)  And voter fraud is limited==
4   ==to in-person voter impersonation; is that correct?==
5       ==A.   Yes.==
6       ==Q.   SB 14?==
7       ==A.   In SB 14, yes.==
8       ==Q.   SB 14 would not prevent the whole range of==
9   ==voter fraud set forth in the Texas election code; is==
10  ==that correct?==
11      ==A.   Yes.  There is -- yes.==
12      ==Q.   Are you aware of incidents of mail-in ballot==
13  ==fraud that have occurred in Texas?==
14      ==A.   Yes.==
15      ==Q.   Tell me what you know about that.==
16      ==A.   I understand it is -- there are concerns about==
17  ==the mail-in ballot process and fraud within the mail-in==
18  ==ballot process.==
19      ==Q.   What do you know about any convictions that==
20  ==have occurred over that conduct?==
21      ==MR. SWEETEN:  Objection, vague.==
22      ==A.   I don't know the specifics, specific number of==
23  ==convictions.  I understand it's a concern.==
24      Q.   (By Ms. Westfall)  Has the Texas legislature
25  taken any steps to address that concern?

## 156

1   MR. SWEETEN:  Don't reveal matters of the
2   legislative privilege.  You can testify based upon the
3   public record and information you've gleaned from that.
4       A.   Yes.  I believe there were several bills filed
5   of legislation to address those issues.
6       Q.   (By Ms. Westfall)  When were those bills filed?
7       A.   I can speak to the 2011 session.  I know there
8   were bills filed in the 2011 session.  I'm not sure
9   about other sessions.  I can't say.
10      Q.   And who sponsored those bills?
11      A.   Representative Aliseda had a mail-in ballot --
12  Aliseda, Jose Aliseda.
13      Q.   What happened with that bill?
14      A.   I believe he -- he had several.  I think there
15  were other bills regarding mail-in.  His was not the
16  only one.  I don't know the -- I do not believe -- I
17  don't believe that his bill passed.
18      Q.   Were these put on the emergency calendar by the
19  governor?
20  MR. SWEETEN:  Just keep your testimony to
21  the matters of public record with respect to this.
22      A.   The governor --
23  MS. WESTFALL:  Mr. Sweeten, isn't the
24  emergency calendar a matter of public record?
25  MR. SWEETEN:  If the emergency calendar is



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                           MAY 14, 2012

---

### 157

1  a matter of public record, then he is going to be able
2  to testify about that, and I will allow --
3      MS. WESTFALL:  That was my question was
4  about the emergency calendar.  It was a question that
5  was within the scope of public matters.  I don't think
6  it warranted an objection, and I'd ask you to withdraw
7  that.
8      MR. SWEETEN:  Okay.  As I've already -- as
9  I've been saying in a constant basis, I will let him
10  testify as to matters of public record.
11      Okay.  You can do so.
12      A.  I believe the governor's emergency item had to
13  do with in-person.  I don't believe it had to -- excuse
14  me -- the governor's proclamation had to do with
15  in-person voter fraud.
16      Q.  (By Ms. Westfall)  Did not include any of this
17  mail-in ballot bills that were filed by Representative
18  Aliseda and others; is that correct?
19      A.  That's my understanding.
20      (Exhibit 7 marked for identification.)
21      Q.  (By Ms. Westfall)  I'm handing you what's been
22  marked as US-7.  Do you recognize it?
23      A.  That is Representative Patricia Harless.
24      Q.  And is this from her website, or what is this
25  exactly?

### 158

1      A.  This appears to be her campaign website.
2      Q.  Have you seen this before?
3      A.  Yes.
4      Q.  Did you draft it?
5      A.  No.
6      Q.  Do you know who did?
7      A.  No.
8      Q.  Do you see under "Immigration Reform" it lists
9  "Require Texas photo ID to vote"?
10      A.  Yes, I do.
11      Q.  Do you know what requiring Texas photo ID to
12  vote has any -- has to do with immigration reform?
13      MR. SWEETEN:  Don't reveal conversations
14  you've had with anyone in answering this question.
15      A.  I didn't draft this document so I don't know.
16      Q.  (By Ms. Westfall)  Are you personally aware of
17  any connection between immigration reform and requiring
18  Texas photo ID to vote?
19      A.  Not to my knowledge.
20      Q.  What -- what does SB 14 have to do with
21  increasing public confidence in voting?
22      MR. SWEETEN:  I'm going to instruct you to
23  answer only based upon matters in the public record.
24  Don't reveal conversations that we've previously
25  enumerated, including legislators, legislative staff,

### 159

1  et cetera.
2      A.  My knowledge, increasing voter confidence by
3  giving election workers a tool to verify people are who
4  they say they are when they go to vote.
5      Q.  (By Ms. Westfall)  Do you have any -- can you
6  point me to any research studies or analysis that would
7  show there's an increase in public confidence when photo
8  ID laws are enacted?
9      A.  In committee there was testimony from the
10  Secretary of State, Georgia Secretary of State, who
11  testified that voter turnout increased after their voter
12  identification laws were implemented.  Indiana, also,
13  there was a representative from the state of Indiana who
14  testified to the same, that when Indiana's voter
15  identification laws were implemented, voter turnout
16  increased.
17      Q.  And was there any exploration during the
18  hearing of whether any other factors increased voter
19  turnout in Georgia or Indiana other than photo ID laws?
20      A.  Yes.  I remember a discussion regarding the
21  2008 election.
22      Q.  And it was possible that was the presidential
23  election and there was significant turnout and interest
24  in that election?
25      A.  Correct.

### 160

1      Q.  Is that correct?
2      A.  Correct.
3      Q.  And it's true that the increase in turnout
4  might not have had anything to do with the photo ID law
5  in place; is that correct?
6      MR. SWEETEN:  Objection, argumentative.
7      A.  The --
8      MS. WESTFALL:  You can answer.
9      MR. SWEETEN:  Keep your matters -- keep
10  what your testimony is to matters of public record.  I
11  think she is asking about the hearing so you're free to
12  do that.
13      A.  The information showed that even after the
14  presidential election, I believe in 2010, that there was
15  also an increase in turnout.  I know from the Secretary
16  of State's office, Georgia Secretary of State, provided
17  us with that information, the committee.
18      Q.  (By Ms. Westfall)  And it had been specifically
19  attributed to photo ID through an analysis that you're
20  aware of?
21      A.  That was his testimony.  He attributed it.
22      Q.  Are there any other studies or research that
23  you're aware of related to increases in public
24  confidence as a result of photo ID?
25      A.  I believe I have seen some studies that show

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

---

### 161

1   that.

2       Q.  Did you take into account as you were drafting
3   SB 14 or considering SB 14 any studies about public
4   confidence?

5       MR. SWEETEN:  Don't reveal any
6   legislatively privileged matters.  You can testify about
7   matters of public record, but any discussions,
8   conversations that you've had, don't reveal those.

9       A.  Did I -- did I consider any?

10      Q.  (By Ms. Westfall)  Studies or research on
11  increases in public confidence?

12      A.  Did I -- yes, they were considered.

13      Q.  What were those?

14      A.  The studies, I can't say specifically.  I
15  remember reading -- reading studies on that issue --

16      Q.  Is this --

17      A.  -- which point -- the studies pointed to
18  Indiana and Georgia as positive.  There was a positive
19  result after the voter -- voter -- voter identification
20  laws had been passed, there was a positive result in
21  turnout.

22      Q.  Did the Texas legislature find any -- that
23  there was a problem with public confidence in voting?

24      MR. SWEETEN:  Don't reveal any matters
25  that are legislatively privileged, including all the

---

### 162

1   conversations that we've enumerated previously.  You can
2   go ahead and testimony based on matters of the public
3   record on that issue.

4       A.  Yes.  I think there was discussion about there
5   being a problem of -- the problem with voter confidence
6   in elections, I remember that being discussed during the
7   debate.

8       Q.  (By Ms. Westfall)  What was the basis of that
9   concern factually?

10      MR. SWEETEN:  Confine to matters of the
11  public record.  Don't reveal legislatively privileged
12  information.

13      A.  I remember from the testimony there were
14  accounts of -- from constituents of incidences, some
15  personal accounts of witnessing incidences of voter --
16  voter fraud.

17      Q.  (By Ms. Westfall)  Are you talking about
18  in-person voter impersonation or other forms of voter
19  fraud?

20      MR. SWEETEN:  Same instruction.

21      A.  All forms.

22      Q.  (By Ms. Westfall)  I believe you testified
23  earlier you were unaware of any specific allegations of
24  in-person voter impersonation or convictions based on
25  that crime; is that correct?

---

### 163

1       MR. SWEETEN:  Objection.  I think that
2   misstates his testimony, but go ahead.  You can answer.

3       A.  My understanding was that that was my personal
4   -- there are -- there was testimony.  There was
5   discussion about that.  Other people might -- I'd have
6   to go back and look, but I thought that was regarding
7   myself.

8       Q.  (By Ms. Westfall)  What -- what hearing are you
9   talking about at which individuals testified about
10  concerns about public confidence in voting?

11      A.  I believe it was discussed on the floor as well
12  as in committee.  I'm not --

13      Q.  Does --

14      A.  There were lengthy committees and they -- it
15  was also discussed in the Senate, so it might have been
16  brought up in the Senate as well.  I can't identify
17  which committee hearing that came from, but I know it
18  was an issue that was discussed.

19      Q.  There was testimony before the House or Senate
20  committees from a particular witness on voter
21  confidence, public confidence?

22      A.  Yes, I believe so.

23      Q.  Do you know the name or identity of the
24  witness?

25      A.  No, I do not.

---

### 164

1       Q.  Do you know the year in which this testimony
2   occurred?

3       A.  This most recent session, 2011.

4       Q.  Who are the main opponents of Senate Bill 14?

5       MR. SWEETEN:  Confine your answer to
6   matters of the public record.  Don't reveal
7   conversations with other legislators, other staff.

8       A.  I believe the vote was along party lines, so I
9   would say the Democratic members of the House and
10  Senate.

11      Q.  (By Ms. Westfall)  And were there any outside
12  groups that opposed the bill?

13      A.  Yes.

14      Q.  What were those groups?

15      MR. SWEETEN:  Don't reveal legislatively
16  privileged matters, including constituent
17  correspondence, discussions with legislators, as well as
18  other staffers.  You can confine your answer to the
19  matters of the public record.

20      A.  The minority interest groups, the League of
21  Women Voters, I believe.

22      Q.  (By Ms. Westfall)  How did you learn about
23  their opposition?

24      A.  Through my research.  They were -- weren't shy
25  about it.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                                          MAY 14, 2012



---

### 165

1    Q.   Was there any opposition to SB 14 amongst
2    election officials in Texas?
3        A.   Election officials meaning?
4        Q.   Secretary of State or county officials?
5        A.   Was there any opposition, yes.
6        MR. SWEETEN:   Just confine your answers to
7    matters of the public record.  Don't reveal any
8    categories of information we've gone over many times.
9        Q.   (By Ms. Westfall)  Your answer was "yes"?
10       A.   I believe there was concern from local
11   officials.
12       Q.   And which local officials?
13       A.   I can't remember who exactly.
14       Q.   What were those concerns?
15       A.   I remember one local official account of
16   concerns regarding the costs associated with
17   implementation of the bill.
18       Q.   Who was that county official?
19       A.   I don't remember.
20       Q.   What county was it?
21       A.   I don't remember.
22       Q.   How did you learn about this concern?
23       A.   Through the media.
24       Q.   Were there any constituents who had any
25   concerns about SB 14 other than the minority voting

---

### 166

1    rights groups that you just testified about?
2        MR. SWEETEN:   Don't reveal matters or
3    discussions between constituents and you or
4    Representative Harless or in any other areas of
5    conversation that we discussed earlier, including
6    legislators, legislative staff, state agencies,
7    regarding that.
8        A.   Yes.  There were constituents who had concerns
9    as well.
10       Q.   (By Ms. Westfall)  What were their concerns?
11       MR. SWEETEN:   Same instruction.
12       A.   I think expressing their concerns would take me
13   into the privileged area of communications.
14       Q.   (By Ms. Westfall)  So you have no answer to
15   that question?
16       A.   Correct.
17       Q.   Did Representative Harless take any steps to
18   address any of the concerns raised by bill opponents?
19       MR. SWEETEN:   Don't reveal communications
20   that are legislatively privileged.  If you cannot do so
21   without -- if you cannot answer the question without
22   doing so, then do not answer the question.
23       A.   I think my answer would get into that so I
24   would say no.  It would -- my answer would get into that
25   privilege so no.

---

### 167

1    Q.   (By Ms. Westfall)  Can you point to anything in
2    SB 14 that was added in the House in response to
3    concerns by groups or individuals representing minority
4    voters?
5        MR. SWEETEN:   You can confine your answers
6    to the public record.  Do not reveal legislatively
7    privileged information.
8        MS. WESTFALL:   Mr. Sweeten, I'm asking
9    about a publicly signed law, and I'm asking him about
10   provisions in the law.  I'm not asking him about
11   privileged communications.  Would you please withdraw?
12       MR. SWEETEN:   What was your question
13   again?
14       MS. WESTFALL:   I said -- my question was:
15   Is there any provision in SB 14 that was added in
16   response to concerns raised by people, groups
17   representing minority voters or minority voters
18   themselves?  Anything in the law?
19       MR. SWEETEN:   You can confine your answers
20   to matters of the public record.  Do not reveal
21   communications as we've outlined before between
22   legislators, legislative staff, state agencies, Texas
23   legislative council, constituents.
24       A.   Okay.  I know from the debate there were
25   several amendments offered by opponents to the bill that

---

### 168

1    were to address concerns.
2        Q.   (By Ms. Westfall)  And were any of them
3    adopted?
4        A.   Yes.
5        Q.   Which ones?
6        MR. SWEETEN:   Same instruction.
7        A.   Specifically, I can't remember which amendments
8    were the total number of amendments which were added in
9    the Senate.
10       Q.   (By Ms. Westfall)  Could you confine your
11   answer to the House?
12       A.   Well, I can -- I can -- I remember from some of
13   the debate, so I was going to -- just was clarifying
14   that this is not the sum total of all the changes that
15   were made by opponents to the bill.
16       And Senator Davis had a -- Senator Davis
17   had an amendment to allow for there to be substantially
18   similar -- when an election worker is reviewing the
19   identification, the names can be substantially similar.
20   That was -- that was added in the Senate and kept in the
21   bill through the House.  And that was to address
22   concerns from that there would be -- that was to address
23   some of the opponents' concerns.
24       Q.   Can you think of any other changes to the bill,
25   or that is the sum total?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                  MAY 14, 2012

---

## 169

1      MR. SWEETEN:  Same instruction.
2      A.  This is by no means the sum total, so I'm going
3  to qualify that.
4      Q.  (By Ms. Westfall)  As you're sitting here
5  today, can you think of any other, or should we move on
6  to another question?
7      A.  I believe there was increased notice
8  requirements placed in the Senate.
9      Q.  By "increased notice," do you mean public
10 notification or notice to voters?
11     A.  Yes.
12     Q.  Can you think of any other changes?
13     MR. SWEETEN:  Same instruction.
14     A.  I apologize.  I was looking at the -- the
15 language regarding the election identification
16 certificate, I believe that was an issue.
17     Q.  (By Ms. Westfall)  Was that certificate put in
18 the bill in response to the concerns of minority groups?
19     MR. SWEETEN:  Same objection and
20 instruction.
21     A.  It was a concern first brought up by
22 Representative Anchia during the House debate, and that
23 language is -- was in response.
24     Q.  Anything else?
25     MR. SWEETEN:  Same instruction.

---

## 170

1      A.  The disability exemption was something we heard
2  from that was, I believe, a concern and --
3      Q.  (By Ms. Westfall)  Was that a concern of
4  minority voters?
5      A.  I'm sorry.  Okay.  (Reading document.)
6      I'll leave it there.  That's my -- that's,
7  from reviewing it, that's not the sum total of the
8  changes that were done on behalf of --
9      Q.  But that's, sitting here today, you're here to
10 testify.  I gave you plenty of opportunity to testify
11 about all changes that were made to the bill in response
12 to minority concerns, and you've testified, and that's
13 your testimony today; is that correct?
14     A.  That's correct.
15     Q.  And to clarify in terms of the concerns about
16 the bill from minority voting groups and minority
17 voters, did Representative Harless seek those opinions
18 out from those groups, or were those -- was that
19 opposition in the public sphere, and you became aware of
20 them that way?
21     MR. SWEETEN:  Don't reveal any matters
22 that are legislatively privileged.  Don't reveal
23 conversations that I've enumerated previously.  You can
24 testimony based upon matters that are public record.
25     A.  I can't speak for Representative Harless, but

---

## 171

1  these groups, the information was -- their opposition
2  was -- was out there in the public sphere.
3      Q.  (By Ms. Westfall)  So you're saying the way you
4  learned about it was -- was from it being in the public
5  sphere; is that correct?
6      A.  Their concerns?
7      Q.  Yes.
8      A.  Through the debate and my research on the
9  issue, yes.
10     Q.  Were you concerned that failing to address the
11 concerns of minority voters might have an impact on
12 preclearance of SB 14 under Section 5 of the Voting
13 Rights Act?
14     MR. SWEETEN:  Was he personally
15 concerned?  Is that the question?
16     MS. WESTFALL:  Yes.
17     MR. SWEETEN:  Okay.  I'm going to let you
18 answer that question, but I want you to confine any sort
19 of information you learned about this from any of the
20 sources we've enumerated to the matters of the public
21 record.  Otherwise, don't answer it and reveal its
22 communication.
23     A.  Okay.  My concerns were that the legislation
24 would comply with federal law and in so much as those
25 minority concerns meshed with that.  It was something

---

## 172

1  that I did, I did think about, of course.
2      MR. SWEETEN:  I also object to the last
3  question, based on it assumes facts not in evidence, but
4  go ahead.
5      Q.  (By Ms. Westfall)  Did you take any steps to
6  address your concerns that not responding to the
7  concerns of minority voters could have an adverse impact
8  on Session 5 consideration of SB 14?
9      MR. SWEETEN:  Don't reveal any
10 communications you've had with legislators, staff
11 members, state agencies, et cetera.
12     THE WITNESS:  Oh, okay.
13     MR. SWEETEN:  As I've previously
14 instructed.
15     A.  I thought the bill as it was drafted would --
16 would comply.
17     Q.  (By Ms. Westfall)  So you took no steps,
18 because you thought the bill was satisfactory; is that
19 correct?
20     A.  I took no steps to address --
21     Q.  The concerns of minority voters, because you
22 thought they were adequately addressed; is that correct?
23     A.  I don't know if I feel comfortable saying that
24 the concerns of minority -- that's pretty broad.  That's
25 a large -- that's a large number, so unless it's a

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 173

1  specific one, I can't answer that.
2      Q.  Does Representative Harless have any minority
3  groups as recipients of her newsletter distribution or
4  her e-mail blasts?
5      A.  I don't know.
6          MR. WESTFALL:  Okay.  Why don't we take a
7  break for a few minutes?
8          (Recess 3:10 p.m. to 3:25 p.m.)
9          MS. WESTFALL:  We're back on the record.
10     Q.  (By MS. WESTFALL)  You testified earlier about
11 studies and research that you had done in advance of
12 drafting SB 14.  Did you share any of those studies with
13 Representative Harless?
14         MR. SWEETEN:  Don't reveal any
15 communications you've had with Representative
16 Harless.  I instruct you not to answer.
17         MS. WESTFALL:  As to whether he shared any
18 studies with Representative Harless?
19         MR. SWEETEN:  He's not going to reveal any
20 communications that he's had with Representative
21 Harless.  I'm going to instruct him not to answer based
22 on that question.
23     Q.  (By MS. WESTFALL)  Did Representative Harless
24 make any public statements about the opposition to
25 SB 14?

---

### 174

1      A.  I don't remember.
2      Q.  Did you handle her public statements on SB 14?
3      A.  I believe her public statements are her own.
4      Q.  Did you draft press releases for her?
5      A.  I was the contact person for press releases.
6      Q.  Did you draft the press releases?
7      A.  Yes.
8      Q.  Did you draft all the press releases on SB 14?
9      A.  I believe so.
10     Q.  How many were there?
11     A.  Two or three.
12     Q.  What was the first one that you issue about?
13     A.  We did a press release when it was determined
14 that we would be lead House sponsor of Senate Bill
15 14.  We did a press release on passage, House passage of
16 Senate Bill 14.  There was another one, I believe,
17 another press release on Senate Bill 14 regarding the
18 Department of Justice rejection of -- the Department of
19 Justice denying preclearance, and we did a press release
20 for that as well.
21     Q.  Did you draft all three of those?
22     A.  Yes.
23     Q.  Do you recall what the first press release
24 said?
25     A.  No.

---

### 175

1      Q.  Did Representative Harless ever discuss whether
2  SB 14 might disproportionately impact minority voters?
3          MR. SWEETEN:  Don't reveal communications
4  you've had with Representative Harless.  To the extent
5  that public statements made that can help you answer
6  that question, you can rely on the public record.
7      A.  Did Representative Harless make any statements
8  regarding whether --
9      Q.  (By MS. WESTFALL)  Whether SB 14 might
10 disproportionately impact minority voters?
11     A.  I don't recall.
12     Q.  Is it possible she might have?
13         MR. SWEETEN:  Are you asking about public
14 statements or are you talking about -- obviously, he
15 can't --
16         MS. WESTFALL:  I'm asking about --
17         MR. SWEETEN:  -- discuss the statements
18 that he's made.
19     Q.  (By MS. WESTFALL)  I'm asking about any
20 statements that Representative Harless have made or
21 discussions she's had about possible impact of SB 14 on
22 minority voters.
23     A.  Okay.
24         MR. SWEETEN:  Don't reveal information
25 that's legislatively privileged or that -- don't reveal

---

### 176

1  communications between Representative Harless and you,
2  Representative Harless and other legislators.  You can
3  confine your answer to matters of public record.
4      A.  I don't know.  It's possible.  I don't know.
5      Q.  (By MS. WESTFALL)  So as to the public record,
6  you don't know; is that your testimony?
7      A.  Correct.
8      Q.  Have you ever had any discussion with
9  Representative Harless about whether SB 14 might
10 disproportionately impact minority voters?
11         MR. SWEETEN:  Don't answer that question.
12 It's legislatively privileged.
13     Q.  (By MS. WESTFALL)  Are you aware of whether
14 Representative Harless has ever discussed whether SB 14
15 might disproportionately impact minority voter with
16 persons other than yourself?
17         MR. SWEETEN:  Don't reveal communications
18 that you had or that you're aware of that she had with
19 legislators, legislator staff, state agencies.  You can
20 confine your answer to matters of the public record.
21     A.  I don't recall.  I can't speak for
22 Representative Harless, so I don't recall.
23     Q.  (By MS. WESTFALL)  And so your answer is to
24 public information; is that correct?
25     A.  Correct.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                        MAY 14, 2012

| 177 | 179 |
|---|---|

**177**

1    Q.  And you're not testifying about any other
2    conversations that Representative Harless might have had
3    based on the advice of counsel?
4        A.  Correct.  I don't know of those conversations,
5    so...
6        Q.  Was Representative Harless concerned that SB 14
7    might disproportionately impact minority voters?
8        MR. SWEETEN:  Don't reveal communications
9    that you've had with Representative Harless.  You can
10   testify as to matters of the public record as to that
11   issue.
12       THE WITNESS:  Okay.
13       MR. SWEETEN:  Objection, calls for
14   speculation.  Go ahead.
15       A.  I would -- based upon the privilege, I would
16   say I don't know.
17       Q.  (By MS. WESTFALL) You do know the public
18   record?
19       A.  I can't -- I can't speculate to her -- her
20   thoughts.
21       Q.  Right.  But your testimony is just about the
22   public record.  Are you aware of any indication in the
23   public record where Representative Harless indicated any
24   concern about the impact of SB 14 on minority voters?
25       MR. SWEETEN:  You can answer.

**178**

1        A.  No, I'm not aware of any.
2        Q.  (By MS. WESTFALL) Did Representative Harless
3    seek any advice from anyone on whether SB 14 complied
4    with Section 5 of the Voting Rights Act?
5        MR. SWEETEN:  Again, don't reveal
6    conversations that Representative Harless had with any
7    legislators or with any staff members with TLC or state
8    agencies' constituents.  To the extent you can answer it
9    without revealing those, you can go ahead and do so.
10       A.  Based on the public record, I'm not aware of.
11       Q.  (By MS. WESTFALL) And you're acting on the
12   advice of counsel not to testify about any private
13   conversations that Representative Harless might have had
14   about SB 14 and the Voting Rights Act; is that correct?
15       A.  That's correct.
16       Q.  Did you, outside of Representative Harless's
17   presence, have any discussions yourself about opposition
18   to SB 14?
19       MR. SWEETEN:  Don't reveal communications
20   that you've had with other legislators, their staff,
21   state agencies, TLC, or Representative Harless herself.
22   To the extent that you can answer that question without
23   revealing those, you can go ahead and do so, including
24   matters of the public record.
25       A.  Did I -- did I have conversations?  Yes.

**179**

1        Q.  (By MS. WESTFALL) With whom?
2        A.  Regarding?
3        Q.  Regarding the opposition to SB 14.
4        MR. SWEETEN:  Same objection and
5    instruction.
6        THE WITNESS:  Okay.
7        A.  Conversations with staff regarding opposition
8    of Senate Bill 14.
9        Q.  (By MS. WESTFALL) You had conversations with
10   staff?
11       A.  No.  That's your question.  I'm sorry.  I'm
12   repeating your question.
13       Q.  My question is:  Did you, outside of
14   Representative Harless's presence, have any discussions
15   about the opposition to SB 14?
16       A.  Okay.
17       MR. SWEETEN:  And, again, the same
18   instruction.
19       THE WITNESS:  Okay.
20       A.  Yes.  And then you asked with who, correct?
21   Okay.  The individuals, the staff I have mentioned.  I
22   believe I had conversations regarding the opposition
23   with the staff I've mentioned previously, as well as
24   other legislators' staff.
25       Q.  (By MS. WESTFALL) And you're talking about

**180**

1    staff from Senator Fraser's office, the Lieutenant
2    Governor's Office, Speaker Straus's Office; is that
3    correct?
4        A.  Correct.
5        Q.  And as a result of those conversations, were
6    any changes made to SB 14?
7        A.  I think --
8        MR. SWEETEN:  Don't reveal any sort of
9    privileged information.
10       THE WITNESS:  Okay.
11       MR. SWEETEN:  Okay?  Don't reveal the
12   conversations that you've had with anyone that are
13   legislatively privileged.  I've enumerated what those
14   are.  So don't reveal that information.
15       A.  I think my conversations with those staff
16   members would be within the privilege.
17       Q.  (By MS. WESTFALL) When did you have those
18   conversations with the staff members about opposition to
19   SB 14?
20       A.  From January until passage of the bill.
21       Q.  Did you have many, many conversations about the
22   opposition to SB 14?
23       MR. SWEETEN:  Objection, vague.
24       Q.  (By MS. WESTFALL) Did you have them on a
25   periodic basis?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

---

### 181

1    A.   Representative Harless was the House sponsor of
2  the legislation.  I think staff knew that I was -- yes,
3  there were many conversations with staff.
4    Q.   And what were the nature of your discussions
5  about the opposition of SB 14 with staff and Senator
6  Fraser's staff.
7         MR. SWEETEN:  Don't answer the question.
8  It would reveal legislatively-privileged information.
9    Q.   (By MS. WESTFALL) What was the nature of the
10 conversations that you had with staff in the Lieutenant
11 Governor's Office?
12        MR. SWEETEN:  Same objection.  Same
13 instruction.
14   Q.   (By MS. WESTFALL) What was the nature of the
15 conversations that you had with staff in Speaker
16 Straus's office?
17        MR. SWEETEN:  Same objection.  Same
18 instruction.
19   Q.   (By MS. WESTFALL) During the drafting or the
20 Legislature's consideration of SB 14, was there efforts
21 to determine the number of registered voters in Texas
22 who lack a driver's license?
23        MR. SWEETEN:  Don't reveal any
24 legislatively-privileged discussions, conversations.
25 That includes discussions with other staff members,

---

### 182

1  other legislators.  That includes the state agencies.
2  That includes constituents.  That includes the TLC.
3        THE WITNESS:  Okay.
4        MR. SWEETEN:  If you can confine your
5  answer to the matters of public record, you are free to
6  do so.
7    A.   The committee.  There was testimony that the
8  information was sought from the Secretary of State's
9  Office regarding those who do not have a social security
10 number or a driver's license number associated with
11 their voter registration.
12   Q.   (By MS. WESTFALL) How did that issue come to
13 the attention of the committee?
14        MR. SWEETEN:  Again, don't reveal any
15 legislatively-privileged discussions that I've
16 enumerated previously.
17   A.   There was testimony from the Secretary of
18 State's Office, and the issue came up.  I believe
19 Representative Anchia asked the questions regarding
20 that.
21   Q.   (By MS. WESTFALL) Was this during the House
22 Select Committee's consideration of SB 14?
23   A.   Yes.
24   Q.   Representative Anchia asked questions about
25 which registered voters did not have allowable forms of

---

### 183

1  ID under SB 14; is that correct?
2    A.   The issue came up.  I don't know if it was
3  Representative Anchia.  The issue did come up regarding
4  registration cards, voter registrations, and those being
5  associated with a social security number or a driver's
6  license number.  The issue did come up, yes.
7    Q.   And was there a response from the Secretary of
8  State's Office.
9         MR. SWEETEN:  Are you asking him in the
10 hearing?
11   Q.   (By MS. WESTFALL) Yes, in the hearing.
12   A.   Yes.  Yes.
13   Q.   There was a response?  And what was the
14 response?
15   A.   I believe the number was in the range of
16 600,000 Texans have a voter registration card without an
17 associated social security number or driver's license
18 number.  I can't remember the exact number.  But it was
19 in that range.
20   Q.   Was there any analysis of the racial
21 composition of those voters?
22        MR. SWEETEN:  Are you asking about is this
23 public record again?
24   A.   (By MS. WESTFALL) I'm asking public record,
25 private record, every record.

---

### 184

1        MR. SWEETEN:  To the extent that the
2  question asks you to reveal conversations between
3  legislative staff, the legislators, state agencies, the
4  TLC, or constituents, do not reveal that information.
5  To the extent that you can answer it without revealing
6  those conversations or matters of the public record, you
7  can do so.
8    A.   Based on the public record, I know the issue
9  came up.  I cannot remember at which point the Secretary
10 of State's office does not have their voter -- racial
11 data is not kept in -- racial data is not collected with
12 voter registration cards, so the Secretary of State's
13 Office, my understanding is, did not have that
14 information.
15   Q.   (By MS. WESTFALL) So the answer my question,
16 there was no racial analysis -- there was no analysis by
17 race of persons who are registered voters who do not
18 have allowable forms of ID under SB 14; is that right?
19        MR. SWEETEN:  Same instruction.  Same
20 objection.
21   A.   The Secretary of State's Office did not have
22 the racial data associated with the voter registration
23 data.
24   Q.   (By MS. WESTFALL) Did Representative Harless or
25 you take any further steps to try to obtain that

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

185

1    information during consideration of SB 14?
2            MR. SWEETEN:  Don't reveal any
3    communications you've had with Representative Harless,
4    that you've had with legislative staff, the state
5    agencies, with TLC, or constituents.
6    Q.  (By MS. WESTFALL) Do you have no answer to that
7    question?
8    A.  No answer to that question.
9    Q.  Because --
10   A.  Correct.
11   Q.  -- based on the advice of counsel that --
12   A.  Correct.
13   Q.  -- it's privileged?
14          It was a pretty important issue, huh,
15   figuring out the racial impact of people who did not
16   have ID; isn't that right?  A pretty important, central
17   issue in the debate?
18          MR. SWEETEN:  Objection.  Can you just
19   keep it to one question at a time?  Also, objection,
20   argumentative.
21          MS. WESTFALL:  I will withdraw that
22   question.
23   Q.  (By MS. WESTFALL) Was it not an important
24   issue, during consideration of SB 14, as to the racial
25   composition of people who did not have an allowable form

186

1    of ID?
2            MR. SWEETEN:  I'm going to instruct you
3    not to reveal discussions or communications between you,
4    state agencies, legislators, legislative staff,
5    constituents, or the TLC.  To the extent you have
6    information where you can answer her question, you can
7    go ahead and do so.
8    A.  The information was not available from the
9    Secretary of State's Office, because they do not collect
10   racial data.
11   Q.  (By MS. WESTFALL) Other than making an inquiry
12   of the Secretary of State about registered voters with
13   forms of ID, were there any other efforts to determine
14   the racial composition of people without allowable IDs?
15          MR. SWEETEN:  Same objection.  Same
16   instruction.
17   A.  They are the record keepers for voter
18   registration in Texas.  I think they would be the
19   appropriate agency for that.  That was -- they are the
20   -- they did not have that information available at the
21   committee hearing.
22   Q.  (By MS. WESTFALL) So is it your testimony there
23   weren't further efforts other than to make that inquiry
24   to the Secretary of State; is that correct?
25          MR. SWEETEN:  Do you understand my

187

1    instruction?
2            THE WITNESS:  Uh-huh.
3            MR. SWEETEN:  Okay.  With that
4    instruction, you can go ahead and answer, to the extent
5    you have any information.
6    A.  My answer is not based on.
7    Q.  (By MS. WESTFALL) Because you have nothing that
8    was in the public record that indicates an answer to my
9    question; is that correct?
10   A.  Correct.
11   Q.  There may be something in the private record
12   that indicates an answer to my question; is that
13   correct?
14          MR. SWEETEN:  Don't answer that question.
15   She is asking you about the content of communications.
16   You don't have to answer that question.  There were
17   legislatively-privileged discussion that occurred.
18   Q.  (By MS. WESTFALL) Did the Secretary of State
19   testify about any analysis of Spanish surname registered
20   voters and their access to forms of allowable ID under
21   SB 14?
22   A.  I don't recall that information being presented
23   at the committee hearing.
24   Q.  Did Representative Harless or anyone on the
25   committee ask for that information from the Secretary of

188

1    State?
2            MR. SWEETEN:  Do not reveal communications
3    between you, state agencies, or any of the other
4    enumerated areas.  Okay?  Don't reveal those.  You can
5    answer to the extent that you can based on public record
6    or to the extent it doesn't implicate communications
7    that we've outlined.  Okay.  Go ahead.
8    A.  No, based on --
9    Q.  (By MS. WESTFALL) There's nothing in the public
10   record on that issue; is that correct?
11   A.  That's correct.
12   Q.  Are you aware of any efforts, at any point
13   during the development of SB 14, to attempt to craft a
14   bill that would accomplish the bill's objectives without
15   disproportionately harming minority voters?
16          MS. WESTFALL:  Colby, don't reveal any
17   communications that you've had with legislators, with
18   legislative staff, with state agencies, the TLC, their
19   constituents.  To the extent that there's information
20   that you have that is outside of those areas, you can go
21   ahead and answer Ms. Westfall's question, to the extent
22   can.
23   A.  Am I aware of any other efforts -- I'm sorry.
24   I've got to repeat it.  Am I aware of any other efforts
25   outside of Senate Bill 14?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                            MAY 14, 2012

---

### 189

1    Q.   (By MS. WESTFALL) During the development of
2  SB 14, to attempt to craft a bill that would accomplish
3  the bill's objectives without disproportionately falling
4  upon minority voters?
5          MR. SWEETEN:  Objection.  Argumentative as
6  well.  Repeat my previous objection and instruction.
7    Q.   (By MS. WESTFALL) You may answer.
8    A.   It's my opinion that the bill addresses that as
9  it is.
10   Q.   And how does the bill address that issue?
11   A.   By providing free ID, a provisional ballot
12 period.
13   Q.   Okay.  We'll talk about that a little about it
14 later.
15        Can you tell me each and every effort that
16 is made to ensure that the forms of ID included in SB 14
17 were equally accessible to all registered voters
18 regardless of race or ethnicity?
19        MR. SWEETEN:  Don't reveal any
20 communications you've had with a legislative staff or
21 legislators, with members of the TLC, state agencies, or
22 constituents.  To the extent you can answer without
23 revealing those, you can go ahead and try to do so.
24   A.   Accessibility of other IDs.
25   Q.   (By MS. WESTFALL) To ensure that the forms of

### 190

1  ID included in SB 14 were equally accessible to all
2  voters, all registered voters regardless of race or
3  ethnicity?
4    A.   Not to my knowledge.
5    Q.   There is nothing in the public record; is that
6  correct?
7    A.   Not to my knowledge.  I'm -- there might be.
8    Q.   But as you sit here today, you can't think of
9  any; is that correct?
10   A.   Correct.
11   Q.   Thank you.
12        When was SB 14 filed in the Senate?
13   A.   I'm not sure if I understand.  When was the
14 bill filed?  The bill was filed --
15   Q.   In the Senate?
16   A.   I not sure when it was filed in the Senate.
17   Q.   Was the sometime in January 2011?
18   A.   The bill has a low bill number, so I imagine it
19 was -- it's one of the bill numbers reserved.
20        MS. WESTFALL:  Could you mark this as
21 Exhibit 8, please.
22        (Exhibit 8 marked for identification.)
23   A.   I imagine it was early on.
24   Q.   (By MS. WESTFALL) That's a good tip about low
25 bill numbers.

### 191

1    A.   It's not always the case.  Not always the case.
2    Q.   That is very sensible.
3          MS. WESTFALL:  Could you hand this to the
4  witness?
5    Q.   (By MS. WESTFALL) You've been handed U.S.
6  Exhibit 8.  Do you recognize this document?
7    A.   This is a printout of the bill history of
8  Senate Bill 14 from, it looks like, the Texas
9  Legislature online.
10   Q.   Have you seen this document before?
11   A.   I've seen a similar document.  Yes, I've seen a
12 similar document.
13   Q.   Could you -- referring to Exhibit U.S. 8, could
14 you tell me when Senate Bill 14 was filed in the Senate?
15   A.   The 12th of January 2011.
16   Q.   And what is a House Select Committee?  And you
17 can turn your attention away from that, but hold on to
18 that, because we may look at it again.
19   A.   Okay.
20   Q.   What is a House Select Committee?
21   A.   A Select Committee is -- it's outside of the
22 standard -- sorry, not standard.  The standing
23 committees that the House has.  It's a separate
24 committee outside of the standing committees.
25   Q.   Are you familiar with the House Select

### 192

1  Committee on voter identification and voter fraud?
2    A.   I am.
3    Q.   Could you describe the committee for me?
4    A.   The -- describe the committee?  The makeup of
5  the committee?
6    Q.   Or the purpose of the committee.
7    A.   Oh, okay.
8    Q.   Tell me about the committee.
9    A.   The committee was tasked with legislation
10 regarding voter identification and voter fraud, and it
11 was created for that purpose.
12   Q.   Was it convened for one legislative session
13 only?
14   A.   I can't speak to future, future sessions.  It
15 was created in the 82nd Legislative Session.
16   Q.   Can you describe the circumstances of the
17 committee's creation?
18        MR. SWEETEN:  Don't reveal any
19 communications that are legislatively privileged that
20 we've previously outlined.  But go ahead, you can answer
21 the question to the extent you can do so without
22 revealing those.
23   A.   To my knowledge, from news reports and the
24 public record, is that it was created for the specific
25 purpose of the voter identification legislation.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

COLBY BEUCK                                                    MAY 14, 2012

---

### 193

1    Q.   (By MS. WESTFALL) Was Speaker Straus behind its
2    creation?
3         MR. SWEETEN:  Don't reveal any
4    legislatively-privileged communications.  To the extent
5    that you -- and also objection, speculation.  But to the
6    extent you can answer that question based on -- without
7    revealing those, go ahead.
8         A.   Typically, the Speaker's office is responsible
9    for creating -- creating committees.
10        Q.   (By MS. WESTFALL) Including special committees?
11        A.   Yes.
12        Q.   Or -- I'm sorry, Select Committees?
13        A.   Yes.
14        Q.   And was it your understanding that Speaker
15   Straus and his office was involved in creating the House
16   select Committee on voter identification and voter fraud
17   in 2011?
18        MR. SWEETEN:  Objection, calls for
19   speculation.
20        A.   I can't speculate, but typically, the Speaker's
21   Office has the ability to create committees.
22        Q.   (By MS. WESTFALL) Would anyone else in
23   leadership have been involved in the creation of the
24   committee?
25        MR. SWEETEN:  Objection, speculation.

---

### 194

1    Also, don't reveal legislatively-privileged
2    communications.  But go ahead.
3         A.   I don't know if anybody else was involved.
4         Q.   (By MS. WESTFALL) How many bills did the Select
5    Committee on -- and I'm just going the refer to this as
6    the Select Committee, if that's okay, for purposes of
7    this discussion.  How many bills did the Select
8    Committee consider?
9         A.   There were several bills that were referred to
10   the committee.  I believe the -- Senate Bill 14 was the
11   single bill heard by the committee.
12        Q.   Did it hear any bills on mail-in ballot fraud
13   that were filed in 2011?
14        A.   No.  I believe those were referred to the
15   Committee on Elections.
16        Q.   Why did they go to the Committee on Elections?
17        MR. SWEETEN:  Objection, calls for
18   speculation.  You can answer to the extent you're not
19   revealing legislatively-privileged communications.  Go
20   ahead.
21        A.   I can't speculate as to why they went where
22   they did.
23        Q.   (By MS. WESTFALL) Did Representative Harless
24   serve on the Select Committee?
25        A.   Yes.

---

### 195

1    Q.   Can you tell me about the circumstances under
2    which she was appointed to that committee?
3         MR. SWEETEN:  Don't reveal any
4    communications that I've previously outlined that are
5    legislatively privileged.  To the extent you can answer
6    without revealing those, you can go ahead.
7         A.   I don't know the circumstances behind her
8    appointment.
9         Q.   (By MS. WESTFALL) How did you first learn about
10   her appointment?
11        MR. SWEETEN:  Don't reveal any
12   legislatively-privileged communications.  You can answer
13   to the extent you have information outside of that.
14        A.   I believe it was a press release from the
15   Speaker's Office.
16        Q.   (By MS. WESTFALL) Is that ordinarily how you
17   learn about Representative Harless's appointments to
18   committees, is via a press release?
19        A.   Typically, that's how it's done.  A press
20   release to all the members so they all find out at the
21   same time.  That's how I learned of it.
22        Q.   When was the first time that the committee met?
23        A.   Early March.
24        Q.   How many times did the committee meet?
25        A.   Less than five times.  I believe it was four,

---

### 196

1    but I cannot be sure on that.  I think it was four
2    times.  Less than five.
3         Q.   Do members of the House generally submit their
4    preferences for serving on committees to the Speaker's
5    office?
6         A.   Yes.
7         Q.   Do you know whether Representative Harless
8    indicated to the Speaker's Office that she wanted to
9    serve on the Select Committee?
10        MR. SWEETEN:  If that's a matter of public
11   record, you can feel free to answer that.  If it's
12   something that falls within what we've outlined as being
13   legislatively privileged, do not.
14        THE WITNESS:  Okay.
15        Q.   (By MS. WESTFALL) Can you not answer that
16   question?
17        A.   I can't answer that question.
18        Q.   On the basis of it being privileged, on the
19   basis of counsel's advice?
20        A.   Correct.
21        Q.   When did Senate Bill 14 pass the Senate?  And
22   if you want to take a look at Exhibit 8, feel free to do
23   so.
24        A.   Senate Bill 14 was reported engrossed on
25   January 26th, 2011.  It was received by the House on the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK

MAY 14, 2012

## 197

1  27th of January.
2      Q.  How usual is it for a bill of this substantive
3  nature to be enacted in one chamber in two weeks on
4  January?
5          MR. SWEETEN:  Objection, assumes facts not
6  in evidence.  Objection, calls for speculation.  You can
7  answer if you have information responsive to that
8  question.  So don't reveal any legislatively-privileged
9  information.
10         MS. WESTFALL:  Mr. Sweeten, I think the
11  timing of bills being passed is a matter of public
12  record, and you have no basis for making a privilege
13  objection.
14         MR. SWEETEN:  Well, I mean, first of all,
15  with respect to my objections, you loaded that question
16  chock full of conclusory statements.
17         MS. WESTFALL:  Those are different
18  objections.
19         MR. SWEETEN:  So those are my objections.
20         MS. WESTFALL:  That's not basis for
21  instructing the witness not to answer.
22         MR. SWEETEN:  Okay.  And I'm not
23  instructing him not to answer.  I'm instructing him not
24  to reveal privileged information, if he needs to do so
25  in order to answer that question.  I'm not saying he

## 198

1  does.  I've already instructed him, he can testify as to
2  the public record.  So if it truly is public record,
3  he's free to answer that question.
4          MS. WESTFALL:  I'm not sure how it could
5  possibly be privileged.
6          MR. SWEETEN:  Okay.  Well, and the
7  instruction don't apply, then, if it's publicly
8  available.
9          MS. WESTFALL:  Then I'm not sure why you
10  made the objection.
11     Q.  (By MS. WESTFALL) Can you think of any other
12  bills that are substantive that got passed in two weeks
13  in the Senate?
14     A.  I'm not a Senate historian, so I can't speak to
15  that.
16     Q.  You've worked in the Senate since 2003, have
17  you not?
18     A.  I have worked in the Senate since 2003, so I
19  can speak to that.  Past 2003, I'm no expert.  The
20  emergency legislation, I guess it's possible.  That is
21  in the beginning of the session, so it is...
22     Q.  Can you recall, based on your experience
23  working in the Senate from 2003 to the present, whether
24  any other substantive bills have been enacted in the
25  Senate in two weeks in January, that are substantive in

## 199

1  nature, such as Senate Bill 14?
2      A.  Not that I recall.
3      Q.  Did you or Representative Harless have any
4  involvement in the Senate's consideration of SB 14 from
5  the time it was filed on January 12th until it was
6  referred to the Select Committee?
7          MR. SWEETEN:  Don't reveal any
8  legislatively-privileged communications.  I've outlined
9  before.
10     A.  Do we have any involvement in the sense -- no.
11     Q.  (By MS. WESTFALL) So you simply watched what
12  happened in the Senate?  Is that your testimony?
13     A.  That's correct.  And I'm speaking of behalf of
14  myself, not Representative Harless.  I had no
15  involvement in it.  I was a spectator.
16     Q.  Do you know whether she had any involvement in
17  SB 14, from the time it was filed in the Senate to the
18  time it was referred to the House Committee?
19         MR. SWEETEN:  Same instruction.
20     A.  Not to my knowledge.
21     Q.  (By MS. WESTFALL) Not to your knowledge based
22  on the public record?  Is that your testimony?
23     A.  That's, I think -- I don't want to -- I don't
24  know if she did.
25     Q.  Have any private conversations?

## 200

1      A.  I can't speak for her, so I don't know her
2  involvement.
3      Q.  Did you have any conversations or
4  communications with the media or the public when SB 14
5  was filed in January?
6          MR. SWEETEN:  If they're public
7  communications, if there's discussions with the media,
8  I'm going to let you answer that.  If it says to
9  constituent communications, I think that that would be
10  privileged, so I don't want you to provide that
11  information.
12     A.  I don't recall having any conversations with
13  the media on the filing of Senate Bill 14.
14     Q.  (By MS. WESTFALL) Did Representative Harless?
15     A.  Not to my knowledge.
16     Q.  Can you describe the Select Committee's
17  consideration of SB 14?
18         MR. SWEETEN:  You're asking about matters
19  of the public record, is that correct, the
20  consideration?
21         MS. WESTFALL:  No.  I'm asking about
22  public and private consideration by the Select Committee
23  of SB 14.
24         MR. SWEETEN:  Well, I don't want you to
25  are reveal any communications that we have already



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 201

1  outlined or that are legislatively-privileged, but to
2  the extent that you have information that is not
3  legislatively-privileged.
4      A.  Can I get, because -- I was -- what was the
5  question again?
6      Q.  (By MS. WESTFALL) Can you describe the
7  committee's consideration of SB 14?
8      A.  Okay.
9          MR. SWEETEN:  You can testify about
10 matters of the public record, okay?  Don't reveal
11 communications that have -- that you're aware of that
12 occurred between legislators, legislative staff, TLC,
13 state agencies, or constituents.
14         THE WITNESS:  Okay.
15     A.  The committee process, there was a full day
16 hearing in early March on the issue.  I believe it began
17 early in the morning and continued.  There was a break
18 during the legislative session.  Then the committee
19 readjourned after session and continued to hear
20 testimony from the -- and invited testimony as well as
21 public testimony.  There was a considerable.
22     Q.  (By MS. WESTFALL) And were any substantive
23 changes made to SB 14 during the committee's
24 consideration of it?
25     A.  There were not -- no, there were not any

## 202

1  committee -- committee amendments.  It was the committee
2  substitute as it went through.
3      Q.  During the first few months of 2011, did you
4  gather any information to assist Representative Harless
5  in her work on SB 14?
6          MR. SWEETEN:  To the extent that this
7  question is asking you to reveal communications that you
8  had with Representative Harless, or any other staff
9  members, I don't want you to provide that information.
10 That's legislatively-privileged.  If you can provide
11 that answer without revealing those communications that
12 we've outlined previously, I'm going to let you do so.
13     Q.  (By MS. WESTFALL) Did you contact the
14 Department of Public Safety during the first few months
15 of 2011?
16         MR. SWEETEN:  You're just asking the
17 contact?
18         MS. WESTFALL:  Yeah.
19         MR. SWEETEN:  Okay.  I'm going to let you
20 answer whether or not you had contact, including,
21 as this is along the lines of a privilege log
22 questions.  You can talk about the contact and the date
23 of.  Do not reveal the substance of any sort.
24     A.  Yes.
25     Q.  (By MS. WESTFALL) What prompted you to contact

## 203

1  DPS?
2          MR. SWEETEN:  Unless matter is a matter of
3  public record, you do not have to reveal that
4  information.  That is legislatively-privileged.
5      Q.  (By MS. WESTFALL) Do you have any answer based
6  on public record?
7      A.  There was an expert witness in committee from
8  DPS.
9      Q.  Which prompted you to contact DPS?
10     A.  Yes.
11     Q.  Do you have any further explanation of why you
12 contacted DPS, based on this expert testimony?
13         MR. SWEETEN:  And based on the public
14 record.  Don't reveal legislatively-privileged
15 communications.
16     A.  No.
17     Q.  (By MS. WESTFALL) What did you learn from DPS?
18         MR. SWEETEN:  I'm going to advise you not
19 reveal that conversation.
20         MS. WESTFALL:  Is this based on
21 legislative privilege, Mr. Sweeten.
22         MR. SWEETEN:  It is.  Legislative fact
23 gathering is within the privilege.  We've asserted
24 that.  He is not going to reveal information or
25 communications between state agencies and him.

## 204

1          MS. WESTFALL:  Is that the sole privilege
2  you're asserting over those conversations?
3          MR. SWEETEN:  I believe we've also
4  asserted the deliberative process privilege over the
5  state agency considerations.
6      Q.  (By MS. WESTFALL) What steps did you take, if
7  any, upon receiving information from the Department of
8  Public Safety?
9      A.  I'm sorry.  Could you repeat the question?
10     Q.  Certainly.  What steps did you take, if any,
11 upon receipt of information from the Department of
12 Public Safety?
13         MR. SWEETEN:  Don't reveal communications
14 that relate -- don't reveal it if revealing so reveals
15 communications you've had with any state agents.
16     A.  What actions were taken upon any conversations
17 with DPS?
18     Q.  (By MS. WESTFALL) Correct.
19     A.  Okay.  None that I can recall.
20     Q.  Is this based on recollection or based on
21 privilege and the instructions of counsel or both?
22     A.  On my recollection.
23     Q.  Of after the committee voted -- actually, the
24 committee voted SB 14 out of committee; is that correct?
25     A.  Correct.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

| 205 |
|---|

1    Q.   And was it placed on the House's emergency
2    calendar?
3    A.   Yes.
4    Q.   Do you know why that happened?
5         MR. SWEETEN:  Don't reveal any
6    communications related to that, that would be
7    legislatively privileged.  To the extent it's a matter
8    of public record, you can freely answer that.
9    A.   I believe the emergency calendar, there are
10   certain items that are eligible for it.  I don't know
11   beyond why that decision was made, but if...
12   Q.   (By MS. WESTFALL) Who was responsible for
13   making the decisions about what gets on the emergency
14   calendar in the House?
15   A.   The chair of the Calendars Committee typically
16   has jurisdiction over the House Floor calendar.
17   Q.   And who is that person?
18   A.   That would be Representative Hunter.
19   Q.   Was he the person who decided to put SB 14 on
20   the emergency calendar in the House?
21        MR. SWEETEN:  Objection to the extent it
22   calls for speculation.  Go ahead.
23   A.   I can't speculate, but he is the Chair, and
24   typically Calendars Committee does have jurisdiction
25   over the House Floor calendars.  I can't speculate if he

| 206 |
|---|

1    was the person who made the final decision or not.
2    Q.   (By MS. WESTFALL) And going back to the Select
3    Committee's consideration of SB 14, did a representative
4    from DPS testify at that hearing?
5    A.   Yes.
6    Q.   Who was the person that testified?
7    A.   I believe her name was Rebecca.  Rebecca Davio.
8    Q.   And what was the testimony concerning?
9    A.   The DPS's involvement as it -- as it --
10   identification -- their involvement in the
11   identification parts of the legislation.
12   Q.   Are you referring to the election
13   identification certificate, or are you referring to
14   drivers' licenses?
15   A.   I believe at that time, it was not the election
16   identification certificate.  I think it was just the
17   personal identification used for voting purposes and the
18   free ID.  That's the part of her testimony that I
19   remember.  There might have been other parts of the
20   testimony, but that's the specific part I remember.
21   Q.   Turning to Floor consideration, House Floor
22   consideration of SB 14, did Representative Harless have
23   a strategy to ensure that SB 14 was passed on the House
24   Floor?
25        MR. SWEETEN:  Don't reveal any

| 207 |
|---|

1    communications you've had with Representative Harless or
2    any other communications that we've discussed and
3    enumerated today multiple times.  To the extent that you
4    can answer that question without revealing those
5    communications, you can do so.
6         THE WITNESS:  Okay.
7    Q.   (By MS. WESTFALL) Can you answer the question
8    based on advice of counsel?
9    A.   Correct.
10   Q.   What was your role during the House
11   consideration, the Floor consideration of SB 14?
12   A.   I was monitoring the debate.  It was a full --
13   full day's debate, and I was monitoring it.
14   Q.   Did you prepare talking points for her?
15        MR. SWEETEN:  Objection.  I think you're
16   asking for communications that he's had with
17   Representative Harless.  I don't believe that those are
18   -- I think those are subject to legislative privileged.
19   I'm going to instruct him not to answer that question.
20        MS. WESTFALL:  I'm asking about the
21   existence of documents, not the substance of the
22   documents, Mr. Sweeten.
23        MR. SWEETEN:  What you asked was:  Did you
24   prepare talking points for Representative Harless?
25        MS. WESTFALL:  Right.

| 208 |
|---|

1         MR. SWEETEN:  And if you're asking if
2    there is an existing document, that is a very different
3    question.
4         MS. WESTFALL:  It's a privilege log
5    question.
6         MR. SWEETEN:  Okay.
7         MS. WESTFALL:  But you can stick with your
8    objection if that's the story you're sticking to.
9         MR. SWEETEN:  I'm sticking with the facts,
10   which are, you asked two separate questions there now.
11   So if you're asking if there's an existing document with
12   talking points?  Is that your question?
13        MS. WESTFALL:  It is.
14        MR. SWEETEN:  Okay.
15        MS. WESTFALL:  Think about a privilege
16   log, Mr. Sweeten.
17        MR. SWEETEN:  Well, and I have let you,
18   during today's questioning, establish facts that you
19   would establish in a privilege log.  So if you're
20   asking:  Is there a document in existence that is
21   talking points, then I think we can let him answer that.
22   A.   Is there a document that exists that contains
23   talking points?
24   Q.   (By MS. WESTFALL) That you prepared or someone
25   in your office prepared for Representative Harless for



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 209

1    Floor consideration.
2        MR. SWEETEN:  The problem is that you're
3    asking him now what he prepared, and that would
4    implicate communications between he and Representative
5    Harless.
6        MS. WESTFALL:  The fact of the
7    communication is not privileged, correct?  You have a
8    privilege log that indicates he authored communications
9    to DPS.  They were received by DPS.  You have a subject
10   matter line.  You have a date line.  That's called the
11   privilege log.  I'm asking him similar questions with
12   regard to communications during this deposition.
13       MR. FREDERICK:  If I may, this is Matt
14   Frederick for the record.  Let me just point out that
15   counsel for the United States representation of the
16   privilege log is not totally consistent with the
17   privilege log that the United States has produced, as
18   far as the level of detail.  I believe that the
19   questions go for more detail than has been provided on
20   any party's privilege log in this litigation.
21       MS. WESTFALL:  Well, I think that's a non
22   sequitur, to the point at hand, Mr. Frederick.
23       Mr. Sweeten, are you going to let him
24   answer the question about the existence of the document,
25   or no?

## 210

1        MR. SWEETEN:  I'm going to let him answer
2    whether or not there is a document in existence.  We
3    won't describe it.  I'm not going to let him provide any
4    detail, but if -- does -- do you want to ask your
5    question again with that?
6        Q.  (By MS. WESTFALL) My stands to the extent you
7    remember what I asked.  Could you please answer the
8    question so I don't have to repeat it, please,
9    Mr. Beuck?
10       A.  There is a document in existence.
11       Q.  Are you the author of such document?
12       A.  I am the author.
13       MS. WESTFALL:  And for the record,
14   Mr. Sweeten, what did the talking points say?
15       MR. SWEETEN:  No.  We're not going to
16   answer that question.  That would reveal communications
17   between Mr. Beuck and Representative Harless.
18       Q.  (By MS. WESTFALL) Did you prepare
19   Representative Harless for questions she might receive
20   on the Floor during consideration of SB 14?
21       MR. SWEETEN:  Objection.  You're asking
22   him for communications he had with Representative
23   Harless.  Do not provide an answer to that.
24       Q.  (By MS. WESTFALL) Getting back to the talking
25   points, did you have anyone else review the talking

## 211

1    points, outside of your office, in advance of providing
2    them to Representative Harless?
3        MR. SWEETEN:  Objection.  It assumes facts
4    not in evidence, and I'm going to object to the extent
5    that it would implicate any sort of communications
6    you've had with any legislative staff or any other
7    enumerated areas.
8        Q.  (By MS. WESTFALL) So can you not testify --
9        A.  No.
10       Q.  -- in response to my question based on advice
11   of counsel?
12       A.  I cannot testify based on advice from counsel.
13       Q.  Besides the talking points we've discussed, did
14   you have meetings with Representative Harless to prepare
15   her for Floor consideration of SB 14?
16       MR. SWEETEN:  Don't reveal -- in answering
17   that question, you would be revealing the substance of
18   communications; therefore, I don't want you to do that.
19   If she wants to ask whether you've had meetings with
20   Representative Harless prior to a Floor appearance,
21   that's a different question.  But don't reveal the
22   substance of the communication.  It is legislatively
23   privileged.
24       Q.  (By MS. WESTFALL) Did you have any meetings
25   with Representative Harless before the Floor

## 212

1    consideration of SB 14?
2        A.  Yes.
3        Q.  How long were those meetings?
4        A.  30 minutes to an hour.
5        Q.  Was anyone else at that meeting besides the two
6    of you?
7        A.  No.
8        Q.  Did you have this meeting in person?
9        A.  Yes.
10       Q.  Did you have this meeting in her office?
11       A.  Yes.
12       Q.  Did Representative Harless review any
13   documents, besides the talking points we talked about,
14   before she engaged in the Floor consideration of SB 14?
15       MR. SWEETEN:  Yeah.  The question is a
16   yes-or-no question.  I'm going to let you answer that,
17   but as to what those documents are, if that's the next
18   question, we're not going to -- I'm going to assert the
19   legislative privilege as to that.  You can yes or no to
20   her question.
21       A.  I believe she did review other documents.
22       Q.  (By MS. WESTFALL) How many?
23       A.  I don't know.
24       Q.  Who were the documents authored by?
25       MR. SWEETEN:  Don't -- you don't have to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 213

1  answer that question. That's legislatively privileged.
2      Q.  (By MS. WESTFALL) Did they come from a
3  lobbyist?
4          MR. SWEETEN:  The same objection and the
5  same instruction.  Don't answer the question.  It's
6  legislatively privileged.
7      Q.  (By MS. WESTFALL) Did they come from the
8  Lieutenant Governor's Office?
9          MR. SWEETEN:  Same objection.
10     Q.  (By MS. WESTFALL) Did they come from the
11 Governor's office, interest groups, or constituents?
12         MR. SWEETEN:  Same objection.
13     Q.  (By MS. WESTFALL) Are you not answering based
14 on advice of counsel?
15     A.  Yes.
16     Q.  What did the documents say?
17         MR. SWEETEN:  Same objection.
18     Q.  (By MS. WESTFALL) Do you recall that during the
19 Floor debate, Representative Harless stated she was not
20 advised concerning the number of voters that lacked the
21 required identification and what percentage of these
22 voters are African American or Hispanic?
23     A.  It was a fairly lengthy debate.  I don't recall
24 that specific statement by her.
25     Q.  We'll get an exhibit on that in a minute.

---

### 214

1          Are you familiar with the amendments
2  offered to SB 14 on the House Floor?
3      A.  Some of them, yes.  There were several.  There
4  were many amendments offered.
5          MS. WESTFALL:  Would you mark this as
6  Exhibit U.S. 9.
7          (Exhibit 9 marked for identification.)
8      Q.  (By MS. WESTFALL) You have been handed U.S.
9  Exhibit 9.  Do you recognize this exhibit?
10         MR. SWEETEN:  Do we get one of those?
11         MS. WESTFALL:  Certainly.  I'm eager not
12 to carry this home.
13     Q.  (By MS. WESTFALL) Do you recognize this
14 document?
15     A.  This appears to be a copy the House Journal
16 from March 23rd.
17     Q.  By the way, were you on the Floor with
18 Representative Harless during the Floor consideration,
19 or were you elsewhere?
20     A.  I was not on the Floor.
21     Q.  Where were you?
22     A.  I was in an office.
23     Q.  What office?
24     A.  It would be considered the -- it's a conference
25 room within the Speaker's Office.

---

### 215

1      Q.  Who were you with?
2      A.  Myself.
3      Q.  Turning your attention to Amendment 15, which
4  is on Page 969 of Exhibit 8.
5          MR. ROSENBERG:  What page was that,
6  Ms. Westfall?
7          MS. WESTFALL:  969.
8      Q.  (By MS. WESTFALL) Amendment 15, could you take
9  a look at that and let me know when you're ready?
10     A.  (Viewing documents.)
11     Q.  Have you had a chance the to review that?
12     A.  Yes.
13     Q.  What is this amendment designed to accomplish?
14     A.  The amendment appears to prohibit fees for the
15 issuance of any document under Senate Bill 14.
16     Q.  And how did Representative Harless respond to
17 this amendment?
18         MR. SWEETEN:  Are you asking a matter of
19 public record?
20         MS. WESTFALL:  Yes.  I'm asking a matter
21 of public record.  It's right here, Mr. Sweeten?
22     A.  Representative Harless moved to table Amendment
23 Number 15.
24     Q.  (By MS. WESTFALL) Why did she do that?
25         MR. SWEETEN:  Objection, calls for

---

### 216

1  speculation.  Also, don't reveal any communications
2  you've had with Representative Harless as to the issue.
3      A.  I can't speculate to her motives on that
4  amendment.
5      Q.  (By MS. WESTFALL) Did you advise her to table
6  that amendment?
7          MR. SWEETEN:  Objection.  It would reveal
8  communications between Mr. Beuck and Representative
9  Harless, and it would be legislatively-privileged.
10         Instruct you not to answer.
11     Q.  (By MS. WESTFALL) Did you have any
12 conversations with Representative Harless about this
13 amendment?
14         MR. SWEETEN:  The subject matter is
15 contained within the question; therefore, I'm going to
16 instruct not to answer, as it would reveal matters of
17 the legislative privilege.
18     Q.  (By MS. WESTFALL) Was Representative Harless
19 holding a cell phone during the House Floor
20 consideration of Senate Bill 14?
21     A.  I don't recall.
22     Q.  Did you receive any texts from her during House
23 Floor consideration of SB 14?
24         MR. SWEETEN:  You can testify as to
25 whether or not you received a text.  Don't testify as to

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 217

1   what those communications were or the substance of
2   those.
3       A.   I believe I did.
4       Q.   (By MS. WESTFALL) More than one?
5       A.   More than one.  Probably less than five.
6       Q.   Do you know whether she was texting persons
7   other than you during House Floor consideration of
8   SB 14?
9           MR. SWEETEN:  Objection, calls for
10  speculation.
11      A.   I don't know.
12      Q.   (By MS. WESTFALL) Turning your attention to
13  Amendment 23 at House Journal 979.  Could you describe
14  this amendment?
15      A.   This is an amendment from Representative Dutton
16  adding a student identification card to the list of
17  acceptable forms of photo identification.
18      Q.   How did Representative Harless vote on this
19  amendment?
20      A.   She voted for the motion to table.
21      Q.   Did you advise her to do that?
22          MR. SWEETEN:  Objection.  Don't reveal any
23  conversation you had with Representative Harless.  I
24  instruct you not to answer that.
25      Q.   (By MS. WESTFALL) So the answer is no, you're

## 218

1   not going to respond based on privilege?
2           MR. SWEETEN:  You've asked him to reveal
3   the substance of communication between he and
4   Representative Harless.  That is clearly within the
5   lines of legislatively privilege that I'm very
6   consistently drawing today.
7           MS. WESTFALL:  I just want to make sure
8   the witness is indicating on the basis of privilege for
9   the record.  Okay?
10          MR. SWEETEN:  Fair enough.  I am
11  instructing you not to answer that question.  It would
12  reveal legislatively-privileged information.
13      Q.   (By MS. WESTFALL) Why do you think she voted
14  against this amendment?
15      A.   I can't speculate.
16      Q.   Weren't student IDs included in previous
17  iterations of the bills?
18          MR. SWEETEN:  Objection, vague.
19      Q.   (By MS. WESTFALL) You can answer.
20      A.   I'd have to go back and look at the previous
21  versions of voter ID through the last sessions.
22      Q.   Did you do any analysis, or did Representative
23  Harless do any analysis, as to whether student IDs would
24  be more frequently possessed by minorities than the
25  general population?

## 219

1           MR. SWEETEN:  I'm going to object to the
2   question.  It think it calls for matters that are
3   legislatively privileged.  Don't reveal any
4   communications you've had with Representative Harless.
5   And legislative fact-gathering is well contained within
6   the privilege, so I'm going to instruct you
7   accordingly.  To the extent you can provide information,
8   matters of public record or that are not part of the
9   legislative privilege, you can provide an answer to that
10  question.
11      A.   No, based upon the advice from my counsel.
12      Q.   (By MS. WESTFALL) I believe you testified
13  earlier that there are lots of different forms of ID
14  that would be considered allowable; U.S. Military IDs;
15  is that correct?
16      A.   I don't remember phrasing my answer that way.
17      Q.   There's more than a handful of military IDs, is
18  there not?
19      A.   Not to my knowledge.  I don't know.
20      Q.   Or do you not know the number of U.S. military
21  IDs?
22      A.   I don't know.
23      Q.   Okay.  And turning back to House Bill 112,
24  Representative Harless had filed a bill, in November
25  2010, that provided for the use of photo IDs issued by

## 220

1   the state, its agencies, and subdivisions; isn't that
2   right?
3       A.   I'm looking at House Bill 112, identification
4   card issued to person by government entity, correct.
5       Q.   And that would be quite a few IDs, would it
6   not?
7       A.   Correct.
8       Q.   Representative Harless indicated publicly that
9   her concern with student IDs was the number of student
10  IDs; isn't that right?
11          MR. SWEETEN:  You can answer to the extent
12  she's asking about matters of public record.
13      A.   I remember the student ID issue coming up
14  during the debate.  I don't remember her specific
15  testimony on...
16          MR. SWEETEN:  Hold one second.
17          MS. WESTFALL:  Would you mark this as
18  Exhibit 10, please.
19          (Exhibit 10 marked for identification).
20      Q.   (By MS. WESTFALL) You've been handed U.S.
21  Exhibit Number 10.  Have you seen this document before?
22      A.   (Viewing documents.)
23      Q.   If I could turn your attention to the top of
24  the third page.  I'm sorry, the third page, double
25  sided.  There is some quotations from Representative



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 221

1  Harless.  If you could just take a look at those and let
2  me know when you've had a chance review it.
3      A.  Okay.
4      Q.  By the way, have you seen this article before?
5      A.  I do remember this.  I remember when it was --
6      Q.  Okay.
7      A.  I do remember the article.  I don't remember
8  the specifics of it.  (Viewing documents.) Just this top
9  portion.  Yes.  Okay.
10     Q.  So it indicates, does it not, that
11 Representative Harless excludes student IDs because,
12 quote, "We wanted a form of identification that was
13 easily recognized by the poll workers at the election
14 site."  Is that correct?
15     A.  That's what --
16         MR. SWEETEN:  You're asking him is that
17 what -- if that's correct, that's what that says?
18         MS. WESTFALL:  That's correct.  Correct.
19     Q.  (By MS. WESTFALL) Does Exhibit 10 indicate
20 that?
21     A.  The exhibit does indicate that.
22     Q.  Did Representative Harless consider whether
23 those same concerns would apply to the number of
24 military IDs for example, which could be varied?
25         MR. SWEETEN:  I'm going to object to the

## 223

1  amendment?
2      A.  She voted for the motion to table.
3      Q.  Did you advise her to vote that way?
4          MR. SWEETEN:  Objection. Don't reveal
5  communications you had with Representative Harless.
6  Those are legislatively privileged.
7      Q.  (By MS. WESTFALL) Did you have any other
8  testimony in response to that question, or no?
9          MR. SWEETEN:  Objection.  The question is
10 vague.
11     A.  No.
12     Q.  (By MS. WESTFALL) Does Representative Harless
13 believe that materials printed under SB 14 should only
14 be in English?
15         MR. SWEETEN:  I'm going to object.  Do not
16 reveal any communications that you've had with
17 Representative Harless.  To the extent that the public
18 record reveals answers to this question, you can refer
19 counsel to that.
20     A.  Not that -- not that I know of.
21     Q.  (By MS. WESTFALL) Do you know what Section 203
22 does of the Voting Rights Act?  Sorry.
23     A.  I know I have expert here to answer that in
24 case I don't.  I'm not going to assume to know.  I
25 remember the debate.  I remember it had to do with

## 222

1  extent that she's asking you to reveal conversations
2  that you've had with Representative Harless.  And I'm
3  going to instruct you not to answer based upon that.  If
4  you can answer based upon public record or matters that
5  don't implicate this communications of legislative
6  privilege, but I'm going to instruct you not to answer.
7      A.  I don't recall in the public record, if that
8  was something.  I don't recall.
9      Q.  (By MS. WESTFALL) Did you have any
10 conversations with Representative Harless about this
11 amendment, Amendment 23?
12     A.  Regarding student IDs?
13         MR. SWEETEN:  Don't reveal the substance
14 of any conversations.
15     Q.  (By MS. WESTFALL) Did you have any
16 conversations with about her this amendment?
17     A.  Not that I recall.
18     Q.  Turning your attention to Amendment 35 at House
19 Journal 991, are you familiar with this amendment?
20     A.  Yes, I remember.  I remember this from the
21 debate.
22     Q.  Could you describe the amendment?
23     A.  It's applying the Voting Rights Act to certain
24 sections of Senate Bill 14.
25     Q.  And how did Representative Harless vote on this

## 224

1  Section -- I can't remember if that's Section 2 or
2  Section 5.
3      Q.  Turning to your attention now to Amendment
4  Number 50 at House Journal 1009 and 1010.
5      A.  Okay.
6      Q.  Are you familiar with this amendment?
7      A.  Okay.
8      Q.  What would this amendment have done?
9      A.  This provides a travel reimbursement, provides
10 travel reimbursement for individuals under a certain --
11 under certain -- certain poverty guidelines.  They may
12 recover expenses for traveling to a DPS office for
13 obtaining photo identification.
14     Q.  How did Representative Harless vote on this
15 amendment?
16     A.  She voted for the motion to table.
17     Q.  Why did she vote that way?
18         MR. SWEETEN:  Objection to the extent that
19 that would reveal communications you had with
20 Representative Harless.
21         Don't provide an answer to that question.
22 If there are matters on the public record that you can
23 refer counsel to, you can answer that question.
24     Q.  (By MS. WESTFALL) Do you have an answer?
25     A.  No, I do not.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 225

1   Q.  Isn't it the case that the majority of
2 individuals who live below the federal poverty line in
3 Texas are members of racial minorities?
4       MR. SWEETEN:  Objection, assumes facts not
5 in evidence.  Objection, argumentative.  If you have
6 personal knowledge of what she's asking you, I'll let
7 you answer.
8   A.  No, I don't have any personal knowledge on
9 that.
10  Q.  (By MS. WESTFALL) Did you have any
11 conversations with Representative Harless about
12 Amendment 50?
13      MR. SWEETEN:  Objection.  The question
14 asks about the subject matter.  Therefore, I'm going to
15 instruct you not to reveal communications you had with
16 Representative Harless and the other communications that
17 I've outlined previously.
18  Q.  (By MS. WESTFALL) Turning your attention to
19 Amendment 54 at Page 1015 of the House Journal, are you
20 familiar with this amendment?
21  A.  This is an amendment directed to the Secretary
22 of State to require certain records be kept regarding
23 Senate Bill 14.
24  Q.  How did Representative Harless vote on this
25 amendment?

---

### 226

1   A.  She voted for the motion to table.
2   Q.  Why did she vote that way?
3       MR. SWEETEN:  Objection.  Don't reveal
4 communications between you and Representative Harless.
5 To the extent there's public information about that
6 issue, you can answer based upon the public record.
7   Q.  (By MS. WESTFALL) Why did Representative
8 Harless not want this information to be gathered?
9       MR. SWEETEN:  Same objection.  Your
10 question asks for matters that are privileged by the
11 legislative privilege, that are covered under that.  It
12 also asks for communications between Mr. Beuck and
13 Representative Harless, and I'm going to instruct him
14 not to answer that question.  It also calls for
15 speculation.
16  Q.  (By MS. WESTFALL) Did Representative Harless or
17 you have any concerns that this information would be
18 harmful because it would show a disparate effect on
19 SB 14 on minority voters?
20      MR. SWEETEN:  I'm going to instruct you
21 not to answer that question in that question asks for
22 you to reveal matters that are subject to the
23 legislative privilege and impact communications you may
24 have had with Representative Harless.
25  Q.  (By MS. WESTFALL) How far in advance were --

---

### 227

1 was there a requirement that these amendments be filed
2 within a certain time period before Floor consideration
3 of SB 14?
4   A.  No, there was not a -- I think what's referred
5 to as a prefiling rule.  These amendments, many of them,
6 from my observation, were being drafted, and a good
7 number of them were being drafted and submitted during
8 the debate.  And I understand a lot of them were
9 prepared beforehand.  But, no, there was no prefiling.
10  Q.  Did you have any awareness or knowledge of
11 Amendment Number 54 in advance of the Floor debate?
12  A.  Not that I recall.
13  Q.  Did you consult with the Secretary of State's
14 Office about her position on this amendment before it
15 was considered?
16      MR. SWEETEN:  I'm going to instruct you
17 not to answer.  That is a matter subject to the
18 legislative privilege.  It's communication between your
19 -- potentially, communication between your office, you,
20 or Representative Harless with a state agency, which is
21 covered by the legislative privilege.
22  Q.  (By MS. WESTFALL) Turning to your attention to
23 Amendment Number 55 on the following page, Page 1016,
24 are you familiar with this amendment?
25  A.  This is an amendment which is requesting the

---

### 228

1 Secretary of State -- or it's requiring the Secretary of
2 State to make a determination on the racial or ethnic
3 identity of -- of those that are required to cast a
4 provisional ballot under Senate Bill 14.
5   Q.  How did Representative Harless vote on this
6 amendment?
7   A.  She voted for the motion to table.
8   Q.  Why did she vote that way?
9       MR. SWEETEN:  Objection.  It calls for
10 matters in communications between Mr. Beuck and
11 Representative Harless.  It implicates those
12 communications, and therefore, it's legislatively
13 privileged.  I instruct you not to answer that question.
14  Q.  (By MS. WESTFALL) Did Representative Harless
15 have any concern that the burden of SB 14 might be felt
16 disproportionately by minority voters?
17      MR. SWEETEN:  Objection, calls for
18 speculation.  Objection, also to the extent that it
19 implicates legislative privilege and communications that
20 Mr. Beuck had with Representative Harless, I instruct
21 you not to answer on that basis.
22  Q.  (By MS. WESTFALL) Did you have any
23 communications with Representative Harless about this
24 amendment?
25      MR. SWEETEN:  I'm going to let you answer

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                              MAY 14, 2012

---

### 229

1  as to the fact of a communication.  Otherwise, I will
2  not -- I'm not going to let you discuss the specific
3  communications involved.
4      A.  Not that I recall.
5      Q.  (By MS. WESTFALL) Turning your attention to
6  Amendment 58 on Page 1021.
7      A.  Yes.
8      Q.  Can you describe this amendment?
9      A.  This is an amendment which requires the
10  Secretary of State to conduct a study on the ethnicity,
11  the potential impact on voter turnout, turn-out data.
12  It's requiring the Secretary of State to conduct a
13  study, and it makes that study conditional on the
14  implementation of Senate Bill 14.
15      Q.  How did Representative Harless vote on this
16  amendment?
17      A.  She voted for the motion to table.
18      Q.  Why did she vote that way?
19          MR. SWEETEN:  Objection, it calls for
20  matters that are covered under the legislative privilege
21  and communications between Mr. Beuck and Representative
22  Harless.  I'm going to instruct you not to answer on
23  that basis.  To the extent that there are matters of
24  public record that you can testify that provide you the
25  ability to answer that question, you can do so.

### 230

1      Q.  (By MS. WESTFALL) Is there anything in the
2  public record that would enable you to answer that
3  question?
4      A.  No.
5      Q.  Why did Representative Harless not want this
6  information gathered?
7          MR. SWEETEN:  I'm going to make the same
8  objection.  You're asking for matters that are contained
9  within the legislative privilege.  You're asking to
10  reveal communications between Mr. Beuck and
11  Representative Harless.  Also, communications with
12  others, potentially.  I'm going to instruct you not to
13  answer on that basis.
14          THE WITNESS:  Okay.
15      Q.  (By MS. WESTFALL) Isn't it true that
16  Representative Anchia raised the issue with
17  Representative Harless as to why this information wasn't
18  gathered prior to the bill being drafted?
19          MR. SWEETEN:  Don't reveal communications
20  between Representative Harless and Representative Anchia
21  unless those are matters of public record.  These are
22  covered by the legislative privilege.
23      Q.  (By MS. WESTFALL) Do you have an answer to my
24  question, based on the public record?
25      A.  I believe that was a conversation they had in

### 231

1  committee.
2      Q.  What was Representative Harless's reaction to
3  Representative Anchia's statement in that regard?
4          MR. SWEETEN:  You can testify as to the
5  public record, if that's what this is, and if you
6  recall.
7      A.  I don't recall.
8      Q.  (By MS. WESTFALL) How would you respond to
9  someone who would say that not studying the impact of
10  allowable forms of ID on minority voters shows a callous
11  disregard for their voting rights?
12          MR. SWEETEN:  I'm going to object to the
13  question as argumentative.  I don't know if you're
14  attempting to find out Representative Harless's
15  position.  If so, it reveals those communications.  If
16  you're asking him his personal opinion, then I will let
17  him answer with respect to his personal opinion on that
18  issue.
19      Q.  (By MS. WESTFALL) What is your opinion as a
20  legislative staffer on that issue, Mr. Beuck?
21      A.  The disregard for the impact?
22      Q.  By not investigating, that it would appear to
23  show disregard for the interests of minority voters?
24          MR. SWEETEN:  Same instruction.
25      A.  I think that statement assumes there was not an

### 232

1  investigation into the impact.
2      Q.  (By MS. WESTFALL) Was there an investigation
3  into the impact?
4          MR. SWEETEN:  Don't reveal information
5  that is subject to the legislative privilege, including
6  communications with any state agencies, with
7  constituents, or the Legislative Council, with
8  Representative Harless, other legislators or staffers.
9      A.  Well, with the testimony and the committee, the
10  turnout shows that voter participation increased in the
11  states that have implemented voter identification.
12      Q.  (By MS. WESTFALL) How is that responsive to the
13  concern that there was no investigation as to the impact
14  of the allowable forms of ID in Senate Bill 14 on
15  minority voters?
16          MR. SWEETEN:  Objection, argumentative.
17      Q.  (By MS. WESTFALL) You may answer.
18      A.  I think that illustrates the impact in the
19  other states, and it would carry over to Texas.
20      Q.  Was there any study conducted or investigation
21  of the impact of the allowable forms of ID under Senate
22  Bill 14 on minority voters that was not disclosed to the
23  public?
24          MR. SWEETEN:  I'm going to object to the
25  extent that your question asks for research conducted

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 233

1    prior to the bill that is potentially impacted by the
2    legislative privilege, including communications with all
3    of the various state agencies, the representatives,
4    representatives' staffs, the Texas Legislative
5    Council.  And I'm going to instruct him not to answer on
6    that basis, except to the extent that you can do so
7    based upon the matters of public record.
8        Q.   (By MS. WESTFALL) Is there any publicly-
9    available information on that topic?
10       A.   On the -- specific to Senate Bill 14?
11       Q.   Yes.
12       A.   Not to my knowledge.
13       Q.   Is there any publicly-available information of
14   any research or studies conducted as to impact of
15   allowable forms of ID under prior photo ID bills
16   introduced in the Texas House or Senate that you're
17   aware of?
18       A.   Not that I'm aware of.
19       Q.   Did Representative Harless serve on the
20   Conference Committee of the bill?
21       A.   Yes.
22       Q.   Did she chair it?
23       A.   As the House sponsor of the legislation, I
24   think it's -- yes, she did chair it.  She was the chair
25   of the House conferees.

---

### 234

1        Q.   Were there any changes that were put in during
2    the conference consideration of the bill that had not
3    been in either version passed in the House or Senate?
4            MR. SWEETEN:  I assume those are matters
5    of public record, if so, you can go ahead and answer.
6        A.   Yes.  There was the -- election identification
7    certificate that was not contained in either the Senate
8    version or the House version.
9        Q.   (By MS. WESTFALL) Could you describe the
10   circumstances of the insertion of that provision into
11   the conference bill?
12           MR. SWEETEN:  You can discuss matters of
13   public record.  Don't discuss conversations that you had
14   with any of the areas with we've been discussing.
15       A.   I know it was a concern brought up by
16   Representative Anchia during the House Floor debate.
17       Q.   (By MS. WESTFALL) What did he ask for?
18       A.   His concerns were that -- having to do with the
19   personal identification and DPS, DPS revenues.
20       Q.   I'm not sure I understand.  Can you clarify?
21       A.   He had -- I remember him discussing the issue,
22   the details of which I don't know.  It had to do with
23   receipt -- the revenue received by DPS and their
24   identification.  The revenue received from DPS from
25   identifications.

---

### 235

1        Q.   Could you describe the election identification
2    certificate provision in SB 14?
3        A.   The election identification certificate, I
4    remember during the debate that it was modeled after the
5    provisions in current law for a personal identification,
6    for a DPS personal identification.  It's modeled after
7    that language.
8        Q.   Were you involved in the drafting of that
9    particular provision that went in, in the conference
10   committee?
11       A.   No.
12       Q.   Who drafted it?
13           MR. SWEETEN:  I caution the witness not to
14   reveal any communications between other legislative
15   staffers, Representative Harless, or any of the other
16   enumerated areas.
17       Q.   (By MS. WESTFALL) On the basis of that
18   instruction, are you not answering the question?
19       A.   Correct.  I'm sorry.
20       Q.   But it wasn't -- it wasn't you?
21       A.   That's correct.
22       Q.   During the drafting or the legislators'
23   consideration of SB 14, was there any analysis of cost
24   or steps that a voter would need to take to obtain an
25   election identification certificate?

---

### 236

1            MR. SWEETEN:  Again, as to matters and
2    communications that relate that are covered by the
3    legislative privilege with the enumerated groups that
4    I've provided today, don't reveal those communications.
5    If you can answer based upon the public record or with
6    information that does not implicate those
7    communications, you can go ahead and try to do so.
8        A.   The cost associated with obtaining a -- the
9    personal identification, election identification
10   certificate.  Are you referring to the documents
11   necessary for an identification?  The election
12   identification certificate is a free ID.
13       Q.   (By MS. WESTFALL) DPS is prohibited from
14   charging --
15       A.   Correct.
16       Q.   -- for an election identification certificate;
17   is that correct?
18       A.   That's my understanding.
19       Q.   What documents are necessary to obtain an
20   election identification certificate under SB 14?
21       A.   They have to be a registered voter.  It
22   references a Section 52. -- 521.142, that DPS may
23   require from the applicant identification.  It doesn't
24   list out the necessary identification.
25       Q.   Are you familiar with any regulations or

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

---

### 237

1 proposals for implementing the election identification
2 certificate that have been developed by either DPS or
3 the Secretary of State?
4    A.  It's my understanding that it is to be
5 implemented in a manner similar -- as the bill says, in
6 a manner similar to the driver's license and personal
7 identification certificate.
8    Q.  Do you have any knowledge or information about
9 the plans to implement the election identification
10 certificate?
11        MR. SWEETEN:  Don't reveal any
12 communications that you've had or Representative Harless
13 has had with state agencies with respect to this matter
14 and in addition to the other enumerated areas, but to
15 the extent that you can answer based upon public
16 information, you can feel free to do so.
17        THE WITNESS:  Okay.
18    Q.  (By MS. WESTFALL) Do you have any knowledge --
19    A.  No.
20    Q.  -- based on public information?  Did you have
21 any conversations with Representative Harless about how
22 this certificate would be implemented?
23        MR. SWEETEN:  Don't answer that, because
24 it would reveal communications that you've had with
25 Representative Harless which are covered by the

### 238

1 legislative privilege.
2    Q.  (By MS. WESTFALL) Are you aware at any time
3 during consideration of SB 46 of any legislators or
4 their staff making any statements about illegal aliens
5 voting?
6        MR. SWEETEN:  I'm going to object to the
7 extent that the question calls for you to reveal
8 communications between legislators, legislative staff,
9 state agencies, the TLC or constituents.  Don't reveal
10 any of those communications.  To the extent that you can
11 do so based upon the public record, on matters not
12 implicated by that, then you can go ahead and try to
13 answer that.
14    A.  Any statements, public statements of staff or
15 members regarding the illegal immigration, not that I
16 recall.
17    Q.  (By Ms. Westfall) Not based on the public
18 record because your counsel has instructed you not to
19 talk about the private record; is that correct?
20    A.  That's correct.
21    Q.  Are you aware of the claims that SB 14
22 attempted to exploit fears of illegal immigrants voting?
23        MR. SWEETEN:  Again, don't reveal
24 legislatively-privileged information, which are the
25 categories that we've discussed.  To the extent that you

### 239

1 have information from the public record, from those
2 sources, if you can answer the question, go ahead and do
3 so.
4    A.  Senate -- my understanding is and I've said it
5 earlier is that Senate Bill 14 was about the elections
6 process and improving that.  How other people feel about
7 it, I can't speculate.
8    Q.  I know it's the end of the day, but you need to
9 listen carefully to the question and answer the question
10 so we can move on to the next question.
11        So I'm going to ask the question again:
12 Are you aware of claims that Senate Bill 14 attempted to
13 exploit fears of illegal immigrants voting?
14        MR. SWEETEN:  The same instruction.  You
15 can testify as to matters of the public record.
16    Q.  (By Ms. Westfall) Are you aware of that claim
17 in your own head sitting here today?
18    A.  Okay.  Okay.  I remember the issue coming up
19 during the committee hearing, public testimony.  There
20 were some individuals.  I remember that being discussed,
21 so yes.
22    Q.  And who testified about those concerns?
23    A.  I don't recall.
24    Q.  Outside of the hearings at which concerns about
25 illegal aliens voting was raised, did Representative

### 240

1 Harless or you become aware of those concerns from any
2 other sources communicated to the representative or to
3 you?
4        MR. SWEETEN:  Objection to the question,
5 it calls for speculation.  In addition, I'm going to
6 instruct you as I previously have:  Do not reveal
7 communications that you have had with Representative
8 Harless, staff members, state agencies, constituents or
9 TLC.  Let me also tell you that if you've got
10 information as to that question based upon the public
11 record, you can go ahead and try to answer her question.
12        THE WITNESS:  Okay.
13        MS. WESTFALL:  And to be clear,
14 Mr. Sweeten, I'm asking about communications from
15 members of the public, groups, interest groups that were
16 communications to Representative Harless or Mr. Beuck.
17        MR. SWEETEN:  Again, as to constituent
18 communications, we've held that there is a privilege as
19 to that information, so...
20        THE WITNESS:  Okay.
21        MS. WESTFALL:  Therefore, you're
22 instructing him not to answer if he received those
23 communications; is that correct?
24        MR. SWEETEN:  I'm instructing him not to
25 reveal the substance of the communication that he

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 241

1  received from constituents; that's correct.
2      Q.  Have there been elections held since SB 14 was
3  signed into law in July -- I mean, pardon me -- in May
4  2011?
5      A.  There was a -- yes, a constitutional election
6  -- a constitutional amendment election in November, and
7  we're currently having an election right now.
8      Q.  To your knowledge, has the Secretary of State
9  or any County election officials enforced SB 14?
10     A.  Not to my knowledge.
11     Q.  Are you aware of any in-person voter
12  impersonation having occurred during these elections?
13     A.  Not to my personal knowledge, no.
14         Could I get a drink of water real fast?
15         MS. WESTFALL:  Why don't we take a little
16  break, because I think we'll be concluding and passing
17  the baton.
18         (Recess 5:05 p.m. to 5:16 p.m.)
19     Q.  (By Ms. Westfall)  I believe you testified
20  earlier about provisional ballots in SB 14?
21     A.  Yes.
22     Q.  Could you describe how provisional ballots work
23  in the bill?
24     A.  Okay.  There is a provision in the bill that
25  allows for a voter to cast a provisional ballot if they

## 242

1  do not have the required photo identification.
2      Q.  And could you describe the circumstances under
3  which a provisional ballot is counted?
4      A.  Yes.  They must -- they must state that they do
5  not have any other form of identification that meets the
6  requirements of Senate Bill 14.  Wait.  No.  Excuse
7  me.  Those are the exceptions.
8      Q.  Is it true that a person who casts a
9  provisional ballot under SB 14 must present one of the
10  allowable forms of ID in order for it to be counted
11  except narrow circumstances related to religious
12  objection or natural disaster?
13     A.  They have within six days to return and show
14  the identification.
15     Q.  And if they don't show the identification or
16  fall into one of these exceptions, the religious
17  exception or the natural disaster exception, their
18  provisional ballot will not be counted; is that correct?
19     A.  That is my understanding.
20     Q.  And I think you testified earlier that there
21  may have been nonpublic investigations of the impact of
22  Senate Bill 14; is that correct?
23         MR. SWEETEN:  Objection.  You're asking
24  him to reveal information that's protected by the
25  legislative privilege.  He's not going to answer that

## 243

1  question.  So I'm going to instruct you not to answer
2  the question, unless public information reveals the
3  answer, which I think by its own terms, it could not.
4      Q.  (By Ms. Westfall)  I believe you testified
5  earlier that you answered phone calls for Representative
6  Harless; is that correct?
7      A.  Correct.
8      Q.  Did you ever receive any phone calls from
9  anyone from the King Street Patriots regarding voter ID?
10         MR. SWEETEN:  Objection, asked and
11  answered.  I'm also going to object, because it
12  potentially implicates communications from a
13  constituent.  And so with that, I'm going to go ahead
14  and instruct you not to answer that.  It's already been
15  asked and answered.
16     Q.  (By Ms. Westfall)  Did you already -- did you
17  take any phone calls from Paul Bettencourt related to
18  photo ID on behalf of Representative Harless?
19         MR. SWEETEN:  Objection, asked and
20  answered.
21         MS. WESTFALL:  You may answer.
22         MR. SWEETEN:  Same instruction.
23         MS. WESTFALL:  Are you instructing him not
24  to answer?
25         MR. SWEETEN:  I am.  I think you're asking

## 244

1  for constituent communications.  I think that's within
2  the privilege.  It's one of the categories that we've
3  been asserting.
4          MS. WESTFALL:  Are you asserting a
5  privilege over the fact that a communication was made?
6          MR. SWEETEN:  First of all, he's already
7  answered this question.  So if you're just asking the
8  fact, was a communication made, I will let him answer
9  whether he received those.  I think I know the answer,
10  though, but I'm going to let him answer it again.
11         So you can go ahead and do it, Colby, if
12  you can.
13     THE WITNESS:  Okay.
14     Q.  (By Ms. Westfall)  Did you receive any phone
15  call from anyone with the King Street Patriots related
16  to photo ID that were made in to Representative Harless?
17     A.  Yes.
18         MR. SWEETEN:  That were made in to?
19         MS. WESTFALL:  That were called in to
20  Representative Harless's office.
21         MR. SWEETEN:  Okay.  All right.  He's --
22  he can answer as to whether contact was made.  He will
23  not answer the substance.
24         Once again, the prefatory remarks on
25  your question, you're asking about substance, and I'm



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 245

1  not going to continue to allow you to do that.  That is
2  improper.  You're asking about substance of
3  conversation.  So I'll let him talk about contact.
4  We'll talk about the privilege log like you said, but
5  I'm not going to let him get into the substance of any
6  conversations.
7        MS. WESTFALL:  I understand that.  The
8  question's not improper.  It's relevant.  It's within
9  Rule 26.  You're asserting a privilege.  You can
10  instruct your witness not to answer.  That's how we've
11  been operating today.
12        MR. SWEETEN:  Okay.  He's answered the
13  question I think you asked.  I'm not going to let him
14  reveal substance of the communication.  I've been very
15  clear about that.
16        MS. WESTFALL:  I'm now going to ask my
17  question to make my record.  I understand your position
18  on privilege.
19        Q.  (By Ms. Westfall)  What was the nature and the
20  substance of the communication and phone call from the
21  King Street Patriots regarding photo ID?
22        MR. SWEETEN:  Do not answer the question
23  proposed.  She's asking about substance of
24  communications.  You don't have to do that.
25        Q.  (By Ms. Westfall)  Did you receive a phone

## 246

1  call --
2        MR. SWEETEN:  Let me just say for the
3  record, it's protected by the legislative privilege.  Go
4  ahead.
5        Q.  (By Ms. Westfall)  Did you receive a phone call
6  from Paul Bettencourt regarding photo ID issues in
7  Representative Harless's office?
8        A.  No.
9        Q.  Did you receive any phone call from Catherine
10  Engelbrecht concerning photo ID issues?
11        MR. SWEETEN:  Objection, asked and
12  answered.
13        Q.  (By Ms. Westfall)  You may answer.
14        A.  Yes.
15        Q.  What was that call regarding or concerning?
16        MR. SWEETEN:  Don't reveal communications
17  between constituents that contacted your office.  It's
18  covered by the legislative privilege.
19        Q.  (By Ms. Westfall)  In Texas, are there as many
20  driver's license offices as polling locations to your
21  knowledge?
22        MR. SWEETEN:  You can answer if you know.
23        A.  I don't know the exact numbers of either of
24  those.
25        Q.  (By Ms. Westfall)  Have there been any driver

## 247

1  license offices that have closed due to lack of funding
2  to your knowledge?
3        A.  Not that I'm aware of.
4        Q.  Did you conduct any research or have any
5  knowledge about availability or locations of driver
6  license offices in either the state of Georgia or the
7  state of Indiana?
8        MR. SWEETEN:  I'm going to object.  I
9  think this falls within legislative fact-gathering,
10  which is within the privilege.  He doesn't have to
11  answer what occurred with respect to legislative fact-
12  gathering.
13        Q.  (By Ms. Westfall)  Are there any answers that
14  you want to change at this point in response to any
15  question that I asked you today?
16        A.  Not that I can think offhand.
17        Q.  Is there any information that you didn't recall
18  that you now recall now that we're at the end of the day
19  in answer to any of my questions?
20        A.  You had mentioned, you had asked a -- if groups
21  contacted me in the preparation of Senate Bill 14.  And
22  I -- the groups that had contacted me, and I -- there
23  was a group before while I was drafting it that
24  contacted me, and add -- Advocacy, Inc.
25        Q.  I see.  And what was the concern of that

## 248

1  organization?
2        MR. SWEETEN:  Don't reveal communications
3  from potential constituents that's subject to the
4  legislative privilege.
5        Q.  (By Ms. Westfall)  Is there anything you would
6  like to add so that we can understand your answers more
7  clearly to any of the questions I asked today?
8        A.  Not that I can think of right now.
9        Q.  Is there any further information beyond the
10  phone call that you received from Advocacy, Inc. that
11  you didn't recall earlier today when I asked you a
12  question that you now recall, or is that the sum total?
13        A.  That's what I can think of right now.
14        MS. WESTFALL:  So throughout today, your
15  counsel has instructed you not to answer many questions
16  on the basis of legislative privilege.  The Attorney
17  General intends to move to compel responses to or will
18  consider moving to compel responses to many of the
19  questions that you did not answer.  We therefore leave
20  this deposition open in the event that the Attorney
21  General's motion is granted in whole or in part.  And I
22  will now conclude my questioning for today.  For the
23  time being, we leave the deposition open and turn over
24  questioning to Mr. Rosenberg.
25        EXAMINATION



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

249

```
1    BY MR. ROSENBERG:
2        Q.  Good afternoon, Mr. Beuck.  I'm Ezra Rosenberg.
3    I represent the Texas State Conference of NAACP Branches
4    and the Mexican-American Legislative Caucus.
5            You're still under oath, you understand
6    that?
7        A.  Yes.
8        Q.  I'm just going to ask you a few questions.  I
9    know it's late in the day.  I'm not going to go over
10   everything that Ms. Westfall did.  I do want to tie up a
11   few points, so let me just start.
12           Earlier, Ms. Westfall asked you about
13   conversations that you had with Representative Harless
14   in preparation for the -- this deposition, and I believe
15   your answer was that the majority of the conversations
16   had to do with scheduling; is that correct?
17       A.  Regarding the depositions?
18       Q.  Yes.
19       A.  Yes.
20       Q.  What did the minority of the conversations have
21   to deal with other than scheduling?
22           MR. SWEETEN:  Okay.  I'm going to go ahead
23   and assert our objection that we made earlier that
24   conversations that occurred that relate to Senate Bill
25   14, even if they're after the time of passage, we're
```

251

```
1        Q.  Assertion of privilege.
2        A.  The assertion of privilege, she told me she was
3    going to assert the privilege.
4        Q.  Did she tell you how extensive her assertion of
5    the privilege was?
6            MR. SWEETEN:  I'm going to object to the
7    extent that it calls for attorney-client privileged
8    information.  Ms. Harless is represented by our
9    office.  Mr. Beuck is as well.  Also, Mr. Beuck is an
10   attorney with Ms. Harless's office.  So to the extent
11   that there were discussions about the deposition, I
12   think that those matters would be privileged.
13           MR. ROSENBERG:  Are you directing him not
14   to answer?
15           MR. SWEETEN:  I'll let him answer that the
16   privilege that she's advised him that she was asserting
17   the privilege.  As to the additional questions about
18   those conversations, to the extent that they implicate
19   the attorney-client privilege, then I would assert that
20   -- I would assert that privilege.
21           MR. ROSENBERG:  And just so it's clear,
22   the attorney-client privilege, vis-a-vis, Mr. Beuck as
23   attorney for Representative Harless?
24           MR. SWEETEN:  Well, I mean, first of all,
25   you haven't established the specifics of the
```

---

250

```
1    asserting legislative privilege as to those.  And as to
2    legislative matters.  But to the extent that
3    Mr. Rosenberg's questions do not implicate those, I'm
4    going to go ahead and let you answer that question.
5        A.  I think the -- what I said previously is the
6    extent that I can answer.
7        Q.  (By Ms. Westfall)  It's your testimony then
8    that every one of those conversations have to deal only
9    with scheduling?
10       A.  No.
11       Q.  Is what -- well, then, again, just so it's
12   clear, what did the rest of the conversations deal with?
13       A.  I think I cannot answer that without stepping
14   into the privilege.
15       Q.  Did you discuss with Representative Harless
16   whether or not she or you would assert privilege in this
17   deposition?
18       A.  It's my understanding that she has asserted the
19   privilege.  She has communicated that with me, and
20   that's my understanding.
21       Q.  When did she communicate that with you?
22       A.  I don't know the exact date.  It was a week or
23   two ago.
24       Q.  And can you tell me about that conversation?
25       A.  Regarding the?
```

252

```
1    question.  Mr. Beuck is an attorney.  If he reasonably
2    believes that he was providing legal advice, then I
3    think that would be covered under the attorney-client
4    privilege.
5            MR. ROSENBERG:  Well, let's inquire into
6    that a bit.
7        Q.  (By Mr. Rosenberg)  Was it your understanding
8    that you were operating as Representative Harless's
9    attorney in that conversation?
10       A.  Regarding the deposition and the privilege?
11       Q.  Yes.
12       A.  Yes.
13       Q.  Did she actually come to you and ask you to
14   give her legal advice concerning the privilege?
15       A.  She did ask me my opinion.
16       Q.  Your job is chief of staff for Representative
17   Harless?
18       A.  Correct.
19       Q.  When you were hired, were you also told that
20   you were going to be operating as her lawyer?
21       A.  It was my being an attorney and was a fact she
22   was well aware of, and I think that was a
23   positive.  You'll have to ask her if --
24       Q.  Well, I mean, there are lots of attorneys in
25   this country who not everything they do is --
```

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 253

1      A.  I understand.
2      Q.  -- in an attorney-client context.  Is it your
3  testimony that you actually operate as Representative
4  Harless's attorney?
5      A.  In matters where she is asking my -- my opinion
6  on a legal issue, that is my understanding.
7      Q.  Just because it calls for your knowledge of the
8  law, you think you're operating as her attorney?
9      A.  That's my understanding.
10     Q.  Have documents been withheld from production in
11 this case on the basis of attorney-client privilege
12 focusing on your relationship with Representative
13 Harless as her attorney?
14     A.  I'm not aware.  I don't know.
15     Q.  Did you review the privilege log in this matter
16 relating to documents from Representative Harless?
17     A.  No.
18     Q.  Did you advise your attorneys here as to any
19 documents that you believed were privileged under
20 attorney-client privilege because of your relationship
21 as Representative Harless's attorney?
22     A.  Any documents that we produced?
23     Q.  Yeah.
24     A.  No.
25     Q.  Does Representative Harless maintain any

---

## 254

1  documents in her own office?  And when I say "her own
2  office," I don't mean her office complex, I mean her own
3  office.
4      A.  Capitol office?
5      Q.  Yeah.  Well, does she have more than one
6  office?
7      A.  We have a district office.
8      Q.  Okay.  Well, that's good.  Let's talk about
9  that, too, but let's start with the Capitol office.
10     A.  Okay.
11     Q.  Does Representative Harless maintain any
12 documents in the room that's her office in the Capitol
13 office?
14     A.  Yes.
15     Q.  And you searched those files in connection with
16 the production of documents in this case?
17     A.  Yes.
18     Q.  And documents were produced from those files?
19     A.  I don't recall where the documents -- if
20 documents came from specifically those files.  I
21 produced all documents in the office that were
22 responsive, so, but I can't recall which file folder it
23 actually came from.
24     Q.  Sure.  Was a search also made of her district
25 office for responsive documents?

---

## 255

1      A.  Yes.
2      Q.  And documents were produced from that office
3  also?
4      A.  There were not responsive documents there.
5      Q.  I think in response to a question from
6  Ms. Westfall, you testified that you received text
7  messages from Representative Harless during the floor
8  debates; is that correct?
9      A.  A few, yes.
10     Q.  Was any search made of text messages on
11 Representative Harless's telephone to the extent that
12 they're kept?
13     A.  I believe she did search that.  I searched mine
14 as well.  I did not have any responsive documents.
15     Q.  And --
16     A.  Texts.  Excuse me.
17     Q.  And during the floor debates, were you able to
18 view the floor debates through a closed-circuit
19 television?
20     A.  I had the debate pulled up on the Internet.
21     Q.  So you were able to watch it as it was going?
22     A.  Correct.
23     Q.  And were you also able to speak with
24 Representative Harless by telephone during the floor
25 debates?

---

## 256

1      A.  I believe we did have a phone conversation.
2      Q.  Do you recall what the phone conversation was
3  about?
4          MR. SWEETEN:  Don't reveal the substance
5  of any conversations you've had.  If the question is, do
6  you recall what it's about, you can go ahead and answer
7  "yes" or "no," but do not reveal the substance of those
8  communications.
9      A.  Okay.  I don't recall the specifics of the
10 phone conversation.  It was -- I don't recall the
11 specifics.
12     Q.  (By Mr. Rosenberg)  Do you recall anything
13 about the phone conversation?
14         MR. SWEETEN:  Don't reveal the substance
15 of it.  It's legislatively privileged.  But you can
16 answer that question.
17     A.  Based on that, I can't.
18     Q.  (By Mr. Rosenberg)  Well, the question was
19 whether you recalled anything.  You can give me a "yes"
20 or a "no" answer.
21     A.  Okay.  Okay.  Yeah.  I thought you were asking
22 -- yes, I do recall.
23     Q.  What do you recall about it?
24         MR. SWEETEN:  Same objection.
25         THE WITNESS:  Okay.  Sorry.  Jumped ahead.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                 MAY 14, 2012

## 257

1    Q.  (By Mr. Rosenberg)  By the way, how do you
2  define "constituents"?
3    A.  It's a broad term.
4    Q.  How broad is it?
5    A.  Well, I guess it's got multiple -- constituents
6  can -- residents of Texas.  Sometimes with -- actual
7  people who live in District 126.
8    Q.  Well, how about for purposes of the assertion
9  of the legislative privilege, how do you define
10  "constituents"?
11    A.  I have defined it broadly.
12    Q.  Okay.  So let's talk about how broad.  How
13  broad?
14    A.  A resident of Texas.
15    Q.  Okay.  So a resident of Texas is a constituent,
16  and therefore, are you asserting privilege over any
17  communication between you or Representative Harless with
18  a constituent dealing with SB 14 with any resident of
19  Texas?
20    A.  Okay.  I might need you to repeat that.
21    Q.  Sure.  Are you asserting privilege as to any
22  communication between either you or Representative
23  Harless and any resident of Texas concerning SB 14?
24        MR. SWEETEN:  I've instructed him to
25  include that, so I think that that answer may be better

## 258

1  for me, but the answer is that that is part of what a
2  constituent is.
3    Q.  (By Mr. Rosenberg)  So let's see.  We have
4  residents of Texas.  Are you asserting privilege --
5        Well, let me ask the question this way:
6  Is a lobbyist a constituent for your purposes of
7  asserting privilege today?
8    A.  If they are a resident of the state.
9    Q.  And is an interest group a constituent for
10  purposes of your asserting privilege in this case today?
11    A.  Yes.
12    Q.  Whether or not they're a resident of the state?
13    A.  That -- that has been my -- so if that's -- if
14  they're a resident, that's --
15    Q.  So let's just start with people whom I guess we
16  can agree are not constituents.
17    A.  Okay.
18    Q.  Did you or Representative Harless have any
19  communication with any lobbyist who is not a resident of
20  Texas concerning SB 14?
21    A.  I can -- I can't speak for Representative
22  Harless.  I can speak for myself.  No.
23    Q.  And when you say you can't speak for
24  Representative Harless, did you receive any telephone
25  calls for Representative Harless from any lobbyist who

## 259

1  is not a resident of the State of Texas?
2    A.  Not that I recall.
3    Q.  Does Representative Harless log appointments
4  and telephone calls with lobbyists?
5    A.  She does keep a schedule of appointments, a
6  calendar.
7    Q.  And do you know how long that schedule is
8  maintained?
9    A.  I believe it's a year.  I'm not -- I'm not a
10  hundred percent sure on that.
11    Q.  Did you or Representative Harless have any
12  communications with any interest groups who are not
13  residents of Texas concerning SB 14?
14        MR. SWEETEN:  Objection, asked and
15  answered.
16        MR. ROSENBERG:  It was lobbyist before,
17  but go ahead.
18    A.  Okay.  I would say no.
19    Q.  (By Mr. Rosenberg)  Which lobbyist whom you
20  consider constituents did you or Representative Harless
21  have communications with concerning SB 14?
22        MR. SWEETEN:  As of right now, you're just
23  establishing --
24        MR. ROSENBERG:  Which ones.
25        MR. SWEETEN:  -- the fact of the

## 260

1  communication --
2        MR. ROSENBERG:  Exactly.
3        MR. SWEETEN:  -- much like counsel was
4  earlier?
5        MR. ROSENBERG:  Yeah.
6        MR. SWEETEN:  You can answer to the extent
7  about the contact.
8    A.  Okay.  Regarding Senate Bill 14?
9    Q.  Yeah.
10    A.  I believe I added Advocacy, Inc. as one.
11    Q.  Anyone else other than Advocacy, Inc.?
12    A.  Not that I can recall right now.
13    Q.  King Street Patriots?
14    A.  Yes.  Yes.  King Street Patriots.
15    Q.  How about Texans for Lawsuit Reform?
16    A.  Not that I recall.
17    Q.  Did you or Representative Harless have
18  communications with this state Republican party
19  concerning SB 14?
20    A.  Not that I recall.
21    Q.  And by the way, just to make sure we have the
22  objection on the record, what was the substance of the
23  communication that you had with Advocacy, Inc.
24  concerning SB 14?
25        MR. SWEETEN:  Object to the extent it



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 261

1 calls for matters that are legislatively privileged,
2 don't answer the question.
3    Q.  (By Mr. Rosenberg)  And what was the substance
4 of the conversation that you had with King Street
5 concerning SB 14?
6       MR. SWEETEN:  Same objection and
7 instruction.
8    Q.  (By Mr. Rosenberg)  Did you review any
9 documents from the Heritage Foundation in connection
10 with SB 14?
11    A.  I don't recall.
12    Q.  Have you ever heard of the Heritage Foundation?
13    A.  Yes.
14    Q.  What is the Heritage Foundation?
15    A.  I believe they are -- well, I'm not going to --
16 I don't want to speculate.  They're an advocacy group, a
17 public policy advocacy group.
18    Q.  Do you know if Representative Harless reviewed
19 any information from the Heritage Foundation concerning
20 SB 14?
21    A.  I do not know.
22    Q.  Did you review any information from McAllen
23 Monitor concerning SB 14?
24    A.  I believe there was a news article.
25    Q.  What is McAllen Monitor?

---

### 262

1    A.  It's my understanding that's the local
2 newspaper for the McAllen area in the Valley.
3    Q.  I'm sorry?
4    A.  For the McAllen area, the Valley newspaper.
5    Q.  Do you recall the nature of the article that
6 you reviewed?
7    A.  No, I don't.
8    Q.  Did you review anything from the Fair Elections
9 Legal Network concerning SB 14?
10       MR. SWEETEN:  Are you asking if he's been
11 contacted with respect to this advocacy --
12       MR. ROSENBERG:  The question was, did you
13 review.
14       MR. SWEETEN:  Okay.  Well, I've asserted
15 that with respect to legislative fact-gathering matters
16 reviewed in connection with Senate Bill 14, that those
17 are matters that are legislatively privileged.
18    Q.  (By Mr. Rosenberg)  So, well, let me change the
19 question first.  Did you have any contact with any
20 entity called the "Fair Elections Legal Network"
21 concerning SB 14?
22    A.  Not that I remember.
23    Q.  Do you know if Representative Harless did?
24    A.  No, I don't know.
25    Q.  What is your understanding as to the factual

---

### 263

1 basis for the declaration of emergency status or the
2 emergency proclamation for SB 14 by the governor?
3       MR. SWEETEN:  I'm going to object.  It's
4 been asked and answered.  Speculation.  I'm also going
5 to instruct you not to answer to the extent it reveals
6 information, communications between legislators, staff
7 members, state agencies, TLC, constituents.  With that
8 instruction, you can answer to the extent that it does
9 not reveal those communications.
10    A.  I'm sorry.  Regarding the governor's?
11    Q.  Proclamation.
12    A.  Proclamation --
13    Q.  Yes.
14    A.  -- of an emergency item.
15    Q.  Yes.
16    A.  The fact pattern behind?
17    Q.  Yes.
18    A.  Could you repeat the question?
19    Q.  Sure.  What's your understanding of the factual
20 basis for the governor's proclamation of emergency
21 status for SB 14?
22       MR. SWEETEN:  The same objection and
23 instruction.  Go ahead.
24    A.  I can't speculate to what the governor was
25 thinking when he issued that proclamation.

---

### 264

1    Q.  (By Mr. Rosenberg)  Did you discuss that issue
2 with Representative Harless?
3       MR. SWEETEN:  Objection.  You're asking
4 him to reveal communication he's had with --
5       MR. ROSENBERG:  "Yes" or "no" answer.
6       MR. SWEETEN:  Did you discuss -- what
7 matter?
8       MR. ROSENBERG:  The factual basis for the
9 governor's proclamation of emergency status for SB 14.
10       MR. SWEETEN:  Yeah.  I think you're doing
11 more than asking a question about a broad matter that
12 would be covered by the privileged log.  You're asking a
13 very specific fact.  So I'm going to instruct you not to
14 answer that question based on the legislative privilege
15 that you reveal communications between you and
16 Representative Harless.
17    Q.  (By Mr. Rosenberg)  Did you do any analysis of
18 the factual basis for a -- did you do any analysis or
19 investigation of the amount of in-person fraud, voter
20 impersonation in person, in connection with SB 14?
21       MR. SWEETEN:  You're asking him questions
22 about legislative fact-gathering.  I've repeatedly made
23 that objection that for him to reveal information that
24 went into the considerations behind Senate Bill 14 is a
25 matter that's covered by the scope of the legislative

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

265

1  privilege.  I'm going to instruct him that is
2  privileged.
3      Q.  (By Mr. Rosenberg)  Did you have any -- so
4  you're not going to answer that question?
5      A.  Correct.
6      Q.  Did you have any discussions with local
7  officials as to voter fraud in connection with SB 14?
8          MR. SWEETEN:  Same objection.  Same
9  instruction.
10     A.  I'm going to -- the answer is no based on --
11     Q.  (By Mr. Rosenberg)  Did you have any
12 discussions with local election officials in connection
13 with SB 14?
14         MR. SWEETEN:  Same objection.  Same
15 instruction.
16         MR. ROSENBERG:  Whether he had any
17 discussions with local election officials?
18         MR. SWEETEN:  You can ask if he has had
19 contact with local election officials.  I'll allow that
20 question.  I think the other is I think you're treading
21 into the substance of conversations and legislative
22 fact-gathering that I think is privileged.  But go
23 ahead, you can answer if you've had contact with local
24 election officials.
25     A.  Yes.

266

1      Q.  (By Mr. Rosenberg)  With whom did you have
2  contact?
3      A.  The Harris County clerk's office.
4      Q.  Who at the Harris County clerk's office?
5          MR. SWEETEN:  You can answer if you know.
6      A.  I'm trying to remember.  George is his first
7  name.  George Hammerline.
8      Q.  (By Mr. Rosenberg)  Hammerline?
9      A.  Yes.
10     Q.  Anyone else?
11     A.  He's -- George.  George is the contact.
12     Q.  And when did you have a conversation with
13 George Hammerline?
14     A.  Late February.
15     Q.  Of 2011?
16     A.  2011.  Yes.
17     Q.  And what was your -- the purpose of your having
18 a conversation with Mr. Hammerline?
19         MR. SWEETEN:  Once again, I think the
20 question implicates legislative fact-gathering.  We
21 believe that that's part of the legislative privilege.
22 I've made that assertion and continue to do so.
23         You can answer to the extent that it
24 implicates matters of public record, however.
25     Q.  (By Mr. Rosenberg)  Can you answer the

267

1  question?
2      A.  No, I cannot.
3      Q.  Was it related to SB 14?
4      A.  Yes.
5      Q.  And what was the substance of your conversation
6  with Mr. Hammerline?
7          MR. SWEETEN:  Same objection.  Same
8  instruction.
9      Q.  (By Mr. Rosenberg)  And you're not going to
10 answer the question?
11     A.  Correct.
12     Q.  Other than Mr. Hammerline, did you have
13 discussions with any other local election officials
14 concerning SB 14?
15     A.  Not that I remember.
16     Q.  Do you know if Representative Harless had any
17 discussions with any local election officials concerning
18 SB 14?
19     A.  I can't speculate.  Not that I know of.
20     Q.  Do you know if there is any investigation or
21 analysis of voter impersonation that has not been made
22 public?
23         MR. SWEETEN:  I object.  You're asking for
24 information related to the legislative fact-gathering
25 process.  It also could implicate communications that

268

1  he's had with these various parties that I believe are
2  subject to the legislative privilege.  So I think that
3  is within the legislative privilege.  I think that is
4  not a proper question.  I'm going to instruct you not to
5  answer.
6      Q.  (By Mr. Rosenberg)  Are you going to answer?
7      A.  No.
8      Q.  Do you know a guy named Ed Johnson?
9      A.  Yes.
10     Q.  Who is he?
11     A.  He works for the Harris County clerk's office.
12     Q.  Okay.  Clerk's office or the tax office?
13     A.  Oh.  He works for Harris County.  I don't know
14 which division he works in.
15     Q.  Have you ever spoken to him about SB 14?
16     A.  Yes.
17     Q.  When did you speak to him?
18     A.  It was in 2011.  I don't know the exact date.
19 It was during the session in 2011.
20     Q.  What was your purpose in speaking with
21 Mr. Johnson?
22         MR. SWEETEN:  Objection to the extent that
23 it reveals legislative fact-gathering with respect to
24 Senate Bill 14.  I believe that's within the legislative
25 privilege and instruct you not to answer that question.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

269

1    Q. (By Mr. Rosenberg) Are you going to answer the
2  question?
3    A. No.
4    Q. On that basis?
5    A. Yes.
6    Q. Did any legislators contact you in order to get
7  preapproval for any amendments to SB 14?
8        MR. SWEETEN: I'm going to object to the
9  extent that that implicates communications between a
10 legislator and you subject to the legislative privilege
11 and communications.
12   A. Were there any communications? Can I -- can
13 you repeat the question?
14   Q. (By Mr. Rosenberg) Sure. Did any legislators
15 contact you in connection with preapproval of any
16 amendments that were going to be offered to SB 14?
17       MR. SWEETEN: Don't answer to the extent
18 that that implicates any communications that you've had
19 with legislators, which it plainly does, unless this is
20 a matter of public record, for example, a colloquy on
21 the floor, discussions that are public.
22   A. Got you. Okay. I'm going to not answer the
23 question.
24   Q. (By Mr. Rosenberg) On that basis?
25   A. Correct.

270

1    Q. In connection with the production of e-mails, I
2  think you said that they were deleted after 30 days; is
3  that correct?
4    A. Correct.
5    Q. Are you aware of any backup system or archiving
6  of e-mails?
7    A. There is an archive within our e-mail
8  system. We have to manually move the e-mail over to
9  that, to that archive. I'm not aware of any automatic
10 archiving system.
11   Q. And were your archives and Representative
12 Harless's archives searched in connection with the
13 e-mail production in this case?
14   A. Yes.
15   Q. Have you spoken with anyone from your IT
16 department as to whether or not there is any kind of
17 backup system over and above the archiving?
18   A. No, I have not.
19   Q. Do you know if there is one?
20   A. I do not know.
21       MR. ROSENBERG: Why don't we take a
22 couple-minute break. I might be just about done.
23   A. Okay.
24       (Recess at 5:57 p.m. to 6:01)
25   Q. (By Mr. Rosenberg) Just a couple of more

271

1  questions, Mr. Beuck. Getting back to Mr. Hammerline,
2  do you know whether he testified as a witness at any of
3  the hearings in connection with the photo ID
4  legislation?
5        MR. SWEETEN: I'm sorry. Can you repeat
6  the question? I apologize. My fault.
7        MR. ROSENBERG: I just asked whether
8  Mr. Hammerline testified as a witness at any of the
9  hearings.
10       MR. SWEETEN: Go ahead and answer.
11   A. I don't believe he was a witness. He -- he --
12 my memory is that he was not a witness in the House. I
13 can't speak to the -- I don't believe he was in the
14 Senate. I'm not a hundred percent sure. It's possible
15 he was in previous sessions. I'm not sure.
16   Q. (By Mr. Rosenberg) Is there such a thing
17 called "interim hearings" in Texas legislature?
18   A. Yes.
19   Q. What are interim hearings?
20   A. Committees, there are -- during the interim,
21 the speaker will issue an interim charge for committees
22 to study issues. The committees typically will hold
23 hearings, one, maybe two hearings on the
24 issue. Sometimes public testimony is taken. Sometimes
25 it's not.

272

1    Q. Were there interim hearings on photo ID
2  legislation?
3    A. Yes. I believe there was.
4    Q. Were you involved in those interim hearings?
5    A. No, I was not.
6    Q. Were you aware of the interim hearings?
7    A. Yes. I was aware of the interim hearings.
8    Q. Do you know if Mr. Hammerline testified at any
9  of the interim hearings?
10   A. I don't know.
11   Q. Were you involved in organizing witnesses for
12 any of the hearings in connection with SB 14?
13   A. Yes.
14   Q. Were you involved in gathering witnesses in
15 connection with -- organizing witnesses in connection
16 with any of the hearings on HB 112?
17   A. No.
18   Q. Which witnesses were you involved with in
19 connection with SB 14?
20       MR. SWEETEN: Which witnesses did he
21 contact? I just want to make sure I'm clear on the
22 question.
23   Q. (By Mr. Rosenberg) Well, let's start with
24 contacting them. We'll go from there.
25   A. The Georgia Secretary of State. The gentleman



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                    MAY 14, 2012

---

273

1   from Indiana.  Wheeler was his last name.  Thomas
2   Wheeler.
3       Q.  Anyone else?
4       A.  There was another individual from -- from
5   Austin.  I cannot remember his name.  I contacted him as
6   well.
7       Q.  Do you remember what issue that witness from
8   Austin spoke on or testified on?
9       A.  His experience with the -- I remember his
10  committee testimony was with his experience on the -- he
11  was -- he's an attorney from Austin and his experience
12  with the Voting Rights Act cases.
13      Q.  Anyone else?
14      A.  The expert witnesses.
15      Q.  Which expert witnesses.
16      A.  DPS, I mentioned earlier, Rebecca Davio.
17  Davio.  I'm not sure how it's pronounced.
18      Q.  Anyone else?
19      A.  The Attorney General -- Attorney General's
20  office have a representative there.
21      Q.  Do you recall who that was?
22      A.  No, I do not.
23      Q.  Ever hear of a guy named Mike Hull?  H-U-L-L.
24      A.  Yes.  Yes.  I am familiar with his name.
25      Q.  Who is he?

---

274

1       A.  I know his name.  I don't really know what he
2   does or who he is.  I am familiar with his name.
3       Q.  You ever have any contact with him?
4       A.  Regarding?
5       Q.  SB 14?
6       A.  No.
7       Q.  Do you know if Representative Harless did?
8       A.  I don't know.
9       Q.  You were contacted with the Georgia Secretary
10  of State's office.  Were those telephone, mail or both?
11      A.  Telephone, e-mails.
12      Q.  And what was the nature of your conversation
13  with them?
14          MR. SWEETEN:  Don't reveal your
15  communications which relate to legislative fact-
16  gathering for Senate Bill 14.  To the extent you can
17  answer based upon the public record, you can feel free
18  to do so.  Otherwise, it's legislatively privileged.  Go
19  ahead.
20          MR. ROSENBERG:  Just so I'm clear.  A
21  communication that Mr. Beuck had with a third party
22  who's not a constituent, and I'm assuming that Georgia
23  Secretary of State is not within your broad definition
24  of constituency, is you're asserting privilege over that
25  communication?

---

275

1           MR. SWEETEN:  I'm saying that when there's
2   legislative fact-gathering occurring with respect to
3   this bill, Senate Bill 14, that that is squarely within
4   the privileges that we've asserted in our briefing, that
5   that information he does not have to reveal the
6   information related to that fact-gathering.  I've let
7   him answer as to the contacts.  I will let him answer as
8   to the public record with respect to these individual
9   witnesses.  However, as far as the fact-gathering,
10  that's squarely on all fours with how we've been
11  asserting legislative privilege.
12      Q.  (By Mr. Rosenberg)  Can you answer my question?
13      A.  What was the nature of the conversation?
14          MR. SWEETEN:  Yeah.  Same objection and
15  instruction with respect to legislative fact-gathering.
16      Q.  (By Mr. Rosenberg)  Can you answer?
17      A.  I cannot.  Sorry.
18      Q.  Same question as to your communication with
19  Mr. Wheeler from Indiana.  Can you tell me the substance
20  of your conversation or correspondence with Mr. Wheeler?
21          MR. SWEETEN:  Same objection and
22  instruction.  To the extent that you can reveal
23  information from a public record, you can feel free to
24  do so.
25      A.  Okay.  No, I cannot.

---

276

1       Q.  (By Mr. Rosenberg)  And the gentleman or
2   gentlewoman from Austin, I think you said was a lawyer
3   experienced with the Voting Rights Act.  Do you recall
4   that person's name?
5       A.  No, I do not.  He also testified in the Senate.
6       Q.  And can you tell me the substance of your
7   conversations or other communications with that person?
8           MR. SWEETEN:  Same objection and
9   instruction.
10      A.  No, I cannot.
11      Q.  (By Mr. Rosenberg)  Was that person's name Eric
12  Opiela?
13      A.  That does not sound familiar.
14      Q.  The name Eric Opiela doesn't sound --
15      A.  Not -- not in this case.  I have heard that
16  name before, but not -- he was not --
17      Q.  Where have you heard that name?
18      A.  I can't say.
19      Q.  You can't say because you don't want to say?
20      A.  No.  I don't know where I've heard that name
21  before.
22          MR. ROSENBERG:  I have no further
23  questions.  Thank you.
24          MR. SWEETEN:  Thank you.  Reserve
25  questions for time of trial.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

COLBY BEUCK                                                          MAY 14, 2012

---

**277**

1       MR. ROSENBERG: And we -- just for the
2   record, as -- we're in the same position as is DOJ, and
3   we will leave this record open and we will undoubtedly
4   join with DOJ in a motion to compel.
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

---

**279**

1   THE STATE OF _____)
2   COUNTY OF_____)
3
4       Before me,_____, on this day
5   personally appeared COLBY BEUCK, known to me (or proved
6   to me under oath or through_____
7   (description of identity card or other document) to be
8   the person whose name is subscribed to the foregoing
9   instrument and acknowledged to me that they executed the
10  same for the purposes and consideration therein
11  expressed.
12      Given under my hand and seal of office
13  this_____day of _____, 2012.
14
15
16                          _____
17                          NOTARY PUBLIC IN AND FOR
17                          THE STATE OF _____
18
19
20
21
22
23
24
25

---

**278**

1       CHANGES AND SIGNATURE
2       RE: TEXAS VS. HOLDER, ET AL
3   PAGE  LINE  CHANGE      REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20      I, COLBY BEUCK, have read the foregoing deposition
21  and hereby affix my signature that same is true and
22  correct, except as noted above.
23
24                  _____
25              COLBY BEUCK

---

**280**

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2   STATE OF TEXAS,              )
3                               )
        Plaintiff,              )
4                               )
    VS.                         )
5                               )
    ERIC H. HOLDER, JR. in his  )
6   official capacity as Attorney )
    General of the United States, )
7                               )
        Defendant,              )
8                               )
    ERIC KENNIE, et al,         )
9                               )
        Defendant-Intervenors,  )
10                              )
    TEXAS STATE CONFERENCE OF   )  CASE NO. 1:12-CV-00128
11  NAACP BRANCHES,             )  (RMC-DST-RLW)
                                )  Three-Judge Court
12      Defendant-Intervenors,  )
                                )
13  TEXAS LEAGUE OF YOUNG VOTERS )
    EDUCATION FUND, et al,      )
14                              )
        Defendant-Intervenors,  )
15                              )
    TEXAS LEGISLATIVE BALCK     )
16  CAUCUS, et al,              )
                                )
17      Defendant-Intervenors,  )
                                )
18  VICTORIA RODRIGUEZ, et al., )
19      Defendant-Intervenors.  )
20          REPORTER'S CERTIFICATION
            DEPOSITION OF COLBY BEUCK
21              MAY 14, 2012
22      I, Chris Carpenter, Certified Shorthand Reporter in
23  and for the State of Texas, hereby certify to the
24  following:
25      That the witness, COLBY BEUCK, was duly sworn by the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

281

1    officer and that the transcript of the oral deposition
2    is a true record of the testimony given by the witness;
3        That the deposition transcript was submitted on the
4    _____day of _____, 2012, to the witness or to the
5    attorney for the witness for examination, signature and
6    return to_____, by
7    _____, 2012; and if returned, the original
8    transcript will forwarded to Elizabeth Westfall, the
9    custodial attorney;
10       That the amount of time used by each party at the
11   deposition is as follows:
12       Ms. Westfall: 5 hours, 56 minutes
13       Mr. Rosenberg:  38 minutes
14       I further certify that I am neither counsel for,
15   related to, nor employed by any of the parties or
16   attorneys in the action in which this proceeding was
17   taken, and further that I am not financially or
18   otherwise interested in the outcome of the action.
19       Certified to by me this 16th day of May, 2012.
20
21
         Chris Carpenter, Texas CSR 1151
22       Expiration Date:  12/31/2012
         100 Congress Avenue, Suite 2000
23       Austin, TX  78701
         (512)328-5557
24
25   Firm Registration No. 283



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS