## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,               )
    Plaintiff,            )
                          )
VS.                           )
                          )
ERIC R. HOLDER, JR., in       )
his official capacity as      )
Attorney General of the       )
United States,                )
    Defendant,            )
                          )
ERIC KENNIE, ET AL,           )
    Defendant-            )
    Intervenors,          )
                          )
TEXAS STATE CONFERENCE OF     )  CASE NO. 1:12-CV-00128
NAACP BRANCHES,               )  (RMC-DST-RLW)
    Defendant-            )  Three-Judge Court
    Intervenors,          )
                          )
TEXAS LEGISLATIVE BLACK       )
CAUCUS, et al,                )
    Defendant-            )
    Intervenors,          )
                          )
VICTORIA RODRIGUEZ, et        )
al,                           )
    Defendant-            )
    Intervenors.          )

*******************************************

ORAL DEPOSITION OF

DENNIS BONNEN

JUNE 6, 2012

*******************************************

ORAL DEPOSITION OF DENNIS BONNEN, produced as a
witness at the instance of the Defendant, and duly
sworn, was taken in the above-styled and numbered cause

## 2

1  on June 6, 2012, from 9:54 a.m. to 7:35 p.m., before
2  Donna Wright, CSR in and for the State of Texas,
3  reported by machine shorthand, at the offices of THE
4  UNITED STATES ATTORNEY, 816 Congress Avenue, Suite
5  1000, Austin, Texas, pursuant to the Federal Rules of
6  Civil Procedure and the provisions stated on the record
7  or attached hereto.

## 3

1
2
3  FOR THE PLAINTIFF:
    Mr. Reynolds Brissenden
4  OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    209 West Eighth Street
5  Austin, Texas 78701
    (512) 936-1307
6
7  FOR THE DEFENDANT HOLDER, ET AL:
    Ms. Risa Berkower
8  Mr. Bruce Gear
    U.S. DEPARTMENT OF JUSTICE
9  950  Pennsylvania Avenue, NW
    Washington, DC 20530
10  (202) 305-7766
11
    FOR THE RODRIGUEZ DEFENDANT-INTERVENORS:
12  Ms. Nina Perales
    Mr. Luis Orlando Figueroa, Jr.
13  Ms. Karolina Lyznik
    MALDEF
14  110 Broadway
    San Antonio, Texas 78205-1910
15  (210) 224-5476
16
17
18
19
20
21
22
23
24
25

**A P P E A R A N C E S** *(line 1)*

## 4

1                          INDEX
2
3  Appearances....................  3
4
5
6  DENNIS BONNEN
7
8  Examination by Ms. Berkower....................  7
    Examination by Ms. Perales....................  243
9  Examination (Continued) by Ms. Berkower.........  294
10
    Witness' Signature Page........................  324
11  Reporter's Certificate........................  326
12
13              GOVERNMENT EXHIBITS
14  NUMBER  DESCRIPTION                        PAGE
    430  ........................  13
15  Notice of Deposition
    431  ........................  48
16  Report about Bills Voted on a Committee
    432  ........................  75
17  Letter to Rep. Dennis Bonnen from
    Thomas E. Wheeler, II
18  433  ........................  91
    Document Regarding H.B. 1706
19  434  ........................  113
    S.B. 362
20  435  ........................  124
    Pledge Concerning Voter ID
21  436  ........................  130
    H.B. 3556
22  437  ........................  142
    Correspondence Between Representative
    Bonnen and Kathy Rogers
23  438  ........................  152
    Interim House Committee Elections
24  Report Filed January 2011
    439  ........................  166
25  H.B. 624



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 5

1  440  .........................................  167
2       Texas Legislature On-Line History
        for H.B. 624
3  441  .........................................  183
        S.B. 14
4  442  .........................................  209
        Insider's Report
5  443  .........................................  213
        House Journal
6  444  .........................................  231
        Amendment to Bill
7  445  Skipped  .............................  237
8  446  .........................................  294
        Insider's Report dated 3-25-11
9  477  .........................................  304
        Post in Fact News dated 1-24-12
   448  .........................................
10      Incoming Correspondence from
        Constituent
11 449  .........................................  310
        Letter dated 4-19-08
12 450  .........................................  314
        Letter from Mr. Betony
13
14
15        PREVIOUSLY MARKED EXHIBITS
16 NUMBER  DESCRIPTION                   PAGE
17  5    .........................................  237
        H.B. 14
18 20    .........................................  265
19 28    .........................................  93
        H.B. 218
20 44    .........................................  82
        H.B. 1706
21
22
23
24
25

## 6

1            RODRIGUEZ EXHIBITS
2  NUMBER  DESCRIPTION                   PAGE
3  30    .........................................  244
        Memo to Members of Committee
4  31    .........................................  246
        Transcript of Hearings
5  32    .........................................  251
        Committee Report for SB 2362
6  33    .........................................  269
        House Research Organization Bill
7       Analysis for S.B. 14
   34    .........................................  271
8       Page from House Journal dated 4-8-11
   35    .........................................  272
9
   36    .........................................  285
10
   37    .........................................  290
11      Correspondence with Representative
        Bonnen's Office
12 38    .........................................  314
        Letter to Mr. Murphy
13

## 7

1      MS. BERKOWER:  Good morning.  This is the
2  case of State of Texas versus Eric Holder, Case
3  No. 12-CV-128 in the US District Court for the District
4  of Columbia.  This is the deposition of
5  Dennis Bonnen, and today is June 6, 2012.
6      Do you want appearances of counsel for
7  the record?
8      THE REPORTER:  It's up to you.
9      MS. BERKOWER:  Risa Berkower for the
10 Attorney General, Eric Holder.
11     MR. GEAR:  Bruce Gear for the Attorney
12 General, Eric Holder.
13     MS. PERALES:  Nina Perales for the
14 Rodriguez defendant-intervenors.
15     MR. FIGUEROA:  Luis Figueroa for the
16 Rodriguez intervenors.
17     MS. LYZNIK:  Karolina Lyznik for the
18 Rodriguez defendant-intervenors.
19     MR. BRISSENDEN:  Reynolds Brissenden for
20 the State of Texas and the witness.
21         DENNIS BONNEN,
22 having being first duly sworn, testified as follows:
23         EXAMINATION
24 BY MS. BERKOWER:
25     Q.  Okay.  Mr. Bonnen, are you represented here by

## 8

1  counsel today?
2      A.  Yes, ma'am.
3      Q.  Who is that?
4      A.  Reynolds.
5      Q.  When did the representation begin?
6      A.  I don't know.
7      Q.  Is it safe to say it began with this lawsuit?
8      A.  Yes.
9      Q.  Okay.  So you've been placed under oath today.
10 It's important to testify truthfully, accurately, and
11 completely as a result.  The court reporter will
12 prepare a transcript of everything that is said today,
13 so please respond to the questions verbally.  No
14 shaking your head or nodding because that can't be
15 recorded.
16     Please wait for me to finish my question
17 before you answer, and I'll try to do the same.  It
18 makes for a clearer record that way.  I'll try to ask
19 you clear questions.  If you don't understand a
20 question, speak up and let me know.  If you wish to
21 stop and take a break, let me know, and I will try to
22 accommodate you.  But we will try to keep our breaks
23 relatively short in the interest of moving the day
24 along.
25     From time to time your attorney may make



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

9

1  an objection.  He's making these objections for the
2  record unless he -- and unless he instructs you not to
3  answer the question, you can go ahead and answer
4  anyway.
5          If he counsels you to answer only to the
6  extent that certain information is not privileged,
7  please clarify for the record whether you are --
8  whether you are not answering or answering completely
9  based on his instructions.  That way we have a clear
10  record.  Does that make sense?
11      A.  Uh-huh.
12      Q.  Do you understand these instructions?
13      A.  Yes, ma'am.
14      Q.  Do you have any questions about any of these
15  instructions?
16      A.  No.
17      Q.  So a few more background questions.
18          Are you on any medication today that
19  would affect your ability to testify?
20      A.  No.
21      Q.  Is there any reason why you cannot testify
22  truthfully and accurately today?
23      A.  No.
24      Q.  If I refer to "you," unless I specify
25  otherwise, I'm asking a question about you in your

10

1  capacity as a member of the Texas House of
2  Representatives.  Do you understand?
3      A.  Yes, ma'am.
4      Q.  And if I refer to "you," I also mean to
5  include anyone in your office or anyone acting on your
6  behalf.  Do you understand?
7      A.  Yes.
8      Q.  I may use the terms "voter ID" and "photo ID"
9  interchangeably during this deposition.  I want you to
10  interpret the terms broadly to mean a requirement by a
11  voter to present a form of identification, whether it
12  has a photo or otherwise, when voting in person before
13  being permitted to vote a regular ballot.  Does that
14  make sense?
15      A.  Yes.
16      Q.  When I refer to the term "minority voters," I
17  mean voters who are nonwhite and non-Anglo.  Do you
18  understand these terms?
19      A.  Yes.
20      Q.  If you have any questions about what I mean,
21  please ask.
22          So have you ever been deposed before?
23      A.  No.
24      Q.  Have you ever been a party in litigation?
25      A.  No, I don't believe so.

11

1      Q.  Have you ever been involved in a case where
2  the State of Texas was the plaintiff or defendant?
3      A.  Not that I'm aware of.
4      Q.  What did you do to prepare for today's
5  deposition?
6      A.  Not much.
7      Q.  Did you meet with your attorneys?
8      A.  Briefly.
9      Q.  Who did you meet with?
10      A.  I met with Reynolds and one other gentleman.
11          MR. BRISSENDEN:  Patrick?
12          THE WITNESS:  Patrick.
13      Q.  (BY MS. BERKOWER)  Mr. Sweeten?
14      A.  Yes.
15      Q.  When did you meet with them?
16      A.  Monday.
17      Q.  How long did you meet with them for?
18      A.  About an hour.
19      Q.  Was anyone else present?
20      A.  No.  I was greeted by other people, but no one
21  else was present.
22      Q.  Okay.  Did you review any documents in
23  preparation for today's deposition?
24      A.  A few, very few.
25      Q.  What did you review?

12

1      A.  I don't recall specifically.
2      Q.  Is it safe to say they were documents related
3  to voter ID legislation in the Texas Legislature?
4      A.  Generally speaking, yes.
5      Q.  Other than your attorneys, did you speak to
6  anyone about your deposition today?
7      A.  You know, short of my wife, no.
8      Q.  Did you speak to anyone on your staff about
9  your deposition today?
10      A.  In the regard that they helped do document
11  preparation and things of that sort.
12      Q.  But did you talk to them specifically about
13  coming here today to be deposed?
14      A.  Certainly they know I'm here, yes.
15      Q.  So what was the nature of your conversation?
16      A.  The fact that they keep my schedule and had to
17  make sure I knew where to be and when.
18      Q.  Okay.  Anything about the substance of what
19  you were going to be discussing today?
20      A.  No.
21      Q.  Did you speak to anyone else in the Texas
22  Legislature about your deposition today?
23      A.  Only in the fact that I ran into
24  Representative Aliseda in the lobby this morning and we
25  both exchanged greetings and acknowledged we both were



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 13

1  here to be deposed.
2      Q.  Did you talk about the substance of what you
3  were going to say?
4      A.  No, ma'am.
5      Q.  Any other conversations with other Texas
6  Legislatures?
7      A.  No.
8      Q.  Have you spoken to anyone who has already been
9  deposed in this case about your deposition today?
10     A.  No.
11     Q.  So just to close the loop, is there anyone
12 else you've spoken with about your deposition today?
13     A.  Not that I can recall and not of any substance
14 that I can remember.
15     Q.  Did you bring any notes or documents with you
16 today?
17     A.  I did not.
18     Q.  Okay.  This will be Exhibit 430.
19          (Exhibit No. 430 marked)
20     Q.  (BY MS. BERKOWER)  Do you recognize this?
21     A.  I guess.  I mean --
22     Q.  Well, take a second to --
23     A.  I understand what it is, but it's not
24 something I personally reviewed.
25     Q.  Well, take a minute to review it now.

## 14

1      A.  Okay.  (Reading.)
2      Q.  Okay?
3      A.  Sure.
4      Q.  Do you know what this is?
5      A.  It is a notice of deposition.
6      Q.  Who is it a notice of deposition for?
7      A.  Myself.
8      Q.  Can I direct your attention to Attachment A,
9  please?
10     A.  Okay.
11     Q.  Did you undertake a search for the documents
12 specified in Attachment A?
13     A.  I worked with the staff in my office to do a
14 very thorough search for all these documents.
15     Q.  Can you describe the search, please?
16     A.  You know, I don't know exactly how you would
17 want it described.  We reviewed everything that would
18 fall under this request.
19     Q.  Did you look through paper files?
20     A.  We looked through paper files and electronic
21 files, all files.
22     Q.  Anywhere else you searched for the documents?
23     A.  We searched everywhere that they would be.
24     Q.  Okay.  And where would that be, just as a
25 general matter for your office?  Where do you keep

## 15

1  these kinds of documents?
2      A.  Filing cabinets in the office, electronically
3  on the computer, in the district office and the Capitol
4  office.
5      Q.  For the electronic files is there a particular
6  location on the network that you usually keep these
7  kinds of documents?
8      A.  Specifically, I'm not aware.  If there is a
9  specific spot, I don't know.
10     Q.  When did you search for the documents?
11     A.  When they were requested.  I don't know the
12 exact date, but whenever -- pretty immediately
13 thereafter the request was made.
14     Q.  In the last few weeks maybe?
15     A.  I think it was longer ago than that, actually.
16     Q.  Okay.
17     A.  It was pretty immediately after the request.
18 And there may have been a second request that we were
19 asked to look at yet again.
20     Q.  Did you look for any document -- any relevant
21 documents specified in Attachment A in your home, on
22 your home computer or home office files?
23     A.  No, I did not, because I don't -- I do not
24 have those documents at home or on a home computer.
25     Q.  Do you -- you said you have more than one

## 16

1  office.  How many offices do you have?
2      A.  I have a district office in my district in
3  Angleton, Texas, and I have a Capitol office.
4      Q.  And you conducted this search in both offices?
5      A.  That's correct.
6      Q.  Did you produce documents to your attorney
7  after concluding the search?
8      A.  We did.
9      Q.  When did you do that?
10     A.  I don't know exactly.
11     Q.  Is it safe to say it was shortly after you
12 finished the search?
13     A.  Yes.  Yes.
14     Q.  Okay.  Did you discuss asserting a privilege
15 over these documents with your attorney?
16     MR. BRISSENDEN:  I'm going to instruct
17 the question -- I'm going to object to the question.
18 It calls for attorney/client privilege and instruct the
19 witness not to answer, divulge, or disclose
20 communications with counsel.
21     MS. BERKOWER:  The witness is allowed to
22 speak to general topics that he's covered with his
23 attorney.
24     MR. BRISSENDEN:  Maybe if you would
25 rephrase the question it would help.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 17

1    MS. BERKOWER:  I just said, "Did you
2  discuss asserting privilege?"  I did not indicate what
3  the advice was.
4        Do you withdraw your objection?
5        MR. BRISSENDEN:  I'll allow him to answer
6  the question in a general manner.
7    Q.  (BY MS. BERKOWER)  Do you need me to repeat
8  the question?
9    A.  Would you rephrase your question?
10    Q.  Did you discuss asserting privilege over the
11  documents you produced to your attorneys?
12    A.  No.
13    Q.  How do you usually communicate with your
14  staff?
15    A.  Verbally.
16    Q.  Do you ever e-mail them?
17    A.  Very rarely.
18    Q.  When do you e-mail them, as a general matter?
19    A.  When?
20    Q.  Well, like what context?  You can't -- you
21  have two offices, so you can't see all your staff in
22  person all the time.
23    A.  On the phone.  I mean, I speak to them.  I'm
24  dyslexic.  I don't e-mail very easily.
25    Q.  Okay.

## 18

1    A.  So I'm very verbal.
2    Q.  Okay.
3    A.  So most responses to e-mails from me are
4  either "yes" or "no" or rather brief and rather short
5  or I make a phone call.
6    Q.  So do you usually communicate with your staff
7  either in person or over the phone?
8    A.  Most usually.
9    Q.  How are documents maintained in your office,
10  to your knowledge?
11    A.  My knowledge is somewhat limited on that, but
12  my understanding is that basically weekly e-mail
13  correspondence is -- or immediately, but is either
14  saved and properly filed or deleted.
15    Q.  Do you have a retention policy in your office?
16    A.  We do in the regard that they hold -- you
17  know, they keep things that need to be saved.  And
18  those that do not are deleted.  And then within, I
19  believe, 30 days they're deleted off the legislative
20  council system.
21    Q.  How do you decide what should be saved versus
22  deleted?
23    A.  I don't really know.
24    Q.  Is there someone in your office who would
25  know?

## 19

1    A.  I guess my chief of staff and other staff
2  members and I talk about whether we need to keep
3  something, or they decide.  I guess, generally
4  speaking, constituent correspondence that would be
5  ongoing we would keep.
6    Q.  Is there any one person in your office who's
7  generally responsible for document retention?
8    A.  No.
9    Q.  And so just to be clear, do you have a
10  specific record retention policy in your office?
11    A.  No.
12    Q.  Have you ever implemented a litigation hold in
13  your office?
14    A.  I do not know.
15    Q.  Do you know who would know?
16    A.  Not really, no.
17    Q.  Do you ever maintain any files specific to
18  particular pieces of legislation?
19    A.  Yes.
20    Q.  When do you do that?
21    A.  During session.
22    Q.  Do you ever maintain those files after the
23  session ends?
24    A.  I'm not certain.
25    Q.  Who would know the answer to that question?

## 20

1    A.  I guess my chief of staff.
2    Q.  Who is that?
3    A.  Shera Eichler.
4    Q.  Did you maintain any files specific to
5  S.B. 362 in the 81st Legislature?
6    A.  I would assume we did.
7    Q.  Do you know if you still have those files?
8    A.  I do not know.
9    Q.  Do you think that you still have those files?
10    A.  In complete honesty, I don't really know.
11    Q.  What about S.B. 14 from the 82nd Legislature,
12  did you maintain any files specific to that piece of
13  legislation?
14    A.  I don't know.  We probably would not have had
15  a file being I did not carry that bill.
16    Q.  Do you maintain files on your -- on your
17  network drive concerning particular -- any particular
18  legislation?
19    A.  I don't.
20    Q.  Have you ever archived e-mail concerning
21  particular legislation?
22    A.  I believe they -- I don't know how they
23  exactly do that.  I don't know if they save e-mail
24  specific to legislation or specific to the constituent.
25  Probably both.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                    June 6, 2012

---

### 21

1    Q.   Who would know the answer to that question?
2    A.   Someone in my office.
3    Q.   Would that be Shera Eichler again?
4    A.   Possibly.
5    Q.   Anybody else in particular you think would
6    know the answer to that question?
7    A.   Possibly her or -- I guess she would know
8    maybe.
9    Q.   What searches exactly were conducted for
10   documents prior to this deposition?
11   A.   I don't know exactly.
12   Q.   During the legislative session, how often do
13   you communicate with your staff generally?
14   A.   Daily.
15   Q.   Do you also communicate with other legislators
16   daily?
17   A.   Not every day, but the days that I would be in
18   Austin I would probably run into a legislator.
19   Q.   How often during the week of the legislative
20   session do you communicate with your staff via e-mail?
21   A.   Do you mean them e-mailing me or me e-mailing
22   them?
23   Q.   Either one.
24   A.   They probably e-mail me frequently and I
25   probably e-mail them infrequently.

### 22

1    Q.   In a given day what does "frequently" mean,
2    just to approximate?
3    A.   And you're speaking this session?
4    Q.   Yes.
5    A.   Actually, they may -- you know, not to be
6    difficult, probably on days that I'm in town, it's less
7    versus days that I'm not in town, it's probably more.
8    Q.   Is that because you're able to talk to them in
9    person then?
10   A.   Correct.
11   Q.   Would you say it's ten e-mails when you are
12   not there?
13   A.   I doubt it's ten.
14   Q.   Less than ten?
15   A.   Most likely, yes.
16   Q.   And when you are not in Austin is it less than
17   ten e-mails a day?
18   A.   Certainly.
19   Q.   How many phone calls do you have a day when
20   you're not in Austin, with your staff here in Austin?
21   A.   Maybe one.
22   Q.   How long would that call last?  Is it like a
23   long call where you sort of discuss everything or --
24   A.   Maybe 30 minutes.  It just -- it -- but
25   obviously it would vary.

### 23

1    Q.   Do you ever exchange text messages with your
2    staff?
3    A.   Rarely.
4    Q.   When, in your memory, have you exchanged text
5    messages with your staff?
6    A.   Well, I mean, we do text.  Over the last
7    couple of years, just as every other normal person uses
8    text.  But we use it less than most because, as I've
9    stated, I don't really like writing.
10   Q.   Have you ever texted your staff from the floor
11   of the House?
12   A.   I guess it's safe to say I probably have.
13   Q.   Do you remember when that happened?
14   A.   Not specifically, no.
15   Q.   When you talk with your staff do you use an
16   official government phone or your personal phone?
17   A.   Personal.
18   Q.   And when you communicate with them by e-mail,
19   do you use official government accounts or personal
20   accounts?
21   A.   Personal.
22   Q.   When you conducted the search of documents
23   relevant to Attachment A, did you check your personal
24   e-mail account for any e-mails that might be relevant?
25   A.   I believe we did.

### 24

1    Q.   You're not sure, though?
2    A.   I'm pretty certain we did.  I don't know if
3    it's of importance, but my personal e-mail also was --
4    I had to start over with that about a year ago due to
5    some weird virus.
6    Q.   Okay.  Will you be invoking any privileges
7    during your deposition today?
8    A.   Yes.
9    Q.   Which ones?
10   A.   Legislative privilege and attorney/client
11   privilege.
12   Q.   Anything else?
13   A.   I certainly would reserve the right, but I
14   don't know.
15   Q.   Have you asserted any privileges over
16   documents and other materials in your possession or in
17   the possession of your staff members that relate to
18   voter identification legislation?
19   A.   I think we have, yes.
20   Q.   And what -- can you be more specific, if you
21   know what in particular you --
22   A.   I think we've used the legislative privilege.
23   Q.   Would that be over documents that you've
24   produced pursuant to the searches you conducted?
25   A.   I believe that's correct.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

25

1    Q.  Do you know if any documents that relate to
2  voter identification that you located in your office
3  have been withheld from production as a result of your
4  assertion of privilege?
5         MR. BRISSENDEN:  I'll instruct you, to
6  the extent you can answer the question, go ahead,
7  without divulging or disclosing communications that
8  you've had with myself and with Patrick and other
9  attorneys at the Attorney General's office, if you can
10 answer the question.
11        MS. BERKOWER:  I just asked if he knew if
12 any documents had been withheld.  I did not ask what
13 documents or why.
14        THE WITNESS:  Right.  I believe some
15 were, due to privilege.
16    Q.  (BY MS. BERKOWER)  Can you explain why you're
17 asserting the legislative privilege today?
18        MR. BRISSENDEN:  Again, the instruction
19 will be the same.  If you can answer the question
20 without disclosing privileged communications that
21 you've had with your attorneys, myself included, you
22 may answer.  Otherwise, I instruct you not to answer.
23        THE WITNESS:  Because it's a privilege
24 that exists and it's a right that we have, and I think
25 it's important.

---

26

1    Q.  (BY MS. BERKOWER)  Would you consider waiving
2  the privilege today?
3    A.  No.
4    Q.  If you would like to waive the privilege in
5  response to a particular question that I ask during
6  this deposition, will you say so?
7    A.  If I choose to, sure.
8    Q.  Could you describe your educational
9  background?
10   A.  In what regard?
11   Q.  Just generally.
12   A.  I graduated from Angleton High School in 1990,
13 and then went to St. Edward's University and graduated
14 in 1994.
15   Q.  What did you study when you were in college?
16   A.  I guess you mean my major?
17   Q.  Sure.
18   A.  Okay.  Political science, among other -- you
19 know, I obviously took a full required course.
20   Q.  Did you do any graduate work?
21   A.  No.
22   Q.  Can you list all the jobs you've had since you
23 graduated from college?
24   A.  Sure.
25   Q.  Do you mind doing that?

---

27

1    A.  Do you mean jobs where I was paid or -- not to
2  be difficult, but -- or internships also or --
3    Q.  I guess just start right when you graduated,
4  and I'll let you know if we can skip over a few.
5    A.  Okay.  My first job was with the Can
6  Manufacturers Institute in Washington, D.C.  I left
7  there to return home to run for office and worked for
8  Master Data Systems, I believe, or Services.  I forget
9  what we called the company, an Internet-providing
10 company.
11       From there I worked for Neal Insurance.
12 I guess, technically speaking, during that period, I
13 guess, even though at $600 a month, I got the
14 employment under the State of Texas as a state
15 representative.
16       I then worked, after Neal Insurance, for
17 Trinity Industries -- actually, Trinity Aggregates, a
18 subsidiary of Trinity Industries.  And then I started
19 Bonnen Clawson Insurance and -- actually, Bonnen
20 Clawson might have been before Trinity.  I can't
21 remember.  I apologize.
22       And then I worked for First Community
23 Bank.  First Community Bank was sold to Wells Fargo and
24 I worked for Wells Fargo.  I then left Wells Fargo and
25 briefly worked for Moody Bank and then began Heritage

---

28

1  Bank Corp.  And, in turn, I worked for Heritage Bancorp
2  and Heritage Bank, which is a wholly-owned subsidiary
3  of the Bancorp that we traded.  And I'm presently
4  employed by Heritage Bank and the -- I guess,
5  technically, the Texas House of Representatives.
6    Q.  So what type -- what type of work do you do
7  for the bank?
8    A.  I am chairman of the board, CEO, and president
9  of the bank.
10   Q.  What made you decide to run for office
11 initially?
12   A.  Do you want the short answer or the long
13 answer?
14   Q.  How long is the short answer?
15   A.  I ran -- no offense to pretty much all but you
16 and me in the room, because my family had been very
17 involved with our local community and I had been raised
18 to involve yourself in the local community, be
19 supportive and volunteer.  And there were some
20 attorneys who were running -- who were running, in my
21 view, to promote and enhance the prestige of the local
22 firm and practice.
23       And so I ran because I had been taught to
24 give back and to be supportive and involved in the
25 local community.  And so that's why I ran.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

**29**

1    Q. And you moved back from Washington, D.C. to
2    run?
3    A. Correct.
4    Q. You were the youngest House member when you
5    first won; is that correct?
6    A. Well, at -- during that session, yes, at the
7    time. I was not the youngest historically.
8    Q. So what year were you first elected to the
9    House?
10   A. It was the '96 election cycle, and I was sworn
11   in, I guess, January of '97.
12   Q. What are the demographics of your district?
13   A. I don't know.
14   Q. Have you ever known?
15   A. Have I ever reviewed them on a website, yes.
16   But have I ever probably had that information where I
17   could regurgitate it, no.
18   Q. And I should have asked this before.
19   A. That's okay.
20   Q. Which district do you represent?
21   A. District 25.
22   Q. Where is that located?
23   A. Well, presently it is basically Southern
24   Brazoria County. But from re-districting, it will,
25   moving forward, include Matagorda County for the first

---

**30**

1    time.
2    Q. How big is your district, population-wise.
3    A. Gosh, presently -- I don't know. Presently
4    it's probably around, as we sit today, 140,000 -- well,
5    maybe more like 130,000.
6    Q. Was it -- has it grown a lot in the time that
7    you've represented it?
8    A. Let me think about this. That's a little
9    difficult to answer because in the late '90s it did
10   grow a lot because I had the north end of Brazoria
11   County.
12        In the 2000 and 2001 redistricting, I no
13   longer retained the north end of the county and
14   remained in the southern end of the county. And in the
15   last decade the district actually shrunk slightly. So
16   in the beginning of my tenure, I guess you could say it
17   grew a fair amount, and then in the last ten years due
18   to the change of the makeup of the district it was
19   really probably more flat with maybe a slight decline.
20   Q. How many staff do you have?
21   A. Three.
22   Q. Does that include both the district office and
23   the Austin office?
24   A. Correct.
25   Q. Who are those staff members?

---

**31**

1    A. Jessica Effenberger, who I believe started in
2    February of this year, somewhere around there.
3    Steven Schar, who started with us after last session at
4    some point. And then Shera Eichler, who's been with
5    me -- I don't know -- eight years or so, eight or
6    nine years.
7    Q. Do they work in both the district office and
8    the Capitol office?
9    A. Not really. Jessica Effenberger is in the
10   district office and Shera Eichler and Steven Schar are
11   in the Capitol office. Obviously, there are rare
12   occasions where they maybe travel to one or the other,
13   but that's very rare.
14   Q. Could you list each and every person who's
15   voted on voter ID legislation from your office from
16   2005 to the present?
17   A. I will certainly try. I will probably not do
18   it effectively, but I will try. Shera Eichler
19   certainly has worked on it. I guess Steven Schar has.
20   Gosh, you know, going back to '05, I don't even know.
21   I apologize.
22   Q. What about --
23   A. Certainly if we pulled a roster of staff I
24   could tell you.
25   Q. What about if we focus just on the 81st and

---

**32**

1    82nd Legislative Sessions?
2    A. Sure.
3    Q. Who worked on it in those sessions, do you
4    remember?
5    A. Shera Eichler definitely would have.
6    Linda Winder would have in a limited extent in that
7    Linda Winder was in the district office. Actually, in
8    all fairness, Linda wouldn't have worked on
9    legislation. She would have more dealt with
10   constituent comments and issues.
11        I apologize. I'm trying to think who --
12   oh, I guess Carson Hooks may have worked on it. He, I
13   believe, worked the '09 session.
14   Q. What was his position with you in the
15   2009 session?
16   A. Legislative staff.
17   Q. And what was Ms. Winder's position with you?
18   A. District assistant and district director. She
19   wouldn't have worked specifically on legislation. She
20   would have, as I stated, more done correspondence with
21   constituents and things of that sort.
22   Q. But Mr. Hooks would have worked on
23   legislation?
24   A. To some extent, sure.
25   Q. Did you recently campaign for office?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                June 6, 2012

---

## 33

1       A.  No, not really.
2       Q.  What do you mean by that?
3       A.  I was lucky enough to be unopposed.
4       Q.  Was that in the election on May 29th?
5       A.  Correct.  And in November.
6       Q.  You were also unopposed in November?
7       A.  Correct.
8       Q.  So what was the extent of any campaign that
9    you did?
10      A.  In my mind, I did no campaigning, to be candid
11   and honest.  I certainly went to community events,
12   civic events and was involved in the community.  But I
13   don't consider that -- that's more my responsibility as
14   a representative and things I do year in and year out
15   regardless of campaign or not.
16          So from a true campaigning election
17   perspective, I did really nothing and simply did my
18   normal activities in being a positive representative
19   involved in his local community as I should be.
20      Q.  When is the last time you had to campaign
21   against an opponent?
22      A.  I don't know.  I guess maybe six years ago.
23   And probably then it was not much of one.
24      Q.  Do you remember if voter identification was an
25   issue in that campaign?

---

## 34

1       A.  I don't think it was.  I've not had much of a
2    campaign.
3       Q.  When is the last time you voted?
4       A.  I guess it would be May 29th.
5       Q.  Did you vote in person that day?
6       A.  No, I voted early, in person early.
7       Q.  So in person early for the May 29th election?
8       A.  Correct.
9       Q.  How far is your polling place from where you
10   live?
11      A.  It depends on which one they're sending me to
12   that day.  I guess -- well, to be clear, do you mean
13   the one that I used for early voting or the one that
14   would be used on the day of the election?
15      Q.  Well, I guess both.  Just first, where is your
16   early voting location and how far is it located from
17   your house?
18      A.  I don't know exactly by miles.  It's on the
19   other side of town.  But I live in a town of about
20   19,000, so the other side is not significantly far.
21   It's probably -- please don't hold me to this.  I'm
22   guessing -- five to ten miles at the most for the early
23   voting pole.
24          The election day location is probably,
25   you know, three miles away.

---

## 35

1       Q.  Do you usually vote in person?
2       A.  Not to be ignorant, but when you say "in
3    person," you mean -- obviously, I'm not allowed to vote
4    by mail.  So you mean early or on election day,
5    correct?
6       Q.  Yes.
7       A.  Yes, absolutely.
8       Q.  When you have gone in person to vote, have you
9    ever witnessed anyone trying to impersonate another
10   voter?
11      A.  No.
12      Q.  Have you ever witnessed a noncitizen trying to
13   vote?
14      A.  Not that I would be aware of.  But I pretty
15   much stick to myself and leave people alone when I'm
16   voting, as you should.
17      Q.  So maybe the next question you've already
18   answered, but have you ever challenged a voter's
19   eligibility at the polls?
20      A.  Have I?  No.
21      Q.  Have you ever seen it happen?
22      A.  Well, no.
23      Q.  Have you ever served on any committees in the
24   House that have handled election issues?
25      A.  Yes, I guess I have.

---

## 36

1       Q.  What are those?
2       A.  I guess in 2009 I was on the elections
3    committee, and then last session I guess the select
4    committee.  In the 11th session, the select committee I
5    chaired, that only handled one issue.
6       Q.  What's the name of that committee?
7       A.  I apologize.  I'm not even sure.  It's the
8    select committee on -- I don't know.
9       Q.  Voter identification and voter fraud maybe?
10      A.  You're exactly right.
11      Q.  Okay.
12      I'm not trying to be -- I just --
13      Q.  Were you also on a House select committee on
14   election contests?
15      A.  Oh, I apologize.  Yes.  Yes, I was.  Well, I
16   don't know if it was -- you would know.  I'm sure
17   you've done your homework.  It was on a specific
18   contest, not broadly speaking.
19      Q.  Okay.  I was going to ask you exactly what
20   that committee was.
21      A.  It -- well, now I'm going to screw up, but to
22   the best of my ability I will describe it.  We have a
23   process in Texas that I will screw up royally.  But to
24   my knowledge, or to my limited understanding, after the
25   election, if there has been, I guess, a recount and

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

## 37

1    someone chooses to continue in a legislative race -- I
2    think it's only a legislative race -- I could be wrong
3    about that, though -- chooses to contest that race,
4    chooses to continue the -- to question the outcome, the
5    validity of that, they are able to then take that to
6    the Texas Legislature.
7            And that committee was created to review
8    the election in question, which I don't remember the
9    House district.  I know it was an Austin district,
10   Travis County, and that we sided with the -- we sided
11   against the Republican candidate who brought the
12   contest and sided with the Democratic candidate, who
13   was Donna Howard.
14       Q.  What years did you serve on the elections
15   committee?
16       A.  I guess that would be the 2009 session and
17   then into the 2010 era.
18       Q.  Were you on the elections committee in any
19   other sessions?
20       A.  I'm pretty certain I wasn't.
21       Q.  And what about the select House committee and
22   voter identification fraud?  What years did you serve
23   on that committee?
24       A.  I guess technically I currently am on it now
25   and in 2009.

## 38

1        Q.  There -- it was in 2009 as well?
2        A.  I'm sorry.  I misspoke.  Thank you.  2011.  I
3    apologize.
4        Q.  So just the 82nd Legislative Session?
5        A.  Correct.  That's correct.
6        Q.  How did you come to serve on those committees?
7            MR. BRISSENDEN:  I'm going to instruct
8    you that to the extent that you had communications with
9    other legislators about the selection process, your
10   appointment to serve on those committees, I instruct
11   you not to answer.
12           THE WITNESS:  I'm simply appointed.
13       Q.  (BY MS. BERKOWER)  Who appointed you?
14       A.  It is through the committee appointment
15   process that the Speaker of the House is responsible
16   for.
17       Q.  Did you have any communications with the
18   Speaker of the House about your appointment?
19       A.  I guess that would be privileged, wouldn't it?
20           MR. BRISSENDEN:  I'll instruct you --
21   same instruction.
22           If you can answer the question generally
23   without disclosing substance of communications or
24   privilege, you may answer.
25           THE WITNESS:  The only communication I

## 39

1    had was the Speaker calling me to tell me that I was
2    being put on the committee.
3        Q.  (BY MS. BERKKOW)  Was that the first time you
4    had heard about the committee?
5        A.  I had no clue it existed before then.
6        Q.  Okay.  Have you -- had you had any experience
7    in election law prior to serving on the House Elections
8    Committee in 2009?
9        A.  What would you mean by "experience"?
10       Q.  In any capacity, I guess.  Well, you're not an
11   attorney --
12       A.  Right.
13       Q.  -- so was that your first involvement with
14   election law, being on that committee?
15       A.  I would say that's accurate.  Certainly being
16   an elected official and going through some campaigns
17   and things you have to be aware of some things
18   regarding election law.  But to suggest that I even be
19   on that committee, much less became a particular expert
20   on it, wouldn't be entirely accurate.
21       Q.  Have you ever been the chair of a committee
22   relating to election issues?
23       A.  I guess in 2011 and the select committee.
24       Q.  So maybe just for ease of reference, when we
25   talk about the select committee we'll just be assuming

## 40

1    we're referring to the select committee and voter
2    identification voter fraud?
3        A.  Correct, yes, because I don't know the name of
4    it.
5        Q.  Okay.  If it turns out that you're referring
6    to a different select committee you can just specify.
7        A.  Absolutely.
8        Q.  Okay.  So what responsibilities does a House
9    member have as chair of a committee?
10       A.  I think the greatest responsibility is to
11   ensure that the committee is conducted within the rules
12   of the House and that all members and all witnesses and
13   all issues are given the highest degree of respect and
14   the opportunity to be heard.
15       Q.  What, in particular, rules -- are there
16   particular rules that you're referring to when you say
17   the rules of the House have to be respected?
18           MR. BRISSENDEN:  I'm going to instruct
19   you that in terms of your knowledge and experience
20   based upon the particular -- your service on a
21   particular select committee, if you developed a
22   knowledge and experience based upon your service on
23   that select committee with regards to voter ID and
24   S.B. 14, if that requires you to disclose that
25   information in regards to this question, I instruct you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                              June 6, 2012

---

**41**

1   not to answer.
2          To the extent that you can answer the
3   question without disclosing that information based upon
4   general experience and in general terms, you may
5   answer.
6          THE WITNESS:  I mean, just -- what I'm
7   referring to is simply generally following the rules
8   that the House adopts at the beginning of each
9   legislative session that govern the practices of the
10  Texas House and its committee and its work procedure.
11      Q.  (BY MS. BERKOWER)  And what are the procedures
12  in place -- sorry.  Let me start that question over.
13      A.  Sure.
14      Q.  You said that you felt that as the chairman of
15  the -- the chairman of the House committee has the
16  responsibility to ensure that everyone has an
17  opportunity to be heard.
18      A.  Uh-huh.
19      Q.  What procedural -- what procedures are there
20  to ensure that everyone has an opportunity to be heard?
21          MR. BRISSENDEN:  Again, I'm going to
22  instruct you that with regards to information,
23  experience, knowledge that you have in relation to your
24  service on the select committee related to the voter ID
25  bill, if it requires you to disclose that information,

---

**42**

1   rules, procedures, I will instruct you not to answer.
2          To the extent that you can answer the
3   question without disclosing that information in general
4   terms, you may answer.
5          MS. BERKOWER:  I think -- just to be
6   clear, I think your objection is a little premature.
7   I'm asking him general questions about the House -- the
8   responsibilities of a chairman of any committee in the
9   House, and generally what the House procedures are to
10  ensure.
11          MR. BRISSENDEN:  Well, I believe your
12  question was a little bit more in particular about his
13  service.  And so if he can -- if he can answer the
14  question based on general terms and general procedure,
15  I believe that's permissible and I'll allow him to
16  answer.
17          MS. BERKOWER:  I said what
18  responsibilities does a member have as chair of a
19  committee in the House.  That's a general question, and
20  I don't think your objection is applicable to that
21  question.
22          MR. BRISSENDEN:  My instruction is the
23  same.
24          THE WITNESS:  Generally speaking, the
25  responsibilities are what are in the rule book that we

---

**43**

1   approve at the beginning of every legislative session.
2      Q.  (BY MS. BERKOWER)  And I think I also had
3   asked you a question about what procedures do the House
4   rules have to ensure that everyone has an opportunity
5   to be heard?
6      A.  Specifically, I'm -- you know, it's what's in
7   the book.  I don't have it in front of me.
8      Q.  Do you remember any of the procedures?
9      A.  Not off the top of my head.
10     Q.  So as the chair of the select committee, were
11  you familiar with the committee?  Just as a general
12  matter, do you have familiarity with the committee,
13  when it met, the proceedings?
14     A.  Generally speaking.
15     Q.  What year was the committee convened?
16     A.  2011.
17     Q.  What was the purpose of convening the
18  committee?
19          MR. BRISSENDEN:  I'm going to instruct
20  you, to the extent that that question requires you to
21  disclose your thoughts, opinions, mental impressions,
22  and analysis about legislation, about the legislative
23  act of convening the committee, I'm going to instruct
24  you not to answer the question.
25          THE WITNESS:  I wouldn't know.

---

**44**

1      Q.  (BY MS. BERKOWER)  Why wouldn't you know?
2          MR. BRISSENDEN:  Same instruction.
3      Q.  (BY MS. BERKOWER)  Are you following the
4   advice of counsel and not answering?
5      A.  Yes, I'm following the advice of counsel.
6      Q.  Okay.  Who convened the committee?
7          MR. BRISSENDEN:  Same instruction.
8          MS. BERKOWER:  I think we're allowed to
9   ask foundational questions like who convened a
10  committee.  I think that's also probably in the public
11  record.  Can he answer to the extent that it's in the
12  public record?
13          MR. BRISSENDEN:  If it's a matter that's
14  within public record, information that you have, then
15  you can answer.
16          THE WITNESS:  What do you mean by
17  "convened the committee"?
18     Q.  (BY MS. BERKOWER)  Did somebody convene the
19  committee or call the committee or create the committee
20  in some way?  It's not a standing committee, right?
21     A.  It's in the record when committees are
22  announced.  This committee was also a part of that
23  announcement by the Speaker of the House.
24     Q.  Okay.  What types of legislation did the
25  committee hear?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 45

1    A.  I believe we heard simply one bill on voter
2    ID, Senate Bill 14.
3        Q.  Was there a reason given in the public record
4    as to why that committee was convened?
5        A.  Maybe.  I don't know.  I don't recall.
6        Q.  Can you identify any other committees that
7    were formed to consider just one bill?
8        A.  I wouldn't know.
9        Q.  Do you remember any during your time in the
10   House?
11       A.  Oh, I'm certain of it, yes.
12       Q.  Do you remember --
13       A.  Maybe not one bill, but certainly one issue.
14       Q.  So in your memory, there were not any other
15   committees that were formed to consider just one bill
16   during your time in the House?
17       A.  I'm not saying there weren't.  I don't know.
18       Q.  Well, you don't remember any?
19       A.  No, I remember -- you're speaking specifically
20   to one bill, but committees are not arranged for a
21   bill; they're arranged for a subject matter.  And there
22   have been multiple committees arranged for one specific
23   subject matter.
24       Q.  Did any of those committees consider just one
25   bill, to your memory?

### 46

1        A.  I don't know.  I would imagine some did, but I
2    don't know.
3        Q.  And I think you said that your committee
4    considered just one bill, right?
5        A.  I'm almost certain of that.
6        Q.  Are you aware of any communications among
7    legislators concerning the creation of a special
8    committee?
9        A.  No.
10       Q.  Does the Speaker also assign members to the
11   committee?
12       A.  That is the Speaker's responsibility, yes.
13       Q.  Was the select committee a fast-track
14   committee?
15           MR. BRISSENDEN:  Objection, vague.
16           To the extent that you can answer the
17   question based upon information that you have -- or
18   knowledge that you have from the public record that's
19   contained therein, you may answer.  To the extent that
20   you have knowledge, information based upon information
21   not in the public record or that you learned from
22   communications with other legislators, legislators'
23   staff, your own staff, Texas Legislative Council, and
24   state agencies, I would instruct you not to answer.
25           THE WITNESS:  I don't know what a

### 47

1    fast-track committee is.
2        Q.  (BY MS. BERKOWER)  Okay.  Were there any bills
3    submitted during the 82nd Legislature to address
4    mail-in voter fraud?
5        A.  I do -- I would assume there was, but I don't
6    know.
7        Q.  Were they referred to the select committee?
8        A.  I do not know for certain.
9        Q.  I think you said a few minutes ago that the
10   select committee considered only one bill.
11       A.  That would be correct.  I'm almost certain
12   that's correct.  I would have to check the record, but
13   I think that's accurate.
14       Q.  Well, actually, I can --
15       A.  Yeah, no.  That's -- I just don't want to give
16   you inaccurate information, but I believe that's right.
17       Q.  Okay.
18       A.  Can I visit with Reynolds a moment?
19       Q.  Yes.
20           MR. BRISSENDEN:  Do you want to take a
21   short break?
22           MS. BERKOWER:  Sure.  Or if -- I'm just
23   looking for this exhibit.
24           MR. BRISSENDEN:  Yeah, just -- no, we
25   only need to take a second.  I want to visit with him

### 48

1    privately.
2            MS. BERKOWER:  Okay.  That's fine.  We'll
3    take a short break.
4            MR. BRISSENDEN:  Okay.
5            (Recess from 10:43 a.m. to 10:51 a.m.)
6        Q.  (BY MS. BERKOWER)  I think we were talking
7    before the break about the special -- the select
8    committee, and I have what we will mark as Exhibit 431.
9            (Exhibit No. 431 marked)
10       Q.  (BY MS. BERKOWER)  Do you know what this is?
11       A.  It appears to be the committee notice of a
12   meeting.  I'm sorry.  No, this is -- this says it's --
13   it seems to be a report about the bills that were voted
14   on a committee.
15       Q.  Okay.  So would this explain which bills were
16   heard by the committee?
17       A.  Technically, no, it wouldn't, but, yes, it
18   does.  You know, there's another report that would tell
19   you what all bills were heard.  But, yes, this says --
20   this is what bills were -- came out of the committee is
21   what this report covers.
22           With that said, I believe it is the only
23   bill that was also heard.  But that's not what this
24   report speaks to.
25       Q.  I see.  But it is accurate that this is the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

| 49 |
|---|

1    only bill that the select committee heard?
2        A.  I believe that is accurate.
3        Q.  Sir, I think before the break I had asked you
4    if any bills submitted during the 82nd Legislature that
5    addressed mail-in voter fraud were referred to this
6    committee and you couldn't remember.
7        A.  No.
8        Q.  Does this refresh your memory?
9        A.  No, it doesn't.
10       Q.  Well, you said this is the only bill that the
11   committee heard.  Is that true?
12       A.  I believe it's the only one heard.  But the
13   question you asked is if any had been referred to the
14   committee.  And I don't know what bills had been
15   referred over there versus what was heard.
16       Q.  Okay.  So sometimes bills are referred to a
17   committee but not heard?
18       A.  That's correct.
19       Q.  I see.  But to your memory, you don't remember
20   hearing any bills about mail-in voter fraud as part of
21   the select committee.  Is that accurate?
22       A.  That would be accurate.
23       Q.  And who decides where bills are sent with
24   regard to which committee they're sent to?
25           MR. BRISSENDEN:  To the extent you can

| 51 |
|---|

1        Q.  I'm asking you.
2        A.  I'm not certain.
3        Q.  Is there --
4        A.  I don't know whether it's parliamentarian or
5    the Speaker's office who has declared the authority on
6    that.
7        Q.  Are those generally referred according to
8    subject matter to different committees?
9        A.  Usually.
10       Q.  Sometimes they're not, though?
11       A.  That would be correct.
12       Q.  Is there any rhyme or reasoning as to when
13   they're not referred by subject matter?
14           MR. BRISSENDEN:  To the extent you can
15   answer that question based upon information that's in
16   the public record or with regards to general procedural
17   rules, you may answer.  To the extent that you have any
18   knowledge or the question requires you to disclose
19   communications, information that you have based upon
20   communications with other legislators or your staff or
21   their staff, I instruct you not to answer.
22           THE WITNESS:  I think, to answer your
23   question, the issue is -- and it would be specific to
24   the issue you're concerned about -- is that many times
25   there are bills that fall clearly within the

| 50 |
|---|

1    answer that question based upon -- the question refers
2    to as a general matter.  I believe you're asking as a
3    general matter, general procedural?
4           MS. BERKOWER:  I'm asking as a general
5    matter who decides where bills are referred to.
6           MR. BRISSENDEN:  You can answer.
7           THE WITNESS:  You know, that's a
8    mysterious question that many legislators would like to
9    better know the answer to.  And the accuracy of my
10   comment is proven by laughter at the end.
11           But from a technical matter -- well, I
12   don't want to be incorrect.  I think technically
13   speaking it is the Speaker's office or the
14   parliamentarian -- or maybe it's the House
15   parliamentarian -- who would decide the referral of
16   bills.
17       Q.  (BY MS. BERKOWER)  So when you said -- just to
18   follow up on what you said, that a lot of legislators
19   would like to know more specifically who decides, why
20   don't -- like, what do you mean by that?
21       A.  Well, I think more generally they're obviously
22   being -- I don't know if it's specifically -- I guess
23   it is specifically described in the rules, and I don't
24   know what the rules say in that area.  Is it the
25   parliamentarian or --

| 52 |
|---|

1    jurisdiction of more than one committee.  And so that
2    bill or other similar bills may be referred in some
3    instances.  Some of those bills that look the same may
4    go to one committee while other bills who look the same
5    may go to another committee because both committees, or
6    even three or four committees -- not normally as many
7    as four, but maybe two or three -- have overlapping
8    jurisdiction where arguments can be made intelligently
9    that they could go to those committees.
10       Q.  (BY MS. BERKOWER)  So do you know why S.B. 14
11   was not referred to the elections committee?
12       A.  I do not.
13           MR. BRISSENDEN:  Objection, legislative
14   privilege.  I instruct you not to answer.
15           MS. BERKOWER:  Well, to be clear,
16   Reynolds, I asked him if he knew.  I did not ask him
17   the substance of what he knew.  And those are questions
18   that we've been permitted to ask, initial questions,
19   throughout all of the depositions that we've conducted
20   in this case.
21           MR. BRISSENDEN:  I disagree with your
22   analysis.
23           MS. BERKOWER:  Well, we can cite
24   authority in the court -- from the court's opinions if
25   you would like.  We can take a break and go through



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN

June 6, 2012

## 53

1     that and I can show you excerpts from other depositions
2 in which those questions have been permitted.
3         MR. BRISSENDEN:  Well, I've gone through
4 the court's order of yesterday that was issued, and it
5 specifically addresses and outlines all the different
6 landscape of the privilege.  And then I think -- well,
7 I think my analysis is correct and I'll stand by the
8 instruction.
9         MS. BERKOWER:  Well, to be clear, we're
10 tailoring our questions today in accordance with the
11 court's instructions because you recognize that the
12 court did actually rule on the motion and defined
13 several areas of privilege in which we are not supposed
14 to be asking questions.
15         MR. BRISSENDEN:  Okay.
16         MS. BERKOWER:  And, for the record, we do
17 not agree with the court's view on that, but we will
18 be -- we plan to preserve our objections for the future
19 and for the record.  But with regard to question of "do
20 you know why," a yes or no question that's
21 foundational, doesn't get into substance, we believe
22 those questions are permissible even under the court's
23 order of yesterday.
24         MR. BRISSENDEN:  And I disagree with your
25 analysis.  It's invading his opinions, his thought

## 54

1 processes, what he knows and doesn't know.  And that's
2 with regard to legislative acts and specifically
3 S.B. 14.
4         MS. BERKOWER:  Okay.  We'll move on.
5     Q.  (BY MS. BERKOWER)  Are you familiar with the
6 Federal Voting Rights Act?
7     A.  I know of its existence.
8     Q.  Are you familiar with Section 5 of the Voting
9 Rights Act?
10     A.  I'm aware it exists.
11     Q.  What is your understanding of the
12 requirements, if you --
13     A.  It's the law of the land.
14     Q.  Do you know any specifics about what Section 5
15 requires?
16     A.  Not really.  I know you're to not
17 discriminate.
18     Q.  What do you mean by that?
19     A.  What I said.
20     Q.  Well, in what way are you not supposed to
21 discriminate?
22     A.  In any way.
23     Q.  Does it relate specifically to voting?
24     A.  I assume so.  I've not studied the Act.
25     Q.  And is the -- when you say you're "not to

## 55

1 discriminate," does that relate to racial and ethnic
2 minorities?
3     A.  Usually that's what discrimination means.
4     Q.  What about language minorities, people who are
5 limited in English proficiency?
6         MR. BRISSENDEN:  I'm going to instruct
7 you to the extent that you can answer that question
8 with regards to your general knowledge outside of the
9 work that you did in relation to S.B. 14, you may
10 answer.  To the extent that you have knowledge with
11 regards to -- that you developed with regards to the
12 Voting Rights Act in connection with your work
13 specifically on S.B. 14, I would instruct you not to
14 answer.
15         THE WITNESS:  I'll accept his
16 instruction.
17     Q.  (BY MS. BERKOWER)  Okay.  Do you believe that
18 compliance with the Federal Voting Rights Act is an
19 important consideration in the lawmaking process?
20         MR. BRISSENDEN:  Objection, vague.
21     Q.  (BY MS. BERKOWER)  You may answer.
22     Q.  Could you repeat the question?
23     Q.  Do you believe that compliance with the
24 Federal Voting Rights Act is an important consideration
25 in the lawmaking process?

## 56

1         MR. BRISSENDEN:  Again, I'm going to
2 instruct -- first of all, the question is vague.
3 Secondly, I'm going to instruct you that to the extent
4 that you have information and knowledge and the
5 question requires you to disclose information and
6 knowledge in connection with your work specifically in
7 connection with S.B. 14, I instruct you not to answer.
8 To the extent you can answer the question in general
9 terms, you may answer.
10         THE WITNESS:  Repeat it again.
11     Q.  (BY MS. BERKOWER)  I asked if you believe that
12 compliance with the Federal Voting Rights Act is an
13 important consideration in the lawmaking process?
14         MR. BRISSENDEN:  Same instruction.
15         THE WITNESS:  Generally we try to follow
16 the law.
17     Q.  (BY MS. BERKOWER)  Prior to S.B. 14's passage
18 did you understand that it would be subject to
19 preclearance under Section 5?
20         MR. BRISSENDEN:  I'm going to instruct
21 the witness if that information -- that question
22 requires you to disclose thoughts, opinions, mental
23 analysis, mental impressions about S.B. 14, I instruct
24 you not to answer the question.
25         MS. BERKOWER:  You're not letting him



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 57

1    answer a question asking if he knew that preclearance
2    existed?
3         MR. BRISSENDEN:  Absolutely.
4         THE WITNESS:  I accept his instruction.
5         Q.  (BY MS. BERKOWER)  Okay.
6         Do you know what types of changes -- do
7    you know what types of voting changes Section 5 applies
8    to?
9         A.  No.
10        Q.  Do you know if it applies to redistricting?
11        A.  No.
12        Q.  Have you ever received legal advice on
13   election-related matters with regards to Section 5
14   compliance?
15        MR. BRISSENDEN:  Can you read the
16   question back again?
17        Q.  (BY MS. BERKOWER)  This is a general question.
18   Have you ever received any legal advice on
19   election-related matters with regard to Section 5
20   compliance?
21        MR. BRISSENDEN:  I'm going to instruct
22   you to the extent that question requires you to
23   disclose information and knowledge that you received or
24   didn't receive as a part of your analysis leading up to
25   the vote on the S.B. 14, I would instruct you not to

---

### 58

1    answer the question.
2         To the extent that you may have received
3    information, knowledge, or advice on other work as part
4    of your work, you may answer.
5         THE WITNESS:  Would you repeat the
6    question?
7         Q.  (BY MS. BERKOWER)  I just asked as a general
8    matter, have you ever received any legal advice on
9    election-related matters with regard to Section 5
10   compliance?
11        MR. BRISSENDEN:  Same instruction.
12        THE WITNESS:  I'll follow his
13   instruction.
14        Q.  (BY MS. BERKOWER)  Are you familiar with the
15   federal law called The Help America Vote Act?
16        MR. BRISSENDEN:  Same instruction.
17        MS. BERKOWER:  There could not be a more
18   general question for me to ask him.
19        Q.  (BY MS. BERKOWER)  Do you know if a certain
20   federal law exists?
21        MR. BRISSENDEN:  And I'll -- to the
22   extent that your question is delving into his mental
23   thoughts, mental impressions, what he's aware of and
24   what he isn't aware of in connection with his work
25   relating to S.B. 14 --

---

### 59

1         MS. BERKOWER:  I didn't ask with
2    related -- with regard to S.B. 14.
3         MR. BRISSENDEN:  Regardless, you're
4    asking him about what his mental opinions and thoughts
5    are and if he has knowledge in -- or does not have
6    knowledge in relation to his work on S.B. 14.  That
7    question invokes the privilege.  I'm going to instruct
8    the witness not to answer.
9         THE WITNESS:  Invoke privilege.
10        Q.  (BY MS. BERKOWER)  Have you ever heard of a
11   Supreme Court decision on an Indiana voter
12   identification law?
13        MR. BRISSENDEN:  Same instruction.
14        THE WITNESS:  Follow the instruction.
15        Q.  (BY MS. BERKOWER)  Have you ever received
16   public information about -- or heard a news article or
17   a news story about a Supreme Court decision on the
18   Indiana voter identification law?
19        MR. BRISSENDEN:  Same instruction.
20        THE WITNESS:  Follow the instruction.
21        MS. BERKOWER:  You're not letting him
22   answer whether he had an item on the news sitting at
23   home in his kitchen eating breakfast?
24        MR. BRISSENDEN:  That wasn't your
25   question.

---

### 60

1         MS. BERKOWER:  Fine.
2         Q.  (BY MS. BERKOWER)  Have you ever, sitting at
3    home, not as a legislator?
4         A.  On Indiana?
5         Q.  On Indiana.
6         A.  Not that I'm aware of.  And I don't eat
7    breakfast too.
8         Q.  Okay.  It's the most important meal.
9         A.  It is.
10        Q.  Are you currently a member of any community
11   organizations or groups?
12        A.  Yes.
13        Q.  What are you a member of?
14        A.  Well, I will attempt to tell you what I'm a
15   member of.  I am a member of the Angleton Chamber of
16   Commerce, the Brazos Chamber of Commerce, the Bay City
17   Chamber of Commerce.  I'm pretty sure we are members of
18   the Sweeney Chamber of Commerce, I believe the West
19   Columbia Chamber of Commerce, I think the -- I mean,
20   I'm sorry -- the Brazoria Chamber of Commerce.  I don't
21   think I'm a member of the Pearland Chamber anymore.
22        Now I'm on the board of an organization
23   called Big Love, which is a support charity for
24   children and their families battling cancer.  I don't
25   know if that's anything you're -- you're wanting listed

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

**61**

1  or not.
2      Q.  Well, I'll stop you there.
3      A.  Okay.
4      Q.  I'll just get a little bit more specific.
5      A.  Sure.
6      Q.  Are you familiar with the American Legislative
7  Exchange Council?
8      A.  I've heard of it.
9      Q.  What is it?
10     A.  It's a legislative council in the country.
11     Q.  What does it do?
12     A.  I really don't know.
13     Q.  Do you have any affiliation with it?
14     A.  I don't know.  To be very candid, I may be a
15  member.  I'm not certain.
16     Q.  Okay.  Why aren't you certain?
17     A.  Because I don't really concern myself with
18  going to legislative conferences, and that's
19  particularly the only reason most people are members.
20     Q.  To get to go to conferences?
21     A.  Correct.
22     Q.  Do you know what services it provides its
23  members, other than conferences?
24     A.  What else would there be?  I'm kidding.
25         Specifically, no, I don't know.  I'm

---

**62**

1  certain it's like other legislative conferences in that
2  it provides issue-based and, you know, policy
3  information.
4      Q.  Have you ever paid for a membership in ALEC?
5      A.  My guess is I probably have, because I think I
6  went to an ALEC conference a couple summers ago.  And
7  I'm sure we paid to be a member.
8      Q.  When was that, approximately, if you remember?
9      A.  I should remember.  And I think it was ALEC.
10  In full candor, we think of legislative conferences in
11  regard to what city they're in, not which organization
12  it is.  And so it's the one that was in San Diego, and
13  I think it was ALEC, and it was probably two or
14  three summers ago.
15     Q.  Do you remember the substance of the
16  conference?  Maybe that begs the question.
17     A.  The substance usually is very broad, broad
18  reaching, in that it will cover numerous areas of
19  policy.
20     Q.  Do you remember what that particular
21  conference covered?
22     A.  No, I don't.  But, again, I -- I don't know
23  specifically, but usually a conference like that covers
24  numerous areas and not -- seldom is there a specific
25  area.  There are many areas.

---

**63**

1      Q.  Do you know if other needs -- excuse me.
2         Do you know if other members or staff of
3  the Texas Legislature are members of ALEC?
4      A.  From hearsay, I guess I know that.  But
5  specifically -- I mean, I would be lying to say they're
6  not.  But I am not responsible to specifically know who
7  is.  So I would be disingenuous to tell you there are
8  folks who are not, but I personally don't know who is.
9      Q.  Okay.  Did you ever receive any documents from
10  ALEC related to voter ID?
11     A.  Not that I am aware of.
12     Q.  Are you familiar with the National Conference
13  of State Legislators?
14     A.  The exact same reasons I'm familiar with ALEC.
15     Q.  Have you attended any of their meetings?
16     A.  I think I have, but, again, I'm not certain.
17  I rarely go to conferences.
18     Q.  Do you remember when?
19     A.  I really don't, not to be difficult.  And for
20  the record, I'm -- I think I've been to one, maybe two
21  at the most.  And, you know, I've been a state rep for
22  15 years, so I don't -- you know --
23     Q.  Just to get a ballpark, was it in the last
24  two years that you attended?
25     A.  No, I'm pretty certain it's not.

---

**64**

1      Q.  More than five years ago?
2      A.  I don't know that.  It could have been in the
3  three to five range or longer.  I don't know.  I
4  apologize.
5      Q.  That's okay.  So maybe this also is not worth
6  asking, but do you remember what information was
7  covered at the conference you attended?
8      A.  Again, speaking both on ALEC and NCSL, those
9  conferences, the ones that I would attend are their
10  large annual conferences, and they cover a very broad
11  and far-reaching number of issues.  So, no, I don't
12  specifically -- actually, I may have been to an NCSL
13  conference, I think it was, in Nashville.  I would be
14  lying if I told you how many years ago, but over
15  five years, I think, in that range.
16         And, you know, specifically there were
17  some environmental and energy-related.  I actually went
18  there and -- you know, went to a committee of the
19  numerous committees they had.  But I don't remember
20  specifically.
21     Q.  Do you remember if other Texas legislators
22  were present when you attended?
23     A.  Absolutely.
24     Q.  Absolutely?  What about at the ALEC conference
25  that you attended?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

**65**

1      A.  Absolutely.
2      Q.  Do you remember who attended an ALEC
3  conference with you?
4      A.  Not really.  I mean, you know, we could go
5  through the roster and I could make some fairly
6  accurate guesses and some fairly inaccurate guesses.
7      Q.  Do you remember who -- which of the Texas --
8  which other Texas legislators attended the National
9  Conference of State Legislators conference that you
10  attended?
11      A.  Not specifically, no.  I think
12  Senator Van de Putte was the chair of the organization
13  at the time and was there.
14      Q.  What is the current system under state law for
15  determining -- for determining how to verify the
16  identity of a voter?
17      A.  It's whatever the law says.  I don't know the
18  law off the top of my head.
19      Q.  Do you have any sense of what the law
20  currently says?
21      A.  Not really, no.
22      Q.  Do you know if the counties issue voter
23  registration cards to voters?
24      A.  My understanding is that they do.
25      Q.  And they mail the voter registration cards to

---

**66**

1  their voters?
2      A.  They're supposed to.
3      Q.  And voters can bring those cards with them to
4  the polls?
5      A.  Yes.  They don't have to, I don't think,
6  though.
7      Q.  And if they don't have that card can a voter
8  show any ID from a various long list of IDs, including
9  non-photo IDs in order to vote?
10      A.  I don't know.
11      Q.  What about if a voter doesn't have those, can
12  they cast a provisional ballot?
13      A.  I don't know absolutely, but I believe that
14  they can.
15      Q.  Have you ever heard any reports of voter
16  registration cards being stolen?
17      MR. BRISSENDEN:  To the extent that that
18  question requires you to disclose information that
19  you -- or knowledge that you received in relation to
20  your work on S.B. 14, I instruct you not to answer.
21      To the extent that you have general
22  information or knowledge beyond your work on S.B. 14 or
23  that is information that is part of the public record
24  you may answer.
25      THE WITNESS:  Only -- only information

---

**67**

1  presented in the public conversation in the committee
2  process.
3      Q.  (BY MS. BERKOWER)  And were there reports of
4  voter registration cards being stolen during the public
5  committee?
6      A.  I don't remember specifically if that was some
7  of what was discussed, but I know generally there were
8  those type issues talked about in the public, and
9  expert testimony.
10      Q.  So the current system does require voters to
11  present identification of some sort.  Is that accurate?
12      A.  I believe it is.
13      Q.  So what was the purpose of photo
14  identification legislation in Texas given that the law
15  already requires identification?
16      MR. BRISSENDEN:  To the extent that you
17  can answer that question, generally speaking, as to
18  what the general purpose of the legislation was, you
19  may answer.
20      THE WITNESS:  The general purpose is to
21  provide the highest degree of confidence and integrity
22  in our elections.
23      Q.  (BY MS. BERKOWER)  Is there any other purpose?
24      A.  Not that I know of.
25      MS. BERKOWER:  Okay.  I think -- can we

---

**68**

1  take a short break, please, off the record?
2      (Recess from 11:15 a.m. to 11:53 a.m.)
3      Q.  (BY MS. BERKOWER)  So I think we're going to
4  go back through a few questions we went through before,
5  and your counsel will instruct you pursuant to a
6  discussion we had off the record.
7      MR. BRISSENDEN:  For the record, the only
8  question you've asked about is one question in
9  particular.  If you have more questions you want to
10  review we need to take another break and discuss those.
11      MS. BERKOWER:  Okay.  Then we need to
12  take another break.
13      (Discussion off the record.)
14      MS. BERKOWER:  We'll go back on now.
15      Q.  (BY MS. BERKOWER)  Sir, like I said a minute
16  ago, we'll go back to some questions and make our
17  record.
18      So are you familiar with the Federal
19  Voting Rights Act?
20      MR. BRISSENDEN:  Same objection, same
21  answer, same instruction.  The question has been asked
22  and answered.  In terms of instructing you not to
23  disclose your mental impressions, thoughts, information
24  that you have in connection with your work, either
25  legislative activities involving drafting, debating

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

69

1    information, gathering with respect to S.B. 14.
2        Now, to the extent that you have
3    information or have knowledge with regards to HABA Act
4    that you learned separate and apart from your work in
5    connection with S.B. 14, outside of the context of
6    legislature, you may -- or if the knowledge that you
7    have is information that was part of the public record,
8    debate on the floor, you may -- or in committee, you
9    may answer the question.
10       Do you understand?
11       THE WITNESS: Yes, I do.
12       MS. BERKOWER: Okay. So just to be
13   clear, I think you just said "HABA." That's not
14   actually what I asked him about. I asked him about the
15   Federal Voting Rights Act. So can you just --
16       MR. BRISSENDEN: Oh, I'm -- I'll change
17   that and amend it to the Federal -- what was it?
18       MS. BERKOWER: Voting Rights Act.
19       MR. BRISSENDEN: -- Voting Rights Act.
20       MS. BERKOWER: And I think you said,
21   "Same objection, same instruction." I'm not exactly
22   sure what you were referring to there.
23       MR. BRISSENDEN: The question that you
24   asked is the same as what you asked previously.
25       MS. BERKOWER: Okay. So you're referring

---

70

1    back to the time you objected when I asked the question
2    before?
3        MR. BRISSENDEN: That's right.
4        MS. BERKOWER: Okay. Well, I'm not --
5    Q.   (BY MS. BERKOWER) Well, can you answer based
6    on his instruction?
7    A.   No.
8    Q.   Okay. Well --
9    A.   Other -- other -- well, based on his
10   instruction, I can answer that it was discussed in the
11   public setting of the House floor and in the committee.
12   Q.   Okay. So you're familiar with -- you were
13   aware of the Federal Voting Rights Act through the
14   public debate?
15   A.   And the committee discussion.
16   Q.   And the committee discussion.
17       MS. BERKOWER: And, to be clear, I wasn't
18   asking him about whether he considered the Federal
19   Voting Rights Act in connection with any deliberation
20   or legislative activity. I was merely asking him
21   whether -- or even in connection specifically with any
22   voter identification legislation or S.B. 14. I merely
23   asked if he was aware of the Federal Voting Rights Act
24   as a general matter.
25   Q.   (BY MS. BERKOWER) Are you familiar with

---

71

1    Section 5 of the Voting Rights Act?
2        MR. BRISSENDEN: My instruction would be
3    the same. To the extent that you have knowledge or
4    information about the section in regards to your -- or
5    information that was in the public record or apart from
6    your work on S.B. 14 as a general matter, you may
7    answer. Otherwise, I'm instructing you not to.
8        THE WITNESS: The same answer.
9        It was mentioned on the House floor and
10   it was discussed during committee deliberations -- not
11   deliberations, but committee hearing.
12   Q.   (BY MS. BERKOWER) Do you know what The Help
13   America Vote Act is?
14       MR. BRISSENDEN: Again, same instruction.
15   To the extent that you have knowledge or information
16   about that act in connection with -- or information
17   that was presented in the public record or that you
18   have knowledge about aside from your work on S.B. 14,
19   you may answer. Otherwise, I instruct you not to
20   answer.
21       THE WITNESS: I'll follow the
22   instruction. I mean, the answer is the same. I mean,
23   it was mentioned on the House floor and it was
24   mentioned during committee hearing.
25   Q.   (BY MS. BERKOWER) Okay. To be clear on that,

---

72

1    I'm asking you whether you knew it in connection with
2    legitimate legislative activity or any deliberation.
3    And I also did not ask for it in the context that would
4    reveal anything about your deliberations or legislative
5    activities.
6        MR. BRISSENDEN: But the question as
7    phrased encompasses both his work in connection with
8    his legislative activity and outside of the context of
9    his work on the legislative activity. So because of
10   the broad scope of the question I'm having to assert
11   the privilege.
12       MS. BERKOWER: And as we explained off
13   the record -- we had a discussion about this, and I
14   referred you to Page 8 of the court's June 5th order.
15   We're not asking -- we're asking this purely as a
16   general matter to find out if he knew generally about
17   it. We're not asking for anything in connection
18   specifically, anything that leads it specifically to
19   his deliberations or legislative activities.
20       As a result, we view this as a basic
21   foundational question that we're permitted to ask under
22   that order and under the court's May 17th order.
23       MR. BRISSENDEN: I'm directing your
24   attention to the top of Page 8. Because the question
25   is very broad, it implicates public or otherwise

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 73

1  nonprivileged information in terms of whether -- or his
2  state of knowledge, consideration as a Texas legislator
3  in connection with legislative activities.
4        MS. BERKOWER:  And we view the question
5  as broad enough to encompass -- broad enough not to
6  require specific information that connects it to his
7  specific legislative activities.
8        Unless you have something further, we'll
9  move on.
10       MR. BRISSENDEN:  We'll move on.
11  Q.  (BY MS. BERKOWER)  Have you ever heard of a
12  Supreme Court decision in the case Crawford versus
13  Marion County concerning Indiana voter identification
14  law?
15       MR. BRISSENDEN:  My instruction to you is
16  the same.  We've just reviewed and just discussed in
17  connection with this question as well.
18       THE WITNESS:  I believe, again, it was
19  discussed possibly on the House floor and I think
20  brought up in committee.
21  Q.  (BY MS. BERKOWER)  When was it mentioned in
22  committee?
23  A.  I believe it was mentioned when we had a
24  public hearing.
25  Q.  Do you remember when that was?

## 74

1  A.  The date of the public hearing?
2  Q.  Do you remember the date?
3  A.  Not off the top of my head.  I think it was
4  February of '11.
5  Q.  Who was present during that hearing?
6  A.  Lots of people.  I mean, the public is invited
7  in and welcome, and so many people.
8  Q.  Do you remember if anyone in particular
9  testified about the decision?
10  A.  No.
11  Q.  Do you remember what they said about the
12  decision?
13  A.  No.
14  Q.  Do you remember any discussion generally about
15  the decision during that hearing?
16  A.  Not at this time.
17  Q.  You also said it was mentioned on the floor.
18  Is that a separate time?
19  A.  Well, possibly.  Yeah, possibly.  I don't
20  specifically remember.
21  Q.  Did anyone mention during their testimony that
22  it impacted the State's ability to develop photo
23  identification laws?
24  A.  I don't recall.
25  Q.  Are you aware of any communications between

## 75

1  Texas legislators and officials in Indiana regarding
2  its photo ID law or the proper decision?
3  A.  I'm not, no.
4  Q.  Did you have any communications with Indiana
5  officials?
6  A.  The reason for my hesitation is that I did not
7  personally have any direct communication with them.
8  I'm unable to recall whether someone connected to
9  Indiana testified in public hearing or not.  And I
10  don't remember the record on that.  I personally did
11  not, though, in a private setting.
12  Q.  I'm going to mark this as Exhibit 432, please.
13        (Exhibit No. 432 marked)
14  Q.  (BY MS. BERKOWER)  Do you recall -- do you
15  know what this is?
16  A.  It looks like a letter.
17  Q.  Who is the letter addressed to?
18  A.  Rep. Dennis Bonnen, Chair.
19  Q.  Would that be you?
20  A.  Yes, it would.
21  Q.  Was it addressed to you in the context of your
22  chairmanship on the select committee?
23  A.  It appears it was.
24  Q.  Do you remember the letter at all?
25  A.  No.

## 76

1  Q.  Can you review it now, please?
2  A.  Certainly.  (Reading).
3  Q.  Let me know when you've had a chance to look
4  through the whole thing.
5  A.  Sure.  No, go ahead.  I can't promise I've got
6  it all down.
7  Q.  What was the substance of this -- of this
8  letter as a general matter?
9        MR. BRISSENDEN:  Objection to the extent
10  the document speaks for itself.
11  Q.  (BY MS. BERKOWER)  You can answer.
12  A.  "I would like to share with you Indiana's
13  experiences with regard to our photo ID voting
14  requirement."
15  Q.  Did anyone solicit this input from Indiana,
16  from this person in Indiana?
17  A.  I did not.  I can't speak for others.
18  Q.  And just to be clear, who was it who wrote the
19  letter?  If you turn to the last page, I think it says.
20  A.  It has no signature on it, but it has a typed
21  name of Thomas E. Wheeler, II.
22  Q.  So do you know -- does the letter explain what
23  the ID requirements in Indiana are under their voter ID
24  law?
25  A.  It might.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

**77**

1    Q.  Can you turn to Page 3 at the top.
2    A.  It appears that it does.
3    Q.  And what are those requirements?
4    A.  "Indiana's photo ID law requires that all
5  Indiana residents present photo ID before casting a
6  ballot in person at the polls on election day.  The
7  photo ID must meet full criteria to be acceptable for
8  voting purposes.  The ID must be issued by the State of
9  Indiana or the US Government, display the voter's
10 photo, display an expiration date that is either
11 current or expired no earlier than the date of the last
12 general election, and display the voter's name such
13 that it reasonably conforms with the name on the voter
14 registration card" (as read).
15        And then in quotes it says "poll book,"
16 period.
17    Q.  Is that what you understand the requirements
18 of the Indiana law to be?
19    A.  I have no real knowledge to know whether this
20 is accurate or inaccurate.
21    Q.  Do you have any idea what the process was by
22 which this particular person was selected to provide
23 input on Indiana law?
24        MR. BRISSENDEN:  To the extent the
25 question requires you to disclose any information that

---

**78**

1  you may have conducted as part of your investigation,
2  your work, your staff may have done as part of your
3  analysis in regards to S.B. 14, I instruct you not to
4  answer.  To the extent that you can answer the question
5  without disclosing that information, you may proceed.
6        THE WITNESS:  Could you repeat the
7  question?
8    Q.  (BY MS. BERKOWER)  I said, what was -- do you
9  know what the process was by which this person was
10 selected to provide input about the Indiana voter ID
11 law.
12        MR. BRISSENDEN:  And, also, do not
13 disclose any communications that you had with other
14 legislators.
15        THE WITNESS:  I do not know.
16    Q.  (BY MS. BERKOWER)  Do you know who
17 Thomas E. Willard, III is?
18    A.  Not at all.
19    Q.  Have you ever met him?
20    A.  Not that I'm aware of.
21    Q.  And what was the date on which this letter was
22 received?
23    A.  It appears that it was after the committee
24 hearing and it was on March the 1st of 2011.
25    Q.  In your memory, was that before the House

---

**79**

1  voted on Senate Bill 14?
2    A.  I do not know.  If I had to guess -- I imagine
3  you'll have the record.  My guess is it was probably
4  before the House voted.
5    Q.  Do you know, was this letter entered into the
6  public record as a result of it being sent to you as
7  the chair of the select committee?
8    A.  I do not know.  My guess is it probably was
9  not for the reason that the committee had already had
10 its public meeting and submitted its report by
11 March 1st is my guess.  I don't know absolutely.
12    Q.  And does the letter explain at all why Indiana
13 decided to pass this law?
14    A.  I guess you could say he makes an attempt at
15 that by discussing on the first page, according to
16 press reports during the East Chicago City primary
17 election on May 6th, 2003, and then he continues on to
18 discuss a concern.
19    Q.  That there was an incident of voter fraud that
20 was prosecuted?
21    A.  That's what it appears to describe.
22    Q.  Do you know of any similar incident that was
23 included in the public record involving a prosecution
24 for in-person election fraud in Texas?
25        MR. BRISSENDEN:  Again, you're asking

---

**80**

1  him --
2        MS. BERKOWER:  I said in the public
3  record.
4        MR. BRISSENDEN:  The public record.
5        THE WITNESS:  Yes.  I know in the
6  committee hearing there was discussion of a case, but I
7  believe due to the fact that the case may have been
8  ongoing the discussion was limited.
9    Q.  (BY MS. BERKOWER)  Was it just that one case
10 that you're remembering?
11    A.  There may have been two, but I'm not positive
12 of that.
13    Q.  And do you also see in Paragraph 2 of the
14 letter -- sorry.  On the first page --
15    A.  Right.
16    Q.  -- in the third full paragraph, it says, "Data
17 collected by the election assistance committee in 2004
18 indicated that 19 of Indiana's 96 counties have
19 registration totals exceeding 100 percent of the 2004
20 voting age population" (as read).
21        Do you see that?
22    A.  Yes, ma'am.
23    Q.  Do you know of any similar problem in any
24 Texas counties?
25        MR. BRISSENDEN:  To the extent that you

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 81

1  have information or knowledge in connection with your
2  S.B. 14, including analysis --
3          MS. BERKOWER:  I'll limit this to the
4  public record.  How about that?
5          MR. BRISSENDEN:  Let me finish.
6          -- then do not answer and disclose that.
7  If you can answer the question limited to the public
8  record, information that's contained therein, you may
9  answer.
10         THE WITNESS:  I'm not sure whether --
11 similar type issues were raised in the public record.
12 I don't know specifically if they were on target with
13 that or not.
14     Q.  (BY MS. BERKOWER)  "Similar type issues"
15 meaning what?
16     A.  In the public.  Issues of irregularities with
17 voter registration.
18     Q.  Do you remember more specifically what those
19 irregularities were?
20     A.  No, I do not.  They're in the public record,
21 though.
22     Q.  Were there any incidences that you remember
23 where a Texas county had a registration total that
24 exceeded 100 percent of the voting age population?
25         MR. BRISSENDEN:  Again, I'm going to

## 82

1  instruct you to the extent that that question is asking
2  you for information that's beyond the public record not
3  to answer the question.  To the extent that you can
4  answer the question based upon information that's in
5  the public record, you can answer.
6          THE WITNESS:  I'll follow his
7  instruction.
8      Q.  (BY MS. BERKOWER)  So to be clear, then, with
9  regard to the public record, do you remember any
10 incident reported on the public record where a Texas
11 county had more than 100 percent registration based on
12 the voting age population in that county?
13     A.  I recall issues being raised.  I don't know if
14 that specifically was.
15     Q.  Okay.  Are you familiar with the voter
16 identification bill that was introduced in the House in
17 2005?
18     A.  In the regard that I'm aware something was
19 probably filed.  Specifically, I don't recall it.
20     Q.  I have what has been previously marked
21 Exhibit 44, so I will remark it here as Exhibit 44.
22     A.  Thank you.
23     Q.  Do you recognize this?
24     A.  I do have a recollection of it, yes.
25     Q.  What is it?

## 83

1      A.  It is a bill, House Bill 1706, by
2  Mrs. Renny and others.
3      Q.  Can you describe the basic provisions of the
4  bill, if you remember them?
5      A.  I don't really remember them.
6      Q.  Okay.  Were you involved in the development of
7  this bill?
8      A.  No.
9      Q.  Turning to Page 4 of the exhibit, can you
10 review that page and the next?  I think the pages
11 include Pages 4 through 7 of this exhibit.
12     A.  Okay.  Certainly.  (Reading).
13     Q.  Let me know when you're done.
14     A.  Sure.
15         I'm done.
16     Q.  Okay.  Could you list the forms of allowable
17 identification provided in the bill?
18     A.  I can try.  "The following documentation is an
19 acceptable form of photo identification under this
20 chapter.  No. 1, a driver's license or personal
21 identification card issued to the person by the
22 Department of Public Safety or the equivalent agency
23 for another -- of another state that is not expired or
24 that expired no later than two years before the date of
25 presentation; 2, a United States military

## 84

1  identification card that contains the person's
2  photograph; No. 3, a valid employee identification card
3  that contains the person's photograph and is issued by
4  an employer of the person in the ordinary course of the
5  employer's business; No. 4, a United States citizenship
6  certificate issued to the person that contains the
7  person's photograph; 5, a United States passport issued
8  to the person; 6, a student identification card issued
9  by public or private institution of higher education
10 that contains the person's photograph; 7, a license to
11 carry a concealed handgun issued to the person by the
12 Department of Public Safety; No. 8, an identification
13 card issued by a state agency of this state that
14 contains the person's photograph; or, 9, an
15 identification card that contains the person's
16 photograph and/or is issued by a county elections
17 administrator or a county clerk" (as read).
18     Q.  Okay.  I'll stop you there.
19     A.  Okay.
20     Q.  Do you know the next section, Section B --
21     A.  B, uh-huh.
22     Q.  -- as a general matter, does that permit a
23 voter to also show two forms of non-photo ID?
24     A.  "The following documentation is acceptable as
25 proof of identification under this chapter.  1, a copy



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

## 85

1  of a current utility bill, bank statement, government
2  check, paycheck, or other government document that
3  shows the name and address of voter; and, 2, official
4  mail addressed to the person by name from a
5  governmental entity" (as read).
6      Q.  I think the reason I stopped you is I know
7  there's -- I don't want to make you read pages and
8  pages --
9      A.  Right.
10     Q.  -- and I know there's a number of others.
11     A.  Right.
12     Q.  But as a general matter, does it look like it
13  also permits a voter to show two forms of what is
14  generally non-photo ID?  And you can review the
15  different types of ID on that page in order to -- to
16  vote.
17     A.  It appears to do so.
18     Q.  What was the purpose of H.B. 1706?
19          MR. BRISSENDEN:  I'm going to instruct
20  you that to the extent that you have knowledge about
21  the general purpose of H.B. 1706 as a general matter,
22  you may answer.
23          THE WITNESS:  I'll follow the
24  instruction.
25     Q.  (BY MS. BERKOWER)  You don't know what the

## 86

1  general purpose of H.B. 1706 was?
2      A.  Well, it was to provide greater integrity and
3  confidence in the election process.
4      Q.  How did it do that?
5          MR. BRISSENDEN:  Objection, privileged.
6  Instruct the witness not to disclose his mental
7  impressions, thoughts, analysis about the bill and
8  instruct you not to answer the question.
9      Q.  (BY MS. BERKOWER)  Do you know of any
10 communication concerns -- excuse me.  I'll start over.
11          Do you know of any communications
12 concerning the forms of allowable identification to be
13 included in H.B. 1706?
14     A.  I do not.
15     Q.  Do you know who drafted the bill?
16     A.  I would have to assume legislative council,
17 but I don't know that factually.
18     Q.  Do you know what -- sorry.
19     A.  That's okay.
20     Q.  Were you present during any of the legislative
21 public debates on H.B. 1706?
22     A.  I assume I was on the House floor when we
23 debated the bill.
24     Q.  Do you remember the justifications for
25 H.B. 1706 as expressed by supporters during the public

## 87

1  debate?
2      A.  I do not.
3      Q.  Are you familiar with any of the legislators
4  who opposed H.B. 1706 during the public debate?
5      A.  I don't recall.
6      Q.  Do you know of any action taken by any
7  legislator to address concerns raised by opponents of
8  H.B. 1706 as would be contained in the public record?
9      A.  I don't recall.
10     Q.  Any amendments that might have addressed the
11 concerns of opponents of the bill?
12     A.  I don't recall the specifics of the bill or
13 amendments to the bill.
14     Q.  Do you remember if any amendments that would
15 have addressed concerns raised by the opponents of 1706
16 were ultimately included in the bill?
17          MR. BRISSENDEN:  Objection, vague.
18          THE WITNESS:  I just don't recall.  I
19 don't know.  The record would indicate that one way or
20 the other.
21     Q.  (BY MS. BERKOWER)  Was H.B. 1706 designed in
22 part to prevent noncitizens from voting?
23          MR. BRISSENDEN:  Objection, privilege.
24 Instruct the witness not to disclose mental
25 impressions, thoughts, opinions, mental analysis

## 88

1  regarding this.  Instruct you not to answer.
2          THE WITNESS:  I'll follow the
3  instruction.
4      Q.  (BY MS. BERKOWER)  Was part of the legislative
5  purpose to prevent noncitizens from voting?
6          MR. BRISSENDEN:  Same instruction.
7          THE WITNESS:  I'll follow the
8  instruction.
9      Q.  (BY MS. BERKOWER)  Do supporters of H.B. 1706,
10 including legislators, publicly indicate that the bill
11 is designed to prevent noncitizens from voting?
12          MR. BRISSENDEN:  You can answer to the
13 extent that is part of the public record.
14          THE WITNESS:  I don't know.  I would hope
15 not.
16     Q.  (BY MS. BERKOWER)  Why would you hope not?
17     A.  That would not be appropriate.
18     Q.  Why not?
19     A.  Because that's not the intent.
20     Q.  Are you aware of any private communications
21 where legislators indicated that H.B. 1706 was designed
22 to keep noncitizens from voting?
23          MR. BRISSENDEN:  Again, instruct the
24 witness not to answer if it discloses thoughts, mental
25 impressions, or opinions of conversations.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

89

1      THE WITNESS:  I'll follow the
2  instruction.
3      Q.  (BY MS. BERKOWER)  Are you aware of any
4  analysis conducted by anyone related to H.B. 1706?
5      MR. BRISSENDEN:  Just a minute.
6      Q.  (BY MS. BERKOWER)  Any analysis conducted by
7  anyone.
8      MR. BRISSENDEN:  I'll allow it.
9      THE WITNESS:  Not as I sit here today,
10  no.  I'm certain someone did, but, no, I'm not aware of
11  it.
12      Q.  (BY MS. BERKOWER)  Are you aware of any
13  attempt to determine who, among registered voters, did
14  not possess the forms of identification required by
15  1706?
16      MR. BRISSENDEN:  Again, I'm going to
17  instruct the witness not to disclose any information
18  that you received knowledge that you have in connection
19  with your work as a legislator and in connection with
20  H.B. 1706, not to disclose thoughts, opinions, mental
21  impressions, analysis about the legislation, not to
22  disclose communications that you've had with other
23  legislators, your staff, or other legislators' staff,
24  state agencies, or Texas Legislative Council.
25      To the extent that you can answer the

---

90

1  question based upon information that's in the public
2  record or not disclosed any privileged information, you
3  may answer.
4      THE WITNESS:  I'll follow his
5  instruction.
6      Q.  (BY MS. BERKOWER)  Do you know of any -- of
7  anything in the public record that indicates
8  legislators tried to determine among registered voters
9  who did not possess the forms of identification
10  required by H.B. 1706?
11      A.  No.
12      Q.  Do you know of any studies entered into the
13  public record about the number of registered voters
14  without allowable forms of identification under 1706?
15      A.  I'm not aware of any.
16      Q.  Are you aware of any attempt as indicated in
17  the public record to determine the impact of H.B. 1706
18  on minority voters?
19      A.  As I sit here today, no, I'm not.  I don't
20  know if that existed or not.
21      Q.  Was H.B. 1706 passed in the House?
22      A.  I don't recall.  I think it did, but I'm not
23  sure.  It may have failed by one vote.  I can't
24  remember.  There's a record, though.
25      Q.  There is.

---

91

1      I have what will be Exhibit 433.
2      (Discussion off the record)
3      (Exhibit No. 433 marked)
4      Q.  (BY MS. BERKOWER)  Does this refresh your
5  recollection as to whether H.B. 1706 was passed in the
6  House?
7      A.  One second.  Let's see.  It appears it was in
8  gross, yes.
9      Q.  Which committee was it referred to in the
10  Senate?
11      A.  In the Senate, the State Affairs.
12      Q.  Do you know who referred it to the State
13  Affairs Committee?
14      A.  Somebody in the Senate.  I'm not sure who's
15  responsible for that.
16      Q.  Do you have a sense of -- do you know as a
17  general matter how the bill referral process works in
18  the Senate?
19      A.  Not really, no.
20      Q.  What happened to H.B. 1706 after it was
21  referred to the State Affairs Committee and the Senate?
22      A.  I don't believe the record indicates that I
23  have here.  It appears that the last action was that it
24  was referred to State Affairs.  And that's all that
25  seems to be in this record.

---

92

1      Q.  Do you recognize where this record came from?
2      A.  Texas Legislature on-line.
3      Q.  Do you know what the Texas Legislature
4  on-line -- well, is it the Legislature on-line history?
5  Is that what that says?
6      A.  Correct.
7      Q.  And does this appear -- this document appear
8  to contain the legislative history for H.B. 1706?
9      A.  It does, but it appears to be incomplete.
10  And -- well, I don't know if it's incomplete or not.
11  The last history that it indicates is -- is May the 5th
12  of 2005, "Referred to State Affairs."  I don't know if
13  that's where it ended or not.
14      Q.  How would you determine if the bill -- if
15  there is subsequent legislative history for this bill?
16      A.  Beyond that?
17      Q.  Yes.
18      A.  I mean, if you pulled this yesterday I would
19  assume that was where it -- where it ended.  I just
20  don't know.
21      Q.  Okay.  Do you see the date on the bottom
22  right-hand corner of the document?
23      A.  I do now, yes, 5-27-12.  So it appears it was
24  referred to State Affairs and never had a hearing.
25      Q.  So is it fair to say that it never passed the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 93

1    the Senate?
2         A.   It appears to be fair to say that.
3         Q.   Are you familiar with the voter ID bill that
4    was introduced in the House in 2007?
5         A.   I'm sure there was one, but specifically, no,
6    I'm not.
7         Q.   I have what will be -- what was previously
8    marked as Exhibit 28 in a different deposition.
9              MR. BRISSENDEN:  Did you say 28?
10             MS. BERKOWER:  Yes.
11             THE WITNESS:  This is from when, '7?
12        Q.   (BY MS. BERKOWER)  Yes.  Are you familiar with
13   this document?
14        A.   In a general, vague sense, yes.
15        Q.   What is it?
16        A.   Is it House Bill 218 by Representative
17   Betty Brown of Kaufman County and others.
18        Q.   Are you familiar with the basic provisions of
19   the bill?
20        A.   No.
21        Q.   Did you play any role in development of
22   H.B. 218?
23        A.   I did not.
24        Q.   Turning to Page 9, can you -- can you list
25   every form of identification that is acceptable for

## 94

1    proof of identification under H.B. 218?
2         A.   Certainly.  "The following documentation is an
3    acceptable form of photo identification under this
4    chapter."  The chapter is Section 11, Section 63.0101.
5              "No. 1, a driver's license or personal
6    identification card issued to the person by the
7    Department of Public Safety that is not expired or that
8    expired no later than two years before the date of
9    presentation; No. 2, a United States Military
10   identification card that contains the person's
11   photograph; No. 3, a valid employee identification card
12   that contains the person's photograph and is issued by
13   an employer of the person in the ordinary course of the
14   employer's business; No. 4, a United States citizenship
15   certificate issued by the person that contains the
16   person's photograph; 5, a United States passport issued
17   to the person; No. 6, a student identification card
18   issued by a public or private institution of higher
19   education located in the United States that contains
20   the person's photograph; No. 7, a license to carry a
21   concealed handgun issued to the person by the
22   Department of Public Safety; or, No. 8, a valid
23   identification card that contains the person's
24   photograph and is issued by, A, an agency or
25   institution of the Federal Government or, B, an agency,

## 95

1    institution or political subdivision of this state" (as
2    read).
3         Q.   And Section B, which begins where you left
4    off, does that provide additional documentation that's
5    acceptable as proof of identification?
6         A.   It does appear to do so.
7         Q.   And just taking -- if you can just quickly
8    review those yourself, do each of those forms of
9    identification require a photograph?
10             MR. BRISSENDEN:  Take your time.
11             THE WITNESS:  Can you repeat the
12   question?
13        Q.   (BY MS. BERKOWER)  Well, that section,
14   Section B, does that list additional documentation
15   that's acceptable as proof of identification under this
16   bill?
17        A.   It appears it does, yes.
18        Q.   And do all of the forms of identification
19   listed in that section, are those all photo
20   identifications?
21        A.   Not all of them, no.
22        Q.   In fact, doesn't that include a library card
23   that contains the person's name under Item 10 on
24   Page 11?
25        A.   A library card that contains a person's name

## 96

1    issued to the person by a public library located in the
2    state.
3         Q.   Does it specify that that must be a photo
4    identification?
5         A.   It doesn't speak to that.
6         Q.   And Item 11, a hunting or fishing license
7    issued to the person by the Parks and Wildlife
8    Department, that doesn't have to be a photo
9    identification either, does it?
10             MR. BRISSENDEN:  If you know.
11        Q.   (BY MS. BERKOWER)  Well, based on the language
12   in the bill, is what I'm asking.
13        A.   I don't think so, but you have to show an ID
14   to receive a hunting or fishing license.
15        Q.   This bill does not specify that that license
16   has to contain a photograph; is that correct?
17        A.   I believe it is.
18        Q.   Item 9 says, "A pilot's license issued to the
19   person by the Federal Aviation Administration or other
20   authorized agency of the United States" (as read).
21             Does that section require the license to
22   be a photo ID?
23        A.   I don't know what a pilot's license looks
24   like.
25        Q.   Well, does the bill say it has to have a



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

97

1    photograph?
2            MR. BRISSENDEN:  Objection to the extent
3    it mischaracterizes the language.
4        Q.  (BY MS. BERKOWER)  I'm asking if this section
5    says the pilot's license has to have a photograph on
6    it.
7            MR. BRISSENDEN:  Same objection.
8        Q.  (BY MS. BERKOWER)  You can still answer.
9            MR. BRISSENDEN:  If you know.
10           THE WITNESS:  I don't know.
11       Q.  (BY MS. BERKOWER)  Okay.  Well, turning back
12   to Part A on Page 9, it says, "The following
13   documentation is an acceptable form of photo
14   identification under this chapter" (as read).
15           Did I read that correctly?
16       A.  You did.
17       Q.  And then Part B says, "The following" -- on
18   Page 10 -- sorry -- Line 20, "The following
19   documentation is acceptable as proof of identification
20   under this chapter" (as read).
21           Did I read that correctly?
22       A.  You did.
23       Q.  Does Part B require it to be photo
24   identification?
25           MR. BRISSENDEN:  Same objection.  If you

---

98

1    know.
2            THE WITNESS:  It simply requires it to be
3    identification.
4        Q.  (BY MS. BERKOWER)  It doesn't specify photo
5    identification?
6        A.  It doesn't say it is or it isn't.
7        Q.  So it may be, but it doesn't have to be?
8        A.  Correct.  And I simply answered I don't know
9    whether the pilot license has a photo ID or not.
10       Q.  Okay.  So all of the identifications specified
11   in Part B may or may not have photographs?  It's not
12   required?
13       A.  Correct.
14       Q.  What was the purpose of H.B. 218?
15           MR. BRISSENDEN:  Again, I'll instruct you
16   in terms of answering the question, to the extent that
17   you know what the general purpose of HB 218 is, you may
18   answer the question.
19           THE WITNESS:  It's to provide confidence
20   and trust in the election process.
21       Q.  (BY MS. BERKOWER)  Was there any other purpose
22   for H.B. 218?
23           MR. BRISSENDEN:  Same instruction.
24           THE WITNESS:  I'll follow the
25   instruction.

---

99

1        Q.  (BY MS. BERKOWER)  You'll follow the
2    instruction, meaning -- I'm a little confused.
3            MR. BRISSENDEN:  To the extent that he
4    has information or knowledge about House Bill 218 in
5    terms of purpose that is a part of his thoughts,
6    opinions, mental impressions, analysis, I instruct the
7    witness not to disclose that information.  But in terms
8    of what the general purpose of the bill is, he has
9    answered that.
10           MS. BERKOWER:  Well, I said is there more
11   than one purpose to H.B. 218, and then he --
12           MR. BRISSENDEN:  I don't believe that was
13   the question.
14           MS. BERKOWER:  Can you read back the
15   question, please?
16           (The requested portion was read)
17           MR. BRISSENDEN:  Same instruction.
18           THE WITNESS:  I'll follow the
19   instruction.
20       Q.  (BY MS. BERKOWER)  Okay.  Are you aware of any
21   communications where the forms of allowable
22   identification under H.B. 218 were discussed?
23       A.  Well, I'm sure they were discussed on the
24   House floor in the public record.
25       Q.  Are you aware of any nonpublic communications

---

100

1    where the forms of allowable identification under
2    H.B. 218 were discussed?
3            MR. BRISSENDEN:  Objection.  I also
4    instruct you not to answer.
5            MS. BERKOWER:  Well, I didn't ask what
6    was -- I didn't ask the nature of the discussions.  I
7    just asked the general topic.  That's a foundational
8    question that we've been permitted to answer in prior
9    depositions under the court's May 17th order.
10           MR. BRISSENDEN:  I believe that you asked
11   about the substance of the communications as opposed to
12   simply asking him about communications regarding House
13   Bill No. 218.
14           MS. BERKOWER:  I said are you aware of
15   communications where the forms of allowable
16   identification were discussed.
17           MR. BRISSENDEN:  That's right.
18           MS. BERKOWER:  That's a privileged law
19   question?
20           MR. BRISSENDEN:  If the question is
21   regarding communications regarding House Bill No. 218,
22   I'll allow that.  But in terms of the substance of the
23   communications, I believe your question delves into
24   more substance about the communications regarding House
25   Bill No. 218.  Instruct the witness not to answer.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                          June 6, 2012

---

### 101

1        MS. BERKOWER:  For the record, we view
2    this as a basic foundational question of the type that
3    would be permitted or even required under the federal
4    rules of the privilege log, and we ask the State to
5    withdraw their objection.
6        Will you withdraw it?
7        MR. BRISSENDEN:  At this time, I'm
8    standing on my objection.
9    Q.  (BY MS. BERKOWER)  Will you answer the
10   question?
11   A.  I'll follow his recommendation.
12   Q.  Are you aware of any communications concerning
13   H.B. 218?
14   A.  No.
15   Q.  Public or private?
16   A.  Well, obviously, I'm aware of public
17   discussion, as I was a member of the Legislature when
18   it was debated on the House floor.  But privately, no,
19   I'm not.
20   Q.  Are you -- were you aware of any concerns
21   raised on the public record during the development,
22   drafting, or considering of H.B. 218 about the impact
23   of H.B. 218 on minority voters?
24   A.  I was not involved in that.
25   Q.  Were you involved in the public debate on

### 102

1    H.B. 218?
2    A.  What does "involved" mean?
3    Q.  Well, were you present, do you remember?
4    A.  I'm certain I was present.  But, respectfully,
5    "involved" would more so mean that I was a part of the
6    debate.  And I don't think I -- I don't know
7    absolutely, but I -- if I participated at all, it was
8    extraordinarily limited.
9    Q.  Okay.
10   A.  But I was present, to answer that, yes.
11   Q.  Do you remember the public debate at all for
12   H.B. 218?
13   A.  Not specifically, no.
14   Q.  What, if anything, do you remember about the
15   public debate of H.B. 218?
16   A.  Pretty much nothing.
17   Q.  Did you have any role in HB 218 after it was
18   filed in the House?
19   A.  None that I recall.
20   Q.  During the time that the House considered
21   H.B. 218, did you learn of any concerns raised about
22   the bill by constituents or interest groups?
23   A.  Not that I recall.
24   Q.  During the time the House considered H.B. 218,
25   did you learn of any concerns raised about the bill by

### 103

1    other legislators on the public record?
2        MR. BRISSENDEN:  And, again, your
3    question is --
4        MS. BERKOWER:  On the public record.
5        MR. BRISSENDEN:  -- your question is
6    limited to the public record?
7        THE WITNESS:  Certainly in debate on the
8    floor there were those who were for and against the
9    bill.
10   Q.  (BY MS. BERKOWER)  Do you remember what the
11   supporters of H.B. 218 on the floor were saying in
12   support of the bill?
13   A.  No.
14   Q.  Do you remember what the concerns of opponents
15   to the bill were as expressed in the public record?
16   A.  I don't, but we can check the record.
17   Q.  Are you aware of the existence of any analysis
18   or report as entered into the public record that would
19   raise any concerns that the bill would have an adverse
20   impact on minority voters?
21       MR. BRISSENDEN:  Again, your answer is
22   limited to what's in the public record.
23       MS. BERKOWER:  That's all I asked him
24   about.
25       THE WITNESS:  I don't know.

### 104

1    Q.  (BY MS. BERKOWER)  H.B. 218 permits a voter to
2    show a driver's license in order to vote.  Is that
3    correct based on what we just reviewed in this on
4    Page 9?
5    A.  That would be Line 17 on Page 9, yes.  A
6    driver's license or personal identification card that
7    has not expired or expired no later than two years
8    before the date of the presentation.
9    Q.  Didn't supporters of H.B. 218, including
10   legislators, publicly indicate that the bill was
11   designed to keep noncitizens from voting?
12       MR. BRISSENDEN:  Again, the question is
13   limited to what's in the public record.
14       THE WITNESS:  I'm unaware of that.
15   Q.  (BY MS. BERKOWER)  Were you present on the
16   floor during the house debate of 218?
17   A.  We've covered that.  Yes.
18   Q.  Did Representative Betty Brown state on the
19   House floor that the bill was, quote, "designed to keep
20   illegal aliens, noncitizens, and other people otherwise
21   not qualified from voting"?
22       MR. BRISSENDEN:  To the extent that the
23   question mischaracterizes the statement on the record,
24   I would object to the question.
25       THE WITNESS:  I don't know.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

## 105

1   Q.  (BY MS. BERKOWER)  Do you remember her saying
2   that?
3   A.  I don't.
4   Q.  Did Ms. Brown write this bill?
5   A.  She was -- I'm not suggesting she didn't.  I'm
6   telling you I don't recall that she did.  I didn't hang
7   on every word that day.  I barely remember it.
8   Q.  But answer in answer to the question, she did
9   write the bill, correct?
10  A.  Yes, that certainly appears to be the case.  I
11  doubt she actually wrote it, but she was the sponsor
12  who carried it.
13  Q.  Okay.  Can noncitizens obtain a Texas driver's
14  license?
15  A.  I don't know.
16  Q.  If they can, how would H.B. 218 have been
17  designed to keep illegal aliens and noncitizens from
18  voting?
19  MR. BRISSENDEN:  Objection, calls for
20  speculation.  Instruct the witness not to disclose
21  mental impressions, thoughts, analysis about the
22  legislation.  Instruct not to answer.
23  THE WITNESS:  I'll follow the
24  instruction.
25  MS. BERKOWER:  Well, I don't think that

## 106

1   that question necessarily asks him for privileged
2   information.  This is just based on, like I said, a
3   hypothetical if a noncitizen could get a driver's
4   license and H.B. 218 permits a voter to show a driver's
5   license to vote.
6   MR. BRISSENDEN:  It is a hypothetical.
7   MS. BERKOWER:  How would that prevent the
8   noncitizens from voting?
9   MR. BRISSENDEN:  It is a hypothetical and
10  you're specifically asking him for his mental
11  impressions, thoughts, opinions about a specific piece
12  of legislation that would be privileged.  I instruct
13  him not to answer.
14  Q.  (BY MS. BERKOWER)  Are you following that
15  instruction?
16  A.  Yes, ma'am, I am.
17  Q.  Can a noncitizen in Texas contain a concealed
18  handgun license?
19  A.  I don't know.
20  Q.  Can a noncitizen in Texas obtain a military
21  ID, US military ID?
22  A.  I would assume only military personnel can
23  obtain an ID.
24  Q.  Do you know if there are any noncitizens who
25  are military personnel?

## 107

1   A.  I don't know.
2   Q.  Sitting here today, would you agree that if
3   the prevention of noncitizens voting was a purpose of
4   H.B. 218, H.B. 218 would not actually serve that
5   purpose?
6   MR. BRISSENDEN:  First of all, I object
7   that it's a hypothetical and calls for speculation.
8   Also, the question is requiring the witness to disclose
9   his thoughts and mental impressions and analysis of the
10  specific legislation.  I instruct you not to answer.
11  MS. BERKOWER:  Well, I didn't ask him
12  with regard to a legislative act that would have taken
13  place at the time.  I'm asking him, sitting here today,
14  looking at the bill's terms, would this prevent
15  noncitizens from voting.  I'm not asking him to draw on
16  anything that he learned as a legislator, nor am I
17  asking him to draw on any considerations he took into
18  account in voting for the bill.  I'm just asking him
19  simply sitting here today, would this bill, if enacted,
20  prevent noncitizens from voting.
21  MR. BRISSENDEN:  And my objection is the
22  same and my instruction is the same.
23  Q.  (BY MS. BERKOWER)  Are you following that
24  instruction?
25  A.  I'll follow the instruction, yes, ma'am.

## 108

1   Q.  Do you know if members of the public or
2   interest groups opposed H.B. 218?
3   A.  I'm sure somebody did.
4   Q.  Do you remember who that was?
5   A.  Not at all.
6   Q.  Do you remember what their concerns were?
7   A.  I do not.
8   Q.  Do you know if any legislators opposed
9   H.B. 218 in the public record?
10  A.  I believe -- I'm sure the public record would
11  indicate that, yes.
12  Q.  Do you remember who they were or what their
13  concerns were?
14  A.  I do not.
15  Q.  Do you know of any action taken as part of the
16  public record by any legislator in 2007 to address
17  concerns raised by the opponents of H.B. 218?
18  A.  Personally, I do not know.
19  Q.  Are you aware of any analysis conducted by
20  anyone unrelated to H.B. 218 that was made part of the
21  public record?
22  A.  I'm not aware.  I'm sure someone did.
23  Q.  Are you aware of any analysis generally
24  conducted by anyone related to H.B. 218, public or
25  private?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                              June 6, 2012

|   | 109 |
|---|-----|
| 1 | A. I am not, publicly speaking. |
| 2 | MR. BRISSENDEN: To the extent that the |
| 3 | question requires you to disclose information that is |
| 4 | private, not part of the public record, I instruct you |
| 5 | not to answer. |
| 6 | MS. BERKOWER: You would object to the |
| 7 | question of any analysis conducted by anyone related to |
| 8 | the bill? |
| 9 | MR. BRISSENDEN: That is not part of the |
| 10 | public record. That is part of his work and analysis |
| 11 | in relation to the bill, yes. |
| 12 | MS. BERKOWER: I didn't ask what the |
| 13 | analysis was. I asked if he was aware -- just aware of |
| 14 | any analysis. Not how he considered it, not how it |
| 15 | factored into his deliberations; just if he was aware |
| 16 | of any analysis related to the bill as conducted at |
| 17 | all. |
| 18 | MR. BRISSENDEN: Same instruction. |
| 19 | MS. BERKOWER: You also did not object to |
| 20 | that question earlier in this deposition. |
| 21 | MR. BRISSENDEN: To the extent that you |
| 22 | have knowledge based upon information that is contained |
| 23 | in the public record, you may answer the question. |
| 24 | THE WITNESS: I'm -- I don't recall. |
| 25 | Q. (BY MS. BERKOWER) Are you aware of any |

|   | 111 |
|---|-----|
| 1 | Committee that session? |
| 2 | A. This would be the '09 session? |
| 3 | Q. Yes. |
| 4 | A. Yes, I was. |
| 5 | Q. Do you remember S.B. 362's introduction into |
| 6 | the house? |
| 7 | A. Vaguely. |
| 8 | Q. Since you were a member of the House Elections |
| 9 | Committee, did you have any role in the development of |
| 10 | S.B. 362? |
| 11 | A. I probably did. |
| 12 | Q. Do you remember? |
| 13 | A. I don't recall. Not really. |
| 14 | Q. What was your involvement with the bill once |
| 15 | it was sent to the House? |
| 16 | A. Which bill? |
| 17 | Q. Sorry. S.B. 362. |
| 18 | A. I don't know. I don't know which one 362 is. |
| 19 | There were -- I may have filed my own bill that |
| 20 | session. So specifically speaking, I don't know which |
| 21 | one 362 is. Not to be difficult, but we -- we really |
| 22 | don't -- at least I don't, and many members don't, |
| 23 | recall bills by bill number. And so -- |
| 24 | Q. How do you recall them? |
| 25 | A. By bill on voter ID. Or Betty Brown had a |

|   | 110 |
|---|-----|
| 1 | studies about the number of registered voters without |
| 2 | allowable forms of ID under H.B. 218 that were entered |
| 3 | into the public record? |
| 4 | A. I don't remember. |
| 5 | Q. Are you aware of any attempt by any legislator |
| 6 | in 2007 to determine who among registered voters did |
| 7 | not possess the forms of identification required by |
| 8 | H.B. 218 that were discussed in the public record? |
| 9 | A. I do not remember. |
| 10 | Q. Are you aware of any attempt to determine the |
| 11 | impact of H.B. 218 on minority voters that was included |
| 12 | in the public record? |
| 13 | A. I'm not aware, no. |
| 14 | Q. Did the House pass H.B. 218? |
| 15 | A. I don't remember. |
| 16 | Q. Are you aware of a photographic -- excuse me. |
| 17 | Are you aware of a photographic voter |
| 18 | identification bill that was introduced in the |
| 19 | 81st Legislature in 2009? |
| 20 | A. There were several filed. |
| 21 | Q. Are you aware of any? |
| 22 | A. I'm aware that several were filed, yes. |
| 23 | Q. You're aware of a few? |
| 24 | A. Uh-huh. |
| 25 | Q. Were you a member of the House Elections |

|   | 112 |
|---|-----|
| 1 | bill on voter ID, or what have you. |
| 2 | Q. What if I told you -- |
| 3 | MR. BRISSENDEN: I was just going to say |
| 4 | it's now 1:00, and we haven't taken a break for lunch. |
| 5 | Whenever you get to a good time to break, maybe we can |
| 6 | take a break and get some food. |
| 7 | MS. BERKOWER: We can take a break now. |
| 8 | How long do you want to take a break for? |
| 9 | THE WITNESS: We can go ahead and finish |
| 10 | this. |
| 11 | MR. BRISSENDEN: Are you at a good |
| 12 | breaking point? How long would you like to take a |
| 13 | break for? |
| 14 | MS. BERKOWER: I think 40 minutes is what |
| 15 | it takes. I guess we'll be back at 1:35. |
| 16 | (Recess from 12:53 p.m. to 1:57 p.m.) |
| 17 | Q. (BY MS. BERKOWER) I don't remember exactly |
| 18 | where we left off. If I repeat a question or two, I'm |
| 19 | sorry. |
| 20 | A. No problem. |
| 21 | Q. So we were talking about the 81st Legislature |
| 22 | in 2009. |
| 23 | A. Yes. |
| 24 | Q. Are you aware that photo -- photographic voter |
| 25 | identification bills were introduced in that session? |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

113

1      A.  Yes.
2      Q.  Do you remember in particular S.B. 362?
3      A.  Not specifically, but generally I'm sure it
4   existed.
5      Q.  Were you a member of the House Elections
6   Committee that year?
7      A.  In '09 I was, yes.
8      Q.  And did you have any role in the development
9   of S.B. 62 due to your position on that committee?
10     A.  No, not if it was a senate bill I would not
11  have.
12     Q.  Once the bill was sent to the House, what was
13  your involvement given that you were on the elections
14  committee?
15     A.  Simply to -- I'm assuming that the committee
16  heard the bill, and I simply would have been a member
17  of the committee while the bill was being heard for
18  public testimony and discussion.
19     Q.  I have what's been -- I know this has been
20  previously marked, but I'm not sure what number it is.
21  So we'll just introduce it again.  This is going to be
22  Exhibit 434.
23         (Exhibit No. 434 marked)
24     Q.  (BY MS. BERKOWER)  Do you know what this is?
25     A.  Senate Bill No. 362 by Senator Frazier and

---

114

1   others.
2      Q.  Take a minute to review the document and let
3   me know when you're finished.
4      A.  (Reading).
5         Okay.
6      Q.  Do you remember this bill now that you've
7   taken a look at it?
8      A.  Generally speaking, yes.
9      Q.  Do you remember what forms of identification
10  were permitted under S.B. 362?
11     A.  I would have to refer to the bill to be able
12  to do that.
13     Q.  Okay.  I think it starts on Page 5.
14     A.  "The following identification is an acceptable
15  form of photo identification under this chapter, a
16  driver's license or personal identification card issued
17  to the person by the Department of Public Safety that
18  is not expired or that expired no earlier than two
19  years before the date of presentation" (as read).
20     Q.  Okay.  I'll just ask you questions.  You don't
21  have to read out loud every single --
22     A.  Okay.
23     Q.  So does it permit a Texas driver's license?
24  That's on Page 5.
25     A.  Yeah, Page 5.  On Page 5, Lines 22, 23, and 24

---

115

1   it does permit a Texas Department of Public Safety
2   issued license.
3      Q.  And a qualifying on that was it must have
4   expired no earlier than two years before the date of
5   the presentation?
6      A.  Correct.
7      Q.  Does the bill permit identification issued by
8   an agency or institution of the Federal Government?
9   And I'll direct your attention to Page 6.
10     A.  Yes.  If an agency or institution of the
11  Federal Government or an agency or institution of a
12  political subdivision of this state, on Page 8 -- on
13  Line 18 and 19 on Page 6.
14     Q.  The part of the bill that -- that permits an
15  identification from an agency institution or political
16  subdivision of the state, would that include state
17  institution of higher education, like student IDs?
18     A.  I -- I do not know what the -- what that would
19  have included.  I don't know.  It certainly could have.
20  I do not know for certain.
21     Q.  Are the state universities of Texas an
22  institution of the state?
23     A.  State -- state-funded ones, yes, I guess they
24  would be considered that.
25     Q.  Does the bill permit employee identification

---

116

1   to be used?
2      A.  Let's see.
3      Q.  I guess I can make that question more
4   specific.  Does that -- does the bill permit employee
5   identification to be used if it's issued by an agency
6   or institution of the Federal Government or an agency,
7   institution or political subdivision of Texas?
8         MR. BRISSENDEN:  Objection, compound.
9      Q.  (BY MS. BERKOWER)  Did you understand the
10  question?
11     A.  Could you repeat it?
12     Q.  Sure.  I can break it down.  On Page 6,
13  Line 16 --
14     A.  Okay.
15     Q.  -- the bill permits a valid identification
16  card that contains the person's photograph and is
17  issued by -- and then it says --
18     A.  Federal Government.
19     Q.  -- Federal Government agency or an agency,
20  institution, or political subdivision of this state.
21         Does that -- does that mean that employee
22  identification issued by those authorities containing
23  the person's photograph would be permitted?
24     A.  I guess logically that would follow, yes.
25     Q.  And then at Line 22 there's another set of

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

117

1    documentation that's acceptable as proof of
2    identification, and that goes on Page 6 and 7, and
3    those are non- -- those forms of identification do not
4    have to be photographic identification; is that
5    correct?
6        A.  Let me review them.  Many of them appear not
7    to require a photo or have a photo.
8        Q.  And I know you've taken a break now, but if
9    you can remember back to H.B. 218.
10       A.  Okay.
11       Q.  And you can take a look to review if you'd
12   like.  Does it appear that for the most part S.B. 362
13   and H.B. 218 require the same identification to vote?
14       A.  No, not really.  If you look at Page 10 of
15   H.B. 218 under Section B, No. 1 is a copy of a current
16   utility bill, bank statement, government check,
17   paycheck, or other relevant document that shows the
18   name and address of the voter, whereas No. 1 under
19   Senate Bill 362, Page 6 is a voter's voter registration
20   certificate.  So that's the difference.
21       Q.  Okay.  But it does still permit a current
22   utility bill, paycheck, or government check -- paycheck
23   or other government document that shows the name and
24   address of the voter?
25       A.  Correct, but they also have listed the voter's

---

118

1    voter registration certificate, which is -- yes, which
2    is the difference there.
3        Q.  Okay.  So -- but -- so in 362 they added voter
4    register cards to --
5        A.  It appears to, yes, yes.
6        Q.  -- be one of the non-photo ID that was
7    permitted under that Section B; is that correct?
8        A.  Yes, that seems to be the case.
9        Q.  Are there other significant differences that
10   you know of?
11           MR. BRISSENDEN:  Objection, form.
12           THE WITNESS:  No, it appears to be very
13   similar.
14       Q.  (BY MS. BERKOWER)  And to be clear, both of --
15   both bills would permit a voter to present non-photo
16   identification under some circumstances to be allowed
17   to vote; is that correct?
18       A.  It appears to be the case, yes.
19       Q.  What were the purposes of -- sorry --
20   S.B. 362?
21           MR. BRISSENDEN:  Again, I'm going to
22   instruct the witness that in terms of the question as
23   it is asking about the general purpose of the bill in
24   the legislation, you may answer.
25           THE WITNESS:  Generally speaking, to

---

119

1    ensure the integrity and confidence in the elections in
2    Texas.
3        Q.  (BY MS. BERKOWER)  Was there any evidence of
4    these problems in the public record?
5        A.  I don't know.
6        Q.  Did anyone explain how the terms of this bill
7    would solve any of the problems related to in-person
8    voter fraud in comparison to current -- current law on
9    the public record?
10       A.  I do believe there was a discussion of that on
11   the House floor, but I don't know absolutely.
12       Q.  Do you recall what the explanation was of how
13   the terms of this bill would solve any problems related
14   to in-person voter fraud as expressed on the public
15   record?
16       A.  Specifically, I do not.
17       Q.  Do you know how the terms of this bill would
18   solve any problems related to in-person voter fraud in
19   comparison to current law?
20           MR. BRISSENDEN:  I would instruct the
21   witness that the question requires you to divulge your
22   thoughts, opinions, mental impressions, and analysis of
23   the legislation and I instruct you not to answer.
24           MS. BERKOWER:  It's actually just a yes
25   or no question, do you know.  I did not ask for the

---

120

1    substance of what he knows.
2            MR. BRISSENDEN:  If you're limited to
3    just whether he knows or not, I'll allow that.
4            THE WITNESS:  Do you mind repeating the
5    question?
6        Q.  (BY MS. BERKOWER)  Sure.  Do you know if the
7    terms of this bill would solve any problems related to
8    in-person voter fraud in comparison to current law?
9        A.  Generally the belief is that it would improve
10   that situation.
11       Q.  When you say "improve that situation," what
12   are you referring to?
13           MR. BRISSENDEN:  Now I'm going to have to
14   instruct him --
15           MS. BERKOWER:  Well, I just think the
16   answer is not clear.  So --
17           MR. BRISSENDEN:  Now you're asking him to
18   clarify and offer his opinion and explain his answer
19   beyond just providing an answer as to whether or not he
20   has knowledge or not.  That delves into his mental
21   impressions and thoughts and opinions, and I instruct
22   you not to answer the question.
23           MS. BERKOWER:  I understand.  But I asked
24   a yes or no question and he didn't respond with a yes
25   or no answer.  He responded with an answer that,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 121

1  frankly, was nonresponsive to a yes or no question, and
2  so I didn't understand what he meant. That's why I
3  asked for the clarification. If you'd rather, I can
4  re-ask the question if he can answer yes or no.
5        MR. BRISSENDEN: If he can answer the
6  question with a yes or no. It was a rather long
7  question that doesn't necessarily allow for a simple
8  yes or no answer without an explanation. And so with
9  that, I'm going to instruct him not to answer the
10 question.
11       MS. BERKOWER: Can I re-ask the question?
12       MR. BRISSENDEN: You can certainly
13 rephrase it, certainly.
14       Q. (BY MS. BERKOWER) Do you know if the terms of
15 this bill would solve any problems related to in-person
16 voter fraud?
17       MR. BRISSENDEN: And so the way that
18 question is phrased is do you know, yes or no? Do you
19 have that knowledge?
20       THE WITNESS: Being I'm not an expert, I
21 would say no.
22       Q. (BY MS. BERKOWER) Do you know if the terms of
23 this bill would solve problems with current law?
24       MR. BRISSENDEN: Again, the way the
25 question is phrased is do you know, yes or no.

---

### 122

1        THE WITNESS: This bill being Senate
2  Bill 362 with current law being --
3        Q. (BY MS. BERKOWER) The current practice.
4        A. -- the current practice, do I know -- I
5  apologize. Do I know what now? Would it solve
6  problems?
7        Q. Do you know if the terms of 362 would solve
8  problems related to in-person fraud under current law?
9        MR. BRISSENDEN: Do you have that
10 knowledge?
11       THE WITNESS: No, I don't have that
12 knowledge. I'm not an expert.
13       Q. (BY MS. BERKOWER) Did you follow the bill at
14 all while it was in the Senate as part of your duties
15 on the election committee?
16       A. I did not, no.
17       Q. How does that work just as a general matter if
18 you're on a committee that has a parallel committee in
19 the Senate? Do you interact at all?
20       A. In a general matter, it -- it varies greatly.
21 I would suggest that more often than not you don't
22 particularly interact. I mean, obviously there might
23 be conversations where there's a significant
24 interaction or conversation. But, respectfully,
25 obviously, that can vary. But largely the House does

---

### 123

1  kind of the House thing and the Senate does the Senate
2  thing and we don't have that much communication.
3        Q. What are the examples of committees that have
4  more interaction between House and Senate?
5        A. I don't think it's specific to a committee. I
6  think maybe it's more specific to members, if that
7  makes sense. There may be a specific time or instance
8  or member relationship where there may be more
9  interaction than otherwise.
10       Q. Are there any members that you interact with
11 regularly in the Senate?
12       A. Not to be difficult, obviously regularly is,
13 you know, definable. But I would -- I would deal more
14 with the state senators who have representation
15 overlapping with my House district, but generally
16 speaking, I don't have any significant interaction with
17 Senate members.
18       Q. Okay. Did you have communications with Senate
19 members concerning your duties on the elections
20 committee in 2009?
21       A. Not -- no, not really. And I want to be
22 respectful. I mean, I think Frazier -- did Senator
23 Frazier and I visit with each other during that
24 session, yes. Did we have visits about voter ID, no,
25 not really.

---

### 124

1        Q. So the visits covered other topics?
2        A. Usually of no substance.
3        Q. Okay. In April 2009, did some House members
4  sign a pledge circulated by the Republican Party of
5  Texas concerning voter ID?
6        A. I believe you're correct, yes, I think so.
7        Q. Did you sign the pledge?
8        A. Not to be -- I don't remember. I think I
9  didn't, but I don't really recall. I'm sure you have
10 the records.
11       Q. I have what's going to be Exhibit 435.
12       A. Thank you.
13       (Exhibit No. 435 marked)
14       Q. (BY MS. BERKOWER) Take a minute to review it
15 and let me know when you're done.
16       A. (Reading).
17       Okay. I reviewed it.
18       Q. Can you describe generally what the pledge
19 required members to agree to?
20       A. On principles concerning what the bill must
21 contain are clear. This bill must ensure a valid photo
22 identification as needed to vote, take effect at the
23 next possible uniform election date, be free of any
24 restriction -- registration, I apologize, registration
25 requirement, such as same day voter registration that

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 125

1  dilutes the intent of the bill, which is ensuring fair
2  and accurate election, and increase criminal penalties
3  for voter fraud and registration. And then members
4  signing their commitment to those principles as stated.
5      Q.  Are you on the list of members who signed the
6  commitment?
7      A.  It appears I am not.
8      Q.  If you turn to Page 4 of the document, the
9  last page.
10     A.  Yes, ma'am.
11     Q.  Do you see the first full paragraph, the last
12  sentence says, "Representative Dennis Bonnen, as a
13  member of the House Elections Committee, has issued a
14  principle stating explaining his revision below" (as
15  read).
16     A.  Yes.
17     Q.  On Tuesday -- and then it quotes you as
18  saying, "On Tuesday, many Texas House Republican caucus
19  members issued a statement calling for four principles
20  to be included in the voter ID bill. While I choose to
21  stand firmly behind these key elements, I choose not to
22  add my name to the statement" (as read).
23         Do you remember saying that?
24     A.  I do.
25     Q.  Did you, in fact, not choose to add your name

---

### 126

1  to the statement?
2      A.  That is correct.
3      Q.  Why didn't you add your name to the statement?
4         MR. BRISSENDEN:  I'm going to instruct
5  the witness at this time not to disclose, in response
6  to the question, information with thoughts and mental
7  impressions, analysis regarding the voter ID bill and
8  in connection with your query. I instruct you not to
9  answer.
10        MS. BERKOWER:  Well, we view promises --
11  I think it's actually pretty well settled that promises
12  concerning support of legislation, agreeing to
13  introduce legislation are actually not privileged under
14  the Supreme Court case of United States versus Saltsky
15  [phonetic] --
16        THE REPORTER:  Saltsky?
17        MS. BERKOWER:  I will get the name for
18  you in a second.
19        And that's why usually that question is
20  proper. Are you willing to withdraw your objection on
21  that basis?
22        MR. BRISSENDEN:  No, I'm not.
23        MS. BERKOWER:  Are you aware of that
24  Supreme Court case?
25        MR. BRISSENDEN:  I'm not -- I'm not the

---

### 127

1  witness and I'm not being examined here today. I will
2  say to you that I'm standing by the objection and the
3  instruction. Your question didn't talk about promises.
4  It asked about why he chose not to add his name to the
5  statement, and that asks for his mental impressions.
6  I'm going to instructing the witness not to answer.
7      Q.  (BY MS. BERKOWER)  Are you going to follow
8  your counsel's instruction?
9      A.  Yes, ma'am.
10     Q.  Did you, in fact, make any promises to support
11  a particular type of voter identification legislation?
12        MR. BRISSENDEN:  I'm again going to
13  instruct the witness not to answer the question based
14  upon legislative privilege.
15        MS. BERKOWER:  Can you explain your basis
16  for that objection, given the relative set of authority
17  on that point?
18        MR. BRISSENDEN:  I'm not going to be
19  examined here today during the deposition, but I'm
20  standing on the privilege, and based upon the court's
21  orders of -- and as I understand them from yesterday,
22  June 5th, May 17th, and May 21st.
23        MS. BERKOWER:  Can you point to any
24  direct citation in any of those opinions just for my
25  personal information that supports your objection on

---

### 128

1  this point?
2         MR. BRISSENDEN:  I have stated my
3  objection.
4      Q.  (BY MS. BERKOWER)  Okay. Are you going to
5  answer the question?
6      A.  No, ma'am.
7      Q.  I think, then, the quotation -- the pledge
8  continues to quote you after that paragraph.
9      A.  Well --
10     Q.  Sorry.
11     A.  This isn't a pledge. It's simply a statement.
12     Q.  Sorry. The pledge ends with the end of the --
13  you're right. Well, this -- this article or
14  communication, whatever it is, from the Republican
15  Party of Texas --
16        MR. BRISSENDEN:  For the record, it's a
17  press release dated Wednesday, April 29th, 2009.
18     Q.  (BY MS. BERKOWER)  Okay. So this press
19  release quotes you; is that a fair statement?
20     A.  That is -- that is a fair statement.
21     Q.  And it continues to quote you saying, "As a
22  member of the election committee, my focus remains to
23  advance this bill to the House floor. I will not sign
24  a commitment that threatens to kill the bill by
25  preventing it from being voted out of committee and

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

129

1    which undermines the many long hours we have worked" --
2         THE REPORTER:  Prevented it from?
3         Q.  (BY MS. BERKOWER) -- "being voted out
4    committed and which undermines the many long hours we
5    have worked to send it to the floor so that my
6    colleagues will then have the opportunity to cast votes
7    for these important principles" (as read).
8         Is that an accurate reading?  Did that
9    accurately quote you?
10        A.  Yes, that I will not sign a commitment that
11   threatens to kill the bill, and therefore, yes.
12        Q.  How would the pledge have killed the bill?
13        MR. BRISSENDEN:  Again, I'm going to
14   instruct the witness that -- not to divulge or disclose
15   your mental impressions, mental thoughts, analysis, and
16   opinions regarding voter IDs and voter ID bill.  I'll
17   instruct you not to answer at this time.
18        Q.  (BY MS. BERKOWER)  I think the press release
19   then quotes you further and says, "My further
20   commitment to advancing a strong executive voter ID
21   bill has not wavered.  One can simply look at the voter
22   bill that I filed, H.B. 3556, to see where I stand on
23   the issues" (as read).  Is that an accurate quote?
24        A.  That is.
25        Q.  Do you remember House Bill 3556?

---

130

1         A.  Not very specifically, no.  Certainly it
2    exists, but the detail of which, no, I do not.
3         Q.  Okay.  I have what's going to be Exhibit 436.
4         MS. PERALES:  While you're marking the
5    exhibit, I just want to say for the record thank you
6    for allowing us to come in late.  We had to be at the
7    start of the Anchia in another location.  So thank you
8    for your patience.
9         THE WITNESS:  No problem.
10        (Exhibit No. 436 marked)
11        Q.  (BY MS. BERKOWER)  Do you recognize this
12   document?
13        A.  I do, yes.
14        Q.  What is it?
15        A.  It is House Bill 3556 by Representative
16   Bonnen, myself.
17        Q.  What does this bill do?
18        A.  It provides for integrity and insurance of
19   confidence in election in the State of Texas.
20        Q.  Does it amend the current election code to
21   provide additional voter ID requirements?
22        A.  It appears to amend Subchapter A, Chapter 15
23   of the election code.
24        Q.  So turning to Page 5 -- do you need a minute
25   to review it?

---

131

1         A.  No, we can go ahead.
2         Q.  Turning to Page 5, on line -- well,
3    Section 10(a)(1), that starts on Line 13.
4         A.  Yes, ma'am.
5         Q.  It requires -- it says, "A voter could
6    present, as an acceptable form of photo identification,
7    a driver's license or personal identification card
8    issued by the Department of Public Safety that is not
9    expired or that has expired no earlier than two years
10   before the date of presentation" (as read).
11        Is that -- do you see that there?
12        A.  I see that on Lines 13 through 16 on Page 5,
13   that's correct.
14        Q.  And then the next section permits a US
15   military identification card to be used if there's a
16   photograph on it.  Is that accurate?
17        A.  It contains the person's photograph, that's
18   correct.
19        Q.  And then line -- Section 3 there says, "A
20   valid employee identification card that contains the
21   person's photograph and is issued by an employer of the
22   person in the ordinary course of the employer's
23   business" (as read).  Do you see that?
24        A.  Yes, that is correct, on Page 5.
25        Q.  And then turning to Page 6, skipping down a

---

132

1    few sections on Line 4, it permits a student
2    identification card issued by a public or private
3    institution of higher education located in Texas that
4    contains the person's photograph.  Do you see that?
5         A.  Yes.  It's No. 6.
6         Q.  And then Section 7 permits a voter to present
7    a license to carry a concealed handgun.  Do you see
8    that?
9         A.  Yes, offered by DPS.
10        Q.  Section 8 then permits a valid identification
11   card that contains the person's photograph and is
12   issued by the either an agency or institution of the
13   Federal Government or an agency, institution, or
14   political subdivision of this state.  Do you see that?
15        A.  Yes, ma'am.
16        Q.  And then the next section provides for
17   additional documentation that's acceptable as proof of
18   identification.  Do you see that?
19        A.  I do.
20        Q.  And it includes a number of items.  It looked
21   like you could present under part one -- could you
22   present a copy of a current utility bill, bank
23   statement, government check, paycheck, or other
24   government document that shows the name and address of
25   the voter?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 133

1      A.  Lines 18 through 20 on Page 6 say that, yes.
2      Q.  And the next section says, "Official mail
3  addressed to the person by name of a governmental
4  entity"?
5      A.  Correct.
6      Q.  The next section says, "A certified copy of a
7  birth certificate or other document confirming birth
8  that is admissible in a court of law and establish the
9  person's identity" (as read).  Yes?
10     A.  Correct.
11     Q.  The next section permits citizenship papers;
12  is that correct?
13     A.  Yes, issued to that person, correct.
14     Q.  The next section permits an original or
15  certified copy of the person's marriage license or
16  divorce decree; is that correct?
17     A.  That is correct.
18     Q.  The next section permits court records that
19  the person's adoption, name change, or sex change; is
20  that correct?
21     A.  That is correct.
22     Q.  And then the next section permits an
23  identification card issued to the person by a
24  governmental entity of this state or the United States
25  for the purposes of obtaining public benefits,

---

### 134

1  including veteran's benefits, Medicaid, or Medicare.
2  Do you see that?
3      A.  I do see it.
4      Q.  Then it further permits a temporary driving
5  permit issued to the person by the Department of Public
6  Safety; is that correct?
7      A.  It is correct.
8      Q.  And then the next section permits a pilot's
9  license issued to the person by the Federal Aviation
10  Administration or another authorized agency of the
11  United States.  Do you see that?
12     A.  I do.
13     Q.  And then there's two more.  One -- the next is
14  a library card that contains the person's name issued
15  to the person by a public library located in this
16  state; is that correct?
17     A.  It is correct.
18     Q.  Or -- and then the last -- the last one,
19  No. 11 there says, "A hunting or fishing license issued
20  to the person by the Parks and Wildlife Department" (as
21  read).  Is that correct?
22     A.  Yes.
23     Q.  So this section that starts on Page 6 and runs
24  to Page 7 permits, it looks like, 11 categories of
25  non-photo identification that are permitted for

---

### 135

1  proof -- proof of identification; is that correct?
2      A.  Can you repeat -- say that again?
3      Q.  This section of the bill, which starts on
4  Line 16 of Page 5 --
5      A.  Page 6.
6      Q.  Sorry, Page 6, yes, right -- permits 11
7  categories of non-photo ID that would be acceptable as
8  proof of identification for voting?
9      A.  Yes, that's correct.
10         MR. BRISSENDEN:  Objection to the extent
11  the question mischaracterizes the bill -- the language
12  in the bill.
13     Q.  (BY MS. BERKOWER)  You may answer.  Does it,
14  in fact, do that?
15     A.  I guess it does.
16     Q.  Now, turning back to the press release we were
17  just looking at on the last page, when you said this
18  was an accurate quotation of you --
19     A.  Uh-huh.
20     Q.  -- you said, "One can simply look at the voter
21  ID bill that I filed, H.B. 3556, to see where I stand
22  on the issues" (as read).
23     A.  Yes.
24     Q.  Do you see that?
25     A.  I do.

---

### 136

1      Q.  Does that mean that this bill 3556 documents
2  or includes the types of voter identification that you
3  find acceptable for voter ID?
4          MR. BRISSENDEN:  I'm going to instruct
5  the witness that to the extent that the question
6  requires you to divulge your mental impressions, your
7  thoughts, analysis of House Bill 3556, I would instruct
8  you not to answer.  To the extent you can answer the
9  question without disclosing information that is
10  privileged, you may answer.
11         THE WITNESS:  I will use my privilege.
12     Q.  (BY MS. BERKOWER)  Would you agree, though,
13  that you introduced a bill into the House that would
14  permit a voter to show an employee ID card as proof of
15  identification?  That's Page 5, Line 23.
16     A.  I'm sorry.  Repeat that again.
17     Q.  I said would you agree that you introduced a
18  bill into the House that would allow a voter to present
19  employee identification cards as proof of
20  identification to vote?
21     A.  No.  I filed a bill that would allow for valid
22  employee identification card that contains a person's
23  photograph that is issued by an employed person in the
24  ordinary course of the employer's business.
25     Q.  In order to vote?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 137 | 139 |
|---|---|
| 1    A. Correct. | 1    MR. BRISSENDEN: I'm going to instruct |
| 2    Q. And you introduced -- is it true that you | 2  the witness not to -- instruct you not to disclose |
| 3  introduced a bill into the House that would allow a | 3  thoughts, opinions, mental impressions, analysis of the |
| 4  voter to present a driver's license or personal | 4  legislation and instruct you not to answer. |
| 5  identification card issued by the Texas Department of | 5    THE WITNESS: I would agree with that. |
| 6  Public Safety that had expired within two years before | 6    Q. (BY MS. BERKOWER) Okay. Well, turning back |
| 7  the date of presentation? Now I'm looking at Lines 13 | 7  to Page 1 of the pledge. |
| 8  through 16 on Page 5. | 8    A. Certainly. |
| 9    A. I don't know if I heard you exactly. But that | 9    Q. Does the bill that you introduce ensure that a |
| 10  has not expired or that expired no earlier than two | 10  valid photo identification is needed to vote? |
| 11  years before the date of the presentation, yes. | 11    MR. BRISSENDEN: I'm going to instruct |
| 12    Q. Yes. Isn't it true -- and now I'm looking at | 12  the witness not to disclose your mental impression, |
| 13  Page 4, Line 4 -- isn't it true that you introduced a | 13  thoughts and opinions, analysis of the legislation. |
| 14  bill into the House that would allow a voter to use a | 14  You may answer as to what the general purpose of the |
| 15  student identification card issued by a public or | 15  legislation was. |
| 16  private institution of higher education located in | 16    Q. (BY MS. BERKOWER) I'll rephrase the question, |
| 17  Texas that contains the person's photograph in order to | 17  actually. Item 1 on the pledge says that, "The bill |
| 18  vote? | 18  must ensure a valid photo identification is needed to |
| 19    A. That is correct. | 19  vote" (as read). Is that an accurate -- did I |
| 20    Q. Now I'm looking at Line 12. Isn't it true | 20  accurately read that? |
| 21  that you would allow a voter to present photographic | 21    A. You did accurately read it. |
| 22  identification that has not expired from an agency or | 22    Q. Isn't it true that the bill you introduced in |
| 23  institution of the Federal Government in order to vote? | 23  the House does not require a valid photo identification |
| 24    A. Correct. | 24  in order to vote? |
| 25    Q. And you introduced a bill into the House that | 25    A. No, it does require a valid photo |

| 138 | 140 |
|---|---|
| 1  would allow a voter to present valid photo | 1  identification to vote. |
| 2  identification from a state agency, institution, or | 2    Q. Can't a voter under the bill you introduce |
| 3  political subdivision in order to vote; is that | 3  provide nonvoter identification in order to vote? |
| 4  correct? | 4    A. It does. |
| 5    A. That is correct. | 5    Q. So does it require, in all circumstances, that |
| 6    Q. And you introduced -- now starting again on | 6  a valid photo identification is needed to vote? |
| 7  Line 16 on Page 6 -- you introduced a bill into the | 7    A. It doesn't, but the pledge doesn't say that |
| 8  House that would allow voters to present non-photo | 8  either. |
| 9  identification as acceptable proof of identification in | 9    Q. What was the purpose of the bill you |
| 10  order to vote; is that correct? | 10  introduced, H.B. 3556? |
| 11    A. Yes. | 11    A. To ensure confidence and integrity in the |
| 12    Q. Getting back to the pledge, just a couple more | 12  election process in Texas. |
| 13  questions about that. Did anyone ask you to sign the | 13    MR. BRISSENDEN: And just so the record |
| 14  pledge? | 14  is clear, I'm instructing the witness to limit his |
| 15    MR. BRISSENDEN: I'm going to instruct | 15  answer to general purpose. |
| 16  the witness not to disclose communications you had with | 16    Q. (BY MS. BERKOWER) What happened to H.B. 3556 |
| 17  your staff and with other legislators and their staff. | 17  that you introduced? Do you remember? |
| 18  To the extent that you can answer the question without | 18    A. I don't, but I think it didn't even get a |
| 19  disclosing communications that you had with those | 19  hearing, or maybe it was heard. I actually don't know. |
| 20  legislators or their staff members, you may answer. | 20  But it didn't move through the process at any level. |
| 21    THE WITNESS: I don't believe anyone | 21    Q. Did you ultimately vote for S.B. 362? |
| 22  asked me to sign the pledge. | 22    A. I'm certain if it -- well, yeah, I don't know. |
| 23    Q. (BY MS. BERKOWER) In your view, did the bill | 23  The record would reflect that. I don't recall. |
| 24  that you introduced in the House, 3556, comply with the | 24    Q. Was there opposition to S.B. 362 in the House |
| 25  pledge? | 25  on the public record? |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 141

1    A. I'm certain there was.
2    Q. Do you remember who opposed the bill?
3    A. Not specifically, not.
4    Q. Do you remember the publicly provided reasons
5  for their opposition?
6    A. No.
7    Q. What other bills concerning voter
8  identification legislation do you remember from the
9  2009 legislative session?
10    A. I don't really recall any. There probably
11  were others. I just don't recall.
12    Q. Do you recall a bill introduced by
13  Representative Smith?
14    A. I'm going to answer accurately. I -- we may
15  have heard of a bill by Representative Smith in -- in
16  committee, but I don't specifically recall the bill.
17    Q. Have you ever heard anyone in public call it a
18  compromised bill?
19        MR. BRISSENDEN: Again, I'm going to
20  instruct the witness not to disclose any communications
21  that you've had with other legislators, their staff, or
22  your own staff. To the extent that you can answer the
23  question without disclosing those communications you
24  may answer.
25        MS. BERKOWER: Well, I would take issue

### 142

1  with that objection because I asked for -- I specified
2  public statements and if he had heard other legislators
3  or staffers publicly call it a compromised bill. That
4  would not be privileged.
5        MR. BRISSENDEN: Well, that would be
6  privileged to the extent that he had communications
7  with those legislators or they have had communications
8  with him that are not part of the public record.
9        MS. BERKOWER: Okay. I'll rephrase the
10  question, but I don't know that I understand your
11  objection. I said have you ever heard anyone publicly
12  call Representative Smith's bill a compromised bill.
13  Can he answer the question?
14        MR. BRISSENDEN: To the extent that that
15  is part of the public record and he has information
16  about that as part of the public record, he may.
17        THE WITNESS: I do not recall whether
18  publicly it was called a compromised bill or not. But
19  if it was, I'm certain the record is there.
20    Q. (BY MS. BERKOWER) Did you ultimately vote for
21  Representative Smith's bill?
22    A. I don't know.
23    Q. I'm going to direct your attention to what we
24  will mark as Exhibit 437 for the record.
25        (Exhibit No. 437 marked)

### 143

1        MS. BERKOWER: Actually, do you mind
2  looking on with him? Do you want me to make an extra
3  copy?
4        MR. BRISSENDEN: No, that's fine.
5        MS. BERKOWER: If you'd like, we can make
6  another copy. I thought we had four.
7        MR. BRISSENDEN: That's okay.
8        THE WITNESS: We're fine.
9    Q. (BY MS. BERKOWER) Do you know what this is?
10    A. It appears to be correspondence between myself
11  and a Ms. Kathy Rogers, Galveston County GOP.
12    Q. Had you met Ms. Rogers before?
13    A. Interestingly, I believe I met her on an
14  elevator when I was stuck with her in the Capitol.
15    Q. Oh, gosh, so you know her very well, is what
16  you're saying?
17    A. No, no, no. If you knew her, only an elevator
18  ride would be considered stuck. The elevator wasn't
19  broken.
20    Q. Okay. And do you see at the top where the
21  description of the correspondence was constituent at
22  the top left corner?
23    A. I do.
24    Q. What does that mean when there's a designation
25  like that on a report like this?

### 144

1    A. I don't actually produce these reports. I
2  would assume that my staff would put constituent on
3  there because it is coming from somebody who is not a
4  part of the Capitol interest groups, lobby group,
5  special interest group. It's coming from a citizen
6  in -- maybe in a community in my district or a nearby
7  district.
8    Q. What's the date on this correspondence?
9    A. May 18th of 2009.
10    Q. Can you take just a minute and review the
11  correspondence?
12    A. Certainly. (Reading).
13        MR. BRISSENDEN: While he's reviewing
14  that, I want to make a statement on the record that
15  there were documents that had been requested by
16  Elizabeth Westfall yesterday following the court's
17  order and she had asked for particular documents
18  pertaining to Representative Bonnen be produced here
19  today by noontime, and I'm told that those documents
20  have been produced.
21        MS. BERKOWER: Yes, I believe that's
22  correct. And this is one of those documents.
23        MR. BRISSENDEN: Okay.
24        MS. BERKOWER: I'm not sure from the
25  e-mail correspondence I saw whether or not all of them



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 145

1  have been produced.  I think there were some technical
2  problems that might have delayed some of them.  But I
3  know at least an attempt at the production has been
4  made.
5          MR. BRISSENDEN:  Right.  I believe there
6  was a -- some technical difficulties that made
7  production slightly after noontime.  But I believe from
8  our office standpoint those documents that Elizabeth
9  specifically asked for have been produced.  And I
10 believe there will be more produced that weren't a part
11 of Elizabeth's letter.  Those will be produced later
12 today.
13         MS. BERKOWER:  Thank you for that
14 clarification.
15     Q.  (BY MS. BERKOWER)  Are you ready?
16     A.  Yes, ma'am, sure.
17     Q.  So turning to the last page first, before I
18 forget, it says -- it looks like Ms. Rogers signed her
19 initial correspondence to you.  Do you see that?
20     A.  I don't know exactly what you mean.
21     Q.  On the last page, one more page at the top
22 there.
23         Okay.  What do you mean "to me"?
24     Q.  Well, on the page -- on Page 5 it looks like
25 her -- her initial correspondence to you is reproduced,

---

### 146

1  and then the end of it spills on to Page 6 and she
2  signs her name, Kathy Rogers.  Do you see that?
3      A.  Yes, I do.
4      Q.  And then she signed underneath that Jenai's
5  friend's mom?
6      A.  Correct.
7      Q.  Who is Jenai?
8      A.  Jenai is my niece.
9      Q.  Have you received other requests or
10 communications from Jenai or another constituent that
11 indicated you'd be getting communication is from
12 Ms. Rogers?
13     A.  No.  Jenai is my niece who is a young -- she's
14 now I think a sophomore or junior in high school.  At
15 the time she would have been in middle school or a
16 freshman.  And I think Kathy Rogers was providing --
17 trying to provide context and significance to her
18 correspondence by presenting and knowing of my family.
19     Q.  When she said Jenai's friend's mom, did you
20 know who --
21     A.  Well, I know who Jenai is, absolutely.
22     Q.  Okay.  On Page 2 of this letter -- well, okay.
23 So it looks like this document reproduces her letter to
24 you and then most of the document is your letter back
25 to her.  Would you agree with that characterization?

---

### 147

1      A.  I believe that's correct, yes.
2      Q.  On Page 2 you said that you requested to be a
3  member of the House Elections Committee so that we
4  could pass a powerful and meaningful piece of
5  legislation.  Did I read that accurately?
6      A.  You did.
7      Q.  Is that true?
8      A.  It is true that it says so that we could pass
9  a powerful and meaningful piece of legislation and that
10 I requested to be a member of the House Elections
11 Committee, yes.
12     Q.  Did you request to be a member of the House
13 Elections Committee?
14     A.  I would assume I did.
15     Q.  I just wanted to be sure because earlier I
16 don't know that we covered that information, or at
17 least I'm not sure you remembered if you had.
18     A.  Earlier I believe we were referencing the
19 select committee.
20     Q.  Okay.
21     A.  And that was in the 2011 session, and we're
22 now referring to my appointment to the elections
23 committee in 2009.
24     Q.  So you did request to be a member of that
25 committee?

---

### 148

1      A.  Yes.  And for clarity, the elections committee
2  is a standing committee that members are able to
3  request, whereas the select committee is exactly that,
4  and it's not a committee that members would have been
5  aware of that it was going to exist and therefore
6  request it.
7      Q.  In the previous paragraph you say that you
8  voted against -- well, I guess maybe we should back up
9  earlier.
10     A.  Okay.
11     Q.  Do you know which -- what Ms. Rogers' concern
12 was in writing to you?
13     A.  Well, she says, "I've been tasked by the
14 Galveston County GOP to find out why you voted against
15 the voter ID bill.  They don't want to hear that you
16 didn't think it was strong enough because" -- in
17 quotes -- "that is always sorted out in the House
18 Senate Committee.  I hope you'll support it when it
19 comes to the floor.  Thanks in advance for any
20 nonautomated reply" (as read), and then there's a "J."
21     Q.  And then I think it looks like above her
22 e-mail to you on the left-hand it says "881 R.S. 362."
23 Can you explain what that means?
24     A.  I assume, because I don't really deal with
25 this system; my staff does -- I assume it would mean

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

### 149

1  that it was -- it is -- it is indicating that this
2  individual is for a bill in the 81st regular session,
3  that is Senate Bill 362.
4      Q.  Okay.  So do you think we can conclude that
5  the bill Ms. Rogers is referring to you that voted
6  against is S.B. 362?
7      A.  Yes, but for clarity, I believe it would be
8  362 as carried in the House by Representative Smith.
9      Q.  Okay.  Thank you for that clarification.  So
10 turning now to Page 2 -- turning now to Page 2,
11 the first full paragraph, the last line.
12     A.  Uh-huh.
13     Q.  I'm sorry.  Sorry.  The second full paragraph,
14 the last sentence, you said that you "Voted against the
15 bill to send a strong message to Chairman Smith and to
16 all Texans that his bill is completely unacceptable and
17 it is an outright insult to citizens who have demanded
18 effective voter ID legislation" (as read).
19         Did I read that accurately?
20     A.  "I voted against the bill to send a strong
21 message to Chairman Smith and to all Texans that this
22 bill is completely in acceptable and is outright insult
23 to citizens who have demanded effective voter ID
24 legislation" (as read), that is correct.
25     Q.  Doesn't S.B. 362 contain many of the same

### 150

1  identification requirements that you included in House
2  Bill 3556?
3      MR. BRISSENDEN:  I instruct the witness
4  not to disclose his thoughts, impressions, and analysis
5  of the legislation and instruct him not answer.
6      Q.  (BY MS. BERKOWER)  Okay.  Well, then let's
7  turn back to House Bill 3556 and also Senate Bill 362.
8  Please turn to Page 5 in both documents.
9      A.  Which exhibits are you referring to?
10     Q.  I'm sorry.  That's Exhibit 434.
11     A.  436.
12     Q.  So turning to Page 5 --
13     A.  What version of the bill is this?
14     Q.  Of that bill, I believe it's as filed.
15     MR. BRISSENDEN:  We're referring to
16 Exhibit 434 for the record.
17     THE WITNESS:  Right.  So the issue I
18 would have concern with here is that you're asking me
19 to compare a bill as filed in trying to create context
20 in the bill I voted against coming out of committee,
21 which is not this bill.
22     Q.  (BY MS. BERKOWER)  Okay.
23     A.  It was changed in the House.
24     Q.  Okay.  In that case we'll come back to this
25 later and leave it alone for now.  Can I just take a

### 151

1  minute to confer with counsel?
2      A.  Absolutely.
3         (Conferring.)
4      Q.  (BY MS. BERKOWER)  So now that we've talked
5  about this correspondence with Ms. Rogers, I think -- I
6  think maybe you said earlier you didn't remember if you
7  had voted for Representative Smith's bill.  Does this
8  refresh your recollection?
9      A.  It refreshes the recollection that I voted
10 against it in the committee.
11     Q.  Did you vote for it on the floor?
12     A.  I don't remember.  I think I did, but I'm not
13 certain of that.  The record would show us that.
14     Q.  What ultimately happened to S.B. 362 in the
15 House?  Do you remember?
16     A.  I don't.
17     Q.  Do you remember there being interim charge to
18 the committee on elections after the 2009 session?
19     A.  There are always interim charges given to
20 committees after sessions, so I'm certain there was.
21 I don't know specifically what those charges were.
22     Q.  Do you remember being involved with a report
23 prepared pursuant to an interim session charge?
24     A.  I wasn't -- I'm sure I signed a report.  I
25 don't know if I did or not.  I'm sure there was a

### 152

1  report written.  I didn't write the report, though.
2      Q.  Do you remember if the charge asked the
3  committee to investigate the prevalence of voter fraud
4  in Texas?
5      A.  There would be a record of whether it said
6  that or not.  I -- I personally don't recall.
7      Q.  I'm going to show you what I'm going to mark
8  as Exhibit 438.
9      MS. BERKOWER:  Is that what we're up to?
10 438.
11     (Exhibit No. 438 marked)
12     Q.  (BY MS. BERKOWER)  This one, the cover stages
13 didn't get stapled on to it, but I will represent to
14 you that this is an excerpt of --
15     A.  Certainly, charges.  Fair enough.
16     Q.  And I don't have the cover pages.  Does this
17 help refresh your recollection about the interim
18 charge?
19     A.  Well, it is a copy of the report filed --
20 House Committee Elections report filed January 2011,
21 interim report.
22     Q.  Were you involved with the preparation of that
23 report?
24     A.  Very insignificantly.
25     Q.  What was your role with regard to the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 153

1  preparation of that report?
2      A.  I don't remember if we had a hearing that I
3  may have attended.  But beyond that, I wouldn't have
4  had any more involvement.
5      Q.  To be clear, do you remember if there was a
6  hearing?
7      A.  I don't.
8      Q.  Do you remember --
9      A.  Well, let me -- let me state it more
10 accurately.  I'm sure there was probably a hearing.  I
11 don't recall whether I attended a hearing or not.
12 There would be a record.  There might have been more
13 than one hearing for that matter.
14     Q.  You don't remember any of the hearings,
15 though?
16     A.  I don't recall whether -- and I'm talking
17 about in the interim.
18     Q.  Yes.
19     A.  Yeah.  I don't recall specifically whether
20 there were hearings or not and if I was at the
21 hearings.
22     Q.  Turning to Page 27, which is --
23     A.  I've got it.
24     Q.  This is an excerpt.
25     A.  Yes.

## 154

1      Q.  The fourth full paragraph.
2      A.  Under testimony or including background?
3      Q.  Under -- under testimony.
4      A.  Okay.
5      Q.  Does that -- well, does the testimony --
6  there's a section called "Testimony."  Do you see that?
7      A.  Correct.  Yes, ma'am.
8      Q.  Does it indicate that someone from the
9  Attorney General's office came to testify before the
10 committee?
11     A.  Well, yes, you know, it says above that the
12 committee held a hearing on June 14th, 2010, to gather
13 more information about issues related to voter
14 identification to fulfill the interim charge.  You are
15 correct.  It says Jay Dyer, Deputy Attorney General for
16 government and external affairs testified.  Yes.
17     Q.  Okay.  And then does -- do the next couple of
18 paragraphs summarize Mr. Dyer's testimony?
19     A.  I assume it does, but I can't say accurately
20 whether it does or not because I don't recall his
21 testimony.  I don't even think I was at the hearing.
22     Q.  Is that the intent of these paragraphs, to
23 summarize what he testified to?
24     A.  As I said, I assume it is.  But I can't vouch
25 for it.

## 155

1      Q.  So the -- in the third paragraph of that
2  section, the last line, does it -- it reads, "To get a
3  complete picture of voter fraud in Texas, further
4  analysis is needed to gather additional information
5  from local election and law enforcement officials" (as
6  read).  Do you see that?
7      A.  Yes, ma'am.
8      Q.  Do you know of any -- if any such analysis was
9  ever conducted pursuant to what's in the public record?
10         MR. BRISSENDEN:  And just the record --
11 we're clear, the question is limited to what's in the
12 public record.  To the extent you can answer that
13 question, go ahead.
14     Q.  (BY MS. BERKOWER)  I can rephrase the
15 question, actually.
16         Do you know if there is any such analysis
17 included in the public record?
18     A.  I know in public testimony there have been
19 examples of -- from local election officials and law
20 enforcement officials of concerns with voter integrity.
21     Q.  Were those presented in the public record
22 before or after this testimony?
23     A.  My recollection is that it was presented
24 before and after.
25     Q.  And were those -- were those public

## 156

1  presentations in the form of analysis, or were they in
2  the form of individual anecdotal accounts for case
3  studies?
4      A.  I'm not sure what you would specifically call
5  them.  I believe there were different individuals and
6  different election officials from different parts of
7  the state who gave reports of concerns with voter
8  integrity.
9      Q.  Did any of those reports conduct a broad
10 analysis of local election enforcement on -- of
11 election fraud enforcement on the local or county
12 level, to your knowledge, in the public record?
13     A.  Well, I don't think the issue was about
14 reports.  It was about specific instances and concerns
15 of voter fraud.
16     Q.  So, to -- to your knowledge, was there any
17 comprehensive analysis that gathered additional
18 information from local election and law enforcement
19 many officials concerning voter fraud?
20         MR. BRISSENDEN:  Objection, vague.
21 Objection, compound.  Again, the question is limited to
22 what's in the public record.
23     Q.  (BY MS. BERKOWER)  Indeed.
24     A.  I believe that information was brought to us
25 showing reports from certain counties or from counties



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

## 157

1  who had reviewed for voter fraud and voter
2  irregularities.
3      Q.   But, to be clear, were any of those reports a
4  statewide analysis?  And I'm limiting go this to the
5  public record.
6      A.   No, I don't think they were statewide
7  analysis, because they were -- they were requested from
8  local election and law enforcement officials.
9      Q.   In the paragraph above that it describes
10 Mr. Dyer's testimony concerning referrals and instances
11 of alleged illegal voting.  Do you see that?
12     A.   Is that the second sentence, allegations of
13 voter fraud without being asked, or where?
14     Q.   I think it's the second paragraph about
15 Mr. Dyer's testimony that starts, "Since 2002."
16     A.   Okay.
17     Q.   So do you see that paragraph?
18     A.   Yes, ma'am.
19     Q.   Does it -- does it say Mr. Dyer testified that
20 the Attorney General's office received 267 referrals of
21 incidences of alleged illegal voting since 2002?
22     A.   It does.
23     Q.   Does it also say Mr. Dyer testified that 35 of
24 those alleged violations were resolved with guilty
25 pleas?

## 158

1      A.   It does.
2      Q.   Dismissals or plea agreements, while 12 cases
3  remain active.
4      A.   Yes, ma'am.
5      Q.   Out of the 267.
6      A.   That -- that is what it reads.
7           MR. BRISSENDEN:  For the record, it goes
8  on to --
9           MS. BERKOWER:  Sorry.  Did you want to
10 say something?
11          MR. BRISSENDEN:  I was going to ask you
12 to complete the sentence.
13     Q.   (BY MS. BERKOWER)  I thought -- okay.  35 -- I
14 thought I cited 12 cases remain active, and the
15 remainder of the cases are still being investigated
16 where the statute of limitations has expired.  So it
17 doesn't explain how many cases can -- are no longer
18 being pursued; is that correct?
19     A.   No, it does not give a number to that.  It
20 simply says 35 were resolved with pleas of guilty,
21 dismissals, or plea agreements.  12 cases remain
22 active.  And the rest are under current investigation
23 or have had the statute run.  So we don't know
24 specifically the number.
25     Q.   And the purpose of this interim charge, what

## 159

1  was it?  What was the purpose of the interim charge?
2      A.   It was --
3           MR. BRISSENDEN:  I'm going to instruct
4  the witness that you can answer the question in terms
5  of generally speaking, what is the general purpose of
6  an interim charge.
7           THE WITNESS:  Well, she -- I'm sorry.
8           MR. BRISSENDEN:  With regards to the
9  purpose of this particular charge as it relates to this
10 particular legislation.  If you can answer the question
11 without divulging your thoughts, analysis, and mental
12 impressions with regards to this legislation, you may
13 answer.  If you can't without disclosing, then I
14 instruct you not to answer.
15          THE WITNESS:  To the best of my knowledge
16 interim charge No. 3, "Examine the prevalence of fraud
17 in Texas elections, study new laws in other states
18 regarding voter identification, and recommend statutory
19 changes necessary to ensure that only eligible voters
20 can vote in Texas elections" (as read).
21     Q.   (BY MS. BERKOWER)  Did the report make a
22 recommendation?
23     A.   It appears it did.
24     Q.   And was that recommendation based on the
25 evidence that the committee reviewed?

## 160

1      A.   Possibly.
2      Q.   Why is it possible that it would be based
3  on --
4      A.   They could have based it on whatever they felt
5  necessary.  I can't be certain what they -- they
6  wrote -- someone else wrote the report.  So I can't
7  speak to what they chose to make a recommendation
8  entirely or partially based upon.
9      Q.   Does that mean that sometimes recommendations
10 are made to the Legislature that are not based on
11 evidence before whatever committee is making the
12 recommendation?
13          MR. BRISSENDEN:  Objection, calls for
14 speculation.
15     Q.   (BY MS. BERKOWER)  You may answer.
16          MR. BRISSENDEN:  I'm going to instruct
17 the witness that to the extent you have knowledge that
18 is based upon your personal experience with regards to
19 specific legislative matters, I would instruct you not
20 to answer and disclose that information.  To the extent
21 that you can answer that question as a general
22 procedural matter, you may.
23          THE WITNESS:  I think the point of my
24 answer is that I don't know factually what they base
25 their recommendations on.  And to your question, the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

161

1  Legislature does not act as a judicial body that takes
2  evidentiary information or is required to draw
3  conclusions.
4      Q.  (BY MS. BERKOWER)  Okay.  Thank you for the
5  clarification.
6          MS. BERKOWER:  How are we doing?  Do you
7  need to take a break?
8          MR. BRISSENDEN:  Sure.  Why don't we take
9  a short break.
10         (Recess from 3:07 p.m. to 3:27 p.m.)
11     Q.  (BY MS. BERKOWER)  Do you remember if there
12  was -- turning back to the 2009 legislative session
13  just for a few more moments, do you remember if a bill
14  on voter identification was voted out of the elections
15  committee on -- into the full House that year?
16     A.  I believe there was, yes.
17     Q.  Do you remember which bill was voted out of
18  committee?
19     A.  It was a senate bill carried by
20  Representative Smith in the House, I believe.
21     Q.  Do you remember if that was Senate Bill 362?
22     A.  I mean, the record would show us that.  I
23  don't know specifically.  It probably was.  But I don't
24  know absolutely.
25     Q.  Do you remember if the bill voted out of

---

162

1  committee had been amended while it was in the
2  committee?
3      A.  I'm pretty certain -- well, I don't know if it
4  was amended, not to be difficult.  I think it was -- I
5  think a substitute of the bill was produced.  And I
6  don't know if it was amended or not.  But I don't know.
7      Q.  How did you vote on Senate Bill 362?
8      A.  When?
9      Q.  When it -- sorry.  When it was -- when the
10  vote was to send it out of the committee to the full
11  House?
12     A.  I believe I voted no.
13     Q.  No?
14     A.  I believe I voted no.
15     Q.  Do you remember if the bill that you voted no
16  on allowed for nonphotographic identification as --
17     A.  I imagine it did, but I don't know
18  specifically.
19     Q.  Didn't the bill that you introduced, that
20  Session 3556, include nonphotographic identification?
21     A.  We've been over that, and it did.
22     Q.  Did you issue any public statements about why
23  you voted against the bill?
24     A.  I may have.  I don't recall.
25     Q.  Did you communicate with any constituents

---

163

1  about why you voted against the bills?
2          MR. BRISSENDEN:  Don't disclose any
3  thoughts, impressions, or mental analysis about
4  conversations.
5      Q.  (BY MS. BERKOWER)  I asked a yes or no
6  question, did you communicate with constituents about
7  the bill.  I didn't ask for the content of the
8  communications.
9          MR. BRISSENDEN:  I don't -- I believe
10  your question was more along the lines about why he
11  voted against the bill as opposed to just a more
12  general question about the legislation.
13     Q.  (BY MS. BERKOWER)  Okay.  I'll rephrase the
14  question.
15         Did you communicate with any constituents
16  about the fact that you voted against the bill?
17     A.  Well, technically speaking, Mrs. Rogers, whose
18  correspondence we've already gone through rather
19  thoroughly, is not my constituent.  But I obviously did
20  communicate with her.  I don't know.  We did a document
21  search and provided the appropriate individuals with
22  the information.  I'm sure if I did, it's there.  But I
23  don't know -- I struggle to recall specific
24  correspondences with constituents from three and fours
25  years ago.

---

164

1      Q.  Okay.  Well, just to briefly turn your
2  attention back to that correspondence with Ms. Rogers,
3  I think you have it there in front of you.
4      A.  Yes.
5      Q.  What's the exhibit number on that?
6      A.  437.
7      Q.  437.  On Page 2, in the second full paragraph.
8      A.  Uh-huh.
9      Q.  You said, "Before casting my nay vote in
10  committee, I took a pass on voting to ensure that there
11  were enough votes being billed to the House floor.
12  Upon seeing that there were five votes, I voted against
13  the bill to send a strong message to Chairman Smith and
14  to all Texans that this bill is completely unacceptable
15  and that it is an outright insult to citizens who have
16  demanded effective voter ID legislation" (as read).
17         Is that a different bill than the bill
18  that was ultimately sent to the full House?
19     A.  I don't know.  What do you mean?
20     Q.  Did you vote no on the bill that went out of
21  committee?
22     A.  Yes, we -- we established that earlier.
23     Q.  Is that the bill you're referencing in this
24  paragraph?
25     A.  Absolutely.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

165

1    Q.  Do you remember what the provisions of that
2  bill were?
3    A.  I do not.
4    Q.  Do you remember if that bill allowed for
5  nonphotographic identification for voters?
6    A.  Specifically I don't recall, but my assumption
7  is -- is that it did.
8    Q.  But you don't remember any of the specific
9  provisions of that bill?
10   A.  No.
11   Q.  During the 2011 legislative session, were you
12  staffed on any committees this addressed
13  election-related or voter ID-related legislation?
14   A.  What?
15   Q.  During the 2011 legislative session, were you
16  staffed on any committees that addressed
17  election-related or voter ID-related legislation?
18      MR. BRISSENDEN:  Objection.
19      THE WITNESS:  What do you mean by
20  "staffed"?  I don't know what that means.  Was I
21  assigned to one, you mean?
22   Q.  (BY MS. BERKOWER)  That's what I mean.
23   A.  Okay.  I'm sorry.  I didn't mean to be
24  difficult.  Yes, I was assigned to the select
25  committee.

---

166

1    Q.  Did you also introduce election-related --
2  sorry -- election-related legislation that session?
3      MR. BRISSENDEN:  Objection, vague.
4    Q.  (BY MS. BERKOWER)  You can answer.
5      MR. BRISSENDEN:  You can answer.
6      THE WITNESS:  In 2011?
7    Q.  (BY MS. BERKOWER)  Yes.
8    A.  I believe I did.
9    Q.  Do you remember which bill that was?
10   A.  No, I don't.
11      (Exhibit No. 439 marked)
12   Q.  (BY MS. BERKOWER)  I have Exhibit 439 here.
13  Do you recognize this?
14   A.  It's House Bill No. 624 filed by Bonnen, which
15  is myself.
16   Q.  What did this bill do?
17   A.  It would have ensured the integrity and
18  confidence in elections in the State of Texas.
19   Q.  What were the bill's terms?
20   A.  Its terms.
21   Q.  Well, let me back up a second.  Do you
22  remember when you introduced this bill?
23   A.  I do not.  With it being the number of 624, I
24  imagine it was probably earlier in the process.
25   Q.  I don't know if I necessarily need to

---

167

1  introduce this as an exhibit.  But I can give it to you
2  to see if it refreshes your recollection.
3    A.  Sure.  Yeah, it doesn't bother me.
4      MR. BRISSENDEN:  Why don't we go ahead
5  and mark that as an exhibit.
6      MS. BERKOWER:  Okay.  I'll mark that as
7  Exhibit 440.
8      (Exhibit No. 440 marked)
9    Q.  (BY MS. BERKOWER)  Do you know what this is?
10   A.  This is the Texas Legislature on-line history
11  for House Bill 624.
12   Q.  Does it refresh your recollection as to when
13  you filed --
14   A.  It does.  It indicates -- this record
15  indicates that I filed the bill on January 12th of
16  2011.
17   Q.  Do you remember if that was before or after
18  you were assigned to be chairman of the select
19  committee?
20   A.  It was before.
21   Q.  At the time that you introduced this bill, had
22  you seen or heard anything about Senate Bill 14?
23   A.  I doubt it.  I can't say absolutely, but I
24  doubt that I have.
25   Q.  Had you had any communications with

---

168

1  Senator Frazier in the fall of 2010?
2    A.  I don't think I had any, but I wouldn't want
3  to lie and say I hadn't.  I doubt I did.  I mean, I
4  don't --
5    Q.  You can't remember any?
6    A.  No.  We don't communicate a lot.
7    Q.  Just as a general matter, if you are working
8  on a piece of legislation and you know there's
9  something similar being drafted in the Senate, do you
10  try to communicate with the senators who are working on
11  that legislation?
12   A.  As a general matter, it really just depends.
13  Sometimes you might, sometimes you might not.
14  Candidly, sometimes there's some competition to try to
15  be the lead author, be it a House bill versus a Senate
16  bill.  So it really truly varies as to whether there
17  would be any real communication or positive working in
18  that regard.  So there's no -- there was no patent
19  scenario there.
20   Q.  Do you recall any communications with members
21  of Senator Frazier's staff in the fall of 2010?
22   A.  I do not recall any.
23   Q.  What was the purpose of House Bill 624?
24      MR. BRISSENDEN:  I'm instructing the
25  witness that -- to answer the question in terms of the

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                              June 6, 2012

---

### 169

1  general purpose of the legislation and not to disclose
2  mental impressions, analysis, and opinions about the
3  legislation.
4          THE WITNESS:  General purpose was to
5  ensure integrity and confidence in the election process
6  in Texas.
7      Q.  (BY MS. BERKOWER)  Turning your attention to
8  Page 5, do you see the Section 63.0101, document of
9  proof of identification?
10     A.  Yes, ma'am.
11     Q.  And under Item 1 --
12     A.  Yes.
13     Q.  -- do you see that it permits a driver's
14 license or personal identification card issued to the
15 person by the Department of Public Safety that is not
16 expired or that has expired no earlier than one year
17 before the date of presentation?
18     A.  Correct.
19     Q.  Turning to the next page, Item 6 on Page 6 at
20 Line 10.
21     A.  Yes, ma'am.
22     Q.  Do you see that this bill would permit a voter
23 to use a student identification card from a public or
24 private institution of higher education that contains
25 the person's photograph?

---

### 170

1      A.  I do see that.
2      Q.  And it looks like that is not limited to
3  institutions in the State of Texas; is that correct?
4      A.  It says, "Student identification card issued
5  by a public or private institution of higher education
6  that contains the person's photograph," yes.
7      Q.  So it doesn't have to be in Texas?
8      A.  It does not appear to have limiting language,
9  no.
10     Q.  Then the next section, Section 17 that starts
11 at Line 14, it permits a voter to use a valid
12 identification card that contains a person's photograph
13 and is issued by either an agency or institution of the
14 Federal Government, an agency, institution, or
15 political subdivision of this state, or a tribal
16 organization.  Do you see that?
17     A.  I do.
18     Q.  Is this bill different from the bill you
19 introduced in the previous Legislature with regard to
20 the types of identifications that are permitted for
21 voters to use at the polls?
22         MR. BRISSENDEN:  Just so we're clear and
23 the record is clear, which bill are you referring to?
24         MS. BERKOWER:  3556.
25         MR. BRISSENDEN:  Exhibit 436?

---

### 171

1          (Discussion off the record.)
2          THE WITNESS:  The bill is not the same.
3  I forget -- I apologize.  What was the question about
4  the two?
5      Q.  (BY MS. BERKOWER)  Is the House Bill 624 that
6  you introduced during the 2011 Legislature different
7  from the House Bill 556, which you introduced in the
8  2009 Legislature?
9      A.  It is different.
10     Q.  How is it different?  And I'm asking with
11 regard to the types of identification voters may use to
12 vote at the polls?
13     A.  Well, House Bill 3556 says a driver's license
14 or personal identification card issued to the person by
15 the Department of Public Safety that is not expired or
16 that expired no earlier than two years before the date
17 of presentation; and House Bill 624 says a driver's
18 license or personal identification card issued to the
19 person by the Department of Public Safety that is not
20 expired or that expired no later than one year before
21 the date of presentation.  And then --
22     Q.  Okay.  Does --
23     A.  Yes, ma'am.
24     Q.  Sorry.  Maybe to make this go a little faster
25 I'll just ask you some questions about -- about some of

---

### 172

1  the terms.
2      A.  Yes, ma'am.
3      Q.  Does House Bill 3556 permit a voter to show a
4  valid employee identification card -- a photo
5  identification card issued by an employee -- an
6  employer?  That's on Page 5 at Line 23.
7          MR. BRISSENDEN:  Objection, asked and
8  answered.
9          THE WITNESS:  I believe it does.
10     Q.  (BY MS. BERKOWER)  Does House Bill 624 allow
11 that type of identification to be used?
12     A.  Not that specific type, no.
13     Q.  Is there any evidence in the public record
14 that indicated that employee identification cards
15 should be -- should not be permitted to be used for
16 voters at the polls?
17     A.  I believe that was discussed at times during
18 hearings and on the floor.
19     Q.  Was it discussed in the time between when you
20 introduced 3556 and 624?
21         MR. BRISSENDEN:  Again, you're limiting
22 your question to what's in the public record?
23         MS. BERKOWER:  Yes.
24         THE WITNESS:  I don't recall when
25 something like that was discussed or not discussed.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

173

1    Q.  (BY MS. BERKOWER)  And with regard to -- you
2    initially said that 3556 permitted a license -- a
3    Department of Public Safety identification card or
4    driver's license that expired within two years, and 624
5    limits that to one year?
6    A.  That's correct.
7    Q.  Was there any evidence in the public record in
8    the time between which you -- between when you
9    introduced 3556 and 624 that supported a shorter period
10   of time?
11   A.  I don't know whether there was or not.
12   Q.  Does H.B. 624 allow a tribal identification to
13   be used?
14   A.  It does.
15   Q.  Does 3556 allow a tribal identification to be
16   used?
17   A.  I don't believe that it includes that.
18   Q.  Is there any evidence in the public record
19   that supported adding tribal identifications in the
20   time between when you introduced 3556 and 624?
21   A.  I don't recall.
22   Q.  After -- turning your attention now just to
23   House Bill 624.
24   A.  Okay.
25   Q.  Do you know of any analysis available in the

---

174

1    public record relating to who among registered voters
2    possess the forms of identification specified in the
3    bill?
4    A.  Well, considering the bill never received a
5    hearing, it was not even referred to the committee that
6    I was chairing as a select committee, I don't think
7    that kind of analysis was ever required in the bill.
8    Q.  Do you know why it wasn't referred to the
9    select committee?
10   A.  I don't make those decisions.
11   Q.  What was the purpose of including a driver's
12   license, a personal ID that expired within one year of
13   presentation?
14       MR. BRISSENDEN:  Let me assert an
15   objection as to privilege.  I'm going to instruct the
16   witness not to answer the question.
17       THE WITNESS:  I agree with privilege.
18       MS. BERKOWER:  I think our position is
19   we're allowed to question on general legislative
20   purpose.
21       MR. BRISSENDEN:  As I understand from the
22   court's orders from yesterday and back in May, the
23   court is allowing questions with regard to general
24   purpose of a particular piece of legislation in
25   general, but in terms of asking questions as to why the

---

175

1    bill contains different provisions and what the purpose
2    of those provisions are, it's my understanding that
3    those are privileged.
4    Q.  (BY MS. BERKOWER)  Do you think that -- just
5    as a general matter, why is an expired
6    identification -- why won't an expired identification
7    verify a person's identity?
8        MR. BRISSENDEN:  Because the question
9    pertains to specific provisions of legislation,
10   including S.B. 14, and you are now asking the witness
11   about questions regarding mental impressions and asking
12   why particular provisions were included, I'm going to
13   instruct the witness not to answer.
14       MS. BERKOWER:  I think this falls into
15   the category of things that we believe are basic
16   background general information that don't necessarily
17   relate directly to a legislative act or to his mental
18   impressions or any deliberations that he participated
19   in as a legislator, and as a consequence -- also,
20   notwithstanding the fact that that question has been
21   answered in many, many depositions in this case without
22   an objection, we believe that that's not actually
23   seeking to uncover privileged information.  We ask that
24   the state withdraws its objection.
25       MR. BRISSENDEN:  And I disagree with the

---

176

1    analysis because I believe that the question is
2    requiring the witness to disclose his thoughts,
3    opinions, mental impressions, and analysis about
4    provisions of legislation that is directly related to
5    provisions of different voter ID bills, including
6    S.B. 14.
7        Obviously the question is being asked
8    because it does relate and has relevance to provisions
9    of voter-ID bills, including S.B. 14, and I would
10   instruct the witness not to answer.
11   Q.  (BY MS. BERKOWER)  How many years is a Texas
12   driver's license valid for?
13   A.  I don't know.
14   Q.  How -- when was the last time did you renewed
15   your own driver's license?
16   A.  I do not know.  I'm certain it was shortly
17   after it expired or just before.
18   Q.  Do you remember --
19   A.  Which you can do on-line now, I believe.
20   Q.  That was my next question.  Do you remember if
21   you renewed it on-line?
22   A.  I don't believe I did, but I don't know for
23   certainty.
24   Q.  If you renewed it on-line, would you have to
25   take a new photograph?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                   June 6, 2012

---

177

1   A.  I don't know absolutely, but I think that's
2   one of the positive natures of an on-line renewal is
3   that you do not take a new photograph.
4   Q.  Do you have an estimate of -- so you said you
5   don't know how long a driver's license is valid for; is
6   that accurate?
7   A.  Yeah.  I don't want to be incorrect.  I think
8   it's six years, but I'm not certain of that.
9   Q.  So more than a year?
10  A.  That's correct.
11  Q.  Probably -- maybe more than five years?
12  A.  Maybe, but I don't know.  I mean, it's not
13  something that's debated or unknown.  I mean, we could
14  find that out.
15  Q.  If you don't have to take a new photograph
16  when you renew, does that mean that you could have the
17  same photograph for up to maybe 12 years?
18  A.  I don't know what the facts are, but I imagine
19  that could be the case.  But I don't know.
20  Q.  Well, assume that it's six years.  You know
21  you can renew on-line.
22  A.  Uh-huh.
23  Q.  If it is, in fact, six years, does that mean
24  you would have a 12-year period with the same
25  photograph.

---

178

1   MR. BRISSENDEN:  Objection, asked and
2   answered.
3   THE WITNESS:  Assuming those facts are
4   accurate, that certainly could happen.
5   Q.  (BY MS. BERKOWER)  Do you know how long a US
6   passport is valid for?
7   A.  I have no idea.  I think it's ten years, but I
8   don't really know.  Isn't it ten years?
9   Q.  Do you know how long a citizenship certificate
10  is valid for?
11  A.  I have no idea.
12  Q.  Do you know how long a naturalization
13  certificate is valid for?
14  A.  No.
15  Q.  Is it possible that someone who possesses a
16  valid photo identification might no longer look like
17  the photograph?
18  MR. BRISSENDEN:  Objection, calls for
19  speculation.
20  Q.  (BY MS. BERKOWER)  You can answer that.
21  A.  I think it's speculative.
22  Q.  Okay.  But is it possible that someone could
23  have a photo ID and they know longer look like the
24  photograph?
25  MR. BRISSENDEN:  Same objection.

---

179

1   THE WITNESS:  Possible.
2   Q.  (BY MS. BERKOWER)  Do you look the same way
3   you looked 12 years ago?
4   A.  Let me think about that.  I don't remember
5   when I started shaving my head.  So if I did 12 years
6   ago, which I very well could have, I would look pretty
7   much the same.
8   Q.  Do you know other people who no longer look
9   the same way they looked 12 years ago?
10  A.  There are some.
11  Q.  If you don't look like the photo on your photo
12  ID, how does that verify your identity?
13  MR. BRISSENDEN:  Objection, calls for
14  speculation, assumes facts not in evidence.
15  Q.  (BY MS. BERKOWER)  You can answer that.
16  MR. BRISSENDEN:  If you can.
17  THE WITNESS:  Repeat the question.
18  MS. BERKOWER:  Can you read it back,
19  please?
20  (The requested portion was read)
21  MR. BRISSENDEN:  Same objection.
22  Q.  (BY MS. BERKOWER)  You may answer.
23  A.  I choose not to.
24  Q.  That's not an option.
25  A.  Okay.  I'll explain it to you.  How it works

---

180

1   is if I have a valid Texas driver's license and my
2   photo does not look the same as maybe I presently do,
3   there are statistics and data verified by our
4   government that will line-up with the statistics and
5   data in the voter registration.  And that is how you
6   verify.  It's not purely and simply in relation to the
7   photo.
8   Q.  What statistics are you referring to?
9   A.  Someone's address, someone's height, weight.
10  Q.  What if they moved or gained weight or lost
11  weight?
12  A.  Well, those are separate issues.  If they
13  moved, you're supposed to renew your license with that
14  new address on it.
15  Q.  And what if they gained or lost a significant
16  amount of weight?
17  MR. BRISSENDEN:  Objection, calls for
18  speculation.  To the extent you're able to answer the
19  question, go ahead.
20  THE WITNESS:  That's not necessarily a
21  factor that's being used to decide that you are the
22  person you say are when you're going in to cast a
23  ballot.
24  Q.  (BY MS. BERKOWER)  Doesn't the photo, though,
25  factor into whether or not the -- the ID card verifies

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

181

1  your identity?

2          MR. BRISSENDEN:  Objection, calls for

3  speculation.

4          THE WITNESS:  Yeah.

5      Q.  (BY MS. BERKOWER)  You may answer.

6      A.  I think it's speculative.

7          MS. BERKOWER:  Okay.  That answer is

8  nonresponsive.  I would ask the witness to provide a

9  responsive answer.

10         THE WITNESS:  Repeat the question.

11         MR. BRISSENDEN:  Objection, asked and

12  answered.  Objection, calls for speculation.  Let's

13  move on.

14         MS. BERKOWER:  You're telling me to move

15  on?

16         MR. BRISSENDEN:  He's tried to answer

17  your question the best he can given the speculative

18  nature of the question.

19     Q.  (BY MS. BERKOWER)  Have you ever seen a

20  naturalization certificate?

21     A.  I don't know if I have or not.

22     Q.  Have you ever known of a person who

23  naturalized -- became a naturalized US citizen at a

24  very young age, say, an adopted child?

25     A.  I -- I don't know about the "very young age"

---

182

1  part.

2      Q.  Do you know anyone who has become a US citizen

3  as a child?

4      A.  I believe so.

5      Q.  Do you know if that person has ever had to

6  retake the photograph on their naturalization

7  certificate?

8      A.  I do not know.

9      Q.  If they didn't have to take -- retake the

10  photograph on their naturalization certificate, would

11  that photograph look the same when they were

12  naturalized versus some decades later?

13         MR. BRISSENDEN:  Objection, calls for

14  speculation.  He's already answered that he does not

15  know.  Now you've gone one step further and asked him a

16  follow-up question on what he already does not know.

17  So I would instruct him --

18         THE WITNESS:  I don't know.

19     Q.  (BY MS. BERKOWER)  Have you ever seen a tribal

20  identification?

21     A.  I do believe I have, yes, I think so.

22     Q.  What does it look like?

23     A.  I think they vary depending on the tribe.

24     Q.  Which one have you seen, if you remember?

25     A.  I don't.

---

183

1      Q.  Do you know how often the photographs are

2  taken for tribal identifications?

3      A.  I have no idea.

4      Q.  Do you remember a bill being filed in the

5  House in 2011 called S.B. 14?

6      A.  Well, not to be difficult in any way, but it

7  wouldn't have been filed in the House if it was an S.B.

8      Q.  Sorry.  Do you remember a bill -- well, what

9  would it be?

10     A.  Well, it would have been -- it would have been

11  a Senate bill, it would have come over to the House

12  after having passed the Senate.

13     Q.  Do you remember a Senate bill coming over to

14  the House after having passed the Senate that's called

15  S.B. 14?

16     A.  I do.

17         (Exhibit No. 441 marked)

18     Q.  (BY MS. BERKOWER)  I have what's marked as

19  Exhibit 441.

20     A.  Thank you.

21     Q.  Do you recognize this?

22     A.  Vaguely, yes.

23     Q.  What is it?

24     A.  It is Senate Bill No. 14 filed by

25  Senator Frazier and others.

---

184

1      Q.  Turning to page -- hold on a second.  Turning

2  to Page 3, Section 7, do you see that that section

3  explains who must provide photographic identification

4  at the polls?

5      A.  I think it's saying who they provide it to.

6      Q.  Okay.

7      A.  And then I guess it goes on and lists.

8      Q.  Do you see Line 14 on Page 4, Section G?

9      A.  I do.

10     Q.  And it says that the requirement for

11  identification prescribed by Subsection B, it's

12  referring to Section B above that, are not met, the

13  voter may be accepted for provisional voting?

14     A.  Yes.

15         MR. BRISSENDEN:  Just so the record is

16  clear, not to be difficult, Exhibit 441 is a version of

17  S.B. 14 that has lines through it and edits.  Do you

18  have -- I think there has been an exhibit that he used

19  before that's been signed.

20         MS. BERKOWER:  This is S.B. 14 as filed,

21  and we have specific questions about the bill as filed,

22  which is why we introduced that as an exhibit at this

23  time.

24         MR. BRISSENDEN:  Very good.

25     Q.  (BY MS. BERKOWER)  Turning to Page 5 of the

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 185

1  bill, Part H at Line 4.
2      A.  Part H, Line 4, yes.
3      Q.  It says, "Requirements for identification
4  described by Subsection B do not apply to a voter, one,
5  who presents the voter registration certificate on
6  offering to vote; and, two, 70 years of age or older on
7  January 1st, 2012, as indicated by the date of birth on
8  the voter registration certificate" (as read).
9          Did I read that correctly?
10     A.  I believe you did.
11     Q.  Does that section mean that someone who is
12  over age 70 and presents a voter registration card does
13  not have to comply with the bill's identification
14  requirements?
15         MR. BRISSENDEN:  I'm going to instruct
16  you to the extent that you know the answer to that
17  question based upon public record, based upon your
18  review of the Exhibit 441, as you sit here today, you
19  may answer to the extent that it requires you to
20  disclose your mental impressions, thoughts, analysis,
21  and impressions as to S.B. 14, and I instruct you not
22  to answer.
23         THE WITNESS:  I'll follow his
24  instruction.
25     Q.  (BY MS. BERKOWER)  Well, I think he said -- to

---

### 186

1  be clear -- to be clear, just so I understand, does
2  that mean that you cannot answer this question based
3  solely on reading the language of the bill today?
4      A.  Well, I agreed with you on what the language
5  said.
6      Q.  But the question I asked was, does this mean
7  that a person who is 70 years of age or more who
8  presents a voter registration certificate does not have
9  to meet the other identification requirements, and you
10  invoked legislative privilege.  Is that accurate?
11     A.  That would be accurate.
12     Q.  So his instruction, though, said you should
13  answer the question or you may answer the question if
14  you could answer it based just on what's here in the
15  document.
16     A.  I've already agreed with you on what the
17  document says.  I'm not arguing with you about what the
18  document says.
19     Q.  Okay.  Turning to Page 8, Section 63.0101,
20  what does this section do?
21     A.  Documentation of proof of identification.
22     Q.  And does this section list the types of
23  identifications that are acceptable photo
24  identifications that a voter may present in order to
25  vote at the polls?

---

### 187

1      A.  It says, "The following documentation is an
2  acceptable form of photo identification under this
3  chapter," and then it lists several.
4      Q.  Does it list only four types of photo
5  identification that may be presented?
6      A.  It appears to -- well, yes, it appears to have
7  four types, correct.
8      Q.  And one of those is a driver's license or
9  personal identification card issued by DPS that has not
10  expired.  Is that accurate?
11     A.  That is accurate.
12     Q.  Another is United States military
13  identification card that contains a person's photograph
14  that has not expired.  Is that accurate?
15     A.  It is.
16     Q.  The third is United States citizenship
17  certificate that contains a photograph.  Is that
18  accurate?
19     A.  Yes.
20     Q.  Or a US passport that has not expired.  Is
21  that accurate?
22     A.  It is.
23     Q.  Is this bill different from -- are the
24  requirements for photo ID in this bill different from
25  that in S.B. 362 from the 2009 Legislature?

---

### 188

1          MR. BRISSENDEN:  Are you referring the
2  witness to another exhibit?
3      Q.  (BY MS. BERKOWER)  Yes, I'm referring to
4  exhibit --
5      A.  Is that 434?  Is that it?
6      Q.  Yes.
7      A.  Okay.
8      Q.  Do you remember the question?
9      A.  Is it different, I believe, that you asked.
10     Q.  Yes.
11     A.  Yes.  And give me one second.  It appears
12  there is some difference.
13     Q.  What are the differences?
14     A.  A difference would be that the driver's
15  license in Senate Bill 14 that is required to not have
16  expired, whereas in Senate Bill 362 the language says,
17  "A driver's license from the Department of Public
18  Safety that has not expired or that expired no earlier
19  than two years before the date of presentation" (as
20  read).  So that's a difference.
21     Q.  Does it also require an unexpired military ID
22  versus not including that requirement in 362?
23     A.  Well, you're correct except that I guess 362
24  is silent on the issue of whether it can be expired or
25  not.  Where 14 specifically states it cannot be



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                      June 6, 2012

|  189  |  191  |
|---|---|

### 189

1  expired, 362 doesn't make it clear.

2    Q. Does 362 permit federal or state issue photo

3  ID; whereas, the S.B. 14 as filed does not?

4    A. You are correct.

5    Q. Does S.B. 362 permit non-photo identification

6  in some circumstances; whereas, S.B. 14 as filed does

7  not?

8    A. That is correct.

9    Q. Is it safe to say that S.B. 14 has fewer types

10  of permissible identification than S.B. 362?

11    A. It appears that would be correct in comparing

12  them.

13    Q. Is there any evidence in the public record in

14  the time between when S.B. 362 was developed and the

15  time that S.B. 14 was developed that indicated that

16  fewer types of identifications should be accepted at

17  the polls in order to ensure election integrity?

18    A. I don't know.

19    Q. Is it fair to say that S.B. 14 was

20  substantially different from S.B. 362?

21    MR. BRISSENDEN: Objection, vague.

22    THE WITNESS: I don't know what

23  "substantially" means.

24    Q. (BY MS. BERKOWER) Is it fair to say there

25  were a number of changes from S.B. 362 to S.B. 14?

### 190

1    A. I would agree that there were changes.

2    Q. Is it fair to say that S.B. 14 was stricter

3  than S.B. 362?

4    MR. BRISSENDEN: Objection, vague. And

5  to the extent that the question is requiring the

6  witness to disclose mental impressions, his opinions,

7  his views about S.B. 14, I instruct him not to answer.

8    Q. (BY MS. BERKOWER) Are you following your

9  counsel's instruction?

10    A. Do you mean repeating the question?

11    Q. I said, is it fair to say that S.B. 14 is

12  stricter than S.B. 362?

13    MR. BRISSENDEN: Same objection and same

14  instruction.

15    THE WITNESS: I follow the instruction.

16    Q. (BY MS. BERKOWER) Is it fair to say there are

17  fewer options for voters to present identification

18  under S.B. 14 as filed than S.B. 362?

19    MR. BRISSENDEN: Objection, vague. To

20  the extent that you can answer the question based upon

21  your review of the two exhibits that are in front of

22  you and the number of -- and comparing the two exhibits

23  and the number of identifications listed there, you may

24  answer. Otherwise, if you cannot, then I instruct you

25  not to answer on the basis of privilege.

### 191

1    THE WITNESS: Senate Bill 362 appears to

2  have six options and Senate Bill 14 appears to have

3  four.

4    Q. (BY MS. BERKOWER) Doesn't Senate Bill 362

5  also have a number of nonphotographic identification

6  options there as well?

7    A. Certainly.

8    Q. So would that be more than six options?

9    A. Well, it would be more than six options that

10  don't -- well, six options that require a photo and

11  then there are others that do not.

12    Q. So is it fair to say there are fewer -- fewer

13  acceptable identification options for voters under

14  S.B. 14?

15    A. I'm certain that's easily said. I don't know

16  where you need my expertise for that.

17    Q. Okay. What is a military ID?

18    A. I am not an expert on that. I would assume

19  it's an ID issued to a member of the United States

20  military.

21    Q. Do you know how many different forms of

22  military ID there are?

23    A. I know there are several, but I don't know the

24  number.

25    Q. Do you know if military ID is issued to

### 192

1  noncitizens?

2    A. I do not know.

3    Q. Do you know if military ID is issued to

4  contractors?

5    A. I do not know.

6    Q. If I've asked you this, I'm sorry. I don't

7  remember. Do you know what a citizenship certificate

8  is?

9    A. Yeah, you did ask that, and I don't really

10  know. Actually, you may have asked if I've seen one.

11  I don't know if you asked me whether I know what one

12  is.

13    Q. Do you know what one is?

14    A. I'm familiar with it, but I'm not --

15    Q. Do you know how much it costs -- I'm sorry.

16    A. Go ahead.

17    Q. Do you know how much it costs to obtain one?

18    A. I do not.

19    Q. Do you know how much it costs to obtain a

20  replacement citizenship certificate?

21    A. I do not know.

22    Q. Do you know what you would have to do to get a

23  replacement citizenship certificate?

24    A. I do not.

25    Q. Do you know how long it would take to get a



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

193

1    replacement citizenship certificate?
2        A.  I do not.
3        Q.  Do you know if citizenship certificates always
4    contain a photograph?
5        A.  I don't know.
6        Q.  Do you know how much it cost to obtain a US
7    passport?
8        A.  I don't know.
9        Q.  Do you know what underlying documents you
10   would need to get a US passport?
11       A.  I could guess, but I don't really know.
12       Q.  Do you know how long it would take to get a
13   US passport?
14       A.  I think the timeframe varies, but I don't know
15   absolutely.
16       Q.  What does the term "legislative emergency"
17   mean within the Texas Legislature?
18       A.  I believe there's a record or a document of
19   that.  I can't quote it to you.
20       Q.  Are there any -- who declares a legislative
21   emergency?
22       A.  The governor.
23       Q.  Are there any constraints on what he may
24   declare to be a legislative emergency?
25       A.  I am not an expert on that part of the law and

194

1    what's the procedure.  But I don't believe there are
2    constraints, but I don't know.
3        Q.  Was photographic voter ID declared to be a
4    legislative emergency for the 82nd Legislature?
5        A.  I believe the record reflects that it was.
6        Q.  When did you first learn about this
7    designation?
8        A.  I don't recall.  I would imagine within a day
9    or two of it being declared an emergency.
10       Q.  Do you know why Governor Perry designated
11   voter ID as a legislative emergency?
12           MR. BRISSENDEN:  I'm going to instruct
13   the witness not to divulge or disclose his thoughts or
14   mental analysis and questions about S.B. 14 and the
15   legislative act of -- in which the emergency -- the
16   legislation has deemed to be an emergency and instruct
17   the witness not to answer.
18           MS. BERKOWER:  I asked if he knows why,
19   not why.
20           MR. BRISSENDEN:  I don't believe that was
21   the question.
22           MS. BERKOWER:  It was the question.  I
23   just read it right off the screen.  But can you read it
24   back, please?
25           MR. BRISSENDEN:  Yes, ma'am.  If the

195

1    question is limited to whether the -- whether or not
2    the witness has knowledge as to why that allows him to
3    answer the question with a simple yes or no answer, he
4    may answer.
5            MS. BERKOWER:  All right.
6        Q.  (BY MS. BERKOWER)  Do you need me to restate?
7        A.  I believe the question is do I know why that
8    was done.  And I do not.
9        Q.  Do you know if any other election law has ever
10   been designated a legislative emergency?
11       A.  I don't know.
12       Q.  What other types of legislation do you know of
13   that were designated as legislative emergencies?
14       A.  Off the top of my head, I don't recall.  I
15   know there have been.
16       Q.  Do you remember if any immigration-related
17   issues have been designated a legislative emergency?
18       A.  No.  I know there's a record.  I don't -- I
19   don't know.
20       Q.  What are the consequences of legislation being
21   designated an emergency?
22       A.  They're rather insignificant, frankly.  To the
23   best of my knowledge -- I could be inaccurate with the
24   fact to some degree.  I'm not intending to be.  But
25   it's simply their rules in the legislative process that

196

1    you cannot bring a bill to the floor within the first
2    100 days.  And the governor declaring something an
3    emergency simply allows that legislation to come before
4    the body in that first 100 days.  It doesn't require
5    that it does and it simply means that it could.
6        Q.  Basically it can jump the line?
7        A.  No.
8            MR. BRISSENDEN:  Objection to the extent
9    that it mischaracterizes testimony and the record.
10       Q.  (BY MS. BERKOWER)  I don't -- I don't know if
11   you said this or not, but after the governor declares a
12   legislative emergency, does the Legislature have to
13   consider the issue within the first 60 days?
14       A.  It does not, and there is precedent to show
15   that we don't.
16       Q.  But it may.  It doesn't have to?
17       A.  It allows it to.
18       Q.  Do you know who was involved with the decision
19   to designate S.B. 14 as a legislative emergency?
20       A.  I do not -- well, that's unfair.  I have to
21   assume being the governor did it, he was.  But beyond
22   that, I don't know.
23       Q.  Did you follow S.B. 14 at all during its
24   progress through the Senate?
25       A.  Vaguely, you know, just from an extraordinary



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                   June 6, 2012

---

197

1    periphery of it.
2        Q.  Did -- what is your memory of its progress in
3    the Senate just as far as the public record goes?
4        A.  I don't have much of one other than I was
5    paying attention to it to know when I would have to
6    then hold a hearing in the House.
7        Q.  Is that -- were you filing it because you were
8    the chair of the select committee?
9        A.  No, because I don't even know if I was the
10   chair of the select committee, at that point.  I don't
11   recall.  And I wasn't following it closely.  I think
12   the -- well --
13       Q.  Did you attend any Senate hearings on S.B. 14?
14       A.  Not at all, no.
15       Q.  Did you have any conversations with senators
16   about S.B. 14?
17       A.  I believe I had one that was brief letting me
18   know that if I need any background --
19           MR. BRISSENDEN:  I'll instruct you that
20   in terms of disclosing the substance of a
21   communication, I'll instruct you not to disclose that
22   communication that you had with the legislator.
23       Q.  (BY MS. BERKOWER)  Who was the communication
24   with?
25       A.  Senator Fraser.

---

198

1        Q.  When did it take place?
2        A.  I don't recall exactly.
3        Q.  Was it early in the legislative session?
4        A.  Yes, it was early.
5        Q.  Do you remember if it was before the bill
6    passed the Senate?
7        A.  I don't think so.  I think it was there
8    afterward.  I think it was between the time it passed
9    the Senate and we held the hearing in the House.  And
10   it was a very brief conversation.
11       Q.  And I guess I should have specified this
12   before.  When I asked about communications with
13   legislators I also should have asked you, did you have
14   any communications with the staff members of
15   legislators concerning S.B. 14?
16       A.  I don't think I did, actually.
17       Q.  Who were the sponsors of S.B. 14 in the House?
18       A.  There's record of that.  I -- I think it ended
19   up being numerous members.
20       Q.  I'm sorry.  Who?
21       A.  I said I think it ended up being numerous
22   members.  There's a record.  I don't off the top of my
23   head recall.
24       Q.  Do you remember who any of the sponsors were?
25       A.  I know Representative Harless was the House

---

199

1    sponsor of the Senate Bill.  There's a record we can
2    look at.
3        Q.  Do you know how it came about that Ms. Harless
4    was the main sponsor of the bill?
5            MR. BRISSENDEN:  And to the extent that
6    you have information or knowledge that is part of the
7    public record and you are relying upon that and you can
8    answer that question, you may do so.  To the extent
9    that that question requires you to disclose
10   communications that you had with other legislators,
11   their staff, or your own staff, with Texas legislative
12   counsel or state agencies or it requires you to
13   disclose thoughts, opinions, and mental analysis with
14   regards to S.B. 14, I instruct you not to answer.
15           THE WITNESS:  I will have to use
16   privilege on that.
17           MS. BERKOWER:  I did ask that as a yes or
18   no question.  Will you still -- are you still going to
19   interpose your objection to that?  I asked if you
20   know how -- I said, do you know how Senator Harless
21   became the main sponsor.
22           MR. BRISSENDEN:  To the extent you can
23   answer that question limited to whether you have
24   knowledge or don't have knowledge, you can answer
25   limited to a yes or no.  But beyond that, I instruct

---

200

1    you not to answer.
2            THE WITNESS:  I was provided anecdotal
3    information, but I don't know if it's accurate.
4        Q.  (BY MS. BERKOWER)  Okay.  Where was the bill
5    sent when it arrived in the House?
6        A.  Again, that would be part of the record.  I
7    assume it was sent to the select committee, but I'm not
8    certain.  But we can check the record in that.
9        Q.  That was the committee we talked about
10   earlier?
11       A.  Yes, ma'am.
12       Q.  Did the special committee hold any hearings?
13       A.  It held one.
14       Q.  Did witnesses provide testimony at that
15   hearing?
16       A.  Yes, they did.
17       Q.  Do you remember who provided testimony?
18       A.  Again, the record would have the witness list,
19   and it would show us everybody who testified.
20       Q.  Do you remember if somebody named
21   Skipper Wallace testified?
22       A.  Do I specifically remember that?  No.  My
23   guess would be he did.
24       Q.  Do you remember what he said?
25       A.  Not at all.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

### 201

1   Q.  Have you ever met or spoken with him?
2   A.  Absolutely.
3   Q.  Yes?
4   A.  Yes.
5   Q.  What have you talked about with
6   Skipper Wallace with regard to voter identification?
7            MR. BRISSENDEN:  Can we take a break just
8   a minute?
9            MS. BERKOWER:  Sure.  Well, can he answer
10  the question first?  I guess there's a question
11  pending.
12           MR. BRISSENDEN:  Well, it depends on --
13  it depends on his answer to my question real quick.
14  And it will help -- it will help make the flow go a lot
15  quicker.
16           MS. BERKOWER:  So you're saying you want
17  to consult with him about a privilege issue?  Is that
18  what you're getting at?
19           MR. BRISSENDEN:  Yes.  Well, it could
20  potentially implicate a privilege issue.
21           MS. BERKOWER:  All right.  Let's take
22  a --
23           MR. BRISSENDEN:  We just need two
24  minutes, yeah.
25           MS. BERKOWER:  Yeah.  I mean, my

### 202

1   understanding is that the reason -- my concern is that
2   Skipper Wallis is -- is not a legislator.  He is not
3   well.
4            MR. BRISSENDEN:  Well, that's -- let's --
5   let me just find that out and then let's -- we'll
6   reconvene this.
7            MS. BERKOWER:  Okay.  That's fine.
8            MR. BRISSENDEN:  Give me just a minute.
9   Recess.
10           (Discussion off the record)
11           MR. BRISSENDEN:  Thank you for allowing
12  me to take a break.  I was not aware of who Mr. Wallace
13  was.  I was just trying to make sure that it wasn't
14  something that would invoke privilege.
15           THE WITNESS:  And it doesn't, so let's
16  go.
17  Q.  (BY MS. BERKOWER)  So who is Skipper Wallace?
18  A.  To the best of my knowledge, I believe he is a
19  Republican party chair who was the head of his -- not
20  to make a joke.  I guess there was an organization of
21  the Republican party chairs, and was the head of that.
22  A very, very prestigious position.
23  Q.  Do you know if he supported S.B. 14?
24  A.  Oh, I'm sure that he did.
25  Q.  Well, do you remember his position on S.B. 14?

### 203

1   A.  I mean, I -- yeah, sure.  He was for it.  I
2   mean --
3   Q.  Do you remember what he testified about
4   concerning S.B. 14?
5   A.  I really don't remember specifically.
6   Q.  You said you've met and spoken with him
7   before?
8   A.  I have.
9   Q.  What was -- when did you meet with him?
10  A.  I met with him during the last legislative
11  session.  I think it's in the documents you-all
12  received today.  And I met with him very briefly and
13  told him that his assistance and help was not needed to
14  pass Senate Bill 14.
15  Q.  What type of help and assistance did he want
16  to provide you?
17  A.  I didn't bother to find out.
18  Q.  Okay.  Did you ever solicit any help from
19  Skipper Wallace?
20  A.  Not at all.
21  Q.  Do you know who Katherine Engelbrecht is?
22  A.  I do simply because I was shown a document
23  that her name was on.
24  Q.  Who is she?
25  A.  Otherwise, I wouldn't have known who she was.

### 204

1   Q.  Who is she?
2   A.  She's is the leader of the King Street
3   Patriots, which is a group out of Houston.
4   Q.  What do the King Street Patriots do?
5   A.  I really don't know.  I guess they're a
6   citizen active grassroots-type organization.
7   Q.  Do you know if she attended the special
8   committee hearing?
9   A.  That I do not know.  If I had to take a guess,
10  I would think she or someone from her group did.  But I
11  don't know because I don't know who she is.
12  Q.  Do you remember if she participated at all
13  during that -- during that hearing?
14  A.  I don't recall.  But, again, it would be in
15  the record if she did.
16  Q.  Have you ever met or spoken with her?
17  A.  I want to be very clear with this.  I have
18  not.  I was shown a document this morning that showed
19  that she was on my schedule to meet with a member of my
20  staff.  I did not meet with her.  And so there is
21  clarity on that.  There is a document that shows that
22  she had a meeting scheduled with a member of my staff.
23  I was not present at that meeting and I have never, to
24  my knowledge, met the woman.
25  Q.  Did your staff relay any information to you

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 205

1  that they received from Ms. Engelbrecht?
2      A.  I believe that they did.
3      Q.  What was that information?
4      A.  She wants you to pass better ID.
5      Q.  What -- other than her opinion, was there
6  anything else she provided to your office?
7      A.  Not at all.
8      Q.  Did she -- do you know of anymore details of
9  why she supported the bill?
10     A.  I have no idea.
11     Q.  And I guess something I should have asked you
12 earlier --
13     A.  Sure.
14     Q.  -- do you approve all of the correspondence
15 that goes out of your office?
16     A.  I'm probably not perfect at that, no.
17     Q.  Do you as a general matter try to approve the
18 correspondence that goes out of your office?
19     A.  Not all of it.  Most of it.
20     Q.  How do you decide what to approve and what not
21 to approve?
22     A.  It's usually probably based on time or
23 importance.
24     Q.  Do you usually review constituents'
25 communications with your office?

### 207

1      A.  It -- it would depend.  It would most likely
2  be Shera Eichler, my chief of staff.  But it may also
3  be the staff member who's dealing with that
4  correspondence.
5      Q.  Have you ever had communications with
6  Ms. Eichler -- like do you have a general policy with
7  her on how to respond to communications when you're not
8  able to review them before they go out?
9      A.  Yes.
10     Q.  What is that policy?
11     A.  Answer their question.
12     Q.  Based on what?
13     A.  The facts.
14     Q.  Will she -- if you're not able to review a
15 particular piece of correspondence, will she ask you
16 questions to get your views on a particular issue?
17         MR. BRISSENDEN:  Objection to the extent
18 the question calls for speculation.
19     Q.  (BY MS. BERKOWER)  You may answer.
20         MR. BRISSENDEN:  If you know.
21         THE WITNESS:  It just depends.
22     Q.  (BY MS. BERKOWER)  Has that happened?
23     A.  Has what happened?
24     Q.  Where you weren't able, due to time pressure,
25 to review a particular piece of --

### 206

1      A.  Most usually, but not always.
2      Q.  Do you remember if you reviewed constituent
3  communications concerning voter identification
4  legislation?
5      A.  I probably reviewed some, but not all.
6      Q.  If there -- do you ever have form letters that
7  you send to respond to constituents?
8      A.  Not really.  And -- let me explain.  Many
9  times -- I try not to send form letters, but many times
10 there's only so many responses or so many different
11 variations of response, so letters become somewhat of a
12 form letter.  But usually we try to be very specific to
13 questions and not create a -- we do not have a practice
14 of creating a boilerplate form letter that is simply
15 sent generally to any question.
16     Q.  Would you say there is some repetition in
17 language?
18     A.  Oh, absolutely, yes.
19     Q.  And do you approve that type of language
20 that's going to be going out in more than one piece of
21 correspondence?
22     A.  Usually I do, but there's certainly been times
23 where it has happened and I did not.
24     Q.  Who is responsible for those communications if
25 you're not approving them?

### 208

1      A.  Yes, that has happened and something has gone
2  out and I didn't review it.  Yes, that has happened.
3      Q.  And has, in those circumstances, Ms. Eichler
4  spoken with you --
5      A.  It may not have been her.  I want to be clear.
6  It may not have only been with her.  It could have
7  been with --
8      Q.  Will someone in your office speak with you
9  generally about the correspondence to get your approval
10 if you're not able to review it personally?
11     A.  Usually, yes, but not always.
12     Q.  Do you know of any times where you have
13 neither been able to review the correspondence nor been
14 able to speak with a staff person before it went out?
15     A.  Specifically, no, but I know it happened.
16     Q.  Do you know if that happened with regard to
17 any correspondence concerning voter ID legislation?
18     A.  Again, specifically, I don't know, but I
19 actually believe it probably has because at times we
20 receive more than not.
21     Q.  When S.B. 14 was heard by your committee, did
22 you publicly state that the bill was too weak?
23     A.  I don't know.  I may have.
24     Q.  Do you ever produce anything called an
25 Insider's Report?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

209

1      A.  Absolutely.
2      Q.  What is that?
3      A.  It is an e-mail newsletter that I send to
4    constituents in my district.
5      Q.  Do you write that personally?
6      A.  No.
7      Q.  Who writes that?
8      A.  My staff.
9      Q.  Would that be Ms. Eichler?
10     A.  It really varies.
11     Q.  Do they speak with you about the contents of
12   the report?
13     A.  Sure.
14     Q.  Do you review it before it goes out?
15     A.  Not always, but usually.
16     Q.  I have something that -- I think it's going to
17   be Exhibit 441.
18     A.  I think you're right.
19          (Exhibit No. 442 marked)
20          THE WITNESS:  Oh, I'm sorry.  No, it's
21   not 441.
22     Q.  (BY MS. BERKOWER)  No, I'm sorry.  442.  Thank
23   you for the correction.  442.
24          Do you recognize this?
25     A.  I guess.

---

210

1      Q.  What is it?
2      A.  Well, the printing looks a little different,
3    but I assume it is my Insider's Report.
4      Q.  What's the date on it?
5      A.  March 6th of 2011.
6      Q.  Is there a section that talks about voter
7    identification legislation?
8      A.  Yes, there is.
9      Q.  That -- reading from that section, you say,
10   "As the chair of" -- and is it fair to say that reading
11   from this is more or less stating your views or
12   expressing your views?
13          MR. BRISSENDEN:  I'm going to object to
14   the extent that the question of the witness -- that
15   would require him to reveal his opinions, motivations,
16   mental thought processes about S.B. 14.  I would
17   instruct the witness not to answer.
18          MS. BERKOWER:  All I asked is whether the
19   newsletter, the Insider's Report, as a general matter
20   can be characterized as expressing his views on
21   whatever its contents contain.  You're objecting to
22   that?
23          MR. BRISSENDEN:  That is correct.
24          MS. BERKOWER:  Newsletters and other
25   similar types of political communications are not

---

211

1    privileged acts by legislators.
2          MR. BRISSENDEN:  That is my understanding
3    of the court's order, although the court states on
4    Page 6 of the order issued yesterday that although the
5    communications are not privileged, questioning a
6    legislator or staff about the communication that would
7    require him to reveal his thought processes and his
8    subjective motivations about S.B. 14 or any legislative
9    activity with respect to the law are -- apply to
10   privilege.
11          So based upon that, the court's order
12   there, I'm instructing the witness not to answer the
13   question about his opinions and views as stated in the
14   question.
15          MS. BERKOWER:  Okay.  Well, I think
16   that -- I'm not sure you heard my question correctly
17   because this was more of a question generally about the
18   creation of the Insider's Report, not anything specific
19   to any legislation, not anything specific to any voter
20   identification legislation, but merely a matter of
21   whether it's fair to say that when Mr. Bonnen -- or
22   Representative Bonnen produces his Insider's Report and
23   distributes it as a newsletter to his constituents that
24   it can be fairly characterized as expressing his views
25   on what is happening in the Legislature.

---

212

1          MR. BRISSENDEN:  And my response would
2    be, first of all, that was not the question that you
3    phrased.  And, secondly, the paragraph that you're
4    quoting from makes specific reference to S.B. 14.
5          MS. BERKOWER:  I didn't quote.  I didn't
6    quote.  I restarted the question and said, as a general
7    matter do those newsletters reflect -- or can they be
8    characterized as expressing your views on what's going
9    on in the House.  Will you accept that question?
10         MR. BRISSENDEN:  If the question is, do
11   these reports, as a general matter, typically reflect
12   your communication as to what is going on in the House,
13   I'll allow that -- I'll allow him to answer.
14     Q.  (BY MS. BERKOWER)  Do these Insider's Reports,
15   as a general matter -- is it fair to characterize them
16   as expressing your views on what's going on in the
17   House?
18     A.  I guess, yes.
19     Q.  So turning your attention to the section
20   entitled "Voter Identification Legislation" --
21     A.  Yes.
22     Q.  -- you wrote, "My committee is working to
23   strengthen the voter ID bill, S.B. 14, that was passed
24   in the Senate and contained exception, but
25   substantially weakened the effectiveness of the bill"

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

213

1     (as read).
2          Is that accurate?
3     A.   It's accurate that that's what it reads.
4     Q.   Did your committee then modify S.B. 14?
5     A.   I don't remember.  I think -- and there's a
6     record of all of it.  I think Representative Harless
7     may have brought in a committee substitute that may
8     have changed the bill, but I'm not positive whether we
9     did that or not.
10    Q.   I have what's going to be marked as
11    Exhibit 443.
12         (Exhibit No. 443 marked)
13    Q.   (BY MS. BERKOWER)  Do you know what this is?
14    A.   It appears to be the House Journal.
15    Q.   What day is it the House Journal from?
16    A.   Monday, March the 21st of 2011.
17    Q.   Were you present that day?
18    A.   It appears the record reflects that I was
19    present.
20    Q.   Do you know if S.B. 14 was considered on that
21    day?
22    A.   I do not know, but I'll look further in the
23    journal and find out.
24    Q.   Will you turn to Page 910?
25    A.   Okay.  It appears that the committee's

---

214

1     substitute to S.B. 14 was heard on the second reading.
2     Q.   Turning your attention now to Page 911, do you
3     see that there is an exchange there between
4     Representative Anchia and Representative Harless?
5     A.   It appears there was.
6     Q.   Are we still on Page 911?
7     A.   Yes, ma'am.
8     Q.   Okay.  Do you see there is a paragraph --
9     well, the third entry from the bottom,
10    Representative Anchia says, "We have studied this thing
11    for eight years now -- almost six years -- seven years,
12    actually, and we haven't been able to find much said
13    voter impersonation" (as read).
14         Do you see that?
15    A.   Actually, I don't.
16    Q.   It's the section that Anchia says, "Are you
17    sure?"
18    A.   Okay.
19    Q.   And then about two lines down from there.
20    A.   Okay.  I see it now.
21    Q.   Based on the evidence in the public record, is
22    that accurate?
23    A.   I don't think it is.
24    Q.   Why not?
25         MR. BRISSENDEN:  Again, to the extent

---

215

1     that you're able to answer that question relying solely
2     upon what's been represented in the public record, you
3     may answer.  To the extent you have information or
4     knowledge beyond public record that is part of your
5     knowledge or thoughts and opinions with regards to
6     legislation, I instruct you not to answer.
7          MS. BERKOWER:  Well, I asked with regards
8     to the public record.  He said --
9          THE WITNESS:  Well --
10    Q.   (BY MS. BERKOWER)  Sorry?
11    A.   Go ahead.
12    Q.   Unless you need clarification.
13    A.   Then go ahead and clarify.
14    Q.   I heard a quote from Representative Anchia
15    that says he's "studied this thing for eight years now,
16    almost six years, seven years actually, and we haven't
17    been able to find much said voter impersonation."  And
18    I said, "Is this true based on the evidence in the
19    public record?"
20    A.   And I don't believe Representative Anchia is
21    the authority on this, and I don't agree with it.
22    Q.   Well, based on the public record, what is in
23    there to discredit his statement that there isn't much
24    voter fraud or voter impersonation?
25    A.   I don't have the record in front of me, but I

---

216

1     believe there are pieces of information in the record.
2     I think the fact of the record we read earlier about
3     the testimony from Jay Dyer of the Attorney
4     General's -- from the Attorney General's office, where
5     I go back to that exhibit -- I believe there were a
6     couple hundred cases that were being dealt with.
7     Q.   I think it's 267 cases --
8     A.   That sounds right.
9     Q.   -- that was referred to the --
10    A.   Attorney General's office.
11    Q.   -- Attorney General's, with 35 convictions,
12    dismissals and/or plea agreements, and 12 ongoing
13    cases?
14    A.   I think there was more than that or there
15    wasn't clarity on the rest.  But, yes, that sounds
16    reasonably accurate.
17    Q.   Other than that, do you know of any other
18    examples of voter impersonation in the public record?
19    A.   I believe there are others.  I don't have any
20    in front of me.
21         MR. BRISSENDEN:  Just so the record is
22    clear, the record that the witness is referring to is,
23    I believe, Exhibit 438.
24         THE WITNESS:  267 incidences of alleged
25    illegal voting is defined by Section 64.012 of the

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                                    June 6, 2012

---

### 217

1  Texas Election Code.  35 of those alleged violations
2  have been resolved with guilty pleas, dismissals or
3  plea agreements.  12 cases remain active and the
4  remainder of the cases are still -- either still being
5  investigated or the statute of limitations has expired.
6  So --
7      Q.  (BY MS. BERKOWER)  And that's you reading from
8  the exhibit --
9      A.  Correct.
10     Q.  -- that your counsel just mentioned?
11     A.  That is, yes, ma'am.
12         So for that reason and others, I do not
13  agree with Mr. Anchia's statement.
14     Q.  Have you ever during your time on the
15  elections committee or the special select committee
16  heard evidence concerning mail-in ballot fraud?
17         MR. BRISSENDEN:  Again, the question, I
18  believe, as phrased, is limited to what is in the
19  public record?
20     Q.  Yes.
21     A.  I believe we have.
22     Q.  Do you remember what that evidence was?
23     A.  I do not.  And I don't know if we heard much
24  specific evidence.
25     Q.  Does S.B. 14 address mail-in ballot fraud, to

---

### 219

1      Q.  Did any of the legislation that you introduced
2  that we've discussed today address mail-in ballot
3  fraud?
4      A.  I never suggested that it would have.
5      Q.  In your memory of the public record, is there
6  more evidence of mail-in ballot fraud versus in-person
7  ballot fraud?
8      A.  I don't remember exactly, but I don't believe
9  there was.
10     Q.  Do you think there was more evidence in the
11  public record of in-person voter fraud than mail-in
12  ballot fraud?
13     A.  I believe there was.  For the periods in which
14  the bills were being heard, that was the issue, was
15  in-person voter fraud.
16     Q.  What do you mean by that?
17     A.  I mean that we were hearing bills that
18  addressed the issue of voting with photo ID and were
19  not addressing an issue of mail-in voter fraud, which
20  is certainly an issue that can be addressed.
21     Q.  Just so I understand, are you saying that if
22  mail-in voter fraud were a bigger problem than
23  in-person voter fraud, you would likely have heard more
24  bills about mail-in voter fraud?
25     A.  Not at all.

---

### 218

1  your knowledge?
2      A.  I don't believe it does.
3      Q.  Does any of the predecessor legislation we've
4  discussed today, S.B. 362, or HB 1706, or S.B. 218
5  address mail-in ballot fraud?
6         MR. BRISSENDEN:  Objection, compound.
7      Q.  (BY MS. BERKOWER)  Do you understand the
8  question?
9         Does S.B. 362 address mail-in ballot
10  fraud?
11     A.  I don't understand the relevance.
12     Q.  Well, I don't --
13         MR. BRISSENDEN:  Do the best you can and
14  answer the question.
15         THE WITNESS:  No, I do not believe that
16  they do.
17     Q.  (BY MS. BERKOWER)  Did H.B. 1706 address
18  mail-in ballot fraud?
19     A.  Which one -- or which one is 1706?
20     Q.  That was the first one we discussed today.
21     A.  I don't believe it did.
22     Q.  Did HB 218 address mail-in ballot fraud?  That
23  was the second --
24     A.  I don't think the intention of that bill was
25  to address mail-in ballot fraud.

---

### 220

1         MR. BRISSENDEN:  Object.
2      A.  That's not what I'm saying.
3         MS. BERKOWER:  I'm just trying to
4  understand his testimony.
5         THE WITNESS:  Well, my testimony is that
6  we heard testimony on the issue we were hearing.  And
7  the issue we were hearing was on voter identification
8  and in-person voter fraud or fraud in voter rolls.  Not
9  legislation and issues dealing with voter mail-in
10  fraud.  It's a separate issue.  Was it raised?  Yes.
11     Q.  (BY MS. BERKOWER)  Wasn't the interim charge
12  in 2010 to examine the presence of fraud in Texas
13  elections?
14         MR. BRISSENDEN:  Are you referring to a
15  prior exhibit?
16         MS. BERKOWER:  Your Honor, I'm sorry.  I
17  don't have the number in front of me.  But I think --
18         THE WITNESS:  Yeah, it's right here.
19         MS. BERKOWER:  -- should have it.
20         MR. BRISSENDEN:  438.
21         THE WITNESS:  It very well could have
22  been, but none of the bills that we ever heard a
23  hearing on dealt with that issue.
24     Q.  (BY MS. BERKOWER)  Okay.  But I think you have
25  the exhibit in front of you now.  Do you --

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

221

1     A.  I do.
2     Q.  -- the interim charge was to examine the
3   presence of fraud in Texas elections, not in-person
4   fraud specifically?
5     A.  Correct.  And I'm not talking about interim
6   charges.  I'm talking about hearings before the
7   legislative committees while in session, hearing
8   specific pieces of legislation that you were asking me
9   about.
10    Q.  But wasn't the recommendation that this
11  interim charge reported -- made --
12    A.  Well --
13    Q.  -- concerning legislation that should be
14  introduced in 2011?
15    A.  Well, respectfully, you were asking me about
16  testimony about specific pieces.  You had rattled off
17  specific bill numbers and you had requested information
18  about those.  You didn't ask me about the interim
19  charge.
20    Q.  Okay.  Well, now I'm asking about the interim
21  charge.
22    A.  Fair enough.
23    Q.  So wasn't the interim charge supposed to make
24  a recommendation about appropriate solutions to voter
25  fraud in Texas for the 2011 legislature?

222

1     A.  The interim charge No. 3 was to examine the
2   presence of fraud in Texas elections, study laws in
3   other states regarding voter identification, and
4   recommend statutory changes necessary to ensure that
5   only eligible voters can vote in Texas elections.
6     Q.  Is that limited to in-person fraud?
7     A.  Study new laws in other states regarding voter
8   identification and recommend statutory changes
9   necessary to ensure that only eligible voters can vote
10  in Texas elections.
11    Q.  Is that -- is that limited to in-person
12  voting, though?
13        MR. BRISSENDEN:  To the extent that you
14  know.
15        I'm going to also insert an objection as
16  to speculation to the extent that the witness did not
17  prepare this document.
18        MS. BERKOWER:  Well, he served on the
19  committee that addressed this interim charge.  And I'm
20  asking him about the language of the interim charge.
21        MR. BRISSENDEN:  To the extent that he
22  knows.
23        THE WITNESS:  And your question -- I'm
24  sorry, can you repeat the question, again?
25        MS. BERKOWER:  Can you read it back,

223

1   please.
2         (The requested portion was read)
3         MR. BRISSENDEN:  Same objection to the
4   extent that the witness has testified previously he did
5   not prepare this document.  But to the extent he is
6   able to answer it sitting here today, he may answer.
7   But to the extent it calls for him to speculate as to
8   what was intended by the drafter of the document, I
9   would object.
10        MS. BERKOWER:  I'm asking him solely
11  about the language on the page in front of him.
12        MR. BRISSENDEN:  I understand.
13        THE WITNESS:  The language on the page in
14  front of me, you were asking what it was supposed to
15  do.  And what it was supposed to do is meet interim
16  charge No. 3, which is to examine the presence of fraud
17  in Texas elections, study new laws in other states
18  regarding voter identification, and recommend statutory
19  changes necessary to ensure that only eligible voters
20  can vote in Texas elections.
21    Q.  (BY MS. BERKOWER)  Does anything that you just
22  read delineate between voting in person and voting by
23  mail invalid?
24    A.  Yes.  Study new laws in other states regarding
25  voter identification.

224

1     Q.  Does it specify that voter identification has
2   to be required at the poles?  Couldn't it also be
3   required at the time that you request a mail-in ballot?
4         MR. BRISSENDEN:  Objection,
5   argumentative.
6     Q.  (BY MS. BERKOWER)  You may answer.
7         MR. BRISSENDEN:  I believe the witness
8   has answered the question as you phrased it as best as
9   he can, and the question that you have followed up with
10  is more argumentative.
11    Q.  (BY MS. BERKOWER)  Is it possible to require a
12  voter to show identification when they request a
13  mail-in ballot?
14    A.  I don't believe it is.
15    Q.  Why not?
16        MR. BRISSENDEN:  I'm going to instruct
17  the witness not to divulge his opinions, his mental
18  processes, mental thoughts, opinions, analysis and
19  impressions about legislation, including legislation
20  that addresses mail-in voter fraud.
21        MS. BERKOWER:  I did not tie this
22  question to any legislation whatsoever, nor have we
23  discussed any legislation in particular that addresses
24  mail-in ballots.  I asked a simple question of would it
25  be possible to require proof of some sort of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 225

1    identification when a voter requests a mail-in ballot?

2       MR. BRISSENDEN:   And because there was

3    legislation, I believe, during the sessions that did

4    pertain to mail-in voter fraud that would implicate

5    your question as to why it would implicate his mental

6    impressions and thought processes about legislation

7    pertaining to mail-in voter fraud.

8       MS. BERKOWER:  So you are not letting him

9    answer if it's possible to require a voter to submit

10   some form of identification when you request a mail-in

11   ballot?

12      MR. BRISSENDEN:  That is correct.

13      MS. BERKOWER:  Well, we ask you to

14   withdraw that objection.  We think that's completely

15   overbroad.  I'm not sure exactly what legislative act

16   you're tying that to.

17      MR. BRISSENDEN:  I think I have explained

18   my position in the pending legislation.  I made

19   reference to the legislation in my objection.  I'm

20   trying to work --

21      MS. BERKOWER:  You're the only one who is

22   referring to legislation concerning mail-in ballots.

23      MR. BRISSENDEN:  That is not correct.

24   I've explained my position.  I'm trying to work with

25   you in going through these court orders and policing

## 226

1    the line as I understand them from the Court's orders.

2    And you have continuously -- despite the Court's order

3    of yesterday, continue to ask questions that delve into

4    privilege.  And I believe that is crossing the line and

5    is more of a harassment of this witness.

6       But we have been with you, cooperated

7    with you today to try to provide you information that

8    is not privileged during the deposition here today.

9      MS. BERKOWER:  For the record, I will say

10   that we have attempted to work with you and to rephrase

11   our questions as you see appropriate and to comply with

12   the Court's order.  And we have certainly not made any

13   willful attempt to defy the Court's order in any

14   regard.

15      MR. BRISSENDER:  Well --

16      MS. BERKOWER:  To the extent that we

17   disagree about the extent of privilege, we will make

18   our objections known.

19      MR. BRISSENDEN:  Well, I appreciate your

20   efforts to rephrase the questions.  But not all of the

21   questions have been rephrased and some of them have

22   been in direct violation of the Court's order.

23      MS. BERKOWER:  And where you have

24   asserted privilege, we have not challenged you and

25   permitted the witness not to answer, as we're required

## 227

1    to do.

2      Q.  (BY MS. BERKOWER)  Can you turn your attention

3    to Page 918 of the House Journal.

4      A.  Yes.

5      Q.  I think that's Exhibit 443, please.  Do you

6    see Representative Anchia addresses -- I guess it's

7    in -- well, it's in the middle of the page.

8      A.  Uh-huh.

9      Q.  He asked a question of Representative Harless:

10   "And you're not aware of any" -- sorry.

11      "Are you aware of any studies conducted

12   by a state agency to project the number of voters that

13   lacked the required identification, and what percentage

14   of these voters are African American or Hispanic?  Are

15   you aware of any studies like that?"

16      Do you see where he asked that?

17      A.  I do.

18      Q.  And she -- and Representative Harless replied,

19   "I do not see that in testimony."  Do you see that?

20      A.  I do.

21      Q.  Do you know who Ann McGeehan is?

22      A.  I believe she works for the Secretary of

23   State.

24      Q.  Do you know what her position there is?

25      A.  She's involved in the election process there.

## 228

1      Q.  She's the former director of elections there?

2      A.  She could be.

3      Q.  Do you know if she testified before the House

4    at all in connection with S.B. 14?

5      A.  I mean, the record would show whether she did

6    or not.  I don't recall.

7      Q.  Do you know that Ann McGeehan testified last

8    week that in fact a match had been conducted of the

9    voter registration and driver's license databases in

10   February or March of 2011?

11      MR. BRISSENDEN:  I'm going to object to

12   the extent that the question is a mischaracterization

13   of prior testimony or evidence.

14      You may answer.

15      THE WITNESS:  I'm not aware of any of

16   that.

17      Q.  (BY MS. BERKOWER)  As the house bill sponsor,

18   do you think Representative Harless would have been

19   informed of that -- of research conducted by the

20   Secretary of State's office concerning the bill of

21   which she was the sponsor?

22      MR. BRISSENDEN:  Objection.  First of

23   all, the question calls for speculation as to what

24   Harless would have been informed of.  And to the extent

25   that that question requires you to disclose or divulge



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

229

1  information that you have in terms of the thought
2  processes as part of your analysis of S.B. 14, I would
3  request that you not disclose that.
4          Also, do not disclose communications that
5  you have had with state agencies and with legislators,
6  their staff or your staff, or Texas Legislative
7  Council. To extent that you can answer the question
8  without disclosing that, you may answer.
9          THE WITNESS: Do you mind repeating?
10         (The requested portion was read)
11         MR. BRISSENDEN: Same objection, same
12  instruction.
13         THE WITNESS: I would only be able to
14  speculate.
15     Q.  (BY MS. BERKOWER) When you sponsor a bill and
16  a state agency conducts an analysis of the bill, are
17  you informed of that analysis?
18         MR. BRISSENDEN: Same objection, same
19  instruction. Do not disclose communications that you
20  have had with state agencies and -- including Texas
21  Legislative Council and the Secretary of State's
22  office.
23         To the extent you are able to answer that
24  question that does not pertain to communications
25  that -- from those agencies that relate to specific

230

1  legislation but more in terms a general procedure --
2          MS. BERKOWER: Which is exactly what I
3  asked.
4          MR. BRISSENDEN: Please let me finish.
5          -- you may answer that question.
6          THE WITNESS: No. There is no
7  requirement or absolute that you would.
8          MS. BERKOWER: I think the lengthy
9  objection, I'm not -- I need to just -- need to restart
10  this.
11     Q.  (BY MS. BERKOWER) As a general matter, as a
12  general practice, if a state agency conducts an
13  analysis of a bill of which you are the sponsor, are
14  you generally informed of that analysis?
15         MR. BRISSENDEN: My same instruction.
16         THE WITNESS: The answer is no, you would
17  ==not absolutely be informed. Let me clarify. I don't==
18  ==believe that the Secretary of State's office conducted==
19  ==an analysis of the bill.==
20     Q.  (BY MS. BERKOWER) Did you participate in the
21  House floor debate on the bill?
22     A.  Sure. I'm sure I did. I think it was
23  limited.
24     Q.  Why -- what do you mean "it was limited"?
25     A.  Well, I mean, I wasn't deeply involved in the

231

1  debate on the floor.
2     Q.  You were present every day, though, or you
3  were present during the debate?
4     A.  You asked if I was involved in the debate.
5  You didn't ask if I was present. You asked if I was
6  involved.
7     Q.  Did you offer amendments?
8     A.  I did, I think one or two. Again, it's all in
9  the record. It will be there.
10         I think we're at 444.
11         (Exhibit No. 444 marked)
12     Q.  (BY MS. BERKOWER) Actually, this is such a
13  lengthy exhibit I only --
14     A.  Sure.
15     Q.  -- have one, if you don't mind sharing.
16     A.  No problem.
17     Q.  Can you turn your attention --
18     A.  May I make a comment? I don't mean to be
19  difficult at all. I mean, when you ask if I was
20  involved, I take that to mean whether I am
21  participated. Obviously I was there, so I'm not
22  suggesting I wouldn't have been there. I take that
23  more as a question of whether I actually was at the
24  front of that mic making an argument.
25     Q.  Okay. Thank you for that clarification.

232

1          Can you turn your attention to Page 961,
2  please.
3     A.  Yes.
4     Q.  Do you see Amendment 7?
5     A.  Amendment No. 7, yes, ma'am.
6     Q.  Were you one of the sponsors of this
7  amendment?
8     A.  It appears I was, yes.
9     Q.  What did this amendment do?
10     A.  Let me look. Amendment to Committee
11  Substitute 14, Section 9 of the bill, added Section
12  63.001(h), Election Code (page 6, lines 17-21), by
13  striking the following: Was 70 years of age or older
14  on January 1 of 2012 as indicated by the date of birth
15  on the voters registration certificate; or (2)."
16     Q.  So would this provision have removed the
17  exemption for individuals over 70 years of age from
18  having to show one of the required forms of
19  identification under S.B. 14?
20     A.  I believe that's correct.
21     Q.  What was the purpose of that amendment?
22         MR. BRISSENDEN: I'm going to instruct
23  the witness not to close his opinions, analysis, and
24  thoughts and mental impressions about this amendment
25  and the legislation, and instruct him not to answer.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

233

1 THE WITNESS: Follow his instruction.
2 Q. (BY MS. BERKOWER) Are you aware of any
3 testimony on the public record expressing concerns that
4 some elderly voters might not be able to access -- may
5 not be able to obtain the required documentation under
6 S.B. 14?
7 MR. BRISSENDEN: Objection to the extent
8 that it mischaracterizes testimony in the record.
9 But you can answer.
10 THE WITNESS: I'm aware of public
11 testimony that people over 71 had to show ID.
12 Q. (BY MS. BERKOWER) I'm sorry?
13 A. That people over 71 had to show ID.
14 Q. Are you aware of any testimony that expresses
15 concerns that some minority voters over the age of 70
16 would be unable to obtain appropriate identification
17 due to prior discrimination?
18 A. No.
19 Q. Do you recall Representative Veasey raising
20 the concern that some elderly minority voters were not
21 born in public hospitals because they were not allowed
22 to at the time that they were born, and so they don't
23 have access to birth certificates the same way other
24 voters may have?
25 MR. BRISSENDEN: Objection to the extent

---

234

1 that the testimony mischaracterizes prior testimony in
2 the record.
3 You may answer.
4 THE WITNESS: I don't remember.
5 Q. (BY MS. BERKOWER) Turning your attention to
6 Amendment 15 at Page 969.
7 A. Okay.
8 MR. BRISSENDEN: We have been going for
9 well over an hour. Is this a good time to take a
10 break?
11 MS. BERKOWER: Sure.
12 Let's go off the record, please.
13 (Recess from 5:07 p.m. to 5:21 p.m.)
14 Q. (BY MS. BERKOWER) Sir, just to let you know,
15 I have some more questions to ask, but then Ms. Perales
16 needs to return back to her family in San Antonio and
17 so I'm going to --
18 A. Certainly.
19 Q. -- let her go before I finish so she can get
20 home.
21 A. No problem.
22 MS. BERKOWER: Can you read me back the
23 last question?
24 (The requested portion was read back)
25 Q. (BY MS. BERKOWER) Turning your attention to

---

235

1 Amendment 15 at Page 969.
2 A. Yes.
3 Q. Do you remember this amendment?
4 A. No.
5 Q. Would this amendment prohibit the use for the
6 underlying documents required to vote under S.B. 14?
7 A. It says, "Fees prohibited for certain forms of
8 identification documentation, notwithstanding any other
9 law and agency, institution, or political subdivision,"
10 and so forth.
11 Q. "May not charge any fee for the issuance of a
12 document that may be used as proof of identification
13 under this chapter." Is that accurate?
14 A. That is accurate.
15 Q. And then it also says, "or to obtain a
16 document that may be used as proof of identification
17 under this chapter." Is that accurate?
18 A. That is accurate.
19 Q. Do you know what the practical effect of that
20 amendment would have been?
21 MR. BRISSENDEN: I'm going to object and
22 instruct the witness not to answer the question on the
23 basis of privilege.
24 Q. (BY MS. BERKOWER) Is the effect of this
25 amendment that it would have been to prohibit fees for

---

236

1 documentation used to vote under S.B. 14?
2 MR. BRISSENDEN: Same instruction.
3 Q. (BY MS. BERKOWER) Did you vote in favor of
4 this amendment?
5 A. I voted yes.
6 Q. Yes to what?
7 A. It appears I voted yes on the motion to table
8 the amendment.
9 Q. Is that effectively a vote against the
10 amendment?
11 A. It would be, yes.
12 Q. Do you know of any concerns in the public
13 record that the cost that would be imposed on voters to
14 obtain identification compliant with S.B. 14 might have
15 an adverse impact on minorities?
16 MR. BRISSENDEN: Can you read back the
17 question?
18 (The requested portion was read)
19 Q. (BY MS. BERKOWER) Do you know of any such
20 publicly made concerns?
21 A. Not off the top of my head, no.
22 Q. Do you know if S.B. 14 provided for an
23 identification free of charge to voters?
24 A. I don't recall.
25 MS. BERKOWER: This will be Exhibit 445.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                          June 6, 2012

237

1            (Exhibit No. 445 skipped)
2            MS. BERKOWER:  This is the final filed
3    version of S.B. 14.  I think you had asked about this
4    earlier.
5            MR. BRISSENDEN:  Thank you.
6        Q.  (BY MS. BERKOWER)  Turning to Page 13.  I
7    should actually mark that as Exhibit 5 instead of 445.
8    We have used it previously in other depositions.  Let
9    me just change that.
10       A.  Sure.
11       Q.  Turning to Page 13 --
12       A.  All right.
13       Q.  -- Chapter 521A, Election Identification
14   Certificate.  Do you see that?
15       A.  I do.
16       Q.  Can you review this section briefly to
17   yourself?  Well, are you familiar with this section?
18       A.  Vaguely.  Go ahead.
19       Q.  Did you review this section now?
20       A.  Briefly, I have.
21       Q.  Does this section provide an identification
22   issued by the Department of Public Safety free of
23   charge to voters who do not have another form of
24   identification required by S.B. 14?
25       A.  It says the department may not collect a fee

238

1    for an election identification certificate or a
2    duplicate election identification certificate issued
3    under this section.
4        Q.  Do you know if there are certain documents
5    required for a voter -- that a voter must present in
6    order to obtain one of these certificates?
7        A.  I do not, no.
8        Q.  Do you know if a voter who wanted to obtain
9    one of these certificates might have to provide
10   documents -- official State documents?
11       A.  I do not know.
12       Q.  If a voter had to present certain documents to
13   obtain the certificate and those documents cost money,
14   would the identification still be free?
15           MR. BRISSENDEN:  Objection, calls for
16   speculation and assumes facts not in evidence.
17       Q.  (BY MS. BERKOWER)  You may answer.
18       A.  I believe that it's stated here, "The
19   department may not collect a fee for an election
20   identification certificate or the duplicate election
21   identification certificate issued under this section."
22       Q.  But if the voter had to -- if the voter had to
23   provide documentation -- underlying documentation to
24   obtain the certificate, and that underlying
25   documentation cost money, would the -- would this

239

1    identification effectively no longer be free?
2            MR. BRISSENDEN:  Objection, calls for
3    speculation, assumes facts in evidence.
4        Q.  (BY MS. BERKOWER)  You may answer.
5            MR. BRISSENDEN:  If you know.
6        A.  It says, "The department may issue an election
7    identification certificate to a person who states that
8    the person is obtaining the certificate for the
9    purposes of satisfying Section 63.001(b), Election
10   Code, and does not have another form of identification
11   described by Section 63.0101, Election Code, and" so
12   forth.
13       Q.  (BY MS. BERKOWER)  Okay.  Directing your
14   attention to Line 9 -- sorry, 19 of Page 14.
15       A.  Okay.
16       Q.  It says, "The department may require each
17   applicant for an original or renewal election
18   identification certificate to furnish to the department
19   the information required by Section 521.142."
20           Do you see that?
21       A.  Actually, I don't.  Tell me where we are
22   again.
23       Q.  Line 19 on Page 14.
24       A.  Okay.
25       Q.  Do you see that?

240

1        A.  I do.
2        Q.  If the -- if the documents required by Section
3    521.142 cost money, would this identification still be
4    free?
5            MR. BRISSENDEN:  Same objection.
6            THE WITNESS:  Well, it says the
7    department may require.
8        Q.  (BY MS. BERKOWER)  If it does, in fact, choose
9    to require documentation that costs money, would this
10   identification still be free?
11       A.  I don't know if they require it or not.
12       Q.  But what if they do require it?
13           MR. BRISSENDEN:  Same objection.
14           The witness has tried to, as best he can,
15   answer your question.
16           MS. BERKOWER:  The witness -- the witness
17   has provided nonresponsive answers.  So I ask that he
18   answer the question, please.
19           MR. BRISSENDEN:  I disagree.  I think the
20   question has been asked and answered, and he has tried
21   to answer it the best he can given the information
22   provided.
23           MS. BERKOWER:  The witness has only
24   answered this question to the extent that the
25   department may not, in fact, require underlying



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

241

1  documentation that costs money.  The witness has not
2  answered my question which is if the department does in
3  fact require underlying documentation that costs money,
4  would this identification still be free.
5      A.  I guess only if it costs money.  But even
6  though it costs money, it doesn't mean that it costs
7  them money to get this.  They may already have that
8  documentation.
9      Q.  (BY MS. BERKOWER)  What if they don't?
10     A.  Then I guess it --
11         MR. BRISSENDEN:  Objection, calls for
12  speculation.
13         THE WITNESS:  Then I guess it would cost
14  money.
15     Q.  (BY MS. BERKOWER)  Okay.  Turning your
16  attention back to the House Journal.  Amendment 15 that
17  we just discussed a few minutes ago.  Part two of that
18  amendment would have prohibited a fee to obtain a
19  document that may be used -- actually, I'll withdraw
20  that.
21         Turning your attention to Amendment 23, I
22  think that's on Page 979.  Do you see Amendment 23?
23     A.  I do.
24     Q.  Would Amendment 23 have allowed voters to
25  present a student identification card containing the

242

1  person's photograph in order to vote?
2      A.  It appears it would.
3      Q.  Did you vote in favor of the motion to table
4  this amendment?
5      A.  It appears I did.
6      Q.  Have you ever worked as a poll worker?
7      Q.  What do you mean by "a poll worker"?
8      Q.  Have you ever worked as an election judge or
9  in any capacity at the polls on election day?
10     A.  I stood in front of a poll encouraging people
11  to vote for myself, but I have not worked in the
12  capacity of helping run an election.
13     Q.  I have never heard that defined as a poll
14  worker before.
15     A.  We call it that all the time.  I apologize.
16     Q.  I guess I mean inside the poll.
17     A.  No, I have not worked inside the poll.
18     Q.  How did -- do you know how many forms of
19  identification are issued by the United States
20  military?
21     A.  I do not.
22     Q.  Do you believe that military IDs will be
23  easily recognized by poll workers?
24         MR. BRISSENDEN:  Objection, calls for
25  speculation as to poll workers.

243

1      THE WITNESS:  I wouldn't know.
2         MS. BERKOWER:  I think at this point I'm
3  actually going to turn -- give Ms. Perales a chance to
4  ask some questions, and then I'll return after she's
5  finished.
6         EXAMINATION
7  BY MS. PERALES:
8      Q.  Good afternoon, Chairman Bonnen.  My name is
9  Nina Perales, and I represent the Rodriguez defendant
10  intervenors in this lawsuit.
11         I'm going to skip the questions that I
12  think have already been answered and so I will not go
13  in depth with you about 2005 or 2007 and those
14  sessions.  You have already testified you were not on
15  the elections committee for those sessions.  That's
16  correct?
17     A.  That is correct.
18     Q.  Okay.  Now, you had earlier testified that you
19  didn't exactly remember what had happened with those
20  bills ultimately, but I did want to ask if you recall
21  in 2005 and 2007 that the voter ID bills originated in
22  the House and died in the Senate.
23     A.  Respectfully, all of that is record.  I don't
24  walk around recalling things like that day in and day
25  out.  But it's a record.  We can check it, and I

244

1  wouldn't argue with the record.
2      Q.  Is your answer, then, that sitting here today
3  you can't recall whether the 2005 and '7 voter ID bills
4  originated in the House and died in the Senate?
5      A.  That is correct.
6      Q.  Okay.
7      A.  But I wouldn't disagree with you if you are
8  telling me what the facts are.
9      Q.  No, I just wanted to ask about your
10  recollection.
11         (Rodriguez Exhibit No. 30 marked)
12     Q.  (BY MS. PERALES)  Chairman Bonnen, the court
13  reporter has handed you what has been marked as
14  Deposition Exhibit Rodriguez 30.  Do you happen to
15  recognize this document?
16         THE WITNESS:  I do not.
17     Q.  (BY MS. PERALES)  You were on the elections
18  committee in 2009, correct?
19     A.  That is correct.
20     Q.  Even though you don't recognize this document
21  specifically, would it have been normal for you to have
22  reviewed a memo sent to the members of the committee by
23  the Secretary of State following up on some questions
24  that came up at hearing?
25     A.  Would I have send it to my office?  Certainly.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 245 | 247 |
|---|---|
| 1  Would I have reviewed it?  No, there's no guarantee of | 1  "Representative Bonnen," and then it has a colon? |
| 2  that. | 2  A.  I do. |
| 3  Q.  I was hoping it might refresh your | 3  Q.  Would you mind just taking a look at what you |
| 4  recollection whether in March of 2009, as the voter ID | 4  said there? |
| 5  bill is being heard, that there were some questions | 5  A.  Okay. |
| 6  raised by members regarding whether some voters might | 6  Q.  And then right before that, if you wouldn't |
| 7  lack a drivers license. | 7  mind, at line three, reading Ms. Collins' remark, just |
| 8  A.  Uh-huh. | 8  to get some context. |
| 9  Q.  And that's specifically addressed in response | 9  MR. BRISSENDEN:  On the same page? |
| 10  number 5 on Page 3. | 10  MS. PERALES:  Yes, Page 613. |
| 11  A.  Go ahead. | 11  THE WITNESS:  Okay. |
| 12  Q.  No, I have a question on the table.  I was | 12  Q.  (BY MS. PERALES)  Now, would it be fair to say |
| 13  waiting for your answer. | 13  that here Ms. Collins is saying that she likes the |
| 14  A.  Oh, Im sorry.  What did you ask?  I apologize. | 14  inclusion of an option to present a valid employee |
| 15  MS. PERALES:  Can you read it back? | 15  identification card, and you are basically responding |
| 16  THE WITNESS:  I didn't hear your | 16  saying that you appreciate that because you have some |
| 17  question. | 17  familiarity with an employee ID card for the Dow |
| 18  MS. PERALES:  That's okay.  It's late in | 18  company in your district.  Is that right? |
| 19  the day. | 19  A.  I know the significance of what security |
| 20  (The requested portion was read back) | 20  requirements a Dow employee or BASF -- not BAS -- BASF |
| 21  Q.  (BY MS. PERALES)  Do you recall concerns being | 21  employee goes through to receive credentials. |
| 22  raised at that time regarding voters who might lack a | 22  Q.  I see.  And do you have a Dow company plant in |
| 23  driver's license? | 23  your district?  Is that why you said this? |
| 24  MR. BRISSENDEN:  To the extent that the | 24  A.  Correct. |
| 25  question requires information that's not a part of the | 25  Q.  Okay.  What is -- |

| 246 | 248 |
|---|---|
| 1  public record, I would instruct you not to answer.  To | 1  A.  And a BASF plant. |
| 2  the extent you can answer the question based upon | 2  Q.  What is BASF? |
| 3  information that's of public record, you may answer. | 3  A.  It is a large petrochemical company. |
| 4  THE WITNESS:  I think the statistics were | 4  Q.  So are those two different companies, then, |
| 5  requested, and that's what this has provided. | 5  the Dow company -- |
| 6  Q.  (BY MS. PERALES)  During the public hearing on | 6  A.  Yes. |
| 7  the -- | 7  Q.  Thank you. |
| 8  A.  I assume that's where it was asked. | 8  If you could identify in your little pile |
| 9  Q.  And do you recall that from your time on the | 9  there US 435, which is the S.B. 362.  US 435. |
| 10  committee, that questions were being raised or | 10  A.  Okay.  435 is a memo or press release. |
| 11  statistics were being requested regarding voters who | 11  MR. BRISSENDEN:  Do you believe it's 434? |
| 12  might lack a driver's license? | 12  MS. PERALES:  Well, if the witness can |
| 13  A.  I vaguely recall that questions were asked | 13  find it, I will mark mine accordingly. |
| 14  about the numbers. | 14  Q.  (BY MS. PERALES)  It should say S.B. 362 in |
| 15  MS. PERALES:  I would like to mark this | 15  the corner. |
| 16  Rodriguez 31, please. | 16  A.  Here it is. |
| 17  (Rodriguez Exhibit No. 31 marked) | 17  Q.  All right.  What exhibit number do you have |
| 18  Q.  (BY MS. PERALES)  Chairman Bonnen, you have | 18  for that? |
| 19  been handed what has been marked Rodriguez Deposition | 19  A.  434. |
| 20  Exhibit No. 31.  You may not have ever seen a | 20  Q.  434.  I'll go ahead and mark mine. |
| 21  transcription of these hearings.  They were done for | 21  And does it say in the upper left-hand |
| 22  this case.  But I will represent to you that it is a | 22  corner, "By Fraser, Estes, Nelson, Nichols"? |
| 23  transcription. | 23  A.  Correct. |
| 24  If you would turn with me to Page 613. | 24  Q.  All right.  So we're looking at the same |
| 25  Do you see where the -- line 15 where it says, | 25  document. |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                                 June 6, 2012

---

249

1        Now, I believe you testified a little bit
2   earlier today about S.B. 362 as it came over from the
3   Senate to the House in 2009?
4        A.  Possibly.  I don't think I was very specific,
5   but sure.
6        Q.  All right.  Well, I want to try to refresh
7   your recollection a little bit about this time when
8   S.B. 362 or Senator Fraser's voter ID bill comes over
9   to the House.  You are on the committee, Todd Smith is
10  the chair.
11       A.  Correct.
12       Q.  And there is -- there is some material in the
13  public record about what was going on during this time.
14       A.  Certainly.
15       Q.  I know you had an exchange earlier with
16  Ms. Brekower about Todd Smith's attempt to draft a
17  compromise bill for an alternative or substitute bill,
18  quite frankly, to 362.
19       MR. BRISSENDEN:  Objection to the
20  extent that calls for speculation.
21       THE WITNESS:  Those all have many
22  different meanings.
23       Q.  (BY MS. PERALES)  I'll call it a committee
24  substitute, then.
25       A.  That would be fine.

---

250

1        Q.  All right.  So you recall based on your
2   knowledge from the public record that there was an
3   effort behind Chairman Smith to craft a committee
4   substitute to S.B. 362, correct?
5        A.  I do recall that, correct.
6        Q.  Do you recall there was some opposition by
7   Representatives Betty Brown and Linda Harper-Brown to
8   Chairman Smith's committee substitute?
9        A.  I don't -- without breaking privilege, I just
10  think that there was issues with who would get what
11  they wanted in what bills.
12       Q.  And a lot of that was covered in the Quorum
13  Report --
14       A.  Yeah.
15       Q.  -- so I don't want you break any privilege
16  there.
17       A.  Not that what I know is always accurate.
18       Q.  Correct.
19       And lastly -- and I am informed by having
20  been in Chairman Smith's deposition last Friday --
21       A.  No, I understand.
22       Q.  -- where he did talk about some of that.
23       A.  Certainly.
24       Q.  And I want to hopefully refresh your
25  recollection.  Do you recall in the public record that

---

251

1   when the bill was finally voted on by the Elections
2   Committee, that it had gone back to Senator Fraser's
3   version; that essentially Chairman Smith gave up on his
4   committee substitute and basically had the committee
5   vote on S.B. 362 as it came from the Senate?
6        MR. BRISSENDEN:  I'm going to object to
7   the extent that the question mischaracterizes prior
8   testimony.
9        But you may answer.
10       Q.  (BY MS. PERALES)  Does that sound familiar?
11       A.  Vaguely familiar.  With that said, though,
12  there would be a clear record of what the committee
13  voted on, and if it was Senator Fraser's original bill
14  passed by the Senate, I respectfully believe you.  I
15  wouldn't try and argue that with you.
16       Q.  And let me see if I can help further.
17       A.  And, respectfully, but at that time was
18  one of the issues that was a challenge, changed
19  frequently and often.
20       MS. PERALES:  Okay.  Let's go ahead and
21  mark this.
22       (Rodriguez Exhibit No. 32 marked)
23       THE WITNESS:  So, respectfully, if you
24  are telling me that the bill that was voted on by the
25  Elections Committee, the record shows that it was

---

252

1   Senator Fraser's bill that was passed by the Senate, I
2   wouldn't argue with you.
3        Q.  (BY MS. PERALES)  The court reporter has
4   handed you what has been marked Rodriguez Deposition
5   Exhibit 32.
6        A.  Okay.
7        Q.  And I'm doing this because I don't want to
8   question you about things that seem unfamiliar.
9        Do you recognize this as a committee
10  report for S.B. 2362?
11       A.  It does appear to be a committee report, yes.
12       Q.  Okay.  Do you see where it says "unamended" in
13  parenthesis up on the front page?
14       A.  I do.
15       Q.  Okay.  So I just want to make sure that you
16  feel comfortable when I'm talking about this bill
17  coming out of the House Elections Committee unamended?
18       A.  Sure.
19       Q.  Now, this is also the time when you testified
20  previously to some correspondence with people who had
21  written you e-mails -- third parties that had written
22  you e-mails.  And a couple of these e-mails mentioned
23  that you had voted no in committee?
24       A.  Correct.
25       Q.  Now, is it correct to say that you voted no in

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

253

1    committee following Representative Heflin casting his
2    vote? Do you recall that?
3        A.   I do recall it.  I believe you are correct,
4    but to be very correct, the record would reflect that
5    my name was called before.  I passed.  Chairman Smith
6    went through the rest of the committee roster.
7    Representative Heflin did vote yes.  He came back to me
8    at the end when all members had voted, and I voted no.
9        Q.   Okay.  And I seem to recall from your e-mail
10   correspondences with third parties that you had some
11   concerns about the bill not being strong enough as
12   written?
13       A.   That is correct.
14       Q.   And when you were writing that in your
15   correspondence to the third parties, were you referring
16   to S.B. 362 as it had come over from the Senate, or
17   were -- were those concerns more expressed towards
18   Chairman Smith's committee substitute?
19       MR. BRISSENDEN:  I'm going to object to
20   the extent that that question delves into the thought
21   process, mental impressions, about the legislation, and
22   instruct you not to answer the question because it
23   does -- although it does relate to correspondence and
24   public communication to third parties, your thought
25   processes, mental impressions about that statement I

---

254

1    believe would be privileged and I instruct you not to
2    answer.
3        MS. BERKOWER:  The privilege does not
4    apply here because if you write a statement to a third
5    party, then you can answer a question about that
6    statement.  So I want to be very, very clear that what
7    I'm asking with respect to the e-mail is when you
8    express that specific concern in that e-mail.  I'm not
9    asking about your deliberative process, but simply the
10   specific concern that you expressed in the e-mail,
11   whether you were referring to S.B. 362 as it came out
12   of the Senate, or whether you were referring to
13   Chairman Smith's committee substitute.
14       MR. BRISSENDEN:  And let me caution the
15   witness, and I do not believe that that is an accurate
16   representation of what the Court's order stated
17   yesterday on Page 6 where it makes reference to public
18   documents; that although they are public
19   communications, questioning a legislator about
20   communications to the extent that it would require the
21   legislator to reveal his thought processes.  Subjective
22   motivations on any legislative activity with respect to
23   the law are covered by the privilege, so that based
24   upon that, that's what I am trying to follow when I'm
25   instructing the witness not to divulge mental

---

255

1    impressions.
2        Do you understand that?
3        THE WITNESS:  I do.
4        MR. BRISSENDER:  Very good.
5        Q.   (BY MS. PERALES)  Okay.  And so just so I can
6    be clear about this, I am not asking you about your
7    thought process, I'm not asking you about your thoughts
8    about the bill.  I'm asking you a question about this
9    document.  And when I say "this document," I mean US
10   437.
11       A.   Correct.
12       Q.   And you make a couple of references to "this
13   bill" --
14       A.   Correct.
15       Q.   -- right here in the e-mail.
16       A.   Uh-huh.
17       Q.   There is a sentence -- second sentence.  "This
18   bill is not a true voter ID bill."  And so I believe it
19   is not privileged to explain what "this bill" means in
20   this correspondence.  Not anything about your
21   deliberations or about your thought process.
22       MR. BRISSENDEN:  Let me get the exhibit
23   here.  This may not be one that I had an extra copy of.
24       Q.   The second sentence of the first real
25   paragraph.

---

256

1        MR. BRISSENDEN:  And just so I
2    understand, your question was what is this bill --
3        MS. PERALES:  What does "this bill" mean.
4        MR. BRISSENDEN:  -- that he's referring
5    to?  That is your question?
6        MS. PERALES:  Yes.
7        MR. BRISSENDEN:  You may answer.
8        THE WITNESS:  Being only a few minutes
9    ago, I didn't remember whether we voted out Senator
10   Fraser's bill from the Senate or not.  I don't recall.
11       Q.   Okay.  Let me try to help you remember by
12   referring you to the bottom of the page.  There is a
13   sentence that begins there, "Chairman Smith, who will
14   be among the 20 House conferees, has made his
15   assistance clear.  He is not committed to strictly
16   requiring photo IDs to vote, nor does he feel that
17   immediate effect of the mandatory voter ID is
18   necessary.  He supports phasing in the changes over a
19   four-year period.
20       Now, do you recall that as being
21   associated with his committee substitute which had a
22   phase-in of four years?
23       A.   I do recall that now that you mention it to
24   me, yes.
25       Q.   It also had some additional funding for voter

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

257

1    education and voter registration programs.  Do you
2    recall that?
3        A.  I think both bills did.
4        Q.  Okay.  Do you -- do you recall whether
5    Chairman Smith's committee substitute -- or proposed
6    committee substitute included a Florida-style signature
7    verification bypass for people without ID?
8        MR. BRISSENDEN:  Objection, vague.  To
9    the extent that you understand that question you may
10   answer.
11       THE WITNESS:  I don't recall.  In all
12   sincerity, I mean, the problem at that time is that
13   Chairman Smith daily was changing his bill.
14       Q.  (BY MS. PERALES)  Do you recall whether daily
15   there were public reports of different requests by
16   either Representative Brown or Representative
17   Harper-Brown?
18       A.  I don't believe there were.  But I don't
19   remember for certain.  But I don't believe so.
20       Q.  Okay.  So after we have gone over this part
21   near the bottom and carrying over to the next page
22   where you are talking about the four-year phase-in and
23   some of this other stuff, does it help you recall
24   whether in the second sentence of this e-mail when you
25   say, "This bill is not a true voter ID bill," whether

---

258

1    "this bill" meant Chairman Smith's committee substitute
2    or whether it was 362?
3        A.  Being I didn't remember which one we were
4    voting on, I would not be telling you the truth saying
5    I'm certain of which one it was.
6        Q.  Okay.  Thank you.
7        Did you vote for Speaker Straus --
8        A.  Yes.
9        Q.  -- for Speaker?
10       A.  I did.
11       Q.  Would it be fair to say that you're one of the
12   Straus lieutenants?
13       A.  No.
14       Q.  Would you -- do you believe you had the trust
15   of Chairman Straus when he appointed you chair of the
16   select committee?  Not giving away any information
17   about communication, but do you personally believe you
18   had his trust when you were made the chair of the
19   select committee.
20       MR. BRISSENDEN:  First of all, objection
21   because it calls for speculation with respect to
22   Speaker Straus.  Secondly, to the extent that you
23   can -- can you answer that question without divulging
24   the substance of communications with other legislators,
25   including Speaker Straus, you may answer.  To the

---

259

1    extent you can't without disclosing those
2    communications, I would instruct you not to answer.
3        THE WITNESS:  I'm really not able to
4    answer that.
5        Q.  You don't know whether you had his trust when
6    he made you the chair of the select committee?
7        MR. BRISSENDEN:  Same objection.
8        THE WITNESS:  I do not.  For clarity, I
9    was not a supporter.  I voted for Speaker Straus, but I
10   was not someone who was supporting him when he became
11   the de facto speaker.  So I have never been one of the
12   lieutenants of Speaker Straus.
13       Q.  (BY MS. PERALES)  Okay.  I was curious because
14   you were the chair of the select committee.
15       A.  Sure.  Well, that was also in his second
16   tenure --
17       Q.  Yes.
18       A.  -- or term --
19       Q.  Yes.
20       A.  -- as speaker.
21       Q.  Okay.  The reason I was asking you before a
22   little bit about whether your concerns as expressed in
23   your e-mail to a third party related to Chairman
24   Smith's committee substitute or to 362 is I was trying
25   to figure out where to place you in terms of the Smith,

---

260

1    Brown, Harper-Brown continuum.  I know that you had
2    your own bill.
3        A.  Uh-huh.  Which was not being dealt with.
4        Q.  Right.  Which didn't come up?
5        A.  Correct.
6        Q.  So I was wondering if you could help me
7    understand that a little bit better.
8        MR. BRISSENDEN:  Object to the extent
9    that the question is vague.
10       I'm not sure I understand.  Do you
11   understand the question?
12       MS. PERALES:  I think he does.
13       THE WITNESS:  Well, I understand it.
14   But --
15       MS. PERALES:  He understands it.
16       Q.  (BY MS. PERALES)  It's a form objection for
17   the record, but you can answer.
18       A.  -- there's lots of -- there's lots of
19   privilege involved in that answer, so I'm not able to
20   answer it.
21       Q.  Without giving any of that, given where you
22   were with your bill --
23       A.  I don't know how I could.  With all due
24   respect, I don't know how I could.
25       Q.  Okay.  Based on a public --

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 261

1    MR. BRISSENDER:  Then I would instruct
2 you not to answer the question.
3    Q.  (BY MS. PERALES)  Okay.  Based on a public
4 record, what was said in a public record by Chairman
5 Smith, by Betty Brown, by Linda Harper-Brown, by
6 yourself, what was said in hearings --
7    MR. BRISSENDEN:  To the extent that you
8 cannot answer that question without divulging
9 privileged information --
10    THE WITNESS:  It would be impossible.
11    MR. BRISSENDEN:  -- I would instruct you
12 not to answer.
13    THE WITNESS:  Yeah, it would be
14 impossible to do it without privilege.
15    Q.  (BY MS. PERALES)  Are you saying there is
16 absolutely nothing in the public record that --
17    A.  I don't know.  I don't know what was in the
18 public record and I don't even know, what was there,
19 whether it was accurate.
20    Q.  I see.  So it's because you can't remember
21 what might have been said publicly and what might have
22 been said behind closed doors?
23    A.  Correct.  And I can't remember what speech --
24 I can't remember what was said publicly and I can't
25 remember even if what was said was accurate.

### 262

1    Q.  Okay.
2    MR. BRISSENDEN:  Then I instruct you not
3 to answer the question.
4    THE WITNESS:  Correct.  I'm not.  Because
5 again, the Quorum Report is not always accurate.  Not
6 to malign, it's a wonderful Quorum Report.
7    MS. PERALES:  I promise I won't rat on
8 you to Harvey.
9    THE WITNESS:  Yeah, don't tell Harvey.
10    Q.  (BY MS. PERALES)  I'm going to re-mark this
11 because I don't know where the other one is.
12    A.  We have got it here.
13    Q.  Do you?  Oh, it would be great if I could have
14 the number.
15    A.  We do.  It might be easiest to stay with the
16 number.
17    Q.  Oh, yeah.
18    A.  435; is that correct?  Is this what you're
19 after?
20    Q.  Yes.  And it looks just the same.
21    A.  Yes, so it's 435.
22    Q.  So I would direct your attention to US 435.
23 I'm going to ask you a question that's similar to the
24 question that I asked you before.
25    If you look on the very last page --

### 263

1    A.  Correct.
2    Q.  -- there is a paragraph that begins, "As a
3 member of the elections committee" --
4    A.  Yes.
5    Q.  -- "my focus remains to advance this bill to
6 the House floor.  I will not sign a commitment that
7 threatens to kill the bill by preventing it from being
8 voted out of committee."
9    And I'm going to ask you -- not with
10 respect to your deliberations or your thought process,
11 I just want to ask you what does that mean, "I will not
12 sign a commitment that threatens" -- and specifically
13 "threatens to kill the bill."
14    MR. BRISSENDEN:  To the extent that that
15 question requires you to divulge your thought
16 processes, your mental impressions, your opinions and
17 views of the legislation, your analysis of the
18 legislation, not just S.B. 14, but other voter ID bills
19 as well, I would instruct you not to answer.
20    THE WITNESS:  I don't know how I could
21 answer that without breaking privilege.
22    Q.  (BY MS. PERALES)  But you have broken
23 privilege to the extent that you wrote these words to a
24 third party.
25    MR. BRISSENDEN:  I disagree with that

### 264

1 analysis.
2    Q.  (BY MS. PERALES)  Sure.  I mean, this is
3 something that you wrote --
4    A.  I didn't write it to a third party.
5    Q.  Okay.  Who did you write it to?  I am
6 permitted to ask that because it says here,
7 "Representative Dennis Bonnen has issued a principle
8 statement" --
9    A.  Right --
10    Q.  -- "explaining his position" --
11    A.  I think the issue -- you're the lawyer -- to
12 argue, but the issue on privilege goes to what I'm
13 thinking, what I'm intending, and what have you, and I
14 don't know how to answer that question for you without
15 doing that.
16    Q.  I understand.  So what I'm going to say in
17 response to that is that when you issue a written statement to
18 the world --
19    A.  Sure.
20    Q.  -- that says, "I will not sign a commitment
21 that threatens to kill the bill," you have opened the
22 door on that, that is no longer something that exists
23 solely in your head or between you and a staff member
24 or another member of the legislature.  So with respect
25 to those words, which you wrote and distributed



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 265

1  publicly -- this is exactly I think where the Court is
2  coming down on this.  If you have written those words,
3  then I can at least ask you what those words mean.
4        MR. BRISSENDEN:  I disagree -- I disagree
5  with your analysis and representations of the Court.
6  I'm looking at the Court's order on Page 6, and the
7  Court has specifically stated that questioning the
8  legislature or staff without communications that
9  include public communications, just like you are
10  talking about -- to the extent it would require the
11  legislator to reveal his motivations, his thought
12  processes about S.B. 14 and the opinions of the
13  legislative activity with respect to the law, the Court
14  has specifically ruled that that is covered, and I
15  would instruct you not to answer.
16       Q.  We will take it up later.  Thank you very
17  much.
18       A.  Thank you.
19       Q.  This is from a prior deposition.
20          MS. PERALES:  Can you put a sticker on
21  this that says Rodriguez 20.
22          (Rodriguez Exhibit No. 20 marked)
23       Q.  (BY MS. PERALES)  The court reporter has
24  handed you what is marked Rodriguez Deposition
25  Exhibit 20.  I would ask you to turn to Page 340, if

---

### 266

1  you would, please.
2       A.  Sorry.  Could you say the number again?
3       Q.  340.
4       A.  Okay.
5       Q.  Okay.  Now, it says Q and A here.
6       A.  Okay.
7       Q.  So I need you to go back to Page 337.
8       A.  Okay.
9       Q.  And you'll see on Page 337 --
10      A.  Yes.
11      Q.  -- on Line 17, it will say Question -- it
12  says," Question by Representative Bonnen."  Do you see
13  that?
14      A.  Yes.
15      Q.  Then what follows is basically an exchange
16  back and forth between you and the witness.
17      A.  Okay.
18      Q.  So then if you wouldn't mind reading your
19  statement on Page 340 now, beginning with Line 11, just
20  to refresh your recollection.
21          MR. BRISSENDEN:  I can't tell from
22  reading the document what he is speaking to.
23      Q.  (BY MS. PERALES)  Oh, I'm sure you can if you
24  read back.  I have a portion that goes back a little
25  bit farther.  If it helps, this is Jenigh Garrett from

---

### 267

1  the Legal Defense Fund.
2       A.  Yes.
3       Q.  Would it be fair to say that here you are
4  basically suggesting that there is a possible
5  correction to students not having photo ID and that
6  correction would be having the university issue a photo
7  ID?
8       A.  "If there is a significant problem, I would
9  really want to know specifics in terms of the absence
10  of photo identification documents that are already
11  available in most universities rather than simply
12  presuming the problem.  I would like to see some
13  identification" -- indication, excuse me -- "I would
14  like to see some indication that it can't be corrected
15  simply by the university issuing a photo identification
16  to their students."
17      Q.  So is it fair to say there that you're
18  suggesting that whatever problem the witness might be
19  describing could be corrected by simply having the
20  university issue a photo ID to its students?
21      A.  Again, I would say I would like to see some
22  indication that it can't be corrected simply by a
23  university issuing a photo identification to their
24  students.
25      Q.  Do you remember in 2009 whether any member of

---

### 268

1  the House offered a hard photo ID bill?
2       A.  I do not remember.
3       Q.  Okay.  And when I say "a hard photo ID," I'm
4  using a shorthand that's come up that it would be a
5  bill that would require -- whatever form of voter ID
6  that would be offered had to have a photo on it.
7       A.  Right.
8       Q.  Okay.  I would like to move with you to 2001.
9  You see how fast we're going through time.  The years
10  are spinning by.
11          In 2011 you become -- you're named the
12  chair of the select committee, correct?
13      A.  Correct.
14      Q.  Did you file a shell bill for voter ID?
15      A.  No.
16      Q.  Are you familiar with any other house
17  committees that only considered one bill?
18          MR. BRISSENDEN:  Objection, asked and
19  answered.
20      Q.  (BY MS. PERALES)  Was that asked?
21      A.  She asked it this morning.
22      Q.  Okay.  Did she ask you?
23      A.  Yes.
24      Q.  Did the select committee on voter fraud and
25  voter identification exist in past legislatures -- past

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 269

1   sessions of the legislature?
2       A.  I believe the record will reflect whether it
3   did or didn't.  I don't believe the committee
4   specifically did, no.
5           (Rodriguez Exhibit No. 33 marked)
6       Q.  (BY MS. PERALES)  I want to give you a minute
7   to take a look at the document which has been handed to
8   you and marked Rodriguez Deposition Exhibit 33.
9       A.  Sure.
10      Q.  Do you recognize this as a House Research
11  Organization bill analysis for S.B. 14?
12      A.  Sure.
13      Q.  If you wouldn't mind coming with me to --
14  where is it?  Okay.  Last page on the section that
15  says, "Notes."  Do you see it there?  The last page --
16      A.  Sure.
17      Q.  -- Page 11 --
18      A.  Okay.
19      Q.  -- the section entitled "Notes."
20          Do you see where it says, "During floor
21  consideration of S.B. 13 on March 21st the bill was
22  resubmitted to committee on a point of order"?
23      A.  Correct.
24      Q.  Do you remember what that point of order was?
25          MR. BRISSENDEN:  Sorry, what page?

## 270

1           MS. PERALES:  The last page, Page 11.
2           THE WITNESS:  No, I do not.
3       Q.  (BY MS. PERALES)  Do you remember how long it
4   took to get the bill back out on the House floor?
5       A.  Well, I don't think it ever got to the House
6   floor.
7       Q.  This is S.B. 14.
8       A.  Correct.  Are you talking about in-house
9   deliberations?
10      Q.  House deliberations.
11      A.  Right.  I don't -- one, I don't think this is
12  accurately presented.
13      Q.  Really?
14      A.  I think it would have been the committee
15  substitute to Senate Bill 14, if it's on the house
16  side.  And I also think -- and also, the bill never
17  went to the floor.  And it was not -- it did not go to
18  the floor and then get recommitted from there.  The
19  bill had been voted out of committee, was in calendars,
20  and then was sent back to the committee for correction
21  to the committee report.  And then -- so it was not
22  taken up on the floor at all.
23      Q.  So -- that was the first time, you mean?
24  Because eventually it had to have been taken up on the
25  floor in the past.

## 271

1       A.  Well, we would have -- right.  My point is it
2   was not -- it did not get to the floor at that point.
3   And we could -- we could find out, but it was -- I
4   don't remember specifically what the issue was.  I do
5   remember that it was debatable if it was an issue.  And
6   it was an extraordinary abundance of caution with which
7   it was returned.
8       Q.  So the issue came up in calendars and the bill
9   returned to the committee for a small fix?
10      A.  Correct.
11      Q.  Do you recall --
12      A.  To the committee report.
13      Q.  To the committee report?
14      A.  Correct.
15      Q.  And do you recall how long it took from the
16  time the bill went from calendars back into committee?
17      A.  I do not at all, but I assume the record would
18  indicate that.
19      Q.  Okay.
20          (Rodriguez Exhibit No. 34 marked)
21      Q.  (BY MS. PERALES)  The court reporter has
22  handed you what has been marked Rodriguez Exhibit
23  No. 34.  Do you recognize this as a page from the House
24  Journal from April 8, 2011?
25      A.  It appears to be.

## 272

1       Q.  Okay.  The question is, is it correct to say
2   that you were appointed to the conference committee for
3   S.B. 14?
4       A.  It appears I was.
5       Q.  Do you remember serving on the conference
6   committee for S.B. 14?
7       A.  Vaguely, yes.
8           MS. PERALES:  Mark this, please.
9           (Rodriguez Exhibit No. 35 marked)
10      Q.  (BY MS. PERALES)  The court reporter has
11  handed you what has been marked as Rodriguez
12  Exhibit 35.
13      A.  Correct.
14          (Discussion off the record)
15      Q.  (BY MS. PERALES)  Now, I'm going to ask you
16  one or two questions.
17      A.  Sure.
18      Q.  And I -- you have the conference report to
19  refresh your recollection --
20      A.  Absolutely.
21      Q.  -- about things that happened in conference.
22          Do you recall in conference that a
23  provision was added that DPS would issue a voter
24  certificate.
25      A.  Vaguely.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                          June 6, 2012

---

273

1     Q.  Do you recall --
2     A.  And respectfully, you have to remember that
3  conference committees don't normally actually even
4  meet.  And we didn't meet, that I'm aware of.
5     Q.  Did you have a chance to review this
6  conference report, Rodriguez 35?
7     A.  Absolutely, no.  I'm just saying that unlike
8  other situations, we don't sit.
9     Q.  You don't sit in a big hearing room?
10    A.  Correct.  Occasionally we do, but usually not.
11    Q.  Do you ever recall meeting together as a group
12 in a conference committee on S.B. 14?
13    A.  I do not.
14    Q.  I wanted to ask you, because it seems to me
15 one of things that happened in conference was that the
16 bill had said DPS to issue free driver's licenses.
17    A.  Correct.
18    Q.  One of the changes I noticed today, in
19 conference the provision was changed a little bit to
20 say DPS would issue free voter certificates.
21    A.  That's correct.
22    Q.  Do you recall that change?
23    A.  I do.
24    Q.  Okay.  Now I'm going to ask you about another
25 change.  Oh, here it is.  I'm going to ask you about

---

274

1  this.
2         Do you recall concerns being raised on
3  the House floor with respect to this issue of free
4  driver's license versus free voter certificate, that it
5  was possible that -- that the legislature couldn't
6  authorize DPS to give out free driver's licenses?
7         MR. BRISSENDEN:  Objection, vague.
8     Q.  (BY MS. PERALES)  You may answer.  That's a
9  form objection.
10    A.  Vaguely.
11    Q.  So you have some recollection that that
12 concern might have been raised?
13    A.  I know it was discussed.  I don't recall the
14 detail.
15    Q.  Okay.  Can you help me understand this phrase,
16 "going outside the bounds"?
17        MR. BRISSENDEN:  Are you referring to a
18 document?
19        MS. PERALES:  No.
20        THE WITNESS:  She's referring to a
21 legislative term.
22    Q.  (BY MS. PERALES)  All right.  So you have
23 identified it as a legislative term.  Can you explain
24 what it means?
25        MR. BRISSENDEN:  To the extent that you

---

275

1  can answer that question without divulging or
2  disclosing mental impressions, mental thought processes
3  about specific legislation, in particular, S.B. 14, you
4  may answer.  To the extent you cannot without
5  divulging, then I would instruct you not to answer.
6         THE WITNESS:  You know, it's a -- I don't
7  know if it's explained in our rules or not.  Going
8  outside of the bounds, as I understand it, is when you
9  have a conference committee report and the exact
10 language was not exactly stated in the House or Senate
11 passed versions.  And even if the change is slight or
12 significant you are required to clarify -- state that
13 you are going outside of the bounds of the House passed
14 or the Senate passed version.
15    Q.  Do you know whether the conference report for
16 S.B. 14 states that it is going outside the bounds of
17 the House and Senate versions with respect to the
18 issuance of the voter certificate?
19    A.  I'm sure it states it or it doesn't.  I don't
20 know.  I mean, I'm sure it's in the record.
21    Q.  Do you recall from your time on the -- as
22 chair of the committee whether the conference report
23 stated that it was going out of bounds?
24    A.  Well, let me clarify.  Being chair of the
25 committee has no significance to being -- to a

---

276

1  conference committee.  Because the chair of the
2  conference committee is Representative Harless, and the
3  senate chair is Senator Fraser.  So my chair in the
4  committee has no standing or significance in regard to
5  the conference committee.
6     Q.  I understand.  But you were the chair of a
7  committee that worked on one bill and got one bill
8  through the house and through the Senate, which was the
9  first time.  I mean, this is historic, your moving a
10 voter ID bill through both houses.
11        MR. BRISSENDEN:  Objection,
12 argumentative.
13        THE WITNESS:  Well, there is --
14        MR. BRISSENDEN:  There is no question
15 pending.
16        THE WITNESS:  Yeah.
17    Q.  (BY MS. PERALES)  So my question is, given
18 that you had such a high-profile position on the select
19 committee and now you're on the conference committee,
20 whether you can recall, in light of that context,
21 whether the conference committee report stated that it
22 was going out of bounds on the voter certificate
23 language?
24        MR. BRISSENDEN:  Same objection and same
25 instruction as before.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 277

1  THE WITNESS: It may have. Again, I'm
2  looking at the report now and I'll have an answer when
3  I find it.
4  Q. (BY MS. PERALES) Do you -- in the meantime,
5  do you have any recollection -- you mentioned that you
6  thought there was some vague discussion -- you have a
7  vague recollection of some discussion in the House
8  about a potential problem with bill language requiring
9  DPS to give out free driver's licenses. Do you recall
10  anything in the public record about those same issues
11  being raised on the Senate side?
12  A. I do not at all.
13  Q. Do you want some more time to take a look at
14  the conference report or do you want to me -- do you
15  want to answer the question whether you recollect?
16  A. Well, I guess the answer would be I don't have
17  a clear recollection of whether we went outside the
18  bounds or not. But, respectfully, the record will tell
19  us that and I don't see any point to guess.
20  Q. Okay. Well, I can move on, then, if it's all
21  right with you.
22  A. That's fine. Sure.
23  Q. Take a look at the part of the conference
24  committee report that looks like a chart.
25  A. That's a lot of --

### 278

1  Q. It should be near the -- these are Pages 1 and
2  2 --
3  A. Okay.
4  Q. -- following the bill language attachment.
5  A. Sure.
6  Q. And I'm going to hold it up so you can take a
7  look, Pages 1 and 2.
8  A. Yes, I have it. Thank you.
9  Q. You're welcome.
10  Near the bottom of Page 1 and flowing
11  onto Page 2 --
12  A. Yes.
13  Q. -- there's a discussion about Section 5 in the
14  Senate version, Section 5 in the House version, and
15  then Section 5 in the conference version. And I
16  believe one is meant to read it from left to right --
17  A. That's correct.
18  Q. -- to compare the versions. Yes?
19  A. It's Senate version, House version, and then
20  conference version.
21  Q. Okay. Now, if you would look with me on the
22  House version of Section 5 where it says,
23  "Substantially the same as Senate version --
24  A. Uh-huh.
25  Q. -- "except requires the Secretary of State

### 279

1  statewide effort to include education targeted at
2  low-income and minority voters."
3  Do you see that sentence there?
4  A. I do.
5  Q. Would it be correct to say that in the
6  conference version of the bill, the language was kept
7  from the Senate version without a provision involving
8  low-income and minority special targeted education?
9  MR. BRISSENDEN: To the extent you can
10  answer that based upon information in the public
11  record, you can answer.
12  THE WITNESS: Could you restate the
13  question?
14  Q. (BY MS. PERALES) Uh-huh. Would it be fair to
15  say, then -- well, I can say it shorthand, but then
16  Reynolds is going to object.
17  A. That's okay.
18  Q. Would it be fair to say that the minority --
19  the education targeted low-income and minority voters
20  that was in the House version of the bill was stripped
21  out in the conference committee?
22  MR. BRISSENDEN: My instruction to you
23  would be the same.
24  THE WITNESS: What it says is that, among
25  other provisions, requires the Secretary of State to

### 280

1  conduct the statewide efforts to educate voters
2  regarding the identification requirements for voting.
3  That is the Senate version.
4  Q. (BY MS. PERALES) Okay. And do you see in the
5  House version where it says requires --
6  A. Targeted.
7  Q. -- targeted -- well, education targeted at
8  low-income and minority voters?
9  A. I do see that.
10  Q. All right. Is it fair to say that
11  specific provision, targeting education to low-income
12  and minority voters, was stripped out in conference?
13  MR. BRISSENDEN: My instruction to you
14  would be the same. To the extent it is part of the
15  public record, you can disclose it. To the extent the
16  question requires you to disclose information that is
17  not part of the public record, I instruct you not to
18  answer.
19  THE WITNESS: I think more appropriately
20  I would say that the Senate version was used, which has
21  a broader statewide effort to educate voters regarding
22  identification and requirements of voting.
23  Q. (BY MS. PERALES) But isn't it true that the
24  House version makes reference to the Secretary of
25  State's statewide effort?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

281

1    A.  It does.
2    Q.  And then says that specifically it needs to
3    include education targeted at low-income and minority
4    voters?
5        MR. BRISSENDEN:  Objection to the extent
6    the question mischaracterizes the statement.  I believe
7    you said needs to.  I don't believe I see that language
8    in the --
9        MS. PERALES:  Okay.  I'll rephrase.
10       MR. BRISSENDER:  -- House version.
11   Q.  (BY MS. PERALES)  Do you see over in the House
12   version that the Section 5 is substantially the same as
13   the Senate version except that it requires the
14   statewide effort to include education targeted at
15   low-income and minority voters?
16       MR. BRISSENDEN:  Objection, vague.
17   Q.  (BY MS. PERALES)  You may answer.
18   A.  The assumption is that the Senate version
19   would not have them target at low-income and minority
20   voters, and I don't agree that that assumption is
21   correct.
22   Q.  No, I'm not making any assumptions.  I just
23   want an answer to the question.
24   A.  Well, the answer is that it says, "Same as
25   Senate version except incorporates effective date same

---

282

1    as House version."
2    Q.  That's right.  So it takes the effective date
3    from the House version?
4    A.  Correct.
5    Q.  And then it takes Section 5 from the Senate
6    version?
7    A.  Correct.
8    Q.  All right.
9    A.  Which requires a statewide education effort.
10   Q.  Right.  So I'll say my question, which is a
11   yes or no question.
12       Is it fair to say that the specific
13   provision that says, "include education targeted at
14   low-income and minority voters" was taken out in
15   conference committee?
16       MR. BRISSENDEN:  My instruction would be
17   to the extent that is matters of public record, you may
18   answer.  To the extent that it is not part of the
19   public report and requires you to divulge thoughts,
20   opinions, analysis and deliberations with regards to
21   the conference, I would instruct you not to answer.
22       THE WITNESS:  I don't agree with that
23   statement.  I think it's semantics as to language.
24   Q.  (BY MS. PERALES)  Okay.  But the language that
25   says "targeted at" --

---

283

1    A.  Correct.
2    Q.  -- "low-income and minority voters" is not in
3    the conference version, is it?
4    A.  That's -- those specific words are not, but it
5    doesn't infer that that does not occur.
6    Q.  I understand.  But the language is not in the
7    conference version?
8    A.  Targeted at low-income and minority voters, I
9    assume it's not, but I'm not certain of that.
10   Q.  All right.  And the language was in the House
11   version as passed by the House?
12   A.  It apparently was, yes.
13   Q.  Okay.  Thank you.  Do you recall that when
14   S.B. 14 came over to the House, it contained an
15   exemption for persons over age 70 so that they might
16   present a voters certificate as acceptable ID for
17   voting?
18   A.  I believe we talked about this.
19   Q.  Okay.  And that exception was not included in
20   the version that was passed by the House, correct?
21   A.  I believe we discussed that, yes.
22   Q.  And I wanted to ask you, putting aside your
23   thought process and your deliberations, just as a
24   separate stand-alone matter, how -- what is the
25   connection between voter fraud and persons over 70

---

284

1    presenting a voter certificate?
2        MR. BRISSENDEN:  That question, I
3    believe, would require the witness to divulge his
4    thought processes, communications, his deliberations,
5    his views about the purpose of that particular
6    exemption, and I would instruct the witness not to
7    answer the question.
8        THE WITNESS:  I don't know how to answer
9    that without breaking privilege.
10   Q.  (BY MS. PERALES)  Okay.  Do you recall whether
11   there was a vote by the House, a record vote, on
12   removing the exemption for persons over age 70?
13   A.  Yeah.  We discussed it earlier.  We went over
14   that amendment.
15   Q.  Do you recall whether there was a record vote
16   on that?
17   A.  I believe there was.  I believe we discussed
18   it earlier in the deposition.
19   Q.  Is it possible that it was -- that the change
20   was made at the agreement of the sponsor of the bill
21   and there was no record vote on the exemption?
22       MR. BRISSENDEN:  I'm going to instruct
23   you, to the extent you can answer that question as a
24   matter of public record, you may do so.  To the extent
25   that it requires you to divulge communications from

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

285

1  legislators, I instruct you not to answer.
2      Q.  (BY MS. PERALES)  And I'm only asking about
3  the public record here.  I'm not asking about --
4      A.  No, no, I understand.
5          MS. PERALES:  And the representative
6  knows that there is a process on the House floor.
7          THE WITNESS:  No, no, I know that.
8          MS. PERALES:  -- regarding making
9  changes.
10         THE WITNESS:  My point is I know we
11 discussed it earlier.
12     Q.  (BY MS. PERALES)  I'm just trying to fix it.
13     A.  I can't remember whether there was a vote or
14 not.  I can't believe there wouldn't have been.  Wasn't
15 there -- didn't we talk about that?  There was a vote.
16     Q.  There was a vote?
17     A.  Correct.
18     Q.  Okay.  And did you -- how did you vote on
19 that?
20     A.  Being it was my amendment, I voted for it.
21     Q.  Oh, okay.
22         MS. PERALES:  Let's go ahead and mark
23 this.
24         (Rodriguez Exhibit No. 36 marked)
25         THE WITNESS:  Let me clarify my earlier

---

286

1  statement.  When I say I voted for it, I don't
2  recall -- I didn't look closely if there was a motion
3  to table, which in turn I may have voted against a
4  motion to table, which obviously would have been
5  considered a vote in favor of the amendment.  So I
6  don't recall specifically whether it was a motion to
7  table or an up and down vote.
8      Q.  (BY MS. PERALES)  Is it possible that an
9  amendment can survive a motion to table and then never
10 experience a record vote because --
11     A.  Absolutely.
12     Q.  -- because the author agrees?
13     A.  Yes.  But legislatively speaking, the motion
14 to table is considered a record vote.
15     Q.  Got it.
16     A.  Many a campaigns have been run where it's been
17 hard to dodge that.
18     Q.  Okay.  And you mentioned that your vote was in
19 support of the amendment?
20     A.  Correct, absolutely.
21     Q.  Go ahead and take a look at Rodriguez --
22     A.  36.
23     Q.  -- 36 for me on Page 69, going over to 70.
24 And that's just to give you some -- some context.  You
25 begin speaking on 69 at Page 16, and then it flows over

---

287

1  to Page 70.
2      A.  Okay.
3      Q.  Go ahead and look at Page 70, Lines 11 and 12,
4  which is still you speaking.
5      A.  Yes.
6      Q.  I'll move past the part about how your mom
7  married a younger man, when you told the whole world
8  about it there on the floor.
9      A.  Certainly.
10     Q.  And is it correct there that you say, "So
11 there's no need to set a line of age that says beyond
12 that age you don't need an ID to go cast a ballot"?
13     A.  That's correct, leaving out previous
14 statements.
15     Q.  Yes.  I figured that was just kind of the sum
16 of what you were saying there.
17     A.  Possibly.
18     Q.  Is it fair to say, then, based on this
19 statement, that you are saying there were other
20 provisions in the bill that you thought were sufficient
21 to protect older voters?
22         MR. BRISSENDEN:  I'm going to instruct
23 the witness that the question requires -- to the extent
24 requires you to divulge your opinions, your thought
25 processes, your analysis, mental impressions about the

---

288

1  legislation of that particular provision of S.B. 14, I
2  would instruct you not to answer the question.
3      Q.  (BY MS. PERALES)  I'm just asking for the
4  summary of your statement here.
5      A.  We have other provisions in this bill that
6  provided exemptions to individuals that may be in their
7  later years, that are indigent, may be handicapped with
8  disabilities, that could allow them to be precluded
9  from using an ID.
10     Q.  All right.  Let me step back a little bit from
11 S.B. 14.
12         During 2009 and 2011, did you receive
13 communications from constituents or third parties
14 expressing concerns about noncitizen voter fraud?
15         MR. BRISSENDEN:  Can you clarify when you
16 say "third parties"?
17     Q.  (BY MS. PERALES)  People who are not in the
18 legislature, people to whom privilege does not apply.
19 These are just people out there in the world, whether
20 they live in your district or don't.
21     A.  I'm sure I did.  I don't know.  I mean, I
22 shouldn't say I'm sure I did.  The record would either
23 reflect that or not.  I mean, you would have those
24 documents.
25     Q.  Well, we don't have all of the communications

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

289

1   because you mentioned that some of the e-mails
2   regularly dealt with.  And so I'm hoping you'll be able
3   to search your memory and tell me whether in 2009 and
4   2011 you received nonprivileged communications from
5   either constituents or interest groups or others
6   expressing concern about noncitizen election fraud.
7       A.  Actually, I don't believe I did.
8       Q.  You don't remember anybody coming to you --
9       A.  I remember saying I don't think anyone did.
10      Q.  Okay.  So you remember, and nobody came to you
11  with those concerns?
12      A.  I believe that's correct.
13      Q.  If somebody did try to express that concern to
14  you in writing, where would those communications be
15  today?
16      A.  I don't understand.
17      Q.  Would they be in your files, would they have
18  been in your e-mail, would they have been produced
19  today?
20      A.  They would have been produced.
21      Q.  Okay.  Do you remember people expressing those
22  concerns earlier than 2009 --
23      A.  I can't remember --
24      Q.  -- let's say 2007.
25      A.  I don't recall dinner last night, so I don't

---

290

1   know.
2           MS. PERALES:  Go ahead and mark this,
3   please.
4           (Rodriguez Exhibit No. 37 marked)
5       Q.  (BY MS. PERALES)  Representative Bonnen, you
6   have been handed what has been marked Rodriguez
7   Exhibit 37.  Do you recognize this as correspondence to
8   your office?
9       A.  I do.
10      Q.  Okay.  Can you take a look at that line where
11  the writer says -- it's not in the first paragraph --
12  well, in the first paragraph, do you see where it says,
13  "I feel cheated as an American and Texan that our Texas
14  Congress couldn't get voter ID passed"?
15      A.  I see that.
16      Q.  Do you see in the next paragraph where it
17  says, "So basically our saying, you have to have an ID
18  to drive and purchase liquor, but forget about voting
19  proof of citizenship"?
20      A.  I see where a constituent wrote that.
21      Q.  Okay.  Does this help refresh your
22  recollection whether you received communications from
23  either constituents or other persons not in the
24  legislature expressing concern about noncitizen voter
25  fraud?

---

291

1       A.  Well, I wish I could say that the
2   correspondence on 6/18 of 2007 from Mr. Murphy, who has
3   a rather extreme view, is etched in my brain, but it's
4   not.
5           MS. PERALES:  Let's go ahead and mark
6   this.
7           (Rodriguez Exhibit No. 38 marked)
8       Q.  (BY MS. PERALES)  The court reporter has
9   handed you what has been marked Rodriguez Deposition
10  Exhibit 38.  Do you recognize this as a letter from you
11  back to Mr. Murphy?
12      A.  It appears to be, yes.
13      Q.  Okay.  It's also from 2007, isn't it?
14      A.  It appears to be, yes.
15      Q.  Now, in the first paragraph, is it true that
16  you're talking to him about H.B. 218 and H.B. 626?
17      A.  It does.
18      Q.  Okay.  And you describe H.B. 626 as requiring
19  a voter applicant to prove US citizenship?
20      A.  It does.
21      Q.  And in the next paragraph, is it true here
22  where you say, "I am just as frustrated as you are at
23  the outcome of these bills," that you're expressing
24  frustration that these two bills didn't make it through
25  the legislature.

---

292

1       A.  I want to be very clear --
2           MR. BRISSENDEN:  Objection to the extent
3   that the question mischaracterizes the statement --
4       Q.  (BY MS. PERALES)  You may answer.
5       A.  I am expressing frustration bills did not
6   pass.  But it doesn't adopt his views.
7       Q.  Oh, no.  I'm certainly not suggesting that you
8   were.
9       A.  I appreciate that.
10      Q.  But it seems to me that at least at this time
11  the issue is on your radar screen in terms of
12  communications with either constituents or third
13  parties.
14      A.  What issue?
15      Q.  The issue of noncitizen voter fraud.  Someone
16  is writing to you with that concern, you're responding,
17  expressing frustration.  Would it be fair to say, then,
18  that --
19      A.  No.
20      Q.  -- the issue was coming up --
21      A.  No.
22      Q.  It was not coming up?
23      A.  Right.
24      Q.  Okay.  Can you explain that answer since we're
25  looking at some exhibits?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

### 293

1     A.  Certainly.  I represent 140-, -50,000 people,
2  and one individual writes a letter.  I have a policy in
3  my office that we respond to every single constituent
4  letter, and this is our response to one of 140-plus
5  thousand people.
6     Q.  Uh-huh.  Were you a supporter of H.B. 626?
7     A.  Absolutely.
8     Q.  Okay.  And were you frustrated when it didn't
9  pass?
10     A.  I was.
11     Q.  Okay.  And did you share that with Mr. Murphy
12  in Lake Jackson?
13     A.  I certainly did.
14     Q.  Is Lake Jackson in your district?
15     A.  It absolutely is.
16     Q.  Okay.  So Mr. Murphy is a constituent?
17     A.  As I have already stated, yes.
18     Q.  Okay.
19        MR. BRISSENDEN:  I believe we have been
20  going for about an hour and a half.  Can we take a
21  short break?
22        MS. PERALES:  Yes.
23        (Recess from 6:44 p.m. to 7:00 p.m.)
24        MS. BERKOWER:  Okay.  Ms. Perales asked
25  me to make a note that she had to leave to return home

---

### 294

1  and she passed the witness back to me.
2        EXAMINATION (CONTINUED)
3  BY MS. BERKOWER:
4     Q.  So after S.B. 14 passed the House, did you --
5  do you remember if you issued another one of the
6  Insider's Reports, one of your newsletters to
7  constituents about the bill's passage?
8     A.  I'm sure I did.
9        (Exhibit No. 446 marked)
10     Q.  (BY MS. BERKOWER)  I have what's marked as
11  Exhibit 446.
12     A.  Thank you.
13     Q.  Do you remember this document?
14     A.  Vaguely.
15     Q.  What is it?
16     A.  It is Insider's Report, Volume 8, No. 7, about
17  House passes voter ID bill, dated March 25th of 2011.
18     Q.  And that was after the House passed S.B. 14?
19     A.  Correct.
20     Q.  Do you see the second line of the first
21  paragraph says, Senate Bill 14, which I co-sponsored,
22  restores the basic principle of one person, one vote
23  within our electoral system by requiring a photo ID to
24  cast ballot"?
25     A.  I do.

---

### 295

1     Q.  What did you mean by "restores our basic
2  principle"?
3     A.  I mean what I wrote.
4     Q.  Had the basic principle of one person, one
5  vote somehow been abrogated in some way?
6        MR. BRISSENDER:  I would like to instruct
7  the witness that to the extent that that question
8  requires him to divulge mental impressions, analysis,
9  mental thoughts that you had pre-enactment of S.B. 14,
10  in your analysis of S.B. 14, I would instruct you not
11  to answer that question.
12        THE WITNESS:  I agree.
13     Q.  (BY MS. BERKOWER)  You're following his
14  advice?
15     A.  Yes, ma'am.
16     Q.  You said in Paragraph 3 there, "Despite some
17  of the vocal and misleading rhetoric opposing the voter
18  ID act, this vote is based on a simple and nonobtrusive
19  principle," and you go on to talk about what.
20        What was the vocal and misleading
21  rhetoric that you were referring to?
22        MR. BRISSENDEN:  First of all, for
23  clarification, what are you referring to?
24        MS. BERKOWER:  The first sentence of the
25  third paragraph.

---

### 296

1        MR. BRISSENDEN:  And my instruction to
2  you would be the same.
3        THE WITNESS:  I agree.
4        MS. BERKOWER:  And to clarify, what was
5  the instruction?
6        MR. BRISSENDEN:  The instruction is to
7  the extent that the question requires the witness to
8  disclose his thoughts, his mental impressions, his
9  motivations, his opinions about S.B. 14 and analysis
10  pre-enactment, I would instruct him not to answer.
11     Q.  (BY MS. BERKOWER)  Okay.  Well, maybe I'll ask
12  this:  Was the vocal and misleading rhetoric you are
13  referring to there available publicly as part of the
14  public record?
15     A.  It could have been at times.
16     Q.  Do you remember which vocal and misleading
17  rhetoric is part of the public record?
18     A.  Testimony that the bill was to attack people
19  in this country illegally.
20     Q.  So rhetoric about noncitizen voting was
21  misleading?  Is that what your -- public testimony
22  about noncitizen voters?
23     A.  Despite some of the vocal, misleading rhetoric
24  opposing that bill, opposing the voter ID act, this
25  bill is based on the simple and nonobtrusive premise

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

**297**

1   that Texans should provide a photo ID to vote, just as

2   they present identification to open a bank account and

3   such.

4     Q.  Okay.  And then I think I asked you if any of

5   the local and misleading rhetoric you are referring to

6   there was part of the public record, and you said yes.

7   So which parts of the public record contain the vocal

8   and misleading rhetoric that you are referring to

9   there?

10     A.  I don't have the record in front of me.  But

11   it usually would have been comments made on the floor

12   or witnesses who came before committees to testify.

13     Q.  What were those comments; do you remember?

14     A.  Not specifically, no.

15     Q.  And then you said, as you read just now, "This

16   bill is based on a simple and nonobtrusive premise that

17   Texans should provide a photo ID just as they

18   identification to open a bank account, board a plane,

19   obtain a fishing license, rent a car, or pick up a

20   prescription at the pharmacy."

21        Is that accurate -- an accurate reading

22   of that?

23     A.  It is an accurate reading.

24     Q.  Do you have a right to open a bank account?

25        MR. BRISSENDEN:  I'm going to object to

---

**298**

1   extent the question as vague.

2     Q.  (BY MS. BERKOWER)  You can answer that.

3     A.  I don't understand the question.

4     Q.  Do you have a constitutional right to vote?

5     A.  You do.

6     Q.  Do you have a constitutional right to open a

7   bank account?

8     A.  I don't believe it's stated in the

9   constitution.

10     Q.  Do you have a constitutional right to board a

11   plane?

12     A.  Some people would argue you might.

13     Q.  Do you have a constitutional right to obtain a

14   fishing license?

15     A.  Again, some people might argue you do.

16     Q.  Would you?

17     A.  That gets into speculation.

18     Q.  You may speculate.

19        MR. BRISSENDEN:  I'm going to instruct

20   the witness not to speculate.

21        MS. BERKOWER:  Well --

22        MR. BRISSENDER:  I object to the question

23   to the extent it requires him to speculate.  It also

24   requires the witness to -- it calls for a legal

25   conclusion, and I object on those grounds as well.

---

**299**

1     Q.  (BY MS. BERKOWER)  Okay.  Well, have you ever

2   read the US Constitution?

3     A.  Sure.

4     Q.  So based on your reading of that -- I'm not

5   asking for any legal conclusion -- but do you recall

6   anything in there that would give you a constitutional

7   right to obtain a fishing license?

8        MR. BRISSENDEN:  Same objection.

9     Q.  (BY MS. BERKOWER)  You may answer.

10     A.  I would prefer not to.

11        MS. BERKOWER:  All right.  I'll note for

12   the record that answer is nonresponsive.

13     Q.  (BY MS. BERKOWER)  Do you have a

14   constitutional right to rent a car?

15     A.  Again, you could argue you do.

16        MR. BRISSENDEN:  Same objection.

17     Q.  (BY MS. BERKOWER)  Would you argue that you

18   do?

19        MR. BRISSENDEN:  Same objection.

20     Q.  (BY MS. BERKOWER)  Are you not going to answer

21   the question?

22     A.  That is correct.

23     Q.  Do you have a constitutional right to pick up

24   prescriptions at the pharmacy?

25     A.  Again, you could argue you do.

---

**300**

1     Q.  What would those arguments be?

2        MR. BRISSENDEN:  Same objection, legal

3   conclusion.

4        THE WITNESS:  I agree with the objection.

5        MS. BERKOWER:  Okay.  That answer is

6   nonresponsive.  I would ask the witness to answer the

7   question presented, please.

8     Q.  (BY MS. BERKOWER)  Are you refusing to answer?

9     A.  Could you repeat the question.

10     Q.  Do you have a constitutional right to pick up

11   a prescription at the pharmacy?

12        MR. BRISSENDEN:  Same objection.  To the

13   extent that the witness has not conducted an analysis

14   to make that determination, he may not be able to

15   answer the question.

16        Do you know if you are able to answer the

17   question?

18        THE WITNESS:  I do not.

19     Q.  (BY MS. BERKOWER)  So is your answer you don't

20   know if you have a constitutional right to pick up a

21   prescription at the pharmacy?

22     A.  My previous answer is I believe there are

23   people who would argue they do.

24     Q.  Well, I'm not asking about other people.  I'm

25   asking about you.  Do you believe that you have a

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                             June 6, 2012

---

### 301

1    constitutional right to pick up a prescription at the
2    pharmacy?
3        MR. BRISSENDEN:  My objection would be
4    the same, if you are able to answer.  If you don't
5    know, you don't know.
6        THE WITNESS:  I don't know.
7        Q.   (BY MS. BERKOWER)  Do you know anyone who has
8    made such arguments, that you have a constitutional
9    right to do any of the things we have just discussed,
10   other than vote?
11       A.   I actually do.
12       Q.   Who are those people?
13       A.   Constituents of mine.
14       Q.   Which constituents?
15       A.   I don't have the names in front of me.
16       Q.   Are you aware of any existing document or
17   report that identifies how many Texas voters are in
18   possession of a concealed handgun license?  And I will
19   limit that to the public record.
20       MR. BRISSENDEN:  Thank you.
21       THE WITNESS:  Am I aware of one?
22       Q.   (BY MS. BERKOWER)  Yes.
23       A.   I'm sure one exists but I'm not aware of it.
24       Q.   What makes you sure it exists?
25       A.   Because we keep records here in the State of

---

### 302

1    Texas of those licenses.
2        Q.   Are you aware if there is any publicly
3    available document that says how many minority Texans,
4    black or Hispanic, are in possession of a concealed
5    handgun license?
6        MR. BRISSENDEN:  Again, your question is
7    unlimited to what is in the public record --
8        MS. BERKOWER:  Yes.  I said any publicly
9    available document.
10       THE WITNESS:  I don't know.
11       Q.   (BY MS. BERKOWER)  Are you aware of any
12   publicly existing document or report that identifies
13   how many minority Texans are in possession of a US
14   military card?
15       A.   Again, I personally am not aware.
16       Q.   Are you aware of any existing document or
17   report that identifies how many Texas voters are in
18   possession of a passport?
19       MR. BRISSENDEN:  Objection.  Again, the
20   question is not limited to the public --
21       Q.   (BY MS. BERKOWER)  Limited to public record.
22       A.   Again, I -- these are not areas of my
23   expertise.  I don't know.
24       Q.   Could you identify each report or analysis
25   that was presented to you as part of the public record

---

### 303

1    during the legislative debate on S.B. 14 that helps
2    form -- well, I'll leave it there -- during the
3    legislative debate on S.B. 14.
4        Do you want me to restart that question?
5        A.   Please.
6        Q.   Could you identify each report or analysis
7    that was given to House members as part of the public
8    record during the legislative debate on S.B. 14?
9        A.   I can't, no.
10       Q.   Do you remember receiving such reports?
11       A.   I don't know which ones you are referring to.
12   I mean, I certainly receive information.  I don't know
13   specifically what reports or what information that I
14   have.
15       Q.   Do you believe that S.B. 14 will have a
16   negative impact on minority voters?
17       MR. BRISSENDEN:  Objection, privileged.
18   Instruct the witness not to answer.
19       Q.   (BY MS. BERKOWER)  Are you aware of any
20   publicly available studies or analysis that would
21   support your position that S.B. 14 would enhance public
22   confidence in elections?  I did limit the question to
23   the public record.
24       A.   I don't specifically know, but I believe some
25   have been presented.

---

### 304

1        Q.   Have you publicly supported this lawsuit?
2        MR. BRISSENDEN:  Objection, vague.
3        Q.   (BY MS. BERKOWER)  Have you issued public
4    statements that support Texas' efforts in this lawsuit?
5        MR. BRISSENDEN:  Same objection.
6        THE WITNESS:  I probably have, but I'm
7    not positive.
8        MS. BERKOWER:  This will be Exhibit 447.
9        (Exhibit No. 477 marked)
10       Q.   (BY MS. BERKOWER)  Do you know what this is?
11       A.   It appears to be a portion, or maybe in total,
12   a post, it seems -- although I'm confused why it would
13   be a post at 2:00 a.m. on January 24th of 2012 -- in
14   The Facts news.  I think it would have been a news
15   article, but it doesn't appear to be.
16       Q.   What is the title of this?
17       A.   Well, it's confusing.  The title is "Voter ID
18   push has Bonnen's backing," but it's presented as
19   posted Tuesday, January 24th, 2012, at 2:00 a.m.  It
20   seems to be incomplete.
21       Q.   Okay.  Well, does this document quote you?
22       A.   It does.
23       Q.   Does it quote you about this lawsuit?
24       A.   It states, "State Representative Dennis Bonnen
25   fully supports Texas Attorney General Greg Abbott's

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

305

1   request to a federal court Monday to clear the way for
2   the state's Voter ID law as the state waits to hear
3   from the Department of Justice."  And then in quote it
4   says, "'We have no choice,' Bonnen said, 'His hand' --
5   and "his" would be referring to Attorney General Greg
6   Abbott -- "'was forced by the complete lack of action
7   by the Department of Justice.'"
8        MR. BRISSENDEN:  For the record, we will
9   object to the use of Exhibit 447 to the extent that it
10  is an incomplete article.
11       Q.  (BY MS. BERKOWER)  How do you know it's
12  incomplete?
13       A.  I remember viewing the article and there was a
14  lot more than this to it.
15       Q.  Okay.  Well, I guess we're unaware that it was
16  incomplete and we will do our best to locate a more
17  complete exhibit.  But is this an accurate quote of
18  what you said?
19       A.  Absolutely, yes, ma'am.
20       Q.  When you said "the complete lack of action by
21  the Department of Justice" --
22       A.  Uh-huh.
23       Q.  -- what action were you referring to?
24       A.  The lack of.
25       Q.  What action, though?  What were you expecting

---

306

1   the Department of Justice to do?
2        A.  I was expecting the Department of Justice to
3   have taken action long before January 24th of 2012.
4        Q.  To do what?  What was the Department of
5   Justice going to do?
6        A.  They should have precleared or moved forward
7   in the courts by that time.
8        Q.  What do you mean move forward in the courts?
9        A.  If that was the direction that was going to be
10  chosen.
11       Q.  Are you aware that the attorney general is
12  not -- is the defendant in this action, not the
13  plaintiff?
14       A.  I am aware.
15       MR. BRISSENDEN:  Just for clarification,
16  you are referring to which attorney general?
17       MS. BERKOWER:  Sorry.  The United States
18  Attorney General.
19       Q.  (BY MS. BERKOWER)  Sorry.  The United States
20  Attorney General is the defendant in this action.  So
21  to the extent that pre-clearance is sought through the
22  courts, the timing of that lawsuit is left to the State
23  of Texas.  Are you aware of that?
24       A.  I don't know if I would agree in total with
25  that statement.

---

307

1        Q.  Why not?
2        A.  Because I don't believe it's completely,
3   totally, and absolutely at the discretion of the State
4   of Texas Attorney General.  I believe there are other
5   factors that have influence on the timeline.
6        Q.  Even though Texas is filing the suit?
7        A.  Even though.
8        Q.  What other factors were you referring to just
9   now?  You said there are other factors at play?
10       MR. BRISSENDEN:  To the extent that
11  question requires you to divulge information that you
12  may or may not have received during communications with
13  your lawyers, I instruct you not to answer.
14       THE WITNESS:  I'll follow your
15  instruction.
16       Q.  (BY MS. BERKOWER)  When you said that some
17  studies or analyses that support your position that
18  S.B. 14 will enhance public confidence in elections,
19  can you say when those studies or analyses were
20  presented?  And I'm referring only to the public
21  record.
22       A.  I believe specifically -- I could be wrong
23  about this, but I think in 2009, a good bit of analysis
24  and report was presented to the House committee on
25  elections about what had occurred in the state of

---

308

1   Georgia, and that there was increased participation in
2   elections after they had passed and implemented their
3   voter identification law.
4        Q.  Okay.  Do you recall earlier today I asked you
5   if you were familiar with a decision in the Supreme
6   Court case Crawford versus Marion County Election
7   Board?
8        A.  I don't know if you asked me that or not.  I
9   don't remember.
10       Q.  A Supreme Court case about Indiana's voter ID
11  law?
12       A.  I vaguely recall.  I mean, six hours and
13  45 minutes ago or somewhere in there you may have asked
14  about that.  I don't remember what --
15       Q.  Okay.  Well, I think --
16       THE WITNESS:  Did she ask me or did she
17  ask you about that?
18       Q.  (BY MS. BERKOWER)  I think you testified
19  earlier you were not familiar with that decision.
20       MR. BRISSENDEN:  Objection to the extent
21  that it mischaracterizes his testimony.  I believe
22  there were some instructions that were given in terms
23  of instructing the witness not to answer.
24       Q.  (BY MS. BERKOWER)  Okay.  Well, I think
25  then --

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                      June 6, 2012

---

309

1   MR. BRISSENDEN: I believe that's been
2   covered.
3   Q. (BY MS. BERKOWER) -- you said that there was
4   nothing -- you were limited to speaking about
5   information you received about the case, and -- that
6   was not privileged, and there was no information you
7   could provide that was not privileged. Is that an
8   accurate summary of what happened?
9   MR. BRISSENDEN: Objection. The court
10  reporter and the transcript will speak for itself.
11  Q. (BY MS. BERKOWER) Okay. Well, this is
12  Exhibit 448.
13  (Exhibit No. 448 marked)
14  Q. (BY MS. BERKOWER) Do you know what this
15  system?
16  A. It appears to be an incoming correspondence
17  from a constituent.
18  Q. What's the date on it?
19  A. 4/30 of 2008.
20  Q. What is this constituent asking you about?
21  A. She writes, In light of the recent US Supreme
22  Court decision on a state law for voter IDs, will there
23  be a bill introduced in Texas soon to require IDs for
24  voting?"
25  Q. Do you remember receiving this?

---

310

1   A. Not particularly, no. I'm not suggesting I
2   didn't, but you're asking if I personally recall it,
3   and I don't personally recall it.
4   (Exhibit No. 449 marked)
5   Q. (BY MS. BERKOWER) This is Exhibit 449.
6   A. Very good.
7   Q. Do you know what this is?
8   A. It appears to be a letter dated April 19th of
9   2008 back to my constituent who sent me the previous
10  correspondence. Which is somewhat peculiar because it
11  appears to be written the day before this says we
12  received her letter.
13  Q. Okay. And did you write this letter back to
14  her?
15  A. A member of my staff would have, yes.
16  Q. And based upon what you testified to earlier,
17  there is a good chance you reviewed this before it went
18  out?
19  MR. BRISSENDEN: Objection, to the extent
20  that it mischaracterizes testimony from previous -- as
21  to that question.
22  Q. (BY MS. BERKOWER) You review most things that
23  go out of your office?
24  A. I do. And because I reviewed a letter in
25  April of 2008 that made note of a Supreme Court case

---

311

1   you asked me about this morning doesn't suggest that
2   I'm familiar and aware of that case to the extent of
3   discussing it in a legal proceeding with you here
4   today.
5   Q. Okay. But you're responding to her --
6   A. I am.
7   Q. -- question will there be a bill introduced in
8   Texas soon to require IDs for voting in light of the
9   Supreme Court case?
10  A. Correct.
11  Q. And you wrote, "Given that this issue was of
12  great importance during the 2007 legislative session, I
13  assure you that there will once again be a bill
14  introduced next session to address voter fraud."
15  A. Uh-huh.
16  Q. Is that accurate?
17  A. Absolutely.
18  Q. And you thanked her for her inquiry regarding
19  future legislation in response to the Supreme Court's
20  ruling in Crawford. Is that accurate?
21  A. I stated, "Any time you wish to visit about
22  this issue or any other state matter, please do not
23  hesitate to call me. It is always a pleasure to
24  hear from you." That's how I end a lot of my letters.
25  Q. Okay. And I should have directed you. It's

---

312

1   my fault. The first paragraph says, "Thank you for
2   your inquiry regarding future state legislation in
3   response Supreme Court's ruling in Crawford."
4   A. Sure. That's what it says.
5   Q. And then directly after that, you explain that
6   "Given this issue was of great importance during the
7   2007 legislative session, I assure you there will once
8   again be a bill introduced in the next session to
9   address voter fraud." Is that accurate?
10  A. It is accurate. And we have discussed many of
11  those bills already.
12  Q. So would it be fair to say that around the
13  time of Crawford you were aware of -- you were aware of
14  requests from constituents to introduce future voter
15  identification legislation in response to Crawford?
16  MR. BRISSENDEN: Can you read the
17  question back?
18  (The requested portion was read)
19  MR. BRISSENDEN: As I understand that
20  question as being posed, the question is asking whether
21  or not you're aware of constituent correspondence. And
22  so with that, you may answer.
23  THE WITNESS: Was I aware of it on
24  April 29th of 2008? Yes. Was I aware of it sitting
25  here today, no.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                                    June 6, 2012

---

**313**

1    Q.  (BY MS. BERKOWER)  Well, I was just asking
2   around the time that the decision was issued were you
3   aware of constituents, you know, contacting your office
4   about the case and about subsequent voter ID
5   legislation.
6        MR. BRISSENDEN:  And for the record, it
7   may help the witness, do you know when the opinion was
8   issued?
9        THE WITNESS:  I have no idea when it was
10  issued.
11       MS. BERKOWER:  That's nonresponsive.
12       MR. BRISSENDEN:  Well, I think it's
13  relevant for purposes of him being able to answer the
14  question.
15       THE WITNESS:  I think to answer the
16  question you're wanting to make issue of a Supreme
17  Court ruling that I am not familiar with or very aware
18  of.  The response that you see in this letter is much
19  more about the fact that I was very aware of the
20  ongoing issue of voter ID and legislation dealing with
21  voter ID in Texas dating back, as I stated in the
22  letter, to the 2007 session and the fact that it would
23  continue to be an issue moving forward.
24       Q.  (BY MS. BERKOWER)  Okay.  But this letter
25  indicates that you are aware of it -- of the Supreme

---

**314**

1   Court case because you mention it specifically by name
2   and you wrote this letter?
3        A.  Certainly.  And a member of my staff, who is
4   charged with making sure they intelligently and
5   accurately respond to letters, did the research,
6   understood the case, simply made one sentence reference
7   to it, and we sent the letter out.  Does that make me
8   an expert and highly knowledgeable?  It does not.
9        Q.  I'm not asking if you were an expert or highly
10  knowledgeable.  I asked if you were aware of
11  constituents writing in to you and you responding about
12  the Supreme Court case and subsequent voter ID law.
13       A.  Obviously I was aware --
14       MR. BRISSENDEN:  Objection to the extent
15  that question [inaudible].
16       (Exhibit No. 450 marked)
17       Q.  (BY MS. BERKOWER)  This is Exhibit 450.  Do
18  you recognize this?
19       A.  I do.
20       Q.  What is this?
21       A.  It appears to be a letter from a very
22  interesting man --
23       Q.  Who is it from?
24       A.  -- who lives in Clute.
25       George Betony.

---

**315**

1        Q.  Is that the person the letter is addressed to
2   or the letter --
3        A.  It is addressed to him.
4        Q.  Who wrote the letter?
5        A.  It appears I did, although it's not on the
6   letterhead or anything of that sort.
7        Q.  Does it look like a response to a constituent
8   communication to you?
9        A.  It does.
10       Q.  Do you see the second full paragraph that
11  starts "Given that I have"?
12       A.  Yes.
13       Q.  It says, "Given that I have witnessed hours of
14  extensive testimony from experts on this issue over the
15  past several sessions, I appreciate the opportunity to
16  address your questions regarding the legislature's
17  efforts to restore the basic principle of one person,
18  one vote in the State of Texas."
19       Did I reread that accurately?
20       A.  You did read it correctly.
21       Q.  What hours of extensive testimony from experts
22  on this issue are you referring to?
23       A.  I would be referring to the hours in 2009 when
24  the House elections committee, which has been well
25  established today I was a member of, had, I believe, at

---

**316**

1   least two days of hearings.  And pretty much one of
2   those days was completely filled, meaning, God, 10,
3   12 hours, largely with expert testimony.
4        Q.  Okay.
5        A.  And then in 2011, at this point in time I had
6   chaired the select committee, which, again, we have
7   well established and well discussed here today.  And
8   that hearing had had -- was, ironically, much shorter
9   but had had -- I don't remember the specific number,
10  but I believe around eight or ten expert witnesses who
11  had testified for many hours that day.  So that's what
12  I would be referring to.
13       Q.  Do you remember the names of any of these
14  experts?
15       A.  I do not, but they are all in the record.
16       Q.  So those two days of testimony are the only
17  testimony you're referring to in this letter?
18       A.  Well, what I'm referring to in this letter,
19  given that I have witnessed hours of extensive
20  testimony -- and I have just explained to you that
21  there were probably, combined, anywhere from eight to
22  14 hours of testimony, that is what I'm referring to.
23  And I'm referring only to expert testimony, not even
24  the testimony of citizens who chose to come and testify
25  at their own will.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                              June 6, 2012

---

317

1      Q.   Okay.  You said a minute ago that George
2  Betony was a -- you characterized him as --
3      A.   As interesting.
4      Q.   Why do you characterize him that way?
5      A.   Because he invited me to come speak to a group
6  that he's a part of, and I was invited to speak as his
7  state representative.  And I always accept those
8  invitations and am appreciative of them.  And he called
9  me every Friday evening around 8:00 for about six
10 months to ask if I was going to attend his Saturday
11 morning meeting, until I finally had to very politely
12 explain to him for about the 20th time that I simply
13 came when he asked me to be a speaker and I had not
14 joined and did not intend to join his group, and that
15 he needed to quit calling my home at 8:00 or 8:30 on
16 Friday night to check and see if I would be there the
17 following morning.
18     Q.   What meeting was that?
19     A.   I forget the name of the group.  I think it
20 was actually -- it's -- it was connected to a church in
21 Freeport, and it's a men's group that meets on Saturday
22 mornings.
23     Q.   What types of issues does this men's group --
24     A.   Having only attended once as their speaker, as
25 their local state representative, I couldn't speak to

---

318

1  what they hear about.
2      Q.   What did you speak about when you went that
3  time?
4      A.   Being their state rep and general issues of
5  the day that I would be dealing with.
6      Q.   Do you see in the second -- in the third
7  paragraph --
8      A.   Yes.
9      Q.   -- three from the bottom, the last sentence of
10 that paragraph --
11     A.   Yes.
12     Q.   -- reads -- talks about the identification
13 certificate available.
14     A.   Its availability with a free photo ID.
15     Q.   In S.B. 14, yes.
16     A.   Yes.
17     Q.   This availability of a free voter ID addresses
18 your concern of costs in obtaining a photo ID.  Do you
19 see that?
20     A.   Yes, I do.
21          MR. BRISSENDER:  Do you have the time?
22          THE REPORTER:  It's seven hours right now
23 from when we started.
24          MS. BERKOWER:  I would like to finish the
25 question.

---

319

1          MR. BRISSENDER:  That's far enough.  I
2  believe there is no question pending at this time.
3          MS. BERKOWER:  No, I was in the middle of
4  a sentence when you interrupted me.
5          MR. BRISSENDEN:  We could ask the court
6  reporter to read it back.
7          MS. BERKOWER:  I would like to finish the
8  sentence that was going to end with a question.
9  Moreover, we take issue with the lengthy amount of time
10 you've used to not make your objections, consider your
11 objections, which we have politely said nothing about.  There is
12 well settled case law that provides that the seven-hour
13 rule has exceptions when counsel takes that time away
14 from the examining counsel.
15          So in our view -- and on top of that we
16 also were provided with documents today in the early
17 afternoon that we have been required to examine during
18 the deposition as it goes on that should have been
19 produced to us months ago.  And these all relate to
20 Representative Bonnen.  And we plan to leave the
21 deposition open and to seek more time to examine him on
22 these documents if necessary given their overdue
23 production.
24          Now, can we have Representative Bonnen
25 please answer my last question -- or I'll finish the

---

320

1  question when you read back the sentence before I was
2  interrupted.
3          MR. BRISSENDEN:  I believe the question
4  was whether or not he saw or read that.
5          And I think you did answer that question,
6  did you not?
7          THE WITNESS:  The question was did I see
8  the line in the third paragraph, and I answered yes.
9          MR. BRISSENDEN:  And I believe from the
10 court reporter we're now past the time of seven hours.
11 And so under the rules and agreement, I believe we're
12 finished here.
13          MS. BERKOWER:  As a professional
14 courtesy, would you be willing to let me ask my
15 question?
16          MR. BRISSENDEN:  How many more questions
17 do you have?
18          MS. BERKOWER:  I was going to ask him
19 about this one line that I just asked him if he saw,
20 and a couple of questions on that topic, and then we
21 can leave, according to you.
22          MR. BRISSENDEN:  If you have one or two
23 more questions about the exhibit, we will accommodate
24 you in that regard.
25     Q.   (BY MS. BERKOWER)  Okay.  So you said you see

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                          June 6, 2012

---

**321**

1   that this availability of a free photo ID addresses

2   your concern of cost in obtaining a photo ID?

3     A.  Correct.

4     Q.  Didn't we discuss earlier that S.B. 14 may

5   require documents that cost money in order to obtain

6   the free photo ID?

7       MR. BRISSENDEN:  Objection, asked

8   answered.  We have covered that already.

9     Q.  (BY MS. BERKOWER)  Do you remember when we

10   discussed that and you agreed that if the underlying

11   documentation costs money, then the ID would

12   effectively cost money?

13     A.  Respectfully, I think that I was answering the

14   question of a constituent who said that it could cost

15   somebody money to go get an ID, and he was unaware of

16   the fact that in the legislation a free ID is offered

17   to someone.

18       Now, are you correct that earlier we

19   discussed that there could be underlying documents

20   requiring -- could be, not guaranteed, but could be --

21   that may cost money, that is accurate.  Does that make

22   the statement in this letter I'm inaccurate?  It does

23   not.

24     Q.  Does it make it slightly misleading?

25     A.  Not at all.

---

**322**

1       MS. BERKOWER:  Okay.  We're leaving this

2   open and pending due to the fact that we got these

3   documents late and also due to the lengthy objections

4   of counsel.

5       MR. BRISSENDEN:  For the record,

6   documents that were produced today were produced

7   actually early, before the Court's order that required

8   us to produce it today.

9       Ms. Westfall communicated with counsel in

10   our office, and we made every effort to get these

11   documents that she requested to you today before

12   noontime so you could ask him questions this afternoon,

13   which you have now had them for about seven hours to

14   answer those questions.  And so we accommodated your

15   request and we got -- we focused on those documents.

16   We had them here at noontime today.

17       And, so in that regard, I don't believe

18   the characterization that we were somehow late in

19   producing them is accurate.

20       MS. BERKOWER:  You're late in producing

21   them in that you improperly withheld them and we were

22   required to seek a court order in order to obtain them.

23   That's what I was referring to.

24       MR. BRISSENDEN:  I disagree with your

25   characterization.

---

**323**

1        THE WITNESS:  Thank you.

2     (Proceedings concluded at 7:35 p.m.)

6        -- SIGNATURE REQUIRED --

11        *  *  *  *  *

---

**324**

1       CHANGES AND SIGNATURE

2   WITNESS NAME:  DENNIS BONNEN

3   DATE OF DEPOSITION:  JUNE 6, 2012

4   PAGE    LINE    CHANGE      REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24   _____

25   _____

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                              June 6, 2012

## 325

1     I, DENNIS BONNEN, have read the foregoing
2  deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4  _____
            DENNIS BONNEN
5
6  THE STATE OF _____ )
7  COUNTY  OF  _____ )
8     Before me, _____, on this day personally
9  appeared DENNIS BONNEN, known to me (or proved to
10  me under oath or through _____) (description
11  of identity card or other document) to be the
12  person whose name is subscribed to the foregoing
13  instrument and acknowledged to me that he executed
14  the same for the purposes and consideration therein
15  expressed.
16
17     Given under my hand and seal of office, this
18  _____ day of _____, _____.
19
20  _____
            NOTARY PUBLIC IN AND FOR
21          THE STATE OF _____
22
23  My commission expires: _____
24  _____ No Changes Made _____ Amendment Sheet(s) Attached
25          STATE OF TEXAS VS. ERIC HOLDER, ET AL

## 326

1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
2
  STATE OF TEXAS,          )
3      Plaintiff,           )
                           )
4  VS.                      )
                           )
5  ERIC R. HOLDER, JR., in  )
  his official capacity as  )
6  Attorney General of the  )
  United States,           )
7      Defendant,           )
                           )
8  ERIC KENNIE, ET AL,      )
      Defendant-           )
9      Intervenors,         )
                           )
10  TEXAS STATE CONFERENCE OF ) CASE NO. 1:12-CV-00128
  NAACP BRANCHES,          ) (RMC-DST-RLW)
11      Defendant-          ) Three-Judge Court
      Intervenors,         )
12                          )
  TEXAS LEGISLATIVE BLACK   )
13  CAUCUS, et al,          )
      Defendant-           )
14      Intervenors,        )
                           )
15  VICTORIA RODRIGUEZ, et   )
  al,                      )
16      Defendant-          )
      Intervenors.         )
17
18       REPORTER'S CERTIFICATION OF THE ORAL
19          DEPOSITION OF DENNIS BONNEN
              JUNE 6, 2012
20
21     I, Donna Wright, a Certified Shorthand
22  Reporter and Notary Public in and for the State of
23  Texas, hereby certify to the following:
24     That the witness, DENNIS BONNEN, was duly
25  sworn by the officer and that the transcript of the

## 327

1  oral deposition is a true record of the testimony given
2  by the witness;
3     That the original deposition was delivered to
4  ^ ATTORNEY.
5     That a copy of this certificate was served on
6  all parties and/or the witness shown herein on
7  _____.
8     I further certify that pursuant to FRCP Rule
9  30(3) that the signature of the deponent:
10     _____ was requested by the deponent or a party
11  before the completion of the deposition and that the
12  signature is to be before any notary public and
13  returned within 30 days from date of receipt of the
14  transcript.  If returned, the attached Changes and
15  Signature Page contains any changes and the reasons
16  therefore:
17     _____ was not requested by the deponent or a
18  party before the completion of the deposition.
19     I further certify that I am neither counsel
20  for, related to, nor employed by any of the parties or
21  attorneys in the action in which this proceeding was
22  taken, and further that I am not financially or
23  otherwise interested in the outcome of the action.
24
25

## 328

1     Certified to by me on this, the _____ day of
2  _____, 2012.
3
4
5
6  _____
  Donna Wright, CSR No. 1971
  Expiration Date:  12-31-2012
7  3101 Bee Caves Road
  Centre II, Suite 220
8  Austin, Texas  78746
  (512) 328-5557
9  Firm Registration 283
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

DENNIS BONNEN                                    June 6, 2012

329

1    COUNTY OF TRAVIS )
2    STATE OF TEXAS   )
3        I hereby certify that the witness was notified
4    on _____ that the witness has 30 days or
5    (_____ days per agreement of counsel) after being
6    notified by the officer that the transcript is
7    available for review by the witness and if there are
8    changes in the form or substance to be made, then the
9    witness shall sign a statement reciting such changes
10   and the reasons given by the witness for making them;
11       That the witness' signature was/was not returned as
12   of _____.
13       Subscribed and sworn to on this, the _____ day
14   of _____, 2012.
15
16
17       _Donna Wright_____
         Donna Wright, Texas CSR No. 494
18       Expiration Date: 12-31-2012
         3101 Bee Caves Road
19       Centre II, Suite 220
         Austin, Texas  78746
20       (512) 328-5557
         Firm Registration 283
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com