## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS          )
                        )
                        )
VS.                     )   NO. 12-CV-128
                        )   (DST, RMC, RLW)
                        )
ERIC H. HOLDER, JR.,    )
In his official         )
Capacity as Attorney    )
General of the United   )
States                  )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
   ORAL DEPOSITION OF BLAINE BRUNSON
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

   ANSWERS AND DEPOSITION OF BLAINE BRUNSON, a witness
called by the United States taken before Janalyn Reeves,
Certified Shorthand Reporter for the State of Texas, on
the 30th day of May, 2012, between the hours of 1:00
p.m. and 6:00 p.m., in the offices Dechert, LLP, 300
West 6th Street, Suite 2101, Austin, Texas, pursuant to
the agreement of counsel for the respective parties as
hereinafter set forth.

## 2

### A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
   OFFICE OF THE ATTORNEY GENERAL:
   By: MR. MATTHEW FREDERICK
   - and -
   MS. STACEY NAPIER
   209 West 14th Street
   Austin, Texas 78701
   PH: (512) 936-6432

FOR THE DEFENDANT:
   DEPARTMENT OF JUSTICE
   By: MS. JENNIFER MARANZANO
      - and -
      MS. RISA BERKOWER
      - and -
      MS. MARIA H. RIOS
   950 Pennsylvania Avenue, NW
   Room 7161 NWB
   Washington, DC 20530
   PH: (202) 305-0185

FOR THE INTEVENORS:
   FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
   By: MR. ADAM M. HARRIS
   One New York Plaza
   New York, NY 10004-1980
   Ph: (212) 859-8952
FOR THE INTEVENORS:
   AMERICAN CIVIL LIBERTIES UNION FOUNDATION
   By: NANCY G. ABUDU
   230 Peachtree Street
   Atlanta, GA 30303-1227
   Ph: (404) 523-2721

## 3

INDEX

                                           PAGE
Appearances............................   2

BLAINE BRUNSON
   Examination by Ms. Maranzano ........  5
   Examination by Mr. Harris.  .........  151

Signature and Changes....................  187
Reporter's Certificate.  .................  189

## 4

EXHIBITS

NO.      DESCRIPTION               PAGE
DOJ EXHIBITS
111    Press Release               118
112    Fact Check                  83
114    Talking Points              138
115    Talking Points              75
119    Overview                    85
120    Standard Reviews            142
130    Notice of Deposition        11
131    Senate Rules                24
132    Texas Legislature Code      53
133    Senate Bill 14              59
134    Letter                      90
135    Letter                      96
136    Senate Rule                 101
137    Fiscal Note                 123
138    Email                       140
139    Email                       146

TLYV
1    Email                         173



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

5

1    BLAINE BRUNSON,
2    having being first duly sworn, testified as follows:
3    EXAMINATION
4    BY MS. MARANZANO:
5    Q. Good afternoon?
6    A. Hello.
7    Q. My name is Jennifer Maranzano. I'm representing
8    the defendant, Attorney General Eric Holder, in this
9    matter. Can you please state your name for the record?
10   A. Blaine Brunson.
11   Q. And have you ever been known by any other names?
12   A. No.
13   Q. Have you ever been deposed before?
14   A. Yes.
15   Q. What was the name of that case?
16   A. I don't know the name of the case.
17   Q. What was the case matter about?
18   A. It was about a salary dispute at the Parks &
19   Wildlife department.
20   Q. Were you a party to that case?
21   A. No. I was just a witness, I guess.
22   Q. Okay.
23   A. Whatever the term is.
24   Q. I'm going to go over some ground rules today.
25   A. Okay.

6

1    Q. You're probably familiar with some of these since
2    you've been deposed before. But you've been placed
3    under oath so it's important to testify truthfully,
4    accurately and completely. The court reporter is
5    preparing a transcript of everything we say today so
6    please make verbal responses and not nods?
7    A. Sure.
8    Q. Great. It's also important that we try not to
9    talk over each other. So if you could wait until I
10   finish my question before you answer and I'll wait until
11   you answer before I ask my next question. If you need a
12   break, please let me and I will do my best to
13   accommodate you. If I have a question open I may ask
14   you to finish answering before we take a break?
15   A. Okay.
16   Q. From time to time your attorney my make an
17   objection. He's making these objections for the record
18   and you can go ahead and answer the question unless he
19   instructs you not to. If he advises you not to answer
20   based on privilege, I would ask that you state on the
21   record whether you're following his advice so we can
22   have a clean record.
23   A. Okay.
24   Q. Do you understand these instructions?
25   A. Yes.

7

1    Q. Do you have any questions?
2    A. No.
3    Q. Are you on any medication today that would impact
4    your ability to testify truthfully and accurately?
5    A. No.
6    Q. Is there any other reason why you cannot testify
7    truthfully and accurately today?
8    A. No.
9    Q. I may use some shorthand today. If I say "the
10   Lieutenant Governor," I'm referring to Lieutenant
11   Governor Dewhurst or anybody who's acting on his behalf.
12   Do you understand that?
13   A. Yes.
14   Q. I may use the terms voter ID and photo ID
15   interchangeably, I'd like you to interpret these terms
16   broadly to include a requirement that a voter present a
17   form of identification whether it has a photo or
18   otherwise in order to cast a regular ballot at the
19   polls. Do you understand that?
20   A. I think so.
21   Q. Okay. Do you have any questions about it?
22   A. No. When we get to it I'll ask if I don't
23   understand the term.
24   Q. Okay. Perfect. When I refer to the term
25   "minority voters," I mean voters who are non-white or

8

1    non-Anglo.
2    A. Okay.
3    Q. Any questions about anything I have said so far?
4    A. No.
5    Q. Are you represented by counsel today?
6    A. Yes.
7    Q. And who is that?
8    A. Matthew Frederick.
9    Q. And when did this representation begin?
10   A. I guess when I received my notice to be deposed.
11   Q. Other than the case that we've talked about
12   earlier, have you been involved in any other litigation?
13   A. No.
14   Q. And that was the only time that you've been
15   deposed in that matter?
16   A. Yes. Yes.
17   Q. Have you ever been involved in a case where the
18   State of Texas was a plaintiff or a defendant other than
19   this matter?
20   A. No. And depending -- I mean I've always worked
21   at the Capital for quite a while. And there's always
22   been lawsuits that we have to work on or around as far
23   as, you know, if -- if the law needs to change or
24   different things that need to be addressed. But not as
25   a personal party.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 9

1     Q. Okay.

2     A. If that -- if that's what you mean.

3     Q. Okay. What were the cases that you've been --

4  that you had to work with or work around?

5     A. As far as personally? The two -- this one and

6  the Parks & Wildlife are the only ones that I personally

7  had to do anything with the legal process.

8     Q. Okay.

9     A. Anything else would just be dealing with after

10  the fact if there's something that had to be done in

11  legislation just in the general course of doing work at

12  the capital.

13     Q. Okay. What did you do to prepare for today's

14  deposition?

15     A. We had two meetings to just talk about the -- the

16  way the process works and our general counsel and the

17  Lieutenant Governor office, Frank Battle, received the

18  notices I think is what they're called to look through

19  records. And so we -- I did that with him and with our

20  computer person.

21     Q. Who -- who were the two meetings with?

22     A. With Matthew Frederick and Stacey.

23     Q. And was anybody else present at those meetings?

24     A. No.

25     Q. And when were those meetings?

## 10

1     A. Let's see, one was about a week ago and we just

2  had lunch together before we came over.

3     Q. How long was the meeting about a week ago?

4     A. About an hour.

5     Q. Did you review any documents in preparation for

6  today's deposition?

7     A. We -- I looked at some of the documents that

8  we -- that our office had produced, but not all of them.

9     Q. Anything else?

10     A. No.

11     Q. Did you bring any documents with you today?

12     A. No. Just the notice -- well, yes. Just the

13  note -- the notice of where to come for this.

14     Q. The notice of deposition?

15     A. Yes.

16     Q. Okay. Other than your attorneys, have you spoken

17  to anybody about your deposition today?

18     A. Just -- just the fact that I have -- have a

19  deposition. Scheduling people and people in my office,

20  they know I'm going to a deposition. Probably can't

21  answer phone calls all afternoon, but not about the

22  specifics or -- or the substance of the deposition.

23     Q. Good. You talked to people in your office about

24  the scheduling of the deposition today?

25     A. Right. That's right.

## 11

1     Q. Have you talked to anybody who has already been

2  deposed in this case about their deposition?

3     A. I saw Julia last night after her deposition. But

4  it was -- we talked about the length of it and that was

5  about it.

6     (Exhibit No. 130 was marked.)

7  BY MS. MARANZANO:

8     Q. Mr. Brunson, I'm showing you what we're marking

9  as Deposition Exhibit 130 for the record. Can you take

10  a look at it and let me know if you recognize this?

11     A. Okay. This is the document that I brought.

12     Q. Okay. Can you direct your attention, please, to

13  the part of the notice that says documents? And I

14  believe this may have been what you were talking about

15  earlier when you said Mr. Battle did a search for the

16  documents?

17     A. Yes.

18     Q. Can you tell me where he searched for these

19  documents?

20     A. He sent an e-mail, probably a month or two ago,

21  there was an initial hold on documents. And so he did a

22  search on -- sent it to the entire -- to our entire

23  staff saying this has been -- I think it was called a

24  hold, has been requested. And at the time looked

25  through our -- I guess whole staff's computers for what

## 12

1  was in there. And then three weeks ago, four weeks ago

2  there was a Boolean search that was requested and he

3  actually had the -- I guess the computer technician come

4  in and do the Boolean search.

5     Q. So am I understanding you correctly that at some

6  point in the past, I think you said about a month ago

7  there was hold put in place and you searched your

8  documents at that point?

9     A. Yes, ma'am.

10     MR. FREDERICK: Objection; mischaracterizes

11  his prior testimony. You can answer.

12  BY MS. MARANZANO:

13     Q. And who did that search?

14     A. I did and then with the general counsel looking

15  on to make sure I was doing it right.

16     Q. And where did you -- where did you search for

17  documents?

18     A. On the computer -- the search function of the

19  computer.

20     Q. Okay. Did you search any hard copies of

21  documents?

22     A. I looked through files, but I didn't have a whole

23  lot of paper documents on -- on -- I don't keep a lot of

24  paper in general, so I didn't have a file on -- on voter

25  ID.



Toll Free: 800.211.DEPO

Facsimile: 512.328.8139

Suite 220

3101 Bee Caves Road

Austin, TX 78746

www.esquiresolutions.com

## 13

1  Q.  And was -- was this search done for only your own
2  files or for other people in the offices?
3  A.  The only one that I know about is mine.  I know
4  that he sent the e-mail to the entire staff.  So I do
5  know that mine was done.
6  Q.  Was the Lieutenant Governor's -- were the
7  Lieutenant Governor's files also searched?
8  A.  The entire offices were.
9  Q.  And three to four weeks ago I think you
10 referenced a Boolean search, is that in regards to an
11 e-mail search that was done?
12 A.  Yes.
13 Q.  Okay.  Did you do any additional searches when
14 you got this notice of deposition for documents that
15 would be responsive to these requests listed here in
16 this notice?
17 A.  No.
18 Q.  And why not?
19 A.  Because I believe we got everything that was --
20 that was available in those first two.
21 Q.  Can I direct your attention to request No. 4?
22 There's no page numbers on this document.  Can you look
23 at that request and let me know -- did you search for
24 documents that would be responsive to request No. 4?
25 A.  In -- I would -- yes.  Anything that was on my

## 14

1  computer that would fit in that would have been searched
2  for.
3  Q.  Do you -- were there any documents on your
4  computer that were responsive to request No. 4?
5  A.  I don't believe so.
6  Q.  Can I direct your attention to request No. 8, if
7  you can look at that for a moment?
8  A.  Yes.
9  Q.  Did you search for documents that would be
10 responsive to request No. 8?
11 A.  I did not personally.  That's our general counsel
12 would have.
13 Q.  Was -- was that not part of the search that you
14 conducted?
15 A.  The general counsel maintains all the public
16 information, request and files.
17 Q.  Okay.  And did you talk to the general counsel
18 about searching documents to make sure that you are
19 turning over all responsive documents to request No. 8?
20 A.  I did not talk to him about it.
21 Q.  So what's your basis for saying that the general
22 counsel did that search?
23 A.  He -- he complied with whatever search request
24 were -- were asked.  And so the only part that I'm
25 familiar with is when he came to me and asked for my --

## 15

1  the search of my records.  But my understanding is he
2  went through the entire request and -- and was provided
3  anything that was responsive.
4  Q.  And can I direct your attention to request No.
5  11?  Did -- did you search for documents that would be
6  responsive to request No. 11?
7  A.  Yes.  I mean, we searched the entire computer for
8  anything that would have been responsive.
9  Q.  Did you find any responsive documents for request
10 No. 11?
11 A.  I don't know.  I just provided everything that
12 came up to our general counsel.
13 Q.  Okay.  Mr. Brunson, can you tell me --
14 MS. MARANZANO:  That's actual the court
15 reporter's.  Yeah.
16 BY MS. MARANZANO:
17 Q.  Can you tell me a bit about your educational
18 background?
19 A.  Yes.  I got my degree in business at Angelo State
20 University and then my master's in business at Texas
21 State University.
22 Q.  Any other courses of study that you've
23 undertaken?
24 A.  No.
25 Q.  What's your current job title?

## 16

1  A.  Chief of staff.
2  Q.  And when did you -- chief of staff for who?
3  A.  Lieutenant Governor Dewhurst.
4  Q.  When did you start working for Lieutenant
5  Governor Dewhurst?
6  A.  In December of 2002.
7  Q.  And what was your position when you started
8  working for Lieutenant Governor?
9  A.  Budget -- budget director.
10 Q.  And how long were you the budget director?
11 A.  Until September of '09.
12 Q.  Can you tell me how you came to initially be
13 employed with Lieutenant Governor Dewhurst?
14 A.  Yes.  When he -- when he became Lieutenant
15 Governor he -- I was working in the Senate Finance
16 Committee on the budget and he -- his staff reached out
17 to me to interview and I interviewed and got the job.
18 Q.  Did you know him prior to working for him?
19 A.  Not personally.  I had met him several times, but
20 didn't know him personally.
21 Q.  And how did you come to switch positions from
22 being budget director to being chief of staff?
23 A.  The chief of staff left the office and I guess I
24 was the only one left -- left standing.  So...
25 Q.  Did you hold any other positions during your time



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 17

1  working for the Lieutenant Governor besides budget
2  director and chief of staff?
3     A.  No.
4     Q.  Do you have any experience related to election
5  law?
6     A.  No.
7     Q.  Any experience related to election
8  administration?
9     A.  No.
10     Q.  What were your responsibilities as the Lieutenant
11  Governor's budget director?
12     A.  To work on the -- on the State's budget and keep
13  the Senate Finance Committee process moving smoothly in
14  order to have a -- a budget for the State at the end of
15  the legislative session.
16     Q.  Do you -- did you have any role with the
17  Legislative Budget Board?
18     A.  As far as while I worked for the Lieutenant
19  Governor?
20     Q.  Yes.
21     A.  Just as the liaison between our offices.  I mean,
22  I did previously work -- that's where I actually started
23  was at the Legislative Budget Board.  So...
24     Q.  Okay.
25     A.  And then in the budget director role, a lot of

## 18

1  coordinating has to happen between the Legislative
2  Budget Board and the Legislature.  So there's not a
3  formal title, but it's just part of the job.
4     Q.  Part of your job as budget director for
5  Lieutenant Governor?
6     A.  Yes, ma'am.
7     Q.  Okay.  Did you -- is part of that working with
8  the Legislative Budget Board to score legislation?
9     Q.  Score?
10     Q.  I'm sorry.  To provide a fiscal note for the --
11  for the legislation -- for legislation?
12     A.  Did I do that?
13     Q.  Uh-huh.
14     A.  No.  The -- actually the Legislative Budget Board
15  does the costing out or scoring on their own.  I mean,
16  it's -- it's intended to be kind of an independent
17  process.  So that, you know, everyone can look at them
18  and say this is an objective fiscal note.
19     Q.  Okay.  Does the Lieutenant Governor have an
20  advisory role to the Legislative Budget Board?
21     A.  He's the Co-Chairman of the Board.
22     Q.  And how do you in sure the board stays
23  independent?
24     A.  Well, the -- as far as on the cost estimates?
25     Q.  Right.  I was -- I was referring to what I

## 19

1  thought you said that -- that the Legislative Budget
2  Board was designed to be sort of an independent body?
3     A.  As far as when a piece of legislation is filed,
4  you asked if I had a role in the scoring of the bills.
5  I did not, as the Lieutenant Governor's staff.  I look
6  at it -- it would be two separate staffs.  He is the
7  Co-Chairman of the Board.  But his Senate office -- the
8  Lieutenant Governor's office does not actively
9  participate or direct how they do fiscal notes.
10  Their -- they have an independent process that in order
11  for the members to have trust that they're not being
12  told what to do, the two staffs are kept separately.
13     And so my role is more as the liaison between --
14  mainly working on the budget, some on fiscal notes for
15  miscellaneous bills, but primarily on the budget.
16     Q.  Okay.  Did you -- when you say you worked some on
17  fiscal notes, would you review their fiscal notes?
18     A.  I would review them after they -- as they
19  published them.  We don't have a role of looking at them
20  and saying that looks good or does not look good.  We
21  review them.  As you pass a budget, you have to account
22  for whatever else is out there that costs money.  And so
23  I would review them from that standpoint, but not, you
24  know, not an editing role.
25     Q.  Okay.  Are the employees of the Legislative

## 20

1  Budget Board employees under Lieutenant Governor
2  Dewhurst?
3     A.  He's the Co-Chair of the Board.
4     Q.  Do they report to him?
5     A.  As for as organizational structure, yes.  But
6  there -- there is a staff executive director who is
7  the -- who the board delegates the duty of running the
8  office to.  So at the end of the day, he's at the top of
9  the organizational chart, but they don't have a
10  direct -- it's not a daily report to the Lieutenant
11  Governor.  And the Speaker is also a Co-Chair.  So they
12  balance, not only House and Senate, but intended balance
13  between Republican Democrat.  It's -- it's intended to
14  be an independent body.
15     Q.  As -- as the chief of staff to the Lieutenant
16  Governor, do you oversee those employees?
17     A.  No.
18     Q.  What -- what are your current responsibilities
19  for the Lieutenant Governor?
20     A.  Duties as assigned.  It's just making sure that
21  the trains run smoothly.  Anything that's, you know,
22  current issue that's a problem that needs to be dealt
23  with or, you know, personnel type issues.
24     Q.  How many staff does Lieutenant Governor have?
25     A.  It's probably 30, 35.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 21

1    Q.  Are there some staff who -- is there a breakdown
2  of staff between executive functions and legislative
3  functions?
4    A.  No.  Because he's part of both branches.
5    Q.  Uh-huh.
6    A.  No, they're all one -- one group.
7    Q.  How many -- how many people in your office have
8  legislative responsibilities?
9    A.  Depending on how you define it, pretty much
10  everyone.
11    Q.  Does everyone report to you?
12    A.  I guess, most of the time.
13    Q.  How many people in your office have legislative
14  responsibilities dealing with election related bills?
15    A.  Probably two or three at the max.
16    Q.  And who are those people?
17    A.  During the -- are you talking about right now or
18  during the session?
19    Q.  About right now.
20    A.  Right now we've got a vacancy and the general
21  counsel would handle it or Julia Rathgeber of the Deputy
22  Chief of Staff.
23    Q.  And the general counsel, is that Frank Battle?
24    A.  Yes.
25    Q.  While you've served as chief of staff, can you

### 22

1  tell me every person who worked on the voter
2  identification issue?
3    A.  Yeah.  I mean, I can try.  As far as from his
4  office?
5    Q.  Yes.
6    A.  I would say Bryan Hebert, Frank Battle and Julia
7  Rathgeber.
8    Q.  Anybody else?
9    A.  No -- no major rolls beyond that.  I mean --
10    Q.  Did you also work on the issue?
11    A.  From a high -- from a high level.  I mean, not
12  the details of it.  But as far as, you know, the
13  planning process, yes.
14    Q.  Uh-huh.  Did the Lieutenant Governor also work on
15  the issue?
16    A.  Yes.
17    Q.  Does -- does Julia Rathgebe -- or do Julia
18  Rathgeber, Frank Battle and Bryan Hebert -- did they --
19  did Bryan Hebert all report to you while they were
20  working on this issue?
21    A.  Yes.
22    Q.  Were you at all involved in the voter
23  identification issue while you were serving as budget
24  director?
25    A.  In a -- on a -- in an ancillary way.  In, I

### 23

1  guess, '09 there was a provision put in the budget to
2  pay for, I believe it was for voter education.  But it
3  was -- my role was more -- they said, "We need to put
4  this in the budget."  And I said, "Okay."  And -- but it
5  wasn't -- I didn't get into the -- I didn't know the
6  details of voter identification.  Just the fact that
7  there was some amount of money, I believe it was $3
8  million -- $2 or $3 million that needed to be
9  appropriated to the Secretary of State for that.  But
10  beyond that, not much on the substance of the -- of
11  voter ID.
12    Q.  Okay.  Who do you report to?
13    A.  The Lieutenant Governor.
14    Q.  What -- what executive functions does Lieutenant
15  Governor have?
16    A.  Say that again.
17    Q.  What -- what are the Lieutenant Governor's
18  executive functions?
19    A.  The primary function is when the governor is out
20  of state he serves as the acting governor.  Beyond that
21  there's not a lot of executive function.
22    Q.  Does the Lieutenant Governor maintain separate
23  offices for an executive office and a legislative
24  office?
25    A.  No.  It's -- it's one single office.

### 24

1    Q.  What are the Lieutenant Governor's legislative
2  duties?
3    A.  To preside over the Senate and all that entails
4  as far as appointing committees and referring bills to
5  those committees.  And he has a signing duty on each
6  piece of legislation as it passes.  And as far as
7  legislative -- I guess it would still be legislative,
8  but like the Legislative Budget Board, those roles are
9  part of his, I guess, ex-officio duties from being
10  Lieutenant Governor, Legislative Council, Legislative
11  Budget Board, any of the legislative agencies.
12    Q.  Uh-huh.  Okay.
13    MS. MARANZANO:  Can we have this marked.
14    (Exhibit No. 131 was marked.)
15  BY MS. MARANZANO:
16    Q.  Mr. Brunson, I'm showing you what we're marking
17  as Deposition Exhibit 131.  If you can take a look at
18  this quickly.  I'm going to represent to you this is
19  actually an excerpt from the 2011 Senate rules.
20    A.  Okay.
21    Q.  Because the entire thing is somewhat voluminous.
22  If you can take a look at rule 13.01 for me which
23  describes the Lieutenant Governor's role in regards to
24  the Committee-of-the-Whole.
25    A.  Okay.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Blaine Brunson

May 30, 2012

## 25

1  Q.  Do you see that?
2  A.  Yes.
3  Q.  Does Lieutenant Governor have a right to vote on
4  bills being considered by the Senate?
5  A.  If it's in the Committee-of-the-Whole or in the
6  Senate in general?
7  Q.  Well, let's start with the Senate in general?
8  A.  He can vote to break a tie.  And then in the
9  Committee-of-the-Whole I believe he has a vote -- a
10 right to vote just like any of the other members.
11 Q.  So in the Senate as a whole, is the only time
12 he's permitted to vote to break a tie?
13 A.  That's my understanding.
14 Q.  And in the Committee-of-the-Whole, he's allowed
15 to, pursuant to that rule, he has a right to debate and
16 vote on all questions?
17 A.  Yes, under 13.03.
18 Q.  Do you play any role in advising Lieutenant
19 Governor when to be involved in the debate and when to
20 vote on questions in the Committee-of-the-Whole?
21     MR. FREDERICK:  Objection; vague.  You can
22 answer.
23 A.  Can you --
24 Q.  Pursuant to rule 13.01, it says in the
25 Committee-of-the-Whole Lieutenant Governor has a right

## 26

1  to debate and vote on all questions, correct?
2  A.  No.  13 -- 13 -- yeah, 03.
3  Q.  13.03.  I apologize.
4  A.  No.  That's fine.
5  Q.  So -- so my question is about your role in
6  advising Lieutenant Governor, if you have a role in
7  advising Lieutenant Governor when to exercise this right
8  of debating or voting the Committee-of-the-Whole?
9  A.  It would be on a case-by-case basis.
10 Q.  Well, how do you determine when to play that
11 role?
12 A.  Well, if we were in the Committee-of-the-Whole
13 and he asked if he should debate or vote I would advise
14 him, yes.
15 Q.  How often does he ask you for advice on that?
16 A.  Not very often.  I mean...
17 Q.  How often does he participate and vote during the
18 Committee-of-the-Whole?
19 A.  He participates -- if there is a
20 Committee-of-the-Whole he'll participate in each one of
21 them and vote.  I believe -- and I'm not 100 percent
22 sure, but I believe like in this case -- I believe he
23 voted on the voter ID bill.
24 Q.  And are you referring to SB 14?
25 A.  Yes.

## 27

1  Q.  Did he ask for your advice on that vote?
2  A.  I don't recall.
3  Q.  In any given legislative session, about how many
4  times does the Senate go into the
5  Committee-of-the-Whole?
6  A.  Generically speaking, I would say maybe once a
7  session.  It depends on the issues that are being looked
8  at.
9  Q.  What sorts of issues would prompt it going to the
10 Committee-of-the-Whole?
11 A.  The bill we're talking -- the Senate bill 14 did.
12 And I -- I believe in the past the school finance bills.
13 Any -- any legislation that there was a majority of the
14 members that wanted to have the testimony in front of
15 everyone so everyone could hear the same thing at the
16 same time.
17 Q.  And is it the Lieutenant Governor's decision to
18 resolve to the Committee-of-the-Whole?
19 A.  I believe so.
20 Q.  Well, let's -- let's look at rule 7.06.  Do you
21 see that?
22 A.  Yeah.
23 Q.  And Section A says, "The president shall refer
24 each bill to the proper committee or standing
25 sub-committee and shall cause such referral to be

## 28

1  announced when the bill is first read"?
2  A.  Yes.
3  Q.  So would that include -- and "the president," is
4  that referring to Lieutenant Governor?
5  A.  Yes.
6  Q.  And would that include, when it talks about
7  referring a bill to the proper Committee, the
8  Committee-of-the-Whole?
9  A.  I believe so.
10 Q.  And so the Lieutenant Governor -- just to ask you
11 the question again, does the Lieutenant Governor make
12 decision to refer bills to the Committee-of-the-Whole?
13 A.  Yes.
14 Q.  And do you play a role in advising him on that
15 decision?
16 A.  Yes.
17 Q.  How do you decide whether to refer a bill to the
18 Committee-of-the-Whole?
19     MR. FREDERICK:  Object on the basis of
20 legislative privilege.  I would instruct you not to
21 answer that question on that ground.
22 BY MS. MARANZANO:
23 Q.  Are you following your counsel's instruction?
24 A.  Yes.
25 Q.  Do chairs of committees make request to have



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 29

1  bills heard in their committee?
2  A. Yes.
3  Q. Frequently?
4  A. Yes.
5  Q. Is the assignment of a bill to a committee
6  connected at all to who is the chair?
7  A. No. It's more -- it's more connected to the
8  subject matter of the committee.
9  Q. It's more connected to the subject matter of the
10 committee. Is there anything else that would inform
11 your decision of where to refer a bill?
12       MR. FREDERICK: Let me just object on
13 legislative privilege to the extent that this question
14 asks you to reveal your own thought process or mental
15 impressions about a specific bill or Lieutenant
16 Governor's thought process or mental impressions or any
17 communications with another legislator or staff, I would
18 instruct you not to answer. However, to the extent you
19 can answer without revealing that kind of information,
20 you may answer the question.
21 A. Can you repeat the question?
22 Q. BY MS. MARANZANO: Can you read it back?
23       (Requested question was read.)
24 A. I -- I don't believe I can answer without
25 revealing legislative privilege.

## 30

1  Q. Okay. And just to be clear, I'm asking you right
2  now just about sort of a general procedural matter, not
3  about any particular bill. Does that change your answer
4  at all or change your ability to answer?
5  A. I don't think so.
6  Q. Okay. Can you also take a look at rule 11.01 for
7  me? Actually, before we do that, can I just ask you --
8  let's go back to the assignment of bills. Does the
9  Lieutenant Governor personally make that decision of
10 where to refer a bill?
11 A. Yes.
12 Q. And does Lieutenant Governor also personally make
13 the decision of when to resolve into the
14 Committee-of-the-Whole?
15 A. Yes.
16 Q. Okay. Can you look at 11.01? Does Lieutenant
17 Governor also make Committee appointments pursuant to
18 rule 11.01?
19 A. Yes.
20 Q. And do you have a role in this duty of Lieutenant
21 Governor's?
22 A. Yes.
23 Q. What's your role?
24 A. My role is to help him decide which members best
25 fit which committee.

## 31

1  Q. And how do you do that?
2       MR. FREDERICK: I'll object -- I'll object
3  on the grounds of privilege and just caution the witness
4  that to the extent this is asking generally about what
5  factors go into a decision, that that's -- you may
6  answer. I would caution you not to reveal any specific
7  thought process or decision about a particular bill.
8  A. The -- it generally matches different member's
9  experience, subject matter, expertise and member's
10 request different committee assignments.
11 Q. When are committee assignments made in a
12 legislative session?
13 A. It depends. Sometimes it -- it depends on how
14 much turn over there has been. If there's new members,
15 they'll do some reassignments. And I believe for -- for
16 example, last session I believe we did the committee
17 assignments before session so that the committees would
18 be in place for the session.
19 Q. Do you ever or does it ever happen that bills are
20 considered before committee assignments are made?
21 A. No, because they wouldn't have anywhere to go.
22 Q. Even if they went to the Committee-of-the-Whole?
23 A. Well, you would have to form the
24 Committee-of-the-Whole to do it.
25 Q. So you have never seen that happen?

## 32

1  A. Not to my knowledge.
2  Q. In terms of the final decision about committee
3  appointments who makes that decision?
4  A. The Lieutenant Governor.
5  Q. Can you look at rule 12.01 for me? Does
6  Lieutenant Governor also play a role in appointing
7  conferees for conference committees?
8  A. Yes.
9  Q. And -- I'm sorry. His role is to make the
10 appointment, correct?
11 A. Yes.
12 Q. And do you play a role in that?
13 A. Yes.
14 Q. What's your role?
15 A. My role is -- is the members will request who
16 they would like to have on the conference committee.
17 And again, in this specific piece, my role is more
18 50,000 feet. I don't deal with every conference
19 committee. But the members will request the people that
20 they would like to have on it, turn it into the
21 Lieutenant Governor. We just make sure that he has the
22 request and then makes the appointment.
23 Q. What criteria does he use to make that
24 appointment?
25 A. Generally he takes the recommendation of the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 33

1  pertinent -- I guess the bill sponsor or the chairman
2  who sends the -- the request in.
3      Q.  And I believe you said that you don't get
4  involved in every conference committee?
5      A.  Right.
6      Q.  Appointment?
7      A.  Right.  I would -- I guess technically they would
8  come through my -- across my desk.  But because there's
9  so many of them I don't look at every one.
10     Q.  Are there some that you have been involved in?
11     A.  Yes.
12     Q.  Which ones?
13     A.  Probably too many to recall.  But if there's
14 any -- like on the budget, if there's -- it's always a
15 very coveted position.  So you'll have, you know, ten
16 members ask for only five spots.  So if there's issues
17 like that, that's when I would work.
18     Q.  Were you involved in appointing conferees for SB
19 14?
20     A.  I would have had to have been.  I don't recall
21 the specifics of who it was and how it came to pass, but
22 I would say that, yes.
23     Q.  Can you tell me what you meant when you said it's
24 a "coveted spot" on the Committee?
25     A.  People want it.

## 34

1      Q.  Why is that?
2      A.  Because it's a good role to have if you're
3  working on the budget to be one of the conferees.
4      Q.  And beyond the budget is it also coveted?
5          MR. FREDERICK:  Objection; vague.  You can
6  answer.
7      A.  It depends on the bill.
8      Q.  BY MS. MARANZANO:  Do the conferees have a
9  significant role in shaping the final -- the final
10 legislation?
11     A.  Usually, yes.
12     Q.  Do you recall how many people -- you said you
13 were involved in the appointment of conferees for SB 14?
14     A.  Yes.
15     Q.  How many members asked to be on that conference
16 committee?
17     A.  I don't remember.
18     Q.  Is your role -- when you're involved in this
19 decision of who's going to be on the conference
20 committee, is your role, in part, to make a
21 recommendation to the Lieutenant Governor?
22     A.  If he asks, yes.
23     Q.  Does he usually ask?
24     A.  Yes.
25     Q.  And then does he make the final decision?

## 35

1      A.  Yes.
2      Q.  Can you look at rule 1.01 and also 5.15?  In
3  terms of rule 5.15, can you tell me about -- does
4  Lieutenant Governor also rule on questions of order?
5      A.  Yes.
6      Q.  How does Lieutenant Governor do that, what's the
7  process he use -- uses to make those rules?
8      A.  While the Senate is in session?
9      Q.  Yes.  While the Senate is in session?
10     A.  He does it from the podium, from the chair.  And
11 if there's a -- I guess if someone is out of order,
12 he'll just gavel the Senate needs to be in order.
13     Q.  Are there also questions of order that he rules
14 on?
15     A.  I'm not sure I understand.
16     Q.  Because rule 5.15 refers to every question of
17 order.  Is it -- is that connected to a point of order
18 or is that a different issue?
19     A.  I believe it's -- I believe it's point of order.
20 I believe it is point of orders.
21     Q.  Do you know how the Lieutenant Governor
22 determines rulings on points of order?
23     A.  He's advised by the parliamentarian.
24     Q.  Do you play any role in that -- in those rulings
25 that he makes?

## 36

1      A.  No.
2      Q.  Is anybody on the Lieutenant Governor staff
3  available to him as a resource when those questions of
4  order arise?
5      A.  The general counsel -- it's primarily the
6  parliamentarian.  It's almost exclusively the
7  parliamentarian.
8      Q.  Is the parliamentarian an employee of the
9  Lieutenant Governor?
10     A.  I think -- I think technically, yes.  But the
11 parliamentarian works for both the Lieutenant
12 Governor -- it's a weird balance between the Senate body
13 and the Lieutenant Governor, but I could be wrong on
14 this.  But I believe the -- I believe that the
15 parliamentarian is technically an employee of the
16 Lieutenant Governor.
17     Q.  Who is the current parliamentarian?
18     A.  Karina Davis.
19     Q.  And was she there during the consideration of SB
20 14 as well?
21     A.  Yes.
22     Q.  In rule 5.15, do you see it makes reference to
23 rules being appealed?
24     A.  Yes.
25     Q.  How often does that happen?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Blaine Brunson                                                          May 30, 2012

---

**37**

1    A. Not -- not very often.
2    Q. In any given legislative session would you say --
3    what would be an approximation for how many times that
4    might happen?
5    A. I've probably seen it once or twice in four or
6    five sessions?
7    Q. Can you look now at rule 1.01 where it talks
8    about -- let me get there. Does that refer to the
9    Lieutenant Governor's duty or ability to appoint a
10   member to perform duties of the chair?
11   A. Yes.
12   Q. So he has that duty as well?
13   A. Yes.
14   Q. How does Lieutenant Governor decide who to
15   appoint as the chair?
16   A. Are you -- and you mean a temporary chair?
17   Q. That's right. That's -- that's his duties -- or
18   his right, correct, under rule 1.01?
19   A. Right.
20   Q. I'm looking at a sentence that's a couple in in
21   that rule. It says the president shall have the right
22   to name a member to perform the duties of the chair.
23   A. Right.
24   Q. Are you familiar with that rule for the
25   Lieutenant Governor?

---

**39**

1    A. Well, while members are presiding entire bills
2    pass. So, yes. If a member is up there and presides
3    over three or four bills, they would preside over the
4    entire debate or process of each one of those bills.
5    Q. While SB 14 was being considered by the Senate,
6    not by the Committee-of-the-Whole, but by the Senate,
7    did Lieutenant Governor preside over that?
8    A. I don't recall. I would -- I believe yes, but I
9    don't recall.
10   Q. Can you turn to rule 7.23 which is about signing
11   of bills. I believe you actually mentioned this
12   earlier. Is that -- is that a discretionary rule for
13   the Lieutenant Governor to sign -- the rule says, "the
14   president of the Senate or presiding officer shall in
15   the presence of the Senate sign all bills and joint
16   resolutions passed by the Legislature." Is that -- is
17   that a discretionary role of his or is that mandatory
18   role?
19   A. I'm looking at -- I'm not a rules expert, but
20   looking at the bottom of rule 7.23, I think that
21   constitutional reference, I believe the constitution
22   requires that each bill be publicly read and the fact of
23   signing entered into the journal.
24   Q. Is it somewhat of a ceremonial duty?
25   A. I think it's constitutional.

---

**38**

1    A. Not -- not very. If it's referring to just a
2    temporary appointment, during the course of a long day
3    he'll periodically have a member of the Senate come up
4    an preside over the Senate.
5    Q. I see. So if he -- if he's presiding over the
6    Senate and he wants to take a break, he might have
7    somebody sit in as chair?
8    A. Yes.
9    Q. Does he ever appoint somebody to be chair for and
10   entire debate on an issue?
11        MR. FREDERICK: Objection; vague. But you
12   can answer.
13   A. Do you -- do you mean while the Senate is in
14   session?
15   Q. BY MS. MARANZANO: I'm referring to -- I'm
16   referring to rule 1.01 which I believe is referring to
17   while the Senate is in session, not the
18   Committee-of-the-Whole; is that correct?
19   A. Yes. I believe so.
20   Q. So for -- for rule 1.01 which allows him to name
21   members to temporarily the chair, would he ever
22   appoint somebody to be the chair for consideration of a
23   piece of legislation?
24   A. He could. He could.
25   Q. Have you seen that happen?

---

**40**

1    Q. Okay. Do you -- do you work on -- well, strike
2    that. Does the Lieutenant Governor create a legislative
3    agenda at the beginning of a legislative session?
4    A. Yes.
5    Q. Do you work on that?
6    A. As far as compiling the agenda?
7    Q. Well, in any way.
8    A. Yes.
9    Q. And what's your role?
10   A. The role of compiling an agenda would be working
11   with the Lieutenant Governor to determine what issues
12   need to be addressed during the session and making sure
13   that those issues -- that, you know, the process is
14   moving on each one of the issues on the list. Like
15   every session the budget has to pass, so it's obviously,
16   you know, for any Lieutenant Governor would be a
17   priority agenda item and then any other items that would
18   need to be addressed, yes.
19   Q. How many priorities does Lieutenant Governor
20   usually have in any given legislative session?
21   A. Well, every session is different.
22   Q. How many did he have in the 2011 legislative
23   session?
24   A. I don't -- I don't know. I mean --
25   Q. Did you work on a agenda -- a legislative agenda

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

41

1  for 2011?
2       A.  There was definitely a discussion of what items
3  needed to be passed.
4       Q.  Was a voter ID bill on his legislative
5  priority -- among his legislative priorities?
6       A.  Yes.
7       Q.  Did you work on a legislative agenda for the 2009
8  legislative session?
9       A.  No.
10      Q.  Are you aware if a voter ID bill was on his list
11  of legislative priorities for that legislative session?
12      A.  I'm not aware.
13      Q.  Do you assist with developing legislation?
14      A.  No, not really.
15      Q.  Not at all?
16      A.  Depends on what you mean by developing.  I don't
17  write legislation.  I think the more specific staff
18  would work on developing legislation.
19      Q.  Do you have any role in insuring that the
20  legislation that's created is -- fits with the
21  Lieutenant Governor's goal?
22      A.  Yes.
23      Q.  So do you oversee this process of a piece of
24  legislation getting drafted?
25      A.  No.

---

42

1       Q.  No.  How do you ensure that the legislation
2  that's created meets the Lieutenant Governor's goals?
3       A.  Usually the staff that works on it will brief him
4  on it and ask him if it meets his expectations.
5       Q.  And are you usually in on those meetings?
6       A.  If I can be, yes.
7       Q.  Do you interact with the Texas Legislative
8  Council at all?
9       A.  Some, but not a whole lot.  It's more of -- the
10  relationship is more directly between the analyst --
11  policy analyst and the drafter.
12      Q.  And are the policy analyst the people who are
13  working on the -- the policy analyst works for the
14  Lieutenant Governor, correct?
15      A.  Yes.
16      Q.  And the policy analysts are the people in the
17  Lieutenant Governor's office who would be involved in
18  the drafting of a bill?
19      A.  They would do the instructions.  The attorneys at
20  the legislative counsel would do the actual drafting.
21      Q.  And how involved is the Lieutenant Governor
22  himself in that process?
23      A.  Not very much.
24      Q.  Not very much in the process of the drafting of
25  the bill?

---

43

1       A.  Yeah.  I would say not at all.
2       Q.  And then do the policy analyst -- the policy
3  analyst would then meet with him to talk about the
4  drafts of the legislation that they are working on.  Is
5  that what you testified to?
6       A.  Yes.
7       Q.  Okay.  Do you play any role in deciding which
8  members of the Legislature will carry a bill?
9       A.  No.
10      Q.  If the Lieutenant Governor -- if the Lieutenant
11  Governor's policy analyst are working on a piece of
12  legislation, is it correct that the Lieutenant Governor
13  himself cannot introduce that legislation?
14      A.  That's correct.
15      Q.  So how do you -- how does the office ensure that
16  that legislation will actually get introduced?
17      A.  Normally a member brings the legislation forward
18  and -- it would -- you kind of move the process a little
19  bit backwards.  Because our policy analyst would
20  normally not go out and do all of the drafting or
21  working on a bill without a legislator involved just
22  because the point that you mentioned, Lieutenant
23  Governor can't introduce legislation.  So normally a
24  member would have a legislative idea and then they would
25  request a bill to be filed and then -- so our policy

---

44

1  analyst simply tract an follow members bills that have
2  been filed.  So our staff generally does not -- it's
3  more of the members and their staff's role to do the
4  requesting of drafts and the changes.
5       Q.  Does the Governor ever request legislation to be
6  introduced?
7       A.  The Governor -- the main way the Governor would
8  request it is through emergency call which he does at
9  the beginning of each session -- I guess he does it
10  every session.  He has the right to do it every session.
11      Q.  How often do you communicate with the Lieutenant
12  Governor?
13      A.  During a session or outside of session?
14      Q.  Let's start with during a session.
15      A.  Very -- very routinely.  I mean, our offices are
16  pretty close to each other.  And then when we're out of
17  session less frequently.  If he's travelling we talk on
18  the phone.  But -- but during session it's, you know,
19  it's like any job.  Your co-worker is right next door.
20  It just happens to be the Lieutenant Governor.
21      Q.  So during a session you would interact with him
22  daily?
23      A.  Yes.
24      Q.  And not during legislative session how often do
25  you interact with him?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 45

1   A. Still daily, but not so much during the day.
2   Q. Okay.  And how do you usually communicate with
3   the Lieutenant Governor?
4   A. Just talk to him.  Either on the phone -- during
5   session it's more in person.  Out of session, you know,
6   more phone than during session.
7   Q. Do you e-mail with Lieutenant Governor?
8   A. No.
9   Q. Not at all?
10  A. No.
11  Q. When you talked with him on the phone, do you use
12  personal cell phones or official work phones?
13  A. Personal.  Well, both.  I use my personal cell
14  phone or my work phone.  Either one.
15  Q. Do you text message with Lieutenant Governor?
16  A. Not very often.
17  Q. About what percentage of the Lieutenant
18  Governor's meetings are you involved in?
19  A. I don't know.  I guess, just a guess, probably
20  during session 70 -- 50 to 75 percent.  And out of
21  session 10 or 15 or 20 percent.
22  Q. And how about communications Lieutenant Governor
23  is involved in, are you usually copied on messages he
24  might have?  Do you have any sense of how many of those
25  you would be copied on?

## 46

1   A. Can you say that again?
2   Q. In terms of -- we were just talking about
3   meetings.  How about other communications the Lieutenant
4   Governor has, are you usually involved in other
5   communications of the Lieutenant Governor's?
6   A. Besides phone calls and in person, not really.
7   Q. While you've worked for the Lieutenant Governor
8   how many election related bills have you worked on?
9   A. I haven't directly handled any election bill.  I
10  mean, I worked on Senate bill 14.  There was -- I'm sure
11  other election bills that passed last session that I
12  wouldn't be able to tell you which ones -- without going
13  back and looking at it, I couldn't tell you how many or
14  what they were about.  But I wouldn't have directly done
15  the work on the bills, on any of them.
16  Q. Okay.  So how many election related bills have
17  you overseen?
18  A. I would have to go back and look.
19  Q. Do you recall any as you sit here today other
20  than Senate bill 14?
21  A. Not really.  I mean, I just haven't thought about
22  it since last session.
23  Q. Have you -- how about have you ever seen any
24  pieces of legislation related to immigration?
25  A. I believe the Senate has debated immigration

## 47

1   related legislation.
2   Q. And were you involved in those?
3   A. In the same role.  If it's a bill that someone
4   files and we have to refer it to a committee or if
5   there's questions about it.  But not on the drafting or
6   detail level.
7   Q. And what bills are those?
8   A. I guess the only one that I can think of off the
9   top of my head is the sanctuary cities bill from last
10  session which was on the Governor's emergency call.
11  Q. You had a similar role with regard to that
12  legislation as you did with regard to Senate bill 14?
13  A. Yes.
14  Q. Do you have any involvement with Lieutenant
15  Governor's current campaign?
16  A. Not an official role.
17  Q. Do you have an unofficial role?
18  A. If I'm called with a question about some -- some
19  legislative record that he's made I would do it.  I'm
20  not, you know, comp time or personal time.
21  Q. Do you have -- do you have communications with
22  his campaign staff?
23  A. Yes.
24  Q. Are those the people who would call you with
25  questions?

## 48

1   A. Yes.
2   Q. That you're referring to?  Have you raised any
3   money for the Lieutenant Governor's campaign?
4   A. No, not directly.  I mean, I've been to his
5   events that he's had here in Austin.
6   Q. So you've given money to Lieutenant Governor's
7   campaign?
8   A. I have not given money to him.  Don't tell him
9   that.
10  Q. Okay.
11  A. He probably knows.
12  Q. Mr. Brunson, are you familiar with Section 5 of
13  the Voting Rights Act?
14  A. Yes.  I mean, I know generically what it is.
15  Q. What's your understanding of the requirements of
16  Section 5?
17  A. What I believe -- what my understanding is not
18  being an attorney, is that it's a federal law that is
19  intended to keep State laws, I guess, uniform and fair.
20  Q. What sorts of laws does Section 5 apply to?
21  A. I know it's involved with like redistricting and
22  voting, with voting -- with voting laws.
23  Q. Does it apply to more than redistricting?
24  A. I think it would -- I would say it would -- if it
25  relates to voting, I think it's covered by Section 5.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 49

1      (Ms. Maria H. Rios joins deposition.)
2    Q.  (By Ms. Maranzano)  Prior to submitting a piece
3    of legislation for preclearance, are there any steps
4    that are taken by the Legislature to increase the chance
5    that that law will be precleared by the Department of
6    Justice?
7    A.  I don't know the answer to that.
8    Q.  Who would know the answer to that?
9    A.  One of our attorneys.
10   Q.  Do you know if the Lieutenant Governor takes any
11   steps to ensure a piece of legislative -- to increase
12   the chances that a piece of legislation will be
13   precleared?
14   A.  I don't know the answer to that, either.
15   Q.  And who would know that answer?
16   A.  Our attorneys.
17   Q.  Does the Lieutenant Governor receive any legal
18   advice about an election related change and whether or
19   not it meets the requirements of Section 5?
20   A.  I would -- I believe he would receive legal
21   advice on any bill, whether Section 5 or any other State
22   or federal law, he would obviously want to know if there
23   was some conflict.  So the answer is, I guess, yes.
24   Q.  He would receive legal advice from your general
25   counsel or someone else?

## 50

1    A.  Either general counsel or if there's a staff
2    attorney working on a piece of legislation.
3    Q.  And part of that advice is whether that statute
4    complies with federal laws?
5    A.  Federal, yes.
6    Q.  Are you aware of any communications involving the
7    Lieutenant Governor's office regarding Section 5 and
8    voter ID?
9    A.  No.
10   Q.  Are you aware of any communications involving the
11   Lieutenant Governor's office involving Section 5 and
12   Senate bill 14?
13   A.  No.
14   Q.  Are you familiar with a group called the American
15   legislative exchange counsel or ALEC?
16   A.  Yes.
17   Q.  What's that group?
18   A.  It's a national group that does conferences and
19   works -- I believe they have model legislation for
20   different issues.
21   Q.  Do you have any affiliation with that group?
22   A.  I've been to -- I believe I've been to one of
23   their meetings.  But I don't have like a membership or
24   any role with them.
25   Q.  But the meeting you attended, was voter ID

## 51

1    discussed at all?
2    A.  I don't believe so.
3    Q.  Does Mr. Dewhurst have any affiliation with ALEC?
4    A.  No.
5    Q.  Have you ever received any documents from ALEC
6    related to voter ID?
7    A.  Not that I'm aware of.
8    Q.  Are you familiar with a group called the National
9    Council of State Legislatures -- I'm sorry.  The
10   National Conference of State Legislators?
11   A.  Yes.
12   Q.  Have you ever been to any of their meetings?
13   A.  Yes.
14   Q.  Was voter ID discussed at any of the meetings
15   that you attended?
16   A.  Not that I recall.
17   Q.  Have you ever received any materials from them
18   about voter ID?
19   A.  Not that I recall.
20   Q.  And in relation to ALEC, have you ever received
21   any materials from ALEC related to voter ID?
22   A.  No.
23   Q.  Has Mr. Dewhurst ever been to any meetings held
24   by the National Conference of State Legislators?
25   A.  He helped host the meeting last summer in

## 52

1    San Antonio.
2    Q.  Were you also at that meeting?
3    A.  Yes.
4    Q.  Are you familiar with the group called the
5    Federation For American Immigration Reform?
6    A.  No.
7    Q.  So I assume you have never been to any of their
8    meetings?
9    A.  Not that I'm aware of.
10   Q.  Are there any other group whose meetings you've
11   attended where voter ID has been discussed?
12   A.  Not that I can think of.
13   Q.  Any groups that have provided you with written
14   materials on voter ID?
15   A.  Not that I can think of.
16   Q.  What's Texas's current system for determining the
17   identity of a voter at the polls?
18   A.  My -- what I -- my personal understanding is you
19   can either have your voter card that's issued by the
20   Secretary of the State or I just use my driver's license
21   when I vote because I can never find my voter card.
22   Q.  Do you know what forms of identification are
23   acceptable if a person doesn't have their voter
24   registration card with them?
25   A.  The only one I know of is the driver's license.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 53

1      MS. MARANZANO:  Can you mark this?
2      (Exhibit No. 132 was marked.)
3  BY MS. MARANZANO:
4      Q.  I'm showing you what we're marking as Deposition
5  Exhibit 132.  I'm going to represent to you that this is
6  a copy of the current Texas legislative code.  Do you
7  see that there's a list of identifications that -- do
8  you see that list of identifications?
9      A.  Yes.
10     Q.  Does that refresh your recollection at all as to
11 what forms of identification are acceptable under
12 current State statute?
13     A.  Yes.
14     Q.  And are there more than just a driver's license
15 listed there?
16     A.  Yes.
17     Q.  Are you aware of any problems that have existed
18 under the system?
19     MR. FREDERICK:  Objection; vague.  You can
20 answer.
21     A.  I haven't spent enough time working on the issue.
22 So the answer is no.
23     Q.  BY MS. MARANZANO:  Has this system failed to
24 prevent in person voter fraud?
25     A.  I don't have any way of knowing that.

---

### 54

1      Q.  Do you know of any voter fraud, in person voter
2  fraud that has occurred under this system?
3      A.  I don't.
4      Q.  Have you ever witnessed any voter fraud occurring
5  when you've gone to vote yourself?
6      A.  Who knows?  Not that I know of.
7      Q.  Are there any other problems that you're aware of
8  under the current system?
9      MR. FREDERICK:  Objection; vague.  You can
10 answer.
11     A.  No.
12     Q.  When did you first hear support for enacting a
13 photo identification requirement for voting Texas?
14     A.  I knew that they worked on the legislation in
15 '09.  I didn't follow it very closely.  And so '09,
16 2009.
17     Q.  And do you hear about this -- what were the
18 circumstances under which you heard about the voter ID?
19     A.  It was the budget provision that I told you about
20 earlier when they were working on the bill we put money
21 in the budget to do voter education.
22     Q.  What were the basis' for support for voter ID
23 when you first learned about it?
24     A.  I don't know.
25     Q.  So I believe you've testified, but I just want to

---

### 55

1  be clear that in 2005 you did not have any involvement
2  in any efforts to pass a photo identification law?
3      A.  Yes.  That's right.
4      Q.  And in 2007 you did not have any involvement in
5  efforts to pass a voter photo identification law?
6      A.  That's right.
7      Q.  Are you familiar with the Lieutenant Governor's
8  involvement in efforts to pass a photo voter
9  identification law in 2005?
10     A.  No.
11     Q.  Are you familiar with the Lieutenant Governor's
12 involvement in attempts to pass a photo voter
13 identification law in 2007?
14     A.  No.
15     Q.  Not at all?
16     A.  Not at all.
17     Q.  How are you doing?  Do you want to take a
18 5-minute break?
19     A.  I'm good.
20     Q.  You're good?  Okay.
21     THE WITNESS:  Unless you think I need one.
22     MR. FREDERICK:  No.  You're good.
23 BY MS. MARANZANO:
24     Q.  So in 2009 I believe you've testified that there
25 was a provision in the voter identification -- in a

---

### 56

1  voter identification bill that required certain amount
2  of funding for voter education?
3      A.  Yes.
4      Q.  Do you know if that bill was Senate bill 362?
5      A.  I don't know.
6      Q.  Would it refresh your recollection to look at the
7  bill?
8      A.  No.  It's whatever bill passed out of the Senate
9  in 2009 on the voter ID.
10     Q.  Do you know what happened to that bill?
11     A.  I believe it died in the House.
12     Q.  And at that time you were working as the budget
13 director in '09?
14     A.  Yes.
15     Q.  And in relation to this funding that was -- that
16 was requested for voter education, was that a part of
17 the language of the bill?
18     A.  I don't know.  I believe it was part of the -- I
19 believe it was the fiscal note.
20     Q.  And did you work at all on coming up with the
21 amount of money that would be required for that voter
22 education program?
23     A.  No.
24     Q.  So can you tell me everything that you did in
25 regard to the 2009 voter identification bill?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

57

1    A. I just received the -- I think the bill went
2    through the Senate Finance Committee -- or the request
3    for the money went through the Senate Finance Committee
4    and I don't know where the bill went.  But a
5    provision -- we were asked to put in a provision in the
6    budget that paid for whatever the fiscal note was for
7    that year in 2009.  But beyond that, I didn't do
8    anything else other than that provision that I can
9    recall.
10   Q. Did you have any role -- I think you've answered
11   this question, but just to be clear, did you have any
12   role in determining or did you have any role in giving
13   input to the Legislative Budget Board about how much
14   money would be necessary for that voter education
15   program?
16   A. No.
17   Q. And you had no other role in the 2009 voter
18   education bill?
19   A. No.
20   Q. When did you first have discussions about voter
21   identification bill in the 2011 legislative session for
22   the 2011 legislative session?
23   MR. FREDERICK:  Object to foundation, but
24   you can answer.
25   A. Sometime during the months leading up to the 2011

---

58

1    session.
2    Q. And what -- can you remind me, when did you say
3    you became the chief of staff?
4    A. September of 2009 after the -- several months
5    after the '09 session.
6    Q. And so in 2010, am I correct that there was no
7    legislative session?
8    A. That's right.  Yes.
9    Q. Did you discuss a voter identification bill at
10   all during the 2010-calendar year?
11   A. I'm sure it was discussed at some point, but I
12   don't recall any specific conversations.
13   Q. You don't recall any specific conversations in
14   November 2010 about voter ID legislative proposals?
15   A. That would have been in the months leading up to
16   that 2011 session.
17   Q. Do you recall whether there were multiple voter
18   identification proposals on the table in approximately
19   November of 2010?
20   A. Not that I'm aware of.  There could have been,
21   but I'm just not aware of it.
22   Q. So when we're talking about discussions about
23   voter identification legislation, are you referring to
24   Senate bill 14 or what became Senate bill 14?
25   A. Yes.

---

59

1    MS. MARANZANO:  Can you mark this?
2    (Exhibit No. 133 was marked.)
3    BY MS. MARANZANO:
4    Q. I'm going to show you what's marked as Deposition
5    Exhibit 133?  Oh, you know what?  We've introduced this
6    previously.  Well, let's just -- let's just keep going.
7    I'm sorry, Mr. Brunson I'm showing you what we're -- I'm
8    showing you what we're marking as Deposition
9    Exhibit 133.  Do you recognize this?
10   A. Looks like Senate bill 14.
11   Q. And can you turn to Page 9, Section 14 for me?
12   And does that comply with your understanding of the
13   forms of identification that are permitted under Senate
14   bill 14?
15   A. I'm not real familiar with the details of the
16   legislation.  But is this is final version of Senate
17   bill 14?
18   Q. Yes.  I will represent to you this is the signed
19   version.  And if you'll look at the last page, you can
20   see that this has the signatures of various people
21   including the Governor.  So in terms of section 14, is
22   it your testimony that you're not aware of whether those
23   are the forms of required identification under Senate
24   bill 14?
25   A. Well, I mean, I can definitely -- since this is

---

60

1    the final bill, I would say yes these are the final.
2    Q. And when you said you're not too familiar with
3    the details, why are you not familiar with the details
4    of that portion of the bill?
5    A. Because I did not work directly on the drafting
6    and the policy of the legislation.
7    Q. Who would be familiar with the details of Senate
8    bill 14?
9    A. Either Brian Hebert or Julia Rathgeber.
10   Q. Would the Lieutenant Governor?
11   A. Yeah.  I'm sure he would be aware of -- generally
12   of what's the final outcome was.
13   Q. Are you familiar with section 16 of the bill
14   which is on Page 11?  Do you see that that portion of
15   the bill increases the criminal penalties for a person
16   who impersonates a voter?
17   A. Yes, I see that's what it does.
18   Q. Did you -- are you familiar with that portion of
19   the bill?
20   A. No.
21   Q. And would the same people be familiar with that
22   portion?
23   A. Yes.  Yes.
24   Q. Mr. Brunson, I'm going to represent to you -- I'm
25   sure your counsel won't disagree with me that you've



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 61

1  been listed on the State of Texas interrogatory's
2  responses as somebody who was involved in the
3  development of Senate bill 14.  Can you tell me each way
4  that you were involved in the development of this piece
5  of legislation?
6        MR. FREDERICK:  I'll object only to the
7  extent that it may not represent the entire statement of
8  his involvement.  I don't disagree necessarily.  But I
9  want the record to reflect that we're not actually
10  looking at the response.
11        MS. MARANZANO:  Okay.
12        THE WITNESS:  But I have no specific reason
13  to disagree that that's what I says.
14        MS. MARANZANO:  Okay.
15     A.  So the question is.
16     Q.  BY MS. MARANZANO:  Can you list for me each and
17  every way that you were involved in the development of
18  Senate bill 14?
19     A.  I guess if you look at it at several different
20  levels of development.  Well, the policy analyst was
21  doing the actual -- the person that worked on this I
22  believe had worked on it the prior session where they
23  had had, you know, 24 hours or something of public
24  testimony.  And I assume multiple drafts.  So the person
25  that was working on it was intimately familiar with the

## 62

1  policy and what was going on and was a very good
2  independent staffer.  So I didn't have a whole lot of
3  reason to learn the details of the bill.  And when you
4  think about the levels, I was more just making sure that
5  the pieces of legislation that needed to move forward
6  moved forward, not necessarily the details.
7     Q.  Who was the policy analyst who worked on Senate
8  bill 14?
9     A.  Brian Hebert.
10     Q.  And did he report to you?
11     A.  Yes.  He reported directly to Julia and then
12  especially on this issue since she had worked on it in
13  2009 as well.
14     Q.  Do you have any knowledge of, I believe you
15  said -- well, do you have any knowledge of the sources
16  of the development of SB 14, the sources of the language
17  of SB 14?
18     A.  I don't.
19     Q.  Other than Brian Hebert and Julia Rathgeber, are
20  there other individuals in your office who worked on the
21  development of Senate bill 14?
22     A.  The only one that would have had any role would
23  be Frank Battle, our general counsel.  But I think he
24  primarily relied on Brian Hebert, as well.
25     Q.  Did you have any communications about the

## 63

1  development or drafting of Senate bill 14?
2     A.  I'm sure just in the general course of the bill
3  moving through the legislative process, yes.
4     Q.  Do you recall any specific communications?
5     A.  No, not any specific.  I mean Brian was -- Brian
6  would try to keep us updated of what was going on.  But
7  we kind of let him work on the details.
8     Q.  Did you have any communication with legislatures
9  about the development of SB 14?
10     A.  Yes.
11     Q.  With who?
12     A.  Senator Fraser, the bill sponsor or author.  I
13  think he's the author.  And maybe other ones, but not
14  that I recall specifically.
15     Q.  Did you have communications with legislative
16  staff about the development of Senate bill 14?
17     A.  I'm sure I did.  But I don't -- I mean, I don't
18  recall specific instance.
19     Q.  Did you have communications with the Governor's
20  office about the development of Senate bill 14?
21     A.  Maybe at a very high level of -- if you put it on
22  the emergency call and were working on it.
23     Q.  What do you mean by a "very high level."
24     A.  Not any details.
25     Q.  Got it.  Who would that communication have been

## 64

1  with?
2     A.  Probably the Governor's chief of staff.
3     Q.  And who is that person?
4     A.  Ray -- it was Ray Sullivan.
5     Q.  Did you have communications with any local
6  elected officials about the development of Senate bill
7  14?
8     A.  I don't think so, no.
9     Q.  Did you have communications with any constituents
10  about Senate bill -- the development of Senate bill 14?
11     A.  No, not me personally.
12     Q.  Did the Governor's office contact your office to
13  ask for updates on the progress of Senate bill 14?
14     A.  I'm sure they -- I don't know.  Specifically I
15  don't -- I would say probably yes, as they do with any
16  other things.  But most of it happens in public and once
17  they put it on the call we worked on it.  If they called
18  and asked what was going on, we normally would tell
19  them.
20     Q.  Did anyone from Lieutenant Governor's office
21  request that Senate bill 14 be put on the emergency
22  call?
23     A.  We might have said this is an issue that was in
24  '09 and we need to work on it.  I don't think there was
25  any official request.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Blaine Brunson                                          May 30, 2012

---

65

1    Q. And who would that conversation have taken place
2    with?
3    A. Probably -- it would have been me.
4    Q. It would have been you. And it would have been
5    Mr. Sullivan or somebody else from the Governor's
6    office?
7    A. Ray, yeah, Ray Sullivan.
8    Q. It would have been you, but do you --
9    A. I don't recall a specific conversation. But I
10   would have -- I would have said this is an -- this is an
11   issue that we know is going to have to be worked on in
12   the 2011 session and I would have -- I would have asked
13   him to put it on there.
14   Q. And what -- what would be the reasons for putting
15   it on the emergency call?
16       MR. FREDERICK: I'm going to object on the
17   basis of privilege to the extent this calls for your
18   thought process or the Lieutenant Governor's thought
19   process about impending bill and instruct you not to
20   answer.
21   BY MS. MARANZANO:
22   Q. Are you following your counsel's instruction?
23   A. Yes.
24   Q. I believe you testified that this was
25   something -- if you had made the request it is because

---

66

1    this is something that would have to be worked on in the
2    2011 legislative session?
3    A. Yes.
4    Q. Why is that?
5        MR. FREDERICK: Object as vague, also object
6    to the extent it calls for your thought process or the
7    Lieutenant Governor's thought process about pending
8    legislation. I think, as phrased, I have to instruct
9    you to answer the question on the basis of
10   privilege.
11   BY MS. MARANZANO:
12   Q. Let me try another way and see if it works. I'm
13   trying to understand what you meant by this would have
14   to be worked on in the 2011 session. Why did this bill
15   have to be worked on? What was the -- well, what do you
16   mean by that statement?
17       MR. FREDERICK: Let me just make the same
18   cautionary objection. If you can answer the question
19   generally without revealing a privileged communication
20   between the Lieutenant Governor's office and any
21   legislator or the Lieutenant Governor or his staff's
22   thought process about the specific bill, you may answer.
23   If you would have to reveal that, I would instruct you
24   not to answer.
25   A. I think that -- maybe I used a poor choice of

---

67

1    words when I said have to. My point was it had not
2    passed in '09 and given the amount of public testimony
3    that had been -- that had been taken during the '09
4    session it was just a safe assumption that it was going
5    to come up again in 2011. Probably the words have to --
6    were probably a bad choice of words.
7    Q. When you say it was the safe assumption that it
8    was going to come up in 2011, was the Lieutenant
9    Governor working to make sure it would come up in 2011?
10       MR. FREDERICK: I'm going to object on the
11   basis of privilege and instruct you not to answer.
12   BY MS. MARANZANO:
13   Q. In terms of the 2009 consideration of voter
14   identification, are you familiar with the testimony that
15   occurred around that bill?
16   A. I just know that it was 2009. I remember that
17   night because they all stayed up there working on it and
18   I got to go home that time.
19   Q. Well, in regards to the testimony, am I
20   understanding you correctly that it was the significant
21   interest in the bill was one of the things that led you
22   to think this issue would come up again in the 2011
23   legislative session?
24   A. Yes.
25   Q. And was that significant interest both support

---

68

1    and opposition for the bill?
2    A. There was definitely support and opposition for
3    the bill.
4    Q. Who were the main supporters of the bill?
5        MR. FREDERICK: I will just object and -- on
6    the basis of privilege and just caution you -- I think
7    the question as phrased does not seek the substance of
8    any confidential privileged communication. So I just
9    caution you not to reveal the substance of any
10   communication with the Legislature.
11   A. I think, generically, it was a very party line
12   issue. Republicans supported it and the Democrats did
13   not.
14   Q. Were there other people testifying about the bill
15   other than legislators during the consideration of the
16   voter identification bill in 2009?
17   A. I don't know. I think the answer is yes.
18   Q. Do you know if any group supporting -- I'm sorry.
19   Do you know if any groups representing minority voters
20   were in support of the voter identification bill in
21   2009?
22       MR. FREDERICK: Objection; vague.
23   Objection; relevance. But you can answer.
24   A. I don't know.
25   Q. BY MS. MARANZANO: Why was this a party -- a very

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 69

1  party line issue?
2          MR. FREDERICK:  I would object on the basis
3  of privilege to the extent this asks for a thought
4  process or mental impression of yourself, the Lieutenant
5  Governor or a legislator or any privileged
6  communications about the bill, if you can answer
7  generally, you may do so.
8      A.  Generally any news story that you looked at
9  clearly showed that it was a party line issue.
10     Q.  BY MS. MARANZANO:  Do you know if any of the
11  minority members of the Senate were supporting the voter
12  identification bill in 2009?
13     A.  I don't know.
14     Q.  Do you know if any supported the voter
15  identification bill in Senate bill 14 in 2011?
16          MR. FREDERICK:  Objection; vague.
17  Objection; relevance.  You can answer.
18     A.  I don't think so.  Did you say on the Senate
19  side?
20     Q.  BY MS. MARANZANO:  I did say on the Senate side?
21     A.  I don't think so.
22     Q.  Did it concern the Lieutenant Governor that no
23  minority members of the Senate were supporting Senate
24  bill 14?
25          MR. FREDERICK:  Objection; legislative

## 70

1  privilege.  Instruct you not to answer.
2  BY MS. MARANZANO:
3      Q.  For the record, you're following your counsel's
4  instruction?
5      A.  Yes.
6      Q.  How many Senate Republicans are minority members
7  or members of a racial or ethnic minorities?
8          MR. FREDERICK:  Objection; relevance.  But
9  you may answer.
10     A.  None.
11     Q.  In regards to the drafting of Senate bill 14, was
12  the Lieutenant Governor himself involved in the drafting
13  of this bill?
14     A.  No.
15     Q.  Did you or anyone from your office exchange
16  drafts of Senate bill 14 with anybody?
17     A.  The staff would have exchanged it with Senator
18  Fraser or the Legislative Council.
19     Q.  Did the Lieutenant Governor mark out any drafts
20  of Senate bill 14?
21     A.  Not that I'm aware of.
22     Q.  If he'd done that, do you think you would be
23  aware?
24     A.  Maybe.  But not every time.
25     Q.  Would anybody -- who would know the answer to

## 71

1  that question?
2      A.  Brian Hebert.
3      Q.  And would the Lieutenant Governor know?
4      A.  I'm sure if he marked something up, I'm sure.
5      Q.  Were any additional forms of identification
6  considered to be added to Senate bill 14?
7          MR. FREDERICK:  Objection; legislative
8  privilege.  Instruct you not to answer.
9  BY MS. MARANZANO:
10     Q.  Did the Lieutenant Governor or anyone in your
11  office conduct any analysis as to how many registered
12  voters possessed the forms of identification required in
13  Senate bill 14?
14          MR. FREDERICK:  Object on the basis of
15  privilege and instruct you not to answer.
16  BY MS. MARANZANO:
17     Q.  Are you familiar with the concept of a Spanish
18  surname voter analysis?
19     A.  No.
20     Q.  You never heard of that?
21     A.  No.
22     Q.  What was the purpose of Senate bill 14?
23     A.  My personal opinion of the purpose was to make
24  sure that a person was, via a photo ID, who they say
25  they were when they went to vote in person.

## 72

1      Q.  Any other purposes?
2      A.  Not that I'm aware of.
3      Q.  And how does Senate bill 14 ensure that the
4  person is who they say they are when they go to vote?
5          MR. FREDERICK:  Object on the basis of
6  privilege only to the extent that this seeks your
7  thought process, the Lieutenant Governor's thought
8  process about this bill or any legislators understanding
9  that has been communicated to you to the extent that you
10  have a general understanding not based on privilege.
11  You can answer if you can.
12     A.  I don't think I would have anything to add that
13  wasn't privileged.
14     Q.  BY MS. MARANZANO:  Okay.  Would forms of
15  identification that are not listed in Senate bill 14
16  also ensure that a person is who they say they are at
17  the polls?
18          MR. FREDERICK:  Object.  Calls for
19  speculation.  Also object on the basis of privilege to
20  the extent it calls for any thought process, mental
21  impressions or communications.  If you can answer
22  without revealing any privileged matters, you can do so.
23     A.  I don't know.  I don't know what other forms
24  would fit that bill.
25     Q.  BY MS. MARANZANO:  You don't know what other



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 73

1  forms of identification might verify that a person is
2  who they say they are?
3      A.  No.
4      Q.  Were there any specific problems with a person
5  voting not as the person that -- were there any specific
6  problems with in person voter impersonation that Senate
7  bill 14 was attempting to address?
8          MR. FREDERICK:  I'll object on the basis of
9  privilege.  To the extent this would call for thought
10  process, mental impressions of yourself, the Lieutenant
11  Governor or his staff or any communications by a
12  legislator other than on the floor or in a debate.  If
13  you can answer without revealing those matters, you can
14  do so.
15      A.  I don't have any personal history with it as far
16  as knowing about it.  And there was testimony, I
17  believe, on the floor that -- other than following
18  debate, you know, the entire debate.  But I know there
19  was some discussion examples of voter fraud.  But I
20  couldn't tell you myself what they were.
21      Q.  By MS. MARANZANO:  So are you -- are you aware of
22  whether those examples of voter fraud were convictions
23  of voter fraud?
24      A.  I don't know.
25      Q.  Do you know anything more about those examples of

## 74

1  voter fraud than what you've already testified to?
2      A.  No.
3      Q.  Is there any other type of voter fraud other than
4  in person voter impersonation that SB 14 would solve?
5      A.  I don't know.
6      Q.  You have no opinion on that?
7      A.  No.
8      Q.  Are you aware of any incidents of in person voter
9  fraud in the State of Texas in the last 20 years?
10          MR. FREDERICK:  I'll object on the basis of
11  privilege only to the extent that this would call for
12  something that was communicated to you in confidence by
13  a legislator or with the Lieutenant Governor or his
14  staff, but if you can answer without revealing that, you
15  may do so.
16      A.  I don't know.  The testimony that happened during
17  the debate would have to stand on its own.  And I didn't
18  follow it closely.
19      Q.  BY MS. MARANZANO:  Do you believe it would be a
20  sufficient deterrent to voter fraud to increase criminal
21  penalties for committing voter fraud?
22          MR. FREDERICK:  I'll object on the basis of
23  relevance.  To the extent it seeks his personal opinion
24  and to the extent it seeks the thought process of the
25  Lieutenant Governor or his staff about SB 14

## 75

1  specifically, I instruct you not to answer on the basis
2  of privilege.
3  BY MS. MARANZANO:
4      Q.  And you're following your counsel's instruction?
5      A.  Yes.
6          (Exhibit No. 115 was marked)
7      Q.  (By Ms. Maranzano)  This has been previously
8  marked.  I'm going to show you what we previously marked
9  as Deposition Exhibit 115.  Can you take a look at that?
10  Does this look familiar to you?
11      A.  Sort of.  I think I've seen it before.  But I
12  don't -- I don't know who produced this.
13      Q.  Do you -- do you believe this came from your
14  office?
15      A.  I don't -- I don't know.
16      Q.  You don't know if you've seen it in the context
17  of your --
18      A.  I don't know if my office produce it.
19      Q.  Okay.  But when you said you've seen it before,
20  would you have seen it in your capacity as chief of
21  staff for the Lieutenant Governor?
22      A.  Yes.  It looks familiar, but I don't remember
23  exactly where I've seen it.
24      Q.  So do you know who wrote this?
25      A.  No.

## 76

1      Q.  Do you know what it was written for?
2      A.  It was just talking -- or talking points for,
3  looks like for the voter ID bill.
4      Q.  And what would be the purpose of these talking
5  points for the voter ID bill?
6      A.  I don't -- I don't know.  You know --
7      Q.  Oh, I'm sorry.
8      A.  I don't know.  Whose document is this?
9      Q.  Well, this document -- I will represent to you
10  that this document was produced as a document from the
11  Lieutenant Governor's office.
12      A.  Okay.  Okay.
13      Q.  So are talking points created for the Lieutenant
14  Governor on pieces of legislation?
15      A.  Yes.
16      Q.  Could this -- would this be talking points for
17  the Lieutenant Governor?
18      A.  It could have been if we produced it.
19      Q.  And who would have written this?
20      A.  Probably Brian Hebert.
21      Q.  And do you see up at the top where it says AD2R?
22      A.  Yes.
23      Q.  Do you -- do you think that refers to legislation
24  session?
25      A.  Yes.  Probably.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Blaine Brunson                                                    May 30, 2012

---

### 77

1      Q.  So this is most likely was about Senate bill 14;
2    is that correct?
3      A.  Yes.
4      Q.  And do you see on the top right-hand corner there
5    is a number written?
6      A.  Yes.
7      Q.  Do you know what that is?
8      A.  This one?
9      Q.  Yeah.  Not the exhibit number.  But that
10   handwritten number?
11     A.  No.
12     Q.  Is that -- is that a reference to the Texas code?
13     A.  I'm not sure.
14     Q.  You're not sure?
15     A.  No.  Looks like a coding -- some kind of coding.
16     Q.  Can you look at what's listed as Roman Numeral 1,
17   the threat of fraud is real, and I would like to direct
18   your attention to the first bullet there?
19     A.  Yeah.
20     Q.  Can you tell me, apart from Senate bill 14, what
21   efforts is Texas making to ensure that it's voter
22   registration rules are accurate?
23     A.  I'm not advised.
24     Q.  You don't know?
25     A.  No.

### 78

1      Q.  Are you familiar with a federal law called the
2    National Voter Registration Act?
3      A.  No.
4      Q.  Not at all?
5      A.  Not at all.
6      Q.  Can you look at the third bullet in that same
7    talking point?
8      A.  Yes.
9      Q.  And it says, "Texas election administration
10   management system is improving, but continues to have
11   accuracy problems"?
12     A.  Okay.
13     Q.  Can you tell me how Senate bill 14 would impact
14   the accuracy level of the Texas election administration
15   management system?
16         MR. FREDERICK:  Just object to the extent
17   this would require you to reveal any privileged
18   communications or matters.  But to the extent you can
19   answer it without getting into that, you can.
20     A.  I don't -- I don't know.
21     Q.  Okay.
22     A.  I don't know what that system is.
23     Q.  Okay.  Was any part of the purpose of Senate bill
24   14 to decrease the number of Hispanic voters?
25     A.  No.

### 79

1      Q.  What's your basis for saying that?
2      A.  It's never -- that never came up.
3      Q.  Okay.  Never came up in what?
4      A.  As far as why people were working on the bill.
5      Q.  And you're basing that on your conversations with
6    who?
7      A.  Well, I guess with members as the process moved
8    along.
9      Q.  And can you tell me specifically what members
10   you're referring to?
11         MR. FREDERICK:  Object on the basis of
12   misstates -- it mischaracterizes the prior testimony.  I
13   want to let him answer the question.  I'm not sure I
14   quite understand what the question is getting at.
15   BY MS. MARANZANO:
16     Q.  Okay.  Let's back up.  I asked you whether any
17   purpose of the -- whether any part of the purpose of
18   Senate bill 14 was to decrease the number of Hispanic
19   voters and you said no?
20     A.  No.  Right.
21     Q.  And when I asked you your basis, you said that
22   was not what anybody working on the bill, that never
23   came up from anybody working on the bill?  Is that --
24     A.  Right.
25     Q.  So I just want to know who specifically you're

### 80

1    talking about?
2          MR. FREDERICK:  I'll object as vague to the
3    extent that it seems to be asking who didn't say
4    something.  I'll object on the basis of privilege to the
5    extent it asks Mr. Brunson to reveal the content of a
6    specific conversation with a member.  I think on that
7    basis, I would instruct you not to answer.
8    BY MS. MARANZANO:
9      Q.  And you're following your counsel's instruction?
10     A.  Yes.
11     Q.  Was any part of the purpose of SB 14 to decrease
12   the number of minority voters?
13         MR. FREDERICK:  I'm going to object on the
14   basis of legislative privilege.  You may answer based on
15   your own knowledge, but don't reveal -- I'll caution
16   you, based on privilege, not to reveal the content of
17   any communication with legislator or Lieutenant
18   Governor.
19     A.  Not that I'm aware of.
20     Q.  BY MS. MARANZANO:  And what's your basis for
21   saying that?
22         MR. FREDERICK:  Same instruction.
23   BY MS. MARANZANO:
24     Q.  Was any part of the purpose of Senate bill 14 to
25   deter non-citizens from voting?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 81

1    A. Not that I'm aware of.

2    Q. And what's your basis for saying that?

3         MR. FREDERICK: Just a cautionary objection

4    on the basis of privilege not to reveal the content of

5    any privileged communication. But you may answer if you

6    can do so.

7    A. I just never heard it discussed.

8    Q. BY MS. MARANZANO: Was any part of the purpose

9    for Senate bill 14 for partisan purposes?

10   A. It was divided on party lines. But I'm not --

11   the law would apply equally to Democrats and

12   Republicans.

13   Q. Was any part of the purpose of Senate bill 14 to

14   depress the turn out of Democratic voters?

15   A. Not that I'm aware of.

16   Q. What's your basis for saying that?

17        MR. FREDERICK: Same cautionary objection

18   not to reveal any privileged communications, but you may

19   answer if you can do so without revealing.

20   A. It's the same answer as the others. It just

21   never was discussed as a reason for working on the bill.

22   Q. BY MS. MARANZANO: Do you think if that was a

23   reason it would be discussed?

24        MR. FREDERICK: Objection; relevance.

25   Objection; calls for speculation.

## 82

1    A. Could you repeat it?

2    Q. BY MS. MARANZANO: If -- if said motivation was

3    for partisan purposes, would that actually come up in

4    discussions?

5         MR. FREDERICK: Same objection, but you can

6    answer.

7    A. I would assume it would.

8    Q. BY MS. MARANZANO: Was any part of the purpose of

9    Senate bill 14 to discriminate in any way against any

10   group or groups of minority voters?

11   A. No, not that I'm aware of.

12   Q. And what's your basis for saying that?

13   A. It was never discussed.

14   Q. And do you think that would be discussed if that

15   was part of the purpose of Senate bill 14?

16        MR. FREDERICK: Objection; relevance and

17   calls for speculation. You can answer.

18   A. I would assume so.

19   Q. BY MS. MARANZANO: Have you ever heard that come

20   up as a purpose for any legislation you've worked on in

21   any of your discussions while serving as a staffer for

22   the Lieutenant Governor?

23   A. No.

24        MR. FREDERICK: Jennifer, when you get to a

25   good stopping point can we take a quick break?

## 83

1         MS. MARANZANO: Yeah. Why don't we take a

2    quick break now, 5 minutes.

3         THE WITNESS: Sounds good.

4         (Brief recess.)

5    BY MS. MARANZANO:

6    Q. Let's go back on the record. Mr. Brunson, before

7    the break we were talking about the purposes of SB 14.

8    Does a bill ever have unspoken but understood purposes?

9         MR. FREDERICK: Objection; vague. You can

10   answer.

11   A. Not that I'm aware of.

12   Q. BY MS. MARANZANO: You don't know of any instance

13   where -- where that would be your understanding of the

14   purpose of a bill?

15   A. None that I can think of.

16        (Exhibit No. 112 was marked.)

17   Q. (By Ms. Maranzano) I'm going to show you what

18   we've previously marked as Deposition Exhibit 112. Does

19   this look familiar to you? Does it look like it could

20   be from the Lieutenant Governor's campaign website?

21   A. Yes.

22   Q. Can you look at what is the third page, but since

23   it's back to back it appears on the second page under

24   the topic that says strongly opposes illegal

25   immigration? Do you see the first item under that says

## 84

1    Dewhurst pushed for voter ID in two sessions?

2    A. Yes.

3    Q. What does voter identification have to do with

4    opposing illegal immigration?

5         MR. FREDERICK: I'll object on the basis of

6    privilege only to the extent this would call for

7    privileged communications or the Lieutenant Governor's

8    thought process about a specific bill. If you can

9    answer without doing that, you can do so.

10   A. I don't know why the campaign would lay it out

11   like this.

12   Q. BY MS. MARANZANO: Do you see any connection

13   between the voter ID bills and opposing illegal

14   immigration?

15        MR. FREDERICK: Objection; relevance, but

16   you can answer.

17   A. I haven't thought about it. And I don't really

18   have an opinion on it.

19   Q. BY MS. MARANZANO: Are non-citizens able to

20   obtain the forms of identification required by Senate

21   14?

22   A. I don't know.

23   Q. Are non-citizens able to obtain a Texas driver's

24   license?

25   A. I don't know the answer to that.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

85

1    Q. Are non-citizens able to obtain a military
2  identification card?
3    A. I don't know the answer to that, either.
4    Q. Are non-citizens able to obtain a concealed
5  handgun license?
6    A. I don't know the answer.
7    Q. Are you familiar with a federal law called the
8  Help America Vote Act?
9    A. Yes.
10    Q. Do you know what that act requires?
11    A. I don't.
12    Q. Do you know if pursuant to that act certain voter
13  registration applications are verified against other
14  State databases?
15    A. I don't.
16        THE WITNESS: Other State what?
17        MS. MARANZANO: Databases.
18  BY MS. MARANZANO:
19    Q. Are you aware of whether a voter registration
20  applicant needs to swear on their -- or sign under oath
21  on their voter registration application that they are a
22  United States citizen?
23    A. I don't know.
24        (Exhibit No. 119 was marked)
25    Q. (By Ms. Maranzano) I'm going to show you what we

---

86

1  previously marked as Deposition Exhibit 119. Does this
2  look familiar to you?
3        MR. FREDERICK: No wonder it was hot. We
4  pushed it all the way up and it's supposed to be all the
5  way down. Go team.
6  BY MS. MARANZANO:
7    Q. Does this document look familiar to you?
8    A. It looks very similar to the earlier document.
9    Q. Is this something that you've seen before? Oh,
10  it's because I -- I think I may have given you the wrong
11  one. Sorry. Let me get my -- let me get my exhibits
12  organized in a second. All right. Sorry about that.
13  Do you know if previous versions of voter identification
14  bills allowed for a voter to show one form of photo
15  identification or two forms of non-photo identification?
16    A. I don't know.
17    Q. Is it your opinion that two forms of non-photo
18  identification would verify the identify of a voter?
19        MR. FREDERICK: Objection; relevance, but
20  you may answer.
21    A. I don't have an -- I don't have an opinion on
22  that.
23    Q. BY MS. MARANZANO: Do you know what steps are
24  necessary to take to acquire a United States passport?
25    A. I don't.

---

87

1    Q. Do you know how much it costs to acquire a United
2  States passport?
3    A. I do not.
4    Q. What is a military identification card?
5    A. A card that someone in the military has. An ID
6  the card for military personnel.
7    Q. How many forms of military identification cards
8  are there?
9    A. I have no idea.
10    Q. Have you ever seen a military identification
11  card?
12    A. Yes.
13    Q. In what context?
14    A. A friend that had one.
15    Q. Okay. And what branch of the military was that?
16    A. Air Force.
17    Q. Do you know if every branch of the military
18  issues an identification card?
19    A. I don't know.
20    Q. Is a veteran's identification an acceptable form
21  of identification under SB 14?
22    A. I don't know.
23    Q. Who would know that?
24    A. Probably Brian Hebert.
25    Q. Do you know what steps are required to obtain a

---

88

1  citizen -- citizenship certificate?
2    A. I do not.
3    Q. Are you familiar with the portion of SB 14 that
4  allows for a form of identification called the election
5  identification certificate?
6    A. No.
7    Q. You're not familiar with that at all?
8    A. Not at all.
9    Q. Are you familiar with the provisions of Senate
10  bill 14 that deal with provisional ballots?
11    A. No.
12    Q. Who would be familiar with those two provisions
13  of SB 14 from the Lieutenant Governor's office?
14    A. Brian Hebert or maybe Julia, but for sure Brian.
15    Q. I believe you testified earlier that SB 14 was
16  placed on the Governor's emergency call list; is that
17  correct?
18    A. Yes.
19    Q. Do you think that it was an emergency to consider
20  this bill?
21        MR. FREDERICK: Objection; relevance. You
22  may answer.
23    A. It wasn't -- wasn't my call to make.
24    Q. BY MS. MARANZANO: I believe you testified
25  earlier that you may have actually asked for it to be

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

89

1   given that designation; isn't that correct?
2           MR. FREDERICK:  Objection; mischaracterizes
3   testimony.  You may answer.
4       A.  I said I would have.  I wouldn't put it past to
5   ask for it just because of the timing.  You can work on
6   emergency legislation in the first 60 days of the
7   session.
8       Q.  BY MS. MARANZANO:  Were there any elections
9   occurring within the first 60 days of the session?
10      A.  There may have been a Dallas Mayoral election.
11      Q.  A local election?
12      A.  I think so.  I don't -- there weren't any -- I
13  don't believe there were any statewide elections.  There
14  were not any statewide elections.
15      Q.  Was there an effort to -- on the part of the
16  Lieutenant Governor to move this bill very quickly
17  through Legislature?
18          MR. FREDERICK:  I'll object based on
19  privilege.  To the extent this would called for the
20  Lieutenant Governor's thought process or mental
21  impressions or communications that you had with him or
22  he had with other legislators.  If you can answer the
23  specific question without getting into privileged
24  matters, you may do so.
25          THE WITNESS:  Do you mind repeating the

---

90

1   question?
2           THE REPORTER:  Sure.
3           THE WITNESS:  Sorry.
4           THE REPORTER:  No problem.
5           (Requested question was read.)
6           MR. FREDERICK:  Same instruction and
7   objection.
8       A.  I guess the fact of the matter is it moved
9   earlier in the session, but that's because it was on the
10  emergency call.
11      Q.  BY MS. MARANZANO:  But I guess my question is, is
12  somewhat the reverse of that.  Was it placed on the
13  emergency call so that it could be moved very quickly
14  through the session?
15          MR. FREDERICK:  Objection.  To the extent
16  this calls for Lieutenant Governor's thought process or
17  that of his staff or any communications you had with him
18  about SB 14, I would instruct you not to answer.  If you
19  can answer based on non-privileged matters, you may do
20  so.
21      A.  I think it is based on his thought process.  So I
22  wouldn't -- I think I can't answer that question.
23      Q.  BY MS. MARANZANO:  Okay.
24          MS. MARANZANO:  Can we mark this.
25          (Exhibit No. 134 was marked.)

---

91

1   BY MS. MARANZANO:
2       Q.  I'm showing you what we're marking as Deposition
3   Exhibit 134.  Do you recognize this document?
4       A.  Yes.
5       Q.  What is it?
6       A.  It's a letter from the Lieutenant Governor to
7   Senator Birdwell.
8       Q.  And who would have drafted this letter?
9       A.  Probably Brian Hebert.
10      Q.  Do you know why it was being sent to Senator
11  Birdwell?
12          MR. FREDERICK:  Objection to the extent it
13  calls for the Lieutenant Governor's thought process or
14  any privileged communications, I would instruct you not
15  to answer.  However, if you can answer based on
16  non-privileged matters, you may do so.
17      A.  I'm going to follow his advice.
18      Q.  BY MS. MARANZANO:  Okay.  Do you know if a letter
19  like this would be distributed to all members of the
20  Senate?
21      A.  I believe it was.
22      Q.  And do you see in the first sentence it says, "on
23  Monday January 24th, it's my intent to recognize Senator
24  Robert Duncan for a motion of resolving the Senate into
25  a Committee-of-the-Whole to consider Senate bill 14"?

---

92

1   Is your recollection that that is indeed what happened
2   on January 24, 2011?
3       A.  I don't recall the exact date.  But I think it
4   did.
5       Q.  Did the Senate resolve into the
6   Committee-of-the-Whole when it considered Senate bill
7   14?
8       A.  Yes.
9       Q.  Why was Senator Duncan recognized for the purpose
10  of bringing that motion?
11          MR. FREDERICK:  Objection; legislative
12  privilege.  I would instruct you not to answer unless
13  you can do so without revealing the Lieutenant
14  Governor's thought process or any privileged
15  communications.
16      A.  I can't.
17      Q.  BY MS. MARANZANO:  Was Senate bill 14 considered
18  in any other committees other than the
19  Committee-of-the-Whole?
20      A.  Not that -- not that I'm aware of.
21      Q.  Is that common for a bill to only be considered
22  by the Committee-of-the-Whole?
23      A.  It's not common, but the Committee-of-the-Whole
24  serves as a traditional committee when it's formed and
25  so the only difference is all the members are there to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Blaine Brunson                                                      May 30, 2012

---

93

1    enter testimony at the same time.
2         Q.  Does it also mean that the Lieutenant Governor
3    has a different role in the proceedings?
4         A.  He does have a different role in the proceedings.
5         Q.  And what is that role during the
6    Committee-of-the-Whole?
7         A.  As we discussed earlier in the rules, he can
8    participate in the debate and vote.
9         Q.  And if a bill was referred to a different
10   Committee, would he have any role in those proceedings?
11        A.  No direct role.
12        Q.  Would he have an indirect role?
13        A.  Just referring which bill the Committee went to
14   and -- no.
15        Q.  Was Senate bill 14 referred to the
16   Committee-of-the-Whole so the Lieutenant Governor could
17   debate and vote on it?
18            MR. FREDERICK:  Objection.  Calls for
19   legislative privilege.  Instruct you not the answer.
20   BY MS. MARANZANO:
21        Q.  Was Senate bill 14 referred to the
22   Committee-of-the-Whole so the bill could move more
23   quickly through Senate?
24            MR. FREDERICK:  Objection; legislative
25   privilege.  Instruct you not to answer.

---

94

1    BY MS. MARANZANO:
2         Q.  Were there any communications that you or others
3    in your office had about the decision to refer Senate
4    bill 14 to the Committee-of-the-Whole?
5             MR. FREDERICK:  Objection; vague.  I would
6    also object -- I think that the question is actually
7    asking for the content of communications.  However, on
8    the basis of legislative privilege I just caution you
9    not to reveal the substance of any communications.
10        A.  Yes, there were discussions.
11        Q.  BY MS. MARANZANO:  And when were those
12   discussions?
13        A.  Prior to -- prior to January 20th, probably
14   between the first two or three weeks of January, maybe
15   some in December.
16        Q.  And who were those discussions with?
17        A.  Primarily -- primarily the bill sponsor.
18        Q.  And that's Senator Fraser?
19        A.  Yes.
20        Q.  And those conversations were with you or with
21   others in the office?
22        A.  I -- probably -- probably some level me, but
23   probably more likely Brian Hebert and his staff
24   discussing the content of the bill.
25        Q.  Did Senator Fraser request that this bill get

---

95

1    referred to the Committee-of-the-Whole?
2         A.  I don't recall.
3         Q.  Did the Lieutenant Governor participate in the
4    debate during the Committee-of-the-Whole?
5         A.  I don't -- I don't think he did.
6         Q.  Were you -- what was your role during the
7    Committee-of-the-Whole's consideration of Senate bill 14
8    in regards to this piece of legislation?
9         A.  During the debate?
10        Q.  Uh-huh.
11        A.  I was probably working on something else.  But I
12   did not have a role during the debate.
13        Q.  You weren't necessary in touch with the
14   Lieutenant Governor during the debate?
15        A.  I was in touch with him, but probably not related
16   to voter ID.  It was probably what else was going on and
17   because Brian Hebert would have been staffing the
18   Lieutenant Governor during the debate.
19        Q.  And so would Brian Hebert have been with the
20   Lieutenant Governor on the floor during the debate?
21        A.  Probably.  Most likely.
22        Q.  Was one of your roles in connection with Senate
23   bill 14 to try to ensure that it was passed?
24        A.  Yes.
25        Q.  How did you do that?

---

96

1         A.  Just made sure the process was orderly and moved
2    forward.
3         Q.  What do you mean by "orderly"?
4         A.  Well, that the members knew that it was coming up
5    for debate.  But as far as a decision-making role on the
6    bill, I didn't have a decision-making role.  Just more
7    of just making sure that if that's what they were going
8    to discuss.  Just like any other issue.  If that is what
9    they were going to discuss, then people were there,
10   staff wise and make sure the Lieutenant Governor was
11   there.  So it was -- it was not a policy role.
12        Q.  And in terms of a decision-making role, did
13   anybody other than the Lieutenant Governor have a role
14   in making decisions on this bill?
15        A.  The members, the members of the Senate.
16        Q.  I'm sorry.  I mean in reference to your office,
17   in reference to the Lieutenant Governor's office?
18        A.  He had the final decision-making authority.
19            MS. MARANZANO:  Can you mark this?
20            (Exhibit No. 135 was marked.)
21   BY MS. MARANZANO:
22        Q.  Can you take a look at this for me?  I'm sorry.
23   I'm showing you what we're marking as Deposition
24   Exhibit 135.  Can you tell me if you have seen this
25   letter before?  Does it look familiar to you?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 97

1  A. Yes. Absolutely.
2  Q. You have. And what context have you seen it?
3  A. I received it -- at least a copy of it when she
4  sent this during session.
5  Q. And can you look at the second paragraph for me
6  that says, "first of all the Lieutenant Governor fully
7  aware that most, if not all of the Senators have left
8  town on Thursday." Is that referring -- that paragraph
9  where it talks about the letter being distributed to all
10  members; is that referring to the letter that we just
11  looked at and marked as Exhibit 134?
12  A. That's -- I think that's right.
13  Q. Do you know if that letter was left under
14  people's doors, slid under the members of the Senate's
15  doors?
16  MR. FREDERICK: Objection; relevance. You
17  may answer.
18  A. I'm not -- I'm not aware if it was slipped under
19  doors. If a member had gone home early and that was the
20  only way to get it there, I'm sure the messengers put it
21  either in their mailbox or under their door.
22  Q. BY MS. MARANZANO: Do you know if when you say
23  "if a member had left early," do you know if the Senate
24  had suspended its business for the weekend?
25  A. I don't recall. But judging from her letter, she

---

### 98

1  says that -- it looks like it was towards the end of the
2  week and they had finished working on the floor for that
3  week.
4  Q. Who from the Lieutenant Governor's office would
5  have handled distribution of the letter? And just to be
6  clear, I don't mean the actual delivery, but the
7  decision to distribute it on that day.
8  A. The actual decision would be the Lieutenant
9  Governor's.
10  Q. And certainly he would have been aware of whether
11  or not the Senate had suspended their business for the
12  weekend, wouldn't he?
13  MR. FREDERICK: Objection; assumes facts not
14  in evidence. You may answer.
15  A. If they had gaveled out earlier that week, yes.
16  Q. BY MS. MARANZANO: Okay. Were there any concerns
17  that distributing a letter about Senate bill 14 being
18  considered four days later could be perceived as
19  attempting to exclude people from the debate?
20  MR. FREDERICK: Objection; legislative
21  privilege. Instruct you not to answer.
22  BY MS. MARANZANO:
23  Q. What was the purpose of only giving four days
24  notice before consideration of Senate bill 14?
25  MR. FREDERICK: Objection; legislative

---

### 99

1  privilege. Instruct you not to answer.
2  BY MS. MARANZANO:
3  Q. Was the Lieutenant Governor aware that Senators
4  had expressed concerns about Senate bill 14?
5  MR. FREDERICK: Objection; legislative
6  privilege. Instruct you not to answer.
7  BY MS. MARANZANO:
8  Q. Wouldn't it be important to ensure that Senators
9  had a chance to voice their opinions during a debate
10  like Senate bill 14?
11  MR. FREDERICK: Objection; argumentative.
12  Objection; relevance, but you may answer.
13  A. Yes.
14  Q. BY MS. MARANZANO: And do you know if the
15  Lieutenant Governor was aware that certain Senators had
16  concerns about the impacts Senate bill 14 might have on
17  voters?
18  MR. FREDERICK: Objection; legislative
19  privilege. Instruct you not to answer.
20  MS. MARANZANO: Mr. Frederick, can he answer
21  the yes or no question of whether or not he was aware of
22  that?
23  MR. FREDERICK: I believe that the question
24  itself implies what he was aware of. So it presumes the
25  substance of his mental -- his thought process. So I

---

### 100

1  would stand by the objection.
2  BY MS. MARANZANO:
3  Q. Okay. And you're following your counsel's
4  instruction?
5  A. Yes.
6  Q. Are you familiar with the procedure by which
7  Senate bill 14 was considered in the Senate?
8  A. In 2011?
9  Q. Yes.
10  A. Yes.
11  Q. And are you aware of whether there was any change
12  in the rules that the Senate traditionally uses when it
13  considered Senate bill 14?
14  A. Yes. I believe they use the same rule process
15  that they did -- I think they use the same rule process
16  in 2009.
17  Q. And what rule process are you referring to?
18  A. The special order.
19  Q. Uh-huh. And can you describe what that is for
20  me?
21  A. I may not have the exact terms, but it's
22  generically -- it basically puts -- a bill that's in the
23  special order does not have a blocker bill that would
24  require two-thirds vote to suspend to go to that bill.
25  So it's inside the Senate rules, but it's an order of

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Blaine Brunson                                                    May 30, 2012

---

### 101

1  its own that has no blocker bill.
2     Q.  Okay.  I'm going to show you --
3       MS. MARANZANO:  Let's mark this as
4  Exhibit 136.
5       (Exhibit No. 136 was marked.)
6  BY MS. MARANZANO:
7     Q.  I'm showing you what we're marking as Deposition
8  Exhibit 136.  And if you can turn to the second page.
9  Does this look to be the Senate rule that we were just
10  talking about, rule 5.11?
11     A.  Yes.
12     Q.  And can you direct your attention to
13  subsection D?
14     A.  Yes.
15     Q.  Do you see that there's a special -- a special
16  carve-out that says, "notwithstanding subsection A of
17  this rule a bill of resolution relating to voter
18  identification requirements reported favorably from a
19  Committee of the Whole Senate may be set as a special
20  order for a time at least 24 hours after the motion is
21  adopted by the majority of the Senate; is that correct?
22     A.  Yes.
23     Q.  So in other words, if the voter identification
24  bill was voted favorably out of the
25  Committee-of-the-Whole, it could be considered if it was

---

### 102

1  just voted by a majority of the members; is that right?
2     A.  Yes.
3     Q.  And as a usual matter, is that different than the
4  way the Senate considers legislation?
5     A.  It is a special order that is different than the
6  normal order of business that's used on other
7  legislation.
8     Q.  And other legislation is usually voted by
9  two-thirds majority; is that correct?
10     A.  If there's a blocker bill in place.
11     Q.  Have you ever seen another time when a category
12  of legislation is carved out at the two-thirds rule as a
13  voter identification requirements in subsection D?
14     A.  Yes.  The entire special session was done without
15  a blocker bill.
16     Q.  And what special session are you referring to?
17     A.  June of 2011, right after the last legislative
18  session.
19     Q.  So in other words, no legislation during the
20  special session was passed with a two-thirds majority?
21     A.  Something might have passed with more than
22  two-thirds of the vote.  But there was not a blocker
23  bill in place for the whole special session.
24     Q.  Okay.  So let me rephrase.  Nothing was required
25  to be passed with a two-thirds majority during the

---

### 103

1  special session; is that correct?
2     A.  As long as -- so long as it was the first bill in
3  order of the -- on the calendar.  There was no blocker
4  bill in place.
5     Q.  Okay.  So the usual order of business was not
6  that it had to be passed by two-thirds majority vote?
7       MR. FREDERICK:  Object to the form of the
8  question.  You can answer.
9     A.  Yes.  I don't think --
10     Q.  BY MS. MARANZANO:  What?
11     A.  I'm not sure I understand.
12     Q.  Okay.  Can you just explain to me what happened
13  during the special session in June 2011 and how that
14  differs from what would happen -- what usually happens
15  in other sessions.
16     A.  In a normal session the -- there is a bill -- a
17  blocker bill that's first on the calendar.  And so in
18  the Senate's rules if you want to -- if you want to pass
19  that bill first it only requires a majority vote.  So
20  whatever bill is first on the calendar is only a
21  majority.  If you say we're going to move out past the
22  first bill to some other bill on the calendar, that's
23  when you do a two-thirds rule.  In a special order and
24  in the special session there was basically no -- there
25  was -- there is no blocker bill in the special order and

---

### 104

1  there is no blocker bill -- or there was no blocker bill
2  during the 2011 special session.  So all those bills --
3  I think all of them were probably just a majority, but
4  there might have been one or two that every one agreed
5  upon?
6     Q.  And how many pieces of legislation were passed in
7  the June 2011 special session?
8     A.  Approximately?  Five or six.
9     Q.  And am I understanding you correctly that there
10  wasn't a special carve-out during that session.  There
11  was just no blocker bill?
12     A.  Yes.  So you're right.
13     Q.  What do you think the purpose of the two-thirds
14  rule is?
15       MR. FREDERICK:  Object on relevance.  But
16  you can answer.
17     A.  The purpose -- traditionally the purpose has been
18  to make people that are working in good faith to
19  compromise to get at least two-thirds of the members of
20  the Senate to agree to a compromise.
21     Q.  BY MS. MARANZANO:  Do you think it's effective at
22  doing that?
23       MR. FREDERICK:  Objection; relevance, but
24  you may answer.
25     A.  It depends.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 105

1   Q. BY MS. MARANZANO:  What do you mean by that?
2   A. I mean, bills that didn't pass it was not
3   effected, but ones that do it does -- if does make
4   people negotiate, usually.
5   Q. So in other words, if people aren't able to
6   compromise, a bill wouldn't pass without the two-thirds
7   majority?
8   A. That's right.
9   Q. Did the Lieutenant Governor request that the
10  two-thirds rule be suspended for Senate bill 14?
11       MR. FREDERICK:  Objection; privileged.
12  Instruct you not to answer.
13  BY MS. MARANZANO:
14  Q. You're following your counsel's instruction?
15  A. Yes.
16  Q. Did the Lieutenant Governor have any
17  communications with anyone about the suspension of the
18  two-thirds rule?
19       MR. FREDERICK:  Object on the legislative
20  privilege only to caution you not to reveal the
21  substance of any communication, but as to the existence
22  of the communication you may answer that.
23  A. Yes. He had -- he had conversations about it.
24  Q. BY MS. MARANZANO:  And who were those
25  conversations with?

---

### 106

1   A. Members of the Senate that were working on the
2   bill.  Probably -- particularly Senator Fraser.
3   Q. Anyone else?
4   A. I'm sure there was.  But I'm not...
5   Q. You're not -- you're not aware whether there were
6   or there weren't?
7   A. I'm sure there were, but I just couldn't point to
8   specific conversations.
9   Q. Do you know if the Lieutenant Governor or others
10  in his office had any conversations with individuals --
11  with Senators who were opposed to Senate bill 14 about
12  the suspension of the two-thirds rule?
13  A. Yes.
14  Q. And who were those people?
15  A. The members that were opposed to it.  I'm sure he
16  didn't talk to all of them, but I would be surprised if
17  he didn't talk to different members on the floor --
18  during this process about the whole issue.
19  Q. But you don't have specific testimony about who
20  particularly he talked to who was opposed to the bill?
21  A. I don't.
22  Q. Did he talk to the parliamentarian about the
23  suspension of the two-thirds rule?
24  A. He would have had to because it's in the rules
25  that they have to adopt at the beginning of session.

---

### 107

1   Q. And why would that have required him to talk to
2   the parliamentarian?
3   A. The parliamentarian is the keeper of the rules.
4   So she's the one that works with him.  Whether it's this
5   rule or any other rule.  I believe this particular
6   special order, I think it was adopted -- I didn't
7   participate in it, but I think it was adopted just like
8   this in 2009.
9   Q. Uh-huh.
10  A. And then adopted the exact same way in 2011.  But
11  the parliamentarian is responsible for making sure that
12  any rule changes are distributed and given to members so
13  they can discuss them and she would talk to the
14  Lieutenant Governor about it.
15  Q. Are you familiar with the circumstances under
16  which this similar rule that you're referring to was
17  adopted in 2009?
18  A. No.  I just know that -- I know that the
19  discussion was -- the big discussion in public debate on
20  that was in 2009.
21  Q. Are you familiar with that public debate?
22  A. No.  Not detail.  I know it happened.
23  Q. Was the Lieutenant Governor presiding over that
24  debate?
25  A. I don't recall, but I would say yes.  I'm pretty

---

### 108

1   sure it was yes, but I don't recall personally.
2   Q. Okay.  Does the special order rule, 5.11, that
3   prevents the use of blocker bills to slow down
4   legislation; is that correct?
5       MR. FREDERICK:  Object to the
6   characterization.  You may answer it.
7   A. It -- it doesn't -- I'm not sure the words you
8   used.  But it -- it is -- it's definitely a special
9   order that would put a bill that has been blocked by the
10  two-thirds bill on it's own special order.
11  Q. BY MS. MARANZANO:  And the carve-out is only for
12  the voter identification -- for voter identification
13  requirements; is that correct?
14  A. In this rule, yes.
15  Q. And other than the June session have you ever
16  seen -- and I think you testified that the June session
17  was not a carve-out, but just a different set of rules
18  governed; is that correct?
19  A. Yes.
20  Q. Have you ever seen another category of
21  legislation categorically carved out as the voter
22  identification requirements are?
23  A. No.
24  Q. Did the Lieutenant Governor have any concerns
25  about suspending the two-thirds rule for this

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 109

1 legislation?
2          MR. FREDERICK:  Objection; legislative
3 privilege.  Instruct you not to answer.
4 BY MS. MARANZANO:
5      Q.  Were there any communications that you or others
6 in your office had about whether carving out voter
7 identification requirements from the two-thirds rule
8 would make it appear particularly partisan in nature?
9          MR. FREDERICK:  Object to that on the basis
10 of privilege.  Instruct you not to answer.
11 BY MS. MARANZANO:
12      Q.  Are you following your counsel's instructions?
13      A.  Yes.
14      Q.  Do the Senators needs to dispense with the
15 two-thirds rule in order to pass Senate bill 14?
16          MR. FREDERICK:  Objection.  Objection;
17 relevance.  Objection calls for speculation.  Also
18 object on the basis of privilege to the extent this
19 would require you to reveal the Lieutenant Governor's
20 thought process, mental impressions or any
21 communications with other members of the Senate.  On
22 that basis, I would instruct you not to answer.
23 BY MS. MARANZANO:
24      Q.  Are you following your counsel's instructions?
25      A.  Yes.

## 110

1      Q.  Did Senate bill 14 pass with two-thirds majority
2 support?
3      A.  No, it did not.
4      Q.  Was there any consideration given to changing any
5 other rules for voter identification requirements?
6      A.  Not that I'm aware of.
7      Q.  What was the Lieutenant Governor's role --
8 actually, strike that.  What was the Lieutenant
9 Governor's role during the consideration of the
10 Committee-of-the-Whole -- Committee-of-the-Whole's
11 consideration of Senate bill 14?
12          MR. FREDERICK:  Objection.  Asked and
13 answered.
14      A.  Per the rules, participate in debate and vote as
15 necessary.
16      Q.  BY MS. MARANZANO:  Right.  But I'm asking you
17 specifically what did he do, not just sort of what he
18 has the ability to do, but what did he actually do?
19      A.  If I remember correctly he sat in the Senate area
20 and listened to the debate.
21      Q.  Did he play any role in talking to other members
22 about how they were going to vote on the bill?
23      A.  I'm sure he talked to members during the debate
24 is.  I don't know if it changed anyone's vote or not.
25      Q.  Was it part of his role to make sure Senate bill

## 111

1 14 passed?
2      A.  As much as its his role that any bill pass.
3      Q.  And I believe you testified earlier that this was
4 a particular priority for him?
5          MR. FREDERICK:  Object.  Mischaracterizes
6 prior testimony.  You can answer.
7 BY MS. MARANZANO:
8      Q.  Did -- did you not say that, Mr. Brunson?
9      A.  I said that it was -- it does definitely one of
10 the issues that -- that he felt we needed to address
11 last session -- in the 2011 session.
12      Q.  So because he thought it was something that
13 needed to be addressed, would he play any larger role in
14 trying to get the bill passed?
15      A.  I would say the same role he would play on any
16 bill that needed to pass.  He -- if it's something that
17 needs to be -- if it needs to be passed, he would take
18 the same action on this bill or any other bill.  I don't
19 think this was a -- that uniquely different of a bill as
20 far as priority, if you want to call it that.  But I
21 think he laid out a -- they laid out a process that
22 resulted in the bill passing.
23      Q.  So how does he determine what bills need to be
24 passed?
25          MR. FREDERICK:  Object on the basis of

## 112

1 privilege.  I don't -- as I understand the question, I
2 don't believe that it's actually seeking the Lieutenant
3 Governor's thought process, but I would caution you not
4 to reveal his actual thought process about determining
5 whether any specific bill needed to pass.  If you can
6 describe the general thought processes, I think that's
7 what she's asking, you can answer that.
8      A.  I think in -- in general terms, I think it would
9 be -- I don't know what way would we call it.  An instinct
10 or common sense.  It's a bill that had passed or had
11 been discussed and had had a lot of attention for
12 several sessions.  And so -- and I'm sure in his mind
13 the -- I don't know.  I can't say what's in his mind.
14 But I'm sure I'm sure that just the common sense of,
15 you know, the publicity and the focus on the bill is
16 something that he said this is something that
17 ultimate -- that the members want to work on and we'll
18 work on it.
19      Q.  BY MS. MARANZANO:  Is it fair to say only some
20 members wanted to --
21      A.  A majority of the members.
22      Q.  Does he consider which political party the
23 members are from when he's deciding how to move a bill
24 through the Legislature?
25      A.  He takes lots of factors into consideration when



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 113

1  he works on bills.
2      Q.  Can you tell me what those factors are?
3      A.  Not specifically.  I mean, it depends on the
4  bill.  Like the budget needs to pass so that the State
5  can finance the different things that work, that the
6  State pays for and every member of the Legislature
7  regardless of party has roads and schools, et cetera.
8  And so the factors are when you look at the issues that
9  need to be worked on to make the State run, I think he
10 takes all those factors into account.
11     Q.  So I guess -- I guess what I'm trying to figure
12 out is what about Senate bill 14 was addressing
13 something that needed to be worked on?
14         MR. FREDERICK:  I'll object on the basis of
15 legislative privilege to the extent this calls for the
16 Lieutenant Governor's thought process about Senate bill
17 14 and instruct you not to answer.
18 BY MS. MARANZANO:
19     Q.  Do you -- do you have and answer or are you able
20 to answer at all?
21     A.  No.
22     Q.  And I think you earlier testified that your role
23 with regard to Senate bill 14 was helping move it
24 through process?
25     A.  Right.

---

### 114

1      Q.  And so what -- so can you tell me specifically
2  what you did to move Senate bill 14 through the process?
3      A.  Well, it was -- my role specifically whether
4  Senate bill 14 or any of the bills that were more of a
5  priority than others was just to make sure that the bill
6  sponsor had the resources, had the bill language ready,
7  if our policy people needed help in areas like on the
8  budget, if our people needed to pitch in and help to get
9  the bills ready to either come out of committee or go to
10 the floor, and then the timing of, generically, just the
11 timing of how bills would flow so that -- it was a big
12 session with a big budget deficit.  So just making sure
13 that things were in place to do bills in a timely
14 manner.
15     Q.  Did you have a role in determining when Senate
16 bill 14 would be considered?
17     A.  Just an advisory role with the Lieutenant
18 Governor.
19     Q.  Did you advice Lieutenant Governor to bring it up
20 quickly at the beginning of the session?
21         MR. FREDERICK:  Objection; legislative
22 privilege.  Instruct you not to answer.
23 BY MS. MARANZANO:
24     Q.  And the decision of when to actually bring the
25 bill up was the Lieutenant Governor's; is that correct?

---

### 115

1      A.  Yes.
2      Q.  Are you aware of concerns that were raised about
3  the impact Senate bill 14 would have on minority voters
4  that were raised during the consideration of the bill by
5  the Committee-of-the-Whole?
6      A.  I definitely know they were raised.  I don't know
7  the specifics of what the concerns were.
8      Q.  Did the Lieutenant Governor make any attempt to
9  respond to those concerns?
10         MR. FREDERICK:  Object on the basis of
11 legislative privilege.  To the extent that calls for the
12 Lieutenant Governor's thought process, communications
13 with his staff or other legislators or any investigation
14 that was done by his office, I would instruct you not to
15 answer on the basis of legislative privilege.
16 BY MS. MARANZANO:
17     Q.  Do you have any answer?
18     A.  I don't.
19     Q.  Do you know -- well, are you familiar with the
20 record from the Committee-of-the-Whole's consideration
21 of Senate bill 14?
22     A.  There is a record.  As far as the specifics of
23 the record?
24     Q.  Uh-huh.
25     A.  No.

---

### 116

1      Q.  Not at all?
2      A.  No.
3      Q.  You testified earlier that one of the reasons it
4  was important the pass Senate bill 14 is because a
5  similar -- or another voter identification bill had
6  passed the Senate in 2009.  Is that a correct
7  restatement of your testimony?
8      A.  Yes.
9      Q.  Do you know if Senate bill 14 is similar to the
10 bill that had passed in the 2009 legislative session?
11     A.  I'm not sure how similar they are.  I think -- I
12 think they're fairly similar.
13     Q.  What are you basing that testimony on?
14     A.  That it was generally the same Senate body that
15 passed it in '09 and '11.
16     Q.  Did you look at -- did you ever look at the text
17 of the bill that passed the 2009 legislative session?
18     A.  I may have -- I mean, I may have looked at it.  I
19 never studied it.
20     Q.  Do you know if the forms of identification that
21 are required under the bill that passed in the 2009
22 legislative session are the same as what passed in the
23 2011 legislative session?
24     A.  I don't know.
25     Q.  You testified earlier that the Lieutenant

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 117

1   Governor voted on Senate bill 14, correct?
2      A.  I said I wasn't sure if he did.
3      Q.  Okay.  Do you believe he voted or you're not
4   sure?
5      A.  I don't know.
6      Q.  If he voted it would have been in the
7   Committee-of-the-Whole; is that correct?
8      A.  Yes.
9      Q.  Did you make any recommendation to the Lieutenant
10  Governor on whether or not to vote on Senate bill 14?
11         MR. FREDERICK:  Object on the basis of
12  legislative privilege only to the extent it seeks the
13  substance of your recommendation.  As to the question
14  whether or not you made a recommendation, you can answer
15  that.
16     A.  I don't know.  I don't think I did.
17     Q.  BY MS. MARANZANO:  Did you make a recommendation
18  to the Lieutenant Governor about whether or not to
19  support SB 14?
20         MR. FREDERICK:  Same objection and
21  instruction.
22     A.  No.
23     Q.  BY MS. MARANZANO:  Did the Lieutenant Governor
24  play any role in the -- in the process by which
25  amendments were introduced to Senate bill 14?

## 118

1      A.  I don't recall.
2      Q.  Are you familiar with the amendments that were
3   introduced to Senate bill 14?
4      A.  No.  No.
5      Q.  Did the Lieutenant Governor draft any amendments
6   to be added to Senate bill 14?
7      A.  Not they I'm aware of.
8      Q.  And who would know the answer to that?
9      A.  Probably Brian Hebert or Julia.
10         (Exhibit No. 111 was marked)
11     Q.  (By Ms. Maranzano)  I'm going to show you -- I'm
12  showing you what we have previously marked as Deposition
13  Exhibit 111.  Can you take a look at this and tell me if
14  you recognize it?
15     A.  I do.
16     Q.  And what is this?
17     A.  It's a press release from the Lieutenant
18  Governor's office.
19     Q.  Have you seen this before?
20     A.  Yes.
21     Q.  Who drafts the press releases for the Lieutenant
22  Governor?
23     A.  Mike -- Mike Walz.
24     Q.  And can you tell me, do you see at the top
25  left-hand side it's dated January 26, 2011?

## 119

1      A.  Yes, ma'am.
2      Q.  And was Senate bill 14 already -- had it already
3   passed the Senate at that time?
4      A.  Based on this statement I would say yes.
5      Q.  The press release is issuing a statement about
6   the passage of the Senate; is that correct?
7      A.  Yes.
8      Q.  Is it unusual for a piece of legislation to pass
9   the Senate in the first two weeks of the session?
10     A.  Not if it's on the emergency call.
11     Q.  Has that happened before?
12     A.  Yes.
13     Q.  How many times?
14     A.  I don't know how many times.  But it's -- that's
15  the reason there is an emergency call is so that bills
16  can be heard in first 60 days in the session?
17     Q.  Can you tell me about other legislation that you
18  do know about that's passed in the first two weeks of
19  the legislative session?
20     A.  I don't have any -- any examples.
21     Q.  Okay.  But it's your understanding that that
22  happens?
23     A.  It has -- I think your question was has it ever
24  happened.  I'm sure it has.
25     Q.  Is it unusual?

## 120

1      A.  It would probably be -- yes, it's unusual.
2      Q.  Can you look at the last sentence in this
3   statement.  It says, "voter ID will help stamp out voter
4   fraud and increase confidence in our election process by
5   insuring only US citizens who are legally eligible vote
6   in Texas elections."  Can you tell me if Senate bill 14
7   is about ensuring that non-citizens don't participate in
8   elections?
9      A.  I don't -- I don't know the answer to that.
10     Q.  Who would know the answer to that?
11     A.  Brian Hebert or Julia.
12     Q.  Would the Lieutenant Governor?
13     A.  I don't know.
14     Q.  Well, how would Senate bill 14 prevent
15  non-citizens from voting?
16     A.  I don't know.
17     Q.  Do you know if the Lieutenant Governor -- the
18  Lieutenant Governor's position on Senate bill 14 was
19  connected to a belief about only US citizens should be
20  able to participate in elections?
21         MR. FREDERICK:  Going to object only to the
22  extent that this would call for privileged, confidential
23  communication between you and the Lieutenant Governor or
24  his thought process, mental impressions obviously that
25  weren't expressed in the public.  But you can answer if



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

121

1   you can do so.
2       A.  I don't know the answer.
3       Q.  BY MS. MARANZANO:  Did you ever talk to the
4   Lieutenant Governor about the basis for his support for
5   Senate bill 14?
6       A.  No.  Most of the debate we were working on
7   happened in the previous session before I started
8   working on it.  So I think by the time we got to 2011 he
9   was where he was and there wasn't a whole lot of
10  discussing about why he was doing what on the bill.
11      Q.  Who would be familiar with the basis for his
12  support of Senate bill 14?
13      A.  Probably -- probably Brian or Julia.
14      Q.  Brian Hebert or Julia Rathgeber or the Lieutenant
15  Governor?
16      A.  Yeah.  Yeah.
17      Q.  Did you -- did you monitor the bill after it
18  passed the Senate?
19      A.  I didn't watch -- I didn't watch it on a daily
20  basis.  But we did -- we did monitor it to make sure
21  that it was still moving in the House.
22      Q.  Are you familiar with changes that occurred to
23  the bill in the House?
24      A.  No.
25      Q.  Did you play a role in picking the conferees for

---

122

1   Senate bill 14?
2       A.  I don't recall any of the specifics.  But the
3   Senate would have turned in the vote card or the
4   conferee request card that I probably -- I probably
5   would have had it and given to the Lieutenant Governor
6   or either Julia or I would have...
7       Q.  So did you play any substantive role in picking
8   the conferees?
9       A.  No.  No.
10      Q.  Are you familiar with changes that occurred to
11  Senate bill 14 during the conference Committee?
12      A.  No.
13      Q.  Not at all?
14      A.  No.
15      Q.  And who would be familiar with those?
16      A.  Brian or Julia.
17      Q.  Or the Lieutenant Governor?
18      A.  Possibly.  I know Brian and Julia would.  Brian
19  in particular.
20      Q.  Did you -- did you work on or monitor -- well, I
21  guess monitor would be a more appropriate, a fiscal note
22  that was attached to Senate bill 14?
23      A.  I didn't do anything specific with the fiscal
24  note.
25      Q.  Are you familiar with the fiscal note for Senate

---

123

1   bill 14?
2       A.  Yes.  As far as the...
3       Q.  Do you know how the fiscal note for the bill was
4   arrived at?
5       A.  I don't.
6       Q.  Do you recall, I think you testified previously
7   to an approximate amount that you believed the fiscal
8   note in 2009 had -- the approximate amount of the fiscal
9   note in 2009?
10      A.  Right.
11      Q.  Do you remember exactly what that was?
12      A.  I think it was $2 or $3 million.
13      Q.  Do you know what the fiscal note for the bill in
14  Senate bill 14 was?
15      A.  I think it's about the same, $2 or $3 million.
16      Q.  And is it your understanding -- well, what is
17  your understanding of what that amount of money will be
18  used for?
19      A.  I believe for like signage and voter education at
20  the polling places.
21          MS. MARANZANO:  Can you mark this?
22          (Exhibit No. 137 was marked.)
23  BY MS. MARANZANO:
24      Q.  Do you recognize this?  I'm showing you what
25  we're marking as Deposition Exhibit 137.  Can you take a

---

124

1   look and tell me if you recognize it?
2       A.  It's the fiscal note for Senate bill 14 as it
3   passed the second House.
4       Q.  And it looks to me like the fiscal note was a
5   little bit over $2 million; is that correct?
6       A.  That's what it looks like.  Yes.
7       Q.  And if you can turn to Page 3 -- Page 3 under
8   Methodology, it describes how that fiscal note was
9   arrived at.  Do you see that?
10      A.  Yes.
11      Q.  And based on that, is it your understanding that
12  the fiscal note is geared towards public education
13  primarily in the form of media advertisements,
14  television, radio, internet?
15      A.  It looks like a million and a half of it is.
16      Q.  A million and half or $2 million?
17      A.  A million and a half for media and a half a
18  million for research.
19      Q.  Research about the media, correct?
20      A.  Yes.
21      Q.  Based on your budget experience, can you tell me
22  why there isn't an inclusion in this fiscal note for the
23  cost of the free ID that is a part of Senate bill 14?
24      A.  I think DPS testified at the -- at the -- I
25  believe at the Committee-of-the-Whole that the -- since

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 125

1    it would be, I guess such as small number of free IDs
2    that it could be absorbed in their budget.
3        Q.  And how did they know there was going to be a
4    small number of free IDs?
5        A.  I don't know.
6        Q.  Okay.  Did they perform any analysis on who would
7    need a free ID?
8        A.  I don't know.  I'm assuming yes, but I don't
9    know.
10       Q.  And why would you assume yes?
11       A.  That's their job.
12       Q.  You're not familiar with whether it occurred or
13   not?
14       A.  No.
15       Q.  Who would know that?
16       A.  Probably the -- either the Legislative Budget
17   Board who prepared the fiscal note and Brian Hebert
18   might know.
19       Q.  Do you believe that this $2 million cost for
20   media would be sufficient to educate the public in Texas
21   about the requirements of Senate bill 14?
22       A.  I can only rely on the -- whoever put this
23   together.  I don't have any personal reason to think
24   otherwise.
25       Q.  How many media markets are in Texas?

## 126

1        A.  I don't know.
2        Q.  Do you have any knowledge about how much it would
3    cost for airtime on TV or radio?
4        A.  I'm sure -- statewide, I'm sure it's pretty
5    expensive.
6        Q.  What -- what would pretty expensive mean?
7        A.  I'm sure it would -- I'm sure the estimates were
8    made off of some -- I'm sure you could ask how they came
9    up with the different amendments for the different
10   medias.  But I would assume that it's somewhere -- if
11   you wanted to run some of -- some significant amount it
12   would be around $2 million.
13       Q.  In other bills that you've worked on that had any
14   sort of public education -- are there other bills you
15   have worked on that have had public education
16   components?
17       A.  None that I can recall specifically.  Just -- I
18   can't think of any others.
19       Q.  Okay.  So -- go ahead?
20       A.  Most State issues have -- usually have a public
21   service announcement component that doesn't cost the
22   State?
23       Q.  I see.  Can you look at the last sentence of that
24   first paragraph under Methodology?  It says, "the
25   Secretary of State indicates that federal funds

## 127

1    associated with Help America Vote Act may be available
2    for use, but the agency would first need to verify this
3    with the federal government."  Do you know if there was
4    an attempt to ensure that the amount of money projected
5    for the fiscal note would be equal to or less than the
6    amount of money that Texas had at its disposal through
7    highway funds?
8        A.  No.  Not that I'm aware of.
9        Q.  And if that was the case would you be aware of
10   it?
11       A.  Probably.
12       Q.  And why is that?
13       A.  Like we talked about earlier, the fiscal note
14   process is intended to be separate and apart from the
15   legislative process so it's not where people can push
16   one way or the other to get a different outcome on cost.
17       Q.  Okay.  So if there was an attempt to make sure
18   that this amount of money matched with the HAVA funds
19   that were available, you think you would know that?
20       A.  Yes.  I think the Legislative Budget Board would
21   have called me and said someone is trying to make us
22   change our fiscal note.
23       Q.  I see.  What if the Legislative Budget Boards --
24   so in your opinion that directive would have come from
25   somebody other than a member of the Legislative Budget

## 128

1    Board?
2        A.  Which directive?  To make it fit?
3        Q.  Uh-huh.
4        A.  I'm not aware of any directive like that.
5        Q.  Okay.  Fair enough.  Are you at all familiar with
6    voter identification requirements that exist in Georgia?
7        A.  No.
8        Q.  How about voter identification requirements that
9    exist in Indiana?
10       A.  No.
11       Q.  Have you heard of a case entitled Crawford?
12       A.  No.
13       Q.  No?
14       A.  No.
15       Q.  Why do you believe there was such strong
16   opposition to Senate bill 14?
17           MR. FREDERICK:  Objection; calls for
18   speculation.  To the extent this calls for your personal
19   opinion, I object.  But I would object on the basis of
20   privilege to the extent it seeks thought process, mental
21   impressions or any communication between yourself and
22   the Lieutenant Governor or another Legislature.
23       A.  So the question is why do I think there is such
24   strong opposition?
25       Q.  BY MS. MARANZANO:  Uh-huh.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Blaine Brunson                                          May 30, 2012

---

### 129

1    A. I honestly don't know why the other side was
2    fighting so hard.
3    Q. What did they say they were fighting it so hard?
4        MR. FREDERICK: Object on the basis of
5    legislative privilege to the extent it call for
6    privilege communication from another Legislature.
7    However, to the extent you are aware of any statements
8    that were not privileged you may answer.
9    A. Yeah. The -- as far as like newspaper accounts,
10   the discussion from the Democrats in this case were that
11   it would suppress voter turnout -- or I guess voting
12   maybe just on their side. I don't know. I never did
13   understand why they were objecting to this.
14   Q. BY MS. MARANZANO: Do you think it would have
15   suppressed turnout?
16   A. I don't think so.
17   Q. Why not?
18   A. I personally don't. Because we have -- every one
19   of us that I can think -- during this process we even
20   talked about how many places you have to have a driver's
21   license to do anything these days. And so I really
22   think that it's so hard to do anything in today's world
23   without a photo ID that it couldn't -- I just don't see
24   how it would have affected -- negatively affected that
25   many people. And then with -- the way it was laid out.

### 130

1    I just think it was a -- like I said, I don't know why
2    they fought it so hard.
3    Q. Did you ever undertake any analysis to determine
4    how it would affect people?
5    A. I personally did not.
6    Q. Did anybody?
7    A. I'm sure the normal analysis that would happen on
8    any bill happened on this. And Brian Hebert can talk to
9    you about --
10   Q. What is -- I'm sorry. What were you saying?
11   A. You can talk to him about what all analysis took
12   place.
13   Q. What is a normal analysis that gets done on a
14   bill?
15   A. It ranges from small bills to larger bills. You
16   spend the entire session working on the budget and all
17   that could be cast as analysis down to whatever amount
18   of due diligence needs to be done to have confidence
19   that you're doing the right thing it has to be done. So
20   bill by bill deal.
21   Q. Well, what do you think would have to be done to
22   give the Legislature they were doing the right thing in
23   regards to Senate bill 14?
24       MR. FREDERICK: Objection based on
25   relevance.

### 131

1    A. I think it's a member by member deal.
2    Q. BY MS. MARANZANO: Are you aware of any analysis
3    that was conducted to determine whether minority voters
4    might be disproportionately less likely to possess the
5    identification forms of Senate bill 14?
6        MR. FREDERICK: Objection; the legislative
7    privilege and instruct you not to answer.
8    BY MS. MARANZANO:
9    Q. Is that something that you think might be
10   important to give a member confidence that they were
11   doing the right thing?
12       MR. FREDERICK: Objection; relevance. You
13   can answer.
14   A. I think each member has to decide for themselves
15   what level of analysis they need before they vote.
16   Q. BY MS. MARANZANO: Well, what level of analysis
17   did the Lieutenant Governor need before he voted?
18       MR. FREDERICK: Objection.
19   BY MS. MARANZANO:
20   Q. If he voted?
21       MR. FREDERICK: Objection; legislative
22   privilege. Instruct you not to answer. Also object as
23   vague.
24   BY MS. MARANZANO:
25   Q. When you said it's hard to do anything without an

### 132

1    ID, what are you referring to?
2    A. The generic discussion has been to get on an
3    airplane or even most buildings that you have to have
4    some sort of ID that people can tell who you are and
5    when you present your identification. So if you want to
6    buy, you know, Sudafed in Texas you've got to have a
7    photo ID.
8    Q. Is it a right to get on an airplane?
9        MR. FREDERICK: Objection. Calls for legal
10   conclusion. You may answer.
11   A. I don't know.
12   Q. BY MS. MARANZANO: Well, I mean, would you
13   consider it to be a right to travel somewhere by plane?
14       MR. FREDERICK: Objection; relevance.
15   Objection; calls for legal conclusion. You can answer
16   if you can.
17   A. I don't think it's a legal right.
18   Q. BY MS. MARANZANO: Is it a legal right to buy
19   Sudafed?
20       MR. FREDERICK: Objection; calls for legal
21   conclusion.
22   A. I it's -- no, I don't think it's a legal right.
23   Q. BY MS. MARANZANO: Do you think it's a legal
24   right to be able to vote?
25       MR. FREDERICK: Objection; calls for legal



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 133

1  conclusion.  Also objects on relevance.  You can answer.
2      A.  I think it's a legal right to vote legally.
3      Q.  BY MS. MARANZANO:  And do you think Senate bill
4  14 is preventing people from voting illegally?
5          MR. FREDERICK:  Objection; relevance,
6  objection -- I guess I'll just object on relevance and
7  to the extent this is seeking your thoughts or the
8  Lieutenant Governor's thoughts or mental impressions as
9  to when Senate bill 14 was pending I would object on
10  privilege.  But I think you can answer if you can.
11      A.  What was the question?
12      Q.  BY MS. MARANZANO:  You said that it was a
13  legal -- you think it's a legal right to vote legally?
14      A.  Right.
15      Q.  So I'm asking you if Senate bill 14 prevents
16  voting illegally?
17          MR. FREDERICK:  Same objection and
18  instruction.
19      A.  I think it does help to ensure that you're voting
20  legally, my personal opinion.
21      Q.  BY MS. MARANZANO:  And what is your personal
22  opinion based on, just how are you arriving at that
23  conclusion?
24      A.  Based on the discussions that have taken place
25  around this bill as -- from the time that I began

## 134

1  focusing on it to now.  I think we should do everything
2  we can the make sure that that legal right is legal.
3      Q.  Is there -- what forms of illegal voting would
4  Senate bill 14 prevent?
5      A.  Like I said earlier, we've talked about that, I
6  don't know the specifics of the bill.  But after the
7  amount of testimony that's been taken on this and the
8  discussion, if there's something that should and can be
9  done, then if it prevents one vote that's not legal, I
10  think that's -- I think it's the right thing to do.
11      Q.  Would you believe that it was the right thing to
12  do if it prevented one vote that was illegal even if it
13  disenfranchised a large number of individuals?
14          MR. FREDERICK:  Objection; relevance.
15  Objection; calls for speculation.
16      A.  I don't know -- I don't have an opinion on that.
17      Q.  BY MS. MARANZANO:  Is there any illegal voting
18  other than in person voter impersonation that Senate
19  bill 14 would prevent?
20      A.  I don't know.  I don't think so.
21      Q.  Are there other forms of ID that could have been
22  included in Senate bill 14 that would have also verified
23  a voter's identity?
24          MR. FREDERICK:  Objection; calls for
25  speculation.  Object to relevance.  But you can answer.

## 135

1      A.  I don't know.
2      Q.  BY MS. MARANZANO:  Do you believe that other
3  forms of identification other than the ones in Senate
4  bill 14 verify somebody's identity?
5          MR. FREDERICK:  Objection; relevance.
6      A.  I just don't know.  I haven't thought about it.
7      Q.  BY MS. MARANZANO:  Are you aware of any
8  legislators making any statements about illegal aliens
9  voting?
10          MR. FREDERICK:  Object based on privilege.
11  To the extent this calls for non-public confidential
12  statements made to your Lieutenant Governor by another
13  legislator, those would be privileged and I would
14  instruct you not to answer.  To the extent you can
15  answer based on non-privileged statements, you may do
16  so.
17      A.  The answer is no.
18      Q.  BY MS. MARANZANO:  And are you answering based
19  on -- based on your counsel's instruction to only talk
20  about statements on the public record; is that correct?
21      A.  I'm answering based on I've never heard anyone
22  say anything like that.
23      Q.  Have you ever heard any Texas State legislator
24  who voted in favor of Senate bill 14 say that it would
25  prevent a legitimately registered voter from voting?

## 136

1          MR. FREDERICK:  Objection; relevance.  Also
2  object on the basis of privilege.  If you can answer
3  without relying on that you may do so.
4      A.  There's not privileged information.  No one has
5  ever said that to me.
6      Q.  BY MS. MARANZANO:  Have you ever heard of any
7  Texas State legislator who voted for the bill -- who
8  voted for Senate bill 14 say that it would prevent a
9  racial or ethnic minority from voting in Texas?
10          MR. FREDERICK:  Objection; relevance.
11  Objection; privileged.  But you may answer if you can do
12  so without revealing privileged matters.
13      A.  Same answer.  There's not any privileged
14  information.  Nobody has ever said that to me.
15      Q.  BY MS. MARANZANO:  Are you aware of allegations
16  that Senate bill 14 attempted to play on people's fears
17  of illegal immigrants voting?
18      A.  Not that I'm aware of.
19      Q.  Are you familiar with a public letter from the
20  Lieutenant Governor in 2007 about photo identification
21  requirements?
22      A.  No.  I'll look at it.
23      Q.  Okay.  This has been -- it was previously marked.
24  This exhibit was previously marked as Deposition Exhibit
25  Number 3.  If you can take a moment to take a look at



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Blaine Brunson
May 30, 2012

---

### 137

1  it?  Is that refreshing your recollection?
2      A.  I don't remember seeing this.
3      Q.  Can you turn your attention to Page 2 for me and
4  at the bottom or midway through it says a letter from
5  Lieutenant Governor David Dewhurst on voter ID bill?
6      A.  Yes.
7      Q.  In that second paragraph there's a sentence that
8  says, "I want people to consider that with 8 to 12
9  million illegal aliens currently living in the US the
10  basic principle of one person, one vote is in danger."
11  Do you see that?
12      A.  I see it.
13      Q.  Is there any connection between photo ID bills
14  and the growth of the non-citizen population in Texas?
15      A.  I don't know the answer to that.
16      Q.  Can you look at Page 3 for me and about midway
17  through the page there's a paragraph that says, "to
18  address critic's concerns," do you see that paragraph?
19      A.  Yes.
20      Q.  And it talks about allowing voters to present
21  certain forms of identification.  This is, as you can
22  see from this paragraph it's referring to a bill called
23  House bill 218?
24      A.  Okay.
25      Q.  Do you know which of these forms of

---

### 138

1  identification listed are also allowed in Senate bill
2  14?
3      A.  I don't.
4      Q.  Do you know -- do you know if a draft of this
5  letter was released to the press?
6      A.  I don't.  But it's in the press.
7      Q.  Did the purpose of photo ID legislation in Texas
8  evolve over time?
9      A.  I don't know.
10      Q.  Who would know that?
11      A.  Brian Hebert.
12      Q.  Would the Lieutenant Governor?
13      A.  I don't know.
14      Q.  Do you believe that the Lieutenant Governor has
15  consistently indicated that one of the purposes of photo
16  ID bills is to prevent non-citizens from voting?
17          MR. FREDERICK:  Object to relevance.  You
18  can answer.
19      A.  I do not know.
20          (Exhibit No. 114 was marked)
21      Q.  (By Ms. Maranzano)  I'm showing you what we
22  previously marked as Deposition Exhibit 114.  Can you
23  take a look at this and let me know if you recognize it?
24  Have you seen this before?
25      A.  I may have.  It looks like something from our

---

### 139

1  office.
2      Q.  Do you know if the Lieutenant Governor made a
3  statement at the bill signing for Senate bill 14?
4      A.  I would assume so.
5      Q.  Do you know if this is the statement that he
6  made?
7      A.  I don't.
8      Q.  Who -- who would have written his statement for
9  that bill signing?
10      A.  Probably the press -- the communications director
11  or the communications office.
12      Q.  Do you see in the right-hand corner it says LRT?
13      A.  Yes.
14      Q.  Do you know who that is or what that refers to?
15      A.  Probably -- I bet it's a lady that works in our
16  press office, Lauren Thurston.  I don't know what the R
17  stands for.
18      Q.  Does she sometimes draft talking points for the
19  Lieutenant Governor?
20      A.  She works for Mike Walz.
21      Q.  Can you look at the second page of this?  It
22  says, "generations of Americans have fought and died for
23  the principal of one US citizen, one vote."  Do you know
24  if Lieutenant Governor made a statement like that after
25  the signing of Senate bill 14 or at the signing of

---

### 140

1  Senate bill 14?
2      A.  I don't.
3      Q.  Is that consistent with his position on Senate
4  bill 14?
5      A.  Yes.
6      Q.  So is it fair to say that part of the reason that
7  the Lieutenant Governor supported Senate bill 14 is
8  related to ensuring that only US citizens can vote?
9          MR. FREDERICK:  I'm going to object on the
10  basis of privilege only to the extent that this would
11  require you to reveal privileged communication with the
12  Lieutenant Governor and to the extent you ask answer
13  based on public documents or statements, you can do so.
14      A.  I think he would possibly say he based it on the
15  principal of people voting legally.  If you're entitled
16  to vote legally you should be able to vote.
17      Q.  BY MS. MARANZANO:  Okay.  And do you think his
18  position was based in part on a belief that there was a
19  need to ensure that non-citizens weren't voting?
20          MR. FREDERICK:  Same objection.
21      A.  I have the same answer.  His goal was to make
22  sure that people were legally voting.
23      Q.  BY MS. MARANZANO:  Okay.
24          MS. MARANZANO:  Can we have this marked.
25          (Exhibit No. 138 was marked.)



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 141

1  BY MS. MARANZANO:
2  Q. You -- I'm showing you what we're marking as
3  Deposition Exhibit, is it 140? 138. Have you seen this
4  before?
5  A. I don't think so. Let me read it. I have not
6  seen this before today.
7  Q. Okay. Well, can you look at the -- the second
8  paragraph and it talks about a compilation of data on
9  race and ethnicity for redistricting bills. And it
10  says, "historically a similar effort to obtain such
11  demographics may be required for a voter identification
12  bill." Do you know if there was such an effort to
13  obtain demographics like that?
14  A. I don't.
15  Q. You don't know?
16  A. I don't know.
17  Q. Who would know the answer to that?
18  A. Brian Hebert.
19  Q. Would anybody else?
20  A. I don't know. Legislative Council maybe.
21  Q. Do you see in the first paragraph it says, "the
22  State does not have statistics regarding the race or
23  ethnicity of registered voters in Texas. We do have
24  data on the number of registered voters with Hispanic
25  surnames"?

### 142

1  A. I see that.
2  Q. "But this data is inconclusive as it simply
3  matches the surnames of registered voters against the
4  list of Hispanic surnames provided by the US Census
5  bureau." Do you know if the list of Spanish surnames
6  provided by the US Census bureau is used by the State of
7  Texas in other analyses?
8  A. I don't.
9  Q. You don't know?
10  A. I do not know.
11  Q. Do you know anything about the Spanish surname
12  list provided by the US Census?
13  A. I don't.
14  Q. If such an analysis had been conducted, would
15  Brian Hebert be the person who would know about it?
16  A. I believe -- yes.
17  Q. Okay.
18  Q. If anybody would know he would know.
19  Q. How about if we take about a 5-minute break. I
20  am close to wrapping up.
21  A. Sure.
22       (Brief recess.)
23       (Exhibit No. 120 was marked)
24  BY MS. MARANZANO:
25  Q. Mr. Brunson, I'm going to show you what was

### 143

1  previously marked as Deposition Exhibit 120. Does this
2  look familiar to you?
3  A. It looks like the same document -- or the same
4  format as the earlier document.
5  Q. Do you know who wrote this?
6  A. I don't.
7  Q. Is it possible that Brian Hebert wrote this
8  document?
9  A. Yeah. If it came from our office, if it was
10  produced in our office, Brian probably wrote it.
11  Q. Do you know what the purpose of this document
12  was?
13  A. I don't.
14  Q. Do you know who it would have been written for?
15  A. I don't.
16  Q. Do you know when it would have been written?
17  A. Probably during the time that this was being
18  discussed on the floor.
19  Q. During that time that Senate bill 14 was being
20  discussed?
21  A. If it's from the last session, yes.
22  Q. Can you look at the topic area that says, "is
23  there a retrogressive effect" and underneath that
24  there's a question posed about did Texas produce or
25  consider any evidence regarding whether Hispanics and

### 144

1  blacks are less likely to possess or obtain that photo
2  ID?
3  A. Yes.
4  Q. Do you know if Texas did produce or consider any
5  evidence on those issues?
6  A. I do not.
7  Q. And the question below that, do you know the
8  answer to that?
9  A. Only what we covered earlier for the Senate.
10  Q. You're not familiar with the House vote?
11  A. No.
12  Q. Can you look at the topic area that says is there
13  a less retrogressive alternative?
14  A. Yes.
15  Q. And in regards to non-photo identification or
16  non-photo identification proving to be unreliable, do
17  you know the answer to that?
18  A. I don't.
19  Q. You don't have a position on whether non-photo
20  documents are unreliable?
21  A. I don't.
22  Q. Do you know what the Lieutenant Governor's
23  position on that topic is?
24       MR. FREDERICK: Object; legislative
25  privilege to the extent it calls for mental impressions.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 145

1 To the extent he's actually taken a position publicly
2 that you know of, you may answer.
3     A. I don't know.
4     Q. BY MS. MARANZANO: Do you know if the Lieutenant
5 Governor has a position on the third question that says,
6 "are there additional forms of photo ID that could be
7 accepted for voting"?
8     A. I do not.
9     Q. And the third topic area says, "does the new law
10 include mitigating effects." The first question is "are
11 photo IDs free of charge and widely available." Is that
12 the case under Senate bill 14?
13     A. I think so.
14     Q. How would you define "widely available"?
15         MR. FREDERICK: Objection; relevance, but
16 you may answer.
17     A. Available around the State.
18     Q. BY MS. MARANZANO: Do you know how the free ID --
19 how the free ID provision under Senate bill 14 is going
20 to be implemented or would be implemented if Senate bill
21 14 was in effect?
22     A. I don't.
23     Q. So then do you know if the free IDs are widely
24 available?
25     A. I do not.

### 146

1     Q. And the third question under that topic says,
2 "are there fail-safe procedures." Do you know if that's
3 the case under Senate bill 14?
4     A. I don't know.
5     Q. And the fourth question right under that do you
6 know if that's the case with education efforts targeted
7 at minority communities?
8     A. I don't -- I do not know.
9     Q. And the question under that, do you know if
10 that's the case in Senate bill 14? A program designed
11 to provide photo ID's in isolated and impoverished
12 areas?
13     A. I don't know.
14     Q. Do you know if these items were considered by the
15 Lieutenant Governor during his consideration of Senate
16 bill 14?
17     A. I do not know.
18         MS. MARANZANO: Can we have this marked?
19         (Exhibit No. 139 was marked.)
20 BY MS. MARANZANO:
21     Q. I'm showing you what we're marking as Deposition
22 Exhibit 139. Can you take a look at it and let me know
23 if you recognize this document?
24     A. I don't recognize it.
25     Q. You don't?

### 147

1     A. No, ma'am.
2     Q. Can I direct your attention to the second page of
3 this document? I'm sorry. The third page of the
4 document, but the second page of the text? Okay. And
5 on the third full paragraph there, there's a sentence
6 that says, "Lieutenant Governor Dewhurst has indicated
7 that he asked Attorney General to file suit to defend
8 the policy choices made by the Texas Legislature with
9 regard to voter identification if US DOJ prevents the
10 law from taking effect." Did the Lieutenant Governor
11 ask the Attorney General to file this lawsuit?
12     A. I don't know if he specifically asked him, but he
13 supported it.
14     Q. In looking at this document does it refresh your
15 recollection at all about Section 552103 which is I
16 think what we had talked about earlier which was a label
17 on one of the documents?
18     A. No. What is 552?
19     Q. I was just asking you if you knew what it was.
20     A. No.
21     Q. Do you know who Jesse Ancira is?
22     A. Yes.
23     Q. Who is that?
24     A. He is was general counsel and now chief of staff.
25     Q. Do you know why Mr. Battle would have been

### 148

1 sending this document?
2     A. They were both the general counsels between the
3 two offices.
4     Q. And so in other words -- I'm not sure that fully
5 explains it to me. Do you know why this would have been
6 sent to Mr. Ancira?
7     A. Ancira.
8     Q. Ancira? Thank you.
9     A. I don't know why. Unless -- I don't even know
10 what it is.
11     Q. Okay. And you said you hadn't seen it before; is
12 that correct?
13     A. I had not seen it.
14     Q. Okay.
15     A. I'm sorry.
16     Q. No problem. I'm showing you what we previously
17 marked as Deposition Exhibit 119. Have you seen this
18 document before?
19     A. It looks like the ones from earlier. It looks
20 like one of the earlier ones.
21     Q. Have you actually seen it before?
22     A. I don't think so.
23     Q. Do you know if this came from your office who
24 would have drafted it?
25     A. Probably Brian Hebert.



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 149

1   Q. And can you look at the -- at the bottom where it
2   says, "likely questions from opponents," do you know
3   what the purpose of that section of this document would
4   be?
5   A. I'm sure it was just to -- if it was a briefing
6   document, I'm sure it was just to have the likely
7   questions and some potential answers fleshed out.
8   Q. And would this be something that would be for the
9   Lieutenant Governor?
10  A. It could have been or for the -- or for the chair
11  of the -- or the author of the bill. I don't know who
12  it was written for.
13  Q. Can you look at the third question under that
14  that says, "what about people who do not have access to
15  photo ID"?
16  A. Yes.
17  Q. And then the first bullet is "I'm confident that
18  every voter in Texas has or can obtain an acceptable
19  photo ID." Do you know why your office would be taking
20  that position, what that confidence would be based upon?
21  A. I don't.
22  Q. You have no idea?
23  A. I have no idea.
24  Q. Who would know the answer to that?
25  A. Probably Brian Hebert.

## 150

1   Q. Would the Lieutenant Governor?
2   A. I don't know.
3   Q. And under the first question?
4   A. Yes.
5   Q. Do you see the first bullet says, "there is
6   potential for fraud and registration in person voting
7   and counting of ballots. This bill addresses one type
8   of potential fraud." Does that refresh your
9   recollection at all to what we were talking about
10  previously as to whether or not Senate bill 14 would
11  address any other types of fraud other than in person
12  voter impersonation?
13  A. I think it just relates to in person.
14  Q. At any time since the passage of Senate bill 14,
15  have you come to believe that this bill would have a
16  discriminatory effect on minority voters?
17  A. No.
18  Q. At any time since the passage of Senate bill 14
19  have you come to believe it was passed with a
20  discriminatory purpose?
21  A. No.
22  Q. If you are called to testify at trial in this
23  matter would you testify that Senate bill 14 had not
24  been passed with a discriminatory purpose?
25  A. Yes.

## 151

1   Q. And would you testify that it -- similarly that
2   Senate bill 14 did not have a discriminatory effect on
3   minority voters in Texas?
4   A. Yes, to the best of my knowledge.
5   Q. Are there any answers that you've previously
6   answered that you wish to change at this point?
7   A. Not that I can think of.
8   Q. Anything that you previously didn't recall that
9   you now recall?
10  A. I don't think so.
11  Q. Okay. Well, my questioning is complete. I want
12  to note on the record as Mr. Frederick no doubt is aware
13  that we are keeping these depositions open because we
14  have a pending motion with the court about a privilege
15  issue. And I will now turn it over to Mr. Harris?
16         EXAMINATION
17  BY MR. HARRIS:
18  Q. Good evening, Mr. Brunson. I'm Adam Harris from
19  the law firm of Fried, Frank, Harris, Shriver &
20  Jacobson. We represent the Texas League of Young Voters
21  Education Fund in this litigation. I believe in
22  response to questioning by Ms. Maranzano you stated that
23  you spoke to Julia Rathgeber about last night; is that
24  correct?
25  A. Yes.

## 152

1   Q. And you spoke about her deposition which took
2   place yesterday; is that correct?
3   A. Only the length of time that it took.
4   Q. And I believe you stated earlier that that was
5   about it, that you had talked about the length and that
6   was about it. Did you talk about anything beyond the
7   length of her deposition?
8   A. No. It was in a social setting and there wasn't
9   really time to talk about anything except that she was
10  late getting to the event.
11  Q. Was that event a campaign event for the
12  Lieutenant Governor?
13  A. Yes.
14  Q. You testified previously that the Lieutenant
15  Governor has authority to refer a bill to the
16  Committee-of-the-Whole; is that correct?
17  A. Yes.
18  Q. Putting aside any piece of legislation in general
19  how does the Lieutenant Governor decide whether to refer
20  a bill to the Committee-of-the-Whole?
21  A. It's a deliberative process that takes into
22  account different factors. In this case, it was a
23  chance for all 31 members of the Senate to hear the same
24  testimony at the same time.
25  Q. Are there other means to make sure that all



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 153

1 Senators hear the same testimony other than signing a
2 bill to the Committee-of-the-Whole?
3    A.  Sure.
4    Q.  What are those means?
5    A.  Make each one of them listen to the record or the
6 recording from the committee hearings.
7    Q.  I believe you testified that the Lieutenant
8 Governor had the authority to appoint conferees?
9    A.  Yes.
10   Q.  On a particular bill?
11   A.  Yes.
12   Q.  And I believe you also stated that under
13 questioning by Ms. Maranzano that you would have had to
14 have been involved in appointing conferees on SB 14.  Is
15 that your testimony?
16   A.  I believe my testimony was I'm not 100 percent
17 sure whether I looked at the -- or had any substantive
18 input into the picking of conferees, but on a bill like
19 this I would definitely have seen who the bill sponsor
20 or bill author was requesting to be on the conference
21 committee.
22   Q.  And when you say "on a bill like this," what do
23 you mean?
24   A.  There's a few bills every session that have a lot
25 of either publicity or like the budget, a lot of, you

### 154

1 know, a very big bill.  And so because there's whatever
2 it was 4,000 bills filed, I don't know, 1,500 bills that
3 finally passed, I don't -- I don't look at all of them.
4 I mean, I'm sure they come across the desk.  But on this
5 one I probably would have at least seen who they were
6 requesting to have.
7    Q.  Why was SB 14 a very big deal?
8    A.  Well --
9         MR. FREDERICK:  Object to the extent it
10 mischaracterizes the testimony.  But you can answer.
11   A.  As we discussed earlier, it's a bill that had
12 been in front of the Legislature for at least two
13 sessions, maybe more than that.  And it was something
14 that was in the news almost every day as we got headed
15 into session.
16   Q.  BY MR. HARRIS:  Were there any other reasons why
17 you or the Lieutenant Governor considered SB 14 a very
18 big deal?
19        MR. FREDERICK:  Object based on privilege.
20 To the extent this calls for your mental impressions or
21 the Lieutenant Governor's, but to the extent you can
22 answer without revealing that, you may do so.
23   A.  I would say any answer would have to include
24 privileged information from the Lieutenant Governor.
25   Q.  BY MR. HARRIS:  I believe previously you referred

### 155

1 to SB 14 as a party line issue; is that correct?
2    A.  I think that's the way it's been characterized in
3 the press.
4    Q.  What is your understanding as to why SB 14 was a
5 party line issue?
6    A.  Because members from each party voted on the
7 other side from the -- from the other.
8    Q.  Do you have an understanding as to why that was?
9    A.  They disagreed on the issue.
10   Q.  And what is your understanding as to what that
11 disagreement was based upon?
12        MR. FREDERICK:  Object based on legislative
13 privilege only to the extent this would require you to
14 reveal specific communication from legislators about SB
15 14 or your own or the Lieutenant Governor's thought
16 process.  If you have and understanding that doesn't
17 require you to reveal those matters, you may answer.
18   A.  I don't have anything additional to add than
19 earlier.  I'm not quite sure what the -- at the end of
20 the day, what the objection is for the bill.
21   Q.  BY MR. HARRIS:  You stated earlier that you
22 sometimes have communications with the Lieutenant
23 Governor's campaign staff; is that right?
24   A.  Yes.
25   Q.  Did you ever discuss SB 14 with the Lieutenant

### 156

1 Governor's campaign staff?
2    A.  Yes.
3    Q.  When did those discussions take place?
4    A.  Probably prior to the legislative session.
5    Q.  And with whom from the campaign did you speak
6 about SB 14?
7    A.  I don't recall specifically.  It would have been
8 one of the either probably Buddy Barfield.
9    Q.  And who is Mr. Barfield?
10   A.  He is currently the campaign manager.
11   Q.  Did you speak to Mr. Barfield about SB 14 on more
12 than one occasion?
13   A.  Probably.
14   Q.  What was the substance of your discussion with
15 Mr. Barfield?
16        MR. FREDERICK:  Object based on legislative
17 privilege, caution you not to reveal privileged
18 communications, but you may identify the general subject
19 matter of any conversation.
20        MR. HARRIS:  Mr. Frederick, are you
21 asserting a privilege both -- as between statements --
22 over statements by Mr. Brunson and statements by
23 Mr. Barfield or just statements by Mr. Brunson?
24        MR. FREDERICK:  Well, I'm not sure yet
25 whether Mr. Barfield made any statements.  I think in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**157**

1  order to ensure that we don't take any steps that could
2  be construed as waiver, I am asserting privilege at the
3  moment. I will however, allow Mr. Brunson to identify
4  the subject matter of the conversation and it's possible
5  that we may be able to -- we may be able to proceed
6  without violating any privilege.
7  BY MR. HARRIS:
8     Q.  What was the subject matter of your discussion
9  with Mr. Barfield concerning SB 14?
10    A.  Whether or not it was going to be discussed or
11 passed in the legislative session. If it was going to
12 be something that was worked on during the legislative
13 session or not.
14    Q.  And what, if anything, did you say to
15 Mr. Barfield about that question?
16    A.  I don't recall the specifics. Just that it was
17 an issue that's been out there for at least two sessions
18 and from his end there were a lot of -- I'm sure a lot
19 of people on the political side, grass roots type people
20 that were asking when this kind of a bill would be
21 finally passed.
22    Q.  What is your basis for that statement?
23    A.  I think it -- at the convention it was actually
24 something adopted in the platform of the party. But I
25 know that there was a lot of interest in getting it

---

**158**

1  done.
2     Q.  What if anything else did you discuss with
3  Mr. Barfield concerning SB 14?
4     A.  I don't recall any other specifics.
5     Q.  Do you recall any specific statements
6  Mr. Barfield made with respect to SB 14?
7     A.  I do not.
8     Q.  Did you speak to anyone from the campaign other
9  than Mr. Barfield about SB 14?
10    A.  Not that I recall.
11    Q.  Have you spoken with the Lieutenant Governor's
12 campaign regarding any other voter ID bill aside from SB
13 14?
14    A.  I don't think so. I don't think -- I wouldn't
15 have worked on it prior -- I didn't work on it prior to
16 SB 14 is.
17    Q.  Have you spoken with the campaign about SB 14
18 since the bill passed?
19    A.  I'm sure we have. I'm sure we have.
20    Q.  And what was the substance of those discussions?
21       MR. FREDERICK:  Object on the basis of
22 legislative privilege only to the extent that this
23 question would ask for the Lieutenant Governor's thought
24 process or mental impressions formed during
25 consideration of SB 14 or a communication from a

---

**159**

1  legislator about the bill during -- before passage.
2  Otherwise, you can answer the question.
3     A.  I think the discussions would have been pretty
4  generic about the bill passed and probably discussions
5  about the timing of this lawsuit and that it was being
6  filed and whether or not the law was in effect for this
7  election cycle. But beyond that, nothing -- nothing
8  that they couldn't have read in the newspaper.
9     Q.  BY MR. HARRIS:  Did you have any discussions with
10 Mr. Barfield or anyone else from the campaign about the
11 impact of SB 14 on the Lieutenant Governor's electoral
12 chances in any races for which he was running?
13       MR. FREDERICK:  Objection; relevance. You
14 may answer.
15    A.  No.
16    Q.  BY MR. HARRIS:  Not at any time?
17    A.  Not at any time.
18    Q.  I believe you stated that you attended Angelo
19 State and Texas State University; is that right?
20    A.  Yes.
21    Q.  Were you issued a student ID at either of those
22 schools?
23    A.  It's been a long time ago. Yes.
24    Q.  Do you have any reason to question the
25 reliability of student ID's? And by reliability I mean,

---

**160**

1  do you have any reason to think that an ID the issued by
2  a Texas State University or another State institution
3  would not be a good indicator that someone is who they
4  say they are?
5        MR. FREDERICK:  Objection; relevance. You
6  may answer.
7     A.  I haven't thought about it. I don't have an
8  opinion on it.
9     Q.  BY MR. HARRIS:  Have you ever worked on the
10 Lieutenant Governor's campaigns?
11    A.  Just in a volunteer basis.
12    Q.  And what did you do on a volunteer basis?
13    A.  Make phone calls for turn out and answer
14 questions -- if any questions came up that related to
15 his work on State side.
16    Q.  Do you generally follow the news about the
17 Lieutenant Governor's campaigns at all?
18    A.  Yes.
19    Q.  Have you been following the recent Republican
20 primary for the US Senate for which Lieutenant Governor
21 is running?
22    A.  Yes.
23    Q.  And I understand that yesterday was the primary
24 election; is that right?
25    A.  Yes.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 161

1    Q. What were the results of that election?
2        MR. FREDERICK: Objection; relevance.
3    A. He ended up -- he finished in first at 44 or
4    45 percent. And there's a run off in 2-month.
5    Q. BY MR. HARRIS: And who is that run off going to
6    be against?
7    A. Ted Cruz.
8    Q. And who is Ted Cruz?
9    A. He is as a guy that's running for the United
10   States Senate that worked for the Attorney General's
11   office here in Texas and is a lawyer.
12   Q. Have you had any discussions at any time with the
13   Lieutenant Governor about Mr. Cruz?
14       MR. FREDERICK: Objection; relevance. You
15   may answer.
16   A. Yes.
17   Q. BY MR. HARRIS: How often have you discussed
18   Mr. Cruz with the Lieutenant Governor?
19   A. Not very often.
20   Q. Can you describe the substance of your
21   discussions with the Lieutenant Governor about Mr. Cruz?
22       MR. FREDERICK: Objection; relevance.
23   A. No.
24   Q. BY MR. HARRIS: You cannot describe the
25   substance?

## 162

1    A. I can. It's a close race and he hopes -- you
2    know, obviously hoping to get over 50 percent last
3    night.
4    Q. Do you have any understanding as to Mr. Cruz's
5    racial or ethnic background?
6        MR. FREDERICK: Objection; relevance. You
7    may answer.
8    A. I do personally?
9    Q. BY MR. HARRIS: Yes?
10   A. Yes.
11   Q. What is his background, to your knowledge?
12       MR. FREDERICK: Same objection.
13   A. His public statements have been that his father
14   came over from Cuba and worked at the University of
15   Texas. And so he's Cuban.
16   Q. BY MS. MARANZANO: Have you had any discussions
17   with Lieutenant Governor or his campaign staff about
18   that fact, the fact that Mr. Cruz ask Cuban?
19       MR. FREDERICK: Objection; relevance. You
20   may answer.
21   A. No.
22   Q. BY MR. HARRIS: Have you had any discussions with
23   the Lieutenant Governor or his campaign staff about the
24   importance of the Hispanic vote in this years Republican
25   primary for the Senate?

## 163

1        MR. FREDERICK: Objection; relevance. You
2    may answer.
3    A. No.
4    Q. BY MR. HARRIS: Have you ever discussed with the
5    Lieutenant Governor or his campaign staff the importance
6    of the Hispanic vote in Texas in general?
7        MR. FREDERICK: Objection; relevance. You
8    may answer.
9    A. Not recently, but yes.
10   Q. BY MR. HARRIS: When did you have those
11   discussions?
12   A. It's been several years ago. Based on the fact
13   that the Lieutenant Governor is fluent in Spanish and
14   he's always had an ability to communicate very fluently
15   in Spanish. And the conversations have been generally,
16   about him doing media interviews in Spanish to reach out
17   to Spanish speaking only voters.
18   Q. And what is your understanding as to why the
19   Lieutenant Governor would reach out to Spanish only
20   speaking voters?
21       MR. FREDERICK: Objection; relevance. You
22   my answer.
23   A. Because he would like to reach out to all voters.
24   Q. BY MR. HARRIS: Have you ever had any discussions
25   with Lieutenant Governor about the size of the Hispanic

## 164

1    voting block in Texas?
2        MR. FREDERICK: Objection; relevance. You
3    may answer.
4    A. No.
5    Q. BY MR. HARRIS: Have you ever had any such
6    discussions with the Lieutenant Governor's campaign
7    staff?
8        MR. FREDERICK: Objection; relevance.
9    A. About?
10   Q. BY MR. HARRIS: About the size of the Hispanic
11   voting block in Texas?
12       MR. FREDERICK: Same objection.
13   A. No.
14   Q. BY MR. HARRIS: Have you ever had any discussions
15   with the Lieutenant Governor or his campaign staff about
16   the importance of the African-American vote in Texas?
17       MR. FREDERICK: Objection; relevance. You
18   may answer.
19   A. Not that I recall.
20   Q. BY MR. HARRIS: Do you have any understanding as
21   to disparities in the extent to which particular racial
22   group support one party or another in Texas?
23       MR. FREDERICK: Objection; relevance. You
24   may answer.
25   A. I do not.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Blaine Brunson                                          May 30, 2012

---

**165**

1    Q.  BY MR. HARRIS:  Do you follow the Lieutenant
2  Governor Governor's election results?
3    A.  Yes.
4    Q.  And do you have any understanding -- let's say
5  taking his last election in 2010, do you have any
6  understanding as to how the Lieutenant Governor did
7  amongst Hispanic voters in Texas?
8        MR. FREDERICK:  Objection; relevance.  You
9  may answer.
10   A.  I do not.
11   Q.  BY MR. HARRIS:  How about amongst
12  African-Americans, do you have any understanding as to
13  how the Lieutenant Governor did amongst African-American
14  vote engineers 2010?
15       MR. FREDERICK:  Objection; relevance.  You
16  may answer.
17   A.  I don't.
18   Q.  BY MR. HARRIS:  If I ask those same two questions
19  about any previous election would you give the same
20  answer?
21   A.  Yes.
22   Q.  How about Governor Perry?  I assume you must
23  generally at least follow his elections; is that right?
24       MR. FREDERICK:  Objection; relevance.
25   A.  Yes.

---

**166**

1    Q.  BY MR. HARRIS:  Do you have any understanding as
2  to how Governor Perry did amongst Hispanic voters in
3  2010?
4        MR. FREDERICK:  Objection; relevance.
5    A.  No.
6    Q.  BY MR. HARRIS:  Do you have any understanding as
7  the affect how Governor Perry did amongst African-American
8  voters in 2010?
9        MR. FREDERICK:  Objection; relevance.
10   A.  I don't.
11   Q.  BY MR. HARRIS:  What is your understanding as to
12  the importance of the issue of immigration in this
13  year's US Senate primary -- Republican primary, excuse
14  me?
15       MR. FREDERICK:  Objection; relevance.  You
16  may answer.
17   A.  I know it's an issue that's definitely discussed
18  during the campaign.
19   Q.  BY MR. HARRIS:  Can you elaborate on that?
20       MR. FREDERICK:  Objection; relevance.
21  Objection; form.  You may answer.
22   A.  It is an -- immigration has been an issue that's
23  been on the public radar for several years that comes up
24  pretty often as the political season heats up in
25  particular.

---

**167**

1    Q.  BY MR. HARRIS:  And how would you characterize
2  the Lieutenant Governor's position on immigration as
3  opposed to Mr. Cruz's position on immigration?
4        MR. FREDERICK:  Objection; relevance.
5    A.  I'm not advised of what Ted Cruz's position is.
6  And so I couldn't do a -- I don't know how the
7  comparison would be.
8    Q.  BY MR. HARRIS:  Have you been following any of
9  the televised adds or radio adds or any form of adds in
10  the campaign?
11   A.  Yes.
12   Q.  And have any of those adds dealt with the issue
13  of immigration?
14   A.  I would say yes.
15   Q.  And can you describe the adds that you've seen
16  that relate to immigration?
17       MR. FREDERICK:  Objection; relevance.
18  Objection; form.  You can answer.
19   A.  I have not seen any adds that relate to
20  immigration except if there was a mention of it in an
21  add that said illegal immigration or something like
22  that.
23   Q.  BY MR. HARRIS:  And the add that you're
24  describing, would that be an add by the Lieutenant
25  Governor or by another candidate?

---

**168**

1        MR. FREDERICK:  Objection; relevance.
2  Objection; assumes facts not in evidence.  You may
3  answer.
4    A.  Probably most candidates.
5    Q.  BY MR. HARRIS:  Are you familiar with assertions
6  by Mr. Cruz in this year's Republican Senate primary to
7  the affect that the Lieutenant Governor's advisors
8  believe that GOP voters in Texas would not support a
9  Hispanic candidate?
10       MR. FREDERICK:  Objection; relevance.
11   A.  I'm not aware of that.
12   Q.  BY MR. HARRIS:  You didn't read anything?
13   A.  No.
14   Q.  Are you aware of the assertions Lieutenant
15  Governor campaign for this year's Republican nomination
16  for the Senate have involved resorts to bigotry?
17       MR. FREDERICK:  Objection; relevance.
18  Objection; assumes facts not in evidence.  You answer if
19  you can.
20   A.  Have I seen an article about that?
21   Q.  BY MR. HARRIS:  Yes.  What did you readable that?
22       MR. FREDERICK:  Objection; relevance.
23  Objection; form.
24   A.  That Cruz's campaign said that some statement or
25  issue being bigotry, that the Lieutenant Governor --

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 169

1   yeah, the Lieutenant Governor laid out.
2       Q.  BY MR. HARRIS:  Did you discuss those allegations
3   with the Lieutenant Governor?
4           MR. FREDERICK:  Objection; relevance.
5       A.  I did not.
6       Q.  BY MR. HARRIS:  Have you discussed those
7   allegations with anyone on the Lieutenant Governor's
8   staff at the Capital or his campaign staff?
9           MR. FREDERICK:  Objection; relevance.
10      A.  No.
11      Q.  BY MR. HARRIS:  What do you think of those
12  allegations?
13          MR. FREDERICK:  Objection; relevance.
14  Objection; form.
15      A.  I don't have an opinion on them.  I haven't
16  looked at it close enough to have an opinion.
17      Q.  BY MR. HARRIS:  So your testimony is that you
18  don't have an opinion on the assertion that the
19  Lieutenant Governor's campaign has resorted to bigotry?
20          MR. FREDERICK:  Objection; form.  Objection;
21  misstates prior testimony.  You may answer.
22      A.  Could you repeat the question?
23      Q.  BY MR. HARRIS:  I would ask the court reporter to
24  please read back the question?  That's okay.  Let's move
25  on.  I know your time is scarce.  Have you discussed

### 170

1   this -- putting aside your attorneys, have you discussed
2   this litigation -- and by this litigation I mean the
3   case you're here testifying about, with anyone?
4           MR. FREDERICK:  Objection; relevance.  You
5   may answer.
6       A.  Just with our general counsel.
7       Q.  BY MR. HARRIS:  Have you discussed litigation
8   with the Lieutenant Governor?
9           MR. FREDERICK:  Objection; relevance.
10      A.  I have discussed it from the standpoint that he
11  knows that myself and Julia are being deposed.
12      Q.  BY MR. HARRIS:  Have you discussed the litigation
13  with the Lieutenant Governor from any other standpoint?
14          MR. FREDERICK:  Objection; relevance.
15      A.  At the time the lawsuit was filed, just that the
16  lawsuit had been filed.
17      Q.  BY MR. HARRIS:  I believe you testified -- excuse
18  me.  Going back -- when the lawsuit was filed, what if
19  anything in particular did you discuss about that fact
20  with the Lieutenant Governor?
21          MR. FREDERICK:  Objection; relevance.
22      A.  Just the fact that it had been filed.
23      Q.  BY MR. HARRIS:  And what, if anything, did the
24  Lieutenant Governor say about the fact that the lawsuit
25  had been filed?

### 171

1           MR. FREDERICK:  Objection; relevance.
2       A.  Keep me posted on what's happening.
3       Q.  BY MR. HARRIS:  Did he say anything else?
4       A.  That's about it.
5       Q.  Can you recall anything else he said?
6           MR. FREDERICK:  Objection, relevance.
7       A.  No.
8       Q.  BY MR. HARRIS:  Have you discussed this
9   litigation -- again putting aside your attorneys and I
10  think putting aside the Lieutenant Governor's general
11  counsel as well and putting aside the Lieutenant
12  Governor since we just spoke about him, have you
13  discussed this litigation with anyone else?
14          MR. FREDERICK:  Objection; relevance.
15      A.  Not that I recall.  If there was any discussions
16  it was nothing substantive.
17      Q.  BY MR. HARRIS:  I believe you testified earlier
18  that SB 14 would apply equally to Democrats and
19  Republicans; is that right?
20      A.  Well, if it's -- if it's finally made law.
21      Q.  Are you aware of any analysis showing whether
22  Democrats and Republicans are equally likely to possess
23  the required forms of ID under SB 14?
24          MR. FREDERICK:  Objection; relevance.
25      A.  I am not.

### 172

1       Q.  BY MR. HARRIS:  What was the Lieutenant
2   Governor's role in including a carve out for voter ID
3   laws from the two-thirds rule under the Senate rules in
4   2011?
5           MR. FREDERICK:  Object to form of the
6   question.  Object it assumes facts not in evidence.  You
7   may answer.
8           MR. HARRIS:  I'll take the objection under
9   advisement and rephrase.
10  BY MR. HARRIS:
11      Q.  Did the Lieutenant Governor have a role including
12  a carve-out for the two-thirds rules under the Senate
13  rules?
14          MR. FREDERICK:  Objection; form.  Assumes
15  facts not in evidence.  Object to the characterization
16  of the Senate rule.  You may answer.
17      A.  Yes.
18      Q.  BY MR. HARRIS:  What was Lieutenant Governor's
19  role?
20          MR. FREDERICK:  Object to the form.  Also
21  caution you not to reveal any privileged information.
22  But you can answer if you can do so.
23      A.  Traditionally the Lieutenant Governor and the
24  Senators work together at the beginning of session to
25  adopt the rules.  And he's -- he and any other



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Blaine Brunson                                                May 30, 2012

---

173

1   Lieutenant Governor would have participated in
2   discussions with any set of Senators about what the
3   rules of Senate would be for the upcoming session.
4         MR. HARRIS:  I'm going to ask this document
5   be marked as League of Young Voters Exhibit 1?
6         (Exhibit No. 1 was marked.)
7   BY MR. HARRIS:
8   Q.  Mr. Brunson, the court reporter has handed you
9   what's been marked as League of Young Voters Exhibit 1
10  which bears the Bates number TX0006413.  Do you
11  recognize this document?
12  A.  I don't.
13  Q.  I see at the top left of the page there's a name,
14  Sheera Ikeler.  Do you know who that is?
15  A.  I don't.
16  Q.  It appears from the face of this document that
17  it's an e-mail.  Do you agree with that?
18  A.  Yes.
19  Q.  And it looks like this e-mail was both sent from
20  and to someone named Skipper Wallace.  Do you see that?
21  A.  Yes.
22  Q.  Who is Skipper Wallace?
23  A.  He is the TRCCA legislative chairman.
24  Q.  And when you say "TRCCA," what does that stand
25  for?

---

174

1   A.  I think it's the Texas Republican County Chairman
2   Association.
3   Q.  And do you have any understanding as to what that
4   group is?
5   A.  It's the collection of the Republican county
6   chairman around the State.
7   Q.  I see that the subject line here, it looks like
8   it's a forward it says FW and then the subject is voter
9   ID bill?
10  A.  Yes.
11  Q.  It looks like the date of this e-mail was May 22,
12  2011.  Do you see that?
13  A.  Yes.
14  Q.  Do you understand the subject voter ID bill to
15  mean SB 14?
16  A.  Yes.
17  Q.  And it looks like the first line of this -- of
18  the body of this e-mail in all caps it says, "a big
19  thank you."  Do you see that line?
20  A.  I do.
21  Q.  Then going on it says that "the Texas Republican
22  County Chairman's Association would like to go on record
23  as thanking the following people for the passage of the
24  voter ID bill."  And then skipping -- it looks like
25  there's a list of names after that.  Do you see that?

---

175

1   A.  Yes.
2   Q.  And under the -- two lines down from what I just
3   read it states, "Lieutenant Governor Dewhurst for
4   suspending the two-thirds rule on the Senate that
5   allowed the bill to be considered."  Do you see that
6   line?
7   A.  I do see it.
8   Q.  Why would Skipper Wallace issue a big thank you
9   to Lieutenant Governor Dewhurst for suspending the
10  two-thirds rule in the Senate that allowed the bill to
11  be considered?
12        MR. FREDERICK:  Objection; calls for
13  speculation.
14  A.  I would say you have to ask Skipper Wallace.
15  Q.  BY MR. HARRIS:  Do you have any understand as to
16  why Skipper Wallace would issue a big thank you to the
17  Lieutenant Governor for suspending the two-thirds rule
18  and allowing the bill to be considered?
19        MR. FREDERICK:  Objection; relevance.
20  A.  You would have to ask Skipper Wallace.
21  Q.  BY MR. HARRIS:  Is it your testimony that you do
22  not have any understanding as to why Skipper Wallace
23  would issue a big thank you to Lieutenant Governor
24  Dewhurst for suspending the two-thirds rule?
25        MR. FREDERICK:  Objection; mischaracterizes

---

176

1   testimony.  Objection; relevance.  You may answer.
2   A.  I think if I had an answer it would be an
3   assumption.  If you ask Skipper Wallace he would be able
4   to tell you.
5   Q.  BY MR. HARRIS:  Have you heard of a group called
6   the King Street Patriots?
7   A.  I've heard of them.
8   Q.  Who are the King Street Patriots?
9   A.  I think it's a Houston -- Houston based -- I
10  believe it's Houston based -- somewhere in the Houston
11  area tea party group.
12  Q.  And to your knowledge has the Lieutenant Governor
13  attended any events hosted or sponsored by the King
14  Street Patriots?
15  A.  He probably has.  I actually think he has gone to
16  one or more of their meetings.
17  Q.  Do you know whether he has done so recently?
18  A.  I don't know.
19  Q.  I believe you testified earlier that because you
20  think it's hard to do things in general without a
21  driver's license, SB 14 cannot negatively effect that
22  many people.  Was that your testimony?
23  A.  I said I find it hard to -- I find it hard to
24  believe that it would be -- there would be that many
25  people without some form of photo ID given in the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 177

1  current society how much you have to have a photo ID --
2  voter photo ID to do anything.
3      Q. Do you know how many registered voters in Texas
4  lack a driver's license?
5      A. I don't.
6      Q. Do you know whether any analysis of that question
7  was performed when SB 14 was being considered?
8      A. I do not.
9      Q. Do you know whether any such analysis has been
10 done since SB 14 was passed?
11     A. I do not.
12     Q. Do you know how many voters in Texas lack --
13 excuse me, registered voters in Texas lack the other
14 forms of identification permitted to vote under SB 14?
15     A. I don't.
16     Q. If we could just take a 2-minute break I'll just
17 confirm that I don't have any other questions and then
18 you can be on your way?
19     A. Sure.
20     Q. Thank you.
21        (Brief recess.)
22 BY MR. HARRIS:
23     Q. I believe you testified in 2011 Governor Perry
24 designated the voter ID law as an emergency item; is
25 that correct?

## 178

1      A. Yes.
2      Q. Why did Governor Perry designate SB 14 as an
3  emergency item?
4          MR. FREDERICK:  Objection; relevance.
5  Objection; calls for speculation. You can answer if you
6  know.
7      A. I don't know.
8      Q. BY MR. HARRIS:  Did you have any discussions with
9  Governor Perry about why he designated SB 14 as an
10 emergency item?
11     A. No.
12     Q. Did you any discussions with any of Governor
13 Perry's staff about why the Governor designated SB 14 as
14 an emergency item?
15     A. Yes.
16     Q. With whom did you -- with whom from the
17 Governor's staff did you discuss why the Governor
18 designated SB 14 as an emergency item?
19     A. With Ray Sullivan.  I don't know if we discussed
20 why he did it.  I thought the question was did we
21 discuss voter ID.
22     Q. Okay.  Well, we can certainly talk about both?
23 Who is Mr. Sullivan?
24     A. He was the Governor's chief of staff.
25     Q. When did you discuss with Mr. Sullivan the

## 179

1  designation of SB 14 as an emergency item?
2      A. It would have had to have been in December of
3  2010 or early January of 2011, prior to the order coming
4  out.
5      Q. And what was the substance of your discussion
6  with Mr. Sullivan about the designation of SB 14 as an
7  emergency legislation?
8          MR. FREDERICK:  Objection; relevance.
9      A. That it was an issue that was definitely going to
10 come up in the session.  And as far as the emergency
11 order, the discussion was if you have a whole bunch of
12 other issues to work on during the session if you did
13 make an emergency item you would work on it in the first
14 60 days of the session.
15     Q. BY MR. HARRIS:  Did you and Mr. Sullivan at any
16 time discuss why the Governor had designated SB 14 as an
17 emergency item?
18     A. Not that I recall.
19     Q. Did you at any time discuss the designation of SB
20 14 as an emergency item with anyone on the Governor's
21 staff other than Mr. Sullivan?
22     A. Not that I recall.  Probably not.
23     Q. Are there individuals who you think you may have
24 had discussions with from the Governor's staff with
25 regard to SB 14 as an emergency item?

## 180

1          MR. FREDERICK:  Objection; vague.  You may
2  answer.
3      A. No.
4      Q. BY MR. HARRIS:  Did you have any discussions with
5  the Lieutenant Governor about the designation of SB 14
6  as emergency legislation?
7          MR. FREDERICK:  Object only to the extent it
8  calls for the substance of those discussions.  You may
9  however answer the question whether or not a discussion
10 occurred.
11     A. Yes, we discussed voter ID.
12     Q. BY MR. HARRIS:  Did you particularly discuss the
13 designation of voter ID as an emergency item?
14         MR. FREDERICK:  Again, same objection.
15     A. Yes.
16     Q. BY MR. HARRIS:  Did you discuss that subject on
17 more than one occasion with the Lieutenant Governor?
18     A. I'm sure we did.
19     Q. When did these discussions occur?
20     A. Prior to the session and during the session.
21     Q. What was the substance of your discussion with
22 the Lieutenant Governor regarding why SB 14 was
23 designated as an emergency item?
24         MR. FREDERICK:  Objection; legislative
25 privilege and instruct you not to answer.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

181

1   BY MR. HARRIS:
2      Q.  Are you taking your counsel's advice?
3      A.  Yes.
4      Q.  Are you familiar with statements which -- let me
5   step back.  Do you know an individual named Mike Walz?
6      A.  Yes.
7      Q.  Who is Mr. Walz?
8      A.  He is the Lieutenant Governor's communications
9   director?
10     Q.  Do you recall any public statements by Mr. Walz
11  regarding why SB 14 was designated as an emergency item?
12     A.  I don't recall his statements.
13     Q.  In a typical legislative session how many items
14  are designated as an emergency?
15     A.  It depends on the session.  I think last time --
16  last session there were, I don't remember.  Three to
17  five.  There's normally not a lot of emergency items.
18     Q.  Is three to five a pretty typical number in a
19  session as far as how many items get designated as an
20  emergency?
21     A.  Probably.  Yes.
22     Q.  In the 2011 session what other items were
23  designated as an emergency besides SB 14?
24     A.  I think the Governor designated voter ID and
25  sanctuary cities.

---

182

1      Q.  Do you recall anything else?
2      A.  Yeah.  There was -- I have to think about it for
3   a second.  Give me a second.
4      Q.  Sure.
5      A.  The sonogram bill and seems like there was one
6   more.  I can't recall.  It may have had something to do
7   with like some -- I don't remember what it was.
8      Q.  Since you've worked for the Lieutenant Governor
9   how many times has the Senate met as the
10  Committee-of-the-Whole?
11     A.  I don't know the exact number.  But probably
12  three or four.
13     Q.  The -- you -- besides SB 14 -- I apologize if you
14  testified this previously, but I just want the clarify
15  the record, besides SB 14 what other issues has the
16  Senate deliberated on as the Committee-of-the-Whole?
17     A.  I believe school finance.  Like maybe the '06,
18  '07 time period.  There may be others.  I just --
19  honestly, until last session didn't have to pay
20  attention to anything except the budget.
21     Q.  Does the Lieutenant Governor consider it
22  important to reach out to minority communities?
23     MR. FREDERICK:  Objection; relevance.  And I
24  would also object on the basis of privilege to the
25  extent that this seeks the Lieutenant Governor's thought

---

183

1   process about any specific bill.  I suppose if you can
2   answer without revealing privileged information you may
3   do so.
4   BY MR. HARRIS:
5      Q.  Let me clarify that I'm not asking about any
6   particular legislation.  But in general does Lieutenant
7   Governor consider it important to reach out to minority
8   communities in Texas?
9      MR. FREDERICK:  Objection; relevance.
10  Objection; vague.  You may answer if you can.
11     A.  I think he feels it's important to reach out to
12  all groups in Texas.
13     Q.  BY MR. HARRIS:  What, if anything, has the
14  Lieutenant Governor done since you've -- since you've
15  worked for him to reach out to the Hispanic community in
16  Texas?
17     MR. FREDERICK:  Objection; relevance.
18  Objection; vague.  You may answer.
19     A.  He has -- like we talked about earlier he's done
20  a lot of Spanish language media.  One that is
21  particularly in South Texas when we were travelling on
22  the border and, you know, he's probably been down to the
23  border area more than any other statewide -- no offense
24  to General Abbott, but I think given that he's a fluent
25  Spanish speaker he feels like it's an easy win for him

---

184

1   to be able to communicate and reach out.  It's, I
2   think -- I was trying to think of any other specific
3   things.  But I think he thinks outreach is important.
4      Q.  BY MR. HARRIS:  And just to clarify, since your
5   counsel objected, if I use the term reach out or
6   political outreach, do you have an understanding of what
7   that means?
8      A.  Yes.
9      Q.  Just for the record, what is that understanding?
10     A.  Could you --
11     MR. FREDERICK:  Object to relevance, but you
12  can answer.
13     A.  Could you repeat the question?
14     Q.  BY MR. HARRIS:  Sure.  What is your understanding
15  of the term political outreach?
16     A.  Reaching out to the political voters.
17     Q.  When you say that the -- that the Lieutenant
18  Governor has reached out to Spanish speakers because
19  it's an easy win for him, what do you mean by that?
20     MR. FREDERICK:  Objection; relevance.  You
21  may answer.
22     A.  He's perfectly fluent in Spanish.  It's a natural
23  fit is what I mean.  It's a win for the voters that only
24  speak Spanish and a win for the Lieutenant Governor
25  because not all the elected officials can fluently speak

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 185

1  Spanish.
2  Q.  BY MR. HARRIS:  I'm a little confused because I
3  think I asked you earlier if you had any understanding
4  of how the Lieutenant Governor has done in terms of his
5  elections amongst Hispanic voters.  And now you're
6  testifying that Hispanic vote because the Lieutenant
7  Governor is a Spanish speaker is an easy win for him.
8  Do you wish to revise your earlier answer with regard to
9  your understanding of the Lieutenant Governor has
10  done amongst Hispanic voters?
11      MR. FREDERICK:  Objection; vague.
12  Objection; relevance.  You can answer if you can.
13      A.  No.  Because you asked if I knew specifics about
14  Hispanic voter turn out or election results and I don't.
15      Q.  BY MR. HARRIS:  Putting aside specifics, do you
16  have any general understanding as to how the Lieutenant
17  Governor has done in his elections amongst Hispanic
18  voters in Texas?
19      MR. FREDERICK:  Objection; relevance.
20      A.  I think he's held his own.
21      Q.  BY MR. HARRIS:  When you say "held his own," what
22  do you mean?
23      MR. FREDERICK:  Objection; relevance.
24      A.  He's done as good as he can.
25      Q.  BY MR. HARRIS:  How good is that?

### 186

1      MR. FREDERICK:  Objection; relevance.
2  Objection; form.  You can answer.
3      A.  It is what it is.  He's done as well as he can.
4  I think he's tried to outreach to all groups, not just
5  any one specific group.
6      Q.  BY MR. HARRIS:  Has the Lieutenant Governor ever
7  won a majority of the Hispanic vote in any of his
8  elections?
9      MR. FREDERICK:  Objection; relevance.
10     A.  I don't know the answer to that.
11     Q.  BY MR. HARRIS:  Do you know whether Lieutenant
12  Governor has ever won a majority of African-American
13  voters?
14     A.  I don't know the answer to that, either.
15     Q.  At this time the Texas League has no further
16  questions, but we reserve the right to recall
17  Mr. Brunson subject to the court's ruling on the motion
18  to compel?
19     (Deposition concluded.)
20
21
22
23
24
25

### 187

CHANGES AND SIGNATURE
RE: STATE OF TEXAS VS. HOLDER

PAGE  LINE   CHANGE          REASON

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

### 188

1      I, BLAINE BRUNSON, have read the foregoing
deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
           BLAINE BRUNSON
4  THE STATE OF TEXAS   )
5  COUNTY OF TRAVIS     )
           Before me, _____, on this day
6  personally appeared BLAINE BRUNSON, known to me (or
proved to me under oath or through
7  (description of identity card or other document) to be
the person whose name is subscribed to the foregoing
8  instrument and acknowledged to me that they executed the
same for the purposes and consideration therein
9  expressed.
10      Given under my hand and seal of office this _____
day of _____, _.
11
12      NOTARY PUBLIC IN AND FOR
THE STATE OF
13
14
15
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

189

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS        )
                      )
                      )
VS.                   ) NO. 12-CV-128
                      ) (DST, RMC, RLW)
                      )
ERIC H. HOLDER, JR.,  )
In his official       )
Capacity as Attorney  )
General of the United )
States                )

*****************************************

CERTIFICATE FROM THE
ORAL DEPOSITION OF
BLAINE BRUNSON
MAY 30, 2012

*****************************************

    I, Janalyn Reeves, a Certified Shorthand Reporter
in and for the State of Texas, do hereby certify that
the foregoing deposition is a full, true and correct
transcript;
    That the foregoing deposition of BLAINE BRUNSON, the
Witness, hereinbefore named was at the time named, taken
by me in stenograph on May 30, 2012, the said Witness
having been by me first duly cautioned and sworn to tell
the truth, the whole truth, and nothing but the truth,
and the same were thereafter reduced to typewriting by
me or under my direction.  The charge for the completed
deposition is $_____ due from Defendant.
    () That pursuant to the Federal Rules of Civil
Procedure, the Witness shall have 30 days after being

190

notified by certified mail, return receipt requested, by
the deposition officer that the original deposition
transcript is available in her office for review and
signature by the Witness and if any corrections made are
attached hereto;
    () That by agreement of counsel, a reading condensed
copy of the deposition transcript along with the
full-size original changes and Signature Sheet has been
sent to_____ on_____ for review and
signature within 30 days and if any corrections returned
are attached hereto;
    () That by agreement of counsel, the deposition
officer is instructed to release the original deposition
transcript to_____ on_____, for review and
signature, and the deposition officer is thereafter
released of any further responsibility with regard to
the original.
    () That the Witness shall have thirty (30) days for
review and signature of the original transcript and if
any corrections returned are attached hereto.
    () That the signed transcript () was () was not
received from the Witness within 30 days.
    () That the examination and signature of the Witness
is waived by the Witness and the parties;
    That the amount of time used by each party at the

191

deposition is as follows:
    Ms. Maranzano - 3 hours 16 minutes
    Mr. Harris - 41 minutes
    Mr. Frederick - no time
    Ms. Abudu - no time
    I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
action in which this proceeding was taken, and further
that I am not financially or otherwise interested in the
outcome of the action.
    WITNESS MY HAND, this _____ day
of_____ A.D. 2012.
_____
JANALYN REEVES
Cert. No. 3631
Expires Dec. 12
100 Congress
Suite 220
Austin, Texas  78701
(512)634-1980
Firm Registration No. 283



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com