## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
        Plaintiff,                 )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR., IN            )
HIS OFFICIAL CAPACITY AS           )
ATTORNEY GENERAL OF THE            )
UNITED STATES,                     )
                                   )
        Defendant,                 )
                                   )
ERIC KENNIE, ET AL.,               )
                                   )
        Defendant-Intervenors,     )
                                   )
THE TEXAS SATE CONFERENCE          )  CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, ET              )  (RMC-DST-RLW)
AL.,                               )  Three-Judge Court
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEAGUE OF YOUNG              )
VOTERS EDUCATION FUND, ET          )
AL.,                               )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, ET AL.,                    )
                                   )
        Defendant-Intervenors,     )
                                   )
VICTORIA RODRIGUEZ, ET             )
AL.,                               )
                                   )
        Defendant-Intervenors.     )

## 2

```
1   **********************************************************
2              ORAL DEPOSITION OF
3              LYDIA CAMARILLO
4              JUNE 12, 2012
5   **********************************************************
6        ORAL DEPOSITION OF LYDIA CAMARILLO, produced as a
7   witness at the instance of the Defendants Eric H. Holder,
8   et al., and duly sworn, was taken in the above-styled and
9   numbered cause on Wednesday, June 12, 2012, from 9:00 a.m.
10  to 10:41 a.m., before Tamara K. Chapman, CSR in and for
11  the State of Texas, reported by machine shorthand, at the
12  Omni, 9821 Colonnade Boulevard, San Antonio, Texas,
13  pursuant to the Federal Rules of Civil Procedure and the
14  provisions stated on the record or attached hereto.
```

## 3

```
1
2                    A P P E A R A N C E S
3   FOR THE PLAINTIFF STATE OF TEXAS:
        Mr. Adam Aston
4       ATTORNEY GENERAL OF TEXAS
        Civil Medicaid Fraud Division
5       209 W. 15th Street
        Austin, Texas  78701
6       adam.aston@oag.state.tx.us
7
8   FOR THE DEFENDANTS ERIC H. HOLDER, ET AL.:
        Ms. Michelle McLeod
9       U.S. DEPARTMENT OF JUSTICE
        1800 G Street, 7254
10      NWB - Room 7202
        Washington, DC  20006
11      michelle.mcleod@usdoj.gov
12
13  RODRIGUEZ DEFENDANT-INTERVENORS:
        Ms. Nina Perales
14      110 Broadway, Suite 300
        San Antonio, Texas  78205
15      nperales@maldef.org
16
17  ALSO PRESENT:
        MR. Luis Figueroa - Legislative Staff Attorney
18      MALDEF
        110 Broadway, Suite 300
19      San Antonio, Texas  78205
        lfigueroa@maldef.org
20
21      Mr. Glenn Bayron - Mi Familia Vota
22
23
24
25
```

## 4

```
1                    I N D E X
2                                          PAGE
3
    APPEARANCES...............................   2
4
    EXAMINATION
5       Examination By Mr. Aston .............   5
    CHANGES AND SIGNATURE.....................  67
7
8   SIGNATURE PAGE............................  68
9
10  REPORTER'S CERTIFICATION..................  70
11
12                  E X H I B I T S
13  NO.  DESCRIPTION                         PAGE
    1   Notice
14      (No Bates - 2 pages)                   9
    2   SB 14
15      (No Bates - 17 pages)                 20
    3   5/1/12 e-mail from Carlos Duarte,
16      Subject:  Fwd: Take Action against
        "True the Vote"
17      (Bates RODR-138)                      32
18
19
20
21
22
23
24
25
```



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

5

1          LYDIA CAMARILLO,
2   having been first duly sworn, testified as follows:
3          EXAMINATION
4   BY MR. ASTON:
5      Q. Good morning.
6      A. Good morning.
7      Q. My name is Adam Aston.  I represent the State of
8   Texas.  Could you please state and then spell your full
9   name for the record?
10      A. Lydia Camarillo, L-Y-D-I-A C-A-M-A-R-I-L-L-O.
11      Q. Have you ever been deposed before?
12      A. Yes, I have.
13      Q. How many times?
14      A. I believe once.
15      Q. Can you explain the case or was it for
16   litigation?
17      A. It was the -- it was the redistricting case.
18      Q. And when was that deposition taken?
19      A. I do not remember.  I believe it was January, but
20   I'm not absolutely sure.
21      Q. So four or five months ago?
22      A. Yes.
23      Q. Okay.  We're going to go over a few things to
24   hopefully make this run smoothly, and then we'll get
25   started.  Okay?

6

1      A. Okay.
2      Q. Please answer audibly so the court reporter can
3   hear you.  No shaking or nodding of the head because those
4   answers cannot be recorded.  Okay?
5      A. I understand.
6      Q. If you don't understand my question or if you'd
7   like for me to slow down at any point, please let me know.
8      A. I will.
9      Q. Please wait until I finish my question to answer,
10   and I will try to wait until you finish an answer before I
11   ask another question.  Okay?
12      A. All right.  Thank you.
13      Q. Your lawyer may object to a question, but even if
14   she objects, unless she instructs you not to answer,
15   you'll still be answering the question.  Do you
16   understand?
17      A. I do.
18      Q. Are you represented by counsel today?
19      A. Yes, I am.
20      Q. Who is your counsel?
21      A. Nina Perales and Luis Figueroa.  And MALDEF.
22      Q. And when -- with MALDEF?
23      A. Yes.
24      Q. And could you please spell their names for the
25   record?

7

1      A. Oh, my goodness. Nina, N-I-N-A. Perales. I
2   always spell it with --
3         MS. PERALES:  P-E-R-A-L-E-S.
4         MR. FIGUEROA:  Luis Figueroa, L-U-I-S
5   F-I-G-U-E-R-O-A.
6         THE WITNESS:  Thank you for the help.
7         MS. PERALES:  You're very welcome.
8      Q. (BY MR. ASTON)  And when did that representation
9   begin?
10      A. I think it began informally when we began the
11   conversations about redistricting.  Oh, for this case?
12      Q. Yes, ma'am.
13      A. As soon as we decided to move forward with this
14   case.
15      Q. Do you know about when that was?
16      A. I do not remember, but we felt that as soon as we
17   knew that the legislation was going to move forward and it
18   was going to be signed by the governor, we were going to
19   prepare ourselves to move forward with the lawsuit if
20   necessary.
21      Q. So this would have been before the lawsuit was
22   filed sometime last fall?
23      A. Well, you asked formally.  So it wasn't until we
24   signed the form.
25      Q. Do you understand that you've been designated to

8

1   provide testimony today on behalf of the Southwest Voter
2   Registration Education Project?
3      A. Yes.
4      Q. Unless I indicate otherwise, when I use the term
5   "you" or "Southwest Voter" or "your organization" during
6   this deposition, that term includes the Southwest Voter
7   Registration Education Project and anyone acting on its
8   behalf.  Do you understand?
9      A. I do believe that I'm speaking for Southwest
10   Voter Registration Education Project, and I have the
11   authority to do so.
12      Q. But what I'm saying is if at any point in this
13   deposition I say "you" or "your organization," what I'm
14   referring to you is not you individually unless I make
15   that explicitly clear --
16      A. I understand.
17      Q. -- I'm referring to your organization.  Thank
18   you.
19         Did you prepare for your deposition today?
20      A. I did.
21      Q. What did you do to prepare?
22      A. I read my former testimony.  I reviewed SB 14.  I
23   looked at the notice, and I looked at other materials
24   provided by my attorney.
25      Q. When you're referring to your former testimony,



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

9

1   do you mean your -- the testimony from redistricting?
2       A.  No, the testimony that I gave before the
3   legislature on voter ID.  Opposing it.
4       Q.  About how long would you say that you spent
5   preparing for this deposition, reviewing those materials
6   and --
7       A.  Half an hour.
8       Q.  A total of about a half hour to prepare?
9       A.  Yes.
10      Q.  In addition to your prior testimony and Senate
11  Bill 14, did you review any other documents to prepare?
12      A.  I did.  And I met with my attorneys.
13      Q.  And you said the notice.
14      A.  Yes.
15      Q.  You reviewed the notice.
16          Anything else?
17      A.  I looked at the other stuff that I was working
18  with my attorneys.
19          (Exhibit 1 was marked.)
20      A.  This is mine?
21      Q.  (BY MR. ASTON)  Yes, ma'am.  That has been marked
22  Exhibit 1.  Would you please review it for a moment and
23  then we'll discuss it for a few minutes.
24      A.  Okay.
25      Q.  Do you recognize this document?

10

1       A.  I sure do.  It's the one I was referring to.
2       Q.  If you could turn to Page 2.  This is the list of
3   topics that Southwest Voter has been requested to provide
4   a person to testify as to.  Topic No. 1:  The factual
5   basis of Southwest Voter Registration Education Project's
6   claims or defenses in this lawsuit, including any
7   contingent in Senate Bill 14, was enacted for the purpose
8   or have the effect of denying or abridging the right to
9   vote on account of race, color, or membership in a
10  language minority group.
11          Have you been designated to testify on Topic 1?
12      A.  Yes.
13      Q.  And are you prepared to testify about Topic 1?
14      A.  Yes.
15      Q.  And your preparations to testify included the
16  things you mentioned before?
17      A.  Correct.
18      Q.  Topic 2:  Any interest of Southwest Voter
19  Registration Education Project in this litigation that is
20  not adequately represented by the United States.
21          Have you been designated to testify on Topic 2?
22      A.  Yes.
23      Q.  Are you prepared to testify about Topic 2?
24      A.  Yes.
25      Q.  Topic 3:  Southwest Voter Registration Education

11

1   Project's membership, including all individuals Southwest
2   Voter Registration Education Project purports to represent
3   in this lawsuit.
4           You've been designated to testify on Topic 3?
5       A.  Correct, yes.
6       Q.  And you're prepared to testify on Topic 3?
7       A.  Yes.
8       Q.  Topic 4:  Southwest Voter Registration Education
9   Project's activities related to voter identification
10  legislation proposed or enacted in Texas.
11          You've been designated on Topic 4?
12      A.  Yes.
13      Q.  And --
14      A.  I guess.
15      Q.  And you're prepared --
16      A.  I'm sorry.
17      Q.  -- to testify on Topic 4?
18      A.  The first rule you told me.  I apologize.
19      Q.  That's quite all right.
20          And you are prepared to testify on Topic 4?
21      A.  Yes, I am.
22      Q.  Topic 5:  Southwest Voter Registration Education
23  Project's activities related to voter identification
24  legislation proposed or enacted by states other than
25  Texas.

12

1           You've been designated on the topic?
2       A.  Yes.
3       Q.  And you're prepared?
4       A.  Yes.
5       Q.  Topic 6:  Any policy making or advocacy-related
6   work performed by or on behalf of Southwest Voter
7   Registration Education Project regarding voter
8   identification.
9           You've been designated on Topic 6?
10      A.  Yes.
11      Q.  And you're prepared on Topic 6?
12      A.  Yes.
13      Q.  No. 7:  Southwest Voter Registration Education
14  Project's activities related to voter registration or
15  education.
16          Have you been designated on Topic 7 --
17      A.  Yes.
18      Q.  -- and are you prepared on Topic 7?
19      A.  Yes.
20      Q.  Topic No. 8:  Southwest Voter Registration
21  Education Project's election-related activities, including
22  but not limited to, driving voters to the polls,
23  assistance with mail-in ballots and poll watching.  Have
24  you been designated on Topic 8?
25      A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 13

1    Q.  And you're prepared on Topic 8?
2    A.  Yes.
3    Q.  No. 9:  Southwest Voter Registration Education
4  Project's plans to assist registered voters to obtain
5  identification required by Senate Bill 14.
6        You've been designated on this topic?
7    A.  Yes.
8    Q.  And you're prepared on this topic?
9    A.  Yes.
10    Q.  No. 10:  Any activities by or on behalf of
11  Southwest Voter Registration Education Project regarding
12  Senate Bill 14.
13        Have you been designated on this topic?
14    A.  Yes.
15    Q.  And you are prepared?
16    A.  Yes.
17    Q.  And finally No. 11.  Any activities by or on
18  behalf of Southwest Voter Registration Education Project
19  regarding Senate Bill 362 in 2009?
20    A.  Yes.
21    Q.  You've been designated?
22    A.  Yes.
23    Q.  And you're prepared?
24    A.  Yes.
25    Q.  I'd like to look at Topic 6 before we get any

## 14

1  further on:  Any policy making or advocacy-related work
2  performed by or on behalf of Southwest Voter Registration
3  Education Project regarding voter identification.
4        Does Southwest Voter engage in policy-related
5  activity regarding voter ID legislation?
6    A.  We have.
7    Q.  And can you describe that advocacy activity?
8    A.  We met with several members of the legislature to
9  discuss this bill and other bills in the past, and we also
10  provided testimony and I not only wrote but actually gave
11  the testimony on SB 14.  We also spoke to community
12  leaders about this issue.
13    Q.  You gave testimony in 2011 on this bill.  Have
14  you testified in the past on previous bills?
15    A.  I believe I've testified every year that this
16  issue was brought forth since '05.
17    Q.  Does Southwest Voter write articles or conduct
18  seminars?
19    A.  We do, but we haven't done this issue.
20    Q.  Present speakers?
21    A.  We do, but we haven't done this issue.
22    Q.  What about conduct studies or surveys?
23    A.  No, that's another organization.  No, we do not.
24    Q.  And if it was testimony before the legislature in
25  either a committee hearing or something like that, that

## 15

1  would be publically available, correct?
2    A.  That is correct.
3    Q.  And as far as you know, you have -- or you
4  believe you've testified not only in 2011 but in 2009 and
5  perhaps in '7 and '05 as well?
6    A.  I'm absolutely sure that I have.
7    Q.  Let's talk a little bit about the background of
8  Southwest Voter.  When was the organization founded?
9    A.  1974.
10    Q.  And do you know the corporate structure of the
11  organization as a partnership or a 501(c)(3)?
12    A.  It's a 501(c)(3).
13    Q.  Do you know how many employees Southwest Voter
14  has?
15    A.  It has ten.
16    Q.  And what is your role?
17    A.  I'm the vice president.
18    Q.  And what do you do as vice president?
19    A.  Everything, including faxing.
20    Q.  What else do you do in addition to the faxing?
21    A.  One of my major roles is figuring out the ground
22  operation, fundraising, media and being the spokesperson
23  on these issues.
24    Q.  Does your organization rely on volunteers?
25    A.  Absolutely.

## 16

1    Q.  Do you know about how many volunteers you have in
2  a given year?
3    A.  We could have as many as 10,000 or more depending
4  on the election cycle.
5    Q.  So it fluctuates with whether it's an election
6  year, but it can be up to 10,000?
7    A.  Yes.
8    Q.  And very possibly this year, it being not only an
9  election year but a presidential election year, will this
10  year be on the higher end?
11    A.  This year would be on a higher end.  That is
12  correct.  Unlike last year.
13    Q.  You said "Unlike last year"?
14    A.  Last year was not a presidential year.
15    Q.  What are the organization's primary activities?
16    A.  Voter registration, voter education and
17  mobilization of the Latino voters.
18    Q.  Does your organization drive voters to the polls?
19    A.  We have.  And we do.
20    Q.  Anything else in addition to the registration and
21  the education?
22    A.  I'm not sure I understand what you're asking me.
23    Q.  Any other sort of primary activities?
24    A.  Well, if you're asking me what do I do in voter
25  registration, that's a certain activity.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 17

1  Q. No, no. The organization itself, what are the
2  primary activities in addition to --
3  A. Our primary activities are voter registration,
4  voter education and mobilization of the voters and, when
5  necessary, have conversations about making sure the voters
6  have a the right to vote. In this case, stopping a voter
7  ID because we believe it's unconstitutional and it's
8  intentional against the right of voters to vote and to
9  cast a vote.
10  Q. How many offices do you have in the State of
11  Texas?
12  A. One.
13  Q. And where is that office located?
14  A. San Antonio.
15  Q. Do you have offices in any other states?
16  A. Los Angeles.
17  Q. And do you have operations outside of Texas or
18  California?
19  A. We have operations in other states depending on
20  the year. In a presidential cycle it will likely be in
21  five to ten states depending on how much money we raise.
22  We are currently working in Los Angeles and we have just
23  completed voter registration projects in Las Cruces and of
24  course in Texas. We expect to do other states this year.
25  Q. Do you know what other states you might?

## 18

1  A. Arizona, New Mexico, Colorado, Florida and of
2  course California and Texas for now.
3  Q. Is Southwest Voter a membership organization?
4  A. It is not. It is a 501(c)(3).
5  Q. So you don't really have members or anyone joins,
6  they just -- there's the ten employees and then whoever
7  volunteers to assist, but it's not a collection of
8  members?
9  A. It is not a collection of members, that is
10  correct.
11  Q. Do you know what the annual budget is for
12  Southwest Voter?
13  A. It depends on the election cycle. This year is
14  probably going to be a little bit over 1.5 million and it
15  can go as high as 3 million depending on how much money we
16  raise.
17  Q. And are most of your -- the way you raise money,
18  is it mostly through donations?
19  A. It's all through donations.
20  Q. Private?
21  A. It's all private. It's either individuals,
22  corporations, foundations. It's all private. You're
23  welcome to make a donation as well, and we take them from
24  Republicans and Democrats, if that's what you want to
25  know.

## 19

1  Q. But you don't receive grants from governmental
2  entities?
3  A. Never. On purpose.
4  Q. The past year do you know about how much you've
5  taken in in donations?
6  A. I don't remember right now. Last year was a hard
7  year. So I think it was not a big year. I don't remember
8  right now. I can get you that later if you want it.
9  Q. Has your organization made plans to assist voters
10  with compliance with SB 14 if it goes into effect?
11  A. We are hoping that the courts will agree with our
12  assumption and assertion that this law violates the
13  voters. So at this point we're not making plans. Should
14  the courts agree with us and not us, then we have to
15  refocus and figure out how we use resources that are very
16  precious and limited to do so. So we're hoping that the
17  courts agree with us so that we don't have to go there.
18  Q. So if you haven't made plans, is it also fair to
19  say that you have not implemented any plans to go into
20  effect should Senate Bill 14 take effect at this time?
21  A. We haven't implemented any plans. We know what
22  we need to do if it needs to be done, but it hasn't been
23  implemented.
24  Q. If it's implemented, you said you know what you
25  need to do. Can you explain what that is?

## 20

1  A. Part of it will have to be a wide media campaign.
2  It's very difficult for people to understand what are the
3  rights and what are the requirements and what documents
4  they can use or not use in order to be able to vote. As
5  well as figuring out how we get them to places in order to
6  get their IDs.
7  Q. And then your organization, would you help them
8  obtain those IDs if that became a requirement?
9  A. I don't know yet. It depends on how much money
10  it would take to do that. It depends. We might.
11  Q. But you'll certainly educate the voters about
12  what is required under the new law?
13  A. That is correct. You know, it's 2.1 million
14  voters that we're speaking of. In Texas.
15  (Exhibit No. 2 was marked.)
16  Q. (BY MR. ASTON) You've been given what is marked
17  Exhibit 2. Take a minute to familiarize yourself with
18  that.
19  A. I remember this document.
20  MR. ASTON: This is the document, or this
21  version of it is the one that we attached to our complaint
22  and that is what the Exhibit 1 designation means on the
23  front cover.
24  MS. PERALES: It's not signed.
25  Q. (BY MR. ASTON) So you are familiar with Senate



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 21

1  Bill 14?
2      A. I sure am.
3      Q. And you've read it?
4      A. I have read it.
5      Q. When did you first hear about the bill?
6      A. Oh, gosh.  Probably in '05.  It's evolving.
7      Q. What about this bill?
8      A. It's an evolving document.  Probably in the
9  middle of 2010.  We anticipated that this bill was going
10 to be brought forth.
11     Q. And when was the first time that you read the
12 bill?
13     A. When it was in the -- available to the public.
14     Q. After bill filing --
15     A. Yes.
16     Q. -- in the -- in --
17     A. Well, whenever it's ready.
18     Q. Just before 2011.
19        Have you read it again since then?
20     A. Yes.  Last night.
21     Q. Have you discussed this bill with other employees
22 at Southwest Voter?
23     A. With my president.
24     Q. And what did you discuss and when?
25     A. Simply that we're going to get deposed today.

## 22

1      Q. But prior to learning of the deposition, did you
2  discuss this bill during the legislative --
3      A. Yes.
4      Q. -- session with --
5      A. Yes.
6      Q. -- employees at Southwest Voter?
7      A. I discussed the idea and the intent of the bill,
8  and I discussed what we thought would be the outcome
9  should this bill become a law.
10     Q. And with whom did you have those discussions?
11     A. With my president.
12     Q. Anyone else?
13     A. No.
14     Q. You've read the bill.  Are you familiar with what
15 the different provisions of the bill do?
16     A. Yes.
17     Q. And --
18     A. Right now if you ask me what Section A, B, C is,
19 I will have to review it.
20     Q. Do you understand what forms of photo ID will be
21 accepted for voting at the polls?
22     A. Yes.
23     Q. Section 14 on Page 9.  Turn there.
24     A. I do.  What did you say?  Page what?
25     Q. Page 9.

## 23

1      A. I heard you say 14.
2      Q. Section 14.
3      A. Yes.
4         (Witness reviews document.)
5      Q. (BY MR. ASTON)  Driver's license, personal
6  identification card.  I think those are probably
7  self-explanatory.
8         Do you know what an election identification
9  certificate is?
10     A. I sure do.
11     Q. Military identification card?
12        MS. PERALES:  I'm sorry.  What's the
13 question?
14        MR. ASTON:  If she's familiar that these are
15 the documents that -- or the photo IDs that would be
16 accepted.
17     A. Yes, I'm also familiar with the documents not
18 accepted.
19     Q. (BY MR. ASTON)  United States citizenship
20 certificate that contains the person's photograph,
21 passport and a license to carry a concealed handgun?
22     A. You know, most citizenship certificates do not
23 have photos.  They have your little feet.
24     Q. Do you know if any of the Southwest Voter's
25 employees lack a photo ID that would be required by Senate

## 24

1  Bill 14?
2      A. I don't know that.
3      Q. Is Southwest Voter aware of any people who do not
4  have the photo IDs required by Senate Bill 14?
5      A. I am aware.
6      Q. All right.  Can you identify them by name and
7  address, please?
8      A. Name and address?
9      Q. Sure.
10     A. I cannot identify them by name and address.  I
11 can identify two individuals that are part of this lawsuit
12 with us, the young ladies, the Rodriguez, but I cannot
13 tell you their first names and I cannot tell you their
14 address.
15     Q. I am familiar with those two.
16     A. But they exist.
17     Q. We're going to talk with them this afternoon.  I
18 know that.
19        Are you aware of any other citizens of Texas who
20 have not?
21     A. I believe those two women reflect many young
22 people like them, and I also belive there's also elderly
23 Latinos that will be going through the same thing that
24 these young women are.
25     Q. But again, Southwest doesn't know of any


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 25

1   particular individuals --
2       A.  At this time --
3       Q.  But Southwest Voter is not aware of any other
4   individuals other than your codefendants?
5       A.  I don't have any names right now, if that's what
6   you're asking.  Which is different than your question.
7       Q.  Does Southwest Voter represent anyone else in
8   this litigation besides its organization?
9       A.  Southwest Voter represents Southwest Voter, and
10  we believe that in doing so we're representing the
11  2.2 million Latinos that are registered to vote and the
12  other 2.5 million that could register to vote in the State
13  of Texas.
14      Q.  About what percentage of the organization's
15  budget is designated to voter registration activities?
16      A.  About 80 percent.
17      Q.  And about what percent is dedicated to voter
18  education?
19      A.  It's all mixed in there because in order to
20  register somebody you ask them what's important about
21  voting, and that includes the education.  And when you
22  turn them out to vote, you're also telling them why it's
23  important for them to vote.  So it's all configured
24  together.  I don't have it split up like that.
25      Q.  So you would say education and registration

## 26

1   combined --
2       A.  Yes.
3       Q.  -- make up about 80 percent --
4       A.  Yes.
5       Q.  -- of your budget?
6       A.  Yes, we believe that once they are registered
7   they will likely vote even if we are not able to turn them
8   out to vote ourselves.
9       Q.  So has your organization produced any reports on
10  the voter ID legislation?
11      A.  Reports, no.
12      Q.  Did your organization provide its members or
13  staff with any materials on voter ID during the 2011
14  legislative session?
15      A.  Only the MALDEF fact sheet, which I believe is
16  part of your exhibit.
17      Q.  Did your organization provide your members or
18  staff with any materials on voter ID during the 2009
19  legislative session?
20      A.  I do not remember.
21      Q.  Do you recall for 2007 or 2005?
22      A.  I do not remember.
23      Q.  Has your organization provided its members or
24  staff with any materials on voter ID during any
25  legislative interim, the time between the sessions?

## 27

1       A.  No.
2       Q.  During the legislative session or before, did
3   Southwest Voter meet with any interest groups about Senate
4   Bill 14?
5       A.  You're speaking of the last legislative
6   legislation, correct?
7       Q.  Correct.
8       A.  Yes.
9       Q.  With whom did you meet?
10      A.  I believe we met with some in a general meeting
11  with League of Women Voters.  I believe the ACLU was there
12  as well.  Mi Familia Vota was there and other community
13  groups.
14      Q.  Do you know how often you met?
15      A.  I believe we met four times or so.  But I'm not
16  absolutely sure.
17      Q.  And do you know of any other organizations with
18  which your organization met?
19      A.  I don't remember right now.
20      Q.  Did any of those groups provide Southwest Voter
21  with any materials on voter ID legislation?
22      A.  Well, I believe MALDEF was with us, and MALDEF is
23  the one that provided the list that I was referring to.
24      Q.  The fact sheet?
25      A.  Yes.

## 28

1       Q.  Are you aware of any other documents?
2       A.  That were presented, no.
3       Q.  Did Southwest Voter provide its members or staff
4   with talking points about Senate Bill 14?
5           MS. PERALES:  Objection to the extent that
6   it says Southwest Voter provided materials to its members,
7   because the testimony is that they don't have members.
8       Q.  (BY MR. ASTON)  Did they provide to the staff --
9   did they provide the staff with any talking points?
10      A.  No, because I'm the one that was doing it.  So
11  it's me, myself and I.
12      Q.  And did anyone provide your organization with
13  talking points, not counting the MALDEF fact sheet that we
14  discussed?
15      A.  I don't think so, no.  No, I'm pretty sure no.
16      Q.  I hope to go about 45 minutes to an hour before
17  we take breaks.  So if you need a break at any time, just
18  let me know.
19      A.  Yeah.  No, I'll ask you if I need to.  I think
20  I'm fine because I took some stuff to not cough too much.
21      Q.  Does Southwest Voter Registration Education
22  Project intervene along with other parties, correct?
23      A.  Correct.
24      Q.  And those parties include Mi Familia Vota
25  Education Fund and two individual intervenors?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 29

1  A. Correct.
2  Q. And no others?
3  A. That is correct.
4  Q. During your meetings during the 2011 legislative
5  session, was Mi Familia present?
6  A. I don't remember them being present until we met
7  at a meeting. I don't remember them being present.
8  Q. When was that meeting?
9  A. The earlier meeting that I just talked about that
10 you asked me previously.
11 Q. Which one?
12 A. You just asked me a question about when have I
13 met with some folks on the voter ID. That's the one.
14 Q. When did this occur?
15 A. Honestly I don't remember. I want to say
16 December, but I don't remember.
17 Q. So it was after the legislation passed, it was --
18 A. Yes.
19 Q. -- at some point during consideration of whether
20 or not to get involved with this suit?
21 A. Yes. But I deserve the right to be incorrect on
22 the date because I don't remember.
23 Q. Has your organization and Mi Familia ever met to
24 discuss intervening in this lawsuit at that meeting?
25 A. No.

## 30

1  Q. Has Southwest Voter and Mi Familia discussed the
2  claims that you've asserted in this lawsuit?
3  A. No.
4  Q. Have the two organizations discussed Senate
5  Bill 14?
6  A. No. Other than the meeting that we had, which
7  was a general discussion about the implications of the
8  voter ID.
9  Q. So that meeting was about Senate Bill 14?
10 A. It was in -- well, I guess --
11 Q. By then it had been passed?
12 A. By then it was signed by the governor. So is
13 that still called SB 14 or is it a law signed by the
14 governor?
15 Q. For purposes of this case, we're still calling it
16 Senate Bill 14.
17 A. Okay. Yes.
18 Q. Has Southwest Voter shared any written
19 information or materials with Mi Familia?
20 A. No.
21 Q. Has Mi Familia shared any information or
22 materials with Southwest Voter?
23 A. No.
24 Q. The two organizations assert the same claims in
25 this lawsuit, correct?

## 31

1  A. Correct.
2  Q. And you have filed a joint answer?
3  A. Correct.
4  Q. And the claims that you're asserting, the two
5  organizations, are they based on the same legal and
6  factual contentions?
7  A. I would assume so.
8  Q. Did you personally speak with anyone at the
9  Department of Justice about SB 14?
10 A. I can't remember. I've talked to the Department
11 of Justice on a number of issues and I cannot remember if
12 it was on this subject.
13 Q. But possible?
14 A. Possible it's not, either. So I don't remember.
15 Q. Did anyone else at Southwest Voter speak with the
16 Department of Justice about Senate Bill 14?
17 A. No. I'm the one that's assigned to this issue.
18 Q. Did your organization send any letters or e-mails
19 to the Department of Justice regarding Senate Bill 14?
20 A. No.
21 Q. What about regarding this litigation?
22 A. No.
23 Q. What about preclearance of Senate Bill 14?
24 A. I may have sent something on preclearance, but I
25 do not remember.

## 32

1  (Exhibit 3 was marked.)
2  Q. (BY MR. ASTON) You've given what has been marked
3  as Exhibit 3. Please review it for a few moments.
4  (Witness reviews document.)
5  Q. (BY MR. ASTON) Are you familiar with this
6  document?
7  A. Yes.
8  Q. You've seen it before?
9  A. Yes. I think I have. You know, I'm not sure.
10 I'm familiar with the questions.
11 Q. If you could turn to your request for production
12 No. 6. All documents in your possession custody or
13 control including e-mails and other communications that
14 support your contention that Texas Senate Bill 14 has or
15 will have an impermissible effect.
16 Answer: Defendant-intervenor has no documents
17 responsive to this request for production.
18 And that's the answer you gave?
19 A. Yes.
20 Q. And that remains true?
21 A. That remains true. We have an e-mail capacity
22 that's limited so I usually get rid of stuff.
23 Q. As far as other documents as well, you have
24 nothing that would provide evidence that you contend --
25 A. I don't have anything other than what I gave you,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 33

1    which was the -- in testimony.
2        Q.  Request for production No. 7:  All documents in
3    your possession, custody or control, including e-mails and
4    other communications that support your contention that
5    Texas Senate Bill 14 was enacted with an impermissible
6    purpose.
7            Answer:  Defendant-intervenor has no documents
8    responsive to this request for production.
9        And that was the answer you gave?
10       A.  That's correct.
11       Q.  And it remains true that you have no documents --
12       A.  That is correct.
13       Q.  -- with regard to --
14       A.  That is correct.
15       Q.  Let's talk for a few minutes about what you
16   believe the effect of Senate Bill 14 will be.  Does
17   Southwest Voter contend that Senate Bill 14 will have the
18   effect of denying or abridging Hispanics' and Latinos'
19   right to vote on account of race, color or membership in a
20   language minority group?
21       A.  Southwest Voter believes wholeheartedly that
22   SB 14 will have a negative impact on Latino voter turnout.
23   We believe it's a bill that ultimately was signed by the
24   governor with the intent to discriminate and dilute the
25   right of Latino voters.  We believe that it is a result of

## 34

1    an emergency that was called by the Governor as a crisis
2    on voter fraud that is nonexistent on a couple of
3    realities that we have.
4        One, the Attorney General conducted a two-year
5    study of over $1.5 million to find a case that he never
6    found.  Second, the Secretary of State provided over
7    600,000 names of individuals that are Latino that would
8    not be able to provide the ID.  And so we believe that the
9    state of Texas in a crisis, financial crisis, was unable
10   to provide the evidence of voter fraud.
11       We believe that it was around the time that
12   redistricting was going to happen, when the state grew by,
13   over the last ten years, 2.3 million more people, of which
14   65 percent of that was Latino.  Ultimately 90 percent was
15   minority, and it was an attempt by the Governor and the
16   legislators to stop the growth of Latino voters, as well
17   other people of color.
18       We also believe that since the Attorney General
19   was not able to provide any case after spending money that
20   we don't have, that the State insists that it's going to
21   be free when in fact this is not going to be free, for a
22   couple of reasons.
23       First, a poor person may not have the resources
24   to drive to wherever they have to pick it up.  If they're
25   lucky, there might be a Department of -- DPS, the

## 35

1    Department of -- a place where you pick up the card.
2    There might not be a place for that.  We know that 40 of
3    them are closed.  We know that another 30 were going to be
4    closed as a result of the budget shortfall.
5        We also know that even if you can drive there,
6    you might not have the right documentation to get an ID.
7    Therefore, it is not free and it is not easy to obtain,
8    and we believe it's another hidden tax poll.
9        We believe that the State of Texas created a
10   crisis that doesn't exist, attacking Latinos, and it's at
11   a moment when they wanted to create an anti-immigrant
12   opportunity, because we all know that the people that vote
13   are American citizens, not immigrants who are unable to
14   vote.
15       Q.  What is your evidence, in addition to what you
16   just said, this will have a discriminatory effect?  We can
17   talk about purpose later, but discriminatory fact.
18       A.  We believe that speaking and -- being on the
19   ground with voters and speaking to them, that there are
20   going to be individuals that are going to be harmed.  We
21   also believe in reading the Brennan report as a second
22   source, we believe that that's our evidence.  But our
23   number one evidence is 38 years of history working on the
24   ground with Latino voters and other voters of color.
25       Q.  So other than your belief and the Brennan report

## 36

1    which says what?  What is the Brennan report?
2        A.  The Brennan report says that individuals will not
3    be able to provide the documents, as many as two million,
4    in Texas.
5        Q.  Do you have any other evidence that you believe
6    supports your contention?
7        A.  My 38 years of experience with the organization
8    and speaking to voters.
9        Q.  And what is that evidence?
10       A.  Individuals telling us that they won't be able to
11   produce the documentation.
12       Q.  Who are these individuals?
13       A.  Voters.
14       Q.  Can you name any of them?
15       A.  I cannot name any of them right now.
16       Q.  Is that the entire universe of your
17   organization's evidence that Senate Bill 14 will have the
18   effect of denying or abridging Hispanics' or Latinos'
19   right to vote?
20       A.  That and the history of Texas having a history of
21   discriminating against voters and having an intent against
22   Latino voters and other voters of color.
23       Q.  But that's all?
24       A.  That's enough, don't you think?
25       Q.  Does Southwest Voter contend that Senate Bill 14



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

**37**

1   will have the effect of denying or abridging
2   African-Americans' right to vote on account of race,
3   color, or membership in a language minority group?
4        A.  I cannot speak for the African-American
5   community, but I believe they have similar realities that
6   the Latino community has.
7        Q.  Do you have any evidence as to what effect this
8   bill might have on African-Americans?
9        A.  I do not have any evidence.
10       Q.  Does Southwest Voter contend that Senate Bill 14
11  will have the effect of denying or abridging
12  Asian-Americans' right to vote on account of race, color,
13  or membership in a language minority group?
14       A.  I think that any voter that's Latino, Asian,
15  black, that is poor, that doesn't have the identification,
16  will be prohibited from voting if they're American
17  citizens and they have the right to vote.  I believe this
18  bill, this law, whichever you want to call it, violates
19  the constitutional rights and the Voting Rights Act of
20  American citizens in Texas.
21       Q.  Do you have any evidence as to the effect this
22  bill will have on Asian-Americans?
23       A.  I have the same evidence that I have for Latinos,
24  which is understanding how voters feel.
25       Q.  Has Southwest Voter conducted any studies or any

---

**38**

1   surveys on the effect that this bill will have on minority
2   voters?
3        A.  No.
4        Q.  Has Southwest Voter conducted any surveys or any
5   studies on the effect that previous voter ID legislation
6   would have on minority voters?
7        A.  No.
8        Q.  Are you familiar with the polls regarding public
9   support for voter ID legislation?
10       A.  I am familiar with the polls.  I am also familiar
11  that there was a time when polls said that it was okay to
12  have slavery.  That doesn't make -- that didn't make it
13  right then, and this doesn't make it right either.
14       Q.  Are you aware of polls showing that the majority
15  of Texans support a photographic ID requirement to vote,
16  regardless of political affiliation?
17       A.  I am familiar but that doesn't make it right, as
18  the case in slavery.
19       Q.  Are you aware of polls showing that the majority
20  of Texans support a photographic ID requirement to vote
21  regardless of their race?
22       A.  No.
23       Q.  Are you aware of polls showing that the majority
24  of Texans support a photographic ID requirement to vote
25  regardless of membership in a language minority?

---

**39**

1        A.  I haven't seen anything like that.
2        Q.  Do you believe that elderly voters are more
3   likely than the average voter to lack a form of
4   identification required by Senate Bill 14?
5        A.  I believe that young voters and older voters will
6   have a problem.  For older voters, there was a time, if
7   you were poor, that you were delivered by a midwife, and
8   they may not have provided the right documentation, and
9   therefore they might not have in their possession their
10  correct certificate.
11       Q.  But are you -- so that means --
12       So do you or do you not believe --
13       A.  I've made my statement.
14       MS. PERALES:  It's okay if he asks the
15  question again just to get a little bit of clarity, and
16  it's all right for you to answer.
17       THE WITNESS:  Okay.
18       Q.  (BY MR. ASTON)  So your answer is yes?
19       A.  I'm sorry.  Ask again.
20       Q.  Do you believe that elderly voters are more
21  likely than the average voter to lack a form of
22  identification required by Senate Bill 14?
23       A.  I believe that elder Latino voters and young
24  Latino voters are going to have a problem to produce the
25  required IDs in order to vote in the state of Texas.

---

**40**

1        Q.  Are you aware of Senate Bill 14's exception to
2   the photo ID requirement for voters over the age of 65?
3        MS. PERALES:  Objection.  I'm sorry, I
4   guess -- I will frame the objection as one for vagueness.
5   I believe that the option would be to cast a mail ballot
6   as opposed to voting in person for a person over 65.
7        MR. ASTON:  That's correct.
8        MS. PERALES:  Okay.
9        Q.  (BY MR. ASTON)  Are you aware that -- let me
10  rephrase the question.
11       Are you aware that voters over the age of 65
12  have the option to cast a mail-in ballot for which they do
13  not need a photo ID?
14       A.  If I remember correctly, the law states that you
15  must be disabled, you must be traveling, before you can
16  use the vote by mail.  Am I incorrect?
17       Second, 65-year old voters who have voted
18  traditionally love voting on election day in person.
19       Q.  Do you believe that rural voters are more likely
20  than the average voter to lack a form of identification
21  required by Senate Bill 14?
22       A.  I believe that Latino voters who live in rural
23  Texas are more than likely poor.  If they're young, they
24  won't have the IDs required by this particular bill or
25  law, and if they're older, they may definitely not have

---



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 41

1  the appropriate documentation to acquire the
2  documentations provided by the State in order to vote.  I
3  do believe that this law will jeopardize the right of
4  Latino citizens who could vote in rural America Texas.
5      Q.  Do you believe that indigent voters are less
6  likely than the average voter to be appropriately educated
7  about the change in the identification requirements for
8  voting under Senate Bill 14?
9      A.  I believe that the budget proposed by the State
10  in order to educate voters is not sufficient and therefore
11  it will also cost the taxpayer voters.  And ultimately the
12  poor voters in Texas will not be informed about the right
13  to vote, or, more importantly, they will not have the
14  right documentation in order to get the required
15  documentation to vote in Texas should this law be
16  implemented.
17      Q.  Do you believe that indigent voters are more
18  likely than the average voter to lack a form of
19  identification required by Senate Bill 14?
20      A.  I believe that the voters that are poor in Texas,
21  including Latino voters who might not have the
22  documentation, even if they could get it, might not have
23  the money to be able to obtain it; therefore, it's a
24  double tax.
25          MR. ASTON:  Go off the record for a minute.

## 42

1              (Break.)
2      Q.  (BY MR. ASTON)  A few more questions on this and
3  then we'll move to a different topic.
4      A.  Okay.
5      Q.  Do you believe that indigent voters are less
6  likely than nonindigent voters to be able to obtain a form
7  of identification prescribed under Senate Bill 14?
8      A.  Yes.
9      Q.  And do you believe that elderly voters are less
10  likely than nonelderly voters to be able to obtain a form
11  of identification required under Senate Bill 14?
12      A.  I'm sorry.  I think I lost it.  Say it again.
13      Q.  Do you believe that elderly voters are less
14  likely than nonelderly voters to be able to obtain one of
15  the forms of identification?
16      A.  Yes.
17      Q.  Do you believe that disabled voters are less
18  likely than other voters to be able to obtain a form of
19  identification required under SB 14?
20      A.  Yes.
21      Q.  Do you believe that rural voters are less likely
22  than urban or suburban voters to be able to obtain a form
23  of identification required under SB 14?
24      A.  Yes.  And I think I answered that already.
25      Q.  And I think we discussed before, you believe that

## 43

1  young voters are less likely than other voters?
2      A.  That's correct.
3      Q.  Finally, do you believe that voters without a
4  high school diploma are less likely than voters with a
5  high school diploma to be able to obtain a form of ID?
6      A.  I'm not sure, but yes.
7      Q.  Let's talk about possession -- current possession
8  of photo IDs.  Do you know how many Texas registered
9  voters lack one of the forms of photo ID that would be
10  required under SB 14?
11      A.  I believe the Secretary of State, by her own
12  accounts, provided data that showed that there were about
13  660,000 Latino voters that would not have the proper ID in
14  order to vote.  And I believe that there is others who
15  believe that it is much higher.  So at this point I have
16  to rely on both, our perception, our understanding, our
17  history, and what the Secretary of State and others have
18  said.
19      Q.  The Secretary of State's figures, did those
20  include all of the IDs listed under SB 14 or were those
21  just people who do not currently have a driver's license
22  or a personal ID provided by the State of Texas or do you
23  recall?
24      A.  I don't remember.
25      Q.  Can Southwest Voter identify any Texas registered

## 44

1  voter who does not have one of the types of photo ID
2  required by SB 14?  Earlier you mentioned your two
3  co-defendants.
4      A.  Our two co-defendants.
5      Q.  Are you aware of any other voters that you can
6  name?
7      A.  Not that the point.
8      Q.  Your answer was, not at this point?
9      A.  No.
10          Thank you for clarifying.
11      Q.  Do you know how many Texas registered voters lack
12  the documents necessary to get a state-issued photo ID?
13      A.  I think I answered this already.
14      Q.  This is a different question.
15          MS. PERALES:  You may answer.
16      A.  Ask me again.  Maybe I didn't understand.
17      Q.  (BY MR. ASTON)  A moment ago we talked about who
18  doesn't currently have the photo ID.  What I'm asking now
19  is do you know how many Texas registered voters lack the
20  underlying documents that would be necessary to get a
21  state-issued photo ID?
22      A.  I'm not sure.
23      Q.  Can Southwest Voter identify any Texas -- any
24  Texas registered voter who does not have those documents
25  necessary to get a state issued photo ID?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 45

1     A. Besides the two young women?
2     Q. Besides the two young women.
3     A. No.
4     Q. But it is your contention that they do not have
5  the necessary documents?
6     A. Correct.
7     Q. Do you know what it is they lack?
8     A. The required ID that they need to vote.
9     Q. Do you know what documents they lack, if any --
10    A. No, I don't.
11    Q. -- that would make them eligible to get the
12  election identification --
13    A. You're right --
14    Q. -- certificate?
15    A. -- I don't.
16    Q. And they're the only two that you're aware of
17  that potentially lack those documents at this time?
18    A. At this time.
19    Q. Has Southwest Voter done any studies regarding
20  photo ID possession by Texas registered voters?
21    A. No.
22    Q. Has Southwest Voter conducted any surveys of
23  photo ID possession by Texas registered voters?
24    A. No.
25    Q. Are you aware that photo ID laws have been

## 46

1  enacted and are in place in other states?
2     A. Yes.
3     Q. Are you aware that they're in place in Georgia?
4     A. Yes.
5     Q. And Indiana?
6     A. Correct.
7     Q. Are you at all familiar with the levels of photo
8  ID possession by voters in Georgia by African-Americans?
9     A. I do not -- I am not familiar with it completely.
10    Q. Anglos?
11    A. I'm not familiar with it completely.
12    Q. Hispanics?
13    A. I'm not familiar with it completely.
14    Q. What do you know?  What are you aware of?
15    A. I don't remember right now.
16    Q. What about for Indiana?  Are you aware of any
17  information regarding photo ID possession by registered
18  voters in Indiana?
19    A. I don't remember right now for Indiana or
20  Georgia.
21    Q. Has Southwest Voter ever looked into those two
22  matters, Georgia or Indiana?
23    A. I have.  I never got -- I'm sorry.  I forgot
24  right now.  I don't remember.
25    Q. Are you familiar with the levels of photo ID

## 47

1  possession by registered voters in Texas?
2     A. With the current law or the SB 14 --
3     Q. The current possession of photo IDs in Texas
4  based on race, are you familiar with that?
5     A. I'm not sure I'm understanding your question.
6  Ask again.
7     Q. Let's maybe try and break it up.  Are you
8  familiar with the level -- what percentage of Hispanic or
9  Latino voters have a photo ID?
10       MS. PERALES:  Objection to the extent that
11  it was asked and answered.  When you mentioned earlier
12  whether she had information about whether there were
13  people who lacked voter ID in Texas and Ms. Camarillo
14  answered with the Secretary of State study.
15       But you may answer.  Subject to that
16  objection, you can go ahead and answer.
17    A. Well, I'm not sure I can answer anything more
18  than what I've already stated, so...
19    Q. (BY MR. ASTON)  Are you familiar with the levels
20  of photo ID possession by African-American registered
21  voters in Texas?
22    A. I have less information about the black
23  community.  I would not be able to answer that.
24    Q. And what about Anglo voters?
25    A. Same.  My experience is with Latinos.

## 48

1     Q. The Secretary of State's numbers, do you
2  acknowledge that if those numbers were compiled listing --
3  using only state-issued photo ID, that the numbers might
4  be overinclusive as to who does not currently have a photo
5  ID that is on the list in Senate Bill 14?
6     A. Restate.
7     Q. Sure.
8       The Secretary of State, if she compiles a list of
9  registered voters who lack a state-issued photo ID --
10    A. Right.  She found 660,000.
11    Q. -- that number might be -- that number might be
12  overinclusive or be a larger than actually accurate list
13  of people who do not have the photo ID required to vote
14  because Senate Bill 14 allows for other forms of ID issued
15  by the federal government?
16    A. Yes, but we've discussed this before where I've
17  mentioned even if it's possible to get the
18  documentation, if it's impossible to get there because gas
19  cost -- -
20    Q. I'm asking about people who may already have a
21  federally-issued photo ID, like a passport or military ID.
22    A. Uh-huh.
23    Q. Do you acknowledge that some of the people on the
24  list of the Secretary of State, people without a
25  state-issued photo ID might currently already possess a



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 49

1   federally issued photo ID, such as a passport or a
2   military ID, that would allow them to vote even if Senate
3   Bill 14 goes into effect?
4       A.  I acknowledge that but I also acknowledge that
5   they might not have it, so I think the point goes either
6   way.
7       Q.  Do you believe that Hispanic and Latino voters
8   are more likely or less likely than other voters to have a
9   passport?
10      A.  Less likely.  It costs money to travel so I don't
11  know that they would have a passport.  There is only a few
12  of us that travel.  And I don't believe that they would
13  have the gun permits, certificate, but I don't know.
14      Q.  The gun permit --
15      A.  I guess my answer to your question would be, I'm
16  not sure because it could go either way.
17      Q.  But you acknowledge the possibility?
18      A.  There is a possibility that they could have it,
19  and there is a possibility they could not have it.  So it
20  might actually be worse.  And it might be better.  I don't
21  know.
22      Q.  But you acknowledge that a Hispanic or a Latino
23  voter who has either a passport or a military ID would be
24  able to vote even if Senate Bill 14 goes into effect?
25      A.  Yes, since that's one of the allowed

## 50

1   documentations where you could vote.
2       Q.  Let's talk about the purpose of the bill.
3       A.  Okay.
4       Q.  You've -- in sort of talking about effect you've
5   discussed purpose a bit.  But does Southwest Voter contend
6   that Senate Bill 14 was enacted with a discriminatory
7   purpose?
8       A.  I do.
9       Q.  And what is the basis for that contention, what
10  is the evidence that you have?
11      A.  The history of Texas, a long history of Texas of
12  being a state that we need to have Section 2 and Section 5
13  of the voting rights to protect our rights because it's a
14  state that is part of the southern states that have a
15  history of discrimination.
16          The fact that this year was a year of
17  redistricting and in the redistricting, people take --
18  those in control want to keep their power and they want to
19  have in -- their intent is to maintain it and so if it
20  means stopping by creating other barriers, they will do
21  so.
22          By the fact that the State claims that there was
23  a crisis when in fact there was no crisis, even after the
24  Attorney General spent significant amount of resource that
25  could have been used for higher education for something

## 51

1   like an infrastructure or cleaning the water or whatever
2   is it is that we need.  Found no voter fraud.
3           The fact that it's an attempt to attack the
4   Latino community.  We're talking about the Latinos who are
5   the ones that are -- supposedly the ones that are voting
6   fraudulently in person.
7           So, yes, I do believe that the State of Texas
8   intentionally put this legislation to stop Latino voters
9   and other voters from fulfilling their right to vote as
10  American citizens.
11      Q.  Do you have any other evidence that supports your
12  contention that this bill was enacted with a
13  discriminatory purpose?
14      A.  I think that's evidence enough.
15      Q.  But do you have any more?
16      A.  I am sure I can find others.
17      Q.  But at this time you have no more evidence?
18      A.  At this time that's the only thing I want to say.
19          MS. PERALES:  You have to answer completely
20  for what you know right now.
21      A.  Well, we know that 2.4 million more people grew
22  in the state of Texas.  We know that that growth is a
23  result of -- 90 percent of it is because of the minority
24  community.  65 percent of that is because of the Latino
25  community.  And there is a genuine fear, we believe -- I

## 52

1   believe, by the laws that are being implemented.  We know
2   that the State of Texas has a history of violating and
3   stopping Latino and other voters from voting.
4           Intent, as you know, is -- can be accumulative of
5   all those things put together, and I believe that all
6   those things put together demonstrate that the State of
7   Texas has the intention to stop Latino and other voters
8   from voting and, therefore, has the intent to purposely
9   stop Latino voters who are American citizens and other
10  voters from voting that are American citizens.
11          In particular because HAVA already exists, and
12  the current law already allows us to vote with certain
13  documentations and there is -- we found no evidence -- the
14  State found no evidence of people who are -- who voted
15  fraudulently in person.
16      Q.  (BY MR. ASTON)  Do you contend that preventing
17  voter fraud was not the purpose of Senate Bill 14?
18      A.  I contend that the State used that as a veiled
19  attempt to say that in fact there was a crisis.  But after
20  the Attorney General spent $1.5 million over two years and
21  found no case, then what crisis exists?  None whatsoever.
22          If there is no crisis and there is a bill to stop
23  a crisis that doesn't exist and it's an added burden
24  because we already have HAVA, and HAVA, as you remember,
25  was established in 2000 with the idea that it would help



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Lydia Camarillo                                                                    June 12, 2012

## 53

1  America vote.  That's why it's even called the Help
2  America Vote Act.  And it provided for several documents.
3       People also know that when they sign the
4  certificate, it's an affidavit, a legal document.  We also
5  know that undocumented, which is really the intent of this
6  stopping supposedly American citizens, claiming that it's
7  really fraudulent because noncitizens will not vote,
8  noncitizens, if their residence is here legally, do not
9  want to jeopardize their opportunity of becoming citizens
10 somedays.  And the undocumented certainly don't want to be
11 split from their families.
12      So we know that there is no crisis, we know that
13 American citizens, because they are the only ones that can
14 vote, are the ones that are being attacked by this bill
15 and this law and, therefore, its purposeful and
16 intentional.
17      And another example of the many patterns of
18 activities that happen in the State of Texas, including
19 polarized voting, we saw when Carrillo ran for office or
20 Judge Rodriguez ran for office, they were incumbents, they
21 were supported by the establishment, they raised the most
22 money, but white voters refused to vote for them in their
23 own party.
24      I believe that that, as a cumulative, provides
25 purpose and intent.

## 54

1       Q.  Do you contend that the Texas legislature
2  intended to harm poor people by passing Senate Bill 14?
3       A.  Yes.  Some of the Latinos are poor, the working
4  poor.  25 percent or over.
5       Q.  So their intent was to harm people because they
6  were poor?
7       A.  Their intent was to stop Latino and other voters
8  from voting and, as a result, as a consequence, poor
9  people will be impacted, of which many of the Latino
10 voters are poor.
11      Q.  You said as consequence.  That might be an
12 effect.  Is it Southwest Voter's contention that the
13 legislature intended to harm the poor?
14      A.  Yes.
15      Q.  What is basis for that contention?
16      A.  In the statement I made earlier.
17      Q.  Are you referring to the one from just a couple
18 of minutes ago?
19      A.  Yes, sir.
20      Q.  And that provides all the information you have on
21 intent with respect to poor people?
22      A.  That's part of it, yes.
23      Q.  What else is there?
24      A.  Well, that's all I have in terms of the poor
25 people, yes.  I'm saying that Latinos, a good portion of

## 55

1  them, are working poor; therefore, they will be impacted
2  and, therefore, the answer as asked implies and says
3  directly that Latinos will impact it because they're poor.
4       Q.  Do you contend that the Texas legislature
5  intended to harm young people by passing Senate Bill 14?
6       A.  Yes.  By the very fact that they did not allow
7  for student IDs to be used as an official, appropriate ID,
8  yes.
9       Q.  So the intention was to harm --
10      A.  Yes.
11      Q.  -- young voters?
12      A.  Yes.  And we know that young voters in Texas are
13 mostly Latino and black.
14      Q.  Do you contend that the Texas legislature
15 intended to harm elderly people by passing SB 14?
16      A.  Yes.
17      Q.  And what is the basis for your contention that
18 they intended to harm the elderly?
19      A.  Because we know that the elderly are less likely
20 to have their documents because they either lost them,
21 they got destroyed or they were born at a time when they
22 didn't have the money to and they were not born in a
23 hospital where they were given the appropriate
24 documentation.
25      Q.  Would you acknowledge that a vote by mail counts

## 56

1  just as a -- an in-person ballot counts?
2       A.  I would and I also have stated in my earlier
3  testimony that elderly people prefer to vote in person, A,
4  and as I understand the law, and I asked if I was wrong
5  for you to correct me, that in order for an elderly person
6  to vote by mail they must be disabled or they must be
7  traveling.  Am I incorrect with your --
8       MS. PERALES:  You just state your best
9  understanding.
10      THE WITNESS:  Okay.  Thank you.
11      Q.  (BY MR. ASTON)  Do you contend that the Texas
12 legislature intended to harm rural voters by passing
13 Senate Bill 14?
14      A.  Yes.
15      Q.  And what is the basis for that contention?
16      A.  Because most of the offices where people can go
17 get their ID, should they not have them, in rural
18 communities have either been closed or will be shut down
19 as a result of the shortage, and rural people are usually
20 very poor people; therefore, they will not be able to have
21 the documentation because either they can't afford to buy
22 it, to get it, or they cannot afford the gas in order to
23 drive the long distances that are required and, therefore,
24 they're being intentionally discriminated against.
25      Q.  Do you have any other evidence for the basis of



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Lydia Camarillo                                                June 12, 2012

---

### 57

1     your contention with regard to rural voters?
2         A.  That's what I have.
3         Q.  Do you contend that the Texas legislature
4     intended to harm urban voters by passing Senate
5     Bill 14?
6         A.  Yes.
7         Q.  And please explain the evidence and the basis for
8     that contention?
9         A.  Urban voters are more likely to be Latino and
10    African-American, and this bill was intended to stop
11    Latino and African-American voters from casting their
12    vote, and that vote being counted.
13        Q.  Please name for me all the members of the Texas
14    legislature that Southwest Voter contends acted with a
15    discriminatory purpose in supporting and voting for Senate
16    Bill 14.
17        A.  You would ask me this and I'm going to become a
18    citizen.  I'm sorry.  That was disrespectful.  I
19    apologize.
20            I cannot remember the names of the members right
21    now, but we can start with the authors of the bills.  And
22    I don't know the names so they're -- they're on record.
23        Q.  So Southwest Voter --
24        A.  At this point I do not remember the name of the
25    members.
        Q.  -- contends that some or all of the authors of

### 58

1     the bill intended to discriminate?
2         A.  Yes.  I also contend that those that voted in
3     favor intended to discriminate.
4         Q.  How many of them?
5         A.  All of them that voted in favor of this bill, as
6     well as the governor, who signed it.
7         Q.  So Southwest Voter believes that every member of
8     the Texas legislature who voted for this bill did so for
9     the purpose of discrimination?
10        A.  Yes.
11        Q.  Do you have any evidence for that contention in
12    addition to all of the things that we've been discussing
13    before?
14        A.  I do not have anything other than what I've said,
15    and accumulatively that I believe was purposely intent to
16    stop voters from voting that are Latino or otherwise.
17            MR. ASTON:  Go off the record for two
18    minutes.
19            (Break.)
20        Q.  (BY MR. ASTON)  Do you support the idea that only
21    registered voters should be allowed to vote?
22        A.  That's the law.  Yes.
23        Q.  Does Southwest Voter support the idea that one
24    should have to register prior to voting?
25        A.  Yes.

### 59

1         Q.  What is voter fraud?  How would Southwest Voter
2     define voter fraud?
3         A.  Well, when someone does not have the right --
4     according to the law of that moment, because laws
5     change -- votes.  That's how I would define it.
6         Q.  Would you agree that voter fraud includes someone
7     showing up to vote and claiming that he or she is a person
8     that he or she is not?
9         A.  Of course.
10        Q.  And does Southwest Voter agree that voter fraud
11    should be illegal?
12        A.  Yes.  But there is a difference between voter
13    fraud and the intent of this law.  I still -- in spite of
14    me agreeing with everybody's agreement that there should
15    be no voter fraud.  And only those who have the right by
16    the current laws to vote should vote and that their vote
17    be counted.  America still does not count the -- every
18    presidential cycle, 1 million people will vote and they
19    will not be counted.  So we still have a problem in
20    America.
21            But in this particular case, I think there is a
22    problem.  There is intent.  And in spite of us believing
23    that there should be no fraud, this bill does not in any
24    way, shape, or form stop fraud.  And there was no fraud or
25    crisis established by the State.

### 60

1         Q.  Do you believe that in-person voter fraud would
2     be harder to detect than mail-in voter fraud?
3         A.  I'm not sure I -- that question is vague.
4             MS. PERALES:  If you don't understand the
5     question, you can say that you don't understand the
6     question.
7         A.  I don't understand.  Give me an example, please.
8         Q.  (BY MR. ASTON)  Let me ask it this way.  Do you
9     think that the State of Texas should try and stop voter
10    fraud?
11        A.  I think if the State of Texas finds that there is
12    voter fraud, then it should work to stopping it.  But in
13    this instance we know that this does not apply.
14        Q.  Do you believe it would harder to detect
15    in-person voter fraud?
16        A.  That's why I don't understand your question.  The
17    whole intent of the SB 14 was to stop Latinos and
18    African-Americans from voting, and it was really an intent
19    to stop the so-called noncitizens who do not vote, who do
20    not take part, who do not sign an affidavit saying that
21    they're registered voters; therefore, this law does not
22    apply.
23            But your questions have to do with a general
24    sense of fraud --
25        Q.  That's correct.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Lydia Camarillo                                          June 12, 2012

---

**61**

1    A. -- and of course we do agree that there should be
2  no fraud.  But in this case, this bill is not the right
3  tool, it's not the right law, and it violates our
4  constitutional right as voters.
5        Q.  Do you believe it would harder for the State of
6  Texas to detect in-person voter fraud -- for example, one
7  person going into one voting booth and voting one ballot
8  for someone that he or she is not.  Would that be harder
9  to detect than someone taking a large stack of ballots,
10  filling them out in the same handwriting and mailing them
11  in?
12       A.  I'm still not understanding your question.  But
13  let me state this.  HAVA already provides for different
14  opportunities for the poll workers to determine who is a
15  voter and that that voter is a correct voter.  So I do
16  believe that there is already systems in place to stop
17  fraud, if that is your question.
18       Q.  Would you agree that in order to detect in-person
19  voter fraud, one would have to be present and witness it?
20       A.  I'm not sure I understand your question.  Reframe
21  or restate or give me an example.
22       Q.  If someone goes into a voting place claiming to
23  be a person that he or she is not, and is given that
24  ballot and votes, would you agree that in order to stop
25  that sort of voter fraud, you would need to stop it at the

---

**62**

1  polling place?
2        A.  Again, SB 14 does not do that.  SB 14 is an
3  attempt, purposeful and otherwise, to stop Latinos and
4  other communities of color from voting.  There are in
5  place, according to many laws that were already
6  established by the legislature and passed and signed by
7  the Governor, so the State, to make sure that the
8  elections law allows for systems to be in place to
9  prohibit people from voting that do not have the right to
10  vote.  And HAVA clearly provides for documents so that the
11  polling voters -- the watch -- the poll workers at the
12  polls can identify whether that voter was there.
13         Second, because it's being -- the poll workers
14  sign when somebody votes.  Someone cannot sign and vote
15  again.  So I think we have the systems in place to stop
16  any voter fraud, and SB 14 only is attempting to stop
17  Latino American citizens and other voters who are American
18  citizens from voting in America and in Texas specifically.
19       Q.  Do you believe that requiring a voter to show a
20  photo ID would make it harder for voters to vote claiming
21  to be someone that he or she is not?
22       A.  I do not believe that this law is going to do
23  what you're trying to do.
24       Q.  But do you believe it would be harder to vote as
25  someone you are not if you are required to show a photo ID

---

**63**

1  at the poll?
2        A.  I already stated that HAVA already provides for
3  those systems, and there are systems in place to stop us
4  from having fraud in Texas.  And there are no cases that
5  we can really identify, and there is no crisis; therefore,
6  this law is not necessary and all it is is an attempt to
7  violate the voter rights of Latinos and other voters.
8        Q.  So is the answer it would not make it harder?
9        A.  My answer is that this bill will not answer your
10  question.  It will not remedy what does not exist because
11  it doesn't exist in the way that this bill is --
12       Q.  My question is just a general question.  It's not
13  about Senate Bill 14 particularly.
14       A.  I know.  But if you're going to use it, then I'm
15  putting it on the record.  My answer on the record is that
16  there is no crisis, there is no fraud, and voters already
17  know that if they are not the voter that's supposed to
18  vote, that they cannot vote.  And there are systems in
19  place to stop a voter from creating fraud, starting with
20  HAVA.
21       Q.  The question is, though, would requiring showing
22  a photo ID make it harder for someone to vote claiming to
23  be someone that he or she is not?
24       A.  I've already answered that question.
25       Q.  I don't believe you have.

---

**64**

1        MS. PERALES:  Do you want to object as
2  nonresponsive?  Keep trying?
3        MR. ASTON:  I guess so.
4        MS. PERALES:  It's up to you.
5        MR. ASTON:  If she's not going to answer the
6  question, then, yes, I'll object as nonresponsive.
7        THE WITNESS:  Thank you.  Because I've
8  answered.
9        MS. PERALES:  He's looking for a yes or a
10  no --
11       THE WITNESS:  I understand.
12       MS. PERALES:  -- which you can give along
13  with an explanation of why you believe it's a yes or a no.
14  But perhaps your answer would be more responsive if you
15  started with a yes or a no, and then you are free to
16  explain your answer.
17       THE WITNESS:  But what's wrong with what I
18  said?
19       MS. PERALES:  I believe perhaps that it was
20  not -- I can't say for Mr. Aston, but perhaps he is
21  seeking a yes or a no, and then you are free in the rules
22  of the deposition to give your explanation.
23       THE WITNESS:  I understand that, but I want
24  to sustain my answer, if it's okay with you.
25       Q.  (BY MR. ASTON)  Well, you're not going to retract

---



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 65

1 anything that you've said.
2      A.  I understand.  But I don't want to use any of the
3 information that I've given as an excuse for this law to
4 be implemented when we all know that this law is an
5 attempt to stop Latino voters who are citizens from
6 participating in America's democracy.
7           MS. PERALES:  Would you like to ask the
8 question again or have the court reporter ask the
9 question, and then I'll ask Ms. Camarillo to begin her
10 answer with a yes or a no and then explain her position.
11           MR. ASTON:  Would you read back the last
12 question, please.
13           MS. PERALES:  Let's go off the record.
14           MR. ASTON:  Okay.
15           (The requested material was read.)
16      A.  I don't know.  But I restate my previous
17 statements, which are that I believe that the State of
18 Texas was not able to prove, in spite of spending
19 $1.5 million that we do not have, on trying to find
20 fraudulent votes.  I believe that this bill and law is
21 specific and intended to stop citizens from voting, and
22 citizens that are Latino and are not -- and are people of
23 color.
24           I believe that HAVA and other systems that exist
25 already prohibit any voter fraud , and if -- and it's

## 66

1 clear by the fact that the State is unable to put forth
2 any real cases of fraud.  Therefore, I believe that this
3 law, all it does is violate the voting rights of Latinos
4 and other communities of color.  And I'm speaking of
5 Latino citizens.
6           And for the record my previous answer was better.
7 So use both.
8           MR. ASTON:  I believe that's all I have.
9           THE WITNESS:  Thank you.  I know you're
10 doing your job, and I'm doing mine.
11           MS. PERALES:  Okay.  Mr. Aston is now
12 passing the witness to me, and I will reserve my questions
13 for the time of trial.
14           I think we're done.  Unless --
15           MS. McLEOD:  No.
16           (THE DEPOSITION CONCLUDED AT 10:41 A.M.)
17
18
19
20
21
22
23
24
25

## 67

CHANGES AND SIGNATURE

2 PAGE     LINE     CHANGE          REASON
3 _____
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
             _____
             LYDIA CAMARILLO
25

## 68

1           SIGNATURE PAGE
2
3      I, LYDIA CAMARILLO, have read the foregoing
  deposition and hereby affix my signature that same is true
  and correct, except as noted above.
4
5
6           _____
           LYDIA CAMARILLO
7
8
9 THE STATE OF _____)
10 COUNTY OF _____)
11      Before me,_____, on this
  day personally appeared LYDIA CAMARILLO, known to me (or
12 proved to me under oath or through
  _____ (description of identity card
13 or other document)) to be the person whose name is
  subscribed to the foregoing instrument and acknowledged to
14 me that they executed the same for the purposes and
  consideration therein expressed.
15      Given under my hand and seal of office this
  _____ day of _____, 2012.
16
17
18      _____
19 NOTARY PUBLIC IN AND FOR
  THE STATE OF _____
20 COMMISSION EXPIRES: _____
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 69

```
1              IN THE UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF COLUMBIA
2
3    STATE OF TEXAS,        )
                            )
4        Plaintiff,         )
                            )
5    VS.                    )
                            )
6                           )
     ERIC H. HOLDER, JR., IN )
7    HIS OFFICIAL CAPACITY AS )
     ATTORNEY GENERAL OF THE )
8    UNITED STATES,         )
                            )
9        Defendant,         )
                            )
10   ERIC KENNIE, ET AL.,   )
                            )
11       Defendant-Intervenors, )
                            )
12   THE TEXAS SATE CONFERENCE )
     OF NAACP BRANCHES, ET   ) CASE NO. 1:12-CV-00128
13   AL.,          )(RMC-DST-RLW)
                  ) Three-Judge Court
14       Defendant-Intervenors, )
15   TEXAS LEAGUE OF YOUNG   )
     VOTERS EDUCATION FUND, ET )
16   AL.,                   )
                            )
17       Defendant-Intervenors, )
18   TEXAS LEGISLATIVE BLACK  )
     CAUCUS, ET AL.,        )
19       Defendant-Intervenors, )
20   VICTORIA RODRIGUEZ, ET  )
     AL.,                   )
21                          )
22       Defendant-Intervenors. )
23
24
25
```

## 70

```
1            REPORTER'S CERTIFICATION
             DEPOSITION OF LYDIA CAMARILLO
2                 JUNE 12, 2012

4        I, Tamara K. Chapman, Certified Shorthand Reporter in
5    and for the State of Texas, hereby certify to the
6    following:
7        That the witness, LYDIA CAMARILLO, was duly sworn by
8    the officer and that the transcript of the oral deposition
9    is a true record of the testimony given by the witness;
10       That the deposition transcript was submitted on
11   _____ to the witness or to the attorney for
12   the witness for examination, signature and return to me by
13   _____;
14       That the amount of time used by each party at the
15   deposition is as follows:
16   MR. ASTON - 1:22
17   MS. McLEOD - 0:00
18   MS. PERALES - 00:00
19       That pursuant to information given to the deposition
20   officer at the time said testimony was taken, the
21   following includes counsel for all parties of record:
22       Mr. Adam Aston - FOR THE PLAINTIFF STATE OF TEXAS
23       Ms. Michelle McLeod - FOR THE DEFENDANTS ERIC H.
24   HOLDER, ET AL.
25       Ms. Nina Perales - RODRIGUEZ DEFENDANT-INTERVENORS
```

## 71

```
1
2        That $_____ is the deposition officer's charges
3    to the Plaintiff for preparing the original deposition
4    transcript and any copies of exhibits;
5        I further certify that I am neither counsel for,
6    related to, nor employed by any of the parties or
7    attorneys in the action in which this proceeding was
8    taken, and further that I am not financially or otherwise
9    interested in the outcome of the action.
10       Certified to by me this 14th day of June, 2012.
11
12
13   _____
     Tamara K. Chapman, Texas CSR 7248
14   Expiration Date: 12/31/12
     Esquire Deposition Solutions
15   Firm Registration No. 283
     100 Congress Avenue, Suite 2020
16   Austin, Texas 78701
     T: 512.634.1980
17   F: 512.328.8139
     www.esquiresolutions.com
18
19
20
21
22
23
24
25
```



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com