## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS §
   Plaintiff, §
§
VS. §
§
ERIC H. HOLDER, JR., IN §
HIS OFFICIAL CAPACITY AS §
THE ATTORNEY GENERAL OF THE §
UNITED STATES, §
   Defendant, §
§
ERIC KENNIE, ET AL., §
   Defendant-Intervenors, §
§
THE TEXAS STATE CONFERENCE §   CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, et al., §   (RMC-DST-RLW)
   Defendant-Intervenors, §   Three-Judge Court
§
TEXAS LEAGUE OF YOUNG §
VOTERS EDUCATION FUND, §
et al., §
   Defendant-Intervenors, §
§
TEXAS LEGISLATIVE BLACK §
CAUCUS, ET AL., §
   Defendant-Intervenors, §
§
VICTORIA RODRIGUEZ, ET AL., §
   Defendant-Intervenors. §

*********************************************
ORAL DEPOSITION OF
KARINA CASARI DAVIS
JUNE 15, 2012
*********************************************

## 2

1     ORAL DEPOSITION OF KARINA CASARI DAVIS,
2  produced as a witness at the instance of the
3  Defendant-Intervenors Texas League of Young Voters
4  Education Fund, and duly sworn, was taken in the
5  above-styled and numbered cause on the 15th day of June,
6  2012, from 8:47 a.m. to 6:24 p.m., before Caroline
7  Chapman, CSR in and for the State of Texas, reported by
8  Computerized Stenotype Machine, Computer-Assisted
9  Transcription, at the Law Offices of Dechert, LLP, 300
10  West Sixth Street, Suite 2010, Austin, Texas pursuant to
11  the Federal Rules of Civil Procedure.

## 3

1       A P P E A R A N C E S
2  FOR THE STATE OF TEXAS:
     OFFICE OF THE TEXAS ATTORNEY GENERAL
3     BY: MR. MATTHEW FREDERICK, ESQ.
     Special Counsel
4     P.O. Box 12548
     Austin, Texas 78711-2548
5     (512) 475-4330; Fax (512) 370-9077
     matthew.frederick@texasattorneygeneral.gov
6
7  FOR THE DEFENDANT ERIC H. HOLDER, JR., IN HIS OFFICIAL
     CAPACITY AS THE ATTORNEY GENERAL OF THE
8  UNITED STATES:
     U.S. DEPARTMENT OF JUSTICE
9     BY: MS. RISA BERKOWER, ESQ.
     MS. ANGELA M. MILLER, ESQ.
10    950 Pennsylvania Avenue, NW
     Room 7161 NWB
11    Washington, D.C. 20530
     (202) 305-0150; Fax (202) 307-3961
12    risa.berkower@usdoj.gov
     angela.miller5@usdoj.gov
13
14  FOR THE DEFENDANT-INTERVENORS TEXAS LEAGUE OF YOUNG
     VOTERS EDUCATION FUND:
15    FRIED FRANK HARRIS SHRIVER & JACOBSON, LLP
     BY: MR. ADAM HARRIS, ESQ.
16    One New York Plaza
     New York, New York 10004
17    (212) 859-8953; Fax (212) 859-4000
     adam.harris@friedfrank.com
18
19
     Also Present: Mr. Ezra Rosenberg, Esq.
20
21    Reported by: Caroline Chapman, CSR No. 467
22
23
24
25

## 4

1       I N D E X
2  Appearances . . . . . . . . . . 2
3  KARINA DAVIS
4              PAGE
    Examination by Mr. Harris . . . . . . 6
5    Examination by Ms. Berkower . . . . . 145
    Examination by Mr. Frederick . . . . . 245
6    Examination by Ms. Berkower . . . . . 269
    Signature and Changes . . . . . . 286
7    Reporter's Certificate . . . . . . 288
8
9       E X H I B I T S
10  NO. DESCRIPTION          PAGE
    Exhibit 14  Senate Rules adopted by 81st   47
11     Legislature, January 14, 2009,
     Senate Resolution No. 14
12    Exhibit 15  Excerpt of Senate Rules adopted  66
     by 82nd Legislature, January 19,
13     2011, Senate Resolution No. 36,
     Pages 24 and 25
14    Exhibit 16  Legislative Reference Library of  88
     Texas, HB 218, 80th Regular
15     Session, downloaded on June 15,
     2012
16    Exhibit 17  Texas Legislature Online   110
     History, Senate Bill 14
17    Exhibit 18  Senate Rules adopted by 82nd  259
     Legislature, January 19, 2011,
18     Senate Resolution No. 36
19      ATTORNEY GENERAL EXHIBITS
    NO. DESCRIPTION          PAGE
20  Exhibit 700  Email to Karina Davis from   --
     David Hanna, Attorney for the
21     Texas Legislative Council
     Exhibit retained by Ms. Berkower
22
23     PREVIOUSLY MARKED EXHIBITS
    NO. DESCRIPTION          PAGE
24  Exhibit 4  Legislative Reference Library of  87
     Texas, HB 1706, 79th Regular
25     Session, downloaded June 13,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 5

```
 1         PREVIOUSLY MARKED EXHIBITS (CONTINUED)
       NO. DESCRIPTION                        PAGE
 2     Exhibit 6   House Engrossment, HB No. 218,    87
                   Pages 1 through 13
 3     Exhibit 10  House Committee Report, First   100
                   Printing, Senate Bill 326,
 4                 Pages 1 through 9
       Exhibit 11  Legislative Reference Library of  100
 5                 Texas, SB 362, 81st Regular
                   Session, downloaded June 13, 2012
 6     Exhibit 12  Senate Bill No. 14, Pages 1     109
                   through 17
 7     Exhibit 44  House Bill No. 1706, Pages 1     79
                   through 10
 8     Exhibit 80  Letter to Honorable Robert Duncan  209
                   from Leticia Van De Putte, R.Ph.
 9                 dated January 21, 2011
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

## 6

```
 1                 KARINA CASARI DAVIS
 2     having been first duly sworn, testified as follows:
 3                     EXAMINATION
 4     BY MR. HARRIS:
 5         Q.  Good morning, Ms. Davis.
 6         A.  Good morning.
 7         Q.  As I told you before, I am Adam Harris.  I am
 8     from the law firm of Fried, Frank, Harris, Shriver &
 9     Jacobson, LLP.  We represent the Texas League of Young
10     Voters Education Fund, Defendant-Intervenors in this
11     lawsuit.
12         Can you start by giving your full name for
13     the record, please.
14         A.  Karina Casari Davis.
15         Q.  And can you give your address, please.
16         A.  5817 Spanish Oaks Boulevard, Austin, Texas
17     78738.
18         Q.  And Ms. Davis, can you please briefly tell me
19     about your post high school education, if any?
20         A.  Yes.  I have a Bachelor's Degree from Texas A&M
21     University in Political Science.
22         Q.  Do you hold any other higher education degrees?
23         A.  No.
24         Q.  Have you ever given a deposition before?
25         A.  Yes.
```

## 7

```
 1         Q.  How many times?
 2         A.  I think twice.
 3         Q.  And can you tell me --
 4         A.  If I remember.
 5         Q.  -- the first time you gave a deposition, what
 6     kind of case that was?
 7         A.  It was actually a -- I was a minor.
 8         Q.  You were a minor at the time?
 9         A.  Yes.  I was a minor at the time.  And it was --
10     actually, I had been involved in a car accident, so it
11     was -- I am sorry.  I am having to remember.  It was a
12     run-of-a-mill car accident with a lawsuit.
13         Q.  Sure.
14         A.  Long time ago.
15         Q.  And how about the second time you gave a
16     deposition, what kind of case was that?
17         A.  That was actually when I worked for the
18     Department of Insurance, I was Executive Commissioner
19     there.  We were -- the State had sued Farmers Insurance,
20     actually, for discriminatory practices at the time and I
21     was kind of the lead staff person in that enforcement
22     action.
23         Q.  Okay.  Well, since you have given a couple
24     depositions before, I will keep the sort of housekeeping
25     and ground rules short.  But, obviously, there is a
```

## 8

```
 1     court reporter taking down the testimony, so she will
 2     need you to give a verbal answer as opposed to nodding
 3     or shaking your head or "uh-huh" or the sorts of things
 4     we would normally do in conversation.
 5         We should, also, try not to talk over each
 6     other, I will certainly try so that the record is easy
 7     to read.
 8         If you don't understand a question, you
 9     should certainly feel free to say that, and I will be
10     happy to rephrase.  I will try to be clear but I
11     certainly will not succeed all the time.
12         And your counsel today may make some
13     objections.  Unless he particularly instructs you not to
14     answer a question, you will need to answer the question.
15         And to the extent that you need a break
16     today, I am happy to take one, so please just let me
17     know.
18         Can you tell me about each of the jobs you
19     have held since graduating college, starting, I guess,
20     with your first job out of college.
21         A.  Uhm, let me think.  You probably -- as soon as
22     I graduated, I probably helped my parents with their
23     business for a little while before I started my first
24     real job.  I started working for a State Senator from
25     Waco by the name of David Sibley in 1992.  And I worked
```



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 9

1  for him in various capacities through -- until the
2  beginning of 2002, so about 10 years, and have been a --
3  I had to work for him in the District as a District
4  Aide, and then I worked as Legislative Aide, as a
5  committee staffer, as his Committee Director and his
6  Chief of Staff at various points in my career with him.
7        After that, I worked at the Department of
8  Insurance for a year. And then I returned to the Senate
9  as the Legislative Director for the current Lieutenant
10 Governor David Dewhurst, did that for about a year, and
11 then became Parliamentarian in the Texas Senate in 2004.
12       Q.   And what year did you become the Legislative
13 Director for Lieutenant Governor David Dewhurst?
14       A.   When he took office in January of 2003.
15       Q.   And then when did you transition from being his
16 Legislative Director to becoming the Senate
17 Parliamentarian?
18       A.   I think that was -- I want to say it was April
19 of 2004, we had a special session at the time and the
20 previous Parliamentarian had retired previous to that,
21 so that would be the -- you know, I think April 2004 is
22 probably a safe answer, that's about right.
23       Q.   Have you served as Senate Parliamentarian
24 continuously from about April 2004 through today?
25       A.   Yes.

## 10

1        Q.   And going back to your position with State
2  Senator, did you say Sibley was the name?
3        A.   Sibley.
4        Q.   Sibley, excuse me.
5        A.   Uh-huh.
6        Q.   As a Legislative Aide, did you cover, to
7  Senator Sibley, did you cover any particular subject
8  area?
9        A.   Education at the time, this was in 1993, that
10 was probably my biggest subject for him.
11       Q.   And then you said, you were a committee staffer
12 and then a Committee Director.
13       A.   Uh-huh.
14       Q.   Was that for a particular committee, I assume?
15       A.   Initially, it was the Economic Development
16 Committee. The name was changed at some point, it
17 became the Senate Business and Commerce Committee.
18       I should say, there were probably some
19 interim committees that were special committees that I,
20 also, directed during that time frame, all related to
21 economic development of business and commerce.
22       Q.   And as Legislative Director to Lieutenant
23 Governor David Dewhurst, did you cover a particular
24 subject area?
25       A.   No. No.

## 11

1        Q.   What were your duties as Legislative Director
2  to Lieutenant Governor David Dewhurst?
3        A.   Really, it was to, you know, advise him on
4  legislative policy in the Senate to, you know, I
5  assisted the Parliamentarian, actually, in many ways,
6  and I think the -- it was somewhat of an Assistant
7  Parliamentarian. Really, the Lieutenant Governor has a
8  lot of responsibility when it comes to the Senate
9  calendars, and so their -- as Legislative Director, I
10 was involved in helping schedule the Senate's business
11 from day-to-day.
12       Q.   And then I think you said you functioned as
13 something like an Assistant Parliamentarian at times.
14       A.   Yes.
15       Q.   Is there an official, you know, assistant or
16 Deputy Parliamentarian in the Texas Senate?
17       A.   There isn't right now.
18       Q.   Has there been in the past?
19       A.   Probably, sometimes.
20       Q.   Since you became Parliamentarian in or about
21 April 2004, have you ever had a deputy or an Assistant
22 Parliamentarian?
23       A.   No, not a formal assistant, no.
24       Q.   As Parliamentarian, does anybody report to you,
25 do you have staff at all?

## 12

1        A.   I have an assistant in the office, yes, one
2  person.
3        Q.   And are you employed by Lieutenant Governor
4  Dewhurst?
5        A.   I am employed -- well, I am an officer of the
6  Senate, and the Senate decrees that I am an officer and
7  in a resolution that they adopt allows the Lieutenant
8  Governor to appoint my position.
9        Q.   Did Lieutenant Governor Dewhurst appoint you to
10 be the Senate Parliamentarian in 2004?
11       A.   Yes.
12       Q.   Where -- do you have an office in the Senate?
13       A.   Yes.
14       Q.   Where is your office located?
15       A.   It's located in front of the Senate Chamber
16 adjacent to the Sergeant at Arms.
17       Q.   What are your duties as Senate Parliamentarian?
18       A.   Generally, it is to advise the presiding
19 officer and the senators on the rules and procedures of
20 the Texas Senate.
21       Q.   As either aide to Senator Sibley or as
22 Legislative Director to Lieutenant Governor Dewhurst,
23 did you ever have any involvement with Texas election
24 law or issues around voting?
25       A.   If I did, it was -- I really -- I don't



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 13

1  remember very specifically.  I have certainly -- I am
2  sure Senator Sibley voted on a lot of bills but I don't
3  remember.  He was -- as Chair of Business and Commerce,
4  that was really the focus of his legislative agenda.
5      Q.  As Senate Parliamentarian, do you have to be
6  re-appointed each year or each session or is it sort of
7  continuous until Lieutenant Governor decides otherwise,
8  how does that work?
9      A.  Generally that appointment happens at the
10  beginning of each Legislature.
11     Q.  What did you do to prepare for your deposition
12  today?
13     A.  You know, I more or less reviewed rules.  I
14  have reviewed the timeline for voter ID.  That's pretty
15  much it.
16     Q.  When you say "rules," are you referring to,
17  like, the current Senate Rules governing procedure in
18  the Senate?
19     A.  Current and previous.
20     Q.  Uh-huh.  You say you reviewed a timeline
21  relating to voter ID, what's that?
22     A.  Just what days it was heard, when it was taken
23  up on the floor.
24     Q.  Was that like a legislative history for -- for
25  a particular bill?

## 14

1      A.  You know, I don't know that I would call it "a
2  legislative history," it was more of trying to remember
3  when we took the -- the Senate took certain actions on
4  that bill, only because I am -- as Parliamentarian, I am
5  there for thousands of bills, so --
6      Q.  Who prepared --
7      A.  -- I wouldn't always remember.
8      Q.  Excuse me.  Who prepared the timeline that you
9  reviewed?
10     A.  The timeline.  I didn't have a particular
11  timeline that I reviewed, I just looked at the brief
12  history of the bill.
13     Q.  What documents did you rely on in order to do
14  that?
15     A.  Computer search.
16     Q.  What did you search?
17     A.  Senate Bill 14.
18     Q.  Were you searching on a website or on your own
19  computer?
20     A.  The Senate has a -- the Legislature has a
21  legislative information system that provides -- that
22  details the actions of a particular bill.
23     Q.  I see.  Do you know Bryan Hebert?
24     A.  Yes.
25     Q.  Who is Bryan Hebert?

## 15

1      A.  He is an attorney that previously worked for
2  the Lieutenant Governor.
3      Q.  Do you recall speaking to Mr. Herbert -- well,
4  let me step back.  Are you aware that Mr. Herbert was
5  deposed in this case?
6      A.  Yes.
7      Q.  Do you recall speaking to Mr. Herbert, prior to
8  his deposition, about the fact that he was going to be
9  deposed?
10     A.  Very briefly, yes.
11     Q.  And what did you discuss with Mr. Herbert?
12     A.  Not really anything.  We just ran into each
13  other at the Attorney General's Office and kind of
14  thought, I think we mistakenly thought we might be in
15  the same meeting and then realized, oh, you're here for
16  a deposition, I am here for something else, that was the
17  extent of it.
18     Q.  Did you receive any specialized training to
19  become Parliamentarian?
20     A.  What do you mean by "specialized training"?
21     Q.  Well, I assume that the Senate rules are
22  somewhat complex, there is a lot of procedure.
23         How did you learn to do the job of
24  Parliamentarian?
25     A.  I studied extensively the rules, previous

## 16

1  legislative authorities like Mason's Manual, Jefferson's
2  Manual, lots of parliamentary authorities, having worked
3  for a State Senator who was very involved in legislation
4  and known for being a rules expert, I came to know the
5  Senate very thoroughly.
6      Q.  What is the -- what are Lieutenant Governor's
7  legislative duties?
8      A.  Can you be more specific?
9      Q.  Sure.  With respect to the Senate, what role
10  does the Lieutenant Governor play?
11     A.  He is the Presiding Officer and the President
12  of the Senate.
13     Q.  What are his powers as Presiding Officer and
14  President of the Senate?
15     A.  Generally, he has the authority to appoint the
16  chairman of committees, the members of committees, the
17  authority to refer legislation, refer bills to
18  committee.
19         He has the authority under the rules to
20  decide questions of order, subject to appeal.
21     Q.  Can the Lieutenant Governor introduce or file
22  legislation in the Senate?
23     A.  That's a good question.  Probably not.  I
24  suppose they could give him that authority, if they
25  wanted to, but it is not clear in the rules.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Karina Casari Davis                                    June 15, 2012

---

17

1    Q.  Is it ever the case that the Lieutenant
2  Governor seeks to introduce a bill via another member of
3  the Senate?  So, for instance, the Lieutenant Governor
4  wants a bill to be passed and given what you just said,
5  he doesn't have the power to introduce the bill, is it
6  ever the case that he would ask another member to file a
7  bill for him?
8    A.  Probably.
9    Q.  You said that the Lieutenant Governor rules on
10  questions or points of order; is that right?
11    A.  That's right.
12    Q.  Does he consult you when a point of order is
13  raised?
14    A.  Yes.
15    Q.  And I assume part of your job is to advise him
16  on your view with respect to the point of order that's
17  been raised?
18    A.  Yes.
19    Q.  Is the Lieutenant Governor obligated to take
20  your advice?
21    A.  No.
22    Q.  Can the Lieutenant Governor vote on
23  legislation?
24    A.  Only in the case of a tie.
25    Q.  Are there any other instances in which the --

---

18

1  beyond a tie, are there any other instances in which the
2  Lieutenant Governor has the authority to vote on a
3  particular bill?
4    A.  He has the authority within the Committee of
5  the Whole to vote and debate on any matter before the
6  Committee of the Whole.
7    Q.  And what is the "Committee of the Whole"?
8    A.  The "Committee of the Whole" is a parliamentary
9  device with historical roots in parliament.  It is
10  essentially a meeting of the full Senate outside of
11  session.  It is an informal meeting where the Senate
12  would consider a wide variety of things on an informal
13  basis.  And by "informal," I mean, not bound by the
14  traditional rules of procedure governing debate in full
15  session.
16    Q.  When you say that the Committee of the Whole
17  process is not bound by the formal rules of debate, what
18  sort of rules are you referring to?
19    A.  Rules such as, that you don't get to speak a
20  second time unless every member of the Senate has
21  already had an opportunity to speak once.  Generally, in
22  a Committee of the Whole, any limitations on debate that
23  the full body might have would not be allowed in
24  Committee of the Whole unless the Senate itself in
25  session chose to place limits on discussion in the

---

19

1  Committee of the Whole, things of that nature.
2    Q.  What is the purpose of using the Committee of
3  the Whole as opposed to -- well, let me step back.
4  Bills are normally -- am I correct that bills are
5  normally referred to a particular committee that has
6  jurisdiction over particular subject matter relating to
7  that bill?
8    A.  I think, frequently, that's the case.  But the
9  Committee of the Whole in the Senate has been used quite
10  a bit for legislation, especially in the last 30
11  years --
12    Q.  How --
13    A.  -- in lieu of the standing committee.
14    Q.  How frequently is the Committee of the Whole
15  process used for bills in the Senate as opposed to
16  sending a bill to a standing committee?
17    A.  Uhm.  Well, I think that the Senate tends to
18  use the Committee of the Whole for legislation for which
19  it -- Senate deems it more beneficial to have the
20  input of every single member of the Senate as opposed to
21  a subset of the Senate.  The standing committee might
22  have 10 members, whereas, the Committee of the Whole
23  would have 31 members.  So the kinds of bills that go to
24  the Committee of the Whole are for bills that the Senate
25  deems would benefit from an exchange amongst the 31

---

20

1  senators as opposed to fewer.
2    Q.  And since you became Senate Parliamentarian in
3  or around April 2004, would you be able to quantify how
4  many -- how many times the Committee of the Whole
5  process has been used as opposed to sending a bill to a
6  standing committee?
7    A.  Yes.  Since 2004, I believe we -- it was used
8  for school finance.  And then probably for voter ID
9  legislation.
10    Q.  Can you think of any other bills that went to
11  the -- since you became Senate Parliamentarian, that
12  went to the Committee of the Whole rather than a
13  standing committee or another committee?
14    A.  I don't remember if we referred anything else
15  to the Committee of the Whole.  I do remember the Senate
16  resolving for those two purposes.
17    Q.  As a general matter, putting aside any
18  particular bill or piece of legislation, why would the
19  Senate use the Committee of the Whole process as opposed
20  to sending a bill to a committee with particular
21  jurisdiction over some subject matter?
22    A.  I think, generally, for the reasons I just
23  explained.
24    Q.  And I think what you were saying is that, the
25  Committee of the Whole involves the entire Senate,

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**21**

1    whereas, a standing committee or another committee would
2    only have 10 or so members; is that right?
3        A.   For example, yes.
4        Q.   And what's the benefit or -- what's the benefit
5    of sending a bill to the Committee of the Whole with 31
6    members as opposed to a committee that has fewer
7    members?
8        A.   I think the benefit is that you have greater
9    deliberation.  It allows the Senate to all -- basically,
10   31 members would have equal rights of participation
11   within the Committee of the Whole.  And by "equal
12   rights," I mean, equal rights to amend a bill in
13   committee, equals rights to question witnesses, equal
14   rights to debate within the informal confines of a
15   committee structure.
16       Q.   And when you say that the Committee of the
17   Whole process lends itself to greater deliberation, are
18   you able to elaborate on that beyond what you have just
19   described?
20       A.   Well, when the Senate is in session, I think --
21   you know, we have rules of debate.  Things like, you
22   should always address the President.  Committee of the
23   Whole is just -- it is an informal meeting of the Senate
24   where they can have full debate, question each other,
25   without having to worry about framing their questions

**23**

1    these actions are entered into the Senate Journal.
2        Q.   When you say "a bill is given a number," what
3    is the significance of the number that the bill is
4    given?
5        A.   Not really any significance, it is just a
6    sequential numbering system for identifying bills.
7        Q.   So is it the case that the first bill filed in
8    a session would be given Bill No. 1, the next bill would
9    be given No. 2 and so on?
10       A.   Not necessarily.  Sometimes we go out of order
11   for the convenience of the members.
12       Q.   Is it ever the case that certain low bill
13   numbers are reserved?
14       A.   Yes.  We do reserve some bill numbers.
15   Traditionally, for example, the budget is considered
16   very important and, also, we give it the designation of
17   one and that is for the convenience of the members, they
18   always know budget bill is Senate Bill 1.
19            House does the same.  Theirs is House Bill
20   1 every time, almost every time, I should say.
21       Q.   Have you ever heard of members camping out to
22   file legislation?
23       A.   Yes.
24       Q.   And what does that refer to when members, what
25   do you take that to mean when members camp out, what are

**22**

1    and conforming to the rules of debate on the Senate
2    floor.
3            The Committee of the Whole has been used
4    for investigations, for other purposes, any time the
5    committee -- the Senate, as a whole, determines informal
6    debate in consideration would be beneficial.
7        Q.   Can you walk me through the process of how a
8    bill gets filed or introduced in the Senate.
9        A.   Sure.  A member of the Senate -- you want me to
10   walk you through, administratively, what they would
11   actually do?
12       Q.   Yes, please.
13       A.   Our process in the Senate is, once you have a
14   piece of legislation, you get what we call "an orange
15   back" where you -- it is stapled to the back of the bill
16   on this orange back, has a place for the caption which
17   is required by the rules that basically notifies the
18   members in the public, generally, what the bill is
19   about, a member would sign that legislation.  The orange
20   back has room on the back where -- when the bill goes
21   through the process of the Senate, it might be stamped
22   with where it was referred that actions that take place
23   on the bill.  But essentially, a member of the Senate or
24   the staff would take this bill to the Calendar Clerk
25   where it is given a number and at some point all of

**24**

1    you describing?
2        A.   You know, I think some members think that a
3    lower bill number gives them -- you know, I think
4    they -- they think that it signals to maybe the
5    membership and the public that their piece of
6    legislation was first in idea, perhaps, or sometimes we
7    get multiple pieces of legislation on the same subject
8    and so some members think that if they have a lower bill
9    number, that indicates to the Senate that, perhaps, they
10   came up with the idea first.  There are many members who
11   don't think that, some -- and don't camp out.
12       Q.   Does the bill number have any affect on when a
13   bill gets considered by a committee?
14       A.   Not at all.
15       Q.   Does it have any affect on when a bill gets
16   considered, if at all, by the entire Senate on the
17   floor?
18       A.   No.
19       Q.   After a bill is filed, what's the next step in
20   the legislative process, what happens to it?  I think
21   you said it -- it is filed with the Calendar Clerk; is
22   that right?
23       A.   Yes.
24       Q.   What's the next step after that?
25       A.   The next step under the rules is that, the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 25

1  Lieutenant Governor, the Presiding Officer, would refer
2  the bill to a committee.
3      Q.  And in this case, Presiding Officer, you're
4  referring to Lieutenant Governor; is that right?
5      A.  Yes.
6      Q.  As a general matter, without regard to any
7  particular bill, how does the Lieutenant Governor decide
8  which committee to assign a bill to?
9      A.  Generally, the Lieutenant Governor would
10 consider the subject of the legislation and consider
11 what committee might have the expertise to deliberate
12 that piece of legislation for the Senate to make
13 recommendations to the Senate.
14     Q.  Is it ever the case that a bill could fall
15 under the jurisdiction of more than one committee?
16     A.  Yes.
17     Q.  And in those sorts of cases, as a general
18 matter, how does the Lieutenant Governor go about
19 deciding which of those two or more committees to assign
20 the bill to?
21     A.  He might look at where that kind of legislation
22 has gone before previously.  He might determine that a
23 bigger committee may -- may -- may serve the bill -- may
24 provide better deliberation and input for a bill than
25 maybe a smaller committee.  He may be requested to send

## 26

1  a bill to a particular committee.  There is probably a
2  wide variety of factors that he could take into
3  consideration.
4      Q.  And when you say, "the Lieutenant Governor may
5  be requested to send a bill to a particular committee,"
6  who would make such a request?
7      A.  Frequently -- okay.
8          MR. FREDERICK:  Let me just object --
9      A.  Okay.
10         MR. FREDERICK:  -- on the basis of
11 privilege.  I think the question is just calling for a
12 general matter.  But I want to caution you not to reveal
13 any specific request or conversation between a member of
14 the Senate and the Lieutenant Governor.  But subject to
15 that instruction, you may answer the question.
16     A.  Sure.  Sometimes a member who files a bill sits
17 on a committee where that committee might have
18 jurisdiction, and so the member, out of convenience, may
19 ask for the bill to go to that particular committee, as
20 an example of why a member would request a referral.
21     Q.  (By Mr. Harris) As the Parliamentarian, does
22 the Lieutenant Governor ever consult with you regarding
23 which committee to send a bill to?
24     A.  Yes.
25     Q.  And when you -- when you, as a general matter,

## 27

1  when you help the Lieutenant Governor deliberate on that
2  question, do you employ the same sorts of criteria that
3  you just talked about, such as the size of the
4  committee, which committee has jurisdiction over the
5  subject matter?
6      A.  Yes.
7      Q.  Are there any other factors that you take into
8  account?
9      A.  I think, generally, I put forward the -- the
10 bigger factors.
11     Q.  How about in deciding whether to assign a bill
12 to the Committee of the Whole, as a general matter would
13 the Lieutenant Governor consult you as a Parliamentarian
14 in deciding whether to assign a bill to the Committee of
15 the Whole as opposed to another committee of the Senate?
16     A.  He may.
17     Q.  Did you discuss the fact that you were giving a
18 deposition today with anybody?
19     A.  Yes.
20     Q.  Who did you discuss it with?
21     A.  My husband, my assistant at work, it probably
22 came up with close friends.
23     Q.  Did you discuss the substance of what you might
24 say today with anybody, other than attorneys?
25     A.  No.

## 28

1      Q.  Did you discuss --
2      A.  Oh, I take that back, my assistant.
3      Q.  And what did you discuss with your assistant
4  about the substance of today's deposition?
5      A.  Probably more of my concerns and worries that I
6  wouldn't remember things but not anything very specific.
7      Q.  Were there particular things you were worried
8  about not remembering?
9      A.  Yes.  As I mentioned previously, we have lots
10 of legislation in the Senate and sometimes I don't
11 recall, you know, very specific events.
12     Q.  Did you meet with any attorneys in preparation
13 for today's deposition?
14     A.  Yes, my counsel.
15     Q.  And who is your counsel?
16     A.  Matt Frederick.
17     Q.  And how many times did you either meet with or
18 speak to Mr. Frederick about the deposition prior to
19 today, or I guess including today?
20     A.  Probably two or three times.
21     Q.  And when -- were those in person meetings or --
22     A.  One of them was, yes, or actually probably two
23 of them.
24     Q.  And when did those in person meetings take
25 place?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 29

1   A.  Yesterday and today.
2   Q.  And how long did you meet with Mr. Frederick
3   yesterday?
4   A.  Probably, maybe two to three hours and probably
5   weren't meeting the entire time.
6   Q.  And how about today, how long did you meet with
7   Mr. Frederick today?
8   A.  Maybe 20 minutes.
9   Q.  And did you have any other contact with
10  Mr. Frederick in preparation for the deposition, other
11  than those two in person meetings?
12  A.  We had a phone call.
13  Q.  And when did that take place?
14  A.  Late yesterday.
15  Q.  And how long did -- how long did the phone call
16  last?
17  A.  You know, 10 to 20 minutes.
18  Q.  Other than the searches for the bill histories
19  with respect to SB 14 that you talked about doing on
20  your computer, did you review any other sources or
21  documents in preparation for the deposition?
22  A.  You know, probably -- I reviewed the rules,
23  although I do that frequently anyways.  I frequently
24  read parliamentary authorities.  I have been working on
25  some research on some other things and -- for instance,

## 30

1   you know, just general parliamentary law.
2   Q.  As Parliamentarian, do you have any role with
3   respect to the -- to the substance of legislation as
4   opposed to the procedure?
5   A.  No.
6   Q.  Do you review or read every bill that gets
7   filed with the Senate?
8   A.  Usually, yes.
9   Q.  Let's go back to the -- to the legislative
10  process.  I think where we left off, you had said that,
11  after the bill gets filed with the Calendar Clerk, the
12  Lieutenant Governor makes a decision about which
13  committee to appoint the bill to; is that right?
14  A.  Yes.
15  Q.  And what's the next step in the process at that
16  point?
17  A.  Once that determination is made, the bill is
18  read on its first reading in front of the Senate, read
19  first reading and referral where the committee of
20  referral is announced in the Senate and the bill is
21  actually referred.  At that point, as I mentioned
22  previously, we have an orange back on the bill, it is
23  stamped with the committee that it's been referred to,
24  the bill goes back to the Calendar Clerk at that time.
25  Q.  Why does it go back to the Calendar Clerk?

## 31

1   A.  She and the Secretary of the Senate or the
2   custodian of the bills in the Senate.
3   Q.  And after the Bill is referred to the
4   committee, read for the first time on the Senate floor
5   and then goes back to the Calendar Clerk, what happens
6   next?
7   A.  Sometimes nothing.  The bill is scheduled for
8   hearing in a committee.  The committee clerk of that
9   committee would probably go to the Calendar's Clerk and
10  check the bill out for the committee's work.
11  Q.  What has to happen for the bill to go from
12  committee to the Senate floor for consideration by the
13  entire Senate, assuming we are not talking about the
14  Committee of the Whole but a regular committee?
15  A.  Generally, a committee would have to make a
16  recommendation to the full Senate that the bill be
17  passed or not passed but usually that it would be
18  passed.
19  Q.  And in making those recommendations, is there a
20  committee vote --
21  A.  Yes.
22  Q.  -- on the bill?  And is it -- what vote would
23  be required to recommend the bill to the -- to the
24  entire Senate, to recommend to the entire Senate that
25  the bill be passed?

## 32

1   A.  For standing committees, I think those
2   procedures require a majority of the membership of the
3   committee.
4   Q.  And assuming that a bill receives a vote from
5   majority of the membership of the committee to recommend
6   it for passage to the entire Senate, what's the next
7   step of the legislative process after that?
8   A.  Well, if the author of the bill chooses to move
9   it forward, the bill, once it's reported from Committee,
10  becomes part of the Senate's Regular Order of Business.
11  A senator choosing to move that bill forward, may choose
12  to -- could choose to submit it to the local calendar to
13  the Administration Committee for consideration on a
14  local calendar.  He or she could choose to have the bill
15  brought up for consideration in the full Senate for
16  debate.
17  Q.  Okay.  You referred to -- "could be a matter of
18  Regular Order of Business."
19  A.  Uh-huh.
20  Q.  What does that mean?
21  A.  The "Regular Order of Business" is what's
22  considered the Senate's general calendar for bills and
23  resolutions.
24  Q.  And how does that work?
25  A.  The Regular Order of Business is formed under



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 33

1    the rules. The rules provide that, as bills are
2    reported from a Senate committee, that the Calendar
3    Clerk or the Secretary of the Senate is to note the date
4    and time that those bills are actually submitted, so it
5    wouldn't be when they are voted out of committee but
6    when they are actually reported back to the committee,
7    to the Senate from the committee, excuse me. And so the
8    Regular Order of Business is formed in the order in
9    which bills are reported out. But there is a precedent
10    within the rules, for example, joint resolutions would
11    take precedence over Senate bills. So if two bills are
12    reported at different times, joint resolutions are in a
13    category of themselves above Senate bills in the Regular
14    Order of Business.
15      Q. So putting aside joint resolutions, is it the
16    case that bills that are put on the general calendar
17    would be considered by the full Senate in the order in
18    which they were submitted to the general calendar?
19      A. That's what the rules require.
20      Q. And you said that the author of the bill could
21    make the decision to place the bill on the local
22    calendar?
23      A. Yes.
24      Q. Is that right? What's the "local calendar"?
25      A. The "local calendar" is a designated meeting of

## 34

1    the Senate to consider a separate calendar. Bills on
2    the local calendar are still part of the general
3    calendar but they are considered at a different time.
4    Essentially, bills that are uncontested in committee and
5    that are recommended by the chairman of the committee
6    from which they are reported have the ability to be set
7    on the local calendar by the Administration Committee,
8    an author of a bill who chooses to place his bill on the
9    local calendar would make a request to the
10    Administration Committee that his bill -- his or her
11    bill be certified for the local calendar. The
12    Administration Committee would meet and consider the
13    request. And if they thought that the bill should be on
14    the local calendar, and there are some requirements for
15    what kinds of bills can be on there and what can't, but
16    generally they would consider all the bills requested at
17    a particular time. They would determine which will be
18    certified. They would produce a calendar, and then the
19    Senate -- and the calendar would set a time for the
20    Senate to consider those bills.
21      Q. As a general matter, why would an author of a
22    bill choose to place the bill on the local calendar as
23    opposed to the general calendar?
24      A. I think it's probably really for efficiency
25    sake. Bills on the local calendar, you know, are not

## 35

1    debated, they cannot be amended. And they are -- while
2    they are uncontested in committee, on the Senate floor,
3    members can vote against them but it is unlikely, you
4    know, that there would be enough opposition that the
5    bill would fail to pass.
6      Q. Does the Lieutenant Governor play any role in
7    deciding which calendar to assign a bill to?
8      A. I think probably a minor role. The authors
9    choose whether they are going to go to the local
10    calendar. If there is a bill being considered by the
11    Administration Committee, which the Lieutenant Governor,
12    you know, thinks should be considered for full debate on
13    the Senate floor from time to time, that indication may
14    be made, but usually not.
15      Q. So assuming that a bill gets placed on the
16    general calendar, what's the next step in the process in
17    terms of the bill being considered -- well, let me ask
18    you this. Do all bills on the general calendar
19    eventually get considered by the full Senate?
20      A. No.
21      Q. So --
22      A. Not in their bill form, no.
23      Q. What do you mean when you say, "not in their
24    bill form"?
25      A. Well, sometimes bills are on the Regular Order

## 36

1    of Business, the Senate bills is on the Regular Order of
2    Business that's been reported out and through the
3    process, maybe it is companion House Bill has come over
4    from the House, you know, might be the equivalent or
5    very similar to the bill. And at that point, that
6    bill -- House Bill would be more advanced in the
7    legislative process, so Senate author or the Senate
8    sometimes is required by rule to do this, would then
9    choose to move the House bill instead of the Senate
10    bill. So that Senate bill would, you know, just remain
11    always part of the Regular Order of Business and never
12    taken up.
13      Q. And once a bill is on the general calendar,
14    what dictates whether it will be heard by the full
15    Senate or not?
16      A. Once it's on the Regular Order of Business?
17      Q. Uh-huh.
18      A. Again, it -- you know, the author plays a big
19    role in that. But in the Senate, you know, the Senate
20    doesn't always follow its regular order. I think it's
21    pretty well-known that we have a -- the Senate has a
22    rule, like most legislative bodies, where it can suspend
23    its calendars to take bills out of order, so that
24    happens.
25      Q. What is the process for suspending the regular



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 37

1  calendar and taking a bill out of order?
2      A.  It's made by motion.
3      Q.  Who makes that motion?
4      A.  The author of a bill, usually.
5      Q.  And is a particular vote required to suspend
6  the Regular Order of Business and take the bill out of
7  order?
8      A.  Yes.  It's two-thirds of the members present
9  voting.
10     Q.  And once a bill is taken up by the full Senate,
11  let's say it is put on the general calendar and that it
12  does get considered by the full Senate, what's the next
13  in the process, what happens at that point?
14     A.  After the motion to suspend the Regular Order
15  of Business is made, is that your question?
16     Q.  Let's assume for now that it is a Regular Order
17  of Business and it is being called up in the regular
18  order.
19     A.  Okay.  So the Senate -- the assumption is that
20  the Senate is following its calendars.
21     Q.  Yes.
22     A.  Okay.
23     Q.  What does the Senate do at that point, is there
24  a floor debate?
25     A.  Well, if the Senate is following its calendar,

### 38

1  the Presiding Officer would lay the bill before the
2  Senate for consideration on second reading.  At that
3  point, it is open for debate and you would have debate
4  on the bill.  Once the debate is concluded, in order for
5  the bill to move forward, a member would make a motion
6  to pass the bill to either engrossment or third reading.
7      Q.  And what's "engrossment" mean?
8      A.  "Engrossment" is the term that we use for bills
9  that are passed on second reading and in the originating
10  chamber.  In other words, if it is a Senate Bill
11  considered on second reading in the Senate then it is
12  passed to engrossment.  If it is a House Bill passed on
13  second reading, in the Senate Chamber, it is passed to
14  third reading.
15     Q.  I see.  And at that point, there is a vote of
16  the full Senate on the bill; is that right?
17     A.  Yes.
18     Q.  And assuming that the bill passes, I take it
19  that that's the last step in the process on the Senate
20  side for a bill or is there something else?
21     A.  Well, no.  We have a requirement of three
22  readings.  The first reading being on referral, that
23  would be the second reading.  Once its passed to
24  engrossment or third reading for the bill to be passed
25  out of the Senate, it has to be debated again or

### 39

1  considered again, actually, I should say, considered
2  again --
3      Q.  And then --
4      A.  -- actually.
5      Q.  Excuse me.  And then there is another vote
6  taken at that point.
7      A.  Yes.  And that would be for final passage.
8      Q.  I see.  So you just described the process,
9  assuming that the Senate was proceeding in the Regular
10  Order of Business.  How would the process differ if the
11  Senate suspended the Regular Order of Business and took
12  a bill out of order?
13     A.  It would be the same.
14     Q.  So the only difference is when -- with respect
15  to suspending the Regular Order of Business is when a
16  bill gets considered?
17     A.  Yes.  Because either the Senate is following
18  the calendar or it isn't.  The calendar is meant to
19  provide a predictable system of when bills are going to
20  come up.  So if it was taken out of offered, you would
21  have a motion to suspend that calendar.  Beyond that,
22  the bill would take the same process.
23     Q.  I am sorry to jump around, but I want to go
24  back to a couple of points that we were discussing
25  before.  When you met with Mr. Frederick on those two

### 40

1  occasions, was anybody else present during those
2  meetings?
3      A.  There was another attorney yesterday present
4  from the Attorney General's Office for part of the
5  meeting.
6      Q.  And do you remember which attorney that was?
7      A.  Yes.  Stacey Napier.
8      Q.  And how about on the phone call that you had
9  later on yesterday with Mr. Frederick, was anybody else
10  on the call?
11     A.  No.
12     Q.  And is the Parliamentarian a partisan position?
13     A.  No.
14     Q.  Do you consider yourself to be a Democrat or a
15  Republican or something else?
16         MR. FREDERICK:  Objection, relevance.  You
17  can answer.
18     Q.  (By Mr. Harris)  You can answer the question.
19     A.  Uhm.  You know, I think probably I have
20  considered myself to be conservative in my voting.
21     Q.  What is the purpose of having a rule -- as a
22  general matter, what's the purpose of having a rule
23  whereby the Senate could vote to consider a bill out of
24  order?
25     A.  Can you state your question again?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**41**

1      Q.  Sure.  Do you know why there is a rule that
2  allows the Senate to vote by, you know, generally
3  two-thirds of the members present to consider a bill out
4  of order?
5      A.  That's just standard parliamentary practice in
6  legislative bodies throughout the country.
7          A calendar system exists for the benefit
8  of the members to provide predictability and a certainty
9  of as to when a business is going to come before the
10  body.  So it is considered that if you are going to take
11  something out of order, it's a -- potentially, a
12  violation of the member's fundamental rights in not
13  being apprised of that, and so it generally takes a
14  super majority to go out of order.
15      Q.  How common is it for a bill to be considered
16  out of order, as opposed to proceeding under the Regular
17  Order of Business in the Senate?
18      A.  It is fairly common for -- for general bills, I
19  would say.
20      Q.  Are you familiar with the term "Blocker Bill?
21      A.  Yes.
22      Q.  What's a "Blocker Bill"?
23      A.  A "Blocker Bill" is generally a bill that would
24  be at the very top of that regular calendar and
25  sometimes it is set there on purpose and sometimes it is

---

**42**

1  just there and it is the first bill.  And because it is
2  the first bill on the calendar, if it is not taken up,
3  other bills would be taken -- would have to, by
4  definition, be taken up out of order.
5      Q.  Is there generally a Blocker Bill in place each
6  session?
7      A.  I would say, since the early 1950s, that for
8  Regular Sessions, there is usually a bill at the top of
9  the calendar, it can be passed.  Sometimes the Blocker
10  Bill changes.  For special sessions, there are probably
11  many instances where a blocker bill is not used.
12      Q.  Has the Blocker Bill -- has a Blocker Bill been
13  used in all the Regular Sessions since you have been the
14  Parliamentarian in the Senate?
15      A.  All of the Regular Sessions, yes.
16          MR. HARRIS:  Why don't we take a short
17  break, if you don't mind.
18      A.  Sure.
19          (Brief recess.)
20      Q.  (By Mr. Harris)  We were talking before about
21  the ability of the Lieutenant Governor to assign a bill
22  to the Committee of the Whole as opposed to a regular
23  committee.  Are there any limitations on the Lieutenant
24  Governor's ability to assign a bill to the Committee of
25  the Whole as opposed to a different committee?

---

**43**

1      A.  "Limitations," I am not sure I know what you
2  mean.
3      Q.  Are there any types of bills, for instance,
4  that the Lieutenant Governor could not assign to the
5  Committee of the Whole?
6      A.  I am sorry.  I need to think about that.
7      Q.  Sure.  Please take your time.
8      A.  Probably not, I don't think so.
9      Q.  Besides the Committee of the Whole, can a
10  Lieutenant Governor sit on any other committees in the
11  Senate?
12      A.  He -- not under our rules, no.
13      Q.  Is it fair to say that the Lieutenant Governor
14  has a more powerful role when a bill is referred to the
15  Committee of the Whole as opposed to Lieutenant
16  Governor's role with respect to a bill being considered
17  by another committee?
18      A.  I don't think I would characterize it as "more
19  powerful."
20      Q.  But you did say before that the Lieutenant
21  Governor could vote on legislation in the Committee of
22  the Whole; is that right?
23      A.  Yes.
24      Q.  And typically beyond, besides the Committee of
25  the Whole, the Lieutenant Governor could only vote on

---

**44**

1  legislation if there was a tie in the Senate; is that
2  right?
3      A.  That's right.
4      Q.  What rules govern the proceedings of the
5  Committee of the Whole?
6      A.  Generally, there are rules in the Senate, I
7  think, in Article XIII that generally govern the
8  Committee of the Whole.  We, also, have -- the Senate
9  can determine rules for each sitting of the Committee of
10  the Whole by resolution or in written format, however
11  they choose to -- to do that.  You have, you know,
12  parliamentary law -- general parliamentary law and
13  precedents would apply where applicable, as would Senate
14  Rules.
15      Q.  Who writes the Senate Rules?
16      A.  The Senate.
17      Q.  Does a particular member usually draft the
18  rules?
19      A.  No.
20      Q.  Is the Legislative Council involved in writing
21  the Senate Rules?
22      A.  They are probably sometimes asked to assist.
23      Q.  And does the Senate have to vote to adopt the
24  Senate rules?
25      A.  Well, yes, I think to -- if they are to adopt

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 45

1  rules, they have to vote.
2      Q.  And can you tell me, more specifically, who
3  actually writes or drafts the rules?
4      A.  Who drafts the rules?
5      Q.  Uh-huh.
6      A.  I can -- I mean, generally, the Parliamentarian
7  will draft -- will have -- will assist in drafting the
8  rules resolution at the beginning of the session.
9      Q.  And then does the Senate vote to adopt the
10 rules at the beginning of each Regular Session of the
11 Senate?
12     A.  Usually, yes.
13     Q.  And when you say "usually," what would be the
14 exceptions to that practice?
15     A.  Well, they don't always adopt new rules in
16 special sessions.  They may not adopt their permanent
17 rules at the very beginning.  Sometimes they may choose
18 to adopt temporary rules and adopt permanent rules
19 later.  There is -- they have the prerogative to adopt
20 the rules of procedure as they see fit.
21     Q.  Since you became Senate Parliamentarian in
22 2004, what has your involvement been with respect to the
23 drafting of Senate Rules?
24     A.  Since I became Parliamentarian.
25     Q.  Uh-huh.

## 46

1      A.  You know, I usually work with the Senate in
2  drafting a resolution for their consideration on the
3  Senate Floor.  I sometimes make recommendations on rules
4  changes.
5      Q.  And is the majority vote of the Senate required
6  in order to adopt the Senate Rules for a particular
7  session?
8      A.  Yes.  It would be by majority vote.
9      Q.  What types of rules changes have you
10 recommended since you have become Parliamentarian?
11     A.  Sometimes we have to conform our rules with
12 constitutional requirements.  We had a change in the
13 constitution a couple of sessions ago dealing with
14 record votes so, at that point, I made a recommendation
15 to the Senate on how to incorporate those requirements
16 into our rules, because our rules were in conflict.
17     Q.  And what other recommendations, if any, have
18 you made to change the Senate Rules?
19     A.  I believe last session, I felt like there was
20 somewhat of a conflict on referral and introduction and
21 how those terms were used.  I made a recommendation to
22 the members on that.  Generally, I don't make many
23 recommendations.
24     Q.  Do you recall any other recommendations to
25 change the rules that you have made as Parliamentarian?

## 47

1      A.  I don't think -- not really.  We don't change
2  our rules frequently, or we haven't lately.
3      Q.  You testified previously that, in order to
4  suspend the Regular Order of Business and take a bill
5  out of the regular order would normally require a vote
6  of two-thirds of those senators present.
7      A.  And voting.
8      Q.  And voting.  Is that right?
9      A.  Uh-huh.  (Witness nodding head up and down.)
10     Q.  Are there any -- since you have been
11 Parliamentarian, have there been any exceptions to that?
12 And by "exceptions," I mean, have there been any
13 instances in which the Senate was able to suspend the
14 Regular Order of Business by something other than a
15 two-thirds vote of members present and voting?
16     A.  No.
17     Q.  I would ask that this document be marked as
18 League Exhibit 14, please.
19         (Deposition Exhibit No. 14 marked.)
20     Q.  Ms. Davis, I am handing you what's been marked
21 as League Exhibit 14.  You obviously don't need to sit
22 here and read the entire document but please feel free
23 to take a few moments to familiarize yourself with what
24 it is.
25         Ms. Davis, have you had a few moments to

## 48

1  look over the document?
2      A.  Yes.
3      Q.  And do you recognize what this document is?
4      A.  Yes.
5      Q.  And what is it, Ms. Davis?
6      A.  Senate Rules from the 81st Legislature 2009.
7      Q.  And if I could please turn your attention to
8  Page 24.  And particularly Rule 5.11.  And in 5.11(a),
9  it states that, "Any bill, resolution or any measure on
10 any day may be made a special order for a future time of
11 the session by an affirmative vote of two-thirds of the
12 members present."
13         Do you see that?
14     A.  Yes.
15     Q.  Is that the rule that you were describing when
16 you said that the Senate could vote by two-thirds of the
17 members present and voting to take a bill out of order?
18     A.  No.
19     Q.  Okay.  What rule were you referring to?
20     A.  Probably 5.12.  Actually, I take that back.
21         Well, they would suspend 5.12 as
22 prescribed by 5.13.
23     Q.  How does 5.13 differ from 5.11(a)?
24         MR. FREDERICK:  Objection, vague, but you
25 may answer.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 49 |
| --- |

1    A.  5.11 is the manner in which the Senate would
2    create a special order.  A special order is actually not
3    part of the Regular Order of Business but is above the
4    Regular Order of Business in precedence on the Senate's
5    calendars.
6    Q.  (By Mr. Harris)  And when you say, "it is a
7    special order is above in precedence," what do you mean?
8    A.  Well, "special order" is a mechanism used to
9    set certain time or precedent for a bill.  So if a bill
10   is set for special order, it comes out of the regular
11   order and is put above the regular order.
12   Q.  How does that differ from what we were talking
13   about before, when you said that the Senate could
14   suspend the Regular Order of Business by a two-thirds
15   vote and take a bill out of order?
16   A.  Well, I guess that's more of an instantaneous
17   motion.  In other words, that could be on their calendar
18   and a member could move to take a bill up out of order.
19   And a special order is typically used to designate --
20   you know, for example, it could be, you know,
21   Mr. President, I move to set, you know, Senate bill
22   blank as a special order for Friday.
23   Q.  What is the effect of making a bill a special
24   order?
25   A.  The effect is that, under the Senate's

| 50 |
| --- |

1    calendar, special orders are considered before the
2    Regular Order of Business, they are considered first.
3    Q.  And do you see on Page 24 in Rule 5.11(d), it
4    says that, "Notwithstanding Subsection (a) of this rule,
5    which we just read before, a bill or resolution relating
6    to voter identification requirements reported favorably
7    from the Committee of the Whole Senate may be set as a
8    special order for a time at least 24 hours after the
9    motion is adopted by a majority of the members of the
10   Senate."
11        Do you see that?
12   A.  Yes.
13   Q.  What do you understand Rule 5.11(d) to mean,
14   based on the text here?
15   A.  Well, I think, as you just read it, a bill with
16   a subject of voter identification requirements reported
17   from the Committee of the Whole could be set as a
18   special order at least 24 hours ahead of time by
19   majority vote of the members of the Senate.
20   Q.  And so does that mean that by a majority of the
21   vote of the Senate, a bill relating to voter
22   identification requirements reported favorably from the
23   Committee of the Whole could be considered immediately
24   as opposed to being considered in the Regular Order of
25   Business?

| 51 |
| --- |

1    A.  Not immediately.
2    Q.  How could it be considered -- considered sooner
3    than a bill that was required to proceed in the Regular
4    Order of Business?
5    A.  Yes.  Unless you would suspend rules to take
6    other bills out of order.
7    Q.  What are the usual factors required to have a
8    bill be considered as a special order?
9    A.  Can you ask that again?  I am sorry.
10   Q.  Sure.  Putting aside Subsection D, what are the
11   factors that would normally go into whether or not a
12   bill would be considered as a special order?
13   A.  I think it is a matter of scheduling.  So it is
14   really up to the Senate to determine whether it would
15   want to schedule the bill differently.
16   Q.  Do you know why there was a rule in 2009
17   allowing a bill relating to voter identification
18   requirements reported favorably from the Committee of
19   the Whole to be considered as a special order by a
20   majority -- by a majority vote from members of the
21   Senate?
22        MR. FREDERICK:  I object on the grounds of
23   legislative privilege and instruct you not to answer the
24   question.
25        MR. HARRIS:  Well, Mr. Frederick, at this

| 52 |
| --- |

1    point, the question is just, does the witness know.  If
2    she does know, we could get into a privilege debate.
3    But I think the question "do you know," would not
4    require her to reveal anything, let alone anything of a
5    legislative privilege.
6        MR. FREDERICK:  If you want to ask a
7    question again, I am -- I think I understand.
8    Q.  (By Mr. Harris)  Sure.  At this point, I am
9    just asking for a yes or no answer to the question of:
10   Do you know why the Senate incorporated in its 2009
11   rules, a rule allowing a bill, a resolution relating to
12   voter identification requirements reported favorably
13   from the Committee of the Whole to be set as a special
14   order by a majority vote of the Senate?
15        MR. FREDERICK:  I would caution you that
16   the way the question is phrased seeks a question of
17   whether or not you know, to the extent, you may answer.
18   I would caution you not to reveal your thought process
19   or any privileged matter relating to the actual reasons.
20   A.  Yes.
21   Q.  (By Mr. Harris)  And what are the reasons that
22   the Senate adopted this rule governing vote or
23   identification requirements as part of the special order
24   rule in 2009?
25        MR. FREDERICK:  Object on the basis of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 53

1  legislative privilege.  To the extent that answering
2  this question would require you to reveal the thought
3  process or mental impressions of any member of the
4  Senate or any communications among members of the Senate
5  regarding this issue.  However, to the extent that you
6  can answer this question without revealing privileged
7  communications or subjective motivations and thought
8  process, you may answer.
9      A.  I think I will claim legislative privilege.
10     Q.  (By Mr. Harris)  Do you know of any reason,
11  based on the public record, why the Senate adopted this
12  Rule 5.11(d) under its 2009 rules?
13     A.  Yes.
14     Q.  And what is that reason?
15     A.  I think they publicly stated, the author of the
16  rules resolution publicly stated his reasons during the
17  debate in 2009.
18     Q.  And who was the author of the rules resolution
19  in 2009?
20     A.  Senator Tommy Williams.
21     Q.  And what reasons do you recall Senator Williams
22  giving for adopting this Rule 5.11(d)?
23         MR. FREDERICK:  This is confined to the
24  public record.
25     Q.  Yes.

### 54

1          MR. FREDERICK:  You may answer.
2      A.  I think, very generally, his reasons for the
3  rules change, is that the question?
4      Q.  Yes.
5      A.  Right?  Were that, generally, he felt like
6  making a change in the rules would be a more
7  straightforward parliamentary way of passing the
8  legislation as opposed to, you know, parliamentary
9  tactics that might have previously been used.
10     Q.  What parliamentary tactics was he referring to
11  or are you referring to?
12     A.  I don't remember if he specifically said.
13     Q.  Are you aware of any publicly known legislative
14  tactics that were used with respect to voter
15  identification bills prior to 2009?
16     A.  Yes.
17     Q.  What were those tactics?
18     A.  I believe in 2007 and, you know, I think people
19  would refer to them as parliamentary tactics.  But it's
20  fairly well-known that there was an attempt to suspend
21  the Regular Order of Business when they had the votes to
22  do so.  And I -- you know, because the requirement to
23  suspend the Regular Order of Business is a two-thirds of
24  the members present and voting, that vote total or
25  requirement can change based on the members that are

### 55

1  present and voting.  So I think there is an attempt to
2  in 2007, to do that when members were absent and the
3  vote total would have changed or the vote requirement
4  would have changed.
5      Q.  And which members were absent that you were
6  referring to?
7      A.  You know, I don't remember entirely.  I
8  remember one of the members.  But I think we probably
9  had more absences, and I don't remember exactly who.
10     Q.  Who is it that you do you remember being absent
11  in 2007?
12     A.  I remember Senator Uresti being absent.
13     Q.  Do you recall the reason why Senator Uresti was
14  absent in 2007?
15     A.  I don't remember whether he was excused or not
16  excused.  I don't recall.
17     Q.  So with respect to the vote to sus -- to make a
18  vote or identification bill a special order in 2007,
19  what was -- what was the result of that vote?
20     A.  The result of the vote.  I don't remember the
21  actual result.
22     Q.  Do you remember if a voter ID bill was, in
23  fact, made a special order in 2007?
24     A.  The question is whether a vote other ID was
25  made a special order in 2007.

### 56

1      Q.  Yes.
2      A.  No.
3      Q.  Your answer is, is that it was not made a
4  special order in 2007.
5      A.  In 2007, that's right, no, it was not made a
6  special order.
7      Q.  Apart from 5.11(d) in the 2009 rules that we
8  have just been looking at, are you familiar with any
9  other time in which the Senate rules carved out a
10  particular type of legislation from the two-thirds
11  requirement to make a bill a special order?
12     A.  Can you ask your question again, please?
13     Q.  Sure.  If fact, I would ask the court reporter
14  read it back, please.
15         (Last question read back.)
16     A.  Yes, I am familiar.
17     Q.  What is your familiarity with that?
18     A.  It was done in 1981.
19     Q.  And what type of legislation -- well, tell me
20  what you remember -- well, I take it in 1981, you were
21  not the Parliamentarian; is that right?
22     A.  That's correct.
23     Q.  What rule in the 1981 Senate Rules are you
24  referring to?
25     A.  I don't remember the specific rule.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Karina Casari Davis
June 15, 2012

---

## 57

1  Q.  Do you remember what the substance or effect of
2  the rule was?
3  A.  Generally, the language was similar to this
4  language, 5.11(d) in that a bill, a particular type of
5  bill could be made a special order if it had been
6  reported from the Committee of the Whole.  And I think
7  similar language for at least 24 hours after the motion
8  is adopted by majority of the Senate.
9  Q.  And what type of legislation did the 1981 rule
10 that you have been talking about refer to?
11 A.  I don't remember their exact phrasing.  I
12 believe it was related to apportionment.  But I don't
13 remember the exact phrasing.
14 Q.  Other than 5.11(d) concerning voter
15 identification requirements and the 1981 rule that you
16 have talked about relating to apportionment, are you
17 aware of any other times when the Senate Rules have
18 allowed a particular type of bill to be set as a special
19 order by a vote of the majority of the members of the
20 Senate?
21 A.  I can't say it has never happened.  I don't
22 recall it happening in recent times.
23 Q.  Since you weren't in the Senate in 1981, how is
24 it that you're familiar with that rule that you were
25 referring to before?

---

## 58

1  A.  Parliamentary research.
2  Q.  And would that research -- if I wanted to find
3  out all the times that the Senate, let's say, in the
4  last 50 years has created a special order for a
5  particular type of legislation, with respect to making
6  that type of legislation a special order, would I just
7  go back and read all the Senate rules for that time
8  period or is there -- do you know of a more efficient
9  way to answer that question?
10 A.  Well, that's the most exact way to answer the
11 question.  You -- depending on the resources available,
12 you could research -- you could look through rules
13 resolutions, you know, for earlier times in the Senate,
14 they are not always compiled and easy to search for, so
15 we often do have to look at the rules or the journals.
16 Q.  What sort of research did you do to look into
17 the question of whether the Senate had previously
18 created an exception for a particular type of
19 legislation with respect to making that type of
20 legislation a special order?
21 A.  Well --
22 MR. FREDERICK:  I am going to object as
23 vague.  I mean, you may answer.
24 A.  I am not sure.  That's why my answer earlier
25 was a bit tentative in the earlier parts of the Senate

---

## 59

1  history.  I am generally familiar with the rules over
2  the course of the Senate's history but that doesn't mean
3  I have performed an exhaustive analysis of whether that
4  particular change in the way Senate special orders are
5  made.
6  Q.  (By Mr. Harris)  But sitting here today, based
7  on your familiarity with the Senate Rules over -- what
8  teams to be at least a good period of time going back to
9  at least 1981, the only instances you can think of in
10 which there was an exception for a particular type of
11 legislation, with respect to making that type of
12 legislation a special order, was the 1981 example of
13 apportionment and this 2009 rule dealing with voter ID;
14 is that right?
15 A.  I think that's an accurate decipher of that
16 time period, yes.
17 Q.  Did Lieutenant Governor play any role in
18 creating this Rule 5.11(d) in 2009?
19 MR. FREDERICK:  I am going to object on
20 the basis of privilege.  You may answer the specific
21 question whether or not he played a specific role.  But
22 I caution you not to go beyond that into any privileged
23 communications or privileged matters.
24 A.  With regard -- well, as Presiding Officer, he
25 would always be somewhat involved in the rules of the

---

## 60

1  Senate.
2  Q.  (By Mr. Harris)  As a general matter, now
3  putting aside 5.11(d), what is the Lieutenant Governor's
4  role with respect to the rules adopted by the Senate?
5  A.  Well, his role in a parliamentary sense is that
6  he is the Presiding Officer, so he would likely be aware
7  of the Senate's work on the rules.
8  Q.  Did you have any discussions with the
9  Lieutenant Governor regarding the proposed Rule 5.11(d)
10 prior to the time that it was voted on by the Senate?
11 A.  Yes.
12 Q.  Did you have any discussions with Senator
13 Williams -- well, let me ask you this.  Go back for a
14 second.
15 How many times did you discuss the
16 proposed Rule 5.11(d) with the Lieutenant Governor
17 before the Senate voted on it?
18 A.  I don't remember.
19 Q.  When the Senate is in session, how frequently
20 do you communicate or interact with the Lieutenant
21 Governor?
22 A.  Interact, daily when we are in session.
23 Q.  And with respect to your discussions with the
24 Lieutenant Governor, with respect to the proposed Rule
25 5.11(d), do you recall whether you had more than one

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 61

1    discussion with him?
2        A.   Are you asking about 2009?
3        Q.   Correct.
4        A.   Okay.  I probably had more than one.
5        Q.   Did you have more than five discussions with
6    the Lieutenant Governor about the proposed Rule 5.11(d)
7    in 2009?
8        A.   I doubt it.
9        Q.   How about Senator Williams?  Prior to the time
10   that the Senate voted on the proposed rule, Senate Rules
11   in 2009, did you have any discussions with Senator
12   Williams about the proposed Rule 5.11(d)?
13       A.   Yes.
14       Q.   And how many times did you discuss the proposed
15   Rule 5.11(d) with Senator Williams?
16       A.   I don't remember.
17       Q.   Was it more than one?
18       A.   I am sure it was.
19       Q.   Was it more than five?
20       A.   That, I don't remember.
21       Q.   Did you -- prior to the time the Senate voted
22   on Rule 5.11(d), did you discuss the substance of the
23   proposed rule with anyone besides Lieutenant Governor
24   Dewhurst and Senator Williams?
25       A.   Prior to the vote?

## 62

1        Q.   Yes.
2        A.   Yes.
3        Q.   With whom did you discuss the proposed Rule
4    5.11(d) other than the two gentlemen we already talked
5    about?
6        A.   Probably most, if not all, of the members of
7    the Senate.
8        Q.   Was that a discussion with multiple members,
9    like a group meeting, or do you have one-on-one contact
10   with other members about the proposed Rule 5.11(d)?
11       A.   Probably both.
12       Q.   And can you give me the names of which members
13   you recall discussing proposed Rule 5.11(d) with,
14   particularly?
15       A.   Probably couldn't because I probably discussed
16   it with all of them at one point or another.  As
17   Parliamentarian, I would have a lot of discussions about
18   the rules with the members.
19       Q.   Did you discuss the proposed Rule 5.11(d)
20   either prior to or after the vote on that rule with any
21   members of the Senate who were in opposition to the
22   voter identification laws that were being proposed at
23   that time?
24       A.   Yes.
25       Q.   And which members were those?

## 63

1        A.   You know, probably, you know -- again, I mean,
2    I probably had discussions with all of them at one point
3    or another, so I would have discussed the rules with
4    many of the members who were opposed to the rules
5    change.
6        Q.   And what sorts of opposition did you hear with
7    respect to 5.11(d) by those members who were opposed to
8    the underlying voter ID legislation?
9            MR. FREDERICK:  I am going to object on
10   the grounds of privilege and instruct you not to answer.
11           MR. HARRIS:  Mr. Frederick, I am not aware
12   of any members who opposed the voter ID laws in 2009
13   have asserted privilege in this case.  And I would
14   simply ask the witness to confine her answer to those
15   members who opposed voter ID.
16           MR. FREDERICK:  To my knowledge, I am
17   aware that there are certain members who have either not
18   asserted or waived privilege.  Although, to my
19   knowledge, many of those waivers have been phrased in
20   such a way that it is not clear what the scope of the
21   intended waiver is.  So because the State has asserted
22   privilege on behalf of legislators who have asserted it
23   and made clear that it does not intend to waive, unless
24   instructed to do so, I am not in a position to allow the
25   witness to invade the privilege of any member without

## 64

1    specific knowledge that they have waived for this
2    subject matter.
3            MR. HARRIS:  Do you agree, Mr. Frederick,
4    that the Court has ruled that, in order to invoke the
5    privilege, a member must have specifically invoked such
6    privilege prior to this point in time?
7            MR. FREDERICK:  I don't recall that
8    specific ruling.  That's not to say that they haven't
9    said that, but I can't recall the specific language on
10   the Court's rulings on privilege.
11           MR. HARRIS:  Are you able to advise me
12   and/or your client with respect to which members of the
13   Senate that opposed voter identification have
14   affirmatively asserted a privilege in this case?
15           MR. FREDERICK:  I think the more
16   appropriate way to proceed is that, if you are confident
17   and can establish that a specific member has waived, I
18   will not oppose you're asking questions about
19   conversations that Ms. Davis may have had with that
20   member.  But because I cannot be in a position of
21   selectively asserting or waiving the privilege only for
22   bill opponents, I cannot -- without some basis for
23   allowing her to discuss privileged matters, I cannot
24   advise her to do that.
25           MR. HARRIS:  Okay.  Maybe we can take this



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 65

1  up on the break and consult the Court's orders.
2         MR. FREDERICK:  And that's fine.
3         MS. BERKOWER:  Don't you want to go off
4  the record?
5         MR. HARRIS:  Let's actually go off the
6  record for a minute, please.
7         (Brief recess.)
8  Q.  (By Mr. Harris)  We have, obviously, had some
9  discussions off the record with respect to what sorts of
10  questions you can answer with respect to discussions
11  about 5.11(d) with other members.  And I think it will
12  take a little time to straighten that out, so we can
13  re-visit it a little later today.
14         But I would ask that, without revealing
15  the substance of any discussion with a particular
16  member, how is it that you came to discuss Rule 5.11(d)
17  with the members of the Senate?  What were the
18  circumstances under which you had those discussions?
19  A.  "The circumstances," what do you mean?
20  Q.  Do you regularly have meetings with all the
21  members of the Senate?
22  A.  As the Parliamentarian, I have lots of
23  day-to-day contact with the members during a session and
24  lots of meetings and discussions.
25  Q.  And how do you, typically, communicate with

## 66

1  members, is it over the phone?  Do they come up to you
2  on the Senate Floor?  How does that work?
3  A.  Most of the time, probably on the Senate Floor,
4  in person it could be a meeting, sometimes on the phone.
5  Q.  And following the adoption of Rule 5.11(d), in
6  the 2009 Senate Session, did the 2011 Senate Rules for
7  the next Regular Session of the Senate contain a similar
8  rule to Rule 5.11(d)?
9  A.  Yes.
10  Q.  I would ask that this document be marked for
11  identification as League Exhibit 15.
12         (Deposition Exhibit No. 15 marked.)
13  Q.  Thank you.
14  Q.  Ms. Davis, I have handed you an excerpt of a
15  longer document, it should have the -- if everything
16  went right, it should have the cover page and Pages 24
17  and 25, is that what you have as well?
18  A.  Yes.
19  Q.  And do you recognize what this excerpted
20  document is?
21  A.  I assume it is the section in the Senate Rules
22  from 2011 dealing with special orders.
23  Q.  And do you see that on Page 24, there is a rule
24  set out under Rule 5.11(a) that says that, "Any bill,
25  resolution, or other measure may on any day be made a

## 67

1  special order for future time of the session by an
2  affirmatively vote of two-thirds of the members
3  present."
4         Do you see that rule?
5  A.  Yes.
6  Q.  And then in Rule 5.11(d) of the 2011 Senate
7  Rules, it says that, "Notwithstanding Subsection (a) of
8  this rule, a bill or resolution relating to voter
9  identification requirements reported favorably from the
10  Committee of the Whole Senate may be set as a special
11  order for a time at least 24 hours after the motion is
12  adopted by a majority of the members of the Senate."
13         Do you see that?
14  A.  Yes.
15  Q.  And that -- would you agree that that rule is
16  substantively similar to the -- to Rule 5.11(d) that we
17  looked at under the 2009 rules?
18  A.  Yes.
19  Q.  And what is your understanding of the effect or
20  the meaning, confining your answer to the text that we
21  have before us here, of this Rule 5.11(d) under the 2011
22  rules?
23  A.  I would say, it is the same as 2009.
24  Q.  And so would you agree that the effect of this
25  rule is that, a bill or resolution relating to voter ID,

## 68

1  that passed through the Committee of the Whole Senate
2  could be considered out of the Regular Order of Business
3  and could, in fact, be considered as soon as 24 hours
4  after the motion is adopted by a majority of the members
5  of the Senate?
6  A.  I think the rule says that it may be set as a
7  special order for a time at least 24 hours after the
8  motion is adopted by majority of the members of the
9  Senate.
10  Q.  Do you know why this Rule 5.11(d) was included
11  in the 2011 Senate rules?
12         MR. FREDERICK:  I will object to the
13  extent that this calls for any privileged communications
14  or privileged mental impressions or thought process.
15         The specific question as to whether or not
16  you know, however, you may answer.
17  A.  Yes.
18  Q.  (By Mr. Harris)  Are you aware of any publicly
19  stated reasons or publicly known reasons why the Senate
20  included Rule 5.11(d) in the 2011 rules?
21  A.  Uhm.  Publicly stated -- you know, I don't
22  recall the public debate on these rules very well.
23  Q.  Who drafted the 2011 Senate rules?
24  A.  I would have drafted the resolution adopting
25  the rules.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

69

1    Q.  How does the resolution adopting the rules
2  differ from the rules themselves?
3    A.  "Differ from the rules."  Well, generally, a
4  rules resolution, although not always, will, you know,
5  perhaps take the previous session's rules and adopt them
6  by reference with changes.
7    Q.  Did Senator Williams play a similar role in
8  drafting Rule 5.11(d) that he had played in drafting
9  that rule under the 2009 rules?
10       MR. FREDERICK:  Object to the extent,
11  assumes facts not in evidence.  But you can answer.
12       MR. HARRIS:  Let's step back for a second.
13  I think that's a well taken objection.  Let's clarify
14  it.
15    Q.  (By Mr. Harris)  What was exactly was Senator
16  Williams' role with respect to inclusion of 5.11(d)
17  under the 2009 rules?
18    A.  In 2009, he was the author of the rules
19  resolution which the Senate adopted.
20    Q.  And what --
21    A.  The permanent rules.
22    Q.  Excuse me.  And was Senator Williams, also, the
23  author of -- well, I believe you stated that you were
24  the author of the 2011 resolution adopting the Senate
25  rules or is that not right?

70

1    A.  That's not right.  I was the drafter.  If I
2  implied that I was the author there is a difference.
3    Q.  I apologize if I confused it.  Who was the
4  author of the 2011 Senate rules?
5    A.  The author was Senator Kevin Eltife.
6    Q.  And prior to the time that the Senate voted on
7  Rule 5.11(d) or prior to the time the Senate voted on
8  the 2011 rules, I guess, is a better way to put it, did
9  you have any discussions with Senator -- sorry, did you
10  say the last name was Eltife?
11    A.  Eltife.
12    Q.  Did you have any discussions with Senator
13  Eltife, particularly with regard to this Rule 5.11(d)
14  under the 2011 rules?
15    A.  Yes.
16    Q.  And how many discussions did you have with
17  Senator Eltife about Rule 5.11(d) prior to the time that
18  the Senate voted on the 2011 rules?
19    A.  I don't recall.
20    Q.  Do you recall whether it was more than one
21  discussion?
22    A.  That be -- I am sure it would have been more
23  than once.
24    Q.  Can you recall whether it was more than five
25  discussions?

71

1    A.  I don't recall.
2    Q.  Did you discuss the proposed Rule 5.11(d) under
3  the 2011 rules with Lieutenant Governor Dewhurst prior
4  to the time that the Senate vote on the rules?
5    A.  I may have, but I don't recall precisely.
6    Q.  Did you discuss the proposed Rule 5.11(d) under
7  the 2011 rules with anyone else -- and by anyone else, I
8  mean anyone besides Lieutenant Governor and Senator
9  Eltife?
10    A.  Yes.
11    Q.  Which members do you recall discussing Rule
12  5.11(d) of the 2011 rules with?
13    A.  I would have had a rules discussion with most,
14  if not all, of the members of the Senate at one point or
15  another.  It is likely, whether it was about this
16  particular rule or not, I -- I wouldn't necessarily
17  remember.  I have lots of discussions with the members.
18    Q.  Do you ever have meetings with -- with all of
19  the members of the Senate?
20    A.  Sometimes.
21    Q.  How frequently do those types of meetings
22  occur?
23    A.  It's hard to say.
24    Q.  Would it be more than once a month?
25    A.  I --

72

1    Q.  While the Senate is in session?
2    A.  To the extent I would have meetings with all
3  the members, it would usually be when we are in session
4  or right before.  I -- you know, I really wouldn't be
5  able to put a number on it.  I don't think I have
6  thought it of that way.
7    Q.  Do you ever attend meetings with just the
8  Republican caucus in the Senate?
9    A.  Usually, no.
10    Q.  In a -- by "usually, no," I assume that at
11  least sometimes you would attend meetings with just the
12  Republican caucus; is that right?
13    A.  I don't think I would even characterize it as
14  sometimes.  I think I was asked to come in once -- I
15  recall one time to answer a question about procedure a
16  long time ago, that would be about it.
17    Q.  Did you discuss the proposed Rule 5.11(d) under
18  the 2011 rules with any members of the Senate who were
19  opposed to voter identification bills being considered
20  at that time?
21    A.  Are you -- I am sorry.  Are we in 2011 or --
22    Q.  Yes, ma'am.
23    A.  Okay.  Yes.
24    Q.  And which -- which -- let's -- I think you
25  previously stated that you, also, recall discussing the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 73

1    proposed Rule 5.11(d) under the 2009 rules with certain
2    members who are opposed to the voter identification
3    bills being considered at that time; is that right?
4        A.   Yes.
5        Q.   Which members of the Senate did you -- that
6    were in opposition to voter identification laws did you
7    discuss the proposed Rule 5.11(d) with in 2009?
8        A.   In 2009?
9        Q.   Uh-huh.
10       A.   You know, probably all of them at one point or
11   another.  Again, I have lots of discussions with the
12   members as the Parliamentarian, discussions regarding
13   rules of procedure are frequent in my job, they happen
14   daily, they happen often, so it is a safe bet to say, I
15   have discussed this rule and the rules with all of the
16   members of the Senate at one time or another of during
17   2009 and 2011 and sometimes I remember a meeting
18   happening and frequently I do not, there are multiple
19   discussions.
20           MR. HARRIS:  Can we go off the record for
21   just a moment.
22           (Brief pause.)
23       Q.   (By Mr. Harris)  So Ms. Davis, we went off the
24   record and your counsel, Mr. Frederick, and I discussed
25   those members of the Senate that you may be permitted to

## 74

1    describe communications with, with respect to border
2    identification legislation.
3           For the record, and Mr. Frederick please
4    correct me if I am wrong.  Mr. Frederick will allow me
5    to question you about communications with Senator Ellis,
6    as Senator Ellis, I think everyone agrees has
7    affirmatively waived his right to privilege -- his
8    legislative privilege in this case.  But the State's
9    position is that a member of the Senate must have
10   affirmatively waived privilege in order to overcome any
11   legislative privilege.
12           Do I understand that correctly,
13   Mr. Frederick?
14           MR. FREDERICK:  I think, generally, yes.
15           And let me just say for the record:  The
16   State does acknowledge that in the May 11th, 2012,
17   letter, Senator Ellis has clearly stated his intent,
18   based upon the advice of counsel, that he intends to
19   waive any and all privileges that would apply in this
20   case.  We recognize that and accept it.  And on that
21   basis, I will not prevent the witness from answering any
22   questions that would require her to reveal matters
23   within Senator Ellis's privilege.
24           With respect to other members who have not
25   waived their privilege, the State's position is that,

## 75

1    the privilege belongs to each member individually, many
2    of these members are represented by separate counsel.
3    And our understanding of privilege is that -- and that
4    waiver, specifically, is that waiver is an intentional
5    relinquishment of a known right.  So as -- as counsel
6    for the State, you know, I am not in a position to
7    affect a waiver or, potentially, waive the privilege of
8    a member who has not clearly stated their intention to
9    waive.  So I think that's consistent with what you said,
10   but I just want to make it clear for the record.
11           MR. HARRIS:  I think that's right.
12           And Mr. Frederick, are you able to provide
13   me or your client with a list of those members of the
14   Senate who have affirmatively invoked privilege in this
15   case?
16           MR. FREDERICK:  You know, I can't right
17   now.
18           MR. HARRIS:  Okay.  Well, subject to
19   resolving some of the legal issues around that, let's
20   proceed with the deposition as, I know, your time is
21   valuable, Ms. Davis.
22       Q.   (By Mr. Harris)  Did you have any discussions
23   in 2009 with Senator Rodney Ellis regarding Rule 5.11(d)
24   of the Senate Rules?
25       A.   I may have.

## 76

1        Q.   Do you --
2        A.   I don't recall any specific conversations.
3        Q.   Do you recall what Senator Ellis's position was
4    with respect to the Rule 5.11(d) under the Senate rules?
5        A.   I recall from the public debate that he was
6    opposed to that provision.
7        Q.   How about in 2011, did you have any discussions
8    with Senator Ellis in 2011 regarding the Rule 5.11(d) of
9    the Senate Rules?
10       A.   I don't recall any specific one-on-one
11   conversations with Senator Ellis.
12       Q.   Do you recall what Senator Ellis's position was
13   with respect to the Rule 5.11(d)?
14       A.   No.  I think I recall -- I recall that his vote
15   was "no" on the motion to adopt the rules.
16       Q.   Are you familiar with the procedure by which
17   the Governor of Texas may declare a particular type of
18   legislation to be an emergency or an emergency item?
19       A.   Yes.
20       Q.   What does it mean for the Governor of Texas to
21   declare a particular piece of legislation as an
22   emergency?
23       A.   I can only speak to the parliamentary effects.
24       Q.   Please do.
25       A.   Of that decision.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 77

1    Q.   Please do.

2    A.   The Texas Legislature has a -- what we refer to

3 as "a constitutional order of business" that provides

4 for the flow of legislation during a Regular Session.

5         The constitutional order of business,

6 essentially, is sort of accumulative list of actions

7 that the Legislature may take throughout that 140 days.

8         What the constitutional order of business

9 says, is that the first 30 days is for the introduction

10 of bills, I think the consideration of gubernatorial

11 appointments.  I don't have it in front of me, but

12 that's generally the case.  Then the next 30 days would

13 be for committees to meet and consider.  So this is a

14 list that's cumulative and gives more and more authority

15 to the Legislature for the consideration of bills and

16 resolutions.

17         Constitutional order of business

18 prescribes that the Governor may declare certain items,

19 bills, subjects, I am not exactly sure how it is

20 phrased, it is not before me, that he may -- he or she

21 may declare those in emergency.  And when an emergency

22 declaration is made, essentially, the limitations within

23 the constitutional order of business would not apply to

24 those subjects.

25    Q.   Does that mean that a bill that is declared to

## 78

1 be an emergency by the Governor may be considered sooner

2 than it would otherwise?

3    A.   Sooner in the legislative session, in a Regular

4 Session.

5    Q.   Correct.

6    A.   Yes.

7    Q.   And are you able to quantify how much sooner

8 once -- I guess to clarify.  Once the Governor declares

9 an item or a bill to be a legislative emergency, what is

10 the effect on the timing of the consideration of that

11 bill in the Senate?

12    A.   The effect is, insofar as committees may meet

13 to consider items, that a committee could meet within

14 the first 30 days.  Whereas, the constitutional order of

15 business would prevent that without a four-fifths vote

16 of the membership of the body.

17         The second effect is for actual

18 consideration on the Senate Floor, the constitutional

19 order of business only allows consideration of bills

20 within the first 60 days on the floor without the Senate

21 itself suspending the constitutional order of business

22 with a four-fifths vote.

23    Q.   During your time as Senate Parliamentarian, do

24 you recall particular bills being introduced to alter

25 the requirements for a voter in terms of identification?

## 79

1    Let me rephrase that.  It wasn't too clear.

2         Do you recall particular bills being

3 introduced that alter the forms of identification

4 required to vote in Texas?

5    A.   Particular bills.  This is during my time as

6 Parliamentarian?

7    Q.   Yes.

8    A.   Okay.  Yes.

9    Q.   In which session do you first recall such a

10 bill introduced?

11    A.   Probably, particularly and specifically, maybe

12 that bills were introduced and I just don't remember.  I

13 roughly remember 2011, 2009, 2000 -- actually, was your

14 question introduced in the Senate or in the Legislature?

15    Q.   I don't exactly remember what the question was,

16 but let's make it the entire Legislature.

17    A.   Definitely in 2007.  And then I don't really

18 recall in 2005 whether there were or there weren't.

19         (Exhibit 44 previously marked.)

20    Q.   Okay.  This document has previously been marked

21 as DOJ Exhibit 44.

22         Ms. Davis, I am handing you what's

23 previously been marked in another deposition as

24 Department of Justice Exhibit 44.  Please take a few

25 moments to look over the document.

## 80

1    A.   Can I -- how thoroughly do you want me to

2 review this?

3    Q.   I don't think it will be necessary for you to

4 review it too thoroughly at all.

5    A.   Thank you.

6    Q.   Does this appear to be a copy of a House Bill

7 No. 1706?

8    A.   Yes.

9    Q.   Are you able to tell, looking at this Bill, in

10 which session it was considered, which legislative

11 session, I mean?

12    A.   I would guess that it was the 2005 Legislative

13 Session, based on its effective clause at the end of the

14 Bill.

15         (League Exhibit No. 4 previously marked.)

16    Q.   This document has previously been marked as

17 League Exhibit 4.

18         And Ms. Davis, the court reporter has

19 handed you what's been marked in a previous deposition

20 as League Exhibit 4.  If you can take a few moments to

21 look over this document and familiarize yourself with

22 it.

23    A.   Okay.

24    Q.   Ms. Davis, am I correct that this appears to be

25 a legislative history for HB 1706, the Bill that we were



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

## 81

1   just looking at a moment ago?
2       A.  Yes.
3       Q.  And, according to the title of the Bill and as
4   well as its legislative history, HB 1706 was from the
5   79th Session of the Legislature; is that right?
6       A.  Yes.
7       Q.  And that -- that Legislative Session would have
8   occurred in the first half of 2005; is that right?
9       A.  Yes.  Regular Session.
10      Q.  And HB 1706, according to its title and as well
11  as the legislative history, relates to requiring a voter
12  to present proof of identification; is that right?
13      A.  Yes.
14      Q.  And are you able to tell from this legislative
15  history what the -- what the ultimate disposition of
16  this -- of this Bill HB 1706 was, first, I will ask you,
17  with respect to the House?
18      A.  Appears to have passed the House of
19  Representatives.
20      Q.  And is -- are you able to tell that from the
21  entry that says, it says, "H," and then "Reported
22  engrossed on May 4th, 2005."
23      A.  Yes.
24      Q.  What does it mean for a bill to be reported
25  engrossed?

## 82

1       A.  Oh, boy.  An engrossment is:  "Reported
2   engrossed," in this particular context, what it would
3   mean is that the bill had passed the House of
4   Representatives on final passage.  And an engrossment is
5   a term that we use for the -- for a bill that passes the
6   first House, the originating chamber.  And then
7   engrossment takes the bill that is passed by that body
8   and makes all of the changes to it that were adopted.
9   You could have a committee substitute that comes out and
10  that's heavily amended on the House floor.  The
11  engrossment actually puts the bill -- rather than just
12  putting amendments on top of a committee substitute and
13  sending them to the Senate, they would actually engross
14  the bill, put it in final form as adopted by the House
15  of Representatives, and that would be the action of
16  engrossment and then that's reported, and that is the
17  actual document that the Senate would receive from the
18  House.
19      Q.  And I see that on that same day, May 4th, 2005,
20  there is an entry that appears to refer to the Senate,
21  but says that, HB 1706 was received from the House.
22          Does that have any particular meaning, the
23  fact that the bill was received from the House?
24      A.  Yes.  The significance of that is that, the
25  Senate would have received a message from the House of

## 83

1   Representatives, the message would be a formal message
2   to the Senate containing, you know, action items or, you
3   know, information from the House has to what it's
4   passed, what it is sending over.  So it would -- in this
5   case, we would have received a message saying that the
6   House is finally passed, you know, it was probably with
7   other -- a lot of other bills but it would have included
8   in bill and a list of bills that would have been passed
9   within the actual message and then the bills and the
10  engrossed version that I formally mentioned would be
11  attached to that message.
12      Q.  And then it looks like on May 5th, 2005, the
13  Bill was read for the first time in the Senate; is that
14  right?
15      A.  Yes.
16      Q.  And that's what you were referring to earlier
17  when you said that, a bill received from the House would
18  be read before the entire Senate on the floor; is that
19  right?
20      A.  Yes.  The Constitution requires three readings,
21  and then the Senate, we consider the first reading at
22  time of referral.
23      Q.  And then I see on that same day, May 5th, 2005,
24  there is an entry on the Senate side that says,
25  "referred to State Affairs."

## 84

1           Do you understand that to mean the -- the
2   Senate Committee on State Affairs?
3       A.  Yes.
4       Q.  What is the subject matter that -- that is
5   covered by the Senate Committee on State Affairs?
6       A.  Well, the State Affairs Committee has a fairly
7   large jurisdiction.  I think I tend to think of it as --
8   it has specific subjects that are frequently referred
9   to, and then kind of history of State Affairs is that it
10  tends to, also, get miscellaneous bills sometimes.  It
11  is a larger committee, so sometimes it receives bills of
12  jurisdictions from other committees.  But generally, its
13  jurisdiction would be -- let me think, you know, it
14  would have certain bills dealing with civil
15  jurisprudence, healthcare insurance, elections.  I think
16  it would receive bills -- sometimes we tend to send
17  bills that deal with matters related to the Attorney
18  General's Office, we typically would refer there.
19  Sometimes bills dealing with general state government
20  and the, you know, could be, like, the computer systems
21  and computer policies of general government, it really
22  receives a kind of a -- it is quite a catchall
23  committee.
24      Q.  I see.  You said that the State Affairs
25  Committee covers the topic of elections.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 85

1    Do any other standing committees have
2  jurisdiction over election law in Texas on the Senate
3  side?
4    A.  You know, they could.  I mean, the -- you know,
5  we don't have jurisdiction spelled out in our rules so,
6  you know, you could have another committee that might be
7  able to handle elections.  But generally speaking,
8  recent history, the State Affairs Committee is
9  considered to have the expertise in elections issues.
10   Q.  And then I see here that the -- the entry we
11 just talked about from May 5th, 2005, on the Senate
12 side, in which the bill was referred to the State
13 Affairs Committee, is actually the last -- the last
14 entry on this legislative history that we are looking
15 at.  Are you able to tell what happened to the Bill
16 after it went to the State Affairs Committee?
17   A.  Well, I can tell that it appears that nothing
18 else happened from a parliamentary sense.
19   Q.  So I take that to mean that the Bill did not
20 pass out of the State Affairs Committee?
21   A.  Based on what you have put before me, no.
22   Q.  And I will, for whatever it is worth, I will
23 represent to you that I printed out a complete
24 legislative history from the Legislative Reference
25 Library of Texas.  In fact, do you know what the

## 86

1  Legislative Reference Library of Texas is?
2    A.  Yes.
3    Q.  What is it?
4    A.  I am not sure I can do justice to -- to what it
5  is.  But it is our -- it is a -- the library has many
6  functions.  It contains -- it contains lots of volumes
7  of journals and reference material for the legislative
8  process that many users utilize on a day-to-day basis.
9    It, also, you know, in frequent cases --
10 well, I guess, primarily, it reports on -- within our
11 computer system, the actions that the Legislature takes
12 on a daily basis.
13   Q.  And is the Legislative Reference Library of
14 Texas, isn't it an agency of the State of Texas or is it
15 a private organization?
16   A.  It is an agency of the Legislature.
17   Q.  I see.  And I think you testified earlier that
18 you recall bills concerning voter identification
19 requirements in Texas being introduced in 2009 and 2011.
20 We just looked at one such bill from 2005.
21    Do you remember any voter identification
22 related laws being introduced in the 2007 Regular
23 Session of the Senate?
24   A.  In 2007, yes, I remember the bill introduced by
25 Senator Fraser.  If there were others, and there may

## 87

1  have been, I don't remember them.
2    (Exhibit No. 6 previously marked.)
3    Q.  This document has previously been marked as
4  League Exhibit 6.
5    And Ms. Davis, please take a few moments
6  to familiarize yourself with the document.  But as
7  before, I don't think it will be necessary for you to
8  read through the entire thing but rather just make sure
9  you know what it is.
10    (League Exhibit No. 6 previously marked.)
11   A.  Yes, I do.  And actually, if your recent
12 question was 2007 --
13   Q.  Yes.
14   A.  I think I understood -- I misunderstood you.  I
15 think was thinking 2009.
16   Q.  I see.
17   A.  So I apologize for that.  I don't really
18 remember what any particular -- I don't specifically
19 remember what may or may not have been introduced in the
20 Senate at that time.
21   Q.  No problem.  Thank you for clarifying.  It is
22 actually a good time to remind you that, if you do
23 determine throughout today that you want to correct
24 something from earlier or you remember something earlier
25 that you didn't remember at the time I asked you, you

## 88

1  should absolutely feel free to interject and I
2  appreciate that.
3    A.  Great.  Thank you.
4    Q.  I would ask that this document be marked for
5  identification as League Exhibit 16.
6    (Deposition Exhibit No. 16 marked.)
7    Q.  And Ms. Davis, please take a few moments to
8  look over this document.  I would offer you an apology
9  that the text is so small.  I don't know why this one
10 printed out like this, but hopefully it is legible.
11   A.  Okay.
12   Q.  Ms. Davis, have you had a sufficient
13 opportunity to look over this Document 16?
14   A.  Yes.
15   Q.  And this appears to be another legislative
16 history, this one for HB 218, the Bill we were just
17 looking at a moment ago.
18    Do you agree with that?
19   A.  Yes.
20   Q.  And HB 218 was from the 80th Regular Session of
21 the Legislature; is that right?
22   A.  Yes.
23   Q.  And that session of the Legislature met during
24 the first half of 2007; is that right?
25   A.  Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

89

1    Q.   And according to the -- to the title of the
2    Bill 218 that we just looked at, as well as what's
3    referenced here in the legislative history, do you agree
4    that HB 218 was a bill relating to requiring a voter to
5    present proof of identification?
6    A.   Yes.
7    Q.   And looking at this legislative history,
8    Exhibit 16, are you able to tell what the disposition of
9    the Bill was in the -- on the House side, first?
10   A.   Yes.
11   Q.   And what, what may be very similar to
12   the House side?
13   A.   It was finally passed, engrossed, and sent to
14   the Senate.
15   Q.   And am I reading this correctly, that the Bill
16   was reported engrossed from the house on April 24th,
17   2007?
18   A.   Yes.
19   Q.   And then it looks like on April 25th, it was
20   received from the House by the Senate; is that right?
21   A.   Yes.
22   Q.   And it looks like it was read on the Senate
23   floor the next day, April 26, 2007?
24   A.   Yes.
25   Q.   And there is an entry on 4-26-2006, it says,

90

1    "Refer to State Affairs."  And I guess the comment at
2    the left has an "S" indicating this is relating to the
3    Senate Chamber.
4         Do you understand that entry to mean that
5    HB 218 was referred to the State Affairs Committee on
6    the Senate side?
7    A.   Yes.
8    Q.   Were you at all involved in the decision to
9    refer HB 218 to the State Affairs Committee in 2007?
10   A.   Probably.  I don't specifically recall it.
11   Q.   And are you able to tell from this legislative
12   history what happened to HB 218 once it was referred to
13   the Committee on State Affairs?  I guess, at this point,
14   I confine your answer to what happened in the Bill in
15   committee.
16   A.   Based on the actions on the list that you have
17   put in front of me, the Bill would have been heard in
18   committee, had -- had a public hearing, you know,
19   witnesses would have had the opportunity to testify.  It
20   appears that there was a substitute for the Bill.  And
21   based on what's before me, we can't determine much more
22   than that.  They would have substituted the Bill and
23   reported it favorably to the Senate.
24   Q.   When you say "the Bill was substituted," what
25   does that mean?

91

1    A.   What it means is that:  When committees make
2    recommendations to the full Senate, they -- they can --
3    there is really three ways that they can report a bill
4    favorably.  They can, basically, recommend a bill as
5    introduced or received from the House with no changes.
6    They can recommend a bill with changes by amendment,
7    where they would make specific amendment
8    recommendations.  And then they can, also, make a
9    recommendation based on a substitute.
10        And what a "substitute" is, is basically a
11   new document, if you will, that may be very similar to
12   the original bill, it may have substantive changes, it
13   may have minor changes, but for parliamentary purposes,
14   it is a new document for consideration.  And so when it
15   becomes before the Senate, that document would be
16   considered in lieu of the original bill.
17   Q.   And so the fact that the Committee on State
18   Affairs reported favorably -- reported the bill
19   favorably as substituted, does that mean that the
20   substitute version of the Bill passed out of the State
21   Affairs Committee?
22   A.   I guess you could say that.  The substitute is,
23   at that point, the recommendation to the full Senate.
24   Q.   And I think you said earlier that, in order to
25   recommend a bill to the full Senate would typically

92

1    require a majority vote of the committee members.
2    A.   Yes.
3    Q.   And then I see that on May 1st, it says that,
4    "a committee report was sent and distributed."  What's a
5    "committee report"?
6    A.   A "committee report" is, basically, a report on
7    the action of the committee.  So on this type of bill,
8    there would be a report on the front indicating to the
9    Senate the action that the committee took on the bill.
10   It would indicate what day the action was taken.  It
11   would indicate the vote on the bill.  I think it
12   indicates what form of recommendation, you know, whether
13   it's a favorable recommendation, an unfavorable
14   recommendation, also, the particular form of the
15   recommendation, as I stated earlier, whether as
16   introduced or received, amended or form substitute.
17        The committee report itself would, also,
18   include a fiscal analysis, what we call "a fiscal" that
19   is required by the rules, if -- if it is required,
20   doesn't always.  Also, a bill analysis, if required.
21   And if any witnesses testified, that would be included
22   and attached to the committee report and then, also, the
23   actual recommendation in its form, either the substitute
24   or amendments, or just the bill.
25   Q.   You referred to a fiscal note.  What's a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

93

1   "fiscal note"?

2      A.   Oh, boy.   A "fiscal note" is an analysis of the

3   fiscal implications of a bill to the State that is

4   performed by the Legislative Budget Board, it is

5   advisory.   And if it is required for a particular bill,

6   it is attached to the bill.

7      Q.   When is a fiscal note required?

8      A.   You know, I may have to refer to the bills on

9   that.   But for -- I would say, in general, for most

10   bills.

11      Q.   Well, what determines whether a fiscal note is

12   required?

13      A.   We would look to the rules.

14      Q.   And you --

15      A.   And substance of the bill.   You know, for

16   example, I think the budget doesn't require a fiscal

17   note so that's the only reason why I would say it is not

18   required on all of them, not the only reason but it is

19   just not always necessary for the body.

20      Q.   I see.   And you referred to the Legislative

21   Budget Board.   What's that?

22      A.   The Legislative Budget Board is an agency of

23   the Legislature that's created in statute.   And it is

24   the Legislature's main resource for budgetary

25   information, as an agency with employees but, also, it

94

1   is governed by the leadership of the Legislature and

2   members from the House and the Senate.

3      Q.   Who appoints the members -- well, how does one

4   become a member of the Legislative Budget Board?

5      A.   I don't have the statute before me.   But my

6   recollection is accurate and let's hope it is.   The

7   Lieutenant Governor is a member, the Speaker of the

8   House is a member.   I am going to say that there is a

9   total of five representatives, if you will, from each

10   chamber of the House and the Senate and that's

11   probably -- that's including the Lieutenant Governor and

12   the Speaker.   I think that some of the positions on the

13   Legislative Board are, for example, I think it is

14   standard that the Chair of Senate Finance is

15   automatically on the Legislative Budget Board.   And I

16   think that the Lieutenant Governor makes the other

17   appointments for the Senate.

18      Q.   Going back to the bill history of HB 218 that

19   we were looking at.   I see an entry that says that, on

20   May 2nd, 2007, the Bill was placed on the Intent

21   Calendar.   What's the "Intent Calendar"?

22      A.   You're looking at of May 2nd.

23          The "Intent Calendar" is a calendar used

24   during a Regular Session of the Senate, of the

25   Legislature and it is used by a Senate, it is only in

95

1   the Senate.   It is a calendar required by the rules for

2   the members to give notice to the Senate of their

3   intention to suspend the Regular Order of Business to

4   take a bill up out of order if that -- if that is what

5   their intention is and if that is what they are going to

6   do.

7      Q.   And would it be correct that, at least during

8   the 80th Session, Regular Session in 2007, that to

9   consider HB 218 out of order would have required a

10   vote -- excuse me, a two-thirds vote of those senators

11   present and voting?

12      A.   To consider HB 218 out of its regular calendar

13   order on the Senate Floor.

14      Q.   Correct.

15      A.   Outside of a local calendar, yes, that's true,

16   we would have taken the two-thirds vote of the members

17   present and voting.

18      Q.   And from this history, it does not look like HB

19   218 was placed on the local calendar; is that right?

20      A.   That's right.   And I only qualify my answer

21   because bills are taken up out of regular order on the

22   local calendar without a suspension of the Regular Order

23   of Business.   But, yeah, you know --

24      Q.   Excuse me.

25      A.   -- this bill was not in the local calendar.

96

1      Q.   Are there any limitations on what sorts of

2   bills can be placed on the local calendar?

3      A.   Yes.   The biggest limitation is a bill that is

4   contested in committee, it is not eligible for

5   consideration by the local calendar.

6      Q.   And what does it mean for a bill to be

7   contested in committee?

8      A.   That means it -- if reported favorably, it

9   would have received a "no" vote from a member of the

10   committee.

11      Q.   Am I correct that it looks like from this

12   legislative history that on May 15th, 2007, there was a

13   vote taken to suspend the Regular Order of Business with

14   respect to HB 218?

15      A.   Yes.

16      Q.   Actually, I want to ask you one other thing

17   before we talk about the vote to suspend the regular

18   order.

19          It looks like on May 3rd, 2007, there was

20   a co-sponsor of the bill authorized.   What does that

21   mean?

22      A.   Co-sponsor authorized.   Generally, for

23   legislation introduced -- well, this is a House Bill.

24          When you have a House Bill in the Senate,

25   generally, there is what I would call a lead sponsor



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

97

1   from the Senate, so in legislative terms, we -- authors
2   are considered bills -- authors of bills for bills in
3   their originating chamber.  So the author of HB 218
4   would have been someone from the House of
5   Representatives.  When that legislation comes over from
6   the House, you know, a senator would need to move that
7   process forward, and so he would sponsor the bill.  So
8   there is usually a lead sponsor for a bill.
9           We, also, permit co-sponsors, and that's
10  usually done in writing, I believe you have to have
11  permission from the main sponsor to be able to do that
12  and it is usually, I think we have, what we call "green
13  cards" that the members would sign and that would
14  indicate a member's major support of a bill through
15  their sponsorship.
16      Q.   And turning back to the legislative history.
17          Am I correct that this legislative history
18  for HB 218 reflects that the motion to suspend the
19  Regular Order of Business failed to receive the required
20  vote on May 15th, 2007?
21      A.   I don't think you can tell that from this list
22  of actions.
23      Q.   Do you see the entry on May 15, 2007, I think
24  it is the third to last entry that, "The motion to
25  suspend" --

---

98

1      A.   Oh.
2      Q.   -- "regular order fails"?
3      A.   Yes.  I am sorry, I just didn't even see that.
4      Q.   Oh, no problem at all.  Does that mean that
5   the -- that the motion to suspend the regular order
6   failed to receive the required vote?
7      A.   Yes.  That would mean that it failed.
8      Q.   And in looking at the remainder of this
9   legislative history, are you able to tell what the
10  ultimate disposition of HB 218 in the Senate was?
11      A.   Appears that it wasn't taken up out of the
12  regular order or taken up at all.
13      Q.   We have already talked about 2009 a bit.  And I
14  think you already testified that you remember a bill
15  being introduced in the Senate with respect to voter
16  identification requirements in 2009; is that right?
17      A.   Yes.
18      Q.   And I think you stated that the bill you
19  remembered being introduced in 2009 was sponsored by
20  Senator Fraser; is that right?
21      A.   Yes.  Authored, yes.
22      Q.   Oh, excuse me, authored.
23          Did you have any discussions with Senator
24  Fraser about voter identification legislation in 2009?
25      A.   Could you be more specific?

---

99

1      Q.   Sure.  Let's say prior to the time that Senator
2   Fraser introduced voter identification related bill in
3   2009, did you have any discussions with Senator Fraser
4   about either the substance of the bill or the procedure
5   that would be used to consider the bill?
6      A.   I don't recall any conversations about the
7   substance.  As to the procedures, probably I did.
8      Q.   Did you ever discuss the substance of
9   legislation with Lieutenant Governor Dewhurst as a
10  general matter?
11      A.   Yes, I think substance does come up.
12      Q.   Do you recall discussing the substance of any
13  voter identification related bills with Lieutenant
14  Governor Dewhurst in the 2009 Regular Session?
15          MR. FREDERICK:  Just caution you not to
16  reveal the actual substance of any conversation.
17      A.   Uh-huh.
18          MR. FREDERICK:  But subject to that
19  instruction, you may answer.
20      A.   You know, I don't recall specific conversations
21  about the substance.  It's possible from a parliamentary
22  perspective that we would have had a conversation about
23  an amendment or something on the bill.  But in general,
24  I don't believe I had any conversations with him about
25  the substance of the legislation.

---

100

1      Q.   This document has previously been marked as
2   League Exhibit 10.
3          (Exhibit No. 10 previously marked.)
4      Q.   And Ms. Davis, please take as much time as you
5   need to look over the document.
6      A.   Okay.
7      Q.   And the document you're looking at appears to
8   be a copy of at least one version of SB 362.
9          Do you agree with that?
10      A.   Yes.
11      Q.   And are you able to tell which legislative
12  session this bill was considered during?
13      A.   Been considered during the 2009 Legislative
14  Session.
15      Q.   And is this the Bill you were referring to
16  earlier when you said you remembered Senator Fraser
17  offering a voter identification bill in the 2009 Regular
18  Session.
19      A.   Yes.  This would be a version of the bill.
20      Q.   This document has previously been marked as
21  League Exhibit 11.
22          (Exhibit No. 11 previously marked.)
23      Q.   And Ms. Davis, please take a moment or as much
24  time as you need to look over the document.
25      A.   Okay.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 101

1    Q.  Do you agree, this appears to be a legislative
2    history from the Legislative Reference Library of Texas
3    concerning SB 362?
4    A.  Yes.
5    Q.  And that Bill was considered during the 81st
6    Regular Session; is that right?
7    A.  Yes.
8    Q.  And do you agree from the title of the Bill
9    and, also, as reflected in the legislative history that
10   SB 362 was a Bill relating to requiring a voter to
11   present proof of identification.
12   A.  Yes.
13   Q.  And I see that the first entry here on the
14   legislative history from December 15, 2008, states that,
15   "the Bill was received by the Secretary of the Senate."
16       What does that mean?
17   A.  What that means is that, it was physically
18   received in the Secretary of the Senate's Office on
19   December 15th, 2008.  We have in the Senate what's
20   called "a prefiling" and we would not have been in
21   legislative session on that date, so the action would
22   show that it was received.  And I guess the action shows
23   it is filed, but it is not really considered, you know,
24   it can't have any -- it is really prefiling, it can't
25   have any legislative activity until the Senate is

## 102

1    actually in session.
2    Q.  It looks like that the bill that was read
3    before the Senate for the first time on February 17,
4    2009.
5    A.  Yes.
6    Q.  Is that right?
7    A.  Yes.
8    Q.  And it looks like that same day the Bill was
9    referred to the Committee of the Whole Senate; is that
10   right?
11   A.  Yes.
12   Q.  Do you know why SB 362 was referred to the
13   Committee of the Whole Senate as opposed to being
14   referred to the State Affairs Committee or some other
15   standing committee?
16       MR. FREDERICK:  I am going to object on
17   the basis of legislative privilege.  To the extent that
18   this would call for you to reveal your knowledge as to
19   the reason why; as to the question of whether or not you
20   were aware why, you may answer only that question.
21   A.  Yes.
22   Q.  (By Mr. Harris)  Are you aware of any publicly
23   known or publicly stated reasons why the Bill was
24   referred to the Committee of the Whole Senate as opposed
25   to the Senate State Affairs Committee or some other

## 103

1    standing committee?
2    A.  I don't recall whether the Lieutenant Governor
3    made public comments or statements as to the referral of
4    this Bill.
5    Q.  Did you have -- without revealing the substance
6    of any discussions, did you have discussions with the
7    Lieutenant Governor regarding which committee to refer
8    SB 362 to?
9    A.  I probably would have but I don't recall.
10   Q.  Did you have -- without, at this point,
11   revealing the substance of any discussions, did you have
12   any discussions with any other members of the Senate
13   regarding which committee SB 362 should be referred to?
14   A.  I don't remember.
15   Q.  Do you remember any discussions with anyone
16   other than Lieutenant Governor or other members of the
17   Senate regarding which committee to refer SB 362 to?
18   A.  I really don't remember.
19   Q.  So it looks like the Bill was considered in
20   committee in the Committee of the Whole on March 10,
21   2009; is that right?
22   A.  Yes.
23   Q.  And then the Bill was reported favorably from
24   the committee without any amendment on March 11, 2009.
25   Am I reading that right?

## 104

1    A.  That it was -- can you repeat your question?  I
2    am sorry.
3    Q.  Sure.  Am I correct that the legislative
4    history reflects that on March 11, 2009, SB 362 was
5    reported favorably out of the Committee of the Whole
6    without any amendment to the Bill?
7    A.  Yes.  You know what, I am going to need a
8    break, I think, because I am starting to not -- I need
9    to eat something.
10       MR. HARRIS:  Sure.  Let's take a lunch
11   break.
12       THE WITNESS:  Okay.
13       MR. HARRIS:  How about, I don't know, half
14   hour, 45 minutes, something like that work for you guys.
15       MS. BERKOWER:  Do you want to go off the
16   record a second?
17       MR. HARRIS:  Sure.
18       (Luncheon recess.)
19   Q.  (By Mr. Harris)  If I am not mistaken, prior to
20   the time we took a break, there was a question pending.
21       I wonder if the court reporter would be
22   able to read back the last question.
23       (Last question read back.)
24   Q.  Having taken a break, we can continue through
25   the legislative history.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

105

1          I see that on March 11, 2009, there is an
2   entry on the legislative history for SB 362 stating that
3   the Bill was set as a special order.
4          Do you see that, Ms. Davis?
5     A.  Yes.
6     Q.  And it looks like the date in the date column
7   is March 11, 2009.  But then there is a comment that
8   say, "March 16th, '09."
9          Do you see where I am looking?
10    A.  Yes.
11    Q.  Do you know what that comment refers to?
12    A.  I really don't.  These are computer entries
13  done by people at the Legislative Reference Library.  I
14  am not positive what that means.
15    Q.  Okay.  And then it looks like on March 17,
16  2009, the Bill was laid before the Senate and then read
17  for a second time.
18    A.  Yes.
19    Q.  Right?
20         And then it looks like there was a point
21  of order made on March 17, 2009.
22         What is a "point of order"?
23    A.  A "point of order" is basically a member of the
24  legislative body pointing out what he or she may believe
25  to be a deviation from the rules of the Senate and the

---

107

1   it finally passed the Senate.  It would be a majority of
2   the members present to pass the Bill.
3     Q.  And then it looks like the Bill was read for
4   the first time in the House on March 31st, 2009; is that
5   right?
6     A.  Yes.
7     Q.  And then it says, "referred to elections."
8          Do you understand that to mean the House
9   Committee on Elections?
10    A.  Yes, probably.
11    Q.  Do you know what the subject matter covered by
12  the House Elections Committee is?
13    A.  I can only presume through its title that it is
14  elections, I am not familiar with the jurisdiction of
15  their committees.
16    Q.  Are you familiar with the term "chub" or
17  "chub-a-thon"?
18    A.  Yes.  It is related to chubbing.
19    Q.  And what is "chubbing"?
20    A.  I think, as I understand chubbing, it would be
21  to, you know, to extend a -- to have extensive debate
22  about bills that are probably not related to the object
23  of the chubbing, and that is, you know, chubbing is
24  basically a delay tactic to keep from getting to a piece
25  of legislation.

---

106

1   procedures used.
2     Q.  And do you recall what the nature of the point
3   of order raised with respect to SB 362 on March 17 was?
4     A.  I -- actually, I don't.
5     Q.  In order to determine that, what documents
6   could you look to, would it be the Senate Journal?
7     A.  Yes.
8     Q.  And with respect to the entry that the SB 362
9   was set as a special order:  Am I correct that under
10  Rule 5.11(d) of the 2009 Senate Rules that we looked at
11  before, in order for SB 362 to be made a special order,
12  that would have required a vote of the majority of the
13  members present in the Senate or -- I will ask you.
14    A.  Would have required a majority of the members
15  of the Senate.
16    Q.  And then skipping ahead a bit.  It looks like
17  on March 18, 2009, the Bill was read for a third time.
18         Do you see that entry?
19    A.  For a third time.  Yes.
20    Q.  And then it looks like on that same day, I see
21  entries, one that says, "passed" and another says
22  "reported engrossed."
23         Does that mean that the Bill passed a vote
24  of the entire Senate?
25    A.  "Passed" would mean that it passed on -- that

---

108

1     Q.  Was there chubbing with respect to SB 362 in
2   the House during the 2009 Regular Session?
3     A.  I think generally, I would probably call it
4   chubbing, I don't remember precisely how they did it or
5   how it happened, but --
6     Q.  And are you able to tell looking at this
7   legislative history for SB 362 what the ultimate outcome
8   was with respect to SB 362 on the House side?
9     A.  It appears that it was -- well, that it was not
10  passed by the House.
11    Q.  It looks like the last entry in this
12  legislative history states that the Bill was placed on
13  the major state calendar on May 23rd, 2009.  I realize
14  we are talking about the House side.  But do you have
15  any understanding of what the "major state calendar" is?
16    A.  More or less, but I really wouldn't be able to
17  answer very specific questions about it.
18    Q.  That's fine.  Can you just briefly tell me what
19  you do understand it to mean?
20    A.  I think my -- as far as my capabilities of this
21  go, it is one of their calendars.  It would have -- I
22  know that they have several calendars, so it is one of
23  the calendars that they use, they would have placed it
24  on that calendar.  I don't know what the specific
25  criteria for a bill being placed on the major state

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 109 | 111 |
|---|---|
| 1  calendar is. | 1  computer records of actions by the Legislature. |
| 2      Q.  And I think you said that a Regular Session of | 2      Q.  It looks like this history is in the reverse |
| 3  the Legislature would last for 140 days; is that right? | 3  order of the ones we have been looking at previously. |
| 4      A.  Yes. | 4  But looking at the last page of the exhibit, it appears |
| 5      Q.  I believe you previously stated that you recall | 5  that SB 14 was filed on January 12th, 2011.  Does that |
| 6  that a bill concerning voter identification requirements | 6  look right? |
| 7  was introduced in the 2011 Regular Session of the | 7      A.  Yes.  That's right. |
| 8  Legislature; is that right? | 8      Q.  And so, prior to January 12, 2011, did you have |
| 9      A.  Yes. | 9  any discussions with Lieutenant Governor Dewhurst about |
| 10      Q.  And do you remember the bill number of that | 10  SB 14? |
| 11  Bill? | 11      A.  I didn't have any specific conversations with |
| 12      A.  Senate Bill 14. | 12  him about the Bill itself. |
| 13      Q.  This document has previously been marked as | 13      Q.  Did you have any general conversations with him |
| 14  League Exhibit 12. | 14  that touched upon SB 14, prior to January 12th, 2011? |
| 15          (Exhibit No. 12 previously marked.) | 15      A.  I am not even sure I had general conversations |
| 16      Q.  And Ms. Davis, please take some time to look | 16  about Senate Bill 14, specifically. |
| 17  over this document. | 17      Q.  Who was the author of Senate Bill 14? |
| 18      A.  Okay. | 18      A.  It was Senator Troy Fraser. |
| 19      Q.  Do you recognize this to be a version of Senate | 19      Q.  Did you have any discussions with Senator |
| 20  Bill 14 that we were just discussing? | 20  Fraser about SB 14 prior to the time it was filed? |
| 21      A.  Yes. | 21      A.  About the Bill itself, no. |
| 22      Q.  And from the -- from the title of this Bill, do | 22      Q.  Did you have any discussions with Senator |
| 23  you see it states that it relates to requirements to | 23  Fraser about the procedure related to SB 14 prior to the |
| 24  vote, including presenting proof of identification, | 24  time the Bill was filed? |
| 25  providing criminal penalties? | 25      A.  I probably did. |

| 110 | 112 |
|---|---|
| 1      A.  Yes. | 1      Q.  Do you recall having more than one such |
| 2      Q.  Did you discuss Senate Bill 14 with Lieutenant | 2  discussion? |
| 3  Governor Dewhurst prior to the time that the Bill was | 3      A.  I don't recall the number. |
| 4  introduced in the Senate? | 4      Q.  Was anyone else present during that discussion |
| 5      A.  I am not sure I can answer that.  I don't even | 5  with Senator Fraser? |
| 6  recall when it was introduced, actually.  I may have | 6      A.  They probably would have been. |
| 7  discussed it with him. | 7      Q.  Who do you think would have been present? |
| 8      Q.  Excuse me for just a moment. | 8      A.  You know, it's -- about the procedures -- and |
| 9          MS. BERKOWER:  This is what I have. | 9  if you're asking about prior to January 12, I would |
| 10          MR. HARRIS:  Do you have enough copies? | 10  almost have to look at a calendar to really remember |
| 11          MS. BERKOWER:  Yeah. | 11  what day that was.  But I think it is safe to say that I |
| 12          MR. HARRIS:  Thank you. | 12  had discussions about procedures relating to voter ID, |
| 13          I would ask that this document be marked | 13  you know, at the beginning of session.  When it would |
| 14  as League Exhibit 17. | 14  have coincided with the filing of the Bill, I really |
| 15          (Deposition Exhibit No. 17 marked.) | 15  don't know. |
| 16      Q.  (By Mr. Harris)  And Ms. Davis, please take a | 16      Q.  Do you recall having discussions with Senator |
| 17  few moments to look over Exhibit 17. | 17  Fraser about SB 14 or the procedure used to consider SB |
| 18      A.  Okay. | 18  14 after the time that the Bill was filed? |
| 19      Q.  Do you agree this appears to be a bill history | 19      A.  Yes. |
| 20  of SB 14? | 20      Q.  How many discussions did you have with Senator |
| 21      A.  Yes. | 21  Fraser of that nature? |
| 22      Q.  This one says that it is from the Texas | 22      A.  It probably would have been multiple |
| 23  Legislature Online History.  Do you know what that is? | 23  discussions taken into consideration the number of times |
| 24      A.  I think that's the -- the Legislature's -- what | 24  I speak with members on the Senate Floor. |
| 25  they call sort of their Internet access into the | 25      Q.  Do you think you had more than five such |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Karina Casari Davis                                        June 15, 2012

---

### 113

1   discussions?
2       A.  It is possible, I --
3       Q.  Did you discuss SB 14 with Lieutenant Governor
4   Dewhurst after the time the Bill was filed?
5       A.  I would have had discussions with him of a
6   procedural nature after the Bill was filed, yes.
7       Q.  Was voter ID or voter -- laws dealing with
8   voter identification or SB 14, in particular, designated
9   as an emergency item by Governor Perry?
10      A.  Yes.
11      Q.  Do you know why Governor Perry designated voter
12  identification legislation as an emergency item in 2011?
13          MR. FREDERICK:  Object on the basis of
14  privilege.
15          I think this specific question is phrased
16  whether or not you know why and I believe you may answer
17  that question.  But I would caution you not -- to the
18  extent you even know, not to reveal any of the reasons.
19      A.  No, I don't know.
20      Q.  (By Mr. Harris)  Did you have any discussions
21  with Governor Perry or his staff regarding the
22  designation of SB 14 as an emergency item?
23      A.  I don't remember having any discussions.
24      Q.  Did you have any discussions with the
25  Lieutenant Governor about the designation of SB 14 as an

### 114

1   emergency item?
2       A.  I don't remember if I did.
3       Q.  How about the Lieutenant Governor's staff?  I
4   think you previously said that you know -- you know of a
5   Mr. Bryan Hebert; is that right?
6       A.  Yes.
7       Q.  Is it correct that Mr. Herbert worked on voter
8   identification legislation as part of his role in the
9   Lieutenant Governor's office?
10      A.  Yes.
11      Q.  And did you of have any discussions with
12  Mr. Herbert about SB 14?
13      A.  I probably did.
14      Q.  Did you ever have any discussions with
15  Mr. Herbert about the designation of SB 14 or voter
16  identification legislation as an emergency item by
17  Governor Perry?
18      A.  I don't remember.
19      Q.  Do you know Julia Rathgeber?
20      A.  Yes.
21      Q.  And she is the Deputy Chief of Staff to the
22  Lieutenant Governor; is that right?
23      A.  Yes.
24      Q.  And she held that position in 2011 as well; is
25  that right?

### 115

1       A.  Yes.
2       Q.  Did you have any discussions with Ms. Rathgeber
3   regarding SB 14?
4       A.  Yes.
5       Q.  How frequently did you discuss SB 14 with
6   Ms. Rathgeber?
7       A.  I wouldn't be able to recall how frequent that
8   was.
9       Q.  Did you have any discussions with Ms. Rathgeber
10  about the designation of SB 14 or voter ID legislation
11  as an emergency item?
12      A.  Can I consult with my attorney for a moment?
13          MR. HARRIS:  Absolutely.
14          (Brief pause.)
15      Q.  (By Mr. Harris)  So I think there was a
16  question pending.  Do you want the Court reporter to
17  read it back?
18      A.  Sure, please.
19          (Last question read back.)
20      A.  I don't remember.
21      Q.  Do you know Blaine Brunson?
22      A.  Yes.
23      Q.  And Mr. Brunson is the Lieutenant Governor's
24  Chief of Staff; is that right?
25      A.  Yes.

### 116

1       Q.  Did you have any discussions with Mr. Brunson
2   about SB 14 at any time during the 2011 Regular Session?
3       A.  Yes.
4       Q.  How many times did you discuss SB 14 with
5   Mr. Brunson?
6       A.  I wouldn't be able to recall the frequency or
7   amount.
8       Q.  Would you say you had more than five
9   discussions with him?
10      A.  It is possible -- I don't know.
11      Q.  Did you discuss with Mr. Brunson the
12  designation of SB 14 or voter legislation as an
13  emergency item by the Governor?
14      A.  I don't remember.
15      Q.  Other than the other individuals we have talked
16  about which were Mr. Brunson, Ms. Rathgeber, Mr. Hebert,
17  the Governor, and the Governor' staff, did you have
18  discussions with anyone else regarding the designation
19  of SB 14 as an emergency item by Governor Perry?
20      A.  I don't remember.
21      Q.  So it looks like from the legislative history
22  that the Bill was read for the first time on January
23  24th, 2011.
24          Do you see that?
25      A.  Yes, I do.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 117

1    Q.   If SB 14 had not been designated as an
2    emergency item by Governor Perry, would it have been
3    possible for the Bill to have been read for the first
4    time on January 24th, 2011?
5    A.   Yes.
6    Q.   I believe you testified previously that there
7    is -- there are constitutional rules governing when
8    bills could be considered; is that right?
9    A.   Yes.
10   Q.   So with respect to SB 14, what is -- what, if
11   any, significance does the fact that the Governor
12   declared the Bill to be an emergency item have on the
13   timing with respect to when the Bill could be
14   considered?
15   A.   Would have enabled the Senate to consider
16   Senate Bill 14 in committee before the first 30 days of
17   session -- or during the first 30 days of session.
18   Q.   I see.  So in the next entry, one up, it says
19   that the Bill was referred to the Committee of the Whole
20   on January 24th, 2011; is that right?
21   A.   Yes.
22   Q.   So it is the case that, had the Governor Perry
23   not designated SB 14 as an emergency item, that it would
24   not have been possible to refer the Bill to the
25   Committee of the Whole on that date?

## 118

1    A.   No.  A bill can be referred at any time.
2    Q.   I see.  So it looks like a public hearing was
3    scheduled on the Bill on January 24th, 2011, and I take
4    it that would have been in the Committee of the Whole;
5    is that right?
6    A.   Yes.
7    Q.   Would it have been possible to have a public
8    hearing on the Bill in the Committee of the Whole on
9    January 24th, 2011, had Governor Perry not designated SB
10   14 as an emergency item?
11   A.   No.  It would not have been possible for the
12   committee to consider a bill within the first 30 days
13   without the Governor either declaring it an emergency or
14   the Senate suspending the constitutional order of
15   business.
16   Q.   What vote would be required to suspend the
17   constitutional order of business?
18   A.   It's a four-fifths vote of the members.
19   Q.   Did you have discussions with Lieutenant
20   Governor Dewhurst regarding the referral of SB 14 to the
21   Committee of the Whole?
22   A.   Yes.
23   Q.   How many times did you and Lieutenant Governor
24   discuss that subject?
25   A.   I don't remember.

## 119

1    Q.   Do you remember having more than one discussion
2    with the Lieutenant Governor about referring to the Bill
3    to the Committee of the Whole?
4    A.   No, I don't remember.
5    Q.   Did you discuss referring the Bill to the
6    Committee of the Whole with any other members of the
7    Senate?
8    A.   I don't remember having a discussion.
9    Q.   Do you know why the Lieutenant Governor
10   referred SB 14 to the Committee of the Whole?
11       MR. FREDERICK:  Object on the basis of
12   privilege as phrased.  To the extent the question asks
13   whether or not you are aware of why, you may answer the
14   yes or no question.  I caution you, however, not to
15   reveal the Lieutenant Governor's thought process.  So
16   you may answer subject to that instruction.
17   A.   I am aware of why he referred --
18   A.   Are you -- excuse me.
19   A.   -- the bill.
20   Q.   Are you aware of any publicly known or any
21   publicly stated reasons why the Lieutenant Governor
22   referred SB 14 to the Committee of the Whole?
23   A.   I don't remember if he made any public comments
24   related to the referral of the Bill.
25   Q.   It appears from the legislative history that on

## 120

1    January 25th, 2011, SB 14 was set as a special order; is
2    that right?
3    A.   On January 25th?
4    Q.   Yes.
5    A.   Yes.
6    Q.   And under Rule 5.11(d) of the 2011 Senate Rules
7    that we looked at previously, is it correct to set SB 14
8    as a special order, that would have required a vote of
9    the majority of the members of the Senate?
10   A.   Yes.
11   Q.   And what was the effect or the significance of
12   designating SB 14 as a special order?
13   A.   I am not sure it had any affect.  The
14   significance would have been to alert the members to
15   when the Bill would be taken up by the Senate.
16   Q.   Did designating SB 14 as a special order enable
17   the Senate to consider SB 14 out of the Regular Order of
18   Business?
19   A.   No, not really.
20   Q.   Then why would SB 14 be designated as a special
21   order?
22   A.   In this case, to give the members notice of
23   when the Bill was to be taken up.
24   Q.   It is your testimony that there is no other
25   reason why the Senate would want to designate SB 14 as a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 121

1   special order?
2            MR. FREDERICK:  Object.  Mischaracterizes
3   the testimony.
4            I would, also, interject an objection on
5   privilege to the extent this -- this seeks to discover
6   any privilege statements about why any particular
7   legislative action was undertaken.
8       Q.  Do you need the court reporter -- I think there
9   was a question pending.  Do you want the court
10  reporter --
11      A.  I am sorry.  I didn't realize that.
12      Q.  That's fine.  Maybe the court reporter can read
13  it back.
14           (Last question read back.)
15           MR. FREDERICK:  Objection,
16  mischaracterizes the testimony.  Object to the extent it
17  calls for a privileged statement about the reason why
18  any particular senator would want to engage in any
19  legislative act.  I would, also, object to vague.
20  Object to the form of the question.
21           To the extent you can answer without
22  revealing any privileged matter, you may do see, if you
23  can.
24      A.  I am not sure I can answer that.
25      Q.  (By Mr. Harris)  Is it your testimony that, had

## 122

1   SB 14 not been set as a special order, that this
2   legislative history could appear no different than it
3   does now?
4            MR. FREDERICK:  Objection, vague.
5   Objection, calls for speculation.
6       A.  I really don't understand your question.
7       Q.  Simply trying to understand why the Senate --
8   and without regard to any particular legislator and,
9   especially, without revealing any privileged matter,
10  would take it upon itself to write a special rule
11  regarding the designation of voter ID legislation as a
12  special order and then vote to make the bill a special
13  order if you're saying there is really know difference
14  either way whether it does that or not.
15           MR. FREDERICK:  I object to the form of
16  the question.  Object as vague.  Object as assuming
17  facts not in evidence.
18           You may answer, if you can.
19      A.  So what is your question exactly?
20      Q.  (By Mr. Harris)  My question is:  Why would the
21  Senate vote to make SB 14 a special order?
22           MR. FREDERICK:  I will object on the basis
23  of privilege, only to the extent that it would call for
24  you to reveal privileged matters.
25           But if you can answer generally without

## 123

1   revealing privileged matters, you may do so.  I would,
2   however, object to the extent it calls for speculation.
3       A.  Setting a special order gives notice to the
4   Senate of when a bill is to be taken up on the calendar,
5   and that would be the effect of making the special
6   order.
7       Q.  Are there other ways to provide notice to the
8   members as to when a bill would be considered other than
9   setting a bill as a special order?
10      A.  Procedurally, no.  It's possible -- sometimes
11  during debates or announcements, the members will tell
12  each other or discuss when they intend to take up
13  business.  But just based on a calendar system alone, it
14  would not indicate to you the time that a particular
15  bill is going to be taken up by the Senate.
16      Q.  I think you stated previously and maybe even
17  more than one time, that setting a bill as a special
18  order allows the bill to be considered out of the
19  regular order; is that correct?
20      A.  Special orders are above the regular order in
21  precedence in the Senate's orders of business.  So to
22  the extent that a bill is actually being taken out of a
23  regular order, that can be the effect.
24      Q.  Was SB 14 considered out of the Regular Order
25  of Business?

## 124

1       A.  It was considered as a special order.
2       Q.  Does that mean that it was considered out of
3   the Regular Order of Business?
4       A.  I wouldn't say it is "out of the order."
5   Special orders are taken up before the Regular Order of
6   Business is considered.
7       Q.  If special orders allow a bill to be considered
8   before other bills, why wouldn't senators try to get all
9   of their bills designated as special orders?
10           MR. FREDERICK:  Objection, calls for
11  speculation.  You may answer, if you can.
12      A.  Why wouldn't -- the question is:  Why wouldn't
13  they set all their bills as special orders?
14      Q.  Yes, or at least try to.
15           MR. FREDERICK:  Same objection.
16      A.  Well, I am not sure how to answer that
17  question.  I don't think members always want to schedule
18  their bills with specificity for particular times.
19      Q.  (By Mr. Harris)  I am sorry to continue to
20  dwell on this but it is an important issue and I just
21  want to make sure the record is clear.  I asked you
22  earlier what the significance of designating SB 14 as a
23  special order was, and you said that the significance
24  was that, it gave notice to all the members as to when
25  the bill would be considered.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

125

1      Do you remember that?
2      A.  Yes.
3      Q.  But now in subsequent questioning, we have
4  established that, by setting SB 14 as a special order,
5  it enabled SB 14 to be considered before other bills
6  that were not designated as a special order.  Why don't
7  you consider that to be an effect or one of the
8  significances of designating SB 14 as a special order?
9      MR. FREDERICK:  Object to the form.
10  Object to the extent it mischaracterizes prior testimony
11  and assumes facts not in evidence.
12      You may answer, if you can.
13      A.  I think the form of your question is
14  inaccurate.
15      Q.  Please correct me.  I am really here just
16  trying to understand what happens.  Please tell me what
17  I don't have right.
18      A.  There were not other bills ahead of Senate Bill
19  14 on the Regular Order of Business.
20      Q.  So is it the case that -- well, I think you
21  previously stated that the bill number has no effect on
22  when a Bill is considered under the Regular Order of
23  Business; is that right?
24      A.  That's right.  The actual bill number which is
25  just its designation as -- for the convenience of the

---

126

1  members.
2      Q.  If SB 14 had not been designated as a special
3  order, could it still have been considered by the entire
4  Senate on January 26, 2011?
5      A.  Yes.
6      Q.  And would that be in accordance with the
7  Regular Order of Business?
8      A.  By its rules, it could have considered the bill
9  on January 26.
10      Q.  So is it your testimony that, by making a
11  special rule with respect to designating voter ID
12  legislation as a special order by a majority vote as
13  opposed to the normal two-thirds of the member's vote,
14  that the only real affect of that, is that, it provided
15  a means to give members notice of when the bill would be
16  considered?
17      MR. FREDERICK:  Object to the extent it
18  mischaracterizes the testimony.  You may answer.
19      A.  I think the only practical effect of that
20  rule's provision for this particular bill, at this
21  particular time here in the legislative session, the
22  only practical effect was to provide notice of when the
23  Bill would be taken up.
24      Q.  If the -- only affect of making something a
25  special order, or at least in this case, making it a

---

127

1  special order would be to give members notice of when a
2  bill would be considered then why did the Senate rules
3  require a two-thirds vote to do that?
4      MR. FREDERICK:  Objection, vague.
5  Objection, assumes facts not in evidence.
6      You may answer the question, if you can.
7      I, also, object to the extent it calls for
8  speculation.
9      A.  You know, I think you have to interpret the
10  rules and their effects based on what point in the
11  parliamentary process you were at, and for this
12  particular Bill, at this particular time, the practical
13  effect of setting it for a special order would have been
14  to give the notice to the members that the Bill was
15  going to be taken up at a particular time.
16      Q.  (By Mr. Harris)  And a couple times now, you
17  have referred to "this particular Bill at this
18  particular time."  What do you mean by that?
19      A.  What I mean is, on January 25th, when the Bill
20  was made a special order for January 26th, at that point
21  in time, the effect of the special order for
22  parliamentary purposes for the members would have been
23  to give them notice that the Bill would be taken up 24
24  hours later.
25      Q.  Was there a blocker bill filed in the 2011

---

128

1  Regular Session?
2      A.  Yes.
3      Q.  Had the blocker bill been considered by the
4  Senate, by January 25th, 2011?
5      A.  I don't believe it was.
6      Q.  So isn't it correct that it would not have been
7  possible to consider SB 14 prior to consideration of the
8  Blocker Bill, had SB 14 not been set as a special order?
9      MR. FREDERICK:  Object to the extent it
10  assumes facts not in evidence.  You may answer.
11      A.  You might have to repeat your question.
12      Q.  Could the court reporter please read back the
13  question.
14      (Last question read back.)
15      MR. FREDERICK:  Object.  Assumes facts not
16  in evidence, but you may answer.
17      A.  What was the previous question to that?  Do you
18  mind reading that question.
19      (Requested testimony read back.)
20      MR. FREDERICK:  Same objection.  You may
21  answer.
22      A.  My first answer which was, no, the Senate had
23  not considered a blocker bill.
24      And I think the answer to the second
25  question, although it is convoluted way of asking the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

## 129

1  question is, no, the Senate did not need --  the Blocker
2  Bill had no parliamentary interaction with Senate Bill
3  14 whatsoever.
4      Q.  So under the Regular Order of Business, is it
5  correct that the Blocker Bill would have to be
6  considered before other bills?
7      A.  Are you talking about the Blocker Bill in 2011.
8      Q.  Yes, ma'am.
9      A.  Well, at this particular time, when are you
10  asking me?
11      Q.  Yes.  At this time in January 20 -- on or
12  around January 25th, 2011.
13      A.  And your question was?
14      Q.  I am just trying to understand.  We talked
15  before about a Blocker Bill.  And I -- please correct me
16  if I am wrong.  Again, I am really trying to understand
17  this.  But I think you said that a blocker bill was a
18  bill that would be filed and under the Regular Order of
19  Business have to be considered before any other bills
20  could be considered; is that right?
21      A.  You know that's the -- that's the way it has
22  been used, yes.
23      Q.  And so I think you, also, said that, prior to
24  January 25th, 2011, there was a blocker bill filed.
25      A.  I don't believe I ever said that.

## 130

1      Q.  Okay.  So I will ask you that.
2          Prior to January 25th, 2011, was there a
3  blocker bill filed?
4      A.  I don't remember if it had been filed.
5      Q.  How would one go about answering that question
6  as to whether or not a blocker bill had been filed as of
7  January 25th, 2011?
8      A.  Filing would be hard to determine from the
9  journals, but you could -- but it is possible to tell
10  from the journals.  The act of filing isn't always
11  included in the journals.
12      Q.  Were there other bills filed prior to the time
13  that SB 14 was filed?
14      A.  Yes.
15      Q.  And under the Regular Order of Business, would
16  it have been necessary to consider those bills prior to
17  consideration of SB 14?
18      A.  No.
19      Q.  Assuming a blocker bill had been filed prior to
20  January 25th, 2011, under the Regular Order of Business,
21  would it have been necessary to consider the blocker
22  bill before considering SB 14?
23      A.  Filed, no.
24      Q.  I take it from your answer that there could be
25  some means through which a blocker bill might have

## 131

1  prevented consideration to SB 14 prior to the
2  consideration of the blocker bill but it is not
3  dependent on filing.
4      A.  That's correct.
5      Q.  What would it be dependent on?
6      A.  If a bill had been reported by a Senate
7  committee before Senate Bill 14 had been reported by a
8  committee, then on the Regular Order of Business, that
9  bill would have been above Senate Bill 14 on second
10  reading.
11      Q.  And were any bills reported by a Senate
12  committee before SB 14 was reported by the Committee of
13  the Whole?
14      A.  No.
15      Q.  And what did you mean when you said that there
16  was no parliamentary interaction between the Blocker
17  Bill and SB 14?
18      A.  I am not even sure when the Blocker Bill was
19  filed.  If it was filed on or before January 26th, it
20  wasn't reported.  It just would have existed a bill that
21  was filed.  For purpose of the calendar, a blocker bill
22  would not have been part of the calendar unless it had
23  been reported from committee.  And on this date, a
24  blocker bill had not been reported from committee, so
25  there would have been no parliamentary interaction

## 132

1  between those two bills on the calendar.
2      Q.  Were any bills considered in committee prior to
3  the time that SB 14 was considered by the Committee of
4  the Whole?
5      A.  I don't believe that any actual bills were
6  considered by committees before voter ID was considered
7  by the Committee of the Whole.
8      Q.  So now we have looked at four bills that
9  concerned voter identification requirements.  For any of
10  those four bills, are you aware of what the source of
11  the legislative language in such bills was?
12      A.  The source?
13      Q.  Well, for any of the four bills we have looked
14  at today, do you know who drafted those bills?
15      A.  No, I don't.
16      Q.  Were you present for the floor debate upon SB
17  14?
18      A.  Yeah.
19      Q.  Were you present for the consideration of SB 14
20  in the Committee of the Whole?
21      A.  For most of it, yes.
22      Q.  Are you aware of any analysis showing how many
23  Texas registered voters lack the required forms of
24  identification under SB 14?
25      A.  I wouldn't remember hardly any specifics of the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

133

1    substantive debate on Senate Bill 14.
2        Q.  Were you aware --
3        A.  I don't remember.
4        Q.  Excuse me.  Were you aware or are you aware of
5    any concerns that SB 14 would disproportionately impact
6    racial minorities or ethnic minorities in Texas?
7            MR. FREDERICK:  I object on the basis of
8    privilege, to the extent that this would require you to
9    reveal any statements by a legislator or any legislators
10   thought process.
11           I instruct you not to answer.
12           If you can answer without revealing those
13   matters, you may do so.
14       A.  I am sure the public record indicates the
15   substance of the debate.  I really would not be able
16   to -- I don't remember specifically arguments that were
17   made.  Those were -- I am sure those were made on the
18   public record but I don't have a recollection of how
19   those arguments were made or what was said.
20       Q.  Who made the decision as to when SB 14 would be
21   considered by the Committee of the Whole?
22       A.  I think that decision was made by the
23   Lieutenant Governor and probably the Chair of the
24   Committee of the Whole, Senator Duncan.
25           MS. BERKOWER:  What was the question?  I

---

134

1    didn't hear it.
2            (Last question read back.)
3        Q.  (By Mr. Harris)  Did you have any discussions
4    with Lieutenant Governor or Senator Duncan regarding
5    when SB 14 would be considered by the Committee of the
6    Whole?
7        A.  Yes.
8        Q.  Did you have -- well, did you have discussions
9    individually with Senator Duncan and Lieutenant Governor
10   or were these joint discussions?
11       A.  Probably individually and joint.
12       Q.  How many times did you discuss the timing
13   of the consideration of SB 14 in the Committee of the Whole
14   with the Lieutenant Governor?
15       A.  I -- I don't remember the number of times.  I
16   don't think it was many times but --
17       Q.  How many times did you discuss the timing of
18   the consideration of the Bill with Senator Duncan?
19       A.  I don't remember the exact number.
20       Q.  Was it more than one?
21       A.  It would have been more than one, yes, it was.
22       Q.  Are you familiar with the Voting Rights Act?
23       A.  Not very.
24       Q.  Are you familiar with the term "legislative
25   intent" or "legislative purpose"?

---

135

1        A.  Yes.
2        Q.  What do you understand either -- either or both
3    of those terms to mean?
4            MR. FREDERICK:  Objection, calls for a
5    legal conclusion.  Objection, relevance.
6            You may answer, if you can.
7        A.  You know, I think that's a -- too broad of a
8    question to answer, it could mean different things for
9    different purposes.
10       Q.  (By Mr. Harris)  Is it always possible to tell
11   why the Legislature is enacting a piece of legislation
12   just by reading the bill itself?
13           MR. FREDERICK:  Objection, calls for a
14   legal conclusion.  Objection, calls for speculation.
15   Objection, relevance.
16           You may answer, if you can.
17       A.  Can you reread the question.
18           (Last question read back.)
19       A.  I think, generally, you can always tell by
20   reading a bill what the intent of the legislature was.
21   There are probably certain provisions in bills that may
22   be more difficult to determine and may require more
23   information.
24       Q.  Have you ever known it to be the case that,
25   putting aside any particular piece of legislation, have

---

136

1    you ever known it to be the case that the Legislature is
2    enacting a bill for reasons that are not apparent on the
3    face of the bill?
4            MR. FREDERICK:  Objection, relevance.
5            Objection, calls for speculation.
6        A.  I couldn't recall anything specifically, no.
7        Q.  (By Mr. Harris)  The public debates that the
8    Senate has, either on the floor or in committee, those
9    are reported to the -- to the public very -- via various
10   means; is that right?
11       A.  Yes.
12       Q.  Do you think it is always the case that, in
13   debate, senators express all of their reasons why they
14   are in favor or in opposition to a bill?
15           MR. FREDERICK:  Objection, calls for
16   speculation.  Objection, relevance.
17           You may answer, if you can.
18       A.  I -- I am not a member.  I don't know why they
19   would -- what their comments mean when they -- I take it
20   at face value.
21       Q.  Have you ever known it to be the case --
22   putting aside any particular bill, have you ever known
23   it to be the case that a legislator has particular
24   reasons for supporting or opposing a bill that that
25   legislator does not express in the public debate?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

137

1      MR. FREDERICK:  Objection, relevance.
2   Objection, calls for speculation.  Objection, vague.
3      A.  I think your questions are really broad and
4   would require me to presume to know why members do what
5   they do, and I am certainly no expert in knowing why
6   members do what they do all of the time.
7      Q.  Well, if it were possible to tell all of the
8   reasons why a member was for or against a bill from the
9   public debate, then you really wouldn't have to assume
10  anything, isn't that right?
11     MR. FREDERICK:  Objection, vague.
12  Objection, calls for speculation.  Objection, calls for
13  a legal conclusion.  Objection, relevance.
14     A.  I am not even sure how to answer your question
15  and what you're asking.
16     Q.  (By Mr. Harris)  Well, I think you said
17  previously that answering my prior question would
18  require you to assume what are members thinking.
19     And I am just asking if -- if the public
20  debate on a bill contained all of the reasons why a
21  senator was for or against the bill, then that sort of
22  assumption wouldn't be required.
23     Do you agree with that?
24     MR. FREDERICK:  Objection, relevance.
25  Objection, assumes facts not in evidence.  Objection,

---

138

1   vague.  Calls for speculation.
2      A.  I don't want to speculate on why a member says
3   or doesn't say anything about a particular bill on the
4   record, in the public record.
5      Q.  (By Mr. Harris)  Do you have any reason to
6   believe that SB 14 will disproportionately impact
7   racial, ethnic, or language minorities in Texas?
8      MR. FREDERICK:  Objection, relevance.
9   Objection, calls for speculation.
10     Also, object on legislative privilege, the
11  extent it would call her to reveal any privileged
12  communications, so object to the extent it calls for a
13  legal conclusion.
14     A.  I don't know.
15     Q.  (By Mr. Harris)  Do you have any understanding
16  as to the number of racial or ethnic voters in Texas --
17  excuse me -- of racial or ethnic minority voters in
18  Texas that lack the required forms of ID under SB 14?
19     MR. FREDERICK:  Objection, relevance.
20     A.  I do not know.
21     Q.  (By Mr. Harris)  What forms of ID do you care
22  you with you or do you have with you today?
23     A.  Would have my driver's license and my state ID,
24  my state employee ID.
25     Q.  Does your state employee ID contain a picture

---

139

1   of you?
2      A.  Yes.
3      Q.  For what purposes do you have to use your state
4   ID, your state employee ID?
5      A.  To obtain access to the Capitol building, to
6   Capitol parking.
7      Q.  Are there areas of the Capitol that you can
8   access with your ID that you wouldn't be able to access
9   otherwise?
10     A.  Well, yes.  You know, I don't -- without an ID,
11  there are certain elevators that you may not be able to
12  use, there are certain tunnels, other buildings in the
13  Capitol complex that you cannot access.
14     Q.  Do you have to show your State employee ID to
15  get onto the floor of the Senate?
16     A.  I don't.
17     Q.  Is that because the security people there know
18  you from your many years of service to the State or is
19  it -- does nobody have to show an ID to go to the floor?
20     MR. FREDERICK:  Objection, form.
21     A.  We have admissions procedures on the Senate
22  floor.  And while we are in session, legislative
23  employees would have -- for the most part, unless they
24  have a position like I do, would have to show what we
25  call "a floor pass" to obtain -- to be able to be on a

---

140

1   Senate Floor.
2      Q.  (By Mr. Harris)  Are there times that the
3   Capitol building is closed to the general public but
4   that -- well, I will ask that question.  Are there times
5   that the Capitol building is closed to the general
6   public?
7      A.  I am not really aware of what the security
8   measures for the Capitol building are outside of my
9   access to the Capitol building.
10     Q.  Do you own a copy of your birth certificate?
11     A.  I think I do, yes.  Well, I think I do.
12     Q.  Were you born here in Texas?
13     A.  No.
14     Q.  What state were you born in?
15     A.  I was born in Argentina.
16     Q.  Assuming you didn't have a copy of your birth
17  certificate or if you lost your birth certificate, would
18  you know how to obtain another copy from Argentina?
19     MR. FREDERICK:  Objection, calls for
20  speculation.
21     A.  I am not sure I would.  I would probably call
22  my family there and ask them to go get me a copy of my
23  birth certificate.
24     Q.  (By Mr. Harris)  And do you have any idea how
25  long that process would take to obtain a copy of your

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 141 | 143 |
|---|---|
| 1    birth certificate from Argentina? | 1    time? |
| 2       A.  I don't know. | 2       Q.  Well, let's say since you have been |
| 3       Q.  Do you know how much it would cost to obtain a | 3    Parliamentarian, since 2004.  We have talked about the |
| 4    copy of your birth certificate from Argentina? | 4    fact that SB 14 sent to the Committee of the Whole, what |
| 5       A.  I don't know. | 5    other bills went to the Committee of the Whole as |
| 6       Q.  Are you aware of any instances of in person | 6    opposed to a regular standing committee of the Senate? |
| 7    voter fraud -- actually, let's step back. | 7       A.  I believe in 2004, the Senate used the |
| 8           Are you familiar with a term called "in | 8    Committee of the Whole -- I think it was 2004, for |
| 9    person voter fraud"? | 9    school finance legislation.  I can't remember if it was |
| 10      A.  I have heard the term used. | 10   couple bills or how many bills but -- |
| 11      Q.  As I am using the term, I am asking you about | 11      Q.  And besides school finance, since 2004, are you |
| 12   instances in which an individual has appeared at the | 12   aware of any other times when a bill was referred to the |
| 13   polls to vote claiming to be a registered voter, that | 13   Committee of the Whole, putting aside SB 14? |
| 14   that individual is not.  Does that -- does that make | 14      A.  2009, I believe, Senate Bill 362 was |
| 15   sense? | 15   referred -- |
| 16      A.  Yes. | 16      Q.  And SB 3 -- |
| 17      Q.  And are you aware of any instances of in person | 17      A.  -- also.  Sorry. |
| 18   voter fraud in Texas? | 18      Q.  Excuse me.  As we talked about before, SB 362 |
| 19      A.  I am not aware of very much having to do with | 19   was also a voter identification bill; is that right? |
| 20   the actual election procedures used in administering | 20      A.  Yes. |
| 21   elections in Texas. | 21      Q.  Beyond school finance in 2004, SB 362 in 2009, |
| 22      Q.  And just so the record is clear, I take that to | 22   SB 14 in 2011, since you became Parliamentarian, are you |
| 23   mean you are not aware of any instances of in person | 23   aware of any other times when a bill was referred to the |
| 24   voter fraud in Texas? | 24   Committee of the Whole Senate? |
| 25           MR. FREDERICK:  Objection, | 25      A.  I don't remember having had any other bills in |

| 142 | 144 |
|---|---|
| 1    mischaracterizes the testimony.  Objection, relevance. | 1    the Committee of the Whole. |
| 2       A.  I would have no direct knowledge of any | 2       Q.  Finally, looking back at -- |
| 3    instances. | 3       A.  At that time, I am sorry, for that time period. |
| 4       Q.  (By Mr. Harris)  Do you have any indirect | 4       Q.  Looking back at Exhibit 17, which is the |
| 5    knowledge of instances of in person voter fraud in | 5    legislative history for SB 14 and, specifically, looking |
| 6    Texas? | 6    at -- it's like Page 6 of 9. |
| 7           MR. FREDERICK:  Objection, relevance. | 7       A.  Okay.  Okay. |
| 8       A.  Probably not.  If it's -- someone has mentioned | 8       Q.  Am I correct that this history reflects that SB |
| 9    it or discussed it, or if it's been mentioned in debate, | 9    14 passed a vote of the full Senate and was reported |
| 10   it's possible, but I don't have any knowledge really in | 10   engrossed on January 26th, 2011? |
| 11   specific incidences. | 11      A.  Yes. |
| 12          MR. HARRIS:  Let's take a five minute | 12      Q.  And I think we already established that SB 14 |
| 13   break, after which I expect to be able to wrap up my | 13   was filed in the Senate on January 12th, 2011? |
| 14   questioning very shortly. | 14      A.  Yes. |
| 15          (Brief recess.) | 15      Q.  So if my math is right, that would mean that SB |
| 16      Q.  (By Mr. Harris)  Ms. Davis, I really do | 16   14 passed exactly two weeks or 14 days passed the |
| 17   appreciate your time today, and I do have just a very | 17   Senate, excuse me, two weeks or 14 days after it was |
| 18   few more questions. | 18   filed in the Senate? |
| 19          Other than SB 14, what other bills have | 19      A.  Your math -- your math sounds correct to me. |
| 20   been referred to the Committee of the Whole Senate as | 20      Q.  Are you since becoming Parliamentarian in 2004, |
| 21   opposed to a standing committee? | 21   are you aware of any other bills that passed the Senate |
| 22          MR. FREDERICK:  Objection, vague. | 22   within the first two weeks of the session? |
| 23      Q.  (By Mr. Harris)  Do you understand my question? | 23      A.  Yes.  I believe, in particular, during special |
| 24      A.  I do.  But I don't think you have been specific | 24   sessions, the Senate would have very quickly passed |
| 25   enough.  Are you asking me about a particular session or | 25   bills. |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Karina Casari Davis                                          June 15, 2012

---

## 145

1    Q.   How about in Regular Session?
2         Are you aware of any other times where a
3    bill passed in the first two weeks of a Regular Session?
4    A.   I am sure it has happened.  I don't recall
5    anything specific.  I am -- you know, I am sure it has
6    happened before with emergencies during a Regular
7    Session that would be a likely result.
8    Q.   But sitting here today, you don't recall any
9    particular bills that passed within the first two weeks?
10   A.   Nothing specific.
11        MR. HARRIS:  At this time, the Texas
12   League has no further questions.  We would reserve the
13   right to reopen the deposition subject to potential
14   motions concerning some of the privilege issues and
15   would, otherwise, turn our time over to the Department
16   of Justice and the Attorney General for any questions
17   that the Attorney General may have.
18            EXAMINATION
19   BY MS. BERKOWER:
20   Q.   Good afternoon, Ms. Davis.
21        My name is Risa Berkower, to refresh your
22   memory, and I represent the Attorney General Eric Holder
23   in this case.
24        So I will be asking you some questions
25   now.  I think at the beginning of the day, Mr. Harris

---

## 146

1    went over some ground rules with you.  And I will just
2    go over a few of mine as well just be clear.
3         I will do my best to ask you clear
4    questions.  But if you don't understand a question, will
5    you let me know?
6    A.   Yes.
7    Q.   And I may use the terms "voter ID" and "voter
8    ID" interchangeably during the deposition but I think
9    you would interpret the term broadly to mean a
10   requirement that a voter presents a form of
11   identification, whether it has a photo or otherwise,
12   when voting in person before being permitted to vote by
13   regular ballot.
14        Does that make sense?
15   A.   Yes.
16   Q.   And if I refer to "minority voters," I mean
17   voters who are non-white or non-Anglo, does that make
18   sense?
19   A.   Yes.
20   Q.   So again, if you have any questions about
21   anything that I say, I would like you to interject; is
22   that alright?
23   A.   Yes.
24   Q.   So I think you have been asked a lot of
25   questions about the duties that you have as Senate

---

## 147

1    Parliamentarian.  And I am going to focus on your time
2    as Parliamentarian.  If I ask a question that asks for a
3    question outside of the time you served as
4    Parliamentarian, I will specify that, okay?
5    A.   Okay.
6    Q.   Could you, as a general matter, explain the
7    role and duties of the Parliamentarian in the Senate.
8        MR. FREDERICK:  That's asked and answered.
9        You may answer.
10   A.   Generally, the Parliamentarian is a or Senate
11   officer is responsible for advising the presiding
12   officer and the members of the Senate on the rules and
13   procedures of the Senate.
14   Q.   (By Ms. Berkower)  And when you say, "rules
15   and procedures," is the advice that you -- how do you give
16   advice, is it requested of you or do you volunteer it
17   yourself?
18   A.   Probably a lot of both on a day-to-day basis.
19   Q.   What are the circumstances in which you
20   volunteer advice on rules of procedure, like, on your
21   own initiative?
22   A.   You know, on a day-to-day basis in the Senate,
23   I prepare -- well, I sit next to the presiding officer,
24   and I prepare items for consideration.  For example, you
25   know, I might -- I prepare a script for the opening of

---

## 148

1    the Senate depending on what we are doing -- to make
2    sure we follow the rules, it would include an
3    introduction of the Pastor for the day.  If there is
4    someone who is absent and has requested to be excused, I
5    would have a motion prepared for the presiding officer
6    to read.  Sometimes these are motions in writing,
7    usually.  Or I would have -- I would help cue for the
8    providing officer on various requests from the
9    membership to be recognized for introduction of guests,
10   ceremonial resolutions, memorial resolutions,
11   announcements.  And that's just within the beginning of
12   the business of the Senate.
13        When we have moved on to the actual
14   calendar, my job is to coordinate when bills are
15   actually taken up, the timing to make sure that they are
16   in order for the debate that would require me to order,
17   review amendments, you know, kind of just, you know,
18   things like, you know, if a member is ready to be
19   recognized on a certain bill, making sure that the
20   members on the floor and that any members who have filed
21   amendments are available.  And I am very heavily
22   involved in when bills are taken up, depending on our
23   schedule, our, you know, perhaps the intentions of how
24   long we are going to be there.  So I -- I would say the
25   large part of my job is coordinating the actual business

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 149

1  of the Senate while we are in session.
2      Q.  So is it fair to say that you -- you ensure
3  that the Senate's business is conducted according to the
4  rules of the Senate on a day-to-day basis or you provide
5  advice.
6      A.  Yes.  I provide advice and help accommodate
7  that.
8      Q.  And then there are, also, instances -- that's
9  when you voluntarily give advice on the rules, is that
10  accurate?
11     A.  Yes.  That's accurate because times motions
12  aren't in order at particular times of the day, things
13  of that nature, and I would, you know, to the extent
14  that a member wants to do something at certain time, I
15  would voluntarily say, we cannot do that at this time,
16  we can take this up later; or I would, you know,
17  coordinate with the member and the presiding officer
18  when we would assume certain activities for the Senate.
19     Q.  And then there are, also, times when people ask
20  your advice on the rules, is that accurate?
21     A.  Yes.
22     Q.  When are those times, just generally?
23          MR. FREDERICK:  Object to vague.  You may
24  answer.
25     Q.  (By Ms. Berkower)  Do you want me to be more

### 150

1  specific?
2      A.  Yes.  I think that would be helpful.
3      Q.  Okay.  When you're in session, do members of
4  the Senate ask your advice on rules?
5      A.  Yes.
6      Q.  When you're not -- when you're not meeting,
7  when the Senate is not in session, do the members ask
8  your advice on rules?
9      A.  Yes.
10     Q.  Does anyone else other than members of the
11  Senate ask your advice on rules?
12     A.  Yes.
13     Q.  Who else asks your advice on rules?
14     A.  The staff for the members in the Senate,
15  committee staff, in particular, staffers for senators,
16  sometimes House members.  Also, most -- the presiding
17  officer would ask for my advice.  Sometimes members of
18  the public would ask.
19     Q.  Are you allowed to give members of the public
20  advice on the rules?
21     A.  Yes.  I think, general advice, I think it is
22  expected that I would be help people with general
23  advice.
24     Q.  What do you do -- I want to just get this out
25  of the way as well.  What do you do when the Senate is

### 151

1  not in session, as the Parliamentarian?
2      A.  Do you mean when we are outside of a Regular
3  Session --
4      Q.  When --
5      A.  -- or just day-to-day?
6      Q.  I guess when you're outside a Regular Session,
7  what -- just a quick summary of what you do when the
8  Legislature is not meeting.
9      A.  Okay.  I still answer questions.  Probably more
10  of my work comes from committees that are meeting
11  throughout the interim.  I would give advice on how they
12  might post for hearing.  Sometimes I would be asked
13  specifics about how to post.  There is a large number of
14  questions that can come into play with committees
15  meeting during the interim and outside of the
16  legislative session.
17          Aside from assisting staff and members
18  outside of the session, what I would do is perform a lot
19  of research in anticipation of an upcoming session and
20  generally prepare for anything that I think might come
21  before the body.
22     Q.  How do you know what areas to research that
23  might become of interest during the session?
24     A.  I -- you know, sometimes I -- you can tell just
25  by what could happen.  You know, a good example of that

### 152

1  is, we have a potential vacancy in an office.  You know,
2  I would research how that vacancy might be filled and
3  sort of anticipate what the Senate might need from me
4  and what they might need to conduct their business.
5      Q.  Do you ever research potential rule changes for
6  future sessions?
7      A.  Yes.  Sometimes, I mean, you know, I have
8  certainly been asked questions about possible changes
9  and, you know, sometimes I think after you have gone
10  through a session, things come up that were
11  unanticipated and I might research those questions
12  further and they sometimes may or may not turn into
13  rules changes.
14     Q.  I think you had discussed a rule change with
15  Mr. Harris earlier, Rule 5.11(d), which was changed in
16  2009, do you remember testifying about that?
17     A.  Yes.
18     Q.  Did you conduct any research on that rule
19  change prior to its institution?
20     A.  Prior to the time it was adopted by the Senate?
21     Q.  Yes.
22     A.  Yes.
23     Q.  Did you conduct any research before it was
24  introduced?
25     A.  Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 153

1    Q.   Were you asked to conduct that research?
2    A.   Some of it, yes.  And some of it, I would have
3  done on my own anyways.
4    Q.   Why -- what do you mean, you would have done it
5  on your own anyways?
6    A.   You know, it is my job to know the rules and
7  how they work and so I regularly research a lot to be
8  prepared for a lot of different situations, and so I
9  might not have specifically researched that provision
10 but I would have done a lot of research about and have
11 done a lot of research about special orders and,
12 certainly, previous rules of the Senate.
13   Q.   Who asked you to conduct the research?
14       MR. FREDERICK:  I will object on the basis
15 of privilege.  We have already established what the
16 subject matter of the research would be, so this would
17 be calling for the substance of request Parliamentarian
18 about a legislative act.
19       I am instructing you not to answer on the
20 basis of privilege.
21       MS. BERKOWER:  Can I ask you a question
22 about that, Matt?
23       MR. FREDERICK:  Of course.
24       MS. BERKOWER:  I think she said she had
25 conducted research on special orders.  So can I ask her

---

### 154

1  who asked her to conduct research on special orders?
2        MR. FREDERICK:  I thought the question was
3  whether she conducted research in connection with Rule
4  5.11(d).
5        MS. BERKOWER:  I did ask her that, she
6  said -- I think she said she did research.  And then she
7  said -- I asked what the nature of that research was, I
8  thought she said it was on special orders generally.  If
9  you want, I can just drop it.  But I didn't think it was
10 as specific as I think maybe you thought it was.
11       MR. FREDERICK:  I think -- yeah.  I mean,
12 I think because of -- because of the predicate
13 questions, I think identifying who made the request
14 would have the effect of reviewing privileged
15 communication.
16   Q.   Okay.  And can I ask you -- well, actually, I
17 will just move on from there.
18       Can you explain the relationship, as a
19 general matter, of the Parliamentarian in the Senate
20 with Lieutenant Governor?
21   A.   As a general matter -- matter, the
22 Parliamentarian is a Senate Officer.  I am designated in
23 what's called "the Caucus Resolution" for the Senate.  I
24 am designated as an Office along with the other
25 officers.  The Senate names, the other officers, and

---

### 155

1  then provides that the Lieutenant Governor appoint the
2  Parliamentarian.
3        The Lieutenant Governor makes a decision
4  as to who the Parliamentarian would be and indicates
5  that to the Senate and then the Senate adopts his
6  appointment in a resolution making the Senate officer.
7  I take an oath, along with the other offices on the
8  Senate Floor.  So I think because of my appointment by
9  the Lieutenant Governor and because his role of the
10 presiding officer, in large part, it is my job to advise
11 him on the rules of procedure, particularly, given his
12 authority under the Senate rules to decide questions of
13 order.
14   Q.   Is there more you wanted to add?
15   A.   I don't think so, on a day-to-day basis, that's
16 what I do is advise the presiding officer and the
17 members of the Senate.
18   Q.   Is it the usual case that the Parliamentarian
19 will retain that position longer than one legislative
20 session?
21   A.   I think in recent practice, it is.
22   Q.   Is it the usual practice that a Parliamentarian
23 will retain the position after a new lieutenant governor
24 comes in?
25   A.   I think the recent practice is that we have had

---

### 156

1  parliamentarians work for multiple lieutenant governors.
2    Q.   And you said that you provide advice.  To be
3  clear, is that purely procedural advice?
4    A.   I think -- I don't know if I would use the word
5  "purely," I am not sure what you mean.  But I think, in
6  general, it is procedural advice.
7    Q.   Does the procedural advice ever impact -- have
8  a subsequent impact on a bill?
9        MR. FREDERICK:  Objection, vague.
10 Objection, calls for speculation.
11       You may answer.
12   A.   I -- I think there can be substantive impacts
13 based on parliamentary rulings that the presiding
14 officer would make.
15   Q.   What types of rulings would those be, where
16 that impact occurs?
17       MR. FREDERICK:  Objection, vague.
18       You may answer.
19   A.   An example would be germaneness might affect
20 the actual bill, based on parliamentary standards.
21   Q.   (By Ms. Berkower)  What is "germaneness"?
22   A.   "Germaneness" is a requirement in the Senate
23 Rules that the bills be germane to the subject matter of
24 the bill.
25   Q.   So is it about the -- would it be similar to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 157

1    like a relevancy requirement?
2        A.   I am not sure what you would mean by "relevancy
3    requirement."
4        Q.   Okay.  What's a definite -- what's the
5    definition of "germane"?
6        A.   I mean, I think we can read the rule.  Would
7    you like for me to read the rule to you?
8        Q.   Sure.  Do you have it, the 2011 rules?
9            MR. FREDERICK:  I think we have all --
10       Q.   (By Ms. Berkower)  I have the whole 2011 rule.
11           Do you know which one it is off the top of
12   your head?
13       A.   It is 715 and it would be the same in 209.
14       Q.   Okay.
15       A.   So Senate Rule 715 reads:  "No motion or
16   proposition on a subject different from that under
17   consideration shall be admitted under color of amendment
18   or as a substitute for a motion or proposition under
19   debate."
20       Q.   And that's one of the areas where you have made
21   rulings that you feel may have had a substantive impact
22   on a bill?
23       A.   Where I would have provided the Lieutenant
24   Governor or the Presiding Officer the time with advice
25   as to whether an amendment to a Bill is germane or not

## 158

1    germane and whether their decision would affect a bill,
2    this would be the case.
3        Q.   And I guess that's a good point.  You advise
4    the Lieutenant Governor.  You don't make rulings
5    yourself, is that accurate?
6        A.   Yes.
7        Q.   Are any of the -- is any of the advice that you
8    provide to the Lieutenant Governor publicly available?
9        A.   No, I don't think it is.
10       Q.   Maybe I should have been more specific.  I know
11   the House Parliamentarian sometimes publishes, or I was
12   told that yesterday by the other Ms. Davis, that there
13   are some ruling papers that the House Parliamentarian
14   may issue from time to time, is that something that
15   happens in the Senate as well?
16       A.   I don't issue ruling papers.  I certainly may
17   assist and may even draft a ruling with the Lieutenant
18   Governor that is entered into the journals but those
19   would be the Presiding Officer's ruling.
20       Q.   Okay.
21       A.   And there are never a ruling of the
22   Parliamentarian directly.
23       Q.   So the Lieutenant Governor is not bound to take
24   your advice, is that accurate?
25       A.   That's accurate.

## 159

1        Q.   Does the -- does the Lieutenant Governor, as a
2    general matter, take the advice of a Parliamentarian?
3            MR. FREDERICK:  Objection, vague.
4            You may answer.
5        A.   Probably, yes.
6        Q.   (By Ms. Berkower)  I think you said a few
7    minutes ago that you were heavily involved in when bills
8    are taken up.  Does that mean when they are taken up for
9    a vote?
10       A.   Yes.  When they are laid out for consideration
11   in the Senate.
12       Q.   What is your involvement in that when bills are
13   taken up for -- or laid out for a vote?
14       A.   You know, sometimes it is very significant and
15   sometimes it is not that significant.
16           You know, just depends on the time of the
17   session as to how much work that is.  It's -- for
18   example, if the Senate is considering, you know, 40
19   bills during the day, I would probably be -- I am very
20   heavily involved in determining when those bills would
21   be brought up and when they are ready for consideration.
22       Q.   Well, what factors make a bill ready for
23   consideration?
24       A.   Well, aside from their procedural stance as to
25   whether they are eligible for consideration on a

## 160

1    day-to-day basis, factors would be, such as, if the
2    author is present or available when he is ready, if he
3    has his notes ready, if there are amendments, if those
4    amendments are in order and I have time to order them or
5    prepare them and be ready.  Sometimes amendments are
6    submitted that are not properly drafted and would be
7    confusing for the membership.  So I would delay
8    consideration of a bill at that point until we have been
9    able to work with the author of the amendment and,
10   perhaps, even the author of a bill in getting the bill
11   ready for consideration.  This is really, largely,
12   logistical.
13       Q.   Is the Parliamentarian and the Senate averse
14   with the development of legislation?
15           MR. FREDERICK:  Object as vague.  But you
16   may answer.
17       A.   Generally, no.
18       Q.   (By Ms. Berkower)  Are there exceptions?
19           MR. FREDERICK:  Object to the form.
20           You may answer.
21       A.   I -- you know, I have assisted members in
22   developing legislation related to constitutional
23   procedures.  With regards to legislation in general, I
24   have been asked to assist and germaneness is sometimes
25   not well understood and so I may be asked from time to



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

161

1    time to help a member with their amendment draft.  But
2    generally, I am not involved in the substance of the
3    legislation.
4         Q.   (By Ms. Berkower)  Do members use you as a
5    resource for parliamentary procedures when they are
6    drafting legislation?
7         A.   Yes.
8         Q.   Was there any assistance that you provided any
9    Senate members who were working on voter ID legislation?
10             MR. FREDERICK:  Object as vague.
11             You may answer.
12        A.   What kind of assistance, if you said, I
13   didn't -- I don't remember.
14        Q.   (By Ms. Berkower)  Well, I think that the
15   problem is, I am going to run into an objection if I
16   asked very specific questions about what type of
17   assistance you provided.  So I am trying to find out if
18   you provided legislators with assistance in their
19   developing voter ID legislation without revealing the
20   substance of what you provided, if you did?
21             MR. FREDERICK:  Same objection.
22             You may answer.
23        Q.   (By Ms. Berkower)  Do you understand the
24   question?
25        A.   Yes, I think I do.  I am having to -- what do

---

162

1    you mean by "legislation"?
2         Q.   Well, okay, I will be more specific then.
3              Did you help any senators draft voter ID
4    bills that were filed in the Senate?
5         A.   No.
6         Q.   Did you help any senators develop voter ID
7    bills that were filed in the Senate?
8              MR. FREDERICK:  Objection, vague.
9              You may answer.
10        A.   No.
11        Q.   (By Ms. Berkower)  Did you help any senators
12   develop amendments to voter ID bills?
13             MR. FREDERICK:  Objection, vague.  You may
14   answer.
15        A.   I think develop, no.
16        Q.   (By Ms. Berkower)  Did you help any senators
17   draft amendments to voter ID bills?
18        A.   I can't say -- I wouldn't remember.  It's very
19   possible on the Senate floor, if somebody came up with
20   something they wanted to do at the last minute, I would
21   have helped them put the words on the paper.  But
22   likely, I wouldn't -- would not have been heavily
23   involved in the drafting of amendments.
24        Q.   So I think you were -- and you said, I just
25   want to make sure I understand this.  You don't remember

---

163

1    the substance of any of the debates on the voter ID
2    bills that Mr. Harris discussed with you today, is that
3    accurate?
4         A.   Yes.  I think that's accurate.
5         Q.   With regard to the Committee of the Whole, I
6    think you testified earlier that, there is a benefit
7    that the hearing will be heard by all senators, is that
8    accurate?
9         A.   Yes.
10        Q.   And is that because many bills never make it
11   out of committee to be heard by all senators?
12        A.   No.  I think at the committee level is before
13   bills are out of committee.  So at committee level, you
14   could have a bill in any number of committees.  It is
15   rare that every member of the Senate would be a member
16   of all the committees.  So a great advantage of the
17   Committee of the Whole is that all 31 members have the
18   equal right to participate in a committee deliberation
19   of a particular piece of legislation.
20        Q.   And --
21        A.   Otherwise, they might not be present for a
22   hearing.
23        Q.   And is it accurate to say that, once a Bill is
24   out of committee, any changes of the bill have to go
25   through a more formal process?

---

164

1         A.   Yes, in the Senate.
2         Q.   In the Senate.
3              So if the -- if the Committee of the Whole
4    is meeting, is is easier then for all senators to have
5    an opportunity to make changes to a bill?
6         A.   If the Committee of the Whole is meeting?
7         Q.   Yes.
8         A.   Yes.  Yes.
9         Q.   Is it possible to send a bill to the Committee
10   of the Whole without -- well, what is -- what is
11   required to send a bill to the Committee of the Whole?
12        A.   I don't know that there are any specific
13   requirements.  I think that the Lieutenant Governor can
14   refer a bill to the Committee of the Whole but, also,
15   the Senate, as a body, could commit a bill to the
16   Committee of the Whole itself.
17        Q.   So there is no vote or anything required to
18   designate a bill as going to the Committee of the Whole,
19   is that accurate?
20        A.   On referral by the presiding officer, no vote.
21   If the body were to commit a bill or re-refer, there
22   would be a vote.
23        Q.   What do you mean by "re-refer"?
24        A.   If they were to choose to remove a bill from
25   another committee and send it -- have it instead

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 165

1  considered in the Committee of the Whole, the body could
2  choose to do that.
3      Q.  Does that happen often?
4      A.  Re-referrals in general, you know, often it --
5  I would say it is not an infrequent occurrence for bills
6  to be re-referred by the body.  I couldn't give you a
7  number.
8      Q.  Is it fair to say that a referral to the
9  Committee of the Whole has no direct relationship to the
10 two-thirds rule for bills to be heard out of order?
11     A.  I think that's probably fair to say that.
12     Q.  Does the Committee of the Whole have strategic
13 benefits for bill passage?
14     A.  Yes.
15     Q.  What are those benefits?
16     A.  I think that the biggest benefit is what I had
17 already stated earlier, is that when a Bill is
18 considered by the Committee of the Whole, the 31 members
19 are able to participate in that deliberative process.
20 And that is a benefit to the Senate as a whole.  It, you
21 know, likely means that when a bill that has gone
22 through Committee of the Whole reaches the Senate Floor
23 for consideration, it's in better form in that it has
24 the input of the entire body.  So it -- you know, as far
25 as collaboration and deliberation goes, you're going to

---

### 167

1  compared to what?
2      Q.  I guess, then, are there a number of procedures
3  layers that a bill must go through before it gets a
4  final vote on the Senate Floor?
5      A.  Compared -- are you asking me more, compare it.
6      Q.  To the House.
7      A.  No.  Actually, I think -- well, this is -- I
8  think probably the Senate in many ways is simpler,
9  procedurally.
10     Q.  Coming out of -- does a bill that comes out of
11 the Committee of the Whole, is it easier to get a vote
12 on the Senate Floor before the full Senate for that bill
13 than bills that come out of committees?
14     A.  I am sorry.  Please repeat your question.
15     Q.  That was pretty convoluted.  I will start over.
16         Is it easier to get a vote on a bill that
17 comes out of the Committee of the Whole than bills that
18 come out of other committees?
19     A.  "Easier to get a vote."
20     Q.  For final passage.
21     A.  I don't know that it's easier, no.
22     Q.  Is it a majority vote requirement to send a
23 bill out of the Committee of the Whole?
24     A.  Yes.  I would say it is a majority.
25     Q.  For a bill to be sent out of a standing

---

### 166

1  get a -- strategically, you're going to get a better
2  work-product out of the Committee of the Whole.
3      Q.  Are there any procedures that would -- are
4  there any procedures bypassed by sending a bill to the
5  Committee of the Whole as opposed to a standing
6  committee?
7      A.  "Bypass," what do you mean?
8      Q.  Well, it sounds like, I think you have heard --
9  well, I wonder if, have you heard the Senate called "the
10 most deliberative body" or something of that sort?
11     A.  Yes.
12     Q.  What does that mean, or what do you take that
13 to mean?
14     A.  Well, I mean the Senate having a fewer number
15 of members can and certainly subject to its
16 constitutional design with having longer terms, as much
17 as in the U.S. Constitution, I think it considers itself
18 more deliberate.
19     Q.  And, also, are there -- is it procedurally a
20 little slower?  Are there more procedures in place that
21 slow down bill passage?
22     A.  That slow down bill passage.
23     Q.  Or delay bill passage, more layers of
24 procedural.
25     A.  I am not sure I would know how to answer that

---

### 168

1  committee, what's the -- is it, also, a majority vote
2  requirement?
3      A.  It would be majority of the membership of the
4  committee.
5      Q.  Right.  That's what I meant.  How are -- how
6  are those committees staffed?
7      A.  The standing committees?
8      Q.  Yes.
9      A.  Under the rules, and -- okay.  Under the rules,
10 the chairman of committees are empowered to hire the
11 staff for the committees, you know, and the Senate
12 Administration Committee approves budgets for the
13 individual committees that enables them to hire staff.
14     Q.  I guess I meant, are you referring to, like,
15 staffers as opposed to members of the Senate?
16     A.  Yes.  And I am sorry, maybe I misunderstood
17 your question.
18     Q.  That's okay.  I should have been more specific.
19         How are senators assigned to committees?
20     A.  Under the rules, they are appointed by the
21 Lieutenant Governor.
22     Q.  Are there any requirements concerning
23 partisanship of how senators are staffed on committees?
24     A.  No.
25     Q.  Is it possible then for a committee to be all



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

169

1    one party or all the other party?
2        A.  Yes.
3        Q.  Have you ever seen a committee staffed with
4    members all of one party or all of the other party?
5        A.  During my time in the Senate, no.
6        Q.  Are there any traditions or customs of having
7    members from both parties staffed on every committee?
8        A.  I can only speak to the recent history of the
9    Senate and I think the practice has been to appoint
10   members of both committee -- both parties to the
11   standing committees and even special committees.
12       Q.  Are those appointments made so that the
13   committee will be staffed 50/50 or --
14       A.  I don't know how that's determined.
15       Q.  You gave testimony earlier about bill numbers.
16   And you said that bills are given numbers in the order
17   in which they are filed.  Is that accurate?
18       A.  Usually, yes.
19       Q.  Is it true that the Lieutenant Governor
20   reserves a set of bill numbers at the start of each
21   legislative session?
22       A.  Yes.
23       Q.  How does -- how does he give out -- how are
24   those bill numbers assigned?
25       A.  Some -- as I mentioned earlier, for example,

---

170

1    the budget is just traditionally or for the long -- for
2    a long time has been the first bill.  After that, you
3    know, the Lieutenant Governor makes that decision.
4        Q.  Is it fair to say that if a bill is -- well, do
5    bills get heard in the order that they are filed?
6        A.  No.
7        Q.  Is there a benefit to having a lower bill
8    number?
9        A.  I don't know that there is a benefit.  Well,
10   other than, you know, I think that the Senate is used to
11   thinking of Senate Bill 1 as the budget, so for purposes
12   of identifying a bill like that, that's a benefit.  But
13   in a parliamentary sense, there is no benefit to a
14   particular bill number.
15       Q.  Is that because -- well, if every bill moved
16   through the Senate at the same rate of speed, would a
17   bill that was filed with a lower bill number be up for a
18   final vote before a bill with a higher bill number?
19       A.  No.
20       Q.  Why -- is that a crazy question?
21       A.  No, it's not.  The calendar is determined by
22   the order in which bills are reported out of committee
23   and it really doesn't have any relationship with the
24   numbers that are assigned to the particular bill.
25       Q.  Just as a matter of Senate taking up business

---

171

1    to even do the procedural mechanisms of assigning bills
2    to committee, and that sort of thing, are bills
3    considered in order of bill number for those types of
4    tasks?
5        A.  Well, as a practical matter, when the presiding
6    officer is considering bills for referral, you know, we
7    probably, for Senate bills only would, you know, they
8    would be in a stack in numerical order.  So we might get
9    two bill -- bills that are numbered higher earlier but
10   that wouldn't present a significant advantage.  I mean,
11   generally, we do referrals in clumps and certainly that
12   might only be helpful, you know, for the first few weeks
13   of referral, and then once we are caught up, it wouldn't
14   matter at all.
15       Q.  I think you spoke, you gave some testimony
16   earlier about the procedure surrounding something called
17   "a Blocker Bill."  Is it more likely a bill will be put
18   up for a vote before the full Senate if it overcomes the
19   two-thirds majority requirement?
20           MR. FREDERICK:  Objection, assumes facts
21   not in evidence.
22           You may answer.
23       A.  Is it more -- can you restate the question, is
24   it more likely --
25       Q.  (By Ms. Berkower)  is it more likely a bill

---

172

1    will be heard -- well, I will restate the question,
2    actually.
3           Is it more likely a bill will be voted on
4    before the full Senate if it doesn't have to meet the
5    two-thirds majority requirement?
6           MR. FREDERICK:  Object.  Assumes facts not
7    in evidence.
8           You may answer.
9        A.  Is it more likely that it would be considered
10   by the Senate if it doesn't have to meet --
11       Q.  (By Ms. Berkower)  The two-thirds vote
12   requirement to jump ahead of everything else on the
13   calendar?
14       A.  I think, procedurally, I don't know that it
15   would be more likely.  We have a calendar and if -- if
16   the Senate goes in calendar order, you know, bills that
17   are -- have been reported first would be taken up first,
18   and if we don't go in order, they are basically could be
19   taken up at any -- just about any time.
20       Q.  So is it he is easier to get a bill up for a
21   vote if it doesn't have to have a two-thirds vote of
22   senators to be heard out of order?
23       A.  If doesn't have to have.
24       Q.  Okay.
25       A.  See, I am not sure I understand the premise in

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

173

1    your question.
2        Q.   Is it true that under the usual rules of the
3    Senate, to be heard out of order, a bill must have that
4    approval by two-thirds majority of the senators?
5        A.   Yes.  For -- for a bill to be considered out of
6    its regular calendar order, it requires a two-thirds
7    vote of the members present and voting.
8        Q.   So if a bill doesn't have to meet the
9    two-thirds threshold to be considered out of order, is
10   it more likely that it will be heard out of order?
11       A.   If it doesn't have to be considered --
12       Q.   Sorry.
13       A.   -- with the suspension of the Regular Order of
14   Business, it is more likely.  Not necessarily.  I think
15   the Senate decides whether it follows its calendar or
16   whether it takes bills out of order.
17       Q.   Okay.  I will rephrase it this way.
18            Is it procedurally easier for a bill to be
19   heard out of order if it doesn't have to meet the
20   two-thirds majority requirement?
21       A.   Well.
22            MR. FREDERICK:  Object to the form of the
23   question, assumes facts not in evidence.  But
24   you may answer.
25       A.   If a Bill is taken out of order, it requires

---

174

1    two-thirds vote.
2        Q.   (By Ms. Berkower)  If a Bill is put into a
3    special category, where it doesn't require a two-thirds
4    vote to be heard out of order, would you say it is
5    procedurally easier to get a vote on that bill?
6            MR. FREDERICK:  Object.  Assumes facts not
7    in evidence.  Objection, vague.
8            You may answer.
9        A.   I -- is it easier to take up a bill that's not
10   in the regular order, is that what you're asking me?
11       Q.   (By Ms. Berkower)  Let me think about this a
12   second and I will rephrase it.
13            Okay.  I think we -- you did say that,
14   usually to be heard out of order, a two-thirds majority
15   of senators must agree to that, right?
16       A.   Yes.
17       Q.   Would you agree that -- would you agree that if
18   a bill only had to -- if to be heard out of order, a
19   bill required only a majority vote of senators as
20   opposed to two-thirds majority vote of senators, it may
21   be easier to get that bill heard?
22            MR. FREDERICK:  Objection, assumes facts
23   not in evidence, vague, calls for speculation.
24            You may answer.
25       A.   To get the bill heard.

---

175

1        Q.   (By Ms. Berkower)  A final vote.
2        A.   I would agree that if a bill is not taken up
3    with a two-thirds vote, I think by the math, it would be
4    easier.  I think getting 21 votes is harder, depending
5    on the bill than getting 16.
6        Q.   Is it fair to say, it is a reduced procedural
7    threshold to require a simple majority rather than a
8    two-thirds majority to have a vote -- to have a bill
9    heard out of order?
10       A.   Well, I --
11            MR. FREDERICK:  Object.  Assumes facts not
12   in evidence.  Calls for speculation.
13            You may answer.
14       A.   I don't -- Senate calendars don't require -- I
15   think the rules require that the body follow its orders
16   of business.  And if the body chooses to go out of order
17   and -- that is -- you know, that does happen, then it is
18   a two-thirds vote to take a bill up out of order.  Is
19   that easier than a majority vote for a bill that would
20   be at the top of the calendar, you know, it is easier to
21   get to a bill that's at the top of the calendar.
22       Q.   (By Ms. Berkower)  Would you agree that a
23   simple majority is a lower threshold for going out of
24   order than a two-thirds majority?
25            MR. FREDERICK:  Object to the form.

---

176

1    Assumes facts not in evidence.  You may answer the
2    question.
3        A.   I don't think you have a simple majority for
4    going out of order.  You have a simple majority for
5    bills that are at the top of the calendar.  And then to
6    go out of order, you have a two-thirds vote.
7        Q.   If you change the rule to be a simple majority
8    to go out of order, would you agree that that's a lower
9    threshold for going out of order than requiring a
10   two-thirds majority to go out of order?
11            MR. FREDERICK:  Objection, calls for
12   speculation.
13            You may answer.
14       A.   I think there is a distinction between going
15   out of order and what your order actually is.  And if it
16   takes a majority vote to get a bill at the top of the
17   calendar, that's a majority vote to get the bill at the
18   top of the calendar.  That bill wouldn't, if it's a
19   special order, it is not part of the Regular Order of
20   Business.
21       Q.   (By Ms. Berkower)  I see.  So does Rule 5.11,
22   essentially, do what you just described, 5.11(d), for
23   voter ID permits the bill to be put at the top of the
24   calendar based upon a simple majority?
25       A.   Yes.  I think it -- yes, it does permit a bill,

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

177

1    if there are other bills.
2        Q.  Right.  If there were other bills.
3        A.  Right.
4        Q.  But normally in order to be put out of order
5    and potentially put at the top of the calendar, it would
6    require a two-thirds vote; is that accurate?
7        A.  To go out of order, yes.
8        Q.  Would you agree that Rule 5.11(d) reduces the
9    threshold for consideration of voter ID legislation?
10       MR. FREDERICK:  Objection, vague.
11       A.  No.
12       Q.  (By Ms. Berkower)  Why not?
13       A.  Because I think that is very dependent on the
14   factors that play, the time of the legis -- the timing
15   of the legislation, what other bills are on the
16   calendar.  There is a lot of variables that come into
17   play.
18       Q.  Okay.  So let's actually talk about the timing.
19           So this bill was deemed emergency
20   legislation, correct, or this area of legislation was
21   deemed emergency legislation, is that accurate?
22       A.  In 2011, yes.
23       Q.  Do you know -- as a result when SB 14 was
24   considered, were there any other bills up for a vote
25   before the Senate at that time?

---

178

1        A.  I don't think there were any other bills on the
2    calendar.
3        Q.  And that was because it was the emergency
4    designation allowed the bill to be considered before
5    bills are normally allowed to be considered under Senate
6    rules, is that accurate?
7        A.  Well, I mean, technically, it -- you know,
8    there had not been any bills reported from Committee, so
9    you could have a bill that's reported from Committee
10   without an emergency designation.  But you know not --
11   you know, just depends on what part of the session
12   you're in.
13       Q.  So turning back, I think it was exhibit --
14   Mr. Harris, what exhibit do you know?
15       MR. HARRIS:  That was Exhibit 17.
16       Q.  (By Ms. Berkower)  17 which was the legislative
17   history for Senate Bill 14.
18           The emergency designation allowed the bill
19   to be considered in the first 60 days of the legislative
20   session, is that accurate?
21       A.  Yes.
22       Q.  Was it in fact considered in the first 60 days
23   of the legislative session?
24       A.  Yes.
25       Q.  Are the only types of legislation that may be

---

179

1    taken up by the Senate during that time, the topics that
2    are designated in the emergency designation?
3        A.  There is two ways.  They can either be declared
4    an emergency or the Senate can suspend the
5    constitutional order of business for the four-fifths
6    vote to take up bills during the first 60 days.
7        Q.  So is it safe to say that the emergency
8    designation ensured there would be fewer other bills up
9    for consideration at the time that the Senate would
10   consider voter ID legislation, if the Senate considered
11   voter ID legislation in those first 60 days?
12       A.  I wouldn't use the word "ensured."
13           The Senate can choose to suspend the
14   constitutional order of business any time it chooses, so
15   it's -- I think the emergency designation has the
16   equivalent effect.
17       Q.  When is the last time the Senate suspended the
18   normal order of rules as you just described?
19       A.  The constitutional order of business?
20       Q.  Yes.
21       A.  You know, I -- it is possible that we did that
22   last session.  I don't remember.
23       Q.  Is it a common occurrence?
24       A.  It -- I wouldn't comment, I don't know.  It
25   used to be more common than it is.  But I -- I don't

---

180

1    remember whether we did that for any bills last session.
2        Q.  Well, is it safe to say, though, that
3    designating the voter ID as emergency legislation
4    ensured that there would not be a blocker bill ahead of
5    voter legislation when it came up for a full vote you?
6        A.  No, it wouldn't have had -- it wouldn't have
7    affected the blocker bills ability to get on the
8    calendar other than -- no, not directly, no.
9        Q.  Well, within the first 60 days, could the
10   blocker bill have gotten on the calendar in front of
11   voter ID legislation?
12       A.  Within first 60 days -- well, the blocker
13   could have been set any time the Senate chose to set it.
14       Q.  How is that the case, though, if the Senate is
15   not allowed to consider bills other than emergency
16   legislation within the first 60 days?
17       A.  Well, for something to be on the calendar, it
18   is not considered by the Senate it is merely reported by
19   committee.
20       Q.  Okay.
21       A.  We might have had a restriction.  But it is,
22   also, always suspendable.
23       Q.  Sorry, what was the last thing you said?
24       A.  Again, outside of an emergency declaration, you
25   can, also, suspend the constitutional order of business.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 181

1    Q.  But the Senate didn't suspend the
2  constitutional order of business in the first 60 days of
3  the 2011 Legislature, did it?
4    A.  I don't know if it did for any other bills.
5  It's entirely possible that it suspended the
6  constitutional order of business for something.
7    Q.  Is designating legislation or emergency
8  legislation one way to make it more likely that the
9  Senate will hear a particular type of legislation for a
10  full vote?
11    A.  Likely.  I don't think it makes it more likely.
12  I think maybe I answered the question earlier that
13  perhaps the Senate could consider something sooner.  But
14  beyond the Governor declaring an emergency, the Senate
15  wants -- wants to have to act on an emergency.  So it
16  doesn't necessarily make it more likely.
17    Q.  Well, if the Senate wants to act on a
18  particular type of legislation and the Governor
19  designates it as emergency legislation, does that make
20  it -- does that remove obstacles for the bill to be
21  heard before the Senate?
22        MR. FREDERICK:  Objection, vague.
23        You may answer.
24    A.  I don't know that it removes obstacles, it
25  enables a bill to be heard sooner.

## 182

1    Q.  (By Ms. Berkower)  Okay.  So if the Senate
2  wants to act on a particular type of legislation and the
3  Governor designates it emergency legislation, it helps
4  the bill be heard sooner, that's accurate?
5    A.  Yes.
6    Q.  Now turning back to the rules for the 2009
7  Senate.  Can you explain what the rule of the Senate
8  Parliamentarian is in developing new rules?
9        MR. FREDERICK:  Objection, asked and
10  answered.
11        You may answer.
12    A.  To the extent that the Senate chooses to use
13  its rules from a previous session as a starting point in
14  a new session, and any changes to those rules or, you
15  know, which would actually be just -- they would all be
16  new rules for a Regular Session, they would ask the
17  advice of the Parliamentarian and the Parliamentarian
18  would be very involved in -- in their discussions.
19    Q.  (By Ms. Berkower)  Would you be providing them
20  advice?
21    A.  Yes.
22    Q.  Would your advice be based on precedence from
23  prior sessions?
24    A.  It could.
25    Q.  Well, where generally would you look to provide

## 183

1  such advice?
2    A.  Well, when the Senate adopts its rules at the
3  beginning of the session it is adopting its rules for
4  that particular session, so it is not bound by
5  precedence necessarily but it may look to those.  And
6  they may ask me questions about how things have been
7  done in the past.
8    Q.  Do you recall the 2009 rules debate?
9    A.  Yes.
10    Q.  Was it lengthy?
11        MR. FREDERICK:  Objection, vague.  You may
12  answer.
13    A.  It probably was.
14    Q.  (By Ms. Berkower)  Do you remember why it was
15  so lengthy?
16    A.  I think it was -- there was opposition to the
17  resolution.
18    Q.  Do you remember what the opposition to the
19  resolution was?
20    A.  I think that most of the opposition was to
21  Senate Rule 5.11.
22    Q.  And why did -- what were the reasons expressed
23  for opposition to that rule?
24        MR. FREDERICK:  Caution you.  I don't
25  think this question is intending to seek privileged

## 184

1  communication.  But I would just caution you, to the
2  extent you relay opinions expressed, please, don't
3  relate privileged communications.
4    A.  I think, generally, the opposition was from
5  opponents of voter ID legislation.  And I think they
6  were opposed to the rule change or, actually, the rule
7  itself.  And I think the -- you know, I think you can
8  look at the record for their specific comments.
9    Q.  To pass the rules every session, is that a
10  majority vote requirement?
11    A.  I think for permanent rules, I think -- you
12  know, under parliamentary law, it would be a majority.
13    Q.  So to pass the 2009 rules, including Rule
14  5.11(d) that just required a simple majority of
15  senators?
16    A.  You know, I think it is likely a simple
17  majority, yes.
18    Q.  So was changing the rule away from majority of
19  senators to get around requiring a two-thirds majority
20  for voter ID to be heard out of order?
21    A.  Can you rephrase -- restate your question?
22    Q.  I asked whether this rule change, 5.11(d), was
23  a way for a majority of senators to get around the
24  two-thirds usual requirement for legislation to be heard
25  out of order for purposes of voter identification



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

185

1  legislation?
2         MR. FREDERICK:  Objection.  Assumes facts
3  not in evidence.  Objection, calls for speculation.
4         You may answer.
5         A.  I think it was the Senate's decision to handle
6  a particular bill in a particular way.
7         Q.  (By Ms. Berkower)  Okay.  But would it be
8  accurate to say that, the rule change allowed a majority
9  of senators to put voter ID legislation in a special
10  category?
11        A.  Well, I mean, I think you have to view this --
12  I think sometimes we want to view these as rule changes.
13  But when we adopt permanent rules in any legislative
14  body, even though we may reference previous rules, they
15  always have the right to establish their rules for that
16  particular session.  They are not bound by previous
17  session.  So I -- you know -- it is their right to adopt
18  the rules and to treat bills in particular ways, and it
19  is certainly, you know, I think the rules prescribe
20  different calendar methods and I think they prescribed a
21  different calendar method potential for a voter ID bill.
22        Q.  But would you agree that 5.11(d) put voter ID
23  legislation in a special category?
24        A.  I think the Senate decided to allow voter ID
25  legislation to be considered by a majority vote, if it

186

1  chose to do so.
2         Q.  And that rule allowing that was adopted by a
3  majority of senators, is that accurate?
4         A.  Yes.
5         Q.  Do senators have to be present on the floor in
6  order to vote on a bill?
7         A.  Generally, yes.  Although, to be present, they
8  can be adjacent to the floor, they can be in a gallery,
9  they can be adjacent to a gallery; so they may not
10  visually actually be seen right there but they are --
11  they are considered present for voting purposes if they
12  are -- you know, basically around, they are either in
13  the chamber or adjacent to it, yes.
14        Q.  Do senators ever vote when they are adjacent to
15  the chamber?
16        A.  Yes.
17        Q.  Does that happen frequently?
18        A.  Yes.
19        Q.  And just as a general matter, what are the
20  reasons for allowing them to do that?
21        A.  You know, I -- we frequently work through the
22  day and frequently work through lunch.  There is a
23  lounge where members can go have lunch, it is adjacent
24  to the chamber, so they can vote from there if they are
25  having lunch.  Also, I think it is considered that there

187

1  is, you know, when we are in session, there is a lot of
2  important activity surrounding legislation occurring
3  sometimes, you know, members may be meeting with
4  constituents in the hallway.  Because -- because we have
5  limited access to the chamber itself, I think the Senate
6  rules contemplate that, it may be necessary to allow a
7  member to vote when they are close by but not
8  necessarily in the chamber.
9         Q.  Is there an outer boundary on what's considered
10  close by?
11        A.  You know, I think that we -- first of all, I
12  should say that, they can vote if they are in the
13  building and not close to the chamber, as long as we
14  actually accurately know they are voting and they are
15  giving it to us, it doesn't change the outcome.  But if
16  we are on a particular bill and the vote is very close,
17  we would not consider a member's vote if they are not
18  where we could actually hear their vote or see them or
19  have some sort of knowledge that they are there.
20        Q.  I see.
21        A.  Yeah.
22        Q.  One thing I forgot to ask you.  Do you know
23  what day the 2009 or -- sorry, let me back up a second.
24        Rule 5.11 was included in the 2011 rules
25  as well; is that correct?

188

1         A.  Yes.  It was the same as in 2009.
2         Q.  Do you know what day the 2011 rules were
3  adopted?  I think one of the exhibits might help you.
4         A.  Okay.  That's great.
5         Q.  I think one of the exhibits was -- now I can't
6  tell.  I think Exhibit 15 there earlier today.  I think
7  it might be on the front page.
8         A.  So based on the exhibit before me, it appears
9  that the Senate rules were adopted on January 19th,
10  2011.
11        Q.  Do you happen to know what day the Governor
12  issued his emergency designation for voter
13  identification?
14        A.  I don't remember the specific day.
15        Q.  Do you remember if it was before or after the
16  adoption of the Senate rules?
17        A.  I think it was after.
18        Q.  So at the time that the Senate rules were
19  passed, there was no -- there had been no public
20  announcement, yet, that there would be emergency
21  designation for voter ID legislation?
22        A.  I really don't know if the Governor might have
23  made any public statements about his emergency
24  declarations at all.
25        Q.  And turning your attention again to Rule



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

189

1  5.11(d), does that rule -- I will wait until you're
2  there.  I think, actually, it is in that exhibit you
3  were just looking at, 15.
4      A.  Okay.  For that particular.
5      Q.  Yeah.
6      A.  All right.
7      Q.  Do you have it?
8      A.  Yes, I do.  Uh-huh.
9      Q.  Does that rule require the Governor for to -- I
10 am sorry, the Lieutenant Governor to refer voter
11 identification legislation to the Committee of the
12 Whole?
13     A.  No, it doesn't.
14     Q.  Do you know if any of the rules require the
15 Governor to refer voter ID legislation to the Committee
16 of the Whole?
17     A.  I don't.
18         MR. FREDERICK:  Objection, assumes facts
19 not in evidence.
20         You may answer.
21     A.  No.
22     Q.  (By Ms. Berkower)  You don't know or they do
23 not?
24     A.  I am not aware of any rules that would require
25 the Lieutenant Governor to make a referral to the

---

190

1  Committee of the Whole.
2      Q.  So that would still be within the Lieutenant
3  Governor's discretion?
4      A.  Yes, for purposes of his referral.
5      Q.  Is there more?
6      A.  Well, I think I mentioned and testified
7  previously that the Senate could choose to commit a bill
8  to the Committee of the Whole --
9      Q.  I see.
10     A.  -- on its own.
11     Q.  But barring that circumstance, it would be
12 within Lieutenant Governor's discretion to refer the
13 bill to the Committee of the Whole, if he saw fit?
14     A.  Yes.  The rule authorize the Lieutenant
15 Governor to refer bills to committee.
16     Q.  And this is something I have actually wondered
17 for a long time and had been looking forward to asking
18 you.
19         When a bill -- can you explain the
20 difference between a vote in the Committee of the Whole
21 and a vote on the Senate Floor?  Because I know all the
22 senators are involved in the Committee of the Whole.
23 But I am a little unclear, procedurally, on exactly what
24 the differences are and how all that works?
25         MR. FREDERICK:  Object as vague, but you

---

191

1  may answer.
2      Q.  (By Ms. Berkower)  Do you understand what I am
3  asking about?
4      A.  I think so.  In this case, the Committee of the
5  Whole -- the Committee of the Whole is a method by which
6  the Senate can consider things informally, I think I
7  have stated that before.
8          Its vote in Committee of the Whole is, if
9  it chooses to vote, and it may not.  Really the
10 Committee of the Whole could do -- you know, could act
11 in different ways.  But really the Committee of the
12 Whole is for informal debate and deliberation and it can
13 make recommendations to the full Senate on a piece of
14 legislation or an investigation, you know, I think it is
15 heard expulsion one time.  It is an informal meeting.
16         The proceedings of the Committee of the
17 Whole aren't kept in the Senate Journal.  The Senate
18 Journal only shows, generally, the Senate resolved
19 itself into the Committee of the Whole.  Committee of
20 the Whole is a meeting of the Senate in committee but it
21 is not in session.
22     Q.  Okay.
23     A.  But it is meeting.
24     Q.  So what's the practical effect of a vote -- of
25 voting a bill out of the Committee of the Whole?

---

192

1      A.  Well, I think that we have -- we do have a
2  constitutional requirement and a Senate requirement that
3  bills have to have been reported from the committee.  So
4  a bill being heard in the Committee of the Whole would
5  satisfy that requirement, that constitutional
6  requirement, and also the requirement in the Senate
7  Rules.  So, you know, in that sense, that's a practical
8  effect.
9          If it -- if it doesn't move a bill forward
10 then the Senate would have no way of further acting on
11 that particular piece of legislation on second and third
12 readings, as required by the Constitution.
13     Q.  It was as though it had died in committee?
14     A.  That's right.  Now there could be other ways to
15 revive it, but, yes, that would be the effect.
16     Q.  So once the Committee of the Whole votes on a
17 bill, it still has to be voted on again to be passed, is
18 that accurate?
19     A.  Yes.  Because the Constitution requires three
20 readings, so the Senate, as a body would have to
21 consider it on second and third reading before it can
22 proceed to the House.
23     Q.  As a practical matter, though, does it in any
24 way short circuit the process in that all the members
25 have already voted, so it becomes more form over

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

193

1 substance when it actually is voted on for final
2 passage?
3      A.  I don't think it short circuits it.  It
4 certainly, as I stated previously, you know, it --
5 because all the members can participate in the Committee
6 of the Whole and you would -- the Senate itself, because
7 it is a member of the Committee of the Whole in its
8 actual meeting would be aware of issues related to the
9 bill, you know, so it would have a greater knowledge of
10 a piece of legislation if it's gone through Committee of
11 the Whole than if it had gone through a different
12 committee just because every member is a member of the
13 Committee of the Whole.
14      Q.  Since every member has already voted on it,
15 though, would it be more form over substance when the
16 bill goes for a final vote?
17          MR. FREDERICK:  Objection, vague.
18 Objection, calls for speculation.
19          You may answer.
20      A.  No.  I wouldn't say it is more form over
21 substance at all.
22      Q.  (By Ms. Berkower)  Do you know if circumstances
23 in which legislator -- senators have ever changed their
24 vote between a vote in the Committee of the Whole and a
25 vote for final passage?

---

194

1      A.  I -- I can't recall anything specific but I am
2 sure that that's happened.  Just sheer logic would tell
3 me it happened and been just in the last 30 years,
4 probably, close to 200 bills that have gone through the
5 Committee of the Whole.  So it is extremely likely that
6 someone might have changed their vote.
7      Q.  Is there further debate on the bill once it
8 comes out of the Committee of the Whole?
9      A.  Yes.  It's subject to the rules of the Senate
10 for debate on second and third reading.
11      Q.  Okay.  Thank you.
12          Under the Senate rules, are there
13 procedural stalling or delay tactics available to
14 senators?
15      A.  Well, I think under any parliamentary process,
16 there are -- there are, you know, ways of -- I think,
17 you know, if you avail yourself of the rights that you
18 have under the Senate rules, certainly, and you can slow
19 down legislation.
20      Q.  Can you name just a few examples of what you
21 mean by tactics to slow down legislation?
22          MR. FREDERICK:  Object to the extent it
23 mischaracterizes the testimony.
24          You may answer.
25      A.  Tactics to slow down.  Well, I think -- you

---

195

1 know -- if perhaps there is a procedural flaw in a bill
2 as it was considered in committee and a member is aware
3 of it and calls a point of order, and the point of order
4 is sustained, to the extent that the remedy for the
5 point of order might delay a bill temporarily, that
6 would be one tactic.  You know, I think certainly could
7 have a lot of debate on a bill.  You can plan a lot of
8 debate.  There may be the difference between one hour
9 versus 10 hours or 30 hours.
10      Q.  Do you think, as a general matter, the
11 two-thirds requirement to hear bills out of order slows
12 down those bill's consideration?
13      A.  Slows them down.  It can, but it can also speed
14 it up.
15      Q.  When would it speed it up?
16      A.  Well, for example, as opposed to a bill -- in
17 the Senate we can have a bill that's on both calendars,
18 could be in the Regular Order of Business in the local
19 calendar.  And we frequently have a case where the local
20 calendar is set for the next day and there is a bill on
21 it, and you know, maybe we are at a point in our session
22 where we are waiting on some amendments for another
23 bill, we don't have much to do, and a member could
24 suspend Regular Order of Business to take that bill up.
25 And in that case -- at that point, it would pass the

---

196

1 bill more quickly than if it had waited for a bill to
2 come up on a local calendar the next day.
3      Q.  For controversial pieces of legislation, as a
4 general matter, does a two-thirds majority requirement
5 to hear bills out of order slow down consideration of
6 those bills?
7      A.  For controversial bills?
8      Q.  Yes.
9      A.  First of all, it is said that there is not
10 necessarily a requirement on all bills.
11          Does it slow down them down?  If there is
12 opposition and that opposition becomes known, you know,
13 at that point when it is on the calendar and members
14 have to deliberate to work out some differences, yes, it
15 could slow it down.
16          MS. BERKOWER:  I think, Matt, can we take
17 a five minute break and then I am hoping after that I
18 will be able to more or less wrap up.
19          MR. FREDERICK:  Yeah, sure.
20          MS. BERKOWER:  Okay.  Off the record,
21 please.
22          (Brief recess.)
23      Q.  (By Ms. Berkower)  So I have a few more
24 questions about the 2009 rules that were adopted by the
25 Senate, which we have talked about a lot today.  And I

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

197

1   think you said before and correct me if I am wrong, that
2   there is no requirement to suspend the two-thirds
3   majority voting rule to refer a bill to the Committee of
4   the Whole, is that accurate?
5       A.  Right.  The Lieutenant Governor has the
6   authority to refer bills directly to a committee, it
7   doesn't require a motion by the body.
8       Q.  There is no, like, implicit connection between
9   the two-thirds -- between any vote of any sort and
10  referral of a bill to the Committee of the Whole.
11      A.  I --
12      Q.  The rules don't require it.
13      A.  Right.
14          MR. FREDERICK:  Objection, vague.
15          You may answer.
16      A.  The rules just authorize the Lieutenant
17  Governor to refer bills.
18      Q.  (By Ms. Berkower)  Rule 5.11(d) does
19  describe -- well, turning you attention back to it.  I
20  think you had that as Exhibit 15 from the Texas League.
21      A.  Yes.
22          MR. FREDERICK:  I am sorry.  Are we
23  talking about 2009?
24          MS. BERKOWER:  2011.
25          MR. FREDERICK:  Okay.

198

1           MS. BERKOWER:  Yes.
2       Q.  (By Ms. Berkower)  So that Rule 5.11(d), as we
3   have discussed at great length, does allow voter ID
4   legislation to be set as a special order based on a
5   majority vote.  Is that an accurate summary of the rule?
6       A.  Yes.
7       Q.  But it also mentions the Committee of the Whole
8   Senate; is that correct?
9       A.  Yes.
10      Q.  Do you recall any discussion of why the
11  Committee of the Whole Senate was included in this rule?
12          MR. FREDERICK:  Object on the basis of
13  legislative privilege and caution you that -- caution
14  you not to reveal any privileged communications about
15  the reason for any part of this rule.  As to the
16  question of whether or not you remember any
17  communications, you may answer that question.
18      A.  There were communications, yes.  I think the
19  debate would probably reveal why that was included.
20      Q.  Do you recall if that was part of -- if Senator
21  Williams raised that point as part of the public record
22  of that debate?
23      A.  I think he -- I think he probably did.  I can't
24  recall what he would have said exactly.
25      Q.  Do you recall if part of the reason he gave was

199

1   that the whole Senate should be present to hear debate
2   on a bill of this nature?
3       A.  He might have said that.  I don't know if he
4   would have phrased it that way but --
5       Q.  Well --
6       A.  I think he -- you know, I shouldn't speculate,
7   I am --
8       Q.  I think you had articulated previously that one
9   of the benefits of the Committee of the Whole Senate is
10  all the senators are present to hear all the evidence
11  and debate in a more informal setting; is that accurate?
12      A.  Yes.
13      Q.  Do you remember if that was one of the reasons
14  that Senator Williams gave for including the Committee
15  of the Whole in this rule?
16          MR. FREDERICK:  Is your question limited
17  to --
18          MS. BERKOWER:  Public record.
19          MR. FREDERICK:  -- reasons -- okay.
20      A.  Probably so.  I think if he had a discussion
21  about Committee of the Whole, he would have said that,
22  because that's how the Senate, the Committee of the
23  Whole has been used in the Senate.
24      Q.  (By Ms. Berkower)  And with regard to the
25  purpose of suspending the two-thirds rule for this type

200

1   of legislation, do you recall if part of the reason he
2   gave was that the issue of voter ID legislation was a
3   divisive issue?
4           MR. FREDERICK:  Object, assumes facts not
5   in evidence.  But you may answer.
6       A.  I don't recall how he would have characterized
7   the issue.
8       Q.  Do you remember if anyone, as part of the
9   public debate over the rules, articulated a need to
10  suspend the two-thirds rule because the issue of voter
11  ID was controversial?
12          MR. FREDERICK:  Object, assumes facts not
13  in evidence.
14          You may answer.
15      A.  I -- I don't remember anybody articulating
16  that -- that that way, I don't remember.
17      Q.  Okay.
18          And Matt, I think you mentioned, you
19  cautioned the witness concerning issues of privilege.
20          Can you explain the basis for the
21  legislative privilege for the Parliamentarian?
22          MR. FREDERICK:  How so?  I am sorry.
23  Sorry.  Put that down.
24          MS. BERKOWER:  That's okay.
25          What is the basis for your assertion of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 201

1 legislative privilege for the Parliamentarian in the
2 Senate?
3         MR. FREDERICK:  She is an officer.  She or
4 the Parliamentarian, generally, is an officer of the
5 Senate.
6         The purpose of the Parliamentarian is to
7 provide advice to senators on parliamentary procedure
8 and legislative acts including bills and the Senate
9 rules.  That's within the basic legislative privilege.
10        MS. BERKOWER:  Okay.  So the -- would it
11 be accurate for me to say that it is not based on the
12 privilege of any other legislator?
13        MR. FREDERICK:  I don't think so.  I mean,
14 no, I wouldn't say that.
15        MS. BERKOWER:  Is the privilege hers to
16 assert or is it other legis -- is it based on other
17 legislators as we have discussed with regard to, say,
18 staff members?
19        MR. FREDERICK:  You know, I can't -- I am
20 not prepared to take a firm position on that right now.
21 I --
22        MS. BERKOWER:  Okay.  That wasn't my
23 intent.
24        MR. FREDERICK:  Okay.  Yeah.
25        MS. BERKOWER:  That's fine.

## 202

1         MR. FREDERICK:  It is a fair question.
2         MS. BERKOWER:  We can move on.
3         MR. FREDERICK:  Yeah.
4     Q.  (By Ms. Berkower)  Okay.  Does the Lieutenant
5 Governor have any input into the rules that the Senate
6 passes every session, at the start of every session?
7         MR. FREDERICK:  Object, asked and
8 answered.
9         You may answer.
10    A.  Sometimes, yes; sometimes, no.
11    Q.  Do you know if he had any input into the rules
12 passed for the 2009 or 2011 legislative sessions?
13    A.  Yes.
14    Q.  I should have been more specific.
15        Do you know if he had input into the rules
16 in 2009?
17    A.  Yes.
18    Q.  Did he have input into the rules in 2011?
19    A.  Yes, he did.
20    Q.  I don't want to tread on areas of privilege.
21 But can you say if his input into the rules is
22 substantive?
23        MR. FREDERICK:  I am going to object that
24 this calls for a legal conclusion.  I, also, think it's
25 getting into matters of legislative privilege, so I

## 203

1 think I am going to instruct the witness not to answer.
2     Q.  Are you following his advice?
3     A.  Yes.
4     Q.  Okay.  I am only asking for the record for
5 that.
6         MR. FREDERICK:  Can I ask:  Do you plan to
7 ask a lot of privilege related questions for the record?
8         MS. BERKOWER:  Oh, no.
9         MR. FREDERICK:  Okay.  Good.
10        MS. BERKOWER:  Oh, no.  No.  I am trying
11 to do my best to stay within the Court's orders but I
12 know that there are some --
13        MR. FREDERICK:  Sure.
14        MS. BERKOWER:  -- questions that you still
15 may find objectionable, that's all.
16        MR. FREDERICK:  I understand.  And I
17 recognize that you have been cautious to do that.
18        MS. BERKOWER:  We are a different place
19 than we were two weeks ago, Matt.
20    Q.  (By Ms. Berkower)  Are you familiar with any
21 rules concerning the amount of notice given to senators
22 before committee hearings?
23    A.  Yes.
24    Q.  What are those rules?
25    A.  Depends on the kind of hearing that you have.

## 204

1 But for standing committees and special committees, the
2 committee is to meet outside of its regular time,
3 although the committees usually comply with this
4 anyways.  They are required to give a 24-hour notice to
5 the members that that committee meeting is going to take
6 place.  If they are going to have a public hearing on a
7 bill, they are to give a -- they are required to give a
8 24-hour notice of a public hearing on a particular bill.
9     Q.  Are there any special rules concerning notice
10 given for meetings of committee -- as the Committee of
11 the Whole?
12    A.  No.  The Senate itself, every time that the
13 Committee of the Whole is convened, determines the
14 procedures for which the Committee of the Whole use
15 outside of what might be prescribed in Article XIII.
16    Q.  When -- are those rules about notice a baseline
17 that may -- sorry, I will rephrase that.
18        Do committees ever give more than the
19 minimum amount of notice before a hearing?
20    A.  Yes.
21    Q.  Why would they do that?
22        MR. FREDERICK:  Objection, calls for
23 speculation.  Also, object on privilege to the extent it
24 calls for anyone's subjective motivation.  If you can
25 answer without revealing that, you can do so.


Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Karina Casari Davis                                              June 15, 2012

---

### 205

1    A.  You know, I think -- I think if they know ahead
2    of time, they might post a bill or a hearing sooner.
3    You know, I think that's largely dependent on their work
4    schedule and, you know, whether they have -- how -- for
5    one thing, you know, when an author would have requested
6    to have his bill heard, you know, if they are planning a
7    meeting for Tuesday and a member, you know, asked Monday
8    morning, it might be scheduled Monday morning.  If they
9    asked Friday, it just depends on when they schedule and
10   their work schedule.
11       Q.  Is more than the minimum amount of notice ever
12   given to senators so that they can prepare for the
13   hearing, like, by getting witnesses or scheduling --
14   scheduling purposes like that?
15       A.  Members other than the author?  Are you asking
16   me about any particular members?
17       Q.  Well, I guess, does anyone ever get more notice
18   than the minimum amount of notice?
19       A.  Yes.
20       Q.  Who is given more than the minimum amount of
21   notice?
22           MR. FREDERICK:  Objection, vague.
23           You may answer.
24       A.  The members in the public are given notice
25   whenever the Bill is posted, and that -- you know,

---

### 206

1    certainly 24 hours is the minimum.  It's not a maximum.
2    Could be more.  It could be less if the rules are
3    suspended and that happens quite a bit.
4        Q.  Is it customary, though, if it is anticipated
5    that a particular hearing may require witnesses to give
6    more than 24 hours notice?
7        A.  Yes, I think so.  If they indeed have the time
8    to do that procedurally, sometimes they have no choice.
9        Q.  What about the Committee of the Whole, is it
10   customary to give more than the minimum amount of notice
11   for those hearings?
12       A.  I think on a bill, probably more than 24 hours
13   would be the case.  You know, for the simple reason that
14   it involves a lot more people, so that's probably
15   likely.
16       Q.  In your memory of instances in which the
17   Committee of the Whole has met, do you remember how much
18   notice was provided of those hearings?
19       A.  I don't remember, no.
20       Q.  Do you remember if any senators --
21       A.  I am sorry.
22       Q.  Oh.
23       A.  I should rephrase that.  I do know -- I think
24   when you were asking your question, I was thinking
25   outside of voter ID, I don't know why.

---

### 207

1        Q.  Oh.
2        A.  So I do have some recollection for voter ID
3    for -- just because it was last session and it is more
4    fresh in my memory, I don't really remember other
5    instances.
6        Q.  Do you remember -- so you're saying you do --
7        A.  I do remember for 2011, I do.
8        Q.  How much notice was given?
9        A.  For the public hearing portion of it which
10   would have occurred on a Tuesday, so the notice for
11   public hearing, and we refer to public hearings -- it is
12   a little bit of a term of art.  But if we call something
13   a public hearing, it is the hearing at which testimony
14   will be taken from the public.  Because I think we did
15   have -- I think the Committee of the Whole did meet that
16   Monday, also.  But I think both hearings were noticed on
17   Friday morning previous to the Monday and Tuesday.
18       Q.  In your view, is that -- was that an unusual
19   amount of notice?
20       A.  I think -- I think that's a typical amount of
21   notice for a bill to be considered by committee on a
22   Tuesday.  I think it's very, very typical.  When I was
23   Committee Director and we had Tuesday hearings, we
24   almost always posted on Friday afternoon.  And I think a
25   lot of our -- a lot -- not all, I mean, there are

---

### 208

1    particularly smaller committees, you know, will probably
2    have a better idea of their agenda.  But a lot of our
3    committees that have hearings on Tuesday, Tuesdays post
4    on Fridays.
5        Q.  Would you view it as typical even for a larger
6    committee like the Committee of the Whole?
7        A.  I think so, yes.  I think that's typical.
8        Q.  Do you remember if any senators complained
9    about the amount of notice given for the Committee of
10   the Whole hearing in 2011?
11       A.  Yes, I do.
12       Q.  Who complained?
13       A.  I particularly remember Senator Van de Putte
14   issuing a letter.  It may have been addressed to Senator
15   Duncan or the Lieutenant Governor, I don't remember, but
16   I remember her writing a letter complaining of the
17   notice.  Or I shouldn't say "complaining," but concerned
18   about the notice.
19       Q.  Actually have the letter if it would help you
20   remember.
21       A.  Well, I -- that's what I remember.
22       Q.  Okay.  Well, let me introduce it as an exhibit
23   and then you can take a look at it.
24       A.  Okay.
25       Q.  I think this was previously Exhibit 80 in

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 209

1  another deposition.
2      (Exhibit No. 80 previously marked.)
3      Q.  Did you have a chance to review it?
4      A.  Yes, I did.
5      Q.  Did this refresh your memory as to Ms. --
6  Senator Van de Putte's notice given about that hearing?
7      A.  Yes.
8      Q.  Who makes the decision about when to give
9  notice for meetings of the Committee of the Whole?
10     A.  I think giving notice for a hearing for the
11 Committee of the Whole is a little bit difficult
12 because, unlike a regular committee, the chairman of the
13 committee can't just decide that the committee is going
14 to meet at certain time.  The Committee of the Whole
15 process requires that the Senate itself resolve in the
16 Committee of the Whole, it is the only way to actually
17 be convened.  So it would be by a vote of the Senate.
18 So to the extent that notice is provided in the public
19 of a hearing, it takes someone and likely, in this case,
20 the Lieutenant Governor had made the decision that
21 Senator Duncan would be appointed the Chair of the
22 committee.  So I think Senator Duncan, in consultation
23 with the Lieutenant Governor, had anticipated and
24 decided that the committee would meet on Monday and
25 Tuesday.  And pursuant to that plan, which is still

## 210

1  subject to Senate approval, because only the Committee
2  of the Whole can convene through a Senate action,
3  Senator Duncan, at that point, made the decision when it
4  would happen.  In terms of how it was actually posted, I
5  don't remember what we would have put in the posting
6  exactly.
7      Q.  So to be clear, was it a notice that the Senate
8  would meet to resolve itself into the Committee of the
9  Whole?
10     A.  Yes.  But, no.  Well, the Senate wouldn't have
11 had to give anyone notice to that, but to have a public
12 hearing --
13     Q.  Uh-huh.
14     A.  -- the Senate would want to have the
15 participation of a lot of people.  And so we would
16 have -- we -- the Senate availed itself of its regular
17 committee posting mechanism to get the notice out to the
18 public that there would be a hearing on the bill and the
19 Committee of the Whole on Tuesday, on that Tuesday.
20     Q.  And based on what you just explained, is it
21 accurate to say that the scheduling of that was Senator
22 Duncan and Lieutenant Governor Dewhurst made that
23 decision?
24     A.  Well, I -- yes.  You know, it would have been
25 in -- probably in consultation -- yes, they would have

## 211

1  made that decision.
2      Q.  Do you see the -- in the second paragraph,
3  Senator Van de Putte says that, the Lieutenant Governor
4  waited until very late in the day Thursday to deliver a
5  letter to senators, literally slipping it under most
6  office doors after hours, giving notice of the Committee
7  of the Whole hearing.
8      Do you see that portion?
9      A.  Yes.
10     Q.  Do you know if that's, in fact, how notice was
11 delivered to some senators?
12     A.  Well, I think that letter was a -- a letter
13 from the Lieutenant Governor indicating his intention to
14 appoint Senator Duncan as Chair of the Committee of the
15 Whole.  I don't remember if it -- how much more detail
16 it gave about when the public hearing would be had.  It
17 wouldn't have served as official notice.  I think, at
18 that point, it would have been more of a courtesy notice
19 in an attempt to get the information to members as
20 quickly as possible.
21     Q.  Where would the official notice have come from?
22     A.  Well, again, Committee of the Whole has to
23 choose to resolve itself, so all the Lieutenant Governor
24 at this point can do is give an indication to members
25 that, if they so choose to convene the Committee of the

## 212

1  Whole, he will appoint a certain person, that's what the
2  rules allow.  And as leadership of the Senate and
3  with -- in consultation with Senator Duncan, they, of
4  course, had planned when the best time for the Senate --
5  you know, we would have to take into consideration when
6  the Senate was coming back in, things like that.  So you
7  would have logistical issues.  There is not a
8  requirement in the rules for any kind of notice to be
9  given because the members choose to resolve themselves.
10     So the Lieutenant Governor issued a letter
11 out of courtesy to indicate to the Senate what his
12 thinking on the timing of the Committee of the Whole
13 was, even though it is their decision.  He issued the
14 letter to give them the notice as soon as he could.  And
15 I believe the Governor had made a declaration of an
16 emergency for voter ID that day, so that was very quick
17 notice.  And probably we weren't able to finalize a
18 posting of the official sort that we might do for --
19 that we would do for public hearing until, you know, the
20 next morning.  So I think that was an attempt by the
21 Lieutenant Governor to communicate information earlier.
22     Q.  I see.  In prior years, when the Committee of
23 the Whole -- when this type of committee -- when this
24 type of procedural -- well, in prior -- you said the
25 Lieutenant Governor sort of had -- the rules don't



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 213

1    specifically provide for a committee hearing or
2    procedures to hold the committee hearing, they have to
3    resolve themselves.  And the Lieutenant Governor, is it
4    fair to say, he plays a role in the timing of that
5    because he is the President of the Senate -- actually, I
6    will withdraw that.
7              I guess what I am trying to ask, in prior
8    years, do you know if the Lieutenant Governor gave more
9    notice of his thinking concerning when the Senate would
10   resolve itself into the Committee of the Whole?
11       A.  I think a notice was given in 2009 of some
12   sort.  I have a recollection of a letter, and I don't
13   remember if it was from the Lieutenant Governor, I think
14   it was.  It is possible that it was from Senator Duncan,
15   I just -- I remember a letter.
16       Q.  Do you remember if there was more notice
17   provided by that letter than by the letter referenced in
18   this exhibit?
19       A.  For the public hearing or for the initial
20   meeting or either, I guess.
21       Q.  Either.
22       A.  I don't remember how much time.
23       Q.  Okay.  Now, turning your attention back to
24   exhibit, I think it was 15, the bill history for Senate
25   Bill 14.

## 214

1        A.  Uh-huh.
2        Q.  No.
3        A.  Oh, the bill history for Bill 14.
4        Q.  Yes.  Oh, it is this one, 17.
5        A.  Okay.
6        Q.  There you go.
7              From the first reading -- well, how many
8    days -- based on this exhibit, can you tell how many
9    days there were between the date on which Senate Bill 14
10   was filed and the date in which it passed the Senate?
11       A.  I think earlier, we had said for the record
12   that that was 14 days and it appears to be, based on
13   Adam's math and my math, it would be 14 days.
14       Q.  And how many days between when it was read for
15   the first time and when it was passed?
16       A.  Two days.
17       Q.  In your experience as Parliamentarian, how
18   frequently is a bill passed in that short of a time
19   span?
20       A.  I would say it is not frequent but it certainly
21   has happened enough times for me to remember that it's
22   been a lot more than one time.  I mean, I have seen
23   bills passed in 45 minutes from start to finish.  So, it
24   is not frequent but it certainly occurred quite a bit.
25       Q.  Do you recall if there was opposition to Senate

## 215

1    Bill 14 as expressed in the public record?
2        A.  Yes.
3        Q.  The other bills that you saw passed in
4    similarly short time span, do you recall if there was
5    opposition on the public record to those bills?
6              MR. FREDERICK:  Objection, vague.
7              You may answer.
8        A.  There could have been.  "Opposition" is a
9    fairly broad word, I think.
10       Q.  (By Ms. Berkower)  Well, do you recall, was
11   this bill passed solely on party lines?
12       A.  Yes, I think it was.
13       Q.  Do you recall any other bill that was passed in
14   this short of a time span that was passed purely on a
15   party line vote?
16       A.  It is possible.  I don't always -- I recall
17   this one because I was here and it was recent but I
18   wouldn't always look at votes in the journals with an
19   eye for what the party breakdown was, so I don't think I
20   can remember anything.
21       Q.  Okay.  In the time -- and you were present, you
22   said, I think earlier, for the debate of all of the
23   bills that Mr. Harris raised with you today, when they
24   were debated in the Senate, is that accurate?
25       A.  Yes.

## 216

1        Q.  You said you don't really remember much of the
2    substance of those debates, correct?
3        A.  That's true.  I am frequently -- I am present
4    for the debates.  I have to pay attention to make sure
5    that their discussions are germane but I am not often
6    engaged in listening to their arguments.
7        Q.  Do you recall anyone expressing, as part of the
8    public record, that -- well, before -- let me back up a
9    second.
10             Do you remember what the purpose of SB 14
11   was, as expressed in the public record?
12       A.  I don't think I can do it any more justice than
13   what they have done in the record.  I mean, I -- I can
14   read you the caption, that's their purpose, but I can't
15   do any justice to what their arguments or their state of
16   purposes were.
17       Q.  Do you recall if during the time that you were
18   present for these public debates, did you ever hear
19   anyone express that part of the purpose for these bills
20   was to prevent non-citizens from voting?
21       A.  If I was listening and I heard that, I would
22   remember, and I don't remember any of those statements
23   being made.
24       Q.  Okay.  And you said earlier today that you were
25   born abroad; is that correct?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 217

1     A.  Yes.
2     Q.  Are you a U.S. citizen now?
3     A.  Yes.
4     Q.  So you became a naturalized U.S. citizen at
5  some point in time?
6     A.  Yes.
7     Q.  Do you have a citizen -- excuse me -- a
8  citizenship certificate?
9     A.  Yeah, somewhere.  Yes, I do.
10    Q.  Does it have a photo on it?
11    A.  It has a photo of me when I was in high school.
12    Q.  Do you look the same as you looked in high
13  school?
14    A.  I look better.
15    Q.  Okay.  Have you ever had to get the photograph
16  retaken or renewed in any way?
17    A.  No.  No, I subsequently -- no, I haven't had
18  the need for using it.  I have got other forms of
19  identification.
20    Q.  Do you know if the certificate ever expires?
21    A.  I don't know.  If it has an expiration date on
22  the certificate.
23    Q.  I did not say that to make you run home and
24  check.
25        Okay.  But to be clear, you haven't had

## 218

1  the photograph retaken in the time that you originally
2  got the certificate?
3     A.  For the actual naturalization certificate, no.
4     Q.  So -- and we are getting more towards the end
5  here, promise.
6     MR. FREDERICK:  Okay.
7     Q.  (By Ms. Berkower)  You said that part of your
8  role as Parliamentarian, you work with amendments for
9  bills.
10    A.  Yes.
11    Q.  What is your role with amendments?
12    A.  I am responsible with some assistance,
13  obviously, thinking there can be a lot of amendments for
14  ordering amendments and correct monitoring order for
15  consideration by the body.
16        And if there is a -- defect in the
17  amendment that would be confusing for the body, maybe it
18  is not drafted correctly or it's drafted to a different
19  version of the bill, to the extent that I catch that on
20  review, I would be involved in attempting to correct
21  that, sometimes the corrections are easy.  You know, I
22  can change line numbers and page numbers.  Sometimes I
23  have to consult with the member or the staff person or
24  assistants would do that for me.  I am sometimes asked
25  to review the germaneness of amendments to legislation.

## 219

1  Sometimes I am asked to draft on the spot amendments to
2  amendments to help the members accomplish their
3  purposes.  Usually this would be, as I said, very on the
4  spot.
5     Q.  I meant to ask you a minute ago, and then we
6  will get back to the subject.  Are you a registered
7  voter here in Texas?
8     A.  Yes.
9     Q.  Are you aware of any instances in which
10  legis -- turning your attention back to amendments now,
11  sorry.
12        Are you aware of any instances where
13  legislation was presented with the understanding that no
14  amendments would be -- would be accepted?
15     MR. FREDERICK:  I am sorry.  Could you
16  repeat the question, please.
17     Q.  (By Ms. Berkower)  Are you aware of any
18  instances where legislation was presented where there
19  was an understanding that no amendments would be made or
20  accepted?
21     MR. FREDERICK:  I am going to object.
22  Object on vagueness.
23        I am, also, going to object on the basis
24  of privilege.  I think this asks you to communicate, as
25  I understand it, the mental impressions of legislators

## 220

1  so I would instruct you not to answer.
2     A.  I am going to take the advice of my counsel and
3  not answer the question.
4     MS. BERKOWER:  Okay.  Can we go off the
5  record a second.
6        (Brief pause.)
7     MS. BERKOWER:  So we just had -- I will
8  say, for the record, counsel and I just had a discussion
9  on this.  And it is my understanding that he is willing
10  to let me examine this witness on this document, is that
11  accurate?  Subject to any objections to specific
12  questions.
13     MR. FREDERICK:  Right.  As I have
14  explained to Ms. Berkower, the state objects to the
15  relevance of this exhibit, maintains that it has
16  absolutely no connection to this case.  However, for
17  purposes of this deposition, I don't -- we will not --
18  subject to that objection, we will not prevent
19  questioning on the document, you know, and obviously, we
20  don't intend to waive any later objections about a
21  specific question.
22     MS. BERKOWER:  Okay.  So this will be --
23     THE REPORTER:  18.
24     MS. BERKOWER:  Well, these are actually
25  Attorney General's exhibits and I am supposed to start



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

221

1    with 700 for this deposition, so can this be 700 please.
2            (Deposition Exhibit No. 700 marked.)
3    Q.  Can you review this, please.
4    A.  Yes.  Okay.
5    Q.  Do you know what this is?
6    A.  Yes.
7    Q.  What is it?
8    A.  It's an email from David Hanna, Attorney for
9    the Texas Legislative Council to me.
10   Q.  What's the date on the email?
11   A.  May 11th, 2011.
12   Q.  And what's the subject line on the email?
13   A.  "Pre-doing committee report."
14   Q.  Do you know what the subject is referring to?
15   A.  Yes.
16   Q.  What is it referring to?
17   A.  I had -- I am pretty sure I had called David
18   Hanna --
19           MR. FREDERICK:  Actually, I am going to
20   caution you here.
21           I would object to the discussion of the
22   content of any communication, including the substance of
23   this email, based on legislative privilege.  I
24   understand that there have been rulings in the case in
25   which this was introduced.  There has not been a waiver

---

222

1    of legislative privilege in this case, and so I am not
2    quite sure how to handle it.  I mean, at this point, I
3    am not really sure that it is possible for us to -- to
4    talk about this exhibit without getting into privilege
5    problems.
6            MS. BERKOWER:  Okay.
7            MR. FREDERICK:  Would it be possible, let
8    me just ask:  Is it possible for you to ask about the
9    subject matter, generally, the rules without revealing
10   the specific content of this communication?
11           MS. BERKOWER:  Yeah.  Why don't I do this.
12   Why don't I ask questions.  I think in other depositions
13   where -- where the testimony could potentially implicate
14   a thought processes that were asserted to be privileged,
15   the witness was allowed to testify about just the text
16   of the document in front of her as an Exhibit.
17           MR. FREDERICK:  Okay.
18           MS. BERKOWER:  And I can ask her general
19   questions about, that don't implicate any specific
20   communications, would that be acceptable to you?
21           THE WITNESS:  Would I be able to have a
22   discussion with my attorney about this?
23           MS. BERKOWER:  Yes.  We can finish talking
24   about this and then you can talk to him.
25           MR. FREDERICK:  Yeah.

---

223

1            THE WITNESS:  Well, some information --
2    you all, go ahead.
3            MS. BERKOWER:  If you want to talk to her
4    now, that's fine with me.
5            MR. FREDERICK:  Yeah.  I don't -- I don't
6    need to go back on our discussion.  I am having second
7    thoughts about whether this should be introduced as an
8    exhibit.  I actually ask at this time that we take this
9    exhibit out.
10           MS. BERKOWER:  Well, what about this,
11   though:  Could we treat this exhibit, since it has been
12   released to public -- and I have represented to you it
13   is represented on blogs, I think you're familiar with
14   that.  Can we treat this as though this is a public
15   statement and ask to extend the questions -- since the
16   questions have been allowed in depositions for this case
17   about public statements?
18           Do you understand what I mean?
19           MR. FREDERICK:  I do.  I do.
20           So can we go off the record?
21           MS. BERKOWER:  Yes.
22           MR. FREDERICK:  And let me talk to my
23   client for a second.
24           (Brief pause.)
25           MR. FREDERICK:  I have spoken to my client

---

224

1    about this.  And I have been reminded that this document
2    is subject not only to legislative privilege, but
3    Ms. Davis has an attorney-client relationship with
4    Mr. Hanna who is a lawyer who works for the Texas
5    Legislative Council.  And at the time that this document
6    was produced or released, or whatever, no one had
7    consulted with Ms. Davis, as the client, to see if she
8    was willing to waive her attorney-client privilege.
9    Regardless of what happened in redistricting, she has
10   not waived her attorney-client privilege over this
11   document.  To the extent that it was disclosed, it was
12   done without her consent as the client.  And I -- I
13   insist that we take this out of the deposition record
14   and that this not be introduced or discussed,
15   specifically.  I believe this is privileged.
16           MS. BERKOWER:  Can I ask one question.
17           MR. FREDERICK:  Yes.
18           MS. BERKOWER:  Who is Doug Davis?
19           MR. FREDERICK:  Doug Davis is a lawyer who
20   was employed by the Senate at the time, at the time that
21   this was raised.
22           MS. BERKOWER:  Would you -- are you
23   asserting that Karina Davis and Doug Davis have the same
24   attorney-client relationship with David Hanna?
25           MR. FREDERICK:  I am not sure.  I don't

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

225

1    know that it would be exactly the same, but they both
2    would have an attorney-client relationship, I am
3    confident of that.
4         MS. BERKOWER:  Are you confident that
5    their interests are aligned, to the extent that cc'ing
6    Doug Davis would not waive any privilege she had with
7    Mr. Hanna.
8         MR. FREDERICK:  Yes.
9         MS. BERKOWER:  And are you asserting,
10   also, that the disclosure of this document, I mean, I
11   think we all agree that legislative privilege and
12   attorney-client privilege are different in terms of
13   waiver.  And while someone else can't waive your
14   legislative privilege for you, someone else can waive
15   your attorney-client privilege for you.  So to the
16   extent that this was disclosed, you're still asserting
17   that attorney-client privilege covers it now that it's
18   been disclosed.
19        MR. FREDERICK:  Yeah.  I mean, you know, I
20   am not -- at this time, I am not prepared or willing to
21   debate the specifics of waiver.  But this is subject to
22   legislative privilege and attorney-client privilege.  It
23   has not been produced by the State in this litigation.
24   And to my knowledge, neither of the clients, nor the
25   holders of the legislative privilege have waived that

226

1    privilege, so.
2         Q.  (By Ms. Berkower)  To your knowledge, just to
3    flesh out the record a bit and I understand your
4    position on this.  Did Ms. Davis or Doug Davis -- and
5    you guys are not related in any way?
6         A.  Well, we are married.
7         Q.  Oh, you're married.  Okay.  -- okay.  Well,
8    another type of privilege.
9         MR. FREDERICK:  I will, yeah.  We haven't
10   talked about spousal privilege, yet.
11        MS. BERKOWER:  I don't know we would need
12   to in the context of this.  Is he a doctor by any
13   chance?
14        Okay.  Did either of the Davises learn
15   prior to today that this email had been disclosed?
16        MR. FREDERICK:  I don't know.
17        I have not -- I have not spoken,
18   specifically, to Ms. Davis or to Mr. Davis about their
19   knowledge of whether it was disclosed.
20        MS. BERKOWER:  Do you know if there was
21   any effort made prior to today to get this -- I don't
22   know what the right term for it is -- clawed back by the
23   State, I guess.
24        MR. FREDERICK:  I don't know.
25        MS. BERKOWER:  So to the extent that

227

1    attorney-client privilege is being asserted of this
2    document, is it fair to say today is, to your knowledge,
3    is the first day to which it is being asserted?
4         MR. FREDERICK:  Actually, it is probably
5    not.  I can't say for sure this is the first day it is
6    being asserted.  It is entirely possible it was asserted
7    previously.  And I understand your questions about
8    privilege and waiver.
9         What I am asking is:  Given that this is
10   not a document that's been produced in this case, it
11   does not have anything to do with Senate Bill 14, I
12   don't think there is any purpose in including this in
13   the record of this deposition or the case and I would
14   ask that we withdraw this is an exhibit.  If you like to
15   ask Ms. Davis about the procedures that are discussed in
16   this email, I have no objection to that but I cannot
17   consent to the inclusion of this as an exhibit in this
18   deposition.
19        MS. BERKOWER:  And to be clear, that's on
20   the basis of attorney-client privilege.
21        MR. FREDERICK:  And legislative privilege.
22        MS. BERKOWER:  So I understand the reason
23   why you are insisting on the withdrawal of this exhibit
24   on the basis of attorney-client privilege.  Can you
25   explain the -- your insistence on the withdrawal of this

228

1    exhibit on the basis of legislative privilege?
2         MR. FREDERICK:  What would -- sorry, what
3    would you like to me to explain?
4         MS. BERKOWER:  Well, do you feel this is
5    in some way improperly produced on the basis of
6    legislative privilege?
7         MR. FREDERICK:  To the extent it is being
8    produced in this case then, yes.  We have asserted
9    legislative privilege.  This is subject to legislative
10   privilege.
11        MS. BERKOWER:  Well, it is not -- I mean,
12   it is a trial exhibit in a district court case in
13   the District of D.C., so it is publicly available for
14   review by anybody.  So I am just trying to understand
15   how -- I am not saying you can't.  I am just trying to
16   understand your theory of asserting legislative
17   privilege over this document right now.
18        MR. FREDERICK:  At this point, I am
19   prepared to say only that we're asserting legislative
20   and attorney-client privilege.  I am not prepared to
21   debate attorney-client or legislative privilege with
22   this document.  I am asserting our strong objection
23   based on those privileges and the complete irrelevance
24   of this document to its introduction in this deposition.
25   I -- I really don't understand why we are looking at a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

229

1  document that was a document from the redistricting
2  case, it just doesn't have anything to do with this
3  case.
4           I am not objecting to you asking questions
5  about the subject matter, but I --
6      MS. BERKOWER:  Okay.
7      MR. FREDERICK:  I cannot -- I cannot
8  consent to this being disclosed in this case.
9      MS. BERKOWER:  Okay.  Well, I guess given
10  that you feel that this is a privileged -- this is
11  subject to privilege, I guess I will agree to withdraw
12  it not -- reserving our right to try and re-introduce
13  this at some other time when perhaps on some sort of
14  motion or just in the future, but out of abundance of
15  caution and given the direction we have received from
16  the Court in this case to be conscious of these
17  privileges, I will agree to that in this instance only.
18  Is that acceptable to you?
19      MR. FREDERICK:  Yes.  And I appreciate it
20  very much.  I understand, and I recognize that you have
21  arguments that you want to assert, I appreciate your
22  consideration.
23      MS. BERKOWER:  I think, though, based on
24  what you said, I am still going to ask her about some of
25  the subjects covered in the exhibit and you can object

---

230

1  as you see fit.  Do you want it back?
2      MR. FREDERICK:  No.  When you say, "the
3  subjects," does that mean you're going to discuss the
4  actual text of that exhibit?
5      MS. BERKOWER:  No.  I am going to ask her
6  about amendments and about preclearance and about her
7  procedures relating to those things.
8      MR. FREDERICK:  Yeah, subject to potential
9  objections but, sure, I understand.
10      Q.   (By Ms. Berkower)  Okay.  Are you ready?
11      A.   Yes.
12      Q.   Do you know what "preclearance" is?
13      A.   More or less, yes.
14      Q.   What is your understanding of "preclearance"?
15      A.   My understanding is that bills involving an
16  elections process, that certain states have to submit
17  laws for preclearance either to the Department of
18  Justice or through the District Court in DC before the
19  bills can be implemented in Texas.
20      Q.   Are those bills relating to certain subject
21  matters?
22      A.   Yes.  And I should be specific, under the
23  Voting Rights Act.
24      Q.   So are those election and voting related bills?
25      A.   Voting related bills.

---

231

1      Q.   To your knowledge, does the Senate consider the
2  preclearance process when it is making legislation?
3      A.   I think, generally speaking, the Senate
4  considers the preclearance process when it is
5  considering certain voting bills.
6      Q.   Do you remember the way in which the Senate
7  considered preclearance during its consideration of SB
8  14?
9      A.   I think, in general, the tenor of all of the
10  debate in consideration on Senate Bill 14, I think it is
11  clear by the public record that the members understood
12  the bill would be subject to preclearance and that they
13  took that seriously and went to great lengths to build a
14  record for that eventual process.
15      Q.   What pieces of the record do you think relate
16  to that process?
17      MR. FREDERICK:  Objection, vague.
18      Q.   Do you understand the question?
19      A.   I don't know that I can distinguish one part of
20  the record versus another part.
21      Q.   Well, what did the senators do, in your view,
22  that related to preclearance?  And I am asking as a
23  matter of the public record.
24      A.   I think they had a lot of discussions about the
25  record.  They submitted, especially, in the Committee of

---

232

1  the Whole and I think, potentially, on the Senate floor,
2  although can't remember very specifically whether in
3  2011, 2011 and 2009 how all this occurred.  But members
4  went to great lengths to submit lots of material for the
5  record, letters, exhibits, in general, and especially in
6  the Committee as a whole process, we were labeling items
7  that were submitted by all the members with exhibit
8  numbers which is not what the Senate would usually do
9  when it is considering bills.  So I think for me, as an
10  employee in that process, it was clear to me that the
11  members were building a record for preclearance or
12  potential litigation.
13      Q.   Do you ever seek legal advice about
14  preclearance?
15      A.   I may have.
16      Q.   Have you ever sought preclear -- advice
17  concerning preclearance in the contracts regarding the
18  voter ID legislation?
19      MR. FREDERICK:  I am going to object.  On
20  the basis of attorney-client privilege, to the extent
21  any such communication occurred, that would be subject
22  to privilege, so I am going to object.
23      MS. BERKOWER:  The fact of the
24  communication is subject to the privilege.  I think I am
25  trying to get at privilege log type questions here.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

233

1    Q.  (By Ms. Berkower)  Did you seek legal advice
2    about preclearance in the context of voter ID
3    legislation seems to me like an entry on a privilege
4    log.
5         MR. FREDERICK:  I think the question
6    requires the substance of the communication, so I stand
7    by my objection.
8         I would instruct you not to answer on the
9    basis of privilege.
10   Q.  (By Ms. Berkower)  Did you seek legal advice
11   concerning preclearance in 2011?
12        MR. FREDERICK:  To the extent that this is
13   a yes or no question, you may answer; but don't reveal
14   the substance of any communication between you and an
15   attorney.
16   A.  Yes.
17   Q.  (By Ms. Berkower)  Did you seek advice
18   concerning preclearance in 2012, legal advice, sorry?
19        MR. FREDERICK:  Going to object as vague.
20   Going to object to relevance.  I don't understand why we
21   are getting into attorney-client privilege, but that's
22   clearly where this is going.
23   A.  I will take the advice of my counsel and not
24   answer those questions.
25   Q.  Okay.  Well, in terms of relevance, she would

234

1    still have to answer today.  And I am not sure how, when
2    I asked, "Did you seek legal advice in 2011 about
3    preclearance," and then I asked the same question in
4    2012, how one would be an inappropriate question and one
5    would be an appropriate question.
6         MR. FREDERICK:  They are both
7    inappropriate questions.  I allowed the one because you
8    were making an effort to make a general statement.
9         MS. BERKOWER:  Okay.
10        MR. FREDERICK:  As to yes or no, whether
11   you sought legal advice about preclearance in 2012, you
12   may answer yes or no.  But beyond that, I will instruct
13   you not to answer on the basis of privilege.
14        THE WITNESS:  What was the last part of
15   your advice, I am sorry?
16        MR. FREDERICK:  You may answer yes or no
17   as to the specific question whether or not you sought
18   legal advice about a -- related to preclearance in 2012.
19   Beyond that, you may not -- I am instructing you not to
20   reveal the substance of any communication related to
21   legal advice.
22   A.  Yes.
23   Q.  Are there any procedures in the Senate for
24   preparing committee reports?
25   A.  Can you be more specific with your question?

235

1    There is -- committee reports are prepared.
2    Q.  Are they prepared pursuant to any rules in the
3    Senate, any of the Senate's rules?
4    A.  For a committee report to be in order on a
5    Senate Floor, it would have to comply with certain
6    rules.
7    Q.  What are those rules?
8         MR. FREDERICK:  Object to the form.
9         You may answer.
10   A.  Generally, if I may refer to the rules.
11   Q.  (By Ms. Berkower)  Yes.
12   A.  Generally, it is Rule 712.  And the Senate Rule
13   712 has a requirement on what printing a committee
14   report should include and there is a number of things
15   that may be required of bills depending on whether those
16   items exist.  And that's -- if there is other rules,
17   there may be some indirect advice, I can't recall
18   anything right now.  But the most specific rule on
19   committee reports is 712.
20   Q.  Are committees required to prepare committee
21   reports in advance of the committee meeting under the
22   rules?
23   A.  The way you characterize the question is a
24   little misleading.  I think there are components to a
25   committee report that exist at various times and

236

1    different parts of the committee report are being worked
2    on at different times.  And it isn't an indication of
3    whether the committee has actually taken action.  Some
4    things have to be prepared ahead of the committee's
5    consideration.  So there is not necessarily a sequential
6    requirement.
7    Q.  So you're saying that just as a logical matter,
8    to be prepared for the meeting, the member might need to
9    prepare part of the report ahead of time.
10        MR. FREDERICK:  Object to the extent
11   mischaracterizes the testimony.
12   A.  Well, I think, for example, a committee cannot
13   vote on a bill until it is in possession of the fiscal
14   note.  The LBB produces the fiscal note, has to have
15   certain amount of time to produce that fiscal note and
16   to analyze a bill.  And it is very customary practice
17   for the LBB to receive the request from the committee to
18   work on a committee -- on the fiscal note before the
19   bill sometimes is even set for hearing, maybe it has
20   already been set, or they may ask at the time that they
21   are setting.  So parts of the committee report are
22   produced, potentially, even before a Bill is set for
23   hearing.
24   Q.  Is an entire committee report prepared in its
25   entirety ever before the committee meets?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 237 | 239 |
|---|---|

**237**

1      MR. FREDERICK: Objection, relevance.
2  Objection, vague. You can answer.
3      A. Well, I think there is a form that's a standard
4  form that the committee clerk fills out indicating the
5  actions of the committee, that's absolutely prepared
6  ahead of time. The committee clerk might even have
7  already filled out information such as what the bill
8  number is and have it prepared so that can be filled out
9  after the committee takes its actions.
10     Q. (By Ms. Berkower) If a committee, are
11  amendments ever produced during a committee?
12     A. Yes.
13     Q. Are committee reports ever prepared in their
14  final form before amendments are introduced in a
15  committee hearing?
16     MR. FREDERICK: Objection, relevance.
17     A. Is a committee report produced -- ask your
18  question again, please.
19     Q. (By Ms. Berkower) Are committee reports ever
20  produced in their final form, created in their final
21  form prior to a committee hearing in which amendments
22  may be introduced to a bill?
23     MR. FREDERICK: Objection, relevance.
24     Q. (By Ms. Berkower) You may answer.
25     A. No.

**239**

1      MR. FREDERICK: Objection, relevance.
2  Objection, argumentative. Objection, calls for
3  speculation. And, also, object to the extent it seeks
4  the mental impressions or thought process of any of the
5  legislator.
6      A. I don't know.
7      Q. (By Ms. Berkower) Do you know of any
8  discussions in which -- whether or not a certain action
9  would look good for preclearance was ever raised?
10     MR. FREDERICK: Objection, vague.
11  Objection, to the extent it calls for you to reveal the
12  substance of privileged communications or legislators
13  thought processes. If you can answer without revealing
14  those, you may do so.
15     A. Can you ask the question again.
16     Q. Can you read it back, please.
17     (Last question read back.)
18     MR. FREDERICK: Objection, vague. Same
19  objection on privilege. Objection, calls for
20  speculation and relevance.
21     A. I think the Senate considered that its actions
22  would -- would be part of a preclearance process.
23     Q. (By Ms. Berkower) If senators were to have an
24  agreement that no amendments would be accepted for a
25  particular bill, do you think -- strike that.

| 238 | 240 |
|---|---|

**238**

1      Q. You don't know of any instance in which that's
2  occurred?
3      MR. FREDERICK: Same objection.
4      A. It wouldn't be possible.
5      Q. (By Ms. Berkower) Why would it not be
6  possible?
7      MR. FREDERICK: Objection, form.
8      A. Because the committee form indicating the
9  actions of the members could not possibly be filled out
10  ahead of time.
11     Q. How could they not be filled out ahead of time,
12  those committee forms?
13     A. Not in their completed state. The committee
14  form has to be signed by the clerk and by the chairman
15  of the committee. The votes by the members on a
16  particular bill have to be filled out on a form. The
17  committee report has to indicate the attachments
18  included with the committee report, whether there was a
19  fiscal note, whether there are amendments, whether there
20  is committee substitute, a form of the bill that's being
21  reported, so a committee report in its entirety could
22  not be produced ahead of a committee's action.
23     Q. Do you know if members of the Senate ever
24  choose not to do certain things in writing for fear of
25  creating a paper trail?

**240**

1      If it were the case that, for a
2  controversial piece of legislation, senators came to an
3  agreement that no amendments from the minority -- from
4  opponents to the bill would be permitted in advance of
5  consideration of those amendments, do you think that
6  would impact the preclearance process?
7      MR. FREDERICK: Objection. Calls for
8  speculation. Objection, calls for a legal conclusion.
9  Assumes facts not in evidence, relevance, argumentative.
10     MS. BERKOWER: You may answer.
11     A. I don't think senators can agree that
12  amendments are not permitted, so I would object to the
13  characterization of the question.
14     Q. (By Ms. Berkower) Representative Peña, are you
15  familiar with who he is?
16     A. More or less, he is a member of the House of
17  Representatives.
18     Q. During his deposition in this case, he
19  described SB 14 as, "a done deal."
20     Would you agree with that statement?
21     MR. FREDERICK: Objection, assumes facts
22  not in evidence, relevance.
23     A. No.
24     Q. (By Ms. Berkower) Why would you not agree with
25  that statement?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 241

1       MR. FREDERICK: Object to form, assumes
2 facts not in evidence, relevance.
3       Also, you know what, I am going to
4 instruct you not to answer on the basis of privilege.
5 This is calling for your thoughts or mental impressions
6 about pending legislation. So I instruct you not to
7 answer on the basis of privilege.
8     A. I will take my attorney's advice.
9     Q. (By Ms. Berkower) Isn't it true that you
10 received an email if your Attorney, David Hanna, on
11 Wednesday, May 11th, 2011.
12       MR. FREDERICK: Objection, relevance.
13 Objection, vague.
14     A. I probably did, given that you showed me a copy
15 of an email written that shows it was written to me on
16 that date.
17     Q. Isn't it true that that email contained advice
18 concerning the preclearance process?
19       MR. FREDERICK: Objection. Object. This
20 is asking for the substance of attorney-client privilege
21 communication. I instruct you not to answer.
22       MS. BERKOWER: I think that's a privilege
23 of a question.
24       MR. FREDERICK: No. I disagree. I will
25 instruct her not to answer.

### 242

1     Q. (By Ms. Berkower) At any time since the
2 passage of SB 14, have you come to believe that it was
3 passed with any discriminatory purpose?
4       MR. FREDERICK: Objection, relevance.
5     You can answer.
6     A. No.
7     Q. At any time since the passage of SB 14, have
8 you come to believe that it will have a retrogressive
9 effect on minority voters?
10       MR. FREDERICK: Objection, relevance.
11     A. No.
12     Q. (By Ms. Berkower) If you are called to trial,
13 will you testify that SB 14 has no discriminatory
14 purpose?
15       MR. FREDERICK: Object to the extent this
16 is asking her to tell you what she would testify about
17 at trial. I believe the question is improper. I would
18 object on relevance. Calls for speculation.
19       You can answer, if you can.
20     A. I don't think I can answer.
21     Q. (By Ms. Berkower) You can't answer because you
22 don't understand the question?
23     A. I don't know what I am going to think in three
24 or four weeks or whenever you would have a trial.
25     Q. Do you want to change any of the answers you

### 243

1 provided today for any reason?
2     A. Yes. I -- the very, very beginning of this
3 deposition, Adam had asked me about my employment
4 history and I had forgotten that when I worked for the
5 Senator in Waco, I had taken a brief amount of time off
6 from my State job to work on his campaign in a
7 fundraising capacity for him back in 1994, and I had
8 completely forgotten that I had done that for a
9 six-month time period and remembered. And I have
10 neglected, it was an oversight for me to mention it. I
11 just don't think about that, because it was a very short
12 duration. So I would like to add that to the record as
13 part of my answer to his question.
14     Q. (By Ms. Berkower) Okay. And getting back to
15 your answer to the question before that. You said you
16 weren't sure what you would think three or four weeks
17 from now. Is that an accurate summary of your answer?
18     A. I think so. I think the question asks for me
19 to speculate on what my answer would be in the future
20 and I think I would not like to speculate.
21     Q. Are you saying it is possible that evidence
22 that you -- or information that you obtained in the
23 interim time may change your view of whether SB 14 has a
24 discriminatory purpose?
25       MR. FREDERICK: Objection,

### 244

1 mischaracterizes the testimony. Calls for speculation,
2 relevance.
3     A. I am not saying that anything is possible. I
4 just don't know what I am going to think in a month, or
5 whenever, I am not even aware of the actual timeline for
6 this trial. So I -- you're asking me to speculate, and
7 I really haven't even given any thought to your
8 question. And I think your question would require a lot
9 of thought.
10     Q. (By Ms. Berkower) Well, then, I will ask.
11       Do you think today that SB 14 has
12 discriminatory purpose?
13       MR. FREDERICK: Objection, relevance.
14     A. I don't know.
15     Q. (By Ms. Berkower) Why don't you know?
16     A. I don't know enough about the legislation.
17 Based on what I heard in public debate, I would say the
18 answer is, no.
19     Q. But as of today, you're not sure?
20       MR. FREDERICK: Objection,
21 mischaracterizes the testimony. Objection, relevance.
22     A. I think you're asking me the purpose of a bill
23 and I -- you know, based on the stated purposes that I
24 have heard, I don't think there was a discriminatory
25 purpose.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

245

1    Q.  (By Ms. Berkower)  Sitting here today, do you
2    think the SB 14 has a discriminatory effect?
3        MR. FREDERICK:  Objection, relevance.
4        A.  I don't know enough about the legislation or
5    its effects to provide an answer; I don't know.
6        Q.  (By Ms. Berkower)  Is there anything else you
7    want to share?
8        A.  No, I don't think so.
9        MS. BERKOWER:  Okay.  Subject to the
10   resolution of any motions that might arise from this
11   deposition testimony, I am going to leave it open,
12   subject to those potential motions but otherwise I am
13   done on questioning this witness.
14       MR. FREDERICK:  Okay.  I have a brief
15   Direct Examination.
16       Could we go off the record for about five
17   minutes, take a quick break.
18       MS. BERKOWER:  Sure.
19       (Brief recess.)
20           EXAMINATION
21   BY MR. FREDERICK:
22       Q.  Good afternoon, Ms. Davis.
23       I have a brief Direct Examination.  You
24   understand that you are still under oath, correct?
25       A.  Yes.

246

1        Q.  Now, as Senate Parliamentarian, is one of your
2    job duties to provide advice on the Senate rules?
3        A.  Yes.
4        Q.  Is your job to provide advice regarding the
5    Senate rules to any senator who requests such advice?
6        A.  Yes.
7        Q.  Is it, also, part of your job to assist
8    senators with Senate procedure?
9        A.  Yes.
10       Q.  Is it common for you to discuss Senate
11   procedure regarding particular bills with senators?
12       A.  Yes, very common.
13       Q.  So is it common for you to discuss the timing
14   or the procedure of a particular Senate bill with
15   senators?
16       A.  Yes.
17       Q.  Can you estimate how frequently you discuss the
18   timing or procedure of a particular bill with senators?
19       A.  It's most of what I do every day on the Senate
20   floor is discuss the timing of bills, the procedures
21   related to how they are considered.  Most of -- that's
22   most of my job right there.
23       Q.  I want to look briefly at what was introduced
24   as, I believe this was U.S. Exhibit 80 for the record.
25   This was a letter.

247

1        A.  Oh, here it is.
2        Q.  If you will look down in the -- on the first
3    page at the last -- the last sentence there, it is a
4    separate paragraph.  Do you see where it says -- it is
5    referring to a previous session two years ago when
6    senators knew a month or more in advance that full
7    hearing on this legislation would take place?
8        Do you see that?
9        A.  Yes.
10       Q.  Do you know what legislation that the letter is
11   referring to here?
12       A.  I would assume it was referring to Senate Bill
13   362 from the 2009 Session.
14       Q.  Do you recall how long the Committee of the
15   Whole met to consider SB 362 in 2009?
16       A.  Trying to decide how to quantify a little bit
17   short of forever.  It was -- I don't remember exactly
18   how many hours; but it was all through one day and all
19   through the night and into the morning.
20       Q.  Was it more than 12 hours?
21       A.  Definitely, yes.
22       Q.  Was it more than 24 hours?
23       A.  I don't remember specifically what time we
24   started, the days, and when it ended but it was probably
25   close to that ballpark.

248

1        Q.  But it went all day and all through night.
2        A.  All through the night.
3        Q.  If you will turn to the second page, please.
4    Down below the signature, does this show that there is
5    someone copied on this letter from Senator Van de Putte?
6        A.  Yes.
7        Q.  And who did Senator Van de Putte copy on this
8    letter?
9        A.  The U.S. Department of Justice Voting Rights
10   Section.
11       Q.  To your knowledge, did the Senate expect the
12   Department of Justice to attend the Committee of the
13   Whole meeting in 2011?
14       A.  No.  I would not say they would have expected
15   their attendance.
16       Q.  Is it common in your experience for the
17   Department of Justice to be copied on correspondence
18   among senators about committee hearings?
19       A.  No, it is not common.
20       Q.  Do you have any knowledge why Senator Van de
21   Putte -- Van de Putte copied the Department of Justice
22   on her letter to Senator Duncan?
23       A.  As I have stated previously, I think the Senate
24   was aware that the bill would be subject to preclearance
25   either at the Department of Justice or before a court.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Karina Casari Davis                                          June 15, 2012

## 249

1  And I would guess Senator Van de Putte wanted to make
2  the Department of Justice aware of her communications
3  with Senator Duncan.
4      Q.   And your testimony is -- is that based on any
5  personal communication with Senator Van de Putte about
6  this letter?
7      A.   No.
8      Q.   That's just based on your -- your review of the
9  letter?
10     A.   Yes.
11     Q.   If you could turn, briefly, to what was marked
12 as -- I believe it was the League Exhibit 15.  This is
13 an excerpt of the 2011 Senate rules.
14         If you will turn to the second page of
15 that exhibit and look at Rule 5.11(a).  And it says,
16 "Any bill, resolution, or other measure may on any day
17 be made a special order for a future time of the session
18 by affirmative vote of two-thirds of the members
19 present."
20         Is that an accurate reading?
21     A.   Yes.
22     Q.   What does it mean when it says, "a future time"
23 in that provision?
24     A.   Well, I think it probably specifies future time
25 because that's the purpose of making the special order

## 250

1  is to establish when a particular bill might be taken up
2  through special order.  If a Bill is part of the Regular
3  Order of Business, it might be taken up on a Tuesday, it
4  could be taken up on a Wednesday, it could be taken up
5  on a Friday, Saturday.  The regular calendar isn't
6  specific as to days; making a special order allows, or
7  its purpose is to -- to give notice of a particular time
8  or day.
9      Q.   Can a special order be taken up immediately?
10     A.   I suppose it's possible to set a special order
11 for an hour from now, if you wanted to make a motion
12 like that on the Senate Floor.
13     Q.   Okay.  Earlier, there was a discussion of a
14 limitation in the Texas Constitution on consideration of
15 legislation within the first 60 days of the session.
16         Are you familiar with that provision of
17 the Constitution?
18     A.   That's the constitutional order of business.
19     Q.   Does that limitation that applies to the first
20 60 days of a session prevent a committee from reporting
21 a bill out of committee during the first 60 days of the
22 session?
23     A.   Not during the first 60 days.  The limitation
24 for committees to meet and consider legislation is
25 during the first 30 days.  And certainly the Senate

## 251

1  could suspend the order of business and consider a bill
2  any time it chooses.
3      Q.   I want to talk about the Regular Order of
4  Business for a minute.  Do the Senate rules give the
5  Presiding Officer the authority to change the order of
6  bills in the Regular Order of Business?
7      A.   No.  He does not have that authority under the
8  rules.
9      Q.   How many votes do the Senate rules require to
10 pass a bill under the Regular Order of Business?
11     A.   For general bills would be the majority of the
12 members present and voting.
13     Q.   In the 2011 Legislative Session, to the best of
14 your recollection, how many bills were ahead of Senate
15 Bill 14 in the Regular Order of Business?
16     A.   2011, there were no bills ahead of Senate Bill
17 14.
18     Q.   Move on briefly to the local and uncontested
19 calendar.  Can you -- can a bill be removed from the
20 local and uncontested calendar?
21     A.   Yes.
22     Q.   How can a bill be removed from the local and
23 uncontested calendar?
24     A.   Rules provide that any two members can request
25 in writing that a bill be removed from the local and

## 252

1  uncontested calendar.
2      Q.   How many votes does Senate rules require to
3  pass a bill that's on the local and uncontested
4  calendar?
5      A.   The same as any bill on any calendar for a
6  general bill, would be a majority of the members.
7      Q.   Move on briefly to House Bill days.  Can you
8  explain what a "House Bill Day" is in the Senate?
9      A.   Yes.  The Senate rules provide for a deference
10 to House bills and joint resolutions on calendar
11 Wednesdays and Thursdays, the effect of which is that
12 the calendar flips and all -- any House bills and joint
13 resolutions that are on the Regular Order of Business
14 would now be above all Senate bills as opposed to other
15 calendar days.
16     Q.   How many votes do the Senate rules require to
17 pass a House Bill on a House Bill Day?
18     A.   Like any other bill, be a majority of the
19 members present and voting.
20     Q.   What vote is required to adopt Senate rules?
21     A.   To adopt permanent rules or temporary rules, it
22 would be majority of the members present and voting in
23 the Senate.
24     Q.   I want to talk briefly about Blocker Bills.
25         Do the Senate rules require a two-thirds



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 253

1  vote of the membership to pass bills?
2      A.  No.
3      Q.  To your knowledge, are there any circumstances
4  under the Senate rules in which a two-thirds vote is
5  required to pass a bill in the Senate?
6      A.  There may be for probably arcane constitutional
7  requirements.  I can't say for sure.  But I seem to
8  recall that perhaps creating a county -- for example, an
9  arcane requirement would be creating a county that's
10 smaller than, I think it is 900 square miles takes a
11 super majority.  There are some provisions in the
12 Constitution that require more votes but those are rare.
13     Q.  For --
14     A.  And for most bills it would be a majority.
15     Q.  For a general bill, is there any circumstance
16 in which the Senate bills would require a two-thirds
17 vote to the pass the bill?
18     A.  No.
19     Q.  Do the Senate rules require a two-thirds vote
20 in any circumstance other than the potentially arcane
21 requirements you just discussed?
22     A.  For any circumstance related to a bill or at
23 all?
24     Q.  Just at all.
25     A.  The confirmation of gubernatorial appointments

## 254

1  requires a two-thirds vote of the members present and
2  voting.
3          The adoption of a proposed constitutional
4  amendment for the people be a two-thirds vote of
5  the membership is, as required by the Constitution.  I
6  may be forgetting something else but, in general, those
7  are the -- the big ones.
8      Q.  I believe that you had discussed earlier that
9  the Senate rules require two-thirds vote to suspend the
10 Regular Order of Business; is that right?
11     A.  Yes.
12     Q.  I want to back up very briefly and discuss
13 special orders.
14          When a bill is a special order, what does
15 the vote require to pass the bill?
16     A.  The same as in every general bill, a majority
17 of the members present and voting.
18     Q.  Thank you.
19          Are you familiar with the term "two-thirds
20 rule" or "two-thirds tradition," as it relates to the
21 Senate?
22     A.  Yes.
23     Q.  What's your understanding of those terms?
24     A.  I -- in general, I would say that the tradition
25 of the Senate in the last 60 years since the late '40s,

## 255

1  early '50s, is to consider many types of legislation out
2  of its calendar order.  And so that most of the -- much
3  of the legislation that is considered is taken up out of
4  order and would require a two-thirds vote to be
5  considered by the body.
6      Q.  When a bill is taken up out of order, what vote
7  is required for passage of the bill?
8      A.  Actual passage would be the same as in any
9  general bill, usually if a majority of the members
10 present and voting.
11     Q.  I know that you discussed with Mr. Harris
12 earlier Blocker Bills.  As a practical matter, can any
13 bill function as a blocker bill?
14     A.  Yes.
15     Q.  Can you explain, just generally, how -- why any
16 bill could function as a blocker bill?
17     A.  Well, it doesn't -- a bill doesn't have to be
18 intended as a blocker bill to be a blocker bill.
19 Certainly on calendar Wednesdays and Thursdays, the
20 Senate blocker bill would not actually cover and would
21 not have the effect of blocking a lot of bills on the
22 calendar.  On those days, whatever House Bill or House
23 Joint Resolution, which probably has precedence if there
24 is one, would -- would have -- would be at the top of
25 the calendar.  And if other bills were considered before

## 256

1  that bill has been considered and disposed of then you
2  would need a two-thirds vote to take up those other
3  bills that could effectively act as a blocker.
4      Q.  But on House Bill days, am I correct in my
5  understanding that the Senate blocker bill would not
6  have the effect of preventing consideration of a House
7  Bill in the Regular Order of Business?
8      A.  That's correct.
9      Q.  Do the Senate rules actually provide for a
10 blocker bill?
11     A.  No.
12     Q.  Is the Senate required to use blocker bills?
13     A.  No.
14     Q.  Has the Senate always used blocker bills?
15     A.  No.
16     Q.  Is it possible for the Senate to conduct
17 business without a blocker bill in place?
18     A.  It is not only possible but that's what the
19 rules would envision as written.
20     Q.  If a blocker bill is in place in the Senate,
21 are there ways in which a Senate could still consider
22 bills without requiring a two-thirds vote to bring the
23 bill to the floor?
24     A.  I am sorry.  Could you ask the question again?
25     Q.  Of course.  If there is a Senate blocker bill



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 257

1  in place, are there ways in which the Senate could
2  consider bills without requiring a two-thirds vote to
3  bring the bill to the floor?
4      A.  Yes.
5      Q.  Can you think of some examples of how that
6  would happen?
7      A.  From a purely calendar sense, as we discussed
8  on House Bill days that Senate bill blocker would not
9  apply; so the Senate could take up a House Bill on a
10 House Bill day without a suspension of the Regular Order
11 of Business and the Senate did so twice last session.
12         Did you ask about actually considering
13 bills?
14         There is -- legislation can sometimes be
15 affected through amendment after rules have been
16 suspended, in conference committee, house amendments to
17 Senate bills.  Sometimes the Senate would vote on these
18 things without a two-thirds vote if it had not
19 originally been considered in the Senate.
20     Q.  So you mention "a conference committee."
21         Can you explain how that would allow the
22 Senate to consider a bill without requiring a two-thirds
23 vote?
24     A.  I think when a bill, whether it's a House Bill
25 or a Senate Bill, is at the conference committee stage

## 258

1  and a conference committee report is filed by the
2  conferees in the House and Senate, at that stage in the
3  preliminary process, it is only a majority vote is
4  required of membership -- members present and voting to
5  adopt a conference committee report and, therefore,
6  finally -- finally pass a bill.
7      Q.  You, also, mentioned a House amendment to a
8  Senate bill.  Can you explain how that would -- how it
9  would be that that might result in a bill being
10 considered by the Senate without requiring a two-thirds
11 vote to bring it to the floor?
12     A.  If you had a general bill -- I shouldn't say
13 "general."  You have a bill in the Senate that relates
14 to certain subject matter, and that bill is passed out
15 of the Senate and sent to the House, if the House
16 chooses to amend that bill with a subject matter, it
17 could be an entire bill.  And if the House passes it
18 with that amendment, the bill at that stage returns to
19 the Senate for consideration.  At that stage, the Senate
20 could choose to concur by majority vote or could choose
21 to take the bill to conference committee, and at that
22 stage, there is no -- there is not a two-thirds vote
23 requirement, it is just an up or down majority vote.
24     Q.  Move on, briefly, to Committee of the Whole.
25         Can you describe, generally, what is the

## 259

1  Lieutenant Governor's role when the Senate resolves into
2  a Committee of the Whole?
3      A.  At the time at which the Senate chooses to
4  resolve in the Committee of the Whole, the Senate rules
5  give the Lieutenant Governor the authority to appoint
6  the Chairman of the Committee of the Whole.  After that
7  appointment is made and the Chair assumes the providing
8  duties over the Senate while it is sitting as a
9  Committee of the Whole, the Lieutenant Governor has the
10 right or privilege to participate in the Committee of
11 the Whole through debate and by voting, and he can
12 participate by listening and even questioning the
13 witnesses.  He has a right, and not really a
14 requirement, that is in the Senate Rules.
15         (Deposition Exhibit No. 18 marked.)
16     Q.  So the court reporter has just handed you
17 Exhibit 18.
18         MS. BERKOWER:  18 or one?
19         MR. FREDERICK:  I think 18, consecutively.
20     Q.  (By Mr. Frederick)  If you will turn to Rule
21 13.02 and see if I can give you a page number.  This is
22 Page 98.
23     A.  All right.
24     Q.  Can you -- do you see Rule 13.02?
25     A.  Yes.

## 260

1      Q.  Can you tell me what that rule says?
2      A.  It is informing a Committee of the Whole
3  Senate, the President shall leave the Chair and appoint
4  a Chair to reside in committee.
5      Q.  Does this Rule 13.02, does this require, the
6  President that's mentioned in this rule, is that the
7  Lieutenant Governor?
8      A.  Yes.
9      Q.  Does this rule require the Lieutenant Governor,
10 in forming the Committee of the Whole, to appoint a
11 Chair to preside, and for lack of a better word, step
12 down from the Chair?
13     A.  He is required to appoint a Chair and then he
14 has to step down from the Chair.  Does that answer your
15 question?  I think he announces, makes the announcement
16 at the time of the appointment.
17     Q.  A more straightforward way of asking is:  Rule
18 13.02 that relates to the Committee of the Whole, does
19 it require the Lieutenant Governor to appoint someone
20 else to preside over the Committee of the Whole?
21     A.  Yes.  He cannot preside over Committee of the
22 Whole.
23     Q.  I want to talk briefly about how Committee of
24 the Whole differs.
25         Can you describe what the affects are of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Karina Casari Davis
June 15, 2012

## 261

1  the Senate's resolving into the Committee of the Whole
2  with respect to considering bills?
3      A.  I think the effect of the Senate considering
4  bills in the Committee of the Whole is consistent with
5  the purposes of a Committee of the Whole and that is to
6  give all 31 members of the Senate equal rights of
7  participation in a committee process.  Those rights
8  include the right to unlimited debate.  The right to
9  question witnesses, if there are witnesses.  The rights
10 to amend.  They are one of 31 in that they have an equal
11 right of participation as opposed to a smaller committee
12 venue that might have a limited membership of the
13 Senate.
14     Q.  Can others -- can other Senate committees meet
15 while the Committee of the Whole is convened?
16     A.  No, they cannot.
17     Q.  And is that required by the rules?
18     A.  Yes.
19     Q.  Is the Committee of the Whole something that is
20 unique to the Texas Senate?
21     A.  Not at all.  It is -- has rich history going
22 back to at least -- at least Parliament.  It is used
23 heavily in legislative bodies throughout this country.
24 It is used in the Congress.  There are many precedents
25 in Congress on the Committee of the Whole which we would

## 262

1  look to.  It is used extensively by some legislatures to
2  consider bills.  And it is not at all unique to the
3  Texas Senate.
4      Q.  In the time that you have worked in the Texas
5  Senate, how often has the Senate resolved into a
6  Committee of the Whole?
7      A.  I am trying to think.  I don't know if I could
8  say exactly how many times they moved to resolve.
9  Certainly, while I have worked in the Senate, I recall
10 it happening in the early 1990s.  I recall it happening
11 in 1999, 2001.  I think we used it in 2003 and 2004,
12 certainly, in 2009 and 2011; so it's happened somewhat,
13 I wouldn't say frequently, but it has been used a lot.
14     Q.  Generally speaking, is there a particular type
15 of legislation that tends be considered by the Committee
16 of the Whole?
17     A.  Yes.  I think the Senate chooses to use the
18 Committee of the Whole process for bills which it thinks
19 would benefit from the greater deliberation that the
20 participation by 31 members could provide for a piece of
21 legislation.  There are some bills for which each member
22 of the Senate has such great interest, they would want
23 to participate in that way and want to be able to
24 participate in the committee process, and so the
25 Committee of the Whole is a convenient device to allow

## 263

1  for that greater participation by the Senate and it is
2  used for those purposes.
3      Q.  I want to move back very briefly to the
4  two-thirds vote mechanism in the Senate.
5          We were talking earlier about the use of
6  the two-thirds vote to bring the bills to the floor.  In
7  your experience as Parliamentarian and as a general
8  matter, do you have an understanding of why the Senate
9  sometimes uses the two-thirds vote mechanism to bring --
10 bring bills to the floor.
11     A.  I think that that tradition is a tradition that
12 evolves, and it has evolved from since the late '40s and
13 early 1950s, and at times has been more heavily used
14 than at other times.  I think probably, initially, it
15 was somewhat of an accident, maybe even on purpose that
16 they discovered, you know, probably members were
17 attempting to load the calendar so they didn't get to
18 particular bills that they were opposed to.  I think
19 they discovered that as it became a practice, that I
20 think, you know, oftentimes the requirement to get a
21 two-thirds vote would yield legislation that has been
22 more carefully developed, perhaps, is the word.
23 Certainly, to get two-thirds vote, you know, a member
24 would probably have to make more concessions or would
25 have to work a little harder to get the bill in the

## 264

1  right shape for it to be able to be considered.  I think
2  any members would say that, it is a -- one of the
3  purposes of using the two-thirds tradition that it
4  yields better legislation.  That's not always the case.
5  And I think that the fact that the rules continue to
6  provide for regular orders of business and mechanisms
7  that allow a bill to be brought forward without a
8  two-thirds vote, it's the Senate's choice that, that
9  two-thirds process doesn't always work.
10     Q.  Is there a calendars committee in the Senate?
11     A.  There is not an official calendars committee in
12 the Senate.
13     Q.  In your experience, is the use of the
14 two-thirds vote mechanism used as something of a
15 calendaring mechanism by the Senate?
16     A.  My belief is that, that is its principal
17 purpose, that the effect of the Senate's sort of
18 imposing a two-thirds requirement on itself when it is
19 not required to do so is that it can continue to use a
20 Regular Order of Business which would be unwieldly when
21 you have lots and lots of bills on it.  And most
22 legislative bodies use a calendar system on the
23 Calendars Committee.  And I think the Senate has just
24 developed its system.  And the great benefit to the
25 members that they believe this, and I believe this, is



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Karina Casari Davis                                          June 15, 2012

---

265

1    that they are one of 31 members on a quasi Calendars
2    Committee as opposed to the type of system such as that
3    is in the Texas House of Representatives where you would
4    have a much smaller number of members on the Calendars
5    Committee that would control the flow of legislation.
6    So this tradition, in large part, is really in its
7    essence a calendar system where each of the members of
8    the Senate have equal participation in the development
9    and the flow of legislation on a daily basis in the
10   Senate.
11       Q.  Is the two-thirds vote mechanism used when the
12   Senate meets in special session?
13       A.  It can be.  There are many instances where the
14   Senate follows its Regular Order of Business during
15   regular -- during special sessions.
16       Q.  In a special session, does the Senate,
17   typically, consider fewer bills than it would consider
18   in a Regular Session?
19       A.  Yes.  Because it is jurisdiction in its ability
20   to consider legislation in a special session is set by
21   the Governor in accordance with the Constitution.
22          The Governor has the authority to call a
23   special session, a Senate does not, the Legislature does
24   not.
25          The Governor would, when calling a special

---

266

1    session under the Constitution has to provide the
2    subject matters for consideration by the Legislature
3    during a special session.  And only those items, say,
4    those bills that fall within that subject category can
5    be considered by the Legislature; so the result is far
6    fewer bills.
7        Q.  In your experience, does that make the calendar
8    easier to manage in the Senate?
9        A.  Yes.
10       Q.  We were discussing times when the Senate
11   chooses to proceed without the two-thirds mechanism.
12          As a general matter, based upon your
13   experience in the Senate, when the Senate chooses to
14   proceed without using the two-thirds mechanism to bring
15   a bill forward, why does -- why would it choose to do
16   that?
17       A.  I think that, in general, the times that it has
18   chosen to proceed outside of the two-thirds tradition
19   usually are times when a piece of legislation can no
20   longer progress.  Usually it -- you know, it may be a
21   controversial piece of legislation.  Lots of times these
22   bills have been around multiple sessions, there has been
23   lots of attempts to get consensus with a two-thirds
24   vote, and those attempts have failed.  And I think the
25   Senate has chosen to proceed with a majority vote and

---

267

1    follow its calendars on occasions where -- to not do so
2    would, potentially, harm -- could harm the state, could
3    delegate its duties, the Legislature's duties to someone
4    else.  You know, sometimes the majority of the Senate
5    feels that it's -- and it is a difficult decision for
6    them.  But some issues are so important and that
7    perhaps, you know, might even say lines have been drawn
8    in the sand and that the two-thirds process will not
9    yield any results, further results.
10       Q.  Is the Senate's custom of using a two-thirds
11   vote procedure to bring many bills to the floor, is that
12   intended to allow a political minority of senators to
13   block legislation?
14          MS. BERKOWER:  Could she read back that
15   question, I didn't hear the first part.
16          (Last question read back.)
17       A.  No.  I don't think that that is the Senate's
18   intent with the two-thirds tradition.
19       Q.  To the best of your recollection, as you sit
20   here today, in your time as Senate Parliamentarian, how
21   many bills has the Senate passed without using the
22   two-thirds vote mechanism?
23       A.  Say that's probably the number of bills being
24   20 to 25 range.
25       Q.  Does passing a bill without using the

---

268

1    two-thirds vote mechanism circumvent the Senate rules?
2        A.  I think it's -- I would characterize it as
3    following the rules and strict enforcement of the rules.
4        Q.  Is passing a bill without using the two-thirds
5    vote mechanism contrary in any way to the Senate rules?
6        A.  Passing without a two-thirds vote?  No, it is
7    not contrary to the rules.
8        Q.  Is passing a bill without requiring a
9    two-thirds vote consistent with the Senate rules?
10       A.  Yes.
11       Q.  To the extent the Texas Senate enacted Senate
12   Bill 14 without using a two-thirds vote mechanism to
13   suspend the Regular Order of Business, did it follow
14   existing Senate rules and procedures?
15       A.  Yes.
16       Q.  To the extent the Texas Senate chose not to
17   follow the custom of requiring a two-thirds vote to
18   suspend the Regular Order of Business to consider Senate
19   Bill 14, did it follow existing Senate rules and
20   procedures?
21       A.  Yes.
22       Q.  When the Senate -- pardon me.
23          When the Texas Senate passed Senate Bill
24   14, did it violate any Senate rules?
25       A.  Not that I am aware of.  I don't believe -- I

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**269**

1  don't believe that it did.
2      Q.  To the best of your understanding, was the
3  Texas Senate's consideration and passage of Senate Bill
4  14 consistent with existing Senate rules and procedures?
5      A.  Yes.
6      Q.  As you sit here today, do you have any reason
7  to believe that the Texas Legislature enacted Senate
8  Bill 14 with a discriminatory purpose?
9      A.  No.
10     Q.  As you sit here today, do you have any reason
11  to believe that Senate Bill 14 will have a
12  discriminatory effect?
13     A.  No.
14         MR. FREDERICK:  I have no further
15  questions.
16         MS. BERKOWER:  All right.  I have some
17  cross on that.
18             EXAMINATION
19  BY MS. BERKOWER:
20     Q.  I will try to follow the same order
21  Mr. Frederick used.
22         Turn your attention to the Attorney
23  General's Exhibit No. 80, a letter from Senator Van de
24  Putte.  I don't know where my copy of it went, but.
25         Do you know if an invitation was extended

---

**270**

1  to anyone from the Department of Justice to attend the
2  Committee of the Whole hearing in 2011 on voter ID?
3      A.  I don't know.
4      Q.  Do you know if, in fact, anyone from the U.S.
5  Department of Justice attended that hearing?
6      A.  I don't know.
7      Q.  Have you ever heard of someone from the U.S.
8  Department of Justice attending Texas Senate hearing for
9  any legislation?
10     A.  I don't know.
11     Q.  Do you recall ever seeing anyone from the U.S.
12  Department of Justice at any Texas Senate hearing in
13  your time as Parliamentarian?
14     A.  If I had seen someone, I wouldn't recognize
15  them.
16     Q.  Well, announced as part of the record.
17     A.  I don't recall.
18     Q.  You said that you recalled in 2009, the Senate
19  had spent almost forever or something of that nature,
20  debating SB 362, is that an accurate characterization?
21     A.  Yes.  And that would be, and I don't remember
22  the question was qualified this way, but that was
23  certainly in the Committee of the Whole.
24     Q.  In the Committee of the Whole.
25     A.  Uh-huh.

---

**271**

1      Q.  Debate in one Senate session doesn't carry over
2  to debate in a subsequent session, does it?
3      A.  Not usually.  But in this case, it somewhat
4  did.
5      Q.  How is that?
6      A.  The senators chose to adopt the record made in
7  2009 as part of their record in 2011, the Senate chose
8  to do that.
9      Q.  But the bills were different; is that correct?
10     A.  They may have been.  I am not super familiar
11  with the content of the bills anymore.  I don't
12  remember.
13     Q.  So it was part of the record in 2011, as it was
14  adopted by the senators, is that what you're saying?
15         Sorry, I will clarify.  The 2009 record
16  from the Committee of the Whole was adopted as part of
17  the record from the 2011 Committee of the Whole meeting?
18     A.  I believe so.  I think that motion was made in
19  the Committee of the Whole.  It is possible it was made
20  on -- it had to have been in the Committee of the Whole
21  and not in the full Senate.
22     Q.  Do you remember anything in the public record
23  explaining why the choice was made to adopt that 2009
24  testimony in 2011?
25     A.  I don't remember very specifically what

---

**272**

1  their -- I am sure -- I am sure they stated why; I don't
2  remember exactly or even generally what they said.
3      Q.  As a new bill introduced in 2011, SB 14 was
4  procedurally entitled to full consideration by the
5  Senate, is that accurate?  And I don't mean
6  consideration by the full Senate but entitled to all of
7  the rules for -- relating to a bill's consideration that
8  any other bill introduced in a new session of the
9  Legislature would be entitled to.
10     A.  Yes.
11     Q.  So just because a bill on a similar topic was
12  debated in 2009 doesn't mean in any way that in 2011,
13  another bill on the same topic would already be viewed
14  under the rules as having been considered already?
15         MR. FREDERICK:  Objection, vague.
16     A.  I think for parliamentary purposes, I think the
17  answer is no, but I am almost going to have to ask you
18  to repeat the question, and I am sorry.
19     Q.  (By Ms. Berkower)  That's okay.  I will
20  rephrase it to be clear.
21     A.  Okay.
22     Q.  Just because a bill -- if a bill is considered
23  on a particular topic in one legislative session and
24  then another -- and it doesn't pass, and then in the
25  next legislative session, another bill, a new bill is

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

273

1   introduced on the same topic, the Senate's prior
2   consideration of a bill on the same topic doesn't
3   foreclose consideration of the new bill on the same
4   topic, does it?
5       A.   No, it wouldn't foreclose that under the rules.
6       Q.   In fact, it has no effect whatsoever under the
7   rules; is that correct?
8       A.   That's correct.
9       Q.   You testified a few minutes ago that there were
10  no bills ahead of SB 14 when it was considered for a
11  full vote before the Senate; is that correct?
12          MR. FREDERICK:  Objection,
13  mischaracterizes the testimony.
14      A.   What I said was, that there were no other bills
15  on the calendar when Senate Bill 14 was considered.
16      Q.   Okay.  So it was first in line for
17  consideration.
18      A.   Yes.
19      Q.   Isn't part of why it was first in line for
20  consideration because it had been designated emergency
21  legislation?
22      A.   I think -- well, I mean, I think -- I think
23  that certainly could be a reason.  You know, the Senate
24  could have -- they -- I think that's probably right, as
25  I think about it, yes.

274

1           (Attorney Ezra Rosenberg enters room.)
2       Q.   And to be clear, isn't it true that if a
3   blocker bill is in place and to be heard out of order, a
4   two-thirds majority would be required?
5           MR. FREDERICK:  Objection, vague.
6       A.   For a bill to be taken out of its regular order
7   of -- calendar order to be considered by the Senate, the
8   rules require a two-thirds vote of the members present
9   and voting to take a bill out of its calendar order.
10      Q.   (By Ms. Berkower)  Is it easier to get a vote
11  on a bill that is first in line rather than a bill that
12  is second, third, or anywhere lower in the order in
13  line?
14          MR. FREDERICK:  Objection, calls for
15  speculation.
16      A.   That would depend on the bill.
17      Q.   Well, procedurally, are there fewer procedural
18  hurdles to get over if a bill is first in line for
19  consideration for a vote on the full -- before the full
20  Senate?
21      A.   To pass a bill, it would be the same vote
22  requirement wherever it is on the calendar.
23      Q.   Well, would it be heard ahead of the other
24  bills?
25      A.   If it is heard -- if it is heard in its

275

1   calendar order then it would require a majority in the
2   members present and voting to pass the bill.
3       Q.   A bill that was second in line in that instance
4   would have to, first, have a majority of two-thirds
5   senators vote to hear it out of order, isn't that true?
6       A.   Yes.  If it's considered out of order.
7       Q.   So the procedural hurdle of having to get over
8   that two-thirds majority does not exist for a bill
9   that's first in line to be heard for a vote.
10      A.   I think its position on the calendar means that
11  it can be taken up and the rules would require for it to
12  be taken up before the other bills.
13      Q.   Without a two-thirds majority of senators
14  present and voting?
15          MR. FREDERICK:  Objection, form.
16      A.   I think the Senate has calendars and it is,
17  under the rules, required to follow those calendars
18  except for when it suspend the rules to take a bill up
19  out of the calendar order.
20      Q.   (By Ms. Berkower)  As a matter of practice, do
21  senators use blocker bills combined with the two-thirds
22  rule to prevent a vote on certain bills?
23          MR. FREDERICK:  I am going to object on
24  the basis of privilege only to the extent that it would
25  require you to reveal what any particular legislature --

276

1   legislator was thinking or intending to do.  But you may
2   answer generally, if you can do so without revealing the
3   privilege matters.
4       A.   I think, generally, a bill that's at the top of
5   the calendar and it is used as a blocker would have the
6   effect of requiring a two-thirds vote for bills that are
7   lower in calendar order beneath that bill.
8       Q.   Have you seen senators use those procedural
9   hurdles to prevent a vote on certain bills?
10          MR. FREDERICK:  The same cautionary
11  instruction.  But I don't believe this calls for
12  privilege matters.
13      A.   Did you say certain bills?
14      Q.   On any bill.
15      A.   On any bill.  I think that, generally speaking,
16  a blocker bill is a decision to be used as a
17  parliamentary device where you're using the first bill
18  to require a two-thirds vote to consider other bills, I
19  think that's a general decision by the Senate and the
20  Presiding Officer and it works, and its intent is for
21  general purposes of managing the Senate's calendar.
22      Q.   Okay.  As a practical matter, though, have you
23  ever seen a senator capitalize on that to prevent a vote
24  on a particular piece of legislation?
25      A.   "Capitalize."  Do members choose to vote no or



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 277

1  to commit to vote no to bring a certain -- to suspend
2  the Regular Order of Business to take up a bill, yes,
3  that's what they do, that's part of the calendar
4  mechanism, that's why they would consider themselves to
5  be part of the calendar process in the Senate.
6      Q.  How often does a bill that passes in the Senate
7  die in the House, just generally?
8      A.  I would say -- I am not sure I could tell you
9  percentages.  I would say that, of the House bills that
10 the Senate receives, the Senate passes half of their
11 bills.  And of the Senate bills that the House passes,
12 they would pass fewer than half of the Senate bills they
13 actually receive.  How much fewer, I couldn't tell you
14 the percentage but I know it is less.
15     Q.  How often does a bill die in the conference
16 committee?
17     A.  You know, I -- I am not sure if I could answer
18 that.  I mean, depends on the number of conference
19 committees that we would have.  It happens.  We may, you
20 know, in session to session basis, you could have --
21 generally you're in the 100 range on conference
22 committees for a Regular Session, 100, 150, I mean, the
23 number could vary.  There are probably quite a few bills
24 that die in conference committee, but there are
25 certainly a lot more that survive.

### 278

1      Q.  Is it fair to say that, as the bill gets
2  further and further in the legislative process, it has
3  less and less chance of dying?
4      A.  I don't think I would characterize it that way.
5      Q.  Is it fair to say that once a -- okay.
6          You testified a few minutes ago that 20 to
7  25 bills between the time -- during the time that you
8  have been Parliamentarian were heard by the Committee of
9  the Whole.
10         Do you remember testifying to that a few
11 minutes ago?
12     A.  I think --
13         MR. FREDERICK:  Objection,
14 mischaracterizes the testimony.
15     A.  I hope I didn't misspeak.  I think the question
16 was:  How many bills had been considered?  Maybe we
17 should have the court reporter read that question
18 because I don't think it was related to the Committee of
19 the Whole.
20     Q.  You know what, you're right, it was not.  I
21 withdraw that question.  Sorry.
22         Would you agree that the -- part of the
23 two-thirds, that the two-thirds rule requires senators
24 to build consensus before a bill gets heard for a final
25 vote?

### 279

1      A.  I think the legislative process requires
2  senators to form a consensus on passing any bill.
3      Q.  Well, a few minutes ago, you were testifying
4  about the two-thirds rule and you said that, a bill
5  that's subjected to the two-thirds rule often will have
6  more concessions made to opponents than other bills.
7          Do you remember testifying to that?
8      A.  Yes.
9      Q.  Would you agree then that the two-thirds bill
10 often requires consent -- is a mechanism that enhances
11 consensus built during the legislative process?
12     A.  I think that the difference and the number of
13 votes required makes -- does make a difference.  Needing
14 16 votes instead of 21 makes a difference.  It is a five
15 vote difference if everybody is there.  And certainly if
16 those five people are not willing to vote unless a
17 concession is made or a change is made, might not even
18 be a concession, I mean, it could be an improvement to
19 the bill in some way, I -- you know.  So, you know, I
20 think it builds consensus, yes.
21     Q.  You said that one of the reasons senators may
22 choose to suspend the two-thirds vote mechanism or
23 two-thirds rule or tradition, however we have been
24 referring to it, is that the majority may feel that
25 failure to pass a particular type of legislation would

### 280

1  harm the state.
2          Do you remember testifying to that a few
3  minutes ago?
4      A.  Yes.
5      Q.  Do you believe that opposition to bills harms
6  the state?
7      A.  I think continued opposition to bills that are
8  necessary to the functioning of the state, yes,
9  ultimately harms the state.
10     Q.  What are examples of bills that are necessary
11 to the functioning of the state?
12         MR. FREDERICK:  Objection, vague.
13     A.  An example of that would be the state's general
14 budget.
15     Q.  Do you believe that opposition to voter ID
16 legislation was harm -- was a harm to the state?
17         MR. FREDERICK:  Objection, relevance.
18         You may answer.
19     A.  I don't have an opinion on voter ID and the
20 policy of voter ID.  I think earlier I gave examples of
21 why the Senate might choose to forgo its two-thirds
22 tradition and to observe its calendar systems.  And I
23 gave examples of what they thought when they did this
24 with voter ID is, you know, it was really a question for
25 them.  I don't -- I don't think I can answer that



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 281

1    question.
2        Q.  (By Ms. Berkower)  Okay.  I think I got your
3    testimony wrong before, when I asked you about the 20 to
4    25 bills in the context of the Committee of the Whole.
5    I think you were actually saying, if I remember
6    correctly, and correct me if I am wrong, that
7    approximately 20 to 25 bills during your time as
8    Parliamentarian were passed without the two-thirds rule;
9    is that accurate?
10       A.  Yes.
11       Q.  How many total bills were passed during the
12   time you have been Parliamentarian?
13       A.  How many total bills in the Senate?
14       Q.  Yes.
15       A.  I would not be able to accurately answer that
16   question, I don't know.
17       Q.  Is it more than 100?
18       A.  Yes.
19       Q.  More than 1,000?
20       A.  Yes.
21       Q.  More than 5,000?
22       A.  I don't know.
23       Q.  More than 2000?
24       A.  It is probably more than 2000.
25       Q.  Mr. Frederick asked you a number of questions

## 282

1    about whether passing a bill without the two-thirds rule
2    was somehow against or contrary to the rules, and you
3    testified that, in fact, it was consistent with the
4    rules.  Is that -- do you remember that testimony?
5        A.  Yes.
6        Q.  Isn't it true, though, that the two-thirds rule
7    is the default rule for bills in the Senate?
8            MR. FREDERICK:  Object, assumes facts not
9    in evidence.
10           You may answer.
11       A.  I don't know that I would characterize it as
12   default.  I think it chooses to impose, through its
13   calendar mechanisms and its calendar systems, I think
14   the Senate chooses to require a two-thirds vote on a lot
15   of the legislation that it passes.
16       Q.  (By Ms. Berkower)  The Senate makes its own
17   rules each session, correct?
18       A.  Yes.
19       Q.  And under the rules in 2009 and 2011, which you
20   have testified are substantially similar, is that
21   accurate?
22       A.  Yes.
23       Q.  So under those two sessions rules, isn't it
24   true that most bills were subject to the two-thirds vote
25   mechanism?

## 283

1            MR. FREDERICK:  Objection, assumes facts
2    not in evidence.
3        A.  I think that many of the bills were considered
4    out of the regular calendar order.
5        Q.  (By Ms. Berkower)  But unless two-thirds vote
6    was successful, would those bills have been able to be
7    considered out of the regular calendar order?
8        A.  The rules do not allow for a bill to be
9    considered out of the regular calendar order unless the
10   rules are suspended.
11       Q.  And that requires a two-thirds vote; is that
12   correct?
13       A.  Yes.
14       Q.  So is it safe to say that the default under
15   those rules is a two-thirds vote is required to suspend
16   the usual order of business?
17           MR. FREDERICK:  Objection, assumes facts
18   not in evidence.
19       A.  I think that the default is under the rules.
20       Q.  (By Ms. Berkower)  Is it implicit in those
21   rules?
22       A.  No, I don't think it is implicit in the rules.
23       Q.  How is it not implicit in those rules?
24           MR. FREDERICK:  Objection, form.
25   Objection, vague.

## 284

1        Q.  (By Ms. Berkower)  You may answer.
2        A.  I think that the rules provide a calendar
3    mechanism.  As a general practice most legislative
4    bodies have provisions for suspending the rules to take
5    bills up out of order, the Texas Senate is no different,
6    and that is what is contained in the Senate Rules, a
7    regular calendar order, orders for the day, if you will,
8    and a requirement within the rule that if that calendar
9    is not followed then it requires a two-thirds vote to
10   take a bill up out of the calendar order.
11       Q.  Would you agree that, to the extent that the
12   2009 and 2011 rules carve out specific types of
13   legislation for which a two-thirds vote is not required
14   but a majority vote is required to take business out
15   of -- to take up bills out of the normal order of
16   business, that that would be different from the rules
17   for other bills?
18           MR. FREDERICK:  Objection, assumes facts
19   not in evidence.
20       A.  I think that the rules provide that bills
21   relating to voter ID requirements may be made a special
22   order with a majority vote of the members of the Senate.
23       Q.  (By Ms. Berkower)  And that rule puts voter ID
24   legislation in a separate category from other bills; is
25   that correct?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Karina Casari Davis                                June 15, 2012

## 285

1    A.  For purposes of setting special orders, yes.
2    Q.  So while it is within the confines of the rules
3  to pass -- or to set voter ID legislation as a special
4  order by a majority vote, it is different from the
5  practices that would be required to set other types of
6  legislation as a special order; is that correct?
7    A.  I think the rule is clear that it takes a
8  majority vote to set bills relating to voter ID
9  requirements as a special order; and that bills that are
10 not voter ID can take a two-thirds vote to be set as
11 special orders.
12   Q.  And the Legislature chose to make that -- the
13 Senate, sorry, chose to make that distinction when it
14 passed its rules, correct?
15   A.  The Senate adopted its rules and wrote those
16 rules, yes.
17   Q.  Okay.
18       MS. BERKOWER:  I don't have any further
19 questions.
20       MR. FREDERICK:  Nor I.
21       (Deposition concluded.)
22
23
24
25

## 287

1  _____
2  _____
3  _____
4  _____
5        I, KARINA CASARI DAVIS, have read the
6  foregoing deposition and hereby affix my signature that
7  same is true and correct, except as noted above.
8
          _____
9        KARINA CASARI DAVIS
10 STATE OF TEXAS    )
11 COUNTY OF TRAVIS  )
12       Before me,_____, on this
13 the day personally appeared KARINA CASARI DAVIS known to
14 me to be the person whose name is subscribed to the
15 foregoing instrument and acknowledge to me that they
16 executed the same for the purposes and consideration
17 therein expressed.
18       Given under my hand and seal of office
19 this _____ day of _____, 2012.
20
21
22       _____
       NOTARY PUBLIC IN AND FOR
23       THE STATE OF_____
24
25

## 286

1          CHANGES AND SIGNATURE
2  PAGE      LINE    CHANGE        REASON
3  _____
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

## 288

1       IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF COLUMBIA
2
3  STATE OF TEXAS            §
      Plaintiff,            §
4                           §
   VS.                      §
5                           §
   ERIC H. HOLDER, JR., IN  §
6  HIS OFFICIAL CAPACITY AS  §
   THE ATTORNEY GENERAL OF THE §
7  UNITED STATES,           §
      Defendant,            §
8                           §
   ERIC KENNIE, ET AL.,     §
9      Defendant-Intervenors, §
                            §
10 THE TEXAS STATE CONFERENCE  §
   OF NAACP BRANCHES, et al.,  §  CASE NO. 1:12-CV-00128
11    Defendant-Intervenors,  §  (RMC-DST-RLW)
                            §  Three-Judge Court
12 TEXAS League OF YOUNG     §
   VOTERS EDUCATION FUND,    §
   et al.,                  §
13    Defendant-Intervenors,  §
                            §
14 TEXAS LEGISLATIVE BLACK   §
   CAUCUS, et al.,          §
15    Defendant-Intervenors,  §
                            §
16 VICTORIA RODRIGUEZ, ET AL., §
      Defendant-Intervenors.  §
17 *************************************************
       REPORTER'S CERTIFICATION
18     DEPOSITION OF KARINA CASARI DAVIS
       JUNE 15, 2012
19 *************************************************
20     I, CAROLINE CHAPMAN, Certified Shorthand
21 Reporter in and for the State of Texas, hereby certify
22 to the following:
23     That the witness, KARINA CASARI DAVIS was
24 duly sworn by the officer and that the transcript of the
25 oral deposition is a true record of the testimony given



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 289

1  by the witness;
2        That the deposition transcript was
3  submitted on June ____, 2012, to the witness or to the
4  attorney for the witness for examination, signature, and
5  return to me within 30 days of receipt thereon;
6        That the amount of time used by each
7  party at the deposition is as follows:
8        Hon. Adam Harris - Four hours and fifty
9  minutes.
10        Hon. Risa Berkower - Two hours and
11  fifty-eight minutes.
12        Hon. Matthew H. Frederick - Forty
13  minutes.
14        That pursuant to information given to the
15  deposition officer at the time said testimony was taken,
16  the following includes all parties of record:
17        Hon. Matthew, Attorney for the Plaintiff;
18        Hon. Adam Harris, Attorney for Defendant
19  Texas League of Young Voters Education Fund;
20        Hon. Risa Berkower, Attorney for Defendant
21  Eric H. Holder, Jr., In His Official Capacity As the
22  Attorney General of the United States.
23        I further certify that I am neither
24  counsel for, related to, nor employed by any of the
25  parties or attorneys in the action in which this

## 290

1  proceeding was taken, and further that I am not
2  financially or otherwise interested in the outcome of
3  the action.
4        Certified to by me on June 17, 2012.
5
6
7  *Caroline Chapman* 
   CAROLINE CHAPMAN, Texas CSR No. 467
8  Expiration Date:  12/31/2012
   Firm Registration No. 286
9  Esquire Deposition Solutions
   9901 IH-10 West, Suite 800
10  San Antonio, Texas 78230
   (210) 331-2280
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com