DENISE DAVIS                                             JUNE 14, 2012

## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
        Plaintiff,                 )
                                   )
VS.                                ) CASE NO. 1:12-CV-00128
                                   ) (RMC-DST-RLW)
ERIC H. HOLDER, JR., in his        ) Three-Judge Court
official capacity as Attorney      )
General of the United States,)     )
                                   )
        Defendant.                 )
                                   )
ERIC KENNIE, et al.,               )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS STATE CONFERENCE OF          )
NAACP BRANCHES, et al.,            )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al.,            )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al.,                    )
                                   )
        Defendant-Intervenors,     )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
        Defendant-Intervenors.     )
-------------------------------------
              ORAL DEPOSITION OF
                 DENISE DAVIS
                 JUNE 14, 2012
-------------------------------------
ORAL DEPOSITION of DENISE DAVIS, produced as a

## 2

1  witness at the instance of the Defendant, and duly
2  sworn, was taken in the above-styled and numbered cause
3  on the 14th day of June, 2012, from 10:07 a.m. to 4:19
4  p.m., before Jean Thomas Fraunhofer, CSR in and for the
5  State of Texas, reported by machine shorthand, at the
6  Law Offices of DECHERT LLP, 300 West 6th Street, Suite
7  210, Austin, Texas 78701, pursuant to the Federal Rules
8  of Civil Procedure and the provisions stated on the
9  record or attached hereto.

## 3

1                    A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4      PATRICK K. SWEETEN
       Assistant Attorney General
5      ATTORNEY GENERAL OF TEXAS
       P.O. Box 12548
6      Austin, Texas 78711
       Tel: (512) 936-1307
7      Email: Patrick.sweeten@oag.state.tx.us
8
9  FOR THE DEFENDANT:
10     RISA BERKOWER
       ANGELA MILLER
       Trial Attorneys
11     U.S. DEPARTMENT OF JUSTICE
       950 Pennsylvania Avenue, NW
12     Washington, DC 20530
       Tel: (202) 305-0115
13     Email: Risa.berkower@usdoj.gov
14
15 FOR THE DEFENDANT-INTERVENOR:  TEXAS LEAGUE OF YOUNG
       VOTERS EDUCATION FUND,
16     ADAM M. HARRIS
       FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, LLP
17     One New York Plaza
       New York, New York 10004
18     Tel: (212) 859-8953
       Email: Adam.harris@friedfrank.com
19
20 FOR SPEAKER STRAUS:
21     THOMAS R. PHILLIPS
       BAKER BOTTS
22     98 San Jacinto Boulevard, Suite 1500
       Austin, Texas 78701
23     Tel: (512) 322-2565
       Email: Tom.phillips@bakerbotts.com
24
25

## 4

1                    I N D E X
   WITNESS                                    PAGE
2
   MEREDYTH FOWLER
3    Examination by Mr. Harris                  5
     Examination by Ms. Berkower              132
4    Examination by Mr. Sweeten               186
5
6  Signature and Changes                      188
7  Reporter's Certificate                     189
8
9        E X H I B I T S
10 NO.        DESCRIPTION                     PAGE
11 League Exhibit 2 House Rules                15
   League Exhibit 3 SB1706                     37
12 League Exhibit 4 SB1706 Legislative History 39
   League Exhibit 5 5/4/05 House Journal       51
13 League Exhibit 6 HB218                      67
   League Exhibit 7 HB218 Legislative History  69
14 League Exhibit 8 3/30/09 Austin Statesman article 75
   League Exhibit 9 Senate Rules              83
15 League Exhibit 10 SB362                     90
   League Exhibit 11 SB362 Legislative History 91
16 League Exhibit 12 SB14                     113
   League Exhibit 13 SB14 Legislative History 116
17
18 US Exhibit 730   Press release for committee 143
                    assignments
19 US Exhibit 731   SB14 Bill Report          144
   US Exhibit 732   Voter fraud interim charge 157
20 US Exhibit 733   Email to Speaker Straus from DPS 173
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 5

1           DENISE DAVIS,
2    having been first duly sworn, testified as follows:
3        BY MR. HARRIS
4        MR. HARRIS:  Good morning, Ms. Davis.  As
5    I told you before, I'm Adam Harris from the law firm of
6    Fried, Frank, Harris, Shriver & Jacobson.  We represent
7    the Texas League of Young Voters Education Fund,
8    defendant-intervenors in this litigation.  Would
9    everyone in the room identify themselves, please?
10       MS. BERKOWER:  Risa Berkower for the
11   Attorney General, Eric Holder.
12       MS. MILLER:  Angela Miller for the
13   Attorney General, Eric Holder.
14       MR. PHILLIPS:  Tom Phillips for Joe Straus
15   and the House of Representatives or such members and
16   former members of the staff as he may designate.
17       MR. SWEETEN:  Patrick Sweeten on behalf of
18   the State of Texas and on behalf of the witness.
19       MR. LEVY:  Jonathan Levy, summer
20   associate, Baker Botts.
21           EXAMINATION
22       BY MR. HARRIS
23       Q.  Mrs. Davis, can you please state your full name
24   for the record?
25       A.  Denise Davis.

## 6

1        Q.  And can you give your address, please?
2        A.  58 Country Oaks Drive, Buda, Texas, 78610.
3        Q.  Ms. Davis, you are an attorney; is that
4    correct?
5        A.  Yes.
6        Q.  Are you currently licensed to practice in
7    Texas?
8        A.  Yes.
9        Q.  Are you licensed to practice in any other
10   states?
11       A.  No.
12       Q.  Have you ever given a deposition before?
13       A.  Yes.
14       Q.  How many times?
15       A.  Once.
16       Q.  Can you tell me about that case?
17       A.  It was a -- just a civil suit with just a -- it
18   was a builder.
19       Q.  With what?
20       A.  A construction lawsuit between us and a
21   contractor.
22       Q.  I see.  Was that a lawsuit that you were
23   involved in your personal capacity?
24       A.  Yes.
25       Q.  Well, given that you are an attorney and you've

## 7

1    given a deposition before, I will skip the various
2    housekeeping rules -- housekeeping and ground rules,
3    but, you know, to the extent there's an issue throughout
4    the deposition, we can always talk about that, then I
5    guess I would remind you, if you need a break at any
6    time, I'll be happy to take one.  Please let me know.
7        A.  Okay.
8        Q.  Where did you go to law school?
9        A.  University of Texas.
10       Q.  When did you graduate?
11       A.  1992.
12       Q.  Can you list the jobs that you've held since
13   graduating law school in 1992?
14       A.  Yeah.  I was a drafting attorney or legislative
15   counsel for the Texas Legislative Council and --
16       Q.  Approximately what years did you hold that
17   position?
18       A.  1993 to 1996.  And then I went to work for the
19   Senate Jurisprudence Committee as committee director and
20   counsel, so from '97 to basically early 1998, somewhere
21   around that time.
22       Q.  What was that next position you held?
23       A.  Director and counsel to the Texas Judicial
24   Council from around 1998 until 2000 -- the end of 2000.
25       Q.  And what was your next position?

## 8

1        A.  General counsel for the lieutenant governor
2    from 2000 until -- from January -- from 2001 until
3    January of 2003.
4        Q.  And after serving as general counsel for the
5    lieutenant governor, what was the next position that you
6    held?
7        A.  Deputy parliamentarian -- Deputy House
8    parliamentarian from 2003 to 2004 and then House
9    parliamentarian from January 2004 until May of 2007, and
10   then from the fall of 2007, special counsel at Baker
11   Botts until January of 2009.  Then back to House
12   parliamentarian from January of 2009 until January of
13   2010, and then chief of staff from January 2010 until
14   March of 2010.
15       Q.  When you say chief of staff --
16       A.  For the speaker.
17       Q.  And that's Speaker Straus, correct?
18       A.  Yes.
19       Q.  Throughout your legal career have you ever had
20   any particular experience with election or voting law?
21       A.  I don't -- What do you mean?  Just reading the
22   Statutes or --
23       Q.  Well, starting with your time as drafting
24   counsel or counsel for the Legislative Council -- for
25   the Texas Legislative Council, excuse me, did you have



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 9

1  any particular responsibility for drafting legislation
2  related to Texas elections?
3      A.  Not that I recall, no.
4      Q.  How about in your capacity as committee
5  director for the senate judiciary?  Was it jurisprudence
6  committee?
7      A.  Senate jurisprudence.
8      Q.  What is the subject matter that the
9  jurisprudence committee covers?
10     A.  Well, back then it was mostly tort.  The
11 jurisdiction's changed, so this was way back, but it was
12 mostly tort law and courts -- jurisdiction and
13 administration of the court system, things like that.
14     Q.  You said that you were director of the Texas
15 Judicial Council?
16     A.  Right.
17     Q.  What is the Texas Judicial Council?
18     A.  They are -- They do policy for the judiciary,
19 so they do things like public access to court records,
20 judicial compensation, judicial -- what I would call
21 judicial management, emergency management, things like
22 that, budget for the courts, technology.
23     Q.  In your capacity as general counsel for the
24 lieutenant governor, what were your duties in that role?
25     A.  Redistricting, working on that, tort issues,

## 10

1  open records, criminal law, general -- just regular
2  general counsel duties, personnel.
3      Q.  In your capacity as general council to the
4  lieutenant governor, did you have any experience with
5  the Voting Rights Act?
6      A.  Probably only as it related to redistricting,
7  but I can't remember directly what it would be.
8      Q.  What do you recall about your involvement with
9  redistricting as general counsel to the lieutenant
10 governor?
11     A.  Just advising on the floor proceeding and the
12 calendar, just general advice.
13     Q.  Okay.  How is it that you came to be deputy
14 House parliamentarian?
15     A.  I was asked to be.  I was just asked by the
16 person that was going to be parliamentarian if I would
17 be his deputy parliamentarian.
18     Q.  What is the House parliamentarian?
19     A.  They are a House officer, and they interpret
20 the rules and precedents, and they advise the presiding
21 officer on matters of rules and procedure and process.
22     Q.  And as deputy House parliamentarian, what would
23 your duties include?
24     A.  You would assist the parliamentarian, do some
25 research on procedural issues and matters of policy -- I

## 11

1  mean, matters of procedure, and when the parliamentarian
2  is unavailable, you would -- you sit in for the
3  parliamentarian whether they are not available.
4      Q.  Is the parliamentarian an employee of the
5  speaker?
6      A.  The parliamentarian is a House officer, so they
7  work for the House of Representatives.
8      Q.  Is it correct that in or around May of 2007,
9  you resigned your position as parliamentarian?
10     A.  Yes.
11     Q.  Can you tell me why you resigned?
12         MR. SWEETEN:  In answering the question, I
13 don't want you do reveal any communications you had with
14 legislative staff as the parliamentarian or any
15 communications that you've had with state agencies, with
16 Texas legislative counsel.  Those would be subject to
17 the legislative privilege, and as we've discussed, any
18 members of the House or legislative staff, okay?
19         THE WITNESS:  Okay.
20         MR. SWEETEN:  So don't reveal any
21 communications.  Also, there is -- another element to it
22 is legislative privilege.  You are protected from having
23 to provides information related to your mental
24 processes, motivations about legislation or a
25 legislative act.  So be mindful of that when answering

## 12

1  the question and you can answer the question to the
2  extent you are not revealing those privileges.
3      A.  Okay.  Ask it again.
4          MR. HARRIS:  Sure.  I will ask the court
5  reporter to read it back.
6          THE REPORTER:  Can you please restate it?
7  I'm having problems with the computer.
8      Q.  I believe the question was can you briefly tell
9  me why you resigned your position as House
10 parliamentarian in 2007?
11     A.  I just felt like it would be better -- in the
12 best interests of the House for someone else to serve
13 that role.
14     Q.  There were press reports in or around 2007
15 describing a letter that Speaker Tom Craddick had sent
16 you regarding your obligation with respect to
17 attorney-client privilege and that letter was published
18 in the press.  Do you recall that?
19     A.  Yes.
20     Q.  And did you consider yourself to have an
21 attorney-client relationship with Speaker Craddick?
22     A.  I considered myself to have the relationship --
23 a confidential relationship with the speaker,
24 legislative privilege.
25     Q.  And I believe you said that in the fall of '07



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                                    JUNE 14, 2012

---

### 13

1   you became special counsel at Baker Botts; is that
2   right?
3        A.   Yes.
4        Q.   What sort of work did you do there?
5        A.   Just a general corporate practice, some
6   governmental relations, but mostly legal research.
7        Q.   At that time did you work on any issues
8   relating to election or voting law?
9        A.   No.
10       Q.   And what were the circumstances under which you
11  came back to become House parliamentarian again in 2009?
12       A.   There was a new speaker, and the House wanted
13  an experienced parliamentarian, so I -- I was available
14  to come back.
15       Q.   Is it correct that when you came back as House
16  parliamentarian in 2009, you also held the title of
17  special counsel?
18       A.   Yes.
19       Q.   Was that special council to the speaker of the
20  House?
21       A.   No, to the House.
22       Q.   What were the circumstances under which you
23  switched from being the House parliamentarian and
24  special counsel to the House to becoming chief of staff
25  to Speaker Straus?

### 14

1        MR. SWEETEN:   You can answer the question.
2   Just don't reveal any sort of attorney-client privilege
3   or legislative privilege matters in doing so, okay?
4        A.   The sitting chief of staff wanted to go back to
5   the private sector, and I was experienced and I was
6   there and I -- I got -- I was asked to do it.
7        Q.   And what were your duties as chief of staff to
8   Speaker Straus?
9        A.   You manage the staff, administrative role --
10  play an administrative role for the speaker of the
11  House.   You just -- What I would call just general
12  duties of the speaker's office, oversee those, work with
13  the speaker on matters of policy and work with the other
14  House officers and --
15       Q.   Can you describe the speaker's role in the
16  House?
17       MR. SWEETEN:   You can answer as a matter
18  of general parliamentary procedure.
19       A.   He is the preceding officer of the House.
20       Q.   What are his duties as preceding officer?
21       A.   He oversees the daily operations of the House
22  and works with the leadership to determine what issues
23  go before the House, and he in consultation with the
24  parliamentarian rules on matters of procedure before the
25  House.

### 15

1        Q.   A speaker can vote on legislation, correct?
2        A.   Yes.
3        Q.   Can he vote on all legislation or only certain
4   legislation?
5        A.   All.
6             (League Exhibit 2 marked.)
7        Q.   I'd like this document to be marked as Texas
8   League -- I think we are up to 2.
9             Ms Davis, the court reporter just handed
10  you Exhibit 2.   Take a moment to look this over.   I'll
11  represent to you it is not the entire document, but,
12  rather, excerpts, but my first question is do you
13  recognize this excerpted document is?
14       A.   Yes.
15       Q.   What is it?
16       A.   It's -- It's portions of the House rules.
17       Q.   And who the writes this document?
18       A.   Well, the members write it, but the ledge
19  council drafts what the members want them to write.
20       Q.   And is there something that the members of the
21  House have to vote on?
22       A.   Yes.
23       Q.   And he see on the cover page here that this
24  refers to the -- to the 81st legislature?
25       A.   Yes.

### 16

1        Q.   Do you know what year that would have covered?
2        A.   That would have been 2009.
3        Q.   And you were House parliamentarian at that
4   time; is that correct?
5        A.   Yes.
6        Q.   Could you please turn to the second page, what
7   I've handed you?   But the page number at the bottom is
8   18.
9        A.   Yes.
10       Q.   And look at Section 9.  It says, "The
11  parliamentarian is an officer of the House who serves at
12  the pleasure of the speaker."  What does it mean to be
13  an officer of the House?
14       A.   It means that you work for the entire House as
15  an institution.
16       Q.   The next sentence says that the
17  parliamentarian -- and I'm sorry, the aspect of the
18  sentence, it says, "serves at the pleasure of the
19  speaker."  Does that mean that the speaker has the
20  authority to terminate you as parliamentarian?
21       A.   Yes.
22       Q.   And then the next sentence says,
23  "Parliamentarian shall advise and assist the presiding
24  officer and/or the members of the House on matters of
25  procedure."  I believe earlier you said that the speaker

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 17

1   is generally the presiding officer; is that right?
2       A.  Yes.
3       Q.  What does it mean to "advise and assist either
4   the presiding officer and/or the members of the House on
5   matters of procedure"?
6       A.  It means is that you answer questions, do
7   research, things like that.
8       Q.  When the House is in session, does the
9   parliamentarian sit on the floor?
10      A.  Yes.
11      Q.  Do you -- or I guess in your capacity as
12  parliamentarian, did you always sit on the floor when
13  the House was in session?
14      A.  No.
15      Q.  How frequently would you sit on the floor when
16  the House was in session?
17      A.  The majority of the time the parliamentarian is
18  on the floor when the House is in the session.
19      Q.  So you said that one of the jobs of the
20  parliamentarian is to answer questions for members.  Is
21  it ever the parliamentarian's role to intervene in the
22  proceeding without a question having been asked?  So,
23  for instance, you are viewing the proceedings and you
24  think something is happening that violates a procedural
25  rule of the House, can you -- I guess the legal term

## 18

1   would be sua sponte, but let's say on your own could you
2   intervene somehow?
3       MR. SWEETEN:  You can answer as a matter
4   of parliamentary procedure.  Don't reveal your specific
5   discussion regarding specific legislation.  Go ahead.
6       A.  Well, under the rules it states you can advise
7   the presiding officer, so you could advise the presiding
8   officer if there was something going on that you had
9   issues about.
10      Q.  Reading from the next sentence, it says, "The
11  parliamentarian has a duty of confidentiality to the
12  speaker and to each member of the House and shall keep
13  confidential all requests made by members of the House
14  for advise for guidance regarding procedure unless the
15  parties otherwise agree."  Does that sort of in a
16  nutshell capture what you were describing before when
17  you said you had duties of confidentiality to the House
18  and to members of the House?
19      A.  Yes.
20      Q.  Do you know when this rule, this Section 9,
21  describing the role and duties of the parliamentarian
22  became an official part of the rules of the Texas House?
23      A.  The Rule 9, I think, it was actually enacted in
24  '09.
25      Q.  Do you recall whether there were any similar

## 19

1   rules describing the official role of the
2   parliamentarian in prior versions of the rules and
3   precedents of the Texas House?
4       A.  Well, it covered the parliamentarian's role
5   prior to that because the parliamentarian is an employee
6   of the council and then in '09, they did a specific
7   provision for the parliamentarian, but the
8   parliamentarian is a legislative council employee, and
9   so they -- prior to that time, Section 10 was used for
10  interpreting that, the role of parliamentarian.
11      Q.  I believe you said that your first job out of
12  law school was as a drafting counsel for the Texas
13  Legislative Council; is that right?
14      A.  Yes.
15      Q.  First of all, what is the Texas Legislative
16  Council?
17      A.  It's a legislative support agency for the Texas
18  legislature.
19      Q.  What role does the Texas Legislative Council
20  perform for the legislature?
21      A.  They do technology, computer support.  They do
22  research.  They draft resolutions.  They do legal work,
23  legal research.
24      Q.  As drafting counsel, what was your duties at
25  the Texas Legislative Council?

## 20

1       A.  I drafted criminal law and juvenile justice and
2   human services.
3       Q.  How would you decide what resolutions or bills
4   to draft as a general matter?
5       A.  The members would make the request for bills to
6   be drafted and then you would take their drafting
7   instructions and draft.
8       Q.  Are you aware of any time when the Texas
9   Legislative Council would take it upon itself to draft a
10  bill without a specific request from a member?
11      A.  I don't know.
12      Q.  Did you ever draft any legislation on your own
13  that you thought of?
14      A.  As a legislative counsel?
15      Q.  Correct.
16      A.  No.
17      Q.  And I apologize if we've already covered this,
18  but did you draft any bills in your time with the Texas
19  Legislative Council relating to either the Texas
20  Election Code or Texas elections in general?
21      A.  Not to my knowledge.  I did criminal law and
22  juvey justice, things like that.
23      Q.  In general without referring to any specific
24  decision you made as parliamentarian, when you would get
25  a request for advice from a member, what would you do at



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**21**

1    that point?

2         MR. SWEETEN:  Object.  Compound, vague,

3    but go ahead.  You can answer the question as a matter

4    of general procedure.

5         A.  Oh, consult the rules and the law.

6         Q.  And when you say "the law," we've obviously

7    talked about the rules.  What other sources of law would

8    you refer to?

9         A.  Constitutional.  The Constitution.

10        Q.  Would you ever look to case law?

11        A.  Occasionally, you could, but rarely -- rarely

12   would you get into case law.  It's usually procedural.

13        Q.  Did you receive any specialized training in

14   order to become either deputy parliamentarian or

15   parliamentarian?

16        A.  No.

17        Q.  Do you know if there exists any specialized

18   training one could take to become a parliamentarian?

19        A.  To become House parliamentarian?

20        Q.  Yes.

21        A.  Not to my knowledge.

22        Q.  There is a senate parliamentarian as well,

23   correct?

24        A.  Yes.

25        Q.  How familiar are you -- or during your time as

---

**22**

1    a House parliamentarian and deputy parliamentarian, how

2    familiar were you with the rules of the Senate?

3         A.  Vaguely -- Vaguely familiar with those.

4         Q.  In general, did you have any interaction with

5    the Senate parliamentarian?

6         A.  Yes.

7         Q.  What the sort of interaction did you have with

8    the Senate parliamentarian?

9         A.  We would talk on the phone, consult about the

10   flow of and consideration of bills to make sure the

11   House and the Senate were, you know, operating in a way

12   that was efficient.

13        Q.  How frequently would you talk to the Senate

14   parliamentarian when the House was in session?

15        A.  Probably once or twice a week maybe.

16        Q.  During your time as House parliamentarian

17   between 2004 -- Let's start with the first period.  From

18   2004 to 2007, do you recall who the Senate

19   parliamentarian was during those years?

20        A.  I believe it was Walter Fisher and then Corina

21   Davis.  Corina.

22        Q.  Then how about when you returned as House

23   parliamentarian in January of 2009 through January of

24   2010?

25        A.  Corina Davis.

---

**23**

1         Q.  If an issue came -- In general, when issues of

2    proper procedure in the House came up, would you ever

3    consult the Senate parliamentarian as to the proper

4    ruling?

5         A.  In a House matter?

6         Q.  Correct.

7         A.  Not to my knowledge.

8         Q.  How about vice versa?  Did either Mr. Fisher or

9    Ms. Corina Davis ever consult with you regarding an

10   issue of either interpretation of the Senate rules or

11   proper procedure in the Senate?

12        A.  Not to my knowledge, no.

13        Q.  What did you do to prepare for your deposition

14   today?

15        A.  Just met with counsel and came here.

16        Q.  And you are represented here today by

17   Mr. Sweeten; is that correct?

18        A.  Correct.

19        Q.  Is anyone else in the room representing you

20   today?

21        A.  I guess technically in my capacity as chief of

22   staff, Tom Phillips.

23        Q.  Are you currently chief of staff to the

24   speaker?

25        A.  No.

---

**24**

1         Q.  What is your current job?

2         A.  I'm in private practice.

3         Q.  As an attorney?

4         A.  Yes.

5         Q.  Can you tell me briefly what sort of practice

6    you have now?

7         A.  I have a small practice that is a regulatory

8    and corporate practice.

9         Q.  And going back to what you did to prepare for

10   this deposition, I think you said you met with

11   Mr. Sweeten.

12        A.  Yes.

13        Q.  How many times did you meet with Mr. Sweeten?

14        A.  Twice.  Yesterday and today.

15        Q.  And when you met with Mr. Sweeten yesterday,

16   how long did you meet yesterday?

17        A.  Maybe about an hour and a half.

18        Q.  Was anyone else present during that meeting?

19        A.  Stacey Napier and Tom Phillips.

20        Q.  I think you said you had a second meeting with

21   Mr. Sweeten.

22        A.  Yes.

23        Q.  When was that?

24        A.  This morning.

25        Q.  How long did that meeting last?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**25**

1     A.  30 minutes.
2     Q.  Was anyone else besides yourself and Mr.
3  Sweeten present during that meeting?
4     A.  Yes.  The intern.
5     Q.  Without asking you to get into any specifics,
6  did you review documents in preparation for this
7  deposition?
8     A.  No.
9     Q.  I'd obviously like to talk to you a lot about
10 the legislative process, specifically on the House side.
11 Starting at the very beginning of the process, how does
12 a bill get introduced in the Texas House?
13         MR. SWEETEN:  You can answer as a general
14 matter.
15    A.  The bill gets referred or read by the -- Well,
16 it gets filed with the clerk -- with the chief clerk and
17 then it gets referred to a committee and then it at that
18 point is in the jurisdiction of the committee to decide
19 when they want to hear the billing and then at that
20 point it comes out of the committee and goes to the
21 calendar committee for consideration for House action --
22 floor action.
23    Q.  You said a bill gets referred to a committee.
24 Who makes the decision as to which committee to refer a
25 bill to in the House?

**26**

1     A.  The speaker.
2     Q.  And as a general matter what sorts of
3  considerations does he take into account in deciding
4  which committee to assign a bill to?
5         MR. SWEETEN:  Hold on a minute.  The
6  question asks for the speaker's thought process.  If
7  answering the question would impact any specific
8  legislation and considerations taken with respect to
9  specific legislation, my instruction would be not to
10 answer the question.  If you can answer as a general
11 matter without discussing specific legislation, then
12 I'll allow you to do so, but be mindful of the fact
13 that -- do not reveal it if it would reveal his mental
14 impressions.
15    A.  Okay.  Under the House rules the speaker can
16 confer with the parliamentarian to determine where bills
17 go.
18    Q.  When you were House parliamentarian, first
19 starting under Speaker Craddick, would he consult with
20 you regarding which committee to assign a bill?
21    A.  Yes.
22    Q.  And how about under Speaker Straus, as House
23 parliamentarian would Speaker Straus consult with you as
24 to which committee a bill would be assigned to?
25    A.  Yes.

**27**

1     Q.  What considerations would you take into account
2  when helping the speaker decide which committee to
3  assign a bill too?
4         MR. SWEETEN:  I'm going to object to
5  compound.  I'm also going to instruct you with respect
6  to the legislative privilege, do not reveal the thought
7  processes or mental impressions that took place with
8  respect to any sort of specific legislation.  If
9  answering this question would do so, do not answer it,
10 okay?
11    A.  Ask the question.  What was the question again?
12    Q.  What considerations would you take into account
13 when advising the speaker as to which committee a bill
14 should be assigned to?
15    A.  You would just look at the House rules, see
16 what -- the jurisdictional issues that there are.
17    Q.  Is it ever the case a committee's -- that a
18 bill could fall under more than one committee's
19 jurisdiction?
20    A.  Yes.
21    Q.  And how would you resolve that conflict as to
22 which of the two or more committees to assign a bill to?
23         MR. SWEETEN:  Same instruction.
24    A.  I think you just look at each bill and confer
25 with the speaker.

**28**

1     Q.  Stepping back for a moment, you said the first
2  step in the process is that a bill is filed.  Going back
3  even earlier in the timeline, we talked about the Texas
4  Legislative Council, but I would ask you in general who
5  writes the bills that are filed in the House?
6     A.  Well, it could be anyone that could write it.
7  It could be the member.  It could be ledge council.  It
8  could be anyone.
9     Q.  What is a co-author?
10    A.  Co-author is someone that is -- that the --
11 along with the author of the bill, they have their name
12 on the bill, another member.
13    Q.  Is there a difference between a co-author and a
14 joint author?
15    A.  I believe that the -- that there is -- that
16 there are a limited number of co-authors that you can
17 have on a bill.  Five, I believe, or there's one author
18 and four co-authors, and then you can have I believe an
19 unlimited number of joint authors.
20    Q.  What is the sponsor of the bill?
21    A.  I'd have to look at the rules and tell you.
22 It's been a long time.
23    Q.  I may not have not have observed that about you,
24 but I'm asking for your recollection if you have one.
25 Well, is the person who introduces the bill, the bill's



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                                    JUNE 14, 2012

---

**29**

1  sponsor?
2      A.  I believe that's the author of the bill is the
3  person that introduces and then you can have -- you can
4  have lots of sponsors and then -- but you can have a
5  limited number of co-authors, I believe, is how the rule
6  is interpreted.
7      Q.  What significance is there to the date on which
8  a bill gets filed?
9      A.  Well, that's when the author of the bill brings
10  the bill into the committee clerk's office and it gets
11  stamped by the chief clerk -- I'm sorry, of the House,
12  not the committee clerk.  By the chief clerk of the
13  House.  That's when they bring the bill in and have it
14  stamped.
15      Q.  Are there any reasons why a member would want
16  to file very early in the session as opposed to waiting
17  longer in time and filing it later?
18      A.  Yes.
19      Q.  And what would those reasons be as a general
20  matter?
21          MR. SWEETEN:  Objection.  Common, but go
22  ahead.  You can answer as a general matter.  Do not
23  reveal any information about a specific piece of
24  legislation.
25      A.  It may be a high priority to the member in the

---

**30**

1  district or it just get it filed for whatever reason.
2  There are many numerous reasons depending on the
3  members.
4      Q.  How long is the Texas House in session for?
5      A.  140 days.
6      Q.  If someone were to introduce a bill, let's say,
7  on Day 138 with two days remaining in a session, as a
8  general matter could that impact the chances of that
9  bill going through the process in time for that session?
10      A.  Do you mean would it?  I don't understand your
11  question.  You mean, would it pass?  Is that what you
12  are asking?
13      Q.  Well, I'm just asking is there any significance
14  as to how early a bill is filed in terms of the chances
15  that it will make it through the session in time prior
16  to the end of the session.
17      A.  I think generally members want to file their
18  bills early.
19      Q.  Have you ever heard of members camping out to
20  ensure that they get an early bill number?
21      A.  Yes.
22      Q.  What does that camping out refer to or what do
23  you recall about that?
24      A.  I just -- I've heard of members bringing things
25  in and sleeping in line, I guess, to file bills.

---

**31**

1      Q.  Is it correct that bill numbers are assigned to
2  a bill in the order in which they are a filed?
3      A.  Generally, yes.  That's generally right.
4      Q.  Do you recall members camping out to file --
5  Let's step back for a moment.  Are you familiar with
6  bills in Texas relating to photo identification for
7  voters that voters must show at the polls?
8      A.  Yes.
9      Q.  Do you recall anyone camping out to file such a
10  bill?
11      A.  No.
12      Q.  Once a bill is referred to committee, what
13  happens then?
14      A.  Once a bill is referred to committee, then it's
15  up to the committee and the chairman of the committee to
16  decide what to do with the bill.
17      Q.  Are there normal procedures that committees
18  following in considering bills?
19          MR. SWEETEN:  Objection.  Compound.  You
20  can answer as a general matter.
21      A.  Yes.
22      Q.  Where are those procedures?
23      A.  Well, they decide what the -- when they want to
24  set it and who they -- which bills they want voted out
25  and what the testimony will be and that just general

---

**32**

1  administrative things and beyond that it's up to the
2  chairman.
3      Q.  If a bill is not voted out of committee, what
4  happens to it then?
5      A.  It just stays there.
6      Q.  If a bill is in fact voted out of committee,
7  what happens to the bill at that point?
8      A.  It goes to the calendars committee.
9      Q.  What is the calendar committee?
10      A.  It's a procedure or committee that sets the
11  floor action of bills for consideration by the House and
12  recommends those for consideration by the House.
13      Q.  When you say they recommend floor action or
14  consideration for the bill, what does that mean?
15      A.  That means they set a calendar -- a daily
16  calendar for House action on bills.
17      Q.  Is it possible that a bill could come out of
18  committee, but not be assigned by the -- for floor
19  action?
20      A.  You mean come out of the committee and just go
21  to the calendars and stay in calendars?
22      Q.  Correct.
23      A.  Yes.
24      Q.  To complete the process, let's say assuming
25  that the calendars committee sets the bill for floor

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 33

1  consideration, what happens at that point in the
2  process?
3      A.  It gets puts on a calendar.
4      Q.  Is there more than one type of calendar?
5      A.  Yes.
6      Q.  What are the types of calendars?
7      A.  There's the emergency calendar, constitutional
8  calendar.  There is a whole system of calendars.  I'd
9  have to look at the rules, but there are several
10  calendars.  Emergency, constitutional, major state,
11  general state, local and consent which is through the
12  local and consent calendars committee.
13      Q.  As a general matter, what dictates which
14  calendar a bill is assigned to?
15      A.  Well, the rules and the calendars committee,
16  they consult the rules and they decide which bills go on
17  the calendar.
18      Q.  What is the process for considering a bill when
19  it's assigned to one of these calendars?
20      A.  You mean by the House?
21      Q.  Correct.
22      A.  Well, the speaker lays the bill before the
23  House.
24      Q.  What does that mean?
25      A.  He lays the bill out and then recognizes the

## 34

1  author of the bill to explain the bill to the members.
2      Q.  And assuming the bill is laid out and the
3  author is recognized, is it always the case that a bill
4  will get a vote by the House at that point?
5      A.  No.
6      Q.  What would prevent a bill from getting a vote
7  even though it's already been laid out before the House?
8          MR. SWEETEN:  You can answer as a general
9  matter.
10      A.  Oh, just a variety of issues.  The member may
11  not somebody ready.  There may be amendments that they
12  are working on.  It could be a timing issue.  Any number
13  of issues.
14      Q.  Who decides when an ultimate vote by the entire
15  House should occur on a bill?
16      A.  Generally, it's the member of the bill.  The
17  author of the bill will decide when they're ready.
18      Q.  And does the author of the bill have the
19  authority to call a vote on the bill or does it require
20  the speaker's involvement?
21      A.  It does.
22      Q.  It does require the speaker's involvement?
23      A.  Yes.
24      Q.  Assuming a bill is -- passes an entire vote of
25  the House, at that point the bill goes to the Senate; is

## 35

1  that correct?
2      A.  Yes.
3      Q.  I asked you before if there was any
4  significance to the date on which a bill is filed -- You
5  know, let's say a bill was filed or introduced on the
6  last day of the session, would there be time -- could it
7  even be possible that there would be time to go through
8  this entire process of assigning a bill to a committee,
9  voting it out of committee, referring it to the calendar
10  committee, setting it for a floor vote, having a floor
11  debate, having a floor vote, finally passing the bill
12  and sending it to the Senate, is there a reasonable
13  chance that, you know, a bill introduced that late in
14  the session could be become law?
15          MR. SWEETEN:  Objection.  Calls for
16  speculation, but you can answer.
17      A.  I suppose if there was a suspension of the
18  rules, I'd have to look at the Constitution, but it
19  would be very difficult.
20      Q.  Are there ever times when bills are not
21  referred to a specific committee, but instead are
22  referred to a committee consisting of the entire House?
23      A.  Like a committee of the whole?
24      Q.  Correct.
25      A.  The rules do allow for a committee of the

## 36

1  whole, but I don't have any memory of us ever doing
2  that.
3      Q.  So starting with your time as House
4  parliamentarian between 2004 and 2007, you don't recall
5  any times when the House referred a particular bill to
6  the committee of the whole House?
7      A.  I don't -- I don't remember that.  I can't
8  recall that at all.
9      Q.  How about between 2009 when you became House
10  parliamentarian again through -- Well, I think you said
11  your service as chief of staff to the speaker ended --
12  was it March 2012?
13      A.  Yes.
14      Q.  So from the time you rejoined the House as
15  parliamentarian through the time you left the speaker
16  staff in March 2012, do you recall any times when the
17  House referred -- or, excuse me -- the speaker referred
18  a bill to the committee of the whole House rather than a
19  particular committee?
20      A.  No.
21      Q.  Do you have any understanding as to why the
22  rules of the House would permit a bill to be assigned to
23  the committee of the whole House rather than a
24  particular committee?
25      A.  No.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                                    JUNE 14, 2012

---

### 37

1  Q.  Without referring to any particular
2  legislation, were you ever asked to consider whether a
3  particular bill should being assigned to committee of
4  the whole rather than a particular committee?
5       MR. SWEETEN:  I think that calls for a
6  matters of legislative privilege.  I realize the preface
7  doesn't, but then you are asking whether as to a
8  specific piece of legislation she was ever asked to, so
9  I'm going to instruct you as phrased not to answer the
10  question.
11  Q.  Ms. Davis, you said that you recalled that laws
12  concerning voter ID requirements for voters in Texas
13  were introduced in legislature at some point during your
14  time there; is that correct?
15  A.  Yes.
16  Q.  Can you recall when the first such law was
17  introduced?
18  A.  No.
19       (League Exhibit 3 marked.)
20  Q.  I'd ask that this document be marked as Texas
21  League Exhibit 3.  And, Ms. Davis, please take a few
22  minutes to look over this document.
23       MR. SWEETEN:  Adam, are we missing the
24  last page of 1706 here?
25       MR. HARRIS:  I can't say for sure.  I

### 38

1  can't tell.  It doesn't have the session on here.  Looks
2  like we are missing one page of this.  Why don't we go
3  off-the-record a few minutes?
4       (Recess from 11:52 a.m. to 11:04 a.m.)
5       MR. HARRIS:  Since it appears that we are
6  missing the last page of what we marked as Exhibit 3, I
7  will show you what has been previously marked and
8  introduced as US44.  Actually, if the court reporter
9  could remark the exhibit, I don't think that one has a
10  sticker.  Please take a few minutes to look over this
11  document, Ms. Davis?
12  A.  (Witness complied.)
13  Q.  Have you had a few moments to look over the
14  document?
15  A.  Yes.
16  Q.  Do you recall in the bill, HB No. 1706,
17  concerning an act relating to requiring a voter to
18  present proof of identification?
19  A.  Not specifically.
20  Q.  Do you remember it in any sort of general way?
21  A.  No, I really don't.  I don't remember this
22  bill.
23  Q.  Are you able to tell from looking at the copy
24  of the bill that you have before you which session of
25  the House it was produced in?

### 39

1  A.  Yes.  It was the 2005 session.
2  Q.  Was that the 79th session; do you recall?
3  A.  Yeah.  I believe that's right.
4  Q.  Would looking at a legislative history of this
5  bill help to reflect your recollection as to the
6  procedural history?
7  A.  I don't know.  I'm not sure.
8  Q.  Let's try.
9  A.  Okay.
10       (League Exhibit 4 marked.)
11  Q.  I'd ask that this document be marked as League
12  Exhibit 4.  And, Ms. Davis, please take a few moments to
13  look over these documents.
14  A.  Okay.
15  Q.  And, Mrs. Davis, that appears to be a
16  legislative history of HB1706 from the 79th session; is
17  that right?
18  A.  Yes.
19  Q.  And it looks like this is printed from the
20  Legislative Privilege Library of Texas.
21  A.  Yes.
22  Q.  Do you have familiarity what that entity is?
23  A.  Yes.  They're a legislative agency.
24  They track legislation and do research.
25  Q.  Is that a state agency of the State of Texas?

### 40

1  And I see here that the bill history refers to the
2  79th regular session.  What does it mean to say a
3  regular session?
4  A.  That's within the 140-day time period.
5  Q.  Are there ever sessions outside of the normal
6  regular 140-day time period?
7  A.  Yes.
8  Q.  What sorts of sessions are those?
9  A.  Special sessions.
10  Q.  What are the circumstances under which a
11  special session occurs?
12  A.  The governor has the authority under the
13  constitution to call a special session.
14  Q.  And does a special session occur at a
15  particular point in time or can it occur at any point in
16  time?
17  A.  Whenever the governor thinks it's appropriate
18  to do so.
19  Q.  In looking at the bill history here, it appears
20  that HB1706 was filed on February 28th, 2005; is that
21  right?
22  A.  Yes.
23  Q.  Looking at the bill itself, there's a byline.
24  It says by Denny, Pitts, Woolley, Nixon, Bohac, et al.
25  Do you have any understanding as to why that group of

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 41

1  names is listed under a byline here?
2      A.  No.  Other than they would be, I guess,
3  co-authors, no.
4      Q.  Then it looks like that on March 2nd, 2005, the
5  bill was read for the first time?
6      A.  Yeah, that's what the history says.
7      Q.  And does that mean that the bill is read aloud
8  on the House floor?
9      A.  Yes.
10     Q.  And then it looks like on that same day, the
11  bill was referred to -- it says, "Referred to
12  elections."  Would you understand that to mean the House
13  committee on elections?
14     A.  Yes.
15     Q.  And can you tell me generally what the subject
16  matter of that committee covers?
17     A.  Okays.  Just election law, campaign finance
18  law.
19     Q.  And then it looks like eight dates later on,
20  March 10th, 2005, the bill was referred directly to
21  subcommittee by the chair.  Do all the committees in the
22  House have subcommittees?
23     A.  Any committee can have a subcommittee.
24     Q.  And what is the -- what is the purpose of
25  having subcommittees?

### 42

1         MR. SWEETEN:  You can is answer as a
2  matter of general procedure.
3      A.  So rules allow for subcommittees whenever the
4  chairman of the committee thinks it's appropriate to
5  appoint a subcommittee.
6      Q.  Then it looks like in the March 2005, the bill
7  was considered and the testimony was taken in a
8  subcommittee; is that right?
9      A.  Yes.
10     Q.  It says that on March 17, 2005, the bill was
11  left pending in subcommittee.
12     A.  Yes.
13     Q.  What does that mean?
14     A.  It means that it wasn't voted out of committee.
15  It was just left in the committee for a -- for whatever
16  reason.
17     Q.  And then on April 4, 2005, it appears that the
18  bill was recalled from the subcommittee.
19     A.  M-hm.
20     Q.  What does that mean to recall a bill from a
21  subcommittee?
22         MR. SWEETEN:  You can answer as a general
23  matter of what that means.
24     A.  Under the rules, you can bring a bill back from
25  a subcommittee and bring it before the entire committee.

### 43

1      Q.  It says on that same day, April 4th, that "A
2  committee substitute was considered in the committee."
3  What is a committee substitute?
4         MR. SWEETEN:  Again, and you can answer as
5  to the general meaning of that.
6      A.  Under the rules of a committee substitute, it's
7  just like an amended version or a different version of
8  the original bill.
9      Q.  And then, again, on that same day, it states
10  that "the bill was reported favorably as substituted."
11  What does that mean to be reported favorably?
12         MR. SWEETEN:  You can answer as a general
13  matter.
14     A.  It means that they voted it out of committee.
15     Q.  And then it says that "a committee report was
16  filed with the committee coordinator."  What's a --
17  What's a committee report?
18         MR. SWEETEN:  Same instruction.
19     A.  That's under the rules in the official
20  documentation of the -- of the bill and the proceedings
21  in committee.
22     Q.  And who is the committee coordinator?
23     A.  The committee coordinator is the person that
24  administratively oversees the committees, the processing
25  of paperwork, things like that.

### 44

1      Q.  Does that person work for the Speaker of the
2  House?
3      A.  The committee coordinator, I believe, is -- I
4  believe they are a House officer or they work for the
5  House at least.
6      Q.  Looks like on April 7th, 2005, it looks like
7  the committee report was sent to calendars.  Do you see
8  that?
9      A.  Yes.
10     Q.  And when it was sent to calendars, is that the
11  process you were describing before when there's a
12  process by which the bill gets assigned to a particular
13  type of calendar --
14     A.  Yes.
15     Q.  -- in the House?  What does it mean when it
16  says that the bill was on April 14th, 2005 considered in
17  calendars?
18         MR. SWEETEN:  On these -- And I just want
19  to make sure my instruction's clear.  He can ask you
20  questions about as a general matter what these -- what
21  these mean.  Now, he's handed you this in the context of
22  the specific bill, 1706.  I'm just going to caution you
23  that when you are answering these questions, don't
24  reveal any specific mental impressions or thoughts about
25  the specific legislation or interpret it as to this



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

DENISE DAVIS                                                    JUNE 14, 2012

---

## 45

1  bill, but you can answer these questions as phrased.  I
2  don't have a problem with those.
3      MR. HARRIS:  Mr. Sweeten, just to clarify,
4  in Ms. Davis's capacity as parliamentarian, putting
5  aside her role as chief of staff, what is the basis of
6  any objection with respect to her own mental impressions
7  or opinions?
8      MR. SWEETEN:  Those would be subject to
9  the legislative privilege.  She's also got an
10 attorney-client relationship based upon that position,
11 and so there are two potential privileges that apply.
12 Legislative privilege does apply, and so when -- and I
13 haven't objected to you asking these questions on what
14 the general parliamentary procedure is, and she will
15 continue to answer.  I'm just making sure that we're
16 clear that that's not going to reveal her specific
17 thoughts or mental impressions about legislation, so you
18 can continue.
19     Q.   (BY MR. HARRIS) Ms. Davis, going back, I
20 believe you stated that when I asked you before whether
21 you believed you had an attorney-client relationship
22 with the speaker, this is Speaker Craddick we are
23 referring to, I think, at this time -- Well, let me ask
24 you this.  During 2005 was Speaker Craddick the speaker
25 of the House?

## 46

1      A.   Yes.
2      Q.   Did you consider yourself to have an
3  attorney-client relationship with Speaker Craddick in
4  2005?
5      A.   In your capacity as parliamentarian, you have
6  a -- you have a relationship with the -- with the
7  presiding officer in his capacity as the presiding
8  officer as a House officer.
9      Q.   And that relationship you would describe as an
10 attorney-client relationship?
11     A.   Yeah, legislative attorney-client.
12     Q.   Okay.  So I believe the question pending was
13 what does it mean for a bill to be considered in
14 calendars?
15     A.   It just means that the calendars committee is
16 looking at the bill and deciding whether or not to set
17 the bill.
18     Q.   Who sits on the calendars committee?
19     A.   Just House members.
20     Q.   Who appoints the members of the calendars
21 committee?
22     A.   The speaker.
23     Q.   Who appoints members of the other committees?
24     A.   The speaker.
25     Q.   And then it looks like on April 19, 2005, the

## 47

1  bill was placed on the general state calendar.
2      A.   Yes.
3      Q.   It looks like the excerpt of the results I
4  handed you does not the describe the general state
5  calendar, but are you able to describe what that -- the
6  purpose of that calendar is?
7      A.   I'd have to see it -- see the rules, but it's
8  just general bills, I guess.
9      Q.   This looks -- Okay.  On that same day, April
10 19th, when you stated that the bill had been placed or
11 at least appears the bill was placed on the general
12 state calendar, that the bill was recommitted to
13 committee.  Do you see that entry?
14     A.   M-hm.
15     Q.   What does that mean?
16     A.   It just means that it was sent back to
17 committee -- back to the elections committee.
18     Q.   Is that a normal procedure?  And by normal, I
19 mean, is it typical that once a bill is placed on a
20 calendar like the general state calendar, that it would
21 be recommitted to committee?
22     A.   It's not unusual.
23     Q.   As a general matter, why would a bill be
24 recommitted to committee as opposed to proceeding to
25 consideration by the House?

## 48

1      A.   Maybe for additional work or, you know,
2  maybe -- just could be any reason to work on the bill.
3  The bill could have a problem.  It could have a
4  procedural problem.  There could be a point of order, a
5  variety of things.
6      Q.   It looks like once the bill was recommitted to
7  committee, there was a version that was substituted
8  again.
9      A.   M-hm.
10     Q.   It actually looks like that all happened on the
11 same day, April 19th; is that right?
12     A.   Yes.
13     Q.   Then it looks like the process repeated itself
14 and the committee report was filed with the court and
15 the committee coordinator on April 20th; is that right?
16     A.   Yes.
17     Q.   Then the bill was sent back to calendars and it
18 was, again, considered in calendars on April 29, 2005;
19 is that right?
20     A.   Yes.
21     Q.   And then, again, on May 2nd it was, I guess,
22 for the second time placed on the general state
23 calendar; is that right?
24     A.   Yes.
25     Q.   On May 2nd, 2005, the bill was read for a

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

|  | 49 |
| --- | --- |

1   second time; is that right?
2       A.  Yes.
3       Q.  Does that refer to reading the bill for another
4   time on the House floor?
5       A.  That's correct, laying it out before the House.
6       Q.  And at that point looks like throughout
7   May 2nd, various amendments were considered by the House
8   and vote; is that right?
9       A.  Yes.
10      Q.  Okay.  Further down in the list of things that
11  happened on May 2nd, I see an entry that the bill was
12  passed to engrossment as amended.  Do you see that?
13      A.  Yes.
14      Q.  What does that mean, passed to engrossment as
15  amended?
16      A.  It just -- It means passed through the third
17  ringing.
18      Q.  What's required in order for a bill to be
19  passed to the third reading?
20      A.  A majority of those present.
21      Q.  A majority of those present have to vote to
22  pass the bill to the third reading?
23      A.  Yes.
24      Q.  And that's -- it looks like that's what
25  happened here?

|  | 50 |
| --- | --- |

1       A.  Yes.
2       Q.  Okay.  And then looks like the next day,
3   May 3rd, the bill was read for a third time; is that
4   right?
5       A.  Yes.
6       Q.  And it looks like on that same day, May 3rd,
7   additional amendments were considered?
8       A.  Yes.
9       Q.  Okay.  Now, I see an entry on May 3rd that says
10  that a point of order was sustained?
11      A.  Yes.
12      Q.  What is a point of order?
13      A.  It's an objection under the rules to -- to a
14  procedural defect of some sort.
15      Q.  And who can make a point of order?
16      A.  The member -- A member can raise a point of
17  order.
18      Q.  And when a point of order is raised, what
19  happens then?
20      MR. SWEETEN:  You can answer as a general
21  matter.
22      A.  The member will consult with the speaker and
23  bring their objection before the speaker, and the
24  speaker consults with the parliamentarian and then makes
25  a ruling.

|  | 51 |
| --- | --- |

1       Q.  Do you recall a point of order being raised
2   with respect to HB1706?
3       MR. SWEETEN:  You can testify as to
4   matters of public record.
5       A.  Yeah, I don't.
6       (League Exhibit 5 marked.)
7       Q.  I would ask that this document be marked as
8   League Exhibit 5.
9       Ms. Davis, have you had a few moments to
10  look over the document that was marked at Exhibit 5?
11      A.  Yes.
12      Q.  And do you recognize this to be an except or
13  does this appear to be an excerpt from the House Journal
14  of May 3rd, 2005?
15      A.  Yes.
16      Q.  And May 3rd, 2005 was the date that's reflected
17  on the bill history we were looking at for HB1706 as the
18  date on which a point of order was sustained; is that
19  right?
20      A.  Yes.
21      Q.  And looking at the middle of the first page of
22  what I handed you, which has Page No. 2543 at the top
23  right, it states that "Representative Burnam raised a
24  point of order against further consideration of HB1706
25  under Rule 6, Section 1(a), Rule 6, Section 15 and Rule

|  | 52 |
| --- | --- |

1   6, Section 17 of the House rules on the grounds that the
2   bill was placed out of order on the calendar."  Do you
3   see where it says that?
4       A.  Yes.
5       Q.  Does reading that help to refresh your
6   recollection as to a point of order that was made with
7   respect to HB1706?
8       A.  It just -- It just says that he raised the
9   journal, just reflects that he raised the point of
10  order.
11      Q.  And reading this sitting here today, does this
12  cause you to remember him raising this point of order?
13      A.  I don't remember him raising it.  I don't have
14  any reason to dispute what the journal says about it.
15      Q.  And point of order under Rule 6, these various
16  sections of Rule 6 on the grounds that the bill was
17  placed out of order on the calendar, what do you
18  understand that to mean in terms of the point of order
19  being raised with respect to HB1706?
20      MR. SWEETEN:  In answering that, don't
21  reveal your thoughts and mental impressions about the
22  bill.  You can answer as a general matter if you know
23  what that means.
24      A.  That it was in the wrong place -- you know, on
25  the wrong place on the calendar.  Maybe, you know,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 53 |
|---|

1    listed wrong on the calendar or something like that.
2        Q.   If you look at the next page of Exhibit 5 under
3    the heading afternoon session and then a further heading
4    that says HB1706, Pending Business, it states "That a
5    point of order against further consideration of HB1706
6    was pending prior to lunch recess on the grounds that
7    the bills were placed on today's calendar out of order."
8            As a general matter, what does it mean to
9    place a bill on a calendar out of order?  Does that
10   mean -- Well, let me ask you.
11       A.   It just means that it's in the wrong order on
12   the calendar.  Maybe it was listed one way instead of
13   the other way or a bill was put in front of it that
14   should not have been there, a clerical error or
15   something like that.
16       Q.   Does it mean that the bill was being considered
17   on the wrong day?
18           MR. SWEETEN:  Are you asking her does this
19   text mean that or can you specify what your question is?
20       Q.   First, I'll ask, as a general matter, if the
21   bill were being considered on the wrong day, would that
22   -- and it were being considered, would that be a case
23   where a bill was being taken out of order?
24       A.   On the wrong legislative day or the wrong
25   calendar day?  This just says placed on that date's

| 54 |
|---|

1    calendar out of order and that means that it was not
2    listed correctly on that calendar on that day.
3        Q.   And it further states here that the speaker
4    sustained the point of order; is that right?
5        A.   Yes.
6        Q.   Looking back at the bill history, it looks like
7    the bill has continued to be considered on May 3rd,
8    2005.
9        A.   Yes.
10       Q.   Does that help you to explain the manner in
11   which this bill was subject to a sustained point of
12   order?
13           MR. SWEETEN:  Objection to the question as
14   vague.  Don't reveal matters of privilege in answering
15   the question, your thoughts or mental impressions about
16   a specific piece of legislation.  You can answer based
17   on the text of what's in front of you, but don't reveal
18   privilege.
19       A.   Yeah.  This means that the bill was taken out
20   of order, that the chair ruled that the bill taken out
21   of order and that they put the bill on another calendar
22   for later in the day.
23       Q.   Then it looks like later on May 3rd, there is
24   an entry that says the bill passed as amended.  Does
25   that mean that a majority of those House members present

| 55 |
|---|

1    voted for the bill?
2        A.   M-hm.
3        Q.   And then.
4        A.   Yes.
5        Q.   -- it looks like -- Thank you.  I should remind
6    you about that, but I appreciate you remembering to give
7    a verbal answer.  And then it looks like on May 4th, the
8    next day, 2005, the bill was reported engrossed.
9        A.   Yes.
10       Q.   What does it mean for a bill to be reported
11   engrossed?
12           MR. SWEETEN:  You can answer as a general
13   matter.
14       A.   That's the final House version of the bill that
15   was sent to the Senate.
16       Q.   And then it looks like the bill was received
17   from the House by the Senate that same day, May 4th,
18   2005; is that right?
19       A.   Yes.
20       Q.   Is there any special meaning to the term
21   received from the House?
22       A.   That means it went over on a message to the
23   Senate.
24       Q.   What does it mean for it to go over on a
25   message?

| 56 |
|---|

1        A.   It means that it goes over on a piece of paper
2    and it's given to the Senate clerk or the secretary of
3    the Senate.
4        Q.   And then it looks like the next day, May 5th,
5    2005, the bill was read for the first time in the Senate
6    and then that same day referred to state affairs.  Do
7    you see that?
8        A.   Yes, I see that.
9        Q.   And do you understand state affairs to mean
10   Senate State Affairs Committee?
11       A.   Yes.
12       Q.   Okay.  Since that's the last entry for this
13   bill, what do you understand about what happened to the
14   bill once it went to the senate?
15       A.   I don't know what happened.
16       Q.   Assuming this is a complete legislative
17   history, do you agree that it reflects that the bill did
18   not pass the Senate?
19           MR. SWEETEN:  Since this is a matter of
20   public record, you can answer based on the public
21   record.
22       A.   This looks like the last action was that it
23   went to state affairs and stayed in state affairs until
24   the session was over.
25       Q.   And if the bill had passed the Senate, the last



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 57

1    action would reflect something other than this, correct?
2        A.  Yes.
3        Q.  Do you have any understanding as to why the
4    bill did not successfully make it out of the Senate?
5            MR. SWEETEN:  Don't answer the question
6    except for as to matters of public records, otherwise,
7    it would reveal matters of legislative privilege.
8        A.  No, I don't.
9        Q.  Now, it looks like by the time it was referred
10   from the House to the Senate, it was May 4th, 2005; is
11   that right?
12       A.  Yes.
13       Q.  When does regular session -- When in the real
14   calendar year does the session typically end?
15       A.  Sometime around the end of May.
16       Q.  Looking back at the bill text, what I think is
17   marked as US Exhibit 44, as parliamentarian of the House
18   did you have any role in reviewing the substantive text
19   of a bill?  I mean, as opposed to considering the
20   procedure of a bill, did you have any role in evaluating
21   or considering the actual text of the bill itself?
22       A.  This bill?
23       Q.  Well, as a general matter first.
24       A.  So you mean for procedural problems or what do
25   you mean?

## 58

1        Q.  Well, did you read -- would you read every bill
2    that would be introduced in the House?
3        A.  Yes.
4        Q.  So at some point you read 1706 during the 2005?
5        A.  I would have read it, yes.
6        Q.  And do you read the bills that -- each step of
7    the way?  Like let's say a bill is amended in a
8    committee.  Do you receive and review the amendments?
9        A.  No.
10       Q.  How about once a bill is substituted in
11   committee?  Let's say what happened here.  It was
12   substituted in committee and then reported favorably as
13   substituted.  Would you read the substituted version?
14       A.  I don't remember.  Maybe sometimes we did,
15   sometimes we didn't.
16       Q.  Do you have any understanding as to the overall
17   legislature's general purpose in enacting HB1706?
18       A.  The general purpose of this bill?
19       Q.  Yes.
20       A.  I would assume for voter integrity, integrity
21   of elections maybe.
22       Q.  And what is that assumption based on?
23       A.  That's just my assumption.
24       Q.  When I use the term legislative purpose, what
25   do you take that to mean?

## 59

1        A.  Legislative intent maybe.  Something like that.
2        Q.  Do you think it's always the case that the
3    intent of the legislature is discernable from the face
4    or text of the bill?
5            MR. SWEETEN:  She can answer as to what is
6    the general purpose of the bill she has to the best of
7    her knowledge.  She's not going to speculate on
8    subjective motivations of any legislature that is
9    outside of what the court has ordered and that is within
10   the scope of privilege.  So if you are asking her to
11   speculate as to what any specific member's intent was,
12   she's not going to do that.  She's answered as to
13   general purpose.  That's what she's been required to do,
14   if she knows, and I'll let her do that.
15       Q.  Okay.  Well, I'm not asking about any
16   legislator's purpose with respect to any piece of
17   legislation.  I'm only asking a general matter -- Well,
18   stepping back, we've been talking about legislative
19   purpose and intent, so my question is is it always the
20   case that one could tell what the legislature's intent
21   or purpose is from looking at the face or text of the
22   bill?
23           MR. SWEETEN:  Objection.  Calls for
24   speculation.  Objection.  Compound.  Objection.
25   Relevance.

## 60

1        Q.  You may answer the question, Ms. Davis.
2        A.  I don't know.
3        Q.  You don't have any opinion on that?
4        A.  It depends on --
5            MR. SWEETEN:  Object.  Asked and answered.
6        Q.  You may answer.
7        A.  It depends on the bill.
8        Q.  Looking at Page 4 of the bill before us,
9    HB1706, and then looking particularly at Section
10   63.0101.  Before I ask you about this section, I just
11   want got to go back for a moment.  I think your last
12   answer when I asked you about could you discern the
13   intent of the bill from the face of the bill and whether
14   that was always the case.  You said that it depends on
15   the bill.  What did you mean by that?
16           MR. SWEETEN:  Objection.  Calls for
17   speculation.  Objection.  Compound.  Objection.
18   Relevance.  Go ahead.  You can answer.
19       A.  I think whoever it -- I guess it depends on the
20   circumstances, the people, their mental processes, and I
21   don't know what people think when they do these bills.
22       Q.  What sorts of circumstances or people would you
23   think would make it harder to discern the intent from
24   the face of the bill?
25           MR. SWEETEN:  Objection to the extent it



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

61

1  calls formal matters that are subject to the legislative
2  privilege.  Objection to the question as vague.  Calls
3  for speculation.  Objection.  Compound.  Objection.
4  Relevance.
5      A.  I don't know.
6      Q.  Okay.  Looking at this Section 63.0101 of
7  HB1706, it states that "A following documentation is an
8  acceptable form of photo identification under this
9  chapter."  Do you see that?
10     A.  M-hm.  Yes.
11     Q.  And then there appears to being a fairly
12  lengthy list of acceptable forms of photo
13  identification.  Do you agree with that?
14     A.  Yes.
15     Q.  And these include a driver's license or
16  personal identification card issued to the person by the
17  Department of Public Safety.  Do you see that?
18     A.  Yes.
19     Q.  It includes "a United States military
20  identification card that contains the person's
21  photograph"; is that right?
22     A.  Yes.
23     Q.  It includes "a valid employee identification
24  card that contains the person's photograph."
25     A.  Yes.

62

1      Q.  Is that right?  No. 4 says, "a United States
2  citizenship certificate issued to the person that
3  contains the person's photograph."  Do you see that?
4      A.  Yes.
5      Q.  Do you have any understanding as to what that
6  means?
7      A.  No.
8      Q.  No. 5 it says, "a United States passport issued
9  to the person."
10     A.  Yes.
11     Q.  No. 6, "a student identification card issued by
12  a public or private institution of higher education that
13  contains the person's photograph"; is that right?
14     A.  Yes.
15     Q.  7 states, "a license to carry a concealed
16  handgun issued to the person by the Department of Public
17  Safety"; is that right?
18     A.  Yes.
19     Q.  8 states, "an identification card issued by a
20  state agency of this state that contains the person's
21  photograph"; is that right?
22     A.  Yes.
23     Q.  And 9 states, "an identification card that
24  contains the person's photograph and is issued by a
25  county elections administrator or county clerk."  Did I

63

1  read that correctly?
2      A.  Yes.
3      Q.  It also appears in that Section B, there's a
4  list of documentation that is acceptable as proof of
5  identification under this chapter, and it then goes on
6  include things like a utility bill, bank statement,
7  government check, paycheck, official mail or certified
8  copy of a birth certificate.  Do you see those in 1, 2
9  and 3?
10     A.  Yes.
11     Q.  In fact there is another lengthy list of
12  further types of documents that would serve as
13  acceptable form of identification under HB1706?
14         MR. SWEETEN:  Adam, we're going to need to
15  take a break.
16         (Recess from 11:38 a.m. to 12:00 p.m.)
17     Q.  (BY MR. HARRIS) Ms. Davis, are you ready to go
18  back on the record?
19     A.  Yes.
20     Q.  I believe when we left off I was asking you
21  whether it appeared that from the text of HB1706 that in
22  Section 63.0101, I believe we were then looking at Part
23  B and that section appears to include another fairly
24  lengthy list of acceptable types of identification.  Is
25  that your understanding that list includes things like a

64

1  copy of a current utility bill or bank statement; is
2  that right?
3      A.  Yes.
4      Q.  Official mail addressed to the person by name
5  from a governmental entity?
6      A.  Yes.
7      Q.  And I think in No. 10, it includes a library
8  card that contains the person's name issued to the
9  person by a public library listed in the state?
10     A.  Yes.
11     Q.  Do you have any understanding as to the source
12  of the legislative language that's in 1706?
13         MR. SWEETEN:  Don't -- Don't answer the
14  question.  It would reveal matters of legislative
15  privilege as to source of the language in the bill.
16         MR. HARRIS:  Well, I think the question
17  was just do you have any understanding.  I don't see how
18  that would reveal anything privileged.
19         MR. SWEETEN:  You can answer yes or no as
20  to whether you have an understanding and then we'll go
21  from there.
22     A.  No.
23         MR. SWEETEN:  Make it easier.
24     Q.  Always makes it easier.  What forms of
25  identification do you have on you today?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

65

1     A.  I have my driver's license.
2     Q.  Anything else?
3     A.  I think I have my bar card and that's it.
4     Q.  Do you own a copy of your birth certificate?
5     A.  Yes.
6     Q.  Were you born in the State of Texas?
7     A.  Yes.
8     Q.  If you lost your birth certificate, would you
9  know where to go to get another copy?
10    A.  Yes.
11    Q.  Where would that be?
12    A.  To the health department -- Bureau of Vital
13  Statistics, Health Department.
14    Q.  Have you ever heard of -- if I use the term
15  in-person voter fraud, do you have some understanding of
16  what that means?
17    A.  No.
18    Q.  Okay.  I'm going to use the term to mean an
19  instance where someone shows up at the polls claiming to
20  be a registered voter when that person is not in fact a
21  registered voter when he or she is claiming to be; is
22  that okay?
23    A.  M-hm.
24    Q.  Have you ever heard of an instance of such
25  in-person voter fraud?

---

66

1     A.  No.
2     Q.  In your capacity as chief of staff to Speaker
3  Straus, do you ever recall receiving any complaints from
4  constituents regarding instances of in-person voter
5  fraud?
6     A.  No.
7     Q.  How about just voter fraud generally?  Did you
8  ever hear constituents complain about voter fraud in
9  Texas in general?
10         MR. SWEETEN:  While she was with the
11  speaker's office you are asking, Adam?
12         MR. HARRIS:  Let's start with that, sure.
13         MR. SWEETEN:  This is from constituents,
14  just so I'm clear.
15         MR. HARRIS:  Correct.
16    A.  No.
17    Q.  How about at any other time before or even
18  after you worked for -- as chief of staff for Speaker
19  Straus, were you aware -- or did you hear complaints
20  of -- Let's say putting aside any -- putting aside any
21  member of the Texas House or Senate that has asserted
22  privilege in this case, have you heard complaints from
23  anybody else about voter fraud in Texas?
24         MR. SWEETEN:  Also, don't reveal
25  communications with state agencies, the Texas ledge

---

67

1  council, legislative staffers, and our position is even
2  if a party has waived with respect to it, that to the
3  extent if she's working for the speaker, for example,
4  and he has not waived, that that privilege attaches to
5  the communication.  With all that, you can answer the
6  question as long as you are not revealing a privileged
7  communication.
8     A.  No.
9     Q.  All right.  Ms. Davis, is this a good time for
10  you to take lunch?
11    A.  Sure.
12         MR. HARRIS:  I think we are at a natural
13  stopping point, so why don't we do that?
14         THE WITNESS:  Okay.
15         (Recess from 12:05 p.m. to 12:31 p.m.)
16    Q.  (BY MR. HARRIS) Ms. Davis, are you ready to go
17  back on the record?
18    A.  Yes.
19    Q.  Do you recall a bill concerning voter
20  identification requirements for Texas voters being
21  introduced during the 2007 House session?
22    A.  No.
23         (League Exhibit 6 marked.)
24    Q.  I'll ask that this document be marked as League
25  Exhibit 6.

---

68

1         Ms. Davis, please take a few moments to
2  familiarize yourself with this document.
3     A.  Okay.
4     Q.  Ms. Davis, this appears to be a copy of a House
5  Bill No. 218; is that right?
6     A.  Yes.
7     Q.  At the top at the first page it says, "House
8  engrossment"; is that right?
9     A.  Yes.
10    Q.  What do you understand that to mean?
11    A.  That's the bill as it's passed on third reading
12  out of the House.
13    Q.  Do you recall anything about the debate over
14  this Bill HB218?
15    A.  No.
16    Q.  Now, you said that the language at the top
17  stating House engrossment refers to the fact that this
18  bill passed a vote of the House after the third reading;
19  is that right?
20    A.  Right.
21    Q.  At that point the bill would go to the Senate
22  generally; is that right?
23    A.  Right.
24    Q.  Do you recall what happened to this bill when
25  it went to the Senate?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 69 | 71 |
|---|---|

**69**

1   MR. SWEETEN:  You can answer as to matters
2   of public record.
3       A.  No, I don't.
4           (League Exhibit 7 marked.)
5       Q.  I ask that this document be marked as League
6   Exhibit 7.  And, Ms. Davis, please take a few moments to
7   familiarize yourself with this document, Exhibit 7.
8       A.  Okay.
9       Q.  Mrs. Davis, this appears to be a legislative
10  history of HB218 from the 80th regular session.
11      A.  Right.
12      Q.  Is that right?
13      A.  Yes.
14      Q.  And this appears to reflect that HB218 was
15  reported engrossed by the House on April 24th, 2007; is
16  that right?
17      A.  Yes.
18      Q.  Then this states that the bill was read for the
19  first time on April 26, 2007, is that right, in the
20  Senate?  Excuse me.
21      A.  Yes.
22      Q.  And then it was referred to the Senate state
23  affairs committee; is that right?
24      A.  Yes.
25      Q.  Do you have any understanding as to what the

**71**

1       A.  Yes.
2       Q.  Do you know if that would be the vote to
3   suspend the regular order of business?
4       A.  Yes.
5       Q.  Yes, it would be that vote?
6       A.  It looks as though that's right, yeah,
7   that it was a record vote on that suspension.
8       Q.  M-hm.  It looks on that same day the bill was
9   read for a second time in the Senate.
10      A.  Yes.
11      Q.  And then it says, "Vote reconsidered on that
12  same day."  Do you see that?
13      A.  Yes.
14      Q.  Do you know what that means, "vote
15  reconsidered"?
16      A.  In this context, I don't know -- I don't know
17  what they did.
18      Q.  Again, reading from the entries for May 15th,
19  2007, that the motion to suspend regular order fails.
20      A.  Yes.
21      Q.  Do you understand that to mean that there were
22  not sufficient votes to suspend the regular order of
23  business and considered the bill out of the regular
24  order?
25          MR. SWEETEN:  You can testify based on the

**70**

1   subject matter jurisdiction covered by the state affairs
2   committee in the Senate is?
3       A.  I don't.
4       Q.  Then it appears that on May 1st, 2007, the bill
5   was reported favorably as substituted by the committee;
6   is that right?
7       A.  Yes.
8       Q.  And then on May 2nd, it was placed on the
9   Senate intent calendar; is that right?
10      A.  M-hm.
11      Q.  Do you have any understanding as to what the
12  Senate intent calendar is?
13      A.  It's the Senate calendar for floor action for
14  bills that they'll take up on the Senate floor.
15      Q.  On May 15th, 2007, I see that there is an entry
16  that the -- it says "Rule suspended (regular order of
17  business)."
18      A.  M-hm.  Yes.
19      Q.  Do you have any understanding as to what that
20  means?
21      A.  I believe that's what the Senate does to take a
22  bill up earlier than they -- earlier than the rules
23  would allow.
24      Q.  And this reflects that there was a record vote
25  taken on May 15th, 2007?

**72**

1   text.
2       A.  Yes, that's right.
3       Q.  And then it looks like the last two entries
4   reflect a record vote May 15th, 2007; is that right?
5       A.  Yes.
6       Q.  And then there was a co-sponsor authorized on
7   May 16th, 2007; is that right?
8       A.  Yes.
9       Q.  And this legislative history appears to reflect
10  that HB218 did not pass a full vote of the Senate; is
11  that right?
12      A.  Yes, that's right.
13      Q.  Looking back to the text of HB218, do you have
14  any understanding of the general purpose of the
15  legislature in attempting to enact HB218?
16      A.  I don't.
17      Q.  Do you have any understanding of the general
18  purpose of HB218?
19      A.  No.
20      Q.  I think you stated previously with respect to
21  House Bill 1706 from 2005 that the general purpose was
22  to protect the integrity of the election system.  Do you
23  recall that testimony?
24      A.  Yes.
25      Q.  Do you have any understanding as to the source



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

73

1    of the legislative language in HB218?
2            MR. SWEETEN:  Don't answer the question as
3    it will require you to reveal matters -- as it could
4    require you to reveal matters of legislative privilege.
5            MR. HARRIS:  I think we actually resolved
6    this one last time by your stating, Mr. Sweeten, that
7    the witness could answer yes or no as to whether she was
8    aware of the sources of legislative language.
9            MR. SWEETEN:  That she was aware of the
10   source of language of 218.
11           MR. HARRIS:  Correct.
12           MR. SWEETEN:  Then we'll allow her a yes
13   or no answer.
14       A.  No.
15       Q.  Do you recall -- Without yet divulging the
16   substance of any such discussions, do you recall having
17   discussions with any members of the House regarding
18   HB218?
19       A.  No.
20       Q.  I'm not sure I asked you that question.  With
21   respect to HB1706, the bill we looked at from 2005
22   concerning voter ID, do you recall having any
23   discussions with members of the House about -- Again,
24   I'm not asking you to reveal the substance, but do you
25   recall any discussions with members of the House about

---

74

1    HB1706?
2        A.  No.
3        Q.  Do you know whether the lieutenant governor of
4    Texas can directly himself introduce legislation?
5            MR. SWEETEN:  You can answer as a general
6    matter.
7        A.  I don't -- I do not know the answer to that --
8    the legal answer to that.  I've never seen that, but I
9    do not know.
10       Q.  M-hm.  Do you recall a situation in 2009, now
11   skipping ahead two years, when Representative Betty
12   Brown attempted to introduce a voter ID proposal as an
13   amendment to another bill?
14           MR. SWEETEN:  You can refer to matters of
15   the public record in answering.
16       A.  Yes.
17       Q.  What do you recall about that situation?
18           MR. SWEETEN:  Okay.  That could very well
19   ask you to reveal matters of privilege.  Don't do so.
20   You can reveal matters of public record.
21       A.  I just remember her trying to do it.  I
22   don't -- I don't remember more -- anymore than that.
23       Q.  Do you remember anything about the substance of
24   the amendment that Representative Brown was attempting
25   to offer?

---

75

1        A.  No.  I believe it was a voter ID amendment, but
2    I don't remember what it did.
3        Q.  And do you remember the -- what -- the
4    legislation that Ms. Brown was attempting to amend to
5    include voter identification requirements, do you recall
6    what that understanding legislation was about?
7        A.  No.
8            (League Exhibit 8 marked.)
9        Q.  I'll ask that this be marked as League
10   Exhibit 8.  Please take a few moments to review
11   Exhibit 8.
12       A.  Okay.
13       Q.  Okay.  So this appears to be an article from
14   the Austin Statesman.
15       A.  Yes.
16       Q.  And it's dated March 30th, 2009; is that right?
17       A.  Yes.
18       Q.  Okay?  And this article -- Does this article
19   refer to the situation we were just speaking with in
20   which Representative Brown attempted to introduce an
21   amendment to a bill concerning voter ID requirements?
22       A.  Yes.
23           MR. SWEETEN:  You can answer about what
24   the article says.  Don't reveal privileged matters.
25       Q.  In the first two paragraphs it states that, "A

---

76

1    could have intense moment in the Texas House passed
2    without a blow-up today with a handshake between House
3    Speaker Joe Straus and Representative Betty Brown,
4    Republican of Terrell, according to Brown.  Brown said
5    she and Straus shook hands on his promise to ensure
6    legislation requiring voters to present photo ID or
7    identifying documents at the polls would get a full
8    hearing before the House committee on elections."  Do
9    you see there it says that?
10       A.  Yes.
11       Q.  Were you at all involved or present for any
12   discussions between Ms. Brown and Speaker Straus
13   concerning any promises that voter ID would be heard
14   before the committee on elections?
15       A.  No.  That would have been a private
16   conversation between them.
17       Q.  Skipping down a few paragraphs, it says that
18   "Perspective:  Brown couldn't have been pleased when it
19   came clear early this session that Smith would be the
20   House's lead dog on the voter ID front.  Two years ago,
21   Brown was author of the voter ID mandate that won House
22   approval before petering out in the Senate where
23   Republicans proponents couldn't hurdle the two-thirds
24   margin usually needed to take up measures for floor
25   action."  Do you see that?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**77**

1    A.  Yes.

2    Q.  Is that paragraph referring to what we saw in

3  the legislative history previously in which there

4  weren't sufficient votes to suspend the regular order of

5  business in the Senate?

6    MR. SWEETEN:  Don't reveal matters of

7  legislative privilege in answering the question, okay?

8    A.  Yes.  That refers to the Senate action -- the

9  Senate actions on the legislative report.

10    Q.  And then the next sentence is in a

11  parenthetical, but it says, "This year Senate

12  Republicans revised the body's rules enabling action on

13  the voter ID topic by a simple majority vote."  Do you

14  see that?

15    A.  Yes.

16    Q.  Are you aware of what this sentence is

17  referring to?

18    MR. SWEETEN:  Don't answer the question as

19  phrased.  It would require you to reveal matters of

20  legislative privilege and interpret the words on this

21  page, and you don't have to do that with respect to

22  legislation.

23    Q.  I'm not sure I follow the objection, but let me

24  try it another way.

25    Were you aware or are you aware as a

---

**78**

1  matter of public knowledge of the Senate Republicans

2  changing the rules of the Senate with respect to the

3  topic of special orders and voter ID?

4    A.  Yes.

5    Q.  When did you first learn about such a change by

6  the Senate Republicans?

7    MR. SWEETEN:  You can refer to matters of

8  public record.

9    A.  When they debated it on the Senate floor during

10  the rules debate.

11    Q.  Do you have any understanding as to why the

12  Senate changed rules with respect to special orders and

13  the topic of voter ID?

14    MR. SWEETEN:  Do not answer.  Calls for

15  matters of legislative privilege.  You can refer to

16  matters of the public record in answering the question.

17    MR. HARRIS:  Let's step back.  I think the

18  first question was do you have any understanding.  May

19  she answer that, Mr. Sweeten?

20    A.  Any understanding of?

21    Q.  Of why the Senate Republicans revised their

22  rules concerning special rules of voter ID.

23    A.  No.

24    Q.  Are you aware of any publicly stated reasons by

25  the Senate Republicans with respect to why they changed

---

**79**

1  the rules regarding special orders and voter ID?

2    A.  No.  I didn't really listen to the debate.  I

3  just knew they took it up on -- when they did the rules,

4  but I didn't -- I am not familiar with what they said.

5    Q.  Okay.  Well, I think we'll come back to that

6  topic in just a few moments, but we can finish with

7  Exhibit 8 for now.

8    In the next paragraph starting with, "In a

9  surprise move," it states is that, "Brown had filed her

10  ID proposal as an amendment to legislation by

11  Representative Frank Corte, Republican of San Antonio,

12  relating to providing a ballot by emails to voters in

13  the military and living overseas."  Do you see that?

14    A.  Yes.

15    Q.  And in the next paragraph it states, I believe

16  this is -- I'll ask you, but -- Excuse me.  States,

17  "Brown told me that House Parliamentarian Denise Davis

18  advised today that her amendment wasn't germane to

19  Corte's proposal, though Brown said it also was clear an

20  ultimate ruling would have been up to Straus."  Do you

21  see that?

22    A.  Yes, I do.

23    Q.  Do you recall whether there was any public

24  decision made that the -- or, I guess, a point of order

25  sustained that the amendment offered by Ms. Brown was

---

**80**

1  not germane to the legislation at issue?

2    MR. SWEETEN:  You can answer as to public

3  record only.

4    A.  I don't remember a point of order being raised

5  at all.  I don't remember.

6    Q.  Do you remember ruling on the question of

7  whether or not Ms. Brown's voter ID amendment was

8  germane?

9    MR. SWEETEN:  I assume a ruling is a

10  public record, so if it's a public record, you can

11  answer that question.

12    A.  What -- Do I remember ruling on whether or not

13  this was germane in a public ruling?

14    Q.  Well, let me ask it this way.  The author of

15  the article states that Brown told him that you, Ms.

16  Davis --

17    A.  Right.

18    Q.  -- advised Ms. Brown --

19    A.  Right.

20    Q.  -- that her amendment wasn't germane to the

21  proposal, and Ms. Brown apparently told that to a

22  reporter making public and certainly waiving any

23  privilege with respect to it.  So my question is is this

24  accurate?  Did you in fact tell Ms. Brown that her

25  amendment was not germane?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

81

1    MR. SWEETEN:  One second.  I want the
2  question re-read, please.
3    (Requested portion was read.)
4    MR. SWEETEN:  No, she's not going to
5  answer.  Even assuming you're correct that Ms. Brown has
6  waived privilege, she is not going to answer the
7  question because, one, I don't think Ms. Brown has
8  provided any such waiver as to that, so -- and she's not
9  going to answer questions as to communications she had
10  with Betty Brown, so I think that would be subject to
11  the privilege.  I'm going to instruct you not to answer
12  the question.
13    MR. HARRIS:  Mr. Sweeten, do you agree
14  that had Ms. Brown communicated to the Austin Statesman
15  what Ms. Davis told Ms. Brown, that that would
16  constitute a waiver of privilege over such a statement
17  given that?
18    MR. SWEETEN:  I don't necessarily agree
19  with that.  In any event, there is no suggestion --
20  there's been no waiver of legislative privilege that I'm
21  aware of from Ms. Brown, and she's not going waive her
22  privilege.  So, in any event, it's not of no moment.  So
23  I'm going to instruct her not to answer based on
24  legislative privilege.
25    Q.  Would a voter ID requirement such as we saw in

82

1  the two previous House bills we've looked at today be
2  germane to a -- as an amendment to a bill concerning
3  voting by military members?
4    MR. SWEETEN:  Don't answer the question.
5  It would require you to reveal your thoughts and mental
6  impressions about legislation that are subject to the
7  legislative privilege, and I instruct you not to answer.
8    Q.  Are you taking your counsel's advice,
9  Ms. Davis?
10    A.  Yes.
11    Q.  Do you have any reason to doubt the author of
12  this article's statement in the paragraph
13  "Brown told me"?
14    MR. SWEETEN:  Are you asking her -- I
15  mean, I think that that would require her to provide her
16  thoughts and mental impressions about the veracity of
17  that statement.  She doesn't have to provide those if
18  they would reveal legislative privilege, so I'm going to
19  instruct her not to answer that question also.
20    Q.  As a general matter, what factors do you
21  consider in deciding whether an amendment to a bill is
22  germane?
23    A.  I mean, you look at the language of the bill.
24  You look at the amendment.  You have the -- Listen to
25  the explanation of the amendment and the precedent,

83

1  number of factors.
2    Q.  Can you give me some instances in which you
3  publicly ruled that an amendment to a bill was not
4  germane?
5    A.  I mean, we look at hundreds of amendments, so
6  there have to be things in the journal.  Off top of my
7  head, I couldn't say.
8    (League Exhibit 9 marked.)
9    Q.  I ask that this document be marked as League
10  Exhibit 9.  Ms. Davis, this is an excerpt -- I'll
11  represent this is an excerpt of a longer document.
12  Please take a moment to review the exhibit.
13    A.  Okay.
14    Q.  I see that the heading under -- or beginning
15  Rule 5.11 says "special orders."
16    A.  Yes.
17    Q.  Now, I know these are the Senate rules, but can
18  you tell me what a special order is?
19    MR. SWEETEN:  Objection.  Foundation.  You
20  can answer as a general matter.
21    A.  The general rule is to a bill that goes sort
22  of, I guess, to the front of the line in consideration.
23    Q.  Do you see in Rule 5.11, Section D where it
24  says -- Well, first let me read from Section A to make
25  sure we have that foundation established.  "Rule 5.11(a)

84

1  states that any bill, resolution or other measure may on
2  any day be made a special order for a future time of the
3  session by an affirmative vote of two-thirds of the
4  members present"; is that right?
5    A.  Yes.
6    Q.  And can you put that into lay terms, explain it
7  to someone who's not very familiar with parliamentary
8  procedure what that means?
9    MR. SWEETEN:  Hold on a minute.  She's not
10  going to interpret Senate rules.  She can testify as to
11  what a special order is or the general purpose of Rule
12  5.11, but she's not going to go down here and give whys
13  and what fors and mental processes of these.  With that,
14  you can go ahead and answer.
15    A.  Yeah.  I'm not an expert on Senate rules, so --
16  but a special order means that a bill gets special
17  consideration above other bills.
18    Q.  Is it correct that as a general matter it takes
19  a two-thirds vote of those senators present in order for
20  something to be made a special order?
21    A.  That's what this rule says.  I think it says
22  that.
23    Q.  And then so reading from Part D of Rule 5.11,
24  it states that "Notwithstanding Subsection A of this
25  rule, a bill or resolution relating to voter



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

DENISE DAVIS                                         JUNE 14, 2012

85

1  identification requirements reported favorably from the
2  committee of the whole Senate may be set as a special
3  order for a time at least 24 hours after the motion is
4  adopted by a majority of the members of the Senate."  Do
5  you see that?
6      A.  Yes.
7      Q.  How do you understand this Subpart D to affect
8  the rule that's set out in Part A that we just talked
9  about?
10     MR. SWEETEN:  Don't answer the question.
11 You are asking for matters of legislative privilege
12 including her interpretation of the specifics of this
13 rule.  She can give you a general purpose answer as to
14 what is the general purpose to the extent she even
15 knows, but she's not going to go through and reveal her
16 thoughts and mental impressions about the Rule 5.11.
17 General purpose is acceptable, and so we will allow her
18 to answer that if she knows.
19     A.  Just generally is -- I mean, that a voter ID
20 can be set as a special order.
21     Q.  And in order for a voter ID bill to be set as a
22 special order, this 5.11(d) would require only a
23 majority of the members of the Senate to vote to make it
24 a special orders; is that right?
25     MR. SWEETEN:  You can answer based on the

86

1  text of the bill.
2      A.  Yeah.  It says after the motion is adopted by a
3  majority of the members of the Senate that it may be set
4  as a special order.
5      Q.  Is there a similar rule to this Rule 5.11 in
6  the House rules concerning special orders?
7      MR. SWEETEN:  You can answer as a general
8  matter.
9      A.  A general rule for special orders?
10     Q.  M-hm.
11     A.  I believe, yes.
12     Q.  Do you know what vote or how many votes are
13 required in order to make a bill a special order?
14     A.  I believe it's is two-thirds present, but I'd
15 have to see the rule.
16     Q.  Have you ever seen an instance under -- Let's
17 say starting with the House rules.  Have you ever seen
18 an instance in which the rule concerning special orders
19 sets out an exception for a particular type of
20 legislation such as what we saw in 5.11(d)?
21     A.  In the House rules?
22     Q.  Correct.
23     A.  Not to my knowledge, no.
24     Q.  Other than this Rule 5.11(d) in the Senate
25 rules, are you aware of any other time during which the

87

1  Senate rules carved out a particular type of legislation
2  from the general rules governing special orders?
3      MR. SWEETEN:  Objection.  Foundation.
4  Objection.  Calls for speculation.
5      A.  I don't know.
6      Q.  Can I take that to mean you are not aware of
7  any other instances besides voter identification?
8      A.  Right.  I'm not sure.  They changed the rules.
9  I don't know the answer to that.
10     Q.  And when we looked at that article from
11 March 2009 and it referred to a special rule governing
12 voter identification with respect to special orders, is
13 this the type of special rule that you take the article
14 to be referring to?
15     MR. SWEETEN:  Hold on a minute.  You are
16 asking her to interpret the words in an article that she
17 hasn't seen before today, and you are asking her is this
18 the type of rule that is referred to in the article.
19     That is -- First of all, that calls for
20 her to speculate.  Secondly, I think that that would --
21 could implicate any conversation she's had that were
22 subject to the legislative privilege and/or her thoughts
23 and mental processes about a certain legislation
24 including legislation referred to in this article.
25     So from that standpoint, I object based on

88

1  legislative privilege.
2      Q.  (BY MR. HARRIS)  Ms. Davis, turning back to
3  Exhibit 8, the article that we were looking at in the
4  paragraph beginning with the word perspective, I think
5  we already read from a parenthetical that said, "This
6  year, Senate Republicans revised the body's rules
7  enabling action on the voter ID topic by a simple
8  majority vote."  Do you have any understanding as to
9  what that means?
10     MR. SWEETEN:  Don't reveal matters of
11 legislative privilege in answering this question
12 including your thought processes about legislation or
13 conversations that you had with anyone that would be
14 protected, okay?  If you can't answer it without doing
15 that, then don't answer the question, okay?
16     A.  There was -- There was a rules change at the
17 beginning of the session that was related to voter ID in
18 the Senate.
19     Q.  Did that rules change concern special orders?
20     A.  I don't remember the text of it, but that
21 was -- that was the rule -- that was the rules change
22 they brought up -- they considered on the first day of
23 session or at the beginning.
24     Q.  Do you know why there was a rules change
25 concerning voter identification under the Senate rules?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                               JUNE 14, 2012

---

## 89

1       MR. SWEETEN:  Don't answer.  Calls for
2   matters of legislative privilege.  Instruct not to
3   answer.
4       MR. HARRIS:  The question was do you know
5   why.
6       MR. SWEETEN:  Do you know why?  And you
7   want a yes or no answer that -- You can answer yes or no
8   or I don't know, but you are not -- don't give anymore
9   substance than that, okay?
10      A.  No.
11      Q.  What is the effect of a special order as a
12  general matter?
13      MR. SWEETEN:  In the House you are asking?
14      MR. HARRIS:  Let's start with the House.
15      A.  Generally it means that a -- an item or bill
16  gets -- goes to the front of the line for consideration
17  ahead of other matters.
18      Q.  Now, I know you said that you left your
19  position as House parliamentarian in May 2007; is that
20  right?
21      A.  Yes.
22      Q.  By the time of the next regular session in
23  January of 2009, you were back once again serving as
24  House parliamentarian; is that right?
25      A.  Yes.

---

## 91

1       Q.  What does that mean?
2       A.  It's just the report as it came out of the
3   House -- of a Senate bill as it came out of the House
4   committee.
5       Q.  Do you recall anything about the legislative
6   history of this bill in the Senate before it came to the
7   House?
8       A.  No.
9       (League Exhibit 11 marked.)
10      Q.  I'd ask this document be marked as League
11  Exhibit 11.  And, Ms. Davis, please take a moment to
12  look over the document.
13      A.  Okay.
14      Q.  Are you able to tell from this legislative
15  history -- Well, stepping back, it looks like this bill,
16  SB362, was filed on December 15th, 2008; is that right?
17      A.  Yes.
18      Q.  And then on -- it looks like February 17th,
19  2009, the bill was referred to the committee of the
20  whole; is that right?
21      A.  Yes.
22      Q.  I believe you stated that there is a process in
23  the House by which a bill could be referred to a
24  committee of the whole House; is that right?
25      A.  Yes.

---

## 90

1       Q.  Do you recall a voter ID bill being introduced
2   during the 2009 regular session?
3       A.  Yes.
4       Q.  What do you recall about that?
5       MR. SWEETEN:  Objection to the question as
6   vague.  In answering the question, don't reveal anything
7   that would be subject to the legislative privilege.  You
8   can refer to matters of the public record.
9       A.  I remember -- I remember bills being filed on
10  voter ID.
11      Q.  Do you remember what happened to those bills
12  ultimately?
13      MR. SWEETEN:  Again, you can refer to
14  matters of the public record.  Don't reveal privilege.
15      A.  I think there were bills filed that were
16  referred and then beyond that, you know, committees.
17      (League Exhibit 10 marked.)
18      Q.  I'd ask that this document be marked as League
19  Exhibit 10.  Ms. Davis, this appears to be a copy of a
20  version of SB362; is that right?
21      A.  Yes.
22      Q.  And the notations at the top of the first page
23  say, "House Committee Report, 1st Printing."  Do you see
24  that?
25      A.  Yes.

---

## 92

1       Q.  I believe you previously stated -- And if we've
2   already covered this ground, I apologize, but I believe
3   you previously stated that you do not recall any
4   instances during your time in service to the House in
5   which a bill was referred to the committee of the whole
6   House; is that right?
7       MR. SWEETEN:  Objection.  Asked and
8   answered.  Go ahead.
9       A.  Correct.
10      Q.  Putting aside SB362, which we are looking at
11  now, are you aware of any other instance in which the
12  Senate referred -- or which a bill was referred to the
13  committee of the whole Senate?
14      A.  I believe redistricting -- there was a
15  redistricting bill referred to committee of the whole in
16  2001.
17      Q.  Is that the only other instance you are aware
18  of in which a bill -- Putting aside SB362 in that
19  instance, are you aware of any other times when a bill
20  was referred to the committee of the whole Senate?
21      A.  Well, I left the Senate after that, so I don't
22  know what had happened after that.
23      Q.  As a general matter, why would a bill be
24  referred to the committee of the whole?
25      MR. SWEETEN:  Don't answer the question to

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

93

1    the extent it would require you to reveal your thoughts,
2    mental impressions about a specific piece of
3    legislation.  If you cannot do so, do not, and, also, it
4    calls for speculation.
5        A.  I don't know.
6        Q.  Are you familiar with the lieutenant governor's
7    powers with respect to the Texas Senate?
8        A.  Generally, yes.
9        Q.  Do you know whether there's any significance
10   with respect to the lieutenant governor's role when a
11   bill is referred to the committee of the whole Senate?
12           MR. SWEETEN:  Are you asking what is his
13   public role with respect to the committee because I'll
14   let her answer as to the public role, but if you are
15   asking about specifics -- by role, that's a very vague
16   term.
17       Q.  Let me rephrase the question and maybe that
18   will solve multiple problems.  What are the lieutenant
19   governor's powers and/or duties when a bill is referred
20   to the committee of the whole Senate?
21       A.  Oh, I don't know.  Under the Senate rules, I
22   don't know.
23       Q.  It looks like on -- well, on the date column,
24   it says March 11, 2009, but there's a comment that says
25   March 16, 2009, but putting aside that wrinkle, it looks

---

94

1    like some point in mid-2011 -- excuse me, in mid-2009 --
2    Let me rephrase again.
3           At some point in mid-March of 2009, SB362
4    was set as a special order; is that right?
5        A.  Yes.
6        Q.  It looks like on March 17, 2009, there was a
7    point of order made in the Senate and then overruled.
8    Do you see that?
9        A.  Yes.
10       Q.  Do you recall anything about -- Do you recall
11   anything from the public record about this point of
12   order?
13       A.  No.
14       Q.  And then on March 18, 2009, it looks like the
15   bill was reported engrossed from the Senate; is that
16   right?
17       A.  Yes.
18       Q.  And that means that the bill passed the Senate
19   by at least a majority vote; is that right?
20       A.  Yes.
21       Q.  And it looks like on March 31st, 2009, this
22   bill was referred to the House committee on elections;
23   is that right?
24       A.  Yes.
25       Q.  Were you involved in the decision to refer the

---

95

1    bill to the committee on elections?
2        A.  It's the speaker's decision to refer bills.
3        Q.  Did he consult you with respect to which
4    committee to refer SB362 to?
5            MR. SWEETEN:  You can answer if you had
6    any conversations or communications with the him about
7    that subject matter.  Don't reveal the communications
8    themselves.
9        A.  I don't remember.
10       Q.  Do you recall having any discussions with any
11   members of the House regarding SB362?
12       A.  I'm sure we discussed SB362.
13       Q.  When you say "we," who are you referring to?
14       A.  Members and myself.
15       Q.  Do you recall the names of particular members
16   of the House with whom you discussed SB362?
17       A.  No, other than maybe the chairman of elections
18   maybe, but other than that, I don't.
19       Q.  Do you recall the general nature of your
20   discussion with the chairman regarding SB362?
21       A.  No.
22           MR. SWEETEN:  Don't reveal the substance
23   of the communication.
24       A.  No.
25       Q.  In the legislative history that we're looking

---

96

1    at, are you able to tell what the ultimate disposition
2    of SB362 was in the House?
3            MR. SWEETEN:  You can answer based on the
4    document and it's a matter of public record.
5        A.  It was put on the calendar.
6        Q.  And that was the last action that was taken; is
7    that right?
8        A.  Yes.
9        Q.  And it says that it was placed on the major
10   state calendar on May 23, 2009.  Do you see that?
11       A.  Yes.
12       Q.  Whats the major state calendar?
13       A.  That's just one of the calendars that the
14   calendars committee can put bills on that is -- under
15   the rules, any bill that they consider a major state
16   bill or major bill, they put on there.
17       Q.  Is it correct that SB362 did not pass out of
18   the House ultimately?
19       A.  That's correct.
20       Q.  Again, taking a look at the text of SB362 or
21   the version that's in front of you, do you have any
22   understanding as to the source of the legislative
23   language of SB362?
24       A.  No.
25       Q.  In looking at SB362 on Page 5, Section 63.0101,

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 97

1  do you see that that section sets forth documentation
2  that is an acceptable form of photo identification under
3  the -- under the bill?
4      A.  Yes.
5      Q.  And you see in what looks like Subpart 7, but
6  got struck out and is now Subpart 6, that the valid
7  forms of identification include a valid identification
8  card containing the person's photograph and issued by
9  either, A, an agency or institution of the Federal
10 government or, B, an agency, institution or political
11 subdivision of this state.  Do you see that?
12     A.  Yes.
13     Q.  Do you know whether that -- that Subsection 6
14 that we just looked at would include as a valid form of
15 identification a student ID card?
16     A.  I don't know.
17     Q.  Do you know who the sponsor in the Senate of
18 SB362 was?
19     A.  Senator Fraser.
20     Q.  If Senator Fraser stated publicly on the floor
21 of the Senate that he understood Section 6 of SB362, the
22 provision providing that an individual -- that an
23 identification card issued by an agency, institution or
24 political subdivision of Texas would be an acceptable
25 form of ID, if Senator Fraser had stated that he thought

## 98

1  that section included a student ID would have any reason
2  to doubt that statement?
3      MR. SWEETEN:  Don't answer the question as
4  phrased.  Calls for matters of legislative privilege.
5  His statement is his statement.  She's not going to
6  interpret his statement.
7      Q.  Are you aware of Senator Fraser making any such
8  statement?
9      A.  No.
10     Q.  So as a general matter, do you think that the
11 author or the sponsor of a bill is in a good position to
12 interpret the language of the bill?
13     MR. SWEETEN:  Objection.  Calls for
14 speculation.  Objection.  Compound.  Objection.
15 Relevance.
16     Q.  You may answer, Ms. Davis.
17     THE WITNESS:  Can you reread the question?
18     (Requested portion was read.)
19     MR. SWEETEN:  Same objection and
20 argumentative.  Go ahead.
21     A.  Generally, yes.
22     Q.  Are you familiar with the term chub or
23 chub-a-thon?
24     A.  Yes.
25     Q.  What do those terms refer to?

## 99

1      A.  It's just when people delay, use dilatory
2  tactics to stall, like filibustering, things like that.
3      Q.  What are the common methods used to stall a
4  bill through a chub or chub-a-thon?
5      MR. SWEETEN:  You can discuss matters of
6  public record or general parliamentary procedures.
7      A.  You mean in the House or in the Senate?
8      Q.  In the House.  Excuse me.
9      A.  Questions -- I think probably asking lots and
10 lots and lots of questions, detailed questions,
11 irrelevant questions of the author of the bill or of an
12 amendment.
13     Q.  Do you recall whether SB362 was the subject of
14 a chub-a-thon in the House?
15     MR. SWEETEN:  You can refer to matters of
16 the public record.
17     A.  Well, it was not taken up on the calendar, so I
18 don't understand your question.
19     Q.  When you say the bill "was not taken up on the
20 calendar," what are you referring to?
21     MR. SWEETEN:  Again, you can answer as to
22 matters of public record.
23     A.  This says it was set on the calendar, but I
24 don't believe we ever reached the bill on the calendar.
25     Q.  Is there any means through which someone can

## 100

1  use the local and consent calendar bill -- Let me step
2  back.  Is there such a thing as a local and consent
3  calendar?
4      A.  Yes.
5      Q.  What is that?
6      A.  That is a separate calendar for bills that
7  are -- local bills that are considered to be consent
8  bills or noncontroversial bills, to pass them quickly.
9      Q.  Do you recall any -- any members using the
10 local and consent calendar as a means to stall
11 consideration of SB362?
12     A.  Yes.
13     Q.  What do you recall about that?
14     MR. SWEETEN:  You can refer only to
15 matters of the public record.  Don't reveal matters of
16 privilege including privileged conversations, okay?
17     A.  I just remember being on the local calendar for
18 a long time, days and days.
19     Q.  Who controls how long a bill stays on the local
20 calendar?
21     MR. SWEETEN:  You can answer as a general
22 matter of parliamentary procedure.
23     A.  What do you mean?  I don't understand your
24 question.
25     Q.  Well, I believe you previously stated that you



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

| 101 |
|---|

1  are aware of the local and consent calendar being used
2  to stall consideration of SB362.
3      A.  Right.  And there were lots of bills on the
4  calendar, so the members, the author of the bill and the
5  presiding officers in the chair -- the presiding officer
6  who's providing over the local and consent calendar
7  would control that.
8      Q.  With respect to SB362 in 2009, do you know who
9  had that kind of control?
10     A.  You mean who's presiding over the local
11 calendar?
12     Q.  Correct.
13     A.  That would have been Craig Eiland.
14     Q.  What can be done to overcome a chub-a-thon?
15         MR. SWEETEN:  You can answer based on
16 matters of general parliamentary procedure.  Don't
17 reveal matters of privilege.
18     A.  For the local calendar or for anything?
19     Q.  Let that's start with the local calendar.
20     A.  You can use, I guess, a variety of maybe
21 procedural things to -- to try to overcome, and I would
22 have to go back and research it.  Probably some vote
23 suspensions, maybe -- since it's a special order,
24 probably have to do some kind of extraordinary vote
25 requirement or something like that.

| 103 |
|---|

1  communications that you had with anyone.  So in
2  answering this question, just be mindful of privilege.
3  You can answer as a general matter.
4      A.  Just a general role, moving things through,
5  things like that, like you do with all the bills, just
6  making sure you move the process.
7      Q.  As a general matter, what do you do to make
8  sure that you move the process?
9          MR. SWEETEN:  You're starting to intrude
10 by this question into matters that would be subject to
11 legislative privilege, motivations, thoughts,
12 impressions about bills, discussions that she may have
13 had.  When you are asking about strategy, you are
14 intruding in a legislative privilege.  I'm going to
15 object.  I'm going to instruct her not to answer that
16 question as phrased.
17     Q.  I'll try to rephrase.  Putting aside any
18 particular piece of legislation, what is the role of the
19 chief of staff with respect to moving bills along?
20     A.  You just listen to the members, listen to the
21 parliamentarian, the speaker and facilitate.
22     Q.  As chief of staff to Speaker Straus, did you
23 have many discussions with members of the House
24 concerning voter ID laws?
25         MR. SWEETEN:  You can answer yes or no as

| 102 |
|---|

1      Q.  You stated that SB362 was the subject of a
2  chub-a-thon via the local consent calendar.  Do you see
3  that reflected somehow in the legislative history that
4  we looked at?
5      A.  Of 362?
6      Q.  Yes.
7          MR. SWEETEN:  You are asking her about
8  Exhibit 11 -- whether it's in Exhibit 11?  Is that the
9  question?
10         MR. HARRIS:  Correct.
11     A.  I don't see it in the calendar or on the -- on
12 this action report.  I don't see it there.
13     Q.  In January of 2010 you became chief of staff to
14 Speaker Straus; is that correct?
15     A.  Yes.
16     Q.  During your time as chief of staff to Speaker
17 Straus, did you have any involvement with respect to
18 voter ID legislation?
19         MR. SWEETEN:  You can answer yes or no to
20 that question.
21     A.  Yes.
22     Q.  What was your role with respect to voter ID
23 legislation as chief of staff to Speaker Straus?
24         MR. SWEETEN:  You can give a general
25 answer.  Do not reveal privilege including

| 104 |
|---|

1  to whether you had communications.
2      A.  Yes.
3      Q.  Which members did you discuss voter ID with?
4          MR. SWEETEN:  You can answer, but don't
5  reveal the substance of the communications.
6      A.  Todd Hunter, Patricia Harless.  That would be
7  all I would remember off top of my head.
8      Q.  How frequently did you discuss voter ID with
9  Mr. Hunter?
10     A.  Not -- Not much.
11     Q.  Can you be more specific?
12     A.  More specific as in how many times?
13     Q.  Yes.
14     A.  Maybe two or three times.
15     Q.  Do you recall when those discussions took
16 place?
17     A.  No, not -- not the specific dates.
18     Q.  Are you able to narrow it down to a particular
19 year?
20     A.  Well, in the spring -- spring of last year.
21     Q.  And how about Representative Harless?  How
22 often did you speak to her about voter ID laws?
23     A.  Oh, maybe -- maybe three or four times.
24 Meredyth Fowler was the policy person, so she was the
25 lead policy person on it, so maybe three or four times.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                                JUNE 14, 2012

---

### 105

1      Q.   And you said that Meredyth Fowler was the lead
2   policy person for Speaker Straus on the issue of voter
3   ID; is that right?
4      A.   Right.
5      Q.   Who else from the speaker's office worked on
6   the issue of voter ID?
7      A.   Directly, pretty much Meredyth.  I mean, she
8   was the point person on it.
9      Q.   Would Ms. Fowler consult with you regarding
10  voter ID?
11     A.   You mean, the substance of it or what was going
12  on with it, things like that?
13     Q.   Well, let's just start as a general matter, did
14  she talk to you about it at all?
15     A.   Yes.
16     Q.   Did she ever talk to you about the substance of
17  it?
18     A.   Yes.
19         MR. HARRIS:  Let's take a short break, if
20  that's okay.
21         THE WITNESS:  Okay.
22         (Recess from 1:28 p.m. to 1:40 p.m.)
23     Q.   (BY MR. HARRIS) Are you familiar with the
24  process through which the governor of Texas may declare
25  a particular type of legislation to be an emergency

---

### 106

1   item?
2      A.   Yes.
3      Q.   Can you tell me how that process works?
4         MR. SWEETEN:  You can answer as a general
5   matter to your understanding.  Don't -- And objection to
6   the extent it calls for speculation.  Go ahead.
7      A.   The legislature gets a proclamation from the
8   governor designating an item an emergency.
9      Q.   Within a particular session, how many items
10  does the governor typically declare to be an emergency?
11     A.   I mean, it's up to the governor to decide what
12  he wants, as many as or few as he wants.
13     Q.   In your experience from your years in the Texas
14  House, how many items in a -- would be designated
15  emergency items in a particular session?
16     A.   Oh, you know, I can't say.  Off the top of my
17  head, it's -- you know.
18     Q.   Would it be less than 10 in a year?
19     A.   In a session?
20     Q.   In a session.
21     A.   Without specials or regular?  Possibly, yeah.
22  It's just up to the governor.
23     Q.   What is the effect of the governor issuing a
24  proclamation that an item is an emergency item?
25         MR. SWEETEN:  You can answer as a general

---

### 107

1   parliamentary procedure as to matters of the public
2   record.
3      A.   Well, the governor issues a proclamation
4   designating something an emergency.  The House and the
5   Senate receive it and decide whether or not they want to
6   act on it and how they want to take it up.
7      Q.   Does it make any difference whether the
8   governor declares something to be an emergency item or
9   not in terms of how and when it gets considered by the
10  legislature?
11         MR. SWEETEN:  You can answer as matters of
12  public record.
13     A.   There's precedent in the rules that says
14  it's -- the House gets to decide how they want to handle
15  emergency matters.
16     Q.   There's an emergency calendar in the House; is
17  that right?
18     A.   Yes.
19     Q.   And the rules provide that -- that certain
20  issues -- bills concerning certain issues may be
21  assigned to the emergency calendar.  Is that your
22  understanding?
23     A.   Yes.
24     Q.   And the rules also state that a bill deemed to
25  be an emergency by the governor may be placed on the

---

### 108

1   emergency calendar; is that right?
2      A.   Yes, it may be.
3      Q.   And what is the emergency calendar?
4      A.   I mean, it's one of the calendars that the
5   calendars committee can assign bills to that it has
6   determined are important bills that are emergency in
7   nature.
8      Q.   Given that the emergency calendar is for
9   important bills that are of an emergency in nature, is
10  it the case that bills assigned to the emergency
11  calendar can be considered sooner than other bills?
12         MR. SWEETEN:  Objection.  Assumes facts
13  not in evidence.  Also, you can answer as a matter of
14  general parliamentary procedures or matters of the
15  public record.  Don't reveal matters of privilege.
16     A.   What do you mean by sooner?
17     Q.   Why have an emergency calendar?
18         MR. SWEETEN:  You can answer as a matter
19  of general parliamentary procedure.
20     A.   Well, the rules put the emergency calendar in
21  the system of calendars as the first calendar.  So if
22  the bill is assigned to an emergency calendar, then it
23  is taken up ahead of the other bills.
24     Q.   As a general matter, if a bill concerning voter
25  identification requirements were not designated by the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                              JUNE 14, 2012

---

## 109

1 governor as an emergency item, could that bill be
2 assigned to the emergency calendar?
3        MR. SWEETEN:  You can answer as to general
4 parliamentary matters, matters of public record.  Don't
5 reveal privileged information.
6    Q.   It could be so assigned?
7    A.   Yes.
8    Q.   And I think you said that the emergency
9 calendar set forth the types of bills that could be --
10 that could be assigned to that calendar; is that right?
11    A.   Yes.
12    Q.   Which category of bills would a voter ID
13 legislation not designated as an emergency by the
14 governor fall within?
15    A.   Rule 7 says --
16        MR. SWEETEN:  Same instruction.  Go ahead.
17    A.   -- "Emergency calendar on which shall appear
18 bills considered to be of such pressing and imperative
19 import as to demand immediate action."
20    Q.   And so it could fall into that category?
21    A.   If the calendars committee believes that that
22 rule applies, yes.
23    Q.   As a general matter, why would the governor
24 deem something to be an emergency?
25        MR. SWEETEN:  Objection.  That calls for

---

## 110

1 matters of legislative privilege and calls for
2 speculation.  Don't answer the question as posed.
3    Q.   Putting aside any particular legislation and
4 given that the governor is not a legislator, as a
5 general matter, why would the governor deem something to
6 be an emergency?
7        MR. SWEETEN:  Objection.  Calls for
8 speculation.  Objection.  Could require her to reveal
9 her thoughts and mental processes about legislation
10 which she does not have to do or communications with
11 state agencies or other protected members.  Don't answer
12 to the extent you would do that.
13    Q.   Are you able to answer the question in spite of
14 counsel's objection?
15    A.   I don't know the answer.  I don't know why the
16 governor decides something is an emergency or not.  I
17 don't know the answer.  That is something that he does
18 with his staff in his office.
19    Q.   Does the governor's office ever consult with
20 the speaker or his staff with respect to which items to
21 designate as an emergency?
22        MR. SWEETEN:  You can answer as to whether
23 or not there are communications covering that general
24 issue.
25    A.   Do they ever consult?

---

## 111

1    Q.   Yes.
2    A.   Yes.
3    Q.   Did the governor's office consult with the
4 speaker or the speaker's office concerning whether or
5 not to designate voter ID as an emergency item?
6        MR. SWEETEN:  I will let her answer as to
7 the general subject matter of -- of the issue of
8 emergency legislation.  You've put too much substance in
9 that question for me to let her answer as phrased, so if
10 you want to ask her a more general subject matter question,
11 I'll let her answer.
12        MR. HARRIS:  I think that the general
13 matter was covered by the last question.  I would argue
14 that nothing more than my question would have to go on a
15 privilege log, but not interested in fighting that out
16 here in the room.
17        MR. SWEETEN:  If you want to ask her if
18 there were communications between Speaker Straus's
19 office and the governor's office about whether this was
20 an emergency, I will let her answer that question, but
21 not anymore substance than that.
22    Q.   Were there any discussions between the governor
23 or his staff and the speaker or his staff concerning
24 whether to designate voter ID as an emergency?
25        MR. SWEETEN:  It's the same question that

---

## 112

1 you asked.  I'm going to let you answer yes or no.
2    A.   I actually don't remember if we talked about it
3 with them or not.
4    Q.   Do you recall whether there were any
5 communications between the governor's office and the
6 speaker's office concerning the declaration of emergency
7 items in 2011?
8    A.   Yes.
9    Q.   And are you saying there were some
10 communications?
11    A.   Yes.  A variety, but I don't know if this was
12 one or not because there were -- you know, there were
13 several.
14    Q.   Do you know why the governor designated voter
15 ID as an emergency item?
16    A.   No.
17    Q.   Do you recall what other items were designated
18 as an emergency during the regular 2011 session?
19    A.   I think Sanctuary Cities, sonogram bill, voter
20 ID, the Texas windstorm -- TWIA, Texas Windstorm
21 Insurance Association, and those are the ones I remember
22 off the top of my head.  The pat-down bill -- the
23 homeless -- The pat-down bill.
24    Q.   Are you familiar with Senate Bill 14 from the
25 2011 82nd legislative session?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 113

1    A.  Not by number.  I don't -- Not by that number.
2        (League Exhibit 12 marked.)
3    Q.  I would ask that this document be marked for
4    identification League Exhibit 12.  And, Mrs. Davis,
5    please take a few moments to look over the document.
6    A.  Okay.
7    Q.  Does this refresh your recollection as to the
8    subject matter of Senate Bill 14 from the 82nd session?
9    A.  Yes.
10   Q.  And this bill, like the previous bills we
11   looked at, concerns identification requirements for
12   voters in Texas.
13   A.  Yes.
14   Q.  Is that right?  Did you have any discussions
15   about SB14?  I think I asked you previously about
16   general discussions you had with members.  I believe you
17   said that you had discussions with Representative Hunter
18   and Representative Harless.
19   A.  Yes.
20   Q.  Did those discussions concern SB14?
21   A.  With -- With Representative Harless, we
22   probably discussed 14.
23   Q.  And what about Representative Hunter?
24   A.  I think those were mostly general discussions.
25   Q.  Other than those two representatives, did you

## 114

1    speak to any other members of the House about SB14?
2    A.  I don't -- I don't -- Not to my memory, no.
3    Q.  Did you have any discussions with constituents
4    regarding SB14?
5    A.  No.
6    Q.  If you can take a look at Page 9 of the bill in
7    Section 63.0101.
8    A.  Okay.
9    Q.  Ms. Davis, do you agree that that appears to be
10   a list of documentation that is an acceptable photo
11   identification under the bill?
12   A.  Yes.
13   Q.  And how would you compare this list in 63.0101
14   to the list of identification permitted under previous
15   bills that we've looked at today?
16       MR. SWEETEN:  Do not answer.  It would
17   require you to reveal your thoughts, mental impressions
18   about legislation instruction.  Instruct you not to
19   answer based on legislative privilege.
20   Q.  What are the forms of identification that are
21   permitted under this bill, SB14?
22       MR. SWEETEN:  You can answer based on the
23   text of the bill.
24   A.  It says an acceptable form of photo
25   identification under this chapter, a driver's license,

## 115

1    election identification certificate or personal
2    identification card issued by the Department of Public
3    Safety that hasn't expired, a US military ID card with
4    the person's photograph, a US citizenship certificate
5    with the person's photograph, a passport, a license to
6    carry a concealed handgun -- or a license to carry a
7    concealed handgun.
8    Q.  And limiting your answer solely to the text of
9    the bills that we've looked at here today, how would you
10   compare Section 63.0101 in SB14 to the prior versions of
11   the voter ID bills that we looked at?
12       MR. SWEETEN:  She's not going to reveal
13   her mental thoughts and impressions about why 14 is
14   different than something else.  If you want her to go
15   through the exercise of comparing the language of Senate
16   Bill 14 and the language of 362, as marginally relevant
17   as that would be, I will let her compare the actual text
18   in front of her.  She will not reveal her mental
19   impression and thoughts about why these are different or
20   how they're different.
21       Q.  Well, limited yourself to a comparison of SB362
22   and SB14, please tell me how the bills differ in terms
23   of the identification permissible.  And I will refer you
24   to Page 5 of SB362.
25   A.  Okay.  Well, all I can do is read what's in

## 116

1    each one of them, but 5 -- I mean in SB362, you have a
2    photo ID, which would be a driver's license or photo ID
3    that hadn't expired or a military ID or a citizenship
4    certificate with the photograph, a passport, a concealed
5    handgun license or a valid ID card issued by a -- by the
6    Federal government or an agency, institution of the
7    Federal government or a political subdivision.
8    Q.  Do you agree that SB362 would also permit a
9    valid identification card issued by an agency,
10   institution or political subdivision of the State of
11   Texas?
12   A.  Yes.
13   Q.  And do you agree that SB14 in contrast does not
14   permit one to vote with a valid identification card
15   issued by an agency, institution or political
16   subdivision of the state?
17       MR. SWEETEN:  You can answer based on the
18   text of the bills he's got in front of you.
19   A.  No, I don't see that in the -- in Senate Bill
20   14.
21   Q.  And do you recall anything about the public
22   legislative history of SB14?
23   A.  So, no, not -- not off the top of my head I
24   don't, no.
25       (League Exhibit 13 marked.)



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 117

1  Q.  I'd ask that this document be marked as League
2  Exhibit 13. Mr. Davis, please take a few moments or as
3  much time as you need to familiarize yourself with the
4  documents.
5  A.  Okay.
6  Q.  Do you agree this appears to be a legislative
7  history of SB14 from the 82nd regular legislative
8  session?
9  A.  Yes.
10  Q.  And it looks like this history is in reverse
11  order of the ones we've been looking at previously, but
12  turning to the -- to the last page of the exhibit, looks
13  like SB14 was filed on January 12, 2011; is that right?
14  A.  Yes.
15  Q.  And it looks like on January 24th, 2011 the
16  bill was referred to the committee of the whole Senate.
17  Do you see that?
18  A.  Yes.
19  Q.  Do you know who makes appointments to
20  particular committees on the Senate side?
21  A.  The lieutenant governor.
22  Q.  Do you know why the lieutenant governor
23  referred SB14 to the committee of the whole Senate?
24  MR. SWEETEN:  Objection. Legislative
25  privilege. Objection. Calls for speculation. It would

## 118

1  require her to reveal her mental thoughts, processes
2  about why the lieutenant governor would have referred
3  something to the committee of the whole which invades
4  the legislative privilege or it also could require her
5  to reveal communications that she's had with the various
6  entities protected under the privilege. Therefore, my
7  question is to not answer the question.
8  MR. HARRIS:  As before, I'm just asking if
9  she knows why which requires a yes or no. Will you
10  permit her to answer yes or no?
11  MR. SWEETEN:  You can answer that question
12  yes or no.
13  A.  No.
14  Q.  And then it looks like on January 25, 2011,
15  SB14 was set as a special order; is that right?
16  A.  Where?
17  Q.  On January 25th, 2011, you see there's a few
18  actions taken that day, but I see --
19  A.  Yes.
20  Q.  -- one entry that says "set as special order,"
21  right?
22  A.  Yes.
23  Q.  Based on our previous review of -- of the
24  Senate rules with respect to special orders in voter ID,
25  do you know how many votes would have been required to

## 119

1  set SB14 as a special order?
2  A.  The -- A majority of the members of the Senate.
3  Q.  Skipping ahead to January 26, 2011, this is on
4  Page 6 of 10 of the exhibit.
5  A.  Okay.
6  Q.  Do you see that on January 26th, 2011, SB14 was
7  reported engrossed from the Senate?
8  A.  Yes.
9  Q.  And that means that the bill passed the Senate;
10  is that right?
11  A.  Yes.
12  Q.  And at that time the bill went to the House; is
13  that right?
14  A.  Yes.
15  Q.  Now, I see here that the bill was referred to
16  the voter identification and voter fraud, select. Do
17  you understand that to mean a select committee?
18  A.  Yes.
19  Q.  What is a select committee?
20  MR. SWEETEN:  You can answer as a general
21  matter.
22  A.  Under the rules it's just a -- a committee
23  that -- that can be created in the House under the
24  rules, separate from a standing committee.
25  Q.  In general, what is the purpose of having a

## 120

1  select committee?
2  MR. SWEETEN:  Don't reveal matters of
3  legislative privilege. If in doing so, it would, do not
4  answer the question.
5  A.  You can have a lot of reasons for it. It
6  depends on the issue, the legislature, the members'
7  interests, whatever. A variety of reasons.
8  Q.  What's the difference between a select and a
9  standing committee?
10  A.  A standing committee is considered to be a -- a
11  permanent -- permanently in the rules from session to
12  session, and a select committee usually lasts for that
13  particular legislature.
14  Q.  When was the voter identification and voter
15  fraud select committee established?
16  A.  Last -- Last session during the committee
17  appointments.
18  Q.  Were any bills other than SB14 referred to the
19  voter identification and voter fraud select committee?
20  A.  I believe, yes. I believe there were some that
21  were -- that were sent there initially, yes.
22  Q.  And which bills are you referring to?
23  A.  I don't know off the top of my head. I believe
24  some were sent there and then re-referred to elections
25  or whatever.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 121

1    Q.  Why was SB14 bill -- let me -- Let's step back
2  for a second.  Do you know why SB14 was referred to the
3  voter identification and voter fraud select committee?
4    A.  No.
5    Q.  What is the process of creating a select
6  committee?
7       MR. SWEETEN:  Don't reveal matters of
8  privilege as to a specific piece of legislation.  If
9  doing so you would, then do not answer the question.
10   A.  It's just a proclamation that's issued by the
11 speaker.
12   Q.  During your time in the House, how many select
13 committees would typically be created in any given
14 session?
15      MR. SWEETEN:  You can answer as a matter
16 of public record.
17   A.  Well, they're created from one legislature to
18 the next, so sometimes 9, 10, 11.  I mean, just depends.
19   Q.  Are the select committees dissolved or
20 terminated in some official way?
21   A.  They last from one legislature to the next.
22   Q.  Do you know whether there was any -- there had
23 been a previous select committee on voter identification
24 and voter fraud?
25   A.  I don't know.

---

### 122

1    Q.  Does the speaker appoint members to select
2  committees?
3    A.  Yes.
4    Q.  As a general matter when you were chief of
5  staff to the House -- excuse me -- to Speaker Straus,
6  did he consult with you regarding whether or not to
7  create a select committee?
8       MR. SWEETEN:  You can answer as to whether
9  he consulted with you.
10   A.  Yes.
11   Q.  And would the speaker consult with you
12 regarding members as a general matter to appoint to a
13 select committee?
14   A.  Yes.
15   Q.  What sort of factors would you take into
16 account as a general matter with respect to whether or
17 not to create a select committee as opposed to just
18 assigning a bill to one of the standing committees?
19      MR. SWEETEN:  Don't answer that.  That
20 would reveal matters of privilege.  Instruct not to
21 answer.
22      MR. HARRIS:  And just for the record,
23 that -- the privilege you are asserting is a legislative
24 privilege?
25      MR. SWEETEN:  Absolutely.  With respect to

---

### 123

1  the speaker who she's testified designates the select
2  committees.  It would reveal thought processes.  That's
3  legislatively privileged.  Don't answer.
4    Q.  As parliamentarian, would the speaker ever
5  consult with you regarding whether or not to create a
6  select committee?
7    A.  Yes.
8    Q.  What results would govern the decision whether
9  or not to create a select committee?
10      MR. SWEETEN:  Same objection.  Don't
11 reveal the thought processes that the speaker may have
12 had or your own internal thought processes as to why a
13 select committee would be impacted in answering the
14 question.  Legislative privilege.
15   A.  Well, there are some rules in there -- in the
16 House rules for the select committees, and I don't know
17 what they are specifically, but there are rules in the
18 rules -- in the House rules for it.
19   Q.  Skipping ahead in this legislative history that
20 we've been looking at, it looks like SB14 passed the
21 House on March 24th, 2011; is that right?
22   A.  Yes.
23   Q.  It says that on April 5th, 2011, a House
24 amendment was laid before the Senate.  What do you
25 understand that entry to mean?

---

### 124

1    A.  That is the House version of the Senate bill
2  that is Senate bill with House amendment attached to it.
3    Q.  It says that on that same day, April 5th, 2011,
4  the Senate refuse tod the concur.  Does that mean that
5  the Senate refused to adopt the version of the bill as
6  amended by the House?
7    A.  Yes.
8       MR. SWEETEN:  You can answer based on
9  public record, which I think you are.
10   A.  Yes.
11   Q.  Then it looks like the Senate requested a
12 conference committee on April 6, 2011.  Do you see that?
13   A.  Yes.
14   Q.  What is a conference committee?
15   A.  It's just a committee between of the House and
16 the Senate that convenes to reconcile the differences
17 between the House and Senate versions of the bill.
18   Q.  Who appoints members to the -- to a conference
19 committee as a general matter?
20   A.  The lieutenant governor and the speaker.
21   Q.  Did the speaker consult with you regarding
22 appointment of members to the conference committee for
23 SB14?
24      MR. SWEETEN:  You can answer.
25   A.  Yes.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                                    JUNE 14, 2012

---

125

1    Q.  How many members of the House and Senate sit on
2    a conference committee?
3    A.  Five members of the House and five members of
4    the Senate sit on a conference committee as a general
5    matter.
6    Q.  As a general matter, how are members chosen to
7    sit on the conference committee?
8        MR. SWEETEN:  Don't reveal any thought
9    processes of the speaker or yourself as to any
10   particular bill with respect to this.  You can answer as
11   to matters of the public record, but don't reveal your
12   decisional process as a matter of legislative privilege.
13   A.  Usually the author and the sponsor of the bill
14   are put on there and beyond that it's a number of
15   factors.
16   Q.  What are those factors you are referring to?
17   A.  It could be --
18       MR. SWEETEN:  Same objection.
19   A.  -- any of them.
20   Q.  Well, when you say anything, there must be some
21   factors that are more typically considered, right?
22       MR. SWEETEN:  Same instruction, but don't
23   reveal your thought processes regarding any specific
24   piece of legislation.  If in answering the question you
25   do so, do not answer it.

---

126

1    A.  Interest, expertise, seniority, experience, a
2    number of things.
3    Q.  Is there a required balance between Democrats
4    and Republicans that need to be appointed to a
5    conference committee?
6    A.  No.
7        MR. SWEETEN:  Same instruction.
8    Q.  How would the speaker and lieutenant governor
9    typically decide how many Republicans and how many
10   Democrats to appoint to a conference committee without
11   regard to any particular piece of legislation?
12       MR. SWEETEN:  You can answer if it will
13   not reveal motivations regarding any particular piece of
14   legislation.  If it will, do not answer the question.
15   A.  I can't answer it.
16   Q.  And as a matter of the public record, is there
17   a -- typically certain members of Democrats and
18   Republicans appointed to a conference committee?
19   A.  Yes.
20   Q.  It looks like from this legislative history
21   that on May 5th, 2011, a conference committee report was
22   distributed.  And I'm looking at the first page.
23   A.  Yes.
24   Q.  And then the last entry says that the Senate
25   adopted a resolution to go outside bounds on May 9,

---

127

1    2011.  Do you see that?
2    A.  Yes.
3    Q.  What does a resolution to go outside bounds
4    mean?
5        MR. SWEETEN:  You can answer as a general
6    matter.
7    A.  That is a resolution that gives the conference
8    committee permission to submit a bill that did more than
9    the original bill.
10   Q.  And when you say "that did more than the
11   original bill," what do you mean by that?
12   A.  That exceeded the jurisdiction of the original
13   bill, added new language that wasn't in either bill and
14   things like that.
15   Q.  As a matter of public record do you know what
16   this entry is referring to with respect to SB14?
17   A.  No, I don't.
18   Q.  And it looks like on May 9, 2011, the Senate
19   adopted the conference committee report; is that right?
20   A.  Yes.
21   Q.  And then on May 16th, the House adopted the
22   conference committee report?
23   A.  Yes.
24   Q.  Is that right?  And it looks like the bill was
25   signed in the House, the Senate and sent to the governor

---

128

1    on May 18th, 2011; is that right?
2    A.  Yes.
3    Q.  With respect to any of the four voter ID bills
4    that we've looked at today, are you aware of any
5    analysis with regard to the number of voters in Texas
6    who lack the required forms of photo ID?
7    A.  No.
8    Q.  Are you aware of with -- Respect to any of
9    those same four bills, are you aware of any analysis
10   with respect to the proportion of racial or ethnic
11   minority groups that possess the required forms of photo
12   ID?
13   A.  No.
14   Q.  Are you aware of -- with respect to any of
15   these four bills, are you aware of any concerns
16   raised -- publicly raised by members of the House with
17   regard to the impact of the bill on racial or ethnic
18   minority groups?
19       MR. SWEETEN:  He's asking about public
20   statements made about this issue.  You can answer to
21   that extent.
22   A.  Yes.
23   Q.  And what is your recollection of those
24   concerns?
25   A.  I just remember generally members in the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                                      JUNE 14, 2012

---

### 129

1    democratic caucus just raising those concerns generally.
2        Q.   Do you remember that for all four of the bills
3    or are you thinking about a particular -- particular
4    bill or session?
5        A.   I was thinking about last session, the 2011
6    session.
7        Q.   Are you aware of any similar concerns with
8    regard to the impact of the bill being raised by
9    interest groups or advocacy groups in Texas?
10       A.   No.
11       Q.   How about constituents?  Did you ever hear
12   constituents express concern that SB14 or any of the
13   three other bills we looked at would have a
14   disproportionate impact on them as minority voters?
15       A.   No.
16       Q.   Are you familiar with the Voting Rights Act?
17       A.   Yes.
18       Q.   Are you familiar with Section 5, preclearance
19   requirement under the Voting Rights Act?
20       A.   Yes.  Generally.
21       Q.   What is your general understanding of the
22   requirements of Section 5 of the Voting Rights Act?
23       A.   There are certain things that have to be
24   precleared by the justice department if they impact the
25   rights of minorities or protected groups to exercise the

---

### 130

1    right to vote, something along those lines.
2        Q.   From your time in the House would you say that
3    the legislature takes any steps to ensure that the bills
4    they pass are in compliance with the Voting Rights Act?
5        MR. SWEETEN:  Objection.  Legislative
6    privilege.  Don't answer the question.
7        Q.   Putting aside any particular piece of
8    legislation, are you aware of any steps taken by the
9    legislature to ensure compliance with the Voting Rights
10   Act?
11       MR. SWEETEN:  Objection.  To the extent it
12   would call for her to reveal thoughts, mental
13   impressions about a particular bill, do not answer that.
14   You can refer to matters of the public record.
15       A.   I know that they have attorneys that probably
16   look at, the ledge council.
17       Q.   When members of the democratic caucus raised
18   concerns about impact of SB14 on minority voters, what
19   was your opinion of those assessments by the democratic
20   members?
21       MR. SWEETEN:  Do not answer.  Legislative
22   privilege.  Instruct not to answer.
23       Q.   Do you have any understanding as to whether
24   Democrats or Republicans would be more or less likely to
25   possess the required forms of identification under SB14?

---

### 131

1        MR. SWEETEN:  In answering the question,
2    don't reveal your thoughts, mental processes about the
3    legislation, and he's asking you for an analysis of
4    that.  In fact, I'm going to instruct you not to answer
5    the question.  It's legislatively privileged.
6        MR. HARRIS:  Let's take a very short break
7    after which I expect to be able to conclude my
8    questioning quickly.
9        (Recess from 2:19 p.m. to 2:28 p.m.)
10       Q.   (BY MR. HARRIS) Ms. Davis, are you ready to go
11   back on the record?
12       A.   Yes.
13       Q.   I appreciate your time, and I have just a few
14   further questions.  First is, we were talking before
15   about -- Well, subject to many objections, my question
16   was whether there were differences in number of the
17   Republicans and Democrats who would possess the required
18   form of photo ID.  And my question is are you aware of
19   any evidence in the public to the effect that either
20   Republicans or Democrats would be more or less likely to
21   possess the kinds of ID required under SB14?
22       A.   I'm not.
23       Q.   Are you aware of any -- Putting aside the
24   specific substance of any discussions with legislators,
25   are you aware of any discussions amongst legislators

---

### 132

1    concerning the proportion of Republicans and Democrats
2    that would request the required forms of voter ID?
3        A.   You'll have to ask it again.
4        MR. HARRIS:  I'd ask that the court
5    reporter read back the question, please.
6        (Requested portion was read.)
7        A.   No.
8        MR. HARRIS:  I have nothing further at
9    this time, but reserve the right to reopen the
10   deposition subject to potential motions with respect to
11   privilege, and, otherwise, I would turn it over to the
12   United States to the extent it has questions.
13       EXAMINATION
14   BY MS. BERKOWER
15       Q.   Good afternoon, Ms. Davis.  My name is Risa
16   Berkower, and I'm here on behalf of the Attorney
17   General, Eric Holder.  I'll do my best not to cover any
18   ground that Mr. Harris has already covered with you
19   today.
20       A.   Okay.
21       Q.   I think to be clear though, when I use the term
22   voter ID or photo ID, I'm going to use those terms
23   interchangeably, and I want you to interpret them
24   broadly to mean a requirement that a voter present a
25   form of identification, whether it has a photo or

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 133 | 135 |
|---|---|
| 1 otherwise when voting in person before being permitted | 1     MS. BERKOWER:  Yes. |
| 2 to vote by regular ballot.  Does that make sense? | 2     MR. SWEETEN:  You can testify as to |
| 3     A.  Yes. | 3 matters of public record. |
| 4     Q.  When I refer to the term minority voters, I | 4     A.  A bill is placed on the calendar by the |
| 5 mean voters that are non-white or non-Anglo.  Does that | 5 calendar's committee and for consideration.  That |
| 6 make sense? | 6 calendar lays out or is before the House 24 to 36 hours |
| 7     A.  Yes. | 7 before it's taken up and then the -- then the speaker |
| 8     Q.  If you have any questions about what I'm trying | 8 lays the bill out in the regular order of business. |
| 9 to ask, just let me know and I'll try and rephrase. | 9     Q.  Is every bill put -- brought up for a vote that |
| 10     A.  Okay. | 10 makes that committee placed on a calendar? |
| 11     Q.  So with regard to your duties when you were a | 11     A.  Ask me that again. |
| 12 parliamentarian, focusing on those right now, you said | 12     Q.  Is every bill that's placed on the calendar |
| 13 that you would provide advice to the speaker.  Was | 13 brought up for a vote? |
| 14 that -- Just to be clear, was that limited only to | 14     A.  No. |
| 15 procedural topics or was the advice ever substantive? | 15     Q.  When would a bill not be brought up for vote? |
| 16     A.  Procedural. | 16     MR. SWEETEN:  You can answer as a matter |
| 17     Q.  Is the speaker bound to take your advice? | 17 of public record. |
| 18     A.  No. | 18     A.  May not be reached in time, could be postponed, |
| 19     Q.  Why -- why -- Why not? | 19 a member may decide they don't want the bill to be |
| 20     A.  Well, traditionally, the parliamentarian is an | 20 brought up for a vote or just a variety of reasons. |
| 21 advisor to the speaker or to the presiding officer. | 21     Q.  Does the parliamentarian have a role in the |
| 22     Q.  Does the speaker usually take the advice of a | 22 decision of whether a bill is brought up for a vote? |
| 23 parliamentarian just generally in terms of your service? | 23     A.  No. |
| 24     A.  Generally, yes. | 24     Q.  Is House leadership ever involved in the |
| 25     Q.  What is a parliamentary inquiry exactly? | 25 decision if a bill will be brought up for a vote? |

| 134 | 136 |
|---|---|
| 1     A.  That is a question that a member asks of the | 1     A.  You mean once it's on the calendar? |
| 2 chair related to procedural issues before the House. | 2     Q.  Yes. |
| 3     Q.  And what does the parliamentarian do when a | 3     A.  No. |
| 4 parliamentary inquiry is made? | 4     Q.  When would House leadership be involved then? |
| 5     A.  The parliamentarian assists the speaker in | 5     MR. SWEETEN:  You can answer regarding |
| 6 answering the question. | 6 matters of the public record.  Don't reveal privilege. |
| 7     Q.  Is that something that occurs on the record or | 7     A.  Well, the bill belongs to the individual |
| 8 off the record? | 8 member, so it's usually up to the member as to whether |
| 9     A.  Both. | 9 or not they want their bill brought up for a vote. |
| 10     Q.  How does -- How is it determined when it's on | 10     Q.  With regard to the voter ID legislation that |
| 11 the record or off the record? | 11 came up before the House during the time you were a |
| 12     A.  It's up to the member. | 12 parliamentarian, 2005, 2007, 2009, is your |
| 13     Q.  In your memory has there been any instance in | 13 responsibility solely procedural? |
| 14 which the speaker has not taken your advice on the | 14     A.  Yes. |
| 15 public record? | 15     Q.  Did you ever issue ruling papers during your |
| 16     A.  You mean, where I've given the speaker | 16 time as a parliamentarian? |
| 17 confidential advice? | 17     A.  Yes. |
| 18     Q.  Well, I guess you said sometimes your advice is | 18     Q.  Are those public? |
| 19 made on the record; is that accurate? | 19     A.  Yes.  They're in the journal.  If the member |
| 20     A.  Well, yes.  I mean, the question is asked and | 20 requests a written ruling, it was placed -- requested a |
| 21 then you advise the speaker between the two of you, but | 21 written ruling, it was placed in the journal. |
| 22 the parliamentarian never speaks on the record. | 22     Q.  Did you make any these publicly issued rulings |
| 23     Q.  Oh, I see.  And how does a bill get brought up | 23 during the time that voter ID -- or about any of the |
| 24 for a vote exactly?  What are the procedures there? | 24 voter ID legislation? |
| 25     MR. SWEETEN:  In the House? | 25     A.  I don't remember. |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                                    JUNE 14, 2012

---

### 137

1    Q.  Does the parliamentarian ever assist with the
2    development of legislation?
3    A.  Well, do you mean like the substantive drafting
4    of it, things like that?
5    Q.  Sure, or anything else really.
6    A.  Rarely.  They usually just review it once it's
7    been written.  They may -- They may review an amendment
8    with a member to assist the member, but they usually
9    don't draft legislation.  That would be very unusual.
10   Q.  Do you remember ever drafting legislation?
11   A.  Not legislation, no.
12   Q.  What about amendments?
13   A.  Usually, no, I never draft it.  I would review
14   it and legislative council's on the floor to do that.
15   Q.  Is the assistance that you provide with the
16   development of legislation as parliamentarian more
17   procedurally oriented or would you provide substantive
18   advice as well?
19   A.  No, it's procedural.
20   Q.  In your view as parliamentarian, are there any
21   areas of procedure that impact substance of bills?
22       MR. SWEETEN:  You can answer as a general
23   matter.  Don't reveal privilege.
24   A.  It's usually issues of germaneness, different
25   things like that and that is a procedural issue.

### 138

1    Q.  But it impacts the substance because it's a
2    question of what substance is germane to the bill topic.
3    Is that what you mean?
4        MR. SWEETEN:  Objection.  Vague.
5    Objection.  Calls for speculation.
6    A.  It's hard to know.  I mean, some members may
7    think it's substantive and some might not, so it's hard
8    to know, but the parliamentarian is limited to
9    interpreting whether or not the bills actually comply
10   with the rules.
11   Q.  And one of the rules is germaneness.
12   A.  Is germaneness.
13   Q.  Now, you said you were also special counsel to
14   the House.  Is there any distinction between that
15   position and the parliamentarian position?
16   A.  The special counsel deals with just a variety
17   of things, sometimes open records, different things like
18   that and legal issues.
19   Q.  As special counsel did you have any role with
20   regard to development of legislation?
21   A.  No.
22   Q.  Legislative drafting, in that capacity?
23   A.  No.
24   Q.  And I guess I meant to ask this when we were
25   speaking about your role as parliamentarian.  Will

### 139

1    members ever ask questions when they're developing
2    legislation about certain procedural points that they
3    need to address with their legislation?
4    A.  Yes.
5    Q.  What types of questions did they ask?  What
6    areas did they get into?
7        MR. SWEETEN:  In answering the question,
8    don't reveal matters of privilege or anything with
9    respect to a specific bill.  If you cannot answer that
10   question, then do not do so.
11   A.  Just one-subject issues, things like that.
12   Does it comply the one-subject rule, things like
13   that .
14   Q.  What's the one-subject rule?
15   A.  The bill -- Under the constitution, a bill can
16   only have one subject.
17   Q.  And is that how germaneness factors in?
18   A.  Or germaneness would be another procedural
19   rule.
20   Q.  Just to be clear though, how is germaneness
21   different from one subject?
22   A.  Well, there's constitutional germaneness and
23   there is the -- the one-subject rule.  It gets really
24   confusing, but there's a germaneness rule in the rules
25   and then there's one-subject rule.

### 140

1    Q.  Okay.  How would you generally distinguish
2    between those when you were working on bills?
3    A.  Well, you're talking about --
4        MR. SWEETEN:  Hold on.  When she's working
5    on bills, how would she distinguish it?  Just don't
6    reveal matters regarding specific legislation in
7    answering this question.  You can reveal matters of
8    general procedure if you can do so without revealing
9    matters of privilege, okay?
10   A.  When you are talking about germaneness issues,
11   you typically are talking about amendment to a bill, and
12   when you are talking about the one-subject rule, you are
13   talking about the entire bill and the subject of that
14   particular piece of legislation.
15   Q.  Okay.  Now, turning your time as chief of staff
16   for Speaker Straus, when you were in that role did you
17   ever participate in legislative drafting?
18       MR. SWEETEN:  You can answer yes or no.
19   A.  Yes.
20   Q.  Did you ever participate in legislative
21   drafting relating to voter ID legislation?
22   A.  No.
23   Q.  What district does Speaker Straus represent?
24   A.  121.
25   Q.  Do you know what the demographics of that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 141

1  district are?
2      A.  I know that it's mostly Republican and that's
3  it.
4      Q.  Turning back to -- I think you testified
5  earlier about the speaker's responsibilities concerning
6  committee appointments.  Does the parliamentarian have a
7  role in committee appointments?
8      A.  Yes.
9      Q.  What is that role?
10     A.  The parliamentarian advises the speaker on
11  seniority, different things like that.
12     Q.  Again, would that advice be more procedural
13  rather than substantive?
14     A.  Yes.
15     Q.  And with regard to the creation of select
16  committees, does the parliamentarian have a role in the
17  creation of those committees?
18     A.  A procedural role, yes.
19     Q.  What about assignment of bills to the
20  committee?  Does the parliamentarian play a role in that
21  assignment process?
22     A.  Yes.
23     Q.  What is that role?
24     A.  The parliamentarian --
25         MR. SWEETEN:  Don't reveal any matters

## 142

1  related to specific legislation.  You can answer
2  generally if you can do so without answering
3  specifically.
4      A.  The parliamentarian reviews bills and -- to see
5  where they fit in the jurisdiction of the committees and
6  advises the speaker if he has questions, things like
7  that.
8      Q.  Can the House overrule a bill referral decision
9  as a matter of procedure?
10     A.  I don't know.  I've not seen that.  I do not
11  know.
12     Q.  What about the speaker?  Can the speaker
13  overrule a decision concerning bill referral?
14     A.  Well, it's the speaker's decision as to where
15  the bills go, so --
16     Q.  Okay.  So you are advising him and then he's
17  choosing whether to take your advice or not.
18     A.  Yes.
19     Q.  He or she.
20     A.  Right.
21     Q.  Now, I know it's a little confusing just
22  because we are kind of jumping around, and you've had
23  different roles, but turning back to the creation of the
24  select committee on voter identification and voter fraud
25  in 2011 when you were the chief of staff for Speaker

## 143

1  Straus, do you remember when that occurred?
2      A.  Yes.
3      Q.  And as chief of staff did you have any
4  responsibilities concerning materials that were
5  distributed to the public from the speaker's office?
6         MR. SWEETEN:  Can you read that back?
7         (Requested portion was read.)
8         MR. SWEETEN:  You can answer.
9      A.  Yes.
10     Q.  What responsibilities did you have?
11     A.  You mean, if we put something on the internet
12  or things like that or letters or -- I'm not clear --
13     Q.  Yeah.  Well, I'll be more specific.  What about
14  press releases?  Did you have any responsibilities with
15  regard to press releases?
16     A.  Well, the press secretary would distribute
17  those.
18     Q.  Did you review them in any way?
19     A.  Occasionally I have.
20         (US Exhibit 730 marked.)
21     Q.  I have what I guess we'll mark for this
22  deposition as Exhibit 730, please.  Have you seen this
23  document before?
24     A.  I don't -- I don't remember seeing it, but --
25     Q.  Do you know what it is?

## 144

1      A.  It's a -- It's a press release for
2  committees -- committee assignments.
3      Q.  And was it released during your time as chief
4  of staff for the speaker?
5      A.  If -- It's from the House website.  I would say
6  yes.
7      Q.  Okay.  Turning your attention to just before on
8  the first page of the exhibit, there is like a gap and
9  two lines up from that it says, "Fast track select
10  committee on voter identification, voter fraud."  Do you
11  see that?
12     A.  Yes.
13     Q.  Do you know -- Do you know what it means that
14  this was labeled a fast track committee?
15     A.  I don't.
16     Q.  Have you ever seen a select committee be
17  labeled a fast track committee before?
18     A.  No, I don't, and I don't -- I don't know that
19  that's the correct title.  That's the first time I
20  remember seeing that.  So I'm not sure why that's there.
21     Q.  Okay.  Do you recall how many bills passed out
22  of the select committee on the voter identification,
23  voter fraud --
24     A.  No.
25         (US Exhibit 731 marked.)



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                          JUNE 14, 2012

---

### 145

1      Q.  I think this will be Exhibit 731, please.  Do
2   you know what this?
3      A.  Yes.  It's a report that was printed out in
4   June of this year, bill report.
5      Q.  What is the bill report referring to?
6      A.  Senate Bill 14.
7      Q.  Is a bill report specifically on Senate Bill 14
8   or does it seek to list the number of bills out of the
9   committee -- on the select committee on voter
10  identification and voter fraud?
11     A.  It's just for Senate Bill 14 or it's all the
12  bills that came out of committee, yes, that's true.
13     Q.  Okay.  And how many bills came out of that
14  committee?
15     A.  One.
16     Q.  That was Senate Bill 14?
17     A.  Yes.
18     Q.  So do you know if any other bills were
19  considered by the select committee?
20     A.  I believe other bills were referred to the
21  select committee at one point.  I don't know if they
22  actually took them up or not.
23     Q.  Do you know SB14, without revealing why, but do
24  you know why SB14 was not referred to the elections
25  committee?

---

### 146

1      A.  No.
2      Q.  In your experience and all of your experience
3   in the House is it unusual for a select committee to
4   have overlapping jurisdiction with another committee?
5      A.  No.
6      Q.  Can you think of other select committees that
7   had overlapping jurisdictions with other committees?
8          MR. SWEETEN:  You can answer as a general
9   matter.
10     A.  School finance, emergency preparedness, special
11  districts.  There is a number of them.  Those would be
12  some examples.
13     Q.  Do you know of any other committees that passed
14  only one bill out to the House?
15         MR. SWEETEN:  You can answer as a general
16  matter.
17     A.  No, I don't.  I don't know.
18     Q.  You don't know of any?
19     A.  I don't know if -- I don't know.  There could
20  be some, but I can't -- off the top of my head, I can't
21  remember.
22     Q.  Without revealing the substance, are you aware
23  of any communications between Speaker Straus or members
24  of his office and other legislators concerning the
25  creation of the select committee?

---

### 147

1          MR. SWEETEN:  You can answer.
2      A.  Yes.
3      Q.  Who were those communications between?
4      A.  I don't -- I know that he conferred with
5   different members.  I don't know exactly who they were,
6   what they discussed, but --
7      Q.  When you said he, who are you referring to?
8      A.  The speaker.
9      Q.  Do you know if the speaker conferred with the
10  lieutenant governor's office about the creation of the
11  select committee?
12     A.  I do not.
13     Q.  Do you know if the speaker conferred with the
14  governor's office concerning the creation of the select
15  committee?
16     A.  I don't.
17     Q.  Now, I think you testified that there was a
18  period of time in 2007 through 2009 -- part of 2007
19  through part of 2009 when you were not employed by the
20  legislature; is that accurate?
21     A.  Yes.
22     Q.  Were you aware of a Supreme Court decision,
23  Crawford versus Marion County Board of Elections that
24  was issued during that time?
25     A.  No.

---

### 148

1      Q.  Did you become aware of that decision later on?
2      A.  No.
3      Q.  Are you familiar with that today?
4      A.  No.
5      Q.  If I told you that that decision concerned the
6   constitutionality of a photo ID from Indiana, would that
7   refresh your recollection at all?
8      A.  I vaguely remember them discussing a voter ID
9   bill from Indiana, but I don't remember a court case
10  about it.
11     Q.  Okay.  So you testified earlier that you have
12  some familiarity with the Federal Voting Rights Act; is
13  that accurate?
14     A.  Very general.
15     Q.  General.  Do you believe that compliance with
16  the Federal Rights Voting Act is an important
17  consideration of the law making process?
18         MR. SWEETEN:  Don't reveal matters of
19  legislative privilege which would be matters that --
20  mental impressions, thoughts, motivations regarding
21  legislation.  If in answering this question you would do
22  so, do not answer the question, okay?
23     A.  Can you reread the question, please?
24     Q.  I can reread the question actually.  Do you
25  believe that compliance with the Federal Voting Rights

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                                    JUNE 14, 2012

---

**149**

1    Act is an important consideration in the law making
2    process?
3        A.  Yes.
4            MS. BERKOWER:  And, Patrick, just to be
5    clear, can you explain whose privilege -- legislative
6    privilege she is covered by here?
7            MR. SWEETEN:  She's worked for the
8    speaker -- She worked for the speaker's office.  He has
9    asserted legislative privilege.  She has asserted
10   legislative privilege, therefore, in any answers to
11   questions, it's definitely subject to legislative
12   privilege.
13           MS. BERKOWER:  I just want to make sure I
14   understand just because she has been in different roles
15   in the legislature.
16           MR. SWEETEN:  And this question is about
17   the consideration of the voting rights bill, and, I
18   mean, your question was about Senate Bill 14, so,
19   clearly, that's legislatively privileged in that
20   context, so that's what I'm asserting.
21           MS. BERKOWER:  That question didn't
22   mention Senate Bill 14.  I was asking that as a general
23   matter, and she answered the question, but I know you've
24   been asserting legislative privilege on her behalf
25   throughout the day.  I just want it to be clear.

**150**

1            MR. SWEETEN:  Understand, Ms. Davis has
2    had a number of jobs.  She is an attorney, so there
3    would be an attorney-client privilege in many of those
4    instances that we would assert.  She has worked for
5    legislative staff, and there is a legislative privilege.
6    She has worked for TLC.  That is a legislative privilege
7    and an attorney-client privilege.  So there are
8    multiple, multiple privileges that apply here with
9    respect to just I think each one of her jobs that she's
10   named, and she's -- also, as a private attorney, she
11   would have attorney-client privilege during that time
12   period.  So she's had a variety of jobs, and there are
13   numbers of privileges, so I'm instructing her as to
14   privilege as I have today.
15           MS. BERKOWER:  I understand.  I just want
16   to be clear though.  With regard to her time
17   specifically as parliamentarian, can you explain your
18   assertion of legislative privilege during that time
19   only?  I understand with regard to the other positions
20   that she's held.
21           MR. SWEETEN:  That is subject to the
22   legislative privilege.  She provides advice to
23   legislators in that capacity.  She's advising them, so I
24   would think that's subject both to the legislative
25   privilege and probably the attorney-client privilege.

**151**

1        Q.  (BY MS. BERKOWER) Okay.  Thank you.  Are you
2    familiar with the law -- a Federal law called the Help
3    America Vote Act?
4        A.  No.
5        Q.  Are you currently a member of any community
6    organizations or groups?
7        A.  What do you mean by community organization?
8        Q.  I guess I'll be more specific.
9        A.  Okay.
10       Q.  I'll ask you about a few of them specifically.
11       A.  Okay.
12       Q.  Are you familiar with a group called ALEC?
13       A.  Yes.
14       Q.  Are you a member of that group?
15       A.  No.
16       Q.  Have you ever been a member of that group?
17       A.  No.
18       Q.  During your time working for Speaker Straus did
19   you ever receive any documents from ALEC related to
20   voter ID?
21       A.  Not my knowledge, no.
22       Q.  Did ALEC ever offer you or Speaker Straus's
23   office any special assistance on voter ID legislation?
24       A.  Not to my knowledge, no.
25       Q.  Are you familiar with the national conference

**152**

1    of state legislators?
2        A.  Yes.
3        Q.  Have you ever attended any of their meetings?
4        A.  Yes.
5        Q.  Do you remember when those were?
6        A.  Well, I went to the national conference, just
7    their convention.
8        Q.  When did you go?
9        A.  Every year that I was parliamentarian and when
10   I was chief of staff, just to their national meeting.
11       Q.  Do you recall attending any sessions concerning
12   voter ID?
13       A.  No.
14       Q.  Are there any other groups that focus on policy
15   advice or assistance to legislators that you have
16   belonged to?
17       A.  No.
18       Q.  Any other groups like that that you attend
19   meetings for?
20       A.  No.
21       Q.  I'm sorry for the pauses.  I'm just trying to
22   skip over things I think you've already answered.
23       A.  That's okay.
24       Q.  So now jumping back in time a little bit to
25   2005 when you were parliamentarian --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 153

1 　　A. Yes.
2 　　Q. -- in the House. Were you present during all
3 of the legislative public debates on HB1706?
4 　　A. That was in 2005?
5 　　Q. Yes.
6 　　A. Yes, I would have been -- Yes. Yes, I would
7 have been there.
8 　　Q. During that time did you -- do you recall any
9 of the public debates on that bill?
10 　　A. I don't.
11 　　Q. Do you recall if anyone expressed as part of
12 the public record that the prevention of noncitizen
13 voting was part of the purpose of voter ID bills?
14 　　A. I don't remember.
15 　　　　MS. BERKOWER: I asked about the public
16 record. Don't worry.
17 　　　　MR. SWEETEN: All right. And general
18 purpose is fine.
19 　　Q. Are you aware if any part of the purpose --
20 overall purpose of HB1706 was to prevent noncitizens
21 from voting?
22 　　A. I don't know.
23 　　Q. During the time that you were present during
24 the public debates, were you -- do you remember any
25 analysis presented as part of the public record

### 154

1 concerning whether any individual group of voters might
2 be adversely impacted by HB1706?
3 　　A. No, I don't remember.
4 　　Q. Are you aware of any studies entered into the
5 public record about the number of registered voters
6 without allowable forms of ID under HB1706?
7 　　A. No.
8 　　Q. Jumping forward in time to 2007, were you
9 present during the legislative debate on HB218?
10 　　A. I don't -- Yes. I don't know if I was in the
11 chair or what, but I would have been there in some
12 capacity.
13 　　Q. What are the circumstances in which you might
14 not be in the chair?
15 　　A. Go take a break or do something in the back or
16 something.
17 　　Q. Okay. In an issue of parliamentary procedure
18 arose, would you go back to the chair or --
19 　　A. Sometimes. Sometimes the deputy would take
20 care of it and sometimes I would.
21 　　Q. Do you recall any supporters of HB218 publicly
22 indicate the bill was designed to keep noncitizens from
23 voting?
24 　　A. Not to my knowledge. I don't remember.
25 　　Q. Do you know if that was part of the purpose of

### 155

1 HB218?
2 　　A. I don't know.
3 　　Q. Now, jumping forward again in time to 2009, do
4 you know if any members of the House had a role in the
5 development of SB362?
6 　　A. I don't know.
7 　　Q. Did you have a role in developing SB362?
8 　　A. No. In 2009?
9 　　Q. Yes.
10 　　A. No. I think the only -- only member that
11 probably would have been -- the member that I know of
12 that actually would have been involved -- I take that
13 back -- is probably Todd Smith, who was chair of the
14 elections. Other than that, I do not know, and I did
15 not have a role.
16 　　Q. Okay. When a bill comes from -- Now, again,
17 you are parliamentarian at this time?
18 　　A. Right.
19 　　Q. So when a bill comes from the Senate as opposed
20 to being developed in the House, what is the role of the
21 parliamentarian when it arrives?
22 　　　　MR. SWEETEN: You can answer as a general
23 matter.
24 　　A. It gets referred to committee -- to the House
25 committee.

### 156

1 　　Q. Is the committee referral process similar to
2 what happens when a bill is assigned to committee that's
3 generated from the House?
4 　　A. Yes.
5 　　Q. So that's something that you would advise the
6 speaker on?
7 　　A. Yes.
8 　　Q. Do you remember advising the speaker on SB362?
9 　　A. Not specifically I don't.
10 　　Q. Do you know what the purpose was of SB362?
11 　　　　MR. SWEETEN: You can answer as to a
12 general purpose, if you know.
13 　　A. I don't know the general purpose of it.
14 　　Q. Now, jumping again to 2010, and now at this
15 point you were chief of staff for Speaker Straus, I
16 think --
17 　　A. Right.
18 　　Q. -- starting in January.
19 　　A. Yes.
20 　　Q. Do you remember any interim charges issued by
21 the speaker to committees in 2010?
22 　　A. We issued a -- I know we issued a number of
23 charges over the interim, but I can't remember which
24 ones we issued, but periodically you would issue a
25 number of them.



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 157

1  Q.  What are the general circumstances under which
2  the speaker would issue interim charges?
3       MR. SWEETEN:  You can answer if in doing
4  so you would not reveal matters of privilege.
5       A.  Request of members or just issues that he
6  thinks are important or not or just a number of reasons.
7       Q.  Do you remember if voter ID was one of the
8  interim -- if an interim charge was issued concerning
9  voter ID?  Actually, I'll withdraw that.  I'll restate
10  it.
11       Do you remember if Speaker Straus issued
12  an interim charge concerning voter fraud and voter
13  identification after the 2009 session?
14       A.  I don't -- I don't believe that we did, but I
15  can't remember specifically.  I don't think so.
16            (US Exhibit 732 marked.)
17       Q.  This might refresh your recollection.  Can we
18  mark this as Exhibit 732?  I have to give it to her
19  first.
20       A.  Yes, we did.
21       Q.  What did the interim charge ask -- Well, who
22  was it issued to first?
23       A.  It was issued to the elections committee, and
24  it says, "Examine the prevalence of fraud in Texas
25  elections, study new laws in other states regarding

### 158

1  voter ID and recommend statutory changes to ensure that
2  only eligible voters can vote in Texas elections."
3       Q.  What is -- As a general matter, when a report
4  like this comes to you in the legislature, is it
5  presented to the whole legislature?  What happens with
6  it?
7       A.  Well, it's made public.  It's public
8  information, so it's presented to -- it's out there to
9  everyone, yes.
10       Q.  Is there an expectation when an interim charge
11  is issued that the committee will also develop
12  legislation at the time that it's working on its report?
13       MR. SWEETEN:  Don't reveal matters of
14  privilege including thought processes and motivations of
15  legislators in answering this question.  If you can't do
16  so, do not answer it.
17       A.  I think it depends on the member of the
18  committee in what they want to do.
19       Q.  Do committees sometimes legislate at the same
20  time they were working on interim charge?
21       A.  Sometimes.
22       Q.  Do you know if in this case they did?
23       A.  I don't.
24       Q.  So Interim Charge No. 3, which you just read
25  out loud, does it specify what type of fraud the

### 159

1  committee was to examine other than election fraud
2  generally?
3       A.  It says, "The prevalence of fraud in Texas
4  elections."  That's all it says.
5       Q.  Is there more than one kind of fraud --
6  election fraud under Texas law; do you know?
7       A.  I don't know.
8       Q.  Do you know if there's such a thing as
9  in-person voter fraud?
10       A.  I don't know.
11       Q.  Turning to Page 27 of the report, which I think
12  is the third page of this excerpt, do you see that the
13  report seeks to summarize testimony provided to the
14  committee?
15       A.  Yes.
16       Q.  Do you see the third paragraph from the bottom,
17  the last sentence?  Could you read that to yourself,
18  please -- or, actually, review the whole thing if you'd
19  like.  I should have told you to do that.  Sorry.
20       A.  Okay.
21       Q.  Would you agree that this is a summary of
22  testimony provided from Jay Dyer from the Attorney
23  General's office?
24       MR. SWEETEN:  You can answer based on the
25  text of the document.

### 160

1       A.  Yes.  It's the committee summary of his
2  testimony.
3       Q.  And does the report state that, "To get a
4  complete picture of voter fraud in Texas, further
5  analysis is needed to gather additional information from
6  local election and law enforcement officials"?
7       A.  Yes, it does.
8       Q.  Do you know in fact if further analysis of that
9  nature was conducted?
10       A.  I do not.
11       MR. SWEETEN:  You can testify to matters
12  of the public record.
13       A.  I don't know.
14       Q.  Did the report conclude with a recommendation;
15  do you know?  It's on Page 31.
16       A.  Yes.  On Page 31, there's a recommendation.
17       Q.  What did the committee recommend?
18       A.  "The committee recommends that the legislature
19  adopt legislation requiring voters to show photo
20  identification in order to cast a ballot at the polls."
21       Q.  Does this recommendation suggest that
22  additional research should be conducted as to the extent
23  of voter fraud in Texas just based on this paragraph?
24       MR. SWEETEN:  Just confine your answer as
25  to the text that she's showing you right now.  Don't



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

161

1   reveal your thoughts and mental impressions.
2       A.  I don't know.  I don't -- I can't tell from
3   this recommendation what it does, but --
4       Q.  Well, does the text of this recommendation also
5   recommend further study of the problem?
6       A.  I don't see a study in here, so I can't -- it
7   just -- I don't see that in here.
8       Q.  Okay.  Now, you testified earlier about SB14 --
9   I think we're done with this exhibit for now.
10      A.  Okay.
11      Q.  You testified -- You were asked some questions
12  about SB14.
13      A.  Right.
14      Q.  During your time as the chief of staff for
15  Speaker Straus, you mentioned that there was another
16  employee, Meredyth Fowler, who was primarily responsible
17  for voter ID; is that correct?
18      A.  Right.
19      Q.  She was deposed last week, and she said that
20  she occasionally spoke with Speaker Straus about the
21  issue, but not very frequently.  Is it accurate to say
22  you were an intermediary between her and Speaker Straus
23  on that issue?
24      A.  From time to time.
25      Q.  So from time to time --

---

162

1       A.  Yes.
2       Q.  -- you would --
3       A.  Yes.
4       Q.  -- you would replay information she told you to
5   Speaker Straus?
6       A.  Right.
7       Q.  So I think you had gone through earlier some of
8   the terms in SB14 concerning which ID it would permit
9   voters to use at the polls; do you recall that?
10      A.  Yes.
11      Q.  And one of the types of ID is a driver's
12  license from the Department of Public Safety; is that
13  accurate?
14      A.  Yes, that's right.
15      Q.  Do you know how long a driver's license is
16  valid for under Texas law?
17      A.  I think 12 years maybe.  6 or 12 years.  I'm
18  not sure.
19      Q.  Do you know if it's possible to renew your
20  driver's license online?
21      A.  I'm going to be finding out, I think, this
22  year, but I don't -- I don't know.  I think you can.
23      Q.  Okay.  Do you recall receiving any information
24  on the length of time that a driver's license is valid
25  from Ms. Fowler concerning voter ID?

---

163

1       A.  No, I don't -- I don't remember.
2       Q.  Do you know what a military ID is?
3       A.  No, I don't.
4       Q.  During your time working on this issue for
5   Speaker Straus, do you remember any communications
6   concerning military IDs?
7       A.  No.
8       Q.  Do you know what a citizenship certificate is?
9       A.  No.
10      Q.  Do you recall receiving any information about
11  citizenship -- excuse me -- a citizenship certificate --
12      A.  No.
13          MS. BERKOWER:  -- in Texas?  Okay.  And do
14  you recall any instances in which you -- Actually, can
15  we go off the record for a second?
16          (Recess from 3:11 p.m. to 3:48 p.m.)
17      Q.  (BY MS. BERKOWER) So during your time as chief
18  of staff for Speaker Straus, do you recall receiving any
19  information from the Department of Public Safety
20  about -- relating to voter identification?
21      A.  About voter identification?
22      Q.  Just relating to it generally.
23      A.  I don't remember.  We got -- He got stuff about
24  driver's license stuff all the time because we had a
25  big -- a big DPS bill too, so I don't know if that was

---

164

1   part of that or not.
2       Q.  Which DPS bill are you referring to?
3       A.  It was like a Homeland Security bill or
4   something like that.  I mean, we had a variety of bills
5   related to driver's license stuff and all of that kind
6   of stuff, but I don't know if that was voter ID or not.
7       Q.  Do you remember receiving any information
8   concerning the wait times at DPS offices?
9       A.  Yes.
10          MR. SWEETEN:  I just want to interpose for
11  the record that counsel and I have had an off-the-record
12  discussion about a document that's been produced, and so
13  she and I will sort that out after the deposition, but
14  we've agreed to allow Ms. Davis to answer some questions
15  based upon any sort of specific data about wait times.
16  Confining it to those questions that are on the email
17  that has been produced to counsel, we'll allow those
18  questions, and I assume with respect to that -- I mean,
19  we're still asserting legislative privilege as to -- as
20  to her analysis and thought process regarding that, but
21  pursuant to Page 7 of the court's order that learned
22  counsel has pointed out to me, we think the fact of
23  analysis, that that probably can be discovered.  So
24  we'll allow limited questioning as to the specific data.
25          MS. BERKOWER:  That's my understanding as

---


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 165 | 167 |
|---|---|

**165**

1  well of our conversation.  I think there's also a few
2  additional facts in that communication -- factual
3  information provided by the Department of Public Safety.
4  Would you permit questioning on that as well?
5      MR. SWEETEN:  Yeah.  As to whether the
6  fact of the analysis occurred, but not as to her
7  thoughts or mental impressions or what she did or what
8  she implied.
9      Q.  (BY MS. BERKOWER) That's my understanding.
10  Thank you for that clarification.  I don't remember what
11  I asked you now.  I think I asked if you had gotten any
12  information about wait times.
13      A.  Yes.
14      Q.  Do you remember what that was?
15      A.  I remember asking how long it took to get a
16  driver's license.
17      Q.  Do you remember what they told you?
18      A.  Three to four -- Depending on where you were in
19  the state.  I think longer in the urban areas or
20  something like that, three hours.
21      Q.  Do you remember if there are any cities in
22  particular that have long wait times?
23      A.  I remember hearing that the urban areas did,
24  like Dallas and Houston, but I don't -- I don't know if
25  they told me that or if I read it somewhere.

**167**

1  probably the spring or something, I'm guessing.
2      Q.  Do you remember if it was before the House
3  voted on SB14?
4      A.  I don't know.
5      Q.  Do you remember if it was after the Senate
6  passed SB14?
7      A.  I don't remember.
8      Q.  Okay.  Thank you.  I'm just trying to figure
9  out where we were.  Were you present for the House floor
10  debate on SB14?
11      A.  I was in and out of the chamber during that
12  time.
13      Q.  Were you present when amendments were offered
14  and voted on for the bill?
15      A.  Most of the time I wasn't.
16      Q.  Did you receive updates on any amendments that
17  were offered or voted on for the bill?
18      A.  Not -- Not really.  I was in my office for most
19  of it.
20      Q.  Is there any particular reason you were not
21  present during that debate?
22      A.  Chief of staff is usually in the office -- in
23  and out meeting with members, doing things in the back.
24      Q.  Do you know by any chance how many amendments
25  were offered to SB14?

| 166 | 168 |
|---|---|

**166**

1      Q.  Do you know if DPS gave you information about
2  its capacity to help members of the public with their
3  transactions?
4      A.  Yes.
5      Q.  What was that information?
6      A.  I remember them saying that it was a personnel
7  issue.  They needed more money, more personnel.
8      Q.  Was that also relative to the number -- the
9  increase in population state-wide?
10      A.  I don't remember that.
11      Q.  Do you know if the population in Texas has
12  increased in the last 10 years?
13      A.  Yes.
14      Q.  Has it increased?
15      A.  Yes.
16      Q.  Has it increased?
17      A.  Yes, it has.  Is that what you are asking me?
18      Q.  Yes.
19      A.  Okay.
20      Q.  Has it increased significantly?
21      A.  I don't know if it's been significant, but I
22  know it has.  I don't know the exact number.
23      Q.  Do you remember around when you received that
24  information from DPS?
25      A.  Sometime in the -- during the session in the --

**168**

1      A.  I don't.
2      Q.  As a general matter -- And I think this might
3  draw partly on your knowledge as parliamentarian.  When
4  or why would an amendment be withdrawn if there's --
5      MR. SWEETEN:  Objection.  Compound.  Also,
6  don't reveal as to specific legislation as a general
7  matter.  If you can answer that question, I'll tell you,
8  but don't reveal matters about specific legislation.
9      A.  For any number of reasons, drafting error, no
10  longer interested in the amendment, doesn't have the
11  votes or doesn't do what it wanted, just what the member
12  wanted, a number of reasons.
13      Q.  As a procedural matter if the amendment is
14  voted down, can it be reintroduced?
15      A.  Yes.
16      Q.  How does that happen?
17      A.  You would have to reconsider the vote.  You
18  would have to do a reconsideration of the vote.
19      Q.  Is it possible that a member might withdraw an
20  amendment if they didn't have the votes and then
21  reintroduce it later when they did have the votes?
22      MR. SWEETEN:  You can answer it as a
23  general matter.  Do not reveal the substance of the
24  legislation.
25      A.  Generally, yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 169

1      Q.   Do you know -- Would you say that the amendment
2 process for SB14 was typical of bills considered by the
3 House?
4        MR. SWEETEN:   Amendment process of 14, I
5 think that's requiring her to put in a value judgment as
6 to whether it was out of the ordinary.   I think that
7 would require her to reveal matters of privilege.   I
8 would instruct her not to answer on that basis.
9      Q.   Okay.   Are you following his instruction?
10      A.   Yes.
11      Q.   If I told you there were 70 amendments offered
12 to SB14, would you view that as a higher or lower
13 number -- a high number of amendments or a low number of
14 amendments?
15        MR. SWEETEN:   I can let her answer as a
16 general amendment whether she thinks 70 amendments is
17 high or low, but I don't think the way it's phrased as
18 to Senate Bill 14 I can allow it.
19        MS. BERKOWER:   I'll rephrase it then.
20        THE WITNESS:   Okay.
21      Q.   (BY MS. BERKOWER) Is 70 a high number of
22 amendments?
23      A.   It's hard to say.   I mean, I've had
24 amendment -- bills with 800 amendments.
25      Q.   What types of bills were those?

---

### 170

1      A.   General government bills, budget bills, tort
2 bills.   Number of bills.
3      Q.   For a bill the size of SB14, speaking as a
4 general matter, would 730 be a high number of
5 amendments?
6      A.   I think it depends on who you ask.   You know, I
7 don't view that as a lot of amendments, but it just
8 depends.   I mean, some people might.   That will just be
9 my opinion.
10      Q.   Do you remember what the publicly articulated
11 purpose for many of the amendments was for SB14?
12      A.   No, I don't.
13      Q.   Do you remember if any of the amendments
14 offered to SB14 were included in the final bill?
15      A.   I don't know.
16      Q.   Now, I think you testified earlier about a
17 conference committee.
18      A.   Yes.
19      Q.   Conference committees in general.   I don't
20 remember if you answered this question.   Do you know how
21 the presiding officer is chosen for a conference
22 committee?
23      A.   You mean, how the chair of the conference
24 committee is chosen?
25      Q.   Yes.

---

### 171

1        MR. SWEETEN:   She just said do you know
2 how it's done, so you can just answer yes or no.
3      A.   Yes.
4      Q.   Is there any non-privileged reason or
5 explanation you can provide as to how that happens?
6        MR. SWEETEN:   Don't reveal the thought
7 processes, mental impressions of why those are done.
8      A.   There is no -- there is no -- I mean, I
9 just -- usually it's someone that carried the bill or
10 that has been involved or people that have been involved
11 with the issue along those lines, expertise.
12      Q.   Is there any limit of what the conference
13 committee can do with the bill?
14      A.   Yes.
15      Q.   What are those limits?
16        MR. SWEETEN:   You can answer as to general
17 parliamentary procedures of matters of public record.
18      A.   That's in Rule 13, Section 9 or somewhere.
19 It's specific in the rules as to what the jurisdiction
20 of the conference committees -- what their jurisdictions
21 are and what they can and can't do.
22      Q.   What happens if the conference committee
23 exceeds its jurisdiction?
24      A.   They have to get permission from the House or
25 the Senate or both.   They have to get permission to go

---

### 172

1 outside the bound of their jurisdiction.
2      Q.   Do you know if that happened for the House with
3 regard to SB14, whether they sought that permission?
4      A.   I don't remember off the top of my head.   I'd
5 have to look at --
6      Q.   I think there's an exhibit that Mr. Harris
7 introduced.
8      A.   Yeah.
9        MR. HARRIS:   Exhibit 13.
10        MS. BERKOWER:   Thank you.
11      A.   Yes.
12      Q.   They did seek to do that in the House?
13      A.   Yes.
14      Q.   Did they seek to do that in the Senate?
15      A.   Yes.
16      Q.   Was that permission granted?   Just for the
17 record, she's looking at a public record, Exhibit 13, so
18 you can answer based on the public record.
19      A.   Yes, it was.
20      Q.   It was granted for both houses?
21      A.   Yes.
22      Q.   How -- Just as a general matter, how is the
23 decision made whether a conference committee has
24 exceeded its jurisdiction?
25      A.   That is -- I think that's usually done



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

173

1    between -- that's between the sponsor and legislative
2    counsel and their legal advice and -- and the
3    parliamentarian.
4        Q.  Do you know what factors are considered when
5    that decision is made?
6        A.  I think they look at each individual thing and
7    it's hard to know.
8        Q.  Did you ever have to make such decisions when
9    you were a parliamentarian?
10       A.  I would sometimes advise members that they --
11   that they were going outside of the bounds and that they
12   should probably have a resolution, yes.
13           (US Exhibit 733 marked.)
14       MS. BERKOWER:  Okay.  I have what will be
15   marked 733.  Can we go off the record for one second?
16           (Recess from 4:00 p.m. to 4:01 p.m.)
17       Q.  (BY MS. BERKOWER) Do you recognize this
18   document?
19       A.  I don't, but it's -- I don't remember it.  It's
20   an email from Rhonda Trumble to me.
21       Q.  Do you know who Rhonda Trumble is?
22       A.  I assume she works for DPS.
23       Q.  And what did she do in this email?
24       A.  It looks to me like she was giving us just a
25   general update on driver's licenses and what they were

---

174

1    doing with the driver's license program and updating
2    it -- just giving us an update.
3        Q.  Do you see the part -- It looks like there's
4    some bullet points on the -- toward the bottom of the
5    page.
6        A.  Yes.
7        Q.  And it looks like those bullet points refer to
8    design changes to the license.  Do you see that?
9        A.  Yes.
10       Q.  Do you see it says they removed all references
11   to temporary or visitor from the face of the driver's
12   license and ID cards?
13       A.  Yes.
14       Q.  And two bullets down from that it says they
15   updated the limited term licenses to be of a horizontal
16   orientation comparable to other driver's licenses and
17   IDs?  Do you see that?
18       A.  Yes.
19       Q.  Do you know what those bullet points are
20   referring to aside from this email?
21       MR. SWEETEN:  In answering the question,
22   don't reveal any thought processes you had pre -- This
23   is an email from after the enactment, but if answering
24   the questions would require you to reveal your
25   pre-enactment thoughts, mental processes or opinions

---

175

1    about legislation, then don't reveal.
2        A.  I don't remember.
3        Q.  Do you know if these design changes were ever
4    implemented?
5        A.  I don't.
6        Q.  And do you know what these design changes are
7    referring to, which types of IDs?
8        A.  I don't.
9        Q.  Based on the document, it looks like they refer
10   to limited term driver's licenses; is that accurate?
11       A.  Yes.  Yes, it does.  Number one says that it's
12   for a limited term.
13       Q.  Do you know who receives limited term driver's
14   licenses?
15       A.  I don't.
16       Q.  Turning to the -- Well, turning to the second
17   page, there's an item marked Item 3.  Can you just
18   review that paragraph?  Let me know when you are done.
19       A.  Yes, I'm done.
20       Q.  Do you remember if one of the issues raised in
21   the public record during the consideration of SB14 was
22   the availability of driver's license facilities to
23   provide identification required by the bill?
24       A.  I don't remember that specifically, but -- it's
25   possible, but I don't remember.

---

176

1        Q.  Do you remember if one of the issues raised in
2    the public record was that there were not many
3    facilities available in urban areas?
4        A.  No, I don't remember that.
5        Q.  You did remember though DPS informed you that
6    wait times in urban areas were very long?
7        A.  Right.  Yes, I do remember that.
8        Q.  And this paragraph indicates that the
9    legislature included funding for DPS to open six mega
10   centers to better serve customers.  Do you see that?
11       A.  Yes.
12       Q.  Do you know if that relates to a concern that
13   there was long wait times in certain areas?
14       MR. SWEETEN:  I think that would implicate
15   matters of privilege, if you are asking if it was in
16   response.  If this was addressed in response to that
17   would require her to reveal legislatively privileged
18   information.  So my instruction would be don't answer
19   the question.
20       Q.  Okay.  Are you following his advice?
21       A.  Yes.
22       Q.  Okay.  Do you see the last line of the last
23   sentence of that paragraph says, "We were not able to
24   find a location that was already built and able to give
25   us a 10-year lease, so this location is a new build and

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 177

1  the facility will be built specifically to suit our
2  office needs"?
3       A.   Yes.
4       Q.   And that was in reference to a mega center in
5  the San Antonio area based on this document?
6       A.   Yes.
7            MR. SWEETEN:  You can answer based on the
8  document itself.
9       Q.   Does that -- Does that sentence imply that
10 there's going to be some time before the facility is
11 ready?
12           MR. SWEETEN:  You can testify as to what's
13 in the text of the letter, but don't reveal your
14 thoughts and mental impressions.
15      A.   I really don't know.
16      Q.   It will have to be built specifically to suit
17 the office needs?
18           MR. SWEETEN:  Same instruction.
19      A.   I don't know how long it would take to do that.
20      Q.   Okay.  Earlier today you said you would
21 sometimes talk on the phone with the Senate
22 parliamentarian to make sure that bills were moving or
23 there was an efficient movement of bills; is that
24 accurate?
25      A.   Yes.

---

### 178

1       Q.   How often did you speak with her on that issue?
2       A.   Once or twice a week maybe.  Not often, you
3  know, unless it was a specific bill, but not much.
4       Q.   Like when would you -- Was there a scheduled
5  meeting that you would have with her or no?
6       A.   No.  Usually if we were coordinating -- if
7  there was a bill on the floor that -- towards the end of
8  the session maybe, if we were doing the conference
9  committee report or adopting, so it was sort of
10 sporadic, frankly.  We didn't have regular meetings.
11      Q.   Was it -- Was there any instance in which these
12 conversations would occur where a bill was going to move
13 from one House to the other?
14           MR. SWEETEN:  Just the existence of the
15 conversation.
16      A.   Yes.
17      Q.   Did you have any of those conversations
18 concerning any of the voter ID legislation?
19      A.   Oh, I don't remember.
20      Q.   You said earlier that generally bills are given
21 a bill number in the House in the order in which they
22 are introduced.
23      A.   That's generally true.
24      Q.   When would that not be true?
25      A.   There's a -- Sometimes there are -- low bill

---

### 179

1  numbers are reserved for the speaker's office and that's
2  been the tradition for, you know, many, many years.
3       Q.   So how do those bill numbers get assigned?
4            MR. SWEETEN:  Don't reveal the process by
5  which or --
6            THE WITNESS:  Right.
7            MR. SWEETEN:  You can reveal matters of
8  public record in answering that.
9       A.   The speaker has those numbers, and then they
10 assign numbers just depending on who would -- you know,
11 members request the numbers.  They usually request a
12 number.
13      Q.   Can you give an example of where a bill was
14 filed and then refiled with a lower bill number from the
15 speaker's office?
16           MR. SWEETEN:  If it's a public record, you
17 can.
18      A.   Well, refiled?
19      Q.   How do they get the lower bill number?  Do they
20 get it upon filing or do they have to re-file it or how
21 does that work?
22      A.   I don't know.  I mean, it just varies.  I mean,
23 the appropriations bill is always number one.  That's
24 just tradition.  So sometimes members will request a low
25 bill number, and if it's available, the speaker will

---

### 180

1  give it to the member.
2       Q.   Okay.  Are any of the low bill numbers given to
3  voter ID legislation by the speaker; do you know?
4       A.   I don't remember.
5       Q.   You said earlier that a bill might be sent to
6  Senate with a message.
7       A.   M-hm.
8       Q.   Can you explain more about what a message is?
9       A.   It's just -- it's just -- That's what it's
10 called.  It's like a notice.  It's just saying we've
11 passed these bills, who they are.  So it doesn't really
12 have any substance.  It's just a notification to the
13 Senate that we've taken action on a particular bill.
14      Q.   Does every bill get a message?
15      A.   They all go over.  It's called going over on a
16 message, so they all go over on a message from the House
17 sergeant.
18      Q.   Okay.  I think there was some testimony that
19 you gave earlier about this amendment being germane.
20      A.   M-hm.
21      Q.   What are the factors as House parliamentarian
22 that you considered when assessing whether a bill was
23 germane?
24           MR. SWEETEN:  If these are matters of the
25 public record and not matters of privilege, then you can

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                          JUNE 14, 2012

---

**181**

1  refer to them.  If it reveals your thought process about
2  specific legislation, then do not.
3      A.  The parliamentarian looks at the precedent text
4  of the bill and the text of the amendment.
5      Q.  Is it an exercise of the parliamentarian's
6  discretion?
7      A.  It's really the speaker's discretion, speaker's
8  decision.
9      Q.  Okay.  The parliamentarian makes a
10  recommendation to the speaker for that as well?
11      A.  Correct.
12      Q.  Do you know if House members as a general
13  matter ever try to make amendments that aren't germane
14  to harm a bill?
15      A.  Yes, they do.
16      Q.  Can you think of any instances in which that
17  has happened?
18          MR. SWEETEN:  You can refer to matters of
19  the public record.
20      A.  There are probably lot of examples.  I can't
21  think of any off the top of my head, but it does happen.
22      Q.  When they do that, is the idea that they would
23  introduce something controversial or how exactly do they
24  go about doing that, I guess?
25      A.  Well --

---

**182**

1          MR. SWEETEN:  Same instruction.
2      A.  -- I think they just try to get the amendment
3  adopted and see what happens.
4      Q.  Is the position of parliamentarian a partisan
5  position?
6      A.  No.
7      Q.  Is it viewed specifically as a nonpartisan
8  position?
9      A.  Yes.
10      Q.  And you provide -- as parliamentarian, the
11  parliamentarian provides advice to any member who asks;
12  is that correct?
13      A.  Yes.
14      Q.  Do you know of any instances -- Well, actually,
15  I won't ask that.  I'm getting close to the end.
16          So given all of the knowledge you have of
17  the public record about voter ID legislation, any bill
18  that's come up during your time as either
19  parliamentarian or Speaker Straus's chief of staff, are
20  you aware of any existing document or report in the
21  public record that identifies how many Texas voters are
22  in possession of a concealed handgun license?
23      A.  I don't know.
24      Q.  And, again, do you know if there's any existing
25  document or report in the public record that identifies

---

**183**

1  how many minority voters are in possession of a
2  concealed handgun license?
3      A.  I don't know.
4      Q.  Are you aware of any existing document or
5  report in the public record that identifies how many
6  Texas voters are in possession of a US military card?
7      A.  No, I don't know.
8      Q.  Do you know of any existing document or report
9  in the public record that identifies how many minority
10  voters are in possession of a -- minority voters in
11  Texas are in possession of a US military card?
12      A.  I do not.
13      Q.  Are you aware of any existing document or
14  report in the -- in the public record that
15  identifies how many Texas voters are in possession of a passport?
16      A.  No, I don't.
17      Q.  Are you aware of any existing document or
18  report that identifies how many Texas minority voters
19  are in possession of a passport?
20      A.  I do not.
21      Q.  In your view, is one of the purposes of SB14 to
22  increase public confidence in elections?
23          MR. SWEETEN:  Objection.  You can provide
24  the general purpose of the bill and -- but that's it,
25  okay?

---

**184**

1      A.  The general purpose is to -- to -- just to
2  ensure integrity of the elections.  That's my
3  understanding of the bill.
4      Q.  What is the evidence in the public record that
5  supports that SB14 will in fact increase the integrity
6  of elections?
7          MR. SWEETEN:  Don't answer the question.
8  Calls for matters of legislative privilege.  Instruct
9  not to answer.
10          MS. BERKOWER:  I asked in the public
11  record.
12          MR. SWEETEN:  No.  You asked her what is
13  the evidence in the public record that shows that Senate
14  Bill 14 will accomplish its purpose which it asks for
15  analysis and she can't provide it.
16      Q.  I'll rephrase that.  I'm sorry.  Do you know of
17  any evidence in the public record -- Well, actually,
18  I'll rephrase that.  Do you know of any analysis or
19  study in the public record that concludes that voter
20  identification would enhance public confidence in
21  elections?
22      A.  I don't.
23      Q.  At any time since the passage of SB14, have you
24  come to believe it was passed with any discriminatory
25  purpose?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 185

1       A.  No.
2       Q.  At any time since the passage of SB14, have you
3   come to believe that SB14 will have a retrogressive
4   effect on minority voters?
5       A.  I don't.  Not to my knowledge, no.
6       Q.  If you are called to trial would you testify
7   that SB14 has no discriminatory purpose?
8           MR. SWEETEN:  She's already testified as
9   to the general purpose and limited to general purpose of
10  legislation, she's answered that.
11          THE WITNESS:  What does that mean?
12          MS. BERKOWER:  Are you instructing her not
13  to answer?
14          MR. SWEETEN:  That means with respect to
15  the question, she's already defined what the general
16  purpose is and would be then a question of whether she's
17  going to be called at trial, which isn't something she
18  knows, but, I mean, she's already testified to the
19  general purpose of the bill.  I think the predicate of
20  your question is sort of trial strategy, are we going to
21  call her to trial.  At any rate, I'll just let you
22  answer the question as phrased.
23      A.  Ask it again, please.
24      Q.  I said if you are called to trial would you
25  testify that SB14 has no discriminatory purpose?

## 186

1       A.  Yes.  I would testify to that.
2       Q.  If you are called to trial would you testify
3   that SB14 has no discriminatory effect?
4       A.  Yes.  To my knowledge, I don't believe it does.
5       Q.  Are there any answers you've given today that
6   you would like to change?
7       A.  No.
8       Q.  Is there any information that you recall now
9   that you did not recall earlier today?
10      A.  No.
11      Q.  Is there anything else you want to share about
12  SB14?
13          MR. SWEETEN:  Objection.  Vague.
14      A.  No.
15          MS. BERKOWER:  Okay.  I think that's the
16  end of my questioning of this witness.
17          MR. SWEETEN:  I just have a few.
18          EXAMINATION
19  BY MR. SWEETEN
20      Q.  In 2011, did you -- was there a substantial
21  portion of the Senate proceedings that you did not see?
22      A.  That's correct.  I did not.
23      Q.  And is that the same with respect to the House
24  committee hearings?
25      A.  Yes.

## 187

1           MR. SWEETEN:  Okay.  I don't have anything
2   else.  Thank you.
3           (Deposition concluded at 4:19 p.m.)

## 188

1           CHANGES AND SIGNATURE
2   RE:  STATE OF TEXAS VS. TEXAS STATE CONFERENCE OF NAACP
    BRANCHES, et al
3
    PAGE  LINE   CHANGE        REASON
4   _____
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11
12      I, DENISE DAVIS, have read the foregoing deposition
    and hereby affix my signature that same is true and
13  correct, except as noted above.
14
15      _____
16      DENISE DAVIS, Witness
    THE STATE OF _____ )
17  COUNTY OF _____ )
18      Before me, _____, on this day
    personally appeared DENISE DAVIS, known to me (or proved
19  to me under oath or through _____)
    (description of identity card or other document) to be
20  the person whose name is subscribed to the foregoing
    instrument and acknowledged to me that they executed the
21  same for the purposes and consideration therein
    expressed.
22      Given under my hand and seal of office this _____
    day of _____, _____.
23
24      _____
25      Notary Public in and for the State
        of _____



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

DENISE DAVIS                                                            JUNE 14, 2012

189

```
 1              IN THE UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF COLUMBIA
 2
     STATE OF TEXAS,          )
 3                            )
         Plaintiff,           )
 4                            )  CASE NO. 1:12-CV-00128
     VS.                      )  (RMC-DST-RLW)
 5                            )
     ERIC H. HOLDER, JR., in his )  Three-Judge Court
 6   official capacity as Attorney)
     General of the United States,)
 7                            )
         Defendant.           )
 8                            )
     ERIC KENNIE, et al.,     )
 9                            )
         Defendant-Intervenors, )
10                            )
     TEXAS STATE CONFERENCE OF   )
11   NAACP BRANCHES, et al.,     )
                              )
12       Defendant-Intervenors, )
                              )
13   TEXAS LEAGUE OF YOUNG VOTERS )
     EDUCATION FUND, et al.,     )
14                            )
         Defendant-Intervenors, )
15                            )
     TEXAS LEGISLATIVE BLACK    )
16   CAUCUS, et al.,           )
                              )
17       Defendant-Intervenors, )
                              )
18   VICTORIA RODRIGUEZ, et al.,  )
                              )
19       Defendant-Intervenors. )
20              REPORTER'S CERTIFICATE
21          ORAL DEPOSITION OF DENISE DAVIS
22                JUNE 14, 2012
23       I, JEAN THOMAS FRAUNHOFER, the undersigned Certified
24   Shorthand Reporter in and for the State of Texas,
25   certify that the facts stated in the foregoing pages are
```

190

```
 1   true and correct.
 2       I further certify that I am neither attorney or
 3   counsel for, related to, nor employed by any parties to
 4   the action in which this testimony is taken and,
 5   further, that I am not a relative or employee of any
 6   counsel employed by the parties hereto or financially
 7   interested in the action.
 8       SUBSCRIBED AND SWORN TO under my hand and seal of
 9   office on this the 18th day of June, 2012.
10
11
12       Jean Thomas Fraunhofer
             JEAN THOMAS FRAUNHOFER
13           Texas CSR 7990
             Expiration Date:  12/31/12
14           ESQUIRE DEPOSITION SERVICES
             Firm Registration No. 77
15           9901 IH-10 West, Suite 800
             San Antonio, Texas  78230
16           Tel:  (210) 331-2280
17
18
19
20
21
22
23
24
25
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com