Senator Wendy Davis                                    June 6, 2012

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS        )
                      )
                      )
VS.                   )  NO. 12-CV-128
                      )  (DST, RMC, RLW)
                      )
ERIC H. HOLDER, JR.,) 
ET AL                 )
********************************************

ORAL DEPOSITION OF SENATOR WENDY DAVIS

********************************************

ANSWERS AND DEPOSITION OF SENATOR WENDY DAVIS, a
witness called by the United States taken before Janalyn
Reeves, Certified Shorthand Reporter for the State of
Texas, on the 6th day of June, 2012, between the hours
of 1:30 p.m. and 3:48 p.m., at 48 East Avenue, Austin,
Texas, pursuant to the agreement of counsel for the
respective parties as hereinafter set forth.

**Page 3**

INDEX

PAGE

Appearances.............................   2

SENATOR WENDY DAVIS
    Examination by Mr. Frederick ..........   4

Signature and Changes ....................   82

Reporter's Certificate ...................   84

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
    OFFICE OF THE ATTORNEY GENERAL
    By:  MR. MATTHEW FREDERICK
    209 West 14th Street
    Austin, Texas  78701
    PH: (512) 936-2779

FOR THE DEFENDANT:
    DEPARTMENT OF JUSTICE
    By:  MR. VICTOR WILLIAMSON
    950 Pennsylvania Avenue, NW
    Washington, DC 20530
    PH:  (800) 253-3931
FOR THE INTEVENORS:
    BRAZIL AND DUNN
    By:  MR. CHAD DUNN
    4201 Cypress Creek Parkway
    Suite 530
    Houston, Texas  77068
    Ph:  (281) 580-6310

**Page 4**

SENATOR WENDY DAVIS,
having being first duly sworn, testified as follows:
EXAMINATION
BY MR. FREDERICK:
    Q.  Good afternoon, Senator Davis.  My name is Matt
Frederick.  I'm with the Texas Attorney General and I
represent the State of Texas.  Would you please state
your full name for the record?
    A.  Wendy Russell Davis.
    Q.  Senator Davis, have you been deposed before?
    A.  Yes, I have.
    Q.  How many times?
    A.  Once.
    Q.  And do you remember the case that that was for?
    A.  Yes, it was in our redistricting litigation.
    Q.  Is there anything that will prevent you from
accurately answering my questions today?
    A.  No.
    Q.  Okay.  Just in case you don't remember from your
redistricting experience, I'll go over some brief ground
rules.  One, answer audibly so the court reporter can
get it on the record.  So rather than nodding your head
say, "yes"?
    A.  Okay.
    Q.  If you don't understand a question I ask, please
let me know and I'll be happy to rephrase.  Okay?
    A.  Okay.

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



Senator Wendy Davis                                    June 6, 2012

5

1    Q.  And again, so the court reporter can get
2  everything on the record, please try and wait until I
3  finish my question to start answering.  I will also try
4  and not answer -- not ask a question while you are
5  answering.
6    A.  Okay.
7    Q.  Your lawyer may object to a question.  Unless he
8  instructs you not to answer, you may still answer the
9  question.
10    A.  All right.
11    Q.  Are you represented by council today?
12    A.  I am.
13    Q.  And who is that?
14    A.  Chad Dunn is here with me today.  I'm also
15  represented by Jerry Hebert.
16    Q.  Okay.  When did that representation begin?
17    A.  I don't recall.
18    Q.  What did you do to get ready for your deposition
19  today?
20    A.  I reviewed, by e-mail, a few of the amendments
21  that I had introduced during the voter ID debate on the
22  Senate floor.
23    Q.  Anything else?
24    A.  That's it.
25    Q.  Okay.  Did you meet with anybody to prepare for

6

1  your deposition?
2    A.  No, I did not.
3    Q.  Did you talk to your lawyer?
4    A.  Yes.
5    Q.  How many times did you meet with your lawyer
6  before your deposition?
7    A.  I met with him.  We had one very brief
8  phone conversation yesterday.
9    Q.  Did anyone else participate in that phone
10  conversation?
11    A.  No.
12    Q.  Have you spoken to anyone else about your
13  deposition today?
14    A.  No.
15    Q.  And other than the amendments that you mentioned,
16  did you review any other documents to prepare for your
17  deposition?
18    A.  No.
19    Q.  Did you bring any documents with you today?
20    A.  I did not.
21    Q.  Are you currently registered to vote?
22    A.  Yes.
23    Q.  Do you have a current Texas driver's license?
24    A.  Yes.
25    Q.  Do you have a concealed handgun license?

7

1    A.  No.
2    Q.  Do you have a passport?
3    A.  Yes.
4    Q.  Are there other members of your household who are
5  voting age?
6    A.  Yes.
7    Q.  Are the voting age individuals in your household
8  registered to vote?
9    A.  Yes.
10    Q.  And do those individuals have a current Texas
11  driver's license?
12    A.  Yes.
13    Q.  Can you describe, generally, your own involvement
14  with Senate Bill 14?
15    A.  Yes.  I participated in a dialogue and a debate
16  about the bill on the Senate floor.  I opposed the bill
17  and introduced amendments that I thought could improve
18  upon it.
19    Q.  Do you recall how many amendments you offered?
20    A.  I do not.  Probably less than ten.
21    Q.  Were any of those amendments accepted?
22    A.  One was.  But not as I had offered it.  I offered
23  an amendment that addressed the issue of persons who
24  were indigent.  To provide an opportunity for them to
25  vote a provisional ballot by swearing to their indigency

8

1  and allowing the election judge to accept their vote.
2  That was modeled after what I had read in the Supreme
3  Court opinion that upheld the Indiana voter ID law.
4      The Court specifically noted that the indigency
5  exception was included in that law.  And from my reading
6  of the Supreme Court opinion, they believed that it was
7  constitutional based on the fact that that exception had
8  been included within it.  I argued that point on the
9  Senate floor.  The amendment was tabled.
10      But Senator Duncan, I think, considering my
11  arguments, at some point during the debate asked that an
12  amendment be drawn up under his name that did,
13  essentially, the same thing.  He actually improved the
14  way it was written, I thought.  And he introduced the
15  amendment then and asked that I be shown also as an
16  author of that amendment since I had originally
17  introduced it.  And it was included in the Senate bill.
18  But it's my understanding that it was stripped out in
19  the conference committee.
20    Q.  And in your understanding, was it stripped in the
21  Senate conference committee or by the House conference
22  committee?
23    A.  I don't know.
24    Q.  Under that amendment did it provide -- and I'll
25  ask about your original amendment for now.  You said it



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

9

1  allowed an indigent person to sign an affidavit of
2  indigency; is that right?
3      A. Yes.
4      Q. And would that, assuming that the affidavit were
5  accepted, would that allow the vote to be counted?
6      A. Yes.
7      Q. Okay. So it wasn't just a provisional ballot
8  that would have to be cured at a later date?
9      A. I believe that's true, though that is not one of
10 the amendments that I went back and read. The one that
11 actually was included that Senator Duncan introduced, so
12 I don't recall. But I'm sure it's very easy to find.
13     Q. Okay. And to the extent you can recall, did
14 Senator Duncan's amendment that listed you as a
15 co-author, did it also provide that an indigent person
16 could swear -- could sign an affidavit and have his or
17 her vote counted?
18     A. Yes.
19     Q. And so it would not have to be cured later by
20 showing a photo ID?
21     A. I think that's correct, yes.
22     Q. Why -- why did you offer an amendment providing
23 for an accommodation for indigent voters?
24     A. One of the pieces of information that I
25 introduced during the debate, I had a large display

10

1  board that I had had created for purposes of introducing
2  that amendment. And on the display board I demonstrated
3  the underlying documentation that is required in the
4  State of Texas in order to be issued, a driver's
5  license or a State ID through the Department of Public
6  Safety. And each of those underlying documents has a
7  cost associated with them. For example, a birth
8  certificate. I don't remember what some of the others
9  were, a passport.
10        And I demonstrated the circularity that occurs in
11 order to get this document, you need to have these
12 underlying documents. And in order to get a different
13 document, you needed some of the same underlying
14 documents. And for each ID or form of ID that was
15 acceptable, subsumed within them were other forms of ID
16 that also cost money.
17        My concern was that, based on information that we
18 received as part of the hearing and also in the hearing
19 in the prior legislative session, a number of persons
20 who do not have current State IDs and yet who are
21 currently legally voting, do not have the underlying
22 documentation in order to go and get those IDs. I was
23 concerned that a person who didn't have the means to be
24 able to get the underlying documents, even if the State
25 ID were offered to them for free, would be in a position

11

1  where their right to vote, which they currently exercise
2  today, would be threatened.
3      Q. So you were concerned that because of the
4  potential costs that might be imposed as a result of an
5  ID requirement, that a person might not be able to
6  afford to get an ID; is that right?
7      A. That's right.
8      Q. Was it your understanding or belief that an
9  exception allowing for indigent voters to sign an
10 affidavit rather than present photo ID, was it your
11 understanding that that amendment would have alleviated
12 any negative effect of SB 14?
13     A. It would have alleviated a significant negative
14 effect. But there were other amendments that I offered
15 as well that were unique, they each had unique concerns
16 behind them that were also important, I felt.
17     Q. I believe it was said on the Senate floor that
18 there was a concern that SB 14, if enacted, would have
19 some impact on African-American and Latino voters; is
20 that right?
21     A. Yes.
22     Q. And is that your -- is that your belief about
23 SB 14 as well?
24     A. My belief about SB 14 is that it has a uniquely
25 negative impact on persons who are currently voting

12

1  today, and who do not have the means to go out and get
2  an adequate form of ID under the way that that law was
3  passed. Information that was presented to us as part of
4  that hearing and part of the legislative session
5  indicated that that disproportionately impacted persons
6  of color, Latino and African-American primarily.
7      I also had concerns about persons who were voting
8  today who would not have their vote accepted in the
9  future. Not because they didn't have the means to
10 receive an ID, but because there may be some unintended
11 or unknown discrepancy on their voter ID card and their
12 State ID.
13     I specifically introduced an amendment for women
14 who were recently married or divorced. I believed it
15 was important. And it also was modeled after something
16 that was part of the Indiana law and that was
17 specifically spoken to in the Supreme Court's opinion.
18 The Lieutenant Governor indicated to me privately that
19 he believed that was a good exception, a good amendment
20 and that he would push that that be approved through
21 Congress, although I don't believe that occurred. It
22 wasn't added.
23     I also had a fairly broad amendment for
24 discrepancies where your name may not exactly match
25 what's on your voter ID card. My own driver's license,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

13

1  for example, and my voter ID card do not have an exact
2  match.  My own driver's license says Wendy Russell Davis
3  on it.  My voter ID card, when I received it a few weeks
4  ago, said Wendy Davis.
5       And I had another broad amendment for a situation
6  where a person's address may not match exactly on their
7  voter ID card as it is on their driver's license.  And a
8  situation where a person may have moved subsequent to
9  getting either of those two forms of voter documentation
10  and they won't be the same because one had been changed
11  while the other one had not yet been changed.
12       It's a broader concern for me that there are a
13  number of people in the State of Texas who will show up
14  to vote, if this law goes into effect, who will not have
15  the opportunity to vote because our amendments that
16  would have allowed, in most of those situations at
17  least, for a provisional ballot to be provided to that
18  voter are not going to be provided.
19       Q.  Is it your understanding, then, that as enacted,
20  the law would not permit a person who appears to vote
21  without a qualifying photo ID to cast a provisional
22  ballot?
23       A.  Can you repeat your question?
24       Q.  Of course.  In your understanding of SB 14 as
25  enacted, would a person who shows up to vote at the

14

1  polls without one of the forms of ID required, would
2  that person still be able to cast a provisional ballot?
3       A.  Well, this is a good question.  And it was part
4  of a question in the debate about the bill.  While the
5  bill may address that, I had a great concern about what
6  the training for our elections officials would be.  And
7  we spent a significant amount of time talking about
8  whether there were any resources being committed by the
9  State to train our election administrators, thousands
10  and thousands of them across the State, on exactly how
11  the deal with issues like that.  If you have a voter who
12  comes in and their ID does not exactly match, what
13  should be done in that situation.
14       And I know from experience at my own polling
15  location a few months ago, when the elections
16  administrator who was working the poll the day that I
17  voted looked at my voter ID card and my license, she
18  said to me, "This won't be acceptable in November.
19  You're going to have to clear this discrepancy."  So
20  that was her understanding.  And that's a very important
21  concern, I think.
22       But regardless of what the law specifically says,
23  there is going to be, I think, a tremendous lack of
24  understanding in those who are asked to administer it
25  because the State didn't commit any resources for that

15

1  training.
2       Q.  The election worker that you just mentioned at
3  your polling place, to your knowledge, had that person
4  received any education or training on how SB 14 would
5  work?
6       A.  I don't know.  I know we didn't commit any
7  resources to that kind of training at the State level.
8       Q.  To your knowledge, has any -- have any training
9  materials on SB 14 been delivered to anyone in the
10  State?
11       A.  I don't know.
12       Q.  Did you -- did you write any articles or op-eds
13  about SB 14?
14       A.  Not that I recall.
15       Q.  Did you give any speeches outside the legislature
16  about SB 14?
17       A.  Not that I recall.
18       Q.  Do you recall any public statements that you made
19  about SB 14?
20       A.  Probably as I spoke to people in wrap up about
21  what happened in this past legislative sessions.  It was
22  one of the items that I mentioned, but I have never
23  given a presentation specific to that bill.
24       Q.  When you say "wrap up," what do you mean by that?
25       A.  I'm asked, as I'm sure all legislators are, to

16

1  speak to different organizations in my district about
2  what happened in the most recent legislative sessions.
3       Q.  So this is kind of a summary of what's happened
4  in this session that you provide in your district?
5       A.  Yes.  Yes.
6       Q.  Did you talk -- did you talk to any lobbyist
7  about SB 14, either before or during the 2011 session?
8       A.  Not that I recall.
9       Q.  Did you speak to any advocacy group about SB 14,
10  either before or during the 2011 session?
11       A.  Not independent of hearing testimony on the
12  Senate floor.
13       Q.  Did you for the -- well, for either -- I guess it
14  would have been in the committee.  But did you have any
15  witnesses appear to give testimony on SB 14?
16       A.  I, specifically, did not request any witnesses to
17  appear, no.
18       Q.  Did any of your constituents appear to testify
19  about SB 14?
20       A.  I don't recall if anyone from SD 10 was there.
21       Q.  Do you recall if anyone from your district
22  testified about the previous voter ID bill from 2009?
23       A.  I don't recall.
24       Q.  Do you recall whether you spoke to any lobbyist
25  or advocacy group about the previous 2009 voter ID bill?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Wendy Davis                                        June 6, 2012

---

17

1    A. I don't recall.

2    Q. Have you spoken -- you mentioned the wrap ups.

3    Have you spoken to any of your constituents about SB 14?

4    A. I can recall having just general conversations

5    with people who have asked questions and expressed

6    concerns about it. But I can't point to anything in

7    particular.

8    Q. Do you recall having any conversations about

9    SB 14 with constituents, either during the legislative

10   session or -- or before?

11   A. I don't recall. I'm sure that we received

12   e-mails on this issue, both in favor and against it.

13   Q. Do you recall, I know that it's a long time ago

14   now, but do you recall roughly what the proportion was

15   of support and opposition?

16   A. I don't. I don't.

17   Q. To the best of your knowledge, do any of your

18   constituents support photo ID requirements for voting,

19   generally?

20   A. I believe that many of my constituents do.

21   Q. And to the best of your knowledge, do any of your

22   constituents oppose a photo ID requirement for voting?

23   A. I believe that many of them oppose it as well.

24   Q. And in your understanding, do any of your

25   constituents support SB 14?

---

18

1    A. I don't know that any of my constituents

2    understand the particulars of SB 14.

3    Q. Do you know whether any of your constituents

4    oppose SB 14?

5    A. Same answer. I'm not sure any of them understand

6    the specifics.

7    Q. Did you prepare any talking points related to

8    SB 14?

9    A. For my introduction of amendments on the Senate

10   floor or to the public at large?

11   Q. Let's start within the legislature. Did you

12   prepare any talking points or -- for any consideration

13   of SB 14 or an amendment?

14   A. My staff may have helped to prepare talking

15   points, which is typical when I'm introducing amendments

16   to bills. I don't recall personally preparing any

17   talking points. I'm sure I made little notes to myself

18   ahead of time.

19   Q. Did anyone outside of the legislature prepare

20   talking points for you on SB 14?

21   A. No.

22   Q. Did anyone outside the legislature, at any time,

23   provide you with talking points about voter -- photo

24   voter ID legislation?

25   A. No.

---

19

1    Q. Did anyone outside of the legislature provide you

2    with any kind of background materials on photo ID

3    legislation?

4    A. Not that I recall.

5    Q. Do you know whether anybody outside the

6    legislature provided your staff with materials on photo

7    ID legislation?

8    A. I don't know.

9    Q. And I can hear myself kind of going back and

10   forth. When I say "photo ID legislation" or "voter ID

11   legislation," what I intend to refer to is legislation

12   that would require a photo ID to vote.

13   A. Yes, I understand your question that way.

14   Q. Can you recall anyone providing you with -- with

15   materials about SB 14 or voter ID legislation?

16   A. I don't recall. We have a Democratic caucus, a

17   Senate caucus and we have a caucus staff person who

18   sometimes sends e-mails to us prior to working on

19   particularly controversial issues. I don't recall him

20   having sent anything to us for that, but he may have.

21   Q. Do you recall whether the Senate Democratic

22   caucus provided any -- well, I'll start with talking

23   points, any talking points for members for committee or

24   floor debate?

25   A. Not that I recall. I know for my own preparation

---

20

1    I concentrated very specifically on the Indiana law that

2    had been upheld and the reasons that the Supreme Court

3    gave for upholding it. I'm an attorney myself, so I

4    read that with my own lawyer hat on, I guess, for lack

5    of a better way of saying it. So that I would

6    understand the nuances of what they found to be

7    supportable in the law, and also expressed concerns that

8    they may have made. And having read that really formed,

9    for me, the background of the amendments that I

10   introduced and the arguments that I made in introducing

11   them.

12   Q. And that's the Crawford versus Marion County

13   case?

14   A. Yes.

15   Q. Okay. Did the Senate Democratic caucus provide

16   any -- any material that you can recall specific to

17   SB 14?

18   A. I do not recall. It's possible, but I don't

19   recall anything specific.

20   Q. Do you recall whether the Senate Democratic

21   caucus provided its members with any material specific

22   to SB 362, the 2009 voter ID bill?

23   A. I can't recall. I do believe that we were

24   provided with a copy -- I don't remember if this came

25   from my staff or if it came from our caucus staffer, but

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

21

1  I recall reading the Baker-Carter report on photo voter
2  ID and their recommendations.  And reading that, both
3  prior to the 81st legislative session debate on the bill
4  and the 82nd legislative debate on the bill, and I
5  specifically asked the bill's author questions from that
6  report as to why some of the recommendations were
7  advanced in the bill while others were not.
8      Q.  Did you, your staff, conduct any studies about
9  the potential impact of SB 14?
10     A.  No.  Not personally, no.
11     Q.  Did you or your staff review any studies about
12 the potential impact of SB 14?
13     A.  Information was introduced in each of the two
14 sessions where the bill was debated as part of our
15 hearing.  I don't recall whether anything independent of
16 that was provided to me.
17     Q.  And when you say that "information was provided,"
18 is that information that was either discussed or
19 introduced into the official record?
20     A.  Yes, both oral testimony and I believe some
21 written testimony as well.
22     Q.  How does that typically work in the Senate?  Is
23 there kind of an organized distribution of materials to
24 senators before a debate?
25     A.  No.  There's -- especially in the context of this

22

1  situation, in both the 81st and the 82nd legislative
2  session, this bill was advanced using a procedural
3  maneuver that assured that it would be debated outside
4  the typical Senate rules.  Typically a bill is sent to a
5  specific committee and debated prior to being sent to
6  the floor for a vote.  And also, typically a bill
7  requires two-thirds of the members to advance the bill
8  to the floor for debate.  In both of the two sessions
9  where this bill was debated, those rules were set aside
10 for procedural maneuver that allowed that.  And so in
11 each of them, the committee hearing that took place on
12 the bill was simultaneous, really, with the Senate floor
13 debate.
14     We functioned as Committee of the Whole.  And we
15 took testimony actually on the Senate floor which is
16 very unusual.  So it was all simultaneously done as part
17 of our debate on the bill.  And it was also the case
18 that the bill was advanced without the requirement of
19 the two-thirds vote in the Senate.
20     Q.  And the two-thirds requirement, was that -- was
21 there a -- there was a specific rule, a Senate rule
22 adopted that created a particular rule for voter ID
23 bills; is that right?
24     A.  My recollection was that the bill was advanced in
25 both sessions prior to the adoption of the Senate rules.

23

1  The Senate rules are adopted usually the first day that
2  we actually convene to do business as a body.  And by
3  advancing this bill prior to the adoption of those
4  rules, it was allowed to come forward without a
5  two-thirds requirement.
6      I know that's what happened in the 81st session.
7  I think that's what happened in the 82nd session, though
8  I may be -- I may be remembering that incorrectly.  It
9  may have occurred through a different kind of procedural
10 mechanism.  But it certainly was something outside of
11 our regular rules.
12     Q.  And when you say it "was advanced prior to
13 adoption of the Senate rules," do you mean it was
14 introduced or filed prior to the adoption of the rules?
15     A.  This bill -- in the 82nd session the governor
16 advanced it as a piece of emergency legislation, and
17 because of that, it came outside the regular process and
18 procedures.  And it was advanced at the very, very
19 outset of the session so that it could move to the floor
20 prior to the adoption of the rules.  I believe that's
21 correct.
22     Q.  How does -- how does the governor's designation
23 of a bill as emergency legislation, how does that affect
24 the procedures that apply to that bill in the Senate?
25     A.  It moved it up in the priority order of bills to

24

1  be considered.  In the Senate, what typically happens is
2  a blocker bill is filed at the outset of the legislative
3  session.  It's a bill that the Republican and Democratic
4  senators agree will not ever be advanced.  So what the
5  two-thirds rule allows is for a bill to move outside the
6  regular order of business and go in front of that
7  blocker bill that's not been advanced.  Where a piece of
8  emergency legislation is filed, it can advance outside
9  of that path.
10     Q.  Okay.  Is it, in your understanding, is it
11 sufficient for -- is the governor's emergency
12 designation, is that sufficient to take a bill, for lack
13 of a better word, outside of the two-thirds blocker bill
14 procedure?
15     A.  No.  No.  In this instance, if I'm remembering
16 this right, I believe that his emergency designation on
17 the voter ID bill occurred and the bill moved forward
18 prior to our adoption of the rules and the filing of the
19 blocker bill.  So there was no blocker bill in front of
20 it or the rules that required two-thirds support to move
21 a bill outside the order had not yet been adopted.  But
22 it was the only of the governor's pieces of emergency
23 legislation that advanced in that way.  The others came
24 in through the two-thirds rule.
25     Q.  Okay.  What is the -- well, let's back up a bit.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Wendy Davis                                          June 6, 2012

25

1   When we talk about the two-thirds rule, am I correct in
2   understanding that -- so you said there's a blocker bill
3   that's kind of put at the front of the line.  Is that
4   accurate?
5       A.  Yes.
6       Q.  And the two-thirds vote is necessary to -- does
7   it suspend the regular order of business?
8       A.  Yes, that's exactly what it does.
9       Q.  And so by suspending the regular order of
10  business, that two-thirds vote allows for a bill to be
11  considered out of order.  Is that -- is that a fair --
12      A.  Yes.  Yes.
13      Q.  So in some sense, the -- what's thought of as the
14  normal Senate procedure is to suspend the regular order
15  of business?
16      A.  Yes.
17      Q.  Are there other -- are there any other ways in
18  the Senate that a bill can not have to go through the
19  two-thirds vote?
20      A.  There was another procedural maneuver used this
21  session that I'm not sure has been used before.  And my
22  memory is fairly vague on it.  But it was on what we
23  call House bill day.  It's when a group of House bills
24  come over and we didn't have a blocker bill in the order
25  of business on the House bills.  So a bill came through

26

1   without having to come outside the regular order of
2   business.  And therefore, the parliamentarian rules that
3   that House Bill could be considered even though it
4   didn't have a two-thirds vote to bring it to the floor.
5          And it was another controversial bill.  I believe
6   it was the sanctuary city bill.  It may have been the
7   sonogram bill, but it was one of those.
8       Q.  So on a House -- on House bill day, is it
9   customary to have a blocker bill or not?
10      A.  Yes.  Well, let me -- let me say that
11  differently.  I'm not sure that anyone had ever really
12  addressed that question before.  And it took a great
13  deal of debate in front of the parliamentarian before
14  she ruled on what should happen.
15         I think it had always been assumed that the
16  Senate blocker bill served as a blocker bill regardless
17  of whether a bill was coming over on House bill day or
18  whether it was coming in the regular order of business
19  through the Senate.  And this was the first time that
20  the question had been pressed.  And honestly, it caught
21  the Democratic minority party off-guard.  And we
22  believed that it shouldn't advance, but the
23  parliamentarian ruled that it should.  So when I
24  answered your question "yes," I think that going
25  forward, that's what she would rule.  That on House bill

27

1   day, unless you've got a blocker House bill there, as
2   long as it's the next one coming up in line, you can go
3   ahead and consider it.
4       Q.  And so are you aware in the 81st Legislature or
5   any previous legislature, are you aware of a blocker
6   bill being filed in the Senate on House bill day?
7       A.  I'm not aware that that question had ever arisen
8   or that anyone considered that there needed to be a
9   separate House blocker.
10      Q.  So to the best of your knowledge, there had not
11  been a specific blocker bill filed in the Senate on
12  House bill day?
13      A.  It would be a House bill blocker.  And to my
14  knowledge, that had never been considered or debated.
15  It was always assumed that the Senate blocker bill
16  served as a blocker for all legislation whether it
17  originated in the House or the Senate.
18      Q.  Is the blocker bill, is that something that is
19  typically provided in the Senate rules themselves?
20      A.  Yes.  Just under the regular order of business,
21  that's how it's discussed.  It's not called a blocker
22  bill.  But there's a rule about the fact that bills must
23  be taken up in order that they come, essentially.  And
24  that in order to bring a bill up to the floor outside of
25  the order, there needed to be a two-thirds vote of the

28

1   membership to allow that to happen.
2       Q.  I see.  So there's no -- if I understand
3   correctly, there's not a rule that says a blocker bill
4   or a --
5       A.  Correct.
6       Q.  Any bill shall be filed and not acted upon?
7       A.  Correct.
8       Q.  But the regular order of business says you take
9   bills in order, right?
10      A.  Yes.
11      Q.  And it's customary to file a bill that's known as
12  a blocker bill that sits at the front of the line?
13      A.  It has always been the tradition of the Senate to
14  do that, yes.  I'm not aware of any session that's ever
15  been conducted without that practice.
16      Q.  Are you -- are you aware of any -- any other
17  bills that have been considered, I guess the word would
18  be in the regular order of business?  And by that I mean
19  without the two-thirds procedure?
20      A.  As I said, I believe either the sanctuary city
21  bill -- I believe it was the sanctuary city bill, I
22  think essentially there was a two-thirds vote sufficient
23  to bring the sonogram bill forward to the floor.  There
24  was another controversial bill this session that came
25  out of the order of business.  Again, it was the House

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Senator Wendy Davis                                    June 6, 2012

29

1   bill day one, but I don't recall what it was.
2      Q.  In the regular order of business in the Senate,
3   how many votes are necessary to pass a bill?
4      A.  There are 31 members of the Senate.  It requires
5   21 of us to vote to bring a bill to the floor for
6   debate.  And after it's brought to the floor on second
7   reading, it only requires a simple majority in order to
8   pass a two-third reading and then to pass it on to the
9   House.
10     Q.  And you say there are 21 votes required to bring
11  it to the floor.  Is that -- is that the regular order
12  of business or is that the -- or is that to suspend the
13  regular vote?
14     A.  That's to suspend, because every time we bring a
15  bill we're suspending the regular order because of that
16  blocker bill.
17     Q.  Okay.  But if there were not a blocker bill in
18  place for whatever reason?
19     A.  Then the next bill that was in line would be the
20  one that could come up outside of a two-thirds vote.
21  But as long as it wasn't the one in the front, every
22  other bill behind it would have to come up under a
23  two-thirds vote.  It would just depend on what the
24  natural order of the bills was as they were advanced
25  through committee and sent to the Senate floor.

30

1      Q.  So if there were no blocker bill for whatever
2   reason, then to bring a bill to the floor, how many
3   votes would that require?
4      A.  If there were no blocker bill and it was the
5   first one in line, it would only require a simple
6   majority.
7      Q.  Do you recall seeing any studies about -- about
8   the impact of a photo ID law on voter turnout?
9      A.  I recall there being testimony about that.  And
10  there was likely written testimony introduced, but I
11  don't recall specifically what it said.
12     Q.  Do you recall generally whether there was
13  testimony or evidence of studies showing that photo ID
14  laws would increase turnout?
15     A.  No.
16     Q.  Do you recall seeing or hearing about any studies
17  that showed a decrease in turnout caused by photo ID
18  laws?
19     A.  I generally recall from the Carter-Baker report
20  that the express concern that that would be the
21  consequence of a voter ID law without adequate
22  compensating procedures to prevent that.  Very
23  specifically they talked about same day voter
24  registration, they talked about mobile voter
25  registration drives, and they talked about a fairly

31

1   delayed time period between adoption of such a rule and
2   implementation with a very well funded education system
3   that would be part of moving to a photo ID -- a photo ID
4   requirement.
5      Q.  Okay.  I'm sure I could read it in the report.
6   But do you recall what the -- what the recommended
7   advance period was in the Carter-Baker report?
8      A.  I'm sorry.  I don't.  I know that amendments were
9   introduced in both sessions on those counter balances,
10  recommendations that were in the Carter-Baker report to
11  enhance and improve the opportunity for people to vote
12  in spite of a photo ID requirement, but none of those
13  was accepted as part of the bill.
14     Q.  Now, in the ordinary course of business in the
15  Senate, a bill is referred to you -- you said a specific
16  committee?
17     A.  Correct.
18     Q.  And -- but SB 14 was referred to the Committee of
19  the Whole, right?
20     A.  Correct.
21     Q.  Is there a particular committee that SB 14 would
22  have been referred to had it not been referred to the
23  Committee of the Whole?
24     A.  I believe the committee -- I don't sit on it so I
25  may get the name of it wrong.  I believe it's called

32

1   Intergovernmental Relations.  I believe that's right.
2   And that's probably where it would have gone.  It could
3   have also gone through State Affairs.  I think either of
4   those would have been a logical place.
5      Q.  How many people typically are on a Senate
6   committee?
7      A.  Depends on the committee.  Some are as large as
8   15.  Others have, I think usually nine members.  And
9   some only have five.  It's always an odd number.
10     Q.  Uh-huh.  Do you know, as you sit here, how many
11  members the State Affairs Committee has?
12     A.  I believe State Affairs has nine members on it.
13     Q.  Okay.  Is the introduction of testimony and
14  evidence, is that limited in the Senate to the
15  committee?
16     A.  Yes.  As part of a Senate debate, we can
17  introduce information that we seek to be added as an
18  amendment to a bill.  And occasionally, but rarely, a
19  piece of information may be introduced to the secretary
20  of the Senate and a request made of her to pass it out
21  to the members for them to review prior to voting on a
22  bill.  It's fairly rare that that happens, but sometimes
23  it does.
24     Q.  If that -- when that does happen, does the
25  material that gets submitted to the secretary, does that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

33

1  become part of the record?
2      A.  If it's requested that that be done, it isn't
3  always the case.  But a member can move that a piece of
4  information that they've handed out to the other members
5  be included in the formal record and then the members
6  vote on whether they agree that that should occur.
7      Q.  In just a typical committee, who is allowed to
8  introduce evidence or provide witnesses to a committee?
9      A.  Any person who wishes to submit testimony to a
10 committee may do so.  The chair makes a decision on
11 whether that information can be submitted verbally or
12 whether in writing.  Sometimes a chair chooses only to
13 allow invited testimony.  And that invitation occurs at
14 the behest of the chair working with their staff.  And
15 then that testimony that's introduced is done so in writing,
16 other testimony that's introduced is done so in writing,
17 typically.  But cards are provided as part of committee
18 hearings for people to fill out, simply to express
19 whether they were in favor or against a bill.  And they
20 can put their name and their address and their
21 identifying information to create part of the formal
22 record.
23     Q.  Are members who don't sit on a committee allowed
24 to introduce evidence into the record?
25     A.  No.

34

1      Q.  When the Senate sits on the Committee of the
2  Whole, are all members allowed to introduce evidence
3  into the record?
4      A.  Yes.  And to -- just to supplement my answer to
5  your question a moment ago.  It's our tradition and our
6  courtesy to each other as a body, if we wish to
7  introduce testimony in a committee or evidence or
8  information in a committee, as a courtesy, a Senator not
9  sitting on the committee can request that that be done
10 through a member and the member -- I can't imagine a
11 situation where they don't agree to do that.
12     Q.  So occasionally it is possible for someone who's
13 not on the committee to, with the assistance of a
14 committee member, introduce evidence into the record?
15     A.  Yes.  Yes.
16     Q.  In an ordinary -- would it be accurate to refer
17 to what I'm calling an ordinary committee as a standing
18 committee?
19     A.  Uh-huh.  Yes.
20     Q.  In a standing committee, is it typical -- how
21 many Senators typically attend the proceedings of an
22 ordinary COMMITTEE?
23     A.  Sometimes all of the members on a committee are
24 present.  Sometimes not.  In order for a vote to be
25 taken, a quorum of the committee must be present.  In

35

1  fact, in order for a bill to be formally introduced to a
2  committee, a quorum must be present in order to move its
3  adoption before the committee.
4      Q.  How often do Senators who are not members of the
5  committee attend committee meetings?
6      A.  Fairly often because we introduce our own bills
7  to committees that we do not sit on.  While we do not
8  come and testify on behalf of other Senators bills or
9  provide evidence on bills that are not our own, we do
10 introduce our own bills before committee members if our
11 bill is being assigned to that committee.  So it's
12 fairly frequent that we appear at each other's committee
13 hearings.  We're usually given courtesy of sitting up at
14 the dios and we introduce our bill to the committee from
15 that position.
16     Q.  Is it typical for members not on the committee to
17 stay and listen to testimony on bills that they have not
18 introduced to the committee?
19     A.  Sometimes.  Any member is certainly provided the
20 courtesy of doing that.  And oftentimes if a bill is
21 particularly controversial or noteworthy, members
22 outside the committee will come and listen and actually
23 participate in asking questions of the witnesses at the
24 discretion of the chair.
25     Q.  Okay.  When the Senate sits as a Committee of the

36

1  Whole, does the chair have any discretion as to whether
2  a member of the Senate may question a witness?
3      A.  The chair in that situation is the Lieutenant
4  Governor.  I suppose he has that discretion.  I don't
5  recall any limitation of questions being a part of our
6  debate on SB 14.  Although there may have been time
7  constraints in terms of how long witnesses could
8  testify.  In fact, I'm fairly sure that there were.
9      Q.  Is it accurate to say that in the Committee of
10 the Whole any Senator has the right to introduce
11 evidence into the record?
12     A.  Yes.
13     Q.  Is it accurate to say that in the Committee of
14 the Whole any Senator has the right to question a
15 witness?
16     A.  Yes.
17     Q.  And I think you just said that in this -- in a
18 Committee of the Whole, the chair would be the
19 Lieutenant Governor?
20     A.  Correct.
21     Q.  Do you believe that SB 14 will have the effect of
22 denying or abridging African-American Texans right to
23 vote?
24     A.  Yes, I do.
25     Q.  What's the basis for that belief?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                          June 6, 2012

37

1     A. I believe that the bill will particularly have an
2  impact on abridging the right to vote of persons who are
3  of low income status, indigent status primarily.  There
4  was information, as I said earlier, that was introduced
5  into the record that that particular class of people in
6  the State of Texas disproportionately is made up of
7  persons who are African-American and Latino.  And that
8  therefore, if one could conclude that persons who are of
9  indigent status will no longer be able to meet the
10  requirements to vote in the State of Texas or to occur,
11  one could also conclude that that would have a
12  disproportionate impact on the African-American and
13  Latino community.
14     Q. Is there any other reason that you believe SB 14
15  will have a negative impact on the African-American
16  community in Texas?
17     A. I believe that that concern that I expressed
18  captures.
19     Q. Do you believe that SB 14 will have the effect of
20  denying or abridging the right to vote of
21  African-American Texans who are not indigent?
22     A. I believe it will disproportionately impact those
23  who don't ordinarily seek out a driver's license in the
24  State of Texas.  That person may not fall in an indigent
25  category, but my concern is that, particularly where no

38

1  funding was provided to create an -- a very broad based
2  education in the State about the photo ID requirement,
3  that many people will be caught off-guard by it.  That
4  those who use the bus for transportation, those who have
5  not had a driver's license for other purposes, will come
6  to vote and will not have the opportunity to do so.  Not
7  because, necessarily, at the end of the day all of them
8  fit into a category of a person who can't afford,
9  ultimately, to get an ID, but because no education
10  component was put in place to make sure that people are
11  aware.
12     Q. Was there any evidence considered or presented in
13  the 81st or the 82nd Legislature that showed or that
14  attempted to show who -- how many non-indigent people
15  would maybe lack an ID?
16     A. I believe the question was asked of the Secretary
17  of State, or a representative of the Secretary of
18  State's office, how many people were presumed to be
19  impacted by such as law.  I also recall that there
20  really was no specific information provided to us about
21  what that impact would look like.  And it was one of our
22  gravest concerns that we were moving forward on a bill
23  where no real analysis had been conducted with regard to
24  the disenfranchisement of persons who are currently
25  legally voting.

39

1     Q. When you say -- when you say that "people who
2  would be impacted," do you mean people who might not
3  have the required ID?
4     A. Yes.  We, you know, as part of our debate in both
5  sessions, members who are opposed to the bill raised the
6  concern that there would be a disproportionately
7  negative impact on persons in the African-American and
8  Latino community of current legal voting citizens.  And
9  we asked specifically that information be provided to us
10  that assured us that that negative impact would not
11  occur.  And it was fairly apparent to me certainly, and
12  I believe to others, that there was flagrant disregard
13  for whether it had that kind of impact.  And many of us
14  believed that that impact was the absolute intent of
15  that piece of legislation.
16     Q. We may have already gone over this a little bit.
17  But you say many of us believed that -- I don't mean to
18  misquote you, but many of us believed that there was a
19  negative impact on African-Americans, Latinos.  What
20  was -- I've asked you about the basis for your belief
21  about an impact.  Do you have a sense of what the
22  general basis of that belief was, that there would be a
23  negative impact on African-Americans and Latinos?
24     A. Well, certainly information that was provided as
25  part of both the 81st and the 82nd legislation in our

40

1  discussions.  Testimony that was provided, as well as
2  information in the Baker-Carter report which
3  specifically refers to the possible impact on members of
4  those communities, those populations.  But the other
5  that was noted in both session's debate on the bill was
6  that there had not been any information put in front of
7  us as a Senate body, as a Legislature, that demonstrated
8  the existence of fraud sufficient to move forward with a
9  bill, a law, that would have the likely consequence of
10  disenfranchising voters who currently have the legal
11  right to vote.  And we specifically asked why this piece
12  of legislation were advancing absent that information,
13  where information that exists with regard to fraud and
14  absentee balloting was not being addressed.
15     Comparatively, the information before the State
16  in terms of where fraud occurs in the voting process
17  demonstrates that there's much more likelihood of fraud
18  occurring in the absentee voter arena than in the photo
19  ID fraud arena or voter fraud arena.  It's my belief,
20  it's other's belief, that the attempt to address the
21  absentee voter fraud would have an impact that was much
22  broader than simply on the African-American and Latino
23  community.  And that that's why that piece of voter
24  fraud is not being addressed in the State of Texas.
25     A great deal of Anglo, particularly senior vote,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                June 6, 2012

41

1  occurred in the absentee vote arena.  And that the
2  likelihood that those persons might be impacted by any
3  kind of a law that would address that fraud was what
4  keeps it from being an issue of concern that's advanced
5  by the majority party in the State of Texas, while a
6  piece of legislation to address an undemonstrated fraud
7  is advancing simply because of the people that it will
8  most assuredly impact.
9      Q.  Is it your belief that there is no in person
10 voter fraud in Texas?
11     A.  I cannot say that with certainty.  What I can say
12 is that we, as a State, spent an enormous amount of
13 money trying to ferret out such fraud in both of the
14 legislative sessions debate on this bill.  Specific
15 questions were addressed to the attorney general's
16 office with regard to the consequences of those
17 investigations and the multiple millions of dollars that
18 were spent in trying to ferret it out.  And my
19 recollection from that testimony was that very, very
20 little fraud had been revealed.
21     Q.  Is that testimony and the effort that you're
22 describing, is that the effort by the Texas Attorney
23 General's office?
24     A.  Yes.
25     Q.  Is it -- is it your understanding that the

42

1  attorney -- the Texas Attorney General has the exclusive
2  ability or jurisdiction to prosecute voter fraud?
3      A.  I don't know.  I do know that as part of each of
4  these legislative sessions, we advanced an enhanced
5  penalty piece of legislation for persons who were caught
6  committing fraud at the ballot box.  And it was our
7  belief that, to the extent fraud exists, that would be
8  an appropriate way to address that fraud where it was
9  discovered.  Particularly because on ballots with the
10 very, very minimal justification for a photo voter ID
11 law, many, many, many people in the State of Texas who
12 currently have the legal right to vote will have this
13 right threatened.  And that a much greater threat to the
14 disenfranchisement to the legal voters is the
15 consequence of moving forward with that as the solution,
16 with a photo ID bill as the solution.
17     Q.  So, then it was your belief that increasing the
18 penalty for in person voter fraud was a sufficient
19 remedy or deterrent?
20     A.  Yes.  Particularly because so little had ever
21 been discovered.
22     Q.  And in your understanding, was that the belief of
23 the Democratic members of the Senate as well?
24     A.  Yes.  And I believe we collectively voted in
25 favor of an amendment that would have addressed voter

43

1  fraud in that manner.
2      Q.  But there -- are you familiar with testimony or
3  argument of proponents of the bill that in person voter
4  fraud is more difficult to detect?
5      A.  I'm not aware.
6      Q.  Do you have any understanding or a personal
7  knowledge whether or not in person voter fraud is more
8  difficult to detect than, say, mail in ballot fraud?
9      A.  I'm not aware.
10     Q.  Would you have any reason to disagree if somebody
11 said that in person voter fraud is more difficult to
12 detect than mail in ballot fraud?
13     A.  No.  I would find it surprising for that to be a
14 reason to support a bill like Senate Bill 14.  If it
15 were easier to detect voter fraud in the absentee ballot
16 arena I would think that would be sufficient reason for
17 that to be addressed through a piece of legislation like
18 SB 14.  And yet it has not been.
19     Q.  Did you introduce any bills either in 2009 or '11
20 to address mail in ballot fraud?
21     A.  I personally did not.  Though, I believe in one
22 of those two sessions, perhaps both, I believe that one
23 of our Senate Democratic members introduced such a bill,
24 or perhaps introduced as an amendment to the voter ID
25 bill such a proposal.

44

1      Q.  You mentioned you're a lawyer.  Do you have -- do
2  you have any experience with prosecution?
3      A.  No, I do not.
4      Q.  Are you -- do you have any understanding whether
5  it is more difficult to prosecute a case of in person
6  voter fraud than, say, mail in ballot fraud?
7      A.  I don't have any understanding of that.
8      Q.  Do you have any understanding whether there are
9  specific political -- well, start over.  Do you have any
10 understanding that there are potential political
11 consequences to prosecuting voter fraud?
12     A.  No.
13     Q.  Do you have any understanding whether a
14 prosecutor who prosecutes voter fraud may be accused of
15 targeting Democratic voters?
16     A.  No.
17     Q.  Would you have any reason to disagree with the
18 contention that prosecuting voter fraud creates
19 potential for accusations of political bias?
20     A.  If other types of voter fraud that are committed
21 by persons outside minority populations is not
22 addressed, I believe it's possible that that assumption
23 might be made.
24     Q.  When you say "voter fraud that's committed by
25 persons outside minority populations," are you referring



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                June 6, 2012

45

1  to a specific kind of voter fraud?
2      A.  The absentee voter fraud that we talked about a
3  moment ago.
4      Q.  So you contend that -- is it your contention that
5  mail in ballot fraud or absentee voter fraud, is it more
6  likely to be committed by persons who aren't members of
7  minorities?
8      A.  I believe there's evidence that in person mail in
9  voter fraud is occurring at a much more frequent level
10 than in person voter fraud.  And that that fraud is
11 occurring across all populations and addressing it would
12 not have a disproportionate impact on persons who are
13 African-American or Latino.  And therefore, it's not
14 nearly the priority to address by the current
15 administration in the State of Texas.
16     Q.  Is it your understanding that in person voter
17 fraud is disproportionately engaged in by members of
18 minority group?
19     A.  It's not.  But I believe that the bill that was
20 advanced to, and I'm putting quotations around this
21 word, "purportedly" addressed in person voter fraud is
22 known to have a disproportionate impact in
23 disenfranchising legal voters who are African-Americans
24 and Latinos in the State of Texas.  I don't think in
25 either instance the question that is really at the heart

46

1  of addressing the fraud for the current administration
2  is to address the fraud.  I believe that it's to impact
3  the community that will be impacted by it.
4      Q.  What is your basis for that statement?
5      A.  The discussions and debates that we had as part
6  of this bill in both the 81st and the 82nd legislative
7  sessions.  The attempts to introduce amendments so that
8  that disproportionate impact in the African-American and
9  Latino community would not occur and the unanimous votes
10 against such amendments by persons in the Republican
11 party.
12     Q.  So it's your contention that because certain
13 members voted against amendments that were designed to
14 reduce the impact of voter ID laws on minority voters,
15 that's evidence that they intended to impact minority
16 voters?
17     A.  We had numerous conversations in the Senate about
18 how to improve this bill in a way that would allow voter
19 fraud at the ballot box to be addressed and yet to
20 alleviate concerns that disenfranchisement would occur.
21 I find it significant that if the true intent of this
22 legislation is to assure integrity at the ballot box,
23 that efforts to likewise assure that disenfranchisement
24 is not the consequence of the bill should have been
25 respected and should have been welcomed as part of

47

1  advancing that piece of legislation.  The bipartisan
2  Baker-Carter report calls for exactly those things.  And
3  where a particular political party issues parts of that
4  and yet embraces other parts of it, yes, I believe that
5  that is evidence of what the intention of that piece of
6  legislation truly is.
7      Q.  So it's your position that there were amendments
8  that would have reduced the discriminatory impact of the
9  bills?
10     A.  Yes.
11     Q.  And so you assume -- I mean, that assumes that
12 there would be the discriminatory impact in the first
13 place, right?
14     A.  Evidence was put forward that the discriminatory
15 impact would occur, that was put before all members of
16 the Senate body.  And no member discussed or gave any
17 defensible reason for voting against amendments that
18 were offered to assure that that disenfranchisement
19 didn't occur.  Instead, without debate on behalf of the
20 Republican members of the Senate, those pieces -- those
21 amendments were, for the most part, tabled without any
22 kind of discussion, without even giving any legitimacy
23 as to whether valid points were being made in the
24 advancement of those amendments.  In other words, it was
25 a complete lack of concern about the disparate impact

48

1  that might occur and a predisposed decision to say no to
2  any amendment that might try to improve upon the bill.
3      Q.  Why is that a lack of concern?
4      A.  In my opinion, if an amendment that has
5  demonstrated validity is introduced by a member and
6  tabled without any kind of discussion on the merits of
7  the amendment occurs, it shows a lack of concern for the
8  arguments that are being made.
9      Q.  Would it also show a lack of concern if an
10 amendment were debated, considered and then rejected?
11     A.  Not to the same degree, not if the debate were a
12 genuine and sincere one.
13     Q.  Isn't it true though, that if someone didn't
14 believe there would be any disparate impact, then voting
15 against an amendment would not necessarily show any lack
16 of concern?
17     A.  I believe that anyone who says to you they
18 believe there would not be a disparate impact is either
19 willfully being ignorant of that fact or choosing to
20 ignore it.
21     Q.  You mentioned a moment ago that there was
22 evidence presented to everybody about a disparate
23 impact.  Can you tell me specifically what that evidence
24 was?
25     A.  It was, as I generally discussed earlier, I don't



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

49

1  recall the specific testimony that was introduced either
2  verbally or in writing, but information that
3  demonstrated that persons in the State of Texas, and
4  certainly I think following legislative session,
5  questions that the DOJ has asked of the Secretary of
6  State has revealed this as well, that persons who are
7  most likely to be disenfranchised by a law such as this
8  fall primarily in our lowest income communities, which
9  unfortunately in the State of Texas are
10  disproportionately represented by African Americans and
11  Latinos.
12      Q.  Do you recall any specific person who provided
13  testimony to that effect?
14      A.  I don't recall.
15      Q.  Do you recall any specific conclusion from any of
16  the testimony or studies about the disparate impact of
17  SB 14?
18      A.  I don't recall.  But I certainly recall us asking
19  the Secretary of State whether those impacts would occur
20  and that the members were willing to advance a piece of
21  legislation without a real clear picture from the
22  Secretary of State on whether that was going to be the
23  case.  And, in fact, with the Secretary of State being
24  fairly candid that she had not done an analysis that
25  would really enable her to make that kind of a

50

1  determination.
2      Q.  Do you know if it's possible to do that kind of
3  analysis?
4      A.  Well, certainly I think the DOJ has asked some
5  very good questions about that in terms of who in the
6  State of Texas today falls into the category of persons
7  who currently have voter IDs in the State of Texas and
8  yet who do not possess Department of Public Safety photo
9  IDs.
10      Q.  Do you know if the data necessary to make that
11  determination is available -- is it available, period,
12  in Texas?
13      A.  I don't know.
14      Q.  If that information weren't available -- let me
15  ask another question first.  So it's your testimony that
16  the fact that there was no -- there was no determination
17  of who would be impacted potentially by SB 14, the fact
18  that there was no determination made shows indifference
19  toward the impact.  Is that true?
20      A.  Yes, together with the fact that information had
21  been provided that that was likely to be the case and
22  that amendments were introduced that could have
23  corrected that.  Amendments that would not have weakened
24  the ability for the law to ferret out voter fraud at the
25  ballot box and yet those amendments were rejected.

51

1      Q.  If an amendment provided for or allowed for
2  non-photo ID, would you contend that that would not
3  weaken the ability to ferret out in person voter fraud?
4      A.  Can you ask that question again?
5      Q.  Of course.  You mentioned a moment ago amendments
6  that would not have weakened the ability to ferret out
7  in person voter fraud?
8      A.  Yes.
9      Q.  Is it your contention that allowing non-photo
10  forms of ID would maintain the same ability to ferret
11  out in person voter fraud?
12      A.  I believe that together with some of the other
13  provisions of the law that could have occurred.  There
14  were very few exceptions that were created as part of
15  the amendments that were introduced.  And I went through
16  those earlier, where there might be some minor
17  discrepancy between a person's photo ID and their voter
18  registration card, where there might be a change of
19  someone's name because of marriage or divorce, and where
20  there might be a situation where a person was indigent,
21  but could provide other forms of voter identification
22  that would be sufficient to identify them as the person
23  who was voting.
24      Q.  Do you believe that persons who would potentially
25  have a discrepancy between their photo ID and their

52

1  voter registration are disproportionately members of
2  minority groups?
3      A.  I don't know.
4      Q.  Do you contend that people who might have a name
5  mismatch between their State ID and their voter
6  registration are disproportionately members of minority
7  group?
8      A.  I don't know.
9      Q.  Do you contend that people who may have a
10  discrepancy in the address on their photo ID and voter
11  registration are disproportionately members of minority
12  groups?
13      A.  I don't know.
14      Q.  But it's your contention that the photo ID
15  requirement in SB 14 will have a disproportionate impact
16  on indigent voters?
17      A.  I believe that's the case.
18      Q.  And you believe that indigent voters will
19  disproportionately be members of minority groups?
20      A.  The evidence that was put in front of us was that
21  that's the case in population in the State of Texas.
22      Q.  Is it your contention that a non-indigent
23  African-American voters would be impacted differently
24  than a non-indigent Anglo voter by SB 14?
25      A.  I don't know.

ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

53

1    Q. Is it your contention that a non-indigent
2    Hispanic voter would be impacted differently by SB 14
3    than a non-indigent Anglo voter?
4    A. What I can tell you from my understanding is that
5    persons who rely on public transportation in the State
6    of Texas, while they may not be indigent, again, are
7    disproportionately represented by members of our
8    African-American and Latino communities.  And that many
9    of those persons do not currently possess photo IDs
10   because they don't have a need for a driver's license.
11   And that that, yes, does create a disproportionate
12   impact to members of our minority community.
13   Q. Is it your understanding that -- well, of the
14   people who take -- who use public transportation in
15   Texas, is it your understanding that some of those
16   people use public transportation because they don't have
17   a car?
18   A. Yes.
19   Q. And perhaps because they're indigent?
20   A. Perhaps.  But, you know, indigency, I think that
21   persons cannot have a car does not necessarily mean that
22   they're indigent.
23   Q. Thank you.  Is it -- then is it your
24   understanding that non indigent people who use public
25   transportation in Texas are disproportionately

54

1    African-American or Latino?
2    A. I believe that public transportation users in the
3    State of Texas, certainly in the district that I
4    represent, are disproportionately members of our
5    African-American and Latino communities.  That may not
6    be the case in all cities depending on the quality of
7    their transportation systems.  But certainly in the area
8    that I represent it's the case.
9    Q. In the area you represent, is it your
10   understanding that the majority of people who use public
11   transportation are indigent?
12   A. It's my belief that the majority of people who
13   use public transportation in my district rely on it as
14   their means of moving about and that they do it because
15   they do not have alternative means of transportation.
16   Q. And you don't know whether that's because of
17   indigency or some other reason?
18   A. No, I don't.
19   Q. So is it your testimony, then, that
20   African-American and Latino voters will be
21   disproportionately impacted even if they aren't indigent
22   because they are more likely to use public
23   transportation?
24   A. I'm saying that there's a greater percentage of
25   persons who are African-American and Latino who do not

55

1    currently have driver's licenses in the State of Texas.
2    And I believe that the information that's been requested
3    of the Secretary of State is being requested in order to
4    demonstrate whether that is indeed the case.
5    Q. What is your basis for saying that people without
6    a driver's license are disproportionately Latino or
7    African-American?
8    A. It's information that was presented to us during
9    these two legislative debates.
10   Q. But you can't remember any specific?
11   A. I can't recall the specific information, no.
12   Q. If it was shown that there was not a significant
13   disparity in ID possession between different racial or
14   ethnic groups, would you support SB 14?
15   A. I would support SB 14 if I didn't believe it were
16   going to have a disproportionate impact on persons who
17   are indigent.  I introduced an amendment that would have
18   resolved that concern.  Unfortunately, that's not part
19   of the law.  And I also believe that others will be
20   disenfranchised.  I don't believe that it's solely
21   limited to persons in the minority community, though I
22   believe it's certainly the case.  With the intention of
23   the bill was to pass it with the understanding that
24   disproportionately members of our minority communities
25   would be disenfranchised as a consequence of it.  But I

56

1    believe there's a side effect as well.  And that some
2    other persons may also be caught unaware and not be able
3    to exercise their legal right to vote in the State of
4    Texas come November if this law is upheld.
5    Q. Are you familiar with any polls regarding support
6    for voter ID legislation in Texas?
7    A. No.
8    Q. Are you aware of whether or not there are
9    non-citizens who will register to vote in Texas?
10   A. I am not aware.
11   Q. Do you contend that there are not non-citizens
12   registered to vote in Texas?
13   A. I don't contend that.
14   Q. Do you believe that the expenditure of State
15   resources to take non-citizens off the Texas voter rolls
16   would be a waste of money?
17   A. No.  But I believe in the recommendations of the
18   Baker-Carter report, that in order to address concerns
19   that that may be the case, that corresponding
20   protections for those who may be caught up in the web of
21   a solution that's too broad should also be addressed and
22   they weren't in Texas.
23   Q. Is it your understanding that SB 14 was intended
24   to move non-citizens from voter registration list in
25   Texas?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

57

1    A. I believe that the intension of the bill is as I
2  said earlier.  I believe that if the intention of the
3  Attorney General's office were really to address voter
4  fraud in Texas, that absentee voting would have preceded
5  any kind of conversation on addressing voter fraud.
6    Q. You said "the Attorney General's office," did you
7  mean the Legislature?
8    A. Well, yes, but certainly the Attorney General's
9  office has spent multiple millions of dollars trying to
10 ferret out ballot box voter fraud and yet failed to show
11 the same energy or enthusiasm in ferreting out
12 absenteeism ballot fraud.
13   Q. So is it -- are you aware of the cases prosecuted
14 by the attorney general's office, do you know how many
15 of those dealt with mail in ballot fraud?
16   A. No.
17   Q. Do you know what percentage dealt with mail in
18 ballot fraud?
19   A. No.
20   Q. Do you know what percentage dealt with in person
21 voter fraud?
22   A. No.  But I certainly know there was a targeted
23 amount of money and effort spent on in person voter
24 fraud.  And there was not a corresponding amount of
25 money and effort spent on determining the extent and

58

1  level to which absentee voter fraud might be occurring.
2    Q. But you don't know how much of that money
3  actually resulted in prosecution of mail in voter fraud?
4    A. I recall in our testimony before the Senate that
5  there was a very, very small number of in person voter
6  fraud cases that were discovered in spite of that
7  investigation.
8    Q. And is it your recollection that there was a
9  higher proportion of mail in ballot fraud?
10   A. I don't recall.
11   Q. But if there were a higher proportion of mail in
12 ballot fraud that was discovered and prosecuted with the
13 money that you were referring to, then it would not be
14 accurate to say that there was not an effort to target
15 mail in ballot fraud?
16   A. I think it would be, certainly support for my
17 earlier statement that if that revealed a greater
18 percentage of mail in voter fraud occurring and yet
19 there were no pieces of legislation advanced to address
20 it, that that is evidence that one voter fraud is being
21 ignored where another one is being addressed.
22 Specifically because of the persons who will be impacted
23 by one law and not the other.
24   Q. But you don't have any understanding of the
25 relative difficulty if prosecuting in person versus mail

59

1  in voter fraud?
2    A. No, I don't.
3    Q. Do you believe that elderly voters are less
4  likely than average to have the ID required by SB 14?
5    A. I do.  I recall that being part of the
6  Baker-Carter report as well.  An amendment was
7  introduced to the Senate bill trying to remove its
8  application from voters, I believe of 65 years of age
9  and above, who were less likely to have photo ID.  My
10 recollection was that amendment was not accepted
11 and instead the floor, I think was set at the age of 70
12 versus 65.  I think that's right.
13   Q. Do you recall whether an exemption of exception
14 for elderly voters was part of the final bill?
15   A. I believe there was.  Again, I don't remember
16 exactly what the age for it was.
17   Q. Do you believe that disabled voters are less
18 likely than average to have the ID required by SB 14?
19   A. I don't know.
20   Q. Do you believe that rural voters are less likely
21 than average to have the ID required by SB 14?
22   A. I don't know.  Though I think it is more
23 difficult for them to get the photo ID that's required.
24   Q. In your understanding was the Legislature aware
25 that rural voters would have a harder time getting the

60

1  ID required by SB 14?
2    A. I don't recall.
3    Q. Do you believe that SB 14 was enacted for the
4  purpose of keeping rural voters from voting?
5    A. No, I do not.
6    Q. Why not?
7    A. I don't.  I simply don't.
8    Q. But you believe that because it would be more
9  difficult for a rural voter to obtain the ID, there
10 might be a disparate impact on rural voters; is that
11 right?
12   A. There might be.
13   Q. Did the proponents of SB 14 express any concern
14 for rural voters?
15   A. Not that I recall.
16   Q. Do you believe they were indifferent to rural
17 voters?
18   A. I don't have a belief one way or the other.
19   Q. But you've testified that you believe the lack of
20 concern shown for minority voters indicates
21 indifference; is that right?
22   A. As part of the debate on SB 14, one of the
23 arguments that I recall being made by members who
24 represent minority rural communities was that their
25 voters would have a harder time meeting the requirements



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

61

1  of getting a photo ID.  And arguments were made that in
2  order for the bill not to have a disproportionate impact
3  on those persons, that resources needed to be committed
4  to enhancing the opportunity to access photo ID through
5  the location of DPS offices that could support that need
6  and the expansion of hours that could allow that.  I
7  recall those arguments being made.
8     Q.  When you say "people who represent minority rural
9  communities," what do you mean by that?
10    A.  I mean members of the Senate who represent
11 minority rural communities.  I don't recall any Anglo
12 member who represents an Anglo rural community
13 expressing a concern on behalf of their rural voters.
14    Q.  Do Anglo Senators who represent rural
15 communities, don't they also represent rural minority
16 voters?
17    A.  Some do.  Some don't.  Not what we would consider
18 a majority community where the majority of the persons
19 are minority.
20    Q.  To qualify a minority rural community it would
21 have to be 50 percent?
22    A.  Yes.  For example, some of the expressed concerns
23 were specific to the Valley area, to the Colonians, to
24 areas where people don't have the resources to access a
25 DPS office.  Not because they live in a rural community,

62

1  but because they live in a rural community without
2  public transportation and they don't possess a vehicle
3  to have the capacity to transport them.  That's the
4  distinguishing feature between some who live in rural
5  communities who may have a harder time going to get a
6  driver's license because it's far away from those who
7  live in a rural community who simply will not be able to
8  get a photo ID because they have no means of
9  transportation to get to the DPS office to begin with.
10 That was a distinguishing argument made about why there
11 was a disproportionate impact on persons who fall within
12 our low-income, minority, rural communities versus those
13 who do not fall within that category.
14    Q.  Is it your understanding that it is easier for
15 voters who live in non-minority rural communities to get
16 to a DPS office?
17    A.  It's easier for someone who has a car or a means
18 of transportation to get to a DPS office than it is for
19 someone who does not.  And again, arguments were made,
20 information was put into the record about what the
21 impact to persons in our low-income, minority, rural
22 communities would be.  With members giving, I thought,
23 very compelling testimony about what the impact of
24 persons who lived in their community would be.  Where
25 there was simply no way for them to go to a DPS office.

63

1     Q.  Do you have any knowledge that it would be easier
2  for a resident of a rural community outside the Valley,
3  would it be easier for that person to access a DPS
4  office than a member of a rural community in the Valley?
5     A.  I'll just answer the question again this way.
6  It's easier for a person in a rural community who has a
7  car and a means of transportation to get to a DPS office
8  and to get a driver's license than it is for someone who
9  lives in a rural community and does not have a means of
10 transportation to get a driver's license.
11    Q.  Is it your understanding that members of the
12 rural communities in the Valley have less access to
13 transportation to cars than members of other rural
14 communities in Texas?
15    A.  It is my understanding that persons who are in
16 low-income communities have a greater challenge in terms
17 of access to transportation than those who do not fit
18 within that category.
19    Q.  Do you have any understanding as to the relative
20 income levels or access to transportation in rural
21 communities in any part of the State of Texas?
22    A.  Well certainly we have areas in the State of
23 Texas that are poor, much more poor than others.  Those,
24 again, disproportionately are comprised of persons who
25 are Latino primarily, and in lesser regard,

64

1  African-American.
2     Q.  In talking about the rural minority communities
3  that have problems with access to public transportation
4  and vehicles, is it your understanding that an Anglo
5  voter living in that kind of community, say a rural
6  community in the Valley, would be affected less than a
7  Latino member of that community by SB 14?
8     A.  My distinction is not whether someone is Anglo or
9  Latino or African-American.  The distinction is income
10 level, poverty, and the ability to access
11 transportation.  I believe it's the case that
12 disproportionately, that impacts persons in the minority
13 community.  It certainly, I am sure, impacts persons who
14 are Anglo as well who fit within that category of being
15 low-income and having no access to transportation.
16    Q.  Is it your understanding that younger voters are
17 less likely to have a form of ID required by SB 14?
18    A.  I don't know.
19    Q.  Do you know how many Texas registered voters lack
20 the form of ID required by SB 14?
21    A.  I don't know.  I will certainly asked that
22 question.
23    Q.  Do you know how many of your constituents don't
24 have one of the forms of ID required by SB 14?
25    A.  No.  And again, I sought that information and was



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                June 6, 2012

65

1  not given it.
2     Q. I know you mentioned that the information was
3  sought statewide. How did you seek that information
4  about your constituents?
5     A. I recall asking that as part of either the Senate
6  hearing or perhaps outside the Senate hearing.
7     Q. Did you ever attempt to survey your constituents
8  to see who lacked a photo ID required by SB 14?
9     A. No, I don't.
10    Q. Can you identify any one of your constituents who
11 lacks one of the IDs required by SB 14?
12    A. No, I cannot.
13    Q. Are you aware or can you identify any specific
14 Texas registered voter who lacks one of the forms of ID
15 required by SB 14?
16    A. No, I cannot.
17    Q. Do you know how many of your constituents do not
18 have the underlying documents necessary to get a photo
19 ID?
20    A. No, I don't.
21    Q. Can you identify any specific constituents who
22 lacks the documents necessary to get a photo ID?
23    A. No, I cannot.
24    Q. Can you identify any particular Texas registered
25 voter who lacks the documents necessary to get a photo

66

1  ID?
2     A. No.
3     Q. Are you familiar with the levels of photo ID
4  possession by different racial and ethnic groups in
5  Texas? And by levels, I mean the proportion of ID
6  possession?
7     A. No, I don't have particular information about
8  that.
9     Q. So you don't know what percentage of registered
10 African-American voters have a photo ID?
11    A. No, I do not.
12    Q. And would the same go for Anglo, Asian, Hispanic
13 voters?
14    A. Correct. What I would say is we certainly should
15 have known that before we passed the law that would
16 affect so many people.
17    Q. Do you know how that would be determined, how one
18 would go about determining the level of ID possession by
19 various ethnic groups in Texas?
20    A. Well, I know the Department of Justice is
21 certainly trying to get at the heart of that right now
22 by asking the discrepancy of persons who have a driver's
23 license in the State of Texas versus those who have
24 voter identification cards in the State of Texas.
25    Q. Are you aware of any efforts by or on behalf of

67

1  the State of Texas to make that determination as part of
2  the preclearance process for SB 14?
3     A. I believe that the Secretary of State has been
4  asked to do that. I don't know what the status of that
5  is.
6     Q. Are you -- do you know whether or not the
7  Secretary of State has tried to do that?
8     A. I don't know.
9     Q. You mentioned earlier that you were -- that you
10 had read the Crawford case out of Indiana. Are you
11 familiar from that or any other source of -- are you
12 familiar with the levels of photo ID possession by
13 voters in Indiana?
14    A. No.
15    Q. So you -- you don't know whether -- whether
16 African-American voters, for example, in Indiana possess
17 photo IDs at a higher rate than African-Americans in
18 Texas?
19    A. No, I don't.
20    Q. And would the same be true for Anglo and Asian
21 and Hispanic voters?
22    A. That's correct.
23    Q. Do you contend that the Texas Legislature
24 specifically intended to harm African-American voters by
25 enacting SB 14?

68

1     A. Yes, I do.
2     Q. And at the risk of asking you to repeat yourself,
3  can you explain to me the basis for that belief?
4     A. I'll tell you broadly, and then more narrowly.
5  Broadly, this session was certainly characterized by
6  what I believe was an unprecedented number of pieces of
7  legislation that disproportionately impacted our
8  minority communities in the State of Texas, particularly
9  African-American and Latinos. Both the redistricting
10 efforts that were made and the disenfranchisement that
11 would occur as a consequence of the maps that were drawn
12 through that process. Legislation that was advanced
13 under the sanctuary city legislation that would have
14 essentially created local police force, immigration
15 officers specifically, to have a negative impact in our
16 Latino community. Pieces of legislation that were
17 advanced in order to remove undocumented persons from in
18 State tuitions in the State of Texas as currently exist.
19    I think this piece of legislation was part and
20 parcel of a broader and purposeful effort to
21 discriminate against minorities in the State of Texas.
22 More specifically, as I said to you before, I believe
23 that valid information was presented to the body of the
24 Senate that this legislation would have a
25 disproportionate impact on members of the minority



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

69

1   community.  That information was part of the record.
2   That information was not disputed by members who
3   advanced this legislation.  And efforts to help to
4   alleviate that disproportionate impact while maintaining
5   the integrity of the photo ID bill were ignored, for the
6   most part, without so much as even a discussion about
7   whether to consider the legitimacy of those
8   enhancements.  I believe, collectively, all of that
9   points to a purposeful effort to suppress minority vote.
10      Q.  Is it possible that the amendments that you
11  believe would have improved the bill and not reduced its
12  effectiveness, is it possible that the proponents of the
13  bill believed that they would reduce the effectiveness
14  of the bill while combating voter fraud?
15      A.  I can't say that that's the case.  Senator Duncan
16  advanced, as I said, the indigent amendment that I had
17  initially introduced.  I don't know whether he did that
18  thinking like a lawyer and wants to make sure that the
19  photo ID in the State of Texas could withstand the same
20  constitutional scrutiny as occurred in the Indiana case
21  or whether he, in his heart, agreed with me that that
22  was the right thing to do so as to not disenfranchise
23  currently franchised voters.
24      But I do know that he moved that amendment in,
25  that it was accepted and then it was stripped out.  And

70

1   an amendment is not stripped from a bill without
2   purposeful action to make that happen.  And I do not
3   believe that that amendment was removed for any reason
4   other than the fact that it would have weakened what was
5   the intention of the bill in terms of who would be
6   impacted by it.
7       Q.  So you believe that the provision that would have
8   provided an exception for indigent voters was removed
9   from the bill specifically to increase the negative
10  impact?
11      A.  Yes, I do.
12      Q.  On minority voters; is that right?
13      A.  Yes, I do.
14      Q.  Has anybody said anything to you that supports
15  that belief?
16      A.  No.  But no one has otherwise argued a reason for
17  not including it that went to any other purpose.
18      Q.  And you don't think it's possible that that
19  provision was removed from the bill out of a sincere
20  belief that it would reduce the bill's effectiveness?
21      A.  That's not my belief.
22      Q.  Is there anything specific that that bill is
23  based on?
24      A.  Four years in the Texas Legislature and my
25  understanding of the way things are there.  I have no

71

1   better way to say it than that.
2       Q.  Do you contend that individual legislators voted
3   in favor of SB 14 for the specific purpose of harming
4   African-American voters?
5       A.  Yes, I do.
6       Q.  Who do you contend voted for SB 14 for the
7   specific purpose of harming African-American voters?
8       A.  Every person who voted for it.
9       Q.  Does that include House members and Senate
10  members?
11      A.  Yes.  Put a better way, I think they had flagrant
12  disregard for whether African-American voters would be
13  impacted by the voter ID bill.  That's a better way to
14  say it.  That's how I would prefer to say it.
15      Q.  Well, I mean, do you or do you not contend that
16  individuals voted for SB 14 for the purpose of harming
17  African-American voters?
18      A.  I believe they had flagrant disregard for whether
19  it would harm African-American voters.  But I believe
20  that the bill's author, and in both the House and the
21  Senate, had a very purposeful intention of that
22  occurring.
23      Q.  You believe that the bill's authors sponsored and
24  voted for SB 14 because they wanted to harm
25  African-American voters; is that right?

72

1       A.  I believe they wanted to disenfranchise current
2   voters in the African-American and Latino communities,
3   yes, disproportionately.
4       Q.  What is your basis for that belief about the
5   bill's authors?
6       A.  I feel that we keep going round and round on this
7   question.  Again, more information has been advanced
8   with regard to voter fraud in the absentee ballot arena.
9   It was specifically pointed out to the bill's author as
10  part of his introduction to this bill.  That were his
11  concern truly voter fraud, that his effort and energy
12  and legislative direction would have been aimed toward
13  that purpose.  And he was unable to answer why he chose,
14  instead, to concentrate his energies on an arena where a
15  very, very small amount of fraud had ever been
16  demonstrated in the face of an understanding that
17  persons would be disenfranchised as a consequence of
18  such a law being put in place.
19      Q.  You assume that the bill's authors had an
20  understanding that people would be disenfranchised?
21      A.  Absolutely.  Chairman information was presented
22  that demonstrated that that was the case.
23      Q.  And you believe that that -- it's your contention
24  that that information was irrefutable and indisputable.  And
25      A.  I believe that it was extremely compelling.  And



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

73

1    that in the face of understanding that that might occur,
2    a person who had concern for that impact would have
3    acted otherwise in terms of their willingness to accept
4    amendments that might address it.
5        Q. So if somebody did not find the evidence as
6    compelling as you did or that other members might have,
7    it's -- you infer from that that they were acting
8    because they wanted to hurt minority voters; is that
9    right?
10       A. That's my inference.
11       Q. Did any of the bill's authors ever say anything
12   to you that expressly stated their intent to harm any
13   minority voter?
14       A. No.
15       Q. Did any member of the legislature ever make a
16   statement to you or to anybody else that you're aware
17   of, that they supported SB 14 because you wanted to
18   harm minority voters?
19       A. No.
20       Q. Do you contend that the legislature intended to
21   harm Asian-American voters by introducing SB 14?
22       A. I don't have an opinion on that.
23       Q. Do you contend that the legislature intended to
24   harm poor people by passing SB 14?
25       A. I believe that the legislature understood there

74

1    would be a disproportionate impact on poor people. And
2    that those populations were disproportionately minority.
3        Q. Do you believe the legislature intended to harm
4    elderly people by passing SB 14?
5        A. No, I don't. Not as a group, no.
6        Q. Do you believe that any legislator intended to
7    harm elderly people by passing SB 14?
8        A. No, I don't. Not specifically.
9        Q. Well, is it your testimony that you believe SB 14
10   will disproportionately impact elderly people?
11       A. I didn't say that.
12       Q. Okay. I should have phrased my question
13   differently. I meant to just ask if that was your
14   contention?
15       A. I don't have any understanding that that's the
16   case.
17       Q. Understood. Other than your understanding of the
18   effect of SB 14 and awareness of that effect on the part
19   of proponents of the bill, is there any other basis for
20   your contention that this bill was passed with a
21   discriminatory purpose?
22       A. No.
23       Q. Would you agree that members of the Texas
24   Legislature have a duty the represent their
25   constituents?

75

1        A. Yes.
2        Q. Would you consider that an important duty of any
3    elected official to represent constituents and represent
4    policy that constituents favor?
5        A. Yes.
6        Q. Is there anything wrong with a representative
7    voting for a policy that's favored by his or her
8    constituents?
9        A. No.
10       Q. Is it political rational for an elected official
11   to vote for a policy that's favored by his or her
12   constituents?
13       A. Well, it's politically rational. Is it always
14   right? Perhaps not. Certainly it's been the case in
15   the history of the United States that there were
16   sentiments that part of the political process that were
17   expressly centered at discriminatory purposes. Do I
18   believe that a person who's elected by his constituents
19   should advance something that's motivated by those
20   beliefs, no. Do I believe that all persons who favor
21   voter ID in the State of Texas are motivated by racially
22   discriminatory intent, no. But I believe that most
23   people in our communities don't really understand the
24   impact that such a law can have on members of the
25   minority community. Nor do I think they understand the

76

1    nuances of how a photo ID bill can be improved, such
2    that that disproportionate impact is minimized as much
3    as possible. That's our job as legislators to really
4    understand the nuances of the laws that we advance.
5        Q. So it's not your contention that the majority of
6    people in Texas who support voter ID support it for an
7    illegitimate reason?
8        A. Absolutely not.
9        Q. And you don't contend that the majority of people
10   in Texas who support voter ID believe it will have a
11   disproportionate impact on racial minorities?
12       A. No, I do not believe that.
13       Q. And it's accurate to say, isn't it, that the
14   majority of voters in Texas support voter ID
15   legislation; is that right?
16       A. I don't know.
17       Q. Do you have any basis to dispute the majority of
18   voters in Texas support voter ID legislation?
19       A. No, I don't.
20       Q. So if a representative or a senator whose
21   constituents overwhelmingly favored voter ID, voted for
22   a voter ID bill, was there anything wrong with that?
23       A. I believe if they voted for a voter ID bill where
24   evidence had been put in front of them, such that
25   persons who were minority would be disproportionately



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

77

1   impacted by it and that there were ways to improve upon
2   it, then I do think there's something wrong with that.
3        Q.  What if an elected official didn't believe that
4   it would have -- that SB 14 or any voter ID bill would
5   have a disproportionate racial impact, if they sincerely
6   believed that, would there be any illegitimate purpose
7   in their voting for the bill?
8        A.  I can't be in the mind of every legislator,
9   obviously.  I can only be in my own mind.  What I can
10  tell you is I believe compelling information was
11  produced that should have raised those concerns in the
12  minds of reasonable people.  And that solutions that
13  were advanced that could have eased those concerns
14  merited consideration.
15       Q.  So you mentioned "reasonable people."  Do you
16  believe that -- do you believe that if a legislator who
17  had considered all the evidence that you considered did
18  not -- still did not believe that there would be a
19  disproportionate racial impact of SB 14, do you believe
20  that would be an unreasonable belief?
21       A.  Yes.  I don't know how they could really
22  understand it otherwise, with all of the information
23  that was put in front of us.
24       Q.  If a legislator voted for SB 14 based on a
25  sincere, but maybe unreasonable belief in its effect,

78

1   would that be an act of intentional discrimination?
2        A.  Not as you just described it.
3        Q.  Other than your lawyer, have you discussed this
4   lawsuit with anybody?
5        A.  No, I have not.
6        Q.  You haven't discussed this lawsuit with any of
7   the parties to the lawsuit?
8        A.  No, I have not.
9        Q.  Have any of the parties to this lawsuit asked you
10  to testify?
11       A.  Any of the parties?
12       Q.  Uh-huh.
13       A.  No.
14       Q.  Did you speak with anybody at the Department of
15  Justice about Senate Bill 14?
16       A.  Yes, I did.
17       Q.  With whom did you speak?
18       A.  I don't recall.
19       Q.  Did you talk to the DOJ over the telephone?
20       A.  Yes, I did.
21       Q.  How many times did you speak to DOJ?
22       A.  Twice.
23       Q.  Do you remember, roughly, when that was?
24       A.  Within the last six months.  That's as best I can
25  tell you.

79

1        Q.  Did you send any letters or e-mails to DOJ about
2   SB 14?
3        A.  I did not, not that I recall.
4        Q.  Do you remember about how long your telephone
5   conversations lasted with DOJ?
6        A.  I had two conversations.  Each lasted probably
7   between 30 minutes and an hour.
8        Q.  Do you recall what you discussed with the
9   Department of Justice?
10       A.  My recollection of the debate about the bill, the
11  amendments that I introduced and that others introduced.
12       Q.  Do you recall whether the Department of Justice
13  asked you if you believed SB 14 was passed with a
14  discriminatory purpose?
15       A.  I don't recall them asking me that question
16  specifically.
17       Q.  Do you recall that the Department of Justice
18  asked you if you believed SB 14 would have a
19  discriminatory effect?
20       A.  I don't recall them specifically asking me that.
21       Q.  Do you recall whether you told the Department of
22  Justice that SB 14 would have a discriminatory effect?
23       A.  I don't recall.
24       Q.  Do you recall whether you told the Department of
25  Justice that SB 14 had a discriminatory intent?

80

1        A.  I don't recall.
2        Q.  Did the Department of Justice ask you to provide
3   a declaration in this lawsuit?
4        A.  Not that I recall.
5        Q.  Did they ask you to provide any kind of statement
6   in this lawsuit?
7        A.  Not that I recall.
8        Q.  Did they ask you to provide -- did the Department
9   of Justice ask you to provide any declaration before
10  this lawsuit for purposes of preclearance?
11       A.  Not that I recall.
12       Q.  Has the Department of Justice asked you to
13  provide any testimony in this lawsuit?
14       A.  No, they've not.
15       Q.  Has the Department of Justice asked you to do
16  anything in this lawsuit?
17       A.  No, they've not.
18            MR. FREDERICK:  At this time I would reserve
19  all further questions for the time of trial.  Pass the
20  witness.
21            MR. DUNN:  Thank you, Mr. Frederick.  Do you
22  have any questions, Department of Justice?
23            MR. WILLIAMSON:  Department of Justice has
24  no questions.
25            MR. DUNN:  Great.  We'll reserve for trial.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012

81

1    Thank you.
2          (Deposition concluded.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

82

1                CHANGES AND SIGNATURE
2              RE: STATE OF TEXAS VS. HOLDER
3
4    PAGE  LINE   CHANGE        REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

83

1        I, SENATOR WENDY DAVIS, have read the foregoing
     deposition and hereby affix my signature that same is
2    true and correct, except as noted above.
3
               SENATOR WENDY DAVIS
4    THE STATE OF TEXAS   )
                          )
5    COUNTY OF _____)
        Before me, _____, on this day
6    personally appeared SENATOR WENDY DAVIS, known to me (or
     proved to me under oath or through
7    (description of identity card or other document) to be
     the person whose name is subscribed to the foregoing
8    instrument and acknowledged to me that they executed the
     same for the purposes and consideration therein
9    expressed.
10      Given under my hand and seal of office this _____
     day of            ,   .
11
12           NOTARY PUBLIC IN AND FOR
             THE STATE OF
13
14
15
16
17
18
19
20
21
22
23
24
25

84

1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
2    STATE OF TEXAS        )
3                          )
                           )
4    VS.              ) NO. 12-CV-128
                      ) (DST, RMC, RLW)
5                     )
     ERIC H. HOLDER, JR.,   )
6    ET AL           )
7    ******************************************
          CERTIFICATE FROM THE
8          ORAL DEPOSITION OF
          SENATOR WENDY DAVIS
9    ******************************************
10      I, Janalyn Reeves, a Certified Shorthand Reporter
     in and for the State of Texas, do hereby certify that
11   the foregoing deposition is a full, true and correct
12   transcript;
13      That the foregoing deposition of SENATOR WENDY DAVIS,
14   the Witness, hereinbefore named was at the time named,
15   taken by me in stenograph on June 6, 2012, the said
16   Witness having been by me first duly cautioned and sworn
17   to tell the truth, the whole truth, and nothing but the
18   truth, and the same were thereafter reduced to
19   typewriting by me or under my direction.  The charge for
20   the completed deposition is $_____ due from
21   Plaintiff
22   () That pursuant to the Federal Rules of Civil
23   Procedure, the Witness shall have 30 days after being
24   notified by certified mail, return receipt requested, by
25   the deposition officer that the original deposition



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                      June 6, 2012

85

1  transcript is available in her office for review and
2  signature by the Witness and if any corrections made are
3  attached hereto;
4    () That by agreement of counsel, a reading condensed
5  copy of the deposition transcript along with the
6  full-size original changes and Signature Sheet has been
7  sent to_____ on_____ for review and
8  signature within 30 days and if any corrections returned
9  are attached hereto;
10   () That by agreement of counsel, the deposition
11 officer is instructed to release the original deposition
12 transcript to_____ on_____, for review and
13 signature, and the deposition officer is thereafter
14 released of any further responsibility with regard to
15 the original.
16   () That the Witness shall have thirty (30) days for
17 review and signature of the original transcript and if
18 any corrections returned are attached hereto.
19   () That the signed transcript () was () was not
20 received from the Witness within 30 days.
21   () That the examination and signature of the Witness
22 is waived by the Witness and the parties;
23    That the amount of time used by each party at the
24 deposition is as follows:
         Mr. Matthew Frederick - 2 hours 9 min
25       Mr. Chad Dunn - no time

86

1    I further certify that I am neither counsel for,
2  related to, nor employed by any of the parties in the
3  action in which this proceeding was taken, and further
4  that I am not financially or otherwise interested in the
5  outcome of the action.
6      WITNESS MY HAND, this the_____ day
7  of_____, A.D., 2012.
8      _____
       JANALYN REEVES
9      Cert. No. 3631
       Expires Dec. 12
10     100 Congress
       Suite 220
11     Austin, Texas  78701
       (512)634-1980
12     Firm Registration No. 283
13
14
15
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis

June 6, 2012

87

---

| A |
| --- |

**A.D**
86:7

**ability**
42:2 50:24
51:3,6,10
64:10

**able**
10:24 11:5
14:2 37:9
56:2 62:7

**abridging**
36:22 37:2,20

**absent**
40:12

**absentee**
40:14,18,21
41:1 43:15
45:2,5 57:4
58:1 72:8

**absenteeism**
57:12

**absolute**
39:14

**Absolutely**
72:21 76:8

**accept**
8:1 73:3

**acceptable**
10:15 14:18

**accepted**
7:21 9:5 12:8
31:13 59:10
69:25

**access**
61:4,24 63:3,
12,17,20
64:3,10,15

**accommodation**
9:23

**accurate**

25:4 34:16
36:9,13 58:14
76:13

**accurately**
4:15

**accusations**
44:19

**accused**
44:14

**acknowledged**
83:8

**act**
78:1

**acted**
28:6 73:3

**acting**
73:7

**action**
70:2 86:3,5

**added**
12:22 32:17

**address**
13:6 14:5
33:20 40:20
41:3,6 42:8
43:20 45:14
46:2 52:10
56:18 57:3
58:19 73:4

**addressed**
7:23 26:12
40:14,24
41:15 42:25
43:17 44:22
45:21 46:19
56:21 58:21

**addressing**
45:11 46:1
57:5

**adequate**
12:2 30:21

**administer**

14:24

**administration**
45:15 46:1

**administrator**
14:16

**administrators**
14:9

**adopted**
22:22 23:1
24:21

**adoption**
22:25 23:3,
13,14,20
24:18 31:1
35:3

**advance**
22:7 24:8
26:22 31:7
49:20 75:19
76:4

**advanced**
21:7 22:2,18,
24 23:12,16,
18 24:4,7,23
29:24 41:4
42:4 45:20
58:19 68:12,
17 69:3,16
72:7 77:13

**advancement**
47:24

**advancing**
23:3 40:12
41:7 47:1

**advocacy**
16:9,25

**Affairs**
32:3,11,12

**affect**
23:23 66:16

**affidavit**
9:1,4,16
11:10

**affix**
83:1

**afford**
11:6 38:8

**African**
49:10

**African-American**
11:19 12:6
36:22 37:7,
12,15,21 39:7
40:22 45:13
46:8 52:23
53:8 54:1,5,
20,25 55:7
64:1,9 66:10
67:16,24 68:9
71:4,7,12,
17,19,25 72:2

**African-Americans**
39:19,23
45:23 67:17

**afternoon**
4:3

**age**
7:5,7 59:8,
11,16

**ago**
13:4 14:15
17:13 34:5
45:3 48:21
51:5

**agree**
24:4 33:6
34:11 74:23

**agreed**
69:21

**agreement**

1:14 85:4,10

**ahead**
18:18 27:3

**aimed**
72:12

**AL**
1:6 84:6

**alarming**
46:21

**alleviate**
46:20 69:4

**alleviated**
11:11,13

**allow**
9:5 28:1
33:13 46:18
61:6

**allowed**
9:1 13:16
22:10 23:4
33:7,23 34:2
51:1

**allowing**
8:1 11:9 51:9

**allows**
24:5 25:10

**along**
85:5

**already**
39:16

**also**
5:3,14 8:15
9:15 10:16,18
11:16 12:7,
15,23 20:7
22:6,17 32:3
37:11 38:19
48:9 55:19
56:2,21 61:15

**alternative**
54:15

**although**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

12:21 36:6
**always**
26:15 27:15
28:13 32:9
33:3 75:13
**amendment**
7:23 8:9,12,
15,16,24,25
9:14,22 10:2
11:11 12:13,
19,23 13:5
18:13 32:18
42:25 43:24
48:2,4,7,10,
15 51:1 55:17
59:6,10
69:16,24
70:1,3
**amendments**
5:20 6:15
7:17,19,21
9:10 11:14
13:15 18:9,15
20:9 31:8
46:7,10,13
47:7,17,21,24
50:22,23,25
51:5,15 69:10
73:4 79:11
**Americans**
49:10
**amount**
14:7 41:12
57:23,24
72:15 85:23
**analysis**
38:23 49:24
50:3
**Anglo**
40:25 52:24
53:3 61:11,
12,14 64:4,8,
14 66:12
67:20

**another**
13:5 25:20
26:5 28:24
50:15 58:21
**answer**
4:19 5:4,8
18:5 34:4
63:5 72:13
**answered**
26:24
**answering**
4:15 5:3,5
**ANSWERS**
1:9
**anybody**
5:25 19:5
70:14 73:16
78:4,14
**apparent**
39:11
**appear**
16:15,17,18
35:12
**Appearances..
.............
.............
.**
3:3
**appeared**
83:6
**appears**
13:20
**application**
59:8
**apply**
23:24
**appropriate**
42:8
**approved**
12:20

**area**
54:7,9 61:23
**areas**
61:24 63:22
**arena**
40:18,19 41:1
43:16 72:8,14
**argued**
8:8 70:16
**argument**
43:3 62:10
**arguments**
8:11 20:10
48:8 60:23
61:1,7 62:19
**arisen**
27:7
**around**
45:20
**articles**
15:12
**Asian**
66:12 67:20
**A s i a n -
A m e r i c a n**
73:21
**aside**
22:9
**asked**
8:11,15 14:24
15:25 17:5
21:5 38:16
39:9,20 40:11
49:5 50:4
64:21 67:4
78:9 79:13,18
80:12,15
**asking**
35:23 49:18
65:5 66:22
68:2 79:15,20

**assigned**
35:11
**assistance**
34:13
**associated**
10:7
**assume**
47:11 72:19
**assumed**
26:15 27:15
**assumes**
47:11
**assuming**
9:4
**assumption**
44:22
**assure**
46:22,23
47:18
**assured**
22:3 39:10
**assuredly**
41:8
**attached**
85:3,9,18
**attempt**
40:20 65:7
**attempted**
38:14
**attempts**
46:7
**attend**
34:21 35:5
**ATTORNEY**
2:3 4:4 20:3
41:15,22 42:1
57:3,6,8,14
**audibly**
4:19
**Austin**

1:13 2:5
86:11
**author**
8:16 21:5
71:20 72:9
**authors**
71:23 72:5,19
73:11
**available**
50:11,14 85:1
**Avenue**
1:13 2:8
**average**
59:4,18,21
**aware**
27:4,5,7
28:14,16
38:11 43:5,9
56:8,10 57:13
59:24 65:13
66:25 73:16
**awareness**
74:18

---
**B**
---

**back**
9:10 19:9
24:25
**background**
19:2 20:9
**Baker-Carter**
21:1 40:2
47:2 56:18
59:6
**balances**
31:9
**ballot**
7:25 9:7
13:17,22 14:2
42:6 43:8,12,
15,20 44:6
45:5 46:19,22
50:25 57:10,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

12,15,18
58:9,12,15
72:8

**balloting**
40:14

**ballots**
42:9

**based**
8:7 10:17
38:1 70:23
77:24

**basis**
36:25 39:20,
22 46:4 55:5
68:3 72:4
74:19 76:17

**behalf**
35:8 47:19
61:13 66:25

**behest**
33:14

**being**
4:1 14:8 22:5
27:6 30:9
35:11 36:5
40:14,24 41:4
47:23 48:8,19
49:23 55:3
58:20,21 59:5
60:23 61:7
64:14 72:18
84:23

**belief**
11:8,22,24
36:25 39:20,
22 40:19,20
41:9 42:7,17,
22 54:12
60:18 68:3
70:15,20,21
72:4 77:20,25

**beliefs**
75:20

**believe**
9:9 11:17
12:21 17:20,
23 20:23
21:20 23:20
24:16 26:5
28:20,21
31:24,25
32:1,12 36:21
37:1,14,17,
19,22 38:16
39:12 42:24
43:21,22
44:22 45:8,19
46:2 47:4
48:14,17,18
51:12,24
52:17,18 54:2
55:2,15,19,
20,22 56:1,
14,17 57:1,2
59:3,8,15,17,
20 60:3,8,16,
19 64:11 67:3
68:6,22 69:8,
11 70:3,7
71:18,19,23
72:1,23,25
73:25 74:3,6,
9 75:18,20,22
76:10,12,23
77:3,10,16,
18,19

**believed**
8:6 12:14,19
26:22 39:14,
17,18 69:13
77:6 79:13,18

**best**
17:17,21
27:10 78:24

**better**
20:5 24:13
71:1,11,13

**between**
1:12 31:1
51:17,25 52:5
55:13 62:4
79:7

**bias**
44:19

**Bill**
7:14,16 8:17
14:4,5 15:23
16:22,25
20:22 21:3,4,
7,14 22:2,4,
6,7,9,12,17,
18,24 23:3,
15,23,24
24:2,3,5,7,
12,13,17,19,
21 25:2,10,
18,23,24,25
26:3,5,6,7,8,
9,16,17,25
27:1,6,11,12,
13,15,18,22,
24 28:3,6,11,
12,21,23,24
29:1,3,5,15,
16,17,19,22
30:1,2,4
31:13,15
32:18,22
33:19 35:1,
11,14,20 37:1
38:22 39:5
40:5,9 41:14
42:16 43:3,
14,23,25
45:19 46:6,
18,24 48:2
55:23 57:1
59:7,14 61:2
69:5,11,13,14
70:1,5,9,19,
22 71:13
72:10 74:19,

20 76:1,22,23
77:4,7 78:15
79:10

**bills**
18:16 22:23
23:25 25:23,
25 27:22
28:9,17 29:24
35:6,8,9,10,
17 43:19 47:9

**bill's**
21:5 70:20
71:20,23
72:5,9,19
73:11

**bipartisan**
47:1

**birth**
10:7

**bit**
24:25 39:16

**blocker**
24:2,7,13,19
25:2,24 26:9,
16 27:1,5,9,
11,13,15,16,
18,21 28:3,12
29:16,17
30:1,4

**board**
10:1,2

**body**
23:2 34:6
40:7 47:16
68:23

**both**
17:12 21:2,20
22:1,8,25
31:9 39:4,25
40:5 41:13
43:22 46:6
68:9 71:20

**box**

42:6 46:19,22
50:25 57:10

**BRAZIL**
2:10

**brief**
4:18 6:7

**bring**
6:19 26:4
27:24 28:23
29:5,10,14
30:2

**broad**
12:23 13:5
38:1 56:21

**broader**
13:12 40:22
68:20

**broadly**
68:4,5

**brought**
29:6

**bus**
38:4

**business**
23:2 24:6
25:7,10,15,
25 26:2,18
27:20 28:8,
18,25 29:2,12
31:14

────── C ──────

**C**
2:1

**call**
25:23

**called**
1:10 27:21
31:25

**calling**
34:17

**calls**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis                                    June 6, 2012
90

47:2

**came**
20:24,25
23:17 24:23
25:25 28:24

**candid**
49:24

**cannot**
41:11 53:21
65:12,16,23

**capacity**
62:3

**captures**
37:18

**car**
53:17,21
62:17 63:7

**card**
12:11,25
13:1,3,7
14:17 51:18
83:7

**cards**
33:17 66:24

**cars**
63:13

**Carter-Baker**
30:19 31:7,10

**case**
4:12,17 20:13
22:17 33:3
44:5 49:23
50:21 52:17,
21 54:6,8
55:4,22 56:19
64:11 67:10
69:15,20
72:22 74:16
75:14

**cases**
57:13 58:6

**cast**

13:21 14:2

**category**
37:25 38:8
50:6 62:13
63:18 64:14

**caucus**
19:16,17,22
20:15,21,25

**caught**
26:20 38:3
42:5 56:2,20

**caused**
30:17

**cautioned**
84:16

**centered**
75:17

**Cert**
86:9

**certain**
46:12

**certainly**
23:10 35:19
39:11,24
49:4,18 50:4
54:3,7 55:22
57:8,22 58:16
63:22 64:13,
21 66:14,21
68:5 75:14

**certainty**
41:11

**Certificate**
3:7 10:8 84:7

**Certified**
1:11 84:9,24

**certify**
84:10 86:1

**CHAD**
2:11 5:14
85:25

**chair**

33:10,12,14
35:24 36:1,3,
18

**Chairman**
72:21

**challenge**
63:16

**change**
51:18 82:4

**changed**
13:10,11

**Changes**
3:6 82:1 85:6

**characterized**
68:5

**charge**
84:19

**chooses**
33:12

**choosing**
48:19

**chose**
72:13

**circularity**
10:10

**cities**
54:6

**citizens**
39:8

**city**
26:6 28:20,21
68:13

**Civil**
84:22

**class**
37:5

**clear**
14:19 49:21

**co-author**
9:15

**collectively**
42:24 69:8

**Colonians**
61:23

**color**
12:6

**COLUMBIA**
1:1 84:1

**combatting**
69:14

**come**
23:4 25:24
26:1 27:23
29:20,22
35:8,22 38:5
56:4

**comes**
14:12

**coming**
26:17,18 27:2

**commit**
14:25 15:6

**committed**
14:8 44:20,24
45:6 61:3

**committee**
8:19,21,22
16:14 19:23
22:5,11,14
29:25 31:16,
18,21,23,24
32:6,7,11,15
33:7,8,10,
17,23 34:1,7,
8,9,13,14,
17,18,20,22,
23,25 35:2,3,
5,10,11,12,
14,16,18,22,
25 36:9,13,18

**committees**
35:7

**committing**
42:6

**communities**
40:4 49:8
53:8 54:5
55:24 60:24
61:9,11,15
62:5,12,15,
22 63:12,14,
16,21 64:2
68:8 72:2
75:23

**community**
37:13,16 39:8
40:23 46:3,9
53:12 55:21
61:12,18,20,
25 62:1,7,24
63:2,4,6,9
64:5,6,7,13
68:16 69:1
75:25

**Comparativel
y**
40:15

**compelling**
62:23 72:25
73:6 77:10

**compensating**
30:22

**complete**
47:25

**completed**
84:20

**component**
38:10

**comprised**
63:24

**concealed**
6:25

**concentrate**
72:14



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

concentrated
20:1
concern
10:17 11:18
13:12 14:5,21
30:20 37:17,
25 39:6 41:4
47:25 48:3,7,
9,16 55:18
60:13,20
61:13 72:11
73:2
concerned
10:23 11:3
concerns
11:15 12:7
17:6 20:7
38:22 46:20
56:18 61:22
77:11,13
conclude
37:8,11
concluded
81:2
conclusion
49:15
condensed
85:4
conduct
21:8
conducted
28:15 38:23
conference
8:19,21
Congress
12:21 86:10
consequence
30:21 40:9
42:15 46:24
55:25 68:11
72:17
consequences

41:16 44:11
consider
27:3 61:17
69:7 75:2
consideration
18:12 77:14
83:8
considered
24:1 25:11
26:3 27:8,14
28:17 38:12
48:10 77:17
considering
8:10
constituents
16:18 17:3,9,
18,20,22,25
18:1,3 64:23
65:4,7,10,17,
21 74:25
75:3,4,8,12,
18 76:21
constitutiona
l
8:7 69:20
constraints
36:7
contend
45:4 51:2
52:4,9 56:11,
13 67:23
71:2,6,15
73:20,23 76:9
contention
44:18 45:4
46:12 51:9
52:14,22 53:1
72:23 74:14,
20 76:5
context
21:25
controversial

19:19 26:5
28:24 35:21
convene
23:2
conversation
6:8,10 57:5
conversations
17:4,8 46:17
79:5,6
copy
20:24 85:5
correct
9:21 23:1
25:1 28:5,7
31:17,20
36:20 66:14
67:22 83:2
84:11
corrected
50:23
corrections
85:2,8,18
correctly
28:3
corresponding
56:19 57:24
cost
10:7,16
costs
11:4
council
5:11
counsel
1:14 85:4,10
86:1
counted
9:5,17
counter
31:9
County
20:12 83:5

course
13:24 31:14
51:5
COURT
1:1 4:19 5:1
8:3,4,6 20:2
84:1
courtesy
34:6,8 35:13,
20
Court's
12:17
Crawford
20:12 67:10
create
33:21 38:1
53:11
created
10:1 22:22
51:14 68:14
creates
44:18
Creek
2:11
cured
9:8,19
current
6:23 7:10
10:20 39:8
45:14 46:1
72:1
currently
6:21 10:21
11:1,25 38:24
40:10 42:12
50:7 53:9
55:1 68:18
69:23
customary
26:9 28:11
Cypress
2:11

| | D |
| --- | --- |

data
50:10
date
9:8
DAVIS
1:7,9 3:4
4:1,3,7,8
13:2,4 83:1,
3,6 84:8,13
day
1:12 14:16
23:1 25:23
26:8,17 27:1,
6,12 29:1
30:23 38:7
83:5,10 86:6
days
84:23 85:8,
16,20
DC
2:8
deal
14:11 26:13
40:25
dealt
57:15,17,20
debate
5:21 7:15
8:11 9:25
14:4 19:24
21:3,4,24
22:8,13,17
26:13 29:6
32:16 36:6
39:4 40:5
41:14 47:19
48:11 60:22
79:10
debated
21:14 22:3,5,
9 27:14 48:10
debates



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

46:5 55:9

**Dec**
86:9

**decision**
33:10 48:1

**declaration**
80:3,9

**decrease**
30:17

**DEFENDANT**
2:6

**defensible**
47:17

**degree**
48:11

**delayed**
31:1

**delivered**
15:9

**Democratic**
19:16,21
20:15,20 24:3
26:21 42:23
43:23 44:15

**demonstrate**
55:4

**demonstrated**
10:2,10 40:7
48:5 49:3
72:16,22

**demonstrates**
40:17

**denying**
36:22 37:20

**DEPARTMENT**
2:7 10:5 50:8
66:20 78:14
79:9,12,17,
21,24 80:2,8,
12,15,22,23

**depend**

29:23

**depending**
54:6

**Depends**
32:7

**deposed**
4:8

**DEPOSITION**
1:7,9 5:18
6:1,6,13,17
81:2 83:1
84:8,11,13,
20,25 85:5,
10,11,13,24

**describe**
7:13

**described**
78:2

**describing**
41:22

**description**
83:7

**designation**
23:22 24:12,
16

**designed**
46:13

**detect**
43:4,8,12,15

**determination**
50:1,11,16,18
67:1

**determined**
66:17

**determining**
57:25 66:18

**deterrent**
42:19

**dialogue**
7:15

**didn't**

6:7 10:23
12:9 14:25
15:6 25:24
26:4 47:19
48:13 55:15
74:11 77:3

**different**
10:12 16:1
23:9 55:13
66:4

**differently**
26:11 52:23
53:2 74:13

**difficult**
43:4,8,11
44:5 59:23
60:9

**difficulty**
58:25

**dios**
35:14

**direction**
72:12 84:19

**disabled**
59:17

**disagree**
43:10 44:17

**discovered**
42:9,21 58:6,
12

**discrepancies**
12:24

**discrepancy**
12:11 14:19
51:17,25
52:10 66:22

**discretion**
35:24 36:1,4

**discriminate**
68:21

**discrimination**

78:1

**discriminatory**
47:8,12,14
74:21 75:17,
22 79:14,19,
22,25

**discussed**
21:18 27:21
47:16 48:25
78:3,6 79:8

**discussion**
47:22 48:6
69:6

**discussions**
40:1 46:5

**disenfranchise**
69:22 72:1

**disenfranchised**
49:7 55:20,25
72:17,20

**disenfranchisement**
38:24 42:14
46:20,23
47:18 68:10

**disenfranchising**
40:10 45:23

**disparate**
47:25 48:14,
18,22 49:16
60:10

**disparity**
55:13

**display**
9:25 10:2

**disproportionate**

37:12 45:12,
22 46:8 52:15
53:11 55:16
61:2 62:11
68:25 69:4
74:1 76:2,11
77:5,19

**disproportionately**
12:5 37:6,22
39:6 45:17
49:10 52:1,6,
11,19 53:7,25
54:4,21 55:6,
24 63:24
64:12 68:7
72:3 74:2,10
76:25

**dispute**
76:17

**disputed**
69:2

**disregard**
39:12 71:12,
18

**distinction**
64:8,9

**distinguishing**
62:4,10

**distribution**
21:23

**DISTRICT**
1:1 16:1,4,21
54:3,13 84:1

**divorce**
51:19

**divorced**
12:14

**document**
10:11,13 83:7

**documentatio**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

n
10:3,22 13:9

documents
6:16,19 10:6,
12,14,24
65:18,22,25

doing
35:20

DOJ
49:5 50:4
78:19,21
79:1,5

dollars
41:17 57:9

DPS
61:5,25 62:9,
16,18,25
63:3,7

drawn
8:12 68:11

driver's
6:23 7:11
10:4 12:25
13:2,7 37:23
38:5 53:10
55:1,6 62:6
63:8,10 66:22

drives
30:25

DST
1:4 84:4

due
84:20

duly
4:1 84:16

Duncan
8:10 9:11
69:15

Duncan's
9:14

DUNN
2:10,11 5:14

80:21,25
85:25

during
5:21 8:11
9:25 16:7,10
17:9 55:8

duty
74:24 75:2

---
E
---

E
2:1

each
10:6,14 11:15
21:13 22:11
34:6 35:12
42:3 79:6
85:23

earlier
37:4 48:25
51:16 57:2
58:17 67:9

eased
77:13

easier
43:15 62:14,
17 63:1,3,6

East
1:13

easy
9:12

education
15:4 31:2
38:2,9

effect
11:12,14
13:14 36:21
37:19 49:13
56:1 74:18
77:25 79:19,
22

effectiveness
69:12,13

70:20

effort
41:21,22
57:23,25
58:14 68:20
69:9 72:11

efforts
46:23 66:25
68:10 69:3

either
10:4 13:9
16:7,10,13
17:9 21:18
28:20 32:3
43:19 45:25
48:18 49:1
65:5

elderly
59:3,14 74:4,
7,10

elected
75:3,10,18
77:3

election
8:1 14:9 15:2

elections
14:6,15

e-mail
5:20

e-mails
17:12 19:18
79:1

embraces
47:4

emergency
23:16,23
24:8,11,16,22

employed
86:2

enable
49:25

enacted

11:18 13:19,
25 60:3

enacting
67:25

end
38:7

energies
72:14

energy
57:11 72:11

engaged
45:17

enhance
31:11

enhanced
42:4

enhancements
69:8

enhancing
61:4

enormous
41:12

enthusiasm
57:11

ERIC
1:5 84:5

especially
21:25

essentially
8:13 27:23
28:22 68:14

ET
1:6 84:6

ethnic
55:14 66:4,19

everybody
48:22

evidence
30:13 32:14
33:8,24 34:2,
7,14 35:9

36:11 38:12
45:8 46:15
47:5,14
48:22,23
52:20 58:20
73:5 76:24
77:17

exact
13:1

exactly
12:24 13:6
14:10,12 25:8
47:2 59:16

Examination
3:5 4:2 85:21

example
10:7 13:1
61:22 67:16

exception
8:5,7 11:9
12:19 59:13
70:8

exceptions
51:14

exclusive
42:1

executed
83:8

exemption
59:13

exercise
11:1 56:3

exist
68:18

existence
40:8

exists
40:13 42:7

expansion
61:6

expenditure
56:14



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

experience
4:18 14:14
44:2

Expires
86:9

explain
68:3

express
30:20 33:18
60:13

expressed
17:5 20:7
37:17 61:22
83:9

expressing
61:13

expressly
73:12 75:17

extent
9:13 42:7
57:25

extremely
72:25

**F**

face
72:16 73:1

fact
8:7 27:22
35:1 36:8
48:19 49:23
50:16,17,20
70:4

failed
57:10

fair
25:11

fairly
12:23 25:22
30:25 32:22
35:6,12 36:8
39:11 49:24

fall
37:24 49:8
62:11,13

falls
50:6

familiar
43:2 56:5
66:3 67:11,12

far
62:6

favor
17:12 33:19
42:25 71:3
75:4,20

favored
75:7,11 76:21

feature
62:4

Federal
84:22

feel
72:6

felt
11:16

ferret
41:13,18
50:24 51:3,6,
10 57:10

ferreting
57:11

file
28:11

filed
23:14 24:2,8
27:6,11 28:6

filing
24:18

fill
33:18

final
59:14

financially
86:4

find
9:12 43:13
46:21 73:5

finish
5:3

Firm
86:12

first
4:1 23:1
26:19 30:5
47:12 50:15
84:16

fit
38:8 63:17
64:14

five
32:9

flagrant
39:12 71:11,
18

floor
5:22 7:16 8:9
11:17 16:12
18:10 19:24
22:6,8,12,15
23:19 26:4
27:24 28:23
29:5,6,11,25
30:2 59:11

following
49:4

follows
4:1 85:24

force
68:14

foregoing
83:1,7 84:11,
13

form
10:14 12:2

64:17,20

formal
33:5,21

formally
35:1

formed
20:8

forms
10:15 13:9
14:1 51:10,21
64:24 65:14

forth
1:15 19:10

forward
23:4 24:17
26:25 28:23
38:22 40:8
42:15 47:14

found
20:6

Four
70:24

franchised
69:23

fraud
40:8,13,16,
17,19,21,24
41:3,6,10,
13,20 42:2,6,
7,8,18 43:1,
4,7,8,11,12,
15,20 44:6,
11,14,18,20,
24 45:1,2,5,
9,10,17,21
46:1,2,19
50:24 51:3,7,
11 57:4,5,10,
12,15,18,21,
24 58:1,3,6,
9,12,15,18,
20 59:1 69:14
72:8,11,15

FREDERICK
2:4 3:5 4:2,4
80:18,21
85:24

free
10:25

frequent
35:12 45:9

front
24:6,19 25:3
26:13 28:12
29:21 40:6
52:20 76:24
77:23

full
4:6 84:11

full-size
85:6

functioned
22:14

funded
31:2

funding
38:1

further
80:19 85:14
86:1,3

future
12:9

**G**

gave
20:3 47:16

GENERAL
2:3 4:4 17:4
39:22 42:1

generally
7:13 17:19
30:12,19
48:25

general's
41:15,23



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

57:3,6,8,14

**genuine**
48:12

**getting**
13:9 59:25
61:1

**give**
15:15 16:15

**given**
15:23 35:13
65:1 83:10

**giving**
47:22 62:22

**go**
4:18 10:22
12:1 24:6
25:18 27:2
62:25 66:12,
18

**goes**
13:14

**going**
13:18 14:19,
23 19:9 26:24
49:22 55:16
62:5 72:6

**gone**
32:2,3 39:16

**Good**
4:3 12:19
14:3 50:5

**Governor**
12:18 23:15
36:4,19

**governor's**
23:22 24:11,
22

**gravest**
38:22

**great**
14:5 26:12
40:25 80:25

**greater**
42:13 54:24
58:17 63:16

**ground**
4:18

**group**
16:9,25 25:23
45:18 52:7
74:5

**groups**
52:2,12,19
55:14 66:4,19

**guess**
16:13 20:4
28:17

────────── H ──────────

**H**
1:5 84:5

**hand**
83:10 86:6

**handed**
33:4

**handgun**
6:25

**happen**
26:14 28:1
32:24 70:2

**happened**
15:21 16:2,3
23:6,7

**happens**
24:1 32:22

**happy**
4:24

**harder**
59:25 60:25
62:5

**harm**
67:24 71:19,
24 73:12,18,
21,24 74:3,7

**harming**
71:3,7,16

**hat**
20:4

**haven't**
78:6

**head**
4:20

**hear**
19:9

**hearing**
10:18 12:4
16:11 21:15
22:11 30:16
65:6

**hearings**
33:18 35:13

**heart**
45:25 66:21
69:21

**Hebert**
5:15

**help**
69:3

**helped**
18:14

**her**
9:17 14:20
32:20 49:25
75:7,11 85:1

**hereby**
83:1 84:10

**hereinafter**
1:15

**hereinbefore**
84:14

**hereto**
85:3,9,18

**higher**
58:9,11 67:17

**Hispanic**

53:2 66:12
67:21

**history**
75:15

**HOLDER**
1:5 82:2 84:5

**honestly**
26:20

**hour**
79:7

**hours**
1:12 61:6
85:24

**House**
8:21 25:23,25
26:3,8,17,25
27:1,6,9,12,
13,17 28:25
29:9 71:9,20

**household**
7:4,7

**Houston**
2:12

**hurt**
73:8

────────── I ──────────

**ID**
5:21 8:3 9:20
10:5,14,15,
25 11:5,6,10
12:2,10,11,
12,25 13:1,3,
7,21 14:1,12,
17 16:22,25
17:18,22
18:24 19:2,7,
10,12,15
20:22 21:2
22:22 24:17
30:8,13,17,
21 31:3,12
38:2,9,15

39:3 40:19
42:10,16
43:24 46:14
51:2,10,17,
25 52:5,10,14
55:13 56:6
59:4,9,18,
21,23 60:1,9
61:1,4 62:8
64:17,20,24
65:8,14,19,
22 66:1,3,5,
10,18 67:12
69:5,19 71:13
75:21 76:1,6,
10,14,18,21,
22,23 77:4

**identificati
on**
51:21 66:24

**identify**
51:22 65:10,
13,21,24

**identifying**
33:21

**identity**
83:7

**IDs**
10:20,22
50:7,9 53:9
65:11 67:17

**ignorant**
48:19

**ignore**
48:20

**ignored**
58:21 69:5

**illegitimate**
76:7 77:6

**imagine**
34:10

**immigration**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

68:14
**impact**
11:19,25
21:9,12 30:8
37:2,12,15,22
38:21 39:7,
10,13,14,19,
21,23 40:3,21
41:8 45:12,22
46:2,8,14,15
47:8,12,15,25
48:14,18,23
49:16 50:19
52:15 53:12
55:16 60:10
61:2 62:11,
21,23 68:15,
25 69:4 70:10
73:2 74:1,10
75:24 76:2,11
77:5,19
**impacted**
12:5 38:19
39:2 41:2
46:3 50:17
52:23 53:2
54:21 58:22
68:7 70:6
71:13 77:1
**impacts**
49:19 64:12,
13
**implementatio
n**
31:2
**important**
11:16 12:15
14:20 75:2
**imposed**
11:4
**improve**
7:17 31:11
46:18 48:2

77:1
**improved**
8:13 69:11
76:1
**include**
71:9
**included**
8:5,8,17 9:11
33:5
**including**
70:17
**income**
37:3 49:8
63:20 64:9
**incorrectly**
23:8
**increase**
30:14 70:9
**increasing**
42:17
**indeed**
55:4
**independent**
16:11 21:15
**INDEX**
3:1
**Indiana**
8:3 12:16
20:1 67:10,
13,16 69:20
**indicated**
12:5,18
**indicates**
60:20
**indifference**
50:18 60:21
**indifferent**
60:16
**indigency**
7:25 8:4 9:2
53:20 54:17

**indigent**
7:24 9:1,15,
23 11:9 37:3,
9,21,24 51:20
52:16,18
53:6,19,22,24
54:11,21
55:17 69:16
70:8
**indisputable**
72:24
**individual**
71:2
**individuals**
7:7,10 71:16
**infer**
73:7
**inference**
73:10
**information**
9:24 10:17
12:3 21:13,
17,18 32:17,
19 33:4,11,21
34:8 37:4
38:20 39:9,24
40:2,6,12,13,
15 49:2
50:14,20
55:2,8,11
62:20 64:25
65:2,3 66:7
68:23 69:1,2
72:7,21,24
77:10,22
**initially**
69:17
**instance**
24:15 45:25
**Instead**
47:19 59:11
72:14
**instructed**

85:11
**instructs**
5:8
**instrument**
83:8
**integrity**
46:22 69:5
**intend**
19:11
**intended**
46:15 56:23
67:24 73:20,
23 74:3,6
**intension**
57:1
**intent**
39:14 46:21
73:12 75:22
79:25
**intention**
47:5 55:22
57:2 70:5
71:21
**intentional**
78:1
**interested**
86:4
**Intergovernm
ental**
32:1
**INTEVENORS**
2:10
**introduce**
32:17 33:8,24
34:2,7,14
35:6,10,14
36:10 43:19
46:7
**introduced**
5:21 7:17
8:14,17 9:11,
25 12:13

20:10 21:13,
19 23:14
30:10 31:9
32:19 33:16
35:1,18 37:4
43:23,24 48:5
49:1 50:22
51:15 55:17
59:7 69:17
79:11
**introducing**
10:1 18:15
20:10 73:21
**introduction**
18:9 32:13
72:10
**investigatio
n**
58:7
**investigatio
ns**
41:17
**invitation**
33:13
**invited**
33:13
**involvement**
7:13
**irrefutable**
72:24
**issue**
7:23 17:12
41:4
**issued**
10:4
**issues**
14:11 19:19
47:3
**items**
15:22

---
**J**
---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**Janalyn**
1:10 84:9
86:8

**Jerry**
5:15

**job**
76:3

**JR**
1:5 84:5

**judge**
8:1

**June**
1:12 84:15

**jurisdiction**
42:2

**Just**
4:17 9:7 15:2
17:4 27:20
29:23 33:7
34:4 36:17
63:5 74:13
78:2

**JUSTICE**
2:7 66:20
78:15 79:9,
12,17,22,25
80:2,9,12,15,
22,23

**justification**
42:10

――――― K ―――――

**keep**
72:6

**keeping**
60:4

**keeps**
41:4

**kind**
15:7 16:3
19:2,9 21:23
23:9 25:3

39:13 41:3
45:1 47:22
48:6 49:25
50:2 57:5
64:5 80:5

**know**
4:24 8:23
14:14 15:6,11
17:13 18:1,3
19:5,8,25
23:6 31:8
32:10 39:4
42:3 50:2,10,
13 52:3,8,13,
25 53:20
54:16 57:14,
17,20,22 58:2
59:19,22
64:18,19,21,
23 65:2,17
66:9,17,20
67:4,6,8,15
69:17,24
76:16 77:21

**knowledge**
15:3,8 17:17,
21 27:10,14
43:7 63:1

**known**
28:11 45:22
66:15 83:6

――――― L ―――――

**lack**
14:23 20:4
24:12 38:15
47:25 48:3,7,
9,15 60:19
64:19

**lacked**
65:8

**lacks**
65:11,14,22,
25

**large**
9:25 18:10
32:7

**last**
78:24

**lasted**
79:5,6

**later**
9:8,19

**Latino**
11:19 12:6
37:7,13 39:8
40:22 45:13
46:9 53:8
54:1,5,20,25
55:6 63:25
64:7,9 68:16
72:2

**Latinos**
39:19,23
45:24 49:11
68:9

**law**
8:3,5 12:2,16
13:14,20
14:22 20:1,7
30:8,21 38:19
40:9 41:3
42:11 49:7
50:24 51:13
55:19 56:4
58:23 66:15
72:18 75:24

**laws**
30:14,18
46:14 76:4

**lawsuit**
78:4,6,7,9
80:3,6,10,13,
16

**lawyer**
5:7 6:3,5
20:4 44:1

69:18 78:3

**least**
13:17

**legal**
39:8 40:10
42:12,14
45:23 56:3

**legally**
10:21 38:25

**legislation**
18:24 19:3,7,
10,11,15
23:16,23
24:8,23 27:16
39:15,25
40:12 41:6
42:5 43:17
46:22 47:1,6
49:21 56:6
58:19 68:7,
12,13,16,19,
24 69:3
76:15,18

**legislative**
10:19 12:4
15:21 16:2
17:9 21:3,4
22:1 24:2
41:14 42:4
46:6 49:4
55:9 72:12

**legislator**
74:6 77:8,16,
24

**legislators**
15:25 71:2
76:3

**legislature**
15:15 18:11,
19,22 19:1,6
27:4,5 38:13
40:7 57:7
59:24 67:23

70:24 73:15,
20,23,25
74:3,24

**legitimacy**
47:22 69:7

**less**
7:20 59:3,9,
17,20 63:12
64:6,17

**lesser**
63:25

**Let's**
18:11 24:25

**letters**
79:1

**level**
15:7 45:9
58:1 64:10
66:18

**levels**
63:20 66:3,5
67:12

**license**
6:23,25 7:11
10:5 12:25
13:2,7 14:17
37:23 38:5
53:10 55:6
62:6 63:8,10
66:23

**licenses**
55:1

**Lieutenant**
12:18 36:3,19

**likelihood**
40:17 41:2

**likely**
30:10 40:9
45:6 49:7
50:21 54:22
59:4,9,18,20
64:17



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

likewise
46:23

limitation
36:5

limited
32:14 55:21

line
25:3 27:2
28:12 29:19
30:5 82:4

list
56:24

listed
9:14

listen
35:17,22

litigation
4:13

little
18:17 39:16
41:20 42:20

live
61:25 62:1,4,
7,15

lived
62:24

lives
63:9

living
64:5

lobbyist
16:6,24

local
68:14

location
14:15 61:5

logical
32:4

long
17:13 27:2
29:21 36:7

79:4

longer
37:9

look
38:21

looked
14:17

low
37:3

lowest
49:8

low-income
62:12,21
63:16 64:15

M

mail
43:8,12,20
44:6 45:5,8
57:15,17
58:3,9,11,15,
18,25 84:24

maintain
51:10

maintaining
69:4

majority
29:7 30:6
41:5 54:10,12
61:18 76:5,9,
14,17

maneuver
22:3,10 25:20

manner
43:1

maps
68:11

Marion
20:12

marriage
51:19

married

12:14

match
12:24 13:2,6
14:12

material
20:16,21
32:25

materials
15:9 19:2,6,
15 21:23

Matt
4:3

MATTHEW
2:4 85:24

mean
15:24 23:13
28:18 39:2,17
47:11 53:21
57:7 61:9,10
66:5 71:15

means
10:23 12:1,9
54:14,15
62:8,17 63:7,
9

meant
74:13

mechanism
23:10

meet
5:25 6:5,7
37:9

meeting
60:25

meetings
35:5

member
33:3 34:10,14
35:19 36:2
47:16 48:5
61:12 63:4
64:7 73:15

members
7:4 19:23
20:21 22:7
29:4 32:8,11,
12,21 33:4,5,
23 34:2,23
35:4,10,16,
21 39:5 40:3
42:23 43:23
45:6,17 46:13
47:15,20
49:20 52:1,6,
11,19 53:7,12
54:4 55:24
60:23 61:10
62:22 63:11,
13 68:25 69:2
71:9,10 73:6
74:23 75:24

membership
28:1

memory
25:22

mentioned
6:15 15:2,22
17:2 44:1
48:21 51:5
65:2 67:9
77:15

merited
77:14

merits
48:6

millions
41:17 57:9

min
85:24

mind
77:8,9

minds
77:12

minimal
42:10

minimized
76:2

minor
51:16

minorities
45:7 68:21
76:11

minority
26:21 44:21,
25 45:18
46:14,15
52:2,6,11,19
53:12 55:21,
24 60:20,24
61:8,11,15,
19,20 62:12,
21 64:2,12
68:8,25 69:9
70:12 73:8,
13,18 74:2
75:25 76:25

minutes
79:7

mismatch
52:5

misquote
39:18

mobile
30:24

modeled
8:2 12:15

moment
34:5 45:3
48:21 51:5

money
10:16 41:13
56:16 57:23,
25 58:2,13

months
14:15 78:24

most
13:16 16:2



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

41:8 47:21
49:7 69:6
75:22

**motivated**
75:19,21

**move**
23:19 24:5,20
33:3 35:2
40:8 56:24

**moved**
13:8 23:25
24:17 69:24

**moving**
31:3 38:22
42:15 54:14

**multiple**
41:17 57:9

**must**
27:22 34:25
35:2

**myself**
18:17 19:9
20:3

**N**

**N**
2:1

**name**
4:3,6 8:12
12:24 31:25
33:20 51:19
52:4 83:7

**named**
84:14

**narrowly**
68:4

**natural**
29:24

**nearly**
45:14

**necessarily**
38:7 48:15

53:21

**necessary**
25:6 29:3
50:10 65:18,
22,25

**need**
10:11 53:10
61:5

**needed**
10:13 27:8,25
61:3

**negative**
11:12,13,25
37:15 39:7,
10,19,23
68:15 70:9

**neither**
86:1

**never**
15:22 27:14

**nine**
32:8,12

**nodding**
4:20

**non**
53:24

**non-citizens**
56:9,11,15,24

**non-indigent**
38:14 52:22,
24 53:1,3

**non-minority**
62:15

**non-photo**
51:2,9

**normal**
25:14

**NOTARY**
83:12

**noted**
8:4 40:5 83:2

**notes**
18:17

**noteworthy**
35:21

**nothing**
84:17

**notified**
84:24

**November**
14:18 56:4

**nuances**
20:6 76:1,4

**number**
10:19 13:13
32:9 58:5
68:6

**numerous**
46:17

**NW**
2:8

**O**

**oath**
83:6

**object**
5:7

**obtain**
60:9

**obviously**
77:9

**occasionally**
32:18 34:12

**occur**
33:6 37:10
39:11 46:9,20
47:15,19 48:1
49:19 68:11
73:1

**occurred**
12:21 23:9
24:17 41:1
51:13 69:20

**occurring**
40:18 45:9,11
58:1,18 71:22

**occurs**
10:10 33:13
40:16 48:7

**odd**
32:9

**offer**
9:22

**offered**
7:19,22 10:25
11:14 47:18

**off-guard**
26:21 38:3

**OFFICE**
2:3 38:18
41:16,23
57:3,6,9,14
61:25 62:9,
16,18,25
63:4,7 83:10
85:1

**officer**
84:25 85:11,
13

**officers**
68:15

**offices**
61:5

**official**
21:19 75:3,10
77:3

**officials**
14:6

**oftentimes**
35:20

**Okay**
4:17,22,24,
25 5:6,16,25
9:7,13 20:15
24:10,25

29:17 31:5
32:13 35:25
74:12

**Once**
4:11

**op-eds**
15:12

**opinion**
8:3,6 12:17
48:4 73:22

**opportunity**
7:24 13:15
31:11 38:6
61:4

**oppose**
17:22,23 18:4

**opposed**
7:16 39:5

**opposition**
17:15

**ORAL**
1:7 21:20
84:8

**order**
10:4,11,12,
22 23:25
24:6,21 25:7,
9,11,14,24
26:1,18
27:20,23,24,
25 28:8,9,18,
25 29:2,7,11,
15,24 34:24
35:1,2 55:3
56:18 61:2
68:17

**ordinarily**
37:23

**ordinary**
31:14 34:16,
17,22

**organization**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

s
16:1
organized
21:23
original
8:25 84:25
85:6,11,15,17
originally
8:16
originated
27:17
other's
35:12 40:20
outcome
86:5
outset
23:19 24:2
outside
15:15 18:19,
22 19:1,5
22:3 23:10,17
24:5,8,13,21
26:1 27:24
29:20 35:22
44:21,25 63:2
65:6
over
4:18 25:24
26:17 39:16
44:9 78:19
overwhelmingl
y
76:21

_____ P _____

P
2:1
p.m
1:13
PAGE
3:2 82:4
parcel

68:20
Parkway
2:11
parliamentari
an
26:2,13,23
part
10:18 12:3,4,
16 14:3 21:14
22:16 31:3,13
32:16 33:1,
17,21 36:5
39:4,25 42:3
46:5,25 47:21
51:14 55:18
59:5,14 60:22
63:21 65:5
67:1 68:19
69:1,6 72:10
74:18 75:16
participate
6:9 35:23
participated
7:15
particular
17:7 22:22
31:21 37:5
47:3 65:24
66:7
particularly
19:19 35:21
37:1,25 40:25
42:9,20 68:8
particulars
18:2
parties
1:15 78:7,9,
11 85:22 86:2
parts
47:3,4
party
26:21 41:5

46:11 47:3
85:23
pass
29:3,8 32:20
55:23 80:19
passed
12:3 66:15
74:20 79:13
passing
73:24 74:4,7
passport
7:2 10:9
path
24:9
penalty
42:5,18
Pennsylvania
2:8
people
13:13 15:20
17:5 31:11
32:5 33:18
37:5 38:3,10,
14,18 39:1,2
41:7 42:11
52:4,9 53:14,
16,24 54:10,
12 55:5 61:8,
24 66:16
72:20 73:24
74:1,4,7,10
75:23 76:6,9
77:12,15
percent
61:21
percentage
54:24 57:17,
20 58:18 66:9
period
31:1,7 50:11
permit
13:20

person
9:1,15 10:23
11:5 13:8,20,
25 14:2 15:3
19:17 33:9
37:24 38:8
41:9 42:18
43:3,7,11
44:5 45:8,10,
16,21 49:12
51:3,7,11,
20,22 57:20,
23 58:5,25
63:3,6 71:8
73:2 75:18
83:7
personal
43:6
personally
18:16 21:10
43:21 83:6
persons
7:23 10:19
11:25 12:5,7
37:2,7,8
38:24 39:7
41:2 42:5
44:21,25
45:6,12 46:10
49:3,6 50:6
51:24 53:5,9,
21 54:25
55:16,21 56:2
58:22 61:3,18
62:11,21,24
63:15,24
64:12,13
66:22 68:17
72:17 75:20
76:25
person's
13:6 51:17
PH
2:5,9,13

phone
6:8,9
photo
9:20 11:10
13:21 17:18,
22 18:23
19:2,6,10,12
21:1 30:8,13,
17 31:3,12
38:2 40:18
42:10,16 50:8
51:17,25
52:10,14 53:9
59:9,23 61:1,
4 62:8 65:8,
18,22,25
66:3,10
67:12,17
69:5,19 76:1
phrased
74:12
picture
49:21
piece
23:16 24:7
32:19 33:3
39:15 40:11,
23 41:6 42:5
43:17 47:1,5
49:20 68:19
pieces
9:24 24:22
47:20 58:19
68:6,16
place
15:3 22:11
29:18 32:4
38:10 47:13
72:18
PLAINTIFF
2:3 84:21
please
4:5,23 5:2



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

point
8:8,11 17:6

pointed
72:9

points
18:7,12,15,
17,20,23
19:23 47:23
69:9

police
68:14

policy
75:4,7,11

political
44:9,10,19
47:3 75:10,16

politically
75:13

poll
14:16

polling
14:14 15:3

polls
14:1 56:5

poor
63:23 73:24
74:1

population
52:21

populations
40:4 44:21,25
45:11 74:2

position
10:25 35:15
47:7

possess
50:8 53:9
62:2 67:16

possession
55:13 66:4,6,
18 67:12

possible
20:18 34:12
40:3 44:22
50:2 69:10,12
70:18 76:3

potential
11:4 21:9,12
44:10,19

potentially
50:17 51:24

poverty
64:10

practice
28:15

preceded
57:4

preclearance
67:2 80:10

predisposed
48:1

prefer
71:14

preparation
19:25

prepare
5:25 6:16
18:7,12,14,19

preparing
18:16

present
11:10 34:24,
25 35:2

presentation
15:23

presented
12:3 38:12
48:22 55:8
68:23 72:21

pressed
26:20

presumed

38:18

prevent
4:14 30:22

previous
16:22,25 27:5

primarily
12:6 37:3
49:8 63:25

prior
10:19 19:18
21:3 22:5,25
23:3,12,14,20
24:18 32:21

priority
23:25 45:14

privately
12:18

Probably
7:20 15:20
32:2 79:6

problems
64:3

procedural
22:2,10 23:9
25:20

procedure
24:14 25:14
28:19 84:23

procedures
23:18,24
30:22

proceeding
86:3

proceedings
34:21

process
23:17 40:16
67:2 68:12
75:16

produced
77:11

proponents
43:3 60:13
69:12 74:19

proportion
17:14 58:9,11
66:5

proposal
43:25

prosecute
42:2 44:5

prosecuted
57:13 58:12

prosecutes
44:14

prosecuting
44:11,18
58:25

prosecution
44:2 58:3

prosecutor
44:14

protections
56:20

proved
83:6

provide
7:24 8:24
9:15 16:4
18:23 19:1
20:15 33:8
35:9 51:21
80:2,5,8,9,
13

provided
13:17,18
19:6,22
20:21,24
21:16,17
27:19 33:17
35:19 38:1,20
39:9,24 40:1
49:12 50:21

51:1 70:8

providing
9:22 19:14

provision
70:7,19

provisional
7:25 9:7
13:17,21 14:2

provisions
51:13

Public
10:5 15:18
18:10 50:8
53:5,14,16,
24 54:2,10,
13,22 62:2
64:3 83:12

purportedly
45:21

purpose
60:4 70:17
71:3,7,16
72:13 74:21
77:6 79:14

purposeful
68:20 69:9
70:2 71:21

purposes
10:1 38:5
75:17 80:10
83:8

pursuant
1:14 84:22

push
12:20

put
25:3 33:20
38:10 40:6
47:14,15
52:20 62:20
71:11 72:18
76:24 77:23



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**putting**
45:20

**Q**

**qualify**
61:20

**qualifying**
13:21

**quality**
54:6

**question**
4:23 5:3,4,7,
9 13:23 14:3,
4 19:13
26:12,20,24
27:7 34:5
36:2,14 38:16
45:25 50:15
51:4 63:5
64:22 72:7
74:12 79:15

**questions**
4:15 17:5
21:5 35:23
36:5 41:15
49:5 50:5
80:19,22,24

**quorum**
34:25 35:2

**quotations**
45:20

**R**

**R**
2:1

**racial**
55:13 66:4
76:11 77:5,19

**racially**
75:21

**raised**
39:5 77:11

**rare**

32:22
**rarely**
32:18

**rate**
67:17

**rational**
75:10,13

**read**
8:2 9:10
20:4,8 31:5
67:10 83:1

**reading**
8:5 21:1,2
29:7,8 85:4

**ready**
5:18

**real**
38:23 49:21

**really**
20:8 22:12
26:11 38:20
45:25 49:25
57:3 75:23
76:3 77:21

**reason**
29:18 30:2
37:14 43:10,
14,16 44:17
47:17 54:17
70:3,16 76:7
82:4

**reasonable**
77:12,15

**reasons**
20:2

**recall**
5:17 7:19
9:12,13
15:14,17,18
16:8,20,21,
23,24 17:1,4,
8,11,13,14

18:16 19:4,
14,16,19,21,
25 20:16,18,
19,20,23
21:1,15 29:1
30:7,9,11,12,
16,19 31:6
36:5 38:19
49:1,12,14,
15,18 55:11
58:4,10 59:5,
13 60:2,15,23
61:7,11 65:5
78:18 79:3,8,
12,15,17,20,
21,23,24
80:1,4,7,11

**receipt**
84:24

**receive**
12:10

**received**
10:18 13:3
15:4 17:11
85:20

**recollection**
22:24 41:19
58:8 59:10
79:10

**recommendatio
ns**
21:2,6 31:10
56:17

**recommended**
31:6

**record**
4:6,20 5:2
21:19 33:1,5,
22,24 34:3,14
36:11 37:5
62:20 69:1

**redistricting**
4:13,18 68:9

**reduce**
46:14 69:13
70:20

**reduced**
47:8 69:11
84:18

**Reeves**
1:11 84:9
86:8

**refer**
19:11 34:16

**referred**
31:15,18,22

**referring**
44:25 58:13

**refers**
40:3

**regard**
38:23 40:13
41:16 63:25
72:8 85:14

**regarding**
56:5

**regardless**
14:22 26:16

**register**
56:9

**registered**
6:21 7:8
56:12 64:19
65:14,24 66:9

**registration**
30:24,25
51:18 52:1,6,
11 56:24
86:12

**regular**
23:11,17 24:6
25:7,9,14
26:1,18 27:20
28:8,18 29:2,
11,13,15

**rejected**
48:10 50:25

**related**
18:7 86:2

**Relations**
32:1

**relative**
58:25 63:19

**release**
85:11

**released**
85:14

**rely**
53:5 54:13

**remedy**
42:19

**remember**
4:12,17 10:8
20:24 55:10
59:15 78:23
79:4

**remembering**
23:8 24:15

**remove**
59:7 68:17

**removed**
70:3,8,19

**repeat**
13:23 68:2

**rephrase**
4:24

**report**
21:1,6 30:19
31:5,7,10
40:2 47:2
56:18 59:6

**Reporter**
1:11 4:19 5:1
84:9

**Reporter's**
3:7



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

represent
4:5 54:4,8,9
60:24 61:8,
10,14,15
74:24 75:3

representatio
n
5:16

representativ
e
38:17 75:6
76:20

represented
5:11,15 49:10
53:7

represents
61:12

Republican
24:3 46:10
47:20

request
16:16 32:20
34:9

requested
33:2 55:2,3
84:24

require
19:12 30:3,5

required
10:3 14:1
24:20 29:10
39:3 59:4,18,
21,23 60:1
64:17,20,24
65:8,11,15

requirement
11:5 17:22
22:18,20 23:5
31:4,12 38:2
52:15

requirements
17:18 37:10

60:25

requires
22:7 29:4,7

reserve
80:18,25

resident
63:2

resolved
55:18

resources
14:8,25 15:7
56:15 61:3,24

respected
46:25

respective
1:15

responsibilit
y
85:14

result
11:4

resulted
58:3

return
84:24

returned
85:8,18

revealed
41:20 49:6
58:17

review
6:16 21:11
32:21 85:1,7,
12,17

reviewed
5:20

right
5:10 9:2
11:1,6,7,20
22:23 24:16
28:9 31:19

32:1 36:10,
14,22 37:2,20
40:11 42:12,
13 47:13 56:3
59:12 60:11,
21 66:21
69:22 70:12
71:25 73:9
75:14 76:15

risk
68:2

RLW
1:4 84:4

RMC
1:4 84:4

rolls
56:15

roughly
17:14 78:23

round
72:6

rule
22:21,22
24:5,24 25:1
26:25 27:22
28:3 31:1

ruled
26:14,23

rules
4:19 22:4,9,
25 23:1,4,11,
13,14,20
24:18,20 26:2
27:19 84:22

rural
59:20,25
60:4,9,10,14,
16,24 61:8,
11,12,13,14,
15,20,25
62:1,4,7,12,
15,21 63:2,4,
6,9,12,13,20

64:2,5

Russell
4:7 13:2

---
S
---

S
2:1

Safety
10:6 50:8

sanctuary
26:6 28:20,21
68:13

saying
20:5 54:24
55:5

says
13:2 14:22
28:3,8 48:17

SB
11:12,18,23,
24 13:24
15:4,9,13,
16,19 16:7,9,
15,19 17:3,9,
25 18:2,4,8,
13,20 19:15
20:17,22
21:9,12
31:18,21
36:6,21
37:14,19
43:18 49:17
50:17 52:15,
24 53:2
55:14,15
56:23 59:4,
18,21 60:1,3,
13,22 64:7,
17,20,24
65:8,11,15
67:2,25 71:3,
6,16,24
73:17,21,24
74:4,7,9,18

77:4,19,24
79:2,13,18,
22,25

scrutiny
69:20

SD
16:20

seal
83:10

second
29:6

secretary
32:19,25
38:16,17
49:5,19,22,
23 55:3 67:3,
7

see
28:2 65:8

seeing
30:7,16

seek
32:17 37:23
65:3

Senate
5:22 7:14,16
8:9,17,21
11:17 16:12
18:9 19:17,21
20:15,20
21:22 22:4,
12,15,19,21,
25 23:1,13,24
24:1 25:14,18
26:16,19
27:6,11,15,
17,19 28:13
29:2,4,25
31:15 32:5,
14,16,20 34:1
35:25 36:2
40:7 42:23
43:14,23

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

46:17 47:16,
20 58:4 59:7
61:10 65:5,6
68:24 71:9,21
78:15

**SENATOR**
1:7,9 3:4
4:1,3,8 8:10
9:11,14 34:8
36:10,14
69:15 76:20
83:1,3,6
84:8,13

**senators**
21:24 24:4
34:21 35:4,8
61:14

**send**
79:1

**sends**
19:18

**senior**
40:25

**sense**
25:13 39:21

**sent**
19:20 22:4,5
29:25 85:7

**sentiments**
75:16

**separate**
27:9

**served**
26:16 27:16

**session**
10:19 12:4
16:4,7,10
17:10 21:3
22:2 23:6,7,
15,19 24:3
25:21 28:14,
24 49:4 68:5

**sessions**
15:21 16:2
21:14 22:8,25
31:9 39:5
41:14 42:4
43:22 46:7

**session's**
40:5

**set**
1:15 22:9
59:11

**shall**
28:6 84:23
85:16

**Sheet**
85:6

**Shorthand**
1:11 84:9

**show**
13:13 38:14
48:9,15 57:10

**showed**
30:17 38:13

**showing**
9:20 30:13

**shown**
8:15 55:12
60:20

**shows**
13:25 48:7
50:18

**side**
56:1

**sign**
9:1,16 11:9

**Signature**
3:6 82:1 83:1
85:2,6,8,13,
17,21

**signed**
85:19

**significant**
11:13 14:7
55:12

**simple**
29:7 30:5

**simply**
33:18 40:22
41:7 60:7
62:7,25

**simultaneous**
22:12

**simultaneousl
y**
22:16

**sincere**
48:12 70:19
77:25

**sincerely**
77:5

**sit**
31:24 32:10
33:23 35:7

**sits**
28:12 34:1
35:25

**sitting**
34:9 35:13

**situation**
13:5,8 14:13
22:1 34:11
36:3 51:20

**situations**
13:16

**six**
78:24

**small**
58:5 72:15

**solely**
55:20

**solution**
42:15,16

56:21

**solutions**
77:12

**somebody**
43:10 73:5

**someone's**
51:19

**sonogram**
26:7 28:23

**sorry**
31:8

**sought**
64:25 65:3

**source**
67:11

**speak**
16:1,9 78:14,
17,21

**specific**
15:23 20:16,
19,21 22:5,21
27:11 31:15
38:20 41:14
44:9 45:1
49:1,12,15
55:10,11
61:23 65:13,
21 70:22
71:3,7

**specifically**
8:4 12:13,17
14:22 16:16
20:1 21:5
30:11,23 39:9
40:3,11 48:23
58:22 67:24
68:15,22 70:9
72:9 74:8
79:16,20

**specifics**
18:6

**speeches**

15:15

**spent**
14:7 41:12,18
57:9,23,25

**spite**
31:12 58:6

**spoke**
15:20 16:24

**spoken**
6:12 12:17
17:2,3

**sponsored**
71:23

**staff**
18:14 19:6,17
20:25 21:8,11
33:14

**staffer**
20:25

**standing**
34:17,20

**start**
5:3 18:11
19:22 44:9

**STATE**
1:2,11 2:3
4:5 10:4,5,
20,24 12:12
13:13 14:9,
10,25 15:7,10
32:3,11,12
37:6,10,24
38:2,17
40:15,24
41:5,12 42:11
45:15,24
49:3,6,9,19,
22,23 50:6,7
52:5,21 53:5
54:3 55:1,3
56:3,14
63:21,22
66:23,24



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

67:1,3,7
68:8,18,21
69:19 75:21
82:2 83:4,12
84:2,10

**stated**
73:12

**statement**
46:4 58:17
73:16 80:5

**statements**
15:18

**STATES**
1:1,10 75:15
84:1

**State's**
38:18

**statewide**
65:3

**status**
37:3,9 67:4

**stay**
35:17

**stenograph**
84:15

**Street**
2:4

**stripped**
8:18,20 69:25
70:1

**studies**
21:8,11 30:7,
13,16 49:16

**submit**
33:9

**submitted**
32:25 33:11

**subscribed**
83:7

**subsequent**
13:8

**subsumed**
10:15

**sufficient**
24:11,12
28:22 40:8
42:18 43:16
51:22

**Suite**
2:12 86:10

**summary**
16:3

**supplement**
34:4

**support**
17:15,18,25
24:20 43:14
55:14,15 56:5
58:16 61:5
76:6,10,14,18

**supportable**
20:7

**supported**
73:17

**supports**
70:14

**suppose**
36:4

**suppress**
69:9

**Supreme**
8:2,6 12:17
20:2

**sure**
9:12 15:25
17:11 18:5,17
25:21 26:11
31:5 36:8
38:10 64:13
69:18

**surprising**
43:13

**survey**

65:7

**suspend**
25:7,14
29:12,14

**suspending**
25:9 29:15

**swear**
9:16

**swearing**
7:25

**sworn**
4:1 84:16

**system**
31:2

**systems**
54:7

―――――――― T ――――――――

**tabled**
8:9 47:21
48:6

**take**
24:12 28:8
53:14 56:15

**taken**
1:10 27:23
34:25 84:15
86:3

**talk**
6:3 16:6 25:1
78:19

**talked**
30:23,24,25
45:2

**talking**
14:7 18:7,12,
14,17,20,23
19:22,23 64:2

**target**
58:14

**targeted**
57:22

**targeting**
44:15

**telephone**
78:19 79:4

**tell**
48:23 53:4
68:4 77:10
78:25 84:17

**ten**
7:20

**terms**
36:7 40:16
50:5 63:16
70:5 73:3

**testified**
4:1 16:22
60:19

**testify**
16:18 35:8
36:8 78:10

**testimony**
16:11,15
21:20,21
22:15 30:9,
10,13 32:13
33:9,13,15,
16 34:7 35:17
40:1 41:19,21
43:2 49:1,13,
16 50:15
54:19 58:4
62:23 74:9
80:13

**Texans**
36:22 37:21

**TEXAS**
1:2,12,14
2:3,5,12 4:4,
5 6:23 7:10
10:4 13:13
37:6,10,16,
24 40:24
41:5,10,22

42:1,11
45:15,24
49:3,9 50:6,
7,12 52:21
53:6,15,25
54:3 55:1
56:4,6,9,12,
15,22,25 57:4
63:14,21,23
64:19 65:14,
24 66:5,19,
23,24 67:1,
1,18,23 68:8,
18,21 69:19
70:24 74:23
75:21 76:6,
10,14,18 82:2
83:4 84:2,10
86:11

**Thank**
53:23 80:21
81:1

**themselves**
27:19

**thereafter**
84:18 85:13

**therefore**
26:2 37:8
45:13

**thing**
8:13 69:22

**things**
47:2 70:25

**think**
8:10 9:21
14:21,23 23:7
26:15,24
28:22 32:3,8
36:17 43:16
45:24 49:4
50:4 53:20
58:16 59:11,
12,22 68:19
70:18 71:11



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

75:25 77:2

**thinking**
69:18

**thirty**
85:16

**thought**
7:17 8:14
25:13 62:22

**thousands**
14:9,10

**threat**
42:13

**threatened**
11:2 42:13

**time**
14:7 17:13
18:18,22
26:19 29:14
31:1 36:6
59:25 60:25
62:5 80:18,19
84:14 85:23,
25

**times**
4:10 6:5
78:21

**today**
4:15 5:11,14,
19 6:13,19
11:2 12:1,8
50:6

**together**
50:20 51:12

**told**
79:21,24

**toward**
50:19 72:12

**tradition**
28:13 34:5

**train**
14:9

**training**

14:6 15:1,4,
7,8

**transcript**
84:12 85:1,5,
12,17,19

**transport**
62:3

**transportatio
n**
38:4 53:5,14,
16,25 54:2,7,
11,13,15,23
62:2,9,18
63:7,10,13,
17,20 64:3,
11,15

**tremendous**
14:23

**trial**
80:19,25

**tried**
67:7

**true**
9:9 46:21
48:13 50:19
67:20 83:2
84:11

**truly**
47:6 72:11

**truth**
84:17,18

**try**
5:2,3 48:2

**trying**
41:13,18 57:9
59:7 66:21

**tuitions**
68:18

**turnout**
30:8,14,17

**Twice**
78:22

**two**
13:9 21:13
22:8 43:22
55:9 79:6

**two-third**
29:8

**two-thirds**
22:7,19,20
23:5 24:5,13,
20,24 25:1,6,
10,19 26:4
27:25 28:19,
22 29:20,23

**types**
44:20

**typewriting**
84:19

**typical**
18:15 22:4
33:7 34:20
35:16

**typically**
21:22 22:4,6
24:1 27:19
32:5 33:17
34:21

_____ U _____

**Uh-huh**
32:10 34:19
78:12

**ultimately**
38:9

**unable**
72:13

**unanimous**
46:9

**unaware**
56:2

**undemonstrate
d**
41:6

**under**
8:12,24 12:2
27:20 29:22
68:13 83:6,10
84:19

**underlying**
10:3,6,12,
13,21,24
65:18

**understand**
4:23 18:2,5
19:13 20:6
28:2 75:23,25
76:4 77:22

**understandin
g**
8:18,20 11:8,
11 13:19,24
14:20,24
17:24 24:10
25:2 41:25
42:22 43:6
44:4,7,8,10,
13 45:16
53:4,13,15,
24 54:10
55:23 56:23
58:24 59:24
62:14 63:11,
15,19 64:4,16
70:25 72:16,
20 73:1
74:15,17

**understood**
73:25 74:17

**undocumented**
68:17

**unfortunatel
y**
49:9 55:18

**unintended**
12:10

**unique**

11:15

**uniquely**
11:24

**UNITED**
1:1,10 75:15
84:1

**unknown**
12:11

**Unless**
5:7 27:1

**unprecedente
d**
68:6

**unreasonable**
77:20,25

**unusual**
22:16

**upheld**
8:3 20:2 56:4

**upholding**
20:3

**ups**
17:2

**use**
38:4 53:14,
16,24 54:10,
13,22

**users**
54:2

**usually**
23:1 32:8
35:13

_____ V _____

**vague**
25:22

**valid**
47:23 68:23

**validity**
48:5

**Valley**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

61:23 63:2,4,
12 64:6
**various**
66:19
**vehicle**
62:2
**vehicles**
64:4
**verbal**
33:15
**verbally**
33:11 49:2
**versus**
20:12 58:25
59:12 62:12
66:23
**VICTOR**
2:7
**vote**
6:21 7:8,25
8:1 9:5,17
11:1 12:8
13:14,15,20,
25 19:12
22:6,19 25:6,
10,19 26:4
27:25 28:22
29:5,13,20,23
31:11 33:6
34:24 36:23
37:2,10,20
38:6 40:11,25
41:1 42:12
56:3,9,12
69:9 75:11
**voted**
14:17 42:24
46:13 71:2,6,
8,16,24
76:21,23
77:24
**voter**
5:21 8:3

12:11,25
13:1,3,7,9,18
14:11,17
16:22,25
18:23,24
19:10,15
20:22 21:1
22:22 24:17
30:8,21,23,24
40:18,19,21,
23 41:10
42:2,10,18,25
43:3,7,11,15,
24 44:6,11,
14,18,20,24
45:1,2,5,9,
10,16,21
46:14,18
50:7,24 51:3,
7,11,17,21
52:1,5,10,24
53:2,3 56:6,
15,24 57:3,5,
10,21,23
58:1,3,5,18,
20 59:1 60:9
64:5 65:14,25
66:24 69:14
71:13 72:8,11
73:13 75:21
76:6,10,14,
18,21,22,23
77:4
**voters**
9:23 11:9,19
40:10 42:14
44:15 45:23
46:14,16
52:16,18,23
54:20 59:3,8,
14,17,20,25
60:4,10,14,
17,20,25
61:13,16
62:15 64:16,

19 66:10,13
67:13,16,21,
24 69:23
70:8,12 71:4,
7,12,17,19,25
72:2 73:8,18,
21 76:14,18
**votes**
29:3,10 30:3
46:9
**voting**
7:5,7 10:21
11:25 12:7
17:18,22
32:21 38:25
39:8 40:16
47:17 48:14
51:23 57:4
60:4 75:7
77:7
**VS**
1:4 82:2 84:4

---
                **W**
---

**wait**
5:2
**waived**
85:22
**wanted**
71:24 72:1
73:8,17
**wants**
69:18
**Washington**
2:8
**wasn't**
9:7 12:22
29:21
**waste**
56:16
**way**
8:14 12:2
19:13 20:5

24:23 42:8
46:18 60:18
62:25 63:5
70:25 71:1,
11,13
**ways**
25:17 77:1
**weaken**
51:3
**weakened**
50:23 51:6
70:4
**web**
56:20
**weeks**
13:3
**welcomed**
46:25
**We'll**
80:25
**WENDY**
1:7,9 3:4
4:1,7 13:2,4
83:1,3,6
84:8,13
**went**
9:10 51:15
70:17
**we're**
29:15 35:13
**weren't**
50:14 56:22
**West**
2:4
**whatever**
29:18 30:1
**whether**
14:8 16:24
18:3 19:5,21
20:20 21:15
26:17,18
27:16 30:12

33:6,11,12,
19 36:1 39:13
43:7 44:4,8,
13 47:23
49:19,22
54:16 55:4
56:8 59:13
64:8 67:6,15
69:7,17,21
71:12,18
79:12,21,24
**Whole**
22:14 31:19,
23 34:2 36:1,
10,14,18
84:17
**willfully**
48:19
**WILLIAMSON**
2:7 80:23
**willing**
49:20
**willingness**
73:3
**wish**
34:6
**wishes**
33:9
**within**
8:8 10:15
18:11 62:11,
13 63:18
64:14 78:24
85:8,20
**withstand**
69:19
**witness**
1:10 36:2,15
80:20 84:14,
16,23 85:2,
16,20,21,22
86:6
**witnesses**



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Wendy Davis

June 6, 2012

108

16:15,16 33:8
35:23 36:7
**women**
12:13
**word**
24:13 28:17
45:21
**words**
47:24
**work**
15:5 21:22
**worker**
15:2
**working**
14:16 19:18
33:14
**wrap**
15:20,24 17:2
**write**
15:12
**writing**
33:12,16 49:2
**written**
8:14 21:21
30:10
**wrong**
31:25 75:6
76:22 77:2

--- Y ---

**years**
59:8 70:24
**yesterday**
6:8
**younger**
64:16
**yourself**
68:2

--- 1 ---

**10**
16:20

**100**
86:10

--- ' ---

**'11**
43:19

--- 1 ---

**12**
86:9
**12-CV-128**
1:4 84:4
**130**
1:13
**14**
7:14 11:12,
18,23,24
13:24 15:4,9,
13,16,19
16:7,9,15,19
17:3,9,25
18:2,4,8,13,
20 19:15
20:17 21:9,12
31:18,21
36:6,21
37:14,19
43:14,18
49:17 50:17
52:15,24 53:2
55:14,15
56:23 59:4,
18,21 60:1,3,
13,22 64:7,
17,20,24
65:8,11,15
67:2,25 71:3,
6,16,24
73:17,21,24
74:4,7,9,18
77:4,19,24
78:15 79:2,
13,18,22,25
**14th**
2:4

**15**
32:8

--- 2 ---

**2**
3:3 85:24
**2009**
16:22,25
20:22 43:19
**2011**
16:7,10
**2012**
1:12 84:15
86:7
**20530**
2:8
**209**
2:4
**21**
29:5,10
**220**
86:10
**253-3931**
2:9
**281**
2:13
**283**
86:12

--- 3 ---

**30**
79:7 84:23
85:8,16,20
**31**
29:4
**348**
1:13
**362**
20:22
**3631**
86:9

--- 4 ---

**4**
3:5
**4201**
2:11
**48**
1:13

--- 5 ---

**50**
61:21
**512**
2:5
**512634-1980**
86:11
**530**
2:12
**580-6310**
2:13

--- 6 ---

**6**
84:15
**65**
59:8,12
**6th**
1:12

--- 7 ---

**70**
59:11
**77068**
2:12
**78701**
2:5 86:11

--- 8 ---

**800**
2:9
**81st**
21:3 22:1
23:6 27:4
38:13 39:25
46:6

**82**
3:6
**82nd**
21:4 22:1
23:7,15 38:13
39:25 46:6
**84**
3:7

--- 9 ---

**9**
85:24
**936-2779**
2:5
**950**
2:8



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com