**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS            )
                         )
                         )
VS.                      )  NO. 12-CV-128
                         )  (DST, RMC, RLW)
                         )
ERIC H. HOLDER, JR.,     )
In his official          )
Capacity as Attorney     )
General of the United    )
States, ET AL            )

***********************************************

ORAL DEPOSITION OF ROBERT DUNCAN

***********************************************

ANSWERS AND DEPOSITION OF ROBERT DUNCAN, a witness called by the United States taken before Janalyn Reeves, Certified Shorthand Reporter for the State of Texas, on the 7th day of June, 2012, between the hours of 9:30 a.m and 4:25 p.m., in the offices the US Attorney, 816 Congress Avenue, Suite 1000, Austin, Texas, pursuant to the agreement of counsel for the respective parties as hereinafter set forth.

**Page 3**

INDEX

                                    PAGE
Appearances...............................    2

ROBERT DUNCAN
    Examination by Ms. Maranzano ........    6
    Examination by Mr. Brazil. .........    242

Signature and Changes....................    254
Reporter's Certificate...................    256

**Page 2**

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
    OFFICE OF THE ATTORNEY GENERAL:
    By: MR. PATRICK SWEETEN
    - and -
    MR. JAY DYER
    209 West 14th Street
    Austin, Texas  78701
    PH: (512) 936-6432

FOR THE DEFENDANT:
    DEPARTMENT OF JUSTICE
    By: MS. JENNIFER MARANZANO
    - and -
    MR. VICTOR WILLIAMSON
    950 Pennsylvania Avenue, NW
    Room 7161 NWB
    Washington, DC  20530
    PH: (202) 305-0185

FOR THE INTEVENORS:
    BRAZIL & DUNN, LLP
    By: MR. SCOTT BRAZIL
    4201 Cypress Creek Parkway
    Suite 530
    Houston, Texas  77068
    Ph: (281) 580-6310

**Page 4**

EXHIBITS

NO.     DESCRIPTION                    PAGE
520     Notice of Deposition            35
521     House Bill                      48
522     Interim Report                  58
523     Online History                  82
524     HB 218 Record                   126
525     Senate Rules                    137
526     Letter                          149
527     Letter                          149
528     Senate Journal                  163
529     Email                           170
530     Senate Bill 14                  172
531     Letter                          215
532     Letter                          215
533     Senate Rules                    219
534     Indiana Voter ID Law            221
535     SB 14 Hearing Transcript        223
536     Senate Journal                  228

PREVIOUSLY MARKED EXHIBITS
3       Letter                          98
28      HB 218                          79
29      SB 362                          105



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                           June 7, 2012

---

**5**

1    MS. MARANZANO:  Good afternoon, Senator
2    Duncan.  My name is Jennifer Maranzano.  I'm
3    representing the defendant, Attorney General Eric
4    Holder, in this matter.  Can you please --
5         MR. SWEETEN:  I'm sorry.  Can we do
6    introductions?  I would like to make sure the record is
7    clear on who is here for whom.
8         MS. MARANZANO:  Yes.  Why don't we go around
9    the room and everybody state their name and who they are
10   representing.
11        MR. WILLIAMSON:  Victor Williamson,
12   Department of Justice.
13        MR. BRAZIL:  Scott Brazil for the Kennie
14   Intervenor's.
15        MS. MARANZANO:  Jennifer Maranzano with
16   defendant, Attorney General Eric Holder.
17        MR. SWEETEN:  I'm Patrick Sweeten with the
18   State of Texas and on behalf of the State and on behalf
19   of the witness, Senator Robert Duncan.  And attorney Jay
20   Dire who will be joining us very shortly.
21        MS. MARANZANO:  Thank you.
22        SENATOR ROBERT DUNCAN,
23   having being first duly sworn, testified as follows:
24
25

---

**6**

1              EXAMINATION
2    BY MS. MARANZANO:
3         Q.  Senator, can you please state your name for the
4    record?
5         A.  Robert Duncan.
6         Q.  Have you been deposed before?
7         A.  Yes.
8         Q.  And what was the -- what case was that?
9         A.  I'm an attorney, so I appeared as an expert on
10   things before.  I was also deposed in the redistricting
11   case by Senator Davis's attorney that was -- occurred
12   here in 2011 I believe, or '12.
13        Q.  How many times have you been deposed?
14        A.  I don't know.  I've had depositions on
15   legislative intent back when I was in the House.  So I
16   would say four or five times, but I can't remember
17   specifically.
18        Q.  And one was the redistricting case in 2011?
19        A.  Correct.
20        Q.  And one was a case where you were an expert, did
21   you say?
22        A.  Well, more or less, yes, on workers'
23   compensation.  It's an area that I had some expertise a
24   long time ago.  Not anymore.
25        Q.  And when was that?

---

**7**

1         A.  90s, 1995, '94.
2         Q.  And the cases on legislative intent, can you tell
3    me about those?
4         A.  That was a case on a workers' comp bill I
5    believe, back in 1994.  And I was deposed on what was
6    the -- I can't remember the specific issue, but it had
7    something to do with workers' comp.
8         Q.  Were you deposed in your capacity as a senator?
9         A.  No, I wasn't a senator at this time.
10        Q.  Were you deposed as a member of the House of
11   Representatives?
12        A.  Correct.
13        Q.  And the other cases you were deposed in?
14        A.  They were private cases, as I was deposed as a
15   person with knowledge, specialized knowledge in a
16   certain area or field.
17        Q.  Okay.  And what field or area?
18        A.  That was workers' compensation.
19        Q.  Okay.  And the case in which you testified -- in
20   which you were deposed that dealt with legislative
21   intent, can you tell me what you mean by that
22   legislative intent?
23        A.  Well, they were -- the lawyers on one side
24   were -- there had been an amendment to a bill that I had
25   handled.  And they were trying to -- and I don't even

---

**8**

1    remember the bill.  And it was workers' comp -- may have
2    been something else.  I can't remember.  But it was --
3    they were trying to understand what the nature of the
4    legislation and what was in it.  That's all I really
5    remember about it.
6         Q.  Do you remember the nature of that case?
7         A.  No.
8         Q.  And the other cases, the other cases for which
9    you were deposed, other than this case that we're
10   talking about right now where you testified about the
11   legislative intent of the workers' compensation bill and
12   the redistricting case, you said you were deposed in
13   your capacity as an individual, not as a legislator; is
14   that correct?
15        A.  In the -- I don't understand the question.  I'm
16   sorry.
17        Q.  So there were two times, I think, that we've
18   talked about where you were deposed in your capacity as
19   a legislator; is that correct?
20        A.  Twice, yes.
21        Q.  And the other times you were deposed, was that in
22   your capacity as an individual?
23        A.  Correct.
24        Q.  Okay.  Well, I'm going to tell you a little bit
25   about how this is going to go today.  It sounds like you

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                            June 7, 2012

9

1   are very familiar with depositions.  You've been placed
2   under oath so it's important to testify truthfully,
3   accurately and completely.  The court reporter is taking
4   a transcript of everything we say, so it's important
5   that you wait until I finish asking a question before
6   you answer and I will wait for you to finish your answer
7   before I ask the next question.  Please respond verbal
8   to my questions instead of nodding or shaking your head.
9   I'll try to ask you clear questions.  If you don't
10  understand anything I say, please let me know.  If you
11  wish to take a break, just let me know and we'll go
12  ahead and take a break.  If there's a question pending,
13  I would ask you to just finish that question before we
14  take a break.  Do you understand these instructions?
15      A.  Yes.
16      Q.  Are you on any medication today that would affect
17  your ability to testify truthfully, accurately and
18  completely?
19      A.  No.
20      Q.  Is there any other reason why you can't testify
21  truthfully, accurately and completely today?
22      A.  No.
23      Q.  Today I may use the terms voter ID and photo ID
24  interchangeably.  I want you to interpret these terms
25  broadly to mean a requirement that a voter present a

10

1   form of identification, whether it has photo on it or
2   not, when voting in person before being permitted to
3   cast a regular ballot.  Do you understand that?
4       A.  Yes.
5       Q.  When I refer to minority voters today, I mean
6   voters who are non-white, non-Anglo.  Do you understand
7   that term?
8       A.  As you laid it out, yes.
9       Q.  Thank you.  Are you represented by counsel today?
10      A.  Yes.
11      Q.  And who is that?
12      A.  The Attorney General of the State of Texas.
13      Q.  And when did that representation begin?
14      A.  Well, I would assume it began at any point in
15  time where, I guess when this litigation -- for the
16  purpose of this litigation, when this litigation
17  occurred, was filed.  I think at any time I confer with
18  the Attorney General on any issue, I think that there's
19  the attorney/client relationship exists.
20      Q.  We've talked a little bit about the times in
21  which you've been deposed.  Have you ever testified in
22  court?
23      A.  Yes.
24      Q.  And how many times have you testified?
25      A.  Twice.

11

1       Q.  What were the nature of those proceedings?
2       A.  The -- one was in connection with this time that
3   I was an expert on workers' compensation issue in a
4   civil case in district court in Texas, the State
5   district court.  The other time was an issue that arose
6   from a lawsuit against Farmers Insurance.  And I was
7   subpoenaed to testify in that case with regard to
8   negotiations and mediation that I conducted as a member
9   of the legislature trying to resolve that dispute.  It
10  was over homeowner's insurance.  And I testified briefly
11  in Travis County district court on that case.
12      Q.  And the first case you said was in State district
13  court?
14      A.  Right.
15      Q.  And the second one was in Travis County district
16  court --
17      A.  State court, yes.
18      Q.  Oh, the State court.  Have you ever been a party
19  to a lawsuit?
20      A.  No.
21      Q.  Other than the redistricting case which we talked
22  about, have you ever been involved in a case in which
23  the State of Texas was either a plaintiff or defendant?
24      A.  No.
25      Q.  What did you do to prepare for today's

12

1   deposition?
2       A.  Well, I had a brief visit with Mr. Sweeten over
3   the phone and then briefly this morning before we came
4   in here.  And I reviewed parts of the transcript of the
5   hearings in 2009-2011.
6       Q.  Which parts of the transcript did you review?
7       A.  Mainly the parts were in the beginning where I
8   was mainly involved in those issues.
9       Q.  The beginning of the legislative debate?
10      A.  Right.
11      Q.  Are you referring to the Committee of the Whole
12  debate?
13      A.  Right.
14      Q.  And your meetings with Mr. Sweeten, how long did
15  you talk to him on the phone?
16      A.  20 minutes.
17      Q.  Was anybody else on the phone?
18      A.  No, not that I know of.  There may have been
19  somebody else from his office, but I can't remember who
20  it was.  I just remember Mr. Sweeten.
21      Q.  Other than your attorneys, have you spoken to
22  anybody about your deposition today?
23      A.  Other than scheduling it, no.
24      Q.  Have you spoken to anyone who has been deposed in
25  this case?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

13

1    A. Not about this -- about the case or the
2    deposition.
3    Q. Have you reviewed any transcripts from anybody
4    who's been deposed in this case?
5    A. No.
6    Q. Did you bring any notes or documents with you
7    today?
8    A. No.
9    Q. Is it your understanding that you, as a state
10   legislator, may invoke legislative privilege?
11   A. Yes.
12   Q. Will you be invoking the legislative privilege
13   over your deposition testimony today?
14   A. Yes.
15        MS. MARANZANO: I would like to note, for
16   the record, that we've received a court order on June
17   5th about what topics are covered by the legislative
18   privilege and what topics are not covered by the
19   legislative privilege. I'm going to ask questions in
20   compliance with that court order. Obviously your
21   attorney can object to questions that he believes invade
22   the legislative privilege and give you instructions
23   accordingly. But I want to say, for the record, that
24   we're reserving our right to appeal that decision at the
25   appropriate juncture.

14

1    BY MS. MARANZANO:
2    Q. Can you describe your educational background for
3    me?
4    A. Yes. I completed a BS degree in 1976 in
5    agricultural economics, a JD degree from the Texas Tech
6    University School of Law in 1981. And that's generally
7    it.
8    Q. Are you currently licensed to practice law?
9    A. Yes.
10   Q. And in what states are you admitted to the bar?
11   A. Texas.
12   Q. Any others?
13   A. Just federal courts and Supreme Courts, 5th
14   Circuit.
15   Q. And your bar license is currently active?
16   A. Yes.
17   Q. Can you tell me every legal job you've had since
18   graduating from law school?
19   A. Yes. I served as an associate in the law firm of
20   Crenshaw, Dupree & Milam until 1984. And then I was a
21   partner in that firm and have been a partner in that
22   firm since then and continue today to be a partner in
23   that firm.
24   Q. And do you have a special area you work on in
25   that firm?

15

1    A. I don't have a legal specialization. I primarily
2    am involved in litigation, personal injury and
3    commercial.
4    Q. How long have you served in the Senate?
5    A. I was elected in the special election and sworn
6    in in December of 1996.
7    Q. And you've served continuously since then?
8    A. Yes, ma'am.
9    Q. Have you held other elected offices?
10   A. Yes, ma'am.
11   Q. And what are those?
12   A. I was a member of the Texas House of
13   Representatives from 1993 until 1996 when I resigned to
14   run for the Senate.
15   Q. What made you decide to seek public office?
16   A. In essence, public service.
17   Q. Can you tell me about the population of the
18   district that you currently serve pre-redistricting?
19   A. Well, be more specific.
20   Q. Do you have any sense of the population
21   demographics?
22   A. I would be speculating on them. I know that the
23   region of the state I represent has Anglo and Hispanic
24   influence and Hispanic influence is growing.
25   Q. Any sense of what percentage, approximately?

16

1    A. Well, I would be guessing so I don't want to
2    speculate on that. I've seen the numbers and know the
3    numbers. But from a general list, but I don't want to
4    lay a number out without being specific. Those
5    demographics exist and change periodically. But
6    generally we have -- in rural West Texas we're Hispanic
7    and Anglo primarily, with African-American as well.
8    Q. Do you do any outreach in your district that's
9    geared particularly at minority communities?
10   A. I try to be available and outreach to all
11   communities. And yes, I do. I work very well with
12   Hispanic leaders and members of the Hispanic community,
13   as well as the African-American community.
14   Q. What do you mean by that, "you work well with
15   leaders of the Hispanic community"?
16   A. Well, I support their events and meet with them
17   on a regular basis. They support me. I recently had a
18   fundraiser. It was supported by and sponsored by
19   Hispanic leaders in the Lubbock community. And so, you
20   know, I try to -- my district is very broad and verse
21   and I try to do the best I can to meet the needs of the
22   members of my constituents I represent.
23   Q. Would you say that Hispanics are an important
24   constituency in your district?
25   A. They are.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

17

1   Q. Would you say African-Americans are an important
2   constituency in your district?
3   A. They are.
4   Q. What committees do you serve on in the Texas
5   Senate?
6   A. I chair the State Affairs Committee. I serve on
7   the Finance Committee, Higher Education Committee, on
8   Jurisprudence -- Committee on Jurisprudence and, you
9   know, various select committees that are appointed
10  during the interim. I don't think I left anything out.
11  Q. You what?
12  A. I think I covered everything.
13  Q. Okay. How long have you served on the State
14  Affairs Committee?
15  A. I was initially appointed to that committee in
16  2003. And in 2000 -- excuse me, 2001 -- no, 2003. I'm
17  sorry, 2003. And then I became chair in 2004 or '05,
18  2004, I believe.
19  Q. How did you become chair?
20  A. The Lieutenant Governor appoints the chairman of
21  select committees.
22  Q. And who was the Lieutenant Governor at that time?
23  A. Lieutenant Governor Dewhurst, David Dewhurst.
24  Q. What were the -- did you say you were on a couple
25  select committees?

18

1   A. Right.
2   Q. What were those?
3   A. Well, I've been on several. But mostly involving
4   school finance, public school finance.
5   Q. Anything else?
6   A. That's all. I think that's really, mainly it.
7   Q. And what's the purpose of a select committee?
8   A. Well, generally a select committee has members of
9   both the House and the Senate to study an issue in the
10  interim and often times they'll also have members of the
11  general public, as school finance did.
12  Q. Are they always held during interim sessions?
13  A. Normally. I can't recall of one not. There's no
14  requirement of that, but it would be unusual to have a
15  select committee operating during a 140-day general
16  session.
17  Q. Other than the Committee of the Whole, is the
18  State Affairs Committee the only Senate committee that
19  considered voter ID bills?
20  A. To my recollection, I believe that to be the
21  case, as far as I remember.
22  Q. If a Senator wishes to introduce a bill that's
23  going to be heard by the State Affairs Committee, do
24  they usually confer with you about that bill?
25  A. No.

19

1   Q. Putting aside voter ID bills, how many election
2   related bills have you sponsored?
3   A. That's a good question. I don't know the answer
4   I have, because as chairman of the committee we
5   interface with the Secretary of State quite a bit and
6   during the terms that I have served as chairman we've
7   implemented HAVA, we've implemented -- last session we
8   did the MOVE Act. So we've worked with the Secretary of
9   State's office. And typically I will sponsor those
10  bills, or a lot of times Leticia Van de Putte will do
11  that. She handles a lot of legislation and she and I
12  have worked together on those issues with regard to
13  election bills.
14  Q. Is Senator Van de Putte also on the State Affairs
15  Committee?
16  A. Yes.
17  Q. And so am I understanding you correctly, it's a
18  number of legislation bills you've sponsored?
19  MR. SWEETEN: You can refer to matters of
20  the public record when answering this.
21  BY MS. MARANZANO:
22  Q. We're just talking about ones that you've
23  publicly sponsored?
24  A. I can't give you an amount. That would be in the
25  record. You can look that up.

20

1   Q. Right. But are you saying you can't give me an
2   amount because it's more than a few?
3   A. Well, that and I've carried a lot of bills over a
4   lot of things in the 14 or 15 years. So I just can't
5   tell you specifically what they are. I can tell you
6   like I did, the general -- the bills that basically are
7   mandated to be -- by Congress to be a part of the State
8   systems, typically I'll handle those. But not always.
9   It depends if there's another member who wants to do
10  that, that's fine with me.
11  Q. And how does that work, if a federal law passes
12  that the State needs to implement, does the Secretary of
13  State usually reach out to you? How do you end up
14  proposing a law to implement HAVA or the MOVE Act, as
15  you referenced?
16  MR. SWEETEN: I'm going to object to the
17  question to the extent it calls for him to reveal his
18  mental impressions, his thoughts, his motivation about
19  legislation or the furtherance of the legislative
20  process. I'm going to instruct you not to answer to the
21  extent that your answer would implement those things.
22  You're free to refer to matters of the public record.
23  Also I'm going object to the question as vague and
24  compound.
25  A. I'll follow his instruction.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                        June 7, 2012

21

1    Q. (By Ms. Maranzano) Okay. There's nothing on the
2  public record that you could tell me about how the State
3  goes about implementing a federal election law that
4  passes?
5    A. Well, the public -- yeah, there is. If you look
6  at the record of our committee. When a bill is passed,
7  or introduced and then it goes to the hearing process.
8  And so there's a recorded testimony, there is evidence
9  that's put in the record and all of that is a part of
10  the legislative record and that's where it is. It's
11  pretty clear on how it goes about what the testimony is,
12  Secretary of State will testify. Typically the expert
13  in their office will testify as to the need for the
14  bill. And that's how that works.
15    Q. Okay. Are there primary areas of focus, of
16  legislative focus that you work on?
17    A. Not really. I've had pretty -- well, work in a
18  lot of different areas.
19    Q. Other than being the chair of the State Affairs
20  Committee, do you have any leadership roles in the
21  Senate?
22    A. Today, that's it.
23    Q. In the past have you had other leadership roles?
24    A. I was chairman of the Jurisprudence and was
25  president pro tem.

22

1    Q. And when were you chair of the Jurisprudence
2  Committee?
3    A. 2003 and 2000 -- 2001, 2003, I think.
4    Q. 2001 to 2003?
5    A. I think it was two sessions.
6    Q. Approximately. Okay. When were you president
7  pro tem?
8    A. 2011. No, 2009. Sorry. Sorry.
9    Q. What are the responsibilities of being president
10  pro tem?
11    A. Well, I think the main responsibility is the
12  constitutional position. And should the Lieutenant
13  Governor not be in the state or not be able to act,
14  well, then, the pro tem immediately succeeds that
15  position. If the Lieutenant Governor leaves office, the
16  president pro tem then must call a special session to
17  elect a presiding officer. That's primarily -- when the
18  Lieutenant Governor and the governor are out of the
19  state temporarily, then the president pro tem moves into
20  the head of the government. So it's primarily what it's
21  responsibilities include.
22    Q. Do you have any experience related to election
23  law?
24    A. Other than serving on the State Affairs Committee
25  no.

23

1    Q. Do you have any experience related to election
2  administration?
3    A. No.
4    Q. Have you ever served as a poll worker?
5    A. No.
6    Q. While you -- well, let me ask you this. Do you
7  vote in person?
8    A. Yes, ma'am.
9    Q. Have you ever witnessed any problems while you've
10  been voting?
11    A. No.
12    Q. Have you ever seen anybody try to impersonate
13  another voter, that you're aware of, while you've been
14  voting?
15    A. No.
16    Q. Have you ever seen a non-citizen trying to vote
17  while you've been voting, that you're aware of?
18    A. I wouldn't be aware.
19    Q. Have you ever challenged a voter's eligibility?
20    A. No.
21    Q. Are you familiar with a group called the American
22  Legislative Exchange Council, or ALEC?
23    A. I've heard of them.
24    Q. Have you ever had any affiliation with them?
25    A. No.

24

1    Q. Have you ever gone to any of their meetings?
2    A. No.
3    Q. Have you ever received any documents or
4  communications from them?
5    A. Not that I know of. You know, I'm not a member
6  so I don't get their documents. If they send something
7  generally to everybody in the legislature, maybe so. I
8  don't know. I don't recall seeing anything. It might
9  not get to me.
10    Q. Are you familiar with a group called the National
11  Conference of State Legislators?
12    A. Yes, ma'am.
13    Q. Do you have any affiliation with that group?
14    A. With who?
15    Q. National Conference of State Legislators.
16    A. I think, like all legislators, we're probably
17  members, the legislature is. But I don't have any
18  particular, individual affiliation or office or anything
19  like that. I don't go to the meetings other than, I
20  think I've given a speech at one. And I think I got an
21  award when I was in the House and I went to one as a
22  result of that award.
23    Q. Can you tell me when you gave the speech?
24    A. I think it was in 2009, something like that 2008
25  or '09.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                          June 7, 2012

25

1   Q.  Do you -- what was that about?
2   A.  Retirement benefits.
3   Q.  And what did you get an award for?
4   A.  The National Republican Legislators Award,
5   something like that, when I was in the House.
6   Q.  When was that?
7   A.  '94 or '95, 95.
8   Q.  And was it for anything in particular?
9   A.  No.
10  Q.  Just being a good legislator?
11  A.  Not sure why I got it.
12  Q.  Okay.  Have you received materials from the
13  National Council of State Legislators?
14  A.  I'm sure we have over the -- overtime.
15  Q.  Do you know if any of them involved voter ID?
16  A.  I don't know.
17  Q.  Do you have any familiarity with a group called
18  Safe Texas?
19  A.  No.
20  Q.  Do you know who they are?
21  A.  No.
22  Q.  Do you have any familiarity with a group called
23  Secure and Fair Elections in Texas?
24  A.  No.
25  Q.  Are you familiar with someone by the name of

26

1   Melinda Frederick?
2   A.  No.
3   Q.  Are you familiar with someone by the name of Tony
4   Ann Dashiell, D-A-S-H-I-E-L-L?
5   A.  No, ma'am.
6   Q.  Do you know someone by the name of Russ Durstine?
7   A.  Durstine, yes, I know Russ.
8   Q.  Can you tell me who he is?
9   A.  Russ is, I think the -- isn't he from San Angelo.
10  I think Russ is from San Angelo, which is in my
11  district.  Or he's either that or he's active in the
12  Republican Party Chairman's Association.  One of those
13  two.  I think Russ is a constituent from San Angelo.
14  Q.  Have you had any communications with Mr. -- say
15  his last name for me again?
16  A.  Durstine.
17  Q.  Durstine.  About voter ID?
18  A.  No.  Probably not.
19  Q.  Probably not?
20  A.  Probably not.
21  Q.  Are you familiar with someone by the name of
22  Barbara Larson?
23  A.  No.
24  Q.  How about -- are you familiar with someone by the
25  name Tom Mecler?

27

1   A.  Yes.
2   Q.  Who is Mr. Mecler?
3   A.  He's a member of the SREC.
4   Q.  And what is the SREC?
5   A.  State Republican Executor's Committee.
6   Q.  Have you had any --
7   A.  And I think he's also a member of the -- he's on
8   the Texas Department of Criminal Justice Board as well,
9   I believe.
10  Q.  I'm sorry.  I didn't catch that?
11  A.  The Texas Department of Criminal Justice Board, I
12  think he's on that, too.
13  Q.  Have you had any communications with Mr. Mecler
14  about voter ID?
15  A.  No.  Not that I recall.
16  Q.  Are you familiar where someone by the name of
17  Bill Nobel?
18  A.  Bill who?
19  Q.  Nobel.
20  A.  No.
21  Q.  Do you know someone by the name Eric Opiela?
22  A.  No.
23  Q.  Linda Rogers?
24  A.  No.
25  Q.  Are you familiar with someone by the name of

28

1   Skipper Wallace?
2   A.  Yes.
3   Q.  And who is Skipper Wallace?
4   A.  Skipper Wallace is the person who is affiliated
5   or associated with the Republican County Chair's
6   Association, I believe.
7   Q.  Do you have any communications with Mr. Wallace
8   about voter ID?
9   A.  Not other than -- you know, I believe Mr. Wallace
10  probably testified in front of the committee.  I would
11  assume that he did because he did on a number of
12  different issues.  He would be the person who would
13  testify in front of the State Affairs Committee on
14  election issues and things like that.
15  Q.  Did you have any communications, apart from his
16  testimony, from Mr. Wallace about voter ID issues?
17  A.  Not that I recall.
18  Q.  Are you familiar with someone by the name of
19  Maria Martinez?
20  A.  No.
21  Q.  Are you familiar with someone named Catherine
22  Englebreth?
23  A.  Catherine who?
24  Q.  Englebreth.
25  A.  No.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                          June 7, 2012

29

1   Q. Have you heard of an organization called True to
2   Vote?
3   A. No.
4   Q. Have you heard of an organization called the King
5   Street Patriots?
6   A. Yes.
7   Q. Do you have any affiliation with them?
8   A. No.
9   Q. Did you have any communications with the King
10  Street Patriots about voter ID?
11  A. If I did it would have been as an entity or a
12  person who represented that entity testifying before the
13  committee.
14  Q. I think I understand you. But just to be clear,
15  you're saying any communications you would have had with
16  them would have been them testifying at the State
17  Affairs Committee?
18  A. Right. I don't recall ever having -- and I had
19  very few meetings like that on issues like that in my
20  office. It would be something that would -- typically I
21  would just say come to the committee and talk to the
22  committee.
23  Q. Okay. So --
24  A. So that would be my interface with those folks.
25  Q. And just to be clear, when you say "you have very

30

1   few meetings like that," what do you mean by that?
2   A. Well, I mean typically serving in the
3   legislature, serving on the finance committee, other
4   capacities. I'm very seldom in my office. And so -- in
5   fact, I'm never in the office. So I'll be in a
6   committee room or in hearing or, you know, typically on
7   the floor all day long. And so I typically don't
8   entertain a lot of in office meetings with people about
9   legislation pending before my committee. My standard
10  thing is come to the committee and testify.
11  Q. Got it. Can anybody come to the committee and
12  testify?
13  A. Yes.
14  Q. During the times of the year when you are not in
15  the legislative session, do you have meetings with
16  people about potential legislative issues?
17  A. From time to time. But, you know, not that many,
18  quite frankly. I mean, there may be constituents in
19  Lubbock or there may be something on workers'
20  compensation or, you know, from time to time people will
21  come to you with ideas. But that's probably like every
22  member, you know, has some meetings and dealings with
23  different trade organizations or work constituents.
24  Q. When you say "not that many," is it -- can you
25  just give me and approximate number?

31

1   A. No.
2   Q. Like a couple a months?
3   A. I'm not going to guess. But, you know, I will
4   say this. Typically in Austin, you know, I will come
5   during the interim once, maybe, a month for one day,
6   maybe two. Usually it's before -- because of a hearing.
7   Typically, if I have a meeting with someone it
8   will be, 90 percent of the time, an agency head over an
9   issue, whether it's a budget issue or an issue that I
10  have jurisdiction over in State Affairs or in some
11  committee or if I passed a bill. And if it's an
12  insurance bill I want to meet with the commissioner and
13  say, "What are you doing with regard to that?" Those
14  are the kinds of meetings I have in Austin.
15  In Lubbock I will have meetings from time to
16  time. I try to never turn down a constituent who wants
17  to come meet with me there. Or in San Angelo. I go to
18  Childress. I have 51 counties now. I had 46. So
19  it's -- you try to meet with your constituents, but at
20  the same time, logistics also cause us some issues
21  there.
22  Q. And you said your district was in Western Texas;
23  is that right?
24  A. Yes, ma'am.
25  Q. Can you describe, just very generally, the

32

1   geographic area?
2   A. Sure. It's -- before redistricting, it was 46
3   counties that spanned from the Panhandle all the way
4   down to Eldorado, Texas. And the major -- the larger
5   cities would be Lubbock and San Angelo. Came near
6   Abilene and Amarillo and near Wichita Falls as well.
7   Q. Can you tell me your staff members who work for
8   you in your legislative capacity?
9   A. Yes. My chief of staff is Porter Wilson. At
10  that time my general council was Cory Pomeroy. The
11  director for State Affairs and also general council is
12  Jennifer Fagan. My staff person in charge of Article 2
13  and health and human service issues is Jennifer
14  Chambers. Sara Clifton is the staff person in charge
15  of -- at that time -- she was with me at this time, in
16  2011. And then numerous staff members that are -- that
17  I can't remember the names of that are interim hires or
18  rather, staff session hires, with regard to legal issues
19  and things like that that, you know, younger lawyers
20  that help us with the committee and briefing bills and
21  working through problems with bills in the committee.
22  Q. And for a couple of these people you said "at
23  that time," and you were referring to during the 2011
24  legislative session?
25  A. Right. That's legislation.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                    June 7, 2012

33

1   Q. Which of these staff worked on the voter ID
2   issue?
3   A. Jennifer Fagan.
4   Q. Anybody else?
5   A. Probably not.
6   Q. Do you know someone by the name of Megan LaVoie?
7   A. Uh-huh.
8   Q. Who is Megan LaVoie?
9   A. I'm sorry. Megan is -- handles the media for us
10  primarily. She's a law student who has just graduated
11  and studying for the bar now.
12  Q. Is she a staff of yours?
13  A. Yes, she still is. I just -- don't tell her I
14  forgot.
15  Q. All right. How often do you communicate with
16  your staff during the legislative session?
17  A. Daily.
18  Q. And how do you usually communicate with them?
19  A. Directly.
20  Q. In terms of verbally?
21  A. Right.
22  Q. Do you ever e-mail with them?
23  A. You know, other than "can you come to the
24  office," yes. "Would you send me -- send down a granola
25  bar," or "would you order me lunch." Just logistical

34

1   things. I don't -- it's hard to communicate like that
2   when you're trying to listen to a hearing or something
3   like that. So at the end of the day, we meet before we
4   go home and we debrief about what's happened.
5   Q. So when you do communicate with them, do you have
6   a blackberry or a phone?
7   A. At that time I had a blackberry, but I didn't --
8   we didn't communicate other than for the purpose of,
9   "can you bring me a granola bar" or, "somebody is here"
10  or whatever. And that's it.
11  Q. Okay. Non-substantive communication?
12  A. Yeah. I'm not very good at that thumb typing
13  stuff, plus I don't -- I think if a member is at the
14  committee dios, you ought to be listening and not
15  communicating with folks. I feel strongly about that.
16  Q. Do you ever use -- when you said you have -- I
17  think I didn't get an answer. Did you say you used a
18  blackberry when you do that?
19  A. Right.
20  Q. And is that a personal blackberry or work
21  blackberry?
22  A. It was a personal blackberry or law firm
23  blackberry.
24  Q. And do you save the messages on that?
25  A. No.

35

1   Q. Do you delete them or do they automatically get
2   deleted?
3   A. I don't know what happens to them, quite frankly.
4   The blackberry quit working so I had to replace it. And
5   because that technology is, more or less, going
6   obsolete, I replaced it with an iPhone. And I
7   definitely can't work that.
8   Q. Me either, actually. Is there someone in your
9   office who maintains legislative records?
10  A. You know, I guess everybody does. We don't
11  have -- we follow whatever the secretary of the Senate
12  tells us to do. I assume my chief of staff probably
13  handles most of that for the committee. It would have
14  been Jennifer Fagan.
15  Q. So the secretary of the Senate issues a retention
16  policy about files?
17  A. Yes.
18  Q. Okay.
19  A. We follow that.
20      MS. MARANZANO: Can we have this marked?
21      (Exhibit No. 520 was marked.)
22  BY MS. MARANZANO:
23  Q. Senator, I'm showing you what we're marking, for
24  the record, as deposition Exhibit 520. Can you just
25  take a look at this and let me know if it looks familiar

36

1   to you?
2   A. Yes, ma'am.
3   Q. And what is this?
4   A. It is a notice of deposition for today.
5   Q. And when you received this notice, can -- well,
6   did you receive this notice?
7   A. Well, we did. And I instructed staff to assemble
8   the documents I think that are necessary to comply.
9   Q. And did the staff turn those documents over to
10  your attorney?
11  A. Yes, they did.
12  Q. Can I direct your attention to request No. 5,
13  which is on the second to last page. Do you know how
14  many documents you turned over that were responsive to
15  that request?
16  A. No, ma'am.
17  Q. Who in your staff conducted the search for these
18  documents?
19  A. I think that Ms. Fagan did.
20  Q. Do you know if she searched electronic documents
21  as well as hard copies of documents?
22  A. I assume that she did and followed the
23  instructions in the subpoena.
24  Q. Did you have any communications with her about
25  her search for documents?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

37

1   A. Other than when the subpoena came in, she called
2   and said we were notified by subpoena. Of course, we
3   get those kind of requests all the time. Typically, she
4   will do those. And I said, "Well, go ahead and comply
5   with it and turn it over to the Attorney General's
6   office." It was more or less routine in our office to
7   do that sort of thing.
8   Q. It's routine because of public information
9   request?
10   A. Sure. Yeah.
11   Q. Did you have any files compiled already that you
12   had done for public request on this issue?
13   A. No, I don't think so.
14   Q. Are you familiar with Section 5 of the Voting
15   Rights Act?
16   A. Not -- I know it exists. I'm not an expert on
17   it.
18   Q. What's your understanding of the requirements
19   under Section 5?
20   A. Well, you know, I'm not -- I don't really want to
21   go into what my understanding of it is. I think that
22   is, Section 5 of the Voting Rights Act, I believe is the
23   requirement for preclearance; is that correct? Is this
24   a test?
25   Q. No. I'm not trying to test you, sir. I'm really

38

1   not.
2      MR. BRAZIL: You'll be graded later.
3   A. Thank you. What I'm trying to figure out is what
4   are you asking, I guess. It's not clear to me.
5   Q. (By Ms. Maranzano) Right. Well, let me ask you
6   a different question. Are you familiar with a
7   requirement under the Voting Rights Act by which Texas
8   has to submit election related changes to either the
9   Department of Justice or federal court to get
10   preclearance?
11   A. I am familiar that we are required to do that.
12   Q. Okay. Could you describe as a general matter any
13   steps of the legislature takes to increase the chances
14   that a law is going to be precleared by the Department
15   of Justice or a federal court?
16      MR. SWEETEN: I'm going to instruct you not
17   to answer on the basis of legislative privilege. The
18   question would require you to reveal your thoughts,
19   mental impression and motivation about legislation in
20   furtherance of the legislative process. So I'm going to
21   instruct you not to answer on that basis.
22   BY MS. MARANZANO:
23   Q. All right. Let me ask you this, Senator. Is
24   there anything based on the public record that you could
25   tell me about the steps the legislature takes in regards

39

1   to Section 5?
2      MR. SWEETEN: Again, if you will confine
3   your answers to matters of the public record. Do not
4   reveal your thoughts, mental impressions or motivations
5   about this.
6   A. The committees in the Texas Senate hold hearings.
7   Those hearings are recorded and the documents that are
8   presented to be included in the record are included in
9   the record. And that would be the public record. The
10   Senate debates are the same way, as far as we don't use
11   exhibits on the Senate floor. But the debates and the
12   amendments to bills are in the public record.
13   Q. And again, based on the public record, does the
14   legislature usually do some sort of factual analysis to
15   determine if a law is going to have a retrogressive
16   effect on minorities?
17      MR. SWEETEN: Objection; compound.
18   Objection. Don't answer if it requires you to reveal
19   your mental impressions, opinions, motivation about
20   legislation. You can refer to matters of the public
21   record. But if in referring to the public record you
22   would be revealing your mental impressions do not do so.
23   It's subject to privilege.
24   BY MS. MARANZANO:
25   Q. And just to be clear, this isn't really -- I'm

40

1   not asking about what you personally do. I'm asking
2   about steps the legislature takes, available in the
3   public record, in terms of a factual analysis about
4   election related changes and whether or not they have a
5   retrogressive effect?
6      MR. SWEETEN: Same instruction.
7   A. I think the public record reflects what we do
8   very clearly and we follow, you know, the -- in the
9   committees we have hearings, we have public hearings.
10   And the testimony that we receive; pros and cons,
11   analytical, not so analytical, is in the public record.
12   Q. And just in terms of a "yes" or "no" answer for
13   this one. Do you do anything beyond that testimony. Do
14   you do any analysis beyond that testimony?
15      MR. SWEETEN: Don't answer that question.
16   That would require you --
17      MS. MARANZANO: Not even to say "yes" or
18   "no"?
19      MR. SWEETEN: No, not even a "yes" or "no."
20   You're asking him about his mental impression,
21   motivation. Whether he does something beyond the public
22   record would go into that and he's not going to provide
23   it based upon the legislative privilege objection.
24      MS. MARANZANO: Okay. This isn't about him.
25   This is about steps the legislature takes. So it's not



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                              June 7, 2012

41

1   his mental impressions.  And I'm not trying to probe
2   what it is, I'm just asking for a "yes" or "no."
3         MR. SWEETEN:  And, you know, respectfully,
4   my response is that if you're asking him things beyond
5   the public record, if things are done, then you would
6   potentially be asking him to reveal communications he's
7   had with other senators, with legislative staff, with
8   State agencies, Texas legislative council constituents,
9   you would be asking for his mental impressions and
10  thought process.  So with respect to that, I'm going to
11  instruct him not to answer that question as posed.
12  BY MS. MARANZANO:
13        Q.  You're following your counsel's instructions,
14  just for the record?
15        A.  Yes, ma'am.
16        Q.  Thank you.  Based on the public record, are there
17  any steps that the legislature takes to build a record
18  that supports an assertion that there's no
19  discriminatory purpose behind the bill?  Based on the
20  public record.
21        MR. SWEETEN:  First of all, I think he's
22  answered based on the public record.  I think he's
23  answered this question.  Secondly, you're now asking him
24  about his process as reflected in the public record.
25  And in that regard, you're seeking to find out his

42

1   mental impressions, opinions and his motivations about
2   legislation.  So he's referred to the public record.  He
3   can do that, but he's not going to get into what his
4   thinking is about how something complies with the Voting
5   Rights Act.  That is absolutely subject to the
6   privilege.
7   BY MS. MARANZANO:
8         Q.  Okay.  Well, let me try it this way.  We spoke
9   about the public record in regard to the retrogressive
10  effect.  And you said people testify at hearings and
11  they're all transcribed or recorded, I think you said.
12  And now I'm just asking about, is there anything
13  additional that happens on the public record that goes
14  to building a record to support an assertion that
15  there's no discriminatory purpose?
16        A.  First, I don't recall you ever asking me about
17  specifically the retrogressive effect.  So I'm not sure
18  I understand your question.  So if you could -- the
19  foundation was fairly lengthy.  If you could just --
20        Q.  Yes.  I'm sorry.  I thought my last question had
21  been about the effect.  That was when you said to me
22  that there were hearings, the hearings were recorded
23  people testified.
24        A.  Well, I just didn't hear the word retrogression
25  effect.

43

1         Q.  Yes.  So this time I'm asking you about, based on
2   the public record, does the legislature take steps to
3   build a record that would support an assertion that
4   there's no discriminatory purpose behind an act?
5         MR. SWEETEN:  Okay.  You're asking him, does
6   the legislature build a record to support facts and
7   based upon the public record.  In doing that, you're
8   asking for more than what's on the public record.
9   You're asking for, are they taking steps to build a
10  record.
11        MS. MARANZANO:  On the record.
12        MR. SWEETEN:  He's not going to talk about
13  his process on what steps they take, the purpose of
14  those steps.  He's not going to answer that question.
15  You can ask him, you know, as to what's on the public
16  record.  But you're not going to get into his thoughts
17  and mental impressions.  There's a line there and these
18  last few questions you're getting into his mental
19  impressions and I'm not going to let him do that.  That
20  is subject to privilege.
21        MS. MARANZANO:  Okay.  I am actually -- I am
22  really not trying to get into his mental impressions.
23  I'm trying to ask him about the steps taken on the
24  record.  And we went through the effect and now I'm
25  asking about steps taken on the record that go to the

44

1   purpose of the legislature.  What sort of steps does the
2   legislature take on the public record that support an
3   assertion that there's no discriminatory purpose behind
4   the bill.
5         MR. SWEETEN:  Again, you're asking for his
6   motivations in that question.  He can testify about what
7   is on the record.  He's not going to testify about steps
8   taken to build a record.  And to answer that question.
9   So you're treading into what is subject to the
10  legislative privilege and I'm going to instruct him not
11  to answer.
12  BY MS. MARANZANO:
13        Q.  When you talked about the committee proceedings,
14  are there any procedures, public procedures established
15  by the committee that relate to Section 5 of the Voting
16  Rights Act?
17        MR. SWEETEN:  You can testify about matter
18  on the public record.
19        A.  I don't know if there are any specific rules or
20  requirements with regard to any specific law of how we
21  would handle anything.
22        Q.  (By Ms. Maranzano) Senator, What is Texas'
23  current system for verifying a voter's identity?
24        MR. SWEETEN:  You can answer.
25        A.  Well, in the statute.  I think you have -- there



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

45

1   is -- I think you present a voter registration card as
2   one.  If you don't have the card, you can present other
3   forms of ID.  I think generally that's it.  I mean, if
4   you can show me the statute I can tell you specifically.
5       Q.  If a voter doesn't have a voter registration
6   card, are you familiar with the forms of ID that the
7   voter would need to show?
8       A.  I believe it's a driver's license or -- there are
9   other alternative forms of ID as well.
10      Q.  Are there some non-photo IDs that a voter can
11  show?
12      A.  I believe that's correct.  Under the current law
13  before Senate Bill 14.
14      Q.  Exactly, yes.  Do you know if a utility bill is
15  one of those forms of identification?
16      A.  Whatever the statute says is what it says.
17      Q.  And if the voter doesn't have any of those forms
18  of identification, can a voter cast a provisional
19  ballot?
20      A.  I think that's correct.
21      Q.  And do you know the standards by which that
22  provisional ballot may or may not be counted?
23          MR. SWEETEN:  Hold on a second.  You're
24  asking about existing law.  I'm going to let him answer
25  that to the extent he knows.

46

1           MS. MARANZANO:  Thank you.
2       A.  I will be -- you know, I'm like most lawyers I
3   would have to go to the statute and look.  I'm not going
4   to guess on what it says specifically.
5       Q.  (By Ms. Maranzano)  Okay.  Is it your
6   understanding that a voter does not need to take an
7   additional trip anywhere to in -- and show the registrar
8   one of the -- this is current law, one of the forms of
9   ID under current law in order for that provisional
10  ballot the be counted?
11      A.  I would have to look at the statute.  And I
12  didn't look at the statute to prepare.
13      Q.  Okay.  Is the current system for verifying a
14  voter's identity inadequate?
15          MR. SWEETEN:  Objection.  It calls for
16  matters of legislative privilege.  Don't answer the
17  question.
18  BY MS. MARANZANO:
19      Q.  Let me ask you this.  Did anything come up on the
20  public record that reflects problems with the current
21  system for verifying a voter's identity?
22          MR. SWEETEN:  You can answer the question as
23  phrased.
24      A.  You would have to look at the public record.  I
25  think -- you know, I don't recall specific anecdotal

47

1   testimony.  I recall whatever is in the record, is in
2   the record is all I can say.  I didn't look at the whole
3   record.  It's a long record.  And so I would be going
4   solely off of memory.  And I'm not comfortable doing
5   that.
6       Q.  So right now as you sit here, you're not aware of
7   problems that were testified to on the public record
8   with the current system of verifying a voter's identity?
9       A.  That's not what I said.  I just said I'm not
10  prepared to go into specific instances.  It is in the
11  record.  Whatever is in the record, is in the record.
12      Q.  Okay.  But right now -- but I'm just asking you
13  what you know right now, sitting here today, and you're
14  not prepared to testify about any?
15      A.  Right now I know there was.  But I can't recall
16  the specific instances to the degree of certainty that I
17  would be comfortable testifying under oath about.
18      Q.  Okay.  You recall there were problems that were
19  testified to?
20      A.  Yes.  I think there were.  But you would have to
21  go to the record to see what they were.
22      Q.  Well, what do you remember about the record?
23      A.  I don't.
24      Q.  You don't?  So you can't tell me anything about
25  those problems?

48

1       A.  I can tell you this -- and, you know, there were
2   issues.  But I'm not prepared to go into specific anecdotal
3   situations.  The record reflects that.  And the record
4   will have to speak for that.
5       Q.  Can you tell me when you first heard support for
6   enacting a photo identification law in Texas?
7           MR. SWEETEN:  You can answer to the extent
8   it doesn't reveal matters of legislative privilege.
9       A.  I can't remember specifically.
10      Q.  (By Ms. Maranzano)  Can you tell me
11  approximately?
12      A.  No.
13      Q.  Do you remember what the first voter
14  identification law that you worked on was?
15      A.  I don't remember the specific bill.  I know --
16  and I didn't work on them.  I was never a sponsor of any
17  of these bills.  They would either, when I took over as
18  State Affairs chairman that's the jurisdiction, voter
19  election laws are in that jurisdiction with a lot of
20  other things.  And so I think there was an interim study
21  on that.  I think there was -- there were bills that
22  were passed went through the committee after that.
23      Q.  Okay.
24          MS. MARANZANO:  Can we mark this?
25          (Exhibit No. 521 was marked.)



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

49

1   BY MS. MARANZANO:
2       Q. Senator, I'm showing you what we're marking as
3   deposition Exhibit 521. If you can take a look at it
4   and tell me if it looks familiar to you?
5       A. No.
6       Q. No? Have you ever seen this bill before?
7       A. I don't -- it's a House Bill. If it passed the
8   House and came to the committee, I would assume I would.
9   I don't know if it did pass the House.
10      Q. Well, I'll represent to you that this bill did
11  pass the House.
12      A. Okay.
13      Q. And it was referred to the State Affairs
14  Committee.
15      A. Okay.
16      Q. Perhaps that refreshes your recollection
17  slightly.
18      A. Well, yes. If that's the case, then we would
19  have heard this bill in the committee.
20      Q. Do you recall if you did hear the bill?
21      A. If you can tell me what year.
22      Q. I'm sorry. This is from 2005.
23      A. Okay. I assume we did hear the bill, but I don't
24  know. You will have to look at the record.
25      Q. Well, I will represent to you that this bill was

50

1   referred to and there was not a hearing on the bill. Do
2   you have any recollection -- you can take a couple of
3   minutes and maybe look it over and see if you have any
4   recollection. You can see at the top it was introduced
5   by -- it's House Bill -- for the record, it's House Bill
6   1706.
7       A. Okay. I do not know why the bill didn't get a
8   hearing. That was seven years ago. There are a number
9   of reasons why bills don't get hearings. So I couldn't
10  tell you, nor do I know if the public record reflects
11  why it didn't get a hearing. I don't know.
12      Q. What are some of the reasons that a bill doesn't
13  get hearing?
14          MR. SWEETEN: Yeah. Don't reveal your
15  thoughts, mental impressions about legislation in
16  answering the question. That's subject to the
17  legislative privilege.
18  BY MS. MARANZANO:
19      Q. Are you able to provide an answer?
20      A. Well, I'm not sure I understand the question.
21      Q. You said there are several reasons a bill might
22  not get a hearing, so I was asking you what are those
23  reasons?
24          MR. SWEETEN: Again, don't reveal your
25  thoughts or mental impressions. I'm also going to

51

1   object based on compound and vague. If you can answer
2   it without revealing your thoughts and mental
3   impressions or communications that you've had, then do
4   so. But the you can't --
5       A. The only thing I can do without -- without going
6   into the legislative privilege is just generally in all
7   committees: Number one, there's not support for the
8   bill. Number two, it's not ready. It has flaws or
9   technical flaws in it and you can't get any agreement to
10  fix it. Number three, and sometimes this is number one,
11  is that there's just not time. A bill doesn't get over
12  to the Senate from the House until late in the session
13  and there's just not time to take up the bill and hear
14  it, especially if it is a bill that requires a lot of
15  testimony. And there are just a lot of discretionary
16  issues that are involved in generally -- in doing that.
17  So that's basically -- that's a few of them. Sometimes
18  they get tagged. They're procedural rules that members
19  follow to prevent bills from getting heard that they
20  don't want to have heard. So it's -- you know, a lot of
21  different ways to -- and reasons why bills don't get
22  hearings or why they don't -- they don't pass.
23      Q. But what does it mean to have a bill tagged?
24      A. In the rules require -- there's a 48 -- when the
25  bill is in a committee, in a standing committee, it

52

1   requires -- a member can ask for a 48-hour hearing. And
2   a 48-hour notice, which is typically twice the notice.
3   So if it's -- you don't ever see that until the end of
4   the session. And it -- you know, somebody will tag a
5   bill and you'll run out of time to hear it.
6       Q. I think the issue that you said before we talked
7   about tagging was that there may just not be enough
8   time. About how much time does a committee need to have
9   a hearing and refer the bill to the floor?
10      A. Depends on the bill.
11      Q. Do you know about how much time a bill like
12  HB 1706 would need?
13          MR. SWEETEN: Objection. I think the
14  question is vague. Also you -- don't reveal matters of
15  legislative privilege about a specific bill. You can
16  answer about general procedures as long as they're
17  matters in public record, but don't reveal your mental
18  impressions in answer.
19      A. Would you repeat the question?
20      Q. (By Ms. Maranzano) About how much time would a
21  bill, such as HB 1706 or another voter ID bill, need to
22  get heard in committee and then referred out?
23          MR. SWEETEN: Same objection. Instruction.
24      A. I can't answer that specifically. There is no
25  formula for how much time it takes. It just depends on



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

---

53

1    the bill.
2        Q.  (By Ms. Maranzano)  Okay.  And can you just give
3    me a sense of -- just a sense of what you mean by that?
4    What about the bill informs how much time you need?
5            MR. SWEETEN:  Let's -- I'm going to object
6    based upon compound, vague.  Also don't reveal any
7    thoughts, mental impressions or communications about any
8    specific legislative act in answering the
9    question.
10       A.  Logistically, depends on how many witnesses you
11   have, depends on the availability of members to be
12   there.  It depends on the length of the bill.  A number
13   of logistical objective things like that.
14       Q.  (By Ms. Maranzano)  Okay.  And one of the other
15   issues you mentioned that sometimes prevents a bill from
16   getting a hearing in committee is there might not be
17   support for the bill.  Were you referring to support in
18   the committee or support in the Senate?
19           MR. SWEETEN:  And this is as a general
20   matter.
21   BY MS. MARANZANO:
22       Q.  As a general matter.
23       A.  A general matter, either way.
24       Q.  How do you usually know if a bill has support?
25           MR. SWEETEN:  You can answer as a general

---

54

1    matter.
2        A.  You don't, unless -- you may hear or know or what
3    you may have a sense as a chairman in your judgment.
4        Q.  (By Ms. Maranzano)  Do you make the determination
5    of whether a bill has a hearing or not?
6            MR. SWEETEN:  Objection to the question as
7    compound.  And don't reveal matters subject to the
8    legislative privilege including your mental impressions,
9    thoughts and opinions.  You can answer as a general
10   matter of procedure, if you can.  But don't reveal
11   privilege.
12       A.  As a general matter, chairmen determine what
13   bills are heard and when they're heard.
14       Q.  (By Ms. Maranzano)  Can you direct your attention
15   to Section 7 of HB 1706, and just take a quick look at
16   that.
17       A.  What page is that on?
18       Q.  I'm sorry.  Page 4 and I goes on to Page 5.  And
19   it looks like it also goes on to Page 6.  And actually
20   the top of 7?
21       A.  Okay.
22       Q.  Do you see that -- well, do you see that this
23   legislation provides for a number of different forms of
24   identification to be used?
25       A.  It appears to have a number of different options.

---

55

1        Q.  And is there both photo ID and non-photo ID
2    listed there?
3        A.  It looks like they all require that, but I may be
4    wrong.
5        Q.  I'm sorry.  It looks like they all require what?
6        A.  A photo identification.
7        Q.  Well, do you see that on Page 5 towards the
8    bottom it says there's a Section B?
9        A.  Oh, there's an alternative, yeah.  Utility bill,
10   which is current law, official mail address.
11       Q.  So would you agree that it allows for both photo
12   an non-photo ID?
13           MR. SWEETEN:  You can answer based on the
14   text of the bill.
15       A.  I think that's what it says.
16       Q.  (By Ms. Maranzano)  Did you have any
17   communications about HB 1706, that you can recall?
18       A.  No, I don't recall any.  I'm not saying I didn't.
19   I just -- it's been a long time ago.
20       Q.  Right.  I understand.  Are you aware of the
21   source of the legislative language for HB 1706?
22       A.  No, ma'am.
23       Q.  Do you know if your staff had any involvement in
24   the development of HB 1706?
25       A.  I'm going to say probably not.  It's a House

---

56

1    Bill.  And so we wouldn't have been involved with that.
2    And I don't know who the Senate sponsor was.
3        Q.  Is it pretty unusual for Senate staff to be
4    involved in developing a House Bill?
5            MR. SWEETEN:  You can answer as a general
6    matter.
7        A.  As a general matter, yes.  But there were times
8    when we worked with House members to build an early
9    consensus, if that's ever possible.
10       Q.  (By Ms. Maranzano)  Did you take a public
11   position on HB 1706?
12       A.  I don't recall.
13       Q.  Do you know if there was any analysis done on
14   HB 1706?
15           MR. SWEETEN:  Don't reveal matters of
16   privilege.  Objection; vague.  Go ahead.
17       A.  The House may have done a bill analysis as they
18   normally do and if it passed the House floor then --
19           MR. SWEETEN:  Yeah.  I'm also going -- go
20   ahead and finish.
21       A.  Oh, I'm sorry.  I'm not aware that the Senate did
22   anything.
23           MR. SWEETEN:  I'm going to object on the
24   foundation as it calls for speculation.
25   BY MS. MARANZANO:

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                              June 7, 2012

57

1   Q.  You're not aware that the Senate did any analysis
2   on House Bill 1706?
3   A.  I don't recall any.
4   Q.  What was the purpose of 1706, if you know?
5       MR. SWEETEN:  You can answer as to the
6   general purpose.  Don't provide the subjective intent of
7   anyone if you know.
8   A.  I'm going to start by saying this is a House
9   Bill.  And it was generated by the House members.  It's
10  not a Senate Bill.  So I'm not going to speculate on
11  what their purpose was.  The general purpose of the
12  voter ID bill was to assure voter integrity or voting
13  integrity.  And that's the primary general purpose of
14  all these types of bills.  It's the general purpose of
15  what we do with a lot of the election bills.  HAVA, even
16  MOVE was designed to help military voters.  So that's
17  the general purpose.
18  Q.  (By Ms. Maranzano)  And based on the public
19  record, do you think that this would have accomplished
20  that goal?
21      MR. SWEETEN:  Don't answer the
22  question.  She's asking for your mental impressions and
23  thoughts about whether this bill accomplishes a certain
24  goal.  So don't answer the question as phrased.  It's
25  legislative privilege.

58

1   BY MS. MARANZANO:
2   Q.  I assume you're not going to answer.  Just for
3   the record, you're going to follow your counsel's
4   instruction not to answer that question?
5   A.  Yes, ma'am.
6   Q.  Do you recall a photo identification bill being
7   introduced in 2007?
8   A.  No.
9   Q.  Do you recall, in 2006, an interim report that
10  the State Affairs Committee did?
11  A.  Yes, ma'am.
12      MS. MARANZANO:  Can we have this marked?
13      (Exhibit No. 522 was marked.)
14  BY MS. MARANZANO:
15  Q.  Can you take a look at that and let me know if
16  you recognize it?
17  A.  I do.
18  Q.  Is this a copy of the interim report that was
19  done in December of 2006?
20  A.  Yes.  It is.
21  Q.  By the State Affairs Committee?
22  A.  Yes, ma'am.
23  Q.  What prompted this interim report?  I mean, how
24  did it come about that the State Affairs Committee
25  issued this report?

59

1       MR. SWEETEN:  Yeah.  Don't answer the
2   question to the extent it would reveal thoughts, mental
3   impressions, opinions, motivation about legislation or
4   any communication you've had with legislators, staff,
5   State agencies, Texas ledge council.
6   A.  If you'll refer to the record, the report was a
7   part of the interim charges that the Senate State
8   Affairs Committee was to take up.
9   Q.  And do the interim charges come from the
10  governor?
11  A.  No.
12  Q.  Who do they come from?
13  A.  Generally they come from the Lieutenant Governor
14  with, I think, input from other members of the Senate.
15      MR. SWEETEN:  Are we at a point where we can
16  take a break in just a few minutes.
17      MS. MARANZANO:  Yeah.
18      MR. SWEETEN:  When you get to a logical
19  stopping point.
20      MS. MARANZANO:  Yeah.  Why don't we do it
21  now before we get into this too much.  Thanks.
22      (Brief recess.)
23  BY MS. MARANZANO:
24  Q.  So before the break we were taking a look at
25  interim report that the State Affairs Committee did.

60

1   Can you take a look for me -- at the first page is a
2   letter that's written to you.  And the signatures are on
3   the next page.  It's from Senator Lucio and Senator
4   Ellis.  Do you see that letter?
5   A.  Yes, ma'am.
6   Q.  You tell me, were there any members of the
7   committee other than Senator Lucio and Senator Ellis who
8   were minority members?
9   A.  Who?
10  Q.  Who were on the committee when this report was
11  issued.
12  A.  The names of the committee members are on the
13  first page on the letterhead.  And then I think all
14  members signed the report.
15  Q.  And were any, other than Senator Ellis and
16  Senator Lucio, racial or ethnic minorities?
17  A.  Not according to this list.  Well, Frank Madla
18  was a member, but I think he -- I'm not sure why he
19  wasn't on the list.  Maybe he had stopped serving or
20  maybe that was an old letterhead that shouldn't have
21  been used.  But I can't -- it shows that he is on the
22  committee.  And I recall that he was on the committee
23  for a while.
24  Q.  His name was?
25  A.  Frank Madla.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

61

1    Q. And what race or ethnicity is he?
2    A. Hispanic. He may have gone off and -- he may
3    have been -- I think that he lost his reelection and
4    that may have been why he didn't -- the report was done
5    after January 1st so that may have been why he wasn't on
6    it.
7    Q. I see. Okay. What was the purpose of this
8    report?
9    A. General purpose was to as stated in the charge.
10       MR. SWEETEN: You can refer to matters of
11   public record. I don't want you to give -- you don't
12   have to give the general -- you've answered the
13   question.
14   A. The general purpose as stated in the charge.
15   Q. (By Ms. Maranzano) Can you tell me what that is?
16   A. Well, the record reflects that -- I don't think
17   you provided the whole report.
18   Q. I'm sorry. I didn't.
19   A. The entire report the charge in it.
20   Q. Okay. And I should have said that earlier. This
21   is actually an excerpt from the report. Well, what's
22   your understanding, as you sit here today, as to what
23   the purpose was?
24       MR. SWEETEN: Again, you can refer to
25   matters of public record.

62

1    A. Purpose of what?
2    Q. (By Ms. Maranzano) Of this report.
3    A. The -- that you have before me?
4    Q. Let me narrow it, because what I'm interested in
5    is the section of the report that says here, which looks
6    like there were several different issues you looked at.
7    And this was related to charge No. 3. And I think that
8    this might be the charge that you're referring to under
9    charge No. 3 on Page 13?
10       MR. SWEETEN: Again, you can refer to
11   matters in the public record in answering the question.
12   Don't reveal matters that are subject to the privilege.
13   A. The charge No. 3 is -- is the purpose for
14   writing -- general purpose for writing a report. And
15   the record here reflects the instructions provided in
16   the charge.
17   Q. (By Ms. Maranzano) Do you see that first
18   sentence under charge No. 3 says, "Study and make
19   recommendations on how election of firms could verify
20   the identity of a voter without hindering a person's
21   right to vote?"
22   A. I do.
23   Q. Did the committee come up with a recommendation
24   on that?
25       MR. SWEETEN: Again, you can refer to

63

1    matters of the public record. Don't reveal matters of
2    privilege including conversations you've had with anyone
3    or your own thoughts or mental impressions.
4    A. The report, which was prepared in 2006, reflects
5    the committee's carrying out the charge. Number,
6    whatever it is, 13, I believe. Whatever the charge
7    is -- it's charge No. 3.
8    Q. (By Ms. Maranzano) Can you just turn back to the
9    letter for a second. It says -- there's a sentence in
10   the second paragraph that says, "The committee makes no
11   recommendations regarding policy issues in favor or in
12   opposition to voter identification or ballot
13   authenticity."
14   A. Where is this? I'm sorry.
15   Q. It's in that letter that we were looking at.
16   It's in the second -- yeah, that one.
17   A. The one from Senator Ellis.
18   Q. From Senator Ellis and Lucio. And it's in that
19   second paragraph and it's a phrase of the second
20   sentence.
21       MR. SWEETEN: It's right there.
22   A. Okay.
23   Q. (By Ms. Maranzano) Does that refresh your
24   recollection as to whether a recommendation was made
25   about voter identification and ballot authenticity?

64

1        MR. SWEETEN: You can reveal matters of the
2    public record.
3    A. It reflects what Senator Ellis said and Senator
4    Lucio.
5    Q. (By Ms. Maranzano) Do you have a different
6    recollection?
7    A. No.
8        MR. SWEETEN: Wait a minute. Can you
9    rephrase the question? Do you have a different
10   recollection of what?
11       MS. MARANZANO: Well, he said --
12       MR. SWEETEN: That it says this?
13       MS. MARANZANO: He said this reflects what
14   Senator Ellis and Senator Lucio said. I'm sorry.
15   BY MS. MARANZANO:
16   Q. Do you have a different recollection of what
17   occurred?
18       MR. SWEETEN: You can refer to matters of
19   the public record. Don't reveal matters of privilege.
20       MS. MARANZANO: I believe this should all be
21   a public record question.
22       MR. SWEETEN: Are you asking him -- I don't
23   understand what you're asking him. Are you asking him
24   does it say what it says. Are you asking him did he
25   write the letter.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

65

1          MS. MARANZANO:  No.  I'm asking did the
2     committee make a recommendation regarding voter
3     identification.
4          MR. SWEETEN:  You can refer to matters of
5     public record.
6     A.  I think you just have to read the report and
7     determine that.  And the report speaks for itself.
8          Q.  (By Ms. Maranzano)  All right.  But I'm just
9     asking you, specifically I'm just wanting to find out
10    your knowledge.  And so as you sit here today, do you
11    have a recollection as to whether there was a
12    recommendation made?
13         MR. SWEETEN:  You can answer.
14    A.  The report reflects.
15         MR. SWEETEN:  Go ahead.  Sorry.
16    A.  The report reflects what we did seven years ago.
17    Q.  (By Ms. Maranzano)  Okay.  And did you -- did the
18    committee thoroughly study this issue prior to making
19    the report based on the public record?
20         MR. SWEETEN:  Yeah.  Don't answer the
21    question as asked.  The question directly asks your
22    thought processes.  I mean, the term "thoroughly" asks
23    for your mental impressions, opinions, motivation about
24    legislation.  Could implicate discussions.  Don't answer
25    as phrased.

66

1     BY MS. MARANZANO:
2     Q.  Okay.  Let me ask it this way.
3          MR. SWEETEN:  Legislative privilege.
4     BY MS. MARANZANO:
5     Q.  What did the committee do in order to issue this
6     report?
7          MR. SWEETEN:  You can refer to matters of
8     the public record.  Don't reveal your processes, mental
9     impressions, opinions, motivations about legislation.
10    A.  I believe the report is fairly clear and specific
11    what we did.
12    Q.  (By Ms. Maranzano)  And as you sit here today,
13    can you add any testimony to that?
14         MR. SWEETEN:  Don't reveal matters of
15    privilege.  You can refer to matter of the public
16    record.  But your thoughts and mental impressions are
17    your own and are subject to the legislative privilege.
18    A.  I wouldn't be able to elaborate further than
19    what's in the report.
20    Q.  (By Ms. Maranzano)  Okay.  Can you, in that same
21    paragraph that we were talking about in the letter, do
22    you see there's a sentence that says, "However,
23    Georgia"?
24    A.  Let's -- when you say "letter," you're referring
25    to Senator Ellis's letter.

67

1     Q.  Yes.  Exactly.  Same paragraph -- second
2     paragraph.  But this one is towards the bottom.  The
3     sentence starts with, "However, Georgia Secretary of
4     State, Cathy Cox, recently completed a demographic
5     analysis revealing that between a quarter and a third of
6     senior and African-American voters lacked State photo
7     identification, thus disenfranchising them from the
8     election process."  Do you know if that was a study that
9     was looked at by the State Affairs Committee in the
10    public record prior to issuing this report?
11    A.  No, I do not know.
12    Q.  And can you look at the last paragraph on that
13    page?  There's a sentence that says, "It is our shared
14    belief that anti-fraud measures adopted by the federal
15    Help America Vote Act sufficiently deter voter fraud and
16    that additional photo identification measures are
17    unnecessary."  Did the committee, based on the public
18    record, analyze whether the identification under the
19    Help America Vote Act would sufficiently deter voter
20    fraud?
21         MR. SWEETEN:  Yeah.  Don't answer the
22    question to the extent it requires you to reveal your
23    mental thoughts, impressions, analysis, motivation about
24    legislation.  You can refer to matters of the public
25    record in answering it, but other than that don't answer

68

1     it.
2     A.  I don't recall other than what's in the report.
3     Q.  (By Ms. Maranzano)  Can you look at Page 25 and
4     26 in the report for me?  On Page 25, do you see a chart
5     that talks about voter fraud investigation from 2006?
6     A.  Yes.
7     Q.  And the fourth one down says, "unspecified
8     allegations."  Can you tell me what that means?
9          MR. SWEETEN:  You can refer to matters of
10    the public record.  Don't reveal your thoughts or mental
11    impressions in answering the question.
12    A.  I don't recall.
13    Q.  (By Ms. Maranzano)  A few down below that there's
14    one that says, "unlawfully accepting a voter and
15    illegally voting."  Can you tell me what that means?
16         MR. SWEETEN:  Same instruction.
17    A.  No.  I would have to -- I don't recall what that
18    is.
19    Q.  (By Ms. Maranzano)  And a few below that,
20    "illegal ballot handling," do you recall what that
21    means?
22         MR. SWEETEN:  Same thing.  You can refer to
23    matters of the public record.  Don't reveal your mental
24    thoughts and impressions about that, other than what's
25    on the public record.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

69

1    A. I don't recall specifically what that refers to.
2    Q. (By Ms. Maranzano) Do you see on -- that
3  chart -- am I correct, that chart is labeled "voter
4  fraud investigations"?
5    A. Yes.
6    Q. And on the next page there's a chart that's
7  listed "voter fraud convictions"?
8    A. Yes.
9    Q. And do you see in that paragraph below it says,
10  "Although there have been three instances of alleged
11  illegal voting which may include circumstances prevented
12  by voter photo ID, only one of these has been fully
13  investigated and referred for criminal prosecution." Do
14  you know if that case that's referred to there, that was
15  referred for prosecution, resulted in a conviction?
16    MR. SWEETEN: Yeah. Don't answer the
17  question except for to the extent it's a matter of
18  public record.
19    A. I don't know.
20    Q. (By Ms. Maranzano) Do you remember any details
21  about that case, based on the public record?
22    A. No.
23    Q. Do you remember any details about the other cases
24  that may have been prevented by a voter photo ID based
25  on the public record?

70

1    MR. SWEETEN: Same objection; legislative
2  privilege, but you can answer to the extent you can
3  refer to public record.
4    A. I don't know.
5    Q. (By Ms. Maranzano) After this report was issued,
6  were there any bills introduced to prevent voter fraud
7  in the vote by mail process, based on the public record
8  that was introduced?
9    MR. SWEETEN: Well, you're asking -- no.
10  You're asking were there bills --
11    MS. MARANZANO: After the report. Not
12  related to the report.
13    MR. SWEETEN: If you want to ask him if
14  there were bills related to photo identification, I'll
15  let him answer the question. You're asking him to
16  address a problem, is what you've put in -- and I think
17  this that's intruding into legislative purpose. In
18  other words, you're asking as result of this, what is
19  the effect to introduce X. He's not going to answer it
20  as phrased. I will let him answer if chronologically an
21  additional photo ID bill was introduced, matters of the
22  public record, he can refer to. But he's not going to
23  reveal his thoughts and mental impressions, as subtle as
24  you want to be, he's not going to do that.
25  BY MS. MARANZANO:

71

1    Q. Okay. No, I've got you. How about I ask it like
2  this. In the 2007 legislative session, were there bills
3  introduced related to the vote by mail process?
4    A. Number one, I didn't introduce any bills.
5    Q. Okay.
6    A. Number two, there may be bills -- the members
7  introduce about 5,000 bills a session. So there may
8  have been bills. I'm not familiar with them,
9  specifically.
10    Q. Do you recall having any hearings on any bills
11  about the vote by mail process in the State Affairs
12  Committee?
13    MR. SWEETEN: You can answer.
14  BY MS. MARANZANO:
15    Q. In the 2007 legislative session?
16    A. As we sit here today, no. If you show me a
17  record, I might refresh my recollection. But if we had,
18  in that committee, several hundred bills and I'm not
19  sure -- when you start talking dates I just can't -- a
20  lot of water has been under the bridge since 2007 so I
21  can't give you a specific answer.
22    Q. How about do you remember any bills related to
23  vote by mail on which the State Affairs Committee heard
24  testimony in either the 2009 or 2011 legislative
25  sessions?

72

1    MR. SWEETEN: You can answer as phrased.
2    A. All of these years run together and so I can't
3  give you a specific time frame of when we heard bills,
4  unless you show me the bill.
5    Q. (By Ms. Maranzano) Okay. But sitting here
6  today, and I'm not trying to ask you which session it
7  was introduced, but do you have a recollection of
8  hearings in the State Affairs Committee on vote by mail
9  bills?
10    A. I think we did. But, you know, again, we hear a
11  lot of bills. And so I believe we did have some
12  legislation in regard to vote by mail. I'm not sure if
13  I sponsored it, it was part of an omnibus bill or what.
14  But I can't recall, specifically, the details around
15  that.
16    Q. Okay. Fair enough. Can you look at the page
17  that says Page 28 at the bottom. And there's a
18  subheading that says "conclusion." Under the second
19  paragraph in that section, there's a sentence that
20  starts with 200. It says, "244 of Texas' 254 counties,
21  96 percent have at least one office." If you look at the
22  sentence before, I think it's referring to driver's
23  license offices. Would you agree with that?
24    A. I'm not finding it.
25    Q. I'm sorry?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                              June 7, 2012

73

1    A. Let me find it.  Oh, it's in the second
2  paragraph.  Yeah, I see.
3    Q. Do you see the sentence now, 200?
4    A. Yes, ma'am.
5    Q. And that's referring to driver's license offices?
6    A. That's what it says.
7    Q. Do you know how many counties currently have
8  driver's license offices in Texas?
9    A. I couldn't tell you.
10   Q. Based on the public record of what occurred in
11 the committee, did the committee determine that the
12 number of driver's license offices in the state was a
13 component that needed to be looked at when analyzing
14 voter ID legislation?
15       MR. SWEETEN:  Don't answer it.  It requests
16 information that would be subject to the legislative
17 privilege.  You can refer to the record for factual
18 matters, but don't reveal your processes or analysis.
19   A. The report speaks for itself on that issue.
20   Q. (By Ms. Maranzano)  And can you look at the
21 paragraph below that.  And the sentence that says,
22 "Opponents of voter ID legislation requiring a photo ID
23 for foreign and elderly voters.  However, as the lack of
24 reports on voter fraud, there are no studies to believe
25 status to support this claim."  Based on the public

74

1  record, did the committee make any effort to look into
2  whether -- how many minority voters, minority registered
3  voters possessed forms of photo identification?
4        MR. SWEETEN:  Don't answer the question as
5  phrased.  It calls for matters of legislative privilege.
6        MS. MARANZANO:  Mr. Sweeten, can he testify
7  at least as to whether this issue was discussed on the
8  public record?
9        MR. SWEETEN:  I will allow him to answer
10 that question, was the issue discussed on the public
11 record, yes.  Were any steps taken -- your previous
12 question was, were any steps taken to do an analysis is
13 not appropriate.  But, yeah, he can answer that
14 question.
15 BY MS. MARANZANO:
16   Q. Okay.  Let me ask you, were any discussions of
17 that taken -- held on the public record?
18   A. You'll have to look at the public record.  I
19 don't -- that's seven years ago and, you know, I can't
20 remember anything specifically -- or can't remember what
21 specific debates or conversations.  Again you've got --
22 we do a lot of legislation.  And it's not -- that's a
23 long time ago.  The report, in the record of the report,
24 would be the best evidence of what we considered and
25 what the committee conclusions were.

75

1    Q. When you're having an interim -- when you're
2  creating an interim report like this one, do you have
3  public testimony in front of the State Affairs Committee
4  as with -- as you testified happened on other matters in
5  front of the State Affairs Committee?
6    A. On most issues, yes.
7    Q. Do you recall if that occurred with this report?
8    A. No.  You know, it may -- the public record would
9  have to reveal that.
10   Q. Can you look at the last sentence in that
11 paragraph that we were just talking about which says,
12 "It is unknown whether the current level of voter fraud
13 will decrease, but a voter photo ID law will certainly
14 prevent some fraud.  At the very least it would increase
15 voter confidence."  Can you tell me if there were
16 discussions on the public record that would allow you
17 to -- were there discussions on the public record about
18 those statements?
19   A. You would have to look at the public record.
20   Q. You have no independent recollection?
21   A. I don't.
22   Q. Can you look at the next page for me.  There's a
23 subheading that says "recommendations."  Under 3 A, do
24 you see that second bullet?
25   A. I do.

76

1    Q. It says, "Issuance of qualifying photo IDs free
2  of charge to any voter requesting, regardless of
3  personal income."  Can you tell me what was the purpose
4  of including that language?
5        MR. SWEETEN:  Don't answer the question if
6  she's asking for your mental thoughts, processes,
7  analyses.
8        MS. MARANZANO:  What about the purpose of
9  the committee, this legislative purpose?
10       MR. SWEETEN:  If you're asking him what is
11 the purpose of the committee.
12       MS. MARANZANO:  For making this
13 recommendation.
14       MR. SWEETEN:  No, he's not going to answer
15 as to the specific recommendation set forth throughout
16 whatever these recommendations are.  That would require
17 him to reveal matters of legislative privilege.  He can
18 refer to the record itself.  But he's not going to
19 answer based on his mental impressions, thoughts,
20 opinions, analysis.  Don't answer except to the extent
21 it's a matter of public record.
22       MS. MARANZANO:  For the record, I disagree.
23 I think that's a question as to the general legislative
24 purpose, which I believe the order allows us to ask.
25       MR. SWEETEN:  Let's pull the order out.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                          June 7, 2012

77

1      MS. MARANZANO:  I'm referring to Page 11.
2      MR. SWEETEN:  I'm going to go to the order
3  on general purpose.  Let's do that first.  The order
4  that I'm reading is dated 5/17/12.  And it says, "It is
5  ordered that to the extent such a privilege exists, that
6  privilege does not protect testimony with respect to the
7  general purpose or the purpose of the legislature as a
8  whole in enacting Senate Bill 14 as opposed to the
9  subjective intent of the legislator."  So he can answer
10 as to the general purpose of legislation.  You're now
11 asking him about, not legislation, but instead you're
12 asking him about something called the Senate Committee
13 on State Affairs interim report to the 80th Legislature.
14 In particular you're asking him about paragraph 3A.2 of
15 Page 29 of that report and what it's purpose was.  That
16 is --
17     MS. MARANZANO:  No, no, no.
18     MR. SWEETEN:  That is not the same thing.
19 He can talk about general purpose of a statute.  He's
20 not going to talk about general purpose of different
21 bullet points within that recommendation.  That is not
22 contemplated by the order that we just read.  Go ahead.
23     MS. MARANZANO:  Mr. Sweeten, I wasn't
24 asking -- the way I interpret what you just read is that
25 I'm not allowed to ask about his subjective motivations.

78

1  I'm not asking that.  I'm asking the committee's purpose
2  for putting this bullet in.  And I'm reading from the
3  order that we got on June 5th, Page 11.  It says, "With
4  respect to deposition testimony this court has already
5  ordered that foundational privilege questions are
6  proper, as are questions regarding overall legislative
7  purpose, as opposed to an individual legislator's motive
8  with respect to the bill."  I'm not asking for his
9  motive.  I'm asking for the committee's purpose.
10     MR. SWEETEN:  Show me where you just read
11 because there's an important word in there.
12     MS. MARANZANO:  F.
13     MR. SWEETEN:  F what?
14     MS. MARANZANO:  The first sentence under F
15 on Page 11.
16     MR. SWEETEN:  "With respect to the
17 deposition testimony this court has already ordered that
18 foundational privilege questions are proper," which
19 we're allowing.  You'll agree we're completely allowing.
20     MS. MARANZANO:  Yes.
21     MR. SWEETEN:  "As are questions regarding
22 overall legislative purpose as opposed to an individual
23 legislator's motive with respect to the bill."  This
24 isn't a bill.  This is an interim report.  It is a
25 sub-subparagraph of an interim report.  And you're

79

1  asking him what he means within that bullet point.  And
2  that is not what the court has said.  We will give
3  general purpose.  We're not going to give bullet by
4  bullet interpretation of what you meant at this date on
5  this report.  That is beyond what the court has ordered.
6  I think that is beyond the scope of the legislative
7  privilege that I am now asserting.
8      MS. MARANZANO:  All right.  Well, we've got
9  to move on.
10 BY MS. MARANZANO:
11     Q.  And I think we are done with this document.  So
12 you can put that aside.  And I believe before -- when we
13 started looking at this deposition I asked you if you
14 recall the photo ID bill being introduced in 2007 and I
15 think you said no; is that correct?
16     A.  That's right.  I don't recall a Senate Bill or
17 House Bill or -- in 2007, whether we considered the
18 bill.  It seems like we did, but I can't recall
19 specifically that.
20     MS. MARANZANO:  Okay.  This we can mark as
21 Exhibit 28 because we've previously marked it.
22     (Exhibit No. 28 was previously marked.)
23 BY MS. MARANZANO:
24     Q.  I'm showing you what we're marking as deposition
25 Exhibit 28.  If you can take a look at that and let me

80

1  know if you recognize this, this bill.
2      A.  I recognize it as House Bill 218.  And it shows
3  on there that it was apparently filed before the end of
4  2007 legislative session, if it was filed.  And it
5  appears it was because it was assigned a number, 218.
6      Q.  Are you familiar with the provisions of House
7  Bill 218?
8      A.  As we sit here today, no.
9      Q.  Can you take a look at Section 11 of the bill
10 which is on page -- Section 11, looks like it starts on
11 Page 9.
12     A.  Okay.
13     Q.  Does it appear that, for the most part, House
14 Bill 218 follows House Bill 1706?
15     MR. SWEETEN:  You can refer to the text of
16 the bill, matters of the public record.
17     A.  Well, it would take a while to do a side by side
18 analysis.
19     Q.  For the most part, just generally.
20     A.  They are both bills relating to requiring a voter
21 to present proof of identification.
22     Q.  And do you see that House Bill 218 allows for
23 both photo and non-photo identification to be presented?
24     A.  If you would point me to where you reach that
25 conclusion.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                June 7, 2012

81

1    Q. Sure. So on Page 10 there's a subsection B.
2    A. Yes, I see that.
3    Q. Okay. And would you agree that allows for some
4  forms of non-photo identification?
5    A. It states that the following documentation is
6  acceptable of proof of identification under this chapter
7  and then it lists a number of things. And it appears
8  that some of those things do not have a photo ID.
9    Q. Did you or did anybody in your office my a role
10 in the development of House Bill 218?
11   A. Because it's a House Bill, no.
12   Q. I'm sorry. You said no?
13   A. We did not.
14   Q. Did you have communications about House Bill 218?
15   A. With whom?
16   Q. Anybody. First let me just ask if you did?
17   A. Not that I recall -- well, when?
18   Q. At any point.
19   A. Today?
20   Q. Other than at this deposition, have you had
21 communications about House Bill 218, that you recall, as
22 you're sitting here?
23   A. I don't recall any.
24   Q. Are you aware of whether your staff had any
25 communications about House Bill 218?

82

1    A. I do not know.
2    Q. If they did, do you think you would know?
3    A. Not necessarily.
4    Q. Did you monitor the consideration of House Bill
5  218 in the House?
6    A. No.
7    Q. Do you recall if House Bill 218 was referred to
8  the State Affairs Committee?
9    A. I don't know if it passed the House. If it did
10 pass the House, you know, whatever the record shows, the
11 record shows. That was in 2007. So that was five years
12 ago.
13          (Exhibit No. 523 was marked.)
14 BY MS. MARANZANO:
15   Q. So I only have one copy of this. I'm showing you
16 what we're marking as deposition Exhibit 523 which is --
17 well, can you tell me what that is?
18   A. The title is Texas Legislature Online History.
19   Q. Can you take a look at that and just let me know
20 if it refreshes your recollection at all as to the
21 procedural history of House Bill 218?
22   A. Well, it's a record of the history. I'm not sure
23 it refreshes my recollection of anything.
24   Q. Fair enough.
25   A. But it appears that, yes, it doesn't refresh my

83

1  memory, but it would reflect what happened to the bill.
2    Q. And does it look like the bill passed the House?
3    A. According to this document, it passed to
4  engrossment on 4/23/07.
5    Q. Did you have any communications with anybody
6  about carrying House Bill 218 in the Senate?
7         MR. SWEETEN: You can answer the question as
8  phrased, but don't reveal the substance of any
9  communications.
10   A. I really don't remember. Some people may tell
11 you they're going to carry a bill or whatever. But I
12 don't recall in this particular instance how that came
13 about.
14   Q. (By Ms. Maranzano) As a general matter, how is
15 it usually determined what senator will carry a bill
16 that passes the House?
17   A. There is no -- chairmen are different about how
18 they do that. Some chairmen are very particular and
19 some aren't. And so it just depends on what committee
20 in the House or the Senate the bill goes to.
21   Q. Can you tell me how you do it just as general
22 matter?
23         MR. SWEETEN: I think you're asking for him
24 to reveal his mental impressions and thought process.
25 How would determine -- carries a bill if he did. So

84

1  objection; legislative privilege. Instruct not to
2  answer.
3  BY MS. MARANZANO:
4    Q. Did you and Senator Fraser communicate about
5  House Bill 218?
6         MR. SWEETEN: You can answer the question as
7  phrased.
8    A. I'm sure we did.
9    Q. (By Ms. Maranzano) Do you have any recollection
10 of communicating with him?
11   A. No. No.
12   Q. Are you aware of any communications about House
13 Bill 218 that reflect concerns that this bill would have
14 a disproportionate impact on minority voters?
15         MR. SWEETEN: Don't answer the question as
16 phrased. This is more than a general subject matter
17 description. If you want to rephrase it and put less of
18 a -- you know, lead up to the question, then he can
19 answer it if you rephrase it. Right now I'm going to
20 instruct him not to answer that question.
21 BY MS. MARANZANO:
22   Q. Let me try it this way. Did you have any
23 communications about House Bill 218 with groups
24 representing minority voters?
25         MR. SWEETEN: You can answer.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                           June 7, 2012

85

1   A.  Communications with groups, what do you mean by
2   groups?
3   Q.  (By Ms. Maranzano)  Groups who are representing
4   the interest of minority voters?
5   A.  The record of the committee will reflect those
6   communications.
7   Q.  So apart from the committee, you didn't -- you
8   aren't aware of any other communications?
9   A.  I'm not aware or recall any of those.
10   Q.  Do you recall any communications, apart from
11   testimony in front of the committee, with local elected
12   officials about House Bill 218?
13   A.  Do I recall, I really don't.  When you say "local
14   elected officials," what are you talking about, who are
15   you talking about?
16   A.  County officials, voter registrars.
17   A.  I don't recall any.  If there are, typically with
18   regard to procedural issues and things like that are
19   necessary in implementing a new voting process, we hear
20   from the committees, the election officials of
21   committees; this causes this issue, this causes this,
22   this causes that.  You need to take into account that.
23   And that would be typically done through the hearing
24   process.  We may have information about that.  But with
25   regard to the general policy consideration, I don't

86

1   recall any.
2   Q.  What was the purpose of House Bill 218?
3   A.  To preserve voter integrity or ballot integrity.
4   Q.  Based on the public record, was there any
5   evidence that a problem existed with ballot integrity?
6       MR. SWEETEN:  Objection to the extent that
7   it asks for your mental impressions about any problem
8   that any legislation was attempting to address.  You can
9   refer to the public record as to anything you've heard
10   regarding a problem.  But don't reveal your mental
11   impressions or thoughts about why you worked on a bill,
12   what a bill was meant to address.  You can just discuss
13   what's in the public record.
14   A.  The public record reflects what information the
15   committee heard on House Bill 218 in 2007.  I wouldn't
16   have any independent recollection of any of that.
17   Q.  (By Ms. Maranzano)  Was House Bill 218 -- was
18   part of the purpose of House Bill 218 to prevent
19   non-citizens from voting?
20   A.  No.
21   Q.  Are you familiar with any statements that
22   Representative Betty Brown made on the floor about House
23   Bill 218?
24   A.  No.
25   Q.  Do you recall the Senate's consideration of House

87

1   Bill 218?
2   A.  At what point?
3   Q.  Overall.  Let me ask you.  Do you have a
4   recollection of it, first?
5   A.  I have a recollection, generally, of the fact
6   that we had a voter ID bill go through the committee and
7   considered by the Senate.
8   Q.  Was the bill amended in the committee?
9   A.  I don't recall.  The record would have to reflect
10   that.
11   Q.  Can you tell me how the witnesses who testified
12   on House Bill 218 were selected?
13       MR. SWEETEN:  Don't answer the question.  It
14   would call for your mental impressions, thoughts,
15   opinions about legislation.
16   BY MS. MARANZANO:
17   Q.  And you're following your counsel's instruction?
18   A.  Yes.
19   Q.  Was House Bill 218 voted out of committee, to the
20   best of your recollection?
21   A.  Yes.
22   Q.  Do you recall if it was voted out of committee on
23   party line?
24   A.  The record would have to reflect the record vote
25   of the members of the Senate and the committee.

88

1   Q.  And as you sit here today, do you have any
2   recollection?
3   A.  I would not speculate.
4   Q.  So in 2006, is it fair to say that based on that
5   interim report, the committee made no recollection --
6   made no recommendation on photo ID laws?
7   A.  You're going to have to repeat that.  I'm sorry.
8   I didn't follow it.
9   Q.  In December 2006, we looked at the interim
10   committee report, and is it fair to say the committee
11   made no recommendation as to photo ID?
12       MR. SWEETEN:  You can refer to matters of
13   the public record.
14   A.  I think the committee report is clear as to what
15   it did and didn't do.
16   Q.  (By Ms. Maranzano)  Well, let me ask you this.
17   Is there anything in the public record that you can
18   testify about today that would reflect a change between
19   when you issued the report in December of 2006 and when
20   you voted HB 218 out of committee?
21   A.  I can't answer that because I don't know and
22   haven't looked at it.
23       MR. SWEETEN:  And I'll instruct you as to
24   legislative privilege.  Don't reveal your mental
25   impressions.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                           June 7, 2012

89

1    A. I do not want to run afoul or ignore the
2    legislative privilege that I am asserted in this case.
3    Q. (By Ms. Maranzano) Did each -- did HB 218
4    require a two-thirds majority vote of senators to bring
5    that bill to the floor of the Senate?
6    A. The bill didn't require it.
7    Q. Did the Senate rules require it?
8    A. The Senate rules require bills to be brought up
9    in the regular order of business.
10   Q. And was House Bill 218 brought up in the regular
11   order of business?
12   A. No.
13   Q. So in order to bring it up out of order, did it
14   require a two-thirds vote?
15   A. In 2007, to suspend the rules you had to have a
16   two-thirds vote.
17   Q. What's the purpose of that requirement, that you
18   needed two-thirds vote to suspend the regular order of
19   business?
20       MR. SWEETEN:  Are you saying in the 2007
21   session, the two-thirds.
22       MS. MARANZANO:  I was asking more generally,
23   actually.
24       MR. SWEETEN:  You can give the general
25   purpose.  Objection; vague.  Because I don't think we're

90

1    talking about a specific rule.  But you can give a
2    general purpose to -- if you can understand what she's
3    asking you about.
4    BY MS. MARANZANO:
5    Q. My question is about the requirement or the
6    tradition in the Senate that when bills go out of order
7    that it requires a two-thirds majority vote.
8    A. There are 31 members of the Texas Senate.  And
9    there are 31 different general purposes of what that
10   rule is all about.  So I couldn't give you -- I couldn't
11   speak for anybody else.  And so the general purpose is
12   obviously to require two-thirds vote to bring up a bill.
13   But I can't tell you what the -- I don't know of any law
14   reviews that discuss that or -- it has different
15   meanings to different members of the Senate, if you're a
16   rule member or what.  It has different meetings.
17   Q. Would it be fair to say that it's an effort to
18   get the senators to reach some sort of consensus?
19       MR. SWEETEN:  You can provide and answer as
20   to the general purpose of the bill.  Don't discuss
21   anything further than that or whatever rule she's
22   referring to.
23   A. Again, I would think that it's -- it has -- to
24   different members it has different general -- there's
25   different interpretations because it is a kind of a

91

1    blend of a rule and a tradition.  And so to that end,
2    there's not really a good answer that I can give
3    speaking on behalf of the whole Senate as a general
4    purpose.
5    Q. Well, to be clear, I'm not interested in your
6    subjective opinion about it.  I'm just interested in
7    your characterization of the legislative purpose.
8       ATTORNEY2:  Objection; asked and answered.
9    BY MS. MARANZANO:
10   Q. Do you have anything else to add?
11   A. I probably don't.
12   Q. Okay.  Are most bills brought to the floor with a
13   two-thirds vote?
14       MR. SWEETEN:  Answer as a general matter.
15   A. In my experience, yes.  But not all.
16   Q. (By Ms. Maranzano)  Can you tell me about the
17   ones that went to the floor without a two-thirds vote?
18   A. Well, over what period of time?  I mean I've been
19   in there 14 years.
20   Q. Well, how many times -- I'm sorry.  I didn't mean
21   to interrupt your answer.
22   A. A number of times.
23   Q. Can you tell me how in the 14 years?
24   A. No.
25   Q. More than five?

92

1    A. Sure.
2    Q. More than ten?
3    A. Yeah.
4    Q. More than 15?
5    A. Yes.
6    Q. More than 20?
7    A. Your question is how many times have bills come
8    to the Senate floor with a lack of -- with only 16 votes
9    or without 21 votes.
10   Q. Uh-huh.
11   A. Multiple times.  More than you've asked.  I
12   believe more than you have stated.
13   Q. Okay.  And I think I left off at 20.  Would you
14   say it's around -- can you just give me and approximate
15   number?
16   A. No, I really can't.  Because I know -- generally
17   I can't.  The 21 vote rule is often debated.  But again,
18   you go back to Bullock, Hobby and other Lieutenant
19   Governors.  Either the rule has been -- there have been
20   special orders or other measures to not apply the rule
21   or that threat has been used.  So it's an interesting
22   part of Texas history.  But it is -- again, there's no
23   specific thing.  It has been done a number of times,
24   though.
25   Q. Do you know what the partisan makeup of the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

93

1   Senate was when the two-thirds rule was suspended under
2   Lieutenant Governor Bullock?
3       A. It was probably -- I believe -- the Republicans
4   did not have a majority until December of '96. So I
5   believe -- I don't believe that it was done in '97. So
6   it would have been -- before that it probably would have
7   been Democrat majority.
8       Q. Do you know by how much?
9       A. No.
10      Q. How about under Lieutenant Governor Hobby?
11      A. I don't believe the Republicans had a majority
12  under Hobby.
13      Q. Do you have any idea by what percentage or by
14  what numbers they were in the minority?
15      A. No. You would have to look -- it would be easy
16  to determine.
17      Q. Can you provide the circumstances under which
18  House Bill 218 was voted on by the Senate?
19      A. No. Is that the 2007 bill?
20      Q. Yeah.
21      A. What was your question?
22      Q. The circumstances on which it was voted on in the
23  Senate, do you recall anything about that vote?
24      A. I don't understand the question. So, no, I
25  can't.

94

1       Q. Okay. Well, let me ask you this. Do you recall
2   it being voted on by the Senate?
3       A. I recall there was a vote.
4       Q. Who made the decision, if this is part of the
5   public record, to bring this bill to the floor, to a
6   vote of the Senate?
7       MR. SWEETEN: When you're saying "bill," are
8   we talking about --
9       MS. MARANZANO: We're talking about House
10  Bill 218.
11      MR. SWEETEN: To the extent you're not
12  revealing legislative privilege, you can answer it. But
13  don't reveal matters of privilege, including
14  communications you've had with others or mental
15  impressions.
16      A. I do not know who made the decision to bring the
17  House Bill in 2007 to a vote.
18      Q. (By Ms. Maranzano) Is that usually the
19  Lieutenant Governor's decision?
20      A. Generally the rules allow the Lieutenant Governor
21  to set the calendar.
22      Q. Do you know if any members of the Senate were not
23  present when the vote was taken?
24      A. I don't recall if there were members, you know,
25  either present or on the floor or what. Members are

95

1   often on and off the floor or absent from time to time.
2   There's an excused absence. There's just people not
3   there. And so I don't know exactly what the record
4   shows for that day.
5       Q. And if somebody has an excused absence, votes are
6   still taken; is that correct?
7       A. Yes, as long as there's a quorum.
8       Q. Are you aware of any conversations that Senator
9   Uresti had with any members of the Senate about House
10  Bill 218?
11      A. No.
12      Q. Were you aware in May of 2007, based on the
13  public record, that there were concerns that House Bill
14  218 would disproportionately impact minority voters?
15      MR. SWEETEN: You can testify to matters on
16  the public record. Don't testify as to communications
17  you've had with others or to matter subject to
18  privilege.
19      A. To the extent those comments were made on either
20  a debate on the Senate floor, which is what I understand
21  the time frame you're talking about now, we're out of
22  committee we're on the floor, is that the public record
23  would reflect those concerns if they were raised.
24      Q. But in May of 2007, were you aware of those
25  concerns?

96

1       A. If I was on the Senate floor and I heard them on
2   the -- as part of the public record, the public record
3   is the public record.
4       Q. Based on the public record, were any concerns
5   expressed about taking a vote on House Bill 218 when
6   some members weren't present?
7       A. The record will reveal that.
8       Q. Do you have any recollection about this
9   occurring?
10      A. If I do, it would be subject to the legislative
11  privilege.
12      Q. I'm just asking you about the public record?
13      A. The public record is the public record. And that
14  is -- if those statements were made on the public
15  record, those statements were made on the public record
16  and they speak for themselves. I'm sure Senator Ellis
17  made a comment or somebody else. This is what the
18  public record is.
19      Q. Why are you sure Senator Ellis made a comment?
20      A. Because he was active in this issue.
21      Q. And what -- I guess I'm losing you. You're sure
22  he made a comment because some members weren't present
23  on the floor?
24      A. No. On the public record, on the public issue of
25  the debate on the bill. The issue -- the record will



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

97

1  reflect who and what was said.
2      Q.  Do you recall that in was a request made to
3  verify the vote on House Bill 218?
4      A.  No.  But there may have been.
5      Q.  Are you aware that Senator Uresti had called in
6  sick that day?
7          MR. SWEETEN:  Don't reveal matters subject
8  to legislative privilege in answering that question.
9  You can refer to matter of public record.
10     A.  I'll refer to the record.
11     Q.  (By Ms. Maranzano)  What's Senator Uresti's race?
12     A.  Well, I think Senator Uresti is Hispanic.
13     Q.  What part of Texas does he represent?
14     A.  He has a large district.  It is similar to mine
15 in that it -- it abuts the mine.  It's in West Texas,
16 far West Texas, but he also has some urban areas.  And
17 he, at that time, was representing part of El Paso as
18 well.
19     Q.  Had he expressed concerns on the public record
20 about the impact of House Bill 218 on his constituents?
21     A.  Public record will reflect what concerns, if any,
22 he expressed.
23     Q.  Do you recall that House Bill 218 failed to
24 obtain a two-thirds majority vote?
25     A.  It apparently did not pass that session.

98

1      Q.  Do you know if there were any additional actions
2  taken on House Bill 218 after it failed to obtain the
3  two-thirds majority vote?
4          MR. SWEETEN:  You can answer based on the
5  public record.
6      A.  I don't understand the question.  It's not clear
7  enough to me to respond accurately.
8      Q.  (By Ms. Maranzano)  Was there any additional
9  action taken on House Bill 218 after it failed to obtain
10 a two-thirds majority vote?
11         MR. SWEETEN:  Again, you can refer to
12 matters of the public record in answering the question.
13     A.  I don't recall based on the question.
14         MS. MARANZANO:  This has been previously
15 marked as Exhibit 3.
16         (Exhibit No. 3 was previously marked.)
17 BY MS. MARANZANO:
18     Q.  Senator, I'm showing you what we're marking for
19 the record as deposition Exhibit 3.  And I would like to
20 direct your attention to -- there's a letter that's
21 issued from Lieutenant Governor David Dewhurst.  Do you
22 recall this letter?  Let me state for the record, what
23 I'm showing you is an article from the Texas Weekly.
24     A.  Let me have just a few minutes to read this.
25     Q.  Sure.

99

1      A.  Okay.
2      Q.  Okay.  Do you see that this includes a letter
3  from the Lieutenant Governor related to House Bill 218?
4      A.  As reported in this media outlet.
5      Q.  And the letter that's printed in this media
6  outlet asserts that the photo identification
7  requirements will prevent voting by persons who are not
8  US citizens, right?
9      A.  Where does it say that?
10         MR. SWEETEN:  Can you reread the question
11 for me, please?
12         (Requested question was read.)
13 BY MS. MARANZANO:
14     Q.  And Senator, below the -- in the second letter,
15 below that topic, "This is a letter from Lieutenant
16 Governor David Dewhurst on voter ID."  In the second
17 paragraph, I just want to read you a sentence that says,
18 "I want people to consider that with 8 to 12 million
19 illegal aliens currently living in the US, the basic
20 American principal of 'one person, one vote' is in
21 danger," correct?
22     A.  Well, that's what -- that's what that says.
23     Q.  Right.  Do you believe that the Lieutenant
24 Governor's letter is not asserting that photo ID
25 requirements will prevent persons voting who are not US

100

1  citizens?
2          MR. SWEETEN:  Don't answer the question.
3  Legislative privilege.
4          MS. MARANZANO:  I'm asking him about the
5  letter.
6          MR. SWEETEN:  You can ask him about what
7  this says.  You can't ask him about his beliefs about
8  legislation or about what he thinks about specific
9  legislation.  Those are his thoughts and mental
10 impressions.  If you're asking him if that's what it
11 says, he's free to answer that.
12 BY MS. MARANZANO:
13     Q.  I'm asking if the Lieutenant Governor made that
14 assertion in this letter.
15     A.  I can't speak for the Lieutenant Governor on what
16 he meant or intended or whether or not this is accurate.
17 So I don't really have an opinion on that.
18     Q.  Let me ask you this.  Is there anything in the
19 public record that would support a contention that photo
20 identification requirements prevent persons from voting
21 who are not US citizens?
22         MR. SWEETEN:  Calls for matters of
23 legislative privilege.  You can refer to matters in the
24 public record, but don't reveal your thoughts and mental
25 impressions about any specific legislation.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

101

1      A. You would have to refer to the legislative record
2   to --
3      Q. Anything you can add today?
4      A. No, ma'am.
5      Q. Do you see that in this letter -- I'm sorry.  In
6   this article there was a -- there are two letters from
7   the Lieutenant Governor that are printed?  There's a
8   letter and then there's a corrected letter.
9      A. This document which's a media report indicates
10  that.  I don't know about the authenticity of it?
11     Q. You have no recollection of the?
12     A. No, I don't subscribe to the Texas Weekly and did
13  not review this.  So this is the first time I've seen
14  this document.
15     Q. And apart from the letter -- apart from the
16  article, do you recall ever seeing either of these
17  letters from the Lieutenant Governor?
18         MR. SWEETEN:  You can answer.
19     A. No, I don't.  Let me correct, my staff may read
20  this Texas Weekly, but I don't.  I don't recall seeing
21  this letter or -- I'm not even sure I recall hearing
22  about it.  It's been five years ago.
23     Q. (By Ms. Maranzano)  Is a voter registration
24  applicant's citizenship status -- well, does a voter
25  registration applicant at firm their citizenship status

102

1   on a voter registration application?
2         MR. SWEETEN:  Under present law?
3         MS. MARANZANO:  Under present law.
4         MR. SWEETEN:  You can answer the question if
5   you know.
6      A. I don't know.  I would have to look at the law.
7      Q. (By Ms. Maranzano)  What ethnic group makes up
8   the largest percentage of the immigrant population in
9   Texas?
10     A. I don't know for a fact.  I think, generally, I
11  believe that the Hispanic growth in Texas is well-known
12  to be flourishing.
13     Q. Based on public record, is there any connection
14  between photo ID bills and the growth of non-citizen
15  population in Texas?
16         MR. SWEETEN:  Don't answer her question.  It
17  calls for matters of legislative privilege.  Instruct
18  not to answer.
19  BY MS. MARANZANO:
20     Q. Have you heard an assertion that photo ID bills
21  are connected to the growth of non-citizen population in
22  Texas?
23         MR. SWEETEN:  You can answer based on
24  matters of the public record.  Don't make a legislative
25  privilege.

103

1      A. I don't recall or have any knowledge of that
2   other than if -- I don't even know if there's anything
3   on the public record on that.
4      Q. (By Ms. Maranzano)  Have you heard anyone in the
5   legislature say there's a connection between photo ID
6   bills and the growth of population?  I'm not talking
7   about private communications you may have had.
8         MR. SWEETEN:  You the can discuss matters of
9   the public record.
10     A. You would have to refer to the public record.
11     Q. (By Ms. Maranzano)  How about anyone in the
12  governor's office, made such an assertion?
13         MR. SWEETEN:  Same instruction.  Legislative
14  privilege.  But you can reveal matters of the public
15  record.
16     A. You would have to look -- refer to public record
17  on that issue.
18     Q. (By Ms. Maranzano)  Are you familiar with a
19  decision by the name of Crawford versus Marion County?
20         MR. SWEETEN:  Don't reveal your thoughts or
21  mental impressions about legislation, your analysis or
22  motivation in answering the question.  You can reveal
23  matters of the public record.
24     A. When you say "familiar," I'm not sure what you
25  mean by that.  If that is the Georgia case, I think it

104

1   may be referred to in the public record.  If that
2   involves the Georgia voter ID.
3      Q. The Crawford opinion, I believe was referred to
4   in the public record.  It's a Supreme Court decision
5   about a law in Indiana.  Does that refresh your
6   recollection at all?
7      A. Right.  Right.  It does.
8      Q. Have you read that opinion?
9      A. I have not analyzed it.
10     Q. Have you read it?
11         MR. SWEETEN:  You don't have to say if
12  you've read the decision or not.  That would reveal your
13  thoughts, mental impressions or processes and
14  legislative privilege.  Objective; legislative
15  privilege.  You can refer to matters in the public
16  record.
17  BY MS. MARANZANO:
18     Q. I assume you can't answer the question?
19     A. I think the public record would answer the
20  question.
21     Q. Did you or your staff have any communications
22  with officials in Indiana regarding photo ID laws?
23         MR. SWEETEN:  You can answer the question.
24     A. I did not.  I do not know if my staff did or not.
25     Q. (By Ms. Maranzano)  Are you familiar with a photo



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

105

1  identification bill that was introduced in the 2009
2  legislative session?
3      A. You're going to have to be more specific. There
4  are many bills.
5      Q. There were many photo identification bills?
6      A. I believe -- I assume there was. I do not know.
7  I just know that members file bills.
8      Q. All right.
9      A. There's nothing to prevent a member from filing a
10 bill.
11     Q. I was asking, just to be clear, I was asking
12 specifically about the photo identification bills?
13     A. Well, I'm familiar with one bill.
14     Q. Okay. Which bill is that?
15     A. It's the bill that was considered by the Senate
16 in 2009.
17         MS. MARANZANO: Can we mark this as 29?
18         (Exhibit No. 29 was previously marked.)
19 BY MS. MARANZANO:
20     Q. Are you referring to Senate Bill 362, Senator?
21     A. Yes, ma'am.
22     Q. I'm showing you what we're marking as deposition
23 Exhibit 29, previously marked exhibit. And can you look
24 at it and tell me if you recognize this document?
25     A. I assume this is the introduced version of Senate

106

1  Bill 362, but I don't know. You have given me -- this
2  doesn't necessarily reflect what -- what this is, other
3  than Senate Bill 362. Was it the original filed
4  version, were there changes. I don't recall what
5  version this is that you're referring to here.
6      Q. Okay. Is there a way, from looking at this bill,
7  that you could determine that?
8      A. No.
9      Q. I can represent to you that it is the engrossed
10 version. And if you will look at Section 10 of the
11 bill, which is on Page 5, do you see that list "forms of
12 identification"?
13     A. Yes.
14     Q. Do you see that Subsection B provides for some
15 forms of identification that don't have photographs on
16 them?
17     A. I believe it does.
18     Q. Do you believe that Senate Bill 362 follows House
19 Bill 218, for the most part?
20     A. I don't know. I haven't analyzed it.
21     Q. Well, just generally?
22         MR. SWEETEN: You can refer to the text of
23 the bill. Don't reveal your impressions.
24     A. I don't know, generally. It appears to me that
25 they're both bills that require -- relate to requiring a

107

1  voter to present proof of identification. And it seems
2  like both bills have photo ID or alternatives.
3      Q. Can you look at Section 10, for me? And, in
4  particular, Section 6 -- Subsection 6 of that, it says,
5  "A valid identification card that contains the person's
6  photograph and is issued by an agency or institution of
7  the federal government or an agency institution or
8  political subdivision of this State." Do you believe
9  that would include a State University?
10     A. I'm not sure what you're referring to, quite
11 frankly. So I'm a little slow on reading.
12     Q. Oh, yeah. I'm sorry.
13     A. Six is struck -- Subsection 6 is struck on my
14 bill.
15     Q. Well, I'm looking at the section that --
16     A. So it would be now, 7. I'm sorry, 6. I see.
17 Yeah. It would be U-6. And it refers to a "valid
18 identification card that contains the person's
19 photograph and is issued by an agency of the federal
20 government or an agencies institution or political
21 subdivision of the State." Is that what you're
22 referring?
23     Q. Uh-huh. Would that include identifications
24 issued by a State University?
25         MR. SWEETEN: You can testify based on the

108

1  text of the bill.
2      A. An institution of the State would -- may be a
3  little bit vague and ambiguous. But it's not -- one
4  could argue that it means a higher Ed institution.
5      Q. Were you involved in the development of Senate
6  Bill 362?
7          MR. SWEETEN: Objection; vague.
8      A. What do you mean by "development"?
9      Q. (By Ms. Maranzano) Were you involved in the
10 concept of creating this bill?
11     A. No.
12     Q. Were you involved in the drafting of this bill?
13     A. No.
14     Q. Was anybody in your staff?
15     A. I don't think so.
16     Q. Would you know if your staff had been involved in
17 the drafting of this bill?
18     A. Not necessarily. I usually would. From time to
19 time members would ask members of my staff issues on
20 questions about things. So I don't know. But that was
21 not our bill and we weren't sponsoring it. So it's
22 unlikely we were involved to any large degree in
23 developing the bill. Now, there may have been questions
24 that may have been answered. But I don't know what
25 those were.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                      June 7, 2012

109

1    Q. If questions had been asked would they likely
2    have been directed to Jennifer Fagan?
3        MR. SWEETEN:  Objection; calls for
4    speculation.  You can answer.  Objection; vague, too.
5        A. Or the Committee staff, generally.  Jennifer
6    would direct the question or answer it.
7    Q. (By Ms. Maranzano)  How many staff work for the
8    committee?
9    A. I don't recall.  It depends, five or six
10   during -- during a session.
11   Q. Did you have communications with Senator Fraser
12   about Senate Bill 362?
13       MR. SWEETEN:  You can answer if you had
14   communications.
15   A. We did.
16   Q. (By Ms. Maranzano)  You did.  How many?
17   A. I can't tell you.
18   Q. Can you give me an approximate number?
19   A. No.
20   Q. Can you tell me when those communications
21   occurred?
22   A. Between the time the bill was filed and between
23   the time it was passed out of the Committee of the
24   Whole.
25   Q. Any communications before it was filed with

110

1    Senator Fraser?
2    A. Probably.
3    Q. And would those have been verbal communications
4    or written?
5    A. Yes, verbal.
6    Q. Are you aware of the source of the legislative
7    language in Senate Bill 362?
8        MR. SWEETEN:  Don't reveal matters of
9    privilege.
10   A. I'm not.
11   Q. (By Ms. Maranzano)  Are you aware of how this
12   list of acceptable forms of identification was arrived
13   at?
14       MR. SWEETEN:  Don't answer.  Objection;
15   legislative privilege.
16   BY MS. MARANZANO:
17   Q. Was there any discussion on the public record
18   about these forms of identification and whether or not
19   any additional forms of identification should be added
20   to this bill?
21       MR. SWEETEN:  You can answer as phrased.
22   A. I recall there was an a lot of discussion on the
23   public record about a lot of things.  And I would assume
24   that some of these issues were discussed, but you would
25   have to refer to the record, generally.

111

1    Q. (By Ms. Maranzano)  You can't recall any?
2    A. Not specifically.
3    Q. Do you recall whether the legislature considered,
4    based on the public record, adding additional forms of
5    identification based on Senate Bill 362?
6        MR. SWEETEN:  Don't answer.  It calls for
7    mental impression, thoughts about legislation.  It also
8    would implicate other communications with other
9    legislators so don't answer the question as phrased.  If
10   you interpret the word "consider" to mean was it
11   discussed on the public record, that's fair game.  But
12   consideration gets into the privilege.  Instruct not to
13   answer on that basis.  But with my instruction.
14   BY MS. MARANZANO:
15   Q. Let me ask you this.  Were proposals made on the
16   public record, such as amendments or other proposals to
17   add additional forms of identification to Senate Bill
18   362?
19       MR. SWEETEN:  You can answer as phrased.
20   A. By "proposed," do you mean amendments.
21   Q. (By Ms. Maranzano)  Amendments or any other kind
22   of proposals.  I'm not of aware of anything other than
23   amendments, but you may be.
24   A. The record would reflect that if there were.
25   Q. And what's your recollection?

112

1    A. You know, I vaguely remember that nobody offered
2    amendments in 2009.  But I may be wrong on that.  The
3    record would have to reflect that in the committee.  Now
4    I don't know about on the floor.  If you're talking
5    about the committee.  But for some reason I recall there
6    were no amendments offered.  But I may be incorrect.
7    The record would reflect that.
8    Q. And how about on the floor?
9    A. I don't recall that.
10   Q. Were there discussions on the public record about
11   how many registered voters did not possess one of the
12   forms of identification listed in Senate Bill 362?
13       MR. SWEETEN:  You can answer.
14   A. The record will reflect that clearly if there
15   was.  I'm not going to speculate on that.
16   Q. (By Ms. Maranzano)  What's your recollection, as
17   you sit here today?
18   A. I don't recall.
19   Q. You don't recall that happening?
20   A. Recall what happening?
21   Q. Discussions about how many registered voters
22   would not possess one of the forms of identification
23   listed in Senate Bill 362?
24   A. There were a lot of discussions over a period of
25   time that I, you know, can't remember specifically if



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                    June 7, 2012

113

1  there were discussions framed exactly as you have framed
2  it or generally as you have framed it.  I believe there
3  were a number of discussions as the record will reflect
4  regarding issues similar to that, generally.
5       Q.  Were there discussions on the public record about
6  doing an analysis to determine how many voters would
7  possess one of those forms of ID.
8       A.  I don't recall whether there was or not.  The
9  record would have to reflect that.
10      Q.  If Senate Bill 362 had passed, would it have been
11 subject to the requirements of Section 5?
12          MR. SWEETEN:  Don't reveal matters of
13 legislative privilege.  You can answer if you would not
14 be doing that.
15      A.  I believe as we discussed earlier, Texas is a
16 state that is subject to Section 5.
17      Q.  (By Ms. Maranzano)  Is that a "yes" or "no"?
18      A.  Well, if you or subject to Section 5 and it
19 changes the vote procedure, I would assume it would
20 require preclearance.
21      Q.  Did the legislature take the position that after
22 Crawford was covered by Section 5 of the Voting Rights
23 Act, did not meet the analysis of the impact of photo --
24 photo identification laws on minority voters?
25          MR. SWEETEN:  In answering the question,

114

1  don't reveal matters of legislative privilege.  Also
2  objection to the question as vague.
3       A.  I can't speak for the legislature.
4       Q.  (By Ms. Maranzano)  Was there any position, such
5  as that taken on the public record?
6       A.  I don't know.
7       Q.  What was the purpose of Senate Bill 362?
8          MR. SWEETEN:  You can answer the general
9  purpose.
10      A.  The general purpose is to preserve ballot
11 integrity.
12      Q.  (By Ms. Maranzano)  Was this law designed to
13 correct any specific problem?
14          MR. SWEETEN:  Don't answer the question.  It
15 calls for matters of legislative privilege.  Instruct
16 not to answer.
17 BY MS. MARANZANO:
18      Q.  Was there anything on the public record that
19 would suggest that that law was designed to address any
20 specific problem with regard to the ballot integrity?
21          MR. SWEETEN:  Don't reveal your thoughts and
22 mental impressions.  You can refer to factual matters on
23 the public record in answering the question.  Don't
24 reveal your analysis.
25      A.  You would just have to look at the record to

115

1  determine that.
2       Q.  (By Ms. Maranzano)  So you have no independent
3  recollection of whether there was discussion of any
4  particular problems that Senate Bill 362 was designed to
5  correct within the realm of voter integrity as you
6  described the purpose?
7       A.  I believe the public record is clear on what was
8  discussed along those lines and that would be the best
9  source, what the public record contains.
10      Q.  But your -- I mean, I'm just trying to
11 understand --
12      A.  Other than my recollection, which would be
13 analysis and mental process.  So what I'm trying to say
14 is simply, that was three years ago.  And the record is
15 created to preserve what was said.  And that would be
16 the best evidence of what was said regarding those
17 things, not my recollection, which is basically a mental
18 impression.
19      Q.  Well, your recollection of the public record is
20 what I'm asking you about?
21      A.  Public record?
22      Q.  Not your impressions of the public record?
23      A.  Well, the public record is the public record,
24 period.  It is the record.
25      Q.  Yes.  But you're being deposed today so I can get

116

1  your knowledge.  So that's what I'm asking you to
2  explain to me.  Things that happened on the public
3  record.  So let me ask you this.
4          MR. SWEETEN:  I just want to -- he can --
5  and I just want to be clear.  He can say whether he
6  recalls it being addressed in the public record.  So I
7  will let him do that.  Obviously, to the extent you're
8  asking for mental impressions or thought processes about
9  the bill, that's legislative privilege.  But he can say
10 if he recalls.  And I think, for the most part, he says
11 he doesn't recall.  So I just want to make sure my
12 instruction is clear on that point.
13 BY MS. MARANZANO:
14      Q.  Was there -- was any part of the purpose of
15 Senate Bill 362 to prevent non-citizens from voting?
16      A.  No.
17      Q.  Based on the public record, was there any
18 evidence that Senate Bill 362 would be more effective at
19 preventing in person voter impersonation than the
20 current system?
21          MR. SWEETEN:  You're now asking him for his
22 qualitative analysis of what was on the record, which
23 would require him to reveal his mental impression,
24 thoughts that would be subject to the legislative
25 privilege so I'm instructing you not to answer on that



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                June 7, 2012

117

```
1   basis.
2   BY MS. MARANZANO:
3       Q.  Was there any factual analysis on the public
4   record that compared Senate Bill 362 to the current
5   system, in terms of the purported goals of the bill?
6       MR. SWEETEN:  You can answer based on the
7   public record if there was factual analysis.
8       A.  I don't -- I don't -- I don't understand the
9   question.  Could you repeat it again?
10      Q.  (By Ms. Maranzano)  Sure.  Was there factual
11  analysis in the public record about Senate Bill 362, the
12  regime that Senate Bill 362 had set up and the current
13  system and each of their -- and the goal of
14  Senate Bill 362 to prevent in person voter
15  impersonation?
16      MR. SWEETEN:  Objection; compound.  Same
17  instruction on legislative privilege.  You can refer to
18  matters of the public record.
19      A.  I think you can refer to the public record.  It
20  would reflect that my memory is a little vague, what
21  you're asking.  But if I understand you correctly, the
22  record would reflect those sorts of things, what was
23  discussed and what was put in the record as far as
24  written testimony, oral testimony, debate between the
25  members and those sorts of things would be covered, I
```

118

```
1   think, in a very extensive record on this issue.
2       Q.  (By Ms. Maranzano)  And you have no independent
3   recollection, as you sit here today?
4       A.  It would be -- if I have independent recollection
5   it would be recollection that would be subject to my
6   mental processes and judgment as a legislator.  And I
7   would not be accurate -- it would be somewhat
8   speculative on my part to try to go back three years and
9   remember what people said without putting my judgment in
10  there as to what it meant.  The record is very clear
11  about what people said and what the debates were.  And
12  that's why the record was created.  And so that's the
13  best evidence, in my view, of what the legislature did
14  in 2009.
15      Q.  Did you have any communications with legislators
16  who opposed Senate Bill 362?
17      MR. SWEETEN:  You can answer.
18      A.  Yes.
19      Q.  (By Ms. Maranzano)  With whom?
20      A.  Well, Senator Ellis, Senator Lucio, Senator
21  Whitmire, Senator Van de Putte, and probably others.
22      Q.  How many conversations?
23      A.  Senator Gallegos.
24      Q.  Sorry.  Anybody else?
25      A.  You know, probably, but I remember those folks
```

119

```
1   typically, I communicated with quite a bit.
2       Q.  How many conversations did you have with Senator
3   Ellis about Senate Bill 362?
4       A.  There's no way to tell you how many.
5       Q.  Do you know when they occurred?
6       A.  No.
7       Q.  Can you tell me --
8       A.  During the process.
9       Q.  Can you tell me, generally, what the subject
10  matter of those conversations were?
11      A.  No, I really don't recall, generally.  I mean,
12  Senator Ellis was opposed to the bill and Senator Ellis
13  expressed that opinion several times.
14      Q.  Can you tell me how in conversations you had with
15  Senator Lucio about Senate Bill 362?
16      A.  No.
17      Q.  Can you tell me when they occurred?
18      A.  No.
19      Q.  The general nature of those conversations?
20      MR. SWEETEN:  Well, you've already asked him
21  was it about this bill so I think that is the general
22  subject matter.
23      MS. MARANZANO:  You're not going to let him
24  testify to anything more specifically?
25      MR. SWEETEN:  Well, I'm not going to let him
```

120

```
1   reveal the substance of the communication.  I think he
2   said opponents about the bill.  That would be a
3   privileged log description.
4       MS. MARANZANO:  That seems extremely general
5   to me.
6       MR. SWEETEN:  Well, what do you
7   specifically -- I mean, if you can find a middle ground
8   I will work with you Jennifer.
9       MS. MARANZANO:  It's hard for me to find a
10  middle ground when I don't know what the subject matter
11  is.
12      MR. SWEETEN:  Well, if you can recall the
13  specific communication she's referring to, I will allow
14  you to give a general subject matter description with
15  the opponents.  Does that satisfy you?
16      MS. MARANZANO:  It does, thank you.
17      A.  ID not recall a specific conversation other than
18  what -- there are thousands of bills.  And as chairman
19  of committee, I communicate with members on all of those
20  bills.  And for me to come and try to reconstruct a
21  specific conversation that occurred three years ago
22  would be impossible, to accurately construct it.  And so
23  I can't give you an accurate answer to your question
24  without violating the privilege and without going into
25  mental processes and opinion.
```



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                               June 7, 2012

121

1    Q. (By Ms. Maranzano)  And would that hold true for
2    each of these members that you've identified?
3    A. I believe it would.
4    Q. Did these members explain to you why they were
5    opposing the bill?
6       MR. SWEETEN:  Objection; compound.
7    A. Common sense would tell you that some more than
8    others, yes.
9       MR. SWEETEN:  Don't reveal anymore than the
10   general subject matter description why they opposed the
11   bill.  You can just answer it.
12   BY MS. MARANZANO:
13   Q. Why do you say some more than others?
14   A. Some were more vocal about their opposition than
15   others.  Some sit closer to me on the floor than others
16   too.  And some members I'm closer to than others.  Just
17   depends on who it is and what's happening on the day.
18   Q. Do you remember if any of them specifically told
19   you why they opposed the bill?
20      MR. SWEETEN:  You can answer "yes" or "no"
21   on that question.  Don't reveal the communication
22   itself.
23   A. Yes.
24   Q. (By Ms. Maranzano)  Which ones?
25   A. I'm sure it would have been Senator Ellis,

122

1    Senator Whitmire, Senator Van de Putte, perhaps Senator
2    Lucio.
3    Q. I'm sorry, did you say perhaps?
4    A. Well, not Lucio.  It would be those three.
5    Probably those three.  Because of the committee and
6    other issues.
7    Q. Did you have communications with outside groups
8    about Senate Bill 362?
9    A. Again, to the extent that they appeared before
10   the committee.  But not to any other extent.
11   Q. Did you have communications with the executive
12   branch about Senate Bill 362?
13   A. You know, I don't really recall doing that.  If
14   it was, it might have been some staff member on
15   logistics of when.  But not on any substantive matter.
16   Q. Did you have conversations with or other
17   communications with locally elected officials on Senate
18   Bill 362?
19   A. To the extent they appeared before the committee
20   and gave public testimony or submitted record --
21   testimony or evidence in the record, yes.
22   Q. Anything -- any conversations apart from their
23   testimony?
24   A. Not that I recall.
25   Q. Were concerns raised on the public record about

123

1    the impact of Senate Bill 362 on minority voters?
2    A. You would have to refer to the public record.
3    Q. Did the legislature take any steps on the public
4    record to address those concerns?
5    A. The record would reflect that.
6    Q. And you have no independent recollection?
7    A. Not as you have framed the question, no.
8    Q. Well, do you have a different recollection?
9       MR. SWEETEN:  Don't provide thought, mental
10   impressions about the bill or discussions that you've
11   had with other legislators in answering the question.
12   A. The only way I can answer the question accurately
13   is to say that there was discussion on the public record
14   about all of these issues.  And there was testimony
15   given by experts on all of these issues.  And there was
16   testimony given by lay witnesses on all of these issues.
17   And all that is reflected in the record.  And my
18   independent recollection of any of that would be
19   inaccurate.  But if you refer to the record, the record
20   would be an accurate depiction of what was considered by
21   the committee, debated by the committee and what was
22   before the Committee of the Whole when it made the
23   decision to vote, based on the record.
24   Q. (By Ms. Maranzano)  So my question is, do you
25   have a recollection, based on what happened on the

124

1    public record, about whether the legislature took any
2    steps to address the concerns raised about the impact of
3    Senate Bill 362 on minority voters?
4       MR. SWEETEN:  Objection; legislative
5    privilege.  You're asking about what steps they took and
6    that's asking for his mental impressions and thoughts
7    and opinions about the legislation that would be subject
8    to the legislative privilege, as phrased.
9       MS. MARANZANO:  But steps that they took --
10   let me clarify.
11      MR. SWEETEN:  You're asking him to
12   characterize steps they took in the context of
13   information which is clearly an analysis and process
14   question.
15      MS. MARANZANO:  All right.  I got you.
16   BY MS. MARANZANO:
17   Q. Let me ask you this.  Was there anything stated
18   on the public record that a step was being taken where
19   it was publicly stated that this step was being taken to
20   address concerns about the potential impact of Senate
21   Bill 362 on minority voters?
22      MR. SWEETEN:  As narrowed, in referencing
23   the public record, to the extent you can recall, you can
24   answer the question.
25   A. The public record is several thousand page.

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com


ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

125

1   Q. (By Ms. Maranzano)  Well, what's your
2   recollection?
3   A. I don't -- I don't have a specific recollection
4   of what was done.  I would have to refer to the record.
5   Q. Did you have a role in attempting to secure
6   passage of Senate Bill 362?
7   MR. SWEETEN:  Hold on a minute.  Object on
8   the basis of legislative privilege.  Any role he had to
9   implicate his analysis and thoughts about the bill or
10  communications that he had.  To the extent you can refer
11  to matters of the public record, you can answer that
12  question.
13  A. My role was as chairman of the Committee of the
14  Whole, with regard to the process of hearing the bill
15  and presenting it to the members.
16  MR. SWEETEN:  Okay.  I think we're getting
17  close to a break.  That bowl of Captain Crunch I had at
18  5 a.m. is not lasting.  So can we get to a point and
19  take a break pretty soon?
20  MS. MARANZANO:  Yes.  Why don't we just go
21  ahead and do that.
22  MR. SWEETEN:  I would like a time check now.
23  Please.
24  MS. MARANZANO:  Let's go back on the record.
25  And can we mark this?

126

1   (Exhibit No. 524 was marked.)
2   BY MS. MARANZANO:
3   Q. Before the break we were talking about Senate
4   Bill 362.  I'm actually going to go back for a moment to
5   House Bill 218.  I'm giving you what we're marking as
6   deposition Exhibit 524.  If you could take a look at
7   that and tell me if you recognize it.
8   A. It appears to be a record of the Senate Committee
9   on State Affairs, dated April 30, 2007.  House Bill 218
10  is the title.
11  Q. Can you look at the page that's Bates labeled at
12  the bottom -- or actually it's Page No. 54 in the
13  record.
14  A. 54 of the transcript.
15  Q. Of the transcript.  And the Bates label is Texas
16  00213319.  There's a statement made by you on that page.
17  Do you see that?
18  A. Does that appear at line 14.
19  Q. Line 14, exactly.  And if you can look down a few
20  lines from that there's a sentence that says, "One thing
21  I think, Senator Fraser laid out a good argument in the
22  beginning and he says that, 'Well, if one voter votes
23  illegally or fraudulently, cancels out the vote of a
24  person who voted legally.'"  Does that seem like an
25  accurate representation of something you said, to the

127

1   extent you remember?
2   A. Well, again as we discussed earlier I don't
3   remember specific things that were said or what I said.
4   But if that's what the record says I said then I'm sure
5   that's what I said.
6   Q. Has anyone ever told you that they're not going
7   to vote because they're worried about somebody voting
8   illegally and cancelling out their vote?
9   MR. SWEETEN:  Don't reveal matters of
10  privilege in answering the question.
11  A. Not specifically.
12  Q. (By Ms. Maranzano)  Not -- not specifically.  Has
13  anybody ever told you generally?
14  A. Well, generally no.  I mean, as far as you hear
15  people discussing, the general public about voter ID and
16  what's wrong with voter ID, people may make statements
17  generally about voter confidence.  But I can't recall a
18  specific statement anybody said.
19  Q. And what kinds of statements about voter
20  confidence do you recall?
21  MR. SWEETEN:  Don't reveal matters that
22  would be subject to the legislative privilege.
23  Communications with the legislative staff, State
24  agencies, Texas Legislative Council.  And don't reveal
25  your thoughts or mental impression.

128

1   A. Just generally, what you would read in the
2   newspaper or what you would hear on the radio talk show
3   or what you would hear on a general discussion of the
4   people at meetings and things like that about,
5   generally, voter confidence, voter ID and that sort of
6   thing.
7   Q. Okay.  And I'm just trying to understand, what do
8   you mean by "voter confidence and voter ID."  What have
9   you heard in those forums that you just listed about the
10  connection between voter confidence and voter ID?
11  A. Generally, what I would recall is that there is a
12  frustration while somebody should not be allowed --
13  should not be required to show and ID to vote when
14  they're shown an ID to do a lot of other things that we
15  all do in this society in this day an age.
16  Q. Have you also heard that, in those same forums,
17  that some of those things we have to show ID for are not
18  legal rights?
19  MR. SWEETEN:  You can answer.  Don't reveal
20  your mental thoughts and impressions and don't reveal
21  the communications that would be subject to the
22  legislative privilege.  You can refer to matters in the
23  public record, which I think you have.
24  A. I don't recall anything specific as to what you
25  described.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                            June 7, 2012

129

1   Q. (By Ms. Maranzano)  Is there any reason based on
2   the various public records that you're familiar with
3   from sitting through COMMITTEE hearings and Senate floor
4   hearings and debates on various voter identification
5   bills and other election bills, based on all of that, is
6   there any reason to believe that voters do not have
7   confidence in the system?
8           MR. SWEETEN:  That asks him to reveal his
9   mental impressions or thoughts, so don't answer the
10  question as posed.  It's subject to the legislative
11  privilege.
12  BY MS. MARANZANO:
13  Q. Can you look at the -- in that same statement
14  there's -- the first sentence says, "number one target
15  of priority on my agenda."  Would you say that that was
16  a consistent position you had throughout the additional
17  debates on voter identification that took place in 2009
18  and 2011?
19          MR. SWEETEN:  As phrased, the question asks
20  for you to reveal matters of legislative privilege,
21  whether it was a consistent position of you.  You can
22  refer to matters in the public record, but don't answer
23  to the extent it requests information that's subject to
24  the legislative privilege.
25  A. I would just simply refer to the statements made

130

1   in the public record.
2   Q. (By Ms. Maranzano)  Did it become a priority on
3   your agenda in 2009 or 2011, if that is something that
4   would have been public?
5           MR. SWEETEN:  You can answer if it has to do
6   with something you said on the public record.  However,
7   do not answer if it became a priority for you or a
8   matter that would be subject to the legislative
9   privilege, including your mental thoughts and
10  impressions.
11  A. I don't know if I've made a statement to -- I
12  don't recall whether I made a statement one way or the
13  other with regard to that being a priority of my office
14  or my -- or me, as a policy issue in -- in subsequent
15  days or periods after April 30, 2007, which is the date
16  of this statement.
17  Q. (By Ms. Maranzano)  Can you look at the next
18  page.  It's a continuation of that same statement from
19  you in the two paragraphs below the paragraph that we
20  were looking at there's a statement that says, "And I'm
21  not sure how I understand that -- how that is so
22  oppressive as opposed to the part -- as opposed to the
23  scenario of when someone votes fraudulently a legal vote
24  is cancelled and that seems to me to be an overriding
25  policy principal in this whole issue."  Is there any

131

1   reason to believe, based on the public record, that
2   criminal penalties are not sufficient to deter
3   fraudulent votes?
4           MR. SWEETEN:  Don't answer that.  She's
5   asking for your qualitative judgment about whether or
6   not criminal penalties are sufficient.  That would
7   require you to reveal your mental impressions, thoughts
8   and motivations regarding legislation.  My instruction
9   is do not answer the question.
10  BY MS. MARANZANO:
11  Q. Was there any public testimony or discussion
12  about whether criminal penalties would be sufficient to
13  deter fraudulent votes?
14          MR. SWEETEN:  You can answer to the extent
15  that it appears on the public record.
16  A. You would have to refer to the public record.  I
17  don't have specific recollection.
18  Q. (By Ms. Maranzano)  You don't have specific
19  recollection, independently?
20  A. Well, not independently.  It may or may not have.
21  I would just to refer you to the record.
22  Q. Do you see that first part that says, "I'm not
23  sure how I understand that is so oppressive."
24  Presumably you can look at the paragraph above to give
25  some context.  Is that talking about the voter ID

132

1   requirement?
2           MR. SWEETEN:  You can refer to the public
3   record itself when answering the question.
4   A. Well, I'm not sure I really understand the
5   question.
6   Q. (By Ms. Maranzano)  I wanted to ask you a
7   question about this phrase, but since it's sort of taken
8   out of context as it is, I was just saying you could
9   look at the statements ahead of it and the paragraph
10  preceding.  And is it your understanding that when you
11  say, "I'm not sure how that is so oppressive," what is
12  that in that sentence, just so that we have a clear
13  record.  Is that talking about the voter identification
14  requirement?
15          MR. SWEETEN:  You're asking him to interpret
16  what that meant, which is in the public record.  And in
17  providing an interpretation of that you're asking him to
18  reveal his thoughts, mental impressions.  You can refer
19  to matters in public record.
20  BY MS. MARANZANO:
21  Q. Can you just look at the full statement which
22  starts on Page 54 and continues on to Page 55?  I'm just
23  asking for the context of that statement.
24  A. It's a legislative debate that's on the public
25  record.  So I will invoke the legislative privilege on



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                      June 7, 2012

133

1    that.  This statement is what it is.  It is a statement
2    that basically is a form of public debate on the issue.
3    So that's what I recall.  And that is how I can answer
4    that.
5        Q.  Okay.  You're not able to provide any additional
6    answer as to what you meant -- what the word that refers
7    to?  I mean I was just actually just asking for the
8    context?
9        A.  You know, I don't remember making -- this is the
10   record -- I don't recall this specific conversation.
11   I'm not denying that it occurred.  I'm just saying I
12   don't recall the conversation.  So I actually
13   don't understand -- can't -- or don't recall -- I cannot
14   accurately answer what context that's in.
15       Q.  So would it be oppressive if a person was unable
16   to afford an identification and couldn't vote, would
17   that system be oppressive?
18       MR. SWEETEN:  Objection.  Don't answer.
19   Calls for matters subject to the legislative privilege.
20   BY MS. MARANZANO:
21       Q.  Can you look at the next page for me, on Page 57
22   of the public record, the public hearing.  And at the
23   bottom of that page do you see there's a quote by you?
24       A.  Well, I have testimony beginning on line 14.
25       Q.  Yes.  Can you look at where that -- can you look

134

1    at the testimony that's at line 24 and 25 and the top of
2    the one on the next page.  Do you see that it says, "So
3    what this is, this is the least restrictive more to be
4    able to verify voters.  It seems to me."  Based on the
5    public record, do you think House Bill 218 is the least
6    restrictive means to verify voters?
7        MR. SWEETEN:  Objection.  Don't answer the
8    question.  It calls for matters of legislative
9    privilege, including your mental impressions, thoughts,
10   motivations about bills.
11   BY MS. MARANZANO:
12       Q.  Was there discussion on the public record about
13   whether House Bill 218 was the least restrictive means
14   to verify voters?
15       MR. SWEETEN:  You can answer the question.
16       A.  It appears that there was discussion and debate
17   about that and the record will speak for that.
18       Q.  (By Ms. Maranzano)  Was there any discussion on
19   the public record about whether House Bill 218 would
20   continue to be the least restrictive means to verify
21   voters if some of the forms of identification in the
22   bill were removed from it?
23       A.  If there was such a discussion of that it would
24   be in the record.
25       Q.  Do you have any recollection of that, as you sit

135

1    here today?
2        A.  Not in the record.  Are you talking just about
3    this Senate Committee public hearing or are you talking
4    about 218, generally?
5        Q.  I'm talking about the public record, generally?
6        A.  Okay.
7        Q.  Does that change your answer at all?
8        A.  No.
9        Q.  Okay.  Can you look at Page 99 of the transcript,
10   the Bates label is Texas 00213364.  And there's an
11   exchange -- I'm sorry.  Do you see there's an exchange
12   at the bottom of the page between Senator Van de Putte
13   and Ms. McGeehan.  Can you identify for the record who
14   Ms. McGeehan is?
15       A.  I believe that would be referring to Ann McGeehan
16   who was an employee of the Secretary of State's office.
17   I'm think in the election division.
18       Q.  Was she the director of elections?
19       A.  I think that was generally her title.  It I'm not
20   sure specifically what her title was.
21       Q.  Do you see on line 22, Senator Van de Putte
22   asked, "About how many complaints have you about had
23   voter impersonation?"  And Ms. McGahan responds on line
24   24, "We have not had any."
25       A.  I see that.

136

1        Q.  Do you recall that exchange?
2        A.  Not specifically.  But I recall it from reviewing
3    the record here.
4        Q.  Do you recall at any point publicly getting an
5    update on that information sometime between when this
6    happened and the 2011 legislative session?
7        MR. SWEETEN:  You can refer to matters in
8    the public record.
9        A.  I don't recall if we did or not.  If we did it's
10   reflected either in -- or it should be reflected in the
11   committee records post April 30, 2007.
12       Q.  Would that information, if it was publicly made
13   available, have gone to the State Affairs Committee?
14       MR. SWEETEN:  Objection.  Calls for
15   speculation.  Also don't reveal your mental processes or
16   communications.
17       A.  It could have gone to the State Affairs
18   Committee.  It could have gone to members generally.
19   Sometimes post-hearing or once a bill is out of the
20   COMMITTEE people will disseminate things.  I don't know.
21   But I can't tell you outside the record whether the
22   committee followed up or did anymore in that session on
23   that question.
24       Q.  (By Ms. Maranzano)  Okay.  We can put this aside.
25   Before the break we had started talking about Senate



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                June 7, 2012

137

1  Bill 362.  Do you recall that?
2       MS. MARANZANO:  Can we have this marked.
3       (Exhibit No. 525 was marked.)
4  BY MS. MARANZANO:
5       Q.  Senator, I'm showing you what we're marking for
6  the record as deposition Exhibit 525.  It does not have
7  a cover page on this, but do you recognize that this
8  looks to be an excerpt from the Senate rules?
9       MR. SWEETEN:  Is this '09 or '11, did you
10  say.
11       MS. MARANZANO:  This is '09.
12       MR. SWEETEN:  '09, okay.
13       A.  Is your question does this appear to be?
14       Q.  (By Ms. Maranzano)  An excerpt from the Senate
15  rules?
16       A.  I assume that it is.
17       Q.  Do you recall -- do you recall having a debate on
18  the rules resolution in 2009 in the Senate?
19       A.  I do recall there was a debate on this.
20       Q.  And can you direct your attention to Section D of
21  Rule 5.11?
22       A.  Yes, ma'am.
23       Q.  Do you see that there's a provision explicitly
24  for voter identification requirements in Section D of
25  Rule 5.11?

138

1       A.  Uh-huh.  Yes, ma'am.
2       Q.  Can you tell me what the circumstances were for
3  adopting that rule, that section of the rules?
4       MR. SWEETEN:  Done reveal -- don't answer
5  the question as phrased.  It will require you to reveal
6  matters subject to legislative privilege.  You can
7  answer as to the general purpose of Rule 5.11.  I will
8  let him do that.
9  BY MS. MARANZANO:
10       Q.  Why don't you tell me about the general purpose
11  of Rule 5.11?
12       A.  Well, as I understand the general purpose of Rule
13  5.11 was to be able to take up consider -- a bill of
14  resolution relating to voter identification
15  requirements, within the confines of this rule.  And it
16  sets up the process and procedure of doing that.
17       Q.  And what was the purpose for making this special
18  carve-out for voter identification requirements?
19       MR. SWEETEN:  You can testify to the purpose
20  of rule 5.11 generally.
21       A.  Well, generally, the purpose is to allow a bill
22  to be brought up as a special order as opposed to the
23  regular order of business.
24       Q.  (By Ms. Maranzano)  So what I'm directing your
25  attention to is the Subsection D of that rule.  What was

139

1  the purpose of subsection D?
2       A.  The purpose of that subsection is to provide for
3  consideration of voter identification or a bill of
4  resolution relating to voter identification requirements
5  by a Committee of the Whole in setting the time limit.
6       Q.  And so -- I'm sorry.  Were you done?
7       A.  I think so.
8       Q.  Do you see that that also allows for a vote by
9  the majority of the members of the Senate?
10       A.  That's correct.
11       Q.  And so that -- was this in the 2007 Senate rules?
12       A.  I think this rule was either added or amended in
13  2009.
14       Q.  So you believe it was or was not in the 2007
15  rules?
16       A.  Not as 5.11.  I don't know what was -- if there
17  was a version of special order bill that was amended by
18  the Senate on -- in January of 2009.
19       Q.  Okay.  But I'm asking specifically about
20  Subsection D?
21       MR. SWEETEN:  You're asking was D in the
22  2007 Senate rules.
23       MS. MARANZANO:  Yeah.
24       MR. SWEETEN:  You can answer.
25       A.  I don't think so.

140

1       Q.  (By Ms. Maranzano)  Okay.  How about the 2005
2  Senate rules?
3       A.  I don't believe it was.
4       Q.  Are you aware of any other times when there has
5  been a carve-out for one particular type of legislation
6  written into the Senate rules?
7       MR. SWEETEN:  You're talking about in -- in
8  the context of the 5.11.  Because I think the question
9  could be very broad.  I just want to make sure I
10  understand.
11  BY MS. MARANZANO:
12       Q.  Okay.  Why don't we focus on 5.11.  Was there any
13  other time that you're aware of when there has been an
14  exception written into the rules for Rule 5.11 about one
15  particular type of legislation?
16       A.  Not that I recall.  Not that I know of.
17       Q.  Did Senate Bill 362 pass by more than two-thirds
18  a majority vote?
19       A.  I think the record would reflect it passed by a
20  majority, but not a two-thirds majority.
21       Q.  Did you have any communication -- well, let me
22  ask you this.  Did Senator Williams introduce the
23  resolution to the Senate rules resolution in 2009?
24       A.  I believe Senator Williams was the primary author
25  of the rule, of the proposed rule.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                               June 7, 2012

141

1   Q. Did you have communications with Senator
2   Williams?
3   A. Yes.
4   Q. About the proposed rules?
5   A. Yes.
6   Q. How many?
7   A. I don't know. Not many.
8   Q. Prior to his introduction of the resolution?
9   A. Yes, prior.
10  Q. Can you give me an approximate number?
11  A. Not really. I mean it was -- I really can't. It
12  would be an approximate guess, so I hate to guess. We
13  had more than one.
14  Q. More than five?
15  A. Probably.
16  Q. And they were all prior to the introduction of
17  the resolution?
18  A. No. Well, I don't know. Prior to passage. I'll
19  qualify it that way.
20  Q. When did you learn that Senator Williams was
21  going to introduce the rules resolution that included
22  this Subsection D for Rule 5.11?
23  A. Sometime in January of 2009.
24  Q. Did any other Senate rules get changed from the
25  consideration of voter identification requirements in

142

1   2009?
2         MR. SWEETEN: Could you read the question
3   back, please, madam court reporter.
4         (Requested question was read.)
5         MS. MARANZANO: And I think what I intended
6   to say was for the identification of voter
7   identification requirements.
8   A. Would you just rephrase it?
9   Q. (By Ms. Maranzano) Were any other Senate rules
10  changed in 2009 solely for -- as is written in 5.11-D,
11  solely for a bill or resolution related to voter
12  identification requirements?
13  A. I don't know if there were any conforming rules
14  or anything that were changed as a result of this. I do
15  not know the answer to this question.
16  Q. Other than conforming rules, did anything change?
17  A. I don't think so. But again, I don't know for
18  sure. I don't recall that there were. I don't think
19  there were.
20  Q. Did you take a public position on the rules
21  resolution that Senator Williams introduced?
22  A. What do you mean?
23  Q. Presumably, you voted on it, right?
24  A. I voted for it.
25  Q. You voted for it?

143

1   A. Yes. Yes.
2   Q. Did you have any communications with anybody
3   about changing other rules in 2009 for the consideration
4   of voter identification requirements, other rules other
5   than the 5.11?
6   A. I don't think so.
7   Q. And other than Senator Williams, did you have any
8   communications about Subsection D of 5.11 with anybody
9   in 2009?
10  A. I had conversations with several members of the
11  Senate over that. During the debate on the floor,
12  during the few days before when it was proposed and
13  voted on. Just part of what we do in the Senate is
14  there are discussions formal and informal. Formal would
15  be on the record, informal would be discussions that
16  would be had on the Senate floor.
17  Q. Who did you have informal communications with?
18  A. I would assume members of the -- different
19  members.
20  Q. Can you give me their names?
21  A. Well, Senator Lucio, Senator Ellis, Senator Van
22  de Putte, Senator Whitmire, probably Senator Fraser,
23  probably Senator Williams, probably Senator Ogden.
24  Probably Carona, Senator Eltife perhaps. Those are just
25  specific people that are coming to my mind that I would

144

1   have had a discussion on the Senate floor about this
2   particular rule.
3   Q. Do you remember conversations with them or you're
4   just saying if you --
5   A. I don't remember the context of generally what
6   members of the legislative body do in discussing an
7   issue.
8   Q. And am I correct that some of the members you
9   listed voted against the rules resolution?
10  A. That's correct.
11  Q. Were you conversations -- did your conversations
12  with them include -- include discussing the reasons why
13  they were voting against the rules resolution?
14        MR. SWEETEN: Don't discuss the specific
15  conversations. But if you want to -- I think as phrased
16  I'm going to let you answer it.
17  A. Members discuss their mental processes and
18  thoughts about bills on the Senate floor all the time
19  that may not be on the record. In other words, it's --
20  as opposed to a formal debate where somebody is holding
21  a mic and debating formally or whether somebody is
22  working on a bill and debating the bill on the Senate
23  floor informally without a debate. It is part of the
24  mental process sharing of legislators that occurs. And
25  that would be the type of communication that we were



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

145

1  having.
2      Q. (By Ms. Maranzano)  So my question was about
3  whether they expressed why they were opposed to the
4  bill's resolution.
5      A. I'm sure those that did expressed or gave reasons
6  as to why they were opposed.
7      Q. Do you recall if Senator Carona gave you reasons
8  about why he was opposed to the rules resolution?
9      A. Yes.
10     Q. How many conversations did you have with him?
11     A. Two or three.
12     Q. Were all of these conversations that you've
13  referred to, and for the purposes of this question I'm
14  including more than just Senator Carona, were they all
15  verbal?
16     A. Yes.
17     Q. Did you have any written communications?
18     A. No.
19     Q. Did Senate Bill 362 go to any Senate committees?
20        THE REPORTER:  Go what?
21        MS. MARANZANO:  Was it referred to any
22  Senate committees?
23     A. I don't believe it was, other than the Committee
24  of the Whole. I don't believe it went to a specific
25  standing committee.

146

1      Q. (By Ms. Maranzano)  Is that the -- is that
2  unusual?
3        MR. SWEETEN:  You can answer as the general
4  Senate procedure.
5      A. That was the procedure that was established by
6  Rule 5.11.
7      Q. (By Ms. Maranzano)  Rule 5.11 established that it
8  would go straight to the Committee of the Whole?
9      A. I believe that's what it says.  I'll look at it.
10  I believe that the Senate Rule 5.11 contemplates the
11  bill being referred to by the Senate of the whole.
12     Q. Would this bill, had it not been referred to the
13  Committee of the Whole, been referred to the State
14  Affairs Committee?  The bill I'm referring to is Senate
15  Bill 362.
16        MR. SWEETEN:  Hold on a minute.  Calls for
17  speculation and calls for him to reveal his thoughts,
18  mental impressions about legislation.  So I'm going to
19  instruct you not to answer based on that.
20  BY MS. MARANZANO:
21     Q. Did you have any communications with the
22  Lieutenant Governor about the referral of Senate Bill
23  362 straight to the Committee of the Whole?
24     A. Yes.
25     Q. How many?

147

1      A. I can't tell you.  Five or more.
2      Q. And when were those?
3      A. From the point of -- it would after the rule was
4  adopted and from the time we had the hearing.
5      Q. I'm sorry.  The time that the Committee of the
6  Whole held the hearing?
7      A. Right.  Right.
8      Q. It was after the rule was adopted you said?
9      A. Yes.  I may have had some conversations before,
10  generally.  I just don't recall.
11     Q. What was the purpose of referring the bill
12  directly to the Committee of the Whole?
13        MR. SWEETEN:  Yeah.  Don't answer that
14  question.  That calls for matters that are your mental
15  impressions, thoughts, opinions about legislation,
16  motivations, so don't answer the question.
17  BY MS. MARANZANO:
18     Q. Were there any conversations on the public record
19  about the referral of this bill straight to the
20  Committee of the Whole?
21        MR. SWEETEN:  You can answer the question as
22  phrased.
23     A. If they there were they're on the record.  I
24  assume there may have been discussions about that during
25  the debate on Rule 5.11.

148

1      Q. (By Ms. Maranzano)  Do you recall any members
2  expressing concern that this bill was trying to be moved
3  along extremely quickly?
4        MR. SWEETEN:  You can refer to matters of
5  the public record.  Don't reveal matters of legislative
6  privilege.
7      A. I don't know for sure.  I don't recall -- have
8  independent recall.  That would be reflected in the
9  record.  It's not unusual for that to occur.
10     Q. (By Ms. Maranzano)  I'm sorry.  For what to --
11  what's not unusual?
12     A. For someone to complain that the bill is moving
13  too quickly.
14     Q. I see.  Based on the public record would you say
15  Senate Bill 362 moved fairly quickly through the
16  legislature compared to other bills?
17     A. No.
18     Q. Did you have less of an ability to shape Senate
19  Bill 362 since it went straight to the Committee of the
20  Whole and not to State affairs?
21        MR. SWEETEN:  Objection; calls for
22  legislative privilege.  Your qualitative judgment about
23  one committee process as opposed to another.  That's a
24  matter of legislative privilege.  Instruct you not to
25  answer.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

149

1    MS. MARANZANO:  Can we get these two
2  exhibits mark?
3       (Exhibit No. 526-527 was marked.)
4  BY MS. MARANZANO:
5     Q.  Do you recognize these?
6     A.  I believe so.
7     Q.  What are these?
8     A.  Well, Exhibit 526 is a letter from Senator Van de
9  Putte to me dated March 3, 2009.  Opening a written
10 dialogue concerning the Committee of the Whole hearing
11 and ground rules.  And the -- and 527 is a letter that I
12 wrote responding to her concerns dated March 5, 2009.
13    Q.  And can you look at -- do you recall having this
14 exchange with Senator Van de Putte?
15    A.  I recall that we wrote letters back and forth and
16 also had conversations seeking conversations about these
17 issues.
18    Q.  Can you look at your response for me?
19    A.  Yes, ma'am.
20    Q.  And can you look at No. 1, the first sentence
21 says, "I am not inclined to support further delay in
22 consideration of voter identification legislation."  Can
23 you tell me, based on the public record, had there been
24 a delay in the consideration of voter identification
25 legislation?

150

1    MR. SWEETEN:  Yeah.  Don't answer the
2  question.  It calls for you to interpret what you said
3  there.  Legislative privilege.  You can answer as to
4  whether you said that.
5     A.  That's a statement I wrote.  But that's as much
6  as I can testify to.
7     Q.  (By Ms. Maranzano)  Okay.  Can you -- can you
8  look down in that same paragraph where there's a
9  sentence that says, "More than a week's notice of a
10 hearing is much more than the Senate usually provides,"
11 what amount of notice does the Senate usually provide?
12    MR. SWEETEN:  You can answer as a general
13 matter, but I don't want you to interpret statements on
14 this.
15    A.  The rules of the Senate provide posting notices
16 and I believe, you can go with the rules, but I think
17 it's 24 hours or 48 hours to the tag and there's certain
18 periods of times it changes depending on the time of the
19 session.  So the rules of the Senate would be the time
20 limits that committees are required to provide for
21 hearings.  And I would just refer you to those rules
22 that were in effect.
23    Q.  (By Ms. Maranzano)  And is it -- is it your
24 testimony that more than a week's notice would be much
25 more than what the Senate would usually provide?

151

1    MR. SWEETEN:  Again, don't refer to the
2  document itself or interpret the words on the page.  If
3  you -- you can answer as a general matter about Senate
4  procedure matters of the public record.
5     A.  Generally a week would be longer than normal
6  bills would -- notice on most bills.
7     Q.  (By Ms. Maranzano)  Are there some bills that you
8  give a longer amount of notice time for?
9       MR. SWEETEN:  You can refer to matters of
10 the public record.
11    A.  Generally, no.  We generally -- we generally set
12 a hearing docket and post it within the required time
13 limits.  Just depends on when it gets down to the
14 Senate.
15    Q.  (By Ms. Maranzano)  Is there any consideration of
16 whether there's significant public interest on a bill?
17    MR. SWEETEN:  Yeah.  Don't reveal that.
18 That would require you to reveal matters that are
19 privileged and instruct you not to answer.
20 BY MS. MARANZANO:
21    Q.  Can you look at that paragraph below the one we
22 were just looking at?  There's a sentence that says,
23 "Additionally, that committee heard extensive testimony
24 last session on a substantially similar voter election
25 bill.  Texas Senate almost spent nearly an entire day on

152

1  the Senate floor discussing the importance of this
2  issue."  Does that sentence refer to the debate that
3  occurred on the rules resolution?
4     MR. SWEETEN:  Don't interpret the sentence
5  on the page.  You can answer -- I mean, I don't know
6  that you can answer that.  I think that's legislative
7  privilege.
8     MS. MARANZANO:  So what he meant in this
9  letter --
10    MR. SWEETEN:  He's not going to interpret
11 what he meant when he said it.  That's legislatively
12 privileged.  He can answer questions about the public
13 record, but he's not going interpret the letter.  That
14 would reveal his thoughts, mental impressions about a
15 bill in legislation.
16    MS. MARANZANO:  I'm not sure I see that as
17 interpretation, but more just as what event he was
18 referring to.  But in the interest of --
19    MR. SWEETEN:  Well, I mean, as the court has
20 said, you can ask him about a public statement, he made
21 it, he didn't make it.  The court has not said that you
22 can -- that you can go behind that and ask for reasons,
23 support or information or thought processes behind that
24 statement.  In fact, they've said the contrary.  And so
25 I'm drawing that line.  I think that is an absolutely



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

153

1   correct interpretation of the court's decision on this
2   matter.  That's why I'm not going to allow him to give
3   additional information about this statement or what he's
4   expressed.
5   BY MS. MARANZANO:
6       Q.  Well, let me ask you this, Senator.  That
7   sentence refers to there being discussion about the
8   importance of this issue.  Was the substance of
9   legislation discussed during that discussion, which
10  would be inappropriate to me is a discussion that happened on the
11  public record?
12      A.  Well, let me answer it this way.  I don't know of
13  any other hearing we had on the public record on the
14  Senate for a day other than the hearing on the rule.
15      Q.  And was the substance of Senate Bill --
16      A.  There may have been, but I don't recall.
17      Q.  There may have been what?
18      A.  There may have been other -- I don't recall any
19  other hearing before the Senate that lasted more than a
20  day, other than the one on Rule 5.11.
21      Q.  And was the substance of Senate Bill 362
22  discussed in that debate?
23      A.  The record will clearly reflect what issues were
24  discussed.
25      Q.  And what's your recollection, as you sit here

154

1   today?
2       A.  My recollection is, we talked about the issues of
3   voter identification and the issues of the special order
4   rule.  But the record -- you would have to check the
5   record to get a better recollection or better reflection
6   of what was discussed.  There were a lot of things
7   discussed that day.
8       Q.  So your recollection is you talked about voter
9   identification and you don't recall whether or not --
10      A.  I don't recall specifics independently.  The
11  record will reflect that.  That was a long day for me.
12  I had a personal tragedy.
13      Q.  I'm sorry.  Can you look at the next page for me?
14  By the --
15      A.  The next -- my letter of March --
16      Q.  Exactly.  By paragraph 5.  Can you read that?
17      A.  Read it?
18      Q.  Just take a look at it.
19      A.  Yes.
20      Q.  Is that about whether the office of the Attorney
21  General would be available to testify in a legislative
22  proceeding?
23      A.  That's correct.
24      Q.  Are you aware of whether this position -- am I
25  correct that what 5 -- what that paragraph is asserting

155

1   is that the office of Attorney General would not testify
2   because should there be litigation that would present a
3   conflict of sorts?
4       A.  Well, I think you just have to read it.
5       Q.  Well, how would you describe it for me?
6       A.  As I wrote it.
7       Q.  Which says, "Given fact that the office of the
8   Attorney General will represent the State of Texas in
9   litigation if any arising out of this legislation, it
10  would be inappropriate to present the Attorney General
11  as a witness in the legislative debate."  Did that
12  position change in any of the legislative debates.  And
13  that's -- that's a public record.  Did the office of
14  Attorney General testify in the 2011 legislative session
15  on voter identification vote?
16          MR. SWEETEN:  That second question, if the
17  AG testified, I'm fine with.  The first one, whether his
18  position changed, I think we --
19  BY MS. MARANZANO:
20      Q.  Okay.  Let's go with the second one.
21          MR. SWEETEN:  Because you amended the
22  question.
23      A.  So to make sure I'm clear, would you restate it?
24      Q.  (By Ms. Maranzano)  Yeah.  Did the office of the
25  Attorney General testify during the debate on SB 14?

156

1       A.  There were staff persons from the office of the
2   Attorney General who testified on -- in the public
3   hearing on Senate Bill 362.
4       Q.  On 362?
5       A.  Or whatever it was.
6       Q.  Senate Bill 14?
7       A.  Yeah, I think on 14 as well.
8       Q.  Okay.  And you think testified in 2009?
9       A.  I think so.
10      Q.  As well?
11      A.  Yeah.
12      Q.  Okay.
13      A.  I'm sorry.  I thought we were on --
14      Q.  We were, but --
15      A.  You've got to be clear with me on what you were
16  talking about.
17      Q.  I'm sorry.
18      A.  It will help me a lot.
19          MR. SWEETEN:  Jennifer, I need to take a
20  2-minute break.
21          (Brief recess.)
22          MS. MARANZANO:  Before we actually go back
23  into the substantive discussion we were having, I wanted
24  to raise an issue with Mr. Sweeten, on the record, about
25  documents that we believe have been produced



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                    June 7, 2012

157

1   yesterday pursuant to the court's order related to --
2   this is from Page 15 of the June 5th order.  The court
3   ordered that y'all produce a constituent lobbyist and
4   interest groups communication on legislative responses.
5   And we believe that the privilege log asserts that there
6   were some constituent communications with Senator
7   Duncan's office that have not been produced.  So I can
8   give you the specific Bates ranges.
9          MR. SWEETEN:  Do you want to -- looks like
10  you've got them all written down.
11         MS. MARANZANO:  I do.
12         MR. SWEETEN:  Do you want to --
13         MR. SWEETEN:  Why don't I read it into the
14  record and then I can send you an e-mail follow-up.
15         MR. SWEETEN:  Yeah.  That would be helpful.
16         MS. MARANZANO:  Okay.
17         MR. SWEETEN:  Let me just say that, in
18  response, that I know that we've obviously -- were in
19  receipt of the court order.  We obviously responded.
20  And I would think you would agree that we sent,
21  certainly over 1,000 constituent -- or documents fitting
22  that description yesterday.  You've been advised --
23         MS. MARANZANO:  I can't represent the
24  number.  I understand that constituent communications
25  were produced.

158

1          MR. SWEETEN:  So you were given -- let's say
2   this.  You were given a substantial number of
3   constituent communications.  If you're suggesting that
4   you don't think you got some of Senator Duncan's, then
5   all I can do in response to that is to look.  And we
6   believe that we've been in full compliance with the
7   court's order.  But I will certainly look at your list
8   and we'll double-check.
9          MS. MARANZANO:  Right.  And, I mean, that's
10  what I'm asking.  And I think -- because our
11  understanding is we don't have these documents, I am
12  going to need to hold the deposition open.  But, you
13  know, we will --
14         MR. SWEETEN:  If at the next break I can
15  potentially make a phone call and check to see.
16         MS. MARANZANO:  So let me just read for the
17  record that the Bates numbers are Texas 00203510, Texas
18  0020354 -- 3524 through 3527, Texas 00203528 through
19  3529, Texas 00203533 through 3539.
20  Texas 00203540 through 3541.  Texas 00203542 through
21  00203544.  Texas 00204706.  Texas 00204707 through 4710.
22  So those are the ones we're missing.  And I can send you
23  e-mail communication following up.
24         MR. SWEETEN:  That actually would be helpful
25  so we can have them all written down and we'll -- I'll

159

1   look into your suggestion.  But again, I think we fully
2   complied yesterday.  But we'll check that.  We'll check
3   what you're suggesting.
4          MS. MARANZANO:  To be clear, we're looking
5   at the privilege log from May 21st and I believe these
6   documents are explicitly listed as constituent
7   communications.
8   BY MS. MARANZANO:
9    Q.  Okay.  Senator, we were talking about Senate Bill
10  362 before the break.  Can you tell me what your role
11  was during the consideration of Senate Bill 362 when it
12  went before the Committee of the Whole?
13         MR. SWEETEN:  You can refer to your
14  public -- matters of public record.
15   A.  I was appointed to be the chairman of the
16  Committee of the Whole.
17   Q.  (By Ms. Maranzano)  And what are your
18  responsibility when you're chair of the Committee of the
19  Whole?
20   A.  To conduct the hearing.
21   Q.  And can you describe to me what that means?
22   A.  Well, it means setting the parameters for the
23  ground -- the parameters and the ground rules for
24  hearing witnesses and organizing the committee so that
25  it moves in an orderly fashion.  So that -- to work with

160

1   the members of the committee to determine how we will
2   move through the witnesses expeditiously.  To get
3   consensus on order of witnesses and generally to ensure
4   that there's proper decorum during the hearing as it's
5   taking place so that there can be the best quality of
6   deliberations possible.
7    Q.  When you say, "work with committee members," when
8   this is a Committee of the Whole, does that mean work
9   with everybody?
10   A.  Right.
11   Q.  Who just thought -- who appointed you to this
12  position?
13   A.  Lieutenant Governor appoints that committee
14  chairman.
15   Q.  Were witnesses invited to testify on the
16  Committee of the Whole for Senate Bill 362?
17   A.  The record reflects proponents and opponents that
18  were invited.
19   Q.  Do you recall what the break down of witnesses
20  was between opponents and proponents?
21   A.  No, the record will reflect that.
22   Q.  What's the -- what's the usual break down between
23  witnesses on either side of the bill?
24         MR. SWEETEN:  Do you mean on the Committee
25  of the Whole?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                           June 7, 2012

161

1  BY MS. MARANZANO:
2      Q. Well, why don't we talk about Committee of the
3  Whole first?
4          MR. SWEETEN: You can talk about general
5  procedure based on the public record.
6      A. There is no usual.
7      Q. (By Ms. Maranzano) What about in the State
8  Affairs Committee while you've been chair, what's the
9  usual break down of witnesses between supporters and
10 opponents of the bill?
11         MR. SWEETEN: Same instruction.
12     A. There is no usual. Just depends on the bill
13 and -- basically.
14     Q. (By Ms. Maranzano) what -- during the Committee
15 of the Whole, who invites the witnesses to testify. So any
16 member of the Senate can propose a witness and bring
17 them. It's not -- there's not any rule about that. So
18 that's the best way I can answer that.
19     Q. There's no rule. Is there a limited time for
20 which people can testify?
21     A. That's a consensus that we normally try to
22 develop a hearing and our standing committee hearing we
23 have witness limits sometimes. Sometimes we don't. And
24 on most public testimony we do have time limits in the

162

1  Senate on public testimony.
2      Q. Do you recall if any groups representing minority
3  voters testified during the 2009 consideration of Senate
4  Bill 362?
5      A. I recall they did.
6      Q. Do you recall if concerns were raised about
7  Senate Bill 362's impact on minority voters, either by
8  these groups or by others?
9          MR. SWEETEN: You can testify to matters on
10 the public record.
11     A. I think the record will reflect they did. I
12 don't recall specifically what the objections were, as
13 we sit here today, independently.
14     Q. (By Ms. Maranzano) Do you recall who raised
15 those concerns?
16         MR. SWEETEN: Same instruction.
17     A. No. It would be on the record.
18     Q. (By Ms. Maranzano) Do you recall if legislators
19 raised those concerns?
20         MR. SWEETEN: Same instruction.
21     A. It would be on the record.
22     Q. (By Ms. Maranzano) And you have nothing to add
23 to the record in that regard?
24     A. No. The record -- I don't have independent --
25 enough independent recollection to give you an accurate

163

1  answer. You would have to rely on the record for that.
2      Q. Were there any public -- well, let me ask. Were
3  there any amendments to Senate Bill 362 when it was
4  being considered on the floor that were publicly stated
5  as amendments to respond to the concerns that SB 362
6  would disproportionately impact minority voters?
7      A. We had talked about this earlier. The record
8  would have to reflect it. Independently, I don't recall
9  and for some reason I think we -- there was a consensus
10 not to add amendments, but -- from everybody. But I
11 can't -- the record would reflect that.
12         (Exhibit No. 528 was marked.)
13 BY MS. MARANZANO:
14     Q. I'm showing what we're marking deposition
15 Exhibit 528. Can you take a look and tell me if you
16 recognize this and I will tell you that it's an excerpt
17 not the full record?
18     A. Appears to be an excerpt from the Senate journal
19 for the week -- or from the day of March 18, 2009.
20     Q. And can you look at the second page. Do you see
21 there's something that says, "statement regarding votes
22 cast on Senate Bill 362." If you would quickly take a
23 look at that. Is this something you've seen before?
24     A. This would be on the third page.
25     Q. It starts on the second and it goes on to the

164

1  third?
2      A. Okay. Paragraph 3.
3          MR. SWEETEN: Are you talking about the
4  statement on the bottom?
5  BY MS. MARANZANO:
6      Q. The statement regarding both House and Senate
7  Bill 362. And it starts and it says, "Senator West
8  submitted the following statement," do you have that?
9      A. No. Sorry. I'm a slow reader I guess. What
10 page is it on? Third page?
11     Q. It starts right here. But actually I'm going to
12 direct your attention to No. 8?
13         MR. SWEETEN: Starting here, she wants you
14 to read that.
15     A. Senator West, yeah. I see that.
16     Q. (By Ms. Maranzano) Yeah. Do you recall this
17 happening?
18     A. No, I really don't. It's -- it may have been
19 submitted and not read to the Senate. It may have just
20 been submitted post-vote. Sometimes those get done.
21     Q. Okay. Can I direct your attention to No. 8 in
22 that -- in that statement. Do you see that it says, "Of
23 all the opportunities members of the Senate have had to
24 vote on voter identification legislation or Senate
25 process regarding voter identification legislation, no



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

165

1   senator who is an ethnic minority has voted in favor of
2   such legislation or the process related to such
3   legislation"?
4       A. I see that.
5       Q. Based on the public record -- let me ask you
6   this. Did you have any public response to the unified
7   opposition of the minority members of the Senate?
8       A. Are you talking about as reflected or a response
9   to Senator West's statement that he placed in the
10  record.
11      Q. I'm asking actually, more generally. Just this
12  statement talked about a unified opposition of minority
13  members of the Senate. And I'm asking if you had any
14  public response to that opposition.
15      A. Did I, as Senator Duncan have any public
16  response? I don't recall that I did.
17      Q. Do you recall the reasons why senators gave for
18  opposing voter ID?
19          MR. SWEETEN: Objection; call for matters
20  subject to legislative privilege. Instruct not the
21  answer.
22  BY MS. MARANZANO:
23      Q. How about if we base it on the public record?
24          MR. SWEETEN: You can testify as to matters
25  of public record.

166

1       A. Public record reflects their opposition to it.
2       Q. (By Ms. Maranzano) Do you recall if one of the
3   issues that they discussed on the public record was the
4   impact that Senate Bill 362 would have on minority
5   voters?
6       A. The record will reflect that if it was brought
7   up.
8       Q. So do you have no recollection of whether that
9   occurred?
10      A. My independent recollection is not accurate as to
11  exactly what was raised. Those issues generally were
12  discussed during our fairly lengthy debate on several
13  occasions on the issue. But specifically what issues --
14  how those issues were framed and what evidence was
15  brought forward I would have to rely on the record.
16      Q. Okay. So you have a recollection that it came up
17  generally, related to voter identification legislation?
18      A. Correct.
19      Q. And based on the public record, do you have any
20  reason to believe that these senators were not being
21  genuine about their concerns on the impact of the bill?
22          MR. SWEETEN: I'm going to object. Because
23  of the subjective interpretation and the sincerity of
24  these senators would be a matter of legislative
25  privilege. And I'm going to instruct him not to answer

167

1   on that basis.
2   BY MS. MARANZANO:
3       Q. Are you following your counsel's instruction?
4       A. Yes.
5       Q. Did any supporters of Senate Bill 362 publicly
6   state that if the Senate -- the legislature did not
7   respond to the concerns of minority legislators it might
8   threaten the preclearance of Senate Bill 362?
9       A. "Supporters," meaning?
10      Q. People who voted for it.
11      A. Members of the Senate?
12          MR. SWEETEN: Your question is about public
13  statements.
14          MS. MARANZANO: Uh-huh.
15      A. I don't know if they did or not.
16      Q. (By Ms. Maranzano) You don't recall that?
17      A. Right.
18      Q. Was it true that some legislators and members of
19  the public stayed up all night to testify about Senate
20  Bill 362?
21      A. The hearing lasted throughout the evening hours
22  and concluded in the late morning hours of the following
23  day.
24      Q. Was there any public discussion of what prompted
25  this level of interest in Senate Bill 362?

168

1       A. You know, I don't recall anything specifically
2   other than what would be on the record.
3       Q. And as you sit here today, you can't --
4       A. Well, I remember there were statements that were
5   made by some people who testified as experts and as
6   laypersons. But I don't -- I can't recall specifically
7   what they said to give you an accurate depiction of it,
8   but the record will reflect that.
9       Q. Well, what do you recall generally, even if you
10  don't recall specifically?
11      A. What I just said.
12      Q. That's it?
13      A. Right.
14      Q. Okay.
15      A. I mean, I recall some loud voices. I recall some
16  passionate testimony. I recall some very
17  straightforward testimony. And, you know, the
18  testimony, I thought, and the debate throughout the day
19  was generally -- we kept things moving. And the debate
20  was on both sides of the issue. And I can't remember
21  generally or specifically -- or specifically what was
22  said by any member of the Senate that day. But it is
23  reflected in the record. That's why we kept the record.
24      Q. Did you have any role when Senate Bill 362 was
25  referred to the House?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                June 7, 2012

169

1  A. No.
2  Q. Did you have any communications with any members
3  of the House about Senate Bill 362?
4  A. Yes.
5  Q. With whom?
6  A. Delwin Jones.
7  Q. Delwin Jones? Is that what you said?
8  A. Right.
9  Q. Can you tell me in a general way what that
10  communication was about?
11  A. He's a member of the Lubbock delegation. Yeah, I
12  can remember generally. But it was just about the bill.
13  Q. Do you -- was it one communication or more than
14  one?
15  A. Just one or two.
16  Q. Was it after the bill had been referred to the
17  House or before?
18  A. It was after.
19  Q. Do you remember what happened to the bill in the
20  House?
21  A. Yes.
22  Q. What happened?
23  A. It didn't pass.
24  Q. Was that because essentially the time ran out?
25      MR. SWEETEN: Don't reveal matters of

170

1  legislative privilege in answering the question.
2  A. Well, the record is fairly clear about what
3  happened on that bill as it went to the House.
4  Q. (By Ms. Maranzano) And you don't want to add
5  anything to the record?
6  A. I don't think you could add much to that record.
7  Q. Fair enough. Have you heard of ID verification?
8      MR. SWEETEN: You can answer as a general
9  matter. Don't reveal any legislative -- your mental
10  impressions. That would be subject to the legislative
11  privilege.
12  A. No. I'll have to say I don't know what you're
13  talking about.
14      MS. MARANZANO: Can we mark this?
15      (Exhibit No. 529 was marked.)
16  BY MS. MARANZANO:
17  Q. I'm showing you what we're marking as deposition
18  Exhibit 527? No, 529. Do you recognize this?
19  A. No, but it's from Jennifer.
20  Q. You testified earlier that Jennifer Fagan is a
21  member of your staff?
22  A. That's correct.
23  Q. Do you know who John Sepehri is?
24  A. John Sepehri? You'll have to refresh my memory.
25  Q. My recollection is John Sepehri is the general

171

1  council for the Secretary of State, or at least was?
2  A. Okay.
3  Q. Does that refresh your recollection as to what
4  this e-mail exchange is about?
5  A. Yes. I guess -- well, I'm not familiar with this
6  e-mail. So -- but if he works for the Secretary of
7  State, we often, through the State Affairs Committee,
8  communicated with the Secretary of State's office about
9  issues that we had questions about technically.
10  Q. So what is the ID verification process bill that
11  Jennifer refers to in her e-mail?
12  A. I'll have --
13      MR. SWEETEN: Don't discuss matters of
14  legislative privilege including communications you had
15  with State agencies.
16  BY MS. MARANZANO:
17  Q. But just generally, can you just tell me what --
18  I mean, I'm not -- I'm not interested in what this
19  exchange is about. I'm just asking you what is the
20  topic on which this says we're not going to file voter
21  identification -- ID verification process bill?
22  A. I don't know.
23  Q. Okay.
24  A. I seriously do not know.
25  Q. Okay.

172

1  A. It may have been discussed and I may have said no
2  or we may not have. I don't know. I just have no
3  idea what -- this is not ringing a bell with me today.
4  Other than we didn't file it.
5      MS. MARANZANO: Can we label that?
6      (Exhibit No. 530 was marked.)
7  BY MS. MARANZANO:
8  Q. Senator, I'm showing you what we're labeling as
9  Exhibit 530, for the record. Can you take a look at
10  this and tell me if you recognize it?
11  A. I would recognize this to be legislation titled
12  Senate Bill 14.
13  Q. If you look at the last page it has signatures on
14  it.
15  A. This appears to be signatures reflecting that it
16  is the enrolled version of the bill signed by the
17  governor.
18  Q. Do you have any knowledge, based on public
19  record, of when Senator Fraser started working on this
20  bill?
21  A. No, I do not.
22  Q. Did you or anyone in your office have
23  conversations with Senator Fraser about the development
24  of what would become Senate Bill 14?
25  A. Probably, at some point in time we did.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                         June 7, 2012

173

1    Q.  And when was that?
2    A.  I cannot tell you a specific time.  I do not
3    know.
4    Q.  Would that have been you or would that have been
5    your staff who had that communication?
6    A.  If Senator Fraser and I had a conversation it
7    would have been more or less informal.  It would not be
8    unusual for Senator Fraser's office to contact my staff
9    for information or records from the last committee or
10   from hearing or to discuss the issue.  It would not be
11   unusual.
12   Q.  Who on your staff would Senator Fraser have
13   contacted?
14   A.  It would be Jennifer.
15   Q.  When you said "record," -- what is the first
16   thing you said?
17   A.  Well, I mean, this is speculation a little bit.
18   So I'm just saying if somebody wanted a document or
19   something they might call our office and request it.
20   Q.  Do you have any knowledge as to whether Senator
21   Fraser's staff and Ms. Fagan did have any communications
22   about Senate Bill 14?
23   A.  Define what you're talking about communications.
24   Q.  I'm referring very broadly to conversations,
25   e-mails.

174

1    A.  Yes.
2    Q.  Yes you do have knowledge?
3    A.  Yes.
4    Q.  And did they?
5    A.  The only -- the only communications that I would
6    be aware of would be communications about logistics.
7    They're going to file a bill.  We're going to --
8         MR. SWEETEN:  Don't reveal the substance on
9    it though.
10   BY MS. MARANZANO:
11   Q.  Are you aware of whether there were any
12   substantive communications between your staff and
13   Senator Fraser's staff about Senate Bill 14?
14   A.  I'm not -- I'm not aware of any.
15   Q.  And I believe you said you may have had
16   conversations with Senator Fraser, but you don't recall
17   specifically whether you did or not?
18   A.  Right.
19   Q.  And would your conversations with Senator Fraser
20   have been about the substance of the bill or about the
21   logistics of the bill?
22   A.  Probably both.
23   Q.  And I assume since you said you have no specific
24   recollection you couldn't tell me how many substantive
25   conversations you had with Senator Fraser?

175

1    A.  No, I couldn't.
2    Q.  Could you give me an approximation?
3    A.  It would be a guess.
4    Q.  Did you have conversations with other legislators
5    about Senate Bill 14?
6    A.  When?
7    Q.  At any time?
8    A.  I assume when you say "Senate Bill 14," it would
9    have to have been from the time we filed it because it
10   didn't have a name then.  I'm just trying to understand
11   the time frames here.
12   Q.  I appreciate that.  Why don't we start and say
13   did you have any conversations with any legislators
14   about what would become Senate Bill 14?
15   A.  No.
16   Q.  Did you have any conversations with legislators
17   about Senate Bill 14?
18   A.  Yes.
19   Q.  With whom?
20   A.  Well, from the time it was introduced until the
21   time it was passed, probably most members of the Texas
22   Senate.
23   Q.  Okay.  And would those have been verbal
24   communications?
25   A.  Yes.

176

1    Q.  Did you have any --
2    A.  Unless there was -- unless there was some writing
3    between Senator Van de Putte and myself, she was acting
4    as chairman of the caucus.  And as in 2009, I seem to
5    recall she may have sent a similar letter in 2011.  But
6    I don't -- I'm sure you've got that if it's part of the
7    record.
8    Q.  Did you have any conversations with any
9    legislators other than Senator Fraser who we've already
10   talked about, about the development or drafting of
11   Senate Bill 14?
12        MR. SWEETEN:  Objection; vague.  Go ahead
13   and answer it.
14   A.  As far as drafting the original version, no.
15   Q.  (By Ms. Maranzano)  How about drafting later
16   versions?
17   A.  Only to understand what was in the bill, which
18   would be generally what a legislator --
19        MR. SWEETEN:  Don't talk about the
20   conversation.
21   BY MS. MARANZANO:
22   Q.  Who were those conversations with?
23   A.  I don't recall all who would have been involved
24   in that.
25   Q.  Well, can you give me some names of who was



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

177

1  involved in that?
2      A.  Well, it probably would have been Senator Fraser,
3  might have involved Senator Williams, Senator -- I don't
4  know if it involved Carona or not.  It would have
5  involved Senator Van de Putte, Senator Ellis and others
6  who, as we generally discuss legislative matters coming
7  before the body.
8      Q.  Are the members that you've just named on the
9  State Affairs Committee?
10     A.  Some of them are.
11     Q.  Which ones are not?
12     A.  Well, I think Carona used to be.  I think most of
13 them are.  Maybe I talked to Senator West.  He's not on
14 the committee.
15     Q.  And you said, "to understand what was in the
16 bill."  Is that what you testified to?  Those were your
17 communications?
18     A.  Well, just a listing of the bill and what's in
19 the bill.
20     Q.  That's how you're describing your communications
21 with all of these members?
22     A.  Right.  Right.
23     Q.  And when would those -- when would those
24 communications have occurred?
25     A.  Throughout the period of deliberations on the

178

1  bill.
2      Q.  Did you have any communications with the
3  Lieutenant Governor about Senate Bill 14?
4      A.  Yes.
5      Q.  And when was that -- or when were those?
6      A.  Generally, as I've stated, randomly throughout
7  the process of deliberations on the bill.
8      Q.  And what was the general nature of that
9  communication?
10         MR. SWEETEN:  You can give a general subject
11 matter description of the communication.  Do not reveal
12 the subject for communication.
13     A.  Progress on setting the hearing, the process that
14 the senators have discussed with regard to the process
15 for procedures for the hearing, generally that was the
16 primary -- main reason for discussions.
17     Q.  (By Ms. Maranzano)  Did you set the hearing date
18 for the -- for Senate Bill 14?
19     A.  I'll answer this in a way that nobody will
20 object.  I don't remember.
21     Q.  Did you have any conversations with the
22 governor's office about Senate Bill 14?
23         MR. SWEETEN:  You can answer.
24     A.  I don't know if I did or not.
25     Q.  (By Ms. Maranzano)  Does that mean you don't

179

1  recall any?
2      A.  I don't remember any.  Not saying I didn't.  I
3  just don't remember any.
4      Q.  Let me ask you this.  Is it common to talk to the
5  governor's office about ongoing legislation?
6      A.  For me --
7          MR. SWEETEN:  Objection; vague and not
8  limited in time and scope, foundation.  But you can go
9  ahead and answer it if you can.  That's fine.
10     A.  The answer is no.  It's not common.
11     Q.  (By Ms. Maranzano)  Can you take a look at Senate
12 Bill 14?  In particular, I would like to direct your
13 attention to Section 14 of the bill.
14     A.  On what page?
15     Q.  It's on Page 9.  Do you see that it lists in that
16 section the forms of identification that are permissible
17 under Senate Bill 14?
18     A.  The section is entitled documentation of proof of
19 identification.
20     Q.  Yep.  Do you see that?
21     A.  Yes.
22     Q.  Can you tell me what the major difference between
23 Senate Bill 14 and Senate Bill 362 are?
24         MR. SWEETEN:  You can answer based on the
25 text of the bill.  Don't give your mental impressions

180

1  and thoughts about it.  We'll take a little while so
2  Jennifer can get a bite in.
3      A.  There are numerous differences textually for one
4  reason or another and I can't tell you why.
5          MR. SWEETEN:  Don't provide the reasons why.
6  She's just asking if there is a difference from this to
7  this.
8      A.  There are differences.
9      Q.  (By Ms. Maranzano)  Does Senate Bill 14 allow for
10 any forms of non-photo identification?
11     A.  The provisions that are in Section 14 of the bill
12 do not appear to provide a form of identification other
13 than one that includes a photo ID and I'm assuming a
14 license to carry a concealed hand gun license does.
15 That's in section 14.
16     Q.  If you look at the very beginning of the
17 provision under Section 14, it says Section 63.0101.  Do
18 you see that it actually specifies that the forms of
19 identification listed need to have a photo
20 identification?
21     A.  Line 17 inserts the word photo.
22     Q.  Can you tell me what the purpose was of removing
23 non-photo identification as allowable for voter
24 identification?
25         MR. SWEETEN:  Don't answer the question.  He



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

181

1  can testify about the general purpose of the bill.  He's
2  not going to testify about the specifics of one
3  insertion, deletion, we're not going to parse it that
4  way.  That was issuing the purpose of the court's order.
5  I'm going to instruct him not to answer that question.
6  BY MS. MARANZANO:
7      Q.  Was there anything in the public record that you
8  can refer to related to the purpose of removing
9  non-photo IDs from Senate Bill 14?
10         MR. SWEETEN:  You can testify based upon
11  matters of the public record.  Don't reveal your
12  thoughts, mental impressions in answering the question.
13     A.  The public record has a discussion between
14  members of the Senate and debate on the floor concerning
15  the purpose for the exclusion of non-photo ID methods of
16  identification.
17     Q.  (By Ms. Maranzano)  And what was the purpose of
18  that as stated in the public record?
19     A.  The public record would reflect that.
20     Q.  Well, what's your testimony about it, as you sit
21  here today?
22     A.  The general purpose of the bill is to basically
23  ensure voter ballot integrity.
24     Q.  And removing non-photo identification from the
25  bill is related to ensuring valid integrity?

182

1         MR. SWEETEN:  He's not going to answer that
2  question.  He's not going to answer the reasons for the
3  insertion or deletions of any bill.  He's answered the
4  general purpose of the bill.  We're not going to have
5  him give his thoughts and general impressions on
6  various -- the reasons and thoughts behind -- or his
7  impressions about the deletion or insertion of a given
8  paragraph.  Legislative privilege.
9  BY MS. MARANZANO:
10     Q.  I'm going to ask you about the public record
11  related to the removal of non-photo ID.  You mentioned
12  ensuring voter integrity, the integrity of the ballot.
13  So based on the public record, what was said about how
14  non-photo IDs are connected to ensuring the integrity of
15  the ballot?
16         MR. SWEETEN:  Misstates the testimony.
17  Objection.  You can answer as to what was said in the
18  public record to the extent you recall.  Do not give
19  reasons behind any changes made.  That's subject to the
20  legislative privilege.  You can answer based on that
21  instruction.
22     A.  I can't -- I do not have independent recollection
23  of exactly what was said.  I would not want to
24  mischaracterize what was said.  And the public record
25  accurately reflects that and I would refer you to the

183

1  public record.
2      Q.  (By Ms. Maranzano)  You have no independent
3  recollection?
4      A.  Not that would be accurate that I could testify
5  to.
6      Q.  And what about your recollection of the public
7  record as related to the purpose of allowing forms of
8  identification that had expired 60 days before
9  presentation?
10         MR. SWEETEN:  Once again, you can refer to
11  matters in the public record in answering this question.
12  Don't reveal matters of legislative privilege.
13     A.  I couldn't answer that.  I don't have a
14  recollection of the details concerning those
15  discussions.
16     Q.  (By Ms. Maranzano)  Are you aware of the source
17  of the language for Senate Bill 14 or sources of the
18  language?
19         MR. SWEETEN:  You can answer that question
20  "yes" or "no".
21     A.  Yes.
22     Q.  (By Ms. Maranzano)  Was there anything on the
23  public record about the source or sources of the
24  language in Senate Bill 14?
25     A.  I think there may be.  I don't recall

184

1  specifically.  But I think there were discussions about
2  that on the Senate floor --
3      Q.  Can you tell me -- I'm sorry.
4      A.  Or in the debate.
5      Q.  Can you tell me what those discussions were?
6      A.  Not without seeing the record.
7      Q.  You can't testify to anything, as you sit here
8  today?
9      A.  Again, I don't want to be inaccurate.  And what I
10  recall about what was said as opposed to what was said
11  is not relevant.  The record is the relevant testimony
12  with regard to the issues that you're asking about.
13     Q.  Who was involved in the drafting of Senate Bill
14  14?
15     A.  Senator Fraser.
16     Q.  Anybody else?
17     A.  I have no recollection of who else might have
18  been involved.  It came out of his office.  And to what
19  extent other members or other staff members were
20  involved, I don't know.
21     Q.  Did you have any communications with current or
22  former legislators about Senate Bill 14 -- I'm sorry.
23  Do you have any communications about Senate Bill 14 with
24  current or former legislators who had offered other
25  voter identification bills?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

185

1    A.  I don't know.
2    Q.  You don't know?
3    A.  I don't know.
4    Q.  Because you don't know --
5    A.  Yeah.  I don't know what other people have
6    offered.  If you could be -- I don't know.
7    Q.  Did you have any conversations with
8    Representative Denny about Senate Bill 14?
9    A.  No.  Well, if I did it would have been in 2005
10   whenever, I think she had -- she had a bill -- or wasn't
11   she on one of those bills that we looked at earlier.
12   Q.  I'm sorry.  Did you have any communications with
13   her about Senate Bill 14?
14   A.  Oh, no, I don't believe so.
15   Q.  Did you have any communications with
16   Representative Betty Brown about Senate Bill 14?
17   A.  No, I don't know Betty Brown very well.
18   Q.  Did you have any communications with
19   representative Leo Berman about Senate Bill 14?
20   A.  I don't recall having any with Leo.
21   Q.  And did you have any conversations with the staff
22   people of any of those members?
23   A.  I don't believe so.
24   Q.  Did you have any communications with officials or
25   legislators in the State of Georgia about Senate Bill

186

1    14?
2    A.  No.
3    Q.  Did you have communications with any officials or
4    legislators in the State of Indiana about Senate Bill
5    14?
6    A.  I did not.
7    Q.  Did anybody in your office?
8    A.  I do not know.  Jennifer may have, but I don't
9    know.
10   Q.  And how about with Georgia, do you know if
11   anybody in your office had communications?
12   A.  I don't know.
13   Q.  Did the legislature publicly considered adding
14   additional forms of identification to Senate Bill 14?
15       MR. SWEETEN:  Don't answer to the extent it
16   calls for you do reveal legislative privilege.  You can
17   testify as to matters on the public record.
18   A.  I can't -- the reason I'm having trouble with
19   this is because I can't remember if we offered
20   amendments on Senate Bill 14 on the floor during the
21   Committee of the Whole or during the debate.  The record
22   will reveal that.  And it may be that someone did, but
23   it would depend on whether or not there were amendment
24   proposals that were offered to Senate Bill 14, either
25   during the Committee of the Whole or during the general

187

1    Senate debate.
2    Q.  (By Ms. Maranzano)  Okay.  We can get to that in
3    a few minutes.
4    A.  Okay.
5    Q.  But other than that, do you recall any
6    conversations, publicly, about the -- about adding
7    additional forms of identification to Senate Bill 14?
8       MR. SWEETEN:  You can testify about matters
9    in the public record.
10   A.  The public record probably reflects some
11   discussion about that.
12   Q.  (By Ms. Maranzano)  Okay.  And you have no
13   independent recollection?
14   A.  I don't have independent recollection of what was
15   said other than the fact that I believe there was some
16   discussion about that on the public record.
17   Q.  Based on the public record, are you aware of any
18   analysis as to how many registered voters possess the
19   required forms of identification in Senate Bill 14?
20       MR. SWEETEN:  You can testify about matters
21   on the public record.
22   A.  I believe the public record may reflect some
23   estimates of that.  But I don't recall exactly what they
24   reflect, the record would show that more accurately.
25   Q.  (By Ms. Maranzano)  Have you heard of a Spanish

188

1    surname voter registration analysis?
2    A.  I believe I have.
3    Q.  Are you aware, based on the public record,
4    whether the Secretary of State conducted such an
5    analysis while the legislature was considering Senate
6    Bill 14?
7    A.  You would have to go to the record to be accurate
8    about that.  I seem to recall some discussion about
9    that, but I don't recall what the conclusion was.
10   Q.  Do you recall Senator Williams asking the
11   Secretary of State's office?
12   A.  No.
13   Q.  Did Legislature -- let me start again.  Are you
14   aware, based on the public record, of whether the
15   legislature conducted any analysis to determine whether
16   minority voters would be disproportionately impacted by
17   Senate Bill 14?
18       MR. SWEETEN:  You're asking him about
19   legislator's analysis.  It calls for speculation.  It
20   also calls for him to reveal legislative privilege
21   including your mental impressions, thoughts,
22   motivations, discussions with other members, staff
23   members.  And I'm going to instruct him not to answer on
24   that basis.  To the extent that there is a discussion on
25   the public record regarding that issue I'll let you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                              June 7, 2012

189

1  refer to the record, but other than do not answer the
2  question.
3  BY MS. MARANZANO:
4      Q.  Are there any specific conversations on the
5  public record about that?
6      A.  You'll have to look at the record.
7          THE REPORTER:  I'm sorry.  I didn't
8  understand.
9          THE WITNESS:  She'll -- you'll have to look
10 at the record.
11 BY MS. MARANZANO:
12     Q.  Are you aware of any legislators publicly
13 requesting that analysis?
14     A.  As I sit here today, no.  The record may reflect
15 that they did.
16     Q.  If I told you that Senator Fraser's chief of
17 staff testified that there was no analysis of who had
18 some ID for purposes of Senate Bill 14, would you
19 dispute that?
20         MR. SWEETEN:  Objection; assumes facts not
21 in evidence, misstates testimony and also calls for
22 matters subject to the legislative privilege.  Don't
23 answer if it would reveal any matters subject to the
24 privilege.
25     A.  I can't respond to that.

190

1      Q.  (By Ms. Maranzano)  Because it's privileged?
2      A.  Because I don't know.
3      Q.  Do you know what a military identification card
4  is?
5      A.  Generally.
6      Q.  What is it?
7      A.  Well, I assume that it's an identification issued
8  to persons who are enlisted in the military.
9      Q.  Do you know how many different forms of
10 identification fall into that category?
11     A.  I don't recall.
12     Q.  Is that something -- when you say "you don't
13 recall," is that something you think you knew when you
14 considered Senate Bill 14?
15         MR. SWEETEN:  And don't answer that.  You're
16 not going to reveal your mental impressions or analysis
17 or thought process.  That's a legislative privilege.
18 Instruct not to answer.
19 BY MS. MARANZANO:
20     Q.  Do you know what a citizenship certificate is?
21     A.  Only generally.
22     Q.  Do you know what steps a person needs to take to
23 obtain a citizenship certificate?
24     A.  Not off the top of my head.
25     Q.  Do you know how much it costs to obtain a

191

1  citizenship certificate?
2      A.  Not off the top of my head.
3      Q.  Do you know -- do you know how much it costs to
4  obtain a US passport?
5      A.  Yes.
6      Q.  How much?
7      A.  I think it's $37, but I just bought one so that's
8  why I know.  But I think it's -- by the time you get the
9  picture made and everything like that, it's like $35 to
10 $37.
11     Q.  And do you know what documents you need to
12 provide in order to get one, a US passport?
13     A.  Yes.
14     Q.  Which documents?
15     A.  A birth certificate.
16     Q.  Do you know how long it takes to obtain a US
17 passport?
18     A.  Not generally.
19     Q.  How long did it take you to get yours?
20     A.  I'm speculating.  A month, three weeks to a
21 month.
22     Q.  Is there anything in public record about a change
23 in circumstances between 2009 and 2011 that would have
24 made non-photo identification acceptable in 2009, but
25 not in 2011?

192

1          MR. SWEETEN:  Objection; calls for matters
2  subject to the legislative privilege.  You can testify
3  if there was such an explicit statement made in the
4  public record.  But otherwise don't reveal your thought
5  processes.
6      A.  I don't know if there was a statement like that
7  might made or not.
8      Q.  (By Ms. Maranzano)  You have no recollection of
9  that?
10     A.  No.
11     Q.  Was there any statement in the public record
12 about removing from Senate Bill 14 the option to show a
13 state or federal issued identification as is allowed in
14 Senate Bill 362?
15         MR. SWEETEN:  You can testify about matters
16 on the public record.
17     A.  I don't completely understand the question.
18     Q.  (By Ms. Maranzano)  Do you recall when we talked
19 about Senate Bill 362 we read that section --
20     A.  Right.
21     Q.  That allowed for a State or federally issued
22 photo ID.  Was there anything stated on the public
23 record about the purpose of removing those forms of
24 identification from Senate Bill 14, although they had
25 been allowed in Senate Bill 362?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

193

1      MR. SWEETEN:  Same objection and
2  instruction.
3      A.  That issue may have been discussed on the Senate
4  floor an would be a part of the Senate record.
5      Q.  (By Ms. Maranzano)  You have no independent
6  recollection?
7      A.  Not really.
8      Q.  Any at all?
9      A.  Well, generally a change in the bill, and I
10  assume that a change in the bill was discussed.  I'm
11  going off of memory, but I would assume that in 14 there
12  was a change from 362 and those discussions took place
13  on the Senate floor.  And I remember the -- that Senator
14  Fraser probably laid out those changes on the public
15  record.  That's what I recall.  But I couldn't tell do
16  you specifically what he said.  You would have to go to
17  the record.
18      Q.  Was it Senator Fraser's decision to make those
19  changes?
20      MR. SWEETEN:  Objection.  Requires him to
21  speculate.  Requires him to reveal communications
22  between -- if any, between he and Senator Fraser or any
23  other legislator.  So to the extent it's even passed by
24  legislative privilege don't answer the question.
25  BY MS. MARANZANO:

194

1      Q.  I assume you're following your counsel's
2  instruction?
3      A.  Yes, ma'am.
4      Q.  Do you recall the circumstances by which the
5  license to carry a concealed hand gun were included
6  in -- came to be included in Senate Bill 14?
7      MR. SWEETEN:  Don't reveal matters of
8  privilege.
9      A.  No.
10      Q.  (By Ms. Maranzano)  Do you know the racial
11  composition of individuals who possess a license to
12  carry a concealed handgun?
13      A.  No.  No.  I should say it louder.
14      MR. SWEETEN:  An objection to the extent it
15  calls for legislative privilege.
16  BY MS. MARANZANO:
17      Q.  Is it disproportionately white relative to Texas
18  registered voters?
19      MR. SWEETEN:  Objections; asked and
20  answered.  Objection to the extent it calls for your
21  mental impressions about a bill, but you can answer
22  otherwise.
23      A.  I don't know.  If it's on the record, it's on the
24  record.
25      Q.  (By Ms. Maranzano)  Well, are you aware of any

195

1  legislator who made a statement on the public record
2  about the racial composition of the license to carry
3  holders?
4      THE REPORTER:  Wait.
5      MS. MARANZANO:  About the racial composition
6  of the license to carry holders.
7      A.  I recall there was a conversation about the -- on
8  the public record about the use of the license to carry
9  as a form of identification.  I do not remember -- I
10  cannot recall independently with accuracy the content of
11  those statements.  That would be reflected in the
12  record.
13      Q.  (By Ms. Maranzano)  And how did the exceptions
14  with individuals with disability come to be included in
15  Senate Bill 14, based on the public record?
16      MR. SWEETEN:  Don't answer to the extent it
17  would require to you to reveal matters of legislative
18  privilege.  To the extent you can refer to matters in
19  the public record, you can do so.
20      A.  There may have been some testimony.  I can't
21  recall specifically.  I think there was concerning that.
22      Q.  (By Ms. Maranzano)  From certain advocates, did
23  you say?
24      A.  Correct.  On the record.  Or some reference to
25  that on the record.

196

1      Q.  And was this added?  Was this provisions added to
2  the bill after the testimony from advocates?
3      A.  I don't --
4      MR. SWEETEN:  Hold on a minute.  Hold on a
5  minute.  Can you read the question back, please?
6      (Requested question was read.)
7      MR. SWEETEN:  So you're asking about an
8  amendment, whether it was -- which is a public record,
9  whether it was added after a public record statement.
10  Is that the question?
11      MS. MARANZANO:  Uh-huh.
12      MR. SWEETEN:  Then you can answer as
13  phrased.
14      A.  I don't know.
15      Q.  (By Ms. Maranzano)  Is your recollection that the
16  amendment was a response to the testimony from advocates
17  from the disability community?
18      MR. SWEETEN:  Don't answer the question.  It
19  calls for matters of legislative privilege as to what
20  the response was, if any.
21  BY MS. MARANZANO:
22      Q.  How did the exception for individuals with
23  religious objections to being photographed come to be
24  included in Senate Bill 14?
25      MR. SWEETEN:  Don't answer the question.  It



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

197

1  calls for matters of legislative privilege.  You can
2  testify about the public record, such as an amendment.
3  BY MS. MARANZANO:
4      Q.  Was that part of an amendment?
5      A.  You would have to look at the record.
6      Q.  You have no independent recollection?
7      A.  No.
8      Q.  Is it fair to say that the legislators --
9  legislators modify Senate Bill 14 to respond to concerns
10  raised by disability groups?
11          MR. SWEETEN:  Don't answer the question.
12  Calls for matters of legislative privilege.
13  BY MS. MARANZANO:
14      Q.  Were there any public discussions about the
15  provisions in Senate Bill 14 pertaining to the
16  administration of identification requirement -- that the
17  identification requirement at the polling place?
18          MR. SWEETEN:  You can answer if there's a
19  public statement.
20      A.  I'm not sure that I follow the question enough to
21  give you and answer.  I don't -- so I can't answer the
22  question.
23      Q.  (By Ms. Maranzano)  Were there any public
24  discussions about how at a polling place that Senate
25  Bill 14 would be administered?  In other words, how the

198

1  requirements laid out in Senate Bill 14 would come to be
2  administered at a polling place.
3      A.  You would have to refer to the public record.
4      Q.  You have no independent recollection of those
5  discussions?
6          THE REPORTER:  No recollection of what?
7          MS. MARANZANO:  Of those discussions on the
8  public record.
9      A.  I do not have an independent recollection of what
10  was said.  I am only -- you have to refer to the record
11  on that.
12      Q.  (By Ms. Maranzano)  Were there any public
13  discussions about including more specific language in
14  Senate Bill 14 related to what a poll worker would need
15  to do to verify somebody's identity?
16      A.  I don't remember that.  There may have been, but
17  I don't remember it.
18      Q.  Are you familiar with the provision in Senate
19  Bill 14 that allows a person to show a form of
20  identification called an election identification
21  certificate?
22      A.  I think if that's referring to the provision that
23  allows a person to go to the DPS to get an ID for free,
24  if that's the title of that, yes, I've heard of that.
25      Q.  Do you recall anything publicly about how this

199

1  form of identification was added to Senate Bill 14?
2          MR. SWEETEN:  Don't reveal matters of
3  legislative privilege.  In fact, court reporter, would
4  you please read that question back.
5          (Requested question was read.)
6          MR. SWEETEN:  Okay.  You can -- because it's
7  got matters of the public record.  Don't reveal
8  legislative privilege, but you can answer as to the
9  public record.  Go ahead.
10      A.  No, I do not know when or how it was added.  I'm
11  about ready for a break.  I don't know about y'all.
12          MR. SWEETEN:  Okay.  Let's take a break.
13          MS. MARANZANO:  Let's take a break.
14          (Brief recess.)
15  BY MS. MARANZANO:
16      Q.  Senator, before the break we were talking about
17  the election identification certificate.  Are you aware,
18  based on the public record, of concerns about potential
19  difficulties in obtaining an election certificate?
20      A.  I'm aware that the issue of the ease or
21  difficulty of retaining a certificate was discussed on
22  the public record.
23      Q.  Do you recall there being concerns voiced on the
24  public record about the distance to drive to those
25  offices?

200

1      A.  I would refer to you to public record with regard
2  to the specific discussions concerning specific concerns
3  about that.
4      Q.  You don't have any independent recollection of
5  the various concerns that were raised?
6      A.  Not sufficient to give you and accurate depiction
7  of that or accurate account of it.
8      Q.  During the drafting of Senate Bill 14 or the
9  consideration of Senate Bill 14, was there any publicly
10  spoken about or discussed analysis of the cost for
11  obtaining an election identification certificate?
12          MR. SWEETEN:  Don't reveal matters of
13  privilege.  You can reveal matters of public record.
14      A.  I think anything having to do with drafting would
15  be privileged.  On the public record there was some
16  discussions about the cost and whether or not
17  appropriations would occur to cover those costs.
18      Q.  (By Ms. Maranzano)  And was there discussion on
19  the public record about the steps a voter might have to
20  take to obtain an election identification certificate?
21      A.  There may have been.  I would refer you to the
22  record for an accurate account of that.
23      Q.  And was there any discussion on the public record
24  about the cost that those steps might -- costs that a
25  voter might incur in obtaining an election



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

201

1  identification certificate?
2       A. I believe there was some discussion of that.
3       Q. What discussion was that?
4       A. You'll have to refer to the record for an
5  accurate account of that.
6       Q. Do you know what documents are needed to obtain
7  an election certificate?
8            MR. SWEETEN: As he is sitting here.
9            MS. MARANZANO: Yes.
10      A. You would have to refer -- I don't have an
11  independent recollection of that.
12      Q. (By Ms. Maranzano) You don't know, as you sit
13  here?
14      A. No, I don't. I would have to look it up.
15      Q. Do you know if there was any discussion on the
16  public record about an analysis conducted regarding
17  individuals who would or would not possess those
18  underlying forms of documentation.
19      A. I don't know what you mean by "analysis." I know
20  there was discussion at length about that issue or
21  whether or not -- about the issue of obtaining an
22  alternative ID. The specifics of that, though, I can't
23  give you accurately from independent recollection and
24  would refer you to the record.
25      Q. Did the legislature conduct any sort of analysis

202

1  in a public way about -- in terms of documents that are
2  needed to obtain election identification certificate in
3  terms of who would have those documents?
4            MR. SWEETEN: You can testify about matters
5  in the record. Don't reveal matters of privilege.
6       A. To the extent there was -- I don't know if it's
7  the word "analysis," but there was a discussion on that
8  in the -- on the Senate -- during the debate on the bill
9  either at the committee level or on the Senate floor or
10  both.
11      Q. (By Ms. Maranzano) If the documents needed to
12  obtain an election identification certificate have a
13  cost to them, then would you agree that that is actually
14  charging a voter to vote?
15           MR. SWEETEN: Objection; don't reveal your
16  thought process, mental impressions, opinions,
17  motivations about the legislation in answering this
18  question. So unless you can avoid doing that, I'm going
19  to instruct you not to answer the question.
20      A. An answer to that would require me to invoke my
21  mental impressions and analysis so I would prefer to
22  invoke the legislative privilege.
23      Q. (By Ms. Maranzano) Do you know where a person
24  can obtain an election identification certificate?
25      A. Under the statute, I believe that it is the

203

1  Department of Public Safety.
2       Q. And when -- is it the driver's license offices?
3       A. I believe it is.
4       Q. When are those offices usually -- what are the
5  hours of those offices generally?
6       A. I would have to call and find out. I would
7  assume from 9:00 to 5:00 during the weekdays. But there
8  may be -- some offices may have local rules or local
9  opening times that are different.
10      Q. Does Senate Bill 14 require employees to provide
11  paid leave for somebody to obtain an identification?
12      A. You'd have to refer to the legislation for that.
13      Q. Do you have any independent recollection of
14  whether that's included?
15      A. Not at this time.
16      Q. Are you aware of any analysis, public analysis
17  conducted to determine if any Hispanic or blacks or any
18  other group are more likely not to have the necessary
19  identification under Senate Bill 14?
20           MR. SWEETEN: I'm going to instruct you not
21  to answer on the basis of legislative privilege.
22           MS. MARANZANO: I asked about public
23  analysis.
24           MR. SWEETEN: If you're talking about public
25  testimony about analysis, boy, I think that's been asked

204

1  and answered a number of times, but you can go ahead and
2  you can answer.
3       A. I would refer you to the record on that.
4       Q. (By Ms. Maranzano) No independent recollection?
5       A. My independent recollection is not include enough
6  information to be accurate to give you testimony with
7  regard to such analysis. If it occurs on the record I
8  would refer you to the record for an accurate account on
9  that.
10      Q. Are you familiar with the provisional ballot
11  provisions in Senate Bill 14?
12      A. If you'll point me to that provision. Refresh my
13  memory.
14      Q. Section 17 talks about provisional ballots.
15      A. Section 17. I'm sorry.
16      Q. Starts on Page 11 and goes on to Page 12.
17      A. Okay. Section 17.
18      Q. Uh-huh.
19      A. I'm generally familiar with Section 17, Senate
20  Bill 14.
21      Q. Do you think that individuals who vote a
22  provisional ballot, except for some narrow exceptions,
23  need to show the same forms of ID as is required under
24  the bill for voters who cast a regular ballot, in order
25  for their ballot to be counted?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

205

1        MR. SWEETEN:  You can talk about the text of
2  the bill.  Don't reveal your thoughts and mental
3  impressions about legislation.
4  BY MS. MARANZANO:
5      Q.  Do you recall my question?
6      A.  Vaguely.  If you'll remember -- If you'll
7  rephrase it.
8      Q.  I'm wondering whether -- with, except for some
9  narrow exceptions, it's essentially the same
10  identification requirements for those who cast a
11  provisional ballots, correct?
12      A.  No.
13      Q.  What's the difference?
14      A.  Well, I think B -- Subsection B and C provides
15  affidavits -- an opportunity to present an affidavit --
16      Q.  So you're --
17          THE REPORTER:  I'm sorry.
18          THE WITNESS:  For the reasons stated
19  therein.
20  BY MS. MARANZANO:
21      Q.  So Section B you're referring to is individuals
22  who have a religious objection to being photographed?
23      A.  Right.
24      Q.  And Section C is individuals who do not have
25  identification meeting the requirements because of a

206

1  natural disaster that was declared by the President of
2  the United States or the governor which occur no earlier
3  than 45 days before the date the ballot was cast and
4  lead to the destruction of the identification; is that
5  correct?
6      A.  Yes.
7      Q.  And so other than those exceptions individuals
8  who cast a provisional ballot need to show one of the
9  forms required of identification?
10          MR. SWEETEN:  I'm sorry.  Can you read the
11  question back, please?
12          (Requested question was read.)
13          MR. SWEETEN:  You can testify based upon the
14  text of the bill don't reveal your thoughts, mental
15  impression that would be a matter of legislative
16  privilege.  Go ahead and answer it.
17      A.  The provision for that -- for provisional ballots
18  is contained in Section 17 and also discussed in Section
19  18 of the bill.  And those provisions would appear to
20  provide the process for provisional ballot.  What's
21  required in the event a provisional ballot is cast with
22  regard to identification.
23      Q.  (By Ms. Maranzano)  And other than the exceptions
24  that we've discussed, does a voter who casts a
25  provisional ballot need to show one of the required

207

1  forms of identification as listed in Senate Bill 14?
2      A.  The Section 65.0541, Subdivision 1, provides that
3  the photo ID would be required or the affidavits
4  required as discussed earlier.
5      Q.  The affidavits for -- that we just discussed with
6  an individual?
7      A.  Correct.
8      Q.  Okay.  Does the voter have to show their
9  identification to a voter registrar, voter who cast a
10  provisional ballot has to show one of the forms of
11  required identification to a voter registrar, correct?
12      A.  I believe there's the provision in the statute.
13      Q.  Is this a voter registrar office in every county?
14      A.  I believe there is.
15      Q.  Are they usually in the county seat?  Are they
16  usually located --
17      A.  That would be normally where they would be.
18      Q.  What's the purpose of Senate Bill 14?
19          MR. SWEETEN:  You can give the general
20  purpose.
21      A.  The general purpose is to in sure ballot
22  integrity.
23      Q.  (By Ms. Maranzano)  Based on the public record,
24  can you tell me the basis of that statement?  Your
25  saying that's the purpose.

208

1          MR. SWEETEN:  That calls for matters of
2  legislative privilege.  He can testify to purpose, which
3  he did.  You're asking him now to go to the public
4  record and do an analysis and give you the reasons that
5  are in the public record in support of what he has
6  stated as general purpose.  And to do so would discover
7  his mental impressions and be subject to the mental
8  impressions.  I instruct you not to answer.
9  BY MS. MARANZANO:
10      Q.  Any other purposes of Senate Bill 14?
11      A.  That's the general purpose.
12      Q.  Can you tell me each and every purpose of Senate
13  Bill 14?
14          MR. SWEETEN:  Asked and answered.
15      A.  I've told you the general purpose which is my
16  response to your question.
17      Q.  (By Ms. Maranzano)  So are there any other
18  purposes?
19      A.  There are -- there is a general purpose to the
20  statute, as I stated.  And it's broad enough to include
21  the general purpose, as I stated.
22      Q.  I would like to know each and every purpose of
23  Senate Bill 14?
24          MR. SWEETEN:  He's answered the question.
25  Asked and answered.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                      June 7, 2012

209

1        MS. MARANZANO:  He hasn't answered that
2   question.
3        MR. SWEETEN:  He's given you the purpose of
4   the bill.  Objection; asked and answered.
5        A.  The purpose of the bill is generally to prevent
6   and preserve -- prevent fraud and observe -- preserve
7   the integrity of the ballot.
8        Q.  (By Ms. Maranzano)  And the reason why I was
9   following up is because you say "generally."  So I'm
10  just trying to make sure I have every purpose of Senate
11  Bill 14?
12       A.  Well, when I say "generally," means the general
13  purpose of the bill.
14       Q.  But are there any other specific purposes of the
15  bill?
16       A.  My testimony involves the general purpose of the
17  bill.  And I stated the general purpose of the bill.
18       Q.  But I am allowed to ask you about the legislative
19  purpose so I think that would include any legislative
20  purpose of Senate Bill 14?
21       A.  Well, just general purpose and legislative
22  purpose are synonymous in this view and that's to
23  prevent voter fraud and protect the integrity of the
24  ballot.
25       Q.  Okay.  That's good.  Can you tell me, based on

210

1   the public record, how Senate Bill 14 prevents fraud?
2        MR. SWEETEN:  Hold on a minute.  How it
3   prevents fraud.  No, he's not going to answer that.
4   That's subject to the legislative privilege.
5   BY MS. MARANZANO:
6        Q.  Was there testimony on the public record about --
7        MR. SWEETEN:  Counsel, let's go to the order
8   here.
9        MS. MARANZANO:  Yeah.
10       MR. SWEETEN:  Specifically, we are on
11  Page 16 of 16 of the court's order.  And that provision
12  order says, "Further ordered that questions of
13  depositions shall comply with the terms and restrictions
14  set forth in this order.
15       MS. MARANZANO:  Yes.
16       MR. SWEETEN:  Yesterday, in two depositions
17  held at this building, we had a sitting representative
18  sit and answer these same types of questions until 7:00
19  p.m. in violation of that provision of the court order.
20  We had another witness, Representative Aliseda, who was
21  here until 6:15 p.m. -- no, it was 7:00 because I was
22  waiting for the attorney to come back so we could visit
23  about other matters.
24       Now, we've got an order from the court that
25  explicitly prohibits and requires that deposition

211

1   questions will comply with the terms and restrictions of
2   the order.  The court has a succession of four orders
3   carved-out and explicitly told us what the areas of
4   legislative privilege are.  You continue, and I'm not --
5   I'm using you in the broadest sense because you have
6   been polite.  But your office is continuing to ask
7   questions in violation of this order.  And at some point
8   this -- in violation of this order, if this conduct
9   continues we are going to have no other choice but to go
10  to the court and seek relief from them.  Because they
11  have been clear.
12       And this type of questioning, where you
13  continue to ask him matters that are subject to the
14  privilege, is inappropriate.  And is in violation of the
15  court's order.  And I'm going to ask you -- I'm going to
16  ask you here at 3:00 p.m. on the late afternoon after
17  Senator Duncan has sat here since 9:30, I'm going to ask
18  you to rein that in.  Because we are now getting to a
19  point where we have our sitting representatives and
20  senators being -- basically sitting here answering
21  questions that have been prohibited by the court.  And
22  at some point this has to end.
23       MS. MARANZANO:  Well, Mr. Sweeten our
24  position is, absolutely, that we are complying with the
25  court's order and, you know, I have made every effort to

212

1   be very clear with the Senator today that I'm asking him
2   questions about the public record.  We've had exchanges
3   and there have been times when I have withdrawn
4   questions.  There's been times when you have withdrawn
5   objections.  So, you know, I think we're both making
6   good faith efforts to comply with the order.
7        And the -- you know, all the attorneys
8   representing the defendant in this matter are doing the
9   same.  And it's absolutely our position that we are
10  complying with this court order.
11       And, you know, my understanding, and
12  obviously I wasn't involved in those depositions
13  yesterday.  My understanding is that part of the reason
14  people were here late was because there were problems
15  with documents that had nothing to do with questions at
16  a deposition.
17       MR. SWEETEN:  Well, I would submit a very
18  different view of that thing and I have.  I've stated it.
19  I'm simply -- I'm letting you know.  And I'm making this
20  clear on the record, that this has got -- you've got to
21  tamper this down based upon this order, or we're going
22  to seek relief from the court.
23       This is -- yesterday's exercise was in
24  violation of the court order.  And we are starting to
25  get there here.  And I want you to take this very



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

213

1  seriously that we are doing our best.
2         We have put these people through seven hours
3  of depositions.  You have taken the limit of time with
4  these individuals.  And this -- at some point this has
5  to stop, or this has to be reined in, because we're
6  going to seek redress from the court.  With that, I'll
7  let you continue with your examination of Senator
8  Duncan.  We'll continue -- continue with this exercise.
9  But please respect the court's order with respect to the
10  legislative privilege.  It is very clear.
11         MS. MARANZANO:  I am going to continue.  But
12  I just want to say, I do not appreciate the suggestion
13  that I am doing anything other than respecting the
14  Court's order.
15  BY MS. MARANZANO:
16     Q.  Senator Duncan, was Senate Bill 14 given an
17  emergency designation by the governor?
18     A.  I believe that the Governor Perry issued an
19  emergency declaration for legislation related to voter
20  identification.
21     Q.  Did you or did anyone in your office have
22  communications about Senate Bill 14's emergency
23  designation?
24     A.  With whom?
25     Q.  With anybody.

214

1     A.  Not that I'm aware of.
2     Q.  What are the consequences of a bill having this
3  designation, this emergency designation?
4     A.  I don't know of any consequences.
5     Q.  What does it mean for a bill to be designated as
6  emergency?
7     A.  The only thing it means is that the constitution
8  requires that you cannot take up a bill or a resolution
9  of substance prior to the 60th day of a legislative
10  session.  Declaring an issue an emergency allows the
11  measure to be taken up and considered before the 60th
12  day.
13     Q.  Were there any public statements about why Senate
14  Bill 14 was given this emergency designation?
15     A.  The only public statement that I would be aware
16  of would be the proclamation by the governor declaring
17  it an emergency.  There may be others by others, but I'm
18  not aware of them.
19     Q.  And in the governor's proclamation, did he give
20  any explanation as to why he was declaring it an
21  emergency?
22     A.  You know, I don't recall that he really did.  I
23  think -- it's in the journal and I don't remember
24  exactly what it said.  But I don't believe there was any
25  statement with regard to considerations in the journal.

215

1  Whether he made other statements I don't know.
2         (Exhibit No. 531-532 was marked.)
3  BY MS. MARANZANO:
4     Q.  Senator, I am showing you what we're marking for
5  the record as deposition Exhibit 531 and 532.  Can you
6  take a look at these and tell me if you recognize them?
7     A.  I recognize -- I don't know if I've seen 531
8  before.  I assume that I've seen 532 because it's
9  addressed to me by Senator Van de Putte.
10     Q.  And deposition Exhibit 532, is that a letter from
11  Lieutenant Governor Dewhurst?
12     A.  It's a letter from Governor Dewhurst to --
13  Lieutenant Governor Dewhurst to Senator Birdwell.
14     Q.  And dated January 20, 2011?
15     A.  Correct.
16     Q.  Do you recall getting a letter similar to this
17  yourself?
18     A.  No.  But I may have.
19     Q.  Do you see that in -- do you see that it says
20  that, "This Lieutenant Governor's intent to recognize
21  Senator Robert Duncan for a motion to resolve the Senate
22  into a Committee of the Whole to consider Senate Bill
23  14"?
24     A.  Yes.
25     Q.  And do you see it says that's going to happen on

216

1  Monday January 24, 2011?
2     A.  Yes.
3     Q.  Can you take a look at Exhibit -- deposition
4  Exhibit 532?
5     A.  Yes, ma'am.
6     Q.  And can you look at the second paragraph for a
7  minute?  Do you see that that's referring to a letter
8  from the Lieutenant Governor?
9     A.  Okay.
10     Q.  Do you see that it states that the Lieutenant
11  Governor circulated a letter on Thursday after most
12  senators had left for the weekend?  And it stated that
13  the Senate was going to convene as Committee of the
14  Whole four days later to consider voter ID legislation.
15  Do you see that?
16     A.  I see her description.
17     Q.  Is that your, based on your recollection, do you
18  believe that that occurred?
19     A.  I don't know.
20     Q.  You don't have any recollection?
21     A.  No.  It -- I don't know one way or the other.  I
22  don't recall an issue about this.  Although, she did
23  raise it in a letter to me.
24     Q.  Do you recall receiving this letter?
25     A.  Let me read it.  I believe -- yeah, I remember



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                              June 7, 2012

217

1   this. I do.
2       Q. You do remember it?
3       A. Yes, ma'am.
4       Q. Did you respond to it?
5       A. I assume I did. I always respond to Senator Van
6   de Putte when I can. So I don't know if I did it in
7   writing or gave her a phone call.
8       Q. Do you -- do you recall if you disputed the way
9   she describes the notice that was given in that
10  paragraph that we were just looking at?
11      A. I don't recall if I did or not.
12      Q. As you sit here today, you don't recall if this
13  is how the notice was provided to members?
14      A. No, I don't. I remember this letter now. But I
15  don't know how that happened or why it happened or what
16  happened, quite frankly.
17      Q. Did any opponents of Senate Bill 14 make
18  allegations that minority members of the Senate were
19  being excluded from participation in the debate because
20  they weren't given enough notice?
21          MR. SWEETEN: You can answer as to matters
22  of the public record.
23      A. I simply don't remember that specifically. I
24  know if there's some correspondence to that effect, you
25  know, there's typically -- I think there was. I think

218

1   this letter right here, basically is some protest of the
2   speed in which the bill was moving. But other than
3   that, I don't recall anything.
4       Q. And you don't recall whether you had a public
5   response to that?
6       A. I don't know. I may have. I mean, I typically
7   would respond to Senator Van de Putte by phone call or
8   formal letter. Not only this issue, but other issues as
9   well.
10      Q. Do you recall that in 2011 there was a similar
11  rule, that's what we discussed in the 2009 session, that
12  allowed for voter identification legislation to be
13  brought to the floor without a two-thirds majority vote?
14      A. I recall it. I think Senate Rule 5.11 remained
15  in place.
16      Q. So Section D of Rule 5.11 would have been the
17  same in 2011 as it was in 2009?
18      A. I don't believe there were any conceptual changes
19  in it.
20      Q. Would it refresh your recollection to look at the
21  rule?
22      A. It would be helpful to look at both the rules.
23  I've got one here. Well, I've got the original exhibit
24  you previously provided.
25      Q. I'm going to give you.

219

1      (Exhibit No. 533 was marked.)
2   BY MS. MARANZANO:
3       Q. I'm going to give you what we're marking as
4   deposition Exhibit 533, which I'll represent to you is
5   from the 2011 Senate rules. And do you see rule 5.11 D
6   on Page 24?
7       A. Okay.
8       Q. Do they appear to be the same to you?
9       A. They appear to be substantially the same, if not
10  identical.
11      Q. Senator, based on the public record, can you tell
12  me why you were the person who introduced the resolution
13  to bring Senate Bill 14 to the Committee of the Whole?
14          MR. SWEETEN: Don't answer the question. It
15  would call for you to reveal matters of legislative
16  privilege, of why it would relate to mental processes
17  about the legislative process. If there's something
18  expressed specifically on the public record you can
19  refer to.
20  BY MS. MARANZANO:
21      Q. Let me actually ask you this. Is there a
22  procedure by which there's a process for who would bring
23  a bill to the floor -- or who would bring a bill to the
24  Committee of the Whole, is that a set procedure in the
25  Senate?

220

1       A. No.
2       Q. Okay. Is that a decision that the Lieutenant
3   Governor makes?
4       A. Yes.
5       Q. And did you preside over the Committee of the
6   Whole's consideration of Senate Bill 14?
7       A. Yes.
8       Q. And that was the same rule, and it contained the
9   same responsibilities as what you testified to in 2009?
10      A. Yes.
11      Q. During the debate and the consideration by the
12  Committee of the Whole, did anybody raise public
13  concerns about the impact Senate Bill 14 would have on
14  minority voters?
15      A. Generally those issues were discussed. An
16  accurate account would be contained in the record.
17      Q. And do you recall -- actually we'll get to that
18  in a second. Never mind. Have you had occasion to
19  review the Georgia and Indiana voter identification
20  laws?
21          MR. SWEETEN: Objection; asked and answered.
22  And don't reveal your mental processes when you're
23  evaluating legislation, your motivations that would be
24  subject to legislative privilege. Instruct not to
25  answer if your answer would reveal that.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

221

1  A. The answer is, I have reviewed materials that
2  relate to the Indiana an Georgia laws and those cases.
3  I can't recall if I've actually read the cases verbatim
4  or -- and I know I have not done an analysis of those
5  cases verbatim.
6  Q. (By Ms. Maranzano)  Is out your belief, as you
7  sit here today, that the Georgia identification law is
8  similar to Senate Bill 14?
9  A. I can't answer that.
10  MR. SWEETEN:  Okay.  I was going to say if
11  this is going to reveal your legislative processes about
12  Senate Bill 14 don't answer it.  But if you don't -- if
13  it's not.
14  A. I can't answer it for two reasons.  One, it would
15  require analysis.  And number two is I haven't -- I'm
16  not prepared give you and accurate answer on that.  It
17  would have to be contained -- it would have to be
18  something contained in the record.
19  Q. (By Ms. Maranzano)  Are you familiar with the
20  Indiana identification law?
21  A. Generally.
22  MS. MARANZANO:  Can you mark this?  Thank
23  you.
24  (Exhibit No. 534 was marked.)
25  BY MS. MARANZANO:

222

1  Q. Senator, I'm showing you what we're marking as
2  deposition Exhibit 534.  Can you take a look at this?
3  Does this appear to be the Indiana voter identification
4  law?
5  A. The title of this document is Public Law
6  109-2005.  And it appears to be an excerpt from the
7  Indiana code.  I don't know the authenticity of this.  I
8  assume you're representing it to be an authentic version
9  of the law and I have no reason to doubt that.
10  Q. Can you take a look at Page 2015 for me, please?
11  And I want to direct your attention to the Subsection C,
12  but if you need to look at the preceding page it might
13  give you the context for that.
14  A. Okay.
15  Q. Do you see that a voter who cast a provisional
16  ballot is able to execute an affidavit saying they're
17  indigent and their provisional ballot would be counted?
18  A. Yes.
19  Q. And they would not have to show the required
20  identification?
21  A. Yes.
22  Q. Do you recall public discussions or discussions
23  on public record about this portion of the Indiana code
24  during the debate of Senate Bill 14?
25  A. I believe there was.

223

1  Q. Do you recall what those discussions entailed?
2  A. No.  You would have to refer to the record for an
3  accurate description.
4  Q. Do you recall introducing any amendments to
5  Senate Bill 14?
6  A. Do I recall?
7  Q. Uh-huh.
8  A. Introducing amendments, I did not introduce
9  amendments that I recall.
10  MS. MARANZANO:  Could we have this marked?
11  (Exhibit No. 535 was marked.)
12  BY MS. MARANZANO:
13  Q. I'm showing you what we're marking as deposition
14  Exhibit 535.  Can you take a look and tell me if you
15  recognize this?
16  A. Well, this is apparently a transcription of the
17  hearing on Senate Bill 14, January 26, 2011.
18  Q. And can you look on that first page by Duncan and
19  take a look at what -- at that paragraph?
20  A. Yes.  That indicates that I apparently introduced
21  amendment 40.
22  Q. Does that refresh your recollection?
23  A. Well, yeah.  Because apparently Senator Davis had
24  an amendment.  And now that I'm looking at this it
25  appears that, according to the record, I was amending

224

1  her amendment.
2  Q. I'm sorry.  You were amending her amendment?
3  A. I believe that's what this is.
4  Q. And can you tell me, based on public discussions,
5  why you thought that was a provision that you wanted to
6  add to Senate Bill 14?
7  MR. SWEETEN:  Don't answer the question.  It
8  calls for matters of legislative privilege.  You're
9  asking why in his thought process.
10  BY MS. MARANZANO:
11  Q. Did you have any discussions on the public record
12  about this amendment?
13  MR. SWEETEN:  You can answer.
14  A. Yes.
15  Q. (By Ms. Maranzano)  Do you recall the substance
16  of those discussions?
17  A. Those discussions were stated in the record.
18  Q. And is that the record that's right here in front
19  of us?
20  A. It is.
21  Q. And do you see that, in that paragraph that we
22  were looking at, you point out that this amendment is
23  very similar to, if not identical to, the provisions of
24  Indiana law?  Do you see that?  And then it says, "and
25  it would be a fail safe privilege for those persons,"



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                    June 7, 2012

225

1    which I assume you're referring to indigent persons?
2         A.  That's what -- well, I will refer you to the
3    record, if that accurately states what I said, I assume.
4         Q.  Can you tell me what the purpose of this
5    amendment was?
6              MR. SWEETEN:  Don't answer the question.
7    You can give general purpose of legislation.  Don't go
8    into the purpose of the amendment, legislative
9    privilege.
10   BY MS. MARANZANO:
11        Q.  Can you tell me if this provision was included in
12   the final version of Senate Bill 14?
13        A.  According to the record it was adopted, but I
14   don't know -- and I assume that it was in the engrossed
15   version, but I don't know.  You would have to go to the
16   record.
17        Q.  Well, do you want the take a look at Senate Bill
18   14 and tell me if you see it in the bill?
19        A.  In the enrolled and signed version?
20        Q.  Uh-huh.
21        A.  The bill will speak for itself I'm sure, but --
22   and that would have been -- I'm trying to see where that
23   was amended.  But I don't recall that it made it through
24   the House.  But let me look and see.
25        Q.  Let me direct your attention to that paragraph

226

1    that we were just looking at.  It points out that this
2    is for individuals who cast a provisional ballot.
3         A.  Right.
4         Q.  So that might help direct your attention to the
5    portion of Senate Bill 14 about provisional ballots.
6         A.  You might remind me of what provision that is.
7         Q.  And you said you don't recall that it did make it
8    through.  Is that what you said?
9         A.  Well, it appears if you're looking at Section
10   60 -- or Section 14 of Senate Bill 14, that -- that
11   amendment No. 40, which was a Senate amendment to Senate
12   Bill did not get in the enrolled version of the bill
13   signed by the governor.
14        Q.  Do you know when this provision was removed from
15   the bill?
16        A.  No, I do not.  You know, you can narrow it down
17   to either in the House or in a conference committee.  I
18   don't think this bill went to a conference committee.
19        Q.  Do you -- did you have any communications with
20   any other legislators about this amendment -- well, this
21   amendment first of all, at all?
22        A.  Not that I recall.
23        Q.  So I take it then, you didn't have any
24   conversations about this amendment getting removed from
25   the bill?

227

1         A.  I don't remember any.  But that doesn't -- I
2    could have.  I just don't remember any specific
3    amendments.  When this bill came back over we were in a
4    lot of other different issues.  But I don't remember
5    being told specifically that it came out.  And I just
6    now remembered that we put the amendment on.  So I don't
7    recall being involved at that stage of any decision to
8    remove the amendment.
9         Q.  Did you have any communication with anybody about
10   whether a provision like this, the exemption for
11   indigency, would increase the chances that Senate Bill
12   14 would be precleared?
13             MR. SWEETEN:  Don't reveal matters of
14   privilege.  I think this asks for more than a general
15   subject matter discussion.  If you -- so I would
16   instruct you not to answer as phrased.  If you want to
17   change the preface of the question, I think we can
18   probably get you and answer that would give you the
19   foundational information you seek.
20   BY MS. MARANZANO:
21        Q.  I think you stated previously you don't recall
22   having conversations about this amendment generally?
23        A.  Well, apparently I did because I put an amendment
24   on the bill.  And as chairman of the committee, I
25   typically work to improve a bill and listen to people.

228

1    And so obviously there was some reason to put that on
2    the bill.  The reasons that are there are stated here.
3    What conversations I had with folks, with other members
4    on this particular amendment were probably based upon
5    Indiana law, as stated in the public record.  But my
6    specific conversations with Senator Fraser or others,
7    Senator Davis, I do not recall specifically what they
8    were.  To provide you, especially, to provide you with
9    an accurate account of those conversations.  The
10   statement contained in the record is my conversation
11   with regard to Amendment 40.
12        Q.  Do you recall any of the other amendments that
13   were proposed for Senate Bill 14?
14        A.  If I don't recall my own, I probably don't recall
15   the others.  But I do recall -- at least I don't think
16   there were amendments in 2009, but I do recall, I
17   thought we did some amendments in 2011 and obviously we
18   did.
19             MS. MARANZANO:  Okay.  Let's mark this.  I'm
20   sorry.  Wrong one.  Can you mark this?
21             (Exhibit No. 536 was marked.)
22   BY MS. MARANZANO:
23        Q.  Senator, I'm showing you what we're marking as
24   deposition Exhibit 536.  Do you recognize this?
25        A.  Well, I recognize the title, as apparently it's



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                             June 7, 2012

229

1    an excerpt from the Senate journal for January 26, 2011.
2        Q. And can you take a look at Page 118, and I'm
3    going to direct your attention to floor Amendment 12.
4    Do you see that that amendment would have prohibited
5    state agencies from charging fees for issuance of any
6    acceptable form of photo identification under Senate
7    Bill 14, or for underlying documentation that would be
8    required to obtain such an ID?
9        A. I believe the provision -- or the amendment poses
10   a similar concept to what you described.
11       Q. And do you see below that amendment there's a
12   recorded motion to table and a vote on that motion to
13   table?
14       A. That's correct.
15       Q. And you voted, according to the public record, in
16   favor of the motion to table?
17       A. According to the record, that's how I voted.
18       Q. Did you take any public position as to how this
19   amendment would have impeded the goals of Senate Bill
20   14?
21       A. I don't recall if I did or not.
22       Q. You have no recollection?
23       A. No.
24       Q. Can you turn to Page 134, Amendment No. 30?
25       A. Page what?

230

1        Q. 130.  Do you see floor Amendment No. 30?
2        A. I see that.
3        Q. Amendment by Senator Ellis as well as Senator
4    Rodriguez and Senator Uresti.  Can you take a look at
5    that amendment?  Do you see that this amendment would
6    have required the secretary of State to conduct a study
7    that would have included information about the number of
8    eligible voters who were prevented from voting because
9    of a lack of possessing an identification?
10       A. I'll only agree to what it says.  I'm not --
11   you're paraphrasing it.  And I'm not familiar enough
12   after two years, after a year, whatever it is, of the
13   language to agree with your paraphrasing.  But I will
14   agree it is an amendment that requires the Secretary of
15   State to produce an annual report.  And it has specific
16   requirements with seven subsections of requirements for
17   the Secretary of State to either collect data or do
18   analysis and report back to the legislature.
19       Q. And can you look at Subsection 7, and that
20   actually requires that "the report include an analysis
21   by subgroup of whether the enhanced identification
22   requirements were being accepted to vote, produce a
23   disparate impact on women, the elderly, persons with
24   disabilities, students or persons of racial or ethnic
25   minorities."  Is that correct?

231

1        A. That's what Subparagraph 7 states, yes.
2        Q. And can you look below, I think it goes on to the
3    next page, that there was a motion the table that
4    amendment?
5        A. Correct.
6        Q. And you publicly voted in favor of this motion to
7    table; is that correct?
8        A. That's correct.
9        Q. Did you take -- did you make any public
10   statements or take a public position about your
11   opposition of this amendment?
12       A. I don't recall doing so.
13       Q. Were there any public statements made about
14   concerns that a study, such as the one proposed by this
15   amendment, would actually show there was a disparate
16   impact on minority voters?
17       A. I'm confident that whenever floor Amendment 30
18   was laid out on the Senate floor that the author and the
19   sponsors of the amendment made certain public statements
20   regarding -- or in support of the amendment.
21       Q. And my question was about whether public
22   statements were made expressing a concern that to do
23   such a study would show there was a disparate impact?
24       A. You would have to look at the record to determine
25   whether or not there were public statement on that.  I

232

1    don't recall independently.
2        Q. Can you look at Page 129 for me?  And
3    specifically at floor Amendment No. 29.  Do you see that
4    amendment it requires driver's license offices to be
5    open until 7:00 p.m. on a weekday during each week and
6    at least four or more hours on two Saturdays of each
7    month?
8        A. I see that.
9        Q. Do you see below that there's a motion to table
10   that amendment?
11       A. Yes.
12       Q. And you voted in favor of that motion to table?
13       A. Correct.
14       Q. And did you take any public position as to how
15   this amendment would have impeded the goals that you
16   described earlier of Senate Bill 14?
17       A. I don't remember if -- whether I did or not.
18   Probably not.
19       Q. Did you make any public statements about that?
20       A. No, I don't think I did.
21       Q. Do you recall when the Senate passed Senate Bill
22   14?
23       A. It was probably in January of 2011 as this
24   particular -- well, somewhere near the January 26, 2011
25   proceeding that's reflected in the Senate journal.  But



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                      June 7, 2012

233

1   I don't recall the exact date.
2        Q. Can you tell me as a general matter, is it
3   unusual for legislation to be introduced, considered and
4   passed within two weeks?
5        A. Not necessarily.
6        Q. Has that happened -- how many times has that
7   happened during your time in the Senate?
8        A. No.  My freshman year I introduced the Boll
9   Weevil.  Actually I introduced it, but I didn't even
10  take it until the Supreme Court had overruled or had
11  held an existing law unconstitutional until April 30th.
12  And I think we headed out of Senate to the House in two
13  and a half weeks.  So it can be done, if it's necessary,
14  on emergency orders.  On orders that are emergency, they
15  can move fairly quickly depending on the consensus in
16  the bill.  Just depends on all those things.  So
17  generally it's not -- it's -- it's not -- it's -- it
18  happens -- it can and does happen that legislation moves
19  fairly quickly.
20       Q. I'm sorry.  I missed the piece of legislation you
21  worked on?
22       A. Boll Weevil.
23           MR. SWEETEN:  Boll Weevil.
24  BY MS. MARANZANO:
25       Q. Okay.

234

1        A. Actually that's a pretty interesting case.
2        Q. We'll talk about that off the record.  And you
3   said it depends on the consensus; is that right?
4        A. Correct.
5        Q. Is it unusual for a bill that is highly
6   contentious to pass -- to be introduced, considered and
7   passed within two weeks?
8        A. Depends.
9        Q. And other than this legislation that yourself
10  mentioned that you worked on, are there other
11  examples -- during the time you've been in the Senate,
12  about how many times have you seen this happen?
13       A. Couldn't tell you.  Special orders.  Other issues
14  that come up late in the session that need to be
15  addressed.  So, you know, I couldn't.  Just too much to
16  me.  Too long and too much.
17       Q. Are you familiar with the Conference Committee's
18  consideration as to Senate Bill 14?
19       A. Remind me who was on the Conference Committee,
20  please?
21       Q. I would have to look it up.  I'm not sure I had
22  that document in front of me.  It would refresh your
23  recollection if you knew if members of the Conference
24  Committee?
25       A. Yeah.

235

1        Q. All right.  We'll come back to that.  Did you
2   ever have any discussions -- strike that.  To the best
3   of your knowledge, based on public record, did the
4   legislature take steps to determine whether SB 14 might
5   disproportionately impact minority voters?
6            MR. SWEETEN:  Don't reveal matters of
7   legislative privilege.  If you can answer the question
8   without doing so, you can.  If you cannot, then instruct
9   you not to answer.
10       A. I can't accurately respond to the question based
11  on independent recollection.  I would refer you to the
12  record.
13       Q. (By Ms. Maranzano)  Okay.  Was any part of the
14  purpose of Senate Bill 14 to decrease the number of
15  Hispanic voters?
16       A. No.
17       Q. Was any part of the purpose of Senate Bill 14 to
18  decrease the number of any other group of minority
19  voters?
20       A. No.  The purpose is as I've stated.
21       Q. Was any part of the purpose of Senate Bill 14
22  partisan?
23       A. No.  The purpose is as I stated.
24       Q. Did the purpose of photo ID in Texas evolve
25  overtime?

236

1        A. I'm not sure I understand that.  What do you
2   mean?
3        Q. Did the purpose of the photo ID bills that we
4   talked about in different legislative sessions change?
5        A. Not that I'm aware of.
6            MR. SWEETEN:  Hold on a second.  I think
7   that you're asking to compare and contrast different
8   bills from different sessions.  I think that the
9   question is vague.  I think it's compound.  I also think
10  that it calls upon him to give you an analysis of how
11  one bill compares with another which would require him
12  to write his mental impressions and would be subject to
13  the legislative privilege.  He will testify -- I think
14  you've asked him all day about the different bills and
15  what he thought the general purpose was.  He has
16  testified to all of that.
17  BY MS. MARANZANO:
18       Q. Are you aware of any legislators making any
19  statements about illegal aliens voting?
20       A. No.
21       Q. Have you ever heard a Texas State legislator who
22  voted in favor of Senate Bill 14 say it would prevent
23  racial or ethnic minorities from voting in Texas?
24       A. No.
25           MR. SWEETEN:  Don't reveal any



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                              June 7, 2012

237

1   communications you've had with any Senate or staff in
2   answering these questions.
3        A.  I've had no such communications is what I'm
4   trying to say.  I want to be clear on that.
5        Q.  (By Ms. Maranzano)  I didn't hear the very last
6   thing you said.  You said you've had no such --
7        A.  I have not been a party to any such
8   communications or overheard or heard any such
9   communications.
10       Q.  Does Senate Bill 14 do anything to address
11  allegations of fraud in the vote by mail system?
12            MR. SWEETEN:  Don't answer the question.
13  Requires you to reveal your mental thought processes and
14  motivations by the voter process.
15            MS. MARANZANO:  I'm just asking him about
16  the text of the bill.
17            MR. SWEETEN:  You're asking if the text of
18  the bill --
19            MS. MARANZANO:  Addresses voter fraud and
20  vote by mail.
21            MR. SWEETEN:  You can answer it based upon
22  the text.
23       A.  The text of the bill is to achieve the general
24  purpose of the bill, which is to enhance voter -- their
25  ballot box integrity and prevent fraud.

238

1        Q.  (By Ms. Maranzano)  So I'm just asking if
2   anything in the bill, based on the face of the bill,
3   addresses vote by mail voter fraud?
4        A.  I've answered the question to the best of my
5   ability.
6        Q.  Okay.
7        A.  Given -- go ahead.  Re-ask the question.
8        Q.  I know we talked about that the purpose of Senate
9   Bill 14 is about integrity of the electoral system and
10  voter fraud.  And I'm just wondering if the specific
11  area of vote by mail fraud is addressed by Senate Bill
12  14, based on the face of the bill?
13            MR. SWEETEN:  But I think your question is
14  asking for him to give you the potential effect of
15  Senate Bill 14 and would therefore, to some extent could
16  reveal his mental processes, opinions and thoughts about
17  the legislation.  So to some -- if to that extent I
18  would instruct you not to reveal it if it implements
19  matters of legislative privilege.
20       A.  I don't know, sitting here today.  I believe that
21  voter -- that mail in ballots is covered under other
22  legislation and not necessarily Senate Bill 14, if my
23  recollection is correct.
24       Q.  (By Ms. Maranzano)  Do you believe that -- well,
25  strike that.  Based on the face of Senate Bill 14, does

239

1   it do anything in terms of the goals that you've stated
2   that is not already covered by federal or State law?
3            MR. SWEETEN:  Don't answer that.  Calls for
4   matters of legislative privilege.  Instruct not to
5   answer.
6   BY MS. MARANZANO:
7        Q.  Do you know how somebody -- do you know what
8   forms of identification a voter registration applicant
9   in Texas needs to show under the current system to
10  register to vote?
11       A.  I know there are -- there are a -- there's a
12  laundry list of items that a voter needs to show.  I
13  couldn't recite them specifically for you right now.
14  You would have to show me the statute.
15       Q.  Is there anything in the public record about the
16  insufficiency of that current system, in terms of the
17  identification of voter registration an applicant needs
18  to show?
19       A.  If there is it would have certainly been stated
20  in the debate of Senate Bill 362 or Senate Bill 14.
21       Q.  Can you give me just a minute?  I think I'm just
22  about done.  I just want to go through my notes real
23  fast.
24       A.  Sure.
25            (Brief recess.)

240

1   BY MS. MARANZANO:
2        Q.  Back on the record.  Senator, do you know how
3   many investigated incidents of in person voter fraud
4   have occurred in the state of Texas in the last
5   20 years?
6        A.  I don't have a statistic available to me at this
7   time to give you an accurate answer on that.
8        Q.  Do you know how many convictions for in person
9   voter fraud have been obtained in the last 20 years in
10  the State of Texas?
11       A.  I don't have that information available to me at
12  this time.
13       Q.  Do you know if those statistics were part of the
14  public debate on Senate Bill 14?
15       A.  If they were, they would be in the record.
16       Q.  At any time since the passage of Senate Bill 14,
17  have you come to believe that it was passed with
18  discriminatory purpose?
19       A.  No.
20       Q.  Have you come to believe it was passed with a --
21  at any time since the passage of Senate Bill 14, have
22  you come to believe that it would have a discriminatory
23  impact on minority voters?
24       A.  No.
25       Q.  If called to testify at trial, will you testify



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

Robert Duncan                                                          June 7, 2012

241

1  that Senate Bill 14 has no discriminatory purpose?
2      A.  Yes.
3      Q.  And will you testify that it has no
4  discriminatory effect?
5      A.  Yes.
6      Q.  Are there any answers that you gave today that
7  now you would like to change?
8      A.  Other than the fact that I forgot that I had
9  offered an amendment.  That's the only one I think.  But
10 I just simply again, don't typically offer those kind of
11 amendments.  But that was corrected and I remember --
12 once you showed it to me I remembered it.  It did
13 refresh my memory.
14     Q.  Is there anything about earlier today you
15 couldn't recall that you are now able to recall?
16     A.  No.  That was the main thing.
17     Q.  Okay.  I'm now going to turn the questioning over
18 to Mr. Brazil.  As I mentioned earlier, we are going to
19 leave this deposition open because we believe there may
20 be some documents that the court has ordered to be
21 produced that have not yet been produced.  So for the
22 moment we're leaving the deposition open?
23     A.  Thank you.
24         MS. MARANZANO:  Thank you.
25

242

1              EXAMINATION
2  BY MR. BRAZIL:
3      Q.  Senator, I just have a few questions and I'll do
4  it from here.  So if I don't speak loud enough just ask
5  me to speak up.  Okay?
6      A.  Yes, sir.
7      Q.  I only have about four areas to briefly cover so
8  I'll jump around and if I lose you, just say so.  Fair
9  enough?
10     A.  Yes, sir.
11     Q.  I believe you said earlier this morning that your
12 Senatorial district is 36 counties?
13     A.  46.
14     Q.  I'm sorry?
15     A.  46.
16     Q.  46.  Do all 46 of your counties have DPS offices?
17     A.  I do not know the -- I couldn't accurately give
18 you and answer right now.  I don't know that they all
19 do.  I'm not sure.  I can't tell you today.
20     Q.  I think you saw in the public record that 77 of
21 the 254 counties do not have DPS offices.  Do you recall
22 that?
23     A.  I don't recall those specific numbers.
24     Q.  And you are not sure how many of your counties do
25 or do not have offices?

243

1      A.  I haven't -- I haven't looked at that.
2      Q.  Did your office do any independent polling of
3  your constituents on the issue of voter ID?
4      A.  I don't believe.
5          MR. SWEETEN:  Hold on a minute.  Don't
6  answer questions that are subject to the legislative
7  privilege.  So that would -- potentially reveal thought
8  process, mental impressions about legislation.  So don't
9  answer if it would to that.
10 BY MR. BRAZIL:
11     Q.  Well, let me make my question more specific.  Did
12 your office send out any mailers, request any e-mails
13 from your constituents, anything of that sort, in the
14 public domain about voter ID?
15         MR. SWEETEN:  That sounds like a public
16 statement so that would be -- you can go ahead and
17 testify.
18     A.  I don't remember doing that.  We don't typically
19 do those sorts of mailers to our constituent.
20     Q.  (By Mr. Brazil)  Did your staff ever keep records
21 of the telephone calls from your constituents, pro or
22 con, against the voter ID bill?
23     A.  I don't know if they did on that bill.  We've
24 done it before on other bills, but I couldn't tell you
25 whether or not we had a log on that.

244

1      Q.  Did you attend any, what we call town meetings,
2  anything of that sort where you specifically discussed
3  the voter ID bill?
4      A.  I'm sure I did.
5      Q.  Do you recall anything specific, any group that
6  you addressed or invited to address?
7      A.  No.  Generally, we have a fairly by-partisan
8  group of people that come to our town hall meetings in
9  these rural counties, even in Lubbock and other areas.
10 So I typically and generally speak about a number of
11 issues that were considered during the legislative
12 session and/or that we are considering or thinking about
13 considering.  And -- but I never have -- I don't recall
14 ever having a specific town hall meeting just dealing
15 with voter ID.  There's a lot of other issues that we
16 generally cover in those types of meetings.
17     Q.  Did you ever -- were you ever invited to speak
18 publicly to a group just on the issue of voter ID?
19     A.  I don't remember if I did.  If I did I didn't do
20 it.
21     Q.  Have you seen any independent studies regarding
22 alleged voter fraud in Texas?
23         MR. SWEETEN:  Don't reveal your thoughts and
24 mental processes regarding legislation.  That would be
25 legislative -- that would be subject to the legislative



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

245

1    privilege.
2         MR. BRAZIL:  How would that be privileged?
3    Are you contending that somehow he got some secret
4    information or something that's not public?  Some
5    independent study that he received that the public
6    didn't receive?
7         MR. SWEETEN:  What I'm saying is that the
8    Senator's thought process, his motivation, his analysis
9    related to any legislation, would be subject to the
10   legislative privilege.  And I think your question asks
11   him to reveal his analysis about legislation,
12   potentially to divulge conversations that he's had that
13   would be subject to the privilege and therefore, that
14   would be a matter of legislative privilege.  That's what
15   I'm saying.
16   BY MS. MARANZANO:
17        Q.  Well, my question was very specific.  Have you
18   seen any independent studies of alleged voter fraud in
19   Texas?
20        MR. SWEETEN:  You can reveal matters of
21   public record.  Don't reveal matters of privilege.
22        A.  The investigations related to voter fraud or that
23   I have seen are those that are contained in the public
24   record of the Senate on this issue.
25        Q.  (By Mr. Brazil)  Okay.  Do you recall whether or

246

1    not the public record contains any study by an
2    independent agency, such as a university or some entity,
3    that's been hired independent of the legislature on
4    alleged voter fraud?
5         A.  If there is such study that it was included in
6    the record either on Senate Bill 362 or the interim
7    study that we did, or on Senate Bill 14.
8         Q.  I think you've already said you're not aware of
9    the number of prosecutions for illegal voting or voter
10   fraud in Texas over the last ten years.  Is that fair?
11        A.  I couldn't give you the numbers.
12        Q.  Did I here you say that Amendment No. 40, floor
13   Amendment No. 40, did not make it into the final bill
14   that was signed into law?
15        A.  Yes.
16        Q.  Okay.  And did you say that the Senate Bill did
17   or did not go to Conference Committee?
18        A.  It apparently did.  And counsel's asked me about
19   that.  But I'm not -- I don't recall any deliberations
20   in regard to the Conference Committee, other than we had
21   a Conference Committee.  I don't believe I was on the
22   Conference Committee.
23        Q.  Okay.  But somewhere in conference, floor
24   Amendment No. 40 was removed?
25        A.  I don't know that to be a fact.  I know it was

247

1    removed, but I don't know where it was removed.
2         Q.  And you don't know, I assume, who removed it?
3         A.  Correct.
4         Q.  Did you serve on any committees or have you ever
5    served on any committee that specifically investigated
6    alleged voter fraud in Texas?
7         A.  The only -- the interim study that we did in 2006
8    had a charge that reflected that we were to look into
9    and study the voter fraud.  You can look at how it's
10   specifically worded.  That's the only committee that
11   I've worked on or served on where that issue that was
12   taken up, I believe.  I don't think any other committee
13   I've served on has taken that issue.
14        Q.  Have you served on any committee that
15   specifically investigated the effect the voter ID bill
16   would have on any group of the voting population.  For
17   example, the elderly, minorities.  Have you served on
18   any committee that specifically investigated what effect
19   this bill may have on their voting?
20        MR. SWEETEN:  Don't reveal any analysis
21   regarding legislation, nor factual information that you
22   did or did not consider in supporting or opposing a
23   bill.  That would be subject to a legislative privilege.
24        A.  The studies or -- that would relate to your
25   question would be the interim study that was a part of

248

1    the charge for the State Affairs Committee in 2006.
2    Other than that, I don't recall anything.
3         Q.  I think you said earlier that Senate Bill 14 was
4    to -- I'm trying to quote you, "ensure voter and ballot
5    integrity."  Is that correct?
6         A.  I think ballot integrity is more accurate.
7         Q.  Okay.  I have reviewed, I think on the record and
8    many of the depositions that have been taken in this
9    case, Senator.  Can you point to any area of the record
10   going back, you know, five or six years where there's
11   any real substantial evidence statewide voter fraud in
12   Texas?
13        MR. SWEETEN:  Don't reveal -- don't answer
14   the question.  It would require you to reveal matters of
15   legislative privilege.  Straight out of the order that
16   would include what factual information a legislator did
17   or did not consider in supporting or opposing a bill.
18   That's legislatively privileged.
19        A.  I'll follow counsel's advice on this.
20        Q.  (By Mr. Brazil)  Well, I think my question
21   basically was what was in the public domain, the
22   hearings, the record, if we stay in that vein, if we
23   stay in that train of thought, can you -- what in your
24   opinion is the most outstanding evidence that you
25   believe supports this allegation of voter fraud in



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                    June 7, 2012

249

1    Texas?
2            MR. SWEETEN:  Don't answer the question.
3    That calls for matters of legislative privilege.  You're
4    asking him to weigh the evidence which is part of his
5    analysis in considering legislation.  You're asking for
6    him to say what's the most -- what's the most relevant
7    evidence.  And that is very clearly asking for his
8    mental impressions and thoughts about a bill.  And
9    instruct you not to answer on that basis.
10   BY MS. MARANZANO:
11           Q.  Can you point to anything in the public record
12   that indicates substantial voter fraud in Texas?
13           MR. SWEETEN:  Same instruction.
14           MR. BRAZIL:  I'm sorry?
15           MR. SWEETEN:  Same instruction.
16           MR. BRAZIL:  So you're contending that the
17   privilege covers what's in the public record.  Is that
18   what you're stating?
19           MR. SWEETEN:  I didn't state that.  I
20   said --
21           MR. BRAZIL:  Let me ask him again.
22           MR. SWEETEN:  No, let me finish my
23   statement.  You're asking him what was substantial
24   evidence, which goes to his mental processes.  Now,
25   remember the court said that what factual information a

250

1    legislator did or did not consider in supporting or
2    opposing a bill is part of the legislative privilege.
3    So I'm instructing him that the court order and the
4    legislative privilege covers the question that you're
5    asking.  And I'm instructing him not to answer the
6    question as posed.
7            BY MR. BRAZIL:  Okay.  Well --
8            MR. SWEETEN:  You can -- if you want to ask
9    him was there evidence or an issue came up in the public
10   record, I don't have a problem with it.  When you start
11   asking him what was substantial, how did he weigh it,
12   that goes to his mental processes.  He's not answering
13   that question.
14   BY MR. BRAZIL:
15           Q.  Was there any evidence in the public record, in
16   your opinion, to support the allegation of voter fraud
17   in Texas?
18           MR. SWEETEN:  I think that's -- it's the
19   same for the same reason that question is inferred.  He
20   can refer to evidence in the public record that existed.
21   He's not going to talk about what was more or less
22   important to him.  He can talk about what occurred in
23   the public record.  That is legislatively privileged.
24   Instruction not the answer.
25   BY MR. BRAZIL:

251

1            Q.  What occurred in the public record that supported
2    the allegation of voter fraud?
3            MR. SWEETEN:  It's the same instruction.
4    It's the same question.
5    BY MR. BRAZIL:
6            Q.  Would you agree with me that there's nothing in
7    the public record to support the allegation of voter
8    fraud in Texas?
9            MR. SWEETEN:  Don't answer the question.
10   The question ask for what was your support for a certain
11   issue that calls for matters of the legislative
12   privilege.
13   BY MR. BRAZIL:
14           Q.  Who put on -- or presented evidence in the public
15   record of voter fraud in Texas?
16           A.  The record I think reflects that in 2006 there
17   was evidence in the interim committee.  I do not recall
18   specifically who put on evidence.  I do believe the
19   Attorney General's office did testify in 2009 and also
20   2011 with regard to those issues.  I would refer you to
21   the record for an accurate account of their testimony.
22           Q.  Do you remember how many specific instances of
23   voter fraud they presented?
24           A.  I would refer you to the record for an accurate
25   recollection of that.

252

1            Q.  Did you serve on any committee that specifically
2    investigated what segment of the population would be
3    most affected by this bill?
4            MR. SWEETEN:  Objection.  Calls for matters
5    of legislative privilege.
6    BY MR. BRAZIL:
7            Q.  Did any committee you serve on investigate that
8    publicly?
9            A.  The Senate Committee on State Affairs in 2006
10   carried out its assignment under its charge as stated in
11   the public record.  And I will refer you to that record.
12   The Senate Committee of the Whole in 2009, 2011 I
13   believe, the public record reflects a discussion of
14   those issues.  I'll refer you to the record for those --
15   for the...
16           Q.  There was a lot of discussion and a lot of
17   questions about how this bill progressed and the rules
18   and what rules were changed, et cetera.  If we just look
19   at this legislative session, how many bills were handled
20   in a similar manner to Senate Bill 14?
21           MR. SWEETEN:  Objection; compound.  You can
22   answer based on matters of public record.
23           A.  I don't recall that there were any other
24   committee -- or any other bills that were considered by
25   a Committee of the Whole to that extent it would have



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                    June 7, 2012



253

1  been different.
2      Q.  (By Mr. Brazil)  What was the urgency of this
3  bill?  What was the emergency?  What precipitated the
4  need for this type of bill and the way was handled?
5      MR. SWEETEN:  Objection; calls for matters
6  of legislative privilege.  Don't answer the question.
7  BY MR. BRAZIL:
8      Q.  Is there anything in the public record that you
9  can point to that would support the urgency or the
10  emergency or the special treatment of this bill?
11      MR. SWEETEN:  Objection.  He's asking you to
12  find evidence that supports something that calls for
13  your mental impressions or thoughts about legislation.
14  Don't answer the question as posed.
15      MR. BRAZIL:  I'll pass the witness.
16      MR. SWEETEN:  I have no questions for the
17  witness.  We'll reserve questions to the time of trial.
18      (Deposition concluded.)
19
20
21
22
23
24
25

254

1              CHANGES AND SIGNATURE
2          RE: STATE OF TEXAS VS. HOLDER
3
4  PAGE  LINE    CHANGE            REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

255

1      I, ROBERT DUNCAN, have read the foregoing
deposition and hereby affix my signature that same is
2  true and correct, except as noted above.
3
                    ROBERT DUNCAN
4  THE STATE OF TEXAS  )
                       )
5  COUNTY OF _____ )
        Before me,        , on this day
6  personally appeared ROBERT DUNCAN, known to me (or
proved to me under oath or through
7  (description of identity card or other document) to be
the person whose name is subscribed to the foregoing
8  instrument and acknowledged to me that they executed the
same for the purposes and consideration therein
9  expressed.
10     Given under my hand and seal of office this _____
day of        ,   .
11
12              NOTARY PUBLIC IN AND FOR
                THE STATE OF
13
14
15
16
17
18
19
20
21
22
23
24
25

256

1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
2
STATE OF TEXAS        )
3                     )
                      )
4  VS.              )  NO. 12-CV-128
                  )  (DST, RMC, RLW)
5                  )
ERIC H. HOLDER, JR.,   )
6  In his official      )
Capacity as Attorney   )
7  General of the United )
States, ET AL          )
8
9          CERTIFICATE FROM THE
            ORAL DEPOSITION OF
            ROBERT DUNCAN
10            JUNE 7, 2012
11
12     I, Janalyn Reeves, a Certified Shorthand Reporter
13  in and for the State of Texas, do hereby certify that
14  the foregoing deposition is a full, true and correct
15  transcript;
16     That the foregoing deposition of ROBERT DUNCAN, the
17  Witness, hereinbefore named was at the time named, taken
18  by me in stenograph on June 7, 2012, the said Witness
19  having been by me first duly cautioned and sworn to tell
20  the truth, the whole truth, and nothing but the truth,
21  and the same were thereafter reduced to typewriting by
22  me or under my direction.  The charge for the completed
23  deposition is $_____ due from Defendant.
24     () That pursuant to the Federal Rules of Civil
25  Procedure, the Witness shall have 30 days after being



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                                                    June 7, 2012

257

1   notified by certified mail, return receipt requested, by
2   the deposition officer that the original deposition
3   transcript is available in her office for review and
4   signature by the Witness and if any corrections made are
5   attached hereto;
6       () That by agreement of counsel, a reading condensed
7   copy of the deposition transcript along with the
8   full-size original changes and Signature Sheet has been
9   sent to_____ on_____ for review and
10  signature within 30 days and if any corrections returned
11  are attached hereto;
12      () That by agreement of counsel, the deposition
13  officer is instructed to release the original deposition
14  transcript to_____ on_____, for review and
15  signature, and the deposition officer is thereafter
16  released of any further responsibility with regard to
17  the original.
18      () That the Witness shall have thirty (30) days for
19  review and signature of the original transcript and if
20  any corrections returned are attached hereto.
21      () That the signed transcript () was () was not
22  received from the Witness within 30 days.
23      () That the examination and signature of the Witness
24  is waived by the Witness and the parties;
25      That the amount of time used by each party at the

258

1   deposition is as follows:
2           Ms. Maranzano - 5 hours 34 minutes
3           Mr. Brazil - 16 minutes
4           Mr. Sweeten - no time
5       I further certify that I am neither counsel for,
6   related to, nor employed by any of the parties in the
7   action in which this proceeding was taken, and further
8   that I am not financially or otherwise interested in the
9   outcome of the action.
10          WITNESS MY HAND, this the_____ day
11  of_____, A.D., 2012.
12          _____
            JANALYN REEVES
13          Cert. No. 3631
            Expires Dec. 12
14          100 Congress
            Suite 220
15          Austin, Texas  78701
            (512)634-1980
16          Firm Registration No. 283
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

259

**A**

**A.D**
258:11

**Abilene**
32:6

**ability**
9:17 148:18
238:5

**able**
22:13 50:19
66:18 133:5
134:4 138:13
222:16 241:15

**absence**
95:2,5

**absent**
95:1

**absolutely**
42:5 152:25
211:24 212:9

**abuts**
97:15

**acceptable**
81:6 110:12
191:24 229:6

**accepted**
230:22

**accepting**
68:14

**accomplished**
57:19

**accomplishes**
57:23

**account**
85:22 200:7,
22 201:5
204:8 220:16
228:9 251:21

**accuracy**
195:10

**accurate**

100:16 118:7
120:23 123:20
126:25 162:25
166:10 168:7
183:4 188:7
200:6,7,22
201:5 204:6,8
220:16 221:16
223:3 228:9
240:7 248:6
251:21,24

**accurately**
9:3,17,21
98:7 120:22
123:12 133:14
182:25 187:24
201:23 225:3
235:10 242:17

**achieve**
237:23

**acknowledged**
255:8

**Act**
19:8 20:14
22:13 37:15,
22 38:7 42:5
43:4 44:16
53:8 67:15,19
113:23

**acting**
176:3

**action**
98:9 258:7,9

**actions**
98:1

**active**
14:15 26:11
96:20

**add**
66:13 91:10
101:3 111:17
162:22 163:10
170:4,6 224:6

**added**
110:19 139:12
196:1,9
199:1,10

**adding**
111:4 186:13
187:6

**additional**
42:13 46:7
67:16 70:21
98:1,8 110:19
111:4,17
129:16 133:5
153:3 186:14
187:7

**Additionally**
151:23

**address**
55:10 70:16
86:8,12
114:19 123:4
124:2,20
237:10 244:6

**addressed**
116:6 215:9
234:15 238:11
244:6

**Addresses**
237:19 238:3

**administered**
197:25 198:2

**administratio
n**
23:2 197:16

**admitted**
14:10

**adopted**
67:14 147:4,8
225:13

**adopting**
138:3

**advice**

248:19

**advised**
157:22

**advocates**
195:22 196:2,
16

**af**
101:25

**Affairs**
17:6,14
18:18,23
19:14 21:19
22:24 28:13
29:17 31:10
32:11 48:18
49:13 58:10,
21,24 59:8,25
67:9 71:11,23
72:8 75:3,5
77:13 82:8
126:9 136:13,
17 146:14
148:20 161:8
171:7 177:9
248:1 252:9

**affect**
9:16

**affidavit**
205:15 222:16

**affidavits**
205:15 207:3,
5

**affiliated**
28:4

**affiliation**
23:24 24:13,
18 29:7

**affix**
255:1

**afford**
133:16

**afoul**

89:1

**African-
American**
16:7,13 67:6

**African-
Americans**
17:1

**afternoon**
5:1 211:16

**AG**
155:17

**age**
128:15

**agencies**
41:8 59:5
107:20 127:24
171:15 229:5

**agency**
31:8 107:6,7,
19 246:2

**agenda**
129:15 130:3

**ago**
6:24 50:8
55:19 65:16
74:19,23
82:12 101:22
115:14 120:21

**agree**
55:11 72:23
78:19 81:3
157:20 202:13
230:10,13,14
251:6

**agreement**
1:17 51:9
257:6,12

**agricultural**
14:5

**ahead**
9:12 37:4
56:16,20



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

65:15 77:22
125:21 132:9
176:12 179:9
199:9 204:1
206:16 238:7
243:16

**AL**
1:7 256:7

**ALEC**
23:22

**aliens**
99:19 236:19

**Aliseda**
210:20

**allegation**
248:25 250:16
251:2,7

**allegations**
68:8 217:18
237:11

**alleged**
69:10 244:22
245:18 246:4
247:6

**allow**
74:9 75:16
94:20 120:13
138:21 153:2
180:9

**allowable**
180:23

**allowed**
77:25 128:12
192:13,21,25
209:18 218:12

**allowing**
78:19 183:7

**allows**
55:11 76:24
80:22 81:3
139:8 198:19,
23 214:10

**along**
115:8 148:3
257:7

**already**
37:11 78:4,17
119:20 176:9
239:2 246:8

**also**
6:10 18:10
19:14 20:23
27:7 31:20
32:11 50:25
52:14 53:6
54:19 56:19
97:16 111:7
114:1 128:16
136:15 139:8
149:16 188:20
189:21 206:18
236:9 251:19

**alternative**
45:9 55:9
201:22

**alternatives**
107:2

**Although**
69:10 192:24
216:22

**always**
18:12 20:8
217:5

**Amarillo**
32:6

**ambiguous**
108:3

**amended**
87:8 139:12,
17 155:21
225:23

**amending**
223:25 224:2

**amendment**

7:24 186:23
196:8,16
197:2,4
223:21,24
224:1,2,12,22
225:5,8
226:11,20,21,
24 227:6,8,
22,23 228:4,
11 229:3,4,9,
11,19,24
230:1,3,5,14
231:4,11,15,
17,19,20
232:3,4,10,15
241:9 246:12,
13,24

**amendments**
39:12 111:16,
20,21,23
112:2,6
163:3,5,10
186:20 223:4,
8,9 227:3
228:12,16,17
241:11

**America**
67:15,19

**American**
23:21 99:20

**amount**
19:24 20:2
150:11 151:8
257:25

**analyses**
76:7

**analysis**
39:14 40:3,14
56:13,17 57:1
67:5,23 73:18
74:12 76:20
80:18 103:21
113:6,23
114:24 115:13

116:22 117:3,
7,11 124:13
125:9 187:18
188:1,5,15,
19 189:13,17
190:16 200:10
201:16,19,25
202:7,21
203:16,23,25
204:7 208:4
221:4,15
230:18,20
236:10 245:8,
11 247:20
249:5

**analytical**
40:11

**analyze**
67:18

**analyzed**
104:9 106:20

**analyzing**
73:13

**and/or**
244:12

**anecdotal**
46:25 48:2

**Angelo**
26:9,10,13
31:17 32:5

**Anglo**
15:23 16:7

**Ann**
26:4 135:15

**annual**
230:15

**another**
20:9 23:13
52:21 148:23
180:4 210:20
236:11

**answer**

9:6 19:3
20:20,21
34:17 38:17,
21 39:18
40:12,15
41:11 43:14
44:8,11,24
45:24 46:16,
22 48:7 50:19
51:1 52:16,
18,24 53:25
54:9 55:13
56:5 57:5,21,
24 58:2,4
59:1 65:13,
20,24 67:21,
25 69:16
70:2,15,19,
20 71:13,21
72:1 73:15
74:4,9,13
76:5,14,19,
20 77:9 83:7
84:2,6,15,
19,20,25
87:13 88:21
90:19 91:2,
14,21 94:12
98:4 100:2,11
101:18 102:4,
16,18,23
104:18,19,23
109:4,6,13
110:14,21
111:6,9,13,
19 112:13
113:13 114:8,
14,16 116:25
117:6 118:17
120:23
121:11,20
123:12 124:24
125:11 128:19
129:9,22
130:5,7
131:4,9,14



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

133:3,6,14,18
134:7,15
135:7 138:4,7
139:24 142:15
144:16 146:3,
19 147:13,16,
21 148:25
150:1,3,12
151:3,19
152:5,6,12
153:12 161:19
163:1 165:21
166:25 170:8
176:13
178:19,23
179:9,10,24
180:25 181:5
182:1,2,17,20
183:13,19
186:15 188:23
189:1,23
190:15,18
193:24 194:21
195:16
196:12,18,25
197:11,18,21
199:8 202:19,
20 203:21
204:2 206:16
208:8 210:3,
18 217:21
219:14 220:25
221:1,9,12,
14,16 224:7,
13 225:6
227:16,18
235:7,9
237:12,21
239:3,5 240:7
242:18 243:6,
9 248:13
249:2,9
250:5,24
251:9 252:22
253:6,14

**answered**
41:22,23
61:12 91:8
108:24 182:3
194:20 204:1
208:14,24,25
209:1,4
220:21 238:4
**answering**
19:20 50:16
53:8 62:11
67:25 68:11
97:8 98:12
103:22 113:25
114:23 123:11
127:10 132:3
170:1 181:12
183:11 202:17
211:20 237:2
250:12
**ANSWERS**
1:11 39:3
241:6
**anti-fraud**
67:14
**anybody**
12:17,22 13:3
23:12 30:11
33:4 81:9,16
83:5 90:11
108:14 118:24
127:13,18
143:2,8
184:16 186:7,
11 213:25
220:12 227:9
**anymore**
6:24 121:9
136:22
**anywhere**
46:7
**apart**
28:15 85:7,10

101:15 122:22
**apparently**
80:3 97:25
223:16,20,23
227:23 228:25
246:18
**appeal**
13:24
**appear**
80:13 126:18
137:13 180:12
206:19 219:8,
9 222:3
**Appearances..
..............
..............
..**
3:3
**appeared**
6:9 122:9,19
255:6
**appears**
54:25 80:5
81:7 82:25
106:24 126:8
131:15 134:16
153:10 163:18
172:15 222:6
223:25 226:9
**applicant**
101:25 239:8,
17
**applicant's**
101:24
**application**
102:1
**apply**
92:20
**appointed**
17:9,15
159:15 160:11
**appoints**

17:20 160:13
**appreciate**
175:12 213:12
**appropriate**
13:25 74:13
**appropriatio
ns**
200:17
**approximate**
30:25 92:14
109:18
141:10,12
**approximatel
y**
15:25 22:6
48:11
**approximatio
n**
175:2
**April**
126:9 130:15
136:11 233:11
**area**
6:23 7:16,17
14:24 32:1
238:11 248:9
**areas**
21:15,18
97:16 211:3
242:7 244:9
**argue**
108:4
**argument**
126:21
**arising**
155:9
**arose**
11:5
**around**
5:8 72:14
92:14 242:8

**arrived**
110:12
**Article**
32:12 98:23
101:6,16
**aside**
19:1 79:12
136:24
**asked**
65:21 79:13
91:8 92:11
109:1 119:20
135:22 194:19
203:22,25
208:14,25
209:4 220:21
236:14 246:18
**asking**
9:5 38:4
40:1,20 41:2,
4,6,9,23
42:12,16
43:1,5,8,9,
25 44:5 45:24
47:12 50:22
57:22 64:22,
23,24 65:1,9
70:9,10,15,
18 76:6,10
77:11,12,14,
24 78:1,8,9
79:1 83:23
89:22 90:3
96:12 100:4,
10,13 105:11
115:20 116:1,
8,21 117:21
124:5,6,11
131:5 132:15,
17,23 133:7
139:19,21
158:10
165:11,13
171:19 180:6



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

184:12
188:10,18
196:7 208:3
212:1 224:9
236:7 237:15,
17 238:1,14
249:4,5,7,23
250:5,11
253:11

**asks**
65:21,22 86:7
129:8,19
227:14 245:10

**assemble**
36:7

**asserted**
89:2

**asserting**
79:7 99:24
154:25

**assertion**
41:18 42:14
43:3 44:3
100:14 102:20
103:12

**asserts**
99:6 157:5

**assigned**
80:5

**assignment**
252:10

**associate**
14:19

**associated**
28:5

**Association**
26:12 28:6

**assume**
10:14 28:11
35:12 36:22
49:8,23 58:2
104:18 105:6,

25 110:23
113:19 137:16
143:18 147:24
174:23 175:8
190:7 193:10,
11 194:1
203:7 215:8
217:5 222:8
225:1,3,14
247:2

**assumes**
189:20

**assuming**
180:13

**assure**
57:12

**attached**
257:5,11,20

**attempting**
86:8 125:5

**attend**
244:1

**attention**
36:12 54:14
98:20 137:20
138:25
164:12,21
179:13 222:11
225:25 226:4
229:3

**Attorney**
1:6,15 2:3
5:3,16,19
6:9,11 10:12,
18 13:21
36:10 37:5
154:20 155:1,
8,10,14,25
156:2 210:22
251:19 256:6

**attorney/clie
nt**
10:19

**ATTORNEY2**
91:8

**attorneys**
12:21 212:7

**Austin**
1:16 2:6
31:4,14
258:15

**authentic**
222:8

**authenticity**
63:13,25
101:10 222:7

**author**
140:24 231:18

**automatically**
35:1

**availability**
53:11

**available**
16:10 40:2
136:13 154:21
240:6,11
257:3

**Avenue**
1:16 2:10

**avoid**
202:18

**award**
24:21,22
25:3,4

**aware**
23:13,17,18
47:6 55:20
56:21 57:1
81:24 84:12
85:8,9 95:8,
12,24 97:5
110:6,11
111:22 140:4,
13 154:24
174:6,11,14

183:16 187:17
188:3,14
189:12 194:25
199:17,20
203:16 214:1,
15,18 236:5,
18 246:8

---

**B**

**B**
55:8 81:1
106:14
205:14,21

**back**
6:15 7:5 63:8
92:18 118:8
125:24 126:4
142:3 149:15
156:22 196:5
199:4 206:11
210:22 227:3
230:18 235:1
240:2 248:10

**background**
14:2

**ballot**
10:3 45:19,22
46:10 63:12,
25 68:20
86:3,5
114:10,20
181:23
182:12,15
204:10,22,
24,25 206:3,
8,20,21,25
207:10,21
209:7,24
222:16,17
226:2 237:25
248:4,6

**ballots**
204:14 205:11
206:17 226:5
238:21

**bar**
14:10,15
33:11,25 34:9

**Barbara**
26:22

**base**
165:23

**based**
38:24 39:13
40:23 41:16,
19,22 43:1,7
51:1 53:6
55:13 57:18
65:19 67:17
69:21,24 70:7
73:10,25
76:19 86:4
88:4 95:12
96:4 98:4,13
102:13,23
107:25 111:4,
5 116:17
117:6 123:23,
25 129:1,5
131:1 134:4
146:19 148:14
149:23 161:5
165:5 166:19
172:18 179:24
181:10
182:13,20
187:17 188:3,
14 195:15
199:18 206:13
207:23 209:25
212:21 216:17
219:11 224:4
228:4 235:3,
10 237:21
238:2,12,25
252:22

**basic**
99:19

**basically**

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

20:6 51:17
115:17 133:2
161:13 181:22
211:20 218:1
248:21

**basis**
16:17 38:17,
21 111:13
117:1 125:8
167:1 188:24
203:21 207:24
249:9

**Bates**
126:11,15
135:10 157:8
158:17

**began**
10:14

**beginning**
12:7,9 126:22
133:24 180:16

**behalf**
5:18 91:3

**being**
5:23 10:2
16:4 21:19
22:9 25:10
58:6 79:14
94:2 115:25
116:6 124:18,
19 130:13
146:11 153:7
163:4 166:20
196:23 199:23
205:22 211:20
217:19 227:5,
7 230:22
256:25

**belief**
67:14 221:6

**beliefs**
100:7

**believe**

6:12 7:5
17:18 18:20
27:9 28:6,9
37:22 45:8,12
63:6 64:20
66:10 72:11
73:24 76:24
79:12 92:12
93:3,5,11
99:23 102:11
104:3 105:6
106:17,18
107:8 113:2,
15 115:7
121:3 129:6
131:1 135:15
139:14 140:3,
24 145:23,24
146:9,10
149:6 150:16
156:25 157:5
158:6 159:5
166:20 174:15
185:14,23
187:15,22
188:2 201:2
202:25 203:3
207:12,14
213:18 214:24
216:18,25
218:18 222:25
224:3 229:9
238:20,24
240:17,20,22
241:19 242:11
243:4 246:21
247:12 248:25
251:18 252:13

**believes**
13:21

**bell**
172:3

**benefits**
25:2

**Berman**
185:19

**best**
16:21 74:24
87:20 115:8,
16 118:13
160:5 161:19
213:1 235:2
238:4

**better**
154:5

**Betty**
86:22 185:16,
17

**between**
1:14 67:5
88:18 102:14
103:5 109:22
117:24 128:10
135:12 136:5
160:20,22
161:9 174:12
176:3 179:22
181:13 191:23
193:22

**beyond**
40:13,14,21
41:4 79:5,6

**Bill**
4:3,7 7:4,24
8:1,11 18:22,
24 21:6,14
27:17,18
31:11,12
41:19 44:4
45:13,14
48:15 49:6,7,
10,19,20,23,
25 50:1,5,7,
12,21 51:8,
11,13,14,23,
25 52:5,9,10,
11,15,21
53:1,4,8,12,

15,17,24 54:5
55:9,14 56:1,
4,17 57:2,9,
10,12,23 58:6
70:21 72:4,13
77:8 78:8,23,
24 79:14,16,
17,18 80:1,2,
7,9,14,16,22
81:10,11,14,
21,25 82:4,7,
21 83:1,2,6,
11,15,20,25
84:5,13,23
85:12 86:2,
11,12,15,17,
18,23 87:1,6,
8,12,19 89:5,
6,10 90:12,20
93:18,19
94:5,7,10,17
95:10,13
96:5,25 97:3,
20,23 98:2,9
99:3 105:1,
10,13,14,15,
20 106:1,3,6,
11,18,19,23
107:14 108:1,
6,10,12,17,
21,23 109:12,
22 110:7,20
111:5,17
112:12,23
113:10 114:7
115:4 116:9,
15,18 117:4,
5,11,12,14
118:16 119:3,
12,15,21
120:2 121:5,
11,19 122:8,
12,18 123:1,
10 124:3,21
125:6,9,14
126:4,5,9

134:5,13,19,
22 136:19
137:1 138:13,
21 139:3,17
140:17 142:11
144:22 145:19
146:11,12,
14,15,22
147:11,19
148:2,12,15,
19 151:16,25
152:15
153:15,21
156:3,6
159:9,11
160:16,23
161:10,12,16
162:4,7
163:3,22
164:7 166:4,
21 167:5,8,
20,25 168:24
169:3,12,16,
19 170:3
171:10,21
172:12,16,
20,24 173:22
174:7,13,20,
21 175:5,8,
14,17 176:11,
17 177:16,18,
19 178:1,3,7,
18,22 179:12,
13,17,23,25
180:9,11
181:1,9,22,
25 182:3,4
183:17,24
184:13,22,23
185:8,10,13,
16,19,25
186:4,14,20,
24 187:7,19
188:6,17
189:18 190:14
192:12,14,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

264

19,24,25
193:9,10
194:6,21
195:15 196:2,
24 197:9,15,
25 198:1,14,
19 199:1
200:8,9 202:8
203:10,19
204:11,20,24
205:2 206:14,
19 207:1,18
208:10,13,23
209:4,5,11,
13,15,17,20
210:1 213:16,
22 214:2,5,8,
14 215:22
217:17 218:2
219:13,23
220:6,13
221:8,12
222:24 223:5,
17 224:6
225:12,17,18,
21 226:5,10,
12,15,18,25
227:3,11,24,
25 228:2,13
229:7,19
232:16,21
233:16 234:5,
18 235:14,17,
21 236:11,22
237:10,16,18,
23,24 238:2,
9,11,12,15,
22,25 239:20
240:14,16,21
241:1 243:22,
23 244:3
246:6,7,13,16
247:15,19,23
248:3,17
249:8 250:2
252:3,17,20

253:3,4,10
**bills**
18:19 19:1,2,
10,13,18
20:3,6 32:20,
21 39:12
48:17,21 50:9
51:19,21
54:13 57:14,
15 70:6,10,14
71:2,4,6,7,8,
10,18,22
72:3,9,11
80:20 89:8
90:6 91:12
92:7 102:14,
20 103:6
105:4,5,7,12
106:25 107:2
120:18,20
129:5 134:10
144:18 148:16
151:6,7
184:25 185:11
236:3,8,14
243:24
252:19,24
**bill's**
145:4
**Birdwell**
215:13
**birth**
191:15
**bit**
8:24 10:20
19:5 108:3
119:1 173:17
**bite**
180:2
**blackberry**
34:6,7,18,20,
21,22,23 35:4
**blacks**

203:17
**blend**
91:1
**Board**
27:8,11
**body**
144:6 177:7
**Boll**
233:8,22,23
**both**
18:9 55:1,11
80:20,23
106:25 107:2
164:6 168:20
174:22 202:10
212:5 218:22
**bottom**
55:8 67:2
72:17 126:12
133:23 135:12
164:4
**bought**
191:7
**bowl**
125:17
**box**
237:25
**boy**
203:25
**branch**
122:12
**BRAZIL**
2:13 3:5 5:13
38:2 241:18
242:2 243:10,
20 245:2,25
248:20
249:14,16,21
250:7,14,25
251:5,13
252:6 253:2,
7,15 258:3

**break**
9:11,12,14
59:16,24
125:17,19
126:3 136:25
156:20 158:14
159:10
160:19,22
161:9 199:11,
12,13,16
**bridge**
71:20
**brief**
12:2 59:22
156:21 199:14
239:25
**briefing**
32:20
**briefly**
11:10 12:3
242:7
**bring**
13:6 34:9
89:4,13 90:12
94:5,16
161:17
219:13,22,23
**broad**
16:20 140:9
208:20
**broadest**
211:5
**broadly**
9:25 173:24
**brought**
89:8,10 91:12
138:22 166:6,
15 218:13
**Brown**
86:22 185:16,
17
**BS**

14:4
**budget**
31:9
**build**
41:17 43:3,6,
9 44:8 56:8
**building**
42:14 210:17
**bullet**
75:24 77:21
78:2 79:1,3,4
**Bullock**
92:18 93:2
**business**
89:9,11,19
138:23
**by-partisan**
244:7

---
C
---

**C**
2:1 205:14,24
222:11
**calendar**
94:21
**call**
22:16 87:14
158:15 165:19
173:19 203:6
217:7 218:7
219:15 244:1
**called**
1:12 23:21
24:10 25:17,
22 29:1,4
37:1 77:12
97:5 198:20
240:25
**calls**
20:17 46:15
56:24 74:5
100:22 102:17
109:3 111:6



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
265

114:15 133:19
134:8 136:14
146:16,17
147:14 148:21
150:2 186:16
188:19,20
189:21 192:1
194:15,20
196:19 197:1,
12 208:1
224:8 236:10
239:3 243:21
249:3 251:11
252:4 253:5,
12

**came**
12:3 32:5
37:1 49:8
83:12 166:16
184:18 194:6
227:3,5 250:9

**cancelled**
130:24

**cancelling**
127:8

**cancels**
126:23

**cannot**
133:13 173:2
195:10 214:8
235:8

**capacities**
30:4

**Capacity**
1:6 7:8 8:13,
18,22 32:8
256:6

**Captain**
125:17

**card**
45:1,2,6
107:5,18
190:3 255:7

**Carona**
143:24 145:7,
14 177:4,12

**carried**
20:3 252:10

**carries**
83:25

**carry**
83:11,15
180:14 194:5,
12 195:2,6,8

**carrying**
63:5 83:6

**carved-out**
211:3

**carve-out**
138:18 140:5

**case**
6:8,11,18,20
7:4,19 8:6,9,
12 11:4,7,11,
12,21,22
12:25 13:1,4
18:21 49:18
69:14,21 89:2
103:25 234:1
248:9

**cases**
7:2,13,14 8:8
69:23 221:2,
3,5

**cast**
10:3 45:18
163:22 204:24
205:10 206:3,
8,21 207:9
222:15 226:2

**casts**
206:24

**catch**
27:10

**category**

190:10

**Catherine**
28:21,23

**Cathy**
67:4

**caucus**
176:4

**cause**
31:20

**causes**
85:21,22

**cautioned**
256:19

**Cert**
258:13

**certain**
7:16 57:23
150:17 195:22
231:19 251:10

**certainly**
75:13 157:21
158:7 239:19

**certainty**
47:16

**certificate**
190:20,23
191:1,15
198:21
199:17,19,21
200:11,20
201:1,7
202:2,12,24
256:9

**Certificate..**
............
...
3:8

**Certified**
1:13 256:12
257:1

**certify**

256:13 258:5

**cetera**
252:18

**chair**
17:6,17,19
21:19 22:1
159:18 161:8

**chairman**
17:20 19:4,6
21:24 48:18
54:3 120:18
125:13 159:15
160:14 176:4
227:24

**Chairman's**
26:12

**chairmen**
54:12 83:17,
18

**Chair's**
28:5

**challenged**
23:19

**Chambers**
32:14

**chances**
38:13 227:11

**change**
16:5 88:18
135:7 142:16
155:12 191:22
193:9,10,12
227:17 236:4
241:7 254:4

**changed**
141:24
142:10,14
155:18 252:18

**changes**
38:8 40:4
106:4 113:19
150:18 182:19

193:14,19
218:18 254:1
257:8

**Changes.....**
............
..
3:7

**changing**
143:3

**chapter**
81:6

**characteriza
tion**
91:7

**characterize**
124:12

**charge**
32:12,14
61:9,14,19
62:7,8,9,13,
16,18 63:5,6,
7 76:2 247:8
248:1 252:10
256:22

**charges**
59:7,9

**charging**
202:14 229:5

**chart**
68:4 69:3,6

**check**
125:22 154:4
158:15 159:2

**chief**
32:9 35:12
189:16

**Childress**
31:18

**choice**
211:9

**chronologica**



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

lly
70:20

**Circuit**
14:14

**circulated**
216:11

**circumstances**
69:11 93:17,
22 138:2
191:23 194:4

**cities**
32:5

**citizens**
99:8 100:1,21

**citizenship**
101:24,25
190:20,23
191:1

**civil**
11:4 256:24

**claim**
73:25

**clarify**
124:10

**clear**
5:7 9:9 21:11
29:14,25 38:4
39:25 66:10
88:14 91:5
98:6 105:11
115:7 116:5,
12 118:10
132:12 155:23
156:15 159:4
170:2 211:11
212:1,20
213:10 237:4

**clearly**
40:8 112:14
124:13 153:23
249:7

**Clifton**

32:14

**close**
125:17

**closer**
121:15,16

**code**
222:7,23

**collect**
230:17

**COLUMBIA**
1:1 256:1

**come**
29:21 30:10,
11,21 31:4,17
33:23 46:19
58:24 59:9,
12,13 62:23
92:7 120:20
195:14 196:23
198:1 210:22
234:14 235:1
240:17,20,22
244:8

**comfortable**
47:4,17

**coming**
143:25 177:6

**comment**
96:17,19,22

**comments**
95:19

**commercial**
15:3

**commissioner**
31:12

**Committee**
12:11 17:6,7,
8,14,15 18:7,
8,15,17,18,23
19:4,15 21:6,
20 22:2,24
27:5 28:10,13

29:13,17,21,
22 30:3,6,9,
10,11 31:11
32:20,21
34:14 35:13
44:13,15
48:22 49:8,
14,19 51:25
52:8,22
53:16,18
58:10,21,24
59:8,25 60:7,
10,12,22
62:23 63:10
65:2,18 66:5
67:9,17
71:12,18,23
72:8 73:11
74:1,25 75:3,
5 76:9,11
77:12 82:8
83:19 85:5,7,
11 86:15
87:6,8,19,22,
25 88:5,10,
14,20 95:22
109:5,8,23
112:3,5
120:19 122:5,
10,19 123:21,
22 125:13
126:8 129:3
135:3 136:11,
13,18,20,22
139:5 145:23,
25 146:8,13,
14,23 147:5,
12,20 148:19,
23 149:10
151:23
159:12,16,18,
24 160:1,7,8,
13,16,24
161:2,8,14,23
171:7 173:9
177:9,14

186:21,25
202:9 215:22
216:13
219:13,24
220:5,12
226:17,18
227:24
234:19,24
246:17,20,
21,22 247:5,
10,12,14,18
248:1 251:17
252:1,7,9,
12,24,25

**committees**
17:4,9,21,25
39:6 40:9
51:7 85:20,21
145:19,22
150:20 247:4

**committee's**
63:5 78:1,9
234:17

**Common**
121:7 179:4,
10

**communicate**
33:15,18
34:1,5,8 84:4
120:19

**communicated**
119:1 171:8

**communicating**
34:15 84:10

**communication**
34:11 59:4
120:1,13
121:21 140:21
144:25 157:4
158:23
169:10,13

173:5 178:9,
11,12 227:9

**communications**
24:4 26:14
27:13 28:7,15
29:9,15 36:24
41:6 51:3
53:7 55:17
81:14,21,25
83:5,9 84:12,
23 85:1,6,8,
10 94:14
95:16 103:7
104:21
109:11,14,
20,25 110:3
111:8 118:15
122:7,11,17
125:10 127:23
128:21 136:16
141:1 143:2,
8,17 145:17
146:21 157:6,
24 158:3
159:7 169:2
171:14
173:21,23
174:5,6,12
175:24
177:17,20,24
178:2 184:21,
23 185:12,15,
18,24 186:3,
11 193:21
213:22 226:19
237:1,3,8,9

**communities**
16:9,11

**community**
16:12,13,15,
19 196:17

**comp**
7:4,7 8:1



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

267

**compare**
236:7

**compared**
117:4 148:16

**compares**
236:11

**compensation**
6:23 7:18
8:11 11:3
30:20

**compiled**
37:11

**complain**
148:12

**complaints**
135:22

**completed**
14:4 67:4
256:22

**completely**
9:3,18,21
78:19 192:17

**compliance**
13:20 158:6

**complied**
159:2

**complies**
42:4

**comply**
36:8 37:4
210:13 211:1
212:6

**complying**
211:24 212:10

**component**
73:13

**composition**
194:11 195:2,
5

**compound**
20:24 39:17

51:1 53:6
54:7 117:16
121:6 236:9
252:21

**con**
243:22

**concealed**
180:14 194:5,
12

**concept**
108:10 229:10

**conceptual**
218:18

**concern**
148:2 231:22

**concerning**
149:10 181:14
183:14 195:21
200:2

**concerns**
84:13 95:13,
23,25 96:4
97:19,21
122:25 123:4
124:2,20
149:12 162:6,
15,19 163:5
166:21 167:7
197:9 199:18,
23 200:2,5
220:13 231:14

**concluded**
167:22 253:18

**conclusion**
72:18 80:25
188:9

**conclusions**
74:25

**condensed**
257:6

**conduct**
159:20 201:25

211:8 230:6

**conducted**
11:8 36:17
188:4,15
201:16 203:17

**confer**
10:17 18:24

**Conference**
24:11,15
226:17,18
234:17,19,23
246:17,20,21,
22,23

**confidence**
75:15 127:17,
20 128:5,8,10
129:7

**confident**
231:17

**confine**
39:2

**confines**
138:15

**conflict**
155:3

**conforming**
142:13,16

**Congress**
1:16 20:7
258:14

**connected**
102:21 182:14

**connection**
11:2 102:13
103:5 128:10

**cons**
40:10

**consensus**
56:9 90:18
160:3 161:22
163:9 233:15
234:3

**consequences**
214:2,4

**consider**
99:18 111:10
138:13 215:22
216:14 247:22
248:17 250:1

**consideratio
n**
82:4 85:25
86:25 111:12
139:3 141:25
143:3 149:22,
24 151:15
159:11 162:3
200:9 220:6,
11 234:18
255:8

**consideratio
ns**
214:25

**considered**
18:19 74:24
79:17 87:7
105:15 111:3
123:20 163:4
186:13 190:14
214:11 233:3
234:6 244:11
252:24

**considering**
188:5 244:12,
13 249:5

**consistent**
129:16,21

**constituency**
16:24 17:2

**constituent**
26:13 31:16
157:3,6,21,
24 158:3
159:6 243:19

**constituents**
16:22 30:18,
23 31:19 41:8
97:20 243:3,
13,21

**constitution**
214:7

**constitution
al**
22:12

**construct**
120:22

**contact**
173:8

**contacted**
173:13

**contained**
206:18 220:8,
16 221:17,18
228:10 245:23

**contains**
107:5,18
115:9 246:1

**contemplated**
77:22

**contemplates**
146:10

**contending**
245:3 249:16

**content**
195:10

**contention**
100:19

**contentious**
234:6

**context**
124:12 131:25
132:8,23
133:8,14
140:8 144:5
222:13



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

continuation
130:18

continue
14:22 134:20
211:4,13
213:7,8,11

continues
132:22 211:9

continuing
211:6

continuously
15:7

contrary
152:24

contrast
236:7

convene
216:13

conversation
120:17,21
133:10,12
173:6 176:20
195:7 228:10

conversations
63:2 74:21
95:8 118:22
119:2,10,14,
19 122:16,22
143:10 144:3,
11,15 145:10,
12 147:9,18
149:16 172:23
173:24
174:16,19,25
175:4,13,16
176:8,22
178:21 185:7,
21 187:6
189:4 226:24
227:22 228:3,
6,9 245:12

conviction
69:15

convictions
69:7 240:8

copies
36:21

copy
58:18 82:15
257:7

Correct
6:19 7:12
8:14,19,23
37:23 45:12,
20 69:3 79:15
95:6 99:21
101:19 114:13
115:5 139:10
144:8,10
153:1 154:23,
25 166:18
170:22 195:24
205:11 206:5
207:7,11
215:15 229:14
230:25 231:5,
7,8 232:13
234:4 238:23
247:3 248:5
255:2 256:14

corrected
101:8 241:11

corrections
257:4,10,20

correctly
19:17 117:21

correspondenc
e
217:24

Cory
32:10

cost
200:10,16,24
202:13

costs

190:25 191:3
200:17,24

couldn't
50:9 73:9
90:10 133:16
174:24 175:1
183:13 193:15
234:13,15
239:13 241:15
242:17 243:24
246:11

Council
23:22 25:13
32:10,11 41:8
59:5 127:24
171:1

counsel
1:17 10:9
210:7 257:6,
12 258:5

counsel's
41:13 58:3
87:17 167:3
194:1 246:18
248:19

counted
45:22 46:10
204:25 222:17

counties
31:18 32:3
72:20 73:7
242:12,16,21,
24 244:9

County
11:11,15 28:5
85:16 103:19
207:13,15
255:5

couple
17:24 31:2
32:22 50:2

course
37:2

COURT
1:1 9:3 10:22
11:4,5,11,
13,16,17,18
13:16,20
38:9,15 78:4,
17 79:2,5
104:4 142:3
152:19,21
157:2,19
199:3 210:19,
24 211:2,10,
21 212:10,22,
24 213:6
233:10 241:20
249:25 250:3
256:1

courts
14:13

court's
153:1 157:1
158:7 181:4
210:11
211:15,25
213:9,14

cover
137:7 200:17
242:7 244:16

covered
13:17,18
17:12 113:22
117:25 238:21
239:2

covers
249:17 250:4

Cox
67:4

Crawford
103:19 104:3
113:22

created
115:15 118:12

creating

75:2 108:10

Creek
2:14

Crenshaw
14:20

Criminal
27:8,11 69:13
131:2,6,12

Crunch
125:17

current
44:23 45:12
46:8,9,13,20
47:8 55:10
75:12 116:20
117:4,12
184:21,24
239:9,16

currently
14:8,15 15:18
73:7 99:19

Cypress
2:14

---
D
---

D
137:20,24
138:25 139:1,
20,21 141:22
143:8 218:16
219:5

Daily
33:17

danger
99:21

Dashiell
26:4

D-A-S-H-I-E-
L-L
26:4

data
230:17



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
269

**date**
79:4 130:15
178:17 206:3
233:1

**dated**
77:4 126:9
149:9,12
215:14

**dates**
71:19

**David**
17:23 98:21
99:16

**Davis**
223:23 228:7

**Davis's**
6:11

**day**
1:14 30:7
31:5 34:3
95:4 97:6
121:17 128:15
151:25
153:14,20
154:7,11
163:19 167:23
168:18,22
214:9,12
236:14 255:5,
10 258:10

**days**
130:15 143:12
183:8 206:3
216:14 256:25
257:10,18,22

**DC**
2:11

**de**
19:10,14
118:21 122:1
135:12,21
143:22 149:8,
14 160:4

176:3 177:5
215:9 217:6
218:7

**dealing**
244:14

**dealings**
30:22

**dealt**
7:20

**debate**
12:9,12 95:20
96:25 117:24
132:24 133:2
134:16
137:17,19
143:11
144:20,23
147:25 152:2
153:22
155:11,25
166:12
168:18,19
181:14 184:4
186:21 187:1
202:8 217:19
220:11 222:24
239:20 240:14

**debated**
92:17 123:21

**debates**
39:10,11
74:21 118:11
129:4,17
155:12

**debating**
144:21,22

**debrief**
34:4

**Dec**
258:13

**December**
15:6 58:19
88:9,19 93:4

**decide**
15:15

**decision**
13:24 94:4,
16,19 103:19
104:4,12
123:23 153:1
193:18 220:2
227:7

**declaration**
213:19

**declared**
206:1

**Declaring**
214:10,16,20

**decrease**
75:13 235:14,
18

**DEFENDANT**
2:7 5:3,16
11:23 212:8
256:23

**Define**
173:23

**definitely**
35:7

**degree**
14:4,5 47:16
108:22

**delay**
149:21,24

**delegation**
169:11

**delete**
35:1

**deleted**
35:2

**deletion**
181:3 182:7

**deletions**
182:3

**deliberations**
160:6 177:25
178:7 246:19

**Delwin**
169:6,7

**Democrat**
93:7

**demographic**
67:4

**demographics**
15:21 16:5

**Denny**
185:8

**denying**
133:11

**DEPARTMENT**
2:8 5:12
27:8,11 38:9,
14 203:1

**depend**
186:23

**depending**
150:18 233:15

**depends**
20:9 52:10,25
53:10,11,12
83:19 109:9
121:17 151:13
161:12 233:16
234:3,8

**depiction**
123:20 168:7
200:6

**deposed**
6:6,10,13
7:5,8,10,13,
14,20 8:9,12,
18,21 10:21
12:24 13:4
115:25

**DEPOSITION**

1:9,11 4:2
12:1,22 13:2,
13 35:24 36:4
49:3 78:4,17
79:13,24
81:20 82:16
98:19 105:22
126:6 137:6
158:12 163:14
170:17 210:25
212:16 215:5,
10 216:3
219:4 222:2
223:13 228:24
241:19,22
253:18 255:1
256:9,14,16,
23 257:2,7,
12,13,15
258:1

**depositions**
6:14 9:1
210:13,16
212:12 213:3
248:8

**describe**
14:2 31:25
38:12 155:5
159:21

**described**
115:6 128:25
229:10 232:16

**describes**
217:9

**describing**
177:20

**DESCRIPTION**
4:2 84:17
120:3,14
121:10 157:22
178:11 216:16
223:3 255:7

**designated**
214:5

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



Robert Duncan

June 7, 2012

270

**designation**
213:17,23
214:3,14

**designed**
57:16 114:12,
19 115:4

**destruction**
206:4

**details**
69:20,23
72:14 183:14

**deter**
67:15,19
131:2,13

**determination**
54:4

**determine**
39:15 54:12
65:7 73:11
83:25 93:16
106:7 113:6
115:1 160:1
188:15 203:17
231:24 235:4

**determined**
83:15

**develop**
161:23

**developing**
56:4 108:23

**development**
55:24 81:10
108:5,8
172:23 176:10

**Dewhurst**
17:23 98:21
99:16 215:11,
12,13

**dialogue**
149:10

**didn't**
27:10 34:7,8,

17 42:24
46:12 47:2
48:16 50:7,11
55:18 61:4,18
71:4 85:7
88:8,15 89:6
91:20 152:21
169:23 172:4
175:10 179:2
189:7 226:23
233:9 237:5
244:19 245:6
249:19

**difference**
179:22 180:6
205:13

**differences**
180:3,8

**different**
21:18 28:12
30:23 38:6
51:21 54:23,
25 62:6 64:5,
9,16 77:20
83:17 90:9,
14,15,16,24,
25 123:8
143:18 190:9
203:9 212:18
227:4 236:4,
7,8,14 253:1

**difficulties**
199:19

**difficulty**
199:21

**dios**
34:14

**Dire**
5:20

**direct**
36:12 54:14
98:20 109:6
137:20

164:12,21
179:12 222:11
225:25 226:4
229:3

**directed**
109:2

**directing**
138:24

**direction**
256:22

**Directly**
33:19 65:21
147:12

**director**
32:11 135:18

**disabilities**
230:24

**disability**
195:14 196:17
197:10

**disagree**
76:22

**disaster**
206:1

**discover**
208:6

**discretionary**
51:15

**discriminatory**
41:19 42:15
43:4 44:3
240:18,22
241:1,4

**discuss**
86:12 90:14,
20 103:8
144:14,17
171:13 173:10
177:6

**discussed**
74:7,10

110:24 111:11
113:15 115:8
117:23 127:2
153:9,22,24
154:6,7
166:3,12
172:1 178:14
193:3,10
199:21 200:10
206:18,24
207:4,5
218:11 220:15
244:2

**discussing**
127:15 144:6,
12 152:1

**discussion**
110:17,22
115:3 123:13
128:3 131:11
134:12,16,
18,23 144:1
153:7,9,10
156:23 167:24
181:13
187:11,16
188:8,24
200:18,23
201:2,3,15,
20 202:7
227:15
252:13,16

**discussions**
65:24 74:16
75:16,17
112:10,21,24
113:1,3,5
123:10
143:14,15
147:24 178:16
183:15 184:1,
5 188:22
193:12
197:14,24
198:5,7,13

200:2,16
222:22 223:1
224:4,11,16,
17 235:2

**disenfranchising**
67:7

**disparate**
230:23
231:15,23

**disproportionate**
84:14

**disproportionately**
95:14 163:6
188:16 194:17
235:5

**dispute**
11:9 189:19

**disputed**
217:8

**disseminate**
136:20

**distance**
199:24

**DISTRICT**
1:1 11:4,5,
11,12,15
15:18 16:8,
20,24 17:2
26:11 31:22
97:14 242:12
256:1

**division**
135:17

**divulge**
245:12

**docket**
151:12

**document**



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

79:11 83:3
101:9,14
105:24 151:2
173:18 222:5
234:22 255:7

**documentation**
81:5 179:18
201:18 229:7

**documents**
13:6 24:3,6
36:8,9,14,18,
20,21,25 39:7
156:25 157:21
158:11 159:6
191:11,14
201:6 202:1,
3,11 212:15
241:20

**doesn't**
45:5,17 48:8
50:12 51:11
82:25 106:2
116:11 227:1

**doing**
31:13 43:7
47:4 51:16
113:6,14
122:13 138:16
202:18 212:8
213:1,13
231:12 235:8
243:18

**domain**
243:14 248:21

**double-check**
158:8

**doubt**
222:9

**down**
31:16 32:4
33:24 68:7,13
126:19 150:8
151:13 157:10

158:25
160:19,22
161:9 212:21
226:16

**DPS**
198:23
242:16,21

**drafting**
108:12,17
176:10,14,15
184:13 200:8,
14

**drawing**
152:25

**drive**
199:24

**driver's**
45:8 72:22
73:5,8,12
203:2 232:4

**DST**
1:4 256:4

**due**
256:23

**duly**
5:23 256:19

**DUNCAN**
1:9,11 3:4
5:2,19,22 6:5
165:15 211:17
213:8,16
215:21 223:18
255:1,3,6
256:10,16

**Duncan's**
157:7 158:4

**DUNN**
2:13

**Dupree**
14:20

**during**
17:10 18:12,

15 19:6 30:14
31:5 32:23
33:16 109:10
119:8 143:11,
12 147:24
153:9 155:25
159:11 160:4
161:14 162:3
166:12
186:20,21,25
200:8 202:8
203:7 220:11
222:24 232:5
233:7 234:11
244:11

**Durstine**
26:6,7,16,17

**DYER**
2:5

---

**E**

**E**
2:1

**each**
89:3 117:13
121:2 208:12,
22 232:5,6
257:25

**earlier**
61:20 113:15
127:2 163:7
170:20 185:11
206:2 207:4
232:16
241:14,18
242:11 248:3

**early**
56:8

**ease**
199:20

**easy**
93:15

**economics**
14:5

**Ed**
108:4

**Education**
17:7

**educational**
14:2

**effect**
39:16 40:5
42:10,17,21,
25 43:24
70:19 150:22
217:24 238:14
241:4 247:15,
18

**effective**
116:18

**effort**
74:1 90:17
211:25

**efforts**
212:6

**either**
11:23 26:11
35:8 38:8
48:17 53:23
71:24 92:19
94:25 95:19
101:16 136:10
139:12 160:23
162:7 186:24
202:9 226:17
230:17 246:6

**El**
97:17

**elaborate**
66:18

**elderly**
73:23 230:23
247:17

**Eldorado**
32:4

**elect**

22:17

**elected**
15:5,9 85:11,
14 122:17

**election**
15:5 19:1,13
21:3 22:22
23:1 28:14
38:8 40:4
48:19 57:15
62:19 67:8
85:20 129:5
135:17 151:24
198:20
199:17,19
200:11,20,25
201:7 202:2,
12,24

**Elections**
25:23 135:18

**electoral**
238:9

**electronic**
36:20

**eligibility**
23:19

**eligible**
230:8

**Ellis**
60:4,7,15
63:17,18
64:3,14
96:16,19
118:20 119:3,
12 121:25
143:21 177:5
230:3

**Ellis's**
66:25

**Eltife**
143:24

**Email**
4:7



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

**e-mail**
33:22 157:14
158:23 171:4,
6,11

**e-mails**
173:25 243:12

**emergency**
213:17,19,22
214:3,6,10,
14,17,21
233:14 253:3,
10

**employed**
258:6

**employee**
135:16

**employees**
203:10

**enacting**
48:6 77:8

**end**
20:13 34:3
52:3 80:3
91:1 211:22

**Englebreth**
28:22,24

**engrossed**
106:9 225:14

**engrossment**
83:4

**enhance**
237:24

**enhanced**
230:21

**enlisted**
190:8

**enough**
52:7 72:16
82:24 98:7
162:25 170:7
197:20 204:5
208:20 217:20

230:11 242:4,
9

**enrolled**
172:16 225:19
226:12

**ensure**
160:3 181:23
248:4

**ensuring**
181:25
182:12,14

**entailed**
223:1

**entertain**
30:8

**entire**
61:19 151:25

**entitled**
179:18

**entity**
29:11,12
246:2

**ERIC**
1:5 5:3,16
27:21 256:5

**especially**
51:14 228:8

**essence**
15:16

**essentially**
169:24 205:9

**established**
44:14 146:5,7

**estimates**
187:23

**ET**
1:7 252:18
256:7

**ethnic**
60:16 102:7
165:1 230:24

236:23

**ethnicity**
61:1

**evaluating**
220:23

**evening**
167:21

**event**
152:17 206:21

**events**
16:16

**everybody**
5:9 24:7
35:10 160:9
163:10

**evidence**
21:8 74:24
86:5 115:16
116:18 118:13
122:21 166:14
189:21
248:11,24
249:4,7,24
250:9,15,20
251:14,17,18
253:12

**evolve**
235:24

**exact**
233:1

**Exactly**
45:14 67:1
95:3 113:1
126:19 154:16
166:11 182:23
187:23 214:24

**Examination**
3:5 6:1 213:7
242:1 257:23

**example**
247:17

**examples**

234:11

**exception**
140:14 196:22

**exceptions**
195:13 204:22
205:9 206:7,
23

**excerpt**
61:21 137:8,
14 163:16,18
222:6 229:1

**Exchange**
23:22 135:11
136:1 149:14
171:4,19

**exchanges**
212:2

**excluded**
217:19

**exclusion**
181:15

**excuse**
17:16

**excused**
95:2,5

**execute**
222:16

**executed**
255:8

**executive**
122:11

**Executor's**
27:5

**exemption**
227:10

**exercise**
212:23 213:8

**Exhibit**
35:21,24
48:25 49:3
58:13 79:21,

22,25 82:15,
16 98:15,16,
19 105:18,23
126:1,6
137:3,6
149:3,8
163:12,15
170:15,18
172:6,9
215:2,5,10
216:3,4
218:23 219:1,
4 221:24
222:2 223:11,
14 228:21,24

**EXHIBITS**
4:1,11 39:11
149:2

**exist**
16:5

**existed**
86:5 250:20

**existing**
45:24 233:11

**exists**
10:19 37:16
77:5

**expeditiousl
y**
160:2

**experience**
22:22 23:1
91:15

**expert**
6:9,20 11:3
21:12 37:16

**expertise**
6:23

**experts**
123:15 168:5

**expired**
183:8



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                              June 7, 2012

                                                                     273

**Expires**
258:13

**explain**
116:2 121:4

**explanation**
214:20

**explicit**
192:3

**explicitly**
137:23 159:6
210:25 211:3

**expressed**
96:5 97:19,22
119:13 145:3,
5 153:4
219:18 255:9

**expressing**
148:2 231:22

**extensive**
118:1 151:23

**extent**
20:17,21
45:25 48:7
59:2 67:22
69:17 70:2
76:20 77:5
86:6 94:11
95:19 116:7
122:9,10,19
124:23 125:10
127:1 129:23
131:14 182:18
184:19 186:15
188:24 193:23
194:14,20
195:16,18
202:6 238:15,
17 252:25

**extremely**
120:4 148:3

――――― **F** ―――――

**F**

78:12,13,14

**face**
238:2,12,25

**fact**
30:5 87:5
102:10 152:24
155:7 187:15
199:3 241:8
246:25

**facts**
43:6 189:20

**factual**
39:14 40:3
73:17 114:22
117:3,7,10
247:21 248:16
249:25

**Fagan**
32:12 33:3
35:14 36:19
109:2 170:20
173:21

**fail**
224:25

**failed**
97:23 98:2,9

**Fair**
25:23 72:16
82:24 88:4,10
90:17 111:11
170:7 197:8
242:8 246:10

**fairly**
42:19 66:10
148:15 166:12
170:2 233:15,
19 244:7

**faith**
212:6

**fall**
190:10

**Falls**

32:6

**familiar**
9:1 23:21
24:10 25:25
26:3,21,24
27:16,25
28:18,21
35:25 37:14
38:6,11 45:6
49:4 71:8
80:6 86:21
103:18,24
104:25 105:13
129:2 171:5
198:18
204:10,19
221:19 230:11
234:17

**familiarity**
25:17,22

**far**
18:21 39:10
97:16 117:23
127:14 176:14

**Farmers**
11:6

**fashion**
159:25

**fast**
239:23

**favor**
63:11 165:1
229:16 231:6
232:12 236:22

**federal**
14:13 20:11
21:3 38:9,15
67:14 107:7,
19 192:13
239:2 256:24

**federally**
192:21

**feel**

34:15

**fees**
229:5

**field**
7:16,17

**figure**
38:3

**file**
105:7 171:20
172:4 174:7

**filed**
10:17 80:3,4
106:3 109:22,
25 175:9

**files**
35:16 37:11

**filing**
105:9

**final**
225:12 246:13

**Finance**
17:7 18:4,11
30:3

**financially**
258:8

**find**
41:25 65:9
73:1 120:7,9
203:6 253:12

**finding**
72:24

**fine**
20:10 155:17
179:9

**finish**
9:5,6,13
56:20 249:22

**firm**
14:19,21,22,
23,25 34:22
101:25 258:16

**firms**
62:19

**first**
5:23 11:12
41:21 42:16
48:5,13 60:1,
13 62:17 77:3
78:14 81:16
87:4 101:13
129:14 131:22
149:20 155:17
161:3 173:15
223:18 226:21
256:19

**fitting**
157:21

**five**
6:16 82:11
91:25 101:22
109:9 141:14
147:1 248:10

**fix**
51:10

**flaws**
51:8,9

**floor**
30:7 39:11
52:9 56:18
86:22 89:5
91:12,17 92:8
94:5,25 95:1,
20,22 96:1,23
112:4,8
121:15 129:3
143:11,16
144:1,18,23
152:1 163:4
181:14 184:2
186:20 193:4,
13 202:9
218:13 219:23
229:3 230:1
231:17,18
232:3 246:12,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

23

**flourishing**
102:12

**focus**
21:15,16
140:12

**folks**
29:24 34:15
118:25 228:3

**follow**
20:25 35:11,
19 40:8 51:19
58:3 88:8
197:20 248:19

**followed**
36:22 136:22

**following**
41:13 81:5
87:17 158:23
164:8 167:3,
22 194:1
209:9

**follows**
5:23 80:14
106:18 258:1

**follow-up**
157:14

**foregoing**
255:1,7
256:14,16

**foreign**
73:23

**forgot**
33:14 241:8

**form**
10:1 133:2
180:12 195:9
198:19 199:1
229:6

**formal**
143:14 144:20
218:8

**formally**
144:21

**former**
184:22,24

**forms**
45:3,6,9,15,
17 46:8 54:23
74:3 81:4
106:11,15
110:12,18,19
111:4,17
112:12,22
113:7 134:21
179:16
180:10,18
183:7 186:14
187:7,19
190:9 192:23
201:18 204:23
206:9 207:1,
10 239:8

**formula**
52:25

**forth**
1:18 76:15
149:15 210:14

**forums**
128:9,16

**forward**
166:15

**foundation**
42:19 56:24
179:8

**foundational**
78:5,18
227:19

**four**
6:16 211:2
216:14 232:6
242:7

**fourth**
68:7

**frame**
72:3 95:21

**framed**
113:1,2 123:7
166:14

**frames**
175:11

**Frank**
60:17,25

**frankly**
30:18 35:3
107:11 217:16

**Fraser**
84:4 109:11
110:1 126:21
143:22
172:19,23
173:6,12
174:16,19,25
176:9 177:2
184:15
193:14,22
228:6

**Fraser's**
173:8,21
174:13 189:16
193:18

**fraud**
67:15,20 68:5
69:4,7 70:6
73:24 75:12,
14 209:6,23
210:1,3
237:11,19,25
238:3,10,11
240:3,9
244:22
245:18,22
246:4,10
247:6,9
248:11,25
249:12 250:16
251:2,8,15,23

**fraudulent**
131:3,13

**fraudulently**
126:23 130:23

**Frederick**
26:1

**free**
20:22 76:1
100:11 198:23

**freshman**
233:8

**front**
28:10,13
75:3,5 85:11
224:18 234:22

**frustration**
128:12

**full**
132:21 158:6
163:17 256:14

**full-size**
257:8

**fully**
69:12 159:1

**fundraiser**
16:18

**further**
66:18 90:21
149:21 210:12
257:16 258:5,
7

**furtherance**
20:19 38:20

**G**

**Gallegos**
118:23

**game**
111:11

**gave**
24:23 122:20
145:5,7

165:17 217:7
241:6

**geared**
16:9

**General**
1:7 2:3 5:3,
16 10:12,18
16:3 18:11,15
20:6 32:10,11
38:12 52:16
53:19,22,23,
25 54:9,12
56:5,7 57:6,
11,13,14,17
61:9,12,14
62:14 76:23
77:3,7,10,
19,20 79:3
83:14,21
84:16 85:25
89:24 90:2,9,
11,20,24
91:3,14
114:8,10
119:19,21
120:4,14
121:10 127:15
128:3 138:7,
10,12 146:3
150:12 151:3
154:21 155:1,
8,10,14,25
156:2 161:4
169:9 170:8,
25 178:8,10
181:1,2
182:4,5
186:25
207:19,21
208:6,11,15,
19,21 209:12,
16,17,21
225:7 227:14
233:2 236:15
237:23 256:7



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

275

**generally**
14:6 16:6
18:8 24:7
31:25 45:3
51:6,16 59:13
80:19 87:5
89:22 92:16
94:20 102:10
106:21,24
109:5 110:25
113:2,4
119:9,11
127:13,14,17
128:1,5,11
135:4,5,19
136:18
138:20,21
144:5 147:10
151:5,11
160:3 165:11
166:11,17
168:9,19,21
169:12 171:17
176:18 177:6
178:6,15
190:5,21
191:18 193:9
203:5 204:19
209:5,9,12
220:15 221:21
227:22 233:17
244:7,10,16

**General's**
37:5 251:19

**generated**
57:9

**genuine**
166:21

**geographic**
32:1

**Georgia**
66:23 67:3
103:25 104:2
185:25 186:10

220:19 221:2,
7

**getting**
43:18 51:19
53:16 125:16
136:4 211:18
215:16 226:24

**give**
13:22 19:24
20:1 30:25
53:2 61:11,12
71:21 72:3
79:2,3 89:24
90:1,10 91:2
92:14 109:18
120:14,23
131:24 141:10
143:20 151:8
153:2 157:8
162:25 168:7
175:2 176:25
178:10 179:25
182:5,18
197:21 200:6
201:23 204:6
207:19 208:4
214:19 218:25
219:3 221:16
222:13 225:7
227:18 236:10
238:14 239:21
240:7 242:17
246:11

**given**
24:20 106:1
123:15,16
155:7 158:1,2
182:7 209:3
213:16 214:14
217:9,20
238:7 255:10

**giving**
126:5

**go**

5:8 8:25 9:11
24:19 31:17
34:4 37:4,21
40:22 43:25
46:3 47:10,21
48:2 56:16,19
65:15 77:2,22
87:6 90:6
92:18 118:8
125:20,24
126:4 145:19,
20 146:8
150:16 152:22
155:20 156:22
176:12 179:8
188:7 193:16
198:23 199:9
204:1 206:16
208:3 210:7
211:9 225:7,
15 238:7
239:22 243:16
246:17

**goal**
57:20,24
117:13

**goals**
117:5 229:19
232:15 239:1

**goes**
21:3,7,11
42:13 54:18,
19 83:20
163:25 204:16
231:2 249:24
250:12

**going**
8:24,25 13:19
18:23 20:16,
20,23 31:3
35:5 38:14,
16,20 39:15
40:22 41:10
42:3 43:12,

14,16,19
44:7,10 45:24
46:3 47:3
50:25 51:5
53:5 55:25
56:19,23
57:8,10 58:2,
3 70:19,22,24
76:14,18
77:2,20 79:3
83:11 84:19
88:7 105:3
112:15
119:23,25
120:24 126:4
127:6 141:21
144:16 146:18
152:10,13
153:2 158:12
164:11
166:22,25
171:20 174:7
181:2,3,5
182:1,2,4,10
188:23 190:16
193:11 202:18
203:20 210:3
211:9,15,17
212:21 213:6,
11 215:25
216:13 218:25
219:3 221:10,
11 229:3
241:17,18
248:10 250:21

**gone**
24:1 61:2
136:13,17,18

**Good**
5:1 19:3
25:10 34:12
91:2 126:21
209:25 212:6

**government**
22:20 107:7,

14,16,19
44:7,10 45:24

20

**Governor**
17:20,22,23
22:13,15,18
59:10,13
93:2,10 94:20
98:21 99:3,16
100:13,15
101:7,17
146:22 160:13
172:17 178:3
206:2 213:17,
18 214:16
215:11,12,13
216:8,11
220:3 226:13

**Governors**
92:19

**Governor's**
94:19 99:24
103:12 178:22
179:5 214:19
215:20

**graded**
38:2

**graduated**
33:10

**graduating**
14:18

**granola**
33:24 34:9

**ground**
120:7,10
149:11 159:23

**group**
23:21 24:10,
13 25:17,22
102:7 203:18
235:18 244:5,
8,18 247:16

**groups**
84:23 85:1,2,
3 122:7 157:4



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

162:2,8
197:10

**growing**
15:24

**growth**
102:11,14,21
103:6

**guess**
10:15 31:3
35:10 38:4
46:4 96:21
141:12 164:9
171:5 175:3

**guessing**
16:1

**gun**
180:14 194:5

---

**H**

**H**
1:5 256:5

**half**
233:13

**hall**
244:8,14

**hand**
180:14 194:5
255:10 258:10

**handgun**
194:12

**handle**
20:8 44:21

**handled**
7:25 252:19
253:4

**handles**
19:11 33:9
35:13

**handling**
68:20

**happen**
215:25 233:18

234:12

**happened**
34:4 75:4
83:1 116:2
123:25 136:6
153:10
169:19,22
170:3 217:15,
16 233:6,7

**happening**
112:19,20
121:17 164:17

**happens**
35:3 42:13
233:18

**hard**
34:1 36:21
120:9

**hasn't**
209:1

**hate**
141:12

**HAVA**
19:7 20:14
57:15

**haven't**
88:22 106:20
221:15 243:1

**HB**
4:4,12 52:12,
21 54:15
55:17,21,24
56:11,14
88:20 89:3

**head**
9:8 22:20
31:8 190:24
191:2

**headed**
233:12

**health**
32:13

**hear**
42:24 49:20,
23 51:13 52:5
54:2 72:10
85:19 127:14
128:2,3 237:5

**heard**
18:23 23:23
29:1,4 48:5
49:19 51:19,
20 52:22
54:13 71:23
72:3 86:9,15
96:1 102:20
103:4 128:9,
16 151:23
170:7 187:25
198:24 236:21
237:8

**Hearing**
4:10 21:7
30:6 31:6
34:2 50:1,8,
11,13,22
52:1,9 53:16
54:5 85:23
101:21 125:14
133:22 135:3
147:4,6
149:10 150:10
151:12
153:13,14,19
156:3 159:20,
24 160:4
161:23 167:21
173:10
178:13,15,17
223:17

**hearings**
12:5 39:6,7
40:9 42:10,22
50:9 51:22
71:10 72:8
129:3,4

150:21 248:22

**held**
15:9 18:12
74:17 147:6
210:17 233:11

**help**
32:20 57:16
67:15,19
156:18 226:4

**helpful**
157:15 158:24
218:22

**her**
33:13 36:24,
25 102:16
135:19,20
149:12 171:11
185:13 216:16
217:7 224:1,2
257:3

**hereby**
255:1 256:13

**hereinafter**
1:18

**hereinbefore**
256:17

**hereto**
257:5,11,20

**Higher**
17:7 108:4

**highly**
234:5

**hindering**
62:20

**hired**
246:3

**hires**
32:17,18

**Hispanic**
15:23,24
16:6,12,15,
19 61:2 97:12

102:11 203:17
235:15

**Hispanics**
16:23

**History**
4:4 82:18,21,
22 92:22

**Hobby**
92:18 93:10,
12

**hold**
39:6 45:23
121:1 125:7
146:16 158:12
196:4 210:2
236:6 243:5

**HOLDER**
1:5 5:4,16
254:2 256:5

**holders**
195:3,6

**holding**
144:20

**home**
34:4

**homeowner's**
11:10

**hours**
1:14 150:17
167:21,22
203:5 213:2
232:6 258:2

**House**
4:3 6:15 7:10
15:12 18:9
24:21 25:5
49:7,8,9,11
50:5 51:12
55:25 56:4,8,
17,18 57:2,8,
9 79:17 80:2,
6,13,14,22
81:10,11,14,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

21,25 82:4,5,
7,9,10,21
83:2,6,16,20
84:5,12,23
85:12 86:2,
15,17,18,22,
25 87:12,19
89:10 93:18
94:9,17 95:9,
13 96:5 97:3,
20,23 98:2,9
99:3 106:18
126:5,9
134:5,13,19
164:6 168:25
169:3,17,20
170:3 225:24
226:17 233:12

**Houston**
2:15

**human**
32:13

**hundred**
71:18

---
                    **I**
---

**ID**
4:9 9:23
18:19 19:1
25:15 26:17
27:14 28:8,16
29:10 33:1
45:3,6,9 46:9
52:21 55:1,12
57:12 69:12,
24 70:21
73:14,22
75:13 79:14
81:8 87:6
88:6,11
99:16,24
102:14,20
103:5 104:2,
22 107:2
113:7 120:17

127:15,16
128:5,8,10,
13,14,17
131:25 165:18
170:7 171:10,
21 180:13
181:15 182:11
189:18 192:22
198:23 201:22
204:23 207:3
216:14 229:8
235:24 236:3
243:3,14,22
244:3,15,18
247:15

**idea**
93:13 172:3

**ideas**
30:21

**identical**
219:10 224:23

**identificatio
n**
10:1 45:15,18
48:6,14 54:24
55:6 58:6
63:12,25 65:3
67:7,16,18
70:14 74:3
80:21,23
81:4,6 99:6
100:20 105:1,
5,12 106:12,
15 107:1,5,18
110:12,18,19
111:5,17
112:12,22
113:24 129:4,
17 132:13
133:16 134:21
137:24
138:14,18
139:3,4
141:25 142:6,

7,12 143:4
149:22,24
154:3,9
155:15
164:24,25
166:17 171:21
179:16,19
180:10,12,19,
20,23,24
181:16,24
183:8 184:25
186:14 187:7,
19 190:3,7,10
191:24
192:13,24
195:9 197:16,
17 198:20
199:1,17
200:11,20
201:1 202:2,
12,24 203:11,
19 205:10,25
206:4,9,22
207:1,9,11
213:20 218:12
220:19 221:7,
20 222:3,20
229:6 230:9,
21 239:8,17

**identificatio
ns**
107:23

**identified**
121:2

**identify**
135:13

**identity**
44:23 46:14,
21 47:8 62:20
198:15 255:7

**IDs**
45:10 76:1
181:9 182:14

**ignore**

89:1
**illegal**
68:20 69:11
99:19 236:19
246:9

**illegally**
68:15 126:23
127:8

**immediately**
22:14

**immigrant**
102:8

**impact**
84:14 95:14
97:20 113:23
123:1 124:2,
20 162:7
163:6 166:4,
21 220:13
230:23
231:16,23
235:5 240:23

**impacted**
188:16

**impeded**
229:19 232:15

**impersonate**
23:12

**impersonatio
n**
116:19 117:15
135:23

**implement**
20:12,14,21

**implemented**
19:7

**implementing**
21:3 85:19

**implements**
238:18

**implicate**
65:24 111:8

125:9
**importance**
152:1 153:8

**important**
9:2,4 16:23
17:1 78:11
250:22

**impossible**
120:22

**impression**
38:19 40:20
111:7 115:18
116:23 127:25
206:15

**impressions**
20:18 39:4,
19,22 41:1,9
42:1 43:17,
19,22 50:15,
25 51:3 52:18
53:7 54:8
57:22 59:3
63:3 65:23
66:9,16 67:23
68:11,24
70:23 76:19
83:24 86:7,11
87:14 88:25
94:15 100:10,
25 103:21
104:13 106:23
114:22 115:22
116:8 123:10
124:6 128:20
129:9 130:10
131:7 132:18
134:9 146:18
147:15 152:14
170:10 179:25
181:12 182:5,
7 188:21
190:16 194:21
202:16,21
205:3 208:7,8



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

236:12 243:8
249:8 253:13
**improve**
227:25
**inaccurate**
123:19 184:9
**inadequate**
46:14
**inappropriate**
155:10 211:14
**incidents**
240:3
**inclined**
149:21
**include**
22:21 69:11
107:9,23
144:12 204:5
208:20 209:19
230:20 248:16
**included**
39:8 141:21
194:5,6
195:14 196:24
203:14 225:11
230:7 246:5
**includes**
99:2 180:13
**including**
54:8 63:2
76:4 94:13
130:9 134:9
145:14 171:14
188:21 198:13
**income**
76:3
**incorrect**
112:6
**increase**
38:13 75:14
227:11
**incur**

200:25
**independent**
75:20 86:16
115:2 118:2,4
123:6,18
148:8 162:24,
25 166:10
182:22 183:2
187:13,14
193:5 197:6
198:4,9 200:4
201:11,23
203:13 204:4,
5 235:11
243:2 244:21
245:5,18
246:2,3
**independently**
131:19,20
154:10 162:13
163:8 195:10
232:1
**INDEX**
3:1
**Indiana**
4:9 104:5,22
186:4 220:19
221:2,20
222:3,7,23
224:24 228:5
**indicates**
101:9 223:20
249:12
**indigency**
227:11
**indigent**
222:17 225:1
**individual**
8:13,22 24:18
78:7,22 207:6
**individuals**
194:11 195:14
196:22 201:17

204:21
205:21,24
206:7 213:4
226:2
**inferred**
250:19
**influence**
15:24
**informal**
143:14,15,17
173:7
**informally**
144:23
**information**
37:8 73:16
85:24 86:14
124:13 129:23
136:5,12
152:23 153:3
173:9 204:6
227:19 230:7
240:11 245:4
247:21 248:16
249:25
**informs**
53:4
**initially**
17:15
**injury**
15:2
**input**
59:14
**insertion**
181:3 182:3,7
**inserts**
180:21
**instance**
83:12
**instances**
47:10,16
69:10 251:22
**instead**

9:8 77:11
**institution**
107:6,7,20
108:2,4
**instruct**
20:20 38:16,
21 41:11
44:10 84:1,20
88:23 102:17
111:12 114:15
146:19 148:24
151:19 165:20
166:25 181:5
188:23 190:18
202:19 203:20
208:8 220:24
227:16 235:8
238:18 239:4
249:9
**instructed**
36:7 257:13
**instructing**
116:25 250:3,
5
**instruction**
20:25 40:6
52:23 58:4
68:16 87:17
103:13 111:13
116:12 117:17
131:8 161:11
162:16,20
167:3 182:21
193:2 194:2
249:13,15
250:24 251:3
**instructions**
9:14 13:22
36:23 41:13
62:15
**instrument**
255:8
**insufficienc**

**y**
239:16
**Insurance**
11:6,10 31:12
**integrity**
57:12,13
86:3,5
114:11,20
115:5 181:23,
25 182:12,14
207:22 209:7,
23 237:25
238:9 248:5,6
**intended**
100:16 142:5
**intent**
6:15 7:2,21,
22 8:11 57:6
77:9 215:20
**interchangea
bly**
9:24
**interest**
85:4 151:16
152:18 157:4
167:25
**interested**
62:4 91:5,6
171:18 258:8
**interesting**
92:21 234:1
**interface**
19:5 29:24
**Interim**
4:3 17:10
18:10,12 31:5
32:17 48:20
58:9,18,23
59:7,9,25
75:1,2 77:13
78:24,25
88:5,9 246:6



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

247:7,25
251:17

**interpret**
9:24 77:24
111:10 132:15
150:2,13
151:2 152:4,
10,13

**interpretation**
79:4 132:17
152:17 153:1
166:23

**interpretations**
90:25

**interrupt**
91:21

**Intervenor's**
5:14

**INTEVENORS**
2:12

**introduce**
18:22 70:19
71:4,7 140:22
141:21 223:8

**introduced**
21:7 50:4
58:7 70:6,8,
21 71:3 72:7
79:14 105:1,
25 142:21
175:20 219:12
223:20 233:3,
8,9 234:6

**introducing**
223:4,8

**introduction**
141:8,16

**introductions**
5:6

**intruding**

70:17

**invade**
13:21

**investigate**
252:7

**investigated**
69:13 240:3
247:5,15,18
252:2

**investigation**
68:5

**investigations**
69:4 245:22

**invited**
160:15,18
244:6,17

**invites**
161:15

**invoke**
13:10 132:25
202:20,22

**invoking**
13:12

**involved**
11:22 12:8
15:2 25:15
51:16 56:1,4
108:5,9,12,
16,22 176:23
177:1,3,4,5
184:13,18,20
212:12 227:7

**involvement**
55:23

**involves**
104:2 209:16

**involving**
18:3

**iPhone**
35:6

**Issuance**
76:1 229:5

**issue**
7:6 10:18
11:3,5 18:9
31:9 33:2
37:12 52:6
65:18 66:5
73:19 74:7,10
85:21 96:20,
24,25 103:17
118:1 130:14,
25 133:2
144:7 152:2
153:8 156:24
166:13 168:20
173:10 188:25
193:3 199:20
201:20,21
214:10 216:22
218:8 243:3
244:18 245:24
247:11,13
250:9 251:11

**issued**
58:25 60:11
70:5 88:19
98:21 107:6,
19,24 190:7
192:13,21
213:18

**issues**
12:8 19:12
28:12,14,16
29:19 30:16
31:20 32:13,
18 35:15 48:2
51:16 53:15
62:6 63:11
75:6 85:18
108:19 110:24
113:4 122:6
123:14,15,16
149:17 153:23

154:2,3
166:3,11,13,
14 171:9
184:12 218:8
220:15 227:4
234:13
244:11,15
251:20 252:14

**issuing**
67:10 181:4

**items**
239:12

---
**J**
---

**Janalyn**
1:12 256:12
258:12

**January**
61:5 139:18
141:23 215:14
216:1 223:17
229:1 232:23,
24

**JAY**
2:5 5:19

**JD**
14:5

**JENNIFER**
2:8 5:2,15
32:12,13 33:3
35:14 109:2,5
120:8 156:19
170:19,20
171:11 173:14
180:2 186:8

**job**
14:17

**John**
170:23,24,25

**joining**
5:20

**Jones**
169:6,7

**Journal**
4:6,10 163:18
214:23,25
229:1 232:25

**JR**
1:5 256:5

**judgment**
54:3 118:6,9
131:5 148:22

**jump**
242:8

**juncture**
13:25

**June**
1:14 13:16
78:3 157:2
256:10,18

**jurisdiction**
31:10 48:18,
19

**Jurisprudence**
17:8 21:24
22:1

**just**
9:11,13 12:20
14:13 19:22
20:4 25:10
29:14,21,25
30:25 31:25
33:10,13,25
35:24 39:25
40:12 41:2,14
42:12,19,24
47:9,12 51:6,
11,13,15
52:7,25 53:2,
3 54:15 55:19
58:2 59:16
63:8 65:6,8,9
71:19 75:11
77:22,24
78:10 80:19



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

280

81:16 82:19
83:19,21
86:12 91:6
92:14 95:2
96:12 98:24
99:17 105:7,
11 106:21
114:25 115:10
116:4,5,11
121:11,16
125:20 128:1,
7,9 129:25
131:21 132:8,
12,21,22
133:7,11
135:2 140:9
142:8 143:13,
24 144:4
145:14 147:10
150:21
151:13,22
152:17 154:18
155:4 157:17
158:16 160:11
161:12 164:19
165:11 168:11
169:12,15
171:17,19
172:2 173:18
175:10 177:8,
18 179:3
180:6 191:7
207:5 209:10,
21 213:12
217:10 226:1
227:2,5
233:16 234:15
237:15 238:1,
10 239:21,22
241:10 242:3,
4,8 244:14,18
252:18

**JUSTICE**
2:8 5:12
27:8,11 38:9,

15

**K**

**keep**
243:20
**Kennie**
5:13
**kept**
168:19,23
**kind**
37:3 90:25
111:21 241:10
**kinds**
31:14 127:19
**King**
29:4,9
**knew**
190:13 234:23
**know**
6:14 9:10,11
12:18 15:22
16:2,20 17:9
19:3 24:5,8
25:15,16,20
26:6,7 27:21
28:9 30:6,17,
20,22 31:3,4
32:19 33:6,23
35:3,10,25
36:13,20
37:16,20 40:8
41:3 43:15
44:19 45:14,
21 46:2,25
47:13,15
48:1,15 49:9,
24 50:7,10,11
51:20 52:4,11
53:24 54:2
55:23 56:2,13
57:4,7 58:15
67:8,11
69:14,19 70:4
72:10 73:7

74:19 75:8
80:1 82:1,2,
9,10,19 84:18
88:21 90:13
92:16,25 93:8
94:16,22,24
95:3 98:1
101:10 102:5,
6,10 103:2
104:24 105:6,
7 106:1,20,24
108:16,20,24
112:1,4,25
114:6 118:25
119:5 120:10
122:13 130:11
133:9 136:20
139:16 140:16
141:7,18
142:13,15,17
148:7 152:5
153:12 157:18
158:13 167:15
168:1,17
170:12,23
171:22,24
172:2 173:3
177:4 178:24
184:20 185:1,
2,3,4,5,6,17
186:8,9,10,12
190:2,3,9,20,
22,25 191:3,
8,11,16 192:6
194:10,23
196:14
199:10,11
201:6,12,15,
19 202:6,23
208:22 211:25
212:5,7,11,19
214:4,22
215:1,7
216:19,21
217:6,15,24,
25 218:6

221:4 222:7
225:14,15
226:14,16
234:15 238:8,
20 239:7,11
240:2,8,13
242:17,18
243:23 246:25
247:1,2
248:10

**knowledge**
7:15 65:10
103:1 116:1
172:18 173:20
174:2 235:3
**known**
255:6
**knows**
45:25

**L**

**label**
126:15 135:10
172:5
**labeled**
69:3 126:11
**labeling**
172:8
**lack**
73:23 92:8
230:9
**lacked**
67:6
**laid**
10:8 126:21
193:14 198:1
231:18
**language**
55:21 76:4
110:7 183:17,
18,24 198:13
230:13
**large**

97:14 108:22
**larger**
32:4
**largest**
102:8
**Larson**
26:22
**last**
19:7 26:15
36:13 42:20
43:18 67:12
72:21 75:10
151:24 172:13
173:9 237:5
240:4,9
246:10
**lasted**
153:19 167:21
**lasting**
125:18
**late**
51:12 167:22
211:16 212:14
234:14
**later**
38:2 176:15
216:14
**laundry**
239:12
**LaVoie**
33:6,8
**Law**
4:9 14:6,8,
18,19 20:11,
14 21:3 22:23
33:10 34:22
38:14 39:15
44:20 45:12,
24 46:8,9
48:6,14 55:10
75:13 90:13
102:2,3,6
104:5 114:12,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

281

19 221:7,20
222:4,5,9
224:24 228:5
233:11 239:2
246:14

**laws**
48:19 88:6
104:22 113:24
220:20 221:2

**lawsuit**
11:6,19

**lawyers**
7:23 32:19
46:2

**lay**
16:4 123:16

**laypersons**
168:6

**lead**
84:18 206:4

**leaders**
16:12,15,19

**leadership**
21:20,23

**learn**
141:20

**least**
74:7 75:14
134:3,5,13,20
171:1 228:15
232:6

**leave**
203:11 241:19

**leaves**
22:15

**leaving**
241:22

**ledge**
59:5

**left**
17:10 92:13
216:12

**legal**
14:17 15:1
32:18 128:18
130:23

**legally.'**
126:24

**legislation**
8:4 19:11,18
20:19 30:9
32:25 38:19
39:20 42:2
50:15 54:23
59:3 65:24
66:9 67:24
72:12 73:14,
22 74:22
77:10,11 86:8
87:15 100:8,
9,25 103:21
111:7 124:7
131:8 140:5,
15 146:18
147:15
149:22,25
152:15 153:9
155:9 164:24,
25 165:2,3
166:17 172:11
179:5 202:17
203:12 205:3
213:19 216:14
218:12 220:23
225:7 233:3,
18,20 234:9
238:17,22
243:8 244:24
245:9,11
247:21 249:5
253:13

**legislative**
6:15 7:2,20,
22 8:11 12:9
13:10,12,17,
19,22 20:19

21:10,16
23:22 30:15,
16 32:8,24
33:16 35:9
38:17,20
40:23 41:7,8
44:10 46:16
48:8 50:17
51:6 52:15
53:8 54:8
55:21 57:25
66:3,17 70:1,
17 71:2,15,24
73:16 74:5
76:9,17,23
78:6,22 79:6
80:4 84:1
88:24 89:2
91:7 94:12
96:10 97:8
100:3,23
101:1 102:17,
24 103:13
104:14 105:2
110:6,15
113:13 114:1,
15 116:9,24
117:17 124:4,
8 125:8
127:22,23,24
128:22
129:10,20,24
130:8 132:24,
25 133:19
134:8 136:6
138:6 144:6
148:5,22,24
150:3 152:6
154:21
155:11,12,14
157:4 165:20
166:24 170:1,
9,10 171:14
177:6 182:8,
20 183:12
186:16 188:20

189:22 190:17
192:2 193:24
194:15 195:17
196:19 197:1,
12 199:3,8
202:22 203:21
206:15 208:2
209:18,19,21
210:4 211:4
213:10 214:9
219:15,17
220:24 221:11
224:8 225:8
235:7 236:4,
13 238:19
239:4 243:6
244:11,25
245:10,14
247:23 248:15
249:3 250:2,4
251:11 252:5,
19 253:6

**legislativel
y**
152:11 248:18
250:23

**legislator**
8:13,19 13:10
25:10 77:9
118:6 176:18
193:23 195:1
236:21 248:16
250:1

**Legislators**
24:11,15,16
25:4,13 59:4
111:9 118:15
123:11 144:24
162:18 167:7,
18 175:4,13,
16 176:9
184:22,24
185:25 186:4
189:12 197:8,

9 226:20
236:18

**legislator's**
78:7,23
188:19

**legislature**
11:9 24:7,17
30:3 38:13,25
39:14 40:2,25
41:17 43:2,6
44:1,2 77:7,
13 82:18
103:5 111:3
113:21 114:3
118:13 123:3
124:1 148:16
167:6 186:13
188:5,13,15
201:25 230:18
235:4 246:3

**length**
53:12 201:20

**lengthy**
42:19 166:12

**Leo**
185:19,20

**less**
6:22 35:5
37:6 84:17
148:18 173:7
250:21

**Leticia**
19:10

**Let's**
53:5 66:24
76:25 77:3
125:24 155:20
158:1 199:12,
13 210:7
228:19

**Letter**
4:5,6,8,12
60:2,4 63:9,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

282

15 64:25
66:21,24,25
98:20,22
99:2,5,14,15,
24 100:5,14
101:5,8,15,21
149:8,11
152:9,13
154:15 176:5
215:10,12,16
216:7,11,23,
24 217:14
218:1,8

**letterhead**
60:13,20

**letters**
101:6,17
149:15

**letting**
212:19

**level**
75:12 167:25
202:9

**license**
14:15 45:8
72:23 73:5,8,
12 180:14
194:5,11
195:2,6,8
203:2 232:4

**licensed**
14:8

**Lieutenant**
17:20,22,23
22:12,15,18
59:13 92:18
93:2,10
94:19,20
98:21 99:3,
15,23 100:13,
15 101:7,17
146:22 160:13
178:3 215:11,
13,20 216:8,

10 220:2

**likely**
109:1 203:18

**limit**
139:5 213:3

**limited**
161:20 179:8

**limits**
150:20 151:13
161:24,25

**Linda**
27:23

**line**
43:17 87:23
126:18,19
133:24 134:1
135:21,23
152:25 180:21
254:4

**lines**
115:8 126:20

**list**
16:3 60:17,19
106:11 110:12
158:7 239:12

**listed**
55:2 69:7
112:12,23
128:9 144:9
159:6 180:19
207:1

**listen**
34:2 227:25

**listening**
34:14

**listing**
177:18

**lists**
81:7 179:15

**litigation**
10:15,16 15:2
155:2,9

**little**
8:24 10:20
107:11 108:3
117:20 173:17
180:1

**living**
99:19

**LLP**
2:13

**lobbyist**
157:3

**local**
85:11,13
203:8

**locally**
122:17

**located**
207:16

**log**
120:3 157:5
159:5 243:25

**logical**
59:18

**logistical**
33:25 53:13

**Logistically**
53:10

**logistics**
31:20 122:15
174:6,21

**long**
6:24 12:14
15:4 17:13
30:7 47:3
52:16 55:19
74:23 95:7
154:11
191:16,19
234:16

**longer**
151:5,8

**look**

19:25 21:5
35:25 46:3,
11,12,24 47:2
49:3,24 50:3
54:15 58:15
59:24 60:1
67:12 68:3
72:16,21
73:20 74:1,18
75:10,19,22
79:25 80:9
82:19 83:2
93:15 102:6
103:16 105:23
106:10 107:3
114:25 126:6,
11,19 129:13
130:17 131:24
132:9,21
133:21,25
135:9 146:9
149:13,18,20
150:8 151:21
154:13,18
158:5,7 159:1
163:15,20,23
172:9,13
179:11 180:16
189:6,9 197:5
201:14 215:6
216:3,6
218:20,22
222:2,10,12
223:14,18,19
225:17,24
229:2 230:4,
19 231:2,24
232:2 234:21
247:8,9
252:18

**looked**
62:6 67:9
73:13 88:9,22
185:11 243:1

**looking**

63:15 79:15
106:6 107:15
130:20 151:22
159:4 217:10
223:24 224:22
226:1,9

**looks**
35:25 49:4
54:19 55:3,5
62:5 80:10
137:8 157:9

**lose**
242:8

**losing**
96:21

**lost**
61:3

**lot**
19:10,11
20:3,4 21:18
30:8 48:19
51:14,15,20
57:15 71:20
72:11 74:22
110:22,23
112:24 128:14
154:6 156:18
227:4 244:15
252:16

**loud**
168:15 242:4

**louder**
194:13

**Lubbock**
16:19 30:19
31:15 32:5
169:11 244:9

**Lucio**
60:3,7,16
63:18 64:4,14
118:20 119:15
122:2,4
143:21



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

283

**lunch**
33:25

**M**

**ma'am**
15:8,10 23:8
24:12 26:5
31:24 36:2,16
41:15 55:22
58:5,11,22
60:5 73:4
101:4 105:21
137:22 138:1
149:19 194:3
216:5 217:3

**madam**
142:3

**Madla**
60:17,25

**mail**
55:10 70:7
71:3,11,23
72:8,12
237:11,20
238:3,11,21
257:1

**mailers**
243:12,19

**main**
22:11 178:16
241:16

**Mainly**
12:7,8 18:6

**maintains**
35:9

**major**
32:4 179:22

**majority**
89:4 90:7
93:4,7,11
97:24 98:3,10
139:9 140:18,
20 218:13

**makeup**
92:25

**making**
65:18 76:12
133:9 138:17
212:5,19
236:18

**mandated**
20:7

**manner**
252:20

**MARANZANO**
2:8 3:5 5:1,
2,8,15,21 6:2
13:15 14:1
19:21 21:1
35:20,22
38:5,22 39:24
40:17,24
41:12 42:7
43:11,21
44:12,22
46:1,5,18
48:10,24 49:1
50:18 52:20
53:2,14,21
54:4,14 55:16
56:10,25
57:18 58:1,
12,14 59:17,
20,23 61:15
62:2,17 63:8,
23 64:5,11,
13,15,20
65:1,8,17
66:1,4,12,20
68:3,13,19
69:2,20 70:5,
11,25 71:14
72:5 73:20
74:6,15 76:8,
12,22 77:1,
17,23 78:12,
14,20 79:8,

10,20,23
82:14 83:14
84:3,9,21
85:3 86:17
87:16 88:16
89:3,22 90:4
91:9,16 94:9,
18 97:11
98:8,14,17
99:13 100:4,
12 101:23
102:3,7,19
103:4,11,18
104:17,25
105:17,19
108:9 109:7,
16 110:11,16
111:1,14,21
112:16 113:17
114:4,12,17
115:2 116:13
117:2,10
118:2,19
119:23 120:4,
9,16 121:1,
12,24 123:24
124:9,15,16
125:1,20,24
126:2 127:12
129:1,12
130:2,17
131:10,18
132:6,20
133:20
134:11,18
136:24 137:2,
4,11,14
138:9,24
139:23 140:1,
11 142:5,9
145:2,21
146:1,7,20
147:17 148:1,
10 149:1,4
150:7,23
151:7,15,20

152:8,16
153:5 155:19,
24 156:22
157:11,13,
16,23 158:9,
16 159:4,8,17
161:1,7,14
162:14,18,22
163:13 164:5,
16 165:22
166:2 167:2,
14,16 170:4,
14,16 171:16
172:5,7
174:10
176:15,21
178:17,25
179:11 180:9
181:6,17
182:9 183:2,
16,22 187:2,
12,25 189:3,
11 190:1,19
192:8,18
193:5,25
194:10,16,25
195:5,13,22
196:11,15,21
197:3,13,23
198:7,12
199:13,15
200:18 201:9,
12 202:11,23
203:22 204:4
205:4,20
206:23 207:23
208:9,17
209:1,8
210:5,9,15
211:23
213:11,15
215:3 219:2,
20 221:6,19,
22,25 223:10,
12 224:10,15
225:10 227:20

228:19,22
233:24 235:13
236:17 237:5,
15,19 238:1,
24 239:6
240:1 241:24
245:16 249:10
258:2

**March**
149:9,12
154:15 163:19

**Maria**
28:19

**Marion**
103:19

**mark**
48:24 79:20
105:17 125:25
149:2 170:14
221:22
228:19,20

**MARKED**
4:11 35:20,21
48:25 58:12,
13 79:21,22
82:13 98:15,
16 105:18,23
126:1 137:2,3
149:3 163:12
170:15 172:6
215:2 219:1
221:24
223:10,11
228:21

**marking**
35:23 49:2
79:24 82:16
98:18 105:22
126:5 137:5
163:14 170:17
215:4 219:3
222:1 223:13
228:23

**Martinez**

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



Robert Duncan                                      June 7, 2012

284

28:19

**materials**
25:12 221:1

**matter**
5:4 38:12
44:17 53:20,
22,23 54:1,
10,12 56:6,7
66:15 69:17
76:21 83:14,
22 84:16
91:14 95:17
97:9 119:10,
22 120:10,14
121:10 122:15
130:8 148:24
150:13 151:3
153:2 166:24
170:9 178:11
206:15 212:8
227:15 233:2
245:14

**matters**
19:19 20:22
39:3,20 46:16
48:8 52:14,17
54:7 56:15
61:10,25
62:11,12 63:1
64:1,18,19
65:4 66:7,14
67:24 68:9,23
70:21 73:18
74:5 75:4
76:17 80:16
88:12 94:13
95:15 97:7
98:12 100:22,
23 102:17,24
103:8,14,23
104:15 110:8
113:12 114:1,
15,22 117:18
125:11 127:9,
21 128:22

129:20,22
132:19 133:19
134:8 136:7
138:6 147:14
148:4,5
151:4,9,18
159:14 162:9
165:19,24
169:25 171:13
177:6 181:11
183:11,12
186:17 187:8,
20 189:22,23
192:1,15
194:7 195:17,
18 196:19
197:1,12
199:2,7
200:12,13
202:4,5 208:1
210:23 211:13
217:21 219:15
224:8 227:13
235:6 238:19
239:4 245:20,
21 248:14
249:3 251:11
252:4,22
253:5

**McGahan**
135:23

**McGeehan**
135:13,14,15

**mean**
7:21 9:25
10:5 16:14
30:1,2,18
45:3 51:23
53:3 58:23
65:22 85:1
91:18,20
103:25 108:8
111:10,20
115:10 119:11
120:7 127:14

128:8 133:7
141:11 142:22
152:5,19
158:9 160:8,
24 168:15
171:18 173:17
178:25 201:19
214:5 218:6
236:2

**meaning**
167:9

**meanings**
90:15

**means**
68:8,15,21
79:1 108:4
134:6,13,20
159:21,22
209:12 214:7

**meant**
79:4 86:12
100:16 118:10
132:16 133:6
152:8,11

**measure**
214:11

**measures**
67:14,16
92:20

**Mecler**
26:25 27:2,13

**media**
33:9 99:4,5
101:9

**mediation**
11:8

**medication**
9:16

**meet**
16:16,21
31:12,17,19
34:3 113:23

**meeting**
31:7 205:25
244:14

**meetings**
12:14 24:1,19
29:19 30:1,8,
15,22 31:14,
15 90:16
128:4 244:1,
8,16

**Megan**
33:6,8,9

**Melinda**
26:1

**member**
7:10 11:8
15:12 20:9
24:5 27:3,7
30:22 34:13
52:1 60:18
90:16 105:9
122:14 161:17
168:22 169:11
170:21

**members**
16:12,22
18:8,10 24:17
32:7,16 51:18
53:11 56:8
57:9 59:14
60:6,8,12,14
71:6 87:25
90:8,15,24
94:22,24,25
95:9 96:6,22
105:7 108:19
117:25 120:19
121:2,4,16
125:15 136:18
139:9 143:10,
18,19 144:6,
8,17 148:1
160:1,7
164:23 165:7,

13 167:11,18
169:2 175:21
177:8,21
181:14 184:19
185:22
188:22,23
217:13,18
228:3 234:23

**memory**
47:4 83:1
117:20 170:24
193:11 204:13
241:13

**mental**
20:18 38:19
39:4,19,22
40:20 41:1,9
42:1 43:17,
18,22 50:15,
25 51:2 52:17
53:7 54:8
57:22 59:2
63:3 65:23
66:8,16 67:23
68:10,23
70:23 76:6,19
83:24 86:7,10
87:14 88:24
94:14 100:9,
24 103:21
104:13 111:7
114:22
115:13,17
116:8,23
118:6 120:25
123:9 124:6
127:25 128:20
129:9 130:9
131:7 132:18
134:9 136:15
144:17,24
146:18 147:14
152:14 170:9
179:25 181:12
188:21 190:16



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

285

194:21
202:16,21
205:2 206:14
208:7 219:16
220:22 236:12
237:13 238:16
243:8 244:24
249:8,24
250:12 253:13

**mentioned**
53:15 182:11
234:10 241:18

**messages**
34:24

**methods**
181:15

**mic**
144:21

**middle**
120:7,10

**Milam**
14:20

**military**
57:16 190:3,8

**million**
99:18

**mind**
143:25 220:18

**mine**
97:14,15

**minorities**
39:16 60:16
230:25 236:23
247:17

**minority**
10:5 16:9
60:8 74:2
84:14,24 85:4
93:14 95:14
113:24 123:1
124:3,21
162:2,7 163:6

165:1,7,12
166:4 167:7
188:16 217:18
220:14 231:16
235:5,18
240:23

**minute**
64:8 125:7
146:16 196:4,
5 210:2 216:7
239:21 243:5

**minutes**
12:16 50:3
59:16 98:24
187:3 258:2,3

**mischaracteri
ze**
182:24

**missed**
233:20

**missing**
158:22

**Misstates**
182:16 189:21

**modify**
197:9

**moment**
126:4 241:22

**Monday**
216:1

**monitor**
82:4

**month**
31:5 191:20,
21 232:7

**months**
31:2

**morning**
12:3 167:22
242:11

**most**
35:13 46:2

75:6 80:13,19
91:12 106:19
116:10 151:6
161:25 175:21
177:12 216:11
248:24 249:6
252:3

**mostly**
18:3

**motion**
215:21
229:12,16
231:3,6
232:9,12

**motivation**
20:18 38:19
39:19 40:21
59:3 65:23
67:23 103:22
245:8

**motivations**
39:4 42:1
44:6 66:9
77:25 131:8
134:10 147:16
188:22 202:17
220:23 237:14

**motive**
78:7,9,23

**MOVE**
19:8 20:14
57:16 79:9
160:2 233:15

**moved**
148:2,15

**moves**
22:19 159:25
233:18

**moving**
148:12 168:19
218:2

**Multiple**
92:11

**must**
22:16

**myself**
176:3

---
**N**
---

**N**
2:1

**name**
5:2,9 6:3
25:25 26:3,6,
15,21,25
27:16,21,25
28:18 33:6
60:24 103:19
175:10 255:7

**named**
28:21 177:8
256:17

**names**
32:17 60:12
143:20 176:25

**narrow**
62:4 204:22
205:9 226:16

**narrowed**
124:22

**National**
24:10,15
25:4,13

**natural**
206:1

**nature**
8:3,6 11:1
119:19 178:8

**near**
32:5,6 232:24

**nearly**
151:25

**necessarily**
82:3 106:2
108:18 233:5

238:22

**necessary**
36:8 85:19
203:18 233:13

**need**
21:13 45:7
46:6 52:8,12,
21 53:4 85:22
156:19 158:12
180:19 191:11
198:14 204:23
206:8,25
222:12 234:14
253:4

**needed**
73:13 89:18
201:6 202:2,
11

**needs**
16:21 20:12
190:22 239:9,
12,17

**negotiations**
11:8

**neither**
258:5

**never**
30:5 31:16
48:16 220:18
244:13

**new**
85:19

**newspaper**
128:2

**night**
167:19

**Nobel**
27:17,19

**nobody**
112:1 178:19

**nodding**
9:8

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



**non-Anglo**
10:6

**non-citizen**
23:16 102:14,
21

**non-citizens**
86:19 116:15

**non-photo**
45:10 55:1,12
80:23 81:4
180:10,23
181:9,15,24
182:11,14
191:24

**N o n -**
**substantive**
34:11

**non-white**
10:6

**normal**
151:5

**Normally**
18:13 56:18
161:22 207:17

**NOTARY**
255:12

**note**
13:15

**noted**
255:2

**notes**
13:6 239:22

**nothing**
21:1 105:9
162:22 212:15
251:6 256:20

**Notice**
4:2 36:4,5,6
52:2 150:9,
11,24 151:6,8
217:9,13,20

**notices**
150:15

**notified**
37:2 257:1

**number**
16:4 19:18
28:11 30:25
50:8 51:7,8,
10 53:12
54:23,25 63:5
71:4,6 73:12
80:5 81:7
91:22 92:15,
23 109:18
113:3 129:14
141:10 157:24
158:2 204:1
221:15 230:7
235:14,18
244:10 246:9

**numbers**
16:2,3 93:14
158:17 242:23
246:11

**numerous**
32:16 180:3

**NW**
2:10

**NWB**
2:10

——————
**O**
——————

**oath**
9:2 47:17
255:6

**object**
13:21 20:16,
23 51:1 53:5
56:23 125:7
166:22 178:20

**Objection**
39:17,18
40:23 46:15

52:13,23 54:6
56:16 70:1
84:1 86:6
89:25 91:8
108:7 109:3,4
110:14 114:2
117:16 121:6
124:4 133:18
134:7 136:14
148:21 165:19
176:12 179:7
182:17 189:20
192:1 193:1,
20 194:14,20
202:15 205:22
209:4 220:21
252:4,21
253:5,11

**objections**
162:12 194:19
196:23 212:5

**objective**
53:13 104:14

**observe**
209:6

**obsolete**
35:6

**obtain**
97:24 98:2,9
190:23,25
191:4,16
200:20 201:6
202:2,12,24
203:11 229:8

**obtained**
240:9

**obtaining**
199:19
200:11,25
201:21

**Obviously**
13:20 90:12
116:7 157:18,

19 212:12
228:1,17

**occasion**
220:18

**occasions**
166:13

**occur**
148:9 200:17
206:2

**occurred**
6:11 10:17
64:17 73:10
75:7 109:21
119:5,17
120:21 133:11
152:3 166:9
177:24 216:18
240:4 250:22
251:1

**occurring**
96:9

**occurs**
144:24 204:7

**offer**
241:10

**offered**
112:1,6
184:24 185:6
186:19,24
241:9

**OFFICE**
2:3 12:19
15:15 19:9
21:13 22:15
24:18 29:20
30:4,5,8
33:24 35:9
37:6 72:21
81:9 103:12
130:13 135:16
154:20 155:1,
7,13,24 156:1
157:7 171:8

172:22 173:8,
19 178:22
179:5 184:18
186:7,11
188:11 207:13
211:6 213:21
243:2,12
251:19 255:10
257:3

**officer**
22:17 257:2,
13,15

**offices**
1:15 15:9
72:23 73:5,8,
12 199:25
203:2,4,5,8
232:4 242:16,
21,25

**official**
1:6 55:10
256:6

**officials**
85:12,14,16,
20 104:22
122:17 185:24
186:3

**Ogden**
143:23

**Oh**
11:18 55:9
56:21 73:1
107:12 185:14

**Okay**
7:17,19 8:24
17:13 21:1,15
22:6 25:12
29:23 34:11
35:18 38:12
40:24 42:8
43:5,21 46:5,
13 47:12,18
48:23 49:12,
15,23 50:7



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

53:2,14 54:21
61:7,20 63:22
65:17 66:2,20
71:1,5 72:5,
16 74:16
79:20 80:12
81:3 91:12
92:13 94:1
99:1,2 105:14
106:6 125:16
128:7 133:5
135:6,9
136:24 137:12
139:19 140:1,
12 150:7
155:20 156:8,
12 157:16
159:9 164:2,
21 166:16
168:14 171:2,
23,25 175:23
187:2,4,12
199:6,12
204:17 207:8
209:25 216:9
219:7 220:2
221:10 222:14
228:19 233:25
235:13 238:6
241:17 242:5
245:25
246:16,23
248:7 250:7

**old**
60:20

**omnibus**
72:13

**once**
31:5 136:19
183:10 241:12

**ones**
19:22 91:17
121:24 158:22
177:11

**ongoing**
179:5

**Online**
4:4 82:18

**open**
158:12 232:5
241:19,22

**Opening**
149:9 203:9

**operating**
18:15

**Opiela**
27:21

**opinion**
91:6 100:17
104:3,8
119:13 120:25
248:24 250:16

**opinions**
39:19 42:1
54:9 59:3
65:23 66:9
76:20 87:15
124:7 147:15
202:16 238:16

**Opponents**
73:22 120:2,
15 160:17,20
161:10,16
217:17

**opportunities**
164:23

**opportunity**
205:15

**opposed**
77:8 78:7,22
118:16 119:12
121:10,19
130:22 138:22
144:20 145:3,
6,8 148:23
184:10

**opposing**
121:5 165:18
247:22 248:17
250:2

**opposition**
63:12 121:14
165:7,12,14
166:1 231:11

**oppressive**
130:22 131:23
132:11
133:15,17

**option**
192:12

**options**
54:25

**ORAL**
1:9 117:24
256:9

**order**
13:16,20
33:25 46:9
66:5 76:24,25
77:2,3,22
78:3 89:9,11,
13,18 90:6
138:22,23
139:17 154:3
157:1,2,19
158:7 160:3
181:4 191:12
204:24 210:7,
11,12,14,19,
24 211:2,7,8,
15,25 212:6,
10,21,24
213:9,14
248:15 250:3

**ordered**
77:5 78:5,17
79:5 157:3
210:12 241:20

**orderly**

159:25

**orders**
92:20 211:2
233:14 234:13

**organization**
29:1,4

**organizations**
30:23

**organizing**
159:24

**original**
106:3 176:14
218:23 257:2,
8,13,17,19

**ought**
34:14

**outcome**
258:9

**outlet**
99:4,6

**outreach**
16:8,10

**outside**
122:7 136:21

**outstanding**
248:24

**over**
11:10 12:2
13:13 20:3
25:14 31:8,10
36:9,14 37:5
48:17 50:3
51:11 91:18
112:24 143:11
157:21 220:5
227:3 241:17
246:10

**overall**
78:6,22 87:3

**overheard**
237:8

**overriding**
130:24

**overruled**
233:10

**overtime**
25:14 235:25

---
P
---

**P**
2:1

**p.m**
1:15

**PAGE**
3:2 4:2 36:13
54:17,18,19
55:7 60:1,3,
13 62:9 67:13
68:3,4 69:6
72:16,17
75:22 77:1,15
78:3,15
80:10,11 81:1
106:11 124:25
126:11,12,16
130:18 132:22
133:21,23
134:2 135:9,
12 137:7
151:2 152:5
154:13 157:2
163:20,24
164:10 172:13
179:14,15
204:16 210:11
219:6 222:10,
12 223:18
229:2,24,25
231:3 232:2
254:4

**paid**
203:11

**Panhandle**
32:3

**paragraph**



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012
288

63:10,19
66:21 67:1,2,
12 69:9 72:19
73:2,21 75:11
77:14 99:17
130:19 131:24
132:9 150:8
151:21
154:16,25
164:2 182:8
216:6 217:10
223:19 224:21
225:25

**paragraphs**
130:19

**parameters**
159:22,23

**paraphrasing**
230:11,13

**Parkway**
2:14

**parse**
181:3

**part**
20:7 21:9
59:7 72:13
80:13,19
86:18 92:22
94:4 96:2
97:13,17
106:19
116:10,14
118:8 130:22
131:22 143:13
144:23 176:6
193:4 197:4
212:13
235:13,17,21
240:13 247:25
249:4 250:2

**participation**
217:19

**particular**

24:18 25:8
77:14 83:12,
18 107:4
115:4 140:5,
15 144:2
179:12 228:4
232:24

**particularly**
16:9

**parties**
1:17 257:24
258:6

**partisan**
92:25 235:22

**partner**
14:21,22

**parts**
12:4,6,7

**party**
11:18 26:12
87:23 237:7
257:25

**Paso**
97:17

**pass**
49:9,11 51:22
82:10 97:25
140:17 169:23
234:6 253:15

**passage**
125:6 141:18
240:16,21

**passed**
21:6 31:11
48:22 49:7
56:18 82:9
83:2,3 109:23
113:10 140:19
175:21 193:23
232:21 233:4
234:7 240:17,
20

**passes**

20:11 21:4
83:16

**passionate**
168:16

**passport**
191:4,12,17

**PATRICK**
2:4 5:17

**Patriots**
29:5,10

**penalties**
131:2,6,12

**pending**
9:12 30:9

**Pennsylvania**
2:10

**people**
30:8,16,20
32:22 42:10,
23 83:10 95:2
99:18 118:9,
11 127:15,16
128:4 136:20
143:25 161:21
167:10 168:5
185:5,22
212:14 213:2
227:25 244:8

**percent**
31:8 72:21

**percentage**
15:25 93:13
102:8

**period**
91:18 112:24
115:24 177:25

**periodically**
16:5

**periods**
130:15 150:18

**permissible**
179:16

**permitted**
10:2

**Perry**
213:18

**person**
7:15 10:2
23:7 28:4,12
29:12 32:12,
14 99:20
116:19 117:14
126:24 133:15
190:22
198:19,23
202:23 219:12
240:3,8 255:7

**personal**
15:2 34:20,22
76:3 154:12

**personally**
40:1 255:6

**persons**
99:7,25
100:20 156:1
190:8 224:25
225:1 230:23,
24

**person's**
62:20 107:5,
18

**pertaining**
197:15

**PH**
2:6,11,15

**phone**
12:3,15,17
34:6 158:15
217:7 218:7

**photo**
9:23 10:1
48:6 55:1,6,
11 58:6 67:6,
16 69:12,24
70:14,21

73:22 74:3
75:13 76:1
79:14 80:23
81:8 88:6,11
99:6,24
100:19
102:14,20
103:5 104:22,
25 105:5,12
107:2 113:23,
24 180:13,19,
21 192:22
207:3 229:6
235:24 236:3

**photograph**
107:6,19

**photographed**
196:23 205:22

**photographs**
106:15

**phrase**
63:19 132:7

**phrased**
46:23 57:24
65:25 70:20
72:1 74:5
83:8 84:7,16
110:21 111:9,
19 124:8
129:19 138:5
144:15 147:22
196:13 227:16

**picture**
191:9

**piece**
233:20

**place**
129:17 160:5
193:12
197:17,24
198:2 218:15

**placed**
9:1 165:9



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

**PLAINTIFF**
2:3 11:23

**please**
5:4 6:3 9:7,
10 99:11
125:23 142:3
196:5 199:4
206:11 213:9
222:10 234:20

**plus**
34:13

**point**
10:14 59:15,
19 79:1 80:24
81:18 87:2
116:12 125:18
136:4 147:3
172:25 204:12
211:7,19,22
213:4 224:22
248:9 249:11
253:9

**points**
77:21 226:1

**policy**
35:16 63:11
85:25 130:14,
25

**polite**
211:6

**political**
107:8,20

**poll**
23:4 198:14

**polling**
197:17,24
198:2 243:2

**Pomeroy**
32:10

**population**
15:17,20
102:8,15,21

103:6 247:16
252:2

**Porter**
32:9

**portion**
222:23 226:5

**posed**
41:11 129:10
250:6 253:14

**poses**
229:9

**position**
22:12,15
56:11 113:21
114:4 129:16,
21 142:20
154:24
155:12,18
160:12 211:24
212:9 229:18
231:10 232:14

**possess**
112:11,22
113:7 187:18
194:11 201:17

**possessed**
74:3

**possessing**
230:9

**possible**
56:9 160:6

**post**
136:11 151:12

**post-hearing**
136:19

**posting**
150:15

**post-vote**
164:20

**potential**
30:16 124:20
199:18 238:14

**potentially**
41:6 158:15
243:7 245:12

**practice**
14:8

**preceding**
132:10 222:12

**precipitated**
253:3

**preclearance**
37:23 38:10
113:20 167:8

**precleared**
38:14 227:12

**preface**
227:17

**prefer**
202:21

**prepare**
11:25 46:12

**prepared**
47:10,14 48:2
63:4 221:16

**p r e -
redistricting**
15:18

**present**
9:25 45:1,2
80:21 94:23,
25 96:6,22
102:2,3 107:1
155:2,10
205:15

**presentation**
183:9

**presented**
39:8 80:23
251:14,23

**presenting**
125:15

**preserve**

86:3 114:10
115:15 209:6

**preside**
220:5

**president**
21:25 22:6,9,
16,19 206:1

**presiding**
22:17

**Presumably**
131:24 142:23

**pretty**
21:11,17 56:3
125:19 234:1

**prevent**
51:19 70:6
75:14 86:18
99:7,25
100:20 105:9
116:15 117:14
209:5,6,23
236:22 237:25

**prevented**
69:11,24
230:8

**preventing**
116:19

**prevents**
53:15 210:1,3

**previous**
74:11

**PREVIOUSLY**
4:11 79:21,22
98:14,16
105:18,23
218:24 227:21

**primarily**
15:1 16:7
22:17,20
33:10

**primary**
21:15 57:13

140:24 178:16

**principal**
99:20 130:25

**printed**
99:5 101:7

**prior**
65:18 67:10
141:8,9,16,
18 214:9

**priority**
129:15 130:2,
7,13

**private**
7:14 103:7

**privilege**
13:10,12,18,
19,22 38:17
39:23 40:23
42:6 43:20
44:10 46:16
48:8 50:17
51:6 52:15
54:8,11 56:16
57:25 62:12
63:2 64:19
66:3,15,17
70:2 73:17
74:5 76:17
77:5,6 78:5,
18 79:7 84:1
88:24 89:2
94:12,13
95:18 96:11
97:8 100:3,23
102:17,25
103:14
104:14,15
110:9,15
111:12 113:13
114:1,15
116:9,25
117:17 120:24
124:5,8 125:8
127:10,22



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

128:22
129:11,20,24
130:9 132:25
133:19 134:9
138:6 148:6,
22,24 150:3
152:7 157:5
159:5 165:20
166:25 170:1,
11 171:14
182:8,20
183:12 186:16
188:20
189:22,24
190:17 192:2
193:24 194:8,
15 195:18
196:19 197:1,
12 199:3,8
200:13 202:5,
22 203:21
206:16 208:2
210:4 211:4,
14 213:10
219:16 220:24
224:8,25
225:9 227:14
235:7 236:13
238:19 239:4
243:7 245:1,
10,13,14,21
247:23 248:15
249:3,17
250:2,4
251:12 252:5
253:6

**privileged**
120:3 151:19
152:12 190:1
200:15 245:2
248:18 250:23

**pro**
21:25 22:7,
10,14,16,19
243:21

**probably**
24:16 26:18,
19,20 28:10
30:21 33:5
35:12 55:25
91:11 93:3,6
110:2 118:21,
25 122:5
141:15
143:22,23,24
172:25 174:22
175:21 177:2
187:10 193:14
227:18 228:4,
14 232:18,23

**probe**
41:1

**problem**
70:16 86:5,7,
10 114:13,20
250:10

**problems**
23:9 32:21
46:20 47:7,
18,25 115:4
212:14

**procedural**
51:18 82:21
85:18

**procedure**
54:10 113:19
138:16 146:4,
5 151:4 161:5
219:22,24
256:25

**procedures**
44:14 52:16
178:15

**proceeding**
154:22 232:25
258:7

**proceedings**
11:1 44:13

**process**
20:20 21:7
38:20 41:10,
24 43:13 67:8
70:7 71:3,11
83:24 85:19,
24 115:13
119:8 124:13
125:14 138:16
144:24 148:23
164:25 165:2
171:10,21
178:7,13,14
190:17 202:16
206:20
219:17,22
224:9 237:14
243:8 245:8

**processes**
65:22 66:8
73:18 76:6
104:13 116:8
118:6 120:25
136:15 144:17
152:23 192:5
219:16 220:22
221:11 237:13
238:16 244:24
249:24 250:12

**proclamation**
214:16,19

**produce**
157:3 230:15,
22

**produced**
156:25 157:7,
25 241:21

**Progress**
178:13

**progressed**
252:17

**prohibited**
211:21 229:4

**prohibits**
210:25

**prompted**
58:23 167:24

**proof**
80:21 81:6
107:1 179:18

**proper**
78:6,18 160:4

**proponents**
160:17,20
161:16

**proposals**
111:15,16,22
186:24

**propose**
161:17

**proposed**
111:20 140:25
141:4 143:12
228:13 231:14

**proposing**
20:14

**pros**
40:10

**prosecution**
69:13,15

**prosecutions**
246:9

**protect**
77:6 209:23

**protest**
218:1

**proved**
255:6

**provide**
40:22 50:19
57:6 90:19
93:17 123:9
133:5 139:2
150:11,15,

20,25 180:5,
12 191:12
203:10 206:20
228:8

**provided**
61:17 62:15
217:13 218:24

**provides**
54:23 106:14
150:10 205:14
207:2

**providing**
132:17

**provision**
137:23 180:17
198:18,22
204:12 206:17
207:12
210:11,19
224:5 225:11
226:6,14
227:10 229:9

**provisional**
45:18,22 46:9
204:10,14,22
205:1 206:8,
17,20,21,25
207:10
222:15,17
226:2,5

**provisions**
80:6 180:11
196:1 197:15
204:11 206:19
224:23

**public**
15:15,16
18:4,11 19:20
20:22 21:2,5
37:8,12 38:24
39:3,9,12,
13,20,21
40:3,7,9,11,
21 41:5,16,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

20,22,24
42:2,9,13
43:2,7,8,15
44:2,14,18
46:20,24 47:7
50:10 52:17
56:10 57:18
61:11,25
62:11 63:1
64:2,19,21
65:5,19 66:8,
15 67:10,17,
24 68:10,23,
25 69:18,21,
25 70:3,7,22
73:10,25
74:8,10,17,18
75:3,8,16,17,
19 76:21
80:16 86:4,9,
13,14 88:13,
17 94:5
95:13,16,22
96:2,3,4,12,
13,14,15,18,
24 97:9,19,21
98:5,12
100:19,24
102:13,24
103:3,9,10,
14,16,23
104:1,4,15,19
110:17,23
111:4,11,16
112:10 113:5
114:5,18,23
115:7,9,19,
21,22,23
116:2,6,17
117:3,7,11,
18,19 122:20,
25 123:2,3,13
124:1,18,23,
25 125:11
127:15 128:23
129:2,22

130:1,4,6
131:1,11,15,
16 132:2,16,
19,24 133:2,
22 134:5,12,
19 135:3,5
136:8 142:20
147:18 148:5,
14 149:23
151:4,10,16
152:12,20
153:11,13
155:13 156:2
159:14 161:5,
25 162:1,10
163:2 165:5,
6,14,15,23,25
166:1,3,19
167:12,19,24
172:18 181:7,
11,13,18,19
182:10,13,18,
24 183:1,6,
11,23 186:17
187:9,10,16,
17,21,22
188:3,14,25
189:5 191:22
192:4,11,16,
22 193:14
195:1,8,15,19
196:8,9
197:2,14,19,
23 198:3,8,12
199:7,9,18,
22,24 200:1,
13,15,19,23
201:16 202:1
203:1,16,22,
24 207:23
208:3,5
210:1,6 212:2
214:13,15
217:22 218:4
219:11,18
220:12 222:5,

22,23 224:4,
11 228:5
229:15,18
231:9,10,13,
19,21,25
232:14,19
235:3 239:15
240:14 242:20
243:14,15
245:4,5,21,23
246:1 248:21
249:11,17
250:9,15,20,
23 251:1,7,14
252:11,13,22
253:8 255:12

**publicly**
19:23 124:19
136:4,12
163:4 167:5
186:13 187:6
189:12 198:25
200:9 231:6
244:18 252:8

**pull**
76:25

**purported**
117:5

**purpose**
10:16 18:7
34:8 41:19
42:15 43:4,13
44:1,3 57:4,
6,11,13,14,17
61:7,9,14,23
62:1,13,14
70:17 76:3,8,
9,11,24 77:3,
7,10,15,19,20
78:1,7,9,22
79:3 86:2,18
89:17,25
90:2,11,20
91:4,7 114:7,

9,10 115:6
116:14 138:7,
10,12,17,19,
21 139:1,2
147:11 180:22
181:1,4,8,
15,17,22
182:4 183:7
192:23
207:18,20,
21,25 208:2,
6,11,12,15,
19,21,22
209:3,5,10,
13,16,17,19,
20,21,22
225:4,7,8
235:14,17,
20,21,23,24
236:3,15
237:24 238:8
240:18 241:1

**purposes**
90:9 145:13
189:18
208:10,18
209:14 255:8

**pursuant**
1:16 157:1
256:24

**put**
21:9 70:16
79:12 84:17
117:23 136:24
213:2 227:6,
23 228:1
251:14,18

**Putte**
19:10,14
118:21 122:1
135:12,21
143:22 149:9,
14 176:3
177:5 215:9

217:6 218:7

**Putting**
19:1 78:2
118:9

---

**Q**

---

**qualify**
141:19

**qualifying**
76:1

**qualitative**
116:22 131:5
148:22

**quality**
160:5

**quarter**
67:5

**question**
8:15 9:5,7,
12,13 19:3
20:17,23
38:6,18 40:15
41:11,23
42:18,20
43:14 44:6,8
46:17,22
50:16,20
52:14,19 53:9
54:6 57:22,24
58:4 59:2
61:13 62:11
64:9,21 65:21
67:22 68:11
69:17 70:15
74:4,10,12,
14 76:5,23
83:7 84:6,15,
18,20 87:13
90:5 92:7
93:21,24 97:8
98:6,12,13
99:10,12
100:2 102:4,
16 103:22



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

292

104:18,20,23
109:6 111:9
113:25 114:2,
14,23 117:9
120:23 121:21
123:7,11,12,
24 124:14,24
125:12 127:10
129:10,19
131:9 132:3,
5,7 134:8,15
136:23 137:13
138:5 140:8
142:2,4,15
145:2,13
147:14,16,21
150:2 155:16,
22 167:12
170:1 180:25
181:5,12
182:2 183:11,
19 189:2
192:17 193:24
196:5,6,10,
18,25 197:11,
20,22 199:4,5
202:18,19
205:5 206:11,
12 208:16,24
209:2 219:14
224:7 225:6
227:17 231:21
235:7,10
236:9 237:12
238:4,7,13
243:11
245:10,17
247:25
248:14,20
249:2 250:4,
6,13,19
251:4,9,10
253:6,14

**questioning**
211:12 241:17

**questions**
9:8,9 13:19,
21 43:18
78:5,6,18,21
108:20,23
109:1 152:12
171:9 210:12,
18 211:1,7,21
212:2,4,15
237:2 242:3
243:6 252:17
253:16,17

**quick**
54:15

**quickly**
148:3,13,15
163:22
233:15,19

**quit**
35:4

**quite**
19:5 30:18
35:3 107:10
119:1 217:16

**quorum**
95:7 160:4

**quote**
133:23 248:4

---

**R**

**R**
2:1

**race**
61:1 97:11

**racial**
60:16 194:10
195:2,5
230:24 236:23

**radio**
128:2

**raise**
156:24 216:23
220:12

**raised**
95:23 122:25
124:2 162:6,
14,19 166:11
197:10 200:5

**ran**
169:24

**randomly**
178:6

**ranges**
157:8

**reach**
20:13 80:24
90:18

**read**
65:6 77:22,24
78:10 98:24
99:12,17
101:19 104:8,
10,12 128:1
142:2,4
154:16,17
155:4 157:13
158:16
164:14,19
192:19 196:5,
6 199:4,5
206:10,12
216:25 221:3
255:1

**reader**
164:9

**reading**
77:4 78:2
107:11 257:6

**ready**
51:8 199:11

**real**
239:22 248:11

**really**
8:4 18:6
21:17 37:20,
25 39:25

43:22 83:10
85:13 91:2
92:16 100:17
119:11 122:13
132:4 141:11
164:18 193:7
214:22

**realm**
115:5

**Re-ask**
238:7

**reason**
9:20 112:5
129:1,6 131:1
163:9 166:20
178:16 180:4
186:18 209:8
212:13 222:9
228:1 250:19
254:4

**reasons**
50:9,12,21,
23 51:21
144:12 145:5,
7 152:22
165:17 180:5
182:2,6,19
205:18 208:4
221:14 228:2

**recall**
18:13 24:8
27:15 28:17
29:18 42:16
46:25 47:1,
15,18 49:20
55:17,18
56:12 57:3
58:6,9 60:22
68:2,12,17,
20 69:1 71:10
72:14 75:7
79:14,16,18
81:17,21,23
82:7 83:12

85:9,10,13,
17 86:1,25
87:9,22 93:23
94:1,3,24
97:2,23
98:13,22
101:16,20,21
103:1 106:4
109:9 110:22
111:1,3
112:5,9,18,
19,20 113:8
116:11 119:11
120:12,17
122:13,24
124:23
127:17,20
128:11,24
130:12 133:3,
10,12,13
136:1,2,4,9
137:1,17,19
140:16 142:18
145:7 147:10
148:1,7,8
149:13,15
153:16,18
154:9,10
160:19 162:2,
5,6,12,14,18
163:8 164:16
165:16,17
166:2 167:16
168:1,6,9,
10,15,16
174:16 176:5,
23 179:1
182:18 183:25
184:10 185:20
187:5,23
188:8,9,10
190:11,13
192:18 193:15
194:4 195:7,
10,21 198:25
199:23 205:5



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

293

214:22 215:16 216:22,24 217:8,11,12 218:3,4,10,14 220:17 221:3 222:22 223:1, 4,6,9 224:15 225:23 226:7, 22 227:7,21 228:7,12,14, 15,16 229:21 231:12 232:1, 21 233:1 241:15 242:21,23 244:5,13 245:25 246:19 248:2 251:17 252:23

**recalls**
116:6,10

**receipt**
157:19 257:1

**receive**
36:6 40:10 245:6

**received**
13:16 24:3 25:12 36:5 245:5 257:22

**receiving**
216:24

**recess**
59:22 156:21 199:14 239:25

**recite**
239:13

**recognize**
58:16 80:1,2 105:24 126:7 137:7 149:5 163:16 170:18 172:10,11

215:6,7,20 223:15 228:24,25

**recollection**
18:20 49:16 50:2,4 63:24 64:6,10,16 65:11 71:17 72:7 75:20 82:20,23 84:9 86:16 87:4,5, 20 88:2,5 96:8 101:11 104:6 111:25 112:16 115:3, 12,17,19 118:3,4,5 123:6,8,18,25 125:2,3 131:17,19 134:25 153:25 154:2,5,8 162:25 166:8, 10,16 170:25 171:3 174:24 182:22 183:3, 6,14 184:17 187:13,14 192:8 193:6 196:15 197:6 198:4,6,9 200:4 201:11, 23 203:13 204:4,5 216:17,20 218:20 223:22 229:22 234:23 235:11 238:23 251:25

**recommendatio
n**
62:23 63:24 65:2,12 76:13,15 77:21 88:6,11

**recommendatio
ns**
62:19 63:11 75:23 76:16

**reconstruct**
120:20

**Record**
4:4 5:6 6:4 13:16,23 19:20,25 20:22 21:2,6, 9,10 35:24 38:24 39:3,8, 9,12,13,21 40:3,7,11,22 41:5,14,16, 17,20,22,24 42:2,9,13,14 43:2,3,6,7,8, 10,11,16,24, 25 44:2,7,8, 18 46:20,24 47:1,2,3,7, 11,21,22 48:3 49:24 50:5,10 52:17 57:19 58:3 59:6 61:11,16,25 62:11,15 63:1 64:2,19,21 65:5,19 66:8, 16 67:10,18, 25 68:10,23, 25 69:18,21, 25 70:3,7,22 71:17 73:10, 17 74:1,8,11, 17,18,23 75:8,16,17,19 76:18,21,22 80:16 82:10, 11,22 85:5 86:4,9,13,14 87:9,24

88:13,17 94:5 95:3,13,16, 22 96:2,3,4, 7,12,13,15, 18,24,25 97:9,10,19, 21 98:5,12, 19,22 100:19, 24 101:1 102:13,24 103:3,9,10, 15,16,23 104:1,4,16, 19 110:17,23, 25 111:4,11, 16,24 112:3, 7,10,14 113:3,5,9 114:5,18,23, 25 115:7,9, 14,19,21,22, 23,24 116:3, 6,17,22 117:4,7,11, 18,19,22,23 118:1,10,12 122:20,21,25 123:2,4,5, 13,17,19,23 124:1,18,23, 25 125:4,11, 24 126:8,13 127:4 128:23 129:22 130:1, 6 131:1,15, 16,21 132:3, 13,16,19,25 133:10,22 134:5,12,17, 19,24 135:2, 5,13 136:3,8, 21 137:6 140:19 143:15 144:19 147:18,23 148:5,9,14

149:23 151:4, 10 152:13 153:11,13,23 154:4,5,11 155:13 156:24 157:14 158:17 159:14 160:17,21 161:5 162:10, 11,17,21,23, 24 163:1,7, 11,17 165:5, 10,23,25 166:1,3,6, 15,19 168:2, 8,23 170:2,5, 6 172:9,19 173:15 176:7 181:7,11,13, 18,19 182:10, 13,18,24 183:1,7,11, 23 184:6,11 186:17,21 187:9,10,16, 17,21,22,24 188:3,7,14, 25 189:1,5,6, 10,14 191:22 192:4,11,16, 23 193:4,15, 17 194:23,24 195:1,8,12, 15,19,24,25 196:8,9 197:2,5 198:3,8,10 199:7,9,18, 22,24 200:1, 13,15,19,22, 23 201:4,16, 24 202:5 204:3,7,8 207:23 208:4, 5 210:1,6 212:2,20

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652



Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

294

215:5 217:22
219:11,18
220:16 221:18
222:23 223:2,
25 224:11,17,
18 225:3,13,
16 228:5,10
229:15,17
231:24 234:2
235:3,12
239:15 240:2,
15 242:20
245:21,24
246:1,6
248:7,9,22
249:11,17
250:10,15,20,
23 251:1,7,
15,16,21,24
252:11,13,14,
22 253:8

**recorded**
21:8 39:7
42:11,22
229:12

**records**
35:9 129:2
136:11 173:9
243:20

**redistricting**
6:10,18 8:12
11:21 32:2

**redress**
213:6

**reduced**
256:21

**reelection**
61:3

**Reeves**
1:12 256:12
258:12

**refer**
10:5 19:19

20:22 39:20
52:9 59:6
61:10,24
62:10,25
64:18 65:4
66:7,15 67:24
68:9,22 70:3,
22 73:17
76:18 80:15
86:9 88:12
97:9,10 98:11
100:23 101:1
103:10,16
104:15 106:22
110:25 114:22
117:17,19
123:2,19
125:4,10
128:22
129:22,25
131:16,21
132:2,18
136:7 148:4
150:21 151:1,
9 152:2
159:13 181:8
182:25 183:10
189:1 195:18
198:3,10
200:1,21
201:4,10,24
203:12 204:3,
8 219:19
223:2 225:2
235:11 250:20
251:20,24
252:11,14

**reference**
195:24

**referenced**
20:15

**referencing**
124:22

**referral**

146:22 147:19

**referred**
42:2 49:13
50:1 52:22
69:13,14,15
82:7 104:1,3
145:13,21
146:11,12,13
168:25 169:16

**referring**
12:11 32:23
39:21 53:17
62:8 66:24
72:22 73:5
77:1 90:22
105:20 106:5
107:10,22
120:13 135:15
146:14 147:11
152:18 173:24
198:22 205:21
216:7 225:1

**refers**
69:1 107:17
133:6 153:7
171:11

**reflect**
83:1 84:13
85:5 87:9,24
88:18 95:23
97:1,21 106:2
111:24 112:3,
7,14 113:3,9
117:20,22
123:5 140:19
153:23 154:11
160:21 162:11
163:8,11
166:6 168:8
181:19
187:22,24
189:14

**reflected**
41:24 123:17

136:10 148:8
165:8 168:23
195:11 232:25
247:8

**reflecting**
172:15

**reflection**
154:5

**reflects**
40:7 46:20
48:3 50:10
61:16 62:15
63:4 64:3,13
65:14,16
86:14 160:17
166:1 182:25
187:10 251:16
252:13

**refresh**
63:23 71:17
82:25 104:5
170:24 171:3
204:12 218:20
223:22 234:22
241:13

**refreshes**
49:16 82:20,
23

**regard**
11:7 19:12
31:13 32:18
41:25 42:9
44:20 72:12
85:18,25
114:20 125:14
130:13 162:23
178:14 184:12
200:1 204:7
206:22 214:25
228:11 246:20
251:20 257:16

**regarding**
63:11 65:2
78:6,21 86:10

104:22 113:4
115:16 131:8
163:21 164:6,
25 188:25
201:16 231:20
244:21,24
247:21

**regardless**
76:2

**regards**
38:25

**regime**
117:12

**region**
15:23

**register**
239:10

**registered**
74:2 112:11,
21 187:18
194:18

**registrar**
46:7 207:9,
11,13

**registrars**
85:16

**registration**
45:1,5
101:23,25
102:1 188:1
239:8,17
258:16

**regular**
10:3 16:17
89:9,10,18
138:23 204:24

**rein**
211:18

**reined**
213:5

**relate**
44:15 106:25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

219:16 221:2
247:24
**related**
19:2 22:22
23:1 38:8
40:4 62:7
70:12,14
71:3,22 99:3
142:11 157:1
165:2 166:17
181:8,25
182:11 183:7
198:14 213:19
245:9,22
258:6
**relating**
80:20 138:14
139:4
**relationship**
10:19
**relative**
194:17
**release**
257:13
**released**
257:16
**relevant**
184:11 249:6
**relief**
211:10 212:22
**religious**
196:23 205:22
**rely**
163:1 166:15
**remained**
218:14
**remember**
6:16 7:6 8:1,
2,5,6 12:19,
20 18:21
32:17 47:22
48:9,13,15

69:20,23
71:22 74:20
83:10 112:1,
25 118:9,25
121:18 127:1,
3 133:9
144:3,5
168:4,20
169:12,19
178:20 179:2,
3 186:19
193:13 195:9
198:16,17
205:6 214:23
216:25 217:2,
14,23 227:1,
2,4 232:17
241:11 243:18
244:19 249:25
251:22
**remembered**
227:6 241:12
**remind**
226:6 234:19
**removal**
182:11
**remove**
227:8
**removed**
134:22
226:14,24
246:24 247:1,
2
**removing**
180:22 181:8,
24 192:12,23
**repeat**
52:19 88:7
117:9
**rephrase**
64:9 84:17,19
142:8 205:7
**replace**

35:4
**replaced**
35:6
**Report**
4:3 58:9,18,
23,25 59:6,25
60:10,14
61:4,8,17,19,
21 62:2,5,14
63:4 65:6,7,
14,16,19
66:6,10,19
67:10 68:2,4
70:5,11,12
73:19 74:23
75:2,7 77:13,
15 78:24,25
79:5 88:5,10,
14,19 101:9
230:15,18,20
**reported**
99:4
**Reporter**
1:13 9:3
142:3 145:20
189:7 195:4
198:6 199:3
205:17 256:12
**Reporter's**
3:8
**reports**
73:24
**represent**
15:23 16:22
49:10,25
97:13 106:9
155:8 157:23
219:4
**representatio
n**
10:13 126:25
**Representativ
e**

86:22 185:8,
16,19 210:17,
20
**Representati
ves**
7:11 15:13
211:19
**represented**
10:9 29:12
**representing**
5:3,10 84:24
85:3 97:17
162:2 212:8
222:8
**Republican**
25:4 26:12
27:5 28:5
**Republicans**
93:3,11
**request**
36:12,15
37:9,12 97:2
173:19 243:12
**Requested**
99:12 142:4
196:6 199:5
206:12 257:1
**requesting**
76:2 189:13
**requests**
37:3 73:15
129:23
**require**
38:18 40:16
51:24 55:3,5
76:16 89:4,6,
7,8,14 90:12
106:25 113:20
116:23 131:7
138:5 151:18
195:17 202:20
203:10 221:15
236:11 248:14

**required**
38:11 128:13
150:20 151:12
187:19 204:23
206:9,21,25
207:3,4,11
222:19 229:8
230:6
**requirement**
9:25 18:14
37:23 38:7
89:17 90:5
132:1,14
197:16,17
**requirements**
37:18 44:20
99:7,25
100:20 113:11
137:24
138:15,18
139:4 141:25
142:7,12
143:4 198:1
205:10,25
230:16,22
**requires**
39:18 51:14
52:1 67:22
90:7 193:20,
21 210:25
214:8 230:14,
20 232:4
237:13
**requiring**
73:22 80:20
106:25
**reread**
99:10
**reserve**
253:17
**reserving**
13:24
**resigned**

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



Robert Duncan

June 7, 2012

296

15:13

**resolution**
137:18 138:14
139:4 140:23
141:8,17,21
142:11,21
144:9,13
145:4,8 152:3
214:8 219:12

**resolve**
11:9 215:21

**respect**
41:10 77:6
78:4,8,16,23
213:9

**respectfully**
41:3

**respecting**
213:13

**respective**
1:17

**respond**
9:7 98:7
163:5 167:7
189:25 197:9
217:4,5 218:7
235:10

**responded**
157:19

**responding**
149:12

**responds**
135:23

**response**
41:4 149:18
157:18 158:5
165:6,8,14,16
196:16,20
208:16 218:5

**responses**
157:4

**responsibilit**

**ies**
22:9,21 220:9

**responsibilit
y**
22:11 159:18
257:16

**responsive**
36:14

**restate**
155:23

**restrictions**
210:13 211:1

**restrictive**
134:3,6,13,20

**result**
24:22 70:18
142:14

**resulted**
69:15

**retaining**
199:21

**retention**
35:15

**Retirement**
25:2

**retrogression**
42:24

**retrogressive**
39:15 40:5
42:9,17

**return**
257:1

**returned**
257:10,20

**reveal**
20:17 38:18
39:4,18 41:6
48:8 50:14,24
52:14,17 53:6
54:7,10 56:15
59:2 62:12

63:1 64:1,19
66:8,14 67:22
68:10,23
70:23 73:18
75:9 76:17
83:8,24 86:10
88:24 94:13
96:7 97:7
100:24
103:14,20,22
104:12 106:23
110:8 113:12
114:1,21,24
116:23 120:1
121:9,21
127:9,21,24
128:19,20
129:8,20
131:7 132:18
136:15 138:4,
5 146:17
148:5 151:17,
18 152:14
169:25 170:9
174:8 178:11
181:11 183:12
186:16,22
188:20 189:23
190:16 192:4
193:21 194:7
195:17 199:2,
7 200:12,13
202:5,15
205:2 206:14
219:15
220:22,25
221:11 227:13
235:6 236:25
237:13
238:16,18
243:7 244:23
245:11,20,21
247:20
248:13,14

**revealing**

39:22 51:2
67:5 94:12

**review**
12:6 101:13
220:19 257:3,
9,14,19

**reviewed**
12:4 13:3
221:1 248:7

**reviewing**
136:2

**reviews**
90:14

**right**
8:10 11:14
12:10,13
13:24 18:1
20:1 29:18
31:23 32:25
33:15,21
34:19 38:5,23
47:6,12,13,
15 55:20
62:21 63:21
65:8 79:8,16
84:19 99:8,23
104:7 105:8
124:15 142:23
147:7 158:9
160:10 164:11
167:17 168:13
169:8 174:18
177:22 192:20
205:23 218:1
224:18 226:3
234:3 235:1
239:13 242:18

**Rights**
37:15,22 38:7
42:5 44:16
113:22 128:18

**ringing**
172:3

**RLW**
1:4 256:4

**RMC**
1:4 256:4

**ROBERT**
1:9,11 3:4
5:19,22 6:5
215:21 255:1,
3,6 256:10,16

**Rodriguez**
230:4

**Rogers**
27:23

**role**
81:9 125:5,8,
13 159:10
168:24

**roles**
21:20,23

**Room**
2:10 5:9 30:6

**routine**
37:6,8

**rule**
90:1,10,16,
21 91:1
92:17,19,20
93:1 137:21,
25 138:3,7,
11,12,15,20,
25 139:12
140:14,25
141:22 144:2
146:6,7,10
147:3,8,25
153:14,20
154:4 161:18,
20 218:11,14,
16,21 219:5
220:8

**Rules**
4:5,9 44:19
51:18,24



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

297

89:7,8,15
94:20 137:8,
15,18 138:3
139:11,15,22
140:2,6,14,23
141:4,21,24
142:9,13,16,
20 143:3,4
144:9,13
145:8 149:11
150:15,16,19,
21 152:3
159:23 203:8
218:22 219:5
252:17,18
256:24

**run**
15:14 52:5
72:2 89:1

**rural**
16:6 244:9

**Russ**
26:6,7,9,10,
13

---

**S**

**S**
2:1

**Safe**
25:18 224:25

**Safety**
203:1

**San**
26:9,10,13
31:17 32:5

**Sara**
32:14

**sat**
211:17

**satisfy**
120:15

**Saturdays**
232:6

**save**
34:24

**saw**
242:20

**saying**
20:1 29:15
55:18 57:8
89:20 94:7
132:8 133:11
144:4 173:18
179:2 207:25
222:16 245:7,
15

**says**
45:16 46:4
55:8,15 62:5,
18 63:9,10
64:12,24
66:22 67:13
68:7,14 69:9
72:17,18,20
73:6,21
75:11,23 76:1
77:4 78:3
99:17,22
100:7,11
107:4 116:10
126:20,22
127:4 129:14
130:20 131:22
134:2 146:9
149:21 150:9
151:22 155:7
163:21 164:7,
22 171:20
180:17 210:12
215:19,25
224:24 230:10

**SB**
4:10,13
155:25 163:5
235:4

**scenario**
130:23

**scheduling**
12:23

**School**
14:6,18 18:4,
11

**scope**
79:6 179:8

**SCOTT**
2:13 5:13

**seal**
255:10

**search**
36:17,25

**searched**
36:20

**seat**
207:15

**second**
11:15 36:13
45:23 63:9,
10,16,19 67:1
72:18 73:1
75:24 99:14,
16 155:16,20
163:20,25
216:6 220:18
236:6

**Secondly**
41:23

**secret**
245:3

**Secretary**
19:5,8 20:12
21:12 35:11,
15 67:3
135:16 171:1,
6,8 188:4,11
230:6,14,17

**Section**
37:14,19,22
39:1 44:15
54:15 55:8

62:5 72:19
80:9,10
106:10 107:3,
4,15 113:11,
16,18,22
137:20,24
138:3 179:13,
16,18 180:11,
15,17 192:19
204:14,15,
17,19 205:21,
24 206:18
207:2 218:16
226:9,10

**Secure**
25:23 125:5

**see**
47:21 50:3,4
52:3 54:22
55:7 60:4
61:7 62:17
66:22 68:4
69:2,9 73:2,3
75:24 80:22
81:2 99:2
101:5 106:11,
14 107:16
126:17 131:22
133:23 134:2
135:11,21,25
137:23 139:8
148:14 152:16
158:15 163:20
164:15,22
165:4 179:15,
20 180:18
215:19,25
216:7,10,15,
16 219:5
222:15
224:21,24
225:18,22,24
229:4,11
230:1,2,5
232:3,8,9

**seeing**
24:8 101:16,
20 184:6

**seek**
15:15 211:10
212:22 213:6
227:19

**seeking**
41:25 149:16

**seen**
16:2 23:12,16
49:6 101:13
163:23 215:7,
8 234:12
244:21
245:18,23

**segment**
252:2

**seldom**
30:4

**select**
17:9,25 18:7,
8,15

**selected**
87:12

**Senate**
4:5,6,7,9,10
15:4,14 17:5
18:9,18 21:21
35:11,15
39:6,10,11
45:13 51:12
53:18 56:2,3,
21 57:1,10
59:7,14 77:8,
12 79:16
83:6,20 87:7,
25 89:5,7,8
90:6,8,15
91:3 92:8
93:1,18,23
94:2,6,22
95:9,20 96:1

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652



Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

105:15,20,25
106:3,18
108:5 109:12
110:7 111:5,
17 112:12,23
113:10 114:7
115:4 116:15,
18 117:4,11,
12,14 118:16
119:3,15
122:8,12,17
123:1 124:3,
20 125:6
126:3,8 129:3
135:3 136:25
137:8,14,18
139:9,11,18,
22 140:2,6,
17,23 141:24
142:9 143:11,
13,16 144:1,
18,22 145:19,
22 146:4,10,
11,14,22
148:15,18
150:10,11,15,
19,25 151:3,
14,25 152:1
153:14,15,19,
21 156:3,6
159:9,11
160:16 161:17
162:1,3,7
163:3,18,22
164:6,19,23,
24 165:7,13
166:4 167:5,
6,8,11,19,25
168:22,24
169:3 172:12,
24 173:22
174:13 175:5,
8,14,17,22
176:11 178:3,
18,22 179:11,
17,23 180:9

181:9,14
183:17,24
184:2,13,22,
23 185:8,13,
16,19,25
186:4,14,20,
24 187:1,7,19
188:5,17
189:18 190:14
192:12,14,19,
24,25 193:3,
4,13 194:6
195:15 196:24
197:9,15,24
198:1,14,18
199:1 200:8,9
202:8,9
203:10,19
204:11,19
207:1,18
208:10,12,23
209:10,20
210:1 213:16,
22 214:13
215:21,22
216:13
217:17,18
218:14 219:5,
13,25 220:6,
13 221:8,12
222:24 223:5,
17 224:6
225:12,17
226:5,10,11
227:11 228:13
229:1,6,19
231:18
232:16,21,25
233:7,12
234:11,18
235:14,17,21
236:22 237:1,
10 238:8,11,
15,22,25
239:20
240:14,16,21

241:1 245:24
246:6,7,16
248:3 252:9,
12,20

**Senate's**
86:25

**Senator**
5:1,19,22
6:3,11 7:8,9
18:22 19:14
35:23 38:23
44:22 49:2
60:3,7,15,16
63:17,18
64:3,14 66:25
83:15 84:4
95:8 96:16,19
97:5,11,12
98:18 99:14
105:20 109:11
110:1 118:20,
21,23 119:2,
12,15 121:25
122:1 126:21
135:12,21
137:5 140:22,
24 141:1,20
142:21 143:7,
21,22,23,24
145:7,14
149:8,14
153:6 157:6
158:4 159:9
164:7,15
165:1,9,15
172:8,19,23
173:6,8,12,20
174:13,16,19,
25 176:3,9
177:2,3,5,13
184:15 188:10
189:16
193:13,18,22
199:16 211:17
212:1 213:7,

16 215:4,9,
13,21 217:5
218:7 219:11
222:1 223:23
228:6,7,23
230:3,4 240:2
242:3 248:9

**Senatorial**
242:12

**senators**
41:7 89:4
90:18 165:17
166:20,24
178:14 211:20
216:12

**Senator's**
245:8

**send**
24:6 33:24
157:14 158:22
243:12

**senior**
67:6

**sense**
15:20,25 53:3
54:3 121:7
211:5

**sent**
157:20 176:5
257:9

**sentence**
62:18 63:9,20
66:22 67:3,13
72:19,22
73:3,21 75:10
78:14 99:17
126:20 129:14
132:12 149:20
150:9 151:22
152:2,4 153:7

**Sepehri**
170:23,24,25

**seriously**

171:24 213:1

**serve**
15:18 17:4,6
247:4 252:1,7

**served**
14:19 15:4,7
17:13 19:6
23:4 247:5,
11,13,14,17

**service**
15:16 32:13

**serving**
22:24 30:2,3
60:19

**session**
18:16 19:7
22:16 30:15
32:18,24
33:16 51:12
52:4 71:2,7,
15 72:6 80:4
89:21 97:25
105:2 109:10
136:6,22
150:19 151:24
155:14 214:10
218:11 234:14
244:12 252:19

**sessions**
18:12 22:5
71:25 236:4,8

**set**
1:18 76:15
94:21 117:12
151:11 178:17
210:14 219:24

**sets**
138:16

**setting**
139:5 159:22
178:13

**seven**
50:8 65:16



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

299

74:19 213:2
230:16

**shaking**
9:8

**shall**
210:13 256:25
257:18

**shape**
148:18

**shared**
67:13

**sharing**
144:24

**Sheet**
257:8

**She'll**
189:9

**Shorthand**
1:13 256:12

**shortly**
5:20

**show**
45:4,7,11
46:7 71:16
72:4 78:10
128:2,13,17
187:24 192:12
198:19 204:23
206:8,25
207:8,10
222:19
231:15,23
239:9,12,14,
18

**showed**
241:12

**showing**
35:23 49:2
79:24 82:15
98:18,23
105:22 137:5
163:14 170:17

172:8 215:4
222:1 223:13
228:23

**shown**
128:14

**shows**
60:21 80:2
82:10,11 95:4

**sick**
97:6

**side**
7:23 80:17
160:23

**sides**
168:20

**Signature**
3:7 254:1
255:1 257:4,
8,10,15,19,23

**signatures**
60:2 172:13,
15

**signed**
60:14 172:16
225:19 226:13
246:14 257:21

**significant**
151:16

**similar**
97:14 113:4
151:24 176:5
215:16 218:10
221:8 224:23
229:10 252:20

**simply**
115:14 129:25
212:19 217:23
241:10

**sincerity**
166:23

**sir**
37:25 242:6,

10

**sit**
47:6 61:22
65:10 66:12
71:16 80:8
88:1 112:17
118:3 121:15
134:25 153:25
162:13 168:3
181:20 184:7
189:14 201:12
210:18 217:12
221:7

**sitting**
47:13 72:5
81:22 129:3
201:8 210:17
211:19,20
238:20

**situations**
48:3

**Six**
107:13 109:9
248:10

**Skipper**
28:1,3,4

**slightly**
49:17

**slow**
107:11 164:9

**society**
128:15

**solely**
47:4 142:10,
11

**somebody**
12:19 34:9
52:4 95:5
96:17 127:7
128:12
144:20,21
173:18 203:11
239:7

**somebody's**
198:15

**somewhat**
118:7

**somewhere**
232:24 246:23

**soon**
125:19

**sorry**
5:5 8:16
17:17 22:8
27:10 33:9
42:20 49:22
54:18 55:5
56:21 61:18
63:14 64:14
65:15 72:25
81:12 88:7
91:20 101:5
107:12,16
118:24 122:3
135:11 139:6
147:5 148:10
154:13
156:13,17
164:9 184:3,
22 185:12
189:7 204:15
205:17 206:10
224:2 228:20
233:20 242:14
249:14

**sort**
37:7 39:14
44:1 90:18
128:5 132:7
201:25 243:13
244:2

**sorts**
117:22,25
155:3 243:19

**sounds**
8:25 243:15

**source**
55:21 110:6
115:9 183:16,
23

**sources**
183:17,23

**Spanish**
187:25

**spanned**
32:3

**speak**
48:4 90:11
96:16 100:15
114:3 134:17
225:21 242:4,
5 244:10,17

**speaking**
91:3

**speaks**
65:7 73:19

**special**
14:24 15:5
22:16 92:20
138:17,22
139:17 154:3
234:13 253:10

**specializati
on**
15:1

**specialized**
7:15

**specific**
7:6 15:19
16:4 44:19,20
46:25 47:10,
16 48:2,15
52:15 53:8
66:10 71:21
72:3 74:21
76:15 90:1
92:23 100:8,
25 105:3



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

300

114:13,20
120:13,17,21
125:3 127:3,
18 128:24
131:17,18
133:10 143:25
144:14 145:24
157:8 173:2
174:23 189:4
198:13 200:2
209:14 227:2
228:6 230:15
238:10 242:23
243:11 244:5,
14 245:17
251:22

**specifically**
6:17 20:5
42:17 45:4
46:4 48:9
52:24 65:9
69:1 71:9
72:14 74:20
79:19 105:12
111:2 112:25
119:24 120:7
121:18
127:11,12
135:20 136:2
139:19 162:12
166:13 168:1,
6,10,21
174:17 184:1
193:16 195:21
210:10 217:23
219:18 227:5
228:7 232:3
239:13 244:2
247:5,10,15,
18 251:18
252:1

**specifics**
154:10 181:2
201:22

**specifies**

180:18

**speculate**
16:2 57:10
88:3 112:15
193:21

**speculating**
15:22 191:20

**speculation**
56:24 109:4
136:15 146:17
173:17 188:19

**speculative**
118:8

**speech**
24:20,23

**speed**
218:2

**spent**
151:25

**spoke**
42:8

**spoken**
12:21,24
200:10

**sponsor**
19:9 48:16
56:2

**sponsored**
16:18 19:2,
18,23 72:13

**sponsoring**
108:21

**sponsors**
231:19

**SREC**
27:3,4

**staff**
32:7,9,12,14,
16,18 33:1,
12,16 35:12
36:7,9,17
41:7 55:23

56:3 59:4
81:24 101:19
104:21,24
108:14,16,19
109:5,7
122:14 127:23
156:1 170:21
173:5,8,12,21
174:12,13
184:19 185:21
188:22 189:17
237:1 243:20

**stage**
227:7

**standard**
30:9

**standards**
45:21

**standing**
51:25 145:25
161:23

**start**
57:8 71:19
175:12 188:13
250:10

**started**
79:13 136:25
172:19

**Starting**
164:13 212:24

**starts**
67:3 72:20
80:10 132:22
163:25 164:7,
11 204:16

**STATE**
1:2,13 2:3
5:9,18 6:3
10:12 11:4,
12,17,18,23
13:9 15:23
17:6,13
18:18,23

19:5,14 20:7,
12,13 21:2,
12,19 22:13,
19,24 24:11,
15 25:13 27:5
28:13 29:16
31:10 32:11
41:8 48:18
49:13 58:10,
21,24 59:5,7,
25 67:4,6,9
71:11,23 72:8
73:12 75:3,5
77:13 82:8
98:22 107:8,
9,21,24 108:2
113:16 126:9
127:23
136:13,17
146:13 148:20
155:8 161:7
167:6 171:1,
7,15 177:9
185:25 186:4
188:4 192:13,
21 229:5
230:6,15,17
236:21 239:2
240:4,10
248:1 249:19
252:9 254:2
255:4,12
256:2,13

**stated**
61:9,14 92:12
124:17,19
163:4 178:6
181:18 192:22
205:18 208:6,
20,21 209:17
212:18 216:12
224:17 227:21
228:2,5
235:20,23
239:1,19

252:10

**statement**
126:16 127:18
129:13
130:11,12,
16,18,20
132:21,23
133:1 150:5
152:20,24
153:3 163:21
164:4,6,8,22
165:9,12
192:3,6,11
195:1 196:9
197:19 207:24
214:15,25
228:10 231:25
243:16 249:23

**statements**
75:18 86:21
96:14,15
127:16,19
129:25 132:9
150:13 167:13
168:4 195:11
214:13 215:1
231:10,13,
19,22 232:19
236:19

**STATES**
1:1,7,12
14:10 81:5
206:2 216:10
225:3 231:1
256:1,7

**State's**
19:9 135:16
171:8 188:11

**statewide**
248:11

**stating**
249:18

**statistic**
240:6



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

301

**statistics**
240:13

**status**
73:25 101:24, 25

**statute**
44:25 45:4,16 46:3,11,12 77:19 202:25 207:12 208:20 239:14

**stay**
248:22,23

**stayed**
167:19

**stenograph**
256:18

**step**
124:18,19

**steps**
38:13,25 40:2,25 41:17 43:2,9,13,14, 23,25 44:1,7 74:11,12 123:3 124:2, 5,9,12 190:22 200:19,24 235:4

**stop**
213:5

**stopped**
60:19

**stopping**
59:19

**straight**
146:8,23 147:19 148:19 248:15

**straightforward**
168:17

**Street**
2:5 29:5,10

**strike**
235:2 238:25

**strongly**
34:15

**struck**
107:13

**student**
33:10

**students**
230:24

**studies**
73:24 244:21 245:18 247:24

**study**
18:9 48:20 62:18 65:18 67:8 230:6 231:14,23 245:5 246:1, 5,7 247:7,9, 25

**studying**
33:11

**stuff**
34:13

**subdivision**
107:8,21 207:2

**subgroup**
230:21

**subheading**
72:18 75:23

**subject**
39:23 42:5 43:20 44:9 50:16 54:7 62:12 66:17 73:16 84:16 95:17 96:10 97:7 113:11,

16,18 116:24 118:5 119:9, 22 120:10,14 121:10 124:7 127:22 128:21 129:10,23 130:8 133:19 138:6 165:20 170:10 178:10,12 182:19 189:22,23 192:2 208:7 210:4 211:13 220:24 227:15 236:12 243:6 244:25 245:9, 13 247:23

**subjective**
57:6 77:9,25 91:6 166:23

**submit**
38:8 212:17

**submitted**
122:20 164:8, 19,20

**Subparagraph**
231:1

**subpoena**
36:23 37:1,2

**subpoenaed**
11:7

**subscribe**
101:12

**subscribed**
255:7

**subsection**
81:1 106:14 107:4,13 138:25 139:1, 2,20 141:22 143:8 205:14 222:11 230:19

**subsections**
230:16

**subsequent**
130:14

**substance**
83:8 120:1 153:8,15,21 174:8,20 214:9 224:15

**substantial**
158:2 248:11 249:12,23 250:11

**substantially**
151:24 219:9

**substantive**
122:15 156:23 174:12,24

**sub-subparagraph**
78:25

**subtle**
70:23

**succeeds**
22:14

**succession**
211:2

**sufficient**
131:2,6,12 200:6

**sufficiently**
67:15,19

**suggest**
114:19

**suggesting**
158:3 159:3

**suggestion**
159:1 213:12

**Suite**
1:16 2:14

258:14

**support**
16:16,17 42:14 43:3,6 44:2 48:5 51:7 53:17, 18,24 73:25 100:19 149:21 152:23 208:5 231:20 250:16 251:7,10 253:9

**supported**
16:18 251:1

**supporters**
161:9 167:5,9

**supporting**
247:22 248:17 250:1

**supports**
41:18 248:25 253:12

**Supreme**
14:13 104:4 233:10

**sure**
5:6 25:11,14 32:2 37:10 42:17 50:20 60:18 71:19 72:12 81:1 82:22 84:8 92:1 96:16, 19,21 98:25 101:21 103:24 107:10 116:11 117:10 121:25 127:4 130:21 131:23 132:4, 11 135:20 140:9 142:18 145:5 148:7 152:16 155:23 176:6 197:20

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

207:21 209:10
225:21 234:21
236:1 239:24
242:19,24
244:4

**surname**
188:1

**suspend**
89:15,18

**suspended**
93:1

**SWEETEN**
2:4 5:5,17
12:2,14,20
19:19 20:16
38:16 39:2,17
40:6,15,19
41:3,21 43:5,
12 44:5,17,24
45:23 46:15,
22 48:7
50:14,24
52:13,23
53:5,19,25
54:6 55:13
56:5,15,19,23
57:5,21 59:1,
15,18 61:10,
24 62:10,25
63:21 64:1,8,
12,18,22
65:4,13,15,20
66:3,7,14
67:21 68:9,
16,22 69:16
70:1,9,13
71:13 72:1
73:15 74:4,6,
9 76:5,10,14,
25 77:2,18,23
78:10,13,16,
21 80:15
83:7,23 84:6,
15,25 86:6

87:13 88:12,
23 89:20,24
90:19 91:14
94:7,11 95:15
97:7 98:4,11
99:10 100:2,
6,22 101:18
102:2,4,16,23
103:8,13,20
104:11,23
106:22 107:25
108:7 109:3,
13 110:8,14,
21 111:6,19
112:13
113:12,25
114:8,14,21
116:4,21
117:6,16
118:17
119:20,25
120:6,12
121:6,9,20
123:9 124:4,
11,22 125:7,
16,22 127:9,
21 128:19
129:8,19
130:5 131:4,
14 132:2,15
133:18 134:7,
15 136:7,14
137:9,12
138:4,19
139:21,24
140:7 142:2
144:14 146:3,
16 147:13,21
148:4,21
150:1,12
151:1,9,17
152:4,10,19
155:16,21
156:19,24
157:9,12,15,
17 158:1,14,

24 159:13
160:24 161:4,
11 162:9,16,
20 164:3,13
165:19,24
166:22 167:12
169:25 170:8
171:13 174:8
176:12,19
178:10,23
179:7,24
180:5,25
181:10 182:1,
16 183:10,19
186:15 187:8,
20 188:18
189:20 190:15
192:1,15
193:1,20
194:7,14,19
195:16 196:4,
7,12,18,25
197:11,18
199:2,6,12
200:12 201:8
202:4,15
203:20,24
205:1 206:10,
13 207:19
208:1,14,24
209:3 210:2,
7,10,16
211:23 212:17
217:21 219:14
220:21 221:10
224:7,13
225:6 227:13
233:23 235:6
236:6,25
237:12,17,21
238:13 239:3
243:5,15
244:23 245:7,
20 247:20
248:13 249:2,
13,15,19,22

250:8,18
251:3,9
252:4,21
253:5,11,16
258:4

**sworn**
5:23 15:5
256:19

**synonymous**
209:22

**system**
44:23 46:13,
21 47:8
116:20 117:5,
13 129:7
133:17 237:11
238:9 239:9,
16

**systems**
20:8

---
T
---

**table**
229:12,13,16
231:3,7
232:9,12

**tag**
52:4 150:17

**tagged**
51:18,23

**tagging**
52:7

**take**
9:11,12,14
35:25 43:2,13
44:2 46:6
49:3 50:2
51:13 54:15
56:10 58:15
59:8,16 60:1
79:25 80:9,17
82:19 85:22
113:21 123:3
125:19 126:6

138:13 142:20
154:18 156:19
163:15,22
172:9 179:11
180:1 190:22
191:19
199:12,13
200:20 212:25
214:8 215:6
216:3 222:2,
10 223:14,19
225:17 226:23
229:2,18
230:4 231:9,
10 232:14
233:10 235:4

**taken**
1:12 43:23,25
44:8 74:11,
12,17 94:23
95:6 98:2,9
114:5 124:18,
19 132:7
213:3 214:11
247:12,13
248:8 256:17
258:7

**takes**
38:13,25
40:2,25 41:17
52:25 191:16

**taking**
9:3 43:9
59:24 96:5
160:5

**talk**
12:15 29:21
43:12 77:19,
20 128:2
161:2,4
176:19 179:4
205:1 234:2
250:21,22

**talked**



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan                                          June 7, 2012

303

8:18 10:20
11:21 44:13
52:6 154:2,8
163:7 165:12
176:10 177:13
192:18 236:4
238:8

**talking**
8:10 19:22
66:21 71:19
75:11 85:14,
15 90:1 94:8,
9 95:21 103:6
112:4 126:3
131:25 132:13
135:2,3,5
136:25 140:7
156:16 159:9
164:3 165:8
170:13 173:23
199:16 203:24

**talks**
68:5 204:14

**tamper**
212:21

**target**
129:14

**Tech**
14:5

**technical**
51:9

**technically**
171:9

**technology**
35:5

**telephone**
243:21

**tell**
7:2,21 8:24
14:17 15:17
20:5 21:2
24:23 26:8
32:7 33:13

38:25 45:4
47:24 48:1,5,
10 49:4,21
50:10 60:6
61:15 68:8,15
73:9 75:15
76:3 82:17
83:10,21
87:11 90:13
91:16,23
105:24
109:17,20
119:4,7,9,14,
17 121:7
126:7 136:21
138:2,10
147:1 149:23
159:10
163:15,16
169:9 171:17
172:10 173:2
174:24 179:22
180:4,22
184:3,5
193:15 207:24
208:12 209:25
215:6 219:11
223:14 224:4
225:4,11,18
233:2 234:13
242:19 243:24
256:19

**tells**
35:12

**tem**
21:25 22:7,
10,14,16,19

**temporarily**
22:19

**ten**
92:2 246:10

**term**
10:7 65:22

**terms**

9:23,24 19:6
33:20 40:3,12
117:5 202:1,3
210:13 211:1
239:1,16

**test**
37:24,25

**testified**
5:23 7:19
8:10 10:21,24
11:10 28:10
42:23 47:7,19
75:4 87:11
155:17 156:2,
8 162:3 168:5
170:20 177:16
189:17 220:9
236:16

**testify**
9:2,17,20
11:7 21:12,13
28:13 30:10,
12 42:10
44:6,7,17
47:14 74:6
88:18 95:15,
16 107:25
119:24 138:19
150:6 154:21
155:1,14,25
160:15
161:15,21
162:9 165:24
167:19 181:1,
2,10 183:4
184:7 186:17
187:8,20
192:2,15
197:2 202:4
206:13 208:2
236:13 240:25
241:3 243:17
251:19

**testifying**

29:12,16
47:17

**testimony**
13:13 21:8,11
28:16 40:10,
13,14 47:1
51:15 66:13
71:24 75:3
77:6 78:4,17
85:11 117:24
122:20,21,23
123:14,16
131:11 133:24
134:1 150:24
151:23 161:25
162:1 168:16,
17,18 181:20
182:16 184:11
189:21 195:20
196:2,16
203:25 204:6
209:16 210:6
251:21

**TEXAS**
1:2,13,16
2:3,6,15 5:18
10:12 11:4,23
14:5,11 15:12
16:6 17:4
25:18,23
27:8,11 31:22
32:4 38:7
39:6 41:8
48:6 59:5
73:8 82:18
90:8 92:22
97:13,15,16
98:23 101:12,
20 102:9,11,
15,22 113:15
126:15 127:24
135:10 151:25
155:8 158:17,
18,19,20,21
175:21 194:17

235:24
236:21,23
239:9 240:4,
10 244:22
245:19 246:10
247:6 248:12
249:1,12
250:17 251:8,
15 254:2
255:4 256:2,
13 258:15

**Texas'**
44:22 72:20

**text**
55:14 80:15
106:22 108:1
179:25 205:1
206:14
237:16,17,
22,23

**textually**
180:3

**Thank**
5:21 10:9
38:3 41:16
46:1 120:16
221:22
241:23,24

**Thanks**
59:21

**the..**
252:15

**themselves**
96:16

**thereafter**
256:21 257:15

**therefore**
238:15 245:13

**thing**
30:10 37:7
51:5 68:22
77:18 92:23
126:20 128:6



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

304

173:16 214:7
237:6 241:16

**things**
6:10 20:4,21
28:14 32:19
34:1 41:4,5
48:20 53:13
81:7,8 85:18
108:20 110:23
115:17 116:2
117:22,25
127:3 128:4,
14,17 136:20
154:6 168:19
212:18 233:16

**think**
8:17 10:17,18
17:10,12 18:6
22:3,5,11
24:16,20,24
26:9,10,13
27:7,12 29:14
34:13,17
36:8,19
37:13,21 40:7
41:21,22
42:11 44:25
45:1,3,20
46:25 47:20
48:20,21
52:6,13 55:15
57:19 59:14
60:13,18
61:3,16 62:7
65:6 70:16
72:10,22
76:23 79:6,
11,15 82:2
83:23 88:14
89:25 90:23
92:13 97:12
102:10 103:25
104:19 108:15
116:10 117:19
118:1 119:21

120:1 125:16
126:21 128:23
134:5 135:17,
19 139:7,12,
25 140:8,19
142:5,17,18
143:6 144:15
150:16 152:6,
25 155:4,18
156:7,8,9
157:20 158:4,
10 159:1
162:11 163:9
170:6 177:12
183:25 184:1
185:10 190:13
191:7,8
195:21 198:22
200:14 203:25
204:21 205:14
209:19 212:5
214:23 217:25
218:14 226:18
227:14,17,21
228:15 231:2
232:20 233:12
236:6,8,9,13
238:13 239:21
241:9 242:20
245:10 246:8
247:12 248:3,
6,7,20 250:18
251:16

**thinking**
42:4 244:12

**thinks**
100:8

**third**
67:5 163:24
164:1,10

**thirty**
257:18

**thoroughly**
65:18,22

**thought**
41:10 42:20
65:22 83:24
116:8 123:9
152:23 156:13
160:11 168:18
190:17 192:4
202:16 224:5,
9 228:17
236:15 237:13
243:7 245:8
248:23

**thoughts**
20:18 38:18
39:4 43:16
50:15,25 51:2
53:7 54:9
57:23 59:2
63:3 66:16
67:23 68:10,
24 70:23
76:6,19 86:11
87:14 100:9,
24 103:20
104:13 111:7
114:21 116:24
124:6 125:9
127:25 128:20
129:9 130:9
131:7 132:18
134:9 144:18
146:17 147:15
152:14 180:1
181:12 182:5,
6 188:21
205:2 206:14
238:16 244:23
249:8 253:13

**thousand**
124:25

**thousands**
120:18

**threat**
92:21

**threaten**
167:8

**three**
51:10 69:10
115:14 118:8
120:21 122:4,
5 145:11
191:20

**throughout**
76:15 129:16
167:21 168:18
177:25 178:6

**thumb**
34:12

**Thursday**
216:11

**time**
6:24 7:9
10:15,17
11:2,5 17:22
30:17,20
31:8,15,16,
20 32:10,15,
23 34:7 37:3
43:1 51:11,13
52:5,8,11,
20,25 53:4
55:19 72:3
74:23 91:18
95:1,21 97:17
101:13
108:18,19
109:22,23
112:25 125:22
139:5 140:13
144:18 147:4,
5 150:18,19
151:8,12
161:20,25
169:24 172:25
173:2 175:7,
9,11,20,21
179:8 191:8
203:15 213:3

233:7 234:11
240:7,12,16,
21 253:17
256:17 257:25
258:4

**times**
6:13,16 8:17,
21 10:20,24
18:10 19:10
30:14 56:7
91:20,22
92:7,11,23
119:13 140:4
150:18 203:9
204:1 212:3,4
233:6 234:12

**title**
82:18 126:10
135:19,20
198:24 222:5
228:25

**titled**
172:11

**today**
8:25 9:16,21,
23 10:5,9
12:22 13:7,13
14:22 21:22
36:4 47:13
61:22 65:10
66:12 71:16
72:6 80:8
81:19 88:1,18
101:3 112:17
115:25 118:3
135:1 154:1
162:13 168:3
172:3 181:21
184:8 189:14
212:1 217:12
221:7 238:20
241:6,14
242:19

**today's**



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.ESQUIREsolutions.com

Robert Duncan

June 7, 2012

305

11:25

**together**
19:12 72:2

**told**
121:18 127:6,
13 189:16
208:15 211:3
227:5

**Tom**
26:25

**Tony**
26:3

**top**
50:4 54:20
134:1 190:24
191:2

**topic**
99:15 171:20

**topics**
13:17,18

**towards**
55:7 67:2

**town**
244:1,8,14

**trade**
30:23

**tradition**
90:6 91:1

**tragedy**
154:12

**train**
248:23

**transcribed**
42:11

**Transcript**
4:10 9:4
12:4,6
126:14,15
135:9 256:15
257:3,7,14,
19,21

**transcription**
223:16

**transcripts**
13:3

**Travis**
11:11,15

**treading**
44:9

**treatment**
253:10

**trial**
240:25 253:17

**trip**
46:7

**trouble**
186:18

**True**
29:1 121:1
167:18 255:2
256:14

**truth**
256:20

**truthfully**
9:2,17,21

**try**
9:9 16:10,20,
21 23:12
31:16,19 42:8
84:22 118:8
120:20 161:22

**trying**
7:25 8:3 11:9
23:16 34:2
37:25 38:3
41:1 43:22,23
72:6 115:10,
13 128:7
148:2 175:10
209:10 225:22
237:4 248:4

**turn**
31:16 36:9

37:5 63:8
229:24 241:17

**turned**
36:14

**Twice**
8:20 10:25
52:2

**two**
8:17 22:5
26:13 31:6
51:8 71:6
101:6 130:19
145:11 149:1
169:15 210:16
221:14,15
230:12 232:6
233:4,12
234:7

**two-thirds**
89:4,14,16,
18,21 90:7,12
91:13,17 93:1
97:24 98:3,10
140:17,20
218:13

**type**
140:5,15
144:25 211:12
253:4

**types**
57:14 210:18
244:16

**typewriting**
256:21

**typically**
19:9 20:8
21:12 29:20
30:2,6,7
31:4,7 37:3
52:2 85:17,23
119:1 217:25
218:6 227:25
241:10 243:18

244:10

**typing**
34:12

---

**U**

**U-6**
107:17

**Uh-huh**
33:7 92:10
107:23 138:1
167:14 196:11
204:18 223:7
225:20

**unable**
133:15

**unconstituti
onal**
233:11

**under**
9:2 37:19
38:7 45:12
46:9 47:17
62:8,18 67:18
71:20 72:18
75:23 78:14
81:6 93:1,10,
12,17 102:2,3
179:17 180:17
202:25 203:19
204:23 229:6
238:21 239:9
252:10 255:6,
10 256:22

**underlying**
201:18 229:7

**understand**
8:3,15 9:10,
14 10:3,6
29:14 42:18
50:20 55:20
64:23 90:2
93:24 95:20
98:6 115:11
117:8,21

128:7 130:21
131:23 132:4
133:13 138:12
140:10 157:24
175:10 176:17
177:15 189:8
192:17 236:1

**understandin
g**
13:9 19:17
37:18,21 46:6
61:22 132:10
158:11
212:11,13

**unified**
165:6,12

**UNITED**
1:1,7,12
206:2 256:1,7

**University**
14:6 107:9,24
246:2

**unknown**
75:12

**unlawfully**
68:14

**unless**
54:2 72:4
176:2 202:18

**unlikely**
108:22

**unnecessary**
67:17

**unspecified**
68:7

**unusual**
18:14 56:3
146:2 148:9,
11 173:8,11
233:3 234:5

**update**
136:5



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

**urban**
97:16

**Uresti**
95:9 97:5,12
230:4

**Uresti's**
97:11

**urgency**
253:2,9

**use**
9:23 34:16
39:10 195:8

**usual**
160:22 161:6,
9,12

**usually**
18:24 20:13
31:6 33:18
39:14 53:24
83:15 94:18
108:18
150:10,11,25
203:4 207:15,
16

**utility**
45:14 55:9

**V**

**vague**
20:23 51:1
52:14 53:6
56:16 89:25
108:3,7 109:4
114:2 117:20
176:12 179:7
236:9

**vaguely**
112:1 205:6

**valid**
107:5,17
181:25

**Van**
19:10,14

118:21 122:1
135:12,21
143:21 149:8,
14 176:3
177:5 215:9
217:5 218:7

**various**
17:9,21
129:2,4 182:6
200:5

**vein**
248:22

**verbal**
9:7 110:3,5
145:15 175:23

**verbally**
33:20

**verbatim**
221:3,5

**verification**
170:7 171:10,
21

**verify**
62:19 97:3
134:4,6,14,20
198:15

**verifying**
44:23 46:13,
21 47:8

**verse**
16:20

**version**
105:25 106:4,
5,10 139:17
172:16 176:14
222:8 225:12,
15,19 226:12

**versions**
176:16

**versus**
103:19

**VICTOR**

2:9 5:11

**view**
118:13 209:22
212:18

**violating**
120:24

**violation**
210:19 211:7,
8,14 212:24

**visit**
12:2 210:22

**vocal**
121:14

**voiced**
199:23

**voices**
168:15

**vote**
23:7,16 29:2
62:21 67:15,
19 70:7 71:3,
11,23 72:8,12
87:24 89:4,
14,16,18
90:7,12
91:13,17
92:17 93:23
94:3,6,17,23
96:5 97:3,24
98:3,10 99:20
113:19 123:23
126:23 127:7,
8 128:13
130:23 133:16
139:8 140:18
155:15 164:24
202:14 204:21
218:13 229:12
230:22
237:11,20
238:3,11
239:10

**voted**

87:19,22
88:20 93:18,
22 94:2
126:24
142:23,24,25
143:13 144:9
165:1 167:10
229:15,17
231:6 232:12
236:22

**Voter**
4:9 9:23,25
18:19 19:1
23:13 25:15
26:17 27:14
28:8,16 29:10
33:1 45:1,5,
7,10,17,18
46:6 48:13,18
52:21 57:12
62:20 63:12,
25 65:2
67:15,19
68:5,14 69:3,
7,12,24 70:6
73:14,22,24
75:12,13,15
76:2 80:20
85:16 86:3
87:6 99:16
101:23,24
102:1 104:2
107:1 115:5
116:19 117:14
126:22
127:15,16,
17,19 128:5,
8,10 129:4,17
131:25 132:13
135:23 137:24
138:14,18
139:3,4
141:25 142:6,
11 143:4
149:22,24

151:24 154:3,
8 155:15
164:24,25
165:18 166:17
171:20 180:23
181:23 182:12
184:25 188:1
200:19,25
202:14 206:24
207:8,9,11,
13 209:23
213:19 216:14
218:12 220:19
222:3,15
237:14,19,24
238:3,10,21
239:8,12,17
240:3,9
243:3,14,22
244:3,15,18,
22 245:18,22
246:4,9
247:6,9,15
248:4,11,25
249:12 250:16
251:2,7,15,
23

**voters**
10:5,6 57:16
67:6 73:23
74:2,3 84:14,
24 85:4 95:14
112:11,21
113:6,24
123:1 124:3,
21 129:6
134:4,6,14,
21 162:3,7
163:6 166:5
187:18 188:16
194:18 204:24
220:14 230:8
231:16 235:5,
15,19 240:23

**voter's**



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

307

23:19 44:23
46:14,21 47:8

**votes**
92:8,9 95:5
126:22 130:23
131:3,13
163:21

**voting**
10:2 23:10,
14,17 37:14,
22 38:7 42:4
44:15 57:12
68:15 69:11
85:19 86:19
99:7,25
100:20 113:22
116:15 127:7
144:13 230:8
236:19,23
246:9 247:16,
19

**VS**
1:4 254:2
256:4

---
**W**
---

**wait**
9:5,6 64:8
195:4

**waiting**
210:22

**waived**
257:24

**Wallace**
28:1,3,4,7,9,
16

**want**
9:24 13:23
16:1,3 31:12
37:20 51:20
61:11 70:13,
24 84:17 89:1
99:17,18
116:4,5,11

140:9 144:15
150:13 157:9,
12 170:4
182:23 184:9
212:25 213:12
222:11 225:17
227:16 237:4
239:22 250:8

**wanted**
132:6 156:23
173:18 224:5

**wanting**
65:9

**wants**
20:9 31:16
164:13

**Washington**
2:11

**wasn't**
7:9 60:19
61:5 77:23
185:10 212:12

**water**
71:20

**way**
32:3 39:10
42:8 53:23
66:2 77:24
84:22 106:6
119:4 123:12
130:12 141:19
153:12 161:19
169:9 178:19
181:4 202:1
216:21 217:8
253:4

**ways**
51:21

**week**
151:5 163:19
232:5

**weekday**
232:5

**weekdays**
203:7

**weekend**
216:12

**Weekly**
98:23 101:12,
20

**weeks**
191:20 233:4,
13 234:7

**week's**
150:9,24

**Weevil**
233:9,22,23

**weigh**
249:4 250:11

**we'll**
9:11 158:8,25
159:2 180:1
213:8 220:17
234:2 235:1
253:17

**well-known**
102:11

**went**
24:21 43:24
48:22 91:17
145:24 148:19
159:12 170:3
226:18

**we're**
8:9 13:24
16:6 19:22
24:16 35:23
49:2 78:19
79:3,24 82:16
89:25 94:9
95:21,22
98:18 105:22
125:16 126:5
137:5 158:22
159:4 163:14
170:17 171:20

172:8 174:7
181:3 182:4
212:5,21
213:5 215:4
219:3 222:1
223:13 228:23
241:22

**weren't**
96:6,22
108:21 217:20

**West**
2:5 16:6
97:15,16
164:7,15
177:13

**Western**
31:22

**West's**
165:9

**we've**
8:17 10:20
13:16 19:6,7,
8 79:8,21
157:18 158:6
176:9 206:24
210:24 212:2
243:23

**whatever**
34:10 35:11
45:16 47:1,11
63:6 76:16
82:10 83:11
90:21 156:5
230:12

**whenever**
185:10 231:17

**whether**
10:1 31:9
40:4,21 54:5
57:23 63:24
65:11 67:18
74:2,7 75:12
79:17 81:24

100:16 110:18
111:3 113:8
115:3 116:5
124:1 129:21
130:12 131:5,
12 134:13,19
136:21 144:21
145:3 150:4
151:16 154:9,
20,24 155:17
166:8 173:20
174:11,17
186:23 188:4,
14,15 196:8,9
200:16 201:21
203:14 205:8
215:1 218:4
227:10 230:21
231:21,25
232:17 235:4
243:25 245:25

**which's**
101:9

**white**
194:17

**Whitmire**
118:21 122:1
143:22

**Whole**
12:11 18:17
47:2 61:17
77:8 91:3
109:24 123:22
125:14 130:25
139:5 145:24
146:8,11,13,
23 147:6,12,
20 148:20
149:10
159:12,16,19
160:8,16,25
161:3,15
186:21,25
215:22 216:14



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

308

219:13,24
220:12
252:12,25
256:20

**Whole's**
220:6

**Wichita**
32:6

**Williams**
140:22,24
141:2,20
142:21 143:7,
23 177:3
188:10

**WILLIAMSON**
2:9 5:11

**Wilson**
32:9

**wish**
9:11

**wishes**
18:22

**withdrawn**
212:3,4

**within**
77:21 79:1
115:5 138:15
151:12 233:4
234:7 257:10,
22

**witness**
1:11 5:19
155:11
161:17,24
189:9 205:18
210:20
253:15,17
256:17,18,25
257:4,18,22,
23,24 258:10

**witnessed**
23:9

**witnesses**
53:10 87:11
123:16 159:24
160:2,3,15,
19,23 161:9,
15

**women**
230:23

**wondering**
205:8 238:10

**word**
42:24 78:11
111:10 133:6
180:21 202:7

**worded**
247:10

**words**
70:18 144:19
151:2 197:25

**work**
14:24 16:11,
14 20:11
21:16,17
30:23 32:7
34:20 35:7
48:16 109:7
120:8 159:25
160:7,8
227:25

**worked**
19:8,12 33:1
48:14 56:8
86:11 233:21
234:10 247:11

**worker**
23:4 198:14

**workers'**
6:22 7:4,7,18
8:1,11 11:3
30:19

**working**
32:21 35:4
144:22 172:19

**works**
21:14 171:6

**worried**
127:7

**wouldn't**
23:18 56:1
66:18 86:15

**write**
64:25 236:12

**writing**
62:14 176:2
217:7

**written**
60:2 110:4
117:24 140:6,
14 142:10
145:17 149:9
157:10 158:25

**wrong**
55:4 112:2
127:16 228:20

**wrote**
149:12,15
150:5 155:6

---

**X**

**X**
70:19

---

**Y**

**y'all**
157:3 199:11

**yeah**
21:5 34:12
37:10 50:14
55:9 56:19
59:1,17,20
63:16 65:20
67:21 69:16
73:2 74:13
92:3 93:20
107:12,17
139:23 147:13
150:1 151:17

155:24 156:7,
11 157:15
164:15,16
169:11 185:5
210:9 216:25
223:23 234:25

**year**
30:14 49:21
230:12 233:8

**years**
20:4 50:8
65:16 72:2
74:19 82:11
91:19,23
101:22 115:14
118:8 120:21
230:12 240:5,
9 246:10
248:10

**Yep**
179:20

**yesterday**
157:1,22
159:2 210:16
212:13

**yesterday's**
212:23

**younger**
32:19

**yourself**
215:17 234:9

---

**0**

**00203510**
158:17

**00203528**
158:18

**00203532**
158:19

**00203533**
158:19

**0020354**
158:18

**00203540**
158:20

**00203542**
158:20

**00203544**
158:21

**00204706**
158:21

**00204707**
158:21

**00213319**
126:16

**00213364**
135:10

---

**'**

**'05**
17:17

**'09**
24:25 137:9,
11,12

---

**1**

**1**
149:20 207:2

**10**
81:1 106:10
107:3

**100**
258:14

**1000**
1:16 157:21

**105**
4:13

**109-2005**
222:6

**11**
77:1 78:3,15
80:9,10
204:16

---

**'**

**'11**



Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

309

137:9

---

**1**

**118**
229:2

**12**
99:18 204:16
229:3 258:13

---

**'12**
6:12

---

**1**

**126**
4:4

**129**
232:2

**12-CV-128**
1:4 256:4

**13**
62:9 63:6

**130**
230:1

**134**
229:24

**137**
4:5

**14**
4:7,10 20:4
45:13 77:8
91:19,23
126:18,19
133:24 155:25
156:6,7
172:12,24
173:22 174:13
175:5,8,14,17
176:11 178:3,
18,22 179:12,
13,17,23
180:9,11,15,
17 181:9
183:17,24

184:14,22,23
185:8,13,16,
19 186:1,5,
14,20,24
187:7,19
188:6,17
189:18 190:14
192:12,24
193:11 194:6
195:15 196:24
197:9,15,25
198:1,14,19
199:1 200:8,9
203:10,19
204:11,20
207:1,18
208:10,13,23
209:11,20
210:1 213:16
214:14 215:23
217:17 219:13
220:6,13
221:8,12
222:24 223:5,
17 224:6
225:12,18
226:5,10
227:12 228:13
229:7,20
232:16,22
234:18 235:4,
14,17,21
236:22 237:10
238:9,12,15,
22,25 239:20
240:14,16,21
241:1 246:7
248:3 252:20

**140-day**
18:15

**149**
4:5,6

**14's**
213:22

**14th**
2:5

**15**
20:4 92:4
157:2

**16**
92:8 210:11
258:3

**163**
4:6

**17**
180:21
204:14,15,17,
19 206:18

**170**
4:7

**1706**
50:6 52:12,21
54:15 55:17,
21,24 56:11,
14 57:2,4
80:14

**172**
4:7

**18**
163:19 206:19

**1976**
14:4

**1981**
14:6

**1984**
14:20

**1993**
15:13

**1994**
7:5

**1995**
7:1

**1996**
15:6,13

**1st**

61:5

---

**2**

**2**
3:3 32:12

**20**
12:16 92:6,13
215:14 240:5,
9

**200**
72:20 73:3

**2000**
17:16 22:3

**2001**
17:16 22:3,4

**2003**
17:16,17
22:3,4

**2004**
17:17,18

**2005**
49:22 140:1
185:9

**2006**
58:9,19 63:4
68:5 88:4,9,
19 247:7
248:1 251:16
252:9

**2007**
58:7 71:2,15,
20 79:14,17
80:4 82:11
86:15 89:15,
20 93:19
94:17 95:12,
24 126:9
130:15 136:11
139:11,14,22

**2008**
24:24

**2009**
22:8 24:24

71:24 105:1,
16 112:2
118:14 129:17
130:3 137:18
139:13,18
140:23 141:23
142:1,10
143:3,9
149:9,12
156:8 162:3
163:19 176:4
191:23,24
218:11,17
220:9 228:16
251:19 252:12

**2009-2011**
12:5

**2011**
6:12,18 22:8
32:16,23
71:24 129:18
130:3 136:6
155:14 176:5
191:23,25
215:14 216:1
218:10,17
219:5 223:17
228:17 229:1
232:23,24
251:20 252:12

**2012**
1:14 256:10,
18 258:11

**2015**
222:10

**202**
2:11

**20530**
2:11

**209**
2:5

**21**
92:9,17



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

310

**215**
4:8

**218**
4:4,12 80:2,
5,7,14,22
81:10,14,21,
25 82:5,7,21
83:6 84:5,13,
23 85:12
86:2,15,17,
18,23 87:1,
12,19 88:20
89:3,10 93:18
94:10 95:10,
14 96:5 97:3,
20,23 98:2,9
99:3 106:19
126:5,9
134:5,13,19
135:4

**219**
4:9

**21st**
159:5

**22**
135:21

**220**
258:14

**221**
4:9

**223**
4:10

**228**
4:10

**24**
134:1 135:24
150:17 216:1
219:6

**242**
3:5

**244**
72:20

**25**
68:3,4 134:1

**254**
3:7 72:20
242:21

**256**
3:8

**26**
68:4 223:17
229:1 232:24

**28**
4:12 72:17
79:21,22,25

**281**
2:15

**283**
258:16

**29**
4:13 77:15
105:17,18,23
232:3

**2-minute**
156:20

**3**

**3**
4:12 62:7,9,
13,18 63:7
75:23 98:15,
16,19 149:9
164:2

**30**
126:9 130:15
136:11 229:24
230:1 231:17
256:25
257:10,18,22

**300**
211:16

**305-0185**
2:11

**30th**

**233:11**

**31**
90:8,9

**34**
258:2

**35**
4:2 191:9

**3524**
158:18

**3527**
158:18

**3529**
158:19

**3539**
158:19

**3541**
158:20

**36**
242:12

**362**
4:13 105:20
106:1,3,18
108:6 109:12
110:7 111:5,
18 112:12,23
113:10 114:7
115:4 116:15,
18 117:4,11,
12,14 118:16
119:3,15
122:8,12,18
123:1 124:3,
21 125:6
126:4 137:1
140:17 145:19
146:15,23
148:15,19
153:21 156:3,
4 159:10,11
160:16 162:4
163:3,5,22
164:7 166:4
167:5,8,20,25

**168:24 169:3**
179:23
192:14,19,25
193:12 239:20
246:6

**362's**
162:7

**3631**
258:13

**37**
191:7,10

**3A.2**
77:14

**4**

**4**
54:18

**4/23/07**
83:4

**40**
223:21 226:11
228:11
246:12,13,24

**4201**
2:14

**425**
1:15

**45**
206:3

**46**
31:18 32:2
242:13,15,16

**4710**
158:21

**48**
4:3 51:24
150:17

**48-hour**
52:1,2

**5**

**5**
36:12 37:14,

**19,22 39:1**
44:15 54:18
55:7 106:11
113:11,16,
18,22 125:18
149:12
154:16,25
258:2

**5.11**
137:21,25
138:7,11,13,
20 139:16
140:8,12,14
141:22 143:5,
8 146:6,7,10
147:25 153:20
218:14,16
219:5

**5.11-D**
142:10

**5/17/12**
77:4

**500**
203:7

**5000**
71:7

**51**
31:18

**512**
2:6

**512634-1980**
258:15

**520**
4:2 35:21,24

**521**
4:3 48:25
49:3

**522**
4:3 58:13

**523**
4:4 82:13,16

**524**



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Robert Duncan

June 7, 2012

311

**4:4** 126:1,6
**525**
4:5 137:3,6
**526**
4:5 149:8
**526-527**
149:3
**527**
4:6 149:11
170:18
**528**
4:6 163:12,15
**529**
4:7 170:15,18
**530**
2:14 4:7
172:6,9
**531**
4:8 215:5,7
**531-532**
215:2
**532**
4:8 215:5,8,
10 216:4
**533**
4:9 219:1,4
**534**
4:9 221:24
222:2
**535**
4:10 223:11,
14
**536**
4:10 228:21,
24
**54**
126:12,14
132:22
**55**
132:22
**57**

133:21
**58**
4:3
**580-6310**
2:15
**5th**
13:17 14:13
78:3 157:2
——— **6** ———
**6**
3:5 54:19
107:4,13,16
**60**
183:8 226:10
**60th**
214:9,11
**615**
210:21
**63.0101**
180:17
**65.0541**
207:2
——— **7** ———
**7**
54:15,20
107:16 230:19
231:1 256:10,
18
**700**
210:18,21
232:5
**7161**
2:10
**77**
242:20
**77068**
2:15
**78701**
2:6 258:15
**79**

**4:12**
**7th**
1:14
——— **8** ———
**8**
99:18 164:12,
21
**80th**
77:13
**816**
1:15
**82**
4:4
——— **9** ———
**9**
80:11 179:15
**90**
31:8
**900**
203:7
**90s**
7:1
**930**
1:14 211:17
**936-6432**
2:6
——— **'** ———
**'94**
7:1 25:7
——— **9** ———
**95**
25:7
——— **'** ———
**'95**
25:7
——— **9** ———
**950**
2:10

**96**
72:21
——— **'** ———
**'96**
93:4
**'97**
93:5
——— **9** ———
**98**
4:12
**99**
135:9
——— **'** ———
**'Well**
126:22



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com