## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
                                   )
        Plaintiff,                 )
                                   )
VS.                                )   CASE NO. 1:12-CV-00128
                                   )   (RMC-DST-RLW)
ERIC H. HOLDER, JR., in his        )   Three-Judge Court
official capacity as Attorney)
General of the United States,)
                                   )
        Defendant.                 )
                                   )
ERIC KENNIE, et al.,               )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS STATE CONFERENCE OF          )
NAACP BRANCHES, et al.,            )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al.,            )
                                   )
        Defendant-Intervenors,     )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al.,                    )
                                   )
        Defendant-Intervenors,     )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
        Defendant-Intervenors.     )
------------------------------------

ORAL DEPOSITION OF
MEREDYTH FOWLER
JUNE 8, 2012

------------------------------------

ORAL DEPOSITION of MEREDYTH FOWLER, produced as a

## 2

1   witness at the instance of the Defendant, and duly
2   sworn, was taken in the above-styled and numbered cause
3   on the 8th day of June, 2012, from 9:31 a.m. to 4:35
4   p.m., before Jean Thomas Fraunhofer, CSR in and for the
5   State of Texas, reported by machine shorthand, at the
6   Law Offices of DECHERT LLP, 300 West 6th Street, Suite
7   210, Austin, Texas 78701, pursuant to the Federal Rules
8   of Civil Procedure and the provisions stated on the
9   record or attached hereto.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 3

1           A P P E A R A N C E S
2
3   FOR THE PLAINTIFF:
4       PATRICK K. SWEETEN
        Assistant Attorney General
5       ATTORNEY GENERAL OF TEXAS
        P.O. Box 12548
6       Austin, Texas 78711
        Tel: (512) 936-1307
7       Email: Patrick.sweeten@oag.state.tx.us
8
9   FOR THE DEFENDANT:
10      RISA BERKOWER
        DAN FREEMAN
        Trial Attorneys
11      U.S. DEPARTMENT OF JUSTICE
        950 Pennsylvania Avenue, NW
12      Washington, DC 20005
        Tel: (202) 305-0115
13      Email: Risa.berkower@usdoj.gov
14
15  FOR THE DEFENDANT-INTERVENOR:  TEXAS STATE CONFERENCE OF
    NAACP BRANCHES and THE MEXICAN AMERICAN LEGISLATIVE
    CAUCUS
16
17      LINDSEY B. STELCEN
        AMY L. RUDD
        DECHERT LLP
18      300 West 6th Street, Suite 2010
        Austin, Texas 78701
19      Tel: (512) 394-3000
        Email: Lindsey.stelcen@dechert.com
20
21  FOR SPEAKER STRAUS:
22      MR. THOMAS R. PHILLIPS
        BAKER BOTTS
23      98 San Jacinto Boulevard, Suite 1500
        Austin, Texas 78701
24      Tel: (512) 322-2565
        Email: Tom.phillips@bakerbotts.com
25

## 4

1           I N D E X
    WITNESS                          PAGE
2
    MEREDYTH FOWLER
3       Examination by Ms. Berkower            6
        Examination by Ms. Stelcen          199
4       Examination by Mr. Sweeten          205
5
    Signature and Changes               206
6   Reporter's Certificate              207
7         E X H I B I T S
8   NO.     DESCRIPTION             PAGE
9   Exhibit US-5    SB14 (previously marked)   165
    Exhibit US-6    OCGA §21-2-417 (previously  130
10                  marked)
    Exhibit US-29   SB362 (previously marked)   75
11  Exhibit US-60   PL109-2005 (Indiana)        134
                    (previously marked)
12  Exhibit US-431  Texas Legislature Online     48
                    Bills Out of Committee
13                  (previously marked)
14  Exhibit US-640  Notice of Deposition         14
    Exhibit US-641  2/9/11 Press Release         44
15  Exhibit US-642  4/28/09 Clear Lake GOP Press 96
                    Release
16  Exhibit US-643  January 2011 Interim Report 109
    Exhibit US-644  SB14                        117
17  Exhibit US-645  3/1/11 Witness List         145
    Exhibit US-646  3/1/11 Select Committee     159
18                  Hearing transcript
                    (Vol. 2 of 2)
19  Exhibit US-647  9/22/11 Email to John Sephri 182
                    from Meredyth Fowler
20  Exhibit US-648  6/14/11 Email to Andrew     185
                    Bilford, et al from Ashley
21                  Kaden
    Exhibit US-649  9/12/11 Email chain between 187
22                  Ashley Kaden and Andrew
                    Bilford
23  Exhibit US-650  March 2011 Email chain      191
24  Exhibit RODRIGUEZ-36 3/23/11 House Floor Debate  170
                    Transcript (TX00211181-281)
25                  (previously marked)



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 5

1         MEREDYTH FOWLER,
2 having been first duly sworn, testified as follows:
3     MS. BERKOWER:  Okay.  Good morning.  This
4 is the case of the State of Texas versus Eric Holder,
5 Case No. 12-CV-128 in the US District Court for the
6 District of Columbia.  Today's June 8th, 2012 and this
7 is the deposition of Meredyth Fowler.  My name is Risa
8 Berkower, and I represent the Attorney General, Eric
9 Holder, in this matter.  Do you want appearances of
10 counsel?
11     THE REPORTER:  Yes.
12     MR. FREEMAN:  My name is Dan Freeman, and
13 I also represent Attorney General, Eric H. Holder.
14     MS. RUDD:  I'm Amy Rudd.  I represent the
15 intervenors, the NAACP and Mexican Legislative Caucus.
16     MS. STELCEN:  Lindsey Stelcen also on
17 behalf of the intervenors, NAACP and the Mexican
18 American Legislative Caucus.
19     MR. PHILLIPS:  Tom Phillips.  I represent
20 Speaker Straus.
21     MR. SWEETEN:  I'm Patrick Sweeten with the
22 Texas Attorney General's Office, and I'm representing
23 the State of Texas and the witness, Meredyth Fowler.
24     MS. BERKOWER:  Do you need to step out a
25 second based on --

## 6

1     MR. SWEETEN:  No, we'll get started.
2          EXAMINATION
3 BY MS. BERKOWER
4   Q.  So Ms. Fowler, are you represented here by
5 counsel today?
6   A.  Yes.
7   Q.  Who is that?
8   A.  Patrick.
9   Q.  Mr. Sweeten?
10   A.  Yes.
11   Q.  And when did that representation begin?
12   A.  Five minutes ago.
13   Q.  So you've been placed under oath.  It's
14 important to testify truthfully, accurately and
15 completely as a result.  The court reporter will prepare
16 a transcript of everything that's said today.  So I
17 would ask that you respond to my questions verbally.  No
18 head shaking or nodding so that your answer can be
19 recorded, and please wait for me to finish my question
20 before you answer, and I will try to do the same for
21 you.  I'll try to ask you clear questions, so if you
22 don't understand my question, let me know.
23     If you wish to stop and take a break, tell
24 me and I'll try to accommodate you, but we'll try to
25 keep our breaks relatively short in the interest of

## 7

1 moving things along.  From time to time your attorney
2 may make an objection.  He's making these objections for
3 the record.  Unless he instructs you not to answer, you
4 can go ahead and answer.  If he counsels you to only
5 answer to the extent that information is not privileged,
6 please clarify for the record whether you are not
7 answering or not answering completely based on his
8 instruction so that we have a clear record.  Does that
9 make sense?
10   A.  Yes.
11   Q.  Do you understand these instructions?
12   A.  Yes.
13   Q.  Do you have any questions about any of these
14 instructions?
15   A.  No.
16   Q.  Are you on any medication today that would
17 affect your ability to testify?
18   A.  No.
19   Q.  Is there any reason why you cannot testify
20 truthfully and accurately today?
21   A.  No.
22   Q.  If I refer to you unless I specify otherwise,
23 I'm asking you a question about you in your capacity as
24 a staff member for Representative Joe Straus; do you
25 understand?

## 8

1   A.  Yes.
2   Q.  I may use the terms voter ID and photo ID
3 interchangeably during this deposition.  I want you to
4 interpret the term broadly to mean a requirement that a
5 voter present a form of identification, whether it has a
6 photo or otherwise, when voting in person before being
7 permitted to vote by regular ballot.  Does that make
8 sense?
9   A.  Yes.
10   Q.  When I refer to the term minority voters, I
11 mean voters who are non-white or non-anglo.  Do you
12 understand these terms?
13   A.  Yes.
14   Q.  If you have any questions about what I mean
15 when I'm asking a question, please ask.  So have you
16 ever been deposed before?
17   A.  No.
18   MR. SWEETEN:  When you say "you," you mean
19 on behalf of Speaker Straus?  That's how you defined it,
20 so --
21     MS. BERKOWER:  Okay.  Well, then I'll --
22     MR. SWEETEN:  Do you want to change that
23 instruction or --
24     MS. BERKOWER:  Yeah.
25     MR. SWEETEN:  -- or do you want to ask her



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 9 |
|---|

1 about herself.
2     Q.  (BY MS. BERKOWER) Well, I'll ask about you.
3 Have you ever been deposed before in your capacity as
4 Speaker Straus's employee or outside of that?
5     A.  No.
6     Q.  And with the same definition of you, have you
7 ever been a party in litigation?
8     A.  No.
9     Q.  With the same definition of you, have you ever
10 been involved in a case where the State of Texas was the
11 plaintiff or defendant?
12     A.  No.
13     Q.  What did you do to prepare for today's
14 deposition?
15     A.  Spoke with this guy in the Attorney General's
16 Office with Patrick and the Attorney General's Office.
17     Q.  Who else from the attorney generals office, if
18 you remember?
19     A.  I think his first name is Reynolds.
20     Q.  Mr. Brissenden?  When did you meet with them?
21     A.  This week.
22     Q.  Do you remember what day this week?
23     A.  I believe it was Wednesday.
24     Q.  How long did you meet with them?
25         MR. SWEETEN:  You mean in your capacity

| 10 |
|---|

1 with the speaker's office or do you mean you in terms of
2 her?  I don't really understand the question.
3         MS. BERKOWER:  Okay.  Well, I guess then
4 for these introductory questions, I will just ask you as
5 a general matter without limiting her capacities as an
6 employee for Speaker Straus and then when we get into
7 the questions that relate more to her employment, I'll
8 switch back to that definition?
9         MR. SWEETEN:  All right.
10     Q.  (BY MS. BERKOWER) So we were talking about your
11 preparation for today's deposition, and you said met
12 with Mr. Sweeten and Mr. Brissenden on Wednesday.  Do
13 you remember how long you met with them approximately?
14     A.  It was about two hours.
15     Q.  Who else was present, if anybody?
16     A.  Justice Phillips.
17     Q.  Okay.  Mr. Phillips?
18     A.  Yes.
19     Q.  Did you review any documents in preparation for
20 today's deposition?
21         MR. SWEETEN:  You can answer yes or no to
22 that question.
23     A.  Yes.
24     Q.  Did you review they non-privileged documents in
25 representation for today's deposition?

| 11 |
|---|

1         MR. SWEETEN:  You can answer what you
2 reviewed.  That's fine.
3     A.  I think I just reviewed the deposition notice.
4 That's all I can recall as far as documents.
5     Q.  Okay.  Other than your attorneys, did you speak
6 to anyone about your deposition here today?
7     A.  I told my parents I was being deposed and my
8 office co-workers.
9     Q.  What was the nature of those conversations?
10     A.  Just telling them I was being deposed.
11     Q.  Did you get into the substance of what you were
12 going to talk about?
13     A.  No.
14     Q.  More of a scheduling thing?
15     A.  Pretty much just telling them I'm going to be
16 deposed.  I don't know what they're going to ask me.  I
17 wonder how long it's going to take.
18     Q.  That's a good question.
19     A.  I'm kind of stuck.
20     Q.  Did you speak to any other legislature or staff
21 members in the Texas legislature about your deposition
22 today?
23     A.  I asked Bryan Hebert if he will be deposed and
24 he said yes.
25     Q.  Did you discuss the content of his deposition

| 12 |
|---|

1 when you talked to him?
2     A.  No.
3     Q.  When did you ask him that?
4     A.  Within the last month.
5     Q.  Was anyone else present when you talked to him?
6     A.  No.  It was -- I just sent him a text.
7     Q.  Did you talk to any other legislatures or staff
8 members about your deposition?
9     A.  Not that I can recall.
10     Q.  You said though you talked to people in your
11 office.
12     A.  Yes.  My co-workers, just with them, I was
13 being deposed.
14     Q.  Did you speak to anyone else other than
15 Mr. Hebert who has already been deposed in this case
16 about your deposition here today?
17     A.  Other than my parents?
18     Q.  Well, anyone who had already been deposed in
19 this case.
20     A.  Oh, no.
21     Q.  And is there anybody else you've spoken with
22 about your deposition today that you haven't already
23 mentioned?
24     A.  I told some co-workers.  I told my best friend
25 I was being deposed.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 13

1    Q.  Did you discuss the content of what you were
2  going to talk about today's with her --
3    A.  No.
4    Q.  -- or him?
5    A.  No.
6    Q.  And did you talk about your deposition today
7  about Speaker Straus?
8    A.  No.
9    Q.  What office do you currently work in?
10   A.  Speaker Straus's office.
11   Q.  Is that the office here in office or are there
12 other offices as well?
13   A.  It's the one in Austin.
14   Q.  And what are the names of your co-workers here
15 at the office in Austin?
16   A.  Jesse Ancira, Ashley Kaden Andrew Blifford,
17 Andrea Sheridan, John Schnautz, Zeke Reyna, Kevin
18 Robnett, Jennifer Deegan, Allison Winney, Kari Torres,
19 Carolyn Scott, Channing Burke.  That's all I can think
20 of at the moment.
21   Q.  Okay.  If you think of anybody else, you can
22 just say.  So did you bring any documents or notes with
23 you today?
24   A.  I brought the deposition notice with me.
25   Q.  Anything else?

## 14

1    A.  No.
2        (Exhibit 640 marked.)
3    Q.  So speaking of the notice of deposition, we
4  have what's going to be marked as Exhibit 640 for this
5  deposition.  I actually don't have a copy for Justice
6  Phillips.  Do you mind?
7        MR. PHILLIPS:  I'll suffer through it.
8        MS. BERKOWER:  I have four copies total.
9        MR. PHILLIPS:  I've seen it.
10   Q.  (BY MS. BERKOWER) Do you recognize this
11 document?
12   A.  Yes.
13   Q.  What is it?
14   A.  The notice for deposition.
15   Q.  Is it your notice of deposition?
16   A.  It has my name on it.
17   Q.  So it's a notice of deposition that we're going
18 to take your deposition; is that accurate?
19   A.  Yes.
20   Q.  Directing your attention to Attachment A of the
21 notice, did you undertake a search for these documents?
22   A.  Yes.
23   Q.  When did you do that?  And I guess I should be
24 clear.  Now I'm talking about her and her employment
25 with Speaker Straus.

## 15

1        MR. SWEETEN:  Okay.
2    A.  Within the last two months.
3    Q.  Where did you look for these documents?
4    A.  I looked in my office, email, my office
5  documents, and my phone.
6    Q.  Did you look for other electronic documents
7  other than your emails?
8    A.  Can you clarify?
9    Q.  Well, I know you said you searched for emails,
10 and were there other documents that you may have saved
11 on your network or your computer that were not emails
12 that you searched?
13   A.  Yes.
14   Q.  What -- Like generally can you describe your
15 search?
16   A.  Sure.  I looked in my computer files on my work
17 computer.
18   Q.  Did you look at paper files as well?
19   A.  Yes.
20   Q.  Where were those paper files located?
21   A.  In my office.
22   Q.  And when you say your office, you are referring
23 to an office that you have inside Speaker Straus's
24 Austin office?
25   A.  Yes.

## 16

1    Q.  You said Speaker Straus has more than one
2  office.  Did you look for any documents in his office?
3    A.  No.
4    Q.  Why not?
5    A.  I don't work in his other office.
6    Q.  Okay.  Did you also look on your home computer?
7    A.  I did.
8    Q.  Do you have any home office files that you
9  looked at as well?
10   A.  I don't have any office files on my home
11 computer.
12   Q.  And you said you looked on your phone.  Is that
13 a work phone or a personal phone?
14   A.  It's a personal phone.
15   Q.  Do you also have a government issued phone?
16   A.  I do not.
17   Q.  Okay.  Did you produce documents to your
18 attorneys --
19   A.  Yes.
20   Q.  When did you do that?
21   A.  Within the last two months.
22   Q.  Did you discuss asserting privilege over any of
23 those documents without revealing the content of your
24 discussion?
25   A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Meredyth Fowler

June 8, 2012

---

17

1    Q.  Do you remember when that was?
2    A.  This week.
3    Q.  Who did you discuss that with?
4    A.  My attorneys.
5    Q.  Mr. Sweeten and Mr. Brissenden?
6    A.  Yes.
7    Q.  And Judge Phillips, I guess?
8    A.  Yes.
9    Q.  How do you usually communicate with people in
10   your office?
11   A.  Usually conversations face-to-face.
12   Q.  Do you use email as well?
13   A.  Yes.
14   Q.  How often do you use email?
15   A.  Daily.
16   Q.  How often per day?
17   A.  Every hour.
18   Q.  Would you say that more like -- if you had to
19   divide up the -- percentage-wise the number of
20   communications that you have with people in your office
21   from face-to-face conversations, telephone conversations
22   and emails, like about roughly what would that breakdown
23   be?
24   A.  My estimation would be 80 percent face-to-face
25   conversations and maybe 20 percent emailing.

---

18

1    Q.  Do you talk on the phone as well?
2    A.  Rarely with co-workers since we're so close in
3    proximity.
4    Q.  How about text messaging?
5    A.  Occasionally.
6    Q.  Just in a ballpark, what is occasionally?  Like
7    once per day, once per week?
8    A.  I would estimate two or three teams a week.
9    Q.  Does it vary depending if you're in session or
10   not?
11   A.  Very much.
12   Q.  So when you are in session, about how often do
13   you communicate via text?
14   A.  Multiple times hourly.
15   Q.  Okay.  And you said you searched your phone for
16   any relevant communications.  Were you searching your
17   text messages?
18   A.  Yes.
19   Q.  Do you keep your text messages generally?
20   A.  Generally, yes.
21   Q.  Did you find any text messages that were
22   relevant to this case?
23   A.  I did not.
24   Q.  Have you deleted any, do you remember, that
25   were relevant to this case?

---

19

1    A.  I do not recall deleting any.
2    Q.  How often do you communicate with Speaker
3    Straus?
4    A.  Not very often.
5    Q.  Would you say once a day, less than once a day?
6    A.  Less than once a day.
7    Q.  Once a week?
8    A.  No.
9    Q.  Is that in session or does it vary whether
10   you're in session or out of session?
11   A.  It does.
12   Q.  So when you're in session, how often do you
13   communicate with him?
14   A.  I would say a couple times a week.
15   Q.  And, generally, what's the nature of those
16   conversations without revealing anything specific?  Is
17   he giving you instructions?  Are you updating him?  What
18   type of conversations are you having with him?
19        MR. SWEETEN:  You can give -- If you are
20   able to characterize those, you can give a general
21   subject matter description.  Do not discuss
22   communications that you've had with Speaker Straus.
23        MS. BERKOWER:  And I think you mean don't
24   reveal the content.
25        MR. SWEETEN:  I mean, don't discuss the

---

20

1    specifics of the communications you've had with Speaker
2    Straus.  Do not reveal the substance of them.
3    A.  Generally, I give him an update on policy
4    issues.
5    Q.  Are you assigned to certain policy areas?
6    A.  Yes.
7    Q.  What policy areas are those?
8    A.  I have five committees.  I have county affairs,
9    urban affairs, pensions, investments and financial
10   services, land and resource management and elections.
11   Q.  So would it be safe to say that when you give
12   policy updates to the -- the -- the speaker, it's based
13   on any developments from one of those committees that
14   you're in charge of?
15        MR. SWEETEN:  Don't reveal the
16   communications you've had with the speaker.  I think
17   I've allowed her to give a general subject matter
18   description of communications she had.  That's the way
19   you asked it, so we are not going to give you any
20   additional substance of the communications she's had
21   with Speaker Straus.
22   Q.  Okay.  Have you ever been assigned to cover any
23   select committees during your employment?
24   A.  Yes.
25   Q.  Which are those?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 21

1   A.  I recall two.  One is the select committee on
2   voter ID and voter fraud.  The other was a select
3   committee on government reform, I believe.
4   Q.  And since it sounds like you -- there's
5   probably other people between you and Speaker Straus,
6   who do you communicate with most frequently?  Who's
7   above you in the office?
8       MR. SWEETEN:  You can answer that question
9   as phrased.
10  A.  That would be our budget and policy director
11  which was Lisa Kaufman, and, occasionally, I would talk
12  with Denise Davis.
13  Q.  So on a day-to-day basis, who are you
14  receiving -- who's supervising you?
15  A.  That would be Lisa Kaufman.
16  Q.  Do you know how documents are generally
17  maintained in Speaker Straus's office?
18  A.  Can you clarify maintained?
19  Q.  Sure.  Do you have a document retention policy
20  or is someone in charge of that?
21  A.  We don't have an office policy.  It's up to the
22  individual's discretion.
23  Q.  Did you ever receive instructions on how to
24  retain documents or how to exercise that discretion?
25  A.  I don't recall.

## 22

1   Q.  But there's nothing written?
2   A.  Not that I can think of.
3   Q.  Have you ever maintained any files specific to
4   particular pieces of regulation?
5   A.  Yes.
6   Q.  Have you maintained any files specific to
7   pieces of legislation that relate to voter
8   identification?
9   A.  Yes.
10  Q.  Did you -- Do you still have those files?
11  A.  I turned over files to the Attorney General's
12  Office.
13  Q.  So you have -- you have kept those and they
14  were part of what you gave over in response to this
15  notice?
16  A.  Yes.
17  Q.  Were there any files specific to SB14?
18  A.  Yes.
19  Q.  When the legislature's in session and there's
20  ongoing hearings, do you ever communicate with the
21  speaker when he's on the floor?
22      MR. SWEETEN:  You can answer that yes or
23  no.
24  A.  Yes.
25  Q.  Now often have you done that?

## 23

1   A.  I don't know a specific number of times.
2   Q.  Do you remember how you communicated with him,
3   like what means you used?
4   A.  Voice-to-voice --
5       MR. SWEETEN:  You can answer.
6   A.  I'm sorry.  Face-to-face conversations.
7   Q.  Okay.  And do you know how Speaker Straus
8   usually communicates with other legislators and their
9   staff?
10  A.  I do not.
11  Q.  Are staff allowed on the floor of the House?
12  A.  Certain staff are.
13  Q.  Who is allowed?
14  A.  Staff from the speaker's office.
15  Q.  Okay.  So no other legislator's staff are
16  allowed on the floor?
17  A.  Generally, no.
18  Q.  What are the exceptions if you -- it sounds
19  like maybe you think there are a few exceptions.
20  A.  I don't know if they do ask for specific
21  permission or not.
22  Q.  Who would they ask?
23  A.  My -- I don't know.
24  Q.  Have you seen other staff on the floor?
25  A.  I can't recall seeing any other staff.

## 24

1   Q.  So this might seem a little redundant, but will
2   you be invoking any privileges during your deposition
3   today?
4   A.  Yes.
5   Q.  What are those?
6   A.  Legislative privilege.
7   Q.  Anything else?
8       MR. SWEETEN:  Well, I mean, it depends on
9   what you ask her, but, obviously, she will assert the
10  attorney-client privilege with respect to any
11  communications she's had with me, Justice Phillips,
12  members of the Office of the Attorney General.  If you
13  ask her about her medical treatment, we may assert the
14  physician --
15  Q.  (BY MS. BERKOWER) Okay.  Well, then we'll be
16  ending early.
17      Have you asserted -- Have you asserted any
18  privileges over -- or have you asserted any privileges
19  over documents or other materials in your possession
20  that relate to voter identification legislation?
21      MR. SWEETEN:  She's just asking -- Do you
22  mean submit it to us, do you mean?
23      MS. BERKOWER:  Yes, yes.  I can -- I can
24  say that again.
25      MR. SWEETEN:  She was just confused by the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

## 25

1    question.  You can answer whether or not about documents
2    and who they have been turned over to.
3       A.  Okay.  Yes, yes.  You asked if I was asserting
4    privilege over documents?
5       Q.  Yes.
6       A.  Yes.
7       Q.  And do you know if documents that relate to
8    voter identification have been withheld from production
9    as a result of your assertion of privilege?
10      A.  I don't know.
11      Q.  Can you describe your -- Can you describe your
12   educational background?
13      A.  Do you want the names of schools I went to?
14      Q.  Sure.
15      A.  For college, I went to Southwest Texas and for
16   law school I went to South Texas College of Law.
17      Q.  When did you graduate law school?
18      A.  May of 2004.
19      Q.  Do you maintain an active bar license?
20      A.  I do.
21      Q.  Where?
22      A.  In Texas.
23      Q.  Anywhere else?
24      A.  No.
25      Q.  Can you list all of the jobs you've had since

## 26

1    you graduated from laws school?
2       A.  Yes.
3       Q.  What are they?
4       A.  Do you want dates?
5       Q.  Just like years or months, if you remember.
6       A.  Okay.  I started and Peggy Hamric in November
7   of 2004 and moved on to Senator Eltife in November of
8   2006.  I left his office in March of 2008 and worked for
9   Tim Tuggey and left his office in February of 2009 to
10   work for Speaker Straus.
11      Q.  And when -- what were -- what was the nature of
12   your jobs for all of these people.  They are all Texas
13   legislators.  Is that accurate?
14      A.  All except for Tim Tuggey.
15      Q.  Okay.  So starting with your first position,
16   Ms. Hamric?
17      A.  Hamric.
18      Q.  Hamric, what did you do for her?
19      A.  I was her chief of staff.
20      Q.  And you said you left then for a senator -- to
21   work for a senator?
22      A.  Yes.  For Senator Eltife.  I was his general
23   counsel.
24      Q.  And after that, you worked for Tim Tuggey, you
25   said?

## 27

1      A.  Yes.
2      Q.  What did you do?
3      A.  He was a lobbyist.
4      Q.  A lobbying firm?
5      A.  It's a law firm and a lobbying firm.
6      Q.  What kinds of issues were you a lobbyist for?
7      A.  Natural resources.  I think our main focus was
8   national resource issues.
9      Q.  And you said then you left to work for Speaker
10   Straus --
11      A.  Yes.
12      Q.  -- in 2009?
13      A.  Yes.
14      Q.  What was your -- What was your title when you
15   came to work for Speaker Straus?
16      A.  Counsel to the speaker on general government.
17      Q.  Is that still your title?
18      A.  Yes.
19      Q.  And so when approximately did you start that
20   position?  You may have said that already.  I don't
21   remember.
22      A.  It was February 2009.
23      Q.  What are your responsibilities in that
24   position?
25      A.  I'm a policy analyst.

## 28

1      Q.  What does that mean?
2      A.  Generally I read legislation, sit in committee
3   hearings, listen to testimony on pieces of legislation,
4   meet with constituents, meet with special interest
5   groups.
6      Q.  Do you belief -- Do you provide advice to the
7   speaker about -- about the issues you cover?
8         MR. SWEETEN:  You can answer the question
9   as phrased yes or no.
10     A.  Yes.
11      Q.  Do you advise the speaker on whether to support
12   or oppose legislation that's being heard by the
13   legislature?
14         MR. SWEETEN:  I think you are starting to
15   get into his -- the processes that he uses to consider
16   legislation when you are asking him that.  I think we're
17   moving into a privileged area.
18      Q.  Are you advising her not to answer?
19      A.  Yeah.  As phrased I am.
20      Q.  Do you participate in legislative drafting for
21   the speaker?
22         MR. SWEETEN:  You can answer yes or no to
23   that question.
24      A.  Can you clarify what you mean by legislative
25   drafting?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



29

1    Q.  Do you ever draft legislation?
2    A.  No.
3    Q.  Do you help other people draft legislation?
4    A.  No.
5    Q.  Just as a procedural matter, can the speaker --
6  like among the House rules, can the speaker introduce
7  amendments to a bill?
8        MR. SWEETEN:  You are just asking as a
9  general matter --
10       MS. BERKOWER:  As a general matter --
11       MR. SWEETEN:  -- of parliamentary
12  procedure.
13       MS. BERKOWER:  Exactly.
14       MR. SWEETEN:  She can answer the question.
15   A.  No.
16   Q.  Can he introduce legislation?
17   A.  As a general matter, my understanding is no.
18   Q.  Is there any circumstance in which he could --
19  like, I guess -- and just to be clear, I'm trying to
20  understand if there is a distinction when he's serving
21  as a representative of his district versus as the
22  speaker.  Can he introduce legislation at all if he's
23  not sitting as the speaker presiding?
24   A.  My understanding of the House rules is no, he
25  does not introduce or carry legislation.

30

1    Q.  Because he's also the speaker?
2    A.  That's my understanding.
3    Q.  And does the same -- the same understanding
4  applies to amendments?
5    A.  Yes.
6    Q.  Have you ever drafted amendments to a bill?
7    A.  Yes.
8    Q.  So do you work with other legislators to do
9  that?
10   A.  Yes.
11   Q.  Does the speaker just as a matter of procedure,
12  is he allowed to vote on amendments?
13   A.  My understanding is no.
14   Q.  What House district does Speaker Straus
15  represent?
16   A.  121.
17   Q.  Do you know what the demographics of that
18  district are?
19   A.  I do not.
20   Q.  Where is the district located generally?
21   A.  Generally it's in San Antonio.
22   Q.  And I think you sort of got into this a little
23  bit before, but how many staff does the speaker have,
24  just a rough estimate of the number?
25   A.  I think a rough estimate would be around 15.

31

1    Q.  And, generally, are people grouped into
2  different areas of responsibility?
3    A.  Yes.
4    Q.  What -- What are those areas?
5    A.  We have communication staff and policy staff.
6    Q.  Can you name the members of the policy staff?
7    A.  Yes.
8    Q.  Who are they?
9    A.  Jesse Ancira, Andrew Blifford, Ashley Kaden,
10  Jennifer Deegan, Zeke Reyna, John Schnautz, Kevin
11  Robnett, Andrea Sheridan, Allison Winney.
12   Q.  And how are people assigned to different
13  issues?  You said you were assigned to certain
14  committees.  What is the division of work in the office?
15       MR. SWEETEN:  If you are asking about
16  how -- the process by which bills are analyzed or
17  legislation is analyzed, she's not going to answer that
18  question.  If they are subject matter areas and it's a
19  general office description, you can answer it that way.
20       MS. BERKOWER:  That's what I was asking,
21  the latter.
22   A.  Can you repeat the question?
23       MS. BERKOWER:  Sure.  I guess I'm just
24  curious how work is divided in your office.  Is that an
25  acceptable question, Patrick?

32

1        MR. SWEETEN:  I mean, again, general
2  subject matter or general division of the facts of how
3  the office is organized, but as long as it doesn't
4  reveal legislatively privileged information which would
5  be about how legislation is analyzed, et cetera.
6    A.  Generally speaking, it's divided, I guess, by
7  issue.
8    Q.  Who works on -- Who worked on voter ID in the
9  office?
10       MR. SWEETEN:  You can answer the question
11  as phrased as to who worked on the issue.
12   Q.  Anybody else?
13   A.  Lisa Kaufman.
14   Q.  Anybody else?
15   A.  Denise Davis.
16   Q.  Did Jesse Ancira work on the voter ID at all?
17   A.  Not that I can recall.
18   Q.  And to be clear, who is Jesse Ancira and what
19  is his title?
20   A.  He is now chief of staff.
21   Q.  What was he in 2011?
22   A.  General counsel.
23   Q.  Do you report to him ever?
24   A.  Can you clarify report?
25   Q.  Is he your supervisor?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 33

1    A.  In a sense, yes.
2    Q.  And going back just a step or two, the location
3    of District 121, is the district located primarily
4    within the city or outside the City of San Antonio?
5    A.  I don't know.
6    Q.  Do you ever work on issues that are specific to
7    District 121?
8    A.  I don't recall ever working on that specific
9    issue related to the district.
10   Q.  Are there people in your office who do that?
11   A.  I don't know.
12   Q.  And when you said that you have assisted others
13   with -- with legislative drafting, have you ever
14   provided substantive requests to legislative council?
15       MR. SWEETEN:  Do you mean to Texas
16   legislative council?
17       MS. BERKOWER:  Yes.
18       MR. SWEETEN:  Has she ever requested
19   something from TLC?  You can answer the question as
20   phrased.  I had to think about that a second.
21   A.  Not in my role in the speaker's office.
22   Q.  When you worked for other legislators?
23   A.  Yes.
24   Q.  Did the speaker recently campaign for office?
25   A.  Yes.

## 34

1    Q.  Was that for House District 121?
2    A.  Yes.
3    Q.  When was that election?
4    A.  Last month.
5    Q.  Would that be the May 29th election?
6    A.  Yes.
7    Q.  What was the -- What was the outcome of that
8    election?
9    A.  He won reelection.
10   Q.  Was he -- Did he have an opponent in the
11   primary?
12   A.  He did.
13   Q.  It was a primary, right?
14   A.  Yes.
15   Q.  Was photo ID an issue in his campaign?
16       MR. SWEETEN:  You can talk about matters
17   of public record, campaign speeches, public statements,
18   but don't reveal communications you've had with Speaker
19   Straus, anything that's not public record.
20   A.  I don't know.
21   Q.  So just to be clear, do you know if the speaker
22   ever publicly discussed voter ID as part of his
23   campaign?
24   A.  I don't know.
25   Q.  Can you explain the process by which a

## 35

1    representative becomes the speaker of the House?
2        MR. SWEETEN:  As a general matter, you can
3    answer the question about legislative procedure.
4    A.  He is voted into the position by the other
5    members of the House of Representatives.
6    Q.  And how does that vote just as a general
7    process matter under the House rules?  When and how does
8    that vote take place?
9    A.  If I recall correctly, I believe it's on the
10   first day of the legislative session, and if I recall
11   correctly, it's a secret ballot.
12   Q.  Are there any public speeches made in
13   connection with the election that the different
14   potential speakers make?
15       MR. SWEETEN:  Objection.  Compound.  But
16   you can answer.
17   A.  I don't recall.  I'm trying to think.  I don't
18   recall.
19   Q.  Do you remember who Speaker Straus's opponents
20   in 2011 for Speaker of the House were?
21       MR. SWEETEN:  You can answer.
22   A.  I remember Ken Paxton.
23   Q.  Do you remember any public statements that
24   either Mr. Paxton or Speaker Straus made about the vote
25   for speaker?

## 36

1    A.  I don't.
2    Q.  So do you remember any public statements that
3    Speaker Straus made in connection with his running for
4    Speaker of the House?
5    A.  I don't.
6    Q.  Did you have any involvement with the process
7    by which he became Speaker of the House?  It's a yes or
8    no question.
9        MR. SWEETEN:  You can answer that --
10   A.  No.
11       MR. SWEETEN:  -- as phrased.
12   Q.  When is the last time that you voted?
13   A.  Last month.
14   Q.  Was it in the May 29th election?
15   A.  It was early voting.
16   Q.  For the May 29th election?
17   A.  Yes.
18   Q.  Did you vote in person?
19   A.  Yes.
20   Q.  Do you usually vote in person?
21   A.  Yes.
22   Q.  How far is the -- is your polling place from
23   your house?
24   A.  Six miles.
25   Q.  Was that -- Is it the same distance for an



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 37

1  early voting polling place and an election day polling
2  place?
3      A.  I don't know.
4      Q.  When you've gone in person to vote, have you
5  ever witnessed anyone try to impersonate another voter?
6      A.  No.
7      Q.  Have you ever witnessed a noncitizen trying to
8  vote?
9      A.  No.
10     Q.  Have you ever challenged a voter's eligibility?
11     A.  No.
12     Q.  So in the time that you've worked in the House,
13  has anyone that you've worked for served on any
14  committee that handled election issues?  And at this
15  point I'm asking generally not just with regard to
16  Speaker Straus because I know she said she's worked for
17  other members of the legislature as well.
18         MR. SWEETEN:  Can you read back the
19  question?
20         (Requested portion was read.)
21         MR. SWEETEN:  You can answer.
22     A.  In my -- When I was working for them?
23     Q.  Just in the whole time you worked in the
24  legislature, has anyone you worked for served on a
25  committee that handled election issues?

## 38

1      A.  Yes.
2      Q.  Who is that?
3      A.  Senator Eltife was in the committee of the
4  wholes in the Senate.
5      Q.  When are you referring to?
6      A.  When voter ID was discussed.
7      Q.  Did you work for him at that time?
8      A.  No.
9      Q.  Okay.  So I guess I should make my question
10  more specific.
11     A.  Sorry.
12     Q.  That's okay.  During the time that you've
13  worked for other legislators, have they served on
14  committees that handled election issues?
15     A.  Not that I recall.
16     Q.  Do you have any experience in election law?
17     A.  Generally speaking, no.
18     Q.  But you said that the elections committee is
19  now one of the committees that you're assigned to in
20  your current position.
21     A.  Yes.
22     Q.  So would you -- would you -- do you have -- Is
23  that the full basis of your experience in election law?
24     A.  Yes.
25     Q.  As a general matter without revealing

## 39

1  anything -- anything -- any specific committee
2  appointments, can you explain what the speaker's
3  responsibilities are with regard to committee
4  appointments?
5         MR. SWEETEN:  You can answer as a general
6  matter.
7      A.  Can you clarify what his responsibilities are?
8      Q.  Well, under the rules is it true that the
9  speaker makes committee appointments?
10     A.  Yes.
11     Q.  So as a general matter without revealing
12  anything about any specific appointment, can you explain
13  how that process works?
14         MR. SWEETEN:  How the process of selecting
15  committee appointments works?  Is that what you are
16  asking?
17         MS. BERKOWER:  Yeah.
18         MR. SWEETEN:  So basically what you'd be
19  asking is how does Speaker Straus decide who's on a
20  committee.  To me, that would be privileged.
21     Q.  I think my original question before I tried to
22  explain it a bit asked as general matter under the
23  rules, so if there are rules that govern the procedure
24  of making committee appointments, if she could just
25  speak to those.

## 40

1         MR. SWEETEN:  In other words, is there
2  a -- are there written rules, I mean, she can refer to?
3  If there is a document that exists, it's called written
4  rules on that, but I'm not going to let her talk about
5  how committees would be chosen.  I think that's part of
6  the legislative privilege.
7         MS. BERKOWER:  Well, I guess what I'm
8  trying to say is there are rules that govern the House,
9  so are there any rules that dictate how --
10         MR. SWEETEN:  House rules that dictate
11  committee appointments is the question.  That's fine.
12     Q.  Okay.  Great.  Do you know?
13     A.  I don't know.
14     Q.  Okay.  Well, I'm glad we got that out of the
15  way.  So have you had any involvement yourself in
16  committee -- in committee appointments?  I'm not asking
17  what the involvement was.  I'm just asking --
18         MR. SWEETEN:  Okay.  You can answer yes or
19  no.
20     A.  No.
21     Q.  Are you familiar with the select committee on
22  voter identification and voter fraud?
23         MR. SWEETEN:  Familiar with the committee,
24  you can answer that.
25     A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 41

1   Q.  When was that convened?
2       MR. SWEETEN:  You can answer.
3   A.  In the 2011 session.
4   Q.  And how are special committees or select
5   committees formed as a general matter?
6       MR. SWEETEN:  I think you are asking for
7   process.
8       MS. BERKOWER:  Yes.
9       MR. SWEETEN:  That would be subject to the
10  legislative privilege.  In other words, she can answer
11  as a general matter who select -- who appoints a select
12  committee, but then if you are asking why --
13      MS. BERKOWER:  I'm not asking --
14      MR. SWEETEN:  I don't think she can reveal
15  legislative privilege.
16      MS. BERKOWER:  I'm not asking why.  I'm
17  asking the general process as a general matter pursuant
18  to House rules how are select committees run.  In if you
19  want, I can specify based on what's in the public record
20  and publicly available rules how are committees formed.
21      MR. SWEETEN:  You can answer that
22  question.
23  A.  I don't know.
24  Q.  Do you know if the speaker is tasked under any
25  rules with that responsibility?

## 42

1   A.  Yes.
2   Q.  Is he tasked under rules with that
3   responsibility?
4   A.  My understanding is yes.
5   Q.  And have you ever been involved with the
6   creation of a select committee?
7       MR. SWEETEN:  You can answer yes or no, if
8   you've ever -- Do you mean has she had discussions or do
9   you mean --
10      MS. BERKOWER:  I just mean, has she ever
11  had any role in the creation of a select committee, just
12  as a yes or no question.
13      MR. SWEETEN:  You can answer yes or no.
14  A.  No.
15  Q.  You said that you have heard of the select
16  committee on to voter identification and voter fraud.
17  Was that -- Did that committee consider a photo ID bill
18  in 2011?
19      MR. SWEETEN:  You can answer.
20  A.  Yes.
21  Q.  Did it consider any other bills to your
22  knowledge?
23  A.  To my recollection, no.
24  Q.  Was it convened for only one legislative
25  session?

## 43

1   A.  I believe so.
2   Q.  Do select committees ever convene for more than
3   one session?
4   A.  I don't know.
5   Q.  Do you know of any that have?
6   A.  I don't know.
7   Q.  Do you know of any other select committees that
8   considered only one bill?
9   A.  I don't --
10  Q.  Are you aware of any communications between
11  your office and other legislators concerning the
12  creation of the select committee?
13      MR. SWEETEN:  You can answer if you are
14  aware of any communications.
15  A.  I am not.
16  Q.  Are you aware of any communications between
17  your office and the lieutenant governor's office
18  concerning the creation of the select committee?
19  A.  I am not.
20  Q.  Are you aware of any communications between
21  your office and the governor's office concerning the
22  creation of the select committee?
23  A.  I am not.
24  Q.  Have you ever heard a reference to the select
25  committee as a "fast track committee"?

## 44

1   A.  No.
2       (Exhibit 641 marked.)
3   Q.  So I have what will be marked as Exhibit 641.
4   Have you seen this document before?
5   A.  It does not look familiar to me.
6   Q.  What is it -- What does did appear to be?
7   A.  To me it appears to be a press release.
8   Q.  Is it from Speaker Straus's office?
9   A.  I don't know.
10  Q.  Okay.  If you look to the bottom, there's a web
11  page where this was printed from.  Do you see that?
12  A.  M-hm.  Yes.
13  Q.  Based on the website address, where does it
14  appear that this press release came from?
15  A.  The website for the Texas House of
16  Representatives.
17  Q.  And does -- the press release at the top of the
18  text, it seems to identify it as coming from Speaker
19  Straus?
20  A.  Yes.
21  Q.  What is the date on the press release?
22  A.  February 9th, 2011.
23  Q.  And turning your attention to -- There's a
24  break in the middle of the page.  Do you see that?
25  A.  Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 45

1     Q.  Two lines up from the break, do you see what
2 that says?
3     A.  Yes.
4     Q.  What does it say?
5     A.  "The fast track select committee on voter
6 identification and voter fraud."
7     Q.  And what does this press release seem to do as
8 a general matter based on the title and -- I should have
9 said you can read the whole thing if you'd like.  Take a
10 moment since you are not familiar with it.
11     A.  You asked what it appears to do?
12     Q.  Yes.
13     MR. SWEETEN:  You can testify about the
14 document that she's put in front of you, but don't -- as
15 you are doing so, do not reveal any sort of motivations
16 of the legislature with respect to this press release.
17 She can ask you about the document.  As long as you are
18 not revealing privilege, you can answer.
19     A.  Okay.  It appears to announce a list of
20 committees to the public.
21     Q.  For the 2011 legislative session?
22     A.  Yes.
23     Q.  And the select committee on voter
24 identification and voter fraud is listed.  I think it's
25 where we just read from.  It's on the first page before

## 46

1 the break.
2     MR. SWEETEN:  I think it's also here on
3 the second page.
4     MS. BERKOWER:  I'm sorry.  It's No. 38 on
5 the second page too.
6     A.  Yes.
7     Q.  But on the first page, it's identified as a
8 fast track committee; is that accurate?
9     A.  I don't know if I would say identified.
10     Q.  Well, the press release says, "Key facts on
11 committees.  Fast track select committee on voter
12 identification and voter fraud."  Is that accurate?
13     A.  Yes.
14     Q.  So does the pretty release identify the select
15 committee on voter identification and voter fraud as a
16 fast track committee?
17     A.  According to the words on the page, yes.
18     Q.  Okay.  Does the press release identify any
19 other committees as fast track committees?  And take
20 your time to review it, if you'd like.
21     A.  I don't see any other statements to that effect
22 in the document.
23     Q.  Does this press release seem to identify all of
24 the committees that were announced for the 2011
25 legislative session?

## 47

1     A.  Yes.
2     Q.  And in your -- in your memory, can you think of
3 any other committees that you've heard identified as
4 fast track committees in the time you've worked in the
5 legislature?
6     MR. SWEETEN:  In a public setting such as
7 this?
8     MS. BERKOWER:  Yes.
9     MR. SWEETEN:  You can answer.
10     A.  I don't recall.
11     Q.  Okay.  Do you remember any other bills
12 submitted during the 82nd legislature that addressed
13 mail-in voter fraud?
14     A.  I know there were some pieces of legislation I
15 don't recall the bill numbers.
16     Q.  Do you remember what committee they were
17 referred to?
18     A.  I believe House committee on elections.
19     Q.  So they were not referred to the select
20 committee?
21     A.  Not that I recall, but I could be wrong.
22     Q.  I think though we -- you said before that the
23 select committee only considered one bill.  Is that
24 accurate?
25     A.  Only considered in public hearing, one bill,

## 48

1 yes.  To my knowledge, yes.
2     Q.  Do you remember if more than one bill was
3 actually referred to the select committee as well?
4     A.  I think there were more than one referred, but
5 I can't recall specifically.
6     Q.  All right.  I have what's going to be marked --
7 This actually has been used a number of times, but maybe
8 we'll mark it with a new number anyway or 431.  Do you
9 know what this is?
10     A.  Yes.
11     Q.  What is this?
12     A.  It looks like is a printout from the
13 committee website showing specific legislation referred
14 to that committee.
15     Q.  And how many bills are referred to that
16 committee?
17     A.  From this document, one.
18     Q.  And are we talking about the select committee
19 on voter identification, voter fraud?
20     A.  According to this document, yes.
21     Q.  Do you know who decides what bills are referred
22 to what committee?
23     A.  To my knowledge, it is the parliamentarian, the
24 House parliamentarian.
25     Q.  Are there official criteria by which she



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 49

1  decides where things go?
2      A.  I don't know.
3      Q.  Are you familiar with the Federal Voting Rights
4  Act?
5      A.  I'm aware there is a Federal Voting Rights Act.
6      Q.  What is your understanding of the Federal
7  Voting Rights Act?
8      A.  My understanding is that it exists.
9      Q.  Okay.  Do you believe that compliance with the
10  Federal Voting Rights Act is an important consideration
11  for the legislature?
12          MR. SWEETEN:  You are asking for her
13  mental thoughts, impressions.  I think that would be
14  subject to the legislative privilege as to whether she
15  believed it's important, so I'm going to instruct you
16  not to answer the question.
17      Q.  Do you know if the legislature considers the
18  Federal Voting Rights Act when it makes law?
19          MR. SWEETEN:  Same instruction.  You can
20  refer to matters of the public record in answering the
21  question, but do not reveal thought processes, mental
22  impressions, opinions regarding legislation.
23      A.  I'd have to look at the public record.
24      Q.  Based on the public record, do you remember any
25  discussion about the Federal Voting Rights Acts'

### 50

1  requirements?
2      A.  Not specifically.  I believe that the Federal
3  Voting Rights Act was discussed in the public record.  I
4  don't recall specifics.
5      Q.  And I think I asked you as a general matter if
6  you remembered any public discussion about the Federal
7  Voting Rights Act and it seems that you do.  So what --
8  in connection with what bill do you remember public
9  discussion of the Federal Voting Rights Act?
10      A.  About Senate Bill 14.
11      Q.  Do you remember a public discussion of the
12  Federal Voting Rights Act with respect to any other
13  election related bills?
14      A.  Senate Bill 362 in 2009, and I think that's all
15  I can think of.
16      Q.  Okay.  Have you ever given or received any
17  legal advice concerning the Federal Voting Rights Act?
18          MR. SWEETEN:  Don't reveal matters of
19  privilege, but in answering the question, don't give any
20  substance.  She's asking if you've given legal advice.
21  You can answer that yes or no.
22      A.  Can you clarify what you mean by legal advice?
23      Q.  Well, I guess I actually asked sort of a
24  two-part question, and Patrick's right, it is a yes or
25  no question, so I'll break it down and make it clear.

### 51

1  Have you ever given any legal advice concerning the
2  Federal Voting Rights Act as part of your job?
3      A.  Yes.
4      Q.  Have you ever given any policy advice
5  concerning the Federal Voting Rights Act as part of your
6  job?
7      A.  Yes.
8      Q.  And I guess I should have asked you this
9  before, but as a general matter without revealing any
10  specific information you have communicated to your boss,
11  how do you distinguish between legal and policy rights?
12      A.  That's a tough one.  I'm trying to think of a
13  way to describe it.  I guess the -- I don't really know
14  how to describe it.  It's rare, I think, for -- in my
15  mind to give, I guess, legal advice.  I give more policy
16  advice than discussing the effect legislation would have
17  on -- on current situations, current groups.
18          MR. SWEETEN:  If you can't answer without
19  giving the substance of any advice, then don't answer,
20  but if you can answer as a general matter what in your
21  mind is the distinction between policy and --
22          THE WITNESS:  General matter.  I don't
23  know.
24          MR. SWEETEN:  Okay.
25      A.  I don't know.

### 52

1      Q.  Would you categorize -- Would you say you give
2  more than policy advice than legal advice in your mind?
3      A.  Yes.
4      Q.  What's the division roughly percentage-wise?
5      A.  Roughly I would probably say 95 percent policy.
6      Q.  Are you familiar with a Federal law called The
7  Help America Vote Act?
8      A.  Yes, I know it exists.
9      Q.  Do you know any of its terms?
10      A.  I don't recall any specifics.
11      Q.  Do you know if HAVA has identification
12  requirements for voter registration?
13      A.  I don't know.
14      Q.  Were you aware of a Supreme Court decision in
15  2008 in -- concerning the Indiana Voter Identification
16  law called Crawford versus Marion County Board of
17  Elections?
18          MR. SWEETEN:  In answering the question,
19  if it would reveal your analysis, your process in
20  evaluating legislation, do not reveal that.  That would
21  be subject to the legislative privilege including mental
22  thoughts, mental impressions, opinions, motivation about
23  recommendation.  So if you reveal that, then don't
24  answer the question as posed.
25      Q.  I think I just asked a yes or no question.  And



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

53

1    if you are aware of the case, is that acceptable?
2           MR. SWEETEN:  You can -- You can answer
3    the yes or no as long as it's not revealing the matter
4    of the legislative privilege.
5        Q.   Did you review the decision at the time it was
6    issued?
7           MR. SWEETEN:  Same objection.  If this
8    would relate to your motivations, your thought
9    processes, your analysis of any legislation, then that
10   would be subject to the legislative privilege, so don't
11   reveal that.
12       A.   You asked if I reviewed it?  Yes.
13       Q.   Around the time of the decision, do you
14   remember any communications from the public or interest
15   groups about the decision?
16       A.   I don't.
17       Q.   Are you aware of any communications between
18   Texas legislators and officials in Indiana regarding
19   photo ID or the Crawford decision?
20       Q.   Can you clarify communications?
21       Q.   Any contact?
22          MR. SWEETEN:  You can reveal if contact
23   occurred.  Don't reveal the substance of contact.
24       A.   Not that I know of.
25       Q.   Did you provide any policies concerning

---

54

1    Crawford as part of your job?
2           MR. SWEETEN:  Don't answer the question.
3    If it reveals matters of legislative privilege.
4    Instruct you not to answer.
5        Q.   Are you going to follow that instruction?
6        A.   Yes.
7        Q.   Okay.  Sitting here today and without referring
8    to any specific legislation of any specific state, do
9    you believe that the Crawford decision impacts a state's
10   ability to obtain preclearance of a photo ID law?
11          MR. SWEETEN:  Don't reveal your thoughts,
12   mental impressions about any legislation in answering
13   the question.  If you cannot do so, do not answer the
14   question.  If you can do so without revealing matters of
15   legislative privilege, you can, but don't reveal your
16   thoughts, mental processes about legislation.
17       A.   I'm going to choose not to answer.
18          MS. BERKOWER:  Patrick, to be clear, even
19   though the question is a general question about any
20   state's ability to obtain preclearance without reference
21   to any specific law of any state, you're still
22   instructing her not to answer?
23          MR. SWEETEN:  I am, and here's my
24   reasoning.  She works for Speaker Straus.  She's an
25   advisor to him.  You are asking about a couple Senate

---

55

1    bills that involve voter photo ID bill of '09, 2001.  To
2    the extent that you are asking her about her analysis of
3    the Crawford opinion and to the extent that would
4    implicate her analysis, thoughts, mental processes about
5    legislation, then I am instructing her not to answer the
6    question.
7        Q.   (BY MS. BERKOWER)  Yeah.  The decision came out
8    in 2008, so if I remember correctly, that's actually
9    when you were not employed by the legislature; is that
10   accurate?
11       A.   2008.  Yes.
12       Q.   So you said you reviewed it at the time that it
13   came out.  Is it safe to say then when you were not
14   employed by the legislature?
15       A.   I probably need to clarify when I was aware of
16   the decision.
17       Q.   Well, you can clarify?
18       A.   Okay.  I wasn't aware that it came out in -- I
19   wasn't aware of it at the time it came out in 2008.  I
20   became aware of it at a later date.
21          MS. BERKOWER:  Okay.  And will you permit
22   her to clarify that it was after she became employed by
23   Speaker Straus?
24          MR. SWEETEN:  You can answer if it was
25   before or after you became employed by Speaker Straus,

---

56

1    yes.
2        A.   It was after.
3        Q.   Are you currently a member of any community
4    organization or group?
5        A.   No.
6        Q.   Are you familiar with the American Legislative
7    Exchange Council or ALEC?
8        A.   Yes.
9        Q.   What is it?
10       A.   My understanding is -- Actually, I don't really
11   know specifically what they are, I guess.
12       Q.   Do you know -- And do you know of any members
13   or staff of the Texas legislature who are members of
14   ALEC?
15       A.   My understanding is that some members of the
16   Texas legislature are members, but I don't know who
17   those people are.
18       Q.   Do you know what services ALEC provides its
19   members?
20       A.   I don't.
21       Q.   Do you know if ALEC ever has conferences for
22   its members?
23       A.   Yes.
24       Q.   Have you ever attended one of those
25   conferences?

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

## 57

1      A.  No.
2      Q.  Do you know people in the Texas legislature or
3  their staff who have?
4      A.  Not specifically.
5      Q.  Has your office ever received any documents
6  from ALEC related to voter ID?
7      A.  Not that I recall.
8      Q.  Did ALEC ever you any technical assistance on
9  voter ID legislation?
10     A.  No.
11     Q.  Are you familiar with the national conference
12  of state legislators?
13     A.  Yes.
14     Q.  Are you a member of that?
15     A.  No.
16     Q.  Have you ever attended any of their meetings?
17     A.  Yes.
18     Q.  When was that?
19     A.  In 2009, if I recall correctly, and 2011, if I
20  recall correctly.
21     Q.  Did any of the meetings that you attended
22  address voter ID issues?
23     A.  I don't recall.
24     Q.  Are there any other groups that focus on policy
25  advice or assistance to legislators that you belong to?

---

## 58

1      A.  No.
2      Q.  Do you know what the current system is under
3  state law for determining how to verify the identity of
4  a voter?
5          MR. SWEETEN:  You can answer as to your
6  understanding of current law.
7      A.  To identify -- Can you repeat it?  I'm sorry.
8      Q.  Sure.  What is the current system under Texas
9  law for determining the identity of a voter?
10     A.  Under current law my understanding is a
11  certain -- they can bring certain documents to the
12  polling place with them.
13     Q.  Do you know what those documents are?
14     A.  Off the top of my head, a voter registration
15  card, a utility bill, a phone bill, a bank statement, a
16  photo ID and that's all I can think of.
17     Q.  So -- And correct me if I'm wrong.  In your
18  understanding of current law is a voter can show a voter
19  registration card or if they don't have the voter
20  registration card, there are a variety of things they
21  could show, some of which you just listed.
22     A.  That's my understanding.
23     Q.  Upon registering, do you know if a county mails
24  a voter registration card to the voter?
25     A.  Yes, that's my understanding.

---

## 59

1      Q.  And under current law, voters are required to
2  obtain a photo ID; is that correct?
3      A.  Yes.
4      Q.  So if a voter lost her voter registration card,
5  she could present ID from a wide-range of IDs like the
6  list you just mentioned?
7      A.  That's my understanding.
8      Q.  And some of those are non-photo ID?
9      A.  Yes.
10     Q.  And the voter could still vote a regular
11  ballot; is that correct?
12     A.  That's my understanding.
13     Q.  Do you know of any evidence in the public
14  record that establishes that the current system for
15  verifying an identity of a voter is not effective?
16         MR. SWEETEN:  I'm going to object to the
17  question.  It calls for matters of legislative
18  privilege.  Don't reveal your thoughts, mental
19  impressions or analysis about a bill.  I think when you
20  are asking her the question, you are asking her to weigh
21  the evidence that you heard --
22         MS. BERKOWER:  Wait.  Patrick, I'm sorry
23  to interrupt you.  If the she can read back the
24  question, I started the question with as part of the
25  public record.

---

## 60

1          MR. SWEETEN:  Understand.  I heard a lot
2  of that yesterday, a lot of prefaces with the public
3  record, but what we can't do is -- She can refer to
4  matters of the public record, but what she won't do is
5  go to the matters of the public record and select an
6  analysis and give a qualitative judgment about what was
7  in the record.  If you want to ask her if something
8  exists, if someone said something the fact of the
9  communication, she can testify, but there won't be any
10  analysis of what was said on the public record, and I
11  think your question did have an analysis portion.
12         MS. BERKOWER:  I think I asked or I
13  intended to ask -- and we could have the court reporter
14  read back the question, but I think I asked just as a
15  matter of public record was there evidence presented
16  that the current system of identifying voters at the
17  polls is ineffective.
18         MR. SWEETEN:  You can testify as to
19  matters of the public record.  I mean, don't weigh the
20  evidence, but you can say if there was testimony about
21  an issue.  Is that clear enough?  I mean, is that fair
22  enough?
23         MS. BERKOWER:  That's fine.  I think that
24  was the call of this particular question.
25     A.  Yes, there was testimony on that issue.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 61

1  Q.  What was that testimony?
2  A.  I don't specifically recall.
3  Q.  Do you remember who provided that testimony?
4  A.  Not specifically.
5  Q.  What was the purpose of -- of requiring a photo
6  ID given the law already in place?
7      MR. SWEETEN:  She can talk about -- I'll
8  let her testify as to her understanding of the general
9  purpose of a bill, but not -- you're having her weigh
10  why this when this is in place, and that is a little
11  beyond -- that would be subject to the legislative
12  privilege.  So with that instruction, I would instruct
13  her not to answer that question as phrased, but I will
14  work with you to try to get at what you're asking.
15  A.  Can you repeat the question?
16  Q.  What was the general purpose of photo ID in
17  Texas?
18  A.  To deter voter fraud.
19  Q.  So in 2005, just because I didn't -- I'm not
20  entirely sure of which person you worked for, can you
21  just tell me which person you worked for in the
22  legislature in 2005?
23  A.  Sure.  Peggy Hamric.
24  Q.  And she's a representative?
25  A.  Yes.  No longer, but she was then.

## 62

1  Q.  Where did she -- What House district did she
2  represent?
3  A.  I don't recall.  She was from Houston.
4  Q.  So like around Houston area?
5  A.  M-hm.  Sorry.  Yes.
6  Q.  Are you familiar with the voter ID bill that
7  was introduced in the House in 2005?
8  A.  I am not.
9  Q.  Did you work on election related issues for
10  Representative Hamric?
11  A.  Not that I recall.
12      MS. BERKOWER:  Okay.  Do you want to take
13  a break?  We've been going for a little while.
14      MR. SWEETEN:  Sure.
15      MS. BERKOWER:  Like 5 minutes?
16      MR. SWEETEN:  Yeah, that sounds good.
17      (Recess from 11:10 a.m. to 11:25 a.m.)
18  Q.  (BY MS. BERKOWER)  So you said that you were
19  not familiar with House Bill 1706 from the 2005
20  legislative session; is that accurate?
21  A.  Yes.
22  Q.  Do you remember if -- even if you didn't work
23  on it yourself, do you remember if you were present
24  during the vote or any of the floor debate on House Bill
25  1706?

## 63

1  A.  I don't recall.
2  Q.  Do you remember hearing any public statements
3  about House Bill 1706?
4  A.  I don't.
5  Q.  Do you have any memories at all connected to
6  House Bill 1706?
7  A.  I have none.
8  Q.  Okay.  Now, in the 2007 legislature, who did
9  you work for?
10  A.  2007?  I believe it was Senator Eltife.
11  Q.  Senator Eltife.  And for your work for Senator
12  Eltife, did you work on any election related bills?
13  A.  I don't recall working on any election related
14  bills.
15  Q.  Was he on -- on a committee that addressed
16  election related bills?
17  A.  Not that I recall.
18  Q.  So did you have any involvement with any
19  election related bills when you worked for him?
20  A.  Not that I recall.
21  Q.  Do you remember hearing -- Do you remember
22  hearing about House Bill 218 in that legislative
23  session?
24  A.  Not that I recall.
25  Q.  Do you know -- And you were present on the

## 64

1  House Bill when the bill -- Sorry.  You were in the
2  Senate then.  Let me think about this for a second.
3      Was Senator Eltife on the state affairs
4  committee by any chance?
5  A.  I don't remember.
6  Q.  Do you remember being present for any hearing
7  in the -- in the Senate state affairs committee on House
8  Bill 218?
9  A.  I don't.
10  Q.  Do you remember any public statements made
11  about House Bill 218?
12  A.  I don't.
13  Q.  As a general matter, were you following voter
14  ID legislation around that time?
15  A.  I don't recall following any voter ID
16  legislation.
17  Q.  When do you first remember starting to follow
18  voter ID legislation?
19      MR. SWEETEN:  If answering it would reveal
20  your thoughts and mental processes, don't answer the
21  question.  But if -- I think the question is vague too
22  as phrased, so I'm going to object to the question
23  itself, but also instruct you not to reveal matters of
24  privilege in answering the question.  You can answer if
25  you want.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 65

1    A.  When do I first remember following the issue?
2  February 2009.
3    Q.  Okay.  So is it safe to say you have no memory
4  at all of House Bill 218?
5    A.  It's safe to say that.
6    Q.  Now, I guess one thing I'm curious to know is
7  when you started working on -- for Speaker Straus and
8  you were staffed on the elections committee, did you
9  ever look at prior legislation or familiarize yourself
10  with prior legislation on the general topics for the
11  committees you were staffed on to update yourself on
12  those issues?
13    MR. SWEETEN:  Did she as a general matter
14  review prior bills on committees that she worked on?
15    MS. BERKOWER:  Yes.
16    MR. SWEETEN:  Objection to the question as
17  compound.  You can answer to the extent you are able.
18    A.  Generally speaking, sometimes.
19    Q.  Do you remember ever reviewing House Bill 218
20  or House Bill 1706 for that reason?
21    A.  I do not recall reviewing either of those
22  pieces of legislation.
23    Q.  Okay.  So bringing us up to 2009, are you aware
24  of a photographic voter identification bill that was
25  introduced in the 81st Texas legislature in 2009?

## 66

1    MR. SWEETEN:  You can testify about your
2  awareness of a bill filed.
3    A.  Yes, I was aware.
4    Q.  Who introduced that bill?
5    A.  I don't recall.
6    Q.  Do you remember any public statements about why
7  the bill was introduced?
8    A.  Yes.
9    Q.  What are those statements that you recall?
10    A.  I don't recall specifics, but I know the
11  reasons for introducing the legislation were discussed.
12    Q.  Publicly?
13    A.  Publicly, yes.
14    Q.  And what are the reasons that you remember
15  being publicly discussed?
16    A.  Deterrence of voter fraud.
17    Q.  Was there a particular type of voter fraud that
18  was specified in those public statements?
19    MR. SWEETEN:  She's asking about public
20  statements, so matters of the public record you can
21  answer.
22    A.  Yes. I recall statements being made about
23  deterring in-person voter fraud.
24    Q.  Do you recall statements about mail-in voter
25  fraud around that -- in connection with that bill?

## 67

1    A.  I do recall discussions.  I don't recall
2  specifics.
3    Q.  Do you remember any public statements
4  concerning noncitizen voting around that time?
5    A.  I recall public statements being made, but I
6  don't remember specifics.
7    Q.  Public statements about noncitizen voting?
8    A.  Yes.
9    Q.  Do you remember who made those statements?
10    A.  I don't recall.
11    Q.  Do you remember where you heard those public
12  statements?
13    A.  In hearings -- In committee hearings.
14    Q.  Were those public statements about noncitizens
15  voting made by our legislators?
16    A.  Yes.
17    Q.  Do you remember which legislators made those
18  public statements?
19    A.  Not specifically.
20    Q.  Do you remember which committee hearing you
21  heard those public statements?
22    A.  The hearing on Senate Bill 362 and on -- and in
23  the hearing on Senate Bill 14.
24    Q.  Okay.  Well, I think I'm just now asking on
25  Senate Bill 362 in 2009.

## 68

1    A.  Okay.
2    Q.  You said there were public statements by
3  legislators at that time concerning noncitizen voting;
4  is that accurate?
5    A.  Yes.
6    Q.  And I think because -- I'm not sure that you
7  were delineating between 2009 and 2011 when I asked you
8  this before.  I'll ask you again.
9    A.  Sorry.
10    Q.  It's okay.  In 2009, do you remember which
11  legislators made public statements about noncitizen
12  voting?
13    A.  I don't recall specifically who did.
14    Q.  But it was during the committee hearings on
15  362?
16    A.  To my recollection, yes.
17    Q.  Okay.  And did you attend those hearings
18  yourself?
19    A.  Yes.
20    Q.  Did you determine all of the hearings on 362?
21    A.  I attended the House hearings and most of the
22  hearings on the Senate floor.
23    Q.  Do you usually follow legislation in the Senate
24  for -- when you think -- Well, let me start that over.
25    Under what circumstances do you follow



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

69

1  legislation in the Senate?
2          MR. SWEETEN:  Don't answer to the extent
3  it would reveal your mental processes, thoughts,
4  impressions about -- about specific legislation.  You
5  can answer as a general matter if you can do so without
6  revealing privilege.
7      A.  I follow every House bill I'm responsible for
8  as it goes through the Senate's process.
9      Q.  362 is a Senate bill, so with regard to Senate
10  bills as a general matter, how do you decide which to
11  follow?
12          MR. SWEETEN:  Same instruction.  Don't
13  reveal matters of privileges.  She's asking your
14  decision process to -- I think it's phrased you are
15  asking for matters of legislative privilege, if it would
16  relate to legislation, so I think the way it's phrased,
17  I think you are asking for privileged information.
18      Q.  Okay.  I can try to rephrase it.  Is it part of
19  your job description to follow bills in the Senate?
20          MR. SWEETEN:  You can answer that question
21  as a general proposition.
22      A.  Generally speaking, yes.
23      Q.  As a general matter, is it part of your job
24  description to follow bills in the Senate that may come
25  to the committees that you staff or that you're covering

---

70

1  in the House?
2          MR. SWEETEN:  You can answer.
3      A.  Yes.
4      Q.  How do you keep track of which bills relate to
5  the committees that you cover for the House?  And I'm
6  asking as a general matter, not with regard to specific
7  recommendations.
8      A.  Generally, I look at the posted committee
9  hearings on the Senate to see what bills they are taking
10  up for consideration.
11      Q.  Do you attend every hearing for every Senate
12  bill that relates to a topic that you cover for a
13  committee in the House?
14      A.  Generally speaking, no.
15      Q.  Is there a point in the legislative process at
16  which it looks like it might be coming to the House and
17  that's when you started attending hearings?
18          MR. SWEETEN:  Again, as a general matter,
19  you can answer.
20      A.  Generally speaking, yes.
21      Q.  What is that point?
22      A.  I don't know if there is a specific point.
23  Generally speaking, it's -- Generally speaking, if the
24  bills seems to have --
25          MR. SWEETEN:  Don't reveal specific

---

71

1  matters that would reveal your mental processes about
2  specific legislation.  Again, you are answering as a
3  general matter this question.  If it would reveal
4  matters of privilege, don't reveal them.
5      A.  Okay.  I'm going to choose not to answer.
6      Q.  Maybe this will help.  Is it safe to say that
7  if a bill doesn't get a hearing, you would not follow
8  it?
9      A.  Yes.
10      Q.  Is it safe to say that if a bill gets a hearing
11  it looks like and it seems that it might be voted out of
12  committee, you might start to follow it?
13      A.  I think that's safe to say.
14      Q.  And is it safe to say that if that -- if a bill
15  is voted out of committee and is going to get a vote on
16  the whole Senate floor, you would attend that hearing?
17          MR. SWEETEN:  Don't reveal matters as to
18  specific legislation.  Don't reveal your thought
19  processes on that.
20      A.  Can you repeat the question?
21      Q.  Yeah.  I guess if there's a bill that relates
22  to -- that's on the same topic of the committees that
23  you cover for the House and it's going to go to a full
24  vote in the Senate, would you attend the hearing on that
25  bill?

---

72

1          MR. SWEETEN:  Objection.  Compound.  Same
2  instruction and privilege.  You can go ahead and answer
3  if you can without revealing privilege.
4      A.  I'm going to choose not to answer.
5      Q.  Okay.  Okay.  Do you ever have a role in the
6  development of bills in the Senate?
7          MR. SWEETEN:  Objection.  If that calls
8  for matters of privilege, don't answer the question.
9      Q.  Do you know if Speaker Straus has a role in the
10  development of bills in the Senate?
11          MR. SWEETEN:  Same objection.
12          MS. BERKOWER:  But I'm asking -- Okay.
13  I'm asking a yes or no question, if she knows not
14  whether he does.
15          MR. SWEETEN:  But the development -- you
16  are talking about the processes of -- of the development
17  of legislation.  It's -- I think that's problematic from
18  the standpoint that she's not going to comment on his
19  mental impressions about legislation or his thought
20  process.
21      Q.  So I'm trying to make the question as
22  unobjectionable as possible by asking yes or no, if she
23  has knowledge if he played a role in the development of
24  bills and not tying it to any particular legislation.
25  So just as a general matter, does he play a role in the

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 73

1    development of bills in the senate?  Yes or no?
2         MR. SWEETEN:  Are you asking as a general
3    -- I mean, does the speaker in general do that?  Are you
4    asking does Speaker Straus specifically himself play a
5    role in the development of Senate bills?
6         MS. BERKOWER:  I guess I'm asking both,
7    and she can answer the first question first.
8         MR. SWEETEN:  You can answer the first
9    question first.  Do you understand that?
10        A.  What was the first question?
11        Q.  Does the speaker as a general matter play a
12   role in the development of bills in the Senate?  Is that
13   fair, Patrick?
14        MR. SWEETEN:  Yeah, you can answer the
15   question as posed.
16        A.  I don't know.
17        Q.  So we don't have to ask the next one.  It's
18   very helpful.
19        Once a bill comes to the House from the
20   Senate, what happens to it as a general procedural
21   matter?
22        MR. SWEETEN:  You can answer as a general
23   matter.
24        A.  Generally it will get referred to the House
25   committee.

## 74

1         Q.  Who makes the decision about where it goes?
2         A.  To my knowledge, it's the parliamentarian.
3         Q.  Okay.  Once Senate Bill 362 came to the House,
4    did you have communications with other legislators or
5    staff about the bill?
6         MR. SWEETEN:  You can answer as to whether
7    you had communication.
8         A.  Yes.
9         Q.  Who did you have communications with?
10        MR. SWEETEN:  You can answer.  Don't
11   reveal the substance of the communications.
12        A.  Denise Davis, Lisa Kaufman, Steven Schar, Todd
13   Smith, Travis Richmond, Dewayne Bohac, Dennis Bonnen,
14   Rafael Anchia, Brian Hebert.
15        Q.  Are there any others?
16        A.  Jesse Ancira.  All I can think of right now.
17        Q.  And can you say who is Steven Schar?
18        A.  He was the committee clerk, I believe, for Todd
19   Smith for the elections committee.
20        Q.  What does a committee clerk do?
21        A.  Generally speaking, they prepare binders,
22   copies of legislation for House members sitting on my
23   committee.
24        Q.  And who's Travis Richmond?
25        A.  He was another staff of Todd Smith.

## 75

1         Q.  You said you communicated with Brian Hebert.
2    Was there anyone else in the lieutenant governor's
3    office you communicated with?
4         A.  Not that I recall.
5         Q.  And around when did these communications take
6    place?
7         A.  I think a month -- or they were during session.
8         Q.  Were they right after the bill was sent to the
9    House?  Were they ongoing throughout the session?
10        A.  They were ongoing throughout the session.
11        Q.  So is it safe to say this is a list of
12   people you communicated with in the House about Senate
13   Bill 362, the people you just named?
14        A.  Yes.
15        Q.  And if you think of any others, will you let me
16   know?
17        A.  Yes.
18        Q.  Great.  Okay.
19        A.  Oh, I just thought of two more.  Never mind.
20   No, I didn't.
21        Q.  Okay.
22        A.  Sorry.
23        Q.  That's all right.  Okay.  So we have what has
24   been previously marked as Exhibit 29 in another
25   deposition.  Actually, I do have a copy.  You can't have

## 76

1    enough copies of this one.  Okay.  So do you know what
2    this is?
3         A.  It looks like a copy of Senate Bill 362.
4         Q.  Turning your attention to Page 5 of the bill,
5    can you review that -- Page 5 through 7, starting at
6    Line 19 on Page 5?  Are you finished?
7         A.  Yes.
8         Q.  And I should have asked you a second ago and I
9    forgot.  Without revealing the content, did you have any
10   communications with Speaker Straus directly about SB362?
11        A.  Yes.
12        Q.  Okay.  So can I add him to that list of people?
13        A.  Yes.  Sorry.
14        Q.  Okay.  How often did you communicate with him
15   about SB362?
16        A.  A couple times during session.
17        Q.  Do you remember around when that was?
18        A.  I don't.  It's during session.
19        MS. BERKOWER:  Patrick, would you allow a
20   question like a basic privilege log question of a
21   general topic of what she communicated with him about?
22        MR. SWEETEN:  Yeah.  I think a general --
23   general description -- privilege log type description is
24   okay.
25        Q.  Okay.  As a general matter, what was the topic



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 77

1  that you communicated with Speaker Straus about?
2       MR. SWEETEN:  Let me caution you.  Don't
3  reveal the substance of the communication other than a
4  general subject matter description.
5     A.  Senate Bill 362.
6       MS. BERKOWER:  That is general.
7       MR. SWEETEN:  That's all you're getting.
8       MS. BERKOWER:  Can you -- Can you say
9  whether or not this was the type of communication that
10  was more legal advice or policy rights?  Will you allow
11  that, Patrick?
12       MR. SWEETEN:  I think you are asking her
13  to characterize the communication.  She's already told
14  you the subject matter.  I think that's probably -- I
15  don't want to open up the substance of those
16  communications that are very clearly within the core of
17  the privilege.
18       MS. BERKOWER:  Well, I won't go any
19  further than that, but I do think that is a privilege
20  log question because it would relate as to whether there
21  was attorney-client privilege or not as part of that
22  communication.  I mean, there were some instances in
23  your privilege log where it specified legal advice and
24  some where it didn't with communications.
25       MR. SWEETEN:  I understand what you are

## 78

1  saying.  I understand where you are coming from, and I'm
2  thinking back to her answer previously about not being
3  able to specifically distinguish between policy and
4  others, so I think that's problematic the way you
5  phrased it given her prior testimony here today.
6       MS. BERKOWER:  What if I asked her if she
7  could characterize it?
8       MR. SWEETEN:  Can we circle back to that?
9  I would like to discuss with her her understanding if it
10  would be a privileged inquiry.  I would like to talk
11  with her about the communication and see if there is
12  even a distinction that could be made on that issue.
13       MS. BERKOWER:  Sure.
14       MR. SWEETEN:  Okay.
15       MS. BERKOWER:  We'll come back to that.
16       MR. SWEETEN:  I can step outside and just
17  ask you if you want to do it now.
18       MS. BERKOWER:  I'll withdraw the question
19  now.  We'll come back to it.
20       MR. SWEETEN:  Okay.  That's fine.
21     Q.  (BY MS. BERKOWER) So I'm sorry.  Maybe you
22  won't even remember it anymore, but on Page 5 of the
23  exhibit, Exhibit 29, do you see at Line 19 it starts --
24  there's a heading there that says, "Documentation of
25  Proof of Identification"?  Do you see that?

## 79

1     A.  Yes.
2     Q.  Can you explain -- Well, does this section,
3  Section 63.0101, describe the types of identification a
4  voter must provide in order to vote under this bill?
5     A.  According to this document, yes.
6     Q.  Do you have any reason to doubt this is an
7  accurate copy of SB362?
8     A.  No.
9     Q.  So the -- under this bill, what are the forms
10  of identification that are permitted?
11     A.  As they're listed in here on this document,
12  it's a driver's license or personal identification card
13  issued to the person by the Department of Public Safety
14  has not expired or that expired no earlier than
15  two years before the date of brings, a United States
16  military identification card that contains the person's
17  photograph, a United States citizenship certificate
18  issued to the person that contains the person's
19  photograph, a United States passport issued to the
20  person, a license to carry a concealed handgun issued to
21  the person by the Department of Public Safety, a valid
22  identification card that contains a person's photograph
23  and is issued by an agency or institution of the Federal
24  government or an agency, institution or political
25  subdivision of this state.

## 80

1     Q.  So is that the list of photo identifications
2  that are permitted under this bill?
3     A.  As I read them.
4     Q.  In the document?
5     A.  Yes.
6     Q.  Now, starting at Line 22 on Page 6, are there
7  alternate forms of identification provided for by the
8  bill?
9     A.  Alternate to photo ID?
10     Q.  Yes.
11     A.  Yes.
12     Q.  So this section lists a number of
13  identifications that may or may not have a photo on
14  them; is that accurate?
15     A.  As I read it, yes.
16     Q.  Does the list of non-photo ID that's permitted
17  under this Part B include a utility bill, bank
18  statement, government check, paycheck or other
19  government document?
20     A.  According to this document, yes.
21     Q.  Does it include official mail addressed to the
22  person that's at Line 1 on Page 7?
23     A.  From a government entity, yes.
24     Q.  Sorry.  From a government entity.  Does it
25  include a certified copy of a birth certificate or other



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 81

1    document confirming birth that is admissible in a court
2    of law and establishes the person's identity?
3        A.   Yes.
4        Q.   Does it include US citizenship papers issued to
5    the person?
6        A.   Yes.
7        Q.   And an original or certified copy of the
8    person's marriage license or divorce decree?
9        A.   Yes.
10       Q.   Court records of the person's adoption, name
11   change or sex change are also allowed; is that correct?
12       A.   Yes.
13       Q.   An identification card issued to the person by
14   a government entity of this state, meaning Texas, or the
15   United States for the purpose of obtaining public
16   benefits including veteran's benefits, Medicaid or
17   Medicare?
18       A.   Yes.
19       Q.   A temporary driving permit issued to the person
20   by DPS?
21       A.   Yes.
22       Q.   A license issued to the person by the Federal
23   Aviation Administration or other authorized agency of
24   the US?
25       A.   Yes.

## 82

1        Q.   A library card containing the person's name
2    issued by a public library in Texas?
3        A.   Yes.
4        Q.   Or a hunting or fishing license issued by the
5    Texas -- I guess it doesn't specify the Texas Department
6    of Parks and Wildlife, but by the Parks and Wildlife
7    Department?
8        A.   Yes.
9        Q.   Okay.  So based on what we went through, it
10   looks like there are approximately 19 categories of
11   known ID that a voter could use as proof of
12   identification; is that accurate?
13       A.   According to this document, yes.
14       Q.   Do you know if a student ID would be permitted
15   under this bill?  And I guess I can direct that question
16   specifically to Line 20 on Page 6 that allows for a
17   photo ID issued by an agency, institution or political
18   subdivision of the state.
19       A.   It doesn't specifically a school ID.
20       Q.   Are some of the universities in Texas
21   institutions of the state?
22       A.   I guess it depends on the definition of
23   institution.
24       Q.   It could -- It could be considered an
25   institution of the state?

## 83

1        MR. SWEETEN:  Don't guess or speculate
2    when answering the question.
3        A.   I don't know.
4        Q.   What state entities would you consider not to
5    be institutions of the state?  Are there any?
6        MR. SWEETEN:  Aren't you kind of asking
7    for her personal impressions now of what the bill is
8    intending --
9        MS. BERKOWER:  I'll actually withdraw that
10   question.
11       Q.   (BY MS. BERKOWER) You said you attended college
12   and law school here in Texas; is that correct?
13       A.   Yes.
14       Q.   Did you go to a public school or a private
15   college for law school?
16       A.   I went to a public college and a private law
17   school.
18       Q.   And I forget.  What was the name of your public
19   college?
20       A.   It was Southwest Texas.  It's now changed to
21   Texas State.
22       Q.   Texas State?  I guess in your view and not
23   necessarily drawing on your experience as a staff member
24   for Speaker Straus, but your experience as a student,
25   was that -- was Texas State an institution of the state?

## 84

1        A.   It depends on the definition of institution.
2        Q.   Did you get something called in state tuition
3    for attending there?
4        A.   Yes.
5        Q.   Did you have a photo ID issued by that college?
6        A.   Yes.
7        Q.   What was the general legislative purpose of
8    SB362?
9        A.   In general, to deter voter fraud.
10       Q.   Did the legislature hear any public testimony
11   about voter fraud in connection with its consideration
12   of SB362?
13       MR. SWEETEN:  You can testify about
14   matters of the public record.
15       A.   Did they -- Can you repeat that?  Sorry.
16       Q.   Do you mind reading -- I'll do my best to
17   recreate it.  As a matter of public record, did the
18   legislature hear testimony about voter fraud?
19       MR. SWEETEN:  You can testify about
20   matters of the public record.
21       A.   Yes.
22       Q.   And this is in connection with SB362?
23       A.   Yes.
24       Q.   What was that public evidence?
25       MR. SWEETEN:  You can testify about what



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

85

1    was testified to, what was said at a public hearing.
2       A.   I recall hearing testimony.  I don't remember
3    exactly who said it, but there was testimony about
4    in-person voter fraud.
5       Q.   What was the general -- Like do you remember
6    generally what kind of testimony it was, who came, where
7    they were from?  Was it a law enforcement official?
8       A.   I do recall I think it was just a citizen who
9    was a -- volunteered to be a poll watcher who made a
10   statement that they saw one person vote more
11   than once and that person had certain tatoos that made
12   them easily recognizable.
13      Q.   Do you know if that incident was ever referred
14   to law enforcement authorities?
15      A.   I don't know.
16      Q.   Do you know if that individual who volunteered
17   as a poll watcher and related that incident was
18   affiliated with any sort of interest group?
19      A.   I don't know.
20      Q.   Do you know if he was affiliated with the King
21   Street Patriots?
22      A.   I don't know.
23      Q.   What other evidence concerning voter fraud was
24   presented on the public record in connection with SB362?
25      A.   I recall -- Again, I don't know the specific

86

1    person, but I recall testimony regarding people from
2    across the border -- Texas-Mexico border voting -- being
3    handed a voter registration card that didn't belong to
4    them to go in and vote.
5       Q.   Do you remember who presented that evidence?
6       A.   I don't recall the specific person.
7       Q.   Do you know if that incident as related to the
8    legislature was ever referred to law enforcement
9    authorities?
10      A.   I don't know.
11      Q.   Do you remember if the person who presented
12   that evidence advocated for voter ID as a means of
13   deterring noncitizen voting?
14      A.   I don't recall, no.
15      Q.   Do you remember if any evidence was presented
16   in the public record indicating that SB362 would solve
17   problems relating to in-person voting fraud?
18      A.   I do recall a discussion about that topic.  I
19   don't recall specifically who said it.
20      Q.   Do you remember how -- Do you remember if there
21   was testimony and, if so, what that testimony was about
22   how specifically 362 would solve the problem?
23      A.   I don't recall specifically.
24      Q.   Do you recall whether there was a discussion in
25   the public record about the specific types of IDs that

87

1    would be appropriate in a voter identification bill to
2    solve in-person voting -- in-person voter fraud?  Sorry.
3       A.   Yes, that was discussed.
4       Q.   How about in-person voting -- have a problem
5    with in-person voting?  You said you don't remember it
6    was discussed?
7       A.   I do remember it being discussed.
8       Q.   What was said about it on the public record?
9       A.   I don't recall specifics.  I remember that
10   topic being discussed.
11      Q.   Do you remember a debate over -- as part of the
12   public record, do you remember any debate over whether
13   certain types of identification should or shouldn't be
14   included in the bill?
15      A.   Yes.
16      Q.   What was that debate?
17          MR. SWEETEN:  Just matters of the public
18   record.
19      A.   I remember in general just different
20   identification being discussed, and I don't remember
21   specifics.
22      Q.   Do you remember whether it was discussed on the
23   public record as to whether the terms of this particular
24   bill, SB362, would solve problems related to noncitizens
25   voting?

88

1       A.   I don't recall.
2       Q.   Do you remember if Speaker Straus voted for or
3    against SB362?
4       A.   As a general matter, the speaker doesn't vote
5    on legislation.
6       Q.   Oh, why not?  Or, I mean, I don't mean to -- I
7    guess I can ask that --
8          MR. SWEETEN:  As a general matter?
9       Q.   -- as a general matter.
10      A.   I don't know if it's part of the House rules or
11   if it's just a policy, but my understanding in the Texas
12   House is that most speakers generally do not vote on
13   legislation.
14      Q.   Are there exceptions to that?
15      A.   Under the House rules, I think if there's a tie
16   in the votes, I think the speaker can vote.  I don't
17   know that he's required to.
18      Q.   Do you remember the speaker voting in the
19   incident of a tie in your time working for him?
20      A.   I don't.
21      Q.   Is the House rule concerning the speaker's
22   ability to vote, is that -- does that mean he actually
23   cannot vote unless there's a tie?
24      A.   I don't know if it's a House rule or if it's
25   just sort of a policy that different speakers have had.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

89

1    Q.  Is it Speaker Straus's policy not to vote
2    unless there's a tie?
3        MR. SWEETEN:  Objection.  Calls for
4    speculation.
5    Q.  If you know.
6    A.  I don't know.
7    Q.  So you said that you did follow SB362 when
8    the -- it was in the committee as a whole in the Senate;
9    is that correct?
10   A.  Yes.
11   Q.  Did you attend or listen to any of the debates?
12   A.  Yes.
13   Q.  Did you have any communications with senators
14   about SB362 while the bill was in the Senate without
15   revealing the content of what you discussed?
16   A.  Not that I recall.
17   Q.  Did you have any communications with Senate
18   staff about SB362 while the bill was in the Senate?
19   A.  Yes.
20   Q.  Who did you communicate with?
21   A.  Brian Hebert.  I think that's all I can think
22   of.  He's the only one that I'm recalling right now.
23   Q.  When did you call him?
24   A.  We talked in person on the Senate floor.
25   Q.  Are you allowed to be on the Senate floor?

90

1    A.  We are.  The speaker's office has a special
2    badge we have to wear to go over there.
3    Q.  Did you have any communications with Janice
4    McCoy about SB362 while the bill was in the Senate?
5    A.  I don't recall.  It's possible.
6    Q.  Did you have any communications with either
7    Mr. Hebert or Ms. McCoy even about SB362 before it was
8    considered by the committee as a whole?
9    A.  With Brian Hebert, yes.
10   Q.  When did you communicates with him about SB362
11   prior to its hearing in the committee as a whole?
12   A.  I don't know a specific date.  My
13   communications with him were ongoing throughout the
14   session.
15   Q.  Was it -- Did you communicate with him about
16   SB362 before it was filed?
17   A.  Not that I recall.
18   Q.  Did you communicate with Janice McCoy about
19   SB362 before it was filed?
20   A.  Not that I recall.
21   Q.  So you said you attended the committee of the
22   whole hearings.  Do you remember did you attend a
23   hearing that occurred around or on March 10, 2009?
24   A.  If that was the date of the committee of the
25   whole, then yes.

91

1    Q.  Do you remember if Senator Fraser, the bill's
2    sponsor, was asked questions during the hearing you
3    attended?
4    A.  Yes.
5    Q.  Do you remember hearing Senator Fraser ask
6    whether an analysis of the racial composition of voters
7    without a driver's license had been conducted?
8        MR. SWEETEN:  You can refer to matters of
9    the public record.
10   A.  I don't recall.
11   Q.  Do you know if any such analysis was conducted?
12       MR. SWEETEN:  Don't reveal -- Don't answer
13   that question.  That would reveal legislative privilege.
14   Instruct not to answer --
15       MS. BERKOWER:  Okay.
16       MR. SWEETEN:  -- if you know of analysis
17   conducted.
18       MS. BERKOWER:  Just asking her knowledge,
19   not the content of that analysis, if it actually was
20   conducted.  Not asking --
21       MR. SWEETEN:  Yeah.  I think that that
22   goes to her mental processes as to her knowledge of
23   analysis conducted, so I think that's subject to the
24   privilege.
25   Q.  (BY MS. BERKOWER) Okay.  Are you going to

92

1    follow his instruction?
2    A.  Yes.
3    Q.  So there's more as a general matter and without
4    connection to any legislation, but in your experience
5    working in the legislature, if a bill's sponsor has
6    asked about certain analysis or to conduct certain
7    analysis concerning his or her bill, does the bill
8    sponsor have an obligation to follow up to seek the
9    information?
10       MR. SWEETEN:  Don't answer the question.
11   It calls for speculation and it's irrelevant, and it
12   also could implicate the legislative privilege.
13       MS. BERKOWER:  Yeah.  I guess I'd rephrase
14   the question.  As a matter of legislative procedure or a
15   general matter of legislative process, if -- when bill
16   sponsors are asked to conduct analysis, do they
17   generally conduct that -- the analysis?  Is that an
18   acceptable question?
19       MR. SWEETEN:  I mean, I think that
20   question is compound.  You are asking -- I mean, what
21   possible relevance would it be to have her comment on
22   whether it's appropriate or whether somebody should
23   follow up on a question whether there's not even
24   specificity as to what the legislation is?
25       MS. BERKOWER:  She's worked for a number



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

93

1   of different legislators, so they've all sponsored
2   legislation, and I guess I'm asking for her view of the
3   session -- of a request from the floor to conduct
4   analysis about a bill and whether those requests are
5   generally taken seriously and followed up on or if
6   they're not.  I think she would know the answer to that.
7        MR. SWEETEN:  I think you are asking her
8   to reveal her mental impressions, opinions about the
9   legislative process, about legislation.  I mean, I think
10  the question -- and for the other reasons I've
11  expressed, so I object to the question.
12       Q.   (BY MS. BERKOWER)  Okay.  I'll move on then.  I
13  think this one -- and I know -- I just want to be clear.
14  I'm doing my best to keep these questions within the
15  boundaries of the court's order.
16       Do you know if the Department of Public
17  Safety ever reported to the legislature about the racial
18  analysis of voters who do not have a Texas driver's
19  license?  And I'm asking that because I think based on
20  the court's most recent order, if it doesn't specify
21  which legislator requested it or which it was reported
22  to, the fact of DPS's ability to transmit to the
23  legislature is not privileged.
24       MR. SWEETEN:  Risa, can you restate that
25  question?

94

1        MS. BERKOWER:  I will do my best to make
2   it clear.
3        MR. SWEETEN:  Can you tell me where in the
4   order it specifically says that?  Can we pull that out
5   because I want to make sure that my --
6        MS. BERKOWER:  It was this most recent
7   order.
8        MR. SWEETEN:  I've got it.
9        MS. BERKOWER:  Can we go off the record,
10  please?
11       (Recess from 12:05 p.m. to 12:10 p.m.)
12       MS. BERKOWER:  Okay.  So we had a
13  discussion off the record.  Patrick, do you want to
14  explain what you just said?
15       MR. SWEETEN:  Yes.  Risa and I had a very
16  civil discussion off the record involving the court's
17  order, Page 9, and along with Chief Justice Phillips, we
18  have reviewed this, and we were -- we were going to
19  allow the witness to answer this question, but we also
20  had an agreement that to the extent that there's a
21  misinterpretation of the order, that in her answering
22  this, there would not be any sort of waiver or argument
23  with respect to this question.  Is that our agreement?
24       MS. BERKOWER:  That is our agreement.
25       MR. SWEETEN:  Okay.

95

1        Q.   (BY MS. BERKOWER)  Do you remember the question?
2        A.   Not really.
3        Q.   So I'm going to do my best to recreate it.
4   Okay.  Do you know if the Department of Public Safety
5   ever -- ever conducted an analysis of the racial
6   composition of voters who do not have a Texas driver's
7   license and presented that information to the
8   legislature without revealing who requested it or to
9   whom any specific individual the response was directed?
10       A.   I don't know.
11       MS. BERKOWER:  Okay.
12       MR. SWEETEN:  We're all doing what we're
13  supposed to do.
14       MS. BERKOWER:  All right.  We'll move on
15  then.  So the turning back to --
16       MR. PHILLIPS:  I'm glad I contributed.
17       MS. BERKOWER:  Only a group of lawyers
18  could spend that much time talking to come up with that.
19  Okay.
20       Q.   (BY MS. BERKOWER)  So moving back to the House
21  in 2009 -- in April 2009, do you remember if the -- some
22  House members signed a pledge circulated by the
23  Republican Party of Texas concerning voter ID?
24       A.   I don't know.
25       (Exhibit 642 marked.)

96

1        Q.   Okay.  We'll mark this as, I guess, 642.  I
2   know it's been marked before, but I don't have the
3   number handy.  Do you know what this document is?
4        A.   It looks like it's a news article.
5        Q.   State press release.  Take a look at the first
6   line of the text and take a minute to review the
7   document.
8        A.   You asked if it was a press release?
9        Q.   Yes.
10       A.   It looks like it is.
11       Q.   Is it a -- Is it a press release from the
12  Republican Party of Texas?
13       A.   It appears to be -- It says Page 4 by the
14  Republican Party of Texas.
15       Q.   Does your review of this document refresh your
16  recollection as to whether a pledge was circulated by
17  the Republican Party of Texas concerning voter ID in
18  2009?
19       A.   No.
20       Q.   No?  Okay.  Well, turning your attention to the
21  middle of the page, now that you've read it, do you know
22  what it is -- just from reading it, do you understand
23  what you read?
24       A.   Yes.
25       Q.   And what do you understand it to be?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

97

1     MR. SWEETEN:  She's asking for your
2  interpretation of this document.  To the extent that
3  would reveal any matter of legislative privilege, don't
4  answer the question, but if you can testify without
5  revealing that, you can.
6     A.  I understand it to be a press release paid for
7  by the Republican Party of Texas.
8     Q.  About what topic?
9     A.  About voter ID.
10    Q.  The Republican Caucus Members Pledge do Support
11  Strong Voter ID Bills.  Is that the title of the
12  document that I just read?
13    A.  That is the title of the document.
14    Q.  Does the document outline principles --
15  statement of principles on voter ID?
16    A.  According to the document, on the statement of
17  principles concerning voter ID legislation.
18    Q.  Are there more principles listed there?
19    A.  According to the document, yes.
20    Q.  Does one of these -- does the first principle
21  require a -- Does the first principle say, "Ensure a
22  valid voter identification is needed to vote"?
23    A.  Yes.
24    Q.  And the second says, "Take effect at the next
25  possible uniform election date"?

98

1     A.  Yes.
2     Q.  And the third says, "Be free of any
3  registration requirements such as same day voting
4  registration that dilutes the intent of the bill, which
5  is ensuring fair and accurate elections"?
6     A.  Yes.
7     Q.  And fourth involves "an increase in criminal
8  penalties;" is that correct?
9     A.  Yes.
10    Q.  Do you know if the speaker was asked to sign
11  this pledge by the Republican Party of Texas?
12    MR. SWEETEN:  Don't reveal any
13  communications that the speaker had with any specific
14  members.  If it would be something that does not involve
15  the member or legislative staff and not within the scope
16  of privilege, you can answer the question.
17    A.  I don't know.
18    MS. BERKOWER:  Okay.  And I think to be
19  clear, I asked about the party, not the other
20  legislators.
21    MR. SWEETEN:  There's overlap whether
22  there's party -- you know, if one of these guys is a
23  legislator who's also the head of the party, then I
24  think that's why I made the objection.
25    Q.  Okay.  We reviewed SB362 a little while ago.

99

1     Do you remember a review of that?
2     A.  Yes.
3     Q.  You testified that that bill allowed voters to
4  present non-photo ID; is that correct?
5     MR. SWEETEN:  I think she testified about
6  what the text of the bill said on 362.  Is that what
7  you are asking?
8     MS. BERKOWER:  Yes.
9     MR. SWEETEN:  You can't testify about your
10  impressions of what 362 means or its effect, but you can
11  testify about the text of the bill.
12    A.  The text of the bill allowed non-photo ID.
13    Q.  Is the safe to say that the text of 362 does
14  not match up with Item 1 in this pledge?
15    MR. SWEETEN:  Based upon the text of the
16  language of the bill, you can it -- answer the question,
17  but don't give a qualitative judgment as to your
18  opinions about your -- the bill.  So if you can't answer
19  without giving your opinions about it, which would be
20  subject to legislative privilege, my instruction to you
21  would be not to answer the question.
22    A.  I'm going to choose not to answer.
23    Q.  Okay.  I can ask it slightly differently.
24  SB362 permits non-photo ID; is that correct?
25    A.  Yes.

100

1     Q.  This pledge demands that only valid photo ID is
2  needed to vote, correct?
3     MR. SWEETEN:  You can testify about the
4  text of the document.
5     A.  The document says, "Ensure a valid photo
6  identification is needed to vote."
7     Q.  Did Speaker Straus ever come out publicly to
8  support SB362?
9     A.  Yes.
10    Q.  Did he in fact publicly support SB362?
11    MR. SWEETEN:  You can testify about public
12  statements that you have knowledge of.
13    A.  Yes.
14    Q.  Did he make any public statements in support of
15  SB362?
16    A.  I'm considering letters we wrote to
17  constituents as public statements.  Is that okay?
18    Q.  Sure.
19    A.  Because we did write -- we had constituents
20  that wrote in on the topic, and he wrote letters back in
21  support.
22    Q.  With regard to the constituent communications
23  your office received about SB362, did you receive
24  communications in support of expressing constituents'
25  support of the bill?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 101

1    A.  Yes.
2    Q.  What did those constituents say?
3    A.  I don't recall specifics, but, generally, they
4  supported the concept of a -- of the legislation.
5    Q.  And I guess this is sort of just a basic
6  question.  Do you get constituent -- When you say
7  constituent mail, do you mean only communications from
8  people in House District 121 or people all over the
9  state?
10   A.  All over the state.
11   Q.  Were there any constituents who wrote to the
12 speaker who opposed SB362?
13   A.  I don't recall.
14   Q.  Do you remember any other public statements
15 such as to the media that Speaker Straus made in support
16 SB362?
17   A.  I don't specifically recall.
18   Q.  Do you remember if there was opposition on the
19 public record in the House against SB362?
20   A.  Yes.
21   Q.  Do you remember who opposed the bill on the
22 public record?
23   A.  On the public record, I recall NAACP, LULAC,
24 League of Women Voters, and I know there were individual
25 citizens that testified, but I don't know their names.

## 102

1    Q.  Do you remember what their reasons were for the
2  opposition on the public records?
3    MR. SWEETEN:  You can testify about the
4  express reasons on the public record.  Don't reveal
5  what -- I mean, what -- your interpretation of their
6  thoughts, mental impressions.  You can testify about
7  what was on the public record though.  I think that's
8  what she was asking.
9    A.  On the public record I recall statements that
10 voter fraud either doesn't exist or is not a problem, a
11 general dislike of the legislation.
12   Q.  Do you remember if MALDEF testified on the
13 public record in opposition to the bill?
14   A.  I don't recall.
15   Q.  Do you remember if there was any talk as part
16 of the public record on a compromise bill that year?
17   A.  I don't specifically remember.
18   Q.  Do you remember if Todd Smith presented an
19 alternative bill on the public record that he offered as
20 a compromise voter ID bill?
21   A.  I don't recall.
22   Q.  Do you remember if Todd Smith introduced a bill
23 that would have delayed implementation of the voter ID
24 for four years in order to conduct voter education?
25   A.  I don't specifically recall.

## 103

1    Q.  Do you remember anything about the bill that
2  Representative Smith introduced concerning voter ID?
3    A.  Specific?  I don't --
4    Q.  Do you remember anything generally about the
5  bill just as it was introduced as part of the public
6  record?
7    A.  No, I don't recall specifics.  I would be
8  guessing.
9    Q.  During this election -- Sorry.  During this
10 legislative session, you were Speaker Straus's liaison
11 to the election committee; is that accurate?
12   A.  Yes.
13   Q.  And you did --
14   A.  Sorry.  Are we still on 2009?
15   Q.  2009.
16   A.  Okay.  Cool.
17   Q.  And you said earlier you did have ongoing
18 communications with Representative Smith and his staff
19 throughout the 2009 legislative session?
20   A.  Yes.
21   Q.  Do you know if Speaker Straus ever publicly
22 came out in support or against Representative Smith's
23 bill?
24   A.  I don't recall.
25   Q.  As a matter of public record, do you know if

## 104

1  attempts to draft some sort of compromise on the
2  legislation that session were successful?
3    MR. SWEETEN:  Only if it's a matter of
4  public record can you answer that.
5    A.  I don't remember.
6    Q.  What ultimately happened to SB362 in the House?
7    A.  I don't think it was heard on the House floor.
8  Therefore, it died.
9    Q.  Did something called chubbing happen to Senate
10 Bill 362?
11   MR. SWEETEN:  You can testify as to
12 matters of public record, if you know.
13   A.  Yes.
14   Q.  What is that?
15   MR. SWEETEN:  If you can answer as a
16 matter of general understanding.
17   MS. BERKOWER:  That was the intent of my
18 question.
19   A.  It is a term given to extended debate on
20 legislation.
21   Q.  Is it a technique that some House members might
22 use to delay consideration of the bill?
23   MR. SWEETEN:  Just generally?  You can
24 answer as a general matter.
25   A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 105

1    Q.  After the end of the is 2009 session -- Well,
2  before we get there, how did the 2009 session end as a
3  matter of public record?
4    A.  I guess the speaker gaveled out.  I don't know.
5    Q.  Would you like to gavel out now?
6    A.  Yes, please.
7    Q.  Okay.  What were the events leading up to his
8  gaveling out; do you remember?
9        MR. SWEETEN:  If it's a matter of public
10 record you can testify to, you can.
11   A.  I -- I don't remember.
12   Q.  After the -- After he gaveled out at the end of
13 the session, were the House rules changed to prevent
14 chubbing in the future?
15       MR. SWEETEN:  You are asking her about --
16 her opinion about why the House rules would have been
17 changed?  You can ask her if a specific bill was
18 passed -- If there was a specific House bill passed that
19 related to chubbing, I'll allow her to answer if she
20 knows.
21   Q.  Okay.  I can restate the question.  So after
22 the end of the session, and I think this is in line with
23 your objection, Patrick, was there a change in House
24 rules that prevented chubbing?
25       MR. SWEETEN:  You can answer.

## 106

1    A.  I don't know.
2    Q.  Okay.  So do you -- do you know what an interim
3  charge is?
4    A.  Yes.
5    Q.  What is it?
6    A.  It is a suggestion of topics do be studied
7  while we're not in session.
8    Q.  Do you have any role in interim charges issued
9  by the speaker and does the speaker issue the interim
10 charges for the House?
11   A.  He does.
12   Q.  Do you have any role in the interim charges
13 issued to committees that you cover for the speaker?
14   A.  Yes.
15   Q.  What is that role just as a general matter?
16       MR. SWEETEN:  What's her role in the
17 speaker's office as to interim charges?
18       MS. BERKOWER:  No.  I was asking --
19       MR. SWEETEN:  As a committee?
20       MS. BERKOWER:  I can be more specific.
21 That might help.
22       MR. SWEETEN:  Okay.
23   Q.  If the -- If the House speaker issues a
24 committee -- Sorry.  If the speaker issues an interim
25 charge that goes to one of the committees that you cover

## 107

1  for him, what is your role with regard to the interim
2  charge?
3        MR. SWEETEN:  You can answer if it won't
4  reveal matters of legislative privilege.
5    A.  I sit in the committee hearings when the topic
6  is discussed.
7    Q.  Do you ever play any other role?  Do you assist
8  them in any way?
9    A.  Do I assist the committee --
10   Q.  Yes.
11   A.  -- with regard to the interim charges?
12   Q.  Yes.
13   A.  Yes.
14   Q.  What do you do?
15       MR. SWEETEN:  Don't reveal matters of
16 privilege.  If you won't be doing, so you can answer the
17 question.
18   A.  I'm going to choose not to answer.
19       MS. BERKOWER:  I guess I'm trying to get
20 at more procedural stuff so, I'm not sure that you would
21 object to all of them, so I'll try to ask a few more
22 specific questions, and if you object to those, we'll
23 move on, and if not, she can answer that.  Is that
24 acceptable, Patrick?
25       MR. SWEETEN:  That's fine.

## 108

1    Q.  Are you involved with -- Do you assist members
2  on -- Well, I'll withdraw that.
3        Does the committee hold hearings during
4  the interim session if they have an interim charge?
5        MR. SWEETEN:  You can answer.
6    A.  If the chair chooses to, yes.
7    Q.  Do you help them organize those hearings?
8    A.  No.
9    Q.  Do you ever reach out to potential witnesses to
10 testify?
11   A.  No.
12   Q.  Do you ever do research to be presented during
13 those hearings?
14       MR. SWEETEN:  Don't reveal matters of
15 privilege as to specific legislation.  I think you can
16 answer that as a general matter.
17   A.  No.
18       MR. SWEETEN:  Okay.
19   Q.  Do you participate in writing any report or
20 recommendation that comes out of the interim charge?
21   A.  No.
22   Q.  Is your role more to observe?
23   A.  Yes.
24   Q.  And to bring a report back on what you see?
25   A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Meredyth Fowler                                                  June 8, 2012



**109**

1    Q.  Do you remember if any interim charges were
2    issued during the -- after the 2009 session that related
3    to the elections committee?
4        MR. SWEETEN:  I think that's a matter of
5    public record.  You can go ahead, if you know.
6    A.  Yes.
7    Q.  It is a matter of public record.  Do you know
8    if the elections committee held hearings as a result?
9    A.  They did.
10   Q.  Did they come up with a report at the end of
11   their investigation?
12   A.  If I recall correctly, they did.
13       (Exhibit 643 marked.)
14   Q.  Okay.  We have what we'll mark as Exhibit 643,
15   please.  And I'll represent to you that this is an
16   excerpt of the full report which was pretty long.  Do
17   you recognize this?
18   A.  Yes.
19   Q.  What is it?
20   A.  It is the interim report to the 82nd Texas
21   Legislature from the House Committee on Elections.
22   Q.  When was it presented?
23   A.  It says January 2009 on the document.
24   Q.  And turning to the fourth page of the exhibit,
25   which is -- actually it says Page 26 on it, but I think

**110**

1    it's the fourth page of this exhibit.  It says, "Interim
2    Charge No. 3."  Do you see that?
3    A.  Yes.
4    Q.  What -- What does Interim Charge No. 3 provide?
5    A.  "Examine the prevalence of fraud in Texas
6    elections.  Study new laws in other states regarding
7    voter identification and recommended statutory changes
8    necessary to ensure that only eligible voters can vote
9    in Texas elections."
10   Q.  Do you remember the issuance of that interim
11   charge?
12   A.  Yes.
13   Q.  And do you remember attending hearings related
14   to that interim charge?
15   A.  Yes.
16   Q.  Do you remember receiving this report when it
17   was presented to the legislature at the end of -- or at
18   the start of the 2009 legislative session?
19   A.  Yes.
20   Q.  Turning to Page 27 under testimony -- And did
21   you want -- do you want to take a minute and review the
22   document?  I don't know if you had a chance to do that
23   yet.
24   A.  Sure.
25   Q.  Let me know when you are done.

**111**

1    A.  Okay.  Okay.
2    Q.  You ready?
3    A.  Yeah, I think so.
4    Q.  So turning to Page 27, does that page describe
5    testimony that was presented to the committee?
6    A.  Yes.
7    Q.  Does it describe testimony presented by Jay
8    Dyer from the Attorney General's Office?
9    A.  Yes.
10   Q.  And does Mr. Dyer explain that there were --
11   does he give some information on the number of referrals
12   and the incidences of alleged illegal voting and the
13   resolution of those cases?
14   A.  Yes.
15   Q.  And he says that the -- Well, how many
16   incidents did he describe?
17       MR. SWEETEN:  You are asking what the
18   document states?
19       MS. BERKOWER:  As recorded in the
20   document, yes.
21       MR. SWEETEN:  Okay.
22   A.  The document says 267 referrals.
23   Q.  Since what date?
24   A.  Since 2002.
25   Q.  And I think I should direct your attention to

**112**

1    the paragraph on background.  It indicates the hearing
2    was held on June 14th, 2010.  Is that accurate?
3    A.  Yes.
4    Q.  So Mr. Dyer's testimony seems to being limited
5    to the periods between 2009 and June 14, 2010.  Is that
6    an accurate reflection of this report?
7        MR. SWEETEN:  You can testify about what
8    the document says.  Don't testify about your thoughts,
9    your mental impressions about the bill.
10   A.  The document says since 2002, 267 referrals
11   were received by the Attorney General's Office and the
12   hearing was on June 14, 2010.
13   Q.  Were you present when Mr. Dyer testified?
14   A.  I don't recall.
15   Q.  So the paragraph that mentions the 267
16   referrals of incidents of illegal voting, it goes on to
17   describe the resolution of those cases.  You reviewed
18   that part of the paragraph?
19   A.  Yes.  The document says, "35 of those alleged
20   violations have been resolved with guilty pleas,
21   dismissals or plea agreements, while 12 cases remain
22   active and the remainder of the cases are either still
23   being investigated or the statute of limitations has
24   expired."
25   Q.  Was there any testimony about the total number



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 113

1  of people voted between 2002 and June 14, 2010?
2      A.  In this hearing?
3      Q.  Yes, in this hearing.
4      A.  I don't remember.
5      Q.  In the testimony section of this report, do you
6  see anything that indicates the number of voters who
7  voted during that period?
8      A.  I'm not seeing it on this page, unless I'm
9  missing it.
10     Q.  So that this report relates -- the testimony --
11  the answer would be no?
12     A.  As far as what is on this document, I'm not
13  seeing it.
14     Q.  Okay.  And then Mr. Dyer testified further and
15  it's described in the next two paragraphs.  The
16  paragraph after the one you were just reading, can you
17  read the last sentence of that paragraph, please?
18     A.  "To get a complete picture of voter fraud in
19  Texas, further analysis is needed to gather additional
20  information from local election and law enforcement
21  officials."
22     Q.  So without -- Do you know if any such analysis
23  was ever conducted without revealing any particular
24  request by a legislator or any communication back to a
25  particular legislator?

---

### 114

1      A.  I don't know.
2      Q.  And do you know if the report made a
3  recommendation to the legislature?  I think it's on Page
4  31.
5      A.  According to the document they did.
6      Q.  Would that be in the section entitled
7  Recommendations?
8      A.  Yes.
9      Q.  What did they recommend based on this report?
10     A.  "Based on the report, the elections committee
11  recommends that the legislature adopt legislation
12  requiring voters to show photo identification in order
13  to cast a ballot at the polls.  We ask that free
14  identification cards be issued by either the Department
15  of Public Safety, the local voter registrar's office if
16  the voter is registered in this state, does not already
17  have a driver's license and is receiving the
18  identification cards with the express intent to vote.
19  It is also important that such legislation provide for
20  the education of voters on any changes enacted and that
21  the Secretary of State and counties coordinate their
22  efforts to inform the state's electorate.  This law
23  should take effect January 1, 2012."
24     Q.  At a general matter of your experience in the
25  legislature, when an interim charge -- when a committee

---

### 115

1  comes back after an interim charge with a
2  recommendation, what do legislators do with that?  How
3  is that received?
4      MR. SWEETEN:  Calls for matters of
5  legislative privilege and compound.
6      Q.  Well, do they have public hearings or any
7  public discussion on the record of the House about the
8  interim charge reports?
9      A.  Sometimes.
10     Q.  Do you know if there was such discussion on the
11  public record about this interim charge report?
12     A.  I don't recall if it was specifically
13  discussed.
14     Q.  Do you know if members who participate in
15  interim charge investigations ever draft legislation
16  simultaneously to their participation in the interim
17  charge investigation?
18      MR. SWEETEN:  I wish -- Sorry.  Can you
19  say that again, Risa?
20      MS. BERKOWER:  Yeah.  It was a question of
21  if she knows whether members who serve on interim charge
22  committees ever draft legislation simultaneously to
23  their work on the interim charge committee.
24      MR. SWEETEN:  You are not asking about a
25  specific bill?  You are just asking generally do they

---

### 116

1  sometimes do that?
2      MS. BERKOWER:  Yes.
3      MR. SWEETEN:  Okay.  You can answer that
4  question as posed to the extent it doesn't reveal the
5  legislative privilege.
6      A.  I don't know.
7      MS. BERKOWER:  Guys, want to take a lunch
8  break?
9      MR. SWEETEN:  Sure.  That sounds good.
10      (Recess from 12:45 p.m. to 1:31 p.m.)
11     Q.  (BY MS. BERKOWER) Okay.  So I think when we
12  left off at the end of lunch, we were just talking about
13  the state interim report that the elections committee
14  presented to the House in January 2011.  So we'll
15  continue with that period of time.  During the 2011
16  legislative session was a special committee created only
17  to address election related or voter ID related
18  legislation?
19      MR. SWEETEN:  Objection.  Because you are
20  asking the purpose of its creation.  She's already
21  testified that it was a committee.  I think she's
22  testified to the matters that you are asking, except to
23  the extent you are asking for the mental process, that
24  portion.
25     Q.  Then I'll actually withdraw that question.  Was

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 117

1  a photo ID bill addressed in the Senate in 2011?
2      A.  Yes.
3          (Exhibit 644 marked.)
4      Q.  This is exhibit -- We'll just give you a new
5  644, please.  Do you know what this?
6      A.  This is a copy of Senate Bill 14.
7      Q.  And if I represent to you this is Senate Bill
8  14 as filed in the Senate, do you have any reason to --
9  sorry -- as filed in the House, do you have any reason
10  to think that's not actually the case?
11      A.  No.
12      Q.  Take a minute to look at the document.  You've
13  reviewed it?
14      A.  Yes.
15      Q.  So do you recognize it?
16      A.  Yes.
17      Q.  Are you familiar with its provisions?
18      A.  Yes.
19      Q.  Turning your attention to -- it's page --
20  page -- well, really it's 4 and 5 of the document is
21  what we're going to be looking at.  Part G on Page 4 at
22  Line 14.  Sorry.  And then Part H on Page 5 at Line 4.
23  Sorry about that.  Do you see what that section -- what
24  that section says?
25      A.  Yes.

### 118

1      Q.  Does that section appear to carve out an
2  exception for voters presenting photo identification?
3      A.  It says -- document says, "The requirements for
4  identification prescribed by Subsection B do not apply
5  to a voter who, one, presents the voter's voter
6  registration certificate on offering to vote and, two,
7  was 70 years of age or older on January 1, 2012 as
8  indicated by the date of birth on the voter's voter
9  registration certificate."
10      Q.  Does that section seem to create an exemption
11  for voters over age 70 to the identification
12  requirements?
13      A.  Yes.
14      Q.  Do you know if that section was taken out of
15  the final bill?
16      A.  I don't recall.
17      Q.  Turning your attention to Page 8 of the
18  document, Section 63.0101, "Documentation of Proof
19  Identification."  Are you familiar with this section?
20      A.  Yes.
21      Q.  Does this section explain which types of photo
22  ID a voter may present to vote at the polls?
23      A.  Yes.
24      Q.  And does it permit a voter to present a
25  driver's license or a personal identification card

### 119

1  issued by the Department of Public Safety as long as
2  those forms of identification have not expired?
3          MR. SWEETEN:  You can answer about the
4  text of the bill, the question.
5      A.  On the text of the bill, yes.
6      Q.  And it permits a voter -- the text of this bill
7  permits a voter to present a United States military
8  identification card that contains the person's
9  photograph and has not expired; is that correct?
10      A.  Yes.
11      Q.  And it also permits a person -- a voter to
12  present a US citizenship certificate that contains a
13  photograph; is that correct?
14      A.  Yes.
15      Q.  And it permits a US passport issued to the
16  person that has not expired; is that accurate?
17      A.  Yes.
18      Q.  If you remember our discussion on SB362, were
19  there additional types of identification that SB362
20  permitted that this bill does not permit?
21          MR. SWEETEN:  You can answer based on the
22  text of the bill.
23      Q.  And you can refer back to that exhibit if you
24  need to.
25      A.  Yes, yes.

### 120

1      Q.  Did SB362, the text of the bill as you are
2  looking at it also permit a voter to use an ID that had
3  expired?  Actually, I should make that more specific.
4          Did it permit a voter to use a driver's
5  license or personal identification card that had expired
6  for no more than two years?
7      A.  Yes.
8      Q.  Whereas, SB14 has filed -- required an
9  unexpired version of those identifications; is that
10  correct?
11      A.  Yes.
12      Q.  And the same goes for the military
13  identification.  SB362 allowed -- wait a second --
14  allowed identification that had expired, whereas, SB14
15  as filed did not.
16          MR. SWEETEN:  Again, you can answer based
17  on the text of this.
18      A.  Yes.
19      Q.  The same question with regards to passports.
20  Did SB362 as it is before you permit an expired passport
21  within two years, whereas, SB14 does not?  Actually, I'm
22  going to withdraw that question.
23      A.  Okay.
24      Q.  So is it fair to say there are also types of
25  identifications allowed under SB362 as it's before you



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Meredyth Fowler

June 8, 2012

---

**121**

1 that are not included in SB14, the version that's before
2 you?
3     A.  In the version before me, yes, I believe that
4 would be a fair statement.
5     Q.  Do you know if there's any evidence in the
6 public record for SB14 that supported the conclusion
7 that only unexpired ID will prevent voter fraud?
8     MR. SWEETEN:  Objection.  Calls for
9 matters of the legislative privilege.  If you want to
10 ask it another way, more topically general, I won't
11 object to that question.
12     Q.  Did you hear anyone testify on the public
13 record that only unexpired IDs will prevent voter fraud?
14     MR. SWEETEN:  You can answer.
15     A.  I don't recall.
16     Q.  Did anyone present any studies on the public
17 record that showed that only unexpired IDs will prevent
18 voter fraud?
19     MR. SWEETEN:  You can answer.
20     A.  I don't recall that type of testimony.
21     Q.  Do you remember any testimony in the public
22 record that explained why the types of identification
23 permitted in SB362 that are not included in SB14 should
24 not be included in SB14?
25     MR. SWEETEN:  I think you can answer the

---

**122**

1 question based on the public record.
2     A.  Yes.
3     Q.  What testimony was that?
4     A.  Basically that certain IDs allowed under 362
5 did not require a photo.
6     Q.  Do you remember who testified to that?
7     A.  I don't remember specifically who did.
8     Q.  Do you remember which hearing it was in?
9     A.  I don't recall if it was House or Senate.
10     Q.  Did the person who testified to that provide
11 any reasons why a photo ID is necessary to prevent voter
12 fraud?
13     MR. SWEETEN:  You can answer -- To the
14 extent that reasons were expressed on the record, you
15 can answer the question.
16     A.  Yes.  Reasons were expressed on the record.
17     Q.  What were those reasons?
18     A.  On the record I remember testimony that you
19 need to compare a photo to the person's face standing in
20 front of you who's voting.
21     Q.  And SB14 as filed in the House only permitted
22 unexpired IDs, correct, based on the version you have in
23 front of you?
24     A.  Yes.  On the version in front of me, yes.
25     Q.  How often do you have to renew a Texas driver's

---

**123**

1 license?
2     A.  If I recall correctly, I could be wrong, I
3 think it's every six years.  I could be wrong.
4     Q.  Is it possible to review your license online?
5     A.  I don't recall.  I don't know.
6     Q.  Do you know if you have to take a new photo
7 every time you renew the license?
8     A.  I don't know.
9     Q.  Well, and to your knowledge someone would go at
10 least six years without having do retake the photo,
11 right?
12     A.  To my knowledge, yes.
13     Q.  Is it possible -- is it possible that someone
14 would look different in a photo taken six years earlier?
15     A.  It's possible.
16     Q.  Do you know if the United States citizenship --
17 a United States citizenship certificate that contains a
18 photo would ever expire?
19     A.  I don't know.
20     Q.  If it didn't expire and it was issued to
21 someone when they were a child, would they still -- is
22 there a chance they would not look like that photograph
23 decades later?
24     MR. SWEETEN:  Objection.  It is compound,
25 calls for speculation.  Please go ahead.

---

**124**

1     A.  There is a chance.
2     Q.  Do you know how long a United States passport
3 is valid?
4     A.  Off the top of my head, I don't.
5     Q.  Now, with regard to driver's licenses, this is
6 something I should have asked you before, do you know if
7 there's a driver's license office for legislators in the
8 capitol next to the mail room?
9     A.  I don't know.  I don't know.  I don't know if
10 it's still there.
11     Q.  Did it exist at one time?
12     A.  I think it did, but I don't know exactly what
13 type of services they offered.
14     Q.  Did you ever go there yourself?
15     A.  Not that I recall.
16     Q.  Do you know if it's included in the list of
17 driver's license offices on the Department of Public
18 Safety's website?
19     A.  I don't know.
20     Q.  Did you have any communications with Senator
21 Fraser or members of his office as he developed SB14
22 without revealing the contents of any communications you
23 may have had?
24     MR. SWEETEN:  I think it assumes facts in
25 evidence because I don't know that she has testified as

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Meredyth Fowler                                                    June 8, 2012



**125**

1  to when he developed it, so I think --
2          MS. BERKOWER:  I'll back up a little.
3          MR. SWEETEN:  I don't mind asking her
4  conversations.
5      Q.  (BY MS. BERKOWER) So do you know when Senator
6  Fraser developed SB14?
7      A.  I do not.
8      Q.  Did you have any communications with him or his
9  office between the 2009 and 2011 legislative sessions?
10     A.  Not that I can recall.
11     Q.  Do you know if Speaker Straus had any
12 communications without revealing their content between
13 Speaker Straus and Senator Fraser or his office between
14 the 2009 and 2011 legislative sessions?
15     A.  I don't know.
16     Q.  Did you have any communications with the
17 lieutenant governor's office between the 2009 and 2011
18 legislative sessions?
19     A.  Yes.
20     Q.  Without revealing the content of what you
21 discussed, who did you communicate with?
22     A.  Brian Hebert.
23     Q.  What was the general topic of those
24 communications?
25     A.  A lot of them were where to go eat for lunch,

**126**

1  where to go to happy hour.  Probably more unwork related
2  than work related.
3      Q.  What were the work related ones about
4  without -- as a general matter?
5          MR. SWEETEN:  If you can give a general
6  description, but don't go into the communication.
7      A.  Generally they were about legislation.
8      Q.  Were any of them about voter ID legislation?
9      A.  Yes.
10     Q.  Were any of them about SB14?
11     A.  Yes.
12     Q.  Do you remember when specifically the
13 communications with Brian Hebert were about SB14
14 occurred?
15     A.  On -- Throughout the session.
16     Q.  What about before the session?
17     A.  I don't recall any conversations before
18 session.
19     Q.  And after the session started, did you have
20 communications with Senator Fraser or anyone from his
21 office?
22     A.  Not that I recall.
23     Q.  Do you know if Speaker Straus without revealing
24 any content had any communications with the lieutenant
25 governor's office between -- about SB14 before the start

**127**

1  of the 2011 legislative session?
2          MR. SWEETEN:  You can answer.
3      A.  I don't know.
4      Q.  Do you know if Speaker Straus had any
5  communications with the lieutenant governor's office
6  about SB14 after the legislative session began without
7  revealing the content?
8      A.  I don't know.
9      Q.  If a photo ID is expired but was validly
10 issued, why doesn't that prove the person is the same
11 person on the ID?
12         MR. SWEETEN:  Don't answer.  It calls for
13 matters of legislative privilege.  Instruct not to
14 answer.
15     Q.  Are you following that instruction?
16     A.  Yes.
17         MR. SWEETEN:  You are trying to see if I'm
18 wake, aren't you?
19         MS. BERKOWER:  That's our strategy.
20 We give you these beef fajitas and I slip them in.
21     Q.  (BY MS. BERKOWER) Do you know what a military
22 ID is?
23         MR. SWEETEN:  You can answer.
24     A.  Yes.
25     Q.  What is it?

**128**

1      A.  An ID issued by the military.
2      Q.  How different forms of military ID are there?
3      A.  That I don't know.
4      Q.  Do you know so -- Did you have any
5  communications during the time that you worked on SB14
6  with anyone about which forms of military ID would be
7  acceptable under SB14?
8          MR. SWEETEN:  I think that would require
9  her to reveal her process and analysis and mental
10 impressions regarding the bill.
11     Q.  I can be more specific and, actually, that
12 might help here.  Did you have any communications with
13 non-legislators or anyone outside the legislature about
14 which forms of military ID SB14 would be unacceptable
15 under SB14?
16     A.  I don't recall any conversations like that.
17     Q.  Do you know what a citizenship certificate is?
18     A.  Yes.
19     Q.  What is it?
20     A.  Essentially a piece of paper stating that the
21 individual is a citizen of the United States.
22     Q.  Have you seen one?
23     A.  I have not.
24     Q.  Do you know how much it cost to obtain one?
25     A.  I do not.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

Meredyth Fowler

June 8, 2012



## 129

1   Q. Do you know how much it would cost to get a
2   replacements citizenship certificate?
3   A. I don't.
4   Q. Do you know what you would have to do to get a
5   replacement?
6   A. I don't.
7   Q. Do you know how long it might take to get a
8   replacement?
9   A. I do.
10  Q. Do you know if citizenship certificates always
11  contain a photo?
12  A. I don't know.
13  Q. Do you know how much it cost to obtain a US
14  passport?
15  A. Off the top of my head, I don't.
16  Q. Do you know what documents you would need to
17  provided to get a passport?
18  A. I believe when I got mine, I had to provide a
19  birth certificate and Social Security card, I think.
20  Q. Have you ever -- Are you familiar with the
21  photo ID laws in Indiana and Georgia?
22  MR. SWEETEN: I'm sorry. Is she familiar
23  with --
24  Q. Is she familiar with those laws?
25  MR. SWEETEN: You can answer except to the

## 130

1   extent it would reveal your mental processes regarding
2   legislation.
3   Q. It's just a yes or no question.
4   A. Yes.
5   Q. Okay. This has been previously marked as
6   Exhibit 6. Do you know what this is?
7   A. This looks like it is the Georgia statutes.
8   Q. The Georgia photo ID statute?
9   A. Yes.
10  Q. Does this -- Turning your attention to the
11  first page of this exhibit, Part A1, does this provision
12  allow a voter to present a Georgia driver's license
13  properly issued by the appropriate state's agency?
14  A. Yes.
15  Q. Does the law specify that the ID must be
16  unexpired?
17  A. This -- On this document, no.
18  Q. Does this -- Does Part 2 there, the next
19  section, allow a voter to present a valid Georgia voter
20  identification card issued under Code Section 21-2-417.1
21  or other valid identification card issued by a branch,
22  department, agency or entity of the State of Georgia,
23  any other state or the United States authorized by law
24  to issue personal identification so long as it's a photo
25  identification?

## 131

1   A. Yes.
2   Q. Based on the version of SB14 that you have in
3   front of you, does SB14 -- does that -- does the text of
4   that bill permit all of those types of identification?
5   A. Permit all of the types?
6   Q. Of identification in that Part A2 that we just
7   reviewed in the Georgia law.
8   A. Does SB14 allow all of these? According to the
9   version of Senate Bill 14 in front of me, no.
10  Q. Does this version of Senate Bill 14 allow
11  identification -- a voter to present photo
12  identification issued by a branch, department, agency or
13  entity of the State of Texas other than those issued by
14  DPS as specified?
15  A. Can you repeat the question?
16  Q. Yes. Does SB14 allow a voter to present photo
17  ID issued by any Texas agency other than the Department
18  of Public Safety?
19  A. No, according to this version.
20  Q. Does SB14 permit a voter to present
21  identification issued by any other state?
22  A. In this version of SB14, no.
23  Q. Does SB14 allow a voter to present as
24  identification a photo ID issued by a branch,
25  department, agency or entity of the United States except

## 132

1   for US military ID, US citizenship certificates and US
2   passports?
3   A. No.
4   Q. Turning back to the Georgia law, No. 4, listed
5   under where we were looking before, does the Georgia law
6   allow a voter to present photographic identification
7   issued by employers of the State of Georgia or the US
8   government?
9   A. Yes.
10  Q. Does the text of SB14 that you have before you
11  allow that type of identification?
12  A. Can you repeat the question?
13  Q. Yes. The Georgia law, Part 4 there, allows a
14  voter to present identification employee IDs issued by
15  the US government or the State of Georgia. Does SB14
16  permit a voter to present identification that's an
17  employee identification issued by anybody?
18  A. In this version of Senate Bill 14, no.
19  Q. Under Part 6 in the Georgia law, that section
20  permits a voter to present a valid tribal identification
21  card containing a photograph; is that correct?
22  A. Yes.
23  Q. Is there a provision for tribal identification
24  in SB14?
25  A. In the document in front of me, no.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 133

1    Q.  Is it fair to say that the Georgia law allows
2  more forms of identification than SB14?
3         MR. SWEETEN:  Based on the text of the
4  bill --
5         MS. BERKOWER:  Yes.
6         MR. SWEETEN:  -- that she's got in front
7  of her?  You can answer that.
8    A.  Based on the text in front of me, yes.
9    Q.  During the public debate of SB14, did anyone
10  that you heard testify raise concerns that SB14 should
11  have adhered more closely to the Georgia law?
12        MR. SWEETEN:  You can answer.  It's a
13  public record.
14    A.  On my own public record, I know that Georgia
15  law was discussed.  I don't know if anyone specifically
16  suggested that Senate Bill 14 should being closer to the
17  Georgia law.
18    Q.  Do you know of any concerns raised by
19  constituents who contacted your office that SB14 should
20  have adhered more closely to the Georgia law?
21    A.  I don't recall.
22    Q.  Do you know if Speaker Straus ever made any
23  public statements that -- to the effect that SB14 was
24  similar to the Georgia law?
25    A.  I don't know.

---

### 134

1    Q.  So I have what was previously marked as
2  Exhibit 60.  Do you know what this is?
3    A.  This looks like it is a copy of the Indiana
4  statutes.
5    Q.  Did you -- Have you read it before?
6    A.  I have not.
7    Q.  Take a minute to look at it now.  Are you
8  ready?
9    A.  Yes.
10    Q.  So looking at Section 1.1C3-5-2-40.5 on the
11  first page of the document -- Did I ask you what this is
12  already?
13    A.  Yes.
14    Q.  Okay.  And you said it was the Indiana voter ID
15  law?
16    A.  I think I said it was the Indiana statute, but
17  it's the Indiana voter ID law.
18    Q.  Okay.  That Section 40.5, Proof of
19  Identification, does that section seem to define the
20  type of identification acceptable for voters to provide
21  at the polls under this law?
22    A.  From the text in front of me, yes.
23    Q.  And does Section 40.5 list four requirements
24  for that identification?
25    A.  Yes.

---

### 135

1    Q.  Are those requirements that the document must
2  contain the name of the individual, photograph of the
3  individual and an expiration date, and the document must
4  have been issued by the United States or the State of
5  Indiana?
6    A.  Yes.
7    Q.  And the expiration date must reveal that the
8  document is either not expired or has not expired -- or
9  expired after the dates of the most recent general
10  election is before the one on which it is presented.
11    A.  From the document in front of me, yes.
12    Q.  So does that mean from -- The face of this does
13  it seem that a voter in Indiana could present an expired
14  ID so long as it hasn't expired before the date of the
15  most recent general election?
16    A.  From the text in front of me, yes.
17    Q.  And this -- since this document -- I'll
18  rephrase that.  Is it fair to say that based on the text
19  in front of you, this -- the Indiana law allows voters
20  to present a wider range of identification than SB14
21  permits based on the text of both bills in front of you?
22    A.  From the text in front of me, yes.
23    Q.  During the time that SB14 was considered by the
24  Texas legislature, are you aware of any discussion on
25  the public record about the differences between SB14 and

---

### 136

1  the Indiana law?
2    A.  I know the Indiana law was discussed.  I don't
3  remember the specifics.
4    Q.  Do you remember if anyone expressed concern on
5  the public record that SB14 should adhere more closely
6  to the Indiana law?
7    A.  Again, I just know it was discussed.  I
8  don't -- I don't remember specifics.
9    Q.  What does the term legislative emergency mean
10  within the Texas legislature?
11        MR. SWEETEN:  You can answer as a general
12  matter what that term means to you to the extent it
13  won't reveal legislative privilege.
14    A.  I don't know.  I've never really thought about
15  it, legislative, emergency.  I think it can be used to
16  characterize seemingly important legislation.
17    Q.  When a type of legislation is deemed a
18  legislative emergency, does that mean that the bill --
19  that the legislation on that topic can be considered
20  earlier in the session?
21        MR. SWEETEN:  You can answer as a general
22  matter if you know.
23    A.  As a general matter, it could mean that.
24    Q.  Do you know just as a matter of procedure if
25  there are any constraints on what types of legislation



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 137 | 139 |
|---|---|
| 1  the governor may declare to be a legislative emergency? | 1  A. I don't know. |
| 2  A. That I don't know. | 2  Q. Did you follow SB14 in the Senate? |
| 3  Q. Do you know who decides -- I'll rephrase that. | 3  A. Yes. |
| 4  So do you know if Speaker Straus had any | 4  Q. Was SB14 referred to the committee of the whole |
| 5  communications with the governor about legislative | 5  Senate? |
| 6  emergency prior to the 2011 legislative session? | 6  A. Yes. |
| 7  MR. SWEETEN: Can you read the question | 7  Q. How many other bills were referred to the |
| 8  back? | 8  committee of the whole Senate during the 2011 |
| 9  (Requested portion was read.) | 9  legislative session? |
| 10  MR. SWEETEN: You can answer. That's a | 10  A. I don't know. |
| 11  general enough subject matter. You can answer the | 11  Q. Do you know if any others were? |
| 12  question. | 12  MR. SWEETEN: Objection. Asked and |
| 13  A. I don't know. | 13  answered, but go ahead. |
| 14  Q. Was photographic voter ID declared to be a | 14  A. I don't recall any others. |
| 15  legislative emergency for the 82nd legislature? | 15  Q. Do you know how the committee referral process |
| 16  A. To my recollection, yes. | 16  works in the Senate? |
| 17  Q. And when did you first learn about the | 17  A. I don't. |
| 18  designation? | 18  Q. Did you attend any Senate hearings concerning |
| 19  A. I don't remember the date. | 19  SB14? |
| 20  Q. Around when? | 20  A. Yes. |
| 21  A. Around the start of the session, I think. | 21  Q. Do you remember attending a Senate hearing on |
| 22  Q. In your time working in the legislature have | 22  January 25, 2012? |
| 23  you seen any other election law designated as a | 23  A. Yes. |
| 24  legislative emergency? | 24  Q. Do you recall having any conversation with |
| 25  A. No. | 25  Senator Williams at that hearing? |

| 138 | 140 |
|---|---|
| 1  Q. During your time working in the legislature, | 1  A. Yes. |
| 2  what other types of legislation were designated to be a | 2  Q. Do you know if there was any discussion on the |
| 3  legislative emergency? | 3  public record during that hearing about matching the |
| 4  A. I forget the name of the bill, but it was | 4  driver's license and voter registration databases? |
| 5  the -- how do I say this tactfully? I guess the | 5  A. Yes. |
| 6  transvaginal thing with abortions. I'm sorry. I can't | 6  Q. What was that evidence? |
| 7  remember the name of the bill because it's been termed | 7  MR. SWEETEN: You can just talk about |
| 8  so many inappropriate things. You have to -- | 8  matters of the public record. |
| 9  MR. SWEETEN: That's descriptive enough. | 9  A. I don't recall specifics. I know that the |
| 10  I will stop there. | 10  topic was discussed. |
| 11  THE WITNESS: Sorry. | 11  Q. Do you remember in what context it was |
| 12  Q. Are you following his advice? | 12  discussed? |
| 13  A. There's that one. What else? Oh, if I'm | 13  A. Can you elaborate? |
| 14  recalling correctly, I think maybe Sanctuary Cities was | 14  Q. Well, do you remember who was testifying about |
| 15  an emergency item last session. Those are the three | 15  it? |
| 16  that come to mind. The wand or whatever. | 16  A. I don't. |
| 17  Q. Do you know if there were any elections held in | 17  Q. Do you remember if it was someone from the |
| 18  Texas within the first 60 days of the 2011 legislative | 18  Secretary of State's office? |
| 19  session? | 19  A. That sounds right. |
| 20  A. I do not know of any. | 20  Q. Do you remember if it was a person named Ann |
| 21  Q. Do you know who had input into the decision to | 21  McGeehan? |
| 22  designate voter identification as a legislative | 22  A. I know she testified. |
| 23  emergency? | 23  Q. During that hearing? |
| 24  MR. SWEETEN: Don't reveal matters of | 24  A. Yes. |
| 25  privilege in answering the question. | 25  Q. And I'm not sure if I got this yet. Do you |



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com



141

1   remember why the question of matching the driver's
2   license and voter registration databases came up or in
3   what context?
4            MR. SWEETEN:  In what context -- If the
5   context would be on the public record, you can answer
6   that.
7            MS. BERKOWER:  Yes.
8        A.  I believe it came up because the question was
9   asked -- I'm not sure by who -- if they could match
10  registered voters with the driver's license database.
11       Q.  Did the person who testified explain why
12  someone would want to conduct that match, like what the
13  purpose of conducting that match would be?
14       A.  They did.
15       Q.  What was the reason?
16           MR. SWEETEN:  Expressed on the public
17  record, you can testify to if you know.
18       A.  I recall whoever -- I guess, Ann, whoever was
19  testifying, stating that the purpose would be to see how
20  many registered voters have a driver's license.
21       Q.  What -- Did she explain what that would show on
22  the public record?
23       A.  I'm sure she did.
24       Q.  Was it to show or get an estimate of the number
25  of voters who might be impacted by SB14's requirements?

142

1            MR. SWEETEN:  If you are asking on matters
2   of public record, you can testify as to that.
3        A.  Can you repeat it?  I'm sorry.
4        Q.  Yeah.  Did she explain on the public record
5   that the purpose of conducting that match would be to
6   show how many voters may not have the identification
7   required by SB14?
8        A.  Yes.
9        Q.  Do you know if that match was in fact
10  conducted?
11       A.  I don't know.
12       Q.  Okay.  Did you ever hear anyone else talk on
13  the public record about the results of such a match?
14       A.  I don't recall hearing anyone talk about the
15  results.
16       Q.  When the bill was back in the House, did you
17  hear anybody say as part of the public record that they
18  would -- that they were interested in the results of
19  such a match?
20       A.  I'm -- I'm -- I don't recall specifically.  It
21  probably was said, but I can't recall specifically.
22       Q.  Maybe I can be a little more specific which
23  would help.
24           During the House debates do you remember
25  anyone expressing on the public record concerns about

143

1   the number of voters who may not have requisite
2   identification under SB14?
3        A.  Yes, I remember that coming up.
4        Q.  In that context, do you remember any discussion
5   on the public record about a match that the Secretary of
6   State's office could conduct between the voter
7   registration database and the driver's license
8   databases?
9            MR. SWEETEN:  Just as to the public
10  record?
11       A.  I recall that testimony.
12       Q.  Do you know if the Secretary of State's office
13  ever provided the results of that match to members of
14  the House without specifying who asked for them or who
15  received them?
16           MR. SWEETEN:  I think she's answered that
17  twice now about analysis.  I think I'm going to let her
18  answer a third time, but I don't want to keep beating
19  this drum, but go ahead, you can answer the question.
20       A.  I don't know.
21       Q.  Okay.  Who were the sponsors of SB14 in the
22  House?
23       A.  In the house it was Patricia Harless.
24       Q.  How is it decided just as a general procedural
25  matter who sponsors a bill in the House that comes over

144

1   from the Senate?
2        A.  As a general matter, my understanding is a
3   senator has the discretion to ask any House member to
4   carry their piece of legislation.
5        Q.  Does Speaker Straus ever play a role in who
6   ends up sponsoring a bill?
7            MR. SWEETEN:  Objection.  Legislative
8   privilege.  Unless it's a matter of public record --
9   Unless it's a matter of public record, then don't answer
10  his process and his role unless that's in the public
11  record.
12       A.  I'm choosing not to answer.
13       Q.  Okay.  I guess maybe I should have been more
14  clear too.  I'm not as familiar with the House rules as
15  you are, so are there any House rules that provide for
16  the speaker's involvement in the designation of sponsors
17  and bills that come from the Senate?
18       A.  Not that I'm aware of.
19       Q.  Okay.  What committee was the bill sent when it
20  arrived in the House?
21       A.  If I recall correctly, it was sent to the
22  select committee on voter ID and voter fraud.
23       Q.  Right.  Did you following the special committee
24  hearings or select committee hearings?
25       A.  Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 145

1    Q.  Did the select committee hold any hearings?
2    A.  Yes.
3    Q.  Did witnesses provide testimony at those
4    hearings?
5    A.  Yes.
6    Q.  Do you remember who provided testimony?
7    A.  I remember some of the witnesses.
8    Q.  Who do you remember?
9    A.  I remember Skipper Wallace.  I remember there
10   were individual citizens that testified both for and
11   against.  I remember NAACP, LULAC, MALDEF.
12   Q.  I may have an exhibit that can help you.
13   A.  Okay.
14   Q.  Do you remember how many times the select
15   committee held hearings at which testimony was received?
16   A.  If I recall correctly, I think it was one
17   hearing.
18       (Exhibit 645 marked.)
19   Q.  Okay.  This will be Exhibit 645, please.  Do
20   you know what this?
21   A.  This is a printout of the witness list for
22   Senate Bill 14.
23   Q.  Does this help refresh your memory -- Is this
24   for the one hearing that you said the select committee
25   held on SB14?

---

### 147

1    Q.  What did he say during those meetings?
2        MR. SWEETEN:  He's not a legislator or
3    legislative staff member of a state agency or member of
4    the TLC, right?
5        THE WITNESS:  Right.
6        MR. SWEETEN:  Okay.  So you can answer the
7    question.
8    A.  He expressed support for the legislation.  In
9    2009, he was complaining that Todd Smith was taking too
10   long to get the bill out of committee.  He complained to
11   me a lot about that.  I mean, generally supportive at
12   that time of Senate Bill 362.
13   Q.  In 2009 did you get complaints from other
14   constituents or members of the public that Todd Smith
15   was taking too long to get the bill out of committee?
16   A.  Yes.
17   Q.  About how many of those communications did you
18   get from constituents or members of the public?
19   A.  I don't recall how many.
20   Q.  More than 10?
21   A.  From constituents?
22   Q.  Or from anyone outside the legislature really.
23   A.  More than 10, yes.
24   Q.  More than 20?
25   A.  I don't recall.

---

### 146

1    A.  Yes.
2    Q.  Does this list refresh your memory about who
3    testified?
4    A.  Yes.
5    Q.  Now, you said Skipper Wallace testified.  Who
6    is he?
7    A.  He is I'm -- not sure his title, but he's the
8    government's relations person for -- I think it's the
9    Republican County Chairs Association, if I have that
10   right.
11   Q.  What did he testify about?
12   A.  He testified in support of the legislation.
13   Q.  What were his arguments in support of the
14   legislation?
15   A.  I don't recall specifically.
16   Q.  Do you remember generally what his arguments
17   were?
18   A.  Generally, he just -- he supported the
19   legislation.
20   Q.  Have you ever spoken or met with him?
21   A.  Yes.
22   Q.  When was that?
23   A.  In the 2009 session.  I recall a 2009 session.
24   I don't recall whether or not I met with him in the 2011
25   session.

---

### 148

1    Q.  Did you have meetings with other members of the
2    public about SB362 in 2009?
3    A.  Yes.
4    Q.  What were the content of those meetings?
5    A.  Different people or groups would either support
6    or not support the legislation and explain the reasons
7    why.
8    Q.  What were the reasons given for their support
9    of the bill?
10   A.  To deter voter fraud, to ensure election
11   integrity, to make sure that the person voting is who
12   they say they are.
13   Q.  Did anyone raise the issue of noncitizen voting
14   with you during those meetings?
15       MR. SWEETEN:  We're talking about
16   constituent meetings?
17       MS. BERKOWER:  Meetings, yeah.
18   A.  I believe the topic came up, but I don't
19   remember exactly who said it.
20   Q.  Did you meet with who opposed the bill?  And
21   I'll think now we jump back in time a little bit to
22   2009.
23   A.  Who opposed the bill?  Gosh, I had so many
24   meetings in that session.  I think there's a group
25   that's called -- they go by the acronym OWLS, and



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 149

1 they -- they call themselves objective election
2 watchers, I think.  Actually, wait.  They supported the
3 bill.  You are looking for who I met that opposed it.
4      If I recall correctly, I think I met with
5 the representatives from NAACP, LULAC, MALDEF, League of
6 Women Voters, a representative from the Texas Democratic
7 Party, a group of college kids, but I can't recall what
8 school they were with, that I know I met with.  I
9 remember meeting with the Catholic Diocese.  I think
10 that's the group, and voter ID was one of the topics
11 that they talked about and didn't support it.  That's
12 tall I can think of.
13      Q.  How did people get meetings with you about
14 different legislation?
15      A.  If they have my direct line, they just call me
16 direct.  Otherwise, they'll call the main line in our
17 policy office and they'll transfer them directly to us
18 so we can set up an appointment.
19      Q.  Do you generally meet in person or on the phone
20 for these types of meetings?
21      A.  Generally in person.
22      Q.  Do you ever say no to a meeting?
23      A.  I've never said no.
24      Q.  So turning back to 2011, you said you met with
25 Skipper Wallace in 2011.  What was the content of your

## 150

1 meeting in 2011?
2      A.  I can't remember whether or not I met with him
3 in 2011.
4      Q.  Okay.  Well, you said you did remember him
5 testifying though at the select committee hearing?
6      A.  Yes.
7      Q.  What did he say during that hearing?
8      A.  I can't recall specifics.  I know he supported
9 the legislation.  Was very adamant about supporting the
10 legislation.  If I recall correctly, I think he talked
11 about other activities for which one needs an ID,
12 boarding a plane, getting government benefits.  That's
13 pretty much all I can recall.
14      Q.  Have you heard that argument generally in the
15 context of voter identification?
16      MR. SWEETEN:  Don't answer the question.
17      Q.  I guess I could say as part of the public -- as
18 part of the public record, have you heard people advance
19 that argument that you need identification to do things
20 like board a plane or obtain government benefits?
21      A.  Yes.  It's come up in testimony.
22      Q.  Do you have a fundamental right to board a
23 plane?
24      A.  No.
25      Q.  Do you have a fundamental right to obtain

## 151

1 public benefits?
2      MR. SWEETEN:  You are asking her as she's
3 sitting here?  I mean to some extent you could be asking
4 her to reveal her thoughts and mental impressions about
5 bills, so if you can separate -- if these questions
6 would require you to do that, do not reveal that
7 information.  To the extent that you can answer as
8 you're sitting here and if not impact those, then you
9 can answer.  Does that make sense?
10      A.  M-hm.
11      Q.  Okay.
12      A.  I've never really thought about it.  Well, the
13 right to government benefits --
14      Q.  I'll withdraw that particular question.  Do you
15 have -- Do you have a fundamental right to vote?
16      MR. SWEETEN:  Same objection.
17      A.  Yes.
18      Q.  Do you have a fundamental right to rent a
19 video?
20      MR. SWEETEN:  Same instruction.
21      A.  No.
22      Q.  Do you -- Do you have a fundamental right to
23 pick up prescriptions at the pharmacy?
24      A.  No.
25      MR. SWEETEN:  Same instruction.

## 152

1      Q.  Okay.  Turning back to this list of people who
2 testified at the March 1st, 2011 hearing, do you
3 remember with any specificity what any of these other
4 witnesses testified to rather than just for or against
5 as they're listed on the page?
6      A.  If I recall correctly, I remember testimony, I
7 think, by whoever was representing the King Street
8 Patriots, that they had witnessed someone voting twice
9 or they thought the person looked -- was the same person
10 voted twice.  They, I think, had a distinctive feature.
11      Q.  Is that the same person that you mentioned
12 earlier with the tattoos who came in and voted twice or
13 is that a different --
14      A.  That's a different one.
15      Q.  It was a different person?
16      A.  M-hm.
17      Q.  So it was not just a tattoo that they knew that
18 the person had voted twice?
19      A.  I want to say that it was strange hair color,
20 purple or green or something, that caught their eye.
21      Q.  Do you remember if that was Ms. Engelbrecht who
22 testified for this -- the King Street Patriots,
23 Catherine Engelbrecht?
24      A.  I don't recall her name.
25      Q.  Have you met her before?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 153

1    A. Not that I know of.
2    Q. Do you know if the person who testified for the
3  King Street Patriots testified that they had witnessed
4  somebody vote twice ever referred that incident to law
5  enforcement?
6    A. I don't know.
7    Q. Do you remember Ann McGeehan testifying at the
8  hearing?
9    A. Yes.
10    Q. You do? Do you remember what she testified
11  about?
12    A. I think she talked about the Secretary of
13  State's Office -- their role in elections and election
14  education, that type of thing.
15    Q. And I should have asked you this. Is
16  Ms. McGeehan from the Secretary of State's office?
17    A. Yes.
18    Q. Is she the direct -- former director of the
19  elections division?
20    A. Yes.
21    Q. Was she the director at the time that she
22  testified?
23    A. To my recollection, yes, and I guess I thought
24  since we are going through this, a couple more people
25  that I met with regarding the bill. I don't know -- Did

## 154

1  you want me to tell you those names or not?
2    Q. Sure.
3    MR. SWEETEN: Are we talking about the
4  2011 bill or the 2009 bill? I just want to make sure.
5    Q. Are you saying people who testified or people
6  you met with?
7    A. People that met with staff and staff that I
8  talked to. You said if I think of anyone else to let
9  you know.
10    MR. SWEETEN: Are we moving back to the
11  earlier statement or if this was recent questioning?
12    THE WITNESS: Sorry.
13    MR. SWEETEN: These are people that you
14  remember talking to?
15    A. That I remember talking to with regard to
16  Senate Bill 14, but when we were talking about -- when
17  you were asking who all I met with was maybe about the
18  2009 bill.
19    Q. Yes.
20    A. Okay. Sorry. I just thought of some names.
21    Q. Why don't we go through that? Just so it's
22  clear, I'd think you had given a list of people that you
23  had communications with, and those were senator -- I'm
24  sorry -- representatives and there are staff members
25  about SB362?

## 155

1    A. Yes.
2    Q. And so I guess I should have asked you who you
3  had communications with about SB14, legislators and
4  staff members, without revealing the content of the
5  conversations.
6    A. Okay.
7    Q. So can you give that list now?
8    A. Yes. It's pretty much the same, except -- in,
9  actually, 2009 and 2011 I met with Ann McGeehan and John
10  Sepehri. I met with Michael Scofield, and I think that
11  was 2009.
12    Q. But not 2011?
13    A. Not that I recall.
14    Q. So Ann McGeehan, John Sepehri. Is John Sepehri
15  also from the Secretary of State's office?
16    A. Yes.
17    Q. And Mr. Scofield is where?
18    A. From the governor's office.
19    Q. And you said you met with Ms. McGeehan and both
20  Mr. Sepehri in both 2009 and 2011?
21    A. Yes.
22    Q. But Mr. Scofield just in 2009.
23    A. I think that's right.
24    Q. Who else did you meet with about SB14 or
25  communicate with in SB14 in 2011?

## 156

1    A. It's pretty much the same list of people that I
2  gave earlier. I don't think there's anyone -- I don't
3  remember.
4    Q. I have to read that list as I have it, and you
5  can tell me if it's the same.
6    A. Yes.
7    Q. You said Steven Schar, who is the committee
8  clerk for Todd Smith, Travis Raymond, Smith staffer,
9  Representative Smith himself, Dewayne Bohac,
10  Representative Bonnen, Representative Anchia, Mr. Hebert
11  from the lieutenant governor's office, Mr. Ancira in
12  your office, and Speaker Straus.
13    A. M-hm. So the list -- Yeah, it will be similar
14  minus talking Todd Smith. I didn't talk with him in
15  2011. I did talk with Patricia Harless and her staffer.
16  I think his name is Colby maybe.
17    Q. Beuck?
18    A. Yes.
19    Q. You said you didn't talk to Mr. Smith. Was he
20  still on the elections committee in 2011?
21    A. I don't believe he was.
22    Q. Who else?
23    A. So I think that's -- including that -- the
24  names I listed, the same people, I think that's it.
25    Q. And how often did -- Well, okay. I guess then



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

157

1    though my question -- You said you spoke with Steven
2    Schar --
3       A.  Yes.
4       Q.  -- and Travis Raymond in 2011.
5       A.  Not Travis in 2011.  He was no longer at the
6    capitol.
7       Q.  Steven Schar, if he was the clerk for Smith,
8    did you still talk to him in 2011?
9       A.  Yes.  He clerked the select committee for
10   Bonnen in 2011.
11      Q.  And so did he stay with the committee even
12   though the chairs changed?
13      A.  Yes.
14      Q.  Were there any other Bonnen staff members that
15   you communicated with about SB14?
16      A.  Not that I can think of.  I think Steven was
17   the only one.
18      Q.  So then you were talking about Representative
19   Harless and Mr. Beuck.  Were there others that you were
20   talking with in 2011?
21      A.  I think that's it.
22      Q.  Is there anyone else from the lieutenant
23   governor's office that you talked with?
24      A.  Not that I can think of.
25      Q.  You said in 2009 you had had communications

---

158

1    with Mr. Scofield of the governor's office.  Was there
2    anyone from the governor's office that you communicated
3    with in 2011 about SB14?
4       A.  I don't remember who this person was.
5       Q.  Is it possible it was Mr. Armbrister?
6       A.  If it was, I don't remember talking to him,
7    but -- I know him, but I don't recall talking to him
8    about Senate Bill 14.
9           MR. SWEETEN:  He's down the hall if you
10   want to --
11          THE WITNESS:  I saw him this morning.
12      Q.  Okay.  So we are talking about Ms. McGeehan's
13   testimony and you said -- you were describing what she
14   had testified, and you said -- I actually don't remember
15   what you said.  I'm sorry to make you repeat yourself.
16      A.  I think I said generally she talked about the
17   Secretary of State's office's role in elections and
18   election education.
19      Q.  Right.  Did she also talk about the cost of the
20   free identification that was being proposed for
21   inclusion in SB14; do you remember?
22          MR. SWEETEN:  On the public record you can
23   testify.
24          MS. BERKOWER:  Yeah, her testimony.
25      A.  Her testimony?  Yes, I think she talked about

---

159

1    the fiscal note of the bill.
2       Q.  And do you know if she also testified during
3    the hearing about the number of voters from that
4    matching?
5       A.  I don't recall.
6           MS. BERKOWER:  We've been going for a
7    little bit of time.  Do you want to take a break?
8           MR. SWEETEN:  Sure.
9           (Recess from 2:47 p.m. to 3:03 p.m.)
10      Q.  (BY MS. BERKOWER) Okay.  So I think before we
11   took the break, we were talking about Ms. McGeehan's
12   testimony before the select committee on March 1st,
13   2011.  Do you remember that?
14      A.  Yes.
15      Q.  Okay.  Do you remember -- You said Ms. McGeehan
16   had testified in part that day about the fiscal note for
17   SB14?  Is that accurate, in your memory?
18      A.  Yes.
19      Q.  Do you remember if Ms. McGeehan also talked
20   about the number of voters who may not have DPS issued
21   identification under SB14?
22      A.  I don't remember.
23          (Exhibit 646 marked.)
24      Q.  Okay.  So I have what will be Exhibit 646,
25   please.  I think this is a pretty long document, but if

---

160

1    you want to just turn your attention to what starts
2    on -- Well, turn your attention to Page 299 and just
3    review that page and the next page or two and see if
4    that refreshes your recollection about her testimony.
5    Let me know when you are done.  You've reviewed it?
6       A.  Yes.
7       Q.  Do you know what this document is?
8       A.  It looks like a transcript of testimony from
9    the March 1st hearing.
10      Q.  The hearing before the select committee on
11   voter identification, voter fraud?
12      A.  Yes.
13      Q.  And is the part I directed -- the part of the
14   testimony -- the part of the hearing I directed you to
15   an exchange between Mrs. McGeehan who is testifying and
16   Representative Harless?
17      A.  Yes.
18      Q.  And during that exchange is there a
19   conversation about how many voters may not have DPS
20   issued identification as required under SB14?
21      A.  In the text of the document, yes.
22      Q.  And is there an estimate that the number of
23   people may be as high as 690,000 people?
24          MR. SWEETEN:  Don't interpret the words.
25   You can testify about what's on the page.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

161

1      A.  Yes.
2      Q.  Okay.  To your knowledge did the -- did the
3  Secretary of State's Office ever provide any information
4  to the legislature to determine how many of those
5  690,000 voters were minority voters?
6          MR. SWEETEN:  You're asking about was an
7  analysis provided to the legislature from Ann McGeehan?
8  Is that what you said?
9          MS. BERKOWER:  From the Secretary of
10  State's Office.
11          MR. SWEETEN:  I'm going to object.  It's
12  been asked three other times and don't reveal any
13  substance of the communication, if any, but you can
14  testify the last time though -- you can testify that an
15  analysis was provided.
16      A.  I don't know.
17      Q.  Okay.  Are you aware of any existing document
18  or report in the public record that identifies how many
19  Texas voters are in possession of a concealed handgun
20  license?
21      A.  I don't recall.
22      Q.  Are you aware of any existing document or
23  report in the public record that identifies how many
24  minority voters are in possession of a concealed handgun
25  license?

---

162

1      A.  I don't recall.
2      Q.  Are you aware of any existing document or
3  report that identified -- in the public record that
4  identifies how many Texas voters are in possession of a
5  US military card?
6      A.  I don't recall.
7      Q.  Are you aware of any existing document or
8  report that identifies how many Texas -- Sorry.  I'm
9  going to start that question over.  Sorry.
10          Do you know how many Texas voters are in
11  possession of a US military card?
12      A.  I don't.
13      Q.  Do you know how many minority voters are in
14  possession of a US military card?
15      A.  I don't.
16      Q.  Do you know how many --
17          MR. SWEETEN:  I want to make sure the
18  instruction's clear.  I don't want you to reveal any
19  matters that would be related to your mental
20  impressions, thought processes, investigations regarding
21  the bill as you're answering these, so don't answer if
22  you'd be revealing any legislative privilege that you
23  don't know, but I want to make sure that the
24  legislative privilege instruction is clear.
25          MS. BERKOWER:  To be clear, I'm asking

---

163

1  these questions in part because it would reflect
2  underlying facts that may have been provided rather
3  than --
4          MR. SWEETEN:  I think your first line of
5  questions before you went into do you know may have done
6  that, and this section is now -- could invade the
7  legislative privilege.  I ask you to be mindful of the
8  privilege.
9      Q.  (BY MS. BERKOWER)  Okay.  Do you know how many
10  Texas voters are in possession of a passport?
11          MR. SWEETEN:  Same instruction.
12      A.  I don't.
13      Q.  Do you know how many minorities voters are in
14  possession of a passport?
15          MR. SWEETEN:  The same instruction.  Don't
16  reveal matters of a legislative privilege.
17      A.  I don't know.
18      Q.  Do you know how many Texas voters are in
19  possession of a citizenship certificate with a
20  photograph?
21          MR. SWEETEN:  Same instruction on
22  legislative privilege.
23      A.  I don't know.
24      Q.  Do you know -- I'm not -- Never mind.  Getting
25  back to the list of witnesses who testified on the -- in

---

164

1  the March 1st, 2011 hearing, were there any other
2  witnesses whose testimony you remember with any
3  specificity that we haven't already discussed?
4      A.  No one else comes to mind.
5      Q.  In the time that the legislature has considered
6  voter fraud, do you recall any evidence entered into the
7  public record concerning mail-in ballot fraud?
8      A.  I know the topic has been discussed in
9  hearings, but I don't know particular specifics.
10      Q.  Do you remember anybody testifying that
11  mail-in -- testifying as part of the public record that
12  mail-in ballot fraud is more common than in-person
13  ballot fraud?
14      A.  Yes.
15      Q.  Does SB14 address mail-in ballot fraud?
16      A.  To my recollection it did not.
17      Q.  Did SB362 address mail-in ballot fraud?
18          MR. SWEETEN:  Don't provide your thoughts,
19  mental impressions or analysis about legislative
20  matters, okay?  That means your mental impressions,
21  opinions about legislation, what it would or wouldn't
22  address would be within the legislative privilege.
23          MS. BERKOWER:  Maybe I can rephrase the
24  question.  I think we were looking at SB362 -- a copy of
25  it earlier today, so you have the text of that bill.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 165

1   Based on the text of the exhibit that you had, did that
2   bill address mail-in voter fraud?  Is that acceptable,
3   Patrick?
4       MR. SWEETEN:  From the text that's in
5   front of her, I'll let her look and see if it
6   addresses --
7       A.  We're on 362 now?
8       Q.  362.
9       A.  From the text in front of me, I do not see the
10  language addressing mail-in ballot fraud.
11      MS. BERKOWER:  And I have this exhibit
12  which has been previously marked as Exhibit 5 in another
13  deposition.  Can have we this marked as 5 here, please?
14      MR. SWEETEN:  I thought we already gave
15  her 14.
16      Q.  (BY MS. BERKOWER)  I gave her as filed.  I think
17  if you turn to the last page, you might have a sense of
18  what this is.  Do you know what this is?
19      A.  This looks like the final version of Senate
20  Bill 14 signed by the governor.
21      Q.  If you -- If you can take a minute to review
22  this.  If you could tell me, does the text of that bill
23  address mail-in ballot fraud?
24      A.  The text in front of me, I don't see provisions
25  related to mail-in ballots.

## 166

1       Q.  Do you remember if there was any discussion on
2   the public record at the time that these bills -- and
3   I'm referring to SB14 and 362 -- were being debated by
4   the legislation that the bill should address mail-in
5   ballot fraud?
6       MR. SWEETEN:  You can testify as to
7   matters of the public record in answering the question.
8       A.  I believe that topic was discussed.
9       Q.  Who raised that issue, if you remember?
10      A.  I don't recall.
11      Q.  What were the arguments that that person made?
12      MR. SWEETEN:  You can refer to the record,
13  but don't reveal legislative privilege.
14      A.  I'd have to look back at the record.
15      Q.  Do you remember if that argument was to the
16  effect of mail-in ballot fraud is a bigger problem than
17  in-person ballot fraud, so legislation addressing voter
18  fraud should address mail-in ballot fraud just as a
19  matter of what you remember from testimony on the public
20  record?
21      MR. SWEETEN:  Yeah.  Don't reveal your
22  thought processes as you are assessing the public
23  record.  So if that was specifically said as phrased,
24  you can answer, if it was on the public record.  If it's
25  requiring you to reveal matters that are subject to the

## 167

1   privilege, don't do that.
2       A.  Can you repeat it?  Sorry.
3       Q.  Sure.  I was asking if -- You said you
4   remembered there was testimony about mail-in ballot
5   fraud and that the bill, I think you said, should
6   address mail-in ballot fraud.  Is that an accurate
7   summary of your testimony?
8       A.  Yes.
9       Q.  With regard to the person who made those
10  arguments on the public record, did they ever argue that
11  the bill should address mail-in ballot fraud because
12  it's a bigger problem than in-person ballot fraud?
13      A.  I don't know specifically if that statement was
14  said.
15      Q.  Was an argument to that effect made on the
16  public record?
17      A.  Yes.
18      Q.  But you don't -- you don't remember who made
19  it?
20      A.  I don't.
21      Q.  Did you receive any constituent correspondence
22  that made that argument against the bill?
23      A.  I don't recall.
24      Q.  Turning back just for a minute to the interim
25  charge -- the interim charge committee report -- I'm

## 168

1   sorry.  I know you have a lots of documents in front of
2   you at this point.  Can I find it?
3       A.  Yes.
4       Q.  In turning to Page 26 of the document, which
5   listed the interim charge given to the committee, was
6   the committee charge limited only to an investigation of
7   in-person voter fraud?
8       MR. SWEETEN:  You can answer based on
9   what's on the text of the report.
10      A.  The charges says, "Examine the prevalence of
11  fraud in Texas elections."
12      Q.  Does that text specifically specify in-person
13  fraud and not mail-in fraud?
14      A.  As I read it, it does not specify any
15  particular type of fraud.
16      Q.  Right.  And it doesn't exclude any type of
17  fraud?
18      A.  Right.
19      Q.  Turning to the last page, I think, for the
20  Recommendation section, I don't remember which page it
21  is exactly.  It's towards the end.  And based on that
22  text, do you see any recommendation to the legislature
23  to pass a bill that addresses mail-in ballot fraud?
24      MR. SWEETEN:  I'm reading about recusal on
25  my recommendation.  Judge's recusal.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 169

1          MS. BERKOWER:  Okay.
2     A.  Here we go.
3     Q.  Sorry.
4     A.  I found it.  Yeah.  I started reading that too.
5          MS. BERKOWER:  I'm sorry.  I don't where
6   my copy went, so I know it's towards the end.
7          MR. PHILLIPS:  Do you need this copy back?
8     Q.  I only have this one question about it.  It's
9   okay.
10     A.  Can you repeat the question?  I'm sorry.
11     Q.  Yeah.  Based on the text of this
12   recommendation, do you see anything in there that
13   recommends that the legislature pass legislation
14   concerning mail-in ballot fraud?
15     A.  Based on this text, I do not.
16     Q.  Okay.  Were you present for the House floor
17   debates on SB14?
18     A.  Yes.
19     Q.  Were you present when amendments were offered
20   and voted on for the bill?
21     A.  Yes.
22     Q.  Do you remember that the debate --
23     A.  The debate on the bill, yes.
24     Q.  So do you remember that amendments were opposed
25   and debated on and there were a number of amendments?

---

### 170

1     A.  Yes.
2     Q.  Okay.  So this exhibit -- actually, only have
3   one copy of it, but I'm happy to give it to you because
4   I think I know what we're going to be talking about, and
5   it was previously marked.  Did you make a copy?  It was
6   previously marked in a different deposition, but maybe
7   as Rodriguez Exhibit 36.  So I guess we can mark that
8   again here.
9          So I have Exhibit 36, and, I'm sorry, I
10   only have the one copy.  If you don't mind sharing,
11   Patrick, with her.  Do you know what this is?
12     A.  It looks like a transcript of the floor debate
13   on Senate Bill 14.
14     Q.  What's the date on that?
15     A.  March 23rd, 2011.
16     Q.  Can you turn to Page 38, please?  Does Speaker
17   Straus speak on the record on Page 38?
18     A.  Yes.
19     Q.  Can you review what he said?  Let me know when
20   you are done.  Have you read it?
21     A.  Yes.
22     Q.  Do you see that he made statements concerning
23   the fact that "many minority groups protected under the
24   Voting Rights Act would like to show photo ID to vote"?
25     A.  Yes.

---

### 171

1     Q.  And he said he had attended a roundtable at
2   which groups raised -- members of minority groups raised
3   that point with him?
4     A.  Yes.
5     Q.  Do you know what roundtable he was referring
6   to?
7     A.  I do not.
8     Q.  Have you ever attended a roundtable event with
9   him?
10     A.  No.
11     Q.  Did you ever hear any reports about that
12   roundtable event?
13     A.  That I can recall.
14     Q.  Turning to Page 89 of the transcript, please.
15   Do you see the speaker spoke on the record on that as
16   recorded in the transcript on Page 89?
17     A.  Yes.
18     Q.  Does it start on the previous page?
19     A.  Yes.
20     Q.  Can you review that -- that part of the record?
21     A.  Yes.
22     Q.  Okay.  Was this exchange with Speaker Straus
23   and was he speaking with Representative Bonnen on the
24   record there?
25          MR. SWEETEN:  You are asking on Pages 88

---

### 172

1   and 89?
2     A.  Yes.
3     Q.  Yes.
4     A.  Yes.
5     Q.  Were they discussing an amendment that
6   Representative Bonnen had proposed to SB14?
7          MR. SWEETEN:  Don't interpret the words.
8     Q.  Just based on what's in the transcript?
9     A.  Yes.
10     Q.  Was the amendment to eliminate the over 70
11   exemption that we discussed in the certification of SB14
12   as filed in the Senate?
13          MR. SWEETEN:  Are you asking was the
14   subject matter of the discussion the over 70 amendment?
15          MS. BERKOWER:  Yes.
16          MR. SWEETEN:  Okay.
17     A.  I don't see any discussion about what the
18   amendment is.  I just see that.
19     Q.  Well, I think you could go back a page or two
20   and that will help.  You can review the few pages before
21   that.
22     A.  Okay.  Okay.  Yes, now I see it.
23     Q.  So were they discussing an amendment to
24   eliminate the over 70 exemption?
25     A.  According to this document, yes.

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

(none)

## 173

1  Q.  Okay.  Did Speaker Straus state that he was not
2  going to support the amendment?
3         MR. SWEETEN:  Don't reveal matters of
4  privilege.
5  Q.  Just as far as that transcript goes.
6  Q.  Can you repeat the question?
7  Q.  Did Speaker Straus say he would not support the
8  amendment?
9  A.  According to this, yes.
10  Q.  Did he give a reason as to why he was not
11  supporting the amendment as reflected in that
12  transcript?
13  A.  Yes.
14  Q.  Was the reason that Texas already allows people
15  over 65 to get mail-in ballots and there's no signatures
16  required -- sorry -- no photo identification for those
17  ballots?
18         MR. SWEETEN:  Don't provide testimony on
19  his reason.  You can testify about what's on the text of
20  the page.
21  A.  According to the text, yes.
22  Q.  Did he also say that voter -- the voter
23  identification bill should be striking a balance between
24  securing each vote but also securing access to the
25  franchise?

## 174

1  A.  According to the text, yes.
2  Q.  Do you know if there were any other amendments
3  to SB14 that Speaker Straus publicly said on the record
4  he would not support?
5  A.  I don't recall.
6  Q.  Do you know if there were any other instances
7  on the public record where Speaker Straus expressed a
8  concern to strike a balance between securing each vote,
9  but also securing access to the franchise?
10         MR. SWEETEN:  You can testify as to the
11  matter of public record.  Don't reveal matters of
12  privilege.
13  A.  I don't recall.
14  Q.  During the legislative debates on SB14, did --
15  were there concerns raised in the public records that
16  the bill would disenfranchise minority voters?
17         MR. SWEETEN:  You can testify if something
18  was expressed on the public record.  Don't interpret
19  what was said on the record to the extent that would
20  reveal your mental impressions and opinions.  You can
21  answer.
22  A.  On the public record, yes.
23  Q.  Did any legislators take action on the public
24  record to prevent the disenfranchisement of minorities
25  as they viewed it by proposing amendments that they

## 175

1  claimed -- that they testified would prevent the
2  disenfranchisement of minorities?
3         MR. SWEETEN:  Objection.  Calls for
4  legislative privilege.  Instruct not to answer.
5  Q.  Okay.  Maybe I can rephrase it.  Did any
6  legislator testify on the public record that an
7  amendment he proposed would prevent the
8  disenfranchisement of minorities?
9         MR. SWEETEN:  You can testify as rephrased
10  as to matters on the public record.
11  A.  That specific statement on that topic, yes.
12  Q.  Do you remember which amendments that testimony
13  referred to?
14  A.  I don't recall the particularly which
15  amendments.
16  Q.  Do you remember if any of those amendments
17  ultimately were included in the final bill?
18  A.  I don't.
19         MR. SWEETEN:  Objection.  Foundation to
20  the question.
21  Q.  What was the general legislative purpose of
22  SB14?
23  A.  To deter voter fraud.
24  Q.  Was any of -- was there any -- Was part of the
25  general legislative purpose of SB14 to prevent

## 176

1  noncitizens from voting?
2  A.  No.
3  Q.  After SB14 was enacted, did you have any
4  conversations about the bill with other staff members
5  about the bill for Speaker Straus?  Sorry.
6  A.  Did I have conversations with other staffers?
7  Q.  Yes.
8         MR. SWEETEN:  She's saying after passage.
9  A.  After passage?
10  Q.  Yeah.
11  A.  I don't recall any specific conversations.
12  Q.  Did you have any communications with Ashley
13  Kaden or Allison Winney after the bill's passage or in
14  passage?  Yeah.
15  A.  Yes.
16  Q.  What were those communications?
17         MR. SWEETEN:  The substance?  Is that what
18  you are asking or in what form?  I'm not sure what
19  you're asking.
20  Q.  Well, let's start with what types of
21  communications were those.
22  A.  Do you mean phone, email, person to person?
23  Q.  Yeah.
24  A.  Email and person to person.
25  Q.  What was the subject matter of those



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 177

1    communications?

2        MR. SWEETEN:  You can give a general

3    subject matter if revealing the subject matter would

4    require you to reveal your mental impressions, thoughts,

5    opinions, motivations about the legislative process or

6    reveal communications you had with any of the protected

7    staff members, legislators, state agencies or Texas

8    legislative council.  You can give a general description

9    if it would reveal legislatively privileged matters.  If

10   it would not reveal legislatively privileged matters,

11   you can tell her the subject matter of the conversation.

12   Do you understand my instruction?

13     A.  Yes.  The nature of those conversations were

14   generally about the status of preclearance of Senate

15   Bill 14.

16     Q.  Okay.  And what were you discussing with them

17   about preclearance?

18       MR. SWEETEN:  Again, if revealing the

19   substance was conversation would go to your thoughts,

20   mental impressions, motivations about the legislation,

21   don't answer the question.  If it would not, you can

22   answer the question.

23     A.  Generally, the conversations were about the

24   timeline and sequence of events for preclearance.

25     Q.  Were any of the -- Did you have any

---

### 178

1    post-enactment conversation with the other people in

2    your office about this lawsuit?

3     A.  Yes.

4     Q.  Were there any conversations aside from those

5    with legal counsel that you had about this lawsuit?

6       MR. SWEETEN:  You can answer if there was

7    a communication about the lawsuit.

8     A.  Yes.

9     Q.  And to be clear, I'm asking anything that

10   wasn't with legal counsel at this point to avoid

11   stepping on any attorney-client privilege.

12      MR. SWEETEN:  As you know, we represent

13   the speaker and we represent Ms. Fowler, and there's a

14   common interest privilege with respect to our

15   representation of them, so to the extent you reveal any

16   of those -- any communications that you had with your

17   attorneys, don't -- don't reveal that.

18      MS. BERKOWER:  Okay.

19      MR. SWEETEN:  Do you understand my

20   instruction?

21     A.  Yes.

22      MS. BERKOWER:  Okay.  I just -- I'm sorry.

23   I just want to make sure I understand in what context

24   you're invoking a common interest alleged between them.

25   I'm seeking to ask if she has discussed -- had

---

### 179

1    conversations with other people in the office other than

2    legal counsel.  I think there's some date issues about

3    common interest privilege.

4       MR. SWEETEN:  Tell me what your

5    concerns -- what you're thinking about.

6      MS. BERKOWER:  I'd think we're -- I think

7    that there were some conversations that she had that

8    were referenced in the privilege log about the lawsuit

9    that did not appear to be conversations with legal

10   counsel and that's what I'm trying to ask about.

11      MR. PHILLIPS:  Or either legal counsel nor

12   somebody in the legislative body -- are you saying that

13   the -- You're asserting the legislative privilege

14   wouldn't apply.

15      MS. BERKOWER:  Right.  Because it was

16   after the enactment of the bill.

17      MR. PHILLIPS:  Right.  And the governor's

18   veto appeared.

19      MR. SWEETEN:  So here's what I will

20   instructs you that you can -- you can -- You can reveal

21   those communications as long as this wasn't as part of

22   giving legal advice, in other words, an attorney was

23   present.  You can reveal the information as long as it's

24   not -- that this would not relate to your thoughts and

25   mental impressions about Senate Bill 14, okay?  You can

---

### 180

1    reveal the communication.  I'm going to allow her to

2    answer the question.

3     A.  What was the question?

4     Q.  (BY MS. BERKOWER)  It was about conversations

5    with people in -- or communications of any type really

6    with people in your office about this lawsuit aside from

7    conversations with legal counsel and subject to the

8    instruction that Patrick just gave you.

9     A.  Did I have any communications?

10     Q.  I mean, I guess I can be more specific.  I'm

11   trying to ask if I know of some, but I think --

12      MR. PHILLIPS:  If you've got them on the

13   log, maybe telling her the dates and who they were with.

14     Q.  Sure.  I know that there were some

15   communications that were -- you were involved with about

16   news articles about this lawsuit.  Does that refresh

17   your memory at all?

18     A.  Sure.  Yeah.

19     Q.  What were those discussions?

20     A.  I think if I saw anything in the news, I would

21   pass it along via email to co-workers as just a FYI.

22     Q.  And was that the extent of it, just forwarding

23   news articles?  Was there other communication there as

24   well about the lawsuit?

25     A.  If -- What I recall is just sort of a timeline

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

181

1  or an update of where the lawsuit was, where -- what
2  dates certain things might occur.
3      Q.  Okay.  Do you remember any other types of
4  communication about the lawsuit that don't implicate
5  conversations with counsel?
6      A.  I'm not recalling any.
7      Q.  Okay.  Without revealing the contents of your
8  conversation, have you had any conversations after about
9  this lawsuit with Speaker Straus?
10     A.  Yes.
11     Q.  When did that occur?
12     A.  Within the past few months.
13     Q.  I think the lawsuit was filed in the past few
14 months.  Can you be more specific?
15     A.  Yes.  Any updates just on preclearance.
16     Q.  Okay.  Have you ever drafted a document called
17 a Week in Review that included a discussion -- You're
18 laughing.  Maybe you've drafted a lot of Week in
19 Reviews.
20     A.  Yes.
21     Q.  Okay.  Have you ever -- Did you ever draft a
22 week in review that included discussion of this lawsuit?
23     A.  Probably.
24     Q.  Do you remember what it said?
25     A.  I don't.

---

182

1          (Exhibit 647 marked.)
2      Q.  Okay.  I'll show you what's going to be marked
3  as Exhibit 647, please.  Do you know what this document
4  is?
5      A.  Yes.
6      Q.  What is it?
7      A.  Is it an email I sent to John Sepehri -- Oh,
8  no, wait.  Yeah.  Okay.  So it's an email I guess I sent
9  to John letting him know that our general counsel,
10 Jesse, had stopped by to let me know the ruling would be
11 announced on Senate Bill 14.
12     Q.  What ruling was that?
13     A.  The preclearance.
14     Q.  Would that be the administrative preclearance
15 decision from the Attorney General?
16     A.  Yes.
17     Q.  And I don't know.  Did we say what the date was
18 on this yet?
19     A.  The date is September 22nd, 2011.
20     Q.  Why did you contact Mr. Sepehri about this?
21     A.  I don't know to be honest.
22     Q.  Do you remember speaking with Mr. Sepehri that
23 day?
24     A.  I remember -- I do remember speaking to him.
25     Q.  What did you talk about?

---

183

1      A.  I don't remember the specifics, but -- I don't
2  remember the specifics.
3      Q.  What was the -- What was the general topic?
4      A.  The general topic was preclearance of Senate
5  Bill 14.
6      Q.  And why were you calling him?
7      A.  I guess to let help know Jesse stopped by to
8  let me know that a ruling would be released soon and to
9  make sure he was in the loop.
10     Q.  Who's -- And who's Jesse?  I don't remember if
11 you said that already.
12     A.  He's our general counsel or he's now our chief
13 the staff.
14     Q.  Is that maybe a misspelling of his name?
15     A.  Probably.
16     Q.  That would be a different Jesse.
17     A.  Yes.  I have a friend that's a girl named
18 Jessi, so --
19     Q.  Okay.  After the passage and enactment of SB14,
20 did you ever draft talking points or participate in the
21 drafting points about the bill for the speaker?
22     A.  Yes.
23     Q.  When did you do that?
24     A.  I don't remember specific dates.
25     Q.  How often do you say you would have done that?

---

184

1      A.  I would say a handful of times.
2      Q.  Generally on what occasions?  Was it speeches
3  he was giving?  Public speeches?
4      A.  Usually for speeches.
5      Q.  Were there any other times he would go speak
6  about the bill publicly that you would prepare talking
7  points for him?
8      A.  Not that I can think of.
9      Q.  Did he do any interviews or anything of that
10 nature about the bill?
11     A.  I don't know.
12     Q.  Any campaign or fundraising events for other
13 candidates where he would speak about the bill?
14     A.  I don't know.
15     Q.  Is this something that the staff such as
16 yourself do as part of your duties at the end of every
17 legislative session like preparing talking points about
18 what happened during the session?
19     A.  Yes.
20     Q.  So had you done that for -- in prior sessions
21 as well?
22     A.  Yes.
23     Q.  Sorry.  Okay.  Sorry.  These documents are
24 relatively new to us, so we are still figuring them out.
25         MR. SWEETEN:  Are those recently produced

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

185

1    documents?
2            MS. BERKOWER:  They are, yes.  We're happy
3    to have them, but they're still new to us.
4            MR. SWEETEN:  Per the court -- So we have
5    complied with the court's 6/5/12 order is what you're
6    saying.
7            MS. BERKOWER:  I know they were produced
8    pursuant to that order.  So I would actually like to --
9    I think I got these a little mixed up, and I would like
10   to take a minute and review them or we can take a break.
11   Just 5 minutes.  Okay.  Thank you.
12           (Recess from 3:53 p.m. to 4:03 p.m.)
13           (Exhibit 648 marked.)
14      Q.  (BY MS. BERKOWER)  Okay.  We're quite close to
15   being done.  Just a few documents that I have some
16   questions about.  This one we'll mark Exhibit 648,
17   please.  Do you know what this is?
18      A.  It looks like a request for information from us
19   on accomplishments of the 82nd legislature.
20      Q.  What's the date on it?
21      A.  It is 6/8/2012.
22      Q.  What was the date?
23      A.  Oh, sorry.  I was looking down here.  Sorry.
24   June 14th, 2011.  Sorry.
25      Q.  That's okay.  And what is the -- who sent this?

---

186

1      A.  Ashley Kaden.
2      Q.  Were you one of the recipients?
3      A.  Yes.
4      Q.  And did she request you and other people in
5    your office to send her talking points for the speaker
6    about legislative activity in the 82nd legislature?
7      A.  Yes.
8      Q.  Was one of the topics she asked you to send
9    information is voter ID and election integrity reform?
10     A.  Yes.
11     Q.  Did you respond to this email; do you remember?
12     A.  Yes.
13     Q.  Did you send her talking points concerning
14   voter ID and election integrity reform?
15     A.  Yes.
16     Q.  What did you -- What was the content of what
17   you sent her?
18     A.  I don't know.
19     Q.  Okay.  Did you have -- Like can you even
20   remember as a general matter the types of things you
21   included in talking points about voter ID following the
22   2011 legislative session?
23     A.  That the legislation passed.  Other specifics,
24   I don't -- I don't remember.
25     Q.  Why did you include the fact that the

---

187

1    legislation passed in the talking points?
2            MR. SWEETEN:  In answering the question,
3    the court has asked us to provide the post-enactment
4    communications that I think she's going over.  The court
5    has instructed that all of the documents must be
6    produced.  That does not give defendants license to
7    inquire about other privileged matters.  The question is
8    about a post-enactment statement or documents that call
9    for a response about legislative acts that legislators
10   took prior to the enactment of Senate Bill 14 and prior
11   voter ID bills.  Questions regarding the motivations of
12   the legislature with respect to those bills are
13   privileged.  So when you are answering the question,
14   don't reveal matters of legislative privilege.
15     A.  I included that statement because it's factual.
16     Q.  Okay.  In your view, was it a significant
17   accomplishment of the legislature that session?
18           MR. SWEETEN:  Again, don't reveal matters
19   that would be subject to the privilege.  You can answer
20   if you are not doing so.
21     A.  I'm going to choose not to answer.
22           (Exhibit 649 marked.)
23     Q.  Okay.  I have what will be marked as Exhibit
24   649, please.  Do you know what this document is?
25     A.  It looks like a request for information and --

---

188

1      Q.  Who's it from?
2      A.  It's from Ashley Kaden.
3      Q.  Did you receive it or -- sorry -- were you one
4    of the recipients?
5      A.  Yes.
6      Q.  Okay.  And what did Ashley Kaden ask you to do?
7      A.  She says, "I need to three five bullet points
8    on the following topics.  I guess you can recycle from
9    previous info you've sent me," and she listed the
10   topics.
11     Q.  Was one of the topics immigration and Sanctuary
12   Cities?
13     A.  Yes.
14     Q.  Was one of them voter ID?
15     A.  Yes.
16     Q.  Of these topics which did you send her bullets
17   points for?
18     A.  Voter ID.
19     Q.  None of the others she listed there?
20     A.  No.
21     Q.  Do you know what she meant by 10th Amendment
22   stuff?
23     A.  I believe last session there was a select
24   committee that handled issues related to the 10th
25   Amendment.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

189

1    Q.  Okay.  And what did you write her about voter
2 ID?
3    A.  I wrote according to this text, "Texas passed
4 arguably the strictest voter ID law in the nation during
5 the 82nd Legislative Session.  This legislation will
6 help both prevent and deter voter fraud in Texas
7 elections.  The legislation requires an individual to
8 present a Federal ID in order to vote, which are:  A
9 driver's license, an election ID certificate or a
10 personal ID card issued to the person by the Department
11 of Public Safety, i.e., an election certificate issued
12 to a person 70 years or older does not expire."
13    Q.  Is that the extent of your comments on voter
14 ID?
15    A.  Yes.
16    Q.  Since you say here that Texas passed arguably
17 the strictest voter ID law in the nation, does that mean
18 it was stricter than the Georgia law?
19    MR. SWEETEN:  I'm going to instruct you
20 and just as I did before that in answering this question
21 about a post-enactment statement that calls for a
22 response about legislative acts legislators took or your
23 mental processes or that require you to reveal matters
24 of legislative privilege, do not do so.
25    A.  I'm going to choose not to answer.

---

190

1    Q.  Is it possible just for you to look at this
2 statement just sort of what we were doing before I think
3 when you were looking just at the text of the document
4 in front of you and drawing interpretations just based
5 on the document in front of you --
6    MR. SWEETEN:  Go ahead.  You can finish
7 the question, Risa.  I didn't mean to interrupt.
8    Q.  Okay.  That the strictest -- something
9 is the strictest of a type means it's stricter than
10 everything else that exists.
11    MR. SWEETEN:  Don't interpret your
12 statement as listed there.  If interpreting your
13 statement would reveal matters, motivations about the
14 legislation, your thoughts, mental processes about the
15 legislation or that otherwise that I've instruct you to
16 do would be subject to privilege.  If revealing that
17 does so, do not answer the question.
18    A.  I'm going to choose not to answer.
19    Q.  Okay.  I guess then I'll just try this one
20 other way.  We'll see -- We'll see where that leads us.
21    When you -- When you wrote strictest, what
22 other laws were you referring to?
23    MR. SWEETEN:  Again, if answering the
24 question would require you to reveal matters of
25 legislative privilege, do not do so.  If you can answer

---

191

1 without doing so, you may.
2    A.  I'm going to choose not to answer.
3    (Exhibit 650 marked.)
4    Q.  Okay.  Now, I think this document actually
5 takes us a step back in time to pre-enactment, so I will
6 just draw your attention, Patrick, because I know it's
7 going to be of concern to you.  Can we mark this is 650,
8 please?  Do you know what this is?
9    A.  Email chain.
10    Q.  Were you involved with this email chain?
11    A.  Yes.
12    Q.  What was the email chain about?
13    A.  "Chairman Bonnen intends to call a formal
14 meeting today for a select committee on voter
15 identification and voter fraud and Senate Bill 14.
16 Attached you will find the BA and substitute that we
17 laid out during the hearing.  It will be in 3W.9 during
18 the reading and referral of bills and, also, from the
19 House floor."
20    Q.  And what's the date on that email?
21    A.  March 7th, 2011.
22    Q.  And what -- do you know what BA refers to?
23    A.  It's short for bill analysis.
24    Q.  Do you know if in fact a formal meeting was
25 convened that day?

---

192

1    A.  I don't recall.
2    Q.  Turning to the next page, it looks like that's
3 the bill analysis; is that accurate?  On the top it says
4 bill analysis?
5    A.  Yes.
6    MR. SWEETEN:  Counsel, you may have said
7 this prior.  This document doesn't have a Bates number
8 on it.  Where did we get this?
9    MS. BERKOWER:  You know, this was part of
10 the production that we -- that we received from you all,
11 and we've been having some remote printing problems.
12 I'm not sure if -- I think the Bates number's actually
13 listed in the bottom of the document under a file path,
14 at least the starting Bates numbering of this.
15    MR. SWEETEN:  Okay.
16    MS. BERKOWER:  So, I'm sorry --
17    MR. SWEETEN:  I see where it is.  It's in
18 the code there.
19    MS. BERKOWER:  It looks like it's Texas
20 Document 00205342.  At least that's the starting page of
21 it, and I apologize.  I'm going to represent to you it's
22 because we don't have -- we're not home right now.
23    MR. SWEETEN:  I feel better.  The Bates
24 number seems to be stuck in there.  I think we can work
25 with it.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 193

1    MS. BERKOWER: I think it's the starting
2  page for each document because if you look at the first
3  page, it's 205341 and then that's the email.  I think
4  the attachment, the starting page, is the next page,
5  205342.  Does that make sense?
6    MR. SWEETEN: I think you've answered what
7  I need, which is this was produced to us by you per
8  court order, and we do have a Bates stamp number on each
9  page, it appears, so I think we're good, I think.
10   Q.  (BY MS. BERKOWER) Okay.  So this -- this looks
11 to be the bill analysis for SB14?
12   A.  For the committee substitute, yeah.
13   Q.  And what is that committee substitute exactly?
14   A.  In short, it is a different version of
15 legislation from the original bill filed.
16   Q.  Is it something that happens during the
17 committee process?
18   A.  Yes.
19   Q.  Is it something that the committee could
20 potentially vote on and send to the floor?
21   A.  Yes.
22   Q.  And that's what the -- if that happened, then
23 the full House would vote on that instead of the bill
24 that was originally filed in the House?
25   A.  Yes.

## 194

1    Q.  Would that then have to go back to the Senate
2  or it would go to a conference committee or what would
3  happen exactly?
4    A.  It would go back to the Senate, and if they
5  don't want to accept any changes that were made in the
6  House, then the author of the Senate bill can call for a
7  conference committee.
8    Q.  Okay.  So under background and purpose on this
9  document, the document says, "Current Texas law requires
10 a voter on offering to vote to present to an election
11 officer at the polling place only a valid voter
12 registration certificate.  This practice attempts to
13 ensure that only registered voters are accepted for
14 voting, but it creates the potential for voter fraud
15 because no procedures currently exist for verifying the
16 person's identity."  Do you see that?
17   A.  Yes.
18   Q.  Is that your understanding of the purpose of
19 SB14?
20   MR. SWEETEN: She's testified to the
21 general purpose of SB14.  I guess you can answer the
22 question as phrased.  Never mind.
23   A.  Yes.
24   Q.  Did you testify earlier that under current
25 practice there's no procedure to verify the person's

## 195

1  identity?
2    MR. SWEETEN: I don't know that she
3  testified to that.  I think you had her look at the --
4  Objection.  Misstates -- Misstates prior testimony to
5  the extent it does.
6    Q.  Okay.  Do you know if current practice -- the
7  benchmark practice, the law currently in place under the
8  Texas Election Code has procedures to verify a person's
9  identity?
10   MR. SWEETEN: Can you restate the
11 question, madam court reporter?
12   (Requested portion was read.)
13   MR. SWEETEN: I think you are asking for
14 matters of privilege.  I'm going to instruct you not to
15 answer to the extent it would require you to reveal your
16 thought processes about the legislation.
17   A.  I'm going to choose not to answer.
18   MS. BERKOWER: I think earlier today you
19 allowed her to testify about the current benchmark
20 practice.
21   MR. SWEETEN: The current benchmark
22 practice.
23   MS. BERKOWER: I shouldn't say benchmark.
24 The current procedures for voter identification at the
25 polls under Texas law as it now stands.

## 196

1    MR. SWEETEN: And I've let her testify
2  about current law.
3    MS. BERKOWER: Okay.
4    MR. SWEETEN: I did do that.  So I think
5  you are doing more than that here.
6    MS. BERKOWER: And what in your view is
7  more?
8    MR. SWEETEN: I think you are asking
9  her -- I mean, we can go back to the question, but I
10 think that you are asking for more process questions
11 that could potentially require her to reveal her
12 legislative privilege.  My instruction is if it won't,
13 she can answer the question, so I'm just instructing her
14 that if it would reveal her mental process and thoughts
15 about this legislation, because you are giving her this
16 in the context of Senate Bill 14 language, then I'm
17 telling her not to answer that.
18   MS. BERKOWER: Maybe this will help.  What
19 if I asked do you know if there is a current procedure
20 to verify a person's identity under the current Texas
21 Election Code?  I'm not asking for her view on it.  I'm
22 asking if she knows.
23   MR. SWEETEN: So divorced from any bill or
24 legislation, current law, I would let her answer that
25 question to the extent she knows.  Is that the question?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

197

1      A.  Can you repeat it again?
2      Q.  (BY MS. BERKOWER) Okay.  Do you know if
3  current law -- under current law procedures exist to
4  verify a person's identify at the polls?
5      A.  I don't know.
6      Q.  At any time since the passage of SB14, have you
7  come to believe it was based with any discriminatory
8  purpose?
9      A.  Repeat it, please.  Sorry.
10     Q.  At any time since the passage of SB14, have you
11  coming to believe it was passed with any discriminatory
12  purpose?
13     A.  No.
14     Q.  At any time since the passage of SB14, have you
15  had come to believe that SB14 will have a retrogressive
16  effect on minority voters?
17         MR. SWEETEN:  You can answer.
18     A.  No.
19     Q.  If you are called to trial, will you testify
20  that SB14 has no discriminatory purpose?
21     A.  Yes.
22     Q.  If you are called to trial, will you testify
23  that SB14 has no discriminatory effect?
24         MR. SWEETEN:  You can answer if you know
25  what you would be called to testify about.  But when you

---

198

1  are saying would she be -- In answering this last
2  question, if it would require you to reveal your
3  thoughts, mental processes related to the bill, then
4  doesn't answer that last question, but if it --
5      A.  Can you ask it again?
6      Q.  If you are called to trial, will you testify
7  that SB14 has no discriminatory effect?
8      A.  Yes.
9      Q.  What's the basis for that?
10         MR. SWEETEN:  In answering the question,
11  if the basis of that would reveal your thoughts, mental
12  impressions about the legislation, then you do not
13  answer that question.
14     A.  I'm going to choose not to answer.
15     Q.  Okay.  We're at the end now.  Do you want to
16  change --
17         MR. SWEETEN:  Okay.  Go ahead.  I thought
18  it was the end.
19     Q.  Well, I was going to say, do you want to change
20  any of the answers you provided today?
21     A.  No.
22     Q.  Is there any information you recall now that
23  you did not recall earlier today?
24     A.  None that comes to mind.
25     Q.  Is there anything additional that you want to

---

199

1  share?
2      A.  No.
3         MS. BERKOWER:  So I'm going pass you now.
4  I'm done with my questions.  I'm going to pass you now
5  to Lindsey who has a few questions for you.
6             EXAMINATION
7  BY MS. STELCEN
8      Q.  Don't worry.  This will be very brief.  First,
9  I believe you stated earlier that Steven Schar was the
10  clerk for Representative Smith; is that correct?
11     A.  He was.
12     Q.  He was -- In '09, he was the clerk for the
13  elections committee?
14     A.  Yes.
15     Q.  And in 2011, he was the clerk for the special
16  committee on voter fraud?
17     A.  Yes.
18     Q.  And I think you said earlier that he was
19  responsible for putting together binders for the
20  committee?
21     A.  Yes.
22     Q.  Is that a practice that's done for every
23  committee, binders are put together?
24     A.  Yes.
25     Q.  And what typically is included in a binder for

---

200

1  the committee?
2      A.  The legislation, the bill analysis, the fiscal
3  note and any written testimony or written exhibits that
4  witnesses have distributed to the committee already.
5      Q.  Okay.  And that's all -- that's all witness
6  statements that are produced prior to the committee.  So
7  is it updated throughout, I guess, is my question?  Is
8  the binder updated throughout?
9      A.  Yes.  Normally witnesses will come in and they
10  have copies that's distributed to members.
11     Q.  That's my only question on that.  How long has
12  Speaker Straus been a speaker?
13     A.  Since January 2009.
14     Q.  And how often does he need to be reelected as
15  speaker?
16     A.  To the speakership, every session.
17     Q.  When's the last time that he had to run for the
18  speakership?
19     A.  Last session.
20     Q.  What month is that typically that he runs?
21     A.  It's January.
22     Q.  And does Speaker Straus publicly campaign for
23  the speakership?
24     A.  When you say publicly --
25     Q.  Does he make public statements about why he

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

|  | 201 |
|---|---|

1   should be elected to the speakership?
2        A.  Yes.
3        Q.  Do you recall if Speaker Straus has been
4   opposed for the speakership in any election?
5        A.  Yes.
6        Q.  Was he opposed in this past election?
7        A.  Yes.
8        Q.  By who?
9        A.  Is Ken Paxton.
10       Q.  And was he opposed in the previous session in
11   2010?
12       A.  I guess that would have been --
13       Q.  I'm sorry.  2011.
14       A.  2011 was Ken Paxton.
15       Q.  In 2010 was he opposed?
16       A.  No.  We weren't in session.
17       Q.  Okay.  Are you familiar with the term robocall?
18       A.  Yes.
19       Q.  What is a robocall?
20       A.  My understanding is it's a recording that I
21   guess is sent to citizens' home phone lines.
22       Q.  Are you familiar with the use of robocalls in
23   campaigns?
24       A.  Yes.
25       Q.  Do you recall whether Speaker Straus's

|  | 202 |
|---|---|

1   opponents in the speakership raise have used robocalls?
2        A.  I don't have personal knowledge.
3        Q.  And let me just rephrase that.  When I say
4   opponent, I also intend to include opponents or
5   supporters of the opponent.  In this case, I guess,
6   Paxton?
7        A.  I don't know.
8        Q.  You are not -- You don't know?
9        A.  (Shakes head.)
10       Q.  Okay.  So you are unaware of any robocalls that
11   were sent out or used by --
12       A.  By Paxton?  I don't remember.
13       Q.  Do you recall any statements during previous
14   speakership campaigns about Speaker Straus not being
15   conservative enough?
16            MR. SWEETEN:  You can refer to matters of
17   the public record.
18       Q.  Public statements made by opponents to Speaker
19   Straus during the campaign about him not being
20   conservative enough.
21       A.  Yes.
22       Q.  And who made those statements; do you recall?
23       A.  Ken Paxton.
24       Q.  Okay.  Do you recall any statements -- public
25   statements that were made by opponents to Speaker Straus

|  | 203 |
|---|---|

1   that he blocked voter ID legislation in order to get the
2   speakership position?
3            MR. SWEETEN:  I think it's a public
4   statement time.
5            MS. STELCEN:  Public statement, correct.
6            MR. SWEETEN:  You can answer.
7        A.  I don't recall a specific statement like that.
8        Q.  Okay.  Are you aware of any statements that
9   have been made about that in general, whether or not you
10   can recall a specific statement, but have you heard that
11   in the public sphere people making those claims?
12            MR. SWEETEN:  Objection to the form, but,
13   also, if you can confine your answer to non-privileged
14   matters that are matters of public record, you can
15   answer the question.
16            MS. STELCEN:  I can rephrase it too.
17       A.  Okay.
18       Q.  Are you generally aware of any public
19   statements that have been made that Speaker Straus
20   blocked voter ID legislation in order to win the
21   speakership position?
22       A.  No.
23       Q.  You just stated that you recalled certain
24   statements that Speaker Straus was not conservative
25   enough, and those statements were made by Paxton; is

|  | 204 |
|---|---|

1   that correct?
2        A.  Yes.
3        Q.  Do you recall whether or not Paxton gave any
4   additional rationale for why he believed that Speaker
5   Straus was not conservative enough in those public
6   statements?
7        A.  I don't recall any specifics.
8        Q.  I think that's all.  Let me just check one
9   thing.
10           Do you remember during the last
11   speakership race whether there were any public
12   statements made that Speaker Straus could not promote
13   conservative Christian values?
14       A.  Yes.
15       Q.  Do you recall who made those statements?
16       A.  I don't recall specifically, but I do recall
17   those statements being made.
18       Q.  And do you remember anything else generally
19   about those statements, any other details or examples
20   that people may have provided in those public statements
21   about why he could not promote conservative Christian
22   values?
23       A.  Yes.
24       Q.  And could you give me what those examples were?
25       A.  That he's Jewish.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 205

1    MS. STELCEN:  I think that's all I have.
2         EXAMINATION
3    BY MR. SWEETEN:
4    Q.  I've got two questions.  What was the general
5    purpose of Senate Bill 14?
6    A.  To deter voter fraud.
7    Q.  Was there any other purpose?
8    A.  No.
9    MR. SWEETEN:  No further questions.
10   (Deposition concluded at 4:35 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 206

1         CHANGES AND SIGNATURE
2    RE:  STATE OF TEXAS VS. TEXAS STATE CONFERENCE OF NAACP
     BRANCHES, et al
3
4    PAGE  LINE   CHANGE       REASON
     _____
5    _____
6    _____
7    _____
8    _____
9    _____
10   _____
11   _____
12   I, MEREDYTH FOWLER, have read the foregoing
     deposition and hereby affix my signature that same is
13   true and correct, except as noted above.
14
15        MEREDYTH FOWLER, Witness
16   THE STATE OF _____)
     COUNTY OF _____)
17
18   Before me, _____, on this day
     personally appeared MEREDYTH FOWLER, known to me (or
19   proved to me under oath or through _____)
     (description of identity card or other document) to be
20   the person whose name is subscribed to the foregoing
     instrument and acknowledged to me that they executed the
     same for the purposes and consideration therein
21   expressed.
22   Given under my hand and seal of office this _____
     day of _____, _____.
23
24
     _____
25   Notary Public in and for the State
     of _____

## 207

1    IN THE UNITED STATES DISTRICT COURT
2      FOR THE DISTRICT OF COLUMBIA
3    STATE OF TEXAS,           )
         Plaintiff,            )
4                             )
     VS.                       )  CASE NO. 1:12-CV-00128
5                             )  (RMC-DST-RLW)
     ERIC H. HOLDER, JR., in his )  Three-Judge Court
6    official capacity as Attorney)
     General of the United States,)
7                             )
         Defendant.            )
8                             )
     ERIC KENNIE, et al.,      )
9                             )
         Defendant-Intervenors, )
10                            )
     TEXAS STATE CONFERENCE OF  )
11   NAACP BRANCHES, et al.,    )
                              )
12       Defendant-Intervenors, )
13   TEXAS LEAGUE OF YOUNG VOTERS )
     EDUCATION FUND, et al.,   )
14                            )
         Defendant-Intervenors, )
15                            )
     TEXAS LEGISLATIVE BLACK    )
16   CAUCUS, et al.,           )
                              )
17       Defendant-Intervenors, )
18   VICTORIA RODRIGUEZ, et al., )
19       Defendant-Intervenors.  )
20       REPORTER'S CERTIFICATE
21       ORAL DEPOSITION OF MEREDYTH FOWLER
22            JUNE 8, 2012
23   I, JEAN THOMAS FRAUNHOFER, the undersigned Certified
24   Shorthand Reporter in and for the State of Texas,
25   certify that the facts stated in the foregoing pages are

## 208

1    true and correct.
2    I further certify that I am neither attorney or
3    counsel for, related to, nor employed by any parties to
4    the action in which this testimony is taken and,
5    further, that I am not a relative or employee of any
6    counsel employed by the parties hereto or financially
7    interested in the action.
8    SUBSCRIBED AND SWORN TO under my hand and seal of
9    office on this the 12th day of June, 2012.
10
11
12   _Jean Thomas Fraunhofer_
13   JEAN THOMAS FRAUNHOFER
     Texas CSR 7990
     Expiration Date:  12/31/12
14   ESQUIRE DEPOSITION SERVICES
     Firm Registration No. 77
15   9901 IH-10 West, Suite 800
     San Antonio, Texas  78230
16   Tel:  (210) 331-2280
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com