**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                      )
                                     )
          Plaintiff,                 )
                                     )
VS.                                  )
                                     )
ERIC H. HOLDER, JR. in his           )
official capacity as Attorney        )
General of the United States,        )
                                     )
          Defendant,                 )
                                     )
ERIC KENNIE, et al,                  )
                                     )
     Defendant-Intervenors,          )
                                     )
TEXAS STATE CONFERENCE OF            )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                      )   (RMC-DST-RLW)
                                     )   Three-Judge Court
     Defendant-Intervenors,          )
                                     )
TEXAS LEAGUE OF YOUNG VOTERS         )
EDUCATION FUND, et al,               )
                                     )
     Defendant-Intervenors,          )
                                     )
TEXAS LEGISLATIVE BLACK              )
CAUCUS, et al,                       )
                                     )
     Defendant-Intervenors,          )
                                     )
VICTORIA RODRIGUEZ, et al.,          )
                                     )
     Defendant-Intervenors.          )

*********************************************
ORAL DEPOSITION OF
SENATOR TROY FRASER
MAY 17, 2012
*********************************************

**2**

1    ORAL DEPOSITION OF SENATOR TROY FRASER, produced as

2    a witness at the instance of the Defendant, was duly

3    sworn, was taken in the above-styled and numbered cause

4    on the MAY 17, 2012, from 9:43 a.m. to 6:29 p.m., before

5    Chris Carpenter, CSR, in and for the State of Texas,

6    reported by machine shorthand, at the offices of The

7    United States Attorney's Office, 816 Congress Avenue,

8    Suite 1000, Austin, Texas 78701, pursuant to the Federal

9    Rules of Civil Procedure and the provisions stated on

10   the record or attached hereto.

**3**

1
2
3                    A P P E A R A N C E S
4    FOR THE PLAINTIFF, STATE OF TEXAS:
5        Patrick K. Sweeten
         Matthew Frederick
6        OFFICE OF THE ATTORNEY GENERAL OF TEXAS
         P.O. Box 12548
7        Austin, TX 78711-2548
8        209 West 14th Street
         8th Floor
9        Austin, TX 78701
         (512) 936-1307
10       patrick.sweeten@texasattorneygeneral.gov
         matthew.frederick@texasattorneygeneral.gov
11
     FOR THE DEFENDANT, HOLDER, ET AL:
12
         Elizabeth S. Westfall
13       Bruce Gear
         U.S. DEPARTMENT OF JUSTICE
14       950 Pennsylvania Avenue, NW
         NWB - Room 7202
15       Washington, DC  20530
         (202) 305-7766
16       elizabeth.westfall@usdoj.gov
17   FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
     NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
18   CAUCUS:
19       Ezra D. Rosenberg
         DECHERT, LLP
20       Suite 500
         902 Carnegie Center
21       Princeton, NJ  08540-6531
         (609) 955-3200
22       ezra.rosenberg@dechert.com
23
24
25

**4**

1    FOR THE KENNIE INTERVENORS:
2        Chad W. Dunn
         BRAZIL & DUNN, LLP
3        4201 Cypress Creek Parkway
         Suite 530
4        Houston, TX  77068
         (281) 580-6310
5        chad@brazilanddunn.com
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser
May 17, 2012

---

**5**

1                           INDEX
2    Appearances,.................................2
3    SENATOR TROY FRASER
4        Examination by Ms. Westfall.................6
         Examination by Mr. Rosenberg..............295
5
     Signature and Changes..............................318
6
     Reporter's Certificate............................320
7
                          EXHIBITS
8
     NO. DESCRIPTION                    PAGE MARKED
9
10   43   Deposition Notice              16
11   44   HB No. 1706                    62
12   45   Declaration of Carlos Uresti   117
13   46   Excerpt of proceedings of the Committee of  207
          the Whole Senate on Tuesday, March 10
14        2009
15   47   Senate Journal of the fifth day,      283
          Wednesday, January the 26th
16   48   Texas Tribune article          289
17   49   Excerpt of Senate Record       311
18
19
20
21
22
23
24
25

---

**6**

```
1                  SENATOR TROY FRASER,
2    having been first duly sworn to testify the truth, the
3    whole truth, and nothing but the truth, testified as
4    follows:
5                      EXAMINATION
6    BY MS. WESTFALL:
7        Q.  Good morning, Senator Fraser.  Could you state
8    and spell your name for the record, please?
9        A.  Troy Fraser, F-r-a-s-e-r.
10       Q.  Have you had your deposition taken before?
11       A.  Not to my knowledge.
12       Q.  Okay.  I'm going to tell you some ground rules
13   so you can understand what will be happening
14   today.  You're here to testify truthfully, accurately
15   and completely.
16           The court reporter here will be preparing
17   a transcript of everything that is said today, so it is
18   important to wait for me to ask my question before you
19   answer.  And also to make verbal responses to my
20   questions.  In other words, please do not shake your
21   head or say "uh-huh" or "nuh-uh," because you can't see
22   that in the transcript.
23           Please wait for me to finish my question.
24   If you have any questions about my question or don't
25   understand my question, please feel free to ask.
```

---

**7**

```
1        If you would like to take a break for any
2    reason, just let me know, and we can take a break.  We
3    will take breaks probably several times today and also
4    break for lunch.  But if I have a question pending and
5    you would like to take a break, if you could go ahead
6    and answer that question first before we take a break,
7    I'd appreciate it.  Is that clear?
8        A.  Yes.
9        Q.  You understand that you've been sworn in and
10   you're under oath and you may be subject to penalty of
11   perjury for giving false or misleading testimony just
12   like a trial, okay?
13       A.  Yes.
14       Q.  Do you understand these instructions?
15       A.  Yes, I do.
16       Q.  Do you have any questions about these
17   instructions?
18       A.  No.
19       Q.  Are you on any medication today that would have
20   any impact on your ability to testify truthfully at this
21   deposition?
22       A.  No.  I should qualify:  I've had knee surgery a
23   month ago, and at some point, about every five minutes,
24   I will stand up and stretch my leg.  So if I stand up,
25   I'm not leaving.
```

---

**8**

```
1        Q.  Very good.  I will not take offense.  Thank you
2    for letting me know, and I hope you're recovering
3    swiftly.
4        I may use the terms "voter ID" and "photo
5    ID" interchangeably throughout this deposition, and I
6    want you to interpret those terms as broadly as you can
7    to mean a requirement that a voter present a form of
8    identification, whether it has a photo or otherwise,
9    when voting in person, before being permitted to vote
10   with a regular ballot.  Do you understand?
11       A.  Yes.
12       Q.  If I refer to "you," I'm asking you a question
13   about you in your capacity as a member of the Texas
14   State Senate, and not in any other capacity.  Do you
15   understand?
16       A.  Yes.
17       Q.  And if I refer to "you," I also mean to include
18   anyone in your office or acting on your behalf, okay?
19       A.  Could I address my attorney?
20       Q.  Certainly.
21           THE WITNESS:  Why, my staff?
22           MR. SWEETEN:  Yeah.  I think, you know,
23   with respect to that instruction, I think that that
24   could be very difficult for him, if you're asking
25   Senator Fraser something, I mean, it depends on the
```

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

9

1  context.  But if you're asking him, "Did you do this,"
2  he could be answering that he personally did something
3  or -- under your definition, you would be requiring him
4  to say that, you know, to speak for, you know, a group
5  of people.
6      I think we would have -- we would ask that
7  when you -- we can't agree to that instruction the way
8  it's phrased, because I think that that could be
9  problematic for him.  And certainly, he's raised that
10  that would be potentially an issue.
11     So we would ask that we -- that "you" be
12  giving its normal meaning.  If there's a circumstance
13  you're asking for "you" to mean his office, then I think
14  that if you would just specify that, we'd appreciate
15  that.
16     MS. WESTFALL:  Thank you, Mr. Sweeten.  I
17  will do my best to make sure that my questions are
18  accurate.  And when I intend to refer to "you" and "your
19  office," I'll try to make sure the question encompasses
20  both of those terms.
21     Q.  (By Ms. Westfall)  Finally, I would like to
22  instruct you that when I state the term "minority
23  voters," I mean voters who are not white or not Anglo.
24  Do you understand that definition?
25     MR. SWEETEN:  So she's saying for purposes

10

1  of this deposition, as she's asking you the questions,
2  when she using the term "minority voters," that she
3  means people that are not white or nonAnglo.  Okay.
4  Just as she says it in the deposition, that that's what
5  that term will mean.
6     THE WITNESS:  Is that a term of art used?
7     MR. SWEETEN:  Well.
8     Q.  (By Ms. Westfall)  Sir, I'm using the term for
9  purpose of this definition -- deposition, and I want to
10  make sure that we have a mutually agreed upon
11  understanding of terms so that when I ask you a
12  question, you can know the question that I'm asking.
13     Otherwise, I could ask -- I could ask you
14  many, many questions about persons of different races,
15  but I don't want to burden you with those number of
16  questions today at this deposition.  So I'm hoping we
17  can agree that you will understand what I mean when I
18  say "minority voter."
19     Do you have any questions about that, sir?
20     A.  No.
21     Q.  Thank you.  Are you represented by counsel
22  today?
23     A.  Yes.
24     Q.  Who is your lawyer?
25     A.  Patrick.

11

1     Q.  And Patrick is Patrick Sweeten?
2     A.  Yes.
3     Q.  And I think I asked you whether you've been
4  deposed before, and you said no?
5     A.  No.
6     Q.  That's correct?
7     A.  I'm sorry.  I do not remember being deposed
8  before.
9     Q.  Thank you.  Have you testified in court before?
10     A.  No.  Again, not to my -- I don't remember
11  testifying in court.
12     Q.  Have you ever been personally a party to a
13  lawsuit, either as a plaintiff or a defendant?
14     A.  Not to my knowledge that I -- not that I
15  remember.
16     Q.  Thank you.  What did you do to prepare for
17  today's deposition?
18     A.  Read the -- all the -- you know, the '09 and
19  '011 hearings data.  Reread the bill that was passed and
20  met with Counsel prior to.
21     Q.  And by "Counsel," you mean Mr. Sweeten?
22     A.  Yes.
23     Q.  Did you read anything else in advance of this
24  deposition other than the things you just testified
25  about today?

12

1     A.  That's a very broad question.
2     Q.  Did you read anything other than the 2009, 2011
3  hearings and the bill to prepare for the deposition?
4     A.  Yes.
5     Q.  What else did you read?
6     A.  Anything that I had in my file that had been
7  delivered to you that, you know, we had released, I read
8  that data.
9     Q.  Okay.  Very good.  And did that include
10  information about Senate Bill 14?
11     A.  Yes.
12     Q.  Did that include information and documents
13  related to previous photo ID bills that had been enacted
14  or considered by the Texas legislature?
15     A.  Yes.
16     Q.  Are there any other categories of documents
17  that I did not mention in that list that you read from
18  your file?
19     A.  No.
20     Q.  When you met with your attorney, Mr. Sweeten,
21  was anyone else present?
22     A.  Yes.
23     Q.  Who else was present?
24     A.  Other counsel that would be working with
25  Mr. Sweeten.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 13

1     Q.  Anyone else besides other attorneys in the
2 room?
3     A.  No.
4     Q.  Other than your attorneys, did you speak with
5 anyone in advance of this deposition about your
6 deposition?
7     A.  No.
8     Q.  Did you speak to Janice McCoy about her
9 deposition?
10     A.  No.
11     Q.  Did you bring any notes or documents with you
12 today?
13     A.  No.
14     Q.  Is it your understanding that as a -- that you
15 as a state legislator may invoke legislative privilege?
16     A.  Yes.
17     Q.  Are you invoking that privilege today?
18     A.  Yes.
19     Q.  Are there any other privileges that you are
20 asserting today other than attorney-client privilege
21 with your attorneys and legislative privilege?
22     MR. SWEETEN:  Those are the two categories
23 that we intend to assert.  Obviously, if something were
24 to come up that we're not expecting in the examination,
25 if you asked about his physician discussions or

## 14

1 something like that, that could be implicated, but I
2 think those are the two, I think, coming in that we
3 expect to assert.
4     Q.  (By Ms. Westfall)  Do you agree with what your
5 attorney just said, Senator?
6     A.  Yes.
7     Q.  Have you asserted legislative privilege over
8 documents and other materials within your possession or
9 in the possession of your staff members that relate to
10 Senate Bill 14?
11     A.  I would like to address Counsel.  I believe we
12 have.
13     MR. SWEETEN:  That's correct.  Correct.
14     A.  The answer is yes.
15     Q.  (By Ms. Westfall)  Do you understand that as a
16 result of asserting this privilege, the office of the
17 Attorney General for the State of Texas has withheld
18 certain documents in your position that relate to Senate
19 Bill 14?
20     A.  Yes.
21     Q.  And do you further understand that the offices
22 of the Attorney General has not produced those documents
23 to counsel for the US Attorney General in this
24 litigation; is that right?
25     A.  Yes.

## 15

1     Q.  Do you continue today to assert legislative
2 privilege over documents related to Senate Bill 14?
3     A.  Yes.
4     Q.  Will you be invoking today legislative
5 privilege over your deposition testimony that you
6 provide today in this litigation?
7     A.  Yes.
8     Q.  Will you be invoking legislative privilege with
9 regard to your deposition testimony today that relates
10 to other photo ID bills that have been considered by the
11 Texas legislature in past sessions?
12     A.  Yes.
13     Q.  Why are you asserting a legislative privilege?
14     MR. SWEETEN:  You don't have to answer why
15 you're asserting that.
16     We revealed communications that I've had
17 with him, discussions about legal matters, he doesn't
18 have to provide you with why, as to why he's asserting
19 the privilege.
20     A.  I think that's protected.
21     Q.  (By Ms. Westfall)  Are you adhering to your
22 attorney's instruction?
23     A.  Yes.
24     Q.  If you would -- and you realize that you
25 yourself personally hold this privilege; is that right?

## 16

1     A.  Yes.
2     Q.  And you may decide if you want to assert it or
3 not; is that correct?
4     A.  Yes.
5     Q.  If you would like to waive the privilege in
6 response to any particular question that I ask today
7 during the deposition, will you let me know?
8     A.  Yes.
9     Q.  Thank you.
10     MS. WESTFALL:  Court Reporter, can you
11 mark this, please?
12     (Exhibit 43 marked for identification.)
13     Q.  (By Ms. Westfall)  Senator, I don't think this
14 is in very small font, but I want you to have your
15 proper glasses because I want to ask you about this
16 stuff.
17     You've been handed by the court reporter
18 what's been marked as US Exhibit 43.  Do you recognize
19 this document?
20     A.  No, I do not.
21     Q.  Okay.  Could you look at the second page, sir?
22 Does taking a look at the second page of Exhibit 43
23 refresh your recollection about what this document is?
24     A.  No.
25     MS. WESTFALL:  I'll note for the record



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 17

1  that Counsel is assisting the witness in reviewing the
2  document.
3      Q.  (By Ms. Westfall)  Does it remain your
4  testimony that you've never seen this document before?
5      A.  (Looking through other pages.)  I have not seen
6  this document.
7      Q.  Thank you.  You need not refer to it right now,
8  but I'm going to ask you some questions about documents
9  that were collected pursuant to US Exhibit 43.
10         Did anyone to your knowledge search in
11  your office for documents and communications related to
12  calculations, reports, audits, estimates, projections,
13  assessments and other analyses of the effect of Senate
14  Bill 14 on minority voters?
15         MR. SWEETEN:  Can you direct him to where
16  you're reading?
17         MS. WESTFALL:  I certainly can.  It's
18  Number 5 in the list of documents.  It's not a paginated
19  document, but Mr. Sweeten could you assist him in
20  looking at Number 5 on this?
21         MR. SWEETEN:  So counsel is asking me to
22  assist him reviewing the document.  Sure.  I can do
23  that.
24         MS. WESTFALL:  Well, if you want me to
25  refer to it, otherwise, I can read, Mr. Sweeten.

## 18

1      Q.  (By Ms. Westfall)  And Number 5 on the next
2  page, sir.
3      A.  Clarify.  You want all through 1 through 5?
4      Q.  No.  Just -- I'm directing your attention to
5  Number 5 in the document.  If you could look at that
6  Number 5, and let me know when you've had a chance to
7  review that.
8      A.  (Witness complies.)
9      Q.  Do you know whether -- you've had a chance to
10  look at Number 5; is that correct, sir?
11      A.  Uh-huh.
12      Q.  Do you know -- is that a "yes"?
13      A.  Yes.
14      Q.  Thank you.  Just so the court reporter can hear
15  you.  Thank you.
16         Do you know whether anyone in your office
17  has searched for documents in response to the documents
18  requested in Number 5 of Exhibit 43?
19         MR. SWEETEN:  She's asking you, do you
20  know if anybody in your office has done a search for
21  these documents?
22      A.  It's my understanding that Janice McCoy did the
23  search for the documents.
24      Q.  (By Ms. Westfall)  Okay.  And did Ms. McCoy, to
25  the best of your recollection, handle all document

## 19

1  searches in response to the documents listed here --
2      A.  Yes.
3      Q.  -- in Exhibit 43?
4         So you don't have any further information
5  about looking for those records, is that your testimony?
6      A.  Yes.
7         MR. SWEETEN:  Were you asking just as to
8  5, when you said "as to this document" --
9         MS. WESTFALL:  No.  I meant --
10         MR. SWEETEN:  -- or are you asking as to
11  any on the list?
12         MS. WESTFALL:  Thank you for the
13  clarification, Mr. Sweeten.
14      Q.  (By Ms. Westfall)  You've testified you've
15  never seen Exhibit 43?
16      A.  No.
17      Q.  Is that correct?
18      A.  Yes.
19      Q.  It -- Exhibit 43 has a list of documents
20  numbered 1 through 12, does it not?
21      A.  Yes.
22      Q.  And to the best of your knowledge, did
23  Ms. McCoy in response to this request for documents
24  search for documents?
25      A.  I have no knowledge that she did.  I think it

## 20

1  was requested of her, but no, I have no knowledge.
2      Q.  Thank you.  And are there any documents related
3  to Senate Bill 14 or previous voter ID bills that you
4  keep in your possession that Ms. McCoy would not have
5  had access to?
6      A.  No.
7      Q.  Can you describe your educational background,
8  please, starting with college?
9      A.  College, three total years of college.  One
10  year of junior college.  And then I attended three other
11  colleges.
12      Q.  Did you eventually get a degree?
13      A.  No.
14      Q.  Did you do any studies after that?
15      A.  In at least one, maybe two occasions, took a
16  course through a university.
17      Q.  Did any of those courses involve election law?
18      A.  No.
19      Q.  Did any of them involve voter ID?
20      A.  No.
21      Q.  How long have you served in the Senate, sir?
22      A.  I was elected in 1996, sworn in January '97.
23      Q.  Before that time, were you a member of the
24  Texas House of Representatives?
25      A.  Yes, I was.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 21

1  Q.  And when did you start that service?
2  A.  I was elected in 1988, and served until '93.
3  Q.  Could you describe the areas within your Senate
4  district currently?
5  A.  Could you clarify?
6  Q.  Certainly.  Just could you describe where your
7  Senate district is?
8  A.  The Senate district is the geographic center of
9  the State of Texas encompassing 21 counties.
10  Q.  And is it Senate District 24?
11  A.  Yes, it is.
12  Q.  What is the total population of your district?
13  A.  The last census, we subdivided the state, and
14  it's approximately 820,000 people.
15  Q.  Could you describe the racial demographics of
16  your district?
17  A.  Racial demographics are in keeping with the
18  rest of the state, probably -- no, probably a pretty
19  good reflection of the percentages within the rest of
20  the state.
21  Q.  Could you tell me approximately how that breaks
22  down, to the best of your knowledge?
23  A.  I'm sorry.  I cannot.
24  Q.  Do you currently serve on any committees in the
25  Senate?

## 22

1  A.  Yes.
2  Q.  What are those committees?
3  A.  The chair of Natural Resources.  I serve on the
4  State Affairs.  I serve on International Relations and
5  something.  I'm sorry.  I'm missing one.
6  Q.  Do you also serve on Nominations?
7  A.  No.
8  Q.  No?
9  A.  No.
10  Q.  My apologies.
11  A.  Well, hold on a second.  I'm sorry, I can't
12  answer that question.  I don't.
13  Q.  That's okay.
14     Is State Affairs committee the sole
15  committee that has considered voter ID bills since
16  you've served in the Senate?
17  A.  Again, I'm not sure I can answer that.  The
18  answer is it has not been the sole committee.
19  Q.  Has the other committee been the Committee of
20  the Whole?
21  A.  Yes.
22  Q.  Are there any other committees you're aware of
23  that have considered voter ID in the Senate since you've
24  served in the Senate?
25  A.  No.

## 23

1  Q.  And putting aside for a moment the photo ID
2  bills that you have sponsored and had involvement in,
3  how many election-related bills have you sponsored, or
4  voter-related bills?
5  A.  Again, I don't have a clear recollection.  I
6  think I probably carried two very minor bills six or
7  eight years ago, but I don't -- I don't have
8  recollection of those.
9  Q.  Do you know generally what they were about?
10  A.  No.
11  Q.  Did they relate to voter registration?
12  A.  No.
13  Q.  Did they relate to voting?
14  A.  If they were a voter bill, they related to
15  voting.
16  Q.  I just wanted to know if they related to
17  campaign finance or some other election-related matter.
18  But to the best of your recollection, they related to
19  voting; is that correct?
20  A.  I don't have a clear recollection, so no, I
21  can't answer that affirmatively.
22  Q.  Do you know whether those bills were enacted?
23  A.  No.
24  Q.  You don't know?
25  A.  No.  I do not know.

## 24

1  Q.  Have you cosponsored any voting bills other
2  than the photo ID bills?
3  A.  I believe the answer is no, not to my
4  knowledge.
5  Q.  What has your primary focus in the legislature
6  been in the Senate?
7  A.  I have chaired, prior to Natural Resources,
8  chaired Business and Commerce and worked on business-
9  related issues.
10  Q.  Could you describe those issues?
11  A.  I heard about 2,000 bills per year for 15
12  years, so it would be a long list of description.
13  Q.  Okay.  Did you have any signature initiatives
14  in that committee?
15  A.  Qualify "signature."
16  Q.  Did you have any area of focus?
17  A.  I focused on the entire committee.
18  Q.  Have you served in any leadership roles in the
19  Senate?
20  A.  We are not divided to leadership positions.
21  There are no leadership positions.
22  Q.  Have you ever served as president pro tem?
23  A.  Yes, I have.
24  Q.  When was that?
25  A.  The -- starting in June of '09 through January



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

25

1  of '11.
2      Q.  What did that role entail as president pro tem?
3      A.  It is an honorary position that is rotated by
4  seniority.  It's not mandated, but it is custom that we
5  transfer it by seniority.  And it becomes your term and
6  you serve.  The responsibilities would be entailed that
7  if the Governor and the Lieutenant Governor are out of
8  the state, then you would be the acting governor in
9  their absence.
10     Q.  I see.  What is the role of the Lieutenant
11 Governor in the Senate?
12     A.  The Lieutenant Governor is a state-wide elected
13 official.  He presides over the Senate at the will of
14 the Senate.  He has no constitutional right to serve.
15 He's given his power by rule from the senators.
16     Q.  Is that in the Senate rules?
17     A.  Yes.
18     Q.  Does the Lieutenant Governor vote as a member
19 of the Senate?
20     A.  He is allowed to be a tiebreaker.  He -- yes,
21 he is allowed to vote.
22     Q.  Is that the sole circumstance under which he
23 may vote?
24     A.  No.  He can vote any time he chooses.
25     Q.  Does the Lieutenant Governor set the agenda for

26

1  what the Senate hears on the Floor?
2      A.  Yes.
3      Q.  Does the Lieutenant Governor --
4      A.  I'm sorry.  I need to reanswer that
5  question.  The -- the Senate sets the order of their
6  agenda based on an order of business by rule that is
7  established by the senators themselves.  In the absence
8  of a -- following the order of business, the Lieutenant
9  Governor will establish what bills are eligible to be
10 heard that day.
11     Q.  Was -- was it true that the Lieutenant Governor
12 played a role in insuring that Senate Bill 14 would be
13 heard by the Senate when it was?
14     A.  Yes.
15     Q.  And describe the role he played.
16         MR. SWEETEN:  At this point, I'm going to
17 instruct you with respect to the legislative privilege,
18 and I want you to not reveal the thoughts, mental
19 impressions, opinions about legislation, including
20 Senate Bill 14.  Don't reveal the communications that
21 you've had with legislators, with legislative staff,
22 with any state agency, including the Lieutenant
23 Governor's Office, the Governor's Office, or the Texas
24 Legislative Council or constituents.
25     A.  I will assert privilege on that question.

27

1      Q.  (By Ms. Westfall)  And outside of any
2  conversations for which your counsel is asserting
3  privilege, as a matter of procedure, did the Lieutenant
4  Governor -- could you describe the role that the
5  Lieutenant Governor played with regard to Senate Bill 14
6  and its placement on the Senate calendar or agenda?
7      A.  I would again assert privilege.
8      Q.  Thank you, sir.  Is the Lieutenant Governor in
9  effect the leader of the Senate?
10     A.  No.
11     Q.  Who is?
12     A.  The senators.
13     Q.  Collectively?
14     A.  Yes.
15     Q.  Are you familiar with an organization called
16 the American Legislative Exchange Council, otherwise
17 known as ALEC?
18     A.  Yes.
19     Q.  Where is that organization based physically, do
20 you know?
21     A.  No.
22     Q.  Is it based in Washington, D.C.?
23     A.  I just answered.  I don't know where it's
24 located.
25     Q.  Thank you.  Do you have any affiliation with

28

1  ALEC?
2      A.  Clarify "affiliation."
3      Q.  Are you a member of ALEC?
4      A.  My understanding of ALEC is that there's not a
5  constant membership, that if you choose to attend a
6  conference, part of the registration fee includes your
7  dues for that year.
8      Q.  What is ALEC?  Could you describe it, please?
9      A.  It's an American legislative something
10 exchange.
11     Q.  We'll call it ALEC for the purposes of this
12 deposition to make things easier, sir.
13     A.  Oh.
14     Q.  Could you describe the type of services it
15 provides or what it does generally?
16     A.  They have a conference once a year and enables
17 legislators to get together to intermingle.
18     Q.  Is it for state legislators solely?
19     A.  I believe it is.
20     Q.  How long have you had any dealings -- for how
21 many years have you had membership or attended the
22 conferences or otherwise participated in ALEC events?
23     A.  In 1991, my first dealing with them in 1991, I
24 was chosen as one of their legislators of the year.
25     Q.  How did you get that honor?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 29

1    A.  I have no idea.
2    Q.  Do you know if there are other members of the
3  Texas legislature who are members of ALEC?
4    A.  Again, to my knowledge, there is no membership
5  to ALEC.  There's a competing group that is a -- you
6  know, the state pays the membership to a competing
7  group.  To ALEC, the only membership is if someone goes
8  to a conference, part of their conference dues includes,
9  I'm assuming, a membership for that year.  So I don't
10  know who's a member.
11    Q.  Have you attended meetings of ALEC with other
12  members of the Texas legislature?
13    A.  Yes.
14    Q.  Who are those members?
15    A.  I would not -- wouldn't recall who they were.
16    Q.  Was it -- did you attend -- have you attended
17  ALEC meetings with 10 other senators from the Texas
18  Senate?
19    A.  Again, I don't remember who was there.
20    Q.  Are there agendas for the meetings of ALEC?
21    A.  You have general meetings, where you have
22  speakers, and you have breakout meetings that address
23  topics.
24    Q.  And I believe you testified you attend, you
25  have attended ALEC conferences once a year; is that

## 30

1  correct?
2    A.  I didn't say that.
3    Q.  Please tell me how often you attend meetings?
4    A.  Whenever there's a meeting that I want to
5  attend.
6    Q.  So could be once a year, could be less than
7  once a year, could be more than once a year; is that
8  correct?
9    A.  Oh, you're asking how many times a year?
10    Q.  Yes, sir.
11    A.  To my knowledge, I've never attended more than
12  one per year.
13    Q.  Do you generally take notes when you go to
14  those meetings?
15    A.  No.
16    Q.  Do you serve on any task forces or other
17  subcommittees that have been convened by ALEC?
18    A.  To my knowledge, none through ALEC.
19    Q.  Have you ever received any documents, materials
20  or communications from ALEC related to voter ID?
21    A.  No.
22    Q.  Has ALEC ever offered any technical assistance
23  on voter ID?
24    A.  No --
25      MR. SWEETEN:  Hold on a minute.  I just

## 31

1  want to make sure that we're -- with respect to
2  legislative privilege, when she's asking you these
3  questions, I don't want you to reveal thoughts, mental
4  impressions, opinions about legislation, including
5  Senate Bill 14.  And don't reveal communications that
6  you've had with other legislators, legislative staff,
7  state agencies and Texas Legislative Council or
8  constituents.  Okay?
9      THE WITNESS:  All right.
10      MR. SWEETEN:  All right.
11    Q.  (By Ms. Westfall)  Have you ever asked ALEC for
12  assistance with any legislation you've been drafting?
13      MR. SWEETEN:  Any legislation at all?
14      MS. WESTFALL:  Yes.
15      MR. SWEETEN:  I think that would still ask
16  him to reveal thoughts, mental impressions, opinions
17  about legislation, so I don't think you should answer,
18  and I instruct you not to answer that.
19    Q.  (By Ms. Westfall)  Are you following your
20  counsel's advice?
21    A.  Yes.
22    Q.  Have you ever attended -- strike that.
23      Are you a member of the National
24  Conference of State Legislators?
25    A.  To my knowledge, yes.

## 32

1    Q.  Do you attend their meetings?
2    A.  Yes.
3    Q.  Where are their meetings held?
4    A.  Always different cities.
5    Q.  How often do you attend those meetings?
6    A.  Never more than once a year and not every year.
7    Q.  Have you attended any of those -- any meetings
8  other than the National Conference of State Legislators
9  where voter ID has been discussed?
10    A.  How do I answer that?
11      MR. SWEETEN:  I'm going to let you answer
12  to the extent you've attended.  She can ask you about
13  whether you've attended a conference.  And just the
14  subject matter of voter ID, I'm going to let you answer
15  as to just yes or no.
16    A.  The answer is no.
17    Q.  (By Ms. Westfall)  Could you identify your
18  staff members by name and title who work for you?
19    A.  Probably not.
20    Q.  Could you name one of them?
21    A.  Janice McCoy is my chief of staff.
22    Q.  Could you name each and every person on your
23  staff who worked on Senate Bill 14?
24    A.  Janice McCoy.
25    Q.  Was she the sole person?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 33

1      A.  (Witness nods head yes.)
2      Q.  Do you have a schedule in your -- scheduler in
3  your office?
4      A.  Yes.
5      Q.  And what's the name of that scheduler?
6      A.  Terri Mathis.
7      Q.  Did Terri play any role in scheduling any
8  witnesses for hearings related to SB 14?
9      A.  Not to my knowledge.
10     Q.  Did she schedule any meetings with any
11  constituents, groups or other legislators regarding SB
12  14?
13     A.  That's not privileged, is it?
14         MR. SWEETEN:  She's just asking if someone
15  scheduled anything related to you.  You can answer that.
16     A.  The answer would be yes.
17     Q.  (By Ms. Westfall)  And I'm sorry, Terri's last
18  name is?
19     A.  Mathis.
20     Q.  Is she still employed with you today?
21     A.  Yes, she is.
22     Q.  How long has she been employed with you?
23     A.  15 years.
24     Q.  How did she generally schedule meetings with
25  constituents for you?

### 34

1      A.  I feel sure they called and asked for a
2  meeting, and she asked if I wanted to take the meeting,
3  and then they arrange it.
4      Q.  Does she maintain a calendar for you?
5      A.  Yes, she does.
6      Q.  Is that calendar maintained on a computer
7  system or is it a paper calendar?
8      A.  It's a computer.
9      Q.  How often do you communicate with your staff
10  when you're in session?
11     A.  When I'm in session?  Constantly.
12     Q.  Do you use e-mail?
13     A.  No.
14     Q.  No e-mail, personal or business?
15     A.  I have a personal e-mail account that -- and I
16  estimate that I've probably have sent less than 10
17  e-mails in my lifetime.  I don't know how to
18  e-mail.  The answer is I don't know how to e-mail, and
19  when I send one, I have to ask staff how to do it.
20     Q.  Thank you.
21     A.  So I don't e-mail.
22     Q.  Do you have a BlackBerry?
23     A.  No.
24     Q.  How do you communicate with your staff?
25     A.  Yell into the other office.

### 35

1      Q.  How do you communicate with your staff on
2  nonlegislative matters?
3      A.  Clarify, please.
4      Q.  I guess scheduling issues, personnel issues, is
5  there a distinction between how you communicate
6  regarding legislation with your staff and other matters?
7      A.  My staff are generally not involved in
8  nonlegislative.  If I have something that I'm going to
9  do, I will just -- I'll say "Don't arrange something on
10  this day.  Block this day."
11     Q.  How often in session do you communicate with
12  other members of the legislature?
13     A.  In session, constantly.
14     Q.  How do you communicate with other legislators?
15     A.  Open my mouth and words come out.
16     Q.  Face-to-face meetings?
17     A.  Yes.
18     Q.  Chiefly?
19     A.  Well, the answer is a combination of face-to-
20  face, and obviously, there are some phone communication
21  that we touch on.  But we generally more face-to-face
22  because we're around each other constantly.
23     Q.  And do you communicate with the Lieutenant
24  Governor's Office and the Lieutenant Governor?
25     A.  You know, limited.  Once in a while.

### 36

1      Q.  Do you communicate with the Governor's Office?
2      A.  Very limited.
3      Q.  How do you communicate with the Governor's
4  Office?
5      A.  If it's involving a staffer question, probably
6  would be a phone call.  If it's the Governor, you'd have
7  to ask to get on his calendar to see him.
8      Q.  But are these chiefly in-person meetings that
9  you have with the Governor's Office?
10     A.  90 percent of the time.  Occasionally, it will
11  be a phone call.
12     Q.  And does the same hold true for the Lieutenant
13  Governor's Office?
14     A.  Yes.
15     Q.  Turning back to ALEC, can you describe the
16  issues that ALEC has highlighted in the last five years
17  in terms of issue priorities for ALEC?
18     A.  They've highlighted a lot of issues.
19     Q.  Could you name some of them?
20     A.  No.
21     Q.  Could you describe ALEC's key issues and goals?
22     A.  No.
23     Q.  Has ALEC highlighted or provided technical
24  advice on immigration-related issues?
25         MR. SWEETEN:  Don't reveal any sort of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 37

1 thoughts, mental impressions or opinions about
2 legislation or your process in considering legislation.
3 And then I think that that would include, you know, any
4 sort of discussions that she's asking you for, so I'm
5 going to ask --
6      MS. WESTFALL:  Mr. Sweeten, I have not
7 posed any question about any legislation.  I'm asking
8 about a policy organization and its issues.  I'm going
9 to ask you to withdraw that objection.
10      MR. SWEETEN:  Well, I heard your question
11 to ask technical assistance, which I believe in the way
12 I'm understanding your question would reveal, and you
13 said as to any legislation, so it would potentially
14 reveal any sort of process that he had in formulating
15 legislation.  So I think that that potentially is
16 legislatively privileged what you've asked him.
17 Q.  (By Ms. Westfall)  Let me try another way.
18      Has ALEC highlighted in its work as a
19 policy organization any immigration-related issues?
20 A.  Not to my knowledge.
21 Q.  Has ALEC highlighted any election-related
22 issues?
23 A.  Again, not to my knowledge.
24 Q.  Have you had any communications with ALEC
25 related to the subject matter of photo ID?

### 38

1 A.  No.
2 Q.  Never, not one?
3 A.  Not to my knowledge.  You're clarifying here
4 that is me as an individual Senator.  I have not had
5 communication that I know of.
6 Q.  Have you had any communications with ALEC in
7 any other capacity, other than being a Texas senator?
8 A.  The answer is no.  I'm just saying that --
9      MR. SWEETEN:  We've defined you as --
10 A.  I want to clarify it's me.  I have -- I have
11 not had communication.
12 Q.  (By Ms. Westfall)  Are you aware of whether
13 Ms. McCoy has had any communications?
14 A.  I'm not aware.
15 Q.  Are you employed in the capacity other than
16 serving in the Texas State Senate?
17      MR. SWEETEN:  Is he employed?  I'm sorry.
18 Q.  (By Ms. Westfall)  In another capacity other
19 than being in the Texas Senate?
20 A.  I have no job other than my $600 a month I'm
21 making as a legislator.
22 Q.  When you last renewed your driver's license,
23 where did you have to go to do that?
24 A.  Marble Falls, Texas.
25 Q.  How far was that from your home --

### 39

1 A.  I'm sorry.  I renewed my driver's license in
2 Austin, Texas.
3 Q.  Where was that office?
4 A.  North end of town.
5 Q.  How far was that from your office?
6 A.  Probably 25 minutes.
7 Q.  How far was that from your home, to the extent
8 you have a home in Austin?
9 A.  It's an hour and a half from my home.
10 Q.  When did you go there?
11 A.  I'm sorry.  I don't know.
12 Q.  Do you know approximately how many years ago?
13 A.  Three years.
14 Q.  Do you know the hours of operations of that
15 office?
16 A.  No.
17 Q.  What time of day did you go, do you recall?
18 A.  No.
19 Q.  Did you go during business hours, to the best
20 of your recollection?
21 A.  Yes.
22 Q.  How did you get to the driver's license office?
23 A.  I drove myself.
24 Q.  Do you remember waiting in line?
25 A.  Yes.

### 40

1 Q.  How long did you wait?
2 A.  I don't remember.
3 Q.  How would you have gotten to that office if you
4 hadn't had a car?
5 A.  Public transportation in Austin.
6 Q.  Could you remind me again, what office was this
7 that you went to, the driver's license office?
8 A.  I'm sorry.  I don't know the name of the
9 office.
10 Q.  Do you know approximately where it's located or
11 what street it's on?
12 A.  Approximately Burnet Road.
13 Q.  Is it your testimony that there's public
14 transportation to that office?
15 A.  No.  I can't testify that there is public.  You
16 asked me what if, and I don't know for sure that there
17 is.
18 Q.  Thank you for your testimony.  Do you have a
19 copy of your birth certificate?
20 A.  Yes.
21 Q.  If you lost it, do you know how you'd get
22 another one?
23 A.  Yes.
24 Q.  How?
25 A.  To request the town that I was born.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

|   | 41 |
|---|---|
| 1 | Q. Were you born in Texas? |
| 2 | A. Yes. |
| 3 | Q. Do you know how much it would cost? |
| 4 | A. No. |
| 5 | Q. And how would you go about getting a |
| 6 | replacement of your birth certificate? |
| 7 | A. Place a phone call to the -- I'm assuming its |
| 8 | county clerk and ask for a replacement. |
| 9 | Q. Do you think you could do that by phone, or |
| 10 | would you have to go in person? |
| 11 | A. I believe you can do it by phone. |
| 12 | Q. Would there be some cost associated with |
| 13 | obtaining that document? |
| 14 | A. I'm not advised. I don't know. |
| 15 | Q. When -- do you generally vote in elections? |
| 16 | A. Yes. |
| 17 | Q. Do you vote in person or by mail? |
| 18 | A. In person. |
| 19 | Q. When was the last time you voted? |
| 20 | A. Three days ago. |
| 21 | Q. How far is your polling place from your house? |
| 22 | A. 15 minutes. |
| 23 | Q. Is that by car? |
| 24 | A. Uh-huh. |
| 25 | Q. Do you ever vote early, early vote, or do you |

|   | 42 |
|---|---|
| 1 | vote on election day? |
| 2 | A. More often, early. |
| 3 | Q. Do you have any experience outside of your work |
| 4 | in the Texas State Senate on any election law-related |
| 5 | matters? |
| 6 | A. Please clarify. |
| 7 | Q. Do you have any -- strike that. |
| 8 | Do you have any experience related to |
| 9 | election administration? |
| 10 | A. Clarify. |
| 11 | Q. Have you ever volunteered as or worked as a |
| 12 | poll worker? |
| 13 | A. No. |
| 14 | Q. Have you ever worked as a poll watcher? |
| 15 | A. No. |
| 16 | Q. Have you ever participated in any other |
| 17 | capacity in serving any polling location on election day |
| 18 | or during early voting? |
| 19 | A. No. |
| 20 | Q. As a voter, have you witnessed any problems in |
| 21 | the polls firsthand? |
| 22 | A. Would that not be privileged? |
| 23 | MR. SWEETEN: I think she can ask you if |
| 24 | in your personal, in your life, if you've witnessed any |
| 25 | what was the problem with the -- with the -- she can ask |

|   | 43 |
|---|---|
| 1 | you that. That's -- I'm not asserting privileges to |
| 2 | that issue. |
| 3 | A. Ask it again, please. |
| 4 | MS. WESTFALL: Could you read back the |
| 5 | question, sir? |
| 6 | (Requested portion read back by the court |
| 7 | reporter.) |
| 8 | A. Again, I would ask you to narrow that question |
| 9 | down. "Problems" is a very broad word. Could be |
| 10 | parking. |
| 11 | Q. (By Ms. Westfall) I'm directing attention to |
| 12 | within a polling place, have you seen any voters having |
| 13 | problems in voting? |
| 14 | A. Yes. |
| 15 | Q. Could you describe the first problem that you |
| 16 | saw in a polling place? |
| 17 | A. Someone showing up at the wrong location to |
| 18 | vote. |
| 19 | Q. What happened to that individual? |
| 20 | A. They were instructed where to go to -- to vote. |
| 21 | Q. Have you ever witnessed anyone who was not |
| 22 | supposed to be in the polling location appearing to |
| 23 | vote? |
| 24 | A. Yes. |
| 25 | Q. Tell me about the first time you saw that. |

|   | 44 |
|---|---|
| 1 | A. The question I just answered before. They were |
| 2 | in the wrong location, and they were sent to another |
| 3 | location. |
| 4 | Q. Have you ever witnessed anyone who was trying |
| 5 | to impersonate another voter in a polling place? |
| 6 | A. No. |
| 7 | Q. Have you ever seen -- have you ever witnessed a |
| 8 | person who was not a US citizen attempting to vote? |
| 9 | A. No. |
| 10 | Q. Have you ever seen anyone challenging someone's |
| 11 | voter eligibility in a polling place? |
| 12 | A. Clarification, again. First answer I gave, the |
| 13 | answer is yes, because they were in the wrong location. |
| 14 | Q. Are you aware that -- that voters may be |
| 15 | challenged at the polls as not properly registered to |
| 16 | vote or otherwise eligible? |
| 17 | A. Please clarify. |
| 18 | Q. I'll strike that question. |
| 19 | Have you ever, when you've been in a |
| 20 | polling location, challenged a voter's eligibility to |
| 21 | vote? |
| 22 | A. No. |
| 23 | Q. Are you familiar with Section 5 of the Voting |
| 24 | Rights Act? |
| 25 | A. Yes. |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 45 | 47 |
|---|---|

**45**

1    Q.  What is your understanding of Section 5
2  requirements as a general matter?
3    A.  As per the 1965 Voter Rights Act, there were
4  certain states, mostly in the south, that were placed
5  under Section 5.  And placed -- given different
6  requirements than everyone else in the nation.
7    Q.  And I understand that you've testified that
8  you're not a lawyer, but can you tell me, to the best of
9  your ability, what the requirements are of Section 5,
10  sir?
11    A.  Currently, are you asking for currently or in
12  1965?
13    Q.  Currently today.
14    A.  Any election activity that happens in a Section
15  5 state, of which Texas is one, that all data pertaining
16  to that has to be cleared by the Justice Department
17  prior to the election, and there's obviously a cost,
18  administrative cost associated with that.
19    Q.  Is there anything else that you want to testify
20  about your understanding of Section 5 requirements, or
21  that is the sum total?
22    A.  That's it.
23    Q.  Do you believe that compliance with the Voting
24  Rights Act is important?
25       MR. SWEETEN:  Objection.  Relevance.  Go

**46**

1  ahead and answer.
2    Q.  (By Ms. Westfall)  You may answer.
3    A.  I believe when the Act was passed in '65, it
4  was important.  I believe today the Voting Rights Act
5  has outlived its useful life.
6    Q.  When do you believe -- first of all, what do
7  you mean by that, "outlived its useful life"?
8    A.  Should I?  Privilege on that?
9       MR. SWEETEN:  Well, here's how we'll --
10  let me instruct you as to that.  I don't want you to
11  reveal any sort of thoughts or mental impressions or
12  opinions about legislation or matters in furtherance of
13  the legislative process as it relates to bills.  And I
14  don't want you to reveal communications between you and
15  legislators or legislative staff, state agencies, Texas
16  Legislative Council or constituents.  If you can answer
17  that question without revealing those, then you can go
18  ahead and do so.  And you can at all times --
19    A.  I believe it's outlived its useful life.
20       MR. SWEETEN:  Okay.  You can also just
21  finish.  You can at all times include matters of the
22  public record.  You can discuss matters on the public
23  record, including committee hearings, proceedings,
24  debates, that sort of thing.
25       MS. WESTFALL:  Mr. Sweeten, I'm not asking

**47**

1  about any legislative act right now.  So I think your
2  instruction is inappropriate.  I would ask you to
3  withdraw it with regard to the question I asked.
4       MR. SWEETEN:  Well, I think he's answered
5  the question.  I think it's important that he not reveal
6  matters that would be legislatively privileged in
7  answering the question.  If he can answer it without
8  doing so, which I think he may have just done, then I'm
9  letting him do so.  So it's just as to matters that
10  could be legislatively privileged.  That's my
11  instruction.
12    Q.  (By Ms. Westfall)  Could you explain what you
13  mean by Section 5 having outlived its useful life?
14    A.  I believe it's outlived its useful life.
15    Q.  Could you explain what you mean by that?
16       MR. SWEETEN:  Same instruction.  Go ahead.
17    A.  I believe it's outlived its useful life.
18    Q.  (By Ms. Westfall)  And that's the sum total of
19  your response to my question?
20    A.  Yes.
21    Q.  When did that occur that it became -- that
22  Section 5 became no longer useful?
23    A.  I wouldn't attach a date to that time.
24    Q.  And what is the basis for your opinion?
25       MR. SWEETEN:  Same instruction.  Go ahead.

**48**

1    A.  I believe it has outlived its useful life.
2    Q.  (By Ms. Westfall)  Do you have any facts to
3  support that statement that you want to testify about
4  today?
5       MR. SWEETEN:  Same instruction.
6    A.  I believe it has outlived its useful life.
7    Q.  (By Ms. Westfall)  Do you receive any legal
8  advice on election-related legislation to ensure
9  compliance with Section 5?  And I'm just asking about
10  the fact of legal advice.  I'm not asking you to testify
11  about any conversations you've had with your attorneys
12  about Section 5.
13       MR. SWEETEN:  Okay.  And so -- so it's
14  clear.  She's not asking you about the substance of
15  communications.  She's simply asking you, do you receive
16  legal advice on that issue?
17    A.  I would claim privilege on that because any
18  advice I'm getting would be involving legislation.
19    Q.  (By Ms. Westfall)  Sir, your counsel has
20  instructed you not to reveal any -- the substance of
21  those conversations, but I'm sure your counsel would not
22  disagree with my assertion that I'm allowed to ask
23  whether you have received advice on compliance with
24  Section 5 of the Voting Rights Act.
25    A.  The answer is yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 49

1    Q.  Thank you.  And from whom?
2    A.  Counsel.
3    Q.  Mr. Sweeten?
4    A.  Not like -- well, Mr. Sweeten, obviously, we
5  have had conversations recently.
6    Q.  Do you have counsel for the -- that you -- that
7  you rely upon within your capacity as a Texas State
8  Senator for advice about Section 5?
9    A.  I do not have specific counsel that I rely on,
10  on Section 5.
11    Q.  Are there any attorneys at all that you relied
12  upon in drafting Senate Bill 14 pertaining to compliance
13  with Section 5?
14    MR. SWEETEN:  Okay.  If you're asking has
15  he communicated and did he have communications with
16  individuals?
17    MS. WESTFALL:  That's not my question,
18  Mr. Sweeten.
19    Court Reporter, would you read back the
20  question?
21    MR. SWEETEN:  Yeah.  Read back the
22  question.
23    (Requested portion read back by the court
24  reporter.)
25    A.  In the drafting of Senate Bill 14.

## 50

1    Q.  (By Ms. Westfall)  Consideration or anything
2  involving Senate Bill 14, did you -- I'm just asking
3  whether you relied upon the advice of counsel.
4    A.  Yes.
5    Q.  Who was that person?
6    A.  I couldn't give you specific counsel.
7    Q.  Was there an office that person was employed
8  with?  What entity housed the lawyer that you relied
9  upon for advice for Section 5?
10    A.  The counsel for the State of Texas generally is
11  the Attorney General's office.  We do have in-house
12  counsel that drafts legislation, the lawyers there that
13  obviously are involved in the drafting.
14    Q.  Who -- what office is that within --
15    A.  There's two groups in Texas.  One is the Texas
16  Legislative Council.  The second group, I'm sorry, I
17  can't pull up the name of it, but there is a second
18  group that does -- does secondary work.
19    Q.  Is that Engrossing and Enrolling, is it that
20  group?
21    A.  Yes, but that's not what it's called.
22    Q.  If you remember later today, will you tell me?
23    A.  Sure.  Yeah.
24    Q.  Doing my best to figure out the various
25  entities of the Texas State Senate, but I'll have to

## 51

1  rely upon your help.
2    So it is your testimony that you solely
3  relied upon advice from the Texas Legislative Council
4  for advice pertaining to compliance with Section 5 in
5  regards to Senate Bill 14; is that right?
6    A.  Yes.
7    Q.  Did you rely upon advice from the office of the
8  Attorney General as well in that regard?
9    A.  Yes.
10    Q.  What is Texas's current system for determining
11  how to verify the identity of a voter before section --
12  before SB 14 was enacted?
13    A.  The only requirement Texas has that if you show
14  your -- your voter registration card that is sent by --
15  in the mail to people, and whoever has that card in
16  their possession can walk up and vote.
17    Q.  Has this system failed to prevent voter fraud
18  in your view?
19    A.  No.
20    Q.  Are there any problems you can identify today
21  with the current system in identifying voter fraud?
22    MR. SWEETEN:  When you're answering this
23  question, I don't want you to reveal thoughts, mental
24  impressions or opinions about legislation or in
25  furtherance of the legislative process, or

## 52

1  communications that you've had among the entities that
2  we've talked about.
3    A.  It has been testified in the hearings on the
4  bill that there's been numerous occasions where a card
5  was either stolen out of a mailbox or given to someone
6  else and that person voted with that card.
7    Q.  (By Ms. Westfall)  Could you tell me when that
8  testimony occurred?
9    A.  When the bill was heard in 2009 and when the
10  bill was heard in 2011.
11    Q.  How many voters did that occur with, to the
12  best of your recollection?
13    A.  I don't recall that number.
14    Q.  Was it more than 10?
15    A.  Yes.
16    Q.  Was it 20?
17    A.  I don't have a number.
18    Q.  Do you know the witness who testified about
19  that activity that you just described?
20    A.  The one witness that comes to mind is Senator
21  Williams' father -- he was deceased and had been voting
22  for multiple elections.  Someone had his card and was
23  taking the card and voting.
24    Q.  Did that result in a conviction of that
25  individual?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 53

1   A.  To my knowledge, no.
2   Q.  Are you aware of any convictions on the basis
3   of -- related to the activity that you described?
4        MR. SWEETEN:  Can you reread the question
5   back?
6        MS. WESTFALL:  Mr. Sweeten, it's a matter
7   of public record, convictions.
8        MR. SWEETEN:  Okay.  I'm -- I didn't ask
9   that.  I'm asking for him to read the question back, if
10  he would, please.
11       MS. WESTFALL:  You may do so, sir.
12       (Requested portion read back by the court
13  reporter.)
14       MR. SWEETEN:  And when you say activity
15  described, he's talking about Williams's testimony on
16  the Senate.  So do you know?  You can answer that
17  question.
18       A.  I'm sorry.  I do not remember.  There has been
19  testimony on that, but I do not remember specific
20  convictions.
21       Q.  (By Ms. Westfall)  So sitting here today,
22  you're unaware, just to -- so I understand your
23  testimony, you're unaware of any convictions related to
24  the fraud that you described, which is stealing
25  someone's voter registration card.  Is that -- am I

### 54

1   correctly stating your testimony?
2        A.  You asked me to list specific ones, and I
3   cannot list specific ones.
4        Q.  Thank you, sir.  Other than that issue that you
5   just flagged as a potential problem under the current
6   law, are you aware of any other problems with the
7   current system for verifying a voter's identity under
8   Texas law?
9        MR. SWEETEN:  Again, don't reveal your
10  thoughts, mental impressions or opinions in furtherance
11  or about legislation.  Don't reveal communications that
12  you've had between legislators, legislative staff, state
13  agencies, Texas Legislative Council or constituents in
14  answering this question.  You can refer to matters in
15  the public record.
16       A.  Texas law is insufficient for making a person
17  identify who they are.
18       Q.  (By Ms. Westfall)  And thank you for your
19  testimony.  And what is the basis for that opinion,
20  other than what you've just testified about, which is
21  testimony regarding stolen voter registration cards?
22       MR. SWEETEN:  Okay.  In answering this
23  question, do not reveal mental impressions, thoughts or
24  opinions about legislation, okay, including Senate Bill
25  14.  And don't reveal communications that you've had

### 55

1   with any of the individuals or entities that we've
2   talked about in answering this question.  You can refer
3   to matters of the public record.
4        A.  In Texas, if someone has in their possession a
5   voter registration card and they go to the proper voting
6   location, they are allowed to vote.
7        Q.  (By Ms. Westfall)  And --
8        A.  Without identifying they are who they say they
9   are.
10       Q.  And it's -- it's your opinion that that creates
11  problems or are there any -- what I'm trying to ask you
12  is whether there are any facts that you haven't already
13  testified to that support your opinion.
14       MR. SWEETEN:  In answering this question,
15  do not reveal thoughts, mental impressions or opinions
16  about legislation or in furtherance of the legislative
17  process.  Okay?  Don't reveal the communications that
18  we've talked about with individuals or entities that
19  we've talked about under the privilege.
20       A.  It's been testified in testimony that it is
21  possible in Texas for someone to go to and present a
22  voter registration card that is not theirs, and if they
23  are on the list, they're allowed to vote and not asked
24  for identification.
25       Q.  (By Ms. Westfall)  So is it your testimony that

### 56

1   the problem with the current system is the potential for
2   in-person voter fraud, as you just described, is that
3   your testimony?
4        MR. SWEETEN:  In answering this question,
5   do not reveal thoughts, mental impressions, opinions
6   about legislation, including Senate Bill 14, and do not
7   reveal communications that you've had with legislators,
8   legislative staff, Texas Ledge Council, constituents or
9   state agencies.
10       A.  I claim the privilege on this question.
11       MS. WESTFALL:  Mr. Sweeten, it will be
12  possible that you could you shorten, shorthand your
13  objections so we don't have to spend much of the day
14  listening to the same objection over and over, and you
15  could have a shorthand understanding.  Is that something
16  I could ask for you to work out with your client?
17       MR. SWEETEN:  We can do that.  Why don't
18  we -- we can discuss that at a break.
19       MS. WESTFALL:  Okay.
20       MR. SWEETEN:  I know you don't want to
21  hear me sit here and go through this exercise.  At the
22  same time, I think it's important that I will
23  occasionally, you know, interject that.  But let's
24  continue as we are.  We will discuss sort of something
25  we can work out at the break.  Okay?  But I'll work with



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

|  | 57 |
| --- | --- |

1    you.
2              MS. WESTFALL:  I would like --
3              MR. SWEETEN:  I know you don't want to
4    hear me all day.
5              MS. WESTFALL:  I would like to remind you,
6    Senator, that -- and it's going to be very difficult
7    within a complicated deposition with your counsel
8    asserting privilege on your behalf and a lot of
9    interruptions, and we found in the last few days that
10   it's sometimes difficult to remember the question that
11   was posed.  But the way we're going to get through this
12   deposition in as quick a process as possible is if you
13   listen carefully to my question and answer it to the
14   best of your ability, if you decide to listen to the
15   advice of your counsel, taking that into account.  But
16   I'm now going to go back and ask that question again so
17   I can get an answer on the record.
18             Could you read the question back, Court
19   Reporter?
20             (Requested portion read back by the court
21   reporter.)
22             I'll claim privilege.
23        Q.  (By Ms. Westfall)  When was Senate Bill 14
24   signed into law?  To refresh your recollection, was it
25   approximately May 2011?

|  | 58 |
| --- | --- |

1         A.  That sounds correct.
2         Q.  Had there been elections held in Texas since
3    that time?
4         A.  Yes.
5         Q.  Approximately how many?
6         A.  I'm sorry.  I don't have that number.
7         Q.  To your knowledge, has the Secretary of State
8    or any county officials enforced Senate Bill 14 since it
9    was signed into law?
10        A.  No.
11        Q.  Have there been any -- and so you've been
12   operating under the current system before Senate Bill 14
13   is enforced; is that correct?
14        A.  Yes.
15        Q.  And have there been any problems related to
16   in-person voter impersonation, fraud, other problems
17   that you're aware of that occurred between May 2011 and
18   the present?
19        A.  I don't have that information.
20        Q.  So is the answer you're not aware of any
21   problems, sitting here today?
22        A.  My answer is I don't have that information.
23        Q.  When did you first hear any support for
24   enacting photo voter identification requirements in
25   Texas?

|  | 59 |
| --- | --- |

1              MR. SWEETEN:  In answering this question,
2    don't reveal your thoughts, mental impressions, opinions
3    about legislation or in furtherance of the legislative
4    process.  Don't reveal communications between the
5    entities or individuals that we've named.
6         A.  Ask the question again, please.
7              MS. WESTFALL:  Court Reporter, could you
8    read it back?
9              (Requested portion read back by the court
10   reporter.)
11        A.  2007.  No, late 2006.
12        Q.  (By Ms. Westfall)  Could you describe the
13   circumstances under which you heard about interest in
14   them -- in that issue?
15             MR. SWEETEN:  Same instruction.
16        A.  Privilege.
17        Q.  (By Ms. Westfall)  Could you tell me the --
18   could you identify the persons who expressed support for
19   such a law?
20        A.  No.
21        Q.  No, you don't know?
22        A.  Privilege.
23        Q.  I'm sure your counsel will agree that the
24   privilege doesn't extend to identifying the persons who
25   expressed support.

|  | 60 |
| --- | --- |

1         A.  Okay.  The answer is no, I don't have a
2    specific person.
3         Q.  So you don't recall at this time, or you do
4    recall?
5         A.  You're asking for the name of a specific
6    person.  The answer is no, I don't have a specific
7    person.
8         Q.  Was there a group of people who were supporting
9    it?
10        A.  No.
11        Q.  Not that you recall?
12        A.  There was not a group that brought the
13   legislation to me.
14        Q.  So you first heard the support in late 2006.
15   It's your testimony you can't remember individuals.
16   It's your testimony you can't remember any groups.  How
17   did you come to learn about the interest in photo ID?
18        A.  I believe my first contact of looking at it was
19   the Baker-Carter commission report that came out in '05,
20   and I believe I read documentation of that and the
21   recommendation of that group.
22             MR. SWEETEN:  Okay.  She can ask you, and
23   the court will allow her to ask you if you had
24   conversations with someone, who was present in the
25   conversations.  She can ask you the approximate date of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 61

1 that.  Do not, though, go beyond that and reveal the
2 substance of the communication or -- when she's asking
3 these questions.  I'm just going to instruct you.
4    Q.  (By Ms. Westfall)  Do you know why there was
5 support for photo ID in 2005?
6       MR. SWEETEN:  Don't answer.  Legislative
7 privilege.
8    A.  Privilege.
9    Q.  (By Ms. Westfall)  Are you not asking on the
10 basis of your counsel's advice?
11    A.  Yes.
12    Q.  Was there a time when photo -- voter ID law was
13 first introduced in the Texas legislature?
14    A.  Clarify.
15    Q.  In 2005, was there a bill?
16    A.  To my knowledge, I do not remember a bill in
17 2005.
18    Q.  Was there a bill in the House?
19    A.  Again, I don't remember.
20       MS. WESTFALL:  Could you mark this as
21 US --
22       MS. MARANZANO:  Has it been marked before?
23       MS. WESTFALL:  It hasn't been.  So what's
24 the next number?
25       MS. MARANZANO:  44.

---

## 62

1       MS. WESTFALL:  Could you mark this as U.S.
2 44, please?
3    Q.  (By Ms. Westfall)  You've been handed what's
4 been marked US 44.  Do you recognize this?
5    A.  I recognize it as a bill, but I don't -- has
6 this got a date on it?
7    Q.  I'll give you a moment to take a look.  I don't
8 believe it does have a date.  Oh, it does.
9    A.  The bill is set to have made -- to take effect
10 on September 1, 2009, so it would imply --
11    Q.  Of 2005?
12    A.  It's Senate Bill 362.
13    Q.  Oh, my apologies.
14       MR. SWEETEN:  You've got 362.  She's was
15 trying to get you 1706 here.  So let's change that out.
16       MS. WESTFALL:  Yeah.  Sorry.  So would you
17 mark this Exhibit 44.
18       (Exhibit 44 remarked for identification.)
19    Q.  (By Ms. Westfall)  You've been handed the
20 corrected copy of US 44.  Do you recognize this?
21 Have you had a chance to look at US 44?
22    A.  Yes.
23    Q.  Do you recognize this?
24    A.  Yes.
25    Q.  What is it?

---

## 63

1    A.  It appears to be legislation that was filed,
2 and again, it doesn't have a date on it for the
3 enactment.
4    Q.  Directing your attention to Page 10, which is
5 the last page of US 44.  Do you see a date on that, sir?
6    A.  Okay.  Okay.  Yes.
7    Q.  Does that refresh your recollection as to when
8 this bill was introduced?
9    A.  No.
10    Q.  Did you have any involvement -- and just for
11 the record's purposes, this is House Bill 1706, correct?
12    A.  Yes.
13    Q.  And does it appear that it was introduced in
14 2005?
15    A.  Yes.
16    Q.  Did you have any involvement whatsoever in this
17 bill?
18    A.  No.
19    Q.  Can you hand the witness what's been previously
20 marked as Exhibit 28?
21       MR. SWEETEN:  You can put that other one
22 aside, Senator Fraser.  And let's start with the stack
23 here so we don't lose any of these.
24    Q.  (By Ms. Westfall)  You've been handed what's
25 been previously marked as US 28.  Do you recognize this

---

## 64

1 document?
2       MR. SWEETEN:  Caution the witness to take
3 your time in reviewing the document before you answer
4 any questions on it.
5    Q.  (By Ms. Westfall)  Sir, have you had a chance
6 to look at this Exhibit 28, or do you need some more
7 time?
8    A.  No.  I've looked at it.
9    Q.  Do you recognize it?
10    A.  Yes.
11    Q.  What is it?
12    A.  It was a bill filed in the Texas House of
13 Representatives in 2007.
14    Q.  Do you recall who authored it?
15    A.  I recall because I can read the author's name
16 on the top of the -- the coauthors.
17    Q.  And who authored it?
18    A.  Brown of Kaufman, Berman, Bohac, Riddle, et al.
19    Q.  Did you or your staff play any role in
20 development of House Bill 218?
21    A.  Not to my knowledge.
22    Q.  Are you familiar with the provisions of House
23 Bill 218?
24    A.  Yes.
25    Q.  Could you tell me -- could you describe it,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 65

1 House Bill 218 for me?
2          MR. SWEETEN:  In answering this, don't
3 reveal thoughts, mental impressions or opinions about
4 legislation or in furtherance of the legislative
5 process, or any conversations that we've talked about.
6          MS. WESTFALL:  I would ask you to withdraw
7 that objection.  I'm asking him questions about the
8 bill, which couldn't be more public.  Do you agree,
9 Mr. Sweeten?
10          MR. SWEETEN:  I think -- I'm not sure that
11 the way you just phrased it is what the question asked,
12 but go ahead and you can -- we'll ask the court reporter
13 to read it back.
14          (Requested portion read back by the court
15 reporter.)
16          MR. SWEETEN:  Okay.  He can describe the
17 bill that's in front of him.
18          MS. WESTFALL:  Would you withdraw your
19 objection, Mr. Sweeten?
20          MR. SWEETEN:  If you're asking him to
21 describe the document in front of him, yeah, I'll
22 withdraw the objection.  Go ahead.
23          MS. WESTFALL:  Thank you.
24     Q.  (By Ms. Westfall)  Could you answer the
25 question?

## 66

1     A.  Could you repeat the question?
2     Q.  Certainly.  Could you describe House Bill 218
3 for me?
4     A.  No.
5     Q.  I believe you just testified you were familiar
6 with this bill, did you not?
7     A.  You asked me if I recognized the bill.
8     Q.  Are you unable to describe House Bill 218 for
9 me, sir?
10     A.  This is with a House Bill filed in part of the
11 House.
12     Q.  Can I turn your attention to the part of the
13 bill that may refresh your recollection?  Could you turn
14 your attention to Page 9 of Exhibit 28, House Bill 218?
15 Do you see on Page 9 it lists forms of acceptable
16 documentary proof of ID?
17     A.  What's that number?  I'm sorry.
18     Q.  Certainly.
19          MR. SWEETEN:  She's asking about Page 9,
20 Senator Fraser, I think.
21     A.  I know.  I'm thinking about something else.
22          MR. SWEETEN:  Okay.
23     A.  I'm trying to recall.  It's been a long time
24 ago.
25          What was your question?

## 67

1     Q.  (By Ms. Westfall)  I was directing you to the
2 list of IDs on Page 9.  Are you there?
3     A.  9?
4     Q.  On Page 9, Section 63.
5     A.  Yes.
6     Q.  So just to clarify, you testified earlier that
7 you were unfamiliar with House Bill 1706, is that right,
8 that was introduced in 2005?
9     A.  I didn't say that I was unfamiliar.
10     Q.  Could you clarify your testimony?
11     A.  You asked if I could describe.
12     Q.  Okay.  Are you able to describe any differences
13 between House Bill 1706 enacted in -- or introduced in
14 2005 and the bill that you have before you, Exhibit 28,
15 House Bill 218?  I just want to know if you're able to
16 do so.
17     A.  I am not able to do so.
18     Q.  Thank you.  Were you present at any meetings
19 during the development of House Bill 218?
20     A.  No.
21     Q.  Was any of your staff?
22     A.  I don't know.
23     Q.  Are you aware of any concerns that were raised
24 during the development of House Bill 218 about the
25 impact of House Bill 218 on Hispanic voters?

## 68

1     A.  Privilege.
2          MR. SWEETEN:  Don't -- yeah, that's
3 privileged.
4     Q.  (By Ms. Westfall)  Are you aware of purposes,
5 the purpose or purposes for House Bill 218?  And I'm
6 just looking for a "yes" or "no" answer.  Are you aware
7 of the purposes, and then we'll talk about what they
8 are?
9     A.  When the bill was filed?
10     Q.  Yes.
11     A.  No.
12     Q.  Are you aware of whether part of the purpose of
13 218 was to prevent noncitizens from voting?
14          MR. SWEETEN:  Objection, legislative
15 privilege.
16     A.  Privilege.
17          MS. WESTFALL:  I hand you what's been --
18 well, could you remark this as -- it's previously
19 marked.  Can you just remark this as 3?
20     Q.  (By Ms. Westfall)  I'm handing you what's been
21 previously marked as Exhibit 3.  Have you seen this
22 document before?
23     A.  As the date of this publication -- it says 4-12
24 on the printing.  Is that the date?
25     Q.  I would turn your attention to the top line of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 69

1  Exhibit 3, where it says Volume 23, Issue 46.  Does that
2  tell you, give you any indication about the date of this
3  document?
4      A.  No.
5      Q.  Have you ever seen this document before?
6      A.  I don't know whether I have or not.
7      Q.  Do you want to take a moment to take a look at
8  it and see if it rings a bell?
9      A.  Sure.  (Witness reading.)
10     Q.  Have you had a chance review Exhibit 3?
11     A.  I have.
12     Q.  Do you remember seeing the letter referenced in
13  Exhibit 3 from -- that was drafted from Lieutenant
14  Governor Dewhurst on voter ID?
15     A.  The answer is no, I don't remember seeing it.
16     Q.  And does it appear from this article that it
17  was -- that letter was written around the time of
18  consideration of House Bill 218?
19     A.  The attempt to consider?
20     Q.  Yes.  Does it appear that the letter was
21  written in conjunction with that --
22     A.  Yes.
23     Q.  -- particular piece of legislation?
24     A.  Yes.
25     Q.  Thank you, sir.

## 70

1          And do you see that this article refers to
2  two versions of a letter from Lieutenant Governor
3  Dewhurst; is that correct?
4      A.  No.  I don't see there's two letters.
5      Q.  All right.  Well, turning your attention to
6  Exhibit 3, does it -- does it appear that -- strike
7  that.
8          Do you know who would have written this
9  letter for Mr. Dewhurst and his staff?
10         MR. SWEETEN:  Objection, calls for
11  speculation.
12     Q.  (By Ms. Westfall)  Would it have been
13  Mr. Hebert?
14     A.  Privilege.
15     Q.  I don't believe that that's a proper response,
16  and your counsel will not -- will advise you.
17         MR. SWEETEN:  I'll instruct you.  On that,
18  I think her question is:  Do you know who wrote this?
19     A.  No.
20         MR. SWEETEN:  Okay.
21     Q.  (By Ms. Westfall)  Do you see in that letter
22  that is referred to in the Texas Weekly article,
23  Exhibit 3, that it urges support for House Bill 218 in
24  order to stop voting by people who are not US citizens?
25  At Paragraph 2 of the Texas Weekly article?

## 71

1      A.  Would you rephrase your question?
2      Q.  Yes.
3      Q.  Or re-ask your question?
4      Q.  Yes.  Turning your attention to the second
5  paragraph of the Texas Weekly article, Exhibit 3, does
6  it indicate that Mr. Dewhurst's support for 218 because
7  it will prevent noncitizens, people who are not US
8  citizens, from voting at the polls?  Do you see that?
9      A.  No.
10     Q.  You don't?  Does it indicate in the letter that
11  you, Senator Fraser, brought up in the Senate for
12  consideration, and I'm reading from Paragraph 2, "House
13  Bill 218 by Representative Betty Brown, which simply
14  requires voters to present a driver's license or some
15  other common form of identification at the election
16  polls to prove who they say they are, US citizens."  Do
17  you see that paragraph?
18     A.  I do see that paragraph.
19     Q.  And do you see down at Paragraph 4, that it
20  refers to testimony from Mr. Paul Bettencourt regarding
21  foreign nationals both applying for and receiving voter
22  registration cards?
23     A.  Would you show me where you're referencing?
24     Q.  Certainly.  The first sentence at Paragraph 4
25  of the Texas Weekly article starting with, "On June 22,

## 72

1  2006, Harris County Tax Assessor-Collector and Voter
2  Registrar Paul Bettencourt testified before the US House
3  Administration Committee that both foreign nationals are
4  both applying for and receiving voter registration
5  cards."  Do you see that sentence?
6      A.  I do.
7      Q.  Was that -- was preventing noncitizens from
8  voting part of the purpose of House Bill 218?
9      A.  Privilege.
10         MR. SWEETEN:  Yeah.
11         MS. WESTFALL:  You may answer.
12         MR. SWEETEN:  You can -- she's asking you
13  -- hold on a minute.  She's asking you about this
14  document.  Okay?  You can answer questions about, you
15  know, any public statements that you've made regarding
16  it.  But you don't have to reveal information, opinions,
17  mental impressions or thoughts about legislation.
18     A.  I didn't write this article.  I didn't make
19  that statement.  And I -- whoever Paul Bettencourt is,
20  obviously, he testified before the US House
21  Committee.  He didn't testify before my Senate
22  committee.
23     Q.  And Mr. -- this article refers to a letter
24  written by Lieutenant Governor Dewhurst in which he
25  expressed the views that I just read into the record,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 73

1  did he not?
2      A.  You're representing that this is a letter from
3  him.  I couldn't -- I can't validate that.
4      Q.  Let me ask you directly:  Was part of the
5  purpose of House Bill 218 to prevent noncitizens from
6  voting?
7          MR. SWEETEN:  I'm going to object to
8  legislative privilege.
9      Q.  (By Ms. Westfall)  Mr. Dewhurst -- well, strike
10  that.
11          Who would be the best -- strike that.
12          Would Mr. Dewhurst know about this letter?
13          MR. SWEETEN:  Objection, calls for
14  speculation.
15      Q.  (By Ms. Westfall)  You may answer.
16      A.  Privilege.  I don't know.  I'm not, you know, I
17  don't know.  I -- I don't know about this letter.
18      Q.  Do you think that if the Texas Weekly published
19  an open letter from Lieutenant Governor Dewhurst, and
20  sitting here today, you are unable to answer questions
21  about this, that Mr. Dewhurst would be the best person
22  that we could ask about this letter and the contents
23  thereof?
24      A.  Speculation.
25      Q.  Is there anybody --

## 74

1      A.  I do not -- you're asking me do I know.  I do
2  not know.
3      Q.  Who would know about this letter and about the
4  purposes expressed about House Bill 218?
5      A.  You'll have to ask them.  I do not know.
6      Q.  And by "them," you mean Mr. Dewhurst?
7      A.  Anyone you want to ask would be appropriate.  I
8  don't -- I don't know.
9      Q.  And I believe when I asked you whether
10  preventing US -- non-US citizens from voting was the
11  purpose of House Bill 218 you asserted privilege.  If
12  that is with regard to any private conversations over
13  which your counsel is asserting privilege, could you
14  identify the person with whom you had a conversation
15  about noncitizens voting and House Bill 218?
16      A.  Is that privilege?
17          MR. SWEETEN:  She's asking you and the
18  court will allow them to ask you questions that reveal
19  the name or legislator or staff involved in a
20  communication, the name of a constituent involved in a
21  communication, whether any individuals were privy to the
22  communication, the date on which the communication
23  occurred, or the form or medium of the communication or
24  the nature of general subject matter.
25          So you can identify those sort of

## 75

1  particulars about a contact or conversation.  Do not
2  reveal the specific content of contacts?
3      A.  Ask the question again.
4      Q.  Certainly.  Let me strike the question and ask
5  another one.
6          Did you ever have any conversations with
7  anyone about House Bill 218 and its purpose as it
8  pertained to preventing non-US citizens from voting?
9      A.  No.
10      Q.  Was part of the purpose of House Bill 218 to
11  prevent foreign nationals from applying for and
12  receiving voter registration cards?
13      A.  Privilege.  Privilege.
14      Q.  Did you ever have any conversations about the
15  purpose of House Bill 218 as it pertained to stopping
16  foreign nationals from applying for and receiving voter
17  registration cards?
18          MR. SWEETEN:  Same objection, legislative
19  privilege.
20      A.  Privilege.
21      Q.  (By Ms. Westfall)  Did you have any
22  conversations?  I'm sure your counsel will instruct you
23  that you can answer that question.
24      A.  Privilege.
25          MS. WESTFALL:  Mr. Sweeten.

## 76

1          MR. SWEETEN:  You can identify whether or
2  not you had a conversation with anyone and you can -- if
3  she's asking you the general subject matter, you can
4  answer about the date or time or who was involved in the
5  conversation.  Don't reveal the substance of the
6  conversation or communication.
7      A.  Ask the question again, please.
8      Q.  (By Ms. Westfall)  Senator Fraser, did you ever
9  have any conversations with anyone about House Bill 218
10  and part of its purpose being to prevent foreign
11  nationals from applying for or receiving voter
12  registration cards?
13          MR. SWEETEN:  I'm going --
14      A.  Not to my knowledge.
15          MR. SWEETEN:  And I'm also going to
16  interpose an objection, assumes facts not in
17  evidence.  But go ahead.  You've answered it, so we're
18  on to the next question.
19      Q.  (By Ms. Westfall)  Would, in your view, House
20  Bill 218 stop noncitizens from voting?
21          MR. SWEETEN:  I'm going to object --
22      A.  Privilege.
23          MR. SWEETEN:  -- yeah, as to legislative
24  privilege on that issue.
25      Q.  (By Ms. Westfall)  Would it stop foreign



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 77

1  nationals from receiving voter registration cards?
2      MR. SWEETEN: Same objection. Same
3  instruction. Legislative privilege.
4      A. Privilege.
5      Q. (By Ms. Westfall) Don't people indicate their
6  citizenship when they register to vote?
7      MR. SWEETEN: Time frame, are you asking
8  currently now? Are you asking in 2007?
9      MS. WESTFALL: I'm asking currently now.
10     MR. SWEETEN: Okay.
11     MS. WESTFALL: And then.
12     MR. SWEETEN: Do you understand the
13 question?
14     A. To my knowledge, no.
15     Q. (By Ms. Westfall) Do people affirm or indicate
16 their citizenship on voter registration applications in
17 Texas?
18     A. Clarify "affirm." Is there a question
19 "asked"? Is that what you're asking?
20     Q. I'm asking whether when you apply to register
21 to vote and submit a voter registration form in the
22 state of Texas today, do you swear or affirm or indicate
23 under penalty of perjury that you are a US citizen?
24     A. To my knowledge, yes, you do.
25     Q. Thank you for your testimony.

### 78

1      **As you sit here today, do you believe that**
2  **part of the purpose of House Bill 218 was to prevent**
3  **noncitizens from voting?**
4      MR. SWEETEN: Objection, legislative
5  privilege.
6      A. Privilege.
7      MS. WESTFALL: I'm asking him as he sits
8  here today --
9      A. Privilege.
10     MS. WESTFALL: -- his opinion, not based
11 upon a legislative act. Mr. Sweeten, will you
12 reconsider your objection?
13     MR. SWEETEN: Well, I think he wants a
14 break, and so let's -- we'll discuss it at the break.
15     MS. WESTFALL: No. Can we finish the
16 question?
17     MR. SWEETEN: Okay. Can you read the
18 question back, please?
19     (Requested portion read back by the court
20 reporter.)
21     MR. SWEETEN: Objection, asked and
22 answered.
23     Q. (By Ms. Westfall) You may answer.
24     **A. The purpose of the bill was to protect the**
25 **integrity of the voting box.**

### 79

1      MR. SWEETEN: Okay. We're going to take a
2  break.
3      MS. WESTFALL: Thank you. Why don't we
4  take a break for a few minutes and we can get some
5  coffee and come back in a few minutes.
6      (Lunch recess from 11:24 a.m. to
7  12:39 p.m.)
8      Q. (By Ms. Westfall) Okay.
9      A. Could I possibly go back and readdress an issue
10 that we had talked about earlier?
11     Q. Certainly.
12     A. The -- on Exhibit 28 that you handed me, which
13 is House Bill 218.
14     Q. Yes.
15     A. I answered that I was not familiar and had not
16 seen it because I thought this was the filed version
17 that had been filed in the House, and was not the
18 amended -- it was amended on the Floor, engrossed in the
19 House, sent to the Senate, and I picked the bill up. I
20 had not been following 218 as filed, which I assume it
21 is. I've since looked at the language and there's an
22 amendment that I recognize in this that was placed, I
23 believe, in the bill that came over. So I believe my
24 answer to your question you asked, is it 218 as you
25 handed it to me, yes, I am familiar with it because it

### 80

1  was the version that was sent to the House and I picked
2  up as to carry.
3      Q. Thank you for that.
4      A. So this -- this -- and I want to correct that.
5      Q. Thank you for that clarification. Just to be
6  clear: Exhibit 28, House Bill Number 218, is that the
7  -- do you believe it is the version that was received in
8  the Senate and engrossed in the House? Is that your
9  testimony?
10     A. I do believe this is the engrossed version as
11 amended in the House that came to the Senate and was the
12 bill that I picked up and took to the Floor.
13     Q. Thank you for that clarification. I appreciate
14 that.
15     MS. WESTFALL: Before we proceed,
16 Mr. Sweeten, will you, as we discussed during the break,
17 agree -- that we can have an agreement, that you can
18 assert legislative privilege and that will be an
19 objection that reflects objections that you've made more
20 fully previously during this deposition?
21     MR. SWEETEN: Right. And Counsel will
22 allow me to, in asserting the legislative privilege,
23 that that preserves the full objection that I had been
24 making throughout this deposition. Okay. That's fine.
25     MS. WESTFALL: Thank you.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

81

1    Q.  (By Ms. Westfall) Senator, we had been
2  discussing House Bill 218 before the break.  I'd like to
3  refer you to that bill again and ask you whether this
4  bill, House Bill 218, would prevent non-citizens from
5  voting?
6    A.  The --
7        MR. SWEETEN.  I'm going to object based on
8  legislative privilege.  I think that goes to effect.
9        THE WITNESS:  Do you think that's
10  privileged?
11       MR. SWEETEN:  Yeah.  I think it --
12       MS. WESTFALL:  Mr. Sweeten, I'm asking
13  about the effect of the bill, so outside of
14  conversations that you've -- that are -- I'm not asking
15  you to testify about anything -- personal conversations,
16  private things that you're alleging to be privileged, in
17  terms of conversations with other legislators, but to
18  the extent you can just testify about whether you
19  believe the bill on its face.
20    A.  And, again, if you get into belief, what I
21  believed, I would've claim privilege.
22    Q.  (By Ms. Westfall) Okay.  So you -- your
23  testimony is you cannot answer the question about
24  whether HB 218 --
25    A.  I'm saying it is privileged the way you asked

---

82

1  the question.
2    Q.  Okay.  And I'm going to counsel you, just
3  because we're having a back and forth, not to talk over
4  each other because the record will be very difficult to
5  read.  So I will try to wait for you answer, and if you
6  wait for me to interpose my question, I'd be grateful.
7        Let me ask it a different way:  Was HB 218
8  enacted, to the best of your recollection?
9    A.  I'm sorry?
10    Q.  Was it enacted and signed by the Governor in to
11  law?
12    A.  218?
13    Q.  Yes.
14    A.  No.
15    Q.  And if it had been and was precleared by the
16  Justice Department or otherwise approved under Section 5
17  through the courts and was enforced in Texas, is it --
18  do you believe that it would prevent non-citizens from
19  voting?
20       MR. SWEETEN:  I'm going to object to the
21  question as legislatively privileged.  It goes into his
22  beliefs.  I think, to help us, if you want to ask if a
23  specific provision as written in the text that you're
24  seeing would prohibit something, I think that would be
25  fine, but I think you're asking his overall believe, his

---

83

1  mental impressions, about the legislation.  So that's my
2  direction.
3    Q.  (By Ms. Westfall) Directing your attention to
4  Page 9 of Exhibit 28, Section 63.0101, on Page 9; do you
5  see that?
6        MS. WESTFALL:  Let the record reflect
7  witness is reviewing Exhibit 28.
8    Q.  (By Ms. Westfall) Do you see where it lists
9  documentation of proof of identification?
10    A.  Yes.
11    Q.  Would this section of the bill have the effect
12  of preventing non-citizens from voting?
13    A.  No.
14    Q.  Is it true as you understand it, sitting here
15  today, that non-citizens in Texas may obtain a Texas
16  driver's license?
17    A.  Yes.
18    Q.  Are you aware that in 2007, Royal Masset --
19  actually, strike that.
20        Who is Royal Masset?
21        MR. SWEETEN:  You can answer who he is.
22    A.  Royal Masset had been affiliated through party
23  politics off and on through the last ten years.
24    Q.  (By Ms. Westfall) And by party politics, do you
25  mean the Republican party of Texas?

---

84

1    A.  Yes.
2    Q.  Was he the former political director?
3    A.  I don't know.
4    Q.  Are you aware that he said something to the
5  effect of -- in -- that he said in 2007, "They're just
6  basically using sheer racism to pump up their own
7  political points; they're just trying to exploit public
8  fear of illegal aliens."  Are you familiar with that
9  quote?
10    A.  No.
11    Q.  Are you familiar with that sentiment?
12    A.  No.
13    Q.  You never heard Royal Masset make any
14  indication of that in the public or in the press?
15    A.  No.
16    Q.  What's your reaction to that quote?
17    A.  Privileged.
18    Q.  Could you identify -- did you have a
19  communication that you're referring to in asserting
20  privilege over?
21        MR. SWEETEN:  I think what she's asking
22  you is are you basing the privilege claim on -- on a
23  communication or on the fact that it would reveal
24  thoughts, mental impressions, opinions about
25  legislation?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 85

1       A.  I think I have to answer this in that the only
2   knowledge I have of this was an assertion made during
3   testimony in 2009.  That's the only time I've ever heard
4   of this issue and had any other knowledge other than it
5   was asserted by a member during testimony.
6       Q.  (By Ms. Westfall) In 2009, your -- could you
7   tell me about the testimony, on the record, that you're
8   referring to?
9       A.  I don't remember the member, but a member of
10  the legislature, and it was a Democrat member, made the
11  assertion that Royal Masset had made this quote.
12      Q.  And what is your reaction to the quote?
13          MR. SWEETEN:  Reaction would be asking for
14  -- objection, legislative privilege.
15      Q.  (By Ms. Westfall) Are you following the advice
16  of counsel?
17      A.  Yes, privilege.
18      Q.  Were there any other bills introduced in the
19  2007 legislative session that you recall related to
20  combatting issues pertaining to undocumented aliens?
21      A.  There was a legislation that was -- I'm sorry,
22  2007?
23      Q.  2007.
24      A.  I have no knowledge that I remember.
25      Q.  And yesterday, your chief of staff, Janice

## 86

1   McCoy, testified in deposition that you advised the
2   Lieutenant Governor's Office that you wanted to sponsor
3   House Bill 218 in the Senate; is that correct?
4       A.  That is correct.
5       Q.  Why did you want to sponsor House Bill 218?
6           MR. SWEETEN:  Objection, calls for
7   legislative privilege.
8       Q.  (By Ms. Westfall) Are you following the advice
9   of counsel?
10      A.  I am.  Privilege.
11      Q.  Is there any conversation that you had with
12  anyone in the Governor's Office concerning your desire
13  to sponsor H Bill -- HB 218?
14          MR. SWEETEN:  Objection.  I think you're
15  -- you're asking the specifics of the conversation.  He
16  can definitely identify whether a conversation occurred
17  with the Governor, but the subject matter is assumed in
18  your question.
19          MR. ROSENBERG:  But the subject, if I may
20  point to the order, we're allowed to get on the record
21  what the subject matter of the conversation was.
22          MS. WESTFALL:  Further, Mr. Sweeten, the
23  witness just confirmed that the testimony of Ms. McCoy,
24  that he indeed made that request to sponsor that
25  legislation.

## 87

1       A.  And did you --
2           MR. SWEETEN:  Hold on.  No, no, no.  No,
3   no, no.  Let me talk.
4           Would -- the subject matter, it was a
5   general subject matter, is what the court's order says.
6   The subject matter does not relate to -- he's not going
7   to identify the specific subject matter.  He can answer
8   the question as to whether or not he had conversations
9   with the Governor's Office.  You can ask about the
10  time.  You can ask about the subject, the general
11  subject matter, but the specifics, I think, are assumed
12  in the question is sort of the issue we're having.
13          MS. WESTFALL:  I'm not going to withdraw
14  my question.  I'm going to try another way.
15      Q.  (By ms. Westfall) Did you have any
16  conversations with anyone in the Lieutenant Governor's
17  Office about sponsoring HB 218 in the Senate?
18          MR. SWEETEN:  I'm going to let you answer
19  that question as phrased.  Do not reveal any additional
20  substance of any conversations other than yes or no.
21      A.  I would first ask for clarification.  You have
22  used Governor in one question and Lieutenant Governor in
23  the other question.  What is the question you're asking?
24      Q.  (By Ms. Westfall) Let's start with the
25  Lieutenant Governor.  Did you have any conversations --

## 88

1   did you or your staff have any conversations with
2   Lieutenant Governor or anyone in his office concerning
3   your sponsorship of HB 218?
4           MR. SWEETEN:  You can answer as phrased,
5   yes or no.
6       A.  Yes.
7       Q.  (By Ms. Westfall) Did you personally
8   participate in that meeting?
9       A.  You're inferring it was a meeting.
10      Q.  Did you personally participate in that
11  communication with the Lieutenant Governor's Office?
12      A.  No.
13      Q.  Did Ms. McCoy?
14      A.  My assumption --
15          MR. SWEETEN:  Answer if you know.
16      A.  My assumption is yes, that she would be the one
17  to do it.
18      Q.  (By Ms. Westfall) Do you know who else was in
19  that part of that communication?  And I'm sure your
20  counsel --
21      A.  No.
22      Q.  Okay.  How many conversations were there about
23  your sponsorship of HB 218 with the Lieutenant
24  Governor's Office?
25      A.  I -- I don't know that because I didn't have



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

89

1    one, so.
2        Q.   Do you know approximately when --
3        A.   Zero.  I had zero conversations.
4        Q.   Do you know approximately when this
5    conversation between Ms. McCoy and the Lieutenant
6    Governor's Office occurred?
7        A.   No.
8        Q.   Why did you want to sponsor HB 218?
9        A.   Privilege.
10           MR. SWEETEN:  Objection privilege.
11       Q.   (By Ms. Westfall) Did you have communications
12   with any election officials, either county or state,
13   concerning your sponsorship of HB 218?
14           MR. SWEETEN:  Objection, that's
15   legislatively privileged.
16       A.   Privilege.
17       Q.   (By Ms. Westfall) Yes or no answer for
18   establishing a privilege log.
19           MR. SWEETEN:  Okay.  You can answer if you
20   had a specific conversation with any election official?
21       A.   No.
22       Q.   (By Ms. Westfall) Are you familiar with
23   Secretary of State Roger Williams?
24       A.   Clarify "familiar."
25       Q.   Do you know him?

90

1        A.   Yes.
2        Q.   Do you know who he is?
3        A.   Yes.
4        Q.   Are you aware that Secretary of State Roger
5    Williams said something to the effect of he wasn't sure
6    a photo ID would improve turnout?
7        A.   Is the question am I aware that he said that?
8    No.
9        Q.   Are you aware of Secretary of State Roger
10   Williams having that sentiment and believing that in
11   2007?
12           MR. SWEETEN:  Don't reveal any
13   conversations that you had on this issue.
14       A.   No.
15           MR. SWEETEN:  Legislative privilege.
16           MS. WESTFALL:  He just testified he hasn't
17   had any conversations with Secretary of State Williams.
18   I'm not sure what -- this is about whether he's aware.
19           MR. SWEETEN:  Okay.  But if he's aware
20   because he heard from a staffer, because he heard from a
21   legislator or someone else, then that would be
22   privilege.  If he heard from public media sources,
23   public statements, that sort of thing, I think that that
24   would be not be.  So that -- it wasn't clear to me the
25   line you were drawing there.  But if it invaded the

91

1    conversations, that needed to be -- we needed to make an
2    objection.
3        Q.   (By Ms. Westfall) Do you think it's important,
4    when you're drafting election-related legislation, to
5    consult with the Secretary of State to obtain the
6    Secretary of State's view on potential legislation?
7            MR. SWEETEN:  Objection, privilege.
8        A.   Privilege.
9        Q.   (By Ms. Westfall) As a general matter?  Not as
10   regarding any particular legislation.  My question
11   stands.  Are you going to claim privilege again?
12       A.   Restate the question, please.
13       Q.   Do you think as a -- as a general matter, it is
14   advisable to consult with the Secretary of State of
15   Texas in crafting election-related legislation?
16           MR. SWEETEN:  I'm going to assert
17   privilege.  Objection, privilege.
18       Q.   (By Ms. Westfall) Are you following his advice?
19       A.   Privilege.
20       Q.   (By Ms. Westfall) Could you -- do you know the
21   party affiliation of Secretary of State Roger Williams?
22           MR. SWEETEN:  You can answer.
23       A.   Today or when he was Secretary of State?
24       Q.   (By Ms. Westfall) In 2007.
25       A.   No.

92

1        Q.   Do you know what his party affiliation is
2    today?
3        A.   Yes.
4        Q.   What is it?
5        A.   Republican.
6        Q.   Did you or your office conduct any analyses
7    prior to carrying House Bill 218 in the Senate?
8            MR. SWEETEN:  Objection.
9        A.   Privilege.
10           MR. SWEETEN:  Privilege.
11       Q.   (By Ms. Westfall) Did you have any
12   conversations about conducting any analyses prior to
13   carrying House Bill 218 in the Senate?
14       A.   Privilege.
15       Q.   (By Ms. Westfall) It's a yes or no answer.
16           MS. WESTFALL:  Mr. Sweeten?
17           MR. SWEETEN:  Well, in the question,
18   you're asking about conversations about analyses.  So
19   first, I think I'm going to object to the question as
20   vague and unclear as to what that would mean.  Secondly,
21   I think the question assumes -- I think that the
22   question does invade privilege to some degree.  He can
23   reveal conversations he's had if you want to ask him
24   about what specific state agencies, with legislators,
25   we're going to give the facts of the actual



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 93

1  communication. But when you're asking him, "What
2  conversations you've had in the course of your
3  analysis," I think that is overly broad, I think it's
4  vague, and I think it invades the legislative privilege.
5      MS. WESTFALL: Could you reread the
6  question, Court Reporter.
7      (The requested portion was read by the
8  court reporter.)
9      MR SWEETEN: Same objection.
10     Q.  (By Ms. Westfall) Are you following his
11  instruction?
12     A.  Yes.
13     Q.  Yesterday, Ms. McCoy testified that your office
14  did not conduct any analysis of House Bill 218; is that
15  correct?
16     MR. SWEETEN: I'm sorry, can you reread
17  the question, please?
18     (The requested portion was read by the
19  court reporter.)
20     MR. SWEETEN: First of all, I'm going to
21  object based upon legislative privilege.
22     You do not have to reveal any analysis
23  that -- that was conducted by or not conducted by your
24  office. So you don't have to answer that question.
25     Privilege.

## 94

1      MS. WESTFALL: Mr. Sweeten, Ms. McCoy has
2  waived the privilege as -- as pertaining to that
3  question and I would ask you reconsider that objection.
4      MR. SWEETEN: It's Senators Fraser's
5  privilege to assert. He is asserting the privilege and
6  we are so asserting it.
7      MS. WESTFALL: She testified about it
8  yesterday.
9      MR. SWEETEN: Okay.
10     MS. WESTFALL: And you did not make any
11  effort to claim that that was privilege or otherwise
12  prohibit that examination on that topic today. It's
13  been waived.
14     MR. SWEETEN: Well, I'm currently
15  objecting to it based upon legislative privilege. So I
16  am making an effort today for him not to disclose that
17  matter which would be privileged. Analysis, it relates
18  to his mental impressions, thoughts, or opinions about
19  legislation. I'm going to instruct him accordingly.
20     Q.  (By Ms. Westfall) Ms. McCoy is a long-term
21  staff person of yours, isn't she?
22     A.  Yes.
23     Q.  She's been working for you since 1992; isn't
24  that correct?
25     A.  No.

## 95

1      Q.  How long has she been working for you?
2      A.  I wasn't elected until '97.
3      Q.  My apologies. How long has she been working
4  for you?
5      A.  I think since 1999. I think she started two
6  years after I got in the Senate, I believe.
7      Q.  Would you describe her as a trusted advisor?
8      MR. SWEETEN: You can answer.
9      A.  Yes.
10     Q.  (By Ms. Westfall) She wouldn't tell you
11  anything that was untruthful, would she?
12     MR. SWEETEN: Objection, argumentative,
13  calls for --
14     Q.  (By Ms. Westfall) You may answer.
15     A.  Is it privilege? That's a judgment.
16     MR. SWEETEN: Objection, argumentative.
17  Objection, calls for speculation. Objection, vague.
18     With that you can answer the question to
19  the extent --
20     A.  I trust her judgment.
21     Q.  (By Ms. Westfall) Thank you. Ms. McCoy also
22  testified yesterday that you and your office did not
23  conduct an analysis of the impact of HB 218 on minority
24  voters; is that correct?
25     MR. SWEETEN: Do not discuss the analysis

## 96

1  that was performed or not performed.
2      So I'm going to object as to legislative
3  privilege?
4      A.  Privilege.
5      Q.  (By Ms. Westfall) Did you conduct any analysis
6  of the impact of HB 218 on minority voters?
7      MR. SWEETEN: Objection, privilege.
8      Q.  (By Ms. Westfall) Are you following the
9  instruction?
10     A.  Privilege.
11     Q.  Thanks. And we'll have to be careful because
12  we're going to make a mess of the transcript. But I
13  realize --
14     A.  All right. Okay.
15     Q.  (By Ms. Westfall) Okay. We need to make our
16  records, both of us.
17     Why didn't you -- strike that.
18     Could you describe the procedural history
19  of House Bill 218 after it was introduced in the House?
20     MR. SWEETEN: By procedural history, you
21  mean how -- how it went through the different committees
22  and legislative process, the public record, it's --
23     Q.  (By Ms. Westfall) Do you -- do you understand
24  the question, Senator Fraser?
25     A.  I do.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

97

1    Q.   Thank you.  Could you answer?
2    A.   I don't have that information.
3    Q.   Do you know whether it was passed in the House?
4    A.   Yes.
5    Q.   And then what happened after that?
6    A.   In the legislative process, when a bill leaves
7  the House, it is delivered to the Senate, and the bill
8  is referred to a committee, and a member can request
9  picking the bill up, or it -- it is assigned to
10 someone.
11   Q.   And I believe you testified earlier that you
12 had -- there were conversations about your interest in
13 carrying the bill; is that correct?
14   A.   No.  There -- that wasn't the conversation at
15 all.
16   Q.   Go ahead and clarify your testimony.
17   A.   Did you ask me a question?
18   Q.   Do you have an answer to that?  Is the answer
19 no?
20        MR. SWEETEN:  Is -- is -- I think he's
21 asking.
22   A.   There is no question.  You didn't ask a
23 question.
24   Q.   I said, I believe you testified earlier that
25 you had indicated interest in carrying HB 218 in the

98

1  Senate; is that correct?
2        MR. SWEETEN:  I'm going to object to the
3  extent it misstates any prior testimony.
4    Q.   (By Ms. Westfall)  You may answer.
5    A.   It's -- if you want -- if you want to pull up
6  -- I'll -- testament of what I've said, you can, but the
7  way you're stating the question, no, it is not correct.
8    Q.   How did HB 218 come to be carried by you in
9  the Senate?
10   A.   The conversations --
11        THE WITNESS:  Is that spec -- is
12 conversation within the office?
13        MR. SWEETEN:  If it -- if this relates to
14 conversations you've had with legislators --
15        THE WITNESS:  And/or staff?
16        MR. SWEETEN:  Staff, et cetera, then
17 that's legislatively privileged.
18   A.   Privilege.
19        MR. SWEETEN:  You can reveal basic
20 information about the conversations, date, time, but not
21 the substance of the conversation.
22   Q.   (By Ms. Westfall)  Let's move on.  Did you
23 monitor consideration of HB 218 in the House?
24   A.   No.
25   Q.   Did you learn of any concerns raised about HB

99

1  218 when it was being considered in the House?
2        MR. SWEETEN:  Objection, privilege.
3  Privilege.
4    Q.   (By Ms. Westfall) Are you aware of any
5  conversations that were had with anybody involving you
6  or your staff concerning concerns raised about HB 218 in
7  the House?
8        MR. SWEETEN:  You can answer to the extent
9  that you can reveal conversations or people involved in
10 those conversations.  Do not reveal the substance of
11 those conversations.
12   A.   Reread the question, please.
13        (Requested portion was read back by the
14 court reporter.)
15   Q.   Are you -- can you answer the question?
16   A.   No.
17   Q.   I believe you just testified that you carried
18 HB 218 in the Senate, correct?
19   A.   Yes.
20   Q.   Was there a reason for your interest in voter
21 ID?
22        MR. SWEETEN:  Objection, privilege.
23   Q.   (By Ms. Westfall) Did you have a conversation
24 with anyone about your interest in voter ID in 2007?
25        MR. SWEETEN:  You can answer whether or

100

1  not you had a conversation.  Don't reveal the contents
2  of the conversation.
3    A.   Ask the question again, please.
4    Q.   (By Ms. Westfall) Did you have any
5  conversations in 2007 related to your interest in voter
6  ID?
7    A.   I believe that's privileged because of nature
8  of the conversation.
9        MR. SWEETEN:  She can -- she can get a
10 general subject matter.  I do think interest in the bill
11 is getting a little towards general.  But I'm going to
12 let you answer the question as phrased.  So you can
13 answer whether conversations were held.
14   A.   What was the question again?
15   Q.   Were there conversations -- were you involved
16 in conversations regarding your interest in voter ID in
17 2007?
18   A.   Yes.
19   Q.   Who were the other parties to that
20 conversation?
21   A.   Privileged.
22        MR. SWEETEN:  You can testify as to who
23 you had conversations with regarding the issue,
24 regarding the subject matter that she's raised.
25   A.   Janice McCoy.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 101

1    Q.  (By Ms. Westfall) Anyone else?
2    A.  No.
3    Q.  Did you have more than one conversation?
4    A.  Yes.
5    Q.  With -- with Janice McCoy?
6    A.  Yes.
7    Q.  Were these conversations in writing at all?
8    A.  No.
9    Q.  Did an interest in preventing voter
10   impersonation prompt your interest in sponsoring --
11       MR. SWEETEN:  Objection.  Sorry.
12       MS. WESTFALL:  Let me finish my question.
13       MR. SWEETEN:  I'm going to.
14   Q.  (By Ms. Westfall) -- HB 218?
15       MR. SWEETEN:  Objection, privilege.
16   Q.  (By Ms. Westfall) And was HB 218 referred to
17   the State Affairs Committee?
18       MR. SWEETEN:  You can answer.
19   A.  I believe it was.  That, you know, to my
20   knowledge that's where it went.
21   Q.  (By Ms. Westfall) Did the committee hold a
22   hearing on HB 218?
23   A.  Again, to my knowledge, yes, that's normal
24   procedure.
25   Q.  What was your role in the committee in 2007?

## 102

1    Were you a member or were you the chair?
2    A.  A member.
3    Q.  Do you recall the hearing that was held on HB
4    218?
5    A.  I'm sorry, no, not in detail.
6    Q.  And Ms. McCoy testified yesterday that there
7    was a hearing on HB 218.  And it's correct, it's your
8    testimony, that there was one hearing?
9    A.  Again, I just testified, I don't -- I don't
10   remember the hearing, but I'm assuming there was.
11   Q.  Do you recall that -- do you recall the
12   identity of any witnesses at that hearing?
13   A.  No.
14   Q.  Janice McCoy testified yesterday that the
15   Republican party testified at the committee hearing on
16   HB 218; do you believe that to be correct?
17   A.  I -- I can't verify or not verify.
18   Q.  And Ms. McCoy testified yesterday that she made
19   Skipper Wallace aware that the committee was having a
20   hearing on HB 218; do you think that's correct?
21   A.  You're subjective.  You're asking what I think.
22   Q.  I'm asking whether --
23   A.  Privilege.
24   Q.  -- Ms. McCoy's statement is correct about
25   something that happened on the public record, and I'm

## 103

1    sure your counsel will instruct you that it's acceptable
2    as to the identity of witnesses at a hearing.
3        MR. SWEETEN:  Well, I'm -- you -- you can
4    answer this question as phrased.
5    A.  Ask the question again.
6        MS. WESTFALL:  Okay.  Could you repeat
7    that question, Court Reporter?
8        COURT REPORTER:  I'm going to have to go
9    back about two questions.
10       MS. WESTFALL:  You know what, why don't I
11   just save you the trouble.
12   Q.  (By Ms. Westfall) Ms. McCoy testified that she
13   made Skipper Wallace aware that the committee was having
14   a hearing about HB 218, and that Mr. Wallace testified;
15   is that correct?
16       MR. SWEETEN:  Objection, compound.
17   Go ahead.
18   A.  There's no reason for me to assume that she
19   didn't.
20   Q.  (By Ms. Westfall) Who is Skipper Wallace?
21   A.  He was a county Republican chair from a county
22   in my district.
23   Q.  And what county was that?
24   A.  Lampasas.
25   Q.  Is he still in that position?

## 104

1    A.  Yes.
2    Q.  How long has he held that position?
3    A.  I'm sorry, I don't know.
4    Q.  Do you know why Mr. Wallace has an interest in
5    voter ID?
6        MR. SWEETEN:  Objection, calls for
7    speculation.
8    Q.  (By Ms. Westfall) You may answer.
9    A.  Privilege.
10       MS. WESTFALL:  I'm not sure that is
11   privilege, Mr. Sweeten.  Could you think about directing
12   your witness to answer the question?
13       MR. SWEETEN:  Well, I mean, the question
14   very clearly calls for speculation.  You're asking why
15   Skipper Wallace believes -- or has an interest in, and
16   so it assumes facts not in evidence, it calls for
17   speculation.
18       With that, you can answer if you're able.
19   A.  I have no idea.
20   Q.  (By Ms. Westfall) Have you ever had
21   conversations about Mr. Wallace with photo ID in 2007?
22       MR. SWEETEN:  Did he have conversation
23   with Mr. Wallace?
24       MS. WESTFALL:  Yes.
25       MR. SWEETEN:  Okay.  You can testify as to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 105

1  the facts of the conversation, whether they occurred.
2  But don't reveal the substance.
3      A.  I don't remember conversations with Skipper
4  Wallace.
5      Q.  (By Ms. Westfall) Do you know whether Ms. McCoy
6  had conversations with Mr. Wallace about voter ID?
7      A.  I have no way of knowing.
8      Q.  Do you generally know whether Ms. McCoy has
9  conversations with groups or individuals?
10         MR. SWEETEN:  Objection, vague.
11      Q.  (By Ms. Westfall) You may answer.
12      A.  I don't always know who she's talking to.
13      Q.  Do you predominantly know who she's talking to?
14      A.  I don't always know --
15         MR. SWEETEN:  Objection, calls for
16  speculation.
17      Q.  (By Ms. Westfall) But listening very carefully
18  to my question, does she mostly let you know when she's
19  meeting with individuals or groups?
20         MR. SWEETEN:  Objection, calls for
21  speculation.
22      Q.  (By Ms. Westfall) You may answer.
23         MR. SWEETEN:  If you -- if you can, answer
24  the question, please.
25      A.  The answer is still the same.  She, you know,

---

### 106

1  she doesn't always tell me who she meets with, and I
2  don't always ask.
3      Q.  (By Ms. Westfall) And you're her direct
4  supervisor; is that right.
5      A.  Yes.
6      Q.  Do you recall, at the hearing on HB 218 before
7  the State Affairs Committee, whether there was any
8  concerns raised about the impact of HB 218 on minority
9  voters?
10         MR. SWEETEN:  At the hearing, you said?
11         MS. WESTFALL:  Right.
12         MR. SWEETEN:  Okay.  No -- no objection.
13         Go ahead.  You can answer.
14      A.  I'm sorry, I do not remember the hearing in
15  2007.
16      Q.  (By Ms. Westfall) Was the bill amended in the
17  State Affairs Committee?
18      A.  I don't remember whether it was or not.
19      Q.  After committee consideration, was it voted out
20  of committee?
21      A.  It had to be voted out of the committee to get
22  to the Floor.
23      Q.  Thank you.  Was it voted out of committee on
24  party lines?
25      A.  Again, I don't -- I don't remember the vote.

---

### 107

1      Q.  Do you remember any member of the Republican
2  party who voted against the bill?
3      A.  No.  I don't remember the vote.
4      Q.  Did you, after Committee voted it out, did you
5  bring it to the Senate Floor?
6      A.  You're -- the answer is no.  I did not bring
7  the bill to the Senate Floor.
8      Q.  Was HB 218 brought to the Senate Floor?
9      A.  It was recognized to be brought forward.
10      Q.  And who recognized it to be brought forward?
11      A.  I don't remember who was in the chair at the
12  time.
13      Q.  Was it Lieutenant Governor Dewhurst?
14      A.  I don't remember who was in the chair at the
15  time.
16      Q.  As a general matter, is the Chair of the Senate
17  would bring a bill, or how would it move from committee
18  to Floor?
19      A.  Whoever is sitting in the chair acting as
20  presiding officer would recognize the member.
21      Q.  Is there a way that it got on to the list of
22  bills to be considered for Floor consideration?
23      A.  When a bill comes out of committee, it is sent
24  to the Floor, and is put in the regular order of
25  business.

---

### 108

1      Q.  Did HB 218 jump the line, so to speak, from the
2  regular order of business, to be heard before other
3  bills that would ordinarily have come before it?
4      A.  I'm going to need to give an explanation.
5         MR. SWEETEN:  Okay.  You --
6         MS. WESTFALL:  I'm sure it would be
7  helpful to me.
8         MR. SWEETEN:  Well, I mean, you can
9  testify about matters of public record.  Okay?  You can
10  do that.  Don't reveal conversations that you've had
11  surrounding the bill, the substance of those
12  conversations.
13      A.  In 2007, there was a bill put in place that
14  acted as a blocker bill and it was the number one bill
15  on the agenda.  All bills, after that, in order to be
16  brought up, had to jump over that bill in order to be
17  heard.  So every bill heard was heard -- held -- heard
18  out of order.
19      Q.  (By Ms. Westfall) I see.  And was the blocker
20  bill a procedural requirement that required two-thirds
21  of senators to vote in favor of bringing a bill to the
22  Floor?
23      A.  It wasn't a procedural requirement.  It was a
24  Senate rule, an agreement, that that bill was placed
25  there.  And in order to bring up a bill, you had to jump

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 109

1  over the blocker bill.
2      Q.  I see.  And is it an ordinary practice for a
3  blocker bill to be put into place at the beginning of
4  session, in the Texas Senate in your experience?
5      A.  Not ordinary.
6      Q.  How did that arise in 2007?
7          MR. SWEETEN:  You can answer to the extent
8  that this doesn't invade privilege.  You can talk about
9  matters of the public record.
10     A.  In the 2007, the chairman of Administration
11 filed a bill, and that bill remained in place.
12     Q.  (By Ms. Westfall) What was the substance of the
13 bill?  What was the blocker bill?
14     A.  I'm sorry --
15     Q.  Can you describe it?
16     A.  It's usually something having to do with the
17 gardening of the state lawn.  It's...
18     Q.  I see.
19     A.  It was a -- administrative bill.
20     Q.  Did HB 218 require the support of two-thirds
21 Senators to be brought to the Floor for a vote?
22     A.  Yes.
23     Q.  Could you describe the two-thirds procedure,
24 for the record; how does it work?
25         MR. SWEETEN:  As a general matter?

---

### 110

1          MS. WESTFALL:  As a general matter.
2      A.  As a general matter, if I had a bill that I
3  wanted to get in front of the blocker bill, the Floor
4  would recognize me, let's say you're recognized for a
5  motion on House Bill 218.  I would say, "I now move to
6  suspend all necessary rules to take up and consider
7  Senate Bill 218.
8      Q.  I see --
9      A.  Or House Bill 218.
10     Q.  Sir, how many other sessions are you aware of
11 and served in, in which there has been a blocker bill
12 introduced?
13     A.  Well, I've only been in the Senate since '95 --
14 '97.
15     Q.  That's seems like a long time to me.  Could you
16 tell me how many times a blocker bill has been
17 interposed?
18     A.  During those sessions, at some point in every
19 session, there was a blocker bill that was put in place.
20     Q.  And so the blocker bill requires a two-thirds
21 vote to overcome?
22     A.  Yes.
23     Q.  Were you involved in bringing HB 218 to the
24 Senate Floor for a vote?
25         MR. SWEETEN:  You can reveal matters of

---

### 111

1  public record.  Don't reveal matters that are
2  legislatively privileged.  Involved could include
3  either.
4      A.  Clarify "involved."
5      Q.  (By Ms. Westfall) Were you're involved,
6  procedurally, in bringing HB 218 to the Senate for a
7  vote in terms of what you just testified to overcoming a
8  blocker bill.
9          MR. SWEETEN:  Same instruction, go ahead.
10         (By Ms. Westfall) You may answer.
11     A.  My involvement was that it was announced that
12 "Senator Fraser, you are recognized for a motion on
13 House Bill 218."
14     Q.  And I believe you testified earlier you didn't
15 know who was chairing the Senate at that time; is that
16 right?
17     A.  No.
18     Q.  Please proceed and describe the rest of the
19 procedure.
20         MR. SWEETEN:  Again, legislatively
21 privilege.
22         Information, don't provide.  Anything
23 public record, you're free to talk about.
24     A.  When I was recognized, I said, "I now move to
25 suspend all necessary rules to take up and consider

---

### 112

1  House Bill 218.
2      Q.  (By Ms. Westfall) When that exchange occurred
3  on the Senate Floor, how many Senators were present?
4      A.  Again, I don't know.
5      Q.  Do you recall if anyone was not present?
6      A.  No, I do not recall.
7      Q.  Was Senator Uresti not on the Floor at that
8  time?
9      A.  Again, I don't -- I don't recall.
10     Q.  Are you aware of Senator Uresti's vote on HB
11 218?
12     A.  I believe the record will reflect that Senator
13 Uresti voted not to suspend -- not to suspend.
14     Q.  Does that mean, in lay persons terms and
15 outside of Senate procedure, does that mean he was for
16 or against the bill?
17     A.  It is not a vote for or against.
18     Q.  It is a procedural prerequisite to voting on
19 the bill; is it not?
20     A.  I think your question is not correct.  It's
21 neither one.
22     Q.  Well, could you clarify your testimony or
23 explain to us?
24     A.  If you ask the correct question, I'll be glad
25 to.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 113

1    Q.   Is it a vote against considering the bill?
2    A.   It would be a vote against consideration of the
3    bill.
4    Q.   Thank you.  Was there a conversation, that
5    you're aware of, involving the timing of when HB 218 was
6    brought to the Floor?  It's a yes or no.  Was there --
7    was there a conversation?
8    A.   Between me?
9    Q.   I'm going to ask you about your knowledge of
10   the existence of a conversation.
11   A.   Privilege.
12   Q.   The existence.
13        MR. SWEETEN:  It's okay.
14   What she's saying is:  Was there a
15   conversation about that issue?  You can identify if a
16   conversation occurred, with whom it occurred, the date
17   it occurred, if you know.  But don't reveal the
18   substance of it otherwise.
19   A.   I have no knowledge of the conversation.
20   Q.   (By Ms. Westfall) So is it your testimony that
21   you just appeared on the Senate one day and you were
22   recognized?
23        MR. SWEETEN:  Objection.  I think that
24   misstates his testimony.
25        MS. WESTFALL:  You may answer.

---

### 114

1         MR. SWEETEN:  Argumentative.
2    A.   My testimony is that I was on the Senate Floor
3    and the chair said, "Senator Fraser, you are now
4    recognized for a motion on House Bill 218.
5    Q.   (By Ms. Westfall) How did you react to that;
6    were you surprised?
7         MR. SWEETEN:  Objection.  I think that
8    definitely asks for him to reveal thoughts, mental
9    impressions, opinions about legislation, in furtherance
10   of the legislative process, and therefore is
11   legislatively privileged.
12        MS. WESTFALL:  His human emotion and
13   reaction is part of the legislative process?
14        MR. SWEETEN:  It would be his mental
15   impressions or opinions about legislation.
16   Q.   (By Ms. Westfall) Are you not answering the
17   question?
18   A.   Privilege.
19   Q.   Was a vote held when Senator Uresti was not on
20   the Floor?
21   A.   I'm sorry?
22   Q.   Was this -- was a vote held on HB 218 when
23   Senator Uresti was not on -- on the Floor?
24   A.   The final vote --
25   Q.   I'm not asking you about the first vote.  Was

---

### 115

1    there a vote when he was not on the Floor?
2    A.   On a bill, there's only one vote.  The vote is
3    the vote that is in the record.  And my only
4    recollection is looking at the vote.  The vote failed to
5    suspend, there wasn't sufficient votes, so I'm assuming
6    that he was on the Floor and voted.
7    Q.   Was there a time in Floor consideration on HB
8    218 when Mr. Uresti did not -- was not on the Floor?
9    A.   I'm sorry, I don't -- I don't know the answer
10   to that.
11   Q.   Was Mr. Uresti sick that day?
12   A.   That would be subjective on my part.  I would
13   say privilege.
14        MR. SWEETEN:  Well --
15   A.   I --
16        MR. SWEETEN:  You -- if you don't know the
17   answer, then that's the answer.  She's asking the fact
18   of whether or not he was sick or not, or whether you
19   knew he was sick or not.  So you can just answer that
20   question.  That's -- that's -- we're not claiming
21   privilege as to that question.
22   A.   I don't -- I don't know whether he was sick or
23   not.
24        MR. SWEETEN:  Okay.
25   Q.   (By Ms. Westfall) Was there a verification of

---

### 116

1    the vote on HB 218 on the Floor?
2    A.   Every vote is a verification.
3    Q.   Were there, in essence, two votes on HB 218;
4    one when Mr. Uresti was not on the Floor, and one when
5    he was on the Floor to verify the vote?
6    A.   I -- I'm sorry, I don't remember.
7    Q.   And just so that we can have a -- in order to
8    facilitate our conversation, as you're an expert in the
9    Texas Senate rules and I'm not, if you could testify
10   about procedure, and grant me some latitude in my
11   questioning, it would make things go along faster.
12   Because I'm -- I -- there's a lot more, many more
13   sessions to cover in today's examination and --
14        MR. SWEETEN:  I'm not sure what you're
15   asking him to do --
16        MS. WESTFALL:  -- I don't want to delay
17   you --
18        MR. SWEETEN:  -- but my instruction to him
19   will be to just answer the question that's posed to him.
20   So that's what --
21        MS. WESTFALL:  Sure.
22        MR. SWEETEN:  -- he's going to do.
23        MS. WESTFALL:  And if we want to play
24   these games, we'll be here for a long, long time,
25   Mr. Sweeten.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 117

1    MR. SWEETEN:  It is not -- Counsel --
2    MS. WESTFALL:  And I'm going to have that
3  on the record.
4    MR. SWEETEN:  It is not a game, I assure
5  you.  I mean, I'm not sure if you're asking him to make
6  a speech on issues.  He's certainly not going to do
7  that.
8    MS. WESTFALL:  No, I --
9    MR. SWEETEN:  The way it works is, you ask
10  a question, he gets to answer.  He trying to do that.
11    MS. WESTFALL:  And I'm asking for
12  assistance as he is an expert in the procedures of Texas
13  State Senate and I am not.  To make sure that --
14    MR. SWEETEN:  I'm not even sure what the
15  -- what you're even asking him.  I mean, he -- he will
16  answer the question that's posed to him.  He will do the
17  best he can to answer that, to the extent it's not
18  privileged.  He's trying do that, will continue to do
19  that.
20    MS. WESTFALL:  Thank you, Mr. Sweeten.
21    Could you mark this as Exhibit 45.
22    (Exhibit 45 marked for identification.)
23    Q.   (By Ms. Westfall) You've been handed what's
24  been marked as Exhibit 45.  If you can take a look at
25  this document and let me know when you've had a chance

---

### 118

1  to review.
2    A.   (Reading.)
3    Q.   You know what, for the time being, Senator,
4  unless you have interest, I'm going to direct your
5  attention to the first page of the numbered paragraphs
6  so you need not read this entire declaration, which is
7  lengthy.
8    Senator, have you seen this declaration
9  before?
10    A.   No.
11    Q.   Turning your attention to Paragraph 6 and 7,
12  concerning the 2007 legislative session, do you have any
13  different view of the facts that Senator Uresti has set
14  forth in Paragraph 6 and 7?
15    MR. SWEETEN:  Okay.  To some degree, what
16  is contained in Paragraph 6 or 7 reveals conversations
17  that could have occurred within the Senate.  When you're
18  answering her question, make sure that -- that you're
19  not doing -- doing so.  And so I'm going to assert a
20  legislative privilege as to that.
21    To the extent you can answer her question
22  without revealing legislative privilege, because I think
23  some of this does not implicate it, that you can feel
24  free to do so.
25    A.   Privilege.

---

### 119

1    Q.   (By Ms. Westfall) This declaration pertains to
2  matters that some of which occurred on the Senate Floor,
3  does it not?
4    A.   Show me what happened on the Senate Floor.
5    Q.   Mr. Uresti appeared on the Senate Floor, on
6  Paragraph 7.
7    A.   And I will agree that that happened.
8    Q.   And also turning your attention to Paragraph 9,
9  do you have any different recollections than what
10  Senator Uresti has put forth in Paragraph 9?
11    A.   The -- no, that is not correct.
12    Q.   Could you -- could you indicate what you
13  disagree with in Paragraph 9?
14    A.   If a bill passes and the bill is suspended,
15  then you would move to the next step, which would be to
16  hear the bill.  There was never a final resolution of
17  the vote to vote to suspend.
18    Q.   Was that --
19    A.   And the vote was kept open.  So what -- the way
20  he's describing it here is -- is partially correct, but
21  not in its entirety.
22    Q.   Were you involved in any conversations
23  concerning keeping the vote open on HB 218?
24    A.   No.
25    Q.   What is Senator Uresti race or ethnicity?

---

### 120

1    A.   I don't know that I've ever asked him.  I have
2  an opinion, is that --
3    MR. SWEETEN:  You can answer to the extent
4  you know.
5    A.   I -- I believe that Senator Uresti is Hispanic.
6    Q.   Do you know what part of the state he
7  represents?
8    A.   San Antonio.
9    Q.   Does he represent a large area of the state
10  bordering the U.S. Mexico border, in part?
11    A.   He -- his district touches the Mexico boarder.
12    Q.   Did you have any concerns about holding a vote
13  on HB 218 given Senator Uresti illness?
14    MR. SWEETEN:  Objection, privilege.
15    Q.   (By Ms. Westfall) Are you following your --
16    A.   Privilege.
17    Q.   Did you have any concerns about holding a vote
18  on HB 218 given the constituency that Senator Uresti
19  represents?
20    MR. SWEETEN:  Same objection.
21    A.   Privilege.
22    Q.   (By Ms. Westfall) Was a request made to verify
23  the vote on 218?
24    MR. SWEETEN:  Are you asking on the Floor?
25    If it's public record, you can testify to

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**121**

1  it. If she's asking if there was a request made and it
2  involved internal communications, then that would be
3  privileged.
4      A.  The answer is no.  There was not a verification
5  of the vote.
6      Q.  (By Ms. Westfall) Did House Bill 218, was there
7  a failure to suspend regular order of business with
8  two-thirds of the vote?
9      A.  Yes.
10     Q.  What -- and could you tell me the purpose of
11  the two-thirds rule that you testified about earlier, as
12  a general matter, and, of course, procedurally?
13     A.  Well, that's privilege.  There's, you know,
14  everyone has a different opinion.
15         MR. SWEETEN:  Privilege.
16     Q.  (By Ms. Westfall) Well, I'm -- Mr. Sweeten, I
17  don't think it -- I'm not asking about a particular
18  legislative act, I'm asking about Senator Fraser's deep
19  knowledge of Senate procedures given his long history in
20  the Senate.
21         MR. SWEETEN:  Okay.
22         I -- we're going to let you answer as to
23  the general purpose of the rule.
24     A.  There is no purpose for the two-thirds rule.
25     Q.  (By Ms. Westfall) It's just a rule that's in

---

**122**

1  place for absolutely no reason?
2      A.  You're asking me.  And my response is there is
3  no...
4      Q.  And Ms. McCoy testified yesterday in her
5  deposition the purpose of the rule is to reach general
6  consensus on the bills.  Do you agree with her view of
7  the purpose of the two-thirds rule?
8      A.  No.
9      Q.  How do you -- why do you disagree?
10     A.  Privilege.
11     Q.  Ms. McCoy also testified that most bills are
12  brought under the two-thirds rule.  Do you agree with
13  that testimony?
14         MR. SWEETEN:  You can answer.
15     A.  I would not agree with the word "most."
16     Q.  How would you characterize it?
17     A.  Meaning?
18         MS. WESTFALL:  Mr. Sweeten, Senator Fraser
19  just refused to answer my question about the purpose,
20  whether the purpose of the two-thirds rule was general
21  consensus on bills.  And I believe that was an improper
22  refusal to answer my question.  Will you advice your
23  client as to the answer in the question?
24         MR. SWEETEN:  I thought he answered.
25         MS. WESTFALL:  I said, "Ms. McCoy

---

**123**

1  testified the purpose of the rule is general consensus
2  on the bills," and he said, "privilege" and didn't
3  answer.  Would you --
4          MR. SWEETEN:  Okay.  Well, I mean, the
5  preceeding question was, you asked him, well, is there a
6  purpose.  And he said there's no purpose. So he's
7  answered what he thinks the purpose is.  And now you're
8  coming back with "she says this, is she -- is she
9  right?"  I mean, by its own --
10         MS. WESTFALL:  It's a different question.
11         MR. SWEETEN:  Okay.
12         MS. WESTFALL:  About the purpose.
13         MR. SWEETEN:  So is the question, "Is
14  Ms. McCoy right about that"?  I think he's already
15  answered it, but if you --
16         MS. WESTFALL:  He said, "privileged."  We
17  can read back the record, Mr. Sweeten.
18         MR. SWEETEN:  You can answer that he
19  question.
20     A.  Privilege to waive the question when asked.
21         MR. SWEETEN:  Okay.
22     Q.  (By Ms. Westfall) I'll reask it:  Ms. McCoy
23  testified yesterday that the purpose of the two-thirds
24  rule is general consensus on bills.  Do you agree with
25  that?

---

**124**

1      A.  No.
2      Q.  Did the Senate take any further action on House
3  Bill 218?
4          MR. SWEETEN:  Don't reveal privilege.  You
5  can reveal matters of public record.
6      A.  To my knowledge, there was no other action
7  taken on 218 in that session.
8      Q.  Were there any conversations about 218 after it
9  failed to pass the Senate?
10     A.  Privilege.
11     Q.  And that's a yes-no question about whether
12  conversations --
13         MR. SWEETEN:  She -- just say if a
14  conversation existed.  Don't say what the conversation
15  entailed.  So, were there conversations, is her
16  question.
17     A.  Yes.
18     Q.  (By Ms. Westfall) How many?
19     A.  One that I can remember.
20     Q.  Were you directly involved or did you hear
21  about the conversation?
22     A.  I was directly involved.
23     Q.  And who else was in the conversation?
24         MR. SWEETEN:  You can identify who was a
25  party to the conversation.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**ESQUIRE**
DEPOSITION SOLUTIONS

## 125

1    A.  I don't remember the specific person.
2    Q.  (By Ms. Westfall) You were in a conversation
3   and you don't know who else was -- I mean, do you have a
4   general sense of whether it was a staff person or was it
5   a legislator?
6    A.  Yes.  I have a general sense.
7    Q.  Was it legislator?
8    A.  No.
9    Q.  Was it a staff person?
10   A.  I believe it was.
11   Q.  Was it a staff person in the Senate?
12        THE WITNESS:  How do I answer this?
13        MR. SWEETEN:  You can answer if -- who --
14   the identity of person to the best of your knowledge.
15   A.  I believe the conversation was with the
16  Lieutenant Governor's Office and I believe it was a
17  staffer.
18   Q.  (By Ms. Westfall) Was it Mr. Hebert?
19   A.  Not likely.
20   Q.  Was it Ms. Rathgeber?
21   A.  Possibly.
22   Q.  Was this in person or by phone?
23        MR. SWEETEN:  You can answer.
24   A.  In person.
25   Q.  (By Ms. Westfall) How soon after the vote on HB

## 126

1   218 did this occur?
2    A.  Not immediately.
3    Q.  A few weeks?
4    A.  A week.
5    Q.  Were there any other conversations, you recall,
6   about HB 218 after it didn't pass in the Senate?
7    A.  No.
8    Q.  Thank you.  Did you talk to -- actually do you
9   recall any conversations with anyone in the Governor's
10  Office after HB 218 failed?
11   A.  You're -- you're -- Governor Governor?
12   Q.  Governor Governor.
13   A.  No.
14   Q.  Do you recall any conversations about HB 218
15  after it failed in the Senate with anyone in the
16  Secretary of State's Office?
17   A.  No.
18   Q.  Or in -- with the Department of Public Safety?
19   A.  No.
20   Q.  Or with anyone, staff person or legislator, in
21  the House?
22   A.  No.
23   Q.  Did you file a photo ID bill in 2009 in the
24  Texas State Senate?
25   A.  Yes.

## 127

1    Q.  Do you remember the bill number?
2    A.  362, SB 362.
3        MS. WESTFALL:  Could you hand the witness
4   29, please.
5    Q.  (By Ms. Westfall) You've been handed what's
6   been previously marked as U.S. 29.  Do you recognize
7   this document?
8        MR. SWEETEN:  I'll tidy this up a little
9   bit here.  Which one do you need?  Are you done with
10  this?
11        Okay, you're asking about 29 right now, is
12  that right?
13        THE WITNESS:  362.
14        MR. SWEETEN:  Exhibit 29 though?
15        MS. WESTFALL:  Yes, yes.
16        MR. SWEETEN:  Okay.  Gotcha.
17        MS. WESTFALL:  They all look alike.
18        MR. SWEETEN:  Yes, they do.
19   Q.  (By Ms. Westfall) And do you recognize this
20  bill?
21   A.  Yes.
22   Q.  And what is it?
23   A.  Senate Bill 362.
24   Q.  This is as filed in the Senate or did this --
25   A.  I believe this is the bill that was -- we

## 128

1   filed.
2    Q.  Did you also file a bill SB 363?
3    A.  Yes.
4    Q.  And could you tell us about that bill and what
5   did it do?
6    A.  My only knowledge of that bill is seeing -- I
7   read in a press release last night of that bill, the
8   bill was filed of what we call a "shell," and to my
9   knowledge, the bill never moved and never had a hearing.
10   Q.  What does "shell" mean?
11   A.  It was a caption for a bill, if needed, to --
12  for a bill to, you know, to address an issue, but it
13  never -- it was never -- to my -- I don't remember
14  having a hearing on the bill.
15   Q.  Was it a placeholder in effect?
16   A.  Yes.
17   Q.  And did SB 362 and SB 363 kind of go hand-in-
18  hand with one another?
19   A.  No.
20   Q.  And why not?
21        MR. SWEETEN:  I'm going object to the
22  extent that calls for matters of his mental impressions,
23  opinions about legislation, and furtherance of the
24  legislative process.
25   Q.  (By Ms. Westfall) SB 363 pertained to voter



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

129

1    registration, did it not?
2         A.  I don't remember 363.
3              MS. WESTFALL:  Court Reporter, would you
4    hand him what's been previously marked as Exhibit 36.
5    Thank you, sir.
6         Q.  (By Ms. Westfall) I'm going to hand you what's
7    been previously marked as Exhibit 36.  Do you recognize
8    this document?
9         A.  What was the question?
10        Q.  Do you recognize this document?
11        A.  I recognize it is represented this is Senate
12   Bill 363.
13        Q.  Yes.  And do you see your name is at the top
14   left --
15        A.  I do.
16        Q.  -- as the person who introduced it; is that
17   right?
18              Is this -- does this bill require persons
19   to present documentary proof of citizenship when
20   registering?
21        A.  The bill, if passed, had a provision in it as
22   filed that would provide for proof of citizenship.
23        Q.  And these -- these bills were filed around the
24   same time, SB 362 and SB 363; is that right?
25        A.  It's implied if it's this next number, it

---

130

1    was --
2         Q.  That's what I was thinking too.  Thank you.
3              And turning your attention to Exhibit 29.
4    Can you identify the forms of identification that were
5    allowable in this bill?  And I would like to turn your
6    attention to Page 5, if that will help.
7         A.  And what would you like to know?
8         Q.  Could you just provide a general overview of
9    the -- not each and every one maybe, but just an
10   overview.
11        A.  An expired driver's license, a military ID card
12   that contains a photograph, a United States citizenship
13   certificate that contains a photograph, a license to
14   carry concealed handgun, an identification card that has
15   a persons photograph issued by a federal government
16   agency or a political subdivision of the state, and,
17   looks like, a typical proof of identification as a
18   voter's registration card.
19        Q.  And some other items that do not require a
20   photo; is that correct?
21        A.  That's true.
22        Q.  And the balance of Section 10; is that correct?
23        A.  You said the balance of section?
24        Q.  Well, you were at -- you were at Subsection B
25   -- I'm sorry, of -- Section 63.0101.

---

131

1         A.  The balance from B down.
2         Q.  Right.
3         A.  It lists 11 other pieces of identification.
4         Q.  Thank you.  Were you involved in the
5    development of Senate Bill 362?
6         A.  No.
7         Q.  You filed 362, didn't you?
8         A.  Yes.
9         Q.  Who developed it if you didn't?
10        A.  This is the bill that was passed -- this was
11   the bill that -- 218 that was passed by the House.  We
12   started with the House version that had passed the House
13   the year before.
14        Q.  So you just simply --
15        A.  Picked up.
16        Q.  -- refiled the --
17        A.  Refiled the Bill 218 that came over.  And I
18   want to clarify, that was my understanding.  It might
19   not be exactly word-for-word, but the intention was to
20   file --
21              MR. SWEETEN:  Don't talk about intention,
22   okay?  You're not talking about -- we're not here to
23   talk about our mental impression, opinions about
24   legislation.
25              THE WITNESS:  Okay.

---

132

1         Q.  (By Ms. Westfall) Are you following your
2    counsel's advice --
3         A.  Yes.
4         Q.  -- as to not further testify on the development
5    of the bill?
6         A.  Yes.
7         Q.  Okay.  When did you start developing Senate
8    Bill -- what became Senate Bill 362?
9         A.  I didn't develope 362.
10        Q.  Is your testimony you simply took House Bill
11   218 and filed it the following session?  In essence?
12        A.  In essence.
13        Q.  Did you, just to confirm, is that -- strike
14   that.
15              Did you look at legislation in any other
16   states.
17              MR. SWEETEN:  Don't reveal your thoughts,
18   mental impressions, opinions about legislation or
19   furtherance of the legislative process.  Answer that
20   question if you can reference matters of public record
21   or -- you can discuss public matters.
22              So objection, privilege.
23        A.  Privilege.
24        Q.  (By Ms. Westfall) Just -- and did you look at
25   any models of bills from any interest groups in drafting

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 133

1  Senate Bill 362?
2        MR. SWEETEN:  Same objection.  Objection,
3  privilege.
4        Don't -- don't reveal thoughts, mental
5  impressions, opinions about legislation or in
6  furtherance of the legislative process.
7     A.  Privilege.
8     Q.  (By Ms. Westfall) Did you look to any other
9  sources other than HB 218 in developing and drafting and
10  filing Senate Bill 362?
11    A.  No.
12        MR. SWEETEN:  Same objection.
13    Q.  (By Ms. Westfall) Did you have any
14  communications about Senate Bill 362 with other current
15  or former legislators who'd offered past photo ID bills,
16  before filing the bill?
17    A.  Privilege.
18        MR. SWEETEN:  You can answer as to the
19  fact of a communication, okay?  So you can say if -- if
20  you -- if conversations occurred, but you do not reveal
21  the substance of those.
22    A.  And this the 362 in '09?  Ask the question
23  again.
24    Q.  (By Ms. Westfall) Did you have any
25  communications about Senate Bill 362 with other current

### 134

1  or former legislators who had offered past photo ID
2  bills, or their staff?
3     A.  No.
4     Q.  Did you have any communications with the
5  Lieutenant Governor's Office staff, Governor's Office
6  staff, or anyone in an executive agency about Senate
7  Bill 362 before filing it?
8        MR. SWEETEN:  You can answer.
9     A.  Yes.
10    Q.  (By Ms. Westfall) Could you identify the staff
11  person with whom you had the conversation -- or the
12  person, the individual, with whom you had the
13  conversation?
14        MR. SWEETEN:  You can identify the person.
15    A.  I can't identify the person.  We just gave
16  notice that we were filing the bill to the Lieutenant
17  Governor's Office and --
18    Q.  (By Ms. Westfall) Was there a person in the
19  office to whom you gave that notice?
20        MR. SWEETEN:  You can answer as to the
21  identity of the person.
22    A.  I don't know for sure.  I assume it was Julia
23  Rathgeber.
24    Q.  (By Ms. Westfall) Did you personally make that
25  communication, or did Ms. McCoy on your behalf, or both

### 135

1  of you?
2     A.  I don't know for sure, but I believe it was
3  likely Ms. McCoy.
4     Q.  Was that -- was there one conversation with the
5  Lieutenant Governor's Office about the filing of 362?
6     A.  Yes.  It's all it would be.
7     Q.  Did you have any communications with officials
8  or legislators from other states including but not
9  limited to Georgia and Indiana concerning the drafting
10  of HB 362 before it was filed?
11    A.  No.
12    Q.  Did you have any conversation about Senate Bill
13  362 with any interest groups before it was filed?
14        MR. SWEETEN:  You can answer as to whether
15  or not a conversation occurred.  Do not discuss the
16  substance of the conversation.
17    A.  No.
18    Q.  (By Ms. Westfall) Did you have any
19  communications about Senate Bill 362 with any
20  individuals including constituents in Texas before you
21  filed it?
22    A.  Yes.
23    Q.  And who was the -- who was the person with whom
24  you had the conversation?
25        MR. SWEETEN:  You can reveal who the

### 136

1  conversation was with.  Do not reveal the substance of
2  the conversation.
3     A.  Skipper Wallace.
4     Q.  (By Ms. Westfall) Did you have one conversation
5  with Skipper Wallace?
6     A.  Yes.
7     Q.  Was it you personally, Ms. McCoy, both of you?
8     A.  Me personally.
9     Q.  And how far in advance did you advise
10  Mr. Wallace -- or had this conversation, pardon me,
11  about 326?
12        MR. SWEETEN:  I'm sorry, how far in
13  advance of what?
14        MS. WESTFALL:  Of the filing of the bill.
15        MR. SWEETEN:  Of the filing.
16        You can answer if you know.
17    A.  Fall of '08.
18    Q.  (By Ms. Westfall) Did he come into your office,
19  or where did this conversation take place?
20    A.  I don't remember the specifics.
21    Q.  Was it a phone call?
22    A.  Likely a phone call.  It was not in my office.
23    Q.  Do you regularly have communications with
24  Mr. Wallace?
25    A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 137

1   Q.  About once a week, once a month?
2   A.  Once a month.
3   Q.  Did you have one conversation with Mr. Wallace
4   about 362 before it was filed?
5   A.  Yes.
6   Q.  Did you have more than one?
7   A.  Not to my knowledge.
8   Q.  Did you have any communications with any other
9   constituents or individuals besides Mr. Wallace about
10  362 before it was filed?
11  A.  No.
12  Q.  I believe you testified earlier about the forms
13  of ID that are listed that are allowable in Senate Bill
14  362.  I want to turn your attention to those.
15      Why did you include the forms of allowable
16  photo ID that you included in 362 that you did?
17      MR. SWEETEN:  Why did you include those,
18  that's legislatively privileged.  Do not provide an
19  answer to that question.
20  A.  That's privileged.
21      MR. SWEETEN:  That's privileged.  Do not
22  answer that question.
23  A.  Yes, privileged.
24  Q.  (By Ms. Westfall) Let me ask you a question
25  about one of the forms of ID.

---

### 138

1       Do you need a minute?
2   A.  No.  I'm good.
3       MS. WESTFALL:  Okay.
4   Q.  (By Ms. Westfall) Turning your attention to
5   Senate Bill 362, do you see where it lists United States
6   military identification cards?
7       MR. SWEETEN:  What page?  I'll help him.
8       MS. WESTFALL:  It's page -- top of Page 6.
9       MR. SWEETEN:  Here.
10  Q.  (By Ms. Westfall) Could you -- do you see that?
11  A.  Uh-huh.
12  Q.  Could you describe what types of cards would
13  fall under this category?
14  A.  A United States military identification card
15  that contains the person's photograph.
16  Q.  Do you have any other information about the
17  types of cards that this would specify?
18  A.  It would cover United States military
19  identification cards that contains the person's
20  photograph.
21  Q.  Is it -- is it your testimony that -- that the
22  definition of military identification card is -- is
23  clear from the face of the statute?
24  A.  It is my testimony that this bill recognizes
25  that a United States military identification card that

---

### 139

1   contains the person's photograph is acceptable.
2   Q.  Do you know what federal agency would issue
3   such a card or agencies?
4   A.  I do not know that.
5   Q.  Was that discussed at all in -- in the drafting
6   or filing process for Senate Bill 362?
7       MR. SWEETEN:  Objection, privilege.
8   A.  Privilege.
9   Q.  (By Ms. Westfall) Turning your attention to a
10  little lower down on the page where it indicates it
11  would include valid ID cards containing a person's
12  photograph from an agency or institution of federal
13  government or agency or institution or political
14  subdivision of the state, do you see that?
15  A.  Uh-huh.
16  Q.  Would that include student IDs from state
17  colleges and universities to the best of your knowledge?
18  A.  I don't know the answer.
19  Q.  Did you have any communications with anyone
20  about the forms of ID to included in Senate Bill 362?
21      MR. SWEETEN:  You can reveal whether or
22  not a communication occurred.  Do not reveal the
23  substance of any such communication?
24  A.  No communication.
25  Q.  (By Ms. Westfall) You had no communications?

---

### 140

1   I'm sorry, I didn't hear you?
2   A.  No communication.
3   Q.  Thank you.  Do you know who would know the
4   answer to my previous question about whether student IDs
5   would be included in the passage of 362 we just
6   described?
7       MR. SWEETEN:  I mean, you're asking who
8   might know?
9   A.  Anyone that could clarify that if a university
10  -- state university is a political subdivision.
11  Q.  Right.  Who would -- who -- or for purposes of
12  this statute, is there any -- any person who would --
13  who you can -- sitting here today, who would know the
14  answer to that question?
15  A.  There's lot of people.
16  Q.  Pardon?
17  A.  Almost anyone but me.
18  Q.  So can you specify anyone?
19  A.  Sure.  Someone working for state government
20  could -- could verify that.  I could verify that with
21  time, but I can't answer -- answer it right now.
22  Q.  Did you analyze or direct anyone to analyze
23  which registered voters did not possess one of the photo
24  IDs identified in Senate Bill 362?
25      MR. SWEETEN:  Don't answer.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

141

1        Legislative privilege.
2    A.  Privilege.
3    Q.  (By Ms. Westfall) Did you read any research
4    about voter ID to assist you in drafting Senate Bill
5    362?
6    A.  Privilege.
7        MR. SWEETEN:  Same objection, legislative
8    privilege.
9    Q.  (By Ms. Westfall) Did you conduct or instruct
10   anyone to conduct an analysis of the impact of Senate
11   Bill 362 on minority voters?
12       MR. SWEETEN:  Same objection, privilege.
13   A.  Privilege.
14   Q.  (By Ms. Westfall) If 362 had been passed, would
15   it have been subject to the requirements of Section 5 of
16   the Voting Rights Act?
17   A.  Ask the question again.
18   Q.  If Senate Bill 362 had been passed, would it
19   have been subject to the requirements of Section 5 of
20   the Voting Rights Act?
21   A.  All voting legislation in a Section 5 state is
22   subject to the Voting Rights Act.
23   Q.  So is your answer that yes, it would have been?
24   A.  Yes.
25   Q.  Turning your attention back to Senate Bill 362,

---

142

1    I believe you testified earlier that it would allow a
2    voter to present forms of nonphoto ID; is that correct?
3    A long list on Page -- starting on Page 6 and continuing
4    into 7?
5    A.  Yes.
6    Q.  Why did you -- why did you include that
7    provision in the bill?
8        MR. SWEETEN:  Objection, legislative
9    privilege.
10       Do not reveal thoughts, mental
11   impressions, opinions about legislation.
12   A.  Privilege.
13   Q.  What was the purpose -- what is the purpose of
14   the nonphoto ID allowable in Senate Bill 362?
15   A.  Privilege.
16       MS. WESTFALL:  Mr. Sweeten?
17   MR. SWEETEN:  As the court has said, he
18   can provide -- let's read from the Court's Order:
19   "Privilege does not protect testimony with respect to
20   the general purpose or the purpose of a legislature as a
21   whole in enacting Senate Bill 14 as opposed to the
22   subjective intent of the legislator."  So, I think he
23   could testify as to the purpose of the bill, and I will
24   allow him testify as to the purpose of the overall bill.
25       MS. WESTFALL:  The purpose of this

---

143

1    provision is what I'm asking about, Mr. Sweeten.  I'm
2    going to restate my question.  You can decide how you
3    want to respond to this order.
4    Q.  (By Ms. Westfall) Could you read back -- well,
5    you know what, it's probably way back.  I'll -- just let
6    me redo the question.
7        As to Senate Bill 362, what was the
8    purpose of the provision allowing voters to use nonphoto
9    ID at the polls on election day?
10   A.  To protect the integrity of the ballot box.
11       MR. ROSENBERG:  Could you repeat that
12   back?  I didn't hear it.
13       MR. SWEETEN:  "To protect the integrity of
14   the ballot box."
15   Q.  (By Ms. Westfall) Okay.  And how would
16   including and allowing those forms of photo ID further
17   that purpose?
18   A.  To protect the integrity of the ballot box.
19   Q.  So is it your testimony that a voter -- it
20   would be acceptable under this bill and would further
21   that purpose to allow voters to present either photo or
22   nonphoto ID; is that correct?
23   A.  I would assert privilege on that.
24       MS. WESTFALL:  I will allow your counsel
25   to confer and then.... Let the record reflect there is a

---

144

1    colloquy between the state's counsel right now about the
2    privilege issues.
3        MR. SWEETEN:  Yeah.  We're all -- of
4    course there is.  We're considering the Court's Order
5    and its application to the facts of the case --
6        MS. WESTFALL:  Very good.
7        MR. SWEETEN:  -- which is not at all
8    times --
9        MS. WESTFALL:  I'm grateful.  I'm
10   grateful.
11       MR. SWEETEN:  Good.  I'm glad you are.
12   We're certainly going to follow the Court's Order.
13       I'm going to go on ahead and go on the
14   record.
15       The Court has, with respect to this
16   matter, the Court has -- has ordered that Texas will --
17   that the witness can testify as to the general purpose
18   or the purpose of a legislature as a whole, and in this
19   case it says enacting Senate Bill 14.
20       So he can testify about the general
21   purpose.  But for you to parse and to take specific
22   provisions out and then ask him each purpose is -- is
23   not, I think, in accordance with what the Court's Order
24   is.  We are going to, as he's sitting here, he can
25   testify as to the general purpose of the bill.  So we'll



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

145

1    allow that testimony.
2            MS. WESTFALL:  In other words, you're
3    directing him not to answer the last question on the on
4    the basis of privilege?
5            MR. SWEETEN:  Well, can we hear the last
6    question again?
7            MS. WESTFALL:  Can you search for my last
8    question, sir.
9            (Requested portion was read back by the
10   court reporter.)
11           MR. SWEETEN:  You're -- you're asking if
12   it would be acceptable under the bill.  I think you've
13   gone beyond what is the purpose of the bill.  He can
14   testify about the purpose of the bill.  I -- I think
15   you're going beyond what -- what he has to do.  He
16   obviously, you know, the Court has said that he doesn't
17   have to provide his subjective intent of the legislator
18   or other legislators.  He can testify about the purpose
19   of the bill.  He's done so.
20           So I think that's -- we're going instruct
21   as to privilege as to that issue.
22           MS. WESTFALL:  Okay.
23       Q.   (By Ms. Westfall) Did you have any
24   conversations with anyone about allowing nonphoto ID in
25   HB -- SB 362?

---

146

1            MR. SWEETEN:  You can testify as to
2    whether or not you had conversations on that issue.  You
3    can identify with whom the conversation was.
4        A.   Repeat the question.
5        Q.   Did you have conversations with anyone about
6    allowing nonphoto ID in Senate Bill 362?
7        A.   Yes.
8        Q.   Did you personally have a conversation or was
9    it Ms. McCoy on your behalf?
10       A.   I personally had a conversation.
11       Q.   And with whom did you have that conversation?
12       A.   Ms. McCoy.
13       Q.   Did you have that conversation with anyone else
14   other than Ms. McCoy?
15       A.   Yes.
16       Q.   Who else was in the meeting?
17           MR. SWEETEN:  Who was in the meeting is
18   all she's asking, just who was there?
19       A.   Senator Williams.
20       Q.   Was his staff or was he himself in the meeting?
21       A.   Only him.
22       Q.   When did that meeting take place?
23       A.   Prior to the bill coming to the Floor.
24       Q.   Did you have any other meetings you can recall
25   concerning the inclusion of nonphoto ID forms in Senate

---

147

1    Bill 362?
2        A.   Yes.
3        Q.   Who was that conversation with?
4        A.   Lieutenant Governor Dewhurst.
5        Q.   And when did that conversation occur?
6        A.   Prior to the bill coming to the Floor.
7        Q.   And was anyone else in that meeting beside you
8    and Mr. Dewhurst?
9        A.   I don't remember.
10       Q.   Was that in-person conversation?
11       A.   Yes.
12       Q.   Was that in his office or yours?
13       A.   His.
14       Q.   Do you recall any other conversations about
15   including nonphoto ID in Senate Bill 362?
16       A.   No.
17       Q.   Thank you.
18           Were there any -- are you aware of any
19   e-mails or other written communications concerning any
20   of the meetings you just testified about including
21   nonphoto ID in Senate Bill 362?
22       A.   No knowledge of any.
23       Q.   Are you familiar with the concept of Spanish
24   surnamed voter registration?
25       A.   No.

---

148

1        Q.   What was the purpose or purposes of Senate Bill
2    362?
3        A.   To protect the integrity of the ballot box.
4        Q.   Could you describe -- you just testified about
5    conversations between you and Lieutenant Governor
6    Dewhurst concerning nonphoto ID in Senate Bill
7    362.  Could you describe that conversation?
8        A.   Privileged.
9            MR. SWEETEN:  Yeah, don't reveal the
10   substance of the conversation.
11       Q.   (By Ms. Westfall) You just testified that you
12   had conversation with Senator Williams and Ms. McCoy
13   about including nonphoto ID in Senate Bill 362; is that
14   correct?  Could you describe that conversation?
15       A.   Privileged.
16           MR. SWEETEN:  Objection, privilege.
17       Q.   (By Ms. Westfall) So I believe you were
18   testifying about the purposes of Senate Bill 362; is
19   that correct?
20           MR. SWEETEN:  He did answer that question.
21       Q.   (By Ms. Westfall) And I -- and you said it was
22   -- I'm sorry, I -- I was talking about the
23   conversations.  Could you testify about -- strike that.
24           What were the purposes of Senate Bill 362?
25       A.   To preserve the -- the integrity of the ballot



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

|  | 149 |
|---|---|

1  box.
2  Q.  Anything else?
3  A.  No.
4  Q.  Is that the sole purpose of 362?
5  A.  Yes.
6  Q.  Is that why you introduced 362?
7      MR. SWEETEN:  Now, wait a minute.  Now
8  you're asking for his subjective intent of the -- as
9  opposed to the subjective intent of the legislator.  So
10  he's testifying as to purpose, and the Court has very
11  specifically said that this is not his subjective
12  intent.
13      I'm going to instruct you not to answer in
14  accordance with the Court's Order.
15  A.  Privilege.
16      MR. SWEETEN:  Which I hope you recognize
17  as well.
18      MS. WESTFALL:  I certainly do.  I have it
19  right in front of me, Mr. Sweeten.
20      MR. SWEETEN:  Right.  So do I.
21  Q.  (By Ms. Westfall) Did anyone ask you to
22  introduce Senate Bill 362?
23  A.  No.
24  Q.  Did you promise anyone that you would introduce
25  Senate Bill 362.

|  | 150 |
|---|---|

1      MR. SWEETEN:  I'm going to object.  I
2  think that you're asking for a specific content of a
3  communication and asking was he -- did he promise
4  someone.  If you want to ask if he had constituent
5  communications --
6      MS. WESTFALL:  We take the position that
7  falls outside the privilege.  That's outside the scope.
8      MR. FREDERICK:  Can we have just a moment
9  to confer.
10      MS. WESTFALL:  Certainly.
11      MR. SWEETEN:  Yeah, I'm going to go ahead
12  and assert privilege on -- on did he promise anyone to
13  -- with respect to the bill.  So I'm going to go ahead
14  and assert privilege as to that issue.
15  Q.  (By Ms. Westfall) Senator, did anything occur
16  between 2007 when HB 218 was introduced in 2009 when
17  Senate Bill 362 was introduced that caused you to
18  conclude there was a continued need for voter ID?
19      MR. SWEETEN:  I'm going to object.  That
20  calls for legislative privilege.
21  A.  Privilege.
22      MS. WESTFALL:  Thanks.  If you can make
23  sure the court reporter can hear you.
24  Q.  (By Ms. Westfall) Are you aware of any
25  in-person voter impersonation that caused you to believe

|  | 151 |
|---|---|

1  a voter ID bill was still needed in Texas.
2      MR. SWEETEN:  Objection, privilege.
3  A.  Privilege.
4  Q.  (By Ms. Westfall) You just testified that the
5  purpose of 362 was to preserve the integrity of the
6  ballot box.  What does that mean?
7  A.  To preserve the integrity of the ballot box.
8  Q.  Correct.  Could you explain a bit -- elaborate
9  a bit on that purpose?
10  A.  To preserve the integrity of the ballot box.
11  Q.  Does that mean that -- why does it need
12  preserving?
13  A.  We need to preserve the integrity the ballot
14  box.
15      MR. SWEETEN:  Yeah, I'm going to assert
16  privilege.  He said what he thought the purpose is.  And
17  he's answered the question.
18  Q.  (By Ms. Westfall) Was a there a lack of
19  integrity in the ballot box in 2009?
20      MR. SWEETEN:  I think that's privileged.
21  A.  Privilege.
22  Q.  (By Ms. Westfall) Had you had any conversations
23  with election officials about the integrity the ballot
24  box in 2009?
25      MR. SWEETEN:  You're asking him if he had

|  | 152 |
|---|---|

1  conversations about the integrity of the ballot box.  I
2  think we're getting a little more in a subjective -- I
3  mean, we're getting a fairly substantive description in
4  the preface of your question.  I think if you would
5  re-ask it and just ask about whether he's had contact
6  with the election officials, we won't have any objection
7  whatsoever as to that.
8      MS. WESTFALL:  Okay.  I'm going to keep my
9  question on the record and not withdraw it.
10  Q.  (By ms. Westfall) But did you have any
11  conversations with election officials in advance of
12  filing Senate Bill 362?
13  A.  Yes.
14  Q.  Which election officials?
15  A.  Those that testified on the bill in 2007.
16  Q.  And who were those?
17  A.  I don't remember the names.
18  Q.  Were they county officials?
19  A.  Yes.
20  Q.  Did they include any state officials?
21  A.  No.
22  Q.  Did it include Mr. Paul Bettencourt?
23  A.  I can't verify it was Mr. Bettencourt.
24  Q.  Do you recall which counties?
25  A.  I believe it was Houston.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 153

1    Q.   Did you have any conversations with any other
2  election officials outside of those public proceedings
3  in 2007 prior to filing SB 362?
4    A.   No.
5    Q.   What was -- are there any bases or facts that
6  you can identify related to the purpose of SB 362, which
7  you just testified was to preserve the integrity of the
8  ballot box?
9    A.   Privilege.
10        MR. SWEETEN:  Objection, privilege.
11   Q.   (By Ms. Westfall) Can you tell me how 362
12 preserves the integrity of the ballot box?
13        MR. SWEETEN:  Objection, privilege.
14   A.   Privilege.
15   Q.   (By Ms. Westfall) Did you become aware of any
16 convictions on -- for in-person voter impersonation
17 between 2007 and 2009?
18   A.   Rephrase the question.
19   Q.   I'm here to ask you --
20   A.   Not rephrase -- repeat the question, not
21 rephrase.  Repeat.
22   Q.   Okay.  Good.  I liked my question.
23        MR. SWEETEN:  I'm going to object on
24 privilege anyway so go ahead and ask it.
25        MS. WESTFALL:  Well, let's let it be.

---

### 154

1    A.   Privilege.
2    Q.   (By Ms. Westfall) Very good.
3         How does Senate Bill 362 -- how is it more
4  effective in preventing in-person voter impersonation
5  than -- than current law?
6         MR. SWEETEN:  Objection, privilege.
7    Q.   (By Ms. Westfall) Under current law, voters
8  must verify their identity by bringing their voter
9  registration certificate, correct?
10   A.   Repeat the question, please.
11   Q.   Under current law voters must verify their
12 identity by bringing their voter registration
13 certificate to the polls on election day; is that
14 correct?
15   A.   No.
16   Q.   Tell me how I'm not correct?
17        MR. SWEETEN:  She's asking you under
18 current law, the requirement.
19   A.   There are multiple options of which one of
20 those is to show your voter identification card.
21   Q.   (By Ms. Westfall) So how is Senate Bill 362
22 more effective than current law under which one -- a
23 voter may show a voter registration certificate or other
24 forms of ID --
25        MR. SWEETEN:  Objection --

---

### 155

1    Q.   (By Ms. Westfall) -- to be verified at the
2  poll.
3         MR. SWEETEN:  Objection, privilege.
4    A.   Privilege.
5    Q.   (By Ms. Westfall) Does Senate Bill 362 address
6  issues of non-citizens voting?
7         MR. SWEETEN:  Objection, privilege.
8    A.   Privilege.
9    Q.   (By Ms. Westfall) Can you identify any
10 non-citizen who has voted in any election in Texas?
11        MR. SWEETEN:  Objection to the extent that
12 this would require you to reveal thoughts, mental
13 impressions, opinions about legislation in furtherance
14 of the legislative process.  However, if it's not under
15 that category or relates to communications you've had,
16 you can answer outside of those.
17   A.   Privilege.
18   Q.   (By Ms. Westfall) Have you ever had any
19 conversations with anyone concerning the identity of any
20 non-citizen who has voted in any election in Texas?
21        MR. SWEETEN:  Don't reveal legislatively
22 privileged information.
23   A.   Privilege.
24   Q.   (By Ms. Westfall) It was concerning
25 conversations, the existence thereof.

---

### 156

1         MR. SWEETEN:  Okay.  Can you say it again?
2         MS. WESTFALL:  Certainly.
3    Q.   (By Ms. Westfall) Have you ever had a
4  conversation with anyone concerning the identity of any
5  non-citizen who has voted in any Texas election?
6         MR. SWEETEN:  There's a lot of substance
7  in that question as to what the conversation was
8  about.  If you want to narrow that down, I'll let him
9  answer whether conversations occurred and facts about
10 the conversation.
11        MS. WESTFALL:  I don't.  I want that on
12 the record.
13        MR. SWEETEN:  Okay.  On that we'll object.
14        MS. WESTFALL:  On the basis --
15   A.   The question is?  Repeat the question, please.
16   Q.   (By Ms. Westfall) Have you -- can you -- have
17 you had any conversations concerning the identity of any
18 non-citizen who has voted in any election in Texas?
19        MR. SWEETEN:  I've got to object on
20 privilege.
21   Q.   (By Ms. Westfall) Are you following your
22 counsel's advice?
23   A.   Privilege.
24        MR. SWEETEN:  Elizabeth, let me offer that
25 if -- if we've objected to that question, if you're

---


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

157

1  trying to seek similar information that is not as
2  descriptive as his conversation, we're more than happy
3  to work with you to try to have an answer to the
4  question you're seeking.
5      Q.  (By Ms. Westfall) Have you -- are you aware of
6  any conversations related to non-citizen voting in
7  Texas?
8          MR. SWEETEN:  Yeah, yeah.  I'm going to
9  let you answer that whether or not you had any
10 conversations.
11     A.  I'm not aware of conversations.
12     Q.  (By Ms. Westfall) I'm going to hand you what's
13 been previously marked as or I'm going to have the court
14 reporter hand you what's been previously marked as
15 Exhibit 31.
16         MS. WESTFALL:  Or maybe I can.  Here you
17 go, sir.
18         MR. ROSENBERG:  31?
19         MS. WESTFALL:  Yes.
20     Q.  (By Ms. Westfall) Do you recognize this
21 document?
22     A.  Yes.
23     Q.  And what is it?
24     A.  Press release from my office December 15, 2008.
25     Q.  And do you see it concerns the Senate Bill 362

---

158

1  and 363 about which you just testified today?
2      A.  Yes.
3      Q.  Have you ever heard of any registered voter
4  indicating that the voter was not going to vote because
5  he or she was concerned their vote would be diluted by
6  illegitimate votes?
7      A.  Privilege.
8          MR. SWEETEN:  To the extent, I mean,
9  here's the distinction here:  You don't have to reveal
10 thoughts, mental impressions, or opinions about
11 legislation in furtherance of the legislative process or
12 communications that we've outlined before.  She can ask
13 you about public statements that are made and matters of
14 public record.  And so if it is -- falls in one of the
15 areas of privilege, you don't have to reveal that, if
16 there is.  She can ask you about the public statement
17 though.
18     A.  Privilege.
19     Q.  (By Ms. Westfall) And this press release, when
20 was it dated?
21     A.  December 15, 2008.
22     Q.  Did Ms. McCoy draft it?
23     A.  Yes.
24     Q.  And it, as to Senate Bill 363, it expresses
25 concern about ensuring that only legal citizens can cast

---

159

1  a ballot, does it not?
2      A.  Repeat the question.
3      Q.  Senate Bill 363, well, this press release
4  Exhibit 31, indicates that the purpose of 363 is to
5  ensure that only legal citizens cast a ballot, does it
6  not?
7      A.  Our current laws state that only legal citizens
8  can cast a ballot.
9      Q.  Do you agree with that, that that statement is
10 included and you're quoted in your press release; is
11 that right?
12     A.  The statements is -- our current laws state
13 that only legal citizens can cast a ballot.
14     Q.  And Senate Bill 363, as explained in this press
15 release, would require voter applicants to prove that he
16 or she is a United States citizen by furnishing a birth
17 certificate or a naturalization oath; is that right?
18         MR. SWEETEN:  Are you reading from this?
19         MS. WESTFALL:  I am.  I'm asking him to
20 just confirm that what's in the document is in the
21 document.
22     A.  It's require a voter to prove he or she is a
23 United States citizen by furnishing a birth certificate
24 or, if it's a naturalized citizen, the city, state and
25 year of taking the naturalized oath.

---

160

1      Q.  (By Ms. Westfall) Did you have any concern that
2  Senate Bill 363 would be burdensome to people trying to
3  register to vote?
4      A.  Privilege.
5          MR. SWEETEN:  Don't reveal privileged
6  information.
7      Q.  (By Ms. Westfall) Do you know of any other
8  states that are -- require producing a birth certificate
9  or naturalization oath to register to vote?
10         MR. SWEETEN:  Don't reveal privileged
11 information.
12     A.  Privilege.
13     Q.  (By Ms. Westfall) Are you aware that the state
14 of Arizona requires documents of proof of citizenship to
15 vote?
16         MR. SWEETEN:  Objection, privilege.
17     A.  Privileged.
18     Q.  (By Ms. Westfall) And are you aware that
19 Arizona has been involved in fiercely fought voter
20 rights litigation over that issue for years?
21         MR. SWEETEN:  Objection to the extent it
22 calls for privilege.
23     A.  Privileged.
24     Q.  (By Ms. Westfall) And what did you mean,
25 Senator Fraser, when you said in Paragraph 4, voting is

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

161

1    one of our most important rights as Americans but it's
2    also a responsibility.
3         A.  I meant that voting is one of our most
4    important rights as Americans but it is also a
5    responsibility.
6         Q.  (By Ms. Westfall) What did you mean by the word
7    "responsibility?"
8         A.  I meant that voting is a one of our most
9    important rights as Americans but it also is a
10   responsibility.
11        Q.  Do you think -- you have to be responsibile to
12   vote, is that what mean?
13        A.  I meant that voting is one of our most
14   important rights as Americans but it also is a
15   responsibility.
16        Q.  I -- it sounds to me I've asked the question
17   three times and is it -- is it your testimony today that
18   you do not have further explanation of the words on the
19   face of this press release and you're not going to
20   answer my question?
21        A.  I believe that voting is one our most important
22   rights as Americans, but it's also a responsibility.
23        Q.  Did you have communications -- are you aware of
24   any communications with legislators or staff who opposed
25   Senate Bill 362?

---

162

1         A.  Privilege.
2         Q.  Did you have any communications with
3    legislators who opposed Senate Bill 362 regarding the
4    purpose of Senate Bill 362?
5              MR. SWEETEN:  Objection, privilege.
6         A.  Privilege.
7         Q.  (By Ms. Westfall) Who, besides you, were the
8    main proponents of Senate Bill 362?
9              MR. SWEETEN:  To the extent you can refer
10   the matters of public record?
11        A.  Its co-sponsors.
12             MR. SWEETEN:  Matters that are privilege,
13   you can --
14        A.  Co-sponsors of the bill were Senator Estes,
15   Senator Nelson, Senator Nichols.
16        Q.  (By Ms. Westfall) Was this legislation a
17   priority for other people in the Texas government
18   besides the sponsors of the bill?
19             MR. SWEETEN:  Don't reveal privileged
20   information.
21        A.  Privilege.
22        Q.  (By Ms. Westfall) Was this legislation a
23   priority for Lieutenant Governor?
24        A.  Privilege.
25             MR. SWEETEN:  Objection, privilege.

---

163

1         Q.  (By Ms. Westfall) Was this legislation a
2    priority for the Governor?
3              MR. SWEETEN:  Same objection.
4         A.  Privilege.
5         Q.  (By Ms. Westfall) Was Senate Bill 362 a
6    priority for anyone outside the Texas government, such
7    as interest groups, other states, people outside of the
8    state?
9              MR. SWEETEN:  To the extent this would
10   require you to reveal thoughts, mental impressions,
11   opinions about legislation in furtherance of the
12   legislative process, don't answer that.  Or
13   communications with any of the individuals or entities
14   named, then don't answer it.  To the extent it
15   does not do so, you're free to answer.
16        A.  Privilege.
17        Q.  (By Ms. Westfall) Did any groups representing
18   minority voters support Senate Bill 362?
19             MR. SWEETEN:  Same objection, same
20   instruction.
21        A.  Privilege.
22        Q.  (By Ms. Westfall) Did you have any
23   communications with anyone supporting Senate Bill 362?
24             MR. SWEETEN:  You can answer whether or
25   not you've had communications and facts about those

---

164

1    communications.  Other than -- but don't reveal the
2    substance.
3         A.  Ask the question again.
4         Q.  (By Ms. Westfall) Did you have any
5    communications with any individuals or groups supporting
6    Senate Bill 362?
7         A.  Yes.
8         Q.  Could you name each and every one of those
9    individuals or groups?
10        A.  Skipper Wallace.
11        Q.  Who else?
12        A.  The only one, Skipper Wallace.
13        Q.  That's the sum total of the supporters you
14   talked to other than legislators and their staff who
15   were supporting the bill; is that correct?
16        A.  Yes.  That was a nod -- that was nod-head yes.
17        Q.  You're getting in the swing of things here in
18   terms of the transcript.  Thank you.
19             Who were the main opponents of Senate Bill
20   362?
21             MR. SWEETEN:  Objection, calls for
22   legislative privilege.
23        A.  Privilege.
24        Q.  Do you know you why -- do you know why
25   opponents oppose Senate Bill 362?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 165

1       MR. SWEETEN: Objection, privilege.
2       A.   Privilege.
3       Q.   (By Ms. Westfall) Did you have any
4   conversations with any bill opponents?
5       A.   Privilege.
6       Q.   Conversations?
7       MR. SWEETEN: You can testify about the
8   facts of conversations. Who you talked to, what day,
9   and how long, the duration of them, but don't reveal the
10  substance of the conversation.
11      THE WITNESS: You said I --
12      MR. SWEETEN: You can testify as to
13  whether you had conversations with -- with opponents as
14  long as they're not privileged. I mean, for example, if
15  you talked to a legislator about it, it would be a
16  privilege. You can talk to -- you can say whether or
17  not you had a conversation with an opponent. You can
18  list the name of the person on the --
19      THE WITNESS: But if it's a legislator,
20  would it be privileged?
21      MR. SWEETEN: You can identify whether or
22  not you had a conversation. Don't reveal any of the
23  substance whatsoever.
24      A.   I had a -- had a conversation with an -- an
25  opponent.

### 166

1       Q.   (By Ms. Westfall) And what -- who was that
2   opponent?
3       A.   John Whitmire.
4       Q.   When was that conversation?
5       A.   I don't remember.
6       Q.   Did you have conversations -- was that the only
7   bill opponent you had a conversation with about SB 362?
8       A.   Likely that I had more. I believe I had a
9   conversation with Rodney Ellis, Senator Ellis.
10      Q.   Was Ms. McCoy at either one of those meetings?
11      A.   No.
12      Q.   Was this a one-on-one meeting with the member?
13      A.   Yes.
14      Q.   Did you have any other conversations with any
15  other bill opponents, legislators or staff?
16      A.   I don't remember having a conversation.
17      Q.   Do you recall when you had a conversation with
18  Mr. Whitmire?
19      A.   Whitmire probably was in the fall before Ellis,
20  would probably have been during the session.
21      Q.   Can -- can you describe the general issue, I
22  mean, the general purpose, or the general discussion
23  that you had with Mr. Whitmire?
24      A.   Privilege.
25      MR. SWEETEN: No, don't -- don't reveal --

### 167

1       A.   Privilege.
2       MR. SWEETEN: I mean, well, general. I
3   think you've already done so when you said has he had --
4   has he had conversations with opponents of the bill. I
5   think he's testified as to the fact of the conversation
6   and he's revealed that he's had discussions with the
7   opponents.
8       Q.   (By Ms. Westfall) And you had one conversation
9   with Senator Whitmire?
10      A.   Likely more than one.
11      Q.   Did, after that, just temporally -- actually,
12  that was before you filed Senate Bill 362; is that
13  right?
14      A.   Yes.
15      Q.   And you also had a conversation with Senator
16  Ellis; is that correct?
17      A.   Yes.
18      Q.   Could you tell me the general nature of that
19  conversation?
20      A.   Privileged.
21      Q.   When was -- did that conversation occur?
22      A.   Likely, after session started.
23      Q.   Was it after you filed the bill?
24      A.   Yes.
25      Q.   Was there any change made to the bill

### 168

1   temporally after that time?
2       A.   No.
3       Q.   I'm -- I'm -- we're going break in one
4   second. Let me just finish.
5       Did you take any steps with regard to the
6   Senate Bill 362, to try to address any concerns raised
7   by bill opponents?
8       A.   Privilege.
9       MR. SWEETEN: Objection, privileged.
10      MS. WESTFALL: Okay. Why don't we take
11  ten minute break.
12      MR. SWEETEN: Okay.
13      (Recess from 2:31 to 2:47 p.m.)
14      MS. WESTFALL: Back on the record.
15  Q.   (By Ms. Westfall) Senator, what was your role in
16  trying to get Senate Bill 362 passed in the Senate?
17      MR. SWEETEN: Objection, legislative
18  privilege.
19      A.   Privilege.
20      Q.   (By Ms. Westfall) What procedures did you use
21  to try to ensure that SB 362 would pass the Senate?
22      MR. SWEETEN: Objection, privilege.
23      A.   Privilege.
24      MS. WESTFALL: Will you allow him to
25  testify about publicly known procedures?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 169

1    MR. SWEETEN:  I will let him testify --
2    well, I'm not going to let him reveal his thoughts,
3    mental impressions or opinions about legislation or in
4    furtherance of the legislative process.  That's covered.
5    So I'm -- I think the way it's phrased, I can't allow
6    him to answer that, so no, I'm going to object on
7    privilege grounds.
8         Q.  (By Ms. Westfall)  Are there any publicly known
9    and publicly available procedures that you used to get
10   Senate Bill 362 passed through the Senate?
11        MR. SWEETEN:  I think it still -- I think
12   that's implying a purpose, and therefore, is
13   legislatively privileged.  I mean, I think you could ask
14   the general what procedures occurred on a factual basis
15   with respect to the bill.  I don't think that that would
16   -- I would have an objection to that.
17        Q.  (By Ms. Westfall)  Okay.  What procedures were
18   employed to -- in conjunction with consideration of
19   Senate Bill 362 in the Senate?
20        MR. SWEETEN:  I think that's still -- it's
21   still infirm.  I object, privilege.
22        Q.  (By Ms. Westfall)  What was your strategy for
23   getting Senate Bill 362 passed?
24        MR. SWEETEN:  Same objection, privilege.
25        A.  Privilege.

---

### 170

1         Q.  (By Ms. Westfall)  When you introduced Senate
2    Bill 362, did you know how many senators would support
3    it?
4         MR. SWEETEN:  Objection, privilege.
5         A.  Privilege.
6         Q.  (By Ms. Westfall)  Did you try to make any
7    determination about the number of senators who would
8    support Senate Bill 362 prior to bringing it to the
9    Floor?
10        MR. SWEETEN:  Objection, privilege.
11        Q.  (By Ms. Westfall)  Sir, are you relying upon
12   advice of counsel?
13        A.  Privilege.
14        Q.  Thank you.  Did you know how many senators
15   would support 362 prior to your bringing it to the
16   Floor.
17        MR. SWEETEN:  Objection, privilege.
18        A.  Privilege.
19        Q.  (By Ms. Westfall)  Did you have any
20   conversations about how much support 362 had prior to
21   bringing it to the Floor?
22        MR. SWEETEN:  Objection, privilege.
23        MS. WESTFALL:  The existence of
24   conversations?
25        MR. SWEETEN:  He can talk about -- well,

---

### 171

1    let me think, about the privilege of your questioning
2    again.
3         Court reporter, can you reread that
4    question, please?
5         (Requested portion read back by the court
6    reporter.)
7         MR. SWEETEN:  That reveals his thoughts,
8    I'm afraid.  I'm going to object on privilege.
9         If you want to rephrase the preface of the
10   question.  You know, general subject matter is one
11   thing.  That is more than general subject matter.  So if
12   you want to change the question, we may allow him to
13   answer.
14        Q.  (By Ms. Westfall)  Did you have any
15   conversations prior to bringing 362 to the Floor
16   concerning counting votes?
17        MR. SWEETEN:  Okay.  I'm going to let you
18   answer as to if you had conversations about counting
19   votes.
20        A.  Yes.
21        Q.  (By Ms. Westfall)  And who did you have a
22   conversation with?
23        A.  Likely had a conversation with all 31 senators,
24   all 30 other senators.
25        Q.  All 30 senators in the Republican caucus?

---

### 172

1         A.  There's not 30 Republican senators.
2         Q.  Who were those 30 senators?
3         A.  There are 31 members of the Texas Senate; not
4    counting me, there are 30.
5         Q.  So you had a conversation with all the senators
6    about counting votes on 362?
7         A.  I would believe that I had a conversation with
8    every senator.
9         Q.  Do you mean individual conversations?
10        MR. SWEETEN:  You can answer that.
11        A.  Yes.
12        MR. SWEETEN:  Okay.  Let me just make sure
13   that we're clear, though, other than just revealing the
14   fact that the conversation happened, you are not to
15   reveal the substance of those conversations.
16        Q.  (By Ms. Westfall)  Did you have a conversation
17   with each and every individual senator prior to bringing
18   362 to the Floor?
19        A.  To my knowledge, yes, I talked to everyone.
20        Q.  Were these one-on-one conversations?
21        A.  For the most part.
22        Q.  Did Ms. McCoy have any conversations on your
23   behalf with any staff members for senators?
24        MR. SWEETEN:  You can answer if you know
25   about the existence of the conversations.  Don't reveal



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

173

1  the substance.
2      A.  I don't know.
3      Q.  (By Ms. Westfall)  Did you learn as a result of
4  these conversations that you did not have the support of
5  two-thirds of senators for 362?
6          MR. SWEETEN:  Objection.  Calls for
7  matters that are subject to the legislative privilege.
8      A.  Privilege.
9      Q.  (By Ms. Westfall)  During these conversations,
10  did you solicit the view of the members as to whether he
11  or she supported 362?
12          MR. SWEETEN:  I'm going to object.  You're
13  asking for the substance of the conversations.  Don't
14  answer based on legislative privilege.
15      Q.  (By Ms. Westfall)  During these individual
16  conversations, did you discuss support or opposition
17  against 362?
18          MR. SWEETEN:  Same objection.
19      A.  Privilege.
20      Q.  (By Ms. Westfall)  Did you try to persuade any
21  member who was opposed to Senate Bill 362 to vote for
22  it?
23          MR. SWEETEN:  Same objection.
24      A.  Privilege.
25      Q.  (By Ms. Westfall)  I hand you what's been

---

174

1  previously marked as Exhibit 32.  Do you recognize this
2  document?
3      A.  Would you like me to read it back to you?
4      Q.  Not the whole entire thing.  I won't do that to
5  you today.  But could you tell me, do you recognize this
6  document?
7      A.  I do recognize this document.
8      Q.  And what is it?
9      A.  I think it is --
10          MR. SWEETEN:  If you don't mind me
11  scooting in here.  I need to be able to see this.  Do
12  you have a copy?
13          MS. WESTFALL:  No, I don't.  We --
14          MR. SWEETEN:  I don't have one either.
15          MS. WESTFALL:  -- lost our others.
16      Q.  (By Ms. Westfall)  Do you recognize what this
17  document is?
18      A.  I do.
19      Q.  What is it?
20      A.  I believe it is the hearing that was held
21  January 14, 2009.
22      Q.  Directing your attention to the first page,
23  does it say "Senate Rules," sir?
24          MR. SWEETEN:  She said the first page.
25      A.  Senate Rules.

---

175

1      Q.  (By Ms. Westfall)  And what year were these
2  rules adopted?
3      A.  Just a second.  I'm sorry.  I need to retract
4  the last of -- okay.  I'm sorry.  The answer I gave you
5  was incorrect.  It was not the hearing.  This is the
6  Senate rules that were adopted.
7      Q.  Thank you.
8      A.  January 14th.
9      Q.  Thank you.
10          And was this in 2009?
11      A.  Yes.
12      Q.  Were these rules operable during consideration
13  of Senate Bill 362?
14      A.  Yes.
15      Q.  And turning your attention to Rule 5.11 on Page
16  24 of this document, Exhibit 32, could you direct your
17  attention to that?
18      A.  Page 24?
19      Q.  24, yes.  Could you take a look at Rule 5.11?
20      A.  Uh-huh.
21      Q.  Could you describe this rule?
22      A.  I'm sorry?
23      Q.  Could you describe this rule?
24      A.  Could you be more specific?
25      Q.  Could you describe what this rule provides for

---

176

1  based on your knowledge of serving in the Senate for
2  many years?
3      A.  Senate Rule 5.11 refers to special orders.
4      Q.  Could you describe the provision in Section A
5  of Rule 11, 5.11?
6      A.  It says "Any bill, resolution, or other measure
7  may be on any day be made a special order for future
8  time of the session by affirmative vote of two-thirds of
9  the members present."
10      Q.  Turning your attention to Subsection D of Rule
11  5.11, what does that subsection provide for?
12      A.  "Notwithstanding Subsection A of this bill, a
13  bill or resolution relating to voter identification
14  requirements reported favorably from the Committee of
15  the Whole may be set as a special order for a time at
16  least 24 hours after the motion is adopted by a majority
17  of the members of the Senate."
18      Q.  Could you explain the effect of Rule 5.11D?
19      A.  I think it's self-explanatory as I just read
20  it.
21      Q.  So you have no further testimony in answer to
22  my question about the effect?
23      A.  The effect is as it reads, that would be the
24  effect.
25      Q.  What is the purpose of Rule 5.11D as it

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 177

1  pertains to voter ID requirements?
2      A.  The purpose is to not --
3          MR. SWEETEN:  Hold on.  Hold on.  I think
4  as it pertains to voter ID requirements, I'm going to
5  object.  I think that that calls for him to reveal
6  matters of legislative privilege.  He's also already
7  answered in previous questioning questions about this
8  rule.
9          MS. WESTFALL:  Are you preventing me from
10  examining the witness about this exhibit, the rules in
11  2009 pertaining to voter ID?
12          MR. SWEETEN:  I'm not prohibiting you from
13  examining about the exhibit.  You can do that.  And you
14  have done that.
15          MS. WESTFALL:  I would direct you also to
16  the Court's Order of today concerning purpose.  And the
17  purpose of a rule governing consideration of voter ID in
18  2009, are you prohibiting me from examining the witness?
19          MR. SWEETEN:  Counsel, you've already
20  asked him very specifically earlier about this rule and
21  what he felt the purpose of it was and what Janice McCoy
22  thought the purpose of it was.  You've already asked
23  this question.
24          MS. WESTFALL:  I can ask a different
25  question.  But I'm going to keep my question on the

---

### 178

1  record.  I'm not withdrawing it.
2      Q.  (By Ms. Westfall)  What was purpose in Rule
3  5.11D of specifying voter ID requirements?
4          MR. SWEETEN:  Okay.  I'm going to let him
5  answer as to your previous question, what is the purpose
6  of that rule.  He can answer that.
7      A.  The purpose of number -- of Subsection C (sic)
8  is to establish a special order, that notwithstanding
9  the section's rule, a bill or resolution relating to the
10  voter identification requirements reported favorably by
11  the committee can be set as a special order.
12      Q.  (By Ms. Westfall)  And are you reading from
13  Subsection D of Rule 5.11?
14      A.  D, yes, I am.
15      Q.  What -- I'm going to ask the question I asked
16  previously, which is what was the purpose of specifying
17  voter ID requirements by name in Rule 5.11D and setting
18  specific procedures for those requirements?
19      A.  It was to specify a special order relating to
20  what is mentioned in Subsection D.
21      Q.  And what was the purpose of that special order?
22      A.  To establish a special order.
23      Q.  Okay.  So what I'm hearing is roundy, roundy
24  circle.  Do you have any further testimony on the
25  subject --

---

### 179

1          MR. SWEETEN:  Objection to the sidebar.
2  Objection to the sidebar.
3      A.  No.
4      Q.  (By Ms. Westfall)  Were there any conversations
5  about establishing Rule 5.11D that you're aware of?
6      A.  Yes.
7      Q.  When did that conversation occur?
8      A.  In the Committee of the Whole meeting with all
9  31 senators.
10      Q.  When was that meeting?
11      A.  Prior to the passage of this.  It was likely
12  the first week of the session.
13      Q.  Is there a Senate rules committee that adopts
14  rules at the beginning of every session?
15      A.  Not a specified rules committee, no.
16      Q.  Does the Committee of the Whole Senate
17  establish its own rules?
18      A.  Yes.
19      Q.  Who is the chair of that committee in 2009?
20      A.  It would have to be John Whitmire, because he's
21  the Dean of the Senate, and he runs the meeting that
22  establishes -- that calls for the vote on the rules.
23      Q.  Did you have any conversations with Senator
24  Williams concerning Rule 5.11D or the concept embodied
25  therein?

---

### 180

1          MR. SWEETEN:  You can answer as to whether
2  a conversation occurred, otherwise it's legislatively
3  privileged.
4      A.  Yes.  There was a conversation.
5      Q.  When did that conversation occur?
6      A.  Immediately prior to this meeting.
7      Q.  I believe you testified this meeting would have
8  been the first week of session in January; is that
9  correct, of 2009?
10      A.  It looks like it was January 14, and the
11  session I think probably started on the 10th, so the
12  first week of the session.
13      Q.  What was your conversation with Senator
14  Williams about?
15          MR. SWEETEN:  Do not reveal, based on
16  legislative privilege.
17      A.  Privilege.
18      Q.  (By Ms. Westfall)  Was anyone else at that
19  meeting?
20      A.  No.
21      Q.  Who requested that meeting, you or Senator
22  Williams?
23          MR. SWEETEN:  Objection.
24      A.  Privileged.
25          MR. SWEETEN:  Yeah, it's privileged.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

181

1    Q.  (By Ms. Westfall)  What was your strategy for
2  gaining two-thirds support of all senators in 2009 to
3  support SB 362?
4        MR. SWEETEN:  Objection, legislative
5  privilege.
6    Q.  (By Ms. Westfall)  Did you request that the
7  two-thirds rule be suspended for Senate Bill 362?
8        MR. SWEETEN:  Objection, legislative
9  privilege.
10    Q.  (By Ms. Westfall)  Do you know of anyone in the
11  Senate or otherwise who requested the two-thirds rule be
12  suspended for consideration of Senate Bill 362?
13        MR. SWEETEN:  Objection, calls for
14  legislative privilege.
15    Q.  (By Ms. Westfall)  Are you aware of any other
16  conversations, other than the one that you just
17  described with Senator Williams, or the meeting of the
18  Committee of the Whole, concerning suspending the
19  two-thirds rule for consideration of Senate Bill 362?
20        MR. SWEETEN:  Is he aware of any
21  conversations about the two-thirds rule?
22        MS. WESTFALL:  Correct.
23        MR. SWEETEN:  Okay.  You can answer as to
24  whether or not there were conversations.  Do not reveal
25  any substance other than that.

---

182

1    A.  This is -- you know, these two are not
2  connected.  This is not a conversation about the
3  two-thirds rule.
4        MR. SWEETEN:  Okay.  Then if you don't --
5  if you're not aware of conversations --
6    A.  There is no conversation about the two-thirds
7  rules.
8    Q.  (By Ms. Westfall)  Was there a conversation
9  about Rule 5.11A, B, C, D or any combination therein
10  that you're aware of?
11    A.  I'm sorry?
12    Q.  Was there a conversation about Rule 5.11 in
13  Exhibit 32 that you're aware of, other than the one that
14  you described between you and Senator Williams?
15    A.  No.
16    Q.  Did you speak to Mr. Dewhurst about Rule 5.11?
17    A.  No.
18    Q.  Or his staff?
19    A.  No.
20    Q.  Do you know whether Janice McCoy spoke to
21  Mr. Dewhurst or his staff about Rule 5.11?
22    A.  I have no idea.
23    Q.  You served in the Senate since 1996; is that
24  right?
25    A.  '97.

---

183

1    Q.  I mean, '97, you started your service.  To the
2  best of your knowledge, have you seen any other rule
3  that was similar to Rule 5.11D during your service in
4  the Texas Senate?
5    A.  You're asking -- ask the question again,
6  please.
7    Q.  Certainly.  During your time in the Senate,
8  since 1997, have you ever seen a rule in the rules that
9  was similar to Rule 5.11D?
10    A.  Yes.
11    Q.  Tell me about each and every time you've seen a
12  rule like that.
13    A.  It would be impossible for me to tell you
14  because every session, there are multiple rule changes
15  in a revision of the rules.  The rules are set by the
16  senators prior to the session, and we change the rules
17  often.
18    Q.  Have you ever seen a subject matter like voter
19  ID requirements listed in Rule 5.11?
20    A.  As a special order?
21    Q.  Yes.
22    A.  Yes.
23    Q.  Tell me each and every time that's happened.
24    A.  I can't, you know, tell you the exact
25  amount.  You asked, had it been done, and I've answered

---

184

1  yes.  I can't give you specifics.
2    Q.  Prior to 2009 when Rule 5.11 was changed to
3  include this carve-out -- to include this provision
4  concerning voter ID requirements in Subsection D, had
5  there been an area of legislation categorically carved
6  out of Rule 5.11 that you're aware of?
7    A.  The answer to your first question is yes, but
8  adding the word "that I'm aware of" would make it a no.
9    Q.  Are you -- do you familiarize yourself with the
10  rules every time a Senate session starts?
11    A.  Ask that again, please.
12    Q.  Do you familiarize yourself with the Senate
13  rules at the beginning of Senate session?
14    A.  Yes.
15    Q.  Could you clarify your testimony that you --
16  that you just gave concerning whether you're aware of
17  any particular time that a subject matter area has been
18  specified in Rule 5.11 during your service in the
19  Senate?
20        MR. SWEETEN:  Objection to the question as
21  vague.
22        Could you ask him, I mean, in another
23  way?  I'm not sure what you're asking to clarify.  I
24  think he's tried to answer your questions.
25    Q.  (By Ms. Westfall)  Could you identify a


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 185

1  particular year or session in which Rule 5.11 referenced
2  a particular subject matter area as being set for
3  special order for a time at least 24 hours after the
4  motion, et cetera?
5      A.  I would believe most years.
6      Q.  Most years.  Okay.  Are you familiar with the
7  two-thirds rule?  You testified about that earlier
8  today, did you not?
9      A.  There's no such thing as a two-thirds rule.
10     Q.  Is there a two-thirds tradition?
11     A.  No.
12     Q.  Is there a two-thirds procedure?
13     A.  Yes.
14     Q.  Do most measures and bills require the support
15 of two-thirds of senators in the Texas Senate?
16     A.  I would not say most.
17     Q.  Ms. McCoy testified yesterday that she was
18 unaware --
19     A.  I'm sorry.  I need to back up.
20     Q.  Certainly.
21     A.  No bills require a two-thirds majority.
22     Q.  Is that because it is two-thirds of senators to
23 bring the bill to the Floor for a vote on the substance
24 of the bill, generally speaking?
25     A.  That's because of the regular order of

---

### 186

1  business.  You follow the regular order of business.
2      Q.  Okay.
3      A.  Everything is a majority vote.
4      Q.  But to, ordinarily, to get a bill to be brought
5  out of the calendar and onto the Floor for consideration
6  on the merits of the bill, you need to have a two-thirds
7  vote --
8      A.  No.
9      Q.  As a procedural matter?
10     A.  No.
11     Q.  And there's a tradition, is there not?
12     A.  No.
13     Q.  How would you describe it?
14     A.  Incorrect that you -- you're describing it
15 incorrectly.
16     Q.  Could you describe what -- what is the
17 procedure that ordinarily requires two-thirds votes of
18 senators?  What is that vote?
19     A.  A bill that is filed in the legislature to be
20 brought up in the regular order of business requires
21 majority vote.
22     Q.  What are the circumstances under which it
23 requires two-thirds?
24     A.  Clarify.
25     Q.  I believe you testified earlier that there is

---

### 187

1  ordinarily a blocker bill put in place and you need
2  two-thirds of a vote to get around the blocker bill; is
3  that right?
4      A.  To bring up the blocker bill is a majority.  If
5  you follow the regular order of business, it is a
6  majority vote.
7      Q.  Once a blocker bill is in place, you need
8  two-thirds to overcome that; is that correct?  And to go
9  out of order; is that correct?
10         MR. SWEETEN:  Objection, compound.
11     A.  You asked two questions.
12     Q.  (By Ms. Westfall)  Why don't you take the first
13 one first, and then we'll do the second one?
14         Does it require two-thirds vote to
15 overcome a blocker bill and go out of order?
16     A.  There's no such thing as overcoming the blocker
17 bill.
18     Q.  I'm using the wrong terms, because I am not
19 familiar with the Texas Senate rules, but I would like
20 you to interpret my terms as broadly as you are able to
21 understand them to answer the question.
22     A.  If you ask that question correctly, I'll be
23 glad to answer it.
24     Q.  Okay.  Well, Ms. McCoy testified yesterday she
25 was unaware of any other bills, except voter ID, that

---

### 188

1  have been accepted under Rule 5.11D.  Are you surprised
2  by her testimony?
3          MR. SWEETEN:  Objection, assumes facts not
4  in evidence.  You can go ahead and answer.
5      A.  Am I surprised by her answer?
6      Q.  (By Ms. Westfall)  Correct.  Yes.
7      A.  That's her recollection.  I'm a member.  She's
8  a staffer.
9      Q.  I see.  Okay.  So did you have any concerns
10 about rule -- all right.  What is the vote for a special
11 order?
12     A.  I'm sorry?
13     Q.  What is the vote required for a special order?
14     A.  Majority.
15     Q.  Majority.  Okay.  And that's indeed what Rule
16 5.11D indicates that it is a special -- that voter ID
17 requirements may be set as a special order; is that
18 right?  And that they will be considered 24 hours after
19 that motion for -- is adopted by a majority; is that
20 correct?
21     A.  (Witness nods head yes.)
22     Q.  OKay.  Did you have any concerns about Rule
23 5.11D?
24         MR. FREDERICK:  Objection, privileged.
25         MR. SWEETEN:  Yeah, objection, calls for

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                                    May 17, 2012

---

189

1    legislative privilege.
2         MS. WESTFALL: Mr. Frederick, Mr. Sweeten
3    is the one defending this deposition.  You may counsel
4    him but not object on the record.
5         MR. FREDERICK: I thought I had to counsel
6    him a little louder that time.  I apologize.
7         MS. WESTFALL: He wasn't awake?  He wasn't
8    listening to you?  That's between the two of you.
9         MR. SWEETEN: Thanks for all this on the
10   record. (Laughing.)
11        Q.  (By Ms. Westfall) Were you concerned that Rule
12   5.11D --
13        A.  I believe Mr. Sweeten was talking to me and
14   counseling the witness, and the other lawyer heard the
15   response, and I believe -- I don't believe he was
16   asleep, for the record.
17        Q.  It's very good that you're defending his honor
18   in this deposition.
19             Senator, did you have any concern that
20   Rule 5.11D would make Senate Bill 362 appear very
21   partisan?
22        MR. SWEETEN: Objection.
23        A.  Privilege.
24        MR. SWEETEN: Privilege.
25        Q.  (by Ms. Westfall) Was there -- was 362 in any

---

190

1    part designed for partisan purposes?
2         MR. SWEETEN: Objection, privilege.
3         A.  Privilege.
4         MS. WESTFALL: Purpose?
5         A.  Privileged.
6         MR. SWEETEN: You said was it designed for
7    partisan purposes.
8         Q.  (By Ms. Westfall) Well, did it have any
9    partisan purpose?  Did Senate Bill 362 have any partisan
10   purpose?
11             MR. SWEETEN: He's already answered what
12   he felt the purpose was.  You've asked him repeatedly.
13             MS. WESTFALL: Are you instructing him not
14   to answer?
15             MR. SWEETEN: You're now asking him, did
16   it have a partisan purpose?
17             MS. WESTFALL: Correct.  That's my
18   question.
19             MR. SWEETEN: I think he's already
20   testified to what he thought the purpose was -- all
21   right.
22             If you want to answer her question, you
23   can go ahead and do so.
24        A.  The purpose of Senate Bill 362 was to protect
25   the integrity of the ballot box.

---

191

1         Q.  (By Ms. Westfall) Was the purpose of 362 in
2    part for partisan reasons?
3         A.  The purpose of the bill was as I just answered
4    the prior question.
5         Q.  Therefore, is your answer no?
6         A.  The purpose of the bill is what I answered
7    previously.
8             MS. WESTFALL: If I don't get responses
9    from your witness, I'm going to move to compel responses
10   based on nonresponsive, Mr. Sweeney.  You may want to
11   step outside and have a counsel, have a conference with
12   him.
13             MR. SWEETEN: Okay.  He's answered what he
14   thinks is the purpose of the bill is.
15             MS. WESTFALL: He hasn't answered my
16   question.
17             MR. SWEETEN: I think he's attempting to
18   do so, and he's tried to tell you what the purpose is.
19   That's what he's done.
20             MS. WESTFALL: We can take it up.  We can
21   take it up.
22             MR. SWEETEN: Okay.  Well, I'll tell you
23   what, we'll talk about it at a break, and --
24             MS. WESTFALL: Okay.
25             MR. SWEETEN: How many more questions are

---

192

1    you going to have about the purpose of?  Because we keep
2    going over the same thing on 362.  I assume we've got
3    2011 to go to.  Go ahead.
4         Q.  (By Ms. Westfall) Would Senate Bill 362 have
5    passed the Senate if it had not -- if it were not for
6    Rule 5.11D?
7             MR. SWEETEN: I'm going to object.
8    Legislative privilege.
9         Q.  (By Ms. Westfall) You following counsel's
10   advice?
11        A.  Privilege.
12        Q.  Did Senate Bill 362 have the support of
13   two-thirds of the Senate?
14             MR. SWEETEN: Same objection.
15        Q.  (By Ms. Westfall) Just for the court reporter,
16   could you --
17        A.  Privilege.
18        Q.  What was your -- what was the reaction from
19   other senators to the resolution to suspend -- strike
20   that.
21             What was the reaction from other senators
22   to Rule 5.11D?
23        A.  Privilege.
24             MR. SWEETEN: Objection, privilege.
25        Q.  (By Ms. Westfall) Was there opposition?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

|  | 193 |
|---|---|

1       A.  Privilege.

2               MR. SWEETEN:  Don't reveal privileged

3   information.

4       Q.  (By Ms. Westfall)  Was there any consideration

5   of modifications of any other Senate rules in 2009 in

6   addition to Rule 5.11D associated with consideration of

7   Senate Bill 362 or voter identification requirements

8   generally?

9               MR. SWEETEN:  Objection, calls for

10  legislative privilege.

11      A.  Privilege.

12      Q.  (By Ms. Westfall)  Was Senate Bill 362

13  considered by any Senate committees?

14              MR. SWEETEN:  I think that's a matter of

15  public record, so you can --

16      A.  The Committee of the Whole is a Senate

17  committee.

18      Q.  (By Ms. Westfall)  When a bill comes from the

19  house, is it usually referred to a Senate committee

20  other than the Committee of the Whole?

21              MR. SWEETEN:  You can answer about the

22  general procedures.

23      A.  You have the option of doing either.

24      Q.  (By Ms. Westfall)  And what -- how does that

25  break down in terms of percentage in your experience in

|  | 194 |
|---|---|

1   the Senate?  In other words, how many go to the

2   Committee of the Whole, and how many go to a committee

3   that's not the Committee of the Whole?

4       A.  I don't have that percentage.

5       Q.  You can't recall sitting here today?

6       A.  No.  I don't have that percentage.

7       Q.  Okay.  How about in 2009 session, how many

8   bills came from the House, originated in the Senate, and

9   went directly to the Committee of the Whole other than

10  362?

11      A.  Well, you've asked an incorrect question.

12      Q.  How many bills that were filed with the Senate

13  in 2009 went -- were assigned directly to the Committee

14  of the Whole that you're aware of?

15      A.  I don't remember.

16      Q.  How many were assigned to other committees in

17  2009?

18      A.  I don't have access to that information,

19  because not every bill is referred.

20      Q.  How many bills were filed in 2009 in the

21  Senate?

22      A.  I don't know the answer to that.

23      Q.  Do you have a ballpark figure?

24      A.  Several thousand.

25      Q.  Of those several thousand, how many went to --

|  | 195 |
|---|---|

1   were assigned directly to the Committee of the Whole?

2       A.  I don't have that information.

3       Q.  Janice McCoy yesterday testified it was unusual

4   for a bill to go straight to the Committee of the

5   Whole.  Do you agree with that?

6               MR. SWEETEN:  Assumes facts not in

7   evidence.  You can go ahead and answer to the extent --

8       A.  Unusual is not the correct word.

9       Q.  (By Ms. Westfall)  What words would you use

10  instead of unusual?

11      A.  It is, you know, they are referred to the

12  Committee of the Whole when there's an interest in all

13  senators hearing the activity on the bill.

14      Q.  What was your role during consideration of the

15  Senate Bill 362 before the Committee of the Whole?  What

16  was your role?  Were you presiding?  Were you in the

17  chair?  Were you managing?  What's the correct verb?

18              MR. SWEETEN:  Hold on one second.  To the

19  extent that that asks matters that are subjective to the

20  legislative privilege, do not answer the question.  To

21  the extent that her question calls for information

22  that's a matter of public record, you can answer.

23              MS. WESTFALL:  This was in the Committee

24  of the Whole.  How much more public could it be?

25      A.  I was standing -- sitting at my desk

|  | 196 |
|---|---|

1   initially.  I was recognized to lay out the bill, and I

2   stood and stood for 27 hours.  I'm sorry.  Not 27 hours

3   straight, but I -- I answered questions about the bill,

4   and the hearing took 27 hours.

5       Q.  (By Ms. Westfall)  Is it ordinarily the rule of

6   the bill author to be the one to answer questions about

7   the bill when it is considered by the Committee of the

8   Whole?

9       A.  The -- generally, the author of the bill lays

10  out the bill and as a courtesy to other members will

11  answer their questions that they can answer.  But if

12  there's questions asked that someone better could answer

13  it, they say if you will hold that question until the

14  expert witness comes, they will answer your question.

15      Q.  So you answered questions for 27 hours; is that

16  correct?

17      A.  I didn't answer questions for 27 hours, but I

18  was -- the bill was before the committee, and I had to

19  be in the neighborhood.

20      Q.  Why did you -- why was the decision to consider

21  the bill for 27 hours?

22              MR. SWEETEN:  Objection, calls for

23  legislative privilege.

24      A.  Privilege.

25      Q.  (By Ms. Westfall)  Was there an urgency in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

197

1   considering Senate Bill 362?
2          MR. SWEETEN:  Same objection, privilege.
3      Q.  (By Ms. Westfall)  In your -- I believe you
4   testified earlier that to prepare for this deposition
5   you reviewed the transcripts from 2009 and 2011
6   regarding voter ID; is that right?
7      A.  Uh-huh.  Yes.
8      Q.  Do you remember that you, in 2009, in the
9   Committee of the Whole, made numerous references to the
10  purpose of the bill relating to voter fraud; is that
11  right?
12     A.  No.  I do not agree with that, and if you'd
13  like to reference something, I'd be glad to.
14     Q.  Okay.  We will do that in one moment.  Do you
15  remember also during 2009 hearing, that you mentioned
16  that Indiana's voter ID law had withstood legal
17  challenge and had been upheld by the Supreme Court; is
18  that correct?
19         MR. SWEETEN:  She's asking you matters of
20  public record.  You can answer as to that.
21     A.  Yes.
22     Q.  (By Ms. Westfall)  And do you recall that you
23  were pointing to the Indiana voter ID law as support for
24  Senate Bill 362; is that correct?
25     A.  I was supporting a fact that the Indiana law

199

1   public record, you can discuss the vote record.
2      A.  Questions were asked and concerns were raised.
3      Q.  (By Ms. Westfall)  And did legislators raise
4   concerns on that topic --
5          MR. SWEETEN:  You're asking in hearings?
6          MS. WESTFALL:  Yes.  I'm confining my
7   questions to the public hearing.
8      A.  Yes.
9      Q.  (By Ms. Westfall)  Who were those legislators?
10     A.  I can't give you specific names, but they were
11  people that were opposed to the bill.
12     Q.  Was there public testimony, members of the
13  public came during the committee consideration of SB
14  362?
15     A.  Yes.
16     Q.  And did some members of the public express
17  concerns about the impact of the bill on minority
18  voters?
19     A.  Yes.
20     Q.  And on the Floor during the committee
21  consideration, what was your response to these concerns?
22         MR. SWEETEN:  Confine your answer to the
23  matters of the public record.
24     A.  I would have to have more of a specific
25  question from a specific member, and they would have to

198

1   had been approved by the US Supreme Court in a 6-3 vote.
2      Q.  And do you also recall that on the Senate floor
3   in the Committee of the Whole proceedings of 362, that
4   you advocated for Senate Bill 362 based in part on the
5   fact that it offered alternatives of two nonphoto IDs;
6   is that right?
7          MR. SWEETEN:  You can testify about
8   matters of the public record.
9      A.  Advocate is not correct.  I explained that the
10  bill, as filed, had those parameters.
11     Q.  (By Ms. Westfall)  And also on the Senate floor
12  during consideration of Senate Bill 362, did you mention
13  that 1.5 percent of registered voters appeared not to
14  have driver's licenses and that you perceived this as a
15  small segment of the voting registered voters; is that
16  correct?
17     A.  I referenced data that had been released, I
18  believe, through the Baker-Carter court that referenced
19  in the states that had passed packed the bill, that 98.5
20  percent of people in those states had a driver's
21  license.
22     Q.  During the Floor debate on the Senate Bill 362,
23  did anyone raise concerns about the impact of the bill
24  on minority voters?
25         MR. SWEETEN:  Since this is a matter of

200

1   reference the, you know, the records.  I can't remember
2   that far back.
3      Q.  (By Ms. Westfall)  Do you recall any changes
4   that were made to Senate Bill 362 in response to
5   concerns from any of these concerns that you just
6   testified about, about the bill's impact on minority
7   voters?
8          MR. SWEETEN:  Objection, legislative
9   privilege.
10     A.  Privilege.
11         MS. WESTFALL:  To the extent that the
12  changes were in iterations of the bill, are you still
13  maintaining that objection?
14         MR. SWEETEN:  Yes.  That is a matter of
15  legislative privilege.  You just asked ask him what
16  changes were made in response to statements made by
17  other legislators, so you don't have to answer that.
18         MS. WESTFALL:  Let me put it this way.
19  I'm going to keep my question for purposes of subsequent
20  motions to compel.  But after these concerns were raised
21  on the -- in the Committee of the Whole in 2009, were
22  any changes made to 362?
23         MR. SWEETEN:  Same objection.  Think that
24  calls for his mental impressions process.
25     Q.  (By Ms. Westfall)  Do you recall that there was



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 201 | 203 |
|---|---|
| 1    a letter signed by all of the racial or ethnic minority | 1      Q.   I see. Looking at the letter today, in your |
| 2    members of the Senate expressing opposition to Senate | 2    deposition, does it refresh your recollection as to when |
| 3    Bill 362? | 3    you first saw this? |
| 4      A.   I don't remember. | 4      A.   It refreshes my -- my recollection that |
| 5      Q.   You don't. Okay. I hand you what's been | 5    something was submitted, but it doesn't, no. |
| 6    previously marked as Exhibit 33. | 6      Q.   Could you indicate to me your interpretation of |
| 7      A.   It's a lot of paper. | 7    what this statement says? |
| 8        MR. SWEETEN: Yes. And if you need any of | 8      A.   Privilege. |
| 9    these to refer to, let me know, and I'll get them back | 9        MR. SWEETEN: Legislative privilege. |
| 10   for you. | 10        MS. WESTFALL: This is a matter of public |
| 11      Q.   (By Ms. Westfall) Have you had a chance to | 11   record. |
| 12    look at Exhibit 33? | 12        MR. SWEETEN: You're asking him to |
| 13      A.   Yes. What are you referencing? | 13    interpret for you. He can refer to matters of the |
| 14      Q.   Could you first off tell me what you're looking | 14    public record, but you're asking him matters that relate |
| 15    at? Could you identify it? | 15    to his thoughts, mental impressions or opinions about |
| 16      A.   It's Senate Journal for the 23rd day of the | 16    legislation or in furtherance of legislation, in this |
| 17    session, Wednesday, March 18. | 17    case, Senate Bill 362. |
| 18      Q.   And does this -- is this journal pertaining to | 18      A.   Yeah. 362. |
| 19    the Committee of the Whole consideration of Senate Bill | 19        MR. SWEETEN: Yes. |
| 20    362? | 20        MS. WESTFALL: So therefore -- |
| 21      A.   This is the journal of the regular session. | 21        MR. SWEETEN: You can answer to the extent |
| 22      Q.   Okay. You mean the Floor consideration of the | 22    you can -- if you want to discuss matters of public |
| 23    bill? What do you mean by "regular session"? | 23    record, but otherwise -- |
| 24      A.   We go into session every day, and we're gabled | 24      A.   I recognize that a statement was submitted. |
| 25    into regular session. And then if -- you know, you have | 25      Q.   (By Ms. Westfall) What does the statement say? |

| 202 | 204 |
|---|---|
| 1    different sections of the session. This is the journal | 1      A.   Would you like for me to read the statement to |
| 2    of the regular session. You will see the part about | 2    you? |
| 3    81st legislature regular session, and this was the | 3      Q.   I would not. I'll represent to you, this is a |
| 4    proceedings on the regular session on the 23rd day. | 4    letter from senators noting that all ethnic and racial |
| 5      Q.   I see. Thank you for your testimony on that | 5    minorities voted against Senate Bill 362 and have |
| 6    point. | 6    consistently opposed the voter ID bills. Am I |
| 7        So this was not the Committee of the | 7    misrepresenting the statement? |
| 8    Whole, in other words? | 8      A.   You're representing that these people -- the |
| 9      A.   No. | 9    answer is no, your -- your statement is incorrect. |
| 10      Q.   Thank you. | 10      Q.   How is it incorrect? |
| 11        Directing your attention to Page 591 of | 11      A.   Can you restate the statement -- you know, the |
| 12    the Senate Journal of the Exhibit 33, could you take a | 12    question? It's incorrect. |
| 13    look at that? | 13      Q.   Could you -- do you have anything further to |
| 14      A.   Yes. | 14    say about why my -- why the summary that I just provided |
| 15      Q.   And do you see that in the middle of the page | 15    you of this statement is incorrect, or is that the sum |
| 16    there is a statement regarding votes cast on Senate Bill | 16    total of your testimony on that point? Do you have |
| 17    362 submitted by Senator West? | 17    further testimony or no? |
| 18      A.   I see a statement submitted by Senator West. | 18        MR. SWEETEN: I think her question is how |
| 19      Q.   Do you recall seeing this statement before | 19    was she incorrect? |
| 20    today? | 20        THE WITNESS: You want me to answer that? |
| 21      A.   No. | 21        MR. SWEETEN: Well, to the extent it's a |
| 22      Q.   You never looked at it until this deposition | 22    matter of the public record, you can say that. You |
| 23    today; is that right? | 23    can't reveal thoughts and impressions. |
| 24      A.   That wasn't what I said. I said I don't | 24      A.   These people are not -- they're not minorities. |
| 25    recall. | 25        MR. SWEETEN: Okay. |



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

205

1    Q.  (By Ms. Westfall)  Okay.  Do you have any
2    further corrections to my summary of the statement?  Or
3    is that -- is that your testimony?
4        A.  You asked me the question, if they were all the
5    -- you know, all these listed were racial minorities,
6    and they're not.
7        Q.  I believe what I said, and which is why I
8    originally asked you if you would like to summarize your
9    read of the letter so we could move things along, was
10   that the letter was from senators noting that all ethnic
11   and racial minorities had voted against this Senate Bill
12   362 and have consistently opposed voter ID bills, not
13   that the signatories were, but the fact that voter ID
14   bills have been consistently opposed by members of
15   racial and ethnic minorities.  That was the summary that
16   I provided.  Do you agree with that summary?
17       A.  In the Senate.
18       Q.  I'm talking about this statement, not the --
19   whether you agree with the merits.  I'm asking you
20   whether you agree with my summary of the statement,
21   which is why we're at loggerheads.
22       A.  I don't disagree that this was filed and it was
23   their statement.
24       Q.  Thank you.
25          Why do you think these senators felt the

---

206

1    need to submit for the record this statement about
2    racial and ethnic minorities voting against voter ID
3    legislation?
4          MR. SWEETEN:  Objection, legislative
5    privilege.
6        Q.  (By Ms. Westfall)  Are you following the advice
7    of counsel?
8        A.  Privilege.
9        Q.  Did you place any significance on the unified
10   opposition of all minority members of the Senate?  And
11   by "minority," I mean racial and ethnic minorities.
12          MR. SWEETEN:  Objection.
13       A.  Privilege.
14          MR. SWEETEN:  It calls for matters covered
15   by the legislative privilege.
16       Q.  (By Ms. Westfall)  Did you believe that their
17   concerns about the impact of the bill on minority voters
18   were genuine?
19       A.  Privilege.
20          MR. SWEETEN:  Objection, calls for matters
21   that are subject to the legislative privilege.
22       Q.  (By Ms. Westfall)  Do you believe that senators
23   who are opposing the bill and had concerns about the
24   impact of the bill on minority voters were acting in
25   good faith in raising those concerns?

---

207

1        A.  Privilege.
2          MR. SWEETEN:  Objection, privilege.
3        Q.  (By Ms. Westfall)  Was it true that some
4    legislators and members of the public stayed up all
5    night during consideration of Senate Bill 362?
6        A.  Yes.
7        Q.  Why do you think there was such strong
8    opposition to the bill?
9          MR. SWEETEN:  Objection, privilege.
10       A.  Privilege.
11       Q.  (By Ms. Westfall)  During consideration of 362,
12   did you indicate that you had done more research and
13   reading on the bill than you've ever done on any other
14   legislation?
15          MR. SWEETEN:  You're asking on the public
16   record?
17          MS. WESTFALL:  Correct.
18          MR. SWEETEN:  You can answer.
19       Q.  (By Ms. Westfall)  Do you recall saying that?
20       A.  No, I do not recall it.
21       Q.  Okay.
22          MS. WESTFALL:  Could you mark this as 46?
23          (Exhibit 46 marked for identification.)
24       Q.  (By Ms. Westfall)  You've been handed --
25          MS. WESTFALL:  Patrick, we have one for

---

208

1    you.
2          MR. SWEETEN:  Ah, that's great.
3        Q.  (By Ms. Westfall)  You've been handed what's
4    been marked as Exhibit 46.  Have you seen this before?
5        A.  Looks awful small.  This looks like a subset of
6    the transcript.
7        Q.  Yes.  I'll represent to you, and I'm sure your
8    counsel will not disagree, this is an excerpt of
9    proceedings of the Committee of the Whole Senate on
10   Tuesday, March 10, 2009.
11          I'm going to turn your attention to -- I'm
12   going to ask you to turn your attention to what's been
13   marked -- there's various paginations on this exhibit,
14   but 72 in the upper right-hand corner of the page of the
15   transcript, it's Bates Number TX3939.  Do you see that
16   page?
17       A.  Yes.
18       Q.  It's an exchange between you and Senator
19   Watson.
20       A.  Yes.
21       Q.  And do you see that you reference 12 percent of
22   persons in other states without proper photo ID?
23       A.  Show me where I reference that.
24       Q.  Actually, you know what, let's look at the
25   beginning of this exchange on Page 70.  That's the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 209

1  beginning of your statement, Senator Fraser, on Page 70,
2  where you talk about records of numbers of people in the
3  voter registration records who do not have appropriate
4  ID, and you indicate that it's around 800,000 or 12
5  percent.  Do you see that?
6      A.  No.
7          MR. SWEETEN:  I caution the witness to
8  make sure that you're taking the time you need to read.
9      A.  I do not see that.  Show me.
10     Q.  (By Ms. Westfall)  I'm sorry.  Page 70, 71 and
11 72.  You discuss the numbers.
12     A.  What is your question?
13     Q.  So here you're discussing the numbers of people
14 who appear not to have a photo ID, and you're discussing
15 that with Senator Watson; is that correct?
16     A.  Yes.
17     Q.  And you indicate the number roughly 809,000
18 people; is that correct?
19     A.  What about the 809?
20     Q.  I'm just asking whether the record reflects
21 that you refer to about 809,000 people who did not have
22 photo ID in your exchange with Senator Watson.
23     A.  No.
24     Q.  What was it?
25     A.  I didn't say that.

### 210

1      Q.  You -- oh, you said no, you don't see it?
2      A.  I said I did not say that.
3      Q.  Tell me what you said.
4      A.  You want me to read you the transcript?
5      Q.  Certainly.  Tell me what you're talking about
6  so we can be on the same page for the questions.  What
7  did you say?
8      A.  The ones that neither number show up, either a
9  Social Security number or voter ID, 809,000.  That --
10     Q.  Okay.
11     A.  There's 5 million that gave their driver's
12 license.  The others did not use their driver's license.
13     Q.  Correct.  So these are -- these are voter
14 applicants who did not indicate a Social Security number
15 or driver's license?
16     A.  They didn't use their driver's license.
17     Q.  When they -- when they registered to vote; is
18 that correct?
19     A.  Yes.  Because there are other options.
20     Q.  Thank you for clarifying your testimony.
21         But you had an exchange with Senator
22 Watson concerning this number of 800,000 people; is that
23 correct?
24     A.  Yes.
25     Q.  How was that analysis conducted?

### 211

1          MR. SWEETEN:  I'm going to object.  Don't
2  reveal thoughts, mental impressions, opinions about
3  legislation or in furtherance of the legislative
4  process.  If you want to, you can reference matters of
5  the public record in answer to that question, but don't
6  reveal the other based on the legislative privilege
7  objection.
8      Q.  (By Ms. Westfall)  Did you have any
9  conversations, are you aware of any communications with
10 the Secretary of State during consideration of Senate
11 Bill 362, concerning the number of registered voters
12 without a driver's license or Social Security number?
13         MR. SWEETEN:  Objection, compound.
14 Objection, I think you're seeking the substance of
15 conversations.  If you want to ask about whether he's
16 had conversations with the Secretary of State, I think
17 that would be fine.  Under the court's order, I think a
18 general subject matter description would also be fine.
19 But I think the way it's asked, it's compound, multiple;
20 it also has the substance of the conversation in it.  We
21 object.
22         MS. WESTFALL:  Specifically, you're not
23 instructing the witness not to answer because it's a
24 compound question; is that right?
25         MR. SWEETEN:  I think my objection has

### 212

1  been clear, but let me just say that I think I will let
2  him answer questions about whether he's had
3  conversations with the Secretary of State.  I'll let him
4  answer about the date, time and a general subject matter
5  description as provided in the court's order.
6      Q.  (By Ms. Westfall)  Senator Fraser, are you
7  aware of any conversations during or before the
8  Committee of the Whole consideration of Senate Bill 362
9  with the Secretary of State's Office?
10         MR. SWEETEN:  You can answer.
11     A.  No.
12     Q.  (By Ms. Westfall)  Did you try to do any
13 analysis of the racial composition or ethnic composition
14 of persons, these 809-approximately-thousand people who
15 did not register to vote with either a Social Security
16 number or driver's license number?
17         MR. SWEETEN:  Objection, legislative
18 privilege.
19     A.  Privilege.
20     Q.  (By Ms. Westfall)  Did Senator Watson raise
21 this as a concern as to the racial composition of these
22 800,000 persons?
23         MR. SWEETEN:  Don't reveal private
24 conversations, but you certainly can bring up matters of
25 public record.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

213

1    Q.   (By Ms. Westfall) I'll direct you to Page 72,
2  at the bottom of the page, at Line 21.  Did Senator
3  Watson ask about the racial composition of the 800,000
4  persons?
5    A.   I think my answer speaks for itself.
6    Q.   And your answer was that you were not advised
7  and you hadn't done that analysis?
8    A.   I didn't say that.  I said I don't remember if
9  the driver's license had that information, the racial
10  breakdown of the license.
11    Q.   And in response to Senator Watson's questions
12  to whether any statistical analysis had been done
13  regarding potential impact of SB 362 on African-
14  Americans, which is on Page 73, your response was it had
15  been implemented in Indiana and Georgia; is that right?
16    A.   I made reference to the fact that we're going
17  to have someone from Indiana and Georgia, two states
18  that had implemented it, where they would give their
19  testimony and they can give reaction to what happened in
20  their states.
21    Q.   Was there any analysis on the racial
22  composition or ethnic composition of those 800,000
23  voters that was conducted with regard to Texas voters?
24    MR. SWEETEN:  Do not reveal based upon --
25  objection, legislative privilege.  Go ahead.

---

214

1    A.   Privilege.
2    Q.   (By Ms. Westfall) Is there any -- are there
3  any conversations about analysis of the racial
4  composition or ethnic composition of those 800,000
5  voters, that you're aware of?
6    MR. SWEETEN:  Objection, privilege.
7    A.   Privilege.
8    MS. WESTFALL:  The existence of
9  conversations?
10    MR. SWEETEN:  Were there conversations
11  about --
12    MS. WESTFALL:  -- the racial composition
13  or ethnic composition of the 800,000 voter registration
14  applicants referenced in this testimony.
15    MR. SWEETEN:  Okay.  That is way more than
16  a general subject matter description that would be on a
17  privilege log, and so I think that's beyond what we --
18  what I'll let him answer.  I'll work with you, though,
19  if you want to talk about conversations, he will do
20  that.  He'll identify the specifics of the conversation,
21  even a general subject matter description, but that is
22  not a general subject matter description.
23    Q.   (By Ms. Westfall) Are you aware of any
24  analysis, conversation -- strike that.
25    Are you aware of any conversations of any

---

215

1  analysis of the racial or ethnic composition of voters
2  who did not have the forms of allowable ID under Senate
3  Bill 362?
4    MR. SWEETEN:  I think you're -- I think
5  there's subject matter within that question is beyond a
6  general description of subject matter that he would have
7  to provide under a privilege log.  So I'm going to
8  object to the question.
9    Q.   (By Ms. Westfall) Do you think 800,000 is a
10  small number?
11    MR. SWEETEN:  Don't reveal your thoughts,
12  mental impressions about the legislation.  Objection,
13  legislative privilege.
14    A.   Privilege.
15    Q.   (By Ms. Westfall) Did these numbers concern
16  you at all?
17    MR. SWEETEN:  Same objection.
18    A.   Privilege.
19    Q.   (By Ms. Westfall) Do you agree that the key to
20  effective implementation of Senate Bill 362 is adequate
21  poll worker training?
22    MR. SWEETEN:  Same objection, legislative
23  privilege.
24    Q.   (By Ms. Westfall) Do you recall that in 2009,
25  during the Committee of the Whole consideration of

---

216

1  Senate Bill 362, when you were asked about training for
2  poll workers to determine whether an ID was proper, you
3  deferred to the Secretary of State at that time on the
4  public record?
5    MR. SWEETEN:  You can answer to matters of
6  the public record.
7    A.   Yes.  I did refer, yes.
8    Q.   (By Ms. Westfall) Why didn't Senate Bill 362
9  address more clearly and have more guidance for the
10  Secretary of State concerning poll worker training?
11    MR. SWEETEN:  Same objection, legislative
12  privilege.
13    A.   Privilege.
14    Q.   (By Ms. Westfall) You're asserting the
15  privilege with regard to that question?
16    A.   (Witness nods head yes.)
17    Q.   You agree that poll worker training is very
18  important, isn't it, in implementing photo ID law?
19    MR. SWEETEN:  Objection, privilege.
20    Q.   (By Ms. Westfall) As a general policy matter,
21  not with regard to legislation?
22    THE WITNESS:  Isn't that privilege?
23    MR. SWEETEN:  Well, she's now saying -- so
24  logically divorcing this from any pending legislation, I
25  think is what you're doing.  If there were any



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

### 217

1  consideration of specific legislation, you're asking as
2  a general matter, whether he thinks considerations of
3  poll worker training are important; is that what you're
4  saying?
5          MS. WESTFALL:  My question stands.
6      A.  That's privileged information because I would
7  give my opinion about any legislation.
8          MR. SWEETEN:  Yeah, I think that's --
9  we're going to object to privilege on that.
10         MS. WESTFALL:  Your opinion just --
11  opinions about the necessity of poll worker training is
12  off limits?
13         MR. SWEETEN:  If you're asking him to
14  reveal thoughts, mental impressions or opinions about
15  legislation or in furtherance of the legislative process
16  in doing that, then that is subject to the well-
17  recognized legislative privilege.
18     Q.  (By Ms. Westfall)  I believe you testified
19  earlier that the purpose of 362 was to ensure integrity
20  of the ballot box; is that right?
21     A.  Yes.
22     Q.  Isn't that connected and furthered by how
23  effectively a poll worker can verify a voter's
24  identity?
25         MR. SWEETEN:  Objection, that's

---

### 218

1  legislative privilege.
2      A.  Privilege.
3      Q.  (By Ms. Westfall)  Why didn't you include a
4  provision on poll worker training in Senate Bill 362?
5          MR. SWEETEN:  Same objection, privilege.
6      Q.  (By Ms. Westfall)  Why did you leave it to the
7  Secretary of State?
8          MR. SWEETEN:  Same objection, privilege.
9      Q.  (By Ms. Westfall)  So did 362 pass in the
10  Senate?
11         MR. SWEETEN:  You can answer.
12     A.  Yes.
13     Q.  (By Ms. Westfall)  And was it referred to the
14  House?
15     A.  Yes.
16         MR. SWEETEN:  You can answer.
17     Q.  (By Ms. Westfall)  Did you have any role in
18  furthering the advancement of Senate Bill 362 once it
19  was referred to the House?
20     A.  No.
21     Q.  Did you talk to any members of the House about
22  362 after passage in the Senate?
23         MR. SWEETEN:  You can reveal
24  conversations -- I mean, don't reveal substance of them,
25  but you can reveal whether conversations occurred.

---

### 219

1      A.  Yes, there were conversations.
2      Q.  (By Ms. Westfall)  Was it with members of the
3  House or their staff?
4      A.  Members of the House.
5      Q.  And who are those members?
6      A.  I can't give you specifics.
7      Q.  Who was carrying the bill in the house?
8      A.  Todd Smith.
9      Q.  Did you have conversations with Mr. Smith?
10     A.  Yes.
11     Q.  Did you have more than one?
12     A.  Yes.
13     Q.  Did you have conversations with his staff?
14     A.  No.
15     Q.  Just the two of you?
16     A.  Yes.
17     Q.  How many conversations?
18     A.  More than five.
19     Q.  When did 362 pass in the Senate approximately?
20     A.  January the 20th -- I'm sorry, I don't know.
21     Q.  362, was that March?
22     A.  362?
23     Q.  Yes.
24     A.  Oh, I don't know.  I'm sorry.  I don't know.
25     Q.  Do you know when you had these conversations

---

### 220

1  with Representative Smith about 362?
2      A.  After the bill was sent to the House.
3      Q.  What was the general nature of the
4  conversations with Mr. Smith?
5          MR. SWEETEN:  You can provide a very
6  general subject matter description.
7      A.  Status of the bill.
8      Q.  (By Ms. Westfall)  Did you have any
9  conversations with any other members of the House about
10  362?
11         MR. SWEETEN:  You can reveal
12  the conversation -- whether a conversation occurred.
13     A.  Yes, there were other members.
14     Q.  (By Ms. Westfall)  Where you had individual
15  one-on-one conversations with other members about 362?
16         MR. SWEETEN:  Of the House.
17     Q.  (By Ms. Westfall)  Of the House?
18     A.  Yes.
19     Q.  Who were those members?
20     A.  I can't tell you specifically who they were.
21     Q.  What happened to Senate Bill 362 in the House?
22     A.  It was never voted out.
23     Q.  Did it get assigned to a committee?
24     A.  Yes.
25     Q.  What was the committee?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

221

1     A.  I don't know.
2     Q.  Was it the House Elections Committee?
3     A.  I'm -- I don't know.  I'm not a House member.
4     Q.  Was Mr. Smith the chair of the Elections
5  Committee in 2009?
6     A.  I believe he was.
7     Q.  Have you spoken in any public settings,
8  meetings, or groups about the subject of voter ID ever?
9     A.  Yes.
10    Q.  Besides the Floor of the Senate?
11    A.  Yes.
12    Q.  When was the first time you talked about voter
13  ID in a public setting?
14    A.  I don't remember.  I don't remember exactly
15  when it was.
16    Q.  Can you remember any time you've spoken in
17  public about voter ID, not on the Senate Floor?
18    A.  One -- yes.  The answer is yes.
19    Q.  Tell me when that was.
20    A.  In Brownwood recently.
21    Q.  What group were you addressing?
22    A.  Chamber of Commerce.
23    Q.  What did you tell the Chamber of Commerce?
24    A.  That the Justice Department had failed to
25  preclear the bill.

---

222

1     Q.  How long were your remarks about voter ID?
2     A.  Ten minutes.
3     Q.  Was it in the answer to a question about the
4  status of the bill?
5     A.  No.
6     Q.  Or were you there with prepared remarks about
7  voter ID?
8     A.  I was prepared -- it was prepared remarks about
9  the status of the, you know, things in the state.
10    Q.  Who prepared those remarks?
11    A.  I did.
12    Q.  Where are those remarks retained?
13    A.  I need to back up.  My staff always give me
14  guidelines of things that I've  either talked about or I
15  generally talk about in an outline or a sketch form.  I
16  never use that.  I always wing it.
17    Q.  So did Ms. McCoy prepare remarks for you?
18    A.  Yes.
19    Q.  Did you retain those remarks?
20    A.  Retain the remarks?
21    Q.  Did you keep a copy --
22    A.  No.
23    Q.  -- of the hard copy of the remarks?
24    A.  No.
25    Q.  Have you been asked by your lawyers to retain

---

223

1  all documents concerning Senate Bill 14 as a result of
2  this litigation?
3         MR. SWEETEN:  Don't reveal communications
4  between you and your attorneys.
5     Q.  (By Ms. Westfall)  Let me rephrase.  Let me
6  rephrase.
7         Was there a time when you started
8  retaining documents related to Senate Bill 14?
9     A.  You're using the word "you," and the answer
10  would be no.
11    Q.  Was there a time that your office took any
12  steps, that you can identify sitting here today, to
13  retain documents?
14    A.  Yes.
15    Q.  When did that occur?
16    A.  I don't know.
17    Q.  Who would know?
18    A.  When we were asked.
19    Q.  I see.  Would Ms. McCoy know?
20    A.  Yes.
21    Q.  Are you familiar with a federal law called the
22  "Help America Vote Act"?
23    A.  I'm assuming that's HAVA.  Yes.
24    Q.  What does HAVA do generally?  Could you tell
25  me?

---

224

1     A.  No.
2     Q.  You testified earlier that you had introduced
3  Senate Bill 363 in 2009.  Remember we talked about that
4  earlier today?
5     A.  Yes.
6     Q.  And that would require documentary proof of
7  citizenship upon registration of voting; is that
8  correct?
9         MR. SWEETEN:  You can refer to matters of
10  the public record.
11    Q.  (By Ms. Westfall)  This is within your bill.
12  I'm summarizing it.
13    A.  We discussed whatever we read on the bill.
14    Q.  Yes.
15    A.  Yes.
16    Q.  Does HAVA implement identification requirements
17  for certain voter registration applicants --
18    A.  Sorry.
19    Q.  -- to your knowledge?
20    A.  I don't know.
21    Q.  Do you know what ethnic group makes up the
22  largest the percentage of the noncitizen population in
23  the state of Texas?
24    A.  I'm sorry.  I -- you know.  Is that --
25         MR. SWEETEN:  She's just asking you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

225

1   whether you know a fact or whether you know.  So you can
2   answer just as to --
3       A.   No, I do not know.
4       Q.   (By Ms. Westfall)  Is it Hispanics?
5           MR. SWEETEN:  Objection.
6       A.   I just said I don't know.
7       Q.   (By Ms. Westfall)  I'm trying to refresh your
8   recollection.
9           Was there a time that you introduced a
10  voter ID bill in the 2011 session?  I guess it would be
11  the 82nd session.
12      A.   Yes.
13      Q.   And was that bill called Senate Bill 14?
14      A.   Yes.
15      Q.   Did anyone ask you to introduce this bill?
16          MR. SWEETEN:  Objection, requires him to
17  reveal matters of legislative privilege, so don't
18  answer.
19      Q.   (By Ms. Westfall)  When did you decide to
20  introduce Senate Bill 14?
21      A.   As soon as 362 didn't pass.
22      Q.   So that was 2009 sometime, you started working
23  on it right away?
24      A.   May 31st, 2009.
25      Q.   But when did you file Senate Bill 14?

---

226

1       A.   By law, you cannot file -- you can file one
2   month before.  So in the one month filing period, I
3   filed it prior to session start.
4       Q.   Did you start -- did you start drafting it
5   immediately following the defeat of Senate Bill 362?
6       A.   No.
7       Q.   When did you start drafting or working on
8   concepts for the bill?
9       A.   I did not start drafting.
10      Q.   I understand you didn't draft, but when did you
11  start thinking about what you wanted the bill to look
12  like?
13          MR. SWEETEN:  You're asking him to reveal
14  thoughts, mental impressions, opinions in furtherance of
15  legislation, including Senate Bill 14, so that would be
16  privileged.
17      A.   Privileged.
18      Q.   (By Ms. Westfall)  Did anyone ask you to file
19  Senate Bill 14?
20          MR. SWEETEN:  Same -- I think he's already
21  answered that, but objection, legislative privilege.
22      A.   Privilege.
23      Q.   (By Ms. Westfall)  Did you make any promises to
24  anyone to file Senate Bill 14?
25          MR. SWEETEN:  Same objection, legislative

---

227

1   privilege.
2           MS. WESTFALL:  Did you -- I mean, for the
3   record, I think what you're instructing him not to
4   answer falls outside any conceivably assertible
5   privilege.  I want to just make that known for the
6   record.  We'll brief that later.
7           MR. SWEETEN:  Okay.  Why don't you go
8   ahead and read the question back, and I will consider it
9   again.  If you think I'm way off base, let's hear it
10  again.
11          MS. WESTFALL:  You've made the same
12  objection earlier today, but my question was whether the
13  Senator promised anyone to file Senate Bill 14.
14          MR. SWEETEN:  Okay.  That is a matter --
15  you're asking about a specific communication whether
16  he's promised someone regarding Senate Bill 14.  I think
17  that is privileged.
18      Q.   (By Ms. Westfall)  Did you promise Mr. Skipper
19  Wallace that you would file Senate Bill 14?
20          MR. SWEETEN:  Objection.  I think this has
21  been asked and answered, questions about Skipper
22  Wallace.  If you want to ask him --
23          MS. WESTFALL:  It's Skipper Wallace but
24  we're in a new year.
25          MR. SWEETEN:  And I've heard that name a

---

228

1   lot today, Counsel.  What I want to say is, I -- he can
2   reveal whether or not there's a communication that
3   existed.  He's not going to reveal the substance of the
4   communication.  So you're free to ask him that.
5       Q.   (By Ms. Westfall)  Did you have any
6   conversations with anyone -- strike that.
7           Was Senate Bill 14 given a designation by
8   the Governor or in his office -- Governor -- let me
9   strike that again.
10          Was Senate Bill 14 designated by the
11  Governor to be emergency legislation?
12      A.   Yes.
13      Q.   What are the -- what happens?  Describe what
14  happens when the Governor designates a bill as emergency
15  legislation.
16      A.   The Governor declares it an emergency
17  legislation.
18      Q.   What's the consequences for its consideration
19  in the Texas State Senate?
20      A.   No consequences.
21      Q.   Is it automatically considered within the first
22  60 days of session?
23      A.   No.
24      Q.   There are no consequences to this designation?
25  Is it purposeless; is that your testimony?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 229

1     A.  No.
2     Q.  What is the purpose of designation by the
3  Governor of emergency legislation?
4     A.  You would have to ask the Governor that.
5     Q.  I'm asking as a general -- I'm asking as a
6  general matter, when -- strike that.
7         As a result of the designation of SB 14 as
8  emergency legislation, was it considered within the
9  first 60 days of the Senate session in 2011?
10    A.  She asked me two questions.
11    Q.  Well, you know what --
12        MR. SWEETEN:  Hold on.
13    Q.  -- I'm asking the questions.  If you don't like
14  the questions and you need clarification, you can ask
15  me, as I instructed you at the beginning of this
16  deposition.
17        MR. SWEETEN:  Okay.  Okay.  Let's -- let
18  me -- I want to hear the question read back, please.
19        (Question read back.)
20        MR. SWEETEN:  Objection, legislative
21  privilege.
22        MS. WESTFALL:  Can you further explain
23  your assertion of privilege?  This is a procedural
24  matter and a timing matter and a matter of public
25  record.

## 230

1         MR. SWEETEN:  He can answer -- the
2  legislative privilege objection relates to matters of
3  nonpublic record.  He is free to answer based upon the
4  public record, if it is as you claim it is.  So he can
5  answer if there are matters of the public record that
6  addresses this, but -- I mean, I'm asserting privilege
7  as to matters not of the public record.
8     Q.  (By Ms. Westfall)  Can you answer the question?
9     A.  Privilege.
10    Q.  When a governor designates legislation as
11  emergency legislation, is it always considered within
12  the first 60 days of the session?
13        MR. SWEETEN:  You can answer as a general
14  matter.
15    A.  No.
16    Q.  (By Ms. Westfall)  Is it sometimes considered
17  within the first 60 days of a session?
18    A.  Yes.
19    Q.  And this designation is done by the Governor;
20  is that right?
21    A.  Yes.
22    Q.  How did Senate Bill 14 come to receive this
23  emergency designation?
24        MR. SWEETEN:  Objection, calls
25  for legislative privilege.  Also calls for speculation.

## 231

1     Q.  (By Ms. Westfall)  Were there any conversations
2  about the designation of Senate Bill 14 as emergency
3  legislation, that you're aware of?
4         MR. SWEETEN:  The question --
5     A.  No.
6         MR. SWEETEN:  -- is were there any
7  conversations?
8     A.  No.
9         MR. SWEETEN:  Okay.  You answered it.
10  Okay.
11    Q.  (By Ms. Westfall)  There were no conversations
12  you're aware of?
13    A.  No.
14    Q.  Did you request this designation of the
15  Governor's Office?
16    A.  No.
17    Q.  When did you first learn that Senate Bill 14
18  had been designated as emergency legislation?
19        MR. SWEETEN:  You can answer.
20    A.  Read about it in the paper.
21    Q.  (By Ms. Westfall)  Do you know why Senate Bill
22  14 had to be considered within the first 60 days of the
23  legislature in 2011?
24    A.  Privilege.
25        MR. SWEETEN:  Yeah, objection, privilege.

## 232

1     Q.  (By Ms. Westfall)  Are you aware of any
2  conversations regarding the timing of consideration of
3  Senate Bill 14 in the Senate?
4         MR. SWEETEN:  Objection, that requires him
5  to reveal his mental impressions, opinions about the
6  legislation.
7     A.  Privilege.
8         MR. SWEETEN:  It's legislative privilege.
9     Q.  (By Ms. Westfall)  Do you know what other bills
10  were designated emergency legislation by the Governor in
11  2011?
12        MR. SWEETEN:  You can answer.
13    A.  He had multiple bills that he declared
14  emergency.
15    Q.  (By Ms. Westfall)  Do you recall any of them
16  sitting here today?
17    A.  The sonogram bill.
18    Q.  Any others?
19    A.  No, I'm sorry, I don't.
20    Q.  Was there any urgency, in your mind, about
21  getting this Senate Bill 14 passed quickly, promptly,
22  and expeditiously, in 2011?
23        MR. SWEETEN:  Objection, it requires him
24  to reveal thoughts, mental impressions, opinions about
25  legislation.  It's legislatively privileged.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 233

1      A.   Privilege.
2      Q.   (By Ms. Westfall)  Was there any -- were there
3  immediate elections that were going to be held for which
4  there was a need for the legislation?
5           MR. SWEETEN:  Same objection.  If you want
6  to ask if there were elections, you know, that's
7  different.
8           MS. WESTFALL:  This was previously marked
9  as 5.  Here's a copy.  We have many.
10          (Discussion off the record.)
11     Q.   (By Ms. Westfall)  You've been handed what's
12  been previously marked as Exhibit 5.  Senator, do you
13  recognize this document?
14     A.   I believe this is probably Senate Bill 14, I'm
15  assuming as filed.  The answer is:  No, I do not
16  recognize it, because I'd have to go through it and
17  verify if this is the bill as filed or the engrossed
18  voted version that was --
19     Q.   Sir, if I could refer you to Page 17 of the
20  exhibit, maybe that will clarify for you what version of
21  the bill it is.
22     A.   This is the version that was signed by the
23  Governor.
24     Q.   Thank you.  Is this a copy of the legislation
25  as signed by the Governor that you introduced in 2011

## 234

1  related to voter ID?
2      A.   Yes.  Appears to be.
3      Q.   And turning your attention to Page 9, Section
4  63.0101, do you see it lists Proof of ID?  And could you
5  describe the forms of identification permitted under
6  Senate Bill 14?
7      A.   A driver's license, a US military
8  identification card that contains a person's photograph,
9  a US citizenship certificate that contains a photograph,
10  a passport that's not expired, a concealed-carry handgun
11  license.
12     Q.   Thank you.
13          And does it also provide, on Page 11 at
14  Section 16, for increasing the criminal penalties for
15  persons who impersonate a voter in an attempt to vote as
16  that voter?  Is that right?  At Section 16 of the bill?
17     A.   Yes.
18     Q.   Thank you.
19          Were you involved in the development of
20  Senate Bill 14?
21     A.   Yes.
22     Q.   What was your involvement?
23          MR. SWEETEN:  Don't reveal --
24     A.   Legislative privilege.
25          MR. SWEETEN:  Yeah.  Objection,

## 235

1  legislative privilege.
2      Q.   (By Ms. Westfall)  Can you describe the process
3  by which Senate Bill 14 was developed?
4      A.   Privilege.
5           MR. SWEETEN:  Objection, legislative
6  privilege.
7      Q.   (By Ms. Westfall)  When was Senate Bill 14 --
8  when was it -- when did the development of Senate Bill
9  14 start?
10     A.   May 31st of 2009.
11     Q.   Were you aware of any communications concerning
12  the drafting of the bill?
13     A.   Say it again.  Repeat.
14     Q.   Are you aware of any communications concerning
15  the drafting of the bill?
16          MR. SWEETEN:  I think that's been asked
17  and answered.  Also, I think objection, vague, as far as
18  considerations of drafting the bill.  Or did you say
19  conversations drafting the bill?
20          MS. WESTFALL:  Conversations.
21     Q.   (By Ms. Westfall)  You may answer.
22     A.   Were there conversations?
23     Q.   Yes.
24     A.   Yes.
25     Q.   And was it -- I believe you testified you had a

## 236

1  conversation with Mr. Wallace.  Were there other
2  conversations you were aware of concerning the drafting
3  of Senate Bill 14?
4      A.   With Ms. McCoy.
5      Q.   With Ms. McCoy.  How many conversations did you
6  have with Ms. McCoy?
7      A.   Hundreds.
8      Q.   Hundreds.  Did you have conversations with
9  anyone outside of conversations with your chief of
10  staff, Ms. McCoy?
11     A.   Only in terms of advising people that I was
12  filing the bill.
13     Q.   And who were those people?
14     A.   Skipper Wallace.
15     Q.   Any legislators in the Senate?
16     A.   I don't know specifics.
17     Q.   You don't recall?  Or you can't identify the
18  people?  Or --
19     A.   I can't give you a specific instance, but the
20  bill was talked about in the interim.
21     Q.   I see.  Did you have any conversations with the
22  Lieutenant Governor or his office concerning your
23  intention to file Senate Bill 14?
24     A.   Not that I can recall.
25     Q.   Did you look at past legislation on voter ID in



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 237

1  developing Senate Bill 14?
2          MR. SWEETEN:  Do not reveal your thoughts,
3  mental impressions, opinions about legislation, or
4  matters of furtherance of the legislative process.
5  Objection, legislative privilege.
6      A.  Privilege.
7      Q.  (By Ms. Westfall)  Did you look to other
8  states' photo ID in drafting Senate Bill 14?
9      A.  Privilege.
10         MR. SWEETEN:  Same objection.
11     Q.  (By Ms. Westfall)  Did you look to any models
12  from any interest groups in developing Senate Bill 14?
13         MR. SWEETEN:  Same objection.
14     A.  Privilege.
15     Q.  (By Ms. Westfall)  Did you have any
16  communications about Senate Bill 14 with other current
17  or former legislators who had offered past photo ID
18  bills?
19         MR. SWEETEN:  You can answer as to whether
20  a conversation occurred.
21     A.  No -- I'm sorry, ask that question again.
22     Q.  (By Ms. Westfall)  Did you have any
23  communications about Senate Bill 14 with other current
24  or former legislators who had offered past photo ID
25  bills?

---

### 238

1      A.  Define "legislators".
2      Q.  People who sit in the legislature past or
3  current.
4      A.  Texas legislators?
5      Q.  Correct.
6      A.  No.
7      Q.  How about outside of Texas?
8      A.  Yes.
9      Q.  And could you identify that person or persons?
10     A.  President of the Senate of Illinois -- I mean,
11  Indiana.  The president of the Senate in
12  Georgia.  President of the Senate in Illinois.
13     Q.  Illinois?
14     A.  Actually, the list is probably 40 of the 50
15  state senate presidents.
16     Q.  Was there a conference call, or did you have
17  individual conversations with these folks?
18     A.  I meet four times a year with the senate
19  presidents.
20     Q.  I see.  So there was a meeting with senate
21  presidents.  When was that meeting?
22     A.  We meet four times a year every year.
23     Q.  When was the meeting that you referred to
24  concerning your development of Senate Bill 14?
25     A.  I don't recall.

---

### 239

1      Q.  Where was that meeting?
2      A.  I don't recall.
3      Q.  Could you describe the general nature of that
4  meeting?
5      A.  The senate presidents get together to discuss
6  state issues.
7      Q.  And was there at that meeting a general
8  discussion of interest amongst many states in enacting
9  photo ID laws?
10     A.  Status of legislation involving voter ID in
11  Texas, specific questions.
12     Q.  Was there -- oh, it was a meeting held on that
13  topic solo?
14     A.  No.
15     Q.  I'm sorry.  Could you verify your testimony?
16     A.  There was a question asked about the status of
17  legislation.
18     Q.  And this convening of presidents of state
19  senates, is there an umbrella organization that
20  organized that meeting?
21     A.  Called the Senate Presidents Forum.
22     Q.  I see.  And did -- at that forum, were there
23  discussed other bills pending in other states concerning
24  photo ID?
25     A.  No.

---

### 240

1      Q.  After that meeting, did you make any changes in
2  the draft of Senate Bill 14?
3      A.  Privilege.
4          MR. SWEETEN:  Objection, legislative
5  privilege.
6      Q.  (By Ms. Westfall)  Did you have communications
7  with legislators in Georgia about photo ID as you were
8  drafting Senate Bill 14 or developing it?
9      A.  Yes.
10     Q.  What officials in Georgia?
11     A.  I'm sorry, I need to backtrack on that.  You're
12  asking in the drafting of the bill?
13     Q.  Yes.
14     A.  No.
15     Q.  In the development of the concepts for Senate
16  Bill 14, which I believe you just testified started
17  around May 31st, 2009?
18     A.  Privilege.
19         MR. SWEETEN:  You can identify if you have
20  conversations from May 2009 --
21         MS. WESTFALL:  31st, 2009.
22         MR. SWEETEN:  May 31st, 2009, until the
23  bill was --
24     A.  With --
25         MR. SWEETEN:  With anyone from Georgia,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

241

1    you can testify about that.
2        A.   No.
3        Q.   (By Ms. Westfall)  Did you have communications
4    with any officials or legislators in Indiana concerning
5    about their photo ID law after May 31st, 2009?
6        A.   Yes.
7        Q.   When did you have that conversation?
8        A.   Four times a year.
9        Q.   Are you referring to the same convening of the
10   senate presidents?
11       A.   Yes.
12       Q.   Were there -- was there any agenda for that
13   meeting that was circulated?
14       A.   Every meeting has an agenda.
15       Q.   Was there an agenda for the meeting you just
16   testified about at which you answered the question about
17   the status of Texas photo ID?
18       A.   Yes.
19       Q.   Who has that agenda?
20       A.   Senate Presidents Forum.
21       Q.   Where is that headquartered?
22       A.   Washington, D.C.
23       Q.   Who's the staff person who you usually deal
24   with at the forum?
25       A.   That I -- I don't deal with anyone.

---

242

1        Q.   Is there any administrative person who
2    maintains records and organizes the meetings for the
3    forum?
4        A.   Yes.
5        Q.   And who is that person?
6        A.   I don't have that name.
7        Q.   And this meeting that you're testifying about
8    where you talked about Texas photo ID, was this -- did
9    this occur in the year of 2009 or 2010?
10       A.   I don't know.
11       Q.   Did you keep any notes from that meeting --
12       A.   No.
13       Q.   -- yourself?
14       A.   (Witness shakes head no.)
15       Q.   You testified earlier about Exhibit 5, Senate
16   Bill 14, and a number of forms of ID; is that correct?
17   You testified about the particular types of ID that are
18   allowable under Senate Bill 14; is that right?
19       A.   I testified?
20       Q.   You testified in this deposition just minutes
21   ago, don't you remember doing that?
22       A.   I don't --
23       Q.   I just -- I asked you a question about the
24   forms of --
25       A.   And I read the forms that are in the bill.

---

243

1        Q.   Correct.  That's what I'm referring to when I
2    said you testified.
3            Have you reviewed the photo ID laws in
4    both Indiana and Georgia?
5        A.   Yes.
6            MR. SWEETEN:  Don't reveal your thoughts
7    or mental impressions or opinions about legislation or
8    matters in furtherance of the legislative process when
9    you're answering these questions here.
10       Q.   (By Ms. Westfall)  Do you know whether under
11   Senate Bill 14 there are fewer forms of allowable ID
12   than under Georgia photo ID law?
13       A.   I don't know that.
14       Q.   Do you know whether there are fewer forms of
15   allowable ID in Senate Bill 14 than in the Indiana voter
16   ID law?
17       A.   Don't know that.
18       Q.   Have you reviewed -- I know you testified
19   earlier that you're not an attorney, but have you
20   reviewed those laws or a summary of those laws?
21           MR. SWEETEN:  Objection, that's been asked
22   and answered.  It's legislative privilege.  It goes to
23   his process, thoughts, mental impressions, opinions
24   about legislature or furtherance of legislation.
25           But you are free to refer to matters of

---

244

1    the public record.
2        Q.   (By Ms. Westfall)  Do you have any answer --
3        A.   Privilege.
4        Q.   Thank you.
5            Have you had any -- did you have any
6    communications in developing or conceptualizing Senate
7    Bill 14 with any groups representing minority voters?
8            MR. SWEETEN:  Objection, legislative
9    privilege.
10       A.   Privilege.
11       Q.   (By Ms. Westfall)  Did you have any
12   communications with any groups representing minority
13   voters in 2009?
14           MR. SWEETEN:  Communications you're
15   asking?
16           MS. WESTFALL:  Correct.
17           MR. SWEETEN:  Okay.  You can ask -- you
18   can answer as to whether a communication occurred or did
19   not occur.
20       A.   Not to my knowledge.
21       Q.   (By Ms. Westfall)  Did you have any such
22   communications with any such groups in 2010?
23       A.   Not to my knowledge.
24       Q.   Did you have any communications about Senate
25   Bill 14 with any officials in the executive branch in

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

245

1   Texas?
2        A.  No.
3        Q.  Did you have any communications about Senate
4   Bill 14 with any member of the Lieutenant Governor's
5   Office or the Lieutenant Governor?
6            MR. SWEETEN:  I think that's been asked
7   and answered, but you may answer.
8        Q.  (By Ms. Westfall)  You may answer.  You may
9   answer.
10           MR. SWEETEN:  I'll instruct him as to
11   whether or not he can answer.  I said, "You can answer."
12       A.  And give me the time frame.
13       Q.  (By Ms. Westfall)  2009 or 2010.
14       A.  I don't remember.  Could I add that, if there
15   was a communication, it was advising them that I was
16   filing the bill again?  That would be the extent.
17           MR. SWEETEN:  Okay.
18           MS. WESTFALL:  Thank you.
19           MR. SWEETEN:  And that's fine.  Just don't
20   reveal the specifics of communications you've had.  Her
21   question was:  Was there a communication?  So just limit
22   it to that, but that's general.
23       Q.  (By Ms. Westfall)  Did you or your office or
24   Ms. McCoy exchange drafts of Senate Bill 14 with
25   anybody?

---

246

1        A.  No.
2        Q.  Did Senate Bill 14 change during the drafting
3   profess before it was filed?
4        A.  Privilege.
5            MR. SWEETEN:  I'm going to object based on
6   legislative privilege.  I think we're getting into the
7   thoughts, mental processes, impressions in furtherance
8   of legislation.
9        Q.  (By Ms. Westfall)  In drafting Senate Bill 14,
10   did you, Ms. McCoy, or anyone associated with the
11   drafting review any reports or studies?
12       A.  Privilege.
13           MR. SWEETEN:  That's -- that's subject to
14   the legislative privilege.  Objection.
15       Q.  (By Ms. Westfall)  When drafting Senate Bill 14
16   or developing the concepts for Senate Bill 14, did you
17   or Ms. McCoy conduct any analysis of how it impacted
18   voters?
19           MR. SWEETEN:  Same objection, privilege.
20       A.  Privilege.
21       Q.  (By Ms. Westfall)  Did you consider including
22   any additional forms of ID in the version of Senate Bill
23   14 that you filed?
24           MR. SWEETEN:  Objection, calls for him to
25   reveal thoughts, mental impressions, opinions about

---

247

1   legislation.  Legislative privilege.
2        Q.  (By Ms. Westfall)  Are you following the advice
3   of counsel on that?
4        A.  Why don't you ask that again?
5        Q.  Sure.  Did you consider including any
6   additional forms of ID in Senate Bill 14?
7            MR. SWEETEN:  Objection, privilege.
8        A.  Privilege.
9        Q.  (By Ms. Westfall)  In -- was this the least
10   restrictive set of forms of ID that you could include in
11   Senate Bill 14 that would achieve your objective?
12           MR. SWEETEN:  Objection, privilege.
13       A.  Privilege.
14       Q.  (By Ms. Westfall)  Did you consider allowing
15   expired forms of ID as allowable ID?
16           MR. SWEETEN:  Objection, privilege.
17   You're asking about his mental impressions and
18   considerations.
19       A.  Privilege.
20       Q.  (By Ms. Westfall)  Did you consider allowing
21   forms of ID that have expired two years prior to the
22   election rather than 60 days?
23           MR. SWEETEN:  Objection, privilege.
24       A.  Privilege.
25       Q.  (By Ms. Westfall)  If a photo ID is expired but

---

248

1   was validly issued, doesn't that prove the person is the
2   same person on the ID?
3        A.  Privilege.
4            MR. SWEETEN:  Objection, you're asking
5   about his considerations of the Senate Bill 14.  That
6   would be legislatively privileged.
7        Q.  (By Ms. Westfall)  I'm asking, as a general
8   matter, if a photo ID is expired but was validly issued,
9   doesn't that prove the person is the same person on the
10   ID, notwithstanding that it's expired?
11           MR. SWEETEN:  Objection, argumentative.
12   You can answer.  She's asking not in relation to
13   legislation, she's just asking you as a general matter.
14       A.  Why don't you ask the question again slowly?
15       Q.  (By Ms. Westfall)  Sure.  If a photo ID is
16   expired but was validly issued, why doesn't that prove
17   the person was the same person on the ID?
18       A.  The logic would be that if it's expired, it is
19   not a valid form of identification.
20       Q.  But nevertheless, when you see the person's
21   picture and you see the person next to the picture,
22   notwithstanding that it's expired, you can make a visual
23   -- a poll worker could make a visual check to affirm an
24   individual's identity; isn't that true?
25       A.  I've given my answer to the question.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

249

1    Q.   You have no further testimony on that issue?
2    A.   I've given my answer to the question.
3    Q.   How often in Texas do you have to go appear to
4    get your picture retaken for a driver's license?  Do you
5    know?
6    A.   Ask the question again.  How often --
7    Q.   -- do you have to have your picture taken for
8    your driver's license?
9    A.   I'm sorry, I don't know that.
10   Q.   Can you renew your driver's license by mail in
11   Texas in certain circumstances?
12   A.   I don't believe so.  I don't know the answer.
13   Q.   How long are driver's licenses in Texas valid
14   for?
15   A.   I don't know the answer to that.
16   Q.   Did you conduct any analysis as to how many
17   registered voters possess the required forms of ID under
18   Senate Bill 14?
19        MR. SWEETEN:  Objection, legislative
20   privilege.
21   Q.   (By Ms. Westfall)  Did you conduct any analysis
22   to determine if minority voters would be
23   disproportionately less likely to possess the forms of
24   ID required by Senate Bill 14?
25        MR. SWEETEN:  Objection, legislative

---

250

1    privilege.
2    A.   Privilege.
3    Q.   (By Ms. Westfall)  And Janice McCoy yesterday
4    testified that there were no studies at all with any
5    analysis of who has an ID for purposes of Senate Bill
6    14, either public or private.  Do you agree with that
7    testimony?
8         MR. SWEETEN:  Objection, calls for matters
9    that are legislatively privileged.
10   A.   Privilege.
11        MS. WESTFALL:  Ms. McCoy has testified
12   about this matter and waived the privilege.  Are you
13   going to let the witness testify on this?
14        MR. SWEETEN:  He is asserting legislative
15   privilege as to any considerations, analysis related to
16   the bill.
17   Q.   (By Ms. Westfall)  Are you surprised Ms. McCoy
18   had that testimony yesterday?
19        MR. SWEETEN:  Objection.  You're asking
20   the same question in another form.  It calls for matters
21   of legislative privilege.  It's also relevant whether
22   he's surprised.  Don't answer.
23   Q.   (By Ms. Westfall)  Are you following the advice
24   of counsel?
25   A.   Privilege.

---

251

1    Q.   What is a military ID?
2         MR. SWEETEN:  Asked and answered --
3    Q.   (By Ms. Westfall)  Do you know how many --
4         MR. SWEETEN:  -- objection.
5    Q.   (By Ms. Westfall)  Do you know how many --
6         THE WITNESS:  Did you --
7    Q.   (By Ms. Westfall) -- different forms of
8    military ID --
9         MR. SWEETEN:  Yes.
10   Q.   (By Ms. Westfall) -- are accepted --
11        (Reporter cautions everyone not to talk at
12   the same time.)
13        MS. WESTFALL:  Let's break.
14        (Recess 4:29 to 4:46 p.m.)
15   Q.   (By Ms. Westfall)  Okay.  Senator, do you know
16   what a citizenship certificate is?
17   A.   No.
18   Q.   Is it a form of ID in Senate Bill 14?
19   A.   Yes.
20   Q.   Do you have any idea how much it costs to
21   obtain a citizenship certificate?
22   A.   No.
23   Q.   Do you know how much it costs to obtain a U.S.
24   passport?
25   A.   No.

---

252

1    Q.   Do you know what documents you would have to
2    provide to get a U.S. passport?
3    A.   I believe a birth certificate.
4    Q.   And anything else besides a birth certificate?
5    A.   Not to my knowledge.
6    Q.   Do you know how long it takes to obtain a
7    passport?
8    A.   No.
9    Q.   Can you tell me what the purpose was of --
10   well, strike that.
11        I believe you testified earlier that
12   Senate Bill 362 allows for nonphoto ID; is that right?
13   A.   Rephrase -- re-read the question, please.
14   Q.   I believe I -- that you testified earlier that
15   Senate Bill 362 allows for the use of nonphoto ID; is
16   that right?
17   A.   The -- the legislation, as filed, had that
18   provision.
19   Q.   And Senate Bill 14 does not; is that right?
20   A.   That is correct.
21   Q.   And what was the purpose of not including in
22   Senate Bill 14 the option for a voter to show nonphoto
23   ID?
24        MR. SWEETEN:  Objection, you're asking him
25   to reveal thoughts, mental impressions, opinions about

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 253

1  legislation, including Senate Bill 14.
2      A.  Privilege.
3          MS. WESTFALL:  Are you instructing him not
4  to answer?
5          MR. SWEETEN:  I'm instructing him not to
6  answer that specific question as to the differences
7  between the two bills and the why's and wherefore's.  He
8  can answer if you're going to ask him as to what is the
9  purpose of Senate Bill 14.  I will allow him to answer
10  that question.
11      Q.  (By Ms. Westfall) Are you aware of any
12  conversations regarding the non-inclusion of photo ID in
13  Senate Bill 14?
14          MR. SWEETEN:  You're asking about the
15  substance of conversations, and so I think that that
16  would be -- that would be privileged.  He can discuss
17  specifics of whether he had a conversation or general
18  subject matter, but I think that the way you're asking
19  it, I think you're asking for the specific subject
20  matter.
21      A.  Privilege.
22      Q.  (By Ms. Westfall) Who made the decision not to
23  include non-photo forms of ID in Senate Bill 14?
24          MR. SWEETEN:  Objection, legislative
25  privilege.

## 254

1      A.  Privilege.
2      Q.  (By Ms. Westfall) What changed between 2009 and
3  2011 that made two forms the non-photo ID an acceptable
4  option in 2009 but not in 2011?
5          MR. SWEETEN:  Objection, legislative
6  privilege.
7      Q.  (By Ms. Westfall) In response to a similar
8  question posed to Ms. McCoy yesterday in her deposition,
9  she testified that what happened between 2009 and 2011
10  was that things have worked out well in Indiana and
11  Georgia.  Do you agree with that statement?
12          MR. SWEETEN:  Don't reveal your thoughts,
13  mental impressions or opinions about legislation or
14  between the difference in the 2009 and 2011.  That is
15  legislatively privileged.  Do not answer.
16      A.  Privilege.
17      Q.  (By Ms. Westfall) We talked about this earlier
18  with regard to Senate Bill 362, but under Senate Bill
19  14, who is responsible for verifying the identity of the
20  voter?  Who checks the ID of the voter in Senate Bill
21  14?
22      A.  When they're voting?
23      Q.  Yes.
24      A.  That is determined by the training that is done
25  by the Secretary of State, and I think it would be

## 255

1  improper for me to speculate what that is.
2      Q.  What are the standards governing how a poll
3  worker administers the -- the photo ID requirement under
4  Senate Bill 14?
5      A.  Those standards are set by the Secretary of
6  State.
7      Q.  And would you agree that those standards are
8  very important for the success and fulfillment of the
9  purpose of Senate Bill 14 you earlier testified about?
10          MR. SWEETEN:  I'm going to object to the
11  extent you're asking for him to reveal thoughts, mental
12  impressions, or opinions about legislation or
13  furtherance of the legislative process.
14      A.  Privilege.
15      Q.  (By Ms. Westfall) There are no standards
16  governing how the ID requirement is administered in
17  Senate Bill 14; isn't that right?
18          MR. SWEETEN:  Objection, privilege.  Are
19  you asking about the text of the bill, Counsel?
20          MS. WESTFALL:  I'm asking about the face
21  of the statute.
22          MR. SWEETEN:  Okay, if you're asking about
23  the face of the statute, he can answer the question.
24      A.  We gave that authority to set that to the
25  Secretary of State.

## 256

1      Q.  (By Ms. Westfall) So, in other words, it's not
2  -- it's not in the face of the statute; is that correct?
3  Would you agree with that?
4      A.  We -- we did not set to micro-manage.  We said
5  to ask the Secretary of State to determine that.
6      Q.  I want to answer.  I know it's late in the day,
7  but I want you to listen carefully to my question.  Is
8  there anything in Senate Bill 14 that -- that sets the
9  standards for how poll workers are to administer the
10  photo ID requirement in the this -- in this law?
11      A.  No.
12      Q.  Thank you.
13          What was the purpose of removing, and not
14  including from Senate Bill 14, the option for a voter to
15  show a state or federal issued photo ID, as you did
16  include in Senate Bill 362?
17          MR. SWEETEN:  You're asking him to compare
18  and contrast bills from 2009 and 2011 which would
19  necessarily reveal his thoughts, mental impressions, and
20  opinions about legislation or furtherance of the
21  legislative process and is therefore privileged.
22  Objection.
23      A.  Privilege.
24      Q.  (By Ms. Westfall) Are there any circumstances
25  in election administration, problems with the election



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

257

1    administration, et cetera, between 2009 and 2011, that
2    caused to you make this change?
3              MR. SWEETEN:  I'm going to object, you're
4    asking for his thoughts and mental impressions,
5    privilege.
6         A.   Privilege.
7         Q.   (By Ms. Westfall) How would allowing the use of
8    state or federal issued photo ID prevent the goal in
9    Senate Bill 14 of ensuring election integrity?
10             MR. SWEETEN:  Objection, legislative
11   privilege.
12        A.   Privilege.
13        Q.   (By Ms. Westfall) Are you aware that the
14   Indiana photo ID law allowed for the use of state issued
15   photo ID?
16             MR. SWEETEN:  Objection, you're asking him
17   to reveal his thoughts, mental impressions, opinions
18   about legislation and furtherance of the process;
19   therefore, it would be privilege.
20        Q.   (By Ms. Westfall) What was the purpose of not
21   including in Senate Bill 14 the option for a voter to
22   show a valid employee ID as was included in the Senate
23   Bill 362?
24             MR. SWEETEN:  Objection, you're asking him
25   to compare 2009 to 2011.  He will answer the question of

258

1    what is the purpose of Senate Bill 14, but to ask him to
2    compare and contrast provisions that were or were not in
3    those two statutes is asking him to reveal the thoughts,
4    mental impressions, and opinions about the legislation.
5         Q.   (By Ms. Westfall) Is there a provision included
6    in Senate Bill 14 related to an election identification
7    certificate?
8              MR. SWEETEN:  You can answer.
9         A.   Would you restate the question?
10        Q.   (By Ms. Westfall) Certainly.  Is there a
11   provision in Senate Bill 14 that would allow for the use
12   of an election identification certificate for persons
13   who do not have allowable forms of ID under Senate Bill
14   14?
15        A.   SB 14 provides that an elections identification
16   certificate may not be used or accepted as a personal
17   identification certificate.
18        Q.   Did any legislators -- strike that.
19             Did you -- are you aware of any
20   conversations with anyone about concerns about the
21   ability to obtain an election identification
22   certificate?
23        A.   No.
24        Q.   Did anyone express concern about their
25   constituents having difficulty obtaining an election

259

1    identification certificate?
2         A.   Not to my knowledge.
3         Q.   Not on the Floor?
4         A.   Again, I -- not to my recollection.
5         Q.   Did you conduct any analysis of the process for
6    obtaining election identification certificate?
7              MR. SWEETEN:  Do not reveal your thoughts,
8    mental impressions, or opinions or -- about legislation
9    or furtherance of the legislation process --
10        A.   Privilege.
11             MR. SWEETEN:  -- legislative privilege.
12        Q.   (By Ms. Westfall) What were the circumstances
13   under which a license to carry a concealed handgun were
14   included in Senate Bill 14?
15             MR. SWEETEN:  Do not answer, it's asking a
16   legislative privilege.
17        A.   Privilege.
18        Q.   (By Ms. Westfall) Do you know the racial
19   composition of license to carry license holders?
20             MR. SWEETEN:  Objection, you're asking for
21   matters covered by the legislative privilege.
22             MS. WESTFALL:  I'm asking him as a matter
23   of general knowledge, not -- not related to a
24   legislative act.
25             MR. SWEETEN:  Okay.  So this is not in

260

1    relation to his analysis or review of legislation.
2    You're asking him, now as he sits here, is he aware of
3    this -- of this piece of information.
4              You can answer that question.
5         A.   I'm not aware.
6         Q.   (By Ms. Westfall) Is it -- is the racial
7    composition of license to carry license holders
8    disproportionately white relative to Texas registered
9    voters?
10        A.   I'm not -- I'm not aware of the percentage.
11        Q.   Are you aware of any conversations about the
12   racial composition of licensed to carry holders?
13        A.   No.
14        Q.   How did the exception for individuals with
15   disabilities come to be included in Senate Bill 14?
16             MR. SWEETEN:  Objection, legislative
17   privilege.
18        A.   Privilege.
19        Q.   (By Ms. Westfall) How did the exception for
20   individuals with religious objections to being
21   photographed come in -- come to be included in Senate
22   Bill 14?
23             MR. SWEETEN:  Objection, legislative
24   privilege.
25        Q.   (By Ms. Westfall) Why is it that some changes



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

---

261

1  in response to some concerns were taken into account and
2  others were not?
3      MR. SWEETEN:  Objection, legislative
4  privilege.
5      Q.  (By Ms. Westfall) The legislature made
6  modifications to Senate Bill 14 for persons with
7  disabilities, is that right, on the face of the bill?
8      MR. SWEETEN:  You can answer.
9      A.  Reread.
10     Q.  (By Ms. Westfall) The legislation made
11 modifications to Senate Bill 14 to accommodate the
12 interests of persons with disabilities; isn't that
13 right?
14     MR. SWEETEN:  Well, now you threw in
15 "accommodate people with disabilities."  I think if you
16 want to ask him a question about the text of the bill,
17 you can you ask him whether it's there or not, but not
18 -- you're starting to get into thoughts, mental
19 impressions, opinions with that question.
20     MS. WESTFALL:  Are you invoking privilege?
21     MR. SWEETEN:  I don't think I objected to
22 the first question, but then the second, the way you
23 worded it, I think you --
24     Q.  (By Ms. Westfall)  Why didn't you answer the
25 first question then, since your counsel is --

---

262

1      A.  Would you repeat the first question?
2      Q.  The legislature made modifications to Senate
3  Bill 14 for persons with disabilities, did they not?
4      A.  Would you reference the part of the bill that
5  does that?
6      Q.  Certainly.
7      MR. SWEETEN:  Okay.  You're saying "for
8  individuals."  If you're asking him does the text say
9  this, I'm fine with him answering that question, but if
10 you're asking him why was it made, I think that's
11 objectionable, legislative privilege.
12     Q.  (By Ms. Westfall) I refer you to Exhibit 5 at
13 Section 1, Senator.
14     MR. SWEETEN:  This is 5. -- yeah, that's
15 5.
16     Q.  (By Ms. Westfall) Where it indicates --
17     A.  5, Section 1?
18     Q.  Exhibit 5, Senate Bill 14, at -- at Section 1
19 on Page 1.  There is, is there not, an exemption for
20 persons with disabilities that provide certain written
21 documentation from federal agencies; is that correct?
22     A.  Yes.
23     Q.  And this is a provision, wouldn't you agree,
24 that is helpful for certain persons that have
25 disabilities in having an exemption from the bill, isn't

---

263

1  that correct, on the face of the statute?
2      A.  Yes.
3      Q.  Likewise, turning to your attention to the
4  provisional ballot section of Senate Bill 14 which is on
5  Page 11 at Section 17 of the bill, do you see that?
6  There is a provision related to persons who have
7  religious objections to being photographed; isn't that
8  correct?
9      A.  On Page 11?
10     Q.  On Page 12, sorry.  It starts on Page 11.  Do
11 you see that?
12     A.  Yes.
13     Q.  And -- and this provision indicates that if a
14 person casts a provisional ballot and is eligible to
15 vote in the election but doesn't have ID because a
16 person -- and consequently casts a provisional ballot,
17 that the ballot will be counted if the voter signs an
18 affidavit indicating a religious objection to being
19 photographed, isn't that correct, on the face of the
20 statute?
21     MR. SWEETEN:  You can answer.
22     A.  Yes.
23     Q.  (By Ms. Westfall) And this is a helpful
24 provision for people who have religious beliefs and
25 objections to being photographed; isn't that right?

---

264

1      THE WITNESS:  She's asking my opinion?
2      MR. SWEETEN:  Yeah.
3      Q.  (By Ms. Westfall)  On the face of the statute.
4      A.  The statute states very clearly what it -- it
5  does.
6      Q.  Did the legislature make any modifications to
7  Senate Bill 14 based on concerns pertaining to racial
8  and ethnic minorities?
9      MR. SWEETEN:  Objection, legislative
10 privilege.
11     A.  Privilege.
12     Q.  Could you -- strike that.
13     During the drafting or legislature's
14 consideration of Senate Bill 14, was there any analysis
15 of the costs or steps that a voter would need to take to
16 obtain an election identification certificate?
17     MR. SWEETEN:  I'm going to object based
18 upon privilege.  You're free to refer to matters of the
19 public record.
20     A.  Privilege.
21     Q.  (By Ms. Westfall) Do you know -- do you know
22 what documents are needed under Senate Bill 14 on the
23 face of the statute to obtain an election identification
24 certificate?  Directing your attention to Section 20 on
25 Page 13.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

265

1      A.  That they -- they must state that they're --
2    the person must sign a certificate for the purpose of
3    satisfying Section 63.001(b) of the election code and
4    does not have another form of identification.
5      Q.  Is it -- is it your recollection that, and
6    based on public record, based on the code, based on the
7    regulations, that the Secretary of State was responsible
8    for identifying the documents needed to obtain an
9    election identification certificate?
10     A.  It says the department may develop -- may
11   cooperate with Secretary of State in developing the form
12   and appearance of an election identification
13   certificate.
14     Q.  So you agree that it's a responsibility of the
15   Secretary of State; is that what the statute says?
16     A.  No.  It says the department may cooperate with
17   the Secretary of State in developing the form and
18   appearance of an election certificate.
19     Q.  Okay.  Thank you.
20        Do you know how much it costs to obtain
21   the documents necessary to get an election
22   identification certificate under Senate Bill 14 and
23   associated regulations?
24     A.  No.
25     Q.  And if the documents needed to get the election

---

266

1    identification certificate are not themselves free, is
2    there a cost associated with obtaining election
3    identification certificates?
4      A.  I don't know.
5      Q.  Where does one obtain an election
6    identification certificate?
7      A.  I don't know.
8      Q.  And when are those offices open?
9      A.  I don't know.
10     Q.  Does one obtain them at the driver's license
11   office in Texas?
12        MR. SWEETEN:  Objection.  He's indicated
13   that he doesn't know the answer, so asked and answered.
14     Q.  (By Ms. Westfall) What was the -- I know we've
15   -- you've testified about the purpose of previous voter
16   ID bills that you've introduced, but what was the
17   purpose, each and every purpose, of Senate Bill 14?
18     A.  The purpose of Senate Bill 14 was to ensure the
19   integrity of the ballot box.
20     Q.  Anything else?
21     A.  No.
22     Q.  Pardon?
23     A.  (Witness shakes head no.)
24     Q.  What is the basis for your assertion that the
25   purpose was to ensure integrity of the ballot box?

---

267

1      A.  Privilege.
2        MR. SWEETEN:  That's -- that's -- now
3    you're asking him, beyond what the purpose is, you're
4    asking him to reveal his thoughts, mental impressions or
5    opinions and his subjective intent in that question.  So
6    he's answered what the purpose is.  I think that you're
7    now going in to matters that are matters protected by
8    the legislative privilege.
9      Q.  (By Ms. Westfall) How would Senate Bill 14
10   ensure integrity of the ballot box?
11        MR. SWEETEN:  Same objection.
12     Q.  For the record, are you asserting privilege?
13     A.  Privilege.
14        MR. SWEETEN:  Objection, privilege.
15     Q.  (By Ms. Westfall) Is there a need in Texas to
16   take measures legislatively to ensure integrity at the
17   ballot box?
18        MR. SWEETEN:  Same objection.
19     A.  Privilege.
20     Q.  Are there any facts, that you're aware of
21   sitting here today, that -- that there's a lack of
22   integrity at the ballot box in Texas?
23        MR. SWEETEN:  Same objection, calls for
24   matters that are covered by the legislative privilege.
25     A.  Privilege.

---

268

1      Q.  (By Ms. Westfall) Yesterday your chief of
2    staff, when asked this question, testified that the
3    purpose of Senate Bill 14 was both election integrity
4    and to prevent in-person voter fraud.  Today, when I
5    asked you the similar question, you did not mention
6    in-person voter fraud.  Is it your testimony that
7    preventing in-person voter fraud is not a purpose of
8    Senate Bill 14, as you sit here today?
9        MR. SWEETEN:  This has been asked, this
10   has been answered.  He has -- he has answered the
11   question, but -- and also objection, assumes facts not
12   in evidence.  Nevertheless, if you want to go ahead and
13   answer, you can.
14     A.  Ask the question again.
15     Q.  (By Ms. Westfall) Is the purpose of Senate Bill
16   14 also to prevent in-person voter fraud and
17   impersonation?
18     A.  The purpose of the bill is to protect the
19   integrity of the ballot box.
20     Q.  (By Mr. Westfall) So is your answer no?
21     A.  The purpose of the bill is to protect the
22   integrity ballot box.
23        MS. WESTFALL:  Mr. Sweeten, did you have
24   chance during the break to counsel your client about
25   answering the question?  Otherwise, unless it is a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

269

1  privileged question, that for which you are asserting
2  privilege, instructing your client not to answer, your
3  client could be -- if we prevail in a motion to compel,
4  could be brought back and asked the same question again.
5  Did you do that, sir?
6      MR. SWEETEN:  Well, I mean, number one,
7  I'm not going tell you what I told my client.  So I'm
8  not going to reveal that.
9      MS. WESTFALL:  Okay, fair point.
10     MR. SWEETEN:  No, no.  But nevertheless,
11 if you can answer that question, just, I mean -- or we
12 can talk about for it second.  But as to what is the
13 purpose of the legislation, I think you've answered what
14 it is, but if you can just answer that second question.
15     Q.  (By Ms. Westfall) Is -- Ms. McCoy testified
16 yesterday that part of the purpose of Senate Bill 14 was
17 to prevent in-person voter fraud.  Is that -- are you --
18 is preventing in-person voter fraud part of the purpose
19 of Senate Bill 14, in your mind?
20     A.  Yes.
21     Q.  Is any part the purpose of Senate Bill 14,
22 private or public, to decrease the number of Hispanic
23 voters?
24         THE WITNESS:  Answer that?
25         MR. SWEETEN:  You can answer what the

---

270

1  purpose of the bill is.
2      A.  No.
3      Q.  (By Ms. Westfall) Are you aware of any
4  conversations about the purpose of Senate Bill 14 being
5  to decrease the number of Hispanic voters?
6          MR. SWEETEN:  Okay, he's not going to
7  answer that question.  You're asking for matters that
8  are covered by the legislative privilege.
9          I'm instructing you not to answer that
10 question.
11         MS. WESTFALL:  Mr. Sweeten, I believe I'm
12 allowed to ask foundational questions about any
13 conversations related to that purpose, pursuant to
14 Paragraph 2 of the order entered today by the Court.  Do
15 you disagree?
16         MR. SWEETEN:  Do you want to cite for me
17 where you -- where you think that that would allow that
18 question?
19         MS. WESTFALL:  The final -- the final
20 sentence of the Order.
21         MR. SWEETEN:  Okay.  Let's go to -- I need
22 Paragraph 1.
23         Actually, Counsel, your -- your question,
24 as I have said on several occasions, and I think we've
25 on most occasions you've been able to move beyond that,

---

271

1  your questions suggests more than a general subject
2  matter of a communication.  You're talking about very
3  specific information in a conversation, which would
4  require him to reveal legislative privilege.  If you
5  want to ask it in another way, you know, that -- that
6  adheres to the Court's Order, which is the nature or
7  general subject matter of the communication, I won't
8  have any objection.  And all day -- let me also say for
9  the record, that all day I have allowed you to ask all
10 of this information about communications.  I think would
11 you agree with that.  And I -- and I -- so I will allow
12 you to do that, but I think the way you phrased that
13 question, it's too specific, it's too -- it's too much
14 into the substance of a potential conversation for him
15 to be able to answer that question.
16         MS. WESTFALL:  Okay.  Well, as to my
17 original question as to whether any part the purpose of
18 Senate Bill 14 was to decrease the number of Hispanic
19 voters, this Order indicates that I'm allowed to examine
20 witnesses as to the purpose, as the witness understands
21 it today, including public information and private
22 information.  So could you make sure that -- or
23 information outside of the public record.  So could --
24 could you make sure that -- that your client is fully
25 answering the question about whether -- and I'll pose it

---

272

1  again, was there any part of the purpose of Senate Bill
2  14 that was to decrease the number the Hispanic voters.
3          MR. SWEETEN:  Okay.  You can -- you can
4  answer that based upon, as she said, based on the public
5  -- or public record or based upon your view of the
6  purpose of the bill, you can tell her what the purpose
7  of Senate Bill 14 was.
8      A.  The purpose of the bill was to preserve the
9  integrity of the ballot box.
10     Q.  (By Ms. Westfall) So in answer to my question,
11 are you answering no, that no part of the purpose of
12 Senate Bill 14 was to decrease the number of Hispanic
13 voters?  Is that your testimony today?
14         MR. SWEETEN:  You can answer that.
15     A.  I'm answering that the purpose of the bill was
16 to preserve the integrity of the ballot box.
17         MS. WESTFALL:  Okay, Mr. Sweeten --
18         MR. SWEETEN:  You can ask -- you can
19 answer the converse of that, as she's asking it:  Was --
20     A.  Ask the question again.
21     Q.  (By Ms. Westfall) Was any part of the purpose
22 of Senate Bill 14 to decrease the number of Hispanic
23 voters?
24     A.  No.
25     Q.  Was any part of the purpose of Senate Bill 14

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

273

1  to decrease the number of any other group of minority
2  voters?
3      A.  No.
4      Q.  Was any part of the purpose of Senate Bill 14
5  to discriminate in any way against any group or groups
6  of minority voters?
7      A.  No.
8      Q.  And I want to -- do you understand that the
9  last three questions that I've asked pertained to the
10 purpose, as you understand it, both from the public
11 record of the consideration of Senate Bill 14 and
12 outside of the public record?  Do you understand that?
13     A.  No.
14     Q.  You don't understand that?
15         MR. SWEETEN:  I -- I think, when you
16 prefaced the question, I told him both.
17         And so I think that -- I mean, she's --
18 she's just asking what is the purpose of the bill based
19 on matters of -- based on your understanding of the bill
20 and based on matters of the public record, both, what is
21 the purpose of the bill.  So in answering --
22         THE WITNESS:  I responded to --
23         MR. SWEETEN:  She's -- she's now answering
24 -- she's now asking you, in those three questions where
25 you said, "no," on all three of those, was that part of

274

1  the -- are you using both your understanding of the bill
2  as well as the matters of the public record in answering
3  the question?
4      A.  Yes.
5      Q.  (By Ms. Westfall) That is correct?
6      A.  Yes.
7      Q.  Thank you.  Was any part of the purpose of
8  Senate Bill 14, either on the public record or outside
9  the public record, for partisan purposes?
10     A.  No.
11     Q.  Was any part of the purpose of Senate Bill 14
12 to depress the participation of registered Democrats in
13 elections?
14     A.  No.
15     Q.  How do you know that?
16         MR. SWEETEN:  Objection, that asks for him
17 to go in to his -- or reveal his thoughts, mental
18 impressions, opinions as well as communications that
19 he's had regarding the issue.
20     Q.  (By Ms. Westfall) Did the purposes of photo ID
21 in Texas from 2005 to 2007 to 2009 to 2011, evolve over
22 time and between legislative sessions?
23         MR. SWEETEN:  I'm going to object.  I
24 think that calls for matters -- you're asking the
25 differences between bills.  I think that calls for

275

1  matters that would reveal his thoughts, mental
2  impressions, opinions about the legislation.  We have,
3  for the record, let you ask as to the purpose of each of
4  those bills and the answer has been consistent on that
5  issue, so --
6          MS. WESTFALL:  I appreciate --
7          MR. SWEETEN:  -- we're not going to let
8  him --
9          MS. WESTFALL:  I appreciate your
10 testimony, but we're here to --
11         MR. SWEETEN:  Elizabeth, I'm trying to
12 make sure the record is clear.  We've got complicated
13 privilege issues, we've got court orders that we're --
14 we're both trying to give the utmost consideration to,
15 and I have at all times done so today.  And I'm trying
16 to make sure that the record here is clear about what
17 we're discussing.
18     A.  Privilege.
19     Q.  (By Ms. Westfall) Was one of the purposes of
20 Senate Bill 14 -- strike that.
21         Was one of the purposes of previous photo
22 bill -- ID bills before Senate Bill 14 to prevent
23 non-citizens from voting?
24         MR. SWEETEN:  I think these questions have
25 been asked and answered all throughout the day.  I think

276

1  he has told you on each singular bill what the purpose
2  of it was.  So if you're now asking him as a whole, as a
3  group, I think the very same question, I'm going allow
4  you to answer it, but we're not going to keep -- we're
5  not going to keep, you know, there's no point in
6  continuing to go back and do this.  You're starting --
7  this is starting to be harassing of this witness.
8          So I'm going let you go ahead and answer
9  her question.  I'm going ask the court reporter could
10 read it back.
11     A.  And I'm going to claim privilege on that
12 question.
13         MR. SWEETEN:  Well, let -- I'm going to
14 have a discussion with -- with him regarding the issue
15 of privilege and we'll --
16         Can you read the question back?
17         (The requested portion was read by the
18 reporter.)
19         MR. SWEETEN:  Okay.  Now, I -- I think I
20 see what the problem is.  You're asking about bills that
21 other people filed.  You're asking about bills that --
22 that were never passed.  You're asking all of these in
23 one loaded question.  And some of this would reveal his
24 mental impressions and thoughts about the bills.  I will
25 let him, as to the legislation that you've already



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 277

1  asked, I will let him answer the -- what the purpose of
2  those bills was.  He -- which he's -- which he's done.
3  And if you want to go through those bills and ask that
4  specific question, I think that -- that we would let him
5  do that.
6        He's also indicated he'd like to discuss,
7  so I think there may be some matters of privilege that
8  he's concerned about and wants to discuss with me, so
9  would ask for a short --
10       MS. WESTFALL:  Would you like a recess?
11       MR. SWEETEN:  Yeah, I'd like a recess.
12       MS. WESTFALL:  Before we you go off the
13  record, I do want to take objection with your accusation
14  that I'm harassing your witness.  I am trying to get
15  through the outline as rapidly as possible.  All the
16  questions are relevant under Arlington Heights,
17  Mr. Sweeten.  And I'm going through the bills, some of
18  the questions repeat from bill to bill, but this is all
19  within the scope of relevance.  And I don't think you
20  have any objection to any of the relevance of the
21  questions that I have asked.
22       MR. SWEETEN:  Well, I've tried to make it
23  clear that I think we've -- I've -- we've had all day to
24  let you -- let him answer the question of purpose.  And
25  I think for you to continue to go back to the same issue

## 278

1  I think is causing difficulty here.
2        MS. WESTFALL:  Mr. Sweeten, I'm asking
3  about purposes for different bills.  We cannot assume
4  that purpose for each bill is different from year-to-
5  year, and I have a right to examine on different bills
6  and different -- and the purposes.  And now we're on
7  Senate Bill 14, which is the subject of this litigation.
8        MR. SWEETEN:  And he has completely
9  answered what the purpose is of Senate Bill 14.  I mean,
10  ad nauseam he's answered that question.
11       MS. WESTFALL:  Why don't you just take a
12  recess.
13       (Recess from 5:20 to 5:33 p.m.)
14  Q.  (By Ms. Westfall)  So I believe you testified
15  that the purpose of Senate Bill 14 was to restore
16  confidence or electoral integrity or something along
17  those lines; is that right?
18  A.  Restore the integrity of the ballot box or
19  protect the integrity of the ballot box.
20  Q.  Has Texas ever had a photo ID requirement prior
21  to the enactment of Senate Bill 14?
22  A.  No.
23  Q.  What do you mean by "restoring confidence" in
24  the system?
25  A.  Our goal --

## 279

1        MR. SWEETEN:  I'm going to object to the
2  extent you're now going into having him reveal thoughts,
3  mental impressions or opinions about legislation, and
4  that would be subject to legislative privilege.
5  A.  Privilege.
6        MR. SWEETEN:  It also misstates his
7  testimony.
8  Q.  (By Ms. Westfall)  Has anyone ever told you
9  they wouldn't vote because they were concerned that
10  voter fraud would cancel out their vote?
11       MR. SWEETEN:  Don't reveal matters of
12  legislative privilege.
13  A.  Privilege.
14  Q.  (By Ms. Westfall)  Are you aware of any
15  conversations regarding anyone saying they wouldn't vote
16  because they were concerned that voter fraud would
17  cancel out their vote?
18  A.  No.
19  Q.  Would a registered voter, who has voted in
20  previous elections who was refused a regular ballot
21  because of this law, still have confidence in the voting
22  system in Texas?
23       MR. SWEETEN:  Objection, you're asking him
24  to reveal his thoughts, mental impressions or opinions
25  about legislation.  Privilege.

## 280

1  A.  Privilege.
2  Q.  (By Ms. Westfall)  How about a student who has
3  an ID from the University of Texas, and that's the sole
4  ID that he or she has, would that person have a level of
5  confidence in Texas's voting system under this law?
6        MR. SWEETEN:  Objection, legislative
7  privilege.
8  A.  Privilege.
9  Q.  (By Ms. Westfall)  What about the person who
10  has to take time off from work and go to a DPS office,
11  Department of Public Safety office or driver's license
12  office, to get an election identification certificate,
13  would that person have confidence in the system?
14       MR. SWEETEN:  Same objection.
15  A.  Privilege.
16  Q.  (By Ms. Westfall)  What about a person who has
17  to wait to get a copy of a birth certificate or a copy
18  of a court order in order to get ID to vote under Senate
19  Bill 14, would that person have confidence in the
20  system?
21       MR. SWEETEN:  Again, you're asking him to
22  reveal his thoughts or mental impressions about
23  legislation.  Objection, privilege.
24  A.  Privilege.
25  Q.  (By Ms. Westfall)  Did you in any part intend



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

281

1    that SB 14 would be designed to increase voter turnout
2    in the state of Texas?
3        MR. SWEETEN:  The question was, did he
4    what?
5        Q.  (By Ms. Westfall)  Is SB 14 designed or does it
6    have any purpose to increase voter turnout in the state
7    of Texas?
8        A.  The purpose of the bill was to protect the
9    integrity of the ballot box.
10       Q.  So I take it the answer is no?
11       A.  The answer is that we designed the bill to
12   protect the integrity of the ballot box.
13       Q.  And that's the sole reason you testified about
14   today; is that correct?
15       A.  That was our -- yes, that's the reason, yes.
16       Q.  Thank you.
17           During -- do you remember Floor
18   consideration of Senate Bill 14?
19       A.  Floor consideration?
20       Q.  Yes.
21       A.  Do I remember?
22       Q.  Yes.
23       A.  Some month.
24       Q.  Yes.  Did you answer many, many, many questions
25   about the bill by saying you were not advised?  Is that

---

282

1    right?  Do you remember that?
2        MR. SWEETEN:  Objection,
3    argumentative.  Objection, vague.  Go ahead.
4        Q.  (By Ms. Westfall)  You may answer.
5        MR. SWEETEN:  You can answer.  It's about
6    the public record.
7        A.  No, I did not answer many, many, many
8    questions.
9        Q.  How about dozens of questions?
10       A.  Probably dozens of questions.
11       Q.  And what did you mean by "I am not advised"?
12       MR. SWEETEN:  I'm going to object.  You're
13   asking what he meant by "I'm not advised," that he said
14   dozens of times.  So how would he possibly -- given the
15   context of that, there's no way he can answer that
16   question.
17       Q.  (By Ms. Westfall)  Do you understand the
18   question?
19       A.  Yes.
20       Q.  What did you mean by "I am not advised"?
21       A.  I'll be glad, if you've give me specific
22   examples of a question, and then I'll tell you, if it
23   applies, why I answered that way.
24       Q.  Okay.  Well, we can go through that maybe at a
25   later time.

---

283

1            Janice McCoy testified yesterday that it
2    was her view that "I'm not advised" means "I don't
3    know."  Do you agree with that testimony by Ms. McCoy?
4        MR. SWEETEN:  Same objection to the
5    question.  You can answer to the extent you can.
6        A.  Privilege.
7            (Exhibit 47 marked for identification.)
8        Q.  (By Ms. Westfall)  You've just been handed
9    Exhibit 47.  Do you recognize this document?
10       A.  Appears to be the Senate Journal of the fifth
11   day, Wednesday, January the 26th.
12       Q.  Thank you.  And on this day, did the Senate
13   consider floor amendments to Senate Bill 14?
14       A.  I believe we did the second reading, which
15   would include the amendments.
16       Q.  Thank you.
17           And could I direct your attention to Page
18   119 of this document?
19       A.  Okay.
20       Q.  Turning your attention to Amendment 13, do you
21   recall that Senator Davis introduced an amendment to
22   include a provision in Senate Bill 14 that would allow
23   individuals to use an ID that is unexpired or has
24   expired at some time since the last general election?
25   Do you recall that amendment?

---

284

1        A.  Yes.
2        Q.  Are you aware of whether the Indiana photo ID
3    law includes such a provision in its photo ID law?
4        A.  I don't know.
5        Q.  And did you move to table this amendment?
6        A.  Yes.
7        Q.  And why did you move to table this amendment?
8        MR. SWEETEN:  Objection, legislative
9    privilege.
10       Q.  (By Ms. Westfall)  Bear with me.  Could you
11   turn your attention to Page 130 at Floor Amendment
12   Number 30.
13       A.  I don't believe I have 130.
14       Q.  130.
15       MR. SWEETEN:  Page 130, it's up here on
16   the left of the page numbers here.
17       MS. WESTFALL:  Yeah.  You may want to take
18   off the clip.
19       MR. SWEETEN:  Yeah.  There's 130 right
20   there.
21       MS. WESTFALL:  Thank you, Mr. Sweeten.
22       Q.  (By Ms. Westfall)  Directing your attention to
23   Floor Amendment Number 30, do you recall that Senator
24   Ellis introduced an amendment or offered an amendment to
25   Senate Bill 14 that would have required the Secretary of

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                      May 17, 2012

---

### 285

1  State to conduct a study that would have included
2  information about the number of eligible voters who are
3  prevented from voting or had to vote provisionally
4  because of a lack of identification and an analysis of
5  this group by race?
6      A.  Is there a question there?
7      Q.  Yes.  Do you recall this amendment?
8      A.  Yes.
9      Q.  Did you vote to table this amendment introduced
10  by Senator Ellis?
11      A.  Yes.
12      Q.  Why would conducting a study have interfered
13  with the purpose that you have described in enacting
14  Senate Bill 14?
15          MR. SWEETEN:  Objection, legislative
16  privilege.
17      A.  Privilege.
18      Q.  (By Ms. Westfall)  Were you concerned that such
19  a study would show that minorities are
20  disproportionately impacted by Senate Bill 14?
21          MR. SWEETEN:  Objection, legislative
22  privilege.
23      A.  Privilege.
24      Q.  (By Ms. Westfall)  Turning your attention to
25  Page 118, turning your attention to Floor Amendment

---

### 286

1  Number 12 listed on Page 118, do you see that?
2      A.  Okay.
3      Q.  Do you recall that Senator Davis introduced an
4  amendment to prohibit state agencies from charging fees
5  for the issuance of any acceptable form of photo ID
6  under Senate Bill 14 or for the underlying documents
7  that may be required to obtain an acceptable form of ID?
8      A.  Yes.
9      Q.  Did you move to table this amendment?
10      A.  Yes.
11      Q.  How would this amendment have interfered with
12  the stated purpose of enacting Senate Bill 14, which was
13  to ensure integrity of the ballot box?
14          MR. SWEETEN:  Objection, legislative
15  privilege.
16      A.  Privilege.
17      Q.  (By Ms. Westfall)  Why did you vote to table
18  this amendment?
19          MR. SWEETEN:  Objection, legislative
20  privilege.
21      A.  Privilege.
22      Q.  (By Ms. Westfall)  Turning your attention to
23  Page 137.  Are you on Page 137, sir?
24      A.  Uh-huh.
25      Q.  Do you see Floor Amendment Number 40?

---

### 287

1      A.  Uh-huh.
2      Q.  Did this amendment allow for the counting of
3  provisional ballots of voters who are indigent and
4  unable to obtain ID because of cost?  Do you recall this
5  amendment?
6      A.  I don't believe it is as you described it, no.
7      Q.  How would you describe it?
8      A.  It is as it's laid out.
9      Q.  Are you aware of whether the Indiana photo ID
10  requirement allows for the counting of provisional
11  ballots of someone who is indigent and unable to obtain
12  photo ID because of the cost of that ID?
13      A.  No.
14      Q.  Did you vote to table this amendment?  Sir, is
15  your vote on this amendment recorded in the Senate
16  Journal or no?
17      A.  You're a step ahead of yourself.
18      Q.  Oh?
19      A.  She offered an amendment to the deal, so the
20  motion was to table the amended motion.
21      Q.  And how did you vote on that motion?
22      A.  Voted to table.
23      Q.  Why did you do that?
24          MR. SWEETEN:  Oh.  Objection, legislative
25  privilege.

---

### 288

1      A.  Privilege.
2      Q.  (By Ms. Westfall)  How would including this
3  provision in Senate Bill 14 have interfered with the
4  accomplishment of the goals of your legislation?
5          MR. SWEETEN:  Same objection, legislative
6  privilege.
7      A.  Privilege.
8      Q.  (By Ms. Westfall)  Turning your attention now
9  to Page 129, turning your attention to Floor Amendment
10  29, do you see that.
11      A.  Uh-huh.
12      Q.  Yes?
13      A.  Yes.
14      Q.  Did Senator Gallegos offer an amendment that
15  would have required driver license offices to be open
16  until 7 p.m. one week day and during four or more hours
17  on at least two Saturdays per month?
18      A.  Yes.
19      Q.  Did you move to table this amendment?
20      A.  Yes.
21      Q.  How would this amendment have harmed the
22  ability of Texas to deter and -- deter and detect a -- a
23  voter fraud?
24          MR. SWEETEN:  Objection, legislative
25  privilege.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

289

1    A.  Privilege.
2    Q.  (By Ms. Westfall)  Do you have any concern that
3 individuals who work an hourly wage may have a difficult
4 time in getting to a driver's license office during
5 business hours?
6    MR. SWEETEN:  Objection, legislative
7 privilege.
8    A.  Privilege.
9    MS. WESTFALL:  Can we go off the record
10 for one moment?
11    MR. SWEETEN:  No objection.
12    (Discussion off the record.)
13    (Exhibit 48 marked for identification.)
14    MS. WESTFALL:  Back on the record.
15    Q.  (By Ms. Westfall)  I'm handing you what's been
16 -- oh, go ahead.
17    MR. SWEETEN:  I'm sorry.
18    Q.  (By Ms. Westfall)  I'm handing you what's been
19 marked as US Exhibit 48.  Do you recognize This
20 document?
21    A.  Appears to be from the Texas Tribune.
22    Q.  Have you seen this article before?
23    A.  I read it last night.
24    Q.  Wonderful.  Could you turn your attention to
25 the second page of the document?

290

1    A.  Okay.
2    Q.  And do you see at the top of the page that
3 there are some quotations from you, attributed to you,
4 concerning the Justice Department's rejection of Texas
5 voter ID law, as you phrase it?  Do you see that?
6    A.  Yes.
7    Q.  And do you see that you cite a Lighthouse
8 opinion, polling and research poll, in the middle of the
9 page?
10    A.  Yes.
11    Q.  In your view, does public support for Senate
12 Bill 14 have anything to do with its purpose, as you
13 stated and testified today?
14    MR. SWEETEN:  Don't reveal matters of
15 legislative privilege.  You can refer to matters of
16 public records and public statements.
17    MS. WESTFALL:  Mr. Sweeten, this is in the
18 public record.
19    MR. SWEETEN:  What are you specifically
20 asking him?
21    MS. WESTFALL:  Well, my question stands.
22    MR. SWEETEN:  Can you read the question
23 back, please?
24    (Record read back.)
25    Q.  (By Ms. Westfall)  Do you have a question about

291

1 the question, sir?
2    MS. WESTFALL:  Or you, Mr. Sweeten?
3    MR. SWEETEN:  Objection, calls for
4 speculation.  You can answer to the extent you know.
5    Q.  (By Ms. Westfall)  Do you know?
6    A.  The question -- repeat the question again.
7    MS. WESTFALL:  Could you repeat the
8 question, court reporter.
9    (Record read back again.)
10    MR. SWEETEN:  Objection, vague.  Go ahead.
11    A.  The purpose of the bill still is to protect the
12 integrity of voting, and public support is certainly --
13 it's good that we have that.
14    Q.  (By Ms. Westfall)  If it was unpopular, would
15 you still have moved forward with Senate Bill 14?
16    MR. SWEETEN:  Objection.  You're now
17 asking about his thoughts, mental impressions or
18 opinions about legislation.  It's legislatively
19 privileged.
20    A.  Privilege.
21    Q.  (By Ms. Westfall)  Are you invoking the
22 privilege?
23    A.  (Witness nods head yes.)  Privilege.
24    Q.  Do you see also in this article that you're
25 quoted as saying, "Polls show that people are less

292

1 likely to vote if they believe their ballot will not be
2 fairly counted"?
3    A.  Yes.
4    Q.  Do you think that's a fair representation of
5 something that you've said?
6    A.  It's printed and I also said it on the record.
7    Q.  Can you identify any people who have indicated
8 to you that they were less likely to vote because they
9 believe their ballot will not be fairly counted?
10    MR. SWEETEN:  Don't reveal matters that
11 are privileged in answering the question.
12    A.  Privilege.
13    Q.  (By Ms. Westfall)  What polls were you
14 referring to in that statement, sir?  It's at the -- the
15 sentence that indicates, "Polls show that people are
16 less likely to vote if they believe their ballot will
17 not be fairly counted."  Do you see that?
18    A.  Uh-huh.
19    Q.  Could you tell me what polls you're referring
20 to?
21    A.  That is a quote that was taken from my opening
22 comments in 2009, and so no, I don't have the poll, but
23 it was a poll that I, you know, I had at that time.
24    Q.  So sitting here today, you don't recall the
25 particular poll; is that your testimony?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                    May 17, 2012

---

### 293

1    A.  No, I do not.
2    Q.  Do you have a legislative ID as a member of the
3  Texas Senate?
4    A.  Yes, I do.
5    Q.  Does it have a photograph on it?
6    A.  Yes, it does.
7    Q.  Does it prove your identity?
8    A.  Yes.
9    Q.  Do other forms of photo ID, in addition to
10  legislative ID that have a picture on it, prove one's
11  identity in addition to the forms of ID listed in Senate
12  Bill 14?
13    MR. SWEETEN:  Objection, vague.
14    A.  If you want to narrow it down, I'll answer the
15  question.
16    Q.  (By Ms. Westfall)  Otherwise, are you refusing
17  to answer my question, sir?
18    A.  No.  I'm asking you to clarify your question.
19    Q.  Are any other photo IDs that we have referred
20  to today, including student IDs, employee IDs, expired
21  state licenses, out-of-state state licenses that have a
22  photograph, do those prove a person's identity?
23    A.  I'll be glad to address those one at a time if
24  you'd like.
25    Q.  We may have time to do that another day.

---

### 294

1    MR. SWEETEN:  Okay.  And also, while
2  you're answering those, I want to caution you that when
3  you're answering a question, don't reveal thoughts,
4  impressions, matters about legislation when you're
5  answering that question.  It's legislatively privileged
6  if you do that.
7    Q.  (By Ms. Westfall)  At any time since --
8    MS. WESTFALL:  I'm sorry.  Are you done
9  with your instruction?
10    MR. SWEETEN:  I am.
11    MS. WESTFALL:  I was looking down at my
12  paper.
13    MR. SWEETEN:  That's okay.
14    MS. WESTFALL:  Thank you.
15    Q.  (By Ms. Westfall)  At any time since the
16  passage of Senate Bill 14, which -- strike that.
17    When was Senate Bill 14 signed into law
18  approximately?  Was it May 2011?
19    A.  May 2011.
20    Q.  At any time since the passage and signing into
21  law Senate Bill 14, have you come to believe that it was
22  passed with a discriminatory intent?
23    A.  No.
24    Q.  At any time since the passage of Senate Bill
25  14, have you come to believe that Senate Bill 14 will

---

### 295

1  have a harmful and retrogressive effect on minority
2  voters?
3    A.  No.
4    Q.  If you are called to trial in this action, will
5  you testify that Senate Bill 14 has no discriminatory
6  purpose?
7    A.  Yes.
8    Q.  If called to trial on this action, will you
9  testify that Senate Bill 14 does not have a
10  discriminatory effect upon minority voters?
11    A.  Does not.
12    MS. WESTFALL:  I would like to at this
13  time conclude the questioning of the witness.
14  Obviously we're leaving the deposition open pending
15  resolution of the motion to compel to be filed shortly.
16    I will turn over the questioning to
17  counsel for Defendant Interveners.
18    EXAMINATION
19  BY MR. ROSENBERG:
20    Q.  I will ask your indulgence.  I will try not to
21  go too far over, although we're reserving our right to
22  ask, as is the DOJ, to continue this deposition, if
23  necessary, to bring back the Senator.  I'm Ezra
24  Rosenberg.  I'm going to ask you a few questions right
25  now.

---

### 296

1    Let me start very briefly with the 5.11,
2  which is in US 32.  Just very quickly, and I don't know
3  if you even have to look at it:  When is a special order
4  needed?
5    A.  I'm having a lot of trouble understanding you.
6    Q.  Okay.  I'm from New Jersey.  I'm going to slow
7  down.  Okay?
8    A.  You need to speak Texan if you're going to
9  talk.
10    Q.  I'll try, y'all.
11    When is a special order needed?  Under
12  what circumstances is a special order needed?
13    A.  There is not a definition of when a special
14  order is needed.
15    Q.  Is one of the times a special order is needed
16  when there's a blockage bill, to get around the blockage
17  bill?
18    A.  No.
19    Q.  Give me one example of when a special order is
20  needed.
21    A.  I don't -- I just said that there's not a --
22  circumstance where a special order.  There are special
23  orders that are put into the rules.
24    Q.  Give me an example of when a special order is
25  put into the rules.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Senator Troy Fraser                                        May 17, 2012

---

297

1     A.   A good example would be the bill we're looking
2   at.
3     Q.   Which says, "Any bill, resolution, or other
4   measure, may on any day be made a special order for a
5   future time of the session by an affirmative vote of
6   two-thirds of the members present," right?
7     A.   Yes.
8     Q.   Did I read that correctly?
9     A.   (Witness nods head yes.)
10    Q.   So that's not an example of a special order
11  being put in the rules, that's -- they talk about a bill
12  being made a special order, correct?
13    A.   Who is "they"?
14    Q.   The Senate, in this rule, talks about any bill
15  may on any day be made a special order, correct?
16    A.   Yes.
17    Q.   All right.  So there are certain times when
18  bills are made special orders, correct?
19    A.   That's what this reads, yes.
20    Q.   And when are those times that bills are made
21  special orders?
22    A.   I couldn't project that without knowing the
23  specific bill and the request of the bill.
24    Q.   Is one of the times that a bill is made a
25  special order when there is a blockage bill?

---

298

1     A.   No.
2     Q.   Okay.  Is -- does a blockage bill have anything
3   to do with special orders?
4     A.   No.
5     Q.   Okay.  The exception in 5.119(d) which carved
6   out from the two-thirds rule voter ID identification
7   requirements bills, right?
8     A.   No.
9     Q.   It did not?
10    A.   No.
11    Q.   Doesn't it say, "Notwithstanding Subsection A
12  of this rule, a bill or resolution relating to voter ID
13  indication requirements reported favorably from the
14  Committee of the Whole Senate may be set as a special
15  order for a time at least 24 hours after the motion is
16  adopted by a majority of the members of the Senate"?  Is
17  that what it says?
18    A.   Yes.
19    Q.   It says, "Notwithstanding the two-thirds rule,"
20  correct?
21    A.   No.
22    Q.   Well, can you tell me --
23    A.   You're making a reference that the two-thirds
24  rule and the blocker bill.
25    Q.   I didn't use "blocker bill."  I said -- I'm

---

299

1   using -- I'm looking right at 5.11D, that says
2   "Notwithstanding Subsection A of this rule," and
3   Subsection A of this rule is the two-thirds rule,
4   right?  So notwithstanding the two-thirds rule, a bill
5   relating to voter identification requirements may be
6   reported on the basis of a majority rule, a majority
7   vote, correct?  That's what that means?
8     A.   No.
9     Q.   Then tell me what that means.
10    A.   You're asking the questions.
11    Q.   That's right.  I'm asking the questions.  I
12  asked you to tell me what that means.
13    A.   What?
14    Q.   5.11D, what does that mean?
15    A.   It says "Notwithstanding Subsection A of this
16  rule, a bill or resolution relating to the voter
17  identification requirements reported favorably from the
18  Committee of the Whole, shall be set as a special order
19  at a time at least 24 hours after the motion is adopted
20  by the majority of the members of the Senate."
21    Q.   What relationship does 5.11D have to 5.11A?
22    A.   "Notwithstanding A."  It is not subject to A.
23    Q.   Okay, fine.  So voter identification
24  requirements are not subject to 5.11A, correct?
25    A.   Yes.

---

300

1     Q.   Okay.  Can you think of any -- can you identify
2   any other category of legislation that is currently not
3   subject to 5.11A?
4     A.   I'm sorry.  I can't -- I don't know the answer
5   to that.
6     Q.   So sitting here today, you cannot identify any
7   other category of legislation, other than voter
8   identification requirements, that are not subject to
9   5.11A; is that right?
10    A.   I can't give you specific answers to a specific
11  bill.
12    Q.   You cannot give me a category of such
13  legislation, correct?
14    A.   You don't go into categories of legislation.
15    Q.   Well, can you name any other types of
16  legislation that are exempt from the requirements of
17  5.11A?
18    A.   It would only be exempt if it was put into the
19  legislation that session, and it would be in that -- in
20  that order until it was taken out the next session.
21    Q.   Can you identify any such examples such as
22  that, other than the voter identification bill?
23    A.   I cannot give you specific examples.
24    Q.   Do you recall -- by the way, the Shoe Horn, is
25  that is a newspaper?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 301 |
| --- |

1      A.  I have no idea.
2      Q.  Have you ever heard of anything -- anything in
3  the media called the "Shoe Horn"?
4      A.  No.
5      Q.  Do you recall making a public statement in
6  January 2011, where you said that the number of Texas
7  citizens who would not have photo identification would
8  be very, very small?
9      A.  Made the statement to who?
10      Q.  To the public.
11      A.  No.
12      Q.  Do you believe that the number of Texas
13  citizens who would have photo identification would be
14  very, very -- who would not have photo identification
15  would be very, very small?
16          MR. SWEETEN:  Objection, legislative
17  privilege.
18      Q.  (By Mr. Rosenberg)  Sitting here today, do you
19  believe that the number of Texas citizens who do not
20  have photo identification is very, very small?
21          MR. SWEETEN:  Don't reveal thoughts,
22  mental impressions or opinions about legislation,
23  including Senate Bill 34.
24      A.  Privilege.
25      Q.  (By Mr. Rosenberg)  And I'm not asking you --

| 302 |
| --- |

1  I'm asking your present knowledge today, not related to
2  legislation that's pending.  I'm asking you for your
3  present knowledge today as to whether or not you believe
4  that the number of Texas citizens who do not have photo
5  identification is very, very small?
6          MR. SWEETEN:  If you can provide that
7  information without revealing thoughts, mental
8  impressions, opinions about legislation or in
9  furtherance to the legislative process, or not revealing
10  conversations you've had with the multiple agencies or
11  categories of individuals or entities that we've
12  discussed earlier, then you can answer the question.
13      A.  Privilege.
14      Q.  (By Mr. Rosenberg)  Did you have discussions
15  with anyone concerning the differences between SB 14 and
16  SB 362?
17          MR. SWEETEN:  You can answer whether you
18  had discussions with anyone.  You can answer that
19  factual question.  Don't reveal the substance of any
20  conversation.
21      A.  I need more clarification about when you're
22  talking about.
23      Q.  (By Mr. Rosenberg)  At any time -- any time.
24  It would have to be, obviously, at a time when SB 14 was
25  either being formulated or drafted.

| 303 |
| --- |

1      A.  Yes.
2      Q.  Okay.  With whom did you have such
3  conversations?
4      A.  Members of the Texas Senate.
5      Q.  With which members of the Texas Senate?
6      A.  Many.
7      Q.  Can you identify -- were these -- and I'd like
8  to focus on conversations that were off the floor and
9  not on the record.
10      A.  Okay.  Then there -- ask the question again.
11      Q.  Sure.  Did you have any discussions that were
12  not on the public record with any Texas legislators
13  concerning differences between SB 14 and SB 362?
14      A.  Yes.
15      Q.  With whom?
16      A.  I had conversations with Senator Van de Putte.
17  I had conversations with Senator Whitmire.
18      Q.  Anyone else?
19      A.  That would probably be it.
20      Q.  Did you have conversations with any
21  constituents concerning differences between SB 362 and
22  SB 14?
23      A.  No.
24      Q.  Did you have conversations with anyone in any
25  executive agency as to differences between SB 362 and SB

| 304 |
| --- |

1  14?
2      A.  No.
3      Q.  And when did you have the conversations with
4  Senator Van de Putte?
5      A.  As we were starting, it was after the bill was
6  filed and we were starting session and we were probably
7  within a day or so it being heard.
8      Q.  And what was the substance of that
9  conversation?
10          MR. SWEETEN:  Objection, privilege.
11      Q.  (By Mr. Rosenberg)  And when did you have the
12  conversation with Senator Whitmire?
13          MR. SWEETEN:  You can answer.
14      A.  More than one conversation.  A conversation in
15  the last quarter of the year, and then another -- at
16  least one other conversation in about the time we
17  started session.
18      Q.  (By Mr. Rosenberg)  And what was the substance
19  of that conversation?
20          MR. SWEETEN:  Objection, privilege.
21      Q.  (By Mr. Rosenberg)  Did you have discussions
22  with anyone off the public record concerning the effect
23  of SB 14 on minorities?
24          MR. SWEETEN:  I think the question is
25  you're asking about specific -- the substance of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 305

1  specific conversations that he's had.  I think -- I
2  don't think he has to reveal that.  That's beyond just a
3  general subject matter description.
4       MR. ROSENBERG:  I really disagree.
5  Q.  (By Mr. Rosenberg)  I'll change it to the
6  effect of, if any, of SB 14 on minorities?
7  A.  Ask the question again, please.
8  Q.  Sure.  Did you have any discussions, not on the
9  public record, as to the effect --
10 A.  I'm sorry.  I don't understand "not in the
11 public record."
12 Q.  Well, meaning, as I think your counsel has
13 advised, that they're taking the position that
14 legislative privilege applies to anything that's not on
15 the public record.  And I think that has been stated
16 over and over again.  So I'm using your counsel's
17 terminology.
18      And my question is:  At any time, did you
19 have discussions with anyone, that was not on the public
20 record, concerning the effect, if any, of SB 14 on
21 minorities?
22 A.  And you're including legislators in session?
23 Q.  No, no.  Off the public record.  During the
24 session, yes, so long as it's not on what your counsel
25 considers the public record.

## 306

1       MR. SWEETEN:  As phrased, I'm going to let
2  you answer whether or not you had such conversations
3  with anyone, whether or not you did.  Don't reveal any
4  substance --
5  A.  I did not have conversations that were not
6  privileged.
7       MR. SWEETEN:  Okay.  And you're not going
8  to reveal any of the substance of any such conversations
9  but you can reveal whether or not you've had a
10 conversation with someone --
11 A.  I just --
12      MR. SWEETEN:  -- on the issue of that.
13 A.  The question before this, I disclosed
14 conversations I had with Van de Putte and --
15      MR. SWEETEN:  Whitmire.
16 A.  -- Whitmire, and I've also said earlier that I
17 had a conversation with Ellis.
18 Q.  (By Mr. Rosenberg)  Right.
19 A.  That sits next to me.  And so I've already
20 testified to those conversations.
21 Q.  Well, this is a different question.  My
22 question is specifically:  Conversations not on the
23 public record with anyone concerning the effect, if any,
24 of SB 14 on minorities?
25 A.  And I can't answer that because I'm saying I

## 307

1  have already answered that question of the three that
2  would be included.  So if you're going to qualify your
3  question, anyone other than the three that I have
4  mentioned.
5  Q.  Well, I -- when I first asked you the question
6  which resulted in you giving me the names of Senator Van
7  de Putte and Whitmire, I didn't specify the effect, if
8  any, on minorities.  So now you're telling me that the
9  conversations that you had with Senator Van de Putte,
10 Senator Whitmire, and Senator Ellis had to do with the
11 effect, if any, of SB 14 on minorities; is that correct?
12 A.  I'm saying that it was part of the total
13 conversation.
14 Q.  Other than those conversations, did you have
15 discussions with any other legislators concerning the
16 effect, if any, of SB 14 on minorities?
17 A.  No.
18 Q.  Did you have discussions off the public record
19 with anyone from executive agencies as to the effect, if
20 any, of SB 14 on minorities?
21 A.  No.
22 Q.  Did you have discussions with any constituents
23 or lobbyists or public interest groups as to the effect,
24 if any, of SB 14 on minorities?
25 A.  No.

## 308

1  Q.  Did you have discussions with anyone concerning
2  the effect, if anything, if any, on election results of
3  SB 14?
4  A.  Not to my knowledge.
5  Q.  And that includes discussions with legislators,
6  with anyone from the executive agencies, Governor,
7  Lieutenant Governor, and constituents?
8  A.  Not to my knowledge.
9  Q.  I'd like you to take a look at United States
10 Exhibit -- Department of Justice Exhibit 46.
11 A.  Which is 46?
12 Q.  Should be in your batch there.  And turn to
13 Page 74, please.  And if you see, there's a quote from
14 you, and I'm going to focus your attention on the last
15 sentence where it says, last two sentences, you're
16 asking, "Have I done that?"  Oh, actually, we should
17 have to give context to this.
18      And I want you to turn a page back to
19 where Senator Watson says, "Well, and I'm looking
20 forward to that.  I'm saying to you, though, with regard
21 to your bill, Senate Bill 362, are you familiar with any
22 data or study that's been done with regard to some sort
23 of statistical analysis concerning the effect of the new
24 requirements of Senate Bill 362 on African-American
25 population, Hispanic, people making less than $35,000 a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 309

1  year," et cetera.

2          MR. SWEETEN:  We -- Ezra, we've lost -- we

3  go from Page 74 to 89.

4     A.  We don't --

5          MR. ROSENBERG:  No, no.  Go back to Page

6  73.  I'm sorry.  I was going back a page.

7          MR. SWEETEN:  Okay.  He's going here.

8          MR. ROSENBERG:  Right.  I was trying to

9  give context to this.

10          MR. SWEETEN:  Here, that's what he

11  read.  You can read that.

12     Q.  (By Mr. Rosenberg)  Have you had a chance to

13  read that, Senator?

14     A.  I have.

15     Q.  You see where on Page 74, where you're saying,

16  you're asking, "Have I done that?  The answer is no."

17  The phrase, "The answer is no," does that refer to doing

18  statistical analyses?

19          MR. SWEETEN:  You can -- don't reveal your

20  thoughts, mental impressions, opinions about

21  legislation.  You can reference the public record.

22     A.  The -- the statement speaks for itself.

23     Q.  (By Mr. Rosenberg)  Well, what does it mean?

24     A.  Privilege.

25     Q.  So you're telling me that you won't answer

---

### 310

1  under privilege the public statement that you made that,

2  quote, "The answer is no," end quote?

3     A.  (Conferring.)

4          MR. ROSENBERG:  Fine.  Let's move on.

5  Look, we don't have all night.  If that's your position,

6  that's --

7          MR. SWEETEN:  Ezra, you're already over.

8          MR. ROSENBERG:  I understand, but it would

9  be a lot easier if I was getting answers.

10          MR. SWEETEN:  I understand.  But I mean,

11  we're sitting here trying to analyze your question as to

12  whether or not we think it invades privilege.  Just give

13  us a second.

14     A.  I think it's clear what I'm saying, and I stand

15  by what I say.

16     Q.  (By Mr. Rosenberg)  Okay.  Let's just move on.

17          Next phrase, "But I am pulling data from

18  the academics that have done that and that have delivered

19  back."  Did I read that correctly?

20     A.  Yes.

21     Q.  What data were you referring to?

22     A.  The testimony --

23          Is it all right for me to answer that?

24          MR. SWEETEN:  As to the testimony, yeah.

25     A.  The testimony was about to be delivered from

---

### 311

1  Indiana and Georgia on their voting results, and it came

2  from data that they had collected and that was about to

3  be delivered.

4     Q.  (By Mr. Rosenberg)  Okay.  And this will be the

5  one and only exhibit that I will mark.

6          (Exhibit 49 marked for identification.)

7     Q.  (By Mr. Rosenberg)  Senator, I'm showing you

8  what's been marked as Exhibit 49, and turning your

9  attention to the page number 48, which is the first page

10  with testimony on it, with discussion.  And the first

11  paragraph -- and I will represent, by the way, that this

12  is an excerpt from a statement by you and I think -- can

13  you verify that from your own memory?

14     A.  Yes.

15     Q.  Okay.  And you're quoting from the Baker-Carter

16  Commission that I think you talked about before.

17     A.  Yes.

18     Q.  And you say, "And regardless of whether one

19  believe that voter impersonation is widespread or

20  relatively rare, it can be no serious dispute that it is

21  a real effect that can be substantial, because in a

22  close election, even a small amount of fraud can make

23  the margin of difference."  Do you see that?

24     A.  Yes.

25     Q.  And is that a statement with which you agree?

---

### 312

1     A.  That is a statement that I pulled from the

2  Baker and Carter commission.

3     Q.  And did you quote it because you agreed with

4  it?

5     A.  Yes.

6     Q.  And what did you mean then by using the words

7  "can make a difference"?

8     A.  I repeated what they had quoted from their

9  quote.

10     Q.  And what did you understand the phrase "can

11  make a difference" to mean from their quote?

12     A.  I understood it can make a difference.

13     Q.  Do you -- are you -- were you taking it to

14  understand that a person who's not supposed to vote and

15  votes can make a difference in an election?

16     A.  I take it on its face for what it says.

17     Q.  Do you believe that a person who is eligible to

18  vote but can't because he doesn't have a photo ID can

19  make a difference in an election?

20          MR. SWEETEN:  Don't reveal your mental

21  processes in passing a legislation.  It's legislatively

22  privileged.

23     A.  Privilege.

24     Q.  (By Mr. Rosenberg)  Generally speaking, as a

25  matter of general practice, would you want to create a

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

### 313

1   system that stopped more eligible persons from voting
2   than stopped ineligible persons from voting?
3          MR. SWEETEN:  Do not reveal your thoughts,
4   mental impressions, opinions about legislation,
5   including Senate Bill 14.  Legislatively privileged.  Or
6   any conversations because it's legislatively
7   privileged.  Objection.
8      A.  Privilege.
9      Q.  (By Mr. Rosenberg)  Are you aware, sitting
10  today, here today, of how many Texans don't have photo
11  ID?
12     A.  I do not have the exact number.
13     Q.  Do you have an approximate number?
14     A.  I have only the data that we received during
15  the testimony of the bill.
16     Q.  And what number is that?
17     A.  I don't have a number.
18     Q.  Is it more than 500,000?
19     A.  There's no way to know that.
20     Q.  Is it more than the number of voter
21  impersonations with which you're aware -- of which
22  you're aware?
23         MR. SWEETEN:  I'm going to object to the
24  extent it calls for his mental impressions, opinions
25  about legislation, including Senate Bill 14, or to the

### 314

1   extent that it reveals any conversations he's had with
2   any of the enumerated individuals or agencies we've
3   discussed.
4          MR. ROSENBERG:  But to the extent that
5   it's in the public record and he has knowledge, he can
6   testify, even according to your theories.
7      A.  Please show me in the public record what's been
8   said.
9      Q.  (By Mr. Rosenberg)  Are you aware of assertions
10  on the public record that minorities are less likely to
11  have public identification -- photo identification?
12     A.  Ask the question again, please.
13     Q.  Sure.  Are you aware of assertions on the
14  public record that minorities are less likely to have
15  photo identification?
16     A.  I'm aware that it has been asserted.
17     Q.  Do you disagree with the assertion?
18     A.  I have no basis to know either way.
19     Q.  Okay.  Are you aware of assertions on the
20  public record that minorities are less likely to have
21  access to driver's license facilities in terms of having
22  cars or public transportation?
23     A.  I'm aware that assertions have been made.
24     Q.  Do you doubt the assertions?  Do you question
25  the assertions?

### 315

1      A.  Yes, I do.
2          MR. SWEETEN:  In answering that question,
3   don't reveal your thoughts, processes or discussions with
4   respect to this -- with respect to this legislation;
5   it's legislatively privileged.  You can answer
6   otherwise.
7      Q.  (By Mr. Rosenberg)  Have you answered?
8      A.  Ask the question again.
9      Q.  Sure.  Are you -- do you doubt the -- do you
10  deny the assertion that minorities have less access to
11  driver's license facilities, in terms of having motor
12  vehicles --
13     A.  "Deny" and "doubt" are different words.
14     Q.  Well, I'm going to rephrase the question, and
15  your attorney can object or counsel you.
16         Let me just say again.  Do you deny the
17  assertion that minorities have less access to driver's
18  license facilities in terms of motor vehicles or public
19  transportation?
20         MR. SWEETEN:  Don't reveal your thoughts,
21  your mental impressions, your opinions about legislation
22  or conversations that you've had.  Those are
23  legislatively privileged.
24     A.  Privilege.
25     Q.  (By Mr. Rosenberg)  Are you aware of assertions

### 316

1   that minorities are more likely to be below the poverty
2   line and therefore would more difficulty for paying for
3   the underlying documents necessary to get photo
4   identifications than nonminorities?
5      A.  Am I aware of the assertion?
6      Q.  Yes.
7      A.  Yes.
8      Q.  Do you deny the assertion?
9          MR. SWEETEN:  Don't reveal matters subject
10  to legislative privilege in answering the question.  If
11  you can answer the question without doing so, you can.
12     A.  Privilege.
13     Q.  (By Mr. Rosenberg)  Do you agree that a person
14  who doesn't have photo identification, doesn't have easy
15  access to driver's license facilities, may have to take
16  time off from work in order to go to the driver's
17  license facilities and doesn't have a spare $22 to pay
18  for underlying documents to get photo identification,
19  may be less likely to vote under SB 14 than people who
20  do have those things?
21         MR. SWEETEN:  Objection, compound.
22  Objection, calls for speculation.  Objection, vague.  In
23  answering that, don't reveal matters, thoughts, mental
24  impressions or opinions about legislation, including
25  Senate Bill 14 or matters communicated to you within --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 317

1  by any legislators, legislative staff, or other
2  enumerated individuals or entities.  If you can answer
3  without doing so, you can attempt to answer his
4  question.
5      A.  Privilege.
6      Q.  (By Mr. Rosenberg)  And my last question:  Just
7  sitting here today, do you have a basis to disagree that
8  minorities will be disproportionately affected by SB
9  14?
10      MR. SWEETEN:  In answering this question,
11  do not reveal matters of legislative privilege,
12  including your thoughts, mental impressions about the
13  legislation, in furtherance of the legislative process,
14  or discussions you've had with legislators, legislative
15  staffs, state agencies, Texas Legislative Council, or
16  constituents.  You can refer to matters of the public
17  record in answering the question.
18      A.  Privilege.
19      MR. ROSENBERG:  Subject to our moving to
20  compel, I'm leaving this open after all the privilege
21  issues and documents are produced, et cetera, I think
22  we're through for the day.
23      MR. SWEETEN:  Okay.  I would like the time
24  total.  I would like the time total appended to the
25  deposition.  And we will reserve questions of Senator

## 318

1      Fraser to the time of trial.
2          (Deposition concluded at 6:30 p.m.)
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 319

1  CHANGES AND SIGNATURE
2      RE: TEXAS VS. HOLDER, ET AL
3  PAGE  LINE  CHANGE        REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  I, SENATOR TROY FRASER, have read the foregoing
21  deposition and hereby affix my signature that same is
22  true and correct, except as noted above.
23
24      _____
25      SENATOR TROY FRASER

## 320

1  THE STATE OF _____)
2  COUNTY OF_____)
3
4      Before me,_____, on this day
5  personally appeared SENATOR TROY FRASER, known to me (or
6  proved to me under oath or through_____
7  (description of identity card or other document) to be
8  the person whose name is subscribed to the foregoing
9  instrument and acknowledged to me that they executed the
10  same for the purposes and consideration therein
11  expressed.
12      Given under my hand and seal of office
13  this_____day of _____, 2012.
14
15
16      _____
      NOTARY PUBLIC IN AND FOR
17      THE STATE OF _____
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

321

```
 1          IN THE UNITED STATES DISTRICT COURT
             FOR THE DISTRICT OF COLUMBIA
 2
    STATE OF TEXAS,        )
 3                         )
              Plaintiff,   )
 4                         )
    VS.                    )
 5                         )
    ERIC H. HOLDER, JR. in his   )
 6  official capacity as Attorney )
    General of the United States, )
 7                         )
              Defendant,   )
 8                         )
    ERIC KENNIE, et al,        )
 9                         )
         Defendant-Intervenors,   )
10                         )
    TEXAS STATE CONFERENCE OF    ) CASE NO. 1:12-CV-00128
11  NAACP BRANCHES,        ) (RMC-DST-RLW)
                           ) Three-Judge Court
12       Defendant-Intervenors,   )
                           )
13  TEXAS LEAGUE OF YOUNG VOTERS  )
    EDUCATION FUND, et al,    )
14                         )
         Defendant-Intervenors,   )
15                         )
    TEXAS LEGISLATIVE BLACK    )
16  CAUCUS, et al,         )
17       Defendant-Intervenors,   )
                           )
18  VICTORIA RODRIGUEZ, et al.,  )
                           )
19       Defendant-Intervenors.   )
20          REPORTER'S CERTIFICATION
            DEPOSITION OF SENATOR TROY FRASER
21           MAY 17, 20112
22       I, Chris Carpenter, Certified Shorthand Reporter in
23  and for the State of Texas, hereby certify to the
24  following:
25       That the witness, SENATOR TROY FRASER, was duly
```

322

```
 1  sworn by the officer and that the transcript of the oral
 2  deposition is a true record of the testimony given by
 3  the witness;
 4       That the deposition transcript was submitted on the
 5  _____day of _____, 2012, to the witness or to the
 6  attorney for the witness for examination, signature and
 7  return to_____, by
 8  _____, 2012; and if returned, the original
 9  transcript will forwarded to Elizabeth Westfall, the
10  custodial attorney;
11       That the amount of time used by each party at the
12  deposition is as follows:
13       Ms. Westfall: 6 hours, 30 minutes
14       Mr. Rosenberg:  30 minutes
15       I further certify that I am neither counsel for,
16  related to, nor employed by any of the parties or
17  attorneys in the action in which this proceeding was
18  taken, and further that I am not financially or
19  otherwise interested in the outcome of the action.
20       Certified by me this 19th day of May, 2012.
21
22
          Chris Carpenter, Texas CSR 1151
23       Expiration Date:  12/31/2012
          100 Congress Avenue, Suite 2000
24       Austin, TX  78701
          (512)328-5557
25       Firm Registration No. 283
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS