## 1

346212 eb

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| STATE OF TEXAS, | * |
|        Plaintiff, | * |
| VS. | * |
| ERIC H. HOLDER, JR., in his | * |
| official capacity as Attorney | * |
| General of the United States, | * |
|        Defendant, | * |
| ERIC KENNIE, et al, | * |
|        Defendant-Intervenors, | * |
| TEXAS STATE CONFERENCE OF NAACP | * CASE NO. |
| BRANCHES, et al, | * 1:12-CV-00128 |
|        Defendant-Intervenors, | * (RMC-DST-RLW) |
| TEXAS LEAGUE OF YOUNG VOTERS | * THREE-JUDGE COURT |
| EDUCATION FUND, et al, | * |
|        Defendant-Intervenors, | * |
| TEXAS LEGISLATIVE BLACK CAUCUS, | * |
| et al, | * |
|        Defendant-Intervenors, | * |
| VICTORIA RODRIGUEZ, et al | * |
|        Defendant-Intervenors. | * |

DEPOSITION OF SENATOR TROY FRASER
VOLUME 2

UPON RECEIPT OF SIGNATURE, THE ORIGINAL OF THIS
DEPOSITION WILL BE IN THE CUSTODY OF:
Elizabeth Westfall, Esquire
U.S. Department of Justice
950 Pennsylvania Avenue, NW
NWB - Room 7202
Washington, DC 20530

Date               Edith A. Boggs, CSR

6-13-12            HOUSTON, TEXAS

## 3

A P P E A R A N C E S

ATTORNEYS FOR PLAINTIFF, STATE OF TEXAS:

Office of the Attorney General of Texas
P.O. Box 12548 (78711-2548)
209 West 8th Street, 8th Floor
Austin, Texas  78701
By:  Patrick K. Sweeten, Esquire
and Stacey Napier, Esquire

(512) 936-1307
patrick.sweeten@aog.state.tx.us

ATTORNEY FOR DEFENDANT, HOLDER, ET AL:

U.S. Department of Justice
950 Pennsylvania Avenue, NW
NWB - Room 7202
Washington, DC 20530
By:  Elizabeth S. Westfall, Esquire
(202) 305-7766
elizabeth.westfall@usdoj.gov

## 2

DEPOSITION OF SENATOR TROY FRASER

DEPOSITION AND ANSWERS of SENATOR TROY FRASER, taken
before Edith A. Boggs, a certified shorthand reporter in
Harris County for the State of Texas, taken at the
offices of Dechert, LLP, 300 6th Street, Suite 2010,
Austin, Texas, on the 13th day of June, 2012, between
the hours of 1:17 p.m. and 3:49 p.m.

## 4

A P P E A R A N C E S (Continued)

ATTORNEY FOR DEFENDANT-INTERVENOR TEXAS STATE
CONFERENCE OF NAACP BRANCHES AND THE MEXICAN AMERICAN
LEGISLATIVE CAUCUS:

Dechert, LLP
300 6th Street, Suite 2010
Austin, Texas  78701

By:  Lindsey Stelcen, Esquire

(512) 394-3000
lindsey.stelcen@dechert.com

ATTORNEY FOR THE KENNIE INTERVENORS:
Brazil & Dunn, LLP
4201 Cypress Creek Parkway, Suite 530
Houston, Texas  77068
By:  Chad Dunn, Esquire
(281) 580-6310
chad@brazilanddunn.com

REPORTED BY:

Ms. Edith A. Boggs



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 5

EXAMINATION INDEX

QUESTIONS BY                        PAGE

Ms. Westfall                        6


INDEX OF EXHIBITS

NO.   MARKED        DESCRIPTION

550   12          Notice of Deposition

551   16          Senate Rules adopted by 82nd
Legislature January 19, 2011, Senate Resolution No. 36
552   48          Senate Rules adopted by 81st
Legislature January 14, 2009, Senate Resolution No. 14

553   65          Senate Journal, Fourth Day, Monday,
January 24, 2011
554   85          E-mail dated 1-27-11 from Brenda
Payne

555   91          E-mail dated 1-28-11 from R. L.
Kucera
556   99          E-mail dated 1-21-11 from Mickey
Mathis

557   102         E-mail dated 1-25-11 from Catherine
Engelbrecht
558   107         E-mail dated 1-26-11 from Sonia
Santana

## 7

1  answers to questions regarding the substance and purpose
2  of the two-thirds rule, the effect of a Governor
3  designating a bill as emergency legislation and whether
4  he was aware of any conversations regarding the timing
5  of consideration of Senate Bill 14.
6      He is going to answer questions based upon
7  those issues, as set forth in the Court's order. He is
8  continuing to assert his legislative privilege as to any
9  matters that would be covered by that.
10     And with that, I'll let you proceed with the
11  examination, Counsel.
12     MS. WESTFALL: Thank you, Mr. Sweeten.
13  Q. (BY MS. WESTFALL) And just to be clear, Senator,
14  are you also aware that the Court ruled that other
15  subjects, such as communications between legislators and
16  constituents, lobbyists and interest groups, public
17  statements and press releases and statements made after
18  Senate Bill 14 was signed into law are not subject to
19  legislative privilege?
20  A. I would like to be shown that, please.
21     MR. SWEETEN: Well, I mean, to the extent
22  that the Court's order is limiting as to these three
23  issues, we don't intend -- I mean, our intention is to
24  have him sit for the issues that the Court has ordered
25  him to sit for. He will answer the questions that the

## 6

1           SENATOR TROY FRASER
2  was called as a witness and, being first duly sworn by
3  the notary, testified as follows:
4           EXAMINATION
5  Q. (BY MS. WESTFALL) Good afternoon, Senator
6  Fraser. How are you?
7  A. Very good.
8  Q. Good. Could you state and spell your name again
9  for the record.
10  A. Senator Troy Fraser. Last name is F R A S E R.
11  Q. And you were previously deposed in this matter,
12  right?
13  A. I was.
14  Q. Do you remember the ground rules I gave you last
15  time?
16  A. I do.
17  Q. And you are appearing to resit for your
18  deposition, as ordered by the Court in this matter on
19  June 5th; is that correct?
20  A. That's my understanding, yes.
21     MR. SWEETEN: Just for the record, let me
22  just state that we are here pursuant to the Court's
23  order of June 5th, 2012.
24     In that order, the Court required Senator
25  Fraser to resit for a deposition, to provide nonevasive

## 8

1  Court has provided for, and the Court has not reopened
2  the examination with respect to constituent
3  communication.
4      MS. WESTFALL: Mr. Sweeten, I provided you
5  with correspondence indicating that we would be
6  examining the Senator on areas related to the order on
7  motions to spell, ECF 167, June 5th, 2012, that related
8  to constituent communications, public statements and
9  press releases and statements made after the signing.
10     This deposition has been ordered by the
11  Court to be reopened. The Court has ruled that certain
12  issues and areas of examination are not subject to
13  legislative privilege, and I'm going to examine the
14  Senator on those areas, as permitted to do so by the
15  Court's order.
16     MR. SWEETEN: Okay. And what I'm telling
17  you is that my interpretation of the Court's order is he
18  is sitting for these three topics and these topics only.
19     If you can show me the support for why you
20  believe that you could extend into the other area, which
21  I understand you to say is constituent communications,
22  then we can have a discussion on that issue.
23     MS. WESTFALL: Mr. Sweeten, the whole entire
24  order is about areas that are in the Court's ruling
25  subject to legislative privilege and outside of that



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 9

1  privilege.
2      They have identified certain areas that are
3  outside of the legislative privilege and, therefore, now
4  that we are -- Mr. Fraser is here for his deposition and
5  to resit, I'm going to examine him on those areas that
6  the Court has deemed not privileged.
7      If you are disagreeing with this ruling, we
8  can take a break and I can -- we can take a break and
9  discuss it further.
10     MR. SWEETEN:  I'm not disagreeing on the
11 Court's ruling, of course.  I'm disagreeing on our
12 interpretation of what the Court's ruling is.
13     So, I'm just saying if you've got support
14 for that, show me that and we'll have a discussion on
15 it.
16     I mean, he's certainly here to testify as to
17 the matters the Court has provided that he will testify
18 to.
19     MS. WESTFALL:  I would add that the Court
20 just recently ruled -- and I don't have the ECF number
21 in front of me -- that Representative Harless, who was
22 deposed today, was subject to examination of some of the
23 areas that the Court ruled did not fall within the
24 legislative privilege, and the State lost on that issue,
25 and she was directed to answer questions in that regard

### 10

1  in that capacity following the issuance of the order on
2  motions to compel, ECF 167.
3      So, I think that reasoning applies with
4  equal force here.  I would ask that you reconsider your
5  position on this issue.
6      MR. SWEETEN:  Okay.  Well, let me discuss it
7  with the Senator.  And I think what I hear you saying
8  is: We were able to do it -- we asked the Court for
9  permission to do it with respect to Patricia Harless
10 and, therefore, we think that the Court would probably
11 do the same thing here.
12     I don't here you saying that we're directly
13 ordered to that.  Is that a fair --
14     MS. WESTFALL:  You're not ordered but I
15 think it is ill advised, not that I would ever give you
16 legal advice, Mr. Sweeten.
17     MR. SWEETEN:  Okay.  I understand your
18 position.
19     THE WITNESS:  Before we leave, I'd like for
20 her to again go over the areas that she intends to ask
21 about so I can be clear in my mind.
22     MS. WESTFALL:  Certainly.  Well, you know
23 what, instead of advising you what is in this order,
24 since I'm not your attorney, I would have your attorney
25 tell you about the scope of the order and the rulings in

### 11

1  the order in a private setting outside of this
2  deposition.
3      We can go off the record if you would like
4  to now or we can do the first part of the examination
5  and then break, whatever your preference is.
6      MR. SWEETEN:  Okay.  If we can put that
7  issue aside, we could get going on this and then we can
8  revisit it at a break, and then we can discuss the
9  specific areas.
10     So, let's proceed with the ordered
11 examination, and then we'll discuss the other issue.
12     MS. WESTFALL:  Very good.  Thank you.
13     Q.  (BY MS. WESTFALL)  Senator, what did you do to
14 prepare for today's deposition?
15     A.  I met with counsel that's sitting beside me,
16 Mr. Sweeten, and I read my last deposition.
17     Q.  Did you review any other documents?
18     A.  No.
19     Q.  When you met with Mr. Sweeten, was anyone else
20 present?
21     A.  Yes, both counsel that are with me today.
22     Q.  Other than your attorneys, did you speak to
23 anyone else about your deposition today?
24     A.  Only commenting that I was being deposed, but no,
25 not a discussion about the deposition.

### 12

1      Q.  Did you bring any notes with you here today?
2      A.  I did not.
3          (Exhibit 550 marked.)
4      Q.  (BY MS. WESTFALL)  You've been handed what's been
5  marked US 550.  Do you recognize this document?
6      A.  Do I recognize it?  No.
7      Q.  If you could take one minute to take a look --
8          MR. SWEETEN:  Let me take a look at this, if
9  you would.
10     Q.  (BY MS. WESTFALL)  Senator, if you could take a
11 look at this document and let me know whether you --
12 after you've had a chance to review it, whether you've
13 ever seen it before?
14     A.  Actually, I'm not sure.  I don't know whether I
15 have or not.
16     Q.  I'd turn your attention to the second page of
17 this document.  And it's a double-sided document.  So,
18 if you could see on the second page where it indicates
19 that the State has been directed to have you appear
20 today at 1:00 p.m.  Do you see that?
21     A.  Yes.
22     Q.  Does that refresh your recollection in any way
23 about what this document is?
24     A.  That -- I'm aware that I was required to be here.
25     Q.  Thank you.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

### 13

1    And turning in a couple of pages after the
2  numbered paragraphs defining terms, do you see that it
3  lists Documents on the next page?
4    A.  What number?
5    Q.  On the following page.  Unfortunately, these
6  pages are not paginated but after --
7    A.  What number is the sub number?
8    Q.  After paragraph 11 on the following page, sir,
9  where it says Documents, do you see it lists a number of
10 documents, 1, 2, 3?
11   A.  Yes.
12   Q.  Did you under -- did you or your staff undertake
13 a search for these documents?
14   A.  I believe my staff did.  I did not.
15   Q.  Do you know whether it was Ms. McCoy?
16   A.  Ms. McCoy would have been the one.
17   Q.  Do you know where she searched for the documents?
18   A.  In our file in our office.
19   Q.  Do you know what she found in terms of documents?
20 And I'm not asking you for the specific documents but
21 the types of documents she found?
22   A.  I believe every document that had been requested
23 had been released to the Attorney General's Office, and
24 I believe they had some that they felt like were
25 privileged but we have no other documents in our

### 14

1  possession that have not been previously either asked
2  for or released to the Attorney General's Office.
3    Q.  I see.  So, is it your understanding that there
4  were no documents recently produced from your office?
5  Is that right?
6    A.  That is my understanding.
7    Q.  Sir, are you familiar with the Senate procedure
8  which you previously referred to in your prior
9  deposition as the two-thirds procedure?
10   A.  No.
11   Q.  Sir, when a bill in the Senate is favorably
12 reported by a committee, what happens to the bill next?
13      MR. SWEETEN:  And you can answer as a
14 general matter.  I think many of these questions today
15 will be general parliamentary matters, and so, you can
16 answer those questions.
17      Just don't -- if it comes to your thoughts
18 or mental impressions about a specific bill today, then
19 we're going to assert legislative privilege on that but
20 go ahead.
21   A.  I'm sorry.  I'm going to stop you here.  I would
22 like to go back to the previous question and have it
23 read back to me again.
24   Q.  (BY MS. WESTFALL)  Certainly.
25      MS. WESTFALL:  Could you read back the

### 15

1  previous question.
2      (Whereupon, the requested testimony was read back
3      as follows:
4      QUESTION:  Sir, are you familiar with the Senate
5      procedure which you previously referred to in
6      your prior deposition as the two-thirds
7      procedure?)
8    A.  I would like for you to show me where I referred
9  to something as the two-thirds rule -- vote rule.
10   Q.  (BY MS. WESTFALL)  Okay.  Well, I'm going to
11 strike that question for the time being.  We'll go on to
12 the next question.
13   A.  And I am prepared to expand and discuss, because
14 I understand the Court would like that, but the question
15 as you asked it, implying that I had referred to that, I
16 don't remember implying, and I am prepared to expand.
17   Q.  Okay.  And I will ask you many questions
18 generally about what has been referred to in the press
19 and elsewhere as the two-thirds rule or procedure or
20 whatnot.
21      I will ask you the question I just asked earlier,
22 which is, when a bill is favorably reported from a
23 committee, what happens to the bill next?
24   A.  The bill, after it's reported -- first,
25 obviously, you have to have the paperwork that would be

### 16

1  correctly delivered, and that is delivered to the
2  Lieutenant Governor's Office.
3      The Lieutenant Governor, they -- my understanding
4  is they generally preview the bill, and then they will
5  post that on a calendar.
6    Q.  Sir, does that go on the calendar of the regular
7  order of business?
8    A.  We have multiple calendars that -- there are
9  special orders, there are regular orders for second
10 reading, there are regular orders for third reading, and
11 then any other that would be considered served.  There
12 are multiple calendars.
13   Q.  I think instead of talking about this in the
14 abstract, we'll mark this 551.
15      (Exhibit 551 marked.)
16   Q.  (BY MS. WESTFALL)  Sir, you've been hand what's
17 been marked US 551.  Do you recognize this document?
18   A.  I have not examined the document in full but on
19 the surface, on the face, it says Senate Rules adopted
20 by the 82nd legislature, and I'm assuming you're
21 representing that this is that document.
22   Q.  Yes, sir, I will represent to you -- and I'm sure
23 your counsel won't disagree -- that this is a copy of
24 the Senate 2011 Rules in its entirety.
25   A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 17

1  Q. Does the Senate consider bills in a particular
2  order?
3  A. Yes.
4  Q. What is that order?
5  A. There are multiple orders that could be created,
6  that if a bill is designated for a special order, it
7  would be designated what special order it would be, and
8  if a bill is designated a special order, it would become
9  the first bill that would be considered on that
10  legislative day.
11  If there's not a special order and you have bills
12  to be considered for a second reading that are eligible,
13  they would be required to be brought up in the order of
14  business in which, you know, they came out of committee.
15  Q. I'd like to turn your attention to Rule 5.09 on
16  Page 21.
17  A. 21?
18  Q. On Page 21, Rule 5.09.
19  A. Okay.
20  Q. Do you see what that rule is?
21  A. Order of considering bills and resolutions.
22  Q. Could you describe your understanding of Rule
23  5.09?
24  A. 5.09 says, "At the conclusion of the morning
25  call, the Senate shall proceed to consider business on

## 18

1  the President's table, which shall be disposed of in the
2  following order." One would be special orders. Two
3  would be unfinished business. Three would be Senate
4  Joint Resolutions. Four would be Senate Resolutions.
5  Five, Senate Concurrent Resolutions. Six, Senate bills
6  on third reading. Seven, Senate bills on second
7  reading. Eight, Senate Joint Resolutions. Nine, House
8  bills on third reading. Ten, House bills on second
9  reading. And Eleven, House Concurrent Resolutions.
10  Q. Is it your understanding that under Rule 5.09
11  that special orders are considered first in terms of
12  order?
13  A. The rule says it will be disposed in the
14  following order.
15  Q. And turning your attention to the end of that
16  rule on the notes of rulings, does it indicate that the
17  order of business may be changed by a two-thirds vote of
18  the Senate? Do you see that?
19  A. I do see that.
20  Q. And what does that mean?
21  A. The -- a 21 vote rule or a vote of two-thirds of
22  the members of the Senate are used any time that you do
23  a suspension of an existing rule.
24  The example would be if there is a printing rule
25  and there's a 48-hour layout, we could suspend the

## 19

1  printing rule with a 21 vote, two-thirds vote.
2  If a bill is coming up -- had been passed on
3  second reading and there's a 24 or 48-hour layout for
4  third reading, the Senate would be allowed -- if the
5  other members would do it, they could suspend that rule
6  with a 21 vote or a two-thirds majority of those present
7  in order to suspend that rule.
8  So, any rule in the Senate where there's an
9  existing rule, you are allowed to suspend that rule.
10  There are literally thousands of suspensions that are
11  done on probably as many as 15 different categories of a
12  suspension.
13  So, when you refer to something as a two-thirds
14  rule, the two-thirds could apply to the posting rule, it
15  could be the printing rule, it could be the layout rule,
16  it could be third reading or it could apply to the
17  regular order of business.
18  And that is my reason for saying there is no such
19  thing as a two-thirds rule. You have to have a
20  two-thirds majority in Robert's Rules of Order,
21  according to parliamentary procedure, in order to
22  suspend any rule that is established by the Senate,
23  which this is a rule that's been established. If you
24  want to change the order of that, then you have to
25  suspend the regular order of business in order to take

## 20

1  up and consider a bill.
2  Q. What is the regular order of business?
3  A. The regular order of business is the order that
4  it came out of the committee.
5  Q. Could you refer to a particular rule in the
6  Exhibit 551 that refers to what the regular order of
7  business is?
8  A. Well, it's -- if you look at the rules, if you
9  have a special order as number one, the first special
10  order that comes out would be number 1, and it would
11  have priority.
12  If there was unfinished business, which means
13  that if you had been carrying a bill and for some reason
14  you suspended that bill and you decided you were going
15  to have a time certain of 11:00 o'clock tomorrow
16  morning, well, at 11:00 o'clock tomorrow morning, it
17  would be -- if there were no special orders, it would
18  be -- would have number 1 preference.
19  So, your order of business is established by
20  Senate Rule 5.09. If you're not going to go in that
21  order and you're asking members to change that -- and
22  the example I'll give you is that if I had a House
23  resolution that I felt very strongly about but it was a
24  hundred bills down in the order and I was going to have
25  to wait and there were some constituents here that we



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

ESQUIRE
DEPOSITION SOLUTIONS

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

21

1    wanted to honor, I could ask the other members to allow
2    me to suspend the regular order of business to take up
3    and consider House Concurrent Resolution such and such,
4    and that is a common thing that happens often if a
5    member chooses to suspend the regular order of business
6    but the regular order of business, it would allow that
7    it is a majority vote as long as you go in the regular
8    order of business.
9        Q. I see. And turning your attention to Rule 5.12
10   on Page 25 --
11       A. I'm sorry.
12       Q. Page 25, Rule 5.12. Do you see at the bottom
13   that describes regular order of business?
14       A. Uh-huh.
15       Q. Is this -- could you describe Rule 5.12?
16       A. I'd be glad to read it to you. It says, "Bills
17   and resolutions shall be considered on second reading
18   and shall be listed on the daily calendar of bills and
19   resolutions on the President's table for second reading
20   in the order in which the committee reports on them are
21   received by the Senate."
22       They're received, stamped with the time stamp as
23   being received by the Senate coming out of --
24       Q. Just so I understand that clearly, the committees
25   report favorably bills and whatever order they come in

22

1    and they're time stamped on, that is the regular order
2    of business; is that right?
3        A. That is the regular order of business. It is my
4    understanding that that's the way they do it. I'm not
5    there when they come in but they do establish a regular
6    order of business, and my understanding is that if I
7    chair Natural Resources and if I complete a bill and
8    we've got, you know, Senate Bill 300 and we send it over
9    favorably from the committee, they review it, as soon as
10   the paperwork is in order, they time stamp it, and if I
11   am 5th in the regular order of business, it is my right
12   to bring that bill up 5th.
13       Q. And then you would only need a majority of the
14   Senates to vote in favor of that pursuant to the regular
15   order of business?
16       A. That is correct. If I chose to try to jump over
17   everybody and I wanted to come up first, I would have to
18   ask the other members to allow me to get two-thirds
19   majority to do that.
20       Q. So, I think you just said this but when a bill is
21   considered in the regular order of business, it only
22   requires a majority vote?
23       A. That's correct.
24       Q. Are most bills considered in the regular order of
25   business?

23

1        MR. SWEETEN: You can answer as a general
2    matter.
3        A. There are some bills that are considered in the
4    regular order of business, and there are some bills that
5    are considered out of the regular order of business.
6        Q. (BY MS. WESTFALL) Is it fair to say that most
7    are considered out of the regular order of business?
8        A. It's fair to say that there are more considered
9    out of the regular order of business, not most.
10       Q. What type of bills or resolutions are considered
11   in the regular order of business?
12       A. Bills that came in the regular order. If they
13   come in the regular order of business and there's not
14   some pressing reason why I or someone else needs to
15   bring our bill up, we operate in the regular order of
16   business, not unlike what the House does. The House
17   does the same procedure.
18       Q. If you do that and you proceed on the regular
19   order of business, there is a risk, is there not, that
20   the session may end without the Senate having considered
21   your bill; isn't that right?
22       A. No.
23       Q. Why not?
24       A. Well, there's no limit on the length of time that
25   you can have the session. I have -- in 2009 on the

24

1    photo voter ID bill --
2        MR. SWEETEN: Don't discuss specific
3    legislation.
4        A. Okay. There are bills that have gone -- there's
5    not a time limit on the length of the time that you can
6    go. So, the answer is no. Generally, there's
7    sufficient time.
8        The Senate operates on -- you know, we -- I don't
9    know whether you would call it pacing yourself but we
10   take care of business to stay up with the order of -- to
11   take care of sufficient business but --
12       Q. (BY MS. WESTFALL) Sir, isn't it true that some
13   bills are reported favorably out of committee and they
14   do not reach the Senate floor for a vote before the
15   session ends?
16       A. Yes.
17       Q. When bills are reported favorably from committee,
18   I believe you said they go to the Lieutenant Governor's
19   Office and get stamped; is that correct?
20       A. I'm telling you what I believe is the policy.
21   I've never physically seen that and it has never been
22   explained to me but my understanding is there is a
23   procedure for establishing the regular order of
24   business.
25       Q. Is that a committee or is it your understanding



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

## 25

1  that that is the Lieutenant Governor in his capacity as
2  the President of the Senate doing that?
3      A. He and his staff but that also is a power given
4  to that office by the Senate members per the Senate
5  Rules.
6      We allow the --
7      THE WITNESS: You can tell me if you don't
8  want me to head there.
9      A. But the House has a Calendars Committee that does
10 this. The Senate has chosen not to have a Calendars
11 Committee. We allow the Lieutenant Governor to
12 establish that but if we disagree, through the rules, we
13 have the ability to override.
14     Q. (BY MS. WESTFALL) I see. So, the Lieutenant
15 Governor's Office is in charge of calendaring bills that
16 come out of committee before they go to the floor; is
17 that right?
18     A. That would be a correct representation.
19     Q. I believe you testified earlier about bill
20 blockers. Do you remember that testimony?
21     A. A blocker bill.
22     Q. Blocker bills. I stand corrected. Can you
23 remind what a blocker bill is?
24     A. A blocker bill would be if my bill is number 10
25 and somebody has a bill that is number 9, that bill is

## 26

1  blocking my bill from being brought up, and until number
2  9 is brought up, I can't bring up number 10.
3      Q. My understanding -- and correct me if I'm
4  wrong -- do blocker bills require that even if you're in
5  the regular order of business and your bill is coming up
6  for a vote that you would have to get two-thirds of the
7  Senate to support a suspension of the rules to have your
8  bill considered?
9      A. Please repeat that question.
10     MS. WESTFALL: Could you read that back.
11     (Whereupon, the requested testimony was read back
12 as follows:
13     QUESTION: My understanding -- and correct me if
14     I'm wrong -- do blocker bills require that even
15     if you're in the regular order of business and
16     your bill is coming up for a vote that you would
17     have to get two-thirds of the Senate to support a
18     suspension of the rules to have your bill
19     considered?)
20     A. No, that is not correct. If you are following
21 the regular order of business and your bill is scheduled
22 to come up next, it requires a majority vote.
23     Q. (BY MS. WESTFALL) I believe you testified
24 earlier that blocker bills are often filed at the
25 beginning of a session. Do you remember that testimony?

## 27

1      A. Yes.
2      Q. And that they are administrative in nature, do
3  you remember that testimony?
4      A. Yes.
5      Q. Does the filing of that blocker bill require that
6  all bills must receive support of two-thirds of Senators
7  to suspend -- or to overcome that blocker bill to be
8  heard?
9      A. What you're actually saying is that you have to
10 come to a resolution of the first bill on the calendar,
11 and if that bill is a bill -- something that the author
12 of the bill does not choose to resolve that and it is
13 sitting and if there's a bill behind it that you choose
14 to break up, you would have to make a motion that I
15 would like to suspend, you know, the regular order of
16 business to take up and consider bill number 2 to jump
17 over bill number 1.
18     Q. Since you have been serving in the Senate
19 since -- you've served in the Senate since 1997, right?
20     A. Uh-huh.
21     Q. Has there always been a blocker bill filed at the
22 beginning of the session in your experience?
23     MR. SWEETEN: I don't think that's correct.
24     You've served in the Senate since '97?
25     THE WITNESS: Uh-huh.

## 28

1      MR. DUNN: Is that a yes?
2      THE WITNESS: That is a yes.
3      MR. DUNN: Just for our court reporter.
4      MS. WESTFALL: Thank you, Mr. Dunn.
5      THE WITNESS: Are you shocked?
6      MR. SWEETEN: Go ahead.
7      Q. (BY MS. WESTFALL) Since you have served in the
8  Senate, every session has there been a blocker bill
9  filed at the beginning of the session?
10     A. To my knowledge, there has been a bill filed that
11 would -- that you -- if your bill was behind that bill,
12 you would have to suspend the necessary rules.
13     Q. So, you can't recall, sitting here today, any
14 legislature that you've served in since you've been in
15 the Senate when there hasn't been such a blocker bill
16 filed?
17     A. No.
18     MR. SWEETEN: Was your question regular
19 session or --
20     A. Again, I'm -- the term blocker bill is a term of
21 art, and there's nothing in the Senate Rules that refers
22 to it, and there's nothing in the Texas Constitution.
23 So, it implies that there is no such thing as a blocker
24 bill.
25     A blocker bill would be something, in my mind,



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

29

1  that that bill is blocking me bringing up my bill.  So,
2  there is really no such thing as a blocker bill.  It's
3  just if there's a bill in front of mine, it would be
4  blocking me bringing my bill up.
5      Q. (BY MS. WESTFALL)  Thank you.
6      Is the blocker bill -- what you refer to as the
7  blocker bill, is that what others in the public may
8  refer to as the two-thirds procedure or rule?
9      A. No.  Now, I probably should -- you know, there is
10 a term of art that people refer to that we're going to
11 suspend the two-thirds rule but there is no such thing
12 as a two-thirds rule.
13     There is a two-thirds majority required to
14 suspend any existing Senate rule.  There's an existing
15 Senate rule that says you have to go in the regular
16 order of business.
17     So, implying that there is a two-thirds rule
18 would imply that that two-thirds rule is the same rule
19 that has to do with a -- the printing rule because you
20 have to have a two-thirds majority, and it's the exact
21 same vote that you have to have to suspend the regular
22 order of business.
23     Q. Thank you.
24     And is there a particular rule in the Senate
25 Rules that embodies some of what you just testified

---

30

1  about in terms of the two-thirds required to suspend
2  rules or is it throughout the rules, it refers to
3  two-thirds?
4      A. And I'm -- I probably should ask you -- it is my
5  belief -- and I'm sorry, I cannot point to it but I
6  believe in the Senate Rules, there is a rule that says
7  that if you want to suspend an existing Senate rule, it
8  would take a two-thirds majority of the Senate to
9  suspend that existing rule.
10     Q. I'm glad you've turned to that because I'm going
11 to direct your attention now to Rule 5.13 on Page 26,
12 suspension of the regular order of business.
13     A. Okay.
14     Q. Do you recognize this rule?
15     A. Yes.
16     Q. What does this rule do?
17     A. This rule says exactly what it says.  "No bill,
18 joint resolution or resolution affecting state policy
19 may be considered out of its regular calendar order
20 unless the regular order is suspended by a vote of
21 two-thirds of the members present."
22     Q. Is this your understanding of what people refer
23 to as the two-thirds rule, Rule 5.13?
24     MR. SWEETEN: Objection.  Calls for
25 speculation.  Compound.

---

31

1      You can answer.
2      A. This rule says exactly what it is.  It is that if
3  you're going to take something out of the regular order
4  of business, it requires a two-thirds vote, but a
5  two-thirds vote is required on a printing if you're
6  going suspend, on a -- I don't know whether there's 15
7  but there's multiple rules that require a two-thirds
8  vote.
9      So, implying that this particular one is the
10 two-thirds vote, I would say no, that's not the case.
11 This is -- there is a two-thirds vote required to
12 suspend the regular order of business but it would be
13 improper to imply that it only applies to this.
14     Q. (BY MS. WESTFALL)  I see.  So, is it your
15 testimony that, generally speaking, the Senate requires
16 two-thirds of the Senators to vote in favor of anything,
17 many rules throughout the rules?
18     A. No.  Every rule, if you do it in the order that
19 you're supposed to, is a majority vote.  If you want to
20 change or get away from the regular rules and not do it
21 in the rules of the Senate, you have to have a vote of
22 two-thirds of the members to suspend that existing
23 Senate rule.
24     Q. Do you recall in the 2011 session which bills or
25 resolutions were considered under the regular order of

---

32

1  business?
2      MR. SWEETEN:  You can testify as to matters
3  of the public record.
4      A. All business in the 2011 session was considered
5  according to the regular order of business.  That is our
6  rule.
7      Q. (BY MS. WESTFALL)  Which bills or resolutions did
8  not -- only required a majority vote to pass on the
9  merits?
10     A. Special orders did not require a two-thirds vote.
11 House bill days that we -- generally it's usually
12 allocated -- I believe it's Wednesday and Thursday.  On
13 that day when you bring up House bills, a two-thirds
14 vote is not required on those bills as long as they're
15 done in the regular order of business.  That would be
16 the regular order of business and we bring those up and
17 it would not require a two-thirds vote to suspend the
18 regular order of business because you're doing them in
19 that order.
20     Q. Sitting here today concerning the 2011 session,
21 can you remember or describe or list all of the bills
22 that were considered in the regular order of business?
23     A. I'm sorry, I could not list all the bills.
24     Q. Do you know how many were?
25     A. I do not know how many.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 33

1  Q. Was it fewer than 10?
2  A. I'm sorry?
3  Q. Was it fewer than 10?
4  A. I'm sorry, I've said I don't remember the bills
5  or the number of bills.
6  Q. Was it -- my question stands. Was it fewer than
7  10, to the best of your recollection?
8      MR. SWEETEN: Objection. Asked and
9  answered. Objection. Foundation.
10     THE WITNESS: Did you tell me to answer?
11     MR. SWEETEN: You can answer that. You can
12 answer the question. I'm not prohibiting you from
13 answering.
14  A. There were -- on the House bills coming over,
15 approximately half of the bills considered in the
16 legislative session come from the House, and if the
17 House bills are considered in regular order, there is
18 not a suspension vote necessary.
19     So, I'm sorry, I can't answer that question. I
20 don't know the number.
21  Q. (BY MS. WESTFALL) Okay. So, your testimony is
22 you do not recall the number of bills in the 2011
23 session that were considered by regular order of
24 business?
25  A. I do not.

### 34

1  Q. And what is a special order?
2  A. A special order, as you've seen in 5.01 -- was
3  that the number?
4  Q. I'll turn your attention to Page 24 at Rule 5.11.
5  A. I'm looking at 5.09. A special order is at the
6  top of the regular order of business. So, if something
7  is specified as a special order, it moves to the top of
8  the list.
9  Q. Turning your attention to Rule 5.11 on Page 24.
10  A. Yes.
11  Q. Do you see that section about special orders?
12  A. Yes.
13  Q. What is a special order?
14  A. 5.11 says, "Any bill, resolution or other measure
15 may on any day be made a special order for a future time
16 of the session by an affirmative vote of two-thirds of
17 the members present."
18  Q. Under what circumstances are bills designated as
19 special orders?
20     MR. SWEETEN: Don't answer that question if
21 it would reveal matters of legislative privilege, your
22 thoughts, mental impressions, motivations regarding any
23 specific legislation.
24     MS. WESTFALL: Mr. Sweeten, this is not
25 about a particular piece of legislation. This is about

### 35

1  the Senator's knowledge of the rules.
2      MR. SWEETEN: You're asking then general
3  information?
4   A. And I'll answer general. What you're referring
5  to here is if a special order had not been designated
6  specifically in the Senate Rules. If the Senate Rules
7  are established and in the Senate Rules themselves, you
8  designate items that would be a special order, that is a
9  majority vote of the Senate to establish that.
10     Once they are in the Senate Rules and the Senate
11 Rules are established and it's been designated that it
12 would only require a majority vote, that would refer
13 back to Rule 5.09, which would put the special order as
14 the number 1 bill on the order of business and would
15 only require a majority vote.
16     If someone wanted to change all other order and
17 make it a special order, they would be suspending the
18 existing rules, the Senate Rules, and it would take a
19 two-thirds vote.
20     But this has no -- this is no different than if
21 someone was in the regular order of business, their bill
22 was number 100 and they wanted to suspend the regular
23 order of business, it would have the same weight.
24  Q. (BY MS. WESTFALL) When do special orders usually
25 arise in the session?

### 36

1   A. Since I've been in the Senate, any time that
2  there was an issue that was a -- either a very large
3  specific issue, difficult issue, it could be and often
4  was given the status of special order.
5  Q. Was that usually --
6   A. I'll add that almost every session since I've
7  been in the Senate, there has been something specified
8  as a special order. And my understanding is, looking at
9  the history of the Senate prior to me getting there when
10 there was Democratic control, they used the special
11 order virtually every session.
12  Q. Would the special orders that you just testified
13 to, would they be set during the session if a Senator
14 made a motion to create a special order or were they
15 usually embodied in the Senate Rules themselves?
16  A. The more logical way to do it would be to embody
17 it in the Senate Rules. And the Senate Rules could
18 either be established at the start of the session or
19 they could be amended at any time during the session.
20     This is a method -- this is a method to do that
21 but if you did that, you had to have a two-thirds -- so,
22 this is a way to establish a special order. I would say
23 it's more likely that it would happen in the Senate
24 Rules themselves as a special order.
25  Q. Do you recall -- other than the special order



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 37

1  regarding voter ID requirements in the 2011 and 2009
2  Rules, do you recall any other special orders that were
3  created in the Senate Rules themselves, to your
4  knowledge?
5      A.  In what year?
6      Q.  Any year in which you've served in the Senate.
7      A.  I'm going to answer you, you know, what I -- I
8  cannot give you specifics but these are issues that I
9  do -- I believe were special orders.
10     Through time, there have been multiple budgets
11  that were put into special order and we voted on.  There
12  have been redistricting plans not only in the current
13  time when the Republicans control but also prior to me
14  getting in the Senate, when the Democrats controlled,
15  that they did special orders for redistricting because
16  they listed that.
17     Prior to me getting to the Senate, when I was in
18  the House, there was a workers' compensation bill that I
19  believe -- my understanding was that it was placed as
20  special order.
21     At that time, there were over two-thirds of the
22  members in the House that were Democrat and about
23  four-fifths of the members in the Senate that were
24  Democrat, with a Democrat speaker and a Democrat
25  Lieutenant Governor, and they placed that as a -- it's

### 38

1  my understanding that they placed that as a special
2  order in the Senate Rules.
3      Q.  And it's your testimony that with regard to
4  budgets, redistricting and worker's comp that there were
5  special specific -- that they were specified as special
6  orders in the Senate Rules themselves; is that right?
7      A.  That's my understanding.
8      Q.  And was it your testimony that any bill could be
9  made a special order with a two-thirds vote of the
10  Senate during session?
11     A.  It is my testimony that there's two different
12  methods to become a special order.  One is that if you
13  amend -- if you either establish it in the Senate Rules
14  that are voted at the start of the session or you do an
15  amendment to the Senate Rules, you can do it that way,
16  or if you want to establish something as a special
17  order, I could move to do a suspension of Rule 5.11 to
18  establish a special order of Senate Bill 6 and if the
19  members chose to establish a special order, they could
20  do that.
21     Q.  How many special orders were there in the 2011
22  session?
23     A.  I don't know.
24     Q.  Were there more than 10?
25     A.  I'm sorry, I don't know.

### 39

1      Q.  To your knowledge, were the Senate Rules in 2011
2  amended at all?
3      A.  Well, yes.  Every session, at the start of the
4  session, the membership goes into caucus, and there will
5  be usually a review of the rules by members of the
6  Senate.
7      They will come back and recommend changes to the
8  Senate Rules.  Those Senate Rules come before the
9  Senate, and there is a -- they're added to the Senate
10  Rules, and then we go to the floor, and we take a vote
11  on the floor.
12     Q.  Does the Lieutenant Governor's Office recommend
13  changes to the rules?  Is he in charge of that?
14     A.  The changes are from the Senators.
15     Q.  But is that done by the whole Senate or by a
16  committee of the Senate or a sub group of the Senate?
17     A.  There is a general sub group that does the review
18  and comes back with recommendations but the vote is by
19  the Senate as a whole.
20     Q.  Who is in that sub group?
21     A.  It would be generally someone who would be
22  appointed by the Dean of the Senate, which is a
23  Democrat.
24     Q.  Is that Mr. Whitmire?
25     A.  Whitmire.

### 40

1      Q.  Who else besides Mr. Whitmire recommends changes
2  to the rules?
3      A.  It's my understanding that any time that
4  happens -- Senate Whitmire is the Dean of the Senate, he
5  runs the meetings, he makes the recommendations.  So,
6  any appointments to people to do a review would come
7  from him.
8      Any member that -- if I had something I wanted to
9  change, I could bring it forward but whoever is doing
10  the review -- I could bring it forward and I could offer
11  an amendment.  If I disagreed with the rules as they're
12  coming out, I could offer to have an amendment when it
13  comes at the floor, and the amendment would be a
14  majority vote.
15     Q.  Who was on the committee in 2011 who recommended
16  the Senate Rules for that session besides Mr. Whitmire?
17     MR. SWEETEN:  You can answer as to matters
18  of public record.
19     THE WITNESS:  Okay.
20     MR. SWEETEN:  And if you don't know --
21     A.  I'm not aware of whether there was a public
22  record on it but I also don't know who they are.  So,
23  the answer is the same.  I don't know whether it was a
24  public record but I also don't remember who they were.
25     Q.  (BY MS. WESTFALL)  What is the general purpose of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

41

1   having a requirement that two-thirds of the Senators
2   vote in favor of suspending the rules or any of the
3   other things you testified about requiring two-thirds?
4           MR. SWEETEN:  He's not --
5           MS. WESTFALL:  Mr. Sweeten, that's a
6   general --
7           MR. SWEETEN:  He's not answering the
8   question as phrased, period.  So, you can rephrase it if
9   you want to ask a general purpose of a rule.  He's not
10  answering a question, "As to everything you just said,
11  what's the purpose of it?"  Absolutely not.
12     Q.   (BY MS. WESTFALL)  I'm going to withdraw my
13  question and try again.
14      What is the general purpose of the two-thirds
15  rule?
16     A.   You'll have to be more specific because there's
17  no such thing as a two-thirds rule.  There is a
18  two-thirds vote required on specific items, and if you'd
19  like to address a specific item, I'll attempt to answer
20  that.
21          MS. WESTFALL:  Mr. Sweeten, as you know, the
22  Court has directed that Senator Fraser sit and answer
23  questions about the general purpose of the two-thirds
24  rule.
25          The Senator has testified that two-thirds

---

42

1   applies to a variety of rules, and I am asking him to
2   testify as to the purpose of two-thirds vote being
3   required in a variety of settings, and I ask your
4   indulgence of being permitted to ask this question in
5   order to resolve any conflicts that there may be between
6   your witness and the Court.
7           THE WITNESS:  I'd like to answer.
8           MR. SWEETEN:  Okay.  Let me just -- let me
9   explain my objection, which is when you ask the question
10  as phrased, you basically referenced every bit of
11  testimony that he had just testified to about the Senate
12  Rules.  There's no possible he could have answered the
13  question that you phrased.
14      If you're asking about why the two-thirds
15  rule applies in certain circumstances, he can give a
16  general purpose answer as to the reason for that since
17  he's indicated he thinks he can answer your question.
18     Q.   (BY MS. WESTFALL)  Can you answer my question?
19     A.   Okay.  I would respectfully address the question
20  that I think the Court has ordered, and I would clarify
21  again that the requirement to have a two-thirds vote is
22  a -- we operate under Robert's Rules of Order.
23      If you look in Robert's Rules of Order, if
24  there's an established rule and you want to suspend that
25  rule, generally, it requires a two-thirds vote of those

---

43

1   present.  That's per Robert's Rules of Order.
2           Now, there are exceptions to that.  There are
3   times where it requires a four-fifths vote.  We have
4   multiple four-fifths votes in the legislature, some of
5   them referring to what you're talking about, which is a
6   regular order of business.
7           So, when you refer to the two-thirds rule, I
8   still say there's not something that is clearly the
9   two-thirds rule.
10      We do have a rule that if you want to take
11  something out of the regular order of business,
12  according to Robert's Rules of Order -- which you said
13  what is the purpose, the purpose is to follow
14  parliamentary procedure as defined by Robert's Rules of
15  Order, which we follow, and those are the rules of the
16  parliamentary procedure that we follow.
17     Q.   Why is it necessary to have that rule for the
18  Senate?  What is the purpose of the rule?
19          MR. SWEETEN:  You can answer as to the
20  general purpose of the rule.  I think you have.  You
21  don't have to give more than what is the general
22  purpose.  That's what the Court has provided.
23      So, if you have additional general purpose
24  information, you can answer but you don't have to give
25  additional.

---

44

1     A.   Robert's Rules of Order have been established
2   through -- I'm not -- I don't have how long they've been
3   in existence but a long time, and it was set up in order
4   that you have something where you have to determine the
5   parliamentary procedure of the order of things as they
6   should proceed.
7           I think it is the accepted method of
8   parliamentary procedure and is -- I was taught that at
9   an early age and have known parliamentary procedure for
10  a long time.
11      But under Robert's Rules of Order, unless it's
12  specifically specified, everything is a majority vote,
13  and if there's going to be an exception to that where
14  you're either suspending or you're having a special
15  request, it is elevated to a higher vote.
16      In Congress, they have to have a 60 -- a
17  three-fifths vote in order to proceed.
18      And our Senate Rules, the Robert's Rules of
19  Order, I believe, recommend a two-thirds vote but we
20  also have if a bill is in the regular order of business
21  during the first 60 days of the session, it takes a
22  four-fifths vote.
23     Q.   (BY MS. WESTFALL)  Turn your attention to Page
24  22, the notes of rulings under Rule 5.09.
25     A.   I'm sorry?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 45

1  Q.  Under the order of considering bills and
2  resolutions, Rule 5.09, there are notes on Page 22.  And
3  do you see the first note is, "The order of business as
4  set forth above may be changed by a two-thirds vote of
5  the Senate," and it refers to the Senate Journal and
6  1931?
7  A.  Uh-huh.
8  Q.  Does that at all relate to the Robert's Rules
9  you've just testified to or do you not know?
10 A.  I'm sorry, I can't answer that because I wasn't
11 in the Senate in 1931.  I would have loved to have been
12 but I wasn't.
13 Q.  Where do Robert's Rules come from?
14 A.  I'm sorry, I don't know that either.  I know that
15 I was taught Robert's Rules of Order as a 13 year old in
16 school.  So, they've been around at least 50ish years.
17 Past that, I don't know.
18 Q.  So, I understand your testimony is that the
19 Senate follows this two-thirds procedure in many context
20 throughout the rules based on adherence to the Robert's
21 Rules; is that right?
22       MR. SWEETEN:  Objection.  Vague.
23       You can answer.  You can answer as to the
24 general purpose of the rules.
25 A.  It is my belief that we always follow the

## 46

1  Robert's Rules of Order if we can but they're also
2  guided by the Senate Rules.
3        And the Senate Rules are if there's a rule of the
4  Senate and it has been established, it will be the
5  presiding rule of the Senate.
6  Q.  (BY MS. WESTFALL)  Why does the Senate generally
7  require the support of two-thirds Senators?  What is the
8  purpose of that rule?
9        MR. SWEETEN:  I think you've asked and
10 answered the question.  If you have more on the general
11 purpose, you can answer.  Otherwise, you don't have to
12 give more than what the general purpose is.
13 A.  The -- any time that a two-thirds vote is
14 required, it's because you are doing a deviation from an
15 established Senate rule.  If you're going to deviate
16 from that, you have to suspend the existing Senate rule
17 in order to move to the rule that you're talking about
18 but it could be on a multiple of issues, and it is not
19 just specific to one particular area.  The two-thirds
20 suspension vote could apply to many, many topics.
21 Q.  (BY MS. WESTFALL)  Thank you for your testimony.
22       Getting back to what is the purpose of the
23 two-thirds rule -- strike that.
24       Your Chief of Staff, Janice McCoy, testified in
25 her deposition that the purpose of this two-thirds vote

## 47

1  in a variety of settings, in a variety of reasons, is to
2  get general consensus in the Senate.  That was her
3  believe of the purpose of this rule.  Do you agree with
4  the testimony of Ms. McCoy?
5        MR. SWEETEN:  Objection.  Assumes facts not
6  in evidence.
7        You can answer.
8        I think he's answered as to general purpose.
9  So, I really don't think this is an appropriate question
10 but --
11 A.  I am a Senator.  I'm responsible for my vote.  I
12 vote in accordance with Senate Rules.  Senate Rules
13 require that you have to follow regular order of
14 business.  If you don't do that, then it's required a
15 two-thirds vote to either suspend that rule or suspend
16 others.
17 Q.  (BY MS. WESTFALL)  So, is it your testimony that
18 two-thirds vote is required for various reasons
19 throughout the Senate Rules because you're adhering to
20 that rule?  Is that your testimony?
21       MR. SWEETEN:  Objection.  Asked and
22 answered.  I think he's already provided an answer as to
23 the general purpose.  This has been now asked probably
24 five times.  So, I think he's answered the question.
25 A.  The two-thirds rule applies any time that you are

## 48

1  going to have to deviate from an existing rule of the
2  Senate.  There are multiple times and reasons you do
3  that but any time you deviate from the Senate Rules, it
4  would require at least a two-thirds vote to suspend
5  that, and occasionally a four-fifths vote.
6  Q.  (BY MS. WESTFALL)  What is the purpose of
7  requiring two-thirds vote when you are deviating from
8  the regular Senate Rules?
9  A.  The two-thirds vote rule is -- you know, I
10 believe, is according to Robert's Rules of Order that
11 says that if you have an existing Senate rule that
12 requires a majority vote, if you're going to deviate
13 from that and not stay within that, if you're not going
14 to observe the 48-hour printing rule, if you're not
15 going to observe the 24-hour layout rule and you want to
16 suspend that, it takes a minimum of a two-thirds vote to
17 do that.
18       So, the purpose would be that if you're going to
19 deviate, you have to use that rule to deviate.
20       MS. WESTFALL:  Would you mark this 552.
21       (Exhibit 552 marked.)
22 Q.  (BY MS. WESTFALL)  You've been handed what's been
23 marked US Exhibit 552.  Do you recognize this document?
24 A.  I believe you've handed me something that says on
25 the face Senate Rules adopted 2009, January 14th.  I'm



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

| 49 | 51 |
|---|---|

**49**

1  assuming that everything inside are those rules. I have
2  not read the document but I'm assuming by you handing it
3  to me that that's what you're representing.
4      Q. I will represent to you that it is a full,
5  complete, nonexcerpted copy of the 2009 Senate Rules.
6      A. Okay.
7      Q. I would like you to turn your attention to Rule
8  5.11 in the 2009 rules and Rule 5.11 in the 2011 rules.
9  And tell me when you have a chance --
10     A. Both of them?
11     Q. Yes.
12     A. Okay.  5.11?
13     Q. Yes.
14     A. Okay.
15     Q. I think it's Page 24 for both sets of rules, if
16 that helps.  Are you there, sir?
17     A. I'm there.
18     Q. I believe you testified earlier that Rule 5.11 A
19 means that any bill, resolution, et cetera, may be made
20 a special order for a future time by an affirmative vote
21 of two-thirds members present; is that right?
22         MR. SWEETEN:  Do you mean in his first
23 deposition or do you mean in this one?
24         MS. WESTFALL:  I mean today.
25         MR. SWEETEN:  Objection.  Misstates

**50**

1  testimony.
2          You can answer the question.
3      A. 5.11, as we discussed earlier, says that if
4  you're going to establish a special order after -- that
5  was not established initially in the Senate Rules, that
6  would be a deviation from the Senate Rules and would
7  require a two-thirds vote, as many, many other votes do.
8      Q. (BY MS. WESTFALL)  And are you referring to Rule
9  5.11 A?
10     A. Yes.
11     Q. Is that true for both the 2009 and the 2011
12 rules?
13     A. Unless I'm missing something, it appears that
14 both of those are exactly the same.
15     Q. So, your testimony is yes, it applies to both
16 rules?
17     A. I'm testifying that what I read as what you
18 represent as the rules, that both of those say exactly
19 the same thing.
20     Q. Turning your attention to Rule 5.11 D for both
21 the 2009 and 2011 rules, could you compare those
22 sections?
23     A. I'm sorry?
24     Q. Could you compare 5.11 D in the 2009 rules and
25 2011 rules and tell me if there are any differences?

**51**

1      A. I do believe it's the same.
2      Q. What does Rule 5.11 D do?
3      A. It says, "Notwithstanding Subsection A of this
4  rule, a bill or resolution relating to voter
5  identification requirements reported favorably from the
6  Committee of the Whole Senate may be set as a special
7  order for a time at least 24 hours after the motion is
8  adopted by a majority of the members of the Senate."
9      Q. Why does it refer to a 24-hour period after being
10 reported from the Committee of the Whole?
11         MR. SWEETEN:  Don't answer the question.
12 You can answer the general purpose of the rule but you
13 don't have to explain the why something was done a
14 certain way or your mental impressions regarding that.
15 Okay?
16     A. And my answer is going to be that I don't know
17 for sure other than potentially there is a 24-hour
18 layout rule of things moving forward, and I'm assuming
19 that would allow for that 24 hours.
20     Q. (BY MS. WESTFALL)  What is the 24-hour layout
21 rule?
22         MR. SWEETEN:  You can answer as a general
23 matter of Senate procedure.
24     A. And I'm sorry, you're getting into an area that
25 I'm -- I will tell you what I believe it to be, that

**52**

1  when a bill is reported from committee, that you have to
2  wait 24 hours layout before that bill could be
3  considered by the Senate.
4      Q. (BY MS. WESTFALL)  What is the usual rule for how
5  long it takes to go from committee to the floor, the
6  minimum amount of time?
7      A. I believe the -- the rule that I just stated to
8  you that I believe the rule applies to all bills.
9      Q. So, it's a minimum of 24 hours for all bills; is
10 that correct?
11     A. Yes.
12     Q. If that's the case for all bills, do you know why
13 it would have had to be included in Rule 5.11 D, that it
14 would have to specify 24 hours?
15     A. I do not know.
16     Q. Are there any different rules to --
17         MR. SWEETEN:  Let me -- when you -- pause
18 when you answer and let me make my objection, if it's
19 necessary.
20         THE WITNESS:  Okay.
21         MR. SWEETEN:  Okay.  Go ahead.
22     Q. (BY MS. WESTFALL)  Do you know whether there's
23 any difference between bills reported out of the
24 Committee of the Whole Senate and other committees as to
25 the minimum amount of time that is required for the



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 53

1 layout of the bill?

2     MR. SWEETEN: You can answer as a general

3 matter.

4   A. My answer will have to be I am not for sure but

5 it is my belief that the same rules apply.

6   Q. (BY MS. WESTFALL) So, it would be 24 hours for

7 any committee, regardless of whether it's the Committee

8 of the Whole or others?

9   A. That would be my belief.

10   Q. Is it your understanding that under some --

11   A. Excuse me. I've got to move that. Sorry.

12   Q. Do you want to go off the record? Are you okay?

13   A. I'm fine.

14   Q. Is it your understanding that bills considered in

15 the Committee of the Whole could, under some

16 circumstances, be considered immediately by the full

17 Senate?

18     MR. SWEETEN: You can answer as a general

19 matter.

20   A. I don't know the answer to that.

21   Q. (BY MS. WESTFALL) Is it your understanding that

22 Rule 5.11 D was put into place in the Senate Rules

23 before the Senate went into session in January, 2011?

24     MR. SWEETEN: You can answer.

25   A. Would you repeat that?

## 54

1   Q. (BY MS. WESTFALL) Let me strike that question.

2 Let me try a more artful question.

3     Is it your understanding that Rule 5.11 D was

4 drafted before the Senate went into session in January,

5 2011?

6   A. No.

7   Q. How do you know that?

8     MR. SWEETEN: Don't reveal matters of

9 privilege in answering the question. Do you want me to

10 go over what those areas would be?

11     THE WITNESS: I think I'm fine in answering

12 this one.

13     MR. SWEETEN: Okay. Well, don't reveal

14 communications you've had with other Senators, don't

15 reveal communications you've had with leg staff,

16 agencies, TLC, and don't reveal your thoughts and mental

17 impressions when answering the question. Those would be

18 subject to the legislative privilege. Go ahead.

19   A. This bill was an existing Senate rule brought

20 forward.

21   Q. (BY MS. WESTFALL) I'm talking about the -- I'm

22 referring you to Rule 5.11 D.

23   A. Uh-huh.

24   Q. Is it your testimony that because it was in the

25 2009 rules, it was in place in 2009, so, it carried

## 55

1 forward to 2011; is that right?

2   A. That is my testimony.

3   Q. In 2009 or 2008, when was the first time you

4 heard about the possibility of including a provision

5 like Rule 5.11 D in the 2009 rules, without revealing

6 any communications you've had with any other legislator?

7   A. I'd like to go off the record and have a

8 discussion with counsel.

9     MR. SWEETEN: We can discuss privilege, yes.

10     THE WITNESS: I don't think there's a

11 problem with answering it.

12     MR. SWEETEN: Are you going to have an issue

13 with this? Because I'm allowed to talk to him about

14 matters relating to privilege. The rules allow for it.

15     MS. WESTFALL: Can you direct him on the

16 record whatever your instruction is, Mr. Sweeten.

17     THE WITNESS: I think I'm okay to answer it.

18     MS. WESTFALL: I have a question pending,

19 so, I'm reluctant to --

20     MR. SWEETEN: That's fine but here's what

21 we're going to do: If she's asking you about

22 communications that occurred that would be subjective to

23 the legislative privilege, do not reveal the substance

24 of the communications.

25     You can reveal whether you had a

## 56

1 conversation or a -- privilege log stuff, like when it

2 happened, who with, but do not reveal the substance of

3 any sort of communication about Rule 5.11.

4   A. Would you repeat the question?

5     MS. WESTFALL: Would you read back the

6 question, please.

7     (Whereupon, the requested testimony was read back

8 as follows:

9     QUESTION: In 2009 or 2008, when was the first

10     time you heard about the possibility of including

11     a provision like Rule 5.11 D in the 2009 rules,

12     without revealing any communications you've had

13     with any other legislator?)

14   A. The first I knew of this rule is when it was

15 brought forward and voted on by the Senators.

16   Q. (BY MS. WESTFALL) Was that in January, 2009?

17   A. Yes.

18   Q. You had never heard of any communication about

19 the concept of Rule 5.11 D prior to that time?

20   A. No.

21   Q. Was redistricting in 2003 designated as a special

22 order in the rules?

23   A. I'm sorry, I don't know. I believe it was but I

24 do not know.

25   Q. Was redistricting -- was any redistricting bill



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

**57**

1  that you've ever been involved in, was it considered by
2  the Committee of the Whole?
3      A.  Again, I don't have a recollection.  I don't
4  remember.
5      Q.  Are you aware of any other bill besides voter ID
6  that has been both subject to being set forth as a
7  special order in the rules and considered in the
8  Committee of the Whole?
9      A.  You've asked a very broad question, and I
10 can't -- I can't give you a yes answer on that because I
11 can't say that I know of issues that were both special
12 orders and Committee of the Whole because we have had
13 some of each but I don't know that they were connected.
14 I can't say.
15     Q.  (BY MS. WESTFALL)  Was there any time in the
16 2000 -- prior to the 2009 legislature that you became
17 aware of any discussions whatsoever about amending the
18 Senate Rules for voter ID?
19         MR. SWEETEN:  Objection.  Asked and
20 answered.
21         THE WITNESS:  What did you just say?
22         MR. SWEETEN:  I just said objection.  Asked
23 and answered.
24         THE WITNESS:  That means I've already
25 answered it?

---

**58**

1          MR. SWEETEN:  That's my objection but you
2  can answer if you can.  I'm objecting to her question as
3  already having been asked and answered.
4      A.  My answer is the same as I just gave, that I have
5  not -- I was not made aware or hadn't discussed it prior
6  to it coming forward in the rules recommendation for a
7  vote.  It was laid out and explained prior to a vote of
8  the Senate, and that's the first I saw of it.
9      Q.  (BY MS. WESTFALL)  In 2007 -- strike that.
10         Was there a time in 2008 when you heard anything
11 about any procedures related to how voter ID would be
12 handled in the Senate in 2009?
13         MR. SWEETEN:  Objection.  Vague.  Objection.
14 Asked and answered.
15         You can answer.
16     A.  No.  The answer is no.
17     Q.  (BY MS. WESTFALL)  You sponsored the voter ID
18 bill in the Senate in 2009; isn't that right?
19     A.  Yes.
20     Q.  That was Senate Bill 362; is that correct?
21     A.  Yes.
22     Q.  Is it your testimony that you were not aware of
23 any conversations prior to the filing of that bill
24 related to how it would be considered procedurally in
25 the Senate in 2009?

---

**59**

1      A.  No.  You're saying were there -- was I aware of
2  it?  I was not aware of any conversations about how it
3  would be considered, no.
4          MR. SWEETEN:  Same objection to the
5  question.
6      Q.  (BY MS. WESTFALL)  Did you hear of any
7  conversations in 2009 or 2010 about how voter ID bills
8  would be handled procedurally in the 2011 legislature?
9          MR. SWEETEN:  Objection.  Vague.  Objection.
10 Compound.
11     A.  I was aware that the rule would be carried -- or
12 would be recommended to be carried forward, not to be
13 removed.  I knew that the rule was in the Senate Rules.
14 And I need to clarify my answer.
15         MR. SWEETEN:  Don't reveal the substance of
16 any communications you've had with anyone.
17     A.  I need to clarify that I was aware that the rule
18 was existing in 2009.  And when the rules were laid out
19 in 2011, I read the rules, and I saw that the rule was
20 still there.  So, that was when I was aware that it
21 would be carried forward, but no, that was the only
22 communication.
23     Q.  (BY MS. WESTFALL)  So, prior to seeing the rules
24 in 2011, you were not aware of any -- not a single
25 conversation prior to that time about carrying forward

---

**60**

1  the rule from 2009 to 2011?
2          THE WITNESS:  Privileged communication?
3      Q.  (BY MS. WESTFALL)  Without revealing the
4  substance of the communication.
5          MR. SWEETEN:  She's asking did a
6  communication occur but don't answer as to the substance
7  of any communication, just if there was a communication.
8      A.  Yes.  Yes.
9      Q.  (BY MS. WESTFALL)  I'm sorry, we had the --
10     A.  You asked was there a communication, and the
11 answer is yes.
12     Q.  When was the first communication that you had
13 about the procedures for voter ID in 2011?
14     A.  Probably a month from session.
15     Q.  Would that be sometime in December, 2010?
16     A.  Yes.
17     Q.  Were you, yourself a party to that communication?
18     A.  Yes.
19     Q.  Who else was in the conversation?
20         THE WITNESS:  Can I answer that question?
21         MR. SWEETEN:  You can answer as to who was
22 another party to the conversation.  Do not reveal the
23 specifics.
24     A.  Senator Williams.
25     Q.  (BY MS. WESTFALL)  Was anyone else involved in

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 61

1 that conversation?
2     A. No.
3     Q. It was only the two of you?
4     A. Yes.
5     Q. Was that an in-person discussion?
6     A. Yes.
7     Q. Were your staff people there?
8     A. I'm sorry. Just a second. I need to retract the
9 question about the date. I will say it was an in-person
10 but it would have been at the start of the session
11 because I don't believe I saw him in December. So, it
12 would have been in and around the first -- either the
13 day before or a day after the start of session would be
14 that conversation.
15     Q. And that was the first conversation that you had
16 about procedures --
17     A. Yes.
18     Q. -- in regards to Senate Bill 14?
19     A. Yes.
20     Q. Did you have any other conversations besides that
21 one with Senator Williams about the procedures for
22 Senate Bill 14?
23     A. No.
24     Q. Did you have any conversations with anyone in
25 Mr. Dewhurst's office?

## 62

1         MR. SWEETEN: And when you say
2 conversations, just general conversations, are you
3 asking about the timing of the --
4         MS. WESTFALL: The procedures to be employed
5 for Senate Bill 14.
6         MR. SWEETEN: Okay.
7     Q. (BY MS. WESTFALL) Did you have any conversations
8 with anyone in Mr. Dewhurst's office?
9     A. And I'm going to qualify your question. We
10 advised Governor Dewhurst's office --
11         MR. SWEETEN: Do not tell her what you
12 advised or discussed or the substance of the
13 conversation. You can tell whether you had a
14 conversation, the existence of the communication only.
15     A. There was a one-way conversation.
16     Q. (BY MS. WESTFALL) Was that conversation between
17 you or your office and Mr. Dewhurst's office about
18 Senate Bill 14 --
19     A. Yes.
20     Q. -- prior to the session?
21     A. Yes.
22     Q. Was there more than one communication?
23     A. No.
24     Q. I believe you testified earlier that you advised
25 the Lieutenant Governor's Office that you were filing;

## 63

1 is that correct?
2     A. Yes, that is what I'm referring to.
3     Q. Was that in November or December, 2010?
4     A. It was likely the first of December because you
5 can't file a bill until 30 days prior to, and in order
6 to establish that I was going to refile, I'm sure --
7         MR. SWEETEN: Hold on a minute. Do not
8 start expressing reasons for why you communicated with
9 him or the substance of that communication. She's just
10 asking you did a communication occur.
11     A. Approximately December the 8th of 2008 would have
12 been in that range when it would have happened.
13     Q. (BY MS. WESTFALL) Are you talking about 2008 or
14 2010, about 362 or --
15     A. 362 was 2008. 2010 for Senate Bill 14.
16     Q. Did you advise the Lieutenant Governor's Office
17 approximately the same time in December --
18     A. I'm sorry, your -- I need to retract that. You
19 led me down a path I didn't mean to go.
20         I don't remember a communication with them on
21 362. I do remember a communication on Senate Bill 14.
22     Q. And that was approximately December 8, 2010; is
23 that right?
24     A. Yes. Yes.
25     Q. And that was the communication between you or

## 64

1 your office and Mr. Dewhurst's office?
2     A. Yes.
3     Q. Related to the filing of Senate Bill 14; is that
4 correct?
5     A. Yes.
6     Q. Other than the communication with Senator
7 Williams about procedures for Senate Bill 14 in January
8 and this communication with Mr. Dewhurst, do you recall
9 any other communications with any of the members of the
10 Senate, House, Governor's Office, Lieutenant Governor's
11 Office about the filing of Senate Bill 14?
12     A. You've asked a very broad question. Not with the
13 Governor, not with House members but after we started
14 session, there were communication with other Senators
15 that they were aware that I had filed it.
16     Q. Okay. But prior to the session starting, there
17 were no other communications besides with Mr. Dewhurst's
18 office and Mr. Williams' office?
19         MR. SWEETEN: We're talking about the '11
20 session, right?
21         MS. WESTFALL: Correct.
22     A. No.
23     Q. (BY MS. WESTFALL) May the Governor designate
24 legislation as emergency legislation?
25     A. May as in does he have the ability?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

65

1    Q. Yes.
2    A. Yes.
3    Q. What allows the Governor to designate legislation
4  as emergency legislation?
5    A. The Governor can -- you know, he can declare
6  anything an emergency legislation.
7         MS. WESTFALL: Could you mark this as 553.
8         (Exhibit 553 marked.)
9    Q. (BY MS. WESTFALL) You've been handed what's been
10 marked US Exhibit 553.
11   A. Could we go off the record?
12   Q. Certainly.
13        (Short recess.)
14        MS. WESTFALL: Let's go back on the record.
15   Q. (BY MS. WESTFALL) Before the break, you had been
16 handed what's been marked as US 553. Do you recognize
17 this document?
18   A. Appears to be the Senate journal for Monday,
19 January 24th, began the session of 1:38 p.m.
20   Q. This was 2011; is that correct?
21   A. 2011.
22   Q. Turning your attention to the second page of the
23 document, which is the 54th page of the Senate Journal,
24 do you see down toward the bottom of the page it has a
25 message from the Governor?

66

1    A. Yes.
2    Q. What does that message indicate?
3    A. Would you like me to read the message to you?
4    Q. Or you could summarize it, whatever you'd like.
5  And I'd like to direct your attention to the first such
6  message.
7         MR. SWEETEN: You can answer based on the
8  text of the document.
9    A. Would you like me to describe it?
10   Q. (BY MS. WESTFALL) Yes, please.
11   A. It appears that a message from the Governor was
12 read, the following message on January 20th, 2011, "I,
13 Rick Perry, Governor of the State of Texas, do hereby
14 submit the following emergency matter for immediate
15 consideration to the Senate and House of Representatives
16 of the 82nd Legislature, now convened. Legislation that
17 requires a voter to present proof of identification when
18 voting. Respectfully submitted, Rick Perry, Governor
19 over the State of Texas, January 20th, 2011."
20   Q. Thank you.
21       And does that refresh your recollection as to the
22 source of the Governor's power for making emergency
23 designations of bills?
24       MR. SWEETEN: Objection. Foundation. Go
25 ahead.

67

1    A. It doesn't refresh my memory of the power of the
2  Governor. I'm very aware of the power of the Governor.
3  No, it does not refresh my memory.
4    Q. (BY MS. WESTFALL) What is the power of the
5  Governor to designate certain areas of legislation as
6  emergency legislation?
7    A. I'm going to clarify your question. You're
8  asking me what power does the Governor have to specify a
9  piece of legislation?
10       The Governor has the -- he takes the authority
11 that he can declare any issue an emergency. Generally,
12 he does not specify a specific bill, which is what you
13 referred to.
14       So, as you stated the question, that would be
15 incorrect because he generally does not mention or state
16 a specific piece of legislation. He will specify an
17 issue.
18   Q. Where does he get that power from?
19       MR. SWEETEN: You can answer as a general
20 matter.
21   A. You're asking where does the Governor get that
22 power from?
23   Q. (BY MS. WESTFALL) Yes.
24   A. You're implying that he has a power. There is no
25 power associated with it because his designation has no

68

1  force of power or affect. So, I would not use the word
2  power.
3        The Governor can declare or submit -- which his
4  wording is very clear here. He submits the following
5  emergency matter. He submits it to the Legislature but
6  it has no force of power.
7    Q. And referring back to his message that you just
8  testified to, do you see that it indicates that he is
9  designating voter ID as an emergency legislation under
10 his powers under the Texas Constitution?
11   A. Your representation is not correct. He is not
12 designating. It very clearly says that, "Pursuant to
13 Section 5 of the Texas Constitution, by this special
14 message, I do submit the following emergency matter for
15 immediate" -- he is submitting it for consideration.
16 There is no power that goes with that that is in any way
17 implied by the Texas Constitution.
18       The Constitution allows him to declare something
19 an emergency but it has no force past that.
20   Q. Can you explain when he designates an area of
21 legislation as emergency legislation, how does he do it?
22       MR. SWEETEN: Do you mean -- I'm sorry --
23   Q. (BY MS. WESTFALL) As a general matter.
24       MR. SWEETEN: He's not going to talk about
25 the times or the Governor's motivation in doing that.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 69

1  That would be subject to privilege and would call for
2  speculation.
3       Are you asking in what means it's done?
4       MS. WESTFALL:  Yes.
5    Q. (BY MS. WESTFALL)  I'm asking procedurally, how
6  does the Governor --
7    A. You need to rephrase your question because your
8  question didn't ask that.
9    Q. I'm going to withdraw my question and ask you,
10 procedurally, how does the Governor submit an area of
11 legislation as an emergency matter?
12   A. I do not know the procedure that the Governor
13 does.  You know, I know when I read about it but I don't
14 know the procedure of how it's done.
15   Q. Thank you.
16      When the Governor submits something as an
17 emergency matter to the legislature, what affect does
18 that have?
19      MR. SWEETEN:  You can answer as a general
20 procedural matter.
21   A. None.
22   Q. (BY MS. WESTFALL)  You can totally disregard it,
23 as a Senator?
24   A. When you say "totally disregard," obviously, if
25 the Governor issued it, I noted that it was important to

## 70

1  him but in this case, if he would have really thought it
2  was important, I think they would have picked up the
3  phone and called me.  I read about it in the newspaper.
4    Q. Are there any procedural consequences of the
5  Governor's designation of a particular area as emergency
6  legislation?
7       MR. SWEETEN:  You can answer as a general
8  matter.
9    A. There's no consequences of this and, in fact,
10 there are numerous issues that are declared as emergency
11 items that never come before the Legislature.
12   Q. (BY MS. WESTFALL)  Is it your testimony that it's
13 totally within the Senate's discretion as to how to
14 respond to an emergency designation from the Governor?
15   A. I would agree with that observation.
16   Q. So, you would -- strike that.
17      Emergency legislation, as designated by the
18 Governor, is not always considered within the first
19 60 days of session, is that your understanding?
20   A. No, it is not always considered.
21   Q. Is it usually considered within the first 60 days
22 of session?
23      MR. SWEETEN:  You can answer as a general
24 matter.
25   A. It is not always considered, and there's --

## 71

1  occasionally, it is considered but also occasionally, it
2  is not considered in the 60 days.  So, there's not a set
3  pattern of when an issue would be considered.
4    Q. (BY MS. WESTFALL)  Based on the public record,
5  was there any consequence to the Governor's designation
6  of proof of identification when voting as an emergency
7  legislative matter in 2011?
8       MR. SWEETEN:  Don't --
9       MS. WESTFALL:  As a matter of public record,
10 Mr. Sweeten.
11      MR. SWEETEN:  Still you're asking for his
12 thoughts, mental impressions as to what the consequence
13 of the Governor declaring this an emergency item was.
14      So, if you want to ask him if something was
15 expressed regarding that that he recalls in the public
16 record, that's one thing but you're asking him whether
17 or not -- what the procedural consequences were, and
18 that reveals legislative privilege.
19      I'm going to instruct you, on that basis,
20 not to answer the question.
21   Q. (BY MS. WESTFALL)  Are you following advice of
22 counsel?
23   A. I would like the question reasked again.
24      MS. WESTFALL:  Would you reread it, please,
25 Ms. Court Reporter?

## 72

1       (Whereupon, the requested testimony was read back
2  as follows:
3       QUESTION:  Based on the public record, was there
4       any consequence to the Governor's designation of
5       proof of identification when voting as an
6       emergency legislative matter in 2011?)
7       MR. SWEETEN:  If you answer the question, it
8  would reveal legislative privilege unless a specific --
9  something was uttered on the public record.
10   A. If you'd like to ask me about the first half of
11 the question and not specify about Senate Bill 14, I
12 would be glad to answer, if you would like to repeat the
13 question up to the point that you address Senate Bill
14 14.
15   Q. (BY MS. WESTFALL)  I'll ask a different question.
16   A. Are you withdrawing that question?
17   Q. I'm going to let it be.  I'm going to ask you
18 another question because I think you've asserted
19 privilege or your counsel has directed you to assert
20 privilege.
21   A. No, I have not done that at all.  The question is
22 still before us.  I'm telling you that the question that
23 you're asking, the majority of the question I'm willing
24 to answer but as you asked it in reference to a specific
25 piece of legislation, which was Senate Bill 14, that



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

73

1 would you force me to assert privilege.
2       So, if you will ask me the question on the
3 general matter without it being specific to that issue,
4 I'll be glad to answer your question.
5       Q. Thank you, sir.
6       Were there any -- strike that.
7       A. Did you withdraw your last question?
8       Q. No, it's pending but you've answered it, so,
9 we're on to another --
10      When the Governor designated legislation
11 requiring a voter to present proof of ID when voting in
12 January of 2011, were there any consequences or effects
13 in the Senate on the public record?
14           MR. SWEETEN:  Don't answer.
15           Objection.  Legislative privilege.
16      Q. (BY MS. WESTFALL)  Senator, are you following the
17 advice of counsel?
18      A. Privileged.  And I would ask you to reask the
19 question.
20      Q. Were there any procedural consequences on the
21 record as a result of the Governor's designation of
22 voter ID as an emergency legislative matter --
23           MR. SWEETEN:  Same objection.
24      Q. (BY MS. WESTFALL)  -- in 2011?
25           MR. SWEETEN:  Same objection on legislative

---

74

1 privilege.
2       A. If you will ask the first part of the question as
3 a general sense about any emergency legislation and not
4 specify to Senate Bill 14, I'll be glad to answer the
5 question.
6       Q. (BY MS. WESTFALL)  Are there any procedural
7 consequences when the Governor generally designates
8 legislation as an emergency?
9           MR. SWEETEN:  You can answer the question.
10      A. No.
11      Q. (BY MS. WESTFALL)  I believe you testified the
12 Senate can take it or leave it; is that right?
13      A. Did I say that?
14      Q. No, but I'm summarizing.
15      A. I believe you're putting words in my mouth, and I
16 don't believe I said that.  I said there were no
17 consequences.
18      Q. The Senate may or may not take into consideration
19 the Governor's wishes?
20      A. The Senate will do their wishes.
21      Q. As a general matter, when the Governor designates
22 an issue area as emergency legislation, does the Senate
23 consider such legislation within the first 60 days?
24      A. There is no general rule.  Every issue is
25 considered on its own merit.

---

75

1       Q. When did you first hear about the Governor
2 designating proof of voter ID in 2011 as emergency
3 legislation?
4       A. I read about it in the paper.
5       Q. Are you aware of any communications about the
6 Governor's designation of voter ID as emergency
7 legislation prior to it appearing in the Senate Journal?
8       A. With who?
9       Q. With anyone.
10      A. I'm not aware of any communications.
11      Q. Are you aware of any conversations or other
12 communications regarding the timing of consideration of
13 Senate Bill 14 by the Senate?
14      A. No.
15      Q. Are you aware of any conversations regarding
16 consideration of the Senate Bill 14 by the Committee of
17 the Whole prior to the session starting?
18      A. Prior to the session starting?
19      Q. Yes.
20      A. No.
21      Q. When did you first learn that the Committee of
22 the Whole would be considering Senate Bill 14?
23      A. And I believe you asked me that question in the
24 last deposition, and the answer remains the same, is
25 that my recollection is that I was advised by the

---

76

1 Lieutenant Governor's office that I would be recognized
2 on Senate Bill 14 on X date.  It was about two days
3 before that happened.
4       Q. Is it your testimony that you filed Senate Bill
5 14 before the session started and that you were not
6 aware or party to any communications about how the
7 Senate would consider Senate Bill 14 until you had that
8 conversation or communication with Mr. Dewhurst's
9 office?
10      A. I'd like the question back.  You've got -- I've
11 got a clarification I've got to make.  I need to hear
12 the question again.
13           MS. WESTFALL:  Could you read it back?
14           (Whereupon, the requested testimony was read back
15 as follows:
16           QUESTION:  Is it your testimony that you filed
17 Senate Bill 14 before the session started and
18 that you were not aware or party to any
19 communications about how the Senate would
20 consider Senate Bill 14 until you had that
21 conversation or communication with Mr. Dewhurst's
22 office?)
23           MR. SWEETEN:  Objection.  Compound.
24           THE WITNESS:  Am I free to answer?
25           MR. SWEETEN:  Yeah, to the extent -- just

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 77

1    don't reveal legislatively privileged matter or the
2    substance of any communication.
3        A.  I can't answer your question, and the reason I
4    can't answer your question is the bill that was filed
5    before session started, the one before, was given
6    another number.  I don't recall what that number was but
7    after we got into session -- or about the time we
8    started session, we refiled the exact same bill but they
9    designated a new number on the bill administratively.  I
10   don't know why that happened but we refiled the bill.
11       So, the question, as you asked it, is not
12   correct.  If you'd like to rephrase it and say the bill
13   that I filed, I'll be glad to answer your question.
14       Q.  (BY MS. WESTFALL)  Thank you for your testimony.
15       Did you have any communications with anyone about
16   that previous bill prior to the session starting?
17       A.  With anyone?
18       Q.  With anyone.
19       A.  Yes.
20       Q.  When was the first conversation that you had in
21   that regard?
22       A.  Probably in the summer of 2010.
23       Q.  Were you a party to that communication?
24       A.  Yes.
25       Q.  Who else was a party to that communication?

### 78

1        A.  Myself and the person that I was talking to.
2        Q.  And who was that individual?
3        A.  Skipper Wallace.
4        Q.  That was in the summer of 2010?
5        A.  It's my recollection it was sometime prior to the
6    start of the session in a three-month period.  I don't
7    remember when it was but it's my recollection that we
8    had a conversation some time prior to the session.
9        Q.  Did you only have one conversation with
10   Mr. Wallace?
11       A.  I can't answer that because I don't remember.
12       Q.  Was anyone else a party it that conversation?
13       A.  No.
14       Q.  Was that a phone conversation or in-person?
15       A.  In-person.
16       Q.  Was that in your office?
17       A.  No.  It would have likely been at a political
18   event that we were both attending, and it was a passing
19   conversation.
20       Q.  Did you have any other conversations with anyone
21   besides Mr. Wallace about the previously numbered voter
22   ID bill that you were going to file in 2010 -- profile
23   in 2010 for the 2011 session?  Sorry.
24       A.  Yes.
25       Q.  Who else -- strike that.

### 79

1        When was that conversation?
2        A.  Summer of 2010.
3        Q.  Were you a party to that conversation?
4        A.  Yes.
5        Q.  Who else was involved in that conversation?
6        A.  Myself.
7        Q.  Who was the other party?
8        A.  The President of the Senate of Indiana.
9        Q.  What is the name of that individual?
10       A.  Senator David Long.
11       Q.  Was that at the meeting of Senate Presidents --
12       A.  Yes.
13       Q.  -- that you had testified to earlier?
14       A.  Yes.
15       Q.  Did you have any other conversations with anyone
16   else about the voter ID bill that you were filing?
17       A.  I believe I had a conversation with the Senate
18   President from Georgia.
19       Q.  Was that at that same meeting?
20       A.  Same meeting.
21       Q.  Are there any other conversations that you had
22   about the bill -- the voter ID bill that you were filing
23   in 2010 for the 2011 session?
24       A.  Yes.
25       Q.  Who was that with?

### 80

1        A.  With the Senate President of Illinois, John
2    Culbertson, a Democrat.
3        Q.  Were there any other conversations about the bill
4    that you were filing related to voter ID not related to
5    that meeting that you had with the Senate Presidents?
6        A.  No.
7        Q.  Do you receive constituent mail in your Senate
8    office?
9        A.  I don't personally but I'm sure there is mail
10   that comes in to the Senate office.
11       Q.  How is that mail received?  Do you receive it by
12   E-mail?  Do you receive hard copies of letters?
13       A.  I don't know.  I believe that we receive, for
14   sure, postage, and I'm assuming we receive some E-mail
15   communication.  I'm not privy to that because, as I told
16   you, I don't do E-mails.
17       Q.  Is there a staff person in your office who
18   handled constituent communication in 2011 for you?
19       A.  Janice McCoy.
20       Q.  Is she the sole person in your office who handled
21   constituent communication in 2011?
22       A.  I don't know the answer to that.
23       MR. SWEETEN:  Okay.  We're going to get into
24   constituent communication, so, let's have a discussion
25   on that.



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

81

1      When we began the deposition, you indicated
2  that you wanted to discuss those issues with Senator
3  Fraser, and I indicated that I didn't believe that that
4  was what the Court has ordered us to do.  It's not part
5  of the Court's order.
6      Nevertheless, you pointed out that we did go
7  with Representative Harless and they made a motion with
8  the Court to allow additional questioning on that issue.
9      I've spoken with Senator Fraser regarding
10 the issue, and we've determined that in view of the fact
11 that the Court has ordered that with respect to
12 Representative Harless, that we're going to allow you to
13 ask questions about constituent communications as you've
14 asked to do.
15      At the same time we would ask that just as
16 the Court limited Representative Harless' questioning on
17 that issue to an hour, I think that is a very reasonable
18 request, so, we would assert that if we're getting into
19 that area, that we limit the questioning of that, if
20 that's agreeable to you, Counsel.
21      MS. WESTFALL:  I appreciate the
22 accommodation.  I don't think it will be a lengthy
23 examination on constituent correspondence.  We have not
24 received a great deal of correspondence produced from
25 Senator Fraser's office.

---

82

1      So, I believe as things stand currently,
2  that it will not take more than one hour to
3  examine Senator Fraser on constituent communication.
4      MR. SWEETEN:  You didn't answer my question.
5      MS. WESTFALL:  I sure didn't.  As things
6  stand right now -- and it's my general practice not to
7  promise to limit my examination to a certain period of
8  time but I do not foresee as of currently, unless we get
9  into extensive communications about communications, that
10 it will go longer than an hour.  I can make that
11 representation to you right now, Counsel.
12      MR. SWEETEN:  And I assume we're finished
13 with the other issues, because I want to make a clean --
14 I want to have an idea of where we are.  Is that
15 correct?
16      MS. WESTFALL:  Yes, unless -- I'm going to
17 hand the podium to counsel for defendant-intervenors,
18 who may have additional questions in that regard.
19      MR. SWEETEN:  Mr. Dunn, do you have any idea
20 of what sort of time your examination will be?
21      MR. DUNN:  At the moment, five minutes or
22 less.
23      MR. SWEETEN:  I accept.  Okay.  So, we'll
24 go -- we'll march forward in the spirit of accommodation
25 and allow these questions to proceed.

---

83

1      MS. WESTFALL:  I'm grateful, Mr. Sweeten.
2      Q.  (BY MS. WESTFALL)  Senator, is there someone in
3  your office who responds to constituent correspondence?
4      A.  I don't know the answer to that.
5      Q.  Do you know whether you generally do respond to
6  constituent correspondence or do you just receive the
7  communications?
8      A.  We are not very big on response.  So, I feel sure
9  that there are people that will respond to but we
10 don't communicate a lot in my office.
11      Q.  Does Ms. McCoy ever share any constituent
12 communication with you that she has reviewed?
13      A.  She occasionally will come in my office and say,
14 "We heard from Skipper and I told him X."
15      MR. SWEETEN:  Now, as you're answering these
16 questions, I want to remind you of the legislative
17 privilege.
18      THE WITNESS:  Okay.
19      MR. SWEETEN:  She can ask you questions
20 about constituent communications.  She can ask about the
21 substance of those communications but in answering those
22 questions, I don't want you to reveal your mental
23 impressions or thoughts about any specific legislation.
24      THE WITNESS:  Okay.
25      MR. SWEETEN:  They are still subject to the

---

84

1  legislative privilege.
2      MS. WESTFALL:  And, Mr. Sweeten, just to be
3  clear before we exam on some exhibits related to
4  constituent communications, it is the Court's order that
5  communications between legislators and constituents,
6  lobbyists and interest groups are not within the
7  legislative privilege.  So, those communications both
8  ways must be produced.
9      The Court also indicated, as you have
10 directed your witness, that questioning a Legislator
11 about -- to the extent it would require the Legislator
12 to reveal subjective motivations is covered within the
13 privilege.  So, I just want to make sure we're in
14 agreement with the scope of the privilege before I
15 examine the witness.
16      MR. SWEETEN:  I think what you said is what
17 I said --
18      MS. WESTFALL:  Right.
19      MR. SWEETEN:  -- which is he's not going to
20 reveal his mental impressions about -- for example, if
21 constituent X wrote something, he's not going to say why
22 he said something to them or he's not going to say what
23 he did as a result of something that was told to him.
24      He will reveal, to the extent he can recall,
25 the substance of the communication, the approximate



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

85

1      date, means of communication.
2             MS. WESTFALL:  In both directions, right?
3             MR. SWEETEN:  That's correct, if we're
4      talking about a constituent.  I think that's the Court's
5      order.
6             MS. WESTFALL:  Okay.  Could you mark this US
7      554.
8             (Exhibit 554 marked.)
9         Q.  (BY MS. WESTFALL)  You've been handed what's been
10     marked US 554.  Do you recognize this document?
11        A.  No.
12        Q.  Do you see that it was from Janice McCoy's
13     E-mail?
14        A.  Yes.
15        Q.  Do you have any reason to believe that Janice
16     McCoy did not receive this E-mail?
17        A.  Well, you're assuming that I understand how
18     E-mail works.
19        Q.  Do you not know whether this was received by
20     Ms. McCoy, is that your testimony?
21        A.  I don't know the answer.  No, I do not know.  I
22     have not seen it, and no, I don't know.
23        Q.  Do you know Brenda Payne?
24        A.  No.
25        Q.  Is Abilene, Texas within your district?

87

1         A.  I have no way of knowing.  I didn't see this
2      E-mail or others, so, I have no way of knowing.
3         Q.  (BY MS. WESTFALL)  Do you know whether others
4      among your constituents or interest groups or advocacy
5      groups expressed the view that there are a lot of
6      undocumented people who have student IDs?
7             MR. SWEETEN:  You can answer based on the
8      public record or based upon communications from
9      constituents.
10        A.  I have no communications that I can fall back on
11     that stated that view that I saw.
12        Q.  (BY MS. WESTFALL)  Sitting here today, is that
13     the first time you've heard that argument that a lot of
14     undocumented people have student IDs in Texas?
15            MR. SWEETEN:  Don't reveal matters of
16     privilege in answering the question.
17        A.  There was debate --
18            THE WITNESS:  If it's a matter of public
19     debate, there's no problem?
20            MR. SWEETEN:  There's no problem with that
21     but if there's a communication --
22        A.  There was a debate in 2009 and 2011 discussing
23     about the type of identification and if the
24     identification was proper and could be -- if someone
25     could get an ID that was illegal, and that's not -- it's

86

1         A.  Uh-huh.
2             MR. DUNN:  Is that a yes?
3         A.  Yes, it is.
4         Q.  (BY MS. WESTFALL)  Could you describe what
5      Ms. Payne is indicating in her E-mail message?
6         A.  Again, I'm not real good at -- I don't do E-mails
7      but it appears that after her name, she has put in, "Yes
8      to voter ID.  No to a school, university or college ID
9      as proper identification to vote.  Too many illegals
10     have acquired these and it would defeat the purpose.
11     Thank you."
12        Q.  Do you see that this communication was sent on
13     Thursday, January 27th, 2011, at the top of the page?
14            MR. SWEETEN:  Objection.  Form.  Objection.
15     Foundation.
16            Go ahead.  You can answer.
17        A.  It appears that it was sent on January 27th.
18        Q.  (BY MS. WESTFALL)  You just described Ms. Payne's
19     E-mail.  Do you know whether others shared Ms. Payne's
20     views that undocumented persons have college IDs?
21            MR. SWEETEN:  Objection to the question as
22     vague.  Objection to the question to the extent it asks
23     you to reveal your thoughts, your mental impressions,
24     your analysis of any given legislation.  So, don't
25     answer it if it would require you to do so.

88

1      not targeted at someone -- to me, this says anyone that
2      is not entitled to that identification and they get one,
3      they illegally got that.  So, I would say that
4      discussion was one that I heard on the floor several
5      times.
6         Q.  (BY MS. WESTFALL)  Senator, had you ever heard
7      concerns that undocumented people could have access to
8      student IDs in particular, based on communications in
9      the public record or constituent or advocacy group
10     communications?
11        A.  It is a matter of public record of newspaper
12     stories and/or magazine articles that discussed that or
13     things that had been written prior to in other reports
14     or studies.  So, yes, I have read that.
15        Q.  So, before appearing for this deposition today,
16     you had heard, either through news articles, public
17     debate or constituent communications, that there was a
18     concern about undocumented people having access to
19     student IDs, is that your testimony?
20        A.  I'm testifying in reading prior to this of
21     accounts of things that were written, there had been
22     people that had written of multiple concerns, of which
23     this was one.
24        Q.  And "this," you mean student IDs in particular?
25        A.  I believe the discussion on student IDs probably



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 89

1    was restricted to discussion on the floor of the Senate.
2        Q.  Did it relate to or concern people without
3    documentation in this country obtaining student IDs?
4        A.  No.
5        Q.  Had you ever --
6        A.  I'm sorry, I need to clarify.  To my knowledge, I
7    do not remember a discussion of that type.
8        Q.  When did you first hear that there was a concern
9    about undocumented people having student IDs?
10          MR. SWEETEN:  Objection to the extent it
11   calls for privilege.
12       A.  To my knowledge, I don't remember that issue
13   being brought up other than you showing me this, that
14   someone, it appears, sent in.
15       Q.  (BY MS. WESTFALL)  Had Ms. McCoy ever raised the
16   issue of undocumented people having student IDs with
17   you?
18          MR. SWEETEN:  Don't answer the question.
19       A.  Privilege.
20       Q.  (BY MS. WESTFALL)  Are you following the advice
21   of counsel?
22          MR. SWEETEN:  Objection.  That calls for
23   privilege.
24          Don't answer the question is my instruction.
25       A.  Privilege.

## 90

1        Q.  (BY MS. WESTFALL)  Had Ms. McCoy ever told you
2    about constituent communication or advocacy groups
3    concerned that undocumented people had student IDs?
4           MR. SWEETEN:  Same objection.
5           Don't answer the question.  Privileged.
6        A.  Privilege.
7        Q.  (BY MS. WESTFALL)  Do you know whether your
8    office responded to this E-mail from Ms. Payne?
9           MR. SWEETEN:  You can answer.
10       A.  I do not know.
11       Q.  (BY MS. WESTFALL)  If Ms. McCoy had received a
12   lot of complaints and a lot of E-mails about the
13   possibility of undocumented people getting student IDs,
14   do you think she would have raised that with you?
15          MR. SWEETEN:  Don't answer the question.
16   Legislative privilege.
17       Q.  (BY MS. WESTFALL)  Can you answer that question?
18          MR. SWEETEN:  No.  My instruction is do not
19   answer the question.
20       A.  Privilege.
21       Q.  (BY MS. WESTFALL)  Do you know whether E-mails
22   sent from constituents to you are automatically routed
23   to Ms. McCoy's E-mail?
24          MR. SWEETEN:  You can answer as a general
25   matter.

## 91

1        A.  Yes.
2        Q.  (BY MS. WESTFALL)  They are, they are sent to her
3    for her response?
4        A.  I think my answer is I don't know.  My assumption
5    is that it is because there are no E-mails sent directly
6    to me.  There are things sent to my Senate office, which
7    in the Senate office, she is the -- she runs the Senate
8    office.  So, it wasn't sent directly to me.  I have -- I
9    don't have things sent to me personally.
10       Q.  Is it your understanding that Ms. McCoy reviews
11   all E-mails that gets sent to your E-mail address?  Is
12   that right?
13       A.  I didn't say that.  I said I believe that they
14   are routed to her, and my assumption is that she does
15   review those.
16          MS. WESTFALL:  Could you mark this as 555.
17          (Exhibit 555 marked.)
18       Q.  (BY MS. WESTFALL)  You've been handed what's been
19   marked as US 555.  Have you seen this document before?
20       A.  Have I seen this?  No.
21       Q.  Could you describe the E-mail message that is
22   contained in US 555?
23       A.  It appears to come from someone outside of my
24   district that -- I don't even know where Needville,
25   Texas is, and I don't recognize the name of the person.

## 92

1    And he appears to have sent a message to my office.
2        Q.  Could you describe the message?
3        A.  He says -- he's congratulating me on a wonderful
4    voter ID bill for all legal citizens of Texas.
5        Q.  Do you know whether you responded to this E-mail?
6        A.  No, I do not.
7        Q.  Do you know why this constituent was saying it
8    was helpful for legal citizens of Texas?
9           MR. SWEETEN:  Objection.  Calls for
10   speculation.  Objection.  Privileged.
11          Don't reveal your thoughts, mental
12   impressions about why someone would have done something
13   to the extent it would relate to any motivation about --
14          MS. WESTFALL:  Mr. Sweeten, I'm asking him
15   about his understanding of why this constituent was
16   writing this E-mail.  It's not about anything that's in
17   the Senator's head.
18          MR. SWEETEN:  Well, he said he's never seen
19   this before in his life, he doesn't know this guy,
20   doesn't know where he's from, and now you're asking him
21   to interpret why he said something.  So, that's first is
22   it's an inappropriate question, but secondly --
23          MS. WESTFALL:  But that's not a basis for
24   instructing the witness not to answer.
25          MR. SWEETEN:  Well, let's get to that.  The



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

93

1   basis for instructing him not to answer is legislative
2   privilege to the extent that it would require him to
3   reveal any mental thoughts, impressions about why
4   someone would do that.
5          If in answering the question, it would
6   require him to reveal his impressions or thoughts or
7   motivations about the bill, then he can't answer the
8   question as phrased.
9       Q.  (BY MS. WESTFALL)  Do you have any understanding
10  about why this constituent would link voter ID and other
11  immigration bills in his E-mail?
12         MR. SWEETEN:  Same objection.  Same
13  instruction.
14      A.  Privilege.
15      Q.  (BY MS. WESTFALL)  Can you answer it outside of
16  any privileged information or testimony that you might
17  have?
18      A.  I don't know this person.
19      Q.  So, is your answer you don't know why he linked
20  voter ID with illegal immigration?
21         MR. SWEETEN:  Same objection.  Same
22  instruction.
23      Q.  (BY MS. WESTFALL)  Do you not know?
24      A.  Privilege.
25      Q.  Do you know whether other constituents, advocacy

94

1   groups or interest groups also saw that there was a
2   connection between the voter ID bill and immigration
3   bills?
4          MR. SWEETEN:  Same objection.  Instruct you
5   not to answer the question on the basis of legislative
6   privilege.
7       A.  Privilege.
8       Q.  (BY MS. WESTFALL)  Do you have any idea why a
9   constituent like Mr. Kucera would have connected the two
10  issues?
11         MR. SWEETEN:  Same instruction.  Don't
12  answer on the basis of privilege.  Same objection.
13         MS. WESTFALL:  Based on their motivations
14  and intents, not based on the Senator's, Mr. Sweeten.
15         MR. SWEETEN:  Same -- you're asking his
16  opinion as to why someone would do something, which
17  could invade his -- his thoughts and mental impressions
18  about a bill.  It is subject to privilege.  Same
19  instruction.  Same objection.
20         MS. WESTFALL:  Mr. Sweeten, the question is
21  about the motivation of the constituent writing the
22  letter.  It's not about the motivation of the Senator.
23         Will you withdraw your objection?
24         MR. SWEETEN:  No, absolutely not.  I'm -- my
25  objection is appropriate based upon the questions that

95

1   you're asking the Senator.
2          MS. WESTFALL:  I am not asking him to reveal
3   any of his subjective motivations in his advancement of
4   Senate Bill 14.
5          I'm asking about his opinion of why a
6   constituent would put something in an E-mail.
7          Mr. Sweeten, would you reconsider your
8   objection?
9          MR. SWEETEN:  It's the same objection.
10  First, we can go back over the reason that -- you're
11  asking for speculation.  You're also asking for him to
12  reveal his thoughts, mental impressions about why
13  someone would vote for a specific piece of legislation,
14  which implicates the legislative privilege.
15         I will not reconsider it -- I mean, I have
16  considered it again but my objection is appropriate and
17  I'm going to maintain the same objection and
18  instructions.
19      Q.  (BY MS. WESTFALL)  Without -- Senator, without
20  talking about your own motivations in advancing Senate
21  Bill 14, why do you think a constituent would praise
22  your work on voter ID based on behalf of legal citizens
23  of Texas, as opposed to illegal citizens of Texas?  Do
24  you know why he would do that?
25         MR. SWEETEN:  Same objection.  Same

96

1   instruction.  Legislative privilege and vague.  Calls
2   for speculation.
3       A.  Privilege.
4       Q.  (BY MS. WESTFALL)  Can you answer that question
5   about why the constituent would write that?
6       A.  Privilege.
7       Q.  Is your answer you don't know why the constituent
8   would link those two issues?
9          MR. SWEETEN:  Objection.  Asked and
10  answered.  Objection to the question as vague and calls
11  for speculation.  Objection based on the legislative
12  privilege.  Instruct not to answer the question.
13      A.  Privilege.
14      Q.  (BY MS. WESTFALL)  Are you following his counsel?
15      A.  Yes, I am.
16      Q.  Did you receive any other constituent
17  communications that similarly praised you for your work
18  on Senate Bill 14 on behalf of legal citizens of Texas?
19      A.  I don't see communications coming in.
20      Q.  I'm not asking about -- I guess I don't
21  understand your answer.
22         Are you aware of any other constituents who were
23  supportive of your work on voter ID because it was
24  helpful to legal citizens of Texas?
25      A.  Are you asking if people communicated to me?



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

### 97

1  Q. Yes.
2  A. By print?
3  Q. Are you aware of any communications at all coming
4  into your office -- and I'm sure your counsel will
5  advise you that those are not privileged -- that were
6  supportive of your work on voter ID because it helped
7  legal citizens of Texas?
8  A. Every time I go to the grocery store, someone
9  still will say something, say, "Good job on Senate Bill
10  14 or the photo ID bill."
11  Q. Are you aware of many constituents who say this
12  is helpful on the issue of illegal immigration that you
13  passed and worked very hard on Senate Bill 14?
14  A. People say, you know, it's a good piece of
15  legislation. They don't go into specifics.
16  Q. Are you aware of ever having heard any
17  constituent say to you, "Thanks for your work on voter
18  ID. It helped. It helps on illegal immigration"?
19  A. I cannot give you a specific example of where
20  someone said that.
21  Q. And looking at US 555, is this the first time
22  today sitting here in this deposition that you have
23  received a communication from a constituent -- or, I
24  guess, a resident of Texas, not a constituent, thanking
25  you for your work on voter ID because it helped on

---

### 98

1  immigration issues?
2  A. What is US 55?
3  Q. This exhibit that you're looking at now.
4  MR. SWEETEN: 555.
5  A. Okay. What was your question?
6  Q. (BY MS. WESTFALL) Is this the first time that
7  you're hearing support for your work on voter ID because
8  it helps on immigration issues, sitting here today?
9  MR. SWEETEN: From constituents.
10  Q. (BY MS. WESTFALL) From constituents.
11  A. Yes.
12  Q. You never heard any constituents say this is
13  good, from the standpoint of immigration, until you saw
14  this letter here?
15  A. My testimony is that I do not recall anyone
16  specifically saying that this was good for immigration
17  issues.
18  Q. Do you recall whether Mr. Wallace saw there being
19  a connection between Senate Bill 14 and voter ID and
20  fighting illegal immigration?
21  MR. SWEETEN: Objection. Calls for
22  speculation but you can testify as to what Mr. Wallace
23  told you.
24  A. No. No communication.
25  Q. (BY MS. WESTFALL) Do you know whether your

---

### 99

1  office responded to Mr. Kucera's E-mail?
2  A. I do not know but suspect we did not.
3  Q. Do you know whether Ms. McCoy searched for
4  responses to constituent E-mail on voter ID and produced
5  them to your attorneys in this action?
6  A. Yes.
7  Q. Did she produce any such responses, to your
8  knowledge?
9  A. I don't know. I know that she was attempting --
10  she checked our office. She told me she was going
11  through it and was going to return everything we had,
12  per the instructions of the Attorney General.
13  Q. I'm sorry, also the Lieutenant Governor?
14  A. No. Attorney General and, I guess, the Justice
15  Department. The request from the Court had a request,
16  and we complied with the request.
17  Q. Thank you.
18  MS. WESTFALL: Would you mark this US 556.
19  (Exhibit 556 marked.)
20  Q. (BY MS. WESTFALL) You've been handed what's been
21  marked as US 556. Do you recognize this document?
22  A. No.
23  Q. Do you know a Mickey Mathis?
24  A. No.
25  Q. Does this appear to be an E-mail message from

---

### 100

1  Mickey Mathis to your office on January 21st, 2011?
2  A. It appears that is. I believe that's what it
3  says.
4  Q. Is Brownwood, Texas in your district?
5  A. Yes, it is.
6  Q. Could you describe the message that Mr. Mathis
7  conveyed -- pardon me -- Ms. Mathis conveyed?
8  MR. SWEETEN: You can testify based on the
9  text of the E-mail.
10  A. "Voter ID, E verify and other anti illegal
11  immigration bills are crucial to this State. 24 percent
12  of the population is on some kind of social program.
13  Schools, communities and our state government are all
14  overdrawn at the bank. Stop the invasion. Clean out
15  the welfare rolls. Verify who is in this state.
16  Washington has stopped deporting. Texas has to tighten
17  up and toughen up now."
18  Q. Do you recall whether Ms. McCoy ever showed this
19  E-mail to you?
20  A. I've never seen this E-mail.
21  Q. Do you recall whether Ms. McCoy ever described
22  the sentiments expressed in this E-mail to you?
23  MR. SWEETEN: Objection. Privilege.
24  Don't answer. Instruct you not to answer.
25  Q. (BY MS. WESTFALL) Are you following the advice

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

101

1    of counsel?
2        A. Privilege. Privilege.
3        Q. Do you know whether you responded to this E-mail?
4        A. I do not know.
5        Q. Do you know why Ms. Mathis saw that voter ID, E
6    verify and other illegal immigration bills, as she puts
7    it, were all connected topically?
8            MR. SWEETEN: Objection. Calls for
9    speculation. Objection. Vague. Objection. Calls for
10   matters of legislative privilege. Instruct not to
11   answer on that basis.
12       Q. (BY MS. WESTFALL) To the extent that you can
13   answer without revealing your mental impressions, could
14   you answer the question?
15           MR. SWEETEN: Same obstruction.
16       A. If you will reword the question, and it's not
17   privileged, I'll be glad to.
18       Q. (BY MS. WESTFALL) Senator, without testifying as
19   to your mental impressions of this E-mail, could you
20   explain why Ms. Mathis is connecting voter ID, E verify
21   and illegal immigration bills topically in her E-mail?
22           MR. SWEETEN: Objection. Vague. Objection.
23   Calls for speculation. Objection. Subject to the
24   legislative privilege.
25           Don't reveal your thoughts, mental

---

102

1    impressions, motivations, analysis recording any sort of
2    legislation, including Senate Bill 14.
3        MS. WESTFALL: Mr. Sweeten, the question
4    itself excludes any mental impressions that the Senator
5    may have in the response.
6            MR. SWEETEN: To the extent that you would
7    not reveal privilege --
8        A. I can't answer the question without a -- giving a
9    privilege. I'm sorry, I cannot answer that question.
10           MS. WESTFALL: Would you mark this as 557.
11           (Exhibit 557 marked.)
12       Q. (BY MS. WESTFALL) You've been handed what's been
13   marked US 557. Do you recognize this document?
14       A. I'm sorry?
15       Q. Do you recognize this document?
16       A. I've never seen it.
17       Q. Do you know Catherine Engelbrecht?
18       A. I do not.
19       Q. You've never heard of her?
20       A. No.
21       Q. Do you know who the King Street Patriots are?
22       A. No.
23       Q. Do you know who True the Vote is?
24       A. What?
25       Q. True the Vote, the organization.

---

103

1        A. No.
2        Q. Never heard of it?
3        A. No.
4        Q. Did Ms. McCoy tell you anything about the
5    existence of this communication, without revealing any
6    private conversations you've had with Ms. McCoy?
7        A. No communications with Ms. McCoy on this.
8        Q. Do you see that it indicates in the second
9    paragraph if you ever have any need of incident reports,
10   Catherine Engelbrecht of King Street Patriots would be
11   willing to provide you with empirical evidence? Do you
12   see in that E-mail it does, sir?
13       A. I read that she said that, yes.
14       Q. Pardon?
15       A. I read that she said that, yes.
16       Q. Could you describe the E-mail that she sent to
17   you?
18       A. I can read you what it says. "If you ever have
19   need of any of our incident reports to provide the
20   empirical evidence I heard requested so often today,
21   please let me know. We would be happy to provide you
22   with any of our documentation."
23       Q. And could you tell me what date on which this
24   E-mail appears to have been sent?
25       A. Looks like January the 25th.

---

104

1        Q. Do you know whether there was any response from
2    your office to this E-mail?
3        A. I do not know.
4        Q. Do you know whether Ms. Engelbrecht ever sent to
5    you any incident reports she had related to Senate Bill
6    14?
7        A. I do not. No, I do not know, and I have no
8    indication that she sent anything.
9        Q. Are you familiar with an organization called
10   Empower Texans?
11       A. I have heard of Empower Texans but I'm not
12   familiar with them.
13       Q. Have you ever had any communications with anyone
14   at Empower Texans?
15       A. Since I don't know who the group is, I don't know
16   the individuals involved, so, my answer would have to be
17   no.
18       Q. To the extent you know, do you know what Empower
19   Texans is?
20       A. No.
21       Q. Do you know Michael Quinn Sullivan?
22       A. I know the name.
23       Q. Who is he?
24       A. He is a person named Michael Quinn Sullivan.
25       Q. Do you know whether he represents a group or

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

---

105

1   represents a particular --
2       A. He is a political activist.
3       Q. Where is he based?
4       A. I don't know.
5       Q. What are his issues on which he advocates?
6       A. I don't know.
7       Q. Have you ever spoken to Mr. Sullivan?
8       A. I believe that I have met him, but a conversation
9   other than hello is probably the extent.  I don't know
10  Michael Quinn Sullivan.
11      Q. Is it your testimony you've never discussed voter
12  ID with Mr. Sullivan?
13      A. No.  No.
14      Q. What is the Immigration Reform Coalition of
15  Texas?
16      A. I don't know.
17      Q. Do you know Rebecca Forrest?
18      A. Forrest?
19      Q. Yes.
20      A. No.
21      Q. What is the San Antonio Tea Party?
22      A. I would suspect it is the San Antonio Tea Party.
23      Q. And do you know what their central areas of
24  advocacy are?
25      A. The geographic area or issues?

---

106

1       Q. No.  Advocacy.  What are their issues?
2       A. I have no idea.
3       Q. Is San Antonio in your district?
4       A. No.
5       Q. Do you know who George Rodriguez is?
6       A. No.
7       Q. Do you know whether George Rodriguez is the
8   president of the San Antonio Tea Party?
9       A. I have no idea.
10      Q. Do you know a Raymond Wilkinson?
11      A. No.
12      Q. Are you familiar with a Tenth Amendment Center?
13      A. No.
14      Q. Do you know Steve Basinger?
15      A. Basinger?
16      Q. Yes.
17      A. No.
18      Q. I believe you testified you're not familiar with
19  the King Street Patriots?
20      A. No.
21      Q. Are you familiar with True the Vote?
22      A. No.
23      Q. And you've never had any contact with
24  Ms. Catherine Engelbrecht?
25      A. No.

---

107

1          MR. SWEETEN:  Asked and answered.
2       Q. (BY MS. WESTFALL)  Do you know Paul Bettencourt?
3          MR. SWEETEN:  Asked and answered.
4   Objection.
5       A. I don't know Paul Bettencourt but he testified in
6   2009.  When we were hearing the bill, he signed up as
7   someone to testify, and I listened to his testimony
8   then.
9       Q. (BY MS. WESTFALL)  Is that the only interaction
10  or communication you have had with Mr. Bettencourt?
11      A. Only communication.
12      Q. Have you had any communications with MALDEF,
13  Mexican-American Legal Defense and Education Fund?
14      A. That's a very broad question.
15      Q. About voter ID.
16      A. Not to my knowledge that I've ever talked to
17  MALDEF about voter ID.
18      Q. Have you ever talked to Luis Figueroa?
19      A. No.
20      Q. Have you ever spoken to LULAC about voter ID?
21      A. No.
22         MS. WESTFALL:  Would you mark this as 558?
23         (Exhibit 558 marked.)
24      Q. (BY MS. WESTFALL)  You've been handed what's been
25  marked US 558.  Do you recognize this?

---

108

1       A. No.
2       Q. You've never seen this article before?
3       A. Not to my recollection because I don't know what
4   it is.
5       Q. Does it appear to be an article from the
6   STATESMAN dated January 26, 2011, called Texas Senators
7   split on whether voter ID bill is constitutional?
8       A. It appears to be connected with the STATESMAN.  I
9   don't know that it was an article.
10      Q. Do you see about two-thirds of the way down the
11  page --
12      A. Uh-huh.
13      Q. -- it references you by name?  Do you see that
14  paragraph?
15      A. "After the vote, the bill's author"?
16      Q. Yes.
17      A. Yes.
18      Q. Do you see that?
19      A. Yes.
20      Q. Could you just read that paragraph and let me
21  know when you've had a chance to review it?
22      A. "After" --
23      Q. Oh, you can --
24      A. "After the vote, the bill's author, State Senator
25  Troy Fraser, Republican Horseshoe Bay, said he expects

---



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

## 109

1   some of the amendments will be added to the bill to
2   address issues that critics said would unfairly affect
3   minorities, people with disabilities and the elderly.
4   Those changes, Fraser said, will ensure it passes muster
5   with the Justice Department, although both he and
6   Dewhurst said they believe the bill as passed Tuesday
7   would be approved under the Voting Rights Act."
8      Q.  Thank you.
9        Did you say something to that effect, do you
10  recall?
11     A.  No.  I don't -- there -- I do not remember making
12  this quote to the AUSTIN AMERICAN STATESMAN.
13     Q.  Do you remember saying anything to that effect?
14     A.  I do remember that we were looking at issues,
15  making sure that we had looked at these issues.
16     Q.  Were any amendments passed that would help
17  address what critics said would unfairly affect
18  minorities?
19        MR. SWEETEN:  Objection.  Don't answer on
20  the basis of legislative privilege.
21     Q.  (BY MS. WESTFALL) Can you answer without --
22     A.  Privilege.  If you want to restate the
23  question --
24     Q.  Without revealing any mental impressions,
25  conversations with other Legislators and based on the

## 110

1   public record, are there any amendments that were
2   incorporated into Senate Bill 14 that addressed critics
3   that the bill would hurt minorities voters?
4        MR. SWEETEN:  Objection.  Calls for matters
5   of privilege.  You're still asking for his mental
6   impressions and his assessment.  Even though I realize
7   the preface of the question intends not to do so, it
8   still does so.  Therefore, objection.  Privilege.
9   Instruct not to the answer.
10     A.  Privilege.
11        MS. WESTFALL:  Okay.  No further questions
12  at this time.
13        I'm going to turn it over to Mr. Dunn.
14        Mr. Dunn, would you like to sit here?
15        MR. DUNN:  I'm not going to ask any
16  questions.
17        MR. SWEETEN:  We will reserve questions
18  until the time of trial.
19        (Whereupon at 3:49 p.m. the
20        deposition was concluded.)
21
22
23
24
25

## 111

1       E R R A T A   S H E E T
2
3
4   Correction              Page      Line
5   _____
6   _____
7   _____
8   _____
9   _____
10  _____
11  _____
12  _____
13  _____
14  _____
15  _____
16  _____
17  _____
18  _____
19  _____
20  _____
21  _____
22  _____
23  _____
24
25

## 112

1        I, SENATOR TROY FRASER, have read the foregoing
    deposition and hereby affix my signature that same is
2   true and correct, except as noted above.
3        _____
              SENATOR TROY FRASER
4
    THE STATE OF _____
5   COUNTY OF _____
6   Before me, _____, on this day personally
    appeared SENATOR TROY FRASER, known to me (or proved to
7   me under oath or through _____) (description of
    identity card or other document) to be the person whose
8   name is subscribed to the foregoing instrument and
    acknowledged to me that they executed the same for the
9   purposes and consideration therein expressed.
10  Given under my hand and seal of office this _____ day
    of _____, _____.
11
        _____
12  NOTARY PUBLIC IN AND FOR
    THE STATE OF _____
13
14
15
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

113

1    STATE OF TEXAS     *
     COUNTY OF HARRIS    *
2
        I, the undersigned certified shorthand reporter
3    and notary public in and for the State of Texas, certify
     that the facts stated in the foregoing pages are true
4    and correct.
5        I further certify that I am neither attorney or
     counsel for, nor related to or employed by, any of the
6    parties to the action in which this deposition is taken
     and, further, that I am not a relative or employee of
7    any counsel employed by the parties hereto, or
     financially interested in the action.
8
        SUBSCRIBED AND SWORN TO under my hand and seal of
9    office on this the 13th day of June, 2012.
10
11
        EDITH A. BOGGS, CSR
12      Certified Shorthand Reporter and
        Notary Public in and for
13      the State of Texas
14   Notary Expires: 5-10-2016
     Certificate No. 3022
15   Expiration date: 12-31-2013
     Esquire Deposition Solutions, LLC
16   Registration No. 3
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 202.296.8652

Suite 350
1425 K Street NW
Washington, DC 20005
www.esquiresolutions.com