## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                )
                               )
          Plaintiff,           )
                               )
VS.                            )
                               )
ERIC H. HOLDER, JR. in his     )
official capacity as Attorney  )
General of the United States,  )
                               )
          Defendant,           )
                               )
ERIC KENNIE, et al,            )
                               )
     Defendant-Intervenors,    )
                               )
TEXAS STATE CONFERENCE OF      )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                )   (RMC-DST-RLW)
                               )   Three-Judge Court
     Defendant-Intervenors,    )
                               )
TEXAS LEAGUE OF YOUNG VOTERS   )
EDUCATION FUND, et al,         )
                               )
     Defendant-Intervenors,    )
                               )
TEXAS LEGISLATIVE BLACK        )
CAUCUS, et al,                 )
                               )
     Defendant-Intervenors,    )
                               )
VICTORIA RODRIGUEZ, et al.,    )
                               )
     Defendant-Intervenors.    )
*****************************************
          ORAL DEPOSITION OF
        SOUTHWEST WORKERS UNION
          TANYA AGUILAR GARDUNO
              JUNE 13, 2012
*****************************************

## 2

1          ORAL DEPOSITION OF TANYA AGUILAR GARDUNO, produced
2    as a witness at the instance of the Defendant, was duly
3    sworn, was taken in the above-styled and numbered cause
4    on the JUNE 13, 2012, from 9:30 a.m. to 1:08 p.m.,
5    before Chris Carpenter, CSR, in and for the State of
6    Texas, reported by machine shorthand, at the offices of
7    Esquire Deposition Solutions, 9901 IH 10 West, Suite
8    800, San Antonio, TX 78230, pursuant to the Federal
9    Rules of Civil Procedure and the provisions stated on
10   the record or attached hereto.

## 3

1
2
3              A P P E A R A N C E S
4    FOR THE PLAINTIFF, STATE OF TEXAS:
5         Reynolds Brissenden
          OFFICE OF THE ATTORNEY GENERAL OF TEXAS
6         P.O. Box 12548
          Austin, TX  78711-2548
7
          209 West 14th Street
8         8th Floor
          Austin, TX  78701
9         (512) 936-1307
          reynolds.brissenden@texasattorneygeneral.gov
10
11   FOR THE DEFENDANT, HOLDER, ET AL:
12        Michelle McLeod
          U.S. DEPARTMENT OF JUSTICE
13        950 Pennsylvania Avenue, NW
          NWB - Room 7202
14        Washington, DC  20530
          (202) 305-7766
15        michelle.mcleod@usdoj.gov
16   FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
     NAACP:
17
          Donita Judge
18        ADVANCEMENT PROJECT
          1220 I. Street, N.W.
19        Suite 850
          Washington, DC  20005
20        (202) 728-9557
          djudge@advancementproject.org
21
22
23
24
25

## 4

1                       INDEX
2    Appearances.........................................3
3    TANYA AGUILAR GARDUNO
4        Examination by Mr. Brissenden...............5
5        Signature and Changes........................120
6        Reporter's Certificate............................122
7                      EXHIBITS
8    NO. DESCRIPTION                       PAGE MARKED
9    1    Deposition Notice                        15
10   2    Applicants' Motion t Add the Southwest   53
          Workers Union and La Union Del Pueblo
11        Entero As Defendant Intervenors
12   3    Responses to State of Texas' First Set of  83
          Interrogatories to the League of Women
13        Voters of Texas, Justice Seekers
          Southwest Workers Union and La Union Del
14        Pueblo Entero
15   4    E-Mail, Jan. 20, 2011               89
16   5    E-Mail Chain, Feb. 8, 2012           93
17   6    E-Mail, Feb. 8, 2012, and Attachments   101
18   7    MALDEF Form                          106
19   8    MALDEF Explanation of Texas Mandatory   106
          Requirements at the Polls
20
21   9    E-Mail, Sept. 21, 2011               108
22   10   E-Mail, Sept. 21, 2011               112
23   11   E-Mail, July 11, 2011                116
24
25



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

5

1    THE REPORTER: Will all counsel present
2  please make their announcements.
3    MR. BRISSENDEN: Reynolds Brissenden for
4  the State of Texas.
5    MS. JUDGE: Donita Judge, Defendant
6  Intervenors, Texas Legislative Black Caucus.
7    MS. McLEOD: Michelle McLeod with the
8  Department of Justice for the Defendant, Eric Holder.
9    TANYA AGUILAR GARDUNO,
10 having been first duly sworn to testify the truth, the
11 whole truth, and nothing but the truth, testified as
12 follows:
13    EXAMINATION
14 BY MR. BRISSENDEN:
15    Q. Could you please state your full legal name?
16    A. Tanya Aguilar Garduno.
17    Q. And how would you prefer that I call today, by
18 what name?
19    A. My first name, Tanya.
20    Q. Tanya?
21    A. Yes.
22    Q. Okay. Have you ever been deposed before today?
23    A. No.
24    Q. All right. As you can see, the court reporter
25 is here sitting next to you, and he is transcribing

6

1  everything that we say here today, and so it will be
2  important that we not talk at the same time, because
3  he'll get mad at us. Okay? So before you answer a
4  question, if you could just wait until I'm finished with
5  my question, give your answer, then it will be a lot
6  cleaner. Okay?
7    A. Okay.
8    Q. Also, since the court reporter is transcribing
9  everything that we say, he can't record nods of the
10 head, so it will be important for you to answer "yes" or
11 "no" rather than shaking your head up or down or saying
12 "uh-huh" or "nuh-uh," because it's really hard for the
13 court reporter to record that. Do you understand?
14    A. Yes, I do.
15    Q. All right. If during the course of the
16 deposition today you don't understand a question that I
17 ask, feel free to let me know. I'll try my best to
18 rephrase it. If you answer the question, I'm assume
19 that you understood the question. Okay?
20    A. Okay.
21    Q. Is there any reason, as you sit here today,
22 that you would not able to understand the questions that
23 I ask of you in terms of: Are you taking any
24 medications?
25    A. No.

7

1    Q. Okay. Does that seem like a strange question?
2    A. Yes.
3    Q. Okay. Well, some witnesses, they are taking
4  medications, and in the past, we've had some issues, not
5  in this case, but in others, where a witness might not
6  be able to understand or remember certain events due to
7  their medications. So that doesn't like that's going to be
8  an issue here today, right?
9    A. No.
10    Q. All right. This is a deposition that's a
11 little bit different than a normal deposition. It's
12 called a 30(b)(6) deposition. Have you ever heard of
13 that term before?
14    A. No.
15    Q. Okay. And what this deposition is, is -- it's
16 a deposition of the Southwest Workers Union as an
17 organization, and I assume you are a member of the
18 organization?
19    A. Yes.
20    Q. And are you employed there?
21    A. Yes.
22    Q. What is your position there?
23    A. Community organizer.
24    Q. Are you a staff member?
25    A. Yes.

8

1    Q. And so today, I will be asking you a series of
2  questions at it pertains to Southwest Workers Union
3  organization as a whole. Do you understand that?
4    A. Yes.
5    Q. All right. And you understand that you have
6  been designated as a representative for Southwest
7  Workers Union to testify here today?
8    A. Yes.
9    Q. All right. Have you done anything to prepare
10 for your deposition today?
11    A. Talked to my attorney.
12    Q. All right. Besides talking with your attorney,
13 have you reviewed any documents?
14    A. Just the documents my attorneys gave me.
15    Q. All right. Did you meet with any staff members
16 in your office?
17    A. Yes.
18    Q. And who did you meet with?
19    A. My director.
20    Q. And what is his name?
21    A. Genaro Lopez Rendon. G-e-n-a-r-o, Lopez,
22 Rendon, R-e-n-d-o-n.
23    Q. When did you meet with -- is it Genaro?
24    A. Genaro.
25    Q. Genaro? When did meet with him?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 9

1    A.  Last week.
2    Q.  And how long did you meet?
3    A.  A couple of hours.
4    Q.  Were there any attorneys present?
5    A.  I need, I guess, clarification.
6    Q.  Okay.  Was your lawyer that's sitting next to
7  you here today, was she present?
8    A.  I feel like -- can I talk to her?
9    Q.  Sure.
10       (Witness and Ms. Judge conferring.)
11       MS. JUDGE:  I'm going to object on
12  vagueness.  You still have to answer the question,
13  but...
14    A.  Yeah, I mean, so...
15    Q.  (By Mr. Brissenden)  Well, let me back up.
16       Who was present at the meeting?
17    A.  Yeah.  So, I mean, I think there's
18  conversations that I have with my boss, and so there's
19  like that conversation I had with my boss.  And then
20  there's a conversation that I did have with Donita and
21  my boss.  So...
22    Q.  Okay.  Going back to the meeting that you had,
23  the two-hour meeting with you had with Genaro, who was
24  present at that meeting?
25    A.  Just me and him.

## 10

1    Q.  All right.  And what did you talk about?
2       MS. JUDGE:  Objection.  Objection, work
3  product and privilege.  I'm going to ask that you not
4  answer the question.
5       MR. BRISSENDEN:  Are you instructing the
6  witness not to answer what they discussed?
7       MS. JUDGE:  Yes, I am.
8       MR. BRISSENDEN:  And on what grounds?
9       MS. JUDGE:  I'm objecting because it was
10  in preparation for this type of litigation.  There's an
11  objection to work product privilege.
12       MR. BRISSENDEN:  I understand that they --
13  there was no attorney present.
14       MS. JUDGE:  I'm going to object and
15  instruct.  Objection.
16       MR. BRISSENDEN:  And you understand that
17  this is a 30(b)(6) deposition?
18       MS. JUDGE:  Yes, I do.
19       MR. BRISSENDEN:  And I'm asking the
20  witness what she did to prepare for the 30(b)(6)
21  deposition?
22       MS. JUDGE:  Yeah.  And I understand that,
23  and we understand that you are asking her what she did
24  to prepare.
25       MR. BRISSENDEN:  Right.

## 11

1       MS. JUDGE:  And not specifically what they
2  discussed.
3    Q.  (By Mr. Brissenden)  Did you see any -- did you
4  review any documents?
5    A.  The documents that we submitted to the DOJ.
6    Q.  All right.  And what documents are those?
7    A.  The comment letter to the DOJ.
8    Q.  Any other documents?
9    A.  The -- well, the questions for the deposition.
10    Q.  And what do you mean by that?
11    A.  The ones that were submitted for -- on our
12  behalf, I guess.  The ones that they -- the organization
13  for Southwest Workers Union, the questions all y'all are
14  going to be asking today.
15    Q.  Did you review some document that had questions
16  on it?
17    A.  I guess they weren't in the form of a question,
18  but they were statements.
19    Q.  And statements by whom?
20    A.  I would assume by you.
21    Q.  Me personally?
22    A.  Not personally.  But, like, I'm guessing your
23  law firm.
24    Q.  Okay.  Let me back up.
25       Do you understand that I represent the

## 12

1  State of Texas and I'm from the Attorney General's
2  Office?
3    A.  Oh, okay.  Yes.  And that's the document.
4    Q.  All right.  And what document is that?
5    A.  It's a deposition document.
6    Q.  All right.  So you've reviewed a deposition?
7    A.  Yes.
8    Q.  And whose deposition was it?
9    A.  For us?  For my organization.
10    Q.  Right.  Who was the witness, do you know?
11    A.  For my organization?
12    Q.  The document, the deposition transcript that
13  you reviewed, who was testifying in the deposition?
14    A.  I think I'm confused by your question.
15    Q.  You said you reviewed a document that had
16  questions in a deposition.
17    A.  Yeah, and they were for my organization.
18    Q.  And what do you mean by that?
19    A.  The notice for the deposition.
20    Q.  Okay.  Have you reviewed any deposition
21  transcripts?
22    A.  No.
23    Q.  And do you know what I mean when I say a
24  deposition transcript?
25    A.  I'm -- no.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 13

1    Q.  All right.  A deposition transcript would be a
2  document that would contain a number of questions and
3  followed by answers.  Have you reviewed any document
4  like that?
5    A.  No.
6    Q.  What other documents did you review in your
7  meeting with Genaro?
8    A.  I would say that's it.
9    Q.  Did you review any e-mails?
10      MS. JUDGE:  Objection, vague.
11    Q.  (By Mr. Brissenden) You know what an e-mail is?
12    A.  I do.
13    Q.  All right.  Then did you review any e-mails?
14    A.  No.
15      MS. JUDGE:  Objection, vague.
16    A.  Yeah.  Just kind of...
17    Q.  (By Mr. Brissenden) Okay.  Let's -- did you --
18  besides the two-hour meeting with Genaro, did you meet
19  with anybody else besides your lawyer?
20    A.  No.
21    Q.  Did you talk with any of the other intervenor
22  groups?
23    A.  No.
24    Q.  Did you tell anybody you were giving your
25  deposition here today?

## 14

1    A.  Yes.
2    Q.  All right.  And who was that?
3    A.  Other staff members.
4    Q.  And who was that?
5    A.  Do you want me to list my whole staff?
6    A.  Sure.
7    A.  I mean, like, I have to go through the whole
8  list?  Laura, L-a-u-r-a, Muriada, M-u-r-i-a-d-a.  Diana
9  Lopez.  Sandra Garcia.  Joaquin Abrego, A-b-r-e-g-o, and
10  Marco -- what's his last name?  I always forget his last
11  name.  I don't remember his last name right now.  Those
12  staffers that I let know because I wasn't going to be in
13  the office today.
14    Q.  All right.  And you understand that we're here
15  to take your deposition in a case that is pending in the
16  United States District Court in the District of
17  Columbia, that is the State of Texas versus Eric Holder?
18    A.  Yes.
19    Q.  All right.  And you understand that this case
20  involves the Department of Justice's denial of
21  preclearance of Senate Bill 14, the voter ID bill that
22  passed in the Texas Legislature in the 2011 session?
23    A.  Yes.
24    Q.  In terms of Southwest Workers Union's
25  involvement with SB 14, were you the person who has the

## 15

1  most knowledge about Southwest Workers Union's work on
2  that issue?
3    A.  Yes.
4    Q.  Was there anybody else from Southwest Workers
5  Union that was involved with any work that pertained to
6  SB 14?
7    A.  Could you be more specific?
8    Q.  Well, in terms of the passage of SB 14 and the
9  voter ID bill that passed through the legislature, was
10  there anybody else from Southwest Workers Union that had
11  done any work on behalf of Southwest Workers Union
12  either supporting or opposing the bill, either way?
13    A.  No.
14    Q.  Okay.  So in terms of when it came to SB 14,
15  you were the primary person that was involved?
16    A.  Yes.
17      (Exhibit 1 marked for identification.)
18    Q.  (By Mr. Brissenden) I'm handing you what's been
19  marked as Exhibit 1, and this is a notice of deposition
20  of Southwest Workers Union.  This is a document that you
21  were talking about just a minute ago?
22    A.  Yes.
23      MS. McLEOD:  Do you have another copy?
24      MR. BRISSENDEN:  Actually, I do.
25    Q.  (By Mr. Brissenden) Directing your attention to

## 16

1  the second page of the deposition notice, you'll see
2  there, there is a list of different topics that we plan
3  to discuss today in the deposition.  Do you see that?
4    A.  Yes.
5    Q.  And are you prepared to talk about each one of
6  these topics that are listed, numbers 1 through 11?
7    A.  Yes.
8    Q.  And you have been designated here today to talk
9  about each one of these topics?
10      MS. JUDGE:  Objection, vague.
11    Q.  (By Mr. Brissenden) You may answer.
12    A.  Yes.
13    Q.  Set that aside for now.
14      What is Southwest Workers Union?
15    A.  It's a community organization.
16    Q.  How long has it existed?
17    A.  This year, 25 years.
18    Q.  How long have you been an employee of Southwest
19  Workers Union?
20    A.  For four years.
21    Q.  And is that a full time or part-time position?
22    A.  From the beginning.
23    Q.  Currently, are you working there full time?
24    A.  Yes.
25    Q.  When you hired on four years ago, was that a



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

### 17

1  full time or a part-time position?
2      A.  Part time.
3      Q.  And when did you become full time?
4      A.  2010?  Or -- yeah, 2010.  Yes.
5      Q.  Are you currently paid by Southwest Workers
6  Union as a staff member?
7      A.  Yes.
8      Q.  Is that position there an hourly or salary --
9  hourly or a salaried position?
10     A.  It's a salaried position.
11     Q.  When you started working Southwest Workers
12 Union four years ago part time, was that a paid
13 position?
14     A.  It was both, volunteer and paid position.
15     Q.  What do you mean by that?
16     A.  I would volunteer maybe ten hours a week, 15
17 hours a week, and then, you know, got paid -- I think I
18 got paid 20 hours a week.  But I would also volunteer.
19     Q.  You worked part time for 20 hours, but actually
20 volunteered more time than just the 20 hours?
21     A.  Yeah.
22         MS. JUDGE:  Objection, asked and answered.
23     Q.  (By Mr. Brissenden) Is that accurate?
24     A.  Yes.
25     Q.  What is your current title at Southwest Workers

### 18

1  Union?
2          MS. JUDGE:  Objection, asked and answered.
3      Q.  (By Mr. Brissenden) You may answer.
4      A.  Community organizer.
5      Q.  Have you held any other titles at Southwest
6  Workers Union?
7      A.  Volunteer.
8      Q.  Any others?
9      A.  No.
10     Q.  When did you take on the title of community
11 organizer?
12     A.  2010.
13     Q.  Is that around the time you became full time?
14     A.  Yes.
15     Q.  What are your duties or responsibilities as a
16 community organizer?
17     A.  I could go on.  I work with our membership base
18 and beyond at this point, and working in -- around civic
19 engagement issues in the community, educating and doing
20 voter registration, you know, just letting folks know
21 what's up at, you know, at the polls, what they're going
22 to be voting on.  I mean, I run staff meetings.
23     A.  I -- I don't know.  I mean, I water the
24 garden.  I pull weeds.  I put information packets
25 together.  I also work with other organizations with the

### 19

1  networks.  Communications.  I update our website.  I
2  don't know what else I do; I feel like I do a lot.  I
3  work closely with my director, helping him out.  Yeah, I
4  mean, I'm a secretary.  I answer the phones and take
5  messages.  What else?  I mean, yeah.
6      Q.  All right.  So quite a spectrum of work.
7          When it comes to working on issues that
8  Southwest Workers Union is interested in, are those
9  issues assigned to different individuals?
10         MS. JUDGE:  Objection, vague.
11     Q.  (By Mr. Brissenden) Do you understand my
12 question?
13     A.  No.
14     Q.  All right.  If there are issues that Southwest
15 Workers Union is interested in or is following, does
16 Genaro assign those issues to different individuals
17 within the organization?
18     A.  I would say not -- no.
19     Q.  How many members does Southwest Workers Union
20 have?
21     A.  2,500 to 3,000.
22     Q.  And can you describe Southwest Workers Union's
23 membership base?
24     A.  School workers, youth, women, and people of
25 color, low income communities.

### 20

1      Q.  Is the membership base comprised of any other
2  individuals other than what you've just described?
3      A.  As we get older, old folks, elderly, I guess.
4  I mean, that's true a little.
5      Q.  And you've described -- let me back up.
6          First of all, is Southwest Workers Union a
7  community organization?
8      A.  Yes.
9      Q.  All right.  Where is it located?
10     A.  1416 East Commerce, San Antonio, Texas.
11     Q.  I'm sorry.  You said 1413?
12     A.  16.
13     Q.  Commerce?
14     A.  Uh-huh.
15     Q.  Does it have any other locations?
16     A.  No.
17     Q.  Do you work at the 1416 Commerce location?
18     A.  Yes.
19     Q.  What -- if I went to 1416 Commerce, what would
20 I -- what would I see if I drove out?
21         MS. JUDGE:  Speculate -- I'm sorry.
22 Objection, vague.
23     Q.  (By Mr. Brissenden) And what type of
24 building -- is there -- first of all, is there a
25 building there?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

21

1     A.   Yes.
2     Q.   Can you describe the building for me?
3     A.   It's a two-story building.
4     Q.   Does Southwest Workers Union share that
5   building with anybody else?
6     A.   Yes.
7     Q.   Who else?
8     A.   Centro Por La Justicia.  It's C-e-n-t-r-o,
9   second word, Por, P-o-r, L-a, Justicia, which is Justice
10  in Spanish, J-u-s-t-i-c-i-a.
11    Q.   Any other -- does it share the building with
12  anybody else?
13    A.   No.
14    Q.   What is that organization?
15         MS. JUDGE:  Objection, calls for
16  speculation.
17    Q.   (By Mr. Brissenden) Do you know what they do?
18    A.   Not completely.  Like a finance, I guess.  I'm
19  not sure.  They're like finances.
20    Q.   You're not employed there?
21    A.   No.
22         MS. JUDGE:  Objection, asked and answered.
23    Q.   (By Mr. Brissenden) What is the mission of
24  Southwest Workers Union?
25    A.   To empower our community, school workers,

22

1   youth, women, through social justice.
2     Q.   Are the members of Southwest Workers Union
3   primarily Latino?
4     A.   Yes.
5     Q.   What percentage of its members are school
6   workers, do you know?
7          MS. JUDGE:  Objection, speculation.
8     A.   I would say like it's 30 percent, to ballpark
9   it.
10    Q.   (By Mr. Brissenden) Sure.  And I'm not asking
11  for exact figures.  I'm just -- a rough -- rough
12  estimates would be fine.
13         Okay.  And in terms of youth, what --
14  approximately what percentage of Southwest Workers
15  Union's members are youth?
16         MS. JUDGE:  Objection, speculation.
17    Q.   (By Mr. Brissenden) You may answer.
18    A.   I mean, 20 percent.
19    Q.   And women?
20         MS. JUDGE:  Objection, speculation.
21    A.   Almost the whole organization.
22    Q.   (By Mr. Brissenden) Low income.  Do you know
23  what percentage --
24         MS. JUDGE:  Objection, speculation.
25    Q.   (By Mr. Brissenden) -- would fall in that

23

1   category?
2          MS. JUDGE:  I'm sorry.  I thought you were
3   finished.
4     A.   I would say all of them.
5     Q.   (By Mr. Brissenden) And in terms of elderly,
6   what percentage of Southwest Workers Union would fall
7   into the elderly category?
8          MS. JUDGE:  Objection, speculation.
9     A.   I don't feel like I can answer that.  I don't
10  -- like, I think that's something new for our
11  organization.  I think there's a lot of -- there's a lot
12  of old folks.  There's a -- I mean, maybe 20 percent, 30
13  percent, something.
14    Q.   (By Mr. Brissenden) And the other group of
15  members you said that Southwest Workers Union represents
16  are people of color?
17    A.   Uh-huh.
18    Q.   And can you be more specific?
19    A.   I mean, you've ask it before.
20         MS. JUDGE:  Objection, speculation.
21    A.   The Latino community.  We have African American
22  members.
23    Q.   (By Mr. Brissenden) Any other?
24    A.   It's largely comprised of.
25    Q.   Do you know what percentage of members of

24

1   Southwest Workers Union are Latino?
2          MS. JUDGE:  Objection, speculation.
3   Objection, asked and answered.
4     Q.   (By Mr. Brissenden) You may answer.
5     A.   80, 90, 95 percent, something like that.
6     Q.   And do you know what percentage would be
7   African American?
8          MS. JUDGE:  Objection, speculation.
9   Objection, asked and answered.
10    Q.   (By Mr. Brissenden) Do you know?
11    A.   10 percent.
12         MS. JUDGE:  Do you mind if we take a
13  break?  I'd just have a minute with my client?  Would
14  that -- just a minute, please.
15         MR. BRISSENDEN:  Sure.
16         (Recess from 10:04 a.m. to 10:05 a.m.)
17         MR. BRISSENDEN:  Ready to proceed?
18         THE WITNESS:  Yes.
19    Q.   (By Mr. Brissenden) I believe you testified
20  earlier that you are a member of Southwest Workers
21  Union?  Is that correct?
22    A.   Yes.
23    Q.   And you're a staff member, correct?
24    A.   Yes.
25         MS. JUDGE:  Objection, asked --



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 25

1    Q.  (By Mr. Brissenden) What are the requirements
2   for a person to become a member of Southwest Workers
3   Union?
4    A.  You can sign up to be a member.
5    Q.  Anything else?
6        (Witness and Ms. Judge conferring.)
7        MR. BRISSENDEN:  Let the record reflect
8   the witness is conferring with counsel.
9    Q.  (By Mr. Brissenden) Are there any other
10  requirements other than the person signing up?
11   A.  I feel like I need clarification.
12   Q.  Okay.  Well, you are a member?
13   A.  Uh-huh.
14   Q.  What did you do to become a member?
15   A.  I signed up.
16   Q.  I don't mean it to be a difficult question.
17  I'm just asking:  Is there any formal requirements that
18  have to be -- that a person has to go through in order
19  to become a member?
20   A.  Signing up is basically it.
21   Q.  Can anybody sign up to become a member?  If I
22  wanted to, could I become a member?
23   A.  Yeah.
24   Q.  Does the -- just so I understand, when you
25  describe it as a community organization, it's not just

## 26

1   members who live within a certain radius or a certain
2   distance from the location there where the office is
3   located on Commerce.  Is that accurate?
4    A.  That is accurate.
5    Q.  Does Southwest Workers Union maintain a list of
6   its membership?
7    A.  Yes.
8    Q.  Are there -- strike that.
9        Are there membership dues?
10   A.  Yes.
11   Q.  How much does it cost to be a member each year?
12   A.  It depends.
13   Q.  And what does it depend upon?
14   A.  The type of member you are.
15   Q.  So there's different types of membership?
16   A.  Yes.
17   Q.  What are the different types of membership?
18   A.  School worker, youth, community.
19   Q.  If a member is a school worker, do school
20  workers pay dues?
21   A.  Yes.
22   Q.  And how much are those dues?
23   A.  It depends.
24   Q.  This year, how much are dues?
25   A.  It depends.

## 27

1    Q.  And what does it depend upon?
2    A.  If they're a full-time employee or a part-time
3   employee.
4    Q.  And are you referring to their employment with
5   the school district?
6    A.  Yes.
7    Q.  And how much are dues for part-time school
8   members?
9    A.  Ten dollars a month.
10   Q.  How about full time?
11   A.  Actually, I retract that.  It's ten dollars for
12  full-time members, full-time employees, and five dollars
13  for part-time members.
14   Q.  And community members, what are the dues for
15  community members?
16       MS. JUDGE:  I'm going to object to
17  relevance.
18   (By Mr. Brissenden) Do you know?
19   A.  It's whatever they can give.  Sometimes
20  nothing.  A lot of the times nothing.  You know.
21   Q.  And so as I understand it, the dues for
22  community members, if I understand you correctly, can
23  vary?
24       MS. JUDGE:  Objection, asked and answered.
25   A.  Yes.

## 28

1    Q.  (By Mr. Brissenden) You may answer.
2    A.  Yes.
3    Q.  And in terms of youth members, what are -- what
4   is the range of dues for youth members?
5        MS. JUDGE:  Objection, relevance.
6    Q.  (By Mr. Brissenden) Do you know?
7    A.  It's the same as community.
8    Q.  Can a youth be a member for free?
9    A.  Yes.
10   Q.  And so there's no required -- requirement that
11  a youth pay a monthly due like it is for school workers?
12       MS. JUDGE:  Objection, relevance.
13   Q.  (By Mr. Brissenden) You may answer.
14   A.  Could you repeat the question?
15   Q.  In terms of dues for youth, is there a
16  requirement for youth to pay a monthly due like there is
17  for school teachers?
18       MS. JUDGE:  Objection, relevance.
19   A.  Not school teachers.
20       You said school teachers at the end of
21  that question?
22   Q.  (By Mr. Brissenden) Yes.
23   A.  Not school teachers.
24   Q.  Okay.  School workers?
25   A.  No, there isn't.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 29

1    Q.  Do you know approximately what the annual
2 budget is for Southwest Workers Union?
3    A.  I don't know.
4    Q.  Who would know that?
5    A.  The director.
6    Q.  The --
7       MS. JUDGE:  Objection.
8    Q.  (By Mr. Brissenden) Is that Genaro?  Is that
9 Genaro?
10    A.  Uh-huh, yes.
11    Q.  What are the major sources of funding for
12 Southwest Workers Union?
13       MS. JUDGE:  Objection, relevance.
14    Q.  (By Mr. Brissenden) You may answer.
15    A.  Our membership dues and foundation money.  We
16 fundraise, grassroots fundraising.
17    Q.  Are there any other sources of funding?
18       MS. JUDGE:  Objection, asked and answered.
19    A.  No.
20    Q.  (By Mr. Brissenden) What foundations contribute
21 or provide funding to Southwest Workers Union?
22    A.  I don't know all of them.
23    Q.  And that's fine.  Do you know any of them?
24       MS. JUDGE:  Objection, speculation.
25    A.  I know some of them.

## 30

1    Q.  (By Mr. Brissenden) And which ones are those?
2    A.  The Ford Foundation, Margaret Casey, Kellogg.
3 That's all I can think of off the top of my head right
4 now.
5    Q.  Okay.  And you also mentioned grassroots
6 fundraising.  Can you just give me an idea of what types
7 of fundraising activities y'all do?
8    A.  Barbecue plate sales.  Car washes.  Selling
9 snow cones.  Selling fruit cups.  Soliciting or asking
10 for donations at community events; whatever people can
11 give.  Selling candy bars.
12    Q.  Before joining Southwest Workers Union four
13 years ago, were you a member?
14    A.  Yes.
15    Q.  How long have you been a member?
16    A.  Since 2005.
17    Q.  And before joining Southwest Workers Union as a
18 part-time employees, where did you work?
19       MS. JUDGE:  Objection, relevance.
20    Q.  (By Mr. Brissenden) You may answer.
21    A.  I, like, waited tables.
22    Q.  Do you currently work anywhere else besides
23 Southwest Workers Union?
24       MS. JUDGE:  Objection, asked and answered.
25    A.  No.

## 31

1    Q.  (By Mr. Brissenden) Before joining Southwest
2 Workers Union, had you done any work related to voter ID
3 legislation in the state of Texas?
4    A.  No.
5    Q.  When did you first become involved with voter
6 ID legislation issues?
7       MS. JUDGE:  Objection, speculation.
8    Q.  (By Mr. Brissenden) You may answer.
9    A.  In 2011.
10    Q.  How was it that you became familiar with voter
11 ID legislation issues?
12    A.  Through the 2011 Texas legislative session.
13    Q.  Can you describe for me how it is that you
14 learned about the voter ID issue in relation to the 2011
15 legislative session?
16    A.  The first time I heard of it, we were having a
17 community meeting, and we were talking about the
18 upcoming legislative session and possible bills, and
19 that was the first time I heard of it.
20    Q.  Do you know approximately when that meeting
21 was?
22    A.  No.
23    Q.  Was it before the legislative session convened?
24    A.  Probably.  I'm not sure.
25    Q.  Were there other bills that Southwest Workers

## 32

1 Union was interested in besides voter ID bills?
2       MS. JUDGE:  Objection, vague.
3    Q.  (By Mr. Brissenden) You may answer.
4    A.  Could you repeat the question?
5    Q.  Sure.  You mentioned you had a community
6 meeting where there was discussion about upcoming bills
7 in the 2011 legislature.  Were there other bills that
8 Southwest Workers Union was interested in besides voter
9 ID legislation?
10       MS. JUDGE:  Could I just ask for clarity:
11 Are we speaking in terms specifically with regards to
12 the 2000 -- okay.
13       MR. BRISSENDEN:  2011 legislative session.
14       MS. JUDGE:  Thank you for that
15 clarification.
16    A.  Yes.
17    Q.  (By Mr. Brissenden) And do you remember what
18 some of those bills were?
19    A.  Yes.
20    Q.  What were those bills?
21    A.  The immigration bill.  The budgetary cuts on
22 education.  The issues around women health.  And there
23 was one or -- I don't remember.
24    Q.  So I have on my list bills that pertain to
25 immigration, budget cuts on education, women health, and



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 33

1  obviously, the voter ID legislation.  But were there any
2  others?
3      A.  Yes.  Redistricting.
4      Q.  Any others?
5      A.  Not that I can think of right now.
6      Q.  Did Southwest Workers Union follow the progress
7  of different bills as it was -- as those bills were
8  making their way through the legislature?
9          MS. JUDGE:  Objection, vague.
10     Q.  (By Mr. Brissenden) Do you understand my
11 question?
12     A.  No.
13     Q.  All right.  Did Southwest Workers Union track
14 the progress of bills as they were making their way
15 through the legislature?
16     A.  What do you mean, track?
17     Q.  Monitor or follow?
18     A.  Yes.
19     Q.  And did that include voter ID legislation?
20     A.  Yeah.
21     Q.  All right.  Did you -- were you responsible for
22 immigration issues?
23     A.  I don't understand your question.
24     Q.  Okay.  Were you -- strike that.
25          Did you follow the passage of legislation

## 34

1  that pertained to immigration?
2      A.  Yes, my organization did.
3      Q.  Did you personally?
4      A.  Yes.
5      Q.  Did anybody else?
6          MS. JUDGE:  Objection, vague.
7      A.  Who?
8      Q.  (By Mr. Brissenden) Did anybody else in your
9  organization?
10     A.  Yes.
11     Q.  In terms of issues, were there certain issues
12 that you followed as opposed to other people in your
13 organization?
14     A.  Could you be more specific?
15     Q.  Sure.  Let me rephrase it.
16          In terms of -- in terms of these issues
17 that you have listed:  Immigration, budget cuts on
18 education, women health, voter ID legislation, and
19 redistricting, were there certain ones that you were
20 responsible for following more than others?
21     A.  Yes.
22     Q.  All right.  Which ones?
23     A.  Women's health, redistricting, the voter ID,
24 and some of the immigration bills.
25     Q.  Was there somebody from Southwest Workers Union

## 35

1  responsible for following the budget cuts on education?
2      A.  Yes.
3      Q.  And who was that?
4      A.  Sandra Garcia and Chavel Lopez.
5      Q.  The community meeting you mentioned just a few
6  minutes ago, were there any other organizations present
7  at that meeting?
8      A.  Yes.
9      Q.  And what organizations were present?
10     A.  MALDEF, the Mexican American Legal Defense and
11 Educational Fund.  Southwest Voters.  RITA.  It's Reform
12 Immigration Texas Advocacy -- Advocates.  Esperanza
13 Peace & Justice Center.
14     Q.  I'm sorry.  You'll need to slow down.
15     A.  Where am I at?
16     Q.  I have MALDEF.  Southwest Voters.
17     A.  Uh-huh.  RITA, Reform Texas Immigration
18 Advocates.
19     Q.  Okay.  That's an acronym?
20     A.  RITA is the acronym, yeah.
21     Q.  Can you spell that, please?
22     A.  R-I-T-A.  Esperanza Peace and Justice
23 Center.  La Fe, L-a, and F-e.  That's Policy and
24 Research Center.  That's all I can remember.
25     Q.  Do you remember who hosted the meeting?

## 36

1      A.  The Esperanza and Peace and Justice Center.
2      Q.  Do you remember who from MALDEF was present?
3      A.  Luis Figueroa.
4      Q.  Anyone else?
5      A.  From MALDEF?
6      Q.  Yes.
7      A.  No.
8      Q.  Was there a discussion of voter ID, in
9  particular SB 14, at that meeting?
10          MS. JUDGE:  I'm going to object on common
11 interest and joint defense.  Also attorney-client
12 privilege, and I'm going to instruct my client not to
13 answer.
14     Q.  (By Mr. Brissenden) Let me back up.  This was
15 before the legislative session, correct, the 2011
16 legislative session?
17          MS. JUDGE:  I'm going to object on common
18 interest and joint defense, attorney-client privilege,
19 and I'm going to instruct my client not to answer.
20          MR. BRISSENDEN:  Well, I believe I can ask
21 some foundation questions, since you are asserting the
22 privilege.  I'm not asking her for what was said at this
23 point.  I'm just simply asking about the meeting.
24     Q.  (By Mr. Brissenden) This was before --
25          MS. JUDGE:  When you ask her what was --



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

37

1 you know, were certain topics discussed.
2          MR. BRISSENDEN: But I'm not asking that
3 question now.
4     Q. (By Mr. Brissenden) I'm simply asking: This
5 was before the 2011 legislative session, correct?
6     A. I don't recall.
7     Q. I believe you said you were -- at the meeting,
8 it was discussed, the upcoming bills for the 2011
9 legislative session, correct?
10          MS. JUDGE: Again, I'm going to object
11 under attorney-client privilege.
12          MR. BRISSENDEN: Well, now, that's a
13 different privilege. I'm asking about foundation
14 questions.
15     Q. (By Mr. Brissenden) When was the meeting?
16     A. I had already stated before that I don't
17 remember when the meeting happened.
18     Q. All right. But it was your understanding it
19 was before the 2011 legislative sessions had begun?
20     A. I mean, we were discussing bills that were
21 upcoming, so I'm not sure if it was, I mean, during the
22 session or -- you know, I don't remember the time right
23 off the top of my head.
24     Q. All right. The legislative session may have
25 begun?

---

38

1     A. It may have. I don't remember it.
2     Q. It wasn't after the session, legislative
3 session, right?
4     A. No.
5     Q. And it wasn't -- it was -- the meeting that you
6 had was before this lawsuit was filed, correct?
7     A. Yes.
8     Q. Do you know of any attorneys that were present?
9     Q. At the community meeting?
10     Q. Right.
11     A. Luis Figuerora was the only attorney I know.
12 From MALDEF. He's an attorney. He was there with
13 MALDEF.
14     Q. Is Luis representing you in this case here
15 today?
16          MS. JUDGE: Objection, common interest and
17 joint defense, attorney-client privilege, and I instruct
18 my client not to answer.
19          MR. BRISSENDEN: That's a foundation
20 question.
21     Q. (By Mr. Brissenden) Is Luis representing you in
22 this case?
23          MS. JUDGE: Again, objection on common
24 interest and joint defense.
25     Q. (By Mr. Brissenden) You may answer.

---

39

1     A. No.
2     Q. Did you receive any materials during the
3 meeting?
4          MS. JUDGE: Objection, vague.
5     Q. (By Mr. Brissenden) Any documents?
6          MS. JUDGE: Objection, vague.
7     A. Yes.
8     Q. (By Mr. Brissenden) Have you -- do you still
9 have those documents?
10     A. I don't know.
11     Q. Do you remember what the documents were?
12          MS. JUDGE: Objection.
13     A. Somewhat.
14          MS. JUDGE: Objection on common interest
15 and joint defense.
16     Q. (By Mr. Brissenden) Was there any documents
17 that pertained to voter ID legislation?
18     A. Some.
19     Q. Did you review it?
20          MS. JUDGE: Objection, common interest,
21 joint defense. I instruct my client not to answer.
22          MR. BRISSENDEN: Let me make sure I
23 understand. You're instructing the witness not to
24 answer whether or not she reviewed the document?
25          MS. JUDGE: Yes, I am.

---

40

1          MR. BRISSENDEN: And on what basis?
2          MS. JUDGE: On the basis that that meeting
3 was basically had an attorney that was at the meeting
4 who is now in litigation who is also our -- also part of
5 this Defendant Intervenor, and if those documents were
6 passed by that -- by that person, then there is some --
7 there is some attorney-client privilege there.
8          MR. BRISSENDEN: I think the witness has
9 represented Mr. Figueroa is not representing her.
10          MS. JUDGE: But there is still a common
11 interest and a joint defense. I'm going to object --
12 object on it.
13          MR. BRISSENDEN: All right. I'll move on.
14     Q. (By Mr. Brissenden) In terms of the -- as a
15 result of the meeting, did you take any action as a
16 result?
17     A. Can you be more specific?
18     Q. Sure. Did you come back from the meeting to
19 Southwest Workers Union and say, "We need to do X, Y and
20 Z"? Anything like that?
21          MS. JUDGE: Objection, vague. And we are
22 -- we are still talking about prior to the legislation,
23 prior to this 2011 legislative session, right? So we're
24 talking about from -- could be any period from --
25          MR. BRISSENDEN: No. I'm talking about



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 41

1   this particular meeting that your witness has just
2   described, and I'm simply asking:  As a result of that
3   meeting, did you come back to your office at Southwest
4   Workers Union and take any steps that related to voter
5   ID legislation?
6       A.  Could you repeat the question?
7           MR. BRISSENDEN:  Can you read the question
8   back?
9           (Requested portion was read back by the
10  court reporter.)
11      A.  Yes.
12      Q.  (By Mr. Brissenden) And what steps did you
13  take?
14      A.  Well, I talked to my staff about what was said
15  at the meeting, and we talked about, you know, this
16  bill, and at that point, we had just said that we were
17  going to be watching it and seeing where it went.
18          THE WITNESS:  Can we take a break?
19          MR. BRISSENDEN:  Certainly.
20          (Recess from 10:37 a.m. to 10:45 a.m.)
21      Q.  (By Mr. Brissenden) All right.  We're back on
22  the record after having taken a short break.
23          Are you ready to proceed?
24      A.  Yes.
25      Q.  Before the break, we talked about Southwest

## 42

1   Workers Union, who its members are, and we talked a
2   little bit about the 2011 legislative session.  I want
3   to talk to you about the voter ID legislation and in
4   particular SB 14.
5           Are you familiar with Senate Bill 14?
6       A.  Yes.
7       Q.  And are you familiar with the forms of
8   identification that it allows?
9       A.  Yes.
10      Q.  As you sit here today, do you know whether any
11  of the Southwest Workers Union's members lack the forms
12  of photo ID that are identified in Senate Bill 14?
13      A.  Yes.
14      Q.  Have you undertaken any analysis to make that
15  determination?
16      A.  Could you be more specific?
17      Q.  Well, you've indicated that you do know whether
18  any of the members of Southwest Workers Union lack the
19  forms of photo ID.  Have you undertaken an analysis to
20  make in that determination?
21      A.  What do you mean, analysis?
22      Q.  Have you done to anything to determine whether
23  or not your members have those forms of ID or not?
24      A.  I wouldn't say analysis.  I would say people
25  called me, they called me on the phone.  People called

## 43

1   me.  I didn't analyze the phone calls, and I'm not --
2   I'm not really clear on what you're asking me.
3       Q.  Well, you've testified that you do know whether
4   or not Southwest Workers Union members lack the forms of
5   ID that are specified in SB 14, and so my follow-up
6   question is:  What efforts did you or what steps did you
7   take to make that determination?
8           MS. JUDGE:  I think -- objection.  I think
9   you're mischaracterizing what my client has basically
10  said.
11          You're free to answer, but I'm going to
12  object.
13      A.  I guess -- sorry.  Membership, and, you know,
14  community members called me and told me they were
15  concerned about this particular policy because they
16  themselves didn't have a photo ID and/or knew of other
17  people that didn't.
18      Q.  (By Mr. Brissenden) Did you keep a log of the
19  people who called your office?
20      A.  Somewhat.  Sometimes people just call randomly
21  because they know the organization and just tell us
22  stuff, so...
23      Q.  And when people call, did you write down their
24  names?
25      A.  Some of them I did.

## 44

1       Q.  Okay.  And approximately how many called?
2       A.  When?
3           MS. JUDGE:  Objection, vague.
4       A.  Yeah.
5       Q.  (By Mr. Brissenden) Well, you just made mention
6   that people would call your office, and I'm asking you
7   in terms of numbers, approximately how many people
8   called your office?
9           MS. JUDGE:  Objection, vague.
10      Q.  Can you rephrase the question?  Or not
11  rephrase, but repeat it?
12          MR. BRISSENDEN:  Can you read back the
13  question?
14          (Requested portion was read back by the
15  court reporter.)
16      A.  It could be anywhere from 20 to 30, approximate
17  on the numbers.  But they didn't always talk to me.
18      Q.  (By Mr. Brissenden) Do you know who they would
19  have spoken with, other than yourself?
20      A.  Staff members.
21      Q.  Specifically, do you know who -- what other
22  staff members would have spoken with your members who
23  called in about -- with concerns about the legislation?
24      A.  I don't know.  Whoever picked up the phone.
25      Q.  Besides receiving the 20 to 30 phone calls that



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 45

1    you just mentioned, did Southwest Workers Union do
2    anything else to make a determination of whether or not
3    its members would be affected by SB 14?
4         MS. JUDGE:  Objection, vague.
5       A.   We read just reports, and we also followed
6    reports on, I guess, basically who would be affected by
7    this bill that different people were putting out at the
8    time.
9       Q.   (By Mr. Brissenden) Anything else?
10      A.   Not that I can think of.
11      Q.   How many reports did you review?
12      A.   I don't know.
13      Q.   And who were the authors of the report, the
14    reports?
15      A.   I don't know.
16      Q.   These were not reports that Southwest Workers
17    Union prepared?
18      A.   That's correct.
19      Q.   Were there any reports that addressed or
20    analyzed SB 14 as to Southwest Workers Union members
21    specifically?
22      A.   That we produced?
23      Q.   Well, my question is:  In terms of any reports,
24    were there any reports that you saw that pertained
25    specifically to the 2500 members of Southwest Workers

## 47

1      Q.   Do you know whether they have been produced as
2    part of this litigation?
3      A.   I don't know.
4      Q.   Can you identify any member of Southwest
5    Workers Union who does not have one of the forms of
6    photo ID that's required by Senate Bill 14?
7      A.   Yes.
8      Q.   And who are the members that you know of?
9      A.   I don't remember her first name but, Senora
10    Lopez.
11      Q.   And how do you know Ms. Lopez?
12      A.   Ms. Lopez has been a lifelong member of the
13    organization.  She has been there longer than I have.
14      Q.   Is she an employee of the organization?
15      A.   No.
16      Q.   And do you know whether or not Ms. Lopez has a
17    driver's license?
18      A.   She does not.
19      Q.   Do you know if she has a state-issued personal
20    identification card?
21      A.   To my knowledge, she does not.
22      Q.   Have you taken any steps to determine whether
23    or not she does?
24      A.   I mean, she talked to me and other members
25    about it.

## 46

1    Union?
2      A.   No.
3      Q.   Do you still have those reports?
4      A.   Some of them.
5      Q.   Approximately how many do you have?
6      A.   I don't know.
7      Q.   Do you remember, as a part of this case,
8    receiving or seeing a -- what's called a request for
9    production of documents to Southwest Workers Union in
10    this case?
11      A.   Yes, I do.
12      Q.   And did you review the document that had the
13    list or categories of documents that were requested?
14      A.   Yes, I did.
15      Q.   Did you assist in preparing responses and
16    gathering documents to produce in response to that
17    request?
18      A.   Yes.
19      Q.   And as part of responding to that request and
20    gathering documents, were these reports part of your
21    efforts to respond to the request?
22      A.   Yes.
23      Q.   Did you turn those documents over to your
24    lawyers?
25      A.   Yes.

## 48

1      Q.   And did she tell you that she did not have a
2    state-issued personal ID?
3      A.   Yes.
4      Q.   Do you know whether Ms. Lopez has a passport?
5      A.   I do not.
6      Q.   Any other members that you have talked to other
7    than Ms. Lopez?
8      A.   Yes.
9      Q.   And besides Ms. Lopez, what other members that
10    you're aware of do not have one of the forms of photo ID
11    that's required by SB 14?
12      (Witness and Ms. Judge conferring.)
13      MS. JUDGE:  I'm going to object on
14    attorney-client privilege, and I'm going to instruct my
15    client not to respond.
16      Q.   (By Mr. Brissenden) I'm not asking you for
17    communications you've had with your -- with your
18    attorney.  Do you understand that?
19      A.   Yes.
20      Q.   All right.  So we're talking about
21    communications you've had with individuals who are
22    members of Southwest Workers Union, and you've
23    identified Ms. Lopez.  Are there any other members that
24    you've spoken with who've indicated they don't have any
25    of the forms of ID that are identified under Senate



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

| 49 | 51 |
|---|---|

**49**

1  Bill 14?

2      MS. JUDGE:  I'm going to object on

3  attorney-client privilege.  I'm going to ask that you

4  not respond.  I'm going to instruct you not to respond

5  to that, if you've had conversations.

6      A.  Under the advice of my counsel, I'm not going

7  to respond.

8      Q.  (By Mr. Brissenden) Do you have knowledge about

9  people you've spoken with, members you've spoken with at

10  Southwest Workers Union about SB 14?

11      A.  Could you repeat the question?

12      Q.  Yeah.  Do you have -- do you have knowledge

13  about the people you have spoken with?  You've already

14  identified Ms. Lopez.  Do you have personal knowledge

15  about other individuals you've spoken with?

16      A.  Yes.

17      Q.  All right.  So and have you spoken to those

18  people, those individuals directly?

19      MS. JUDGE:  I'm going to object on

20  attorney-client privilege.

21      MR. BRISSENDEN:  Well, I'm not asking

22  about communications she's had with her attorney.

23      MS. JUDGE:  But I can understand --

24      MR. BRISSENDEN:  I'm asking about

25  communications she's had with Ms. Lopez and others who

**50**

1  are members.

2      MS. JUDGE:  I understand that, but there

3  are reasons why there is attorney-client privilege

4  attached to that.  And at this point, I'm going to

5  instruct her not to answer.  If you would like to go

6  further and, you know, deal with it in the court, then

7  we can do it.  But at this point, sir, I'm going to ask

8  that she not respond to that, and there are reasons

9  behind us asking that.

10      MR. BRISSENDEN:  There is no grounds for

11  it.

12      MS. JUDGE:  Well, then if there's no

13  grounds for it, then you'll probably be able to get the

14  response in court then.  But at this point, I'm going to

15  instruct her not to answer that.

16      MR. BRISSENDEN:  Well, I think it's bad

17  faith grounds and it's an obstruction.

18      MS. JUDGE:  Well, it's not -- it's not an

19  obstruction, and I'm just going to protect my client.

20      MR. BRISSENDEN:  It's a fair question, and

21  she's already -- she's already disclosed Ms. Lopez.

22  There is no --

23      Q.  (By Mr. Brissenden) Are any of the community

24  members that you have spoken with attorneys?

25      A.  Not to my knowledge.

**51**

1      Q.  And none of them are representing you as

2  attorneys in this case?

3      A.  No.

4      Q.  And none of your attorneys were the source of

5  knowledge, your personal knowledge in terms of these

6  communications with these members, right?

7      A.  That's correct.

8      MR. BRISSENDEN:  Would you like to

9  reconsider your assertion of attorney-client privilege?

10      MS. JUDGE:  I would like to -- what I

11  would like to do is make sure that my client not have to

12  respond to people who do not want to be -- who do not

13  want to be a part of this.  And so therefore, therefore,

14  I am asking again to my client, I am going to instruct

15  her not to respond in terms of anything else -- and this

16  is attorney-client privilege.  And, in fact, you think

17  it's obstructionist, then, please, by all means, put it

18  in the court -- let's put it in the record.  But at this

19  point, I'm not going to withdraw it.

20      MR. BRISSENDEN:  Well, there is no grounds

21  for it to be attorney-client privilege, as the witness

22  has already described the foundation testimony, and it

23  is, I believe, just purely obstructionist.

24      Q.  (By Mr. Brissenden)  You understand I'm trying

25  to ask you some of these questions in hopes of not

**52**

1  having you come back and sit for a second deposition?

2      A.  I understand.

3      Q.  And you understand I'm not trying to drag in

4  other people as a part of this case?

5      A.  I don't understand that.

6      Q.  Do you understand I'm not interested in

7  dragging poor Ms. Lopez and make her a part of this

8  case?

9      A.  I don't understand that.

10      Q.  All right.  You've identified Ms. Lopez.  Any

11  other individuals who you've spoken with about whether

12  or not they have identifications listed under Senate

13  Bill 14?

14      A.  I have spoken to other people about it.

15      Q.  How many?

16      A.  I'd say a handful.

17      Q.  So when you say a handful, I assume you mean

18  three, four, five other individuals?

19      A.  Yes.

20      Q.  Those other individuals have indicated to you

21  they don't have the requisite forms of identification

22  under Senate Bill 14?

23      A.  Yes.

24      Q.  Have you taken any steps to verify one way or

25  another whether they do have the requisite forms of ID?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 53

1    A.   No.  It's not the role of my organization or
2    myself.
3    Q.   Does Southwest Workers Union represent anyone
4    else as a part of this litigation, other than the 2500
5    members it represents?
6    A.   No.
7    Q.   Do you have a driver's license?
8    A.   Yes.
9         (Exhibit 2 marked for identification.)
10   Q.   (By Mr. Brissenden) All right.  The court
11   reporter has handed you what's been marked as Deposition
12   Exhibit 2.  Do you recognize that document?
13   A.   Yes.
14   Q.   And what is this document?
15   A.   It's the Intervenors document.
16   Q.   And do you see a title there on the first page?
17   A.   Yes.
18   Q.   All right.  And this is titled, "Applicants'
19   Motion to Add Southwest Workers Union and La Unión Del
20   Pueblo Entero as Defendant Intervenors"?
21   A.   Yes.
22   Q.   I know I pronounced that horribly.  I
23   apologize.
24        What is the acronym for La Unión --
25   A.   La Union Del Pueblo Entero, LUPE.

## 54

1    Q.   (By Mr. Brissenden) LUPE?  Are you familiar
2    with the LUPE organization?
3    A.   Yes.
4    Q.   Do LUPE and Southwest Workers Union have
5    similar interests in regards to voter ID legislation?
6         MS. JUDGE:  Objection, calls for
7    speculation.
8    Q.   (By Mr. Brissenden) Do you know?
9    A.   I would -- I would say yes.
10   Q.   It's LUPE located here in -- do they have an
11   office here in San Antonio?
12   A.   Not to my knowledge.
13   Q.   Do you know whether members of your
14   organization, Southwest Workers Union, are members of
15   LUPE?
16   A.   I don't know.
17   Q.   All right.  Directing your attention to the
18   second page of Exhibit 2, I represent to you this was a
19   document that was filed as a part of the pleadings in
20   this case.  And on the second page, the first paragraph
21   describes Southwest Workers Union, and it states,
22   "Southwest Workers Union is a San Antonio-based
23   organization representing approximately 2,500 low-income
24   workers, including migrant farm workers, domestic
25   workers, and public school workers.  Most of its

## 55

1    membership is Latino.  SWU's aim is to build multi-
2    generational grassroots power to create sustainable
3    change for social, economic, and environmental justice
4    and to build the movement for dignity and justice."  Did
5    I read that correctly?
6    A.   Yes.
7    Q.   In terms of South -- the statement "SWU's aim
8    is to build multi-generational grassroots power to
9    create sustainable change for social, economic, and
10   environmental justice and to build the movement for
11   dignity and justice," does that accurately reflect the
12   mission of SWU?
13   A.   Yes.
14   Q.   The paragraph goes on to state, "They
15   accomplish this through hands-on civic engagement work."
16   Do you see that?
17   A.   Yes.
18   Q.   Is that true?
19   A.   Yes.
20   Q.   And the sentence goes on to state, "Primarily
21   in the Latino community, including voter education and
22   voter registration work."  Do you see that statement?
23   A.   I do see that statement.
24   Q.   Did I read that correctly?
25   A.   Yes.

## 56

1    Q.   Is that true?
2    A.   This is true.
3    Q.   All right.  What type of voter education work
4    does Southwest Workers Union engage in?
5    A.   We teach people about what's going to be on the
6    ballots.  We block walk.
7    Q.   I'm sorry?
8    A.   We block walk.  You know, to tell people what's
9    on the ballot.  Do voter education.  We let people
10   know what they're going to be facing at the polls, which
11   precincts they're in, when early voting is, when
12   election day is.  I mean, yeah.  I mean, yeah.  I mean,
13   candidate accountability forums or informative forums.
14   You know, people want to know who's on the forum, like,
15   who's going to be on the ballot and what they're
16   about.  We do information sessions.  I mean, yeah.
17   Q.   Anything else?
18   A.   And we let people know about precinct changes,
19   if there's been any.
20   Q.   Do you discuss different issues with voters?
21   A.   Around what?  I mean, yes.
22   Q.   In terms of voter registration work, what work
23   does SWU do?
24   A.   We register voters, or assist in voter
25   registration with our members and just within the



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 57

1    community, anybody.
2      Q.  So you help voters in the Latino community
3    register to vote?
4      A.  Yes.
5      Q.  On election day, does SWU engage in any voter
6    education or work in connection with the election?
7      A.  Which election?
8      Q.  On a typical -- just generally speaking on an
9    election day.
10     A.  Sometimes.
11     Q.  All right.  For example, a few weeks ago, we
12    had the May primary.  Did anybody from your organization
13    work at any polls?
14     A.  A member of our organization?
15     Q.  Yes.
16     A.  I'm sure they did.
17     Q.  Did they assist individuals, voters in getting
18    to the polls?
19     A.  I'm not sure.
20     Q.  Have you ever heard of anybody from your
21    organization helping to get voters to the polls?
22     A.  Yes.
23     Q.  The paragraph on Page 2, Paragraph 1, the last
24    sentence states, or goes on to state, "More recently, it
25    has used its scarce resources to educate its members and

## 58

1    members of the Latino community on the new voter photo
2    identification law."  Do you see that statement?
3     A.  I do see that statement.
4     Q.  And did I read that correctly?
5     A.  Yes.
6     Q.  Is it true?
7     A.  Yes.
8     Q.  What resources has Southwest Workers Union used
9    to educate its members on SB 14?
10     A.  Mainly around community meetings, letting folks
11    know what SB 14 is, and then just through our elections,
12    you know, the upcoming elections, and doing phone
13    banking, just letting folks know that they don't need a
14    Texas ID to actually go vote, that they can still use
15    their voter registration card, because there was a lot
16    of confusion.
17     Q.  Was there some confusion -- you're referring to
18    the May primary?
19     A.  Yeah.  And then -- yeah, yeah.
20     Q.  And so were -- was -- was there some effort to
21    educate voters, for this last May primary, in terms of
22    whether or not those voters would need a photo ID?  Is
23    that what you're referring to?
24     A.  Not the May primary.  During the San Antonio
25    city elections.

## 59

1     Q.  Okay.
2     A.  There was a bond election.
3     Q.  And when was that election held?
4     A.  The 12th or 14th.  12th was the last day of
5    early voting, and the 14th was election day.
6     Q.  On which day?
7     A.  May.  The month, May.
8     Q.  May 14th?
9     A.  Yeah.
10     Q.  Has the voter education included educating
11    members about SB 14 in terms of, if the law is
12    precleared or approved and enacted, what forms of voter
13    ID will be required?
14     A.  Yeah.
15     Q.  The statement there on Page 2, the first
16    paragraph, the last sentence, makes reference to scarce
17    resources.  Do you see that?  What resources have been
18    used to educate voters about SB 14?
19     A.  Staff time.
20     Q.  Anything else?
21     A.  Telephone.  Use of space.  I mean, anything you
22    can think of around the building; you know, food,
23    drinks, electricity.
24     Q.  Anything else?
25     A.  I guess like just printing, production of

## 60

1    information.
2     Q.  Anything else?
3     A.  Not that I can think of.
4     Q.  Okay.  How much of your time has been spent on
5    educating voters about SB 14?
6     A.  Throughout what time period?
7     Q.  Let's say from -- since the beginning of the
8    year.
9     A.  In terms of what, hours?
10     Q.  Generally speaking, yes.
11        MS. JUDGE:  Objection, vague.
12     A.  Yeah.  Could you be more specific?
13     Q.  (By Mr. Brissenden) Sure.  Can you give me idea
14    how much time, of your time has been spent on educating
15    voters on SB 14?
16     A.  I'd say like April and May, was probably -- I
17    mean, you know, I would say dedicated.  How many hours?
18    I got to think.  I don't know.  It was like, did a lot
19    of phone banking.  I don't know how many hours.  I can't
20    say how many hours.  But we did do a lot of phone
21    banking to let folks know, that, one, to remind them to
22    go vote and that an ID was not necessary to vote.  I
23    can't -- I don't remember.  I don't know.
24     Q.  You mentioned printing information and printing
25    materials.  Over the past six months, did Southwest



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 61

1   Workers Union prepare any printed materials in
2   connection with or relating to SB 14?
3       A.   We didn't produce anything.  We just made
4   copies of what other people had, just to have one, you
5   know, solid thing that we could give people.
6       Q.   All right.  And what was copied from -- that
7   you had received from other people?
8       A.   We used stuff from the Advancement Project, and
9   some folks wanted to see the actual bill, so we printed
10  those out for people to have.  And we also printed out
11  some documents from MALDEF that they forwarded to us,
12  and from Southwest Voters.
13      Q.   Any other documents?
14      A.   Just ballot information.
15      Q.   Anything else?
16      A.   And just the dates for voting.
17      Q.   Okay.  Any other documents that you remember?
18      A.   Not that I can remember right now.
19      Q.   The documents from the Advancement Project,
20  what were those documents; do you remember?
21      A.   I mean, they're the documents that I -- that
22  they forwarded to me around SB 14, just like fact sheets
23  and...
24      Q.   Do you remember what they said?
25      A.   They just went in depth about the bill, more

## 62

1   details.
2       Q.   Did they provide a summary of what the
3   provisions of the bill were?
4       A.   I believe so, yeah.
5       Q.   Do you still have copies of those documents
6   from the Advancement Project?
7       A.   Yeah.  We gave them to y'all.
8       Q.   How about the documents from MALDEF; do you
9   still have those documents?
10      A.   I do, and I gave those to you as well.
11      Q.   And how about from Southwestern Voters?
12      A.   I do, and I gave them to you all.
13      Q.   Has Southwest Workers Union hosted any speakers
14  about voter ID legislation?
15          MS. JUDGE:  Objection, vague.
16      A.   I'm sorry, could you repeat the question?
17      Q.   (By Mr. Brissenden) Has Southwest Workers Union
18  hosted any speakers?  Have they had any speakers come in
19  and speak about voter ID legislation?
20      A.   To whom?
21      Q.   To its members.
22      A.   During what time frame?
23      Q.   The past six months.
24      A.   No.  I don't know, actually, no.
25      Q.   Is there somebody in the organization who would

## 63

1   know?
2       A.   Me.
3       Q.   So as you sit here today, do you know?
4       A.   I don't.  The last -- no.
5       Q.   Any -- let's go beyond six months.  Any -- make
6   it broader than the past six months.  Can you remember
7   any speaker coming in and speaking to members of
8   Southwest Workers Union regarding voter ID legislation?
9           MS. JUDGE:  Objection, vague.
10      A.   Not to my knowledge.
11      Q.   (By Mr. Brissenden) Did Southwest Workers Union
12  meet with any Texas legislators during the 2011
13  legislative session regarding SB 14?
14      A.   Yes.
15      Q.   And who -- who did it meet with?
16      A.   I can't remember all of them, but Leticia Van
17  de Putte was one of them.  Bobby Cruz.  Joaquin Castro.
18  Is it Trey Fischer Martinez.  I think -- I mean, at that
19  point, we had tried to meet with most of the law makers
20  in San Antonio, if not their aides, just kind of let
21  them know where we're at with most of the -- you know,
22  anything that we're working at that point.  Just because
23  we're limited resources, we can't continuously go to
24  Austin, you know, and we don't have resources to do
25  that.

## 64

1       Q.   How many times did anyone from Southwest
2   Workers Union go to Austin to talk about SB 14?
3       A.   I don't know.
4       Q.   Did you ever go to Austin?
5       A.   Yes.
6       Q.   How many times?
7       A.   I don't know.
8       Q.   Who is the state representative for the
9   district in which Southwest Workers Union is located?
10      A.   I don't -- I don't know.
11      Q.   The same question as to the State Senator.  Do
12  you know?
13      A.   It should be Leticia Van de Putte.
14      Q.   And Senator Van de Putte is one of the
15  individuals that Southwest Workers Union met with, with
16  regards to SB 14?
17      A.   Uh-huh.
18      Q.   How many times did you meet with the Senator?
19      A.   Probably once.
20      Q.   Were you present?
21      A.   Yeah.
22      Q.   And where was the meeting?
23      A.   In her office.
24      Q.   Where?
25      A.   In Austin.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

65

1    Q.  Do you remember when?
2    A.  I don't.
3    Q.  And what was discussed?
4    A.  Several things.
5    Q.  And what were those things?
6        MS. JUDGE:  Objection, vague.  It calls --
7    A.  How the weather was.  How we're doing.
8    Q.  (By Mr. Brissenden) Let's narrow it down to
9  Senate Bill 14.  Was there discussion about Senate Bill
10 14?
11   A.  Yes.
12   Q.  And what was discussed?
13   A.  Whether or not it was going to pass.  Where she
14 was at on the issue.  Where we were at on the issue.
15   Q.  Anything else with regards to Senate Bill 14?
16   A.  That's it, that I can remember.
17   Q.  And what did you tell the Senator in terms of
18 where Southwest Workers Union was on the issue?
19   A.  That we were opposed.
20   Q.  Did you say why or explain why?
21   A.  I don't remember specifically what was said,
22 but I do remember that the Senator had the same
23 sentiment that we did.  She just understood that it was
24 not a good -- a good thing for the state.
25   Q.  And so when you left the meeting, it was your

---

66

1  understanding that Senator Van de Putte would be voting
2  against the bill?
3    A.  That's how I left feeling.
4    Q.  Did you provide the senator with any materials?
5    A.  My business card and just let her know that we
6  would try to make the hearing.  I don't remember,
7  actually.  I'm sure we gave her something, but I don't
8  remember.
9    Q.  Did you attend the Senate hearing?
10   A.  I did not get to.
11   Q.  Did anybody from Southwest Workers Union attend
12 the hearing?
13   A.  Not to my knowledge.
14   Q.  How about other hearings, committee hearings,
15 hearings on the House side; did Southwest Workers Union,
16 any representative attend those hearings?
17   A.  Yes.
18   Q.  Which hearings?
19   A.  Some of the committee hearings.
20   Q.  Do you remember which ones?
21   A.  I don't.
22   Q.  Did anyone from Southwest Workers Union testify
23 during the hearings?
24   A.  No.  There was -- no.
25   Q.  Did anybody testify at the hearing on behalf of

---

67

1  Southwest Workers Union, more generally?
2    A.  Maybe.
3    Q.  Who would that have been?
4    A.  Possibly the folks from Southwest Voters or
5  from MALDEF.
6    Q.  Do you know of any Southwest Workers Union
7  member who personally appeared at the hearings to
8  testify?
9    A.  Not to my knowledge.
10   Q.  On that day when you met with Senator Van de
11 Putte, did you meet with any other senators?
12   A.  I don't remember.
13   Q.  When did you first learn about this lawsuit?
14   A.  Could you be more specific?
15   Q.  Sure.  We're here to take your deposition and
16 ask you some questions about the case of the State of
17 Texas versus Eric Holder.  Southwestern Workers Union
18 has intervened as a party in this case, and so my
19 question is:  At what point did Southwest Workers Union
20 first learn about this lawsuit?
21   A.  I don't recall.  Sometime last year.
22   Q.  Who made -- who at Southwest Workers Union made
23 the decision to intervene in this case?
24   A.  The director.
25   Q.  That would have been Genaro Rendon?

---

68

1    A.  Yes.
2    Q.  He was the director at the time?
3    A.  He is the director.
4    Q.  Do you know when he decided to intervene in the
5  case?
6    A.  I don't remember the exact date.
7        MS. JUDGE:  Objection, calls for
8  speculation.
9    Q.  (By Mr. Brissenden) Why did Southwest Workers
10 Union intervene in this case?
11   A.  Because we felt it was discriminatory.
12   Q.  And what do you mean by that?
13   A.  We felt that it would affect our members, and
14 that just overall for the state, it was not a good -- a
15 good thing for voters.
16   Q.  And I understand Southwest Workers Union was
17 opposed to SB 14, correct?
18   A.  Yes.
19   Q.  And you went and spoke with several
20 legislators, including Senator Van de Putte, in
21 opposition to the bill during the session, but in terms
22 of intervening in this lawsuit, why has Southwest
23 Workers Union intervened in the case?
24       (Witness and Ms. Judge conferring.)
25   A.  Yeah.  I mean, we just feel that it's going to

---



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 69

1  impact the state, our members, so we felt it important
2  for us to intervene.
3      Q.   You understand that the lawsuit is filed by the
4  State of Texas against the United States Federal
5  Government?
6      A.   Yes, I do understand that.
7      Q.   And the issue, the general issue is whether or
8  not the Senate Bill 14, the voter ID bill should be
9  approved or not and enacted.  Do you understand that?
10     A.   Yes, I do.
11     Q.   And do you understand that the Department of
12  Justice and the United States of America is taking a
13  position; the Department of Justice in particular is
14  taking a position that it should not be approved?
15     A.   I understand that.
16     Q.   Is there some -- is there some aspect of the
17  United States Government's defense in this case that you
18  disagree with?
19         MS. JUDGE:  I object.  It calls for --
20  first off, it's irrelevant, this motion, and we've
21  already been allowed to intervene in the case.  It is
22  irrelevant.  The other thing, I also object, basically
23  on that you're asking for a legal conclusion.
24         THE WITNESS:  Yeah.
25         MR. BRISSENDEN:  I'm not asking for a

## 70

1  legal conclusion.  I'm asking for your witness's
2  position.
3         MS. JUDGE:  Well, we basically still
4  object to the relevance of the line of questioning.
5      Q.   (By Mr. Brissenden) You may answer.
6      A.   I feel like you're asking me a legal question,
7  and I'm not very clear.
8      Q.   Well, let me back up.  Are you familiar with
9  the defense -- defenses that the Department of Justice
10  has taken on this case?
11     A.   Yes.
12     Q.   All right.  And you understand that they are
13  opposed to approval of SB 14?
14     A.   Yes.
15     Q.   All right.  So my question is:  Have you seen
16  or reviewed anything that would indicate to you,
17  Southwest Workers Union, that the Department of
18  Justice's defense to this lawsuit, is there anything
19  that you've read that you disagree with?
20         MS. JUDGE:  I object.  It calls for a
21  legal conclusion.
22     A.   I don't feel like I am apt to answer those
23  legal question.
24     Q.   (By Mr. Brissenden) All right.  But I'm not
25  asking you for the legal conclusion.  I'm just asking if

## 71

1  you've seen anything.
2      A.   It feels like you are asking me for a legal.
3      Q.   No.  I'm just asking if you've seen anything --
4         MS. JUDGE:  Objection
5      Q.   (By Mr. Brissenden) -- that you disagree with?
6         MS. JUDGE:  Objection it's irrelevant.
7  Calls for a legal conclusion.
8      A.   What do you mean, anything?
9      Q.   (By Mr. Brissenden) Have you reviewed any
10  documents that have been filed in this case?
11     A.   I have reviewed the documents that have been
12  given to me, yes.
13     Q.   All right.  And you understand the Department
14  of Justice has taken the position, the United States of
15  America has taken the position, the federal government
16  has taken the position, they're opposed to SB 14 for
17  purposes of clearance?
18     A.   Yes.
19     Q.   All right.  And in terms of them handling that
20  case and presenting their evidence, have you seen
21  anything in the case, any documents or anything, that
22  would indicate that you disagree with the way they have
23  handled the case?
24         MS. JUDGE:  Objection, calls for a legal
25  conclusion.

## 72

1      A.   I would say we have a stance in the case.
2  Whether or not we agree with the DOJ or not is -- I
3  mean, I don't see it relevant to where we're at in the
4  case.  I don't know.
5      Q.   (By Mr. Brissenden) Okay.  But in terms of
6  seeing anything in particular where Southwest Workers
7  Union would disagree with the Department of Justice, the
8  federal government, you're not here able to speak to
9  that?
10     A.   I am not.
11         MS. JUDGE:  Objection, calls for a legal
12  conclusion.
13         MR. BRISSENDEN:  I'm just asking whether
14  she can answer the question.
15         MS. JUDGE:  And I'm just objecting.
16         MR. BRISSENDEN:  It's not a legal
17  conclusion.
18         MS. JUDGE:  I feel like you're asking her
19  to make a determination based on what the -- what the
20  claims were, whether or not she agrees or disagrees.
21  That's a legal -- you're asking her to make a legal
22  conclusion.
23     Q.   (By Mr. Brissenden) And I'm just asking if
24  you've seen anything.  Do you know?
25     A.   I -- I don't know.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Tanya Aguilar Garduno                                      June 13, 2012

---

73

1    Q.   Besides meeting with senators and
2  representatives of the Texas Legislature that you've
3  indicated you met with previously and then some law
4  makers in San Antonio, did you -- and I'm saying you in
5  general, Southwest Workers Union do anything else to
6  oppose SB 14 during the 2011 legislative session?
7    A.   I mean, we participated in actions with other
8  organizations.
9    Q.   Okay.  And what actions are you referring to?
10   A.   Of the numerous marches on the Hill.  I mean,
11 that's -- I can just say that there's a lot of things
12 happening in Austin during the session.
13   Q.   Okay.  So you attended -- Southwest Workers
14 Union participated in marches on Capitol Hill?
15   A.   Yes.
16   Q.   Anything else?
17   A.   Not that I can remember.
18   Q.   Were those marches, did those relate
19 specifically to SB 14?
20   A.   I don't remember.  There's so many.
21   Q.   Did Southwest Workers Union meet with any lobby
22 organizations?
23   A.   I don't know.  I don't know which ones are
24 lobbying organizations or not, you know.
25   Q.   Has Southwest Workers Union, to your knowledge,

---

75

1    Q.   Do you know whether any member of Southwest
2  Workers Union sent any letters or e-mails to the
3  Department of Justice regarding SB 14?
4      MS. JUDGE:  Objection, vague.
5    A.   I don't know.
6    Q.   (By Mr. Brissenden) Does Southwest Workers
7  Union contend that Senate Bill 14 will have the effect
8  of denying minorities the right to vote?
9    A.   Yes.
10   Q.   And does it contend that SB 14 will affect all
11 minority groups or just some minority groups?
12   A.   All.
13   Q.   And what is the basis for that contention?
14   A.   Well, as I stated before, we received and
15 reviewed documents and reports from other organizations,
16 and we have also received phone calls from membership on
17 this, and we feel that it's discriminatory against
18 minority voters in the state.
19   Q.   Okay.  Now, those -- when you say reports, are
20 those the reports that -- that you made reference to
21 just a few minutes ago?
22      MS. JUDGE:  Objection, asked and answered.
23   Q.   (By Mr. Brissenden) Or are these different
24 reports?
25   A.   They are the same.

---

74

1  ever intervened in a lawsuit before?
2    A.   Not to my knowledge.
3    Q.   After the bill passed through the Senate, do
4  you understand that there was an administrative
5  preclearance process?
6    A.   Yes.
7    Q.   And that administrative process was handled by
8  the Department of Justice.  Do you understand that?
9    A.   I do.
10   Q.   Did you ever speak with anyone at the
11 Department of Justice about SB 14?
12   A.   No.
13   Q.   Did any member of Southwest Workers Union
14 communicate with the Department of Justice about SB 14?
15      MS. JUDGE:  Objection, vague.
16   Q.   (By Mr. Brissenden) Well, let me clarify
17 that.  Did any employee or staff member of Southwest
18 Workers Union communicate with the Department of Justice
19 about SB 14?
20      MS. JUDGE:  Objection, vague.
21   A.   Not to my knowledge.
22   Q.   (By Mr. Brissenden) Did anyone from Southwest
23 Workers Union send any letters or e-mails to the
24 Department of Justice regarding SB 14?
25   A.   Not to my knowledge.

---

76

1    Q.   All right.  And which organizations did you
2  receive those reports from?
3      MS. JUDGE:  Objection, asked and answered.
4    A.   I don't remember all of them.
5    Q.   (By Mr. Brissenden) Did Southwest Workers Union
6  undertake any of its own investigation to determine what
7  effect SB 14 would have on minority voters here in the
8  state of Texas?
9      MS. JUDGE:  Objection, asked and answered.
10   A.   No.
11   Q.   (By Mr. Brissenden) Has Southwest Workers Union
12 conducted any surveys concerning the effects of SB 14
13 other on its members?
14      MS. JUDGE:  Objection,
15 mischaracterization.
16   A.   Could you be more specific around the word
17 survey?
18   Q.   (By Mr. Brissenden) Do you understand what a
19 survey is?
20   A.   Not in your question.
21   Q.   All right.  When I say survey, I'm asking like
22 a questionnaire.  Did Southwest Workers Union send out
23 any questionnaires or conduct any surveys concerning the
24 effect of SB 14 on its members?
25   A.   No.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 77

1    Q.  In terms of the reports that you received from
2  other organizations, did any of those reports that you
3  reviewed include reports showing poll results indicating
4  support for voter ID legislation?
5    A.  Could you repeat the question?
6    Q.  In the reports that you reviewed, you've been
7  discussing, made reference to a few minutes ago that you
8  received from organizations, did any of those reports
9  have poll results showing support for voter ID
10  legislation?
11       MS. JUDGE:  Objection, vague.
12    A.  I don't really understand the question.
13    Q.  (By Mr. Brissenden) Do you know what a poll is?
14    A.  I do know what a poll is but --
15    Q.  Okay.  So I'm asking you:  In those reports,
16  did they -- did any of those reports include poll
17  results showing support for voter ID legislation?
18    A.  I don't remember.
19    Q.  Have you seen any poll results showing that the
20  majority of Texans support the photo ID requirement as
21  laid out in SB 14?
22    A.  I have not.
23    Q.  Are you aware of a poll result showing the
24  majority of Texans support photo ID requirement to vote
25  regardless of race?

## 78

1    A.  Could you repeat that?
2    Q.  Sure.  Are you aware of poll results showing
3  that the majority of Texans support the photo ID
4  requirement to vote regardless of race?
5    A.  Not to my knowledge.
6    Q.  Do you believe that indigent voters are more
7  likely than average voters to lack a form of the
8  required photo IDs under SB 14?
9    A.  Could you define indigent?
10    Q.  Poor.
11    A.  Do I -- could you repeat it?
12    Q.  Do you believe that poor voters are more likely
13  than the average voter to lack a form of ID required by
14  SB 14?
15       MS. JUDGE:  Objection, calls for
16  speculation.
17    Q.  (By Mr. Brissenden) You may answer.
18    A.  I don't know.
19    Q.  Do you believe that rural voters are more
20  likely than the average voter to lack a form of ID
21  required by SB 14?
22    A.  I don't know.
23    Q.  That's not something you've considered?
24    A.  I've considered it or do I know it?
25    Q.  Whether you've considered that.

## 79

1    A.  I'm confused by your question.
2    Q.  Okay.  We'll move on.
3       Do you -- and when I say you, I'm
4  referring to Southwest Workers Union.  Do you contend
5  that SB 14 was passed with a discriminatory purpose?
6    A.  Yes.
7       MS. JUDGE:  Objection --
8    A.  Yes.
9    Q.  (By Mr. Brissenden) And what is the basis for
10  Southwest Workers Union's contention that SB 14 was
11  passed with a discriminatory purpose?
12       MS. JUDGE:  Objection, calls for legal
13  conclusion.
14    A.  Well, as I stated before, we feel that it's
15  going to affect our membership and you, know, voters in
16  the state of Texas.
17    Q.  (By Mr. Brissenden) All right.  And I
18  understand you're talking about effect that bill will
19  have, but I'm talking about purpose, discriminatory
20  purpose.
21    A.  Could you explain that?
22       MS. JUDGE:  Objection, calls for a legal
23  conclusion.
24    Q.  (By Mr. Brissenden) In terms of purpose, do you
25  know whether or not there was any -- first of all, do

## 80

1  you know what -- in your opinion, what is the purpose of
2  SB 14?
3       MS. JUDGE:  Objection, vague.
4    A.  I don't understand your question.
5    Q.  (By Mr. Brissenden) What is your understanding
6  as to what the purpose of SB 14 is?
7    A.  My understanding of it?
8    Q.  Yes.
9    A.  To prevent voter fraud.
10    Q.  Do you know --
11       (Witness and Ms. Judge conferring.)
12       MR. BRISSENDEN:  Let the record reflect
13  that counsel is speaking with the witness during the
14  questioning, and I'd request that the sidebars stop.
15    Q.  (By Mr. Brissenden) Do you know how many Texas
16  registered voters lack one of the forms of ID that are
17  required under SB 14?
18    A.  I do not.
19    Q.  Can you identify any Texas registered voter who
20  does not have one of the types of photo IDs that are
21  required?
22       MS. JUDGE:  Objection, asked and answered.
23       MR. BRISSENDEN:  I don't believe I've
24  asked this question.
25    Q.  (By Mr. Brissenden) Do you understand my



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

## 81

1  question?
2       A.  Could you repeat the question?
3       Q.  Sure.
4            Can you identify any Texas registered
5  voter who does not have one of the types of photo ID
6  that's required under SB 14?
7            MS. JUDGE:  Objection, asked and answered.
8       Q.  (By Mr. Brissenden) You may answer.
9       A.  Yes.
10      Q.  And who are those individuals that are Texas
11  registered voters who you believe don't have the types
12  of required photo ID under SB 14?
13      A.  I think we already spoke about her earlier
14  today.
15      Q.  Oh, okay.  Was that Ms. --
16      A.  Senora Lopez.
17      Q.  Ms. Lopez?
18      A.  Yes, sir.
19      Q.  Do you know if she's a registered voter?
20      A.  Yes.
21      Q.  Any others?
22      A.  Yes.
23      Q.  And who are those individuals?
24      A.  I mean, community members.
25      Q.  And who are those individuals?

---

## 82

1            MS. JUDGE:  Objection, asked and answered
2  previously.
3       Q.  (By Mr. Brissenden) You may answer.
4       A.  They are community members within the state of
5  Texas that we know.
6       Q.  And who are those individuals?
7            MS. JUDGE:  Objection, asked and answered.
8       A.  I don't want to name them because I don't think
9  they want to be part of -- well, I know they don't want
10  to be named in this or be a part of it.
11      Q.  (By Mr. Brissenden) How many individuals are
12  you aware of?
13      A.  Could you repeat the question?
14      Q.  How many individuals are you aware of that you
15  can identify -- again, I understand you don't want to
16  disclose their names -- that are Texas registered voters
17  who do not have the requisite forms of ID under SB 14?
18      A.  I said earlier, a handful.
19      Q.  Do you know if those individuals are all
20  currently registered to vote?
21      A.  I don't know.
22           MS. JUDGE:  We've been going at this for a
23  while.
24           MR. BRISSENDEN:  Sure.  Why don't we take
25  a short break.

---

## 83

1            (Recess from 11:57 p.m. to 12:10 p.m.)
2       Q.  (By Mr. Brissenden) We're back on the record
3  after having taken a short break.  Are you ready to
4  proceed?
5       A.  Yes.
6       Q.  All right.
7            MR. BRISSENDEN:  Let's go ahead and have
8  this exhibit marked.
9            (Exhibit 3 marked for identification.)
10      Q.  (By Mr. Brissenden) The court reporter has just
11  handed you what's been marked as Exhibit 3.  Do you
12  recognize this document?
13      A.  Yes.
14      Q.  Have you seen this document before today?
15      A.  Yes.
16      Q.  Did you assist in preparing Responses to the
17  State of Texas's First Set of Interrogatories?
18      A.  No.
19      Q.  Do you know who from Southwest did prepare or
20  assist in preparing the answers?
21           MS. JUDGE:  Objection, vague.
22           Do you mind if we go off the record for a
23  minute?  I think she's confused.
24           THE WITNESS:  Yeah.
25           MR. BRISSENDEN:  Okay.

---

## 84

1            (Witness and Ms. Judge conferring.)
2       A.  Okay.  Yeah.  I'm sorry, I was confused.
3       Q.  (By Mr. Brissenden) So you understand that
4  you've seen this document before today?
5       A.  Uh-huh.
6       Q.  And the State of Texas had asked -- or sent
7  some written questions to Southwest Workers Union and
8  asked them to provide responses?
9       A.  Yes.
10      Q.  Did you assist in preparing those responses?
11      A.  Yes.
12      Q.  Did anybody else from Southwest?
13      A.  No.
14      Q.  Directing your attention to Page 5 of the
15  exhibit.
16      A.  Uh-huh.
17      Q.  Do you see your name listed there on Page 5?
18      A.  Yes, and it's actually misspelled.
19      Q.  And your name is listed there along with
20  Mr. Rendon?
21      A.  Yes.
22      Q.  And Laura Muriada?
23      A.  Muriada.
24      Q.  And were there any other individuals, other
25  than yourself and Genaro or Laura, that participated in



Toll Free:  800.211.DEPO
Facsimile:  210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 85

1    any form of discussions, communications relating to
2    SB 14, that you're aware of?
3        A.  No.
4        Q.  Interrogatory Number 2 on that same page,
5    Page 5, asks Southwestern to identify all analysis,
6    investigation, studies, reviews, assessments, and/or
7    reports done, commissioned, received, or reviewed, or
8    considered in connection with SB 14.  Do you see that
9    interrogatory?
10       A.  Number 2?
11       Q.  Yes.
12       A.  Yes, I see this.
13       Q.  And do you see the statement, the answer that
14   was provided there in Paragraph 2, which states,
15   "Southwest Workers Union further responds that it
16   received and reviewed various studies and reports
17   showing the disparate impact of SB 14 that are no longer
18   in SWU's possession or control."  Do you see that?
19       A.  I do see that.
20       Q.  Are those the reports that you had made
21   reference to earlier today?
22       A.  Yes.
23       Q.  And to your knowledge, those have been turned
24   over and produced in this case?
25       A.  Yes.

## 86

1        Q.  Do you know why the statement there says that
2    they are no longer SWU's possession or control?
3        A.  I'm not sure what you're asking.
4        Q.  Do you see the statement there at the end that
5    states that those reports are no longer in SWU's
6    possession or control?
7        A.  I do see that statement.
8        Q.  But you've indicated that those were turned
9    over and produced in this case, correct?
10       A.  Yes.
11       Q.  Do you know why that statement is in there
12   suggesting that SWU no longer has that document or those
13   reports?
14       A.  I don't know.
15       Q.  And then directing your attention to Page 6 of
16   the exhibit on Interrogatory Number 4, which asks,
17   "State the name and address of each of your members who,
18   A, is registered to vote in Texas, and B, does not have
19   one or more of the forms of identification listed in
20   Texas Election Code Section 63.0101."  Do you see that
21   interrogatory?
22       A.  I do see that Number 4.
23       Q.  And do you see the answer below that indicates
24   that, "Intervenors currently do not possess any
25   information responsive to this interrogatory, but

## 87

1    reserve the right to supplement this response."  Do you
2    see that answer?
3        A.  I do see that.
4        Q.  Is that accurate, to the best of your
5    knowledge?
6        A.  To the best of my knowledge, yes.
7        Q.  The trial in this case is scheduled for about
8    three and a half weeks.  Are you aware of any efforts by
9    Southwestern Workers Union to develop or create
10   information that would be responsive to Interrogatory
11   Number 4?
12       A.  Not to my knowledge.
13       Q.  So you see the date of the interrogatory
14   answers is on May 3rd, 2012?
15       A.  I do see that.
16       Q.  So as you sit here today, it's now June 13th,
17   is that answer still correct today, to the best of your
18   knowledge?
19           (Witness and Ms. Judge conferring.)
20       MR. BRISSENDEN:  Let the record reflect
21   witness is conferring with counsel.
22       Could you repeat the question?
23       Q.  (By Mr. Brissenden) Do you see the date there,
24   it's dated May 3rd in the interrogatory?
25       A.  Yes, I do.

## 88

1        Q.  Okay.  And it's now June -- today is June 13th.
2           Between the time that this answer was
3    given on May 3rd, are you aware of any new information
4    between now and May 3rd that would somehow make that
5    answer incorrect?
6        A.  I mean, I believe we gave you Senora Lopez's
7    information.
8        Q.  Are you referring to a document?
9        A.  I am not referring to a document.  I'm
10   referring to earlier I talked to you about Mrs. Lopez as
11   one of our members.
12       Q.  Okay.
13       A.  And so, yes.  So that's somebody that I've
14   mentioned.
15       Q.  All right.  Are you aware of any other
16   information that would change the answer to
17   Interrogatory Number 4?
18       A.  Am I aware of -- can you repeat the question?
19       Q.  Are you aware of any other information --
20       MS. JUDGE:  I'm going to object.  Object,
21   asked and answered earlier.
22       Q.  (By Mr. Brissenden) Other than Ms. Lopez, are
23   you aware of any other information that would change
24   your answer to Interrogatory Number 4?
25       A.  No.

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

89

1    Q.  Okay.  You can set that aside for now.
2        (Exhibit 4 marked for identification.)
3    Q.  (By Mr. Brissenden) The court reporter has
4    handed you Exhibit 4.
5    A.  Yes.
6    Q.  Have you seen this document before?
7    A.  Yes.
8    Q.  And I would represent to you this is a document
9    that was produced during the course of discovery in this
10   case.  Do you recognize this as an e-mail from
11   Lesley@TexasTable.org?
12   A.  Yes.
13   Q.  And do you see the subject of the e-mail is,
14   "Voter ID Monday"?
15   A.  I do see that.
16   Q.  And it appears that the date of the e-mail is
17   sent January 20th of 2011, correct?
18   A.  This is correct.
19   Q.  And does your name appear in the e-mail chain?
20   A.  No.
21   Q.  All right.  Do you see the names of other
22   members of Southwestern Union?
23   A.  I see one, yes.
24   Q.  And who is that?
25   A.  Genaro.

90

1    Q.  Do you know a person by the name the
2    Lesley@TexasTable.org?
3    A.  I know Lesley.
4    Q.  And who is Lesley?
5    A.  She's the director.
6    Q.  And what organization is she the director of?
7    A.  The Texas Civic Engagement Table.
8    Q.  And do you see, in the second paragraph there
9    Lesley states, "Please let us know how we can help if
10   you are planning any sort of mobilization and want to do
11   a phone bank, we can help coordinate a statewide virtual
12   phone bank using the VAN."  V-A-N.  "If anyone needs an
13   emergency training or help getting a program up ASAP,
14   please contact Bryan or me," and then goes on to give
15   e-mail addresses and phone numbers.  Did I read that
16   correctly?
17   A.  Yes.
18   Q.  Was there any type of phone bank that
19   Southwest -- Southwestern Workers Union participated in,
20   in connection with voter ID?
21       MS. JUDGE:  Objection, vague.
22   A.  Are you asking if we did phone banking -- I
23   don't know what you're asking, actually -- with Lesley?
24   Q.  (By Mr. Brissenden) Right.  Well, do you see
25   there where Lesley is asking or referring to a phone

91

1    bank?
2    A.  I do see that.
3    Q.  All right.  What's your understanding of what a
4    phone bank is?
5    A.  Calling members, calling people.
6    Q.  When you, Southwestern Workers Union conducts a
7    phone bank, do the people it calls upon include people
8    other than members?
9    A.  Sometimes.
10   Q.  All right.  Did Southwestern Workers Union
11   conduct a phone bank specifically in connection with
12   voter ID legislation?
13   A.  In regards to this e-mail?
14   Q.  No.  With regards to voter ID legislation.
15       MS. JUDGE:  Objection, vague.  Is this
16   specific to a certain ID?  A certain bill?  I mean,
17   you're just saying voter ID.  I'm not trying to be
18   argumentative.  I'm just trying to be sure that we're
19   talking about -- I mean, I know the dates, but I don't
20   understand that she will.
21       MR. BRISSENDEN:  All right.  Well, let's
22   -- sure, I understand.  Let's try to narrow it down.
23   Q.  (By Mr. Brissenden) In the January through,
24   let's say, May time frame, 2011, did Southwestern
25   Workers Union participate in a phone bank that related

92

1    to voter ID?
2    A.  With Lesley and the Table.  I feel like you're
3    referencing this e-mail.  And in regards to this e-mail
4    and during that time frame, we did not do phone banking
5    around the voter ID legislation to our members or
6    beyond their membership.
7    Q.  All right.  After receiving this e-mail, did
8    Southwestern Workers Union participate in a phone bank
9    as referenced by Lesley in the e-mail?
10   A.  In regards to voter ID legislation or just in
11   general?
12   Q.  In general.
13   A.  We phone bank all of the time, yes.
14   Q.  And did Lesley help you in that regard?
15   A.  Lesley did not help.
16   Q.  Did anybody from her organization assist?
17   A.  No.
18   Q.  When you conducted the phone bank or
19   participated in a phone bank, was there discussion with
20   members that you called upon regarding SB 14?
21   A.  Which phone bank are you referring to?
22   Q.  The ones that you conducted after this e-mail
23   on January 20th.
24   A.  I feel like, this is like a year and a half
25   later, and you're talking about any phone banks we've


Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 93

1  done in a year and a half later?
2      Q.  I'm talking about the phone banks through --
3      A.  Through January to May?
4      Q.  That you conducted from January through May.
5      A.  From January to May 2011?
6      Q.  Right.
7      A.  We didn't do any phone banking.
8      Q.  So I thought a minute ago you said that members
9  of Leslie's organization did assist you in the phone
10 banking?
11     A.  I said they did not.
12         MS. JUDGE:  Objection, it's a
13 mischaracterization.
14     Q.  (By Mr. Brissenden) They did not?
15     A.  Yes.
16     Q.  Then I misunderstood your testimony.  I
17 apologize.  All right.
18         (Exhibit 5 marked for identification.)
19     Q.  (By Mr. Brissenden) The court reporter is
20 handing you what's been marked as Deposition
21 Exhibit 5.  I'll give you a minute to look at this
22 document.
23     A.  Uh-huh.
24     Q.  Do you recognize Exhibit 5?
25     A.  I do.

## 94

1      Q.  And is this an e-mail that was part of the
2  e-mails that you had produced -- that Southwest Workers
3  Union produced in this case?
4      A.  Yes.
5      Q.  And directing your attention to the top of the
6  exhibit, do you see your name identified there at the
7  top?
8      A.  I do see my name identified.
9      Q.  All right.  And your name is identified along
10 with Laura -- is it Muriada?
11     A.  Muriada, yes.
12     Q.  Along with that Genaro Rendon's name?
13     A.  Yes.
14     Q.  And the date of the e-mail is February 8th,
15 2012; is that correct?
16     A.  Yes.
17     Q.  Directing your attention to the e-mail below
18 your heading, your name that appears on the heading, it
19 appears that this e-mail was sent -- originally sent
20 from Peter Bloch Garcia; is that right?
21     A.  Peter Bloch Garcia, yes.
22     Q.  Do you know who Peter is?
23     A.  I do know Peter.
24     Q.  And does he work at Casey Grant's organization?
25     A.  I don't know.

## 95

1      Q.  Do you know see the e-mail address there, it
2  says @caseygrants.org?
3      A.  Yes, I do see that.
4      Q.  Do you know he works there?
5      A.  I don't know where he works.
6      Q.  How do you know Peter?
7      A.  I know Peter because he does work in the
8  Rio Grande Valley.
9      Q.  And does he volunteer with an organization
10 there, do you know?
11     A.  I don't know exactly what he does.
12     Q.  And Peter sent this e-mail February 8, 2012, to
13 Genaro Rendon at Southwest, correct?
14     A.  Yes.
15     Q.  And then it appears that Genaro then forwarded
16 this message on to you and Laura, correct?
17     A.  That's correct.
18     Q.  And the e-mail below that is from Michael
19 Seifert?
20     A.  Yes.
21     Q.  Do you know who Michael is?
22     A.  I do know Michael.
23     Q.  And is Michael associated with a particular
24 organization?
25     A.  He's associated with a lot of organizations

## 96

1  down in the Valley.
2      Q.  Do you know if one of those includes Equal
3  Voice Network?
4      A.  Could be.  I've seen him at some of those
5  meetings, yeah.
6      Q.  And do you see on the second page of Exhibit 5
7  where he has his name listed and then below that Equal
8  Voice Network?
9      A.  Yeah.
10     Q.  What is the Equal Voice Network?
11     A.  The Equal Voice Network is a network of
12 organizations.
13     Q.  And what organizations does that network
14 include?
15     A.  I mean, we're one organization.  LUPE is
16 another organization.  Texas Organizing Project is
17 another organization.  Azteca is another organization.
18 I mean, I don't know all of the organizations down in
19 the Valley.
20     Q.  Okay.  And do you see there, Mr. Seifert goes
21 on to state in his e-mail, "Dear Network:  Attached are
22 two documents that can be printed back to back.  The PDF
23 is in English.  The Word document is in Spanish.  MALDEF
24 is asking help in finding people who would be affected
25 by a new voter ID law.  If at all possible, if you could



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 97

1  ask your clients, neighbors, and friends to use this
2  form, it would be of great help in fighting back against
3  those who would steal the right to vote from those folks
4  who may not have a reason to have a driver's license,
5  passport, or other photo ID.  Thank you.  Mike."  Did I
6  read that correctly?
7        A.  Yes.
8        Q.  Did you understand from Mike's e-mail that
9  MALDEF was asking help in finding people who were
10  affected by the new voter ID law?
11       A.  Yes.
12       Q.  And did you assist -- did you or anyone from
13  Southwest Union Workers assist Mike in his efforts?
14             MS. JUDGE:  Objection, common interest and
15  joint defense, attorney-client privilege.  I'm going to
16  ask my client not to respond.  I'm going to instruct my
17  client not to respond.
18       Q.  (By Mr. Brissenden) Do you see the date of the
19  e-mail is February 8th, 2012?
20       A.  I do.
21       Q.  Do you know whether or not that was sent before
22  or after this lawsuit was filed?
23       A.  This e-mail?
24       Q.  Yes.
25       A.  I don't know.

## 98

1        Q.  Is there anything in the e-mail that makes
2  reference to this lawsuit?
3        A.  Are you asking -- what are you asking me?  I'm
4  sorry.
5        Q.  Is there anything in Mike's e-mail that makes
6  reference to this lawsuit?
7        A.  Not specifically.
8        Q.  Do you know whether Michael Seifert is a
9  lawyer?
10       A.  Is a what?
11       Q.  Is he an attorney?
12       A.  I don't know.
13       Q.  And is he representing Southwestern Workers
14  Union in this case?
15       A.  Not to my knowledge.
16       Q.  Do you see anything in there where Michael
17  would be giving legal advice to Southwestern Workers
18  Union?
19       A.  It seems like he sort of is.
20       Q.  And what legal advice is he providing Southwest
21  Workers Union?
22       A.  In assisting MALDEF.
23       Q.  But in terms of discussing anything legal in
24  terms of a legal opinion, a case or legal concepts, do
25  you see anything in there that would refer to something

## 99

1  in that regard?
2             MS. JUDGE:  I'm going to object, again, on
3  common interest and a joint defense.
4             And while certainly Mike may not, and
5  MALDEF, you are asking in terms of assisting MALDEF and
6  what type of assistance that was provided, MALDEF is a
7  party to this lawsuit, they are intervenors, and at this
8  point, I'm going to instruct my client not to respond as
9  an attorney-client privilege.
10            MR. BRISSENDEN:  Is it your position that
11 MALDEF itself has intervened as a party in this case?
12            THE WITNESS:  I'm sorry.  Could you repeat
13 the question?  Are you not asking me?
14            MR. BRISSENDEN:  I'm asking Counsel.
15            THE WITNESS:  Sorry.
16            MS. JUDGE:  No, but they -- MALDEF has not
17 intervened, but they are certainly representing
18 individuals who have intervened in this case.
19            MR. BRISSENDEN:  All right.  But they are
20 not an intervenor in this case, correct?
21            MS. JUDGE:  Yes.  That -- that's --
22            MR. BRISSENDEN:  Okay.
23            MS. JUDGE:  Yes.  It was a correction for
24 the record.
25            MR. BRISSENDEN:  And MALDEF is not

## 100

1  representing the witness here today; is that right?  I
2  mean, are they representing Southwestern Workers Union?
3             MS. JUDGE:  I'm representing Southwest
4  Workers Union, but we are all defendant intervenors, but
5  I am representing specifically.
6             MR. BRISSENDEN:  Okay.  I just wanted to
7  make sure I had that clear.
8             MS. JUDGE:  And so to the point that
9  you're asking things with regards to MALDEF and any
10 assistance and that was given to them to help their
11 intervenor client, then we are going to object.  But if
12 there's anything that you're asking that is not that,
13 then if, in fact, there's no other objections and no
14 type of privilege, then I will instruct my client to
15 answer.  But certainly where it may cross the line, I'm
16 going to object.
17            MR. BRISSENDEN:  Okay.  So in terms of --
18 just to be clear, in terms of Southwestern Workers
19 Union's response to this e-mail, are you instructing the
20 witness not to answer?
21            MS. JUDGE:  Can we go back and could you
22 repeat the question again?  Go back in the record?
23            MR. BRISSENDEN:  Sure.
24       Q.  (By Mr. Brissenden) I believe my question was:
25 Do you know whether or not anyone from Southwestern



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 101

1  Workers Union assisted MALDEF in their request for help
2  finding people who would be affected by the new voter ID
3  law?
4        MS. JUDGE:  I think you can answer that.
5     A.   Okay.  Assisted how?
6     Q.   (By Mr. Brissenden) In any way.
7     A.   We distributed this information from MALDEF to
8  community and community members.
9     Q.   And when you say this information, you're
10  referring to the attachments?
11     A.   I am referring to the attachments.
12           (Exhibit 6 marked for identification.)
13     Q.   (By Mr. Brissenden) The court reporter has
14  handed you what has been marked as Deposition
15  Exhibit 6.  And again, I represent to you that this was
16  an e-mail that was part of the production from you all
17  in this case.  Do you recognize this document?
18     A.   Yes.
19     Q.   All right.  And just for the sake of saving
20  some time here, in looking at Exhibit 6 and the e-mail
21  that is in that exhibit and comparing it to the e-mail
22  that is in Exhibit 5, do you see that the e-mail that is
23  in Exhibit 6 also contains the same e-mail from Mike
24  Seifert?
25     A.   Yes.

## 102

1     Q.   All right.  And directing your attention to the
2  bottom of the first page of Exhibit 6, do you see the
3  document that is reflected there with the heading
4  MALDEF?
5     A.   I do.
6     Q.   All right.  And in that document, it states,
7  "MALDEF is committed to protecting your right to vote.
8  The following form will help us identify individuals
9  that may be affected by a new law requiring strict photo
10  ID requirements to vote at the polls."  Did I read that
11  correctly?
12     A.   Yes, you did.
13     Q.   And below that heading on the bottom of Page 6
14  and at the top of Page 7, the form goes on to ask for
15  information.  Do you see that?
16     A.   I do see that.
17     Q.   And was that the document that was attached to
18  Mike's -- Michael e-mail that you just made reference?
19     A.   That was one of the attachments.
20     Q.   And the form goes on to ask individuals whether
21  they are registered to vote in Texas.  Do you see that?
22     A.   I do.
23     Q.   And if no, would they like assistance in
24  registering.  Do you see that?
25     A.   Yes.

## 103

1     Q.   And then the form goes on to ask, "Which forms
2  of identification do you currently possess?  Mark all
3  that apply."  Do you see that one?
4     A.   I do.
5     Q.   And then the form goes on to ask over a list of
6  various forms of identification.  Do you see that?
7     A.   I do.
8     Q.   Are those the forms of identification that are
9  provided for under SB 14?
10     A.   Are you asking me if SB provides
11  identification?
12     Q.   I'm asking you if those are the various forms
13  of identification that are required under SB 14?
14     A.   Yeah.
15     Q.   All right.  And then at the bottom, the
16  document form goes on to state, "A MALDEF representative
17  will contact you if you are an affected individual to
18  ensure your rights are protected.  All of the provided
19  information will be held confidentially.  Thank you for
20  your time and participation in this questionnaire."  Did
21  I read that correctly?
22     A.   Yes, you did.
23     Q.   And then at the very bottom it states, "Please
24  return a complete form to Luis Figueroa at," and then it
25  provides Luis's e-mail.  Do you see that?

## 104

1     A.   I do.
2     Q.   And does Luis work at MALDEF?
3     A.   To my knowledge, yes.
4     Q.   When you forwarded this document to members of
5  your organization, did you receive feedback?
6        MS. JUDGE:  Objection.  You know,
7  foundation.  I am not sure that foundation was laid
8  in terms of what my client did or do not do specifically
9  with regards to this e-mail.
10        MR. BRISSENDEN:  I believe she testified
11  just a few minutes ago that she forwarded these
12  documents on, sent these documents to members?
13     A.   Well, we printed them out for distribution.
14     Q.   (By Mr. Brissenden) All right.  And when you
15  distributed them to members, did you get feedback?
16     A.   Yeah.
17     Q.   All right.  And what did you do with those
18  responses once you received them?
19     A.   Could you be more specific about what feedback
20  means?
21     Q.   Sure.  Did you receive the form that's shown on
22  Exhibit 6?  Did you receive those back in completed form
23  after you sent them out?
24     A.   Oh, no, that I did not.  That should have been
25  gone -- I mean, if they filled it out and gave it to



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 105

1  anybody, it should have been sent to MALDEF.
2      Q.   Did anybody, to your knowledge, at Southwest
3  Workers Union receive these forms back that were
4  completed?
5      A.   To my organization?
6      Q.   Yes.
7      A.   No, not to my knowledge.
8      Q.   As you sit here today, do you know whether or
9  not any members of Southwestern Workers Union sent this
10  completed form to Luis Figueroa at MALDEF?
11      A.   Not to my knowledge.
12          MS. JUDGE:  Objection, calls for
13  speculation.
14      I don't know.
15      Q.   (By Mr. Brissenden) Did any of your members
16  contact you and say they had sent this form to MALDEF?
17      A.   No.  They don't remember -- no.  Actually, I
18  don't remember, yeah.
19      Q.   When you printed out the forms and distributed
20  them to your members, what did you tell your members to
21  do with the form?
22      A.   I told them to read it, and I told them if --
23  to fill it out if it pertained to them, and if not, to
24  pass it along to other people, and get in touch with
25  MALDEF, that they would be able to assist.

## 106

1      Q.   And do you know whether any of the members
2  followed your instructions?
3          MS. JUDGE:  Objection, asked and answered.
4      A.   I don't know.
5          (Exhibit 7 marked for identification.)
6      Q.   (By Mr. Brissenden) The court reporter has just
7  handed you what's been marked as Exhibit 7.
8      A.   Uh-huh.
9      Q.   And this is another document that was produced
10  as part of the litigation in this case.  Does this
11  questionnaire form look to be the same document or
12  similar to what we were just discussing, Exhibit 6?
13      A.   It looks familiar.
14          (Exhibit 8 marked for identification.)
15      Q.   (By Mr. Brissenden) The court reporter has
16  handed you Exhibit 8.  Do you recognize this document?
17      A.   I do.
18      Q.   And what is this document?
19      A.   This document is from MALDEF, and it talks
20  about the ID requirements at the polls.
21      Q.   And does it provide a summary of the provisions
22  of the photo ID law?
23      A.   Yes.
24      Q.   And was this Exhibit 8 the second attachment to
25  Michael's e-mail that's referred to in Exhibit 5 and 6?

## 107

1      A.   I don't remember.  I don't remember.  And
2  actually, I don't know.
3      Q.   As you sit here today, it may have but not have
4  been?
5      A.   Yes.
6      Q.   Do you know whether or not you distributed
7  Exhibit 8 to members of Southwest Workers Union?
8      A.   I mean, I believe we did.
9      Q.   Are there any individuals members of Southwest
10  Workers Union who have appeared as intervenors in this
11  case?
12      A.   Not to my knowledge.
13      Q.   You're aware that there have been a number of
14  individuals who have intervened in the case?
15      A.   I am not aware.
16      Q.   All right.  So do you know whether Peter
17  Johnson, an Intervenor in this case, whether he is a
18  member of Southwest Workers Union?
19      A.   I don't know.
20      Q.   Ronald Wright?
21      A.   I don't know.
22      Q.   Anna Burns?
23      A.   I don't know.
24      Q.   Nicole Rodriguez?
25      A.   I don't know.

## 108

1      Q.   Victoria Rodriguez?
2      A.   I don't know.
3      Q.   Brianna Williams?
4      A.   I don't know.
5      Q.   Felicia Johnson?
6      A.   I don't know.
7      Q.   Dominic Munday?
8      A.   I don't know.
9          (Exhibit 9 marked for identification.)
10      Q.   (By Mr. Brissenden) The court reporter has
11  handed you what's been marked as Exhibit 9.  Do you
12  recognize Exhibit 9?
13      A.   I do.
14      Q.   And what is Exhibit 9?
15      A.   It's an e-mail.
16      Q.   And is this an e-mail that was sent to you on
17  September 21st, 2011?
18      A.   Yes.
19      Q.   And do you see that the e-mail was sent to you
20  from Sam Patton of The League of Young Voters Education
21  Fund?
22      A.   I do.
23      Q.   And it states, "Subject:  48 hours to reject
24  voter ID.  Dear Tanya:  The Texas student voters are
25  under attack and they need your help.  We have just 48



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 109

1  hours to tell the Department of Justice that we see the
2  Texas voter ID bill for what it is; an attempt to divide
3  our generation and cut us out of the 2012 elections.  As
4  an organization dedicated to protecting young voters, we
5  are asking the Department of Justice to reject the law
6  based on the fact that it deliberately disenfranchises
7  young voters."  Did I read that correctly?
8       A.  Yes.
9       Q.  And do you agree with the statements in that
10 e-mail?
11          MS. JUDGE:  Objection,
12 irrelevant.  Relevance here.  Relevance.
13      Q.  (By Mr. Brissenden) You may answer.
14      A.  Are you asking me if I personally agree with
15 the statement?
16      Q.  Yes.
17      A.  My personal opinion?
18      Q.  And on behalf of Southwestern Workers Union,
19 yes.
20      A.  Yes.  We feel it's discriminatory.
21      Q.  The e-mail goes on to state that or instructs,
22 "Stand with the students of Texas by telling the DOJ to
23 reject SB 14."  Do you see that line?
24      A.  I don't see it.
25      Q.  I'm sorry.  In the middle in bold.

## 110

1       A.  Oh, yes.  I'm sorry.
2       Q.  Do you see that?
3       A.  Yes.
4       Q.  And did I read that correctly?
5       A.  Yes.
6       Q.  The e-mail then goes on to state, in the -- I'm
7  directing your attention to the last paragraph.  "We
8  must show them that we stand united against youth voter
9  suppression.  We have a very short window -- two more
10 days -- to pressure the Department of Justice to deny
11 preclearance of SB 14 and stop this assault on student
12 voters.  Your letter could change the course of the 2012
13 elections."  Did I read that correctly?
14      A.  Yes, you did.
15      Q.  And do you agree with the statements contained
16 therein?
17      A.  Yes.
18      Q.  Did you join in League of Young Voters' efforts
19 to, as they say, quote, pressure the Department of
20 Justice to deny preclearance of SB 14?
21      A.  Are you asking if I personally did or did my
22 organization join with The League of Young Voters?
23          MS. JUDGE:  Yes.  Objection, compound
24 question.
25      Q.  (By Mr. Brissenden) All right.  Well, then

## 111

1  we'll start with whether Southwest Workers Union --
2       A.  Did Southwest Workers Union do what?
3       Q.  Join in the League of Young Voters' efforts to,
4  as they describe, pressure the Department of Justice to
5  deny preclearance of SB 14?
6          MS. JUDGE:  Objection, vague.
7       A.  I'm not very clear on what you're exactly
8  asking me.
9       Q.  (By Mr. Brissenden) All right.  Let me clear it
10 up for you then.  In terms of responding to this e-mail,
11 did you do what Mr. Patton was asking you to do?
12      A.  So you're asking me if we sent to a letter to
13 the DOJ?
14      Q.  That's right.  He's asking did you -- he's
15 asking to -- requesting you to contact the Department of
16 Justice with regards to SB 14.  Did you do that?
17          MS. JUDGE:  Objection, vague.  And we're
18 trying to figure out:  Are you asking on behalf of the
19 students here, or, you know, because as you know, we
20 have certainly disclosed that our clients did sign on to
21 a letter, a comment letter to the Department of Justice,
22 but it wasn't through the students here.  So we just
23 want to be clear that she's responding to the correct
24 questions she's asking.
25      Q.  (By Mr. Brissenden) Okay.  And I'm just simply

## 112

1  asking at this point, in response to Exhibit 9, did you
2  respond to what Sam Patton's -- what Sam Patton was
3  requesting you to do in this e-mail?
4       A.  To write a letter after this e-mail was sent?
5       Q.  Is that what your understanding of the e-mail
6  is?
7       A.  The last statement says, "Your letter could
8  change the course of the 2012 elections," that is my
9  understanding.
10      Q.  And did you do that?
11      A.  Did I personally do that?
12      Q.  Yes.
13      A.  No.
14      Q.  Do you know if anyone from Southwest Workers
15 Union sent or communicated with the Department of
16 Justice about SB 14 in response to Sam's e-mail?
17      A.  No.
18          (Exhibit 10 marked for identification.)
19      Q.  (By Mr. Brissenden) The court reporter has
20 handed you what's been marked Exhibit 10.  Do you
21 recognize Exhibit 10?
22      A.  Yes.
23      Q.  What is Exhibit 10?
24      A.  It's an e-mail.
25      Q.  And was it sent from you?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

113

1   A.  From my personal e-mail.
2   Q.  And does your name appear there at the top of
3   the e-mail?
4   A.  Yes.
5   Q.  And was that e-mail sent on September 21st,
6   2011?
7   A.  Yes.
8   Q.  And was that sent on the same day that you
9   received the e-mail from Sam Patton that's reflected in
10  Exhibit 9?
11  A.  Yes.
12  Q.  And do you see the subject heading, it says,
13  "Do not preclear SB 14"?
14  A.  I do see that.
15  Q.  And you sent that e-mail to Chris Herren,
16  correct?
17  A.  Yes.
18  Q.  And Chris Herren is an attorney at the
19  Department of Justice, correct?
20  A.  As far as my knowledge goes, yes.
21  Q.  And Chris was involved with the administrative
22  preclearance process of SB 14 at the Department of
23  Justice, correct?
24  A.  I believe so, yes.
25  Q.  How is it that you had Chris's e-mail address

114

1   at the Department of Justice?
2   A.  I'm guessing I got it from this other e-mail,
3   from The League of Young Voters.  I forgot, I guess.
4   Q.  And you're referring to Exhibit 9?
5   A.  Yes, I am.  It's a lot of e-mails.  I get
6   confused and forget.
7   Q.  Is there anything in Exhibit 9 that indicates
8   you should send the e-mail directly to Chris?
9   A.  I mean, I don't know.  It could have been
10  something to click on in there, but I don't know which
11  one it is or what was it in there.
12  Q.  Okay.  But in any event, you did send this
13  e-mail to Chris?
14  A.  Yes.
15  Q.  And on the subject heading, "Do not preclear
16  SB 14," correct?
17  A.  Yes.
18  Q.  And in the e-mail -- first of all, could you
19  read the substance of the e-mail?
20  A.  What's inside the e-mail?
21  Q.  Yes.
22  A.  It says, "The right to vote is the bedrock of
23  our democracy, and SB 14 takes the power to vote --" "of
24  the vote out of the hands of Texas students.  Please
25  deny preclearance of SB 14 and stand for the future of

115

1   the Texas electorate."
2   Q.  And below that, then, is your name, correct?
3   A.  That is my name.
4   Q.  In comparing Exhibit 10 to Exhibit 9, do you
5   see there the time stamps that are reflected on the two
6   e-mails?
7   A.  I do.
8   Q.  Would you agree with me that in looking at the
9   two e-mails, that you sent the e-mail roughly about an
10  hour after receiving the e-mail from Sam Patton?
11      MS. JUDGE:  I'm going to object,
12  certainly, to the point that it's an unfair
13  characterization in terms of, this was sent on behalf of
14  Southwest Workers Union.  Let the record note that this
15  was sent from a private e-mail account.
16  Q.  (By Mr. Brissenden)  You may answer.
17  A.  Yes.  It was within an hour, roughly.
18  Q.  When Sam Patton sent the e-mail that's
19  reflected in Exhibit 9, do you see there that the e-mail
20  was sent to your e-mail address at Southwestunion.org?
21  A.  Yes.
22  Q.  And in the e-mail that's reflected in Exhibit
23  10, you sent the e-mail but did not use your work e-mail
24  from Southwest Workers Union, correct?
25  A.  That is correct.

116

1   Q.  And instead, you have simply listed your, I
2   assume, personal e-mail address; is that correct?
3   A.  That is correct.
4   Q.  All right.  Is there anything in there, in
5   Exhibit 10, that indicates that at the time that you
6   sent this that you were employed at Southwestern Workers
7   Union at the time?
8   A.  I don't understand your question.
9   Q.  Is there anything in the e-mail that would have
10  indicated to Chris that you were an employee of
11  Southwestern Workers Union?
12  A.  No.
13  Q.  Did you send any more communications to Chris
14  other than this e-mail?
15  A.  I don't remember.
16  Q.  Did you have any more communications with
17  anyone at the Department of Justice regarding SB 14?
18  A.  I don't remember.
19  Q.  Did you hear back from Chris after this e-mail
20  was sent?
21  A.  I don't remember.
22  Q.  Did you hear back from anybody from the
23  Department of Justice after you sent this e-mail?
24  A.  I don't remember.
25      (Exhibit 11 marked for identification.)



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

### 117

1    Q.   (By Mr. Brissenden) The court reporter has
2  handed you what's been marked Exhibit 11.  Do you
3  recognize this exhibit?
4    A.   I do.
5    Q.   What is Exhibit 11?
6    A.   It's an e-mail I sent to staff at my
7  organization.
8    Q.   To other members -- or staff at Southwest
9  Workers Union?
10   A.   Yes.
11   Q.   And you sent this e-mail on July 11th of 2011?
12   A.   Yes.
13   Q.   And do you see on the subject heading, "Voter
14 ID Law Texas."  Is that correct?
15   A.   That is correct.
16   Q.   And you state, "Hey, folks.  I know I have
17 talked to some folks about this, but I thought I'd ask
18 again:  Do you know someone or somebodies that will be
19 affected by the new voter ID law that passed this year?
20 They must NOT--" in all caps -- "have a state-issued ID
21 and vote using ONLY --" all caps -- "a voter
22 registration card.  If you do know someone or somebodies
23 like this, please put them in connection with myself."
24 Did I read that correctly?
25   A.   Yes.

### 118

1    Q.   And this was in July of 2011, correct?
2    A.   Yes.
3    Q.   And this -- was this a follow-up to the prior
4  e-mail we discussed referencing the MALDEF
5  questionnaire?
6    A.   I don't know.
7    Q.   Do you know if anybody responded to you in this
8  e-mail?
9    A.   I don't remember.  If they did, I'm sure I
10 would have produced it in the stuff that you asked us
11 for.
12   Q.   As you sit here today, do you know of anybody
13 in particular that -- a member, a nonmember, who
14 contacted you as a result of this e-mail?
15   A.   I don't know.  I don't remember.
16   Q.   You'd agree that in this e-mail, you're asking
17 for other staff members to let you know if they know of
18 someone or somebody who would be affected by the new
19 voter ID law, correct?
20   A.   That's what my e-mail says.
21   Q.   And as you sit here today, do you know whether
22 any of the other staff members gave you the names of
23 anyone?
24   A.   I mean -- I don't remember last year, last
25 summer.

### 119

1         MS. JUDGE:  About how much longer do you
2  think we'll go?
3         MR. BRISSENDEN:  I think I'll pass the
4  witness at this time.
5         MS. JUDGE:  Okay.  Well, we'd like the
6  opportunity to review -- or passing in terms of me.  I
7  don't have a redirect.  But we would like the
8  opportunity to review and sign the transcript and make
9  any corrections.
10        MS. McLEOD:  I have no questions.
11        MR. BRISSENDEN:  Thank you for your time
12 today.
13        (Signature reserved.)
14        (Deposition concluded at 1:08 p.m.)
15
16
17
18
19
20
21
22
23
24
25

### 120

1  CHANGES AND SIGNATURE
2      RE: TEXAS VS. HOLDER, ET AL
3  PAGE  LINE  CHANGE         REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20    I, TANYA AGUILAR GARDUNO, have read the foregoing
21 deposition and hereby affix my signature that same is
22 true and correct, except as noted above.
23
24    _____
25       TANYA AGUILAR GARDUNO



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 121

1  THE STATE OF _____)
2  COUNTY OF_____)
3
4      Before me,_____, on this day
5  personally appeared TANYA AGUILAR GARDUNO, known to me
6  (or proved to me under oath or
7  through_____ (description of identity
8  card or other document) to be the person whose name is
9  subscribed to the foregoing instrument and acknowledged
10  to me that they executed the same for the purposes and
11  consideration therein expressed.
12      Given under my hand and seal of office
13  this_____day of _____, 2012.
14
15
16      _____
        NOTARY PUBLIC IN AND FOR
17      THE STATE OF _____
18
19
20
21  IN THE UNITED STATES DISTRICT COURT
        FOR THE DISTRICT OF COLUMBIA
22  STATE OF TEXAS,          )
                            )
23      Plaintiff,          )
                            )
24  VS.                     )
                            )
25  ERIC H. HOLDER, JR. in his )

## 123

1  return to_____, by
2  _____, 2012; and if returned, the original
3  transcript will forwarded to Reynolds Brissenden, the
4  custodial attorney;
5      That the amount of time used by each party at the
6  deposition is as follows:
7      Mr. Brissenden: 3 hours, 16 minutes
8      I further certify that I am neither counsel for,
9  related to, nor employed by any of the parties or
10  attorneys in the action in which this proceeding was
11  taken, and further that I am not financially or
12  otherwise interested in the outcome of the action.
13  Certified to me this 14th day of June, 2012.
14
15      _Chris Carpenter_
16  Chris Carpenter, Texas CSR 1151
        Expiration Date: 12/31/2012
        100 Congress Avenue, Suite 2000
17  Austin, TX 78701
        (512)328-5557
18
19  Firm Registration No. 283
20
21
22
23
24
25

## 122

1  General of the United States, )
                                )
2      Defendant,          )
                                )
3  ERIC KENNIE, et al,        )
                                )
4  Defendant-Intervenors,    )
                                )
5  TEXAS STATE CONFERENCE OF  )  CASE NO. 1:12-CV-00128
   NAACP BRANCHES,            )  (RMC-DST-RLW)
6                             )  Three-Judge Court
   Defendant-Intervenors,    )
7
   TEXAS LEAGUE OF YOUNG VOTERS )
8  EDUCATION FUND, et al,     )
                                )
9  Defendant-Intervenors,    )
                                )
10  TEXAS LEGISLATIVE BLACK    )
    CAUCUS, et al,             )
11                             )
    Defendant-Intervenors,    )
12                             )
    VICTORIA RODRIGUEZ, et al., )
13                             )
    Defendant-Intervenors.    )
14
15      REPORTER'S CERTIFICATION
        DEPOSITION OF TANYA AGUILAR GARDUNO
16          JUNE 13, 2012
17      I, Chris Carpenter, Certified Shorthand Reporter in
18  and for the State of Texas, hereby certify to the
19  following:
20      That the witness, TANYA AGUILAR GARDUNO, was duly
21  sworn by the officer and that the transcript of the oral
22  deposition is a true record of the testimony given by
    the witness;
23
24      That the deposition transcript was submitted on the
25  _____day of _____, 2012, to the witness or to the



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com