## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                        )
    Plaintiff,                     )
                                       )
VS.                                    )
                                       )
ERIC H. HOLDER, JR. in his             )
official capacity as Attorney          )
General of the United States,          )
                                       )
    Defendant,                     )
ERIC KENNIE, et al,                    )
                                       )
    Defendant-Intervenors,         )
                                       )
TEXAS STATE CONFERENCE OF              )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                        )   (RMC-DST-RLW)
                                       )   Three-Judge Court
    Defendant-Intervenors,         )
                                       )
TEXAS LEAGUE OF YOUNG VOTERS           )
EDUCATION FUND, et al,                 )
                                       )
    Defendant-Intervenors,         )
                                       )
TEXAS LEGISLATIVE BLACK                )
CAUCUS, et al,                         )
                                       )
    Defendant-Intervenors,         )
                                       )
VICTORIA RODRIGUEZ, et al.,            )
                                       )
    Defendant-Intervenors.         )

*********************************************
ORAL DEPOSITION OF
REPRESENTATIVE MAY HELEN GIDDINGS
JUNE 6, 20112
*********************************************

## 2

1      ORAL DEPOSITION OF REPRESENTATIVE MAY HELEN
2  GIDDINGS, produced as a witness at the instance of the
3  Defendant, was duly sworn, was taken in the above-styled
4  and numbered cause on the JUNE 6, 20112, from 9:43 a.m.
5  to 12:59 p.m., before Chris Carpenter, CSR, in and for
6  the State of Texas, reported by machine shorthand, at
7  the offices of Attorney General for the State of Texas,
8  209 West 14th Street, 1st Floor Conference Room, Austin,
9  TX 78701 Austin, Texas 78701, pursuant to the Federal
10 Rules of Civil Procedure and the provisions stated on
11 the record or attached hereto.

## 3

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
    Matthew Frederick
    Stacey Napier
    OFFICE OF THE ATTORNEY GENERAL OF TEXAS
    P.O. Box 12548
    Austin, TX 78711-2548
    209 West 14th Street
    8th Floor
    Austin, TX 78701
    (512) 936-1307
    matthew.frederick@texasattorneygeneral.gov

FOR THE DEFENDANT, HOLDER, ET AL:

    Angela Miller
    Jennifer Maranzano
    U.S. DEPARTMENT OF JUSTICE
    950 Pennsylvania Avenue, NW
    NWB - Room 7202
    Washington, DC 20530
    (202) 305-7766
    angela.miller5@usdoj.gov
FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
CAUCUS:
    John K. Tanner
    (for Ezra D. Rosenberg)
    DECHERT, LLP
    Suite 500
    902 Carnegie Center
    Princeton, NJ 08540-6531
    (609) 955-3200
    john.k.tanner@gmail.com
    ezra.rosenberg@dechert.com

## 4

INDEX

Appearances........................................3
REPRESENTATIVE MAY HELEN GIDDINGS
    Examination by Mr. Frederick.............5
    Examination by Mr. Tanner................98
    Examination by Ms. Miller...............108
Signature and Changes..........................112
Reporter's Certificate.........................114

EXHIBITS

| NO. | DESCRIPTION | PAGE MARKED |
|---|---|---|
| 1 | Amended Notice of Deposition | 13 |
| 2 | Photos of Members of the Texas Legislative Black Caucus | 17 |
| 3 | Motion For Leave To Intervene As Defendants | 33 |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 5

1      REPRESENTATIVE MAY HELEN GIDDINGS,
2  having been first duly sworn to testify the truth, the
3  whole truth, and nothing but the truth, testified as
4  follows:
5          EXAMINATION
6  BY MR. FREDERICK.
7    Q.  Good morning, Representative Giddings.
8    A.  Good morning.
9    Q.  Please state your full name for the record.
10    A.  May Helen Giddings.
11    Q.  Thank you.  My name is Matt Frederick.  I
12  represent the State of Texas in the lawsuit styled Texas
13  versus Holder.  Have you ever been deposed before?
14    A.  I can't remember.  I think I was many years
15  ago.
16    Q.  Okay.  Well, I'll go over some ground rules in
17  a minute just to reacquaint you.
18    A.  Okay.
19    Q.  Are you suffering from any illness today that
20  will affect your ability to answer my questions
21  accurately?
22    A.  No.
23    Q.  Are you taking any medication that might affect
24  your ability to provide accurate answers to my
25  questions?

## 6

1    A.  No.
2    Q.  Are you aware of anything else that might
3  prevent you from accurately answering my questions
4  today?
5    A.  No.
6    Q.  Okay.  A couple of ground rules.  One, maybe
7  the most important, is to just answer audibly so that
8  the court reporter can take down what we're saying.  So
9  instead of nodding your head, he would prefer that you
10  say "yes" or "no."
11    A.  Uh-huh.  Yes.
12    Q.  And if you don't understand any question that I
13  ask, please tell me, and I will happy to rephrase it.
14  Okay?
15    A.  That's fine.
16    Q.  Thanks.  And please wait until I finish a
17  question to start answering just so we're not talking
18  over each other, and I will also to do my best not to
19  ask a question while you're still answering.  Okay?
20    A.  Fine.
21    Q.  Okay.  Are you represented by counsel today?
22    A.  I am not.  I am here representing the Texas
23  Legislative Black Caucus, and the Black Caucus has
24  counsel.  I personally do not.
25    Q.  Okay.  And who is the Legislative Black

## 7

1  Caucus's counsel?
2    A.  John Tanner.
3    Q.  And you understand that you have been
4  designated to provide testimony on behalf of the Texas
5  Legislative Black Caucus today?
6    A.  Yes.
7    Q.  So I'll try and be clear if I'm referring to
8  you personally or to the Caucus, but my -- unless I
9  otherwise indicate, my questions will be directed toward
10  the Caucus as a whole.
11    A.  Yes.
12    Q.  Thanks.  What did you do to get ready for your
13  deposition today?
14    A.  I reviewed the Senate Bill 14.  I did a little
15  search, a little research surrounding the bill as it was
16  on the Floor, and I had a brief conversation with the --
17  with the Black Caucus's general counsel.
18    Q.  Who is the Legislative Black Caucus's general
19  counsel?
20    A.  Or -- the Caucus is represented by John Tanner,
21  so general counsel is probably the wrong word, just
22  counsel, I suppose.
23    Q.  How long did that meeting with Mr. Tanner last
24  about?
25    A.  Well, we had dinner, and we talked about this

## 8

1  among other things, so it lasted probably an hour or so
2  last evening.  And then we had about a 20-minute
3  breakfast this morning, some of which I spent talking
4  about the Celtics game.
5    Q.  What research did you do specifically to
6  prepare for this deposition?
7    A.  I took a look at the amendments that members of
8  the Texas Legislative Black Caucus had proposed during
9  the debate.  I took a look at Senate Bill 4 -- Senate
10  Bill 14.  And I looked at the House research
11  organization piece.  Pardon me.  I looked at the letter
12  from -- that the Department of Justice sent to the
13  State, briefly this morning.  And I looked at -- I don't
14  know what you call it, the notice of intention to take
15  oral deposition of -- I looked at that.
16    Q.  All right.
17    A.  Additionally, and so forth that had happened with my
18  conversations and so forth that had happened with my
19  office regarding this particular legislation, and I
20  tried to find an e-mail as it related to that.
21    Q.  What was the e-mail that you tried to find?
22    A.  Well, it was an e-mail from Riley Simmons, who
23  back in December of 2011, I believe it was, was very,
24  very concerned about the chilling effect that this bill
25  would have on voter turnout, particularly for elderly



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 9

1  African Americans and for students.  And Mr. Simmons
2  called our office and asked if we could make available
3  the Department of Public Safety coming out on site,
4  doing on-site registrations for the elderly so that they
5  would not have to go down to the Department of Public
6  Safety and stand in line for a very long time.  Many of
7  them might not be able to do that.
8          And also, because we had some colleges,
9  that there was some concern about students there who
10 might not have a driver's license because they might not
11 drive, and their student ID could not be used.  And
12 therefore, they might be absent what was required under
13 Senate Bill 14 to be able to vote.
14     Q.  Did you find that e-mail?
15     A.  I found our response to Mr. Simmons.  I did not
16 find his e-mail.  I did find our response to him.  And
17 our response to him said our having worked with the
18 Department of Public Safety, the Department of Public
19 Safety said to us that they would come out and offer
20 education and guidance to the citizens that were bussed
21 into a particular site, but they were unable to set up
22 on-site registration.
23     Q.  Do you know if that e-mail has been or the --
24 or Mr. Simmons -- I'm sorry.  Is it Mr. or Mrs. Simmons?
25     A.  It's Mr. Simmons.  Riley Simmons.

## 10

1      Q.  Do you know if Mr. Simmons e-mail has been
2  produced in this litigation?
3      A.  I don't know that it has.  I just -- I just
4  recall that very, very vividly because, you know, I said
5  to Mr. Simmons, this -- this issue has not finally been
6  decided just yet.  But there was a lot of confusion, or
7  I should say concern in the community and believing
8  that, in fact, everything had been cleared and this
9  legislation was, in fact, in place.  And so, you know, I
10 was trying to tell him I wasn't sure that we were, you
11 know, quite where he was yet and let the process play
12 out.  So I don't know is the answer to that question.
13     Q.  You mentioned a letter from the Department of
14 Justice to the State.  Was that the March 12th letter
15 where the department objected to Senate Bill 14?
16     A.  Yes.
17     Q.  Okay.  Great.
18     A.  I saw it for the first time last night, and I
19 reviewed it for the first time for a few minutes this
20 morning, and a lot of legalese there so I don't know how
21 much I know about that.
22     Q.  And it looks like you've brought some documents
23 with you today.  Can you tell me what those documents
24 are?
25     A.  Senate Bill 14.  The House research organ --

## 11

1  organization report, and that's -- and the documents
2  that we've already talked about.
3      Q.  Okay.
4      A.  That's -- oh, some amendments that were filed
5  by members of the legislative -- Texas Legislative Black
6  Caucus.
7      Q.  Do you have copy of the e-mail we were
8  discussing with Mr. Simmons?
9      A.  Yes, I do.
10     Q.  Okay.  Do you mind if I looked at that e-mail?
11     A.  No, sure don't.  (Handed to counsel.)
12     Q.  Thanks.
13         Did you talk to anyone else about your
14 deposition today besides Mr. Tanner?
15     A.  Well, yes, just in passing, but no details.  My
16 staff knows I'm here to do a deposition on -- on voter
17 ID, you know, I -- but in terms of the details of what I
18 might -- my testimony is or whatever, no, I -- I can't
19 think of anyone that I talked to about it.
20         I mean, we've had a conversation with
21 Mr. Tanner, with the chair of the Legislative Black
22 Caucus some time ago, I think before I was asked to
23 provide whatever testimony I could provide, and
24 certainly probably the director of the Texas Legislative
25 Black Caucus was on that conversation and maybe other

## 12

1  members.  I don't know.  It was the chair, to the best
2  of my memory, some weeks ago calling a meeting, a
3  telephone meeting.
4      Q.  Do you know how you were designated to testify
5  on behalf of the Legislative Black Caucus?
6      A.  No, I do not.  I'll be perfectly honest with
7  you and tell you that we have members in the legislature
8  that are experts on various issues and --
9      Q.  And are you an expert --
10     A.  No.
11     Q.  -- on SB 14?
12     A.  No.
13     Q.  Okay.  Is there any member of the Legislative
14 Black Caucus who is an expert on SB 14 to your
15 knowledge?
16     A.  Well, to my knowledge, and now, you know, this
17 is my personal opinion.
18     Q.  Sure.
19     A.  And I'm here speaking on behalf of the Caucus,
20 but the person I think who sat on the committee was
21 Mr. Veasey, I believe, and so because he sits on that
22 committee and he knows what transpired, I would say, but
23 it's my understanding, and I could be wrong, that he has
24 presented himself as somebody who has an issue.
25     Q.  Right.

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

ESQUIRE
DEPOSITION SOLUTIONS

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 13

1    A.   And so I'm suspecting that at some point in
2    time, whatever it is he has to say, he will have an
3    opportunity to say it.
4         MR. TANNER:  Just to clarify for the
5    record, again, Representative Giddings is appearing as a
6    witness for the Caucus.  Mr. Veasey has separate
7    representation in this.  And she's here as the witness
8    for the Caucus as the organization.
9         MR. FREDERICK:  Right.  Okay.  Thanks.
10        (Exhibit 1 marked for identification.)
11   Q.   (By Mr. Frederick)  Do you recognize this
12   document?
13   A.   Yes.
14   Q.   Can you tell me what this document is?
15   A.   It's -- it says it's the -- well, I'm not sure,
16   amended notice of intention.  I'm trying to see.  I
17   don't think I've ever seen that document before, because
18   the document that I have says "notice of intention to
19   take oral deposition," and this document says "amended
20   notice."
21   Q.   Okay.
22   A.   So --
23   Q.   The document that you have that's the notice of
24   intention, is there a date on that document for the
25   deposition?

## 14

1    A.   Oh, May 24th.
2    Q.   Okay.
3    A.   Uh-huh.
4    Q.   And what is the date on the amended notice of
5    deposition?
6    A.   That I've just been handed, June 6th.
7    Q.   Okay.  Let me direct your attention down to the
8    bottom of the first page, there's a number, and then a
9    sentence that starts, "The factual basis."  Do you see
10   that?
11   A.   Yes, I do.
12   Q.   Have you been designated to testify on this
13   topic, to your understanding?
14   A.   Have I been designated to testify on Item
15   Number 1?
16   Q.   Correct.
17   A.   Yes.
18   Q.   Let me ask you, but before we get into this,
19   is -- you'll notice on Pages 1 and 2, there are --
20   there's a list of 11 items.
21   A.   Uh-huh.
22   Q.   Is this list the same as the list that was
23   included on the original notice of intention?
24   A.   A quick look would indicate -- yes, the pages
25   look the same.

## 15

1    Q.   Now, turning back to Topic 1, are you prepared
2    to testify about Topic 1 today?
3    A.   I believe that I am.
4    Q.   Other than what we talked about a moment ago,
5    the documents you reviewed and conversations you had,
6    did you do anything specific to prepare to testify about
7    Topic 1?
8    A.   I did not.
9    Q.   And then on Page 2, let's see, there's Topic
10   2.  Have you been designated to testify about Topic 2?
11   A.   Yes.
12   Q.   And are you prepared to testify about Topic 2
13   today?
14   A.   Yes.
15        MR. TANNER:  Subject to objections of
16   which we have notified the state beforehand.
17   Q.   (By Mr. Frederick)  And moving down Topic 3,
18   have you been designated to testify about Topic 3?
19   A.   Could we pause here and let me get clarity?
20   Q.   Of course.
21   A.   Let me say that I am here as the witness for
22   the Texas Legislative Black Caucus.  I'm not an
23   attorney.  And so, you know, if these are legal issues
24   or they require legal standards, you know, we'll just
25   see, you know, when you get to the questions on these

## 16

1    particular ones.
2         But as far as I am concerned, when we
3    looked at these, as far as I know, when we looked at
4    these on last evening, these are the questions that you
5    said you would want the Legislative Black Caucus to
6    speak to, and so in that regard, that's -- that's why
7    I'm here.
8         As to whether or not I'm going to be an
9    expert or have knowledge of legal standards on all these
10   questions, I think that will be determined,
11   Mr. Frederick, as we go forth.
12   Q.   That's a fair point.  And I'll tell you, I'm
13   not asking for a legal answer and --
14   A.   Okay.
15   Q.   -- and so that we can just move through it,
16   I'll just ask you generally.
17   A.   Okay.
18   Q.   The 11 topics that are listed in this notice,
19   are you prepared to testify about those topics on behalf
20   of the Legislative Black Caucus?
21   A.   To the best of my -- excuse me, didn't mean to
22   talk over you.  To the best of my knowledge, I am.
23   Q.   Thank you.  What are the requirements for
24   membership in the Texas Legislative Black Caucus?
25   A.   Any member who is of African American descent



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

May Helen Giddings                                                    June 6, 2012

## 17

1    can join.
2        Q.  Is the Legislative Black Caucus made of
3    exclusively of members of the Texas House of
4    Representatives?
5        A.  The two senators are also considered members of
6    the Texas Legislative Black Caucus.  I notice that this
7    is -- some of these things I'm seeing for the first time
8    but maybe on the website they're not listed, but
9    certainly, we consider them members.  And as far as I
10   know, they consider themselves members.  And we work
11   together on pretty much everything.
12       Q.  Do you mind, can we mark that as an exhibit?
13           MR. TANNER:  Certainly.  I'll represent
14   that this is printed out of the Legislative Black
15   Caucus's website, and there's a list of members with
16   their photographs and other information.
17           MR. FREDERICK:  We'll mark that as Number
18   2, please.
19           (Exhibit 2 marked for identification.)
20       Q.  (By Mr. Frederick)  Representative Giddings,
21   I'm handing you what we've just marked as Exhibit 2, and
22   I believe that we all know what this is, but can you
23   just identify this for the record, please?
24       A.  Yes.  It is a document with photos of members
25   of the Texas Legislative Black Caucus that are in the

## 18

1    House.  Not my document, Mr. Tanner's document.  I just
2    happened to see it there and started reading from it.
3    Yes.
4        Q.  As far as you can tell, and feel free to look
5    at it, is that an accurate representation of the
6    membership of the Texas Legislative Black Caucus as of
7    today?
8        A.  Yes, it is.  These are the members of the
9    House.  And I have not looked at this website myself, so
10   I don't know how the senators appear there.  But this
11   is -- these are the members of the Texas House that are
12   African American descent.
13       Q.  Can a former member of the Texas House be a
14   member of the Texas Legislative Black Caucus or must one
15   be a current member of the House?
16       A.  It's current members, to the best of my
17   ability.  I don't know of a former member that is -- is
18   engaged, but let me say that I would need to go back and
19   look at the bylaws to really answer that question with
20   absolute certainty.
21           And so I'm going to say we're, as far as I
22   know, we're not engaged with any former members at the
23   current time, but there -- I'm going to leave that a
24   little bit open, because I believe there is a provision
25   where there could be, but to my -- there could be, but

## 19

1    today, as far as I know, there is no one who takes part
2    in our meetings and so forth, except those members who
3    are currently serving.
4        Q.  And you that believe if there is a provision
5    for former members to -- former members of the House or
6    Senate to be members of the Legislative Black Caucus,
7    that would probably be in the bylaws of the organization?
8        A.  I think it would probably be.  Yes.  Uh-huh.
9        Q.  And Exhibit Number 2, which we've discussed is
10   the current members of the House, there are no former
11   members of the House on that --
12       A.  No.
13       Q.  -- currently?  Thank you.
14           Do any of the members of the Texas
15   Legislative Black Caucus lack the photo ID required by
16   Senate Bill 14?
17       A.  I would, of course, not have surveyed these
18   members, but my guess would be that they all have the
19   proper identification.  That would be -- that would be
20   my best guess.
21       Q.  So as you sit here today, can you identify
22   any -- any specific member of the Legislative Black
23   Caucus who does not have one of the types of ID required
24   by SB 14?
25       A.  No.  I could not identify anybody who does not

## 20

1    have ID.
2        Q.  Does the Texas Legislative Black Caucus, to
3    your knowledge, represent anyone else in this litigation
4    besides its members?
5        A.  Its members and our constituents, I think, we
6    represent our constituents in this -- in this matter and
7    African Americans throughout the state in a broad sense.
8        Q.  And to be clear, constituents, although they're
9    obviously represented by members in their capacity as
10   legislators, they are not -- constituents are not
11   actually members of the Texas Legislative Black Caucus?
12       A.  No.  They are not.
13       Q.  Okay.  Can you tell me how preclearance --
14   well, let me first ask you, are you familiar with
15   Section 5 of Voting Rights Act?
16       A.  I am probably not as familiar as you attorneys,
17   but --
18       Q.  Do you understand what I mean when I say
19   "preclearance"?
20       A.  Yes.
21       Q.  Okay.  How would preclearance of Senate Bill 14
22   harm the Texas Legislative Black Caucus?
23       A.  I think, basically, we are -- we want to make
24   sure that there is not an opportunity for retrogression,
25   for the suppressing of the vote.  And again, and I think



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 21

1 at least in -- that the State, that the State has the
2 burden of making sure that it is not discriminatory.
3    Q.   Just so I understand your testimony, so your
4 testimony is that the Texas Legislative Black Caucus
5 wants to ensure that there's not suppression or voters
6 or a retrogressive effect that might happen if the
7 Senate Bill went into effect; is that right?
8    A.   Yes.
9    Q.   But as I understand your testimony, you do not
10 or the Caucus does not contend that its own members
11 would be prevented from voting by SB 14; is that
12 correct?
13         MR. TANNER:  I object.  I think that
14 misstates the witness's testimony.
15    Q.   (By Mr. Frederick)  Do you -- does the Caucus
16 contend that its members, as listed in Exhibit 2, would
17 be prevented from voting by SB 14 if it went into
18 effect?
19    A.   If I understand your question, if it is, would
20 these 17 people not be able to vote as a result of the
21 enactment of Senate Bill 14, to my knowledge, they would
22 not be.
23    Q.   Does the Legislative Black Caucus, does it
24 register voters?
25    A.   Well, the Legislative Black Caucus, as a body,

## 22

1 collectively, we do a number of things, but each of us
2 acts independent and individually to some extent.  And
3 so all of us from time to time are very involved with
4 making sure that we offer every opportunity for persons,
5 regardless of who they are, to vote.
6    Q.   To your knowledge, is -- is there any of the
7 Legislative Black Caucus's budget that is dedicated or
8 set aside for voter registration?
9    A.   Unfortunately, we have a very small budget, and
10 so we don't have a budget that is set aside for that,
11 for voter registration.
12    Q.   Does the Caucus conduct any voter education
13 activities?
14    A.   We do.  We have a summit every year, and
15 certainly, we talk about voter education during those
16 summits.  And we have other town hall-like meetings from
17 time to time, and so voter education is generally
18 permeated throughout all of our initiatives.
19    Q.   To your knowledge, is there a specific part of
20 the Caucus's budget that's dedicated or allocated to
21 voter education?
22    A.   If we were to say specifically, no.  You know,
23 generally, I think it's incorporated in what we do, but
24 to have a specific line item, no, we do not.
25    Q.   You mentioned a summit.  Is there, to your

## 23

1 knowledge, is that something where there might be a
2 specific budget item or part of the Caucus's budget
3 devoted to the summit that you mentioned?
4    A.   Once a year we have, you know, twelve, fifteen
5 hundred, maybe more, probably more people, come to
6 Austin to just meet with any number of people and to
7 talk about issues that -- of concern to them, but I'm
8 not sure how that -- how that is reflected in the
9 budget.
10    Q.   Are there any other specific activities that
11 the Caucus officially engages in?
12    A.   Town hall meetings, electronic town hall
13 meetings, that kind of thing.
14    Q.   Can you tell me about how many town hall
15 meetings the Caucus hosts or conducts per year?
16    A.   Well, that -- that really varies with what's
17 going on and what might need to be addressed.  And they
18 happen in a number of different ways.  For instance,
19 individual members have town hall meetings all the
20 time.  And we will go from -- I'll go, some of us will
21 go to Houston, some of the Houston people will come to
22 Dallas.  You know, we're going to Galveston,
23 whatever.  So we don't have a schedule for these, but
24 they do happen with some degree of regularity.  And
25 again, individual members, you know, continuously have

## 24

1 their own town hall meetings.
2    Q.   For the summit, you mentioned maybe 1200 to
3 1500 people?
4    A.   I think I really underestimated.  I think it's
5 probably 2,000 or so.
6    Q.   But a lot of people?
7    A.   A lot of people.  Uh-huh.
8    Q.   Do people have to -- like is there an
9 attendance fee or a fee that people have to pay to cover
10 materials or anything to attend the summit?
11    A.   For the most part, no, we make sure that people
12 can -- can come.
13    Q.   Has the Texas Legislative Black Caucus hosted
14 any speakers to address voter ID legislation?
15    A.   Not speakers.  We've, you know, we are pretty
16 much the people who try to explain to our constituents
17 what the legislation is and what's happening.
18    Q.   Has the Caucus produced any reports, generally,
19 on voter ID legislation?
20    A.   Not that I'm aware of.
21    Q.   Did the Caucus provide its members with any
22 materials on voter ID for the 2011 legislative session?
23    A.   I'm not aware of any printed material, per se,
24 and this is to the best of my memory.  Remember, we're
25 looking at 4,000 bills in a legislative session.  This



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 25

1  is certainly an important one.  But so to the best of my
2  ability, I'm not aware.
3      Q.  Did the Caucus provide information to its
4  members in any other way about voter ID legislation in
5  the 2011 session?
6      A.  I think for the most part, when we come
7  together for our meetings or informal discussions or
8  that kind of thing, this is a long way of answering this
9  question.  But because of who we are and because of what
10  our history is, particularly here in Texas, anything
11  that comes up that appears -- that is going to suppress
12  voter participation is a red flag for us.  And it's
13  everybody starts to talking and whatever.  And for the
14  most part, people don't feel that they have to do a lot
15  of research on that to know what effect that's going to
16  have, and it's just based on history.
17      Q.  Is it fair to say that any information that
18  Caucus members gathered or considered about voter ID
19  legislation in 2011 came from other members?
20      A.  I -- I couldn't speak for the entire group on
21  that.  But no, I couldn't speak for the entire group.
22  But personally -- well, no, I'm speaking for the
23  Caucus.  I don't remember a lot of information.
24          There are people who are advocates for
25  various issues, and certainly, there were people who

## 26

1  were concerned about this issue outside of the Capitol.
2  And certainly, those people come and make their voices
3  heard.  And you know, groups, advocacy groups tend to
4  have surveys and polls and facts and those kinds of
5  things, and it doesn't matter whether it's electricity
6  or voter participation, you know, voter ID or whatever,
7  people come to share their thoughts.  So I'm sure that
8  as -- as in that kind of scenario, people came and
9  shared their thoughts about what they thought the
10  effects of this legislation might have.
11      Q.  Can you --
12      A.  My opinion.
13      Q.  Can you remember any of the individuals or
14  groups who came to talk to the Caucus about voter ID
15  legislation?
16          MR. TANNER:  And just to clarify, are you
17  talking about the Caucus as the group or individual
18  members of the Caucus?
19      Q.  (By Mr. Frederick)  The Caucus as a group.
20      A.  The Caucus as a group, I cannot.
21      Q.  Can you recall, and to the extent that you
22  know, were there any advocates or advocacy groups or
23  anyone, really, who came to talk to individual members
24  of the Caucus about voter ID?
25      A.  I don't have specific knowledge of this, and so

## 27

1  I guess I would have to say I have no specific knowledge
2  of this.  Would I believe that it happened?
3  Absolutely.  But do I have specific knowledge?  I do
4  not.
5      Q.  Can you recall -- do you recall at any time
6  let's say since 2009, do you recall any material or
7  information provided by the Caucus to its members about
8  voter ID?
9      A.  I can't say that I have a direct recollection
10  of that.  And also remembering that every day when we go
11  into the Texas House, there's a stack of handouts that
12  people have put on the desk this tall.  Some of them you
13  see, some of them you do not.  But in terms of
14  remembering a specific document from the Caucus, I do
15  not.
16      Q.  And I can see that -- how high would you
17  estimate the stack of documents every day in the House?
18      A.  It's really high.
19      Q.  Like several inches?
20      A.  Several inches.  In spite of the fact that the
21  House -- we've said we're going to do everything
22  electronically.  I mean, you know, you put it on the
23  computer and how many people see it.  So best way to get
24  them to see it, put it on their desk.
25          MR. TANNER:  I'm going to make a general

## 28

1  objection, moving forward.  I think a lot of the
2  questioning assumes a level of structure to the
3  activities of the Texas Legislative Black Caucus that
4  may be present in many organizations, including the
5  Texas Attorney General's Office and the Department of
6  Justice and most corporations, that has -- that has not
7  been shown to exist in the Caucus.  I believe the
8  witness testified about the members taking an individual
9  action, and I think that will clarify things moving
10  forward if we bear that in mind.
11          MR. FREDERICK:  I appreciate that.  And
12  that's fair.  I think that's part of just what I'm
13  trying to figure out, and so I appreciate that.
14      Q.  (By Mr. Frederick)  You're aware that the
15  Caucus has intervened with other parties in this
16  lawsuit; is that right?
17      A.  Yes.
18      Q.  And those parties include the League of Women
19  Voters of Texas, the Justice Seekers, and some
20  individuals as well; is that right?
21      A.  Yes.  Is that -- is that the full list?  Oh,
22  you're the person who's asking the questions, but I
23  thought the list was longer.
24      Q.  Well, are you aware that the Caucus has joined
25  with the League of Women Voters of Texas in this



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

May Helen Giddings                                          June 6, 2012

---

### 29

1   lawsuit?
2       A.  I am aware that the League of Women Voters is
3   party to this.
4       Q.  Okay.  And you're aware that there was a --
5   that they moved, the League of Women Voters moved with
6   the Caucus to intervene; is that right?
7       A.  Yes.
8       Q.  Okay.
9       A.  I -- I understand that we are both intervenors
10  and, you know, how together that is or whether we've
11  said to them something or they've said to us something,
12  I don't know anything about that.  But I'm aware that
13  we're both intervenors.
14      Q.  Okay.  Did the Legislative Black Caucus meet
15  with the League of Women Voters of Texas during the 2011
16  legislative session?
17      A.  As a group, we did not, to the best of my
18  ability.  Also remembering, I think it's important,
19  Mr. Frederick, to say that because of our very, very
20  busy schedules at -- while we're in session, many times
21  one of us, including -- I might not be in all of the
22  meetings just due to other things, so to the best of my
23  ability, we did not meet with the League of Women Voters
24  as a group when I was present.
25      Q.  Has the Caucus, to your knowledge, met with the

### 30

1   League of Women Voters at any time before moving to
2   intervene in this lawsuit?
3       A.  Not that I'm aware of.  I might also say that,
4   you know, on a personal basis, the League of Women
5   Voters is so active as it relates to voter rights and
6   those kinds of things, that any of us individually at
7   one time or another might be in meeting with members of
8   the League of Women Voters.  They hold a lot of voter
9   education seminars and that kind of thing.  But in terms
10  of them meeting, the League of Women Voters meeting with
11  the Caucus as a group, I don't recall that.
12      Q.  Do you know how the Caucus decided to join with
13  the League of Women Voters in seeking to intervene in
14  this lawsuit?
15      A.  The very nature of --
16          MR. TANNER:  I'm going to object to that
17  as attorney-client and instruct the witness not to
18  answer.
19      Q.  (By Mr. Frederick)  Do you know who -- or who
20  in the Caucus, if anyone, would have made the decision
21  to join with the League of Women Voters in intervening
22  in this lawsuit?
23      A.  The way these decisions are generally made is
24  the chairman of the Caucus either calls a meeting and
25  gets a sense that he has the vast -- the support of the

### 31

1   vast majority of the members or he takes a telephone
2   poll or that kind of thing.  That's generally.  How the
3   decision was made in this particular instance, I'm not
4   -- I'm not sure that I know the answer.
5       Q.  Do you know -- do you recall a meeting where
6   the chairman took a vote or a poll of the members about
7   whether to intervene in this lawsuit?
8       A.  I am sure that --
9           MR. TANNER:  Are you asking whether there
10  was a meeting?
11          MR. FREDERICK:  Right -- yes, right now
12  just whether there was meeting where there was a vote or
13  a poll.
14      A.  I don't know that there was an in-person
15  meeting.  There are lots of telephonic meetings with us,
16  and I had a knowledge that this was an issue that the
17  Caucus would be involved in because of our interest in
18  these matters.  Today I couldn't tell you how that --
19  how that played out.
20      Q.  (By Mr. Frederick)  Do you personally recall,
21  whether in person or by phone or even in e-mail, being
22  asked for a vote or asked if you wanted to intervene or
23  wanted the Caucus to intervene in this lawsuit?
24      A.  I am sure that that took place, and if I were
25  to guess, I would say it was by phone, and that would be

### 32

1   my guess.
2       Q.  To your knowledge, were -- were you ever
3   specifically asked whether -- were you specifically
4   asked about intervening in this lawsuit with any other
5   group like the League of Women Voters or Justice
6   Seekers?
7       A.  Not -- not --
8           MR. TANNER:  You're asking about her
9   personal views?
10          MR. FREDERICK:  You, yes.
11          MR. TANNER:  I think that's outside the
12  scope of the deposition.
13          MR. FREDERICK:  Okay.
14      Q.  (By Mr. Frederick)  Are you aware of any vote
15  or poll taken by the Caucus to determine whether it
16  should join in intervening in this lawsuit with the
17  League of Women Voters, Justice Seekers or anyone else?
18      A.  I think what makes that -- that question just a
19  little bit confusing for me, Mr. Frederick, is you
20  continue to say with the League of Women Voters or
21  something or Justice Seekers or somebody else.  And you
22  know, I'm not sure that we so much joined up
23  intentionally with somebody else or if we decided to
24  intervene based on what we believe was the best interest
25  of those people that we represent.  That's -- so that I

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 33

1   just don't think I can speak to that at all or
2   adequately.
3       Q.  Well, let me show --
4       A.  I guess it's a little bit legal to me in terms
5   of joining the League of Women Voters or Justice
6   Seekers, per se, rather than, you know, the Caucus
7   acting on it and what was in the best interest of the
8   people that they represent.
9       Q.  I understand.  And let me -- I'll show you
10  something that I think will maybe explain a little bit
11  what I mean when I say that.
12      A.  All right.
13      Q.  I understand that's probably confusing.
14          MR. FREDERICK:  Will you please mark this
15  as 3?
16          (Exhibit 3 marked for identification.)
17      Q.  (By Mr. Frederick)  I'm handing you what has
18  been marked as Deposition Exhibit 3.  Are you
19  familiar with this document?
20      A.  Personally -- well, this is kind of hard to
21  answer on behalf of the Caucus because it does require a
22  personal -- I'm not familiar with this document, no.
23      Q.  Just for the record, can you identify what this
24  document says it is?
25      A.  It says it's a Motion For Leave To Intervene As

### 34

1   Defendants.
2       Q.  And in the first sentence, right under the
3   title, you see it says "Texas Legislative Black Caucus";
4   is that right?
5           MR. TANNER:  I'm going to object to this
6   on a number of grounds:  The attorney-client privilege,
7   work document and relevance.  We are going down -- we've
8   spent a fair amount of time going down a road that has,
9   as far as I can discern, nothing to do with the legal --
10  the factual issues involved in this case.  And so I'll
11  -- unless I get some explanation, I'll instruct the
12  witness not to answer the question.
13          MR. FREDERICK:  On what basis, relevance?
14          MR. TANNER:  Attorney-client privilege and
15  work product.
16          MR. FREDERICK:  Well --
17          MR. TANNER:  This is a brief, a motion and
18  a memorandum in support.  It's a legal document.
19          MR. FREDERICK:  Okay.
20          MR. TANNER:  And it has to do with an
21  issue separate from the issue of this case.
22          MR. FREDERICK:  Okay.  Well, let me ask
23  the question again.  I'll move quickly through it.  All
24  I'm intending to ask about is just what the document is
25  and what it says.  So I'm not asking for any attorney-

### 35

1   client conversation or work product.  I mean, this has
2   been filed in the lawsuit.
3           MR. TANNER:  Well, the document speaks for
4   itself, and it's a legal brief, and this is a
5   nonattorney factual witness.
6           MR. FREDERICK:  I understand, and I'm just
7   asking her to confirm what the document says.
8           MR. TANNER:  And I will also note for the
9   record that she said she's not familiar with it, and
10  we're burning up time here going over it.
11          MR. FREDERICK:  I understand.
12      Q.  (By Mr. Frederick)  Let me just ask one
13  question.  In this document that's been marked as
14  Exhibit 3, it's titled, "A motion For Leave To Intervene
15  As Defendants."  Is it -- does this document list the
16  Legislative Black Caucus, the League of Women Voters,
17  the Justice Seekers, Reverend Peter Johnson, Reverend
18  Ronald Wright and Donald Wright?
19          MR. TANNER:  I'll object.  The document
20  speaks for itself.
21      Q.  (By Mr. Frederick)  You may answer.  You may
22  answer.
23      A.  The -- what you just read is what the document
24  said.  And that's a little bit confusing for a
25  nonlawyer, when counsel objects and the opposition is --

### 36

1   where is the judge here to tell me I have to answer or
2   not.
3       Q.  Sure.  And I should have made that clear at the
4   beginning.  Generally, the way depositions work, you
5   know, your counsel is free to object on the record, and
6   unless he instructs you not to answer, even if he
7   objects, generally, you just answer.
8       A.  Oh, okay.
9       Q.  But if you're not to answer, he will instruct
10  you.
11      A.  Oh, okay.  Good.  Great.  Now I know the answer
12  to that.
13          MR. TANNER:  Thank you, Matt.
14      Q.  (By Mr. Frederick)  Okay, well, let's move on
15  to a different area.  Did you speak with anyone at the
16  Department of Justice about Senate Bill 14?
17      A.  No, I have not.
18      Q.  Are you aware whether the Caucus spoke with the
19  Department of Justice about SB 14?
20          MR. TANNER:  The Caucus is an
21  organization.  Just to clarify the form of the question.
22      A.  The Caucus, as an organization, I don't have
23  direct knowledge.
24      Q.  (By Mr. Frederick)  To your knowledge, did --
25  have any of the members of the Caucus spoken with the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 37

1 Department of Justice about SB 14?
2     A.  To my knowledge.  I might -- I would not know
3 whether or not individual members did.  There are two --
4 and I want to make sure that I'm clear here.  I want to
5 make sure that -- I'm trying to keep two things
6 separated.  We were very concerned about -- about
7 redistricting.  We very concerned about SB 14.  And I do
8 know that we had some conversations, not as a group, the
9 organization, but to the best of my knowledge, that
10 conversation that we had would have been with
11 redistricting.  I'm not -- there were two things going
12 on, both of them with the Department of Justice, and I
13 think that what I'm aware of was probably having to do
14 with redistricting.
15     Q.  I understand.  Thank you.
16         Did the Caucus send any letters or e-mails
17 to the Department of Justice about SB 14?
18     A.  It's the same answer because on -- on either
19 redistricting -- and I'm going to guess, you know, my
20 best -- to the best of my memory, that correspondence,
21 at least while we were in session, had to do with
22 redistricting, rather than SB 14.
23         Now, you know, after the session, the
24 Caucus as an organization has a chairman that very often
25 speaks for us, and with our permission, but I'm not -- I

## 38

1 may not be aware of all contact, if any, that might have
2 been made, but between the redistricting and SB 14, and
3 I believe it was mostly redistricting, I think there has
4 been communication.
5     Q.  Does the Caucus contend that Senate Bill 14, if
6 enacted or if it takes effect, will deny or abridge
7 African American Texans' right to vote?
8         MR. TANNER:  Excuse me.  I'm going to
9 object to the form of the question which calls for a
10 legal conclusion, and I think, as to this, and I presume
11 you're going to get into the purpose too.  You can break
12 it down into elements.
13         MR. FREDERICK:  Sure.
14         MR. TANNER:  And it will be -- and we can
15 move along.
16         MR. FREDERICK:  Okay.
17     Q.  (By Mr. Frederick)  And that question was
18 stated in more legal terms.  So I'll -- I'll try and
19 make it more clear.
20         First, do you understand -- do you
21 understand what I mean when I say "denying or abridging
22 the right to vote"?
23     A.  Yes.
24     Q.  Does the Caucus contend that Senate Bill 14, if
25 put into effect, would deny or abridge African American

## 39

1 Texans' right to vote?
2         MR. TANNER:  Again, I'm going to object to
3 the form.  The legal terms have precise legal meaning,
4 which may not be the same as the lay meaning of the
5 terms, and I think that there's some plain language ways
6 that would be easier for the witness to answer.
7     Q.  (By Mr. Frederick)  Do you understand the
8 question as I've stated it?
9     A.  Let me -- can I play it back to you in my own
10 language?
11     Q.  Of course, yes.
12     A.  Is the question, does the Caucus believe that
13 the African American vote is going to be suppressed
14 because of Senate Bill 14?
15     Q.  Well, that's fair.  Does the Caucus believe
16 that the African American vote will be suppressed by
17 Senate Bill 14?
18     A.  The Caucus does.
19     Q.  Earlier you mentioned a retrogressive effect.
20     A.  Uh-huh.
21     Q.  Does the Caucus believe that Senate Bill 14
22 would have a retrogressive effect on African American
23 voters?
24         MR. TANNER:  Would you like to rephrase
25 that?  Plain language.  Again, I object to the form.

## 40

1     Q.  (By Mr. Frederick)  Okay.  If you can answer
2 the question, please do.
3     A.  If you're asking me if it has the potential of
4 lowering the vote, percentage-wise or otherwise, of
5 African Americans, that's the concern that the
6 Legislative Black Caucus does have.
7     Q.  So your testimony, just so I'm clear and we can
8 move on, is that the Caucus believes that Senate Bill
9 14, if enacted or put into effect, would suppress
10 African American votes and -- well, is that accurate?
11     A.  I think it's -- it's pretty accurate,
12 Mr. Frederick, because from all the -- from our town
13 hall meetings and so forth, when these particularly
14 elderly people and very young people come up, they tell
15 us in many cases they do not possess the document that
16 they are going to need to go and vote.  And so that's
17 how we have come up with -- with our belief that it is
18 going to lower voter turnout.
19         And people who are voting today, because
20 of the variety of documents that they can use to vote,
21 will not be able to do it tomorrow because -- or if this
22 bill is enacted, because some of the documents that are
23 used today they won't be able to use in the future.
24     Q.  So the Caucus believes that SB 14, if put into
25 effect, will lower African American turnout?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

May Helen Giddings                                    June 6, 2012

## 41

1    A. Yes. Yes.
2    Q. Are there any other negative effects that the
3  Caucus believes SB 14 would have if put into effect?
4    A. To the best of my knowledge, it would be that,
5  you know, while we're trying to get as many people to
6  have a voice in government and feel a part of
7  government, and they do that by voting, and these people
8  no longer be able to vote, that would be the major
9  reason that I believe that the Caucus would have for its
10 position.
11   Q. So you said that that belief of the Caucus is
12 based on town hall meetings where individuals have
13 stated that they don't have the required documents under
14 SB 14; is that right?
15   MR. TANNER: I believe that was part of
16 the witness's previous answer. She also referenced
17 other materials that had been provided to the members of
18 the Caucus in which we discussed earlier.
19   Q. (By Mr. Frederick) Okay. Well --
20   A. Repeat, please.
21   Q. Sure. A moment ago you mentioned that that
22 belief, the Caucus's belief about the effect of SB 14,
23 was based at least in part on town hall meetings where
24 individuals had said that they lacked the required ID.
25   A. Uh-huh.

## 42

1    Q. Is that right?
2    A. Well, that, in part, but then again, you know,
3  we speak to advocacy groups, so it's just not from a
4  town hall meeting. It's from advocacy groups. I mean,
5  this bill caused a real major stir in the African
6  American community. And because of the history of
7  African Americans, it was very frightening that
8  something has been fought for so long and so hard
9  might -- might now be in danger.
10   So we, basically, if there's something
11 really good happening, we hear from our constituents.
12 If there's really something bad happening, we hear from
13 our constituents. And we heard a lot from constituents
14 on -- on this particular issue. And again, the very
15 young, the very old, the people in the rural areas, and
16 interestingly enough, a lot of married women.
17   I remember a town hall meeting in Dallas
18 that I did with several other state reps, and it -- it
19 was a little bit of surprise to me that married women
20 were standing up and saying, "Well, you know, my voter
21 ID says this and my driver's license says that," and
22 based on that, their question was, "How is this going to
23 be reconciled? Am I going to be able to vote?" And
24 so --
25   Q. Did the Caucus conduct any studies on the

## 43

1  effect of SB 14 on African American voters?
2    A. Not to my knowledge.
3    Q. Other than -- well, I'll just ask it this way,
4  and hopefully, this will be clear: Has the Caucus
5  conducted any -- any formal surveys on the effect of SB
6  14 on African American voters?
7    A. Not formal surveys, no.
8    Q. But -- but members of the Caucus have spoken to
9  individuals who are concerned about the potential
10 effects; is that accurate?
11   A. Many, many individuals, especially, you know,
12 in our individual meetings, our phone calls, town hall
13 meetings, that kind of thing. Electronic town hall
14 meetings where, you know, you get thousands of people.
15   Q. So, and the purpose of this is just to figure
16 out what the basis for the contention is about the
17 effect, and you've mentioned town hall meetings,
18 advocacy groups that provided material, and constituent
19 communications about the potential effect of SB 14. Is
20 there anything -- anything else that the Caucus's belief
21 about the potential effect of SB 14 is based on?
22   A. I don't think we can leave out history.
23   Q. History.
24   A. That's I think a major part of this. And I
25 think, secondarily, you know, when we pass bills,

## 44

1  generally speaking, I think the Caucus believes that
2  we're trying to move to a higher level and improve, make
3  an improvement that makes us a better -- a better state
4  and so forth.
5    And I -- I know that the Caucus did -- did
6  look at some information that indicated to them that
7  there really hadn't been a lot of evidence of widespread
8  misuse of the ballot with people being misidentified, so
9  to speak.
10   We -- we certainly realize that we don't
11 want people who are not eligible to vote, illegal voters
12 voting, and we didn't see and we haven't been presented
13 with a lot of evidence that that is the case.
14   Q. Has -- has the Caucus -- you mentioned
15 widespread misuse, are you referring to voter
16 impersonation?
17   A. Uh-huh. Yes.
18   Q. Was there any evidence that -- of any voter
19 impersonation in Texas?
20   MR. TANNER: Are you talking about the
21 consideration of the period for the consideration of
22 this bill?
23   MR. FREDERICK: Correct. And let me
24 broaden that a little bit.
25   Q. (By Mr. Frederick) During the -- during the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

**45**

1 consideration of this bill or any other voter ID bill,
2 has there been any evidence of any voter impersonation
3 in Texas?
4     A.  Well, I'm trying to remember the debate, and I
5 won't say that I can remember it precisely, but I think
6 the conclusion was that we're -- while there might have
7 been some cases of voter fraud that, by and large, it
8 did not appear that those cases were based on somebody
9 impersonating somebody.  Which is, you know, I think
10 largely what this bill tries to fix, is making sure that
11 the person that, you know, presents themselves as a
12 certain person is that person.
13          So in the debate, that was one of the key
14 questions that members of the Caucus and other members
15 continued to ask, do we believe based on whatever
16 evidence we have that this has been occurring, that this
17 is a big problem in Texas?  And I don't believe that I
18 recall a lot of evidence in that regard.  You know, if I
19 -- I would say that in a state with 26, almost 26
20 million people, and I don't know how many of those are
21 voters off the top of my head, but you know, I would
22 think that you would be talking about something, you
23 know, in -- you would be talking about some pretty large
24 numbers for that to be an issue.
25     Q.  Does the Caucus contend that there is no

**46**

1 in-person voter fraud in Texas?
2     A.  I don't know that that's the Caucus's
3 contention.  But I will say this.  I will say it is the
4 Caucus's belief that with fraudulent votes, this is not
5 an area where we have evidence as a state, based on the
6 debates on the Floor, that we have a lot of
7 activity.  Now, is that zero?  No.  I'm not saying it's
8 zero.
9          But I'm saying from the debate on the
10 Floor, and I'm sure that the persons who came with this
11 bill were armed with the best evidence that they could
12 get so as to convince their colleagues that this was the
13 right thing to do.  And obviously, they were able to
14 convince a number of people that this was the right
15 thing to do.  But it wasn't based, from my recollection,
16 that our knowing that, oh, yeah, a couple of hundred
17 people did this in the last year and here's who they
18 were and here's what they did.  That didn't happen.
19          There's, you know, yes, there -- from now
20 until the end of the time, end of time, I would suspect
21 that there's going to be some attempt at voter fraud.
22 But the Caucus belief was that this bill doesn't get at
23 that.  This bill is basically about impersonation and
24 doesn't get to the issues that may be out there.
25     Q.  When you say "the issues that may be out

**47**

1 there," would that include mail-in ballot fraud?
2     A.  I think that there have been allegations over
3 the years that there have been some mail-in ballots
4 where there was fraud, where there was suspected fraud.
5     Q.  But it's not the Caucus's contention that there
6 is no such thing as in-person voter fraud or voter
7 impersonation; is that right?
8     A.  No, not -- it's not a zero game.
9     Q.  Does the Caucus contend that Senate Bill 14
10 will prevent Latino Texans from voting or lower Latino
11 turnout?
12     A.  I think the Caucus is concerned that this bill
13 would prevent a lot of people from voting, including --
14 the people that I'm talking about at the town hall
15 meeting that I went to in Cedar Springs with a couple of
16 other state reps happen to be primarily Anglo, and it
17 was the Anglo women who stood up and said that they
18 weren't going to be able to vote either.  You know,
19 because their drivers license said this and their voter
20 ID said that.  And so they had a question.
21          So anytime anybody is going be denied the
22 right to vote, we're concerned about that.  But the
23 primary concern of the -- I think of the Texas
24 Legislative Black Caucus in taking whatever action it
25 took, was to two speak to -- speak for those people that

**48**

1 we represent, because that's what they expect us to do,
2 to come here and to voice their concerns and their
3 issues.  So the chairperson would be the person to speak
4 to that, I guess, absolutely, but in my case, speaking
5 for the Caucus and being in those meetings, our concerns
6 were everybody overall, but certainly African
7 Americans.
8          And you know, there's a college in my
9 district that's a small historically Black college.
10 Many of those students don't have government ID because
11 they don't have, you know, they don't have a driver's
12 license.  They don't travel out of the country so, you
13 know, they don't have a passport.  Their student ID
14 won't help them.  So it's a major concern.  How do these
15 students -- I mean, what are they going to -- it was a
16 major concern that this created another barrier, and if
17 you don't call it a barrier, at least you have to say
18 that for some people there's at least another step that
19 you have to take in order to vote.
20          And our thing is about removing barriers
21 as best we can.  And at the same time, I don't want
22 anybody to vote who shouldn't be voting.  But I also
23 don't want anybody who should be voting to have to climb
24 some mountain that they shouldn't have to climb.
25     Q.  What colleges in your district?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 49

1    A.  Paul Quinn.
2    Q.  Paul Quinn.
3    A.  Also the University of North Texas -- the
4  University of Texas -- the University of North Texas at
5  Dallas is in my district as well as Cedar Valley
6  College, as well as North Haven -- Northbrook.  Oh,
7  they're going to kill me.  I'll have to tell you before
8  I leave.
9    Q.  Okay.
10    A.  And North -- I have to remember the rest of the
11  North.  But I'm very fortunate in that I have at least
12  four colleges in the -- in the area that I
13  represent.  You know, two privates and two
14  publics.  Northwood.
15    Q.  Northwood?
16    A.  Northwood Institute.
17    Q.  Did you hear -- did you or the Caucus hear from
18  students at all of the colleges in your districts about
19  concerns about ID?
20    A.  I don't know that I -- I know that I heard from
21  -- I know that the Caucus heard from Paul Quinn and
22  Cedar Valley.  I don't know -- I think the University of
23  North Texas at Dallas is a little bit different kind of
24  a university in that, for the most part, you don't have
25  -- we don't have the 18 and 19-year-olds there, you

## 50

1  know.  It's older, more mature people.  And I did not
2  hear from those people regarding this.  And
3  specifically, I don't recall that I specifically heard
4  from Northwood.
5    Q.  To the extent that students expressed concern
6  about IDs, did that tend to be younger 18 and 19-year-
7  old students?
8    A.  It did tend to be younger ones.
9    Q.  Does the Caucus believe that Senate Bill 14
10  would prevent indigent Texans from voting?
11    A.  Well, yes, in that they are now required in
12  many cases to take an additional step that they didn't
13  have to take before.  If you didn't have a government
14  ID, currently, there are a number of ways you could
15  establish your identity.  And with that taken away, many
16  of them are going to have to go the Department of Public
17  Safety and get this alternative identification.  And the
18  Department of Public Safety in the state of Texas is --
19  those folks are already -- I don't want to say
20  understaffed, that would get me in trouble since I'm on
21  appropriations but --
22    Q.  Overworked maybe?
23    A.  But let me just say that the Department of
24  Public Safety gets a few complaints about having long
25  lines, having long waiting periods and that kind of

## 51

1  thing, which is why many of the churches -- I just
2  happened to have the conversation -- correspondence with
3  Riley Simmons, but many of the African American churches
4  in the area that I represent and other members represent
5  were concerned about the very elderly who might not have
6  this card, having to stand in that line, and how
7  discouraging that was going to be.  It isn't always --
8  it isn't always the easiest thing for the elderly to get
9  out to vote to begin with, and anything that makes it a
10  little bit harder, it has a negative effect.
11    MR. FREDERICK:  Do you all mind if we take
12  a quick break?
13    MR. TANNER:  I was just about to suggest
14  that.
15    (Recess from 11:03 to 11:20 a.m.)
16    Q.  (By Mr. Frederick)  Representative, are you
17  familiar with the polls regarding Texans' support for
18  voter ID legislation?
19    A.  No, I'm not.
20    Q.  Does the Caucus believe that elderly voters are
21  more likely than average to lack one of the IDs required
22  by SB 14?
23    A.  We particularly believe that elderly African
24  Americans are -- are more likely.
25    Q.  Why is it -- what's the basis of that belief

## 52

1  that elderly African Americans would be more likely to
2  lack ID?
3    A.  Well, I think they -- they have, if you're
4  elderly and you're poor, you have perhaps fewer
5  transactions where these -- where certain documents are
6  required.  I guess a lot of times with banks, for
7  instance, if you have banking relationships, certain
8  kind of photo IDs and so forth, are required to
9  establish those banking relationships.  But
10  particularly, I think the elderly, I think more African
11  Americans who are elderly than the general elderly
12  population.
13    Q.  And among elderly people, this -- is that
14  belief based on the understanding that more elderly
15  African Americans would be poor than other elderly
16  persons?
17    A.  I don't know that that's the case, but -- that
18  that's the case for the belief, but if you're asking me
19  if I believe that, the answer is yes.  But I'm speaking
20  here for the Caucus.  I passed legislation to that
21  effect.
22    Q.  Does the Caucus believe that poor or indigent
23  voters are more likely than average to lack a form of ID
24  required by SB 14?
25    A.  I'm sorry.  I was taking a drink of water and



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

May Helen Giddings                                      June 6, 2012

---

53

1   the bottle made a noise, so I didn't hear the whole
2   thing.
3       Q.   Of course.  Does the Caucus believe that poor
4   or indigent voters are more likely than average to lack
5   a form of ID required by SB 14?
6       A.   Okay.  That sounds like the same question that
7   I just answered.  Do we believe that elderly African
8   Americans are more likely to not be in possession of
9   photo ID?
10      Q.   Well, this one is:  Does the Caucus believe
11  that poor or indigent voters, regardless of age, would
12  be less likely to have the ID required by SB 14?
13      A.   Gee, you know what?  I -- I'm not sure that the
14  Caucus really has a position on that.
15      Q.   Does the Caucus contend that disabled voters
16  are less likely than average to have the identification
17  required by SB 14?
18          MR. TANNER:  If I could interject with an
19  objection as to the form.  I think we're, again, we're
20  getting back to the level of formality in the Caucus and
21  how much the Caucus is an institution, an unstructured
22  institution, takes positions that are separate from the
23  legal aspect of the position, and whether they take
24  positions as a group or have taken.  I think the witness
25  has been very forthcoming in terms of providing the

---

54

1   general information about the sense of the Caucus, and
2   I'm sure will continue to do so.  But again, we're
3   presuming a level of formality and structure that has
4   not been established by the questions so far.
5           MR. FREDERICK:  Okay.  Well, I mean, the
6   basis of these questions is that the Caucus as a group
7   has intervened and answered in this lawsuit, so that's
8   -- that's the only basis for my questions directed at
9   the Caucus.  And I would contend that's a sufficient
10  basis, because the Caucus has actually appeared in the
11  lawsuit.  So, I mean, that's the only way that I know
12  how to answer the question -- or to phrase these
13  questions.
14          MR. TANNER:  All right.  Well, I was just
15  adding that caveat to it.
16          MR. FREDERICK:  Okay.
17          MR. TANNER:  And to clarify the nature of
18  -- I understand the limitations on how you can ask
19  questions and how the witness can respond.
20      Q.   (By Mr. Frederick)  Let me reask the question.
21          Does the Caucus contend that disabled
22  voters are less likely than average to possess the
23  identification required by SB 14?
24      A.   I'm not sure that the Caucus has taken a
25  position on that.

---

55

1       Q.   Does the Caucus contend that rural voters are
2   less likely than average to possess the ID required by
3   SB 14?
4       A.   Speaking for the Caucus, the Caucus is -- has
5   been very concerned about African American voters in
6   rural areas and that voter turnout and the fact that we
7   need to do what we can to make sure that those people
8   are -- have an opportunity to be engaged.  I think I
9   would have to -- I would have to leave it there.
10          So, yeah, we do -- we have some concern
11  about rural voters, and particularly those -- those
12  rural voters who happen to be African American.
13  Because, for the most part, African American legislators
14  that can be accessed easily by African American
15  constituents are folks in large cities.  In the rural
16  areas, we -- there is a, you know, a -- some
17  representation in some of the rural areas but not that
18  much.  And so, yeah, there is -- there is a real concern
19  about the African Americans and their ability to vote in
20  rural areas.
21          And a lot of that has to do with, I know
22  you -- we just coming back to history.  There are places
23  in the state that history reflects that it has not been
24  very good for African Americans who want to vote.  And
25  those areas are -- I don't want to say largely rural,

---

56

1   but certainly in rural areas, there's been a problem
2   historically.
3       Q.   Does the Caucus believe that an African
4   American voter in a rural area would be less likely than
5   other voters, say Anglo or Hispanic voters, in the same
6   area to have an ID required by SB 14?
7       A.   I'm not sure that they -- they have taken --
8   I'm not sure that the Caucus has taken a position on
9   that.
10      Q.   Okay.  Are you aware or is the Caucus aware of
11  any evidence that an African American in a rural area
12  would be less likely than a Hispanic or Anglo voter in
13  the same area to have the required ID under SB 14?
14      A.   I don't think the Caucus has any facts, factual
15  evidence on that.  They may have more anecdotal kind of
16  information.
17      Q.   Are you aware of any specific anecdotal
18  information about whether African Americans in rural
19  areas would have the ID required by SB 14?
20      A.   Not directly, no, not directly.  Just again, I
21  mean, you're asking for -- I mean, I can't -- is it out
22  there?  Yes.  Can I pinpoint it to a person and a
23  place?  I can't.  But anecdotally, I will say yes, it's
24  that kind of feeling exists, that kind of thought
25  pattern exists.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 57

1   Q.  Can you identify kind of how or by whom that
2   thought has been expressed to the Caucus, anecdotally or
3   otherwise?
4   A.  Well, I think would it have come through some
5   of our discussions about how to better engage African
6   Americans in some of the rural areas, particularly, I
7   would say in some of the East Texas areas where the
8   voter turnout doesn't seem to be, you know, what it
9   could be, what the potential is.  And I think that whole
10  thought pattern of the rurals not -- of the rurals being
11  less likely to possess this has to do with perhaps
12  occupations even, you know, largely agricultural in a
13  lot of cases and so forth, and maybe less likely to have
14  some of these pieces of -- some of these IDs.
15  Q.  But you're not aware of specific --
16  A.  No, I'm not.
17  Q.  -- information?
18  A.  No, I'm not.
19  Q.  Does the Caucus believe that poor or indigent
20  voters are less likely to be able to obtain one of the
21  IDs required by SB 14?
22  A.  Less likely from the standpoint of their being
23  able to go and get the transportation to a site where
24  they can get a free ID.  And also taking into
25  consideration that with the Department of Public Safety,

### 58

1   I'm pretty sure we don't have a Department of Public
2   Safety in every one of our counties in this state.  I
3   could be wrong about that, but you know, just trying to
4   recall as best I can.
5       I mean, if you were to ask just people in
6   general whether or not we need more DPS sites, I think
7   the answer to that would be -- would be yes.  But
8   certainly if you don't have an automobile and you don't
9   have transportation and the only place you can go and
10  get this ID is 35 or 40 miles away, I think the
11  likelihood of you being -- some people being up to doing
12  that is not that great.
13  Q.  And would the burden that that would place on a
14  voter, the problem of transportation, access to a DPS,
15  would that be any different for an African American
16  voter or a Hispanic voter or an Anglo voter?
17  A.  Well, yes, Mr. Frederick, because we do have
18  national statistics as well as state statistics that
19  really show that African American wealth is nowhere near
20  that of Anglo wealth.  And so what that transforms into
21  is that they may, you know, a lot of these people may
22  not even have automobiles to be able to, you know, live
23  in a rural area or some place and be able to have a car
24  to go 40 miles if they need to, to get to a site where
25  they can do it.

### 59

1       So I think in a general broad sense kind
2   of way because we know where wealth is and where it
3   isn't, it would seem to me that -- or would seem to us
4   that African Americans would be more at a disadvantage.
5   Q.  Is there anything -- is there anything besides
6   the disparity in wealth --
7   A.  Uh-huh.
8   Q.  -- that would put African Americans at a
9   disadvantage related to getting one of the required
10  forms of ID under SB 14?
11  A.  Well, I don't know.  I'm not -- I'm going to
12  speak, you know, the Caucus and as a member of the
13  Caucus, I'm going to speak as an individual, but one of
14  the things that I've worked with a lot with African
15  Americans, older and in rural areas, is that many of
16  them -- I won't say many, but I'm going to say a number
17  of them who have come to our offices that we work with
18  never had birth certificates, because they were
19  delivered by midwives.  And those midwives somehow or
20  another -- I mean, I'm talking about a lot of years ago,
21  didn't make it to wherever they needed to make it to, to
22  register, so I can't tell you -- we've had to counsel
23  and work with and direct a number of elderly people who
24  did not have birth certificates, so and had to get what
25  is called a "delayed birth certificate," so I think, you

### 60

1   know, just kind of based on that, the same thing
2   follows.
3   Q.  And in your experience with what you were just
4   talking about, is it your understanding that people who
5   might have been birthed with a midwife and might not
6   have a birth certificate, are those people more likely
7   to be African American?
8   A.  Well, what I can say is that the folks that we
9   have been asked to work with from our office have all
10  been African Americans.  I mean, it's -- you know, and
11  you have to go back and try to help them try to figure
12  out how to research the census, how to get something
13  from their church, how to get a Bible, you know, how to
14  get an insurance policy, how to do -- you know, because
15  the documentation apparently doesn't exist for these
16  people.  And I don't know how they got that way, except
17  that most of them who have contacted us have said that
18  they were delivered by a midwife, and I dare say, in
19  some cases, nobody at all, just family delivered.
20      So when we speak about the elderly, I
21  think we have to take those kinds of things into
22  consideration, and I think it's a whole separate set of
23  issues from the very young.  So I think the elderly are
24  disproportionately affected if they're African
25  Americans.  The young are disproportionately affected.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

May Helen Giddings                                        June 6, 2012

---

61

1    That's -- that was my position. I hope the Caucus is
2  okay with that.
3      Q. Are you aware of any studies or statistics that
4  show that the people who would lack a birth certificate
5  or have a midwife birth would be disproportionately
6  African American?
7      A. I think in the old days that's true. I -- you
8  know, and that's why I say the elderly, because I think
9  we have a whole new -- another game now. I mean, the
10  whole midwife thing is popular across the board, and
11  it's pretty much regulated, and folks have to do what
12  they have to do. And those kind of regulations did not
13  exist back in those days. And in rural areas, you might
14  not have been even close to any doctors. You might have
15  been miles away from a doctor.
16      Q. Do you have a sense based on your experience
17  with that issue of how -- where the age cutoff is for
18  people who would have that kind of problem?
19      A. Well, I think they're -- quite frankly, I think
20  they're pretty old. You know, I mean, we're not talking
21  about folks in their fifties. We may not even be
22  talking about people, you know, up to 65. I mean, we
23  may be talking about, you know, the -- well, the people
24  that we've -- that we've helped, they have been in their
25  sixties, because many of them, quite frankly, are trying

---

62

1  to go over to the -- where you apply for Social
2  Security, and didn't have proper documentation to apply
3  for Social Security. So, you know, that -- that would
4  say you were -- you were, you know, sixty-ish, I would
5  say.
6      Q. Does the Caucus contend that voters in the
7  rural areas would be less likely than urban or suburban
8  voters to be able to get one of the IDs required by SB
9  14?
10      A. I think the answer to that would be yes, you
11  know, basically, due to the availability of a DPS
12  site. DPS sites are more available in urban areas, I
13  think, or I know.
14      Q. Does the Caucus contend that with respect to
15  availability of DPS sites and transportation to get ID,
16  does the Caucus contend that African Americans would
17  be -- rural African Americans would be affected
18  differently than Anglo or Hispanic rural residents?
19      A. I suspect that Hispanics would be affected as
20  well. And again, I want to -- you know, the Caucus is
21  concerned about everybody in the state. But the Caucus
22  has a primary concern for African Americans. And so,
23  generally, as loose as our organization is in terms of
24  having, you know, structure that says this, this and
25  this, we're concerned about everybody, but we're -- but

---

63

1  we exist to make sure that African Americans have equal
2  opportunities in this state. And, but at the same time,
3  we understand that African Americans cannot advance
4  while, you know, everybody else that's disadvantaged is
5  standing still. So everybody has to move together.
6      But you know, we -- our agenda really is
7  one that is African Americans. But we do believe, I
8  think I can say on behalf of the Caucus, that we believe
9  that Hispanics are going to be disproportionately
10  adversely affected by Senate Bill 14 as will African
11  Americans.
12      Q. Since we've been talking about this, I think
13  we've identified a couple of factors that would be I
14  think you said an extra step that would be required to
15  get an ID, and I think one of those was you might have
16  to just go to the DPS; is that right?
17      A. Uh-huh.
18      Q. And then one -- another might be you might not
19  have a birth certificate or whatever documentation; is
20  that right?
21      A. Uh-huh. Yes.
22      Q. Another might be if you had to pay money to
23  get, you know, either a driver's license or a birth
24  certificate, that would be an extra step; is that right?
25      A. Yes.

---

64

1      Q. And are there any other -- are there any other
2  specific burdens that the Caucus contends SB 14 would
3  have on people?
4      A. Gee, other than the things that -- that we have
5  -- that I have articulated, for us, having to take an
6  extra step and not being able to take that extra step is
7  huge.
8      Q. Uh-huh.
9      A. And it's a reason to be concerned, because we
10  want people to -- we want people who are eligible to
11  vote, to vote. And it's been such a long difficult ride
12  for African Americans. I mean, when people have died
13  because they simply wanted to vote, it takes years to
14  turn around that kind of thinking and to get people to
15  understanding, you know, that, yeah, it's okay now. And
16  then you -- so just the mere fact that you're putting in
17  another step that says you've got to have this -- this
18  is the only thing that you can use, it requires a whole
19  new education.
20      Particularly for the elderly, and you
21  know, I don't know that our state is going to be willing
22  to do what is necessary to educate these people. I
23  mean, we need some TV -- if this were to go into effect,
24  we need some TV PSAs and all kinds of education to make
25  this -- to get anywhere near a good result. And I just

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

65

1   don't think you can get a good result by asking people
2   to make -- make this -- to take this -- this extra step
3   in terms of being able to identify themselves as being
4   eligible to vote.
5       Q.   So if you, hypothetically, if you had an
6   African American voter and an Anglo voter who were, you
7   know, lived in the same place, had the same
8   socioeconomic status, would there be any extra burden or
9   any other steps that the African American individual
10  would have to take to comply with SB 14?
11      A.   I think you would -- I would have to answer
12  that by, you know, we've got to take into consideration
13  all the things -- did you say economically?  Tell me --
14  give me your question again.
15      Q.   Of course.  Of course.  If we had, let's say
16  hypothetically, we've got an Anglo voter, an African
17  American voter, say they're the same age, live in the
18  same place, same neighborhood, and they have the same,
19  you know, socioeconomic status.
20      A.   Uh-huh.
21      Q.   Is there anything, any extra burden or step
22  that the African American voter would have to go through
23  under SB 14 as opposed to the Anglo voter?
24      A.   Well, even though I'm older than you, that
25  aside, you and I would be dealing with the same set of

66

1   circumstances.  We wouldn't have to do anything
2   differently.  The only difference would be that I have a
3   history of not being able to vote.  And unfortunately,
4   we can't leave that baggage behind.  And so do I have to
5   take another step?  A step more than you would have to
6   take?  No.
7           But I come -- I mean, the only reason we
8   have the Voter Rights Act is because of the history of
9   voting in our state, and we can't minimize that.  So you
10  and I would be similarly situated.  You know, you
11  wouldn't have -- I wouldn't have to do anything more
12  than you would do, because you know, it would just be a
13  -- the same, the effort would be the same.  But I think
14  that we -- we really cannot minimize the historical
15  piece of this and how we got here and why we're even
16  grappling with this.
17      Q.   And I understand that.  I guess what -- and
18  this is what I'm trying to figure out.  It's just I
19  think a piece of all of this.
20      A.   Yeah.
21      Q.   And it's the effect that just the specific
22  requirements of SB 14 will have on -- on voters, and
23  it's what I'm trying to get at is whether -- is whether
24  SB 14, because of the history that you've been talking
25  about, just in terms of availability of ID or ability to

67

1   vote, whether that history would have any effect or
2   impose any burden on an African American voter who, you
3   know, is not indigent, is not in a rural area, you know,
4   doesn't have any of the kind -- you know, is not
5   elderly, who doesn't have any of, you know, the burdens
6   that we've been talking about, is it -- I'm just trying
7   to understand how the history would play into the burden
8   on a specific voter.
9       A.   How the history would play into the burden on
10  -- we're all creatures of our circumstances, our
11  experiences, our backgrounds, and I guess that's one of
12  those things that is not easily articulated, but it is
13  something that has to be contended with and taken into
14  consideration.
15          And for African Americans, we know that it
16  is very real to be able to get the voting participation
17  rate up among African Americans to where the voter
18  participation rate is across the board.  And so we have
19  to look at all of these things, I think, that may have a
20  chilling effect.  And I think adding this extra step
21  really does -- really does do that, and it's at least
22  real for those people who have to -- who have to deal
23  with it.
24          I mean, in the case of two people -- two
25  groups who are similarly situated, middle income, this

68

1   and that and the other thing, so they got a car, can get
2   to the driver's license -- to the Department of Public
3   Safety, to get the -- what -- their driver's license or
4   whatever they need, they've got a birth certificate,
5   this and that.  You know, that's -- that's pretty even,
6   but that's not necessarily most of the world.
7       Q.   Uh-huh.
8       A.   That's really not most of the world.  I mean,
9   you've got such a high unemployment rate, you know, for
10  African American youth, for instance.  And if you've got
11  a choice between, you know, going to try to find
12  yourself a job and going to try to get this document,
13  which one are you going to do?
14          I mean, yeah, there are all kinds of
15  barriers that come in those kinds of circumstances that
16  are not easily articulated, but I think the fact that
17  we're doing what we're doing brings all of that into
18  consideration.  Because yeah, there are a lot of
19  barriers for people, not for you and I.  But one of the
20  things that I try to do in the legislature is -- and I'm
21  on record as saying this many times from the mic, "We
22  ought not to be making laws for people who sit in this
23  chamber, because we're special.  We're privileged."
24          And so what we're talking about is dealing
25  with those people who are not as privileged as we



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

May Helen Giddings                                              June 6, 2012

---

69

1  are.  I mean, you and I are on the same level, but
2  unfortunately that doesn't exist for everybody.  And I
3  think we believe that this is -- this is an extra step,
4  and any additional step will have a negative effect on
5  African Americans if it's one that requires additional
6  resources in terms of financial resources to get to the
7  DPS.  If you had to buy a birth certificate, which might
8  require another visit to city hall.  Or if you don't
9  live -- if you were born someplace other than the city
10  in which you live, that's a whole another set of
11  circumstances.  If you're from Texas, it's dealing with
12  Austin.  If you're from outside of the state, it's
13  dealing with some other capital.  And so there are a lot
14  of additional things that go into making what seems like
15  one easy step.
16      Q.  But to the extent that -- to the extent that
17  any voter, you know, say they have a driver's license
18  that's current --
19      A.  Uh-huh.
20      Q.  -- SB 14 wouldn't impose a different burden on
21  a voter if he or she happened to be African American,
22  Anglo or Hispanic or Asian American, if they actually
23  had a driver's license; is that right?
24      A.  Yes, that's right.  And that's why I brought my
25  notes so I could just be sure what the bill says.  So

---

70

1  these are -- you know, got that section of the bill, you
2  know, printed, but you know.  No, I mean, to the -- to
3  just -- well, I thought I had that so I could just move
4  right in there and see it.  But no, I mean, if you've
5  got that, that documentation, then it's -- it's no
6  different.
7      Q.  Well, let me ask you some questions about who
8  has documentation.  And by the way, I don't mean to stop
9  you, if you're still looking for something.
10      A.  No, no, I found it.  I was just looking at what
11  we can use now, you know, all these -- a sufficient
12  amount of -- I would think, of pieces of identification
13  versus just a driver's license, just the military ID,
14  citizenship certificate, U.S. passport.
15      And I will tell you that I was -- well,
16  anyway.  Yeah.  So, I mean, a lot of people don't have a
17  passport.  If they don't travel out of the country, they
18  might not have a passport.  Some of them haven't been to
19  the military.  I don't know where they would get the
20  U.S. citizenship certificate.  So they're pretty much
21  going to be dealing with, if they haven't been to the
22  military, they're going to be dealing with a driver's
23  license or a concealed handgun license.
24      Q.  Can you tell me, I notice you're referring to a
25  document, what document is that?

---

71

1      A.  It's just our House Research Organization.
2      Q.  Oh, it's the HRO report on SB 14?
3      A.  Yeah, that goes with SB 14.
4      Q.  Okay.
5      A.  Just made it easy for me to look up.
6      Q.  Of course.
7      A.  So I would know what I was talking about.
8      Q.  Does the Caucus know how many Texas registered
9  voters lack one of the IDs required by SB 14?
10      A.  We do not.
11      Q.  Can -- can you, speaking for the Caucus,
12  identify any Texas registered voter who does not have
13  one of the IDs required by SB 14?
14      A.  Can we identify them?
15      Q.  Uh-huh.
16      A.  I can't give you the names right now, but we --
17  I have been in some -- had some meetings where people
18  stood up and said they didn't.
19      Q.  You don't know what their names are?
20      A.  No.
21      Q.  Do you know if their names were ever recorded
22  or written down anywhere?
23      A.  Possibly.  I'm not -- I'm going to say no,
24  because you know, basically, these -- these were
25  meetings where we were trying to say, "Well, we got to

---

72

1  figure out a way to fix that probably before the bill
2  was done," and whatever, but was completed.
3      Q.  Did the Caucus -- and forgive me if I've asked
4  you this already, did the Caucus conduct any study of
5  photo ID possession by Texas voters?
6      A.  Not that I'm aware of.
7      Q.  To your knowledge, is the Caucus -- does it
8  know, say, the levels of photo ID possession by various
9  groups of voters in Texas, and what I mean is, does the
10  Caucus know the percentage of African American
11  registered voters in Texas who have one of the required
12  IDs under SB 14?
13      A.  Factually, we don't.  I can tell you that I
14  think that the Caucus believes that African Americans
15  are less likely to have had a concealed weapon permit.
16      Q.  Uh-huh.
17      A.  Which is one of the documents that would be
18  acceptable.  I -- that would be something that would be
19  easy to get, but I suspect -- or it might not, but I can
20  tell you that on that one particular document, the
21  Caucus certainly anecdotally believes that there would
22  be far fewer African Americans who would possess that
23  document.
24      Q.  Does the Caucus have a specific belief about,
25  you know, the different levels of possession of any

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

May Helen Giddings                                      June 6, 2012

---

73

1    other of the documents listed in SB 14?
2         A.   I -- I don't believe so.
3              MR. TANNER:  Just -- never mind.
4         A.   I don't believe so.
5         Q.   (By Mr. Frederick)  All right.
6         A.   I -- you know, I don't -- you know, the
7    driver's license or the passport, again, you would have
8    to deal with anecdotal.  We don't have any statistics.
9    I mean, I would suspect that the passport would be one.
10   I mean, if you're not traveling internationally, I don't
11   quite know what else you do with passports.  So "I don't
12   know" I guess is the real answer.
13        Q.   We've been talking about it, so I'll just ask
14   you:  Do you have -- do you have a driver's license, a
15   current Texas driver's license?
16        A.   I do.
17        Q.   Are there -- are there other members of your
18   household who are voting age?
19        A.   Yes.  And Mr. Frederick, so we don't have to go
20   down that line, again, everybody in my family has
21   whatever kind of ID is his.  But I think I just said,
22   and I'm going to say that again, that we should not be
23   the model for this.  I mean, we've got to think about
24   people who are in other circumstances.  So I wasn't
25   supposed to be speaking personally, but I was supposed

---

74

1    to be speaking for the Caucus, but yeah, I mean -- I
2    mean, yes, we all have birth certificates, almost all of
3    us have passports, but then we're talking about people
4    in different circumstances.  I just said that you and I,
5    other than age, we're probably very similarly situated.
6    That is not the case overall.
7         Q.   And while we're on the subject, and I'll move
8    on in just a moment, but what are -- if you just remind
9    me what the specifics circumstances are that would put
10   someone in a different situation than maybe you or I are
11   in?
12        A.   I think, you know, beyond the control of
13   people, if they're elderly, born in a rural area where
14   there might not be doctors and what have you, and where
15   there might not be easy access in terms of where they're
16   -- where their birth need to be registered, you and I
17   probably travel internationally a great deal, and so,
18   yeah, I would have a passport because I travel a lot.
19   So that would -- that would differentiate us.
20             We are -- or in my case, I'm a driver, so,
21   you know, I have a DPS -- I have a driver's
22   license.  But we're talking about -- I talked a lot
23   about the elderly and the very young, African American
24   elderly and very young, which is an area that I know an
25   awful lot about.

---

75

1    We both probably have birth certificates.
2    I do.
3         And I think we -- we cannot -- we cannot
4    discount the fact that the whole socioeconomic deal has
5    an impact on people.  It has a -- depending where you
6    are in that, you may not be -- you might not have easy
7    access to some of these documents.
8         So, and then -- I mean, it just probably
9    needs somebody else to talk about this, but even when
10   you talk about, you know, the concealed handgun permits
11   unfortunately in Texas and throughout this country, for
12   that -- for that matter, I mean, we've got so many young
13   men who have been somehow or another caught up in the
14   criminal justice system, some rightly, some wrongly,
15   we've seen by the exonerations.  And so all of those
16   things impact who has a concealed weapon permit and who
17   doesn't.  So there are lots of factors out there that
18   would cause some people to be more likely to have these
19   documents that are acceptable as identification at the
20   voting booth that just don't come to the surface
21   immediately.  There's a real difference.
22        Q.   Well, I want to move on and don't have a whole
23   lot more, but I'd like to move on now.  We've been
24   talking a lot I think about effect and how this bill
25   might affect the people.  I want to move briefly to the

---

76

1    purpose of the bill.
2         Does the Caucus contend that preventing
3    in-person voter fraud is not the purpose of Senate Bill
4    14?
5              MR. TANNER:  I'm going to object to the
6    form of the question and that it calls for a legal
7    conclusion.  You know, purpose is a complex legal
8    question that involves a lot of specific factors, and we
9    can go through those one by one if you like.  But I'd
10   like to stay away from legal conclusions.  You know,
11   those are reflected in documents filed by the court.
12             MR. FREDERICK:  Let me --
13             MR. TANNER:  And will he reflected in
14   additional documents filed by the court by various
15   parties.
16             MR. FREDERICK:  Fair enough.
17        Q.   (By Mr. Frederick) Let me see if -- let me just
18   ask you before I move on:  Do you understand -- do you
19   understand my question about the purpose of SB 14, or do
20   you need me to rephrase?
21        A.   Would you rephrase?
22             MR. TANNER:  Yeah.  I think that in terms
23   of form of a question about the purpose of the
24   legislative act would need to be open to the possibility
25   that there are multiple purposes held by multiple

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

|  | 77 |
|---|---|

1 legislators in terms of what actually is going on. I
2 think the Court would be able to take judicial notice of
3 that. And so we can go among the -- well, I don't want
4 to phrase your questions for you.
5     MR. FREDERICK: Let me rephrase. I think
6 I can avoid the legal confusion.
7     Q. (By Mr. Frederick) Does the Caucus contend
8 that the Texas legislature did not actually pass SB 14
9 in order to prevent in-person voter fraud?
10     MR. TANNER: I think you've just
11 rephrased, but it has the same problem as to the
12 form. And the possibility, again, of multiple forms of,
13 you know, that -- the witness would be in a position to
14 answer whether that was a stated purpose of it or
15 whether she heard on the Floor or elsewhere statements
16 of legislators to that effect.
17     Q. If I were to ask you what the purpose of a
18 bill, a piece of legislation was, what would you -- what
19 is your understanding of purpose, i.e., legislative
20 purpose, if you have one?
21     A. Well, the purpose usually comes from the person
22 who is bringing the bill and saying "We're doing this
23 because of that, and this is what we're trying to
24 accomplish."
25     Q. Was there -- are you aware or is the Caucus

|  | 78 |
|---|---|

1 aware of a stated purpose for Senate Bill 14?
2     A. Yes. I would have to -- look at the House
3 research. But obviously, the stated purpose was not --
4 it was to -- the stated purpose was to prevent voter
5 fraud, voter impersonation, loosely, generally, I'll say
6 was the stated purpose.
7     Q. Does the Caucus contend that there was any
8 other purpose behind SB 14, stated or unstated?
9     A. I would have to say that the Caucus does not
10 believe that this bill does anything to prevent voter
11 impersonation, nothing.
12     Q. I understand that and I appreciate that. I
13 guess I'm asking a slightly different question. Whether
14 or not -- well, understanding that the Caucus may
15 believe that it may not accomplish the stated purpose --
16     A. Uh-huh.
17     Q. -- does the Caucus contend that there was any
18 other purpose behind SB 14, whether it was stated or
19 unstated?
20     A. I think the Caucus's position would be that
21 they have questions about what the purpose was.
22     Q. Does the Caucus contend that there was any
23 other specific purpose behind SB 14?
24     MR. TANNER: I -- again, I'm going to
25 object to the form. I've been trying to give

|  | 79 |
|---|---|

1 leeway. And there are many purposes the many members of
2 the legislature have, and ultimately, you know, you do
3 get down to certain factors as for a legal sense of
4 whether they're a purpose, and I think the form of the
5 question needs to be clearer as to that.
6     MR. FREDERICK: I think the -- I think the
7 questions have been clear, because the witness has been
8 able to answer. So I think that -- I don't think that
9 there's a problem with the form of the questions. I
10 believe that the witness has understood them and is
11 perfectly capable of answering them, as far as she
12 understands, so I would like to reask the question.
13     MR. TANNER: As far as she understands in
14 terms of the position of the Caucus.
15     MR. FREDERICK: Exactly.
16     Q. And let me be clear. I'm not asking for any
17 legal conclusions. I'm just asking for what does the
18 Caucus believe?
19     A. Uh-huh.
20     Q. And that's it. So let's see if I can remember
21 my last question.
22     Does the Caucus contend that there are
23 any -- that there's any other specific purpose other
24 than preventing in-person voter fraud behind SB 14?
25     A. Well, I know I answered that before in another

|  | 80 |
|---|---|

1 way, and Mr. Frederick, that's the only way that I can
2 answer that. The Caucus didn't say, "Hey, this is the
3 real deal or that's the real deal." What the Caucus
4 said is this bill doesn't do what we've been told it's
5 supposed to do, what the purpose is. It doesn't do
6 anything to improve that situation.
7     So I cannot tell you, you know, I cannot
8 tell you more than that. But other than the fact that
9 this doesn't -- it's not going to do anything to --
10 and do we even have a problem in the state with people
11 impersonating someone else and voting for someone else?
12 Those are the kinds of discussions that the Caucus has
13 had, to the best of my knowledge.
14     Q. I understand that. I appreciate that. So is
15 it your testimony then that the Caucus doesn't contend
16 that there's a different unstated purpose other than
17 preventing in-person voter fraud behind SB 14?
18     A. I can't say that --
19     MR. TANNER: Again, is the form. You're
20 presuming that there is one purpose among of legislature
21 with a lot of people who are, as we've already
22 discussed, individuals --
23     MR. FREDERICK: Uh-huh.
24     MR. TANNER: -- who -- and the whole
25 notion that there's one purpose in a legislative act is



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 81

1    --

2        MR. FREDERICK:  I understand.  I think

3 this has been addressed by the Court as a legal issue in

4 a lot of orders and filings.

5    Q.  (By Mr. Frederick)  I want to be clear to you,

6 Representative Giddings, I am -- I do not intend to

7 presume that there is a single purpose.  In fact, what

8 I'm trying -- I'm just asking you whether the Caucus

9 contends that there were other specific purposes.  So I

10 think my question presumes that there may not be a

11 single purpose.

12    So what I'm asking is:  Can -- does the

13 Caucus contend that there is another specific purpose

14 besides preventing in-person voter fraud behind SB 14?

15    A.  That there is another specific purpose?

16    Q.  Yeah.

17    A.  I'm not sure that I can speak for the Caucus on

18 that issue other than to -- to go back to what I said; I

19 mean to say, this bill is not going to do anything for

20 this situation.  So I can't say that -- I can't speak

21 for the Caucus on the other part.  All I can speak to

22 is, at this point, is just what I said, that the bill

23 doesn't seem to accomplish the stated purpose.

24    Q.  And does that lead the Caucus to believe that

25 there is another purpose behind the bill?

## 82

1    A.  Well, I won't say for the Caucus, but it always

2 leads people to ask questions.  If the purpose is this

3 and it doesn't accomplish that, then there's always a

4 question of what does it do?  And that's not with just

5 this bill, that's with every -- you know, every bill or

6 many bills.  So I am not sure, you know, how to answer

7 that, rather than we took it from the opposite end, it

8 doesn't do that, but here's what it is going to do on

9 the other side.

10    Q.  Has any legislator made any statement that

11 you're aware of that there was another purpose other

12 than preventing in-person voter fraud behind SB 14?

13    A.  Has any other legislator?  I -- now, this --

14 I'm testifying for the Caucus, for the entity, for the

15 organization, and whether the -- whether or not the

16 organization has any information along those lines, I'm

17 not aware.

18    Q.  Does the Caucus contend that the Texas

19 legislature intended to harm African American voters by

20 passing SB 14?

21        MR. TANNER:  That's the same objection.

22    Q.  (By Mr. Frederick)  You can answer.

23    A.  I think what the -- what the Texas legislative

24 Black Caucus did is forget about -- well, I think what

25 the Texas Legislative Black Caucus did is look at

## 83

1 results, what will the result of this be?  That's where

2 they hung their hat.

3    Q.  So would it be fair to say then that the Caucus

4 does not actually contend that the legislature

5 intentionally acted to harm African American voters by

6 passing SB 14?

7        MR. TANNER:  We're going to object to the

8 form of the question in that it calls for a legal

9 conclusion for the grounds I've stated before.  The

10 contentions of the Caucus are stated in the papers that

11 are filed thus far, and we're happy to answer factual

12 questions about -- you asked about the activity on the

13 Floor.  And given the nature of the issues in the case,

14 it would be more appropriate, a more appropriate form of

15 the question to ask whether the passage of the bill

16 satisfied the Caucus, that it was entirely free of any

17 racial or discriminatory purpose or effect.

18        MR. FREDERICK:  John, with respect, I'm

19 going to object on the record.  I would ask you not to

20 coach the witness.  I believe I understand you need to

21 object, but -- and I appreciate your thoughts on the

22 questions, but I believe that we're getting pretty close

23 to a line.  So I would respectfully request that I just

24 be allowed to ask the witness questions.  You may

25 certainly object, but I would ask that the witness be

## 84

1 permitted to answer subject to your objection.

2        MR. TANNER:  I'm certainly not trying to

3 coach the witnesses, and now it's getting into legal

4 discussion or legal language in terms of talking to you

5 about it.  And the witness has been very forthcoming in

6 answering the questions, and I'm sure we'll continue to

7 be so.

8    Q.  (By Mr. Frederick)  Does the Caucus contend

9 that SB 14 was passed with a racially discriminatory

10 purpose?

11    A.  I guess if you're not a member of the

12 legislature, this is very hard to understand.  We pass

13 lots of legislation, you know, on occasion, that we

14 think is going to do this.  And we pass it, and we try

15 to pass it for the purpose of doing that, but sometimes

16 the effect is something else.

17    I'm personally involved in one of those

18 cases right now which went before a committee that I

19 chaired.  We passed the legislation to do this.  It's

20 not racially anything to do with this.  But now we're

21 finding out that the legislation really -- the effect of

22 the legislation is really this.  And so sometimes you

23 deal more with the effect than you do with the purpose,

24 and so that's what we've dealt with here is the effect

25 of this legislation, and what it does, what it might do,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

May Helen Giddings                                                    June 6, 2012

---

## 85

1   what we believe that it will do in terms of African
2   Americans.
3        So that's not uncommon, not just with the
4   bill, but with lots of bills.  I mean, you know, there's
5   a purpose and then there's, you know, what is the -- you
6   know, what is the result of that.  And so lots of times
7   we don't concentrate so much on -- we concentrate on
8   what's going to happen if this bill gets passed.
9        Q.  Sure.
10        A.  And that's where we came down.  What's going to
11   happen, you know, on African American -- to -- to just
12   people in general and particularly African Americans if
13   the bill gets passed, that's -- that's sort of where
14   we've come down.
15        And as a legislator, this is probably too
16   much information, you do your best not to try to get
17   into -- it's hard to get into the heads and hearts of
18   people who are trying the pass legislation, but I think
19   -- I think it's fair game when you start to talk about
20   what's the result of this.  What's going to happen as a
21   result of this piece of legislation being passed?
22        Q.  I appreciate that.  That's -- I mean, that's
23   very helpful, and it kind of -- it helps me phrase the
24   question:  What -- I mean, I guess what I'm trying to
25   get at is:  Does the Caucus contend that any member of

## 86

1   the Texas legislature who supported SB 14 did so in
2   order to, you know, have the kind of negative effects on
3   African Americans that the Caucus believes the
4   legislation may have?
5        MR. TANNER:  I think the witness has
6   already answered that question by her statement that
7   that's not the focus of -- of her approach.  And again,
8   the legal contentions the Caucus has set forth in the
9   documents and the witness is trying provide as much
10   information as she can about the actual experience of
11   the -- of the legislature.
12        Q.  (By Mr. Frederick)  Do you remember the
13   question?
14        A.  Yes.  And Mr. Frederick, my answer is going to
15   be the same, because, you know, I'm very -- very sincere
16   about that.  I mean, there are lots of times when you
17   just -- you have to -- you have to look at the results
18   of something, and not the purpose, and I can't get into
19   another legislator's head, and they can't get into
20   mine.  I've passed pieces of legislation that I thought
21   the purpose was this, and the result was that.
22        And so it's -- it's the same, it's the
23   same with this.  I mean, that's how I personally looked
24   at it, and I think that's how the Caucus looked at it
25   is, you know, what effect will this have on some of our

## 87

1   voters, some of the people that we represent.  We looked
2   at it that way.  And also, we had lots of -- lots of
3   communication with lots of people who believed that it
4   was going to have a negative effect on being able to --
5   to get voters out.
6        Q.  And I -- you understand the difference between
7   purpose and effect, right?
8        A.  Not in a legal sense, I don't.
9        Q.  No, no.  And I'm not asking a legal sense.
10   Based on your previous answers, I believe you testified
11   that, you know, sometimes when you pass legislation,
12   there's a purpose, and then it might have an effect that
13   you didn't think it would have.
14        A.  Uh-huh.
15        Q.  So I mean in that sense --
16        A.  Uh-huh.
17        Q.  -- you understand the difference between the
18   purpose of a bill and its effect?
19        A.  Uh-huh.
20        Q.  Is that right?
21        A.  (Witness nods head yes.)
22        Q.  And all -- and so what I'm -- my question is:
23   In that sense, does -- is it the Caucus's position that
24   there was a racially discriminatory purpose for the
25   passage of SB 14?

## 88

1        MR. TANNER:  That --
2        A.  If there was a what?
3        Q.  Racially discriminatory purpose?
4        A.  Is it the Caucus's contention?
5        Q.  Correct.
6        A.  I -- I'm not -- I can't answer that any other
7   way than -- than I've answered it and not because of
8   this, but just because that's the way in a lot of cases
9   we measure legislation.  I'm dealing right now with the
10   lease purchase that came through my committee.  The
11   intention was to help some people over there who had
12   gotten in bad situations and never got deeds.  The
13   effect was we pretty much closed down lease purchases in
14   the state of Texas.  So the effect was we pretty much
15   closed down lease purchases in the state of Texas.  So
16   that was the effect, wasn't my bill, somebody else's,
17   that was the effect of that legislation.
18        And so that's what we -- that's basically
19   what I try to deal with is effect.  You know, what's the
20   real effect?  The purpose might be this, but when you
21   put it all together, this is what the effect is going to
22   be.
23        Q.  The lease purchase bill that you mentioned, I
24   mean, despite its effect, you can say that the purpose
25   was something else and it had this different effect,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

### 89

1 right?
2    A. Uh-huh.
3    Q. So, I mean, it's true, isn't it, that a bill
4 may have one purpose, and then it may have an
5 unanticipated or unintended effect, right?
6    A. Uh-huh.
7    Q. This may be a better way of phrasing my
8 question is: Is it the Caucus's position that -- that
9 SB 14, that any legislator intended SB 14 to have a
10 negative effect on African American voters?
11    A. I think that would be, you know, just a real,
12 real stretch for me to get it. There's 150 of us over
13 there in the House. We're just like the rest of
14 society, you know. The vast majority of us are well-
15 intentioned. The big, big vast majority of us are well-
16 intentioned. We just reflect society.
17    I try not to -- not to, on a personal
18 basis, judge legislators or legislation from, you know,
19 from that standpoint. And you know, all of my remarks
20 regarding redistricting, and other than passing an
21 amendment, I didn't actually go to the mic on this, I
22 don't think, other than to pass an amendment.
23    I just have to go back to the effect,
24 which is I think why -- why the Caucus is involved is
25 because of the effect. And I understand that there may

### 90

1 be some legal standards as it relates to purpose. And
2 as an attorney, I'm not -- I don't think I'm qualified
3 to speak on those, but beyond that, just as a
4 legislator, I don't -- I can't speak of -- I can't say
5 that the Caucus never -- I cannot say what -- about were
6 there other purposes or whatever, but what I can talk
7 about is -- is the result and effect of it.
8    Q. Earlier we went through the deposition notice,
9 and we looked at some of the topics.
10    A. Uh-huh.
11    Q. And the first -- let's see if I can find it
12 here. This was -- this would have been Exhibit 1, but
13 the first topic was: "The factual basis of Texas
14 Legislative Black Caucus's claims or defenses in this
15 lawsuit, including any contention that Senate Bill 14
16 was enacted for the purpose or will have the effect of
17 denying or abridging the rights to vote on account of
18 race, color or membership in a language minority group."
19    A. And I took that to mean either/or. And you
20 know, or --
21    Q. Right.
22    A. -- "or" means purpose or effect.
23    Q. Right.
24    A. And while I could not speak to purpose
25 directly, I'm hanging my hat on effect. And so I

### 91

1 thought I could be responsive by dealing with effect.
2    Q. And let me -- I think it may help if I just
3 back up from what we've been talking about. A basic
4 question is: Are you aware of the claims or defenses
5 that the Caucus has asserted in this lawsuit?
6    A. I'm smiling, because I am not.
7    Q. Okay.
8    A. I'm, you know, I -- I just came on with my
9 basic knowledge of the Caucus and that. So have I --
10 have I read the filing or the pleading or the whatever?
11 Sir, I have not.
12    Q. To your knowledge -- and I'm asking only about
13 what has been alleged in this lawsuit, I'm not asking
14 you to give me a legal answer. To your knowledge, has
15 the Caucus claimed in this lawsuit that there was a
16 discriminatory purpose behind SB 14?
17    A. I have -- I have not read -- I'm not sure what
18 it's called, the filing, the pleading, the whatever, I
19 have not read that at all.
20    Q. So you don't know whether the Caucus has
21 asserted that there was a --
22       MR. TANNER: Asked and answered.
23    Q. (By Mr. Frederick) Okay. So you don't know
24 whether the Caucus has asserted in this lawsuit that
25 there was a discriminatory purpose behind SB 14?

### 92

1    A. No, sir. I -- I have not -- I have not read
2 the -- I've not read the document.
3    Q. Okay. If there were -- if there were evidence
4 that -- that African American voters possessed the
5 required photo identification at the same rate or level
6 as every other group of voters, would the Caucus --
7 would the Caucus -- would the Caucus still contend that
8 the bill would have a negative effect on African
9 American turnout or voting?
10    A. I think that --
11       MR. TANNER: I think that question has
12 been asked and answered several times. The witness has
13 testified repeatedly about the special burdens that face
14 African American voters, in particular, who may not have
15 one of the qualifying documents, including the birth
16 certificate and including the driver's license, because
17 of the various disparities to which the witness has
18 testified.
19    Q. (By Mr. Frederick) And let me ask it again,
20 because I'm asking you, and I realized that this may ask
21 you to assume something that's different from what the
22 Caucus contends in the case. But if there were evidence
23 that showed that there was not a disparity in ID
24 possession --
25    A. Uh-huh.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

May Helen Giddings                                          June 6, 2012

---

**93**

1    Q.   -- would the Caucus still contend that SB 14
2    would have a negative effect on African American turnout
3    on voting participation?
4          MR. TANNER:  Or has the Caucus taken a
5    position to that?
6    A.   Well, I was -- I was going to say there,
7    Mr. Frederick, that if I'm speaking here for the Caucus,
8    I can't answer that question.  Because number one, we've
9    never believed that, and therefore, we've never had any
10   discussion that would lead us to be able to answer the
11   question that you've -- that you've just asked, because
12   we've never believed that to be the case as a Caucus.
13         On a personal basis, I would still have to
14   wonder about the effects, the historical effects on
15   African American turnout.  There's no way that that can
16   ever be discounted.  It's just like people going to the
17   museum.  For many, many years, people of color didn't
18   get to go to the museum.  Now they can go to the
19   museum.  Do they go in the numbers that they should?
20   No, they don't.
21         And so there's -- at this point, I don't
22   know when the time will come when we can say, you know,
23   people being killed because they wanted to vote is not
24   affecting what's happening to voting today.  But -- but
25   the Caucus never addressed that, because the Caucus

---

**94**

1    never believed that to be -- to be the case.  That would
2    be interesting to see.
3    Q.   But it's possible, isn't it?  I mean, I'm not
4    at all at all trying to discount the effect of history on
5    voting.
6    A.   Uh-huh.
7    Q.   But it's possible, isn't it, that history could
8    have an effect on its own even if it turned out that SB
9    14 didn't require anybody to go get a new ID?
10         MR. TANNER:  I believe that the witness
11   already has testified that that's not something that the
12   Caucus has taken a position on.
13   Q.   (By Mr. Frederick)  Can you answer the
14   question?
15   A.   Well, if I'm answering -- and I'm here, you
16   know, for the Caucus and to talk about our proceedings
17   and the things that we did.  It's not something that we
18   could -- that I could answer.  But I do really want to
19   understand the question you just posed.
20   Q.   Sure.  We've talked a lot about the history,
21   and you know, as I understand it, the -- your testimony
22   has been that the history of discrimination and violence
23   associated with voting --
24   A.   Uh-huh.
25   Q.   -- specifically toward African Americans in

---

**95**

1    Texas, has an effect on how many African American people
2    vote; is that accurate?
3    A.   I think that's right.
4    Q.   And so it seems to me, based on that testimony,
5    that even -- you know, even if SB 14 didn't exist, that
6    history might have some effect on African American
7    turnout, African American voting; is that right?
8    A.   I think that that history has an effect today,
9    if that's what you're asking me.  Does that history have
10   an effect today?  Yes.  You know, are we getting -- is
11   it getting better?  Yes, it is.  Will this cause us to
12   make a turn and go back the other way?  Quite possibly.
13   Q.   And what I'm trying to get at is:  What is --
14   I'm just trying to figure out, if I can, what it is that
15   SB 14 would add to the history?  What additional burden
16   or deterrent, or whatever the word would be, what that
17   would add to the history?
18         MR. TANNER:  I've got to object.  This has
19   been asked many times, and the witness has talked about
20   this in response to many questions.  And I -- it's been
21   asked and answered over and over again.  You keep trying
22   -- you know, the --
23         MR. FREDERICK:  I mean, I think the
24   objection is on the record.  I respectfully disagree
25   that the specific question has been asked or answered.

---

**96**

1    Q.   (By Mr. Frederick)  So can you answer the
2    question?  Do I need to have it read again?
3    A.   Yes, would you?
4    Q.   Of course.
5          MR. FREDERICK:  Could you please read the
6    last question?
7          (The requested portion was read back by
8    the court reporter.)
9    A.   What it would add to the history?  I don't know
10   that it's going to add to the history, but what it's
11   going to do is make it more difficult for some people,
12   as I just talked about, people who don't have birth
13   certificates, people who don't have a driver's license,
14   who may not have a car to get to.  So it creates an
15   additional step that has to be taken, and that
16   additional step for some people is not simple or easy.
17   They have to do some things to take that additional
18   step, some of which they may want to do, and they may
19   not be able to do.
20         But we -- we really want to make it easy
21   for people who are eligible to vote, to vote.  We really
22   want people to think that government is by the people,
23   for the people and of the people.  And they are the
24   people, and they ought to be able to vote.  And so we
25   want more people who are eligible and legal voters to

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 97

1  vote in this process.  Not people who want -- we don't
2  want to step back from that.  I mean, it's against
3  everything I think that we believe in as a country, as a
4  state, as a people.  And if we're not accomplishing --
5  if we're not seeing the result, if it's not -- if it's
6  not solving a problem -- and in our opinion, it's not
7  solving a problem, it's causing a problem.  Why are we
8  doing it?
9       Q.   Okay.  I appreciate that.
10           So last question:  So what it would add,
11  then, just to sum it up, it just adds that people might
12  have to go get an ID that they don't have; is that
13  right?
14      A.   And going to get that might require them some
15  financial resources.  It might require that they may not
16  be able to do it at all.  And so then, if they can't do
17  it at all, it would deny them the right to vote, which
18  is something that we certainly would not want to
19  happen.  But we might set up a scenario where for some
20  people, at least in the near future, they may be able to
21  correct it if given some time, but they may not be able
22  to vote at all because they don't have the required
23  documents for whatever reason.
24      Q.   Thank you.
25      A.   Thank you.

## 98

1            MR. FREDERICK:  I will reserve further
2  questions until the time of trial.
3            MR. TANNER:  I've just got a few
4  questions.
5            EXAMINATION
6  BY MR. TANNER:
7       Q.   Representative Giddings?
8       A.   Yes.
9       Q.   The voter ID measure has been before the
10  legislature several times during your -- a voter -- one
11  voter ID bill or another has been before the legislature
12  several times during your tenure; is that correct?
13      A.   Yes.
14      Q.   Okay.  During any of those periods, to the best
15  of your knowledge, and the best of the Caucus's
16  knowledge, did the State ever produce examples of voter
17  impersonation fraud that would be prevented by
18  possession of a voter ID?
19      A.   Not that I'm aware of.
20      Q.   During that time, did the State or the
21  people who were pushing the -- supporting the bill, get
22  any state agency or other authority to provide a study
23  of the number of Black voters who would be affected by
24  the law?
25      A.   I'm not aware of that study.

## 99

1       Q.   Or the number of Latinos who would be affected
2  by any of the laws?
3       A.   You know, this is taxing my memory, because we
4  did this in '9 and '11, I think, but I don't recall --
5       Q.   Okay.
6       A.   -- such a study.
7       Q.   On the Floor of the legislature and in the
8  discussions among legislators, you testified that there
9  was a stated purpose --
10      A.   Yes.
11      Q.   -- to prevent ID, and that no one produced
12  examples of voter impersonation.  On the Floor of the
13  legislation, did -- on the Floor of the Legislature,
14  excuse me, did members of the Black Caucus and others
15  voice concerns such as you have voiced today, about the
16  discriminatory impact on minority voters by such a
17  requirement as -- by such a requirement?
18      A.   There was a great deal of discussion as it
19  relates to the effect of this legislation.
20      Q.   And were advocacy groups also presenting to
21  members of the legislature various studies and
22  statistics about the impact of the bill?
23      A.   Well, I can't speak to studies and statistics
24  specifically, but I can say that advocacy groups were
25  coming in and saying this is going to be the effect, and

## 100

1  I'm sure some of those had studies and what not, but I
2  can't specifically recall the studies myself.
3       Q.   In the course of your tenure in the
4  legislature, has the history of discrimination against
5  minority voters in Texas been discussed frequently?
6       A.   Absolutely.
7       Q.   And particularly, the history of discrimination
8  in the area of voting --
9       A.   Yes.
10      Q.   -- has that been discussed in the legislature?
11      A.   Yes, it has.
12      Q.   Has it been discussed many times over the
13  years?
14      A.   It has been discussed many times over the
15  years.
16      Q.   How about the social and economic disparities;
17  any social and economic disparities that may exist
18  between minority voters and Anglo voters, you mentioned
19  earlier, the great disparity in wealth.  Has that been
20  discussed before the legislature many times?
21      A.   Absolutely.  Health disparities, disparities in
22  the insurance -- in insureds, the disparities exist out
23  there, and we discuss those frequently.
24      Q.   In this last iteration of the voter ID bill
25  that was passed, SB 14, did the legislature -- well,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

May Helen Giddings                                    June 6, 2012

---

### 101

1   backing up a step.
2        Does the legislature normally have a
3   two-thirds rule on consideration of legislation?
4        A.   In the Senate.
5        Q.   In the Senate?
6        A.   Yes.
7        Q.   Okay.  And did, in this instance, the Senate
8   abandon the two-thirds requirement for the voter -- for
9   SB 14?
10       A.   That is my understanding.  I'm more familiar
11  with, you know, what went on in the House, but it is my
12  understanding.
13       Q.   Okay.  And the House, is there a practice in
14  the Texas legislature called "chubbing"?
15       A.   Yes.
16       Q.   Could you explain briefly, for those not
17  familiar with the Texas legislature, what chubbing is?
18       A.   Well, chubbing is a practice that members have
19  when they find something so very objectionable that they
20  just keep talking and talking and talking and talking,
21  and they try to talk -- talk the bill into the death
22  chamber, I guess.
23       Q.   Is it fair to characterize that as similar to a
24  filibuster?
25       A.   Yes, it is.  Very much so.

---

### 102

1        Q.   In the instance of the passage of SB 14, the
2   voter ID bill in this instance, did the legislature take
3   steps to prevent chubbing?  To the best of your
4   recollection?
5        A.   You know, I'm -- I'm going to have to say that
6   I don't really remember.  I believe that is the case,
7   but I cannot say definitively.  I know that there were
8   bills, maybe, I don't remember specifically what bill it
9   might have affected.
10       Q.   Are you an officer of the Caucus?
11       A.   I am.
12       Q.   What office?
13       A.   Secretary.
14       Q.   Now, you've testified some about the structure
15  or lack of structure of the Caucus, of the independence
16  of the members, of the small budget, and Mr. Frederick
17  has elicited information about the absence of studies
18  conducted by the Caucus on any issues.
19       A.   Uh-huh.
20       Q.   About how many, if you can give any sort of
21  ballpark, communications do you have with constituents
22  and advocates and others about the circumstances of the
23  Black community in Texas?
24       A.   Okay.  I got lost.  I'm somewhere.  I'm
25  sorry.  Repeat that.

---

### 103

1        Q.   All right.  In addressing the circumstances or
2   in terms of your knowledge of the circumstances of the
3   minority community in Texas, about how many
4   communications per year do you have meetings, town
5   halls, telephone calls, e-mails, other letters, other
6   communications, do you get a year that describe the
7   circumstances of the Black community in Texas?
8        A.   Oh, I mean, there's no way I could count
9   those.  I mean, it's just too numerous to count.  If
10  you're asking me how many telephone calls I get talking
11  about whether it's voter ID, whether it's redistricting,
12  whether it's health care disparities, whether it's
13  educational disparities, if you're asking me how many of
14  those I get, there's no way I could count those.  I
15  mean, it's just a continuous flow of communication.
16       Q.   And that is -- has that been the case for you
17  and other members of the Caucus for many years?
18       A.   For many years, yes.
19       Q.   And on various issues you receive statistics
20  and studies from state agencies and other sources?
21       A.   Yes.
22       Q.   In terms -- if this goes through, if SB 14
23  becomes effective as law, will that change the burdens
24  on you as a member of the legislature or as a leader in
25  your community, in terms of responding to requests from

---

### 104

1   constituents and others?
2        A.   Well, I --
3            MR. FREDERICK:  Object to the form of the
4   question.
5        Q.   (By Mr. Tanner)  If SB 14 goes through, will
6   there be any change in the number of requests for
7   information, such as you mentioned that you go through,
8   help a lot of people get replacement or delayed birth
9   certificates, I think you called it?
10       A.   Right.  Yes.  There's no question that there's
11  going to be a greater need for voter education, just
12  based on the number of questions that we're getting
13  right now.  It can -- you know, it can only go up when
14  this is actually -- if it's actually implemented.  So it
15  is going to be an increase in the number of people
16  that -- that we communicate and the number of
17  communications and trying to help people, who are having
18  difficulty, walk through how they can eliminate whatever
19  problems they're having in access of the documents that
20  they need.
21       Q.   In response to questions from Mr. Frederick, I
22  believe in terms of the voter registration, voter
23  education activities of the Caucus and its members, you
24  indicated, I believe, if I'm characterizing this
25  correctly, that those issues are not separated out, but

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 105

1 they come up, tend to come up whenever you've have town
2 halls and the summit that you mentioned?
3    A. Right. Yes.
4    Q. Are there a large number of issues, or how many
5 issues do members of the Caucus have to deal with that
6 are of concern, of particular concern to the minority
7 communities in the state?
8    A. Oh, wow. There are just so many issues,
9 because in a lot of cases, you know, we're trying to
10 look at, as I said, eliminate disparities, whether they
11 are -- whether they be in education and the number of
12 students of color who are not achieving at the level
13 they should be. That's a whole big conversation.
14 Health care is a -- is a big conversation.
15          There are just any number of issues that
16 are before us. In addition to that, you know, we've got
17 House members who are going to file some 4,000-plus
18 bills, and you know, what do you do with all of those
19 bills? So we have a full plate.
20    Q. You have a full plate, and then there are only
21 24 hours in the day; is that correct?
22    A. Right. Yes.
23    Q. So if you are, as you've testified, spending
24 additional time on voter education and other activities,
25 for any new voter ID requirement, what effect would that

### 106

1 have, if any, on your ability to address other concerns
2 of minority voters?
3    A. Well, if we take some time away from our
4 other -- other issues that are on our plate and -- and
5 we will definitely have to spend some time, a lot of
6 time on education and on assisting our voters here, it's
7 -- it's definitely going to take time away from some of
8 the other issues that we have to -- we have to deal
9 with. This -- this issue is a big concern in my
10 district, and so it's going to take some time deal with
11 it.
12    Q. And getting a delayed birth certificate, I
13 think you mentioned that people have to go back to
14 census records; is that correct?
15    A. There are several things that you can do. As I
16 remember it, you can go get some census records. You
17 can go to your church and get a record that's over 15
18 years old, I think. You can go to your insurance
19 company and get records that are over 15 years old. You
20 can get your oldest living relative to swear that you
21 were born in this time and place and whatever. So
22 it's -- it's a big -- it's a big process that people
23 have -- have had to go through.
24    Q. Have you had to deal with those processes with
25 people who have come from other states?

### 107

1    A. Well --
2    Q. Texas attracts a lot of people from other
3 states, I know.
4    A. All of the people that we've dealt with have
5 been people who are -- who reported that they were born
6 in Texas, as far as I know. Because, of course, I don't
7 do all the work in my office. I just kind of get a
8 briefing on what's going on, but some of these things,
9 you know, I do get personally involved in.
10    Q. Well, that appears, I think it's a fair
11 characterization, or is it, that this is a truly
12 complex process that individuals, the average individual
13 would need some assistance in accomplishing.
14    A. Oh --
15    Q. Is that --
16    A. Yes. I think -- I think people definitely need
17 assistance, and even with the assistance in my office,
18 sometimes it's taken us, the person thought forever to
19 assist them, because we can't do it. All we can help
20 them do is to follow the guidelines that are set forth
21 by the Bureau of Vital Statistics.
22    Q. It seems like forever to the person. Are we
23 talking days, weeks, months, years?
24    A. I'm talking in some cases months. I can
25 remember one that actually took months.

### 108

1    Q. And if a judgment were to come down in this
2 case, say, two months before the election, and if the
3 demand for assistance from your office were to increase,
4 and thus, the demand on other offices increases, would
5 you expect those delays to increase, and the time that
6 it takes to get responses to increase as well?
7    A. From vital statistics and getting the delayed
8 birth certificates? You know, I don't know, really,
9 what that demand would be, but just -- just in general,
10 there are going to be some people, if something -- if
11 people have two months advance notice before they have
12 to produce these documents to vote, in my opinion,
13 you're going to be -- a lot people, for various and
14 sundry kinds of reasons, are simply not going to be able
15 to vote in that election.
16    MR. TANNER: I don't have any further
17 questions at this time.
18    MS. MILLER: Could I ask a question? I'm
19 sorry. I originally said we weren't going to ask any
20 questions.
21    EXAMINATION
22 BY MS. MILLER:
23    Q. I should be quick. I just want to clarify,
24 Representative Giddings, early on in the deposition, we
25 were talking about the materials you reviewed to prepare



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

May Helen Giddings                                      June 6, 2012

---

### 109

1 for the deposition, and one of the things you mentioned
2 was the letter from the Department of Justice.
3       A.  Yes.
4       Q.  Do you recall -- I think you said the letter
5 was dated in March 2012; is that correct?
6       A.  I -- I have it here.  It's the only -- I
7 reviewed it this morning.  It's stamped March the 12th.
8       Q.  Okay.  And Mr. Frederick characterized that
9 letter as the letter in which the Department of Justice
10 objected to SB 14.  Is there specific language in the
11 letter that -- where the Department of Justice objects?
12           MR. TANNER:  Would you like to point to a
13 particular part of the multipage letter?
14       Q.  (By Ms. Miller)  Does the letter ask for
15 information from the State?
16       A.  Well, from -- from what I've seen, the letter
17 asked for additional information and also points out,
18 makes -- makes certain points like concluding that the
19 total number of registered voters who lack a driver's
20 license.  It provides information, I suppose, that they
21 are saying ought to be taken into consideration as it
22 relates to SB 14.
23           I will say that in order for me to ask
24 your question directly, I would have to say -- answer
25 your question directly, I would have to sit here and

---

### 110

1 read this letter, because I read it very quickly just
2 before I came over here.  And but -- but I don't --
3       Q.  So just his characterization of the letter
4 objects to SB 14.  Is there any specific language that
5 would make you concur that this is an objection to the
6 bill?
7       A.  Just, well, you know, generally, on behalf of
8 the -- I object to Sections 9 and 14 of SB 14.
9       Q.  Okay.
10       A.  Would that -- I suppose.  I see that language.
11 But not -- I don't see language as it relates to SB 14,
12 overall.  But this -- let me point out for the record
13 that this is a five -- this is a six-page letter in
14 probably 6-point, no bigger than 8-point, so it was a
15 very quick reading that I did this morning, and -- but,
16 no, I don't see an objection, per se, overall, to SB 14,
17 but certain sections.
18           MR. MILLER:  Thank you.
19           MR. TANNER:  Matt, do you have anything
20 else?
21           MR. FREDERICK:  I don't think so, except
22 that if I could, I know that you brought some documents,
23 do you mind if I look at the documents that you brought
24 with you?
25           THE WITNESS:  No.  I don't think that I

---

### 111

1 do.  As I mentioned, I wanted to know what -- in case
2 you asked me, what amendments the Texas Legislative
3 Black Caucus had filed, and I didn't want to rely on my
4 memory.
5           MR. FREDERICK:  Thank you very much.  I
6 don't have any more questions today.  I appreciate your
7 time very much, Representative Giddings.
8           THE WITNESS:  Thank you.
9           (Deposition concluded at 12:59 p.m.)

---

### 112

1 CHANGES AND SIGNATURE
2     RE: TEXAS VS. HOLDER, ET AL
3 PAGE LINE  CHANGE          REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20     I, REPRESENTATIVE MAY HELEN GIDDINGS, have read the
21 foregoing deposition and hereby affix my signature that
22 same is true and correct, except as noted above.
23
24     _____
25     REPRESENTATIVE MAY HELEN GIDDINGS

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 113

1  THE STATE OF _____)

2  COUNTY OF_____)

3

4      Before me,_____, on this day

5  personally appeared REPRESENTATIVE MAY HELEN GIDDINGS,

6  known to me (or proved to me under oath or

7  through_____ (description of identity

8  card or other document) to be the person whose name is

9  subscribed to the foregoing instrument and acknowledged

10  to me that they executed the same for the purposes and

11  consideration therein expressed.

12      Given under my hand and seal of office

13  this_____day of _____, 2012.

14

15

16      _____

         NOTARY PUBLIC IN AND FOR

17      THE STATE OF _____

18

19

20

21

22

23

24

25

## 114

1      IN THE UNITED STATES DISTRICT COURT
         FOR THE DISTRICT OF COLUMBIA

2
   STATE OF TEXAS,          )

3          Plaintiff,        )

4   VS.                      )

5   ERIC H. HOLDER, JR. in his  )

6   official capacity as Attorney )
    General of the United States, )

7          Defendant,        )

8   ERIC KENNIE, et al,      )

9          Defendant-Intervenors,  )

10  TEXAS STATE CONFERENCE OF    )  CASE NO. 1:12-CV-00128

11  NAACP BRANCHES,          )  (RMC-DST-RLW)
                    )  Three-Judge Court

12         Defendant-Intervenors,  )

13  TEXAS LEAGUE OF YOUNG VOTERS )
    EDUCATION FUND, et al,    )

14         Defendant-Intervenors,  )

15  TEXAS LEGISLATIVE BLACK      )

16  CAUCUS, et al,           )

17         Defendant-Intervenors,  )

18  VICTORIA RODRIGUEZ, et al.,  )

19         Defendant-Intervenors.   )

20      REPORTER'S CERTIFICATION
         DEPOSITION OF REPRESENTATIVE MAY HELEN GIDDINGS

21      JUNE 6, 20112

22      I, Chris Carpenter, Certified Shorthand Reporter in

23  and for the State of Texas, hereby certify to the

24  following:

25      That the witness, REPRESENTATIVE MAY HELEN GIDDINGS,

## 115

1  was duly sworn by the officer and that the transcript of

2  the oral deposition is a true record of the testimony

3  given by the witness;

4      That the deposition transcript was submitted on the

5  _____day of _____, 2012, to the witness or to the

6  attorney for the witness for examination, signature and

7  return to_____, by

8  _____, 2012; and if returned, the original

9  transcript will be forwarded to Matthew Frederick, the

10  custodial attorney;

11      That the amount of time used by each party at the

12  deposition is as follows:

13      Mr. Frederick:  2 hours, 36 minutes
         Mr. Tanner: 17 minutes

14      Ms. Miller:  7 minutes

15      I further certify that I am neither counsel for,

16  related to, nor employed by any of the parties or

17  attorneys in the action in which this proceeding was

18  taken, and further that I am not financially or

19  otherwise interested in the outcome of the action.

20  Certified to by me this 7th day of June, 2012.

21

22      _____

23      Chris Carpenter, Texas CSR 1151
         Expiration Date:  12/31/2012

24      100 Congress Avenue, Suite 2000
         Austin, TX  78701

25      (512)328-5557
         Firm Registration No. 283



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com