## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS )
)
)
VS. ) NO. 12-CV-128
) (DST, RMC, RLW)
)
ERIC H. HOLDER, JR., )
In his official )
Capacity as Attorney )
General of the United )
States )

**********************************************
ORAL DEPOSITION OF LARRY GONZALES
**********************************************

ANSWERS AND DEPOSITION OF LARRY GONZALES, a witness
called by the United States taken before Janalyn Reeves,
Certified Shorthand Reporter for the State of Texas, on
the 31st day of May, 2012, between the hours of 9:30
a.m. and 5:16 p.m., in the offices of the US Attorney,
816 Congress, Austin, Texas, pursuant to the agreement
of counsel for the respective parties as hereinafter set
forth.

## 2

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
OFFICE OF THE ATTORNEY GENERAL:
By: MR. JOHN W. McKENZIE, III
209 West 14th Street
Austin, Texas 78701
PH: (512) 936-6432

FOR THE DEFENDANT:
DEPARTMENT OF JUSTICE
By: MR. BRUCE GEAR
- and -
MS. RISA BERKOWER
- and -
MR. SPENCER R. FISHER
950 Pennsylvania Avenue, NW
Room 7161 NWB
Washington, DC 20530
PH: (202) 305-0185

FOR THE INTEVENORS:
BRAZIL & DUNN
By: MR. SCOTT BRAZIL
4201 Fm 1960 West
Suite 550
Houston, Texas 77068
Ph: (281) 580-6310

FOR THE INTEVENORS:
ADVANCEMENT PROJECT
By: MS. DONITA JUDGE
1220 L Street, NW
Suite 850
Washington, DC 20005
Ph: (202) 728-9557

## 3

INDEX

PAGE

Appearances.................................. 2

LARRY GONZALES
Examination by Mr. Gear ................ 5
Examination by Mr. Brazil .............. 237

Signature and Changes ......................... 249
Reporter's Certificate ......................... 251

## 4

| NO. | EXHIBITS DESCRIPTION | PAGE |
|---|---|---|
| 5 | SB 14 | 155 |
| 28 | HB 218 | 105 |
| 29 | SB 362 | 99 |
| 44 | HB 1706 | 67 |
| 102 | Online History | 105 |
| 106 | SB 362 | 100 |
| 220 | Notice of Deposition | 14 |
| 221 | Post Session Report | 170 |
| 222 | House Journal | 183 |
| 223 | Online History | 192 |
| 224 | Letter | 205 |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**5**

1              LARRY GONZALES,
   having being first duly sworn, testified as follows:
2              EXAMINATION
   BY MR. GEAR:
3      Q.  Good morning, Representative Gonzales.
4      A.  Morning.
5      Q.  This is the deposition for Representative Larry
6  Gonzales in the matter of Texas V Holder, USDC for DC
7  docket No. 1:11-CV-128.  Again, good morning.  And could
8  you state your full name and spell your name for the
9  record?
10     A.  Sure.  Larry Dean Gonzales.
11     Q.  My name is Bruce Gear.  I'm with the Department
12 of Justice and I represent the defendant in this case,
13 Eric Holder, the Attorney General.
14         MR. GEAR:  I just say to everyone else could
15 you introduce yourself for the record.
16         MS. BERKOWER:  Risa Berkower for the
17 Attorney General, Eric Holder.
18         MR. FISHER:  Spencer Fisher for the Attorney
19 General.
20         MS. JUDGE:  Donita Judge for the
21 Intervenors.
22         MR. BRAZIL:  Scott Brazil for the Kennie
23 Intervenors.
24         MR. McKENZIE:  John McKenzie for the State
25 of Texas and the witness.

---

**6**

1      Q.  (By Mr. Gear)  Now, this is the opportunity for
2  me to ask you questions and for you to give full and
3  complete answers.  And do you understand that you've
4  been sworn in under oath under penalty and perjury and
5  that this is kind of like a trial setting where
6  everything you say must be truthful and you must try to
7  give complete and full answers.  Do you understand that?
8      A.  Yes.
9      Q.  Okay.  And so let me -- let me go through a
10 couple of ground rules with you.  Again, I'm going to be
11 asking you some questions and you are going to be
12 answering.  But while I'm asking you the questions, give
13 me an opportunity to complete my question and I will
14 give you an opportunity to complete your full answer.
15 If at any time you don't understand the question that
16 I'm asking you, you can always let me know that and I
17 will try to rephrase it for you so that you understand
18 completely.  Do you understand that?
19     A.  Yes.
20     Q.  All right.  Now, it's important for you to say
21 "yes" or "no" or give a complete answer.  You can't nod
22 your head because the court reporter is taking
23 information and she won't be able to capture the nod of
24 the head "yes" or "no".  Do you understand that?  So you
25 have to give a verbally answer?

---

**7**

1      A.  Yes.
2      Q.  Okay.  So is there any reason today that you
3  cannot testify completely and truthfully?
4      A.  No.
5      Q.  Are you taking any type of medication or drugs
6  that would interfere with your ability to understand and
7  testify completely and truthfully today?
8      A.  No.
9      Q.  This is an important one, if at any point you
10 want to take a break, you know, we may be in the middle
11 of a question and answer.  And so what I would ask is
12 that if I've posed a question and you're in the middle
13 of answering that, that you complete your answer and
14 then I will give you an opportunity to take a break.
15 And that's also true if you -- if you need to speak with
16 your attorney at any time.  If you're in the middle of
17 an answer, please complete your answer.  Let me know
18 that you would like to speak to your attorney and I will
19 give you that opportunity.  Do you understand that?
20     A.  Yes.
21     Q.  Now, there's a couple of terms that we're going
22 to be using throughout the day.  One is voter ID and
23 photo ID.  And we're going to be using that
24 interchangeably throughout the day during this
25 deposition.  And I want you to interpret those terms as

---

**8**

1  broadly as you can, to mean a requirement that a voter
2  present a form of identification, whether it has a photo
3  or otherwise, when voting in person before being
4  permitted to vote with a regular ballot.  Do you
5  understand that term?
6      A.  Yes.
7      Q.  Okay.  When I refer to you, I'm asking you
8  questions about your capacity as a member of the House
9  of Representatives.  Do you understand that?
10     A.  Yes.
11     Q.  Okay.  And when I'm also referring to you, I am
12 going to be referring to anyone in your office acting on
13 your behalf.  Do you understand that?  And before your
14 attorney objects to this, I'm going to be -- I'm going
15 to try my best to make it very clear when I'm referring
16 to just you and when I'm referring to you and your
17 staff.  Do you understand that?
18         MR. McKENZIE:  I'm just going to lodge the
19 objection for the record that to the extent there's
20 ambiguity, he's going to interpret "you" to mean
21 himself.  And in the question, if it's obvious, "when
22 did you last vote."  But other questions might be more
23 ambiguous.  But with that objection, go ahead and
24 answer.
25 BY MR. GEAR:

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**9**

1    Q. Fair enough. And again, I'm going to give it my
2  best effort to make sure you understand when I'm
3  referring to you and when I'm referring to you and your
4  staff. Okay?
5    A. Yes.
6    Q. When I use the term minority voters, I mean
7  voters who are not white or not Anglo. Do you
8  understand that?
9    A. Yes.
10    Q. Do you understand everything that I've said to
11  you so far today?
12    A. Yes.
13    Q. So let me -- let me ask you a little bit about
14  your previous trial or deposition experience. Have you
15  ever been deposed before?
16    A. No.
17    Q. Are you represented by counsel today?
18    A. Yes.
19    Q. And who is your counsel?
20        MR. McKENZIE: Verbally.
21    A. John.
22        MR. McKENZIE: McKenzie.
23    A. McKenzie.
24    Q. (By Mr. Gear) Who, if anyone, have you spoken
25  with in preparation for the deposition today?

---

**10**

1    A. John Brook.
2    Q. You said, "John Brook?"
3    A. No. John McKenzie.
4        MR. McKENZIE: Don't know -- they don't know
5  who these people are, so if you can tell the office
6  where they're from.
7    A. The office of the Attorney General. The office
8  of the Texas Attorney General.
9    Q. Anyone else?
10    A. No.
11    Q. Are you aware that other legislators have been
12  deposed for this case?
13    A. Yes.
14    Q. Have you spoken to any of the other deponents in
15  this case about your deposition today?
16    A. No.
17    Q. Have you spoken to any other deponents about
18  their depositions?
19    A. No.
20    Q. So when you spoke with the attorneys of the AG's
21  office, when did you actually have this conversation?
22    A. Weeks ago.
23    Q. And where did the conversations take place?
24    A. My capital office.
25    Q. And during that conversation, was there anyone

---

**11**

1  present other than you and the attorneys from the AG's
2  office?
3    A. My chief of staff was there.
4    Q. And who is your chief of staff?
5    A. Chris Sanchez.
6    Q. Anyone else?
7    A. No.
8    Q. How much time did you spend preparing for the
9  deposition today?
10    A. Oh, 30 minutes maybe.
11    Q. Did you review documents in preparation for the
12  deposition?
13    A. Yes.
14    Q. What type of documents -- can you identify,
15  describe the types of documents that you reviewed in
16  preparation for your deposition?
17    A. A printout of my videos on YouTube. My words
18  entered into the House journal, I read the House
19  journal. There was a bill, like a record vote bill that
20  I read.
21    Q. Was that dealing with voter ID?
22    A. It was -- it wasn't. It was dealing with
23  election judges. And then I read my web page, the
24  issues on my web page.
25    Q. Okay. Let's talk about -- a little bit about

---

**12**

1  your YouTube videos. What -- you have YouTube videos.
2  Were those videos addressing the issue of voter ID?
3    A. No. No.
4    Q. Okay. Why did you feel the need to look at
5  YouTube videos?
6    A. I was looking at all my videos.
7    Q. Okay. Were you looking at them for the purpose
8  of determining if there was any issues of voter ID?
9    A. Yes.
10    Q. And do you remember the date of the House journal
11  that you reviewed?
12    A. No, I don't.
13    Q. And you spoke in this House journal?
14    A. Yes.
15    Q. And you said the other document that you reviewed
16  was record votes dealing with -- a record vote bill
17  dealing with election judges?
18    A. Right.
19    Q. Can -- can you describe what that document is?
20    A. It was a bill by Representative Bonnen and had to
21  do with election judges. And I was reviewing the
22  history of the bill filed when it was in committee,
23  things like that.
24    Q. And again, did that have anything to do with
25  voter ID?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 13

1    A.  No.
2    Q.  Did it have anything to do with the rights of --
3    and when you say "election judges," do you mean
4    individuals who are hired and working in the polling
5    places?
6    A.  Yes.
7    Q.  And does this have anything to do with the
8    authority of the election judges in the polling places,
9    the bill?
10   A.  No.
11   Q.  Can you tell me what, specifically, the record
12   vote bill for election judges dealt with?
13   A.  The requirement to be an election judge.
14   Q.  What are the requirements to be an election
15   judge?
16   A.  Boy, I'm not certain.  By statute, you're asking
17   by Texas statute?
18   Q.  Well, based on your review of the record vote
19   bill dealing with election judges, can you tell me what
20   the requirements are for being an election judge?
21   A.  That didn't address any previous or statutory
22   requirement as it is now.
23   Q.  Okay.  What did it address, specifically?
24   A.  It addressed the requirement to be a judge.
25   Q.  And why was that important for your review in

### 14

1    preparation for this deposition?
2    A.  I kept that document because it has to do with a
3    judge reading and writing English.
4    Q.  Okay.  And as I understand it, under -- under
5    Texas law, election judges are required to speak and --
6    strike that.  As I understand it, under Texas law,
7    election judges are required to be able to speak both
8    English and then those that are working as bilingual
9    pole workers are required to speak both English and
10   Spanish.  Is that your understanding?
11   A.  I don't know.
12   Q.  Okay.  Fair enough.
13       (Exhibit No. 220 was marked.)
14   BY MR. GEAR:
15   Q.  I'm showing you what's been marked as Exhibit
16   No. --
17       MR. GEAR:  I'm sorry.  I passed it down that
18   way.
19       MR. McKENZIE:  Oh, no.  That's no problem.
20   BY MR. GEAR:
21   Q.  Showing you what's been marked as Exhibit No.
22   220.  I'll give you chance to look at that.  When you're
23   done just let me know and we'll talk about it.  I see
24   you're still reviewing it, but let me ask you a few
25   questions about it and if you need more time I'll gladly

### 15

1    give it to you.  Do you know what this is?
2    A.  No.
3    Q.  Have you seen this document, reviewed this
4    document before?
5    A.  No.
6    Q.  Were you aware that there was a request for you
7    to search documents and communications within your
8    office?
9    A.  Yes.
10   Q.  And did you conduct that search?
11   A.  No, sir.
12   Q.  You did not?
13   A.  No, sir.
14   Q.  When were you given the request to conduct a
15   search for documents within your office?
16   A.  Weeks ago.  I can't tell you.
17   Q.  And why did you not conduct a search for
18   documents or communications within your office?
19   A.  My chief of staff did everything.
20   Q.  Okay.  So when you said, "No, sir," you meant you
21   did not conduct the search personally, but your chief of
22   staff did?
23   A.  That is correct.
24   Q.  Are you aware of -- of whether your chief of
25   staff received the -- the document which is titled 220

### 16

1    amended notice of deposition?
2    A.  I don't know.
3    Q.  Well, let's turn your attention to the page which
4    indicates documents.  I believe it's Page 5?
5    A.  Uh-huh.
6    Q.  And specifically, I want to turn your attention
7    to No. 1, which indicates "all documents and
8    communications including, but not limited to those among
9    and between your staff, other members of the Texas
10   Legislature, the Texas Legislative Council and other
11   Texas State executive offices and agencies concerning
12   any or all reasons, justifications, rationals, interests
13   or purposes for enacting SB 14."  Do you see that?
14   A.  Yes.
15   Q.  And did you or your staff, and I believe you said
16   your chief of staff, search for these documents?
17   A.  Yes.
18   Q.  Did he report back to you on his search for these
19   documents?
20   A.  Yes.
21   Q.  And did you find documents, communications
22   related to No. 1?
23   A.  My chief of staff did.
24   Q.  Okay.  And did you produce those documents and
25   turn those over to your attorney?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 200
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

17

1    A. My chief of staff did.
2    Q. Can you tell me the types of communications or
3 documents that you found related to No. 1?
4        MR. McKENZIE: I'm just going to interpose a
5 brief objection. When you say "type," don't go into
6 content if it reveals personal thoughts, opinion,
7 motivations of legislatures. But if you want to talk
8 about "type" in terms of e-mails, letters, what type of
9 document, you're free to answer the question.
10 BY MR. GEAR:
11   Q. I'm going to ask you to identify what documents
12 were found by your chief of staff?
13   A. I didn't review that book, other than one
14 pass-through, a while ago.
15   Q. And when you refer to "that book," what do you
16 mean?
17   A. Chris had put together a book for me and gave it
18 to me. And I did a cursory, literally, flip through and
19 just put it aside.
20   Q. Did it break out the communications or documents
21 by number or was it just simply a book with -- with
22 documents that were found by your chief of staff?
23   A. Just a book with documents.
24   Q. Okay. And I guess, for the record, were those
25 documents in the book in response to the amended notice

18

1 of deposition?
2    A. Yes.
3    Q. Okay. About how many documents would you say
4 were in the book?
5    A. Less than ten.
6    Q. I want to turn your attention to No. 5 on the
7 next page. And if you could read that quickly for me?
8    A. I'm done.
9    Q. And this relates to any calculations, reports
10 audits, estimates, assessments or other analysis of the
11 effect that SB 14 will impose upon minority voters. Did
12 you produce or your chief of staff produce any documents
13 related to No. 5?
14   A. Not anything official from anybody. Not like a
15 report or numbers that came from any place at all.
16 We -- what we talked about was the 605,000 number from
17 the Texas Secretary of State. Chris and I talked about
18 that number.
19   Q. And when you say "Chris," who are you referring
20 to?
21   A. Sanchez, chief of staff.
22   Q. So let's just talk about that 605,000 number for
23 just a second. That was testimony from the Secretary of
24 State's office that was given during the legislative
25 debate on SB 14?

19

1    A. Yes.
2    Q. And you were present during that testimony?
3    A. Yes.
4    Q. And as I understand it, the Secretary of State
5 testified that there were approximately 605,000
6 registered voters in Texas that may not possess one of
7 the allowable forms of ID under the -- under SB 14?
8    A. That's my understanding of testimony, yes.
9    Q. That 605,000 was 605,000 or more according to the
10 Secretary of State?
11   A. I don't know that to be true.
12   Q. Okay. Did you have an occasion after that
13 testimony to learn that the 605,000 may actually be more
14 than 605,000?
15   A. No.
16       MR. McKENZIE: I'm going to object to
17 legislative privilege to the extent it asks you to
18 express your personal opinions, thoughts, impressions.
19       THE WITNESS: Okay.
20 BY MR. GEAR:
21   Q. Okay. So what I'm asking you is, are you aware
22 of any communication after the Secretary of State's
23 testimony that would have identified that this 605,000
24 voters in the State of Texas who may not have the
25 allowable forms of ID under SB 14, are you aware that

20

1 this number actually may be higher?
2    A. No.
3    Q. All right. I want to turn your attention to No.
4 6. "All documents and communications between you, your
5 office and members of the public, private organizations
6 and governmental entities related to SB 14 or SB 362,
7 the 81st Legislature, HB 218, the 80th Legislature, or
8 HB 1706, the 79th Legislature." Did you or your chief
9 of staff find any documents responsive to No. 6?
10   A. I'm not familiar with that.
11   Q. You're not familiar with whether or not --
12   A. I don't know if he -- well, I was not in office
13 for one, two, three of those bills.
14   Q. Okay. So let me -- let me break this down for
15 you, then, so the record is clear. Did you find any
16 documents in response to -- and when I say documents,
17 documents or communication in response to SB 14 or --
18 let's start there, SB 14?
19   A. Yes.
20   Q. And did you find any documents, and "you" meaning
21 you or your chief of staff or anyone else in your
22 office, find any documents or communications related to
23 SB 362 which is from the 81st Legislature?
24   A. No.
25   Q. Did you or anyone within your office find any



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 21

1  documents or communication related to HB 218, the 80th
2  Legislature?
3      A.  No.
4      Q.  And finally, did you or anyone in your office
5  find any documents or communication related to HB 1706,
6  the 79th Legislature?
7      A.  No.
8      Q.  And you indicated that you were not present
9  during some of these bills and now, you gave a number,
10 which I don't remember as we sit here.  But can you tell
11 me which time period you were present when looking at
12 No. 6.  Was it SB 14, 262 or 1706?
13     A.  I was an elected member during SB 14.
14     Q.  And you were elected in 2010?
15     A.  Yes, sir.
16     Q.  All right.  I want to turn your attention to
17 No. 8.  All public statements you or your staff have
18 made about SB 14 or SB 362, 81st Legislature, HB 218,
19 80th Legislature, HB 1706, the 79th Legislature for
20 photo voter identification.  And did you produce or your
21 staff members produce any documents responsive to No. 8?
22     A.  Yes.
23     Q.  And can you describe what was produced in
24 response to No. 8?
25          MR. McKENZIE:  I'm going to the object to

## 23

1      A.  I couldn't give you a general number.
2      Q.  Okay.  Well, do you recall the public statements
3  that you made in reference to SB 14?
4      A.  Yes.
5      Q.  And do you recall how those public statements
6  were made?
7      A.  House journal.
8      Q.  Newspaper?
9      A.  I don't think newspaper.  House journal and then
10 a TV interview.  That's what -- yeah, TV.
11     Q.  Do you recall when you gave that TV interview?
12     A.  No.
13     Q.  Was that TV interview in reference to SB 14 voter
14 ID?
15     A.  Yes.
16     Q.  And the House journal was in reference to a floor
17 debate referencing SB 14?
18     A.  Yes.
19     Q.  All right.  Let me ask you a few questions.  As a
20 House member, are you asserting or invoking any type of
21 privilege today?
22     A.  Yes.
23     Q.  What type of privilege are you invoking?
24     A.  Legislative privilege.
25     Q.  Can you tell me, is there any other type of

## 22

1  the extent it reflects your personal opinions, mental
2  impressions, thoughts about legislation.  You can answer
3  to the extent it reflects public record or general
4  legislative purposes.
5      A.  Can you ask that again for me?
6      Q.  (By Mr. Gear)  Well, let me just break it out
7  for you --
8      A.  Okay.
9      Q.  Just to make it clear.  Did you produce any
10 public statements in response to paragraph 8?
11     A.  Yes.
12     Q.  And were those in response to SB 14?
13     A.  Yes.
14     Q.  So let's talk about those public statements
15 that -- that you produced in response to No. 8.  How
16 many -- how many communications did you produce?
17     A.  No idea.
18     Q.  Well, you started off by saying you produced less
19 than ten total in response to all of these, correct?
20     A.  Yes.
21     Q.  So can you give me a general number of how many
22 of those were public statements made by you in reference
23 to SB 14?
24     A.  General number?
25     Q.  General number is fine.

## 24

1  privilege that you're invoking today?
2      A.  No.
3      Q.  Have you asserted any privileges over documents
4  or other materials of yours or other staff members
5  possession that relate to voter identification
6  legislation?
7      A.  I'm sorry.  Any other documents?
8      Q.  Have you asserted any documents, any privilege
9  over any documents, and I'm talking about legislative
10 privilege over any documents that are in your
11 possession, custody or control or the possession,
12 custody or control of your staff?
13     A.  Yes.
14     Q.  Can you tell me, generally, out of the ten
15 documents how many of those you asserted privilege over?
16     A.  No.
17     Q.  Did you specifically identify the documents that
18 you wanted to assert privilege over?
19     A.  No.  I guess I'm --
20          MR. McKENZIE:  Well, I'm going to object to
21 the extent it calls for attorney/client privilege and to
22 the extent you consulted with attorneys to determine
23 which documents may or may not have been legislative
24 privilege.
25 BY MR. GEAR:



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

25

1    Q. Do you realize that you hold the ability to
2  assert your privilege or not to assert your privilege?
3    A. Yes.
4    Q. And are you continuing to assert your privilege,
5  legislative privilege over -- over this deposition
6  today?
7    A. Yes.
8    Q. And are you willing to waive your privilege at
9  any point during our questioning during the deposition
10  today?
11    A. No.
12    Q. Where were you born and raised?
13    A. I was born in Houston, Texas.  And I was raised
14  in Alvin, Texas.
15    Q. And can you describe your educational background
16  for me?
17    A. Sure.  Public school, community college, the
18  University of Texas at Austin for an undergraduate
19  degree.  And then Texas State University for a Master's
20  degree, which I'm three hours -- or nine hours short.
21    Q. What was your undergraduate degree in?
22    A. Government.
23    Q. And what's your -- what's the focus of your
24  Master's degree?
25    A. Public administration.

26

1    Q. Are you currently a member of any community
2  organizations or groups?
3    A. Yes.
4    Q. Which community organizations or groups?
5    A. The Round Rock Chamber of Commerce, the Texas
6  State Advisory Counsel, probably a PTA or two I'm sure
7  from parents night.  I think I'm still on the rolls for
8  El AMISTAD Club.
9       REPORTER:  The what?
10      WITNESS:  El AMISTAD, A-M-I-S-T-A-D.
11  BY MR. GEAR:
12    Q. And what is that?
13    A. A civic organization in Round Rock.  And that's
14  all I can think of right now.
15    Q. Are you a member of the Mexican Legislative
16  Exchange Counsel?
17    A. Mexican American.
18    Q. Let me do that again.  I'm sorry.  Are you a
19  member of the American Legislative Exchange Counsel?
20    A. I've never like paid or gone.  I don't know if
21  we're automatically a part of it.  But I have never made
22  an effort to join or send them dues or attend a meeting.
23    Q. So you have never participated in any of their
24  conferences or meetings?
25    A. No.

27

1    Q. Have you ever had any communications of any kind
2  with this organization?
3    A. No.
4    Q. Have you ever introduced any bill language in the
5  House related to voter identification from this
6  organization?
7    A. No.  And just to be clear, I have the name right,
8  we're talking about ALEC, right, A-L-E-C?
9    A. Yes.
10    A. No.
11    Q. Did you communicate with ALEC at any time during
12  the legislative debate pertaining to SB 14?
13    A. No.
14    Q. Are you a member of the Hispanic Republican
15  Conference?
16    A. Yes.
17    Q. When did you join?
18    A. At the beginning of session, I guess.
19    Q. So and -- is that -- would it be accurate to say
20  that's when the organization was actually created?
21    A. Yes.
22    Q. And who was the founder or who is the founder of
23  that organization?
24    A. Aaron Pena.
25    Q. And do you know what the Mission statement of

28

1  this organization is?
2    A. I don't.
3    Q. Why did you join?
4    A. I joined because there were six of us who wanted
5  to show some solidarity as Hispanic Republicans.
6    Q. And can you name the six that are original
7  founders of the membership?
8    A. Aaron Pena, Jose Aliseda, Raul Torres, John
9  Garza, Dee Margo and myself.
10    Q. And all six, are they Republicans?
11    A. Yes.
12    Q. All six, did they vote in support of SB 14?
13    A. I don't know for sure, but -- I don't know for
14  sure.
15    Q. As -- as an organization, Hispanic Republican
16  Conference, did you have discussions regarding SB 14?
17      MR. McKENZIE:  I'm going to object to the
18  extent it calls for communications among legislators
19  that are not public record that reflect individual
20  motive or purpose.  You may answer as to general purpose
21  and to the public record.
22  BY MR. GEAR:
23    Q. And just to be clear, I'm asking you in -- in
24  reference to your membership in an organization, the
25  Hispanic Republican Conference.  I'm asking you in



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**29**

1  reference to that, did you have discussions specific to
2  SB 14?
3         MR. McKENZIE:  Same instruction.  You can
4  answer if you had discussions.  The content of the
5  discussions would be privileged, actually.
6      A.  Of course.  At some point, yes, but I can't
7  recall for sure.  I wasn't very active in that group.
8      Q.  (By Mr. Gear)  Well, let's try to make this a
9  little clearer for the record.  You said, "at some
10 point," do you recall when this conversation took place?
11     A.  Oh, no.
12     Q.  Do you recall -- do you recall where this
13 conversation took place?
14     A.  No.
15     Q.  Do you recall who was present during this
16 conversation?
17     A.  No.
18     Q.  Well, it would have been members of the Hispanic
19 Republican Conference, correct, that were present?
20     A.  I didn't go but to, maybe one or two meetings.
21     Q.  So during those one or two meetings, did you
22 discuss voter ID issues at both?
23     A.  No.
24     Q.  At one of them, then, as -- as I understand your
25 testimony?

---

**30**

1      A.  One was organizational.  That was the set up,
2  organizational.  And the other one -- I don't know what
3  we were talking about at that deal.  I didn't stay very
4  long.
5      Q.  Let me just -- tell me if I misunderstood your
6  testimony.  You testified that as a member of the
7  Hispanic Republican Conference, you engaged in a
8  communication regarding voter ID related to SB 14.  Is
9  that accurate?
10     A.  I don't specifically recall sitting down and
11 having a discussion on Senate Bill 14.
12     Q.  Do you recall having this discussion with any of
13 the members that you testified here to today?
14     A.  Not in the context of HRC.  See I'm thinking HRC,
15 like the group, the entity.  Is that what you're asking
16 about?
17     Q.  Yes.
18     A.  Okay.  As a group -- as a group we discussed
19 it -- not as a group, as individuals we discussed it on
20 the day it was on the House floor.
21     Q.  And that was during the public legislative
22 debate?
23     A.  That's correct.
24     Q.  And so during that public debate, can you tell me
25 did you meet with Representative Pena?  And so we're

---

**31**

1  clear, can you tell me when this individual meeting
2  occurred?
3      A.  During the debate.
4      Q.  And which debate are we talking about, what date,
5  if you remember?
6      A.  It would be the second reading debate.  Whatever
7  second reading was.  Whatever the day that was.  The day
8  of the House journal entry.
9      Q.  Would it be in March of 2011?
10     A.  I don't know the day of the House entry, whatever
11 that day is.
12     Q.  2011?
13     A.  2011, yeah.
14     Q.  Okay.  Can you tell me who else, if anyone else
15 was present during your individual meeting with
16 Representative Pena?
17     A.  Nobody.
18     Q.  And can you tell me what the substance of the
19 that conversation was?
20         MR. McKENZIE:  Objection to the extent it
21 calls for legislative communications that aren't public
22 or purpose that are private and not public.  You may
23 answer as a general purpose.
24 BY MR. GEAR:
25     Q.  You can answer.

---

**32**

1      A.  It was just me and Aaron.  What was your question
2  again?
3      Q.  The question was the substance of the
4  conversation that you had with Representative Pena?
5         MR. McKENZIE:  You may answer as it
6  references matters of public record, but if it is not
7  matter of public record, I would instruct you not to
8  answer or if it reflects general legislative purpose.
9  BY MR. GEAR:
10     Q.  Are you refusing to answer the question?
11     A.  I'm not going to answer that one.
12     Q.  Are you following the advice of your counsel?
13     A.  Yes.
14     Q.  Let me ask you, the discussion which you've
15 identified as related to SB 14, did you use that -- part
16 of that private discussion to present any public
17 information during the debate?
18     A.  No.
19     Q.  So as I understand it, your conversation with
20 Representative Pena was not advanced publicly in any of
21 the debate that took place on the floor?
22     A.  If I understand, "advance publicly," what does
23 that mean?
24     Q.  "Advance publicly," as did you speak about a
25 subject related to SB 14 and did you talk about that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 33

1  subject on the mic, publicly on the floor?
2  A. Yes.
3  Q. Okay. So when you went to the mic and you spoke
4  publicly, what was the subject matter of your
5  discussion?
6  A. When, timing, when, if we were going to -- same
7  thing.
8  Q. You're -- you're providing testimony. I'm trying
9  to understand what you know?
10  A. Right.
11  Q. So if you could give me some detail on what
12  you're talking about that would be helpful?
13  A. Well, the substance of it, I think I'm not going
14  to say anything on the substance.
15  Q. Well, again, you're at -- as I understand it, you
16  went to the microphone and you -- you spoke on the mic,
17  on the floor which is part of the public record?
18  A. Right.
19  Q. So I'm asking you, what did you say when you went
20  to the mic?
21  A. Oh, I don't know. It's in the journals that I
22  don't have on me. But it's that journal from the pages
23  we discussed earlier.
24  Q. Okay.
25  A. That's what I said.

### 34

1  Q. We'll get to that, but you said it was about
2  timing and when and I'm trying to understand your
3  testimony. What do you mean by that?
4  A. Well, that -- it's a long debate. And that I
5  would -- I would tell -- or ask the questions of
6  Representative Harless, the public questions that I
7  would ask it much later in the day.
8  Q. So the questions that you asked of Representative
9  Harless, that was a subject that you discussed with
10  Representative Pena?
11  A. No.
12  Q. Well, again, I'm trying to understand your
13  testimony. And forgive me if I'm asking. You had an
14  individual meeting with Representative Pena on the
15  floor, correct?
16  A. Yes.
17  Q. You then went to the mic and you spoke on the
18  record and you indicated that the subject matter was the
19  timing or when, correct?
20  A. Uh-huh.
21  Q. The timing or when for what?
22  MR. McKENZIE: I'm just going to object.
23  You can say what you said on the public record. The
24  private conversations you had with Aaron Pena are, from
25  what I understand, you're asserting legislative

### 35

1  privilege over that. So to the extent you're speaking
2  about what you said on the mic. You can talk generally
3  about what you remember about what you said on the mic.
4  But the private conversations are privileged.
5  A. It's all House journal.
6  Q. (By Mr. Gear) Okay. But I'm -- I'm just asking
7  you generally, when you said "the timing for when and
8  what". I'm just trying to understand what that means.
9  And then I -- then we can move on. But if you tell me
10  what the timing for "when" means, we can move on?
11  A. Thought I already answered that. It's the
12  questions that were asked on the mic publicly, that's
13  what I was -- that's what I asked Patricia Harless.
14  Q. Okay.
15  A. And as I stated previously, I was going to ask
16  those questions much later in the day.
17  Q. Okay. So was that a choreographed presentation
18  on the microphone?
19  MR. McKENZIE: Objection to the extent it
20  calls for private communications with you and a
21  legislator. You may answer to the extent it reflects
22  the public record.
23  A. I'll take that right.
24  THE REPORTER: Say that again.
25  THE WITNESS: Oh, I'll invoke that right.

### 36

1  BY MR. GEAR:
2  Q. Are you following the advice of your counsel and
3  refusing to answer the question?
4  A. Yes.
5  Q. You also indicated that you had a meeting with
6  Mr. Aliseda on the floor; is that correct?
7  A. Yes.
8  Q. And can you tell me when that meeting took place?
9  A. The date that the second reading of the bill was.
10  Q. Around the same time you spoke to Representative
11  Pena?
12  A. Yes.
13  Q. And would that also be true for Representative
14  Torres -- is it Garza?
15  A. Garza.
16  Q. And -- and what was the last name again? Is it
17  Marango?
18  A. Margo.
19  Q. Margo. Thank you. Did you have a meeting with
20  each of these individuals prior to taking the microphone
21  on the date that the legislative debate took place?
22  A. Not all of them.
23  Q. Okay. So which ones did you not meet with on
24  that day?
25  A. Dee Margo.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 37

1  Q. And Dee Margo is a representative?
2  A. He is.
3  Q. And can you tell me when you met with Dee Margo?
4  A. Well, I didn't. The question you asked me is
5  which one of these I did not meet with. Isn't that what
6  you asked me?
7  Q. Yes, but did you meet with Dee Margo regarding SB
8  14?
9  A. No.
10  Q. Okay. Thank you. Did the Texas Conservative
11  Coalition as an organization have any communication with
12  any House member regarding voter identification?
13        MR. McKENZIE: Objection, it may call for
14  speculation. Go ahead.
15  A. I don't recall seeing anything.
16  Q. (By Mr. Gear) Are you a member of the Mexican
17  American Legislative Caucus?
18  A. Yes.
19  Q. When did you join that organization?
20  A. At the very beginning of session.
21  Q. And do you know, is there a Mission statement for
22  the Mexican American Legislative Caucus?
23  A. I'm not aware.
24  Q. Do you know if they addressed, publicly, issues
25  regarding voter ID?

## 38

1  A. I'm not aware.
2  Q. Do you hold a position in the Mexican American
3  Legislative Caucus?
4  A. No.
5  Q. Did the Mexican American Legislative Caucus have
6  any communication with any House members regarding voter
7  identification?
8        MR. McKENZIE: Objection to the extent it
9  calls for private communications that are not public
10  among legislatures. You may answer as to public record
11  and legislative purpose.
12  A. I'm not aware.
13  Q. (By Mr. Gear) Well, let's talk about publicly
14  first. Did they issue any public report or
15  communication regarding voter ID?
16  A. I'm not aware.
17  Q. Did you engage or -- excuse me. Did the Mexican
18  American Legislative Caucus engage in any private
19  communications regarding voter ID?
20  A. I'm not aware.
21  Q. You indicated that you were elected in 2010?
22  A. Yes, sir.
23  Q. And during 2010, can you tell me what your
24  campaign issues were?
25  A. Oh, man. Public education, higher education,

## 39

1  property rights were the big ones. Second amendment
2  rights, transportation, we talk about voter ID. I'm not
3  sure what else. I'm not sure what else. I was trying
4  to visualize my website.
5  Q. Sure.
6  A. I can't remember what else is on there.
7  Q. So let's focus on voter ID. That was a campaign
8  issue in 2010?
9  A. Uh-huh.
10  Q. Can you tell me the position you took on voter
11  ID?
12  A. Yes, that I was -- would be supportive.
13  Q. Why were you supportive of voter ID in 2010?
14        MR. McKENZIE: Objection to the extent it
15  calls for legislative privilege.
16        MR. GEAR: He's not a member of the House in
17  2010. So I'm asking him during his campaign, why did he
18  take the position to support voter ID. I don't know
19  where that would be privileged.
20        MR. McKENZIE: It's still -- with respect,
21  it still could reflect his private deliberations prior
22  to thought. But you may answer as to anything that's in
23  your campaign, anything that's public. But to the
24  extent it doesn't reflect your thoughts before the bill,
25  then you're open to answer that, too.

## 40

1  BY MR. GEAR:
2  Q. Again, I'm focusing solely on your campaign in
3  2010. And your position that you are a supporter of
4  SB 14 or voter ID, more specifically. Can you tell me
5  why you took the position to support voter ID?
6  A. As stated on my website.
7  Q. Okay.
8  A. Yeah. Which is public record. The -- it was
9  protect the integrity of the elections process and to
10  instill confidence in the voters.
11  Q. And that's your current website, correct?
12  A. I haven't seen it in a while, but...
13  Q. So moving away from your website, I want to know
14  personally as an individual why you made the
15  determination to support voter ID?
16        MR. McKENZIE: Same instructions, answer to
17  the extent it doesn't reflect your thoughts as a
18  legislator.
19  BY MR. GEAR:
20  Q. And again this is before you became a legislator?
21  A. Uh-huh. It's on the website.
22  Q. I'm not asking you about your website. I'm
23  asking about your personal opinion, your personal
24  decision to support voter ID?
25        MR. McKENZIE: I'm going to object on



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 41

1  relevance.  Go ahead.
2    A.  It's -- it's clearly in writing on the website.
3  You're asking me to -- or it was.  I haven't seen the
4  website in a while.  I haven't looked at it in a while.
5    Q.  (By Mr. Gear) Did you as an individual conduct
6  any analysis to determine the impact of voter ID prior
7  to becoming a legislator?
8    A.  No.
9    Q.  Did you engage in any communications regarding
10  voter ID prior to becoming a legislator that helped
11  determine your position on voter ID?
12    A.  No.
13    Q.  Did you communicate with community members
14  regarding voter ID prior to becoming a legislator?
15    A.  No -- yeah, yeah.
16    Q.  And when did those communications take place?
17    A.  No idea.
18    Q.  Was it in terms of your campaign?
19    A.  Campaign.
20    Q.  Can you tell me what the general concerns were
21  regarding voter ID that you heard from community
22  members?
23    A.  Oh, different people expressed all kinds of
24  different reasons.  I mean, there's just -- everybody
25  has their opinion.  We heard -- we heard from a lot of

### 42

1  people different issues.
2    Q.  Did you hear people express support for voter ID?
3    A.  Yes.
4    Q.  Did you hear people express concern or opposition
5  to voter ID?
6    A.  Yes.
7    Q.  Did you have an occasion the speak with
8  legislators prior to becoming a legislator yourself
9  regarding the issues of voter ID?
10    A.  No.
11    Q.  Okay.  And can you tell me what formed the basis,
12  beyond the communication that you had with individuals
13  in the community, that formed the basis of your opinion
14  on voter ID?
15    A.  That my constituents --
16    Q.  Well, you don't have constituents at that point,
17  correct?  You're campaigning.
18    A.  That the citizens, that my community weren't --
19  weren't supportive -- I mean, were supportive.
20    Q.  Some of the concerns that you heard, did any of
21  them also include that this would have a -- a
22  disproportionate impact on minority voters from
23  community members?
24    A.  No.
25    Q.  So you didn't hear anyone express concern about

### 43

1  the impact or the effect of voter ID on minority voters?
2    A.  I don't know any specific time or -- I mean, I
3  just don't recall.
4    Q.  And so specifically, what did people tell you
5  regarding voter ID?
6    A.  Just -- I don't -- you know, that they were
7  supportive.  That if you -- they wanted people who voted
8  to produce an ID.  That's what they wanted.
9    Q.  And as I understand it, not all people told you
10  that they were supportive of voter ID; is that correct?
11    A.  That's correct.
12    Q.  And so the people that -- that told you that they
13  were not supportive of voter ID, what were their
14  concerns or what did they express to you?
15    A.  Oh, let me think.  Some of my guys -- some of the
16  guys there -- some of the community members, I can't --
17  I can't quote them.  I can't possibly put it in words
18  what, you know, specifically what they were saying.
19    Q.  So you remember what the supporters were saying,
20  but you don't remember what the concerns were?
21    A.  Yeah.  The concerns -- very, very few where I
22  live.  We heard concerns on a lot of other issues not
23  related to voter ID.
24    Q.  And I want to focus solely on voter ID right now?
25    A.  Right.  I can't recall.

### 44

1    Q.  Was there any discussion about what problems --
2  what specific problems voter ID was intended to address?
3    A.  Most conversation was just -- kind of the quote I
4  use over and over again was "prove who you are," just
5  show an ID that you are who you say you are.  That's
6  just what we heard, that's what the people said during
7  the campaign.
8    Q.  Did community members also express concern about
9  undocumented non-citizens or illegal aliens voting?
10    A.  No.  No.
11    Q.  And you said "where you live."  Where
12  specifically do you live?
13    A.  I live in Williamson County.
14    Q.  Williamson County.
15    A.  Right.
16    Q.  And can you tell me what the demographics of
17  Williamson County are?
18    A.  No.
19    Q.  In terms of Black or Hispanic?
20    A.  No.
21    Q.  Can you tell me what the percentage specifically
22  of Hispanic population is?
23    A.  No.
24    Q.  In Williamson County?
25    A.  No.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 45

1   Q.  Have you ever attempted to determine that?
2   A.  No.
3   Q.  My understanding is -- strike that.  When
4   speaking with the people who expressed concern against
5   voter ID, did they express any specific problem that
6   voter ID may cause?
7   A.  Not that I recall.
8   Q.  My understanding that you -- is that you are
9   currently campaigning in House District 52?
10  A.  I'm up for reelection.
11  Q.  Does that mean you're campaigning?  I don't want
12  to put words in your mouth so tell me how you would
13  describe it?
14  A.  Oh, I mean, I'm on the ballot, but I'm up for
15  reelection.  Campaigning, we sent out a mail piece.
16  But, you know.
17  Q.  You're running for reelection?
18  A.  We're running for reelection.
19  Q.  But you're unopposed?
20  A.  I'm unopposed.
21  Q.  Okay.
22  A.  Well, I have a Libertarian, but there's not a
23  Democrat.  So we're not unopposed.
24  Q.  Thanks for the clarification.
25  A.  Sure.

## 46

1   Q.  Let me ask you a question about your history of
2   participation in government outside of your elected
3   office.  Can you tell me a little bit about that?
4   A.  Sure.  I've been employed -- you're asking about
5   government, right?
6   Q.  Yes.
7   A.  Okay.  Sure.  I've been employed by the House.
8   I've been employed by the Senate.  I've been employed by
9   the Attorney General's office.  I've been employed by
10  Texas State University system.  And Texas State.
11  Q.  You indicated that you were appointed by the
12  House.  So does that mean that you were appointed by
13  specific House members?
14  A.  I'm not appointed.  I worked -- I work with the
15  House.
16  Q.  Okay.  You were hired?
17  A.  Yes.
18  Q.  By members of the House.  Okay.  Can you tell me
19  which members of the House you were hired by?
20  A.  Sure.  I'll start in -- with Pitts, that's Jim
21  Pitts.  And by Kevin Brady.
22  Q.  If you can give me the time frame?
23  A.  Okay.  So '93 is Jim Pitts.  '95 is Kevin Brady.
24  '97 Wayne Christian.  '99 is Rick Perry.  2001 is John
25  Cornyn, 2003 is Robert Talton, 2005 is John Otto, 2007

## 47

1   is John Otto, 2009 --
2   Q.  So you said '05 through '07 is John Otto?
3   A.  Yes.  Yes.  2009 is the Texas State University
4   System and then elected 2011.
5   Q.  Okay.  So let me break that out.  John Cornyn, is
6   he with the House of Representatives?
7   A.  No.  He was, at that time, serving as our Texas
8   Attorney General.
9   Q.  Okay.  So let me just focus primarily right now
10  on the House.  Can you -- can you go through again who
11  hired you in the House solely?
12  A.  Oh, okay.  So 1993 Jim Pitts.  1995 Kevin Brady,
13  1997 Wayne Christian, 2005 John Otto, 2007 John Otto and
14  in the interim of '93 was Huey McCoulskey.  I forgot
15  about Huey.  Huey McCoulskey.
16  Q.  Okay.  So let's just start with, I believe you
17  said Jim Pitts was the first House member that hired
18  you, correct?
19  A.  Let's back up.  Let's go to -- I forgot Tim Von
20  Dohlen.  I was an intern, so there might be paperwork
21  for Tim Von Dohlen.  I'm not certain.  But Tim never
22  paid me.  Tim Von Dohlen.  That would be '92.
23  Q.  And Tim was a Representative?
24  A.  Yes.  Yes.  Tim Von Dohlen in '92.
25  Q.  So as I understand it you've been in the House as

## 48

1   a senior staff member?
2   A.  Yes.  Well, all of it from intern, you know, all
3   the way up to chief of staff.
4   Q.  Okay.  And as we talk about each one I would like
5   you to try to identify what your title or position was
6   during that time period?
7   A.  Okay.
8   Q.  But let's start with 1992, which you said was
9   Tim?
10  A.  Von Dohlen.
11  Q.  Von Dohlen.
12  A.  Uh-huh.
13  Q.  Tim Von Dohlen was a Representative.  Is he still
14  in the House now?
15  A.  He is not.
16  Q.  He is not.  Okay.  And as an employee of Tim Von
17  Dohlen, can you tell me what your position or title was?
18  A.  Intern.
19  Q.  And as an intern for Tim Von Dohlen, can you tell
20  me what your responsibilities generally were?
21  A.  Case work.
22  Q.  And when you say "case work," do you mean
23  research?  How are you defining that?
24  A.  Case work is when a constituent calls and they
25  have a question, they have a question about child



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 49 |
|---|
| 1  support or maybe Medicaid, State services.  And as an |
| 2  intern we take those phone calls and problem solve for |
| 3  them. |
| 4      Q.  As an intern for Tim Von Dohlen, did you deal |
| 5  with any issues related to voter ID? |
| 6      A.  No. |
| 7      Q.  And that would have been in 1992? |
| 8      A.  1992, correct. |
| 9      Q.  And did you field any calls, did you take any |
| 10  calls regarding voter ID? |
| 11      A.  No. |
| 12      Q.  Did you take any calls regarding voter fraud? |
| 13      A.  No. |
| 14      Q.  Let's go to 1993 which did -- did Huey -- |
| 15      A.  McCoulskey. |
| 16      Q.  Or Jim Pitts come first? |
| 17      A.  Huey McCoulskey. |
| 18      Q.  And Huey McCoulskey was a Representative in the |
| 19  House? |
| 20      A.  Yes. |
| 21      Q.  What was the title or position that you held for |
| 22  Huey McCoulskey? |
| 23      A.  Two.  I was an intern as well. |
| 24      Q.  Okay. |
| 25      A.  And then I worked in the district office.  I |

| 50 |
|---|
| 1  can't tell you my title.  If I'm -- I'm district office |
| 2  director, maybe something like that. |
| 3      Q.  So your answer would suggest that you worked in |
| 4  two different locations -- |
| 5      A.  That is correct. |
| 6      Q.  For Jim McCoulskey? |
| 7      A.  Huey.  Yes. |
| 8      Q.  And so can you tell me which locations you worked |
| 9  at? |
| 10      A.  Sure.  So at the beginning of '93 I was in Huey's |
| 11  capital office as an intern.  And then after the session |
| 12  '93, when it was over, I went back to work for Huey. |
| 13  And between that time is when I worked for Jim Pitts in |
| 14  '93.  So it was Huey McCoulskey beginning of '93.  I |
| 15  finished the session with Jim Pitts in '93 and went back |
| 16  to work for Huey McCoulskey in '93. |
| 17      Q.  So in '93 while you're in the capital office for |
| 18  Representative McCoulskey, can you tell me what your |
| 19  responsibilities were.  I believe you're an intern? |
| 20      A.  Open mail. |
| 21      Q.  Did you open my mail related to voter ID? |
| 22      A.  No. |
| 23      Q.  Did you open any mail related to voter fraud |
| 24  issues? |
| 25      A.  No. |

| 51 |
|---|
| 1      Q.  And so then -- also in 1993 you worked for -- |
| 2  let me back up.  You also said you were in his other |
| 3  office, correct? |
| 4      A.  Correct. |
| 5      Q.  And same questions.  Did you have any |
| 6  responsibilities related to voter ID? |
| 7      A.  No. |
| 8      Q.  Did you have any responsibilities related to |
| 9  voter fraud of any kind? |
| 10      A.  No. |
| 11      Q.  All right.  And so also in 1993 you worked for |
| 12  Jim Pitts, Representative Pitts.  And can you tell me |
| 13  what your title or position was in 1993? |
| 14      A.  Same thing.  I mean, you got to check the |
| 15  paperwork for exact titles.  Because I don't know what |
| 16  his exact title -- what my exact title was.  But it was |
| 17  the same thing.  Like, intern.  Same job. |
| 18      Q.  When you say "same job," do you mean case work or |
| 19  do you mean opening mail? |
| 20      A.  Opening mail. |
| 21      Q.  Opening mail.  Okay and in 1993 with Jim Pitts |
| 22  did you deal with any issues related to voter ID? |
| 23      A.  No. |
| 24      Q.  Did you deal with any issues related to voter |
| 25  fraud? |

| 52 |
|---|
| 1      A.  No. |
| 2      Q.  Were those issues that you were even aware of in |
| 3  1993? |
| 4      A.  No. |
| 5      Q.  So I believe the next Representative that you |
| 6  worked for, and correct me if I'm wrong, is Kevin Brady? |
| 7      A.  Yes. |
| 8      Q.  In 1995? |
| 9      A.  Yes. |
| 10      Q.  And in 1995 can you tell me what your |
| 11  responsibilities were for Representative Brady? |
| 12      A.  Administrative aid.  So mail, case work, |
| 13  assigning the interns, file folders.  This is |
| 14  pre-computers.  So we were, you know, manually filing |
| 15  them.  Kind of made sure the interns had jobs. |
| 16      Q.  That sounds like a promotion. |
| 17      A.  It was. |
| 18      Q.  In any event in 1995 did your responsibilities |
| 19  conclude -- include anything dealing with voter ID? |
| 20      A.  No. |
| 21      Q.  Did your responsibilities include anything |
| 22  dealing with issues of voter fraud of any kind? |
| 23      A.  No. |
| 24      Q.  All right.  So from 1995 you then, looks like you |
| 25  took a little time off and you came back and worked for, |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 53

1  is it Wayne Christian?
2      A.  Yes.
3      Q.  And Wayne Christian is also a representative?
4      A.  Yes.
5      Q.  And that time period would have been 1997, if
6  I'm -- if I'm correct?
7      A.  Yes.
8      Q.  And in 1997 what title or position did you hold?
9      A.  Legislative aid.
10     Q.  And tell me, if you can, what the
11  responsibilities were for a legislative aid?
12     A.  Making sure the committee book for the committees
13  he was serving, making sure the committee books had the
14  right bills in them and that we had the analysis in
15  them, everything was together for him.  And then
16  managed, you know -- at this point the administrative
17  assistant, any interns and making sure that the case
18  work was done, you know, and the letters were being
19  written and things were getting filed correctly.
20     Q.  So you were dealing with his constituents in
21  terms of letter writing?
22     A.  Not really anymore.  I was kind of making sure
23  that what came in had an answer going out.  But I wasn't
24  involved with like the -- the copy writing at this stage
25  anymore.  That was the administrative assistant's job.

## 54

1      Q.  Okay.  So in 1997 while working for Wayne
2  Christian were you aware of issues related to voter
3  fraud?
4      A.  No.
5      Q.  Was that a topic of discussion in 1997, if you
6  remember?
7      A.  I don't recall that it was.
8      Q.  Okay.  Were you aware of any issues related to
9  voter ID in 1997?
10     A.  No.
11     Q.  So from -- and I should follow it up with, did
12  you work on any issues related to voter ID?
13     A.  No.
14     Q.  And did you work on any issues related to voter
15  fraud?
16     A.  No.
17     Q.  And so from 1997 you then went to, if I am
18  correct, Jim Pitts in 2005?
19     A.  No.  1999 would be Rick Perry.
20     Q.  1999.  But Rick Perry was not a representative in
21  1999?
22     A.  No.  That's right.
23     Q.  He would have been Lieutenant Governor?
24     A.  That's correct.
25     Q.  Okay.  So let's -- let's skip over Rick Perry for

## 55

1  a second --
2      A.  Okay.
3      Q.  And focus on Jim Pitts in 2005.
4      A.  2005 would be John Otto.
5      Q.  You're correct.  Thank you.  Let's focus on
6  Representative Otto in 2005.  Can you tell me what title
7  you held as -- as an employee for Representative Otto?
8      A.  Legislative aid.  When you ask me title, you'll
9  have to check the personnel action request.  Because
10  I -- I don't know if that says legislative assistant, if
11  it says legislative director.  The titles for each
12  member are kind of vague here in Texas.  The members
13  kind of put a title on there.  So when I say that, you
14  know, there's -- there's four recognized titles in the
15  handbook.
16     Q.  What are the four recognized titles?
17     A.  Oh, gosh.  It was clerk, intern, administrative
18  aid and legislative aid.
19     Q.  Okay.
20     A.  Those are like, the four.  So people put, you
21  know, on the actual paperwork other stuff.  So when I
22  tell you legislative aid that's what I did, I mean,
23  legislative aid.
24     Q.  And so in 2005 under Representative Otto, can you
25  tell me, generally, what your responsibilities were?

## 56

1      A.  Yeah.  His legislative package, his bills -- his
2  bills, ones that he was carrying, dominated almost all
3  of my time.
4      Q.  Okay.  And so as a legislative aid did you -- did
5  you conduct analysis, research on a particular bill?
6      A.  Yes.
7      Q.  Okay.  And did Jim Otto address any issues of
8  voter ID in 2005?
9      A.  John Otto, no.
10     Q.  I'm sorry.  John Otto.  I'll get that right.
11  I'll just call him Representative Otto for now.
12     A.  That'll work, too.
13     Q.  Did any of your responsibilities include issues
14  of voter ID in 2005?
15     A.  No.
16     Q.  Did any of your responsibilities include issues
17  related to voter fraud in 2005?
18     A.  No.
19     Q.  Were you aware of issues related to voter ID in
20  2005?
21     A.  At this time, 2005, I don't think a bill had been
22  filed in 2005.  I'm not certain when I saw that first
23  one.  But I can't remember if that was '05 or '07.  I
24  don't remember.
25     Q.  So as you sit here today, is it your testimony



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 57

1   that you are not -- you were not aware of issues related
2   to voter ID?
3       A.  Right.  Right.
4       Q.  In 2005?
5       A.  Right.
6       Q.  And you were not aware of issues related to voter
7   fraud in 2005?
8       A.  Right.
9       Q.  Okay.  And so you worked for Representative
10  Otto --
11      A.  That's right.
12      Q.  From 2005 to 2007 or was there a break in there
13  somewhere?
14      A.  That one was consecutive.  So it would have been
15  the whole time.
16      Q.  Okay.  At any time during the period that you
17  worked for Representative Otto did your responsibilities
18  include issues related to voter ID?
19      A.  No.
20      Q.  At any time during the period in which you worked
21  for Representative Otto did your responsibilities
22  include issues related to voter fraud?
23      A.  No.
24      Q.  Did you receive any calls or communications
25  regarding voter ID while you were a legislative aid for

## 58

1   Representative Otto?
2       A.  Not that I recall.
3       Q.  And did you receive any communications or phone
4   calls while you were a legislative aid for
5   Representative Otto that addressed the issue of voter
6   fraud?
7       A.  Not that I recall.
8       Q.  Okay.  And so I want to take you back.  Was --
9   was there anybody else that you worked for as a
10  legislative aid or any other -- of the other titles that
11  you described in the House after 2007?
12      A.  No.  No.  Because then it was Texas State so I
13  got elected.
14      Q.  Okay.  So your period would have been from 1992
15  to 2007 you worked for various representatives in the
16  House?
17      A.  That is accurate.
18      Q.  All right.  So let me take you back for a second
19  to your campaign in 2010.  Do you know what -- do you
20  know what the people you communicated with wanted to see
21  regarding the issue of voter ID?  Wanted to see happen I
22  should say?
23      A.  A picture -- photo picture when you voted.
24      Q.  And do you -- at any time during that time that
25  you were campaigning, and I'm talking about 2010, did

## 59

1   you do any independent research to determine the effects
2   of voter -- photo ID?
3       A.  No.
4       Q.  On minorities?
5       A.  No.
6       Q.  Did you do any independent research at all or
7   engage in any communications that would have supported
8   your position on -- that helped to support your position
9   on photo ID?
10      A.  No.
11      Q.  And so now, let me move forward to your actual
12  position as a representative in District 52.  Why don't
13  you know the demographics of your district?
14      A.  I don't see my district like that.
15      Q.  You don't think it's important to know the
16  demographics, the people in your district?
17      A.  I think it's important to know the issues that
18  are facing my district.
19      Q.  Well, obviously during your campaign in 2010, you
20  campaigned, correct?
21      A.  Uh-huh.
22      Q.  You went out and -- into your community?
23      A.  Yes.
24      Q.  And did you go to the various areas, cities
25  within your, now District 52?

## 60

1       A.  Yes.
2       Q.  And that's contained completely within Williamson
3   County?
4       A.  Yes.
5       Q.  And there are various cities within District 52?
6       A.  Yes.
7       Q.  Can you identify the cities that -- that are
8   currently within District 52?
9       A.  Currently or at the time of the election?
10      Q.  At the time of the election.  I understand there
11  was a redistricting process.
12      A.  Right.  Round Rock, Georgetown, Hutto, Taylor,
13  Coupland, C-O-U-P.  Coupland, parts of Austin, and parts
14  of two different municipal utility districts, or as we
15  say MUDS.
16      Q.  Okay.  And I just want to ask you, specifically,
17  you spent time in Taylor during your campaign?
18      A.  Yes.
19      Q.  Could you describe for me the demographics of --
20  of Taylor as far as Black, Hispanic?
21      A.  No.
22      Q.  So who did you speak to when you went to Taylor.
23  Did you speak to Anglos?
24      A.  A lot of folks.
25          MR. McKENZIE:  I'm also going to object.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 61

1  When you see someone, you don't always know what,
2  exactly, the demographics of the folks you're seeing
3  are.  But you may answer.
4  BY MR. GEAR:
5      Q.  Okay.
6      A.  Don't know.
7      Q.  So as you sit here today, is it your testimony
8  that you have never attempted to determine the
9  demographics of the District 52 which you are currently
10  a House member in, correct?
11      A.  Yeah.  I don't know the racial demographics of
12  District 52.
13      Q.  Okay.  And on your own representative website,
14  are the demographics posted on that website?
15      A.  I don't know.
16      Q.  You've never attempted to look to see if
17  demographics are posted on your website for House
18  member?
19      A.  I don't know -- oh, the House member?
20      Q.  Yes.
21      A.  House member or campaign member?
22      Q.  As a House member?
23      A.  Oh, I don't know if it's there.  Probably is, I
24  guess.
25      Q.  Who do you view as your main base of electoral

## 62

1  support?
2          MR. McKENZIE:  Objection; vague.
3  BY MR. GEAR:
4      Q.  Well, when you were campaigning in 2010 --
5      A.  Uh-huh.
6      Q.  For District 52, did you have an opponent?
7      A.  Yes.
8      Q.  And who was that opponent?
9      A.  Diana Maldonado.
10      Q.  And that's a Hispanic surname.  Am I accurate to
11  say that she is Hispanic?
12          MR. McKENZIE:  Objection; calls for
13  speculation.
14  BY MR. GEAR:
15      Q.  Well, did you meet this candidate?
16      A.  Oh.  Yeah.  Yeah.
17      Q.  And is this candidate a Spanish Speaker?
18      A.  I think she speaks Spanish.
19      Q.  Okay.
20      A.  I've never heard her speak Spanish, but I think
21  she speaks Spanish.
22      Q.  Okay.  So I'm going to ask you again, is it fair
23  to say that this candidate that you were running against
24  in 2010 was also Hispanic?
25          MR. McKENZIE:  Objection.  Same objection.

## 63

1  Speculation.  Go ahead.
2  BY MR. GEAR:
3      Q.  Are you Hispanic?
4      A.  Yes.
5      Q.  Okay.  And did you have an occasion to look at
6  her website while campaigning against her?
7      A.  Oh, yeah.
8      Q.  And did that indicate at all whether or not she
9  was Hispanic?
10      A.  I don't know.
11      Q.  Was she a -- a member of any Hispanic membership
12  groups?
13      A.  I don't know.
14      Q.  Were you a member of any Hispanic membership
15  groups during the -- during 2010 campaign?
16      A.  El Amistad Club.  And I say that because they
17  list me officially, but I haven't been there in years.
18  But it's my understanding that they list me on their
19  Secretary State filings, whatever they do, that I appear
20  there.  But it's been years since I've gone there.
21      Q.  Do you have any support from the Hispanic
22  community, did you have any support during your
23  candidacy in 2010?
24      A.  Yes.
25      Q.  Did you have an occasion to look at the vote

## 64

1  results during the campaign or after the campaign in
2  2010?
3      A.  Which -- which campaign?
4      Q.  I'm talking about your 2010 campaign where you
5  first ran for district 52.
6      A.  There were three campaigns in 2010.
7      Q.  You were involved in three campaigns in 2010?
8      A.  Yes.
9      Q.  You ran for three different positions?
10      A.  No.
11      Q.  Elected positions in 2010?
12      A.  No.
13      Q.  So help me understand what you mean by three
14  campaigns?
15      A.  Sure.  There's a campaign for the Republican
16  nomination.
17      Q.  Okay.
18      A.  There was a campaign for the runoff.
19      Q.  Okay.
20      A.  And there was a campaign to be the elected
21  official in November.  So three campaigns.
22      Q.  So -- so Republican nomination --
23      A.  Runoff.
24      Q.  Runoff.  General election?
25      A.  Correct.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 65

1    Q.  So during the Republican nomination, did you have
2  a chance to look at how the -- the precincts in House
3  District 52 broke out and what type of support you were
4  receiving?
5    A.  Yes.
6    Q.  Okay.  And did you attempt to do an analysis
7  based on Spanish surname to determine if the Hispanic
8  community or Spanish surname community in this case, was
9  supporting you during to your campaign.
10    A.  Yes.
11    Q.  And what did you find?
12    A.  A lot of support by the Hispanic community.
13    Q.  And when you say "a lot of support," what does
14  that mean?
15    A.  Numbers were -- were big.  A lot of support.  You
16  want a number?
17    Q.  Well, generally, I've been trying to understand
18  your testimony on not knowing the constituents, the
19  demographics of your constituents in House District 52.
20  But during the campaign you've testified that you looked
21  at -- at the data precinct by precinct and you did a
22  surname analysis to determine what Spanish surname
23  constituents, at least, were supporting you.  And so I
24  was attempting to find out if you could tell me based on
25  the precinct data now, how that would break out in terms

## 66

1  of the cities in House District 52?
2    A.  I didn't do the surname search.  I didn't do the
3  research.  It was sent to me, although we didn't ask for
4  it.  It was sent to my office and we looked at it.  So
5  as to how it was done, I don't know.  As to methodology,
6  I don't know.  As to the metrics --
7    Q.  You don't know.
8    A.  No.  I didn't do that.
9    Q.  Okay.
10    A.  I didn't do that part of it.  So I can't speak to
11  the methodology.
12    Q.  Did you look to see if the majority of the
13  Hispanic precincts supported you during your campaign?
14  And I'm talking about both the Republican, the --
15  through to the general election.  The Republican
16  nomination to the general election?
17    A.  Can you define for me Hispanic precinct?
18    Q.  Sure.  A majority Spanish surname precinct?
19    A.  I don't know that information.
20    Q.  Okay.  Have you had -- ever had an occasion to
21  review voter ID bills that were presented prior to SB
22  14?
23    A.  Not that I recall.  There was one voter ID bill,
24  but I don't know if it was '07 or '09.  I can't remember
25  the year.  There was another one, but it was not my --

## 67

1  it wasn't in my scope.  Like, I wasn't working on that.
2  There was -- there was one out there that I recall.  I
3  couldn't tell you who did it or what year it was.  But
4  it wasn't like, within my scope of like, my job
5  description to -- to follow that particular bill.  But
6  there was one out there, I think filed previously in a
7  different session.
8    Q.  Okay.
9    A.  That I recall.
10       MR. GEAR:  This has been previously marked
11  as Exhibit 44, so I want to follow that same number.
12       MR. McKENZIE:  Do you have a copy?
13       MR. GEAR:  Say that again.
14       MR. McKENZIE:  Do you have a copy?
15       MR. GEAR:  Yes, I do.
16       MR. McKENZIE:  Okay.
17       (Exhibit No. 44 was marked.)
18  BY MR. GEAR:
19    Q.  Okay.  Now, I want to give you a chance to look
20  at this and then ask you a few questions about it.
21    A.  Okay.  Okay.  I think I get it.
22    Q.  Have you seen this before?
23    A.  It is not familiar to me at all.
24    Q.  Can you identify what it is?
25    A.  This is House Bill 1706.  Authors are listed

## 68

1  there.  I couldn't tell you that I recall seeing this in
2  any kind of capacity, really.
3    Q.  And can you tell me who the authors are on this?
4    A.  Well, I can tell you who the authors listed are.
5    Q.  Sure.
6    A.  There's Denny -- that's Mary Denny, that would be
7  Jim Pitts, it would be Beverly Woolley, Joe Dixon,
8  Dwayne Bohac and then the et al refers to other members
9  who may have signed on.
10    Q.  And is this the same Representative Pitts that
11  you worked for between 2005 and 2007?
12    A.  No.  Jim Pitts was in 1993.
13    Q.  And that's where my mistake was.  There was a Jim
14  Pitts --
15    A.  And a John Otto.
16    Q.  John --
17    A.  That is correct.
18    Q.  Otto.  Okay.  Did you have occasion to review
19  this during or prior to the legislative debates for SB
20  14?
21    A.  No.
22    Q.  I just want to direct your attention to page --
23  it would be -- it would be Page 4, Section 63.0101?
24    A.  Okay.
25    Q.  Documentation of proof of identification?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

69

1    A. Uh-huh.
2    Q. And do you understand this -- this Exhibit 44 to
3  be the voter ID bill that was introduced in 2005?
4    A. No, I wouldn't.
5         MR. McKENZIE: Objection.
6    A. I wouldn't know that.
7    Q. (By Mr. Gear) Well, again, take some time to
8  review it. I would like to ask you some questions about
9  it. And I would like you to try to familiarize yourself
10  with it.
11    A. Okay.
12    Q. Can you tell me what this is now?
13    A. It is a bill to be entitled An Act Relating to
14  Requiring a Voter to Present Proof of Identification.
15    Q. And, you know, again, directing your attention to
16  Section 63.0101 --
17    A. Uh-huh.
18    Q. Documentation of proof of identification.
19    A. Uh-huh.
20    Q. Can you describe for me what the allowable forms
21  of identification were in HB No. 1706?
22    A. Okay. Line 19 says a driver's license or
23  personal identification card issued by DPS or, I guess
24  an ID card, if it's not a driver's license issued by
25  DPS, and has some expiration dates. On line 25 it talks

---

70

1  about a United States military identification card with
2  the person's photograph. On page -- on my Page 5, line
3  2 it talks about a valid employee identification card
4  that contains a person's photograph and is issued by an
5  employer. Ordinary course of business. My Page 5, line
6  7 talks about a US citizenship certificate that has a
7  photograph. Same page, my page line -- my Page 9, line 9
8  talks about passport. Page 10 is a student
9  identification card issued by an institution of higher
10  education that contains a person's photograph. Line 14
11  appears to be a CHL, concealed handgun license, issued
12  by DPS, Department of Public Safety. Line 16 is an ID
13  card issued by a State agency of the State that has a
14  photograph. Line 18 is an ID card, the person's
15  photograph that's issued by the county election's
16  administrator or county clerk. And 21 says there's
17  more.
18       So 23 says -- oh, I guess that's current
19  language. Yeah, that's not underlined, so line 23, 24,
20  25 are current language. And that lists utility bill,
21  government bill, paycheck, other government documents.
22  In 26 they added official mail addressed to the person
23  by name from a governmental entity. Wait a minute.
24    Q. I asked you a few questions before about voter
25  fraud. You testified that between 1992 to 2007 you were

---

71

1  not aware of any issues of voter fraud; is that correct?
2    A. Yeah. It wasn't in my scope of responsibility.
3    Q. Okay. And does that mean you were not aware of
4  issues of voter fraud between 1992 and 1997?
5    A. Yeah. Not from a legislative, I mean, not from a
6  legislative -- I'm a staffer, read legislation, it
7  wasn't -- it wasn't -- I wasn't aware of that at all.
8    Q. Okay. And you also testified that between 1992
9  and 19 -- 2007 you were not aware of issues related to a
10  voter ID. Is that also correct?
11    A. Right.
12    Q. Okay. So do you understand or have you become
13  aware, at some point, regarding the issues of voter
14  fraud?
15    A. Yes.
16    Q. And can you tell me, how would you define voter
17  fraud?
18    A. I would define voter fraud as somebody who --
19  well, there's different definitions. Let's see here.
20    Q. And when you say "there's different definitions,"
21  you're talking about the Texas -- Texas election code?
22    A. I wasn't going to quote statute. I was just
23  going to, you know --
24    Q. Fair enough.
25    A. Yeah. I mean, it's an illegal vote that's being

---

72

1  cast is how I would define it.
2    Q. When you say "an illegal vote that's being cast,"
3  what do you mean?
4    A. There are -- maybe somebody votes and represents
5  to be somebody they aren't. Maybe somebody has a
6  mail-in ballot that they shouldn't legally have. Fills
7  out a mail-in ballot they shouldn't be filling
8  out.
9    Q. Anything else?
10    A. If we sat here long enough. But no.
11    Q. How would you identify or define voter
12  impersonation?
13    A. I guess it would be representing yourself to be
14  somebody other than yourself. Representing yourself --
15  yeah. Representing yourself to be somebody other than
16  yourself.
17    Q. So generally, as I understand your testimony, you
18  identified by mail ballot fraud?
19    A. Uh-huh.
20    Q. And voter impersonation or voting at the polling
21  place types of fraud, correct?
22    A. Yes.
23    Q. And is that your understanding of voter fraud in
24  general?
25    A. Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 73

1   Q. Turning your attention back to Exhibit 44,
2   section 63.0101.
3   A. Okay.
4   Q. Section 3, which would be, I believe Page 5?
5   A. My Page 5. Yes.
6   Q. In your opinion, would allowing a valid employee
7   identification card that contains the person's
8   photograph and is issued by an employer of the person in
9   the ordinary course of the employer's business be an
10  effective method of preventing voter fraud as you
11  identified it?
12  A. No.
13  Q. Why not?
14  A. Because you're asking an election judge to know
15  that that is a valid source of ID, to recognize that
16  that is valid or not valid.
17  Q. Does an election judge have an ability -- a
18  greater ability to identify whether a driver's license
19  is valid versus an employee card?
20  A. Yes.
21  Q. And how do you know this?
22  A. Consistency of documentation.
23  Q. So does it make any difference if the ID card,
24  for instance, expired within a two-year period or a
25  60-day period, does that make any difference to you?

## 74

1   A. No.
2   Q. Would that make it any easier or harder for an
3   election judge to identify a invalid card, for instance?
4   A. Yeah, harder.
5   Q. Harder in what -- what capacity?
6   A. Harder in that a four-year old card versus a --
7   you know, a four-year old picture versus a two-month old
8   picture might be more difficult for someone to identify.
9   Q. Well, that may be the case anyway, because how
10  often do Texas residents have to renew their driver's
11  license?
12  A. Every four years, I guess.
13  Q. So someone could actually come in to a polling
14  place with a four-year old picture and still have a
15  valid card; is that correct?
16  A. You said card, you mean driver's license?
17  Q. Driver's license ID card, State issued ID card.
18  A. Yes.
19  Q. Can you renew your driver's license on line?
20  A. Yes.
21  Q. Is that something you're allowed to do? And when
22  you renew on line, do you take a new photo?
23  A. You take a new photo every other renewal, I
24  think.
25  Q. So in essence, someone could still possess a

## 75

1   valid driver's license or State issued ID with an
2   eight-year old photo?
3   A. I don't know the exact years. But you do have to
4   get -- but you do have to get a new picture done. You
5   have to get a new picture done in Texas even on line.
6   Actually --
7   Q. I'm sorry.
8   A. You have to go -- it's on line once. But I think
9   the next time you have to go get your picture redone.
10  Q. So as I understand your testimony, driver's
11  licenses in Texas last -- are valid for four years?
12  A. Yes.
13  Q. And if you renew on line, then you would use the
14  old photograph that was taken previously for your
15  renewed license, correct?
16  A. I think it's one time.
17  Q. And that -- that renewed license would be valid
18  for another four years?
19  A. That is correct.
20  Q. So again, it's -- it's possible and likely then,
21  that an individual who renewed on line could vote at a
22  polling place with a valid driver's license or State
23  issued ID that has an eight-year old picture?
24  A. That's correct.
25  Q. Why don't we take a quick break?

## 76

1   A. Sure.
2       (Brief recess.)
3   BY MR. GEAR:
4   Q. Okay. Back on the record. I just want to return
5   your attention to Exhibit 44. We had a chance to look
6   at this. The -- you've identified who the authors of
7   this bill are and you also see that this is listed as
8   House Bill No. 1706. And do you understand that to be
9   the House Bill that was introduced in 2005?
10  A. I -- I couldn't tell you the year, but if you say
11  2005, okay.
12  Q. Okay. Would you be surprised if that was the
13  House Bill introduced in 2005?
14  A. It -- no, it was sometime in there.
15  Q. And the categories of ID that we've been going
16  through, do you understand those to be described as the
17  allowable forms of ID under House Bill 1706?
18  A. Yes.
19  Q. Okay. My understanding is that you also worked
20  for Lieutenant Governor Perry at the time, in 1999?
21  A. Yes.
22  Q. And can you tell me what your responsibilities
23  were for Lieutenant Governor Perry?
24  A. Read and write an analysis for any bill that was
25  in government code.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 77

1    Q. Can you give me a little bit more on that? "Any
2  bill that was in government code," does that include
3  voter ID, does that include election law, I should say?
4    A. Government code. So if this were to, say amend
5  the government code, then that's something I would have
6  read.
7    Q. Did you have an occasion to read or write any --
8  any government code related to election law?
9    A. No, not that I remember at all.
10   Q. Okay. And along that line of questioning, did
11 you have an occasion to read or write any government
12 code related to voter fraud?
13   A. No, not that I remember at all.
14   Q. And as a staff member for Governor Perry, what
15 position or title did you hold?
16   A. I don't know what the paperwork says, but we were
17 referred to as research assistant, maybe, something like
18 that.
19   Q. And as a research assistant specifically, were
20 you ever given the responsibility to research issues
21 related to voter fraud?
22   A. No.
23   Q. Were you ever given responsibility to research
24 issues related to voter ID?
25   A. No.

### 78

1    Q. Was voter ID ever a topic of discussion in
2  Lieutenant Governor Perry's office during the time that
3  you were employed by him?
4    A. Not that I would be aware of.
5    Q. Was voter fraud ever a discussion in Lieutenant
6  Governor Perry's office during the time that you were
7  employed?
8    A. No.
9    Q. And I believe that was in 1999.
10   A. 1999. Not that I'm aware of at all.
11   Q. And you were employed in his office from 1995
12 until?
13   A. January of '99 until June of '99.
14   Q. Okay.
15   A. Maybe July 1. I don't know.
16   Q. So as I understand your testimony, you were --
17 during your employ with Governor Perry you were never
18 involved in any writing or analysis of, either voter ID
19 or voter fraud; is that correct?
20   A. That's correct.
21   Q. Okay. You also indicated that you were an
22 employee in the Attorney General's office?
23   A. Yes, sir.
24   Q. And that was under which Attorney General?
25   A. John Cornyn.

### 79

1    Q. Cornyn?
2    A. C-O-R-N-Y-N.
3    Q. And what time period was that?
4    A. This would be February-ish of '01 through
5  December of '01.
6    Q. And what responsibilities did you have in the
7  AG's office?
8    A. It was broken down the same way. So I had --
9  like Perry's office was by topic.
10   Q. Okay.
11   A. So I had transportation and I don't remember any
12 other topic, but there at the end of session I was asked
13 to look at loan repayment programs.
14   Q. Okay. And so there's something I don't
15 understand.
16   A. Okay.
17   Q. You said Perry's office was my topic. I don't
18 think -- I'm not really sure what that means?
19   A. Well, I mean like, as in Perry's office, the
20 General Cornyn had the staffers broken down by policy
21 area.
22   Q. Okay.
23   A. So when I worked for General Cornyn, my policy
24 area was transportation. And then toward the end of
25 session they asked me to help with -- with like, a law

### 80

1  school loan repayment program.
2    Q. So while in the Attorney General's office, did
3  you ever have any responsibilities related to voter
4  fraud?
5    A. No.
6    Q. Did you ever have any responsibilities related to
7  either the research analysis of voter ID?
8    A. No, sir.
9    Q. Do you -- do you or were you aware of the issue
10 of either -- let's start with voter fraud. Were you
11 aware of the issue of voter fraud being discussed in the
12 Attorney General's office in 2001?
13   A. No, sir.
14   Q. And that would not have been your area of -- that
15 would not have been your policy area, correct?
16   A. Correct.
17   Q. Are you aware of anyone that had a policy area in
18 2001 that -- that dealt with the issue of voter fraud in
19 the Attorney General's office?
20   A. No, sir.
21   Q. Are you aware of anyone that had a policy issue
22 in 2001 that dealt with the issue of voter ID?
23   A. No, sir.
24   Q. Okay. So again, let me take you back to your
25 campaigns in 2010. And when I say "campaigns," I mean



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 81

1  from the beginning to the end.
2      A.  Okay.
3      Q.  Is that clear?
4      A.  That is clear.
5      Q.  Okay.  And so as we've gone through our -- your
6  testimony today, you've indicated that between 1992 and
7  2007 you -- you had no knowledge or you were not aware
8  of issues related to voter fraud; is that correct?
9      A.  Yeah.
10      Q.  And as we went through our testimony today, you
11  indicated that between 1992 and 2007 you had no
12  knowledge of issues related to voter ID; is that
13  correct?
14      A.  That's correct.
15      Q.  Okay.  And so you then entered into your campaign
16  for House District 52 in 2010.  And that's what,
17  three -- approximately a three-year period between the
18  times that you worked for these various individuals you
19  testified about -- to the point where you determined
20  that you were going to run for House District 52?
21      A.  Yes.
22      Q.  And I -- I'd like to know, as you sit here today,
23  what information did you become aware of that -- that
24  first identified the issue of voter fraud for you and
25  voter fraud as you've defined it on the record?

## 82

1          MR. McKENZIE:  May I ask a clarifying
2  question.
3          MR. GEAR:  Sure.
4          MR. McKENZIE:  Are you talking about him as
5  candidate or him as a legislator?
6          MR. GEAR:  I'm talking to him about as -- as
7  a candidate.
8          MR. McKENZIE:  Okay.
9          MR. GEAR:  Between 2007 and 2010 -- let
10  me -- let me strike that.  Let me make it very simple.
11          MR. McKENZIE:  Okay.
12  BY MR. GEAR:
13      Q.  When did you first take a position on voter ID?
14      A.  Probably 2009.
15      Q.  So prior to 2009 were you -- were you aware of
16  voter fraud issues at all in the State of Texas?
17      A.  Cursory, what you see on the news stuff.  But it
18  wasn't something that I was, you know, engulfed in.  You
19  see it, but wasn't working on it.
20      Q.  So other than the news, did you undertake any
21  independent research analysis that would have helped to
22  form the basis of your position on voter fraud?
23      A.  No.
24      Q.  Did you engage in any specific types of
25  communication with anyone in the State of Texas that

## 83

1  would have helped to form your basis and position on
2  voter fraud?
3      A.  We're asking '07 through '09.  Is that what we're
4  talking about?
5      Q.  '07 through '09.
6      A.  No.
7      Q.  And let me ask the same questions about voter ID.
8  Did you engage in any independent research or analysis
9  that would have helped to form your basis on the issue
10  of voter ID between 2007 and 2009?
11      A.  No.
12      Q.  Did you engage in any communications with anyone
13  in the State of Texas that would have helped to form the
14  basis of your opinion on voter ID between 2007 an 2009?
15      A.  No.
16      Q.  All right.  And so is it fair to say between 1992
17  to 2009 you were unaware of issues related to both voter
18  fraud and voter ID?
19          MR. MCKENZIE:  I'm going to object as
20  slightly mischaracterizing his testimony.  But you may
21  answer.
22  BY MR. GEAR:
23      Q.  If I'm mischaracterizing it, you clarify it for
24  the record?
25      A.  Okay.  As I said earlier cursory knowledge, like

## 84

1  what you see on the news.  It wasn't an area.  So what
2  you're saying is not true.  I was aware, but just like
3  anybody else would be aware.
4      Q.  Okay.
5      A.  It wasn't in like -- like a capacity of research.
6  It was just what you hear.
7      Q.  Fair enough.  And you did say that you -- you
8  heard, like anyone else, issues on the news.  So let's
9  focus on the issues on the news.  Do you recall what
10  issues you heard between this time period, and I would
11  assume you're talking about 2007 to 2009, that came up
12  regarding voter fraud on the news?
13      A.  All right.  You know, information that there
14  would be illegal votes cast in person, mail-in --
15  mail-in ballots, in person and mail-in ballots are it.
16      Q.  So let's talk about in person voter
17  impersonation.  That's what you're talking about?
18      A.  Yes.
19      Q.  Okay.  And -- and when we're talking about in
20  person voter impersonation, we're talking about the way
21  you defined it here on the record, correct?
22      A.  Uh-huh.
23      Q.  Can you tell me, specifically what you heard
24  regarding in person voter impersonation between 2007 and
25  2009?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 85

1    A.  Specifically no.  I mean, it's just general
2    knowledge.  It's what you hear.  I can't tell you
3    specifically what was said.
4    Q.  Between 2007 and 2009 are you aware of any
5    investigations, specific investigations related to voter
6    fraud?  And we're talking about voter impersonation.
7    A.  Yeah.  I can't tell you when or where or a court
8    case.  Just a general knowledge that was a concern that
9    people had.
10   Q.  Well, let's focus on the "yes."  What was it that
11   you heard regarding voter impersonation between that
12   time period?  Do you know any details?
13   A.  No.  That there's a concern that people were
14   showing up and they weren't who they say they were.
15   Q.  So let's see if we can put substance to the
16   concern that other people are saying or that you
17   yourself had?
18   A.  Just what I was seeing, hearing.
19   Q.  Okay.  Do you know what county this
20   investigation, as you described, it took place in?
21   A.  No.
22   Q.  Do you know the actual year that this
23   investigation that you described took place?
24   A.  No.
25   Q.  Do you know what any of the details regarding

## 86

1    that investigation may be?
2    A.  No.
3    Q.  Do you know if that investigation resulted in
4    prosecution?
5    A.  No.
6    Q.  Do you know if that investigation resulted in a
7    criminal conviction?
8    A.  No.
9    Q.  Do you know if that investigation dealt
10   specifically with voter impersonation?
11   A.  Investigation?
12   Q.  Well, you described it on the record as an
13   investigation that you were aware of.  I'm just trying
14   to understand what it is that you know.  So if -- if I'm
15   mischaracterizing your testimony, you can correct it?
16   A.  Yeah, I would like to because I don't know.  And
17   I said earlier I couldn't tell you a specific court
18   case.  So to use the word investigation, I don't think
19   is what I was talking about.  I said, generally
20   speaking, you hear things about things that are going
21   on.  Your questioning is very specific to an
22   investigation that I wouldn't have knowledge of.
23   Q.  Okay.  Fair enough.  And would you have knowledge
24   of it -- a conviction that was the result of what you
25   heard on the news?

## 87

1    A.  No.
2    Q.  Okay.  You also talked about by mail balloting.
3    Again, are you describing that as a general source of
4    information from the news?
5    A.  Yes.
6    Q.  And same questions.  Are you aware of any
7    specific investigations that resulted in what you heard
8    on the news?
9    A.  No.
10   Q.  And are you aware of any specific prosecutions
11   that took place regarding the by mail ballot voting that
12   you heard on the news?
13   A.  No.
14   Q.  And are you aware of any convictions that took
15   place as a result of what you heard on the news?
16   A.  No.
17   Q.  So other than the general information, you
18   can't -- as you sit here the day, can you provided any
19   specific detail on any of these news broadcasts that you
20   heard?
21   A.  No.
22   Q.  Okay.  Do you -- do you speak Spanish?
23   A.  No.
24   Q.  Have you ever learned Spanish?
25   A.  Yes.

## 88

1    Q.  Okay.  Is it -- is it by choice that you don't
2    speak Spanish or you no longer -- you no longer speak
3    it?
4    A.  I learned it because UT told me I had to learn
5    it.
6    Q.  Okay.  Do your parents speak Spanish?
7    A.  Yes.
8    Q.  Do you ever speak Spanish or did you ever speak
9    Spanish during the time you were campaigning in 2010?
10   A.  No.
11   Q.  Do you believe that -- my understanding is that
12   in the State of Texas there's been some push to pass
13   English only legislation.  Do you agree with that
14   legislation?
15       MR. McKENZIE:  I'm going to object to the
16   extent it reflects your thoughts as a legislator.  You
17   may talk about your candidacy or public record or
18   anything like that.
19   A.  That's privileged.  I take privilege.
20   Q.  So we're talking about prior to you becoming a
21   legislator.  And I want to focus solely on 2010 and
22   before?
23   A.  Okay.
24   Q.  Between -- now that we've described it, between
25   2009 and 2010, are you aware of any specific instances



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 89

1  of voter fraud that helped to form your basis on voter

2  ID?

3      A.  No, not a specific case or docket number or court

4  number.

5      Q.  Investigation, prosecution?

6      A.  No.

7      Q.  Conviction?

8      A.  No.

9      Q.  So in 2010, you indicated that your campaign

10  supported voter ID.  And we've walked through, during

11  this deposition, your understanding, your awareness of

12  both voter ID and voter fraud.  Can you tell me, for the

13  record, what you are basing your position on, and this

14  is prior to becoming a legislator, what you're basing

15  your position on in supporting voter ID?

16      A.  To build the confidence of an electorate who felt

17  that there is and to instill integrity into the system

18  that my voters felt were being compromised.

19      Q.  You said, "to build confidence in a system."  Did

20  you have any communication that would support that there

21  was a lack of confidence in the election system because

22  of voter fraud?

23      A.  If I can correct you?

24      Q.  Sure.

25      A.  I said it was integrity of the system and it was

## 90

1  the confidence of the people.

2      Q.  So the integrity of the system.  Did you have

3  any -- and information or communication that would

4  support that there was a concern about the integrity of

5  the system?

6      A.  The people in House District 52 said they were

7  concerned about it.

8      Q.  And in House District 52, which is Williamson

9  County, correct?

10      A.  Yes.

11      Q.  Are you aware of any investigations, actual

12  investigations related to voter fraud?

13      A.  No.

14      Q.  Are you aware of any actual convictions related

15  to voter fraud?

16      A.  No.

17      Q.  Are you aware of any actual investigations

18  related to voter fraud?

19      A.  No.

20      Q.  Are you aware of any actual allegations related

21  to voter fraud?

22      A.  No.

23      Q.  And so do you believe that there was a basis of

24  concern when you were a candidate hearing individuals

25  speak about voter fraud even though you didn't have

## 91

1  any -- any actual source of information?  Do you believe

2  that there was an actual basis for this voter fraud?

3          MR. McKENZIE:  Can I ask a clarifying

4  question real quick?

5          MR. GEAR:  Sure.

6          MR. McKENZIE:  We're talking about at the

7  time as a candidate and not as a legislator.

8          MR. GEAR:  Yes.  We are.

9          MR. McKENZIE:  Okay.

10      A.  They expressed a concern for that and I told them

11  I would help them.

12      Q.  (By Mr. Gear) I'm asking what you believed as a

13  candidate in 2010, did you -- did you believe that voter

14  fraud was a problem in House District 52?

15      A.  I've never known it to be in House District 52 --

16  a problem in House District 52.

17      Q.  Do you believe that voter fraud was a problem in

18  the State of Texas?

19      A.  Could have been.  I don't -- I don't know that we

20  discussed any kind of case or court number or docket

21  number.  But, you know, enough people expressed concern

22  about it to me.  And I told them that we would work on

23  it.

24      Q.  And what did you tell them that you would work

25  on?

## 92

1      A.  That we'd support a piece of legislation that had

2  a voter ID requirement to vote.

3      Q.  Did your -- did your views of minority voters

4  play any role in taking a position on supporting voter

5  ID?

6      A.  No.

7      Q.  Did you -- so other than general fairs expressed

8  in the public adds, and as you described it, by news,

9  you're often unaware of any actual investigations,

10  convictions, prosecutions, allegations of voter fraud?

11          MR. McKENZIE:  Again as a candidate,

12  correct?

13          MR. GEAR:  Yes.

14      A.  No.

15      Q.  (By Mr. Gear) Once you became a House member in

16  House District 52, did you undertake any process of

17  determining if voter fraud was a problem in the State of

18  Texas?

19          MR. McKENZIE:  I'm going to object on the

20  grounds of privilege about what his process is --

21          MR. GEAR:  I'm not tying -- I'm sorry.  I'm

22  sorry.  I'm not tying this into legislation.

23  BY MR. GEAR:

24      Q.  We've -- we've talked about voter fraud for some

25  time on -- in your deposition and I want to understand



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 93

1    what it is that you actually know.  We don't have to tie
2    it to legislation.  So again, I just want to be clear on
3    that.  Do you understand or did you take any steps to
4    understand whether or not voter fraud is actually a
5    problem in the State of Texas?
6         MR. McKENZIE:  Can we go off the record?  I
7    don't want to take your record time.
8         MR. GEAR:  Sure.
9         (Discussion off the record.)
10   BY MR. GEAR:
11        Q.  Now, specifically I asked once you became a
12   representative for House District 52, did you or your
13   staff undertake any effort to determine if voter fraud
14   was a real problem in the State of Texas?
15        A.  I'm going to invoke privilege there because you
16   just said as a member.  So I'm invoking that privilege.
17        Q.  The question is, did you undertake any effort to
18   determine if voter fraud was a problem.  That's a yes or
19   no question?
20        A.  I'm going to invoke that privilege if you're
21   talking about as a member because that's what you say
22   that's how you phrased the question was as a member.
23   I'm not asking you about the substance.  I'm
24   asking about did you as a member of House District 52 --
25   have you or your staff conduct any analysis of the issue

## 94

1    of voter fraud and whether or not it was a problem in
2    the State of Texas?
3         A.  My work as a member, I'm going to the claim
4    privilege.
5         Q.  Are you refusing to answer based on the advice of
6    your counsel?
7         A.  I'm refusing to answer based on that's privileged
8    work as a member.
9         Q.  Do you know of any studies or analysis on the
10   issue of voter fraud that are not privileged and that
11   would be public?
12        A.  Not off the top of my head.  I couldn't give you
13   any kind of cite or source or anything like that.
14        Q.  Well, in -- this is the time for me to understand
15   what you know.  So I would like you the take your time
16   with that answer.  And let me ask that again and see if
17   we can get a clear answer?
18        A.  Okay.
19        Q.  Do you know of any studies or analysis related to
20   voter fraud in the State of Texas that would be part of
21   a public record?
22        A.  I couldn't tell you of one.  I can't cite for you
23   anything that I've read.
24        Q.  Have you reviewed any part of the public record,
25   studies or analysis that relate to voter fraud?

## 95

1         A.  Not to my recollection at all.
2         Q.  Okay.  Now, we've gone through a series of
3    different employers.  We did the House, we did the
4    Attorney General's office.  Is there any other
5    employment that -- that you described for me on the
6    record?  I believe there is.
7         A.  Oh, Texas State University System.
8         Q.  Thank you?
9         A.  There you go.
10        Q.  Can you tell me what that employment involved?
11        A.  Sure.  The title was assistant vice chancellor
12   for government relations.
13        Q.  And was that part of the university?
14        A.  It's the university system.  So the university
15   system is comprised of eight colleges an universities.
16        Q.  Okay.  And just briefly, would your
17   responsibilities in the position with Texas State, would
18   that have involved any issues of voter fraud?
19        A.  No.
20        Q.  Would that have involved any issues of voter ID?
21        A.  No, sir.
22        Q.  In your experience with the university system are
23   you familiar with student IDs?
24        A.  Yes.
25        Q.  And do you have an opinion as to whether or not

## 96

1    student IDs would be an appropriate form of
2    identification based on your experience at -- at -- in
3    the university system in voting in the State of Texas?
4         A.  Not in that capacity, no.
5         Q.  Well, do you understand process for students to
6    obtain student IDs?
7         A.  I don't know that it's consistent so I would say
8    no.
9         Q.  Do you -- well, let me put it in -- let me put
10   into context.  Do you understand that SB 14 allows for
11   military IDs?
12        A.  Yes.
13        Q.  Can you describe for me what a military ID is?
14        A.  A State issued identification card with the
15   personnel photo on it, military personnel photo on it.
16        Q.  Are college IDs, are they State issued IDs?
17        A.  Depends on what college they go to.
18        Q.  Okay.  A military card, do you know what's on the
19   front of it?
20        A.  Photo, branch of service, rank.  Those are the
21   only three I can name off the top of my head.
22        Q.  Were you in the military by any chance?
23        A.  I currently serve in the Guard.
24        Q.  You currently serve in the Guard and you have a
25   military ID?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

97

1    A.  I do.
2    Q.  Do you understand that there are multiple forms
3  of military ID?
4    A.  No.
5    Q.  There's only one form of military ID?
6    A.  No.  The question was, do I understand that.  I
7  don't understand that.
8    Q.  So as a member of the Guard, are there different
9  forms of military ID for the Guard?
10    A.  From each other?
11    Q.  Yes.
12    A.  I don't know.  The IDs I've seen of my fellow
13  Guard members look just like mine.
14    Q.  Have you seen IDs of different branches such as
15  Army, Navy, Marines?
16    A.  No.
17    Q.  Did you ever undertake an effort to determine if
18  military IDs are consistent across the board?
19    A.  No.
20    Q.  Did you consider that during the legislative
21  debates on SB 14?
22    A.  No.
23        MR. McKENZIE:  Objection.
24  BY MR. GEAR:
25    Q.  Was that topic of public debate during SB 14?

---

98

1    A.  No.
2    Q.  Military IDs?
3    A.  Yeah.  I think.  Yeah.  Yeah.
4    Q.  And what was that topic of debate, what was the
5  substance discussion?
6    A.  Wow.  I don't recall on the floor quotes or in
7  the record what people said.  I can't recall for you
8  verbatim type of stuff.  One of the exceptions being
9  discussed was a military ID.  That's generally what
10  we're talking about.  But I can't tell you specifically
11  what the arguments.  I don't remember that.
12    Q.  What's your position on -- on military ID and
13  voting in the State of Texas?
14        MR. McKENZIE:  I would object to the extent
15  it reveals privileged thoughts or communications.
16    A.  And I'll take -- I'll invoke that.
17    Q.  As a -- as a member of the Guard, do you believe
18  it's appropriate for a member of the military to be
19  allowed to present photo ID and vote?
20        MR. McKENZIE:  Again, that's the same
21  objection as he's currently serving in the Guard as he
22  was a legislator.  You may answer.
23  BY MR. GEAR:
24    Q.  Are you refusing to answer the question based on
25  the advice of your counsel?

---

99

1    A.  Yes, I am.
2        (Exhibit No. 29 marked.)
3  BY MR. GEAR:
4    Q.  I'm showing you what's been marked as Exhibit No.
5  29.  I just like you to take a look -- second and then
6  we'll talk about it.
7    A.  Okay.
8    Q.  What is this?
9    A.  Okay.
10    Q.  Have you had an opportunity to review Exhibit 29?
11    A.  I'm just now, yes, sir.
12    Q.  Okay.  Can you tell me what this is?
13    A.  It is a Senate Bill to be entitled An Act
14  Requiring a Voter to Present Proof of Identification.
15    Q.  Okay.  And it's titled Senate Bill No. 362?
16    A.  Uh-huh.
17    Q.  And can you tell me who the authors of this bill
18  were?
19    A.  The authors appear to be Fraser, Estes, Nelson,
20  and Nickels.
21    Q.  And do you know when this bill was offered?
22    A.  I -- I don't.  Is it the companion to -- no, I
23  guess I don't.
24    Q.  Okay.  Let me see if I can give you something to
25  help refresh your recollection?

---

100

1        (Exhibit No. 106 was marked.)
2  BY MR. GEAR:
3    Q.  I'm showing you what's been previously marked in
4  other depositions as Exhibit 106.  Do you see up in the
5  left-hand corner that this addresses SB 362?
6    A.  Yes.
7    Q.  And it's part of the legislative session -- 81st
8  legislative session?
9    A.  Yes.
10    Q.  And again, it indicates that the -- who the
11  authors are up in the --
12    A.  Authors and co-authors.
13    Q.  And is that consistent with the --
14    A.  The bill doesn't say who the co-authors are, but
15  the same four names.
16    Q.  Okay.  And so does this help you understand what
17  you're actually looking at in front of you?
18    A.  Yes.
19    Q.  Okay.  And so can you describe what you're
20  looking at for the record?
21    A.  A bill to be entitled An Act Relating to
22  Requiring a Voter to Present Proof of Identification.
23    Q.  And do you understand that this is the voter ID
24  bill that was offered in 2009 as SB 362?
25    A.  I would have to take your word on it.  I didn't

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 101

1  recognize it when you gave it to me.
2      Q.  Well, are you familiar with Exhibit 106 which is
3  the Texas Legislature online history?
4      A.  No.  Not until you just gave it to me.
5      Q.  Okay.  You've -- you've never went online to look
6  at the online history of a bill?
7      A.  Online history of a bill?  Yes.
8      Q.  Okay.  And is it similar to what you're looking
9  at here?
10     A.  Depending on the website, yeah.
11     Q.  Okay.  Do you have any reason to believe that
12  what you're looking at is not SB 362 --
13     A.  No. No.
14     Q.  Which is offered in 2009?
15     A.  No.
16     Q.  Okay.  So just -- just briefly, turning your
17  attention back to Exhibit 29?
18     A.  Okay.
19     Q.  I'd like you to turn to Section 63.0101, which is
20  Page 5?
21     A.  Okay.
22     Q.  Do you see that?
23     A.  I do.  Line 19 I have.
24     Q.  And that deals with documentation and proof of
25  identifications.

### 103

1  or personal identification card issued to the person by
2  the Department of Public Safety that has not expired or
3  that has expired no earlier than two years before the
4  date of presentation.  Do you see that?
5      A.  Yes.
6      Q.  And then turning the page to Page 6, SB 362 would
7  have allowed a United States military identification
8  card that contains the person's photograph?
9      A.  Yes.
10     Q.  Okay.  Section 3, it would have allowed United
11  States citizenship certificate issued to the person that
12  contains a person's photograph.  Do you see that?
13     A.  Yes.
14     Q.  Section 4, United States passport issued to the
15  person.  Do you see that?
16     A.  Yes, sir.
17     Q.  Section 5, license to carry a concealed hand gun
18  issue to the person by the Department of Public Safety.
19  Do you see that?
20     A.  Yes.
21     Q.  Or as we described before a valid identification
22  card that contains the person's photograph and issued by
23  an agency or institution of the federal government.  Do
24  you see that?
25     A.  Yes.

### 102

1      A.  Yes.
2      Q.  And just going through this briefly.
3      A.  Uh-huh.
4      Q.  Do you understand that SB 362 would have allowed
5  a valid identification card that contains a person's
6  photograph and issued by an agency or institution of the
7  federal government or an agency, institution or
8  political subdivision of the State?
9      A.  I don't see that.  What line are you on?
10     Q.  That would be Page 6.
11     A.  Okay.
12     Q.  I believe it's Section 6.
13         MR. McKENZIE:  Line 14.
14         MR. GEAR:  Line 14.  Thank you.
15         THE WITNESS:  Line 14.  My line 14 is
16  crossed out.
17         MR. McKENZIE:  It's just below it.  Line 16.
18         THE WITNESS:  Oh, so 16.  Okay.
19  BY THE WITNESS:
20     A.  A valid identification card that contains the
21  person's photograph and is issued by agency or
22  institution of federal government or agency and
23  institution or political subdivision of the State.
24     Q.  Okay.  And turning back to Page 5, Section A1
25  that SB 362 would have also allowed a driver's license

### 104

1      Q.  An agency, institutional political subdivision of
2  the State, you also see that?
3      A.  Yes.
4      Q.  An then it also goes on the say that the
5  following documentation is acceptable as proof of
6  identification under this chapter.  And that would be
7  Section B on line 22.  Do you see that?
8      A.  Yes.
9      Q.  And on Page 6, Section 1, the voters -- voter
10  registration certificate or -- and it lists a number of
11  other allowable forms of identification.  Do you see
12  that?
13     A.  Uh-huh.
14     Q.  And do you understand this to be the allowable
15  forms of identification under SB 362?
16     A.  Yes.
17     Q.  And that bill was -- was offered as a photo --
18  photo identification bill?
19     A.  I'll take your word for that.
20     Q.  During your time as a legislature -- legislator
21  did you ever engage in any discussions regarding SB 362
22  or HB -- HB 1706, which was a 2005 bill marked as
23  Exhibit 44?
24         MR. McKENZIE:  You can answer whether there
25  was a discussion or not.  Substance of discussions is

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**105**

1 totally privileged it's not public.  So you can say yes
2 or no as to whether a discussion took place.
3     A.  Never had a discussion on Senate Bill 362.
4     Q.  Did you have a discussion on HB 1706?
5     A.  No, sir.
6         (Exhibit No. 28 was marked.)
7 BY MR. GEAR:
8     Q.  I'm showing you what's been marked as Exhibit 28
9 and asking you to take some time to take a look at it
10 and then we'll talk about it?
11     A.  Okay.
12         (Exhibit No. 102 was marked.)
13 BY MR. GEAR:
14     Q.  Have you had some time to look at that?
15     A.  I've had some time.  I'm not finished.  Okay.
16     Q.  Have you seen this document before?
17     A.  No, sir.
18     Q.  Showing you what's been marked as Exhibit
19 No. 102?
20     A.  Okay.
21     Q.  And for the record, this is the Texas Legislature
22 online history for HB 218 which is dated the last
23 section of the bill is dated 5/16/2007.  Do you see
24 that?
25     A.  Last section.  5/16/2007, yes.

---

**106**

1         MR. McKENZIE:  Counsel, do you have a copy.
2         MR. GEAR:  I am so sorry.
3         MR. McKENZIE:  Thank you.
4 BY MR. GEAR:
5     Q.  And this is for the 80th Legislature?
6     A.  Yes.
7     Q.  Okay.  And do you see who the authors are on this
8 bill?
9     A.  Yes.
10     Q.  Can you tell me who the authors are?
11     A.  The authors are Betty Brown, Bereman, Bohac and
12 Riddle.  And the co-authors are Aycock, Christian,
13 Darby, Harless, Harper-Brown, King, Laubenberg,
14 Mesillis, Miller, Paxton, Taylor, and Zedler.
15     Q.  All right.  So I gave you Exhibit 102 because I
16 wanted -- wanted to see if that would help put
17 Exhibit 28 into context.  Do you understand Exhibit 28,
18 which is House Bill 218, to be a bill authored by Betty
19 Brown and others during the 80th Legislature?
20     A.  Yes.
21     Q.  And do you understand House Bill No. 218 to be a
22 bill related to voter ID?
23     A.  Yes.
24     Q.  And again, turning your attention to, let's see,
25 I believe it's Page -- 9, 63.0101 documentation of

---

**107**

1 proof of identification, do you see that?
2     A.  Not yet.  Okay.
3     Q.  Similar to SB 362 and HB 1706, this also goes
4 through a list of allowable forms of ID.  Do you see
5 that?
6     A.  Yes.
7     Q.  And similar to the bills which I've -- I've just
8 discussed this allows for a driver's license or a State
9 issued ID by the -- by DPS?  If you look at Section 1 --
10 or line 17 on Page 9.
11     A.  Yes.
12     Q.  And it allows for the presentation of a driver's
13 license or State ID that has expired no earlier than
14 two years before the date of presentation.  Do you see
15 that?
16     A.  Yes.
17     Q.  It also allows for a United States military
18 identification card?  Line 23, Section 2 that contains a
19 person's photograph.
20     A.  Is that a question?
21     A.  Yes.
22     A.  What was the question?
23     Q.  Does it also allow for a United States military
24 identification card that contains a person's photograph?
25     A.  Yes.

---

**108**

1     Q.  All right.  And as far as military identification
2 cards, do you know if non-citizens are issued military
3 ID cards, can be issued military ID cards?
4     A.  I don't know.
5     Q.  In your service in the Guard, are you aware of
6 any non-citizens who are serving for the United States
7 military?
8     A.  No.
9     Q.  Do you know if you have to be a citizen to serve
10 in the United States military?
11     A.  I don't.
12     Q.  Turning your attention back to Exhibit 28,
13 Section 3 on Page 9, it allows for valid employee
14 identification card that contains the person's
15 photograph and is issued by the employer of the person
16 in the ordinary course of the employer's business.  Do
17 you see that?
18     A.  Yes.
19     Q.  Section 4, line 5 on Page 10, it indicates that
20 United States citizenship should -- citizenship
21 certificate issued to the person that contains a
22 person's photograph, do you see that?
23     A.  Yes.
24     Q.  Section 5 on Page 10, United States passport
25 issue to the person, do you see that?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 109

1    A. Yes.
2    Q. A student identification card issued by a public
3  or private institution of higher education, located in
4  the United States that contains the person's photograph.
5  Do you see that?
6    A. Yes.
7    Q. Section 7, license to carry a concealed handgun
8  issued to the person by the Department of Public Safety.
9  Do you see that?
10    A. Yes.
11    Q. Do you have any idea how many individuals in the
12  State of Texas carry a concealed handgun license?
13    A. No.
14    Q. Do you have any idea if the number of Hispanics
15  who can carry a concealed handgun license in the State
16  of Texas?
17    A. No.
18    Q. Do you have any idea the number of
19  African-American that carry a concealed handgun license
20  in the State of Texas?
21    A. No.
22    Q. During the legislative debate on SB 14, was the
23  issue of concealed handgun licenses debated?
24    MR. McKENZIE: Objection. Public stuff you
25  can talk about.

## 110

1  BY MR. GEAR:
2    Q. Well, let's start with the public record. Was
3  the issue of concealed handguns debated during the
4  legislative debate on SB 14?
5    A. Yeah, I'm -- I'm going to say it was. I don't
6  recall specifically what we were talking about. But
7  I -- it had to be if we're going through the list.
8    Q. What does a concealed handgun license look like.
9  Actually, let me -- strike that. Do you have a
10  concealed handgun license?
11    A. Yes.
12    Q. Do you know if there is a -- do you know,
13  generally, what a concealed handgun license looks like?
14    A. Yes.
15    Q. Can you describe it for me?
16    A. It has my photograph on it. Texas -- it says
17  Texas concealed handgun license on there. It has all
18  the markings of a -- of a State issue with a -- the
19  paper of the stock, the seal, all that kind of stuff,
20  not a hologram, but like a full stamp on it. Issued by
21  the State of Texas. I couldn't tell you much else past
22  that.
23    Q. Do you know if a concealed handgun license for a
24  police officer is different than a concealed handgun
25  license for a representative of the House?

## 111

1    A. I don't know that.
2    Q. Do you know if a concealed handgun license for
3  someone in the military, such as yourself, is different
4  from a can sealed handgun license from a representative
5  of the House?
6    A. I don't know that.
7    Q. Do you know if there is any consistency in what a
8  concealed handgun license looks like in the State of
9  Texas. Is there any inconsistency that you're aware of?
10    A. I'm not aware of any inconsistencies in CHL's.
11    Q. Okay. But you're not aware of whether or not the
12  concealed handgun license for a police officer may be
13  different than the concealed handgun license that you
14  have?
15    A. Yeah, I don't know.
16    Q. Section 8 deals with valid identification cards
17  that contains the person's photograph and it's issued by
18  an agency or institution of the federal government. Do
19  you see that?
20    A. Uh-huh.
21    Q. And Section B is an agency institution or
22  political subdivision of the State. Do you see that?
23    A. Yes.
24    Q. And then it goes on to say the following -- in
25  Section B, line 20, the following documentation is

## 112

1  acceptable as a proof of identification under this
2  chapter. Do you see that?
3    A. Yes.
4    Q. And it allows, for instance, official mail
5  addressed to the person by name from a governmental
6  entity, correct?
7    A. Yes.
8    Q. A certified copy of the birth certificate or
9  other documentation confirming birth that is admissible
10  in the court of law and establishes a person's identity.
11  Do you see that?
12    A. Yes.
13    Q. And the United States citizenship papers issued
14  to the person. Do you see that?
15    A. Yes.
16    Q. And that citizenship paper does not need to
17  contain a photograph. Are you aware of that?
18    A. I have no idea.
19    Q. Okay. But it does not say with photograph; is
20  that correct?
21    A. Oh --
22    Q. I'm talking about --
23    A. The actual language?
24    Q. Yes, the actual language.
25    A. It does not say that.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**113**

1    Q. Okay. And just turning your attention back to
2  line 7, Page 10, license to carry a concealed handgun.
3  In the State of Texas can non-citizens obtain concealed
4  hand guns?
5    A. I don't know.
6    Q. Have you ever explored that issue?
7    A. No.
8    Q. And again, do you understand this to be the
9  allowable form of identification in HB No. 218 that was
10 authored by Representative Brown and others?
11   A. In the form that it is in front of me, yes.
12   Q. And you've also looked at Exhibit 102 I
13 believe -- I believe it's 106 -- is that HB 218.
14        MR. McKENZIE: This is 106 right here.
15        MR. GEAR: 106? That's 102. You're right.
16 BY MR. GEAR:
17   Q. So have you looked at Exhibit 102 and does that
18 confirm for you that this is HB 218?
19   A. Yes.
20   Q. Okay. Have you ever had an occasion to -- go
21 ahead. If you would like to talk to your attorney.
22   A. Yeah. I'd like to.
23        MR. McKENZIE: Can we break take a break off
24 the record?
25        MR. GEAR: Sure. Let's go off the record.

---

**114**

1         (Brief recess.)
2  BY MR. GEAR:
3    Q. Let's go back on the record. I want to take you
4  back to 2010 when you were campaigning for House
5  District 52. Did you seek out the opinion of the
6  minority community in District 52 regarding the issue of
7  voter ID?
8         MR. McKENZIE: I'm going to object on vague
9  about minority community. But go ahead and answer.
10 BY MR. GEAR:
11   Q. Well, let me clarify before you answer that.
12 Minority community meaning the Hispanic and Black
13 community?
14   A. Okay, visiting with them, forums, events, things
15 like that.
16   Q. Specifically the -- the question is, did you seek
17 out the opinion of the minority community, as I've now
18 defined it for you, in House District 52 regarding the
19 issue of voter ID?
20   A. No.
21   Q. We've gone through a series of bills during your
22 deposition, one of which is HB -- HB 1706, which has
23 been marked as Exhibit 44, which you had a chance to
24 review. Can you tell me what the purpose of HB 1706 is?
25 You can answer.

---

**115**

1         MR. McKENZIE: You can answer, yes.
2         THE WITNESS: I was making sure you had it
3  in front of you. I was waiting for you.
4         MR. McKENZIE: Oh, okay.
5    A. Relating to requiring a voter to present proof of
6  identification.
7    Q. Anything else?
8    A. In requiring a voter to present proof of
9  identification.
10   Q. And the question was anything else that you're
11 aware of?
12   A. No.
13   Q. Okay. We've also gone through what's been marked
14 as Exhibit No. 28. Do you see that?
15   A. Yes.
16   Q. And Exhibit 28 is HB 218, which was authored by
17 Betty Brown, I believe. Can you tell me what the
18 purpose of HB 218 was?
19   A. Relating to requiring a voter to present proof of
20 identification.
21   Q. And you're just simply reading from the title of
22 the bill or from the language in the bill?
23   A. Yes.
24   Q. Okay. Are you aware of any other purpose?
25   A. I'm not aware.

---

**116**

1    Q. And we've also gone through SB 362. Do you see
2  that exhibit?
3    A. Yes.
4    Q. And that Exhibit is Exhibit No. -- can you
5  tell -- State that for the record. 29, correct?
6    A. Correct.
7    Q. And you had a chance to review that. Can you
8  tell me what the purpose of SB 362 was?
9    A. To require a voter to present proof of
10 identification.
11   Q. And again, you're reading from the language of
12 SB 362, correct?
13   A. That's correct.
14   Q. All right. Now, again, prior to being elected to
15 House District 52, I'd like to ask you if you were aware
16 of any concerns in House District 62 or -- or anywhere
17 in Texas for that matter, of non-citizens or illegal
18 aliens voting in elections in the State of Texas?
19   A. Not specifically. Generally speaking, news what
20 you hear on TV kind of stuff.
21   Q. So you described in your deposition previously
22 that you heard general information and voter fraud in
23 the news. Would that be consistent with what you're
24 testifying to now --
25   A. Yes.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 117

1    Q.  Regarding undocumented citizen -- non-citizens or
2  illegal aliens voting?
3    A.  Yes.
4    Q.  You testified a little bit about the location of
5  your office.  I believe you said one was the capital
6  office location?
7    A.  Right.  Yes.
8    Q.  And can you tell me what the address of the
9  capital office location is?
10   A.  1401 North Congress, maybe, in Austin.  State
11 capital, so 14 -- I think it's 1401 North Congress.
12   Q.  Okay.  And that's in Austin?
13   A.  Yes.  Austin.
14   Q.  And you indicated there was another location.
15 Can you identify that location for the record?
16   A.  Oh, my office.
17   Q.  Yes, sir.
18   A.  Okay.  We have an office in Round Rock.
19   Q.  Focusing on your office in Austin, can you
20 identify your staff that are employed in that office?
21   A.  Chris Sanchez, Courtney Forsell and Sara -- I
22 don't know Sara's last name.  Hidalman or Hinalman or
23 something.  I don't know.  She's part-time.
24   Q.  Okay.  So if I refer to her as Sara you would
25 know who I'm speaking about?

---

### 118

1    A.  Yes.
2    Q.  Okay.  And you identified Chris Sanchez as your
3  chief of staff?
4    A.  Yes.
5    Q.  And as your chief of staff chat responsibilities
6  does Chris Sanchez have?
7    A.  My legislative package, the bills that I author
8  reviewing the calendar for the next day, like when they
9  put out the calendar for what's coming up the next day,
10 greet people when they come in an take their literature
11 and visit with them about whatever they're going to
12 visit with me about.  And just generally knowing the
13 legislative issues that are in front of us, I mean, just
14 big picture stuff.  That's his responsibility.  So if I
15 come in and ask him what's on this, you know, he should
16 know that.
17   Q.  Okay.  During the legislative debate for SB 14,
18 did you direct any of your staff to research the issue
19 of voter fraud?
20     MR. McKENZIE:  I'm going to object on the
21 basis of legislative privilege those extent it's not
22 public.  If it's public or general purpose you can
23 answer.
24   A.  I'll take that privilege.
25   Q.  (By Mr. Gear) And are you following advice of

---

### 119

1  your Counsel and refusing to answer my question?
2    A.  Yes.
3    Q.  Did you publish any research analysis or analysis
4  related to voter fraud as a result of research done in
5  your office?
6    A.  I'll invoke that as well.
7      MR. McKENZIE:  It's published.
8  BY MR. GEAR:
9    Q.  I'm asking did you publish public record?
10   A.  No.
11   Q.  Do you know of any research conducted on voter
12 fraud regarding SB 14?
13     MR. McKENZIE:  Objection.  You may answer to
14 the extent there's public record on that.
15   A.  I'll kind of go back to the previous question.
16 You said published, like a report.  What are you asking
17 me again.
18   Q.  Let me be clear.  That's a fair question.
19 Published or part of the public record during the
20 legislative debate on SB 14.
21   A.  We sent out like an e-mail update that we did
22 every week.  So probably in -- in one, two of the
23 updates, maybe.  But that was just generally -- here's
24 where we are.
25   Q.  Let's talk about the e-mail update for a second.

---

### 120

1  You said "we sent out."  Who is we?
2    A.  The office, my office.
3    Q.  And are you referring to both of your offices or
4  one office in particular?
5    A.  The Round Rock office didn't exist during
6  session.
7    Q.  Okay.  Thank you for that clarification.  So the
8  Austin office -- office sent out an e-mail and that
9  e-mail included issues on voter ID.  Is that accurate?
10   A.  I wouldn't say that the Austin office did it.  I
11 would say that the Larry Gonzales campaign did it.  It
12 wasn't State computers.  It wasn't State times.  It
13 wasn't like official, like it was in the capacity as a
14 State rep.
15   Q.  Can you tell me when the e-mail was sent out?
16   A.  I have no idea.
17   Q.  Can you tell me the purpose of the e-mail?
18   A.  To let people know what's gone on with all the
19 different areas we'd been talking about during session.
20   Q.  Was this during the 2011 session?
21   A.  Yes.
22   Q.  And was it sent out to your constituents?
23   A.  Yes.
24   Q.  Okay.  And you hesitated for a second.  Was it
25 second out to an audience broader than your constituents

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 121

1  in House District 52?
2      A. Yes.
3      Q. And who did the e-mail include, what individuals?
4  Let's start by that.
5      A. Whoever signs up for it. I couldn't tell you who
6  signed up for it.
7      Q. What is that process?
8      A. They go to the website and sign up for the
9  newsletter.
10     Q. And the website that you're referring to is that
11 a website specific to the -- your elected position or is
12 that a website specific to Larry Gonzales campaigning?
13     A. It's through the campaign website.
14     Q. Okay. So it's a privately owned website by you?
15     A. Right. Well, the campaign.
16     Q. Thank you for the clarification. Okay. And so
17 you said e-mails. Was there more than one e-mail? Was
18 there one e-mail?
19     A. I said -- I said e-mails just to cover -- cover
20 the basis because I can think of one, but I can't -- I
21 don't know if there's anymore. So I said e-mails just
22 in case there was two. But I couldn't tell you how many
23 there were.
24     Q. Okay. And so when you mentioned the e-mail that
25 was sent out we were talking about voter fraud, correct?

---

### 122

1      A. Voter ID.
2      Q. Okay. So the e-mail that went out is -- is
3  related to voter ID and SB 14? And again the time
4  frame --
5      A. Yeah.
6      Q. That I'm talking about is 2011.
7      A. Yeah. I don't know specifically reference SB 14
8  or if it was like bigger picture than that. I can't
9  recall.
10     Q. Okay. With that can you tell me what the
11 substance of that e-mail was?
12     A. Where we were in the process.
13     Q. And where were you in the process at the time?
14     A. I don't recall. Those updates just tell
15 people -- as of today, here's where we are.
16     Q. But it discussed voter ID, correct?
17     A. Yes.
18     Q. What topics did it discuss related to voter ID?
19     A. Where we were in the process. I just remember
20 the heading.
21     Q. What did the heading say?
22     A. It was talking about where we are today. Like
23 the committee process or if it was on the floor, that
24 kind of update.
25     Q. And when you say "the process," what are you

---

### 123

1  referring to?
2      A. The process that you'll see if you look at the
3  legislature online reports that you have given me.
4      Q. And you're referring to Exhibit 102?
5      A. Yeah. For this case, 102. If you look at this
6  exhibit it walks you through the process of legislation.
7  So the updates would just take whatever day that was and
8  let people know where we were in the process.
9      Q. Okay. Did you state a position in that e-mail to
10 your constituent or the broader audience?
11     A. I can't recall what those e-mails said.
12     Q. And you can't recall the date?
13     A. No.
14     Q. You also mentioned Courtney Forsell. Can you
15 tell me what her title or position was?
16     A. Courtney's title is legislative aid.
17     Q. And what responsibilities does Courtney have in
18 your office?
19     A. Courtney answers the phones. Courtney works on
20 case work that we defined earlier. And during session
21 Courtney was responsible for my committee books. The
22 books that -- for the specific committees that I served
23 on. She prepared those for me.
24     Q. Did any of her responsibilities include voter ID?
25     A. No.

---

### 124

1      Q. Did any of her responsibilities include issues
2  related to voter fraud?
3      A. Well, I say that. If there was a case work where
4  someone called.
5      Q. When you say "case work," what do you mean?
6      A. Well, we defined that already. Someone calls in
7  the office and has questions.
8      Q. Okay. I just wanted to make sure that we were on
9  the same subject matter when we're talking about case
10 work. Are you aware of any calls or case work that came
11 in regarding the issue of voter ID or voter fraud?
12         MR. McKENZIE: I'm going to object.
13     A. I take privilege on that one.
14     Q. (By Mr. Gear) When you searched the documents and
15 in response to Exhibit 220, the deposition notice, did
16 you produce any documents related to case work?
17     A. I don't know.
18     Q. There was one other employee that you mentioned,
19 Sara. And you didn't known her last name, specifically.
20 Can you tell -- I believe you said she was an intern?
21     A. Uh-huh.
22     Q. And can you tell me what her responsibilities
23 are?
24     A. She answers the phone and gets whichever staffer
25 she needs.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 125

1  Q.  Okay.  And just for the record, does Sara have
2  any responsibilities related to voter ID?
3  A.  No.
4  Q.  Does Sara have any responsibilities related to
5  voter fraud as we've defined it on the record?
6  A.  No.
7  Q.  And when responding to the notice of deposition,
8  Exhibit 220, did anyone other than your chief of staff
9  Mr. Sanchez search for documents in your Austin office?
10  A.  I'm not aware.
11  Q.  Do you have a record retention policy in the
12  Austin office?
13  A.  No.  No.
14  Q.  Do you know what type of search Mr. Sanchez
15  conducted in the Austin office?  Specifically, did he
16  look at electronic documents, did he look another paper
17  documents, do you know?
18  A.  I don't know.
19  Q.  Did you ask him specifically to search electronic
20  documents?
21  A.  I asked him to search my e-mail because I was not
22  in the office.
23  Q.  Okay.  When you say "your e-mail," can you
24  describe that a little more?
25  A.  That would be the official capital e-mail

---

### 126

1  address.
2  Q.  Okay.  And that's one that's -- is that one
3  that's issued to you as a representative?
4  A.  Yes.
5  Q.  And do you have personal e-mail?
6  A.  Oh, yeah.
7  Q.  And did you ask him to search your personal
8  e-mail or did you search your personal e-mails?
9  A.  No.
10  Q.  Did you have any personal e-mails that were
11  relevant to the notice of deposition and request for
12  documents?
13  A.  No, not aware of anything.
14  Q.  And did he find e-mails on the official capital
15  e-mail address that were relevant to the request for
16  documents in the notice of deposition?
17  A.  I'm not aware.
18  Q.  Are you aware of whether or not he produced
19  e-mails?
20  A.  I'm not aware.
21  Q.  Well, when you looked at the -- the binder or the
22  book as you described it that had ten documents or less,
23  did you see any e-mails within that binder or book?
24  A.  No.
25  Q.  Are you aware of the existence of e-mails that

---

### 127

1  relate to voter ID?
2  A.  No.
3  Q.  And when I say "existence of e-mails," I mean
4  e-mails that were either received or sent by you or
5  anyone in your office?
6  A.  Just whatever Chris sent in.  I don't know of
7  anything.
8  Q.  When do you say "whatever Chris sent in," what
9  are you referring to?
10  A.  The -- the request that the office received.  And
11  Chris produced the documents.
12  Q.  Are you aware of whether or not Mr. Sanchez
13  search the paper files in your office?
14  A.  I'm not aware.
15  Q.  How do you maintain paper files in your office?
16  A.  They come in and the get filed under topic
17  heading, I think.
18  Q.  Were you done?  I'm sorry.
19  A.  Yea.
20  Q.  And tell me specifically in your office where do
21  you maintain paper files?
22  A.  I have no idea.  I don't do any of that.
23  Q.  You never walk to the file cabinet and pull out a
24  paper?
25  A.  I don't do any of that.

---

### 128

1  Q.  Do you have a file room for instance?
2  A.  No.
3  Q.  Do you have a file cabinet that sits outside in
4  if foyer to your office?  Where would the papers
5  actually be maintained?
6  A.  In a filing cabinet the office.
7  Q.  Is that in a separate room by itself?
8  A.  No.
9  Q.  And I believe I asked you this, I'm sorry if I
10  did.  Do you know if Mr. Sanchez searched the file
11  cabinet?
12  A.  I -- I don't know.
13  Q.  For documents related to voter ID?
14  A.  I don't know.
15  Q.  Do you have a personal laptop?
16  A.  Not -- not anymore.  I mean, I do, but it doesn't
17  work.  Hasn't worked in some time.
18  Q.  When did it stop working?
19  A.  The modem card for purposes of using it, you
20  know, a year and a half ago, two years ago.  It's not
21  functional for any kind of purpose.
22  Q.  So prior to the 2011 session?
23  A.  Oh, oh, yeah.  Yeah.  That thing just sits at
24  home now.
25  Q.  Do you have a work issued laptop?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 129

1     A. I think we do. I think it's the one we use on
2 the floor.
3     Q. Do you have a work issued laptop?
4     A. I think so.
5     Q. Do you know if Mr. Sanchez searched the work
6 issued laptop for documents related to voter ID?
7     A. I don't know.
8     Q. Would he have access to that?
9     A. Yes.
10    Q. Did you personally search the work issued laptop
11 for documents related to voter ID?
12    A. No.
13    Q. Do you ever use your personal e-mail for work
14 purposes?
15    A. Not really. You mean for like with my staff. I
16 guess, can you explain?
17    Q. With your staff or the legislatures, executive
18 office, anyone related to the Texas government?
19    A. Oh, yeah. I get a lot of friends who are members
20 and you, know, we communicate all kinds of stuff.
21    Q. And it's your testimony today that you did not
22 search your personal e-mail to determine if you had any
23 documents relevant to our document request for photo ID?
24    A. That's correct.
25    Q. And why didn't you search your personal e-mail?

---

### 131

1     Q. Do you ever text message while you're on the
2 floor to your staff?
3     A. Oh, I'm sure we to that.
4     Q. And have you -- and are you aware of any text
5 message that were related to SB 14 that you sent to your
6 staff?
7     A. Not aware at all.
8     Q. Do you have any off side storage facilities that
9 you send overflow papers or papers for any reason?
10    A. No. Personally, yes for my business, yes. But
11 not for legislative.
12    Q. And what business do you currently own?
13    A. Oh, I have a company called Lazarus Graphics.
14    Q. And in Lazarus Graphics, do you -- is there --
15 have you had occasion to print anything related to voter
16 ID?
17    A. No.
18    Q. Do you print on behalf of other candidates?
19    A. Yes.
20    Q. Have you used your business to print on your own
21 behalf regarding your own campaigns?
22    A. My campaign, yes.
23    Q. And is it your testimony that -- that either
24 yourself or other candidates have not used your business
25 for the purpose of printing communications that are --

---

### 130

1     A. Not used for that purpose.
2     Q. And again, let me understand, is it your
3 testimony that you receive documents or text, e-mails
4 from your staff on your personal phone?
5     A. Yeah.
6     Q. And did you receive e-mails from your staff or
7 texts from your staff during the legislative debate for
8 SB 14?
9     A. I wouldn't have any idea.
10    Q. Well, let's explore that for a second. Do you
11 e-mail while you're on the floor?
12    A. No, not really.
13    Q. How do you communicate with your staff while
14 you're on the floor?
15    A. Phone.
16    Q. Do you use your personal phone or do you use a
17 phone --
18    A. House phone.
19    Q. Okay. So in -- on the floor there's a House
20 phone you can use for those purposes?
21    A. That's correct.
22    Q. Do you have e-mail while you or on the floor to
23 your staff?
24    A. No, I can't think of hardly any reason why we did
25 that.

---

### 132

1 are first responsive to the notice of deposition and
2 related to voter ID?
3     A. I'm sorry. I didn't understand that at all.
4     Q. Okay. That's fair.
5     A. I didn't know what you were talking about.
6     Q. It was just kind of -- kind of long and
7 on-running. But are you testifying here today or is it
8 your position today that there -- that other candidates
9 who have used your business, your graphics business,
10 have not asked you or an employee of your business to
11 print documents, communications that are related to
12 voter ID?
13    A. I don't know how to claim a legislative privilege
14 there, but I would if I can because they are, in fact,
15 legislatures. And --
16    Q. But they're using your private business.
17    A. I'm a legislator and they're legislators. That's
18 a communication that I'm going to claim.
19    Q. I'm asking you, based on your private business,
20 have other legislators used your business to print
21 communications that are relevant -- I'm sorry. Relevant
22 is not a good word. That are related to voter ID?
23    A. I'm going to claim legislative privilege.
24        MR. McKENZIE: You can -- you can answer for
25 whether or not a document was printed. But going into



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 133

1  the contents of the document or why it was printed or
2  anything else is where we go on privilege.
3      THE WITNESS:  Well, there's also the who.
4      MR. McKENZIE:  The who is something you can
5  talk about.  It's not privileged.
6      THE WITNESS:  If they're a legislator?
7      MR. McKENZIE:  If they're a legislator you
8  can still say who you talked to.  Just can't say what
9  they said.
10     A.  Yes.
11     Q.  (By Mr. Gear) Do you remember the date?
12     A.  Oh, no.
13     Q.  Do you remember who?
14     A.  No.
15     Q.  Who you published these documents for you printed
16  these documents for?
17     A.  Not off the top of my head.
18     Q.  It was another legislator?
19     A.  Yes.
20     Q.  It was during the legislative debate for SB 14?
21     A.  No.
22     Q.  Was it related to a voter ID bill prior to SB 14?
23     A.  No.
24     Q.  Was it related to a voter ID legislation?
25     A.  No.

## 134

1      Q.  Was it related to voter ID?
2      A.  No.
3      Q.  Was it related to voter fraud?
4      A.  Yes.
5      Q.  Okay.  What was the subject matter of the
6  communication that you printed?
7      MR. McKENZIE:  I'm going to object on the
8  basis of privilege.  It goes into what was communicated.
9      MR. GEAR:  Wait a minute.  If I understand
10  his testimony correctly it was not related to SB 14.
11  BY MR. GEAR:
12     Q.  But the printing job that you completed on behalf
13  of another legislator; is that correct?
14     A.  Yes.
15     Q.  So this would have occurred before you were
16  actually a legislator in House District 52?
17     A.  Not exclusively.
18     Q.  You've got to help me understand that, now.  I
19  asked for a time period.  I asked you when.  I asked you
20  who.  Is it your testimony that -- that the printing --
21  strike that.  When did the printing occur?  Did it occur
22  when you were an elected official or did it occur before
23  you were an elected official?
24     A.  That question -- they're not mutually exclusive.
25     Q.  Well, were you an elected official at the time

## 135

1  that you were asked to print documentation that was
2  related to voter I did or voter fraud as you say?
3      A.  Yes.
4      Q.  You were --
5      A.  Yes.
6      Q.  You were an elected official?
7      A.  Yes.  Yes.
8      Q.  You were elected in 2010?
9      A.  That's correct.
10     Q.  So now you remember when you actually completed
11  the printing job?
12     A.  Oh, I have no idea when it was completed.
13     Q.  So is it your testimony that the printing was
14  done subsequent to 2010?  Was it done in 2010?
15     A.  Yes.  Well, I mean, it was ongoing.  I mean, it's
16  not like there's a job you have and you have to be done
17  with it.  It was prior to being elected.  It was after
18  being elected.
19     Q.  So that's the issue.  It was an ongoing print
20  job.  Is that -- is that your testimony?
21     A.  I mean, or jobs, yeah.
22     Q.  So in 2010 prior to being -- being an elected
23  official in House District 52, were you asked to print
24  any communications related to voter fraud?
25     A.  Yes.

## 136

1      Q.  So focusing exclusively on the time period in
2  2010 before you became an elected official, what was the
3  subject matter of that print job?
4      A.  Voter fraud.
5      Q.  What was the subject matter?  Beyond just voter
6  fraud, what did it discuss?  What was the topic?
7      A.  I don't write copy.  It was voter fraud.
8      Q.  Did you produce the -- the print job, the
9  communication in response to the notice of deposition?
10     A.  No, I don't think so.
11     Q.  Did the notice of deposition ask for public
12  communication?
13     A.  Yeah.
14     Q.  Are you claiming legislative privilege on any
15  documents that are related to voter fraud prior to you
16  becoming a legislator?
17     A.  Yeah.
18     Q.  On what basis?
19     A.  It goes into my thought process, reasoning.
20     Q.  But you're not a legislator.
21     A.  Oh, but it's -- it affects decisions as a
22  legislator.
23     MR. GEAR:  Counsel, I'd ask that those
24  documents be produced to the Attorney General.  I don't
25  believe that they're covered under legislative



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

137

1   privilege.  It was prior to Representative Gonzales
2   becoming a legislator in the House.  I would ask that
3   those documents be produced.
4        MR. McKENZIE:  Okay.  I will check with the
5   representative and see whether or not we have those in
6   our custody.  And if we do have those in our custody,
7   we'll get them to you fast.  And if we don't, I'll ask
8   when we can get them if he still has a copy of them.
9        MR. GEAR:  Thank you.
10  BY MR. GEAR:
11       Q.  I believe I asked you before, are you a member of
12  the Texas Conservative Coalition?
13       A.  You didn't.  And I think that I am.
14       Q.  When did you become a member of the Texas
15  Conservative Coalition?
16       A.  Well, they accept you upon your election before
17  swearing in.  But you write your check, your dues, I
18  think once you're elected.  I think I wrote the check
19  once you're elected.  But you're officially part of the
20  caucus before you're sworn in.
21       Q.  And can you tell me, does the Texas Conservative
22  Coalition have a Mission statement?
23       A.  I have no idea.
24       Q.  And has the Texas Conservative Coalition
25  addressed the issue of voter ID?

---

138

1        A.  I would assume so, but I wouldn't have any idea
2   what that is.
3        Q.  Have they publish any communication related to
4   voter ID?
5        A.  I wouldn't have any idea.
6        Q.  Does the Texas Conservative Coalition issue or
7   distribute floor reports to the House?
8        A.  The Texas Conservative Coalition Research
9   Institute does, but not the Texas Conservative
10  Coalition.
11       Q.  And is that affiliated with the Texas
12  Conservative Coalition?
13       A.  Yes.
14       Q.  And as a member of the Texas Conservative
15  Coalition, have you have reviewed any House -- any
16  research reports related to voter ID that were
17  distributed by the Texas Conservative --
18       A.  I have no idea.
19       Q.  Coalition?
20       MR. McKENZIE:  I'll object to the extent it
21  was during your time as a legislator and might reflect
22  your personal opinions, thoughts, and mental
23  impressions.
24       MR. GEAR:  I'm just simply asking if he's
25  reviewed any documents related to photo -- voter ID that

---

139

1   were issued by the Texas Conservative Coalition.  I
2   think it's a "yes" or "no" answer?
3        A.  I'll take the privilege.
4        Q.  (By Mr. Gear) Are you refusing to answer that
5   question based on advice of your counsel?
6        A.  Yes.
7        Q.  And are you -- you're refusing to answer that
8   question?
9        A.  Yes.
10       Q.  Okay.  Are you aware of the existence of any
11  reports by the Texas Conservative Coalition that address
12  the issue of photo ID?
13       A.  I have no idea.
14       Q.  Have you reviewed any reports issued by the Texas
15  Conservative Coalition that relate to SB 14?
16       A.  Not that I recall.
17       Q.  Do you believe that compliance with the federal
18  voting rights act is an important consideration in the
19  law making process?
20       A.  Yes.
21       Q.  Have you yourself reviewed the provisions of the
22  Texas election code?
23       A.  As per what section?
24       Q.  The Texas election code.  Specifically as it
25  relates to voter fraud.

---

140

1        MR. McKENZIE:  I'm going to object on the
2   grounds of privilege to the extent in played a part in
3   your deliberations to vote.
4        A.  I'll take that privilege.
5        Q.  (By Mr. Gear) You're refusing to answer that
6   question based on the advice of your counsel?
7        A.  Yes, that's right.
8        Q.  Under the current Texas State law, what forms of
9   identification be -- can be presented at the polling
10  place by a voter?
11       A.  Oh, you've got your voter card, driver's license,
12  I think you can do like public utility bills, things
13  like that.  Water bill, electric bill, power bill,
14  something like that.  And that's all I can speak to.
15       Q.  Under the current law do you know what the
16  penalties are for voter fraud?
17       A.  No.
18       Q.  Have you ever researched that issue?
19       A.  No.
20       Q.  Has anyone in your staff, in your office ever
21  researched that issue?
22       MR. McKENZIE:  I'm going to object on the
23  grounds of privilege that it reflects your
24  deliberations.
25       A.  I'll take that.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 141

1   Q. (By Mr. Gear) Are you aware that voter fraud
2   under the current law carries a possible jail sentence?
3        MR. McKENZIE:  Same objection.
4   A.  Take that privilege.
5   Q. (By Mr. Gear) Do you have an opinion as to
6   whether or not a potential penalty of -- of prison and
7   fine acts as a deterrent when it comes to voter fraud?
8        MR. McKENZIE:  Same objection.
9   A.  I'll take that privilege.
10  Q. (By Mr. Gear) Are you refusing to answer that
11  question based on the advice of your counsel?
12  A.  Yes.
13  Q.  Do you know under the current law what the
14  penalty is for a non-citizen to register to vote?
15       MR. McKENZIE:  Same objection.
16  A.  I'll take that.
17  Q. (By Mr. Gear) What is it that you're taking?
18  A.  The legislative privilege.
19  Q.  And are you refusing to answer that question
20  based on the advice of your counsel?
21  A.  Yes.
22       MR. McKENZIE:  I've been saying same
23  objection a lot.  Let me clarify, for the record.  To
24  the extent it reflects your deliberations and it's not
25  public record, don't answer it.  Or if it's public

---

### 142

1   record you may answer it.
2   BY MR. GEAR:
3   Q.  Does voting as a non-citizen carry any additional
4   penalties under the Texas election code?
5        MR. McKENZIE:  It's the same objection.
6   A.  I'll take the same privilege, legislative
7   privilege.
8   Q. (By Mr. Gear) Do you know if -- if a non-citizen
9   has the ability to obtain a driver's license in the
10  State of Texas?
11       MR. McKENZIE:  Same objection.
12  A.  I'll take the same legislative privilege.
13       MR. GEAR:  I -- Counsel, I'm wondering how
14  his knowledge of the Texas election code and its affect
15  on non-citizens draws a legislative privilege objection.
16       MR. McKENZIE:  Well, to the extent it is
17  considered information of that type.  And to be fair, I
18  don't know what the witness knows so I don't know if it
19  does reflect it or not, but to the extent it does
20  reflect it.  His knowledge today may or may not have
21  been acquired during a legislative session and it may be
22  something he considered when he was voting.  So I object
23  to that extent.  To the extent he didn't require it in
24  that process or it doesn't affect his acts as a
25  legislator, then he's free to answer.  And I have to --

---

### 143

1   I have to let the witness make that call because I don't
2   know what the witness knows.
3   BY MR. GEAR:
4   Q.  Are you refusing to answer my question based on
5   advice of your counsel?
6   A.  Yes.  Yes.
7   Q.  Can you obtain a Texas State ID if you're a
8   non-citizen?
9        MR. McKENZIE:  Same objection.
10  A.  I'll take that legislative privilege.
11       MR. BRAZIL:  What was the last thing you
12  said?
13  A.  Invoking that legislative privilege.  Sorry.
14  Q. (By Mr. Gear) So let me ask, do you know if a
15  non-citizen can obtain a Texas driver's license in the
16  State of Texas?  And I don't believe that "do you know"
17  questions are subject to a legislative privilege
18  objection?
19       MR. McKENZIE:  I understand.  And it's our
20  position that his knowledge if acquired as part of the
21  legislative process and part of his research on deciding
22  whether or not to vote on a bill is where he got this
23  information, then that would be privileged.  But if it's
24  not from that source and he just happens to know it and
25  it's not something part of the legislative process then

---

### 144

1   he can answer.
2   BY MR. GEAR:
3   Q.  All right.  And are you refusing to answer that
4   question based on the advice of your counsel?
5   A.  Yes.
6   Q.  And that was a yes?
7   A.  Yes, sir.
8   Q.  Does having a State issued ID or do you know if
9   having a State issued ID or a State issued -- in the
10  form of a State issued driver's license or ID card --
11  strike that question.  Are you a registered voter in
12  Williamson County?
13  A.  Yes.
14  Q.  When is the last time you voted?
15  A.  May the 15th of 2011.
16  Q.  Did you vote in person or by mail?
17  A.  In person.
18  Q.  And how far is your polling place away from your
19  home?
20  A.  My polling place is a little over a mile.  I did
21  not vote at my polling place, though.
22  Q.  What did -- I'm sorry.  I may not have heard the
23  first part of your answer.  Did you vote in person or
24  did you vote by mail?
25  A.  In person.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 145

1    Q.  Okay.  Can you tell me where you vote?
2    A.  I vote at Chisholm Trail Middle school.
3    Q.  And --
4    A.  Actually this year it was different.  I voted at
5  Precinct 38 votes at Restoration Covenant church.
6    Q.  And can you tell me why you did not vote at your
7  regular polling place?
8    A.  Because I voted early.
9    Q.  Okay.  So early voting would be a different
10 location?
11   A.  Yes.
12   Q.  Okay.  And how did you get there?
13   A.  I drove.
14   Q.  To the polling place?
15   A.  I drove.
16   Q.  Okay.  And do you have a valid driver's license?
17   A.  Yes.
18   Q.  Where did you go to get your driver's license,
19 your valid driver's license?
20   A.  I -- I don't recall.  I don't recall.
21   Q.  Did you have to go to DPS?
22   A.  Yes.  Yes.  DPS.
23   Q.  Do you know how any DPS offices there are if
24 Williamson County?
25   A.  I -- I don't know the answer to that.

### 146

1    Q.  Do you know what the operational hours are of the
2  DPS offices in Williamson County?
3    A.  No.
4    Q.  Do you know if the DPS offices in Williamson
5  County are full services offices?
6    A.  I don't know.  I want to clarify.  When you ask
7  me where, the end decision is I don't know if it was at
8  one location or the other.  So I don't -- I can't
9  remember if I was at the 183 location or the downtown
10 Austin location.
11   Q.  And just so we're clear for the record, when you
12 say "where," you're talking about voting?
13   A.  No.  The -- getting the certificate, the DPS
14 certificate -- DPS driver's license.  You asked me where
15 did I get it and it's one of those two locations.
16   Q.  Okay?
17   A.  Neither of which is in Williamson County.
18   Q.  I thought I previously asked you do you know the
19 locations of the DPS offices and I understand your
20 answer now because you said neither of them are in
21 Williamson County.  So is there a reason why you
22 obtained your driver's license in the location other
23 than Williamson County?
24   A.  Yes.
25   Q.  And what is that reason?

### 147

1    A.  Because I work downtown.
2    Q.  Okay.  Do you know what the cost of renewing your
3  driver's license was?
4    A.  No.
5    Q.  For a person who does not have a valid driver's
6  license or State issued ID, do you know what
7  documentation they would be required to bring to a DPS
8  is office to get a driver's license or State issued ID?
9    A.  No.
10   Q.  Do you know what the cost, the underlying cost
11 for those documents may be?
12   A.  No.
13   Q.  When you went to renew your driver's license, did
14 you -- did you have to stand in a line to do it?
15   A.  Yes.
16   Q.  How long did it take from entering the door to --
17 to the time you actually had card in hand?
18   A.  No idea.
19   Q.  Was it more than an hour?
20   A.  No idea.
21   Q.  How long was the line that you had to stand in?
22   A.  No idea.
23   Q.  What's the process for renewing your license?
24 And I mean specifically when you get to DPS, what's the
25 process that you have to go through?

### 148

1    A.  I cannot recall what I did.
2    Q.  Fair enough.  Okay.  Do you know if any DPS
3  offices are being closed in the State of Texas due to
4  the lack of funding?
5    A.  No idea.
6    Q.  Was the lack of funding for DPS offices discussed
7  publicly during the legislative debate on SB 14?
8    A.  Not that I recall hearing that particular
9  discussion.  I don't have any recollection of that -- of
10 that dialogue at all.
11   Q.  Was there any discussion during the public
12 legislative debate regarding the burden that SB 14 may
13 place on minority voters?
14   A.  Yes.
15   Q.  And specifically regarding the distances to DPS
16 offices?
17   A.  Yes.  Yes.  Yes.
18   Q.  Can you tell me what that discussion was?  And
19 we're talking about the public debate?
20   A.  All I remember is Pete Gallego saying that it was
21 going to be far, that in his district it's -- it's a
22 long drive.
23   Q.  And that was Pete Gallego, Representative
24 Gallego?
25   A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 149 | 151 |
|---|---|

**149**

1   Q. And do you recall any public debate regarding
2   some constituents that may be required to travel as far
3   as 100 miles to renew or to obtain a driver's license?
4       A. I couldn't tell you what number Pete used. I
5   don't remember. I just remember it was far.
6       Q. Do you have an opinion as to whether or not
7   requiring individual to travel a far distance place as
8   burden on them when it comes to voting?
9           MR. McKENZIE: I'm going to object to the
10  extent you developed an opinion during your time as a
11  legislator. If you have an opinion separate and apart
12  from that time you're free to answer.
13      A. I'll take that legislative privilege.
14      Q. (By Mr. Gear) Well, I'm asking you your opinion.
15  And I want to be clear that you're not just asserting
16  legislative privilege without considering and breaking
17  out your knowledge based on public debate and your
18  knowledge based on private debates that may have --
19  private discussions that may have taken place during the
20  legislative debate on SB 14. So I'm asking you to focus
21  on your knowledge, your personal knowledge. Do you have
22  an opinion as to whether or not requiring someone to
23  travel a substantial distance to obtain a driver's
24  license or a State issued ID imposes a burden on -- when
25  required to vote?

**151**

1       Q. And when did you have to go get one?
2       A. Within a year and a half or so.
3       Q. And do you recall -- do you recall what the cost
4   of obtaining that birth certificate was?
5       A. No.
6       Q. Do you recall what underlying documents you
7   needed to obtain a certified birth certificate?
8       A. I was trying to think of that while you were
9   asking the question. I have no idea why I was there
10  now.
11      Q. And when you say "you have no idea why you were
12  there," you mean no idea what you took?
13      A. I did -- I don't know why I was asking for it. I
14  don't know the reason why I was asking for my birth
15  certificate.
16      Q. And that's a little different than the question
17  which I asked which is, do you know what documentation
18  you had to bring in order to obtain a certified copy of
19  your birth certificate?
20      A. Oh, I don't remember what I gave the clerk.
21      Q. As you sit here today, you don't remember what
22  underlying documentation you needed to present to obtain
23  a copy of a certified birth certificate?
24      A. Correct.
25      Q. Do you know if every county in the State of Texas

**150**

1           MR. McKENZIE: Just make a quick objection.
2   If -- if that opinion is not publish and was weighed by
3   you in your decision to vote then I'm going to instruct
4   you not to answer. If that opinion was not a factor in
5   your decision to vote then you may answer.
6       A. I'll invoke the legislative privilege.
7       Q. (By Mr. Gear) Are you refusing to answer my
8   question on the basis of advice from your counsel?
9       A. Yes.
10      Q. Do you currently possess a certified copy of your
11  birth certificate?
12      A. I -- I don't know. I don't know.
13      Q. Do you know what you would have to go through to
14  obtain a certified copy of a birth certificate in the
15  State of Texas?
16      A. No.
17      Q. Do you know what the cost of obtaining a
18  certified birth certificate is in the State of Texas?
19      A. No.
20      Q. Do you know where you would have to go to obtain
21  a certified copy of your birth certificate in the State
22  of Texas?
23      A. I think you can go to Department of Health and
24  Human Services. You know what, I do have one because I
25  had to go get one.

**152**

1   has a DPS office or an office where you can obtain a
2   driver's license or a State issued identification card?
3       A. I am not aware.
4       Q. Do you know, or are you aware of counties which
5   do not have a DPS is office?
6       A. Not aware.
7       Q. Was the discussion, and I'm talking about a
8   public discussion, was there public discussion expressed
9   during the legislative debates on SB 14 that addressed
10  the issue of DPS offices and where they were located?
11      A. There was a conversation. To the extent of what
12  that was I -- I don't recall.
13      Q. Would I be accurate to say that the public
14  discussion during the legislative debate on SB 14
15  identified our counties that did not have a DPS is
16  office?
17      A. Not that I can remember.
18      Q. So as you sit here today, it's your testimony
19  that you're not aware of any counties in the State of
20  Texas that do not have a DPS office or an office where
21  you can -- where you go to obtain a driver's license or
22  a State issued ID?
23      A. No. I have no idea.
24      Q. Are you concerned that if SB 14 were implemented
25  do you believe that that would cause a burden -- strike



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 153

1  that.  If, in fact, there are counties that do not have
2  a driver's license office or a DPS is office, are you
3  concerned that would impose a burden on individuals who
4  would be required to obtain allowable forms of ID under
5  SB 14 if they had to travel long distances to get there?
6      A.  Well, I'll take that privilege.
7          MR. McKENZIE:  You already testified, as far
8  as I remember, that you didn't know that before.  So
9  it's not an opinion you would have developed on the part
10 of the legislation.
11     A.  I don't -- I don't -- can you ask me the question
12 again so I can make sure I understand it.
13         MR. GEAR:  Can you read that back?
14         (Requested question was read.)
15         MR. McKENZIE:  Relevance objection.  You may
16 answer.
17     A.  No.
18     Q.  (By Mr. Gear) You're not concerned?
19     A.  No.
20     Q.  Were you an author or co-author of SB 14?
21     A.  I don't recall, but it's easy to find out.
22     Q.  Well, were you involved in the drafting of SB 14?
23     A.  No.
24     Q.  Were you involved in any communications regarding
25 SB 14?

## 154

1      A.  No, sir.
2      Q.  As you sit here today, you don't know if you were
3  an author or co-author of SB 14?
4      A.  No, but I could look it up for you.
5      Q.  We'll to that.  I'm just trying to understand
6  what you know.  So what is the process, generally, for
7  determining who will sponsor or cosponsor a bill in the
8  House?
9      A.  Anybody can sponsor anything.  Anybody can put
10 their name on a draft and file it.  So anybody can
11 author whatever they want to author.
12     Q.  What about cosponsor, is there -- is there any
13 process in place for determining who will cosponsor a
14 bill?
15     A.  Well, cosponsor as a House member assumes it
16 comes from the Senate itself, which is different from
17 co-authoring.
18     Q.  Uh=huh.
19     A.  So cosponsor, to your question, when it comes
20 over from the Senate there is a sheet in the chief
21 clerk's office that you can sign up as co-op -- I mean,
22 cosponsor.
23     Q.  So as I understand it there's a sheet in the
24 Senate where you can sign up as a cosponsor?
25     A.  When the Senate Bill comes to the House you go to

## 155

1  the House chief clerk's office and you can sign up as a
2  cosponsor.
3      Q.  Okay.  And did you sign up as a cosponsor for
4  SB 14?
5      A.  That's what I'm not sure about, but I would be
6  happy to check.  I just don't recall.
7      Q.  I think that was previously marked as Exhibit 5?
8          (Exhibit No. 5 was marked.)
9      A.  Okay.
10     Q.  So I've handed you what's been marked as Exhibit
11 No. 5.  What is that?
12     A.  This is Senate Bill No. 14.
13     Q.  And so the question I had for you was were you a
14 co-author of Senate Bill No. 14?
15     A.  Well, you would be a cosponsor of Senate Bill if
16 you're in the House.
17     Q.  I stand corrected.
18     A.  A cosponsor.  I need to look it up.  I can look
19 it up for you.  I don't know.  Can you give me a minute
20 to look it up and then I could answer your question?
21     Q.  I don't mean to be difficult.
22     A.  I can look it up if you want me to.  I'm not
23 trying to not answer it.  I don't know.
24     Q.  Okay.  That's fair.  And I apologize.  I just
25 didn't have it in front of me.

## 156

1      A.  That's it.  That's it.
2      Q.  Okay.  I'm just going to show you this document.
3  It's been previously introduced as Exhibit No. 8 in
4  other depositions.  And does that help refresh your
5  recollection?
6      A.  Yes.  Yes.
7      Q.  And the answer is, yes, you were a cosponsor of
8  SB 14?
9      A.  That is a cosponsor of SB 14, yes.
10     Q.  And can you identify who the author of SB 14 was?
11     A.  The author of Senate Bill 14 is Fraser, Birdwell,
12 Corona, Dual, Duncan, Eltife, Estes, Harris, Haber,
13 Huffman, Jackson, Nelson, Nichols, Ogden, Patrick,
14 Seliger, Shapiro, Wentworth and Williams.
15     Q.  And SB 14 was passed in the Senate and then came
16 to the House?
17     A.  Yes.
18     Q.  Can you tell me when it came to the House?
19     A.  When it came to the House or when it came to the
20 House Committee?  When it came to the House floor?  What
21 are you asking?
22     Q.  And let's just be clear.  What is the process
23 for -- what was the process for SB 14 when it passed the
24 Senate?
25     A.  It is received by the House.  It is assign -- it



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 157

1  is read aloud.  It is assigned to committee.  The
2  committee, if passes goes to a calendar committee, if
3  passes comes to the floor with a lot of variables in
4  between depending on what happened.
5      Q.  Is that what happened with SB 14?
6      A.  Let me check.  I'm sure it did.
7      Q.  Okay.  And let me turn your attention back to the
8  actual bill which has been marked as Exhibit No. 5.
9      A.  Okay.
10     Q.  Can you tell me what the allowable forms of ID
11 are under SB 14?
12     A.  Okay.  In this version of Senate Bill 14 a
13 driver's license, election identification certificate,
14 personal identification card issued from Department of
15 Public Safety that hasn't expired or that expired no
16 earlier than 60 days before the date of presentation, a
17 United States military identification card with a
18 photograph on it that has not expired or that expired no
19 earlier than 60 days before the date of presentation, a
20 United States citizen certificate with a photograph of
21 the person.  A passport that has not expired or that
22 expired no earlier than 60 days before date of
23 presentation.  Concealed handgun license issued by
24 public safety that has not expired or that expired no
25 earlier than 60 days before date of presentation.  I

### 158

1  think this -- that's it.
2      Q.  Now, previously during your deposition we went
3  through HB 1706 which was sponsored by Representative
4  Denny and others.  We went through HB 218 and we went
5  through SB 362.  Would you agree that the allowable
6  forms of ID in SB 14 are different than the allowable
7  forms of ID in the bills that I just referenced?
8      A.  Hold on let me check.  Well, let me look at them.
9  They all have a driver's license, they have a personal
10 identification card.
11     Q.  But is it accurate to say that the driver's
12 license in SB 14 has an expiration date of no more than
13 60 days and the driver's license in all of the other
14 referenced ID bills has an expiration date to be
15 presented no more than two years?
16     A.  Yes.
17     Q.  And do you have an opinion as to -- strike that.
18 I think that's been asked and answered actually.  Do you
19 see any -- any other differences as we're describing
20 this for the record, between SB 14 and the other bills
21 that I've referenced?
22     A.  The United States military ID in Senate Bill 14
23 has an expiration date.  I don't see in 1706, 218 or
24 362 -- let's see, citizenship certificate date is that
25 on all of them.  It's on that one.

### 159

1      Q.  Well, let me ask a specific question to help you
2  out.  Does SB 14 allow for identification for a student
3  identification card issued by public or private
4  institution of higher education that contains the
5  person's photograph?
6      A.  It does not.
7      Q.  Do you know why -- what the basis of the change
8  was between the 2007, 2009 and HB -- HB 12 -- SB 14?
9  I'm sorry.
10         MR. McKENZIE:  I didn't mean to talk over
11 you.  I'm going to object to the extent that it reveals
12 private communications that are not public or to the
13 extent it reveals personal reflections that are not
14 public and factored into your decision to vote.  If it
15 reflects public record or a general legislative purpose
16 you may answer.
17 BY MR. GEAR:
18     Q.  The question is what's the basis of the change
19 from the previous voter ID legislation and SB 14?
20         MR. McKENZIE:  Same objection.
21     A.  I don't know.  I'll answer.  I don't know because
22 I wasn't a member for any of that.  I'm not familiar
23 with these three.  This is the one that I'm familiar
24 with.  So I can't speak to any changes that were made
25 for this purpose.

### 160

1      Q.  Was there public debate regarding the removal or
2  the decision not to include student identification cards
3  issued by public or private institution in SB 14 that
4  you can recall?
5      A.  Yes.
6      Q.  And what was the subject matter or the substance
7  of that public debate?
8      A.  I don't know who was talking, but I remember the
9  conversation was that it would be difficult for an
10 election judge to recognize a valid student ID because
11 there were so many different forms.  That's what --
12 that's the discussion I remember on the floor.
13     Q.  Are you aware of any personal -- are you
14 personally aware of any voter impersonation allegations
15 by students who have used student identification?
16         MR. McKENZIE:  I'm going to object to the
17 extent that you acquired that knowledge in furtherance
18 of your duties of the Legislature.  You may answer it to
19 the extent you didn't acquire knowledge that way or it's
20 a matter of public record.
21     A.  I don't have any knowledge.
22     Q.  (By Mr. Gear) Are you aware of any convictions of
23 students whose have falsely used a student
24 identification?
25         MR. McKENZIE:  Same objection.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

161

1    A. I don't know.
2    Q. (By Mr. Gear) Are you aware of any allegations
3  what so never the State of Texas of students who have
4  falsely used a student identification card?
5    A. I don't have any knowledge.
6    Q. Do you see that SB 14 also does not include a
7  valid employee identification card?
8    A. Yes, that's correct.
9    Q. Do you know what the basis of the change from the
10  previous voter ID legislation to SB 14, do you know the
11  basis of that change?
12       MR. McKENZIE:  Legislative privilege
13  objection.  Subject, you may answer.
14    A. I can't speak to any reason for change.
15    Q. (By Mr. Gear) In your opinion, would you -- would
16  allowing an employee ID that contains photograph be an
17  effective method of presenting voter fraud?
18       MR. McKENZIE:  If you developed an opinion
19  and factored it in your decision to vote, I would say
20  it's privileged.  If not then you may answer.
21    A. I am going to say privilege on that one.
22    Q. (By Mr. Gear) Are you refusing to answer my
23  question based on the advice of your counsel?
24    A. Yes.
25    Q. Are you aware of any allegations in the State of

---

162

1  Texas where an individual has used a voter -- an
2  employee identification card to impersonate someone else
3  at the polling place?
4       MR. McKENZIE:  Same objection.
5    A. Legislative privilege on that.
6    Q. (By Mr. Gear) Are you aware of any investigations
7  by any entity in the State of Texas that involved an
8  individual who used a employee identification card to
9  impersonate someone else at a polling place?
10       MR. McKENZIE:  Again, if the awareness of
11  these investigations factored into your duty as a
12  legislator, I instruct you not to answer.  Otherwise,
13  you may answer if it's public record or general
14  legislative purpose.
15    A. I'll claim legislative privilege.
16    Q. (By Mr. Gear)  And you see that SB 14 also does
17  not include Section B or the information acceptable
18  regarding acceptable proof of identification under --
19  strike that.  That made no sense.  You see that SB 14
20  does not include official mail addressed to a person by
21  name from a governmental entity?
22    A. This version of Senate Bill 14 does not.
23    Q. And so let's be clear for the record, when you're
24  talking about this version of Senate Bill 14, do you see
25  the last page of SB 14?

---

163

1    A. The last page.  Yes.
2    Q. And you see that that page has been signed?
3    A. Yes.
4    Q. And that page has been signed by Governor Rick
5  Perry?
6    A. Uh-huh.  I do.
7    Q. So does that indicate that this is the version
8  that's been passed?
9    A. Yes.
10    Q. Do you have a photo ID with you here today?
11    A. No, sir.
12    Q. Why not?
13    A. I didn't bring anything with me.
14    Q. Is it true that if an individual did not bring a
15  photo ID to the polling place, if SB 14 was adopted,
16  that they would not be allowed to vote regular ballot?
17    A. Regular ballot, yes.
18    Q. Do you have an opinion as to whether that places
19  a burden on a legitimate voter when attempting to cast a
20  ballot in the State of Texas?
21       MR. McKENZIE:  Same objection.  If you
22  gathered that opinion before the vote and used it and it
23  factored into your vote, then it's privileged.  If you
24  got it separate and apart from your legislature you can
25  answer.

---

164

1    A. Legislative privilege.
2    Q. (By Mr. Gear)  Are you refusing to answer my
3  question base on the advice of counsel?
4    A. Yes.
5    Q. Was photograph -- was the voter ID declared an --
6  a legislative emergency?
7    A. Yes.
8    Q. Do you know why voter ID was declared a
9  legislative emergency?
10       MR. McKENZIE:  Again you can answer this to
11  public record.  Prior conversations are privileged.
12    A. Legislative privilege.
13    Q. (By Mr. Gear)  Are you refusing to answer my
14  question based on the advice of your counsel?
15    A. Yes.
16    Q. Do you know who was responsible for declaring
17  voter ID to be a legislative emergency?
18    A. The governor.
19    Q. Were you part of any communication concerning the
20  issue of declaring voter ID as a legislative emergency?
21    A. No, sir.
22    Q. Was your staff present during any communications
23  regarding declaring voter ID as a legislative emergency?
24    A. No, sir.
25    Q. Are you aware of any communications that have

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

165

1  been obtained in your office by either you or your staff
2  that relates to declaring voter ID as a legislative
3  emergency?
4      A.  No, sir.
5      Q.  Was there any election set the occur 60 days
6  before SB 14 was considered by the Legislature?
7      A.  Sixty days before the Senate Bill was brought up?
8      Q.  Yes.
9      A.  Let's see the date.  It was brought up on January
10  12th.  So 60 days, November 12th.  Is that what you're
11  asking?
12      Q.  Was there any election that was 60 days before SB
13  14 was brought up by the Senate?
14      A.  Close.  I'm not sure if it's exactly 60.  It may
15  be 65 or 70.
16      Q.  So as you sit here today, you're not sure?
17      A.  I'm not sure.  It's close.
18      Q.  Why was SB 14 declared an emergency?
19          MR. McKENZIE:  Again, you may answer as a
20  matter of a public record.  Otherwise, private
21  communications legislative privilege.
22      A.  Legislative privilege.  I'll take that.
23      Q.  (By Mr. Gear) What was the purpose of Senate Bill
24  14?
25          MR. McKENZIE:  Again, you may answer if its

---

166

1  public record, your own personal purpose.  If it is not
2  communicated publicly, it's privileged.
3      A.  Relating to requirements to vote, including
4  presenting proof of identification.
5      Q.  (By Mr. Gear)  Are you reading from an exhibit?
6      A.  Yes.  I don't know if this is an exhibit.  Does
7  it have a number on it?
8      Q.  It does not?
9      A.  I didn't know.
10      Q.  Just note for the record that the witness was
11  reading from the Texas Legislature online history 82nd
12  legislative session dated May 27, 2011.  Do you have any
13  independent knowledge of why SB 14 was declared
14  legislative emergency?
15          MR. McKENZIE:  Again, you can answer as a
16  matter of public record.
17      A.  Legislative privilege.
18      Q.  (By Mr. Gear) Do you have any independent
19  knowledge as to why -- what the purpose of SB 14 was?
20          MR. McKENZIE:  Same objection.
21      A.  Legislative privilege.
22      Q.  (By Mr. Gear) Does SB 14 address the issue of
23  voter impersonation?
24      A.  Yes.
25      Q.  And we talked about voter impersonation on the

---

167

1  record already and you defined that, correct?
2      A.  Yes.
3      Q.  Other than voter impersonation, does it address
4  any other type of voter fraud?
5      A.  It does not.
6      Q.  Are you familiar with the House Research
7  Organization?
8      A.  Yes.
9      Q.  And can you tell me does the House Research
10  Organization have a membership?
11      A.  Yes, it does.
12      Q.  How are members selected?
13      A.  I don't know.  I think they're appointed, but I
14  don't know how you get on an HRO.
15      Q.  Are you a member of the House Research
16  Organization?
17      A.  No.
18      Q.  Do you know what the appointment process?
19      A.  I do not.
20      Q.  Can you explain the purpose of the House Research
21  Organization?
22      A.  They provide background on the legislation that
23  we're going to consider on the House floor.
24      Q.  And do they do that for every bill or select
25  bills?

---

168

1      A.  Select bills.
2      Q.  Did they do this for SB 14 during the 2011
3  session?
4      A.  I don't recall.
5      Q.  Do you recall reviewing any reports or analysis
6  from the House Research Organization in 2011?
7      A.  I don't recall.
8      Q.  Does the House Research Organization set policy
9  for the House?
10      A.  No.
11      Q.  But they do conduct research; is that correct?
12      A.  Yes.
13      Q.  Do they take testimony?  We're talking generally,
14  at this point about --
15      A.  They call the author -- well, actually what they
16  do is they call people who have an interest in the bill
17  and ask them what their, you know, concerns are, what
18  their, you know, pro, con, so they'll call different
19  people to ask different opinions that we as members can
20  see supporters say and opponents say.
21      Q.  Do House members rely on the information or the
22  reports that are provided by the House Research
23  Organization?
24      A.  I can't speak to other members at all, what they
25  think of that.

---


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 169

1  Q. Do you rely on information that's provided by the
2  House Research Organization?
3  A. I read it. I don't rely on it.
4  Q. Is there a standard that the House Research
5  Organization has to follow when conducting research on a
6  select bill?
7  A. I'm not familiar with their process.
8  Q. Do you -- House members -- would you generally
9  find reports issued by the House Research Organization
10 reliable?
11 A. Yeah. Yeah. Rather, I believe that is what they
12 were told by the people they called. Yes. And I
13 believe that they reflect that accurately from what they
14 were told, yes. But I don't rely on them.
15 Q. Is it accurate to say that the House Research
16 Organization provides impartial information on
17 legislation and issues before the Texas Legislature?
18 A. To the degree that they're just reporting what
19 they heard from the other people.
20 Q. What, if any regulation or guidelines, and I
21 believe you testified to this, are they required to
22 follow when conducting and analysis of a bill?
23 A. I do not know their process.
24 Q. Does the HRO, or the House Research Organization,
25 publish or distribute their findings of its analysis?

### 170

1  A. Yes.
2  Q. And generally is the House Research Organization
3  analysis distributed to House members?
4  A. Yes.
5  Q. And how would that be distributed?
6  A. Distributed on our desk the day we vote and also
7  online, always available online.
8  Q. And are those called the daily floor reports, the
9  ones that are distributed on your desk?
10 A. They have a blue cover. I don't know what it's
11 called.
12 Q. Let's see, I think this would be 221 if I'm
13 correct.
14     (Exhibit No. 221 was marked.)
15 BY MR. GEAR:
16 Q. I handed you what's been marked as Exhibit 221.
17 Take your time and we're going to talk about it.
18 A. Okay.
19 Q. Can you identify this? What is this?
20 A. This is a post session report from the House
21 Research Organization on the major issues. And Page 55
22 and 56 have been photocopied, requiring voters to
23 present photo ID.
24 Q. Okay. And you see that this is dealing
25 specifically with SB 14 in the left-hand corner?

### 171

1  A. Left-hand corner?
2  Q. Page 55, left-hand corner.
3  A. Yes.
4  Q. And what does that say?
5  A. Requiring voters to present photo ID, Senate Bill
6  14 by Fraser, generally effective January 1, 2012.
7  Q. And it's your testimony, as I understand it, that
8  the House Research Organization calls individuals to
9  understand what the issues are related to a particular
10 bill?
11 A. Yes.
12 Q. Okay. And do you see on Page 55 where it says,
13 "supporters said"?
14 A. Yes, sir.
15 Q. Indicating that SB 14 would strengthen the
16 election process. Do you agree with that position?
17     MR. McKENZIE: I'm going to object to the
18 extent it reflects your personal opinions and you
19 factored into your vote. To the extent you didn't, you
20 may answer.
21 A. I -- I'll take the legislative privilege on that.
22 Q. (By Mr. Gear) Do you have a personal opinion as
23 to whether or not SB 14 would strengthen the election
24 process?
25     MR. McKENZIE: Same objection to the extent

### 172

1  you have one. If it's not the same as the one you
2  considered when you voted on the bill. You may answer
3  if you don't have any separate.
4  A. Legislative privilege.
5  Q. (By Mr. Gear) And was it your testimony that you
6  don't rely on information produced by the House Research
7  Organization?
8  A. To make my decision, that's correct.
9  Q. But it was your testimony that you believe that
10 the information that's produced by the House Research
11 Organization is reliable?
12 A. It's reflective of what they were told.
13 Q. Also directing your attention to Page 55,
14 "supporters said the bill would deter voter fraud." Do
15 you see that?
16 A. Yes.
17 Q. Do you have a position as to whether or not SB 14
18 would deter voter fraud?
19     MR. McKENZIE: Same objection. Object on
20 legislative privilege grounds. To the extent you have
21 an opinion different from the one you considered in
22 voting or didn't have an opinion when you voted on the
23 subject you may answer. Otherwise I'm going to instruct
24 you not to answer on legislative privilege grounds.
25 A. Okay. Legislative privilege on that question.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

173

1     Q.  (By Mr. Gear)  Are you refusing to answer my
2   question based on advice of counsel?
3     A.  Yes.
4     Q.  Do you see where it says keep in eligible voters
5   from voting?
6     A.  Yes.
7     Q.  Do you recall if there was public debate
8   regarding that particular issue?
9     A.  Yeah.  During the debate on the floor.
10    Q.  Do you recall that ineligible voters also
11  included undocumented citizens or illegal aliens?
12    A.  I don't remember that part of the conversation.
13    Q.  Do you know if SB 14 was passed, in part, to
14  prevent undocumented citizens or illegal aliens from
15  voting?
16        MR. McKENZIE:  Again, you may answer as a
17  matter of public record.  If it reflects private
18  conversations with legislators and factored into your
19  vote, I will instruct you not to answer.
20    A.  Legislative privilege.
21    Q.  (By Mr. Gear)  Are you refusing to answer my
22  questions based on the advice of your counsel?
23    A.  Yes.
24    Q.  Do you have an opinion as to whether SB 14 was
25  passed, in part, to prevent undocumented non-citizens or

---

174

1   illegal aliens from voting?
2        MR. McKENZIE:  Again, to the extent you
3   developed that opinion as part of your duties as a
4   legislator and its not public, I instruct you not to
5   answer.  You may answer as a general legislative purpose
6   and matter of the public record.
7     A.  Legislative privilege.
8     Q.  (By Mr. Gear) Do you see where it said -- where
9   it says SB 14 would promote a higher turnout, also on
10  Page 55?
11    A.  Yes.
12    Q.  Do you have an opinion as to whether or not SB 14
13  would promote a higher turnout?
14        MR. McKENZIE:  Same objection on legislative
15  privilege grounds.
16    A.  I'll claim legislative privilege.
17    Q.  (By Mr. Gear) And you're refusing to answer that
18  question on the advice of your counsel?
19    A.  That's correct.
20    Q.  Was there any public debate during the
21  legislative process for SB 14 regarding SB 14 promoting
22  a higher turnout?
23    A.  I don't recall going into that conversation.  Not
24  that I recall.
25    Q.  Do you see where it says, also in that same

---

175

1   paragraph, that increasing the criminal penalties for
2   voter fraud would help ensure the integrity of
3   elections?
4     A.  Yes.
5     Q.  Was there any public debate regarding increasing
6   the voter fraud to ensure the public integrity of
7   elections?
8     A.  As per the criminal penalty?
9     Q.  Yes.
10    A.  I don't recall.  I don't remember.
11    Q.  Do you think that increasing criminal penalties
12  would ensure the integrity of elections?
13        MR. McKENZIE:  Objection to the extent it
14  reflects an opinion you developed prior to voting.  If
15  it factored into your voting, if it doesn't meet those
16  requirements and you have an opinion, you may answer.
17    A.  I will claim legislative privilege.
18        MR. GEAR:  So just so we're clear for the
19  record, I'm asking him about the purpose of SB 14.
20        MR. McKENZIE:  Right.
21        MR. GEAR:  And are you advising him that he
22  should not answer based on legislative privilege?
23        MR. McKENZIE:  Only if it's a -- reflects
24  private, unspoken, individual purposes and motivations
25  to vote.  To the extent it's in the public record and he

---

176

1   can recall that there's something to say about that,
2   then he is free to answer.
3        MR. GEAR:  And I'm being very clear and I
4   don't believe that that's what the court ordered.  So I
5   want to put on the record and I've been asking over and
6   over again if he's following the advice of counsel and
7   he has said over and over again that he is.  I'm going
8   to continue to ask the questions, you know.  We may have
9   to take this up with the Court.
10        MR. McKENZIE:  I understand.  But I was
11  going to ask, I mean, it's our position that we are
12  complying with the court's order, as we understand it.
13  The way I understand the court's order is that general
14  legislative purpose you're allowed to speak about and
15  public record you're -- you're allowed to speak about.
16  And there's no privilege protecting those two items.
17  When it comes to private opinions and private purposes,
18  then it is protected, as far as I understand.  But if
19  you have a court opinion with you right now, I'll be
20  happy to look over it.
21        MR. GEAR:  Can we go off the record?
22        (Discussion off the record.)
23  BY MR. GEAR:
24    Q.  So we had a brief conversation off the record
25  regarding legislative privilege.  And I'm going to try



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 177

1    to rephrase some of these questions so that we can try
2    to understand what you know about these particular --
3    about SB 14.  So was the purpose of SB 14 in part to
4    prevent undocumented non-citizens or illegal aliens from
5    voting?
6        MR. McKENZIE:  And I'll just ask a
7    clarifying question.  You mean general legislative
8    purpose when you say SB 14, correct?
9        MR. GEAR:  Yes.
10       MR. McKENZIE:  Okay.  You may answer.
11    A.  I don't know.
12    Q.  (By Mr. Gear) Was the general legislative purpose
13   of SB 14, in part, to promote a higher -- to promote a
14   higher turnout?
15    A.  I don't know.
16    Q.  Was the general legislative purpose of SB 14
17   adopted, in part, or passed, in part, to restore and
18   enhance the public confidence in elections?
19    A.  I am not aware.
20    Q.  Do you have an opinion as to whether or not
21   increasing criminal penalties for voter fraud would
22   ensure the integrity of elections?
23       MR. McKENZIE:  Again, if you have an opinion
24   that's private, do not disclose.  I'll object on
25   privilege grounds or if it factored into your duties as

---

### 178

1    a legislator.  If you have an opinion separate and apart
2    from that, you may answer.
3    A.  Going to claim legislative privilege on that.
4    Q.  (By Mr. Gear)  Have you heard any public debate
5   regarding voter fraud driving honestly -- honest
6   citizens out of the Democratic process?
7    A.  Yes, they did discuss that on the House floor.
8    Q.  Do you know what the basis of that discussion is?
9    A.  No.
10    Q.  What was the general legislative purpose of SB
11   14, each and every purpose that you're aware of?
12    A.  To address the requirements to vote, including
13   presenting proof of identification.
14    Q.  And are you reading from an exhibit?
15    A.  Yes.
16    Q.  And which Exhibit are you reading from, sir?
17    A.  Five.
18    Q.  And five is which Exhibit?
19    A.  That is the signed version of Senate Bill 14.
20    Q.  And you said that there was some public debate
21   about the concern that voter fraud was driving honest
22   citizens out of the Democratic process; is that correct?
23    A.  Yes.
24    Q.  And can you tell me when that conversation took
25   place?

---

### 179

1    A.  During the floor debate.
2    Q.  Can you tell me what the substance of that
3   conversation was during the floor debate?
4    A.  That there might be people who felt that voter
5   fraud kept them from voting.
6    Q.  Was there any specific allegation that was
7   presented during the floor debate?
8    A.  I don't recall.
9    Q.  Was there any specific investigation --
10   information of investigations that was presented during
11   the floor debate?
12    A.  I don't recall.
13    Q.  Was there any specific information of convictions
14   that was presented during the floor debate, and I'm
15   referencing voter fraud?
16    A.  I don't recall.
17    Q.  Was there any specific allegation of voter fraud
18   that would support that honest citizens were being
19   driven out of the Democratic process that was presented
20   during the legislative debate on SB 14?
21    A.  I think they talked about it.  But I couldn't
22   tell you who or in what context.  I just remember it was
23   going on.
24    Q.  You see -- and again, I'm going to refer you back
25   to the House Research Organization focus report.  Do you

---

### 180

1    see where it says on Page 55 that "every day
2   circumstances require citizens to present a photo ID."
3   Do you see that at the bottom of Page 55?
4    A.  Bottom right or bottom left?
5    Q.  Bottom right.
6    A.  Yes.
7    Q.  What does that mean?
8    A.  When I read that, I take it to mean that you in
9   your course of business, everyday kind of activities
10   that you have to use -- or have to show a photo ID.
11    Q.  Do you believe this voting is a fundamental
12   right?
13    A.  Yes.
14    Q.  Do you believe that cashing a check is a
15   fundamental right?
16       MR. McKENZIE:  Objection; relevance.  You
17   may answer.
18    A.  I don't even know what the question means.
19    Q.  (By Mr. Gear) Do you believe that travelling on
20   an airplane is a fundamental right?
21       MR. McKENZIE:  Same objection.
22    A.  Yeah.  I don't know what that means.
23       MR. McKENZIE:  You can answer.
24    A.  I don't know what it means.
25    Q.  (By Mr. Gear) Do you have a position regarding



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 181

1  this statement that was made by supporters of SB 14 that
2  every day circumstances require citizens to present
3  photo ID?
4       MR. McKENZIE:  Object if he developed this
5  position in the course of your duties as a legislator.
6  To the extent you did not develop that opinion in that
7  course, you may answer the question.
8       A.  Can you repeat the question?
9       Q.  (By Mr. Gear) Can you read it back?
10      (Requested question was read.)
11  BY MR. GEAR:
12      Q.  And I would include, including air travel and
13  cashing a check.  Do you have a position on that?
14      A.  I am going to claim legislative privilege on
15  that.
16      Q.  Do you usually carry a photo ID with you?
17      A.  Yes.
18      Q.  But you didn't bring one with you today?
19      A.  No.
20      Q.  And why not?
21      A.  Just didn't bring one.
22      Q.  Do you have an opinion as to whether or not if SB
23  14 was adopted and an individual who just didn't bring a
24  photo ID would be allowed to vote on a regular ballot?
25      A.  Can you ask that again, please?

### 182

1       Q.  A person who didn't bring a photo ID to the
2  polling place and did not have any other forms of
3  allowable identification under the SB 14, would they be
4  allowed to vote a regular ballot?
5       A.  No.
6       Q.  Do you have an opinion as to whether or not
7  stricter identification requirements under SB 14 impose
8  an unreasonable burden on voters?
9       MR. McKENZIE:  If you have a position that
10  you developed during the course of your duties as a
11  legislator and it factored into your vote, I'll instruct
12  you not to answer if it's not public.  If it's public or
13  you developed an opinion outside the legislator, you may
14  answer.
15      A.  Invoke legislative privilege.
16      Q.  (By Mr. Gear) Are you refusing to answer that
17  question on the basis of advice from your counsel?
18      A.  Yes.
19      Q.  During the legislative debate on SB 14, are you
20  aware of discussions on the floor where the issue of
21  stricter identification requirements related to SB 14
22  creating an unreasonable burden on voters?
23      A.  Yes.
24      Q.  Did you respond publicly on the floor to the
25  concerns expressed?

### 183

1       A.  My record in the House journal would reflect
2  that.  I don't have that with me.
3       (Exhibit No. 222 was marked.)
4  BY MR. GEAR:
5       Q.  Can you read my question back?  I'm handing you
6  what's been marked as Exhibit 222.
7       A.  Okay.
8       Q.  Can you identify that for the record?  What is
9  that?
10      A.  This is the House journal from the 82nd regular
11  session of Legislature from Wednesday March 23, 2011.
12      Q.  Now, you've referenced during your deposition
13  several times that the House journal would reflect your
14  testimony on the -- on the House floor; is that correct?
15      A.  That is correct.
16      Q.  And this is the Wednesday March 23, 2011 House
17  journal.  Is this the -- the journal that you were
18  referencing?
19      A.  Yes, sir.
20      Q.  Okay.  So the question that I asked you
21  previously and --
22      (Requested question was read.)
23      A.  Which concerns were you asking me about?
24      Q.  We were talking about the stricter identification
25  requirements would impose an unreasonable burden on

### 184

1  voters.  And you recalled hearing that debate.  And I
2  asked did you respond to those concerns?
3       A.  My questions were as to the word
4  "disenfranchised."  You're using a different word there.
5  What word are you using?
6       Q.  I'm using burden.
7       A.  I spoke to the disenfranchised -- the
8  disenfranchisement of others.
9       Q.  Okay.  Do you have an opinion as to whether or
10  not stricter identification requirements under SB 14
11  would impose an unreasonable burden on voters?
12      MR. McKENZIE:  Same objection.  If you
13  developed the opinion in the course of your duties as a
14  legislator and it's the same today and it's not public,
15  I instruct you not to answer.  If you have an opinion
16  that you developed prior to being in the legislature or
17  has already been publicly stated, you may answer.
18      A.  I'll claim legislative privilege.
19      Q.  (By Mr. Gear) Are you refusing to answer that
20  question on the advice of counsel?
21      A.  Yes.
22      Q.  I just refer your attention back to the House
23  organization focus report.
24      A.  Okay.
25      Q.  Did you ever review the Crawford vs. Marion



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 185

1   County election board decision?
2       A.  No.
3       Q.  You know what that is?
4       A.  No.
5       Q.  Are you aware of whether or not SB 14 was based
6   on any other voter ID legislation?
7       A.  I claim legislative privilege on that.
8       Q.  Do you know if SB 14 was based on any other voter
9   ID legislation?
10      A.  Legislative privilege on that, I would like to
11  claim.
12          MR. McKENZIE:  You can answer to the extent
13  it's in the public record if you know it's in the public
14  record.  But if all you know about is in private stuff
15  or private communications in the Legislature, then don't
16  answer.
17      A.  Legislative privilege.
18      Q.  (By Mr. Gear)  Is it your testimony that you don't
19  know it's in the public record -- if there's any
20  testimony in the public record?
21      A.  Yes.
22          MR. GEAR:  I think we need to go off the
23  record and move upstairs.
24          (Discussion off the record.)
25  BY MR. GEAR:

## 186

1       Q.  Back on the record.  During your deposition
2   testimony you testified that voting as a fundamental
3   right.  Do you remember that?
4       A.  Yes.
5       Q.  Do you leave it's a right that should be
6   protected by the voting rights acts?
7       A.  Yes.
8       Q.  We also had a discussion on the record about
9   showing ID in everyday life activities.  Do you recall
10  that discussion?
11      A.  Yes.
12      Q.  And do you believe that showing and ID to board a
13  plane or showing and ID to cash a check should be
14  something that's protected by the Voting Rights Act?
15      A.  Yeah.  Voting Rights Act?
16      Q.  That's right.
17      A.  I don't see what that would mean, cashing a check
18  in a voting rights act?
19      Q.  Do you believe -- let me rephrase that so that
20  there's no ambiguity to it.  Do you believe that cashing
21  a check or showing an ID to board a plane is a
22  constitutional right?
23      A.  Constitutional right?
24          MR. McKENZIE:  Objection to the extent it
25  calls for a legal conclusion.  But you may answer it.

## 187

1       A.  I don't really know what that -- what you're
2   asking about a constitutional right.
3       Q.  (By Mr. Gear)  Do you understand what I'm
4   referencing when I talk about the Constitution?
5       A.  Yes.
6       Q.  And for your purposes we can talk about the State
7   of Texas, they have a constitution, correct?
8       A.  Yes.
9       Q.  And is showing an ID to board a plane covered
10  under the State of Texas Constitution?
11      A.  I wouldn't know.
12      Q.  Do you have a right to board a plane?
13      A.  I don't know.  I don't know.  If it's a private
14  business, no.
15      Q.  It's not a trick question.
16      A.  I don't understand your question.  I don't
17  understand the question.
18      Q.  Okay.  The question was do you have a right to
19  board a plane?
20      A.  I -- I don't know.
21      Q.  Okay.  During the legislative debate for SB 14,
22  do you recall public discussion regarding the
23  implementation of SB 14 would create an obstacle for
24  minority voters?
25      A.  Yes.

## 188

1       Q.  And can you tell me what the substance of that
2   discussion was?
3       A.  That it's an obstacle for minority voters.
4       Q.  Obstacle in what ways?
5       A.  I don't recall.  It was a very long conversation.
6   I don't recall the specifics of a 14-hour debate.
7       Q.  Do you recall distance being discussed?
8       A.  Yes.
9       Q.  And that was described as an obstacle?
10      A.  Yes.  But not as per minority that you're asking
11  about, I don't think.  I don't know that that link was
12  made.  I don't recall that link being made.
13      Q.  Well, and I'm specifically asking you regarding
14  minority voters.  Was there concern expressed during the
15  legislative debate for SB 14 that would create an
16  obstacle for minority voters?
17      A.  Not that I recall.  The obstacle that I remember
18  was regionally.  It was regional argument that it was
19  too far.  That's what I recall from the floor.  It was a
20  regional argument.
21      Q.  Do you have a position whether or not the
22  implementation of SB 14 would create an obstacle for
23  minority voters in terms of distance?
24          MR. McKENZIE:  Object on the grounds of
25  legislative privilege.  If you developed the opinion in



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

189

1  the course of deliberating your vote on that bill.  If
2  you have an opinion separate and apart from that, then
3  please, answer the question.
4      A.  Legislative privilege.
5      Q.  (By Mr. Gear) Are you refusing to answer my
6  question base on the advice of counsel?
7      A.  Yes.
8      Q.  We also talked during your deposition about DPS
9  offices and I asked you the question whether or not you
10 had any knowledge of counties that do not have a DPS
11 office.  Do you recall that?
12     A.  I do.
13     Q.  Do you recall what your answer was?
14     A.  That I don't have any knowledge of DPS offices,
15 essentially.
16     Q.  Do you recall any public debate regarding DPS
17 offices during the legislative debate on SB 14?
18     A.  Just that Pete Gallegos said it would be a far
19 distance to travel.
20     Q.  I direct your attention to Exhibit 221 Page 56,
21 top right-hand corner.  There's no DPS office in 77 of
22 Texas's 54 counties.  Do you see that?
23     A.  Yes.
24     Q.  Do you recall that being part of the public
25 legislative debate on SB 14?

190

1      A.  No.  I don't remember.
2      Q.  Do you recall the second sentence here, "the bill
3  also would give election workers too much power and pave
4  the way for discrimination."  Do you recall that being
5  part of the public legislative debate?
6      A.  I don't remember that being discussed.
7      Q.  Do you recall during the legislative debate that
8  there was concern that SB 14, if adopted, would suppress
9  the rights of eligible voters?
10     A.  Yes.  I remember -- I remember that.
11     Q.  What did supporters of SB 14 say in response to
12 that concern?
13     A.  I don't recall what the supporters were saying.
14 I just remember the conversation was that it would --
15 and I can't tell you who was saying it.  But they were
16 testifying that it would be.  But I can't -- I don't
17 recall the dialogue back and forth.
18     Q.  You are a supporter of SB 14?
19     A.  I voted for SB 14, yes.
20     Q.  Did you express publicly any response to the
21 concern that SB 14 would suppress voting among eligible
22 voters?
23     A.  My public testimony in the House journal had to
24 do with disenfranchisement.
25     Q.  So the answer the that is, no?

191

1      A.  That is correct answer.
2      Q.  Let's talk about your testimony.  And I'm
3  referring you to what's been marked as Exhibit No. 9,
4  the House journal.
5      A.  I've got Exhibit 222.
6      Q.  Okay.  Okay.  For this deposition it is marked as
7  Exhibit No. 222.  Do you see where you provide testimony
8  there?
9      A.  I did earlier.  Let me get back to it.  But I
10 did.  Yes.
11     Q.  Can you tell me what page that's on, please?
12     A.  It starts on Page 1036.
13     Q.  This discussion that you've referenced several
14 times in your deposition occurred on March 23, 2011?
15     A.  Yes.
16     Q.  And that was during the 82nd Legislature regular
17 session?
18     A.  Yes.
19     Q.  And the discussion that you referred to occurred
20 between yourself and Representative Harless?
21     A.  Correct.
22     Q.  And Representative Harless is a cosponsor of the
23 bill?
24     A.  I believe she would be listed as the sponsor.
25 But I would have to look at that thing you gave me.

192

1      Q.  So she sponsored the bill in the House?
2      A.  I don't know.  I have to look at that sheet.
3      Q.  Take your time.
4          MR. McKENZIE:  I wouldn't have any of the
5  originals.
6      A.  I don't have any -- what I have is for the
7  previous sessions.
8          MR. GEAR:  Why don't we go ahead and mark
9  this as an exhibit if we're going to the referencing it.
10         (Exhibit No. 223 was marked.)
11 BY MR. GEAR:
12     Q.  So I'm showing you what's been marked as
13 Exhibit 223.  And again, this is a document that we've
14 referenced in your deposition.  Can you identify it
15 again, for the record?
16     A.  Yes.  This is the Texas Legislature online
17 history of Senate Bill 14.
18     Q.  And the question that just before you is, was
19 Representative Harless a sponsor or cosponsor of Senate
20 Bill 14?
21     A.  She is a sponsor.
22     Q.  Can you identify any actions taken by
23 Representative Harless to ensure that ethnic minorities
24 were not disenfranchised by SB 14?
25     A.  To the extent that I asked her in public record,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 193

1   I asked her from the House floor.
2        Q.  What did you ask her from the House floor?
3        A.  I asked her, is it your intention for this bill
4   to disenfranchise ethnic minority voters.
5        Q.  And her response?
6        A.  No, sir.
7        Q.  And my question to you was, can you identify any
8   actions taken by Representative Harless to ensure that
9   SB 14 did not disenfranchise ethnic minorities?
10       A.  There's nothing in the record that indicates
11  that.
12       Q.  Are you aware of any private communications with
13  Representative Harless that would support that she took
14  some action to ensure that ethnic minorities were not
15  disenfranchised by SB 14?
16           MR. McKENZIE:  I'm going to object on
17  legislative privilege grounds.
18       A.  I'll claim legislative privilege on that
19  question.
20       Q.  (By Mr. Gear)  Are you aware of any
21  communications, including documents on the public
22  record, that would support that SB 14 did not
23  disenfranchise ethnic minorities?
24       A.  No.
25       Q.  Is there any report or analysis that was

### 194

1   presented during the public debate on SB 14 that
2   supports the position that SB 14 will not disenfranchise
3   ethnic minorities?
4        A.  Not that I recall.  I don't remember.
5        Q.  As you sit here today, you -- do you know of any?
6        A.  That this bill would disenfranchise voters, is
7   that what you're asking?
8        Q.  Specifically I asked is there any report or
9   analysis that was presented during the public debate on
10  SB 14 that supports the position that SB 14 will not
11  disenfranchise ethnic minorities?
12       A.  I don't recall.
13       Q.  And my question following up your answer was, as
14  you sit here today, are you aware of any analysis or
15  report that supports that position?
16           ATTORNEY2:  I'm going to object to the
17  extent you received a report in private prior to voting
18  for a bill.  But if you know of anything after
19  legislative or before your time as a legislator that
20  reflects that, you may answer the question.
21  BY MR. GEAR:
22       Q.  Just so the record is clear, I asked you during
23  the public debate?
24       A.  Okay.  I don't recall.
25       Q.  Are you aware of any private communications?  And

### 195

1   again, I'm referring to communications off the public
2   record that support the position that SB 14 will not
3   disenfranchise ethnic minorities?
4            MR. McKENZIE:  I'm going to object to the
5   extent it reflects legislator communications.  You may
6   answer as to non-legislator communications to the extent
7   there are any.
8        A.  I'm claim the legislative privilege.
9        Q.  (By Mr. Gear)  What, if any, actions did you take
10  to ensure that SB 14 would not disenfranchise ethnic
11  minority voters?
12           MR. McKENZIE:  I'm going to object to the
13  extent it's not public record.  But answer to the extent
14  it's public record.
15       A.  I asked Patricia Harless these questions that are
16  in the House journal.
17       Q.  Is that the only public action that you took to
18  ensure that SB 14 would not disenfranchise minority
19  voters?
20       A.  As I recall, yes.
21       Q.  Have you ever heard a legislator who voted in
22  favor of SB 14 explain that voter ID would prevent any
23  minority voter from voting?
24           MR. McKENZIE:  I'm going to object on
25  legislative privilege grounds, to the extent if reflects

### 196

1   private and non-public communications.  You may answer
2   if its public.
3   BY MR. GEAR:
4        Q.  Let's start with the public record.
5        A.  I don't have any knowledge of that.
6        Q.  And so is the answer, no?
7        A.  I don't have any knowledge of that.
8        Q.  You referenced during your deposition that there
9   was some discussion about the timing of when you would
10  speak on the record.  Do you recall that?
11       A.  Yes.
12       Q.  And when you talk about the timing of what would
13  be said is -- is this what -- is this exhibit and the
14  testimony that you gave, does that -- is that related to
15  the timing of when you would make this statement?
16           MR. McKENZIE:  I'm going to object to the
17  extent it deals with issues that are private
18  communications between other legislators and your
19  personal deliberations on when to reveal this
20  information.  But you may answer it to the extent it
21  that's matter of public record.
22       A.  Legislative privilege on that, I'll claim.
23       Q.  (By Mr. Gear)  Did you have any discussions with
24  any legislators about what you would say on the record
25  to Representative Harless?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

197

1    MR. McKENZIE:  Again, I'm going to object to
2  the extent you didn't actually say anything on the
3  record.
4    A.  Legislative privilege.
5    Q.  (By Mr. Gear) Are you following the advice based
6  on the advice of counsel not to answer this question?
7    A.  Yes.
8    Q.  Were the -- did you prepare in advance for the
9  questions that you asked Representative Harless on the
10  record?  It's a yes or no answer?
11    A.  Or I can claim legislative privilege on that one,
12  as well.
13    Q.  Well, the question is before you.
14    A.  Can you repeat the question?
15    MR. GEAR:  Can you read it back?
16    (Requested question was read.)
17    MR. McKENZIE:  I think you can answer to the
18  extent it says what you did to prepare or anything else
19  to that effect it would probably be privileged.  But the
20  mere fact that you prepared, I think you can answer the
21  question.
22    A.  As you'll see in the video, it clearly shows that
23  I'm reading these questions that I have written out
24  prior to getting to the microphone.
25    Q.  (By Mr. Gear) Is the answer to that, yes?

---

198

1    A.  Yes.
2    Q.  When did you prepare the questions that you asked
3  Representative Harless on the record on March 23, 2011?
4    A.  Oh, gosh.  Toward the very end of the day.
5    Q.  You're referencing March 23rd?
6    A.  Oh, yeah.  Well, March 23rd, yes.
7    Q.  Was the preparation of the questions that you
8  asked Representative Harless on the record on March 23rd
9  the subject of any communications with any other
10  legislators?
11    MR. McKENZIE:  I'm going to the object on
12  privileged grounds to the extent that those
13  communications are not public.
14    A.  Legislative privilege on that.
15    Q.  (By Mr. Gear) And the question is, what is the
16  subject of any communications with any other
17  legislatures.  I'm not asking you about the substance of
18  it?
19    MR. McKENZIE:  I'm still going to object.
20  It's a fine line between subject and substance.
21  BY MR. GEAR:
22    Q.  Are you refusing to answer that question based on
23  advice of your counsel?
24    A.  Legislative privilege, yes.
25    Q.  Who was present, if anyone else, while you

---

199

1  prepared the questions that you asked Representative
2  Harless on the record on March 23, 2011?  The question
3  is, who was present?
4    A.  Nobody.
5    Q.  Where did you prepare these questions?
6    A.  At my desk.
7    Q.  In your Austin office?
8    A.  No.
9    Q.  On the floor?
10    A.  Yes.
11    Q.  Were there other legislators in the -- on the
12  floor at the time you prepared these questions?
13    A.  It was during debate, so yes.
14    Q.  Did you receive assistance from any other --
15  other legislators?
16    A.  No.
17    MR. McKENZIE:  I was going to object the
18  word "assistance," would reveal communications by the
19  legislators.
20  BY MR. GEAR:
21    Q.  Were the -- in preparation for the questions for
22  Representative Harless, did you receive any -- was it
23  the subject of any e-mails or text messages?
24    MR. McKENZIE:  I'm going to object on the
25  same grounds.

---

200

1    A.  Legislative privilege, I'll claim on that one.
2    Q.  (By Mr. Gear) Are there any e-mails or text
3  messages that exist regarding communications in
4  preparation for the questions that you asked
5  Representative Harless on March 23, 2011?
6    A.  I don't know.
7    Q.  Did you send any e-mails or text messages in
8  preparation for the questions that you asked
9  Representative Harless on March 23, 2011?
10    MR. McKENZIE:  I'm going to object to the
11  extent that his communications were to other legislators
12  in a private, not disclosed.  But to the extent there
13  weren't other legislatures in the work process, you may
14  answer.  Assuming there were any communications.
15  BY MR. GEAR:
16    Q.  And I want to be clear that all of these
17  questions that I'm asking are based -- privilege log
18  questions.  Who, what, when, where.  And that there's a
19  ruling that's pending by the Court and we have a right
20  to create a privilege log during this deposition of the
21  who, what, when and where.  And that's what I'm asking
22  right now.  And so the question is before you, are you
23  refusing to answer that question based on the advice of
24  your counsel?
25    A.  Yes.

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

---

201

1      MR. McKENZIE:  Can I have you read it back
2  to me real quick?
3      MR. GEAR:  Sure.
4      (Requested question was read.)
5      MR. McKENZIE:  My concern is that the
6  subject of that question contains -- the subject of that
7  question contains a lot of the subject matter that may
8  have been communicated.  So that's why I lodged the
9  objection.  I'm afraid it might reveal more than a
10 privilege log would reveal and possibly risk disclosure.
11 So that's why I'm lodging the objection.  I'll allow the
12 same objection to the extent it's to other legislatures.
13 I instruct you not to answer if it was public, or to
14 non-legislators you may answer.
15     A.  Claim legislative privilege.
16     Q.  (By Mr. Gear) And you're refusing to answer that
17 question on the advice of your counsel?
18     A.  Yes.
19     Q.  During the public debate on SB 14, were you aware
20 of the concern expressed by opponents that minority
21 voters were less likely to possess the allowable forms
22 of ID required pursuant to SB 14?
23     A.  Yes, I remember that it.
24     Q.  And do you recall what the supporters of SB 14,
25 how they responded so that concern?

---

202

1      A.  No, I don't.
2      Q.  Do you believe -- do you have an opinion that
3  minority voters in the State of Texas are less likely to
4  have the allowable form of ID under SB 14?
5      MR. McKENZIE:  Object to the extent you
6  developed that opinion in the course of your
7  deliberations on SB 14 and prior to voting.  To the
8  extent you have an opinion prior to that, you may
9  answer.
10     A.  I claim legislative privilege.
11     Q.  (By Mr. Gear) I want to ask you to you have a
12 personal opinion?
13     MR. McKENZIE:  Same objection to the extent
14 the opinion was developed in the course of your
15 legislative duties.
16     A.  I'll tell you legislative privilege.
17     Q.  (By Mr. Gear) Well, as a member of the minority
18 community, and I believe you identified on the record
19 that you were Hispanic, do you have an opinion as to
20 whether or not minority voters are less likely to have
21 the allowable forms of ID under SB 14?
22     A.  I'll claim legislative privilege.
23     Q.  Are you refusing to answer that question on the
24 basis of -- on the advice of your counsel?
25     A.  Yes, sir.

---

203

1      MR. GEAR:  And again, for the record, I
2  don't believe it's a privilege -- a legislative
3  privilege if he has an opinion.  As to the substance of
4  any opinion that he has.  I just don't believe that
5  that's a legislative privilege.  But I understand your
6  instruction.  And I understand that he's following your
7  instructions.
8      MR. McKENZIE:  In that case, the mere
9  existence of an opinion, you can answer if you have an
10 opinion, yay or nay.  The substance of that opinion, I
11 would instruct you not to answer.
12 BY MR. GEAR:
13     Q.  And just so we're clear on the record, again, I
14 ask you, a member of the minority community, and I
15 believe you identified yourself as Hispanic on the
16 record.  Do you have an opinion as to whether or not
17 minority voters are less likely to possess the allowable
18 forms of ID that are required under SB 14?
19     MR. McKENZIE:  Sorry.  The objection I think
20 is proper because you're asking him if he has an
21 opinion.  And then the following piece of it is that
22 minority voters are less likely to have IDs, so that
23 would reveal the subject of his opinion whether or not
24 he believed that to be a true fact.  If he developed
25 that in the course of deliberating on his vote, I would

---

204

1  object privilege.  If the question was merely does he
2  have an opinion on who among the minority community has
3  an ID, I think you can answer that, what the rates of it
4  are.
5  BY MR. GEAR:
6      Q.  Who is Ann McGeehan?
7      REPORTER:  Who?
8      MR. GEAR:  Ann McGeehan, M-C-G-E-E-H-A-N.
9      A.  I don't know what that is, or don't recall who she
10 is.
11     Q.  (By Mr. Gear) Was she with the Secretary of
12 State's office?
13     A.  I have no idea.
14     Q.  Do you recall the Secretary of State's office
15 providing testimony during the legislative debate for SB
16 14?
17     A.  No.
18     Q.  I believe you testified previously that you were
19 aware that there was testimony that over 600,000 voters
20 in the State of Texas may lack the State issued driver's
21 license or ID required under SB 14; is that right?
22     A.  That's what I've read.
23     Q.  And where did you read that?
24     A.  The Austin American-Statesman.
25     Q.  Do you have an opinion on this issue?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

205

1    A. Yes.
2    Q. What is your opinion on this issue?
3         MR. McKENZIE: Objection to the extent you
4    developed it as part of your deliberations as a
5    legislator. If you developed it independently, you may
6    answer.
7    A. Yeah. On -- I forget the question, again.
8         MR. McKENZIE: What is the substance of the
9    opinion about the 600,000 voters approximately who may
10   lack a photo ID.
11   A. The fact that I read it in the Statesman and it
12   was a follow-up questions. I can't remember.
13   Q. (By Mr. Gear) I'm asking you what your opinion on
14   that is?
15   A. Oh, that, I will claim legislative privilege on.
16        (Exhibit No. 224 was marked.)
17   BY MR. GEAR:
18   Q. Before we go to Exhibit 224, do you have an
19   opinion as to whether minority voters are less likely to
20   have proper ID under SB 14?
21        MR. McKENZIE: To the extent you developed
22   that during the course of deliberating on your vote, I
23   instruct you not to answer. If it's public or you
24   developed it after the voting of SB 14, you may answer
25   the question.

206

1    BY MR. GEAR:
2    Q. And that's a "yes" or "no" answer.
3    A. Well, I'm talking about -- I'm talking about the
4    disenfranchised.
5    Q. Wait a second? You're looking at Exhibit --
6    A. 224.
7    Q. 224. I'm asking you specifically -- and I'm not
8    asking about that exhibit?
9         MR. McKENZIE: Whether or not -- whether or
10   not he has an opinion?
11   BY MR. GEAR:
12   Q. I'm asking if you have an opinion. And I'm sorry
13   if that was confusing.
14   A. Yeah. If I have an opinion whether minorities
15   are disenfranchised?
16   Q. No. Are less likely to possess the required ID
17   under SB 14?
18   A. I don't have an opinion.
19   Q. Are you concerned if -- if the concerns that were
20   expressed by the opponents of SB 14 are accurate, are
21   you concerned that that would have a disproportionate
22   affect on minority voters in the State of Texas?
23        MR. McKENZIE: I'll object to the extent you
24   developed a concern in the course of your voting or
25   deliberations to vote. If you have a concern that was

207

1    developed after the fact, you may answer the question.
2    A. My concerns are in the House journal with my
3    conversations with Patricia Harless.
4    Q. (By Mr. Gear) And specifically, what concerns do
5    you express there?
6    A. I don't. I asked questions. I asked her if it
7    was her intention for the bill to disenfranchise ethnic
8    minority voters. And then I asked if there was anybody
9    who joint authored or co-authored the bill, if it was
10   their intention to disenfranchise the minority voters.
11   Q. Are you aware of any public communications or
12   analysis of documents which would support that, either
13   co-authors or co sponsors or authors or anyone that was
14   related to -- involved in drafting SB 14, are you aware
15   of any steps that they took to ensure that SB 14 would
16   not disenfranchise ethnic minority voters?
17   A. The purpose of asking the questions was to -- was
18   to find that exact point. And that's why I asked --
19   that's why I asked the questions.
20   Q. And other than asking the questions and getting
21   and answer, did you take any personal steps to determine
22   if SB 14 would disenfranchise ethnic minority voters?
23   A. No.
24   Q. Turning your attention to what's been marked as
25   Exhibit 224, do you see this?

208

1    A. Yes.
2    Q. Can you tell me what this is?
3    A. This is a letter to me from Boyd L. Ritchey from
4    the chairman of the Texas Democratic party.
5    Q. You earlier referenced a TV interview that you
6    gave regarding voter ID issues. Do you recall that?
7    A. Yes.
8    Q. And would that be the YNN Capital Tonight
9    interview that aired on October 24th?
10   A. I don't know the date of the airing. But it was
11   the YNN interview.
12   Q. And do you see the statement attributed to you in
13   this October 21, 2011 letter from Boyd Ritchey?
14   A. Quote, "What the Democrats aren't taking into
15   consideration is, the numbers they saw do not include
16   all seven forms of identification. It only includes a
17   few of them. We feel confident that once all forms are
18   included, no one will be disenfranchised and people will
19   have access to the poles. And remember it's about voter
20   integrity in the first place."
21   Q. When you say, "we feel confident," who are you
22   referencing?
23   A. In this particular context, the body, the House,
24   the body.
25   Q. Did the entire body of the House feel confident,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 209

1  based on your knowledge, that SB 14 would not
2  disenfranchise ethnic minority voters?
3      A.  I would say there was -- well, you don't have a
4  vote total on this.  I would say there were, as
5  indicated by their "I" votes that those that voted "I".
6  But this doesn't have the floor.  This is just the
7  committee votes.
8      Q.  Well, is it fair to say that not all members of
9  the House voted in favor of SB 14?
10     A.  That's correct.
11     Q.  Do you know how many Hispanic legislators voted
12  in favor of SB 14?
13     A.  Not without having it in front of me.  But I
14  would say there were six.
15     Q.  You're looking at the online legislative history?
16     A.  Correct.
17     Q.  And the you're saying that does not reflect the
18  votes?
19     A.  It does not reflect the votes.  It does not.
20  That is just committee votes.
21     Q.  Would you agree that a majority of the House
22  members that were Hispanics did not support and vote in
23  favor of SB 14?
24     A.  Yes.
25     Q.  Are there any African-American House members?

## 210

1      A.  Yes.
2      Q.  How many African-American House members voted in
3  favor of SB 14?
4      A.  I would have to see the vote totals to know.
5      Q.  Are you aware of any that voted in favor of SB
6  14?
7      A.  Yes.
8      Q.  Do you know who that is?
9      A.  I'm pretty sure it was Stephanie Carter.
10     Q.  Are you aware of anyone else, other than
11  Stephanie Carter, that is an African-American and House
12  member that voted in favor of SB 14?
13     A.  I think James white did, African-American from
14  East Texas but I would have to look at the vote totals.
15     Q.  Do you know how many African-American House
16  members there are?
17     A.  No.
18     Q.  Now, I would just like to ask you again, you
19  reference here that no one will be disenfranchised and
20  people will have access to the poles.  Did you take any
21  public steps, anything on the public record during the
22  legislative debates for SB 14, which would support your
23  position that no one would be disenfranchised by SB 14?
24     A.  Just the questions I asked of Ms. Harless.
25     Q.  Okay.  And other than that, you took no other

## 211

1  steps?
2      A.  That is correct.
3      Q.  Are you aware of anyone regarding -- during the
4  legislative debates for SB 14, who researched this issue
5  or conducted analysis of this issue that supports
6  that -- that no one would be disenfranchised under the
7  provisions of SB 14?
8          MR. McKENZIE:  May I ask a clarifying
9  question?
10         MR. GEAR:  Sure.
11         MR. McKENZIE:  Is that confined to public
12  record or is that --
13         MR. GEAR:  The public record.
14     A.  I don't know about the public record, other than
15  what's in the bill and the questions that were asked
16  here.
17     Q.  (By Mr. Gear) Did you ever publicly inquire,
18  other than your statement here to Representative
19  Harless, to anyone -- other legislator whether or not
20  SB 14 would disenfranchise ethnic minority voters?
21     A.  Not that I recall.
22     Q.  You referenced seven forms of identification --
23  let me put that into proper context.  What the Democrats
24  aren't taking into consideration is, the numbers they
25  saw do not include all seven forms of identification.

## 212

1  What seven forms of identification were you referencing?
2      A.  The ones listed in Senate Bill 14.  In Section --
3  Section 14 of the bill, which is section 63.0101 of
4  Senate Bill 14.  So driver's license, military ID card,
5  citizenship certificate, passport, CHL, driver's
6  license, and State issued ID card and military ID,
7  citizenship certificate, passport, CHL, and I'm counting
8  six.
9          MR. GEAR:  Go off the record.
10         (Discussion off the record.)
11  BY MR. GEAR:
12     Q.  Were you done?
13     A.  Yes.
14     Q.  Why did you say in this statement that this is
15  about voter integrity.  This is not a purpose of SB 14
16  that you listed earlier; is that right?
17     A.  Yeah.  It was the integrity of the system, I
18  believe, is what I said.  The integrity of the system.
19     Q.  Are there other purposes to SB 14 that you're
20  aware of?
21     A.  Integrity of the system...
22     Q.  As you sit here the day, are you aware of any
23  other purposes of SB 14?
24     A.  No.  No.  It was voter confidence, integrity of
25  the system.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 213

1  Q. Are you aware of the number of minority voters,
2  and when I say "minority voters" I'm referencing Black
3  and Hispanic, who lack a driver's licenses in the State
4  of Texas?
5  A. No.
6  Q. Are you aware of minority voters, Black and
7  Hispanic, who lack a State issued identification card
8  from the Department of Public Safety?
9  A. I read -- I read something that broke those
10  numbers down. But I can't tell you what I was reading.
11  Q. Is it fair to say that number of minority voters,
12  Black and Hispanic, that lack allowable driver's license
13  or identification card is higher than Anglos?
14      MR. McKENZIE: Object to the extent you
15  gathered knowledge like that during legislative process.
16  But if you have never gathered knowledge, you may
17  answer.
18  BY MR. GEAR:
19  Q. And you're testifying to --
20  A. I have no idea.
21  Q. Okay. Do you know how many minority voters,
22  Black or Hispanic, are in possession of concealed
23  handgun licenses?
24  A. I don't know that.
25  Q. Are you aware of any existing communications that

## 214

1  identify how many Texas voters are in possession of a US
2  military card?
3  A. I don't know that.
4  Q. Do you know how many minorities, Black or
5  Hispanic, are in possession of a US military card?
6  A. I don't know that.
7  Q. Are you aware of any communications -- public
8  communications during the legislative debate on SB 14
9  that would identify how many Texas voters are in
10  possession of a passport?
11  A. I don't recall that part of the debate.
12  Q. Are you aware of any existing document or report
13  that identifies how many Texas voters are in possession
14  of a citizenship certificate with a photo?
15  A. I'm not.
16  Q. Citizenship certificates can also be issued
17  without a photo. Do you know that?
18  A. No.
19  Q. Is that "no, they cannot," or "no, you're not
20  aware"?
21  A. No. I'm not aware. Sorry.
22  Q. Identify any communication that you're aware of
23  that supports your position that no voter will be
24  disenfranchised under SB 14.
25      MR. McKENZIE: Object to the extent the

## 215

1  communications are private or communications that were
2  had during the legislative process. But if they are
3  public and not part of the legislative process, you may
4  answer.
5  A. Just what the -- just what the quote is there.
6  I've already Stated.
7  Q. (By Mr. Gear) Can you testify to any
8  communication that supports your opinion that no voter
9  will be disenfranchised under SB 14?
10      MR. McKENZIE: Same objection.
11  A. Legislative privilege on that.
12  Q. (By Mr. Gear) And that's -- that's any
13  communication that that would be public or private?
14  A. Legislative privilege on that.
15  Q. I don't believe you can assert legislative
16  privilege on public communications.
17  A. Well, divide the questions up. What are you
18  asking me?
19  Q. Are you aware of any communications, public
20  communications that would support your position that SB
21  14 would not disenfranchise ethnic minority voters?
22  A. Only what's in the record that I asked
23  Representative Harless.
24  Q. Are you aware of any private communications that
25  exist that support your position that SB 14 would not

## 216

1  disenfranchise ethnic minority voters?
2  A. And that's the legislative privilege.
3  Q. Do you believe that SB 14 is color blind?
4  A. Yes.
5  Q. What's the basis for your statement?
6  A. That it doesn't address color.
7  Q. Well, you heard expressed -- concerns expressed
8  by opponents of the bill that SB 14 would have a
9  disproportionate impact on minority voters. Do you
10  recall testifying to that?
11  A. I recall that they said it, yes.
12  Q. Do you have a concern as to whether or not
13  SB 14 would disproportionately impact minority voters?
14      MR. McKENZIE: I'm going to object to the
15  extent you developed a concern or opinion during the
16  course of your legislative deliberations. Any opinions
17  independent of that, you may answer the question.
18  A. As per my interview, I don't think that they will
19  be.
20  Q. (By Mr. Gear) And do you have any public
21  communication that supports your position that ethnic
22  minorities voters will not be disenfranchised if SB 14
23  is implemented?
24  A. No.
25  Q. Can you tell me each and every basis that your --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 217

1  that your position that ethnic minorities will not be
2  disenfranchised by SB 14 is based upon?
3          ATTORNEY2: Objection; vague. And objection
4  to the extent the communications are not public and
5  legislative communications. But subject to those
6  qualifications if they are public communications, you
7  may answer.
8      A. I'm sorry. Can you ask the question again for
9  me?
10     Q. (By Mr. Gear) We can strike that question. All
11 right. Let me try to wrap this up. Let me turn your
12 attention to the March 23, 2011 regular session floor
13 debate that you've referenced throughout your
14 deposition. Could you turn to Page 1016?
15     A. Okay. I'm ready.
16     Q. I direct your attention to amendment No. 55. Do
17 you see that?
18     A. I do.
19     Q. What does this amendment address?
20     A. The use of voter registration certificate
21 following certain elections.
22     Q. And what does that reference?
23     A. Provisional votes.
24     Q. Do you believe that if amendment No. 55 was
25 adopted that it would have mitigated the impact to

## 218

1  minority voters in reference to SB 14?
2          MR. McKENZIE: To the extent you have a
3  belief that you developed prior to voting on SB 14 or
4  voting on this amendment, to the extent you could vote
5  on the amendment, I would instruct you not to answer.
6  To the extent you never had an opinion and you developed
7  one after the fact, you may answer the question.
8      A. I never had an opinion on registration
9  certificate problems.
10     Q. (By Mr. Gear) If you were aware that SB 14 had a
11 disproportionate impact on minority voters, would you
12 want to remedy that?
13     A. Yes.
14     Q. Do you think that amendment No. 55 would have
15 mitigated the impact on minority voters if adopted?
16     A. I don't know.
17     Q. Does this amendment, and I'm referring to
18 amendment No. 55, allow the Secretary of State to keep
19 track of provisional ballots by race?
20     A. Yeah. It says, "Secretary of State shall
21 determine whether, through out the State, majority of
22 persons who are required to cast provisional ballot were
23 members of a racial or ethnic minority." So that's what
24 that does.
25     Q. So again, the question that I had posed to you

## 219

1  is, would this amendment, if adopted, have mitigated the
2  impact on minority voters and I'm referencing SB 14?
3      A. I don't know.
4      Q. Let me turn your attention to amendment No. 54 on
5  Page 1015. Do you see that?
6      A. Yes.
7      Q. Can you tell me what this amendment is?
8      A. Sure. "The Secretary of State is keeping
9  demographic information relating to eligible voters who
10 are prevented from voting as a result of failure to make
11 requirements for being accepted to vote, and the
12 eligible voters who are required to file provisional
13 ballots as a result of the requirements being accept to
14 vote that include the number of provisional ballots that
15 were not counted." And then it gives them -- looks like
16 rulemaking authority in Section B.
17     Q. And this is an amendment that was offered to
18 SB 14?
19     A. Yes.
20     Q. And how did you vote on this amendment?
21     A. I don't know. Well, the motion was to table and
22 I voted to table.
23     Q. Why did you vote to table this amendment?
24          MR. McKENZIE: I'm going to instruct you not
25 to answer to the extent the reasons why you vote and the

## 220

1  way you vote are not public.
2      A. Legislative privilege.
3      Q. (By Mr. Gear) Would this amendment allow the
4  Secretary of State to keep tract of provisional ballots
5  cast due to the lack of ID on the basis of race?
6      A. Let's see here. I don't see -- and help me on
7  the basis of race -- anywhere in amendment No. 54. Am I
8  missing that? It does not say race in amendment 54.
9  And based on my reading, I would say no.
10     Q. Well, what this does say is that the -- this
11 deals with the Secretary of State recordkeeping,
12 correct?
13     A. Yes.
14     Q. And it allows the Secretary of State to keep
15 records showing for the State in each county and each
16 election precinct demographic information related to.
17 Do you see that?
18     A. Yes.
19     Q. The eligible voters who were prevented from
20 voting as a result of failing to meet the requirements
21 for being accepted to vote. Do you see that?
22     A. Yes.
23     Q. It also allows the Secretary of State to keep
24 records related to the eligible voters who were required
25 to file provisional ballots as a result -- as a result



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

221

1  of the requirements for being accepted to vote that
2  include the number of those provisional ballots that
3  were not counted.  Do you see that?
4      A. Yes.
5      Q. And Section B says, "the Secretary of State may
6  adopt rules to implement this section, including rules
7  requiring other State agencies and authorities holding
8  elections to record information relevant to the record
9  required by this section."  Do you see that?
10     A. Yes.
11     Q. And you voted against that, correct?
12     A. I voted for the motion to table.
13     Q. I want to direct your attention to amendment
14  No. 50 which is on Page 1009.
15     A. Okay.
16     Q. Can you tell me what this is, the amendment?
17     A. Amendment by Raymond regarding travel
18  reimbursement program.  It's says "Department of Public
19  Safety shall establish and operate a travel
20  reimbursement program which -- under which individuals
21  whose earnings are not more than 100 percent of the
22  income standard established by applicable federal
23  poverty guidelines, may submit an application for
24  reimbursement to the Department to recover the expenses
25  incurred by the individual travelling to and from the

222

1  Department office to obtain a photo identification for
2  purposes of voting."
3      Q. Do you believe that if this amendment was adopted
4  it would have mitigated the impact to minority voters in
5  reference to SB 14?
6      A. I don't know if that would have mitigated the
7  minority -- I forget the verb you used.
8      Q. The impact.
9      A. Impact.  Impact.
10     Q. To minority voters who -- in reference to SB 14.
11     A. I don't know if this would have done that.
12     Q. I direct your attention to Page 1010, and
13  Representative Raymond's discussion with Representative
14  Phillips.  Representative Raymond indicates rights.  So
15  we've got four million people I would call poor.  I
16  mean, this would be someone who earns, if your an
17  individual, someone who earned $10,800 a year.  If
18  you're a family of two, it would be $14,000 a year.
19  Families earned $10,000 -- families of three, $18,000 a
20  year.  Do you see that?
21     A. I'm going to reread this real quickly.  Let me
22  read it real quickly.  Yes.
23     Q. Do you agree with Representative Raymond's
24  position that there are four million Texans who fall
25  below the poverty line or who were considered poor in

223

1  the State of Texas?
2      A. I have no idea if that number is right or not.
3      Q. Do you have any knowledge of the number of
4  Texans -- Texans who fall below the poverty line in the
5  State of Texas?
6      A. I do not.
7      Q. Ir -- if that number was correct, that there are
8  four million Texans who fall below the poverty line, do
9  you believe that the amendment that was offered by
10  Representative Raymond would have mitigated the impact
11  to those poor voters?
12     A. I don't know if it does that.
13     Q. Did you make any effort to find out?
14     A. No.
15     Q. Why not?
16         MR. McKENZIE:  Object on the basis of
17  legislative privilege, the deliberations during session
18  and if they're public, you may answer.  If they're not I
19  would instruct, you not to answer.
20     A. Legislative privilege.
21     Q. (By Mr. Gear) Are you refusing to answer that
22  question based on advice of your counsel?
23     A. Yes.
24     Q. Why wouldn't this -- do you have an opinion as to
25  whether or not this amendment would benefit or help poor

224

1  voters to obtain allowable forms of ID under SB 14?
2      A. I don't have -- can you ask me again real
3  quickly?
4         MR. GEAR:  Can you read that back?
5         (Requested question was read.)
6         MR. McKENZIE:  You may answer "yes" or "no."
7  But not the substance, if it's not public, your opinion.
8      A. I don't think this does what -- I think the
9  answer is no, but I keep forgetting the question.
10     Q. (By Mr. Gear) Do you need her to read it back?
11     A. Yes.
12         MR. GEAR:  Could you read it back again
13  please?
14         (Requested question was read.)
15         MR. McKENZIE:  Same objection.
16  BY MR. GEAR:
17     Q. Do you have an answer?
18     A. I don't have an opinion.
19     Q. Turn your attention to amendment No. 35 on Page
20  991.  Do you see that?
21     A. Not yet.  Okay.
22     Q. Can you tell me what this amendment is?
23     A. I don't see an amendment.  I just see a statement
24  of legislative intent.  Am I missing something?  There's
25  not an amendment here.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

225

1    Q. Page 991?
2    A. Right.
3    Q. Amendment No. 35?
4    A. Oh, that one line.  Okay.  Sorry, I missed that.
5    Now that I see the amendment, can you ask me the
6    question again?
7    Q. What is this amendment?
8    A. I don't know.  I would have to go back and pull
9    Section 203 and 14 F and 4 of the Voting Rights Act.
10   Q. Do you see that it references Section 203 and 4F
11   of the Voting Rights Act?
12   A. 203 and 14 F4, yes.
13   Q. And do you know what Section 203 and 14 F 4 are
14   under the Voting Rights Act?
15   A. I do not.
16   Q. If I was to tell you that Section 203 of the
17   Voting Rights Act applies to the Spanish language
18   provisions of the Voting Rights Act, would you agree
19   that it would be necessary in implementing SB 14 to also
20   allow Spanish language provisions?
21   A. I don't know.  I would need you to sit down with
22   me and show me those sections.
23   Q. If Section 203 indicated that all election
24   related material needed to be translated into both
25   English and Spanish, do you believe that that's a good

---

227

1    the advice of your counsel?
2    A. That's correct.
3    Q. Turn to amendment No. 34 which is on Page 987.
4    A. Okay.
5    Q. Do you see that?
6    A. I do.
7    Q. And can you tell me what amendment No. 34
8    addresses?
9    A. Section 5, Section 203 and Section 4 F 4 of the
10   Voting Rights Act.
11   Q. Do you see the public debate between
12   Representative Harless and Representative Raymond where
13   Representative Raymond asks, "do you believe that
14   there's discrimination in the voting place?"  Do you see
15   that?
16   A. What page do you have there?
17   Q. Page 897 -- or 987.  I'm sorry.
18   A. Yes.  I'm sorry.  Yes.  At the top.
19   Q. And I'll ask you that question, do you believe
20   that there is discrimination in the voting places in
21   Texas?
22   A. No.
23   Q. So I'm clear, you do not believe that
24   discrimination occurs at the voting place in -- places
25   in the State of Texas?

---

226

1    thing under SB 14?
2         MR. McKENZIE:  I'll object as vague.  But go
3    ahead and answers it.
4    A. I don't know that I can.  I don't know if that
5    represents what Senator Raymond is trying to address.
6    Q. Well, what do you think he's trying to address
7    here?
8    A. I don't know.
9    Q. How did you vote on this amendment?
10   A. Okay.  Here we go.  The motion was to table and I
11   voted to table.
12   Q. And this amendment addresses the Voting Rights
13   Act, correct?
14   A. Yes.
15   Q. And you already testified that you believed that
16   the Voting Rights Act should apply to SB 14?
17   A. Yes.
18   Q. Why did you vote to table this amendment?
19   A. Because --
20        MR. McKENZIE:  I'm going to object on
21   legislative privilege grounds to the extent your
22   reasoning is not public.  To the extent it's public, you
23   may answer the question.
24   A. I'll claim legislative privilege on that.
25   Q. (By Mr. Gear) And you're not answering that on

---

228

1    A. Correct.
2    Q. And how did you vote on that amendment?
3    A. Let's see here.  The motion was to table and I
4    voted to table the amendment.
5    Q. Turn your attention to Page 979, Exhibit No. --
6    amendment No. 23.  Do you see that amendment?
7    A. Yes, sir.
8    Q. Can you tell me what this amendment addresses?
9    A. This amendment addresses a student ID card issued
10   by a public or private high school or institution of
11   higher education that contains the person's photograph.
12   Q. What's the purpose of this amendment?
13   A. I would have to read it in context from
14   subdivision 5, because you're inserting it as a stand
15   alone.  But I don't have the language in front of it.  I
16   don't know what it's purpose is.
17   Q. Is that language contained without the floor
18   debate of March 23rd?
19   A. Is the language contained?
20   Q. Well, you're referencing that you don't have the
21   language.  You would need to see the language.
22   A. Right.  You just pull up the language on the
23   computer and look at it.
24   Q. So as you sit here today, you don't know what
25   amendment No. 23 -- what the purpose of amendment No. 23

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

229

1  is?
2      A.  No.  It's just out of context for me.
3      Q.  Amendment No. 23 addresses the student
4  identification card issued by a public or private high
5  school or institution of higher education that contains
6  the person's photograph, correct?
7      A.  Yes.
8      Q.  How did you vote on that amendment?
9      A.  The motion was to table and I voted yes, to
10  table.
11     Q.  Do you believe that if this amendment was adopted
12  it would have reduced the impact to minority voters in
13  reference to SB 14?
14         MR. McKENZIE:  I'm going to object that it
15  assumes facts not in evidence about the impact on
16  minority voters, but you may answer the question.
17     A.  I don't know that it does or it doesn't.
18     Q.  (By Mr. Gear)  Turn your attention to Exhibit --
19  amendment No. 15 on Page 969.
20     A.  Okay.  I'm ready.
21     Q.  Do you see that amendment?
22     A.  Yes.
23     Q.  Can you tell me what this amendment does?
24     A.  Talking about fees prohibited for certain forms
25  of identification documentation.

230

1      Q.  And what's the purpose of this amendment?
2      A.  It's saying that an agency, institution or
3  political subdivision of the State may not charge any
4  fee for the issuance of any document that may be used as
5  proof or identification under this chapter or to obtain
6  a document that may be used as proof or identification
7  under this chapter.
8      Q.  So this addresses the underlying documentation
9  required to obtain the allowable forms of identification
10  under SB 14, correct?
11     A.  Yes.
12     Q.  Would you agree that the underlying documentation
13  required to obtain an allowable form of ID under SB 14
14  are not free?
15     A.  I don't know about each of the -- well, there's
16  six or seven of them.
17     Q.  You're saying there are six or seven underlying
18  documents that you could use to obtain the allowable
19  form of identification?
20     A.  Right.
21     Q.  Can you identify which six or seven you're
22  referencing?
23         MR. McKENZIE:  Counsel, I think he's
24  confused about underlying documentation versus the ID
25  itself.

231

1          MR. GEAR:  Okay.  Then let me clarify.  I
2  think you're probably right.
3          MR. McKENZIE:  Okay.
4  BY MR. GEAR:
5      Q.  When I'm talking about underlying documentation
6  to obtain a driver's license, can you simply go to a DPS
7  office without any documentation and ask and obtain a
8  Texas driver's license?
9      A.  Without any documentation?
10     Q.  Correct.
11     A.  I don't know.
12     Q.  Well, when you went to renew your driver's
13  license did you need to bring underlying documentation
14  to obtain a renewed driver's license?
15     A.  I don't remember what I brought with me.  I don't
16  know if I have to or not.  I can't remember.
17     Q.  So do you know if obtaining a birth
18  certificate -- a certified birth certificate in the
19  State of Texas is free?
20     A.  I don't think it is.
21     Q.  Do you know what the cost of a birth certificate
22  is?
23     A.  No.
24     Q.  If I or some other voters lost their social
25  security card, is there a cost for renewing or obtaining

232

1  a new copy of a social security card?
2      A.  No idea.
3      Q.  Have you ever lost your social security card?
4      A.  No.
5      Q.  Do you know what you need to do to obtain a new
6  copy of a social security card?
7      A.  No.
8      Q.  Do you know if there's any cost associated with
9  obtaining a copy of a social security card?
10     A.  I don't know.
11     Q.  Do you know if there's any cost for obtaining the
12  underlying documentation required to obtain an allowable
13  form of ID under SB 14?
14     A.  Underlying document, just so that I'm clear,
15  you're talking about the birth certificate?  You're
16  talking about something you have to give to somebody to
17  get an ID.  Is that what you're talking about?
18     Q.  I tried to start this conversation off by giving
19  you a hypothetical.  If you, Mr. Voter went into a
20  polling place and you had no identification, no
21  credentials and no paperwork, could you simply obtain a
22  driver's license from the State of Texas, a DPS office?
23     A.  I don't know the criteria to get a driver's
24  license from DPS.  I don't know what you have to give
25  them to get a driver's license.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

233

1    Q.  Okay.  How did you vote on this amendment No. 15?
2    A.  The motion was to table and I voted to table the
3    amendment.
4    Q.  Well, if you had to give some form of
5    documentation to obtain a Texas driver's license, but
6    you lost that and you had to renew it, would the cost
7    for a driver's license be free?
8    A.  I guess what you're asking me, is there a cost
9    to -- the stuff you have to give them, right, to get
10   your driver's license?
11   Q.  That's correct.
12   A.  I don't know if there's a cost for that or not.
13   Q.  Is there a cost for a driver's license?
14   A.  Yes.
15   Q.  Is there a cost for a State issued ID card in the
16   State of Texas?
17   A.  Don't know.
18   Q.  I think we can take a quick break and I can wrap
19   up my portion of this?
20       (Brief recess.)
21   BY MR. GEAR:
22   Q.  Back on the record.  Are there any provisions in
23   SB 14, and I'm referring to Exhibit 5 which reference
24   free -- or election identification certificates.  And I
25   direct your attention to Page 13.

---

235

1    for the purposes of code.  I don't see that they have to
2    give them -- unless I'm just reading that wrong.
3    Q.  You were a cosponsor of SB 14, correct?
4    A.  Yes.
5    Q.  Was there public debate during the discussion of
6    SB 14 regarding what would be required to be presented
7    to obtain an election certificate, election
8    identification certificate?
9    A.  I don't recall any conversation about election
10   identification certificate.
11   Q.  I'll direct your attention to Page 14-F.  The
12   department may require each applicant for an original or
13   renewal election identification certificate to furnish
14   to the department the information required by section
15   521.142.  Do you see that?
16   A.  Yes.
17   Q.  Do you know what's required under Section
18   521.142?
19   A.  I don't.
20   Q.  Would that suggest that a person who is -- who
21   walks in to obtain a certificate would have to present
22   identification?
23   A.  It's saying that the Department may require,
24   doesn't have to, it may require each applicant for an
25   original or renewal application certificate to furnish

---

234

1    A.  Yes.
2    Q.  Do you see that?
3    A.  Yes.
4    Q.  And it says the department shall issue an
5    election identification certificate to a person who
6    states that the person is obtaining the certificate for
7    the purposes of satisfying section 63.001 B.  Do you see
8    that?
9    A.  Yes.
10   Q.  And does election code -- and does not have
11   another form of identification described by section
12   63.0101 election code.  Do you see that?
13   A.  Yes.
14   Q.  Do you know if there's a requirement to present
15   identification if you do not have to obtain an election
16   identification certificate if you do not have one of the
17   allowable forms of ID under SB 14?
18   A.  I'm sorry.  I didn't follow that.
19   Q.  What, if any, documentation do you need to
20   present to obtain an election identification certificate
21   under SB 14?
22   A.  I'm not seeing one.  Unless I'm missing it, I'm
23   not seeing what you have to give to them to get an
24   election identification certificate.  It talks about if
25   the person states that they are getting that certificate

---

236

1    the Department.  So not required, but they may require
2    it.
3    Q.  Would you agree if the underlying documents cost
4    money that the election certificate would not be free?
5    A.  I don't -- if they cost money?
6    Q.  That's correct.
7    A.  Yes.  Yes.  Well, might.  It says may.  It didn't
8    say shall.  It says may.  So it may.  Doesn't say that
9    it will.
10   Q.  So a person who has to obtain the underlying
11   documentation to obtain an election certificate and pays
12   money to do that, would you then agree that the election
13   certificate is not free?
14   A.  If -- I mean, if they -- if they require it,
15   right.  Because it doesn't say that they are making them
16   give that.  Am I reading that correctly?
17   Q.  You tell me.  You're the author of the bill, the
18   cosponsor of the bill.
19   A.  I don't know.
20   Q.  Do you want to change any of your answers that
21   you provided here today?
22   A.  I don't think so.
23   Q.  Is there any information that you recall now that
24   you didn't recall earlier during your deposition
25   testimony?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Larry Gonzales                                              May 31, 2012

---

237

1     A.  No, I don't think so.
2     Q.  Is there anything additional that you would want
3   to share regarding SB 14?
4     A.  No.
5     Q.  Well, I have no additional questions today.  And
6   I thank you for your time and patience during this
7   deposition.  And I'm going to hold this deposition open
8   based on the pending decision by the Court.  So you may
9   be called back to provide additional testimony.  Do you
10  understand that?
11    A.  Yes.
12    Q.  And I'm going to turn it over to my other
13  colleagues.
14         MR. BRAZIL:  Good afternoon.  I'm going
15  to -- if you have trouble hearing me just ask me to
16  speak up.
17         THE WITNESS:  Okay.
18              EXAMINATION
19  BY MR. BRAZIL:
20    Q.  Good afternoon.  I'm going to jump around if I
21  could to speed up the process and I will try not to
22  repeat any of the questions that have already been
23  asked.  And I'll try to make my questions very specific.
24  Have you ever served on a committee or subcommittee that
25  has investigated in person voter fraud?

---

238

1     A.  No, sir.
2     Q.  Have you ever served on a committee or
3   subcommittee that's ever investigated mail in fraud,
4   meaning voter registration or mail in ballots where
5   there's some allegation of fraud.  Have you ever served
6   on a committee or subcommittee?
7     A.  No, sir.
8     Q.  Have you ever personally observed in person voter
9   fraud?
10    A.  No, sir.
11    Q.  Have you ever served on any kind of committee or
12  any type of organization that has investigated
13  allegations of mail in ballot fraud?
14    A.  No, sir.
15    Q.  Now, we talked about earlier, you did, about the
16  DPS offices?
17    A.  Yes, sir.
18    Q.  Just in general.  And I think you said you did
19  not know how many counties did not have DPS offices,
20  correct?
21    A.  Correct.
22    Q.  If we -- if we believe the information that came
23  from the -- let's see what it's called, Texas -- let's
24  see here.  Texas House Research Organization.
25         MR. McKENZIE:  Exhibit No.

---

239

1         MR. BRAZIL:  221.
2   BY MR. BRAZIL:
3     Q.  If we believe their information, approximately
4   30 percent of the 254 counties in Texas do not have DPS
5   offices.  Do you agree with that?
6     A.  Yes.
7     Q.  Do you have any idea how many people live in
8   those 77 counties?
9     A.  No idea.
10    Q.  Do you have any idea how many African-Americans
11  live in those 77 counties?
12    A.  No idea.
13    Q.  Do you have any idea how many Asians?
14    A.  I have no idea.
15    Q.  Do you have any idea how many Latinos live in
16  those 77 counties?
17    A.  I have no idea.
18    Q.  Have you seen any other studies, investigation or
19  research from any organization or entity that talks
20  about those 77 counties?
21         MR. McKENZIE:  To the extent you've seen it
22  as part of your deliberations I would object on
23  privileged grounds.  But to the extent you've seen it
24  outside of that, you're free to answer.
25    A.  Just here.

---

240

1     Q.  (By Mr. Brazil)  Just this information,
2   Exhibit 22?
3     A.  Yes.
4     Q.  Okay.  Are you aware of any independent studies
5   of alleged voter fraud in Texas?
6     A.  Individual studies, no, sir.
7     Q.  Independent studies?
8     A.  Independent, no, sir.
9     Q.  Are you aware of any independent studies of
10  alleged voter intimidation in Texas?
11    A.  No, sir.
12    Q.  Did you request any independent information on
13  alleged voter fraud in Texas before you cosponsored SB
14  14?
15         MR. McKENZIE:  I would object on privileged
16  grounds as to what he requested unless it's public
17  record in which case.  You may answer.
18  I guess I'll claim legislative privilege on that.
19    Q.  (By Mr. Brazil):  Okay.  Were you provided any
20  independent research or information from any
21  organization or entity before you cosponsored SB 14,
22  that had anything to do be with allegations of voter
23  fraud?
24    A.  Not that I recall seeing.
25    Q.  Do you agree that SB 14 addresses only the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 241

1    allegations of in person voter fraud?
2        A.  Yes.
3        Q.  Do you agree that it does not address the
4    allegations of mail in voter fraud?
5        A.  Yes.
6        Q.  Are you aware of any voter -- in person voter
7    fraud in Texas?  Do you have any personal knowledge of
8    one instance of someone voting for someone else in
9    person?
10       A.  No.
11       Q.  Okay.  Would you agree with me that based on all
12   your testimony today and everything that you've seen,
13   that this allegation or these allegations of in person
14   voter fraud is really a myth, would you agree with me?
15       A.  No.
16       Q.  Well, if you have no information and we've never
17   seen it before and we haven't seen any study show
18   there's any in person fraud in Texas, why do you not
19   disagree that it's just a myth?
20       MR. McKENZIE:  I don't think he's testified
21   there's no studies out there ever.  I think he's
22   testified that none were provided to him and that's to
23   the extent of his testimony.
24       BY MR. BRAZIL:  So is that instruction not
25   to answer or is that an objection?

---

## 242

1        MR. McKENZIE:  It's an objection.
2    BY MR. BRAZIL:
3        Q.  You may still answer.
4        A.  Legislative privilege.
5        MR. McKENZIE:  You can answer.
6        A.  Repeat the question for me.
7        Q.  (By Mr. Brazil)  Based on your testimony today
8    and based on the fact that we really haven't seen
9    anything that proves that there's no in person voter
10   fraud in Texas and based on your testimony the last few
11   hours, why do you disagree that this allegation of in
12   person voter fraud is not just a myth?
13       MR. McKENZIE:  Object to facts not in
14   evidence.  You may answer.
15       A.  Anecdotal conversations, people talk.
16       Q.  (By Mr. Brazil)  And conversations with whom?
17       A.  Oh, lots of people.
18       Q.  Can you give me the name of one person who has
19   told you that they personally observed voter fraud in
20   Texas?
21       MR. McKENZIE:  Object to private legislative
22   communication, but otherwise you can answer.
23       A.  Yeah.  Legislative privilege on that.
24       Q.  (By Mr. Brazil)  Do you have anything in your
25   office, whether it be an e-mail or a letter or an

---

## 243

1    affidavit from anyone who hesitated to you as a
2    representative, that they personally observed voter --
3    in person voter fraud in Texas?
4        MR. McKENZIE:  Object to state legislative
5    provided that information.  But if it's not a State
6    legislator, you may go ahead and answer.
7        A.  Not to my knowledge.
8        Q.  (By Mr. Brazil)  Have you been to any, sometimes
9    we call them town meetings, in your district where you
10   have specifically discussed this allegation of in person
11   voter fraud in Texas?
12       A.  I think it came up at like a forum.  I couldn't
13   recall the specifics or anything.  There was a forum
14   at -- oh, where were we, where somebody was asking a
15   question.  But I couldn't tell you a whole lot more than
16   that.  And we were talking about, in context, of in
17   person fraud and voter ID.  But I can't remember what
18   they were asking.
19       Q.  Did you do anything before you cosponsored SB 14
20   to determine what the reaction would be from your
21   constituents in your district?
22       MR. McKENZIE:  I'm going to object on
23   legislative privilege grounds.  I think we're still
24   covering legislative communications.  To the extent it
25   doesn't play into your thoughts, one way communication

---

## 244

1    to you, you may answer it.
2        A.  Yeah.  People in the district were asking me to
3    vote yes on this bill.
4        Q.  (By Mr. Brazil)  Okay.  But that really wasn't my
5    question.  My question was did you send out a mailer
6    saying, "please respond to this.  What's your idea about
7    this?"  Did you send out a blast e-mail saying, "please
8    respond to your thoughts on voter fraud," things of that
9    nature.  Did you do anything like this to your
10   constituents?
11       A.  No.
12       Q.  Can you provide us today, under oath, any facts
13   to support the allegation of voter fraud in Texas?
14       ATTORNEY2:  Objection; vague.  You may
15   answer.
16       A.  No, sir.
17       Q.  (By Mr. Brazil)  Do you believe that, or do you
18   have an opinion as to what was wrong with all of the
19   laws in effect before SB 14 that dealt with registering
20   to vote and voting that somehow needed to be corrected
21   by SB 14?
22       MR. McKENZIE:  I'm going to object to the
23   extent your opinion was developed in the course of your
24   deliberations with the legislator.  To the extent you
25   have an opinion apart from that after you passed the

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 245

1  legislator.  You can answer the question.
2      A.  Sorry I forgot the question.
3      Q.  (By Mr. Brazil)  Sure.  What was defective with
4  all these other laws?  We have federal laws, as you
5  know, that cover voting registration and voting.  We
6  have State laws that cover registration and voting,
7  right?  Do you agree with that?  Is that a yes.  She
8  can't take down uh-huh.
9      A.  Yes.  I'm sorry.
10     Q.  What was defective in any of those laws that
11 needed to be corrected in your opinion by SB 14?
12     A.  I don't know if it was corrected in as much as it
13 was added to.
14     Q.  Okay.  What did SB 14 add to, whether it be HAVA
15 or any other voting legislation, what did it add?
16     A.  Can you explain HAVA?
17     Q.  No, I cannot.  Not with the amount of time we
18 have left here today.  What, in your opinion, did it add
19 to these other laws?  Whether it be one law, federal
20 law, State law, what did SB 14 add?
21     A.  The people of House District 52 asked me to
22 support it so I'm going to support it.
23     Q.  What specifically did it add to any other laws
24 that you believe is necessary to correct this allegation
25 of voter fraud?

### 246

1      A.  I think it put into place a process that would
2  protect the integrity of that system and the confidence
3  the voters have in the system based on what they told me
4  during the campaign.
5      Q.  Basically it sounds good.
6          MR. McKENZIE:  Objection.  You're
7  mischaracterizing the testimony.  You may answer.
8      A.  I don't know.
9      Q.  (By Mr. Brazil)  You don't know?
10     A.  I mean, they asked me to be supportive.
11     Q.  Okay.  Would you agree with me that there's
12 absolutely no independent Texas data to support the
13 allegation of voter fraud?
14         MR. McKENZIE:  Objection; speculation.  You
15 may answer.
16     A.  No.  I would not agree.
17     Q.  (By Mr. Brazil)  Can you give me any example of
18 independent Texas data to support the allegation of
19 voter fraud in Texas?
20     A.  I don't have any.
21     Q.  Okay.  Would you agree with me that all of the
22 information that you had before you cosponsored SB 14
23 regarding alleged voter fraud was hearsay?
24     A.  Anecdotal.
25     Q.  What's the difference between that and hearsay?

### 247

1      A.  I'm not an attorney.  I used the word anecdotal.
2      Q.  Okay.  Did I understand your testimony that the
3  first time you ever considered voter fraud to be an
4  issue was 2009?
5      A.  No.  What we were talking about earlier was in
6  the context of what have you.  My testimony was in
7  the context of what anybody hears on the news or
8  whatever else that that's always been out there.  That's
9  what you see and you learn about and you hear about.
10 Into that we drilled down into it as a matter of policy.
11 For the first time we ever looked at that in that way
12 was about that time frame, yeah, for the campaign.
13     Q.  Just a couple other questions and I'm finished.
14 Do you know what a provisional ballot is?
15     A.  Yes.
16     Q.  And you tell us your definition of a provisional
17 ballot?
18     A.  Oh, man.  My understanding is that if you don't
19 have the election judge who you walked up to doesn't
20 feel that you have the right or necessary information
21 that they need to authenticate your vote that they put
22 you in a provisional ballot category.
23     Q.  And do you know when or if the provisional
24 ballots are counted?
25     A.  The only thing I know is in the event of a

### 248

1  contest provisional ballots are counted.  I can't tell
2  you that's the only time they're counted.  But in a
3  contest they're counted.
4      Q.  Can you provide any example of any election in
5  the last 50 years that's been changed by voter fraud?
6      A.  No, sir.
7      Q.  Thank you.  That's all I have.  I appreciate it.
8  Thank you.
9          MR. GEAR:  With that we'll conclude with
10 that -- do you have any questions?
11         THE WITNESS:  No.  I'm good.
12         MR. GEAR:  We'll conclude your deposition
13 for now, but we'll hold it open for a later date.
14         THE WITNESS:  Thank you.
15
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

249

```
 1          CHANGES AND SIGNATURE
 2        RE: STATE OF TEXAS VS. HOLDER
 3
 4   PAGE  LINE   CHANGE        REASON
 5
 6
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

251

```
 1        IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLUMBIA
 2
     STATE OF TEXAS      )
 3                       )
                         )
 4   VS.                 )  NO. 12-CV-128
                         )  (DST, RMC, RLW)
 5                       )
     ERIC H. HOLDER, JR.,  )
 6   In his official
     Capacity as Attorney  )
 7   General of the United  )
     States              )
 8
     **********************************************
 9        CERTIFICATE FROM THE
             ORAL DEPOSITION OF
10             LARRY GONZALES
                MAY 31, 2012
11   **********************************************
         I, Janalyn Reeves, a Certified Shorthand Reporter
12   in and for the State of Texas, do hereby certify that
13   the foregoing deposition is a full, true and correct
14   transcript;
15       That the foregoing deposition of LARRY GONZALES, the
16   Witness, hereinbefore named was at the time named, taken
17   by me in stenograph on May 31, 2012, the said Witness
18   having been by me first duly cautioned and sworn to tell
19   the truth, the whole truth, and nothing but the truth,
20   and the same were thereafter reduced to typewriting by
21   me or under my direction.  The charge for the completed
22   deposition is $_____ due from Defendant.
23       () That pursuant to the Federal Rules of Civil
24   Procedure, the Witness shall have 30 days after being
25   notified by certified mail, return receipt requested, by
```

250

```
 1           I, LARRY GONZALES, have read the foregoing
     deposition and hereby affix my signature that same is
 2   true and correct, except as noted above.
 3
                LARRY GONZALES
 4   THE STATE OF TEXAS   )
                          )
 5   COUNTY OF TRAVIS     )
         Before me,             , on this day
 6   personally appeared LARRY GONZALES, known to me (or
     proved to me under oath or through
 7   (description of identity card or other document) to be
     the person whose name is subscribed to the foregoing
 8   instrument and acknowledged to me that they executed the
     same for the purposes and consideration therein
 9   expressed.
10       Given under my hand and seal of office this ____
     day of        ,   .
11
12           NOTARY PUBLIC IN AND FOR
             THE STATE OF
13
14
15
16
17
18
19
20
21
22
23
24
25
```

252

```
 1   the deposition officer that the original deposition
 2   transcript is available in her office for review and
 3   signature by the Witness and if any corrections made are
 4   attached hereto;
 5       () That by agreement of counsel, a reading condensed
 6   copy of the deposition transcript along with the
 7   full-size original changes and Signature Sheet has been
 8   sent to_____ on_____ for review and
 9   signature within 30 days and if any corrections returned
10   are attached hereto;
11       () That by agreement of counsel, the deposition
12   officer is instructed to release the original deposition
13   transcript to_____ on_____, for review and
14   signature, and the deposition officer is thereafter
15   released of any further responsibility with regard to
16   the original.
17       () That the Witness shall have thirty (30) days for
18   review and signature of the original transcript and if
19   any corrections returned are attached hereto.
20       () That the signed transcript () was () was not
21   received from the Witness within 30 days.
22       () That the examination and signature of the Witness
23   is waived by the Witness and the parties;
24       That the amount of time used by each party at the
25   deposition is as follows:
```



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

253

```
 1        Mr. Gear -  5 hours 41 minutes
 2        Mr. Brazil - 15 minutes
 3        Mr. McKenzie - no time
 4        Ms. Judge - no time
 5     I further certify that I am neither counsel for,
 6   related to, nor employed by any of the parties in the
 7   action in which this proceeding was taken, and further
 8   that I am not financially or otherwise interested in the
 9   outcome of the action.
10        WITNESS MY HAND, this the _____ day
11   of_____ A.D. 2012.
12        _____
             JANALYN REEVES
13           Cert. No. 3631
             Expires Dec. 12
14           100 Congress
             Suite 220
15           Austin, Texas  78701
             (512)634-1980
16           Firm Registration No. 283
17
18
19
20
21
22
23
24
25
```



