**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                     )
   Plaintiff,               )
             )
V.                                  )
             )
ERIC H. HOLDER, JR.,                )
in his official capacity            )
as Attorney General of              )
the United States,                  )
    Defendant.              )
             )
ERIC KENNIE, et al.,                )
  Defendant-Intervenors,          )
             )
TEXAS STATE CONFERENCE              )   CASE NO. 1:12-CV-00128
OF NAACP BRANCHES, et al.,          )   (RMC-DST-RLW)
  Defendant-Intervenors,          )   Three-Judge Court
             )
TEXAS LEAGUE OF YOUNG               )
VOTERS EDUCATION FUND, et al.,      )
  Defendant-Intervenors,          )
             )
TEXAS LEGISLATIVE BLACK             )
CAUCUS, et al.,                     )
  Defendant-Intervenors,          )
             )
VICTORIA RODRIGUEZ, et al.,         )
  Defendant-Intervenors.          )

ORAL DEPOSITION OF
REPRESENTATIVE PATRICIA HARLESS
May 15, 2012

   ORAL DEPOSITION OF REPRESENTATIVE PATRICIA HARLESS,
produced as a witness at the instance of the Defendant, and duly
sworn, was taken in the above-styled and numbered cause on the
15th day May, 2012, from 9:42 a.m. to 7:11 p.m., before Amy C.
Kofron, CSR in and for the State of Texas, reported by machine
shorthand, at the offices of the United States Attorney, 816
Congress Avenue, Austin, Texas, pursuant to the Federal Rules of
Civil Procedure and the provisions stated on the record or
attached hereto.

**2**

A P P E A R A N C E S

FOR THE PLAINTIFF:
Mr. Patrick Sweeten
Mr. Matthew H. Frederick
OFFICE OF THE ATTORNEY GENERAL OF TEXAS
P.O. Box 12548
Austin, Texas 78711-2548

FOR THE DEFENDANT:
Mr. Daniel J. Freeman
Ms. Elizabeth S. Westfall
Ms. Risa Berkower
Ms. Jennifer Maranzano
Mr. Bruce Gear
U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue NW
NWB Room 7203
Washington, DC 20530

FOR THE DEFENDANT-INTERVENORS, TEXAS
STATE CONFERENCE OF NAACP BRANCHES AND
MEXICAN AMERICAN LEGAL CAUCUS:
Mr. Ezra Rosenberg
DECHERT, L.L.P.
902 Carnegie Center
Suite 500
Princeton, New Jersey 08540-6531

FOR THE DEFENDANT-INTERVENOR, KENNIE:
Mr. Chad Dunn
BRAZIL & DUNN, L.L.P.
4201 Cypress Creek Parkway
Suite 530
Houston, Texas 77068

**3**

INDEX

Appearances. . . . . . . . .                    2
REPRESENTATIVE PATRICIA HARLESS
 Examination by Mr. Freeman. . .        5
 Examination by Mr. Rosenberg. . .      274
Signature and Changes. . . .                   292
Reporter's Certificate. . .                    294

EXHIBITS

NO.  DESCRIPTION                               PAGE
(Exhibits 1-10 referred to were marked in previous depositions)
11   Deposition Notice                         13
12   Press Release                             35
13   Texas Legislature Bills by Committee      37
14   Population and Voter Data                 82
15   Population and Voter Data                 89
16   Press Release                             102
17   House Journal                             115
18   House Debate Transcript Vol. I            116
19   "Making the Case for Photo IDs at the polls"   133
20   Houston Chronicle NewsRoom                142
21   May 9, 2012 letter                        155
22   Caucus Members Pledge Press Release       177
23   Plaintiff's Interrogatory Responses       218

**4**

24   House Debate Transcript Vol. II            246
25   Recognized Tribes List                     255
26   House Committee Transcript Vol. III        267
27   Texas Response to Motion to Compel         268



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 5

1    REPRESENTATIVE PATRICIA HARLESS,
2    having been first duly sworn, testified as follows:
3         EXAMINATION
4    BY MR. FREEMAN:
5    Q.  This is the deposition of Representative Patricia
6    Harless in the matter of Texas V. Holder, U.S. District Court
7    for the District of Columbia, Docket No. 1:11-CV-128.
8         My name is Dan Freeman, and I'm here on behalf of
9    Attorney General Eric Holder.  And with me are my colleagues,
10   Elizabeth Westfall, Risa Berkower, Jennifer Maranzano and Bruce
11   Gear, who you've already met, as well as attorneys for the
12   defendant intervenors, who you've also met, so I won't introduce
13   them again.
14        Could you spell your name for the record.
15   A.  It's Patricia, P-a-t-r-i-c-i-a, Harless,
16   H-a-r-l-e-s-s.
17   Q.  Thank you.  Have you ever been deposed before,
18   Representative?
19   A.  I have.
20   Q.  And when was that?
21   A.  I can't remember.  20 years ago maybe, 10 years ago.
22   Q.  Okay.  So let me just give you a few ground rules.
23   I'm sure that your attorneys have spoken to you already.  But a
24   deposition functions in the form of questions and answers.  So
25   it's necessary for you to speak rather than gesture in order to

## 6

1    answer so that the court reporter can get everything down.  Do
2    you understand?
3    A.  Yes.
4    Q.  And the purpose of the deposition is to secure your
5    testimony and your complete version of the facts relevant to
6    this case.  And so I will need your full and complete answers to
7    the questions that I ask.  Do you understand?
8    A.  Yes.
9    Q.  I may not always be clear when I ask my questions.
10   And so if you don't understand, please ask me to restate the
11   question so that you're able to answer completely.  Do you
12   understand?
13   A.  Yes.
14   Q.  And I think we just had someone come onto the
15   phone, so --
16        MR. ROSENBERG: Well, we'll enter our appearances --
17        MR. FREEMAN:  Okay.
18        MR. ROSENBERG:  -- formally, I guess, at some point.
19        MR. FREEMAN:  All right.
20   Q.  If you need a break, please let me know, and we'll
21   finish the question that's pending, and then we'll see about a
22   break.  Is that acceptable?
23   A.  Yes.
24   Q.  And if you need to get up for additional water or
25   coffee or something, we should do that between questions, not

## 7

1    while a question is pending.  Is that all right?
2    A.  Yes.
3    Q.  Okay.  If you want to talk to your attorney, that's
4    fine.  But if there's a question pending or if you're in the
5    middle of an answer, if you could finish that up first, that
6    would be great.  Is that okay?
7    A.  Yes.
8    Q.  Okay.  At various points your attorney may object to
9    a question that I ask.  Many of these objections will be resolved
10   by the Court at a later time.  We have some disagreements
11   regarding the law that is applicable to this case, and so none
12   of us will be offended.  But unless your attorney specifically
13   directs you not to answer, you need to please respond to my
14   question.  Is that all right?
15   A.  Yes.
16   Q.  Sometimes your attorney may instruct you not to rely
17   on certain information when you're answering a question.  If you
18   follow that instruction, please answer by preceding your answer
19   by saying, "based on the instruction" or "in reliance on my
20   attorney's instruction."  This will help it be clear for the
21   record that you are relying on that instruction and possibly
22   providing a partial answer.  If you follow that instruction and
23   as a result cannot answer at all, please do say, "I cannot
24   answer based on my attorney's instruction."  Is that all right?
25   A.  Yes.

## 8

1        MR. ROSENBERG:  And, Dan, before you begin then --
2        MR. FREEMAN:  Sure.
3        MR. ROSENBERG:  -- we did not put our appearances on
4    the record.
5        Ezra Rosenberg from Dechert on behalf of the Texas
6    State Conference of NAACP Branches and the Mexican American
7    Legislative Caucus.
8        MR. DUNN:  Chad Dunn on behalf of the defendant,
9    Kennie Intervenors.
10       MR. ROSENBERG:  And we have someone on the line.  Amy?
11       MS. PEDERSON:  Amy Pederson for the Rodriguez
12   intervenors.
13       MR. ROSENBERG:  Okay.  Thanks.
14       MR. FREEMAN:  And that's P-e-d-e-r-s-o-n.
15       THE REPORTER:  Thank you.
16   Q.  Now, I believe that your attorney agrees that you hold
17   any legislative privilege personally.  Therefore, with regard to
18   your own statements or actions or those of your staff, you may
19   choose to waive that privilege in order to share the truth with
20   the Court, with the public, and with your constituents.  For
21   example, during the redistricting litigation, numerous
22   legislators chose to provide full testimony.  Sometimes is --
23   does -- do you understand that?
24   A.  Yes.
25   Q.  Sometimes you may remember things later in the day.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

9

1  If that happens, let me know while it's on your mind, and we'll
2  add it to the record.  Will you do that?
3      A.  Yes.
4      Q.  I'll give you regular chances to do that as well.
5         Sometimes after we've been talking for a period, you
6  may realize that a prior answer is not entirely accurate.  If
7  you realize that, will you let me know?
8      A.  Yes.
9      Q.  Thank you.  And sometimes while you're answering, you
10 may think of a document that would help you remember or help you
11 answer more accurately.  If you do, please let me know.  We may
12 have that document here.  I brought a small library.  And if
13 not, we may be able to get it in order to help you.  Is that
14 okay?
15     A.  Yes.
16     Q.  I have a few just routine questions to make sure that
17 you're in fine shape to participate in the deposition.  Please
18 don't take offense.  They're standard procedure.
19        Are you on any medication or drugs of any kind that
20 would make it difficult for you to understand and answer
21 questions?
22     A.  No.
23     Q.  Have you had anything alcoholic to drink in the last
24 eight hours?
25     A.  No.

10

1      Q.  Are you at all sick today?
2      A.  No.
3      Q.  Are you currently under a doctor's care for any
4  illness?
5      A.  No.
6      Q.  Is there any reason you can think of why you would not
7  be able to answer my questions fully and accurately?
8      A.  No.
9      Q.  And last thing, I want to remind you that you're under
10 oath and subject to federal penalties for giving false or
11 misleading testimony.  So it's important that you answer my
12 questions truthfully, accurately and completely.  Do you
13 understand?
14     A.  Yes.
15     Q.  Do you have any questions so far?
16     A.  No.
17     Q.  Great.
18        MR. SWEETEN:  Dan, at this point, I think it's
19 appropriate for me to go ahead, as we talked about yesterday,
20 is -- is to tell you that -- that Representative Harless will be
21 asserting the legislative privilege with respect to questions
22 that we anticipate you will be asking today.  To the extent that
23 Representative Harless is asked questions that reveal her
24 thoughts, mental impressions or opinions about legislation or
25 communications with legislators, legislative staff, state

11

1  agencies, Texas Legislative Council or constituents that relate
2  to pending litigation, we'll be objecting to those questions on
3  the basis of legislative privilege.
4      MR. FREEMAN:  That's fine.  I understand.  I will
5  ask that the representative state for the record, "I am
6  asserting legislative privilege" in those cases.
7      Q.  So first off --
8      MR. SWEETEN:  Oh, let me also -- I forgot.
9      MR. FREEMAN:  Sure.
10     MR. SWEETEN:  This does not -- the scope of
11 legislative privilege, we are not including matters of public
12 record, including committee hearings, House floor proceedings,
13 debates or public speeches.  That is not -- we're not asserting
14 the legislative privilege as to those issues.
15     MR. FREEMAN:  And just, if we're laying out the
16 ground rules, does that also include you will not be asserting
17 with regard to statements to the press?
18     MR. SWEETEN:  I think that -- obviously, you can
19 ask her a question about a statement to the -- that she made to
20 the press.  That also is part of, I think, the public record.
21 So long way to say yes.
22     MR. FREEMAN:  Okay.  Good.  Thank you.
23     Q.  So you said you've been deposed once before about 20
24 years ago, correct?
25     A.  Once, maybe twice.  I'm not sure.  I own my own

12

1  business.
2      Q.  Okay.  It was related to your business?
3      A.  Yes.
4      Q.  Okay.  And you don't remember the nature of the
5  proceedings?
6      A.  You mean the deposition?
7      Q.  The type of the case.
8      A.  It was a suit.
9      Q.  Okay.  Related to?
10     A.  My business.
11     Q.  Okay.  Do you remember what court it was in?
12     A.  No.
13     Q.  Okay.  Have you ever testified in court before?
14     A.  Yes.
15     Q.  And what was that related to?
16     A.  On that same case.
17     Q.  Same case.  Were you a defendant in that case?
18     A.  Yes.
19     Q.  Did you win?
20     A.  One, I did.  One, I didn't.
21     Q.  Okay.  Have you ever been involved in a case where the
22 State of Texas was a party?
23     A.  No.
24     Q.  Okay.
25     A.  Not that I know of.  Not that I went to court on.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**13**

1  Q.  Okay.

2       MR. FREEMAN:  If the court reporter can please

3  mark this as U.S. 11.

4       (Exhibit No. 11 marked)

5  Q.  Have you seen this document before?

6  A.  Yes.

7  Q.  Could you tell me what it is?

8  A.  It is the notice of the deposition.

9  Q.  What did you do to prepare for this deposition?

10      MR. SWEETEN:  Don't reveal any communications -- the

11  substance of any communications you've had with your attorneys

12  in this matter.

13  A.  I read through this request, and that's pretty much

14  it.

15  Q.  Did you review any documents?

16  A.  Reviewed the documents that -- that I had in my file,

17  the bill.

18  Q.  And anything besides the bill?

19  A.  Part of the testimony, the record testimony on the

20  floor.

21  Q.  The floor testimony from both the 38th day and the

22  40th day of the session, both floor days?

23  A.  No.

24  Q.  Which day?

25  A.  The day that was the 11 hours.

---

**14**

1  Q.  Okay.  The 40th day?

2  A.  I guess.

3  Q.  Okay.

4  A.  I don't remember which day.

5  Q.  Anything besides the text of the bill and the

6  transcript of the floor debate?

7  A.  Conference committee report.

8  Q.  Okay.  Anything besides those three documents?

9  A.  That's it.

10  Q.  Okay.  And when did you review those?

11  A.  Last night.

12  Q.  Okay.  Did any of those documents refresh your memory

13  concerning S.B. 14?

14  A.  Yes.

15  Q.  Okay.  Did you meet with counsel?

16  A.  Yes.

17  Q.  And when was that?

18  A.  About a month ago.

19  Q.  Okay.  And where did that occur?

20  A.  In my office, and then again last night.

21  Q.  And who was present?  First, the meeting in your

22  office.

23  A.  Patrick and Matt, myself and my chief of staff at the

24  one in my office.

25  Q.  Okay.

---

**15**

1  A.  And was Stacey -- maybe one other person.  I don't

2  know.

3  Q.  Would that will be Stacey Napier?

4  A.  I can't tell you for sure if she was there.

5  Q.  Okay.  From the attorney general's office?

6  A.  Uh-huh.

7  Q.  Okay.  And last night, who did you meet with?

8  A.  Matt, Brooke, Jay with the attorney general's office,

9  and Patrick came in later.

10  Q.  And who is Brooke?

11  A.  With the AG's office.  I don't know.

12  Q.  You don't know her last name?

13  A.  No, sir.

14  Q.  And would Jay be Jay Dyer?

15  A.  Yes.

16  Q.  Okay.  If you could turn to Attachment A, which is the

17  third page of the document.  Did you undertake a search for

18  these documents?

19  A.  I instructed my staff to.

20  Q.  And when was that?

21  A.  I can't tell you for sure.  Maybe a week to two weeks

22  ago.

23  Q.  Okay.  And did you -- other than instructing your

24  staff, did you take any other actions personally?

25  A.  No.

---

**16**

1  Q.  Did you search your personal e-mail?

2  A.  My staff did.

3  Q.  Your staff have access to your personal e-mail?

4  A.  Uh-huh.

5  Q.  Okay.  Did you search the text messages on your phone?

6  A.  No.

7  Q.  Do you retain text messages on your phone?

8  A.  No.

9  Q.  What type of phone do you use when you are using your

10  phone for text messaging in the context of legislative activity?

11  A.  Currently now an iPhone.

12  Q.  And what were you using in 2011?

13  A.  Part, a BlackBerry --

14  Q.  Uh-huh.

15  A.  -- and then I converted to an iPhone.

16  Q.  And is it your belief that those phones do not store

17  the text messages that you send and receive?

18  A.  I have no idea about the technology.  I know that I

19  delete them --

20  Q.  Oh, you --

21  A.  -- every day.

22  Q.  -- you go back and delete at the end of the day?

23  A.  Every day.

24  Q.  Okay.  Okay.  Representative Harless, where were you

25  born?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

17

1      A.  Houston, Texas.
2      Q.  And did you grow up in Houston?
3      A.  Yes, sir.
4      Q.  Okay.  Where did you go to school?
5      A.  I went to Spring ISD and graduated from Candlestick
6   Christian Academy --
7      Q.  Okay.
8      A.  -- in Spring.
9      Q.  Okay.  Did you go to college?
10     A.  I did.
11     Q.  And --
12     A.  LeTourneau, Longview.
13     Q.  Pardon me?
14     A.  LeTourneau University --
15     Q.  Okay.
16     A.  -- in Longview, Texas.
17     Q.  Where is Longview?
18     A.  It's Northeast Texas.
19     Q.  Okay.  And what was your degree in?
20     A.  Business Administration, BS in BA.
21     Q.  Okay.  And when did you first start working?
22     Start working?
23     A.  Uh-huh.
24     A.  When I was nine years old.
25     Q.  Okay.

18

1      A.  Full-time -- full-time?
2      Q.  Full-time.
3      A.  1983.
4      Q.  Okay.  And who were you working for?
5      A.  My father, second generation --
6      Q.  Okay.
7      A.  -- car dealer.
8      Q.  And what's his business?
9      A.  He's deceased, but it's a used car dealership.
10     Q.  Is that Fincher Automotive?
11     A.  Fred Fincher Motors.
12     Q.  Okay.
13     A.  There's a lot of Finchers in Houston.
14     Q.  My apologies.
15     A.  I'm Fred Fincher Motors.
16     Q.  Okay.  Are there other Fincher car dealerships?
17     A.  Yes.  I have six brothers, two sisters, and several of
18   them are in the business.
19     Q.  Okay.
20     A.  We are competitors.
21     Q.  Oh, that sounds rough.
22     A.  It's fun.
23     Q.  Okay.  Okay.  And you're still -- you're still at Fred
24   Fincher Motors?
25     A.  Yes, sir.

19

1      Q.  Okay.  Have you participated in government at all
2   outside of elected office?
3      A.  Yes.
4      Q.  And what is your history of participation in
5   government outside of elected office?
6      A.  I was a member of the Texas Independent Auto Dealers
7   Association --
8      Q.  Uh-huh.
9      A.  -- past president, and I would participate in the
10   committee hearing process as an industry volunteer.
11     Q.  Did you testify at hearings?
12     A.  I did.
13     Q.  And how else did you participate?
14     A.  That was it.
15     Q.  And were these on issues in -- which particular
16   committee?
17     A.  Transportation, licensing, on issues pertaining to the
18   automobile industry.
19     Q.  Okay.  And outside of your own campaigns, have you
20   worked on any political campaigns or in any political sphere?
21     A.  Yes.
22     Q.  And what is your history of political participation
23   outside of your own campaigns?
24     A.  Working on campaigns.
25     Q.  Which campaigns?

20

1      A.  I started in '80 -- '89 -- '79-'80 on Reagan's first
2   campaign.
3      Q.  Okay.
4      A.  Worked for President Bush, both senior and President
5   George W.
6      Q.  Okay.
7      A.  Sheriff race, state rep race, state senate race,
8   county commissioner, JP, constable --
9      Q.  Okay.  And --
10     A.  -- judges.
11     Q.  What was the scope of your participation in those
12   races?
13     A.  I just was a volunteer.
14     Q.  Okay.
15     A.  I like electing good people.
16     Q.  Okay.  Did you ever -- were you ever involved in any
17   fundraising?
18     A.  You mean as far as organizing it --
19     Q.  Yes.
20     A.  -- or participating?
21     Q.  First -- first one, then the other.  First,
22   organizing.
23     A.  I never organized a fundraiser.  I participated.  I
24   may have sponsored one, held one at my home.
25     Q.  Okay.  Were you ever involved -- strike that.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless

May 15, 2012

---

**21**

1  During your involvement on policy matters as a
2  business owner, did you ever make any requests for materials
3  under the Texas Open Records Act?
4  A. Not that I recall.
5  Q. Did you have to interact with government regulation
6  and regulators as a small business owner?
7  A. Yes.
8  Q. And did you expect those government agencies to
9  communicate with you fully, openly and honestly?
10  A. Yes.
11  Q. When did you last renew your driver's license?
12  A. Well, about six years ago, I think. I think it's up
13  for renewal this year, so we renew every six years.
14  Q. Okay. And where did you have to go for that?
15  A. I did it by mail.
16  Q. And when was the last time you had to do it in person?
17  A. I can't recall.
18  Q. When are you allowed to renew a Texas driver's license
19  by mail?
20  A. You can renew your Texas driver's license, if I
21  remember correctly, for the first renewal after six years.
22  They're good for six years. The first renewal, if you haven't
23  had any citations or speeding tickets or issues on your driver's
24  license, you can renew by mail. After 12 -- after the second
25  renewal, you have to go in, in person.

---

**22**

1  Q. Do you have to submit a new photograph when you renew
2  by mail?
3  A. No.
4  Q. Okay. Do you know where the closest driver's license
5  office is to your house?
6  A. I do.
7  Q. And how far is that from your house?
8  A. It's probably about 7 to 10 miles.
9  Q. And do you know what hours it's open?
10  A. No, I don't.
11  Q. And how long would it take you to get there?
12  A. Depending on traffic, maybe 15 to 20 to 30 minutes.
13  Q. And do you remember last time you went how long you
14  had to wait in line?
15  A. When my son turned 16, about 45 minutes.
16  Q. Okay. And when your son turned 16, do you know what
17  time of day you went with him?
18  A. We went two different times, one to take a test and
19  then one to get his temporary -- his temporary then to take the
20  test. Maybe an hour to do the driving test.
21  Q. Do you know what time of day you went, though?
22  A. After school.
23  Q. So --
24  A. After 2:30 or 3:00.
25  Q. If you hadn't been going with him, would you have

---

**23**

1  normally been at work?
2  A. Yes.
3  Q. If you didn't have a car, would you be able to get to
4  that driver's license office from your House?
5  A. I don't know if the bus runs there. I can't tell you
6  for sure.
7  Q. Okay. If there weren't a bus, how long would it take
8  you to get there?
9  A. In my car?
10  Q. Without a car.
11  A. I can't even speculate.
12  Q. Okay. If you had to walk, do you know how long it
13  would take?
14  A. No.
15  Q. Do you know how much it would cost to take a cab from
16  your House to the driver's license office?
17  A. No.
18  Q. Okay. Do you know what documents you brought with you
19  when you went with your son to help him get his driver's
20  license?
21  A. I can't remember.
22  Q. Do you know if some driver's license offices are
23  currently closed because of funding issues?
24  A. I think the record testimony in committee is that
25  there are some.

---

**24**

1  Q. Are some currently using reduced hours?
2  A. There may have been testimony on that. I can't recall
3  specifically.
4  Q. Okay. Do you know -- is there a driver's license
5  office in every county in Texas?
6  A. I think the testimony was that there is not.
7  Q. Okay. Do you have a copy of your birth certificate?
8  A. I do.
9  Q. And does the name on the birth certificate match your
10  current name on your driver's license?
11  A. No.
12  Q. Do you know where you'd get a copy if you lost your
13  birth certificate?
14  A. I do what my constituents do and call my office.
15  Q. Okay. How much would it cost to get a new copy of
16  your birth certificate?
17  A. I couldn't tell you. I've got -- I've got a certified
18  copy I've had since I was a kid.
19  Q. Okay. Do you know how long it takes to get a new copy
20  of a birth certificate?
21  A. I don't.
22  Q. Do you have a copy of the order that legally changed
23  your name?
24  A. I don't know if I do.
25  Q. Do you know where you would get a copy?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 25

1    A.  The order that -- no, I don't.
2    Q.  I guess after you got married?
3    A.  Yeah.
4    Q.  Do you know how much a copy would cost?
5    A.  I don't.
6    Q.  Do you know how long it would take to get a copy?
7    A.  I don't.
8    Q.  How would you go about finding out where to get a copy
9  of that document?
10   A.  I'd call my office.
11   Q.  Okay.  You probably get a lot of phone calls, don't
12  you?
13   A.  We do, a lot.
14   Q.  And the next question is going to kind of sound a
15  little silly, but I don't drive a car.
16       How much is gas going for in Harris County right now?
17   A.  I filled up yesterday.  I think I paid 3.79 a gallon.
18   Q.  When is the last time you voted?
19   A.  I voted last week.
20   Q.  And how far is your polling place from your home?
21   A.  I had to go to two different polling places.  I voted
22  in a MUD election and in an EDS election.
23   Q.  And just for the record, a MUD is a municipal utility
24  district?
25   A.  Yes.

## 26

1    Q.  And an EDS is?
2    A.  Is emergency -- or ESD, emergency service district.
3    Q.  Okay.  And those had different polling places?
4    A.  Yes.
5    Q.  And how far was the MUD polling place?
6    A.  The MUD is our subdivision MUD, so it was probably a
7  quarter of a mile.  The EDS was at the fire department, so it
8  was probably five or six miles, but they had -- they had a
9  number of locations open.
10   Q.  Okay.  And so those are much closer than the driver's
11  license office; is that correct?
12   A.  Yes.
13   Q.  And where do you vote for presidential elections?  How
14  far is that from your house?
15   A.  Well, in Harris County, we have early voting.
16   Q.  Okay.
17   A.  And I typically vote early voting, and that is at a
18  church --
19   Q.  Uh-huh.
20   A.  -- and it's probably 7 to 10 miles from my house.
21   Q.  Okay.  If you were to vote on election day --
22   A.  It's in --
23   Q.  -- do you know where you would vote?
24   A.  It's in my subdivision at an elementary school that's
25  probably a mile or two away.

## 27

1    Q.  Okay.  So that's much closer than the driver's license
2  office as well, correct?
3    A.  Well, not early voting.
4    Q.  But the election day precinct is much closer, correct?
5    A.  If I voted on election day.  I don't.
6    Q.  Okay.
7    A.  I'm scared I might be sick and miss it.
8    Q.  I understand.  We're often very busy on election day
9  as well.  Although in DC, our vote doesn't count quite as much.
10       Okay.  What ID are you carrying on you today?
11   A.  I have my driver's license, my concealed handgun
12  license, my voter registration card.
13   Q.  And which ones of those have your photo on them?
14   A.  My driver's license and my concealed handgun license.
15   Q.  Okay.  And which of those establish your citizenship?
16   A.  I would say my driver's license.
17   Q.  Does it indicate on your driver's license that you're
18  a United States citizen?
19   A.  No.
20   Q.  And so how does that document establish your
21  citizenship?
22   A.  I think you have to answer a question that you're a
23  citizen or provide some type of citizenship paper to get a
24  driver's license.
25   Q.  So if someone is a Green Card holder who is a legal

## 28

1  resident of Texas and in line to become a citizen, can they not
2  get a Texas driver's license?
3    A.  I'm not sure.
4    Q.  Okay.  And if someone's here on a work visa, can they
5  not get a Texas driver's license?
6    A.  I'm not sure.  I don't know the procedures.
7    Q.  Okay.  Do you have a passport on you?
8    A.  No.
9    Q.  Do you have a military ID?
10   A.  No.  Now --
11   Q.  Is --
12   A.  -- I need to clarify that.  You mean on me?
13   Q.  Yes.
14   A.  Okay.
15   Q.  Those are coming.
16   A.  Okay.  I just --
17   Q.  And do you have a passport?
18   A.  I do.
19   Q.  Do you have a military ID?
20   A.  I don't.
21   Q.  Does anyone in your family have a military ID?
22   A.  Oh, my goodness, I have no clue.
23   Q.  Immediate family.
24   A.  I have six brothers, two sisters, 37 nieces and
25  nephews and 42 great nieces and nephews all in Harris County.  I



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless

May 15, 2012

---

29

1  have no clue.
2      Q.  You must have amazing picnics.
3          What other types of ID are produced by the State of
4  Texas?
5      A.  Identification card, a driver's license --
6      Q.  Uh-huh.
7      A.  -- concealed handgun are all provided by DPS.
8      Q.  Anything else by the state or its agencies?
9      A.  I don't know that.
10     Q.  Do state colleges produce identification cards?
11     A.  I'd assume some do.  The one my son went to had -- he
12  had an ID, student ID card.
13     Q.  And do employers -- when the state is an employer,
14  does it produce identification cards?
15     A.  I don't know what their procedures are.
16     Q.  Do you have any kind of legislator ID?
17     A.  I do.
18     Q.  Does it have your photo on it?
19     A.  It does.
20     Q.  Does that legislator identification card establish
21  your identity?
22     A.  I guess it could.
23     Q.  Okay.
24     A.  It hadn't got me out of tickets.
25     Q.  I hope not.

---

30

1      A.  Yeah, I know.
2      Q.  Where do you get your information about elections?
3      A.  What do you mean?
4      Q.  In terms of news, information about issues.
5      A.  You mean on polling places or the date?
6      Q.  I mean in terms of the candidates, the issues, the
7  polling.
8          MR. SWEETEN:  You're asking as a general matter?
9          MR. FREEMAN:  As a general matter, yes.
10         MR. SWEETEN:  Okay.  All right.
11     A.  We get massive amounts of mail during the election
12  season.  I typically try to look at a sample ballot and do some
13  research on the candidates --
14     Q.  Okay.
15     A.  -- just for my own information to see who I'm going to
16  vote for.
17     Q.  And how do you do that research?
18     A.  I go to their web site if they have one, look at their
19  web sites and read what their values are, what they say their
20  values are.
21     Q.  And what newspapers or web sites do you read other
22  than candidates' web sites?
23     A.  Just the Houston Chronicle.
24     Q.  Okay.  What news channels do you watch?
25     A.  None.

---

31

1      Q.  And do you listen to any talk radio?
2      A.  No.
3      Q.  And do you receive any e-mail newsletters or repeated
4  e-mails from any organization or individual?
5      A.  Our republican clubs that I'm members of send out
6  massive amounts of information.  I typically delete most of
7  them.
8      Q.  And what republican clubs are you a member of?
9      A.  Northwest Forest Republican Women in Harris County and
10  Texas Tea Republican Women, Cy-Fair Republican Women.
11     Q.  What was the last one?
12     A.  Cy-Fair Republican Women.
13     Q.  What is Cy-Fair?
14     A.  Cy-Fair is northwest area in Harris County.
15     Q.  Oh, okay.  Thank you.
16         Representative Harless, what committees do you
17  currently sit on?
18     A.  I sit on State Affairs, on Licensing and -- LAP,
19  Licensing and Administrative Procedures, Redistricting.  I
20  sit -- I sit on the Select Committee For Human Trafficking, and
21  I served on the Select Committee For Voter -- I don't -- I don't
22  know the technical name.
23     Q.  Was it the Select Committee on Voter Identification
24  and Voter Fraud?
25     A.  Yes.

---

32

1      Q.  Okay.  What is a select committee?
2      A.  A select committee is a committee issued to study a
3  specific item.
4      Q.  And who decides to establish a select committee within
5  the legislature?
6      A.  Our information comes from the speaker's office.
7      Q.  So can the speaker decide to establish a select
8  committee on any issue?
9      A.  I would assume he could.
10     Q.  Does anyone else participate in that decision-making
11  process, to your knowledge?
12     A.  I wouldn't know.
13     Q.  Okay.  Who picked the name of the Select Committee on
14  Voter Identification and Voter Fraud?
15     A.  I don't know.
16     Q.  Are you aware of any other select committees related
17  to voting or elections, first in the current legislature?
18     A.  Not other than this committee.
19     Q.  Any in past legislatures?
20     A.  I don't know.  I've only been there three sessions.
21     Q.  Okay.  But you said that you were involved, to some
22  extent, as a small business owner; is that correct?
23     A.  Yes.
24     Q.  But were you not following issues related to election
25  law?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

33

1      A.   As a small business person, prior to being elected,
2   no.
3      Q.   Okay.  Are you aware of any other select committees
4   that relate directly to a standing committee in the way that the
5   Select Committee on Voter Identification and Voter Fraud relates
6   to elections?
7      A.   I think we've had committees, yes.
8      Q.   Could you provide any examples?
9      A.   We had a select committee on emergency appropriation.
10  We had a select committee on state sovereignty.  I think there
11  was a select committee on government efficiency, which are all
12  under other jurisdictions of other committees.
13     Q.   And what is the purpose of establishing a select
14  committee in those circumstances?
15     A.   In my opinion, it's to bring more attention and a
16  larger venue to an issue.
17     Q.   Is the Select Committee on Voter Identification and
18  Voter Fraud larger than the election committee?
19     A.   You mean as far as members?
20     Q.   As far as the number of members, yes.
21     A.   I don't know that.
22     Q.   What did you mean by a larger venue?
23     A.   It's a select issue --
24     Q.   Uh-huh.
25     A.   -- so you don't have to share the stage with other

---

34

1   issues, and it brings in more participation, in my -- my view, a
2   larger group to participate.  It's a single issue, so it's open
3   more to the public, and testimony is not limited.
4      Q.   Okay.  By saying that testimony is not limited, do you
5   mean that there are not limitations on the amount of time that
6   individuals can testify under the House rules?
7      A.   No.
8      Q.   What do you mean by that?
9      A.   I mean that in the regular committee process on agenda
10  when we have legislation that's there for a hearing --
11     Q.   Uh-huh.
12     A.   -- there may be five, ten, twenty pieces of
13  legislation.  So the committee kind of establishes a time frame
14  in how long they'll give each of these issues in order to get
15  through the agenda.  And on the select committee, it is the sole
16  purpose to hear that information as broad and as wide with as
17  much participation as possible.
18     Q.   Do select committees overlap in the time that they
19  meet with other committees that members of the committee may be
20  on?
21     A.   It's possible.  I can't tell you for sure if we did or
22  if they do, but it's possible.
23     Q.   Okay.  Was the Select Committee on Voter
24  Identification and Voter Fraud a "fast-track" committee?
25     A.   I can't answer that.

---

35

1           MR. FREEMAN:  If I can mark this as U.S. Exhibit 12.
2           (Exhibit No. 12 marked)
3      Q.   I guess that copy is for you.  Could you take a look
4   at this document?  Have you seen this document before?
5      A.   Not that I recall.
6      Q.   Do you see on the second-to-last line of the first
7   page where it says "fast track"?
8      A.   I see that.
9      Q.   Do you have any idea what that means?
10     A.   I know that the voter ID legislation was an emergency
11  item for the governor's office.
12     Q.   Were there other emergency items for the governor's
13  office?
14     A.   Yes.
15     Q.   Were those assigned to fast-track select committees?
16     A.   I don't recall.
17     Q.   Were there any other fast-track select committees in
18  the 82nd legislature in 2011?
19     A.   I can't answer 100 percent sure, but I think that the
20  state sovereignty committee was a select committee.  The
21  government reform committee was a select committee for
22  government for the governor's emergency items.  I think there
23  were more than just this that were the governor's emergency
24  items that had select committees.
25     Q.   But if you look on this document below "Fast Track

---

36

1   Select Committee on Voter Identification and Voter Fraud," do
2   you see "Select Committee on State Sovereignty"?
3      A.   I do.
4      Q.   Is that designated a fast-track committee?
5      A.   It doesn't -- it doesn't say that in this document.
6      Q.   Are you aware of any other fast-track committees
7   having been established in the sessions of the legislature in
8   which you served?
9      A.   I can't answer that.  I didn't write this, so I can't
10  answer that.
11     Q.   But are you aware of any other committees being
12  designated as fast-track committees?
13     A.   I don't know for sure.
14     Q.   Okay.  So you're not aware?
15     A.   I'm not aware.
16     Q.   Thank you.
17     A.   No.  I can't say I'm not -- I don't recall.
18     Q.   Okay.  How many bills did the Select Committee on
19  Voter Identification and Voter Fraud consider?
20     A.   We had a hearing on just the one.
21     Q.   Okay.  Are there any other examples of committees of
22  which you are aware that heard only one bill?
23     A.   I don't know.
24     Q.   So you're not aware of any other examples of a
25  committee that has heard only one bill?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

37

1      A.  I don't know if there were any other committees that
2  only heard one bill.  There's like 30-plus committees, and I
3  have my hands full with my committee.
4      Q.  No.  I understand.  I'm just asking:  To your
5  knowledge, you don't --
6      A.  Not to my knowledge.
7      Q.  -- you're not aware of any other?
8      A.  I don't remember.
9      Q.  Okay.  Thank you.
10         Were there any bills submitted in the 82nd legislature
11  to address mail-in voter fraud?
12      A.  Any committees?
13      Q.  Any bills submitted?
14      A.  Yes, I think there were.
15      Q.  Were those referred to the Select Committee on Voter
16  Identification and Voter Fraud?
17      A.  If they were, we did not hear them.
18      Q.  Okay.
19      A.  I'm not sure where they referred them, but we did not
20  have a hearing on them.
21      Q.  If I can just -- we can just clean this up real
22  quickly, if I can have this marked U.S. Exhibit 13.
23         (Exhibit No. 13 marked)
24      MR. SWEETEN:  That last one was 12?
25      MR. FREEMAN:  Yes.

38

1      Q.  Have you seen this document before?
2      A.  No, I haven't seen it in this form.
3      Q.  Do you recognize it, though?
4      A.  Yes.
5      Q.  And does this document indicate the number of bills
6  that were heard by the Select Committee on Voter Identification
7  and Voter Fraud?
8      A.  Bills by committee.  Seems to be.
9      Q.  And how many bills were heard by the select committee?
10      A.  One.
11      Q.  Okay.  So is it the case that any of the bills that
12  were submitted related to mail-in voter fraud were not submitted
13  to the select committee; is that correct?
14      A.  You know, I'm not familiar with how the system
15  searches that.  If you are and you're saying that, then I
16  understand, but I don't know.  Is this a search on all the bills
17  that were referred to that committee, or --
18      Q.  Well --
19      A.  -- is it just a search on the bills that were heard in
20  that committee?
21      Q.  If you can see, the report indicates that it is the
22  82nd legislature regular session.
23      A.  Right.
24      Q.  And the number of bills by committee.  Do you see
25  where it indicates one?

39

1      A.  It says, "Number of bills: 1."
2         And it says, "Bills Out of Committee: (1)."
3      Q.  But if you look at the top of the page, it states,
4  "Texas Legislature" --
5      A.  Right.
6      Q.  -- "Bills By Committee."
7      A.  Right.
8      Q.  Does -- do you understand what that would mean?
9      A.  I guess this document is saying there was only one
10  bill referred, from what --
11      Q.  Okay.
12      A.  -- what you're saying.
13      Q.  And you don't have any recollection of hearing or
14  addressing any other bill in the select committee?
15      A.  No, we did not.
16      Q.  Okay.  Why would a bill related to the -- to mail-in
17  voter fraud not be referred to the select committee?
18      MR. SWEETEN:  Hold on one second.  I just want to
19  provide you a admonitory instruction you're going to hear
20  several times today.  I don't want you to reveal in answering
21  questions for Mr. Freeman any thoughts, mental impressions or
22  opinions about legislation, including S.B. 14.  I don't want you
23  to reveal any communications with legislators, legislative
24  staff, state agencies, including the governor's office or
25  lieutenant governor, any communications with Texas Legislative

40

1  Council or constituents.  You are free to include matters of the
2  public record, including committee hearings, House floor
3  proceedings, debates or those proceedings.
4      MR. FREEMAN:  And I will just -- just note for
5  the record that you are, in fact, free to reveal your own
6  communications and mental impressions.  It is your privilege to
7  assert or to waive.
8      MR. SWEETEN:  Counsel, first of all, I'm going
9  to -- I'm her attorney.
10      MR. FREEMAN:  I recognize that.
11      MR. SWEETEN:  I will do the instructing as to
12  what -- and I'm communicating with my client, and she is
13  asserting the privilege.  This is the second time now that
14  you've told her that.  I'll give her the legal advice, and she
15  has indicated that she will assert the privilege.  So my
16  marching orders is I will provide her with the framework for how
17  to assert that privilege.
18      MR. FREEMAN:  Okay.
19      MR. SWEETEN:  So I would ask you to not continue
20  with that line.
21      MR. FREEMAN:  Okay.  Well, Counsel, at this
22  point, she has not verbally asserted the privilege in this
23  deposition, although she is, of course, free to if she chooses
24  to.
25      MR. SWEETEN:  We have done so in a court filing,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

41

1  and she is asserting that privilege.
2          MR. FREEMAN:  I believe there was a question
3  pending.  Is it possible to get it read back?
4          THE REPORTER:  Yeah.  Sure.  Yeah, I can read it
5  back.
6          Question:  "Okay.  Why would a bill related to
7  the -- to mail-in voter fraud not be referred to the select
8  committee?"
9          MR. SWEETEN:  With that instruction, go ahead and
10 answer.
11     A.  I don't know.
12     Q.  Who makes the decisions concerning to which committee
13 each bill is referred?
14     A.  I'm -- I don't know that.
15     Q.  How many bills did you submit in the 82nd legislature?
16     A.  I can't answer.
17     Q.  Do you have a rough number?
18     A.  I think it was less than 35.
19     Q.  Okay.  And were you ever concerned regarding what
20 committee each of those bills would be referred to?
21     A.  On advice from my counsel, I can't answer that.
22     Q.  And does the name -- does the particular committee to
23 which a bill is referred affect its likelihood of being passed
24 out of committee and out of the House and becoming law?
25     A.  I don't know that.

42

1      Q.  So if a particular committee is busy with one issue,
2  is it more or less likely that it would address other bills that
3  may be referred to it?
4      A.  I don't know that.
5      Q.  Why was the Select Committee on Voter Identification
6  and Voter Fraud convened?
7          MR. SWEETEN:  Don't reveal thoughts, mental
8  impressions or opinions about the legislation, including
9  communications that we've outlined.
10     A.  I can't answer that.
11     Q.  Thank you.  Why are you asserting legislative
12 privilege here today?
13     A.  On advice from my counsel, protected conversations.
14     Q.  Did you ask to be included on the Select Committee on
15 Voter Identification and Voter Fraud?
16     A.  I can't remember.
17     Q.  Did you discuss your assignments before they were
18 formally made?
19         MR. SWEETEN:  Don't reveal any communications that
20 you've had with other legislators, legislative staff, state
21 agencies, Texas Legislative Council or constituents.  Those are
22 legislative privileges.
23     A.  That would be a conversation that I had with another
24 member.
25     Q.  When did that conversation occur?

43

1      A.  I can't -- I can't remember.
2      Q.  Do you recall, did it occur in person?
3      A.  I don't know.
4      Q.  Did you ever send an e-mail regarding the assignment
5  to that committee?
6      A.  Not that I recall.
7      Q.  Did you submit preferences for committees prior to the
8  committee assignments being made?
9      A.  I think that's privileged communication.
10     Q.  What legislation would that relate directly to?
11         MR. SWEETEN:  I'm sorry.  The question again?
12 Can you -- can you say it again?
13     Q.  Did you submit preferences regarding your choices for
14 committees?
15         MR. SWEETEN:  I think you're asking her to reveal
16 communications she's had with other legislators, legislative
17 staff, state agencies, Texas Legislative Council or constituents
18 as to pending legislation.
19     Q.  At the time that the -- strike that.
20         Did you ever discuss committee assignments with
21 Speaker Straus?
22         MR. SWEETEN:  Don't reveal any communications
23 that you've had regarding pending legislation.
24     A.  I can't answer that for a privileged conversation.
25     Q.  Did you ever have communications regarding committee

44

1  assignments with Chairman Bonnen?
2          MR. SWEETEN:  You can say -- you can reveal
3  whether or not you've had a conversation with Representative
4  Bonnen.  You cannot -- I'm instructing you not to reveal the
5  substance of that conversation.
6      A.  Not that I recall.
7      Q.  Did you have any conversation concerning committee
8  assignments with Senator Fraser?
9      A.  Not that I recall.
10     Q.  What committees did you serve on in your past
11 sessions?
12     A.  2009, I served on State Affairs, Workforce and
13 Technology.  I can't remember the other committee.  There was
14 another one.  And 2007, I served on Transportation, County
15 Affairs, and Rules and Resolutions.
16     Q.  Okay.
17     A.  Redistricting was the other one in 2009.
18     Q.  Okay.  Did you ever -- so you never served on the
19 Elections committee?
20     A.  No.
21     Q.  Did you ever assert that you wished to serve on the
22 Elections committee?
23         MR. SWEETEN:  Don't reveal any communications
24 that you've had with other legislators, legislative staff, state
25 agencies, Texas Legislative Council or constituents.  If it's a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

45

1    matter of public record, you can answer the question.
2        A.   Not that I recall.
3        Q.   Okay.  Have you ever sponsored or cosponsored
4    legislation related to open government?
5        A.   I think I probably have.
6        Q.   Okay.  And what was that?
7        A.   Whew.  I filed a bill on the Systems Benefit Fund to
8    stop state agencies from diversions of funds, and I can't
9    remember the specifics of the others.
10       Q.   And why did you submit a bill related to open
11   government?
12       A.   Well, this one was specifically diversions of the
13   funds.
14       Q.   Okay.  And why was that issue important to you?
15       A.   Because the money that is taxed should go to that
16   specific purpose.
17       Q.   Okay.  Before this last term, did you ever sponsor any
18   election-related bills?
19       A.   I filed a bill pertaining to election costs in my
20   school district in 2009.
21       Q.   Okay.  Anything in 2007?
22       A.   I may have filed that same bill in 2007.
23       Q.   And in 2011, did you file that same bill?
24       A.   I possibly could have.  I can't recall for sure.
25       Q.   Did you file anything related to elections in 2011

46

1    other than the school election funding bill and bills related to
2    photographic voter ID?
3        A.   Not that I recall.
4        Q.   Okay.  Why were you more interested in
5    election-related matters in the 82nd legislature?
6            MR. SWEETEN:  I'm going to caution the witness to
7    not reveal thoughts, mental impressions or opinions about
8    legislation, including Senate Bill 14, or communications
9    surrounding that.  You're free to include matters of public
10   record.
11       A.   I think testimony on the floor was that it was a bill
12   that was important to my district.
13       Q.   Okay.  How do you usually communicate with your
14   legislative colleagues?
15       A.   One-on-one.
16       Q.   Okay.  So in person on the floor?
17       A.   Yes.
18       Q.   Do you ever send e-mails between legislators?
19       A.   I think that's privileged.
20           MR. SWEETEN:  I'm going to let you testify as to
21   the means of communication, in other words, if you've talked to
22   them, if you've sent e-mails.  But as far as the substance of
23   that, you're right, that is privileged.  So you can just say if
24   you've e-mailed.  You can answer that question.
25       A.   I would bet I probably have e-mailed, but I could not

47

1    guarantee that I do.  I know it's usually face-to-face.
2        Q.   And if I can -- if I can jump back real quickly.  Can
3    I ask you -- you earlier testified that you were -- that you had
4    an increased interest in matters related to elections because
5    photographic voter ID was important to your district.  Is that
6    correct?
7        A.   That was my testimony on the floor --
8        Q.   Okay.
9        A.   -- and in the committee.
10       Q.   Why was it important to your district?
11           MR. SWEETEN:  You can provide an answer to the
12   extent that you're relying upon matters of public record,
13   including committee hearings, floor debates, but do not reveal
14   thoughts, mental impressions or opinions about the legislation
15   relating to Senate Bill 14.
16           THE WITNESS:  As in --
17           MR. SWEETEN:  Tell him --
18           MR. FREEMAN:  There's a question pending.
19       A.   As in -- as in my points that I spoke about in
20   committee and on the floor, it was important to protect the
21   integrity of the election process.
22       Q.   Did any constituents ever volunteer information to you
23   related to this issue and the importance of it?
24           MR. SWEETEN:  I think you're asking at this point
25   about a communication between a constituent and Representative

48

1    Harless.  I believe that that's within the scope of the
2    legislative privilege.
3            So my instruction to you will be not to answer that
4    question.
5        A.   On advice from my counsel, I can't answer that
6    question because it's privileged conversation.
7        Q.   Thank you.  So back to communications with legislative
8    colleagues.  Sorry to be back and forth like that.  Do you
9    ever communicate with your legislative colleagues via text
10   messaging?
11       A.   Yes.
12       Q.   Do you do that from your office, between offices?
13   When you're in your office, would you use your phone to
14   text-message other colleagues?
15       A.   Possibly to see if they're in their office.
16       Q.   And do you use your phone for texting on the floor?
17       A.   Yes.
18       Q.   And when you e-mail with your legislative colleagues,
19   do you use your official House account?
20       A.   Yes --
21       Q.   Do you --
22       A.   -- both.
23       Q.   You use your personal account as well?
24       A.   Could possibly.
25       Q.   Is your personal account subject to disclosure under



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

49

1    the Texas Open Government Act?
2        A.   If it --
3             MR. SWEETEN:  If you know.
4        A.   If it pertains to legislative issues, I would say yes.
5        Q.   Okay.  Why would you use your personal account rather
6    than your official account?
7        A.   I would only use my personal account if they sent me
8    an e-mail and I'm responding.
9        Q.   Okay.  Are you particularly close with any of your
10   colleagues in the Harris County delegation?
11       A.   Yes.
12       Q.   Who?
13       A.   Carol Alvarado.
14       Q.   Are you particularly close with Beverly Woolley?
15       A.   I'm closer to Carol.
16       Q.   Okay.  Who are your staff?
17       A.   Colby Beuck is my chief of staff.  Julie Scott is
18   scheduler.
19       Q.   How do you spell Ms. Scott's name?
20       A.   S-c-o-t-t.
21       Q.   Oh, Scott.  Okay.
22       A.   Sorry.
23       Q.   It's different parts of the country, different
24   accents.  Thank you.  Did you have any part-time staff during the
25   session?

50

1        A.   I have interns that work.
2        Q.   Okay.  Any other paid staff?
3        A.   Our interns get nominal pay, $100 a month or enough
4    for gas.
5        Q.   Okay.  Any other staff receiving a living wage?
6        A.   No.
7        Q.   Okay.
8        A.   Not in my district -- not in my Austin office.
9        Q.   Did you have any other -- do you have any other staff
10   in your district office?
11       A.   I do.
12       Q.   And who is that?
13       A.   Ella Edmiston, E-d-m-i-s-t-o-n.
14       Q.   And what is her role?
15       A.   She's a district director.
16       Q.   And what is the role of a district director?
17       A.   To attend meetings in my stead and handle the
18   constituent inquiries that come into the office.
19       Q.   The questions about how to get a new birth
20   certificate?
21       A.   Uh-huh.
22       Q.   Got it.  And what is your scheduler's role?
23       A.   To -- and I'm not sure that's her official title.  I
24   know she's got a title on her card, but she's to look through
25   the e-mail invitations and the mail invitations and update my

51

1    calendar and schedule any type of speaking or arrange those
2    schedules.
3        Q.   Okay.  And what are the interns' roles?
4        A.   To smile at the people as they walk through the door
5    and ask them to take a bag.
6        Q.   What's in the bag?
7        A.   We provide constituents with maps and promoting Texas.
8        Q.   Okay.  And what is Mr. Beuck's role as chief of staff?
9        A.   He's in charge of everything.
10       Q.   Such as?
11       A.   Taking out the trash if it needs to be taken out,
12   ordering the office supplies, working on the legislation,
13   meeting with the different parties that come to the office,
14   handling constituent inquiries that Julie or Ella can't handle.
15       Q.   Anything else?
16       A.   Oh, my goodness.  I'm sure there is, but I'm not in
17   the office day-to-day, so --
18       Q.   Do you spend more of your time in Harris County or in
19   Austin during the session?
20       A.   During session, more in Austin.
21       Q.   And outside of session?
22       A.   More in my district.
23       Q.   And is Mr. Beuck in Austin full-time?
24       A.   Yes, sir.
25       Q.   Okay.  Do any staff serve as your attorney for the

52

1    purpose of providing you with legal advice?
2        A.   Colby.
3        Q.   And how do you distinguish between when he's providing
4    you with legal advice versus policy advice or nonlegal advice?
5        A.   I don't know that we've established that.
6        Q.   Well, at a practical level, when -- when is he
7    providing you with legal advice?
8        A.   I don't know how to answer that.
9        Q.   Do you ever provide him with confidential information
10   for the purpose of obtaining a legal opinion?
11       A.   I could have.
12       Q.   Are there any past incidents when you could -- that
13   you can name?
14       A.   Not that I --
15       Q.   And I'm not going to ask you to disclose the contents
16   because they are confidential.
17       A.   Not that I recall.
18       Q.   Okay.  How do you usually communicate with your staff?
19       A.   On the phone.
20       Q.   Okay.  Do you e-mail with them?
21       A.   Occasionally.
22       Q.   And do you text with them?
23       A.   Not as often, but, yes, occasionally.
24       Q.   Okay.  How are documents maintained in your office?
25       A.   What do you mean maintained?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

53

1    Q.  How are they kept?
2    A.  The computer documents?
3    Q.  We can start with that.
4    A.  I think House administration has a policy that
5    documents are saved and purged after 30 days.  I'm not sure of
6    the procedures in the office on paper documents.
7    Q.  Are e-mails purged after 30 days, or is -- is that all
8    electronic documents?
9    A.  House administration has a policy.  I'm not specific
10   of it.  I just know that there's a 30-day window.
11   Q.  Okay.  And do you save files on your X drive?
12   A.  I don't know what their procedures are.
13   Q.  But when you're saving a file, if you were working in
14   a -- in a Word document, where would you save it?
15   A.  If I hit the save button, and I don't know where it
16   puts it.
17   Q.  Okay.  Is that -- does Mr. Beuck find the documents
18   for you?
19   A.  Yes, he does.
20   Q.  Okay.  Are you familiar with the term "X drive"?
21   A.  I've heard them say that before.
22   Q.  Are you familiar with the term "Y drive"?
23   A.  I've heard them say that before as well.
24   Q.  Are you familiar with the distinction?
25   A.  No.

54

1    Q.  Okay.  If you had a personal document that you were
2    working on, on your office computer because you're there for the
3    whole session, where would you save it; do you know?
4    A.  I'd have hit the save button, and wherever it puts it.
5    I'm sorry.
6    Q.  That's fine.  That's fine.
7    A.  I would love to give you more information, but I gripe
8    about the computer, so --
9    Q.  Okay.  So do you know -- just to be certain, do you
10   know if files, electronic files, are saved separately for
11   different pieces of legislation?
12   A.  I don't know what their procedure is.
13   Q.  But you don't move them around?
14   A.  I don't.
15   Q.  Okay.  Do you have -- related to paper documents,
16   where are those kept in your office?
17   A.  I don't set up the procedures of how they organize the
18   office, but I know we have several lateral files.
19   Q.  Okay.  And do you have any kind of procedure related
20   to how long those files are kept?
21   A.  I don't.
22   Q.  Do you have any procedure for how they are -- how they
23   are arranged?
24   A.  I don't.
25   Q.  Okay.

55

1    A.  I'm a delegator.  Sorry.
2    Q.  That's fine.  Do you ever archive your e-mail?
3    A.  I don't.
4    Q.  Does anyone else archive your e-mail for you?
5    A.  I think there has been -- I think they may have in the
6    past.  I don't know for sure.
7    Q.  Okay.  Do you believe that compliance with the Texas
8    Constitution is an important consideration in the law-making
9    process?
10   A.  Compliance with the Texas Constitution is an important
11   process --
12   Q.  Important consideration in the law-making process?
13   A.  Yes.
14   Q.  How do you ensure, when you're submitting a bill or
15   voting on a bill, that the bill complies with the Texas
16   Constitution?
17   A.  I --
18       MR. SWEETEN:  Hold on a second.  I want you to make
19   sure that you're not revealing thoughts, mental impressions or
20   opinions about specific legislation.  If he's asking you as a
21   general matter or if it's something that relates to something
22   that you've said publicly, you can answer that, but not as to
23   specific legislation.  Okay?
24   A.  As a general matter, I rely on Leg Council.
25   Q.  Okay.  Anyone else?

56

1    A.  No.
2    Q.  And so does Leg Council submit a determination as to
3    whether a given bill -- an opinion as to whether it complies
4    with the Texas Constitution?
5    A.  I'm not aware of their procedures.
6    Q.  Do you know if anyone else provides a formal opinion
7    as to whether a bill complies with the Texas Constitution?
8    A.  I'm not aware of if there are any.
9    Q.  So would it be fair to say that your process is to
10   rely solely on Leg Council with regard to the question of
11   whether a given bill relies -- or complies with the Texas
12   Constitution?
13   A.  That would be my impression, yes.
14   Q.  Okay.  Do you believe that compliance with federal law
15   is an important consideration in the law-making process?
16       MR. SWEETEN:  Same instruction.
17   A.  I assume that the agencies do that.
18   Q.  But in term --
19   A.  Leg Council.
20   Q.  Okay.  And how do you ensure that -- that there is
21   compliance with federal law when you're drafting a bill?
22   A.  I rely on Leg Council.
23   Q.  And how do you ensure that you're complying
24   with -- with federal law when you're voting on a bill?
25   A.  I rely on Leg Council's draft.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

57

1    Q.  Okay.  Leg Council's draft, what do you mean by that?
2    A.  The -- drafting the legislation.
3    Q.  Okay.  Do you believe with -- that compliance with the
4    federal Voting Rights Act is an important consideration in the
5    law-making process?
6    A.  Yes.
7    Q.  Prior to passage, did you understand that S.B. 14
8    would be subject to preclearance under Section 5 of the Voting
9    Rights Act?
10   A.  The record on the floor was that I did.
11   Q.  I'm asking about your personal understanding, not
12   the record on the floor.
13       MR. SWEETEN:  And don't reveal your thoughts,
14   mental impressions or opinions about legislation, including
15   specifically Senate Bill 14.  You can rely on matters of the
16   public record as you have.  Go ahead.
17   A.  On the floor, I stated that.
18   Q.  Okay.  How did you act on this consideration, this
19   issue, when you were drafting S.B. 14?
20   A.  How did I act?
21   Q.  Yeah.
22       MR. SWEETEN:  He's -- the question is -- and I
23   want to make sure that you are not revealing any mental
24   impressions or opinions about legislation.  Okay?  That also
25   includes all these -- all the communications that we've

58

1    outlined, constituents, state agencies, legislators, legislative
2    staff or the Texas Legislative Council.
3    Q.  Do you need me to rephrase?
4    A.  Please.
5    Q.  Okay.  What actions did you take or changes did you
6    make in consideration of the fact that S.B. 14 would have to be
7    submitted for preclearance under Section 5 of the Voting Rights
8    Act?
9        MR. SWEETEN:  Don't answer that question except
10   to the extent that it's a matter of public record.  It's
11   legislatively privileged.
12   A.  On advice from my attorney, I'm not answering that
13   question.
14   Q.  Thank you.  And what -- when you were voting on S.B.
15   14, how did you take into account the Voting Rights Act
16   compliance of the bill?
17       MR. SWEETEN:  Same instruction.
18   A.  Can you explain what you're asking?
19   Q.  When you were voting on the bill, in what way did you
20   consider whether the bill complied with the federal Voting
21   Rights Act?
22       MR. SWEETEN:  Same instruction.  Don't reveal
23   mental impressions, opinions about legislation.
24   A.  On advice from my counsel, I can't answer that.
25   Q.  Okay.  Thank you.  Now, you've said that you relied on

59

1    Leg Council with regard to whether S.B. 14 relied -- complied
2    with the federal Voting Rights Act.  Is there a written document
3    setting out Leg Council's opinion with regard to Voting Rights
4    Act compliance?
5    A.  I'm not aware.
6    Q.  And so was it solely Leg Council's drafting of the
7    bill that you were relying on?
8        MR. SWEETEN:  Objection, assumes facts not in
9    evidence.  Also assumes -- also, you're asking her to reveal
10   mental impressions, opinions about legislation, including Senate
11   Bill 14.
12   A.  On advice from my counsel, I can't answer that.
13   Q.  Okay.  Was there any other formal opinion that you
14   received or read as to whether S.B. 14 complied with
15   the Federal Voting Rights Act?
16       MR. SWEETEN:  Don't reveal your mental
17   impressions, opinions about legislation or your thoughts about
18   the legislation.  Okay?  You can answer to the extent that --
19   that you can refer to the public record on this issue.
20   Otherwise, don't answer.
21       MR. FREEMAN:  Mr. Sweeten, this is a privileged
22   log type of question.  I'm asking you about the existence of the
23   document.
24       MR. SWEETEN:  Okay.  And let me explain that to
25   her.

60

1        MR. FREEMAN:  Sure.
2        MR. SWEETEN:  During the course of today's
3    deposition, there may be moments where he's attempting to
4    establish if it -- the existence of a specific type of document.
5    There's a line there, however.  We're not going to disclose;
6    we're going to just --
7        THE WITNESS:  An existence of the --
8        MR. SWEETEN:  Yeah.  Just let me tell you.  There
9    is a line there that we're not going to disclose the substance
10   of what's in that document, but he can ask questions about, for
11   example, if a document exists or the date of a document.
12   However, do not reveal what's contained in the document.  So
13   with that instruction, if you can answer that, then go ahead and
14   do so.
15   A.  Can you ask your question again.
16   Q.  Sure.
17       MR. FREEMAN:  If we could have the court reporter read
18   it back.
19       THE REPORTER:  Sure. Question: "Okay.  Was there any
20   other formal opinion that you received or read or reviewed as to
21   whether S.B. 14 complied with the federal Voting Rights Act?"
22   A.  My testimony on the floor was that we looked at the
23   legislation drafted from Georgia and Indiana and drafted and
24   filed our legislation along those lines.
25   Q.  I'll repeat my question. Was there any formal opinion



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

61

1    with regard to S.B. 14 that you read or reviewed in drafting or
2    voting on the bill with regard to its compliance with the
3    federal Voting Rights Act?
4        A.  I can't answer that.
5        Q.  So are you not aware of any such opinion issued by TLC
6    or anyone else?
7        A.  TLC is?
8        Q.  The Legislative Council.
9        A.  I can't recall.  I don't remember.
10       Q.  Now, the Legislative Council, their job is to draft
11   bills based on the substantive suggestions of legislators or
12   legislative staff; is that correct?
13       A.  That is my understanding.
14       Q.  And so if a legislator asks for a substantive change
15   to be in a bill, TLC will include it in that bill; is that
16   correct?
17       A.  That's privileged, and our discussion is privileged
18   with Leg Council.
19       Q.  So I think in terms of objections about privilege, I'm
20   going to ask that your counsel make those objections.  Because
21   unless you are submitting -- even assuming that there is an
22   attorney/client privilege with Legislative Council, which the
23   United States does not -- or the attorney general does not
24   believe there is, the only privileged communications are going
25   to be confidential communications.  I'm asking about the

62

1    function of the -- the legislative agency.
2            So I'm asking if Legislative Council were to
3    receive an instruction from a legislator to include a particular
4    substantive provision in a bill, would it be within the role of
5    Legislative Council to reject that request?
6        A.  I don't know how other members do their relationship
7    with Leg Council.
8        Q.  Okay.  In your experience as a legislator, has Leg
9    Council ever rejected a substantive request that you've asked
10   for legislation that you've submitted to them for drafting?
11       A.  I can't recall that they -- that we've asked a
12   substantive change.
13       Q.  Well, for example, if you submitted something to Leg
14   Council saying I would like you to draft legislation that will
15   decrease the gasoline tax in Texas by a penny per gallon, would
16   they draft that legislation for you, or would they -- would
17   they, in some cases, say, no, we can't do that?
18       A.  They would draft the legislation.  I don't know if
19   they would say no.
20       Q.  Have they ever said no?
21       A.  Not that I recall, but I don't have the one-on-one
22   communications with Leg Council.
23       Q.  So how does the fact that Leg Council drafted a bill
24   based on these substantive requests of legislators or staff
25   indicate that the bill complies with the Texas Constitution?

63

1            MR. SWEETEN:  As a general matter, you're asking?
2            MR. FREEMAN:  As a general matter.
3        A.  I'm not sure what their procedures are.  I know the
4    legislature relies on their legal interpretation and following
5    all federal and state statutes prior to drafting.
6        Q.  How is their legal interpretation a part of the draft
7    bill that you received from them after submitting a substantive
8    request?
9        A.  I don't know what their procedures are.  I know that
10   we request legislation based on accomplishing a goal, and I
11   don't know what their procedures are after that.
12       Q.  And if a legislator were to submit a request to Leg
13   Council for a bill that would raise the voting age in Texas to
14   25, is it your understanding that Leg Council would say to that
15   legislator, no, I will not do that?
16       A.  You're asking me to speculate on what their
17   conversation is with another member.  I can't do that.  I don't
18   know.
19       Q.  I'm just trying to understand how the agency works.
20       A.  Yeah.
21       Q.  I don't want you to speculate.  So if you don't know
22   how the agency works --
23       A.  I don't.
24       Q.  Okay.  So what is the basis for your reliance on the
25   fact that Leg Council drafted a bill for the fact that it would

64

1    comply with the Texas Constitution?
2            MR. SWEETEN:  As a general matter?
3            MR. FREEMAN:  As a general matter.
4        A.  As a general matter, they're the agency that has the
5    sole responsibility of making sure the legislation is drafted
6    properly, correctly and meets all the standards.
7        Q.  Okay.
8        A.  That's my opinion of what their role.
9        Q.  Okay.  And if I could just shift that over.  What is
10   the basis for your reliance on the fact that Leg Council drafted
11   a bill for the fact that it complies with Section 5 of the
12   Voting Rights Act?
13       A.  It's my reliance that they draft all legislation that
14   comply with federal and state rules and laws.
15       Q.  Has Leg Council ever drafted a bill that did not
16   comply with the Voting Rights Act?
17       A.  I don't know.
18       Q.  Has the United States Supreme Court ever found that a
19   Texas redistricting violated Section 5 of the Voting Rights Act?
20           MR. SWEETEN:  If you know.
21       A.  If you know.
22       A.  I don't know.
23       Q.  Are you aware of whether any Texas redistricting has
24   ever been struck down by the Texas -- by the United States
25   Supreme Court?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

65

1    A.  I don't know that.
2    Q.  Are you aware of whether part of the Texas
3  congressional redistricting from the last decade was struck down
4  by the U.S. Supreme Court?
5    A.  I'm not aware.
6    Q.  Why don't we take a break for a minute.
7    A.  Okay.
8        (Recess from 10:58 a.m. to 11:14 a.m.)
9    Q.  Have you had any communications with legislators or
10  staff outside the presence of attorneys from the attorney
11  general's office concerning the assertion of legislative
12  privilege in this case?
13    A.  No.
14    MR. SWEETEN:  Wait.  Hold on a minute.  Can you read
15  that back, that question?
16    THE REPORTER:  Sure, uh-huh.
17    Question: "Have you had any communications with
18  legislators or staff outside the presence of attorneys from the
19  attorney general's office concerning the assertion of
20  legislative privilege in this case?"
21    A.  I answered that too quickly.
22    MR. SWEETEN:  Okay.  Let me say that with respect to
23  conversations that relate to Senate Bill 14, I'm instructing her
24  not to answer related to communications she's had with those
25  individuals.  The fact of communications and the date of, to the

66

1  extent she can provide you that, I'll let her answer that
2  question, but I'm not going to allow her to reveal the
3  communications that you're asking about.
4    MR. FREEMAN:  How is this related to a
5  legislative act, Mr. Sweeten?
6    MR. SWEETEN:  Well, I mean, first of all, the
7  substance of the conversation is not known to you or to me at
8  this point.  So with respect to if she's had communications
9  regarding Senate Bill 14 --
10    MR. FREEMAN:  Okay.
11    MR. SWEETEN:  -- it is my view that that would
12  absolutely be related to a legislative act.  So she would not be
13  able to reveal that information or other mental impressions
14  regarding legislation.
15    MR. FREEMAN:  Well, my question was about the
16  insertion of privilege in litigation.  And so I would ask that
17  you limit your instruction to your client to communications
18  regarding legislative acts and not regarding this litigation or
19  testimony in this case.  It is not related to the substance of
20  the legislative process.
21    MR. SWEETEN:  If your question is not related to
22  legislation at all -- is that what I'm understanding?
23    MR. FREEMAN:  It's not related --
24    MR. SWEETEN:  But rather the litigation itself.
25    MR. FREEMAN:  It is not related to legislative

67

1  process.  The subject of this litigation is, of course,
2  legislation, and so I'm trying to get at --
3    MR. SWEETEN:  But --
4    MR. FREEMAN:  -- I'm trying to get at --
5    MR. SWEETEN:  -- I want to make sure that I'm
6  dividing this correctly.
7    MR. FREEMAN:  Okay.
8    MR. SWEETEN:  Okay.  I will not allow her to
9  testify, because it's covered by the legislative privilege,
10  about information regarding legislation.  If your question is
11  has she talked with another legislator --
12    MR. FREEMAN:  Uh-huh.
13    MR. SWEETEN:  -- about the assertion of
14  legislative privilege, just about that matter, outside the
15  presence of counsel, then I think I would let her answer that
16  specific question, and I think that's what you're asking.
17    MR. FREEMAN:  Let me rephrase my question and
18  hopefully I can avoid an objection by your attorney.
19    Q.  Have you discussed outside of the presence of
20  attorneys from the attorney general's office whether or not you
21  would assert privilege in this case, legislative privilege?
22    A.  With?
23    Q.  With anyone outside the presence of attorneys from the
24  attorney general's office.
25    A.  I have not had those conversations with any

68

1  legislator.
2    Q.  Have you had those conversations with any of your
3  staff?
4    A.  With my chief of staff and --
5    MR. SWEETEN:  Don't reveal communications that
6  you've had with Mr. Beuck that -- where attorneys were present.
7    THE WITNESS:  May I ask my counsel a question?
8    MR. SWEETEN:  Yeah, sure.
9    MR. FREEMAN:  There's a question pending, so let
10  me perhaps rephrase if that can clarify.
11    Q.  Have you had any conversations outside the presence of
12  attorneys from the attorney general's office concerning the
13  assertion of legislative privilege with your staff?
14    MR. SWEETEN:  Mr. Beuck yesterday indicated he's
15  an attorney and he's at times provided her information.  So I
16  need to speak with her -- before she's going to answer that
17  question, I need to speak with her about that assertion of
18  privilege.  And we may be able to provide you an answer to that
19  question, but I have a right to -- you know, otherwise, I'm
20  going to have to instruct her not to answer, but I think we can
21  maybe --
22    MR. FREEMAN:  Okay.
23    MR. SWEETEN:  -- get past this if we -- if you
24  give me one minute to speak with her.
25    MR. FREEMAN:  That's fine.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

69

1          (Recess from 11:18 a.m. to 11:20 a.m.)
2          MR. SWEETEN:  Yesterday there -- at the tail end,
3    Mr. Rosenberg's question was about -- was to Mr. Beuck, and at
4    that time, as an -- as an attorney and someone who has spoken
5    with Representative Harless, he asserted the attorney/client
6    privilege.  Obviously, that is hers as a potential client to
7    waive.  So with respect to -- at this point, we're going to
8    allow her to answer that question, and we're not -- we obviously
9    are still maintaining our assertion of legislative privilege.
10         MR. FREEMAN:  Uh-huh.
11         MR. SWEETEN:  But as to the questioning regarding
12   attorney/client privilege, Representative Harless is not going
13   to stand by that privilege.  So she will --
14         MR. FREEMAN:  Okay.
15         MR. SWEETEN:  -- answer your question.
16         MR. FREEMAN:  Okay.
17    A.   I've had a conversation with my chief of staff on
18   privilege.
19    Q.   Okay.  And what was the substance of that
20   conversation?
21    A.   The affidavit that we submitted in the privilege.
22    Q.   And did you discuss whether you would agree to that
23   affidavit?
24    A.   Yes.
25    Q.   And did you ever discuss considerations against

70

1    agreeing to assert legislative privilege in this case?
2     A.   No.  Can you ask that again so that I understand
3    completely what you're asking?
4     Q.   Sure.  Did you ever discuss reasons why you might not
5    want to discuss -- or might not want to agree to assert the
6    legislative privilege in this case?
7          MR. SWEETEN:  Okay.  Let me also say that
8    obviously any conversation that you had, if Mr. Beuck was
9    present with me or with any of the members the attorney
10   general's office, is a privileged conversation.  Do not reveal
11   any matters discussed within those conversations.
12    A.   The only conversation Colby and I had was about
13   signing the affidavit on privileged motions.
14    Q.   And was the idea to assert legislative privilege in
15   this case, did that originate in your office?
16    A.   I --
17         MR. SWEETEN:  Do not reveal any conversations
18   that you've had with attorneys for the attorney general's
19   office.  If answering that question would do so, do not answer
20   the question.
21    A.   I can't answer that question because it would reveal
22   private conversations.
23    Q.   I understand.  Have you ever asserted legislative
24   privilege in any other matter?
25    A.   Not that I recall.

71

1     Q.   Do you have copies of the affidavit?  Sorry.  Strike
2    that.
3          Did you -- sorry.  Strike that as well.
4          Did you ever have discussions with other legislators
5    concerning their decision not to assert legislative privilege in
6    the redistricting litigation?
7     A.   No.
8     Q.   Did you ever have conversations with other legislators
9    concerning their decision to testify in the redistricting
10   litigation?
11    A.   Not that I know of.
12    Q.   Did you ever have discussions with other legislators
13   concerning their testimony in the redistricting litigation?
14    A.   Not that I remember.
15    Q.   Are you aware of any other instances where legislators
16   have asserted the legislative privilege in litigation with the
17   federal government?
18    A.   I wouldn't have a way of knowing that.
19    Q.   So you're not aware of any other instances?
20    A.   Not -- I would have no way of knowing that.
21    Q.   Okay.  Let's turn to a different subject.
22         When were you first elected?
23    A.   2006, sworn in 2007.
24    Q.   Did you have a primary?
25    A.   I did.

72

1     Q.   Was it an open seat?
2     A.   Yes.
3     Q.   And who was your opponent in the primary?
4     A.   Judge John Devine.
5     Q.   Is he still a sitting judge?
6     A.   No.
7     Q.   Was he a sitting judge at the time?
8     A.   No.
9     Q.   He was a former judge?
10    A.   Yes.
11    Q.   And how did you distinguish yourself from your
12   opponent in that election?
13    A.   As the community activist and a long-time resident of
14   the district.
15    Q.   Did you campaign on any particular issues?
16    A.   I'm sure we did --
17    Q.   Do you --
18    A.   -- the same ones.
19    Q.   Do you recall what those issues were?
20    A.   Not exactly, but my stance has always been
21   probusiness, limited government, personal responsibility.
22    Q.   Okay.  Do you consider Devine to be conservative?
23    A.   He considers himself to be conservative.  He's running
24   for U.S. Supreme Court judge against David Medina, so --
25    Q.   You mean Texas Supreme Court?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

73

1    A.  Yeah.  I'm sorry.
2    Q.  Okay.
3    A.  Texas.
4    Q.  And did you campaign on issues related to elections at
5  all?
6    A.  I can't remember exactly what -- what all of our
7  talking points were.
8    Q.  But you don't recall having campaigned on issues
9  related to elections, do you?
10    A.  I can't remember exactly.  I may have -- there may
11  have been discussion about integrity of elections.
12    Q.  Okay.  But you don't recall any specific?
13    A.  No.
14    Q.  Okay.  Did you have a general election opponent?
15    A.  I did.
16    Q.  And who was that?
17    A.  The first one, Chad Khan.
18    Q.  And what were the issues in that campaign?
19    A.  Same thing:  Probusiness, limited government, personal
20  responsibility, increasing quality of life in the district.
21    Q.  And what did Mr. Khan campaign on?
22    A.  What a bad person I was.
23    Q.  I'm sorry to hear that.  You seem like a very nice
24  person.
25    A.  It's just part of it.

74

1    Q.  Has a -- when is the last time that a democrat won in
2  District 126?
3    A.  My predecessor was Peggy Hamric, and I know she was
4  elected in 1991, so -- she was a republican.
5    Q.  So at least back to 1991 no democrat has won in
6  District 126?
7    A.  That I remember, yes.
8    Q.  Okay.  Why did you decide to run?
9    A.  Because I had been involved in the legislature as a
10  business person and realized that there are laws that are made
11  without any input of the impact on businesses.
12    Q.  And who encouraged you to run?
13    A.  Peggy Hamric, my predecessor.
14    Q.  Okay.  Did Representative Hamric take into account the
15  interest of small businesses when she was a legislator?
16    A.  Yes.
17    Q.  Okay.  Did anyone else besides the former
18  representative encourage you?
19    A.  My mom.
20    Q.  Anyone else?
21    A.  You know, people in the community.  It was an open
22  seat.  She was running for senate, for SD 7, and so community
23  leaders.
24    Q.  And who currently holds the seat in SD 7?
25    A.  Dan Patrick.

75

1    Q.  Did the Independent Automobile Dealers Association
2  encourage you to run?
3    A.  I think they were supportive.  I don't think they
4  necessary encouraged me.
5    Q.  Okay.  Who are your campaign staff?
6       MR. SWEETEN:  Is this the original campaign --
7       MR. FREEMAN:  Yes.
8       MR. SWEETEN:  -- for representative?
9    Q.  In 2007 -- '6.
10    A.  Spencer Newman, Kendra Hefner.
11    Q.  And do either of them work for you in a legislative
12  capacity?
13    A.  No.
14    Q.  Have they also worked on your later campaigns?
15    A.  Yes, Spencer Newman has.
16    Q.  Okay.  Did you have any consultants?
17    A.  Kendra was my consultant my first --
18    Q.  Okay.
19    A.  -- election.
20    Q.  And who does she work with?
21    A.  She's independent.
22    Q.  Okay.  As a general matter, who are your donors?
23    A.  I have huge support in my district.  Mainly my
24  district.  I mean, after elected in -- in my race, I had support
25  from Texans lawsuit -- Texans for Lawsuit Reform, the

76

1  Independent Auto Dealers, Texas Automobile Dealers, small
2  business groups.
3    Q.  Okay.  And who endorsed you in that first primary
4  race?
5    A.  You mean business groups?
6    Q.  Any groups at all.
7    A.  The Texas Realtors, AAA rated with Texas Rifle
8  Association.  Really not -- not many folks.  It was an open
9  seat, and my opponent got all the conservative endorsements from
10  all the groups du jour.
11    Q.  Okay.  And in the general, who endorsed you?
12    A.  I can't recall specifically, but a lot of the business
13  groups and the realtors, the restaurant association, the car
14  dealer association.
15    Q.  Okay.  In 2008, did you have a primary?
16    A.  Yes.
17    Q.  And who was your primary opponent?
18    A.  So I ran in 2006.  2008, it was Chad Khan.
19    Q.  Was that the general or the primary?
20    A.  The general.
21    Q.  Did you have a primary?
22    A.  No.
23    Q.  Okay.  So in the general, it was Chad Khan?
24    A.  Again.
25    Q.  Again?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

77

1    A.  Uh-huh.
2    Q.  And was it a close race?
3    A.  No.
4    Q.  Do you know how many points you won by?
5    A.  No.
6    Q.  Do you know how many points you won by in 2006?
7    A.  2006, in my primary, it was really close in the
8    general.  It was 60, in the 60s.
9    Q.  Okay.
10   A.  In 2008, I think it was in the 60s again.
11   Q.  Congratulations.
12   A.  I got eight points above McCain, which meant that I
13   reached out to my district.
14   Q.  And sorry.  Just to jump back to 2006 real quickly.
15       Do you know what the turnout was in the general
16   election?
17   A.  In the general, I can't say exactly.  I think it was
18   anywhere from 7 to 12,000.
19   Q.  And do you know in 2008 what the turnout was?
20   A.  I -- it was more --
21   Q.  Okay.
22   A.  -- but I don't know how much more.
23   Q.  And do you remember what issues you campaigned on in
24   2008?
25   A.  The same issues in 2006.

78

1    Q.  So you don't recall specifically whether you
2    campaigned on election issues or voter ID?
3    A.  No, not specifically, but it's possible on integrity
4    of the election.
5    Q.  Okay.  And in 2010, did you have a primary?
6    A.  No.
7    Q.  And did you have a general election opponent?
8    A.  Yes.
9    Q.  And who was that?
10   A.  Casey McKinney.
11   Q.  And do you remember what issues you campaigned on in
12   2010?
13   A.  Education, business, limited government, some
14   immigration issues and community issues.
15   Q.  And what immigrations issues did you campaign on?
16   A.  From the literature, providing -- I'm trying to
17   remember how to phrase it -- providing verification when
18   employers hire employees.
19   Q.  Okay.  Different from the I-9 process?
20   A.  Yes, through the E-Verify.
21   Q.  Okay.  But that's also a federal program, correct?
22   A.  Right.
23   Q.  Okay.  Did -- and do you recall if you campaigned on
24   voter ID as an issue?
25   A.  I think -- I think we did.  I think we talked about

79

1    the integrity of the election process in photo voter ID.
2    Q.  Okay.  And do you remember what the turnout was like
3    in 2010?
4    A.  I don't.
5    Q.  Do you know if it was different at all from 2008?
6    A.  I think it was about the same.
7    Q.  As 2008?
8    A.  Yeah.  Maybe a little less.  I can't remember.
9    Q.  So it was higher than 2006; is that correct?
10   A.  I would be guessing.
11   Q.  Okay.
12   A.  I could have checked that if I'd have known, but --
13   Q.  It's all right.
14   A.  I have it in a file on my desk.
15   Q.  It's all right.
16       I'm going to actually ask and see if we can find --
17   this might be one of those circumstances where documents can
18   refresh your recollection, and I'm going to try and remember it,
19   and we'll come back to it -- it will be a little bit out of
20   order.
21   A.  Okay.
22   Q.  Do you remember, did you vote in favor of S.B. 1
23   budget measure?
24   A.  This session?
25   Q.  I believe it was this session, yes.

80

1    A.  I think I did.  I can't remember.
2    Q.  You don't recall?
3    A.  I don't.
4    Q.  Okay.
5    A.  I may have voted against it.  There was one bill I
6    voted against most of the members on, and I don't remember if
7    that was it.
8    Q.  Do you recall why you voted against a bill that most
9    of the -- do you mean most of the republican members or most of
10   the members of the House as a whole?
11   A.  Most --
12       MR. SWEETEN:  And I don't want you to reveal your
13   thoughts, mental impression or opinions about legislation or why
14   you specifically voted for something.  I don't want you to
15   reveal that unless it's a matter of public record, something
16   expressed publicly.
17   A.  I think I publicly went to the microphone and said I
18   was disappointed in the funding cuts in education.
19   Q.  Okay.  And so that was a -- so that was the -- that
20   was a republican sponsored bill, correct?
21   A.  Yes, I think so.
22   Q.  Where do you fall in the political spectrum within the
23   republican delegation to the Texas House?
24   A.  You mean as number?
25   Q.  Well, if -- to the far, far right or towards the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

81

1  middle?
2      A.  I consider myself an independent.
3      Q.  Okay.
4      A.  And my record reflects that.
5      Q.  Okay.  Do you have a primary coming up?
6      A.  No.
7      Q.  Glad we didn't keep you away from that.  That might
8  have been hard.  So I'm glad this wasn't a problem.
9  Congratulations on that.
10     A.  Thank you.  Thank you.
11     Q.  How would you describe your current district, the one
12  from which you were elected in -- in 2010?
13     A.  What do you mean by describe it, the -- the
14  boundaries?
15     Q.  The constituents.  So in terms of the work they do,
16  socioeconomic class, ethnicity.
17     A.  My boundaries are very diverse.  I live in
18  unincorporated Harris County --
19     Q.  Okay.
20     A.  -- which has no city rules or regulation.  The area is
21  1.5 million people, and if it were a city, it would be the fifth
22  largest city in the United States without any type of city
23  government, which is the reason I have a lot of constituent
24  inquiries, because I'm their first level.
25     Q.  Is there no county government?

82

1      A.  There's county commissioners, but typically the
2  constituents come to me to get response from county government.
3      Q.  Okay.
4      A.  It's very economically diverse.  One of my school
5  districts, I represent Spring, is at close to 70 percent free
6  and reduced lunches.  Cy-Fair is becoming more economically
7  diversed and probably approaching 50 percent free or reduced
8  lunches.  I have a broad mix of people from bus riders that
9  don't buy cars to people that have several cars.
10     Q.  And are you aware of the -- racial make-up of your
11  district?
12     A.  Not specifically.  I would say it's probably over
13  50 percent Caucasian.
14         MR. FREEMAN:  We can mark this as U.S. 14.
15         (Exhibit No. 14 marked)
16     Q.  Have you ever seen this document before or a document
17  similar to it?
18     A.  Similar to it, yes, sir.
19     Q.  And if you can go to District 126.  And if you can
20  look at the percent BH column under population and the total.
21     A.  Uh-huh.
22     Q.  Do you see what percentage population for your
23  district?
24     A.  Am I reading it in the right column of 51.2?
25     Q.  Yes.

83

1      A.  Okay.
2      Q.  So does that indicate that this is combined
3  majority --
4      A.  Black and Hispanic.
5      Q.  -- minority?
6         So that's your current district, correct?
7      A.  When you say current, this is --
8      Q.  The district from which you were elected in the -- in
9  2010.
10     A.  Well, this is the 2010 census numbers --
11     Q.  Yes.
12     A.  -- so I was elected in a district that reflected
13  different numbers.
14     Q.  But in 2010, that was the district from which you were
15  elected, correct?
16     A.  I disagree with that because of the fact that these
17  are 2010 census numbers, which we didn't get until January of
18  2011.  And so the district I was elected in and voted for,
19  though these were certified after 2010, this was not the numbers
20  I was relying on.
21     Q.  Are you -- not in terms of reliance, but are you aware
22  of what date the census reflects the population on?
23     A.  They started, I want to say, in May.
24     Q.  Are you aware that the census reflects April 1st,
25  2010?

84

1      A.  No.
2      Q.  Okay.  But it's the 2010 census, correct?
3      A.  Yes.  I know we got the information in 2011.
4      Q.  Okay.  So as of the 2010 election, is it your
5  understanding, after seeing this document, that the district
6  from which you were elected is -- the population is majority
7  either black or Hispanic?
8      A.  Yes.
9      Q.  Okay.
10     A.  From this document.
11     Q.  Yes.
12         And do you see on the top right-hand corner where the
13  document is produced from?
14     A.  Top right-hand, Texas Legislative Council.
15     Q.  Okay.  Thank you.  Were the demographics of your
16  district trending over the last decade?
17     A.  Yes.
18     Q.  And in what way were they trending?
19     A.  I think more minority population.
20     Q.  Okay.  Now, you said before that you were on
21  Redistricting; is that correct?
22     A.  Yes.
23     Q.  And what was your involvement in the map that was
24  passed by the legislature last spring?
25         MR. SWEETEN:  Hold on a second.  I think the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

85

1   question you're asking her is -- requires her to reveal
2   potentially communications that we've outlined are protected
3   under the legislative privilege.  And also, I don't know that
4   this question specifically does so, but she's -- I'm going to
5   instruct her not to reveal mental impressions, opinions about
6   legislation, including redistricting legislation.  I believe
7   that's legislatively privileged.
8          So you can go ahead and answer.
9      Q.   What was your public role in the redistricting
10  process?
11     A.   To sit through the committee process and make a vote
12  when it was called for vote on the plan.
13     Q.   And just so I can be clear, despite the fact that all
14  other legislators who were asked questions about this during the
15  redistricting litigation waived legislative privilege, are you
16  asserting legislative privilege with regard to the redistricting
17  legislative process?
18         MR. SWEETEN:  I think my instruction has been
19  clear, and she is asserting legislative privilege here today.
20  If you want to ask her that, that's fine, but she said that.
21  She's not going to reveal mental impressions, opinions about
22  legislation despite whatever anybody else did.  We're talking
23  about Representative Harless, and she is asserting that
24  privilege.
25         MR. FREEMAN:  Mr. Sweeten, with all due respect,

86

1   you've informed me that she is, but I'm just asking --
2          MR. SWEETEN:  Okay.
3          MR. FREEMAN:  -- her to state for the record that
4   she is asserting legislative privilege with regard to the
5   redistricting bill.
6      A.   On advice from my counsel, I am asserting legislative
7   privilege.
8      Q.   Okay.  And so I'm going to ask a series of questions
9   that are probably going to trigger objections.  No one will be
10  offended.
11         Did you provide any input to Representative Beverly
12  Woolley concerning the Harris County delegation map?
13         MR. SWEETEN:  Objection.  I'm going to instruct
14  you not to reveal any mental impressions, opinions about
15  legislation, including Senate Bill 14, including any
16  communications with legislators, legislative staff, state
17  agencies, Texas Legislative Council or constituents.  With that
18  instruction, you can answer his question.
19     A.   By answering that question, I would reveal private,
20  privileged conversations.
21     Q.   Just in terms of asking the privilege log related
22  questions, did you have any conversations with Representative
23  Woolley concerning redistricting as a broad subject?
24     A.   Not that I recall.
25     Q.   Okay.  Did you attend any meetings of the republican

87

1   delegation from Harris County concerning redistricting?
2          MR. SWEETEN:  Her attendance at meetings, I
3   think -- I think you're wading into the areas that we think are
4   legislatively privileged.  Based on the preface of the question,
5   you said the meeting involved what?
6          MR. FREEMAN:  Redistricting and the Harris County
7   republican delegation.
8      A.   They had several meetings.  I was only able to attend
9   one.
10     Q.   Okay.
11         MR. SWEETEN:  I'll let -- and she has.  I will
12  let her establish -- again, these are privilege log questions.
13  You're asking were communications made.  If she attended a
14  meeting, I'm going to let her answer that question.
15         MR. FREEMAN:  Okay.
16         MR. SWEETEN:  But any substance, I'm not going to
17  let her.
18         MR. FREEMAN:  Okay.
19     Q.   Did you ask for any specific areas to be included in
20  your new district?
21         MR. SWEETEN:  Objection.  That asked for
22  communications.
23         So I'm going to instruct you not to answer based on
24  the legislative privilege.
25     Q.   How would you describe the district that you voted in

88

1   favor of in H283, the House redistricting plan that was passed
2   out of Texas legislature?  I'm just asking a description of the
3   district as passed.
4          MR. SWEETEN:  That would ask her to reveal her
5   thoughts, mental impressions or opinions about legislation that
6   has passed; and therefore, I'm going to instruct her not to
7   answer that question.  Also, I mean -- there -- there -- an
8   overlay to all of this is I'm not sure what the relevance of
9   redistricting litigation is to this litigation.  So --
10         MR. FREEMAN:  We'll get there.
11         MR. SWEETEN:  -- objection.
12     Q.   I guess, just so I can clarify my question and make
13  sure that you're asserting an objection here, I just want to
14  know how you would describe the area contained within your
15  district in terms of demographics, socioeconomics, industry, the
16  same types of questions we discussed here, but in your -- the
17  new district that was passed by the Texas legislature last time
18  around.  And I --
19         MR. SWEETEN:  Hold on.
20         MR. FREEMAN:  They're caucusing.
21         MR. SWEETEN:  To the extent you can answer that,
22  I'm going to let you answer the question as to after passage
23  what the district -- whatever his question is about, the
24  description of the current existing district.  I don't want you
25  to reveal any mental impressions, opinions or thoughts about



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

89

1 that legislation that was passed. Do you understand that
2 distinction?
3     THE WITNESS: Yes.
4     MR. SWEETEN: Okay. And with that, you can go
5 ahead and answer his question.
6     A. The district passed during session, the San Antonio
7 district and my previous district and now the court ordered
8 district were all fine with me.
9     Q. But how would you describe the new district in terms
10 of --
11    A. It --
12    Q. -- differences from the old district?
13    A. It has different boundaries. It goes further north.
14 I think that there -- it's probably more -- more houses, more
15 developments, less industry.
16    Q. Okay. Is there any difference in the demographics in
17 terms of the racial communities?
18    A. To be honest, to be absolutely honest, I have never
19 looked at that.
20    Q. Okay. Let's take a look.
21    MR. FREEMAN: If we can mark this as U.S. 15.
22    (Exhibit No. 15 marked)
23    Q. And can you tell me, for District 126, is it still a
24 majority minority district?
25    A. From the Leg Council sheet that you have given me --

90

1     Q. Uh-huh.
2     A. -- on the House Plan 283, it shows that the percentage
3 BH is 45.1, and my district that I ran in, in 2010 was 51.2. So
4 that would make me 6.1 percent less minority than in the
5 previous district I ran in.
6     Q. Did you ask to eliminate the majority minority status
7 of your district?
8     A. No.
9     MR. SWEETEN: Objection. Don't reveal any -- any
10 mental impressions or communications that you had regarding any
11 sort of bill.
12    THE WITNESS: Okay.
13    MR. SWEETEN: And give me time to make my
14 objections.
15    THE WITNESS: I'm sorry.
16    Q. And would eliminating the majority minority status of
17 your district make it easier for you to run for reelection?
18    MR. SWEETEN: You're asking about the bill that
19 was passed, and so I'm going to instruct her not to answer the
20 question based on because it would reveal thoughts, mental
21 impressions, opinions about legislation.
22    MR. FREEMAN: Mr. Sweeten, I would say that's
23 outside the scope of the bill and reflects the general issue of
24 whether it would be easier for Representative Harless to run for
25 reelection in a majority Anglo district or a majority minority

91

1 district.
2     MR. SWEETEN: Is your question following passage?
3     MR. FREEMAN: My question is related to the
4 demographics of greater than 50 percent or lesser than
5 50 percent.
6     MR. SWEETEN: I'm going to object, calls for
7 speculation. I'm going to let her answer that question about
8 after passage of the bill because I don't think that you're
9 asking her to reveal mental impressions about the passage of the
10 bill; you're asking her as it stands now --
11    MR. FREEMAN: Yes.
12    MR. SWEETEN: -- how she would view that issue.
13    Q. Based on your political knowledge of Harris County,
14 your own election.
15    MR. SWEETEN: Objection, calls for speculation.
16 Go ahead.
17    A. I was happy with my old district. I'm happy with my
18 new district. I didn't care.
19    Q. Okay. Are you a member of a group called the Texas
20 Tea Republicans?
21    A. Texas Tea Republican Womens Club.
22    Q. Oh, okay. I don't think we need to show the exhibit.
23 What is your involvement with that group?
24    A. I pay dues to them annually.
25    Q. Are you involved in leadership at all?

92

1     A. No.
2     Q. Do you attend meetings?
3     A. Rarely. Maybe --
4     Q. Do --
5     A. -- once a year.
6     Q. Do they send materials to you?
7     A. They send e-mails out as a distribution, and I'm on
8 that list as a member.
9     Q. Do they discuss particular issues?
10    MR. SWEETEN: Don't reveal communications you've
11 had with -- with constituents. If it's a mass mailing and is of
12 a public nature, I'll let you discuss that.
13    A. They send out e-mails.
14    Q. Okay. At the meetings you've attended, does this --
15 has this group had a substantial number of minority individuals
16 attending, black or Hispanic?
17    A. I -- I don't -- I can't recall. I would say probably
18 no.
19    Q. Okay.
20    A. I've attended maybe one meeting in a year.
21    Q. Okay. And have they sent out any communications
22 regarding voter ID?
23    A. They send out communications every day that I usually
24 delete.
25    Q. Okay.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

93

1    A.  They don't like me, and I don't like them.
2    Q.  Sorry to hear that.
3    A.  Sorry.
4         MR. SWEETEN:  Just answer the question.
5    Q.  Are you a member of the American Legislative Exchange
6    Council?
7    A.  I am.
8    Q.  And what is your participation in the American
9    Legislative Exchange Council?
10   A.  I've attended a couple of their conventions.  I think
11   the speaker appointed me to a task force on cable ready, but I
12   can't --
13   Q.  Does the speaker -- you mean Speaker Straus?
14   A.  Yes.
15   Q.  Okay.  And so Speaker Straus is also involved in the
16   American Legislative Exchange Council?
17   A.  I don't know if he is or isn't.
18   Q.  Okay.  Have you ever introduced bill language that was
19   provided by the American Legislative Exchange Council?
20   A.  No.
21        THE WITNESS:  Sorry.
22   Q.  That's fine.
23        MR. SWEETEN:  That's okay.  Don't reveal
24   communications you've had with constituents.  Okay?  Don't
25   reveal the substance of communications.

94

1         MR. FREEMAN:  And, Mr. Sweeten, are you
2    considering the American Legislative Exchange Council to be a
3    constituent?
4         MR. SWEETEN:  To be honest with you, Mr. Freeman,
5    I am not familiar with the American Legislative Exchange, but as
6    you know, we -- we've defined constituents as those who live in
7    the State of Texas, so --
8         MR. FREEMAN:  It's an organization also known as
9    ALEC that is based outside of the State of Texas.
10        MR. SWEETEN:  I don't -- I think under our
11   interpretation of what a constituent is, if you're asking if it
12   originated -- information originated outside of the State of
13   Texas, not from a Texas citizen, then -- then that's -- I don't
14   think that's covered under where we're asserting our
15   privilege.
16        MR. FREEMAN:  Okay.  But I'm asking about -- the
17   representative's already answered no, so this is --
18        MR. SWEETEN:  Okay.  All right.
19        MR. FREEMAN:  -- largely a moot point.
20        MR. SWEETEN:  Well, I'm glad we had that debate.
21        MR. FREEMAN:  Yes.  Good.  But we're setting
22   ground rules for things in the future.  That's important.
23   Q.  Okay.  If we can move on -- we're going to move on to
24   S.B. 14 itself.  What were the purposes of S.B. 14?
25        MR. SWEETEN:  Okay.  I'm going to -- I'm going to

95

1    instruct you at this time not to answer based upon the fact that
2    that would invade legislative privilege, including
3    communications with legislators, legislative staff, state
4    agencies, Texas Legislative Council, constituents, as well as it
5    would reveal your mental impressions regarding Senate Bill 14.
6    That's my instruction.  You can answer based on the public
7    record.
8    A.  If I recall in testimony on the floor, I stated the
9    purpose was to protect the integrity of the election process and
10   to deter and detect fraud.
11   Q.  Were there any other purposes?
12        MR. SWEETEN:  Same instruction.  Same objection.
13   A.  Those are the ones that I recall that I mentioned on
14   the floor.
15   Q.  And so any other purposes -- am I correct that you
16   would not be stating any other purposes based on the instruction
17   received from counsel?
18   A.  I can't recall anything else.  I can't remember what
19   all I discussed on the House floor.
20   Q.  Okay.  Was the purpose of S.B. 14, in part, to
21   decrease the number of Hispanic voters?
22        MR. SWEETEN:  I'm going to object to the
23   question.  The matter invades the legislative privilege, and --
24   and I'm going to instruct Representative Harless not to answer
25   that question because it reveals thoughts, mental impressions

96

1    and opinions about legislation.  Also reveals communications
2    that she may have had with the parties that I've already listed.
3    A.  And my testimony on the House floor that I believe
4    that the legislation would increase participation for all
5    Texans.
6    Q.  Was the purpose, in part, to decrease the number of
7    African-American voters?
8    A.  My --
9         MR. SWEETEN:  Object -- hold on.  I'm going to object
10   to the question based upon the legislative privilege.  I'm going
11   to instruct Representative Harless not to answer because it
12   would invade her mental impressions, thoughts about pending
13   legislation, about past legislation and would implicate
14   communications that she's had with other legislators and other
15   legislative staff as well as the other groups that I've
16   previously mentioned.
17        You can answer based upon the public record.
18   A.  My testimony on the House floor was that I felt the
19   bill would increase participation with -- for all Texans.
20   Q.  And I guess if I can clarify my question beyond your
21   personal belief but the purpose of the legislation as a whole as
22   understood by any other legislators, was the purpose of the
23   bill, in part, to decrease the number of any group of minority
24   voters?
25        MR. SWEETEN:  I'm going to instruct



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

97

1  Representative Harless not to answer that question.  You're
2  asking her to reveal thoughts, mental impressions about
3  legislation.  You're also asking her to reveal communications
4  between state agencies, legislators, legislative staff, Texas
5  Legislative Council and constituents.
6         And so I'm going to instruct you not to answer that
7  question based on that.  You can refer to public matters such as
8  the public floor debates as to the issue.
9      A.  My testimony on the floor was that this legislation
10 was to protect the integrity of the election process.
11     Q.  And are you asserting legislative privilege with
12 regard to any other purpose maintained by yourself or any other
13 individual for this legislation?
14         MR. SWEETEN:  My instruction to you is to do so
15 unless it -- you can refer to matters of the public -- from
16 public debate, public hearings or committee hearings.
17         MR. FREEMAN:  Mr. Sweeten, this is her privilege
18 to hold or waive, and so I would ask that you instruct her that
19 she can but not that she must withhold this information.
20         MR. SWEETEN:  She's already asserted the
21 legislative privilege.  We're asserting it throughout this
22 deposition.  This is an area that implicates legislative
23 privilege.  This is a protected privilege that this court has
24 recognized and we are going to -- and I'm instructing her as to
25 the boundaries of that privilege.

98

1          MR. FREEMAN:  Okay.
2      A.  I agree with my counsel that I will invoke privilege,
3  but I'm happy to discuss from my memory what my conversations
4  were on the floor that I recall.
5      Q.  On the floor.
6      A.  And in committee.
7      Q.  Okay.
8      A.  When I say on the floor, I mean from -- from
9  the -- from the front and back mike, public record.
10     Q.  Was the purpose of S.B. 14, in part, to discriminate
11 in any way against any group or groups of minority voters?
12         MR. SWEETEN:  I'm going to instruct you about the
13 legislative privilege and that specifically legislative
14 privilege covers mental impressions, opinions about legislation.
15 It also allows you not to reveal communications between
16 legislators, legislative staffers, state agencies, constituents
17 or the Legislative Council.  That privilege is recognized by
18 this court, and you -- and I'm instructing you accordingly.  You
19 can answer based upon matters of public record.
20     A.  Can I hear the question one more time?
21         MR. SWEETEN:  Yeah, she can read it.
22     Q.  The court reporter can read it back.
23         THE REPORTER:  Question: "Was the purpose of S.B.
24 14, in part, to discriminate in any way against any group or
25 groups of minority voters?"

99

1      A.  The purpose of the --
2          MR. SWEETEN:  Same objection.
3      A.  The purpose of --
4          MR. SWEETEN:  Same instruction.
5      A.  The purpose of the legislation, as I stated on the
6  floor during the debate, was to protect the integrity of the
7  election process.
8      Q.  And if you can confirm that you are refusing to answer
9  questions about nonpublic purposes of S.B. 14 on the basis of
10 your assertion of the state legislative privilege --
11     A.  I confirm that.
12     Q.  -- and that it is your assertion and not the assertion
13 of the Office of the Texas Attorney General?
14     A.  It is my assertion.
15     Q.  Okay.  How do you know that the purpose of S.B. 14 is
16 limited to nondiscriminatory reasons?
17         MR. SWEETEN:  I'm going to again instruct you not to
18 answer that question based upon the fact that it would reveal
19 mental impressions about legislation.  It also would reveal
20 communications you've had with the various categories that I've
21 enumerated:  Legislators, legislative staff, state agencies,
22 constituents or Texas Legislative Council.  All of those are
23 covered by the legislative privilege.  This court has found that
24 there is -- that a legislative -- that legislative privilege
25 does exist, and I'm instructing you as to the boundaries of that

100

1  privilege.  So you can go ahead and answer with that -- you can
2  answer with respect to matters of the public record.
3          THE WITNESS: Could you repeat the question,
4  please.
5          THE REPORTER: Question: "Okay.  How do you know that
6  the purpose of S.B. 14 is limited to nondiscriminatory reasons?"
7      A.  I --
8          MR. SWEETEN:  Same instruction.
9      A.  I don't recall the debate on that specific question.
10     Q.  Is it your testimony that you do not recall the debate
11 with regard to potential discriminatory purposes or
12 discriminatory effects of S.B. 14?
13         MR. SWEETEN:  You can confine your answer to
14 matters of the public record.
15     A.  I stated on the floor that I felt that S.B. 14 would
16 increase participation for all Texans.
17     Q.  And what was the basis for your understanding that it
18 would increase the participation for all Texans?
19         MR. SWEETEN:  Don't reveal your thoughts, mental
20 impressions or opinions about legislation.  You can answer to
21 the extent that you've made a public statement with respect to
22 that.  Otherwise, the legislative privilege would cover
23 this -- this information that he's seeking.
24     A.  From public testimony in committee that I repeated on
25 the House floor, I believe that it would increase participation



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

101

1  because people will be -- would be more confident that their
2  vote is counted and --
3      Q.  We'll turn to that later.  But if we can first -- if I
4  can first ask, what is Texas' current system for determining how
5  to verify the identity of a voter?
6      A.  The current system --
7      Q.  Uh-huh.
8      A.  -- for --
9      Q.  With -- S.B. 14 is currently not being implemented
10  because of this litigation.  So without S.B. 14 in place, what
11  is the current system to identify -- to verify the identity of a
12  voter when they show up to vote at the polls?
13      A.  If I remember correctly, testimony during committee
14  was voters show up with a voter registration certificate --
15      Q.  Uh-huh.
16      A.  -- or a driver's license, and they're checked against
17  the current data voter registration -- the voter registration
18  database.
19      Q.  Okay.  On the day that Governor Perry signed S.B. 14,
20  which I believe was May 27th, 2011, correct?
21      (Laughter.)
22      Q.  On the day that Governor Perry signed S.B. 14,
23  did you state, quote, "We must do all we can to guarantee our
24  elections are conducted fairly and without fraud.  This bill
25  takes a significant step to ensure the integrity of the ballot

102

1  box by providing a means to detect and deter in-person voter
2  fraud"?
3      A.  If you have a statement that I said that.
4      MR. FREEMAN:  If we could mark this U.S. 16.
5      (Exhibit No. 16 marked)
6      Q.  Do you recognize this press release?
7      MR. SWEETEN:  I caution the witness to take your
8  time to review it before answering the question.
9      Q.  Please do.
10      A.  Well, it's kind of printed over.  Is this a press
11  release from me or from Governor Perry's office?
12      Q.  If you look at the top left.
13      A.  Oh, okay.
14      Q.  And your quote begins at the bottom of Page 1.
15      MR. SWEETEN:  So just so I'm clear, this is a
16  press release from Governor Perry's office, Dan?
17      MR. FREEMAN:  That's correct.
18      A.  It shows that that is a quote from me.
19      Q.  And what did you mean in that statement by "in-person
20  voter fraud"?
21      MR. SWEETEN:  You can testify about the -- the
22  statement that you made, if you indeed made that statement, but
23  I don't want you to go back and reveal thoughts and mental
24  impressions or opinions about legislation.  You can talk about
25  that specific -- about public statements about that issue.

103

1      A.  My statement says, "We must do all we can to guarantee
2  our elections are conducted fairly and without fraud.  This bill
3  takes a significant step to ensure the integrity of the ballot
4  box by providing means to deter and detect in-person voter
5  fraud."
6      Q.  What do you mean by the term "in-person voter fraud"?
7      A.  From the testimony on the House floor, the purpose of
8  the photo voter ID is to verify the person showing up to vote is
9  who they say they are.
10      Q.  So what is the act that you are trying to prevent by
11  S.B. 14?
12      MR. SWEETEN:  Okay.  That -- and he's asking you
13  now a question that would require you to reveal thoughts, mental
14  impressions, opinions about legislation, okay, or potentially
15  communications with constituents, legislators, staff, TLC or
16  state agencies.  So to the extent he's asking you to do that, my
17  instruction to you is that that is a matter covered by the
18  legislative privilege.  To the extent that you can refer to
19  public debate about the issue or public statements, you can
20  answer.
21      MR. FREEMAN:  Let me see if I can rephrase my
22  question to avoid the objection.
23      Q.  How would you define the term used in this press
24  release, the act that you are detecting and deterring, which is
25  in-person voter fraud?  How would you define the term that you

104

1  used?
2      A.  The debate on the floor was the act to deter and
3  detect is by having a person that shows up to vote in person
4  show a photo ID showing that they are who they say they are.
5      Q.  But without S.B. 14, what is the in-person voter
6  fraud?
7      A.  Excuse me?
8      Q.  What is in-person voter fraud?
9      MR. SWEETEN:  I don't want you to reveal
10  thoughts, mental impressions or opinions about the legislation.
11  He can ask you about that specific statement that -- that you
12  made, if you made that.  But don't go into the process of
13  making -- of how the legislation came to be, your thoughts as
14  the legislation proceeded or communications that you've had with
15  the individuals I've outlined earlier.
16      A.  I don't recall public testimony specifically about
17  that question.
18      Q.  About the definition of in-person voter fraud?
19      A.  I don't recall it.  I'm not saying it didn't exist.  I
20  don't remember it.
21      Q.  Do you personally have a working definition, an
22  understanding of what in-person voter fraud is?
23      A.  Say that one more time?
24      Q.  Do you have -- oh, sorry.  We can have the court
25  reporter read it.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

105

1       THE REPORTER: Question: "Do you personally have a
2   working definition, an understanding of what in-person voter
3   fraud is?"
4       MR. SWEETEN: Just same instruction. Don't
5   reveal any mental impressions, opinions about the legislation,
6   but you can -- if you want to give him your current
7   understanding -- I think is what he's asking you -- of what
8   voter -- in-person voter fraud means, I don't think that
9   that's -- to the extent you're not doing -- you're not providing
10  that information, you can go ahead and do so.
11      A.  There was testimony in committee --
12      Q.  Uh-huh.
13      A.  -- that people stated someone had used an ID of a
14  person that was deceased and went and voted with that person's
15  ID.  That was the testimony of impersonation of a voter.
16      Q.  Okay.  So if -- allow me to -- I'll provide a working
17  definition so we can use that moving forward that -- can we
18  accept that in-person voter fraud is the act of showing up at a
19  polling place with someone else's ID in order to falsify your
20  identity and vote for that other person?  Does that work?
21      A.  Yes.
22      Q.  What would a voter need to do under the
23  existing law, pre-S.B. 14, to commit in-person voter fraud?
24      A.  Show up to vote with someone else's voter registration
25  card.

106

1       Q.  How would they obtain someone else's voter
2   registration card?
3       A.  I have no idea.
4       Q.  Would they have to steal it, for example?
5       A.  I don't know.
6       Q.  What is the punishment under current law for
7   committing in-person voter fraud?
8       A.  Prior to --
9       Q.  Prior to S.B. 14.
10      A.  I don't know exactly.  It was -- we increased it to a
11  second degree -- I think it was a third degree.  I can't
12  remember exactly.
13      Q.  So it was a felony; is that correct?
14      A.  I -- I think it was.
15      Q.  Okay.  And in-person voter fraud would change one
16  vote; is that correct?
17      A.  Excuse me?
18      Q.  An act of in-person voter fraud would change one vote;
19  is that correct?
20      MR. SWEETEN: Under existing statute or --
21      MR. FREEMAN: Under the -- under the existing
22  statute, as the term is defined.
23      A.  Yes.
24      Q.  And that would be a felony; is that correct?
25      A.  I think.

107

1       Q.  Okay.
2       A.  I'm not sure.  I can't remember.  I know we
3   increased it to a second degree and a state jail felony, but I
4   don't remember what it was prior to.
5       Q.  Are you aware of any specific incidents of in-person
6   voter fraud in your district, Texas House District 126, in the
7   last 20 years?
8       MR. SWEETEN: Hold on a second.  When you're
9   answering this question, I don't want you to reveal thoughts,
10  mental impressions or opinions about legislation.
11      THE WITNESS: Right.
12      MR. SWEETEN: I also don't want you to reveal
13  communications you've had with constituents or state agencies,
14  other legislators or staff.
15      A.  I was going to say that's privileged conversation with
16  constituents.
17      Q.  Okay.  But in the public record, is it correct that
18  there are no statements in the public record before the
19  committee or before the floor concerning -- that set out
20  incidents of in-person voter fraud in Texas House District 126?
21      A.  I cannot say that for sure.  There were people that
22  were testifying.  I don't know where they lived.
23      Q.  Okay.  And have you, in any public statements,
24  articulated any incidents of in-person voter fraud that occurred
25  in Texas House District 126 in the last 20 years?

108

1       A.  I don't think I have made any public statements of
2   that.
3       Q.  Are you aware of any specific incidents of in-person
4   voter fraud in Harris County in the last 20 years?
5       A.  There was testimony that -- in committee that there
6   were cases referred to the Secretary of State and some
7   prosecuted in Harris County.
8       Q.  For in-person voter fraud?
9       A.  If I remember correctly.
10      Q.  Did Paul Bettencourt give that testimony?
11      A.  I don't remember him giving testimony --
12      Q.  Okay.
13      A.  -- during our committee.  I'm not saying he didn't,
14  but I don't remember him.
15      Q.  Are you aware of how many convictions the attorney
16  general has secured for in-person voter fraud in the last 20
17  years in the State of Texas?
18      MR. SWEETEN: In answering that question, don't
19  reveal thoughts, mental impressions, opinions about legislation,
20  including Senate Bill 14, or communications with legislators,
21  legislative staff, state agencies, Legislative Council or
22  constituents.
23      MR. FREEMAN: Mr. Sweeten, I believe convictions
24  are a matter of public record.
25      MR. SWEETEN: You can -- you can confine your



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

109

1    testimony to matters of public record.
2         A.   I remember in committee there were testimony of
3    numbers, but I can't tell you what they were.
4         Q.   Was it less than five?
5         A.   I could not tell you for sure.
6         Q.   Okay.  In the last 20 years, are you aware of any
7    convictions of noncitizens for in-person voter fraud?
8              MR. SWEETEN:  Same instruction.
9         A.   I don't recall that in testimony.
10        Q.   Okay.  Are you aware of whether Attorney General
11   Abbott has dedicated substantial resources over the last decade
12   to investigating allegations of voter fraud, in-person voter
13   fraud?
14             MR. SWEETEN:  In answering that question, don't
15   reveal thoughts, mental impressions, opinions about legislation.
16   Don't reveal communications with legislators, legislative staff,
17   state agencies, Texas Legislative Council, constituents or your
18   lawyers.
19             THE WITNESS: Could you please repeat the
20   question.
21             THE REPORTER: Question: "Okay.  Are you aware of
22   whether Attorney General Abbott has dedicated substantial
23   resources over the last decade to investigating allegations of
24   voter fraud, in-person voter fraud? "
25        A.   I don't --

110

1              MR. SWEETEN:  Same instruction.
2         A.   I don't recall testimony of that.
3         Q.   Okay.  What is the drinking age in Texas?
4         A.   21.
5              MR. SWEETEN:  You can answer.
6              MR. FREEMAN:  Thanks.
7              THE WITNESS: I'm getting better about waiting,
8    though.  My arm's sore.  I'm teasing.
9         Q.   Have individuals ever created counterfeit photographic
10   identification cards in Texas?
11        A.   Repeat that, please.
12        Q.   I'm happy to.  Have individuals ever created
13   counterfeit photographic identification cards in Texas?
14        A.   I'm not aware of any public testimony of that.
15        Q.   Are you aware, in your personal experience outside the
16   legislature, in terms of any source of information you may have,
17   of whether individuals in Texas have ever created counterfeit
18   photographic identification cards?
19             MR. SWEETEN:  Same instruction that I've given.
20        A.   I agree.  That's privileged conversations with
21   constituents and staff.
22        Q.   And you have no information outside the legislative
23   process concerning the production of counterfeit photographic
24   identification cards in Texas?
25             MR. SWEETEN:  Same instruction.

111

1         A.   Not that I recall in the legislative sense.
2         Q.   Are you aware of any incidents of minors or
3    individuals who are underneath the age of 21 creating or using
4    false IDs in order to obtain alcohol?
5              MR. SWEETEN:  Same instruction.
6         A.   There was testimony in committee that that is
7    possible.
8         Q.   How many convictions have been obtained in the last 20
9    years concerning the use of false IDs either to -- either to
10   obtain alcohol or for any other purpose?
11             MR. SWEETEN:  Same instruction.
12        A.   I have no clue.
13        Q.   Do you know how many investigated incidents there have
14   been?
15        A.   On alcohol?
16        Q.   Using fake IDs to obtain alcohol, fake photo IDs to
17   obtain alcohol or for any other purpose.
18             MR. SWEETEN:  Same instruction.
19        A.   There may have been testimony.  I don't recall it.
20        Q.   Would it be fair to say that there are more
21   convictions for using fake IDs, photo IDs, to obtain alcohol in
22   the State of Texas than there are for in-person voter fraud?
23             MR. SWEETEN:  Objection, calls for speculation.
24   In addition, I object and instruct her, as I have, regarding the
25   specific privilege.

112

1              But you can go ahead and answer with that instruction.
2         A.   I have no way of knowing that.  I don't recall any
3    testimony on that.
4         Q.   What are the security features of a Texas driver's
5    license?
6         A.   They have a scan -- a scan bar on the back.  I think
7    they're made with holographic material.  I know there's a number
8    of them, but I don't know them all off the top of my head.
9         Q.   Do they have anything that appears if you shine a
10   black light on them?
11             MR. SWEETEN:  Same -- I'm going to make the same
12   objection just to the extent that this could reveal
13   communications in the legislative process between state
14   agencies.  Don't reveal that.  If it's a matter of public
15   record, then you can -- and not part of the legislative process,
16   you can answer.
17        A.   Well, outside of the legislature, when I travel on a
18   plane, I have noticed them shining something on my driver's
19   license.  I don't know what that is and what purpose that is.
20        Q.   Does S.B. 14 provide funding for polling places to
21   have those similar lights, like they use when you're traveling
22   on a plane, to test the validity of Texas driver's licenses?
23             MR. SWEETEN:  You're asking about Senate Bill 14
24   as passed?
25             MR. FREEMAN:  Yes.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

113

1          MR. SWEETEN:  Does it contain that?
2          MR. FREEMAN:  Yes.
3      A.  There was a fiscal note that was several pages with a
4  lot of breakdown from departments on what the fiscal expense
5  they expected the legislation to add up to, and I'm not sure
6  exactly what all the specifics were that went to drafting that
7  fiscal note.
8      Q.  Are you aware of whether S.B. 14 provides financing
9  for handheld computers to scan the back of the driver's license?
10     A.  I'm -- I don't know.
11     Q.  Do you recall any debate in the House concerning the
12 fiscal note attached to S.B. 14?
13     A.  I do.
14     Q.  And do you recall whether all of the funding for S.B.
15 14 would be provided using federal funds available under the
16 Help America Vote Act?
17     A.  If I recall the testimony correctly, there was
18 discussion that part of the funding could be applied for --
19     Q.  Uh-huh.
20     A.  -- through the Help America Vote Act.
21     Q.  And was -- were there discussions as to whether that
22 funding would be available -- would be used only for voter
23 education?
24          MR. SWEETEN:  You're talking about public
25 hearing --

114

1          MR. FREEMAN:  Public hearing testimony, yes.
2          MR. SWEETEN:  You can answer.
3      A.  I'm not sure what the -- I don't remember what the
4  testimony was of what specifically that money would be used for,
5  but that we could apply for half of funding to help offset the
6  cost of the fiscal note part of process.
7      Q.  We're going to probably just jump back to that later
8  when I'll find something to refresh your recollection on that
9  during a break --
10     A.  Okay.
11     Q.  -- rather than stop now.
12     A.  Okay.
13     Q.  When there are a greater number of one crime being
14 committed than another, in your opinion, what crime should be
15 given the greater priority in terms of the legislature's
16 attention?
17          MR. SWEETEN:  Okay.  To the extent that this
18 question is asking you to reveal thoughts, mental impressions,
19 opinions about legislation, do not reveal those.  Do not also --
20 also, do not reveal any communications you've had with state
21 agencies, legislators, staff members, constituents or the Texas
22 Legislative Council.  You can refer to matters of the public
23 record or matters that aren't implicated by that legislative
24 privilege.
25     A.  I don't know that that was ever discussed in the

115

1  debate of photo voter ID.  I don't remember.
2      Q.  I'm just asking as a general -- as a general
3  principle, your opinion.
4          MR. SWEETEN:  Same instruction.
5      Q.  Okay.  Are you not able to offer an opinion because of
6  the advice of counsel?
7      A.  Yes.
8      Q.  Okay.
9      A.  Because it relies on my thought process.
10     Q.  Did you ever state in the House that you were not
11 advised as to how often in-person voter fraud occurs?
12     A.  I could have possibly stated that.  It was a 12-hour
13 debate.
14     Q.  I thought you said 11.
15     A.  11, 12.  The second time.
16     Q.  Okay.
17     A.  The first time it was four hours.
18          MR. FREEMAN:  If we could mark this as, I
19 believe, U.S. Exhibit 17.
20          (Exhibit No. 17 marked)
21     Q.  My apologies for making you re-live all those hours.
22     A.  It's part of it.
23     Q.  If you could turn to Page 910.  And if you could just
24 read beginning with, "And how does -- describe how voter
25 impersonation works," Representative Anchia's statement.

116

1          MR. SWEETEN:  Dan, where are you in the --
2          THE WITNESS:  Right here (indicating).
3          MR. FREEMAN:  910.
4          MR. SWEETEN:  Thank you.
5      A.  And your question was?
6      Q.  My question was:  Did you state on the House floor
7  that you were not advised how often in-person voter fraud or
8  voter impersonation occurs?
9      A.  That's what the transcript said, so, yes.
10     Q.  Okay.  And is it correct that you stated on the House
11 floor that you'd heard testimony in committee, quote, suggesting
12 that in-person voter fraud occurred?  It's not in that
13 transcript; it was from a different day.  But do you recall
14 that?
15     A.  I don't recall that.
16          MR. FREEMAN:  If we could -- I apologize.  This
17 is much larger.  But if we could mark this as U.S. 18.  Sorry.
18          (Exhibit No. 18 marked)
19          MR. FREEMAN:  I don't have copies for everyone.
20 This is pretty big.
21     Q.  And this is -- if you could look to Page 96, right in
22 the middle of page, starting with Representative Veasey's
23 question, beginning, "Ms. Harless, why on earth."  Could you
24 read for the record beginning with Representative Veasey's
25 question?

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

## 117

1    A.   What line is that?

2    Q.   It is Line 8.

3    A.   No?  Or 96?  Page 6?

4    Q.   On Page 96.

5    A.   Okay.

6    Q.   Beginning --

7    A.   Line 8.

8    Q.   -- Line 8, Mr. Veasey.

9    A.   "Ms. Harless, why on earth would anyone go into a

10   polling place and lie and say that they are not who they are and

11   sign a form that could put them in jail with a second degree

12   felony to cast one ballot?  Help me understand the process here.

13   Help me understand why that would be."

14        "We heard testimony in committee of people suggesting

15   that that occurred."

16   Q.   Okay.  Are there any other incidents in which you have

17   presented legislation based on the suggestion of a problem

18   rather than evidence of a problem?

19        MR. SWEETEN:  I'm going to instruct you to not

20   reveal thoughts, mental impressions, opinions about legislation.

21   Do not reveal communications you've had with legislators,

22   legislative staff, state agencies, Texas Legislative Council or

23   constituents.  You can reveal matters of public record,

24   including committee meetings, House floor proceeding or debates.

25   You can answer the question.

## 118

1    A.   From the transcript --

2    Q.   Uh-huh.

3    A.   -- this is at the end of the debate.

4    Q.   It's the end of Volume I of III.

5    A.   Okay.  So I don't know at what part of the process

6    this is.

7    Q.   Uh-huh.

8    A.   But we heard testimony in committee of people saying

9    that voter impersonation happens.

10   Q.   Did they provide evidence in the form of convictions?

11        MR. SWEETEN:  You're saying in the committee?

12        MR. FREEMAN:  In the committee.

13        MR. SWEETEN:  Yeah.  Go ahead and answer.

14   A.   I know that there was information in the committee

15   presented from the AG's office, the Secretary of State of the

16   number of complaints referred --

17   Q.   Uh-huh.

18   A.   -- and the number of convictions, but I cannot recall

19   the specific number of convictions from the testimony in the

20   committee.

21   Q.   Do you recall if they were numerous?

22   A.   I know they were more than one.

23   Q.   Are you certain they were more than one?

24   A.   I am -- and make sure we're asking the same thing --

25   Q.   Uh-huh.

## 119

1    A.   -- I'm answering the same thing.

2    Q.   Convictions for in-person voter fraud.

3    A.   I don't know specifically what the convictions were,

4    but it was -- I can't say specifically it was in-person voter

5    fraud.  I know they talked about convictions.

6    Q.   Okay.  And just so you know, could you look at the

7    date on that transcript?

8    A.   March 23rd, 2011.

9    Q.   Was that after the committee hearings had occurred?

10   A.   Yes.

11   Q.   Okay.  So that was after you'd received all the

12   evidence that you had received in public proceedings; is that

13   correct?

14   A.   Yes.

15   Q.   And on that date, on March 23rd, you stated that there

16   was the suggestion that in-person voter fraud had occurred; is

17   that correct?

18   A.   That's what it says here.  I can't recall the exact

19   testimony.

20   Q.   And I'll let you know that that's a  transcript that

21   was provided by your counsel to the United States.

22   A.   Right.  But if you notice, in these transcripts,

23   there's a lot of times that it's difficult to hear or understand

24   because of the microphone issues.

25   Q.   But you were at the front mike; isn't that correct?

## 120

1    A.   I was.

2    Q.   And the front mike, it's easier to hear;

3    isn't -- isn't that correct?

4    A.   You read the transcript.  How many times did they say,

5    "Could you repeat yourself"?

6    Q.   But no one asked you to repeat yourself there, did

7    they?

8    A.   No, they didn't.

9    Q.   Representative Harless, how many incidents of mail-in

10   ballot fraud have occurred in the State of Texas in the last 20

11   years?

12        MR. SWEETEN:  Okay.  In answering this question,

13   I don't want you to reveal thoughts, mental impressions or

14   opinions about the legislation.  Also, do not reveal

15   communications with legislators, legislative staff, state

16   agencies, Texas Legislative Council or constituents, as all of

17   those matters are legislatively privileged.  To the extent you

18   can answer that question based upon the public record, you -- I

19   will allow you to do so.

20   A.   I don't recall testimony on mail-in ballot in

21   committee.

22   Q.   Have you heard outside of the context of committee but

23   outside of the context in which your counsel has instructed you

24   not to answer anything about mail-in ballot fraud?

25        MR. SWEETEN:  Same instruction.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

121

1      A.  That would be privileged communication between
2  constituents.
3      Q.  Okay.  And so are you aware of whether mail-in ballot
4  fraud has been prosecuted more than in-person ballot fraud?
5          MR. SWEETEN:  Same instruction.
6      A.  It was not part of the committee testimony that I
7  recall.
8      Q.  Okay.  When you were asked in the House about mail-in
9  ballot fraud, did you state, "This bill is only interested in
10 one type of potential fraud, in-person voter fraud"?
11     A.  I don't recall the exact words, but --
12     Q.  Let me see if we can refresh your recollection.  It
13 might be easier --
14     A.  Yeah.
15     Q.  -- if you could take a look at Exhibit 17 on Page 914.
16 It's the third line on Page 914.
17     A.  "This bill is only interested in one type of potential
18 fraud, in-person voting fraud."
19     Q.  Why did you -- why did you limit the bill in this way?
20         MR. SWEETEN:  Don't answer to the extent that
21 your answer would reveal thoughts, mental impressions, opinions
22 about legislation.  Don't reveal communications that we -- to the
23 legislators, legislative staff, state agencies, Texas Leg
24 Council or constituents.
25     A.  My testimony on the committee was this bill was

122

1  specifically about in-person, protecting the integrity of the
2  ballot box by verifying you are who you say you are when you
3  show up to vote in person.
4      Q.  But it wasn't about protecting the integrity of the
5  ballot box from -- from mail-in ballot fraud?
6      A.  My testimony --
7          MR. SWEETEN:  Same instruction.
8      A.  -- was only about in-person.  This bill was about
9  in-person voting.
10     Q.  And why did you limit it that way?
11         MR. SWEETEN:  Same instruction.
12     A.  That is privileged.
13     Q.  Okay.  And why would you focus on a bill that
14 addressed a problem such as in-person ballot fraud that occurs
15 rarely, far more rarely than any issues concerning mail-in
16 ballot fraud?
17         MR. SWEETEN:  I'm going to instruct you not to reveal thoughts,
18 legislative privilege and instruct you not to reveal thoughts,
19 mental impressions, opinions about legislation or reveal
20 communications between you and legislators, legislative staff,
21 state agencies, Texas Legislative Council or constituents.
22     A.  This bill was about in-person voting and only
23 in-person voting.
24     Q.  And any other reason is protected by privilege; is
25 that your -- is that your testimony?

123

1      A.  Yes.
2          MR. SWEETEN:  Same instruction.
3          MR. FREEMAN:  Okay.  I just want to get that on
4  the record without -- okay.
5      Q.  Now, are you familiar with your campaign web site?
6      A.  Vaguely.
7      Q.  And are you aware of whether you -- whether you list
8  important issues facing Texans?
9      A.  I think I have an issue drop box.
10     Q.  And this has already been entered as U.S. Exhibit 7.
11 And do you see where you list immigration reform?
12     A.  I do.
13     Q.  And do you see under immigration reform where you list
14 require Texans -- a Texas photo ID to vote?
15     A.  I see that.
16     Q.  Why is requiring Texas photo ID to vote listed under
17 immigration reform?
18         MR. SWEETEN:  I'm going to instruct you to not
19 answer based upon -- and reveal thoughts, mental impressions,
20 opinions about legislation.  Don't reveal communications that
21 we've already discussed.  Because this is a -- on a web site,
22 you can answer this specific question, but you cannot -- I
23 instruct you not to reveal the information about the bill or
24 legislation, why it's passed.
25     A.  My consultant does my web site, and I don't know why

124

1  he put -- put it under immigration reform.
2      Q.  Who is your consultant?
3      A.  Spencer Newman.
4      Q.  And do you see any connection between requiring Texans
5  to show a photo ID to vote and immigration reform?
6          MR. SWEETEN:  Same instruction.  Objection.
7      A.  If I would have designed this, I would have probably
8  put it under other.
9      Q.  So you don't see a connection; is that correct?
10     A.  It's on my --
11         MR. SWEETEN:  Same instruction.
12     A.  -- web site under immigration reform.
13     Q.  Are you aware of any documented cases of noncitizens
14 committing in-person ballot fraud in Texas?
15         MR. SWEETEN:  Don't reveal thoughts, mental
16 impressions or opinions about legislation.  Don't reveal
17 conversations that you've had with legislators, legislative
18 staff, state agencies, Texas Legislative Council or constituents
19 as those matters are legislatively privileged.  If you can
20 answer the question without doing so, you are free to do so.
21     A.  I don't recall that in testimony in committee.
22     Q.  Okay.  And any further information would be covered by
23 privilege?
24     A.  Yes.
25     Q.  Okay.  Are you aware of any documented cases of



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

125

1  undocumented immigrants --
2          MR. SWEETEN:  Same --
3      Q.  -- voting in Texas elections?
4      A.  I don't --
5          MR. SWEETEN:  Same objection.  Same instruction.
6      A.  I don't recall any testimony of that in committee.
7      Q.  Is it necessary to prove citizenship to obtain a Texas
8  license to carry a concealed handgun?
9          MR. SWEETEN:  Same instruction.  Well, answer if
10  you know.
11     A.  I don't know that I know that.
12     Q.  Okay.
13     A.  I applied for my handgun, but I don't remember the
14  questions.
15     Q.  And we already discussed a driver's license?
16     A.  Right.
17     Q.  Are you aware of whether it's necessary to prove
18  citizenship to obtain a Texas identification card, a
19  non-driver's identification?
20         MR. SWEETEN:  Same instruction.  Same objection.
21  You can answer.
22     A.  I don't know for sure.  It seems like there was
23  testimony in committee on other bills about that, but I don't
24  know specifically what the requirements are.
25     Q.  Okay.  Are you aware of whether it's necessary to

---

126

1  prove citizenship in order to obtain a U.S. military
2  identification card?
3      A.  I'm not aware.
4      Q.  Are you aware of whether it's necessary to prove
5  citizenship to obtain a state or federal ID card related to
6  employment?
7          MR. SWEETEN:  Same instruction regarding
8  legislative privilege.
9      A.  I'm not aware.
10     Q.  Okay.  What ethic group makes up the majority of
11  immigrants in Texas?
12         MR. SWEETEN:  Same instruction.  Same objection.
13  You can answer.
14     A.  I couldn't tell you for sure.
15     Q.  Is it possible that it is Hispanics?
16     A.  It's possible.
17     Q.  But you're not certain?
18     A.  I'm not exactly certain.
19     Q.  Okay.  Are you aware of any other legislators or
20  staff, including the lieutenant governor, making any public
21  statements about illegal aliens voting?
22     A.  I'm not aware of their statements, if they've made
23  them or not.
24     Q.  Are you aware of any other legislators or staff,
25  including the lieutenant governor, making any nonpublic

---

127

1  statements about noncitizens voting?
2          MR. SWEETEN:  I'm going to -- I'm going to object
3  based upon the legislative privilege.  Don't reveal thoughts,
4  mental impressions or opinions about legislation nor
5  communications between legislators, state agencies, including
6  the lieutenant governor's office or governor's office,
7  legislative staff, Texas Legislative Council or constituents.
8      A.  I don't recall any nonpublic statements.
9      Q.  And is that based on the assertion of privilege?
10     A.  Yes.
11     Q.  Okay.  Are you aware of the claims that S.B. 14
12  attempted to exploit fears of illegal immigrants voting?
13         MR. SWEETEN:  Same instruction.
14     A.  I don't recall that testimony on the floor or in
15  committee.
16     Q.  And if you could be clear that any other statements,
17  you will not be providing them on the basis of privilege?
18     A.  If it's conversations about the legislation with
19  constituents --
20     Q.  Okay.
21     A.  -- staff, Leg Council, then you are correct.
22     Q.  You learned Mr. Sweeten's list.
23     A.  I'm trying.  It's -- it's tough for a blonde female,
24  but I'm working on it.
25     Q.  With all due respect, the blonde females who are

---

128

1  working with me on this team --
2      A.  This blonde female.
3      Q.  -- they are outstanding lawyers and I'm sure that you
4  are an outstanding legislator.
5      A.  I'm not an attorney.
6      Q.  If I can just ask that when you are withholding
7  testimony on the basis of privilege that you do state it for the
8  record.  It's just easier moving forward for all parties.
9      A.  Yes, sir.
10     Q.  Okay.  Now, you've described in public the purpose of
11  S.B. 14 as restoring public confidence in the election system;
12  is that correct?
13     A.  Yes.
14     Q.  And have you used the word "restoring"?
15         MR. SWEETEN:  You're asking her in public
16  statements?
17         MR. FREEMAN:  In public statements, yes.
18     A.  I would say yes.
19     Q.  Okay.  Can you tell me why you used the word "restore"
20  in public statements?
21     A.  I can't tell you why.
22     Q.  Was there a time previously when Texans had -- had
23  confidence in the election system and lost that confidence?
24     A.  I think that would be privileged based on
25  conversations with constituents.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                                    May 15, 2012

---

**129**

1   Q.  Has Texas ever had a photo ID requirement in the past?

2   A.  Not that I'm aware of, not in the public testimony.

3   Q.  Has Texas ever had other restrictions on voting that

4   would coincide with a time when Texans had confidence in their

5   elections?

6   A.  I'm not exactly sure what you're asking.

7   Q.  Well, you testified that there was a time in the past

8   when Texans had confidence in their elections, and in the past

9   they did not have a photo ID requirement.  Was there some other

10  limitation on voting that coincided, was at the same time, as

11  that public confidence in the voting?

12  MR. SWEETEN:  Same instruction on legislative

13  privilege.  Go ahead and answer.

14  A.  I don't know that I can answer that.  I don't know

15  if I understand what you're asking.

16  Q.  Did Texans have more confidence in their elections

17  when elections were limited on the basis of race?

18  MR. SWEETEN:  Same instruction.

19  A.  Testimony on the floor was that in the last election

20  cycle we had a House member that won her recount by three votes

21  and an election with a representative from Houston that won his

22  election by eight votes and that it was important that every

23  person that goes to vote in person knows that their vote is

24  going to count.

25  MR. FREEMAN:  I'll object to that testimony as

---

**130**

1   nonresponsive.

2   Q.  And just so that it's clear, what is your personal

3   view on the issue of whether there was a time in the past that

4   Texans had more confidence in their elections?

5   MR. SWEETEN:  I'm going to object to the extent

6   the question calls for her to provide matters that are

7   legislatively privileged.  Don't reveal thoughts, mental

8   impressions, opinions about legislation.  Don't reveal

9   communications with legislators, legislative staff, state

10  agencies, Texas Legislative Council or constituents.

11  A.  My testimony on the floor was that asking a person to

12  verify who they say they are increases the confidence that every

13  vote counts.

14  Q.  And my question was with regard to the past time when

15  Texans had confidence without a voter -- photo voter ID

16  requirement, what your personal opinion as to why they had

17  confidence but no longer have it.

18  MR. SWEETEN:  Same objection.  Same instruction.

19  A.  I hate to say the same thing over and over, but the

20  purpose of the bill was to increase participation by allowing

21  people to know that their vote counts when they show up to vote

22  in person by verifying you are who you say you are.  That

23  increases public confidence, in my opinion, from the testimony

24  on the floor by the results of the Georgia increase in

25  participation.

---

**131**

1   Q.  We'll get to those later.  If I can just ask one last

2   time as an attempt --

3   A.  I think that --

4   Q.  Based on the use of the word "restore" -- and I'm not

5   trying to be argumentative.  I just want to know why you said

6   restore, which would imply that at some time in the past there

7   was voter confidence and then that voter confidence was lost.

8   And so I want to know what your opinion is not with regard to

9   your constituents, but what your opinion is with regard to when

10  there was confidence and why that confidence was lost such that

11  you would now need a new photo ID requirement to restore that

12  confidence.

13  MR. SWEETEN:  Objection, asked and answered.

14  Objection, compound.  Also, she's already testified she doesn't

15  know why she used the word "restore."  I think she -- that --

16  that's already been -- but go ahead.  You can answer, I guess,

17  again.

18  A.  I thought I had answered, and I absolutely agree with

19  my counsel that I don't know why I used that, but I think I've

20  answered the question that you've asked.

21  MR. FREEMAN:  Mr. Sweeten has offered excellent

22  testimony today.

23  Q.  Have you ever had an individual registered voter tell

24  you that they did not vote because they were concerned about

25  voter fraud cancelling out their vote?

---

**132**

1   A.  Privilege.

2   MR. SWEETEN:  Okay.  Don't reveal -- I'm going to

3   object based on legislative privilege.  Don't reveal matters

4   that we've already discussed.

5   THE WITNESS:  I need to go to the bathroom.

6   MR. SWEETEN:  Okay.  We can take a break.

7   MR. FREEMAN:  Okay.  Let's take a break.

8   Actually, you know what, it is -- it's a quarter to 1:00.  Let's

9   take lunch.

10  MR. SWEETEN:  Okay.

11  (Recess from 12:45 p.m. to 2:12 p.m.)

12  Q.  We are back from the lunch break and a discussion of

13  legislative privilege.  And before the break, we had been

14  discussing public confidence.

15  And I'm not sure if I asked this question before the

16  break, but I wanted to know:  Have you ever had an individual

17  registered voter tell you that they did not vote because they

18  were concerned about voter fraud cancelling out their vote?

19  MR. SWEETEN:  Don't reveal thoughts, mental

20  impressions, opinions about legislation, including Senate Bill

21  14.  Don't reveal discussions you've had with constituents.

22  A.  I believe by answering that I will -- I will reveal

23  personal conversations with constituents.

24  Q.  Okay.  Have you ever had an individual registered

25  voter who is a member of a racial minority group or ethnic

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

133

1   minority group or language minority group tell you that you did
2   not -- that they did not vote because they were concerned about
3   voter fraud cancelling out their vote?
4           MR. SWEETEN:  Same instruction.
5       A.  My same answer, that will reveal personal
6   conversations.
7       Q.  Okay.  Do you remember writing an op-ed in the Houston
8   Chronicle back in November?
9       A.  I do.
10      Q.  And this has already been marked as an exhibit.  Okay.
11  It has not.
12          MR. FREEMAN:  If we could have this marked as U.S.
13  Exhibit 19.
14          (Exhibit No. 19 marked)
15      Q.  Do you recognize that document?
16      A.  I do.
17      Q.  Is that your November 11th op-ed -- excuse
18  me -- November 14th?
19      A.  It's the op-ed I wrote.  I don't know what date -- I
20  don't remember the date that the Chronicle published it, but,
21  yes.
22      Q.  Is that the Houston Chronicle?
23      A.  Yes.  Sorry.
24      Q.  And have you ever published any other op-eds?
25      A.  I don't think so.  I was surprised about this one too.

134

1       Q.  Okay.  And in that op-ed, did you state that,
2   "Statistics from Indiana and Georgia show that ID requirements
3   work well and do not suppress turnout, as opponents claim"?
4       A.  "Statistics from Indiana and Georgia show that ID
5   requirements work well and do not suppress turnout, as opponents
6   often claim."  That's what it said.
7       Q.  Did you then claim that voter ID would, in fact,
8   increase turnout?
9       A.  It says, "All along our goal with photo ID has been to
10  restore integrity in the election process, which will increase
11  turnout."
12      Q.  And did you state during debate that there had been
13  document evidence that in two states that have passed this more
14  restrictive photo ID that voter turnout increases?  Do you
15  recall making that statement in debate, not in the op-ed?
16      A.  In debate, I said that the testimony during committee
17  was that they had increased participation in elections from what
18  I remember.
19      Q.  If you could take a look at Exhibit 17, which was the
20  Day 38 transcript on Page 912.
21      Q.  Is that the little one or --
22      Q.  It's the little one, yes.
23          On Page 912 -- oh, I'm sorry.  It's on 913.  It's the
24  first sentence on 913.  Oh, no, it's not.  You know what, let's
25  just stick to your public -- to the statement in the op-ed.

135

1       Are you aware of what the voter ID requirements are in
2   Georgia?
3       A.  Vaguely.  I mean, I don't know if I can quote exactly
4   from memory, but from carrying the legislation and testimony, I
5   remember some of it.
6       Q.  Could you tell me what you remember?
7       A.  I know they allow tribal IDs, tribal cards.  I know --
8   I think that they don't have a provision for absentee ballot.  I
9   think they don't have a -- or provisional ballot.  I don't think
10  they have a provision that allows exemption for indigent,
11  religious.  I think they have state and federal
12  government-issued ID.  And I can't remember all the specifics,
13  but those are the things off the top of my head.
14      Q.  Okay.  So the things that you were saying they do have
15  or they don't have, those are differences from S.B. 14, correct?
16      A.  Right.
17      Q.  And so the Georgia one is different from S.B. 14 --
18      A.  Right.
19      Q.  -- in several ways?
20          Do you know that the prior ID requirements were in
21  Georgia before they passed their new photo ID requirement?
22      A.  I don't remember.
23      Q.  So do -- same question with Indiana:  Do you know what
24  the requirements are in Indiana?
25      A.  Indiana, I know that they had -- I don't know.  I

136

1   think that they had a provisional ballot of a couple days, two
2   days, maybe.  I think that they did allow a religious exemption
3   for being photographed, and I think they allowed an indigent
4   provision.  I think their ID requirements were one of the
5   specific ID requirements, something along those lines.  I don't
6   think they were spelled out the same as in Texas and Georgia.
7       Q.  And so that was also different from S.B. 14?
8       A.  Yes.
9       Q.  And do you know what the ID requirement was in Indiana
10  before the law that you're discussing?
11      A.  I don't remember.
12      Q.  Now, with regard to increased turnout, the statistics
13  from Indiana and Georgia that you've cited in the op-ed, what
14  elections were those?
15      A.  I can't recall exactly, but I know in committee
16  testimony in -- the Secretary of State from Georgia was our
17  expert that we brought in, and he testified that in 2008, they
18  had a significant increase, but in the elections since 2008,
19  they had an increase in participation in election turnout in
20  person, and the increase was more so for the minority vote.
21      Q.  And that's in Georgia?
22      A.  Yes.
23      Q.  And are you aware of who the candidates were for the
24  presidential election in 2008?
25      A.  I do, yes, sir.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

137

1    Q.   And who were they?
2    A.   President Obama and Senator McCain.
3    Q.   And are you aware of whether there were any voter
4    registration efforts in the minority community in Georgia prior
5    to the 2008 election?
6        MR. SWEETEN:  I want to go ahead and just
7    instruct you not to reveal thoughts, mental impressions or
8    opinions about legislation.  To the extent that you have this
9    information based on a public record, you can feel free to
10   provide that.
11   A.   From reading the newspaper, I saw that there were
12   voter drives, but I don't know specifically where they were.
13   Q.   And can you think of any reason why there might be
14   higher turnout in 2008 unrelated to voter ID among minority
15   population in Georgia than in prior elections?
16   A.   I think in --
17       MR. SWEETEN:  Same instruction.
18   A.   I think the testimony in committee was, yes,
19   there -- there was a higher turnout in 2008 and in committee
20   there were testimony from members of the committee and the
21   public that said, well, that was probably attributed to the
22   presidential race.
23   Q.   Uh-huh.
24   A.   But the Secretary of Georgia's testimony followed up
25   saying that, yes, they had had increased participation in other

---

138

1    election since.  And I can't tell you the number, but Georgia
2    has a lot of elections.
3    Q.   Okay.  But there would be newly registered minority
4    voters because of the presidential race, wouldn't there be?
5    A.   I don't know.
6    Q.   And with regard to Indiana, because you also cited
7    Indiana in your op-ed, do you know what elections you're
8    referring to there?
9    A.   The testimony was -- I think it was written, and he
10   referenced -- he referenced a couple of elections, two or three,
11   but I can't tell you which ones.
12   Q.   And so you're not aware of who the candidates were?
13   A.   No.
14   Q.   And you're not aware of general population trends in
15   either Georgia or Indiana that would account for changes in the
16   number of votes?
17   A.   No.
18   Q.   And you're not aware of any changes with regard to
19   registration rates in Indiana?
20   A.   Not that I recall.
21   Q.   And you're not aware of any voter registration efforts
22   in Indiana?
23   A.   Not that I recall.
24   Q.   And you're not aware of any get-out-the-vote efforts
25   in Indiana and the elections at issue?

---

139

1    A.   Not that I recall in testimony.
2    Q.   And you're not aware of any get-out-the-vote efforts
3    in Georgia in the elections at issue?
4    A.   Not that I recall.
5    Q.   Are you aware of any national trends concerning voter
6    registration in states other than Georgia and Indiana in those
7    same elections?
8    A.   You know, I'm sure I've read articles on it.  I just
9    can't grasp the information right now.
10   Q.   And are you aware of any national trends concerning
11   turnout in those same elections?
12   A.   No.
13   Q.   So you stated that you'd gotten information from the
14   Secretary of State of Indiana and the Secretary of State of
15   Georgia.  Did you get information from any academic studies?
16       MR. SWEETEN:  Hold on a second.  Just make sure
17   you're not revealing mental impressions, opinions about the
18   legislation or discussions you've had with legislators,
19   legislative staff, state agencies, Leg Council or constituents
20   in answering that question.
21   A.   Your statement was that I got information from them.
22   The information we got was through testimony.
23   Q.   Okay.  But in preparing this op-ed that I have here,
24   you stated that the statistics from Indiana and Georgia show
25   that ID requirements work.  And so I'm wondering, with regard to

---

140

1    statistics, did you get information in the form of any studies?
2        MR. SWEETEN:  Same instruction on legislative
3    privilege.
4    A.   The testimony in committee, they gave us the specific
5    breakdown of the number of voters in the elections, and that was
6    what I was relying on.
7    Q.   And so you were not relying on any academic studies at
8    all?
9        MR. SWEETEN:  Same instruction.
10   A.   I was relying on the testimony in committee.
11   Q.   Okay.  Was there any testimony given in committee by
12   other individuals who stated that voter ID was likely to
13   decrease turnout?
14   A.   I can't recall specifically, but there was a full
15   range of people testifying on the bill.
16   Q.   Did anyone from the Brennan Center for Justice
17   testify?
18   A.   I can't recall specifically if they testified, but I
19   know there was discussion about the Brennan Justice and the
20   report that they had done.  I don't know if there was someone
21   from that group that actually testified or if it was brought up
22   by a committee member.
23   Q.   And why did you not rely on that report in terms of
24   its projections of turnout or the effect of the bill?
25       MR. SWEETEN:  To the extent that he's asking you

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

141

1  to reveal your thoughts, mental impressions or opinions about
2  the legislation, don't reveal those or any communications.
3      A.  I believe by answering that, that would reveal private
4  conversations.
5      Q.  And why did you not rely on any academic studies
6  concerning the effect of turnout --
7      A.  Again, by answering that, that's private
8  conversations.
9      Q.  Okay.
10     A.  Other than what was discussed publicly.
11     Q.  Now, previously, we discussed how the number of voters
12 who turned out in each of your elections has differed in the
13 three times that you've run.  That's correct, right?
14     A.  I think that's what we kind of said, yeah.  You were
15 going to get the numbers, I thought.
16     Q.  And I neglected to do that during lunch, for which I
17 apologize, and I will try to get it during our next break.  We
18 didn't take a long lunch.
19         And can I ask, what factors do you think were
20 responsible for the different levels of turnout in each of your
21 own elections?
22     A.  Well, I'm not exactly sure that there were that big of
23 differences.  I think there probably was but I'm not sure so
24 until I see what elections they were and what the difference was
25 it would be hard to speculate on that.

143

1  something I would say.
2      Q.  Okay.  Is your understanding that S.B. 14 will let
3  voters know that their vote counts?
4          MR. SWEETEN:  Don't reveal your mental
5  impressions, thoughts or opinions about the legislation itself.
6  You can --  also don't reveal communications that you've had as
7  outlined before.  But you can go ahead and answer that question.
8      A.  My testimony was that participation will likely
9  increase or -- I think I believe that it will increase because
10 of the increased confidence in the election process.
11     Q.  Do you believe it is necessary to let individuals know
12 that their vote counts?
13         MR. SWEETEN:  Same instruction as to the
14 legislative privilege.  Go ahead.
15     A.  I think my testimony on the floor was that it's
16 important -- it's important for everyone to know that one
17 person, one vote, and that when you show up to cast your vote
18 that your vote matters.
19     Q.  Okay.
20     A.  That it counts.
21     Q.  Is any individual's vote not counted under current law
22 when they show up at the polls with their voter registration
23 certificate?
24     A.  I wouldn't be able to answer that.  I don't work in
25 the registrar's office.

142

1      Q.  Okay.  We'll try and get those numbers in a moment.
2      A.  Thank you.
3      Q.  Now, you also stated to the Houston Chronicle in a
4  different article do you recall stating we will increase turnout
5  for all voters because it protects our integrity of the election
6  it makes you know that your vote counts?  Do you recall making
7  that statement?
8      A.  I don't recall that, but I do recall a few interviews
9  and being somewhat disappointed in how they paraphrased what I
10 said.  I don't know if that was the specific article.
11     Q.  Well, let's see.  This should be U.S. Exhibit 20.  And
12 let's see if this is one of those instances.  Hopefully it won't
13 be.
14         (Exhibit No. 20 marked)
15     A.  If it's Gary Scharrer, probably -- yeah.
16     Q.  Do you see right above "Full GOP support" where it has
17 a quote?
18     A.  Yes.
19     Q.  Is that an accurate statement, to your knowledge?
20     A.  Let me finish reading.
21     Q.  Sure.
22         MR. SWEETEN:  Were you asking is that an accurate
23 quote, Dan?
24         MR. FREEMAN:  Yes.
25     A.  Yeah.  I'm -- I don't -- this doesn't sound like

144

1      Q.  But if an individual shows up -- if S.B. 14 becomes
2  law and an individual shows up at the polls with their voter
3  registration certificate, but they lack a photo ID, isn't it the
4  case that their vote will not be counted if they don't have the
5  other necessary ID?
6      A.  The testimony on the floor was that if they show up
7  and don't have a photo ID, if S.B. 14 is implemented, that they
8  can cast a provisional ballot, have six days to go back to the
9  registrar and provide the documentation needed, and their vote
10 would be counted.
11     Q.  But if they don't have that documentation, they don't
12 own that documentation, their vote will not be counted?  That
13 professional ballot will be thrown away.  Isn't that the case?
14         MR. SWEETEN:  Same instruction on legislative
15 privilege.  Go ahead and answer.
16     A.  I'm not sure of the procedures that happen after they
17 cast their provisional ballot.
18     Q.  But if they have six days to show up and show an ID,
19 if they don't arrive and show an ID, are you aware of what
20 happens to the provisional ballot and whether it is counted?
21     A.  I think the testimony on the floor was if they don't
22 show up within the six days with the proper information that
23 that is considered a provisional ballot as the standards are
24 already in place with the Secretary of State and the registrar's
25 office.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

145

1    Q.   Okay.  And I think we have the figures from your
2    general elections.  If I can represent from the Secretary of
3    State's office that in 2006 there were 27,962 votes cast in your
4    general election, 27,962.  In 2008 there were 55,131 votes cast
5    in your general election.  And in 2010 there were 37,472 votes
6    cast.  And that's from the Texas Secretary of State's web site.
7    A.   And that was in District 126?
8    Q.   In District 126, in your race.  And you had a healthy
9    percentage each time.
10   A.   Okay.
11   Q.   So can I ask, stepping back, what are the factors that
12   you believe were responsible for the different levels of turnout
13   in each one of those elections?
14       MR. SWEETEN:  Objection, calls for speculation.
15   Q.   To the extent that you have political knowledge of
16   your own district and were able to win that district?
17       MR. SWEETEN:  Same objection.
18   A.   I don't know how to answer that without going into the
19   process of our campaign.
20   Q.   I don't believe that the process of your campaign is
21   privileged in this matter, and your counsel has not asserted a
22   privilege over that.  So I would ask, to the extent necessary to
23   answer the question, but no more than necessary, I would ask
24   what factors you thought were responsible for the number of
25   votes essentially doubling from 2006 to 2008 and then dropping

146

1    by approximately 18,000 between 2008 and 2010, but that 2010
2    level being significantly higher than 2006?
3    A.   In my experience in the campaigns --
4        MR. SWEETEN:  Hold on.  Objection, calls for
5    speculation, but go ahead.
6    A.   In my experience in the campaigns, presidential
7    election always has a larger percentage of participation.
8    Q.   Okay.
9    A.   And that was 2008.
10   Q.   What about 2010?
11   A.   That is a governor's race.
12   Q.   Okay.
13   A.   And that also has an increase in participation.
14   Q.   Wasn't there a governor's race in 2006?
15   A.   Yes, possibly, but I don't know who was -- I don't
16   know who was fighting for the governor's race then.
17   Q.   So it's possible that -- well, wasn't Governor Perry
18   elected in 2006?
19   A.   Yes, he was.
20   Q.   But it's possible that if the governor's race were
21   more contested in 2006 -- or excuse me -- in 2010 than it was in
22   2006 that more people would turn out?
23       MR. SWEETEN:  Objection, speculation.
24   Q.   Based on your knowledge of Texas politics, as a member
25   of the Texas House of Representatives.

147

1    A.   Okay.  Of running a campaign?
2    Q.   Yes, absolutely.
3    A.   2010 I know there were a lot of local races --
4    Q.   Uh-huh.
5    A.   -- that were more contested than in the past.
6    Q.   Uh-huh.
7    A.   And there was a lot of participation in pushing
8    getting out the vote.
9    Q.   Okay.
10   A.   I know my campaign we did several mail pieces to get
11   out the vote and calling our supporters, saying, you need to
12   show up and vote.
13   Q.   Is it possible that those same types of local
14   contested local races and get-out-the-vote efforts occurred in
15   Georgia?
16   A.   I can't speak for Georgia.
17   Q.   But is it possible that those occurred in Indiana as
18   well?
19   A.   I can't speak for Indiana.  I can speak for District
20   126.
21   Q.   Sure.  And in District 126 you saw between
22   non-presidential years a significant increase from 2006 to 2010;
23   is that correct, in terms of turnout?
24   A.   From what you have here, 17,000 out of 20,000.
25   Q.   That's almost doubling; isn't that right?

148

1    A.   How much is the population growth from 2006 to 2010?
2        MR. SWEETEN:  Let me make sure the numbers.
3    27,000 is what I heard him say is the '06.
4    Q.   So that's another 10,000.  Thank you for the
5    correction.
6    A.   Another 10,000.
7    Q.   Another 10,000 voters?
8    A.   I can't answer those questions because I don't know
9    what the population of District 126 was in 2006 and what it was
10   in 2008 and what it was in 2010.
11   Q.   But the number -- the turnout rose by approximately 35
12   percent or so?
13   A.   I don't know.
14   Q.   And there was no change in the voter identification
15   law between 2006 and 2010, correct?
16   A.   Not that I know of.
17   Q.   And so there were other factors that were responsible
18   for that increase in turnout, correct?
19       MR. SWEETEN:  Objection, calls for speculation.
20   Go ahead and answer, if you can.
21   A.   I don't know.
22   Q.   I mean, as a matter of logic, if it wasn't photo ID,
23   it had to be something else, correct?
24   A.   I don't know how to answer that.
25   Q.   Okay.  Let's move on.  Does S.B. 14 address any other



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

149

1  problems other than what we've discussed?

2          MR. SWEETEN:  I'm going to go ahead and instruct

3  you, based on the legislative privilege, do not reveal thoughts,

4  mental impressions, opinions about Senate Bill 14.  Don't reveal

5  communications you've had with any of the areas that we've

6  already gone over.  If you can, go ahead and answer.

7      Q.  Allow me to rephrase.  Is the purpose of S.B. 14 to

8  address any other problems than the ones we have discussed?

9          MR. SWEETEN:  Hold on one second.  Okay.  Are you

10  asking about the purpose of the bill or are you asking about the

11  individual purpose of the legislators who passed the bill or

12  their thought process or mental impression?

13          MR. FREEMAN:  I am asking about the purpose of

14  the bill.

15          MR. SWEETEN:  The purpose of the bill as written,

16  as passed, Senate Bill 14.

17          MR. FREEMAN:  As written and passed, stated and

18  unstated purpose, in any context.

19          MR. SWEETEN:  I'm going to let you answer, to the

20  extent you know.

21      A.  I've answered this before.  The purpose of the bill

22  was to increase participation by protecting the integrity of the

23  election process.

24      Q.  I will note that your counsel has not objected and has

25  not instructed you to limit your testimony to the public record.

150

1  And, therefore, I would ask, is the purpose of the bill, as you

2  understand, from both public and non-public sources, legislators

3  and all other sources from which legislators derive the purpose

4  of a bill, limited to only those purposes that we have

5  previously discussed?

6      A.  I can only speak to my purpose.

7      Q.  Okay.

8      A.  And that was to protect the integrity of the election

9  process, as I stated a number of times on the floor.

10      Q.  Okay.  Nothing else than we've discussed?

11      A.  There's pages of testimony.

12      Q.  Okay.  I just want to make sure we're closing off.

13      A.  I answer all those questions here.

14      Q.  Do you know of any other purpose held by any other

15  legislator that may be construed as the purpose of the bill?

16          MR. SWEETEN:  Hold on a second.  I'm going to

17  object.  That calls for speculation.  I'm also going to object.

18  You're asking her to reveal thoughts, mental impressions,

19  opinions, discussions with other legislators, legislative staff.

20  Those are covered by the legislative privilege.  I'm going to

21  reassert the objection to that issue.

22      A.  I couldn't answer that anyway.  I don't know what

23  their thought processes are -- is.

24      Q.  Let's move on then.  Do you know how many registered

25  voters in Texas lack a driver's license, state ID card, or

151

1  license to carry?

2      A.  I know in committee there was testimony of a number

3  presented by Ann McGeehan but I -- when I asked her more

4  questions on, could that number be accurate, could there be name

5  issues, could that number of people have one of the other forms

6  of identification, she said yes.  So I -- I just know the number

7  that was -- she presented.

8      Q.  Do you recall ever telling the Dallas Morning News

9  that you assumed that the population without a necessary ID

10  would be very, very small?

11      A.  I think, yes.  Could be possible.

12      Q.  Okay.  Did you ever try to find out what that number

13  was beyond your conversation with Ms. McGeehan?

14          MR. SWEETEN:  I'm going to instruct you at this

15  point that, based upon legislative privilege, don't reveal

16  thoughts, impression or opinions or discussion you had with

17  legislators, state agencies, legislative staff, Texas

18  Legislative Council or constituents.

19      A.  The discussion -- we had had that discussion in committee

20  and we tried to get to those numbers, and there was never a real

21  good answer from the Secretary of State's office.

22      Q.  Okay.  I'm going to ask a series of privilege log

23  questions, if that's all right.  Did you have a conversation

24  with the Department of Public Safety concerning the number of --

25  or concerning the number of registered voters who lacked a Texas

152

1  photo ID?

2          MR. SWEETEN:  I'm going to let you answer that

3  question.  It's a yes or no question.

4      A.  During committee hearing, yes.

5      Q.  Did you ever reach out via telephone, e-mail, anything

6  like that, outside the context of committee hearing, to try and

7  get an answer to that question, given that you said you did not

8  receive a definite answer from Ms. McGehan?

9      A.  I think during the committee we asked specifically for

10  some information from TXDOT, and they were to provide that

11  information in the future.  And I don't know if they did.  I

12  can't recall.

13      Q.  Is TXDOT the Texas Department of Transportation?

14      A.  Yes.  I'm sorry.

15      Q.  Is the Department of Public Safety somehow related to

16  TXDOT?

17      A.  Yes.

18      Q.  What is the relationship between the two?

19      A.  At the time it was a division under TXDOT.

20      Q.  Are they separate now?

21      A.  No.  I think they're still probably -- I think they

22  are.  I don't know TXDOT changes.

23      Q.  So just so I understand, you asked the Department of

24  Public Safety or TXDOT for information concerning the number of

25  registered voters who lacked photo ID, but you're not sure



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

153

1    whether you received it?
2         A.   I don't know that we specifically asked the way you
3    did.
4         Q.   Okay.
5         A.   It was during committee, and I don't remember the
6    specific question that we asked her.  But I know that it was
7    something that she said she would have to follow up on.
8         Q.   And did you make sure that she followed up?
9         A.   I don't know that I did.  I think my staff might have.
10   I am not sure.  It wasn't necessarily a question I was looking
11   for.
12        Q.   Are you -- strike that.
13             Who do you believe will make up the group of
14   individuals whose lack the necessary photo ID, the driver's
15   license, state ID card or license to carry?  What is your
16   understanding based on everything you've learned?
17             MR. SWEETEN:  Okay.  Don't reveal thoughts,
18   mental impressions about legislation.  Don't reveal
19   communications you've had with state agencies, legislative
20   staff, legislators, Texas Leg Council or constituents in
21   answering this question.
22        A.   My testimony in committee and on the floor in the
23   debate was that I think there is a very, very small universe of
24   people that won't have one of the approved forms of ID.  And if
25   there are any, we provided for a free ID card.

154

1         Q.   Is that the election identification certificate?
2         A.   Right, a free election identification certificate.
3         Q.   We'll discuss more about that later.  Can I just ask,
4    do you think that the individuals who lack the ID will be more
5    likely to be poor?
6              MR. SWEETEN:  Same objection.  Don't reveal any
7    sort of thoughts, mental impressions, opinions about legislation
8    or conversations you've had with state agencies, staff,
9    legislators, Leg Council or constituents.
10        A.   The testimony that I stated on the floor a number of
11   times was that I think that it will be a small universe and they
12   have access to a free election certificate card.
13        Q.   If I can just look back real quickly.  You said a
14   moment ago that following up with DPS on the number of
15   registered voters without acceptable ID was not something you
16   were interested in.  Why not?
17             MR. SWEETEN:  I'm going to object.  I think that
18   asks for her to reveal thoughts, mental impressions, opinions
19   about legislation.
20             You can testify as to whether or not you had
21   follow-up conversation with DPS; however, I don't want you to
22   testify about communications with state agencies such as DPS.
23        A.   I don't know that I had follow-up conversations with
24   them, but a lot of that I rely on my staff to do.
25        Q.   Okay.  Do you believe that the individuals who lack --

155

1    who are registered voters who lack a Texas driver's license,
2    state ID card, or license to carry will be more likely to be
3    members of racial minority groups?
4              MR. SWEETEN:  Same instruction on legislative
5    privilege.  Don't reveal your mental impressions or opinions
6    about legislation or communications that we've discussed.
7         A.   And my answer is the same as it has been.  I feel like
8    that the people that do not have one of the approved forms of ID
9    will be a very small universe and we have provided for a free
10   election certificate card for those.
11        Q.   Are you aware that the State of Texas recently
12   informed the attorney general that there are 795,955 individuals
13   in the State of Texas who are registered voters and lack a Texas
14   driver's license or photo ID?
15             MR. SWEETEN:  Objection.  I think that misstates
16   -- I'm going to object.  I think that assumes facts not in
17   evidence.
18             MR. FREEMAN:  Well, I will get that into
19   evidence.  If we can have this marked U.S. 21.
20             (Exhibit No. 21 marked)
21        Q.   Take a moment to read this letter.  And so just to
22   clarify, do you now understand that the recent comparison
23   conducted by the State of Texas between the registered voter
24   database to its driver's license database indicated that 795,955
25   registered voters lack a Texas driver's license?

156

1         A.   That's what this says.
2         Q.   Do you consider that number to be very, very small?
3         A.   I consider that number in relation to we don't know
4    that they have a citizenship paper with an ID, a CSL, a
5    passport.  They may have one of the other approved forms of
6    identification.
7         Q.   But you don't know whether any of them do either; is
8    that correct?
9         A.   I don't know that for a fact.
10        Q.   Do you think it's likely that individuals who don't
11   have a driver's license will have a passport, given what those
12   two documents are needed for?
13             MR. SWEETEN:  Objection, calls for speculation.
14   You can answer.
15        Q.   Based on your life experience?
16             MR. SWEETEN:  Don't reveal thoughts, mental
17   impressions, opinions about legislation or any communications
18   that you've had with legislators, legislative staff, state
19   agencies, constituents or Leg Council.
20        A.   I would not be surprised to learn that people without
21   a driver's license may have a passport.
22        Q.   Significant numbers of people?
23        A.   I can't answer that.
24             MR. SWEETEN:  Objection, calls for speculation.
25   Same instruction.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

157

1    Q.   Have you ever seen a U.S. citizenship certificate?
2    A.   Not that I recall.
3    Q.   Do you know if all of them have photographs on them?
4    A.   Not that I recall.
5    Q.   Could you take another look at Exhibit No. 20, the
6    article from May 17th from the Houston Chronicle.  Do you see in
7    there where you told the Chronicle that you did not believe the
8    bill would disenfranchise minority voters?
9    A.   Where is that at?  I'm trying to skim, but my eyes are
10   getting foggy.
11   Q.   It says, "Representative Patricia Harless, republican
12   of Spring, House author of the voter ID bill dismissed
13   assertions that the bill would disenfranchise minority voters."
14   Do you see that?
15   A.   I think that is the reporter reading into an interview
16   what he wants.
17   Q.   Do you believe that the bill will disenfranchise
18   minority voters?
19        MR. SWEETEN:  I'm going to instruct you as to
20   legislative privilege.  Don't reveal thoughts, mental
21   impressions, opinions about legislation or conversations you had
22   with any of the individuals or entities that we named.  Without
23   revealing that, you can answer that question.
24   A.   I believe that by answering that question it would
25   reveal private conversations with constituents and other

158

1    legislators.
2    Q.   So just to be clear, you're asserting legislative
3    privilege with regard to your understanding of whether the
4    effect of S.B. 14 will be to disenfranchise some minority
5    voters; is that correct?
6    A.   I am asserting privilege from answering the question
7    that a reporter is summarizing, without a quote, of what his
8    feelings are about my statement.
9        MR. SWEETEN:  I think he's referring to --
10       THE WITNESS:  I think he's referring to that.
11   Q.   I'm happy to step away from the op-ed and just say --
12       THE WITNESS:  I think that's what he's --
13   Q.   Without with regard to the article there, do you now
14   believe that S.B. 14 will not disenfranchise minority voters?
15       MR. SWEETEN:  Don't reveal the matters of the --
16   A.   I can't answer that without revealing private
17   conversations.
18   Q.   Okay.  So I just wanted to be clear that you are
19   asserting legislative privilege with regard to that question.
20   It is now clear.
21   A.   Yes.
22   Q.   Do you believe that any valid registered voters will
23   show up to vote if S.B. 14 is implemented and will be turned
24   away -- excuse me -- will have to vote a provisional ballot
25   because they lack the necessary ID?

159

1    A.   I can't speculate on what will happen.
2    Q.   Do you know if there are any minority voters who lack
3    the necessary ID and don't own cars needed to get to a driver's
4    license office?
5    A.   I don't know of any.
6    Q.   Do you know if there are any minority voters who
7    currently lack the necessary ID and work during the hours when
8    driver's license offices are open?
9        MR. SWEETEN:  Again, I'm instructing you about
10   legislative privilege.  Don't reveal thoughts, mental
11   impressions or opinions about legislation or discussion you've
12   had with individuals that we discussed earlier.
13   A.   I don't know of any.
14   Q.   Now, you described the election identification
15   certificate under S.B. 14 as a free ID, right?
16   A.   Free election voter certificate.
17   Q.   But free?
18   A.   Yes.
19   Q.   Okay.  Do you know what documents are needed in order
20   to get the election identification certificate under S.B. 14?
21       MR. SWEETEN:  Representative Harless, you can
22   answer this question, but don't reveal thoughts, mental
23   impressions or opinions about legislation or conversations that
24   you've had with the individuals or entities we've discussed
25   earlier.

160

1    A.   I know there was discussion in committee and on the
2    floor, but I can't tell you the specific requirements to get an
3    ID or a driver's license off the top of my head, without going
4    back and refreshing my memory.
5    Q.   Okay.  And we discussed earlier that you didn't know
6    how much it cost to get a new copy of a birth certificate or a
7    name change certificate.  Do you know if those cost money,
8    though?
9    A.   I don't recall.
10   Q.   If an ID requires documents that you have to pay for,
11   then you can't get the ID without paying money, correct?  If I
12   have to buy a document to get the free document, then the free
13   document -- I still have to spend money before I get the free
14   document, correct?
15       MR. SWEETEN:  Objection, argumentative.  Also
16   instruct as to legislative privilege.  But go ahead.  You can
17   answer.
18   A.   I have to say I agree with my attorney.  I can't
19   speculate on any of that.  I know that we provided for people
20   that do not have one of the approved forms of identification to
21   get a free election certificate card.
22   Q.   Okay.  Where can a voter obtain the election
23   identification certificate?
24   A.   I think --
25       MR. SWEETEN:  Same instruction on leg privilege.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                                        May 15, 2012

<table>
<tr><td>

161

1   You can go ahead and answer -- legislative privilege.  Go ahead.
2      A.  I think the debate on the floor was that that would be
3   provided by DPS and they would provide the standards upon what
4   is required to get a free ID card.
5      Q.  But do you know where you get the ID card?
6      A.  From I think the DPS.  If I remember correctly, the
7   DPS office.
8      Q.  And do you know if those offices are -- strike that.
9         Does S.B. 14 require employers to provide paid leave
10  in order for an individual to go get an EIC?
11     MR. SWEETEN:  Same instruction on leg privilege.
12  You can go ahead and answer.
13     A.  I don't remember any -- I don't remember that as being
14  part of the bill.
15     Q.  And is it possible that some individuals in Texas live
16  at least 50 miles from a driver's license office?
17     A.  I think there was --
18     MR. SWEETEN:  Okay.  Hold on.  I'm going to
19  instruct you as to leg privilege.  Don't reveal mental thoughts,
20  impressions, opinions about legislation.  Also don't reveal
21  conversations you've had with any of the individuals or entities
22  we've discussed.
23     A.  I think there was testimony or debate on the floor
24  that that was possible.  I don't know that for a fact.
25     Q.  How much would the gas cost to drive 100 miles

</td><td>

163

1      Q.  Beginning with, "The bill also provides."
2      A.  Okay.
3      Q.  Do you agree that you stated that, "The bill also
4   provides reasonable exceptions to the photo ID requirement for
5   indigent voters"?
6      A.  Yes.
7      Q.  And that's in addition to the photo election ID for
8   registered voters who request an ID, correct, as you stated it
9   in your op-ed?
10     A.  It says, "indigent and disabled voters and allows
11  individuals not carrying a photo ID to vote provisionally, as
12  long as they provide verification of their identity within six
13  days of the election."
14     Q.  What is this exception for indigent voters?
15     A.  From the legislation?
16     Q.  Uh-huh.
17     A.  I can't remember exactly.
18     Q.  Did that exception remain in the bill as it was
19  signed, or was that only a part of an earlier version of the
20  bill?
21     A.  I can't remember.
22     MR. SWEETEN:  Same instruction on leg privilege.
23  Go ahead and answer.
24     A.  I can't remember.
25     Q.  Isn't is the case that that exception was removed

</td></tr>
<tr><td>

162

1   roundtrip?
2      A.  I sell cars for a living.  It could cost as much as $5
3   or --
4      Q.  100 miles?
5      A.  If you have an electric car, it doesn't cost you
6   anything.
7      Q.  How much would it cost you, in your car, to drive 100
8   miles?
9      A.  I'd have to guess.
10     Q.  Approximately?
11     A.  100 miles?  Probably $20, $25.
12     Q.  Okay.  Now, if you could take another look at your
13  op-ed real quickly from November of 2011.  You stated in that
14  op-ed that S.B. 14 contains a reasonable exception for indigent
15  voters in addition to the election identification certificate;
16  is that correct?
17     A.  Where are you reading that at, just to save me from
18  reading everything again.
19     Q.  It's the bottom of the second full paragraph.  "The
20  bill also provides."  Last sentence.
21     A.  On the first page?
22     Q.  First page, yes.
23     A.  My last paragraph said, "The provisions will ensure."
24     Q.  The second full paragraph, last sentence.
25     A.  Okay.

</td><td>

164

1   during the amendment process?
2      A.  It could be possible.  I don't remember.
3      Q.  During the debate, do you recall stating that --
4   sorry.  Strike that.
5         Did you consider it to be an important issue whether
6   minority voters were more likely to lack the necessary ID needed
7   to vote pursuant to S.B. 14?
8      MR. SWEETEN:  Don't reveal thoughts, mental
9   impressions, opinions about the legislation, discussions you've
10  had with leg staff, legislators, state agencies, Leg Council or
11  constituents.
12     A.  I think my testimony on the floor was that I felt that
13  everyone -- it would increase participation and protect the
14  integrity, and if citizens of Texas did not have the approved
15  forms of ID, they were able and eligible to get a voter
16  certificate card.
17     Q.  But it's certainly harder to go get that voter
18  identification card, even if it's free, than to just go to a
19  polling place and vote, isn't it?
20     MR. SWEETEN:  Same instruction as to legislative
21  privilege.
22     A.  I don't believe I can answer that.
23     Q.  I mean, it would be much harder for you to go seven
24  miles from your house to a driver's license office than
25  three-quarters of a mile to a polling place, isn't it?

</td></tr>
</table>



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 165

1    A.    Not for the right to vote.

2    Q.    But it's more trouble?

3    A.    It's a sacrifice I'm willing to make to vote.

4    Q.    Are you aware of what turnout rates are statewide in

5    Texas among registered voters?

6    A.    I can't tell you off the top of my head, no.

7    Q.    Are you aware of whether Texas is a high turnout or

8    low turnout state as percentage, relative to other states in the

9    United States?

10   A.    No, I can't answer that.

11   Q.    Would it surprise you to learn that it is one of the

12   five lowest turnout states in the United States?

13   A.    No reaction to that.

14   Q.    Do you think that it is important to make it as easy

15   as possible for voters to be able to exercise the franchise

16   rather than making it harder for them to do so?

17         MR. SWEETEN:  Same instruction on leg privilege.

18   And I believe by answering that it would reveal

19   private conversations.

20   Q.    Do you believe that if African-American or Hispanic

21   voters lacked the required ID at a greater rate than Anglos, the

22   photo ID bill would still be worth enacting?

23         MR. SWEETEN:  I'm going to object to the

24   question.  It calls for matters that are legislatively

25   privileged, including requiring her to reveal thoughts, mental

### 166

1    impressions or opinions about legislation or communications

2    between she, other legislators, legislative staff, state

3    agencies, Leg Council or constituents.

4          To the extent you can provide information that

5    does not reveal that information, you can go ahead and answer.

6    A.    My debate on the floor and my testimony was that I

7    think it will increase participation for all Texans.

8    Q.    I'm going to object to that as nonresponsive and ask

9    one more time, is it your belief that if African-American or

10   Hispanic voters lacked the needed ID at a greater rate than

11   Anglos, that the photo ID bill will still be worth enacting?

12         MR. SWEETEN:  Same instruction as to legislative

13   privilege.  Also objection, asked and answered.

14   A.    I agree.

15   Q.    Your counsel did not instruct you not to answer.  And

16   so if you're not answering on the basis of privilege, please

17   state that for the record.

18   A.    I'm not answering on the basis of privilege.

19   Q.    Okay.

20   A.    Because I felt like I answered it.

21   Q.    Okay.  Is it your belief that if African-American or

22   Hispanic voters lacked the required voter ID at a rate greater

23   than that of Anglos that this bill would still meet what you

24   described, I believe, as the important criterion of compliance

25   with the Voting Rights Act?

### 167

1          MR. SWEETEN:  I'm going to instruct you again as

2    to the legislative privilege.  Don't reveal thoughts, mental

3    impressions, opinions about the legislation.  Don't reveal

4    communications you've had with legislators, legislative staff,

5    state agencies, Leg Council and constituents.

6    A.    And I'm not going to answer that, based on privilege.

7    Q.    What do you believe is the purpose of the Voting

8    Rights Act?

9    A.    Excuse me?

10   Q.    What do you believe is the purpose of the Voting

11   Rights Act?

12         MR. SWEETEN:  I'm going to object to the extent

13   that that calls for her to reveal thoughts, mental impressions,

14   opinions about legislation or communications she's had with any

15   of the entities or individuals that we've discussed.

16         MR. FREEMAN:  Mr. Sweeten.

17         MR. SWEETEN:  To the extent you can answer that

18   question, I'll let you go ahead and do so.

19         MR. FREEMAN:  Mr. Sweeten, I'm going to ask what

20   legislative act my question refers to, as I've asked her for

21   general understanding of the purpose of the Federal Voting

22   Rights Act.

23         MR. SWEETEN:  First, with respect to any

24   considerations that she had with Senate Bill 14, she's had

25   conversations with individuals or state agencies, et cetera,

1    where those could have been revealed, I'm instructing her that

2    if those communications occurred do not reveal that information.

3          Also to the extent that that question asks her to

4    reveal thoughts, mental impressions or opinions about

5    legislation, that would be legislatively privileged.  To the

6    extent she can answer outside of that, the privilege area, then

7    I'm going to let her do so.

8          MR. FREEMAN:  Mr. Sweeten, I'm going to ask you

9    to withdraw your objection on the basis that my question had

10   absolutely nothing to do with S.B. 14 and solely asked

11   Representative Harless' understanding of the purpose of the

12   Federal Voting Rights Act of 1965.

13         MR. SWEETEN:  If it has nothing to do with

14   legislative privilege, i.e., any of those communications that

15   we've discussed, she can answer that.  If she's had discussions

16   with legislators, state agencies, staff, counsel, constituents

17   about this issue, she does not have to reveal that.  She can

18   answer outside of that.  If you believe that your question

19   doesn't invade any of those and she also agrees it doesn't

20   invade those communications, I'm going to let her answer that.

21   That's my instruction.

22         MR. FREEMAN:  Mr. Sweeten, I am going to ask you

23   to withdraw your objection on the basis that Texas did not enact

24   the Federal Voting Rights Act of 1965 and that this question has

25   absolutely nothing to do with this state legislative privilege.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

169

1   Now, you've asserted this privilege over and over and over
2   again, but there has to be a line, and this is that line.
3   Please withdraw your objection.
4         MR. SWEETEN:  Mr. Freeman, I understand what
5   you're suggesting.  But you nor I have a full understanding of
6   communications that she's had with the specific individuals that
7   would be privileged.  Okay?  If any part of your question
8   invades communications that she's had or reveals thoughts,
9   mental impressions or opinions about legislation, then that
10  would be privileged.  To the extent it does not, I am allowing
11  her to answer that question.  So I will not withdraw my
12  objection.  I will instruct her as I have.
13        Go ahead.  You can answer.
14        MR. FREEMAN:  Representative Harless -- why don't
15  we have the court reporter read back the question, just so you
16  have it clear.
17        THE REPORTER:  Question: "What do you believe is
18  the purpose of the Voting Rights Act?"
19     A.   I learned about the Voting Rights Act in 8th grade.
20  And I know it was done in 1965.  And I know there's Section 2
21  and Section 5.  And we're here on Section 5, part of the Voting
22  Rights Act.  And most of my discussions about the Voting Rights
23  Act and education process came after I started doing work on
24  S.B. 14, which I would assume that that would fall under
25  privilege.

170

1      Q.   Do you believe that the Voting Rights Act is necessary
2   in 2012?
3      A.   I'm not sure how to answer that.
4      Q.   Do you believe that the Voting Rights Act enforces
5   important principles in 2012?
6      A.   I don't know how to answer that.
7      Q.   I would ask for a yes or no answer as to whether the
8   Voting Rights Act enforces principles to the extent that you
9   understand the principles that the Federal Voting Rights Act of
10  1965 enforces?
11     A.   In 2012?
12     Q.   In 2012.
13        MR. SWEETEN:  You're asking her for her opinion
14  about the Voting Rights Act?  Am I clear on that?
15        MR. FREEMAN:  That's correct.
16        MR. SWEETEN:  I'm going to object to relevance as
17  to that question.  I think also it has been asked and answered.
18  She's attempted to answer that.  And she does not have to answer
19  a yes or no.  She can say she doesn't know.
20     A.   And that's what I've answered.  I don't know what the
21  relevance is in 2012.
22     Q.   Okay.  Did you participate in Texas' submission of
23  S.B. 14 for administrative preclearance, including responses to
24  requests for more information?
25        MR. SWEETEN:  Hold on a minute.  When -- can you

171

1   clarify the question by participate, what you're specifically
2   asking.
3         MR. FREEMAN:  Sure.
4      Q.   First, did you provide any -- well, first off, did you
5   understand the question?
6      A.   I am not sure I did.
7      Q.   Okay.  Did you provide any information to the
8   Department of Justice during preclearance process?
9      A.   I did a phone interview.
10     Q.   And did you provide any additional information to the
11  State of Texas as part of the preclearance process?
12     A.   My staff may have.
13     Q.   You did not personally?
14     A.   All my files were in Austin and my staff may have
15  provided.
16     Q.   Okay.  Did you participate in the decision to sue the
17  attorney general and initiate this case?
18     A.   I was never asked.
19     Q.   Okay.  Did you participate in the drafting of the
20  complaint in this case and the allegations that are at issue in
21  this case?
22     A.   Our staff -- my staff --
23        MR. SWEETEN:  Hold on a minute.  I am going to
24  object as to the attorney/client privilege.  Our office
25  represents Representative Harless.  So any communication that

172

1   we've had with Representative Harless would be privileged under
2   the attorney/client privilege.
3      Q.   Did you provide any non-confidential information as
4   part of participating in the drafting of the complaint in this
5   matter?
6      A.   I cannot tell you what my office did.
7      Q.   Okay.  But you did not personally.
8      A.   No.
9      Q.   And you're not aware of what your office did?
10     A.   No.
11     Q.   Okay.  That solves the question.  Are you familiar
12  with the Federal Help America Vote Act of 2002, or HAVA?
13     A.   From the debate on the floor and in committee.
14     Q.   Are you familiar with the voter identification
15  requirements of HAVA?
16     A.   I can't say off the top of my head I am, no.  I'm sure
17  at some point I knew that, but --
18     Q.   Are you aware of HAVA's requirements allowing the use
19  of non-photographic ID in order to identify a voter who has
20  previously registered to vote via mail?
21     A.   I don't know that I'm aware of that.
22     Q.   Okay.  If the Federal Help America Vote Act provided
23  for non-photographic ID in order to establish the identity of a
24  voter, do you think that that would be sufficient for Texas'
25  purposes as well?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

173

1      A.  I think the testimony on the floor was that a photo ID
2   helps verify you are who you say you are.
3          MR. SWEETEN:  I will object to that as
4   nonresponsive and ask another time.
5      Q.  Do you believe that if the Federal Help America Vote
6   Act allows non-photo ID, two forms of non-photo ID to establish
7   identity, that that should be sufficient for Texas as well?
8          MR. SWEETEN:  Don't reveal your thoughts, mental
9   impressions or opinions about the legislation, Senate Bill 14 or
10  communications you've had with any of the entities we've listed.
11  Go ahead and answer.
12     A.  That's privileged.
13         MR. FREEMAN:  Why don't we take a five minute
14  break so that we don't have any similar problems to last time.
15         (Recess from to 3:17 p.m. to 3:33 p.m.)
16     Q.  If we can turn to before you became a member of the
17  Texas Legislature very quickly.  At any point prior to being
18  sworn in as a member of the Texas legislature, did you hear of
19  any photographic voter identification bill or issue as a
20  political issue in Texas?
21     A.  I can't recall that I did.
22     Q.  Okay.
23     A.  It could be possible, but I can't recall.
24     Q.  Are you aware of a photographic voter identification
25  bill that was introduced during your first term, in 2007?

174

1      A.  Yes.
2      Q.  Was any particular bill subject to serious
3   consideration?
4      A.  I don't remember.
5      Q.  Was a bill passed out of the House?
6      A.  I don't recall.  It seems like there's been stories
7   that it did, but I don't recall.
8      Q.  So is this an issue that, in 2007, would it be fair to
9   say, that you were not greatly involved in?
10     A.  Yes.
11     Q.  Okay.  And just to make sure, did you make any public
12  statements about that bill in 2007, of which you're aware?
13     A.  Not that I know of.
14     Q.  Do you know if you voted in favor of the bill?
15     A.  I don't even know if it made it to the floor.  I can't
16  remember.
17     Q.  Okay.  That's fine.  In 2009, are you aware of a
18  photographic voter identification bill that was introduced?
19  This was in your second term, 81st Texas Legislature?
20     A.  Right.  I know there was a voter ID bill, but I don't
21  know the specifics of it.
22     Q.  Do you know when the bill was introduced in the House?
23     A.  No.
24     Q.  Do you know who introduced it?
25     A.  I think there were more than one.

175

1      Q.  Do you know who introduced the bill that had passed
2   from the Senate?
3      A.  Senator Fraser.
4      Q.  But do you know who introduced it in the House?
5      A.  No.
6      Q.  Okay.  What was your involvement with that bill?
7      A.  Just watching it as it proceeded.
8      Q.  Did you offer any amendments?
9          MR. SWEETEN:  You can confine your testimony to
10  matters of the public record.
11     A.  I don't recall if it ever made it to the House floor
12  in 2011 or 2009.
13     Q.  Are you aware of the basic provisions of that bill?
14     A.  I know it was different than the bill that we passed
15  this session.
16     Q.  And are you aware of what any of those differences
17  were?
18         MR. SWEETEN:  Are you asking about the bill
19  introduced in 2009 as to what was passed in 2011 and the
20  differences between those?  Which duration?  I want to make sure
21  that I'm clear.
22     Q.  I think I'll ask if the witness understands.  Do you
23  understand what my question was?
24     A.  Partially.  If I recall correctly, which no
25  guarantees, there were more than one voter ID bill filed in the

176

1   2009 session by multiple members of the Texas House.
2      Q.  Do you recall what the differences were between the
3   bill that was passed from the Senate in 2009 and was introduced
4   in the Texas House and the bill that was passed from the Senate
5   in 2011 and what was introduced in the Texas House?
6      A.  That's where I think the confusion is coming from,
7   because I don't think the bill that was passed in the Senate in
8   2009 actually made it to the House floor.  I think it went to
9   committee.  And I don't think it got out of committee.  And I
10  did not serve on that committee.  So I wouldn't have known the
11  provisions of the bill and if it was the same bill and how many
12  bills were filed.
13     Q.  Isn't it the case that S.B. 362 was passed out of
14  committee but was chubbed on the floor?
15     A.  I don't recall that.
16     Q.  Okay.
17         THE REPORTER:  I'm not familiar with that term,
18  chubbed.
19         MR. FREEMAN:  Chubbed, c-h-u-b-b-e-d.
20         THE REPORTER:  Thank you.
21         MR. FREEMAN:  It's a term of art that I only
22  recently learned myself.
23     Q.  Did you make any public statements concerning S.B.
24  362, the photographic voter identification bill that passed the
25  Senate in 2009?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

177

1    A.   Not that I recall.
2    Q.   Did you send any e-mails concerning that bill?
3    A.   Not that I recall.
4    Q.   During the 81st Legislature, 2009, did you sign a
5  pledge circulated by the Republican Party of Texas concerning
6  voter ID?
7    A.   Probably.  I can't say for sure, but it is possible.
8    Q.   Do you recall what the principles in that pledge were?
9         MR. SWEETEN:  I assume this is a public record?
10        THE WITNESS:  I don't know.
11        MR. FREEMAN:  If this could be marked as U.S.
12  Exhibit 22.
13             (Exhibit No. 22 marked)
14        MR. SWEETEN:  Dan, is this from a web site of
15  some kind?  Clear Lake GOP it says.
16        MR. FREEMAN:  That is correct.  It is a copy of a
17  Republican Party of Texas press release.
18        MR. SWEETEN:  Okay.
19        THE WITNESS:  I don't see my name on it.  Do you?
20    Q.   If you look at Page 2, in between Hancock and
21  Harper-Brown.  It's double sided.
22    A.   Oh.  Sorry.  Yes.
23    Q.   And what were the principles that were in that pledge
24  concerning voter ID?
25    A.   From this press release posted on Clear Lake GOP, it

---

178

1  says, "Ensure a valid photo ID is needed to vote.  Take effect
2  at the next possible uniform election date.  Be free of any
3  registration requirements such as same day voter registration
4  that dilutes the intent of the bill, which is ensuring fair and
5  accurate elections.  Increase criminal penalties for voter fraud
6  and registration."
7    Q.   Okay.  Are you aware of whether Attorney General
8  Abbott has dedicated substantial resources over the last decade
9  to investigating allegations of voter fraud, in-person voter
10  fraud?  And you agreed to those principles, correct?
11    A.   Looks like that.
12    Q.   How would allowing same-day registration dilute the
13  intent of a photographic voter ID bill?
14        MR. SWEETEN:  Okay.  Don't reveal any thoughts or
15  mental impressions or opinions about legislation or
16  communications that you've had with legislators, legislative
17  staff, state agencies, Legislative Council or constituents.
18        MR. FREEMAN:  I'm asking the representative to
19  explain a public statement.
20        MR. SWEETEN:  If that's the question, then you
21  can go ahead and have her explain the public statement.
22    A.   I'm not sure, in the context of this.  Our bill did
23  not address same-day registration, the bill that I was involved
24  in.
25    Q.   Do you believe that including a provision allowing

---

179

1  same-day registration based on possession of the documents
2  needed to vote under S.B. 14 would have diluted the intent of
3  S.B. 14?
4         MR. SWEETEN:  Same objection as to legislative
5  privilege.  Don't reveal your mental impressions or thoughts
6  about that legislation or communications that we've outlined
7  previously.
8         THE WITNESS:  May I have the question repeated.
9         THE REPORTER:  Question: "Do you believe that
10  including a provision allowing same-day registration based on
11  possession of the documents needed to vote under S.B. 14 would
12  have diluted the intent of S.B. 14?"
13        MR. SWEETEN:  Same objection.
14    A.   It was not a provision of the bill, so I can't
15  speculate on that.
16    Q.   What does it mean to dilute the intent of a bill?
17    A.   To dilute?
18    Q.   Dilute the intent.
19    A.   From this?  Are you taking that statement from here?
20    Q.   I am.
21    A.   I have no clue what they meant by that.
22    Q.   Why did you sign this pledge?
23    A.   I can't answer.
24    Q.   You don't recall?
25    A.   I don't.

---

180

1    Q.   Do you recall who urged you to sign the pledge?
2    A.   I don't.
3    Q.   Do you recall whether you spoke with Eric Opiela
4  concerning this pledge?
5    A.   I am pretty positive I did not.
6    Q.   Do you know who Eric Opiela is?
7    A.   I've seen his name.  I don't ever recall having a
8  conversation, whether on the phone or in person, with him.
9    Q.   Was Eric Opiela the chairman of the Republican Party
10  of Texas in 2009?
11    A.   I don't know.
12    Q.   Do you have any documents concerning any
13  communications regarding this pledge?
14    A.   Not that I know of.
15    Q.   Okay.  When was the last time that you were asked to
16  prove your citizenship?
17    A.   When I got a passport, maybe.
18    Q.   Do you remember any time before that?
19    A.   Since I just got a new passport about seven years ago,
20  I don't remember since then.  I don't know.  Maybe when I got my
21  concealed handgun license in '96.
22    Q.   Okay.  So once in the last seven years, maybe twice in
23  the last 16 years or so.  To your knowledge, what documents
24  prove that an individual is a U.S. citizen?
25    A.   For me it would be my birth certificate.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

181

1    Q.  Okay.  Any other documents of which you're aware that
2  prove that an individual is a U.S. citizen?
3    A.  I'm not familiar except for maybe the citizenship
4  paper.
5    Q.  Passport?
6    A.  Could possibly.
7    Q.  Okay.
8    A.  I don't know.  Does the passport have the country of
9  origin where you're from?  I don't know.
10   Q.  At Fred Fincher Motors, how many people do you employ?
11   A.  About 13, 12 or 13.
12   Q.  Have you ever had to verify their citizenship?
13   A.  I do every time I interview someone.
14   Q.  And what proof of citizenship do you accept?
15   A.  I take their driver's license, Social Security card,
16  birth certificate.  I run them through the E-Verify system and
17  have them fill out an I9.
18   Q.  During the 2009 legislature, did you sponsor any bills
19  related to immigration?
20   A.  Probably.
21   Q.  Did you sponsor any bills related to the term
22  Sanctuary Cities?
23   A.  Possibly.  I know I did one in the '11 session.
24   Q.  What was the purpose of that Sanctuary Cities bill?
25       MR. SWEETEN:  I'm going to object to the extent

182

1  that -- instruct you not to reveal thoughts, mental impressions
2  or opinions about the legislation.  You can testify about the
3  specific purpose of the bill, but you can't testify about
4  communications you've had with other legislators, legislative
5  staff, state agencies, constituents or Texas Legislative
6  Council.
7       MR. FREEMAN:  Mr. Sweeten, I asked it pretty
8  cleanly, what the purpose of that bill was.  And I think that we
9  discussed earlier that questions solely related to the purpose
10  of the bill should not draw an objection.
11       MR. SWEETEN:  I'm clarifying that you're not
12  asking what one legislator's opinion was or you're not getting
13  into discussions about the bill, you're asking about the purpose
14  of the bill, and I'll let her answer that question.
15       MR. FREEMAN:  Mr. Sweeten, I'll ask you to
16  withdraw the objection as you preceded your statement with, "I
17  object."
18       MR. SWEETEN:  I've already given an instruction.
19  I think it is very clear that she can answer this to the extent
20  she's just going to talk about purpose and not talk about
21  legislative intent or mental impressions as we've laid out.
22       You can go ahead and answer the question as
23  posed.
24       MR. FREEMAN:  Mr. Sweeten, do you withdraw your
25  objection?

183

1       MR. SWEETEN:  Again, if your question is
2  attempting to discover the information that I've set forth here
3  that would be legislatively privileged, then I do not.  If your
4  question is not intended to discover that, then I will let her
5  answer the question.  I am going to let her answer the question,
6  just with that admonitory instruction.
7    A.  Do you have a copy of my bill?
8    Q.  You know, I do not, but I believe that you've
9  testified you introduced a Sanctuary Cities bill in 2009 and
10  2011.  At a broad level, what was the purpose of that bill?
11   A.  I don't remember the 2009 bill.  I know I did one in
12  2011.  I can't remember specifically.  I think it was used as a
13  tool to give law enforcement an opportunity to do their job, but
14  I can't remember exactly without seeing a copy of it.
15   Q.  Can you explain what you mean by, "an opportunity for
16  law enforcement to do their job"?
17   A.  I'm just remembering that from the caption and
18  legislatively.  I'm sorry.  I'm really not trying to be
19  difficult, but we file a lot of bills.  And as soon as the
20  session is over, I go back to my district and my full-time
21  paying job, and I don't remember all the specifics.  I'm happy
22  to explain it more if I could see what it said in it.  It didn't
23  move.
24   Q.  Okay.  But I guess this is a bill that you sponsored,
25  and so I assume you provided input as to the purpose and

184

1  drafting.  And so I guess, if I could ask just, do you at all
2  recall any purpose of this Sanctuary Cities bill that you
3  offered in 2009?
4    A.  The answer would be no.
5    Q.  Okay.  Do you recall if the bill that you advanced in
6  2009 was sported by any Hispanic members of the Texas House?
7       MR. SWEETEN:  Don't reveal thoughts, mental
8  impressions or discussions with other legislators, legislative
9  staff, state agencies, constituents or TLC.
10   A.  Thank you.  I don't remember my 2009 bill.
11   Q.  Do you remember if any Sanctuary Cities bill in 2009
12  was supported by any Hispanic member of the Texas House?
13       MR. SWEETEN:  Same instruction, but go ahead.
14   A.  I don't know that.
15   Q.  Okay.  Did you submit a photographic voter
16  identification bill in the 82nd Legislature in 2010 as prefiled
17  for 2011?
18   A.  I prefiled a bill that was similar to the bill that
19  was heard in committee in 2009.  And then I filed an additional
20  bill.  I think there were two of them.  But that's just from
21  memory.
22   Q.  Okay.  Let's see if we can refresh your recollection.
23  This is U.S. Exhibit 4.
24   A.  Okay.
25   Q.  Which is House Bill 112.  Was that a bill that you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

185

1 submitted for the 82nd Legislature related to photographic voter
2 identification?
3     A.  It was a bill that was prefiled because it's got a low
4 number.  Is it photographic or is it --
5         MR. SWEETEN:  Just take your time.  You can
6 review it.
7     A.  I think this was the bill that was similar to the bill
8 filed in -- yeah, driver's license.  Yeah.  It's a photographic
9 identification bill, yes.
10    Q.  Why did you take a more prominent position on this
11 issue in the 82nd Legislature?
12        MR. SWEETEN:  Don't reveal any communications
13 that you've had with other legislators, staff, state agencies,
14 constituents or Texas Legislative Council, and don't reveal
15 thoughts, mental impressions or opinions about legislation.  To
16 the extent you're not doing so, you can answer that question.
17    A.  Well, it's difficult to answer that without revealing
18 communications with constituents, but I will say it's an issue
19 that was important to my district.
20    Q.  Did you have any communications in 2010, prior to
21 filing this bill, concerning photographic voter ID with
22 constituents?
23    A.  That's privileged.
24        MR. SWEETEN:  I'm going to object to legislative
25 privilege.

186

1     Q.  I'm going to ask not in favor or opposed, so I'm not
2 going to ask the position, but I want to ask as a matter of
3 subject matter whether you had any such conversations.  And I
4 think that --
5         MR. SWEETEN:  You can answer that question.  You
6 can identify as to the subject matter that he's saying.  You can
7 identify whether you had constituent communications and the form
8 and the approximate date, if you're able to.
9     A.  Yes.
10    Q.  Did you have -- did you speak with anyone from ALEC,
11 the American Legislative Exchange Council?
12    A.  No.
13    Q.  Did you speak with anyone from the King Street
14 Patriots?
15    A.  No.
16    Q.  Did you speak with anyone from any other Tea Party
17 groups?
18    A.  No.
19    Q.  Did you speak with Catherine Engelbrecht?
20    A.  Prior to this legislation?
21    Q.  Yes.
22    A.  No.
23    Q.  Did you speak with her after this legislation?
24    A.  That's privileged.
25    Q.  As a matter -- not as a matter of whether she

187

1 supported or opposed the legislation, but just about voter ID.
2         MR. SWEETEN:  You can testify about whether or
3 not you had contact and with whom the contact was with.  Don't
4 go into the subject matter of it.
5     A.  I had contact with her after the committee hearing
6 on --
7     Q.  Do you remember the approximate date?
8     A.  No.
9     Q.  But the hearing was -- do you remember which
10 particular committee hearing?
11    A.  The committee hearing where this legislation went
12 through.
13    Q.  Okay.  And this was S.B. 14?
14    A.  Yes.
15    Q.  So March 2011?
16    A.  Yes.
17    Q.  Okay.  Did you have any conversations with Paul
18 Bettencourt?
19    A.  No.
20    Q.  Did you have any conversations with any experts,
21 political scientists, concerning photographic voter ID before
22 filing this bill?
23    A.  I would have to say probably no.
24    Q.  Okay.  Did you have any conversations with any
25 experts, including political scientists, at any time after you

188

1 filed this bill concerning photographic voter ID?
2     A.  I have concerns that those are privileged.  But we
3 were doing due diligence in the legislation, so I am probably
4 sure there were some conversations with experts.
5     Q.  Just to jump back real quickly to Ms. Engelbrecht, how
6 many times did you speak with her?
7     A.  Maybe once or twice.
8     Q.  Was it on the phone?
9     A.  She came by the office after the committee hearing.
10    Q.  Okay.  And how long was the conversation?
11    A.  Ten minutes.
12    Q.  Okay.  Did you have any conversations -- excuse me.
13 Who are the experts who you had conversations with?
14    A.  I can't recall.  I don't know for sure that I did.
15    Q.  Did you ever speak with an individual named Hans von
16 Spakovsky?
17    A.  No, I didn't.
18    Q.  Are you aware of any conversations that occurred with
19 Mr. Von Spakovsky?
20    A.  I think my chief of staff may have, but I don't know
21 for sure.
22    Q.  Okay.  That's fine.  Did you ever have any
23 conversations with George Hammerline?
24    A.  Yes.
25    Q.  When did that occur?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

189

1      A.  Probably after -- probably after they announced that I
2  would be carrying the bill in the House.
3      Q.  And who is George Hammerline?
4      A.  He's someone who works for one of the government
5  agencies in Harris County.  I can't tell you which one.  He used
6  to work with Paul Bettencourt before Bettencourt left office.
7      Q.  Okay.  Did you speak with him in person?
8      A.  He came by the office.
9      Q.  About how long was the conversation or conversations?
10     A.  Longer than I wanted.  Maybe five, ten minutes.
11     Q.  Okay.  Did you ever have any conversations with any
12 minority groups concerning photographic voter ID?
13     A.  I can't tell you for sure, but I know that after it
14 was announced that we would carry the legislation, there were a
15 number of groups that came back to visit about --
16     Q.  Do you recall any of the names of those groups?
17     A.  It seems like League of Women Voters was probably one,
18 but I can't recall all of them.  And I didn't meet with them.
19     Q.  Who did?
20     A.  I would -- I don't know if one of the interns did,
21 Julie or Colby.  I'm not sure.
22     Q.  Did you make any changes to either your proposed bill,
23 H.B. 112 or S.B. 14 as a result of concerns expressed by these
24 groups?
25         MR. SWEETEN:  Hold on a minute.  Don't reveal any

190

1  thoughts, mental impressions or opinions about legislation or
2  conversations or the substance of conversations with any
3  legislator, staff, state agency, TLC or constituents.
4      A.  That is privileged.
5      Q.  Okay.  Who drafted the bill that you have in front of
6  you, H.B. 112?
7      A.  Leg Council.
8      Q.  What input did you provide?
9          MR. SWEETEN:  Don't talk about the specific
10 substance of any input or communications you've had with TLC.
11     A.  None.
12     Q.  Who else provided input concerning the substance of
13 the bill?
14         MR. SWEETEN:  Again, I think that you're asking
15 her to provide mental impressions, opinions about legislation or
16 conversations that she's had with the individuals or entities
17 named.  So I'm going to instruct you not to answer based on
18 legislative privilege.
19     Q.  If you can indicate if you're not answering on the
20 basis of privilege, that would be great.
21     A.  Not answering based on privilege.
22     Q.  Okay.  Thank you.  Are you aware of whether the
23 speaker provided input concerning the substance of H.B. 112?
24         MR. SWEETEN:  Same objection, same instruction.
25     A.  Privileged.

191

1      Q.  Any of the speaker's staff?
2          MR. SWEETEN:  Same instruction, same objection.
3      A.  Privileged.
4      Q.  Lt. Governor Dewhurst?
5          MR. SWEETEN:  Same instruction, same objection.
6      A.  Privileged.
7      Q.  Any of Lt. Governor Dewhurst's staff?
8          MR. SWEETEN:  Same objection, same instruction.
9      A.  Privileged.
10     Q.  Senator Fraser?
11         MR. SWEETEN:  Same objection, same instruction.
12     A.  Privileged.
13     Q.  Senate Fraser's staff?
14         MR. SWEETEN:  Same objection.
15     A.  Privileged.
16     Q.  Governor Perry?
17         MR. SWEETEN:  Same objection and instruction.
18     A.  Privileged.
19     Q.  Governor Perry's staff?
20         MR. SWEETEN:  Same objection and instruction.
21     Q.  Lobbyists?
22         MR. SWEETEN:  Same objection and instruction.
23         THE WITNESS:  May I have a minute?
24         MR. SWEETEN:  Sure.
25         THE WITNESS:  Thank you.

192

1          (Brief off-record discussion)
2          MR. FREEMAN:  I believe this is when you say
3  "privileged".
4      A.  Privileged.
5      Q.  Thank you.  While you were drafting H.B. 112, did you
6  speak with the Department of Public Safety?
7          MR. SWEETEN:  You can testify about the fact of
8  communication.  You can't testify about the substance.  It's
9  legislatively privileged.
10     A.  I didn't draft House Bill 112.
11     Q.  While your staff were drafting House Bill 112, are you
12 aware of whether they spoke with the Department of Public
13 Safety?
14     A.  To clarify that as well, my staff doesn't draft the
15 bill.  We present to Leg Council information, and they draft the
16 bill.
17     Q.  So let me clarify based on that.  Thank you.  While
18 your staff were providing the substance of the bill to Leg
19 Council for drafting purposes, while the drafting process was
20 ongoing --
21     A.  Sorry.
22     Q.  -- did they -- accuracy is what we do.
23     A.  I don't want to get down the road with this and --
24     Q.  While your staff was providing information to Leg
25 Council and Leg Council was drafting H.B. 112, did you or anyone



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

193

1   in your staff speak with the Secretary of State's office?
2           MR. SWEETEN:  You can testify about the fact of
3   communication.
4       A.  I did not.  I can't answer whether my staff did.
5       Q.  Did you conduct or did you instruct anyone to conduct
6   an analysis of the impact that H.B. 112 would have on minority
7   voters?
8           MR. SWEETEN:  Don't answer that.  That's
9   privileged.  Reveals thoughts, mental impressions about
10  legislation.
11      A.  Privileged.
12      Q.  Why not?
13          MR. SWEETEN:  Same objection and instruction.
14      A.  Privileged.
15      Q.  Now, you've testified that your staff provided
16  instructions to Legislative Council concerning the substance of
17  the bill, but who made decisions concerning what components
18  would go into the bill?
19      A.  Into?
20      Q.  Into H.B. 112?
21          MR. SWEETEN:  That's the same instruction as the
22  legislative privilege and objection based on that.  You can
23  answer to the extent it doesn't reveal legislatively privileged
24  information.
25      A.  I am not sure.  I think it's a companion.  It's

194

1   similar to the bill that was filed the previous session.
2       Q.  Did you provide any instructions specifically to your
3   staff concerning what should and should not appear in H.B. 112?
4           MR. SWEETEN:  Don't reveal communications between
5   yourself and legislative staff.  It's legislatively privileged.
6           MR. FREEMAN:  I'm going to try and frame this in
7   a way that we can just have this be a subject matter question,
8   Mr. Sweeten.
9           MR. SWEETEN:  Sure.  I'm fine with that.
10      Q.  Were there any communications between you and your
11  stuff on the subject of what should and should not be included
12  in H.B. 112?
13          MR. SWEETEN:  You can answer that.
14      A.  No.
15      Q.  Okay.  Was H.B. 112 ever referred to the Select
16  Committee on Voter Identification and Voter Fraud?
17      A.  I can't remember.
18      Q.  Isn't it the case that we earlier determined that the
19  only bill referred to --
20      A.  I think that's what you said from that sheet.  I could
21  look up the bill number and see where it went, where it was
22  referred to, but I can't remember where it was referred to.
23      Q.  Are all bills referred to some committee after they're
24  filed?
25      A.  I'm not sure of the procedure, if all bills are.

195

1   Under typical legislative sessions, bills are referred to
2   committee.  But close to the end of the session there may be 10
3   to 20,000 bills filed and there may not be time to refer them to
4   committee.
5       Q.  But an early bill, a prefiled bill like H.B. 112, that
6   would be referred to some committee, right?
7       A.  It's my understanding it should be.
8       Q.  And so insofar as only one bill was referred to the
9   Select Committee on Voter Identification and Voter Fraud, that
10  was the bill that was going to move in terms of any voter ID
11  bill that was filed in the last session, right?
12      A.  I think that it would be easy to make that point.
13      Q.  Okay.
14      A.  I can't guarantee that, but I think that would make
15  sense.
16      Q.  Okay.  What were the basic provisions of H.B. 112?  Do
17  you know?
18      A.  Voter education, acceptable identification outside of
19  a polling place, an election officer at a polling place, either
20  one form of identification listed on section.  So it looks like
21  it's got the approved forms of IDs that we talked about and
22  maybe some additional forms.
23      Q.  Okay.  Can we -- can you take a quick look at Section
24  6(b) and tell me whether this allows an individual to present
25  either one form of ID listed in one list or two forms from

196

1   another list?
2       A.  It does.
3       Q.  Can you take a look at Section 11.
4       A.  Just one second.  I got to take my contacts out,
5   because I can't look anymore.
6       Q.  Do you want us to go off?
7       A.  No.  It will be fine.  They're disposable, but after
8   awhile they blur.  Section 11?
9       Q.  Yes.  And if you can look at Section 11(a).
10      A.  This is the bill?
11      Q.  I'm sorry.  It's actually Section 10.  Its on Page 5,
12  where it says, "Documentation of Proof of Identification"?
13      A.  Yes.  This is the --
14      Q.  What are the forms of photo identification that are
15  acceptable under your bill?
16      A.  Under which section?
17      Q.  It's going to Section 10, which modifies section
18  63.0101 of the Election Code, begins, "The following
19  documentation is an acceptable form of photo identification."
20  Bottom of Page 5.
21      A.  Expired or expired no earlier than two years before
22  the date of presentation.
23      Q.  And is that a driver's license or a Texas
24  identification card?
25      A.  It says issued to a person by DPS, so, yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

197

1    Q. Okay.

2    A. United States military ID card that contains the

3  person's photograph.

4    Q. Uh-huh.

5    A. United States citizen certificate issued to person

6  that contains the person's photograph. License to carry

7  concealed handgun issued by the Department of Public Safety.

8    Q. Does it allow passport?

9    A. Valid ID card that contains persons issued by federal

10  government. Agency, institution, political subdivision of the

11  state.

12    Q. And Representative Harless, did you skip Subsection 4.

13  Do you see where it says United States passport?

14    A. Yes, but that's not underlined or crossed out so --

15    Q. But it is in the list, isn't it?

16    A. Yes.

17    Q. So those are all forms of photographic identification?

18    A. Uh-huh.

19    Q. And the bill also allowed two forms of

20  non-photographic identification, correct?

21    A. Yes.

22    Q. And what are the forms of non-photographic

23  identification, if you can just -- well, I'll list them quickly.

24  Did it allow voter registration certificate?

25    A. Uh-huh.

198

1    Q. Official mail addressed to the person by name from a

2  government entity?

3    A. Yes.

4    Q. Certified copy of a birth certificate?

5    A. Yes.

6    Q. Citizenship papers without a photograph?

7    A. Yes. It doesn't say without. It says citizenship

8  papers.

9    Q. Okay. An original or certified copy of a marriage

10  license or divorce decree?

11    A. Yes.

12    Q. Court records of adoption, name change, or sex change?

13    A. Yes.

14    Q. An identification card issued by a government entity

15  of the state or the United States for the purpose of obtaining

16  benefits?

17    A. Yes.

18    Q. A temporary driving permit?

19    A. Yes.

20    Q. Pilot's license?

21    A. Yes.

22    Q. A library card?

23    A. Yes.

24    Q. A hunting or fishing license?

25    A. Yes.

199

1    Q. Okay. Did this conform, H.B. 112, to the pledge that

2  you made in 2009?

3    A. Probably not.

4    Q. Why the difference?

5    A. What is the difference --

6    MR. SWEETEN: Well, hold on. I want to make sure

7  that you're clear. Don't reveal thoughts, mental impressions or

8  opinions about legislation. I don't want you to reveal

9  communications. You're free to include matters of public

10  record, but I caution you on that privilege issue.

11    A. The question again.

12    Q. Why the difference between the bill you introduced

13  that allows non-photo ID and the pledge that you made in 2009

14  concerning an identification bill that would only allow photo

15  ID?

16    MR. SWEETEN: I can't interpret that question

17  other than to ask for her to reveal her mental impressions or

18  opinions about legislation. I think that is squarely within the

19  order regarding this privilege. So I'm going to globally

20  instruct her not to answer that question.

21    A. Privileged.

22    Q. Thank you. Why did you introduce a bill that allowed

23  non-photo ID in terms of a photo ID bill?

24    MR. SWEETEN: Same objection. Instruction not to

25  answer.

200

1    Q. Are you not answering on the basis of privilege?

2    MR. SWEETEN: Let me finish. It would reveal

3  your mental impressions, opinions about legislation.

4    A. Privileged.

5    Q. Okay. Is your understanding that a driver's

6  license or Texas identification card that is expired provides

7  proof of the identity of the individual who holds it?

8    MR. SWEETEN: Are you asking her as a factual

9  matter?

10    MR. FREEMAN: Yes.

11    MR. SWEETEN: You can answer just as to what you

12  know.

13    A. An ID or a driver's license issued by the Department

14  that's expired provide ID of that person, who they are.

15    Q. Okay.

16    A. I think in our legislation we put a provision --

17    MR. SWEETEN: Let's go ahead and just answer the

18  question he's asked. Okay?

19    A. Yes.

20    Q. Okay. Does the identification card cease to prove the

21  identity of the person after six months after it's expired?

22    A. No.

23    Q. Does it cease to prove the identity of the person two

24  years after it's expired?

25    A. No.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

201

1    Q.  Are you aware of how the Department of Public Safety
2  maintains records about driver's license expiration?
3    A.  No.
4    Q.  Are you aware of whether they maintain only a notation
5  that it's less than two years expired or more than two years
6  expired?
7    A.  I'm not aware.
8    Q.  Okay.  Does a valid identification card that contains
9  a person's photograph and is issued by an agency or institution
10  of the federal government establish an individual's identity?
11    A.  It could possibly.
12    Q.  How about a valid identification card that contains
13  the person's photograph and is issued by an agency, institution
14  or political subdivision of the State of Texas?
15    A.  It could.
16    Q.  In what ways could it not?
17    A.  You know, I just have no way of knowing what checks
18  and balances that that political subdivision goes through
19  issuing an ID.  I may can go up and say, "I'm John Smith," and
20  you issue me an ID.
21    Q.  Why did you include valid identification cards issued
22  by political subdivisions of the state in H.B. 112?
23        MR. SWEETEN:  I'm going to object.  I think that
24  asks for legislatively privileged information, asks her to
25  reveal thoughts, mental impressions, opinions about legislation,

202

1  why she included something or did not include something, was
2  covered by that.
3    A.  Privileged.
4    Q.  And why did you say that a valid identification card
5  issued by an agency or institution with the federal government
6  could establish an identity but not always establish an
7  individual's identity?
8        MR. SWEETEN:  Same objection.
9    A.  The question one more time?  Are you saying --
10    Q.  I'm not saying why, but I'm asking -- you previously
11  testified that a valid identification card that contains the
12  person's photograph and is issued by an agency or institution of
13  the federal government could establish an individual's identity.
14  And I'm asking why only could.  Why are you qualifying that
15  statement?
16        MR. SWEETEN:  I think she's answered that.
17        MR. FREEMAN:  I said that with regard to the
18  state.  I didn't say that with regard -- with state subdivision,
19  not with regard to the fed government.
20        MR. SWEETEN:  You can answer as to that.
21    A.  So we're talking specifically about the federal
22  government?
23    Q.  Yes.
24    A.  I'm not sure how they issue their IDs.
25    Q.  Okay.  And just for the record, why did you include

203

1  valid identification cards issued by agencies or institutions of
2  the federal government in H.B. 112?
3    A.  Privileged.
4        MR. SWEETEN:  Objection, calls for legislatively
5  privileged information, asks her to reveal thoughts, mental
6  impressions or opinions about legislation.
7        MR. FREEMAN:  I would ask that you wait for your
8  counsel to finish just so the record is clean.
9    A.  I should.  I'm just trying to speed it up.  Sorry.
10  I'm old and tired.
11    Q.  Now, you previously testified that you don't know what
12  a citizenship certificate looks like; is that correct?
13    A.  I don't know that I do.
14    Q.  Okay.
15    A.  I may have seen one, but I can't recall.
16    Q.  And can I ask, so you included among the list of photo
17  ID in H.B. 112 the United States citizenship certificate issued
18  to the person that contains the person's photograph.  And on the
19  non-photo list you included just a United States -- or United
20  States citizenship papers issued to the person.  From that, can
21  it be inferred that sometimes citizenship papers have a photo on
22  them and sometimes they do not?
23        MR. SWEETEN:  Don't reveal thoughts, mental
24  impressions or opinions about legislation.  Okay.
25    A.  Privileged.

204

1    Q.  I'm just asking for your knowledge and the logical
2  inference that can be made from a bill that you publicly
3  submitted for consideration in the Texas Legislature.
4        MR. SWEETEN:  But you can't do that by asking her
5  legislatively privileged information.  You're asking her about
6  her mental impressions, opinions about why something was or
7  wasn't included, what can be inferred based upon the inclusion
8  or non-inclusion of certain information.  I think you're asking
9  for privileged information.
10    Q.  To the extent that you lack knowledge of the answer to
11  that question, whether it sometimes has a photo and sometimes
12  does not, that's a fine answer as well.
13    A.  I don't know if there are certificates without photos.
14  I don't know.
15    Q.  Okay.  Why would H.B. 112 solve any problems related
16  to in-person voter fraud in comparison to current Texas law?
17        MR. SWEETEN:  I'm going to object.  I think
18  you're asking her for her mental impressions, opinions about
19  legislation.  I think that falls squarely within the legislative
20  privilege.
21    A.  Privileged.
22    Q.  Did you make any public statements concerning H.B.
23  112?
24    A.  Not that I remember.  Could possibly, but.
25    Q.  You don't recall?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

205

1      A.  No.
2      Q.  Do you recall if it was ever mentioned in your
3  constituent newsletter?
4      A.  Possibly as the bills that I filed.
5      Q.  Anything more than just a list of the bills that you
6  filed?
7      A.  I don't know.  We do those weekly during session.
8      Q.  Okay.  Do you keep all of your constituent newsletters
9  maintained in a file somewhere?
10     A.  I don't.
11     Q.  Do you know if your staff does?
12     A.  I don't know if they do.
13     Q.  Would you like to take a break or can we keep going?
14     A.  Keep going until my --
15         MR. SWEETEN:  She's got that 4:40.
16     Q.  20 minutes.  Sounds good.
17     It's 20 or 30.
18         MR. ROSENBERG:  What happens at 4:40?
19         MR. SWEETEN:  She has a phone call that will take
20  15 minutes.  It's physician related.
21     Q.  What were the basic provisions of S.B. 14?  And if
22  you'd like, I'm happy to give you a copy of U.S. Exhibit 5.
23     A.  Photo ID from prescribed list, including driver's
24  license, ID card, concealed handgun, citizenship paper with a
25  photo on it, U.S. military ID.  It also provided for extensive

206

1  training or training.  I shouldn't say -- training on the new
2  requirements under S.B. 14.  It provides for a free election ID
3  certificate, voter certificate.  It provides for, off the top of
4  my head, a provisional ballot, that notice be placed outside of
5  the polling place, provision that the names that are similar be
6  accepted, rights to cast provisional ballot, requirements for
7  identification prescribed by Subsection B, that they do not
8  apply to a person who is disabled and presents the voter
9  registration certificate containing the indication described in
10  Section 15.01, and increased penalties for attempting to vote
11  with someone else's ID and actually voting.
12     Q.  Isn't it the case that S.B. 14 limited the use of
13  expired driver's license or personal identification cards to
14  those that are expired up to 60 days as opposed to two years in
15  your bill?
16     A.  I think that's correct in S.B. 14, up to 60 days.
17     Q.  Why the difference?
18         MR. SWEETEN:  I'm going to object.  That calls
19  for legislatively privileged information.
20     A.  It's privileged.
21     Q.  And isn't it correct that S.B. 14 limits the use of
22  passports to those that are expired up to 60 days?
23     A.  That is correct.
24     Q.  And isn't it the case that H.B. 112 put no limitation
25  concerning expiration on U.S. passports?  It's on Page 6 of

207

1  Exhibit 4.
2      A.  Expired or that expired no later than two years before
3  the date.
4      Q.  But with regard to passports?
5      A.  Passports wasn't a new section in the bill.
6      Q.  But there was no modification to exclude passports
7  that were expired by more than 60 days, correct?
8      A.  Right.
9      Q.  Okay.  Why did S.B. 14 exclude passports that were
10  expired by more than 60 days?
11         MR. SWEETEN:  Don't reveal thoughts, mental
12  impressions or opinions about the legislative process or
13  discussions you've had with legislators, legislation staff,
14  state agencies, TLC or constituents.  Refer to matters of the
15  public record.
16     A.  Privileged.
17     Q.  Okay.  Were you involved in the drafting process for
18  S.B. 14?
19     A.  No.
20         MR. SWEETEN:  I think that's been asked and
21  answered.
22     Q.  Did anyone in the media ask you questions concerning
23  changes between H.B. 112 and S.B. 14?
24     A.  Could possibly.  I don't recall.
25     Q.  Okay.  Why did you shift your support in four months

208

1  from a bill that allowed individuals to establish their identity
2  via non-photographic ID to a bill that required individuals to
3  present one of a few articulated forms of photo ID?
4         MR. SWEETEN:  I'm going to object based on
5  legislative privilege.  You're asking her to reveal thoughts,
6  mental impressions, opinions about legislation and also
7  communications she's had.  So I'm going to instruct her not to
8  answer based on that.
9      A.  It was privileged.
10     Q.  Are you aware of any records that are maintained of
11  driver's licenses that are expired by more than 60 days but less
12  than two years?
13     A.  I'm not.  You asked that earlier.  I'm not aware.
14     Q.  I'm sorry.
15     A.  It's okay.
16     Q.  Are you aware of what forms of ID are permissible
17  under the Georgia photo ID law?  And I'm happy to put them in
18  front of you if that makes it easier.
19     A.  We talked about it earlier.
20     Q.  This is U.S. Exhibit 6.  Just, if you can look through
21  now that you've just recently looked at S.B. 14 and tell me
22  what's in the Georgia law and not in S.B. 14?
23     A.  And not?  A card issued by the branch, department,
24  agency or identity of the State of Georgia or other state or of
25  the United States authorized by law to issue personal



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

209

1   identification and provide such identification, a valid U.S.
2   passport, which I assume that means not expired, a valid
3   employee identification card, obtained photograph of elector
4   issued by a branch and department agency or entity of the United
5   States Government, the state or any county, municipal board,
6   authority or other entity of the State. It says a valid
7   military ID. So that's not an expired. And a valid tribal ID
8   card.
9       Q. And doesn't it also not have an expiration limitation
10  on driver's licenses in Subsection 1?
11      A. I'm not sure. I guess you're reading this. It was my
12  understanding that Georgia's was two -- or not past the last
13  election cycle, but I don't recall.
14      Q. Just to clarify my question. Does it say that -- does
15  it limit use of Georgia driver's licenses to those that are
16  unexpired or less than 60 days expired?
17      A. I don't think it's specific here, unless you see it
18  and I don't. It says a Georgia driver's license which are
19  properly issued by the appropriate state agency. The difference
20  between that and the ID card and the passport, it says valid. I
21  don't know what they're reading into the difference of that is.
22      Q. Okay. So would it be fair to say that several of
23  these are different from S.B. 14? Nearly all of them?
24      A. I wouldn't use the word different, but they're
25  similar.

210

1       Q. Okay. Well, the driver's license provision doesn't
2   limit the use of expired IDs, correct?
3       A. It says a Georgia driver's license which was issued,
4   and the difference between the other one says a valid Georgia
5   voter identification card issued or a valid U.S. passport. I'm
6   not sure what they are meaning by valid.
7       Q. Okay.
8       A. Does that mean current? I don't know. Why wouldn't
9   they say current? I just can't answer.
10      Q. Okay. But an employee identification card issued by a
11  state --
12      A. That is different.
13      Q. It's easier if you don't talk over me.
14      A. Sorry.
15      Q. No problem. And a tribal identification card is not
16  included in S.B. 14, correct?
17      A. That is different.
18      Q. Okay. When Representative Veasey asked you on the
19  floor of the Texas House, "Why should we pass such a stringent
20  bill and stringent law based on rumor and innuendo," isn't it
21  the case what you responded, "S.B. 14 is similar to the case,
22  the legislation that was passed in Indiana, that was upheld by
23  the U.S. Constitution, is similar to the bill that was filed in
24  Georgia that was approved by the Department of Justice"? Isn't
25  that correct?

211

1       A. You're reading it, so I assume that it is.
2       Q. If you'd like me to -- it's on Page 97 of that
3   transcript right in front of you, which is Exhibit?
4       A. 11. I don't have it.
5       Q. It is Exhibit 18. Look at Page 97, onto Page 98.
6       A. "Similar to the case, the legislation that was passed
7   in Indiana, upheld by the U.S. Constitution" -- should have been
8   Supreme Court. "It is similar to the bill that was filed in
9   Georgia that was approved by the Department of Justice." Yes.
10      Q. Now, you've testified earlier that these bills had a
11  variety of differences, correct?
12      A. Was that my word? I can't remember.
13      Q. Not verbatim, but you just testified that there were a
14  number of differences in terms of the acceptable ID in Georgia
15  versus S.B. 14, correct?
16      A. I think you were asking me specifically, and I said --
17  when you read the statement, I said that's different and the
18  tribal ID was different. The others are similar.
19      Q. Do you still maintain the position that you
20  articulated on the floor, that the reason for passing the bill
21  was that the legislation is similar to what was passed in
22  Indiana and what was passed in Georgia?
23      A. My testimony on the floor and during the debate was
24  that it was similar.
25      Q. And do you still maintain that position today?

212

1       A. I still support what I said on the floor.
2       Q. How is the legality of S.B. 14 responsive to
3   Representative Veasey's question concerning the need for the
4   law?
5       A. The legality?
6       Q. So Representative Veasey asked -- let me rephrase.
7          Representative Veasey asked, "Why should we pass such
8   a stringent bill and stringent law based on rumor and innuendo?"
9   He is asking what is the need for this bill. And then you
10  responded, S.B. 14 is similar to the legislation in Indiana and
11  in Georgia, Indiana, having been, you asserted, upheld by the
12  U.S. Constitution and Georgia being approved by the Department
13  of Justice. So that was talking about how those bills were
14  considered legal. How was your response that S.B. 14 was legal
15  responsive to Representative Veasey's question about why the
16  legislation was needed?
17      A. All I can tell you is what I said here.
18      Q. But why did you respond to a question about the need
19  for the bill with an answer saying that the bill would not
20  violate the U.S. Constitution?
21      A. I can't remember exactly at what point this was, but I
22  think this was about the debate on an amendment and I was
23  responding to the amendment.
24      MR. FREEMAN: I'm going to object to that as
25  nonresponsive and ask you to review the transcript a little bit



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

213

1  further back if that provides some context and assistance for
2  you to be able to answer the question.
3      A.  It was in regard to his provision that would gut the
4  bill, is what my testimony is.  And then he continued with his
5  questioning that had nothing to do with his amendment, and I
6  went back to the purpose of his amendment, which the purpose of
7  the bill was that it was similar to Indiana and the U.S.
8  Constitution, and his amendment was trying to gut the provision
9  of the bill.  And I don't know how to answer that any other way.
10         MR. FREEMAN: I'm going to object to that as
11  nonresponsive as well, but we'll move on.
12         THE WITNESS:  Can we take a break?
13         MR. FREEMAN:  Sure.
14         (Recess from 4:36 p.m. to 5:01 p.m.)
15      Q.  Other than modeling bills on Indiana and Georgia, what
16  did you do to ensure that S.B. 14 was constitutional?
17         MR. SWEETEN: I think to some extent that the
18  question is asking her to reveal thoughts, mental impressions,
19  opinions about the legislation or conversations she's had with
20  legislator's staff, state agencies, Leg Council or constituents.
21  So I think that you're asking about the process and how she came
22  up with the bill.  I think that's squarely within the
23  legislative privilege.
24      A.  Privileged.
25      Q.  Did you make any public statements concerning your

214

1  efforts to ensure that S.B. 14 was constitutional?
2      A.  I don't know if I made public statements about that or
3  not.
4      Q.  Did you make any public statements or statements on
5  the record concerning your efforts to ensure that S.B. 14 would
6  comply with the Voting Rights Act?
7      A.  I don't know if I made statements on that or not.  I
8  recall making statements that I felt comfortable that it would
9  comply with Section 5 of the Voting Rights Act.
10      Q.  And what was the basis for your comfort?
11      A.  The statements that I said were that we had filed
12  legislation that were similar to Georgia, that had been pre-
13  cleared in Indiana, that had been upheld by the U.S.
14  Constitution, and I think I remember continuing by saying that
15  protected the integrity of the election process, it helped deter
16  and detect in-person voter fraud, and we provided for -- we
17  provided for provisional ballots and free voter certificate
18  card.
19      Q.  And did you take into account the differences between
20  S.B. 14 and the Georgia photo ID bill?
21         MR. SWEETEN:  Are you asking her in her public
22  statements or you're asking her did she take it into account in
23  her process?
24         MR. FREEMAN:  I'm asking with regard to the
25  public statements that she made, did those public statements

215

1  take it into account.
2         MR. SWEETEN:  Okay.
3      A.  The public statements were that the legislation was
4  drafted similar to those states.  I never said on record that it
5  was identical or the exact same piece of legislation, that it
6  was similar.
7      Q.  And that's -- just so I'm clear, was it your belief
8  that none of these -- strike that.
9         Sitting here today, can you identify any purpose for
10  the change from H.B. 112 to HB-14 as to the use of non-photo ID
11  what the purpose for that change was?
12         MR. SWEETEN:  You're asking her thoughts, mental
13  impressions or opinions about the legislation, the differences
14  between that legislation.  It could also implicate
15  communications she's had.  I believe that's legislatively
16  privileged.
17      A.  It was clearly privileged communications.
18      Q.  What does the term legislative emergency mean within
19  the Texas Legislature?
20      A.  You would have to ask the governor that.  I don't know
21  how to define that.
22      Q.  What does a legislative emergency effectively mean
23  within the legislature?  What is the effect of the declaration
24  of legislative emergency?
25      A.  It's my understand that the governor can call issues

216

1  that are emergency, that are heard during the first part of the
2  legislative session, a priority.
3      Q.  And if something is not declared a priority, it cannot
4  be heard in the beginning of the legislative session; is that
5  correct?
6      A.  There's certain days that it cannot be heard, until
7  committees are organized.
8      Q.  Are there any substantive constraints on what the
9  governor may declare to be a legislative emergency?
10      A.  Not to my knowledge.  I don't know.
11      Q.  Was photographic voter ID declared to be a legislative
12  emergency?
13      A.  I think the photo voter ID was.
14      Q.  Who was responsible for declaring photographic photo
15  ID to be a legislative emergency?
16      A.  The governor.  It's my understanding that only the
17  governor can call an emergency.
18      Q.  Are you aware of any conversations that occurred with
19  the governor concerning what bills would be declared legislative
20  emergencies?
21         MR. SWEETEN:  I think if you're asking about the
22  fact of the conversation, if you would just -- I think you're
23  asking subject matter.  We talked about this.  We talked about
24  trying to get through this issue together, and I'll work with
25  you.  I think you've put too much substance into the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

217

1   conversation. If you want to ask about communications she's
2   aware of, I'm comfortable with that.
3       MR. FREEMAN: I'll rephrase.
4       Q. Are you aware of any conversations concerning the
5   declaration of legislative emergencies for the 2011 legislative
6   session?
7       A. I am not aware of any conversations prior to them
8   being declared emergency.
9       Q. So you didn't participate in any of those
10  conversations?
11      A. I did not.
12      Q. Okay. Do you have any documents relating to the
13  declaration of voter ID as a legislative emergency?
14      A. Not that I'm aware of. I'm sure that we were sent
15  something from the governor's office, but I can't tell you for
16  sure I saw it or I have it.
17      Q. Okay. So nothing outside the actual declaration
18  itself?
19      A. Right.
20      Q. Okay. Was an election set to occur during the first
21  60 days of the legislative session, to your knowledge?
22      A. An election?
23      Q. Uh-huh.
24      A. In the State of Texas?
25      Q. Uh-huh.

218

1       A. I don't know, but I would bet there's some type of
2   municipal or some type of election across Texas. I don't know
3   though.
4       Q. Was there a uniform election date -- maybe that's the
5   right term -- set to occur during the first 60 days of the
6   legislative session?
7       A. If I remember correctly, the uniform election dates
8   are either in May or November, and they're for school board
9   elections or city municipal elections. So my guess would be no,
10  because May is past 60 days.
11      Q. Are you aware of any other reason why photographic
12  voter ID was declared to be a legislative emergency?
13      A. I am not aware.
14      Q. Okay. Did you have any role in the development of
15  S.B. 14 before it was submitted for consideration in the Senate?
16      A. No.
17      Q. Did your staff?
18      A. No. Now, you're asking specifically about S.B. 14,
19  correct?
20      Q. I am.
21      A. Because I think we filed a bill in the House that was
22  similar to S.B. 14, if not a duplicate.
23      Q. If I can put in front of you and mark as Government
24  Exhibit, U.S. Exhibit 23.
25          (Exhibit No. 23 marked)

219

1       Q. And if you can turn to Page 5. Now, as you can see on
2   Page 5, this is an indication from the State of Texas in
3   response to questions posed by the attorney general.
4       A. Uh-huh.
5       Q. And the State of Texas has indicated that Mr. Beuck
6   assisted with the drafting, development and passage of S.B. 14
7   in the Texas House of Representatives. Are you aware of any
8   assistance that Mr. Beuck provided concerning the drafting of
9   S.B. 14?
10      A. I have no idea.
11      Q. Are you aware of any assistance he provided in the
12  development of S.B. 14?
13      A. I have no idea.
14      Q. Did you provide him with any instructions as to the
15  substance of what you wished to be included in S.B. 14?
16          MR. SWEETEN: I think we're getting into
17  communication that she may have had with Mr. Beuck, her
18  legislative assistant. I think that if you're asking did she
19  talk with Mr. Beuck, I'll let her answer with respect to that.
20  But as far as what she talked to him about or the specific
21  matters, including Senate Bill 14, I think that those would be
22  privileged, the substance of those.
23      A. I'm sure we've had conversations about drafting a
24  photo voter ID.
25          MR. SWEETEN: Don't reveal the substance of

220

1   conversations. You can reveal the existence of conversations.
2       A. I would bet that we had conversations.
3       Q. Are you Mr. Beuck's direct supervisor?
4       A. Yes. I can hire and fire him, if that's what you're
5   asking.
6       Q. Does Mr. Beuck take direction from any other
7   individuals with regard to his work in the Texas Legislature?
8       A. Not while employed by me.
9       Q. Does he take any direction from Lt. Governor Dewhurst,
10  his former employer?
11      A. No. I have to answer -- I have to assume he doesn't
12  because if he does then he doesn't have a job with me.
13      Q. Okay. And I don't mean to imply that he does.
14      A. Yeah. Be careful, because we may be having a talk
15  about this tomorrow.
16      Q. I'm just trying to understand --
17      A. I --
18      Q. -- why Mr. Beuck was listed as having assisted with
19  the development of S.B. 14 if you provided no instruction or
20  gave no input with regard to the bill and you are the person who
21  is his immediate supervisor. I guess if you could explain, to
22  the extent of your knowledge and inside the confines of any
23  instruction your counsel may give, this statement.
24          MR. SWEETEN: One, I think your question would
25  ask for conversations that she had with Mr. Beuck, who is her



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

221

1   assistant, and that would be under the umbrella of what we
2   believe is covered by the legislative privilege. Two, I think to
3   some degree your question would ask for thoughts, mental
4   impressions or opinions about legislation or her thoughts about
5   that, and so I think that that's legislatively privileged.
6        A.   You know, we have discussions about legislation I want
7   filed.
8        Q.   Okay.  But you didn't file S.B. 14, correct?
9        A.   I filed -- I am pretty sure I filed a companion bill
10  to S.B. 14.
11       Q.   That was identical in substance to S.B. 14?
12       A.   I think it was.  I can't remember exactly.
13       Q.   And did you provide substantive direction with regard
14  to that companion bill?
15       A.   No.
16       Q.   When was S.B. 14 filed in the Senate; do you know?
17       A.   I don't.
18       Q.   We can refresh your recollection.  This is U.S.
19  Exhibit 8.
20       It says received by the Secretary of State.  That
21  doesn't make sense to me.  Filed 1/12 of 2011.
22       Q.   Does that say the Secretary of the Senate?
23       A.   Yes.  I'm sorry.
24       Q.   So January 12th?
25       A.   Yes.

222

1        Q.   And when did S.B. 14 pass out of the Senate?
2        A.   Testimony taken, record vote, reported favorably.  So
3   it was reported favorably without amendments.  I'm not exactly
4   sure because their procedures are different than ours.
5        Q.   Was it -- on Page 6 does it note that it was reported
6   engrossed from the Senate on January 26?  Do you see that?  The
7   last one that says S before it starts saying H?
8        A.   Yes.  It says reported engross, January 26.
9        Q.   And when was the bill referred to the Select Committee
10  on Voter Identification and Voter Fraud?
11       A.   2/11.
12       Q.   So February 11th?
13       A.   Yeah.  It was read in the House on the 11th and
14  referred to the committee on the 11th.
15       Q.   How were you chosen as the House sponsor?
16       A.   I don't know.
17       Q.   Did you ever ask Senator Fraser or speak to Senator
18  Fraser about it?
19       A.   I would say that's privileged.
20       MR. FREEMAN: Unless your attorney asserts
21  privilege, I'll ask you to answer.
22       THE WITNESS: Wake up.
23       MR. SWEETEN: Actually, with respect to any
24  conversation she had with Senator Fraser, that's legislatively
25  privileged.

223

1        MR. FREEMAN: You're a good student.
2        MR. SWEETEN:  She's only heard it, what, 200
3   times today?  Sorry.  I was communicating with Matt over here.
4        Q.   Did you ever have a conversation with Speaker Straus
5   on the general subject of House sponsorship of S.B. 14?
6        MR. SWEETEN:  You can answer the question as
7   phrased.
8        A.   Yes.
9        Q.   When did that discussion occur?
10       A.   Probably after he was elected Speaker, before
11  committee assignments came out.
12       Q.   How long did you speak for?
13       A.   Oh, when he and I spoke?  Usually five minutes, two
14  minutes.
15       Q.   Who else was present?
16       A.   I don't think anyone was.
17       Q.   Who initiated the conversation?
18       A.   I did.
19       Q.   Was that the only conversation that you had on that
20  subject?
21       A.   Pertaining to photo voter ID?
22       Q.   And sponsorship in the House.
23       A.   We may have had one more.
24       Q.   Did you ever have any conversations with Chairman
25  Bonnen on the same subject?

224

1        MR. SWEETEN:  Again, you can answer as to whether
2   a conversation occurred.  Don't reveal any of the contents.
3        A.   No.
4        Q.   Were any of these conversations documented in
5   memoranda or e-mail?
6        A.   No, not that I know of.
7        Q.   Okay.  When did you find out that you would be the
8   House sponsor of S.B. 14?
9        A.   When Chairman Bonnen issued a press release and sent
10  it out through House administration, and I got the press
11  release.
12       Q.   He didn't speak to you first?
13       A.   No.  The dynamics in the House are different.
14       MR. SWEETEN: Okay.  Just answer his question.
15       Q.   Based on the history of the bill that you have in
16  front of you, how long did the bill take to pass out of the
17  select committee to the floor of the House?
18       A.   It was referred to the select committee on 2/11 and
19  scheduled for a committee hearing on 3/1.  Testimony was taken
20  on 3/1, was left pending on 3/1, and it was voted out with a
21  committee substitute on 3/7 and recorded favorably on 3/7.
22       Q.   So it was only in committee for a week; is that
23  correct?
24       A.   From the date it was referred was 2/11 to 3/7.  So
25  that was a month.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

225

1    Q.   But from the first hearing to the final hearing, it
2    was just a week; is that correct?
3        A.   From the date that it was heard for public comment on
4    3/1 to voted out on 3/7, six days.
5        Q.   Just to loop back real quickly, why did you go to
6    Speaker Straus to talk to him about sponsorship of S.B. 14 in
7    the House?
8            MR. SWEETEN:   I think your question would require
9    her to reveal thoughts, mental impressions, opinions about
10   legislation, legislative process, and would require her to
11   reveal communications with Speaker Straus, and, therefore, I'm
12   going to object as legislatively privileged.
13       A.   Privileged.
14       Q.   Okay.  Did you have any additional conversations with
15   Senator Fraser concerning S.B. 14 on the general subject?
16       A.   Prior to it getting referred to the House in the press
17   release?
18       Q.   Yes.
19       A.   I don't recall if I did.
20       Q.   Did you have any conversations with Senator Fraser on
21   the subject of S.B. 14 after it was referred to the House?
22       A.   I don't think I had any conversations with him prior
23   to Dennis Bonnen doing his press release that I would carry it.
24       Q.   Did you have any conversations with Senator Fraser
25   after Chairman Bonnen's press release?

226

1        A.   I could have.  I don't remember specifically.
2        Q.   So you don't recall any specific conversations with
3    Senator Fraser even after you were carrying his bill?
4        A.   Yes.  We -- after we started moving the bill forward.
5        Q.   Okay.
6        A.   We had conversations, but not -- I don't recall
7    anything from the -- from before we had the hearing to the time
8    it got to the floor.  After we had the hearing, I'm sure we had
9    conversations.
10       Q.   Okay.  When did those conversations occur?
11       A.   You know, I don't remember.
12       Q.   Do you remember approximately how many there were?
13       A.   I know I went to his office and visited with him once
14   and maybe visited with his staff one other time.
15       Q.   Okay.  When you visited with him, was anyone else
16   present?
17       A.   I know my chief of staff and his chief of staff were
18   there.
19       Q.   Is his chief of staff Janice McCoy?
20       A.   Yes.  I think that's her title.
21       Q.   Okay.  And when you met with his staff, who was
22   present?
23       A.   Janice and Colby.
24       Q.   So just the three of you?
25       A.   Yes.

227

1        Q.   Okay.  Did you ever e-mail with Senator Fraser or his
2    staff?
3        A.   I don't recall e-mailing Senator Fraser at all and I
4    don't recall e-mailing Janice.  May have, but I don't recall it.
5        Q.   Okay.  Did you ever instruct Mr. Beuck to e-mail
6    Janice?
7        A.   I don't recall instructing him to e-mail her.
8        Q.   Uh-huh.
9        A.   But I know that he probably did e-mail her during the
10   course of the legislation moving.
11       Q.   Okay.  Was the period of time between when S.B. 14 was
12   first addressed in a public hearing and when it was passed out
13   of committee shorter than usual for a major bill like this?
14       A.   Actually, I don't think it is.
15       Q.   Okay.  What does it mean for a bill to be placed on the
16   emergency calendar?
17           MR. SWEETEN:   I think that's been asked and
18   answered, but go ahead.
19       A.   I don't know what the rules are.
20       Q.   Okay.  You haven't served on the rules committee?
21       A.   Served on Rules and Resolutions, but --
22       Q.   I'm sorry.  Calendars committee?
23       A.   No, I have not.
24       Q.   Okay.  So you're not aware of the distinction between
25   the emergency calendar and any other calendar?

228

1        A.   I'm not.  I probably should be.  I'm not.
2        Q.   Does the Calendar committee control who puts bills on
3    the emergency calendar?
4        A.   I am not aware.  I'm not advised.
5        Q.   Okay.  Were any changes introduced to S.B. 14 in the
6    conference committee that had not been in the version of the
7    bill passed by either House?
8            MR. SWEETEN:   You mean the House or the Senate?
9        A.   Either House of the Texas Legislature.
10       A.   Yes.  I know from the floor we had a resolution on the
11   changes in the Conference committee.
12       Q.   And what were those changes?
13       A.   There were several.  We defined the voter certificate
14   election card.  We took out an amendment on the -- we deleted
15   some of the amendments.  I can't remember all of them.  I had an
16   outside-of-the-bounds resolution.
17       Q.   And what does an outside-of-the-bounds resolution
18   mean?
19       A.   It means that when something is different that was in
20   the House version or the Senate version that hadn't been in
21   either, it has -- you have to have a vote on allowing the
22   membership to do that.
23       Q.   How often does that happen?
24       A.   During the last few days of session, when we're doing
25   conference committee reports, it happens more often than



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

229

1    probably we would like.
2         Q.  And why was the exemption based on religious beliefs
3    added back in in conference?
4         MR. SWEETEN:  Hold on a minute.  You're asking
5    her, I believe, to reveal thoughts, mental impressions or
6    opinions about legislation.  I think the "why" question does
7    that.  It also could require her to reveal communication.  So I
8    think that is within the confines of what is legislatively
9    privileged.  Instruct her accordingly.
10        A.  If I could remember, I would probably say it was
11   privileged.
12        Q.  So you didn't make any public statements regarding
13   that, of which you're aware?
14        A.  Not that I'm aware.  There could have been when we did
15   the out-of-the-bounds resolution.  I don't know.
16        Q.  And do you recall what changes were included
17   concerning the election identification certificate in the
18   out-of-the-bounds resolution?
19        A.  There was a clarification to make sure the discussion
20   was -- during the debate Representative Anchia raised a concern
21   that the free ID card would draw funds out of the Texas Mobility
22   Fund.  So the out-of-the-bounds resolution and the change was to
23   clarify that it would be election certificate voter card -- I
24   forget the proper name -- and that it would not draw from the
25   Texas Mobility Fund.

230

1         Q.  Are you aware of the date on which the governor signed
2    S.B. 14?
3         A.  I bet it's in here.
4         Q.  Feel free to refresh your recollection.
5         A.  Signed by the governor on 5/27.
6         Q.  To your knowledge has the Secretary of State enforced
7    any part of S.B. 14 concerning photographic voter ID?
8         A.  To my knowledge, they have not.
9         Q.  Are you aware of any local election official who has
10   enforced any part of the photographic voter ID requirements of
11   S.B. 14?
12        A.  To my recollection, no.
13        Q.  Okay.  Have you heard of any reports of confusion
14   concerning voter ID requirements leading up to the upcoming
15   primary in a couple weeks?
16        A.  I have seen a press release issued by a senator in
17   Harris County instructing the Secretary of State to make sure
18   that there is not confusion.
19        Q.  Who is that senator?
20        A.  I think it was senator Rodney Ellis from Harris
21   County, I think.
22        Q.  And are you aware of the reason why Senator Ellis
23   issued that press release?
24        A.  No.
25        Q.  Okay.  Who were the main opponents of S.B. 14.

231

1         A.  People?
2         Q.  Individuals.
3         MR. SWEETEN:  I just want to make sure that
4    you're not revealing communication with other legislators,
5    legislation staff, state agencies, Legislative Council,
6    constituents.  And don't reveal thoughts, mental impressions,
7    opinions about the legislation.  To the extent you can answer
8    that question without doing so, you can answer.
9         A.  I think from the committee testimony and the debate on
10   the floor, probably the most vocal in opposition to the
11   legislation, if I remember correctly -- I know Anchia, Rafael
12   Anchia.  I know Mark Veasey.  I remember a number of times with
13   back-and-forth debate with Represent Richard Raymond.  I think
14   there were some -- I know Yvonne Davis offered a couple of
15   amendments, one which I took.  Representative Donna Dukes
16   offered a couple amendments, and I think we adopted one of her
17   amendments, I think.
18        Q.  Are you aware of any outside groups who were opposed
19   to S.B. 14?
20        MR. SWEETEN:  Again, don't reveal communications
21   with other legislators, with legislative staff, state agencies,
22   Texas Leg Council or constituents in answering this question.
23        A.  Other than the people that testified in committee
24   against it, those are the only ones.
25        Q.  And who were those?

232

1         A.  MALDEF testified.  I think LULAC testified.  I think
2    there were some individuals representing different minority
3    groups that testified.
4         Q.  Were there any minority groups that testified in favor
5    of the bill?
6         A.  There were some minorities that testified in favor of
7    the bill.  I don't know what groups they were associated with.
8         Q.  Can you, sitting here today, identify any minority
9    groups that testified in favor of the bill in committee
10   hearings?
11        A.  I can't recall specifically what groups they were
12   with.
13        Q.  Did it concern you at all that all the major minority
14   groups were opposed to S.B. 14?
15        MR. SWEETEN:  Don't reveal your thoughts, mental
16   impressions or opinions about the legislation or communications
17   with the groups that we've discussed.
18        A.  Okay.  I don't know that I can define all the minority
19   groups, but if I were to, it was probably privileged
20   communication.
21        Q.  I'm not asking for any communication between different
22   legislators.  I'm asking with regard to major groups that you've
23   named.  And based on your inability to name groups that were in
24   favor of the bill representing minority voters, did it concern
25   you that the major groups all lined up against the bill?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

233

1      MR. SWEETEN:  When you're asking about her
2  concern, you're asking her to reveal her thoughts, her mental
3  impressions and her opinions about legislation.  I think that
4  directly asks that.  So I think that's squarely within the
5  legislation privilege.  I'm going to instruct you not to answer.
6      A.  Privileged.
7      Q.  Okay.  Did you at any time learn of any election
8  officials who were opposed to S.B. 14?
9      A.  I can't recall if any testified in committee against
10  it.  That's not to say there were or weren't.  I just can't
11  remember.
12      Q.  Okay.  Are you aware of any constituents who testified
13  against S.B. 14?
14      A.  That is possible, but I can't remember.
15      Q.  Did any one of your constituents, without prompting
16  from your office, reach out to your office to offer their
17  opposition to S.B. 14?
18      MR. SWEETEN:  With respect to the substance of
19  conversations between constituents and Representative Harless'
20  office, I believe that would be a matter that is legislatively
21  privileged and would fall within one of the communication areas
22  that I've been objecting to earlier.  Don't reveal the substance
23  of any communications with constituents.
24      THE WITNESS: I don't understand.  Do I answer the
25  question?

234

1      MR. SWEETEN:  If you can't answer that question
2  without revealing the substance of conversations between you and
3  constituents, then you can't answer the question and tell him
4  so.
5      A.  Okay.  It's privileged.
6      Q.  Okay.  And did you take any steps to address the
7  concerns expressed in the hearings or elsewhere by minority
8  groups?
9      A.  I think the testimony on the floor was that we
10  provided for the approved forms of identification.  If someone
11  did not have one of the approved forms, we would provide them
12  with free identification card in order to vote.  And the bill
13  was drafted with funds set aside for education and an
14  opportunity for, as we have now, ballot by mail if you're a
15  senior or disabled.  We put in all the safeguards.
16      MR. FREEMAN: Going to object to that as
17  nonresponsive, and I guess I'll rearticulate.
18      Q.  Can you identify today any changes that were made to
19  S.B. 14 in response to concerns articulated by minority groups
20  during the hearings held by the Select Committee on Voter
21  Identification and Voter Fraud?
22      Mr. SWEETEN:  Other than matters of public
23  record, including committee hearings or House proceedings, your
24  question is asking her to reveal thoughts, mental impressions,
25  opinions about the legislation or communications between

235

1  constituents, legislators, legislative staff, state agencies or
2  Texas Legislative Council.  I will instruct you to only answer
3  to the extent you are not revealing matters that are subject to
4  the privilege.
5      A.  It's privileged.
6      Q.  Okay.  Were you ever concerned that failing to address
7  the concerns of minority voters and the groups representing
8  minority voters might have an impact on preclearance of S.B. 14
9  under Section 5 of the Voting Rights Act?
10      MR. SWEETEN:  You're asking her to reveal her
11  thoughts, mental impressions or opinions about the legislation,
12  therefore, it's legislatively privileged.
13      A.  My testimony on the floor was that I felt that we had
14  met the constitutional standards laid out in Georgia's
15  legislation with -- providing the ability to deter and detect
16  fraud, providing for a free ID card, a disabled exemption,
17  religious exemption.  We met all the tests.
18      Q.  Okay.
19      A.  To meet Section 5.
20      Q.  Why did you think there was such strong opposition to
21  S.B. 14?
22      MR. SWEETEN:  I think that question asks her to
23  reveal thoughts, mental impressions, opinions about legislation,
24  Senate Bill 14, and it also could ask her to reveal
25  communications among the groups or individuals that we've

236

1  listed, and is therefore legislatively privileged.
2      Q.  Is your response that any response would be
3  privileged?
4      A.  Yes.
5      Q.  Okay.  Did you ever make any public statements about
6  the opposition to the bill that you recall?
7      MR. SWEETEN:  You can answer.
8      A.  Possibly.  There may be.
9      Q.  Do you have your op-ed in front of you?
10      A.  I do, somewhere.
11      Q.  I believe that's it.  Did you ever refer to the claims
12  made by opponents of photo ID as spurious?
13      A.  If it's in here, I guess I did.
14      Q.  It's on the bottom of the first page, last sentence of
15  the first page.  And this is Exhibit No. 19.
16      A.  Yes.  And then I proceeded by quoting Justice Stevens'
17  opinion that includes, "Burdens arising from life's" -- I can't
18  read it.  It's typed over.
19      Q.  Would it be "vagaries"?
20      A.  Yeah --  "however, are neither so serious or frequent
21  as to raise questions about the constitutionality of the photo
22  voter ID."
23      Q.  Are you aware of what the legal test is under
24  Section 5 of the Voting Rights Act?
25      A.  I don't recall it.


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

237

1    Q.  Are you aware of whether Crawford V. Marion County
2  Board of Elections was a case under the Voting Rights Act?
3    A.  That's the Georgia?
4    Q.  No.  That's the Indiana.
5    A.  Indiana?  No, that was not subject to preclearance.
6    Q.  And are you aware of whether that case addressed
7  whether the photo ID legislation would have a disparate impact
8  on minority voters, a greater impact on minority voters than on
9  Anglo voters?
10   A.  I don't remember the specifics of the case.  I have
11 read it, but I don't remember.
12   Q.  How would you define spurious?
13   A.  I couldn't define that.  And I'd like to take complete
14 authorship of this, but my staff pretty much wrote a lot of
15 this.  And I'm sorry.
16   Q.  Were all of the arguments made against photo ID
17 requirements just concerning the constitutionality of the photo
18 ID requirement?
19        MR. SWEETEN:  Are you asking about arguments made
20 at the hearing or are you --
21        MR. FREEMAN:  We can start with public.
22   A.  Say that one more time.
23   Q.  Were all of the arguments made against photo ID
24 arguments that photo ID would be unconstitutional?
25        MR. SWEETEN:  He's asking about public, so I'm

238

1  not going to make an instruction.
2    A.  I don't recall.
3    Q.  Did anyone argue that it was simply not necessary?
4        MR. SWEETEN:  This is still as to public?
5        MR. FREEMAN:  In public.
6    A.  I'm sure there were witnesses that said that it wasn't
7  necessary.
8    Q.  And did Crawford V. Marion County Board of Elections
9  address whether photo ID was good policy?
10   A.  I don't recall that in Indiana's testimony.
11   Q.  Does the Supreme Court ordinarily pass on whether a
12 law is good policy?
13   A.  I don't know what the Supreme Court does.
14   Q.  Okay.  Did you ever discuss whether S.B. 14 might
15 impact minority voters more than it impacted Anglo voters with
16 anyone?
17        MR. SWEETEN:  I'm going to object.  I think
18 you're asking for information that relates to mental impressions
19 or communications between legislators, legislative staff, Texas
20 Legislative Council or constituents.  To the extent it does so,
21 I'm going to instruct you not to answer based on legislative
22 privilege.
23   A.  It's privileged.
24   Q.  Did you ever have any discussions of disproportionate
25 impact on the public record?

239

1    A.  On the public record, I felt like -- I remember
2  testifying that I felt that it would affect all Texans equally.
3    Q.  Were you concerned that S.B. 14 might
4  disproportionately and negatively impact minority voters?
5        MR. SWEETEN:  I think you're asking for her to
6  reveal thoughts, mental impressions, or opinions about
7  legislation,  particularly Senate Bill 14, which is privileged.
8  Don't answer the question.
9    A.  Privileged.
10   Q.  Did you seek any advice on whether S.B. 14 complied
11 with Section 5 of the Voting Rights Act?
12        MR. SWEETEN:  Same objection.
13   A.  That's privileged.
14   Q.  What was your strategy to ensure that S.B. 14 was
15 passed on the House floor?
16        MR. SWEETEN:  Same objection.  Don't answer the
17 question.  It's legislatively privileged.
18   A.  It's privileged.
19   Q.  How did you prevent chubbing?
20        MR. SWEETEN:  Good lord. Chubbing?
21        MR. FREEMAN:  Chubbing.
22        MR. SWEETEN:  That sounds like it would ask her to
23 reveal mental impressions, opinions about legislation.  So I'm
24 going to object as legislatively privileged.
25   A.  There was never any debate about chubbing on the

240

1  floor.
2        MR. FREEMAN:  Mr. Sweeten, after this deposition
3  we can have a discussion about what chubbing is.  That's fine.
4        MR. SWEETEN:  I'd like to know what chubbing is.
5        THE WITNESS:  I know what chubbing is.
6    Q.  How did you prepare for the floor debate?
7        MR. SWEETEN:  To the extent that that question
8  would require you to reveal communications between legislators,
9  legislation staff, state agencies, Texas Legislative Council,
10 constituents or would reveal your thoughts, mental impressions
11 or opinions about the legislation, don't answer the question.
12   A.  It would do all of those.
13   Q.  Did you have any discussions with any individuals on
14 the general subject of the floor debate prior to the floor
15 debate?
16        MR. SWEETEN:  I'm going to let you answer to
17 whether or not you had discussions and the names of the
18 individuals.  Do not reveal the substance of the communication.
19   A.  I had discussions with members of the House that were
20 going to help me with the floor debate.  Discussions with my
21 staff.  I'm trying to remember if there were anyone else.
22 Possibly discussions with Janice.  Possibly discussions with an
23 employee with the Lt. Governor's office.
24   Q.  And who was that?
25   A.  Brian Herbert.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

241

1    Q.  And is that H-a-e-b-e-r-t?
2    A.  I think it's H-e-r-b-e-r-t.
3    Q.  Okay.
4    A.  Spelled Herbert but pronounced Abear.
5    Q.  Very fancy.
6    A.  From who knows where.
7    Q.  Anyone else that you can recall?
8    A.  No.
9    Q.  And who were those legislators?
10   A.  Representative Truitt, Represented Todd Smith,
11   Representative Kelly Hancock, Representative Larry Phillips,
12   Representative Bonnen, Representative Geren, Representative
13   Larry Taylor, and maybe Representative Burt Solomons.
14   Q.  Did you approach these individuals prior to the
15   conversation?  Did you initiate these conversations?
16   A.  I did.
17   Q.  With each individual one on one or in a group?
18   A.  It may have been more than one at a time.
19   Q.  Okay.  Did anyone instruct you as to who you should
20   speak to concerning support during floor debate?
21       MR. SWEETEN:  Don't answer that.  It would
22   require you to reveal communications with another legislator,
23   Texas Leg Council, constituents.  If it doesn't do that, you can
24   answer, but otherwise don't answer the question.
25   A.  No.

242

1    Q.  Were any of these individuals on the select committee
2    with you?
3    A.  Representative Bonnen was.
4    Q.  Anyone else?
5    A.  I can't remember all the committee members, but since
6    you said that, Representative Aliseda was another one I spoke
7    with.
8    Q.  Okay.
9    A.  And he did serve on the select committee.
10   Q.  Okay.  Were any of these individuals on the Elections
11   committee?
12   A.  Representative Larry Taylor serves on Election
13   committee.
14   Q.  Anyone else?
15   A.  I don't know off the top of my head.
16   Q.  Okay.  Did you prepare any documents prior to the
17   floor debate for use during floor debate?
18       MR. SWEETEN:  You can answer as to whether you
19   prepared a document.  I'll let you answer that, but do not go
20   any further and reveal any sort of substance.
21   A.  Yes.
22   Q.  Who prepared that document?
23   A.  Colby and myself.
24   Q.  When did you prepare that document?
25   A.  Maybe two days before, three days before.

243

1    Q.  Did anyone else provide input concerning that
2    document?
3    A.  Not that I'm aware of.
4    Q.  Did you receive any other instructions from Speaker
5    Straus' office?
6    A.  No.
7        MR. SWEETEN:  Wait a minute.  I'm going to let
8    you ask if she had communications, but I think instructions,
9    you're starting to get into mental impressions and discussions
10   that she may have had and the specifics of those.  So I'll let
11   you ask it, if you would just ask it as to substance.
12   Q.  Happy to scale it back, as comprise.
13   A.  The Speaker's office did not contact me prior to the
14   debate on the floor.
15   Q.  Did Senator Fraser's office contact you prior to the
16   debate on the floor?
17   A.  I don't think they did.  I think we contacted them.
18   Q.  Were there any e-mails passed between your offices
19   prior to the debate on the floor?
20       MR. SWEETEN:  You can answer about the existence
21   of e-mails.
22   A.  Possible.  I don't know.
23   Q.  Any other documents?
24   A.  Possibly.
25   Q.  Okay.  But not to your recollection?

244

1    A.  No.
2    Q.  That's good enough.  Anyone from -- did you have any
3    communications with anyone from Lt. Governor Dewhurst's office
4    prior to the floor debate?
5        MR. SWEETEN:  I'll let you answer as to existence
6    of communications, not to the substance.
7    A.  As I mentioned, Brian Herbert.
8    Q.  Okay.  I'm going to put a document in front of you
9    that has previously been marked Document 9, U.S. Government 9.
10   Sorry to make you relive 11 hours.
11   A.  Is this the same one or a different one?
12   Q.  That is the House Journal.  The one I previously gave
13   you a transcript, that is the full transcript as provided by
14   counsel.  This is the official journal.  Just so we can clarify
15   for the record, is it your understanding that the House journal
16   only prints remarks if a member requests that remarks be printed
17   and that some remarks from the day's floor debate are not
18   included in the House journal?
19   A.  To clarify your statement, I know that if a member
20   requests that it be recorded in the House journal, then it is.
21   Q.  Uh-huh.
22   A.  And I know that not everything is recorded in the
23   House journal, but I don't know if they record stuff without
24   members requesting it.
25   Q.  Okay.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

245

1  A. I think on occasion, when a member has gone to the
2  back mike, if I remember correctly and said, please let the
3  remarks be recorded in the journal, the speaker has said, it's
4  already been done. So I don't know what the distinction is.
5  Q. But not everything will automatically show up in the
6  House journal, correct?
7  A. Yes. That's a true statement.
8  Q. Good enough. Can you turn to Amendment 15 on Page 969
9  and take a look at that amendment.
10  A. Amendment 15?
11  Q. That's correct. When Amendment 15 was offered -- well,
12  first, can you explain what the purpose of Amendment 15 was, to
13  the extent of your understanding?
14  MR. SWEETEN: I'm going to let you discuss it to
15  the extent it appears on public record or you can refer to
16  hearings or committees. He's asking about purpose though
17  potentially invades and requires you to reveal thoughts, mental
18  impressions, opinions about the legislation, including that
19  amendment offered on Senate Bill 14. Also could implicate
20  communications that you've had. Therefore, I want you to be --
21  to answer to the extent it does not invade legislative
22  privilege.
23  A. I'm not sure what this was about.
24  Q. Well, can you explain the substance, what it would do?
25  A. It says fees prohibited for certain forms of

246

1  identification documents, and it references the election code
2  strikes. So I'm not sure exactly what this amendment did except
3  for it's saying you can't charge any fees for identification
4  documents.
5  Q. And isn't it the case that Amendment 15 would have
6  prohibited fees needed -- fees to obtain a document that may be
7  used as proof of identification under S.B. 14? Isn't that
8  correct?
9  A. I'm not sure. The way it reads, it says for certain
10  forms of identification. I don't know if they're the same forms
11  that are required to get a driver's license or ID or different
12  forms or -- I can't answer it.
13  Q. Why did you move to table this amendment?
14  MR. SWEETEN: Don't answer that. It would
15  require you to reveal your thoughts, mental impressions,
16  opinions about the legislation.
17  A. It's privileged, unless it's in the record.
18  Q. During the debate, do you recall saying that the bill
19  was about voter ID, not issuing documents for free ID? And I
20  can put in front of you what we're going to mark as U.S. Exhibit
21  24.
22  (Exhibit No. 24 marked)
23  Q. This is Volume II of the full transcript. And if you
24  look to Page 12. And perhaps if you could take a look at
25  Representative Martinez's statement, you can get a better sense

247

1  of the bill as well, the amendment.
2  A. That's what I said.
3  Q. And now that you've read Representative Martinez's
4  statement, can you tell me what the amendment would have done?
5  A. It -- his statement talks about, he doesn't know where
6  his birth certificate is. It's probably at his mom's house. If
7  he had to get a certified copy of his birth certificate he would
8  have to go down to the vital statics and pay $22 in order to get
9  that.
10  Q. And so essentially, isn't it the case that this
11  amendment would make it free to get the documents that you need
12  to get the free ID? Is that correct?
13  A. I don't know that the people that would -- this bill
14  was about providing integrity in the election process and
15  protecting the election process.
16  MR. SWEETEN: You want to confine your answers to
17  the matters of the public record. I don't want you to go into
18  reveal thoughts, mental impressions or opinions about the
19  legislation. So there's a line here. Clearly, you can discuss
20  the public record. You can discuss his questions to the extent
21  they appear in the House journal, but I don't want you to go
22  into your mental impressions, opinions about the legislature.
23  A. And I'll stay with my statement that I said on the
24  record that the bill was about photo ID and not issuing
25  documents for free IDs.

248

1  Q. But didn't you earlier say that it was important that
2  an election identification certificate be available for free in
3  order for this not to have a negative impact on any Texans,
4  including minority Texans?
5  A. I don't know if I said it was important. I said one
6  of the provisions was a free voter certificate card for people
7  that didn't have one of the approved forms of devices --
8  devices? -- of IDs.
9  Q. Okay. And so I guess I'll ask again, if that was one
10  of the elements of S.B. 14 that helped make it legal, that that
11  ID be available for free, for that to be a free ID, doesn't it
12  need to be free to get the documents that you need to get the
13  free ID, as a matter of logic?
14  A. I think that's privileged.
15  MR. SWEETEN: Yeah. Don't reveal your thoughts,
16  mental impressions, opinions about the legislation. Okay?
17  Q. Okay. I'll simply ask for the record one more time,
18  why did you move to table Amendment 15?
19  MR. SWEETEN: Same objection. Refer to matters of
20  public record, that it's legislatively privileged.
21  A. I said, "Members, I'd like to move to table this
22  motion. This bill is about voter ID and not about issuing free
23  IDs, not about issuing documents for free IDs."
24  Q. If you could please turn to Page 979 and Amendment No.
25  23 and take a look at that amendment real quickly.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

249

1    A. 979?
2    Q. 979 of the House journal, which is again Exhibit No --
3    A. 9.
4    Q. Yes, 9.
5    A. Amendment number?
6    Q. 23, offered by Representative Dutton?
7    A. It's an amendment to allow for student identification
8    cards by public, private high school or institution of
9    education.
10   Q. Do you recall telling Bloomberg News -- I believe I
11   showed you the article earlier -- that you wanted a form of
12   identification that was easily recognized by poll workers at the
13   election site?
14   A. I haven't seen the article, but I remember that
15   statement.
16   Q. You do remember making that statement?
17   A. I don't know who I made that statement to, but I've
18   made that statement before.
19   Q. It's Exhibit 10. I believe you should have it in
20   front of you, if you want to take a look and refresh your
21   recollection.
22   A. I've got 11, 4, 12, 7, 6. Do you know about where it's
23   at? Where it says "Election Integrity, Harless, Republican
24   State Rep, said concerns of constituents about 'the integrity of
25   elections' rather than possible partisan advantage explains why

250

1    she sponsored the voter ID measure last year. The law reduces
2    the possibility of fraud, she said. Lawmakers excluded student
3    IDs because 'we wanted a form of identification that was easily
4    recognized by poll workers at the election site.'"
5    Q. So that's a correct statement?
6    A. Yes. That's what it says there.
7    Q. Bloomberg does a better job of quoting than the
8    Houston Chronicle?
9    A. I don't know. I recognize saying that statement
10   before.
11   Q. Okay.
12   A. Whether it was in this record or that.
13   Q. Okay. Didn't you previously testify that your polling
14   place is at a school?
15   A. At my current home?
16   Q. Uh-huh.
17   A. Yes.
18   Q. So isn't it likely that there wouldn't be more than
19   one or two, a few different high school IDs at any given polling
20   place?
21   A. I couldn't even speculate on that.
22   Q. Okay. Are you aware of how many forms of
23   identification are issued by the United States military?
24   A. I'm not sure what your question is.
25   Q. Are you aware of how many forms of identification, how

251

1    many different IDs are issued by the United States military?
2    A. In the record we talked about the military ID. And if
3    I remember correctly, when asked about that, my response was the
4    military identification is a card issued by one of the branches
5    of the service. Other than that, I don't know.
6    Q. Are you aware of whether they issue identification
7    cards to contractors?
8    A. I'm not aware of any of that.
9    Q. Are you aware of whether they issue identification
10   cards to family members of active military soldiers?
11   A. I am not aware of any of that.
12   Q. Are you aware of whether they issue identification
13   cards to veterans?
14   A. The active branches of the military?
15   Q. Or the Veterans Administration?
16   A. I am aware that the Veterans Administration issues
17   IDs.
18   Q. And are you aware of whether the military issues ID
19   cards to reservists?
20   A. I don't know.
21   Q. Did you assess, when you were working on S.B. 14, how
22   many ID cards were issued by the United States military?
23   MR. SWEETEN: Don't reveal thoughts, mental
24   impressions, opinions about the legislation. Don't reveal
25   communications between legislators, legislative staff, state

252

1    agencies, Leg Council or constituents.
2    A. That's privileged.
3    Q. Do you believe that poll workers will be able to
4    easily recognize military IDs?
5    A. I think that they are a standardized form.
6    Q. What is the basis for that belief?
7    A. If it's issued by one of the branches of the military.
8    If they're a Marine, they have a Marine card.
9    Q. Have you ever seen a military ID?
10   A. I think I probably have.
11   Q. Could you tell me what it looks like.
12   A. I can't off the top of my head.
13   Q. Why does S.B. 14 allow military identification and not
14   college identification as a permissible form of ID?
15   MR. SWEETEN: Objection, calls for matters of
16   legislative privilege and asks her to reveal thoughts, mental
17   impressions, opinions or communications she's had with the
18   entities or individuals I've previously named.
19   A. That's privileged.
20   MR. SWEETEN: Instruct her not to answer.
21   Q. Are you aware of the demographics of the college
22   population in the State of Texas?
23   A. I am not.
24   Q. Are you aware of whether the population in the State
25   of Texas that is currently attending college is a higher



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

253

1    percentage minority than the population of the state as a whole?
2        A.  I'm not.
3        Q.  Okay.  If you can turn to Amendment No. 30, which is
4    on Page 984, onto 985.  And Amendment 30 added a valid
5    identification card that contains the person's photograph and is
6    issued by a tribal organization to the list of acceptable IDs,
7    correct?
8        A.  Yes.
9        Q.  And you didn't oppose this amendment, correct?
10       A.  Um, we had --
11           MR. SWEETEN:  Just reveal it as to matters of
12   public record.  Don't reveal your thoughts or mental impressions
13   or opinions.  So oppose could be -- if it's a public matter, you
14   can discuss it.  If it's a mental impression or opinion about
15   the legislation, do not.
16       A.  We had considerable amount of debate on the floor or
17   dialogue on the floor about this.  Representative Gonzalez
18   offered the amendment, if I remember correctly.  Then she pulled
19   it down, went to seek counsel with other members, came back with
20   the other members, offered the amendment back.  And we discussed
21   that, in her opinion, all tribal cards were issued by an agency
22   of the federal government.
23       Q.  Uh-huh.
24       A.  And we had a discussion -- I don't remember the
25   specifics of it, but it was on the record -- that if she could

254

1    provide me with the information that she was quoting from then I
2    would keep this amendment in the legislation.
3        Q.  Uh-huh.
4        A.  But if she could not provide that, we would not keep
5    it.  We would accept it based on her response that she had this
6    information.
7        Q.  And so is it your statement, then, that it came out in
8    the conference committee because she did not provide that
9    information?
10           MR. SWEETEN:  Same instruction.
11       A.  That's privileged conversation.
12       Q.  You told the Texas Tribune that these IDs do not have
13   a single standardized form; is that correct?
14       A.  If that's what it says I did.
15       Q.  And what was the basis for that statement?
16       A.  That would be privileged conversation.
17       Q.  Are you asserting that the --
18       A.  I'm sorry.  I'm not allowed to do that.
19           MR. SWEETEN:  Go ahead.  You can ask your
20   question again.
21       Q.  What was the basis for your statement to the Texas
22   Tribune that tribal ID do not have a single standardized form?
23           MR. SWEETEN:  You can discuss a public statement,
24   but you can't at the same time reveal thoughts, mental
25   impressions or opinions about the legislation.  So I think that

255

1    would be legislatively privileged.  Public matter, though, you
2    can answer questions about the statement, but don't reveal the
3    privileged information.
4        A.  The statement was based on privileged information from
5    conversations with colleagues.
6        Q.  Okay.  What about enhanced tribal IDs issued by the
7    federal government?  Aren't these in a single standardized form?
8        A.  If I remember correctly, that was the term that she
9    used during her presentation of the amendment.
10       Q.  Uh-huh.
11       A.  And could not confirm -- or there was never any proof
12   in the record that she knew that those were the types of IDs
13   that were presented in Texas.
14       Q.  Do you know how many state or federally recognized
15   tribes there are in Texas?
16       A.  I know we discussed that on the floor.  I can't
17   remember.  I remember the debate being about 5,000 tribal
18   members in Texas, but I don't know how many select tribes.
19       Q.  If I can just get -- this is U.S. 25.  And if you can
20   just take a look under Texas and see if you can refresh your
21   recollection.
22           (Exhibit No. 25 marked)
23       A.  I don't recall ever seeing this document at any time
24   during the debate.
25       Q.  Sure.

256

1        A.  But on this document it says there are three tribes in
2    Texas.
3        Q.  And so there would only be three forms of ID that we
4    are talking about, right?
5        A.  There are three tribes in Texas.  I don't know if they
6    offer different IDs for different members of the tribe.  I don't
7    know.
8        Q.  So, again, why does S.B. 14 permit military ID but not
9    tribal ID?
10           MR. SWEETEN:  Don't reveal thoughts, mental
11   impressions or opinions about the legislation.
12       A.  Privileged.
13       Q.  Okay.  If we can move on to Amendment 34, which is
14   House Journal Page 987.  Take a quick look.
15       A.  Okay.
16       Q.  Have you taken a look?
17       A.  Amendment 34 would have rendered the act unenforceable
18   if it did not comply with Section 5, Sectin 203 or Section
19   4(f)(4) of the Voting Rights Act, correct.
20       A.  Yes.
21       Q.  Now, you earlier stated that the Texas Legislature
22   considered, as part of its process, why -- whether a law
23   complies with federal law and federal Voting Rights Act,
24   correct?
25       A.  Say that one more time.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

257

1    Q.  You earlier testified that as part of the legislative
2    process you would consider whether a law complied with federal
3    law and the federal Voting Rights Act, correct?
4        MR. SWEETEN:  Objection.  I'm not sure that
5    accurately characterizes the specific testimony.
6    A.  And I agree.  I don't remember specifically what I
7    said.
8    Q.  Earlier in the deposition you said that during the
9    drafting process you depended on the Texas Legislative Council
10   to ensure that laws complied with federal law and the federal
11   Voting Rights Act.
12   A.  I agree I said something similar to that, yes.
13   Q.  But -- and on Page 988 near the top, your third
14   statement, you said, "As I said before, this is a federal issue
15   to be decided by the federal courts.  This isn't for us in the
16   Texas Legislature to discuss right now."
17   A.  That was taking a statement out of context from the
18   record.
19   Q.  I'm asking you if you made that statement.  And if
20   you'd like, I can ask you if you'd like to explain that
21   statement in context.
22       MR. SWEETEN:  Let's just answer the question he's
23   asking.  I think he's asking did you make that statement.
24   Q.  Did you make that statement?
25   A.  Yes.

258

1    Q.  Would you like to provide context -- could you provide
2    context for that statement?
3        MR. SWEETEN:  I'm going to instruct her not to
4    reveal thoughts, mental impressions or opinions about the
5    legislation.  She can refer to matters of the public record.
6    A.  I think during the debate it was discussed that the
7    legislation is drafted to comply with the Voting Rights Act.
8    Q.  But you stated that this was not an issue for the
9    Texas Legislature, it was an issue for the federal courts,
10   correct?
11   A.  The debate that he wanted to have in the record --
12       MR. SWEETEN:  Just answer his question.  Did you
13   state that?
14   A.  Yes, I stated that.
15   Q.  I'll ask you, since your counsel did not object or
16   provide an objection to stop your testimony, I would ask you to
17   complete the statement that you were making.
18   A.  In this debate that we were having, he wanted to
19   debate the need for the Voting Rights Act.  And I told him I
20   don't think this is the place to debate that.
21   Q.  Okay.  Why did you vote against this amendment?
22       MR. SWEETEN:  Don't answer the question.  It
23   would reveal thoughts, mental impressions, opinions about the
24   legislation and is legislatively privileged.
25   A.  Privileged.

259

1    Q.  If we can turn to Amendment No. 35 is which is on Page
2    991.  And that only states that Section 203 and 14(f)(4), which
3    probably should be 4(f)(4) of the Voting Rights Act should be
4    applied to this section; is that correct?
5    A.  That's what it says.
6    Q.  Are you aware of what Section 203 and Section 4f(4)
7    of the Voting Rights Act do?
8    A.  Not off the top of my head.
9    Q.  Can I represent to you that those are the language
10   minority provisions of the Voting Rights Act that require
11   certain documents to be translated into languages spoken by U.S.
12   citizens within the state?
13   A.  Okay.
14   Q.  What was your understanding of the effect of this
15   amendment to apply those two provisions to the bill?
16       MR. SWEETEN:  That would ask her to reveal
17   thoughts, mental impressions, opinions about the legislation.
18   That would be legislatively privileged for her to provide that
19   answer.
20   A.  And it's privileged, and I wasn't involved in that
21   discussion.
22   Q.  Why did you vote against the amendment?
23       MR. SWEETEN:  Don't answer.
24   A.  It's privileged.
25   Q.  Do you believe that materials that must be printed

260

1    under S.B. 14 should be printed only in English?
2        MR. SWEETEN:  The question is does she currently
3    believe that or did she believe it at the time of the passage?
4    A.  Let's say currently.
5    A.  Okay.  I carried a bill last session that said that
6    the Secretary of State must do the translation because now, in
7    Harris County, we translate in English, Spanish, Vietnamese and
8    Mandarin.  And other counties are required, since the census, to
9    print their ballots in additional language.  So I would say that
10   your statement that you're making or asserting that I believe is
11   not true.
12   Q.  It was a question.
13   A.  Yeah.
14   Q.  So the answer is no?
15       MR. SWEETEN:  Dan, I need to go to the bathroom,
16   so I'll be back.  We can take a very short break.
17       MR. FREEMAN:  Yeah.  I'm almost done.
18       (Recess from 7:04 p.m. to 7:06 p.m.)
19   Q.  With regard to the language requirements that you just
20   discussed in Harris County, are you aware that Section 203 of
21   the Federal Voting Rights Act requires Harris County to print
22   those materials in those languages?
23   A.  I think that you said that earlier.
24   Q.  And so, let me just reiterate my question.  Why did
25   you then vote against an amendment that would simply articulate



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

261

1    that Section 203 applies to S.B. 14?
2         MR. SWEETEN:  To not reveal thoughts, mental
3    impressions, opinions about legislation, why you voted for
4    something.  Don't reveal communications that you've had.  Those
5    are legislatively privileged.
6         A.  Privileged.
7         Q.  Okay.  Let's move to Amendment 50, Page 1009 on to
8    1010.  If you can take a quick look through it.  Okay.  So
9    Amendment 50 would have simply reimbursed the costs for poor
10   individuals to travel to obtain ID, correct?
11        A.  Yes.
12        Q.  Why did you vote against this amendment?
13        MR. SWEETEN:  Objection.  It would require her to
14   reveal thoughts, mental impressions, opinions about legislation
15   and would therefore be legislatively privileged.
16        A.  Privileged.
17        Q.  Isn't is the case that the majority of the individuals
18   who live below the poverty line in Texas are members of racial
19   or language minority groups?
20        A.  I don't know that I know that for sure.
21        Q.  Do you know whether members of racial or language
22   minority groups are more likely to live below the federal
23   poverty line in Texas than Anglos?
24        MR. SWEETEN:  Objection, asked and answered.
25        A.  I don't know that I know what the breakdown is.

262

1         Q.  Okay.  Let's move to Amendment 54 on Page 1015.  We
2    can take a quick look.
3         A.  I'm sorry.  I didn't know you were waiting on me.
4         Q.  No worries.  So Amendment 54 would require the
5    Secretary of State to determine who is prevented from voting and
6    who filed provisional ballots that were eventually not counted
7    because the individual did not later show up to provide the
8    necessary ID and would require the Secretary of State to record
9    that by demographics, correct?
10        A.  Yes, that's what it says.
11        Q.  Why did you move to table this amendment?
12        MR. SWEETEN:  Objection.  It would ask her to
13   reveal thoughts, mental impressions, opinions about legislation
14   and it is therefore legislatively privileged.
15        A.  It's privileged.
16        Q.  Would it concern you if members of racial or language
17   minority groups were disproportionately likely to show up at the
18   polling place lacking the necessary ID and then later not return
19   to show ID to have their provisional ballot counted and, thus,
20   not have their ballot counted at all?
21        MR. SWEETEN:  Are you asking her would it concern
22   her now?
23        MR. FREEMAN:  Yes.
24        A.  Could you rephrase the question.
25        Q.  Sure.  Would it concern you if members of racial

263

1    minority groups or language minority groups were
2    disproportionately -- or a larger share of the group of people
3    who voted by provisional ballot, because they didn't have the
4    necessary ID under S.B. 14 and then did not return, for whatever
5    reason, with the necessary ID in the time frame that S.B. 14
6    allows, and thus, as a result, that that group of people didn't
7    have their ballots counted?
8         A.  You want to answer a hypothetical.  We have no
9    evidence that that's going to happen.
10        Q.  But if it did happen, would it concern you?
11        A.  I'm --
12        MR. SWEETEN:  Objection, calls for speculation,
13   assuming facts not in evidence.
14        A.  I can't answer a hypothetical.
15        Q.  Okay.  Let's move on to Amendment 55, which is on Page
16   1016.  Take a quick look.
17        A.  1016.  Okay.
18        Q.  Amendment 55.  Under Amendment 55, the Secretary of
19   State is required to determine whether the majority of voters
20   casting provisional ballots because they lacked photo IDs were
21   members of minority groups, and, if so, if that were the case,
22   would then allow the use of voter registration certificates,
23   correct?
24        A.  That's what it says.
25        Q.  Why did you vote against this amendment?

264

1         MR. SWEETEN:  Objection.  It would ask her to
2    reveal her thoughts, mental impressions, opinions about
3    legislation and, therefore, falls under the legislative
4    privilege.
5         A.  Privileged.
6         Q.  Now, you said on the record -- and it's on Page 1018
7    -- in response to arguments in favor of this amendment that in
8    Crawford V. Marion County Board of Elections that The Court
9    ruled that the requirement to produce photo ID imposes only a
10   limited burden on the voter and justifies by the State's
11   interest in restoring confidence in elections and deferring
12   fraud, correct?
13        A.  Where you are reading that?
14        Q.  On Page 1018.  Top of the page.
15        A.  I did.  That's what the record reflects.
16        Q.  And I know we discussed this a little bit earlier, but
17   are you aware of the nature of the legal dispute in Crawford?
18        A.  It was not exactly off the top of my head.  I've
19   reviewed the case.  It was the case on the voter ID for Indiana.
20        Q.  It was constitutionally, correct?
21        A.  I guess.  I can't remember.
22        Q.  But it wasn't discrimination on the basis of race,
23   right?
24        A.  I can't answer that.  I don't know.
25        Q.  If I can represent to you that it was not --



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

265

1     A.   Okay.

2     Q.   -- discrimination on the basis of race.

3     A.   I trust you.

4     Q.   I appreciate that.  We've spent a lot of time

5   together.

6          How was your response concerning Crawford responsive

7   to concerns about racial discrimination?

8          MR. SWEETEN:  You're asking her to interpret

9   matters that were part of the legislative record.  I'll let her

10  refer to the record in answering that question.  But I think to

11  some extent you're asking her to reveal thoughts, mental

12  impressions, opinions about the legislation.  So to the extent

13  you can refer to public documents, feel free to do so.

14  Otherwise, do not reveal those.  They are subject to the

15  legislative privilege.

16    A.   The record is talking about if -- it says in here that

17  I'm not a big fan of talk radio.  I don't listen to it, and I

18  don't believe everything they say.  So that goes to mention what

19  we talked about earlier.  It talks about the decision.  And

20  they're asking me questions, and I'm answering the questions.  I

21  don't recall.

22         MR. FREEMAN:  I'll object to that as

23  nonresponsive.

24    Q.   But I'll assume the remaining answer to my question

25  would be privileged; is that correct?

266

1     A.   Yes, sir.

2     Q.   Okay.  Last one.  Amendment No. 58 on Page 1021, if

3   you could take a quick look.

4     A.   Is this the amendment?

5     Q.   Amendment 58.  It's on Page 1021.  Strike Section 25

6   and substitute a new Section 25.  Do you see that?

7     A.   Okay.  Yes.

8     Q.   And so Amendment 58 essentially required a study by

9   county and according to ethnicity of access to photo ID along

10  with a analysis of potential impact on voter turnout, correct?

11    A.   That's what it says.

12    Q.   Why did you move to table that amendment?

13         MR. SWEETEN:  Don't answer.  The question would

14  ask you to reveal thoughts, mental impressions, opinions about

15  legislation.  Therefore, it's subject to the legislative

16  privilege.

17    A.   I would say it's privileged if there's no more record

18  than this.

19    Q.   Do you recall Representative Anchia asserting that

20  such a study should have been conducted prior to consideration

21  of this bill?

22    A.   I don't recall that specifically.  It doesn't mean it

23  didn't happen.

24    Q.   If I can just quickly put this in front of you.  This

25  should be U.S. 26.  If you can turn very quickly to Page 62

267

1   through 64.  Just skim through.

2          (Exhibit No. 26 marked)

3     A.   And this is from the floor or --

4     Q.   This is a transcript of the March 23rd floor debate.

5   This is Volume III.  This is Day 40.

6     A.   How far do you want me to read through?

7     Q.   Until you move to table.

8     A.   Okay.

9     Q.   Which I believe is Page 64.

10         MR. SWEETEN:  You've gone past it, I think.

11    A.   It goes to Lamar Davis after that.  Do you have Volume

12  II or Volume III?

13         MR. SWEETEN:  III.

14    A.   And 63 is talking about studies and 64 is taking about

15  statics.  And then it seems that Yvonne Davis and Anchia have a

16  back-and-forth dialogue to 65, 66.

17    Q.   You move to table on Page 69.  Do you see that?

18    A.   Do I need to know what all this is?

19    Q.   If you can just skim through and see -- do you say

20  anything prior to simply moving to table?

21    A.   I'm on 71 and still don't see where I move to table.

22    Q.   It's the top of 69.  Will you accept my representation

23  that --

24         MR. SWEETEN:  She's found it.

25    Q.   Do you move to table without responding to any of

268

1   Representative Anchia's statements?

2     A.   That's what it shows.

3     Q.   Why did you move to table without responding to any of

4   Representative Anchia's statements?

5          MR. SWEETEN:  I'm going to object.  The question

6   calls for her to reveal thoughts, mental impressions, opinions

7   about the legislation.  She can answer to the extent that the

8   public record reveals information responsive.  Otherwise, I'm

9   going to instruct her not to answer on the basis of legislative

10  privilege.

11    A.   It's privileged.

12    Q.   Okay.  And do you believe that such information was

13  not necessary to support the bill concerning the effect of the

14  bill in terms of possession of ID based on race?

15         MR. SWEETEN:  Same objection.

16    A.   Privileged.

17    Q.   We are done with amendments.  If you can mark this as

18  U.S. 27.

19         (Exhibit No. 27 marked)

20    Q.   This is a declaration that you signed with regard to

21  an assertion of privilege in this case.  Can you take a quick

22  look.  Are you familiar with that document?

23    A.   Yes, sir.

24    Q.   Did you meet with the Office of the Texas Attorney

25  General prior to receiving a copy of this document?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

Patricia Harless                                                                May 15, 2012

269

1      A.  No.
2      Q.  Who wrote this document?
3      A.  I received it from my chief of staff.
4      Q.  Did you write this document?
5      A.  I never asked him --
6      Q.  Are you aware of whether he wrote this document?
7      A.  I don't know.  We discussed the issues that should go
8   into the document, but --
9      Q.  Did your chief of staff draft this document?
10      A.  I didn't ask him.
11      Q.  But did you have a conversation about this document
12   with your chief of staff before you received the document?
13      A.  Yes.
14      Q.  And did you have a conversation with the Office of the
15   Texas Attorney General before you received this document?
16      A.  No.
17      Q.  Are you aware of any supporter of the bill who is not
18   asserting attorney/client privilege, legislative privilege, and
19   any other privilege available under state or federal law to
20   protect from disclosures in this case?
21          MR. SWEETEN:  When you're answering that
22   question, don't reveal any communications that you've had with
23   our office or meetings or other discussions.
24      A.  I'm not aware.
25      Q.  Has anything changed since you signed this

270

1   declaration?  Do you stand by everything in the declaration
2   today?
3          MR. SWEETEN:  Take your time to the extent you
4   need to answer his question.
5      A.  Yes.
6      Q.  The next two questions I'm going to ask concern
7   conversations that didn't happen on the House floor.  I'm
8   curious about what gets said in members' offices at lunch,
9   fundraisers, etcetera.  Have you ever heard a legislator in
10   those contexts in any other who voted in favor of S.B. 14 state
11   that a photo ID requirement would prevent any registered voter
12   from voting?
13          MR. SWEETEN:  The question -- the scope of the
14   question is very broad.  I'm not clear as to what -- are you
15   talking at matters prior to the passage of it, or can you be
16   specific as to what you're asking.  It will help me in knowing
17   whether to assert privileges to the question.
18      Q.  I'm asking in any circumstance, private circumstance,
19   so off the floor, have you ever heard any legislator who voted
20   in favor of S.B. 14 state that S.B. 14 would, in effect, prevent
21   any registered voter from voting?
22          MR. SWEETEN:  I'm going to instruct you not to
23   answer.  He has not limited the question.  To the extent this
24   question could reveal communications with legislators,
25   legislation staff, state agencies, Texas Legislative Council or

271

1   constituents, that would be legislatively privileged.
2      A.  That's privileged.
3      Q.  And have you ever heard a legislator who voted in
4   favor of S.B. 14 explain that voter ID would prevent any
5   minority registered voter from voting?
6          MR. SWEETEN:  Same instruction.
7      A.  Privileged.
8      Q.  Now, distinctly with regard to the purpose of the
9   bill, do you believe that S.B. 14 has no purpose to reduce the
10   number of Hispanic voters who will be able to vote in elections
11   in Texas?
12          MR. SWEETEN:  This question has been asked and
13   answered.  I think -- and we've had a discussion at lunch
14   regarding purpose and questions about that.  I will let her
15   discuss what she believes the purpose of the bill is.  We will
16   allow that.  She will not be able to talk about what other
17   people think, what other legislators' opinions are, but I will
18   allow her to testify as to the purpose of the bill.
19      Q.  In the context -- I am asking in the context of all
20   the aspects of the legislative process that led up to passage of
21   the bill, with regard to the purpose of the bill in its
22   complete, all provisions, do you believe that S.B. 14 has no
23   purpose to reduce the number of Hispanic registered voters who
24   will be able to vote in elections in Texas?
25          MR. SWEETEN:  I think the way you've asked this

272

1   question, you're asking her to reveal matters up until the time
2   of the passage of the bill that could include thoughts, mental
3   impressions, discussions, communications with other legislators.
4   I think your question as phrased is directly -- would require
5   her to give information that is legislatively privileged.  So
6   I'm going to instruct her accordingly.
7          MR. FREEMAN:  Mr. Sweeten, can I ask, based on
8   your understanding of the privilege, as you're asserting this
9   privilege, do you believe there's a way to phrase this question
10   that I can ask with regard to the purpose of the bill and with
11   whether a particular purpose was a purpose of the bill that
12   would ask for purpose but not intent, because you've agreed, I
13   believe, that purpose is a permissible inquiry.
14          MR. SWEETEN:  We're attempting to accommodate you
15   based upon the letter that we received earlier today and our
16   discussions.  We also are very cognizant of her legislative
17   privilege.  Again, I can allow her to testify about what she
18   believes the purpose -- what the purpose of the bill.  She can
19   testify to that.  We'll let her do that.
20          MR. FREEMAN:  Okay.
21      A.  As I've answered earlier and as I stated on the floor
22   a number of times and in committee, the purpose of S.B. 14 was
23   to increase and improve the integrity of the election process.
24      Q.  And I'm asking whether there was any secondary
25   subsidiary purpose behind the bill in any aspect that was



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

273

1  motivating the bill, not just on your part, but on the part of
2  the legislators advancing the bill.
3      A.  I can't answer for anyone other than myself.  The
4  purpose of S.B. 14, as I've stated over and over, was to improve
5  the integrity of the election process.
6      Q.  Let's wrap this up then.  Are there any answers you
7  wish to change from what you said earlier?
8      A.  Heck, I can't even remember past the last five
9  questions.  I'm stuck in the amendments.
10     Q.  It's been a long day.  I appreciate your time.  Any
11 information that you didn't recall before that you now recall?
12     A.  No, sir.
13     Q.  Anything you'd like to add so we can understand your
14 questions more clearly?
15         MR. SWEETEN:  Let me take one minute with her.
16         (Brief off-record discussion)
17         THE WITNESS:  The only thing that I might want to
18 add is that I had met with the AG's office and there was
19 discussion about --
20         MR. SWEETEN:  Don't talk about what it was about.
21 You met with the AG's Office.
22         THE WITNESS:  We met with the AG's office prior
23 to signing this affidavit.
24     Q.  Prior to signing?
25     A.  Uh-huh.

274

1      Q.  But did you meet with the AG's office prior to
2  receiving a copy of the draft?
3      A.  I don't know that I did.
4      Q.  Okay.
5      A.  I can't remember.
6          MR. FREEMAN:  Okay.  I appreciate the correction.
7  Thank you.  And thank you for your testimony.  I want to state
8  that the deposition is left open pending decisions on the, I
9  believe as Mr. Sweeten said, 300 assertions of privilege as well
10 as over various documents and other testimony, and I now pass
11 the witness to Mr. Rosenberg.
12         THE WITNESS:  Thank you.
13             EXAMINATION
14 BY MR. ROSENBERG:
15     Q.  I'm obviously not going to repeat everything that
16 Mr. Freeman did.  Just a few questions, Representative Harless.
17 And thanks for your patience during the day.  Can we show
18 Representative Harless U.S. 19.  Is that the op-ed piece?  And
19 looking at the first paragraph, the last sentence actually says
20 -- second paragraph -- the first paragraph is one sentence, "Yet
21 as the U.S. Department of Justice reviews the law for
22 preclearance under the Voting Rights Act, a barrage of
23 inaccurate attacks has been levied against our election
24 integrity bill that must be corrected."  Do you see that?
25     A.  Yes, sir.

275

1      Q.  What did you mean by a barrage of inaccurate attacks?
2          MR. SWEETEN:  You can reference the public
3  statement made.  Don't reference your mental impressions about
4  the passage of Senate Bill 14.
5          MR. ROSENBERG:  Mr. Sweeten, let me respond to
6  that because I respectfully request that you withdraw that
7  objection.  We're dealing with a public statement that
8  Ms. Harless made.  If it happens to have been based on
9  privileged information, then I would submit that she's waived
10 that privileged information.  We have the right to inquire as to
11 the entire basis.
12         MR. SWEETEN:  I'm going to let her discuss
13 matters of the public record, including this statement.  She
14 hasn't waived and she hasn't revealed her thoughts, mental
15 impressions or opinions about the legislation that preceded
16 this.  She's made this statement.  She can answer questions
17 about the statement.  I will allow that to occur.
18     Q.  My question remains, what do you mean by a barrage of
19 inaccurate attacks?
20     A.  As we debated in the record, there were some
21 inaccuracies in information that was being repeated.  And I
22 can't name specifically.
23     Q.  Can you name any one?
24     A.  Not off the top of my head.
25     Q.  Can you name who was making these inaccurate attacks?

276

1      A.  No.
2      Q.  Turn your attention to the second page, the paragraph
3  that's going to be a little hard to read because it's
4  overwritten, but I'll try to read it and you tell me if I'm
5  accurate.  "While an ID requirement may place a burden on
6  voters;" do you see that?
7      A.  Yes, sir.
8      Q.  And then you go on to quote from Justice Stevens.  Do
9  you see that?
10     A.  Yes, sir.
11     Q.  What do you mean by burden?
12     A.  I honestly can't tell you what emotions I was going
13 through at the time I wrote this.
14     Q.  Well, let me ask you this.
15     A.  And what had prompted up to it.
16     Q.  Do you think it's a burden -- did you think it was a
17 burden on voters who did not have a photo ID to get a photo ID?
18     A.  I think the record that I've talked about over and
19 over a number of times is that we provided for those that do not
20 have one of the approved forms of ID an opportunity to
21 get a free ID, and that that's no more cumbersome in the record
22 than the act of voting.
23     Q.  Well, if someone has a photo ID and someone does not
24 have a photo ID, you would admit that there is at least some
25 burden on the fact that the person who does not have a photo ID



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

277

1    to go and get a photo ID; is that correct?
2            MR. SWEETEN:  You can answer in the context of
3    the public statement.  Don't reveal privileged information.
4            MR. ROSENBERG:  Again, I disagree with that,
5    Mr. Sweeten, and would ask you to withdraw that objection in the
6    context of a statement that Representative Harless made in
7    public.
8            MR. SWEETEN:  If you're asking her about the
9    public statement, I've again said that she can answer questions
10   about that.
11           MR. ROSENBERG:  I'm asking her what she meant by
12   something she wrote in public.
13   A.   I can't tell you what every word that I wrote meant at
14   the time that I wrote it, which was November the 14th of 2011.
15   Q.   I understand that.  That's why I'm only asking about
16   one word, burden.
17   A.   I don't know what you want me to answer.  I'm not sure
18   what you're asking.
19   Q.   Let me ask it again.
20   Q.   Do you want me to define what burden means?
21   Q.   In the context of how you were using it in this
22   article, yes.
23   A.   Well, I'm not -- I said while an ID requirement may
24   place a burden.  It may.  I don't know that it will.
25   Q.   What kind of burden were you talking about?

278

1    A.   That someone shows a photo ID when they vote.
2    Q.   How about that someone has to go and get a photo ID if
3    they don't already have one?  Would that be a burden?
4    A.   I don't know that that's what I was referring to at
5    the time that I wrote this.
6    Q.   Well, if someone had to go to a motor vehicle facility
7    to get either a driver's license or a voter identification,
8    would that be a burden that someone who already had a driver's
9    license or a voter identification would not have?
10   A.   I don't think that's what I was discussing in this
11   statement.
12   Q.   Would you agree that would be a burden, though?
13   A.   No, I don't.
14   Q.   Well, what if someone had to drive 100 miles to the
15   motor vehicle facility as opposed to someone who already had a
16   driver's license or a photo identification?  Would you agree
17   that that would be more of a burden on the person who had to
18   drive the 100 miles than the person who did not have to drive
19   the 100 miles?
20   A.   I don't think that that's part of the debate or the
21   record it's -- you know, what one person may think is a
22   burden I may not think is a burden.
23   Q.   Is it your testimony that there was nothing in the
24   public record about the burden on people who had to travel to --
25   long distances to motor vehicle facilities?

279

1    A.   That's not what I said.  I think there was members
2    that talked about that people had to travel to motor vehicle
3    divisions, but we don't know if there are actually any of those
4    people that don't already have one of the approved forms of ID
5    or that aren't already eligible to vote by ballot by mail
6    whether they're senior or disabled.  So I can't speculate on if
7    that person actually exists.
8    Q.   Was there also discussion in the public record during
9    the debate in S.B. 14 that people who were minorities were more
10   likely to be further away from motor vehicle facilities than
11   non-minorities?
12   A.   I don't recall that discussion.  It could be possible.
13   But if you don't live close to a DPS station, you don't live
14   close to it whether you're Caucasian or a minority.
15   Q.   Was there any discussion in the public record as to
16   whether or not minorities would be less likely to have
17   transportation to get to motor vehicle facilities than
18   non-minorities?
19   A.   I don't recall the exact testimony.
20   Q.   Would you agree that someone who did not have motor
21   vehicle transportation or public transportation to get to a
22   motor vehicle facility and who did not have a driver's license
23   would have more of a burden on that person than someone who
24   already did have a driver's license?
25           MR. SWEETEN:  Objection, asked and answered, but

280

1    go ahead.
2            MR. ROSENBERG:  Not quite, but go ahead.
3    A.   I don't know that that person doesn't already have one
4    of the other approved forms of ID.  I don't know that they have
5    to get the free ID.
6    Q.   Let's assume that that person has none of the other
7    IDs.
8    A.   I'm not going to assume.  I'm not going to assume that
9    some person may exist out there.
10   Q.   Is it your testimony that there is no one who does not
11   have any of the photo IDs under S.B. 14?
12   A.   I've never said that in testimony.
13   Q.   Was there any analysis or study done to see how many
14   individuals did not have the requisite photo ID during the
15   consideration of S.B. 14?
16           MR. SWEETEN:  Do not reveal thoughts, mental
17   impressions, opinions about legislation or communications that
18   you've had with legislators, legislative staff, state agencies,
19   Texas Leg Council or constituents.  You can refer to the public
20   record.
21   A.   That's privileged.
22   Q.   Do you agree that there are people who do not have a
23   birth certificate in Texas?
24   A.   That's not part of the record.
25   Q.   Do you think that's an important consideration in



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

281

1    terms of whether or not there are people who might be burdened
2    by the requirements of S.B. 14?
3         MR. SWEETEN:  Objection.  You're calling for
4    matters that are subject to the legislative privilege, which
5    includes her thoughts, mental impressions about the bill.  If
6    you can answer based upon the public record, feel free to do so.
7         A.  Privileged.
8         Q.  Would you consider that a burden if someone did not
9    have a birth certificate, did not have a driver's license, did
10   not have any of the photo identification requirements under S.B.
11   14?
12        A.  I don't recall that being discussed in the record.
13        Q.  Would you consider that a burden?
14        A.  I'm not going to answer that for privilege.
15        Q.  Would you consider that a burden today?
16        A.  Excuse me?
17        Q.  Would you today, sitting here today -- I'm not asking
18   prior to S.B. 14.  Sitting here today, would you consider that a
19   burden?
20        A.  Consider?
21        Q.  Consider a person who does not have any of the photo
22   identifications under S.B. 14 and who did not have a birth
23   certificate in order to get one of the photo identifications
24   under S.B. 14, would you consider that person more burdened than
25   someone who already had a photo ID?

283

1         Q.  You think that it would be -- if a person needed to
2    get a birth certificate in order to get the requisite photo
3    identification under S.B. 14, paying $22 would be an additional
4    burden on that person not imposed on people who already have the
5    photo ID?
6         MR. SWEETEN:  You're asking her questions about
7    Senate Bill 14.  You're asking her to reveal mental impressions,
8    opinions about the legislation.  That is squarely within the
9    legislative privilege.  That's what you're asking.  Objection.
10        A.  I can't answer that.
11        Q.  Sitting here today, do you consider that more of a
12   burden, someone who had to pay $22 for a birth certificate in
13   order to meet the requirements of S.B. 14?
14        A.  I can't speculate if that's a burden for that person.
15   I don't know why they need the birth certificate.  I don't know
16   if that's their only form of ID.  I can't speculate on that.
17        Q.  Do you think $22 is an insignificant sum?
18        A.  I guess if I needed a birth certificate to get a job,
19   I would not think it is.  I don't know.
20        Q.  What's a Calendar committee or Calendars committee?
21        A.  It's the committee that bills go to in order to get
22   set on the calendar for the floor.
23        Q.  And how long typically do bills sit in the Calendars
24   committee awaiting placement on the calendar?
25        A.  I don't serve on that committee and I don't know if

282

1         A.  I can't answer that because I don't know that the
2    birth certificate is the only form of ID that we discussed that
3    you are required to have to get an ID.  I don't know what the
4    specific identification.
5         Q.  Well, if a person had none of the identification that
6    are listed under S.B. 14 that would allow that person to get a
7    driver's license or voter identification, would you consider
8    that, sitting here today, more of a burden on that person than
9    the person who already has the photo ID?
10        A.  I'm not going to speculate on if some person that
11   meets all that criteria actually exists in Texas.  I'm not going
12   to speculate on it.
13        Q.  Have you looked to see or done any kind of analysis as
14   to whether or not such a person exists in the State of Texas?
15        MR. SWEETEN:  Do not reveal your thoughts, mental
16   impressions, opinions about legislation or efforts, including
17   communications with legislators, legislative staff, state
18   agencies, Texas Leg Council or constituents considering this
19   bill.
20        A.  By answering that, I'd waive privilege, and I can't do
21   that.
22        Q.  Do you know how much it costs to get a birth
23   certificate?
24        A.  I think we talked today about it.  And somewhere in
25   the record somebody made mention of, I think $22, I think.

284

1    there's any specific time frame.
2         Q.  Can you give me a range?
3         A.  I can tell you I've had bills in Calendars for up to
4    two or three months.  I've had bills die in calendars.  I don't
5    know how they operate and what the priority is.
6         Q.  Do you know how long it took S.B. 14 from the time the
7    committee report was received by the Calendars committee to the
8    time it was placed in the calendar the first time?
9         A.  I don't remember.  I saw something, but I don't
10   remember.
11        Q.  If I suggested it was under two hours, would that be
12   right?
13        A.  I couldn't answer that.  I don't know.
14        Q.  Does it sound wrong?
15        A.  I don't know.
16        Q.  Do you recall what happened after S.B. 14 was placed
17   on the calendar the first time?
18        A.  The very first time?
19        Q.  The very first time.
20        A.  When we got to the floor debate?
21        Q.  Right.
22        A.  We started the floor debate, and then there was a
23   point of order called and it was upheld.
24        Q.  And it was because there was a material error in the
25   bill?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

285

1    A.  I don't recall exactly.  I remember what the error
2  was, but I don't know if it was in the bill or in the summary,
3  the bill analysis.  I don't know which one it was.
4    Q.  There's a reference to business days as opposed to
5  calendar days?
6    A.  Exactly.
7    Q.  And what happened as a result of that?  Point of order
8  was sustained.  What does that mean?
9        MR. SWEETEN:  We're talking about the process of
10  Senate Bill 14.  I want to remind her -- I don't want you to
11  discuss mental impressions, opinions about legislation.  You can
12  talk about matters of public record.  If that's what we're
13  doing, you can provide that.
14        MR. ROSENBERG:  And just for the record, Mr.
15  Sweeten, is it your position that testimony as to the regularity
16  or irregularity of the procedure used in S.B. 14 is privileged?
17        MR. SWEETEN:  It depends on the way you ask it.
18  And let's be very clear.  When you asked about the calendar
19  committee or, you know, how common it is, I've let her answer
20  those questions.  Let's not pretend that I've shut that down.
21  That hasn't happened.
22        MR. ROSENBERG:  I haven't pretended anything.
23        MR. SWEETEN:  Okay.  So you can ask her questions
24  about procedure, about how it works generally.  When it comes to
25  Senate Bill 14 and her considerations of that legislation,

286

1  that's where I'm asserting privilege.  I'm not -- we'll leave it
2  at that.
3        MR. ROSENBERG:  Can we have the question read
4  back.
5        THE REPORTER:  Question: "And what happened as a
6  result of that?  Point of order was sustained.  What does that
7  mean?
8    Q.  We were at the point of order business day, calendar
9  day.
10    A.  They called the point of order from the record.  The
11  parliamentarian ruled on the point of order, that it was -- I
12  don't know the proper term -- a valid point of order, and the
13  bill was -- I think I remember it being re-referred to
14  committee.
15    Q.  Right.  And after it was re-referred to committee went
16  back to the Calendars committee, right?
17    A.  After it goes to committee -- the procedure is after a
18  bill goes to committee, is voted out of committee, then it goes
19  to Calendars to be voted out of Calendar.
20    Q.  And do you recall how long it sat in Calendars
21  committee the second time?
22    A.  I don't.
23    Q.  If I suggested 12 minutes, would that be about right?
24    A.  I have no clue.
25    Q.  Can you -- that's pretty short, though; would you

287

1  agree?
2    A.  I don't know.  I mean, as a member, we don't
3  necessarily know when our bills get to Calendars.  So I don't
4  know what the time frame is.
5    Q.  Would you agree that a total of -- let's assume around
6  80 minutes the first time it sat in the Calendar committee and
7  the second time it sat in the Calendars committee is unusually
8  short for a bill of this importance?
9    A.  I can't answer that.  I don't know.  I don't know.  I
10  don't serve on that committee.  I don't know how long it usually
11  takes them to get the paperwork and if there was a delay in the
12  paperwork and after they get it how long.  I don't know the
13  procedures of how that committee operates.
14    Q.  And I assume, then, you can't name any other bill that
15  sat in the committee that short?
16    A.  I can't.  I don't know.
17    Q.  Were you a legislator in 2009?
18    A.  I was.
19    Q.  And this is really for Mr. Sweeten's edification.  Why
20  don't you tell him what chubbing is.
21    A.  Chubbing is when members take a bill to the -- it's
22  filibuster, in essence, in the Texas House.
23    Q.  And do you recall something called a chub-a-thon?
24    A.  I remember I had legislation that died because of
25  chubbing.

288

1    Q.  And when was that?
2    A.  That was in 2009.
3    Q.  And that was on H.B. 112?
4    A.  No.
5    Q.  What was it?
6    A.  I think the chubbing, if I remember correctly, wasn't
7  pertaining to the voter ID legislation.  The chubbing was on our
8  local and consent calendar.  And local and consent calendar, the
9  procedures typically are the member lays out the bill and it's a
10  local issue.  It's voted without debate.  And they use the rules
11  to talk each of those local and consent bills to where it bumped
12  the general calendar to the next day.
13    Q.  Are you aware of when the use of the local and consent
14  -- is it local consent calendar -- was used by a minority to
15  block a previous photo ID bill.
16    A.  That was when the chubbing, but I'm not sure -- I
17  don't know.  I'm not exactly sure why the chubbing -- I can't
18  remember exactly.  I don't remember the voter ID bill getting on
19  the calendar.  Was it?  You must know.
20    Q.  I can't answer questions.  I can only ask them.
21  Sorry.
22    A.  Yeah.  I don't remember.  I remember the chubbing on
23  the local calendar.  I knew that it was to stall, to get -- so
24  we wouldn't get to the general calendar.  But I don't know why.
25    Q.  You don't recall if it was specifically used in



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

289

1   opposition to a photo ID bill?

2       A.  No.  I don't know.  I seem to vaguely remember

3   conversation about that, but it was conversation.

4       Q.  Do you know what the two-thirds rule is?

5       A.  In the Senate?

6       Q.  Yes.  Are you familiar with that?

7       A.  A little.

8       Q.  And what little?

9       A.  I'm just a little familiar of the debate by Dan

10  Patrick and other members of the Senate about the value of the

11  two-thirds and not.

12      Q.  Was there a change in the two-thirds rule?

13      A.  In the Senate on this?

14      Q.  Yes.

15      A.  It seemed like, if I remember correctly, that the

16  members of the Senate voted to suspend the two-thirds for this

17  one piece of legislation, but I can't say that for sure.

18      Q.  And the one piece of legislation was photo ID bill?

19      A.  I think it was S.B. 14.

20      Q.  Just a couple of tie-up points.  You testified I think

21  that there were conversations that you had with Catherine

22  Engelbrecht?

23      A.  I heard Catherine's name.

24      Q.  Right.  And I think you testified that there were

25  conversations you had with Catherine Engelbrecht concerning the

290

1   photo ID bill; is that correct, without going into what the

2   substance was?

3       A.  I think the conversation was after the bill was heard

4   in committee she visited my office.

5       Q.  Right.  I don't think you were asked and just to tie

6   it up, can you tell me what you and she talked about?

7           MR. SWEETEN:  I'm going to object.  It calls for

8   matters that are legislatively privileged or communication

9   specifically.

10      Q.  And similarly, I think you were asked about

11  conversations with George Hammerline.

12      A.  Yes.

13      Q.  Concerning S.B. 14, correct?

14      A.  After the bill was heard in committee, George stopped

15  by the office.

16          MR. SWEETEN:  Don't reveal communications or the

17  substance of them.  You can talk about the existence of the

18  communication.

19      Q.  And now I will ask you something that your attorney

20  will tell you you can't talk about.  What were the substance of

21  the conversation or conversations that you had with

22  Mr. Hammerline concerning the photo ID bill?

23          MR. SWEETEN:  Objection.  That's subject to the

24  legislative privilege.

25      A.  And that's privileged communications with

291

1   constituents.

2       Q.  Are you aware of any information contrary to the

3   positions that you took on the floor concerning the impact of

4   S.B. 14 on minorities that has not been made public?

5           MR. SWEETEN:  Do not reveal any thoughts, mental

6   impressions, opinions about the legislation or communication

7   with legislators, legislative staff, state agencies, Texas Leg

8   Council or constituents.

9       A.  My opinions would be privileged.

10          MR. ROSENBERG:  Thank you very much.  Told you

11  I'd be quick.

12          MR. SWEETEN:  Let me make a statement on the

13  record.  We have gone seven hours with Representative Harless

14  and she has sat here and we've answered a tremendous number of

15  questions posed by Mr. Freeman and Mr. Rosenberg.  So the

16  gratuitous remark about objections, yes, but there were many

17  objectionable questions asked of Representative Harless.

18          MR. ROSENBERG:  And just so my record is kept

19  open, I'd like to keep my record open for the same reasons that

20  Mr. Freeman stated.  Thank you very much.

21          (Deposition concluded at 7:11 p.m.)

22

23

24

25

292

1                   CHANGES AND SIGNATURE

2

3   WITNESS NAME_____  DATE OF DEPOSITION_____

4   PAGE LINE    CHANGE      REASON

5   _____

6   _____

7   _____

8   _____

9   _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

293

1      I, REPRESENTATIVE PATRICIA HARLESS, have read the
2  foregoing deposition and hereby affix my signature that same is
3  true and correct, except as noted above.
4
5
6  _____
   REPRESENTATIVE PATRICIA HARLESS
7
8
9      THE STATE OF TEXAS  )
10     COUNTY OF TRAVIS    )
11        Before me,_____, on this day personally
12  appeared REPRESENTATIVE PATRICIA HARLESS known to me (or proved
13  to me under oath of through_____) (description of
14  identity card or other document) to be the person whose name is
15  subscribed to the foregoing instrument and acknowledged to me
16  that they executed the same for the purposes and consideration
17  therein expressed.
18        Given under my hand and seal of office this_____
19  day of _____.
20
21
22  _____
   NOTARY PUBLIC IN AND FOR
23  THE STATE OF
24
25

295

1  on_____ to the witness or to the attorney for the
2  witness for examination, signature and return to me
3  by_____;
4      That the amount of time used by each party at the
5  deposition is as follows:
6        Mr. Freeman 06:33
7        Mr. Rosenberg 00:24
8      That pursuant to information given to the
9  deposition officer at the time said testimony was taken the
10  following includes counsel for all parties of record:
11       Mr. Sweeten, Attorney for Plaintiff
        Mr. Freeman, Attorney for Defendant
12       Mr. Rosenberg, Attorney for Defendant-Intervenor
        Mr. Dunn, Attorney for Defendant-Intervenor
13
14       I further certify that I am neither counsel for,
15  related to, nor employed by any of the parties or attorneys in
16  the action in which this proceeding was taken, and further that
17  I am not financially or otherwise interested in the outcome of
18  the action.
19     Certified to by me this_____day of_____, 2012.
20
21
22     _Amy Kofron_
23     Amy Kofron, Texas CSR #6352
       Expiration Date: 12/31/2013
       Esquire Deposition Solutions
24     100 Congress Avenue, Suite 2020
       Austin, Texas 78701
25

294

1        IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF COLUMBIA
2
3  STATE OF TEXAS,          )
       Plaintiff,           )
4  V.                       )
5  ERIC H. HOLDER, JR.,     )
   in his official capacity )
6  as Attorney General of   )
   the United States,       )
7      Defendant.           )
                            )
8  ERIC KENNIE, et al.,     )
       Defendant-Intervenors, )
9
   TEXAS STATE CONFERENCE   )  CASE NO. 1:12-CV-00128
10 OF NAACP BRANCHES, et al., )  (RMC-DST-RLW)
       Defendant-intervenors,  )  Three-Judge Court
11                          )
   TEXAS LEAGUE OF YOUNG    )
12 VOTERS EDUCATION FUND, et al., )
       Defendant-Intervenors,  )
13                          )
   TEXAS LEGISLATIVE BLACK  )
14 CAUCUS, et al.,          )
       Defendant-Intervenors, )
15                          )
   VICTORIA RODRIGUEZ, et al., )
16     Defendant-Intervenors.  )
17        REPORTER'S CERTIFICATION
       DEPOSITION OF REPRESENTATIVE PATRICIA HARLESS
18              MAY 15, 2012
19     I, Amy C. Kofron, Certified Shorthand Reporter in
20 and for the State of Texas, hereby certify to the following:
21     That the witness, REPRESENTATIVE PATRICIA
22 HARLESS, was duly sworn by the officer and that the transcript
23 of the oral deposition is a true record of the testimony given
24 by the witness;
25     That the deposition transcript was submitted



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com