## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS          )
                        )
                        )
VS.                     )  NO. 12-CV-128
                        )  (DST, RMC, RLW)
                        )
ERIC H. HOLDER, JR.,    )
ET AL                   )
*******************************************
ORAL DEPOSITION OF BRIAN HEBERT
*******************************************

ANSWERS AND DEPOSITION OF BRIAN HEBERT, a witness called by the United States taken before Janalyn Reeves, Certified Shorthand Reporter for the State of Texas, on the 29th day of May, 2012, between the hours of 9:30 a.m. and 7:06 p.m, in the offices of United States Department of Justice, 816 Congress, Third Floor, Austin, Texas, pursuant to the agreement of counsel for the respective parties as hereinafter set forth.

## 2

A P P E A R A N C E S

FOR THE PLAINTIFF, STATE OF TEXAS:
ATTORNEY GENERAL'S OFFICE
By: MR. PATRICK K. SWEETEN
209 West 14th Street
Austin, Texas 78701
PH: (512) 936-1307

FOR THE DEFENDANT:
U.S. DEPARTMENT OF JUSTICE
By: MS. ELIZABETH S. WESTFALL
950 Pennsylvania Avenue, NW
NWB Room 7202
Washington, DC 20530
PH: (202) 305-7766

FOR THE INTEVENORS:
BRAZIL & DUNN, LLP
By: MR. CHAD W. DUNN
4201 Cypress Creek Parkway
Suite 530
Houston, Texas 77068
PH: (281) 580-6310

- and -

DECHERT, LLP
By: MR.EZRA D. ROSENBERG
902 Carnegie Center
Suite 500
Princeton, New Jersey 08540-6531
PH: (609) 955-3200

ALSO PRESENT:
  Reynolds Brissenden
  Jennifer Maranzano
  Michelle A. McLeod

## 3

INDEX

                                              PAGE

Appearances................................      2

BRIAN HEBERT
  Examination by Ms. Westfall ..............  6
  Examination by Mr. Dunn ..................   343

Signature and Changes .......................  370
Reporter's Certificate .......................   372

## 4

EXHIBITS
NO.   DESCRIPTION                          PAGE

3     Texas Weekly Article..............    163
5     SB 14.......................          252
28    HB 218.......... ................    129
29    SB 362......................          184
44    HB 1706.......................        117
70    Texas Conservative Round Table 40
71    Privilege Log................         43
72    Notice of Deposition.............     51
73    Senate Rules...............    56
74    Legislature Online History    126
75    Legislature Online History    154
76    Dallas News Article       212
77    Senate Rules    215
78    Letter from Dewhurst to Birdwell  239
79    Emergency Call     243
80    Letter from Van de Putte to Duncan 247
81    SB 14.....................    249
82    Indiana Code....................      311
83    Dewhurst Statement Regarding Voter ID
                                           319
84    Voter ID Bill Signing Draft.........  323
85    Talking Points....................    325
86    Standard Review....................   327



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 5

| NO. | DESCRIPTION | PAGE |
|-----|-------------|------|
| 88 | Letter from Dewhurst to Beck. | 336 |
| 89 | Voter ID Overview.................... | 339 |
| 90 | Email from Battle to Ancira | 341 |

## 6

            BRIAN HEBERT,
having being first duly sworn, testified as follows:
            EXAMINATION
BY MS. WESTFALL:
    Q. Good morning, Mr. Hebert, how are you?
    A. Well, thanks.
    Q. Could you please state and spell your name for the record?
    A. Bryan Hebert.  B-R-Y-A-N, H-E-B-E-R-T.
    Q. Have you had your deposition taken before?
    A. No.
    Q. I'm going to explain some ground rules for you so you'll understand how the day will go.  You've just been sworn in by the court reporter and you're here to testify truthfully, accurately, and completely.  Do you understand?
    A. Yes.
    Q. The court reporter will prepare a transcript of everything that is said today.  So you must wait for me to ask my question before you respond so the transcript is readable.  Do you understand?
    A. Yes.
    Q. By the away, I forgot to introduce myself.  I'm Elizabeth Westfall.  I represent the US Attorney General in this action.
        Please, wait for me to finish my question before you answer and I will try to do the same.  Do you

## 7

understand?
    A. Yes.
    Q. I will try to ask you clear questions, but if you don't understand a question, please let me know?
    A. Okay.
    Q. If you wish to stop and take a break, please let me know and we'll try to accommodate you, but I ask if there is a question pending that you go ahead and answer that question before you take a break.  Okay?
    A. Okay.
    Q. You understand that you're under oath today and you may be subject to penalty of perjury for giving false or misleading testimony?
    A. Yes.
    Q. Do you understand these instructions?
    A. Yes.
    Q. Do you have any questions about these instructions?
    A. No.
    Q. Are you on any medication today that would affect your ability to testify truthfully?
    A. No.
    Q. Is there any reason you can't testify truthfully or accurately today?
    A. No.

## 8

    Q. So during the deposition, I may use the terms voter ID and photo ID interchangeably.  I want you to interpret them as broadly as possible to mean a requirement that a voter present a form of identification, whether it has a photon on it or not when voting in person before being permitted to vote by regular ballot.  Do you understand?
    A. Yes.
    Q. I may refer to Lieutenant Governor Dewhurst, Mr. Dewhurst or the Lieutenant Governor's office and I would like you to construe all those as broadly as possible to refer to Lieutenant Governor's office.  Do you understand?
    A. Yes.
    Q. When I refer to the term minority voters, I mean voters you are not white or not Anglo.  Do you understand?
    A. Yes.
    Q. Are you represented by council today?
    A. Yes.
    Q. Who is your council?
    A. Attorney General's Office, Reynolds & Patrick.
    Q. Great.  And if I could ask that you just keep your voice up so that everyone in the room can hear what you are saying.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

9

1    A. Sure.
2    Q. Thank you.  Have you testified in court before?
3    A. No.  Other than a traffic offense.
4    Q. Hope it turned out well for you.
5        Have you ever been involved in a case where the
6    State of Texas was a plaintiff or defendant?
7    A. No.
8    Q. What did you do to prepare for today's
9    deposition?
10   A. I had a meeting with my council.  We met briefly
11   this morning.  That was it.
12   Q. Other than your attorneys, did you speak to
13   anyone about your deposition today?
14   A. Except to say I'm being deposed, no.
15   Q. And who did you say I'm being deposed?
16   A. My wife, a few friends, former workers,
17   coworkers.
18   Q. Did you speak to Governor Dewhurst?
19   A. No.
20   Q. Did you speak to Ms. Rathgeber?
21   A. No.
22   Q. Did you speak to Blaine Brunson?
23   A. No.
24   Q. Who are the former colleagues who you spoke to
25   about your deposition?

10

1    A. Doug Davis, Karina Davis.  Those are probably the
2    only ones.
3    Q. And could you describe your conversation with
4    Ms. Davis?
5    A. It was -- actually saw her in the lobby going
6    into meet with my council and said, oh, you're here,
7    too.  And that was it.
8    Q. That was the sum total of the conversation?
9    A. That's right.
10   Q. Did you talk about the substance of what you
11   intended to testify about?
12   A. No.
13   Q. Did you bring any notes or documents with you
14   here today?
15   A. No.
16   Q. And are the papers over there in front of
17   Mr. Sweeten, are those Mr. Sweeten's or yours?
18   A. Mr. Sweeten's.
19   Q. When is the last time you voted?
20   A. In the primary, early voting just a couple weeks
21   ago.
22   Q. Do you usually vote by early voting or in person
23   on election day?
24   A. I would say I usually vote election day.
25   Q. And how far is your polling place from your

11

1    residence?
2    A. It is a mile.
3    Q. How do you get there?
4    A. I walk sometimes and I drive sometimes.
5    Q. How long does it take to walk?
6    A. 10 minutes, 5 minutes.
7    Q. How long does it take to drive?
8    A. Less.  I mean, I would usually stop on the way
9    back from work so I'm not really timing it from my
10   residence.
11   Q. Have you ever, while you've been voting in a
12   polling location, witnessed anyone trying to impersonate
13   another voter?
14   A. No.
15   Q. Have you ever witnessed a noncitizen voting?
16   A. Not that I know of.
17   Q. Have you personally ever challenged a voter's
18   eligibility to vote?
19   A. No.
20   Q. Could you tell me your educational background,
21   please, starting with college.
22   A. I graduated from Louisiana State University with
23   a degree in political science.  Went to law school at
24   Washington University in Saint Louis.  Graduated from
25   with a JD.

12

1    Q. What year did you graduate from law school?
2    A. 1998.
3    Q. Are you licensed to practice law?
4    A. Yes.
5    Q. In which states are you admitted to the bar?
6    A. Texas.
7    Q. Any other states?
8    A. No.
9    Q. Do you list an employer with your bar membership?
10   A. Yes.
11   Q. And who is that employer?
12   A. Today it is myself.
13   Q. Since you graduated from law school in 1998,
14   could you tell me every single job that you've held in
15   chronological order?
16   A. My first job was with the Texas Legislative
17   Council, which is a non partisan drafting legal agency
18   here at the capital.  I worked there for 8 years and
19   then took a position with Lieutenant Governor, David
20   Dewhurst, and I was with him for 5 years.  And then this
21   January I left to do political consulting.
22   Q. Could you describe the Legislative Council?
23   A. Sure.  It's 200 people total.  Research document
24   production and legal, maybe it's 400, the legal division
25   is about 50 attorneys, at least it was when I was there.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT

MAY 29, 2012

---

### 13

1  And they're basically the sort of law firm for the
2  Legislature.  So any drafting request for bills, any
3  legal advice, constitutional advice, procedural advice,
4  the Legislative Council exists to help the legislatures
5  pass bills and serve their constituents.  They're non
6  partisan so it's Republican/Democrat Committee
7  legislator, Governor, Lieutenant Governor in some cases.
8  Yeah.
9      Q.  And what years were you there specifically at the
10  council?
11      A.  I would have been there from '98 to I guess '05.
12      Q.  Does the council serve --
13      A.  Sorry.  It would have been '07.
14      Q.  My apologies.
15      A.  Sorry.
16      Q.  I broke my own rule already.  You described the
17  council as serving as a law firm for the Legislature; is
18  that right?
19      A.  That's how most people think of it, yes.
20      Q.  Does the council serve any other role other than
21  a law firm.  For example, does it provide strategic
22  advice?
23      A.  I would say, no, except to the extent, you know,
24  they would help members navigate bills through the
25  legislative process.  So, you know, I would say that

---

### 14

1  providing strategic advice in the sense of you should do
2  this is not something that council does.  It's not their
3  role.
4      Q.  Does it provide policy assistance to
5  legislatures?
6      A.  Again, other than sort of laying out the options
7  that a legislator might have or doing research on what
8  other states do, no.
9      Q.  Are there staff members who are not lawyers who
10  work for the council?
11      A.  Yes.  Because they are different departments
12  within Legislative Council.  So there's a legal
13  division, research division, document production
14  division, human resources and maybe one more.
15      Q.  What does the research division do?
16      A.  Whatever legislators request.  So please tell me
17  what the 50 states do on this issue or what is the
18  history of Texas action on this given issue.
19      Q.  So people in the research division are not
20  lawyers; is that correct?
21      A.  I believe none of them are lawyers.  Maybe there
22  are now, but I don't think so.  Certainly not a
23  requirement in my memory.
24      Q.  Are you aware of persons in the research
25  department who provided advice to legislators about

---

### 15

1  voter ID?
2      A.  I'm not aware.
3      Q.  You don't know a single person?  You couldn't
4  name anyone?
5      A.  The only person I know that still works there is
6  Carey Eskridge and I don't know that he worked on this
7  issue or not.
8      Q.  When you were working for the Lieutenant
9  Governor, did you do work with anyone in the research
10  division of the Legislative Council on voter ID?
11      A.  No.
12      Q.  Does the council have a governing body?
13      A.  Yes.
14      Q.  What's the role of the governing body?
15      A.  As I understand it, it's sort of like a Committee
16  of the legislators and they approve hiring of the
17  director.  Maybe budget issues.  That's all I know.
18      Q.  Do you know who sits on the governing body?
19      A.  I don't know the current makeup of it, no.
20      Q.  Does the Lieutenant Governor always play a role
21  in the governing body?
22      A.  Yes, I believe so.
23      Q.  Do you know what Mr. Dewhurst responsibilities
24  are in that capacity?
25      A.  I'm not aware.

---

### 16

1      Q.  And who would know?
2      A.  Maybe our general counsel.  Our meaning
3  Lieutenant Governor Dewhurst general counsel.
4      Q.  Who is that person?
5      A.  Frank Battle.
6      Q.  So I believe you were testifying it's
7  nonpartisan; is that correct?
8      A.  Correct.
9      Q.  Do staff people serve -- is there -- strike that.
10          Is there a majority and minority staff?
11      A.  No.
12      Q.  So does staff serve both sides of the isle so to
13  speak?
14      A.  Correct.
15      Q.  When a staff person drafts a bill, is he or she
16  also responsible for drafting amendments to the bill?
17      MR. SWEETEN:  Objection.  I think it's --
18  the question is vague and general.  I'm going to let you
19  answer that question.  Go ahead.
20      A.  Typically the same person who drafted the bill
21  would draft the amendments because they're most familiar
22  with that legislation.  On a very large bill it wouldn't
23  be uncommon to have other people draft amendments and
24  then further complicate it, everyday during session
25  they've got a few Legislative Council attorneys that sit

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT

MAY 29, 2012

## 17

1 on the House floor and so, sort of, last second
2 amendments may have been drafted by someone not involved
3 through out the process.
4    Q. (By MS. WESTFALL)  Do you know with regard to
5 Senate Bill 14 the name of the person at the legislative
6 council whole was involved in drafting?
7    A. My memory is that there are two attorneys that
8 were primarily in charge of election laws and this bill.
9 Jennifer Jackson and David Hanna.
10    Q. Did those persons also draft the amendments to
11 Senate Bill 14?
12    A. I don't know.
13    Q. But based on your testimony that you just
14 provided, is it your inference that they would have
15 drafted the amendments?
16       MR. SWEETEN:  Objection, calls for
17 speculation. Go ahead.
18    A. I think they probably would have.
19    Q. (By MS. WESTFALL)  Was there any concern or, I
20 guess, is there any concern about maintaining
21 confidentiality when you have someone in the Legislative
22 Council drafting the bill and you have bill opponents
23 who are drafting amendments?
24       MR. SWEETEN:  You're asking as a general
25 matter?

## 18

1       MS. WESTFALL:  Yes.
2       MR. SWEETEN:  You an answer as a general
3 matter.
4    A. I can say from my own experience as an attorney,
5 yeah, the training of a legislative council attorney is
6 something that we spent a lot of time on was, you know,
7 sort of, building these walls that each bill has its on
8 clients, yeah.
9    Q. So in other words, you did not share information
10 with the bill sponsor about amendments you were
11 drafting. Is that your testimony?
12       MR. SWEETEN:  Objection. I think assumes
13 facts not in evidence. I'm not even clear on the
14 question. So objection vague. You can answer to the
15 extent you can.
16    A. Could you repeat the -- I'm also unclear what
17 you're asking.
18    Q. (By MS. WESTFALL)  Could you read back the
19 question?
20       (Requested question was read.)
21    A. Right. To the extent I was writing an amendment
22 or assisting with an amendment, I probably communicated
23 with the bill sponsor. I don't recall ever passing
24 messages back and forth between unless, again, it's
25 possible there was some general communications about the

## 19

1 bill with Legislative Council and the sponsor.
2    Q. I see. So it's your testimony that you -- there
3 weren't necessarily any strict walls between
4 communications you had with legislatures who wanted
5 amendments to be drafted, versus the legislator who
6 sponsored the bill; is that right?
7       MR. SWEETEN:  Objection, vague.
8    A. Yeah, again. I'm not clear exactly what you're
9 getting at.
10    Q. (By MS. WESTFALL)  Let me try again.
11    A. Sure.
12    Q. I believe you just testified that sometimes you
13 would share information with a bill sponsor about
14 amendments that were being contemplated; is that
15 correct?
16    A. Sure.
17    Q. You testified that the council has a legal
18 division; is that right?
19    A. Yes.
20    Q. Could you tell me what the legal division does as
21 opposed to the other sections of the council?
22    A. During session the legal division spends the bulk
23 of their time drafting bills and amendments and
24 assisting with, sort of, procedural questions.
25    Q. And when they're not in session, what does the

## 20

1 legal division do?
2    A. They have an ongoing code -- provision project
3 where they take sort of old and antiquated statutes and
4 modernize them, do intern legal research projects.
5    Q. Are there any other responsibilities the legal
6 division has that you haven't already testified about?
7       MR. SWEETEN:  Again, as a general matter not
8 a specific Legislature you can answer.
9    A. Sure. They may do other things now. I know when
10 I was there that was the primary interim activity.
11    Q. (By MS. WESTFALL)  When you were employed with
12 the council, what were your responsibilities?
13    A. I was a Legislative Counsel, C-O-U-N-S-E-L, and I
14 did all the things I just described, drafted bills and
15 amendments and provided legal advice and assisted with
16 the interim code projects and random special intern
17 research projects.
18    Q. Did you work on any legislation related to photo
19 ID when you were in the council?
20    A. I don't believe so. I don't think I did. And I
21 say I don't believe so because we would draft hundreds
22 and hundreds of bills and amendments when I was there
23 8 years. I don't think I did election law or much of it
24 when I was there, not as a drafter.
25    Q. Did you have an active bar license when you were



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT

MAY 29, 2012

## 21

1  with the council?
2      A. Yes. I'm sorry. There may have been a window at
3  the very, very beginning where my bar results came in
4  November, but I started in October or something, but
5  generally speaking, yes.
6      Q. Could you describe -- and did you provide legal
7  advice while you were employed with the council?
8      A. Yes.
9      Q. Could you describe that legal advice?
10         MR. SWEETEN: I'm going object as to
11  attorney/client privilege. As council for the TLC don't
12  disclose any specific legal advice that you provided
13  within that job.
14      Q. (By MS. WESTFALL) And to clarify, I'm not asking
15  you for the legal advice. I'm asking you to describe
16  the nature of the advice that you provided, not the
17  specifics.
18      A. Sure.
19         MR. SWEETEN: If you can answer it without
20  revealing the substance of the communications as a
21  general matter, you can answer it. But if you're
22  required to provide substantive information, do not
23  answer the question.
24      A. Sure. I mean, it would typically be in relation
25  to a piece of legislation is this constitutional, does

## 22

1  this conflict with common law or some other statutory
2  precedent or anything else. Again, it would usually be
3  tailored to what is this bill and is it okay.
4      Q. And you would provide that advice in response to
5  what kind of inquiry?
6      A. Usually a phone call or a meeting with a staffer
7  or a legislator.
8      Q. Did you provide any advice in that regard
9  pertaining to Section 5 of the Voting Rights Act?
10      A. As a Legislative Council Attorney?
11      Q. Yes?
12         MR. SWEETEN: You can answer that question
13  yes or no. Just don't provide the substance of any
14  communication.
15      A. Not that I recall.
16      Q. What was your title at the council?
17      A. Legislative Counsel and then they would have one,
18  two, three, four. So Legislative Counsel one is where
19  you start. I think I may have been Legislative Counsel
20  three when I left.
21      Q. Were you -- did you ever have the title of policy
22  analyst at the council?
23      A. No.
24      Q. Did you have any agreement with the legislatures
25  or staff to whom you provided legal advice?

## 23

1         MR. SWEETEN: Don't reveal the substance of
2  any communication. Are you asking him as a general
3  matter? But don't reveal any specific communications
4  regarding any sort of bill with any legislators.
5      A. I'm not sure what you mean by agreement.
6      Q. (By MS. WESTFALL) An agreement to provide
7  services, legal services?
8      A. I mean, that's the way that the Legislative
9  Council operates is the staff of attorneys -- and I'm
10  sure there is some statutory language that I'm
11  forgetting that says the Legislative Counsel exists to
12  provide legal and other advice to legislatures.
13      Q. So is it your testimony that the statute is the
14  sole source of the agreement between the council and
15  legislators as to the provision of legal services?
16      A. I would say that's not my testimony. There is
17  probably some statutory authority is all I'm saying.
18      Q. But are you aware of any other agreements either
19  oral or written about the provision of legal services
20  between the council and the legislators?
21      A. I guess I'm not aware.
22      Q. Does the counsel provided advice on whether --
23  strike that.
24         Are you aware of the counsel having provided
25  advice to any legislator on whether a bill complies with

## 24

1  Section 5 of the Voting Rights Act?
2      A. I'm not aware.
3      Q. Did you handle election laws while you were
4  employed with you counsel?
5         MR. SWEETEN: Objection, asked and answered.
6      A. No.
7      Q. (By MS. WESTFALL) Are you aware of who did at
8  the council handle election laws?
9      A. I think I said Jennifer Jackson and David Hanna.
10      Q. Was that while you were employed at the council
11  or subsequent to that time or both?
12      A. Both. Jennifer started after I did so there may
13  have been -- I forget who else may have been doing
14  election law while I was there?
15      Q. Did you ever have any conversations with
16  Ms. Jackson or Mr. Hanna concerning Section 5 of the
17  Voting Rights Act?
18         MR. SWEETEN: You're asking while he was at
19  Texas Legislative Council.
20         MS. WESTFALL: Yes.
21      A. Not that I recall.
22  BY MS. WESTFALL:
23      Q. Was there a time when you became employed by
24  Mr. Dewhurst?
25      A. Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 25

1    Q.  And in what capacity were you first employed with
2 Mr. Dewhurst?
3    A.  My initial title was council for public policy.
4 And then after one session I became deputy general
5 counsel.
6    Q.  What year did you start working for him as
7 council for public policy?
8    A.  '07, January '07.
9    Q.  How did your relationship with Mr. Dewhurst
10 arise?
11       MR. SWEETEN:  Objection, vague.  Go ahead.
12    A.  While at Legislative Council, I drafted a fair
13 number of bills related to school finance.  I worked
14 closely with his staff.  So I built a relationship with
15 staff and they had an opening and let me know.
16    Q.  When in 2007 did you start working for
17 Mr. Dewhurst?
18    A.  January I believe.
19    Q.  Who did you report to at that time?
20    A.  Julia Rathgeber was the policy director.
21    Q.  Could you describe the structure of
22 Mr. Dewhurst's office when you started working for him
23 in 2007?
24    A.  Governor Dewhurst, chief of staff, policy
25 director, there was a budget director and then a dozen

## 27

1 part of my responsibility included general government
2 issues which occasionally flavored into election stuff,
3 but not really conduct of elections, more sort of the
4 big picture stuff.
5    Q.  Would you describe yourself as coming to the job
6 with Mr. Dewhurst as not having a lot of familiarity
7 with election law?
8    A.  I would not describe it that way.  I had also
9 been a lawyer and political science major and law school
10 graduate so to the extent I was familiar with it.
11    Q.  Did you familiarity with State election code at
12 that time?
13    A.  I was familiar with it, yes.
14    Q.  Did you understand code as it pertained to voter
15 registration and election day procedures?
16       MR. SWEETEN:  Objection vague.  Go ahead you
17 can answer.
18    A.  Sure.  And certainly meeting with the Secretary
19 of State's office that familiarity increased.
20    Q.  (By MS. WESTFALL)  When did you meet with the
21 Secretary of State's office?
22    A.  As part of my role with Governor Dewhurst I was,
23 sort of, the point person with that office for the
24 5 years there.
25    Q.  Guess I'm directing your attention to the time

## 26

1 or more staff, policy staff and a general counsel.
2    Q.  And how large was the office in whole?
3    A.  30, 35 people, something like that.
4    Q.  Were you hired to handle a particular issue area?
5    A.  No.  I mean, I'll say that the way -- within the
6 structured question, each staff member would be in
7 charge of certain committees or in some cases issues.
8 In my case, I had two or three committees that I was in
9 charge of which encompassed a whole range of issues.
10    Q.  Could you identify those committees?
11    A.  Sure.  The Senate State Affairs Committee, the
12 Senate Jurors Prudence Committee, there may have been
13 one more.  Every one, sort of, got involved in the
14 budget process.  So to a lesser extent the finance
15 Committee.
16    Q.  When you were heard by Mr. Dewhurst, did you have
17 anyone -- did you have any conversations with anyone in
18 his office concerning the fact that you would be
19 handling voter ID as an issue?
20    A.  I don't remember it being specifically discussed,
21 except that I would be handling some election issues.
22    Q.  Did you have any familiarity or background with
23 election issues before you started working for
24 Mr. Dewhurst?
25    A.  As a lawyer, yes.  And at Legislative Council

## 28

1 before you started working for Mr. Dewhurst, did you
2 have any contact with the Secretary of State's office?
3    A.  Not that I recall.
4    Q.  Did you have any background in federal election
5 laws, other than law school, of course?
6    A.  Right.  No.
7    Q.  When you became council for public policy, did
8 you have a written job description?
9    A.  I think no, not that I recall.
10    Q.  With regard to your responsibilities for the
11 State Affairs Committee, could you describe those
12 responsibilities?
13    A.  Sure.  Attending Committee meetings, working with
14 the staff and Senators on those committees, reporting
15 back to the Lieutenant Governor's office on what
16 billings were proceeding or substance of those bills.
17    Q.  He did not sit on the Committee, correct?
18    A.  Correct.
19    Q.  You would simply go to the meetings and report
20 back as to what happened; is that right?
21    A.  Correct.
22    Q.  Could you identify every person in Mr. Dewhurst's
23 office who handled the issue of voter ID from when you
24 were hired in 2007 until you stopped working for
25 Mr. Dewhurst?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 29

1  A. Myself. That's it. I conferred occasionally
2  with our general counsel, Frank Battle. And when you
3  say handled voter ID, I mean, you know, the chief of
4  staff and the policy director would have been aware of
5  that bill just like they were aware of every bill coming
6  through the Senate. But I wouldn't characterize it as
7  handling voter ID.
8  Q. So you mean you handled the substance of the bill
9  for Mr. Dewhurst; is that right?
10  MR. SWEETEN: Okay. Just -- I want to make
11  clear that with respect to your thoughts and mental
12  impressions with respect to the bill that passed, we're
13  getting into areas, I don't think we're there yet, but
14  that could be covered by legislative privilege and
15  therefore you can discuss if you had a communication,
16  you can answer general matters, but don't reveal
17  specific thoughts and mental impressions with respect to
18  a specific bill as to voter ID. But with that, you can
19  go ahead and answer the question.
20  A. I think I handled the analysis of election
21  legislation or at least the analysis and the processing
22  of it. And that would include voter ID.
23  Q. (By MS. WESTFALL) Was there anything else or was
24  it a general category of activity that you had
25  associated with handling election legislation besides

### 30

1  analysis and sort of processing of drafts?
2  A. No.
3  Q. Did you have a press person on staff who issued
4  press releases regarding voter ID for Mr. Dewhurst?
5  A. Yes.
6  Q. Who was that person?
7  A. It would have been several people over the 5 year
8  period. Mike Walz, W-A-L-Z, I think is the still
9  current press secretary. Then Mike Wintemute and Rich
10  Parsons were communications guys when I first started.
11  Q. Could you generally describe the role of the
12  chief of staff with regard to voter ID while you were in
13  office?
14  MR. SWEETEN: You can answer. Now, she's
15  asked about specifically about voter ID. So don't
16  reveal in your answer thoughts, mental impressions or
17  conversations you've had with anybody. If you can
18  answer a question without doing so you can go ahead and
19  do it.
20  A. All right. I think from my perspective and I
21  don't know all that he did, I mean, I would report back
22  to status updates like I would with any legislation.
23  Q. (By MS. WESTFALL) And with regard to -- so are
24  you referring to Ms. Rathgeber?
25  A. You asked about the chief of staff which would be

### 31

1  then -- let's see now Blaine Brunson and before that Rob
2  Johnson.
3  Q. Okay. So with regard to Mr. Brunson, what was
4  his role pertaining to voter ID.
5  MR. SWEETEN: Same objection. I'm also
6  going to instruct you with respect to communications you've
7  had internally with Lieutenant Governor's office, you
8  being an attorney that those are potentially protected
9  by the attorney/client privilege. We's discussed
10  already the legislative privilege. So to the extent you
11  can answer these questions without revealing matters
12  that are privileged, then you can do so. Okay.
13  A. So the question.
14  Q. What did Mr. Brunson generally do with regard to
15  voter ID? What were his responsibilities.
16  A. I don't know because he didn't tell me all his
17  responsibilities, but what I saw him do as I just
18  mentioned; received status updates and shepherd
19  Lieutenant Governor's policies.
20  Q. As a council for public policy, did you solely
21  report to Ms. Rathgeber?
22  A. I directly reported to her, but the chief of
23  staff obviously was my supervisor as well.
24  Q. How long did you serve as a council for public
25  policy?

### 32

1  A. My title changed after my first session there.
2  So it would have been '08 or '09. I honestly can't
3  remember when that switch happened.
4  Q. And with regard to Mr. Brunson, was his role for
5  voter ID different from his role with regard to other
6  legislation?
7  MR. SWEETEN: In answering this question,
8  don't reveal thoughts, mental impressions or opinions
9  about legislation or in furtherance of the legislative
10  process including Senate Bill 14.
11  A. I don't think it was different.
12  Q. (By MS. WESTFALL) So I'm sorry. You said after
13  you had served as a council for public policy, there was
14  a time when you changed your job titles; is that right?
15  A. Correct. I was promoted to deputy general
16  counsel.
17  Q. And when did that occur?
18  A. Again, I think it must have been '08 or '09. It
19  was after the first session I was there which began in
20  January '07.
21  Q. When you were council for public policy, did you
22  have an attorney client relationship with the Lieutenant
23  Governor, yourself?
24  A. Yes.
25  Q. What was the basis of that relationship?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT

MAY 29, 2012

## 33

1    A.  He employed me as an attorney.

2    Q.  Did you have any written or oral agreement?

3    A.  Not that I'm aware.

4    Q.  Were you serving as his attorney with regard to
5    all aspects of your employment as council for public
6    policy?

7    A.  I'm not sure what you mean.

8    Q.  I mean, were there certain responsibilities for
9    which you were providing him legal advice and serving as
10   his attorney in certain parts of your job where you were
11   not functioning as an attorney for the Lieutenant
12   Governor?

13   A.  I guess it's possible.  But, again, to the extent
14   I was communicating with him, they were almost always
15   generally speaking, have been some legal analysis.  So
16   that's why I was there as an attorney.

17   Q.  So in other words there was no differentiation of
18   your rolls?

19   A.  Certainly no formal differentiation.

20   Q.  And sitting here today, you can't think of any
21   role in which you were not serving as an attorney for
22   Mr. Dewhurst as council for public policy?

23   A.  I can't think of any, no.

24   Q.  Did your -- strike that.

25       Did you consider yourself as having an attorney

## 34

1    client relationship with members of the Legislature and
2    their staff?

3    A.  Members -- you mean, House and Senate members and
4    their staffs?

5    Q.  Yes.  Other members of the --

6    A.  Probably not.  Probably not.

7    Q.  Could you describe your responsibilities as
8    deputy general counsel?

9    A.  Very, very similar as council for public policy.
10   Just with a new title and a bigger paycheck.

11   Q.  Can you think of any ways, other than the things
12   you've just described, more pay, in which they differed?

13   A.  No, not really.  I will say, at this point I
14   began taking a larger role in Open Records request.

15   Q.  Did your Committee assignments change at all or
16   did they remain the same?

17   A.  They remained the same.

18   Q.  How long did you serve as deputy general counsel
19   for Mr. Dewhurst?

20   A.  Until I left.  So that would have been about
21   3 years.

22   Q.  And did you the have the same attorney
23   relationship with Lieutenant Governor during that period
24   of time as deputy general counsel as you did as a
25   counsel for public policy?

## 35

1    A.  Yes.

2    Q.  In no way, shape, or form it differed; is that
3    correct?

4    A.  I think that's correct.

5    Q.  Did you provide any strategic advice to
6    Mr. Dewhurst?

7       MR. SWEETEN:  I'm going to object to the
8    question as vague.  Also don't reveal the substance of
9    any communications you've had with Mr. Dewhurst or
10   members of that office.

11   A.  I mean, over 5 years the vast majority, at least
12   what I would remember of anything that could be called
13   strategic advice would have been sort of legal strategy
14   or legislative procedural strategy.

15   Q.  (By MS. WESTFALL)  Is it your testimony you never
16   provided any political strategic advice to Mr. Dewhurst,
17   ever?

18       MR. SWEETEN:  Objection to the question as
19   vague.  Also objection to the extent you're asking him
20   to reveal the specific substance of communications he's
21   had with Lieutenant Governor Dewhurst or other members
22   of Lieutenant Governor's office.  If you can answer
23   without revealing the substance of those communications
24   you can do so.  Otherwise I instruct you not to answer.

25       MS. WESTFALL:  I'm going to object to your

## 36

1    objection.  I'm asking him about his roles and
2    responsibilities.  I'm not asking him about the content
3    of those discussions.  I would ask you to withdraw that
4    objection, Mr. Sweeten.

5       MR. SWEETEN:  I think I've already allowed
6    you to ask him questions about the general subject
7    matter of the role.  And I'm also allowing him to answer
8    this to the extent it doesn't require him to reveal
9    communications between he and the Lieutenant Governor or
10   Lieutenant Governor's staff.  So I will not withdraw the
11   objection.

12       MS. WESTFALL:  I'm asking about the
13   existence of strategic discussions and not the content.
14   Do you understand the question?

15   A.  I do.

16   BY MS. WESTFALL:

17   Q.  Can you answer the question?

18       MR. SWEETEN:  Objection, vague, same
19   instruction.  You can answer it to the extent you can.

20   A.  I think I'll just repeat what I said.  You asked
21   about political strategy.  I think to the extent of my
22   discussions with him and staff would have been legal and
23   procedural.

24   Q.  So there's -- you never gave him strategic advice
25   that wasn't legal; is that right.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

### 37

1    A.  That's probably right.

2    Q.  You testified before that you did not have an

3  attorney/client relationship as council for public

4  policy with members of the legislatures.  Did that hold

5  true when you were deputy general counsel?

6    A.  Yeah.  I don't think the nature of that

7  relationship changed.

8    Q.  Do members of the Senate routinely advise the

9  Lieutenant Governor before they file legislation?

10   A.  I'm not aware.

11   Q.  Do they give them a heads up, him a heads up?

12     MR. SWEETEN:  Objection asked and answered.

13  Objection vague.  Go ahead and answer.

14   A.  I'm not aware.  I'm sure it happens.  I don't

15  know the frequency.

16   Q.  (By MS. WESTFALL)  When a senator is filing

17  legislation -- have you ever learned of a circumstance

18  where the Lieutenant Governor received advance notice

19  before a bill was filed?

20     MR. SWEETEN:  Don't reveal any

21  communications that you had with any members of the

22  Lieutenant Governor's office.  Don't reveal any matters

23  that are -- that would be thoughts, mental impressions,

24  or opinions about legislation or furtherance of the

25  legislature process or communications between other

### 38

1  legislators, legislative staff, state agencies, Texas

2  Leg. Council or constituents in answering that question.

3    A.  The question is am I aware of heads up?

4    Q.  (By MS. WESTFALL)  Yes.

5    A.  I can't think of specific bills.  But, again, I'm

6  sure that, you know, there were some communications

7  between Senators and Lieutenant Governor about upcoming

8  legislation.

9    Q.  And who would know the answer to that question if

10  you're not able to answer that question today?

11   A.  If -- I assume Julia Rathgeber or Blaine Brunson

12  in their roles as chief of staff and policy director.

13   Q.  And certainly Mr. Dewhurst would know himself,

14  correct?

15   A.  I assume.

16   Q.  Was there a time when you stopped working for the

17  Lieutenant Governor?

18   A.  Yes.

19   Q.  Could you describe the circumstances of your

20  departure from the office?

21   A.  Sure.  This was just this January of 2012 and I

22  just was ready for a new opportunity.

23   Q.  Are you currently employed?

24   A.  Yes.

25   Q.  Where are you employed?

### 39

1    A.  I'm a independent consultant.

2    Q.  Are you employed or serve on the Texas

3  Conservative Round Table?

4    A.  Yes.  Not employed.  I'm contract relationship

5  with them.

6    Q.  I see.  They're one of your clients?

7    A.  Correct.

8    Q.  Do you have any other clients?

9    A.  No.

10   Q.  Could you describe the Texas Conservative Round

11  Table?

12   A.  Sure.  It is a 501 C4, nonprofit, education

13  policy agency -- entity.  The goal is to ensure that

14  Texans are aware of the challenges that lie ahead in

15  finding responsible conservative solutions to those

16  problems.

17   Q.  Are your familiar with your bio that you list on

18  the Round Table's website?

19   A.  I don't recall all the lines.  But hopefully it's

20  not too embarrassing.

21   Q.  Did you draft the bio on the website?

22   A.  I did.

23   Q.  Do you recall that it referred to your having

24  experience in providing strategic advice?

25   A.  I don't remember specifically, but if you say so.

### 40

1    Q.  I'm going to mark this US 70.

2      (Exhibit No. 70 was marked.)

3    Q.  (By MS. WESTFALL)  You've been handed what's been

4  marked as US 70.  Do you recognize this document?

5    A.  Yes.

6    Q.  What is it?

7    A.  It's the who we are, staff bios from the website.

8    Q.  Do you see on the second page it list you?

9    A.  Yes.

10   Q.  Do you see that it says that in the first

11  paragraph that you provided strategic advice?

12   A.  Yes.

13   Q.  To a number of entities?

14   A.  Yes.

15   Q.  Did you provide any strategic advice to anyone

16  concerning voter ID in the past?

17   A.  As I said earlier, I think legal and procedural

18  strategy is what I was referring to here and that would

19  have been the extent, generally speaking the extent of

20  my advice to those people.

21   Q.  So is it your testimony that it is not accurate

22  or not entirely clear from this paragraph where it says

23  that you provided strategic advice, that was actually

24  legal and strategic advice?

25     MR. SWEETEN:  Objection, compound.  Go ahead



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 41

1  and answer.
2      A.  I think it just says what it says.  Like I said,
3  strategic advice could be a whole range of things and it
4  was.
5      Q.  Outside of your work for the Legislative Council,
6  Mr. Dewhurst, did you ever provide any advice of any
7  kind, legal or strategic, to a campaign candidate or
8  political party about election law?
9          MR. SWEETEN:  Can you read the question
10 back?  We were interrupted.
11         (Requested question was read.)
12         MR. SWEETEN:  You can reveal it as long as
13 you're not revealing any sort of attorney/client
14 privileged information.  Go ahead if you think you can
15 answer.
16     A.  No.
17     Q.  (By MS. WESTFALL)  Is the no based on advice of
18 council that or is the no that you never provided any
19 advice on election law?
20     A.  The no is I don't believe I ever provided ay
21 advice.
22     Q.  Are you asserting any privileged here today?
23     A.  Yes.
24     Q.  Which privileges are you asserting?
25     A.  Potentially attorney/client privilege,

### 42

1  deliberative process privilege and legislative
2  privilege.
3      Q.  Could you describe the attorney/client privilege
4  you're asserting today?
5          MR. SWEETEN:  You can answer to the extent
6  you know.  Obviously, much of your question will be
7  based upon what he is asked to provide.  He is an
8  attorney and has been since 1998.  So he can't possibly
9  know what you're going to ask him today.  That's the
10 same as to the other two privileges, but you can answer
11 to the extent you know.
12     A.  Right.  I think regarding my employment with
13 Texas Legislative Council, I would assert that privilege
14 regarding communications with legislators or their
15 staff.  Regarding my employment with Lieutenant
16 Governor, I would assert that privilege with regarding
17 communications with Lieutenant Governor Dewhurst and his
18 staff.
19     Q.  (By MS. WESTFALL)  And could you describe the
20 deliberative process privilege you're asserting today?
21     A.  Again, I think to the extent that I was involved
22 in the development of legislation I would assert that
23 privilege.
24     Q.  Is that the sum total of what you're asserting
25 deliberative process privilege over?

### 43

1          MR. SWEETEN:  Same objection.
2      A.  Yeah.  I mean, I guess any of the questions that
3  fall within the realm of developing legislation, yes.
4      Q.  (By MS. WESTFALL)  Could you describe the
5  legislative privilege you're asserting today?
6      A.  Again, it's similar to the deliberative process
7  to the extent that legislation and communications about
8  that legislation were exchanged.  I think potentially
9  the privilege would apply.
10     Q.  Could you mark this as US 71?
11         (Exhibit No. 71 was marked.)
12     Q.  (By MS. WESTFALL)  You've been handed what's been
13 marked as US 71.  Do you recognize this document?
14     A.  No.
15     Q.  I will represent to you, and I'm sure Mr. Sweeten
16 will not disagree, that this is the first page of a
17 privileged log produced by Texas in this litigation to
18 the Attorney General.  It's Page 1, and then an excerpt
19 which runs from pages 434 through 442 pertaining to
20 documents withheld from the Lieutenant Governor's office
21 in this litigation on the basis of privilege.
22         Turning your attention to page 434 of the
23 document, and these are double sided pages so if you
24 could follow along.  The entries are not numbered, but
25 two up from the bottom there is an entry, Bates numbered

### 44

1  3442.  Do you see that line?
2      A.  Yes.
3      Q.  Could you just take a minute to review that line
4  and let know when you've read it?
5      A.  Okay.
6      Q.  Do you remember this document?
7      A.  No.  It's so general I'm not sure.
8      Q.  Do you see that it list Senator Author Bryan
9  Hebert and recipient Brian Hebert?
10     A.  Yes.
11     Q.  And do see that the entry indicates it was
12 confidential e-mail between attorneys and legislative
13 staff offered for the purpose of giving legal advice on
14 voter ID?
15     A.  Yes.
16     Q.  Do you see that?  Do you know who the legislative
17 staff people were referenced in this entry?
18     A.  I don't know.
19     Q.  Turning your attention to Page 435, three entries
20 down from the top at Document 34452.  Do you see that
21 line?
22     A.  Yes.
23     Q.  Do you see that it refers to a news article on
24 voter ID?
25     A.  Yes.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 45 | 47 |
|---|---|

**45**

1    Q. Do you recall what that news article was about?
2    A. No.
3    Q. Do you see again that it list Bryan Herbert,
4  Senator, Author, and Bryan Herbert as recipient?
5    A. Yes.
6    Q. Do you know to whom you were sending this e-mail?
7    A. I don't know.
8    Q. Could you tell me who Daniel Hodge is?
9    A. He is, I think, currently the first assistant to
10  the Texas Attorney General.
11    Q. Who is Jerry Bonay?
12    A. The name is not ringing a bell.
13    Q. Turning your attention to Page 437 of this
14  document, three entries down at Texas 34472, do you see
15  that?
16    A. Yes.
17    Q. And do you see that it list the sender author of
18  that document as Jerry Bonay and that you were the
19  recipient?
20    A. Yes.
21    Q. Does that refresh your recollection as to who
22  Mr. Bonay?
23    A. It's -- my guess is that he would be an election
24  official from Indiana, but I'm not sure of that.
25    Q. From the description of the e-mail does that

**47**

1    A. When you -- what do you mean when you say set the
2  agenda?
3    Q. He doesn't present an agenda and then the Senate
4  must execute it pursuant to his authority; is that
5  right?
6    A. I think that's right.
7    Q. Was -- strike that.
8       Was Mr. Dewhurst a member of the State Affairs
9  Committee in 2007?
10    A. The Lieutenant Governor does not serve on
11  committees so no.
12    Q. So he was not a member of that Committee at any
13  time, correct?
14    A. Correct.
15    Q. Could you describe Mr. Dewhurst's authorities or
16  roles pursuant to the Senate rules in the State Affairs
17  Committee?
18       MR. SWEETEN:  As a general matter.
19    Q. (By MS. WESTFALL)  As a general matter.
20    A. He appoints the members of that Committee and
21  then extent to which any bills from any Committee are
22  considered on the Senate floor that's because they're
23  recognized for that purpose by the Lieutenant Governor.
24    Q. Can he call a Committee hearing for the State
25  Affairs Committee?

| 46 | 48 |
|---|---|

**46**

1  refresh your recollection as to what this document is?
2    A. No.
3    Q. Could you tell me who Jennifer Fagan is?
4    A. She still is, I think, either general counsel or
5  director of the Senate State Affairs Committee.
6    Q. Who does she report to?
7    A. Senate or the Robert Duncan.
8    Q. Is she Committee staff person or is she personal
9  staff for Mr. Duncan?
10    A. I think maybe both actually.
11    Q. Who is David Duran?
12    A. He is a budget analyst for Lieutenant Governor
13  Dewhurst.
14    Q. Who is John Opperman?
15    A. Budget and policy analyst for Lieutenant Governor
16  Dewhurst.
17    Q. And who is John Green?
18    A. Budget analyst for Lieutenant Governor Dewhurst.
19    Q. Are you familiar with the roles and
20  responsibilities of the Lieutenant Governor under the
21  Senate rules?
22    A. Generally familiar, yes.
23    Q. Is it true that Mr. Dewhurst has no authority to
24  set the legislative agenda for the Senate under the
25  Senate rules?

**48**

1    A. The State Affairs committee, no.
2    Q. Can he -- when the committee is acting as a
3  committee as a whole call a hearing for that committee?
4    A. I'm actually forgetting now whether it was
5  Lieutenant Governor or motion from a Senator to convene
6  the committee.
7    Q. Are you familiar with the American Legislative
8  Exchange Council?
9    A. I'm aware of them, yes.
10    Q. What is it?
11    A. I think it's a policy group.  That's all I know.
12    Q. Do you know where it's based?
13    A. No.
14    Q. Do you have any affiliation with ALEC, yourself?
15    A. No.
16    Q. Do you know whether Mr. Dewhurst was or is a
17  member of ALEC?
18    A. I don't know.
19    Q. Have you ever received any documents from ALEC
20  related to voter ID?
21    A. No.
22    Q. Are you familiar with the National Conference of
23  State Legislatures?
24    A. Yes.
25    Q. What is that entity?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 49

1    A. Again, I think it's an outside policy or resource
2  group for State legislatures.
3    Q. Have you ever attended any of its meetings.
4    A. I've been to I think two, three conferences, yes.
5    Q. At any of those conferences, was the subject of
6  voter ID discussed?
7    A. Not that I recall.  At least not any of the
8  presentations that I went to.
9    Q. Do you currently have any communications with
10  Lieutenant Governor in your current role as a
11  consultant?
12    A. No.  Other than friendly.
13    Q. How often do you communicate with the Lieutenant
14  Governor currently?
15    A. Rarely.
16    Q. When you were most recently employed for him, how
17  often did you communicate with him?
18    A. Regularly.
19    Q. How did you -- what was the method of
20  communication?
21    A. Usually personal meetings.
22    Q. Did you e-mail him?
23    A. No.
24    Q. Never?
25    A. Never.

## 50

1    Q. Does he not use e-mail?
2    A. I'm not aware.
3    Q. Did you ever text him?
4    A. I may have texted him before.
5    Q. Was that on a government phone or a personal
6  phone?
7    A. That would have been on my personal phone.
8    Q. Was it to his government phone or his personal
9  phone?
10    A. I don't know that he has a government phone so I
11  assuming his personal phone.
12    Q. Did you ever text him concerning voter ID
13  legislation?
14    A. No.
15    Q. And did you use e-mail when you were employed
16  with the Lieutenant Governor?
17    A. Yes.
18    Q. Did you use both a government account and a
19  personal account for work related e-mail?
20    A. All my work related e-mails were on the
21  government account.
22    Q. Did you maintain two e-mail accounts when you
23  were working for the Lieutenant Governor that were work
24  related?
25    A. Yes.

## 51

1    Q. Was one
2  BrianHebert@Lieutenantgovernorsstate Texasus; is that
3  right?
4    A. Yes.
5    Q. Was another one 0580ag@capital.com?
6    A. No.  I think it's the same e-mail, but for
7  internal, sort of, purposes I don't understand that's
8  how it shows up within the capital, I think.
9    Q. I see.  Thank you.
10      How often did you communicate when you were
11  employed with the Lieutenant Governor with other members
12  of the legislator or their staff?
13    A. I would say daily.
14    Q. How did you communicate with them?
15    A. E-mail, phone call, personal visits.
16    Q. Did you communicate directly with members or
17  mostly their staff?
18    A. Mostly their staff.
19    Q. Could you mark this as 72?
20      (Exhibit No. 72 was marked.)
21    Q. (By MS. WESTFALL)  You've been handed what's been
22  marked as US 72.  Do you recognize this document?
23    A. Yes.
24    Q. What is it?
25    A. Its the request for documents regarding this

## 52

1  trial deposition.
2    Q. Did you -- when you received this notice, did you
3  undertake a search for responsive documents?
4    A. Yes.
5    Q. Could you describe your search?
6    A. I scrolled through my personal e-mail accounts
7  and I had a conversation with the general counsel for
8  Lieutenant Governor Dewhurst since I was no longer an
9  employee at the time that I saw this.  I directed him
10  where I thought responsive documents might be.
11    Q. Were those electronic documents only?
12    A. I think it would have been a mix of different
13  types of documents.
14    Q. Could you describe those documents and
15  categories?
16    A. Communications, e-mails, memos, that's probably
17  all.
18    Q. In other words, paper and electronic?
19    A. Well, I should say since I handled Open Records
20  request for Lieutenant Governor we had received Open
21  Records requests for all these types of documents and so
22  I had completed a responsive Open Records request and so
23  technically they would have all been paper because I
24  printed them out and they would have been in a file.
25    Q. Did you take any electronic or paper documents



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

BRIAN HEBERT

MAY 29, 2012

## 53

1  when you left the employment of Mr. Dewhurst to your
2  home?
3     A. No.
4     Q. Did you take anything from the office related to
5  photo ID?
6     A. No.
7     Q. Does Mr. Dewhurst maintain more than one office?
8     A. I think he has a business office and his capital
9  office.
10    Q. Is the capital office for both the roles and
11 responsibilities that he has with the legislator and his
12 roles and responsibilities as a member of the executive
13 branch?
14    A. I think, yes.
15    Q. So one office total; is that right?
16    A. As far as I know.
17    Q. Does he not have separate staff for executive
18 responsibilities versus responsibilities in the Texas
19 State Senate?
20    A. There's one capital staff.
21    Q. Is there a person in Mr. Dewhurst's office who
22 maintains records?
23    A. Yes.
24    Q. Who is that person?
25    A. Well, I take that back. Well, let me clarify, I

## 54

1  should say. Each member of the staff is responsible for
2  holding on to documents they think might be required for
3  archival purposes or open records purposes. And then
4  the general counsel and when I was there deputy general
5  counsel would compile those documents as necessary to
6  respond to the open records request.
7     Q. I see. And with regard to the photo ID bills
8  that you were involved in, was there anticipation of
9  Section 5 submissions or litigation that prompted you to
10 retain those records?
11       MR. SWEETEN: Objection, vague. Objection,
12 I think it calls for him to reveal mental impressions
13 that he may have had with respect to the legislative
14 process. To the extent you're not providing
15 information, you can answer the question.
16    A. Yes. We held onto records assuming people might
17 want to see them.
18    Q. (By MS. WESTFALL) Did you hold onto and retain
19 records related to photo ID legislation in a broader
20 sense than you might otherwise have done pursuant to the
21 Texas Open Records request?
22       MR. SWEETEN: Objection vague, objection
23 calls for speculation. But go ahead and answer.
24    A. No. I think I would treat it like any other
25 bill.

## 55

1     Q. (By MS. WESTFALL) Which is simply saving
2  documents that you thought could be subject to the open
3  records request; is that right?
4     A. I think that's fair.
5     Q. But you took no special precautions or retention
6  of documents given that it was election related
7  legislation; is that right?
8     A. I think that's right.
9     Q. What is the retention policy for Mr. Dewhurst's
10 office?
11    A. There is a schedule set in the administrative
12 code for all legislative and executive agencies and I
13 think for most items for Lieutenant Governor it's keep
14 everything and send it to the State archives and for
15 some other things it's 2 years.
16    Q. Are you generally familiar with the Senate rules
17 in effect in the from sessions from 2005 to 2011?
18    A. Yes.
19    Q. Are you generally familiar with the Texas State
20 Constitution?
21    A. Yes.
22    Q. Could you describe in general terms the
23 differences between the Lieutenant Governor's executive
24 and legislative functions broadly?
25       MR. SWEETEN: Objection, vague. Go ahead.

## 56

1     A. He's elected statewide which would be an
2  executive feature. He presides over the Legislature --
3  the Senate which would be a legislative feature. There
4  are some things about filling his vacancy and things
5  which would make it more executive than legislative.
6     Q. Can you describe off the top of your head any
7  other roles that he has in Senate besides presiding over
8  the Senate?
9     A. He appoints committees, he issues interim charges
10 for study by the Senate, he participate as a voting
11 senator would in the case of a tie or in the Committee
12 as a whole in the Senate. That's all. That's all I can
13 remember.
14    Q. What are questions of order?
15       MR. SWEETEN: As a general matter you're
16 asking what is a question of order, you can answer.
17    Q. (By MS. WESTFALL) Do you understand the
18 question?
19    A. Yes. I mean, I guess I'm not sure. I'm not
20 familiar if it's a term of art question of order.
21    Q. Could you mark this?
22       (Exhibit No. 73 was marked.)
23    Q. (By MS. WESTFALL) You've been handed what's been
24 marked as US 73. Do you recognize this document.
25    A. It's the rules of the Texas Senate.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 57

1    Q. And I will represent to you that this is an
2    excerpt of the rules. It only contains certain rules
3    and not all of the rules because it is otherwise a very
4    voluminous document.
5    A. It is.
6    Q. Turn your attention to past the table of contents
7    to Page 1 of the Senate rules. Do you see that?
8    A. Yes.
9    Q. And first of all, before we get there, could you
10   tell me what year these rules applied to?
11   A. First page says 2011.
12   Q. Thank you. And turning your attention back to
13   Page 1.
14   A. Okay.
15   Q. Do you see rule 1.01?
16   A. Yes.
17   Q. And the first sentence refers to, does it not,
18   that the Lieutenant Governor is present in the Senate
19   and decides all questions of order subject to appeal by
20   another member. Do you see that sentence?
21   A. Yes.
22   Q. Could you tell me what that means in your words?
23   A. I suppose my interpretation would be if a member
24   of the Senate raises any sort of objection in the form
25   of a point of order, that a ruling on that point of

## 58

1    order would be made by the Lieutenant Governor.
2    Q. Turning your attention to page 28, rule 5.15,
3    called ruling by president. Do you see that?
4    A. Yes.
5    Q. And could you describe for me your understanding
6    of this rule?
7    A. Again, if there's a point of order raised by a
8    member of the Senate, the Lieutenant Governor would rule
9    on that point of order. That ruling may be appealed to
10   the entire Senate for a vote to overrule or uphold that
11   ruling.
12   Q. Turning your attention to page 46, at rule 6.18,
13   Lieutenant Governor to give casting vote. Do you see
14   that rule?
15   A. Yes.
16   Q. Does this rule suggest that the Lieutenant
17   Governor may vote on anything or only when there is a
18   tie?
19   A. This rule says that if there is a tie Lieutenant
20   Governor shall give the casting vote.
21   Q. And otherwise is the Lieutenant Governor
22   prohibited from voting?
23   A. If there is a Committee as a whole I believe that
24   also allows the Lieutenant Governor to participate in
25   debate and vote.

## 59

1    Q. And in a Committee of the whole may he vote on
2    anything before the Committee or only certain types of
3    bills or resolutions or?
4    A. My understanding is the Committee of the whole is
5    only convened to consider a particular item.
6    Q. I see. So as a general matter under rule 6.18,
7    it's only when there is a tie he may vote; is that
8    right?
9    MR. SWEETEN: Objection vague. Misstates
10   prior testimony. Go ahead and answer it.
11   A. 6.18 says he shall vote if there is a tie.
12   Q. (By MS. WESTFALL) Do you remember in your
13   employment with Mr. Dewhurst how many times he voted
14   when there was a tie?
15   A. I'm not sure I recall that ever happening.
16   Q. Can he ever vote on final passage of a bill if
17   there is not a tie?
18   A. Not that I'm aware.
19   Q. And I believe you testified earlier that he may
20   refer assigned bills to the Committee; is that right?
21   A. I believe technically bills are assigned to
22   Committee through the Secretary of State -- secretary of
23   the Senate or parliamentarians office.
24   Q. I will refer you to page 51, rule 7.06, referral
25   bills. Do you see that?

## 60

1    A. Yes.
2    Q. Could you tell me what that rule means?
3    A. That means the Lieutenant Governor shall refer
4    each bill to the proper Committee.
5    Q. Turning your attention to the next page, page 69,
6    rule 7.23, do you see that rule, signing bills?
7    A. Yes.
8    Q. Is that -- is your understanding of this rule
9    that it's -- it's somewhat of a ceremonial function, the
10   signing?
11   A. I think that's fair, yes.
12   Q. He doesn't have any discretion whether he can or
13   can't sign those bills or joint resolutions; isn't that
14   right?
15   A. I'm not aware.
16   Q. Are you aware of any time during your employment
17   with Mr. Dewhurst that his refused to sign
18   legislation -- a bill or a joint resolution that had
19   been enacted by the Legislature?
20   A. I'm not aware.
21   Q. Turning your attention to the next page, page 78,
22   do you see rule 11.01?
23   A. Yes.
24   Q. And it indicates that the president of the Senate
25   appoints committees and standing subcommittees; is that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                                    MAY 29, 2012

---

### 61

1  right?
2      A.  Correct.
3      Q.  Turning your attention to the next page on 79,
4  rule 11.03, do you see the president, in other words the
5  Lieutenant Governor may appoint special committees and
6  standing committees?
7      A.  Yes.
8      Q.  Including subcommittees and the Committee of the
9  senate; is that right?
10     A.  Yes.
11     Q.  And on the next page, page 80, at rule 11.04, do
12  you see it indicates the president shall designate the
13  chair and vice chairs of each standing committee and
14  subcommittee?
15     A.  Yes.
16     Q.  And on page 91, at rule 12.01, do you see that
17  conference committees of the Senate are selected and
18  appointed by the Lieutenant Governor; is that correct?
19     A.  Yes.
20     Q.  And then on Page 98, at rules 13.02 and 13.03, do
21  you see that the Lieutenant Governor with regard to
22  Committee of the whole Senate may debate and vote on
23  questions?
24     A.  Yes.
25     Q.  Do you have any idea why the president is allowed

### 63

1  answer.
2      A.  I think the Committee of the whole is less usual
3  than the regular meeting of the Senate for sure.
4      Q.  (By MS. WESTFALL)  Do you have a general
5  understanding of why the purpose of the convening of the
6  Committee of the whole Senate?
7          MR. SWEETEN:  Objection, asked and answered.
8      A.  I think generally speaking a Committee of the
9  whole is convened to consider an issue.  The
10  circumstances probably vary.
11     Q.  (By MS. WESTFALL)  Well, I believe you just
12  testified that the Committee of the whole was convened
13  to consider two voter ID bills, correct?
14     A.  I remember those two, I remember, yes.
15     Q.  And did that occur in order to allow the
16  Lieutenant Governor to have the right to debate and vote
17  on these questions?
18         MR. SWEETEN:  Don't reveal the thoughts,
19  mental impressions, or opinions about the legislation or
20  the furtherance of the legislation process and don't
21  reveal any communications you had between the Lieutenant
22  Governor, legislators, legislative staff, state agency,
23  or Texas Council in answering this question.
24     A.  I don't know why it was convened as a Committee
25  of the whole.

### 62

1  to debate and vote on all questions of the Committee of
2  the whole Senate?
3      A.  I don't know.
4      Q.  What's the purpose of the that rule?
5      A.  I don't know.
6      Q.  During your employment with the Lieutenant
7  Governor, how many times was a Committee of the whole
8  Senate convened.
9      A.  I would say a few times.
10     Q.  Can you remember the first time it happened?
11     A.  I know it was done on voter ID twice and it seems
12  like there may have been another time, but I can't remember
13  the circumstances.
14     Q.  For voter ID twice, do you mean in 2011 and 2009?
15     A.  That's my memory, yes.
16     Q.  And sitting here today, you can't remember
17  another time when the Committee of the whole was
18  convened; is that correct?
19     A.  I can't be certain.
20     Q.  You can't be certain that you can't remember or
21  that it didn't happen?
22     A.  I'm not certain that it did not happen other
23  times.
24     Q.  Well, it certainly was unusual, was it not?
25         MR. SWEETEN:  Objection, vague.  You can

### 64

1      Q.  (By MS. WESTFALL)  Is your response -- are you
2  responding based in part on asserting privilege today
3  based on your counsel's advice?
4      A.  I think the short answer is I don't know and so I
5  don't have to get to the question of whether there's a
6  privilege that attaches.
7      Q.  Does forming a Committee of the whole Senate
8  allow more expeditious consideration of legislation?
9          MR. SWEETEN:  As a general matter,
10  Elizabeth?
11         MS. WESTFALL:  Yes.
12         MR. SWEETEN:  You can answer.
13     A.  Yes.
14  BY MS. WESTFALL:
15     Q.  How does that work?
16     A.  Typically you would have a bill that goes to a
17  Committee and then to the full Senate for a vote.  And
18  the Committee of the whole allows all the Senators to
19  hear testimony and vote.  I believe straight to final
20  passage from the Senate.
21     Q.  Are there two votes?  One in the Committee of the
22  whole and one final passage or is it one vote to the
23  best of your knowledge?
24     A.  I cannot recall.  If they're back to back
25  votes -- I mean, if they're two votes they're probably



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                                    MAY 29, 2012

---

### 65

1  very close together.
2      Q. I see. And they can just be held sequentially?
3      A. They may require suspension of the rules to do
4  that. I can't remember frankly. If it's one or two.
5          MR. SWEETEN: Elizabeth, I think we've been
6  going over an hour. Do you want to take a break pretty
7  soon. And also is there any way we can move? It's
8  getting warm in here.
9          MS. WESTFALL: Yes. Mr. Sweeten, I fully
10  agree with your assessment on the temperature in the
11  room.
12          MR. SWEETEN: We've agreed on something.
13          MS. WESTFALL: And we can have that on the
14  record even. Could I please ask two more questions and
15  we will investigate a more comfortable room for this
16  deposition to move to.
17          MR. SWEETEN: Sure, absolutely.
18  BY MS. WESTFALL:
19      Q. Could you describe for me the differences that
20  Mr. Dewhurst would play if a bill were considered by a
21  State Affairs Committee as opposed to the Committee of
22  the whole as a general matter?
23          MR. SWEETEN: You can answer as a general
24  matter.
25      A. Yeah. I think a bill in the State Affairs

### 66

1  Committee the Lieutenant Governor would not have a
2  direct role in the way he would in a committee of the
3  whole where he gets to participate and vote.
4      Q. Are there any other differences you're aware of?
5      A. No.
6      Q. Are you aware of any communications concerning
7  consideration of photo ID legislation by the Committee
8  of the whole and as it pertained to Section 5 of the
9  Voting Rights Act?
10          MR. SWEETEN: Objection to the question as
11  compound. I think if you're asking him as matters of
12  public record, he can answer that question. If you're
13  asking him, you know, information that would reveal
14  communications that he's had with the individuals or
15  entities that we've enumerated then that would be
16  legislative and privileged, but then I'll go ahead and
17  let him answer.
18      A. If you could repeat the question.
19      Q. (By MS. WESTFALL) Certainly. Are you aware of
20  any communications concerning consideration of photo ID
21  legislation by the Committee of the whole and as it
22  pertained to Section 5 of the Voting Rights Act?
23      A. No.
24      Q. And are you asserting privilege in your response
25  or is that simply based on your memory?

### 67

1      A. Again, I think it's just based on my memory. I'm
2  not sure how the Committee of the whole would
3  communicate, frankly.
4      Q. I'm just -- let me rephrase the question. Are
5  you aware of any communications concerning having photo
6  ID considered by the Committee of the whole?
7      A. No.
8      Q. As it related to Section 5 in the Voting Rights
9  Act?
10      A. No.
11          MR. SWEETEN: Same objection.
12      Q. (By MS. WESTFALL) What is the Lieutenant
13  Governor's role when the Senate is considering a bill on
14  the floor?
15      A. He recognizes senator to bring up a bill, he
16  answers questions, points of order, questions of order,
17  and helps the bill proceed administratively through the
18  process.
19      Q. Does he manage the bill or is the bill sponsor
20  the one who is managing the floor debate?
21      A. His role is only procedural. So managing would
22  just be recognizing senators to ask questions.
23      Q. And turning back to Exhibit US 73, I asked you a
24  number of questions about a number of rules and the
25  senate rules related to the Lieutenant Governor's

### 68

1  powers, are you aware of any other powers in the senate
2  rules that were applicable in 2011 that we haven't
3  already discussed and referred to and to which you
4  answered questions?
5      A. I'm not aware of any.
6      Q. So in other words, what you've testified about
7  any rules that I've identified in the senate rules are
8  the sum total of the Lieutenant Governor's powers and
9  responsibilities in the senate in 2011; is that your
10  understanding?
11      A. Yeah. I mean, generally speaking I'm looking at
12  it now, if there's some matter that's open for
13  interpretation or the rules are silent then other
14  parliamentary precedent can be used. But other than
15  that I think the senate rules are the sum of his
16  authority.
17      Q. And the rules to which you answer questions and
18  which we identified in the record in your deposition
19  today, are those the sum total of the rules that define
20  the Lieutenant Governor's powers in the 2011 session, to
21  if best of your knowledge sitting other day?
22          MR. SWEETEN: Objection, asked and answered.
23      A. I would say -- I mean, the universe of his powers
24  presiding over the senate. The Lieutenant Governor has
25  got other constitutional powers and authority that would

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

69

1    be outside of these senate rules.
2       Q.  Okay.  But can you think of any rules that we
3    haven't discussed today in your deposition that pertain
4    to the Lieutenant Governor's powers?
5           MR. SWEETEN:  You're asking about --
6           MS. WESTFALL:  In the Senate rules.
7           MR. SWEETEN:  In the Senate rules.
8       A.  No.
9       Q.  (By MS. WESTFALL)  Thank you.  Why don't we take
10   a break?
11          (Brief recess.)
12   BY MS. WESTFALL:
13      Q.  The Lieutenant Governor can't ever introduce
14   legislation in his own name; is that right?
15      A.  That is correct.
16      Q.  Could you describe his powers concerning the
17   development of legislation?
18      A.  I think he issues interim charges so directing
19   committees of the senate to study certain issues.
20   Again, he recognizes Senators on the floor so in that
21   sense he decides the agenda for the session.
22      Q.  With regard to interim charges, is there a rule
23   in the senate rules that authorizes him to do that and
24   requires the senate to follow those charges?
25      A.  I'm not aware if those are constitutional rules

---

70

1    authority.
2       Q.  Does his office develop legislation for other
3    members to introduce?
4       A.  I think --
5           MR. SWEETEN:  Don't reveal specific thoughts
6    or impressions about pending legislation or matters
7    related to the legislative process in answering the
8    question.  You can answer as a general matter.
9       A.  Generally, the Lieutenant Governor like any
10   elected official would layout their priorities before
11   any session or during any session and to the extent
12   those bills are picked up and sponsored by senators.
13   There's a connection there.
14      Q.  Does he ordinarily set forth a legislative agenda
15   in particular legislative language for bills that would
16   go along with that agenda?
17      A.  I'm not sure --
18          MR. SWEETEN:  Don't reveal legislatively
19   privileged information, but you can answer.
20      A.  I'm not sure if it's typical, but I think there
21   are probably times when, you know, he suggests
22   particular language.
23      Q.  Do you remember that having occurred?
24          MR. SWEETEN:  At this point, I don't want
25   you to reveal any communications with respect to -- that

---

71

1    would reveal mental impressions or opinions about
2    legislative or in furtherance of the legislative process
3    or any communications surrounding those.  So to the
4    extent you can answer this question without doing so,
5    you can answer.
6       A.  I guess I can't recall examples that would not
7    include my personal communications.
8       Q.  (By MS. WESTFALL)  So you're asserting privilege
9    with regard to that answer?
10      A.  I think, yes.  Yes.
11      Q.  And Mr. Dewhurst role with regard to introduction
12   of bills is limited to what you just testified to and
13   advocating with legislatures to introduce his
14   legislation; is that correct?
15          MR. SWEETEN:  Objection asked and answered.
16      A.  I think certainly, you know, he is an advocate
17   for his own priorities.
18      Q.  In addition to the ability to introduce
19   legislation, are there any other powers that members of
20   the senate have that the Lieutenant Governor does not
21   have?
22      A.  I mean a senator can introduce a bill, the
23   Lieutenant Governor then refers it to the Committee and
24   recognizes it on the floor if it makes it out of
25   Committee and then recognizes them again if there's a

---

72

1    change in the House and the conference Committee report
2    to be considered as well as appointing conference
3    Committee members.
4       Q.  But turning back to my question, are there other
5    powers that members of the senate have in addition to
6    introducing bills, that you can think of sitting here
7    today that the Lieutenant Governor does not have?
8       A.  The voting Committee.  That's probably it from a
9    legislative procedural standpoint.
10      Q.  While you were employed with Mr. Dewhurst, did
11   you assist in developing legislation?
12      A.  Yes.
13      Q.  Can you describe that process generally?
14          MR. SWEETEN:  In answering this question, I
15   don't want you to reveal thoughts, mental impressions,
16   or opinions about legislation or in furtherance of the
17   legislation process.  Just asking as a general matter to
18   the extent you can answer that without revealing
19   attorney/client privilege or legislative privilege or
20   the deliberative process privilege, you can go ahead and
21   do so.
22      A.  I think generally as a staffer, we would be made
23   aware of an issue either because Lieutenant Governor
24   informed us it was a priority or because the
25   constituents were talking about it or because it was

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 73

1  raised in one of these interim Committee hearings or
2  otherwise just reading the newspaper what's a problem
3  and what's not.  So from any number of sources, the
4  staff would decide this is something, you know, we
5  should support or help with and then so my role as a
6  staffer -- as an attorney on the staff would be to
7  sometimes to draft language since I had some experience
8  from that from a former job, to provide legal advice
9  about what's possible and not possible.  And just
10  generally talk procedurally about how to make that
11  happen.
12      Q.  Could you describe the breakdown given your
13  experience in the council as to when you would,
14  yourself, draft the bill and whether it -- when you
15  would refer it to the council to draft it, kind of in a
16  percentage way?
17      A.  Most of the time I did not request legislation.
18  It was not my job to provide particular language
19  typically.  So I guess the answer is, sort of,
20  emergency, last second, we need this language now
21  situations is when I was most likely to assist in
22  drafting.
23      Q.  How often did that occur in your employment with
24  the Lieutenant Governor?
25          MR. SWEETEN:  You can answer as a general

### 74

1  matter.  Don't reveal matters of privilege.
2      A.  It would happen -- it was not unusual, but,
3  again, there would be lots and lots of preparation
4  leading up to the floor debate.  I guess floor debate is
5  what I would typically be called upon to help with a
6  last minute amendment.
7      Q.  (By MS. WESTFALL)  But did you do primary
8  drafting of legislation for Mr. Dewhurst?
9      A.  As a general matter, no.
10     Q.  You never drafted any bills to be filed for
11  Mr. Dewhurst?
12     A.  I didn't say that.  I said as a general matter,
13  my role was not to draft all the bills even in my
14  subject area.  I'm sure I drafted some drafts of
15  legislation.
16     Q.  How many bills were you the primary drafter for
17  during your employment with Mr. Dewhurst?
18     A.  Gosh, I don't know.  Not that many.
19     Q.  A handful?
20     A.  A dozen or less.
21     Q.  And how, as a general matter, do you interact
22  with the council in drafting and creating legislation?
23         MR. SWEETEN:  Objection, vague.
24     A.  I think the formal process is you get on the
25  council website, there's a form you fill out about we

### 75

1  want this bill to do that and here's what, you know,
2  additional details and then they'll open up a file on
3  their end and then communicate as necessary to get
4  details.
5      Q.  Did you oversee research for the legislation?
6          MR. SWEETEN:  Any legislation?
7          MS. WESTFALL:  Any legislation.
8      A.  When you say oversee research?
9          MR. SWEETEN:  Objection, vague.  Go ahead.
10  BY MS. WESTFALL:
11     Q.  Let me withdraw that question and ask it a
12  different way.
13         Were you responsible for tasking anyone or
14  conducting yourself, any research, to support the bill
15  drafting process?
16         MR. SWEETEN:  Objection, vague.  You can
17  answer it.
18     A.  I can only speak for -- I did research on bills,
19  but I was not supervising anyone else's research.
20     Q.  Did you do any research for any voter ID bill
21  while you were employed with the Lieutenant Governor?
22         MR. SWEETEN:  You can answer as to whether
23  or not you did research on a bill.
24     A.  Yes.
25     Q.  (By MS. WESTFALL)  Did you do research for voter

### 76

1  ID in 2010?
2      A.  I can not recall.  I'm assuming I probably did
3  since the bill came up in the session before.  But
4  depending on when in 2010, and I can't remember when the
5  legislation was filed or discussed.
6      Q.  Did you develop or contribute to the Lieutenant
7  Governor's legislative agenda for any of the years for
8  which you were employed with the Lieutenant Governor?
9      A.  Yes.
10     Q.  And which years was that?
11         MR. SWEETEN:  Don't reveal specifics as to
12  what you did.  She's asking you the year.  You can
13  answer.
14     A.  Sure.
15     Q.  (By MS. WESTFALL)  Do you understand the
16  question?
17     A.  Yes.  And I think probably most or all staff
18  contributed in some way each year.  So in my case
19  probably the whole time I was there I had some input
20  into that.
21     Q.  How many legislative priorities would the
22  Lieutenant Governor typically have?
23         MR. SWEETEN:  Okay.  Don't reveal
24  communications that you had with the Lieutenant Governor
25  in answering this, members of his staff.  Don't reveal



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                          MAY 29, 2012

---

### 77

1  matters that are legislatively privileged or matters
2  covered by the deliberative process in answering the
3  question.
4        A.  I can't -- I can't recall any given number or any
5  given session or year, but my guess is tenish.  I really
6  don't know.
7        Q.  (By MS. WESTFALL)  Did that remain stable
8  throughout your employment with the Lieutenant Governor
9  or did the number change from year to year?
10        MR. SWEETEN:  Same objection and
11  instruction.  Go ahead.
12        A.  I don't recall.  I'm guessing it changed.
13        Q.  (By MS. WESTFALL)  Did it get larger or smaller
14  over time?
15        A.  I don't recall.
16        Q.  Besides drafting bills and trying to get
17  legislatures to introduce them, how did you otherwise
18  ensure that Mr. Dewhurst's agenda was carried out?
19        MR. SWEETEN:  I'm going to instruct you with
20  respect to the legislative privilege, don't reveal
21  thoughts, mental impressions, opinions about legislation
22  or matters in further of the legislative process.  Don't
23  reveal any communications you had with legislators,
24  legislative staff, State agencies, Texas Legislative
25  Council.  Also don't reveal matters that are subject to

---

### 78

1  the deliberative process or the attorney/client
2  privilege.
3        MS. WESTFALL:  Mr. Sweeten, I'm not asking
4  about any particular legislative acts.  This is wholly
5  outside of your objections.  I ask that you withdraw
6  with this line of questions.
7        MR. SWEETEN:  Why don't read the question
8  back.
9        MS. WESTFALL:  Court reporter, could you
10  read that back?
11        (Requested question was read.)
12        MR. SWEETEN:  Same objection, same
13  instruction.  You can answer to the extent you're not
14  revealing matters of privilege drop develop.
15        A.  Generally, on issues within my areas, coverage, I
16  would, again, update our staff on procedurally where the
17  bills were.  I was available as a resource to answer
18  questions.  Usually legal questions for our staff and
19  for the Texas Senate.
20  BY MS. WESTFALL:
21        Q.  As deputy general counsel for the Lieutenant
22  Governor, did you have staff underneath you?
23        A.  No.
24        Q.  Who reported to you?
25        A.  No.

---

### 79

1        Q.  Did you work with legislatures and their staff in
2  furthering the Lieutenant Governor's agenda?
3        MR. SWEETEN:  Objection, vague.  You can
4  answer yes or no if you worked with -- if you worked
5  with.
6        A.  Yes.
7        Q.  (By MS. WESTFALL)  Which legislatures did you
8  most often work with?
9        A.  Members of the Texas Senate.
10        Q.  Could you identify particular senators?
11        A.  Sure.
12        MR. SWEETEN:  While you're answering, you
13  can answer, you can identify the fact that a
14  communication occurred.  Approximate date, the means,
15  but do not reveal the substance of the conversation or
16  what it was about.
17        MS. WESTFALL:  Mr. Sweeten, I would ask that
18  you identify the legislative act over which you are
19  asserting privilege because there is none.  I'm asking
20  hit about procedure.
21        MR. SWEETEN:  Well --
22        MS. WESTFALL:  And his job description and
23  what he did generally.  There is no legislation.
24        MR. SWEETEN:  I've let him answer a lot
25  about his job description so we've done that.  Now, to

---

### 80

1  the extent you're asking him with whom he dealt I'm
2  saying don't reveal the substance of the conversation.
3        MS. WESTFALL:  We're not discussing a bill.
4        MR. SWEETEN:  Okay.  Well, to the extent we
5  are, to the extent your answer would be revealing
6  information about a specific bill, then I think that is
7  covered.  He can provide the information you're
8  requesting to -- as long as he's not revealing the
9  substance of those communication.
10        MS. WESTFALL:  Mr. Sweeten, if he's
11  answering a question about a particular bill that's a
12  different question than I have imposed.
13        MR. SWEETEN:  If her question is limited,
14  you can answer as a general matter the individuals with
15  whom you had communication.  I think that's your
16  question.  Go ahead.
17        A.  So the legislators that I most often communicated
18  with, Senator Duncan, Senator Williams, Senator Eltife,
19  Senator Huffman, Senator Seliger, I would say that's
20  probably who I communicated with the most.
21  BY MS. WESTFALL:
22        Q.  And with regard to the Governors -- I mean
23  Lieutenant Governor's role with regard to the State
24  Affairs Committee, would it be the same set of senators
25  or a different set of senators?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                                    MAY 29, 2012

---

**81**

1      A.  I think most of those senators serve or served on
2    State Affairs Committee.
3      Q.  Did you communicate directly with legislators or
4    with their staff?
5      A.  Both.
6      Q.  Who more often, legislators or staff?
7      A.  Staff.
8      Q.  Did you communicate with the Governor Perry's
9    staff about Lieutenant Governor's responsibilities on
10   State Affairs Committee?
11     A.  I'm not sure if I communicated with Governor's
12   staff specific to State affairs matters.  I think I
13   probably did.  I think the Governor has a staff member
14   assigned to most major committees so I'm sure there were
15   communications about bills.
16     Q.  But sitting here today you can't recall
17   communications between Governor Perry's staff and you
18   regarding State Affairs matters?
19     A.  I would say, yes, there were communications.
20     Q.  Was it about photo ID?
21           MR. SWEETEN:  Don't reveal the substance of
22   the specific communication.  You can reveal the general
23   subject matter.
24           MS. WESTFALL:  Mr. Sweeten, that is a
25   general subject matter that you list throughout your

---

**82**

1    privilege log so I would ask that you let him answer the
2    question.
3           MR. SWEETEN:  And I'm letting him.
4      A.  There are communications about election bills
5    including photo ID.
6    BY MS. WESTFALL:
7      Q.  About how many did you have regarding photo ID?
8      A.  I probably didn't have many communications
9    outside the weekly Committee hearings and even then not
10   every week about elections and even then not every time
11   about voter ID.  So I would say no more than a handful.
12     Q.  And just to clarify your testimony, you had no
13   more than a handful of conversations with Governor
14   Perry's staff about photo ID; is that correct?
15     A.  I think that's correct.
16     Q.  And were those communications chiefly in the 2009
17   through 2011 period of time?
18     A.  Yes.
19     Q.  How did you communicate with Governor Perry's
20   staff?
21     A.  In person, at Committee hearings.
22     Q.  Did you have any written communications with
23   Governor Perry's staff?
24     A.  Not that I recall.
25     Q.  Did you have any e-mail?

---

**83**

1      A.  I may have, but I don't recall any specific
2    e-mails.
3      Q.  And who was the person in Governor Perry's office
4    with whom you communicated?
5      A.  The elections person was Michael Scofield and it
6    seems like there was a woman's name whom I'm forgetting
7    when I first started in '07.
8      Q.  As part of your roles and responsibilities, did
9    you advice Lieutenant Governor when he should exercise
10   his discretion to cast a vote?
11           MR. SWEETEN:  You're asking about the
12   substance of communication that he had with Lieutenant
13   Governor Dewhurst.  I think that that's clearly under
14   the attorney/client privilege in the legislative
15   privilege as well as the deliberative process privilege.
16           MS. WESTFALL:  I'm not asking about the
17   substance of the communication.  I'm asking about
18   whether he advised as part of his job responsibilities.
19   It's not a substance of a communication.  It doesn't
20   pertain to a legislative act.  It's wholly outside of
21   anything which you could reasonably assert privilege.
22           MR. SWEETEN:  I'm going to let him answer as
23   to whether or not he advised as to who framed it.  Go
24   ahead.
25           MS. WESTFALL:  Thank you.

---

**84**

1      A.  As to whether he can vote?
2    BY MS. WESTFALL:
3      Q.  Whether he should exercise his discretion to vote
4    on anything?
5      A.  No.
6      Q.  Did you play any role in Mr. Dewhurst's committee
7    appointments when he made committee appointments?
8           MR. SWEETEN:  Objection.  Vague and don't
9    reveal the substance of any particular communication.
10     A.  I think probably the chief of staff and policy
11   director would ask and if the rest of the staff had
12   recommendations about particular senators that would be
13   a particularly good fit for committees.
14     Q.  (By MS. WESTFALL)  Did you provided input as part
15   of that process?
16     A.  Yes.
17     Q.  Did you provide input with regard to State
18   affairs?
19     A.  No.
20     Q.  Did you provide any input with regard to
21   Committee assignments in the House?
22     A.  No.
23     Q.  Did you advise the Lieutenant Governor on how to
24   assign bills to committees?
25           MR. SWEETEN:  Same instructions, don't

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 85

1   reveal the substance of communications.  Give a general
2   subject matter description.  Go ahead.
3       A.  Generally, I think the only time that staff would
4   be asked is if it was a close call about, you know, the
5   subject of this bill could be State affairs or finance.
6   So sort of deciding which Committee is a better fit for
7   the substance of the bill.
8       Q.  (By MS. WESTFALL)  Who in Mr. Dewhurst's office
9   advised him on committee assignments -- I mean, pardon
10  me, on assigning bills to committees?
11      A.  I think --
12          MR. SWEETEN:  Same objection and
13  instruction.
14      A.  I think Julia Rathgeber was primarily charged
15  with referring bills to committee.  And then I'm sure
16  any number of senior staff would have had some input.
17      Q.  (By MS. WESTFALL)  Did someone advise or are you
18  aware of any communications that Mr. Dewhurst had with
19  staff person concerning assigns SB 14 to the Committee
20  of the whole?
21          MR. SWEETEN:  I think she's asking you there
22  to reveal the substance of a communication.
23          MS. WESTFALL:  No.  I'm asking about the
24  existence of a communication.  We can read question
25  back, Mr. Sweeten.

## 86

1           MR. SWEETEN:  Well, you're saying to advise
2   as to Senate Bill 14.  I think there was even more in
3   there about the substance of the communication.  Don't
4   reveal the substance of communication that you had as
5   that matter is legislatively privileged, part of the
6   deliberative process privilege and subject to the
7   attorney/client privilege.  You can answer questions
8   about if you had a communication on a given date, the
9   means of the communication, who was present.  That's
10  all.
11      A.  So the question is am I aware of whether or not
12  Governor Dewhurst communicated with staff prior to
13  referring the bill to the Committee of the whole.
14      Q.  (By MS. WESTFALL)  Correct.
15      A.  I think, yes.
16      Q.  And did Ms. Rathgeber have any involvement in
17  those discussions?  Was she -- strike that.
18          Was she a party to the communications which you
19  just testified to?
20      A.  I don't know.
21      Q.  Was Mr. Brunson a party to the communication?
22      A.  I don't know.
23      Q.  Were you a party to the communication?
24      A.  No.
25      Q.  When did that communication take place?

## 87

1       A.  I don't know.
2       Q.  You just testified that you believe you are aware
3   of a communication concerning a referral of SB 14 to the
4   Committee of the whole, correct?
5       A.  I guess what I'm saying is a bill that was -- any
6   high profile bill there would have been some discussion
7   about in this case to go to the Committee of the whole.
8   I assume there would have been a discussion.  I'm not
9   aware of any particular times or dates or parties to
10  that discussion.
11      Q.  And who do you think would know about the
12  existence of that communication?
13          MR. SWEETEN:  Objection, calls for
14  speculation.  You can answer.
15      A.  I'm guessing the chief of staff and the policy
16  director.
17      Q.  (By MS. WESTFALL)  Ms. Rathgeber and Mr. Brunson?
18      A.  Correct.
19      Q.  And Mr. Dewhurst himself, correct?
20      A.  Probably, yes.
21      Q.  And if Ms. Rathgeber and Mr. Brunson don't recall
22  this communication concerning Mr. Dewhurst would be
23  the one to ask about it; is that right?
24          MR. SWEETEN:  Objection calls for
25  speculation, assumes facts not in evidence.  You can

## 88

1   answer.
2       A.  That's who I would ask.
3       Q.  (By MS. WESTFALL)  Do chairs of committees make
4   request to have bills sent to their committee?
5       A.  Yes.
6       Q.  How often does that happen?
7       A.  I don't know.
8       Q.  Do you know with regard to Senate Bill 14 whether
9   the chair of the State Affairs Committee ask that it be
10  referred to his committee?
11      A.  I don't know.
12      Q.  Do you play any role in assisting the Lieutenant
13  Governor in the appointment of conferees to conference
14  committee?
15      A.  Yes.
16      Q.  Did you play such as role with regard to Senate
17  Bill 14?
18          MR. SWEETEN:  Objection, that calls for
19  legislatively privileged information.  Would ask him to
20  reveal thoughts, mental impressions, conversations and
21  furtherance of the legislative process regarding Senate
22  Bill 14.  Don't answer.
23          MS. WESTFALL:  I don't think it does.  I
24  want you to state on the record how this has anything to
25  do with the substance.  This has to do with what role,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 89

1   who was playing with regard to certain legislative acts.
2       MR. SWEETEN:  You asked the specific nature
3   -- in your question, you're asking about the subject
4   matter of the communication and it also presupposes that
5   that occurred.  So I think you're beyond asking general
6   information about a communication.  You're asking about
7   the specifics of the communication.
8       MS. WESTFALL:  Mr. Sweeten, it is a matter
9   of public record that conferees were appointed to the
10  conference committee with regard to SB 14, is it not?
11  I'm asking whether he played any role in that.  I'm not
12  asking about any communications.  I'm not asking what
13  the role was.  I'm asking was he involved in that
14  decision.  What is objectionable about those questions?
15      MR. SWEETEN:  Well, I mean, think you're
16  starting to seek -- you're drilling down into specific
17  mental impressions on how the bill took its course and
18  the involvement that his office had.  And I think once
19  you're walking down that path, then you're starting to
20  get into matters that are matters of privilege.  I think
21  the way it's phrased that it's objectionable.
22      MS. WESTFALL:  Just to be clear, you're
23  taking the position that the identify of staff people
24  involved in decisions, which is clearly a foundational
25  issue and not going to the communication itself, is

## 90

1   privileged?  Is that what you're asserting today?
2       MR. SWEETEN:  First of all, I'm not subject
3   to your examination, but let me tell you what I am
4   telling you.
5       MS. WESTFALL:  It's important to have this
6   on the record, Mr. Sweeten.
7       MR. SWEETEN:  It's fine.  Le's have a clear
8   record.  Let me say what I'm going to say.  The court
9   has very clearly said that whether or not communications
10  occurred is a matter that you can ask him.  The dates,
11  the means of communications, the parties involved,
12  that's all stuff that I'm going to let you ask him.
13  When you start to get into -- and as a precursor to the
14  question, you start talking about the substance and you
15  presuppose what was discussed, then I think you're
16  starting to get into matters that are legislatively
17  privileged and are covered by that.  So, I mean, I'm
18  happy to work with you if your question is, did he have
19  a communication?  We'll let him answer that question.
20  If you're asking about specific information that
21  occurred in the conversation, then I think we're getting
22  to a point where you are trying to discover his mental
23  impressions, thoughts, or impressions about pending
24  legislation.  You even said Senate Bill 14.  So I'm
25  going to let him, you know, answer to the extent that

## 91

1   we're not revealing the substance of the conversation.
2   What I think you're starting to ask him about specific
3   conversations.  That's my point.  So if you want to
4   rephrase -- if you could read the question back that
5   she's asked, we'll look at it in that light, but I want
6   to be clear on what I'm instructing him.
7   BY MS. WESTFALL:
8       Q.  I'm going try it a different way.
9           Were you a party to any communications concerning
10  Lieutenant Governor's appointment of conferees to the
11  conference committee to consider SB 14?
12          MR. SWEETEN:  I'm going to let you answer as
13  to that general subject matter and description.  You can
14  answer that question.
15      A.  Yes.
16      Q.  (By MS. WESTFALL)   Who else was involved in that
17  communication?
18      A.  Julia Rathgeber.
19      Q.  Was anyone else involved in that conversation?
20      A.  Not that I recall.
21      Q.  Were any staff people for legislators involved in
22  that conversation?
23      A.  Not that I recall.
24      Q.  Was that one conversation?
25      A.  Probably.

## 92

1       Q.  Are you aware of any conversations that the
2   Lieutenant Governor had with anyone in the House
3   concerning the appointment of conferees --
4       A.  No.
5       Q.  -- to that Committee?
6           Does the Lieutenant Governor engage in public
7   relations or media?
8           MR. SWEETEN:  Objection, vague.  You can --
9       Q.  (By MS. WESTFALL)  Press releases?
10      A.  Yes.  He issued -- his staff issues press
11  release.
12      Q.  And who was the person who handled that with
13  regard to SB 14?
14      A.  I think Mike Walz.
15      Q.  Was there anyone else besides Mr. Walz?
16      A.  Not that I'm aware.
17      Q.  Does the Lieutenant Governor, as part of his
18  responsibilities, communicate with interest group
19  outside of the legislature?
20      A.  I think he address various groups and
21  conventions, yes.
22      Q.  And who is the staff person who organizes those
23  discussions?
24      A.  I don't know.
25      Q.  Are you aware of any such communications that he



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

BRIAN HEBERT                                              MAY 29, 2012

## 93

1  had with interest groups regarding photo ID?
2      A.  No.
3      Q.  Are you familiar with Section 5 of the Voting
4  Rights Act?
5      A.  Yes.
6      Q.  What is your understanding of Section 5's
7  requirements?
8      A.  Broadly that a certain class of states have to
9  seek preclearance from the federal government before
10  implementing changes to election laws.
11      Q.  Is there anything else you can just generally
12  tell me about your understanding of Section 5 or is that
13  it in terms -- from your legal perspective?
14      A.  More general than that?
15      Q.  Well, I mean --
16      A.  It largely applies to -- I mean, the most common
17  examples would be redistricting and matters relating to
18  eligibility for voting.
19      Q.  And Section 5, regardless of anyone's personal
20  views of Section 5, it remains the law of the land,
21  right?
22      A.  Yes.
23      Q.  And the Legislature must comply with all federal
24  laws including Section 5, correct?
25          MR. SWEETEN:  Objection, you're asking for a

## 94

1  legal opinion, legal inference.  You can answer.
2          MS. WESTFALL:  He testified he has a law
3  degree.
4      A.  I think, yes, is the answer.
5  BY MS. WESTFALL:
6      Q.  And you drafted a lot of election laws while
7  employed with the council and the Lieutenant Governor;
8  is that right?
9      A.  I would not say I drafted a lot.  I drafted some.
10      Q.  Were you only involved in the drafting of photo
11  ID, in terms of election laws or others?
12      A.  Others.
13      Q.  Could you --
14      A.  Election laws bills went through the State
15  Affairs Committee generally.  And so I read and reviewed
16  and waited on a dozen at least over the 5 years.
17      Q.  Could you generally provide me a sense of the
18  categories of bills that you were involved in the
19  drafting or consideration of that went through State
20  affairs?
21          MR. SWEETEN:  While at Leg. Council or while
22  at the Governor's office.
23          MS. WESTFALL:  While at the Governor's
24  office.
25          MR. SWEETEN:  Lieutenant Governor's office.

## 95

1      A.  The ones which I provided drafting assistance?
2
3  BY MS. WESTFALL:
4      Q.  Or had any general advisory assistance or bills
5  that went through State affairs while you were employed
6  with the Lieutenant Governor?
7      A.  There's just a very broad range.  Everything in
8  the election code so from polling place locations to
9  cleanup and technical changes, to the code to make it
10  easier to understand, voter ID obviously.  Election
11  dates, most recent -- I just passed a bill last session
12  changing primary dates to comply with federal law.  I
13  think it was just a very broad spectrum.
14      Q.  What is your understanding of the scope of the
15  applicability of Section 5 to the laws that you just
16  described and listed?  Does it cover some of those laws?
17  All of those laws?
18          MR. SWEETEN:  Objection, compound.
19  Objection vague.  Objection calls for speculation.
20  Objection asked for a legal opinion.  You can answer to
21  the extent you have and answer to that question.
22      A.  I think without having the election code in front
23  of me, I would just say that some of the laws that went
24  through State affairs were probably subject, if they
25  passed, to Section 5 voting rights.

## 96

1      Q.  (By MS. WESTFALL)  Is it your understanding that
2  Section 5 applies to a broader range of bills than
3  redistricting?
4      A.  Yes.
5          MR. SWEETEN:  Same objection.  Go ahead.
6      A.  Yes.
7      Q.  (By MS. WESTFALL)  And with regard to the
8  billings that are subject to Section 5, could you
9  describe as a general matter steps that the Legislature
10  takes during development, introduction or passage to
11  increase the likelihood that the bill will be pre
12  cleared under Section 5?
13          MR. SWEETEN:  I'm going to object based upon
14  the legislative privilege.  You're asking for specific
15  thoughts, mental impressions, about pending legislation.
16  And I think that those matters are potentially
17  legislatively privileged because you're asking what they
18  generally do.
19          MS. WESTFALL:  Are you instructing him not
20  to answer, period.
21          MR. SWEETEN:  Well, I mean -- your
22  question -- if you're asking what the legislator has
23  done with respect to bills that impact the election
24  code, then I think you're asking about specific bills
25  that have been before the legislator -- legislature, so



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                    MAY 29, 2012

---

### 97

1  therefore I think those would be -- you're asking for
2  his thoughts and mental impressions about pending
3  legislation.  Also the question is compound.  So those
4  are my objections.
5     BY MS. WESTFALL:
6        Q.  Can you answer my question, Mr. Hebert?
7        A.  So does the legislature take special steps in
8  bills that might be subject to Voting Rights Act.
9        Q.  As a general matter, not with regard to any
10 particular legislative act or bill?
11       A.  I guess, I would say any legislator who's
12 concerned about passage of their bill would take steps
13 that they and their staff thought necessary.  And then
14 during the open testimony in any given committee you
15 would probably hear a lot of testimony about sides about
16 the relevance and applicability of the Voting Rights
17 Act.
18       Q.  And can you point to any particular steps that
19 might be taken to ensure that it would be pre cleared?
20       A.  They would probably consult council.  They would
21 probably listen to public testimony.  They would
22 probably confer with the Secretary of State's office.
23       Q.  And is --
24       A.  And the Attorney General's office.
25       Q.  And is it your experience that in order to ensure

---

### 98

1  that there would be no retrogressive adverse effect on
2  minority voters, that there would be any factual
3  analysis conducted of such a bill?
4        MR. SWEETEN:  Okay.  My instruction to you
5  is don't reveal any matters related to a specific bill
6  including thoughts, mental impressions, or the process.
7  You can answer her question as a general matter
8  without -- but not as to a specific piece of
9  legislation.
10       A.  Yes.  I think the legislature considers
11 surrounding facts when passes legislation.
12       Q.  (By MS. WESTFALL)  And do they look into whether
13 an election law might have a retrogressive or adverse
14 impact on the minority voters?
15       MR. SWEETEN:  Objection to the form.
16 Objection compound.  Objection calls for speculation.
17 You can answer as a general matter, but not as a
18 specific legislation.
19       A.  As a general matter they would consider all
20 surrounding facts when given specific legislation.
21       Q.  (By MS. WESTFALL)  But listen carefully to my
22 question.  My question is, whether they would analyze
23 the impact on minority voters.  Can you answer that
24 question?
25       MR. SWEETEN:  Don't answer as to a specific

---

### 99

1  bill.  Do not reveal mental impressions, thoughts, or
2  opinions as to specific legislation.  Also, I'm going to
3  object compound, calls for speculation and vague.
4        A.  So the question is, does the legislature consider
5  impact on minority voters during the past election laws?
6        Q.  (By MS. WESTFALL)  In order to ensure that it
7  would be pre cleared through Section 5?
8        A.  I think the answer is probably, yes.
9        Q.  Can you think of any particular instances where
10 that was done?
11       MR. SWEETEN:  Don't reveal matters related
12 to specific legislation.  Those are legislatively
13 privileged.  To the extent you can answer, generally,
14 the question without revealing matters of legislative
15 privilege or deliberative process privilege or
16 communications impacting those, then you can do so.
17       A.  Any bills that affecting polling locations,
18 eligibility to vote would have undergone some of that
19 analysis.
20       Q.  (By MS. WESTFALL)  Was such analysis, you know,
21 in your experience shepherding through, analyzing
22 reviewing, monitoring, election laws, was that type of
23 analysis usually done as a matter of course to ensure
24 preclearance for Section 5?
25       MR. SWEETEN:  Objection, multiple.

---

### 100

1  Objection, calls for speculation.  Objection, vague, and
2  objection to the extent you're seeking to find out
3  information about a specific piece of legislation.  To
4  the extent that it does not do so or invade the
5  deliberative process or legislative process you can
6  answer the question.
7        A.  Could you repeat the question?
8        Q.  (By MS. WESTFALL)  Certainly.  As a matter of
9  course when election laws were considered being
10 developed, et cetera, would you -- actually strike that.
11       Why don't you read back the question because now
12 I forget my question.
13       (Requested question was read.)
14       MR. SWEETEN:  Same objection and
15 instruction.
16       A.  I think yes.
17       Q.  (By MS. WESTFALL)  And with regard -- with regard
18 to election bills, did you -- did the legislature
19 typically take steps to ensure that the law would not be
20 seen as having a discriminatory purpose, for the
21 purposes of ensuring preclearance under Section 5, of
22 the Voting Rights Act?
23       MR. SWEETEN:  Same objection and
24 instructions.
25       A.  I don't think any legislator -- I think every

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                           MAY 29, 2012

## 101

1  legislator would be concerned about clarifying that
2  there is no discriminatory purpose in the legislation.
3      Q. (By MS. WESTFALL)  And would steps be taken to
4  ensure on the public record and otherwise there would be
5  a legitimate bona fide nondiscriminatory reason for
6  election bills?
7          MR. SWEETEN:  Same objection, same
8  instruction.
9      A. I guess, I don't know.  I mean, I assume every
10  piece of legislation has a purpose and that legislators
11  are not choosing a discriminatory purpose?
12     Q. (By MS. WESTFALL)  And is it your testimony that
13  they bear Section 5 in mind when they are enacting
14  election bills to ensure that there's no discriminatory
15  purpose?
16         MR. SWEETEN:  That calls for speculation.
17  And I'm also going to object to the extent she's asking
18  about any specific piece of legislation that you've had
19  experience with.  You don't answer the question with
20  respect to specific legislation.  To the extent you can
21  answer the question as a general matter without
22  discussing mental impressions or reveal any thought
23  processes regarding legislation, you can do that.
24     A. I don't think I know the intent of legislators on
25  that.

## 102

1      Q. (By MS. WESTFALL)  Is there any particular role
2  that the Lieutenant Governor plays in ensuring the
3  likelihood that an election bill will be pre cleared
4  under Section 5?
5          MR. SWEETEN:  Same objection, same
6  instruction.
7      A. I mean, on all legislation that passed through
8  the Senate, I think the Lieutenant Governor's staff was
9  available as a resource to any senator who wanted it.
10     Q. (By MS. WESTFALL)  I guess, my question is
11  whether the Lieutenant Governor plays any role in
12  ensuring that as election bills pass through the
13  legislator that they will be pre cleared under Section
14  5?
15         MR. SWEETEN:  Same objection, same
16  instruction.
17     A. I don't think there's a formal role.
18     Q. (By MS. WESTFALL)  Is there an informal role?
19     A. Again, his staff was available on this or any
20  other legislation to senators and staff who wanted
21  opinions.
22     Q. Is that different from any other types of
23  legislation that is not election related?  That is not
24  subject to Section 5?
25     A. It's the same, I think, for all types of

## 103

1  legislation.
2      Q. So is it your testimony that they're basically no
3  steps taken to ensure that election bills will be pre
4  cleared pursuant to Section 5?
5          MR. SWEETEN:  Objection compound.  Objection
6  misstates facts and also I'm going to instruct don't
7  reveal specific matters related to specific legislation
8  in answering the question.
9      A. That's not my testimony.  My testimony is that a
10  legislator has their purpose for filing legislation.
11  They have a staff and the resources at the capital to
12  perfect that legislation.  One of those resources is the
13  staff of the Lieutenant Governor.
14     Q. Okay.  Turning back to my question, I just want
15  to make sure that I clearly understand your testimony.
16  I'm asking about election bills which are subject to
17  Section 5 and then there's a universe of other bills
18  that are not subject to Section 5.  Does the Lieutenant
19  Governor take any steps to ensure that election bills
20  that are subject to Section 5 will be pre cleared?
21         MR. SWEETEN:  Same objection, asked and
22  answered also.
23     Q. (By MS. WESTFALL)  Or no?
24     A. I think the answer is, election bills that go
25  through State Affairs Committee or any other committee

## 104

1  that might be subject to the Voting Rights Act.  The
2  staff on those committees and the staff of the
3  Lieutenant Governor to the extent we recognize issues or
4  problems would raise those issues or problems.
5      Q. What do you mean by issues and problems?
6      A. If we fear that a bill might not pass
7  preclearance.
8      Q. Then the staff would raise that with the members?
9  I'm not sure I understand your testimony?
10         MR. SWEETEN:  Objection.  I'm going to
11  object to the question.  You're asking compound
12  questions about a review of the entire election code and
13  his experience with the election code.  I think the way
14  the question is phrased is confusing.  I also am
15  instructing him with respect to the legislative
16  privilege, don't reveal matters that relate to specific
17  pieces of legislation.  With that instruction, you can
18  answer.
19     A. I guess the way it would typically work.  Let's
20  say, it's a bill changing up polling location.  If I or
21  any other staffer recognize that that bill needed
22  amendments or changes or improvements to ensure its
23  compliance with federal law, the staff would probably
24  suggest that to the senator or their staff.
25     Q. (By MS. WESTFALL)  And are you aware of any



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 105

1  communications between staff and a member or the
2  Lieutenant Governor or the Governor's office or the
3  Secretary of State, in which any staff person raised
4  concerns about SB 14 and it's ability to be pre cleared
5  under Section 5 of the Voting Right Act?
6      MR. SWEETEN:  Objection.  Don't answer the
7  question.  It asks you to repeat communications that are
8  legislatively privileged.  Also privileged by the
9  deliberative process privilege and potential
10  attorney/client privilege.
11     Q.  (By MS. WESTFALL)  I'm asking you about the
12  existence of communications.
13     MR. SWEETEN:  You've asked more than that.
14  If you want to ask him about a specific communication
15  that's fine, but you've laced this question with
16  specific subject matter and that's why it's
17  objectionable.  I'll work with you to try to, you know,
18  figure out how he can answer your question about the
19  general substance, but you've gone beyond that in your
20  question.
21     Q.  (By MS. WESTFALL)  Can you answer my question?
22     A.  The question is were there communications that
23  I'm aware of related to --
24     Q.  Any concerns about SB 14 not being able to be pre
25  cleared under Section 5 of the Voting Rights Act?

## 106

1      MR. SWEETEN:  Same objection, same
2  instruction.
3      A.  I guess I'm not -- I'm comfortable saying I'm
4  aware of communications regarding the ability of the
5  bill to be pre cleared or not.  I'm not sure concerned
6  is the right word.
7      Q.  (By MS. WESTFALL)  How many such conversations
8  are you aware of?
9      A.  I think the passage of any piece of legislation
10  is an ongoing deal from four session through three
11  session.  So I can't give you a number of conversations
12  about the Voting Rights Act during the last session.  It
13  would be lots probably.
14     Q.  Were you a party to such conversations?
15     A.  Yes.
16     Q.  Were these conversations that occurred before the
17  signing of the bill in May 2011?
18     A.  Yes.
19     Q.  Were any steps taken subsequent to those
20  conversations in the substance of the bill?
21     MR. SWEETEN:  Don't answer that question.
22  You don't have to answer that.  That's legislatively
23  privileged.  You're asking about mental impressions,
24  thoughts about pending legislation.  Don't answer it.
25     Q.  (By MS. WESTFALL)  Could you tell me Texas's

## 107

1  current system for determining how to verify the
2  identity of a voter at the polls on election day?
3      A.  I believe a voter can show up with a voter
4  registration card or some alternate forms of ID with
5  government issued paperwork with their name on it.  So
6  an electric bill or something like that.
7      Q.  Turning back to the conversations you just
8  testified about, who was involved in these conversations
9  about -- not concerns, but it's not fears.  You used
10  another word that SB 14?
11     MR. ROSENBERG:  Ability was the word.
12     Q.  Ability was the word.  About the ability of SB 14
13  to be pre cleared under Section 5?  It's a foundational
14  question.
15     MR. SWEETEN:  You can answer as to who was
16  involved in the conversation.
17     MR. ROSENBERG:  Conversations, I think was
18  his testimony.
19     A.  I would say probably staff from almost every
20  single office in the Senate.
21  BY MS. WESTFALL:
22     Q.  Outside of?
23     A.  And then maybe even a couple House offices.
24     Q.  Outside of opponents of the bill, persons who

## 108

1  voted against the bill, could you identify particular?
2      A.  So who -- in those who supported the legislation,
3  who in that group did I talk to about Voting Rights Act?
4      Q.  Correct.  As it pertained to SB 14?
5      A.  I would probably need to see a list of senators,
6  but probably every single one.  Them or their staff.  I
7  mean, it could have ranged from, you know, indefinite
8  analysis to nothing.
9      Q.  Did you speak with anyone outside the Legislature
10  about similar concerns?
11     A.  Yes.
12     Q.  Could you tell me who those people were?
13     A.  It wasn't concerns.  It was discussion of the
14  Voting Rights Act and it's applicability to election
15  laws.  I think, probably the people over the course of
16  the sessions that were involved in the public testimony.
17     Q.  Only the public testimony?
18     A.  I mean, aside from just -- yeah.  Public
19  testimony.  I mean.
20     Q.  Did you talk to anyone from the Governor's office
21  on this topic?
22     A.  As I mentioned earlier, I think I probably talked
23  with their staffer who was in charge of the State
24  Affairs Committee.
25     Q.  Mr. Scofield?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 109

1        A. I think that's probably right.
2        Q. And you talked to him about the applicability or
3    how it would all play out?  SB 14 in the Section 5 of
4    the Voting Rights Act?
5            MR. SWEETEN:  Objection.  You're asking for
6    more information about the thoughts, mental impressions
7    about legislation Senate Bill 14 and I think you're
8    moving into matters that are legislatively privileged.
9    You can identify whether he had a conversation with
10   whom, when, who was there, but we're not going to get
11   into the specifics of the conversation.
12       Q. (By MS. WESTFALL)  Can you answer the question?
13       A. I had limited interaction with the Governor's
14   office.
15       Q. Was there anyone in your office, in the
16   Lieutenant Governor's office who had more extensive
17   communications with the Governor's office about voter
18   ID?
19       A. I'm not aware.
20       Q. Would it have been Mr. Brunson?
21           MR. SWEETEN:  Objection.  You're --
22   objection, vague.  Objection assumes facts not in
23   evidence.  Objection calls for speculation.  Go ahead
24   and answer if you can.
25       A. I don't know.  I mean, I'm guessing the policy

---

### 110

1    director and the chief of the staff are most likely.
2        Q. (By MS. WESTFALL)  Getting back to Texas's
3    current system for determining how to verify the
4    identify of voter, when someone registers to vote, the
5    county election official mails the person a voter
6    registration card; is that the current procedure?
7        A. I believe yes.
8        Q. Therefore, if you have that card in your
9    possession and go to the polls on election day you get
10   to vote a regular ballot?
11       A. I believe that's right.
12       Q. Do you know what happens if a voter lost her
13   voter registration card or forgets to bring it to the
14   polls on election day?
15       A. I believe they can cast a provisional ballot.
16       Q. Is it possible that if the voter has some sort of
17   other form of ID that that would be a sufficient
18   substitute under current?
19       A. Yes.  I'm sorry.  Yes.  Sorry.  If they don't
20   have their registration card.  I thought you were asking
21   if they didn't have any.
22       Q. And are you aware of whether the other forms of
23   currently supplemental ID include non photo ID?
24       A. I believe they do.
25       Q. Do you know what the forms of ID are off the top

---

### 111

1    of your head?
2        A. Again, I think it's government issued paperwork.
3    So your electric bill, you're -- some other
4    communications with the government.
5        Q. And is it your impression that it's a number of
6    forms of ID that would suffice; is that correct?
7        A. Correct.
8        Q. And if you don't have any of those IDs from that
9    large range or a voter registration card, then what
10   happens to a voter?
11       A. Then you cast a provisional ballot.
12       Q. And is that -- how is it determined whether that
13   provisional ballot will be counted?
14       A. I believe that the person has a certain period of
15   time to return with sufficient ID to prove that they're
16   an eligible voter.
17       Q. Are you certain that's current law or is it
18   simply that the county election official compares or
19   verifies from the registration records that the voter is
20   eligible and then counts the ballot.  Do you believe
21   it's that system?
22       A. That might be correct.
23       Q. Is the current system for identifying voters of
24   the polls inadequate in any way?
25           MR. SWEETEN:  Objection.  In answering this

---

### 112

1    question, you're not -- under legislative privilege, you
2    are not to reveal your thoughts, mental impressions,
3    opinions about legislation or in furtherance of the
4    legislation process including as to Senate Bill 14.
5    Also, don't reveal communications you've had with any
6    members of the staff, with any legislators in the
7    furtherance of this specific bill.
8            MS. WESTFALL:  Mr. Sweeten, I'm asking his
9    view as he sits here today.  I'm not asking about any
10   legislative act.  I would ask that you withdraw that
11   objection.
12           MR. SWEETEN:  To the extent that you can
13   answer the question without revealing that information,
14   I'm going to the let you do so.
15       A. So my question is, is the current system of
16   identification sufficient?
17   BY MS. WESTFALL:
18       Q. Inadequate in any way?
19       A. Is it inadequate in any way?  I think given the
20   amount of attention being paid to this, there's
21   certainly people concerned about its efficiency.
22       Q. I'm asking about your view as someone who's
23   drafted a lot of elections bills, who's served for Leg.
24   Council, who's served for the Lieutenant Governor, in
25   your view is the current system inadequate?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 113

1   MR. SWEETEN:  In answering this question,
2   don't reveal your thoughts, mental impressions, or
3   analysis regarding specifically Senate Bill 14.  You can
4   answer as you're sitting here today as long as your
5   answer does not reveal those communications.
6   A.  I think it's inadequate to the extent it's
7   subject to fraud.
8   Q.  (By MS. WESTFALL)  What is your basis for that
9   opinion?
10  MR. SWEETEN:  Do not reveal matters that you
11  learned with respect to -- that are covered by the
12  legislative privilege, the deliberative process
13  privilege or attorney/client privilege in answering that
14  question.
15  A.  I think like any system, any system is
16  susceptible to fraud.  So why do I think the election
17  system is potentially susceptible, because it's a system
18  made up of human beings.
19  Q.  (By MS. WESTFALL)  So is it your testimony that
20  it is the potential for fraud that makes it inadequate?
21  MR. SWEETEN:  Same objection and
22  instruction.  Don't reveal your past mental impressions
23  or considerations regarding the bill.  To the extent you
24  can answer without do so, you can.
25  A.  I think that's -- the potential is certainly part

### 114

1   of it.  And then there are cases of election fraud in
2   Texas in the past.
3   Q.  (By MS. WESTFALL)  And to be clear, the current
4   system for voting -- for identifying voters at the
5   polls, we're only talking about fraud as it pertains to
6   in voter impersonation; is that correct?
7   A.  Repeat the question.
8   Q.  I'm sorry.  Let me withdraw that question and ask
9   another one.
10      The only voter fraud that is potentially at issue
11  when we're talking about voters appearing at the polls
12  on election days, in person voter impersonation; is that
13  correct?
14      MR. SWEETEN:  Objection, vague.  Also
15  objection, don't reveal any matters that were subject to
16  the legislative privilege that I've outlined before or
17  the deliberative process privilege or the
18  attorney/client communication.
19  A.  I suppose there are other types of fraud you
20  could commit regarding the electronic storage of the
21  votes or on election day I would say the in-person fraud
22  is probably the biggest threat.
23  Q.  (By MS. WESTFALL)  And certainly photo ID laws
24  would address only in-person voter impersonation,
25  correct?

### 115

1   MR. SWEETEN:  Objection.  Voter ID laws, you
2   haven't defined what that is.
3   MS. WESTFALL:  Actually I have.
4   MR. SWEETEN:  Tell me what it is.
5   MS. WESTFALL:  I had an instruction in the
6   beginning.
7   MR. SWEETEN:  Well, let's talk about what
8   that is then because I'm not sure if you're talking
9   about a specific Senate Bill, another iterations of
10  legislation.  He's not going discuss his thoughts,
11  mental impressions about a specific bill.  You're asking
12  him as he sits here and these are matters that don't
13  invade his thought process or that are matters of the
14  deliberative process or attorney/client communications
15  that I'm going to let him answer as he's sitting here.
16  But also objection, vague as to the question.
17  A.  So what was the question?
18  Q.  (By MS. WESTFALL)  When did you first hear any
19  support for enacting photo ID requirement in Texas?
20  MR. SWEETEN:  Don't reveal matters of
21  legislative privilege.  You can answer.
22  A.  I don't recall.
23  Q.  (By MS. WESTFALL)  Was it 2005?
24  A.  It's possible.  It may have been before that.
25  Q.  Was it prompted by Indiana's enactment of photo

### 116

1   ID law in that State?
2   MR. SWEETEN:  Objection.  You're asking for
3   him to reveal his thoughts and mental impressions,
4   opinions about specific legislation.  If you are asking
5   him about that, then don't do that.
6   MS. WESTFALL:  I'm asking him about Indiana
7   photo ID.  That's not anything that could be covered by
8   legislative privilege in this case, Mr. Sweeten.
9   MR. SWEETEN:  I'm not even clear on what
10  your question is.  Did he first hear of the Indiana
11  bill, is that the same time that he heard something --
12  he's already testified that he didn't know about when he
13  heard it.  It doesn't make sense.  So objection, vague.
14  Objection, calls for speculation.  Go ahead and ask your
15  question again.
16  BY MS. WESTFALL:
17  Q.  Do you know why there was support for photo ID in
18  Texas?
19  MR. SWEETEN:  Objection, calls for
20  speculation.  Do not reveal your thoughts, mental
21  impressions or opinions about legislation in furtherance
22  of the legislative process including any specific bill
23  in answering this question.  Do not reveal
24  attorney/client communications that you've had with
25  anybody at the Lieutenant Governor's office and do not



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 117 | 119 |
|---|---|
| 1  reveal matters that are subject to the deliberative | 1  allowable ID under SB 14? |
| 2  process privilege.  If you can answer that question | 2      A.  Yes. |
| 3  without doing so, you can do so. | 3      Q.  Do you know them off the top of your head? |
| 4      A.  I imagine different people have different | 4      A.  It is several forms of government issued ID: |
| 5  motivations for supporting that law. | 5  Driver's license, military ID, concealed handgun |
| 6      Q.  (By MS. WESTFALL)  Okay.  Well that doesn't | 6  license, immigration status papers that include photo |
| 7  really answer my question, but we'll move on. | 7  ID.  I think there was one or two more. |
| 8          MR. SWEETEN:  Objection to the side bar. | 8      Q.  And you've had a chance to review the forms of |
| 9  Argumentative. | 9  allowable ID under House Bill 1706? |
| 10     Q.  (By MS. WESTFALL)  Could you mark this as US 44? | 10     A.  Yes. |
| 11  You've been handed what's been -- oh.  You know my | 11     Q.  Could you compare those list and tell me what's |
| 12  apologies.  We need to remark this exhibit.  Could you | 12  included in HB 1706 that was not included in Senate Bill |
| 13  give that back to the court reporter.  We previously | 13  14? |
| 14  used this exhibit.  Could you mark it as US 44? | 14         MR. SWEETEN:  You can answer as to a factual |
| 15         (Exhibit No. 44 was marked.) | 15  matter.  I don't want you to give the basis for or I |
| 16     Q.  (By MS. WESTFALL)  My apologies.  You've been | 16  don't want you to provide mental impressions regarding |
| 17  handed what's been previously marked as US 44.  Do you | 17  the differences between these other than what's revealed |
| 18  recognize this? | 18  on the bill itself. |
| 19     A.  I don't think so.  It's a voter ID bill.  I don't | 19     A.  All right.  Looks like HB 1706 includes employee |
| 20  know what session it's from. | 20  ID cards, student ID cards, and county issued ID cards |
| 21     Q.  Have you seen this before? | 21  in addition to the ones I stated earlier. |
| 22     A.  I may have.  I don't know what session it's from. | 22     Q.  (By MS. WESTFALL)  And also does it not include |
| 23     Q.  Okay.  Turning your attention to the last page, | 23  non photo ID? |
| 24  Page 10 of Exhibit 44.  It list the proposed effective | 24     A.  Yes.  Section B.  Yes. |
| 25  date, do you see that? | 25     Q.  I'm sure you're better at reading these bills |

| 118 | 120 |
|---|---|
| 1      A.  Uh-huh. | 1  than I am. |
| 2      Q.  Does that refresh your recollection as to what | 2      A.  I used to write a lot of them.  Yes.  One off the |
| 3  session this was introduced in? | 3  first list or two off of the second, I think. |
| 4      A.  Yes. | 4      Q.  Turning your attention back to the photo ID's, do |
| 5      Q.  And what session was that? | 5  you see that the driver's license allowable in the HB |
| 6      A.  That would have been the 2005 session probably. | 6  1706 allowed for driver's license that had expired no |
| 7      Q.  Okay.  And do you see who was sponsoring this | 7  earlier than 2 years before the date of presentation? |
| 8  bill?  Or authoring this bill, pardon me? | 8      A.  Yes. |
| 9      A.  Yes. | 9      Q.  Do you know why that time period was selected for |
| 10     Q.  Who was that? | 10  HB 1706? |
| 11     A.  Representatives Denny, Pitts, Bohac and probably | 11         MR. SWEETEN:  Don't answer the question. |
| 12  a lot more. | 12  Legislative privilege.  Objection. |
| 13     Q.  Have you read this bill before sitting here | 13     Q.  (By MS. WESTFALL)  Are you following your |
| 14  today? | 14  counsel's advice? |
| 15     A.  I probably reviewed it.  I'm not sure when or how | 15     A.  Yes. |
| 16  many times. | 16     Q.  Do you see it list military ID cards at Section |
| 17     Q.  Could you just take a look at US 44 and let me | 17  2 -- |
| 18  know when you've had a chance to review it?  In | 18     A.  Yes. |
| 19  particular, I would direct you to Page 4, at section | 19     Q.  -- under A?  Can you describe the different types |
| 20  63.0101. | 20  of cards that that form of ID would encompass? |
| 21     A.  Okay. | 21         MR. SWEETEN:  You can answer. |
| 22     Q.  Just let me know when you've had chance to look | 22     A.  I assume any of the branches of the United States |
| 23  at those pages in that section. | 23  military that issues a photo ID would follow that |
| 24     A.  Okay. | 24  description. |
| 25     Q.  Okay.  So are you familiar with the forms of | 25     Q.  Do you know how many forms of different ID's that |



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                              MAY 29, 2012

---

### 121

1    would be?

2        A.  I don't have that number now.

3        Q.  Would it be more than a dozen, fewer than a

4    dozen?

5        A.  I don't know.

6        Q.  As to any of the forms of ID listed in BB 1706,

7    do you know the intent of the bill's authors including

8    that form of ID in HB 1706?

9        MR. SWEETEN:  Objection.  You're asking for

10   matters that are subject to the legislative privilege.

11       MS. WESTFALL:  I'm asking about the purpose

12   and intent which is permissible.

13       MR. SWEETEN:  He can provide what he

14   believes is the legislative purpose of a bill.

15       MS. WESTFALL:  And you're not allowing him

16   to answer the legislative purpose of why a particular ID

17   was listed in a particular bill?  Is that your

18   instruction to your client?

19       MR. SWEETEN:  What I'm telling you is he can

20   provide an answer as to the general purpose of the bill.

21   He cannot provide, pursuant to the court's order.  He does

22   not have to provide the subjective intent of any

23   specific legislator with respect to that bill.  So you

24   can ask him about what the purpose of the bill is, he

25   can answer that.  Otherwise, it is subject to the

---

### 122

1    legislative privilege.

2        MS. WESTFALL:  To be clear, you're not

3    allowing him to answer any questions about the purpose

4    of individual ID's included in this bill; is that right?

5        MR. SWEETEN:  I will let him testify as to

6    what his understanding of the legislative purpose of a

7    specific bill is.

8        MS. WESTFALL:  The overall bill; is that

9    right, because I'll change the question.  I just want to

10   be clear of your objection.

11       MR. SWEETEN:  Yeah.  I think that's what the

12   court has said is you can ask as to the legislative

13   purpose of a bill.

14   BY MS. WESTFALL:

15       Q.  What is your understanding of the legislative

16   purpose of HB 1706?

17       A.  I was not in Lieutenant Governor's office at the

18   time, but my guess is they wanted to --

19       MR. SWEETEN:  Don't guess.  Just answer the

20   question she's posed.

21       A.  I don't know the purpose is the answer.

22       Q.  (By MS. WESTFALL)  Do you know whether anyone in

23   the Lieutenant Governor's office was involved in the

24   development of drafting of HB 1706?

25       MR. SWEETEN:  Objection, calls for

---

### 123

1    speculation.  Also don't reveal any specific

2    communications you've had related to HB 1706.

3        MS. WESTFALL:  I said do you know.  It's not

4    calling for speculation.  You may answer.

5        A.  I don't know.

6    BY MS. WESTFALL:

7        Q.  Are you aware of any communications related to

8    the drafting of the element of HB 1706 outside of the

9    Lieutenant Governor's office?

10       A.  No.

11       Q.  Are you aware of the source of legislative

12   language of HB 1706?

13       MR. SWEETEN:  Don't reveal specific mental

14   impressions, thoughts about specific legislation

15   including the process by which the legislation came

16   through.  So I'm going to instruct you not to answer, if

17   your answer would reveal that.

18       A.  I don't know.

19       Q.  (By MS. WESTFALL)  Do you know anyone in the

20   Lieutenant Governor's office who would have knowledge or

21   testimony about the purpose of HB 1706?

22       MR. SWEETEN:  Objection, asked and answered.

23       A.  No.

24       Q.  (By MS. WESTFALL)  Would the Lieutenant Governor

25   himself know the purpose of HB 1706?

---

### 124

1        MR. SWEETEN:  Objection, asked and answered.

2        A.  I don't know.

3        Q.  (By MS. WESTFALL)  Are you aware of the source of

4    any of the legislative language of HB 1706?

5        MR. SWEETEN:  Objection, asked and answered

6    also.

7        A.  No.

8        Q.  (By MS. WESTFALL)  Are you familiar with the

9    Indiana photo ID law?

10       MR. SWEETEN:  You can answer that question.

11       A.  Yes.

12       Q.  (By MS. WESTFALL)  Did you review that law?

13       A.  Yes.

14       Q.  When did you review that law?

15       MR. SWEETEN:  Don't reveal your mental

16   thoughts and impressions about specific pending

17   legislation, okay?  In answering this question.

18       A.  I think I probably would have reviewed it

19   certainly in '07 when I started with the Lieutenant

20   Governor.

21       Q.  (By MS. WESTFALL)  Would you describe the Indiana

22   ID photo law as similar or dissimilar to HB 1706?

23       MR. SWEETEN:  Don't answer that.  It

24   requires you to reveal mental thoughts -- mental

25   impression, thoughts, opinions about specific

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**125**

1  legislation.  Don't answer it.
2       Q.  (By MS. WESTFALL)  Based on the face of the
3  statutes, the Indiana photo ID law and HB 1706, and
4  based on your knowledge as a lawyer and with your
5  experience in election law, would you describe those --
6  that bill and the Indiana law as similar or dissimilar?
7       MR. SWEETEN:  Objection, ask for a legal
8  conclusion.  Objection, also you can -- I'll let you
9  answer, but don't reveal any thoughts, mental
10  impressions about any pending legislation.  She's asked
11  you on the face of it and you can answer.  Go ahead.
12       A.  On the face of this bill and what I remember of
13  the Indiana law, they're similar.
14       Q.  (By MS. WESTFALL)  Can you describe, generally,
15  the legislator's consideration of HB 1706 after it was
16  filed?
17       MR. SWEETEN:  Objection.  Don't answer
18  except as to the matter it's public record.  Don't
19  reveal thoughts or mental impressions about the
20  legislation, the process by which it went through.  You
21  can answer as to public record.
22       A.  I don't remember.
23       Q.  (By MS. WESTFALL)  After the House -- did the
24  House pass HB 1706?
25       A.  I don't remember.

---

**126**

1       Q.  Could you mark this as US 74?
2       (Exhibit No. 74 was marked.)
3       Q.  (By MS. WESTFALL)  I'm handing you what's been
4  marked as US 74.  Do you recognize this document?
5       MR. SWEETEN:  Caution the witness to review
6  the document before answering questions about it.
7       A.  Looks like a legislative history of HB 1706.
8       Q.  (By MS. WESTFALL)  Could you take a moment to
9  review this and let me know when you've had a chance to
10  look at it?
11       A.  Okay.
12       Q.  Does this document refresh your recollection as
13  to whether the House passed HB 1706?
14       A.  It looks like it passed.
15       Q.  And when it went to the senate, what committee
16  was it referred to?
17       A.  Looks like it was referred to State Affairs.
18       Q.  Would that have been the ordinary jurisdiction --
19  committee that would have jurisdiction over election
20  laws in the Senate?
21       A.  It's fair to say that those election laws goes to
22  State Affairs Committee.
23       Q.  What happened to HB 1706 after it was referred to
24  the State Affairs Committee?
25       MR. SWEETEN:  You can answer as to the

---

**127**

1  matters of public record.
2       A.  I don't know.  It didn't pass.  But it was also
3  May.
4       Q.  (By MS. WESTFALL)  In other words, it was late in
5  the session?
6       A.  Correct.
7       Q.  Why was it referred to the State Affairs
8  Committee and not the Committee of the whole?
9       MR. SWEETEN:  Don't answer that.  Ask for
10  matters that are subject to legislative privilege.
11       A.  I don't know.
12       Q.  (By MS. WESTFALL)  Are you following the advice
13  of your council?
14       MR. SWEETEN:  I'm instructing you not to
15  answer that question.  It asks for matters of
16  legislative privilege.
17       A.  Yes.
18       Q.  (By MS. WESTFALL)  Do you know whether the
19  Lieutenant Governor took a public position on HB 1706?
20       A.  I don't remember.
21       Q.  Did you say you didn't remember?
22       A.  I don't remember if he did or did not.
23       Q.  Do you notice whether the Lieutenant Governor or
24  anyone in his office had any communications with anyone
25  about HB 1706?

---

**128**

1       MR. SWEETEN:  You can testify as to whether
2  or not you know of any communications.
3       A.  I don't know of any.
4       Q.  (By MS. WESTFALL)  Are you aware of any analysis
5  conducted by the Lieutenant Governor's office prior
6  to -- actually, strike that.
7       Are you aware of any analysis conducted by the
8  Lieutenant Governor's office related to HB 1706?
9       MR. SWEETEN:  Don't answer that.  It asks
10  for matters that are subject to legislative privilege,
11  the deliberative process privilege, and the
12  attorney/client privilege.
13       Q.  (By MS. WESTFALL)  Are you following the advice
14  of your counsel?
15       A.  Yes.
16       Q.  Are you aware of any attempt to determine who
17  among registered voters did not possess the forms of ID
18  required or allowed by HB 1706?
19       MR. SWEETEN:  Objection, calls for matters
20  that are legislatively privileged.  Instruct not to
21  answer.
22       Q.  (By MS. WESTFALL)  Are you following your
23  counsel's advice?
24       A.  I am.
25       Q.  Sitting here today, what is your opinion of HB

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 129

1706?

2    MR. SWEETEN:  Don't answer to the extent
3  that that question ask you to reveal your mental
4  thoughts, impressions, about the legislation.  So don't
5  provide that if it does that.
6    A.  Seems like an attempt to ensure the integrity of
7  the elections.
8    Q.  (By MS. WESTFALL) I'm sorry?
9    A.  Seems like an attempt to ensure the integrity of
10  the elections and require photo ID.
11    Q.  Had this bill, HB 1706, been elected into law,
12  would it have accomplished that purpose in your view?
13    MR. SWEETEN:  Objection.  She's asking for
14  matters that are subject to the legislative privileges,
15  instruct not to answer.
16    Q.  (By MS. WESTFALL)  Are you following the advice
17  of your counsel?
18    A.  I am.
19    Q.  Was there a photo ID bill introduced in the next
20  legislative session in 2007?
21    A.  I believe there was.
22    Q.  Do you remember that bill number?
23    A.  I don't.  A lot of bill numbers.
24    Q.  Could you mark this as US 28?
25    (Exhibit No. 28 was marked.)

---

### 130

1    Q.  (By MS. WESTFALL)  You've been handed what's been
2  previously marked as US Exhibit 28.  Do you recognize
3  this document?
4    A.  It's a photo ID bill from the '07 session.
5    Q.  Who authored the bill?
6    A.  Representatives Brown, Berman, Bohac, Riddle and
7  others.
8    Q.  Are you familiar with the provisions of HB 218?
9    A.  Yeah.
10    Q.  Could you compare HB 218 with HB 1706 and tell me
11  if there are any major difference that strike you?
12    MR. SWEETEN:  In answering the question, I
13  don't want you to reveal any thoughts, mental
14  impressions or opinions about those two bills or
15  legislation that occurred -- that you would have
16  developed in the furtherance of the legislative process.
17  She's asking you to compare the text of two bills right
18  now.  I'm not objecting to that specific question.
19    Q.  (By MS. WESTFALL)  Thank you.
20    A.  Looks like the HB 218 has some exceptions for --
21  or a place for military and military widows or widowers
22  to indicate they are that status on their registration
23  form.  And for the registration form to include a notice
24  on there whether or not it is a disabled veteran or
25  military widow or widower.

---

### 131

1    Q.  Okay.  Sir, I would like you to limit your
2  discussion of the differences to the forms of allowable
3  ID at section 63.0101 at Page 9.  So you need not
4  compare the whole bill.  But could you tell me the
5  differences in allowable forms of ID between HB 1706 and
6  HB 218?
7    A.  Looks like 218 requires a Texas license and any
8  license from Texas or other states.  Looks like 218 does
9  not allow State agency ID cards or county issued ID
10  cards.  Oh, wait, take that back.  It does.  Generally
11  similar.
12    Q.  So is it your testimony that HB 218 now limits it
13  to Texas driver's licenses and eliminated the use of
14  county issued forms of ID; is that correct?
15    A.  I think that's right.
16    Q.  Pardon me.  County election office issued ID; is
17  that correct?
18    A.  That's correct.
19    Q.  Otherwise, the forms of allowable ID are similar
20  to HB 1706?
21    A.  I think that's right.
22    Q.  But is it fair to say that it's a narrowing of
23  the allowable forms of ID; is that correct?
24    A.  Yes.
25    Q.  As to the photo ID; is that correct?

---

### 132

1    A.  Correct.
2    Q.  And HB 218 as with HB 1706 still allows the use
3  of non photo ID; is that correct?
4    A.  Correct.
5    Q.  And turning your attention to the forms of
6  allowable photo ID, is it your view that student IDs
7  issued by a state institution are still permissible
8  forms of photo ID under HB 218, though they're not
9  expressly identified as such?
10    A.  Well, in 218 --
11    Q.  218.
12    A.  In par in six says, a student ID card that
13  contains their photograph is acceptable.
14    Q.  Thank you.  Did you or anyone in the Lieutenant
15  Governor's office play any role in the development of
16  218?
17    MR. SWEETEN:  Objection.  I don't want you
18  to discuss any matters that are subject to the
19  legislative privilege, which could include thoughts or
20  mental impressions opinions about legislative or could
21  also reveal communications of legislators, legislative
22  staff, State agencies, Texas Legislative Council, those
23  are all matters of legislative privilege so do not
24  reveal any specifics with respect to that.  They're
25  privileged.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 133

1     A.  The question is did Lieutenant Governor or staff
2  play a role in the development of HB 218?
3     Q.  (By MS. WESTFALL)  Yes.
4        MR. SWEETEN:  I'm going to instruct you not
5  to answer if it would reveal matters that are subject to
6  the privilege.
7     A.  The answer is don't recall.
8     Q.  (By MS. WESTFALL)  So you're not asserting
9  privilege with regard to that answer?
10     A.  Correct.
11     Q.  Were you present at any meetings during the
12  development or drafting of HB 218?
13        MR. SWEETEN:  Same objection, same
14  instruction.
15     A.  I don't recall.
16     Q.  (By MS. WESTFALL)  Are you aware of who in
17  particular was involved in the drafting of HB 218?
18     A.  No.
19     Q.  Are you aware of any concerns raised during the
20  development, drafting or consideration of HB 218 about
21  the impact of the bill on Hispanic voters?
22        MR. SWEETEN:  That calls for matters that
23  are subject to the legislative privilege, the
24  deliberative process privilege, as well as potentially
25  attorney/client privileged information, so don't answer

## 135

1     Q.  (By MS. WESTFALL)  Are you going to answer the
2  question or follow the advice of council?
3     A.  Follow the advice.
4     Q.  Did you learn or become aware of any concerns
5  raised about HB 218?
6        MR. SWEETEN:  Same objection, legislative
7  privilege, same instruction, don't answer the question.
8     Q.  (By MS. WESTFALL)  Are you following advice of
9  council?
10     A.  I am.
11     Q.  If there's a bill in the House that gets passed
12  and then referred to the senate, how is it determined
13  who sponsors the House in the senate as a general
14  matter?
15        MR. SWEETEN:  I'm going to object to the
16  question.  I think you're asking for matters that are
17  subject to the legislative privilege.
18        MS. WESTFALL:  You are not going to allow
19  him to answer generally?
20        MR. SWEETEN:  Let me hear the question
21  again.  Madam, court reporter, will you please read it
22  back?
23        (Requested question was read.)
24        MR. SWEETEN:  You can answer as a general
25  matter.  Don't reveal matters subject to legislative

## 134

1  the question.
2     Q.  (By MS. WESTFALL)  Are you following advice of
3  counsel?
4     A.  I am.
5     Q.  Are you aware of any concerns raised during the
6  development or drafting of HB 218 about the impact of
7  bill on Black voter?
8        MR. SWEETEN:  Same objection, same
9  instruction.
10     Q.  (By MS. WESTFALL)  Are you following the advice
11  of council?
12     A.  I am.
13     Q.  Are you aware of any analysis conducted to
14  determine the impact of HB 218 on racial or ethnic
15  minority voters?
16        MR. SWEETEN:  Objection, legislative
17  privilege.  My instruction is to not answer the
18  question.
19     Q.  (By MS. WESTFALL)  Are you following the advice
20  of council?
21     A.  I am.
22     Q.  Did you monitor consideration of HB 218 in the
23  House?
24        MR. SWEETEN:  Objection.  I think that calls
25  for matters subject to the legislative privilege.

## 136

1  privilege.  So go ahead.
2     A.  I think generally there's communications between
3  House sponsors and senators, people who share priorities
4  sponsor each other's bills.
5     Q.  (By MS. WESTFALL)  So generally speaking, is the
6  Lieutenant Governor not a party to those communications?
7        MR. SWEETEN:  Objection, I mean, that's
8  vague.  It also ask about his particular role in
9  legislation.  That is subject to the legislative
10  privilege.
11        MS. WESTFALL:  I'm not referring to any
12  particular legislative act.  I'm asking about general
13  procedures.  Will you let your witness answer that
14  question?
15        MR. SWEETEN:  You're asking about general --
16  can you read the question back again.
17        (Requested question was read.)
18  BY MS. WESTFALL:
19     Q.  To those conversations, I think, about who
20  will -- who in the Senate will sponsor a House Bill?
21        MR. SWEETEN:  Objection to the question.
22  Objection form, objection vague.  Objection, it's
23  compound.  You can answer as a general matter to that
24  question.  Do not refer to any specific legislation in
25  answering that.  In particular, Senate Bill 14 or these



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 137

1   bills she's showing you.  Okay.

2        A. I think generally the Lieutenant Governor is not

3   involved in who sponsors what.

4        Q. (By MS. WESTFALL)  Does he become involved if he

5   has particular interest in a bill and who will be the

6   senate sponsor of a House bill?

7            MR. SWEETEN:  Same objection, same

8   instruction.

9        A. I don't know.

10       Q. (By MS. WESTFALL)  So Janice McCoy has testified

11   in this litigation.  Did you review her transcript in

12   advance of this deposition today?

13       A. No.

14       Q. So she testified that she had one or two dozen

15   conversations with the Lieutenant Governor's office

16   about HB 218, including the person who staffed State

17   Affairs for the Lieutenant Governor.  Was that you?

18           MR. SWEETEN:  Objection to the form of the

19   question.

20       A. In '07 --

21           MR. SWEETEN:  Objection, calls for facts not

22   in evidence.  Go ahead.

23       A. -- probably yes.  I should say there's several

24   people that staff State affairs although my guess is I

25   would have been one of those people.

---

### 138

1        Q. (By MS. WESTFALL)  Who were the other people in

2   2007 that were staffing State affairs besides you?

3        A. State affairs is a large-- insurance bills would

4   have been Karen Barret and health related bills would

5   have been Jamie Dudensten.  And my memory is during this

6   session, myself and general counsel Frank Battle

7   probably would have split the elections bills.  There

8   may have been others.

9        Q. And Ms. McCoy and Senator Fraser when they

10   testified in this matter also testified that they met

11   with the Lieutenant Governor's office and indicated that

12   Senator Fraser wanted to sponsor HB 218.  Is that your

13   recollection as well?

14           MR. SWEETEN:  Objection, assumes facts not

15   in evidence.  You can answer to the extent you know.

16       A. I don't know.  I don't remember.

17       Q. (By MS. WESTFALL)  Are you aware of any meeting

18   that occurred between Senator Fraser or Janice McCoy or

19   with the Lieutenant Governor concerning sponsorship of

20   HB 218 in the Senate?

21       A. I don't recall.

22       Q. You don't recall?

23       A. I don't recall a meeting.

24       Q. Were you aware of Senator Fraser's interest in

25   sponsoring HB 218 in the Senate?

---

### 139

1            MR. SWEETEN:  Don't reveal matters that are

2   subject to communications that you've had with

3   legislators or legislative staff.  So if it would reveal

4   a communication you had with his office or one of his

5   staffers, don't reveal that information.

6        A. I think I was aware when he filed it or shortly

7   before, possibly, but I can't remember.

8            MR. SWEETEN:  You can testify as to matters

9   of public record.  We need a bathroom break.

10       (Brief recess.)

11   BY MS. WESTFALL:

12       Q. We're back on the record.  Before the break we

13   were discussing HB 218 and talking about Janice McCoy's

14   testimony about this bill, do you remember that?

15       A. I do.

16       Q. Ms. McCoy testified in her deposition in this

17   case that she had never had any discussions with anyone

18   in the Lieutenant Governor's office about the impact of

19   HB 218 on minority voters.  To your knowledge, is that

20   accurate?

21           MR. SWEETEN:  Don't reveal in answering the

22   question legislative privilege would cover

23   communications that you've had with legislative staff,

24   don't reveal any substance of any communications that

25   you've had with staff as that is a matter covered by

---

### 140

1   legislative privilege.

2        Q. (By MS. WESTFALL)  Can you answer the question?

3            MR. SWEETEN:  You can testify if you had a

4   conversation with Janice McCoy.  Don't testify about the

5   substance of it.  The way it's currently phrased,

6   they're asking you the substance of the conversation.

7   Therefore, I'm instructing you not to answer it as

8   phrased.

9        Q. (By MS. WESTFALL)  Are you following your

10   counsel's advice?

11       A. Yes.

12       Q. Are you aware of any discussions that occurred

13   about the impact of HB 218 on minority voters?

14           MR. SWEETEN:  Again, in the question she's

15   asking you the substance of the conversations.  The

16   question is problematic from that standpoint.  I'll

17   allow you to answer as to any conversations you've had,

18   who those conversations were with, including whether you

19   had a discussion with Janice McCoy.  However, as the

20   question is phrased, I believe the question is calling

21   for you the reveal the substance of communications and

22   therefore I'm instructing you not to answer the

23   question.

24       Q. (By MS. WESTFALL)  Are you following your

25   counsel's advice?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                                    MAY 29, 2012

---

### 141

1      A.  Yes.
2      Q.  The question was not about -- just to clarify,
3   for the witness, the question was not about
4   conversations with Janice McCoy.  Are you aware of any
5   discussions about the impact of HB 218 on minority
6   voters?
7          MR. SWEETEN:  You can reveal if you're aware
8   of any specific discussions regarding that subject
9   matter, but do not reveal anything beyond that.
10     A.  I don't recall.
11     Q.  (By MS. WESTFALL)  Are you aware of any
12  communications with election officials concerning HB
13  218?
14         MR. SWEETEN:  You can answer as phrased.
15     A.  I don't recall.
16     Q.  (By MS. WESTFALL)  Are you aware of a statement
17  by Secretary of State, Roger Williams, that he wasn't
18  sure if a photo ID bill would improve turn out?
19         MR. SWEETEN:  You can answer, if you are
20  aware.
21     A.  I don't recall that statement.
22     Q.  (By MS. WESTFALL)  Do you know the party
23  affiliation of Secretary Williams?
24     A.  I believe he's Republican.
25         THE REPORTER:  Can you speak up.

---

### 142

1      A.  I believe he's Republican.
2      Q.  (By MS. WESTFALL)  What were the purposes of the
3   bills authors in introducing HB 218?
4          MR. SWEETEN:  Don't reveal the subjective
5   intent of any specific person.  You can -- you can as
6   the court has indicated, you can provide your
7   understanding of the purpose of the bill itself was, but
8   don't speculate as to subjective intent.  You don't have
9   to do that and that's privileged.
10         MS. WESTFALL:  I'm not asking about
11  subjective intent.  Just to be clear.  My question was
12  limited to the purpose of HB 218.
13         MR. SWEETEN:  You can answer as to the
14  purpose of 218 as phrased.
15     A.  If you're asking why they filed it?
16     Q.  (By MS. WESTFALL)  Yes.
17     A.  I don't know.  Presumably to improve the
18  integrity of the election process in Texas.
19     Q.  How do you know that?
20         MR. SWEETEN:  Don't reveal the conversations
21  that you've had.  Those would be legislatively
22  privileged.  You can answer as to the purpose of the
23  bill, I think you have, but you don't have to give all
24  the conversations you've had or the discussions mental
25  impressions that occurred as that bill was considered.

---

### 143

1   Don't answer if it would reveal that information.
2      A.  Just seems a natural purpose to file this sort of
3   legislation.
4      Q.  (By MS. WESTFALL)  You mean, to your mind -- in
5   your mind HB 218 would improve the integrity of the
6   election process?  Is that your testimony?
7      A.  That wasn't your question, I don't think.  I
8   thought your question was, why do I think they did it.
9   I don't know why they did it.  My guess is because it
10  would improve integrity of the elections.
11     Q.  And then what is basis of your supposition that
12  that was the purpose in introducing HB 218?
13         MR. SWEETEN:  In answering that question
14  don't reveal conversations you had that would be subject
15  to the legislative privilege or thoughts, mental
16  impressions about that specific legislation.  If you can
17  answer without doing so, you can do so.
18     A.  I mean, there's been lots of election bills and
19  voter ID bills filed.  And I would say it's fair to say
20  that in those cases for those similar bills that was the
21  purpose.
22     Q.  (By MS. WESTFALL)  Were there any other purposes
23  that you're aware of underlying the filing of HB 218?
24     A.  I'm not aware.
25     Q.  Are you aware of any evidence that there was a

---

### 144

1   problem with the integrity of elections at the time HB
2   218 was filed?
3          MR. SWEETEN:  The question as phrased ask
4   you to reveal information, mental impressions, thoughts,
5   about specific legislation.  In answer to the question,
6   don't do that.  You can reveal matters that are on the
7   public record, but do not reveal the substance of
8   conversations and don't reveal mental impressions.
9   Those would be subject to the legislative privilege.  So
10  objection.
11     A.  I don't recall public discussion of the purpose
12  of this.
13     Q.  (By MS. WESTFALL)  Are you following the advice
14  of council as to any other purposes you're aware of or
15  basis of problems?
16         MR. SWEETEN:  That wasn't your question.
17  Your question was different than that.  If you want to
18  ask him what the purpose of the bill was, you can ask
19  him that.
20     Q.  (By MS. WESTFALL)  Is your response as to
21  evidence supporting need for the problem based on
22  private information for which you are asserting
23  privilege?
24         MR. SWEETEN:  That is privileged, I would so
25  instruct you not to reveal mental impressions about the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT

MAY 29, 2012

---

**145**

1  legislation or conversations that you've had with
2  anyone, any legislators, legislative staff or the other
3  enumerated individuals or entities.
4      A. The short answer is I just don't recall.
5      Q. (By MS. WESTFALL)  Was HB 218 in part designed to
6  prevent noncitizens from voting?
7          MR. SWEETEN:  Don't answer that.  You can
8  answer as to the specific purpose of the legislation.
9  She's now asking you about the design and the intent of
10  the subjective intent of individuals.  So you can answer
11  as to the purpose of the legislation, the court has said
12  that you can and so I will allow that.  But I'm not --
13  but legislative privilege covers mental impression,
14  thoughts, about the bill in conversations related to the
15  bill.
16      Q. (By MS. WESTFALL)  Do you have any testimony in
17  response to my question?
18      A. I think the answer is I don't know.
19      Q. Are you following the advice of your council not
20  to provide testimony?
21          MR. SWEETEN:  And the correct question is,
22  are you saying that you don't know at all or are you
23  saying I don't know based upon the instruction.
24      A. I'm saying I don't know at all.
25      Q. (By MS. WESTFALL)  Was the purpose of HB 218 in

---

**146**

1  part to prevent noncitizens from voting?
2          MR. SWEETEN:  You can answer as to the
3  purpose of 218.
4      A. It seems to me.  I'm not sure how that's
5  different from the last question.  I don't know the
6  purpose.  I don't know why these members filed this
7  bill.
8      Q. (By MS. WESTFALL)  Are you aware of
9  representative Betty Brown, who was the sponsor of 218
10  stating on the House floor that it was designed to keep
11  illegal aliens, noncitizens and otherwise people not
12  qualified from voting?
13      A. I don't recall that.
14      Q. How do you determine what is legislative purpose
15  of a bill?
16      A. I mean, when you say legislative purpose I think
17  of the indent of the author.  Sometimes that is spelled
18  out in the bill in the four corners of the document,
19  what is the intent and other times it's from the floor
20  statement.  Other times it's in their head and I don't
21  have access to that.
22      Q. How do you figure out the intent when a bill is
23  enacted?  How do you figure out the purpose of the bill
24  besides what you've just testified to?
25          MR. SWEETEN:  Okay.  Again, the court has

---

**147**

1  said that you do not have to testify based upon the
2  legislative privilege about the subjective intent of
3  individuals who passed a bill.  You can testify about
4  the purpose of the legislation.  When you're answering
5  this question, don't reveal matters that are subject to
6  legislative privilege, including the deliberations,
7  conversations, or mental impressions you may have had
8  when this particular bill was moving forward.  So you
9  can answer to the extent you can.
10      A. So how does one determine the purpose of the law
11  after it has passed Legislature.
12      Q. (By MS. WESTFALL)  Where does one look to
13  determine and ascertain and derive purpose?
14      A. To the extent that the purpose is relevant to the
15  law, then I imagine a court would look at that and some
16  courts would give weight to things like history and
17  public comments and other courts would dismiss the
18  importance of legislative history entirely.
19      Q. I believe you just testified that you saw
20  protecting the integrity of elections and preventing
21  noncitizens from voting was the same purpose; is that
22  correct?
23      A. I'm sorry.  Could you repeat?
24      Q. I may have misunderstood you or misheard you.
25  But did you testify that ensuring integrity elections

---

**148**

1  and preventing noncitizens from voting are one and the
2  same?
3      A. I don't think I mentioned noncitizens.  I
4  mentioned that ensuring the integrity of the election
5  system and instilling confidence in that system and the
6  voting public's purpose.
7      Q. Okay.  Do you believe that HB 218 would prevent
8  noncitizens from voting?
9          MR. SWEETEN:  Don't provide an answer to
10  that.  That calls for matters that are legislatively
11  privileged.
12      Q. (By MS. WESTFALL)  Based on the face of the
13  statute?
14      A. I think I don't know.
15          MR. SWEETEN:  You're asking his mental
16  impressions about a specific bill that is covered by the
17  legislative privilege.  He can answer as to what he
18  thinks the legislative purpose is.  He won't answer as
19  to subjective intent or his own personal mental
20  impressions about the bill.  It's legislatively
21  privileged.  Objection.
22      Q. (By MS. WESTFALL)  can you answer the question?
23      A. The question is, will this bill prevent
24  noncitizens from voting?
25      Q. Correct.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                                           MAY 29, 2012

---

149

1      A.  I think to the extent it's designed to prevent
2  ineligible voters from voting and noncitizens or
3  ineligible voters, it probably will have that effect.
4      Q.  Is it your understanding that a person's -- a
5  voter applicant's citizenship is determined by county
6  election officials when a person submits a voter
7  registration application?
8          MR. SWEETEN:  As it currently stands?  The
9  current law or are you talking about a new bill.
10         MS. WESTFALL:  Under any law.
11         MR. SWEETEN:  Under current law, you're
12  asking the question?
13  BY MS. WESTFALL:
14     Q.  Do you understand the question?
15     A.  I think, yes.  I think my understanding is you're
16  registered to vote in a county.  That county registrar
17  determines whether you're eligible and if you are
18  submits that information to the Secretary of State.
19     Q.  And as part of the voter registration
20  application, does an applicant indicate whether he or
21  she is a US citizen?
22         MR. SWEETEN:  You can answer.
23     A.  I'm pretty sure, yes, but I don't have a
24  registration card in front of me.
25     Q.  (By MS. WESTFALL)  And does photo ID legislation

---

150

1  including HB 218, help to prevent persons who are not US
2  citizens from casting a ballot?
3          MR. SWEETEN:  When you're answering this
4  question don't reveal your mental processes thoughts,
5  communications, with other people regarding specific
6  legislation.  To the extent that you can answer not
7  based upon that information, you can do so.
8      A.  Again, I think, my guess, is this bill would
9  prevent some number of ineligible voters from voting and
10  to the extent that noncitizens are not eligible, then
11  they would be prevented from voting.
12     Q.  (By MS. WESTFALL)  Can you elaborate on that and
13  how that would work?
14         MR. SWEETEN:  Again, don't reveal matters
15  that are subject to the legislator privilege in
16  answering this question.
17     Q.  (By MS. WESTFALL)  Under the face of this
18  statute?
19     A.  On the face of House Bill 218, if you do not have
20  proper identification and you do not fall into one of
21  these exceptions, then you are not eligible to vote.  So
22  to the extent you are a citizen or a noncitizen and fit
23  that description, you would not be eligible to vote.
24     Q.  Do you know under current law whether noncitizens
25  can obtain driver's licenses in the State of Texas?

---

151

1      A.  I believe that they can.
2      Q.  Do you know whether noncitizens in the State of
3  Texas can obtain a concealed handgun license?
4      A.  I'm actually not sure of that.
5      Q.  Do you know whether in the State of Texas a
6  noncitizen can obtain a military ID?
7      A.  I'm not sure of that either.
8      Q.  So if -- suppose a noncitizen submitted a voter
9  registration application and falsely indicated that he
10  or she was a US citizen and was added to the voter rolls
11  as a citizen, and then appeared at the polls on election
12  day with a driver's license that indicated his or her
13  identify, visually you could match the person and was
14  able to vote.  Would that -- would that scenario be
15  prevented by HB 218 or similar photo ID legislation?
16         MR. SWEETEN:  In answering this question,
17  don't reveal your thoughts, mental impressions, or
18  opinions, about legislation or information you learned
19  from conversations with legislative staff members,
20  legislators, State agencies, Texas Legislative Council.
21  You can answer to the extent you're not revealing that
22  information.
23     A.  So the question is, a noncitizen has registered
24  to vote and has a photo ID, does this bill stop that
25  person from voting?

---

152

1      Q.  (By MS. WESTFALL)  Correct.
2      A.  I guess I'm not clear.  Maybe there's some types
3  of ID under this bill that would have an indication of
4  whether the person was a citizen or not a citizen, which
5  presumably would be discovered by the poll worker.
6      Q.  Could you turn your attention again to HB 218 and
7  look at the list of photo IDs?  I believe it begins on
8  Page 9, of section 63.0101?
9      A.  Yeah.
10     Q.  Could you identify one of the documentary -- one
11  of the photo IDs that would indicate a person's
12  citizenship?
13     A.  Again, I think outside the bounds of this
14  document, it may be that, you know, the Department of
15  Public Safety has guidelines for what a driver's license
16  looks like or that the United States Military has
17  guidelines for what a military ID looks like and those
18  guidelines might include some designation for citizen
19  versus noncitizen.  Same as perhaps any of these.
20     Q.  Is your testimony today that you are uncertain of
21  whether the IDs indicate a person's citizenship status?
22         MR. SWEETEN:  You can answer the question,
23  but don't do it based upon matters that you learned
24  prior to the bill's passage, including the conversations
25  we've talked about.  Don't reveal your thoughts and

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 153 | 155 |
|---|---|

**153**

1  mental impressions, but you can answer if you're not
2  doing that.
3      A.  Right.  In the case of some of these I am unsure.
4      Q.  (By MS. WESTFALL)  Which ones are you unsure of?
5  Could you just identify those for the record?
6      A.  Out of the list starting on Page 9?
7      Q.  Yes.
8      A.  Military identification I'm not sure.  Employer
9  identification cards, it would depend on the employer
10  perhaps.  Student identification cards perhaps.  Again,
11  I'm unclear about concealed handgun licenses and number
12  eight is broad enough to include some card that has a
13  citizenship designation.  That's any ID card issued by
14  the federal government or State government and then
15  subsection B official mail addressed to the person or
16  governmental entity that seems like it.
17      Q.  What is the most commonly held form of
18  identification on this list, of photo IDs?
19          MR. SWEETEN:  You can answer the question,
20  but as you're doing so don't reveal the thoughts, mental
21  impressions, about specific legislation or information
22  you have learned from conversations between legislatures
23  because that would be legislatively privileged.  But you
24  can answer the question to the extent you're not doing
25  that.

**155**

1      A.  I may have a long time ago, but not so that I can
2  remember it.
3      Q.  Can you take a look at US 75 and let me know
4  whether based on this document it refreshes your memory
5  as to whether HB 218 was referred to the State Affairs
6  Committee?
7      A.  It was.
8      Q.  About the Lieutenant Governor made that committee
9  assignment, correct?
10      A.  Presumably, yes.
11      Q.  Did the committee hold a hearing on HB 218?
12      A.  Yes.
13      Q.  And under the -- I believe, you testified under
14  the senate rules of Lieutenant Governor is not the --
15  does not serve on the committee of State Affairs; is
16  that right?
17      A.  Correct.
18      Q.  And therefore he cannot order, convene committee
19  hearings or call witnesses; is that right?
20      A.  Correct.
21      Q.  Do you know who testified at that hearing?
22      A.  I do not recall.
23      Q.  And you were handling State Affairs that year; is
24  that correct?
25      A.  Correct.

**154**

1      A.  So on House Bill 218, what is the most common
2  form of photo ID?
3      Q.  (By MS. WESTFALL)  Yes.
4      A.  I don't know that.  I would guess a driver's
5  license, but number eight seems broad enough that any ID
6  from a federal or state institution.  I don't know.
7      Q.  And it was your testimony earlier that you were
8  uncertain whether driver's license indicates US
9  citizenship; is that correct?
10      A.  That's correct.  I don't believe it does, but I'm
11  not a 100 percent sure.
12      Q.  After the House -- maybe you testified about this
13  earlier.  Oh, no.  After the House passed HB 218, was it
14  considered by the senate?
15          MR. SWEETEN:  You can answer as matters of
16  public record.
17      A.  I don't recall.
18      Q.  (By MS. WESTFALL)  Could you mark this as 75?
19          (Exhibit No. 75 was marked.)
20      Q.  (By MS. WESTFALL)  You've been handed what's
21  marked US 75.  Do you recognize this document?
22      A.  Yes.
23      Q.  What is it?
24      A.  It's the legislative history of HB 218.
25      Q.  Have you reviewed this before today?

**156**

1      Q.  Do you know whether the bill was amended in
2  committee?
3      A.  I don't recall that either.
4      Q.  And after committee consideration, was it voted
5  out of committee?
6      A.  Yes.  This indicates that it was.
7      Q.  Was it voted out on party lines?
8      A.  I don't recall that either.
9      Q.  Did HB 218 require the support of two-thirds of
10  the senators to bring it to the floor for a vote?
11      A.  In '07, I believe those were the senate rules,
12  yes.
13      Q.  And why was that quantum of senators required?
14      A.  That is a long standing rule that applies to all
15  bills in the senate.  Two-thirds of the senate must
16  agree to take items out of order and there's typically a
17  place holder bill at the top of the calendar.
18      Q.  What is the purpose of that rule?
19          MR. SWEETEN:  You can answer.
20      A.  I don't know the purpose.  I think most people
21  would say it encourages some level of conciliation or
22  cooperation.
23      Q.  (By MS. WESTFALL)  What was the partisan
24  composition of the Senate in 2007, do you recall?
25      A.  I don't recall.  Maybe -- I would guess 21/10,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                              MAY 29, 2012

---

### 157

1    but I don't know for sure.
2        Q.  And if all democrats were present on the floor to
3    vote against the bill, could they block legislation
4    subject to the two-thirds rule?
5        A.  In 2007?
6        Q.  2007?
7        A.  Yeah.  It would take 11 votes.  And so if it was
8    21 to 10, then, no, the democrats would not be able to
9    stop it or the opposition would not be able to stop it.
10       Q.  Do you believe there were 11 democrats?
11           MR. SWEETEN:  Objection, asked and answered.
12       Q.  (By MS. WESTFALL)  Did the Lieutenant Governor
13   attempt to bring 218 -- pardon me.  HB 218 to the Senate
14   floor for a vote?
15           MR. SWEETEN:  You can answer the question.
16   But in doing so don't reveal communications you've had
17   with other members of the Lieutenant Governor's staff or
18   mental impressions regarding this specific bill, but you
19   ask answer if you know.
20       A.  I don't recall.  I'm trying to remember looking
21   at this.
22       Q.  (By MS. WESTFALL)  Do you know any of the
23   circumstances under which Lieutenant Governor brought HB
24   218 to the Senate floor?
25           MR. SWEETEN:  Objection vague.  Also

### 158

1    objection, I'm going to instruct you not to reveal
2    matters of legislative privilege including conversations
3    between legislators, between Lieutenant Governor, staff
4    members, other individuals.
5        A.  I don't recall.
6        Q.  (By MS. WESTFALL)  Are you following the
7    instruction of council and asserting privilege over some
8    your testimony or is it your testimony fully that you
9    don't recall anything about this?
10       A.  My testimony is, that I do not recall whether the
11   Lieutenant Governor what he did in the process of
12   bringing this or not bringing this to the Senate floor.
13       Q.  Were you present in any meetings or a party to
14   any conversations that the Lieutenant Governor held
15   concerning the timing of the vote of HB 218 on the
16   Senate floor?
17
18           MR. SWEETEN:  I'll let you answer as too
19   whether or not -- you can answer.
20       A.  I don't recall anything like that.
21       Q.  (By MS. WESTFALL)  Are you aware of any
22   conversation between the Senator or any member of the
23   Senate the day before the vote?  Or the day of the vote
24   in the Senate?
25           MR. SWEETEN:  You can answer whether or not

### 159

1    you are aware of the conversation.
2        A.  I dont' think so, no.
3        Q.  (By MS. WESTFALL)  Do you know -- strike that.
4            When the Lieutenant Governor called a vote to
5    bring HB 218 to the Senate for a vote, how many Senators
6    were present on the Senate floor?
7        A.  I do not recall.
8        Q.  Do you recall whether anyone was not present?
9        A.  When the vote was called?  No.
10       Q.  Are you aware of whether Lieutenant Governor was
11   aware at the time of the Senate vote on HB 218 of the
12   concerns that HB 218 would disproportionately harm
13   minority voters?
14           MR. SWEETEN:  Okay.  I'm going to object
15   based upon legislative privilege and also based upon
16   speculation.  I'm going to instruct you not to reveal
17   information that you may have learned from any
18   conversations with the Lieutenant Governor, with any
19   legislators, with any legislative staff, state agencies,
20   Texas Legislative Council.  So that's my instruction to
21   you.  Don't answer the question as posed.
22       A.  I'm not aware of such information.
23       Q.  (By MS. WESTFALL)  Are you asserting privilege
24   over some of your testimony based upon council's advice?
25           MR. SWEETEN:  I'm instructing you that what

### 160

1    she's asking you would require you to reveal privilege.
2    So my instruction would be to not answer the question.
3        Q.  (By MS. WESTFALL)  Are you following your
4    counsel's advice?
5        A.  Yes.
6        Q.  Where were you working, physically, in the
7    capital the day of the vote for HB 218 on the Senate
8    floor?
9        A.  I don't remember.  I most certainly was not on
10   the Senate floor.  It would have been my first session.
11   So I probably was in my office, which is in the basement
12   two floors below.
13       Q.  Are you aware that the vote on HB 218 was held
14   when not all members were present on the floor?
15       A.  I don't know.
16       Q.  Can you recall during your time working for the
17   Lieutenant Governor of any time when a vote was held,
18   intentionally scheduled to be brought to the floor when
19   a member of the Senate was sick and had called in sick
20   that day?
21           MR. SWEETEN:  You can answer to the extent
22   you're not being asked to reveal matters of legislative
23   privilege.
24       A.  I'm not aware of such circumstance.
25       Q.  (By MS. WESTFALL)  Do you know that there was a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 161

1  vote on HB 218 and then there was a request to verify
2  the vote?
3      A. That sounds right in the recesses of my mind, but
4  I can't be 100 percent sure.
5      Q. Can you tell me what you remember about the
6  verification of the vote of HB 218 in the Senate floor?
7      MR. SWEETEN: You can discuss matters of
8  public record which is what I think the question is
9  asking.
10     A. My memory is that there were not the votes to
11 bring it up. I forget what the votes were for that.
12     Q. (By MS. WESTFALL) Did the Senate take any
13 further action on HB 218?
14     A. I don't recall.
15     Q. Did HB 218 -- was there a failure to suspend the
16 regular order of business rule with two-thirds of the
17 vote?
18     MR. SWEETEN: You can testify as to matters
19 of public record. Don't reveal matters that are
20 legislatively privileged. We can discuss those areas if
21 you would like me to go through them.
22     MS. WESTFALL: This is a procedural question
23 purely Mr. Sweeten.
24     MR. SWEETEN: But if, you know, Elizabeth,
25 you don't know what he's -- I mean, if it comes from a

## 162

1  conversation he learned from someone, potentially it
2  could impact privilege. That's why I'm letting him
3  answer with the instructions.
4      MS. WESTFALL: You're asserting privilege
5  over a procedural matter that he has knowledge of just
6  because he has a conversation; Is that your position?
7      MR. SWEETEN: My position as it's been all
8  the way through is that legislative privilege covers
9  communications that he would have had with legislators,
10 with legislative staff members, State agencies, Texas
11 Legislative Council, to the extent this does not call
12 for that information or for his mental impressions about
13 the bill. I'm going to let him answer it, but to the
14 extent that it invades those areas of communication that
15 are covered by the legislative privilege, my instruction
16 would be not to answer. So you can answer with that
17 instruction.
18     A. My memory is that there were not votes to bring
19 the bill to the floor.
20 BY MS. WESTFALL:
21     Q. What happened to HB 218 in the Senate,
22 ultimately?
23     MR. SWEETEN: Same instruction.
24     A. It looks like it did nothing.
25     Q. (By MS. WESTFALL) Did the Senate take any

## 163

1  further action on the bill?
2      A. I don't recall further action.
3      Q. Are you aware of any communications about HB 218
4  after it did not pass the Senate?
5      MR. SWEETEN: You can answer if you're aware
6  of any communications. Don't reveal the substance of
7  those communications, however. Go ahead.
8      A. When you say aware of communications?
9      Q. (By MS. WESTFALL) Were there any conversations
10 about HB 218 after it didn't pass?
11     MR. SWEETEN: Same instruction. Don't
12 reveal the conversation substance, but you can -- you
13 can answer that question as posed.
14     A. I certainly don't recall any specifics, but my
15 guess is any piece of legislation would be discussed in
16 some capacity among some staff or something, but I don't
17 recall any particular conversations.
18     Q. (By MS. WESTFALL) Could you mark this as US 3?
19         (Exhibit No. 3 was marked.)
20     Q. (By MS. WESTFALL) You've been handed what's been
21 previously been marked as US 3. Do you recognize this
22 document?
23     A. It is a Texas weekly article about legislative
24 activity the previous week. Looks like it starts with
25 some voter ID issues.

## 164

1      Q. Have you seen this article before?
2      A. I probably read the tribune that week. If you
3  give me a second I can.
4      Q. I will definitely give you a second.
5      A. Looks like it reproduces a letter that Lieutenant
6  Governor Dewhurst sent out and then some reaction to
7  that.
8      Q. Are you familiar with the letter?
9      A. I remember it now that I'm reading it.
10     Q. Do you know who drafted the letter?
11     A. I do not.
12     Q. Do you know anything about the circumstances of
13 the drafting of the letter?
14     MR. SWEETEN: Don't reveal communications
15 subject to legislative privilege in answering the
16 question.
17     MS. WESTFALL: I'm examining the witness
18 about a letter that was in the Texas Weekly, so this is
19 pretty public.
20     MR. SWEETEN: I'll let him testify to the
21 extent that he's not revealing communications that are
22 subject to the legislative privilege.
23     A. The question was the circumstances of this
24 letter?
25     Q. (By MS. WESTFALL) Yes.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

BRIAN HEBERT                                                    MAY 29, 2012

---

### 165

1    A. I'm not aware of any specifics other than it came
2  out after the vote we discussed earlier.
3    Q. Did you, yourself, have any part in drafting
4  this?
5    A. No. I should say it's possible I reviewed, you
6  know, some of the statistics and things in here, but I
7  did not draft this letter.
8    Q. Would the press person in Mr. Dewhurst's office
9  likely have drafted this?
10     MR. SWEETEN: Objection, calls for
11  speculation.
12    A. I really don't know.
13    Q. (By MS. WESTFALL) So you handled photo ID for
14  the Lieutenant Governor, correct?
15    A. I handled the legal and procedural analysis of
16  it, yes.
17    Q. And you testified and identified a press person
18  earlier; is that correct?
19    A. Correct.
20    Q. And the press person in your office, did he
21  usually write all of the substance for all of his press
22  releases or did he rely upon the subject matter experts
23  within the office to assist him with content?
24    A. Well, in this case it would have been a different
25  press person. In '07, again, it would be typical to

### 166

1  have a draft to the extent there were things like
2  statics or procedural history, those things would have
3  been run by a staff person. But it's also not uncommon
4  for Lieutenant Governor to write his own opinions and
5  then have those crafted into a press release format.
6    Q. Do you think in this instance Lieutenant Governor
7  wrote this letter himself because you handled photo ID
8  and you don't recall having drafted this?
9     MR. SWEETEN: Objection, calls for
10  speculation.
11    A. Again, I would never have -- I think it's safe to
12  say that I would never have drafted a press release.
13  I'm not sure if this is a press release or something he
14  sent directly to the Senate or something else. It's
15  addressed to Senate colleagues and it's signed David
16  Dewhurst. That would be an unusual formate for a press
17  release I would think.
18    Q. (By MS. WESTFALL) Do you think that was a leaked
19  letter that Mr. Dewhurst wrote?
20     MR. SWEETEN: Objection, calls for
21  speculation. He's already said he doesn't know.
22    Q. (By MS. WESTFALL) Can you see that in the draft
23  letter referred to that was later corrected that it's
24  referred to on Page 1, that it says in the second
25  paragraph, HB 218 requires voters to present a driver's

### 167

1  license or some other common form of ID at the election
2  polls to prove who they say they are, US citizens. Do
3  you see that sentence?
4    A. I do see that sentence.
5    Q. Can you explain how HB 218 would ensure that
6  people prove they are US citizens at the polls?
7     MR. SWEETEN: Don't reveal your thoughts,
8  your mental impressions, about legislation or in
9  furtherance of the legislative process including Senate
10  Bill 14. Do not reveal conversations you had with
11  Lieutenant Governor Dewhurst. Do not reveal
12  conversations you've had with legislators, legislative
13  staff, state agencies, or Texas Legislative Council.
14    A. Right. Just looking, again, at the face of the
15  bill and as we discussed earlier, I think the intent is
16  to ensure that eligible voters vote and you have to be a
17  US citizen to vote and so I assume that's what this
18  sentence is getting at.
19    Q. (By MS. WESTFALL) I believe you testified
20  earlier that you were not certain of whether the forms
21  of photo ID required by HB 218, in fact, proved that the
22  voter was a citizen; is that right?
23    A. That's what I said, yeah.
24    Q. So is there any way that you can reconcile your
25  understanding of what the forms of photo ID require and

### 168

1  show and prove, versus what you just testified your
2  belief is in terms of the purpose and effect of House
3  Bill 218?
4     MR. SWEETEN: Objection to the question as
5  vague. Objection also to the extent that the question
6  requires or asks you to reveal your thoughts, mental
7  impressions, or opinions about legislation. Okay.
8  Don't reveal communications that you've had with respect
9  to the issue. If you can answer it without doing --
10  without providing matters that are subject to
11  legislative privilege or to the attorney/client
12  privilege, then you can do so.
13    A. I would just say that, I mean, I think this bill
14  would make it more likely that eligible voters only are
15  voting and citizens are the only eligible voters, then
16  it would have -- it would be reflected in what this
17  letter says.
18    Q. (By MS. WESTFALL) And what I'm trying to
19  understand is, can you explain further how you believe
20  HB 218 would further that purpose?
21     MR. SWEETEN: Same objection. Same
22  instructions.
23    A. By requiring additional forms of identification,
24  you are attempting to ensure and, again, not system is
25  perfect. You are attempting to insure that only



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

BRIAN HEBERT

---

### 169

1　eligible voters can vote.  And I think the more -- in my
2　opinion, the more secure you try to make these
3　elections, the less tempted someone who wants to
4　fraudulently vote is -- the less tempted they are to
5　vote or the less able they are to vote.
6　　Q.  But you nevertheless testified earlier that a
7　person's citizenship status is determined at the voter
8　registration stage; is that correct?
9　　　MR. SWEETEN:  You can testify about matters
10　of fact, she asked you that earlier.  You do not testify
11　about your mental impressions, communications that you
12　had, or thoughts and impressions about a specific piece
13　of legislation.  That is legislatively privileged.  So
14　I'm going to instruct you accordingly.  You can answer
15　to the extent you are not revealing matters of
16　privilege.
17　　A.  I also think it's useful to point out that it not
18　just be noncitizens who would be presumably prohibited
19　from voting.  It would be anyone trying to
20　fraudulently -- me trying to vote in a different county,
21　me trying to vote in an election in which I'm not
22　eligible to participate.  So I think the idea here, and
23　my opinion here is, you are putting up some standards
24　and if a fraudulent person wants to try to vote
25　fraudulently, they are going to have to get through

### 170

1　several hurdles or, you know, yes, you have to check a
2　box saying that you're a citizen and then turn that into
3　your County.
4　　As the current law stands, that would be enough
5　for you to vote fraudulently.  If you put in Mickey
6　Mouse, and this was an example, I think, if you wrote
7　Mickey Mouse, yes, I'm a citizen and you get that ID
8　card, that voter registration card, you could vote.
9　This would require you also to get some sort of photo ID
10　with Mickey Mouse on it, which is, again, not a fool
11　proof system and does not prevent every ineligible voter
12　from voting, but I think it raises the bar somewhat of
13　the security of the election.
14　　Q.  (By MS. WESTFALL)  Well, likewise, a voter
15　registration card that has the individuals name and
16　address indicating he or she is a voter, also
17　indicates -- proves identity under the current system;
18　isn't that correct?
19　　　MR. SWEETEN:  Are you asking about current
20　law?
21　　　MS. WESTFALL:  Yes, I'm asking about current
22　law.  Do you understand the question.
23　　A.  Yes.  A voter registration card is a form of
24　identity under the current system and then this bill
25　apparently thinks that's not secure enough.

### 171

1　BY MS. WESTFALL:
2　　Q.  So would HB 218 prevent the following scenario:
3　Noncitizen lies on voter registration application,
4　county official adds that person to the rolls.  That
5　person has a driver's license or another form of photo
6　ID that does not indicate citizenship.  That person goes
7　to the polls, presents the photo ID and votes a regular
8　ballot.  Would HB 218 stop that?
9　　　MR. SWEETEN:  Again --
10　　Q.  (By MS. WESTFALL)  On the basis of the public
11　record, the face of the statute?
12　　　MR. SWEETEN:  Okay.  You can answer with
13　that qualification.
14　　A.  Based on this statute, someone who committed, I
15　think those two or three levels of fraud, potentially
16　could vote and again I think that is a much smaller
17　class of potential fraud than the existing system which
18　is you just have to do first thing, get your card and
19　show up and vote.
20　　Q.  (By MS. WESTFALL)  Does HB 218 solely stop
21　in-person voter impersonation?
22　　　MR. SWEETEN:  When you're answering this
23　question don't --
24　　Q.  (By MS. WESTFALL)  Based on the face of the
25　statute?

### 172

1　　　MR. SWEETEN:  You can answer based on the
2　face of the statute.
3　　A.  I think no bill, including this statute, is able
4　to stop every type of fraud in every type of
5　circumstance.
6　　Q.  (By MS. WESTFALL)  So in answer to my question,
7　yes, it is solely designed to stop in-person
8　impersonation?
9　　　MR. SWEETEN:  Objection, misstates his
10　testimony.
11　　A.  Yeah.  And I think potentially there are other, y
12　ou know, intents here.  I'm just not aware.  I mean, you
13　could argue that this decreases the incidents of
14　fraudulent voter registration.  If people know that they
15　will now have to show an ID when they show up to vote,
16　they may never bother to file a fake registration card
17　in the first place.  So the side effect of this could be
18　fewer fraudulent registrations in addition to fewer
19　fraudulent in-person attempts to vote.
20　　Q.  (By MS. WESTFALL)  Do you think it would deter
21　fraudulent registration even though the IDs, the photo
22　IDs, required in HB 218 do not require a person to be a
23　US citizen to obtain those IDs; is that your testimony?
24　　　MR. SWEETEN:  Don't reveal your thoughts--
25　　　MS. WESTFALL:  Based on the face of the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

173

1    statue --
2        MR. SWEETEN:  -- without legislation.
3    A.  Based on this bill, I don't -- I could read it
4    more closely.  I don't get the intent that it's
5    noncitizens that the bill is worried about.  They're
6    worried about in eligible voters which may be US
7    citizens or Texas citizens, but still in eligible to
8    vote.  I could request a, you know, registration for my
9    roommate.  We may both be citizens, I still can't go
10   vote in his name.
11       Q.  (By MS. WESTFALL)  Isn't eligibility to vote
12   determined at the voter registration stage and not at
13   the point of presenting yourself to vote on election
14   day?
15       MR. SWEETEN:  You're saying under current
16   law?
17       MS. WESTFALL:  Under current law.
18       MR. SWEETEN:  You can answer.
19   A.  The eligibility question is, yes, do I have
20   sufficient -- I still have to when I show up at to vote
21   either show the required proof of registration or some
22   other form of identification, answer whether I'm still
23   living at the same address.  I mean, there's still some
24   interaction with the poll worker there.
25       Q.  That is --

---

174

1        MR. SWEETEN:  We're going to take a break
2    after this question, but go ahead.
3        Q.  (By MS. WESTFALL)  What you just testified about,
4    is it not, is proving who you say you are at the polls
5    on election day; is that correct?
6    A.  I'm sorry.
7        Q.  Proving your identity on election day, those are
8    the --
9        MR. SWEETEN:  Objection.
10       Q.  (By MS. WESTFALL)  That's the scope of the issue
11   that you just defined?
12       MR. SWEETEN:  Objection to the question as
13   vague.
14   A.  I'm not clear what you're asking.  I'm sorry.
15       Q.  (By MS. WESTFALL)  Is there a difference between
16   voter registration and proving your identity at the
17   polls on election day?
18       MR. SWEETEN:  When you're answering that
19   question, don't reveal matters of legislative privilege.
20       MS. WESTFALL:  Based on current law.  Based
21   on the current face of the statute.
22   A.  Under current law those are different processes.
23   BY MS. WESTFALL:
24       Q.  And HB 218 is designed to -- or it does require
25   proof of identification at the polls on election day; is

---

175

1    that right?
2        MR. SWEETEN:  Are you asking about the face
3    of the statute?
4        MS. WESTFALL:  I'm asking about the face of
5    the statute.
6        MR. SWEETEN:  Okay.
7    A.  The bill on its face requires a voter to prevent
8    certain forms -- one of certain forms of acceptable ID.
9    BY MS. WESTFALL:
10       Q.  And HB 218 does not govern or change current law
11   pertaining to how a voter registers to vote; is that
12   correct?
13   A.  Give me a second to double-check.
14       MR. SWEETEN:  You can answer based upon the
15   statute, the face of the statute.
16   A.  In the provisions that state what happens if a
17   voter only has a registration certificate, but in terms
18   of actually getting a voter on the rolls and becoming a
19   registered voter, apparently no.
20       Q.  (By MS. WESTFALL)  Thank you.
21       MR. SWEETEN:  Okay.  We're going to take a
22   quick break.  I don't mean a big long.
23       MS. WESTFALL:  Sure.
24       (Brief recess.)
25   BY MS. WESTFALL:

---

176

1        Q.  We're back on the record.
2        Turning your attention back to Exhibit 3, are you
3    aware that a corrected letter was released after initial
4    letter was released referred to in Exhibit 3?
5    A.  Yes.
6        Q.  How soon was it released?
7    A.  I don't know.
8        Q.  Do you know why it was released?
9    A.  No.
10       Q.  Do you know changes that were made to the letter
11   between the draft that was released and the corrected
12   draft?
13   A.  I don't recall.
14       Q.  Did the Lieutenant Governor at some point come to
15   the conclusion that photo ID would not prevent
16   noncitizen voting?
17       MR. SWEETEN:  Don't answer the question as
18   phrased.  It would require you to reveal matters that
19   are subject to the legislative privilege and potentially
20   attorney/client privilege.
21       Q.  (By MS. WESTFALL)  You going to follow your
22   counsel's instruction?
23   A.  Yes.
24       Q.  Are you aware of any discussions about noncitizen
25   voting that occurred in 2007 involving your office?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 177

1     MR. SWEETEN:  You can answer whether or not
2  there was a discussion.
3     A.  2007 session were noncitizens ever discussed in
4  the context of voter ID?
5     Q.  (By MS. WESTFALL)  Correct.
6     A.  I'm not sure.
7     Q.  Is there a connection between the photo ID bill
8  HB 218, and the growth of noncitizen population in
9  Texas?
10     MR. SWEETEN:  Don't answer the question.  It
11  calls for matters that are subject to the legislative
12  privilege.
13     Q.  (By MS. WESTFALL)  Are you going to follow your
14  counsel's instruction?
15     A.  Yes.
16     Q.  Have you ever heard of such an assertion before?
17     A.  Heard an assertion that voter ID is tied to
18  growth, I don't guess I have, no.
19     MR. SWEETEN:  And when you're answering --
20     Q.  (By MS. WESTFALL)  Did you say you have not?
21     MR. SWEETEN:  He said he has not.  But just
22  so you're clear, don't reveal communications that are
23  nonpublic.  You can reveal a matter of a public
24  communication, but I think your answer is no.
25     Q.  (By MS. WESTFALL)  Are you aware of any public

## 178

1  statements about tying photo ID to noncitizen voting?
2     MR. SWEETEN:  You can answer.
3     A.  No.  I think that's the same question I was
4  answering before.
5     Q.  (By MS. WESTFALL)  Have you heard anyone in
6  either the Governor's office or the Lieutenant
7  Governor's office make any statement connecting photo ID
8  with noncitizen voting?
9     MR. SWEETEN:  Has you ever heard -- can you
10  restate that again because I don't know if we're talking
11  about a public statement as phrased or if you're talking
12  about communications.
13     (Requested question was read.)
14     MR. SWEETEN:  Don't reveal communications
15  you've had with members of the Lieutenant Governor's
16  staff.  Those would be attorney/client privileged.
17  Don't reveal matters of legislative privilege to the
18  extent that you can answer based upon the public record
19  or public statement, you can go ahead and do so.
20     A.  So did anyone in the Governor's or Lieutenant
21  Governor's office publicly or privately mention
22  noncitizens and photo ID; is that the question?
23     Q.  (By MS. WESTFALL)  Yes.
24     MR. SWEETEN:  And my instruction is don't
25  reveal any nonpublic statements with respect to that.

## 179

1     A.  I cannot remember specific references.
2     Q.  (By MS. WESTFALL)  Can you remember any
3  references?
4     MR. SWEETEN:  Same instruction.
5     A.  Right.  I mean, again, I think to the extent I'm
6  aware of noncitizens it was in the context of a
7  discussion about ineligible voters and noncitizens would
8  be part of a class of eligible voters.
9     Q.  (By MS. WESTFALL)  And beyond the testimony that
10  you gave earlier today, is there anything in addition
11  that you remember on that topic in terms of
12  conversations?
13     MR. SWEETEN:  Don't reveal communication
14  that you've had with legislatures, legislative staff,
15  Lieutenant Governor, State agencies, Texas Legislative
16  Council.
17     A.  No.
18     Q.  (By MS. WESTFALL)  Are you familiar with the
19  Crawford supreme court decision?
20     A.  Yes.
21     Q.  Did you read it when it was issued in 2008?
22     A.  Almost certainly.
23     Q.  Did you at that time believe that it impacted the
24  ability of States to craft photo ID laws?
25     MR. SWEETEN:  Don't provide your mental

## 180

1  impressions at the time.  Those are matters of
2  legislative privilege.  You don't have to reveal those.
3     Q.  (By MS. WESTFALL)  Can you answer or can you not
4  answer?
5     MR. SWEETEN:  My instruction about
6  legislative privilege applies.
7     A.  Yeah.  I think, I don't have an answer based on
8  privilege.
9     Q.  (By MS. WESTFALL)  Did you believe that the
10  Crawford decision impacted the ability of states covered
11  by Section 5 of the Voting Rights Act to obtain
12  preclearance under Section 5?
13     MR. SWEETEN:  Don't answer the question.
14  That requires you to reveal matters that are subject to
15  the legislative privilege.
16     MS. WESTFALL:  Are you instructing him not
17  to answer at all.
18     MR. SWEETEN:  I am.  Unless, except to the
19  extent that you can refer to matters of the public
20  record.
21  BY MS. WESTFALL:
22     Q.  Are you following your counsel's advice?
23     A.  Yes.
24     Q.  Are you aware of any communications between the
25  Lieutenant Governor's office and officials in Indiana



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 181

1  regarding this photo ID law?
2      MR. SWEETEN:  You can answer whether or not
3  you're aware of communication.
4      A.  Between Lieutenant Governor's office and Indiana,
5  I believe that in the '09 and '11 sessions public
6  testimony was given by representatives from Indiana.
7      Q.  (By MS. WESTFALL)  And is that -- are those the
8  only communications you can testify about today?
9      A.  Yes.
10     Q.  Are you asserting privilege over other
11 communications that you had with -- you're aware of
12 between Lieutenant Governor's office and Indiana
13 election officials?
14     A.  Yes.
15     Q.  Are you aware of any communications between
16 Lieutenant Governor's office and Indiana officials
17 regarding the Crawford decision?
18     A.  No.
19     Q.  Are you aware of any written communications
20 between the Lieutenant Governor's office and Indiana
21 officials regarding its photo ID law or the Crawford
22 decision?
23     MR. SWEETEN:  You can answer if you're aware
24 of such communications.
25     A.  I believe, yes.

---

### 182

1      Q.  (By MS. WESTFALL)  What communication are you
2  aware of?
3      MR. SWEETEN:  Don't reveal the substance of
4  the communication.
5      Q.  (By MS. WESTFALL)  When did it occur?
6      MR. SWEETEN:  You can answer.
7      A.  I think it would have been just prior to their
8  public testimony.
9      Q.  (By MS. WESTFALL)  Who was the communication
10 between?
11     MR. SWEETEN:  You can answer.
12     A.  Again, I think -- I think it would have been
13 between the person who went up to publically testify in
14 each case.
15     Q.  (By MS. WESTFALL)  How do you know about this
16 communication?
17     A.  My memory is that I was included in
18 correspondence leading up to that testimony.
19     Q.  And so this correspondence that you were copied
20 on involving Indiana officials before the testimony on
21 the 2009 bill?
22     A.  I think that's right.  Yes.
23     Q.  Who in the legislature was communicating with the
24 Indiana officials?
25     MR. SWEETEN:  You can answer if you know the

---

### 183

1  person that was communicating.
2      A.  My memory is that it would have been Senator
3  Fraser and his staff arranging for witnesses for their
4  bill.
5      Q.  (By MS. WESTFALL)  Are you aware of any other
6  such communications with Indiana officials?
7      A.  No.
8      Q.  Are you aware of any communications between the
9  Lieutenant Governor's office and the officials in
10 Indiana regarding the burden imposed upon Indiana voters
11 by the photo ID law?
12     MR. SWEETEN:  Objection.  You're asking the
13 substance of the communication.  If you want to ask
14 about whether communications occurred that's fine, but
15 this is loaded with information about what the
16 conversations pertained to, so I'm going to instruct you
17 as phrased not to answer the question.
18     Q.  (By MS. WESTFALL)  Are you following the advice
19 of council.
20     A.  Yes.
21     Q.  Was a photo ID bill filed in the Senate in 2009?
22     MR. SWEETEN:  You can answer.
23     A.  Yes.
24     MS. WESTFALL:  Mr. Sweeten, are you going to
25 be instructing him yes, no, yes, no for every question

---

### 184

1  moving forward?  Is that how it's going to go?  Does he
2  need that level of advice because it's going to burn up
3  a lot of time and kind of interrupt the flow.
4      MR. SWEETEN:  Well, I'm not trying to
5  interrupt the flow.  I'm trying to be clear on --
6  because we're asserting privilege on many of these
7  questions that you know that I have been asserting
8  privilege to and you keep bringing up.  So I will try to
9  rein that in, but I want to make it clear that you keep
10 treading into areas that you well know that I've been
11 asserting privilege on.  And so to the extent you keep
12 doing that, I'm going to have to continue to impose this
13 objection.  But with that, you can go ahead and answer.
14 BY MS. WESTFALL:
15     Q.  So, yes, a photo ID bill was filed in the Senate
16 in 2009?
17     A.  I believe, yes.
18     Q.  Do you recall the number?
19     A.  No.
20     Q.  Could you mark this US 29?
21     (Exhibit No. 29 was marked.)
22     Q.  (By MS. WESTFALL)  You've been handed what's been
23 previously marked as US 29, do you recognize this
24 document?
25     A.  It's Senate Bill 362 from the 2009 session.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 185 | 187 |
|---|---|

**185**

1     Q. Who authored this bill?

2     A. Senators Fraser, Estes, Nelson, and Nichols.

3     Q. Could you please review this bill, particularly

4 the forms of allowable ID and let me know when you've

5 had a chance to do so.

6     A. Okay.

7     Q. What forms of ID are allowable under Senate Bill

8 362.

9         MR. SWEETEN: You're asking on the Texas

10 statute.

11         MS. WESTFALL: On the Texas statute.

12         MR. SWEETEN: I'll let you answer.

13     A. On Section 630101 it lists a driver's license or

14 ID card issued by DPS, military ID citizenship

15 certificate with a photograph, passport, concealed

16 handgun license, photo ID issued by the federal

17 government or a State entity. And then there's a list

18 of non-photo IDs.

19 BY MS. WESTFALL:

20     Q. Can you compare Senate Bill 362 with House Bill

21 218 and let me know whether there are changes in the

22 forms of allowable ID based on the Texas bill?

23         MR. SWEETEN: That's fine. I'm going to

24 allow him to compare the text of the bill, but as far as

25 whys or mental impressions about those differences, he

**186**

1 won't answer those questions. As those matters are

2 legislatively privileged.

3     A. It looks like 362 does not include employee

4 identification card as a photo?

5     Q. (By MS. WESTFALL) Yes. Anything else?

6     A. I'm looking. Looks like they're otherwise the

7 same.

8     Q. Do you recall earlier you testified that student

9 IDs were included in HB 218; is that right?

10     A. Yes.

11     Q. Does it appear that they -- in Senate Bill 362

12 they are not expressly provided for?

13     A. I do not see it on the list.

14     Q. Would you construe valid ID cards issued by

15 agency institution or local subdivision of the State,

16 any of that language to include State college and

17 university issued IDs or no?

18     A. In looking at the face of the bill, an agency

19 institution or subdivision of the state, arguably could

20 include state universities.

21     Q. I believe you testified that Senate Bill 326 also

22 includes the use of two forms of non-photo ID; is this

23 right?

24     A. Yes. Subsection B.

25     Q. Was photo ID a part of the Lieutenant Governor's

**187**

1 legislative agenda for 2009?

2         MR. SWEETEN: You can reveal matters that

3 are public or on the public record as to his legislative

4 agenda. Don't reveal conversations you've had with the

5 other enumerated individuals or entities we talked

6 about.

7     A. I don't recall if it was part of some sort of

8 public pronouncement of his priorities.

9     Q. (By MS. WESTFALL) And you handled his State

10 Affairs Committee issues in 2009; is that correct?

11     A. Correct.

12     Q. And you testified earlier that subject matter

13 experts within the office who handled issues would

14 contribute to the Lieutenant Governor's agenda; did you

15 not?

16     A. Yes. We would be asked are those some of the

17 things that we should be talking about this session.

18     Q. Do you recall having recommended or -- strike

19 that.

20     Do you recall any conversations about inclusion

21 of photo ID in the Lieutenant Governor's agenda for

22 2009?

23         MR. SWEETEN: Don't reveal any conversations

24 that you had with the Lieutenant Governor or the

25 legislatures.

**188**

1     A. I don't recall.

2     Q. (By MS. WESTFALL) Are you -- is this based on --

3 in part on advice of council?

4     A. Yes.

5     Q. Were you or anyone in the Lieutenant Governor's

6 office involved in the development or drafting of Senate

7 Bill 362?

8         MR. SWEETEN: Objection. The question is

9 vague. As you're answering the question be mindful that

10 the legislative privilege prohibits you -- or the scope

11 of the privilege does not require you to reveal

12 thoughts, mental impressions, about a bill or

13 conversations you had with respect to that. So you can

14 answer the question to the extent you're not revealing

15 matters of legislative privilege.

16     A. So the question was, was the Lieutenant

17 Governor's staff involved in the drafting of Senate Bill

18 326.

19     Q. (By MS. WESTFALL) Or the development?

20         MR. SWEETEN: Objection compound. Same

21 instruction.

22     A. Yes.

23     Q. (By MS. WESTFALL) Who was involved in the

24 development or drafting of Senate Bill 362?

25         MR. SWEETEN: Objection, compound.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

BRIAN HEBERT                                                MAY 29, 2012

---

189

1     A. Myself.
2     Q. (By MS. WESTFALL) Can you think of anyone else
3  or was it solely you?
4     A. I'm the only one I know for sure. Me is the only
5  answer I can say yes. It's possible other people were.
6     Q. Can you identify the time -- strike that.
7        Was there -- were there any conversations about
8  the development or drafting of the Senate Bill 362?
9        MR. SWEETEN: Objection, compound. You can
10  answer whether or not a communication -- such
11  communication occurred. Do not reveal the substance of
12  any communications.
13     A. Yes.
14     Q. (By MS. WESTFALL) When did the first
15  conversation occur?
16     A. I don't recall the first conversation.
17     Q. Did it occur sometime shortly after House Bill
18  218 failed to pass?
19     A. I don't recall.
20     Q. Who else was involved in that conversation?
21        MR. SWEETEN: You can answer.
22     A. I'm sure I would have talked about this generally
23  with our policy director and chief of staff so Julia
24  Rathgeber, Blaine Brunson.
25     Q. (By MS. WESTFALL) Do you recall what year it

---

190

1  occurred in?
2     A. It was supposed to be '09 session it probably
3  would have been '08.
4     Q. Do you think it was in the second half of the
5  year?
6     A. I don't recall. I can't remember. There may
7  have been an interim charge in the '07, '08 year that
8  addressed these issues that may have come up in that
9  context.
10     Q. Were you primarily responsible for developing
11  Senate bill 362?
12        MR. SWEETEN: In answering that question
13  don't reveal your thoughts, mental processes, your
14  conversations that you've had with individuals in
15  answering that question. I'm also going to object to
16  the question as vague.
17     A. No. I was not primarily responsible for
18  developing the draft the bill.
19     Q. (By MS. WESTFALL) Was the Legislative Council
20  also involved in drafting the bill?
21     A. I don't recall. Usually there would be a number
22  or letter at the bottom here if it was a formal
23  council -- was it a council draft. I don't know what
24  version this was. It could be that -- I'm almost
25  certain that Legislative Council would have been

---

191

1  involved at some point, in some draft or amendment, but
2  I'm not sure.
3     Q. Was Senator Fraser's staff involved in the
4  drafting of Senate Bill 362?
5     A. Yes.
6        MR. SWEETEN: Objection, vague.
7     Q. (By MS. WESTFALL) Was that Janice McCoy?
8     A. Yes.
9     Q. Were any other staff or Senators involved in the
10  drafting of Senate Bill 362?
11        MR. SWEETEN: You can answer if they were
12  involved in the drafting. Don't reveal the specific
13  communications you had.
14     A. It could be that possibly Ginger Fagan is a
15  lawyer I trust, but is also someone from the State
16  Affairs Committee.
17     Q. Anyone else?
18     A. I can't recall names. Again, I'm sure I
19  discussed this with lots of people around the capital,
20  but I don't have a list.
21     Q. Senator --
22     A. Sorry. If your question is development of the
23  draft, I think that's probably the list.
24     Q. Thank you for your testimony.
25        Senator Fraser testified that in essence, he

---

192

1  testified in a deposition in this case. In essence he
2  took House Bill 218 and filed it in the following
3  session more or less the same. Do you agree with that
4  assessment?
5     A. Do I agree that 218 is essentially the same as
6  Senate Bill -- House Bill 218 is the same as Senate Bill
7  362?
8     Q. Yes, that's part of the question. Based on the
9  face of the statute?
10        MR. SWEETEN: You can answers.
11     A. Looking at them now there are some similarities.
12  And it looks like, I mean, starting with the very first
13  page there are also some differences. I mean, but
14  they're substantially similar I suppose. They're both
15  proof of identification.
16     Q. And is it true that Senator Fraser was the one
17  who re-crafted the bill or would you say that you played
18  more of a role?
19        MR. SWEETEN: Objection to the term
20  re-crafted, vague. Are you talking about the text --
21  who filed the -- I mean, you can answer as to that if
22  you know.
23     A. I cannot recall how much specific input I had on
24  this draft of this bill.
25     Q. (By MS. WESTFALL) On this bill?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 193

1     A. Correct.
2     Q. 362?  But it essentially was developed and
3  created by yourself, Ms. McCoy, and Ms. Fagan; is that
4  correct?
5     A. I think I would say it was developed.
6     MR. SWEETEN:  Hold on a minute.  The term
7  developed -- do not answer a question as to the mental
8  impression, thoughts that occurred with respect to the
9  legislative the conversations that you've had with these
10 individuals.  So to the extent that she's asking you
11 whether conversations occurred you can answer.  To the
12 extent she's asking about whether someone did a draft
13 you can answer, but don't talk about the matters that be
14 covered by legislative privilege.
15    Q. (By MS. WESTFALL)  Can you answer my question?
16    A. I'll exercise my privilege.
17    Q. Other than House Bill 218, are you aware of any
18 other sources of legislative language or -- I guess
19 legislative language that provided the basis of Senate
20 Bill 362?
21    MR. SWEETEN:  In answering the question
22 don't reveal thoughts, mental impressions, or opinions
23 about legislation or furtherance of the legislative
24 process.  You can answer to the extent that you can do
25 so without revealing.

### 194

1     A. I don't recall and/or don't know the source of
2  all the language in 362.
3     Q. (By MS. WESTFALL)  Are you aware of any
4  conversations concerning any other additional forms of
5  ID that were contemplated with regard to Senate Bill
6  362?
7     MR. SWEETEN:  You can answer whether or not
8  a communication occurred.
9     A. Yes, communications occurred about forms of ID.
10    Q. (By MS. WESTFALL)  How many such conversations
11 occurred?
12    MR. SWEETEN:  You can answer.
13    A. I think it was an ongoing part of the bill.
14 Several.
15    Q. (By MS. WESTFALL)  Were they between you and
16 Ms. Fagan and Ms. McCoy?
17    A. Probably.
18    Q. Are you aware of any conversations involving
19 Mr. Dewhurst on that topic?
20    MR. SWEETEN:  You can reveal whether a
21 conversation occurred.  Don't reveal the substance of
22 the conversation.
23    A. So 2009 was Governor Dewhurst involved in any
24 discussions about the forms of identification?
25    Q. (By MS. WESTFALL)  Correct.

### 195

1     A. I don't recall.
2     Q. Would anyone else know the answer to that
3  question?
4     MR. SWEETEN:  Objection, calls for
5  speculation.
6     Q. (By MS. WESTFALL)  You may answer it?
7     A. As I said before, the chief of staff and the
8  policy director would possibly have had -- I didn't have
9  that conversation.
10    Q. And Mr. Dewhurst himself would certainly know
11 whether he was involved in those conversations, would he
12 not?
13    A. I don't know.  I guess.
14    Q. Are you aware of any conversations concerning the
15 analysis of the impact of Senate bill 362 on minority
16 voters?
17    MR. SWEETEN:  Don't answer the question.
18 The question -- the preface of the question asks for the
19 particular subject matter.  So as phrased I'm going to
20 object that it calls for matters that are subject to
21 legislative privilege and instruct not to answer.
22    Q. (By MS. WESTFALL)  Are you going to follow the
23 advice of council?
24    A. Yes.
25    Q. If Senate Bill 362 had been passed, which it

### 196

1  wasn't, correct?
2     A. Correct.
3     Q. It would have been subject to the requirements of
4  Section 5, right?
5     A. Correct.
6     Q. Are you aware of any conversations involving
7  staff being directed not to conduct analysis of the
8  impact of Senate Bill 362 on minority voters?
9     MR. SWEETEN:  Don't answer the question.
10 The question assumes the subject matter and it's calling
11 for matters that are subject to the legislative
12 privilege.  You can reveal if you had conversations
13 about general subject matter and with whom the
14 conversations occurred and approximately when and the
15 means.
16    Q. (By MS. WESTFALL)  Do you have any testimony?
17    MR. SWEETEN:  But as phrased she's asking
18 for the subject matter of the conversations, so my
19 instruction would be not to answer the question as
20 phrased.
21    Q. (By MS. WESTFALL)  Based on advice of council --
22    A. Correct.
23    Q. -- you are asserting your privilege?
24    Okay.  Are you familiar with the concept of
25 Spanish surname voter registration?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

197

1       MR. SWEETEN:  If answering the question
2   would require you to reveal your thoughts, mental
3   impressions, opinions, about legislation or discussions
4   you've had about legislation, the legislators, Governor
5   Dewhurst, with other members of the Lieutenant
6   Governor's office, legislative staff, State agencies or
7   Texas Legislative Council.  Do not reveal those as those
8   are legislatively privileged.
9       A.  I'm just generally aware of it from redistricting
10  conversations and other matters.
11      Q.  (By MS. WESTFALL)  Did you hear about any
12  conversations related to an analysis of whether Spanish
13  surname voter registrations were more or less likely to
14  have the necessary photo ID under Senate Bill 362?
15      MR. SWEETEN:  Don't answer the question.  It
16  calls for matters that are subject to legislative
17  privilege.  If Council wants to rephrase it as to
18  conversations that are not in that particular, I will
19  allow him to answer.
20      Q.  (By MS. WESTFALL)  Are you following the advice
21  of council?
22      A.  Yes.
23      Q.  Are you aware of any conversations related to
24  Spanish surname voter registration and Senate Bill 362?
25      MR. SWEETEN:  I'll let you answer the

---

198

1   question as phrased.  Don't reveal the substance of the
2   conversation.
3       A.  I don't recall.
4       Q.  (By MS. WESTFALL)  Were you in touch with Janice
5   McCoy on a near daily basis during consideration of
6   Senate Bill 362?
7       A.  Probably.
8       Q.  Outside of the communications between Lieutenant
9   Governor's office and Senate Fraser's office that you
10  just testified to, to which Jennifer Fagan may have been
11  a party, are you aware of any other communications
12  regarding the development with drafting Senate Bill 362?
13      MR. SWEETEN:  Objection, as vague, compound,
14  assumes facts not in evidence.
15      Q.  (By MS. WESTFALL)  You may answer.
16      A.  Yeah.
17      MR. SWEETEN:  Don't reveal the substance of
18  conversations, those would be matters of legislative
19  privilege.  If she's asking you about conversations you
20  can answer it to the extent you can.
21      A.  I don't have any firsthand knowledge of what
22  other people were talking about.
23      Q.  (By MS. WESTFALL)  I wasn't asking about the
24  substance of the communication.  I was asking about your
25  knowledge of the existence of the communication and then

---

199

1   your council made an objection which created a different
2   question that is different from what I just asked.  So
3   I'm going to re-ask the question if it's okay.
4       Outside of communications between the Lieutenant
5   Governor's office and Senator Fraser's office, are you
6   aware of the existence of any other communication's
7   regarding the development or drafting of Senate Bill
8   362?
9       MR. SWEETEN:  Objection, compound.  You can
10  answer.
11      A.  I'm not aware of it.
12      Q.  (By MS. WESTFALL)  In your opinion, based on your
13  experience handling election law bills and drafting,
14  being a lawyer as you testified earlier today, sitting
15  here today after Crawford, do you believe that States
16  covered by Section 5 of the Voting Rights Act need not
17  conduct an analysis of the impact of photo voter ID laws
18  on minority voters.
19      MR. SWEETEN:  You're asking him to reveal
20  his thoughts, mental impressions, opinions, about
21  legislation.  I'm going to instruct you not to answer.
22  That matter is subject to legislative privilege.
23      Q.  (By MS. WESTFALL)  Are you going to follow the
24  advice of council?
25      A.  Yes.

---

200

1       Q.  What was the purpose or purposes of Senate Bill
2   362?
3       A.  This bill, like the ones that you've shown me
4   before, are intended to improve the integrity of the
5   election system in Texas and instill confidence in the
6   electoral.
7       Q.  So improve integrity of the elections and the
8   second one was instill confidence?
9       A.  Correct.
10      Q.  Anything else?
11      A.  Again, any -- I suppose any given sponsor of a
12  bill and amendment could have a different purpose or
13  intent.
14      Q.  But those are your understandings of the purposes
15  sitting here today; is that correct?
16      A.  Yes.
17      Q.  Senator Fraser testified in deposition in this
18  case that before he filed Senate Bill 362 he gave notice
19  to the Lieutenant Governor; is that accurate?
20      A.  He gave notice --
21      Q.  That he was going to file; is that correct?
22      A.  I don't recall.
23      Q.  Are you aware of such communication?
24      MR. SWEETEN:  Objection, asked and answered.
25      A.  No.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 201

1    Q. (By MS. WESTFALL) Senator Fraser also testified
2  at deposition that he had an in-person meeting with
3  Mr. Dewhurst in his office regarding allowing non-photo
4  ID in Senate Bill 362. Are you aware of that meeting?
5        MR. SWEETEN: Objection, assumes facts not
6  in evidence. You can answer.
7    A. I don't recall a meeting. I guess I'm not aware
8  of a meeting.
9    Q. (By MS. WESTFALL) And you were the person who
10  was developing and drafting the bill as you testified
11  to, correct?
12        MR. SWEETEN: Objection to the form.
13  Objection, compound. You can answer.
14    A. I was a person.
15    Q. (By MS. WESTFALL) Was Senate Bill 362, was it's
16  purpose to in terms of improving the integrity of
17  elections, did that relate to in-person voter
18  impersonation?
19        MR. SWEETEN: You can testify as to the
20  purpose of the legislation. Other than that, don't
21  reveal matters that are subject to legislative privilege
22  including your thoughts, mental impressions, about
23  legislation.
24    A. Again, looking at the draft, certainly whether or
25  not a person has an acceptable ID when they show up to

## 202

1  vote is part of that bill.
2    Q. (By MS. WESTFALL) And that would be targeted
3  towards in-person voter impersonation, correct?
4        MR. SWEETEN: Objection, asked and answered.
5  Objection, to the extent it asks him to reveal matters
6  that are subject to legislative privilege which includes
7  mental impressions or opinions about the conversation.
8    Q. (By MS. WESTFALL) Based on the face of this
9  statute?
10    A. Right. It says a voter who when offering to vote
11  presents documentation, et cetera, et cetera, so, yes.
12    Q. And to clarify your testimony, Senate Bill 362
13  was targeted towards ensuring that in-person voter
14  impersonation would not occur; is that right?
15        MR. SWEETEN: Objection, asked and answered.
16  Objection, to the extent that you're asking him to go
17  beyond the purpose. He's expressed what the purpose is.
18  You're asking matters that are subject to legislative
19  privilege.
20    A. Again, the document on its face in-person voter
21  fraud is part of what it appears to be designed to
22  combat.
23    Q. (By MS. WESTFALL) How would Senate Bill 362
24  preserve the integrity of elections in any other way
25  than deterring in-person voter impersonation?

## 203

1        MR. SWEETEN: Don't reveal.
2
3    Q. (By MS. WESTFALL) Based on the face of the
4  statute?
5        MR. SWEETEN: Okay. I'm going to let you
6  answer based upon the text of the statute. When
7  answering, do not reveal your thoughts, mental
8  impressions about legislation or furtherance of the
9  legislation process or communications that you've had
10  that I've already previously enumerated, okay?
11    A. The Bill 362 adds a level of security to the
12  voting process and presumably a level of security makes
13  people feel more secure.
14    Q. (By MS. WESTFALL) Okay. But in terms of the
15  type of harm that it's targeting, based on the face of
16  the statute, it's not mail inverter fraud of mail in
17  ballots; is that right?
18        MR. SWEETEN: You can limit your answer to
19  what is on the text of the statute. Do not reveal your
20  mental impressions or thoughts about legislation in
21  doing so.
22    A. Right. This bill in front of me does not address
23  mail in ballots. Without me looking at it one more
24  time.
25    Q. (By MS. WESTFALL) And it does not address fraud

## 204

1  that might occur at the voter registration stage; is
2  that correct?
3        MR. SWEETEN: Same instruction. Same
4  objection.
5    A. This Bill 362 does not directly address, doesn't
6  appear to.
7    Q. (By MS. WESTFALL) What is the basis for your
8  testimony that you believe it would deter people from
9  fraudulently registering to vote?
10        MR. SWEETEN: In answering the question,
11  don't reveal your thoughts, your mental impressions,
12  your opinions about the legislation. I've let you
13  answer as to the purpose of it. I think that that can
14  be answered, but don't reveal your thoughts, mental
15  impressions, or communications that we've discussed
16  earlier.
17    A. So the question is what is -- how does 362 --
18    Q. (By MS. WESTFALL) Deter --
19    A. -- deter fraudulent conduct?
20    Q. I believe you testified earlier that you
21  were of the view that one of the purposes of HB 218
22  would be to deter fraudulent voter registration; is that
23  correct?
24    A. I believe so.
25    Q. And would you testify that with regard to SB 362,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 205

1    that it would likewise deter fraudulent voter
2    registration?
3        MR. SWEETEN:  Same objection and
4    instruction.
5        A.  Sure.  Just looking at the draft, I think it has
6    that potential.
7        Q.  (By MS. WESTFALL)  What's the basis for you
8    saying that based on the statute?
9        MR. SWEETEN:  You can testify --
10       Q.  (By MS. WESTFALL)  And the structure of the
11   election code?
12       MR. SWEETEN:  You can testify as to the
13   specific text of the Bill.  Do not reveal your thoughts,
14   mental impressions, or opinions about legislation that
15   is legislatively privileged.  You've asserted your
16   privilege and that would be beyond the bounds of that
17   privilege.
18       A.  So what is the question.
19       Q.  (By MS. WESTFALL)  I was just asking based on
20   your understanding of the election code and Senate Bill
21   362, how Senate Bill 362 would deter fraudulent voter
22   registration?
23       MR. SWEETEN:  Same instruction as to
24   legislative privilege, objection.
25       A.  I just think generally this Bill appears to deter

## 206

1    fraudulent activity and if it requires a person to
2    commit several forms of fraud, maybe that makes it less
3    likely that a fraud will occur.
4        Q.  (By MS. WESTFALL)  Do you have any further
5    testimony or explanation as to the basis of your
6    conclusion?
7        A.  No.
8        Q.  That Senate Bill 362 would deter fraudulent voter
9    registration, other than what you just testified to?
10       A.  No.
11       Q.  And I believe that you testified that Senate Bill
12   362 would make the system more secure; is that correct?
13       MR. SWEETEN:  Don't -- I object based on
14   legislative privilege.  Don't reveal your thoughts,
15   mental impressions, opinions about the legislation.
16   It's legislatively privileged.  Or the communications
17   that you had with the enumerated entities or individuals
18   we've been discussing.
19       Q.  (By MS. WESTFALL)  Do you have any testimony in
20   response to my question?
21       A.  No.
22       Q.  Are you following your counsel's advice on
23   privilege?
24       A.  Yes.
25       Q.  Would showing two forms of non-photo ID make the

## 207

1    system more secure?
2        MR. SWEETEN:  Same objection, same
3    instruction.
4        Q.  (By MS. WESTFALL)  Do you have any testimony?
5        A.  No.
6        Q.  Are you aware of any conversations about two
7    forms of non-photo ID making the system more secure?
8        A.  Two forms of --
9        Q.  Non-photo ID.
10       A.  -- non-photo ID making it more secure?
11       Q.  Yes?
12       A.  More secure than what.
13       Q.  The status quo?
14       MR. SWEETEN:  You can testify as to a
15   general description of subject matter of a conversation,
16   whether conversations occurred.  Don't reveal any
17   substance of communications.
18       A.  Yes.
19       Q.  (By MS. WESTFALL)  When did that conversation
20   occur?
21       A.  I think it would have been simultaneous with the
22   development of this draft, this bill.
23       Q.  Is this the conversation you already testified to
24   previously?
25       A.  Maybe?  Which conversation?

## 208

1    Q.  Without discussing the subject matter it's hard
2    for me to refer to previous testimony that you've given,
3    but when did this conversation occur?
4    A.  It would have been, again, probably 2008, 2009.
5    Q.  Were you a party to the conversation?
6    A.  I was party to conversations, yes.
7    Q.  And who else was a party to the conversation?
8    A.  Probably Janice McCoy, possibly Julia Rathgeber,
9    possibly Senator Fraser.
10   Q.  Was Mr. Dewhurst a party to any of these
11   conversations?
12   A.  Not that I recall.
13   Q.  How many conversations did you have involving the
14   use of non-photo ID?
15       MR. SWEETEN:  You can answer.
16   A.  In 2009.  Some, I think -- some.
17   Q.  (By MS. WESTFALL)  Were these conversations in
18   person?
19   A.  I think, probably, yes.
20   Q.  Were any of these in writing?
21   A.  Not that I recall.
22   Q.  Was there any e-mail on this topic in 2008 or '9?
23   A.  There might have been, but I don't recall.
24   Q.  Would it have been between you and Ms. McCoy?
25   A.  Probably.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 209

1  Q.  Do you recall any communications with legislators
2  who opposed Senate Bill 362?
3  A.  In 2009 on Senate Bill 362?  I can't recall.
4  Q.  Would you have been at those meetings had the
5  been held since you were the staff person who handled
6  the bill?
7          MR. SWEETEN:  Objection, calls for
8  speculation.
9  A.  I don't know if I would have been at every
10 meeting.
11 Q.  (By MS. WESTFALL)  Would you have generally have
12 had a sense in your role as a deputy general counsel for
13 the Lieutenant Governor -- when you handled the bill,
14 would you generally know about meetings with opponents,
15 with supporter, et cetera, to inform you of how to craft
16 the bill to respond to those concerns of supporters?
17        MR. SWEETEN:  Objection, the question is
18 vague.  Objection, form.
19 A.  I can't say that I was aware of every meeting
20 about Senate Bill 362.
21 Q.  (By MS. WESTFALL)  Do you think you were aware of
22 most of the meetings --
23        MR. SWEETEN:  Objection, alls for
24 speculation.
25 Q.  (By MS. WESTFALL) -- that Lieutenant Governor had

## 210

1  regarding that subject?
2          MR. SWEETEN:  Objection, calls for
3  speculation.
4  A.  I don't know.
5  Q.  (By MS. WESTFALL)  Was it your impression that
6  you were kept in the dark as you were drafting Senate
7  Bill 362 about communications about the very topic
8  that -- and very bill that you were drafting?
9          MR. SWEETEN:  Objection, speculation.
10 Objection, argumentative.  Go ahead.
11 Q.  (By MS. WESTFALL)  You may answer.
12 A.  Again, I was a person working on the draft.
13 Q.  I believe your testimony earlier was that you
14 were -- the Lieutenant Governor's office you were the
15 central person, the main person?
16 A.  Correct.  And he's not a sponsor.
17 Q.  He's not a sponsor, but you were the one handling
18 it for the Lieutenant Governor's office, right?
19 A.  Correct.
20 Q.  Who were the main opponents to Senate Bill 362?
21 A.  I would have to go back and look at the record of
22 the hearing.
23 Q.  Can you not think of any opponents to the bill
24 right now, either within the legislature or outside?
25 A.  Sure.  Senator --

## 211

1          MR. SWEETEN:  Hold on a minute.  When you're
2  answering the question don't reveal communications you
3  had with Senators or legislators or legislative staff.
4  So to the extent you can refer to matters of the public
5  record, do not reveal those matters, you can do to so.
6  A.  My memory from the Committee hearing is that
7  Senator Van de Putte, Senator West, Senator Gallegos,
8  Senator Watson, opposed the bill and there may have been
9  others.
10 Q.  (By MS. WESTFALL)  Can you identify based on your
11 review of Senate Bill 362, any parts of the bill that
12 were changed in response to those concerns by the bills
13 opponents?
14        MR. SWEETEN:  That question asks you to
15 reveal matters that are legislatively privileged,
16 specifically it requires you to reveal thoughts, mental
17 impressions about legislation.  It also would ask you to
18 reveal communications between legislatures, legislative
19 staff, State agencies, Texas Leg. Council, so you can
20 answer as to matters of the public record, but do not
21 answer to the extent that it would invade legislative
22 privilege.
23 A.  Right.  I don't recall from the public record if
24 there were amendments or specific debate that resulted
25 in changes.

## 212

1  Q.  (By MS. WESTFALL)  And are you following the
2  advice of council in part in that answer?
3  A.  Yes.
4  Q.  Did the Lieutenant Governor's office play a role
5  in attempting to secure passage of Senate Bill 362 in
6  the Senate?
7          MR. SWEETEN:  Objection, that calls for
8  legislatively privileged unless it's asking for matters
9  on the public record which you can answer.
10 A.  Did Lieutenant Governor attempt to secure passage
11 of SB 362?
12 Q.  (By MS. WESTFALL)  Yes.
13        MR. SWEETEN:  Don't reveal matters of
14 privilege.
15 Q.  (By MS. WESTFALL)  Do you have any testimony in
16 response?
17 A.  No.
18 Q.  Are you relying upon your counsel's advice?
19 A.  Yes.
20 Q.  Could you mark this as US 76?
21        (Exhibit No. 76 was marked.)
22 Q.  (By MS. WESTFALL)  I'm handing you what has been
23 marked as US 76.  Do you recognize this document?
24        MR. SWEETEN:  Do I have a copy of that?
25 A.  Looks like a Dallas morning news article about

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com


ESQUIRE
DEPOSITION SOLUTIONS

213

1    photo ID, early in session.
2        Q.  (By MS. WESTFALL)  Have you seen this document
3    before?
4        A.  I may have read it, but I don't recall.
5        Q.  Can you take a look at it, just a few paragraphs
6    in where it quotes the Lieutenant Governor?
7        A.  Okay.
8        Q.  Have you had a chance to review it?
9        A.  Uh-huh.
10       Q.  Could you describe what this article is
11   concerning?
12       A.  It's beginning of session and it talks about how
13   voter ID might cause some disagreement in the Senate.
14       Q.  And it refers to the so-called two-thirds rule;
15   is that right?
16       A.  Yes.
17       Q.  Can you describe the controversy surrounding the
18   two-thirds rule in 2009?
19       MR. SWEETEN:  You can describe matters of
20   public record, don't reveal any communications that
21   you've had with legislatures or legislative staff or
22   reveal your thoughts, mental impressions, opinions about
23   legislation in answering.
24       A.  Right.  I mean, I think, looking at the article
25   some bills come to the floor or maybe most bills come to

214

1    the Senate floor, again, if only -- only if two-thirds
2    of the Senate agrees to consider those bills.  And so
3    there's a disagreement about whether that rule should
4    apply to debate over voter ID.
5        Q.  (By MS. WESTFALL)  And do you see that Lieutenant
6    Governor Dewhurst is quoted as saying, I don't think the
7    two-thirds rule is going to change.  Do you see that?
8        A.  I see that.
9        Q.  Do you think he said that?
10       MR. SWEETEN:  Objection, calls for
11   speculation.
12       A.  It's in quotes.  I don't recall him saying that.
13       Q.  (By MS. WESTFALL)  Do you believe that he expressed
14   that sentiment that it wasn't going to change as to this
15   day in 2009?
16       MR. SWEETEN:  Objection, speculation.
17       A.  Yeah.  I don't know.  That's what the article
18   says.
19       Q.  (By MS. WESTFALL)  Would Mr. Dewhurst be the best
20   person to ask that question of?
21       A.  Or the reporter.
22       Q.  Are you familiar with the 2009 Senate rules?
23       A.  Generally.
24       Q.  Do you remember that -- actually.  Hang on.
25   Could you mark this as 77?

215

1        (Exhibit No. 77 was marked.)
2        Q.  (By MS. WESTFALL)  You've been handed what's been
3    marked as US 77.  Do you recognize this document?
4        A.  Yes.
5        Q.  And what is it?
6        A.  Appears to be a copy of rule 5.11 from the Senate
7    rules in 2009.
8        Q.  Are you familiar with this rule?
9        A.  Generally.
10       Q.  Do you know the circumstances under which this
11   rule was adopted in 2009?
12       MR. SWEETEN:  Don't answer any matters that
13   would impede legislative privilege.  That would be
14   thoughts, mental impressions about legislation, that
15   would be discussions that you've had with Senators,
16   legislative staff, Lieutenant Governor Dewhurst.
17       A.  The question is, am I aware --
18       Q.  (By MS. WESTFALL)  Are you aware of the
19   circumstances under which rule 5.11 was adopted in 2009?
20       A.  I think I'll assert privilege.
21       Q.  I'm sorry.  You're asserting privilege with
22   regard to --
23       MR. SWEETEN:  The circumstances on which --
24   as to the question and I instructed him so.
25       Q.  (By MS. WESTFALL)  What was the purpose of

216

1    exempting voter ID requirements in rule 5.11?
2        MR. SWEETEN:  I'm going to object to the
3    question.  I think you're asking now about specific
4    thoughts, mental impressions, opinions about legislation
5    and/or communications between legislatures, legislative
6    staff.
7        MS. WESTFALL:  I'm asking about the purpose
8    of the Senate rule.  My question stands.
9        MR. SWEETEN:  But the court's ruling related
10   to the purpose of the specific voter ID legislation not
11   as to specific Senate rules and his understanding of the
12   purpose of that.
13       MS. WESTFALL:  Is it your view that
14   questions concerning the purpose of Senate rules or
15   other legislation, other than voter ID is something upon
16   which you can assert privilege and instruct a witness
17   not to answer questions in a deposition.
18       MR. SWEETEN:  When you're asking him
19   questions about why was this rule 5.11 adopted by the
20   Senate, you're asking for his subjective impressions as
21   to why this bill was included.  Therefore, you were
22   asking matters that are subject to legislative
23   privilege.  You're also asking matters that could
24   require him to reveal communications he's had with
25   legislatures or legislative staff.  So I think that's



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



**217**

1  squarely within the area of privilege.
2       MS. WESTFALL:  I'm not asking about his
3  subjective intent.  None of the questions I am asking
4  today go to suggesting intent, they go to purpose.  What
5  was the purpose of the Senate in adopting rule 5.11?
6       MR. SWEETEN:  Okay.  I'll let you answer
7  just as to the purpose of 5.11.  You can answer that
8  question.
9    A.  When you say purpose you're not asking the
10  intent, you're asking what does this do.
11  BY MS. WESTFALL:
12    Q.  Sure.  Yes.  What does this do?
13    A.  Rule 5.11 from 2009 appears to say that a bill
14  can be considered on the affirmative vote of two-thirds
15  of the members, except that voter identification bill
16  considered by the Committee of the whole can be set to
17  special order 24 hours minimum.
18    Q.  So is the effect of this rule based on the face
19  of the rule, not based on any privileged conversations
20  you had; is that it carves out an exemption for voter ID
21  in 2009?
22       MR. SWEETEN:  I'll let you answer as to the
23  text.
24    A.  5.11 has a general rule and says, notwithstanding
25  the general rule there are other criteria for voter

**218**

1  identification, bills or resolutions.
2    Q.  (By MS. WESTFALL)  And what is that criteria for
3  voter identification resolutions set forth in 5.11?
4    A.  That a bill of resolution reported favorably from
5  the Committee of the whole may be set as a special order
6  with 24 hours notice.
7    Q.  Are you aware of any communications involving the
8  Lieutenant Governor pertaining to rule 5.11 in the 2009
9  rules?
10       MR. SWEETEN:  You can answer if you're aware
11  of any communication.
12    A.  Yes.
13    Q.  (By MS. WESTFALL)  When did that communication
14  occur?
15    A.  January.  I don't know.  It would have been 2008
16  or 2009.
17    Q.  Are you aware of more than one communication on
18  this topic?
19    A.  Yes.
20    Q.  When was the first one that you're aware of, when
21  did that take place?
22    A.  Again, it would have been right before -- right
23  at the beginning of session.  So 2008 or January 2009.
24    Q.  Who was a party to that communication?
25    A.  I remember it was discussed generally, I mean,

**219**

1  when these rules were adopted.  It would have been
2  senior staff in my office.  Again, Blaine Brunson and
3  Julia Rathgeber likely.  But I don't have memory of
4  specific conversations about this.
5    Q.  Was it after the rule was adopted or before the
6  rule was adopted?
7    A.  I don't recall.
8    Q.  Was it an in person meeting or an e-mail
9  communication or phone call?
10    A.  I think probably in person discussions.
11    Q.  Were you talking about the ramifications of rule
12  5.11 or development of the rules?
13       MR. SWEETEN:  The question is asking you to
14  reveal the specific subject matter.  Don't do that.
15  That impacts the attorney/client privilege as well as
16  the legislative privilege.  So you can answer it.  I've
17  let you as to who was involved, when, how long, but
18  don't reveal the subject.
19    Q.  (By MS. WESTFALL)  Are you following the advice
20  of council?
21    A.  Yes.
22    Q.  Was Mr. Dewhurst, himself, involved in this
23  communication?
24    A.  Not that I recall.
25    Q.  It was solely staff?

**220**

1    A.  That's my memory, yes.
2    Q.  And there was more than one communication; is
3  that correct?
4    A.  Probably.
5    Q.  Do you believe there was a conversation in the
6  end of 2008 regarding the two-thirds rule and voter ID?
7    A.  A conversation before session started in '09
8  about the two-thirds rule.
9    Q.  Correct.
10    A.  Do I believe it?
11    Q.  Do you recall?
12    A.  Oh, I don't recall it.  Again, no, it's possible
13  that it was discussed, but I really can't recall whether
14  it was reacting to this or before this.
15    Q.  When did you first hear about photo ID and the
16  two-thirds rule?
17    A.  I think within generally, it would have been late
18  2008, early 2009 is my guess.  I don't remember a
19  specific date of when I heard about it.
20    Q.  Did you have any conversations with anyone
21  outside of the Lieutenant Governor's office about the
22  two-thirds rule and voter ID before the rule was
23  adopted?
24    A.  I don't think so.  I don't recall.
25    Q.  Did you have any discussions with Janice McCoy on



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

221

1   this topic?
2       A. I don't recall.
3       Q. Did you have any discussions with anyone in
4   Governor Perry's office about this topic?
5       A. Probably not. But I don't recall for sure.
6       Q. Based upon your experience working for the
7   Lieutenant Governor, how many times has the two-thirds
8   rule been suspended as a matter of public record?
9           MR. SWEETEN: You can answer.
10      A. There was a -- I remember there being debate on
11  the Senate floor about how often this happens and it
12  seemed like under Lieutenant Governor Dewhurst it
13  perhaps had happened once or twice. But then
14  historically it happened more than that.
15      Q. (By MS. WESTFALL) And what were the occasions
16  you're aware of, the two-thirds rule has been suspended?
17      A. I'm not aware of specific examples. I just
18  remember discussion of it has happened before.
19      Q. Janice McCoy testified in deposition she was
20  unaware of any other bills except voter ID being
21  exempted from the two-thirds rule. Do you believe that
22  testimony is accurate?
23      A. I guess, I believe she's not aware. I'm not sure
24  that that's right or not. It seems like there may have
25  been -- in my memory, there may have been one special

222

1   session, but again, I can't remember the specific
2   examples. Just that there were examples.
3       Q. Did it pertain to the directing?
4       A. Maybe.
5       Q. Would Senate Bill 362 have passed the Senate if
6   the Senate had not adopted rule 5.11 in the 2009 Senate
7   rules?
8           MR. SWEETEN: Objection. When you're
9   answering the question, don't reveal thoughts or mental
10  impressions or opinions about legislation or furtherance
11  of the legislative process.
12      A. I don't know. I don't know whether it would have
13  passed or not.
14      Q. (By MS. WESTFALL) You have no idea?
15      A. I have no idea.
16      Q. Was it -- was the bill passed on party lines,
17  Senate Bill 14?
18      A. I believe that it was.
19      Q. So sitting here today you have no understanding
20  of whether the bill would have or would not have --
21  whether -- I'm sorry. Strike that.
22          Sitting here today you no idea of whether Senate
23  Bill 362 would have passed if it had been subject to a
24  two-thirds rule in 2009?
25          MR. SWEETEN: Yeah. She's asking for

223

1   matters that are subject to the legislative privilege.
2   She ask you to reveal thoughts or mental impressions
3   about legislation, legislative process so I'm going to
4   instruct you don't reveal those to the extent you can
5   refer to matters that are public record you're free to
6   do so.
7       A. I'm not aware of public statements by Senators
8   about whether they were willing to vote for or against
9   the bill. But, again, in the legislative process the
10  bill goes through different iterations and for any
11  number of reasons a member can change their vote so --
12  and they do change their votes. I don't know the answer
13  about whether it could have passed.
14      Q. (By MS. WESTFALL) Did Senate Bill 362 ultimately
15  pass the Senate?
16      A. Yes.
17      Q. Did it pass by two-thirds?
18      A. I don't recall. I believe it was majority.
19      Q. Are you aware of any other communications related
20  to consideration of modifying any other Senate rules in
21  addition to rule 5.11, with regard to voter ID bills?
22          MR. SWEETEN: She's asking you to reveal
23  communications that may have occurred between
24  legislatures and legislative staff, State agencies,
25  Texas Leg. Council, as well as to reveal your thoughts

224

1   and mental impressions, opinions about legislation. To
2   the extent you're asserting the legislative privilege
3   that question that asks for matters of the legislative
4   privilege so my instruction would be not to answer the
5   question.
6       Q. (By MS. WESTFALL) Are you going to follow your
7   counsel's advice?
8       A. Yes.
9       Q. Was Senate Bill 362 considered by any Senate
10  committees?
11          MR. SWEETEN: You can answer as a matter of
12  public record.
13      A. I believe it was considered by the Committee of
14  the whole.
15      Q. (By MS. WESTFALL) And ordinarily it would have
16  been sent to State affairs; is that right?
17      A. I don't know that. But given that other election
18  bills were generally referred there, then probably.
19      Q. Janice McCoy testified in her deposition it was
20  unusual for a bill to go straight to the Committee of
21  the whole, do you agree with that assessment?
22      A. Most bills do not go to Committee of the whole.
23      Q. What was the purpose of the assignment of Senate
24  Bill 362 to the Committee of the whole?
25          MR. SWEETEN: In that question she's asking



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 225

1   you to reveal thoughts, mental impressions, opinions
2   about legislation or further answer of the legislative
3   process as well as communications. Therefore, that
4   would be a matter that is subject to the legislative
5   privilege?
6       Q. (By MS. WESTFALL) Are you asserting privilege
7   and not answering the question?
8       A. Yes.
9       Q. What was Lieutenant Governor's role, generally,
10  during Senate Bill 362, as Committee of the whole?
11          MR. SWEETEN: In that -- to he extent that
12  she's asking you to reveal thoughts, mental impressions,
13  opinions about legislation or furtherance of the
14  legislative process including communications you had
15  with Lieutenant Governor Dewhurst, legislatures,
16  legislative staff, state agencies, Texas Legislative
17  Council, so don't reveal those. To the extent you can
18  refer to matters of the public record you're free to do
19  so.
20          A. I believe the Senate rules provide that he can
21  participate and vote like any Senator and my memory is
22  that he was on the Senate floor and I don't recall if he
23  had questions for witnesses or not. I believe he did
24  cast a vote on the bill.
25      Q. (By MS. WESTFALL) On 362 before the Committee of

### 226

1   the whole; is that right?
2       A. I believe that's right.
3       Q. Did he vote in favor of the bill?
4       A. I believe he did.
5       Q. During the floor debate on Senate Bill 362, do
6   you recall any concerns about the impact of the bill on
7   minority voters on the public record?
8           MR. SWEETEN: If she's asking you what was
9   expressed on the public record you're free to answer.
10  Don't reveal matters of legislative privilege. Go
11  ahead.
12      A. I do recall discussion during the public debate
13  of 326 about the impact on voters, yes.
14      Q. (By MS. WESTFALL) On minority voters?
15      A. All voters, including minority voters.
16      Q. And who expressed those concerns?
17      A. My memory is that most of the witnesses had
18  something to say about it.
19      Q. What was the response to those concerns?
20          MR. SWEETEN: Again, you can reveal matters
21  on the public record, but don't reveal matters that are
22  subject to the legislative privilege.
23      A. I don't recall particular responses. I'm
24  assuming you mean from the Senators themselves. I don't
25  recall.

### 227

1       Q. (By MS. WESTFALL) Was there any response from
2   Lieutenant Governor to these concerns?
3           MR. SWEETEN: Same objection, same
4   instruction.
5       A. I don't recall if he had questions of witnesses
6   or not.
7       Q. (By MS. WESTFALL) Are you asserting privilege
8   over your response in part?
9           MR. SWEETEN: Well, I mean, I thought you
10  were asking matters of the public record.
11          MS. WESTFALL: I am. I thought you made an
12  objection.
13          MR. SWEETEN: Well, I mean, I instructed and
14  I'll continue to do so. You can refer to matters on the
15  public record to the extent that it's asking for
16  something else other than legislative privilege that
17  would my instruction.
18      A. I don't remember any public input. I don't
19  remember specific public questions or input from
20  Lieutenant Governor or anyone else on the floor about
21  the testimony from the witnesses. I know there was. I
22  just don't remember particular specifics.
23      Q. (By MS. WESTFALL) Based on the bill history of
24  Senate Bill 362, were there any changes in the
25  iterations of the bill, either from when it was filed,

### 228

1   went through the drafting process that were made in
2   response to concerns about the impact of the bill on
3   minority matters?
4           MR. SWEETEN: You're asking him to reveal
5   thoughts, mental impressions, or opinions about
6   legislation or furtherance of the legislative process as
7   well as protected communications. So I'm asserting --
8   I'm objecting based upon legislative privilege.
9       Q. (By MS. WESTFALL) Do you recall that there was a
10  letter from Senators expressing concern that ethnic and
11  racial minority members of the Senate were unified in
12  their opposition to Senate bill 362?
13          MR. SWEETEN: Is this a matter of public
14  record.
15          MS. WESTFALL: Yes.
16      A. Yes.
17  BY MS. WESTFALL:
18      Q. You recall that letter?
19      A. I believe so, yes.
20      Q. Do you recall any conversations in response to
21  that letter?
22          MR. SWEETEN: Don't reveal matters of
23  legislative privilege including discussions you have had
24  with staffers, legislators, Lieutenant Governor, et
25  cetera. You are free to refer to the matters of the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                              MAY 29, 2012

---

229

1   public record.
2       A.  Right.  I don't recall the specific public
3   response to that letter from Lieutenant Governor
4   Dewhurst or anyone else.
5       Q.  So you're talking about public record, public
6   response.  Are you aware of any conversations about that
7   letter?
8           MR. SWEETEN:  You can answer if you're aware
9   of conversations.
10      A.  Right.  I cannot recall.
11      Q.  (By MS. WESTFALL)  Was it true that some
12  legislatures and members of the public stayed up all
13  night during consideration of Senate Bill 362?
14      A.  I did.  We did.
15      Q.  And many people did?
16      A.  My recollection is the Senate chamber was --
17  certainly the Senators did.  Yes, there was some public
18  testimony.
19      Q.  Why do you think there was such strong opposition
20  to Senate Bill 362?
21          MR. SWEETEN:  Don't answer.  That would
22  require you to reveal thoughts mental impressions
23  opinions about legislation.  It's a matter that is
24  subject to legislative privilege.
25      A.  Right.

---

230

1       Q.  (By MS. WESTFALL)  Are you asserting privilege?
2       A.  Yes.
3       Q.  Are you aware of any amendments to Senate Bill
4   362 that were -- which had the purpose of addressing the
5   concerns of minority legislatures or minority voters?
6           MR. SWEETEN:  As phrased, the question
7   requires you to reveal thoughts, mental impressions,
8   opinions about legislation or furtherance of the
9   legislative process subject to legislative privilege.  I
10  instruct you not to answer.
11      Q.  (By MS. WESTFALL)  Are you following the advice
12  of council?
13      A.  Yes.
14      Q.  Did Senate Bill 326 pass the Senate?
15          MR. SWEETEN:  You can answer.
16      A.  Yes.
17      Q.  (By MS. WESTFALL)  Did it get referred to the
18  House?
19      A.  I believe it did.
20      Q.  Did you play any role in Senate Bill 362 once it
21  went to the House?
22          MR. SWEETEN:  Objection, vague.
23      Q.  (By MS. WESTFALL)  You may answer.
24      A.  I think in a similar way that I was available for
25  questions.  I was available as a resource.  Certainly

---

231

1   from a procedural standpoint.
2       Q.  Did you any conversations with House members or
3   their staff concerning Senate Bill 362 when it was
4   referred to the House?
5           MR. SWEETEN:  You can answer whether you had
6   any conversations.
7       A.  I may have had conversations.
8       Q.  (By MS. WESTFALL)  With whom?
9       A.  House staff.
10      Q.  And who specifically?
11      A.  I can't remember the names of staff.
12      Q.  Did you talk to Speaker Strauss's staff?
13      A.  Probably.
14      Q.  Did you talk to Meredith Fowler?
15      A.  Probably.
16      Q.  Was she the main person handling photo ID issues
17  for the Speaker in 2009?
18      A.  I don't know if she was the primary person.  She
19  was a person that I talked to.
20      Q.  What was her role?
21      A.  I believe she's a lawyer in the Speaker's office.
22      Q.  Is she still employed with the Speaker or is she
23  no longer employed with the Speaker?
24          MR. SWEETEN:  You can answer.
25      A.  I think she's still employed.

---

232

1       Q.  (By MS. WESTFALL)  How many conversations did you
2   have with Ms. Fowler?
3       A.  Probably a few, more than a handful, but not a
4   lot.
5       Q.  Did you have conversations with any other staff
6   person in the House regarding Senate Bill 362?
7       A.  Perhaps the staff in the bill sponsor's office.
8       Q.  Was that -- so what happened to Senate Bill 362
9   in the House?
10      A.  I cannot recall.  It did not pass.
11      Q.  Do you know why?
12          MR. SWEETEN:  Objection.  She's asking
13  you -- to the extent she's asking you for communications
14  you've had with individuals or thoughts, mental
15  impressions, or opinions about legislation.
16      A.  I don't know why.
17          MR. SWEETEN:  Therefore privileged.
18      Q.  (By MS. WESTFALL)  Was a photo ID bill introduced
19  in the Senate in 2011?
20          MR. SWEETEN:  You can answer.
21      A.  Yes.
22      Q.  (By MS. WESTFALL)  Was it Senate Bill 214?
23      A.  Yes.
24      Q.  Did Senator Fraser introduce that?
25      A.  Yes.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                          MAY 29, 2012

## 233

1    Q. Senator Fraser testified in deposition in this
2  case he started working on the bill on May 31, 2009. Do
3  you believe that sounds accurate?
4    A. I believe that sounds like Senator Fraser.
5    Q. In other words, it's accurate?
6    A. Sure.
7    Q. Did the Lieutenant Governor or anyone in his
8  office have any conversations prior to May 31, 2009
9  about Senate Bill 14?
10   A. So did we discuss that Bill 14 before the end of
11  2009 session?
12   Q. Correct.
13   A. I don't recall. I mean, as a practical matter it
14  wouldn't have even had a number.
15   Q. I'll rephrase it to say, did you conceptually
16  discuss filing a photo ID bill in the 2011 session prior
17  to May 31, 2009?
18   A. I can't recall.
19   Q. Did the Lieutenant Governor promise anyone he
20  would file -- or push -- not file, push photo ID in
21  legislation 2011?
22       MR. SWEETEN: The question potentially calls
23  for matters that are -- calls for information that would
24  be protected by the legislative privilege including
25  conversations you had with the Lieutenant Governor,

## 235

1    A. I don't recall any promise.
2  BY MS. WESTFALL:
3    Q. Are you asserting any privileges in responding to
4  that question?
5        MR. SWEETEN: I haven't instructed him as to
6  privilege.
7    A. I just don't recall.
8    Q. (By MS. WESTFALL) Was Senate Bill 14
9  considered -- strike that.
10   Was Senate Bill 14 designated by the Governor to
11  be emergency legislation?
12   A. Yes. Well, the issue of voter identification was
13  an issue that was deemed to be an emergency issue.
14   Q. How did voter ID come to receive that emergency
15  designation?
16       MR. SWEETEN: Objection. You're asking for
17  thoughts, mental impressions, or opinions about
18  legislation. You can testify about matters in the
19  public record.
20   A. I don't recall the Governor's statement about why
21  he added the emergency items that he did to the
22  emergency call.
23   Q. (By MS. WESTFALL) Are you asserting legislative
24  privilege over gubernatorial acts as the Governor is not
25  able to introduce legislation? Is that your position?

## 234

1  legislative staff, legislators, or it also could require
2  you to reveal thoughts or mental impressions about the
3  bill. So to the extent that she's asking for matters of
4  legislative question do not answer the question.
5        MS. WESTFALL: Is it your position that
6  promises to advance legislation falls within legislative
7  privilege?
8        MR. SWEETEN: You're asking about a
9  conversation that Lieutenant --
10       MS. WESTFALL: Promises to advance
11  legislation. Are you saying that falls within the
12  privilege? Is that your position?
13       MR. SWEETEN: Well, I mean I think what you
14  are asking for is the substance of communications that
15  Lieutenant Governor Dewhurst may or may not have had
16  with someone. If you want to ask specifically about
17  whether he had a conversation with someone about the
18  bill that's a general subject matter, I think promises
19  that relates to, you know, is probably a little beyond
20  what you're allowed to ask for.
21   Q. So you're asserting privilege over promises,
22  Mr. Sweeten? I'm not sure you've take then position.
23       MR. SWEETEN: You know what. I'm going to
24  let him answer as to promises. You can answer that
25  question.

## 236

1        MR. SWEETEN: Well, what I'm saying is, if
2  you're asking him questions about communications he's
3  had with the State agency including the Governors
4  office, legislatures, legislative staff, and you're
5  asking him to reveal that information, then that would
6  be subject to legislative privilege. I also said he can
7  testify about matters in the public record so to the
8  extent it involves privilege don't answer it. If you
9  can answer without providing information that would be
10  privileged then you can do so.
11   A. The short answer is, I don't know why he added
12  the items he did to the list of emergency items.
13   Q. (By MS. WESTFALL) Are you aware of any
14  communications on that topic?
15   A. No.
16   Q. Are you aware of whether the Lieutenant Governor
17  requested this designation of the Governor's office?
18   A. Not aware.
19   Q. Are you aware of any conversations about that
20  topic between the Lieutenant Governor's office and the
21  Governor's office related to the emergency designation
22  of voter ID?
23   A. I'm not aware.
24   Q. Who would know the answer to that question?
25       MR. SWEETEN: Objection calls for



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                                    MAY 29, 2012

---

**237**

1    speculation.
2        Q.  (By MS. WESTFALL)  Would Lieutenant Governor
3    Dewhurst?
4        A.  If they existed he might.
5        Q.  What were the consequences of this emergency
6    designation of voter ID?
7        A.  Generally speaking, an emergency item -- an item
8    designated as an emergency by the Governor is exempted
9    from some of the normal procedural time lines and so you
10   can introduce it sooner and consider it sooner and pass
11   it sooner to address the emergency.
12       Q.  What was the emergency?
13           MR. SWEETEN:  The question would ask you to
14   reveal matters that are subject to legislative privilege
15   or conversations that would be subject to legislative
16   privilege, so don't answer to the extent you would have
17   to do so.  You can refer to matters of the public
18   record.
19       A.  I'm not aware of the grounds for the items that
20   he listed, the emergency items.
21       Q.  (By MS. WESTFALL)  Are you aware of any
22   conversations about the emergency nature of the need for
23   voter ID in the State of Texas in 2011?
24           MR. SWEETEN:  Objection, asked and answered.
25       Q.  (By MS. WESTFALL)  You may answer.

---

**238**

1        A.  I'm not aware.
2        Q.  Did you have any communications with Senator
3    Fraser's staff about the emergency designation?
4            MR. SWEETEN:  Objection, asked and answered.
5    You can answer.
6        A.  I'm sure I had conversations just in terms of how
7    it affected the timeline for introducing the bill and
8    passing it.
9            MR. SWEETEN:  But don't reveal substance of
10   the communication.  You can reveal whether a
11   communication occurred.
12   BY MS. WESTFALL:
13       Q.  Would those conversations have been with
14   Ms. McCoy?
15       A.  Yes.
16       Q.  And do you believe anyone else was involved in
17   those communications besides Ms. McCoy?
18       A.  I don't recall.
19       Q.  Is there anything in the public record related to
20   the need or urgency or emergency nature of voter ID in
21   2011, that you're aware of?
22       A.  What in the public record was evidence of an
23   emergency?  I don't recall now.
24       Q.  Are you familiar with the public record related
25   to SB 14?

---

**239**

1        A.  At committee hearing or in the newspapers, in the
2    State, nationally or when you say public record, what is
3    it that you're referring to?
4        Q.  The public and legislative record related to SB
5    14.
6        A.  So the debate between Senators and the Senate?  I
7    don't recall if there was specific discussion or debate
8    on the Senate floor about whether it was an emergency or
9    not or why it might have been an emergency?
10       Q.  And I was just -- I would ask you again, were you
11   as the person who was involved in the issue for
12   Lieutenant Governor, did you familiarity with the public
13   record and legislative history of Senate Bill 14, as a
14   general matter?
15       A.  Sure.
16       Q.  Could you mark this as US 78?
17           (Exhibit No. 78 was marked.)
18       Q.  (By MS. WESTFALL)  You've been handed what's been
19   marked US 78.  Have you seen that document before?
20       A.  Yes.
21       Q.  What is it?
22       A.  It is a letter from Lieutenant Governor Dewhurst,
23   in this case to Senator Birdwell, but I think it went to
24   the whole Senate saying that he intends to recognize
25   Senator Duncan to bring the Senate into a Committee of

---

**240**

1    the whole to consider Senate Bill 14.  And so appoints
2    Senator Duncan to chair that Committee.
3        Q.  Why did Senator Duncan make a motion to resolving
4    the Senate to a Committee of the whole?
5            MR. SWEETEN:  Objection.  Calls for matters
6    of legislative privilege.  Don't answer the question.
7        Q.  (By MS. WESTFALL)  Are you following the advice
8    of council?
9        A.  Yes.
10       Q.  Could Lieutenant Governor, himself, not make this
11   motion to resolve the Senate to a Committee of the
12   whole?  It's a procedural question.
13       A.  Procedurally under the senate rules I don't
14   believe the Lieutenant Governor can make that motion.
15       Q.  And that is why Senator Duncan or any Senator
16   could have made this motion; is that correct?
17       A.  I think that's right.
18       Q.  And as chair of Committee of the whole, what
19   powers did Senator Duncan have under the rules?
20           MR. SWEETEN:  She's asking you a matter of
21   public record and procedure.  So you can answer it.
22       A.  Right.  My memory is that under the rules of
23   precedent and Senate procedure that you would have
24   similar role as when he was chairing his own State
25   Affairs Committee.  He would preside procedurally

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                                    MAY 29, 2012

---

## 241

1  recognizing members and so forth to debate.
2      Q. (By MS. WESTFALL)  Who was the chair of the State
3  Affairs Committee in 2011?
4      A. Senator Duncan.
5      Q. And this also -- this letter from Mr. Dewhurst
6  also refers to a draft resolution concerning procedures,
7  do you see that?
8      A. Yes.
9      Q. And do you know whether the draft -- strike that.
10     What did the draft resolution regarding
11 procedures indicate, if you know?
12         MR. SWEETEN:  You can testify if that's a
13 matter of the public record.
14     A. I believe it just outlined who would preside, the
15 general timing of the day, how amendments would be
16 handled, how witnesses would be handled, just procedural
17 nuts and bolts.
18     Q. (By MS. WESTFALL)  Were those procedures adopted
19 and incorporated into the Senate journal?
20     A. I don't recall.
21     Q. Have those procedures been produced to us,
22 Mr. Sweeten, as part of this litigation?
23         MR. SWEETEN:  I'm not sure even what you're
24 specifically talking about.  If they're procedures that
25 are a matter of the public record -- can you tell me a

## 243

1  duty to provide something.  I mean, there's several
2  layers of analysis we must do before we're going to be
3  able to answer that question, but if you're asking if --
4  where we can start is, I can ask my folks back at the
5  office if such a thing exists.  Whether we have it in
6  our production and we'll take it from there.  I'm glad
7  to do that.
8         MS. WESTFALL:  Thank you.
9  BY MS. WESTFALL:
10     Q. Do you know whether the procedures proposed in
11 this letter were adopted by the Senate?
12     A. I don't recall.
13     Q. Do you know anything about procedures or could
14 you describe them?
15     A. My memory, again, is that there's a president of
16 Senate going into the Committee of the whole.  My guess
17 is that they were just parallel to what had been done
18 before, but I don't recall.
19     Q. Thank you for your testimony.
20     Could you mark this as US 79?
21         (Exhibit No. 79.)
22     Q. (By MS. WESTFALL)  You've been handed what's been
23 marked as US 79.  Do you recognize this document?
24     A. It is a press release from Lieutenant Governor's
25 Dewhurst office regarding Governor Perry's emergency

## 242

1  little more about what you're asking for.
2         MS. WESTFALL:  The procedures set forth in
3  the letter of January 20th, 2011, from David Dewhurst to
4  Senator Birdwell referred to in the exhibit we were just
5  discussing.
6         MR. SWEETEN:  Are we talking about 13 rule
7  13--
8         MS. WESTFALL:  The procedures for the
9  Committee of the whole.  Do we have those?  Have they
10 produced to us in this litigation, Mr. Sweeten?
11         MR. SWEETEN:  I mean, is this something that
12 is part of the record?
13         MS. WESTFALL:  That's what I'm examining the
14 witness on and he's uncertain.  And --
15         MR. SWEETEN:  Okay.  Well, as you're asking
16 me this --
17         MS. WESTFALL:  He's surprised that there's
18 a privilege you can assert over procedures related to
19 the process of the Committee of the whole.
20         MR. SWEETEN:  Nor am I trying to take that
21 position.  I eman, one way or the other I'm not even --
22 you know, you're asking me, did we produce something --
23         MS. WESTFALL:  Yes.
24         MR. SWEETEN:  I mean, that first presupposes
25 that we were provided something or that someone had a

## 244

1  call.
2      Q. Have you seen it before today?
3      A. I probably read it when it came out.
4      Q. And do you see that it's dated January 20, 2010?
5      A. Yes.
6      Q. Do you think that's an error and it should be
7  2011?
8      A. Yeah, probably.
9      Q. Do you see in the last paragraph it reads, Texans
10 have fought and died for the principal of one person,
11 one vote?
12     A. Yes.
13     Q. Can you explain what is meant by the need to
14 uphold the principal of one person, one vote?
15         MR. SWEETEN:  You can answer the question to
16 the extent it doesn't ask you to reveal communications
17 you had with Lieutenant Governor Dewhurst, legislatures,
18 legislative staff, or that it doesn't require you to
19 reveal thoughts, mental impressions, opinions about the
20 legislative session.  You can answer to the extent you
21 are not providing information that is within that
22 privilege.
23     A. I think it just means what it says.  One person
24 one vote, as a tenant of voting in the United States and
25 I don't know what else asking.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 245

1    Q. (By MS. WESTFALL)  Was there any threat to the
2  principal of one person, one vote that voter ID was
3  intended to remedy?
4        MR. SWEETEN:  You're asking him to reveal
5  thoughts, mental impressions, opinions about furtherance
6  of the legislation process and/or conversations that
7  we've discussed previously.  So to that extent I'm going
8  to the object based on legislative privilege.
9    Q. (By MS. WESTFALL)  You following your counsel's
10  advice?
11    A. Yes.
12    Q. Do you see it also states in that paragraph that
13  there's a need to uphold the integrity of elections?
14    A. Yes.
15    Q. What was the basis for that statement?
16        MR. SWEETEN:  Same objection.  The question
17  asks you to reveal thoughts, mental impressions,
18  opinions, about legislation or furtherance of the
19  legislative process or communications.  So don't answer
20  to the extent that you would have to do so in answering
21  that question.  You can answer it based on the public
22  record matters that are not subject to legislative
23  privilege, you can do so.
24    A. Right.  I mean, it means what it says on its
25  face.  I mean, during the debate of the bill on the

## 246

1  Senate floor there was a lot of discussion about
2  ensuring the integrity of the elections.
3    Q. (By MS. WESTFALL)  But what was the need to
4  ensure?  Was there a threat to the integrity of
5  elections that this bill was intended to address?
6        MR. SWEETEN:  Same objection.  You're asking
7  him about the intent of the bill and what it was
8  intended to address that impacts matters of legislative.
9  Therefore, I'm instructing him not the answer to the
10  extent it would reveal matters of legislative privilege.
11    Q. (By MS. WESTFALL)  Are you following the advice
12  of council?
13    A. Yes.
14        MR. SWEETEN:  You can reveal matters of the
15  public record.
16    Q. (By MS. WESTFALL)  Do you have any testimony
17  related to the public record on any threats to the
18  integrity of the elections that necessitated the need
19  for voter ID?
20    A. My memory is just that, you know, the debate
21  among Senators was that there were threats.  There was
22  election fraud that existed and this was a tool to
23  combat that.
24    Q. Do you have any specific information about fraud
25  that was referenced in the public record that was

## 247

1  intended to be remedied by Senate Bill 14?
2    A. Again, from the public record, I recall evidence
3  and discussion of the types of fraud that were being
4  committed in Texas and other states, I don't have those
5  specific numbers on my fingertips.
6    Q. And was notice to Senators of the convening of
7  the Committee of the whole upheld within four days
8  notice from the time Senators were notified to when the
9  Committee was convened, do you recall that?
10    A. I don't recall the number of days.
11    Q. Bear with me one minute.  Could you mark this.
12        (Exhibit No. 80 was marked.)
13    Q. (By MS. WESTFALL)  You've been handed what's been
14  marked US 80.  Do you recognize this document?
15    A. It appears to be a letter from Senator Van
16  DePutte to Senator Duncan.
17    Q. Have you seen this before?
18    A. I believe, yes, when it came out I saw it.
19    Q. Do you see that it issues a complaint about short
20  notice on convening of the Committee of the whole
21  executed by the Lieutenant Governor, on Page 1 of this
22  document?
23    A. The second paragraph, yes.
24    Q. Were you aware at the time of the relatively
25  short notice that the convening of the Committee of the

## 248

1  whole?
2        MR. SWEETEN:  Objection, asked and answered.
3  He's already said.
4    Q. (By MS. WESTFALL)  You may answer.
5    A. Again, I don't recall specific discussions about
6  this.
7    Q. Are you aware that the notice was given to
8  Senators by slipping a note under the door after hours
9  on Thursday night before the Committee was convened?
10    A. I don't know that it was to use the letter's
11  language literally slipped under most office doors.
12    Q. Was the notice provided after hours on Thursday
13  of the convening of the Committee of the whole the next
14  week?
15    A. I don't know what time it was delivered to each
16  Senator.
17    Q. Was it delivered on Thursday before the convening
18  on Monday?
19        MR. SWEETEN:  Objection, asked and answered.
20    A. Yeah.  Again, probably, but I'm not sure of the
21  exact time.
22    Q. (By MS. WESTFALL)  Are you aware of any
23  conversations about perceived exclusion of members of
24  the Senate representing minority voters from the debate
25  on Senate Bill 14?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 249

1      MR. SWEETEN:  You can answer the question.
2  Don't reveal matters subject to legislative privilege
3  including communications.  You can answer to the extent
4  you're not doing so.
5      A.  I think there was some, again, in the public
6  debate on the bill I think some Senators made some more
7  statements.
8      Q.  (By MS. WESTFALL)  And who would know exactly
9  when the Lieutenant Governor gave notice to all members
10 of the convening of the Committee of the whole?
11     A.  I don't know who would have hand delivered the
12 letter.
13     Q.  The Lieutenant Governor, himself, would know,
14 correct?
15     A.  He probably did not hand deliver the letter
16 personally.
17     Q.  He probably did not hand deliver it, but he
18 directed the letter to be sent to the Senators, correct?
19     A.  Yes, presumably.
20     Q.  Could you mark this.
21         (Exhibit No. 81 was marked.)
22     Q.  (By MS. WESTFALL)  Can you show the witness.
23         MR. SWEETEN:  Guess you better get one over
24 to me.
25         MS. WESTFALL:  I won't answer that question.

---

### 250

1      MR. SWEETEN:  Objection.
2      Q.  (By MS. WESTFALL)  You've been handed what's been
3  marked as US 81.  Do you recognize this document.
4      A.  It is some version of Senate Bill 14.
5      Q.  If you look at the notation at the bottom of the
6  exhibit, does that indicate that this is the version of
7  the bill as filed?
8      A.  It doesn't indicate that.  I would need to see --
9  the file version will have a stamp from the Clerk's
10 office.  I don't know if this is the final version or
11 what.
12     Q.  Can you look at the last page of Exhibit 81 and
13 you see there's -- this is certainly not the engrossed
14 version of the bill, correct?
15     A.  Correct.
16     Q.  Are you familiar with the provisions of Senate
17 Bill 14?
18     A.  Yes.
19     Q.  Could you describe the differences between Senate
20 Bill 362, about which you testified extensively and
21 Senate Bill 14?
22         MR. SWEETEN:  If you're asking him about the
23 differences on the text he can do so, but if you're
24 asking him about his thoughts, opinions about the
25 legislation, then, I would object to that.

---

### 251

1      MS. WESTFALL:  Mr. Sweeten, I'm going to ask
2  him a series of questions about the text of the bill.  I
3  am not intending to invade the privilege that you have
4  been asserting to that.
5      MR. SWEETEN:  Then I don't object at this
6  time.
7      MS. WESTFALL:  Very good.  Very good.
8      A.  There's a difference of the forms of
9  identification that are acceptable.
10 BY MS. WESTFALL:
11     Q.  Could you describe those?
12     A.  Sure.  Senate bill 362 has a slightly longer list
13 of photo IDs that are acceptable and it allowed
14 non-photo ID at the polling place and Senate Bill 14
15 requires photo ID.  And Senate 14 implements a longer
16 explanation and procedure for people who are exempted
17 from the photo ID requirement.  Those seem to be the
18 major differences.
19     Q.  And many previous iterations of the bill before
20 Senate Bill 14 was filed.  It allowed use of a driver's
21 license that had not expired more than 2 years before,
22 correct?  And Senate Bill 14 reduced that time to
23 60 days; is that correct?
24     A.  I would have to look at the final version of the
25 draft.  Senate Bill 14 in front of me it just says a not

---

### 252

1  expired driver license.  And I can't remember the final
2  number from the final draft.
3      Q.  Could you mark this as US Exhibit 5, please?
4         (US Exhibit No. 5 was marked.)
5      Q.  (By MS. WESTFALL)  You've been handed what's been
6  previously marked as US Exhibit 5.  Do you recognize
7  this document?
8      A.  Yes, this is the SB 14.
9      Q.  Yes.  And is this the version that was engrossed?
10     A.  Yes, this appears to be that version.
11     Q.  Turning your attention to Page 9, where it list
12 the form of ID.  Do you see that?
13     A.  Uh-huh.
14     Q.  And do you see that with regard to driver's
15 licenses that they expire no earlier than 60 days before
16 presentation; is that correct?
17     A.  Yes.
18     Q.  Would you characterize this on the face of the
19 Senate Bill 326 and Senate Bill 14 as having major
20 changes between the two bills?
21     A.  There are changes between the two bills, yes.
22     Q.  And was it a significant change, in your view, to
23 have removed non-photo ID as a form of ID?  Just on the
24 face of the bills?
25     MR. SWEETEN:  You're asking for his opinions

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                          MAY 29, 2012

## 253

1  about legislation.  You know, I don't have a problem if
2  you ask him a period of the text, but I think if you're
3  asking him these major changes and certainly qualitative
4  issues then I think that you're getting into legislative
5  privilege.
6        MS. WESTFALL:  As he's sitting today he
7  can't testify based on his expertise of drafting, based
8  on his expertise of election law?  How does that relate
9  to a legislative --
10       MR. SWEETEN:  Okay.  If that's your question
11  and you're not asking him to discuss matters for
12  example, information he heard from communication or his
13  mental impressions that he had, you know, as these bills
14  were proceeding, then he can answer as he's sitting here
15  today, if that's your question.
16  BY MS. WESTFALL:
17       Q.  Sitting here today, is it a significant change
18  between Senate Bill 362 an Senate Bill 14 in terms of
19  the forms ID allowable?
20       A.  Yes.
21       Q.  And is that in part because Senate Bill 14 no
22  longer allows the use of non-photo ID; is that correct?
23       A.  Yeah.  I think that's the significant difference.
24       Q.  Are there any other significant differences other
25  than that?

## 254

1       A.  I think the SB 14's addition of expansion of the
2  ways in which provisional ballots can be counted for
3  those people who don't have ID is also significant.
4       Q.  And how is that based on the face of the bill?
5       A.  I think under 362 the provisional ballot system
6  stayed essentially the same.  And then SB 14 the
7  provisional ballot system is expanded to clarify which
8  persons -- to include a class of people who can still
9  cast a ballot even without photo ID.  And I'm looking
10  for that now.
11       Also, SB 14 creates a new election identification
12  certificate.
13       Q.  Are there any other major differences that you're
14  aware of between the two bills?
15       A.  Glancing at the math I think those are the big
16  ones.
17       Q.  Thank you for your testimony.
18       Were you involved in developing Senate Bill 14?
19       MR. SWEETEN:  Objection, to the form.
20  Objection, vague.  Also don't reveal information that's
21  subject to the legislative privileges including your
22  thoughts or opinions or your communications with
23  individuals.  Those are subject to legislative
24  privileges.  Also, don't reveal attorney/client
25  privileges between you and other members of the

## 255

1  Lieutenant Governor's staff.
2       A.  Yes, I was involved with Senate Bill 14.
3
4       Q.  (By MS. WESTFALL)  Were you involved in the
5  drafting analysis of Senate Bill 14?
6       MR. SWEETEN:  Objection, compound.  Also,
7  don't reveal your thoughts and mental impressions or
8  communications regarding this bill.
9       A.  Yes.
10       Q.  (By MS. WESTFALL)  Were you involved in the
11  drafting of Senate Bill 14?
12       A.  Yes.
13       Q.  Were you involved in analysis of Senate Bill 14?
14       A.  Yes.
15       Q.  When did you start drafting Senate Bill 14?
16       A.  I don't recall when I first started drafting it.
17  To the extent -- I don't remember when I first
18  contributed to the draft.
19       Q.  Do you remember when anyone first started
20  drafting Senate Bill 14?
21       A.  No.  I don't remember the particular date.
22       Q.  Was it after SB 362 failed?
23       A.  Probably.
24       Q.  Shortly after?
25       A.  My memory is that was not shortly after, but just

## 256

1  sometime after when the next session was rolling around
2  is when you would introduce legislation.
3       Q.  Was the drafting of Senate Bill 14 started in
4  earnest after the November 2010 elections?
5       MR. SWEETEN:  Objection, asked and answered.
6       A.  I don't know when exactly.
7       Q.  (By MS. WESTFALL)  When did -- when did your role
8  in drafting Senate Bill 14 start?
9       A.  My role had been for several years at that point.
10  So I don't -- I don't know that there was a time at
11  which we sat and drafted this thing and, you know, had
12  it filed.  So again, it was a process, not a day when we
13  sat down and rolled up our sleeve.
14       Q.  Do you recall when your involvement in that
15  process, you just described, started with regard to this
16  particular bill?
17       A.  I don't remember particulars or start date.
18       Q.  Who would know when that process started in your
19  office?
20       MR. SWEETEN:  Objection, calls for
21  speculation.
22       Q.  (By MS. WESTFALL)  You may answer.
23       A.  I think you would have to ask the sponsor of the
24  bill when they started it.
25       Q.  And when you started working on the drafting of



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

257

1  Senate Bill 14, whenever that occurred, were there any
2  source that you consulted with?
3       MR. SWEETEN:  That calls for matters that
4  are subject to the legislative privileges.  Don't reveal
5  thoughts, mental impressions, opinions about legislation
6  or furtherance of the legislation process that includes
7  your thought processes.  That is subject to legislative
8  privilege, objection.  Instruct not to answer.
9       Q.  (BY MS. WESTFALL)  Are you following the advice
10 of your council?
11      A.  Yes.
12      Q.  Did you look at any models from any interest
13 group?
14      MR. SWEETEN:  Same objection.
15      Q.  (BY MS. WESTFALL)  Are you following the advice
16 of your council?
17      A.  Yes.
18      Q.  So it's your -- okay.
19          Did you look at any other States photo ID's laws
20 in drafting Senate Bill 14?
21      MR. SWEETEN:  Once again, you're asking for
22 his mental impressions, his thought processes regarding
23 the legislation.  That is subject to the legislative
24 privilege.
25      MS. WESTFALL:  Are you instructing him not

258

1  to answer?
2       MR. SWEETEN:  I am.  Unless you can
3  answer -- hold on one second.  Unless you can answer
4  without revealing matters that are subject to the
5  legislative privilege.
6       A.  There may have been discussion and testimony
7  about other states.  Otherwise, I would assert the
8  privilege.
9  BY MS. WESTFALL:
10      Q.  Who else besides you was involved in drafting
11 Senate Bill 14?
12      A.  I believe Janice McCoy and Legislative Council
13 attorneys.  Probably Jennifer Jackson is all I know for
14 sure.
15      Q.  Jennifer Jackson was with the State Affairs
16 Committee?
17      A.  No.  She was -- Jennifer Jackson was the
18 legislative council attorney.
19      Q.  Thank you.
20          Anybody else you can think of involved in the
21 drafting?
22      A.  Again, there may have been amendments offered on
23 the floor that were drafted by other people, I don't
24 know.
25      Q.  But just as to the body of the bill that was

259

1  introduced, have you listed everybody who was involved
2  in drafting?
3       A.  I think so.
4       Q.  Did you have any communications about SB 14 with
5  any current or former legislatures or staff who had
6  offered or introduced past photo ID bills?
7       A.  Did I communicate with members or staff from '09
8  or '07 about the '11 bill?
9       Q.  Or '05?
10      A.  I don't think so.
11      MR. SWEETEN:  Elizabeth, can we get to a
12 point of a break pretty quickly here.
13      MR. WESTFALL:  Sure.  Why don't we break
14 now.
15      MR. SWEETEN:  Sounds good.
16      (Brief recess.)
17 BY MS. WESTFALL:
18      Q.  Let's go back on the record.  I want to turn your
19 attention back to Exhibit 78, the letter from
20 Mr. Dewhurst to Senator Birdwell.  Could you look at
21 maybe a copy of your counsel's?  Do you see at the
22 bottom it says DD colon E G?
23      A.  Yes.
24      Q.  Is the DD, David Dewhurst?
25      A.  I don't know.

260

1       Q.  And who is the EG, do you know whose initials
2  those are, who would have been copied on this letter?
3       A.  I don't know that those -- I don't know what
4  those letters mean.
5       Q.  Do you know anyone who's first name --
6       A.  There's also a David Duran at the Governor's
7  office.  That's probably not his initials, but the point
8  being I don't know.
9       Q.  Who is Elaine Gonzales?
10      A.  She the -- I don't know her title.  Office
11 manager assistant to Governor Dewhurst, et cetera.
12      Q.  Thank you.
13      MR. SWEETEN:  By the way, Elizabeth I want
14 to go ahead on the record and tell you that we have
15 produced what you asked earlier about the draft
16 resolution outlining the procedures of the Committee as
17 a whole.  On Page 60 of the Senate journal dated 1/24/11
18 and that has been produced I'm told.
19      MS. WESTFALL:  Fantastic.  Thank you.
20      MR. SWEETEN:  That seemed very helpful to
21 you.
22      MR. ROSENBERG:  Have we decided is that
23 going to happen tomorrow or not, do we know?  I'm just
24 trying to tell my other people.
25      (Discussion off the record.)



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 261

1  BY MS. WESTFALL:
2      Q.  So we will go back on the record.
3          Are you aware of any communications with any of
4  firms or any legislatures from any other States about S
5  B 14?
6      A.  Yes.
7          MR. SWEETEN:  You can answer if you're aware
8  of.
9      A.  Yes.
10     Q.  (By Ms. Westfall) And who are those individuals?
11     A.  About SB 14?
12     Q.  Yes.
13     A.  There would have been communications with
14  individual and elections official and I forget his name.
15  I believe he testified in the hearing.  That's all I
16  know for sure.
17     Q.  Did you have any communications with any official
18  in Georgia?
19     A.  That's what I'm trying to remember.  I cannot
20  recall for sure.
21     Q.  How many conversations did you have with
22  officials in Indiana?  Or how many communications are
23  you aware of with officials in Indiana?
24     A.  There would have been a handful.  And again, I
25  only had one or two conversations, communications.  I

## 262

1  shouldn't say conversation.
2      Q.  Was anyone else involved in those communications?
3      A.  I believe Janus McCoy lined up that witness or
4  the hearing.
5      Q.  Were the communications regarding the hearing?
6      A.  I don't know everything they talked about, but
7  anything they I'm aware of it was about the hear.
8      Q.  You were a party to these conversations; is that
9  right?
10     A.  Yes.
11     Q.  And can you tell me the general nature of the
12  communications?
13     A.  Before the hearing it was, can you come down and
14  share your experience in Indiana.  And then the day of
15  the hearing it was more sort of pleasantries, welcome to
16  Texas, if you need something, explaining procedurally
17  how the Senate works and so forth.
18     Q.  Did you have any other communications with those
19  officials?
20     A.  Not that I recall.
21     Q.  Did you have any communications about SB 14 with
22  any interest group?
23     A.  Other than there were people that testified in
24  the original hearing.  I can't remember specific group.
25     Q.  Do you remember whether you had communications or

## 263

1  anyone in your office had communications with any group
2  representing minority voters?
3          MR. SWEETEN:  Hold on a minute.  You can
4  answer as to the subject matter as phrased.  Whether you
5  mad communications that's fine.
6      A.  I'm trying to keep straight SB 146789 there are
7  groups that made their opinions on voter identification
8  in general for and against.  I would say I probably had
9  indirect communications, meaning some sort of
10  constituent letter or e-mail or conversation in a
11  meeting.  I'm sure that happened with group from both
12  sides, including minority workers case.
13     Q.  Do you recall any with regard to Senate Bill 14
14  in particular?
15     A.  I believe in the public testimony there were
16  testimony from MALDEF and NAACP and maybe LULAC.
17     Q.  Were there any meetings involving anyone from
18  Lieutenant Governor's office with any of those group
19  related to SB 14?
20     A.  I would say we didn't have meetings with interest
21  group.
22     Q.  Pardon?
23     A.  We didn't have meetings with interest group as
24  you described them.  We met with anyone who wanted to
25  have a meet?

## 264

1      Q.  Did you or the Lieutenant Governor exchange
2  drafts with Senate Bill 14 with anybody?
3          MR. SWEETEN:  Objection, compound.
4      A.  Drafts of Senate Bill 14 I would have only
5  exchanged with Lieutenant Governor's staff and the
6  people I mentioned so far, the staff I mentioned so far.
7      Q.  (By MS. WESTFALL)  That is Ms. McCoy?
8      A.  Correct.
9      Q.  Ms. Jackson?
10     A.  Correct.
11     Q.  Anybody else?
12     A.  Not that I recall.
13     Q.  In drafting Senate Bill 14 did the Lieutenant
14  Governor or anyone in his office review any reports or
15  studies?
16         MR. SWEETEN:  I'm going to object based upon
17  legislator privilege.  You're asking for mental
18  impressions, thought processes related to pending
19  legislation and that is a matter that is subject to
20  legislative privilege as well as the deliberative
21  process privilege.
22     Q.  (By Ms. Westfall) Do you have any testimony in
23  response to my question?
24     A.  I'll assert the privilege.
25     Q.  Did you consider including any forms of

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



ESQUIRE
DEPOSITION SOLUTIONS

265

1    additional ID in Senate Bill 14?
2        MR. SWEETEN:  Same objection.  Do not reveal
3    any thoughts, communications or privileged
4    communications as we went over in legislative privilege.
5        A.  In the Senate Committee there was discussion of
6    previous drafts there was discussion of potential
7    amendments there was a lot of discussion.
8        Q.  (By MS. WESTFALL) And other than that, you're
9    asserting privilege in response to that answer?
10       A.  Correct.
11       Q.  Are you aware of any analysis that was conducted
12   regarding how many registered voters possessed the
13   required forms of ID under S B 14?
14       MR. SWEETEN:  Don't reveal thoughts, mental
15   impressions, or opinions about legislative for
16   answer of the legislative process and don't reveal
17   communications.  You can refer to matters in the public
18   matter with respect to this question.
19       A.  Again, there was discussion in the public hearing
20   about the impact it would have on vote something
21   general, particular communities specifically regarding
22   internal communications.  I'll assert the privilege.
23       Q.  (By MS. WESTFALL)  Thank you.  Are you aware of
24   any analysis to determine if minority voters would be
25   disproportionately less likely to possess the additional

266

1    forms or ID allowed under SB 14?
2        MR. SWEETEN:  Same objection.  The question
3    asks you to reveal thoughts, mental impression, opinions
4    about legislations, rules, the potential communications
5    with State Agencies, State Legislative Staff,
6    Legislators, Legislative Council, therefore it'd be
7    legislatively privileged.  It also invades deliberative
8    process of privilege, therefore I'm instructing you not
9    to answer.
10       A.  Again, to the extent -- my answer would involve
11   internal communications.  I would assert the privilege.
12   But again in public -- in the testimony publicly, there
13   was a discussion I recall about how this would impact --
14   I mean, what percentages of different communities might
15   have or not have the identification.  And I believe that
16   was from the Secretary of State's office and from
17   Senators.
18       MS. WESTFALL:  What is the final -- what is
19   the decision that you're asserting with regard to
20   deliberative process privilege with regard to these
21   communications?
22       MR. SWEETEN:  Well, first of all, I am
23   honestly relying upon the legislative privilege.
24   However with respect to their deliberations with respect
25   to Senate Bill 14, I'm referring to that.  Those would

267

1    be subject to the privilege.
2        MS. WESTFALL:  Those are deliberations.  But
3    what was the decision since Lieutenant Governor Dewhurst
4    did not ultimately vote on Senate Bill 14; is that
5    correct?  So what is the decision that you are asserting
6    deliberative process over?
7        MR. SWEETEN:  As to decisions with respect
8    to any procedural aspect of the bill, the decisions that
9    they reviewed, that the processes were formulated -- so
10   it would be as to their actions with respect to the bill
11   --
12       MS. WESTFALL:  So that's --
13       MR. SWEETEN:  In addition to the legislative
14   privilege.
15       MS. WESTFALL:  I understand you're asserting
16   legislative privilege.  I'm going to ask you to withdraw
17   deliberative process privilege because I'm not -- unless
18   there's something else that you need to add on this
19   topic -- I'm not understanding what the decision is that
20   relates to these communications since the Lieutenant
21   Governor did not vote on this legislation he was
22   actively involved.
23       MR. SWEETEN:  He was also involved in the
24   Committee-of-the-Whole hearing.  It reflects the give
25   and take of the consultative process, which is something

268

1    that the court has recognized as being subject to the
2    deliberative process privilege.
3        MS. WESTFALL:  It's certainly deliberative,
4    but the court certainly had concerns about the
5    privileged logs produced previously and their failure to
6    identify the decision at issue.  So I would ask you to
7    identify on the record what the decision is or to
8    withdraw your privilege instruction based on
9    deliberative process.
10       MR. SWEETEN:  I think I have been clear.
11   We're talking about the Committee-of-the-Whole -- of the
12   whole process with respect to decisions about that
13   process, with respect to his role in that process, with
14   respect his role -- any role that he had with the Senate
15   Bill 14 legislation.  I think that that all -- those all
16   would be matters that are covered in addition to the
17   fact that I'm asserting legislative privilege.
18       MS. WESTFALL:  I understand the assertion of
19   legislative privilege.  We have plenty of testimony from
20   this witness that -- and it's clear from the face of the
21   Senate rules that the Lieutenant Governor is not able to
22   introduce legislation.  What I'm examining this witness
23   on right now is about his participation in drafting
24   Senate Bill 14 so I do not believe that deliberative
25   process privilege is an appropriate privilege to be



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 269

1   interposing with regard to these questions. I ask you
2   withdraw that privilege. If you want to assert
3   legislative privilege, go ahead and do so, but not
4   deliberative process.
5        MR. SWEETEN: I've made my objections.
6   Q. (BY MS. WESTFALL) Ms. McCoy testified in
7   deposition in this case that there were no studies at
8   all about the analysis of who has and ID the for
9   purposes of Senate Bill 14, either public or private
10  studies.
11       A. Studies of -- I'm sorry, Texas?
12       MR. SWEETEN: Let her ask her question.
13  Q. Ms. McCoy testified in deposition in this case
14  that there are no studies at all about any analysis of
15  who has and ID for purposes of Senate Bill 14, you know,
16  either public or private studies. Do you agree with her
17  testimony?
18       MR. SWEETEN: In answering the question
19  don't reveal your thoughts, mental processes, opinions
20  about legislation or in furtherance of the legislative
21  process that would be legislatively privileged. Don't
22  reveal the communications that we previously outlined in
23  answering the question. So to the extent you can answer
24  it without revealing those, you can go ahead and do so.
25  Otherwise objection privileged.

### 270

1        A. The question is, are there studies about Texas
2   voters?
3   Q. (BY MS. WESTFALL) Correct.
4        A. Okay. I think that's correct. I don't remember
5   for sure.
6   Q. Do you know what a citizenship certificate is?
7        A. My understanding was that it's -- it's just that,
8   it's a certificate issued for various states of presence
9   in that state.
10  Q. Do you know how much it costs to obtain one?
11       A. I don't recall.
12  Q. Do you know how much it would cost if you had one
13  and you need to replace it?
14       A. I don't recall.
15  Q. Do you know how long it would take to get a
16  replacement citizenship certificate?
17       A. I don't recall.
18  Q. Do you know how much it cost to obtain a U.S.
19  passport?
20       A. I don't know exactly.
21  Q. Do you know approximately?
22       A. I think it's about -- there's a different price
23  for expedited versus regular. I want to say it's
24  $60-something for the regular and then $100 for an
25  expedited-ish.

### 271

1   Q. Do you know what documents you need to have to
2   get a U.S. Passport?
3        A. I don't know the full list. I know birth
4   certificate, driver's license, those sorts of documents.
5   I don't know the full list.
6   Q. Do you know how long it takes to get a U.S.
7   passport?
8        A. I don't recall.
9   Q. Do you recall any conversations about not
10  including the non-photo forms of ID in Senate Bill 14 as
11  was permitted under Senate Bill 362?
12       MR. SWEETEN: You can reveal whether or not
13  a conversation occurred on general subject matter, but
14  don't reveal the substance of the specific conversation.
15       A. Yeah. I don't recall specific conversations.
16  But I think we discussed the forms of ID.
17  Q. (BY MS. WESTFALL) What was the purpose of
18  excluding non-photo forms of ID as allowable in Senate
19  Bill 14?
20       MR. SWEETEN: Don't reveal your thoughts,
21  mental impressions, or opinions about legislation or
22  furtherance of the legislative process, or
23  communications to legislative privilege.
24       A. I'll assert privilege.
25  Q. You'll assert privilege. Are there any changes

### 272

1   that occurred in the state of election administration in
2   Texas or otherwise between 2009 and 2011 that made these
3   forms of identification unacceptable and not proving
4   one's identity under Senate Bill 14?
5        MR. SWEETEN: The question asks you to
6   reveal mental impressions, opinions, and furtherance of
7   the legislation. Therefore -- and also potentially
8   conversations that are privileged -- and therefore I'm
9   asserting legislative privilege. I instruct you not to
10  answer.
11  Q. (BY MS. WESTFALL) Are you following the advice
12  of council?
13       A. Yes.
14  Q. Can you -- do you know anything about the
15  circumstances under which the license to carry a
16  concealed handgun was included as a form of photo ID in
17  Senate Bill 14?
18       MR. SWEETEN: Same objection. Instruct you
19  not to answer except for as to matters on the public
20  record.
21  Q. (BY MS. WESTFALL) Are you following advice of
22  council?
23       A. Yes.
24  Q. Do you know why Senate Bill 14 or what the
25  purpose was in not including Student IDs in the bill?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

273

1          MR. SWEETEN:  You can answer questions per
2     the court order about the general purpose of Senate Bill
3     14.  However don't reveal thoughts, mental impressions
4     that would be subject to the legislative privilege or
5     the subjective intent of the legislator.
6          A.  I believe -- my memory is there may have been
7     some public debate about that issue during the Committee
8     hearing, but I don't remember the exact nature of it.
9          Q.  (By MS. WESTFALL)  Are you aware of any
10    conversations about the removal of Student IDs an
11    allowable form of ID from Senate Bill 14 and it's impact
12    on students at historically black colleges in Texas?
13         MR. SWEETEN:  Objection.  You're asking him
14    to reveal thoughts, mental impressions, or opinions,
15    about legislation or conversations that he had with
16    legislators, legislative staff, state agencies, or Texas
17    Legislative Council.  As such, the question that you're
18    asking imposed is subject to the legislative privilege.
19    If you want to ask a more general and have a general
20    topical subject matter description, you know, I'll let
21    him answer that as I have all day.  But as to the way
22    you've asked that question you're asking for very
23    specific conversation.
24         Q.  (By MS. WESTFALL)  Are you following the advice
25    of council?

274

1          A.  Yes.
2          Q.  Are you aware of any conversations, public or
3     private, concerning voter ID bills and historically
4     black colleges in Texas?
5          MR. SWEETEN:  I think we are a little beyond
6     general subject matter, but I'll let him answer if he's
7     aware of such conversations.
8          A.  I'm not aware.
9          Q.  How did the exception for individuals with
10    disabilities come to be included in Senate Bill 14?
11         MR. SWEETEN:  That's a matter subject to
12    legislative privilege and I instruct you not to answer.
13         Q.  (By Ms. Westfall) Are you following the advice of
14    council?
15         A.  Yes.
16         Q.  Could you describe, on the basis of the face of
17    the statute, the provisions in the bill pertaining to
18    the administration of the ID requirements at the polls
19    and how poll workers would determine whether the ID was
20    sufficient?
21         MR. SWEETEN:  The question -- since the
22    question is confined to the texts of the bill, you can
23    answer.
24         A.  Section 6 of the bill, at the bottom of Page 3,
25    looks like it requires training standards for election

275

1     workers to include provisions on acceptance and handling
2     of identification.
3          Q.  (By MS. WESTFALL)  Does the bill essentially
4     leave it to the Secretary of State to call and get
5     regulations on this -- not regulations, but guidelines?
6          A.  I believe the amended section of law here are
7     standards adopted by the Secretary of State.
8          Q.  Do you think the key to success of this bill,
9     Senate Bill 14, is the administration of the bill and
10    for poll workers to understand how they determine a
11    voter's identity?
12         MR. SWEETEN:  Her question is asking you to
13    reveal thoughts, mental impressions, and opinions and
14    legislation, therefore it's matter subject to the
15    legislator privilege.
16         Q.  (By MS. WESTFALL)  Are you following the advice
17    of council?
18         A.  Yes.
19         Q.  Can you describe the provisions in Senate Bill
20    14, based on the face of the bill, concerning the
21    Election Identification Certificate?
22         A.  The Election Identification Certificate on Page
23    13 requires, I believe it's DPS, Department of Public
24    Safety, to issue these cards to persons if they are a
25    registered voter in the State and eligible for

276

1     registration.  It provides they cannot collect a fee for
2     that certificate, or for a duplicate certificate, or any
3     replacement.  It says it can only be used for election
4     purposes and not for as a personal identification
5     certificate.  It provides election officers have to
6     accept that election ID as a valid form of
7     identification proof.  It says the election ID should be
8     similar to but distinguishable from the Driver's
9     License.  It requires provision of certain documents or
10    information to get the ID.  It allows the department to
11    decide when those certificates or identification cards
12    expire, except that once you reach 70 years of age, it
13    doesn't expire.
14         Q.  Was this provision related to election
15    identification certificates in the bill as filed first?
16         A.  My memory is that it was not filed.
17         MS. WESTFALL:  Let the record reflect the
18    witness is turning to Exhibit 81 or looking for
19    Exhibit 81.
20         MR. SWEETEN:  Caution the witness to review
21    Exhibit 81, the prior version of the bill.
22         MS. WESTFALL:  It's actually the filed
23    version of the bill.
24         THE WITNESS:  Election Identification
25    Certificate was not in the filed version.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                          MAY 29, 2012

---

277

1    Q. At what stage in the process, based on the public
2  record did it become included in SB 14?
3    A. I don't have all of the different versions in
4  front of me and I can't remember if it was before it
5  passed the Senate or in conference Committee or in the
6  House maybe. Sometime after being filed.
7    Q. Thank you. Were you involved in the drafting of
8  this particular provision yourself?
9    A. Yes.
10   Q. Was the Election Identification Certificate in
11 previous photo ID bills and prior legislative sessions?
12   A. I don't think so.
13   Q. How did you develop this language in SB 14?
14       MR. SWEETEN: Objection. You're asking him
15 to reveal his thoughts, mental impressions, opinions
16 about legislation, legislative process and so subject to
17 legislative privilege.
18       MS. WESTFALL: Instruct him not to answer?
19       MR. SWEETEN: Instruct him not to answer.
20   Q. (BY MS. WESTFALL) Are you following your
21 counsel's advice?
22   A. Yes.
23   Q. Are you aware of any conversations about the
24 Election Identification Certificate to which you or
25 anyone in the Lieutenant Governor's office was a party

---

278

1  during the drafting process for Senate Bill 14?
2       MR. SWEETEN: You can answer.
3    A. Yes.
4    Q. (BY MS. WESTFALL) When was the first
5  conversation you're aware of?
6    A. Again, it would have been sometime after the
7  filing of the bill. Perhaps even after -- again I can't
8  remember without seeing each stage of the draft, I
9  recall exactly when it would have been.
10   Q. Who was a part of the communication?
11   A. Again, it would have been myself and probably
12 Janus McCoy, perhaps Senator Fraser. That's all I can
13 recall for sure.
14   Q. Was the Lieutenant Governor involved in any
15 conversations about the Election Identification
16 Certificate?
17   A. I don't believe so.
18   Q. How many conversations did you have with
19 Ms. McCoy?
20   A. About Identification Certificate?
21   Q. Yes?
22   A. Probably a handful.
23   Q. Did you have any e-mail communications with her?
24   A. Perhaps, but I don't recall specifically.
25   Q. Where you aware of any conversations concerning

---

279

1  the difficulty or steps necessary to take to obtain an
2  election certificate?
3    A. I'm sorry. Could you repeat that?
4    Q. Certainly. Certainly. Are you aware of any
5  communications or conversations concerning difficulty in
6  obtaining an Election Identification Certificate that
7  occurred during that drafting and consideration of SB
8  14?
9        MR. SWEETEN: I think this does more than
10 ask for a general subject matter topic, but you can go
11 ahead and answer the question as posed.
12   A. I don't recall specific conversations about it
13 being difficult to obtain one of these certificates.
14   Q. (By MS. WESTFALL) Are you aware of any testimony
15 or public statements about difficulty of obtaining an
16 Election Identification Certificate?
17   A. I don't recall any.
18   Q. Are you aware of any analysis of the cost or
19 steps that a voter would need to take to obtain an
20 Election Identification Certificate?
21   A. Yeah --
22       MR. SWEETEN: In answering that questions it
23 would require you to reveal thoughts, mental
24 impressions, opinions about legislation, or
25 communications that are subject to the legislative

---

280

1  privilege. Therefore I instruct you not to answer the
2  question on the basis of legislative privilege.
3    Q. (By MS. WESTFALL) Are you following council's
4  advice?
5    A. Yes.
6    Q. What documents are needed to obtain an Election
7  Identification Certificate under SB 14?
8    A. Looks like Subsection F allows the department to
9  require applicants to furnish information required by
10 and it refers to another section. So I think it's the
11 same sorts of documents required to get a Driver's
12 License.
13   Q. Do you know how much it costs to obtain those
14 underlying documents as you sit here today?
15   A. I don't recall.
16   Q. If an individual lacks those documents, is it
17 possible to get an Election Identification Certificate
18 without paying the cost for the underlying documents?
19       MR. SWEETEN: You're asking based upon the
20 text as written?
21       MS. WESTFALL: Yes.
22       MR. SWEETEN: And his current knowledge?
23       MS. WESTFALL: Yes.
24   A. I would have to see a list under 521142 that's
25 referenced here.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

281

1    Q.  (BY MS. WESTFALL)  If the documents needed for
2  the underlying forms of identification are not
3  themselves free, there's a cost to voting for those who
4  lack the necessary documents, is there not?
5    A.  There's a cost to obtain the Certificate if this
6  is the only way, yes.  There are also provisional ballot
7  provisions that allow you to vote without the proper --
8    Q.  Right.  And under those provisions under the face
9  of the statute, if you vote a provisional ballot, your
10  ballot won't be counted unless you produce and supply an
11  appear before the County Election Official with a
12  necessary form of ID, correct?
13    A.  Let me check.  Looks like Page 6 there, if you
14  are disabled, that's an exception.  But generally I
15  think you're right.
16    Q.  Thank you.  Do you know where a voter can obtain
17  an Election Identification Certificate?
18    A.  It says the department may issue so I assume the
19  same place as you would get personal identification
20  certificates for a Driver's License.
21    Q.  And that would be under the Department of Public
22  Safety?
23    A.  Correct.
24    Q.  That would be Driver's License offices; is that
25  right?

---

282

1    A.  Correct.  It looks like it's silent as the
2  different types of places.
3    Q.  Do you know the hours of operation of those
4  offices, generally speaking?
5    MR. SWEETEN:  Objection compound.
6    A.  Of all driver's license offices in the State of
7  Texas?
8    MR. SWEETEN:  And when you're providing this
9  answer, just don't reveal mental impressions, thoughts
10  or communications that occurred in formulating the bill.
11    THE WITNESS:  Sure.
12    MS. WESTFALL:  This is information about
13  hours of operation.  How is this possibly something that
14  over which you could assert privilege?  This is like
15  probably on a website, Patrick.
16    MR. SWEETEN:  If it relates back to
17  information that he learned and would reveal his mental
18  impression, thoughts, or communications that incurred at
19  the time then that potentially is privileged.  Again he
20  can answer as he is sitting here if he knows so I will
21  let him do that.
22    Q.  (BY MS. WESTFALL)  Do you know?
23    A.  I believe the hours vary depending on the
24  location of the office.
25    Q.  Does SB 14 require employers to provide paid

---

283

1  leave to -- for the time it takes to obtain an
2  identification?
3    A.  I don't believe it does.
4    Q.  Do you know whether some individuals and voters
5  in Texas live at least 50 miles from the Driver's
6  License office?
7    MR. SWEETEN:  You can answer, if you know
8  while you're sitting here.
9    A.  Yeah, I mean, as, I sit today I don't know that
10  for sure.
11    Q.  Do you know whether any group of minorities are
12  less likely than other groups to have the necessary
13  forms of ID under SB 14?
14    MR. SWEETEN:  Objection to the extent that
15  the question calls for you to reveal thoughts, or mental
16  impressions, opinions about legislations, discussions
17  you had with legislators, legislative staff, state
18  agencies, Texas Legislative Council.  Those matters
19  would be subject to the legislative privilege so do not
20  reveal those.  You can refer to matters in the public
21  record.
22    A.  So the question is:  Are some minority groups
23  less likely to have photo identification than other
24  group?  I don't know.
25    Q.  (By MS. WESTFALL)  Are you aware of any

---

284

1  conversations with the Department of Public Safety
2  during the drafting of SB 14 related to Election
3  Identification Certificates?
4    MR. SWEETEN:  You can reveal whether or not
5  you're aware of such conversations.  Do not reveal the
6  substance of those conversations.
7    A.  I am not aware of conversations with the
8  Department of Public Safety.
9    Q.  (By MS. WESTFALL)  During any time during the
10  consideration of SB 14; is that right?
11    A.  About Election Identification Certificates?
12  Correct.
13    Q.  Yes.  Thank you.  And when did you last renew
14  your Driver's License?
15    A.  I don't know.  A year or two ago.
16    Q.  Did you go in person?
17    A.  Yes.
18    Q.  What were the hours of operation of that office?
19    A.  My memory is they were standard 8:00 to 5:00,
20  9:00 to 5:00 hours, but I can't recall for sure.
21    Q.  How far that office from your home?
22    A.  It was -- well, about 8 miles.
23    Q.  Did you wait in a line to renew Driver's License?
24    A.  No.
25    Q.  Did you drive to get there?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 285

1    A.  I walked from my office where I worked.
2    Q.  Do you have a copy of your birth certificate?
3    A.  Did I?
4    Q.  Do you?
5    A.  Yes.
6    Q.  If you lost it, do you know how you would replace
7    it?
8    A.  I'm not 100% sure.  I imagine I would contact the
9    State of birth.
10   Q.  We talked a little bit about this, but could you
11   provide an overview based on the statute of the
12   provisional ballot provisions?
13       MR. SWEETEN:  You're asking him based upon
14   the text of the statute?
15       MS. WESTFALL:  Right.
16       MR. SWEETEN:  Of SB 14?
17       MS. WESTFALL:  Yeah.
18   A.  So if you show up to vote -- and this is on Page
19   4 of the final -- never mind.  Wrong copy.  Looking at
20   the bill engrossed version as finally adopted, if a
21   voter shows up and does not have the required
22   identification he'd be accepted provisional voting at
23   which point the election officer shall inform them of
24   the right to cast a provisional ballot, provide them
25   written information listing the requirements for ID

---

### 286

1    procedures for presenting that ID, and a map showing
2    them where the identification must be presented.  And
3    then it says those provisions do not apply to a voter
4    who is disabled and prevents their Voter Registration
5    Certificate.
6    Q.  So with the exception of that exception, if you
7    vote provisionally and you do not, within 6 days,
8    provide a form of the ID, your provisional ballot is not
9    counted; is that right?
10   A.  I believe that's correct.
11   Q.  Can you describe each and every purpose of Senate
12   Bill 14?
13       MR. SWEETEN:  You can answer the question,
14   provide the general purpose of the bill.
15   A.  When you say purpose, you don't mean intent.  You
16   mean, what does the bill do on its face?
17   Q.  (By Ms. Montgomery)  Well, purpose, you
18   know, per the court's order either public or private,
19   the purpose of the bill, any purpose?
20   A.  So SB 14, again, looking at the statute --
21   Q.  But this is not limited to looking at the
22   statute.  This is any purpose.  And I'm sure Mr. Sweeten
23   will let you testify.  Any purpose of the bill, public
24   or private, that you're aware of, pursuant to the order
25   of, I believe it was May 17th.

---

### 287

1    A.  Sure.  Again, the general purpose of voter
2    identification and election reform bills would be to
3    ensure --
4    Q.  I'm directing your attention to Senate Bill 14.
5    I'm sorry to interrupt you but I just want to make sure
6    the question is understood.
7    A.  Sure.  As I stated earlier, to ensure the
8    integrity of the elections and instill confidence among
9    voters, certainly a purpose.  This particular bill also
10   has the purpose of making sure that voters are informed.
11   And making sure that poll workers are trained.
12   Q.  Anything else?
13   A.  I'm sure there are others.  But that seems to me
14   to be the main purposes.
15   Q.  In terms of the basis and information and behind
16   why SB 14 furthers the integrity of elections; is there
17   anything other than the testimony you provided earlier
18   about that purpose with regard to an earlier iteration
19   of the bill that you would like to testify about today,
20   with regard to Senate bill 14?
21   A.  I don't understand the question.  Can you read
22   that back, please?
23   Q.  All right.  It's late in the day.  Let me
24   withdraw that question.
25       You testified earlier about how a previous Photo

---

### 288

1    ID Bill furthered the integrity of elections.  Do you
2    remember that testimony?
3    A.  Yes.
4    Q.  Does all that testimony apply to why Senate Bill
5    14 furthers the integrity of elections?
6    A.  I believe, yes.
7    Q.  Is there anything else that you want to testify
8    about as to why Senate Bill 14 promotes integrity of
9    elections?
10   A.  I don't think so.
11   Q.  You also testified earlier that a previous
12   iteration Photo ID Bill instilled confidence in voters,
13   did you not?
14   A.  I believe that's right.
15   Q.  Could you explain how SB 14 instills confidence
16   in voters?
17       MR. SWEETEN:  He's testified as to the
18   purpose of the bill.  You're now asking him why is the
19   purpose of the bill correct.  I think what you're asking
20   him to do is to reveal his thoughts, mental impressions,
21   or opinions with respect to the specific bill and I
22   think what you're asking him is subject to the
23   legislative privilege.  I will allow him to testify as
24   he has about the purpose of Senate Bill 14.  But I think
25   your questions beyond that are covered by the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

BRIAN HEBERT                                      MAY 29, 2012

---

### 289

1  legislative privilege.
2      A.  I mean, I think -- again, there was testimony in
3  Committee that the bill was designed to do the things
4  that I just mentioned:  Increase the security of the
5  elections which has the impact of increasing the
6  integrity of those elections.
7      Q.  (By MS. WESTFALL)  Is there any facts, analysis,
8  or information that you can testify about today that
9  would indicate that Texas voters have confidence in
10  their elections?
11      MR. SWEETEN:  Objection.  You're asking him
12  matters that would require him to reveal his mental
13  impressions, his opinions about legislation, or
14  furtherance of the legislative process and/or
15  communications that we've outlined previously.
16  Therefore this matter is legislatively privileged.  And
17  I object to the question on that basis.  You can answer
18  based upon matters of the public record.
19      A.  I don't recall what evidence is in the public
20  record.
21      Q.  (By MS. WESTFALL)  Thank you.  And are you --
22      A.  I'm asserting privilege otherwise.
23      Q.  Thank you.  Was any part of the purpose of SB 14
24  to decrease the number of Hispanic voters?
25          MR. SWEETEN:  You can testify about the

---

### 290

1  purpose of the bill.
2      A.  Looking at the bill, the purpose is not to
3  decrease voting by any particular group, except the
4  group of ineligible voters.
5      Q.  (By Ms. Montgomery)  But not based solely on the
6  face of the bill -- I'm talking about the public and
7  private purposes.  I'm -- the court has allowed inquiry
8  as to the public and private purposes of bills pursuant
9  to its May 17th order.  So not limiting your answer to
10  the face of the bill, was any part of the purpose of
11  Senate Bill 14 to decrease the number of Hispanic
12  voters?
13          MR. SWEETEN:  You can answer.  The court has
14  said that it is -- that to the extent such as privilege
15  the privilege does not protect testimony with respect to
16  the general purpose or the purpose of a Legislature as a
17  whole in enacting Senate Bill 14 as opposed to the
18  subjective intent of the Legislature.  Therefore you can
19  answer based upon what the court has said you can
20  testify to about the purpose.
21      A.  I'm not aware of any legislative purpose to
22  decrease Hispanic voters turnout.
23      Q.  (By MS. WESTFALL)  Was any part of the purpose of
24  Senate Bill 14 to decrease the number of any other group
25  of minority voters?

---

### 291

1      A.  I'm not aware of any legislative incentive to
2  decrease turnout among any group of voters.
3      Q.  Was any part of purpose of Senate Bill 14 to
4  discriminate in any way against any group or groups of
5  minority voters?
6      A.  I'm not aware of any legislative intent to
7  discriminate against any group of voters.
8      Q.  Was any part of the purpose of Senate Bill 14 for
9  partisan purposes?
10      A.  Partisan?  You mean Republican versus democrat?
11      Q.  Correct.
12      A.  I'm not aware of any legislative intent based on
13  partisanship.
14      Q.  And I believe you testified earlier that part of
15  the purpose of Senate Bill 14 was to inform voters and
16  train poll workers.  Are both of those items with regard
17  to the requirements of Senate Bill 14?
18      A.  Yes.
19      Q.  Did the purpose of photo ID in Texas evolve over
20  time and change in any way from one session to the other
21  in your view?
22      MR. SWEETEN:  I'm going to object.  That
23  calls for him to reveal matters that are subject to the
24  legislative privilege including his thoughts, mental
25  impressions, opinions about legislation or in

---

### 292

1  furtherance of the legislative process.
2      MS. WESTFALL:  I'm asking his opinion about
3  purposes which I'm allowed to examine on.  So I'm not
4  certain I'm asking his analytical ability of discussing
5  purpose to purpose to purpose which he's testified about
6  today.  So I'm not certain why you would be directing
7  him not to answer my question, Mr. Sweeten.
8      MR. SWEETEN:  Well, just to be clear.  He's
9  answered the question on the general purpose of the
10  bill.  He's answered the question on the general purpose
11  of the other statutes that -- presented in front of him.
12  So to the extent that you're asking him that, I will let
13  him answer the question as to purpose.  So you can go
14  ahead and answer with that instruction.
15      A.  I would say generally the purpose has been the
16  same.  I mean, given that there are different sponsors,
17  again, when you say purpose, I hear intent.  And I don't
18  know the intent of any given sponsor, or voter, on the
19  supporter of this bill.
20      Q.  (BY MS. WESTFALL)  Yes.  I'm not asking about the
21  intent.
22      A.  Right.
23      MR. SWEETEN:  Let him finish if you would.
24  He's not finished with his answer.  You can finish.
25      A.  So, yes.  Generally speaking, the purpose as you

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 293

1    mean it of each of these versions of the bill has
2    remained similar.
3        Q.  (BY MS. WESTFALL) And is it true that the
4    Lieutenant Governor has consistently indicated that one
5    of his purposes was to prevent non-citizens from voting?
6        MR. SWEETEN:  Don't reveal matters or
7    discussions that you've had with the Lieutenant Governor
8    that would invade the attorney/client privilege.  Also
9    that would be subject to the legislative privilege.  You
10   can testify as to matters of the public record and
11   public statements.
12       A.  Right.  I'm not aware of any statements that
13   indicate that was his intent.
14       Q.  (BY MS. WESTFALL)  Okay.  Well, remember you
15   testified about U.S. Exhibit 3 concerning a letter in
16   the Texas Weekly that related to the purpose of photo
17   ID --
18       A.  Right.
19       Q.  In preventing non-citizens from voting.  Does
20   that refresh your recollection as to one of the
21   Lieutenant's Governor's intents and purposes in
22   promoting the issue of voter ID?
23       MR. SWEETEN:  He's not going to testify
24   about someone's subjective intent.  He can testify about
25   whether or not something was -- a statement was made on

## 294

1    the public record.  But what you're asking him to do is
2    to reopen communications that he may have had with
3    Lieutenant Governor Dewhurst which would be both
4    protected by the attorney/client privilege as well as
5    the legislative privilege.
6        MS. WESTFALL:  I'm asking about an article
7    that was published in the Texas Weekly so it seems to me
8    to be fairly public.
9        MR. SWEETEN:  You're asking about intent of
10   the statement.  And the intent of the statement, again,
11   is a legislative privilege as well as the
12   attorney/client privilege.  He can testify about whether
13   or not a statement was made, but he's not going to
14   testify about the subjective intent which is something
15   specifically prohibited in the court.
16       A.  I believe your earlier question was the purpose
17   of Lieutenant Governor Dewhurst to prevent non-citizen's
18   from voting.
19       Q.  (BY MS. WESTFALL)  Yes.
20       A.  And I said no.  The Texas Weekly article to which
21   you referred appears to have two versions of the letter.
22   And I can't remember which one was deemed to be the
23   official statement and which was a draft or not.  The
24   short answer, again, is:  I'm not aware of that being
25   the purpose for Lieutenant Governor to support the bill,

## 295

1    given public statements.
2        Q.  Was any purpose of any Photo ID Bill to increase
3    voter turnout?
4        MR. SWEETEN:  Objection.  Asked and
5    answered.  He's provided the purpose of each of the
6    bills.  You can answer as to the general purpose of the
7    legislation.
8        A.  Again, I would say that, yes, I'm more confident
9    in electorate that turns out in greater numbers.
10       Q.  (By MS. WESTFALL)  So are you amending your
11   response to my question about each and every purpose of
12   Senate Bill 14 to include -- one of the purposes was to
13   increase voter turnout?
14       MR. SWEETEN:  Objection argumentative.  You
15   can answer.
16       A.  My understanding was that you are asking me to
17   clarify and give more detail about an existing answer.
18   So my answer is the purpose of the bill -- one of the
19   purposes, the one that I would identify was to insure
20   the integrity of the elections and instill confidence in
21   the voting public.  Whether that results in an increased
22   turnout might be ineffective and maybe it's the purpose
23   of it depending on how you characterize it.
24       Q.  (By MS. WESTFALL)  Is it your testimony here
25   today that one of the purposes was to increase turnout?

## 296

1        MR. SWEETEN:  Objection.  Asked and
2    answered.
3        A.  I would repeat it's -- whether it's characterized
4    as an effective legislation, or a purpose, or an intent,
5    I'm not sure.  But I think it's a possibility.
6        Q.  (BY MS. WESTFALL)  Are you aware of any incidents
7    of in-person voter impersonations in the State of Texas
8    in the last 20 years?
9        MR. SWEETEN:  Hold on.  When you're
10   answering the question don't reveal thoughts, mental
11   impressions, opinions about legislation, including
12   discussions or conversations you had with legislatures,
13   legislative staff, State Agencies, Texas Legislative
14   Council.  You can answer it based upon matters of the
15   public record or as you're sitting here right now the
16   question is what are you aware of.  And it doesn't
17   invade those privileges then you can answer that
18   question.
19       A.  I don't recall how much of the public testimony
20   -- and are we talking about SB 14 now?
21       Q.  (BY MS. WESTFALL)  Yes.
22       A.  I don't recall how much of the public testimony
23   of SB 14 involved examples of in-person voter fraud.
24       Q.  I'm sorry.  You don't recall any public
25   testimonies ever?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

297

1      A. I don't recall whether the public testimony
2   included examples of in-person voter fraud.
3      Q. How many incidences of mail-in voter fraud have
4   occurred in Texas in the last 20 years?
5          MR. SWEETEN:  In answering this question
6   don't reveal matters that are subject to the legislative
7   privileges I have outlined today.
8      A. Right.  I don't know that number.
9      Q. (By MS. WESTFALL)  Have you heard of any voters
10  who did not participate in an election because they were
11  concerned that voter fraud would cancel out their vote?
12         MR. SWEETEN:  Same objection, same
13  instructions.  You can answer as to matters of the
14  public record, but don't reveal matters subject to the
15  legislative privilege.
16     A. Again, I don't recall all the public provide
17  testimony specifically.
18     Q. (By MS. WESTFALL)  Do you think Senate Bill 14,
19  if ultimately able to be implemented, will result in
20  increased turnout in Texas?
21         MR. SWEETEN:  When you're answering the
22  question don't reveal matters that are subject to the
23  legislative privileges.  You can answer if your answer
24  will not reveal those matters.
25     A. I don't know what will happen.

298

1      Q. (By MS. WESTFALL) Did the Lieutenant Governor
2   play any role in developing the strategy to insure that
3   Senate Bill 14 would be passed?
4          MR. SWEETEN:  Objection.  You're asking him
5   to reveal thoughts, mental impressions, conversations he
6   may have had with Lieutenant Governor Dewhurst as well
7   as his -- any specific roles he may have had or
8   discussions with legislators.  So to the extent that
9   what she's asking calls upon matters that are subject to
10  legislative privilege, I would instruct you not to
11  answer the question.  You can answer based upon the
12  public record or matters of -- that are public as to
13  those matters.
14     A. I'll assert the privilege.
15     Q. (By MS. WESTFALL)  Are you aware of any
16  conversations surrounding how to prevent what happened
17  in 2009 with voter ID from happening again in 2011?
18         MR. SWEETEN:  I'm going to instruct you on
19  the legislative privilege, don't reveal communications
20  that you've had regarding this bill.
21     A. Could you clarify what you mean?
22         MR. SWEETEN:  Sorry.  With the individuals
23  that I've already outlined previously.
24     Q. (By MS. WESTFALL)  You testified earlier that
25  voter ID failed in 2009, right?

299

1      A. Right.
2      Q. Are you aware of any conversations about that
3   failure in 2009 and how to avoid such failure in 2011?
4          MR. SWEETEN:  You're asking about the
5   specific substance of the communication.  You're asking
6   matters that would require him to reveal matters that
7   are subject to the legislative privilege.  Accordingly,
8   I'm going to instruct him not to answer.  Also you
9   potentially are asking questions that may relate to the
10  attorney/client privilege or that deliberative process
11  privilege.
12     Q. (By MS. WESTFALL)  Do you have any testimony?
13     A. No.  I'll assert the privilege.
14     Q. Is it true that the Lieutenant Governor reserves
15  low bill numbers for priority bills?
16         MR. SWEETEN:  You can testify about matters
17  in the public record general procedure.
18     A. I believe that's right.
19     Q. (By MS. WESTFALL)  And did Lieutenant Governor
20  not have any involvement with SB 14 until Senator Fraser
21  filed it in 2011 -- 2010, sorry.
22         Mr. Sweeten:  Objection to the question as
23  vague.
24     A. I don't know if he did.
25     Q. (By MS. WESTFALL)  If you learned that

300

1   Ms. Rathgeber just testified to that effect, would it
2   surprise you?
3      A. That she testified to the effect?
4      Q. That she testified that the Lieutenant Governor
5   had no involvement in SB 14 until Senator Fraser filed
6   it in November 2010?
7          MR. SWEETEN:  Objection asked and answered.
8      A. Does it surprise me?
9      Q. (By MS. WESTFALL)  Does it sound accurate?
10         MR. SWEETEN:  Same objection asked and
11  answered.
12     A. I'm not aware of any such meetings or
13  involvement.
14     Q. (By MS. WESTFALL)  Are you aware that the
15  Lieutenant Governor asked Senator Fraser to re-file his
16  bill in order to have a lower number?
17         MR. SWEETEN:  Don't reveal communications
18  that are subject to legislative privilege.  She's just
19  asking a very specific question about a conversation
20  that would require you to do so.  I'll instruct you not
21  to answer.  I would advice council that he can answer
22  about a specific conversation as long as it does not
23  reveal the subject matter of the communication which you
24  are doing so in your question.
25     Q. (By MS. WESTFALL)  Do you have any testimony?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                          MAY 29, 2012

---

### 301

1    A.  No.
2    Q.  Are you asserting the privilege based on advice
3  of council?
4    A.  Yes.
5    Q.  Are you aware of the Senate 2011 rules?
6    A.  Generally, yes.
7    Q.  And did those rules similar to the 2009 rules
8  include Rule 5.11 concerning special orders and Voter ID
9  Legislation?
10   A.  My memory is that they did, but I can't be
11  certain.
12   Q.  Was SB 14 considered by any Senate Committees?
13   A.  I believe it was considered by the
14  Committee-of-the-Whole.
15   Q.  What role did the Lieutenant Governor play in
16  consideration of Senate Bill 14 by the
17  Committee-of-the-Whole?
18       MR. SWEETEN:  You can testify as to matters
19  of the public record.  Don't reveal matters that are
20  subject to the privilege or the to attorney/client
21  privilege, including conversations you had with
22  Lieutenant Governor Dewhurst.
23   A.  My memory from the Committee was that Lieutenant
24  Governor Dewhurst sat among the Senators and I can't
25  recall if he asked questions of the witnesses or not.  I

---

### 302

1  believe he voted in favor of the bill.
2    Q.  (By Ms. Montgomery) Did you play any role during
3  the Committee's consideration of Senate Bill 14?
4        MR. SWEETEN:  Objection to the question as
5  vague.  You can answer to the extent you understand it.
6    A.  I was also in the Committee on the floor
7  available as I sometimes was for questions from any
8  Senator.
9    Q.  (By MS. WESTFALL)  Were you charged with advising
10  the Lieutenant Governor, providing him with information
11  if Senators had inquiries of Lieutenant Governor about
12  the bill?
13   A.  I mean, my job was to be general counsel for the
14  Lieutenant Governor.  So I acted like I would have on
15  any other work day, I suppose.
16   Q.  During the floor debate on Senate Bill 14, did
17  anyone raise concerns about the bill's impact on
18  minority voters?
19   A.  My memory is that the public testimony did
20  include testimony about that.
21   Q.  Who made -- who raised those concerns?
22   A.  My memory is that concerns were raised by some
23  Senators in opposition to the bill, and perhaps from
24  some of the invited, and public testimony.
25   Q.  Were any changes made to Senate Bill 14 as a

---

### 303

1  result of those concerns being aired?
2        MR. SWEETEN:  Don't reveal thoughts, mental
3  impressions, or opinions about legislator or
4  communications that you've had with Lieutenant Governor
5  Dewhurst, with legislators, legislative staff, State
6  Agencies, Texas Legislative Council.  You can answer to
7  the extent that you can reveal matters that are not
8  privileged or that are matters of the public record.
9    A.  Looking at the file version of the bill -- the
10  final version of the bill, there are several changes
11  that were made.
12   Q.  (By MS. WESTFALL)  What were those?
13   A.  As we discussed earlier the Election
14  Identification Certificate, the forms of ID acceptable,
15  provisional ballot process.  There may be others I'm
16  forgetting.  I can looking back through if you'd like.
17   Q.  And are these changes that were made from when it
18  was filed to when it was passed?
19   A.  The ones I just described, yes.
20   Q.  And do any of those respond specifically to the
21  concerns raised by legislators and others about the
22  impact of the bill on minority voters?
23       MR. SWEETEN:  Again, don't reveal your
24  mental impressions, your opinions about legislation, or
25  the furtherance of the legislative process, or

---

### 304

1  communications that I've outlined previously.  To the
2  extent you can refer to matters of the public record,
3  you can do so.
4    A.  My memory is that minutes were successfully added
5  on the floor -- I mean, in the Committee to -- I don't
6  remember for sure, by Senator Hinojosa and Senator Lucio
7  who had earlier expressed concerns generally about the
8  impact of the bill.  And I believe they were both
9  successful in adding amendments.
10   Q.  (By Ms. Montgomery) Do you remember what the
11  substance of those amendments were?
12   A.  I believe Senator Hinojosa was added to related
13  to the Concealed Handgun License as an acceptable form
14  of ID.  And I believe Senator Lucio dealt with whether
15  expired licenses could be used or not.  The length of
16  time at which a license could be expired and still be
17  acceptable as proof of ID.
18   Q.  And how do those amendments mitigate the impact
19  of the bill on minority voters?
20       MR. SWEETEN:  On that question don't reveal
21  any mental impressions, opinions, about legislation, or
22  furtherance of the legislative process, or other matters
23  that were subject to the conversations we discussed
24  previously.  To the extent you can refer to matter of
25  the public record, you can do so.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 305

1    A.  I think from what I remember in their testimony
2   their purpose in introducing those amendments was to
3   increase the acceptable forms of ID.  Presumably that
4   would have an impact on all voters including minority
5   voters.
6    Q.  (By MS. WESTFALL)  What does it mean when a
7   legislator says on the Senate floor, I am not advised?
8    MR. SWEETEN:  Objection.  Calls for
9   speculation.  You can answer to the extent you know.
10    A.  I think it depends on who is saying it and the
11   context.
12    Q.  (By MS. WESTFALL)  When Senator Fraser said, "I
13   am not advised", dozens and dozens of times
14   during consideration of SB 14, how did you interpret
15   that statement?
16    MR. SWEETEN:  Objection calls for
17   speculation.  Objection compound.  You can answer.
18    A.  The way I take it, hearing it now, is that he
19   didn't know for sure.  But I don't know.
20    Q.  (By MS. WESTFALL)  Is it part of the Bill
21   Sponsor's role as the author of Senate Bill 14 to field
22   questions from other Senators on the floor during the
23   debate?
24    A.  It's typical for a Bill Sponsor to take
25   questions.

---

## 306

1    Q.  Would you say it's typical or atypical to say, "I
2   am not advised", as many times as Senator Fraser did
3   during the debate of SB 14?
4    MR. SWEETEN:  Let me interpose an objection.
5   Objection calls for speculation.  You can answer to the
6   extent you know, based on public record.
7    A.  I would it's atypical for a debate to last that
8   long.  And so if he said I'm not advised more often it
9   might be -- in part it's because the debate was so long.
10    Q.  (By MS. WESTFALL)  How long was the debate of SB
11   14?
12    A.  I don't recall exactly.  Hours and hours.
13    Q.  So you think it was routine for a Bill Sponsor to
14   have that response to so many questions based on the
15   length of the testimony -- I mean based on the length of
16   the consideration; is that your testimony?
17    MR. SWEETEN:  Objection.  Calls for
18   speculation.  Objection.  Vague.  You can answer.
19    A.  I would say it's probably not typical of a
20   Senator.  But I honestly, I'm not sure it's typical of
21   Senator Fraser or not.
22    Q.  (By MS. WESTFALL)  Do you believe that Senator
23   Fraser in fact did not know the answer to all those
24   questions?
25    MR. SWEETEN:  Objection.  Calls for

---

## 307

1   speculation.  You can answer to the extent that -- you
2   can answer.
3    A.  I don't know.
4    Q.  (By MS. WESTFALL)  Is it possible that he knew
5   the answer to some of those questions but didn't want to
6   state the answers on the Senate floor?
7    MR. SWEETEN:  The same objection.  Calls for
8   gross speculation but go ahead.
9    A.  Is it possible that he knew the answer to some of
10   the questions he said he was unadvised on.  Again,
11   anything is possible but I certainly don't know.
12    Q.  (By MS. WESTFALL)  Some minority legislators who
13   listen to the repeated assertion of, "I am not advised",
14   might have felt that the lack of substantive response
15   about the impact of SB 14 on minority voters might be --
16   might be viewed as a lack of concern for those issues.
17   Did you have that feeling as you watched the debate?
18    MR. SWEETEN:  Objection.  Relevance.
19   Objection, to the extent you're asking him about
20   communications he may have had with anybody, don't
21   reveal those.  You can answer the question, though to
22   the extent she's asking you questions that are public
23   record.  So, go ahead.
24    A.  So the question is:  In my opinion, did Senator's
25   Fraser's handling of the debate in saying, "I am not

---

## 308

1   advised", that was the word you used --
2    Q.  (By MS. WESTFALL)  Callous.
3    A.  Callous.  Before you said -- That it was not --
4   you phrased it differently.
5    Q.  That it was not -- I'm not sure what the question
6   was.  But it was showing a lack of regard for those
7   issues.
8    A.  I did not and I don't interpret it as a lack of
9   regard for any particular population.
10    Q.  Are you aware of any communications concerning a
11   less restrictive means of achieving the same purpose of
12   SB 14 than what is set forth in SB 14?
13    MR. SWEETEN:  Okay.  I'm going to instruct
14   you as to legislative privilege and specifically I'm
15   going to instruct you, don't reveal deposits, mental
16   impressions, or opinions about legislation or in
17   furtherance of the legislative process.  Don't reveal
18   communications you've had with Lieutenant Governor Dewhurst,
19   members of the Lieutenant Governor's office,
20   legislators, legislative staff, State Agencies, or Texas
21   Legislative Council in answering the question.
22    A.  Okay, I -- could you explain what you mean by
23   less restrictive?
24    Q.  (By MS. WESTFALL)  Are you aware of any
25   communications about whether there could be more

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                              MAY 29, 2012

---

### 309

1  expansive set of allowable forms of ID in SB 14 and
2  still accomplish the same purpose of the legislature in
3  enacting SB 14?
4       MR. SWEETEN: You're asking him about
5  specific conversations and the substance of specific
6  conversations. I think those are subject to legislative
7  privilege. I'm going to instruct you not to answer on
8  that basis. If council wants to rephrase it without all
9  the substance of the conversation in it I will allow him
10  to answer the question as to who was involved, when the
11  conversation was, who were the parties, et cetera.
12       Q. (By MS. WESTFALL) My question stands. Do you
13  have any testimony in response?
14       A. I'll assert privilege.
15       Q. Are you familiar with the Georgia Photo ID Law?
16       A. Generally, yes.
17       Q. Did you review it at the time when you were
18  involved in drafting Photo ID Laws?
19       MR. SWEETEN: I think the question asks him
20  to reveal thoughts, his mental impressions, and opinions
21  in the process by which legislative -- Senate Bill 14 or
22  legislative acts, including Senate Bill 14, was passed.
23  You don't have to reveal your thought process with
24  respect to that. That's subject to the legislative
25  privilege.

---

### 310

1       Q. (By MS. WESTFALL) Are you aware that the Georgia
2  Photo ID Law allows for the use of photo ID issued by
3  any entity of the United States, Georgia, or another
4  State entity?
5       MR. SWEETEN: You can answer whether you're
6  aware.
7       Q. (By MS. WESTFALL) Based on the -- just based on
8  the face of the law?
9       A. That sounds right to me.
10       Q. And are you aware that the Georgia ID allows for
11  the use of valid employee cards?
12       A. That sounds right.
13       Q. Are you aware that the Georgia ID Law allows for
14  expired IDs to be used that are photo in nature?
15       A. I don't know that. I don't recall that.
16       Q. Is it fair to say that there are differences
17  between the Georgia Photo ID Law and SB 14?
18       A. From what I remember, yes.
19       Q. Is it fair to say that SB 14 provides for a more
20  restrictive and narrower set of forms of allowable photo
21  ID than does the Georgia Law?
22       MR. SWEETEN: You can answer based upon the
23  text of the bills as they exist.
24       A. My memory is that there are fewer forms of
25  acceptable ID in Texas than in Georgia.

---

### 311

1       Q. (By MS. WESTFALL) And does the same hold true
2  with regard to the Indiana Photo ID Law?
3       A. I would have to review the Indiana Law.
4       Q. Could you mark this as U.S. 16?
5            (Exhibit No. 82 was marked.)
6       Q. (By MS. WESTFALL) Would you mark it as 82,
7  please? I'm handing you what's been marked as U.S. 82;
8  do you recognize this document?
9       A. That looks like Indiana's Motor ID Law.
10       Q. Can you take a look at the first page of the
11  document where it list allowable forms of ID and defines
12  proof of identification. Do you see that?
13       A. Uh-huh. Yes.
14       Q. And does it allow for use of photo ID issued by
15  the United States or the State of Indiana?
16       A. Yes.
17       Q. And is that different from SB 14?
18       A. Yes.
19       Q. Is it fair to say that SB 14 is more restrictive
20  than the Indiana Photo ID Law, on its face?
21       A. There are probably fewer acceptable
22  identifications under the SB 14 Law.
23       Q. Are you familiar with the amendments that were
24  offered to SB 14 on the Senate floor?
25       A. Generally.

---

### 312

1       Q. Are you aware of an amendment introduced by
2  Senator Davis that would have allowed the use of ID that
3  is either unexpired or has expired sometime since the
4  past election?
5       A. I don't recall that one specifically.
6       Q. Did the Lieutenant Governor vote on any of the
7  amendments to SB 14?
8       A. I don't recall that either.
9       Q. Did you play any role in advising the Lieutenant
10  Governor about any of the amendments that were offered
11  to SB 14?
12       MR. SWEETEN: You can answer, but don't
13  reveal the substance of the conversation.
14       A. Certainly not for all of them. It's possible I
15  gave them some input on some of them.
16       Q. (By MS. WESTFALL) Do you recall which ones?
17       A. No.
18       Q. Are you aware of any amendments that would have
19  mitigated the impact of Senate Bill 14 on minority
20  voters as you sit here today?
21       MR. SWEETEN: Objection. I think you are
22  going into his mental processes, his mental impressions
23  about legislation or furtherance of the legislative
24  process. If you want to ask as to the text of the bill,
25  sitting here he can answer that, but otherwise I think

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 313

1    that's legislative privilege.
2        Q.  (By MS. WESTFALL)  Do you have an answer?
3        A.  So the question is, please?
4        Q.  Are you aware of any amendments that would have
5    mitigated the impact of Senate Bill 14 on minority
6    voters?
7        A.  My memory is --
8            MR. SWEETEN:  Same objection and
9    instruction.
10       A.  My memory is from the debate that some amendments
11   were offered and the author maybe said that that was the
12   intended effect.  But I'm not sure which of those were
13   adopted or if that was an actual effect.
14       Q.  (By MS. WESTFALL)  I see.  When did the Senate
15   pass Senate Bill 14?
16       A.  I don't remember the date.  It would have been in
17   January of 2011.
18       Q.  Was it -- was it approximately 2 weeks from the
19   date of filing of the bill or receipt of the bill and
20   the Senate until when it was passed by the Senate in
21   January 2011; is that about right?
22       A.  That sounds about right.
23       Q.  Is that kind of unusual for a bill to be received
24   by the Senate and passed within two weeks?
25       A.  It's not unusual for an emergency bill.

### 314

1        Q.  I see.  And how many emergency bills are you
2    aware of based on your experience working for the
3    Lieutenant Governor?
4        A.  I think there were six or eight last session.
5    There are at least a few every session.
6        Q.  Were they all passed in the Senate within
7    two weeks in January?
8        A.  I don't know.
9        Q.  Do you know of any others that were passed within
10   two weeks in January?
11       A.  I don't recall examples.
12       Q.  Did the Lieutenant Governor play any role in
13   conferring with or having any discussions with Senators
14   about amendments?
15           MR. SWEETEN:  Objection.  I think you're
16   asking him to reveal conversations that he may have had
17   with Lieutenant Governor Dewhurst, that he or Lieutenant
18   Governor Lieutenant Dewhurst may have had the
19   legislators, legislative staff, State Agencies, Texas
20   Ledge Council, or to reveal thoughts, mental
21   impressions, or opinions about the legislation.  You can
22   answer as to matters that are of public record.
23       A.  I'm not aware of any public conferring between
24   Lieutenant Governor and senators.  And I'll assert
25   privilege as to any private conversation.

### 315

1        Q.  (By MS. WESTFALL)  Are you aware of any
2    conversations between Lieutenant Governor or staff
3    related to any amendments offered by opponents of the
4    bill?
5            MR. SWEETEN:  You can answer.
6        A.  Communications between opponents of the bill and
7    Lieutenant Governor staff.  So did I have those
8    conversations or did someone on our staff?  I think
9    there were conversations on the floor during the debate.
10       Q.  (By MS. WESTFALL)  Any other conversations that
11   did not occur in the debate?
12       A.  I don't recall.  I'm not sure.
13       Q.  Did you have -- did you monitor Senate Bill 14
14   once it was passed to the Senate and went to the House?
15       A.  Yes.
16       Q.  Could you describe your monitoring of Senate Bill
17   14 once it went to the House?
18           MR. SWEETEN:  You can answer, but in doing
19   so don't reveal communications you've had with
20   Lieutenant Governor with Legislators, Legislative Staff,
21   State Agencies, Texas Legislative Council.
22       A.  The bulk of my activity was charting the progress
23   of the bill, being -- again, as I mentioned earlier,
24   being available as a resource for anyone including House
25   and staff, House members and their staffs on the lawyer

### 316

1    or staffer from the Senate.
2        Q.  (By MS. WESTFALL)  Did the Lieutenant Governor
3    play any role in the Conference Committee's
4    consideration of Senate Bill 14?
5            MR. SWEETEN:  You can testify as to matters
6    of public record.  Don't reveal communications that
7    would be subject to legislative privilege.
8        A.  Yeah.  I'm not aware of any sort of public
9    pronouncements of his role with members of the
10   committee.
11       Q.  He appointed the conferees; did he not?
12       A.  Yeah.  To clarify.  Beyond appointing them.  But
13   I think your questions was the process of that
14   Committee.
15       Q.  Did -- are you familiar with the changes to SB 14
16   that occurred during conference?
17       A.  I would -- I would -- I don't recall.  Is the
18   short answer.  I would need to look at different
19   versions to be sure.
20       Q.  And was the Election Identification Certificate
21   Provision inserted into the bill in conference?
22       A.  It's possible.
23       Q.  Are you aware of whether that provision and
24   perhaps others outside of the versions of SB 14 passed
25   in the House and Senate were put into the bill in



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 317

1  conference?
2     A. I can't be sure about the timing of it.
3     Q. Are you aware that during the conference
4  Committee, the committee removed a provision from the
5  bill that would have required voter education targeted
6  at low income and minority voters?
7     A. I don't recall that.
8     Q. Are you aware of any conversations involving
9  Lieutenant Governor on whether SB 14 might
10 disproportionately impact minority voters?
11    MR. SWEETEN: I'm going to object based upon
12 legislative privilege. Don't reveal, in answering the
13 questions she's asking, reveal substance of
14 communications that Mr. Dewhurst may have had with
15 others. Don't reveal those. Those are subject to the
16 attorney/client privilege or the legislative privilege.
17    A. I'm not aware of any public discussions like that
18 and I'll assert privilege on other internal
19 communications.
20    Q. (By MS. WESTFALL) Are you aware of any
21 communications that the Lieutenant Governor had about an
22 obligation to adhere to Section 5 of the Voting Rights
23 Act with regard to Senate Bill 14?
24    MR. SWEETEN: Don't reveal matters that are
25 subject to the attorney/client privilege or matters of

---

### 318

1  legislative privilege. You can reveal public testimony
2  on the issue.
3     A. I don't recall all of his public statements and
4  I'll assert privilege as to internal communications.
5     Q. (By MS. WESTFALL) Have you ever heard of any
6  Texas State Legislator who voted in favor of SB 14,
7  saying that it would prevent racial or ethnic minorities
8  from voting in Texas?
9     MR. SWEETEN: Did you say testimony,
10 Elizabeth? Can you read the question?
11    Q. (By MS. WESTFALL) Have you ever heard any Texas
12 State Legislator who voted in favor of Senate Bill 14
13 say that it would prevent racial or ethnic minorities
14 from voting Texas?
15    MR. SWEETEN: Don't reveal communications
16 that you've had with Legislators, Legislative Staff,
17 other productive communications, but you can answer to
18 the extent you can refer to matters of the public
19 record.
20    A. I think, again, during the open testimony
21 there were, you know, there were probably members of the
22 Senate who asserted that that would be the impact. But
23 that's, I think, as close as a yes as I can get.
24    Q. (By MS. WESTFALL) I was asking whether any Texas
25 State Legislator voted in favor?

---

### 319

1     A. Voted for. Sorry.
2     MR. SWEETEN: Don't reveal communications of
3  Legislators. Don't reveal matters of the public record.
4     A. Right. Again, from the public testimony my
5  memory is that there were general discussions about the
6  impact of the bill and that included opponents and
7  proponents.
8     MS. WESTFALL: Thank you. Could you mark
9  this as Exhibit 83.
10    (Exhibit No. 83 was marked.)
11    Q. (By MS. WESTFALL) I'm handing you what's been
12 marked as U.S. 83; do you recognize this exhibit?
13    A. It looks like a press release from Lieutenant
14 Governor David Dewhurst.
15    Q. Can you review it and let me know when you've had
16 a chance to take a look at it?
17    A. It looks like it was a late January press release
18 saying that he's glad that it passed the Senate.
19    Q. And can you see that it indicates increasing
20 public confidence in our election process by insuring
21 only U.S. citizens who are legally eligible vote in
22 Texas. Do you see that statement?
23    A. Yes.
24    Q. How does Senate Bill 14 promote that?
25    MR. SWEETEN: You're asking him to reveal

---

### 320

1  matters that are subject to the legislative privilege.
2  Do not reveal those matters. You can reveal matters
3  that are based on the public record.
4     A. As I said before, I think, to the extent that SB
5  14 is designed to increase the integrity of the election
6  process and discourage ineligible voters from
7  fraudulently voting, that the statement would reflect
8  that purpose.
9     Q. (By MS. WESTFALL) Notwithstanding all of the
10 testimony that you gave earlier today about how voter
11 registration is when you say you're a citizen and voting
12 and Photo ID Laws stop in-person voter impersonation; is
13 that right?
14    MR. SWEETEN: Objection to the question as
15 argumentative, vague. Also, don't reveal matters of
16 legislative privilege in answering the question.
17    A. I think what I said earlier was that making
18 elections more secure would have the general effect of
19 deterring all sorts of voter fraud.
20    Q. (By MS. WESTFALL) Do you believe
21 Senator Dewhurst -- not Senator -- strike that.
22    Do you believe Mr. Dewhurst approved this press
23 release before it was released?
24    MR. SWEETEN: Objection. Calls for
25 speculation. You can answer it if you know.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

BRIAN HEBERT                                                    MAY 29, 2012

## 321

1       A. I don't know.
2       Q. (By MS. WESTFALL)  Do press releases go out under
3  his name that he doesn't approve of?
4       A. I don't know.
5       Q. Who would know?
6       A. I imagine Mike Walz would know, the press
7  secretary.
8       Q. And certainly Mr. Dewhurst would know, right?
9       A. He might.
10      Q. He might know whether he said this or not?
11      A. I don't know how many press releases go out and
12  whether he signs off on some, or all, or none of them.
13          MR. SWEETEN: How are we doing on time?
14          MS. WESTFALL: We're getting there.
15          MR. SWEETEN: I'm asking the court reporter
16  for time total.
17          COURT REPORTER: It is 6 hours and 27
18  minutes.
19          MS. WESTFALL: And I would ask that given
20  number of objections that Mr. Dunn be permitted to have
21  some time. I'm close to completing my examination for
22  the time being, of course, leaving this deposition open,
23  but given number of objections, and privilege
24  assertions, and discussions between council on this
25  subject I would ask your indulgence in allowing Mr. Dunn

## 323

1  pending motions to compel on legislative privilege that
2  have not yet been ruled upon.  There are open questions
3  on these issues an it has taken the time for the two of
4  us to discuss them on the record.
5          MR. SWEETEN: It has been very clear what my
6  position was going to be with respect to legislator
7  privilege.  We've articulated it over and over again
8  within filings with the court.  You understand what my
9  position is on this and you have repeatedly asked
10  questions that invade the legislative privilege and
11  invade the other privileges we have discussed today.
12  Nevertheless there is no point sitting here and debating
13  it.  I will let you continue your questioning.  When Mr.
14  Dunn has questions, we will take that matter up then.
15          MR. DUNN: And just -- this will probably
16  help. I will have very little to no questions.
17          MR. SWEETEN: Okay. Yeah. That helps.
18          MR. DUNN: I didn't want to interrupt what
19  was an awesome oration by both sides.
20          MS. WESTFALL: Could you please mark this as
21  84?
22          (Exhibit No. 84 was marked.)
23      ==Q. (By MS. WESTFALL) You've been handed what's been==
24  ==marked U.S. 84.  Do you recognize this document?==
25      ==A. It talking points for a speech.==

## 322

1  to have a few moments once I am finished with the exam.
2          MR. SWEETEN: Well, I mean the Federal Rules
3  allow for 7 hours.  You have spent much of this
4  deposition asking him about questions that are very,
5  very, clearly implicating legislative privilege.  We
6  have court orders on this subject.  You're asking
7  questions that are -- that the court is already very
8  clearly indicated are matters of privilege.  You have
9  spent much of your questioning doing that today.  So I
10  understand that I have objected but I have had to object
11  because you have gone way beyond the scope of what is
12  permissible with respect to our assertion of this
13  privilege and you have done it repeatedly.  So my
14  response to that is, we'll let Mr. Dunn question the
15  witness but as far as your implication that this
16  deposition has gone on this long as a result of me.  I
17  absolutely reject that proposition.
18          MS. WESTFALL: Well, I wasn't suggesting
19  that.  I was saying council had been having, we have
20  been having extensive discussions about privilege.  I
21  have asked repeated questions about communications,
22  which are permissible.  I have asked repeated questions
23  about purpose, which are permissible.  We had a
24  disagreement about the scope and application of the
25  orders that have been ordered in this case.  We have

## 324

1      ==Q. Did you draft those?==
2      ==A. No.==
3      ==Q. Who drafted this?==
4      A. I don't know.
5      Q. Do you see that it is dated May 27, when the bill
6  was signed?
7      A. Well, there's another date above that.  But yes.
8      Q. You're right.  It looks like there are two dates.
9  Could you read for the record those two dates?
10     A. One says 5/26/11 and the other one says May 27,
11  2011.
12     Q. Did LRT refer to an individual's initials or
13  something else?
14     A. I don't know.
15     Q. Do you see on the second page, it indicates a
16  talking point that generations of Americans have fought
17  and died for the principal of one U.S. citizen, one
18  vote.  Do you see that?
19     A. Yes.
20     Q. And does this document suggest to you that part
21  of Mr. Dewhurst's support for the bill was that it is
22  protecting the right of U.S. citizens to vote.  Is that
23  how you would interpret this bullet?
24         MR. SWEETEN: When you're answering the
25  question don't reveal communications you've had with



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                         MAY 29, 2012

---

### 325

1   Lieutenant Governor Dewhurst.  Those are privileged
2   under legislative privilege and attorney/client
3   privilege.  You can answer to the extent that you are
4   not revealing matters of privilege.
5       A.  I don't know is the short answer.  I don't know
6   if this is the -- the speech he gave.  I don't know if
7   he wrote this draft.  So I don't know if it's an
8   accurate reflection of his purpose, or intent, or
9   anything else.
10      Q.  (By MS. WESTFALL)  Who would know?
11      A.  I suppose whoever wrote it.
12      Q.  And Mr. Dewhurst would also know; is that right?
13      A.  Perhaps.  Again that's possible.  I don't know if
14  this is his speech or interview that he gave or if it
15  was just something prepared for his possible use.
16      Q.  Thank you.
17          MS. WESTFALL:  Could you mark this as 85?
18          (Exhibit No. 85 was marked.)
19      Q.  (By MS. WESTFALL)  You've been handed what's been
20  marked as U.S. 85; do you recognize this document?
21      A.  Yes.
22      Q.  What is it?
23      A.  It's talking points on voter ID.
24      Q.  And how to you recognize this document?
25      A.  I wrote it.

---

### 326

1       Q.  Do you see where, in the first bullet, it refers
2   to fraudulent registration applicants or applications?
3       A.  Yes.
4       Q.  And was this -- were these talking points by the
5   way in support of SB 14?
6       A.  I don't recall if they were generally about voter
7   ID or if they were for a particular bill.  I mean, it
8   says 82 R, but I don't know if it was for -- the timing
9   of it compared to the legislation.
10      Q.  But 82 R referred to?
11      A.  82nd regular session?
12      Q.  And that was 2011 was it not?
13      A.  Correct.
14      Q.  And could you explain why one talking point in
15  support of photo ID related to fraudulent registration
16  applicants and listed as an example application
17  submitted by non-citizens?
18          MR. SWEETEN:  Don't reveal matters subject
19  to the legislative privilege.
20      A.  So the question is why are these examples used?
21      Q.  (By MS. WESTFALL)  Yes.
22      A.  They're examples of fraudulent registration
23  applications.
24      Q.  And how does that support the case for photo ID?
25          MR. SWEETEN:  Same objection.

---

### 327

1       A.  Right.  I mean, on its face it says over 6,000
2   applications were rejected.  That seems to me to
3   implicate the security of the elections.
4       Q.  (By MS. WESTFALL)  How does Photo ID Law --
5   requiring photo ID at the polls on election day, stop
6   fraudulent registration applications?
7           MR. SWEETEN:  Don't reveal matters of
8   legislative privilege.  You can answer.
9       A.  I think as I said earlier today, it's additional
10  levels of security make the elections more secure and
11  that if an election is more secure, I think fraudulent
12  voting is less likely, including fraudulent registration
13  applications.
14          By MS. WESTFALL:  Could you mark this as 86?
15          (Exhibit No. 86 was marked.)
16      Q.  (By MS. WESTFALL)  You have each been
17  handed what's been marked as U.S --
18          MR. SWEETEN:  Can I have a copy?
19          MS. WESTFALL:  Sure.  I don't know.
20          MR. SWEETEN:  I'll just look on.  That's
21  fine.
22      Q.  (By MS. WESTFALL)  Thank you.  You've been handed
23  what's been marked U.S. 86.  Do you recognize this
24  document?
25      A.  It's an overview of the process overview by the

---

### 328

1   Justice Department.
2       Q.  And how are you familiar with this document?
3       A.  It looks like something I drafted but I'll have
4   to double-check.
5       Q.  Let me know when you've had a chance to review?
6       A.  Okay.
7       Q.  Did you draft this document?
8       A.  I think so.
9       Q.  Do you know when you drafted this document?
10      A.  I can't be sure if it was 2009 or 2011.  Well, it
11  says, Georgia is the only Section 5 State with the Photo
12  ID requirement.  So I'm guessing that might have been
13  '07 or '09.  I can't remember when Indiana's law went
14  into effect or any of the other states.
15      Q.  And you see that it indicates you wrote about
16  retrogressive effect in this document?
17      A.  Where are we at?  Is there a retrogressive
18  effect?  Yes.
19      Q.  By the way, to whom was this document circulated?
20      A.  I can't recall.
21      Q.  Was it internal to the Lieutenant Governor's
22  office or was it to other Senate staff?
23      A.  I can't recall.
24      Q.  What was -- what did you do with this document
25  after you drafted it?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 329

1    A.  It was almost certainly for use in my office.  I
2    just can't remember if it was also distributed to other
3    people or not and by whom.
4    Q.  Did you have any conversations or discussions
5    with anyone about retrogressive effect after you
6    circulated this document, within your office?
7    MR. SWEETEN:  Don't reveal communications
8    you had with anyone within your office.  Attorney/client
9    privilege.
10   Q.  (By MS. WESTFALL)  Well, to the extent there's
11   any attorney/client privilege it seems to have been
12   ordered to have been produced in this litigation.  So
13   it's been produced.
14   MR. SWEETEN:  He doesn't have to reveal
15   communications that he's had with anyone in his office
16   That's subject to the attorney/client privilege.  You
17   can ask about the document.  I'm freely allowing you to
18   ask about the document.
19   MS. WESTFALL:  I'm asking about
20   conversations about the document.
21   MR. SWEETEN:  You can answer whether
22   conversations occurred.
23   MS. WESTFALL:  And this is not about
24   legislative privilege.  This is a different privilege,
25   Mr. Sweeten.  This has now been produced in litigation.

### 330

1    I can examine the witness on this document.
2    MR. SWEETEN:  You can examine him based upon
3    the document.  That doesn't allow you to go into any
4    communications he's had within the realm of the
5    attorney/client communication with individuals in his
6    office.
7    MS. WESTFALL:  I disagree with your view of
8    attorney/client privilege and what I can examine the
9    witness on.
10   MR. SWEETEN:  So is it your position then
11   that in light of this document you can ask any question
12   about the attorney/client privilege, because I reject
13   that.
14   MS. WESTFALL:  I can ask him about what
15   happened with this document and conversations about this
16   document.
17   MR. SWEETEN:  You can ask him what happened
18   with this document, if he had conversations about the
19   document, I'm not objecting to that.  But he is not
20   going to reveal the specifics of his communication
21   surrounding the document.
22   MS. WESTFALL:  In other words you're only
23   going to let me examine him about the existence of
24   communications and foundational questions; is that what
25   you're saying.

### 331

1    MR. SWEETEN:  You can ask about the
2    existence of them you can ask about this document to the
3    extent that whatever you want to ask.
4    Q.  (By MS. WESTFALL)  Did you have any conversations
5    with anyone in your office about this document after you
6    circulated it?
7    MR. SWEETEN:  You can answer.
8    A.  Probably.
9    Q.  (By MS. WESTFALL) Did you have a conversation
10   with Mr. Dewhurst about this document after you
11   circulated it?
12   A.  I don't recall.
13   Q.  Did you have conversation with Ms. Rathgeber, or
14   Mr. Brunson about this document, or Mr. Battle?
15   A.  Probably all of them.
16   Q.  Were any steps taken as a result of your
17   circulation of this document?
18   A.  I don't know that it requires steps.  It looks
19   like it's a summary of State of preclearance, in
20   general, and this one opinion, legal review, in
21   particular.
22   Q.  Were there any efforts after you circulated this
23   document to determine whether SB 14 or 362, whatever
24   bill was at issue when you circulated this memo, whether
25   that bill would have an impact on Hispanic and Black

### 332

1    voters disproportionately?
2    A.  I don't recall any -- I don't recall from the
3    public record whether evidence to that effect was
4    introduced or not.
5    Q.  But we're now dealing with a different privilege.
6    I'm asking you a different set of questions.  Your
7    council is letting you be examined -- I realize it's
8    late in the day -- based on a different set of
9    privileges.  I'm asking whether any -- not based on the
10   public record -- were any steps taken after you
11   circulated this memo concerning retrogressive effect and
12   the legal standard, were any steps taken in response to
13   the circulation of this memo?
14   A.  I'm not aware of specific steps.  Again, there
15   was -- I'm not aware of specific steps.
16   Q.  And you see underneath retrogressive effect, you
17   indicate the issue of less retrogressive alternatives,
18   do you see that section?
19   A.  Right.
20   Q.  Did you have any conversations about that topic
21   with anyone in your office after your circulated this
22   memo?
23   A.  Probably the same list that I gave earlier.
24   Q.  Ms. Rathgeber, Mr. Brunson?
25   A.  Mr. Battle.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT

MAY 29, 2012

---

### 333

1  Q. Anyone else?

2  A. In my office, no.

3  Q. And are you aware of any less retrogressive

4  alternatives that were pursued after you circulated this

5  memo?

6      MR. SWEETEN: Don't reveal matters that are

7  subject to the legislative privilege. In other words,

8  if you had communications with Legislators, Legislative

9  Staff, State agencies, Texas Ledge Council, in answering

10  that question.

11  A. Again, without knowing the timing I can't be

12  sure. The bills, as I've reviewed them today, have a

13  sort of spectrum of alternatives. Some, to use your

14  word, less restrictive than others. But I can't be sure

15  without knowing when this was produced.

16  Q. (By MS. WESTFALL) Are you aware, at any time,

17  during consideration of any of the bills to which you've

18  testified today, that there were considerations of less

19  retrogressive alternatives, based on the legal standard

20  you set forth in this memo?

21      MR. SWEETEN: In answering the question

22  don't reveal matters of legislative privilege, don't

23  reveal discussions she's asking you as to this memo.

24  A. The question is: Was there consideration of --

25  Q. (By MS. WESTFALL) Less retrogressive

---

### 334

1  alternatives?

2  A. I think there were consideration of lots of

3  things, I suppose, yes.

4  Q. What were those alternatives?

5  A. I don't recall specifically.

6  Q. Do you see underneath, you list Mitigating

7  Effects. Do you see that?

8  A. Uh-huh.

9  Q. By the way, before I ask a question about that.

10  Do you see the number indicated at the top right-hand

11  corner? 552.111?

12  A. It looks -- I see a number. It looks like it

13  might be 557.

14  Q. You may be right. Does this indicate to you --

15  do you have any indication of an internal number that

16  would help you to remember when you wrote this document?

17  A. No.

18  Q. Okay. Do you see where you write about

19  mitigating effects in this document?

20  A. I do.

21  Q. Did you have conversations about mitigating

22  effects with the same persons in your office you

23  testified to earlier?

24  A. I probably discussed each of those things with

25  Mr. Brunson, Ms. Rathgeber, and Mr. Battle since it was

---

### 335

1  essentially a summary of that one opinion, is what it

2  appears to be.

3  Q. And do you see here you list education efforts

4  targeted among minority communities?

5  A. Yes.

6  Q. And I believe we just testified about an

7  amendment offered to provide voter education to minority

8  communities that was not adopted by the Senate; is that

9  correct?

10  A. Yes, you did mention that.

11  Q. So ultimately Senate Bill 14 does not include

12  such education efforts that are targeted to minority

13  communities. Is that correct?

14  A. I don't recall that it does.

15  Q. And does Senate Bill 14 include any program

16  designed to provide photo ID's in isolated or

17  impoverished areas?

18  A. Does it include those?

19  Q. In the bill, as passed?

20  A. I don't think it does.

21  Q. And are there any other programs that were

22  designed to minimize the impact of the bill on minority

23  voters included in Senate Bill 14 as passed?

24      MR. SWEETEN: In answering the question

25  don't reveal matters that are subject to legislative

---

### 336

1  privilege. That includes thoughts, mental impressions,

2  opinions about legislation or in furtherance of the

3  legislative process, including communications with

4  legislators or legislative staff. Okay?

5  A. I think the voter education provision and the

6  free education -- I mean, Election ID Certificate

7  arguably are designed to minimize the impact of minority

8  voters.

9  Q. (By MS. WESTFALL) Thank you. And anything else

10  in Senate Bill 14?

11  A. I'm not sure. I'd have to review it.

12  Q. Thank you.

13      MS. WESTFALL: Could you mark this as 87.

14      (Exhibit No. 87 was marked.)

15  Q. (By MS. WESTFALL) I've handed you what's been

16  marked as U.S. 87. Do you recognize this document?

17  A. No. It looks like it's a letter to Governor

18  Perry, Lieutenant Governor Dewhurst.

19  Q. Okay.

20      MS. WESTFALL: Can you mark this as 88,

21  please?

22      (Exhibit No. 88 was marked.)

23  Q. (By MS. WESTFALL) You've been handed what's been

24  marked as U.S. 88; do you recognize this document?

25  A. It looks like it's a letter to Mr. Beck from

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 337

1   Lieutenant Governor Dewhurst.
2       Q.  Is Mr. Beck presumably a constituent?
3       A.  He lives in Texas so, yes.
4       Q.  And who drafts responses to constituent mail in
5   Mr. Dewhurst's office?
6       A.  It depends.  Sometimes it's the staff.  Sometimes
7   it's the press office.  Sometimes it's a combination.
8       Q.  Do you see in the second paragraph where it says,
9   Voter ID will help stamp out voter fraud and increase
10  public confidence in our election process by insuring
11  that only U.S. citizens who are legally eligible vote in
12  Texas elections?
13      A.  I see that.
14      Q.  Do you see that this letter is dated February 8,
15  2011?
16      A.  Yes.
17      Q.  So it was right after the Senate passed Senate
18  Bill 14; is that right?
19      A.  Uh-huh.  Yes.
20      Q.  Can you explain why Mr. Dewhurst would assert
21  that it would -- voter ID would help ensure that only
22  U.S. citizens are voting in Texas elections?
23          MR. SWEETEN:  Objection.  Calls for
24  speculation.  Also asks him to reveal thoughts, mental
25  impressions, opinions about legislation.  Also requires

## 338

1   him to reveal communications with Lieutenant Governor
2   Dewhurst.  If you can answer the question without
3   revealing matters of legislative privilege or matters of
4   related to the attorney/client confidentiality then you
5   can answer the question.
6       A.  I guess I would refer to my earlier answers to
7   similar questions.  The bill -- the purpose of the bill
8   is to ensure that elections are secure.  That includes,
9   meaning that -- the meaning that voters are eligible to
10  vote and if you're not a U.S. citizen then you're not
11  eligible to vote.  So that's the connection.
12      Q.  (By MS. WESTFALL)  And Remember when I asked you
13  about the purposes of Senate Bill 14 and you said ensure
14  election integrity, increase voter confidence, do you
15  remember that?
16      A.  Huh-uh.
17      Q.  And do you remember when I asked you whether the
18  -- one of the purposes advanced by Mr. Dewhurst was to
19  prevent non-citizens from voting in elections and you
20  responded, no; do you remember that?
21      A.  I think I said, no, except to the extent it ties
22  into making sure all voters are eligible.
23      Q.  Does this letter, Exhibit 88, cause you in any
24  way to modify your testimony about Mr. Dewhurst's
25  purpose in advancing Senate Bill 14?

## 339

1       A.  No.
2       Q.  Was one of Mr. Dewhurst's purposes in advancing
3   and promoting Senate Bill 14 to prevent non-citizens
4   from voting?
5           MR. SWEETEN:  Objection.  You're asking for
6   him to glean the subjective intent of Lieutenant
7   Governor Dewhurst and that is a matter that is outside
8   of what -- of the purpose question that you've been
9   asking so I'm going to object to him answering that
10  question based upon the court's order.
11      Q.  (By MS. WESTFALL)  Are you following the advice
12  of council?
13      A.  Yes.
14      Q.  Who is Jesse Ancira?
15      A.  Ancira.
16      Q.  Ancira.
17      A.  I believe he is general counsel for Speaker Joe
18  Strauss.
19      Q.  Does he handle voter ID for Speaker Strauss?
20      A.  I don't know his exact role on that issue.
21          MS. WESTFALL:  Could you mark this as 89?
22          (Exhibit No. 89 was marked.)
23      Q.  (By MS. WESTFALL)  You have been handed what's
24  marked as U.S. 89; do you recognize this document?
25      A.  Looks like an overview of voter ID issues, like a

## 340

1   sort of talking points.
2       Q.  Did you draft this?
3       A.  I think I did.
4       Q.  Do you see at the bottom where it says, likely
5   questions from opponents?
6       A.  Yes.
7       Q.  Do you see it doesn't include anything about
8   concerns about impact of minority voters?
9       A.  I'm sorry, repeat.
10      Q.  It doesn't include any questions about, what's
11  the impact on minority voters.
12      A.  That is not one of the three questions.
13      Q.  Right.  Is there a reason --
14      A.  Other than -- I'm sorry.
15      Q.  Pardon?
16      A.  Other than perhaps the last one, what about
17  people who do not have access to photo ID?
18      Q.  Is there a reason why you didn't have any concern
19  or list a likely question from opponents related to
20  minority voters?
21          MR. SWEETEN:  You're asking for him to
22  reveal his thoughts and mental impressions when he is
23  formulating this document.  That is matter of
24  legislative privilege and I'm asserting that objection.
25  It also is matter potentially that impacts the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 341

1  attorney/client privilege.  So your question as to why
2  something wasn't included is privileged.
3      Q.  (By MS. WESTFALL)  Are you going to assert
4  privilege?
5      A.  To the extent that it was -- yes.
6      Q.  Is there a second page to this document missing
7  from this document?
8      A.  I'm not sure.
9      Q.  Do you recall whether there was an additional
10  page of this document?
11      A.  I don't recall.
12          MS. WESTFALL:  Could you mark this as 90.
13          (Exhibit No. 90 was marked.)
14      Q.  (By MS. WESTFALL)  You've been handed what's been
15  marked as Exhibit 90; do you recognize this document?
16      A.  No.
17      Q.  Is this a document from Mr. Battle in your office
18  to Jesse Ancira?
19      A.  Yes, appears to be.
20      Q.  Have you ever seen this document before?
21      A.  I don't recall.  It looks like -- I'm not
22  familiar with it.  I don't recall seeing it before.
23      Q.  To your knowledge, did Mr. Dewhurst ask the
24  Attorney General to file suit in this lawsuit concerning
25  SB 14?  Is he the one that requested Attorney General

### 342

1  Abbot to file suit?
2          MR. SWEETEN:  Don't reveal communications
3  between Lieutenant Governor Dewhurst and our office.
4  Those are covered by the attorney/client privilege.
5      A.  I'm not aware of it.
6      Q.  (By MS. WESTFALL)  Turning your attention to
7  Exhibit 90, three pages in at what's marked Bates Stamp
8  the TX00087577; do you see that page?
9      A.  Yes.
10      Q.  And do you see down at the paragraph, it starts,
11  giving the delays in the administrative approve process?
12      A.  Yes.
13      Q.  Do you see, it indicates that Mr. Battle writes,
14  Lieutenant Governor has indicated he will ask the
15  Attorney General to file suit to defend the policy
16  choices made by the Texas Legislature with regard to
17  voter ID if DOJ prevents the law from taking effect?
18      A.  Yes.
19      Q.  Are you aware of whether that statement is true?
20          MR. SWEETEN:  Objection.  Don't reveal
21  communications you've had with Lieutenant Governor
22  Dewhurst.  Those are covered by the attorney/client
23  privilege.
24      A.  I'm not aware.
25      Q.  (By MS. WESTFALL)  Would Mr. Dewhurst himself

### 343

1  know about his intentions to bring suit in this lawsuit?
2          MR. SWEETEN:  Objection, calls for
3  speculation.
4      Q.  (By MS. WESTFALL)  I'm now going to hand over the
5  podium to Mr. Dunn, of course, reserving the right to
6  keep open this deposition based on our ongoing disputes
7  related to privilege.
8              EXAMINATION
9  BY MR. DUNN:
10      Q.  I should have 10 or 15 minutes.  I know you've
11  been here a while today.  It's Hebert, is that right,
12  Mr. Hebert?
13      A.  Correct.
14      Q.  Alright.  My name is Chad Dunn.  We've not met
15  before, have we?
16      A.  No.
17      Q.  I'm going to go through a few documents here.  If
18  I lose you I'm sorry, but I'm going to try very hard not
19  go over some ground that's already been covered.
20      A.  All right.
21      Q.  First, I would like for you to go with me -- you
22  have the Exhibit there in front of you?
23      A.  I do.
24      Q.  Go with me to Exhibit 85.  And actually while
25  you're hunting for 85, as I understand your testimony

### 344

1  this morning, you have now left the government employ
2  and you do political consulting; is that true?
3      A.  That is correct.
4      Q.  Does political consulting include strategy with
5  respect to elections?
6      A.  No.
7      Q.  So what sort of consulting then do you for
8  political candidates?
9      A.  I don't consult candidates.
10      Q.  What kind of consulting then do you do?
11      A.  I work -- right now I have a contract with a
12  group called the Texas Conservative Round Table and they
13  are an education informational public policy group.
14      Q.  And you help them with their compliance issues or
15  legal status?
16      A.  My title is executive director.
17      Q.  I see.  Alright.
18      So it's an umbrella of different things.
19      Q.  But you don't have any role in terms of
20  elections?
21      A.  Correct.  The organization is not involved in
22  elections.
23      Q.  And you don't have any other clients where you're
24  involved in elections?
25      A.  Correct.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 345

1    Q. Were you able to locate 85 for me?
2    A. Yes.
3    Q. Now, if I understand your earlier testimony you
4  prepared and drafted Exhibit 85?
5    A. I believe that is correct.
6    Q. I would like that go through a few of these
7  statements.  The first one we can skip the first one.
8  I'm interested in the second one.  "Fraudulent
9  registration applications are rampant."  Do you see that
10  sentence?
11    A. Yes.
12    Q. And there's a parenthetical after that?
13    A. Correct.
14    Q. Where did you get that information?
15    MR. SWEETEN:  In answering the question I
16  don't want you to reveal thoughts or mental impressions
17  about legislation or conversations that you had with
18  legislators or legislative staff.  Those would be
19  subject to the legislative privilege.
20    A. Sure.  It says they made national news.  I think
21  they're from various newspaper accounts at the time.
22    Q. (By MR. DUNN)  Well, you think or you know.
23    A. I don't know how else I would have gotten them.
24    Q. All right.  Did you get that information from
25  officers in Harris County?

## 346

1    A. I can't recall.
2    MR. SWEETEN:  Same objection with respect to
3  your mental impressions about the legislative process.
4  Don't reveal those in communications that would be
5  protected as we've discussed.  But you can answer based
6  on matters of the public record or based on the document
7  itself.
8    A. I can't recall.  I'm pretty sure it was from the
9  news.
10    Q. (By MR. DUNN)  You're pretty sure you got it from
11  a news source; is that true?
12    A. Correct.
13    Q. Now, I assume that somebody employed for the
14  Lieutenant Governor you had the ability to call local
15  officials an discuss facts and circumstances with them?
16    A. I suppose that's true.
17    Q. All right.  Did you contact anybody with the
18  Harris County Voter Registration Office to confirm any
19  of this information?
20    A. I don't recall and I don't -- again, without
21  knowing the date of it it's possible that Harris County
22  officials I think were involved in the testimony in '07
23  or '09.  I can't remember if it was one or both of those
24  years.
25    Q. So you might have drawn this conclusion,

## 347

1  Paragraph 2 of Exhibit 85, from testimony Harris County
2  Officials gave.  Is that right?  Is that what I'm
3  hearing you say?
4    A. It's possible.
5    Q. Alright.  As you sit here today, if I can sort of
6  boil down what I think you said, you either got this
7  from Harris County Officials, or the news, or you simply
8  just don't recall; is that right?
9    A. I think I said I probably got it from the news
10  but it's possible I got it from those other sources or
11  some other source.
12    Q. Are you aware of a lawsuit settled by Harris
13  County in the lead up to the 2010 election related to
14  how they handled voter registration applications?
15    A. No.
16    Q. Are you aware that Harris County ultimately
17  entered into a consent decree where -- that
18  significantly scaled back the number of applications
19  that were rejected?
20    A. No.
21    Q. Are you aware that Harris County rejected nearly
22  68,000 voter registration applications in the lead up to
23  the 2008 election?
24    A. I'm not familiar with that number.
25    Q. With respect to the allegation here that's 6,000

## 348

1  applications by non-citizens where rejected by Harris
2  County from 2004 to 2007, is your testimony the same
3  that you either got that from the news, from Harris
4  County Officials, or that you don't remember?
5    A. I do not remember the exact source of those
6  numbers.  Again, I think I probably got them from news
7  accounts.
8    Q. So if the facts and circumstances demonstrate
9  that the 6,000 applications rejected were rejected
10  because people simply didn't check whether they were a
11  citizen, you don't know one way or the other?
12    A. I'm not familiar it.
13    Q. Is it possible people submit applications and
14  forget to check that they are citizen.  They actually
15  are citizens; is that true?
16    MR. SWEETEN:  Objection.  Calls for
17  speculation.  You can answer.
18    A. I don't know if it's true.  I know it's possible.
19    Q. (By MR. DUNN)  You don't know much about voter
20  registration in terms of the laws and how voter
21  registration applications are actually processed in an
22  office.  Is that something you have some expertise in?
23    A. I've never done it.  I'm generally familiar with
24  it.
25    Q. You're familiar with the statutes?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 349

1    A. Correct.
2    Q. Okay. But have you ever been involved in either
3  administering or working in an office that process
4  applications?
5    A. No.
6    Q. Now, I notice under your threat of, Fraud is
7  Real, talking point here in Exhibit 85 that the only
8  example given here that has an explanation is the Harris
9  County. Let me rephrase that. The only one of these
10  evidences of the threat of fraud that gives an actual
11  example is the Harris County example. But that I recall
12    A. Well, there -- it says Acorn in 2008, the team
13  system in general. I mean, I'm not sure when you say an
14  example. It just says 6,000 applications by
15  non-citizens rejected in Harris County and then there
16  are two other examples after that. I don't think it
17  directly involved Harris County.
18    Q. What was it about the 2008 Acorn and 2010 Houston
19  vote registration situations that, quote, made them
20  scandals that made national news?
21    A. The fact that they were widely reported and were
22  relatively recent to what I assume was the time of the
23  production of this memo that made them relevant.
24    Q. Do you remember any details about them?
25    A. The 2008 A corn and 2010 Houston votes?

## 350

1    Q. Yes, sir.
2    A. My memory is that there were, I mean, I remember
3  a particular story where, again, the news account was
4  someone registered in the name of Mickey Mouse, or Troy
5  Aikman, or clearly fictional people. There were other
6  larger examples.
7    Q. And it's your recollection that those fictional
8  registrants actually got on the rolls in Harris County
9  Texas?
10    A. I don't recall.
11    Q. Do you recall that, if not the name of the
12  publication, the types of publications that reported
13  these events?
14    A. I believe it was a major state newspapers.
15    Q. Like the Houston Chronicle or Dallas Morning
16  News.
17    A. Correct.
18    Q. Not in other words organizations that have more
19  of a political bend?
20    A. It was probably all of those. It wasn't one type
21  of information in my memory.
22    Q. Let me ask it from this angle. The media
23  accounts that you relied upon in preparing Exhibit 85,
24  are these AP Member Papers?
25    A. I don't recall every source I used. But

## 351

1  certainly AP Papers were part of that.
2    Q. Now, the next line says, Texas Election
3  Administration Management System is improving. And how
4  so; how was it improving?
5    A. My memory is that the Texas Election
6  Administration and Management System was designed to do,
7  sort of, eventually real-time update the State voter
8  rolls based on submissions of whether data -- whether
9  voters are alive or dead or eligible or not. And that
10  there were some initial technical problems but other
11  problems in keeping that accurate. But that I recall
12  Secretary of State testimony that it was getting better.
13    Q. But it was continuing to have accuracy problems
14  according to your statement in Exhibit 85; is that true?
15    A. I think there were still in eligible voters
16  listed on the team system in my memory.
17    Q. From where did you gather that information?
18    A. I think from Secretary of State testimony and
19  Committee.
20    Q. And so how was it that Senate Bill 14 has either
21  proposed or ultimately passed was going to resolve the
22  team accuracy problems?
23    MR. SWEETEN: I'm going the object. I think
24  you're asking for matters that are subject to the
25  legislative privilege, including his opinions, his

## 352

1  thoughts, mental impressions about Senate Bill 14. So
2  I'm going to object on that basis. You can answer based
3  upon the public record.
4    A. It looks like the heading of No. 1 is, The Threat
5  of Fraud is Real. And these look like examples of
6  throats of fraud which is one ground that the Supreme
7  Court has said is justifies voter ID laws in general.
8    Q. (By MR. DUNN) Is it your opinion that Senate
9  Bill 14 will improve the accuracy problems with the team
10  system?
11    MR. SWEETEN: Same objection. Don't reveal
12  matters that are subject to the legislative privilege
13  including communications with State Agencies,
14  communications we've outlined previously. Don't reveal
15  matters, thoughts, or impressions about the bill. So to
16  the extent you can answer, based upon the public record,
17  you're free to do so.
18    A. I don't think that SB 14 or Voter ID Law will
19  improve team but it will at least as we stated before it
20  will have the general purpose of improving the integrity
21  of the elections. Which if the team system is
22  inaccurate and there are in eligible voters, I think
23  those in eligible voters are probably less likely to
24  cast a vote.
25    Q. (By MR. DUNN) Well, assuming that the team



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 353

1  system is inaccurate, there's sort of -- it appears to
2  me to be at least two possible solutions.  One was the
3  -- I suppose your argument, adoption SB 14.  Another
4  would be to actually address the team system and
5  implement reforms in that system.  Would you agree?
6       MR. SWEETEN:  Don't reveal thoughts and
7  mental impressions about the bill.  Those are subject to
8  the legislative privilege.  You can answer to the
9  extent, you can refer to matters of public record.  But
10  don't reveal matters that are subject to the legislative
11  privilege.
12       A.  Right.  I think if you wanted to improve the team
13  system you -- there's lots of ways you could to that.
14       Q.  (By Ms. Montgomery)  Lots of ways that you could
15  improve the team system independent from what SB 14 did;
16  is that true?
17       A.  True.
18       Q.  Is it true that the overarching concern that you
19  express in Exhibit 85 under Threat of Fraud is Real
20  section is the inaccuracy -- is generally the inaccuracy
21  of the State's voter registration databases; is that the
22  overarching concern expressed here?
23       A.  Let me take a look.  Looks like registration
24  fraud, inaccurate rolls, and inadequate ability to catch
25  in-person fraud are the three general umbrellas of fraud

## 354

1  listed there.
2       Q.  Your first bullet is Inaccurate Registration
3  Rolls.  Your second bullet is Registration Problems in
4  Harris County.  Your third bullet is the Team System,
5  which is the registration database, having accuracy
6  problems; is that right?  Those are the first three
7  bullets?
8       A.  Right.
9       Q.  And then the fourth one is, we have this
10  inadequate system to catch in-person voter fraud; is
11  that correct?
12       A.  That's what I said, yeah.
13       Q.  Okay.  Now if you would go with me -- is this --
14  before we do that.  On Exhibit 85, is this all of 85?
15       A.  I don't recall for sure.  I think it is.
16       Q.  And to whom did you deliver 85?
17       A.  I don't recall, as I stated earlier.  Probably my
18  staff and I don't recall who else might have received
19  it.
20       Q.  Who was your staff?
21       A.  The people mentioned earlier.  Blaine Brunson and
22  Julie Rathgeber, our Chief of Staff and Policy Director,
23  and possibly Frank Battle, our general counsel.
24       Q.  Would anybody have participated in drafting the
25  document?

## 355

1       A.  I can't recall if that was meant to be a summary
2  of the Supreme Court opinion or if that was intended to
3  be some sort of -- serve some other purpose.
4       Q.  Were there any earlier drafts to Exhibit 85 other
5  than the one that we have here before us?
6       A.  I don't recall.
7       Q.  Do you recall at what point -- strike that.
8       At the top of Exhibit 85, at the sort of title it
9  says, 82 R.  I assume that's 82nd regular session?
10       A.  Correct.
11       Q.  Can you recall whether that was prepared prior to
12  the beginning of session, or in the middle of it, or
13  after the end?
14       A.  Not at the end.  Well, probably not at the end.
15  I don't recall when otherwise.
16       Q.  So other than not being at the end, you can't
17  otherwise nail down when Exhibit 85 was prepared by you?
18       A.  Correct.
19       Q.  Now, go with me to Exhibit 86.
20       A.  Okay.
21       Q.  I know I'm probably going to ask a question or
22  two that you were already asked, but I couldn't hear and
23  I didn't want to interrupt during that part of the
24  review, but why was 86 drafted?
25       A.  Why was it drafted?

## 356

1       Q.  Yes, sir.
2       A.  My memory is, it's intended to give an overview
3  of the preclearance process and overview of a memo
4  issued by the Department of Justice.
5       Q.  There was -- I didn't quite understand that.
6  There was a memo issued by the Department of Justice
7  that you were summarizing?
8       A.  Here in the middle Standard Legal Review it says
9  the 2005 Department of Justice Legal Review of the
10  Georgia law that refers to a memo by the Department of
11  Justice.
12       Q.  Alright.  And how did you obtain that memorandum?
13       A.  It's publicly available.
14       Q.  Other than the memoranda, did you obtain anything
15  else in order to prepare Exhibit 86?
16       A.  I don't recall.
17       Q.  Did anybody else help you participate in the
18  drafting of 86?
19       A.  It's possible our general counsel Frank  Battle
20  looked at it.
21       Q.  Were there any other earlier drafts of 86?
22       A.  I don't recall.
23       Q.  Now, if you need to take a minute to review it, I
24  would like you to do so.  Tell me if there's anything in
25  86 that, as of today, that you disagree with or you



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

357

1  think you got incorrect in this memo.
2      A.  Georgia is not the only State with photo ID
3  requirement anymore.  I would have to review the Georgia
4  memo again to be sure that each of these summarizing
5  points about the content of the memo are correct, but
6  I'll assume they are.
7      Q.  Well, you were preparing this to be relied upon,
8  I'm sure, by at least the Lieutenant Governor if not
9  other members of the Legislature, is that true?
10     A.  I can't recall who it was for, who the intended
11  audience was for.
12     Q.  Well, you would agree that you were somewhat
13  careful in the preparation of Exhibit 86?
14     A.  I hope so.
15     Q.  All right.  Now, if you go with me to the
16  underlying section; Is there a Retrogressive Effect, do
17  you see that?
18     A.  Yes.
19     Q.  And the first question is:  Did Texas produce or
20  consider any evidence regarding whether Hispanics or
21  Blacks are less likely to possess or obtain a photo ID.
22  Did I read that correctly?
23     A.  Correct.
24  What's the answer to that question?
25         MR. SWEETEN:  You can answer the question to

---

358

1  the extent that you are not revealing information that's
2  subject to the legislative privilege and concluding
3  communications with legislatures, legislative staff,
4  State Agencies.  Also do not reveal your thoughts,
5  mental impressions, or opinions about legislation,
6  including Senate Bill 14.  You can refer to matters of
7  the public record in answering the question or the
8  specific memo itself.
9      A.  My memory is that that was discussed in the
10  public hearing, probably in each of the years that we
11  discussed today.  And I'll assert privilege as to
12  internal communications.
13     Q.  (By MR. DUNN) All right.  Well, I just want to
14  focus on, without prejudice to our argument on
15  privilege.  My questions are just going to focus on what
16  you know that's in the public record.  All right?
17     A.  Okay.
18     Q.  What information do you have that's in the public
19  record that Texas produced or considered regarding
20  whether Hispanics or Blacks are less likely to possess
21  or obtain a photo ID?
22     A.  I believe there was testimony from Texas
23  Department of Transportation and from the Secretary of
24  State.  And I know evidence from other states was also
25  discussed.

---

359

1      Q.  Do you remember if there was any analysis
2  actually performed on whether or not Hispanics or
3  African Americans were less likely to possess a photo
4  ID?
5          MR. SWEETEN:  You're asking as to matters of
6  public record?
7          MR. DUNN:  Yes, that's all.
8      A.  And you're talking about for Texas, Hispanics and
9  Blacks or for --
10     Q.  (By MR. DUNN) For Texas Hispanics and Blacks.
11     A.  I don't recall whether that was introduced into
12  the testimony or not.
13     Q.  You can't think of any examples of such report as
14  you sit here today?
15     A.  I think that's -- that were introduced into
16  public testimony, I think that's right.
17     Q.  The next question is, how did the minority
18  members of the legislature vote on the proposed changes
19  in the law?  Again, constricting your answer to the
20  public record, what's the answer to that question with
21  respect to Senate Bill 14?
22     A.  I'd have to review it to be sure.  But I think
23  minority members voted against the law.
24     Q.  Can we agree that nearly all of them, if not all
25  of them voted against the law in both the House and the

---

360

1  Senate?
2      A.  The House, I'm less comfortable saying so but
3  yes.
4      Q.  The next section, Is there a less retrogressive
5  alternative.  And the first question is:  Are non-photo
6  documents, birth certificate, social security cards, et
7  cetera, proven to be unreliable or lack security?  Is
8  there evidence of that forgery or fraud.  Did I read
9  that correctly?
10     A.  Correct, yes.
11     Q.  How does Senate Bill 4 measure up to that
12  question, using only the public record?
13         MR. SWEETEN:  You can answer based upon the
14  public record.  Otherwise object, legislative privilege.
15     A.  Senate Bill 14 does not include non-photo
16  documents except in some cases.  Again, I think there
17  was a disability exception that you could present just a
18  voter registration card without a photo.
19     Q.  (By MR. DUNN) Did you -- is there any record or
20  evidence in the public record about birth certificates
21  proven to be unreliable or lack security?
22     A.  I think my memory is there was general discussion
23  about non-photo IDs being inherently unreliable because
24  you could never be certain that the person holding a
25  paper document was the actual person eligible to vote.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                    MAY 29, 2012

---

361

1   Q. From whom was that testimony given?
2   A. I think it was lots of people. My sense is that
3   it was stated as a matter of fact.
4   Q. Did that testimony in your view prove that a
5   birth certificate was unreliable or lacked security?
6   MR. SWEETEN: You're asking him to reveal
7   his thoughts an mental impressions about legislation in
8   consideration of evidence and you're asking his -- what
9   you're asking is a matter that is legislatively
10  privileged. Again he can refer to what he heard on the
11  public record and he can refer specifically to the
12  document. But as to his thought processes and mental
13  impressions or communications that I have previously
14  asserted, I'm going to instruct you not to answer based
15  upon that.
16  A. I guess I would answer that this doesn't say, are
17  birth certificates unreliable? It says, are any
18  non-photo documents unreliable or do they lack security
19  i.e. Are they more open to fraud or forgery? And so I
20  guess as I sit here today that the answer would be yes.
21  Q. (By MR. DUNN) So it's your opinion that the
22  public record testimony or other supports for this bill
23  demonstrated or to use the word in the memorandum
24  Exhibit 86, prove then that birth certificates and
25  social security cards were unreliable or lacked security

---

362

1   measures. Is that true?
2   A. I would have to review the records. I would say
3   it speaks for itself probably.
4   Q. Now, the next question, is there evidence that
5   criminal penalties are sufficient to deter voter fraud;
6   did I read this correctly?
7   A. Yes.
8   Q. What is the answer to that question with respect
9   to Senate Bill 14, using only the public record?
10  MR. SWEETEN: Don't reveal matters of
11  legislative privilege. You can answer.
12  A. My memory of the -- I don't recall from the
13  public record.
14  Q. (By Ms. Montgomery) The next question is: Are
15  there additional forms of photo ID that can be accepted
16  for voting? Did I read that correctly?
17  A. Yes.
18  Q. What is the answer to that question using only
19  the public record for Senate Bill 14?
20  A. The -- it is not every type of photo ID that is
21  acceptable under SB 14.
22  Q. So with regard to the questions here under Is
23  there a less retrogressive alternative, you can't
24  provide testimony today whether Senate Bill 14 presents
25  the least retrogressive alternative or not is that true?

---

363

1   MR. SWEETEN: Again, in answering that
2   question, I don't want you to reveal thoughts, mental
3   impressions, or opinions about legislation or
4   communications that we've outlined previously. Those
5   are subject to the legislative privilege.
6   A. I can't recall what, or if any, public testimony
7   touched on those items.
8   Q. (By MR. DUNN) Well, in asking just your opinion
9   based upon the public record, was there a less
10  retrogressive alternative to address the concerns, if
11  there were any on voter fraud, other than Senate Bill
12  14?
13  MR. SWEETEN: Do you understand the
14  question? He's confining it to matters of the public
15  record. Don't reveal internal thought processes,
16  discussions. You can answer as to the public record.
17  A. Right. I guess it depends on what we mean by
18  alternative. Is it less retrogressive alternative to
19  the bill or a less retrogressive alternative that's
20  still insures secure elections. So I guess my short
21  answer is, I don't know.
22  Q. (By MR. DUNN) What did you mean here in Exhibit
23  86 when you used the term less retrogressive
24  alternative?
25  A. Well, I think this is intended to be a summary of

---

364

1   the 2005 DOJ opinion -- staff opinion.
2   Q. So in trying to summarize the DOJ staff opinion
3   as it related to Georgia, is it your testimony you
4   weren't able to understand what a less retrogressive
5   alternative meant to the DOJ?
6   A. And to the DOJ reviewing the Georgia law it
7   probably meant a less retrogressive alternative than
8   that implemented by law.
9   Q. And is it your opinion based upon the public
10  record and your research of the Georgia law and Senate
11  Bill 14 that Texas's Senate Bill 14 is less
12  retrogressive than the Georgia law?
13  MR. SWEETEN: Objection you're asking for
14  his mental impressions about legislation particularly
15  Senate Bill 14. That is a matter of legislative
16  privilege.
17  A. The question is: Is the SB 14, in my opinion,
18  less retrogressive than --
19  Q. (By MR. DUNN) The Georgia law?
20  MR. SWEETEN: Don't reveal thoughts, mental
21  impressions regarding the legislation or communications
22  you've had with legislators of the other enumerated
23  groups I've been talking about today.
24  A. Sure. I would have to review the Georgia law to
25  be sure.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 365

1  Q.  (By MR. DUNN)  Now, the next section says, Does
2  the new law include mitigating effects?  The first
3  sentence is, Are photo IDs free of charge and widely
4  available?  Is that true under Senate Bill 14?
5  A.  I believe it is, yes.
6  MR. SWEETEN:  Same objection.
7  Q.  (By MR. DUNN)  What information do you have from
8  the public record that the free ID's that can be
9  obtained from DPS are widely available?
10  A.  I recall testimony about the number of DPS
11  offices and other locations to obtain the photo IDs.
12  Q.  Did you recall that from the public record that
13  there were a number of locations in the State that were
14  hundreds of miles from the local DPS office?
15  A.  I don't recall the number of miles.
16  Q.  Do you recall any testimony or evidence that some
17  DPS offices even in urban locations though close in
18  proximity to citizens have extraordinary wait times?
19  A.  I do recall a discussion about wait times at
20  offices and I think it was in the context of pending
21  litigation -- I mean, pending legislation designed to
22  address those areas that were having long wait times.
23  Q.  What do you recall and those wait times?
24  A.  That some people had to wait a long time.
25  Q.  Do you remember what locations that occurred at?

---

### 366

1  A.  I think my memory is that Houston was mentioned.
2  But I don't remember what other locations.
3  Q.  Do you remember which location in Houston?
4  A.  No.
5  Q.  Do you remember any information in the public
6  record on whether or not there were locations at the DPS
7  offices with long wait times and where those offices
8  were in relation to minority population centers?
9  A.  My memory is that it was opponents of the bill
10  arguing that, as you said, minority populations would be
11  adversely impacted by that.
12  Q.  Did you see any evidence in the public record to
13  contest that allegation made by minority representatives
14  or Senators?
15  A.  I believe the questions were directed to a
16  Department of Transportation official and I don't recall
17  her exact responses.
18  Q.  In terms of posing these question that you posed
19  in Exhibit 86, did you undertake any effort to answer
20  these questions as they applied to Senate Bill 14?
21  MR. SWEETEN:  In answering his question
22  don't reveal mental impressions, opinions about
23  legislation or communications that you had with the
24  individuals we've enumerated previously.  You can answer
25  as to matters of the public record.

---

### 367

1  A.  Right.  I don't recall any -- I don't think I
2  publicly addressed these.
3  Q.  (By MR. DUNN)  Do you know -- well, let me ask it
4  this way.  Did you direct anybody to go about answering
5  these questions in Exhibit 86 as they applied to Senate
6  Bill 14?
7  A.  In public or internally?
8  Q.  Anywhere.  Not asking the result of the review,
9  just asking if you're aware -- well, not aware, if you
10  assigned anybody the project of answering these
11  questions in Exhibit 86 as they applied to Senate Bill
12  14?
13  A.  I'll assert the privilege earlier mentioned.
14  Q.  Do you know whether there was any review by any
15  party starting publicly as to the questions that you
16  pose in Exhibit 86 as to Senate Bill 14?
17  MR. SWEETEN:  Caution you on legislative
18  privilege.  Don't reveal communications or your thoughts
19  or mental processes regarding legislation.
20  A.  Right.  I'll assert legislative privilege.
21  Q.  Where are we on time?
22  THE REPORTER:  He's been on the record
23  28 minutes.
24  MR. DUNN:  I probably have five to seven
25  more minutes.

---

### 368

1  Now, skipping down to the, How does the law
2  compare to laws of other states, is it more or less
3  restrictive than the identification laws in other
4  states?  Did you conduct an analysis to answer that
5  question?
6  MR. SWEETEN:  Don't reveal your thoughts,
7  mental processes, impressions about legislation in
8  answering the question or communications that you've had
9  with legislators, staff, State Agencies, Texas Ledge
10  Council.
11  Q.  (By MR. DUNN)  And again, I'm going to withdraw
12  that question and ask it this way:  Relying on only the
13  public record, which is the statute as passed, Senate
14  Bill 14, the evidence that you're aware of in the public
15  record supporting it and the laws as passed in other
16  states is clearly available to anyone, did you develop
17  an opinion on whether or not Senate Bill 14 is more or
18  less restrictive than identification laws in other
19  states?
20  A.  I don't recall.  I recall a general discussion in
21  the Committee and how this law compares to Georgia.  And
22  again, without knowing the timing it's -- I can't recall
23  if it was Georgia, Indiana, Mississippi, Louisiana,
24  other states involved or if it was limited to Georgia.
25  Q.  Now, moving to the last paragraph in the last

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                    MAY 29, 2012

## 369

1    section under Conclusion, last sentence of the first
2    paragraph, Without inclusion of these three options,
3    other forms of IDs fail-safe, non-photo ID options, it
4    seems doubtful the DOJ staff will recommend preclearance
5    of the Photo ID Law.  You drafted that sentence?
6        A.  I think so, yes.
7        Q.  I think I'm just about finished.
8           In your preparations of Exhibits 86, 85 and 89,
9    did you undertake any analysis as to what types of data
10   the State collects on voters in terms of race and ID
11   availability?
12          MR. SWEETEN:  In answering that question,
13   don't reveal your thoughts, mental impressions regarding
14   -- or opinions about legislation or furtherance of the
15   legislative process nor communications that we've
16   outlined previously.  If you can't answer it without
17   doing that then do not do so.  Otherwise you can refer
18   to the matters of the public record.
19       A.  I'll assert privilege.
20       Q.  (By Mr. Dunn)  Alright.  I think subject to the
21   court's rulings, I'm finished.
22          MR. SWEETEN:  Reserve questions to the time
23   of trial.
24          (Deposition concluded.)
25

## 371

1        I, BRIAN HEBERT, have read the foregoing
2    deposition and hereby affix my signature that same is
     true and correct, except as noted above.
3
4               BRIAN HEBERT
     THE STATE OF TEXAS  )
5                        )
     COUNTY OF _____  )
6        Before me,          , on this day
     personally appeared BRIAN HEBERT, known to me (or proved
7    to me under oath or through
     (description of identity card or other document) to be
8    the person whose name is subscribed to the foregoing
     instrument and acknowledged to me that they executed the
9    same for the purposes and consideration therein
     expressed.
10       Given under my hand and seal of office this _____
     day of        ,   .
11
12              NOTARY PUBLIC IN AND FOR
                THE STATE OF
13
14
15
16
17
18
19
20
21
22
23
24
25

## 370

1              CHANGES AND SIGNATURE
2           RE: STATE OF TEXAS VS. HOLDER
3
4      PAGE   LINE   CHANGE        REASON
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

## 372

1            IN THE UNITED STATES DISTRICT COURT
2               FOR THE DISTRICT OF COLUMBIA

     STATE OF TEXAS      )
3                        )
                         )
4    VS.            )  NO. 12-CV-128
                    )  (DST, RMC, RLW)
5                        )
     ERIC H. HOLDER, JR.,  )
6    ET AL            )
7    *******************************************
                CERTIFICATE FROM THE
8              ORAL DEPOSITION OF
                BRIAN HEBERT
9    *******************************************
        I, Janalyn Reeves, a Certified Shorthand Reporter
10   in and for the State of Texas, do hereby certify that
11   the foregoing deposition is a full, true and correct
12   transcript;
13      That the foregoing deposition of BRIAN HEBERT, the
14   Witness, hereinbefore named was at the time named, taken
15   by me in stenograph on May 29, 2012, the said Witness
16   having been by me first duly cautioned and sworn to tell
17   the truth, the whole truth, and nothing but the truth,
18   and the same were thereafter reduced to typewriting by
19   me or under my direction.  The charge for the completed
20   deposition is $_____ due from Defendant.
21      () That pursuant to the Federal Rules of Civil
22   Procedure, the Witness shall have 30 days after being
23   notified by certified mail, return receipt requested, by
24   the deposition officer that the original deposition
25   transcript is available in her office for review and



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

BRIAN HEBERT                                                    MAY 29, 2012

373

1    signature by the Witness and if any corrections made are
2    attached hereto;
3        () That by agreement of counsel, a reading condensed
4    copy of the deposition transcript along with the
5    full-size original changes and Signature Sheet has been
6    sent to_____ on_____ for review and
7    signature within 30 days and if any corrections returned
8    are attached hereto;
9        () That by agreement of counsel, the deposition
10   officer is instructed to release the original deposition
11   transcript to_____ on_____, for review and
12   signature, and the deposition officer is thereafter
13   released of any further responsibility with regard to
14   the original.
15       () That the Witness shall have thirty (30) days for
16   review and signature of the original transcript and if
17   any corrections returned are attached hereto.
18       () That the signed transcript () was () was not
19   received from the Witness within 30 days.
20       () That the examination and signature of the Witness
21   is waived by the Witness and the parties;
22       That the amount of time used by each party at the
23   deposition is as follows:
                Ms. Westfall - 6 hours 55 minutes
24              Mr. Dunn - 31 minutes
                Mr. Rosenbert - no time
25       I further certify that I am neither counsel for,

374

1    related to, nor employed by any of the parties in the
2    action in which this proceeding was taken, and further
3    that I am not financially or otherwise interested in the
4    outcome of the action.
5        WITNESS MY HAND, this the_____ day
6    of_____ A.D. 20___.
7        _____
         JANALYN REEVES
8        Cert. No. 3631
         Expires Dec. 12
9        100 Congress
         Suite 220
10       Austin, Texas  78701
         (512)634-1980
11       Firm Registration No. 283
12
13
14
15
16
17
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com