## 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                )
                              )
          Plaintiff,          )
                              )
VS.                           )  CASE NO. 1:12-CV-00128
                              )  (RMC-DST-RLW)
ERIC H. HOLDER, JR., in his   )  Three-Judge Court
official capacity as Attorney )
General of the United States, )
                              )
          Defendant.          )
                              )
ERIC KENNIE, et al.,          )
                              )
          Defendant-Intervenors, )
                              )
TEXAS STATE CONFERENCE OF     )
NAACP BRANCHES, et al.,       )
                              )
          Defendant-Intervenors, )
                              )
TEXAS LEAGUE OF YOUNG VOTERS  )
EDUCATION FUND, et al.,       )
                              )
          Defendant-Intervenors, )
                              )
TEXAS LEGISLATIVE BLACK       )
CAUCUS, et al.,               )
                              )
          Defendant-Intervenors, )
                              )
VICTORIA RODRIGUEZ, et al.,   )
                              )
          Defendant-Intervenors. )
------------------------------------------------
                ORAL DEPOSITION OF
             TREY MARTINEZ FISCHER
                 JUNE 15, 2012
------------------------------------------------
    ORAL DEPOSITION of TREY MARTINEZ FISCHER, produced

## 2

1  as a witness at the instance of the Plaintiff, and duly
2  sworn, was taken in the above-styled and numbered cause
3  on the 15th day of June, 2012, from 10:00 a.m. to 3:43
4  p.m., before Jean Thomas Fraunhofer, CSR in and for the
5  State of Texas, reported by machine shorthand, at REGUS,
6  18756 Stone Oak Parkway, Suite 200, San Antonio, Texas
7  78258, pursuant to the Federal Rules of Civil Procedure
8  and the provisions stated on the record or attached
9  hereto.

## 3

1              A P P E A R A N C E S
2
3  FOR THE PLAINTIFF:
4    ADAM ASTON
     Assistant Attorney General
5    ATTORNEY GENERAL OF TEXAS
     P.O. Box 12548
6    Austin, Texas 78711
     Tel: (512) 936-0596
7    Email: Adam.aston@oag.state.tx.us
8  FOR THE DEFENDANT:
9    MICHELLE A. McLEOD
     Trial Attorneys
10   U.S. DEPARTMENT OF JUSTICE
     950 Pennsylvania Avenue, NW
11   Room 7254 NWB
     Washington, DC 20005
12   Tel: (202) 305-0115
     Email: Michelle.mcleod@usdoj.gov
13 FOR THE DEFENDANT-INTERVENOR:  TEXAS STATE CONFERENCE OF
   NAACP BRANCHES and MEXICAN-AMERICAN LEGISLATIVE CAUCUS
14
15   JOSE GARZA
     LAW OFFICE OF JOSE GARZA
16   7414 Robin Rest Drive
     San Antonio, Texas 78209
17   Tel: (210) 392-2856
     Email: Garzapalm@aol.com
18 FOR THE DEFENDANT-INTERVENOR:  THE BRENNAN CENTER FOR
   JUSTICE AT NYU LAW SCHOOL
19
     IAN VANDEWALKER  (BY Speakerphone)
20   THE BRENNAN CENTER FOR JUSTICE AT NYU LAW SCHOOL
     161 Avenue of the Americas, Floor 12
21   New York, New York 10013
     Tel: (646) 292-8362
22   Email: Ian.vandewalker@nyu.edu
23
24 ALSO PRESENT:  Martin Golando
25

## 4

1              I N D E X
2
3
   WITNESS                           PAGE
4
   TREY MARTINEZ FISCHER
5    Examination by Mr. Aston          5
     Examination by Mr. Garza        186
6
7  Signature and Changes             192
8  Reporter's Certificate            193
9
10         E X H I B I T S
11 NO.      DESCRIPTION              PAGE
12 Exhibit 1   Waiver List            12
   Exhibit 2   Notice of Deposition   17
13 Exhibit 3   SB14                   45
   Exhibit 4   Election Code 82.003   51
14 Exhibit 5   House Rules            72
   Exhibit 6   House Journal          76
15 Exhibit 7   SB1811                 80
   Exhibit 8   SB1811, Amendment 58      80
16 Exhibit 9   Expert Declaration of Daron R. Shaw 109
   Exhibit 10   House Journal        145
17 Exhibit 11   SB362                172
18
19
20
21
22
23
24
25



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

**5**

1          TREY MARTINEZ FISCHER,
2    having been first duly sworn, testified as follows:
3                    EXAMINATION
4    BY MR. ASTON
5         Q.  Good morning.  My name is Adam Aston, and I
6    represent the State of Texas, the plaintiff in this
7    lawsuit.  Please state and spell your full name for the
8    record.
9         A.  Sure.  My name is Trey Martinez Fischer.
10   That's T-R-E-Y, M-A-R-T-I-N-E-Z, no hyphen, Fischer,
11   F-I-S-C-H-E-R.
12        Q.  Have you ever been deposed before?
13        A.  I have.
14        Q.  How many times?
15        A.  One recently and maybe twice over the last
16   10 years, 15 years.
17        Q.  In what cases did those depositions take place?
18        A.  I was -- I was deposed in the redistricting
19   litigation by the Attorney General's office, and I
20   recall being deposed as a plaintiff in a personal injury
21   lawsuit, and I want to correct that.  That was in the
22   late '80s, early 1990s.
23        Q.  So you are aware of two depositions --
24        A.  Yes.
25        Q.  -- that you recall?

**6**

1         A.  Yes.
2         Q.  And the redistricting deposition, when did that
3    take place?
4         A.  That took place sometime in the summer or early
5    fall of 2011.
6         Q.  And it was by the Texas Attorney General's
7    office?
8         A.  Yes, sir.
9         Q.  Have you been -- Have you been a party to any
10   other lawsuits?
11        A.  I was a -- I was a plaintiff in a landlord and
12   tenant action that was in justice court in the -- in
13   about 1998, 1999 or so.
14        Q.  And the redistricting litigation, were you an
15   intervenor in that suit?
16        A.  Yes, sir.  We were a plaintiff.  I'm sorry.
17   I'm sorry.  I guess I should --
18             MR. GARZA:  So in this case we're
19   intervenors.  In the redistricting case, MALC was the
20   plaintiff.
21             MR. ASTON:  Section II plaintiffs?
22             MR. GARZA:  Section II constitution.
23             THE WITNESS:  I thought you were referring
24   to the District of Columbia lawsuit where we were an
25   intervenor.  No, that lawsuit so we were both.

**7**

1              MR. GARZA:  That's right.  I'm sorry to
2    interrupt then.
3         Q.  (BY MR. ASTON)  That's quite all right.  So to
4    be clear, in the San Antonio lawsuit, you are
5    plaintiffs.  In the District of Columbia lawsuit, you
6    were an intervenor-defendant?
7         A.  That's correct.
8         Q.  You sat for one deposition.  Did it apply to
9    both cases or do you recall which case it occurred in?
10        A.  I was deposed in Section II case for
11   San Antonio, and I think those materials were made
12   available to the DC court.  I don't know if they were
13   used.
14        Q.  Are you taking any medication or suffering from
15   any illness that would affect your ability to provide
16   full and accurate testimony today?
17        A.  I am taking medication.  I don't believe it
18   will impact my ability to answer questions.
19        Q.  Are you aware of anything else that might
20   prevent you from fully or accurately answering the
21   questions?
22        A.  No, sir.
23        Q.  Before we -- Again, I'd like to go over a few
24   ground rules, hopefully make this go as quickly and
25   smoothly as possible.  Please answer audibly so that the

**8**

1    court reporter can hear and record your answers.
2    Nodding and shaking of the head cannot be recorded; do
3    you understand?
4         A.  I do.
5         Q.  If you do not understand my question, you
6    cannot hear my question or if you'd like for me to slow
7    down at any point, please let me know, okay?
8         A.  Okay.
9         Q.  Please wait for me to finish asking my
10   question, and I'll do my best to let you finish
11   answering before I move on to the next question, okay?
12        A.  Okay.
13        Q.  Your lawyer may object to questions.  Even if
14   he objects, you must answer my question unless
15   instructed to do otherwise; do you understand?
16        A.  I do.
17        Q.  Is MALC represented by counsel today?
18        A.  Yes.
19        Q.  Who is MALC's counsel?
20        A.  Jose Garza.
21        Q.  Could you spell his name, please, for me?
22        A.  Jose, J-O-S-E, Garza, G-A-R-Z-A.
23        Q.  Is MALC represented by any other counsel?
24        A.  Yes.
25        Q.  And who's that?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 9

1      MR. GARZA: Ian Vandewalker.

2      MR. ASTON: Can you spell that name,

3  please?

4      MR. GARZA: Sure. His name is Ian, I-A-N,

5  second name is Vandewalker, V-A-N-D-E-W-A-L-K-E-R. Did

6  I get it right, Ian?

7      MR. VANDEWALKER: I'm actually very

8  impressed. I appreciate it.

9      MR. GARZA: You're welcome.

10     MR. VANDEWALKER: It causes people

11  problems a lot.

12     Q. Is MALC represented by any counsel other than

13  the two who have participated in the deposition today?

14     MR. GARZA: Are you referring to this

15  deposition or in the litigation?

16     Q. Are they represented by any other counsel in

17  the litigation?

18     A. Marty Golando is a licensed lawyer who is a

19  member of my capitol staff. He's also a lawyer for

20  MALC, and he has been assisting in the litigation.

21     Q. Are you personally represented by counsel

22  today?

23     A. I'm not.

24     Q. When did MALC's representation in this suit

25  begin?

## 10

1      A. I would have to rely on our pleadings when we

2  officially filed our motion to intervene, and I imagine

3  our -- our answer shortly thereafter, so I think

4  whatever date is on those pleadings, I think, will be

5  the official entry date, formal.

6      Q. That was the entry into the lawsuit?

7      A. Yes. And did I misunderstand your question?

8      Q. The representation by counsel, that occurred

9  sometime before that; do you recall?

10     A. MALC retained counsel in the -- bear with me --

11  in the late 2010, voting rights counsel, as it pertained

12  to voting rights, specifically redistricting, but most

13  certainly under the advice of counsel we've paid

14  attention to anything that had an impact on minority

15  voting rights.

16     Q. So that representation has continued on for the

17  last year and a half or so?

18     A. I believe it has.

19     Q. Is it your understanding that today you've been

20  designated to provide testimony on behalf of the Mexican

21  American Legislative Caucus?

22     A. That is my understanding.

23     Q. For this deposition, unless I indicate

24  otherwise, when I use the term you or MALC or the caucus

25  or your organization, that term includes the Mexican

## 11

1  American Legislative Caucus or anyone acting on its

2  behalf; do you understand that?

3      A. Yes.

4      Q. Representative Martinez Fischer, for this

5  deposition, there is one more background rule I'd like

6  to go over with respect to legislative privilege. Many

7  of your colleagues in the Texas House and the Texas

8  Senate are asserting legislative privilege. As a

9  result, any and all questions I ask today about the

10  content of your conversations or written communications

11  between you and other members of the legislature or

12  their staffs are asking only about conversations and

13  communications in which all participating parties have

14  affirmatively waived legislative privilege. None of

15  the State's questions are asking you to divulge privileged

16  communications or conversations. None of your answers

17  should divulge such privileged information; do you

18  understand?

19     A. I understand the statement. I don't understand

20  how it would impact my answers.

21     Q. Is that because you don't believe you've

22  engaged in any privileged conversations or do you not

23  understand how I'm asking you to imply the same?

24     A. I don't know who's asserted a privilege and who

25  hasn't.

## 12

1      Q. Do you know who has affirmatively waived a

2  privilege?

3      A. I don't. I only know what I've done.

4      Q. You've not been informed as to those -- which of

5  your colleagues have waived privilege?

6      A. I've not inquired.

7      Q. No one has informed you of that?

8      A. No.

9      (Exhibit 1 marked.)

10     Q. Please take a minute to review what has now

11  been marked Exhibit 1. In the list is a list of

12  legislators who have affirmatively waived legislative

13  privilege. If there are any questions or any doubts for

14  this deposition, assume that the conversation is

15  privileged and should not be divulged.

16     MR. GARZA: Just so the record is clear,

17  Adam, I have a question. So when you are asking

18  questions of the representative only with regard to

19  conversations that he's had with people on this list,

20  you want answers to.

21     MR. ASTON: That's correct.

22     MR. GARZA: Just for the record, I want to

23  make sure that it's clear that MALC objects to the

24  instruction because we do not believe that it is

25  consistent with the court's orders, interpretation of --



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 13

1  of the privilege, that is, that the court's order
2  clearly sets out that unless a legislator has
3  affirmatively asserted the privilege, the privilege does
4  not apply.
5          And as I understand your instruction, you
6  are asking questions only as to those members who have
7  affirmatively waived the privilege.
8          MR. ASTON:  That is correct.
9          MR. GARZA:  With that objection lodged,
10  you can go ahead and answer any of his questions based
11  on that instruction, that is, only divulge conversations
12  with regard to these legislators.
13     A.  May I ask for a clarification, please?  On this
14  waiver list there's a reference to a Davis and there are
15  two Davis's in the House, so I'd like to know which
16  Davis that is, and there's also two Lucio's in the
17  legislature, so I'd like to know which Lucio that is.
18     Q.  I'm not sure.
19     A.  There's three Davis's.  I'm sorry.
20          MR. GARZA:  How do you want to handle
21  this?
22     Q.  Let's assume that the Davis's and Lucio's have
23  retained privilege then, so do not answer as to those to
24  be safe.
25     A.  So any conversation with Sarah Davis, John

## 14

1  Davis, Wendy Davis -- Sarah, Yvonne, Wendy and John, so
2  four Davis's or Senator Eddie Lucio or Representative
3  Eddie Lucio, just don't --
4     Q.  Do not answer as to those conversations.
5     A.  Understood.
6     Q.  And then if your conversations with two or
7  three people that have waived privilege, but there was
8  someone else or some other staffer also present has
9  retained privilege, then we do not want to discuss those
10  conversations either.
11     A.  And in the instance if I'm not -- if I'm not
12  able to discern who the staff member worked for, do I --
13  do I conclude that they may work for a member that may
14  have asserted a privilege?
15     Q.  And do not answer as to those conversations.
16     A.  Okay.
17     Q.  Unless we're absolutely certain that everyone
18  in the room is a member or works for a member who has
19  affirmatively waived, we're not asking questions about
20  those conversations.
21          MR. GARZA:  Okay.
22     A.  Thank you.
23     Q.  All right.  Have the intervenors in this suit
24  entered into a joint defense agreement with each other
25  or with the Department of Justice?

## 15

1     A.  I'm not aware.
2     Q.  Do you know if MALC has entered into any such
3  agreement?
4     A.  I have not seen any pleadings or agreements
5  that are responsive, so that I'd certainly defer to any
6  communications that counsel has been having with our
7  lawyers in Washington and other places.
8     Q.  But as far as you know, MALC has not?
9     A.  As far as I know, MALC has not.  I have -- Let
10  me clarify.  I have not been asked as a representative
11  of MALC to give an opinion or authorize the joint
12  defense agreement.
13     Q.  What did you do to prepare for your deposition?
14     A.  I reviewed the notice of the deposition, the
15  second and third amended notice.  I met with may lawyer
16  yesterday.  I reviewed our motion to intervene.  I
17  reviewed our memorandum in support of our motion, and I
18  reviewed our answer and that's about it, I think.
19     Q.  Did all of those preparations take place
20  yesterday?
21     A.  Conversations with counsel about litigation
22  have been ongoing.  Specific preparation for deposition
23  began yesterday, correct.
24     Q.  How long did you meet with your counsel?
25     A.  I met with counsel -- with MALC counsel for a

## 16

1  little over two hours yesterday, and then I've been, you
2  know, reviewing documents since that time and probably
3  about three hours this morning.
4     Q.  Who was at your meeting?
5     A.  With counsel?
6     Q.  Yes, sir.
7     A.  Lawyers Jose Garza and Martin Golando.
8     Q.  And yourself and no one else?
9     A.  That's correct.
10     Q.  Have you talked to anyone else about your
11  deposition today?
12     A.  I've talked to people about having to take a
13  deposition today, but not about the deposition itself.
14     Q.  To whom did you speak?
15     A.  My -- My legal staff at my law office advising
16  them where I would be today, my wife, my three-year old
17  daughter at breakfast.  She didn't want me to come,
18  so --
19     Q.  And so, again, the documents that you reviewed
20  are your pleadings.  Did you review the notice of
21  deposition?
22     A.  I did.
23     Q.  And that was the exclusive list of the
24  documents?
25     A.  Yes.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 17

1      (Exhibit 2 marked.)
2      Q.  Please take a minute to review Exhibit 2.  Is
3  that a copy of the notice that you reviewed yesterday?
4      A.  It appears to be.
5      Q.  If you turn your attention to Page 2, please.
6      A.  (Witness complied.)
7      Q.  MALC has been asked to designate a person to
8  testify on its behalf on 11 topics, and we're going to
9  review them.  Topic 1, "The factual basis of MALC's
10  claims or defenses in this lawsuit including any
11  contention that Senate Bill 14 was enacted for the
12  purpose or will have the effect of denying or abridging
13  the right to vote on account of race, color, or
14  membership in a language minority group."  Have you been
15  designated to testify on Topic 1?
16      A.  Yes.
17      Q.  And you have prepared to testify on Topic 1?
18      A.  Yes.
19      Q.  Those preparations included the matters we
20  discussed before and nothing else, correct?
21      A.  That's correct.
22      Q.  Topic 2, "Any interest of MALC in this
23  litigation that is not adequately represented by the
24  United States."
25          MR. GARZA:  Let me for the record lodge an

## 18

1  objection as to Topic No. 2.  We believe that that is a
2  topic that is only at issue with regard to intervention.
3  The intervention issue is no longer at issue here.
4  There we believe that inquiries of this sort are
5  inappropriate and irrelevant.  With that objection, Mr.
6  Martinez Fischer is prepared to respond to your
7  questions with regard to Topic No. 2.
8      Q.  And you have been designated on that topic,
9  correct, sir?
10      A.  Yes.
11      Q.  And you are prepared?
12      A.  I am.
13      Q.  Topic No. 3, "MALC's membership including all
14  individuals MALC purports to represent in this lawsuit."
15  You've been designated on Topic 3?
16      A.  Yes.
17      Q.  And you are prepared on Topic 3?
18      A.  Yes.
19      Q.  And those preparations included the matters you
20  previously discussed?
21      A.  Yes.
22      Q.  Topic 4, "MALC's activities related to voter
23  identification legislation proposed or enacted in
24  Texas."  You're designated on Topic 4?
25      A.  Yes.

## 19

1      Q.  And you are prepared on Topic 4?
2      A.  Yes.
3      Q.  Topic 5, "MALC's activities related to voter
4  identification legislation proposed or enacted by states
5  other than Texas."  Have you been designated to testify
6  on Topic 5?
7      A.  Yes.
8      Q.  And you are prepared on Topic 5?
9      A.  Yes.
10      Q.  Topic 6, "Any policy making or advocacy related
11  work performed by or on behalf of MALC regarding voter
12  identification."  You've been designated on Topic 6?
13      A.  I have.
14      Q.  And you are prepared on Topic 6?
15      A.  Yes.
16      Q.  Topic 7, "MALC's activities related to voter
17  registration or education."  You've been designated on
18  Topic 7?
19      A.  I have.
20      Q.  And you are prepared on Topic 7?
21      A.  Yes.
22      Q.  Topic 8.  "MALC's election related activities
23  including, but not limited to, driving voters to the
24  polls, assistance with mail-in ballots and poll
25  watching."  Have you been designated on Topic 8?

## 20

1      A.  Yes.
2      Q.  And you are prepared on Topic 8?
3      A.  Yes.
4      Q.  Topic 9, "MALC's plans to assist registered
5  voters to obtain identification required by Senate Bill
6  14."  Have you been designated on this topic?
7      A.  I have.
8      Q.  And you're prepared on this topic?
9      A.  Yes.
10      Q.  Topic 10, "Any activities by or on behalf of
11  MALC regarding Senate Bill 14. (2011)."  You've been
12  designated on Topic 10?
13      A.  Yes.
14      Q.  And you are prepared on Topic 10?
15      A.  Yes.
16      Q.  And, finally, Topic 11, "Any activities by or
17  on behalf of MALC regarding Senate Bill 362 (2009)."
18  You've been designated on this topic?
19      A.  Yes.
20      Q.  And you are prepared on this topic?
21      A.  I have.
22      Q.  For a moment, I'd like to turn your attention
23  to Topic 6.
24      A.  Okay.
25      Q.  Does MALC engage in policy related activity



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 21

1  regarding voter ID legislation?
2      A.  In the capacity as to our Texas roles or out of
3  state or --
4      Q.  Just in general the issue of voter
5  identification.
6      A.  I think that MALC has clearly demonstrated its
7  interest in legislation that could have a impact on --
8  on minority election outcomes, and so this is clearly --
9  as MALC is a member driven organization and as it has a
10  collection of its members, they all have their
11  particular areas of special expertise.  We have a couple
12  of members who are well versed in election law, voter
13  identification law.  We have members who sat on the
14  select committee for this voter identification bill that
15  was passed in 2011, and so there was a lot of robust
16  discussion and advocacy about the need to engage authors
17  of that bill and to see if we could improve the bill or
18  at least point out the significant deficiencies of the
19  legislation.
20      Q.  You mentioned a minute ago that MALC has
21  several members that are particularly experts in voter
22  related matters or election related matters.  Which are
23  those members?
24      A.  I said that there were a few members and the
25  members that come to mind is Representative Anchia who

## 22

1  has worked very hard on this subject matter, served on
2  the elections committee.  I know that Representative
3  Gutierrez was on the select committee that considered
4  this legislation.  I think that Representative Martinez
5  from the valley was very involved in the discussion and
6  debate, and Representative Ana Hernandez Luna from
7  Houston brings a particular perspective having been a
8  first generation US citizen.  Her perspective was very
9  unique and helpful in the debate, and those are the --
10  those are the outliers I think that come to mind.
11      Q.  And those are the members that you were
12  referring to a moment ago.
13      A.  Yes.
14      Q.  Has MALC written any articles on the topic of
15  voter identification?
16      A.  Nothing for publication.  I think that we do
17  have a -- a newsletter that we talk about a variety of
18  topics.  It's a weekly electronic piece to anybody who
19  wants to receive it.  I would -- I would guess that we
20  have probably commented on voter identification
21  legislation over the course of time.
22      Q.  The weekly newsletter that you are referring
23  to, is that The Caucus?
24      A.  Yes.
25      Q.  And it's sent out electronically through email

## 23

1  or --
2      A.  Through email.
3      Q.  Has MALC written any academic papers on voter
4  identification?
5      A.  MALC hasn't.  I'm not sure if the individual
6  members have, but MALC has not submitted anything in the
7  organization's name.
8      Q.  Has MALC conducted any seminars on this topic?
9      A.  MALC has not hosted any seminars.  I would
10  imagine members of MALC have probably participated in,
11  you know, panels and discussions at various policy
12  conferences at different times.
13      Q.  Has MALC presented any speakers on this topic?
14      A.  We have had caucus meetings where our voting
15  rights council have addressed the body, addressed the
16  membership about any sort of, you know, voting rights
17  issues.  Voter ID certainly could have been one of them.
18  MALC hasn't had official convenings or policy
19  conferences where we would be in a position to invite
20  those kinds of speakers.
21      Q.  Has MALC conducted any studies on this topic?
22      A.  Not that I know of other than anything that
23  might be related to litigation in terms of working with
24  different experts, and I'm not -- I'm not saying that we
25  have, but I would -- I would imagine that if we are

## 24

1  doing any studies, they might be related to litigation.
2      Q.  And has MALC taken any surveys on the issue of
3  voter identification?
4      A.  Surveys in what context?  I'm sorry.  I don't
5  understand.
6      Q.  Perhaps public surveys or conducted polls
7  that --
8      A.  Engaging the public, not the membership.
9      Q.  Sure.
10      A.  Okay.  Not that I'm aware of, no.
11          MR. ASTON:  Can we go off the record for
12  just a minute?
13          (Recess from 10:28 a.m. to 10:29 a.m.)
14          MS. McLEOD:  Michelle McLeod of the
15  Department of Justice for defendant Attorney General
16  Eric Holder.
17      Q.  (BY MR. ASTON) Sir, what is your role with the
18  Mexican American Legislative Caucus?
19      A.  I'm the chairman.
20      Q.  And as chairman what are your duties?
21      A.  I preside over the caucus.  I have an executive
22  committee that I work with.  We have a vice-chairman, a
23  treasurer, secretary, legal counsel.  The chairman has
24  always had the discretion to -- to engage the membership
25  on issues of import to Latino community.  Having said



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 25

1  that, the MALC chairman, you know, also serves merely as
2  a facilitator for the membership to have the caucus
3  engage in issues that the members feel are important to
4  the Latino community.  It's a -- I think that from a
5  policy making standpoint, we are a very good sounding
6  board for the pulse of the Latino community because the
7  membership -- to be in the caucus, MALC is one of the
8  few caucuses that actually has some very -- how should I
9  say -- some very rigorous membership requirements, and
10 so as you may know, there are other caucuses in the
11 capitol that a $10 fee will make you a member.  It's not
12 the case for MALC, so we are very cohesive in the sense
13 that we believe our job is to advocate on behalf of our
14 constituents, and most of our constituents are -- are
15 majority voting age population Latino, and so we believe
16 that we probably represent our constituents, but we are
17 representing their interests.
18      Q.  I believe by count, you mentioned five
19 officers, chair, vice-chair, treasurer, secretary, legal
20 counsel.
21      A.  Yes.  I hope I'm not forgetting anybody, but I
22 think that's it.
23      Q.  Those are the officers of MALC?
24      A.  Yes, sir, the executive committee.
25      Q.  But are there other officers of MALC?

## 26

1       A.  No.  And if there are, I'll come back after a
2  break, but that's what I remember.
3       Q.  And especially legal counsel, that is still --
4  that's a member of the legislature.  He serves as legal
5  counsel.  He's not like a staff attorney.
6       A.  No.  That is a presumptively a member lawyer.
7       Q.  How long have you been chairman?
8       A.  Since the 2009 session?
9       Q.  And have you held any previous leadership
10 offices with MALC?
11      A.  Prior to the 2009 session, I was the
12 vice-chairman of MALC.  Prior to that I was the legal
13 counsel and prior to that I was the treasurer.
14      Q.  How long have you been a member of MALC?
15      A.  Since my election into the House, my first
16 session, which was in 2001.
17      Q.  And how long have you been -- you call it the
18 executive counsel or the executive committee?
19      A.  I've been a member of the executive committee
20 since, I believe, the session of 2003, if not 2005.
21 It's been a while.
22      Q.  When was MALC founded?
23      A.  MALC was -- Historically, it has been told that
24 MALC has been an organization that was together since
25 the late '60s.  We have found some records and

## 27

1  documentation that showed that it was in existence since
2  1973, and since that's where we find, you know, official
3  paperwork, that's -- that's the time that we -- that we
4  use.  One of the founders of MALC was elected to the
5  Texas House of Representatives in the late 1960s, and he
6  indicates that, you know, MALC was alive and well in the
7  late '60s, although we can't find documents and records
8  that go back that far.
9       Q.  You mentioned a moment ago that MALC is one of
10 the caucuses that in your view has more rigorous
11 membership requirements.  When you say caucus in a Texas
12 House as opposed to a committee or a standing committee
13 or special committee, what is a caucus in the Texas
14 House of Representatives?
15      A.  Well, I think that everybody will have a
16 different view.  I perceive the Mexican American
17 Legislative Caucus to be a body of members that work in
18 some sort of cohesive manner on issues of interest to
19 the caucus, and so in the interest of our caucus, it's
20 looking out for the rights of Mexican Americans and
21 Latinos in specific but in general minority rights.
22      I will say that now that differs from our
23 caucus, I think, if I'm not mistaken, that I might be a
24 member of the sportsmen's caucus and I don't really know
25 what the sportsmen's caucus does, but it sounded cool at

## 28

1  the time, and I became a member.  I'm also a member of
2  the Democratic caucus and being a Democrat and my
3  ability to pay my dues makes me a member of that caucus.
4  And the reason why I'm trying to -- when I use the word
5  rigor, I think it's known around the capitol that there
6  are members who would have wished or would desire to be
7  a member of MALC, but they don't meet the eligibility
8  requirements to become members, and so it's -- you know,
9  sometimes we're teased about it because people make us
10 out to be an exclusive caucus, but, really, what makes
11 this caucus work is that, you know, we work -- we work
12 together on many issues.  We don't always agree
13 100 percent, but we always agree to talk it out, and any
14 one member can bring up any idea at any time so long as
15 that member is active and present at the meetings.
16      Q.  That response I think certainly helps frame
17 MALC as a caucus as compared to other caucuses.  Could
18 you explain a bit about how a caucus, whether it's MALC
19 or another one, differs from an official committee
20 membership appointed by the speaker?
21      A.  Sure.  Well, for one, if a standing committee
22 of the House is a committee that's recognized in the
23 rules and it's defined in the rules and the membership
24 is laid out and specified and the speaker has, you know,
25 the discretion in most instances and seniority decides



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 29

1  the other half of the committee, those committees are
2  given a jurisdiction, and they have official oversight
3  over agencies, they are part of the legislative branch,
4  and so I think that's a big distinction between a
5  committee and a caucus.  And a caucus is a body of
6  members that, you know, again, work on issues of similar
7  interest or has a -- you know, lots of commonality with
8  the membership group and members work in achieving
9  objectives that are of mutual interest.
10     Q.  Does MALC have an official mission statement?
11     A.  I'm not sure that we do.  We may.  I've been
12  a -- I've been a member of MALC since my election or my
13  first session in 2001, and I've always known that while
14  I may not have ever seen it in print, I view MALC as not
15  only, you know, the oldest and largest Latino caucus in
16  the United States, that our mission is to advocate on
17  behalf of the minority community in Texas.  And I think
18  every chairman has sort of had that deference to -- to
19  tailor the -- the need of the caucus, I guess, depending
20  on what is going on at the -- in the present day, and so
21  I can --
22       You know, if I may, in the early 1970s,
23  MALC had a much different meaning.  MALC was -- was --
24  You know, people have a tendency to say that MALC looks
25  like they are just Hispanics that just happen to be

## 30

1  Democrats, and they are just a democratic group
2  operating as a Hispanic organization.  MALC was created
3  in the 1970s because the democratic majority of the
4  House didn't view the opinions and the voices of the
5  Mexican American representatives the way they wanted to
6  be represented, and so they organized to combat a
7  democratic majority to give themselves a voice and using
8  their leverage as a number of votes to achieve and
9  accomplish their objectives.
10       That's 1970s.  You know, we're now in
11  2012, and the needs are different now.  You know, we --
12  we very much will never lose site of our mission which
13  is to advocate for civil and social justice on behalf of
14  the minority community, but we also recognize that as we
15  grow demographically speaking, that we have a much
16  larger responsibility and obligation to participate in
17  the body politic to either come up with practical
18  solutions to problems or to find ways -- to find ways to
19  deal with that reality that -- that these are issues
20  that Texans are going to have to address that, you know,
21  census after census dictate or indicate that these
22  Texans will be largely minority.
23       And so I think that MALC sees itself now
24  with a very different mission of having to prepare
25  itself and to prepare folks to -- to accept the

## 31

1  demographic changes the State is bringing and be
2  addressed and be prepared to have leadership positions
3  to provide those solutions on behalf of a growing
4  constituency.
5     Q.  To fulfill what MALC views as that role or its
6  role, what were the primary activities -- what were the
7  primary things that they do -- it does to achieve those
8  goals?
9     A.  Well, I think that it's two-fold.  I think that
10  there is an internal -- you know, there's an internal
11  objective which is to be a member driven member service
12  caucus that provides, you know, again, the facilitation
13  of ideas and the flow and exchange of ideas between the
14  membership, our ability to track legislation that we see
15  as things we want to support and things that we want to
16  engage on.  Also, to help members advance their
17  individual legislative agendas.
18       The idea of a caucus is that if the caucus
19  comes together on this issue, then you start off with a
20  block of votes and that's a very good head start in a
21  business where, you know, counting the majority makes
22  the difference on whether your ideas make it out of the
23  House or not.  So that's sort of an internal role, and I
24  think MALC does a very good job keeping its members
25  active and engaged and being supportive of their efforts

## 32

1  to pursue their individual legislative pursuits.
2       Externally, again, I think that there is a
3  recognition that the membership of MALC is all over the
4  State of Texas, and so as a consequence, we find
5  ourselves being an external voice too for advocacy
6  groups, community groups, Hispanic elected officials
7  across the state that come to see us about issues that
8  are important to their region, understanding the
9  different needs and desires of a state as big as Texas
10  that, you know, can elect a Hispanic sheriff in a city
11  as large as Dallas, but at the same time, you know, has
12  a mayor from a border state in Eagle Pass that, you
13  know, happens to be Hispanic as well that have totally
14  different priorities, totally different issues and, you
15  know, MALC sort of tries to serve as that repository of
16  ideas, and -- and I think that over time more and more
17  people outside the capitol have come to MALC for
18  guidance and assistance and advocacy on issues that they
19  feel are important to help.
20     Q.  Let's shift our focus for a minute to election
21  and voting issues and MALC's activities in that regard.
22  Does MALC register voters?
23     A.  No.
24     Q.  Does MALC participate or lead in a get out the
25  vote drives or efforts?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Trey Martinez Fischer                                                June 15, 2012

## 33

1    A.   In the name of MALC, no.
2    Q.   Does MALC drive voters to the polls?
3    A.   No.
4    Q.   Does MALC conduct voter education activities?
5    A.   As a matter of -- of forming and shaping public
6    policy, yes.
7    Q.   Now, when you say "public policy," do you mean
8    through legislation or otherwise?
9    A.   Well, I think legislation is one form of policy
10   making, but in -- you know, in terms of being
11   knowledgeable of the subject matter, individual members
12   of MALC participate, you know, in various policy
13   conferences, and those that have the subject matter
14   expertise oftentimes are sought out, you know, for that
15   expertise.  And so, you know, insofar as it relates to
16   that, yes, but in terms of MALC having a division or, a
17   you know, working group or paid staff that engages in
18   that on a regular constant basis, then the answer would
19   be no.
20   Q.   When the members, especially the ones with the
21   particular expertise that we discussed a couple of
22   times, when they go out and do those activities, whether
23   it's in their community or in their district or
24   what-have-you, are they doing those in the name of MALC
25   or in the name of their representative office?

## 34

1    A.   I think that every individual member will have
2    a -- their own individual answer.  I think as far as I'm
3    concerned, I mean, whenever I'm asked to engage the
4    public or participate in various panels or discussion
5    groups or what-have-you, I am mostly introduced as the
6    chairman of the Mexican American Legislative Caucus.
7    Most of my speaking invitations in my roles have been
8    related to fact that I do chair this, Hispanic caucus so
9    oftentimes for me, I think it's very intertwined.
10   Q.   Does MALC have office space?
11   A.   It does.
12   Q.   And where is that located?
13   A.   It is a -- I apologize.  I'm going to sound
14   like I'm from the country, but it's just about a hundred
15   yards west of the capitol.  I refer to it as the west
16   office.  It's at the intersection of Colorado and, I
17   believe, 13th Street.
18   Q.   But it's like -- it's a privately-leased office
19   space?
20   A.   Privately leased office space next to the Price
21   Daniel Building, a place you know well.
22   Q.   Yes, sir, I do.  You've touched on, I believe,
23   earlier that MALC is a membership organization with
24   individual members; is that correct?
25   A.   Yes, sir.

## 35

1    Q.   How many members does MALC have?
2    A.   39.
3    Q.   Does MALC publish a list of the members?
4    A.   We have our website, yes.
5    Q.   What are the criteria for membership?
6    A.   The by-laws are -- probably have the most
7    accurate description, but what comes to mind that you
8    either have to be Hispanic or you have to represent a
9    district that is majority voting age population
10   Hispanic, and so those are the two requirements that I
11   recall.
12   Q.   And it is one or the other, but not both that
13   is required?
14   A.   Only one, yeah.  One or the other, but often
15   many members have both.
16   Q.   Can a former legislator join MALC or remain a
17   member of MALC?
18   A.   No.  However, I don't -- we don't have a bylaw
19   that says that, but it is an organization and a caucus
20   that's for an elected class and there's a dues component
21   to be a member of MALC as well, and so we've never
22   accepted or been asked to accept dues from someone who's
23   not a nonmember or a former member.
24   Q.   And members of the public or other elected
25   officials, for example, state supreme court justices who

## 36

1    happen to be Hispanic, they are not eligible for
2    membership, correct?
3    A.   Correct.  Not a bad idea though.
4    Q.   The 39 members of MALC, is that House and
5    Senate or House only?
6    A.   Just the House.
7    Q.   Does the Senate have a similar organization?
8    A.   I believe there is a Senate Hispanic caucus.
9    Q.   Do you happen to know how many members they
10   have in that caucus?
11   A.   I know the chairman, Senator Carlos Uresti, but
12   I don't know their membership.  Excuse me.  I don't know
13   their entire membership.  I know some of their
14   membership.
15   Q.   Is MALC a partisan organization?
16   A.   We're not.
17   Q.   How many members of MALC are authorized to act
18   or speak on MALC's behalf?
19   A.   I think that any member of MALC is not
20   prohibited from speaking.  The only instance where we
21   have control is when there is a, you know, press release
22   or a news conference, you know, those instances, you
23   know, MALC sends out the press release, you know,
24   conducts it.  Usually it's either going to be an officer
25   of MALC or a subject matter expert, but MALC doesn't



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

### 37

1  have a rule that that censors or prohibits anyone from
2  speaking.  That's not -- That's not anything that we
3  would do.
4      Q.  But if a press release were to go out or if a
5  press conference was to be called on behalf of MALC, how
6  many members would be authorized to issue that release
7  or call that press conference on behalf of the
8  organization?
9      A.  Well, the MALC staff would always handle the
10 work, so members will never be asked to do that work
11 product, so that's more of a staff driven thing, and I
12 guess the true answer lies in the origin of the news
13 conference.  So if, for instance, we had a member who
14 was, you know, very concerned about, you know, voter
15 identification legislation and wanted to have a press
16 conference to highlight that issue, you know, they would
17 simply, you know, coordinate that with, you know, MALC
18 and MALC staff, and they would be asked and charged to
19 lead that.
20          On the other hand, there have been press
21 conferences that I have arranged.  I have asked people
22 to speak on our behalf, and so there's -- it's not
23 necessarily very formal, but I think that members by
24 their own designation as elected officials have the
25 ability to host and conduct press conferences and really

### 38

1  rarely need the support of MALC.  So it's not something
2  that we focus on as a member service, but, you know, we
3  have a briefing room.  For instance, if somebody wanted
4  to use our briefing room, it just requires them to ask
5  for the use of it.
6      Q.  Suppose we're talking about something very
7  formal like filing a lawsuit or intervening in a
8  lawsuit.  Which members have the authority to do
9  something like that on behalf of MALC?
10     A.  I think that any member of MALC has the ability
11 to raise the issue in terms of, you know, this is
12 something that we should get engaged in or this is
13 something that we should stay away from.  I think that
14 when it rises to the level of spending funds, I think it
15 falls within the realm of the executive committee.  I
16 think when it comes to the discretion of the caucus to
17 engage in these matters, it certainly can come from the
18 chairman as well, and so I think the by-laws, you know,
19 sort of spell out what each officer's duties are.
20          I do know that as chairman that I do have
21 broad discretion, but I also know that the practice of
22 the caucus is for any individual member to be able to
23 raise any individual issue at any time and not be
24 limited because they're non-officers.
25     Q.  But could a non-officer intervene in a lawsuit

### 39

1  or file a lawsuit on MALC's behalf?
2      A.  I don't believe they can.
3      Q.  The five officers that we've discussed a couple
4  of times, the executive committee, are any of those
5  officers currently Republican?
6      A.  No.
7      Q.  Do you know if any of the five current officers
8  are members of the House who voted in favor of Senate
9  Bill 14?
10     A.  If any executive committee member voted in
11 favor of Senate Bill 14?  Bear with me.  I didn't vote
12 for it.  I don't believe Vice-chairman Rodriguez voted
13 for it.  I don't believe that Secretary Martinez voted
14 for it.  I don't believe that Treasurer Gutierrez voted
15 for it, and I'm fairly certain that Counsel Gonzales did
16 not, as in Veronica Gonzales, did not vote for it.
17     Q.  Do you know how many MALC members did vote for
18 Senate Bill 14?
19     A.  Specifically, I don't know.  I want to say
20 anywhere from five to seven members.  I can certainly
21 take a look at the list during the break and come back
22 and answer that.
23     Q.  That would be great.  Did any MALC members
24 oppose MALC's intervention in this suit?
25     A.  Not -- Not in any communication that came to

### 40

1  the MALC staff and myself.
2      Q.  Do you know how many Republicans are currently
3  members of MALC?
4      A.  I don't off the top of my head.  I certainly
5  could look at the membership list and tell you.  I mean,
6  I would sense it's anywhere between four to six or
7  seven, somewhere around there.  It's a small number.
8      Q.  But because the membership list is public on
9  your website, that is available?
10     A.  Absolutely it's available.
11     Q.  How many employees and/or staff does the caucus
12 have?
13     A.  I think it varies from a legislative session to
14 an interim session, so, currently, there are -- there
15 are -- not to be technical, but I'd say there are two
16 and a half members of MALC.  We have one full-time
17 employee.  We have second full-time employee.  And
18 Marty, you know, appropriates his time between the
19 capitol office and MALC, and so, I mean, in theory he
20 works for MALC as well, but he doesn't exclusively work
21 for MALC.
22     Q.  When you refer to the capitol office, you are
23 referring to your staff?
24     A.  Yes.
25     Q.  Does MALC rely on volunteers?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 41

1    A.  We don't rely on volunteers.  We have used
2    volunteers.  You know, interns, we have a fellowship
3    program as well.  We've utilized our fellows both at
4    the -- at our designated, you know, home office and,
5    also, in our member offices.
6    Q.  And how many volunteers does MALC have at any
7    one time?  Is that a pretty small number?
8    A.  I think so.  It would be anywhere -- I would
9    imagine we would pick up one to two during a legislative
10   session.  We may even pick up a -- We may even hire an
11   initial staff person during legislative session.  That's
12   sort of the cycle.  We're busier during the legislative
13   session than we are in the interim.
14   Q.  What is MALC's annual budget?
15   A.  I am not quite sure.  We -- Fortunately, we --
16   we have successful fundraising initiatives and the
17   fundraising is able to fund the caucus.  We employ an
18   outside accountant who really handles those matters,
19   and, frankly, it's -- it's so much handled outside that
20   MALC staff has to request checks in order to write them,
21   and so those finances are outsourced.
22   Q.  From whom do you raise money?
23          MR. GARZA:  Objection.  It's not relevant
24   to the issues before this case.  It is harassment of the
25   organization.  We believe that it is a violation of the

## 42

1    organization's First Amendment rights to inquire into
2    its sources of income, and I'm instructing the witness
3    not to answer.
4    Q.  I'm not asking as to individual donors or a
5    donor list.  What I'm wanting to know is do you get
6    government grants?
7          MR. GARZA:  You can answer that question.
8    A.  No, we don't.
9    Q.  Do you accept private donations?
10   A.  We do.
11   Q.  Do you accept donations from corporations?
12   A.  We do.
13   Q.  And from private citizens?
14   A.  Less so, but, yes.  And I might add that MALC
15   files compliance reports with the Texas Ethics
16   Commission, so that information is also accessible on
17   the website.
18   Q.  Do you know how much money you received in
19   those grants in the last year?
20   A.  We didn't receive grants.
21   Q.  How about from the donations?
22   A.  I couldn't tell you, but I know that we
23   annually fundraise, and we've been very successful in
24   our fundraising.
25   Q.  Could you approximate how successful?

## 43

1    A.  I have -- I wouldn't want to speculate, but I
2    will say that, you know, when you look at the cost
3    associated about litigation and so forth, that you have
4    to be raising, you know, a good amount of money to be
5    able to engage the State of Texas.
6    Q.  Do you know about -- Can you approximate what
7    percentage of your annual budget would be devoted to
8    election/voter issues?
9    A.  I don't know if I could tell you that.  I don't
10   believe that we apportion or approximate, you know,
11   based on those issues.  I can tell you that the -- an
12   overwhelming majority of our resources is dedicated to
13   our policy caucus and our public policy issues that we
14   find to be of substantial import, and I think over the
15   course of the 2011 session, two of the subject matters
16   that kept us the busiest was legislative redistricting
17   which impacts voters and voter identification
18   legislation is what we're before right now.
19   Q.  Has MALC made any plans to assist voters with
20   compliance with Senate Bill 14 if it goes into effect?
21   A.  MALC in its official capacity, no.
22   Q.  Has MALC any plans to educate voters as to
23   Senate Bill 14 if it goes into effect?
24   A.  I don't believe MALC's made any plans.  I would
25   imagine through our communications we've articulated,

## 44

1    you know, some of the problems that we believe are
2    associated with this type of legislation and how it
3    could impact elections in our various communities, but
4    we have not done any strategic planning or set out a
5    task list to accomplish things by election date.
6    Q.  Will MALC educate voters about the requirements
7    of Senate Bill 14?
8    A.  It would be my hope that if Senate Bill 14
9    passes, the State of Texas would assume that
10   responsibility.  That's at least what they've reported
11   to do in the legislation, so my hope is that that's
12   being done now.  Having said that, you know, MALC is
13   a -- is a communications piece for -- for Hispanics
14   across the State of Texas, and we certainly believe that
15   we try our best to keep them informed on issues that may
16   have an impact on their lives.
17   Q.  And would MALC help voters either obtain photo
18   identification or the underlying documents necessary to
19   obtain photo identification?
20   A.  I think that as a means of being a disseminator
21   of information, I think so.
22          MR. ASTON:  How about a break before we
23   move on?
24          THE WITNESS:  I'm fine.  I'll follow you.
25          (Recess from 10:59 a.m. to 11:07 a.m.)



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

Trey Martinez Fischer                                      June 15, 2012

---

45

1          (Exhibit 3 marked.)
2       Q.  (BY MR. ASTON) Please take a minute to review
3    what's been marked Exhibit 3.
4       A.  I felt like you are a test proctor.  I didn't
5    want to flip until you told me.
6       Q.  Do you recognize this?
7       A.  It looks like Senate Bill 14.
8       Q.  When was the first time you read this bill?
9       A.  Well, I read a version of this bill when it was
10   introduced.  I read a version of this bill when it was
11   presented in the floor, and I have attempted to keep up
12   with the bill as it may have changed in conference and
13   outside the bounds, and so the final legislation I can't
14   recall spending a lot of time studying it, but I think I
15   saw it develop over the course of time.
16      Q.  And one version or another, you've read it a
17   handful of times.
18      A.  Well, I can't say I read it a handful of times,
19   but I've certainly read it and studied it.
20      Q.  Have you discussed the bill with people at
21   MALC?
22      A.  Not -- Not in any precise detail.  I'm sure
23   we've talked about it.
24          MR. GARZA:  When you say that, Adam, are
25   you talking about the staff or the members?

---

46

1          MR. ASTON:  Both.  But let's do members
2    first.
3       A.  Okay.  Well, clearly, I mean, in the
4    preparation, in the engagement and the debate and the
5    offerings and amendments and all of the legislative
6    tactics, I mean, of course multiple conversations.
7       Q.  Both on the floor and off.
8       A.  On the floor, off, in my sleep, people on this
9    list, people not on the list of the waivers, of course.
10   In terms of the staff, if it was an assignment that was
11   research based or, you know, empirical or find out what
12   other states are doing, absolutely.  In terms of, you
13   know, having a discussion or -- or a -- dissecting the
14   bill with the staff, no.
15      Q.  Does MALC, the caucus -- And maybe I should
16   have asked this earlier.  Do they have weekly meetings,
17   biweekly meetings?  Do they have regular group sessions?
18      A.  MALC meetings are called by the chair.  They --
19   they -- The idea is to have them, you know, on a
20   recurring basis, but it's not a standing meeting and,
21   again, the reason for that is there is the flexibility
22   that -- that, number one, it's a very busy legislative
23   session.  Number two, members should have the
24   flexibility to have a convening nearby saying that we
25   need to meet for a particular reason.

---

47

1       Q.  Was Senate Bill 14 discussed during any of the
2    MALC members meetings?
3       A.  Well, again, what -- what comes to mind is the
4    specific briefing we had on -- on voting rights that
5    Jose Garza participated in with another lawyer by the
6    name of Joaquin Avila who was available by conference
7    call and that we talked about what we perceived to be
8    some, you know, very discriminatory pieces of
9    legislation in both voter ID and redistricting.  At the
10   time there were, you know, Sanctuary Cities, and so
11   there never in my mind was a meeting that was
12   specifically called, you know, for voter ID and only
13   voter ID, but it certainly came up in the membership
14   meetings.
15      Q.  Have you discussed or debated the bill with
16   people who are outside the legislature?
17      A.  Discussed or debated the bill with people
18   outside the legislature.  I think the easy answer is I
19   certainly have discussed it outside the legislature.
20   Whether I've engaged in any debate, I mean, from a
21   coffee shop debate or a policy conference, likely.
22      Q.  Probably with constituents?
23      A.  No, no.  I mean, I think nothing specific, but
24   I think that I happen to participate in, you know, lots
25   of public appearances and being an invited guest to

---

48

1    speak at different panels and so forth.  So if a topic
2    came up, I knew how to talk about it.
3       Q.  Is MALC familiar with what the different
4    provisions of the final bill do?
5       A.  I would like to think that we are.
6       Q.  Does MALC know what forms of photo ID will be
7    acceptable for voting at the polls?
8       A.  I think that they know among the more, you
9    know, popular, of course.  I was reviewing it this
10   morning and/or just in some of the -- some of the
11   objections that were made in the answers, and there were
12   some things that I didn't -- you know, I didn't realize.
13   I'm mostly familiar with the driver's license, the
14   passport, the concealed gun license.  I didn't think for
15   a minute that a state ID just -- a non-driving state ID
16   would be sufficient just didn't occur to me, but I can
17   understand why it's on the list.
18      Q.  You mean, the personal identification card?
19      A.  Right.
20      Q.  Like a state employees's --
21      A.  Right.
22      Q.  That's what you are referring to, right?
23      A.  Right.
24      Q.  Can we turn to Section 5 on Page 3, please?
25   This section opens with voter identification education.

---



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 49

1  Is this the section you were referring to a few minutes
2  ago when you said that the legislation requires the
3  state to do some education with the voters?
4     A.  This -- In part, but in the bill analysis,
5  specifically in the fiscal note, there was express
6  language that the State of Texas by and through the
7  Secretary of State would use up to $2 million of HAVA
8  money to educate voters on the changes in voting, and I
9  think it's -- you know, there's a split opinion as to
10  whether that is an appropriate use of HAVA money.  So
11  I'm familiar with that and that sort, of course, takes
12  me to Section 5 that says that the State does have an
13  obligation and responsibility to educate the voters.
14     Q.  Section 14 begins on Page 9, and this is the
15  list of acceptable identification.  Part 1, which begins
16  on Line 18, reads a driver's license, election
17  identification certificate or personal identification
18  card issued to the person by the Department of Public
19  Safety.  Do you know what an election identification
20  certificate is?
21     A.  I don't know.  Unless, of course, this is the
22  new ID that's being proposed.  I've never seen one, and
23  so because it's underlined, it would tell me that that's
24  something new, and so I imagine that that's defined
25  somewhere else in the bill.

## 50

1     Q.  Yes, sir.  Section 20 which begins on Page 13.
2     A.  Okay.
3     Q.  If you'll review that for a minute.
4     A.  I'm very familiar with the evolution of this
5  card.  Very interesting topic.
6     Q.  So MALC is aware of the idea of the election
7  identification certificate being something that a voter
8  can obtain --
9     A.  Yes.
10     Q.  -- free of charge at the DPS offices?
11     A.  I think the free part is in dispute, but I
12  believe they can obtain one, yes.
13     Q.  Do you dispute that the card itself is free or
14  that the things you need to get or to obtain the card
15  would be free?
16     A.  Well, both.  Certainly it could cost a voter to
17  physically prepare themselves to present relevant
18  documentation to qualify for one, but I think that
19  there's been a dispute in the debate of the bill as to
20  the state's method of financing these cards.  Some would
21  argue that it's an intrusion on our Texas Mobility Fund,
22  which would be unconstitutional.  Others would say that
23  that part has been cured.  I don't know if it has, but
24  certainly it's something that's very important to TXDOT
25  and bond covenants and our full faith and credit.

## 51

1     Q.  But does MALC agree that the voter himself or
2  herself who appears at the DPS to obtain one of these
3  cards will not be charged a fee at the time of obtaining
4  that card?
5     A.  I think we can agree that a -- that a person
6  who is seeking a certificate shall not be required to
7  give money to the Department of Public Safety or to
8  receive a certificate.  Yes, we can agree on that.
9     Q.  Is MALC aware of who'll be exempt from showing
10  a photo ID to vote if Senate Bill 14 takes effect?
11     A.  I believe they would know -- MALC would know,
12  its members would know, and those who would look at it,
13  you know, with the -- with the legislative or with the
14  legislation that's -- and supporting documents, I think,
15  they could figure it out yes.
16     Q.  And who'll be exempt?
17     A.  I think -- I'm aware of a narrow religious
18  exception that I know and that will be for those who
19  don't want to be photographed.  That's the one that
20  comes to mind right now.
21     Q.  Are you aware of an exception for those over
22  the age of 65 that would not have to present the photo
23  ID if they wish to vote?
24     A.  I'd have to refresh my memory.
25         (Exhibit 4 marked.)

## 52

1     Q.  Please review the next exhibit.  Have you seen
2  this provision to the election code before?
3     A.  In some form or fashion, yes.
4     Q.  And do you recognize this as a current
5  provision of law --
6     A.  For those who wish to vote by mail, yes.
7     Q.  And this is Election Code, Section 82.003, Age.
8  "A qualified voter is eligible for early voting by mail
9  if the voter is 65 years of age or older on election
10  day."
11     A.  Yes.
12     Q.  Does MALC recognize that this provision would
13  allow anyone who's 65 years or older to vote without a
14  photo ID?
15     A.  I think MALC would recognize that this allows
16  the person who's 65 years of age or older to vote by
17  mail.
18     Q.  Without a photo ID?
19     A.  Well, I'm not -- I can't tell you from the
20  letter of that statute that that's the objective.  I
21  think that as I understand it and as I think MALC would
22  understand it that when a person registers to vote,
23  there are some instances where the Secretary of State
24  would require the presentation of some form of ID at one
25  point or another if in fact the driver's license or



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 53

1    other identification didn't match up with their internal
2    record.
3             And so, you know, is it likely that that
4    could have happened to a person who then turns 65 and
5    chooses to vote by mail?  At some point there would have
6    been a presentation of identification.  But I can also
7    see your instance where if someone who turns 65 years of
8    age and decides they just want to vote by mail that they
9    can request a ballot with a paper request and receive
10   the ballot.
11        Q.   And MALC would agree that a mail-in ballot
12   counts just the same as an in-person ballot on election
13   day?
14        A.   I would hope so.
15        Q.   Sir, do you have a Texas driver's license?
16        A.   I do.
17        Q.   How does your name appear on your driver's
18   license?
19        A.   How in print, you mean, or what name appears?
20        Q.   Is it your full name?  Is it your name without
21   a middle initial or how does it appear?
22        A.   It is my legal name on my driver's license.
23        Q.   Trey Martinez name?
24        A.   Ferdinand Frank Fischer, III.
25        Q.   So for the court reporter, how does that

## 54

1    appear?
2         A.   Ferdinand Frank Fischer, III.
3         Q.   What address appears on your driver's license?
4         A.   My home.
5         Q.   Do you have a passport?
6         A.   I do.
7         Q.   How does your name appear on your passport?
8         A.   I believe it says Ferdinand Frank Fischer, III.
9         Q.   Do you have a military photo ID card?
10        A.   No, sir.
11        Q.   Do you have a license to carry a concealed
12   handgun?
13        A.   I believe a recently expired one.
14        Q.   How did your name appear on that license?
15        A.   I believe Ferdinand Frank Fischer, III.
16        Q.   Are you registered to vote in Texas?
17        A.   I am.
18        Q.   How does your name appear on your voter
19   registration card?
20        A.   I believe Ferdinand F. Fischer, III.
21        Q.   Do any of MALC's members lack the photo ID that
22   is required by Senate Bill 14?
23        A.   I don't believe that they lack the ID -- I
24   mean, a form of the acceptable IDs.
25        Q.   MALC cannot identify any member who lacks any

## 55

1    of those forms of ID.
2         A.   Not that I -- No, I cannot.
3         Q.   Do any of MALC's members contend that they will
4    be unable to vote if Senate 14 is precleared and takes
5    effect?
6         A.   No.
7         Q.   So Senate Bill 14 will not deny or abridge any
8    MALC member's right to vote.
9         A.   The individual member, no.
10        Q.   Does MALC represent anyone else in this
11   litigation besides the organization?
12        A.   MALC -- MALC counsel represents the
13   organization.
14        Q.   So MALC represents MALC and no one else in this
15   lawsuit?
16        A.   That is correct.
17        Q.   So then would it be true that MALC has
18   intervened because some of its members strongly oppose
19   Senate Bill 14 rather than because its members lack the
20   photo identification and fear that they will be unable
21   to vote if Senate Bill 14 goes into effect?
22        A.   I think dislike or disapprove or oppose the
23   legislation.  I mean, that is certainly true, but I
24   think that the essence is is that members of MALC oppose
25   it because they know it impacts their constituents who

## 56

1    elect them to serve.
2             And so while directly it doesn't infringe
3    on an individual's ability to vote if they possess any
4    of those forms of identification, these members know,
5    particularly those that are in very heavily populated
6    minority communities, that the -- the evidence was a
7    theory and a hunch at the time of the legislation's
8    formation and it's certainly become more and more
9    evidence to the development of the evidence at trial
10   that minorities are more likely to be impacted by this
11   voter identification legislation.
12            So I think in theory when you -- when you
13   are a membership caucus that represents the minority
14   community, then it is very likely that those impacted by
15   this kind of legislation are the very constituents that
16   these members were elected to represent.
17        Q.   How would preclearance of Senate Bill 14 injure
18   MALC as an organization?
19        A.   I think -- I think, again, that if MALC deems
20   itself and views itself as sort of a protector and
21   gatekeeper for advocating on behalf of the Latino
22   community, any time there's any piece of legislation
23   that has an impact on Latinos and minorities, it
24   certainly -- it certainly doesn't settle well with MALC
25   because if there's -- if it's not MALC looking out for



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

57

1    their interests, then, you know, there's not really
2    anyone left.  And so we take those things very seriously
3    for those reasons.  That's what we believe our mission
4    is.
5        Q.  So it is MALC's belief that it is -- how this
6    bill would impact the constituents of the individual
7    members of MALC, that is, the concern that MALC -- that
8    brought MALC into this lawsuit?
9        A.  Could you say that again, please?
10           MR. ASTON:  Actually, could she read that
11   back, please?
12           (Requested portion was read.)
13       A.  I think broader than that, I think that MALC's
14   interest in this bill would be for advocacy on behalf of
15   the Latino community and recognizing that there are
16   Latinos in the State of Texas that aren't currently
17   represented by a MALC member.  So I think much broader
18   than we view this the same way we viewed redistricting,
19   which was the entire state, everybody included, but
20   precisely the -- the Latino -- the Latinos in the state
21   that we wanted to make sure had fair districts and given
22   the opportunity to elect candidates of choice.
23       Q.  So MALC members believe that this bill will
24   affect their ability to be reelected -- will affect
25   their constituents' ability to elect them?

58

1        A.  I think MALC feels that -- that the
2    constituents of those members will be impacted, but,
3    again, so will minorities who don't reside within those
4    constituency districts and so the overall policy
5    objection to impacting the minority community, both
6    within members' districts and other parts of the state.
7        Q.  Did MALC provide its members or staff with any
8    written materials on voter ID during the 2011
9    legislative session?
10       A.  Nothing that I recall.  There are instances,
11   however, where members will request, you know,
12   information.  They may have dispatched staff to
13   conduct -- have some sort of research assignment.  We
14   may have notified them of bill alerts.  We may have
15   notified them about making sure they were present on the
16   floor for upcoming debates.  Certainly there had been
17   those forms of communication, but I don't recall a
18   specific briefing document that was created by MALC and
19   distributed, you know, exclusively on voter
20   identification.
21       Q.  Have these materials, unless they're covered by
22   the privilege, been produced to the State?
23       A.  I believe that, you know, MALC having gone
24   through redistricting and being very knowledgeable of
25   our obligations have done the best search that we can

59

1    when we presented anything that has been requested to us
2    to present to our lawyers who then presented them for
3    inspection or distribution.
4        Q.  And a privilege log was also produced?
5        A.  I will -- I will rely on your --
6        Q.  To your knowledge, you believe that it was?
7        A.  I don't know, but I wouldn't be surprised if
8    there was one.
9        Q.  Did MALC provide its members or staff with any
10   written materials on voter ID in the 2009 legislative
11   session?
12       A.  That I recall, no.  And, again, I believe it
13   would be -- if that was a discovery request that was
14   presented to us, then we would have conducted our search
15   and presented any documents that were relevant that
16   weren't subject to a privilege or privilege log to our
17   counsel for distribution.
18       Q.  Did MALC provide its members or staff any
19   written materials on voter ID in any previous or prior
20   legislative sessions?
21       A.  Prior to 2009, I wasn't the chair of the
22   caucus.  I certainly was a member of the executive
23   committee.  Again, I don't recall that being the case,
24   but if we did, we would have certainly provided that
25   information if properly requested.

60

1        Q.  And would the same go for any materials
2    provided to members during any legislative interim?
3        A.  I believe so with a -- with a lean more
4    towards -- you know, more inactivity in the interim.
5        Q.  Less likely that there's anything out there.
6        A.  Right.
7        Q.  Did MALC meet with any interest groups about
8    Senate Bill 14 prior to or during the 2011 legislative
9    session?
10       A.  Interest groups with regard to voter
11   identification?
12       Q.  Senate Bill 14.
13       A.  Senate Bill 14?  I know that no interest group
14   addressed MALC on Senate Bill 14.  I can't say with
15   certainty that the MALC staff wasn't engaged by an
16   interest group, and what I'm thinking about, I'm
17   thinking about the official instances when someone
18   knocks on our door and says we want to meet with you
19   versus you are in a committee room, you are in the
20   gallery of the capitol, you are in a -- you know, the
21   pit, outside the front door, where, you know, there is
22   just constant communication going on, and so in those
23   instances I think there might be a higher frequency
24   where there could be some engagement in dialogue, but in
25   terms of official requests for visits or communications,



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 61

1   I don't recall those.
2       Q.   And that would be as to Senate Bill 14 or voter
3   ID groups -- or voter ID legislation in general.
4       A.   Yes.
5       Q.   Did MALC meet with any groups about Senate Bill
6   14 after the 2011 legislative session concluded?
7       A.   You know, MALC is -- I guess in defining
8   groups, I mean, I'm certainly -- we talked to the
9   lawyers that we're working with.  We've had discussions
10  with Lawyers Committee for Civil Rights and the Brennan
11  Center, I mean, they are our lawyers now.
12      Q.   I'm certainly not asking about conversations
13  that you had with your lawyers.
14      A.   Well, they weren't our lawyers.  I mean, we met
15  them at some point.  You know, they weren't instantly
16  our lawyers, and so I can recall those -- those
17  discussions of, course.
18      Q.   Did MALC meet with any interest groups about
19  Senate Bill 362 prior to or during the 2009 legislative
20  session?
21      A.   That certainly challenges my memory a bit.  I
22  think that you know, it is very possible that we could
23  have had these communications and conversations with
24  like minority groups whether, again, in these instances
25  of committee hearings or -- you know, I don't recall

## 62

1   this for voter ID, but in the past on matters of broad
2   interests, we have hosted the debate watch or committee
3   watching from our offices where, you know, people could
4   show up.  If we had a witness who was testifying on
5   voter identification or one of these bills that -- As
6   you know, these hearings, as you may recall, were often
7   capacity crowd with overfilled rooms.  We have provided,
8   you know, a parking area or a place for -- for witnesses
9   to wait for their turn to testify when, you know, the
10  committee rooms were at capacity, and so those types of
11  instances, yes, but in terms of having a -- a
12  organization come address the caucus --
13      Q.   A formal scheduled sort of a thing.
14      A.   -- not that I recall.
15      Q.   Did MALC provide its members or staff with
16  talking points about Senate Bill 14?
17      A.   Those would have been provided on a requested
18  basis, in other words, and it's not -- that is not an
19  infrequent occurrence on any subject matter.  Any
20  member, you know, will use the MALC staff as a resource,
21  and so that is possible that that could have happened.
22      Q.   And if those materials exist, either of the
23  materials, that a privilege log would have been produced
24  just like the others?
25      A.   Yes.

## 63

1       Q.   Did MALC provide its members or staff with
2   talking points about Senate Bill 362 in 2009?
3       A.   Again, I don't -- I don't recall, but it could
4   certainly be a similar -- the arrangement would have
5   been similar to '11.
6       Q.   And did anyone outside of MALC provide MALC's
7   members or staff with memos or talking points about
8   Senate Bill 14?
9       A.   That I don't know.  I think that, you know,
10  members of MALC have their own offices, their own
11  staffs, their own means of communicating with outside
12  groups, so MALC did not distribute anything to
13  individual members from outside groups that I'm aware
14  of.
15      Q.   Same question with regard to 362.  Did anyone
16  outside MALC provide MALC's members or staffs with
17  talking points that you know of?
18      A.   I'm not aware.
19      Q.   Did MALC take a public position as an
20  organization whether Senate Bill 362 should have passed?
21      A.   It's likely.
22      Q.   Do you know what that position was?
23      A.   We would have opposed it.
24      Q.   How would MALC have publicized that position?
25      A.   It could have been a -- It could have been in

## 64

1   the form of a caucus blast that we referred to earlier.
2   It could have been in a form of a press release.  It
3   could have been in the form of a position from a
4   speaking and debate on the House floor, and it could
5   have been, you know, discern by -- you know, by looking
6   at the individual members themselves working directly in
7   opposition to the bill.
8       Q.   And it could have been one or more of those
9   ways that they would have made it known to not just as
10  members, but the public at large that MALC as an
11  organization opposes 362?
12      A.   Yes.
13      Q.   One of those ways you mentioned was speaking on
14  the floor.  MALC does not speak on the floor, correct?
15      A.   No.
16      Q.   It would have been a member in his or her
17  capacity as a member of the House during the course of
18  his or her remarks said that as a member of MALC, as a
19  leader of MALC or something like that, MALC is in
20  opposition to this bill?
21      A.   That's correct.
22      Q.   Did MALC undertake any efforts in an attempt to
23  delay the vote on Senate Bill 362?
24      A.   That was in 2009?
25      Q.   Correct.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

65

1      A.  Well, I think the fact that it was a Senate
2  bill, I think MALC had very little influence on
3  controlling the pace of the Senate.  To the extent that
4  it came to the House and found itself behind the local
5  calendar, I would imagine that many members in MALC
6  participated in debates that prevented Senate Bill 362
7  from coming to the floor.
8      Q.  Would those efforts have been at MALC's urging
9  or request?
10     A.  No, not at their request.  But I know -- Again,
11 I believe that MALC is a collection of members, and
12 sometimes I think actions speak louder than words.
13     Q.  Did MALC undertake any efforts in an attempt to
14 defeat Senate Bill 362?
15     A.  I'm sorry?
16     Q.  Did MALC undertake any efforts in an attempt to
17 defeat Senate Bill 362?
18     A.  I don't know that MALC did.  Again, my
19 recollection of the -- of the occurring on the floor --
20 what occurred on the floor, that remaining members of
21 MALC engaged in debate and discussion that -- that, you
22 know, prevented Senate Bill 362 from becoming eligible
23 or becoming considered on the House floor.
24     Q.  Let's shift focus back to Senate Bill 14.
25 Prior to or during the 2011 legislative session, did

---

66

1  MALC take a public position as an organization whether
2  Senate Bill 14 should pass?
3      A.  I don't know if we did.  I think in the event
4  that there was discussion about a upcoming voter
5  identification legislation, I know that if I was asked
6  to comment on behalf of MALC, I would have said that I
7  would be opposed to it.
8      Q.  Would you have said that I represented --
9  Representative Martinez Fischer would be opposed to or
10 MALC would be opposed to it or both?
11     A.  It could be both.  Oftentimes, we try to
12 parse -- when there's a request for coverage, is it
13 coming out of the caucus office or is it coming out of
14 my member office, but I can't control what ultimately is
15 written by writers.  You know, oftentimes I've seen my
16 title, you know, used in, you know, whether it's House
17 rep or chairman of MALC.
18     Q.  Was MALC opposed to Senate Bill 14?
19     A.  Yes.
20     Q.  When did MALC take that position?
21     A.  I can't tell you a specific date and time.  I
22 imagine any public statements we made, you know, I think
23 that those statements and those dates of times would
24 obviously be the best evidence.  I think the actions and
25 the deliberations by MALC members from referral of

---

67

1  committee to debate on the floor, I think at all times
2  there was a, you know, pretty large group of MALC
3  members working in opposition to the bill.
4      Q.  If The Caucus published or produced or whatever
5  in your mind The Caucus does when it sends out its
6  email --
7      A.  The Caucus -- The blast.
8      Q.  The Caucus, the newsletter email, not the
9  caucus, the organization.  If The Caucus newsletter
10 spoke out against Senate Bill 14, would that represent
11 MALC's public statement?
12     A.  I think that would represent a form of a public
13 statement, yes.  I don't think that that would be the
14 way or the only way to make a public statement about
15 being in support or in opposition to legislation.
16     Q.  Sure.  There are other ways.
17     A.  Sure.
18     Q.  But MALC would recognize that if it publishes
19 in The Caucus a statement opposing a bill, that should
20 and is construed as a public statement of that position.
21     A.  I certainly believe one could rely on that, of
22 course.
23     Q.  Did MALC undertake any organized efforts to
24 stop the passage of Senate Bill 14?
25     A.  I think in the -- if one could get away with

---

68

1  saying -- using the word organized on the House floor, I
2  mean, it's -- anyone who has experienced it, it's less
3  than that, but I think the record, you know, clearly
4  indicates the -- the very first point of order on the
5  voter identification bill that sent it back to committee
6  was, you know, lodged by a MALC officer.
7          And so I think from -- If the floor debate
8  is the starting point, I think you would find that, I
9  guess, the -- the lead opposition voices to Senate Bill
10 14 were members of MALC.
11     Q.  The point of order, that would be one
12 procedural mechanism by which you could slow down
13 consideration of a bill?
14     A.  Well, sometimes you can permanently defeat a
15 bill, but, yes, in that instance, procedural defect,
16 that would delay passing the bill.
17     Q.  Are there other procedural mechanisms that MALC
18 officers or MALC members used?
19     A.  Well, I think there's obviously the debate --
20 the speaking and debate.  I think there's the ability to
21 change legislation by offering amendments.  I think
22 there's, you know, the leverage and discussions that
23 often take place when you are trying to shape the
24 legislation and that would be at the point it's
25 introduced when it's heard in committee, when it's

---



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 69

1   passed out of committee, when it's sitting in calendars.
2   I mean, at all points certainly, you know, MALC members
3   were -- if there was a discussion to be had about making
4   the bill acceptable to MALC, MALC members would have
5   participated.  If there was a opportunity to improve the
6   bill with a floor amendment, MALC members participated.
7   If there was a way to tactically, strategically delay or
8   defeat the bill, I would imagine MALC members were
9   involved in that too.
10      Q.  Do you recall whether you were involved in some
11  of those activities?
12      A.  Guilty by association, yes.
13      Q.  I just want to be clear.  I believe a minute
14  ago you said that there were tactics to delay or defeat,
15  and both of those were attempted?
16      A.  Yes.
17      Q.  Not always successfully, but MALC members would
18  have attempted both of those kinds of tactics with
19  respect to Senate Bill 14.
20      A.  MALC members did, yes.
21      Q.  And MALC officers?
22      A.  And MALC officers.
23      Q.  Did MALC as an organization urge its members or
24  its officers to utilize any of those tactics to stop or
25  delay the bills in the past, not Senate Bill 14, but --

## 70

1       A.  Well, I think that MALC from a organizational
2   staff perspective, you know, is probably, you know, more
3   along the lines of an information resource.  I think
4   that once the recommendation actually makes its way into
5   a committee or onto the floor, it really is in a sort of
6   a member only project, and so insofar as MALC had any
7   role in coordinating members, it would have been the
8   things that I referred to, sending you a text message to
9   be on the floor, calling around in your offices to make
10  sure your boss is accessible for a vote, but most of
11  those discussions in terms of, you know, actual floor
12  strategy or parliamentary tactics, those would have been
13  individual discussions with members that would have been
14  member to member.
15      Q.  Would you, MALC, consider these kinds of
16  tactics to be pretty standard in the Texas House?
17      A.  I think the -- I think it's not only standard,
18  I think it's historically significant.  I mean, this is,
19  you know, the -- from the days of Abe Lincoln jumping
20  out of a window to break quorum, I mean, you've heard
21  legendary stories about the use of the rules and
22  parliamentary procedure to empower minority.  In this
23  instance, it's a minority within a minority.
24      Q.  Are you familiar with the term chubbing?
25      A.  Yes.  And I want you to know that I'm on a

## 71

1   1,700 calorie a day diet as a result of that.  I don't
2   like that stigma, but I do know the term.
3       Q.  In the Texas House of Representatives, what
4   does the term chubbing mean?
5       A.  I believe it means a -- an excessive use of the
6   microphone to stall or to delay a bill from passing.
7       Q.  Is there a rule in the House rules regarding
8   chubbing?
9       A.  I don't know that there is.  I think that there
10  are rules about civility and decorum, about speaking
11  over each other.  I think that the -- there's certainly
12  a practice of chubbing and there's certainly a
13  commentary on chubbing itself.  I've never heard of a
14  point of order being called or sustained because a
15  member was speaking excessively.
16      Q.  What is the practice of chubbing?
17      A.  Well, I will represent one time as a junior
18  member that there was a piece of legislation, you know,
19  was controversial, and I watched two senior members and
20  I know one of them was Warren Chisum, and he's very
21  seasoned in the rules, and I remember him just talking
22  at length about a bill that really meant nothing.  But
23  what I didn't know is that while he was spending all
24  this time on the microphone, there were members of the
25  legislature on airplanes coming back to Austin so that

## 72

1   they could participate in the upcoming controversial
2   vote.  So that's approximately been my first exposure to
3   what is known as chubbing, and I imagine that every
4   session has some instance where that occurs.
5       Q.  I don't want to mischaracterize you.  Did you
6   call that excessive talking or --
7       A.  Well, I said -- when you asked me what I
8   thought it meant, I think it's when a member talks
9   excessively.
10      Q.  Is there a time limit that is required to reach
11  that point?
12      A.  You do have -- You do have layout provisions
13  that call for -- for 10-minutes, and you do have
14  specific rules that allow time for pro and con speeches.
15  On the other hand, there are rules that -- that give
16  members privileges that are not bound by time.  So -- So
17  the -- in those instances, the rules did provide for,
18  you know, very express limitations on time.
19          (Exhibit 5 marked.)
20      Q.  Please take a minute to review -- any or all
21  that you wish to review, but what we're going to focus
22  on is Section 14.
23      A.  I've read it.
24      Q.  Do you recognize this as House Rule 6, Section
25  14?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

73

1    A. Yes, I do.
2    Q. And then Subpart 4.
3    A. Yes.
4    Q. Which reads, "Any bill or resolution on a local
5    consent and resolutions calendar shall be considered
6    contested. If the debate exceeds 10 minutes, the chair
7    shall strictly enforce this time limit and automatically
8    withdraw the bill from further consideration if the time
9    limit herein imposed is exceeded."
10   A. Correct.
11   Q. Is this the sort of procedure you are talking
12   about when you are talking about chubbing?
13   A. No. I mean, I think you could say that that is
14   chubbing, but you could talk for 9 minutes and chub.
15   You could talk for 5 minutes and chub. I think it's a
16   rather subjective interpretation. I think if -- if a
17   member has a bill that's voted unanimous out of
18   committee and voted unanimous out of calendars and is
19   about to be voted unanimous out of the floor and all of
20   a sudden a member entertains five, six, seven minutes of
21   unanticipated questions, I think someone can say, well,
22   what is that about?
23        And so I don't think that -- I don't think
24   that if a member chooses to talk 10 minutes on a local
25   bill, that's not necessarily chubbing. That could just

74

1    be killing a bill.
2    Q. Okay. Whether or not you would describe the
3    provision we just read as chubbing, this is a provision
4    that certainly could be used to move a bill off a
5    calendar?
6    A. Of course.
7    Q. And is it routinely used in that fashion?
8    A. It has been, yes.
9    Q. And that would be one of the tactics that one
10   could use to delay consideration of a disfavored bill?
11   A. I think that's -- I think that that is a way
12   that you can defeat a bill in the local calendar. I
13   guess that's what that bill is for.
14   Q. Did you engage in chubbing of the House
15   calendar in 2009?
16   A. I would like to think that I defeated
17   legislation in 2009. I wouldn't have -- I wouldn't have
18   said that I chubbed on a bill, but I certainly would
19   have said that I killed a bill on the rules.
20   Q. And how in 2009 did you kill a bill on the
21   rules?
22   A. I've done it many different ways. But with
23   regard to Section 6 -- or, excuse me, Rule 6, I have
24   done it by acquiring signatures. I have done it by
25   getting my colleagues to show with a raising of their

75

1    hand that there was an objection to a bill, and I've
2    certainly done it by speaking and debating for
3    10 minutes.
4    Q. And would you have done any or all of those
5    things in 2009?
6    A. I probably did.
7    Q. And what would have been the purpose of that
8    exercise?
9    A. You know, there are many different motivations.
10   I think that passing legislation on the House floor is a
11   full contact sport, and so, you know, it could have been
12   personality driven. It could have been philosophical on
13   legislation. Oftentimes, I mean, I think it's --
14   there's a notoriety that every legislative session
15   there's always a meltdown on a particular calendar,
16   and -- you know, so I think every time that happens
17   there's a different motivation.
18   Q. Does MALC believe that chubbing is a legitimate
19   means to kill a bill?
20   A. Well, I don't know if MALC believes that, but I
21   think the rules indicates it. So, you know, again, I
22   mean, just the term chubbing is a term that's not in the
23   rules. It's a term that, you know, people have given
24   it. And so -- so I think it's an appropriate use of the
25   rules. That's why it's there.

76

1    Q. Do you recall -- Do you recall in 2011 that
2    there was an amendment to the House rules to limit the
3    practice of chubbing?
4    A. No.
5        (Exhibit 6 marked.)
6    Q. Do you recognize this as a portion of the House
7    Journal?
8    A. Yes, I do.
9    Q. And this has been marked Exhibit 6. On the
10   second page is the vote on House Resolution 4. At the
11   bottom of the page, it says it's Record Vote No. 30, and
12   there are 143 yays, zero nays and one present not
13   voting.
14   A. Yes. It looks like I was excused absent that
15   day, but, yes, that is right.
16   Q. Would MALC recognize that if 143 yays and zero
17   nays were recorded on a vote, one can presume that was
18   uncontroversial?
19   A. I think so. You know, very proforma vote
20   certainly. Sure.
21   Q. Would there be any way a vote that was 143 to
22   zero was something done for a discriminatory purpose?
23   A. Sure. If the body wasn't informed as to what
24   the purpose was at the time, if it was a deliberate
25   attempt to have a discriminatory purpose and conceal it,



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 77

1  sure.
2      Q.  And how would it be concealed?
3      A.  Well, I -- I guess in reading -- the question
4  you asked me, you know, could it be construed that there
5  would be a discriminatory purpose, and I think, yes.  I
6  think that I'm relying on your word that that is a vote
7  on the rules, I guess, or an amendment to the rules.  I
8  didn't see the actual amendment itself, but -- so I
9  guess if I had an idea of what was amended or what that
10  vote was referencing.
11      Q.  Let's talk a bit about a practice of amending a
12  bill onto another bill.  Have you ever amended a piece
13  of legislation onto another bill that was under
14  consideration in the full House?
15      A.  I have amended legislation on the floor of the
16  House.  I don't recall amending legislation with entire
17  pieces of other legislation.  I've made several
18  amendments.
19      Q.  Well, how about with parts of other
20  legislation?
21      A.  Sure.  Absolutely.
22      Q.  And is that a common occurrence in the Texas
23  House?
24      A.  It can be, yes.
25      Q.  What is the vote required to amend the bill

## 79

1  substantive issues, for example, those that were added
2  to bills as amendments, the decision of the Senate could
3  be by simple majority and not by a two-thirds Senate
4  vote?
5      A.  Could you explain that one more time?
6      MR. ASTON:  How about we have her read it
7  back and then I'll try to clarify it?
8          (Requested portion was read.)
9      A.  I'm not quite sure I understand the question.
10  You are referring to bills that are amended -- Senate
11  bills that are amended in the House, correct?
12      Q.  Correct.  Okay.  They go back to the Senate and
13  then on a simple majority vote, they could concur in the
14  changes?
15      A.  Correct.  That could happen.
16      Q.  And so, for example, the Senate could pass a
17  bill that says A, B and C.  It goes to the House and
18  they add D?
19      A.  Sure.
20      Q.  It goes back to the Senate on a simple majority
21  vote, they could pass the bill with A, B, C and D?
22      A.  That's correct.
23      Q.  And so given the nature of the way the things
24  work with amendments back and forth, back and forth
25  during the, you know, fast pace of a legislative session

## 78

1  before the full House on second reading?
2      A.  It's a majority vote of those present and
3  voting.
4      Q.  Simple majority of those present and voting.
5      A.  Present and voting, yes.
6      Q.  Is that true for both House bills and Senate
7  bills that are on the floor for second reading debate?
8      A.  Yes.  For amendments, not on passage to
9  engrossment or anything like that.
10      Q.  And if you amended a Senate bill that was under
11  consideration on the House floor, you would only take a
12  majority vote to amend that bill, correct?
13      A.  Yes.
14      Q.  And if that bill ultimately passed in the House
15  and went back over to the Senate, the full Senate would
16  have to either agree with the changes made or they would
17  have to go to conference, correct?
18      A.  Yes.  Or they could -- they could let the bill
19  die.
20      Q.  Do you know if a vote by the Senate to concur
21  or to go to conference is decided by a simple majority
22  of the members present?
23      A.  I'm not as familiar with Senate rules, but that
24  sounds logical.
25      Q.  So would that suggest or indicate that on many

## 80

1  is it perhaps common that a substantive piece of
2  legislation is passed out of the Senate on that simple
3  majority vote?
4      A.  I think it's possible.  I don't know if I would
5  go so far as to say it is common, but it is certainly
6  possible.  It certainly has happened.
7      Q.  Have you ever amended a Senate bill with a text
8  of a House bill you authored?
9      A.  I believe I have amended Senate bills with
10  amendments.  Some of those could have been portions of
11  legislation that I've authored or it could have been
12  ideas that were newly drawn and drafted and amended on
13  the floor of the House.
14          (Exhibit 7 marked.)
15      Q.  Do you recall Senate Bill 1811 from the 2011
16  session?
17      A.  I don't.  It looks likes this is for
18  unemployment benefits or victims of sexual assault.
19      Q.  Does this amendment look familiar to you?
20      A.  The language of it certainly does, yes.
21      Q.  Where do you recognize it from?
22      A.  I had legislation that dealt with providing
23  unemployment compensation to victims of sexual assault.
24      Q.  Do you think that was House Bill 2755?
25      A.  It could have been, yes.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 81

1 (Exhibit 8 marked.)
2 Q. Would you take a minute to review what's marked
3 Exhibit 8?
4 A. Okay.
5 Q. Beginning on Page 2, two-thirds of the way down
6 the page, Amendment No. 58.
7 A. Yes.
8 Q. Do you recognize this?
9 A. I do.
10 Q. And could you explain a little bit about this
11 amendment and how it came about?
12 A. Well, this appears to be an amendment to Senate
13 Bill 1811 that I authored that would give unemployment
14 compensation to victims of sexual assault and, I
15 believe, members of their immediate family.
16 Q. Do you recognize this amendment as the same
17 that is in Exhibit 7?
18 A. Yes.
19 Q. And I think you earlier that this procedure of
20 amending legislation with parts or even whole part, you
21 know, other pieces in its entirety, is a fairly common
22 one?
23 A. Yeah. I think that it's more common for
24 amendments on bills. That's a regular occurrence. I
25 think that there is a -- among the members that have

## 82

1 served in the institution have been there for some
2 sessions, I think people that are very watchful or
3 mindful for entire pieces of legislation to pass. You
4 know, there are -- there are certain pieces of
5 legislation, you know, that folks will, you know,
6 designate those Christmas trees or wish list bills and,
7 you know, it's almost anything goes. And so I -- every
8 member is sort of given -- you know, they operate on
9 their own, and it's the body that sort of regulates the
10 behavior of an amendment activity.
11 Q. Do you know how many times you've attempted a
12 procedure of amending a bill in the session?
13 A. I think on one session I was told that I had
14 about 30 amendments -- 34 amendments that passed off the
15 House floor in 2009, I think, or '07, one of the two.
16 Q. Would that be fairly common for you?
17 A. I think that's a high number. I think someone
18 nicknamed me the amender when I was doing that, so --
19 Q. But even if that's a high number for one
20 particular member of the House, everybody tries to do it
21 at least occasionally?
22 A. I think everyone can. They certainly are
23 capable. There are rules and, you know, of -- both
24 formal rules in the -- in the House rules and there's --
25 you know, there are rules, you know, practices on the

## 83

1 House floor.
2 Q. Earlier with respect to a different rule, you
3 said that's what the rule is there for. Would you agree
4 that applies to the ability to amend the bill in this
5 fashion? It's legitimate and that's what it's there
6 for?
7 A. I think that the rules are -- spell out what
8 our operating procedure is and having said that,
9 there's -- one of -- the first rule you learn is that
10 there are rules and the second rule you learn is you can
11 suspend them, you know, and so, like I said, it depends
12 on your perspective.
13 Q. Did MALC urge the Department of Justice to deny
14 administrative preclearance to Senate Bill 14?
15 A. I believe we had some correspondence with the
16 Department of Justice with regard to Senate Bill 14.
17 Q. Would that have been written communications?
18 A. I believe so.
19 Q. What about in person?
20 A. I am not aware of any -- any person
21 conversations now. You know, again, MALC was a party to
22 the redistricting lawsuit for the District of Columbia,
23 and it could have been an occasion just that there was
24 litigant talk where we were talking to the Attorney
25 General and to the DOJ about things we had before them

## 84

1 or expect to have before them.
2 Q. What about phone conversations?
3 A. I have not had any phone conversations. I'm
4 not aware of MALC having any conversations.
5 Q. And MALC's conversations, written
6 communications in whatever form to DOJ, those urge a
7 denial of preclearance?
8 A. I believe that any sort of official
9 correspondence or communication to the DOJ from MALC
10 would have been very limited to MALC's retained counsel
11 and those working on our behalf. So those rare
12 instances would have -- again, would have been done by
13 those folks that we entrusted to advocate on our behalf.
14 Q. Do you know if MALC urged the DOJ to delay
15 preclearance of Senate Bill 14?
16 A. I don't recall. Not in voter ID. I don't
17 recall that.
18 Q. Do you know if MALC has urged DOJ to delay
19 preclearance in any other -- of any other legislation?
20 A. You know, what only comes to mind is that -- is
21 that any piece of legislation that would have required
22 preclearance, if MALC was opposed to it, we certainly
23 would have been capable -- we would have known how to
24 correspond with government officials, but I would -- I
25 would think that our counsel would have been involved in



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 85

1  those either discussions in terms of having those
2  communications themselves or -- or directing us on what
3  would be the best approach to do that.
4      Q.  Onto Senate Bill 14.  Of the offered
5  amendments, was there any of them that if accepted would
6  have caused MALC to support passage of this photo ID
7  bill?
8      A.  I think that that answer runs the risk of -- of
9  bringing up conversations with people that you've asked
10  me not to refer to.
11     Q.  Did you offer any amendments to Senate Bill 14?
12     A.  I did.
13     Q.  How many?
14     A.  Not quite sure.  I know -- I know at least one
15  that I can think of right now.
16     Q.  What was that amendment?
17     A.  I believe it was an amendment that would allow
18  people like you to be able to vote with your AG issued
19  ID, state employees.  I believe that I authored that
20  amendment.  So that -- that's -- that's the one
21  amendment that does come to mind.
22     Q.  Had that amendment passed would that have
23  changed your views on Senate Bill 14 ultimately?
24     A.  I think in that alone, probably not, but I
25  think that there was definitely some goals and

## 86

1  objectives that were worth working towards that would
2  have made the bill appear to be more inclusive.
3      MR. ASTON:  Could we go off-the-record for
4  a couple of minutes?
5      (Recess from 12:16 p.m. to 12:29 p.m.)
6      Q.  (BY MR. ASTON) When did MALC first hear about
7  this lawsuit?
8      A.  I imagine our awareness was heightened right
9  around the time Texas made its submission because I
10  don't believe that the -- I apologize because, you know,
11  redistricting and voter ID in terms of litigation were
12  right on the backs of each other, so it was around the
13  time there was an exchange of correspondence from the
14  Department of Justice asking for more information and
15  those sorts of things, and so I guess that would have
16  been some time after the bill finally passed and before
17  the declaratory judgment was filed.
18     Q.  When you say "submission," are you referring to
19  the administrative preclearance submission to the
20  Department of Justice filed by the State?
21     A.  Yes.
22     Q.  And the transfer of information, the -- what --
23  you are referring to the times when the Department of
24  Justice asked --
25     A.  For additional information.

## 87

1      Q.  -- the State of Texas to provide more things
2  for it to review during its consideration of the bill.
3      A.  Correct.
4      Q.  Do you know how MALC first heard about the
5  lawsuit?
6      A.  I imagine if we didn't find it from an
7  independent news source, we probably heard about it from
8  our lawyers.
9      Q.  Did MALC hold a meeting after they heard that
10  the State of Texas had filed this lawsuit?
11     A.  No.  I don't believe that we were in session,
12  and so I think it's fair to say that we probably didn't
13  meet.
14     Q.  Do you know when the lawsuit was field?
15     A.  The day, I don't know off the top of my head,
16  no.
17     Q.  Do you know about when?
18     A.  I imagine it would have been somewhere in the
19  in the late summer to fall of 2011.
20     Q.  Was that the lawsuit you were referring to or
21  the preclearance submission to DOJ?
22     A.  I imagine they were both within a proximity --
23  If I understand the submission having like a 60-day
24  requirement and in this instance there was some request
25  for additional documents.  They may have stretched that

## 88

1  out a little bit, but at some point there was a
2  declaratory action filed, so I know that -- And, again,
3  I mean, you know, the redistricting litigation itself
4  took place right after Labor Day, so sometimes the
5  litigation and the corresponding dates all run together.
6      Q.  You mentioned there was a 60-day window at DOJ.
7  Do you know how long this bill was pending at DOJ?
8      A.  No.
9      Q.  How long do you think would have been
10  reasonable for DOJ to take to consider this bill?
11     A.  I think as long as the DOJ needed, provided
12  that there's not a hard number of days in Federal law.
13     Q.  So they could delay the State of Texas
14  indefinitely from implementing a pass to sign law?
15     A.  I think there's a reason why Texas is a covered
16  jurisdiction.
17     Q.  So you don't think DOJ should have any deadline
18  as to when they have to give Texas an answer?
19     A.  I think DOJ answers to Congress on that.  So if
20  Congress set a number of days, then that should be the
21  number of days.  If DOJ is charged with preclearance
22  authority for covered jurisdiction, then that's their
23  call.
24     Q.  Has MALC intervened in other lawsuits before?
25     A.  Other than this instant litigation, we



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

### 89

1  intervened in the District of Columbia on redistricting.
2  I believe 10 years ago we were a party to a
3  redistricting lawsuit.  I don't know as a plaintiff or
4  an intervenor defendant.  I think at that time the
5  preclearance sought by the State was administrative.  I
6  know MALC had a role.  I just don't know how official or
7  in what capacity that role was.
8      Q.  But your understanding is MALC was involved in
9  the litigation over redistricting?
10     A.  When I came onto the scene in 2001, yes.
11     Q.  About 10 years ago?
12     A.  Yes, sir.
13     Q.  And do you have any recollection or any
14  knowledge of -- since this -- you know, since the
15  decennial census has passed, whether MALC got any
16  involved in any lawsuits that followed?
17     A.  What decennial census?
18     Q.  Whether it was 1990 or 1980.
19     A.  My -- That predates me.  My knowledge of
20  MALC -- By the time I was elected in 2007, at that time
21  my first experience of MALC advocacy was getting
22  involved in a redistricting lawsuit.
23     Q.  So you believe that MALC has been involved in
24  at least three because you are aware of personally at
25  least three?

### 90

1      A.  I was, yes.  I was aware of three.
2      Q.  MALC intervened in this suit with another
3  party, correct?
4      A.  Yes.
5      Q.  Who is that party?
6      A.  I believe it's the NAACP.
7      Q.  Is that the Texas State Conference of NAACP
8  Branches?
9      A.  Yes.
10     Q.  Did NAACP Branches and MALC meet during the
11 2011 legislative session?  Did the organizations meet?
12     A.  That I know of, no, although we worked
13 together.
14     Q.  Do you know if you worked together in the 2000
15 session with respect to voting issues or voter ID?
16     A.  I don't know that.
17     Q.  Did the two groups meet before intervening in
18 this lawsuit?
19     A.  I think to the extent that counsel for MALC
20 engaged in discussions with the Texas Branches, that's a
21 possibility.  MALC itself did not meet with the Texas
22 Branches of NAACP.
23     Q.  So the members did not.  Your counsel might
24 have.
25     A.  Correct.

### 91

1      Q.  Has MALC members discussed the claims that you
2  are asserting in this suit with members of the NAACP?
3      A.  I think the answer to that question you would
4  advise me not to answer it because of your objection or
5  your ground rules, I'm sorry, on the waivers.
6      Q.  Have the two groups discussed Senate Bill 14?
7      A.  I think that the answer requires me to violate
8  your housekeeping rule on not disclosing confirmation or
9  discussions involving people that are on the disclosure.
10     Q.  Well, the content -- I don't know want to know
11 what was discussed, but whether there was a meeting.
12     A.  I misunderstood.  Could you tell me the
13 question again, please?
14     Q.  Was there a meeting or a discussion between the
15 two groups?
16     A.  The two groups being MALC --
17     Q.  MALC and NAACP.
18     A.  Oh, I don't believe so.
19     Q.  Has MALC shared any information -- written
20 information with the NAACP group?
21     A.  If we did it's been under -- it's been at the
22 counsel level, our legal counsel level.
23     Q.  And would the same hold true for NAACP sharing
24 group information with MALC?
25     A.  That I wouldn't know, but perhaps, yes.

### 92

1      Q.  The two groups, do they assert the same claims
2  in this lawsuit?
3      A.  As far as I know they are on the same sets of
4  pleadings and the lawyers represent both entities.
5      Q.  They filed a joint answer, as you've indicated.
6      A.  Every pleading I've seen has been done jointly,
7  yes.
8      Q.  Why did MALC intervene in this lawsuit?
9      A.  Well I, think it's very important, and so --
10 but, you know, for a variety of reasons.  I think that,
11 you know, as I indicated earlier responses, you know,
12 this is sort of pierces the heart and the essence of our
13 caucus.  We are a civil and social justice caucus.  Many
14 people who have served MALC have been in a myriad of
15 battles for advocating on behalf of the minority
16 community, whether it be public education, access to
17 higher education, redistricting, and so I think that
18 there is a -- when you analyze the -- the discussion,
19 debate and the involvement of MALC members taking such a
20 very prominent position in debate and while there are
21 members of MALC who, you know, demonstrated a different
22 view by way of how they voted, there was very little to
23 no advocacy, save and except one or two members that was
24 diabolically in support of Senate Bill 14.  It seemed to
25 me that when you balanced all of the equities, that it


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 93

1    made perfect sense for MALC to assert itself on behalf
2    of the Latino community and on behalf of our
3    constituents and members.
4        Q.   Any other reason you care to add or would
5    that --
6        A.   You know --
7        Q.   Just don't want to cut you off.
8        A.   You are not cutting me off, but at the expense
9    of giving you a narrative, I mean, there's -- this is --
10   you know, these are very serious issues.  This is not
11   something that MALC wanted to do because we just had an
12   overwhelming amount of resources to combat the State of
13   Texas that has a blank check.  It's very significant,
14   despite the fact that, you know, we have a handful of
15   lawyers, and we're, you know, lodging litigation against
16   the largest law firm in the State of Texas.  Very
17   serious matters when it comes to the voting rights of
18   the Latino community, and, frankly, if MALC didn't
19   assert itself, from the looks of things, very few Latino
20   advocacy groups did.  I think at last check it was MALC
21   and MALDEF involved in this.
22        I think it's important for us to be in the
23   discussion, and, most importantly, the members of MALC
24   were -- you know, were there when all this was
25   occurring, had been privy to the discussions that we can

## 94

1    talk about today and we can't talk about today.  So I
2    think the best evidence and the ability to provide the
3    perspective that nobody else can, only MALC can do that,
4    and so I think that it's -- we have a very appropriate
5    place at the counsel table to present that perspective.
6        Q.   Have you personally spoken with anyone at the
7    Department of Justice about Senate Bill 14?
8        A.   Not -- Well, the answer is yes, I have.  I've
9    been interviewed by the Department of Justice.
10       Q.   When did that occur?
11       A.   The actual date and time, I can't recall.  It
12   was -- It was after redistricting.  It was on or about
13   the time that we engaged as a party or sought a motion
14   to intervene, and the communication was -- was vetted
15   through our lawyer -- through our legal counsel in terms
16   of having the conversation.
17       Q.   You called it an interview.  Did they ask to
18   speak to you in connection with their administrative
19   work or within connection to this lawsuit?
20       A.   I don't know that.  I know that it was a
21   conversation about Senate Bill 14 and what I knew and
22   what I could add to their perspective.
23       Q.   But you don't know if that occurred before or
24   after they denied administrative preclearance.
25       A.   I don't know on recall.  I would imagine that I

## 95

1    can give you a more specific, you know, time frame that
2    might answer that for you, but maybe we can do that on a
3    break if you want that.
4        Q.   Do you know if other members of MALC were
5    similarly interviewed?
6        A.   I believe so, but I don't know.  I spoke to
7    them alone.
8        Q.   It was not a group interview, but you believe
9    that others had the same opportunity?
10       A.   I believe that I was interviewed.  I certainly
11   answered the questions in terms of any other member that
12   may have knowledge of relevant facts or access to
13   information, and so I would suspect that there would
14   have been some follow up on some of the conversations
15   that I had.
16       Q.   Did that interview, conversation take place on
17   one day?
18       A.   Yes, at one phone call.
19       Q.   It was by phone?
20       A.   Yes.
21       Q.   Texas filed this lawsuit on January 24, 2012.
22   Do you know who this lawsuit was filed against?
23       A.   The Attorney General of the United States.
24   January?
25       Q.   I'm sorry.  January 24 of 2012.  Since that

## 96

1    date, has MALC sent any letters or emails to the
2    Department of Justice regarding Senate Bill 14?
3        A.   That I'm aware of, no.  MALC wouldn't have done
4    that.
5        Q.   Since that date has MALC sent any documents to
6    the Department of Justice regarding Senate Bill 14?
7        A.   MALC has not.  You know, again, I'm not trying
8    to qualify, but if MALC did anything with regard to
9    Senate Bill 14 after administrative submission or prior
10   or after to any lawsuit, it would have been done at the
11   behest of our legal counsel, and so I'm not aware of
12   everything that counsel might have directed staff to
13   do or -- but in those instances, if -- if MALC was
14   anticipating litigation, then those decisions were being
15   made by our lawyers.
16       Q.   And as we discussed before, to your knowledge
17   unless those documents are privileged, they would have
18   been turned over?
19       A.   I think that to my knowledge if those documents
20   existed, they were given to our lawyers and I would hope
21   that they would know what to do with them.
22       Q.   Does MALC contend that DOJ is inadequately
23   representing its interests in this case?
24       A.   Does MALC contend that --
25       Q.   DOJ is inadequately representing its interests



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

97

1    in this case.
2            MR. GARZA:  MALC lodges an objection to
3    that question as to Topic No. 2 on the notice of
4    deposition and in which we have stated from the
5    beginning of the deposition that relates to the
6    qualifications of MALC as an intervenor, a decision has
7    been made on intervention.  The court has granted
8    intervention.  MALC has filed legal pleadings through
9    its counsel regarding the issues involved in this
10   intervention, and it's irrelevant to this deposition --
11   the 30(b)(6) deposition.  Having made that objection,
12   you may answer the question to the best of your
13   knowledge.
14       A.   And, I'm sorry.  Mr. Aston, the question again
15   is does MALC feel DOJ is inadequate in representing our
16   interests?
17       Q.   Inadequately representing MALC's interests,
18   yes.
19       A.   I think that MALC and DOJ share similar goals
20   and objectives.  I think that MALC's approach in
21   strategy and perspective is certainly very unique, local
22   and very knowledge based, and what we know and what we
23   anticipate that we will present at trial will be a
24   perspective that no one else other than MALC can present
25   because of our uniqueness and being situated not only as

98

1    policymakers that are impacted by these decisions, but
2    the policymakers that were involved in the debate and
3    all of the nuances that occur when you're trying to
4    craft, you know, big controversial public policy.
5            So I think that, you know, with due to
6    respect to anybody who's litigating this case, there's
7    sometimes an advantage in terms of capacity and strategy
8    and approach when you know you are inside that brass
9    rail seeing everything happen real-time.
10       Q.   Can MALC think at this time of anything that
11   DOJ has failed to do?
12       A.   I think that if MALC has some inside
13   observations as to what DOJ should do, I imagine that
14   counsel for MALC is in a position to convey those
15   thoughts, and asking me personally as a representative
16   of MALC, I trust that my lawyers are giving me solid
17   reasonable advice and they are advocating and
18   positioning our case in the best way they know how.
19       Q.   If the court denies preclearance of Senate Bill
20   14, will MALC seek attorney fees from the State of
21   Texas?
22       A.   I guess it's a legal question I'll defer to
23   counsel on, and I'll certainly heed their advice.
24       Q.   Does the MALC believe that the United States is
25   incapable of winning this case without MALC's

99

1    participation?
2        A.   MALC believes that its involvement in this case
3    provide a very unique perspective, and to the extent
4    that we're able to work cooperatively with the DOJ in
5    presenting that case, it's our intention to do so.
6        Q.   Does MALC contend that they could not have
7    provided that perspective via an amicus submission?
8        A.   I think that, you know, counsel has counseled
9    me in understanding the benefits and the reasons why we
10   want to be present in the courtroom to examine and
11   cross-examination witnesses and present evidence.
12       Q.   How many intervenors in addition to your group,
13   MALC and NAACP, are in this lawsuit?
14       A.   I'd have to rely on the pleadings.  I know I
15   saw MALDEF in there.  I thought I saw a group called The
16   League of Young Voters.  If you want me to look at the
17   pleading.  It seems that there's a group represented by
18   Gerald Hebert.  There's a group represented by John
19   Tanner.  There is the ACLU.  It looks like they're
20   represented.  Counsel for the Texas Legislative Black
21   Caucus, League of Women Voters of Texas, The Justice
22   Seekers, Reverend Johnson, Reverence Wright.  There
23   appears to be a few, you know, other intervenors.  And
24   I'm, you know, Mi Familia Vota, MALDEF, so that's a fair
25   number of intervenors.

100

1        Q.   Would you agree that it is more than 20?
2        A.   I'll take your word for it.  I just -- I didn't
3    really examine to know just how many there are, but I
4    see that there are more than MALC.
5        Q.   Does MALC have any contention that that
6    collection of intervenors is not adequately representing
7    MALC's interest in this case?
8        A.   I think MALC, you know, prefers to speak for
9    MALC, and as far as MALC's concern about our
10   involvement, I think one of the reasons I stated
11   previously, I don't have an opinion as to how other
12   groups view their role in the litigation.
13       Q.   Does MALC contend that Senate Bill 14 has the
14   effect of denying or abridging Hispanics and Latinos'
15   right to vote on account of their race, color or
16   membership in a language minority group?
17       A.   I believe it will.
18       Q.   What is the basis for that contention?
19       A.   Well, I think the evidence as I understand it
20   demonstrates that there are anywhere between 600 and
21   700,000 minorities that currently are registered to vote
22   that don't possess a driver's license.  I think that --
23   that the -- a significant -- when you consider election
24   outcomes and you consider election participation rates
25   state-wide, that is a -- that is a large number of



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 101

1 Texans that would have additional hurdles in order to
2 vote.
3           Beyond that, I've struggled trying to
4 understand the basis by which there's even a public
5 policy concern for a need to have a voter identification
6 requirement, and I have yet to understand a proponent of
7 this legislation articulate just exactly what's going on
8 that we have to disenfranchise potentially 6 to 700,000
9 minority in order to achieve some sort of public policy
10 purpose.
11      Q.  Before we move on, would there be anything else
12 you would like to add as far as evidence or facts that
13 you believe demonstrate a discriminatory effect of this
14 lawsuit?
15      A.  Well, I mean, I think that the overwhelming
16 barrier to access -- I mean, it's -- it's more than -- I
17 mean, that you could look at this from multiple points
18 of view.  I mean, you know, compliance with this law
19 would be a tremendous place -- a tremendous burden on
20 access.  It's not just access to the polls, but it's
21 access to DPS to -- to conform to the dictates of the
22 law -- of the proposed law, and so I -- you know, I
23 surmise that you could probably look at this from a
24 number of different ways, and I guess when I -- when I
25 understand what the specific public policy objective --

## 102

1 like what was the -- what was the problem that we were
2 seeking to solve, I mean, I could probably form an
3 opinion, you know, in response to that policy objective.
4      Q.  All right.  Let's review a few of those things.
5      A.  Sure.
6      Q.  You mentioned 600 to 700,000 minorities bought
7 a driver's license.  Do you know where that figure came
8 from?
9      A.  I believe those are -- I've learned of those
10 numbers based on, I guess, the evaluation of discovery
11 material the State has produced in this litigation.
12      Q.  And do you understand that to be 600 to 700,000
13 people with no form of photo ID or who lack a driver's
14 license issued by the State of Texas?
15      A.  I think that to be fair, I think that it's
16 those number of people that are currently registered to
17 vote that are -- that the State of Texas is unable to
18 identify with its records as being people that are in
19 receipt of things like a driver's license, yes.
20      Q.  That would be -- In your understanding that
21 would be people who Texas cannot identify within Texas's
22 own databases which would be the driver's license, the
23 concealed handgun databases?
24      A.  Personal identification card.
25      Q.  Personal identification card.  It's people who

## 103

1 do not have those three forms?
2      A.  I think I imagine that I would -- I would like
3 to think that the State is in the best position to
4 acquire and accumulate data on all of its Texans whether
5 it be at the DMV or the electrician who wants a license
6 to be an electrician.  So whatever data -- And I'm not
7 privy -- I have not seen the data.  I have not analyzed
8 the data.  I have just had discussions with our lawyers
9 in terms of what the data is revealing, and so if there
10 is data that suggests that there's other metrics out
11 there from other State data, then I'm not aware of it.
12      Q.  When we reviewed earlier Section 14 of Senate
13 Bill 14, the list of IDs that are acceptable, a number
14 of those are not State issued, correct?
15      A.  They're Federal issued.  I know of two that I
16 can recall without looking at the bill.
17      Q.  Which two?
18      A.  The passport and the military ID.
19      Q.  If you want to turn to Page 10 of that exhibit,
20 Lines 5 and 6 note "A United States citizenship
21 certificate issued to the person that contains the
22 person's photograph."  Do you know what that is?
23      A.  I don't.  I don't even know if I have one.
24 Where would I get one of those?
25      Q.  But would you agree that the United States and

## 104

1 not Texas would be in the best position to know who has
2 a passport or who has a Federally issued military ID?
3      A.  I think that's fair.
4      Q.  So would you agree that -- that if Texas
5 determines within our own State issued database -- I'm
6 sorry -- within our own State databases as to our State
7 issued IDs, the number of folks without an ID is one
8 thing.  It is not only possible, but likely that that is
9 an over-inclusive number as to the people who lack an ID
10 within Senate Bill 14?
11      A.  I'm not sure I understand that question.
12      Q.  Would you agree -- I'll try to rephrase.  Would
13 you agree that just because someone does not have a
14 State issued photo ID, he or she might well have a
15 Federally issued photo ID that satisfies Senate Bill
16 14's requirements?
17      A.  I think it's possible.  I think it's -- You
18 know, I think it's very -- it's -- it's very
19 problematic, I think.  I don't -- I'm trying to remember
20 what it took for me to obtain my passport, and I don't
21 think I would have had a lot of luck without a birth
22 certificate or driver's license or some sort of
23 identification.
24      Q.  Suppose you are a member of the military and
25 you move around a lot and you have a driver's license



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 105

1  from your home state, but you're stationed here in
2  Texas.  Would that be the sort of person who might well
3  have the Federally issued ID but not yet have a Texas
4  driver's license who might wish to quickly register to
5  vote?
6      A.  I think an active soldier, yes.  Correct.
7      Q.  Suppose a Texas citizen who lives on the
8  border, would that be the sort of person who might have
9  a passport to cross freely back and forth between Texas
10 and Mexico, but who may not have a driver's license
11 because they live with a family member who does?
12     A.  I'm not a -- I'm not aware of -- I mean, I
13 think that's possible.  I'm not aware of that being a
14 requirement to cross the border and return back.
15     Q.  A passport?
16     A.  Right.  I remember a time in my lifetime you
17 could go over with a birth certificate.
18     Q.  Before we move on again, was there anything
19 else you wanted to add as to MALC's contention of
20 evidence of the allege discriminatory effect of this
21 bill as to Hispanics and Latinos?
22     A.  You know, again, I mean, with the
23 disenfranchising to the degree to which I believe is a
24 very high number if we're looking at 600 to 700,000
25 minorities, you know, I think that the -- the rigors of

## 106

1  the recommendation certainly has an impact in areas
2  where there is not the access to DPS stations to conform
3  with the law or those that do have them, the ability by
4  which they're able to obtain those licenses, you know,
5  whether they work or rely on public transportation or
6  whether they have to travel multiple counties to arrive
7  at a location.  I think that the overarching -- I think
8  when you start to list, you know, what you think is a
9  discriminatory effect, I cannot get past the impact this
10 has on access, and I think that that is one of the
11 bigger ones that I have spent a lot of time thinking
12 about.
13     Q.  Does MALC contend that Senate Bill 14 will have
14 the effect of denying or abridging African-American's
15 right to vote on account of race, color or membership in
16 a language minority group?
17     A.  I think our concern -- While our view is we're
18 the Mexican American Legislative Caucus, oftentimes our
19 viewpoint as a member of a minority group certainly has
20 a lot of commonality with a lot of other minority
21 groups.  So the fact that we're standing together with
22 the Texas Branch of the NAACP tells me that we have a
23 lot in common with this issue.  So if it's yes for MALC,
24 it's going to be yes for the NAACP who represents and
25 advocates on behalf of African Americans.

## 107

1      Q.  And what the evidence would you have for the
2  contention as to African Americans?
3      A.  Well, I think -- I would imagine that some of
4  the barriers that exist to access would also exist -- I
5  mean, to be very candid and frank with you, I was
6  prepared to testified as a representative of MALC, and
7  then we do have members of MALC that are
8  African-American, so I have heard perspectives from
9  people that are on a list that you, you know, have not
10 waived or have asserted privilege.  But I think there
11 have been some very similar dialogue with respect to
12 access and barriers that exist to obtaining documents in
13 order to present themselves for a free ID or the
14 challenges that exist in order to, you know, simply walk
15 into a DPS station and obtain a license, and, frankly,
16 those who have been, you know, voting all their lives
17 that suddenly find themselves having to do things
18 differently for reasons that are, you know, yet to be
19 articulated.
20     Q.  Does MALC contend that Senate Bill 14 will have
21 the effect of denying or abridging Asian Americans'
22 right to vote on account of race, color or membership in
23 a language minority group?
24     A.  I think that MALC would defer the advocates on
25 behalf of the Asian community.  I'm not prepared to

## 108

1  answer that question.
2      Q.  Has MALC conducted any studies or any surveys
3  on the effect of Senate bill 14 on minority voters?
4      A.  MALC has not in MALC's official capacity.
5      Q.  Is MALC familiar with the polls -- the public
6  opinion polls regarding support for voter ID
7  legislation?
8      A.  I know that I have been made aware of polls
9  that speak to that, yes.
10     Q.  Is MALC aware of polls showing that the
11 majority of Texans support a photographic ID requirement
12 to vote regardless of their political affiliation.
13     A.  I'm not aware, but I accept that viewpoint.
14     Q.  Is MALC aware of polls showing that the
15 majority of Texans regardless of their race support a
16 photographic ID requirement to vote?
17     A.  I'm not aware.
18     Q.  And is MALC aware of polls showing that the
19 majority of Texans support a photographic ID requirement
20 to vote regardless of their membership in a language
21 minority?
22     A.  I am not aware.
23         (Exhibit 9 marked.)
24     Q.  Please take as long as you care to to review
25 Exhibit 9, which is the Expert Declaration of Daron R.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 109

1  Shaw.
2      A.  It appears to be 48 pages.  We may have to come
3  back tomorrow if you really want me to take a look at
4  this.
5      Q.  Again, take as long as you want to review this.
6  I'm going to focus on Page 22 and then Page 28 and the
7  three or four pages after that.
8      A.  I will try to indulge.  This is not my area of
9  expertise here.  Page 22 and what else?
10     Q.  And then 28 through 33.
11     A.  May I write on this?
12     Q.  Certainly.
13     A.  I'll try my best.
14     Q.  On Page 22, the two paragraphs, Mr. Shaw is
15  talking about he's conducted a survey, and he says,
16  "Even if the size of the potentially affected population
17  is quite small, the question remains whether any turnout
18  affect will be disproportionately great among Hispanic
19  voters.  Looking at the general sample, it appears that
20  amongst those who are identified as Hispanic, the
21  possession of some form of ID as defined above is
22  actually the same or higher than the rate among white
23  respondents.  Hispanic respondents didn't have any form
24  of identification necessary for voting either 5 percent
25  of the time unweighted or 6 percent of the time

## 111

1  Do you have any reason to dispute -- Does MALC have any
2  reason to dispute the survey data compiled by Dr. Shaw,
3  any evidence to dispute that data?
4      A.  Well, first, I will say that MALC hasn't made
5  inquiry, and so having said that, these kinds of
6  discussions about looking at empirical evidence and data
7  is what we entrust our legal counsel and experts that we
8  work with to do that.  I'm not an expert.  I'm not even
9  a doctor.  I'm not a statistician.
10         I read polls that say we should fully fund
11  education, and we are at the bottom of the list in the
12  country.  And so I -- I know I -- recognize and
13  understand the importance of surveys and opinions, but
14  I -- I also know, you know, the devil's in the details
15  in the sampling, the time when you poll, the questions
16  you ask, the questions you didn't ask, but with respect
17  to Dr. Shaw, my only opinion is he has an opinion, and
18  if that is opinion is worth any wait, then I hope the
19  State of Texas brings him as a witness to the trial so
20  that our lawyers can cross-examine him.
21     Q.  Do you understand that this portion here was
22  not meant to be an opinion poll?
23     A.  I'm seeing this for the first time, sir.  It's
24  a survey.  It says survey at the top of Table 9.  I
25  don't know if this was done in conjunction with

## 110

1  weighted, the same rate as for white respondents."
2         "Additionally, when looking at the 600
3  person Hispanic surname sample, even fewer respondents
4  indicated not having any of the forms of identification
5  necessary to vote between 2 percent unweighted and
6  3 percent weighted."
7         He goes on to write, "A large part of this
8  positive discrepancy with respect to the ID possession
9  is probably due to varying rates of passport possession.
10  In the unweighted general sample, 45 percent of
11  Hispanics state that they have passports compared to
12  42 percent of white respondents, 46 percent compared
13  with 42 percent in the weighted sample.  Within the
14  Hispanic surname sample, between 53 percent weighted and
15  56 percent unweighted indicated possessing a valid
16  passport."
17         "Additionally, between 21 percent weighted
18  and 22 percent unweighted of Hispanics in the general
19  sample indicated possessing a citizenship certificate
20  with their photograph, 32 percent and 35 percent
21  respectively, in the Hispanic surname sample compared
22  with only 10 percent and 12 percent of whites."
23         We were discussing earlier whether or not
24  it was possible that Hispanics and Latinos might have
25  passports even if they don't have a driver's license.

## 112

1  litigation.  It doesn't have any -- It doesn't have a
2  docket reference number.  I don't know.  I see this
3  filed as a declaration, but I'm not sure this -- as an
4  attachment, if this is done in anticipation of
5  litigation.  Is this something that was done that's just
6  been, you know, made part of the litigation.  But,
7  again, you know, I mean, I think that's why we're in
8  litigation to let the fact witnesses say what the facts
9  are, let the opinion experts give the opinions and let
10  the triers of facts decide what the facts are and how
11  that shapes with the law.
12     Q.  If you are turn to Page 28, please.
13     A.  Sure.
14     Q.  28 through the 33, collect a series of polls,
15  some of them nationally, some done within the State of
16  Texas as to popularity of voter ID legislation.
17         Do you recall seeing any of these polls
18  prior to a few minutes ago?
19     A.  No.  This is the first time I've heard the name
20  Dr. Shaw, and this is the first time I've seen, I'm
21  presuming, Daron, his material.
22     Q.  Well, when you reviewed these or when you
23  reviewed these, these are a collection of polls done by
24  other folks, sources listed at the bottom of each poll.
25  Do you recall seeing any of these before?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

### 113

1      A.  No.  I think that -- you know, that I would
2  imagine that if these statistics existed around the time
3  of the debate, I'm sure they were referenced in the
4  debate somewhere.  I'm sure there may have been flyers
5  and talking points and newspaper articles written about
6  them, but in terms of giving it the attention that I'm
7  giving it right now, I'd say that I'm looking at this
8  for the very first time.
9      Q.  On Page 31 is a survey that's conducted in 2009
10  in Texas, and the question is "Do you support or oppose
11  voter ID legislation and would be strongly or
12  suggest somewhat?"  54 percent strongly support.
13  17 percent somewhat support.  8 percent somewhat oppose.
14  18 percent strongly oppose.  And broken down further,
15  whites strongly support 61, somewhat 17.  Blacks
16  strongly support 58 percent, somewhat support 17.
17  Hispanics strongly support 44 percent, somewhat support
18  15 percent.  Done by party affiliation.  Democrats
19  strongly support 39 percent, somewhat support
20  19 percent.  Independents, 55 percent strongly support
21  and 15 percent somewhat support, and Republicans,
22  70 percent strongly support and 16 percent somewhat
23  support.
24      And then on the next page, 32, there's a
25  more recent study or survey conducted between

---

### 114

1  February 11 and February 17, 2011, once again, within
2  Texas.  The question was, "Do you agree or disagree with
3  the idea that registered voters should be required to
4  present a government issued photo ID at the polls before
5  they can be allowed to vote?"  75 percent agree,
6  17 percent disagreed, and then broken down, agreed,
7  white, 80 percent, black, 63 percent, Hispanic, 68
8  percent, and as far as party breakdown, 59 percent for
9  Democrats, 70 percent independents, 92 percent
10  Republicans, but there are a number of others here, but
11  would MALC dispute that photo ID laws are widely
12  supported in Texas?
13      A.  Well, MALC would want some clarification to
14  show what those statistics support, you know, and so,
15  again, I'm looking at this for the very first time, and,
16  I mean, if I read a question that says the Texas
17  legislature recently considered legislation stating that
18  people have to provide photo ID, I mean, I could be a
19  respondent and think that's a college ID.  I could be a
20  respondent and think that that is a state employee ID.
21      I -- You know, I wonder what the
22  respondents were thinking because they're not told that
23  it's just a Texas driver's license or a passport or a
24  certificate of citizenship to the United States.  And
25  so, I mean, I'd have those questions and I'd want to

---

### 115

1  know, you know, what the respondents do about that and
2  if that would have changed their opinion.  Again,
3  looking at it for 5 minutes, that's the first thing
4  that comes to mind, and I think members of MALC would be
5  thinking the same thing.
6      Looking at your example on Page 32 or
7  Dr. Shaw's example on Page 32 about, you know, some
8  people argue that requiring registered voters to present
9  government issued photo IDs at polls reduces voter
10  fraud.  I wonder if the respondents knew that if you
11  combine the elections of 2008 and 2010, 13 million votes
12  were cast, and of those 13 million votes, there were
13  only four allegations of voter fraud presented to the
14  Attorney General, and of those four allegations of voter
15  fraud, there was only one indictment.  So if the
16  respondents knew that, I wonder what they would think
17  about photo ID having any impact on voter fraud that
18  apparently hadn't existed in the 2008 and 2010 election.
19      And so I think a respondent, given that
20  opportunity to weigh that fact or that argument, would
21  say, well, why are we doing this at the risk of 600 to
22  700,000 minorities not being given an opportunity to
23  vote or making it harder for them to vote because they
24  don't possess a form of acceptable identification.
25      So I think, you know, again, I hope

---

### 116

1  Dr. Shaw can answer that because I think that that's
2  what I'd like our MALC counsel to ask them because I
3  think it's important and relevant and would certainly
4  have an impact on how I would answer a question.
5      Q.  Does MALC believe that elderly voters are more
6  likely than the average voter to lack a form of
7  identification required by Senate Bill 14?
8      A.  I think MALC -- MALC is inclined to believe
9  what data produced by the state is revealing is that 600
10  to 700,000 minorities are registered to vote that lack a
11  driver's license, and I would imagine within that sample
12  of 600 to 700,000 Texans, there would be some seniors in
13  there.  To the extent is there a scientific precise
14  correlation, I can't tell you that.  I would hope
15  that -- I would hope that our MALC lawyers and experts
16  working on behalf of MALC or with MALC or in conjunction
17  with MALC would have some more precise opinions on that.
18      Q.  Does MALC contend that indigent voters are more
19  likely than the average voter to lack a form of
20  identification required by Senate Bill 14?
21      A.  I think that -- I think one could argue that
22  there's a correlation in transient and indigent people
23  not having access to things that people would have who
24  weren't transient and indigent.
25      Q.  Does MALC contend that disabled voters are more

---



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 117

1  likely than the average voter to lack a form of
2  education required by Senate Bill 14?
3      A.  Again, I would think that -- that Texans that
4  have limitations due to disabilities are probably not as
5  mobile and can access or endure some of the impediments
6  to conforming to the dictates of the law, particularly
7  if they have to present themselves to DPS locations that
8  aren't in their communities.  Certainly I think that
9  would be a challenge.
10     Q.  Does MALC contend that rural voters are more
11 likely than the average voter to lack a form of
12 identification required by Senate Bill 14?
13     A.  That I think I have more of an opinion of
14 because, as I mentioned to you, MALC is almost
15 state-wide now.  We have members coming in from every
16 pocket of the state, and I know of members whose
17 districts, you know, are larger than many northeastern
18 states, and I've been told directly from some of those
19 members, one of them who's on the list of approved
20 members you can discuss, that talk about the round-trip
21 that would be a required of a citizen from one part of
22 west Texas to drive to a DPS facility to get a license
23 or get an identification card to vote.
24         And I think when you ask somebody, you
25 know, I want you to vote, but I want you to make a

## 118

1  200-mile round-trip to go get in compliance with Senate
2  Bill 14, I think that puts an impediment.  Of course it
3  does.
4      Q.  Does MALC contend that young voters are more
5  likely than the average voter to present a lack of
6  identification required by Senate Bill 14?
7      A.  I think, again, to the extent of the
8  demonstrated data that suggests 600 to 700,000
9  minorities could be impacted by this, I would imagine if
10 you sample that with the demographic trajectory of
11 minorities in Texas than being relatively younger than
12 average -- being younger and more likely, most
13 likely Latino, I think, yes, they probably could be
14 disproportionally impacted than their peers or those
15 who are not in their demographic area.
16     Q.  What evidence do you have that young voters are
17 less likely than voters who are 30 or 40 or 50 that they
18 don't --
19     A.  I'm sorry.
20     Q.  That they are less likely to currently possess
21 photo IDs.
22     A.  I mean, I'm operating again under the parameter
23 that there are 600 to 700,000 minorities that could be
24 impacted.  I think demography and simple math tells us
25 that when you can look at the course of the last decade

## 119

1  and see that Texas grew by 4 million Texans and
2  89 percent of those Texans were minority and if we know
3  that there is a state data point from our demographer
4  that says minorities and in particular, Latinos, are
5  younger than their Anglo counterparts, I think one needs
6  to do a little bit more work.  But I think on a hunch
7  and gut instinct, that would tell me that there are
8  probably more younger minority Texans that could
9  potentially be minority and fall within that
10 classification of 600 to 700,000 folks that might be
11 impacted.
12         So it's just -- kind of just a hunch of
13 what I know about the State and what I know about its
14 people and what I know about who's, you know, not
15 accounted for in Senate Bill 14.
16         MR. ASTON:  Go off the record for a
17 minute.
18         (Recess from 1:29 p.m. to 1:42 p.m.)
19     Q.  (BY MR. ASTON) Okay.  Does MALC know how many
20 Texas registered voters lack one of the forms of photo
21 ID that is required by Senate Bill 14?  We talked a bit
22 about the 600 to 700,000 number.  Does MALC have any
23 other evidence that might get to this figure?
24     A.  To the six to 700,000?
25     Q.  No.  What is the actual number of Texans

## 120

1  without one of the forms of photo ID.
2      A.  I don't believe I -- In fairness, I don't
3  believer I ever asked that question, but I know that
4  I've not seen anything that would suggest we know what
5  the full and final number is of Texans who lack any of
6  the forms of ID.
7      Q.  Can MALC identify any Texas registered voter
8  who does not have one of the types of photo ID
9  requirements in Senate Bill 14?
10     A.  Well, you know I, was joking with someone the
11 other day, and I represented this guy the other day who
12 has a -- who had a Mississippi violation of the law and
13 one of the consequences was his license was confiscated,
14 so I asked him whether or not he could vote with a valid
15 ID.  Now, I didn't ask him if he had a national birth
16 certificate, but I asked him if he had a passport and he
17 doesn't.  I asked him if he had a concealed handgun
18 license and he doesn't.  And -- And the license he had
19 was taken away from him.  So, you know, I guess, you
20 know, to the extent that I'm doing the arm chair survey,
21 you know, for the State of Texas, I mean, I was -- that
22 could be one.
23     Q.  Do you know any others?
24     A.  Well, I think that those that are similarly
25 situated, but, again, I have not made it my -- my -- I



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 121

1  have not taken responsibility to find that out, but I
2  think it's just a matter of having a casual conversation
3  from three blocks to the courthouse, I think that there
4  are probably other people that are impacted similarly.
5      Q.  But MALC can't identify by name any of these
6  people.
7      A.  I don't think MALC's attempted to, but if --
8  if -- if the methodology could be that simple, I suppose
9  we could.  And, you know, just to be fair to MALC, I
10 think that, you know, the ultimate burden lies with the
11 State.  We would expect the State to do that and to tell
12 us because -- because we wouldn't pass legislation that
13 would have that kind of impact without doing our due
14 diligence, I wouldn't think.
15     Q.  If the State is not in the best position to
16 determine who has a passport or a military ID or the
17 citizenship certificate, what is the legislature to do
18 with respect to those documents in MALC's eyes?
19     A.  Well, there used to be a time when the State of
20 Texas had the Office of State and Federal Relations
21 where we had a Federal advocate that would run a lot of
22 these traps, and if I'm not mistaken, our current
23 governor said that we had, you know, two Republican
24 United States senators and we had Republicans from
25 corner to corner of the Texas House of Representatives,

## 122

1  and we could get anything we want at any time
2  essentially.
3          So my sense would be that the State of
4  Texas was really looking for this information from
5  Federal authorities and for some reason cannot seem to
6  convince, persuade or order a court to have a dialogue
7  with Federal agencies that we would get our Federal
8  representatives involved, I would think.
9          And so, you know, I know in the context of
10 redistricting, if you will, I mean, you certainly saw
11 that in the discovery that there was significant
12 involvement from members of United States Congress, if
13 not all of them at some point.  So I -- I would say that
14 if the State of Texas knew how to communicate with
15 members of Congress for redistricting, then you had to
16 do it for voter ID.
17     Q.  In addition to the perhaps gentleman you were
18 speaking of a few minutes ago who had his license
19 confiscated, do you personally know of other Texas
20 registered voters who do not possess one of the forms of
21 photo ID listed in Senate Bill 14?
22     A.  You know, I've been -- I've been corrected that
23 I -- You know, I have a mother who has Parkinson's
24 Disease.  She doesn't drive.  Until very recently, I
25 didn't think she had a driver's license because she

## 123

1  medically is not able to drive, but lo and behold she
2  does, and I can imagine when it expires, which I think
3  is in the very near future, we have no compelling reason
4  to renew her driver's license because her doctors would
5  probably have a problem with it, number one, and number
6  two, she hasn't driven in two years.  At the age of 73,
7  I don't see her getting a passport any time soon.
8  Certainly hope that she doesn't go out and get a
9  concealed handgun license.  She may mistake me for an
10 intruder one day when I come over to visit.
11         So I worry about her.  I know that I have
12 the manner and means and the resources and the staff and
13 employees that work in my law office that could cover
14 for me so that I can make it my obligation to see that
15 she complies, but I think about people who do this on a
16 bus.  I think about people who do this and have 8 to 5
17 jobs and don't have bosses or have bosses that aren't as
18 flexible as me.  I worry about people who work all week
19 and who are off on Saturdays and Sundays and don't have
20 a open DPS office, and I think in the wake of Homeland
21 Security being what it is, if you cannot board a plane
22 without a driver's license, then I imagine you can't get
23 a passport without a driver's license.  I don't know
24 that, but I -- it's just my speculation.
25         So I worry about people that are situated

## 124

1  like my mother, and I think that, you know, she's not
2  out of the ordinary.  I think there are many Texans just
3  like her, and I wonder what they're doing, and if it
4  wasn't for me, I would wonder who would help my mother,
5  so I worry about people who don't have that kind of
6  support system.
7      Q.  Does the Federal policy that requires you to
8  present a government issued photo ID when you choose to
9  board an airplane, is that discriminatory?
10     A.  I think that there is a distinction between
11 rights and privileges, and I think that while there may
12 be -- you know, buying a beer is not a constitutional
13 right, you know, I think you have a right to be free,
14 and we have all these liberties that we're all defining
15 and reminding people that we have, but, you know, I
16 think the right to vote is a very special and unique and
17 when the government tries to impose a duty on a
18 privilege to vote, I see that different from, you know,
19 requiring them to present themselves to board a plane
20 because you don't have to travel by plane to get to
21 places you want to go to these days.
22     Q.  But do you see the two activities as different,
23 voting versus buying a beer or voting versus taking a
24 plane?  But is the requirement that says we want to know
25 who you are via a photo ID before you do these things,



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 125

1 is it discriminatory in one but not the others?
2     A.  I think when you -- when you make it clear that
3 you are limiting the type and scope of identification
4 that you are willing to accept, I think you start
5 picking winners and losers, yes.
6     Q.  So they are all discriminatory -- Is it your
7 contention that in all three instances it's
8 discriminatory, but it's worse for voting or it's only
9 discriminatory when it's voting?
10     A.  I know that -- I know that the United States
11 Constitution gives me the right to vote, okay?  It also
12 gives me the right to be free, the freedom to get on an
13 airplane if I wanted to and not have to get permission
14 from the government.  I get that.
15         But express rights that I have to vote and
16 participate are democracy, and when the government tells
17 me how I'm going to participate in my democracy, I think
18 it's much different.  And so if the government feels a
19 compelling need or interest or public policy concern
20 that, again, is yet to be articulated, when that is
21 demonstrated to me, I think we are going to adopt a
22 manner and means by which we'll try to accommodate
23 people rather than exclude those.
24         And so the suggestive -- the subjective
25 intent of the authors of sponsors of this bill to limit

## 126

1 the list of acceptable forms of identification has
2 clearly demonstrated that 600 to 700,000 people are not
3 going to be in the same position they were in -- in the
4 previous election, and I don't think we gave a lot of
5 thought into accommodating those folks.  And I think
6 that there was, you know, potential that you could have
7 had a win-win, but that was never the design and the
8 desire of the author of the bill, and the language
9 speaks for itself.
10     Q.  Does MALC know how many Texas registered voters
11 lack the underlying documents necessary to get a State
12 issued photo ID such as an election identification
13 certificate?
14     A.  We would not.  I'm not aware of MALC making
15 inquiries, no.
16     Q.  So MALC can't identify the Texans by name?
17     A.  No.
18     Q.  They don't know who any of these people are
19 that lack those documents?
20     A.  Well, I think MALC in terms of the
21 organization -- I mean, I think MALC does not know.
22 MALC members have some insights on that perhaps.
23 Perhaps they do.
24     Q.  But you do not?
25     A.  I do not.

## 127

1     Q.  Would MALC agree that people who have the
2 ability and the means to obtain a photo ID but choose
3 not to would not have this right denied or abridged by
4 Senate Bill 14?
5     A.  I -- I'm not -- I'm not sure that -- that I
6 could say that.
7     Q.  Yes?
8     A.  I guess I could take a defeatist position and
9 let that apathy kick in and say just like what the
10 number of people said last night on the 10 o'clock news
11 here on the ABC affiliate after the basketball game that
12 showed a B roll of a line of people standing outside the
13 DPS office for one to two hours who then finally get
14 their turn in line and say, oh, you have the wrong
15 documents, and so they have to leave and come back the
16 next day and sit another one to two hours without a
17 glass of water or a courtesy employee telling them
18 here's what you need, here's what you don't need.  Let
19 me make sure you have everything before you stand in
20 this line.
21         I think somebody could say you know what,
22 you know, this isn't worth it.  I can't do this.  My job
23 won't let me do this.  My children get out of school,
24 and I need to be home for them.  I need to make them
25 dinner.  You know, I think that citizens are going to

## 128

1 have a number of reasons and even one reason is one more
2 than what they had in the last election.
3         And so, quite frankly, I think that
4 because they don't exercise their ability to conform to
5 the dictates of Senate Bill 14 doesn't mean that they
6 are no longer impacted.  They may be impacted and that
7 apathy speaks for itself, and so it's a -- it's a
8 wonderful news story, if you hadn't seen it.  But we're
9 140 days out from a national election and there are
10 people standing in 100-degree weather trying to get a
11 driver's license.  Can you imagine what the line's going
12 to look like when this -- should this become pretty
13 clear when people have to conform before the November
14 election?  It could be chaos, particularly when a city
15 as large as San Antonio I think has three facilities and
16 the fourth one is in construction and won't be online
17 prior to the election?
18         We're the second largest city in the
19 state, so I wonder what it's like to be in a smaller
20 community.  If that's -- If this is the San Antonio
21 experience, what's it like for people in rural and, you
22 know, communities along the border that -- that don't
23 have this.
24     Q.  Would MALC agree that the requirement that one
25 must register prior to a election day does not deny or


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 129

1 abridge the right to vote?
2     A.  Register to vote?
3     Q.  Yes, sir.
4     A.  The current requirement in Texas to register,
5 we don't have same day registration.
6     Q.  Would MALC agree that that does not deny or
7 abridge one's right to vote?
8     A.  I think it's fair saying that individual
9 members of MALC in this piece of legislation advocated
10 as a means of compromise to provide for same day
11 registration as a way of making the legislation
12 palatable, and it was rejected, so if, you know, maybe
13 there are some members of MALC that would have a
14 different view.  I -- You know, the purpose of me being
15 here is on the bill itself and what it does and not what
16 it could have done, you know.  So I -- You know, I don't
17 dispute the fact that you have to register to vote, but
18 I think that as a general notion the easier we make it
19 for people to vote, the more participation we have in
20 the electoral process.
21     Q.  A few minutes ago before you started looking at
22 the polls in Dr. Shaw's report, you read the bit about
23 passports and citizenship certificates.  Again, it's on
24 Page 22.
25         If it's the case that Hispanics and

## 130

1 Latinos do have passports at a higher rate than an
2 Anglos, would MALC concede that at a minimum that
3 lessens the burden?
4     A.  Not sure that I'm qualified to answer that.  I
5 mean, I think -- I think when, you know, 41 and
6 45 percent of Hispanics say they don't have one, I mean,
7 that's what we need to be concerned about.  You know, if
8 they don't have a passport, then arguably they also
9 don't have a driver's license.  That's -- You know,
10 that's going to be a tough obstacle to overcome without
11 having to go out and get an additional form of
12 identification, but -- so, I mean, I don't think MALC
13 can concede or -- and, frankly, can't even give an
14 accurate dispute to the findings because we don't have
15 the basis, we don't have the sample, the cross tabs, all
16 the things you want to see in a poll.
17         I mean, the top sheets are great to see
18 the numbers, but it's really the methodology that
19 matters, and there's so much that goes into the art of
20 scientific polling and sampling that it's specialized
21 fields, and I'm not the person to opine on -- on what
22 these statistics stand for.
23     Q.  But if it were true that Hispanics and Latinos
24 do in fact have passports, citizenship certificates with
25 photos at a higher rate, might that change your view of

## 131

1 Senate Bill 14?
2     A.  If Latinos -- If it were true that Latinos
3 had -- higher percent of them had passports.
4     Q.  Or the citizenship certificates than Anglos
5 such that there was no disparity as to --
6     A.  With Anglos.
7     Q.  -- the Anglos as to who does not currently
8 possess a photo ID, would that change your mind on
9 Senate Bill 14?
10     A.  I think that that is relevant.  I think it's a
11 important consideration.  I'd like to see those
12 disparities as they exist to college identification
13 cards or state employee photo identification cards.  I
14 mean, I want to be able to weigh that relative to other
15 forms of photo identification that minorities may be in
16 possession of.
17         You know, I'm from San Antonio, and I read
18 a great article here about the -- our public transit
19 system here is, you know, disproportionate.  Our
20 ridership is minority.  If it were true that you had to
21 have a photo ID to ride the bus, I'd wonder -- I'd like
22 to see that statistic measure up to a passport when it
23 came to being eligible to vote.  Public transit is a
24 quasi-governmental entity, and I'd love to see what that
25 number is relative to passports or driver's licenses.

## 132

1     Q.  I'd like to talk next about the purpose behind
2 Senate Bill 14.  Does MALC contend that Senate Bill 14
3 was enacted with a discriminatory purpose?
4     A.  You know, the short answer's yes, I think.
5     Q.  I'm sorry.  Did you see yes?
6     A.  The short answer is yes.
7     Q.  What is the basis for that contention?
8     A.  Understand I find that, you know, the rationale
9 remains elusive.  You know, I was very active in the
10 2011 debate.  I talked to many members, and in my
11 conversations, you know, I -- the different rationales
12 were why we have to have this, and, you know -- and if
13 I'm told that, you know, the purpose of this legislation
14 is to combat voter fraud, you know, I'm reminded by
15 numbers, you know, that I've reviewed directly from the
16 Attorney General that suggests there's not a lot of that
17 going on that -- that Senate Bill 14 would fix.  I'm
18 acutely aware of the discussions and floor proceedings
19 that, you know, we have higher instances voter fraud and
20 inappropriate behavior through the use of mail ballots
21 and poll worker activity.  None of that is addressed in
22 Senate Bill 14.
23         I think that when you start looking at
24 this subject matter from a 10,000-foot view, you see
25 once upon a time the committee on elections, a chairman



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 133

1 is one of the most outspoken critics of minorities and,
2 in particular, Latin American immigrants.  We chair the
3 elections committee.  We worked very hard in 2007 to
4 make sure that bill came out.  And I apologize.  If no
5 bill came out, I get confused because this is something
6 that I've seen in '07, '09, '11, '05 and at some
7 juncture, and I know that he has some very hardened
8 views about minorities.
9         And you sort of come full circle when you
10 see one of the nicest most personable members of the
11 legislature, Patricia Harless, author of the 2011 voter
12 identification bill, and -- and she doesn't have those
13 outward manifestations of how she views or perceives
14 Hispanics and Latin Americans, particularly immigrants,
15 but you can look on her website and, you know, she
16 identifies voter identification as a means of
17 immigration policy.  Anybody who thinks voter
18 identification is appropriate immigration policy, I have
19 to ask you what that purpose was.  Is the purpose for
20 voting or is the purpose to curve illegal immigration.
21 The only immigrants that I know of that Texas seems to
22 talk an awful lot about are ones that look like me, and
23 so I wonder what -- again, what the purpose was.
24         And on a final point, I -- you know, I
25 look at the -- You know I appreciated your earlier

## 134

1 display of knowledge of the House Journal and how it
2 works and your knowledge of the rules, and I think it's
3 also fair to recognize the -- the departures from our
4 legislative procedures that were done to simply
5 facilitate only one bill, which is this bill.  And so if
6 the motive was legitimate and neutral, and we don't
7 intend to impact anybody -- single out anybody because
8 of their race or origin, then we didn't have to do
9 legislative somersaults to pass voter ID.  It should
10 have been able to pass on its own merit or die on its
11 own merit.  That's not the case here.
12     Q.  Was there any other evidence you wanted to
13 discuss as to the purpose of Senate Bill 14?
14     A.  I mean, those seem to be the most visible in my
15 mind.
16     Q.  So that's what MALC relies on to make its claim
17 that there was a discriminatory purpose behind Senate
18 Bill 14, that's the evidence?
19     A.  I think that that is the evidence that seems to
20 be the most weighing on my mind, yes.
21     Q.  You touched a bit on voter fraud as being a
22 purpose articulated -- that was articulated, I assume,
23 on the floor and assume it was articulated in public
24 statements by any number of members who were supporting
25 Senate Bill 148; is that correct?

## 135

1     A.  Yes.  And I thought I saw a reference to it in
2 Dr. Shaw's own publication.
3     Q.  Does MALC contend that preventing voter fraud
4 was not a purpose of Senate Bill 14?
5     A.  I think that it's not a proven purpose.  I
6 think it may have been a red-herring.  It may have been
7 a talking point.  It may have been sort of a -- you
8 know, a misdirection, but I'm not aware -- I think in
9 the debate it was over and over again to ask the authors
10 and proponents of the bill to articulate to me what
11 exactly is the fraud that we're seeking to eliminate.
12         There were proposals offered by members,
13 and I venture to say they may have been MALC members
14 that said if there's voter fraud going on, throw them in
15 jail.  Let's help you.  Let's make it a felony where
16 there's a substantial sum of years in prison.  Let's do
17 that.  If that's what you want to do, we'll help you do
18 that.  You won't see that.
19         There was acknowledgment by -- You know, I
20 remember a debate between two members of MALC,
21 Representative Aliseda and Representative Anchia, and I
22 debated Representative Aliseda on a newscast.  He said
23 we know there's problems with mail ballots, and we're
24 going to do that next.  Didn't happen.  I mean, if the
25 focus was to attack the fraud, well, the fraud I know

## 136

1 of, the fraud that's being tracked by the Attorney
2 General, like I said, one indictment out of 13 million
3 votes on voter fraud for voter impersonation.  I have to
4 question what the purpose was.
5     Q.  Earlier you discussed the mail-in ballot fraud,
6 and I think poll worker fraud are two things you
7 mentioned.  Does MALC acknowledge that there is voter
8 fraud in Texas?
9     A.  As a general concept or specific to --
10     Q.  That is happening in Texas and it has happened
11 in the recent past, some of those sorts of fraud that
12 you discussed.
13     A.  Well, yes, and not -- I think that there's a --
14 there is a higher instance of other types of fraud than
15 impersonating a voter, yes.
16     Q.  Do you know how high?
17     A.  I don't.
18     Q.  Would MALC agree that going after mail-in
19 ballot fraud is something the Texas legislature should
20 be doing?
21     A.  I think MALC agrees, and I think the Texas
22 legislature has.  I remember a reform in the early
23 2000's.  I thought at least it was attempted in the
24 House deal with the handling of mail-in ballots and
25 people associated with that.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

### 137

1  Q. Does MALC contend that the Texas legislature
2  intended to harm poor people by passing Senate Bill 14?
3  A. I don't know if the legislature intended to
4  harm them, but I think the legislature knew that they
5  were excluding them. If they are someone who would link
6  exclusion to a harm, then, yes, I think they knew that,
7  but I think that -- Again, I mean if the -- if the data
8  point was protecting the integrity of a ballot box and
9  nobody ever getting a real view of what was exactly
10 going on at the ballot box that required an overhaul of
11 our voter identification processes, you know, I'd say
12 that there are some people excluded by it as a result of
13 these policy choices, and that's harmful. At least it's
14 harmful to the person who no longer has the luxury of
15 voting how they did in the last election.
16 Q. Does MALC contend that the Texas legislature
17 intended to harm young people by passing Senate Bill 14?
18 A. I think they intended to exclude.
19 Q. What's the basis for that contention?
20 A. Well, again, I'm operating off my notion of
21 demography, the notion that minorities are --
22 particularly Latinos are younger in the state-wide
23 population. And I am being told that 600 to 700,000
24 minorities don't possess a driver's license, and so I --
25 I think we know we're excluding, and when there was a

### 138

1  sensible alternative to allow people to vote with
2  college identification cards, I think we could have
3  captured many of those folks who were potentially on the
4  list of excluded, and there was a cognizant choice to
5  exclude them by way of a rejection of that amendment.
6  Q. Do you know if the requirements to obtain a
7  student ID are as rigorous as the requirements to obtain
8  a driver's license or election identification
9  certificate or a passport?
10 A. I think that the State is in the best and only
11 position to dictate what those requirements be, and so
12 if the State as a matter of policy choice didn't think
13 they were rigorous enough, then we could have changed
14 that. We would probably do it with rule making. You
15 know, so Texas went through litigation just to change
16 the form of its driver's license. I'm certainly very
17 cognizant of the fact that we could do this with college
18 IDs, state employees IDs, hunting licenses, fishing
19 licenses, electrician licenses. Everything that we
20 licensed, we could make the application requirements
21 more rigorous if we wanted to use those as a list of
22 approved identification cards in order to vote, but that
23 wasn't the case.
24 Q. Does MALC contend that the Texas legislature
25 intended to harm elderly voters by passing Senate Bill

### 139

1  14?
2  A. I think that when -- when the proponents of
3  Senate Bill 14 had the choice to vote on amendments that
4  would have excluded seniors from having to meet the
5  requirements of Senate Bill 14, I think they knew they
6  were excluding seniors, and they had the opportunity to
7  give them a hold harmless and --
8  Q. Give them a what?
9  A. Hold harmless. In other words, to exclude
10 senior citizens from the requirements of Senate Bill 14.
11 There was an actual amendment to exempt them, and it was
12 rejected. I haven't compared the votes, but I'm sure
13 there's a high correlation of people who voted to pass
14 Senate Bill 14, and those very same people are the ones
15 that projected the alternative to exempt the elderly. I
16 think that we were harming them. I think we knew that
17 we were going to exclude some of them. I think it's
18 harmful to the senior who's impacted.
19 Q. The amendment that did not pass in that regard,
20 what was the age requirement for that, do you recall?
21 A. I don't, but, you know, there's an amendment.
22 It could be found. I imagine we're going to define
23 them. Maybe we may define them very similar to the
24 ability to vote by mail, which is 65 and older.
25 Q. And so wouldn't you agree that for those who

### 140

1  are 65 and older, Senate Bill 14 would prevent you from
2  voting even if you do not have a photo ID?
3  A. It would have prevented them from voting at the
4  poll. Sure, it would have.
5  Q. But they are still allowed to vote by mail,
6  correct?
7  A. Sure. They can vote by mail, but if they want
8  to vote at the polls, they ought to be able to. I mean,
9  anybody deserves to have it their way. It's our
10 seniors.
11 Q. But is it a denial of the right to vote to say
12 that if you choose to vote without a photo ID, you get
13 to stay at home and do it by mail?
14   MR. GARZA: Objection. Argumentative and
15 asked and answered. You can answer.
16 A. I think that -- I think voters should be
17 afforded the opportunity to vote however they want to,
18 so long as it's provided by law, and by arbitrarily,
19 cutting out one avenue and saying, well, you know, don't
20 fret, you can do it this other way, you know, I think
21 it's a preference. I think there are people who still
22 don't like voting with computer machines and want to see
23 a tabulated ballot. I think that -- And bare in mind
24 these seniors that have been voting much longer than you
25 and I have, they like things a certain way. As I reach



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 141

1  that status, I agree with them, you know.  So I just --
2  I think it's a -- if that was the case, if that was the
3  -- if the fact is you could have voted by mail and not
4  have to show an ID, then why did we deny the opportunity
5  to vote in person without an ID?  What's the harm?
6      Q.  Does MALC contend that the Texas legislature
7  intended to harm rural voters by passing Senate Bill 14?
8      A.  I think during the debate when it was
9  illustrated and laid out that the challenges that rural
10  Texans would experience and endure of having to make
11  themselves available to a DPS office that may not be in
12  their respective county, I think we knew that we were
13  going to be excluding population that would have an undue
14  hardship to receive a -- receive a certificate of
15  voting.  And I don't think that -- that -- I don't think
16  it would be fair to allow anyone to say, well, I didn't
17  know that that was the -- you know, that that was just
18  merely an unintended consequence.
19      I think that on every instance that we've
20  discussed, there was an alternative to provide a more
21  reasonable path, and for not granting them that path, I
22  think the legislature -- those who voted for this Senate
23  Bill 14 made a conscious decision to exclude or limit
24  their ability to participate.
25      Q.  Does MALC contend that the Texas legislature

## 142

1  intended to harm urban voters by passing Senate Bill 14?
2      A.  As I think in the debate when members including
3  members of MALC pointed out the challenges of urban
4  environments, the limitations on the number of DPS
5  facilities within major cities, the limitations of the
6  operating hours to 8 to 5 and open till 6 on Tuesday,
7  but closed on Saturdays and Sundays, and that testimony
8  conflicting with people who don't have a driver's
9  license are presumptively not driving, which means they
10  are riding buses and getting rides, skipping work.
11      I think when you lay out all the
12  challenges to live in a big city and go to DPS only to
13  be met with a two-hour waiting line, like San Antonians
14  did yesterday afternoon, I think when that was
15  articulated and there was no accommodation made to
16  facilitate or provide funding for additional voter
17  stations or having mobile driver's license and voter
18  identification cards to make them more accessible, I
19  think we knew we were excluding people, and I don't
20  think it was by omission.  I think people knew the
21  consequences of their voting rights.
22      Q.  I hear through a number of these answers to
23  these last questions, MALC contends that you can infer
24  discriminatory purpose based on the effect that this
25  bill would have on minority groups and the other groups

## 143

1  that we've discussed recently; is that true?
2      MR. GARZA:  Objection.  Mischaracterizes
3  his testimony.
4      A.  I guess what I'm -- what I'm trying to say is
5  that oftentimes in the legislative arena, we pass pieces
6  of legislation and then there's these consequences that
7  ensue, and you hear more often than not, well, that was
8  just an unintended consequence.  In every subject matter
9  that you presented to me, whether they be rural Texans
10  or urban Texans or senior Texans or young Texans, this
11  debate captured and covered these challenges that were
12  going to be presented if Senate Bill 14 passed, and,
13  more importantly, there were those who felt there were
14  reasonable alternatives and accommodations that could
15  have been made to offset or to dilute, diminish that
16  risk of disenfranchising a voter, and every single time
17  those were rejected on some pretty consistent yays and
18  nays.  The vote patterns were very consistent.
19      And so I can tell you a number of -- or at
20  least a few conversations -- you know, maybe fewer
21  conversations of people who felt one way and their party
22  told them to do it another way, but the fact of the
23  matter is they were made acutely aware of these
24  challenges that could potentially exist, and so a
25  conscious vote to either accept or deny an amendment was

## 144

1  going to come with these consequences that could not be
2  then presented sometime in the future to say, well, we
3  had no idea that we were going to impact seniors.  We
4  had no idea that the challenges in rural Texas were
5  going to be that bad.  We had no concept that you had to
6  wait two hours in a big city just to get inside a DPS
7  office.
8      I think people are very aware of the
9  circumstances because they were very well -- they were
10  articulated very -- you know, very well, and when --
11  when people may be decisions to reject those amendments,
12  I think they knew that they were going to -- the result
13  of that policy choice was going to impact people, and I
14  think it's harmful.
15      Q.  How many members of the legislature who are
16  members of a minority group voted for passage of Senate
17  Bill 14?
18      A.  I don't know.  I'm guessing, 7, 10.  I'm -- You
19  know, in that ballpark.  In that ballpark.
20      Q.  But more than five?
21      A.  I'd be guessing, but I -- I think so.
22      Q.  Does MALC know how many amendments that were
23  offered by minority members of the House or the Senate
24  were accepted?
25      A.  I don't know that.  I don't.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

### 145

1    Q.   Does MALC know how many of those amendments
2  ultimately ended up in the bill?
3    A.   I don't know that.
4         (Exhibit 10 marked.)
5    Q.   Do you recognize what has been marked
6  Exhibit 10?
7    A.   Portion of the House Journal.
8    Q.   On Page 3, SB14, Adoption of Conference
9  Committee Report.  What is this vote?
10   A.   This is the -- This is the -- the bill as it
11 comes out of conference.  There's a conference committee
12 report that is pretty near the final passage and
13 placement of this bill on governor's desk, so that's
14 what that is.
15   Q.   And if the conference committee report is
16 approved, then that's the version that goes up to the
17 governor, correct?
18   A.   Yes.
19   Q.   Was this the last vote on SB14 in the House?
20   A.   I'm not sure because at some point there was a
21 resolution to go outside the bounds which I think is
22 very rare and unusual, and I don't know if that preceded
23 this conference committee report or if it -- if it came
24 afterwards, but I think that -- that even though it's a
25 separately numbered resolution, it's asking for

---

### 146

1  permission to exceed the bounds of the conference
2  committee in Senate Bill 14.  I know that happened
3  because it's a -- again, it's something that rarely
4  happens in just regular legislation.
5         I can't tell from the journal, but,
6  obviously, the resolution would have been -- you know,
7  would have been really right before or right after, so
8  it would have been -- to answer your question, it would
9  have been potentially one of the last votes before going
10 to the governor's desk.
11   Q.   And this would have been a vote on the bill in
12 its entirety, not on an amendment or revision?
13   A.   Right.  This is on the conference committee
14 report, yes.
15   Q.   If you would take a few minutes to review the
16 members of the House who voted in support of the bill.
17   A.   Okay.
18   Q.   And please circle the names of all members that
19 MALC contends had a discriminatory purpose in voting for
20 Senate Bill 14.
21   A.   That was a very interesting question.  I think
22 it certainly would require me to know what motivates the
23 inner-workings of my colleagues.  I think that as I said
24 in previous questioning, that there are some members
25 that have voted yay that have some very distinct and

---

### 147

1  public views that some people would say question, but in
2  terms of, you know, looking someone in the eye and
3  asking them if -- if they're racist or they're intending
4  to discriminate, I can't tell you that I did that, nor
5  would I do that.
6         But I do believe that actions sometimes
7  speak louder than words, and to the extent that there
8  are members who say that voter identification is a means
9  of immigration policy, then I think that that is a --
10 that does not have anything to do with elections.  It
11 has to do about singling people out for who they are.
12 So that being your question, I can say that with respect
13 to one person that I know firsthand that I've seen, you
14 know, make that kind of association.
15   Q.   What number was that?
16   A.   That would be the member that I circled here,
17 the author of Senate Bill 14, Representative Harless.
18   Q.   That's because of what you read on her website.
19   A.   That's because of what I've read on her
20 website.
21   Q.   Anyone else?
22   A.   That is the only member that I have seen with
23 my own eyes make that sort of public comment as
24 associated with Senate Bill 14.
25   Q.   Do you know how many other states have photo ID

---

### 148

1  requirements in place at this time?
2    A.   I don't.
3    Q.   Do you know if it's more than five?
4    A.   I don't.
5    Q.   Do you believe Texas is the first to adopt such
6  a requirement?
7    A.   I don't.
8    Q.   So you know there are other states.  You are
9  just not aware of how many?
10   A.   That's correct.
11   Q.   Is MALC aware that the United States Supreme
12 Court upheld Indiana's photo ID law in a case called
13 Crawford versus Marion County Election Board?
14   A.   I'm aware.
15   Q.   Have you read that case?
16   A.   No.
17   Q.   Would MALC agree that if the 10 or 15
18 states are allowed to pass a particular kind of law,
19 that other State's should be allowed to do so as well?
20   A.   I think it would matter to know if those states
21 were a covered jurisdiction under the Voting Rights Act.
22   Q.   So MALC believes that non-covered jurisdictions
23 should be allowed to have laws that covered
24 jurisdictions cannot have?
25   A.   No.  I think that covered jurisdictions are

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

149

1   required to meet their burden pursuant to the Voting
2   Rights Act, and if 10 to 15 covered jurisdictions were
3   to do that, that would be persuasive with MALC.
4       Q.  But you think that non-covered jurisdictions
5   and covered jurisdictions should have different -- not
6   just what they must do to pass muster with the
7   Department of Justice or District Court, but they should
8   have substantive differences as to what laws they could
9   have on their books?
10          MR. GARZA:  Objection as to relevance.
11   You can answer the question?
12      A.  I guess what I'm simply saying is that Texas
13   didn't volunteer to be a covered jurisdiction.  There's
14   a reason for it.  And -- And so long as they are a
15   covered jurisdiction, and there's a Federal act that
16   says covered jurisdictions have to meet certain
17   obligations, then I believe that that's Texas's burden,
18   and -- and so -- so long as that exists -- And, you
19   know, I think whether Texas likes it or not or whether I
20   like it or not is insignificant.  What matters is that
21   it's a covered jurisdiction, and we have a Federal
22   Voting Rights Act.
23      Q.  Is MALC aware of anyone in any of the states
24   that have photo ID laws in place at this time who has
25   been unable to vote because he or she lacks a photo ID?

---

150

1       A.  I know -- I -- I vaguely read an article
2   somewhere about a woman who worked at some capitol in
3   another state that, you know, cleaned the offices of
4   lawmakers and everybody knew her and everybody liked
5   her, and lo and behold, she wouldn't qualify to vote
6   under the rigors of that voter identification law in
7   that state or something to that effect.  And I remember,
8   you know, reading that somewhere in the newspaper.
9   Can't tell you who it is, can't tell you what state it
10   is, but I vaguely recall something like that.
11      Q.  Do you remember when you read that?
12      A.  Probably sometime in the last six months.
13      Q.  Do you remember where you read it?
14      A.  I do a lot of reading online.  I also, you
15   know, take home a lot of reading material mostly
16   generated by staff, and so -- but -- but it would have
17   to have been in a publication, but mostly -- most likely
18   an online publication.
19      Q.  But MALC is not aware of any effort of any
20   particular person who has not been able to vote in the
21   one of those states being --
22      A.  I don't know that we do.  I don't know, and I
23   don't know if now I -- Sorry.  I just wanted to be
24   comprehensive.  I don't want to undersize the point that
25   many members of MALC participate in policy conferences

---

151

1   across the country.  So the extent that they are serving
2   on panels or engaging members in other jurisdictions and
3   that has come up, that is quite possible, but I'm not
4   aware of any.
5       Q.  And you are not aware of any news stories, TV,
6   newspaper, magazine, otherwise in any of the states that
7   articulate that this has become a problem because they
8   enacted the photo ID law?
9       A.  What I know of other states who enacted or
10   attempted to enact the photo ID law has not come
11   without, you know, disagreement or litigation.  There's
12   always been -- As a result of a dispute, I'm not aware
13   of any jurisdiction that's modified their voting and not
14   been challenged, so but other than that, I don't know
15   any state that's repealed their voter identification
16   law.
17      Q.  Do you know of any state that has had a court
18   order then to cease using a photo ID law?
19      A.  I'm not aware.  I don't believe so.  I don't
20   know.
21      Q.  Does MALC recognize that the Supreme Court's
22   decision in Crawford versus Marion County Election Board
23   is binding on the district court here?
24      A.  In Texas?
25          MR. GARZA:  Objection.  Argumentative.

---

152

1   Calls for a legal conclusion.  You may answer.
2       A.  Here as in Texas or here as in this litigation?
3       Q.  Here in this litigation.
4       A.  Yeah.  I think that -- I don't know what the
5   opinion -- I don't know what it says, but I know that
6   our view of the opinion will be interpreted and
7   advocated by MALC's counsel.
8       Q.  Doesn't the Crawford decision that photo ID
9   requirements are nondiscriminatory voting regulations
10   bind the court in this case?
11          MR. GARZA:  Objection.  Argumentative.
12   Calls for legal conclusion, assumes the legislation is
13   identical, which it's not.  You may answer the question.
14      A.  I think that it's our position that our lawyers
15   will counsel us on the applicability of the Supreme
16   Court opinion in our Texas case.
17      Q.  Did MALC consider the Crawford decision when
18   deciding whether to support or oppose Senate Bill 14?
19      A.  I don't believe so.
20      Q.  Did you consider it?
21      A.  I didn't.
22      Q.  Why not?
23      A.  Because what I recall is that MALC had voting
24   rights counsel retained and providing those
25   recommendations from before the 2011 session.  So on



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

## 153

1  matters, you know, pertaining to voting rights and
2  voting rights litigation, you know, MALC would defer to
3  its counsel.  And so whatever counsel relies on in
4  forming his opinions is certainly, you know, Mr. Garza's
5  and that of our legal team.
6      Q.  Did MALC consider the Crawford decision at all
7  when deciding whether to intervene in this lawsuit?
8      A.  MALC considered the counsel that was presented
9  to us by our lawyers and our responses, you know,
10  indicated by our intervention.
11      Q.  Even if Crawford alone were not sufficient to
12  permit the Texas legislature to adopt a photo ID
13  requirement, don't the federalism concerns raised by the
14  Supreme Court in the northwest Austin case, mandate that
15  Texas be allowed to adopt the same kinds of laws that
16  other states currently have in effect?
17      MR. GARZA:  Objection.  Argumentative.
18  Counsel, file a motion for summary judgment.
19      A.  I'm not quite sure what the Supreme Court in
20  the northwest Austin MUD said or didn't say.
21      Q.  How does MALC define voter fraud?
22      A.  Not quite sure.  I would certainly invite -- I
23  believe this would necessarily include definitions for
24  voting and for fraud, and so the -- anybody who is
25  voting with a fraudulent purpose, I imagine would fall

## 154

1  within the very broad confines of voter fraud.  You
2  know, specifically speaking, I think it's in the eye of
3  the beholder.  I think you hear lots of members from
4  south Texas talk about the politiquera system there
5  where you have a number of individuals who hold
6  themselves out as voting consultants, if you will, and
7  go around and marshal up the vote.  Then you have people
8  in urban areas that talk about the -- the -- the
9  potential for fraud and inappropriateness of voting by
10  mail campaigns, and then you go to some other places in
11  the state where, you know, people are talking about the,
12  you know, very aggressive and assertive election poll
13  workers that have their own particular styles that may
14  conflict with sort of the norms of practices of voting.
15      And so I think if you -- depending on
16  where you come from, I think you have a different, you
17  know, perspective, but I think all three of those
18  things -- I think voting -- you know, impersonating a
19  voter certainly is fraudulent, so I think all of those
20  things could be voter fraud.
21      Q.  So there's a variety of types of voter fraud
22  that you've heard complaints about?
23      A.  I didn't say that I heard complaints about, but
24  I just --
25      Q.  Heard stories about?

## 155

1      A.  You hear like anecdotal, yes, yes.
2      Q.  And MALC agrees that voter fraud should be
3  illegal, correct?  I think you mentioned earlier.
4      A.  All right.  I think that -- I think we ought to
5  have laws in place for people who violate our election
6  laws, yes.
7      Q.  Have you ever witnessed voter fraud?
8      A.  I can't say that I have.  I can't say that I
9  have.
10      Q.  Would you agree that in order to witness
11  in-person voter fraud you would have to be present and
12  know the person who is voting?
13      A.  No.
14      Q.  How else might you discover it?
15      A.  Somebody could tell me.  Somebody could give me
16  a photo from a cell phone, I suppose.
17      Q.  But someone would have had to have been there,
18  not you personally.  I mean, you could hear a story of
19  it, but the person who discovers the fraud would you
20  agree that person has to be there and witness it as it's
21  happening?
22      A.  In some instances -- And I'm trying to think on
23  my feet about, you know, instances where it happens and
24  it's not noticed, you know.
25      Q.  Could you indulge me?

## 156

1      A.  And repeat your question again.
2      (Requested portion was read.)
3      A.  I think not in every instance.  I think you
4  could -- I think you could say you live in one precinct
5  and -- and you vote in that precinct, but, in fact, you
6  live in another precinct and, you know, that alone
7  unwitnessed is a crime.  And the fact that no one
8  witnessed it doesn't mean that it's not a crime.  I
9  think that on its face is not whether or not it's
10  an enforceable act or whether there's a prosecution.
11      Q.  No.  I think we would agree that that's a
12  crime.  My question is I think was no one there to
13  witness it, would it be discovered?
14      A.  Well, I think you could document that.  Of
15  course, you could.  If -- If you knew that the person
16  was registered to vote at a place that wasn't his or her
17  residency, I certainly think you could discover that.
18  You don't need to be told.  Now, whether you want to
19  expend the resources of the State to go out and do that,
20  that's a policy and budget question, but in terms of you
21  don't need to -- you can conceivably discover that
22  without the aid or assistance of anybody else because
23  the act has been committed, and -- and, you know, an
24  investigation can be conducted, and you could certainly,
25  you know, come up with a violation of the law.



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

### 157

1    Q.  Would MALC agree that it's easier to discover
2    fraud such as mail-in ballots when someone with the same
3    handwriting mails a stack of them?  Would that be easier
4    to detect after it happens than would be in-person voter
5    fraud potentially?
6    A.  And I hate to say, well, give me 5 minutes to
7    give you a scenario.  I think that that wouldn't be the
8    case, but I think I understand your position -- I mean,
9    your question, and I -- I don't dispute the logic, but I
10   also think that that's not an absolute -- that there are
11   instances where that may not be true.
12   Q.  Does MALC agree that it would be harder to
13   commit in-person voter fraud if each voter who arrives
14   at the polls must show a photo ID?
15   A.  It seems to me that it is pretty hard already,
16   and the -- you know, as I understand it, when you
17   register to vote today you are submitting confidential
18   information as to who you are.  And when there's a
19   match -- you know, everything's okay, when there's
20   something that's not consistent, you are identified.
21   You are asked to present identification at the polls.  I
22   mean, that's a pretty hard clad system now.  I mean, you
23   know, and I think it's supported in the fact that you
24   have very little to none by way of prosecutions in this
25   area of the law.

---

### 158

1        You know, I think -- Do you want to expose
2    600 to 700,000 Texans so that you can make a system go
3    from 99.8 percent secure to 99.9 percent secure?  I
4    don't think that's a good policy choice, but that's --
5    the decision has been made by those who back Senate Bill
6    14.  So I think that if you work hard and try hard, you
7    can make anything harder.  Not so sure if it's justified
8    under the current circumstances.
9        MR. ASTON:  Can we go off the record for
10   just a couple minutes?
11       (Recess from 2:49 p.m. to 2:51 p.m.)
12   Q.  (BY MR. ASTON) Does MALC agree that members of
13   the Texas legislature have a duty to represent the
14   interests of their constituents?
15   A.  Of course.
16   Q.  Does fulfilling that duty include proposing,
17   supporting and voting for policies favored by his or her
18   constituents?
19   A.  Sure.
20   Q.  Is it a rational decision for a legislator to
21   vote for bills that are widely supported throughout the
22   state and nation?
23   A.  I think history has demonstrated that sometimes
24   that may not be a good idea.
25   Q.  Isn't fulfilling the wishes of one's

---

### 159

1    constituents an acceptable purpose behind voting for a
2    piece of legislation?
3    A.  Again, I think it has proper context, yes, but
4    I can think of a number of instances where the popular
5    thing to do wasn't necessarily the right thing to do.
6    Q.  Does MALC have any basis for disputing that a
7    majority of Texans support photo ID requirements?
8    A.  Do we have a basis?
9    Q.  For disputing that a majority of Texans support
10   photo ID requirements.
11   A.  I think that while MALC may not dispute that
12   proposition, I think before MALC can concede that that
13   is the case, MALC would want to make sure that they had
14   access to the same materials that the opinion makers use
15   in forming that opinion to see if it's consistent with
16   our standards and methodologies.
17   Q.  Does MALC have any basis for disputing that a
18   majority of the constituents of every single
19   representative that voted for Senate Bill 14 support
20   photo ID requirements?
21   A.  I would -- I am unaware of that proposition
22   that -- again, make sure I heard you right -- that the
23   majority of the constituents of every single House
24   district is in favor of photo identification
25   requirements.

---

### 160

1    Q.  The question referred to -- I guess it would be
2    districts represented by someone who supported the bill.
3    So the question is those who voted for the bill, do you
4    have any basis -- does MALC have any basis for disputing
5    that a majority of their constituents support photo ID
6    requirements?
7    A.  Yeah.  I would be -- I don't have a basis,
8    but -- but I have a comparative that -- in some of those
9    instances, and so -- but, again, I think it's really the
10   devil's in the details and how that decision or that
11   statistic was arrived at.  It would be very important to
12   really look at.
13   Q.  We talked a while ago about procedural tactics
14   one might use and indeed legislators do use to slow
15   down, delay or stop a disfavored bill.
16   A.  Or defeat.
17   Q.  Or defeat.  I'd like to talk now for a few
18   minutes about procedures one might use to speed up a
19   bill that he or she supports.  Do the House rules
20   provide a mechanism to waive certain procedural rules to
21   expedite the process on a particular bill?
22   A.  You could suspend all rules.  You can even
23   suspend the Constitution.
24   Q.  And is one example waiving the five-day posting
25   rule for the House?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

161

1      A.  Routinely, no.
2      Q.  Have you ever had one of your bills set for
3  hearing after the five-day posting rule was suspended?
4      A.  I'm not sure.  I'm not sure.  I mean, it's not
5  an infrequent -- Excuse me.  Yeah, I'm sorry.  It's not
6  an infrequent request that's happened.  I mean, it
7  could.
8      Q.  So that is routine you said.
9      A.  It's not a routine.  It's just not infrequent.
10  I mean, no one would be surprised by it if someone were
11  to make that motion.
12      Q.  So then isn't it fair to say that the House
13  rules can be utilized by members both to expedite a bill
14  they support and to delay or stop a bill they oppose?
15      A.  To a degree, yes, sir.
16      Q.  Do the rules allow for -- Do the rules have
17  mechanisms by which you could do either one of those
18  things?
19      A.  I mean, the rules say that you can have no
20  rules, okay, and so in that instance, it's -- it's the
21  OK Corral on the House floor, I mean, and so -- but I do
22  believe that the -- the rules themselves are in place
23  have a tendency to be designed to work towards the
24  elimination of proposals, not to encourage and foster --
25  not to encourage and foster the way you accelerate and

---

162

1  pass proposals.
2      MR. ASTON:  Can you read that back?
3      (Requested portion was read.)
4      Q.  So what do you mean by that?
5      A.  Well, I mean, if you take a 10,000-foot view of
6  the legislature and we introduce 5,000, 6,000 pieces of
7  legislation every session, we pass 1,000 of them, 1,500,
8  the fact that we have 140 day time limit, we have
9  express rules that prevent activity on the floor of the
10  House within the first 60 days, you are -- literally,
11  it's a race against the clock.
12      And so to the extent that -- that you are
13  trying to advocate and pass your proposals, your
14  measures, you are working against hard deadlines that
15  can defeat a bill, I have rarely seen someone say we
16  need to suspend all the rules so that we can take a bill
17  and pass it now.  I have heard -- I've never witnessed
18  it myself, but I am told, you know, about the days where
19  you could stop the clock before midnight, and it was --
20  it was midnight everywhere else in Texas, but the House
21  floor.  And I'm reminded of days where bills have been
22  introduced -- have been drafted, filed, introduced,
23  passed and sent to the Senate all in one day.  I've
24  heard about these, but these are really kind of the
25  outliers, the tails.

---

163

1      When we start departing from procedure on
2  bills of great import, not just local bills or something
3  that may have a significance in somebody's particular
4  district, when we do it on big controversial bills, I
5  think that that's being done more so for a different
6  reason.  It's to facilitate passage of something that
7  would be difficult to do.
8      And so, you know, you asked me a question
9  earlier about, well, you can -- people pass entire bills
10  as amendments and there are one or two pages, of course
11  they do.  When you want to pass an omnibus rewrite of a
12  code or multi-page, multi-section bill with lots of new
13  language, the body as a matter of practice will put a
14  stop to that because nobody's going to pass something or
15  vote on something that they don't know, you know, what
16  it does.
17      And so, you know, I think that even though
18  the body will often disagree over the direction of
19  policy, we all sort of hold a fidelity to the
20  institution itself and not going to create a practice
21  that -- you know, that can be detrimental to the
22  institution, and I think that's why you see -- you know,
23  people talk about, you know, the institution sometimes
24  being bigger than the two parties that represent it.
25      Q.  So does MALC believe that one use of the rules

---

164

1  to slow things down is legitimate and the other to speed
2  things up is not legitimate?
3      A.  I think that rules that are used to slow down
4  legislation is not a first option.  It's really a last
5  resort.  I think rules used to accelerate -- If you have
6  the ability to use the rules to accelerate legislation,
7  then you probably have the ability to not have any
8  rules, and the fact of the matter is -- I mean, the
9  rules are really not designed -- I think the rules as
10  written when you -- when you read through them, you
11  recognize that they apply to, you know, really protect
12  the minority voice as the way I see it.
13      And -- And so, you know, I think it's fair
14  game -- it's fair game that if you wrote the rules, you
15  know, you ought to be in a best position to follow them.
16  These are rules that were written and passed by the
17  majority.  And so, you know, the reason why people
18  operate under the rules -- I mean, the five-day postings
19  are insignificant, you know.  I think, you know,
20  rewriting an entire calendar rule in hindsight because
21  of a result that prevented a voter ID bill from passing
22  in 2009, I think that's questionable.  That's a
23  questionable procedural day of departure, I think.
24      Q.  Are you referring there to the House resolution
25  that we talked about earlier?



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

165

1    A. Yeah, of course.
2    Q. The one that passed 143 to zero?
3    A. Absolutely. I'm very -- I'm intrigued to go
4    play back the videotape to hear the author of the bill
5    say we're going to add a new Section 6 so that we could
6    prevent people from killing the Voter ID Bill. I think
7    you would have had a different debate. I don't think --
8    You know, these are rules that we all have to read, and
9    we are all accountable to and we're responsible for our
10   own votes, but, you know, if you -- if you -- if you
11   wanted to take a detailed look at, you know, problems
12   and solutions and the evolution of voter ID passages,
13   you would see that. There have been accommodations made
14   to facilitate passage based on whatever barrier you ran
15   into in the prior session. There's at least a couple of
16   examples in that regard.
17   Q. You mentioned earlier your view that the rules
18   are designed to protect the minority. In your -- I
19   guess it's 10 years now in the House?
20   A. 12.
21   Q. 12 years now in the House, how many of those
22   years were you in the majority and how many of those
23   years have you been in the minority?
24   A. I've been in the majority two years and the
25   minority ten.

---

166

1    Q. Implementation of Senate Bill 14 has been
2    delayed for about a year now. Can MALC quantify the
3    burdens, financial and otherwise, that this process has
4    placed on the State and the people of Texas?
5    A. Can we quantify in terms of telling you how
6    much it cost?
7    Q. Or the financial burden over the last year of
8    preclearance and the other burdens.
9    A. Sure. You know, I -- I think it's -- I think
10   that's a fair question. I think it's also equally fair
11   to sort of measure the fact that it does take two to
12   Tango. You know, one defendant or defendant-intervenor
13   can control the -- the -- you know, the legal docket
14   system. You know, from what I remember and what I
15   experienced in redistricting, I think the judges on the
16   panel have something to say about how fast or slow we
17   go, and I've been paying attention to the exchange of
18   information in discovery, and, you know, I can tell you
19   in redistricting, you know, that the state went so far
20   as to blame the litigants for slowing things down.
21   I mean, if things were perfect, there
22   wouldn't be any litigation. So I think that if -- if
23   the State wanted to facilitate a more efficient means of
24   administering changes to voting patterns and procedures,
25   that they would probably engage in a more robust and

---

167

1    earnest discussion about coming up with practical
2    policies that are appealing to people of all stripes,
3    not just political stripes, but of people of different
4    races and ethnicities.
5    I have had my share of conversations with
6    people that have waived and have not waived that have
7    talked about the fact that, you know, having a primary
8    in May is not as much fun as it is having one in March,
9    and if we only worked a little harder to get a better
10   redistricting map, perhaps we could have a March
11   primary. I think there's people in runoffs that are
12   having regrets right now. Of course, things could be
13   faster. It could be easier, but, certainly, it's not
14   because groups like MALC are holding up the train. I
15   think it -- I think that we both acknowledge that
16   there's a shared responsibility of being where we are
17   today.
18   Q. You mentioned something about passing policies
19   that are popular --
20   A. Yeah.
21   Q. -- among many stripes. The polls that we
22   looked at from Dr. Shaw's report would suggest --
23   A. It would tell half the story.
24   Q. That Voter ID bills are popular, correct?
25   A. It would say half the story, correct, and I'm

---

168

1    curious to see responses to Dr. Shaw's questions about
2    same day voter registration or being able to vote by
3    internet, being able to, you know, register to vote as
4    you get your driver's license, being able to register to
5    vote as you pay your property taxes. I'd like to see
6    the responses to questions about making voting easier.
7    As I think that -- You know, just because
8    Dr. Shaw's been so gracious to give us just a few sets
9    of questions doesn't mean that's the only thing Texans
10   are thinking about. Let's find out what they really
11   think about voting, and let's find out ways to
12   accommodate that. I can tell you the area I represent,
13   they'd like to see a much longer voting period. They'd
14   like to see election days on weekends, be able to go to
15   church and go cast their ballot when they walk out,
16   being able to walk out of a college classroom and go to
17   the dining hall and cast a ballot. I think it would be
18   great if we make those accommodations to make voting
19   more accessible. I agree with you.
20   Q. Do you agree that as a covered jurisdiction,
21   Texas is at a tremendous disadvantage when it attempts
22   to enact laws that change voting procedures?
23   A. I would be the first person to tell you that I
24   wish Texas wasn't a covered jurisdiction. Again,
25   there's a part of our State's past that nobody's proud

---



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

### 169

1   of, and this is a result of trying to rectify in writing
2   a bunch of wrongs.
3           And so to the extent that it places a
4   additional strain on the State of Texas to -- to
5   demonstrate that they are working with clean hands and
6   in good faith, I think that's a distinction Texas earned
7   all by itself as a result of its history.
8       Q.  But would you disagree with the quote that
9   we're still at a disadvantage as opposed to non-covered
10  jurisdictions?
11      A.  As a minority, I don't see that.
12      Q.  You don't see that as a disadvantage is what
13  you are saying?
14      A.  As a minority, no.
15      Q.  We discussed a minute ago, May was when Texas
16  conducted the 2012 primaries for Republicans and
17  Democrats?
18      A.  Right.
19      Q.  Once again, that was about a year after Senate
20  Bill 14 passed and signed, and the photo ID requirement
21  was not used in May, correct?
22      A.  That's correct.
23      Q.  Does MALC acknowledge that this constitutes an
24  irreparable injury to the State of Texas?
25      A.  I think that it's a speculative injury if Texas

### 170

1   were to prevail.
2       Q.  And if Texas does prevail and this law's
3   precleared, would MALC acknowledge that -- what remedy
4   will Texas get for not being able to use it in the May
5   primary?
6       A.  They will get the assurance that their public
7   policy choices don't have the purpose -- discriminatory
8   purpose or effect that some people thought.
9       Q.  But there's nothing to make them whole, is
10  there?
11      A.  Well, it's to -- it's to let Texans know that
12  we've come a long ways since the days of Jim Crow, I
13  think, and that's something that we need to acknowledge
14  if you are right.
15      Q.  And Texas would be irreparably injured a second
16  time in late July when we hold our primary runoffs
17  without Senate Bill 14 in place, correct?
18      A.  I'll think that's speculative again.  I think
19  the only way that can be true is if Texas were to
20  prevail, and since the trial hasn't happened, it's hard
21  for me to give you an opinion.
22      Q.  Are there large numbers of noncitizens on
23  Texas's voter rolls?
24      A.  I don't know that.
25      Q.  Should Texas use its resources to attempt to

### 171

1   remove noncitizens from Texas's voter rolls?
2       A.  I think Texans have a legitimate interest in
3   making sure that their election registration rolls are
4   as accurate as they can be.
5       Q.  Would MALC have supported Senate Bill 14 if it
6   had allowed for non-photo IDs to be used?
7       A.  I think that there was a package of ideas that
8   would have made Senate Bill 14 more of a compromise
9   position that I don't think -- You know, MALC doesn't go
10  into a room and do a straw poll and say we're going to
11  come out and support this.  You know, MALC tries to
12  provide its members and equip them with the best
13  information and the best practice out there.  The
14  individual members go out and represent their districts.
15          And so I think that you could have found
16  several accommodations and still find people who would
17  vote against photo identification.  I think there were
18  those that were working in true belief that they could
19  come up with a measure that would have been acceptable,
20  albeit not ideal, but acceptable, and I think that, you
21  know, a dialogue of looking at certain forms of ID
22  that -- you know, that don't require a photo or not
23  require a photo and not limited to a driver's license
24  may have been appealing.
25      Q.  This morning, if I recall, you said that MALC

### 172

1   opposed Senate Bill 362, is that correct, in 2009?
2       A.  I believe it did, yes.
3       Q.  And didn't that allow for some of the sorts of
4   non-photo IDs?
5       A.  I'd have to look at it.  While you are looking
6   for it, I can tell you that one of the -- one of the
7   bigger discussion points that Representative Anchia was
8   leading was the ability to have the same day voter
9   registration, and -- and I know that members of MALC
10  were in support of that, and I don't think that that was
11  given a -- given any real consideration.
12          (Exhibit 11 marked.)
13      Q.  Please take a few minutes to review this
14  exhibit.  For your information, it's Section 6 and
15  Section 10, the two that I want to discuss.
16      A.  Okay.
17      Q.  Section 6 on Page 3?
18      A.  Yes.
19      Q.  Part B, "On offering to vote, the voter must
20  present to an election officer at the polling place
21  either, one, one form of identification listed in
22  Section 63.0101(a), or, two, two different forms of
23  identification listed in Section 63.0101(b)."
24          If you turn to Section 10 on Page 5,
25  that's where they have amended Section 63.0101.  Section



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

173

1    (a) is a photo identification.  Driver's license or
2    personal identification card, US military identification
3    card, US citizenship certificate, US passport, a license
4    to carry a concealed handgun issued to the person by the
5    Department of Public Safety.
6         Would MALC agree that those are photo IDs
7    that list -- it's quite similar to the one in Senate
8    Bill 14?
9    A.  Correct.
10   Q.  And one of those from that list would entitle
11   one to vote had this bill passed.
12   A.  I see that.
13   Q.  Reading starting on Line 22, Part (b) of the
14   bill.
15   A.  You are still on Page?
16   Q.  Still on Page 6, Line 22.  "The following
17   identification is acceptable as proof of identification
18   under this chapter."  And then we have things like the
19   voter's voter registration certificate or a copy of a
20   currently utility bill, bank statement, government
21   check, paycheck, other government document shows the
22   name and address of the voter, official mail address of
23   the person by name from a governmental entity, certified
24   copy of a birth certificate, original or certified copy
25   of a person's marriage license or divorce decree.

---

174

1    Further on down, a library card, a pilot's license.
2         Would MALC agree that this is a pretty
3    substantial list of non-photo identifications?
4    A.  Much different than Senate Bill 14, yes.
5    Q.  And any two of those would have entitled one to
6    vote had this bill passed?
7    A.  Correct.
8    Q.  And yet MALC still opposed Senate Bill 362.
9    A.  I think that --
10   Q.  Do you recall why that was?
11   A.  Well, I mean, I think it's -- let's put this in
12   proper context.  The fact of the matter is Senate Bill
13   362 never came up for a vote on the floor of the House,
14   and I think you and I have had the very engaging
15   conversation about, you know, policy choices as
16   reflected by statements of voters in journals.  I mean,
17   we don't have one for Senate Bill 362.  I think that
18   until a bill is passed to engrossment and passed on
19   final passage, if they're reading -- everything's being
20   negotiated.
21        And I can tell you that in 2009, some of
22   the areas that were very important to our subject matter
23   experts on voter identification had to deal with same
24   day voter registration, stiffened penalties for those
25   are accused of voter impersonation, making them felonies

---

175

1    and finding ways to make voting more accessible, and so,
2    you know, there is the -- there are some of those people
3    who harbor the view that you can't -- that you have to
4    be opposed to legislation because once you lose it in
5    conference, once it's rewritten in conference, once it's
6    finally negotiated -- You know, very much like the
7    budget.  We take a budget vote and then we take a
8    conference committee report on the budget that's much
9    different than the budget we voted on.
10        There are people who think, well, I don't
11   trust the leadership to hold true to these provisions,
12   so I'm going to negotiate myself -- on the conference
13   committee, I'm going to negotiate myself a commitment
14   from the chairman to do different things.  So suffice it
15   to say Senate Bill 362 never made it to a second reading
16   debate, you know, never made it to the floor.  I want to
17   make sure I'm right here.
18        So if it never was eligible for
19   consideration because of the local calendar being in
20   front of, you know -- and some of these decisions were
21   never final, while I may have personally opposed it,
22   MALC may have opposed the notion of disenfranchising
23   voters, I would be -- I'd be -- I'd be devastated if
24   there weren't conversations and communications taking
25   place to try to find a reasonable middle ground or

---

176

1    alternative to find sensible legislation that would have
2    been palatable to many people.  So that's my
3    recollection, but forgive me.  Lots of bills, lots of
4    sessions.  They all sort of run together sometimes.
5    Q.  Are there any circumstances -- Because I guess
6    Senate Bill 362 wouldn't even really truly have been a
7    photo ID requirement with the long list of non-photo
8    IDs.
9    A.  Sure.
10   Q.  Are there any section you could imagine in
11   which a photo ID was required that the MALC could
12   support that bill?
13   A.  You know, I know that the MALC would have been
14   in support of MALC member amendments to do certain
15   things.  We've talked about exclusions for senior
16   citizens.  We've talked about opening the list of photo
17   identifications.  You know, I think the fact of the
18   matter is if we look at the evolution in voter
19   identification legislation, when you compare the 2011
20   version or the 2009 version, you know, you don't need to
21   take a lot of time to -- to decide that the 2009 version
22   seems to be a little more accommodating, and for some
23   reason, you know, that bill did not pass.
24        And so, logically, you would think that
25   folks who want to work into a direction to make the bill

---



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

177

1    even more accommodating, if they had that desire to keep
2    it the same, if they didn't want to negotiate any
3    further, but what happened is the bill actually became
4    more restrictive in 2011 and, you know, nothing occurred
5    between the interim of 2009 and the session of 2011 that
6    demonstrated that we need to tighten our grip on voter
7    identification.
8         So, I mean -- So I think that, you know,
9    it's not fair to characterize that no matter the
10   circumstances MALC would never embrace a photo
11   identification requirement. I think that's not true. I
12   think people file amendments because they want to make
13   legislation better and then they will look at the end
14   game. They will look to see what the final bill looks
15   like, what are the commitments and assurances that this
16   bill is not going to be yanked from under our feet while
17   it's in conference and commitments from the authors to
18   say if this bill comes back without this proviso, you
19   will -- you will jump on the grenade and you will not
20   let this bill pass. Those things happen all the time in
21   the legislative baseball.
22        This is one of the few bodies that still
23   believes in looking someone in the eye, shaking a hand
24   and having a deal, and while we fight like cats and
25   dogs, like Republicans and Democrats, Republicans and

---

178

1    Democrats can look each other in the eye, shake their
2    hand and make a deal, and so I don't want to minimize,
3    you know, that environment. That certainly exists.
4    But, you know, people will negotiate a bill. It finally
5    leaves the chamber of the House and Senate Bill 362 just
6    did not have that opportunity.
7         Q.  I didn't want to interrupt you, but you
8    mentioned that nothing happened between the '09 and the
9    2011 sessions. There was an election in 2010, correct?
10        A.  Certainly.
11        Q.  Do you know what that turnover partisan-wise,
12   Republican and Democrat, was between the '09 session and
13   the Texas House and the 2011 session in the House?
14        A.  I think Republicans won, if that's what you are
15   asking.
16        Q.  Do you know how many seats they gained?
17        A.  20 something.
18        Q.  But is protecting the integrity of the ballot
19   box partisan or is it civic?
20        A.  Again, I think that there was a Republican
21   majority. You don't need a hundred. You just need 176,
22   and so, you know -- and with the change in political
23   landscape, you could have passed the same bill,
24   suspended every rule in the book, and, you know, that
25   didn't occur, I mean.

---

179

1         So I'm not persuaded that because there
2    was a landslide election, that voter ID, you know,
3    became tougher. Voter ID was proposed because there was
4    a problem that needed a cure, and -- and if the voter
5    identification problem worsened in the election of 2010,
6    then maybe there were some Republicans that might be
7    wanting to recount their elections, I mean, because if
8    there's fraud, you know, it happened in the Republican
9    landslide, I don't -- I don't -- I don't buy the notion
10   that because it became more partisan and more Republican
11   that these bills have to get tougher and not be as
12   accommodating or work towards that end.
13        Q.  But aren't there some things in the House that
14   require two-thirds vote?
15        A.  It's just suspending the Constitution.
16        Q.  What about suspending the rules?
17        A.  Majority vote.
18        Q.  With that large turnover, you said might be
19   about 20 seats?
20        A.  I think it went from 76 to 101, I think, or
21   something like that.
22        Q.  But isn't the -- There are certain things in
23   which the threshold between 99 and 101 members matters,
24   correct?
25        A.  In suspending rules, I mean, or having bills

---

180

1    take immediate effect requires a two-thirds vote. If
2    you want to suspend the rules, you need a majority vote.
3    You want to suspend the Constitution, you need a
4    four-fifths vote. So when you want to tinker with the
5    Constitution, 30 people control the legislature, but
6    everything else requires a majority vote or two-thirds.
7         Q.  In the House two-thirds would be at 101,
8    correct?
9         A.  It's two-thirds of present and voting, and so
10   assume you have perfect attendance, yes, that's the
11   number.
12        Q.  Is the number 100 or is it 101?
13        A.  I thought it was 101. It all runs together. I
14   apologize.
15        Q.  Sir, I definitely want to thank you for your
16   time. We've had a long day. I appreciate your patience
17   and your cooperation, and we are almost finished.
18        A.  Well, thank you -- if we're thanking each
19   other, thank you. I mean, the material is dense. It's
20   hard to absorb sometimes. So I gave you the impression
21   that I wasn't being responsive or, you know, giving long
22   answers. It's only because this is just a lot of
23   information, so thank you for your accommodation.
24        Q.  Certainly. You've talked throughout the day,
25   and I want to make sure I get the way you characterize

---



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

---

181

1  it -- characterize it accurately.  You were talking
2  about the purpose of the bill.  I believe you said that
3  the rationale remains in your words elusive.  You said
4  that you don't believe there is a lot of in-person voter
5  fraud going on.
6          Are those fair characterizations, A, of
7  what you've said, but, B, of your position?
8      A.  I think the transcript will reflect what I've
9  said, so if I differ with what's in the transcript, I
10  rely on the transcript.  That said, I think in its
11  proper context that the notion of a high level of voter
12  impersonation activity taking place is only reflected in
13  the fact that there are virtually no prosecutions for
14  that other than one that's been referred to the Attorney
15  General's Office.
16     Q.  Does the low number of prosecutions necessarily
17  mean that there's a low amount of voter fraud or could
18  it also just mean that there's a low amount of voter
19  fraud that's been detected to date?
20     A.  I think that when you compare that data point,
21  one actual indicted case of voter fraud, and you say I
22  have time to work on that or I have time to fix a budget
23  that needs $27 billion, I think I know what's more
24  important to the voters I represent.
25          And -- And if it's -- You know, those

---

182

1  kinds of choices, I think, it's easy.  If it's -- You
2  know, I'm -- I'm bound and determined to pass something
3  that I haven't been able to pass since 2005 and, you
4  know, then I think that's -- I think budget and other
5  important issues aren't really as significant as passing
6  something that you've thought you should have been able
7  to do six years ago.
8      Q.  How much fraud should Texas be required to
9  discover before the legislature is permitted to enact a
10  photo ID requirement that is designed to prevent fraud?
11         MR. GARZA:  Objection.  Argumentative,
12  assumes conclusions that the witness has not testified
13  to.
14     A.  I think that -- I think that when we have
15  140 days to conduct the people's business and our only
16  constitution requirement is to pass the budget, doing
17  things, setting emergency calendar items, that -- that
18  we did in 2011, nothing was more emergent than closing a
19  $27 billion budget shortfall, and so for everyday that
20  we spent working on these types of issues, you know,
21  sometimes when you have a hunch that something's going
22  on and you want to make sure you perfect the
23  legislation, we pass a lot of studies.
24         We empower our Department of Public Safety
25  to conduct investigations.  We have Texas Rangers.  We

---

183

1  have prosecutors, assistants at the Attorney General's
2  Office that's bill funded.  We have lots of good lawyers
3  out there.  If we needed to really work on our voter
4  fraud to make this a real priority, we could have done
5  the work.  Instead, we passed the bill because someone
6  says, well, you don't know how bad it is if you are not
7  there.
8          I can say that about a lot of things.  I
9  could say that about the people sitting in traffic right
10  behind you.  I can say that about the people who showed
11  up to the health clinic today and found out that they
12  are no longer eligible to receive services.
13         At some point we have to prioritize.  I
14  think the data points on some of these other more
15  important issues are very real and undisputed.  We're
16  enacting voter identification, photo identification
17  because we have the ability to do so, but it doesn't
18  necessarily mean that it rises to the level of import at
19  the exclusion of our priorities, and so I think that we
20  could have done this another way.
21         And I think the State of Texas is well
22  equipped to, you know, find a legitimate means to come
23  up with a very laser like solution to a very specific
24  problem, and, instead, you know, we took a mallet
25  instead of a scalpel and 600 to 700,000 minorities have

---

184

1  voter registration that doesn't have a driver's license.
2  That's a big concern for me.
3      Q.  But does MALC believe that Texas must tolerate
4  some voter fraud before it could enact a photo ID law?
5      A.  I think that when Texas decides to address the
6  real or perceived allegations of voter fraud, we need to
7  get it right is what I think.  If it means we have to
8  tolerate fraud or if it means we have to put it off a
9  session, if it means we have to study it, if it means we
10  have to put some money into discovering what the real
11  problem is, then we should do it because I think that if
12  someone telling me, well, how many -- you know, how many
13  guilty people on death row are we are going to have to
14  spare their lives so that we can save one who's
15  wrongfully accused?  I don't know if we can make that
16  judgment.  And so I want to be careful when we're
17  trampling on people's constitutional rights, and I want
18  to get it right.  I don't want to pass a bill on a
19  hunch.
20     Q.  So if Texas has to tolerate some fraud before
21  it can enact a photo ID, is that suggesting or isn't
22  that suggesting that Texas can't attempt to prevent
23  voter fraud, rather, it may only attempt to cure it
24  after it becomes a big enough problem?
25         MR. GARZA:  Objection.  Argumentative,

---



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 185

1  mischaracterizes the witness's testimony.  You can
2  answer.
3          THE WITNESS:  Could you repeat the
4  question, please?
5          (Requested portion was read.)
6      A.  And I think that the only objective evidence to
7  even suggest that there is a voter fraud problem is one
8  indictment out of 13 million votes cast in the 2008 and
9  2010 elections.  I think if somebody came to me and said
10 we needed to pass this because the sky is falling at the
11 ballot box, I think I'd want to know a little bit more,
12 and I wouldn't want to give a knee jerk reaction because
13 one person's been indicted without checking firsthand
14 about the elections officials in every county in the
15 state, without dispatching the resources of the Attorney
16 General's Office to go out into the field and
17 investigate, without dispatching the resources that are
18 strategically placed by the Department of Public Safety
19 to have them monitor these polls, to have our committees
20 and agencies write reports and do legislative findings,
21 conduct hearings and let's take evidence.
22          We do those things all the time to solve
23 Texas's problems.  Voter ID is no different.  Why we
24 have to exercise shortcuts and why we have to do things
25 by augmenting rules and processes knowing that we're

## 186

1  exposing three-quarters of a million Texans?  There's a
2  better way and that's simply what MALC is suggesting and
3  that's why MALC is in the lawsuit.
4      MR. ASTON:  That's all I have.
5      MR. GARZA:  I just have a couple -- just a
6  few questions, Mr. Chairman.
7          EXAMINATION
8  BY MR. GARZA:
9      Q.  We've talked in a speculative way about lots of
10 topics.  Would you agree that voting in one party's
11 primary and voting in the other party's runoff is voter
12 fraud?
13     A.  Sure.
14     Q.  That's illegal in Texas?
15     A.  It is.
16     Q.  Do you know whether that's ever happened?
17     A.  I'm sure it has.  I don't -- I don't --
18     Q.  Would that be something that you could detect
19 without requiring photo ID?
20     A.  Of course.
21     Q.  You could simply look at the records?
22     A.  Absolutely.
23     Q.  Do you know if the Attorney General's Office
24 ever has done -- has ever done an analysis of a
25 crosscheck of people who voted in one primary and

## 187

1  another party's runoff?
2      A.  I don't know that.
3      Q.  Have you ever heard of -- of a race in Houston,
4  Texas for Congress between Gene Green and Ben Reyes?
5  Are you familiar with that?
6      A.  I know both of the individuals.  I know at one
7  point in time they ran against each other.
8      Q.  And you are not aware of whether that
9  circumstance actually occurred in Harris County?
10     A.  That -- That's a little bit before my time.  I
11 know there's -- my Houston colleagues talk about the
12 intensity of Harris County elections.
13     Q.  You are not aware that over 100 people voted in
14 the Republican primary and then the Democratic runoff?
15     A.  Something to that degree.  With precision, I
16 don't know.
17     Q.  And you are not aware that none of those people
18 were prosecuted.
19     A.  Right.  I'm not aware of that.
20     Q.  Okay.  You were asked if it wouldn't be harder
21 to commit voter fraud if you have a photo ID
22 requirement.  If you have a fake photo ID, would having
23 a photo ID requirement prevent that person from voting?
24     A.  Not if it was -- Not if it was a good ID.
25     Q.  Well, do Texas election officials have any

## 188

1  material in order to examine a fake registration,
2  driver's license, the scanner that they use, for
3  instance, at the airport, the black light that they use
4  at the airport?  Are resources allocated to election
5  officials to purchase those kinds of equipment?
6      A.  There's nothing in 14 that deals with that, and
7  I know that, you know, fiscal note having to be as near
8  zero as possible, I mean that would certainly have cost
9  somebody some money.  That would have been a cost of the
10 bill.
11     Q.  If voter fraud is being committed by a corrupt
12 election official, does it matter if the State of Texas
13 has a photo ID requirement for voters?
14     A.  No.
15     Q.  It's the election official that determines who
16 can vote and who can't vote in Texas.
17     A.  That's correct.  Ultimately, yes.
18     Q.  And just one final question, Mr. Chairman.  You
19 were asked about in the context of how the rules were
20 changed to facilitate photo ID to become law, and there
21 was -- it wasn't asked of you directly, but there was an
22 insinuation that two-thirds rule -- elimination of the
23 two-thirds rule was of no consequence because
24 legislation could be passed in the Senate even under
25 two-thirds rule.  Amended in the House -- And the



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

## 189

1     assumption was is that it could be amended in the House
2 to include a photo ID voting requirement and then sent
3 back to the Senate in a simple majority could pass this
4 legislation.  What do you think the likelihood of
5 something like that occurring within the rules that are
6 available in the House of Representatives?
7     A.  Well, I mean, I think if someone asked me the
8 question is it possible that that could happen, of
9 course it's possible.  I mean, is it likely?  No.  I
10 mean, it's -- it's less likely for a number of reasons.
11 The House and the Senate always have this ongoing
12 dispute about the interpretation of rules such as the
13 germaneness and two-subject rules and various strict
14 interpretations of captions of bills, and so the House
15 has a very narrow view of germaneness, and so I think
16 that if -- if you had a -- if you had a bill that was
17 voter specific and you were to pass it out of the Senate
18 and make it to the House floor, you could amend it with
19 voter ID, I think that -- I think even if it was
20 possible, I think a series of points of order would have
21 been lodged to dissect every section of that bill.
22     Yeah, I mean, I don't want to be pollyanna
23 about it, but, I mean, we amend all the time.  I mean, I
24 can take a one-page bill and two-page bill and put it on
25 a bill, but when you start amending 10 page, 15 pages of

## 190

1     legislation, even no matter who's sponsoring the
2 legislation, people put the brakes on it because they
3 want to know what they are about to pass and things slow
4 down right away, and so, I mean, sure, all these things
5 could have happened and a super majority could have said
6 we don't care, we're doing it anyway, and provided they
7 can get around the rules, then maybe they can, but it
8 wouldn't be easy.  I think that the odds are that it
9 would have lesser chance of making it back over.
10     MR. GARZA:  Pass the witness.
11     MS. McLEOD:  I don't have any questions,
12 but the department wants to join in the objection made
13 by MALC's counsel, Mr. Garza, regarding the limitation
14 and scope of the chairman's testimony as it relates to
15 what I believe was previously marked as Exhibit 1, but
16 it's the list of legislators that waived legislative
17 privilege, and add for the record, that the court
18 ordered Texas to indicate which legislators were
19 asserting legislative privilege or that privilege would
20 be waived.  Today, Texas has failed to provide that list
21 of legislators in violation of the court's order.
22     Therefore, it is the position of the
23 defendant, Attorney General Eric Holder, that any
24 limitation to the chairman's testimony today relating to
25 conversations with fellow legislators that have not

## 191

1     affirmatively invoked legislative privilege is improper.
2 That's all I have.
3     (Deposition concluded at 3:42 p.m.)

## 192

1
2           CHANGES AND SIGNATURE
   RE:  STATE OF TEXAS VS. TEXAS STATE CONFERENCE OF NAACP
   BRANCHES, et al
3
   PAGE  LINE   CHANGE        REASON
4 _____
5 _____
6 _____
7 _____
8 _____
9 _____
10 _____
11
12    I, TREY MARTINEZ FISCHER, have read the foregoing
   deposition and hereby affix my signature that same is
13    true and correct, except as noted above.
14
15        TREY MARTINEZ FISCHER, Witness
16    THE STATE OF _____)
   COUNTY OF _____)
17
   Before me, _____ on this day
18    personally appeared TREY MARTINEZ FISCHER, known to me
   (or proved to me under oath or through _____)
19    (description of identity card or other document) to be
   the person whose name is subscribed to the foregoing
20    instrument and acknowledged to me that they executed the
   same for the purposes and consideration therein
21    expressed.
22    Given under my hand and seal of office this _____
   day of _____, _____.
23
24
       Notary Public in and for the State
25    of _____



Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

193

```
 1        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF COLUMBIA
 2
   STATE OF TEXAS,          )
 3                         )
        Plaintiff,         )
 4                         )  CASE NO. 1:12-CV-00128
   VS.                     )
 5                         )  (RMC-DST-RLW)
   ERIC H. HOLDER, JR., in his )  Three-Judge Court
 6 official capacity as Attorney)
   General of the United States,)
 7                         )
        Defendant.         )
 8                         )
   ERIC KENNIE, et al.,    )
 9                         )
        Defendant-Intervenors, )
10                         )
   TEXAS STATE CONFERENCE OF   )
11 NAACP BRANCHES, et al.,   )
                           )
12      Defendant-Intervenors, )
                           )
13 TEXAS LEAGUE OF YOUNG VOTERS )
   EDUCATION FUND, et al.,   )
14                         )
        Defendant-Intervenors, )
15                         )
   TEXAS LEGISLATIVE BLACK   )
16 CAUCUS, et al.,          )
                           )
17      Defendant-Intervenors, )
                           )
18 VICTORIA RODRIGUEZ, et al.,  )
                           )
19      Defendant-Intervenors.  )
20        REPORTER'S CERTIFICATE
21    ORAL DEPOSITION OF TREY MARTINEZ FISCHER
22        JUNE 15, 2012
23    I, JEAN THOMAS FRAUNHOFER, the undersigned Certified
24 Shorthand Reporter in and for the State of Texas,
25 certify that the facts stated in the foregoing pages are
```

194

```
 1 true and correct.
 2    I further certify that I am neither attorney or
 3 counsel for, related to, nor employed by any parties to
 4 the action in which this testimony is taken and,
 5 further, that I am not a relative or employee of any
 6 counsel employed by the parties hereto or financially
 7 interested in the action.
 8    SUBSCRIBED AND SWORN TO under my hand and seal of
 9 office on this the 19th day of June, 2012.
10
11
12
```



```
      JEAN THOMAS FRAUNHOFER
13    Texas CSR 7990
      Expiration Date:  12/31/12
14    ESQUIRE DEPOSITION SERVICES
      Firm Registration No. 77
15    9901 IH-10 West, Suite 800
      San Antonio, Texas  78230
16    Tel:  (210) 331-2280
17
18
19
20
21
22
23
24
25
```

Toll Free: 800.211.DEPO
Facsimile: 210.558.3670

Suite 800
9901 IH-10 West
San Antonio, TX 78230
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS