

**1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

STATE OF TEXAS,                    )
          Plaintiff,               )
                                   )
VS.                                )
                                   )
ERIC H. HOLDER, JR. in his         )
official capacity as Attorney      )
General of the United States,      )
                                   )
          Defendant,               )
                                   )
ERIC KENNIE, et al,                )
                                   )
    Defendant-Intervenors,         )
                                   )
TEXAS STATE CONFERENCE OF          )   CASE NO. 1:12-CV-00128
NAACP BRANCHES,                    )   (RMC-DST-RLW)
                                   )   Three-Judge Court
    Defendant-Intervenors,         )
                                   )
TEXAS LEAGUE OF YOUNG VOTERS       )
EDUCATION FUND, et al,             )
                                   )
    Defendant-Intervenors,         )
                                   )
TEXAS LEGISLATIVE BLACK            )
CAUCUS, et al,                     )
                                   )
    Defendant-Intervenors,         )
                                   )
VICTORIA RODRIGUEZ, et al.,        )
                                   )
    Defendant-Intervenors.         )

*************************************************
ORAL DEPOSITION OF
JANICE McCOY
MAY 16, 2012
*************************************************

**2**

1     ORAL DEPOSITION OF JANICE McCOY, produced as a
2  witness at the instance of the Defendant, was duly
3  sworn, was taken in the above-styled and numbered cause
4  on the MAY 16, 2012, from 9:39 a.m. to 6:24 p.m., before
5  Chris Carpenter, CSR, in and for the State of Texas,
6  reported by machine shorthand, at the offices of The
7  United States Attorney's Office, 816 Congress Avenue,
8  Suite 1000, Austin, Texas 78701, pursuant to the Federal
9  Rules of Civil Procedure and the provisions stated on
10  the record or attached hereto.

**3**

3            A P P E A R A N C E S
4  FOR THE PLAINTIFF, STATE OF TEXAS:
5      Matthew Frederick
       Patrick K. Sweeten
6      OFFICE OF THE ATTORNEY GENERAL OF TEXAS
       P.O. Box 12548
7      Austin, TX 78711-2548
8      209 West 14th Street
       8th Floor
9      Austin, TX 78701
       (512) 936-1307
10     matthew.frederick@texasattorneygeneral.gov
11
12  FOR THE DEFENDANT, HOLDER, ET AL:
13     Jennifer Maranzano
       Elizabeth S. Westfall
14     U.S. DEPARTMENT OF JUSTICE
       950 Pennsylvania Avenue, NW
15     NWB - Room 7202
       Washington, DC 20530
16     (202) 305-7766
       jennifer.maranzano@usdoj.gov
17     elizabeth.westfall@usdoj.gov
18  FOR THE DEFENDANT-INTERVENOR TEXAS STATE CONFERENCE OF
    NAACP BRANCHES AND THE MEXICAN AMERICAN LEGISLATIVE
19  CAUCUS:
20     Ezra D. Rosenberg
       DECHERT, LLP
21     Suite 500
       902 Carnegie Center
22     Princeton, NJ  08540-6531
       (609) 955-3200
23     ezra.rosenberg@dechert.com
24
25

**4**

1  FOR THE KENNIE INTERVENORS:
2      Chad W. Dunn
       BRAZIL & DUNN, LLP
3      4201 Cypress Creek Parkway
       Suite 530
4      Houston, TX  77068
       (281) 580-6310
5      chad@brazilanddunn.com



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 5

INDEX

Appearances.........................................3

JANICE McCOY
    Examination by Ms. Maranzano...............7
    Examination by Mr. Dunn..................227

Signature and Changes..........................286

Reporter's Certificate.........................288

EXHIBITS

NO. DESCRIPTION                          PAGE MARKED

28   HB No. 218, Filed 2007                      41

29   SB No. 362                                  79

30   Notice of Deposition                        14

31   Press Release From the Office of State      97
     Senator Troy Fraser

32   Senate Rules Adopted by the 81st           119
     Legislature, Jan. 14, 2009

33   Senate Journal, March 18, 2009             132

34   Transcript, March 10, 2009, Committee of   134
     the Whole Senate

36   SB No. 363                                 139

37   Declaration of Janice McCoy, March 30,     161
     2012

38   Senate Rules Adopted by 82nd Legislature  196

39   Transcript, Jan. 25, 2011, Committee of    204
     the Whole Senate

40   Transcript, Jan. 26, 2011, Committee of    206
     the Whole Senate

41   Transcript Excerpt: Senate Bill 14, Jan.   208
     26, 2011

## 6

42   Transcript Excerpt: Senate Bill 14, Jan.   213
     26, 2011, CD 1, Section II

## 7

1          JANICE McCOY,

2   having been first duly sworn to testify the truth, the

3   whole truth, and nothing but the truth, testified as

4   follows:

5                EXAMINATION

6   BY MS. MARANZANO:

7       Q.  Good morning.

8       A.  Good morning.

9       Q.  My name is Jennifer Maranzano.  I'm

10  representing the Defendant, Eric Holder, in this matter.

11      Can you please state your full name for

12  the record?

13      A.  Janice Steffes McCoy.

14          MS. MARANZANO:  And can we have everybody

15  go around and identify themselves, please?

16          MR. ROSENBERG:  Ezra Rosenberg from

17  Dechert LLP on behalf of the Texas State Conference of

18  NAACP Branches and MALC.

19          MR. DUNN:  Chad Dunn on behalf of the

20  Kennie Intervenors.

21          MR. ROSENBERG:  And let me see if we're

22  having a telephone guest today.

23          MR. FREDERICK:  Matthew Frederick for the

24  State of Texas.

25          MS. MARANZANO:  Let's just continue while

## 8

1   they are doing that.

2       Q.  (By Ms. Maranzano) Ms. McCoy, have you ever

3   been known by any other names?

4       A.  My maiden name is Janice Steffes.

5       Q.  Have you ever been deposed before?

6       A.  No.

7       Q.  Let me go over some ground rules with you.  You

8   have been placed under oath today, so it's important to

9   testify truthfully, accurately, and completely.

10          The court reporter is taking down a

11  transcript of everything that we say, and so it's

12  important to answer my questions verbally, not with

13  shaking your head or nodding.  It's important for you to

14  wait until I finish a question before you answer.  We

15  shouldn't talk over each other, and that way, the record

16  will be clear.  If you wish to stop and take a break at

17  any point, go ahead and let me know, and I will do my

18  best to accommodate you.

19          From time to time, your attorney may make

20  an objection to a question that I ask.  He is doing this

21  for the record, and unless he instructs you not to

22  answer, you can go ahead and answer my question.  If he

23  counsels you to answer only to the extent that

24  information is not privileged, I'd ask you to clarify

25  whether you're not answering based on that ground, so



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 9

1  that we have a clear record.
2        Do you have any questions based on these
3  instructions?
4     A.  I do not.
5     Q.  Are you on any medication today that would
6  affect your ability to testify?
7     A.  No.
8     Q.  Is there any other reason why you can't testify
9  truthfully, accurately, and completely today?
10    A.  No.
11    Q.  I may use some shorthand today.  If I say "the
12  Senator," I'm referring to Senator Fraser or anyone who
13  is acting on his behalf.  Do you understand that?
14    A.  Yes.
15    Q.  I may use the terms "voter ID" and "photo ID"
16  interchangeably during this deposition.  I'd like you to
17  interpret those words broadly to include any photo
18  identification -- I'm sorry -- any voter identification
19  requirement, whether it had a photo or not, that a voter
20  needs to present in order to vote in person.
21    A.  Okay.
22    Q.  If I use the term "minority voters," I'm
23  referring to voters who are not white, nonAnglo.
24    A.  Okay.
25    Q.  Do you understand all those terms?

### 10

1     A.  Yes.
2     Q.  If I ask any questions today that you do not
3  understand, please let me know.
4     A.  I will.
5     Q.  Are you represented by counsel today?
6     A.  I am.
7     Q.  And who is that?
8     A.  Matthew Frederick.
9     Q.  And when did that representation begin?
10    A.  I think when I started working for the
11  state.  I mean, in terms of this case?
12    Q.  In terms of -- you're being represented by
13  Mr. Frederick today in this deposition?
14    A.  Yes.
15    Q.  And when did that representation start, to the
16  best of your knowledge?
17    A.  When the case was brought before the court.
18    Q.  How did you come to be informed that you were
19  being represented by Mr. Frederick?
20    A.  The Attorney General's Office called me.
21    Q.  Have you ever been a party in litigation?
22    A.  No.
23    Q.  Have you ever been involved in a case in which
24  Texas was the -- was a party?
25    A.  No.

### 11

1     Q.  What did you do to prepare for today's
2  deposition?
3     A.  I reviewed the bill, and I looked at some
4  minutes of the Committee of the Whole and the Floor
5  debate.
6     Q.  And when you say "the bill," can you tell me
7  what bill you're referring to?
8     A.  The enrolled version of Senate Bill 14.
9     Q.  And minutes of the Committee of the Whole
10  debate was for Senate Bill 14?
11    A.  Senate Bill 14, yes, ma'am.
12    Q.  Okay.  Did you review anything else?
13    A.  No, ma'am.
14    Q.  Did you meet with your attorneys prior to this
15  deposition?
16    A.  Yes, ma'am.
17    Q.  And who did you meet with?
18    A.  I met with Matt Frederick and Stacey Napier.
19    Q.  And when was that?
20    A.  I met with Matt and Stacey three or four weeks
21  ago.  I don't know the exact date.  And I talked with
22  Matt on the phone last evening.
23    Q.  How long did you meet with Mr. Frederick and
24  Ms. Napier three to four weeks ago?
25    A.  Hour, hour and a half.

### 12

1     Q.  And was anybody else present?
2     A.  No, ma'am.
3     Q.  And how long did you talk to Mr. Frederick last
4  night?
5     A.  About an hour.
6     Q.  Did you bring any documents with you today?
7     A.  No, ma'am.
8     Q.  Other than your attorneys, did you speak to
9  anybody about today's deposition?
10    A.  I talked to Colby on Tuesday afternoon about
11  the length of his deposition.
12    Q.  Did you talk to -- and I'm sorry, you're
13  referring to Colby Beuck?
14    A.  Is that how you say his last name?  Yes.  From
15  Representative Harless's Office, yes.
16    Q.  Did you talk to about him anything else from
17  his deposition?
18    A.  No, ma'am.  Just the length.
19    Q.  Did you talk to Senator Fraser about your
20  deposition?
21        MR. FREDERICK:  Let me interject here and
22  say, as I think will not come as a surprise to anybody,
23  the State of Texas will be asserting legislative
24  privilege throughout the deposition.  I will be
25  instructing Ms. McCoy not to answer questions that seek



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 13

1   to discover thoughts or mental impressions of herself or
2   Senator Fraser about pending legislation, or
3   communications about pending legislation with
4   legislators, staffs, state agencies, the Texas
5   Legislative Council, and constituents.
6         So I will instruct you, I think you can
7   answer the question to the extent it asks for whether a
8   conversation occurred, who was party to the conversation
9   and how long it took, when it occurred, but I want to
10  instruct you not to reveal the substance of any
11  conversation that you had with the Senator.  But you may
12  answer her question.
13      A.  The Senator and I did speak about the
14  depositions.
15      Q.  (By Ms. Maranzano) And when was that?
16      A.  We have talked about the deposition when they
17  were trying to get scheduled, and we talked about
18  scheduling and the timing of those depositions.  And
19  then this week, we talked several times Tuesday.  Is
20  today Wednesday?  We talked several times on Tuesday
21  strictly about the length of the depositions that have
22  occurred so far this week, and about the fact that I'm
23  probably going to be out of the office all day today.
24      Q.  Anything else that you discussed with the
25  Senator?

## 14

1       A.  I would probably assert legislative privilege
2   at this point.
3       Q.  Was anybody else present during these
4   conversations?
5       A.  No.
6       Q.  Did these conversations take place in person?
7       A.  No.
8       Q.  On the phone?
9       A.  Yes.
10      Q.  Okay.
11      A.  I'm sorry.  Jennifer, we -- the Senator and I
12  also spoke this morning as I was coming over here, so
13  yesterday and this morning.
14      Q.  And did you speak on the phone this morning?
15      A.  Yes, ma'am.
16      Q.  For about how long?
17      A.  Five, ten minutes.
18      Q.  Was that also about the length of time of the
19  deposition?
20      A.  Yes.
21          (Exhibit 30 marked for identification.)
22      Q.  (By Ms. Maranzano) I'm showing you what we've
23  marked as Deposition Exhibit 30.  Can you take a look at
24  it and tell me if you recognize this document?
25      A.  I do.

## 15

1       Q.  And what is it?
2       A.  It's the Notice of Deposition for -- for me to
3   appear.
4       Q.  And can I direct your attention to the third
5   page of this document.  Do you see that there's a list
6   of documents there?
7       A.  Yes, ma'am.
8       Q.  Did you undertake a search for these documents?
9       A.  Yes, ma'am.
10      Q.  Can you describe that search to me?
11      A.  I searched -- well, it wasn't very hard,
12  because I had a box marked Voter ID, and everything that
13  I had ever produced was in that box.  And then I did the
14  -- I did a search of my e-mail, and I did a search of my
15  computer files, which also, I had specific files marked
16  as Voter ID in folders, and went through there.
17      Q.  The box that was marked Voter ID, did you
18  say --
19      A.  Uh-huh.
20      Q.  -- can you tell me:  When did you compile
21  documents and put them in that box?
22      A.  I started compiling the box in 2009, when we
23  were debating the legislation then.
24      Q.  Uh-huh.
25      A.  And just continued it through 2011.

## 16

1       Q.  And what documents would go in that box?
2       A.  Studies, polls, information from agencies,
3   constituent letters, documents related to the
4   legislative process.
5       Q.  Does that box contain all of your documents
6   about voter ID?
7       A.  That box contains all of my documents about
8   voter ID from 2009 forward.
9       Q.  Did you collect documents prior to 2009?
10      A.  In 2007, Senator Fraser was the Senate sponsor
11  of a House bill related to voter ID, and that particular
12  bill folder has been archived, and those documents were
13  provided to the Attorney General electronically, not in
14  written form.
15      Q.  And when you say that you -- well, let me ask
16  you this:  About how many documents are in that box?
17      A.  Hundreds.
18          (Mr. Patrick Sweeten joins the
19  deposition.)
20      Q.  (By Ms. Maranzano) And then you said you
21  searched your e-mail and computer files?
22      A.  Yes, ma'am.
23      Q.  How did you search your e-mail?
24      A.  The Legislative Council provided a list of
25  terms to search on, and so I searched on those terms.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 17

1    Q.   And how did you search your computer files?
2    A.   Again, all of my voter ID stuff was in the same
3    folders.  I created specific folders for voter ID.  And
4    so other than looking in, potentially, the media folder,
5    I just -- actually just went and grabbed those files and
6    provided them to the Attorney General.
7    Q.   So all the documents you found, you provided to
8    the Office of the Attorney General?
9    A.   Yes, ma'am.
10   Q.   Can I direct your attention particularly to
11   Number 5, Request Number 5?  Can you read that for me,
12   please.
13   A.   "All documents and communications, including
14   but not limited to those among and between staff,
15   members of the Texas Legislature, the Texas Legislative
16   Council, and other Texas State executive offices and
17   agencies relating to any calculations, reports, audits,
18   estimates, projections, assessments, or other analysis
19   of the effect that SB 14 will impose upon minority
20   voters."
21   Q.   Did you search for documents responsive to
22   Request Number 5?
23   A.   I searched for all documents related to voter
24   ID.
25   Q.   Did you have any documents responsive to

## 18

1    Request Number 5?
2    A.   No.
3    Q.   Can I direct your attention to Request
4    Number 8?  Did you search for documents responsive to
5    Request Number 8?
6    A.   Yes.
7    Q.   Did you find any responsive documents?
8    A.   Yes.
9    Q.   Can you tell me how many?
10   A.   No.
11   Q.   Because you don't know?
12   A.   Because I didn't count them.
13   Q.   Can you approximate how many?
14       MR. FREDERICK:  For the record, I'll
15   object to the extent it calls for speculation.  But if
16   you can approximate, you may answer the question.
17   A.   I mean, I'm just trying -- the guess that I
18   would make, if you're talking about things the Senator
19   said publicly that I actually wrote and did a public --
20   a press release on, was probably four or five a session
21   that we would write a public statement.
22   Q.   (By Ms. Maranzano) Okay.  And you mentioned the
23   Senator's involvement in the 2007 legislation.  Was he
24   also involved in the 2005 legislation?
25   A.   No, ma'am.

## 19

1    Q.   Can I direct your attention to -- let me ask
2    you this about Request Number 8:  Where were those
3    documents?
4    A.   The public statements that I wrote for the
5    Senator on voter ID were stored on my computer.
6    Q.   Now, when you say the public statements that
7    you wrote, are there public statements that you did not
8    write that the Senator made?
9    A.   Potentially, yes.
10   Q.   And is there a reason you didn't search for
11   those, too?
12       MR. FREDERICK:  Objection to the extent it
13   misstates the testimony.
14   Q.   (By Ms. Maranzano) Did you search for -- I
15   understood you to say that --
16   A.   I did not search newspaper articles for
17   comments that the Senator made.
18   Q.   And -- okay.  Just so I'm understanding you, do
19   you keep newspaper articles --
20   A.   No.
21   Q.   -- in which the Senator makes comments?
22   A.   No.
23       MR. FREDERICK:  Let her finish the
24   question.
25       THE WITNESS:  Oh, okay.

## 20

1    Q.   (By Ms. Maranzano) Can I direct your attention
2    to Request Number 11.  Can you take a look at that?  Did
3    you search for documents that were responsive to Request
4    Number 11?
5    A.   Yes.
6    Q.   Did you have any documents that were responsive
7    to Request Number 11?
8    A.   No.
9    Q.   Ms. McCoy, can you tell me a little bit about
10   your educational background?
11   A.   I graduated from a Texas public high school out
12   of Houston and went to Texas A&M University and got a
13   bachelor of science degree awarded in 1991 in political
14   science.
15   Q.   Any other schooling?
16   A.   No, ma'am.
17   Q.   What's your -- what's your job title?
18   A.   Chief of staff.
19   Q.   For?
20   A.   I'm sorry.
21   Q.   For who?
22   A.   Senator Troy Fraser.
23   Q.   What was your job prior to working for Senator
24   Fraser?
25   A.   I worked for the Republican Party of Texas.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 21 | 23 |
|---|---|

**Page 21**

1    Q.  How long did you work for the Republican Party
2  of Texas?
3    A.  Twelve and a half, 13 months.
4    Q.  And what was your title with them?
5    A.  Coalitions Director.
6    Q.  And when did you start working for them and
7  when did you complete your time there?
8    A.  I started working for the Republican Party in
9  August of 1997, and it ended in September of 1998.
10   Q.  When did you start working for Senator Fraser?
11   A.  September of 1998.
12   Q.  What does it mean to be a coalitions director?
13   A.  The chairwoman who hired me wanted to try and
14  be more inclusive and bring different types of
15  coalitions to the Republican Party.
16   Q.  What coalitions did she want to bring to the
17  Republican Party?
18   A.  We tried to create a Hispanic Business
19  Council.  Now you're testing my memory.  I don't know if
20  that's the exact title or not.  But there was a couple
21  -- there was another group, but I can't remember.  I'm
22  sorry.
23   Q.  There was another -- another group that you
24  formed with the Republican --
25   A.  Yes.

**Page 22**

1    Q.  The Republican Party of Texas?
2    A.  Yes.
3    Q.  How did you get your job with Senator Fraser?
4    A.  The current chief of staff and I had met, and
5  he interviewed me and offered me a position.
6    Q.  Did you start working for Senator Fraser as
7  chief of staff or as something else?
8    A.  Something else.
9    Q.  And what was that position?
10   A.  Legislative assistant.
11   Q.  And what did you do as a legislative assistant?
12   A.  I did policy work, reviewed bills, answered
13  constituent inquiries.
14   Q.  Any areas of legislative specialty as a
15  legislative assistant?
16   A.  No.
17   Q.  And just so I'm clear, I meant, did you have
18  any areas of --
19   A.  Right.  I -- I was assigned to the State
20  Affairs Committee.  Senator Fraser sat on that
21  committee, and I worked that committee.
22   Q.  And what --
23   A.  I think.  I'm sorry.  I don't remember.
24   Q.  Okay.  What issues does the State Affairs
25  Committee deal with?

**Page 23**

1    A.  In 1999, they did transportation.  They did
2  elections.  They did tort reform.
3    Q.  Anything else that you can remember?
4    A.  I can't remember.
5    Q.  Are those the same issues that they do now?
6    A.  They do -- State Affairs no longer does
7  transportation.
8    Q.  Okay.  How long were you a legislative
9  assistant for Senator Fraser?
10   A.  I think in 2000, I became legislative
11  director.  In or around the year 2000, I became
12  legislative director, and then I became chief of staff
13  in December of 2004.
14   Q.  What did you do as Senator Fraser's legislative
15  director?
16   A.  Similar things; legislative assistant, policy
17  work, constituent work, bill analysis.  But I also
18  directed the other legislative staff in their work.
19   Q.  Did you have the same legislative areas that
20  you worked on when you were the legislative director as
21  when you were a legislative assistant, or did you change
22  your area of focus?
23   A.  I think in the 2001 session, I worked on
24  business and commerce issues and in the 2003 session.
25  No, that's not right.  It all runs together.  I'm

**Page 24**

1  sorry.  It seems like it should have been yesterday, and
2  it wasn't.  At some point, State Affairs was my focus,
3  and at some point, State Affairs, workers' comp -- no
4  business and commerce became my focus, and I started
5  doing workers' comp issues.  And then in 2003, Senator
6  Fraser became Chair of Business and Commerce.  So in
7  2001, I did Business and Commerce.  2003, I think I went
8  back to State Affairs.
9    Q.  Can you describe for me all of your experience
10  that relates to election law?
11   A.  My experience related to election law is
12  related to when I staffed State Affairs and monitoring
13  and analyzing the legislation that impacted the election
14  code.
15   Q.  And you staffed State Affairs as a legislative
16  assistant, correct?
17   A.  Yes, ma'am.  And then again in 2003, as
18  legislative director.  In 2005 as well, I think.
19   Q.  And do you staff State Affairs as the chief of
20  staff?
21   A.  No, ma'am.
22   Q.  Do you have any experience related to election
23  administration?
24   A.  Yes, ma'am.
25   Q.  What's that experience?



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**25**

1     A.  In 1998, when I worked for the Republican Party
2 of Texas, I was also, in addition to being coalitions
3 director, they asked me to help their primary
4 administrator with some of her job.
5     Q.  And what was that job?
6     A.  To help coordinate the county chairs and get
7 them the information they needed to run their election,
8 the primary election, and then get that information back
9 so it could get certified by the chairman of the
10 Republican Party.
11     Q.  Have you ever worked at a polling place on
12 election day?
13     A.  Yes, ma'am.
14     Q.  In what capacity?
15     A.  Election judge.
16     Q.  And can you describe for me what an election
17 judge does?
18     A.  The election judge helps run the primary in
19 terms of getting the ballots in the ballot box to the
20 polling location, ensuring that the voters are voting in
21 the correct location and that they're eligible to vote
22 at that location, and then when the polls close, getting
23 the ballots back to the county.
24     Q.  Have you ever witnessed any problems at a
25 polling place while you were serving as election judge?

**26**

1     A.  No, ma'am.
2     MR. FREDERICK:  Objection, vague.
3     THE WITNESS:  Sorry?
4     MR. FREDERICK:  It's okay.  You can
5 answer.
6     A.  No.
7     Q.  (By Ms. Maranzano) Did you ever witness anyone
8 trying to impersonate another voter while you were
9 serving as election judge at a polling place?
10     A.  No.
11     Q.  Can you describe all of your current
12 responsibilities as chief of staff for Senator Fraser to
13 me, please.
14     A.  I'm responsible for managing the office in
15 terms of just Senate paperwork, time sheets, travel
16 vouchers, general day-to-day business of making sure the
17 Senate office runs.  I'm responsible for overseeing and
18 directing six staff people, in terms of giving them
19 advice about issues that they see or are dealing with in
20 their roles working for the Senator.  I handle the
21 Senator's media relations, and I continue to work policy
22 and legislative issues for the Senator.
23     Q.  Do you assist with drafting legislation?
24     A.  Yes, ma'am.
25     Q.  In what capacity?  What role do you play in

**27**

1 drafting legislation?
2     A.  There's several ways you can draft
3 legislation.  Once an idea is -- once it's determined
4 that the Senator wants to carry legislation, we
5 typically make a request to either the Texas Legislative
6 Council or Senate Engrossing and Enrolling and we just
7 send them -- or the Texas Legislative Council with just,
8 you know, general two, three lines, this is what we'd
9 like to see the law do, and then they draft it.  And
10 during session, occasionally we will draft -- I will
11 draft amendments to various legislation, if they're in
12 order to facilitate movement.
13     Q.  If a Senator -- if the Senator has proposed
14 legislation, do you work on trying to ensure that
15 legislation gets passed?
16     A.  Yes.
17     Q.  Can you describe that process for me?
18     MR. FREDERICK:  I'll object, and to the
19 extent that it calls for communications that you might
20 have had with legislators, staff, state agencies, the
21 TLC, or constituents about pending legislation, I'll
22 instruct you not to answer on the basis of privilege.
23 But to the extent you can answer without relying on
24 that, you're free to answer the question.
25     Q.  (By Ms. Maranzano) And I'm asking you right now

**28**

1 in a general sense what your role is in that capacity.
2     A.  In a general sense, once a piece of legislation
3 has been drafted by whomever drafted it, as staff, we
4 get the bill filed with the calendar clerk, and then it
5 goes through a general process that every bill goes
6 through, and once it gets referred to a committee, we
7 make the bill hearing request.  Along with the bill
8 hearing request, we will do a bill analysis, or provide
9 information to the committee so that they can have a
10 bill analysis prepared.  Once the bill is set for a
11 hearing, we will help the Senator with talking points.
12     If the bill makes it out of committee, we
13 will -- in the Senate, we have what's called an intent
14 calendar, so it's my job to -- once when we're ready to
15 move something on the Floor, we will notify the intent
16 calendar, essentially, and we will do talk -- and once
17 we're going to be recognized on the Floor, we'll do
18 talking points for the Floor.  And then if it passes the
19 Senate, we will provide that information to -- the same
20 sort of talking points and data that we have to whoever
21 will pick up the bill in the House.
22     Q.  What is a bill analysis?  I think you mentioned
23 that in regards to the committee portion of the bill.
24     A.  The Senate rules require that every bill have
25 an analysis attached to it.  The committees are



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

29

1  responsible for -- in the Senate, the committees are
2  responsible for putting that bill analysis together.
3  The Senate Research Center helps with that; it's an arm
4  of the Senate, and it basically provides a general
5  description of the bill, and then it will provide a
6  section-by-section analysis.
7      Q.  Do you have -- do you personally have
8  communications with other legislators?
9      A.  Yes.
10     Q.  Regularly about legislation?
11     A.  I mean, regularly is an interesting term.
12  During session?
13     Q.  Uh-huh.
14     A.  Yes.  During the interim, no.
15     Q.  Are your communications with other legislators
16  usually related to bills that Senator Fraser is
17  sponsoring or authoring?
18     A.  Yes.
19     Q.  What else would communications with other
20  legislators be about?
21     A.  Potentially, it could be about that
22  legislator's legislation, if I have a question about it.
23     Q.  Okay.
24     A.  I don't --
25     Q.  About how many times -- during the legislative

---

30

1  session, about how many times in a given week would you
2  talk to another legislator?  Not Senator Fraser, a
3  different legislator.
4      A.  I talk to other legislators pretty much every
5  day during session.
6      Q.  Do you communicate with the Executive Branch
7  about legislation?
8      A.  Yes.
9      Q.  About how frequently during a legislative
10  session do you communicate with the Executive Branch?
11     A.  Infrequently.  It depends on the bill.  I mean,
12  if it's something that is changing the way an agency
13  does business, it could be every day.  If it's a bill
14  that doesn't do that, then maybe never.  I mean...
15     Q.  About how frequently do you communicate with
16  the Governor's Office about legislation?
17     A.  Two, three times a session.
18     Q.  About how frequently do you communicate with
19  the Lieutenant Governor's Office about legislation?
20     A.  Every day.  During session.  I'm sorry.
21     Q.  Yeah.  When we were talking about your
22  responsibilities as chief of staff, did you say
23  communicating with constituents was one of your
24  responsibilities?
25     A.  I might not have said it, but it would be, yes.

---

31

1      Q.  Is communicating with interest groups or
2  advocacy groups one of your responsibilities?
3      A.  Yes.
4      Q.  And you said that you had a role in drafting
5  legislation.  Do you have a role in researching issues
6  that might be related to legislation?
7      A.  Yes.
8      Q.  When Senator Fraser is taking a vote on a bill,
9  what's your role in regards to that legislation?  Do you
10  make a recommendation to him?
11     A.  Yes, ma'am.  We do.
12     Q.  You do.  Does that role change if the Senator
13  is the sponsor of a bill?
14     A.  No.
15     Q.  Can you tell me, I think you said the Senator
16  has six staff people?
17     A.  Well, I'm seven.  Yeah.
18     Q.  Can you tell me their names and their titles?
19     A.  We have three people working in the district.
20  They're all called district coordinators.  Mel Ferguson,
21  Blake Woodall, Ralph Gauer, G-a-u-e-r.  And then
22  currently in Austin, in addition to myself, we have
23  three people, and Terri Mathis is scheduler.  Will
24  McAdams, policy analyst.  I think that's his title,
25  legislative analyst, policy analyst, something like

---

32

1  that.  And then Whitney Smith-Nelson, administrative
2  assistant.
3      Q.  Do the staff people in the district office have
4  any role in legislative efforts the Senator makes?
5      A.  No.
6      Q.  Does your office have a records retention
7  policy?
8      A.  No.
9      Q.  None?
10     A.  Our specific office does not have a records
11  retention policy.
12     Q.  When you say "our specific office," you mean
13  Senator Fraser's office?
14     A.  Yes, ma'am.
15     Q.  Do you retain records?
16     A.  No, not --
17     Q.  What prompted you to save certain files from
18  2009 voter ID?
19     A.  I knew that the Senator would want to try again
20  in 2011.
21     Q.  How often do you communicate with Senator
22  Fraser?
23     A.  During the interim?  Two or three times a week.
24     Q.  I'm sorry.  During the interim, can you
25  describe what you mean by that?

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 33

1    A.   The Texas legislature is in regular session for
2  140 days in odd-numbered years.  The rest of the time,
3  it's called the interim.  And that's the period we're in
4  right now, and I speak with him two or three times a
5  week during the interim.
6    Q.   And by what means do you communicate with him,
7  usually, during the interim?
8    A.   Phone.
9    Q.   Just phone?
10    A.   (Witness nods head yes.)
11    Q.   And do you speak on the phone, or do you text
12  message each other?
13    A.   Both.
14    Q.   Is that on the Senator's personal phone or an
15  official government phone?
16    A.   Personal phone.
17    Q.   Is that on your personal phone or an official
18  government phone?
19    A.   Both, depending on what time of day it is.
20    Q.   Do you save those messages on your phone?
21    A.   No.
22    Q.   Not at all, or not for any length of time at
23  all?
24    A.   I don't save anything.
25    Q.   Do you delete them, meaning, if they're not on

### 34

1  your phone now, is that because they weren't archived in
2  some manner or --
3    A.   Right.  I delete them.
4    Q.   Okay.  So other than the phone during the
5  interim, do you communicate with the Senator in any
6  other ways?
7    A.   I will, if I'm writing a speech or if he needs
8  some information, I fax things to his home.  But other
9  than that, I do not communicate with him in any other
10  way.
11    Q.   When you're in the legislative session --
12    A.   Yes, ma'am.
13    Q.   -- how often do you communicate with the
14  Senator?
15    A.   Every day.
16    Q.   And how do you usually communicate with him?
17    A.   Verbally.
18    Q.   Do you and the Senator ever exchange e-mails?
19    A.   I have sent him e-mail.  He does not respond.
20    Q.   Do you send e-mail to his personal account or
21  to a government account?
22    A.   Personal.
23    Q.   During the time that you worked for Senator
24  Fraser, how many election-related bills has the Senator
25  authored?

### 35

1    A.   I don't know.
2    Q.   Can you give me an estimate?
3    A.   The Senator typically does not author election-
4  related legislation.  He sponsors it.  So typically, I
5  would say, because of his seat on State Affairs, House
6  members will ask him to pick up their election bills,
7  and it could be 10 or 15 a session.  That's not to say
8  that he hasn't authored election related, other than,
9  obviously, voter ID, I just -- I don't -- I don't know.
10    Q.   So as you sit here, you can't think of other
11  election-related bills that Senator Fraser has authored
12  other than voter ID bills?
13    A.   That's correct.
14    Q.   And he has sponsored about 10 to 15 election-
15  related bills in those legislative sessions that you
16  worked in?
17    A.   That's a good guess.
18    Q.   During the time that you've worked for Senator
19  Fraser, how many immigration-related bills has Senator
20  Fraser authored?
21    A.   I don't know.
22    Q.   Can you give me an approximation?
23    A.   My guess would be none.
24    Q.   How about how many immigration-related bills
25  has Senator Fraser sponsored or co-sponsored?

### 36

1    A.   Again, my guess would be none, but I don't
2  know.
3    Q.   Are you familiar with Section 5 of the Voting
4  Rights Act?
5    A.   I know what it is.
6    Q.   What's your understanding of the requirements
7  of Section 5?
8    A.   My understanding is that Section 5 of the
9  Voting Rights Act requires the Department of Justice to
10  review election-related legislation for nine specific
11  states and a few other entities, and to ensure that
12  those election changes don't discriminate against
13  minorities.
14    Q.   Did you think it was important to save your
15  voter ID files because of Section 5 of the Voting Rights
16  Act?
17    A.   No.
18    Q.   How does the Legislature ensure that an
19  election-related change complies with Section 5 of the
20  Voting Rights Act?
21        MR. FREDERICK:  Let me interpose an
22  objection.  To the extent that the question seeks
23  information that reflects thoughts or mental impressions
24  about pending legislation or privileged communications,
25  I'll instruct you not to answer.  I think that the



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                           MAY 16, 2012

---

**37**

1  question is more general.  And to the extent it doesn't
2  call for privileged information or communications, you
3  may answer the question.
4      A.  Can you ask the question again?
5      Q.  (By Ms. Maranzano) Yes.  How does the Texas
6  Legislature ensure that an election-related change to
7  the law complies with Section 5 of the Voting Rights
8  Act?
9      A.  I don't know.
10     Q.  Do you believe that compliance with the Voting
11  Rights Act is important?
12         MR. FREDERICK:  Object to relevance.
13     Q.  (By Ms. Maranzano) You can answer.
14     A.  No.
15     Q.  Why not?
16     A.  I don't believe it's fair that nine states --
17  personally don't believe it's fair that nine states are
18  singled out in 2012.
19     Q.  To your knowledge, does Senator Fraser believe
20  that compliance with the Voting Rights Act is important?
21     A.  I don't speak to the Senator's beliefs.
22     Q.  In regards to your files on voter ID, did
23  anybody instruct you not to save those files?
24     A.  No.
25     Q.  Did anybody instruct you to delete your text

---

**38**

1  messages?
2      A.  No.
3      Q.  Can you tell me, describe for me, the current
4  system in Texas by which a voter's identity is verified
5  at the polls?
6      A.  Under current law, the voter who does not show
7  up with a voter registration card -- well, under current
8  law, if a voter shows up with a voter registration card
9  and they're on the rolls, gets to vote.  That's all they
10  need is the card.  If you don't have a card, under
11  current law, you can show several different forms of
12  ID:  Photo, one photo, with several options, or two
13  nonphoto.
14     Q.  Are you aware of any problems with the system?
15         MR. FREDERICK:  Objection, vague, but you
16  may answer.
17     A.  I think that the system works mostly, but it's
18  open to fraud.
19     Q.  (By Ms. Maranzano) Why do you say that?
20     A.  Because the voter registration card doesn't
21  necessarily have to be the person who is standing there
22  with it.
23     Q.  Are you aware of instances of voter fraud?
24     A.  No, ma'am.
25     Q.  Are you aware of any instances of voter fraud?

---

**39**

1      A.  I think in -- are we talking about in-person
2  voter fraud or voter fraud?
3      Q.  Well, let's talk generally first.
4      A.  I mean, I think, yes, there are instances of
5  voter fraud in that we know that there is some being
6  prosecuted.  Particularly, mail-in ballots are probably
7  the worst offenders, where we actually have the tools to
8  catch fraud.  In-person voter fraud, I'm not personally
9  aware of any.
10     Q.  When you said earlier that this -- the current
11  system, I think you said, it left -- it left open the
12  possibility of in-person voter fraud?  Is that a correct
13  summary of your testimony?
14     A.  Yes, ma'am.
15     Q.  What would somebody need to do to commit
16  in-person voter fraud under the current system?
17         MR. FREDERICK:  Objection to the extent it
18  calls for speculation, but you may answer, if you can.
19     Q.  (By Ms. Maranzano) What did you mean by it
20  leaves open the possibility?
21     A.  You could register yourself five times, five
22  different names, go vote five times.  You could steal
23  someone's voter registration card and go vote.  You
24  could, you know, borrow.  Like, I don't have time to
25  vote, you go vote for me.  Someone could go vote twice.

---

**40**

1      Q.  Are you familiar with the voter registration
2  application in Texas?
3      A.  Generally.
4      Q.  Does somebody have to make certain attestations
5  on that voter registration application?
6      A.  Yes, ma'am.
7      Q.  And what are those?
8      A.  I think that you are who you say you are, and
9  you live where you say you live, but I don't know for
10  sure.
11     Q.  Does somebody have to swear that they are a
12  citizen on the voter registration application?
13     A.  I think so.
14     Q.  When was SB 14 signed into law?
15     A.  Around the end of May 2011.
16     Q.  Have there been elections since the time that
17  SB 14 was signed into law?
18     A.  Yes, ma'am.
19     Q.  Was SB 14 enforced in those elections?
20     A.  No, ma'am.
21     Q.  Are you aware of any in-person voter fraud that
22  occurred in any of those elections?
23     A.  No, ma'am.
24     Q.  I believe you testified earlier that there was
25  a photo ID bill introduced in 2007; is that correct?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                                    MAY 16, 2012

## 41

1     A.   Yes, ma'am.
2          MS. MARANZANO:   Can I get that marked?
3     We can do 28.
4          (Exhibit 28 marked for identification.)
5     Q.   (By Ms. Maranzano) Can you take a look at that
6     exhibit that has been marked for the record as
7     Deposition Exhibit 28?
8     A.   (Viewing document.)
9     Q.   Do you recognize this?
10    A.   Yes, ma'am.
11    Q.   What is it?
12    A.   It looks like the filed version of House Bill
13    218 from 2007.
14    Q.   Can you tell me what forms of identification
15    were permitted under House Bill -- is this House Bill
16    218?
17    A.   Yes, ma'am.
18    Q.   Can you tell me what forms of identification
19    this bill would have permitted?
20         MR. FREDERICK:   And take your time.   If
21    you need a minute to review.
22    A.   Oh, no, I just to find it.   Under Section 11 of
23    the bill --
24    Q.   (By Ms. Maranzano) Uh-huh.
25    A.   -- it shows eight different forms of photo ID

## 42

1     that were acceptable:  Driver's license, ID card,
2     military card, employee ID card, citizen's certificate
3     that has a photo, passport, student ID card, concealed
4     handgun license, or a valid ID card issued by a
5     government institution, federal or local.
6          And then if you didn't have photo ID, the
7     bill would allow two forms.  Well, I thought it was two,
8     but I don't see that in here.  The bill would allow for
9     some forms of nonphoto ID, which is also in Section 11:
10    Utility bills, bank statements, official mail, birth
11    certificate, citizenship papers, marriage license,
12    divorce decree, court records.
13    Q.   So under HB 218, am I correct that a voter
14    could show either a form of photo identification or
15    forms of nonphoto identification?
16    A.   Yes, ma'am.
17    Q.   Does nonphoto verification verify a voter's
18    identity?
19    A.   Most of the time, yes.
20    Q.   Is there something about the forms of nonphoto
21    identification in HB 218 that you think verifies an
22    identity in a more secure fashion than a voter
23    registration card?
24         MR. FREDERICK:   Object to the extent that
25    this seeks information of thoughts or mental impressions

## 43

1     about pending legislation or requires information that
2     would reflect communications with legislators, staff,
3     state agencies, the Texas Legislative Council,
4     constituents, I'll instruct you not to answer on the
5     basis of privilege.  If you are able to answer without
6     relying on privileged matters, you may do so.
7     A.   Can you ask the question again?
8     Q.   (By Ms. Maranzano) Yeah.  My question is:  Do
9     you think HB 218 would have made an improvement on the
10    current system that you described to me, where a voter
11    shows their voter registration card or other forms of ID
12    when they show up to vote?
13         MR. FREDERICK:   Same objection and
14    objection.  But you may answer if you can.
15    Q.   (By Ms. Maranzano) Do you have an answer to
16    that, ma'am?  Thinking?
17    A.   Yeah.  My personal opinion is no.
18    Q.   What's Senator Fraser's opinion on that?
19         MR. FREDERICK:   Object to the extent it
20    calls for a legislator's thoughts and mental impressions
21    about pending legislation, and I'll instruct you not to
22    answer that question.
23    A.   I choose not to answer.
24    Q.   (By Ms. Maranzano) Would HB 218 prevent a voter
25    from voting multiple times?

## 44

1          MR. FREDERICK:   I'll make the same
2     objection.  To the extent it calls for privileged
3     information, thoughts or mental impressions or
4     privileged communications.  But to the extent you can
5     answer without relying on privileged matters, you may do
6     so.
7     A.   I have no answer.
8     Q.   (By Ms. Maranzano) Have you no answer because
9     of the instruction?
10    A.   Yes, ma'am.
11    Q.   Okay.  What was the purpose of including two
12    forms of photo identification at HB 1218?
13         MR. FREDERICK:   Objection to the extent it
14    seeks thoughts or mental impressions you or Senator
15    Fraser may have had about pending legislation or
16    communications that are privileged.  To the extent that
17    you can answer without relying on privileged matters,
18    you may answer the question.
19    Q.   (By Ms. Maranzano) And for the record, this is
20    about the legitimate purpose of part of this bill.
21    A.   I think you are better off asking
22    Representative Betty Brown.
23    Q.   Betty Brown.  Did the Senator bring HB 218 to
24    the Senate Floor?
25    A.   He did.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

45

1    Q.  And did you have a role in that?
2    A.  I did.
3    Q.  Do you know what the purpose of including two
4    forms of nonphoto ID in HB 218 was?
5        MR. FREDERICK:  I'll make the same
6    objection.
7        But I think she's just asking just a
8    yes-or-no question, so you may answer whether or not you
9    know.
10   A.  I was not part of how House Bill developed in
11   the House.  My personal belief is that they included two
12   forms of voter ID in order to get the necessary votes to
13   move it out of the House.
14   Q.  Okay.
15       MS. MARANZANO:  And just to clarify the
16   record, it's my understanding that Mr. Sweeten has
17   actually alerted the court that you all are going to
18   allow witnesses to answer questions about legislative
19   purpose.  I missed the e-mail, but that's my
20   understanding of what has happened, is --
21       MR. FREDERICK:  No.  Consistent, I think,
22   with what we have tried to convey yesterday and today,
23   we will permit testimony about legislative purpose to
24   the extent that is available from nonprivileged sources.
25       MS. MARANZANO:  Okay.  This might be

---

46

1    something that we discuss with the court later.
2    Q.  (By Ms. Maranzano) Did Senator Fraser have any
3    role in the development of HB 218?
4    A.  No.
5    Q.  Did the Senator take a public position on HB
6    218?
7    A.  Yes.
8    Q.  What position was that?
9    A.  In favor.
10   Q.  Did you play any role with regard to advising
11   the Senator on that position?
12   A.  Yes.
13   Q.  Did you recommend that he support the bill?
14   A.  Yes.
15   Q.  And what was that recommendation based upon?
16       MR. FREDERICK:  Object to the extent the
17   question calls for thoughts and mental impressions about
18   pending legislation or asks for the substance of
19   communications of legislators' staff, state agencies,
20   TLC and constituents, I will instruct you not to
21   answer.  If you can answer without relying on that
22   material, you may do so.
23   A.  I cannot answer.
24   Q.  (By Ms. Maranzano) Okay.  And just so we have a
25   clear record, you cannot answer because of the privilege

---

47

1    being asserted?
2    A.  Yes.
3    Q.  Did you have any conversations with
4    constituents about HB 218?
5    A.  Yes.
6    Q.  How many?
7    A.  How many conversations or how many
8    constituents?  Sorry.
9    Q.  That's an important distinction.  Let's start
10   with how many constituents.
11   A.  Verbally, I probably spoke to five to ten
12   constituents.
13   Q.  Did you speak to any of these constituents on
14   multiple occasions?
15   A.  Yes.
16   Q.  About how many did you speak to on multiple
17   occasions?
18   A.  How many constituents?
19   Q.  Uh-huh.
20   A.  One.
21   Q.  And was this a conversation on the phone?  In
22   person?  In another means?
23   A.  Most of the time, the conversations with this
24   one constituent were in person.
25   Q.  Have -- I'm sorry.

---

48

1    A.  Otherwise, I might have spoken to him once or
2    twice on the phone.
3    Q.  Was anybody else party to the conversations
4    that occurred in person?
5    A.  The Senator may or may not have been part of
6    the conversations.  I don't remember 2007 very well.
7    Q.  Does the Senator meet with any constituent who
8    comes to his office if he's in the office?
9    A.  If the Senator is in the office, in a meeting
10   or on the phone, he will visit with constituents.
11   Q.  Do you recall if he met with anybody, any
12   constituent about HB 218?
13   A.  The same constituents that I met with on
14   several occasions, I think the Senator met with.
15   Q.  Who was this constituent?
16   A.  Skipper Wallace.
17   Q.  Why was he particularly interested in HB 218?
18       MR. FREDERICK:  Object to the extent it
19   calls for the substance of communications with a
20   constituent or a legislator or staff for the thoughts
21   and mental impressions about pending legislation; I
22   instruct you not to answer.
23   A.  I can't answer because of privilege.
24   Q.  (By Ms. Maranzano) Did these conversations all
25   take place in the Senator's office?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**49**

1     A.  I don't remember, but probably, yes.  By
2  "office," you mean our general office because I have a
3  -- so there's three rooms, so in that space?
4     Q.  In Senator Fraser's office complex --
5     A.  Yes.  Okay.  Right.
6     Q.  -- in the Capitol.
7     A.  Okay.
8     Q.  Okay.  Thank you for clarifying that.
9         Did either you or the Senator ask
10  Mr. Wallace to comment, to speak about HB 218?
11     A.  No.  Are we still talking about 2007?
12     Q.  We're still talking about 2007 right now.
13     A.  Thank you.  No.
14     Q.  We'll get to the other bills at some point.
15         What was the nature of your conversation
16  with Mr. Wallace?
17         MR. FREDERICK:  I'll object and instruct
18  you not to answer to the extent that you would reveal
19  the substance of the conversation.  You may testify as
20  to the general subject matter only, and to the extent
21  you can do that, you may answer.  Otherwise, I instruct
22  you not to answer the question.
23     Q.  (By Ms. Maranzano) And are you going to --
24     A.  I'm going to assert privilege.
25     Q.  All right.

---

**50**

1         MS. MARANZANO:  So that I'm clear,
2  Mr. Frederick, is your position that unsolicited
3  conversations with constituents are also covered by
4  privilege?
5         MR. FREDERICK:  Yes.
6     Q.  (By Ms. Maranzano) Did you or Senator Fraser
7  communicate with any members of the Executive Branch
8  about HB 218?
9     A.  I don't remember.  I'm sorry.  I'm probably
10  sure that I talked to Ann McGeehan in the Secretary of
11  State's Office.  Other than that, I don't remember.
12     Q.  What did you talk to Ann McGeehan about?
13         MR. FREDERICK:  I'll object again, and
14  instruct you not to answer to the extent it requires you
15  to disclose the substance of your conversation with
16  Ms. McGeehan about pending or proposed legislation.  To
17  the extent you can answer by giving the general subject
18  matter, you may do so.
19     A.  Generally, I'm sure you've heard Ann.  Ann was
20  responsible for the Elections Division.  Generally, we
21  spoke of how they would implement the bill.
22     Q.  (By Ms. Maranzano) About how many times did you
23  speak with Ms. McGeehan?
24     A.  I don't remember.
25     Q.  Do you remember whether those were

---

**51**

1  conversations or e-mails or other written
2  communications?
3     A.  I would assume in 2007, most of our
4  conversations were verbal, either on the phone or in
5  person.
6     Q.  Did Senator Fraser have any communications with
7  the Executive Branch about HB 218?
8     A.  I don't know.
9     Q.  Did you communicate with any interest groups or
10  lobbyists about HB 218?
11     A.  I don't remember.
12     Q.  Did you communicate with any election officials
13  about HB 218?
14     A.  Election officials outside of the Secretary of
15  State's Office?
16     Q.  Yes, that's right.  NonExecutive Branch
17  election officials.
18     A.  Yes.
19     Q.  Who did you communicate with?
20     A.  Well, Skipper was County Chair.  I think that I
21  also spoke with the Republican Party of Texas.
22     Q.  How many times did you speak with the
23  Republican Party of Texas?
24     A.  Probably once.
25     Q.  Who from the Republican Party of Texas did you

---

**52**

1  speak with?
2     A.  I don't know.
3     Q.  Was that an in-person conversation or a
4  conversation by phone, e-mail?
5     A.  Most likely, it was by phone.
6     Q.  And when was that?
7     A.  It was sometime in May, April May of 2009.
8  2007.  I'm sorry.
9     Q.  Anyone else a party to that conversation?
10     A.  No.
11     Q.  Did the Republican Party of Texas also speak to
12  Senator Fraser about HB 218?
13     A.  No.
14     Q.  And how do you know that?
15     A.  Because the Senator doesn't speak to the
16  Republican Party of Texas.  I do.
17     Q.  What was the nature of your conversation with
18  the Republican Party of Texas?
19     A.  I might have been asking about witnesses and
20  testifying and just generally about the bill.
21     Q.  When you say witnesses and testifying, are you
22  talking about for --
23     A.  For the State Affairs Committee.
24     Q.  Did you talk to the Republican Party of Texas
25  about the substance of HB 218?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY
MAY 16, 2012

---

### 53

1    A.  I don't remember.  I don't think so, but I
2  don't remember.
3    Q.  Did you have any communications or -- well, let
4  me:  Are there any other election officials that you
5  spoke with about HB 218?
6    A.  Not that I know of.
7    Q.  Did you have any conversations with any groups
8  representing minority voters about HB 218?
9    A.  I don't remember.
10   Q.  Did you have any conversations with the
11 Lieutenant Governor's Office about HB 218?
12   A.  Yes.
13   Q.  How many?
14   A.  I don't remember.  A dozen, two dozen.
15   Q.  Who did you have those conversations with?
16   A.  His executive staff, Julia Rathgeber.  I'm
17 trying to remember if Blaine Brunson was chief of staff
18 then or not.  I can't remember if Blaine was or not.
19 And then whoever staffed State Affairs for Lieutenant
20 Governor, and I don't know who was at the time, either.
21   Q.  Did you say his executive staff?  Is that what
22 you said initially?
23   A.  Yeah.
24   Q.  Does he have --
25   A.  Well -- go ahead.

---

### 54

1    Q.  I was going to ask:  Does he have an executive
2  staff that's distinguishable from legislative staff?
3    A.  No.  I said executive staff because there's
4  like three or four people that sit upstairs with him.  I
5  just classified them that way.
6    Q.  Okay.  So you believe that you spoke with Julia
7  Rathgeber potentially?
8    A.  It's Rathgeber.
9    Q.  And you said Blain Brunson possibly?
10   A.  If he was chief of staff in 2007, then, yes.
11   Q.  And potentially whoever was staffing his State
12 Affairs issues?
13   A.  Uh-huh.
14   Q.  And when were these conversations?
15   A.  I would have to look at the record of when the
16 bill made it to the Senate.  April, May time frame of
17 2007.
18   Q.  Were these conversations in person, over the
19 phone, e-mail?  How did you communicate with the
20 Lieutenant Governor's Office?
21   A.  Primarily in person.
22   Q.  Were they in the Capitol offices?
23   A.  Yes.
24   Q.  What was the nature of your conversations with
25 Lieutenant Governor's staff?

---

### 55

1    MR. FREDERICK:  I'll give you the same
2  instruction.  I instruct you not to answer to the extent
3  that it would reveal thoughts and mental impressions
4  about pending legislation or the substance of
5  conversations between you and Senator Fraser or members
6  of the Lieutenant Governor's staff or the Lieutenant
7  Governor.  But to the extent you can identify the
8  subject matter without revealing the substance of the
9  conversations, you may answer the question.
10   Q.  (By Ms. Maranzano) Can you answer?
11   A.  I'm trying to decide if I can.
12   Q.  Okay.
13   A.  We generally spoke about the process of moving
14 the bill in the Senate.
15   Q.  Did you have any discussions with anyone in the
16 Lieutenant Governor's Office about the impact of HB 218
17 on minority voters?
18   A.  No.
19   Q.  Did you have conversations with anybody about
20 the impact of HB 218 on minority voters?
21   A.  I don't remember.
22   Q.  Do you keep any record of meetings that you
23 have?
24   A.  No.
25   Q.  None?

---

### 56

1    A.  Not from 2007.
2    Q.  How about from 2009?
3    A.  No.
4    Q.  How about from 2011?
5    A.  There might be some stuff on my calendar from
6  2011.
7    Q.  Do you keep any record of meetings or
8  conversations the Senator has?
9    A.  No.
10   Q.  Does the Senator keep such a record?
11   A.  Of meetings that he's had in the past, only to
12 the extent that his calendar is stored electronically,
13 and if that meeting made it to the calendar.
14   Q.  Who keeps that calendar in your office?  Does
15 the Senator keep his own calendar?
16   A.  The scheduler.
17   Q.  Did you turn that calendar over to counsel?
18   A.  No, I didn't.  I'm sorry.
19   Q.  Do you believe that's responsive to the
20 requests that were propounded on your office?
21   A.  I suppose not.
22   Q.  You don't believe that was?
23   A.  Well, I mean, I guess if -- I didn't search the
24 calendar.  So then the answer is no, it was not
25 responsive.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

57

1    Q.  Am I understanding that you didn't turn -- you
2  didn't search it because it was --
3    A.  I forgot to search it.  And so now that you've
4  brought it up, it's not responsive, and I can search for
5  it.
6    Q.  Okay.  Yeah.  I think we're going to ask you to
7  make that search and turn it over to counsel.
8        MR. FREDERICK:  And just for the record,
9  I'll object to the request.
10       MS. MARANZANO:  On what grounds?
11       MR. FREDERICK:  On the grounds that it's
12  privileged and not relevant and not reasonably
13  calculated to lead to discovery of relevant evidence.
14       MS. MARANZANO:  Okay.  But I'm asking her
15  to turn it over to you.  I mean, you can still do a
16  privilege review.
17       MR. FREDERICK:  Fair enough.  Fair enough.
18  That's fine.  I understand.
19       MS. MARANZANO:  Okay.  For the record, our
20  position is who the Senator met with on the dates is not
21  actually privileged.  The substance, we understand
22  you're asserting privilege over.  But we would ask that,
23  at the very least, she'd turn that information over to
24  you.
25       MR. FREDERICK:  And we understand.

---

58

1        MS. MARANZANO:  Yeah.
2    Q.  (By Ms. Maranzano) Did Senator -- yes.
3    A.  Just so we can be clear, the Senator meets with
4  people unexpectedly, and it doesn't make to it his
5  calendar.
6    Q.  Okay.
7    A.  So there may have been meetings that have took
8  place that will not reflected on his calendar.
9    Q.  Okay.  And are there any documents that reflect
10  those meetings?
11   A.  Again, the meetings that just took place
12  unexpectedly, no, ma'am.
13   Q.  Okay.  Did you review any studies that would be
14  related to HB 218?
15   A.  No.
16   Q.  Did anyone in your office?
17   A.  No.
18   Q.  Did the Senator -- did you or the Senator make
19  any attempt to determine who among registered voters did
20  not possess one of the forms of identification listed in
21  HB 218?
22   A.  No.
23   Q.  Why not?
24       MR. FREDERICK:  Object to the extent it
25  calls for thoughts, mental impressions, or

---

59

1  communications between you and the Senator or you and
2  the Senator and the legislative staff, state agencies,
3  TLC, and constituents.  If you can answer without
4  revealing privileged matters, you may do so.
5    A.  Generally, when you pick up a bill from the
6  other chamber, you assume most of the work was done in
7  the other chamber.
8    Q.  (By Ms. Maranzano) Did you feel you had any
9  obligation to analyze the bill prior to recommending to
10  your boss that he take a position on it?
11       MR. FREDERICK:  I think I'll make the same
12  instruction:  Don't reveal thoughts, mental impressions,
13  or communications that are privileged.  But if you can
14  answer without doing, so you may answer the question.
15   A.  I did review the bill prior to making a
16  recommendation.
17   Q.  (By Ms. Maranzano) And did you feel that you
18  needed to do anything in addition to reviewing the bill
19  prior to making a recommendation to the Senator?
20   A.  No.
21   Q.  Were you aware that if this bill had been
22  passed, it would have been subject to Section 5 of the
23  Voting Rights Act?
24   A.  Yes.
25   Q.  And did you believe that includes any

---

60

1  obligation to take any additional steps before
2  recommending a position to Senator Fraser?
3    A.  No.
4    Q.  Are you aware of whether the House analyzed the
5  impact of HB 218?
6    A.  I'm not aware.
7    Q.  Do you know whether there was any attempt in
8  the House to analyze whether HB 218 would have a
9  disproportionate impact on minority voters?
10   A.  I'm not aware.
11   Q.  Who would know that information?
12   A.  The House author.
13   Q.  And that was?
14   A.  Representative Betty Brown.
15   Q.  What was the purpose of HB 218?
16       MR. FREDERICK:  Object on grounds of
17  privilege.  To the extent the question calls for
18  thoughts or mental impressions of you, Senator Fraser,
19  or communications that you or the Senator have had with
20  other legislators, staff, agencies, TLC, or
21  constituents, I instruct you not to answer.  But to the
22  extent that you are able to identify the purpose of the
23  bill without relying on privileged matters, you are free
24  to answer the question.
25   A.  I think the record from the State Affairs



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**61**

1  Committee hearing on House Bill 218 will show that the
2  Senator said the intent was to stop in-person voter
3  fraud.
4     Q.  (By Ms. Maranzano) And how does this bill stop
5  in-person voter fraud?
6        MR. FREDERICK:  Object to the extent it
7  calls for speculation and object to the extent it calls
8  for thoughts, mental impressions, or privileged
9  communications.  But to the extent you can answer
10 without relying on privileged matters, you may do so.
11    A.  What was the question?
12    Q.  (By Ms. Maranzano) How does HB 218 solve
13 in-person -- or help with in-person voter fraud?  Is
14 that what -- what did you say the purpose of the bill
15 is?  Why don't you repeat that?
16    A.  If you look at the record from the State
17 Affairs Committee hearing, the Senator said that the
18 intent of a voter ID bill was to stop in-person voter
19 fraud.
20    Q.  And so my question is:  How does this bill do
21 that?
22       MR. FREDERICK:  Same instruction.
23    A.  I'll assert privilege.
24    Q.  (By Ms. Maranzano) Is that the only purpose of
25 HB 218?

---

**62**

1        MR. FREDERICK:  Same objection and
2  instruction.  Don't reveal thoughts, mental impressions
3  or communications with legislative staff, agencies, TLC
4  or constituents.  If you are able to answer without
5  doing so, you may.
6     A.  Again, according to the record, if you look at
7  what Senator Fraser said in the State Affairs Committee
8  hearing, his only intent is to stop in-person voter
9  fraud.
10    Q.  (By Ms. Maranzano) Can you describe to me the
11 procedural history of after HB 218 was introduced, what
12 happened?
13       MR. FREDERICK:  I'll object on grounds of
14 vagueness, but you can answer if you can.
15    A.  I cannot --
16    Q.  (By Ms. Maranzano) I'm looking for a general
17 summary of what happened with the bill.
18    A.  I mean, the House process is the House
19 process.  The bill gets filed, gets sent to committee,
20 gets voted out of committee, it goes to calendars, goes
21 the Floor, gets passed.  In the Senate, it gets -- comes
22 to over to the Senate, then just like every bill,
23 Lieutenant Governor reviews it, refers it to a
24 committee, committee chairman decides to give it a
25 hearing or not, and the bill has a hearing in committee,

---

**63**

1  and the bill gets voted out of committee, and Senator
2  places the bill on the intent calendar.
3     Q.  Can I stop for a second.
4     A.  Uh-huh.
5     Q.  I'm asking you particularly about HB 218, not
6  about a general description.
7     A.  House Bill 218 was voted out of the House, and
8  I can't speak to how it got out of the House.  You need
9  to go back and talk to Betty Brown about that.  House
10 Bill 218 showed up in the Senate, was read, Lieutenant
11 Governor referred it to the Senate State Affairs
12 Committee.  The Senate State Affairs Committee had the
13 bill.  Senator Fraser notified the Senate State Affairs
14 Committee that he wanted to sponsor HB 218 and requested
15 a hearing.  The bill was set for a hearing by the
16 Chairman of Senate State Affairs.  The bill had a
17 hearing.  I don't remember if this bill sat in State
18 Affairs or if it was voted out the same day it was
19 heard.  You'd have to look at the record.  But the bill
20 was voted out of committee.
21       And Senator Fraser decided to move forward
22 with the bill, and so he notified, via the intent
23 calendar notification process, the other senators that
24 he wanted to hear the bill, and we had the bill in
25 Intent for quite a while.

---

**64**

1        This particular bill, we tried to move one
2  day, when we thought we had the necessary votes, and we
3  were not successful, and the bill died.
4     Q.  Okay.  So I'm going to ask you a couple of
5  questions about that process as you've described it.
6        I believe that you testified that the
7  Lieutenant Governor reviews a bill, after it gets voted
8  out of the House, and than refers it to committee?
9     A.  Yes, ma'am.
10    Q.  Does every bill that gets voted out of the
11 House get referred to some Senate committee?
12    A.  Yes, ma'am.
13    Q.  And does the Lieutenant Governor solely -- is
14 that decision of which committee to refer it to solely
15 that of the Lieutenant Governor's?
16    A.  Based on the current Senate rules, yes.
17    Q.  And you mean the 2011 rules?
18    A.  2007, but even now in 2011, yes, ma'am.
19    Q.  Okay.  And you said that the Senator, Senator
20 Fraser notified the committee on State Affairs that he
21 wanted to sponsor this bill?
22    A.  Yes, ma'am.
23    Q.  Why did he do that?
24       MR. FREDERICK:  Well, object to the extent
25 it calls for the Senator's thoughts, mental impressions,

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY
MAY 16, 2012

### 65

1  or any communications that you had with him, and I will
2  instruct you not to answer.
3      A.  I'll assert privilege.
4          MR. FREDERICK:  Okay.
5          Jennifer, sometime soon, if we could take
6  a quick break.
7          MS. MARANZANO:  Yeah, just give me a
8  couple of minutes.
9          MR. FREDERICK:  Sure.  Sure.
10     Q.  (By Ms. Maranzano) And you said the committee
11 held hearings on HB 218?  The Committee on State Affairs
12 held hearings on HB 218?
13     A.  Held a hearing.  I don't think they had
14 multiple.  I think they had one.
15     Q.  Who invited the witnesses to testify at that
16 committee hearing?
17         MR. FREDERICK:  I'm going to object to
18 that, and to the extent it calls for communications that
19 any legislator had or that you or Senator Fraser had
20 with legislators, staff, agencies, TLC, constituents, or
21 potential witnesses, I'll instruct you not to answer.
22 To the extent you can answer without revealing the
23 substance of conversations, you can do so.
24     A.  I don't remember that there was an invited
25 panel.  It was just the process of laying out a bill by

### 66

1  the Senator and then the public testifying.
2          I earlier said that I think I talked to
3  the Republican Party of Texas about coming and
4  testifying, so I may have called a few people that I
5  thought would be helpful to the passage of the bill
6  besides the Republican Party of Texas.  I'm not sure.
7  And then the one constituent that we talked to quite a
8  bit about this bill.  Other than that, I don't think
9  there was invited to testimony.
10     Q.  (By Ms. Maranzano) So the one constituent was
11 Skipper Wallace?
12     A.  Yes.
13     Q.  And are you saying that you may have invited
14 him to testify as well?
15     A.  I think I didn't invite him to testify.  I
16 think I was more making sure he knew that the bill had
17 been scheduled for hearing.
18     Q.  Do you remember about how many members of the
19 public testified at that hearing?
20     A.  I do not.
21     Q.  Can you approximate?
22     A.  I cannot.  It's in the record, however.
23     Q.  Okay.  Did anybody raise any concerns about 218
24 during this committee hearing?
25     A.  My recollection is yes.

### 67

1      Q.  What were those concerns?
2      A.  I cannot -- I cannot speak to what they
3  actually said.
4      Q.  Did anybody raise any concerns about the impact
5  HB 218 might have on minority voters?
6          MR. FREDERICK:  Well, object and instruct
7  you not answer to the extent that the question calls for
8  communications that you had or Senator Fraser had with
9  legislators or legislative staff, agencies, TLC, or
10 constituents.  But to the extent you can answer without
11 revealing.
12     A.  I mean, the record is there.  The hearing was
13 videotaped.  I think that you could watch it.  I don't
14 remember specifically.
15     Q.  (By Ms. Maranzano) Okay.  Did the bill change
16 at all in committee?
17     A.  I don't think so, but -- yeah, I don't think
18 so.  I don't remember.  I mean, we might have made minor
19 tweaks, but I don't think so.
20     Q.  Okay.
21         MS. MARANZANO:  Let's take a five-minute
22 break.
23         (Recess from 11:11 a.m. to 11:32 a.m.)
24     Q.  (By Ms. Maranzano) Ms. McCoy, before the break,
25 we were talking about HB 218.  Who brought HB 218 to the

### 68

1  Floor of the Senate?
2      A.  Senator Fraser.
3      Q.  Did anyone ask the Senator to bring it to the
4  Floor?
5          MR. FREDERICK:  Object to the extent that
6  calls for communications with other legislative staff in
7  this case the legislators or staff members that's not on
8  the public record, I will instruct you not to answer.
9  If you can answer without revealing that, you may
10 answer.
11     A.  I'll assert privilege.
12     Q.  (By Ms. Maranzano) Why was Senator Fraser
13 playing a leadership role in HB 218?
14         MR. FREDERICK:  I'll object to the extent
15 that calls for thoughts or mental impressions of Senator
16 Fraser about HB 218 or communications with other
17 legislators, staff, or state agencies.  If you can
18 answer without revealing subjective mental impressions
19 or you may do so.
20     A.  I'll assert privilege.
21     Q.  (By Ms. Maranzano) When HB 218 was brought at
22 the time Floor of the Senate, what was your role?
23     A.  My role with House Bill 218 at that point was
24 to help the Senator with his talking points, and that's
25 it.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

69

1    Q.   Did you draft his talking points?
2    A.   Yes.
3    Q.   Did you save those talking points?
4    A.   Yes.
5    Q.   Do you still have them?
6    A.   Yes.
7    Q.   Were those turned over to your counsel?
8    A.   Yes.
9    Q.   Did you do any research prior to drafting those
10   talking points?
11   A.   I read the bill book that Representative Brown
12   provided to us.
13   Q.   And what does the bill book include?
14   A.   I don't remember what the bill book included
15   specifically.  Typically, a bill book has copies of the
16   legislation, copies of the bill analysis, copies of the
17   fiscal note, and occasionally, supporting documents.
18   This bill book had all of those things.  I do not
19   remember what those supporting documents were.
20   Q.   Did you do any additional research other than
21   read the bill book?
22   A.   No.
23   Q.   Why not?
24        MR. FREDERICK:  I'll object.  I believe
25   that question calls for your mental impressions about

---

70

1    pending legislation.  I'll instruct not to answer.
2    Q.   (By Ms. Maranzano) Are you going to follow your
3    counsel's instruction not to answer the question?
4    A.   Yes, ma'am.
5    Q.   Okay.  When HB 218 was brought to the Floor of
6    the Senate, did -- or did HB 218 require the support of
7    two-thirds of the senators to bring bill to the Floor
8    for a vote?
9    A.   Yes.
10   Q.   When Senator Fraser brought HB 218 to the
11   Floor, how many senators were present at that time?
12   A.   I don't recall exactly.  Either 29 or 30.
13   Q.   I believe you testified earlier that the
14   Senator brought the bill to the Floor when he -- he
15   tried to move this bill on a day when you thought it
16   would pass?
17   A.   Yes, ma'am.
18   Q.   What did you mean by that?
19   A.   We knew that a particular Senator was absent.
20   Q.   Which Senator was absent?
21   A.   Senator Uresti.
22   Q.   Why was Senator Uresti absent?
23   A.   If you look at the record from that day, I
24   think he was excused because he was sick.
25   Q.   Did you know Senator Uresti's position on HB

---

71

1    218?
2        MR. FREDERICK:  I'll object to the extent
3    it calls for thoughts or mental impressions of any
4    legislators or staff of pending legislation or
5    communications with other legislators of Senator Fraser
6    or staff.  But if you can answer without revealing
7    privileged matters, you may do so.
8    A.   After the bill moved, Senator Uresti voted no.
9    Q.   Can you --
10   A.   So I did not know how he was going to vote
11   prior to the bill moving.  After he voted, he voted
12   no.  After we voted, he voted no.
13   Q.   Well, why did you bring the bill to the Floor
14   when he was absent?
15        MR. FREDERICK:  Object to the extent the
16   question calls for thoughts and mental impressions about
17   pending legislation or communications indications that
18   are privileged.  I instruct you not to answer.  If you
19   can answer without revealing privileged matters, you may
20   do so.
21   A.   I'll assert privilege.
22   Q.   (By Ms. Maranzano) Do you think it's important
23   to give every Senator a chance to weigh in on a bill
24   like HB 218?
25        MR. FREDERICK:  I'll object as

---

72

1    argumentative, but you may answer if you can.
2    Q.   (By Ms. Maranzano) Are you able to answer that,
3    Ms. McCoy?
4    A.   No.
5    Q.   No, you're not able to answer or --
6    A.   I'm sorry.
7    Q.   -- no, you don't think it's important to --
8    A.   No, I don't think it's important that every
9    Senator vote on every specific piece of legislation,
10   including House Bill 218.
11   Q.   Do you know Senator's Uresti's ethnicity?
12   A.   Yes.
13   Q.   What ethnicity is he?
14   A.   He's Hispanic.
15   Q.   Do you know anything about the district that he
16   represents?
17   A.   Not specifically.
18   Q.   Do you know if he made any comments about
19   HB 218 and the impact it would have on his constituents?
20   A.   I do not know.
21   Q.   Would that impact your thoughts on whether it
22   was important to give him an opportunity to vote on
23   HB 218?
24        MR. FREDERICK:  Objection, calls for
25   speculation.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

73

1    Q.   (By Ms. Maranzano) You can ahead and answer.
2    A.   I'm sorry.  You need to ask the question
3  again.  I don't know what you're asking me.
4    Q.   I'm asking if you thought that Senator Uresti
5  believed that HB 218 would impact his constituents,
6  would you think it was important that he be given an
7  opportunity to take a vote on that bill?
8        MR. FREDERICK:  Same objection.  You can
9  answer.
10   A.   I think, again, generally, every bill impacts
11 every Senators' constituents.  And generally, Senators
12 should on the Floor to vote, but not -- we don't have a
13 31 -- we don't always 31 Senators on the Floor to vote.
14 And so with Senator Uresti, I can't speak to Senator
15 Uresti's constituents what they think is important or
16 not important for him to vote on.
17   Q.   (By Ms. Maranzano) But am I understanding you
18 correctly that your position is, you don't think every
19 Senator needs to vote on every bill, including HB 218?
20   A.   That's correct.
21   Q.   And did you say that the bill -- well, after
22 the first vote was taken on HB 218, was there
23 verification of the vote that was taken?
24   A.   I think that's what it's called, yes.  I think
25 of we -- they voted again.  I don't know if it was a

74

1  verification or if they just chose to vote again.  I'm
2  not really sure how that worked.  But there was a second
3  vote.
4    Q.   And did you say Senator Uresti arrived for that
5  vote?
6    A.   He did.
7    Q.   And what happened to HB 218?
8    A.   It failed to suspend the regular order of
9  business rule.
10   Q.   Was that because it did not have a two-thirds
11 majority --
12   A.   That's correct.
13   Q.   Two-thirds majority support?
14   A.   That's correct.
15   Q.   What is the purpose of the two-thirds rule?
16   A.   There is not a rule that's the two-thirds
17 rule.  The rule is the regular order of business rule,
18 and that rule says that as a bill comes out of the
19 calendar, it's placed on the regular order of business,
20 and you're supposed to vote in that order.  So there is
21 no two-thirds rule.
22   Q.   So to vote on a bill out of order, does that
23 require two-thirds majority support?
24   A.   You have to suspend the regular order of
25 business rule, and that requires a two-thirds vote of

75

1  the members present.
2    Q.   What do you think the purpose of that
3  requirement is?
4    A.   I can't speak to the purpose.  It's just the
5  way the Senate has done business.
6    Q.   But as somebody who has worked there since
7  1992, do you have any thoughts on what you think the
8  purpose of that is?
9    A.   General consensus on bills.
10   Q.   Are most bills brought to the Floor by getting
11 two-thirds majority support?
12   A.   Yes.
13   Q.   After HB 218 failed to get two-thirds majority
14 support, did anything further happen to that bill?
15   A.   No.
16   Q.   Who were the main supporters of HB 218?
17       MR. FREDERICK:  I'll object to the extent
18 that it calls for communications that you or Senator
19 Fraser might have had with legislators, staff, agencies,
20 or constituents or thoughts and mental impressions.  But
21 if you can answer without that, I think you're free to
22 answer.
23   A.   Well, I think the record will show, if you look
24 at the vote in the Senate, you're talking about who the
25 supporters were in the Senate; Republican Senators

76

1  supported it, Democrat Senators did not.
2    Q.   (By Ms. Maranzano) How about, were there any --
3  would you consider anybody from the Executive Branch to
4  be a main supporter of HB 218?
5        MR. FREDERICK:  Same objection.  To the
6  extent it calls for communications between you or
7  Senator Fraser and a member the Executive Branch or
8  their thoughts or mental impressions, I instruct you not
9  to answer.  If you can answer without revealing that,
10 you can answer.
11   A.   I'll assert purchase.
12   Q.   (By Ms. Maranzano) Was there any outside groups
13 or advocacy groups that you would consider to be in the
14 group of the main supporters of HB 218?
15       MR. FREDERICK:  Again, I'll instruct you
16 not to answer and object on privilege, to the extent
17 that it would require you to reveal the substance of any
18 conversation.  But to the extent it's just seeking
19 identity, then you may identify.
20   A.   I honestly don't remember who testified for and
21 against the bill.  Republican Party, I think, was for
22 it.
23   Q.   (By Ms. Maranzano) And did you say -- you said
24 most of the legislators who supported the bill were in
25 the Republican Party?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 77

1      A.  Yes, ma'am.
2      Q.  Do you believe any part of the purpose of
3  HB 218 was partisan?
4          MR. FREDERICK:  I'll object and assert
5  privilege to the extent that the question seeks thoughts
6  or mental impressions about pending legislation or the
7  substance of communications with legislators, staff,
8  agencies, TLC, or constituents.  But, I mean, to the
9  extent that you can identify -- to the extent you're
10  able to identify a purpose without relying on those
11  matters, you're free to answer the question.
12      A.  I think the purpose of the bill, from Senator
13  Fraser and our office's perspective, was to stop
14  in-person voter fraud.
15      Q.  (By Ms. Maranzano) Who were the main opponents
16  to HB 218?
17      A.  I don't remember.
18      Q.  You don't remember any of them?
19      A.  I don't.
20      Q.  Do you believe that HB 218 would have had a
21  discriminatory impact on minority voters?
22          MR. FREDERICK:  I'll object to the extent
23  it calls for your thoughts and mental impressions about
24  pending legislation and communications, and based on
25  that, I will instruct you not to answer the question.

### 78

1      A.  I'll assert privilege.
2      Q.  (By Ms. Maranzano) Are you familiar with
3  Section 2 of the Voting Rights Act?
4      A.  No.
5      Q.  Not at all?
6      A.  Not at all.
7      Q.  Would it surprise you if I told you that
8  Section 2 includes an antidiscrimination provision that
9  applies to all 50 states?
10      A.  I don't know anything about Section 2, so...
11      Q.  So you've never made any effort to ensure that
12  legislation you worked on complied with Section 2 of the
13  Voting Rights Act?
14          MR. FREDERICK:  Objection, argumentative.
15  Objection, assumes facts not in evidence.
16      A.  I don't know anything about Section 2.
17      Q.  (By Ms. Maranzano) Do you think a federal law
18  is required to make sure a piece of legislation doesn't
19  discriminate against minorities?
20      A.  No.
21      Q.  Do you make any attempts to make sure that
22  legislation you work on doesn't discriminate against
23  minorities?
24          MR. FREDERICK:  I object, to the extent it
25  calls for you to reveal thoughts, mental impressions, or

### 79

1  communications relating to specific legislation.  To the
2  extent you can answer without relying on privileged
3  matters, you may do so.
4      A.  I assert privilege.
5      Q.  (By Ms. Maranzano) Was Senator Fraser involved
6  in a photo identification bill in 2009?
7      A.  Yes, ma'am.
8          (Exhibit 29 marked for identification.)
9      Q.  (By Ms. Maranzano) Ms. McCoy, I'm showing you
10  what has been marked as Deposition Exhibit 29.  Do you
11  recognize this?
12      A.  Yes, ma'am.
13      Q.  And what is this?
14      A.  I think it's the filed version of Senate Bill
15  362.
16      Q.  Can you take a look at it and tell me what
17  forms of identification would be allowed in this bill?
18      A.  Section 10 of the bill shows six different
19  forms of photo ID that would be acceptable, including a
20  driver's license or ID card, a military card, a citizen
21  certificate that has a photograph, a passport, a
22  concealed handgun license, and a valid ID card from a
23  federal or local government, or two forms of nonphoto
24  ID, including registration cards, utility bills,
25  official mail, birth certificates, marriage license or

### 80

1  divorce decrees, court records.
2      Q.  Is -- I think I didn't ask you this question.
3  Is this the bill that Senator Fraser introduced in 2009?
4      A.  I think I said it was the filed version, yes,
5  ma'am.
6      Q.  Okay.
7      A.  I don't know that to be exact, but based on the
8  title of the bill, it looks like it's the filed version.
9      Q.  Okay.  And this bill would allow for a voter to
10  show one form of photo identification or two forms of
11  nonphoto identification?
12      A.  That's correct.
13      Q.  I believe you testified earlier that two forms
14  of nonphoto identification would verify a voter's
15  identity in both instances?
16      A.  Uh-huh.
17      Q.  What are the instances --
18          MR. DUNN:  Was that a yes?
19          THE WITNESS:  Yes.
20      Q.  (By Ms. Maranzano) What are the instances that
21  a nonphoto ID would not verify a voter's identity?
22          MR. FREDERICK:  Objection to the extent it
23  calls for speculation, but you can answer.
24      A.  Again, if someone is trying to cheat the
25  system, they can -- nonphoto IDs can be reproduced and



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 81

1  manipulated.
2      Q.  (By Ms. Maranzano) Can photo IDs be reproduced
3  and manipulated?
4          MR. FREDERICK:  Objection to the extent it
5  calls for speculation, but you can answer if you know
6      A.  Some can.
7      Q.  (By Ms. Maranzano) Can you tell me what your
8  involvement was in the development of SB 362?
9      A.  Senate Bill 362 as filed was the legislation
10  that the House sent to us from House Bill 218.  So
11  Exhibit 28 is not the bill the Senate was debating,
12  because this is the filed version.  So after the House
13  manipulated it a while, this is the language they sent
14  us.  So we refiled the bill that had passed the House
15  from 2007.  We refiled it in 2009.
16      Q.  Why did Senator Fraser decide to file the bill
17  in the Senate in 2009?
18          MR. FREDERICK:  Object.  That question
19  seeks thoughts or mental impressions of Senator Fraser.
20  I'll instruct you not to answer on the basis of
21  privilege.
22      A.  I'll assert privilege.
23      Q.  (By Ms. Maranzano) So you filed -- I'm sorry.
24  Senator Fraser filed a bill that was -- that had been
25  previously filed in the House; is that correct?  And SB

---

### 82

1  362 was a version of a previously-filed bill in the
2  House?
3      A.  Senate Bill 362 was the version of House Bill
4  218 that the House sent us, the engrossed version of
5  House Bill 218 from 2007.
6      Q.  Okay.  And you did not make any changes to the
7  bill prior to filing SB 362?
8      A.  I think Senate Bill 362, as filed, was exactly
9  the language that was House Bill 218 as it came out of
10  the Senate committee on State Affairs.
11      Q.  Did you do any -- we've talked a little bit
12  about what you did in relation to House Bill 218.  Did
13  you take any additional steps, in terms of developing or
14  working on SB 362, with regards to any research you did,
15  any studies you looked at?
16      A.  Yes, ma'am.
17      Q.  And what did you do?
18          MR. FREDERICK:  I'll object to the extent
19  this calls for you to reveal thoughts or mental
20  impressions, any communications with legislators, staff,
21  agencies, TLC, or constituents, I instruct you not to
22  reveal the substance of those communications or your
23  thoughts or mental impressions.  If you can answer
24  without revealing those matters, you may do so.
25      A.  I gathered more poll data.  I gathered more

---

### 83

1  research reports, and compiled that information for the
2  Senator.
3      Q.  (By Ms. Maranzano) What poll data did you
4  gather?
5          MR. FREDERICK:  Object.  That calls for
6  you to reveal your thoughts or mental impressions.  I
7  will instruct you not to answer on the basis of
8  privilege.
9      Q.  (By Ms. Maranzano) Are you following your
10  counsel's instruction not to answer that question?
11      A.  Yes, ma'am.
12      Q.  What research reports did you gather?
13          MR. FREDERICK:  Object on the basis that
14  calls for thoughts or mental impressions.  I'm going to
15  instruct you not to answer on the basis of privilege.
16      A.  I'll assert privilege, yes, ma'am.
17      Q.  (By Ms. Maranzano) All right.  Why did you
18  decide to look at poll data when you were doing research
19  on this question?
20          MR. FREDERICK:  I object.  That answer
21  calls for your thoughts or mental impression on pending
22  legislation.  I instruct you not to answer on the basis
23  of privilege.
24      A.  I'll assert privilege.
25      Q.  (By Ms. Maranzano) Did the Senator cite any of

---

### 84

1  the poll data or reports that you had gathered on the
2  public record?
3      A.  Yes.
4      Q.  Which polls or reports did he cite?
5      A.  In 2009, he cited Rasmussen Poll on the
6  record.  He cited the Carter-Baker Commission report on
7  the record.  And I don't know that I can recall more
8  than those two on the record.
9      Q.  Were there any polls that you had found in
10  doing your research that the Senator did not cite on the
11  public record?
12          MR. FREDERICK:  I object on the basis that
13  that calls for your thoughts or mental impression,
14  communications.  I instruct you not to answer on the
15  basis of privilege, except to the extent that you can
16  answer yes or no if there are such reports.
17      A.  No.
18      Q.  (By Ms. Maranzano) Were there any studies that
19  you had found or other research you had found that the
20  Senator did not cite on the public record?
21          MR. FREDERICK:  Same objection, same
22  instruction.  You may answer yes or no.
23      A.  Yes.
24      Q.  (By Ms. Maranzano) And what were those?
25          MR. FREDERICK:  I object on the basis that



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

85

1    seeks thoughts or mental impressions and communications
2    that are privileged.  I instruct you not to answer on
3    the basis of privilege.
4        A.  But I can answer because I don't remember the
5    names of those reports.
6        Q.  (By Ms. Maranzano) Do you remember how many
7    there were?
8        A.  Four or five.  Three, four, five, something
9    like that.
10       Q.  Do you remember what they were about?
11       A.  Voter identification.
12       Q.  Anything more specific than voter
13   identification?
14           MR. FREDERICK:  I'll object.  That seeks
15   thoughts and mental impressions, communications.  I
16   object and instruct you not to answer on the basis of
17   privilege.
18       A.  I'll assert privilege.
19       Q.  (By Ms. Maranzano) When you were working on SB
20   362, did you study any other state's identification
21   requirements?
22           MR. FREDERICK:  I'll object to the extent
23   that calls for your thoughts or mental impressions or
24   communications with legislators, staff, agencies, TLC,
25   or constituents, instruct you not to answer on the basis

---

86

1    of privilege.  However, if you can answer without
2    revealing privileged matters, you may do so.
3        A.  On the record, Senator Fraser said that he had
4    looked at how Indiana was working.
5        Q.  (By Ms. Maranzano) Did you look at any
6    information or study information from any interest
7    groups in relation to SB 362?
8            MR. FREDERICK:  I'll make the same
9    objection that this question calls for thoughts or
10   mental impressions about pending legislation and your
11   investigative process.  I instruct you not to answer on
12   the basis of privilege, except to the extent you can
13   answer without revealing privileged matters, you may do
14   so.
15       A.  I don't remember.
16       Q.  (By Ms. Maranzano) Did you have any
17   communications about SB 362 with other legislators?
18       A.  Yes.
19       Q.  Which ones?
20           MR. FREDERICK:  I'll just issue a
21   cautionary instruction.  I don't think that this
22   question is seeking the content of those communications,
23   so I would instruct you not to reveal the content, but
24   you may identify people with whom you spoke.
25       A.  Can we just on the record say that I was four

---

87

1    months pregnant with twins when we were debating Senate
2    Bill 362, so I don't remember a lot.
3        I probably spoke to a dozen Senators about
4    Senate Bill 362.  And as the bill moved through the
5    Senate, Senator Williams, Senator Ellis, Senator West,
6    Senator Duncan, Senator Van de Putte, Senator Whitmire.
7    2009, Senator Huffman, was she in the Senate?  Senator
8    Harris.  Generally, I mean, a lot of senators I --
9        Q.  (By Ms. Maranzano) Uh-huh.  So is it fair to
10   say that you spoke to senators who -- those senators who
11   voted for and against SB 362?
12       A.  Yes, ma'am.
13       Q.  Did you speak to the Lieutenant Governor's
14   Office about SB 362?
15       A.  Yes, ma'am.
16       Q.  How many times?
17       A.  I mean, I probably spoke to them every day as
18   the bill was being scheduled for hearing and being
19   heard, and then probably not at all until the House was
20   done with it, and it was moving back over, and then
21   again every day until we voted on it again.
22       Q.  Can you tell me, generally, what those
23   conversations, the nature of those conversations?
24           MR. FREDERICK:  I'll object to the extent
25   it asks you to reveal the substance or content of those

---

88

1    conversations, which are subject to privilege.  However,
2    to the extent you're able to identify a general subject
3    matter, you may answer.
4        A.  We generally spoke about the legislative
5    process and we generally spoke about the bill itself.
6        Q.  (By Ms. Maranzano) The legislative process, do
7    you mean how the bill would get passed?
8            MR. FREDERICK:  I'll object to the extent
9    that seeks the content of privileged communications and
10   instruct you not to answer.
11       A.  I'll assert privilege.
12       Q.  (By Ms. Maranzano) Were those conversations by
13   phone or in person?
14       A.  I spoke to Lieutenant Governor's Office.  I
15   generally spoke to them in person.
16       Q.  Is there anybody from the Lieutenant Governor's
17   Office who you spoke to who you haven't already
18   testified about?
19       A.  In 2009?
20       Q.  Uh-huh.
21       A.  I would add Bryan Hebert to the list.
22       Q.  And who is Bryan Hebert?
23       A.  He was Lieutenant Governor's primary staff
24   person for State Affairs in 2009.
25       Q.  Do you know when Bryan Hebert started working



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 89

1  for the Lieutenant Governor?
2      A.  No, ma'am.
3      Q.  He was not the Lieutenant Governor's staff
4  person on voter ID issues in 2007?
5      A.  I don't remember.  He might have been.
6      Q.  Was he the Lieutenant Governor's staff person
7  on voter ID issues in 2011?
8      A.  Yes, ma'am.
9      Q.  Did you have communications with officials from
10  other states about SB 362?
11     A.  Yes, ma'am.
12     Q.  And who was that?
13     A.  When I was looking to get witnesses to testify,
14  I spoke to somebody in Indiana.  I don't recall who.  I
15  think from the Secretary of State's Office.  And they
16  were not able to come.  And then I spoke with someone in
17  Georgia.  And I don't remember his name, although it's
18  in the record, because he did come testify.
19     Q.  Did anyone ask you to contact these
20  individuals?
21         MR. FREDERICK:  Object that the question
22  asks you to reveal the substance of communications with
23  legislators, staff or agencies or constituents.  To the
24  extent that you can answer without revealing those
25  privileged conversations, you may do so.

---

### 90

1      A.  Senator Fraser.
2      Q.  (By Ms. Maranzano) Why did you think, or why
3  did the Senator think that individuals from Georgia or
4  Indiana would be helpful in terms of the testimony about
5  SB 362?
6          MR. FREDERICK:  I object, based that that
7  seeks thoughts or mental impressions of Senator Fraser
8  and communications between Senator Fraser and his
9  staff.  I instruct you not to answer on the basis of
10  privilege.
11     A.  I'll assert privilege.
12     Q.  (By Ms. Maranzano) Do you remember either of
13  these individuals' names who you talked to in Indiana
14  and Georgia?
15     A.  No.
16     Q.  Did anyone from Indiana come and testify during
17  the hearings on SB 362?
18     A.  No.
19     Q.  Did anyone from Georgia come testify?
20     A.  Yes, ma'am.  He was very nice.  I just can't
21  remember his name.
22     Q.  Did you have communications about SB 362 with
23  any interest groups?
24     A.  I don't remember.
25     Q.  Did you have communications about SB 362 with

---

### 91

1  any groups representing minority voters?
2      A.  I don't remember.
3      Q.  Is there anything that would help you remember
4  whether you had any communications about SB 362 with any
5  interest groups?
6      A.  No.
7      Q.  Did you consider adding any additional forms of
8  identification to SB 362?
9          MR. FREDERICK:  Object.  That question
10  seeks thoughts or mental impressions about pending
11  legislation.  I instruct you not to answer on the basis
12  of legislative privilege.
13     A.  I'll assert privilege.
14     Q.  (By Ms. Maranzano) Can you look at Exhibit 29
15  and Exhibit 28, I believe, HB 218 and SB 362, and look
16  at forms of ID that are allowed in each bill.
17     A.  (Viewing documents.)
18     Q.  What was the purpose of excluding from 362 the
19  student ID as a form of allowable identification even
20  though it was allowed in HB 218?
21         MR. FREDERICK:  I object to the extent
22  this question seeks your thoughts or mental impressions
23  about pending legislation or thoughts of any other
24  legislator, including Senator Fraser or their staff or
25  to the extent it requires communications with

---

### 92

1  legislators, staff, agencies, TLC, and constituents, I
2  instruct you not to answer on the basis of legislative
3  privilege.  To the extent you are able to identify the
4  purpose of any part of the bill without relying on those
5  privileged matters, you may do so.
6      A.  Again, this version of House Bill 218 is not
7  the version that came to the Senate.  I think that the
8  student ID was pulled out by the House, not by the
9  Senate.
10     Q.  (By Ms. Maranzano) I believe that the bill that
11  I have introduced as evidence was actually the bill that
12  was engrossed.  Does that seem correct to you?
13     A.  It does not.
14     Q.  Okay.
15     A.  I'd have --
16     Q.  And you think that the student ID was pulled
17  out of SB 362 in the House?
18         MR. FREDERICK:  I just object to the
19  extent it mischaracterizes the testimony, but you can
20  answer.
21     Q.  (By Ms. Maranzano) Okay.  Can you describe to
22  me what you --
23     A.  My understanding --
24     Q.  Uh-huh.
25     A.  My recollection, Senate Bill 362 should be the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 93

1    engrossed version of House Bill 218.  So I what I see in
2    front of me with House Bill 218 is not the bill that the
3    Senate debated.  So I don't know what this version is
4    without -- it's saying that it's the engrossed version.
5    I think it's the filed version.
6        Q.  Okay.  Well.  Let me ask you this:  Did SB 362
7    allow, as a form of acceptable identification, student
8    identifications?
9        A.  No, ma'am.
10       Q.  What was the purpose of excluding that from the
11   bill?
12           MR. FREDERICK:  I object to the extent
13   this seeks thoughts or mental impressions from you,
14   Senator Fraser, or other legislators or staff or to the
15   extent it requires you to reveal the substance of
16   communications with legislators, staff, state agencies,
17   TLC, and constituents, I instruct you not to answer on
18   the basis of privilege.  However, to the extent that you
19   are able to identify the purpose of that portion of the
20   bill without relying on those privileged matters, you
21   can do so.
22       A.  I'll assert privilege.
23       Q.  (By Ms. Maranzano) Did you ever look or do any
24   research into who among registered voters would be most
25   likely to have a student identification card?

## 94

1            MR. FREDERICK:  Object.  The question
2    calls for your thoughts, mental impressions about
3    pending legislation.  I instruct you not to reveal --
4    not to reveal the substance of your efforts.  However,
5    to the extent that you can answer whether you did or
6    not, you may answer.
7        A.  Ask the question again.
8            MS. MARANZANO:  Can you read back the
9    question.
10           (The requested portion read back by the
11   court reporter.)
12       A.  No.
13       Q.  (By Ms. Maranzano) Why not?
14           MR. FREDERICK:  I'll object on the ground
15   that that calls for your subjective mental impressions
16   and thoughts about pending legislation and instruct you
17   not to answer on the basis of privilege.
18       A.  I'll assert privilege.
19       Q.  (By Ms. Maranzano) Did you have any
20   communications with anyone about the forms of
21   identification, what forms of identification to include
22   in SB 362?
23       A.  No, ma'am.
24       Q.  Did you do any analysis to determine who among
25   registered voters possessed the forms of identification

## 95

1    included in SB 362?
2            MR. FREDERICK:  I'll object to the
3    question on the ground that it seeks thoughts and mental
4    impressions and investigative efforts related to pending
5    legislation, and instruct you not to answer to the
6    extent that it would disclose the substance or -- the
7    substance or nature of the process you engaged in.
8    However, you may answer to the extent that you can do so
9    without revealing those matters.
10       A.  I'm sorry.  I'm having some brain fatigue.  You
11   have to read the question again.
12           MS. MARANZANO:  Can you read the question?
13           (The requested portion was read back by
14   the court reporter.)
15       A.  No.
16       Q.  (By Ms. Maranzano) Were you ever instructed not
17   to look at who among registered voters possessed one of
18   the forms of identification included in SB 362?
19           MR. FREDERICK:  I object on the grounds
20   that that seeks communications between legislators,
21   staff, and state agencies.  I instruct you not to answer
22   on the basis of privilege.
23       A.  I'll assert privilege.
24       Q.  (By Ms. Maranzano) If SB 362 had passed the
25   Texas Legislature, would it have been subject to the

## 96

1    requirements of Section 5?
2        A.  Yes.
3        Q.  Are you familiar with the concept of a Spanish
4    surname voter registration match?
5        A.  No.
6        Q.  Have you ever heard of a Spanish surname
7    analysis being conducted on a voter registration list?
8        A.  No.
9        Q.  Have you ever heard of a Spanish surname list
10   that's put together by the U.S. Census?
11       A.  No.
12       Q.  What's the purpose of SB 362?
13           MR. FREDERICK:  I'll object to the extent
14   that the question calls for thoughts or mental
15   impressions about pending legislation, or to the extent
16   it seeks the substance of communications from
17   legislators, staff, state agencies, TLC, and
18   constituents.  To the extent, however, that you can
19   identify the purpose of the bill without relying on
20   privileged matters, you may do so.
21       A.  Senator Fraser's stated purpose on the record
22   about Senate Bill 362 is to prevent in-person voter
23   fraud.
24       Q.  (By Ms. Maranzano) Any other purposes?
25       A.  No, ma'am.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

**97**

1    Q.  Did he state on the record any evidence that
2    in-person voter fraud exists?
3    A.  No.
4    Q.  Why was SB 362 a better way to deter in-person
5    voter fraud than through the current system?
6         MR. FREDERICK:  Object to the extent this
7    question seeks thoughts and mental impressions or
8    communications that are privileged about pending
9    legislation.  To the extent that you can answer without
10   relying on those matters, you can do so.
11       A.  I'll assert privilege.
12       Q.  (By Ms. Maranzano) Did anyone ask Senator
13   Fraser to introduce SB 362?
14       A.  No.
15       Q.  And how do you know that?
16        MR. FREDERICK:  I object to the extent it
17   calls for the substance of any privileged
18   communications, and I instruct you not to answer on the
19   basis of privilege.
20       A.  I'll assert privilege.
21        MS. MARANZANO:  Can I have this marked as
22   Exhibit 31?
23        (Exhibit 31 marked for identification.)
24       Q.  (By Ms. Maranzano) Ms. McCoy, I'm showing you
25   what we are marking as Deposition Exhibit 30.  Do you

---

**98**

1    recognize -- I'm sorry, 31.  Do you recognize this
2    document?
3    A.  Yes, ma'am.
4    Q.  What is this?
5    A.  This is a press release that Senator Fraser
6    issued when he filed Senate Bill 362.
7    Q.  And can I direct your attention to the second
8    to last paragraph there.  Do you see that there is a
9    quote that says -- it's a quote by Fraser, by Senator
10   Fraser.  It says, "In no way am I trying to prevent any
11   legal citizen from voting.  Instead, I want to ensure
12   that illegal aliens, noncitizens, and people otherwise
13   not qualified do not dilute the legitimate votes cast by
14   citizens."  Do you know see which paragraph I'm talking
15   about?
16   A.  You have a different one.
17        MR. FREDERICK:  Okay.  I'm sorry.  Can I
18   stop you real quick?  I think I may have the wrong
19   one.  Oh, okay.  That one is right, December 15th.
20   Thanks.  She wrote -- do you want to mark a different
21   one for the record?
22        (Brief discussion held off the record.)
23        MR. RODRIGUEZ:  That's 30, not 31.
24        (Brief discussion held off the record.)
25        MS. MARANZANO:  We accidentally took this

---

**99**

1    the other day.  That's an original exhibit.
2         MR. FREDERICK:  Just so the record
3    reflects that we have marked a nonmarked copy of the
4    exhibit.
5         MS. MARANZANO:  Are we -- we're on the
6    record?
7         THE REPORTER:  Yes.
8         MS. MARANZANO:  Okay.
9    Q.  (By Ms. Maranzano) Do you see that paragraph
10   that I just read?
11   A.  Yes, ma'am.
12   Q.  And can you tell me what the Senator meant by,
13   "I want to ensure that illegal aliens, noncitizens, and
14   people otherwise not qualified do not dilute the
15   legitimate votes cast by citizens."  What does that
16   mean?
17        MR. FREDERICK:  I'll object to the
18   question to the extent it seeks mental impressions of
19   the thought process regarding pending legislation.  But
20   to the extent that -- and I'll also object to the extent
21   it calls for speculation.  To the extent that you think
22   you can answer without relying on privileged matters,
23   you may do so.
24   A.  I'll assert privilege.
25   Q.  (By Ms. Maranzano) Ms. McCoy, did you write

---

**100**

1    this press release?
2    A.  Yes, ma'am.
3    Q.  And are you the contact person for any
4    inquiries from --
5    A.  Yes, ma'am.
6    Q.  -- the press release?
7    A.  Yes, ma'am.
8    Q.  And it's your position that you can't testify
9    as to what he meant because it's privileged?  Is that --
10        MS. MARANZANO:  I mean, Mr. Frederick,
11   this is public document.
12        MR. FREDERICK:  Yeah.  Yeah.  Sure.  And
13   let me clarify.  I think we need to be clear on my
14   instruction.  I'm objecting to the extent that it seeks
15   thoughts or mental impressions of Senator Fraser.  To
16   the extent that Ms. McCoy sitting here can -- to the
17   extent that she can tell you in her personal knowledge
18   what she thinks this means sitting here today, then that
19   would not be privileged.  And communications with Fraser
20   would be privileged.  But I mean, the words are on the
21   page, and to the extent that she can tell you what she
22   thinks they mean today, I think that that's fine.
23        MS. MARANZANO:  And just to be clear, she
24   did just testify that she wrote the words, so...
25        MR. FREDERICK:  Right.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

### 101

1     Q.   (By Ms. Maranzano)  Okay.  So to the extent that
2  you --
3     A.   Would you like to ask the question again?
4     Q.   Yes.  I'm interested in what -- the sentence
5  that starts with, "Instead, I want to ensure that
6  illegal aliens, noncitizens, and people otherwise not
7  qualified, do not dilute the legitimate votes cast by
8  citizens, said Fraser."  What does that mean?
9     A.   I think it means that he wants to ensure that
10  the person who shows up at the polls is the person who
11  is supposed to be voting under that name.
12     Q.   Was a part of the purpose of SB 262 related to
13  illegal aliens voting?
14     MR. FREDERICK:  Let me just interpose a
15  objection to the extent that seeks thoughts, mental
16  process, or privileged communications that would be
17  privileged, and I would instruct you not to answer.  But
18  to the extent that you can identify the purpose or
19  whether that's a purpose, you may answer.
20     A.   The purpose of Senate Bill 362 was to stop
21  in-person voter fraud, and that would entail anybody not
22  voting legally, including illegal aliens who are not
23  allowed to vote.
24     Q.   (By Ms. Maranzano)  So if a noncitizen votes,
25  you define in-person voter fraud to include a noncitizen

### 102

1  voting as themselves?  Am I understanding you correctly?
2     A.   Because they're committing fraud, yes, ma'am.
3     Q.   Okay.  So when you said the purpose of SB 362
4  was to deter in-person voter fraud, you also are
5  including in that category deterring noncitizens from
6  voting in elections; is that correct?
7     MR. FREDERICK:  I'll just object to the
8  extent it mischaracterized the testimony.  But to the
9  extent we're talking about the purpose of the bill, you
10  may answer the question.
11     A.   The purpose of the bill was to ensure that
12  citizens, registered -- were voting -- were not
13  committing fraud.  There was no in-person voter fraud.
14  So whatever that constitutes, this bill was trying to
15  prevent.
16     Q.   (By Ms. Maranzano)  Okay.  So what I'm asking
17  you now is:  What do you believe that that constitutes?
18  As somebody who was the chief of staff for the author of
19  the bill, what do you think that constitutes?
20     MR. FREDERICK:  I will object, based on
21  privilege, the extent that this seeks a subjective
22  motivation, a subjective thought or a mental impression
23  somehow incorporated in the text of the bill.  And I
24  would instruct you not to answer on the basis of
25  privilege.  To the extent that sitting here today, you

### 103

1  can explain your understanding of the terms at issue
2  that would not be privileged, then you may answer.
3     A.   I don't know that I understand your question.
4     Q.   (By Ms. Maranzano)  Okay.  What I'm trying to do
5  is, you have testified earlier today that the purpose of
6  both SB 362 and HB 218 was to detect in-person voter
7  impersonation.  And I want to be clear for the record as
8  to how you define that term, the term in-person voter
9  impersonation.
10     A.   Someone who is not authorized to vote by our
11  constitution who is voting in person.  Someone who is
12  cheating the system by voting under a different name.
13  Someone who is cheating the system by voting more than
14  once in an election.
15     Q.   So is part of the purpose of SB 362 to prevent
16  noncitizens from voting?
17     MR. FREDERICK:  Same objection.  But you
18  can answer subject to my previous instruction.
19     A.   Okay.  Can we back up?  Because I just reread
20  this press release.
21     Q.   (By Ms. Maranzano)  Uh-huh.
22     A.   Senator Fraser filed two bills in 2008 -- 2008,
23  Senate Bill 362 and Senate Bill 363?
24     Q.   Uh-huh.
25     A.   Senate Bill 363 was talking about -- more about

### 104

1  the illegal immigrant issue.  Senate Bill 362 was about
2  in-person voter fraud.  This quote probably relates more
3  to Senate Bill 363 than it does to Senate Bill 362.  So,
4  I mean, we have to read the whole press release in
5  context.
6     Q.   Uh-huh.
7     A.   I mean, but in-person voter fraud is someone
8  showing up who's not supposed to be there, who is not a
9  citizen of our country, who has someone else's ID, who
10  has falsified voter records and is voting fraudulently,
11  and that's what Senate Bill 362 was trying to do.
12     Q.   Okay.  So how does Senate Bill 362 deter
13  noncitizens from voting?
14     MR. FREDERICK:  I object to the extent it
15  calls for speculation.  You may answer if you can.
16     A.   By requiring someone to show ID, if they're not
17  a legal citizen, they wouldn't have that ID,
18  necessarily, and then they wouldn't be able to vote.
19     Q.   (By Ms. Maranzano)  Do you know how many forms
20  of ID listed in SB 362 a noncitizen is able to obtain?
21     A.   I do not.
22     Q.   Did you look into that when you were working on
23  SB 362?
24     MR. FREDERICK:  I object to the extent it
25  calls for mental impressions, thought process,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 105

1  privileged communications.  But subject to that
2  instruction, if you can answer without revealing that,
3  you may answer.
4      A.  No.
5      Q.  (By Ms. Maranzano) No, you didn't look into it?
6      A.  I did not.
7      Q.  Do you think that would be an important issue
8  to look into, if part of the goal of the bill is to
9  prevent noncitizens from voting?
10     A.  The goal of the bill was to prevent in-person
11  voter fraud.
12     Q.  Okay.  I thought you testified earlier that
13  that included anyone who was not legally permitted to
14  vote.  Is that not correct?
15     A.  The goal of Senate Bill 362 was to prevent
16  in-person voter fraud.  Whether it was by legal citizens
17  or illegal citizens, we were trying to create a tool to
18  prevent in-person voter fraud.
19     Q.  Okay.  And to be clear, you did not look into
20  whether noncitizens could obtain the forms of
21  identification required by SB 362?
22     A.  I did not.
23     MR. FREDERICK:  If we can take a break
24  soon.
25     MS. MARANZANO:  Do you want to go like

## 106

1  another 15 minutes and break for lunch?  That's fine.
2      MR. FREDERICK:  Sure.
3      MR. DUNN:  But then we'll have to do the
4  hearing.
5      MR. ROSENBERG:  Yeah, that would fit in
6  with the hearing.
7      MS. MARANZANO:  Okay.
8      Q.  (By Ms. Maranzano) Did the Senator consider any
9  alternative legislative measures that would have
10  accomplished the goal of deterring in-person voter
11  impersonation?
12     MR. FREDERICK:  Object on the ground that
13  it seeks thoughts, mental impressions, and privileged
14  communications, and I instruct you not to answer the
15  question based on privilege.
16     A.  I'll assert privilege.
17     Q.  (By Ms. Maranzano) Did the Senator make any
18  promises to anyone concerning alternative legislative
19  measures that would have accomplished the goal of
20  deterring in-person voter impersonation?
21     MR. FREDERICK:  I'll object to the extent
22  that calls for thoughts, mental impressions, or
23  communications with other legislators or legislative
24  staff members, other privileged communications.  To the
25  extent you can answer without revealing privileged

## 107

1  communications, you may do so.
2      A.  I'll assert privilege.
3      Q.  (By Ms. Maranzano) Ms. McCoy, is it your
4  position that promises that the Senator makes about
5  legislation are covered by the privilege, the
6  legislative privilege?
7      MR. FREDERICK:  Yes, to the extent -- I
8  mean, I guess promises, I'm not entirely clear on what a
9  promise would entail, but I think to the extent that it
10  would include a discussion with another legislator or
11  discussions between legislative staff members about
12  pending legislation.  I mean, I think promise could be
13  construed to include ordinary legislative discussions
14  and, you know, policy discussions and compromises.  I
15  think that kind of thing is an integral part of the
16  legislative process in determining votes to get
17  legislation passed.
18     MS. MARANZANO:  Is it also your position
19  that promises to constituents or groups would be covered
20  by the privilege?
21     MR. FREDERICK:  It's my understanding that
22  a promise to somebody outside the Legislature, I think,
23  would not fall under the privilege.
24     MS. MARANZANO:  That's my understanding,
25  too.

## 108

1      MR. FREDERICK:  Yeah.  Yeah.  And I think
2  to the extent it's not an -- to the extent it's a
3  nonconfidential or an external communication, I think
4  that's not what I intend to object to.
5      MS. MARANZANO:  Okay.
6      Q.  (By Ms. Maranzano) Ms. McCoy let me rephrase
7  that question.  Did the Senator make any promises to
8  constituents or outside groups related to SB 362?
9      A.  In what way?
10     Q.  Did the Senator make any promises to bring a
11  bill to the Senate Floor that would require photo
12  identification in 2009?
13     A.  The Senator committed, after the legislation
14  failed in 2007, to constituents that he would try again.
15     Q.  Which constituents did he commit to?
16     A.  Skipper Wallace.
17     Q.  Can you tell me who Skipper Wallace is?
18     A.  He's a constituent from Lampasas.
19     Q.  Why is he so interested in photo identification
20  bills?
21     MR. FREDERICK:  I'll object to the extent
22  that calls for privileged communications between Senator
23  Fraser, Ms. McCoy, and privileged communications between
24  either and Mr. Wallace, and as well as to the extent it
25  calls for thought process, mental impressions.  If you



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 109

1 can answer without revealing thoughts or privileged
2 communications, you can do so.  Otherwise, I instruct
3 you not to answer on the basis of privilege.
4    A.  I mean, Skipper has been a long-time election
5 worker and judge, and I think he just advocates for
6 election law change.
7    Q.  (By Ms. Maranzano) He's an election worker and
8 judge.  What is his profession, if you know?
9    A.  He's a businessman.
10    Q.  So he is a volunteer election judge, and what
11 was the first thing you said?
12    A.  Election worker, election judge.
13    Q.  Does he have any role in the government
14 structure of the county?
15    A.  Skipper, I think, used to be city manager in
16 Lampasas, I think.
17    Q.  Does he have any role with a political party?
18 Any political party?
19    A.  Yes.
20    Q.  Which one?
21    A.  Republican.
22    Q.  And what's his role?
23    A.  He's Chair of the Lampasas Republican Party.
24    Q.  Ms. McCoy, you testified earlier that there was
25 no partisan purpose to SB 362.  So now that you've

## 110

1 testified that the Senator made a promise to a person
2 who was affiliated with a political party, the Chair of
3 a political party, do you wish to change your testimony
4 from earlier today?
5    A.  No, ma'am.
6    Q.  Did your office have any communications about
7 the purpose of SB 362?
8       MR. FREDERICK:  Object as vague, also
9 object on grounds of privilege to the extent it calls
10 for the substance of confidential communications, and
11 instruct you not to answer.  To the extent you can
12 answer without revealing confidential communications,
13 you may.
14    A.  I'm going to assert privilege.
15    Q.  (By Ms. Maranzano) Did your office have any
16 communications in response to a -- did you -- did your
17 office ever get a Texas public records request regarding
18 SB 362?
19    A.  We have received public information requests
20 about voter ID.  I do not recall if they were in post
21 2009 session or post 2011.  Probably both.
22    Q.  Has Senator Fraser had any meetings with
23 constituents where the purpose of 362 was discussed?
24       MR. FREDERICK:  I'll object to the extent
25 it calls for the content of communications, privileged

## 111

1 communications between Senator Fraser and
2 constituents.  To the extent you can answer without
3 revealing the substance of those conversations, you may
4 do so.
5    A.  The Senator has met with constituents about
6 voter ID.
7    Q.  (By Ms. Maranzano) How many times?
8    A.  The Senator mentions voter ID when he speaks
9 and when he gets invited to go speak to different
10 chambers and groups.  Pretty much every time he speaks
11 to a group like that, he'll mention it.  And in office,
12 half dozen.
13    Q.  Would you say that voter ID was one of the
14 Senator's key legislative accomplishments?
15       MR. FREDERICK:  I'll object to the extent
16 to calls for mental impressions or thoughts.  However,
17 to the extent you can answer, based on -- to the extent
18 you can answer without relying on privileged
19 information, you can do so.
20    A.  Yes.
21    Q.  (By Ms. Maranzano) Who besides Senator Fraser
22 were the main proponents of SB 362?
23    A.  Other members?
24    Q.  Well, presumably.  Well, why don't we start
25 with:  Were there any members who voted for the bill who

## 112

1 were strong proponents of it?
2       MR. FREDERICK:  I'll just interpose, I
3 don't think that this question is asking for the
4 substance of communications, so I would admonish you not
5 to reveal the substance of any privileged communications
6 in answering, but I think that you can do that.
7    A.  I mean, I think that all the members that
8 signed on as co-authors would consider themselves strong
9 proponents of the bill.
10    Q.  (By Ms. Maranzano) Were there others in the
11 Texas government who were strong proponents of SB 362?
12       MR. FREDERICK:  Same instruction.
13    A.  I don't think so.  I don't know.
14    Q.  (By Ms. Maranzano) Was 362 a priority for the
15 Governor?
16       MR. FREDERICK:  I'll object on the same
17 grounds.  To the extent it seeks thoughts, mental
18 impressions of the Governor or communications between
19 Senator Fraser's office and the Governor, I will
20 instruct you not to answer.  I mean, if you know.
21    A.  I don't know the Governor's priorities from
22 2009.
23    Q.  (By Ms. Maranzano) Was SB 362 a priority for
24 the Lieutenant Governor?
25       MR. FREDERICK:  The same instruction.  To



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 113 | 115 |
|---|---|

**113**

1  the extent it seeks thoughts or mental impressions of
2  the Lieutenant Governor or confidential communications
3  between Senator Fraser's office and the Lieutenant
4  Governor's Office, I would instruct you not to answer.
5  If you're able to answer, you may do so.
6      A.  I don't know -- I don't know the Lieutenant
7  Governor's priorities from 2009.
8      Q.  (By Ms. Maranzano) Was SB 36 a priority for
9  anyone outside of the Texas government?
10      MR. FREDERICK:  I'll object as vague, but
11  you can answer if you know.
12      A.  I don't.  I don't know.
13      Q.  (By Ms. Maranzano) How often did you say that
14  you talked to Lieutenant Governor's Office during the
15  consideration of SB 362?
16      A.  I probably talked to them every day while we
17  were scheduling the bill and during the hearing.
18      Q.  And you have no idea whether it was priority
19  for their office?
20      MR. FREDERICK:  Object, argumentative.
21      Q.  (By Ms. Maranzano) You can answer.
22      A.  That process was about six days long, so to
23  talk to them for six days.  But again, I don't speak for
24  the Lieutenant Governor, so I don't know his priorities.
25      ==Q.  Were there any groups that represented minority==

**114**

1  ==voters who supported SB 362?==
2      ==MR. FREDERICK:  I'll just object to the==
3  ==extent this calls for the substance of confidential==
4  ==communications between any constituents and Senator==
5  ==Fraser's office, I would instruct you not to answer.==
6  ==But to the extent that you can answer without revealing==
7  ==the substance of any conversation, you can do so.==
8      ==A.  I don't know.==
9      ==Q.  (By Ms. Maranzano) Ms. McCoy, who would know==
10  ==the Lieutenant Governor's priorities?==
11      ==MR. FREDERICK:  Object as vague and calls==
12  ==for speculation.  You can answer if you know.==
13      ==A.  The Lieutenant Governor and his staff.==
14      ==Q.  (By Ms. Maranzano) Who on his staff?==
15      ==MR. FREDERICK:  Same objection.==
16      ==A.  His chief of staff, Blaine Brunson.==
17      Q.  (By Ms. Maranzano) Who were the main opponents
18  to SB 362?
19      A.  I don't recall.
20      Q.  Do you recall having communications with
21  constituents who opposed SB 362?
22      A.  No.
23      Q.  Do you recall having -- do you recall having
24  communications with outside groups that opposed SB 362?
25      MR. FREDERICK:  I'll object to the extent

**115**

1  it seeks the substance of any privileged communication
2  between a constituent and Senator Fraser's office, but
3  to the extent it doesn't require you to reveal the
4  substance, you may answer the question.
5      A.  I don't recall.
6      Q.  (By Ms. Maranzano) Do you recall that there was
7  opposition to SB 362?
8      A.  Yes, ma'am.
9      Q.  What was the basis of that opposition?
10      MR. FREDERICK:  I'll object to the extent
11  it calls for speculation.  Also object to the extent it
12  seeks the substance of any privileged communications
13  between other legislators and staff or constituents and
14  Senator Fraser and Ms. McCoy.  To the extent that you
15  know independent of privileged sources or you don't have
16  to reveal any, you may answer.
17      A.  I think if you look at the record, that the
18  people that testified against Senate Bill 362 believed
19  that it would disenfranchise voters.
20      Q.  (By Ms. Maranzano) What do you think about that
21  testimony?
22      MR. FREDERICK:  I'll object to the extent
23  it calls for thoughts or mental impressions about
24  pending legislation.  I also object to relevance.
25      A.  I'll assert privilege.

**116**

1      Can I do that?
2      MR. FREDERICK:  Yeah.
3      Q.  (By Ms. Maranzano) Did the Senator take any
4  steps with regard to SB 362 to address any of these
5  concerns that were raised by opponents to SB 362?
6      MR. FREDERICK:  Objection, vague.
7  Objection, seeks thoughts and mental impressions of the
8  Senator.  It also seeks the substance of confidential
9  communications and privileged communications with the
10  Senator.  To the extent that you can answer without
11  revealing the substance of confidential communications
12  or the Senator's thought process or the thought
13  processes of you or any other legislator, you may do so.
14      A.  I don't think we amended the bill, so the
15  answer would be no.
16      Q.  (By Ms. Maranzano) Just to be clear, you don't
17  think you amended the bill at all throughout the entire
18  Senate process?
19      A.  I don't think we did.  Maybe on the margins,
20  but -- so, we did not take any action to make changes
21  either direction.
22      Q.  Is there a reason you didn't take any action to
23  respond to the concern of opponents?
24      MR. FREDERICK:  Objection, it seeks
25  thoughts and mental impressions.  I instruct you not to



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

117

1  answer on the basis of privilege.
2      A.   I'll assert privilege.
3      Q.   (By Ms. Maranzano) Did anybody raise any
4  concerns that SB 362 would disenfranchise minority
5  voters?
6           MR. FREDERICK:  I'll object to the extent
7  it calls for privileged communications between
8  constituents, legislators, staff, and you or Senator
9  Fraser.  To the extent you can answer without relying on
10  privileged communications, you may do so.
11     A.   And on the record, during the debate, several
12  members testified that way, and then we had witnesses
13  that testified in the same manner.
14     Q.   (By Ms. Maranzano) And do you recall what the
15  basis of their testimony was?
16     A.   No, ma'am.
17     Q.   Did you take any steps to determine whether
18  SB 362 would disenfranchise minority voters?
19          MR. FREDERICK:  Object to the extent it
20  seeks thought process -- thought processes and mental
21  impressions and confidential communications with
22  legislators and legislative staff.  I would instruct you
23  not to answer that question on the basis of privilege.
24     A.   I'll assert privilege.
25          MS. MARANZANO:  I think that I'm a point

---

118

1  where it might make sense to stop for lunch.  And maybe
2  we can start back up after the call to the court?  Does
3  that make sense?
4           MR. SWEETEN:  That's fine.
5           With respect to letting Janice go, I'm
6  going to let her go for a while.  Let's probably have
7  you come back at two o'clock.  I mean, I don't think she
8  needs to be here before 2:00 for any reason.
9           MS. MARANZANO:  Yeah, I think that's
10  right.
11          MR. DUNN:  That's fine.  The only thing
12  I'll add is that I invoked the rule, and under the
13  Federal Rules of Procedure you're not to talk to anybody
14  about your testimony other than your lawyers.
15          THE WITNESS:  That's fine.
16          (Lunch recess from 12:46 p.m. to
17  2:15 p.m.)
18          MS. MARANZANO:  Let's go back on the
19  record.
20     Q.   (By Ms. Maranzano) Before the break, we were
21  talking about SB 362, and I'd like to continue talking
22  about SB 362.
23          Ms. McCoy, what was your role in trying to
24  get SB 362 passed?
25     A.   My role in trying to get 362 passed was to

---

119

1  navigate the legislative process for the Senator in
2  terms of the behind-the-scenes staff work that takes
3  place.
4      Q.   And can you describe that to me?
5      A.   Filing the bill.  Filing the bill and
6  requesting hearings, prepping talking points.
7      Q.   Did you have any role in determining how
8  different senators would vote on SB 362?
9      A.   No.
10     Q.   Did Senator Fraser have any idea of how many
11  senators would support SB 362 when he introduced it?
12          MR. FREDERICK:  Object.  The question
13  calls for thought process and mental impressions of
14  Senator Fraser.  It may also call for communications
15  with legislators and staff that are privileged.  I would
16  instruct you not to answer on the basis of privilege.
17     A.   I'll assert privilege.
18          (Exhibit 32 marked for identification.)
19     Q.   (By Ms. Maranzano) Okay.  Can you take a look
20  at what we've marked as Deposition Exhibit 32?  In
21  particular, can you look at Rule 5.11, which is on Page
22  24.  Do you see Provision D under 5.11?
23     A.   Yes.
24     Q.   When was that provision added to the rules?
25     A.   January 14th, 2009.

---

120

1      Q.   And how was -- was there a resolution to
2  specifically add Subsection D to Rule 5.11?
3      A.   Yes.
4      Q.   Who introduced that resolution?
5      A.   Senator Williams.
6      Q.   Did Senator Fraser ask Senator Williams to
7  exempt voter ID requirements from the two-thirds Rule?
8           MR. FREDERICK:  I object on the grounds
9  that it seeks confidential communications related to
10  pending legislation, and I'm going to instruct you not
11  to answer on the basis of privilege.
12     A.   I'll assert privilege.
13     Q.   (By Ms. Maranzano) How was the resolution
14  brought up in the Senate to add Subsection D to 5.11?
15     A.   I don't remember.
16     Q.   During the time that you have worked for
17  Senator Fraser, have you ever seen another category of
18  legislation exempted from the two-thirds rule?
19          MR. FREDERICK:  I'll object just on -- to
20  the extent that it mischaracterizes the testimony in the
21  record, but you can answer.
22     A.   I don't recall the Committee of the Whole
23  meeting, except for 2009 and 2011, since I've worked for
24  Senator Fraser.
25     Q.   (By Ms. Maranzano) So am I understanding you



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 121

1  correctly that there has not been, to the best of your
2  recollection, another category of legislation that's
3  been written into the rules as exempted from the
4  two-thirds vote requirement under Rule 5.11?
5          MR. FREDERICK:  The same objection, but
6  you can answer.
7      A.  Can you repeat the question?
8      Q.  (By Ms. Maranzano)  I just want to make sure I
9  understood the answer that you gave, because you
10 mentioned the Committee of the Whole.  But am I
11 understanding you correctly that it's your recollection,
12 as you sit here, that during the time you worked for
13 Senator Fraser, there has not been another category of
14 legislation carved out of Rule 5.11 as voter
15 identification requirements are carved out in
16 Subsection D in the 2009 rules?
17     A.  Yes.
18     Q.  Okay.  What was the purpose of carving out the
19 voter ID identification requirement from the two-thirds
20 rule?
21     A.  I don't know.
22     Q.  Did the Senator have any concerns about
23 exempting SB 362 from the requirement that legislation
24 get two-thirds support in the Senate?
25         MR. FREDERICK:  Object on the grounds that

---

### 122

1  it seeks the thought process and mental impressions of
2  Senator Fraser about pending legislation, and I instruct
3  you not to answer on the basis of privilege.
4      A.  I'm going to assert privilege.
5      Q.  (By Ms. Maranzano)  Did the Senator have any
6  concerns that by exempting legislation from the
7  two-thirds rule requirement, it would appear to be a
8  very partisan-supported piece of legislation?
9          MR. FREDERICK:  I object on the grounds
10 that it seeks the mental impressions and thought
11 processes of Senator Fraser on pending legislation.  I
12 instruct you not to answer on grounds of privilege.
13     A.  I'll assert privilege.
14     Q.  (By Ms. Maranzano)  If SB 362 had not been
15 exempt from the two-thirds rule requirement, would it
16 have passed the Senate?
17         MR. FREDERICK:  Object to the extent it
18 calls for speculation.
19     A.  I don't know.
20     Q.  (By Ms. Maranzano)  Well, SB 362 was voted on,
21 did two-thirds of the members support it?
22     A.  No.
23     Q.  Did you have any communications with Senator
24 Williams about the resolution that led to Subsection D
25 of Rule 5.11 in the 2009 rules?

---

### 123

1          MR. FREDERICK:  I object to the question
2  to the extent it calls for the substance of confidential
3  communications between Ms. McCoy and Senator Williams,
4  so it's subject to legislative privilege.  I'm going to
5  instruct you not to answer on that basis.
6      Q.  (By Ms. Maranzano)  Are you following your
7  counsel's instruction not to answer that question?
8      A.  I never spoke to Senator Williams about this
9  resolution.
10     Q.  Did you speak to anybody at Senator Williams's
11 office about this resolution?
12     A.  No.
13     Q.  Did you speak to anybody in the Lieutenant
14 Governor's Office about the resolution that led to the
15 suspension of the two-thirds rule?
16     A.  No.
17     Q.  Did you speak to anybody in the Governor's
18 Office?
19     A.  No.
20     Q.  What was the reaction from senators on the --
21 well, let me ask you this first:  Are you familiar with
22 the testimony that occurred when Senator Williams
23 introduced the resolution to suspend the two-thirds
24 rule?
25     A.  No.

---

### 124

1      Q.  Can you also take a look at Rule 16.07?  It's
2  on Page 106 and 107.
3      A.  Which rule did you want me to look at?
4      Q.  16 -- hold on.
5      A.  07?
6      Q.  16.07.
7      A.  Okay.
8      Q.  Actually, you know what; let's do 16.06 and 07,
9  which relate to matters regarding -- 16.06 is matters
10 requiring a vote of two-thirds of the members present,
11 and 16.07 is Matters of Requiring Vote of Majority
12 Members of the Senate.  Were these rules also impacted
13 by Senator Williams's resolution?
14     A.  I don't know.
15     Q.  Can you look at Section 7, Subsection 7 of Rule
16 16.07, matters -- and 16.07, again, is Matters Requiring
17 Vote of Majority of Members of the Senate.  And
18 Subsection 7 says, "Set voter identification requirement
19 bills for special order."  Does that refresh your
20 recollection as to whether that was something that was
21 impacted by Senator Williams's resolution?
22     A.  I never read Senator Williams's resolution, so
23 I would assume yes, it was in there.
24     Q.  So these changes in the rules directly impacted
25 SB 362, did they not?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 125 |
|---|

1    A.  Yes.
2    Q.  So you never read Senator Williams's
3  resolution, but are you familiar with the impact that
4  his resolution on the rules?
5    A.  Yes.
6    Q.  Did Senator Fraser have any concerns about
7  suspending the two-thirds rule for SB 362?
8         MR. FREDERICK:  I object on the grounds
9  that it seeks the mental impressions and thought
10  processes of Senator Fraser as well as privileged
11  communications of the staff, and I instruct you not to
12  answer on the basis of privilege.
13    A.  I'll assert privilege.
14    Q.  (By Ms. Maranzano) Were there any other changes
15  in the rules in 2009 from previous Senate rules that --
16    A.  I don't recall.  I'm sorry.  I thought you were
17  done.  I'm sorry.
18    Q.  No, it was just a pause.
19         That were related only to voter
20  identification requirements?
21    A.  I don't recall.
22    Q.  Was there any consideration of changing any
23  other Senate rules in 2009 to ensure that SB 362 would
24  get passed in the Senate?
25         MR. FREDERICK:  I object to the extent the

| 126 |
|---|

1  question calls for thought process, mental impressions
2  of legislators and for confidential communications,
3  privileged communications among legislators and
4  staff.  I would instruct you not to answer on the basis
5  of privilege, except to the extent there is something
6  nonprivileged you can point to answer.
7    A.  I don't know.
8    Q.  (By Ms. Maranzano) Was SB 362 considered by any
9  Senate committees?
10    A.  Senate committee on the whole.
11    Q.  Is that the only one?
12    A.  Yes, ma'am.
13    Q.  Is it unusual for a bill to go straight to
14  Senate Committee of the Whole?
15    A.  Yes.
16    Q.  Have you seen that happen with other
17  legislation during the time you have worked for Senator
18  Fraser?
19    A.  I don't recall it happening since I've worked
20  for Senator Fraser.
21    Q.  What was your role during the Floor
22  consideration of SB 362?
23    A.  I sat with Senator Fraser as he laid out the
24  bill, and when he asked me to produce documentation, I
25  would give it to him.

| 127 |
|---|

1    Q.  What kind of documentation did you have with
2  you?
3         MR. FREDERICK:  I object on the ground
4  that it seeks thought process and mental impressions
5  that may reflect confidential communications.  I would
6  instruct you not to answer on the basis of privilege.
7    A.  I will answer, because I will tell you the same
8  things that we've talked about earlier:  The poll data,
9  the studies, the Carter-Baker Commission report.  Just
10  those two.
11         MS. MARANZANO:  I'm going to ask, if it's
12  possible, Mr. Frederick, can you shorten your objections
13  just so that we can --
14         MR. FREDERICK:  Yeah.
15         MS. MARANZANO:  I mean, you know, since
16  it's the same objection, that will maybe save us some
17  time.
18         MR. FREDERICK:  Absolutely.
19         MS. MARANZANO:  Thank you.
20         MR. FREDERICK:  If y'all are willing to --
21  you know, to stipulate that when I make a shorter
22  objection, it covers all the matters, I am happy to
23  shorten it.
24         MS. MARANZANO:  Great.  Thank you.
25         MR. FREDERICK:  Can I propose "Objection,

| 128 |
|---|

1  legislative privilege"?
2         MS. MARANZANO:  That's sounds --
3         MR. FREDERICK:  Is that good enough?
4         MS. MARANZANO:  That's great.  And you
5  will understand what he means overall.
6         THE WITNESS:  And then I may not forget
7  your question.
8         MR. FREDERICK:  Yeah.  Thanks.
9         MS. MARANZANO:  Okay.  Terrific.
10    Q.  (By Ms. Maranzano) During the Floor debate on
11  SB 362, did anyone raise concerns about the impact that
12  the bill might have on minority voters?
13    A.  Yes.
14    Q.  What concerns were those?
15    A.  I can't speak to specific concerns.
16    Q.  Who raised those concerns?
17    A.  Democrats and the senators.
18    Q.  Were they minority senators?
19    A.  Some of them were.
20    Q.  Do you know if they were senators who
21  represented minority voters?
22    A.  Yes.
23    Q.  What was the Senator's response to these
24  concerns?
25    A.  His response was that he disagreed.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 129

1  Q.  What was that disagreement based upon?

2      MR. FREDERICK:  Object on legislative

3  privilege, but matters in the public record you may

4  address.

5      A.  He referenced election data in both Georgia and

6  Indiana that showed that their voter ID laws did not

7  impact minority voters on the record.

8      Q.  (By Ms. Maranzano) What was that election data?

9      A.  Data from Indiana and Georgia's elections that

10 were held after they voted -- after they had a voter ID

11 law, that showed that the turnout increased.

12     Q.  So the data you referenced was about turnout?

13     A.  Yes, ma'am.

14     Q.  Was it solely about turnout?

15     A.  Yes, ma'am.

16     Q.  And was it about turnout of minority voters in

17 particular?

18     A.  All voters.

19     Q.  All voters?

20     A.  By I think the data he showed did have

21 minority -- I think the data he referenced in his

22 testimony did show that minority voters increased as

23 well.

24     Q.  And what years were those studies run?

25     A.  I don't remember.

---

### 130

1      Q.  Do you know if he looked into whether other

2  issues might have had any impact on that turnout?

3      MR. FREDERICK:  Objection, legislative

4  privilege.  To the extent there's material in the

5  record, you may answer.

6      A.  I'll assert privilege.

7      Q.  (By Ms. Maranzano) Did any of those studies

8  record any information about voter registration rates in

9  Indiana and Georgia?

10     A.  The data -- I'm sorry.  The data that I

11 mentioned was not a study.  It's actual voter turnout

12 from those states' Secretaries of State.  So I want to

13 be real clear that they're not studies.  We're talking

14 about actual turnout.

15     Q.  Okay.  I got you.  So did the Senator do any

16 research to determine whether voter registration rates

17 changed in those states during the years in which there

18 was an increase in voter turnout?

19     MR. FREDERICK:  Objection, legislative

20 privilege.  Instruct you not to answer.

21     A.  I'll assert privilege.

22     Q.  (By Ms. Maranzano) Did the Senator do any

23 research to determine whether there were any close

24 elections during those years?

25     MR. FREDERICK:  Objection, legislative

---

### 131

1  privilege.  Instruct you not to answer.

2      A.  Assert privilege.

3      Q.  (By Ms. Maranzano) Did the Senator do any

4  research to determine whether there were any high

5  profile elections during those years?

6      MR. FREDERICK:  Objection, legislative

7  privilege.  Instruct you not to answer.

8      A.  I assert privilege.

9      Q.  (By Ms. Maranzano) Did the Senator do any

10 additional research about turnout and Georgia and

11 Indiana?

12     MR. FREDERICK:  Objection, legislative

13 privilege.  Assert privilege.

14     A.  Assert privilege.

15     Q.  (By Ms. Maranzano) Did SB 362 change at all in

16 response to the concerns that were raised on the Senate

17 Floor?

18     MR. FREDERICK:  Objection, legislative

19 privilege, to the extent it calls for actual thought

20 process, but I think to the extent there's anything on

21 the record, you're free to testify about that.

22     A.  So I went and looked over at the break, while

23 y'all were doing your conference, about the process,

24 because I don't recall, didn't recall, and Senate Bill

25 362, there was a committee substitute in committee.  But

---

### 132

1  I don't think it changed on the Floor after the Floor

2  debate.

3      Q.  (By Ms. Maranzano) What were the changes that

4  occurred in committee?

5      A.  I didn't -- I don't recall, and I didn't have

6  time to review it.

7      Q.  I just want to go back to finish what you were

8  talking about earlier, and just make sure.  You said the

9  Senator disagreed with the opposition that was brought

10 up on the Floor, and then we talked about turnout.

11     A.  Uh-huh.

12     Q.  Were there any other bases from the Senator's

13 disagreement with the concerns that were raised on the

14 Floor?

15     MR. FREDERICK:  Object on the legislative

16 privilege only to the extent those bases were not

17 disclosed.  But if there's anything else on the record,

18 you're free to address it.

19     A.  I don't remember if he had any other arguments.

20     (Exhibit 33 marked for identification.)

21     Q.  (By Ms. Maranzano) Okay.  Ms. McCoy, I'm

22 showing you what we're marking for the record as

23 Deposition Exhibit 33, and it's Bates labeled U.S.

24 00005599 through U.S. 00005615.  And I'd like to turn

25 your attention to Page 5607 at the bottom and 5608.

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 133

1        Do you recognize this, sort of, the
2   overall document?
3        A.   Yes, ma'am.
4        Q.   Is it the Senate Journal from March 18th, 2009?
5        A.   Yes, ma'am.
6        Q.   And do you see on the pages I've directed you
7   to, there's a letter that was submitted by Senator West?
8        A.   The letter was submitted by Senator Van de
9   Putte.  Senator West had comments further down the page.
10       Q.   Gotcha.
11       A.   Is that the letter you're referring to?
12       Q.   Yes, the letter that -- well, I'm referring to
13  the letter the starts out by saying, "Senator West
14  submitted the following statement."
15       A.   Oh, that's not a letter.  That's his statement.
16       Q.   Okay.
17       A.   Uh-huh.
18       Q.   And then on the next page, if you see, it was
19  signed off by Senators West, Ellis, Gallegos, Lucio,
20  Shapleigh, Uresti, Van de Putte, Watson, Whitmire and
21  Zaffirini?
22       A.   Yes, ma'am.
23       Q.   And can you look at Paragraph Number 8, and
24  there's a sentence in there that says, "No Senator who
25  is an ethnic minority has voted in favor of such

## 134

1   legislation," and it's talking about voter ID
2   legislation.  Why do you think these senators felt the
3   need to put in the record the fact that no ethnic
4   minority had voted in favor of voter ID legislation?
5        MR. FREDERICK:  Objection, legislative
6   privilege to the extent it calls for the thought process
7   of these senators.  If you can answer on a nonprivileged
8   basis, you can.
9        A.   I cannot.
10       Q.   (By Ms. Maranzano) Did Senator Fraser place any
11  significance on the fact that there was such unified
12  opposition from the minority members of the Senate?
13       MR. FREDERICK:  Objection, legislative
14  privilege.  Instruct you not to answer.
15       A.   I'll assert privilege.
16       Q.   (By Ms. Maranzano) Why do you think there was
17  such strong opposition to SB 362?
18       MR. FREDERICK:  Objection, legislative
19  privilege.  Objection, calls for speculation.  I
20  instruct you not to answer.
21       A.   I'll assert privilege.
22            (Exhibit 34 marked for identification.)
23       Q.   (By Ms. Maranzano) Okay.  I'm showing you what
24  we're marking as Deposition Exhibit 34.
25            For the record, it's labeled Texas, Bates

## 135

1   range Texas, underscore, 00003857 through 00003920.
2        And I'd like to direct your attention to
3   Page 3911.  It's the second page of this.
4        Do you recognize -- first of all, do you
5   recognize this document?
6        A.   I don't think I've seen the whole document, but
7   I recognize what it is.
8        Q.   Is it a transcript -- does it appear to be a
9   copy of a transcript from the Committee of the Whole on
10  March 10th, 2009?
11       A.   Yes, ma'am.
12       Q.   Is that when you considered SB -- when the
13  Senate considered SB 362?
14       A.   Yes.
15       Q.   Can you look at the bottom of 3911.  It's a
16  statement from Senator Fraser.  And if you see at the
17  bottom of the page, the statement says, "And I actually
18  came back, and sat down, and I've got probably,
19  interestingly, more research and more reading and debate
20  on this bill maybe than one that I've ever done."
21       Can you tell me what reading and research
22  the Senator is referring to in that?
23       MR. FREDERICK:  Objection, legislative
24  privilege.  Instruct you not to answer.
25       A.   Again, I mean, the same reports and polls that

## 136

1   I referenced earlier would be what he was referencing
2   there.
3        Q.   (By Ms. Maranzano) Nothing in addition to what
4   you've already testified about?
5        A.   No, ma'am.
6            (Exhibit 35 marked for identification.)
7        Q.   (By Ms. Maranzano) Okay.  We marked this as
8   Deposition Exhibit 35.  It's TX underscore 00 --
9        A.   It's the same one you just gave us.
10       Q.   Oh, okay.  Well, we have two copies.  I'm going
11  to -- all right.  Let's just use the same exhibit, then.
12       I'm going to direct your attention
13  Page 3940.
14       A.   Uh-huh.
15       Q.   And do you see there is a comment from Senator
16  Watson?
17       A.   Oh, maybe it is different.  Uh-huh.  Yes.
18       Q.   Yes.  Okay.  And do you see that he asks a
19  question:  "Are you familiar with any data or study
20  that's been done with regard to some sort of statistical
21  analysis concerning the effect of the new requirements
22  of Senate Bill 362?"  And then on the next page, you see
23  Senator Fraser has an answer, and at the end of that,
24  that paragraph, he says, "I think you're asking a
25  subjective question that we have objective data that is



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 137

1  available that the witnesses are going to lay out.
2  You're asking have I done that?  The answer is no."  Do
3  you see all that?
4    A.  Uh-huh.
5    Q.  Do you recall this testimony?
6    A.  Not specifically, but...
7    Q.  Did Senator Fraser ever do any research on how
8  SB 362 would impact minority voters?
9    MR. FREDERICK:  Objection, legislative
10 privilege.  Instruct you not to answer.
11   Q.  (By Ms. Maranzano) Was there any testimony
12 presented during the debate of SB 362 by Senator Fraser
13 about any analysis related to the impact that the bill
14 would have on minority voters?
15   A.  I think the only testimony that Senator Fraser
16 might have talked about, in terms of voter turnout,
17 minority or not, was the election results from Indiana
18 and Georgia.
19   Q.  Did SB 362 pass the Senate?
20   A.  Yes.
21   Q.  Did Senator Fraser have any role with regard to
22 SB 362 once it was referred to the House?
23   A.  No.
24   Q.  Did you have any role?
25   A.  I met with Representative Todd Smith once.

### 138

1    Q.  Anybody else?
2    A.  No.
3    Q.  What was your meeting with Representative Smith
4  about?
5    MR. FREDERICK:  Object, legislative
6  privilege to the extent it seeks the substance of the
7  communications, but you are free to describe general
8  subject matter of the meeting, if you can.
9    A.  Senate Bill 14.  I mean, specifically the
10 provisions in Senate Bill 14.
11   Q.  (By Ms. Maranzano) And did Representative Smith
12 carry Senate Bill -- oh, wait.  Did you say Senate Bill
13 14?
14   A.  Oh, I'm sorry.  Senate Bill 362.  I'm sorry.
15   Q.  Did Representative Smith carry Senate Bill 362
16 in the House?
17   A.  Yes.
18   Q.  And did the bill pass the House?
19   A.  No.
20   Q.  Why not?
21   A.  It ran out of time.
22   Q.  Was it essentially filibustered in the House?
23   A.  I don't really remember how that worked, but I
24 think it -- yes.  No.  That's the wrong term.  The
25 calendar was filibustered.

### 139

1    Q.  Okay.  All right.  Thank you for the
2  distinction.
3    A.  Yeah.  I don't -- yeah.
4    Q.  You testified earlier about Senate Bill 363.
5  Do you recall that --
6    A.  Yes, ma'am.
7    Q.  -- when we read the news article?
8    Can we have this marked as Exhibit 36?
9    (Exhibit 36 marked for identification.)
10   Q.  (By Ms. Maranzano) Does this appear to be a
11 copy of Senate Bill 363 that you referred to earlier?
12   A.  Yes, ma'am.
13   Q.  What are the general requirements of this
14 legislation in regard to voter registration applicants?
15   A.  Honestly, without reading it again, I can't
16 tell you.
17   Q.  Would it sound correct to you if I said that
18 this requires voter registration applicants to prove
19 citizenship?
20   MR. FREDERICK:  And take your time to read
21 it, if you need to.
22   A.  (Viewing documents.)  Yes.
23   Q.  (By Ms. Maranzano) What was the purpose of
24 Senate Bill 363?
25   MR. FREDERICK:  I object to legislative

### 140

1  privilege to the extent that it seeks mental
2  impressions, thought process, or confidential
3  communications, but to the extent that the question just
4  seeks the purpose of the bill, then you may answer, if
5  you know.
6    A.  I don't remember.
7    Q.  (By Ms. Maranzano) Was this filed at the same
8  time as Senate Bill 362?
9    A.  Yes, ma'am.
10   Q.  Were they filed -- would you say these bills
11 were filed in conjunction with each other?
12   A.  Yes, ma'am.
13   Q.  Why would it be necessary for a voter
14 registration applicant to prove their citizenship?
15   MR. FREDERICK:  Objection, calls for
16 speculation.
17   A.  I don't remember this bill.
18   Q.  (By Ms. Maranzano) Did you work on this bill,
19 Ms. McCoy?
20   A.  Not since it was filed in November of 2008.
21   Q.  Do you recall that press release that we looked
22 at earlier today?
23   A.  Yes, ma'am.
24   Q.  And did it mention Senate Bill 363?
25   A.  Yes, ma'am.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 141

1    Q.   And didn't you testify that you had written
2  that press release?
3    A.   Yes, ma'am.
4    Q.   Are you aware of any evidence that noncitizens
5  register to vote?
6        MR. FREDERICK:  I'll object, legislative
7  privilege, to the extent this seeks your thought
8  process, mental impressions or those of Senator Fraser
9  related to this pending legislation.  To the extent you
10 can answer just based on general knowledge, if you can,
11 you're free to do so.
12   A.   I don't know.
13   Q.   (By Ms. Maranzano) You don't know of any
14 evidence?
15   A.   I do not.
16   Q.   Did you look into any such evidence when you
17 were working on Senate Bill 363?
18       MR. FREDERICK:  Objection, legislative
19 privilege.  Instruct you not to answer.
20   A.   I don't recall.
21   Q.   (By Ms. Maranzano) Are you familiar with a
22 federal law called the Help America Vote Act?
23   A.   Yes.
24   Q.   Does HAVA, the Help America Vote Act, implement
25 certain identification requirements for voter

### 142

1  registration applicants?
2    A.   Yes.
3    Q.   Is there any reason to think that those forms
4  of identification wouldn't be sufficient?
5        MR. FREDERICK:  Objection, calls for
6  speculation.  You can answer if you can.
7    A.   Well, my understanding is, HAVA requires your
8  driver's license or your social security card number.
9  Those are the photo -- those are the IDs.
10   Q.   And if a person does not list those forms of
11 identification on their voter registration application,
12 are you familiar with any additional requirements?
13   A.   When they go to vote the first time, they're
14 supposed to show some form of ID.
15   Q.   And do you know what forms of ID are acceptable
16 HAVA?
17   A.   I do not.
18   Q.   Do you know if it's only photo identification?
19   A.   I think it's more than that, but I don't know
20 specifically.
21   Q.   Did you look into the requirements of HAVA when
22 you were working on any voter identification bills?
23       MR. FREDERICK:  Objection, legislative
24 privilege.  Instruct you not to answer.
25   A.   I'll assert privilege.

### 143

1    Q.   (By Ms. Maranzano) Do you know what ethnic
2  group makes up the largest percentage of the noncitizen
3  population in Texas?
4    A.   The noncitizen --
5    Q.   Uh-huh.
6    A.   -- population in Texas?  No.
7    Q.   How long have you lived in Texas?
8    A.   My whole life.
9    Q.   And you have no idea what ethic group makes up
10 the largest -- percentage of the noncitizen population?
11   Q.   Do you want me to guess?
12       MR. FREDERICK:  Objection, argumentative.
13   Q.   (By Ms. Maranzano) You can make an educated
14 guess.
15   A.   Hispanic.
16   Q.   And what's your educated guess based on?  Your
17 time in Texas?
18   A.   We're close to Mexico.
19   Q.   Okay.  Let's talk about Senate Bill 14.  When
20 did Senator Fraser introduce Senate Bill 14?
21   A.   In November of 2010, Senator Fraser filed a
22 piece of legislation -- and I don't recall the bill
23 number -- that was essentially Senate Bill 14.  When
24 session started, we refiled that legislation as Senate
25 Bill 14, so it was right January of 2011.

### 144

1    Q.   Would it sound correct to you if I say:  Did he
2  introduce a bill that's called Senate Bill 178?
3    A.   That's it.  Yes, ma'am.
4    Q.   And that was the one that was introduced prior
5  to the session beginning?
6    A.   Yes, ma'am.
7    Q.   Was that the same as Senate Bill 14 as it was
8  introduced?
9    A.   No, ma'am.
10   Q.   What were the changes?
11   A.   There was a provision added to Senate Bill 14
12 to exempt certain elderly people from the provisions of
13 voter ID.
14   Q.   And how did that get added?
15       MR. FREDERICK:  Object, legislative
16 privilege.  If you can answer without revealing
17 confidential communications or thought processes, you
18 may.
19   A.   I'll assert privilege.
20   Q.   (By Ms. Maranzano) Did anyone ask Senator
21 Fraser to introduce Senate Bill 14?
22       MR. FREDERICK:  Object, legislative
23 privilege.  Instruct you not to answer.
24   A.   I'll assert privilege.
25   Q.   (By Ms. Maranzano) Did Senator Fraser ever make

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                                    MAY 16, 2012



---

**145**

1   any public commitments to introduce Senate Bill 14 after
2   Senate Bill 362 did not get enacted?
3       A.  Probably, but I can't definitively say.
4       Q.  Was Senate Bill 14 given a designation by
5   Governor Perry as emergency legislation?
6       A.  Governor Perry designated photo ID as an
7   emergency.  I don't think that order specifically said
8   that bill number.
9       Q.  What does it mean to be designated emergency
10  legislation?
11      A.  According to the constitution, the Legislature
12  can't do anything substantive for 60 days unless the
13  Governor says it's an emergency.
14      Q.  How did photo ID come to be included in the
15  Governor's designation?
16      A.  I don't know.  I'll just tell you.  I mean...
17      Q.  Did you have any conversations with anyone in
18  the Governor's Office about the emergency designation?
19      A.  No.
20      Q.  Did the Senator?
21      A.  I don't know.
22      Q.  Why would photo ID requirements need to be
23  considered within the first 60 days of the legislative
24  session?
25          MR. FREDERICK:  Objection, calls for

---

**146**

1   speculation.  You can answer if you know.
2       A.  I don't know.
3       Q.  (By Ms. Maranzano) Were there any elections
4   scheduled within the first 60 days of 2011, of the 2011
5   legislative session?
6       A.  I don't think so, but I can't speak to every
7   election that local governments or...
8       Q.  What other categories of -- what other topics
9   were given emergency designation in 2011?
10      A.  I don't remember.
11      Q.  Does legislation automatically get considered
12  within the first 60 days if it's designated as emergency
13  legislation?
14      A.  No.
15      Q.  Who makes the decision whether or not the
16  legislation will be heard within the first 60 days?
17      A.  My guess is leadership, Lieutenant Governor or
18  the Speaker.  They set the calendars.
19      Q.  Did you have any conversations with anybody in
20  the Lieutenant Governor's Office about SB 14 getting
21  heard within the first 60 days of the 2011 legislative
22  session?
23          MR. FREDERICK:  Object, legislative
24  privilege.
25      A.  Yes.

---

**147**

1           MR. FREDERICK:  I think that's calls
2   for --
3           THE WITNESS:  Sorry.
4           MR. FREDERICK:  Just let me finish my
5   objection, please.
6           THE WITNESS:  Okay.
7       Q.  (By Ms. Maranzano) Who in the Lieutenant
8   Governor's Office did you have a conversation with?
9       A.  Julia Rathgeber and Blaine Brunson.
10      Q.  How many conversations did you have with them?
11      A.  Probably two on that issue.
12      Q.  How many conversations did you have with the
13  Lieutenant Governor's Office about SB 14?
14      A.  I probably spoke to them once or twice a day
15  during the whole process until voter ID left the Senate.
16      Q.  And is there anybody, other than the people
17  that you've already testified to from the Lieutenant
18  Governor's Office, who you were communicating with?
19      A.  In the Lieutenant Governor's Office?
20      Q.  Uh-huh.
21      A.  No.
22      Q.  So am I correct that it was Julia Rathgeber,
23  Blaine Brunson and Bryan Hebert?
24      A.  Uh-huh.
25          (Brief discussion held off the record.)

---

**148**

1       Q.  (By Ms. Maranzano) Okay.  Ms. McCoy, I'm
2   showing you what we've marked as Deposition Exhibit 5
3   for the record.  Do you recognize what this is?
4       A.  It's the enrolled version of Senate Bill 14.
5       Q.  And can you look at Section 14 of the bill and
6   tell me what forms of identification are permitted under
7   Senate Bill 14?
8       A.  A driver's license, an election ID certificate,
9   an ID card by DPS, a military ID card, a citizens
10  certificate, a passport, and a license to carry a
11  concealed handgun.
12      Q.  What is a military identification card?
13      A.  My understanding is it's a card issued by the
14  Department of Defense.
15      Q.  Is it your understanding that only the
16  Department of Defense issues military IDs that would be
17  acceptable under SB 14?
18      A.  Yes.
19      Q.  And what's that understanding based on?
20          MR. FREDERICK:  We'll object on
21  legislative privilege, only to the extent it would
22  require you to disclose confidential communications or
23  thought process.  If it's based on something outside of
24  that, then you're free to answer.
25      A.  I'll assert privilege.

---



**ESQUIRE**
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 149

1    Q.   (By Ms. Maranzano) Have you ever seen a
2    military ID card?
3    A.   No.
4    Q.   Do you know if veterans ID -- a veterans
5    identification is an acceptable form of military
6    identification under SB 14?
7    A.   I don't believe that it is.
8    Q.   And what is that based on?
9    A.   The Department of Veterans Affairs is not a
10   military.  It's an executive branch agency.
11   Q.   Do you know if any Department of Homeland
12   Security identifications would be considered acceptable
13   under SB 14?
14   A.   Again, I would say no.
15   Q.   And what is that based on?
16   A.   That they're not also not military.  They're
17   not under the Department of Defense.
18   Q.   What is a citizenship certificate?
19   A.   My understanding is when someone becomes a
20   citizen of the United States, they are issued a
21   certificate showing that they are now a citizen.
22   Q.   Do you know how much it costs to get a
23   citizenship certificate?
24   A.   No.
25   Q.   Do you know how much is costs to get a United

## 150

1    States passport?
2    A.   No.
3    Q.   Did you look into the cost of obtaining these
4    IDs when you were working on SB 14?
5    A.   No.
6    Q.   Can you look at Page 11, Section 16 of the
7    bill?  Does SB 14 increase criminal penalties for a
8    person who impersonates a voter?
9    A.   Yes.
10   Q.   Were you involved in the drafting of SB 14?
11   A.   Yes.
12   Q.   What involvement did you have?
13   A.   I presented options to Senator Fraser, and when
14   he determined what he wanted included in the bill, I had
15   it drafted by Senate Engrossing and Enrolling.
16   Q.   Who is Senate Engrossing and Enrolling?
17   A.   It's an administrative arm of the Senate that
18   works on -- it's a group of lawyers that help us with
19   bill drafts and amendments.
20   Q.   What options did you present to Senator Fraser?
21   MR. FREDERICK:  Objection, legislative
22   privilege.  Instruct you not to answer.
23   A.   I'll assert privilege.
24   Q.   (By Ms. Maranzano) Does Senate Engrossing and
25   Enrolling -- did you say that was a committee?

## 151

1    A.   No, ma'am.  It's an administrative arm of the
2    Senate.
3    Q.   Do they provide legal advice about whether a
4    law complies with federal law?
5    A.   No.
6    Q.   Are they connected at all to the Texas
7    Legislative Council?
8    A.   No.
9    Q.   How are those two bodies different?
10   A.   The Texas Legislative Council -- well, Senate
11   Engrossing and Enrolling is strictly a body that's
12   designed to assist the senators, but they do the same
13   essential work.  They work just for the Senate.
14   MS. MARANZANO:  Mr. Frederick, have you
15   produced any documents from the Engrossing and Enrolling
16   branch that Ms. McCoy is testifying about?
17   MR. FREDERICK:  I am not aware at this
18   time whether or not we have.
19   MS. MARANZANO:  Have you reached out to
20   them in terms of the document requests that were
21   propounded on the State of Texas?
22   MR. FREDERICK:  I'm not aware that we
23   have.
24   MS. MARANZANO:  It sounds to me like they
25   might have relevant documents, so I'd request that you

## 152

1    all do that.
2    Q.   (By Ms. Maranzano) Did you also work with the
3    TLC, Ms. McCoy, in developing SB 14?
4    A.   Yes.
5    Q.   And what was the TLC's role?
6    A.   I'm trying to remember if we did substitutes or
7    amendments.  But they assisted me with either a
8    substitute or potential amendments.  And then at the
9    end, they also assisted me with the conference committee
10   reports.
11   Q.   When you say -- all right.  So the substitute,
12   can you tell me what the substitute was?
13   A.   I don't remember how we moved this bill through
14   the process.  I don't remember if we had a substitute.
15   I don't remember if we had amendments.  So once we filed
16   the bill with the E & E draft, I used the Legislative
17   Council, as we moved forward, with whatever drafting
18   needs I had.  But I don't remember what those drafting
19   needs are -- were.
20   Q.   So just so I'm clear, what -- how do you
21   distinguish between the drafting E & E does versus the
22   drafting that Texas Legislative Council does?  Is it the
23   process that the bill is in, or is there another
24   distinction?
25   A.   Senate Engrossing and Enrolling moves a lot



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 153

1   faster, so when we need quick drafts, we tend to use
2   them.  Legislative Council is a little bit slower, but
3   they review all of the sections of the code to make sure
4   that we're -- if something needs to get changed for
5   compliance -- not -- compliance is not the right word,
6   but settle up reasons, they'll say, "Hey, if you're
7   amending this section of code, you need to address this
8   section, too."  And so sometimes we go through Leg
9   Council, even though we know it's going slower, to make
10  sure that we've hit every part of the code or statute
11  that we need to.
12      Q.  And does Leg Council also look at how
13  legislation interacts with federal law?
14      A.  I don't know.
15      Q.  So did you go through the Engrossing and
16  Enrolling with the initial draft of SB 14 because you
17  were on an expedited -- because you were -- it was
18  because the bill was given emergency designation?
19      A.  No.  We used Engrossing and Enrolling in
20  November because we wanted to get the bill filed as
21  close to the first day of filing as we could.
22      Q.  And why was that?
23      A.  The Senator just wanted to.
24      Q.  Were there multiple drafts of SB 14 prior to it
25  being introduced?

## 154

1       A.  Yes.
2       Q.  And would E & E, Engrossing and Enrolling, be
3   the -- would they be the holders of those drafts?
4       A.  No.
5       Q.  Who would?
6       A.  Me.
7       Q.  And did you keep them?
8       A.  Yes.
9       Q.  And did you turn them over to your counsel?
10      A.  Yes.
11      Q.  Did Senate Engrossing and Enrolling draft
12  SB 362 as well?
13      A.  Yes.
14      Q.  Did they draft HB 218 as well?
15      A.  Oh, I'm sorry.  No, no, no.  I'm sorry.  I got
16  confused.  Senate Bill 362 in 2009 was drafted by
17  Legislative Council.
18      Q.  And why was that one drafted by Legislative
19  Council?
20      A.  Because it was -- I think what I filed as
21  Senate Bill 362 was the Senate Committee report of House
22  Bill 218.  So that's all I asked them to do, was, like
23  would you just make this document ready to file, and
24  they did.
25      Q.  Who from -- if I say E & E, can we agree that

## 155

1   that's this Engrossing and Enrolling?
2       A.  Yes, ma'am.  That's how we call them.
3       Q.  Okay.  Who from E & E did you work with on
4   Senate Bill 14?
5       A.  Mardi, M-a-r-d-i, Alexander was my contact.
6       Q.  Anybody else?
7       A.  She was head of E & E.  I think she assigned it
8   to a lawyer, but she's who I dealt with.
9       Q.  How did you communicate with Ms. Alexander?
10      A.  E-mail.
11      Q.  Did you save those e-mails?
12      A.  If I printed out the e-mail, I saved it.  If it
13  was not printed out, then it was not saved.
14      Q.  And would those be in your files if you printed
15  out the e-mails?
16      A.  Yes, ma'am.
17      Q.  And that's the files that we talked about
18  earlier that you kept of SB 362 and SB 14?
19      A.  Yes, ma'am.
20      Q.  Do you know about how many e-mails you
21  exchanged Ms. Alexander?
22      A.  Three or four.
23      Q.  For the whole process of drafting SB 14?
24      A.  Yes, ma'am.
25      Q.  Was there anything you looked at, when you were

## 156

1   developing SB 14, that you haven't already testified to,
2   when we were talking about other bills?
3           MR. FREDERICK:  Object, legislative
4   privilege.  Instruct you not to answer.
5       A.  I'll assert privilege.
6       Q.  (By Ms. Maranzano) Did you have any
7   communications about SB 14 with other legislators?
8       A.  Yes.
9       Q.  Which legislators?
10      A.  Throughout the process?
11      Q.  Uh-huh.
12      A.  I would say probably 90 percent of the
13  senators.  Representative Harless.
14      Q.  Anyone else?
15      A.  I'm trying to think.  That's -- I mean, those
16  are the ones I can remember.  House members.  Other
17  House members potentially, but it was probably more of
18  size than substantive.
19      Q.  Did you have communications with any
20  individuals from the Governor's Office about SB 14?
21      A.  Yes.
22      Q.  And who was that?
23      A.  Michael Scofield.
24      Q.  When was that?
25      A.  Throughout the legislative session.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 157

1  Q.  Were those communications verbal or written?
2  A.  Verbal.
3  Q.  By phone or in person?
4  A.  Both.
5  Q.  Was Senator Fraser involved in those
6  communications?
7  A.  Yes.
8  Q.  In none of them?
9  A.  No.
10  Q.  What was the nature of those communications?
11  MR. FREDERICK:  I'll object, legislative
12  privilege.  Instruct you not to answer.
13  A.  I'll assert.
14  Q.  (By Ms. Maranzano) Did you have communications
15  about SB 14 with any interest groups or lobbyists?
16  A.  Yes.
17  Q.  What groups?
18  A.  I talked to AARP a couple of times.  I'm pretty
19  sure the Disability Coalition, although I'm not sure
20  that's how they're known, came in a time or two, and
21  that group out of Houston, the Patriots or the -- I
22  can't think of what their name is.
23  Q.  Does the King Street Patriots sound correct?
24  A.  Yes, ma'am.  The King Street Patriots.  I think
25  they came in once.  Other than that, I can't think of

## 158

1  any particular interest group that came in.
2  Q.  Did you have any communications with a group by
3  the name of American Legislative Exchange Council, or
4  ALEC, about SB 14?
5  A.  I did not.
6  Q.  Did the Senator?
7  A.  Not to my recollection.
8  Q.  Did you have any communications with an
9  individual by the name of Catherine Engelbrecht about SB
10  14?
11  A.  I did not, but I think she testified.  Did she
12  testify in the Senate?  I can't remember.  I'm sorry.
13  Q.  Did you have any communications with an
14  individual by the name of Paul Bettencourt about SB 14?
15  A.  Yes.
16  Q.  How many?
17  A.  Maybe two.
18  Q.  And do you remember when -- when were those
19  communications?
20  A.  I do not recall.
21  Q.  Were they in person or by phone?
22  A.  By phone.
23  Q.  Were you and he the only parties to those
24  conversations?
25  A.  As far as I know, yes.

## 159

1  Q.  What was the nature of those conversations?
2  MR. FREDERICK:  Object on legislative
3  privilege and instruct you not to answer.
4  A.  I'll assert.
5  Q.  (By Ms. Maranzano) Can you tell me the general
6  nature of your conversation with Mr. Bettencourt in
7  terms of a --
8  A.  I generally am having a hard -- I think -- I
9  know I talked to him.
10  Q.  Uh-huh.
11  A.  And generally, I'm -- I honestly don't recall
12  that he was helpful to me.  I don't really remember.  We
13  generally talked about Senate Bill 14.
14  Q.  How about the general nature of your
15  conversation with the King Street Patriots?
16  MR. FREDERICK:  To the extent it's a
17  general subject matter, I'll permit you to answer.
18  THE WITNESS:  Right.  Okay.
19  A.  I think generally, they came in to talk about
20  their history of monitoring elections in Harris County.
21  Q.  (By Ms. Maranzano) Did they bring up any
22  in-person voter impersonation?
23  MR. FREDERICK:  Object, legislative
24  privilege and instruct you not to answer.
25  A.  I'll assert.

## 160

1  Q.  (By Ms. Maranzano) Did you say there was a
2  disability group that came in, disability advocate?
3  A.  I don't -- I think that the disability
4  lobbyists, interest group came in as we were in
5  conference committee to talk to me about the language
6  that was added -- that was amended by the House.
7  Q.  And what was that amendment?
8  A.  It was the Section 1 of the bill.
9  Q.  And were they concerned about that?
10  MR. FREDERICK:  Objection, legislative
11  privilege.  Instruct you not to answer.
12  Q.  (By Ms. Maranzano) Did you have any
13  communications about SB 14 with an individual by the
14  name of Hans von Spakovsky?
15  A.  No.
16  Q.  Did you have any communications with any local
17  election officials about SB 14?
18  A.  I don't recall.
19  Q.  Did you have any communications with the Texas
20  Republican Party about SB 14?
21  A.  I don't think so, but I don't recall.
22  Q.  Did Senator Fraser exchange drafts of SB 14
23  with anyone other than Engrossing and Enrolling or TLC?
24  MR. FREDERICK:  We'll object on
25  legislative privilege to the extent that it seeks the



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

|  161  |  163  |
|---|---|

**161**

1  substance of those drafts, but the fact that drafts were
2  exchanged, you can testify if you remember.
3      A.  No.
4      Q.  (By Ms. Maranzano) Did he discuss drafts of the
5  bill with anybody other than E & E or the Legislative
6  Council?
7          MR. FREDERICK:  Same objection and
8  instruction.  The fact of the communications you can
9  identify.
10     A.  I don't think so.
11         (Discussion held off the record.)
12         (Exhibit 37 marked for identification.)
13     Q.  (By Ms. Maranzano) Can you take a look at --
14  and what exhibit number is -- 23?  Okay.  So I'm showing
15  what we're marking as Deposition Exhibit 37, along with
16  what's been previously marked as Deposition Exhibit 23.
17         And can you look at 37 for a moment and
18  tell me if you recognize that document?
19     A.  I do.
20     Q.  What is that?
21     A.  That's a declaration.
22     Q.  And is that your declaration?
23     A.  Yes, ma'am.
24     Q.  Did you sign that in response to providing
25  information that's contained in Interrogatory Response

**162**

1  Number 1 in Deposition Exhibit 23?
2      A.  Yes, ma'am.
3      Q.  What did you do to compile the list of names
4  that's included in Response Number 1?
5          MR. FREDERICK:  I'm going to object to
6  that on grounds of work product.
7          MS. MARANZANO:  But she's verifying the
8  names.  I'm just asking her what she did to compile the
9  information.  Is that --
10         MR. ROSENBERG:  Whose work product?
11         MR. FREDERICK:  Well, she compiled the
12  information at the direction of an attorney, namely
13  me.  I mean...
14         MS. MARANZANO:  I mean, I'm interested in
15  what she did to come up with the information of who
16  participated in the process of putting SB 14 together.
17  Did she talk to people?  Did she go through records?  Is
18  that, in your mind, work product?
19         MR. FREDERICK:  Hmm.  I mean, if she can
20  answer without waiving the objection.
21         MS. MARANZANO:  What about this:  What did
22  you do to make sure this was a complete list of
23  individuals responsive to Interrogatory Number 1?  Does
24  that alleviate your concerns, Mr. Frederick?  I mean,
25  she did verify in a sworn declaration that she was

**163**

1  supplying this information.
2          MR. FREDERICK:  Okay.  Yeah.  You can
3  answer.
4      A.  Okay.  Well, I worked with the Attorney
5  General's Office and Colby in Representative Harless's
6  office to try and remember who helped in developing and
7  analyzing Senate Bill 14, and amongst three offices,
8  this is the list we produced.
9      Q.  (By Ms. Maranzano) Did you review any documents
10  when you were compiling this list?
11     A.  No.
12     Q.  Did you review any e-mails when you were
13  compiling this list?
14     A.  No.
15     Q.  Did you review anything, or is this solely from
16  your memory and Mr. Beuck's memory?
17     A.  I can't speak for Mr. Beuck in terms of how he
18  developed.
19     Q.  Okay.  Good point.  The names that you provided
20  here, are they solely from your memory?
21     A.  Yes, ma'am.
22     Q.  With regard to Page 3 and 4, do you see there's
23  a list of several legislators:  Representative Pena,
24  Representative Gonzalez, Representative Aliseda, and
25  they are described as co-sponsors and joint sponsors?

**164**

1      A.  Uh-huh.
2      Q.  Are there additional joint sponsors and
3  co-sponsors of SB 14?
4      A.  There's additional co-authors.  All of the 18
5  Senate Republicans signed on as co-authors.  I do not
6  know if there were additional co-sponsors in the House.
7      Q.  You know, I'm going to show you what we've
8  marked -- what was this -- this has been previously
9  marked as Deposition Exhibit 8.
10     A.  Uh-huh.
11     Q.  Can you look at that and tell me if it
12  refreshes your recollection as to are there other
13  co-sponsors of SB 14?
14     A.  Like I said, all the other 18 Republicans and
15  apparently, quite a few House members also were
16  co-sponsors.
17     Q.  So why are only these three of the co-sponsors,
18  these three legislators who co-sponsored or joint
19  sponsored the bill, listed in response to Interrogatory
20  Number 1?
21         MR. FREDERICK:  You know, I let you ask
22  her a little bit.  I'm very uncomfortable with this line
23  of questioning, because I think it invades attorney work
24  product that goes to the process of answering discovery,
25  and I object to the question on grounds of work product



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 165

1  privilege, the work product immunity.

2          MS. MARANZANO:  Okay.  I mean, our

3  position is she signed a sworn declaration that this is

4  complete and accurate information.

5          MR. FREDERICK:  I would disagree.

6          MS. MARANZANO:  True and correct.

7          MR. FREDERICK:  Yes, that I would agree

8  to.

9          MS. MARANZANO:  And so our position is

10 that we should be able to question her about what she

11 did to make sure it was true and correct and what she

12 meant, you know, by listing these as the individuals who

13 are responsive to the request.  It's about the three.

14         The question remains about the three

15 co-sponsors and joint -- and the -- about Representative

16 Aliseda, Representative Gonzalez, Representative Pena,

17 and why those three individuals are listed in response

18 to Interrogatory Number 1 and why the other co-sponsors

19 are not listed.  So let's just, you know, be clear.  Are

20 you going to instruct her not to answer that question?

21         MR. FREDERICK:  No.  I'll permit her to

22 respond subject to my objection.

23    Q.  (By Ms. Maranzano) So the question is about why

24 Representative Pena, Gonzalez and Aliseda are listed

25 here, and the description provided for them is that they

## 166

1  were co-sponsors and joint sponsors.  But my

2  understanding is that there a number of other co-

3  sponsors and joint sponsors who are not listed here.

4    A.  And those names were provided by Representative

5  Harless's Office as people that were instrumental in

6  specifically drafting, proposing, and developing Senate

7  Bill 14.  My assumption, when I signed this, was that

8  the other members that supported the legislation didn't

9  draft, propose, develop, or analyze the bill.  They

10 supported it, but they didn't do those fours things.

11 And so that's, I think, probably how these members got

12 on the list and not every member.

13    Q.  And was the person who provided these names to

14 you, Mr. Beuck?

15    A.  Yes.

16    Q.  And do you see that on Page 5, Mr. Beuck is,

17 is also listed?

18    A.  Yes, ma'am.

19    Q.  Would it surprise you to learn that

20 Representative Harless testified yesterday that

21 Mr. Beuck was not instrumental in drafting, developing,

22 and passing SB 14?

23         MR. FREDERICK:  Object, mischaracterizes

24 the testimony and assumes facts not in evidence.

25    Q.  (By Ms. Maranzano) Would you like to me to read

## 167

1  you testimony from yesterday?

2    A.  Sure.

3    Q.  The question was:  "And the State of Texas has

4  indicated that Mr. Beuck assisted with the drafting,

5  development, and passage of SB 14 in the Texas House of

6  Representatives.  Are you aware of any assistance that

7  Mr. Beuck provided concerning the drafting of SB 14?"

8          Representative Harless said, "I have no

9  idea."

10         "Were you aware of any assistance he

11 provided in the development of SB 14?"

12         Representative Harless said, "I have no

13 idea."

14         MR. FREDERICK:  Can I get page and line

15 cite for that?

16         MS. MARANZANO:  Yes.  That is, of the

17 dirty transcript, at Page 201, Line -- I think I started

18 reading -- I read Line 12 through Line 20.  And that's

19 of the transcript that we were sent last night, not the

20 final.

21         MR. FREDERICK:  Thank you.

22    Q.  (By Ms. Maranzano) Would that surprise you

23 Ms. McCoy?

24    A.  That she didn't remember?

25    Q.  That she has no idea if Mr. Beuck was involved

## 168

1  in the development, drafting, and passing of SB 14?

2    A.  Yes.

3    Q.  Can you look at -- below Mr. Beuck's name on

4  the interrogatories, Bryan Hebert and Julia Rathgeber?

5    A.  Uh-huh.

6    Q.  Can you tell me what Mr. Hebert's role was in

7  the drafting of SB 14?

8          MR. FREDERICK:  Object on the grounds of

9  legislative privilege.  To the extent you can answer

10 without revealing -- no, I'm going to object.  I'm going

11 to object to that on legislative privilege and instruct

12 you not to answer.

13    A.  I'll assert privilege.

14    Q.  (By Ms. Maranzano) Can you tell me what

15 Mr. Hebert's role was in analyzing SB 14?

16         MR. FREDERICK:  Object, legislative

17 privilege.  Instruct you not to answer.

18    A.  I'll assert privilege.

19    Q.  (By Ms. Maranzano) Can you tell me what

20 Ms. Rathgeber's role was in assisting with the

21 development of SB 14?

22         MR. FREDERICK:  Objection, legislative

23 privilege.  Instruct you not to answer.

24    A.  I'll assert privilege.

25    Q.  (By Ms. Maranzano) And at the bottom of Page 5,



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

169

1   the top of Page 6, do you see Mr. Battle is listed as
2   somebody who assisted with the analysis of legal
3   questions relating to SB 14.  Can you tell me what legal
4   questions Mr. Battle analyzed?
5        MR. FREDERICK:  Objection, legislative
6   privilege.  Instruct you not to answer.
7        A.  I'll assert privilege.
8        MS. MARANZANO:  And is that even on what
9   issues he was looking at Mr. Frederick, what legal
10  issues he --
11       MR. FREDERICK:  Yeah, that reflects the
12  thought process in mental impressions.
13       Q.  (By Ms. Maranzano) And below Mr. Battle,
14  Mr. Brunson is listed as involved in the development of
15  SB 14.  Can you tell me what his role was in the
16  development of SB 14?
17       MR. FREDERICK:  Objection, legislative
18  privilege.  Instruct you not to answer.
19       A.  I'll assert privilege.
20       Q.  (By Ms. Maranzano) Can you turn to Page 7, and
21  there's two individuals who are listed as staff members
22  for Senator Tommy Williams, both Amanda Montague and
23  Ryan Larue.  Can you tell me why these two staffers are
24  listed here, but Senator Williams is not?
25       MR. FREDERICK:  Again, this whole line of

---

170

1   questioning I object to.  I object to that question on
2   the grounds of work product immunity.
3        Q.  (By Ms. Maranzano) Why don't we do this,
4   Ms. McCoy.  Can you just look through the list and tell
5   me, as you sit here today, if this looks like a true and
6   correct list of individuals involved in the drafting,
7   development -- drafting, proposing, development or
8   analysis of SB 14?
9        MR. FREDERICK:  May I also note for the
10  record that the State -- I mean, as reflected in the
11  exhibit, the State made numerous objections to the
12  request, including overbreadth, undue burden.
13       But you may answer to the extent you can.
14       A.  I think that potentially you could have listed
15  every elected official and every legislator in this
16  document.  But I think this list is pretty complete,
17  given that Senate Bill 14 and how it was developed.
18       Q.  (By Ms. Maranzano) Every -- every legislator in
19  the Texas Senate could be listed as being involved in
20  the drafting, development --
21       A.  Or analysis.
22       Q.  -- or analysis?
23       A.  They all had a thought.  They all had talked
24  about it.  And if you wanted to just...
25       Q.  Did you consider listing every legislator in

---

171

1        response to Interrogatory Number 1?
2        A.  No.
3        Q.  Why not?
4        MR. FREDERICK:  I object.  It's attorney
5   work product.  I instruct you not to answer that
6   question.
7        Q.  (By Ms. Maranzano) Are you following your
8   counsel's advice not to answer?
9        A.  Yes.
10       Q.  In drafting SB 14, did you or the Senator
11  review any studies or reports or analysis that you
12  haven't already testified about today?
13       MR. FREDERICK:  You may testify to the
14  fact of yes or no whether you did.
15       A.  Yes.
16       Q.  (By Ms. Maranzano) What were those?
17       MR. FREDERICK:  Objection, legislative
18  privilege.  Instruct you not to answer.
19       Q.  (By Ms. Maranzano) How many --
20       A.  Well, except that in the record, we referenced
21  more recent polls, more recent public opinion polls.
22  Those types of things weren't -- and they're in the
23  record, so I'll tell you that they were there.
24       Q.  Were there any polls or reports or studies or
25  analysis that you reviewed that are not in the public

---

172

1   record?
2        MR. FREDERICK:  Again, I'll instruct you
3   that you may answer to the question posed, which is a
4   yes-or-no question.
5        A.  Yes.
6        Q.  (By Ms. Maranzano) And for the record, what
7   were those?
8        MR. FREDERICK:  Objection, legislative
9   privilege.  Instruct you not to answer.
10       A.  I'll assert privilege.
11       Q.  (By Ms. Maranzano) How many were there?
12       MR. FREDERICK:  You know what; I'm going
13  to object to that on legislative privilege and instruct
14  you not to answer as well.  That goes to thought
15  processes and mental impressions.
16       A.  I'll assert privilege.
17       Q.  (By Ms. Maranzano) Who were the authors or who
18  conducted these reports or studies?
19       MR. FREDERICK:  Objection, legislative
20  privilege.  Instruct you not to answer except to the
21  extent that the question includes matters that are on
22  the public record.
23       A.  The one in particular that's on the record is
24  the one led by Lighthouse.
25       Q.  (By Ms. Maranzano) Ms. McCoy, did you consider

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                               MAY 16, 2012

---

173

1   including any additional forms of identification in
2   SB 14?
3            MR. FREDERICK:  Objection, legislative
4   privilege.  Instruct you not to answer the question.
5       A.  I'll assert privilege.
6       Q.  (By Ms. Maranzano) Did you consider including
7   identification forms that had expired?
8            MR. FREDERICK:  Objection, legislative
9   privilege.  Instruct you not to answer.
10      A.  Except that -- the answer is yes, and there's
11  an amendment where we -- the original bill required
12  to be valid and the amendment allowed expired photo IDs
13  to be used.
14      Q.  (By Ms. Maranzano) And under SB 14, are you
15  allowed to use identification that has expired for a
16  length of time that is greater than 60 days?
17      A.  No.
18      Q.  So you're referring to the amendment that
19  allowed for identification, certain forms of
20  identification in SB 14 to be expired for 60 days --
21      A.  Yes, ma'am.
22      Q.  -- prior to the presentation?  Thank you.
23           What was the purpose of excluding from
24  SB 14 the option that a voter could present two forms of
25  nonphoto ID?

---

174

1            MR. FREDERICK:  Objection, legislative
2   privilege.  Instruct you not to answer.
3       Q.  (By Ms. Maranzano) What changed between 2009
4   and 2011 that would impact what forms of voter -- what
5   forms of identification would verify a voter's identity?
6            MR. FREDERICK:  I object on legislative
7   privilege.  To the extent there are matters in the
8   record that you can identify, you're free to do so, but
9   don't go beyond that.
10      A.  On the record, Senator Fraser said he thought
11  the additional two years from 2009 to 2011 provided us
12  the opportunity to see that the states that had voter ID
13  were not -- that it was working.
14      Q.  (By Ms. Maranzano) What do you mean by that?
15      A.  That people were still voting, that turnout was
16  still fine, that there hadn't been any voter had come
17  forward that had been unable to vote.
18      Q.  And are you referring to anything other than
19  what we already talked about with the Senator having
20  presented the actual turnout rates from Georgia and
21  Indiana?
22      A.  No.
23      Q.  And so I believe we discussed that the Senator
24  didn't do any -- whether the Senator did any additional
25  research other than looking at the turnout rates?

---

175

1       A.  That's correct.
2       Q.  Okay.  Ms. McCoy, how often does a driver's
3   license photo need to be renewed?
4       A.  I don't know.
5       Q.  Do you know how often a driver's license needs
6   to be renewed?
7       A.  Six years.
8       Q.  Did you think it was an important consideration
9   to look into whether -- how recent a photo was be on
10  one of the forms of identification that you were
11  requiring under SB 14?
12           MR. FREDERICK:  Objection, legislative
13  privilege.  Instruct you not to answer.
14      A.  I'll assert.
15      Q.  (By Ms. Maranzano) Pursuant to SB 14, who will
16  be verifying the voter's identity when they -- well, who
17  looks at the --
18      A.  The election worker.
19      Q.  And how would they do that?
20           MR. FREDERICK:  Objection to the extent it
21  calls for speculation.  If you know, you can answer.
22      A.  I think the legislation is designed for the
23  Secretary of State to write rules to implement that
24  provision.
25      Q.  (By Ms. Maranzano) Do you know if there's going

---

176

1   to be additional training given to poll workers on that
2   topic?
3       A.  I think under Senate Bill 14, the Secretary of
4   State is instructed to provide additional training.
5       Q.  Did you discuss any of these regulations with
6   the Secretary of State's Office?
7            MR. FREDERICK:  I'll object on legislative
8   privilege.  To the extent it calls for communications
9   between you, Senator Fraser, and the Secretary of
10  State's Office about SB 14 or any other pending
11  legislation.
12      A.  I'll assert privilege.
13           MS. MARANZANO:  And just for the record to
14  be clear, are you asserting privilege over the fact of
15  whether or not she had a conversation with the Secretary
16  of State's Office?
17           MR. FREDERICK:  I did not intend to, so if
18  you want to reask the question, I'm not intending to
19  prevent you from discovering that.
20      Q.  (By Ms. Maranzano) Did you have conversations
21  with the Secretary of State's Office about SB 14?
22      A.  Yes.
23      Q.  How many?
24      A.  Five or six.
25      Q.  And when were those?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

177

1    A.  After the bill was filed, but prior to it being
2    heard in committee.
3       Q.  Were those conversations in writing or verbal?
4    A.  Verbal.
5       Q.  Was anybody else a party to those
6    conversations?
7    A.  Yes.
8       Q.  And who was that?
9    A.  Bryan Hebert.
10      Q.  Anyone else?
11   A.  I'm trying to think.  It all runs together.
12   Ryan Larue, I think, was in on one of those meetings.
13   Amanda Montague, I think, was in on one of those
14   meetings.
15      Q.  Anyone else?
16   A.  I don't think so.
17      Q.  And were those meetings about how SB 14 would
18   be implemented?
19      MR. FREDERICK:  I want to just caution the
20   witness, the question asked, you may answer, but please
21   don't reveal the substance of any communication.
22          THE WITNESS:  Right.
23   A.  Yes.
24      Q.  (By Ms. Maranzano) And what were the nature of
25   those conversations?

---

178

1       MR. FREDERICK:  Object on the basis of
2    legislative privilege.  Instruct you not to answer.
3    A.  I'll assert privilege.
4       Q.  (By Ms. Maranzano) Ms. McCoy, wouldn't it be
5    fair to say that the standards by which a poll worker is
6    going to verifying the identity of a voter is pretty
7    central to the purpose of SB 14?
8       MR. FREDERICK:  Objection.  Objection,
9    calls for speculation.  Objection to the extent it calls
10   for thoughts and mental impressions about SB 14.  I
11   object on the basis of legislative privilege and
12   instruct you not to answer.
13   A.  I'll assert privilege.
14      MS. MARANZANO:  Let's take a break.
15      (Recess from 3:46 p.m. to 3:56 p.m.)
16      MS. MARANZANO:  Back on the record.
17   Q.  (By Ms. Maranzano)  Ms. McCoy, you testified
18   earlier that under SB 362, a voter could show a state or
19   a federal-issued photo ID; is that correct?
20   A.  Yes, ma'am.
21      Q.  What was the purpose of removing that form of
22   photo identification from the required forms of ID
23   allowed under SB 14?
24      MR. FREDERICK:  Objection, legislative
25   privilege.  Instruct you not to answer.

---

179

1       Q.  (By Ms. Maranzano)  What was the purpose of
2    removing from SB 14 the option for voters to show a
3    valid employee ID?
4       MR. FREDERICK:  Objection, legislative
5    privilege.  Instruct you not to answer.
6       Q.  (By Ms. Maranzano)  Did any legislators express
7    concern to Senator Fraser that the election
8    identification certificate pursuant to SB 14 would be
9    difficult for their constituents to obtain?
10      MR. FREDERICK:  I'll object on legislative
11   privilege.  However, to the extent any concerns were
12   raised on the Floor in committee, you may testify about
13   that.
14   A.  I don't recall.  Yeah.  That was added by the
15   conference committee, and so I -- the debate on the bill
16   at that point, I don't think anybody raised it on the
17   Floor.
18      Q.  (By Ms. Maranzano)  Prior to the addition of
19   the election identification certificate, was there a
20   provision that allowed for a different sort of
21   pre-identification in SB 14?
22   A.  Yes.
23      Q.  And was that a form of identification that
24   needed to be obtained at driver's license offices?
25   A.  Yes, ma'am.

---

180

1       Q.  And does the election identification
2    certificate also need to be obtained at driver's license
3    offices?
4    A.  Yes, ma'am.
5       Q.  Did anybody testify on the Floor about the
6    distance their constituents would need to travel to get
7    to a driver's license office?
8    A.  Yes, ma'am.
9       Q.  Did anybody testify on the Floor about the lack
10   of public transportation options available to driver's
11   license offices?
12   A.  I don't specifically remember that point being
13   raised, but I'm sure it was.
14      Q.  Did anybody testify on the Floor about the wait
15   times at driver's license offices?
16   A.  Yes.
17      Q.  Did anybody testify on the Floor about the cost
18   of obtaining the required underlying documentation to
19   obtain the identification that needed to be issued free
20   of charge under SB 14?
21   A.  I don't specifically recall, but I assume yes.
22      Q.  What was the Senator's response to these
23   concerns that were raised on the Floor?
24      MR. FREDERICK:  I'll just object,
25   legislative privilege, only to the extent the question



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

---

181

1  could be construed to ask for confidential privileged
2  communications, but anything on the Floor, you may
3  testify about.
4      A.  I don't remember how he responded to those
5  particular complaints on the Floor specifically.
6      Q.  (By Ms. Maranzano)  Did he conduct any
7  analyses, or did you conduct any analysis at his request
8  on any of these issues?
9          MR. FREDERICK:  Objection, legislative
10  privilege.  Instruct you not to answer.
11      A.  I'll assert.
12      Q.  (By Ms. Maranzano)  You'll assert the
13  privilege?
14      A.  Yes, ma'am.
15      Q.  What were the circumstances by which the
16  license to carry a concealed handgun were included in SB
17  14?
18          MR. FREDERICK:  Object on the grounds of
19  legislative privilege, to the extent it seeks thoughts,
20  mental impressions or confidential communications among
21  legislators or staff or agencies.  To the extent you can
22  answer without revealing any of that, you may.
23      A.  It was added as an amendment by Senator
24  Hinojosa.
25      Q.  Do you know the racial composition of license

---

182

1  to carry license holders?
2      A.  No.
3      Q.  Is it disproportionately white relative to
4  Texas registered voters?
5      A.  I do not know.
6      Q.  Are you aware of whether any staff or
7  legislator investigated the racial composition of
8  license to carry holders?
9          MR. FREDERICK:  I'll object only to the
10  extent that it seeks the substance or nature of the
11  investigations, whether or not you were aware, you may
12  answer.
13      A.  I am not aware.
14      Q.  (By Ms. Maranzano)  Was there any discussion
15  expressing concern that this form of identification
16  might disproportionately favor white voters?
17          MR. FREDERICK:  Object on the grounds of
18  legislative privilege, to the extent there was
19  discussion on the Floor and committee on the record, you
20  may answer.
21      Q.  (By Ms. Maranzano)  Are you asserting
22  privilege?
23      A.  Well, Senator Hinojosa offered the amendment,
24  so I think -- I don't -- I can't speak to his research
25  on the bill or on his amendment.

---

183

1      Q.  Was there any discussion expressing concern
2  that this form of ID might disproportionately favor
3  white voters?
4          MR. FREDERICK:  Same objection,
5  legislative privilege, only to the extent it seeks
6  confidential communications, but to the extent that
7  there were.
8      A.  Not that I know of.
9      Q.  (By Ms. Maranzano)  How did the exception for
10  individuals with disabilities come to be included in SB
11  14?
12          MR. FREDERICK:  Object on legislative
13  privilege, only to the extent it seeks confidential
14  communications and thought processing and mental
15  impressions.  To the extent it seeks information about
16  the legislative process or testimony, you may answer.
17      A.  Senator Patrick offered an amendment, and
18  Senator Fraser accepted it.
19      Q.  (By Ms. Maranzano)  What was the purpose of
20  this provision?
21          MR. FREDERICK:  Object to the legislative
22  privilege.  I instruct you not to answer.
23      A.  I think that the record -- Senator Patrick
24  probably on the record said why he wanted to include
25  it.  I don't recall what he said.

---

184

1      Q.  (By Ms. Maranzano)  Was this amendment in
2  response to concerns by any particular groups or
3  constituencies?
4          MR. FREDERICK:  Object on the basis of
5  legislative privilege.  To the extent there's -- you
6  have any nonprivileged basis to answer, you may.
7      A.  I think that -- well, again, I don't want to
8  speak for Senator Patrick because I -- I don't want to
9  speak for Senator Patrick.  But there was an individual
10  that testified on the Floor during the Senate committee
11  debate that was fairly moving, and I think Senator
12  Patrick wanted to do something to help him.
13      Q.  (By Ms. Maranzano)  What was the general nature
14  of that testimony?
15      A.  I don't know.  I didn't listen to it.
16      Q.  Was there any testimony on the Floor related to
17  difficulties other individuals might have obtaining
18  identification?
19      A.  I don't know.  I didn't listen to the
20  testimony.
21      Q.  What -- what was your -- your role during the
22  Floor consideration of SB 14?
23          MR. FREDERICK:  I would just caution you
24  not to reveal any confidential communications or mental
25  impressions or thought process, but as to your -- the

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

185

1    process, you may answer.
2        A.  It was the same as what we had testified
3    earlier, I think, on the Senate bill 362, and I sat next
4    to the Senator and helped him with his debate and
5    providing him information that he asked me to provide
6    him during the debate.
7        Q.  (By Ms. Maranzano)  So you were on the Floor
8    with him during the debate?
9        A.  During the Committee of the Whole, yes, ma'am.
10       Q.  And when you say this individual testified with
11   moving testimony that potentially led Senator Patrick to
12   include this exemption, was that during the Committee of
13   the Whole?
14       A.  Yes, ma'am.
15       Q.  How did the exception for individuals with
16   religious objections to being photographed come to be
17   included in SB 14?
18           MR. FREDERICK:  I'll object only to the
19   extent that it seeks confidential communications,
20   thought processes or mental impressions.  But to the
21   extent it seeks the process or public discussion, you
22   may answer.
23       A.  I'll assert privilege.  I don't -- yeah.
24           MR. FREDERICK:  I mean, just -- I want to
25   be clear with you.  I'm not instructing her not to

---

186

1    answer about when it was introduced or how it became
2    part of the bill.  And so I think if you want to probe
3    that further, I'm not objecting to that part.
4           MS. MARANZANO:  Okay.
5        Q.  (By Ms. Maranzano)  Was that provision added in
6    response to any particular concern, Ms. McCoy?
7           MR. FREDERICK:  I'll just -- only to the
8    extent it seeks mental impressions, communications, but
9    if there's testimony, Floor testimony, and if you know,
10   you may answer.
11       A.  There was not Floor testimony on that issue.
12       Q.  (By Ms. Maranzano)  During the drafting of the
13   legislator's consideration of SB 14, was there analysis
14   of the cost that a voter would need to take -- the cost
15   or the steps the voter would need to take to obtain an
16   election identification certificate?
17           MR. FREDERICK:  Objection, legislative
18   privilege.  Instruct you not to answer.
19       A.  I'll assert privilege.
20       Q.  (By Ms. Maranzano)  What documents are needed
21   to obtain an election identification certificate?
22       A.  I don't know.
23       Q.  Was that something that you -- I'm sorry.  You
24   can finish your answer.
25       A.  I used to know, but I don't know now.

---

187

1        Q.  Was that something that you looked into while
2    developing SB 14?
3        A.  Yes, ma'am.
4        Q.  And were the costs, in particular, something
5    that you looked into while developing SB 14?
6           MR. FREDERICK:  Object on the grounds of
7    legislative privilege.  Instruct you not to answer.
8        A.  I'll assert privilege.
9        Q.  (By Ms. Maranzano)  If there are costs to
10   obtaining underlying documentation for the election
11   identification certificate, is it fair to say the
12   election identification certificate is not actually
13   free?
14           MR. FREDERICK:  Object to the form of the
15   question.  Object, it calls for speculation.  And object
16   to relevance.  If you -- if you have an opinion, you may
17   answer.
18       Q.  (By Ms. Maranzano)  Do you have an opinion?
19       A.  I do not.
20       Q.  You have no opinion on that?
21       A.  I don't know which documents are required to
22   get an ID at this point.  I don't remember.  And so I
23   don't recall why people wouldn't or would not have
24   them.  So my opinion, I mean, I'd have to go back and
25   kind of look.

---

188

1        Q.  If -- if you were to determine that there were
2    costs to obtaining those underlying documentations for
3    an individual who did not have them --
4        A.  Right.
5        Q.  -- would you say it would be fair to
6    characterize the election identification certificate as
7    free?
8           MR. FREDERICK:  Objection to the form of
9    the question.  You can answer if you can.
10       A.  I suppose not.
11       Q.  (By Ms. Maranzano)  Do you know when driver's
12   license offices are open in Texas?
13       A.  I do not.
14       Q.  Does SB 14 require employers to provide paid
15   leave to obtain an ID?
16       A.  No.
17       Q.  Do some individuals in Texas live at least 50
18   miles from a driver's license office?
19       A.  I think there was testimony to that effect,
20   yes.
21       Q.  How much does gas cost in Texas?
22       A.  Texas is a big state.  It varies.  I think in
23   Austin right now it's 3.55 a gallon.
24       Q.  So how much would it cost for somebody to drive
25   a hundred miles round trip?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 189

1    MR. FREDERICK:  Objection, calls for
2    speculation.
3        A.  Depends on their car, how they drive.
4        Q.  (By Ms. Maranzano)  Do you know whether any
5    racial or ethnic group is more likely than not have the
6    necessary ID to obtain the election identification
7    certificate?
8        MR. FREDERICK:  I'll object only to the
9    time extent that this can be construed to seek
10   information related to the development of SB
11   14. Insofar as you can answer based on your knowledge,
12   sitting here today, you may answer.
13       A.  Can you repeat the question?
14       Q.  (By Ms. Maranzano)  Is there any racial or
15   ethnic group that is more likely to not possess the
16   underlying documentation needed to obtain election
17   identification certificate?
18       A.  I do not know.
19       Q.  Is that something that you ever looked into
20   during the development of SB 14?
21       MR. FREDERICK:  Objection, legislative
22   privilege.  I instruct you not to answer.
23       A.  I'll assert privilege.
24       Q.  (By Ms. Maranzano)  Did you ever look into or
25   analyze who among registered voters would be -- might

## 191

1        Q.  (By Ms. Maranzano)  Did the Senator seek legal
2    advice from anybody about to ensure that Senate Bill 14
3    would comply with Section 5?
4        MR. FREDERICK:  I'm going to object on the
5    grounds that it seeks information within the attorney-
6    client privilege.  I think the fact that he might have
7    sought some legal would not itself be privileged, but
8    the question -- the question entails the substance of
9    the advice that he may or may not have sought, so I
10   object on that ground.
11       MS. MARANZANO:  And you're instructing
12   Ms. McCoy not to answer?
13       MR. FREDERICK:  Yes.  Yes.
14       Q.  (By Ms. Maranzano)  Are you going to follow
15   your counsel's advice?
16       A.  Yes, ma'am.
17       Q.  Was the passage of SB 14 a priority for Senator
18   Fraser?
19       MR. FREDERICK:  I'll object on legislative
20   privilege and instruct you not to answer as to the
21   extent it calls for confidential communications, but to
22   the extent it's in a public statement or testimony, you
23   can answer.
24       A.  I think the answer is he consistently told his
25   constituents that he thought voter ID needed to be

## 190

1    not have the forms of identification included in SB 14?
2        MR. FREDERICK:  Objection, legislative
3    privilege.  I instruct you not to answer, except to the
4    extent you can do so based on nonconfidential matters or
5    nonprivileged matters.
6        A.  The specific question again was?
7        Q.  (By Ms. Maranzano)  Did you ever research or
8    analyze who among registered voters in Texas would be
9    more likely or less likely to have the required forms of
10   identification under SB 14?
11       A.  No.
12       Q.  No, you never looked into that?
13       A.  That is correct.
14       Q.  Why not?
15       MR. FREDERICK:  Objection, legislative
16   privilege.  Instruct you not to answer.
17       A.  I'll assert privilege.
18       Q.  (By Ms. Maranzano)  Would you agree that that
19   might be a relevant inquiry pursuant to Section 5?
20       MR. FREDERICK:  Objection, calls for
21   speculation.  Objection, calls for a legal opinion.  You
22   can answer if you can.
23       A.  As I testified earlier, I didn't really
24   consider Section 5 when I was helping the Senator
25   develop this bill.

## 192

1    passed.
2        Q.  (By Ms. Maranzano)  Did his constituents ask
3    for him to pass some sort of voter ID law?
4        MR. FREDERICK:  We'll object to the extent
5    that seeks -- to the extent it seeks the substance of
6    any particular constituent communication.  If you can
7    answer based on nonconfidential communications from
8    constituents, you may answer.
9        A.  I assert the privilege.
10       Q.  (By Ms. Maranzano)  Was passage of SB 14 a
11   priority for Governor Perry?
12       A.  He declared it an emergency.  I can't speak
13   further than that.
14       Q.  Was passage of the SB 14 a priority for any
15   interest groups that you're aware of?
16       A.  Not that I'm aware of, no.
17       Q.  What was the purpose of SB 14?
18       MR. FREDERICK:  I'm just going to give a
19   cautionary instruction.  You may testify about the
20   purpose of SB 14 to the extent you know.  I would only
21   caution you not to reveal the substance of the
22   confidential communications between yourself and the
23   legislature or any legislative thought process or mental
24   impressions.  But as to the purpose of the bill, you may
25   testify.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

| 193 | 195 |
|---|---|

**193**

1    A.   Senator Fraser consistently said on the record
2    that his purpose was to stop in-person voter fraud.
3    Q.   (By Ms. Maranzano)  Were there any additional
4    purposes to SB 14?
5    A.   Election integrity.
6    Q.   What does that mean?
7    A.   It means -- it means that elections are valid
8    and true and there isn't fraud.
9    Q.   Any other purposes?
10    A.   (Witness shakes head no.)  No.  I'm sorry.
11    Q.   Thank you.  Were there any purposes of SB 14
12    that were not stated on the public record?
13         MR. FREDERICK:  Object, legislative
14    privilege.  Instruct you not to answer.
15    Q.   (By Ms. Maranzano)  Are you following your
16    counsel's advice?
17    A.   I am.
18    Q.   Was any part of the purpose of SB 14 to
19    decrease the number of Hispanic voters?
20         MR. FREDERICK:  Object, legislative
21    privilege.  Instruct you not to answer.
22    A.   I'll assert privilege.
23    Q.   (By Ms. Maranzano)  Was any part of the purpose
24    of SB 14 to decrease the number of any group of minority
25    voters?

**195**

1    nonlegitimate voter?
2    A.   No.
3    Q.   Who are the main opponents of SB 14?
4    A.   I think the Senate Democrats, Democrat
5    members.  I think the Texas Democratic party.
6    Q.   Did any minority members of the Senate support
7    SB 14?
8         MR. FREDERICK:  Object on legislative
9    privilege, only to the extent that support or opposition
10    was expressed confidentially by a legislator or staff
11    member to you.
12    A.   No minority senator voted for the bill.
13    Q.   (By Ms. Maranzano)  Did any groups representing
14    minority voters support SB 14?
15         MR. FREDERICK:  Same cautionary
16    instruction.  You may answer to the extent that you know
17    from public statements or the legislative record, but
18    caution you not to reveal any privileged matter
19    communicated to you by a constituent.
20    A.   I don't know.
21    Q.   (By Ms. Maranzano)  Did the Senator consider
22    any alternative legislative measures that would have
23    deterred voter fraud?
24         MR. FREDERICK:  Objection, legislative
25    privilege, and instruct you not to answer.

| 194 | 196 |
|---|---|

**194**

1         MR. FREDERICK:  Objection, legislative
2    privilege.  I'll instruct you not to answer.
3    A.   I'll assert.
4    Q.   (By Ms. Maranzano)  Was any part of the purpose
5    of SB 14 to discriminate in any way against any group of
6    minority voters?
7         MR. FREDERICK:  Objection, legislative
8    privilege.  Instruct you not to answer.
9    A.   Assert the privilege.
10    Q.   (By Ms. Maranzano)  Was any part of the purpose
11    of SB 14 for partisan purposes?
12         MR. FREDERICK:  Objection, legislative
13    privilege.  I'll instruct you not to answer.
14    A.   Assert the privilege.
15    Q.   (By Ms. Maranzano)  Did the purpose of photo ID
16    in Texas evolve over time in legislative sessions?
17         MR. FREDERICK:  Object on the basis of
18    legislative privilege.  Instruct you not to answer
19    unless you can do so based on public statements or
20    testimony.
21    A.   Senator Fraser's stated purpose has always been
22    to be prevent in-person voter fraud across the sessions.
23    Q.   (By Ms. Maranzano)  Have you ever heard of a
24    voter who decides not to vote on election day because
25    they're worried their vote will be diluted by a

**196**

1    A.   I'll assert.
2    Q.   (By Ms. Maranzano)  What was the Senator's
3    strategy to ensure that Senate Bill 14 was passed?
4         MR. FREDERICK:  Objection, legislative
5    privilege.  Instruct you not to answer.
6    A.   I'll assert.
7         (Exhibit 38 marked for identification.)
8    Q.   (By Ms. Maranzano)  Ms. McCoy, I'm showing you
9    what we marked as Deposition Exhibit 38.  Do you
10    recognize what this -- what this is?
11    A.   Yes.
12    Q.   What is it?
13    A.   It's the Senate Rules Adopted by the 82nd
14    Legislature.
15    Q.   And this, what I've given you is actually the
16    table of contents and some portion of the rules.  It's
17    not the entire set of Senate rules.  Can you look at the
18    table of contents and tell me what procedural rules are
19    implicated by the consideration of SB 14, what
20    procedural rules were applied to SB 14's consideration?
21         MR. FREDERICK:  Objection, vague.  You can
22    answer if you can.
23    A.   I'm not sure.
24    Q.   (By Ms. Maranzano)  Oh, you know what, that
25    looks like it's highlighted.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com



**197**

1    A.  It is highlighted.  Is that the one you want?

2         MS. MARANZANO:  Why don't we mark a clean

3    one for the record.

4         MR. FREDERICK:  Here, that one's got a

5    mark on it.  I've got a clean one right here.

6         MS. MARANZANO:  Thank you.

7         MR. FREDERICK:  Here's your highlighted

8    one.

9         (Clean copy Exhibit 38 exchanged for

10   highlighted copy originally marked.)

11        A.  I don't --

12        Q.  (By Ms. Maranzano) If you look -- let's look

13   at Rule 5.11.

14        A.  Yes, ma'am.

15        Q.  Subsection D of 5.11.  Is that the same

16   provision that we talked about earlier that was included

17   in the 2009 rules that carves out voter identification

18   requirements from the two-thirds rule?

19        A.  Yes, ma'am.

20        Q.  And can you look at Rule 16 for me?

21             You can scratch looking at Rule 16.

22        THE REPORTER:  I'm sorry.  I didn't get

23   that.

24        MS. MARANZANO:  I said she could scratch

25   reviewing Rule 16.

**198**

1    Q.  (By Ms. Maranzano) Can you look at Rule 12.03

2    about conference committees?

3         A.  Yes, ma'am.

4         Q.  And do you see that Section 4 states -- well,

5    can you read Section 4 for me and tell me what your

6    understanding of that subsection of the rule is?

7         A.  "Add text on any matter which is not included

8    in either the House or Senate version of the bill or

9    resolution."

10        Q.  What's your understanding of what this rule

11   does?

12        A.  That rule says that when a bill is in

13   conference committee, they -- the conference committee

14   should not consider including provisions that weren't in

15   either the House or Senate passed versions.

16        Q.  How many times have you seen that section of

17   the rule disregarded while you've worked for Senator

18   Fraser?

19        A.  Probably happens 20 to 30 times a session.

20        Q.  What type of bills does that happen on?

21        A.  All types.

22        Q.  Was SB 14 considered by any -- you know what,

23   scratch that.  I think we've talked about that already.

24             What did you do to ensure that Senator

25   Fraser was prepared for Floor consideration of SB 14?

**199**

1         MR. FREDERICK:  Object based on

2    legislative privilege, to the extent it calls for

3    substance of any communication or your thought process

4    or Senator Fraser's thought process.  However, to the

5    extent you can answer without revealing that, you may

6    describe your preparation.

7         A.  Typically, when we do floor prep for Senate

8    Bill 14 or any bill, we put together a bill book, which

9    includes the bill, the bill analysis, the fiscal notes,

10   any supporting documentation and talking points.  And

11   that's what I did for Senate Bill 14.

12        Q.  (By Ms. Maranzano) And do you write the

13   talking points?

14        A.  Yes.  Or -- not for every bill.  I did for

15   Senate Bill 14.

16        Q.  And is the bill analysis what we've previously

17   discussed, a section-by-section analysis of the bill?

18        A.  Yes, ma'am.

19        Q.  And do you write that?

20        A.  No, ma'am.

21        Q.  Who does?

22        A.  Those are prepared through the committee

23   process, and I think the Senate Research Center prepares

24   those.

25        Q.  Are you familiar with this Floor testimony on

**200**

1    SB 14?

2         A.  Generally.

3         Q.  And I believe you testified earlier you were

4    with the Senator, correct?

5         A.  For some of it.  I don't -- I think I got up

6    and left for part of it.  Actually, I know I got up and

7    left for part of it.

8         Q.  During the Floor consideration of SB 14, did

9    Senator Fraser answer any questions about SB 14 by

10   saying he was not advised?

11        A.  Can we be clear when we're talking about Floor

12   consideration, Committee of the Whole consideration

13   or Floor?  Specifically when we talk about the Floor,

14   it's when they're actually in session on the Floor.  The

15   Committee of the Whole meets on the Senate Floor, just

16   because there's no other place for them to meet.

17             So during the Committee of the Whole

18   debate, there were times that Senator Fraser said "I'm

19   not advised."

20        Q.  What does that mean, "I'm not advised"?

21        MR. FREDERICK:  Object, based on

22   legislative privilege, only to the extent it asks for

23   Senator Fraser's thought process or mental impressions.

24   To the extent you can answer from your own personal

25   knowledge of what "I'm not advised" means, you may.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 201

1    A.   Typically, when a senator says that, it means
2    they don't know.
3    Q.   (By Ms. Maranzano)  About how many questions
4    did he answer by saying "I'm not advised"?
5    A.   I don't know.
6    Q.   Can you approximate?
7    A.   No.
8    Q.   Would you say it was hundreds?
9    A.   I don't remember.
10    Q.   Isn't it part of the Senator's role as author
11    of the bill to answer questions about the bill?
12        MR. FREDERICK:  Objection, argumentative.
13    You may answer.
14    A.   The Senator offered his colleagues that he
15    didn't know the answer to some questions and that
16    resource and expert witnesses were going to testify
17    later during the committee, and those questions would be
18    better addressed to those resource expert witnesses.
19    Q.   (By Ms. Maranzano)  Did anyone instruct Senator
20    Fraser not to answer substantive questions about SB 14
21    during the Committee of the Whole?
22        MR. FREDERICK:  Objection, legislative
23    privilege.  Instruct you not to answer.
24    A.   I'll assert privilege.
25    Q.   (By Ms. Maranzano)  During -- during the

## 202

1    Committee of the Whole's consideration of SB 14, did
2    anyone raise concerns about the impact of SB 14 on
3    minority voters?
4    A.   Yes.
5    Q.   What was the Senator's response?
6    A.   I don't remember.
7    Q.   You don't recall how he responded?
8    A.   (Witness shakes head no.)
9    Q.   Did numerous senators raise concerns about the
10    impact of SB 14 on minority voters?
11        MR. FREDERICK:  Objection, legislative
12    privilege, only to the extent it calls for confidential
13    communications.  Anything on the committee or on the
14    Floor, you may testify about.
15    A.   I think that 10 of the 12 Democrat senators
16    testified against the bill during the Committee of the
17    Whole.  May have been 9.  May have been 11.  It wasn't
18    all 12.
19    Q.   (By Ms. Maranzano)  But my question was about
20    testimony related to concerns about the impact of SB 14
21    on minority voters.  It not about --
22    A.   I don't recall what they said.  I know that
23    many senators testified against the bill, but I can't
24    recall what each of them said.  So I cannot answer that
25    question.

## 203

1    Q.   Was that testimony that you would consider to
2    be important?
3        MR. FREDERICK:  Objection, vague.  You may
4    answer.
5    A.   To some people, yes.
6    Q.   (By Ms. Maranzano)  How about to you?
7    A.   No.
8    Q.   Why not?
9    A.   I just work for the Senator.  I don't --
10    Q.   Well, part of your job in working for the
11    Senator is giving him advice on this bill, is it not?
12    A.   Yes.
13    Q.   And so the impact of this bill on minority
14    voters is a relevant consideration, is it not?
15    A.   Yes.
16    Q.   So I'm just wondering why that wasn't an
17    important testimony to you.
18        MR. FREDERICK:  Object to the extent it
19    mischaracterizes the testimony, but you may answer if
20    you can.
21    A.   I think that the position that the Senator had
22    relative to this bill wasn't going to change because of
23    testimony we heard in January of 2011, because we heard
24    the same testimony in January of 2009, and we heard the
25    same testimony in May of '07.

## 204

1    So the testimony is important to the
2    people that were giving it, mainly, I think, because
3    they were trying to put it on the record for you guys,
4    but it wasn't going to change my recommendations to the
5    Senator on how to proceed with this legislation.
6    Q.   (By Ms. Maranzano)  Did you take any actions
7    with regard to Senate Bill 14 in response to those
8    concerns?
9        MR. FREDERICK:  Objection, legislative
10    privilege.  Instruct you not to answer.
11    A.   I'll assert privilege.
12        (Exhibit 39 marked for identification.)
13    Q.   (By Ms. Maranzano)  I'm showing you what we've
14    marked for the record as Deposition Exhibit 39.  Can you
15    turn to the label at the bottom, Texas 00000098, and
16    look at the portion of the print?
17        Well, let me ask you first, do you
18    recognize this document, or can you tell me what this
19    document is?
20    A.   I've never seen this document, but it is a
21    transcript of the Committee of the Whole from Tuesday,
22    January 25, 2011.
23    Q.   Can you look at the transcript Page 168.  And
24    do you see that there's a question posed by Senator West
25    as to whether the forms of identification that are



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

## 205

1    listed in the bill are the least restrictive options in
2    order to achieve the goal of avoiding what you have said
3    is voter identification fraud?
4        A.  Uh-huh.  Yes.
5        Q.  And can you look at Senator Fraser's answer to
6    that?
7        A.  (Witness complies.)
8        Q.  Is that a topic that you looked into prior to
9    introducing Senate Bill 14 of whether this was the least
10   restrictive way to achieve the Senator's goal?
11       MR. FREDERICK:  Objection, legislative
12   privilege.  Instruct you not to answer.
13       A.  I'll assert privilege.
14       Q.  (By Ms. Maranzano)  Can you tell me anything
15   about that topic based on the comments that were made in
16   public during the Committee of the Whole, Ms. McCoy?
17       MR. FREDERICK:  Object to the form, but
18   you may answer.
19       A.  Well, I can speak to what Senator Fraser said.
20   The Secretary of State had provided us information,
21   which he referenced here, showing that people -- 91
22   percent of voters registered with their driver's license
23   under HAVA.
24       Q.  (By Ms. Maranzano)  90 percent of the -- of
25   voter registration applicants registered with their

## 206

1    driver's license number?
2        A.  Under the HAVA requirement.
3        Q.  And do you know when HAVA started requiring
4    people to write down their driver's license number?
5        A.  Texas passed its version of HAVA in 2005, so I
6    would assume it took a while to make sure -- it started
7    probably that fall of 2005 or 2006.  Sometimes we start
8    things in January of the next year.
9        Q.  And did anybody ever -- or did you or the
10   Senator ever conduct any analysis of who those 10
11   percent, approximately 10 percent of registered voters
12   without driver's license numbers might be and whether or
13   not they might have any other forms of identification?
14       MR. FREDERICK:  Objection, legislative
15   privilege, and instruct you not to answer.
16       A.  I'll assert privilege.
17       Q.  (By Ms. Maranzano)  Okay.  I'm going to have
18   this marked.
19       (Exhibit 40 marked for identification.)
20       Q.  (By Ms. Maranzano)  I'm showing you what we are
21   marking as Deposition Exhibit 40, which is a transcript
22   of another transcript of the Committee of the Whole from
23   Tuesday, January 26, 2011.
24       Can you look at the second page of this
25   document that's labeled on the transcript as Page 189 at

## 207

1    the top?  Actually, the quote starts -- I'm sorry.  The
2    quote starts on Page 188 from Senator Fraser.  If you
3    can just take a look at that.
4        Does that appear to be saying that there
5    are very small differences between Texas's bill and
6    Indiana and Georgia's bill?
7        A.  That does what it seems to be saying.
8        Q.  Are you familiar with the Indiana and Georgia
9    photo identification requirement?
10       A.  No.
11       Q.  Didn't you testify earlier that you had looked
12   at those two states when you were developing SB 14 362?
13       A.  We looked at voter turnout from those two
14   states.  I never looked at the legislation.
15       Q.  So, Ms. McCoy, you've never looked at either
16   Indiana or Georgia's photo identification requirements?
17       A.  I might have printed out a copy of Indiana's,
18   and I might have seen a table that included the
19   different IDs that allowed under every state's photo ID
20   law, but I've never looked at Indiana or Georgia's
21   legislation in depth, no.
22       Q.  So do you have any position on whether the
23   Indiana and Georgia identification requirements are
24   similar to SB 14?
25       A.  I do not have a position, no.

## 208

1        (Exhibit 41 marked for identification.)
2        Q.  (By Ms. Maranzano)  Okay.  I'm showing you what
3    we've marked as Deposition Exhibit --
4        MR. FREDERICK:  Do you have one for me?
5        MS. MARANZANO:  Sorry.  I only have one
6    copy.
7        MS. WESTFALL:  Can you look on with the
8    witness?
9        MR. FREDERICK:  Oh, yeah, yeah, I'll look
10   at this one.
11       Q.  (By Ms. Maranzano)  Ms. McCoy, this is a
12   transcript from July 26, 2011.  The Committee of the
13   Whole's consideration of SB 14.  I'm going to direct you
14   to certain pages, but I want to say at the beginning,
15   this transcript has two sets of pagination.  On the
16   left-hand side, it says "CD Number" and "Section
17   Number," and then it also has a page.  So I will give
18   you both of those, because it has -- the pagination
19   restarts with every CD and section number.
20       A.  Okay.  But I want to clarify this isn't from
21   the Committee of the Whole.  This is from when the
22   Senate was actually in session as the Senate.
23       Q.  Okay.  Thank you for that clarification.
24       A.  You're welcome.
25       Q.  Can you turn to Page 34 on CD 1, Section 1?



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 209 | 211 |
|---|---|
| 1   A. Hold on. Okay. | 1     MR. FREDERICK: Well, you may answer the |
| 2   Q. Were you on the Floor with the Senator during | 2 question whether or not you had a role. |
| 3 -- during the Floor consideration on January 26th of SB | 3   A. Yes. |
| 4 14? | 4   Q. (By Ms. Maranzano) What was your role? |
| 5   A. Yes, but -- | 5     MR. FREDERICK: I'll object to legislative |
| 6   Q. Yes, but? | 6 privilege, to the extent it seeks confidential |
| 7   A. Can I just clarify? | 7 communications, thought processes or mental |
| 8   Q. Yes, please. | 8 impressions. But to the extent you can describe your |
| 9   A. During the Committee of the Whole, I could | 9 role without going into that, then you may answer the |
| 10 actually be inside the rail right next to the Senator. | 10 question. |
| 11 When the Senate was in full session, I had to be outside | 11   A. I provided the Senator with some thoughts on |
| 12 the rail away from the Senator's desk. | 12 what he could say if certain amendments that we thought |
| 13   Q. Okay. Did you communicate with the Senator | 13 were going to be introduced were introduced. |
| 14 during that time? | 14   Q. (By Ms. Maranzano) And did you provide him |
| 15   A. As much as you can if they turn around and look | 15 with a recommendation on how to vote on certain |
| 16 at you. | 16 amendments? |
| 17   Q. You didn't -- you didn't communicate by a | 17     MR. FREDERICK: Just caution you, I mean, |
| 18 Blackberry or cell phone? | 18 you can answer the question as phrased, whether or not |
| 19   A. No, ma'am. | 19 you offered a recommendation. |
| 20   Q. Okay. Can you take a look at on Page 34, where | 20   A. I did not. |
| 21 it starts with the testimonies by Davis? Can you just | 21   Q. (By Ms. Maranzano) Why -- well, how would this |
| 22 take a look at that? | 22 amendment introduced by Senator Davis have interfered |
| 23   A. I think I'm on the wrong page. | 23 with the Senator's goals of deterring voter fraud? |
| 24     MR. FREDERICK: I think you're on Section | 24     MR. FREDERICK: Object on legislative |
| 25 2. Got Section 1. | 25 privilege. |

| 210 | 212 |
|---|---|
| 1   A. Okay. | 1   Q. (By Ms. Maranzano) Ms. McCoy, as you're |
| 2     MR. FREDERICK: Yeah. | 2 sitting here today, are you aware of any ways in which |
| 3   A. Okay. | 3 not charging for the acceptable forms of identification |
| 4   Q. (By Ms. Maranzano) Can you just take look at | 4 under SB 14 would interfere with the goal of deterring |
| 5 that amendment which starts with Davis? And then the | 5 in-person voter impersonation? |
| 6 action that's taken on that amendment is lower on the | 6   A. No. |
| 7 page. Do you recall this amendment being offered? | 7   Q. Can you turn to what's labeled as CD-1, Section |
| 8     MR. FREDERICK: Just to clarify, is | 8 2, Page 28 through 30? |
| 9 this -- is it Floor Amendment 12 we're talking about? | 9   A. (Witness complies.) |
| 10     MS. MARANZANO: Yes. I think that's | 10   Q. You see that this testimony is related to an |
| 11 right. | 11 amendment proposed by Senator Ellis that would have |
| 12   A. I don't recall, because I'm not seeing the text | 12 required the Secretary of State to conduct a study |
| 13 of the amendment. | 13 including information about the number of eligible |
| 14   Q. (By Ms. Maranzano) Uh-huh. | 14 voters who are prevented from voting or have to vote |
| 15   So I don't -- I don't recall. | 15 provisionally because they lacked an ID? |
| 16   Q. Do you recall that Senator Davis introduced an | 16   A. Yes. |
| 17 amendment to prohibit state agencies from charging fees | 17   Q. And do you recall that amendment being offered? |
| 18 for the issuance of any acceptable ID under SB 14? | 18   A. Yes, ma'am. |
| 19   A. Not really, no. | 19   Q. Did you provide a recommendation to Senator |
| 20   Q. Do you recall that Senator Fraser moved to | 20 Fraser as to how to handle that amendment? |
| 21 table that amendment? | 21     MR. FREDERICK: I'll caution. You can |
| 22   A. I mean, I can see that he did. I don't recall | 22 answer the question as phrased, as long as you don't |
| 23 this particular part of the debate. | 23 reveal the substance of any confidential communication. |
| 24   Q. Did you have any role in recommending to him | 24   A. No. |
| 25 how to handle amendments to SB 14? | 25   Q. (By Ms. Maranzano) Did Senator Fraser move to |


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 213

1  table that amendment?
2      A.  Yes.
3      Q.  And how would conducting a study about who was
4  impacted by SB 14 have interfered with the Senator's
5  goals of deterring in-person voter impersonation?
6          MR. FREDERICK:  Objection, legislative
7  privilege.  Instruct you not to answer.
8      A.  I'll assert privilege.
9      Q.  (By Ms. Maranzano)  Was Senator Fraser
10 concerned that such a study would show that minorities
11 are disproportionally impacted by Senate Bill 14?
12         MR. FREDERICK:  Objection, legislative
13 privilege.  Instruct you not to answer.
14     A.  I'll assert privilege.
15     Q.  (By Ms. Maranzano)  Can I have you turn to --
16 I'm going to actually get out another exhibit.
17         (Exhibit 42 marked for identification.)
18     Q.  (By Ms. Maranzano)  I'm showing you what we're
19 marking as Deposition Exhibit 42.  If you could look at
20 the side of the page that has 28 at the top.  Actually,
21 I'm sorry.  It starts on the bottom of 27.  There's an
22 amendment presented by Senator Gallegos that goes to the
23 top.
24         Do you see that Senator Gallegos offered
25 an amendment that would have required driver's license

## 214

1  offices to be open until 7 p.m. on one weekend and
2  during four or more hours on at least two Saturdays per
3  month?
4      A.  Yes.
5      Q.  Did you provide a recommendation to Senator
6  Fraser as to how to vote on this bill -- on this
7  amendment?
8          MR. FREDERICK:  I just caution.  You may
9  answer the question as phrased.  I advise you not to
10 reveal the substance of any communication.
11     A.  No.
12     Q.  (By Ms. Maranzano)  Did Senator Fraser move to
13 table this amendment?
14     A.  Yes.
15     Q.  How would keeping driver's license offices open
16 longer interfere with deterring in-person voter
17 impersonation?
18         MR. FREDERICK:  Objection, legislative
19 privilege.  I instruct you not to answer.
20     A.  I'll assert privilege.
21     Q.  (By Ms. Maranzano)  Did Senator Fraser have any
22 concern that any individuals who work at hourly wage may
23 have a difficult time making it to a driver's license
24 office while it's open?
25         MR. FREDERICK:  Objection, legislative

## 215

1  privilege.  I'll instruct you not to answer.
2      A.  I'll assert privilege.
3      Q.  (By Ms. Maranzano)  Did Senator Fraser
4  acknowledge on the Floor that a person needed to work to
5  make sure that a driver's license office was open?
6      A.  Can you repeat that question?
7      Q.  Do you recall the Senator acknowledging on
8  the -- during the consideration of SB 14, that people
9  needed to work to make sure that a driver's license
10 office was open?
11     A.  I do not recall.
12     Q.  Were there any other amendments that you
13 haven't testified about that were offered that would
14 have mitigated the impact of SB 14 on minority voters?
15         MR. FREDERICK:  Objection, assumes facts
16 not in evidence.  Also object on legislative
17 privilege.  Instruct you not to answer.
18     A.  I'll assert privilege.
19     Q.  (By Ms. Maranzano)  Based on the public record,
20 are there any amendments that we haven't discussed that
21 you believe would have mitigated the impact of SB 14 on
22 minority voters?
23         MR. FREDERICK:  Objection, assumes facts
24 not in evidence.  You -- otherwise, you may answer if
25 you can.

## 216

1      A.  I don't recall every amendment offered.
2      Q.  (By Ms. Maranzano)  Do you recall any amendment
3  that you believe would have mitigated the impact of SB
4  14 on minority voters?
5          MR. FREDERICK:  Again, object, assumes
6  facts not in evidence.  You may answer.
7      A.  I don't know how to answer, because I don't
8  know that Senator Fraser or I think the bill impacted
9  minority voters negatively.  So the amendment -- I don't
10 know that the -- the answer then is no, because I don't
11 know that they would have added to what we already
12 believe the bill did.
13     Q.  (By Ms. Maranzano)  When did the Senate pass SB
14 14 and refer it to the House?
15     A.  It was either January 26th or 27th when we
16 passed it to engrossment.  I don't recall exactly which
17 day that occurred.
18     Q.  Is it unusual for the Senate to pass
19 legislation within the first two weeks of a session?
20     A.  Yes.
21     Q.  Has that ever happened before during the time
22 that you've worked for Senator Fraser?
23     A.  I don't recall.
24     Q.  Did the Senator have any role with regard to SB
25 14 once it was referred to the House?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

## 217

1      MR. FREDERICK:  Object only to the extent
2   it seeks privileged matters as to the fact, whether or
3   not he had a role.  You may answer.
4      A.  Yes.
5      Q.  (By Ms. Maranzano)  What role was that?
6      MR. FREDERICK:  And I'll object on the
7   basis of legislative privilege and instruct you not to
8   answer to the extent that your answer would reveal
9   his -- the Senator's or your thought process, mental
10  impressions or disclose the substance of any privileged
11  conversation.  But to the extent you can describe his
12  role without divulging that, you may answer.
13     A.  It was limited in that once Representative
14  Harless was determined to be the House sponsor, we
15  provided her the information that we had that she could
16  move forward.
17     Q.  (By Ms. Maranzano)  Was the Senator concerned
18  about any of the changes to SB 14 that occurred in the
19  House?
20     MR. FREDERICK:  Objection, legislative
21  privilege.  Instruct you not to answer.
22     A.  I'll assert privilege.
23     Q.  (By Ms. Maranzano)  Was the Senator on the
24  conference committee?
25     A.  Yes.

## 218

1      Q.  Did the conference committee change the
2   structure of the identification card that was required
3   to be issued free of charge?
4      A.  Yes.
5      Q.  Did they insert a new provision into the bill
6   on that topic?
7      A.  Yes.
8      Q.  Is that unusual?
9      MR. FREDERICK:  Objection, vague.  You may
10  answer.
11     A.  As I testified earlier, the conference
12  committees, 20, 30 times during a session, we'd go
13  outside the bounds.
14     Q.  (By Ms. Maranzano)  What was the purpose of the
15  conference committee removing the provision of SB 14
16  that would have allowed a tribal identification to be
17  used by a voter?
18     MR. FREDERICK:  Objection, legislative
19  privilege.  Instruct you not to answer.
20     A.  I'll assert privilege.
21     Q.  (By Ms. Maranzano)  What was the purpose of the
22  conference committee removing a provision that would
23  require the voter education that was required in SB 14
24  be targeted at low income and minority voters?
25     MR. FREDERICK:  Objection, legislative

## 219

1   privilege.  Instruct you not to answer.
2      A.  I'll assert privilege.
3      Q.  (By Ms. Maranzano)  What was the purpose of the
4   conference committee removing the provision of SB 14
5   that would have exempted from the photo ID requirement
6   individuals whose ID had been stolen and who certified
7   that in an affidavit?
8      MR. FREDERICK:  Objection, legislative
9   privilege.  Instruct you not to answer.
10     A.  I'll assert privilege.
11     Q.  (By Ms. Maranzano)  Did the Senator ever
12  discuss whether SB 14 might disproportionately impact
13  minority voters?
14     MR. FREDERICK:  I'm sorry, Jennifer.  You
15  said did the Senate ever discuss --
16     MS. MARANZANO:  Senator.  I'm sorry.
17     Q.  (By Ms. Maranzano)  Did Senator Fraser ever
18  discuss whether SB 14 might disproportionately impact
19  minorities voters?
20     MR. FREDERICK:  Objection, legislative
21  privilege, and instruct you not to answer, except to the
22  extent that you recall public statements or statements
23  on the Floor in response.
24     A.  He had discussions in the Committee of the
25  Whole and on the Floor with other members about their

## 220

1   impressions of the bill that it would impact minority
2   voters.
3      Q.  Did he have discussions about this topic that
4   are not included in the public record?
5      MR. FREDERICK:  I'll object, vague, object
6   to form, and object on the legislative privilege, to the
7   extent that it seeks the substance of any nonpublic
8   conversation.  To the extent you were aware of it, the
9   fact of the conversation, you may testify.
10     A.  I can't speak to the Senator's private
11  conversations.  I wasn't privy to them.
12     Q.  (By Ms. Maranzano)  Are you aware of any
13  legislators making any statements about illegal alien
14  voting?
15     A.  Yes.
16     Q.  Who was that?
17     A.  I just know it happened.  I don't remember who
18  said it.
19     Q.  What was the statement?
20     A.  I don't know the specifics of it.  I remember
21  reading about it in the newspaper, but I don't remember
22  who said it.
23     Q.  When -- when did you read about the statement?
24     A.  I want to say there was something in 2009, but
25  I'm not -- I don't recall.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

## 221

1    Q.   What newspaper was that in?
2    A.   I do not recall.
3    Q.   What was the general subject of the statement?
4    A.   I don't recall.  Generally, I remember hearing
5  that somebody said something in a committee hearing on
6  public record, but that's the extent of what I know.
7    Q.   Somebody said something in a committee meeting,
8  that somebody being one of the legislators?
9    A.   Yes.  I'm sorry.
10   Q.   Okay.  Thank you.  Have you ever heard any
11 Texas state legislator who voted in favor of SB 14 say
12 that it would prevent a legitimately registered voter
13 from voting in Texas?
14   MR. FREDERICK:  I object on privilege, to
15 the extent it calls for confidential privileged
16 communications, but other than that, you may answer.
17   A.   That specific statement, no.  That general
18 idea, yes.
19   Q.   (By Ms. Maranzano)  Who said that?
20   A.   The general thought that a legitimate voter
21 might not be able to vote was generally said by the
22 Democrat senators who testified against the bill.
23   Q.   Okay.  I'm sorry.  My question was any
24 legislator who voted in favor of SB 14 saying that?
25   A.   Then the answer is no.  I'm sorry.

## 223

1  who they say they are, U.S. citizens"?
2    A.   Yes.
3    Q.   Was that part of the purpose of House Bill 218?
4    A.   No.
5    Q.   Any reason that the Lieutenant Governor would
6  assert that that is the purpose of House Bill 218?
7    MR. FREDERICK:  Objection, calls for
8  speculation.  You can answer.
9    A.   I can't speak to what Lieutenant Governor wrote
10 in 2007.
11   Q.   (By Ms. Maranzano)  Ms. McCoy, at any time
12 since the passage of Senate Bill 14, have you come to
13 believe that it was passed with any discriminatory
14 purpose?
15   MR. FREDERICK:  I'll object on the basis
16 of legislative privilege.  I mean, to the extent -- and
17 I'll object to the extent that the question seeks your
18 thought processes, based on information gathered during
19 consideration of SB 14.  And otherwise, you can answer
20 if you won't reveal that.
21   MS. MARANZANO:  My question is, post
22 enactment, did she come to believe it was passed with
23 discriminatory purpose?
24   A.   No.
25   Q.   (By Ms. Maranzano)  At any time since the

## 222

1    Q.   Have you ever heard any Texas state legislator
2  who voted in favor of SB 14 say that it would prevent
3  racial or ethnic minorities from voting in Texas?
4    A.   No.
5    Q.   Are you familiar with a public letter from the
6  Lieutenant Governor in 2007 about photo ID requirements?
7    A.   No.
8    Q.   This has been previously marked as -- as
9  Exhibit 3.  This has been previously marked as
10 Deposition Exhibit 3.  Have you seen this before,
11 Ms. McCoy?  I'm sorry.  I'm showing you what has been
12 marked as Deposition Exhibit 3, previously marked.  And
13 if you can tell me if you've seen it before.
14   A.   I don't specifically remember reading this, but
15 I'm sure I did.
16   Q.   Do you see that there's a sentence that 8 to 12
17 million illegal aliens currently living in the U.S. --
18 wait, I'm sorry.  Let me find the exact sentence.
19   Can you look at the second paragraph?  Do
20 you see that -- do you see that that sentence says that
21 "Yesterday, Senator Troy Fraser brought up in the Senate
22 consideration of House Bill 218 by Representative Betty
23 Brown, which simply requires voters to present a
24 driver's license or some other common form of
25 identification at the election polls to prove they are

## 224

1  passage of SB 14, have you come to believe that SB 14
2  will have a discriminatory effect on minority voters?
3    MR. FREDERICK:  Same objection, but you
4  can answer.
5    A.   No.
6    Q.   (By Ms. Maranzano)  Ms. McCoy, can you give me
7  about two minutes?  I'm just about done.
8    A.   Sure.
9    Q.   We'll go off the record for about two minutes.
10   A.   Yeah.  Uh-huh.
11   (Recess from 5:03 to 5:11 p.m.)
12   Q.   (By Ms. Maranzano)  Ms. McCoy, do you know what
13 percentage of Senator Fraser's district was made up of
14 Latinos?
15   A.   No.
16   Q.   You testified earlier that minority legislators
17 made statement on the Floor to -- statements on the
18 Floor for the benefit of I believe you said, "of you."
19 Did you mean the Department of Justice?
20   A.   I meant -- yes, yes.
21   Q.   What's the basis of that statement?
22   A.   Personal opinion.
23   Q.   What's your personal opinion based on?
24   A.   Their opposition to the bill and the fact that
25 they thought maybe y'all could help kill it.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 225 | 227 |
|---|---|

**225**

1    Q.   Did any of them say anything like that to you?

2         MR. FREDERICK:  Object, based on

3    legislative privilege, to the extent there was any

4    confidential communication between a specific legislator

5    and you or Senator Fraser, I'll instruct you not to

6    answer.  Otherwise, to the extent you can answer, you

7    may.

8    Q.   (By Ms. Maranzano)  Can you answer this

9    question?

10   A.   I cannot.

11   Q.   Ms. McCoy, if you're called to testify at

12   trial, will you testify that SB 14 has no discriminatory

13   purpose?

14   A.   Yes.

15   Q.   If you're called to testify at trial, will you

16   testify that SB 14 has no discriminatory effect?

17   A.   Yes.

18        MS. MARANZANO:  Well, to be clear for

19   Mr. Frederick, it's our position that if she's taking

20   that position, we have a right to explore the basis of

21   that under our motion to compel.

22        MR. FREDERICK:  I'm sorry.  Just so I'm

23   clear, to explore what?

24        MS. MARANZANO:  To explore the -- I mean,

25   there's a number of questions that are related to that,

**227**

1    taking it out at some point.  I don't recall really when

2    that came out just because I was kind of hurriedly

3    looking through the versions.  And I think the House did

4    send it to us with it in and we had taken out.

5    Q.   Thank you for that clarification.

6    A.   You're welcome.

7    Q.   Anything else?

8    A.   That's -- that's it.

9    Q.   Any -- I'm sorry.

10   A.   So that was the only thing that I wasn't sure

11   about when I answered earlier.

12   Q.   Is there any information that you didn't recall

13   earlier that you now recall?

14   A.   No.

15        MS. MARANZANO:  Well, as I said, we're

16   leaving this deposition open, and I will now hand it

17   over to Chad.

18            EXAMINATION

19   BY MR. DUNN:

20   Q.   Good afternoon.

21   A.   Hi.

22   Q.   Hi.  My name is Chad Dunn.  I don't think we've

23   ever met before, have we?

24   A.   I don't think so.

25   Q.   All right.  Well, I know you've been here for

| 226 | 228 |
|---|---|

**226**

1    that y'all have not permitted her to answer.  So we

2    would reserve our right -- we're going to leave this

3    deposition open.  I'd like to say that for the record.

4    And you know, we believe that we have a right to ask her

5    and get answers on a number of questions that you've

6    instructed her not to answer, if she's taking the

7    position that she will offer these opinions if she's

8    called to testify at trial.

9         MR. DUNN:  Intervenors join.

10        MR. FREDERICK:  Okay.  I understand.

11   Q.   (By Ms. Maranzano)  Ms. McCoy, are there any

12   answers that you've provided today that you now wish to

13   change?

14   A.   Yes.

15   Q.   What's that?

16   A.   When we took our break.

17   Q.   Uh-huh.

18   A.   I went back and tried to look at the record of

19   when things passed or didn't pass.

20   Q.   Uh-huh.

21   A.   And I didn't have a lot of time, because there

22   was someone in my office on an unrelated issue for most

23   of the hour.  But you -- the Senate did remove the

24   provision on student ID's, not the House.  I think I had

25   testified that the House removed it, but we ended up

**228**

1    quite a while today, so I'm not going to, you know, try

2    to waste your time.  I've got a few issues that I want

3    to ask you about.  And I'm going to jump around a little

4    bit, all right?  I'm going to do my best to not ask you

5    anything that's already been asked.

6    A.   Okay.

7    Q.   But in order to get done with you as soon as I

8    can, I may end up having to overlap just a little bit,

9    and for that I apologize.  All right.

10        I'm going to start a little bit with some

11   of your earlier testimony.  As I understand it, you used

12   to be an election judge; is that true?

13   A.   One election I served as election judge.

14   Q.   Which election was that?

15   A.   Maybe 2000.  I don't really recall.  It's been

16   a while.

17   Q.   Was that in Travis County?

18   A.   Yes, sir.

19   Q.   And were you appointed as the actual election

20   judge, or you served as a volunteer?

21   A.   I was not precinct chair.

22   Q.   Okay.

23   A.   I -- they called and asked me, it was a

24   November election, the local party called and said we

25   need a Republican, because they had -- they wanted a



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

229

1    Democrat and a Republican.  And I lived in the precinct,
2    and they asked me to do it, and I said yes.  I don't
3    know if they had to actually turn my name in or not.
4        Q.   Okay.  And I'm not trying to quarrel with you,
5    but it sounds more like you were an election observer or
6    a poll watcher than an election judge.
7        A.   No, sir.  I was an election -- or the assistant
8    election -- I don't think I was the election judge.  I
9    was the assistant election judge.  I mean, I actually
10   had the title.
11       Q.   Okay.  And what were you responsibilities there
12   at the polling location?
13       A.   I was -- what was it?  I was -- I -- served as
14   the election judge, assistant election judge.  So I
15   monitored the election.  If there were any issues that
16   came up, I was there to resolve them.  There were not.
17   And then at the end of the night, I do remember taking
18   the box.  They used -- they used to take the boxes to --
19       Q.   Central tabulation?
20       A.   Yeah.  Well, you know where Palmer Event
21   Center -- there used to be a building next to Palmer
22   Event Center, but they tore it down.  Whatever that
23   building was, I took the box there and had to turn it in
24   official.  And then by election code, you have to keep
25   the documents for two years.  And so I was the custodian

230

1    of the documents for that precinct for two years.
2        Q.   All right.  Were you actually assigned the
3    responsibility of enrolling voters as they came in?
4        A.   I did not sit there and check the voters.
5    That, the election workers did that.
6        Q.   And did you do that during early vote or
7    election day or both?
8        A.   It was only on election day.
9        Q.   Do you remember the precinct?
10       A.   No.  The precinct number, no, sir.
11       Q.   Do you remember the actual location?
12       A.   There was a church just at 45th and Medical
13   Parkway.
14       Q.   While there, did you observe any activity that
15   you were concerned might be election fraud?
16       A.   No.
17       Q.   Have you served in an election judge or
18   election official capacity any other time than we just
19   spoke about?
20       A.   No.
21       Q.   Now, you said somebody called you and asked you
22   to do this.  Do you remember who that was?
23       A.   No, sir.
24       Q.   Was it a party official or a county official?
25       A.   I think it was a party official.  Travis County

231

1    Republican party official.
2        Q.   Was it the chairman?
3        A.   I don't recall.
4        Q.   I assume that you vote in most elections?
5        A.   Yes, sir.
6        Q.   Do you vote in both nonpartisan and partisan
7    elections?
8        A.   Yes, sir.
9        Q.   And you're going to hate me for asking this,
10   but it's important for several questions, what year were
11   you born?
12       A.   1969.
13       Q.   All right.  I tried to do it as gingerly as I
14   could.
15       A.   I'm not embarrassed.
16       Q.   So I assume since you turned 18 and since then,
17   you have more or less consistently voted?
18       A.   Yes, sir.
19       Q.   Whenever you have voted in Texas, have you ever
20   observed activity that made you concerned it would be
21   voter fraud?
22       A.   No, sir.
23       Q.   Have you ever voted in an election and observed
24   discriminatory behavior by an election clerk?
25       A.   No, sir.

232

1        Q.   I think you also testified that you've lived in
2    Texas your whole life; is that true?
3        A.   Yes, sir.
4        Q.   Have you, during that time, ever witnessed an
5    act of discrimination against a minority citizen in
6    Texas?
7             MR. FREDERICK:  Object as vague.  Object
8    to relevance.  But you can answer.
9        A.   Yeah.  I don't -- I don't know that I can
10   answer that question because it's vague.  I mean --
11       Q.   (By Mr. Dunn)  Well, I'll do -- I'll see if I
12   can do better.  All right?
13       A.   Okay.
14       Q.   Have you ever seen a government official deny a
15   benefit or service to a minority citizen?
16       A.   No, sir.
17       Q.   Have you ever seen another citizen in Texas
18   treat a minority citizen with some degree of disrespect?
19       A.   Another citizen?
20       Q.   Yes, ma'am.
21       A.   So one citizen treating somebody else with
22   disrespect?  Yes, sir.
23       Q.   And was that an Anglo to an African-American or
24   an Anglo to a Latino or something different?
25       A.   I think in all instances I have seen people


ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

233

1   treat people poorly, whether it's minority on minority
2   or Anglo on minority or minority on Anglo, I've seen it
3   all.  And I've lived 43 years, you see a lot of
4   disrespect.
5        Q.   So, in your opinion, there's not a higher
6   degree of discrimination amongst the citizenry between
7   Anglos and minority population in Texas anyway?
8        A.   In my opinion, that's correct.
9        Q.   Have you always lived in Austin?
10       A.   No, sir.
11       Q.   Where else have you lived in the state?
12       A.   Houston, in College Station, Bryan/College
13  Station when I was at A&M.
14       Q.   You went to school at A&M?
15       A.   Yes, sir.
16       Q.   Where did you grow up?
17       A.   Houston.
18       Q.   So is it fair to say that you've more or less
19  split your life in-between Houston and Travis County?
20       A.   Yes, sir.
21       Q.   Now, I'm going to move to a different topic, so
22  I'm trying not to lose you here.  But you were asked a
23  number of questions about the various photo voter ID
24  bills over the last several sessions about documents
25  prepared as part of the legislative process.  Okay.

---

234

1   That's where I'm going now.
2        A.   Yes, sir.
3        Q.   And you were asked some questions about bill
4   analysis that were prepared.  And I want to focus on SB
5   14 for a minute.  The bill analysis prepared for SB 14
6   was created by whom?
7        A.   The bill analysis that was created by Senate
8   Bill 14 as it came out of Senate, as it was filed, as it
9   came out of Senate committee as it was grossed,
10  engrossed, was prepared by Senate Research Center,
11  essentially, via the Senate administrative process.
12       The House, when it made it over there,
13  their processes developed their own bill analysis for
14  use.  I don't really recall -- I don't know who does
15  theirs.
16       Q.   All right.
17       A.   They probably base it on ours, but they do
18  their own.
19       Q.   And I want to focus on the Senate report
20  first.  The Senate report was prepared by Senate
21  Research, if I understood your answer right.
22       A.   That's -- yes.
23       Q.   Okay.  And I want to make sure we're being very
24  specific about that.
25       A.   Right.

---

235

1        Q.   Was it completely created by and put out by
2   Senate Research, or did it include language provided by
3   you or somebody in your office?
4        A.   Senator Fraser, through me, provides language
5   to the committee chair and their staff, and in this
6   case, Senator Duncan chaired Senate State Affairs.  They
7   then take that information and submit it to Senate
8   Research Center.  I don't know for sure if they used my
9   language verbatim.  Sometimes they do.  Sometimes they
10  don't.  And on this instance, I do not recall if they
11  used any of my language verbatim.
12       Q.   And so just to be clear in our record, do you
13  recall whether or not the language your office submitted
14  to Senator Duncan's staff was changed at all when it was
15  submitted by Senator Duncan's staff to Senate research?
16       A.   I do not recall.
17       Q.   Who was it with Senator Duncan's staff you
18  would have coordinated on the research analysis?
19       A.   Jennifer Fagan.
20       Q.   Was any convincing or cajoling necessary to
21  convince Senator Duncan's staff to support this bill?
22            MR. FREDERICK:  Object, legislative
23  privilege.  Instruct you not to answer.
24       A.   I'll assert privilege.
25       Q.   (By Mr. Dunn)  With respect to the -- in

---

236

1   addition to the bill analysis, a fiscal note was also
2   prepared; is that true?
3        A.   Yes, sir.
4        Q.   And was that prepared by the Legislative Budget
5   Board?
6        A.   Yes, sir.
7        Q.   Can you recall if, and I'm not asking for the
8   numbers, but from the various sessions you've been asked
9   about photo ID bills today, can you recall if there were
10  any changes to the fiscal note of the bill in its
11  various iterations?
12       A.   I don't recall what the fiscal note was in
13  2007.  I think in 2009 the number stayed somewhere in
14  the 2 to 4 million dollar range.
15       Q.   Do you remember who the analyst at LBB was on
16  these bills?
17       A.   I did not know the analyst at LBB.
18       Q.   Did you ever communicate with the analyst at
19  LBB?
20       A.   No, sir.
21       Q.   Did you ever provide LBB any estimates as to
22  your belief as to the fiscal impact of the bill?
23       A.   No, sir.
24       Q.   Did you ever do or conduct any research as to
25  what the fiscal impact of the bill would be?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 237

1    MR. FREDERICK:  Object, based on
2  legislative privilege.  Instruct you not to answer to
3  the extent it reveals the substance of any research.  I
4  instruct you not to answer.
5    A.  I'll assert privilege.
6    Q.  (By Mr. Dunn)  Stepping way from this bill for
7  a minute, is it generally important that a bill in the
8  legislature not have a fiscal impact or have a minimal
9  fiscal impact in order to pass?
10    MR. FREDERICK:  Object, vagueness, but you
11  can answer.
12    MR. DUNN:  I'll strike the question and
13  rephrase.  How about that?
14    Q.  (By Mr. Dunn)  Is it -- bills with a large
15  fiscal impact, do they typically get defeated or fail?
16    A.  They take longer to pass.
17    Q.  And they -- and because the bill involves a
18  larger fiscal impact, that means the state has to divert
19  financial resources to the bill's tenants; is that true,
20  if it were to pass?
21    A.  No.
22    Q.  Well, I assume that in all these years that
23  you've worked for Senator Fraser and perhaps others, you
24  have prepared a lot of bills and received a lot of
25  fiscal impacts on bills; is that true?

---

### 238

1    A.  Yes, sir.
2    Q.  Is it not typically bad news when you received
3  a fiscal impact statement from LBB that puts money on
4  the cost of a bill?
5    MR. FREDERICK:  Object to vagueness.  You
6  can answer.
7    A.  Well, I think I need you to ask the question
8  better.  I don't -- can you ask the question again?
9    Q.  (By Mr. Dunn)  Uh-huh.  Is it more difficult to
10  pass a piece of legislation when it has a fiscal impact
11  statement from LBB that it costs a considerable amount
12  of money?
13    A.  Not always, but the majority of the time, yes,
14  you'd rather have a zero fiscal note than not.  Or have
15  a low fiscal note than not.
16    Q.  And just so our court, which may not understand
17  the process here in Texas, our budget here in the state
18  is prepared either by the House Appropriations Committee
19  or the Senate Finance Committee in alternating sessions;
20  is that true?
21    A.  That's true.
22    Q.  And so if a member wants to pass a bill that
23  has a fiscal impact, they typically have to go to either
24  the Appropriations or Finance Committee and work out an
25  arrangement to pay for the bill; is that also true?

---

### 239

1    A.  Yes.
2    Q.  All right.  What efforts were made -- is it
3  true then that Senate Bill 14 had a fiscal impact
4  according to the LBB?
5    A.  Yes.
6    Q.  What steps were taken to make sure the funding
7  would be available for the bill?
8    A.  In 2007, no, I'm sorry.  I get my years -- in
9  2009 -- well, let's back up.
10    So when a bill has a fiscal impact, you
11  need a Finance Committee member to propose an amendment
12  to the budget or a rider or some sort of mechanism to
13  get that included, a contingency rider, sometimes.  In
14  2007, I want to say that -- I can't remember if I did
15  one of those or not.  In 2009, I'm sorry.  Sorry.
16  2009.  In 2007, I don't -- I didn't do anything with the
17  budget of the bill.  I don't remember that.
18    In 2009, I think we prepared a contingency
19  rider, and I think we asked another senator who was on
20  the committee to move that forward, who was a supporter
21  of the bill.
22    In 2011, I don't recall that I did any
23  work on trying to -- on behalf of Senator Fraser in
24  trying to get money in the budget.
25    Q.  Is the short answer with respect to Senate Bill

---

### 240

1  14, in 2011, you can't recall what, if anything, you did
2  to get the bill funded?
3    A.  I don't recall that I did anything to get the
4  bill funded --
5    Q.  All right.
6    A.  -- on behalf of Senator Fraser.
7    Q.  Senator Fraser has served on the Finance
8  Committee before, has he not?
9    A.  Yes, he has.
10    Q.  When did that service stop?
11    A.  I don't recall.  2005 or 2007.
12    Q.  Do you recall the senator you approached in
13  2009 to hold the contingency rider on the committee?
14    A.  I do not.
15    Q.  Do you know who carried it in 2011?
16    A.  I do not.
17    Q.  Just for our record, which -- was the
18  appropriation bill in '11 out of the house or out of the
19  Senate?  Or do you remember?
20    A.  I don't remember.
21    Q.  I don't either so I was hoping you did.
22    A.  I try to forget.
23    Q.  All right.  As part of the fiscal analysis for
24  the bill, did you participate in trying to determine
25  what it would cost to fully fund antifraud technologies

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                            MAY 16, 2012

---

241

1   in voting locations?
2       MR. FREDERICK:  I'm going to object on the
3   basis of privilege, to the extent it calls for the
4   substance of any communications or your thought process,
5   mental impressions, but the question as phrased, you may
6   answer it as long as you don't reveal those matters.
7       A.  Senator Fraser and I didn't do any work on
8   developing what the fiscal note looked like or what the
9   agency said it would cost them or not cost them.  So we
10  did nothing on the fiscal impact.
11      Q.  (By Mr. Dunn)  All right.  Fair enough.  So
12  I'll ask this question:  Did you, though, in working on
13  the bill, in any session, come to learn of various
14  technologies that have been developed or being developed
15  that can be used in polling locations to stop voter
16  fraud?
17      MR. FREDERICK:  Object to legislative
18  privilege.  Instruct you not to answer.
19      A.  I'll assert privilege.
20      Q.  (By Mr. Dunn)  With respect to Senate Bill 14,
21  do you know which legislator or which legislator's staff
22  was the point person for the fiscal impact of the bill,
23  if it wasn't you?
24      A.  I mean --
25      MR. FREDERICK:  If you know.

---

242

1       A.  When a bill moves to the legislative process,
2   the committee staff in the committee is responsible for
3   asking LBB for a fiscal note.  LBB then asks the
4   different agencies that are impacted how much it will
5   cost.  That comes back, gets attached to the bill, and
6   we move forward.
7       I mean, I don't -- I mean, I think -- I
8   mean, I don't know that I can be responsive to your
9   question, because I don't know that any legislative
10  staff directed anybody to provide that type -- those
11  numbers.  It's just that's what happened.  That's what
12  we got back from legislative budget board.
13      Q.  (By Mr. Dunn)  Let me try a different way of
14  phrasing the question.  Do you know and can you name for
15  us any staffer that was involved in formulating the
16  fiscal impact of this bill or coordinating with LBB?
17      A.  No.
18      Q.  Okay.  As I understand your description earlier
19  of your job responsibilities, you principally handle the
20  Capitol office for Senator Fraser and his legislative
21  priorities; is that true?
22      A.  Yes.
23      Q.  Do you have any district office
24  responsibilities?
25      A.  Only insomuch as I oversee the same

---

243

1   administrative functions for those three employees, and
2   they call me and bounce things off me about meetings or
3   issues or case work that they're working on.
4       Q.  Do you go out into the district?
5       A.  I have.  I haven't done it in the last couple
6   of years.
7       Q.  Senator Fraser's district is, gross
8   generalization, but more or less northwest of the Austin
9   area; is that true?
10      A.  He would categorize it as the Hill Country from
11  Kerr County to Abilene, from Belton to Menard.
12      Q.  All right.
13      A.  Junction.
14      Q.  Where are his district offices?
15      A.  Abilene, Belton and Marble Falls.
16      Q.  Is there an area in the district that has a
17  high degree of African-American, Latino or Asian
18  population?
19      A.  I would assume Bell County probably has our
20  largest minority population because it's our largest
21  county.
22      Q.  How would you describe that minority?  I mean,
23  is it Latino, African-American mixed?
24      A.  African-American.
25      Q.  I think you were asked earlier if you knew the

---

244

1   percentage of Latinos you have in your district.  I
2   think you said you didn't know; is that true?
3       A.  That's true.
4       Q.  Do you have an estimate?
5       A.  No, sir.
6       Q.  Do you have an estimate for the number of
7   African-Americans in your district?
8       A.  No, sir.
9       Q.  Do you have an estimate for the number of
10  Asians in your district?
11      A.  No, sir.
12      Q.  You've been with Senator Fraser for 10 years.
13  Did I hear that right?
14      A.  Since 1998.
15      Q.  '98.  All right.  So about 14 years?
16      A.  Yes, sir.
17      Q.  In the 14 years, what activities have you taken
18  or Senator Fraser taken to support the minority
19  community in his district?  Any bills, business,
20  meetings, or legislative business undertaken for those
21  groups?
22      MR. FREDERICK:  I'll object on legislative
23  privilege, only to the extent that your answer would
24  require you to reveal thought process, mental
25  impressions or confidential communications related to

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                      MAY 16, 2012

---

### 245

1  pending legislation.  To the extent you can answer
2  without revealing that, you may answer.
3      A.  Senator Fraser votes and promotes and works
4  with every constituent equally.
5      Q.  (By Mr. Dunn)  And I appreciate that.  I'm just
6  trying to find out, can you name for us some bills or
7  meetings or sort of administrative lobbying he's done on
8  of behalf of the minority constituents in his district?
9      A.  No.
10     Q.  Now, with regard to your district
11 responsibilities, do you ever go out and take the place
12 of the Senator at an event or speak to group because
13 he's unavailable?
14     A.  I have in the past.  I have not done it in
15 about three years.
16     Q.  What sort of events would you go speak to?
17     A.  They weren't necessarily speaking events where
18 it was a public forum.  They typically would just be
19 meetings with various constituency groups that wanted to
20 express concerns or opinions to our office.
21     Q.  Are there -- if I understand the testimony
22 earlier, there's sort of a schedule kept by your office
23 of where the Senator goes and does.  It doesn't have
24 everything, but it has some things; is that right?
25     A.  Yes, sir.

---

### 246

1      Q.  Would it also include the events that you
2  attended or another staff attended on his behalf?
3      A.  No, sir.
4      Q.  Those would be kept on the staffer's private
5  calendar?
6      A.  That's correct.
7      Q.  Can you recall ever have gone to an event in
8  place of Senator Fraser and speaking with a group of
9  African-Americans or Latinos?
10     A.  I've gone to events where African-Americans and
11 Latinos were present but nothing specific to those
12 groups.
13     Q.  Not a group or event where they made up the
14 predominant population in the attendees?
15     A.  That's correct.  I have not.
16     Q.  Have you attended any public meetings in
17 Senator Fraser's district as it relates to photo ID?
18     A.  I've attended meetings with the Senator where
19 he has -- speaking to a group where he brings up the
20 topic of photo ID in terms of the legislation that he
21 passed or didn't pass, given whatever year it was, but
22 nothing specific for the meeting specifically about
23 voter ID.
24     Q.  In other words, you didn't go to any rallies or
25 events put together by certain political groups who were

---

### 247

1  pushing photo ID?
2      A.  No, sir.
3      Q.  It would just come up as a part of more general
4  political discussion?
5      A.  Yes, sir.
6      Q.  My question earlier was limited to events in
7  the district.  Now I'm going to ask you about anywhere.
8  Have you been to such events?
9      A.  No, sir.
10     Q.  When is it that photo ID became something you
11 started working on in your office?
12     A.  The spring of 2007.
13     Q.  What caused that project to develop?
14     MR. FREDERICK:  Object, based on
15 legislative privilege.  To the extent you can answer
16 without revealing communications with the Senator,
17 legislators, constituents, or thoughts or mental
18 impression, you can answer.
19     A.  When the Senator agreed to be the House sponsor
20 to House Bill 218.
21     Q.  (By Mr. Dunn)  Prior to agreeing to be the
22 sponsor of House Bill 218, you hadn't researched,
23 drafted bill language or otherwise worked on the photo
24 ID issue?
25     MR. FREDERICK:  Objection, legislative

---

### 248

1  privilege.  Instruct you not to answer.
2      A.  I'll assert privilege.
3      Q.  (By Mr. Dunn)  The impetus to your office
4  beginning to deal with photo ID, did it have anything to
5  do with a specific event or events actually involving
6  voter impersonation?
7      MR. FREDERICK:  Object on the basis of
8  legislative privilege.  Instruct you not to answer.
9      A.  I'll assert privilege.
10     Q.  (By Mr. Dunn)  Why is it that Senator Fraser,
11 after having been asked in 2007 to carry House Bill 218,
12 why is it that he continued to hold the issue and push
13 it in future sessions?
14     MR. FREDERICK:  Object on the basis of
15 legislative privilege.  To the extent that it -- that
16 the question calls for subjective mental impressions,
17 thought process or confidential communications, I
18 instruct you not to answer.  If you can answer based on
19 nonprivileged matters including public statements or
20 core testimony, you can do so.
21     A.  I think I can say that Senator Fraser has said
22 consistently, public record or public meetings, that he
23 believes that the issue of in-person voter fraud and
24 protecting the integrity of our elections was important,
25 and he wanted to continue to fight.

---



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

249

1    Q.   (By Mr. Dunn)  And he came to that conclusion
2    sometime in or around the spring of 2007 when he was
3    asked to support House Bill 218?
4        MR. FREDERICK:  Objection to the extent it
5    mischaracterizes the prior testimony.  Also object on
6    legislative privilege.  I instruct you not to answer.
7        A.   I'll assert privilege.
8        Q.   (By Mr. Dunn)  Is it true that Senator Fraser's
9    issue in the photo ID matter -- strike that.
10       Senator Fraser's interest in the photo ID
11   matter did not develop until he was approached by a
12   member of the House?
13       MR. FREDERICK:  Objection, legislative
14   privilege.  Instruct you not to answer.
15       A.   I'll assert privilege.
16       Q.   (By Mr. Dunn)  You were asked some testimony
17   about Section 5 of the Voting Rights Act.  I'm just
18   telling you that to sort of get you to where I'm going
19   now.
20       A.   Yes, sir.
21       Q.   All right.  And you mentioned something that
22   nine states and some territories are subject to Section
23   5.  Did I hear you correctly?
24       A.   That was my comment.  Yes, sir.
25       Q.   Do you know how it is that those nine states

250

1    and territories were made subject to Section 5?
2        A.   My understanding is that it was part of -- back
3    when LBJ was president, but that's as much I could speak
4    to.
5        Q.   In other words, you don't know if there was a
6    formula or some kind of basis used to select the areas
7    subject to Section 5, you're not familiar with it?
8        A.   That's correct.
9        Q.   Are you aware that Section 5 was applied to
10   certain areas because of the history of discrimination?
11       A.   It's my understanding that that was the
12   intent.  Yes, sir.
13       Q.   And do you deny that there's a history of
14   discrimination in Texas?
15       A.   No, sir.
16       Q.   When is it that you think, if you do, that the
17   discrimination in Texas stopped?
18       A.   I don't recall that there being discrimination
19   in my life -- well, in my adult lifetime.
20       Q.   So sometime in your adolescence is when that
21   problem was solved in your view?
22       MR. FREDERICK:  Objection, to the extent
23   misstates the testimony.  You can answer.
24       MR. DUNN:  I'll rephrase.
25       Q.   (By Mr. Dunn)  When in your view was racial

251

1    discrimination in Texas resolved?
2        A.   I don't know.
3        Q.   Okay.  But in any event, in your opinion, we're
4    at the point now where federal laws are not required to
5    protect minority citizens in Texas?
6        MR. FREDERICK:  You may answer to the
7    extent that --
8        A.   My personal opinion is federal law is not
9    necessary to protect minority voters in Texas.
10       Q.   (By Mr. Dunn)  But you believe that minority
11   citizens have an equal opportunity to vote as Anglos or
12   anyone else?
13       A.   That they do?
14       Yes, ma'am.
15       A.   Yes, sir.
16       Q.   Okay.  That is -- that sort of belief, the
17   belief that everybody that's an American citizen has an
18   equal vote is also part of the law in the constitution,
19   the federal constitution; is that true?
20       A.   Yes, sir.
21       Q.   All right.  So when you draft legislation,
22   whether it's on elections or anything else for the
23   Senator, do you keep that concern in mind to make sure
24   you're complying with that provision of the
25   constitution?

252

1    A.   I --
2        MR. FREDERICK:  Object on the basis of
3    legislative privilege, and instruct you not to answer.
4        A.   I'll assert privilege.
5        Q.   (By Mr. Dunn)  Do you believe that -- this
6    is -- I'm going to make sure I'm clear about this.  If
7    you're confused, ask me.  But do you believe that
8    government, whether it's state or federal, is capable of
9    disenfranchising a citizen?  I beg your pardon?
10       A.   I'm sorry.  I'm just thinking in my head.
11       Q.   Oh.
12       What do you mean by "disenfranchising"?
13       Q.   Well, let's say the federal government passed a
14   law that said that people with blue eyes can't vote any
15   longer.
16       So we're specifically talking about elections?
17       Q.   Yes.  Uh-huh.  Such a law would disenfranchise
18   voters.  Would you agree?
19       A.   If you had blue eyes, yes, sir.
20       Q.   All right.  You and I share that trait.  That's
21   why I picked that one.
22       A.   Maybe we shouldn't be voting.
23       Q.   Well, we probably -- well, I won't even say.
24       All right.  With respect to -- there have
25   been laws over the years that have caused voters to be



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

253

1 disenfranchised; would you agree?
2     A.  Previous, yes.
3     Q.  For example, requiring a voter to pay a poll
4 tax.  Would you agree that resulted in disenfranchise?
5     A.  Yes.
6     Q.  Laws that require voters to take a literacy
7 test.  Would you agree that was disenfranchising?
8     A.  Yes.
9     Q.  Do you believe that government can make voting
10 so onerous that it becomes a disenfranchisement?
11     MR. FREDERICK:  Object as vague, but if
12 you have an opinion, you can answer it.
13     A.  I don't believe the government would do that.
14     Q.  Fine.  But if it did, it could become
15 disenfranchising?
16     A.  I think the government could do a lot of things
17 that are bad and does.
18     Q.  So is it your opinion that Senate Bill 14 as
19 passed has no effect on the difficulty in voting in
20 Texas?
21     MR. FREDERICK:  I'll object only to the
22 extent that the question seeks your mental impressions,
23 thought processes related to the development of SB 14
24 and any confidential communications.  As you sit here
25 today, you may answer based on personal knowledge or

254

1 opinion.
2     A.  I do not believe Senate Bill 14 disenfranchises
3 voters.
4     Q.  (By Mr. Dunn)  All right.  And that's fair
5 enough, but that's a slightly different answer to a
6 different question.
7         I'm asking:  Do you believe that Senate
8 Bill 14 puts some burden on voting that wasn't there
9 before?
10     MR. FREDERICK:  Same objection and
11 instruction.
12     A.  I'll assert privilege.
13     THE WITNESS:  Can I?  Is that what --
14     MR. FREDERICK:  No.  Let me repeat it just
15 so I'm clear to you.
16     THE WITNESS:  Okay.
17     MR. FREDERICK:  I object based on
18 legislative privilege, only to the extent the question
19 seeks your thoughts or Senator Fraser's thoughts or
20 mental impressions about SB 14 during the process of
21 development and passage or any confidential
22 communications --
23     A.  Okay.
24     MR. FREDERICK:  -- related to it.  To the
25 extent that you have a personal opinion or personal

255

1 knowledge, as you sit here today, not based on that, you
2 may answer.
3     A.  So the question is?
4     Q.  (By Mr. Dunn)  The question is, what is your
5 opinion as to whether or not Senate Bill 14 places some
6 burden on voting?
7     A.  I don't believe it imposes an additional burden
8 on voting that makes it hard for anybody to vote.
9     Q.  And so I just want to make sure I understand.
10 You don't think that there's any burden, or you think
11 that the burden is insignificant?
12     A.  I think the burden is insignificant.
13     Q.  All right.  And so whereas a burden that would
14 come from a poll tax or a literacy test is some degree
15 higher -- well, let me just strike that.
16         Where do you draw the line between the
17 burden of a poll tax, for example, and the burden
18 created by the photo ID requirement?
19     MR. FREDERICK:  Object as vague.
20     A.  I don't know that I personally believe that the
21 burden of having a photo ID is a burden or having a
22 photo ID is a burden.
23     Q.  (By Mr. Dunn)  I see.  All right.  Well, have
24 you worked on -- you staffed State Affairs for some
25 period of time I think you said, right?

256

1     A.  Yes, sir.
2     Q.  And State Affairs in the Senate is where most
3 election bills go through unless --
4     A.  Yes.
5     Q.  -- there's a special rule set up?
6     A.  Yes, sir.
7     Q.  All right.  In this case, Senate Bill 14 didn't
8 go through State Affairs because the Committee of the
9 Whole was created; is that true?
10     A.  That's true.
11     Q.  But typically, the committee with senators who
12 have the background and knowledge about election matters
13 are in State Affairs?
14     A.  Yes, sir.
15     Q.  There have been a number of bills that have
16 been passed by the state legislature in the last several
17 sessions that relate to election laws; is that true?
18     A.  Yes, sir.
19     Q.  There have also been a number that relate to
20 voter registration; is that true?
21     A.  Yes, sir.
22     Q.  Are you familiar with bills that have created
23 new requirements for deputy voter registrars in Texas?
24     A.  Not specifically, no.
25     Q.  All right.  Are you familiar with any bills



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

## 257

1  that create additional burdens in order to become
2  registered to vote in Texas?
3      A.  I don't recall that we passed anything about
4  registering to vote since HAVA or that doesn't comply
5  with HAVA.
6      Q.  So if things have been passed since then, you
7  just don't recall it?
8      A.  That's correct.
9      Q.  Now, could you see a scenario where the -- and
10 I'm using your language, the insignificant burden of SB
11 14 added on to a burden of voter registration, added on
12 to a burden of deputy registrars, could add up to
13 disenfranchisement in time?
14      MR. FREDERICK:  Objection, calls for
15 speculation.  You can answer if you can.
16      A.  I don't know what the changes were to voter
17 registration and deputies, so I cannot answer the
18 question.
19      Q.  (By Mr. Dunn)  But you would agree that if we
20 take stacks of hairs and we continue to stack the hairs,
21 sooner or later we'll get to the thickness of a quarter?
22      MR. FREDERICK:  Objection, vague.  You can
23 answer if you can.
24      A.  I don't believe that Senate Bill 14 was passed
25 in a vacuum, and I think we recognized what the rest of

---

## 258

1  the election code did when we passed it.
2      Q.  (By Mr. Dunn)  So it's your testimony then that
3  whatever burden, if there is one on Senate Bill 14, does
4  not add into other burdens if there are in state law to
5  the right to vote?
6      MR. FREDERICK:  Object to the extent it
7  mischaracterizes prior testimony, but you can answer.
8      A.  I don't know that I said there were other
9  burdens.  So, I mean.
10     Q.  All right.  What burdens are there, if any, to
11 the voting in Texas?
12     A.  I don't believe there are any burdens currently
13 to voting in Texas.
14     Q.  Are you familiar with new regulations adopted
15 by the Department of Public Safety relating to documents
16 required to be presented in order to get an ID or
17 driver's license?
18     A.  I have recently read news clips saying they did
19 that.  Yes, sir.
20     Q.  These are new regulations that came out May the
21 1st; is that true?
22     A.  I don't know the date, but recent, yes, sir.
23     Q.  Very recently?
24     A.  Yes, sir.
25     Q.  DPS also adopted some new regulations shortly

---

## 259

1  in advance of the last legislative session, did they
2  not, with respect to information that had to be provided
3  to get a driver's license or ID?
4      A.  I think that's correct.  Yes.
5      Q.  So is it your opinion that as DPS continues to
6  add requirements to getting a driver's license or an ID,
7  that doesn't create a burden, even ever so slight, to
8  voting?
9      A.  Well, Senate Bill 14 provides with other forms
10 of ID, so you could use one of those forms, those five
11 other forms, four other forms, to vote if you didn't
12 want to get a driver's license.
13     Q.  So if the state, whether it be through the
14 legislature, the agency makes it extremely difficult to
15 get a driver's license, that's not a burden, in your
16 view, because there are other IDs that can be obtained.
17 Do I have that right?
18     MR. FREDERICK:  Object to the extent it
19 misstates prior testimony.  You can answer.
20     A.  I don't -- can you say that, can you repeat
21 your question?
22     MR. DUNN:  Sure.  Would you mind reading
23 that one?
24     (Requested portion read back by the court
25 reporter.)

---

## 260

1      MR. FREDERICK:  Object, again, as
2  vague.  Object to the extent it mischaracterizes the
3  prior testimony.  And object, it calls for speculation.
4  But you can answer.
5      (Cell phone buzzes.)
6      Q.  (By Mr. Dunn)  Do you need to deal with that?
7      A.  I need to just turn it off.
8      Q.  I know you have twins.  If you need to get it.
9      A.  No.  My husband has them.
10         I don't know that what we -- what DPS has
11 done is created a burden in terms of getting a driver's
12 license.  And I believe that Senate Bill 14 provided
13 with other mechanisms if you didn't want to use a
14 driver's license as a photo ID to vote.
15     Q.  All right.  Well, did you or anybody in your
16 office have any coordination with DPS and its adoption
17 of regulations relating to obtaining a driver's license
18 or ID?
19     A.  No.
20     Q.  Are you aware of any impediments to DPS through
21 its rule-making authority to create other requirements
22 for folks to bring in order to obtain one of these state
23 IDs?
24     A.  No.
25     Q.  So then it would be true that even under the



Toll Free:  800.211.DEPO
Facsimile:  512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

### 261

1  current sort of situation and regulation in which we're
2  judging Senate Bill 14, that could easily change should
3  DPS decide to alter its regulations?
4          MR. FREDERICK:  Objection, calls for
5  speculation, but you can answer.
6      A.  I don't think I can answer the question.  I
7  can't speculate what DPS will or won't do.
8      Q.  (By Mr. Dunn)  I don't think I was asking you
9  to speculate.
10     A.  Okay.
11     Q.  I guess all I was asking is since DPS
12  regulations are as fluid as DPS wants to create rules,
13  you would agree with me the effect of Senate Bill 14
14  will change as those requirements change?
15     A.  I disagree because DPS has to operate within
16  statute, and if statute is clear, then DPS rules can't
17  go beyond that.
18     Q.  Was there anything in Senate Bill 14 that
19  authorized DPS to require documentation of 30-day
20  residency in order to get a voter ID or a driver's
21  license?
22     A.  No, sir.
23     Q.  So do you know what their statutory authority
24  was for doing that?
25     A.  No, sir.

### 262

1          Q.  If there was statutory authority, it would have
2  had to come from someplace other than Senate Bill 14?
3      A.  That's correct.
4      Q.  All right.  Now, I'd like to ask you a little
5  bit about the 21-vote rule.  And I understand that you
6  say it's not a rule, so I'm not trying to put the word
7  "rule."  How do you want to refer to it, the 21-vote
8  tradition?
9      A.  We can call it a rule if you'd prefer, if that
10  makes it easier for you.
11     Q.  All right.  A bill or measure in the Senate in
12  order to pass out of the body under typical rules and
13  traditions requires 21 votes, if all 31 senators are
14  present?
15     A.  It requires -- yes, sir, if all 31 senators are
16  present.  Yes, sir.
17     Q.  All right.  And if there's some number below 31
18  senators, then two-thirds of the number who are present
19  is required, then so long as there's a quorum; is that true?
20     A.  Yes, sir.
21     Q.  What measures can you recall in your 14 or so
22  years of experience have been passed out of the Senate
23  without complying with the two-thirds tradition?
24     A.  Besides photo ID, I don't know of any.
25     Q.  Now, you gave some testimony earlier -- well,

### 263

1  strike that.
2          The 31 senators who are in the Senate are
3  the only people eligible to vote in the Senate.  Seems
4  like a silly question, but that's true; is that right?
5      A.  That's true.
6      Q.  All right.  So you either have to convince the
7  requisite number of those senators to support your
8  measure or you have to somehow change the electorate; is
9  that true?
10     A.  Change the electorate.  I don't understand.
11     Q.  These 31 senators.  You either got to convince
12  --
13     A.  Right.
14     Q.  -- two-thirds or a majority, whatever you
15  need --
16     A.  Right.
17     Q.  -- or you got to beat a senator or two in an
18  election?
19     A.  That's correct.
20     Q.  As I understand earlier forms of photo ID,
21  because there wasn't the two-thirds vote in the Senate,
22  the maneuver then was to have the vote when one senator
23  who opposed the bill was missing; is that true?
24     A.  Yes.
25     Q.  And that happened on at least one occasion when

### 264

1  Senator Uresti was not around?
2      A.  In terms of voter ID, yes.
3      Q.  And it was senators, I'm not asking you to
4  identify whom, but it was senators who came up with this
5  maneuver of trying to get a bill through when there
6  wasn't two-thirds of the -- when you didn't have a
7  senator present.
8          MR. FREDERICK:  I'll object on legislative
9  privilege.  Instruct you not to answer it.
10         MR. DUNN:  Okay.  And I'm not talking
11  about Senate Bill 14.  I'm talking about process in
12  general in the Senate.  So is it your -- is it your
13  instruction to her, she can't talk about the two-thirds
14  rule in general?
15         MR. FREDERICK:  No.  That's not my
16  instruction to her.
17         MR. DUNN:  Oh, okay.  All right.  I just
18  didn't want to keep asking the same question.
19         MR. FREDERICK:  No, no, I hear you.
20     Q.  (By Mr. Dunn)  All right.  So -- let me just
21  start over.
22         Your experience there in the Senate is
23  that senators occasionally will wait for an opponent
24  senator to not be in the chamber in order to push a
25  bill?



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

---

265

1    A.  Yes, sir.
2    Q.  All right.  And the hope then is to get the
3  bill passed and get two-thirds while this other senator
4  is out of the room?
5    A.  Yes, sir.
6    Q.  And sometimes it might take a couple of
7  senators out of the room; is that true?
8    A.  Yes.
9    Q.  There's a tradition in the Senate, though, on
10  big and large and hot button measures that senators ask
11  the chair that a bill not come up when they have to be
12  away from the Senate; is that true?
13          MR. FREDERICK:  Objection, vague.  You may
14  answer.
15    A.  It has been done, to my knowledge, yes.
16    Q.  (By Mr. Dunn)  And now here's where I'll get
17  his objection.  All right.
18          Do you know if Senator Uresti asked
19  whoever was in the Lieutenant Governor's chair, don't
20  bring up this bill while I'm out of the chamber?
21          MR. FREDERICK:  I'll object on legislative
22  privilege, to the extent it calls for a confidential
23  communication from a legislator or staff, or -- yeah,
24  but to the extent it's in the public record or the
25  Senate, you may answer.

---

266

1    A.  I don't know Senator Uresti's discussions with
2  Governor Dewhurst's office.
3    Q.  (By Mr. Dunn)  Now, senators who have it in
4  their intent when they pass a bill, to try to get the
5  bill passed without another member present, that senator
6  could also have the intent to conduct elections in Texas
7  where certain members can't participate?
8          MR. FREDERICK:  Objection, calls for
9  speculation.
10    A.  I disagree.
11    Q.  (By Mr. Dunn)  Have you ever done any research
12  or been presented any data as to whether or not there's
13  racially polarized voting in Texas?
14          MR. FREDERICK:  I'll object, legislative
15  privilege, to the extent that you have performed any
16  such research in connection with pending legislation.
17  I'm instructing you not to answer on the basis of
18  legislative privilege.
19    A.  I'll assert privilege.
20          MR. DUNN:  So even sitting -- not talking
21  about Senate Bill 14, just in general, are you familiar
22  with whether or not there's racially polarized voting in
23  Texas, you're instructing her not to answer on that?
24          MR. FREDERICK:  No.
25          MR. DUNN:  Okay.

---

267

1          MR. FREDERICK:  If you're asking her, in
2  general, is she aware of whether or not there's racially
3  polarized voting, that's different.  If you're asking
4  her whether she's performed research in her role as the
5  senate staffer, that I would object to.
6          MR. DUNN:  I see.
7    Q.  (By Mr. Dunn)  Are you aware of whether or not
8  there's racially polarized voting in Texas?
9    A.  I am not aware.
10    Q.  Do you know what racially polarized voting is?
11    A.  Not necessarily.
12    Q.  Have you ever worked on campaign staff?
13    A.  No.  I'm sorry.  When I first got out of
14  college, I worked for a political consultant, but we had
15  several campaigns, and I never actually staffed a
16  campaign.
17    Q.  Do you play any role in Senator Fraser's
18  reelection campaign?
19    A.  I do Senator Fraser's campaign books.  Senator
20  Fraser hasn't had a campaign for several years.  So I
21  have helped him develop press releases saying he's
22  running for reelection, but that's the extent of it.
23    Q.  All right.  When you say his books, are you
24  talking about the Ethics Commission reports?
25    A.  Yes, sir.

---

268

1    Q.  All right.  But you don't actually direct
2  political strategy for him?
3    A.  No, sir.
4    Q.  Do you do that for any other candidate?
5    A.  No, sir.
6    Q.  Did you have any involvement in redistricting
7  this last election cycle?
8    A.  No, sir.
9    Q.  Did you make any recommendations to
10  redistricting members or their staff as it related to
11  the makeup or the shape of Senator Fraser's district?
12          MR. FREDERICK:  I'll object on privilege,
13  only to the extent that your answer would reveal
14  confidential communications or thought processes, the
15  fact of whether or not you did.  You may answer.
16    A.  Yes.
17    Q.  (By Mr. Dunn)  Who was it that you spoke with
18  about Senator Fraser's district?
19    A.  Senator Seliger.
20    Q.  He was the chairman of the redistricting effort
21  in the Senate; is that true?
22    A.  Yes, sir.
23    Q.  Anyone else?
24    A.  His asides, probably other staff, legislative
25  staff, other senators, members, staffs.



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

| 269 |
| --- |

1     Q.   What was the characteristic of the changes
2   Senator Fraser wanted to his district?
3         MR. FREDERICK:  Objection, legislative
4   privilege.  I'm instructing you not to answer.
5         A.   I'll assert privilege.
6         Q.   (By Mr. Dunn)  All right.  Earlier we asked, I
7   asked you about discrimination in Texas.  Are you aware
8   of any courts in Texas finding that legislative acts
9   have a discriminatory effect or purpose?
10        A.   Not specifically, no.
11        Q.   Are you aware that in this most recent
12  redistricting cycle, a panel of judges in San Antonio
13  unanimously found that parts of the redistricting plan
14  in Texas either had a discriminatory effect or purpose?
15        MR. FREDERICK:  Object to the extent it
16  assumes facts not in evidence.
17        A.   I didn't follow.
18        Q.   (By Mr. Dunn)  You didn't follow?
19        A.   No, sir.
20        Q.   Did you follow the United States Supreme Court
21  opinion in 2003 where a majority of that court found
22  that Texas legislature had been racially discriminatory
23  in redistricting?
24        A.   No, sir.
25        Q.   At least with respect to the legislators that

| 270 |
| --- |

1   passed Senate Bill 14, the vast majority of them were
2   the same ones that passed the legislative redistricting
3   in both 2003 and the most recent set; is that true?
4         A.   I'm sorry.  I don't know the votes of
5   redistricting in 2003.  The votes of the redistricting
6   bill in 2011, I think only two senators voted against
7   it, and those two senators also voted against voter ID.
8         MR. DUNN:  All right.  So I object to the
9   responsiveness.
10        Q.   (By Mr. Dunn)  I guess all I'm asking, though,
11  is that the senators that voted in support of
12  redistricting in 2011 were the same body of senators
13  that voted on Senate Bill 14?
14        MR. FREDERICK:  Object to the extent it
15  assumes facts not evidence, but you can answer if you
16  know.
17        A.   Yes.
18        Q.   Is it also true that the champions, so to
19  speak, the people who were pushing the redistricting
20  effort in the Senate, were also the same senators that
21  were pushing Senate Bill 14?
22        MR. FREDERICK:  Objection, assumes facts
23  not in evidence.  Object, vague.  You can answer if you
24  can.
25        A.   I really honestly didn't work on redistricting.

| 271 |
| --- |

1         Q.   (By Mr. Dunn)  All right.  I'm going to move to
2   a new topic.  You spoke with Ann McGeehan about Senate
3   Bill 14, if I recall?
4         A.   Yes, sir.
5         Q.   And she was -- she left the Secretary of
6   State's office, what, in January of this year; is that
7   true?
8         A.   She left sometime this -- in the last couple of
9   months.  I don't know exactly when.
10        Q.   Have you had -- and the person that replaced
11  her is a gentleman named Ingram; is that right?
12        A.   Keith Ingram.  Yes, sir.
13        Q.   Keith Ingram.  Have you spoken with him at all
14  about Senate Bill 14's implementation?
15        A.   About Senate Bill 14's implementation.  I
16  talked -- I don't recall.  I know I think I've talked to
17  him.  I don't know if it's specifically about Senate
18  Bill 14.
19        Q.   Turning back to Ms. McGeehan, did she testify
20  in either the House or the Senate committee as a whole
21  on Senate Bill 14?
22        A.   She testified on Senate Bill 14, yes, in the
23  Senate.  Yes, sir.
24        Q.   Did she testify in favor or opposition to it?
25        A.   She testified on as a resource witness.

| 272 |
| --- |

1         Q.   In other words, she didn't express an opinion
2   on behalf of the Secretary of State as to whether or not
3   Senate Bill 14 was a good idea?
4         A.   Not that I recall.
5         Q.   Was there any effort by you to encourage
6   Ms. McGeehan to get behind the bill in her testimony?
7         MR. FREDERICK:  Objection, legislative
8   privilege.  I would instruct you not to answer.
9         A.   I'll assert privilege.
10        Q.   (By Mr. Dunn)  In your -- I'm going to do
11  several questions.  He's going to object, and you're
12  going to answer, but I just want to get these out here.
13        In your conversations with Ms. McGeehan,
14  did you ask her to provide you data on election returns
15  and how they might be impacted by the photo ID
16  requirement?
17        MR. FREDERICK:  Objection, legislative
18  privilege.  I'll instruct you not to answer.
19        A.   I'll assert.
20        Q.   (By Mr. Dunn)  Did you provide Ms. McGeehan any
21  data or research that you had performed on the effect of
22  the photo ID requirement on turnout?
23        MR. FREDERICK:  Objection, legislative
24  privilege.  I'll instruct you not to answer.
25        A.   I'll assert.



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

---

### 273

1    Q.  (By Mr. Dunn)  Did you request at any time that
2  the Secretary of State's office prepare research or
3  analysis on whether or not the photo ID requirement
4  would have a disparate impact on minority citizens?
5    MR. FREDERICK:  Objection, legislative
6  privilege.  Instruct you not to answer.
7    A.  I'll assert.
8    Q.  (By Mr. Dunn)  Are you aware -- this one ought
9  to get past the bully here.
10    Are you aware that the Secretary of
11  State's office has data and computer staff that might be
12  capable of performing an analysis about the impact of a
13  particular legislation on minority citizens?
14    A.  I've seen the data that they prepared for the
15  Department of Justice, so yes, I know that now.
16    Q.  You know that they are capable of doing that?
17    A.  Yes, sir.
18    Q.  The data, though, that's been prepared for the
19  Department of Justice, all that came about after Senate
20  Bill 14 had been passed by legislature and signed by the
21  Governor, true?
22    A.  True.
23    Q.  Other than the resource of the Secretary of
24  State's office, are you familiar with any other
25  organization that you had sort of access to that could

---

### 274

1  have performed an analysis, what I would call an
2  analytical analysis of whether or not Senate Bill 14
3  would have disparate impact on minorities?
4    MR. FREDERICK:  I'll object on the basis
5  of legislative privilege, only to the extent that it
6  seeks thought process or mental impressions during the
7  development and passage of SB 14, to the extent it --
8  he's asking you as you sit here today, are you aware.
9    Q.  Let me fix the question.
10    What resources other than Secretary of
11  State did you have to consult about doing data type
12  analysis on the effect of SB 14 on minorities?
13    MR. FREDERICK:  I'm sorry.  Could you
14  read -- read the question back, sir?
15    (Requested portion read back by the court
16  reporter.)
17    MR. FREDERICK:  I'm going to object on
18  legislative privilege.  I think that gets into thoughts
19  and mental impressions.  I'll instruct you not to
20  answer.
21    A.  I'll assert.
22    MR. DUNN:  All right.  And I just want to
23  make sure.  So she's not allowed to tell me what
24  agencies or groups could have performed this analysis
25  that she's aware of?

---

### 275

1    MR. FREDERICK:  To the extent you're
2  asking her during -- during the development and passage
3  of SB 14, what she thought at the time was available to
4  her to perform specific subject matter, subject matter
5  specific analysis, yes, I believe that's a thought,
6  mental impression, that's protected by legislative
7  privilege.
8    Q.  (By Mr. Dunn)  Is it your opinion that this
9  bill will not have the effect of discouraging even one
10  voter?
11    MR. FREDERICK:  That's -- cautionary
12  instruction, I mean, I think as phrased, to the extent
13  the question seeks your opinion, as you sit here, you
14  may answer.
15    A.  My opinion is that it will not impact one voter
16  negatively.
17    Q.  (By Mr. Dunn)  All right.  If you could go with
18  me to US-31.  Right here on the top.
19    A.  Oh, yes.
20    Q.  I'd like to go with you to the last paragraph,
21  and if I remember your testimony from earlier, you at
22  least prepared the initial draft of 31; is that true?
23    A.  Yes, sir.
24    Q.  All right.  The first sentence of --
25    A.  The first phrase.

---

### 276

1    Q.  And I told you the last paragraph.  I really
2  meant the next to the last one that begins with "voting
3  is"?
4    A.  Okay.
5    Q.  The sentence reads:  "Voting is one of our most
6  important rights as Americans, but it is also a
7  responsibility."  Do you see that?
8    A.  Yes, sir.
9    Q.  In my reading, I don't understand, and I don't
10  think it's defined in the writing here what it was meant
11  be responsibility.  Is there a sentence that informs
12  what that phrase, "but it is also a responsibility," in
13  this document?
14    A.  No, sir.
15    Q.  All right.  So what is it that you meant, at
16  least when you drafted this, about voting is a
17  responsibility?  I mean, why was that in here?
18    MR. FREDERICK:  I object on the basis of
19  legislative privilege, to the extent that it seeks a
20  thought or mental impression about pending legislation
21  that goes -- that -- underlying a public statement.  So
22  I -- as phrased, I would instruct you not to answer the
23  question.
24    A.  I'll assert.
25    Q.  (By Mr. Dunn)  Do you believe that members who

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                         MAY 16, 2012

---

### 277

1  don't have a significant population of minority citizens
2  in their district still have to take care to make sure
3  the minority citizens elsewhere in the state are
4  protected under the law?
5       A.  Yes.
6       Q.  In other words, if there's a member that -- and
7  I know this doesn't happen, but if there's a member that
8  just represented 100 percent African-Americans, would it
9  be fair for that member to just ignore the needs of
10  Anglos and Latinos?
11       A.  No.
12       Q.  So when you prepare legislation or help Senator
13  Fraser with legislation, do you consider it one of your
14  responsibilities to make certain that that legislation
15  doesn't have a disparate impact on minority citizens or
16  majority citizens?
17          MR. FREDERICK:  Objection, legislative
18  process.  Instruct you not to answer.
19       A.  I'll assert.
20       Q.  (By Mr. Dunn)  Is there any -- have there ever
21  been situations where you've been working on bills where
22  you believe there was a conflict in your duties under
23  the state constitution and the federal constitution?
24          MR. FREDERICK:  Objection, legislative
25  process privilege.  Legislative privilege.  Instruct you

---

### 278

1  not to answer.
2       A.  I'll assert.
3       Q.  (By Mr. Dunn)  Do you believe that federal law
4  is supreme to state law?
5          MR. FREDERICK:  Objection, relevance.
6  Objection, vague.  I would also object on the basis of
7  legislative privilege, to the extent it's asking for
8  what she believes in her role as a role in the Senate.
9  If he's asking for your opinion or belief as you sit
10  here today, not based on confidential matters, you can
11  answer if you can.
12       A.  I do -- I believe that the state -- that the
13  federal government is not superior to the states.
14       Q.  (By Mr. Dunn)  All right.  And that's not what
15  I thought my question was.
16       A.  Okay.
17       Q.  So, but I may have done a bad job of wording
18  it.
19          Really what I'm asking is, to the degree
20  there's conflict between federal law and state law,
21  which one controls, if one does?
22          MR. FREDERICK:  Objection, asks for legal
23  opinion.
24       A.  I don't think I can answer that question.
25       Q.  (By Mr. Dunn)  Well, as you helped Senator

---

### 279

1       Fraser prepare legislation, do you have to consider how
2       that legislation will interact with federal law?
3            A.  In some cases, yes.
4            Q.  And do you think the state is authorized to
5       pass statutes that conflict with the federal law?
6               MR. FREDERICK:  Objection, relevance.
7       Objection, legislative privilege, to the extent it seeks
8       her opinion with respect to specific legislation.  To
9  the extent it just asks for your opinion, you can answer
10  if you can.
11            A.  I don't think I have an opinion.
12            Q.  (By Mr. Dunn)  All right.  I'm going to switch
13  gears on you now and go to the ID requirements
14  themselves.  You were asked some questions about
15       nonphoto IDs?
16            A.  Yes, sir.
17            Q.  And as I understand your testimony, without
18       going through it all, but under current state law, a
19       voter can arrive at the polling location without a photo
20       ID and rely on some nonphoto IDs; is that right?
21            A.  That's my understanding, yes.
22            Q.  And some of those things are like utility
23       bills, for example?
24            A.  Yes.
25            Q.  Do you have an opinion as to whether or not a

---

### 280

1       nonphoto ID is as effective as a photo ID in
2       discouraging voter fraud?
3               MR. FREDERICK:  Just caution to the extent
4       it asks for your opinion as you sit here today, based on
5       nonprivileged matters, you can answer if you have an
6       opinion.
7            A.  My opinion is the photo ID is a better
8       mechanism to prevent fraud.
9            Q.  (By Mr. Dunn)  Now, do you believe that photo
10       identification can be sort of manufactured?
11               MR. FREDERICK:  Objection, vague.  I'll
12       caution you to the extent you can answer based on
13       personal opinion, not based on privileged information,
14       you may answer if you have an opinion.
15            Q.  (By Mr. Dunn)  Have you ever heard of a fake
16       ID?
17            A.  When I was in college, yes, sir.
18            Q.  All right.  People made fake driver's license?
19            A.  A lot of people had fake driver's licenses,
20       yes, sir.
21            Q.  And they would use them to go into bars and
22       convince the bartender they were 21 and get an alcoholic
23       beverage; is that right?
24            A.  Yes, sir.  Back when we are younger, yes, sir.
25            Q.  You don't think people fake IDs any longer?

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

JANICE MCCOY                                                    MAY 16, 2012

---

### 281

```
1    A.  I think it's a lot harder to fake IDs these
2    days.
3    Q.  What do you think makes it harder about faking
4    IDs today?
5    A.  I think that the provisions of real ID -- the
6    federal provisions of real IDs that Texas has enacted to
7    make driver's licenses harder to fake make it harder.
8    Q.  Like, for example, a driver's license now have
9    like a black light insignia; is that right?
10   A.  Yes, sir.
11   Q.  And there's other things that when you put the
12   ID in a certain type of viewing device, you can see
13   whether it's genuine; is that true?
14   A.  That's my understanding.  Yes, sir.
15   Q.  And you see these devices at the airport, you
16   know, occasionally at the bank; is that right?
17   A.  I haven't seen them at a bank but --
18   Q.  You've seen them at the airport?
19   A.  I don't know that I've seen them at an
20   airport.  I haven't flown in over three years.
21   Q.  With twins?
22   A.  Yes, sir.
23   Q.  All right.  Well, was there ever any discussion
24   about funding technology of polling locations that would
25   allow the staff to determine whether or not a particular
```

### 282

```
1    photo ID was genuine?
2         MR. FREDERICK:  Objection, legislative
3    privilege.  To the extent you can answer based on
4    discussions on the Floor or any public statements or
5    testimony, you may do so.
6    A.  I don't recall any public discussions about
7    that --
8    Q.  (By Mr. Dunn)  Was there any --
9    A.  -- issue.
10   Q.  Do you recall any private discussions without
11   giving me the details?
12        MR. FREDERICK:  Objection, legislative
13   privilege.  Instruct you not to answer that.
14        MR. DUNN:  She doesn't even have to admit
15   whether the discussion happened.
16        MR. FREDERICK:  I think with the lead up,
17   I believe that the question implies the substance of a
18   conversation.  I'm not trying to prevent you from asking
19   if a conversation ever took place, generally, but I
20   think the subject matter was drawn too specifically to
21   lead up.
22   Q.  (By Mr. Dunn)  Are you aware of any
23   conversations in the consideration of Senate Bill 14
24   relating to technology at the polling location to
25   determine the genuineness of a photo ID?
```

### 283

```
1    A.  No.
2    Q.  Do you know why not?
3    A.  Why people didn't have discussions about that
4    issue?  No, sir.
5    Q.  Now, would you agree that nonphoto ID, if you
6    required a number of them, might be accurate to confirm
7    the identity of a voter?
8         MR. FREDERICK:  Objection, calls for
9    speculation.  Objection, vague.  But you may answer.
10   A.  Nonphoto ID, a number of nonphoto ID could
11   confirm the identity of someone, yes.
12   Q.  (By Mr. Dunn)  Do you know why that wasn't
13   included in the bill?
14        MR. FREDERICK:  Objection, legislative
15   privilege.  Instruct you not to answer.
16   A.  I'll assert privilege.
17   Q.  (By Mr. Dunn)  Did you have any senators come
18   to you and tell you or in your presence that they were
19   voting against this bill but they really supported it?
20        MR. FREDERICK:  Objection, legislative
21   privilege.  To the extent that calls for communication
22   between a senator and you, that would be privileged, and
23   I instruct you not to reveal it.
24   A.  I'll assert.
25   Q.  (By Mr. Dunn)  When was the last time you
```

### 284

```
1    renewed your driver's license?  Ballpark.  You don't
2    need to look it up.
3    A.  I don't know.
4    Q.  Oh, okay.  Has it been a while?
5    A.  It's been -- yeah.  I think I'm due next year.
6    Q.  All right.
7    A.  So five or six years.
8    Q.  Do you use the private DPS office here
9    available to Capitol staff members?
10   A.  I think I do it online.
11   Q.  Okay.  Each time you do it, you do it online?
12   A.  The last time I renewed online.  I think I
13   renewed when I got married in 2006, or I went in 2006,
14   because I had to actually show my marriage -- my new
15   Social Security card.  And since then, I've done it
16   online if I had to do it.  I guess, probably, I haven't
17   had to do it since 2006.
18   Q.  Are you aware of there being a DPS office
19   available for Capitol employees and state employees?
20   A.  If you're speaking of the office at 15th and
21   Congress, I thought that was open to the public.
22   Q.  All right.  Are you aware of an office that is
23   open to the public but is not advertised to the public
24   for DPS driver's license?
25   A.  I didn't know that it wasn't advertised.
```



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                                MAY 16, 2012

---

### 285

1    Q.  Did you ever go to a DPS office for a driver's

2  license in the Clement's building?

3    A.  No.

4    Q.  So if there's an office that is available to

5  the public but isn't otherwise made known to the public

6  for obtaining a driver's license, you wouldn't know

7  about it?

8    A.  That's correct.

9    (Recess from 6:20 to 6:23 p.m.)

10    MR. DUNN:  I'm going to say the thing

11  today that you're going be the most happy to hear:

12  There are no more questions for you.

13    THE WITNESS:  Woo-hoo.

14    MR. DUNN:  However -- there's my however

15  -- however, we join in the United States' position we're

16  leaving the deposition open, after the court rules on

17  some issues, and we may have to ask you more questions

18  later on.

19    THE WITNESS:  Yes, sir.

20    MR. DUNN:  Thank you for your time.

21    (Deposition concludes at 6:24 p.m.)

22

23

24

25

---

### 287

1  THE STATE OF _____)

2  COUNTY OF_____)

3

4    Before me,_____, on this day

5  personally appeared JANICE McCOY, known to me (or proved

6  to me under oath or through_____

7  (description of identity card or other document) to be

8  the person whose name is subscribed to the foregoing

9  instrument and acknowledged to me that they executed the

10  same for the purposes and consideration therein

11  expressed.

12    Given under my hand and seal of office

13  this_____day of _____, 2012.

14

15

16    _____

    NOTARY PUBLIC IN AND FOR

17    THE STATE OF _____

18

19

20

21

22

23

24

25

---

### 286

1  CHANGES AND SIGNATURE

2    RE: TEXAS VS. HOLDER, ET AL

3  PAGE  LINE  CHANGE      REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20    I, JANICE McCOY, have read the foregoing deposition

21  and hereby affix my signature that same is true and

22  correct, except as noted above.

23

24    _____

25    JANICE McCOY

---

### 288

1    IN THE UNITED STATES DISTRICT COURT

    FOR THE DISTRICT OF COLUMBIA

2

3  STATE OF TEXAS,    )

    )

4    Plaintiff,    )

    )

5  VS.    )

    )

6  ERIC H. HOLDER, JR. in his  )

    official capacity as Attorney )

7    General of the United States, )

    )

8    Defendant,    )

    )

9  ERIC KENNIE, et al,    )

    )

10    Defendant-Intervenors,  )

    )

11  TEXAS STATE CONFERENCE OF   ) CASE NO. 1:12-CV-00128

    NAACP BRANCHES,    ) (RMC-DST-RLW)

    ) Three-Judge Court

12    Defendant-Intervenors,  )

    )

13  TEXAS LEAGUE OF YOUNG VOTERS )

    EDUCATION FUND, et al,    )

14    )

    Defendant-Intervenors,    )

15    )

    TEXAS LEGISLATIVE BLACK    )

16    CAUCUS, et al,    )

    )

17    Defendant-Intervenors,    )

    )

18  VICTORIA RODRIGUEZ, et al.,  )

    )

19    Defendant-Intervenors.  )

20    REPORTER'S CERTIFICATION

    DEPOSITION OF JANICE McCOY

21    MAY 16, 2012

    I, Chris Carpenter, Certified Shorthand Reporter in

22  and for the State of Texas, hereby certify to the

23  following:

24    That the witness, JANICE McCOY, was duly sworn by

25

---



Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com

JANICE MCCOY                                          MAY 16, 2012

289

1   the officer and that the transcript of the oral
2   deposition is a true record of the testimony given by
3   the witness;
4       That the deposition transcript was submitted on the
5   _____day of _____, 2012, to the witness or to the
6   attorney for the witness for examination, signature and
7   return to_____, by
8   _____, 2012; and if returned, the original
9   transcript will forwarded to Jennifer Maranzano, the
10  custodial attorney;
11      That the amount of time used by each party at the
12  deposition is as follows:
13      Ms. Maranzano: 5 hours, 28 minutes
14      Mr. Rosenberg:  1 hour, 6 minutes
15      I further certify that I am neither counsel for,
16  related to, nor employed by any of the parties or
17  attorneys in the action in which this proceeding was
18  taken, and further that I am not financially or
19  otherwise interested in the outcome of the action.
20      Certified to by me this 18th day of May, 2012.
21
22
        Chris Carpenter, Texas CSR 1151
23      Expiration Date:  12/31/2012
        100 Congress Avenue, Suite 2000
24      Austin, TX  78701
        (512)328-5557
25      Firm Registration No. 283



ESQUIRE
DEPOSITION SOLUTIONS

Toll Free: 800.211.DEPO
Facsimile: 512.328.8139

Suite 220
3101 Bee Caves Road
Austin, TX 78746
www.esquiresolutions.com